QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar. No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc. and
Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, and Mattel de Mexico, S.A. de C.V., <br><br> Plaintiff, <br><br> vs. <br><br> MGA ENTERTAINMENT, INC., a California corporation, et al., <br><br> Defendant. <br><br> AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx) <br> Consolidated with <br> Case No. CV 04-09059 <br> Case No. CV 05-02727 <br><br> Hon. David O. Carter <br><br> **MATTEL'S SUBMISSION OF DEPOSITION TESTIMONY OF ISAAC LARIAN WAIVING PRIVILEGE AS TO COMMUNICATIONS WITH SKADDEN LAW FIRM REGARDING EXHIBIT 7055** |

On February 9, 2011, Isaac Larian testified before the jury concerning his communications with three lawyers from the Skadden law firm (which represented Mr. Larian at the time), about the withholding of the full email string reflected in Trial Exhibit 7055.  MGA's objections to this testimony on the ground that it was privileged were overruled.  See Trial Tr., dated Feb. 9, 2011, Vol. 1, at 106:25-132:12; id., Vol. 2, at 7:9-10:19.

The Court later reconsidered and on February 11, 2011, indicated it was considering giving an instruction to the jury *sua sponte* that this testimony should be disregarded.  As Mattel stated when the Court raised this possibility, such an instruction would be improper because Mr. Larian expressly waived the privilege as to this testimony at his April 12, 2010 deposition and fully testified as to all the same facts he testified to before the jury.  Copies of the relevant deposition pages in which this testimony appears are attached.  (Larian Depo. Tr., dated April 12, 2010, at 2371:22-2390:23).

Mattel calls the Court's attention in particular to the statements of Ms. Hurst, counsel for Mr. Larian, at the beginning of this passage in which she acknowledges that the privilege is waived as to information disclosed by Mr. Larian in response to Mattel's questions and seeks only an agreement that this is not a waiver as to other matters not testified to.  See attachment (Larian Depo. Tr., dated April 12, 2010, at 2372:25-2373:4 (stating that Mr. Larian's testimony "is not going to be a waiver of anything *other than whatever this answer may be*."); id. at 2373:20-22 (Ms. Hurst: "Again, we're agreeing that that's not a waiver as to anything, other than -- if this answer is a potential disclosure.").

DATED:  February 16, 2011         QUINN EMANUEL URQUHART & SULLIVAN. LLP


                                  By /s/ John B. Quinn
                                     John B. Quinn
                                     Attorneys for Mattel, Inc., and
                                     Mattel de Mexico. S.A. de C.V.

# **ATTACHMENT**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| MATTEL, INC., A DELAWARE CORPORATION, | ) ) ) | |
| PLAINTIFF, | ) ) ) | CASE NO. CV 04-9049 DOC (RNBX) |
| V. | ) ) | CONSOLIDATED WITH CASE NO. 04-9059 |
| MGA ENTERTAINMENT, INC. , | ) ) | AND CASE NO. 05-2727 |
| DEFENDANT. | ) ) ) | |
| AND CONSOLIDATED ACTION(S) | ) ) | |

# CONFIDENTIAL - ATTORNEYS' EYES ONLY

# DEPOSITION OF ISAAC LARIAN

# VOLUME VIII

# APRIL 12, 2010



COURT REPORTERS

REPORTED BY:
PAULA A. PYBURN
CSR. NO. 7304
JOB NO. 10AE280-PP

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

1       MR. ZELLER:  You know, this obstruction and

2   interruption of my sequence -- I mean, it's being

3   done deliberately to disrupt the flow of the

4   examination.  I really think this is a problem.

5       MS. HURST:  I said "while Mr. Zeller is                    19:41:31

6   continuing with his examination" so that there would

7   be no disruption.

8       THE DISCOVERY MASTER:  Mr. Zeller, why

9   don't you continue with your examination.

10  BY MR. ZELLER:                                                19:41:44

11      Q.   Directing your attention to Exhibit 7055.

12      A.   Yes.

13      Q.   Now, you understand that this document,

14  Exhibit 7055, was not produced in this case until

15  August of 2009; correct?                                      19:42:02

16      A.   I don't know when it was produced, but I

17  know that I don't think -- if I learn --

18          From what I learn from my lawyers, can I

19  testify to that?

20      MS. HURST:  No.                                           19:42:14

21      THE WITNESS:  Okay.

22      I can't.

23      I need to take a break.

24      THE VIDEO TECHNICIAN:  Going off the record

25  at 7:42 p.m.                                                  19:42:20

2370

1          (A recess was taken from 7:42 to 7:47.)

2          THE VIDEO TECHNICIAN:  Going back on the

3     record at 7:47 p.m.

4          MR. ZELLER:  There was a pending question

5     that was not answered.  If we can read it back.          19:48:04

6          MS. HURST:  I don't think that's right,

7     actually.  So if there was an answer, would you read

8     it too.

9     BY MR. ZELLER:

10         Q.   Well, then, let me ask:  Was your answer to          19:48:12

11    my last question complete?

12         A.   I don't recall your last question.

13         Q.   Directing your attention to Exhibit 7055.

14         A.   Yes.

15         Q.   Did you discuss this email exchange with          19:48:26

16    anyone at MGA around the time when the emails were

17    sent in October of 2002?

18         A.   I don't recall.

19         Q.   Have you discussed it, this email exchange,

20    with anyone at MGA at any time?          19:48:41

21         A.   I don't recall.

22         Q.   Do you recall discussing Exhibit 7055 with

23    anyone outside of MGA back in this October 2002 time

24    period?

25         A.   Not that I recall.          19:48:53

2371

1      Q.   At any time?

2      A.   I don't recall.  Beside my lawyers?  Are

3   you -- are you excluding lawyers?

4      Q.   I'm not excluding anybody.

5           MS. HURST:  You can answer as to the fact          19:49:05

6   of a discussion regarding lawyers.

7           THE WITNESS:  Yes.

8   BY MR. ZELLER:

9      Q.   Have you discussed it with anyone other

10  than lawyers?                                               19:49:13

11     A.   Not that I recall.

12     Q.   What part of Exhibit 7055 reminded you --

13          (Telephonic interruption.)

14  BY MR. ZELLER:

15     Q.   -- of legal advice?                                19:49:29

16     A.   What part of it?  I cannot disclose it

17  without disclosing attorney-client privilege.

18     Q.   So it's your testimony that -- that there

19  are some aspects or some parts of Exhibit 7055 that

20  reminded you of legal advice?                              19:49:44

21     A.   I don't understand your question.

22     Q.   Please point out to us the portions of

23  Exhibit 7055 that reminded you of legal advice.

24     A.   I --

25          MS. HURST:  Well, can you agree that the --        19:49:59

                                                        2372

1    answering that question is not going to disclose an

2    attorney-client communication?  In other words, the

3    fact is not going to be a waiver of anything other

4    than whatever this answer may be.

5         MR. ZELLER:  Correct.  I do.                    19:50:14

6         THE WITNESS:  When Carter Bryant started

7    working for MGA.

8    BY MR. ZELLER:

9         Q.   And what part of it are you referring to?

10        A.   What do you mean, "What part?"  Did --      19:50:23

11   the --

12        Q.   What part of Exhibit 7055, specifically,

13   are you referring to?

14        A.   The dates, October and September.

15        Q.   Anything else?                              19:50:36

16        A.   No.

17        Q.   And I take it at some point you believe

18   that that language in Exhibit 7055 reflected legal

19   advice?

20        MS. HURST:  Again, we're agreeing that           19:50:52

21   that's not a waiver as to anything, other than -- if

22   this answer is a potential disclosure.

23        MR. ZELLER:  Right.

24        THE WITNESS:  I cannot answer that question

25   without disclosing attorney-client privilege.        19:51:03

                                                      2373

```
1          MS. HURST:  Can I hear the question again.

2          (The record was read by the court

3          reporter as follows:

4          "Q.  And I take it at some point you

5          believe that that language in                    19:51:07

6          Exhibit 7055 reflected legal

7          advice?")

8          MS. HURST:  Can I confer with the witness?

9          MR. ZELLER:  Sure.

10         THE VIDEO TECHNICIAN:  Off -- going off the   19:51:31

11   record at 7:51 p.m.

12         (A discussion was held between the

13         witness and his attorney outside of

14         the room.)

15         THE VIDEO TECHNICIAN:  Going back on the      19:53:53

16   record at 7:53 p.m.

17         MR. ZELLER:  I think you'll want to hear

18   the question back.

19         MS. HURST:  Yeah.

20         Can we hear the question again, please.       19:54:07

21         (The record was read by the court

22         reporter as follows:

23         "Q.  And I take it at some point you

24         believe that that language in

25         Exhibit 7055 reflected legal                   19:54:07
```

                                                    2374

```
 1          advice?")
 2          MS. HURST:  And by "that language," you
 3   mean the email from Ms. O'Connor?
 4          MR. ZELLER:  Well, the portion he was
 5   talking about relating to September and October in       19:54:28
 6   his prior answer.
 7          THE WITNESS:  Yes, I believe that to be
 8   based on legal advice.
 9   BY MR. ZELLER:
10      Q.   And without going into the legal advice at       19:54:39
11   this point --
12      A.   Uh-huh.
13      Q.   -- when was that legal advice received,
14   that you're referring to?
15      A.   I don't remember the date.  Probably about       19:54:47
16   this time here.  I don't remember the exact date.
17      Q.   Is it your recollection it was at some
18   point in 2002, as opposed to 2000 or 2001?
19      A.   Definitely I don't think it was in 2000.
20   It's either 2001 or 2002.                                19:55:04
21      Q.   And -- and who was the attorney who gave
22   that -- that legal advice that we've been
23   discussing?
24      A.   Oh, God.  I don't remember.  I have a vague
25   recollection.  I don't want to just testify without      19:55:18

                                              2375
```

1    exact saying who it was.

2        Q.   Do you remember if it was an outside

3    lawyer, as opposed to an in-house lawyer?

4        A.   Outside lawyer.

5        Q.   And do you remember if it was litigation          19:55:29

6    counsel for -- for MGA that was handling a

7    particular lawsuit, as opposed to transactional

8    lawyers, for example?

9        A.   Probably one of them was a litigation law

10   firm.                                                       19:55:41

11       Q.   Do you recall the firm?

12       A.   I think either Ray Black or William Fan.

13       Q.   And Mr. Black, as we discussed earlier, was

14   the -- an attorney -- an outside attorney for MGA in

15   the UK?                                                     19:55:57

16       A.   Yes.  With -- he -- well, he -- he works

17   with a law firm.  I forgot his law firm's name.

18   SJ -- SJ -- SJ something.  Berwin.

19       Q.   And by the way, does Mr. Black still do

20   work for MGA?                                               19:56:11

21       A.   I don't know if that's the case or not.  I

22   think he does.

23       Q.   Can you remember the last time you remember

24   having any dealings with Mr. Black?

25       A.   Personally, I don't.  Our law department          19:56:18

                                                         2376

1   handles all the matters.

2     Q.   And then the Mr. Fan you referred to is an

3   outside lawyer, or was an outside lawyer for MGA in

4   Hong Kong?

5     A.   I think he's still an outside lawyer for    19:56:31

6   MGA in Hong Kong.

7     Q.   Other than those -- those firms, is there

8   anyone else who you have any recollection, no matter

9   how vague, who was providing that legal advice

10   that -- that we're -- that you're referring to?    19:56:47

11     A.   Those are the ones that come to my mind.

12     Q.   Is it the case that MGA never received

13   legal advice that it should say that Bratz was born

14   or created after Bryant left Mattel?

15     MS. HURST:  I'm going to instruct the    19:57:06

16   witness not to answer that on the grounds of

17   attorney-client communication.

18     THE WITNESS:  And I don't understand the

19   question.

20   BY MR. ZELLER:    19:57:14

21     Q.   Well, let me rephrase it, then, just so we

22   have a clear record.  Your counsel will probably

23   instruct on it, in any event.

24     But did MGA ever receive legal advice that

25   MGA should say that Bratz was born after Bryant left    19:57:23

2377

1    Mattel?

2          MS. HURST:  I'm going to instruct the

3    witness not to answer that on the grounds of

4    attorney-client communication.

5    BY MR. ZELLER:                                    19:57:33

6       Q.    Was the legal advice MGA received at any

7    time to conceal the date of the creation of Bratz?

8          MS. HURST:  Same -- same instruction.

9    BY MR. ZELLER:

10      Q.    Did MGA ever receive advice that if Bryant   19:57:47

11   created Bratz while he was still employed by Mattel,

12   that Mattel might own Bratz?

13         MS. HURST:  Same instruction.

14   BY MR. ZELLER:

15      Q.    Or whatever else he had created?           19:58:00

16         MS. HURST:  Same instruction.

17         You -- you mean legal advice --

18         MR. ZELLER:  Correct.

19         MS. HURST:  -- right?

20         MR. ZELLER:  Right.                           19:58:06

21         MS. HURST:  I'll -- I'll instruct the

22   witness not to answer that.

23         MR. ZELLER:  And just for the record, while

24   normally I would ask for a ruling on this,

25   Mr. O'Brien, this is bound up in pending issues      19:58:20

                                                 2378

```
 1    already before the Court.

 2            THE DISCOVERY MASTER:  I understand.

 3            MR. ZELLER:  Thank you.

 4       Q.   Have you ever discussed -- well, let me

 5    strike that.                                          19:58:32

 6            Focusing on Exhibit 7055, which is the

 7    email exchange.

 8       A.   Uh-huh.

 9       Q.   Have you ever discussed with anyone at any

10    time, January of 2008 or prior, about whether this    19:58:45

11    document should be withheld from Mattel?

12       A.   From -- give me a time frame again.

13       Q.   Sure.

14            Focusing on the time period January 2008 or

15    before --                                             19:58:59

16       A.   Uh-huh.

17       Q.   -- did you ever have any discussions or

18    communications with anyone about withholding this

19    exhibit, this document here, Exhibit 7055, from

20    Mattel in this case?                                  19:59:09

21       A.   No.

22            MS. HURST:  Exclude from your answer any

23    communications that you had with attorneys in this

24    litigation.

25            THE WITNESS:  And I didn't.                   19:59:16
```

                                                    2379

```
 1    BY MR. ZELLER:

 2         Q.    Do you have any knowledge or information as

 3    to who made the decision not to produce to Mattel

 4    Exhibit 7055 prior to the Phase 1 trial?

 5         A.    My -- my recollection is --                    19:59:33

 6              MS. HURST:  Let me just --

 7              THE WITNESS:  -- from lawyers.

 8              MS. HURST:  Yeah.  Can you agree that this

 9    is not a waiver of anything?

10              MR. ZELLER:  I do.                              19:59:42

11              MS. HURST:  Okay.  Great.

12              You can answer.

13              THE WITNESS:  I think the law firm of

14    Skadden, Arps made that decision.

15    BY MR. ZELLER:                                            19:59:48

16         Q.    And do you know who in particular?

17         A.    I --

18              MS. HURST:  Again, you agree that's not a

19    waiver of anything?

20              MR. ZELLER:  I do.                              19:59:53

21              MS. HURST:  Okay.

22              THE WITNESS:  I will be guessing.  A series

23    of people.

24    BY MR. ZELLER:

25         Q.    You're not sure?                              19:59:59
```

                                                                2380

1    A.   I think at the end it was Tom Nolan's

2    responsibility, but I'm not sure who the people were

3    who made that decision.

4    Q.   Well, I guess part of what I'm trying to

5    understand is, is that -- that's your understanding;          20:00:16

6    is that -- is that correct?

7    A.   What's my understanding?

8    Q.   Your understanding is, is that Mr. Nolan

9    was involved in that decision at some level?

10   A.   And other people in Skadden.                             20:00:26

11   Q.   Right.  And so, then, my next question is,

12   is do you have any -- any idea or information as to

13   who the others were?

14        MS. HURST:  Including what he may have read

15   in the in camera submissions, and that sort of                20:00:37

16   thing, or --

17        MR. ZELLER:  Well, right now he can just

18   tell me "yes" or "no," and I think -- because I,

19   frankly, think I know what the answer is, and maybe

20   it just ends it.  But --                                      20:00:45

21        MS. HURST:  All right.  Well --

22        THE WITNESS:  I know from what I have read

23   in the papers.  Is that what you want to testify to?

24   BY MR. ZELLER:

25   Q.   Well, I'm not asking you to testify about            20:00:53

                                                        2381

1      anything, other than just trying to find out if you

2      have knowledge about something, from whatever

3      source.

4           A.   My knowledge is from the documents and

5      talking to the lawyers.                                    20:01:02

6           Q.   And do you have any other source of

7      information about that?

8           A.   No.

9           Q.   Can you name any of those other people by

10     name?                                                      20:01:11

11          A.   I can see his face, and he was in court,

12     with the white hair.  You probably remember him.

13     His name just -- name escapes me.

14          Q.   Was he at the trial?

15          A.   With a "K."                                      20:01:25

16          Q.   Mr. Kennedy?

17          A.   No.  No, no, no.  He was like a copyright

18     lawyer, et cetera.  Oh, God.

19               MS. HURST:  Do you want me to help?

20               MR. ZELLER:  Yeah.                               20:01:34

21               MS. HURST:  Ken Plevan?

22               THE WITNESS:  Yes.

23     BY MR. ZELLER:

24          Q.   Anyone else who you can remember by name?

25          A.   Those are the two I remember.                   20:01:42

                                                           2382

A & E COURT REPORTERS   (213)955-0070   FAX: (213)955-0077

```
 1        And then, yeah, there was another guy.

 2   Unfortunately -- and I apologize, I hope he doesn't

 3   read it, but short guy who sometimes stutters.  I

 4   forgot his name.

 5        Do you know?                                    20:01:53

 6        MS. HURST:  Do you -- do you want me to

 7   answer him?

 8        MR. ZELLER:  Yeah.

 9        MS. HURST:  Do you mean Rob Herrington?

10        THE WITNESS:  No, no.                           20:01:59

11        MS. HURST:  Okay.

12        THE WITNESS:  No.

13        MS. HURST:  Then I don't -- then I can't

14   help.

15   BY MR. ZELLER:                                       20:02:02

16     Q.  Marcus?  Marcus Mumford?

17     A.  Yes, Marcus.

18     Q.  Anyone else you can think of by name?

19     A.  No, those are the ones.  And I hope he

20   doesn't take this as an insult.                      20:02:16

21     Q.  And so is it the case that you are not

22   aware that Exhibit 7055, which is that email

23   exchange, had been withheld from Mattel on

24   attorney-client privilege grounds until after the

25   Phase 1 trial?                                       20:02:36

                                                    2383
```

1          A.    That's correct.

2          Q.    And do you recall -- if I told you that

3     this document, Exhibit 7055, was produced in August

4     of 2009 --

5          A.    Yeah.                                              20:02:47

6          Q.    -- would that help you give a time frame as

7     to when you first learned that?

8                MS. HURST:  We'll stipulate to that.

9                THE WITNESS:  I think if it was -- I

10    learned from the lawyers that they produced it at      20:02:55

11    one time.  I don't know exactly a date.  I think

12    when they became involved.  "They," I'm talking

13    about Orrick.

14    BY MR. ZELLER:

15         Q.    Right.  And part of what I'm trying to find   20:03:04

16    out is, is that you said that you had not known

17    yourself that Exhibit 7055 had been withheld on

18    privilege grounds until after the trial.

19                And so --

20         A.    Uh-huh.                                        20:03:16

21         Q.    -- sort of can you put a time period on it

22    as to when you first learned that?  I'll represent

23    to you that trial ended, the first phase, in August

24    of 2008, and then this document, Exhibit 7055, was

25    produced in August 2009, about a year later.           20:03:32

                                                        2384

A & E COURT REPORTERS   (213)955-0070   FAX: (213)955-0077

1     A.    Right.

2     Q.    So can you narrow that time down at all?

3     A.    August 2009.  I think that should be...

4           THE REPORTER:  I think what?

5           THE WITNESS:  I think when -- when they                20:03:43

6     produced it, just about that time, in August.

7     BY MR. ZELLER:

8     Q.    So is it your testimony that Skadden, Arps

9     was solely the one that made the decision to

10    withhold this document that has been marked as            20:03:56

11    Exhibit 7055 on attorney-client privilege grounds?

12    A.    I believe that's -- that's true.

13    Q.    Do you know of anyone else who was involved

14    in that decision?

15    A.    No.                                                   20:04:09

16    Q.    And -- and you weren't involved in that

17    decision; is that --

18    A.    I was not.

19    Q.    And you're not aware of anyone else at MGA

20    who was -- who was involved in that decision; is          20:04:19

21    that correct?

22    A.    I'm not.  I'm not aware of anyone.

23    Q.    Do you have any knowledge or information as

24    to -- and this is just "yes" or "no" -- as to the

25    basis on which Exhibit 7055 was withheld on               20:04:34

                                                        2385

1   privilege grounds?

2       A.   I don't understand the question.  Do I know

3   why they kept it?  It's based on legal advice.

4       Q.   Well, I guess I'm asking something a little

5   bit more specific.  So let me -- let me try this.          20:04:50

6            You first became aware that Exhibit 7055

7   was being withheld on privilege grounds up until

8   about the -- well, you first became aware about the

9   August 2009 period, you mentioned.

10      A.   Yes.                                               20:05:07

11      Q.   So is it true that prior to that time you

12  didn't have any knowledge or information about the

13  reasons why Exhibit 7055 had been withheld?

14      A.   No --

15           MS. HURST:  Well, I'm not sure he can            20:05:17

16  answer that without disclosing attorney-client

17  communications.

18           THE WITNESS:  That's what I was going to

19  say.

20           MS. HURST:  Yes.  I'm going to instruct him     20:05:24

21  not to answer that.

22  BY MR. ZELLER:

23      Q.   Let me try it a slightly different way.

24           Excluding any communications that you had

25  about Exhibit 755 --                                       20:05:33

                                                      2386

```
 1        A.    Uh-huh.
 2              THE REPORTER:  7055?
 3              MR. ZELLER:  I'm sorry?
 4              THE WITNESS:  7055.
 5              MR. ZELLER:  Right, 7055.          20:05:40
 6        Q.    So is it true that you had no
 7   communications with anyone in 2008 regarding
 8   withholding Exhibit 7055 for any reason?
 9        A.    Yes, I never told anybody to withhold this
10   document.                                     20:05:57
11        Q.    And that was true in 2007 as well?
12        A.    That's correct.
13        Q.    And that was true in 2006?
14        A.    Forever it was true.  It is true.
15        Q.    Did you at any time discuss Exhibit 7055  20:06:08
16   with anyone at Skadden, specifically prior to the
17   start of the Phase 1 trial?
18        A.    Not that I recall.  It's possible, yes.  I
19   think I did discuss it with them.
20        Q.    And so the record's clear, this is the one  20:06:28
21   that has the whole -- the two additional emails?
22        A.    Right.
23        Q.    And what was that time period when you had
24   those communications?
25        A.    I think -- what was the time period?      20:06:38
```

2387

A & E COURT REPORTERS   (213)955-0070   FAX: (213)955-0077

| | |
|---|---|
| 1 | Definitely was before trial.  It was in my office, I |
| 2 | remember. |
| 3 | What did you say his name was?  Ken -- |
| 4 | MR. ZELLER:  Plevan. |
| 5 | MS. HURST:  Plevan. |
| 6 | THE WITNESS:  Plev- -- |
| 7 | MS. HURST:  Plevan. |
| 8 | THE WITNESS:  -- Plevan and Marcus and Tom |
| 9 | Nolan were there, and we discussed it.  They were |
| 10 | asking me questions. |
| 11 | MS. HURST:  Yeah.  Let's not disclose the |
| 12 | substance of the discussion.  The facts of it -- |
| 13 | THE WITNESS:  Okay. |
| 14 | MS. HURST:  -- who was present, the timing, |
| 15 | okay.  Not the substance. |
| 16 | BY MR. ZELLER: |
| 17 | Q.   And -- and so this was a face-to-face |
| 18 | meeting you had? |
| 19 | A.   Yes, in my office. |
| 20 | Q.   And do you remember if anyone else was |
| 21 | present other than who you mentioned? |
| 22 | A.   Those are the three I remember.  There |
| 23 | could have been another attorney, but those are the |
| 24 | three that I clearly remember. |
| 25 | Q.   Do you remember if the other attorney who |

20:06:50

20:06:58

20:07:06

20:07:16

20:07:23

2388

A & E COURT REPORTERS   (213)955-0070   FAX: (213)955-0077

1    you think might have been present was a Skadden

2    attorney, as opposed to someone in-house?

3       A.   No, they were all with Skadden.

4       Q.   So it might have been that there were four

5    Skadden people, as opposed to three, but that --          20:07:33

6    you're not entirely sure?

7       A.   I am not sure, yes.  I know that those

8    three for sure were there.

9       Q.   And is it -- so is it the case that you

10   were the only person there for MGA at this meeting?        20:07:43

11      A.   Yes, I believe I was.

12      Q.   And about how long did -- did this meeting

13   last?

14      A.   Oh, it was not only about this subject.

15   They were about the introduction, showing -- telling       20:07:56

16   us who the team is.  So I think --

17          MS. HURST:  No, you're getting into the

18   substance of the discussions again.

19          THE WITNESS:  Okay.

20          MS. HURST:  Okay?  So let's not --                  20:08:04

21          THE WITNESS:  How long was it?  I don't

22   know.  But more than an hour.

23          Do you know how much time we have left?

24          MS. HURST:  Yeah, I think we're -- we're

25   over.                                                      20:08:16

                                                          2389

1          THE WITNESS:  Can you find out?  I really

2     am having some pain.

3          MS. HURST:  Yeah.  It was 15 -- we had 15

4     minutes at the start left at 7:48.  So at 8:05 we

5     ran out of time.  It's 8:08 now, so I'll suggest                    20:08:30

6     that we adjourn.

7          THE DISCOVERY MASTER:  Do you have a final

8     question you want to ask, Mr. Zeller?

9          MR. ZELLER:  Just -- yeah, might as well.

10    I do have more questions, there's no question --                    20:08:42

11         THE DISCOVERY MASTER:  I understand.

12         MR. ZELLER:  -- but I'll pick one.

13         THE WITNESS:  He will never say no.

14    BY MR. ZELLER:

15    Q.   And during -- in this meeting that you                         20:08:54

16    were -- you were describing, was it a meeting that

17    you had requested or had Skadden requested it?

18    A.   I think they had requested it, to the best

19    of my recollection.

20         MS. HURST:  Okay.                                              20:09:08

21         THE WITNESS:  Thank you.

22         THE DISCOVERY MASTER:  Let's excuse

23    Mr. Larian.

24         I want to keep counsel here so that we can

25    come up with a briefing schedule.  To the extent                   20:09:15

2390

1    that Mr. Zeller wants to file a brief, I want to

2    make sure that the schedule that is agreed upon

3    that -- allows Ms. Hurst to get her -- her work done

4    early --

5          MS. HURST:  Yeah.  I --                         20:09:28

6          THE DISCOVERY MASTER:  -- not overly burden

7    her associates.

8          So why don't we go off the record now.

9    Whatever -- do you need to make your stipulations --

10         MS. HURST:  Yeah.  You're out of here.         20:09:36

11         THE DISCOVERY MASTER:  -- or anything about

12   the record, or do you have a standing --

13         MS. HURST:  We have a standing.

14         MR. ZELLER:  We have a standing.

15         THE DISCOVERY MASTER:  Okay.                   20:09:40

16         If I don't see you again, sir, have a good

17   day.

18         THE WITNESS:  Sure.

19         THE DISCOVERY MASTER:  Okay.  Take care.

20         Take care.                                      20:09:46

21         (Mr. Larian exits the proceedings.)

22         MS. HURST:  We can go off the video record.

23         Did you want this -- the rest --

24         THE DISCOVERY MASTER:  We can -- we can go

25   off the record for now.  Certainly, we're off the    20:09:56

                                                    2391

1                  Deposition Officer's Certificate

2    United States District Court      )

3                                      ) SS.

4    Central District of California    )

5         I, PAULA A. PYBURN, hereby certify:

6         I am a duly qualified certified shorthand

7    reporter in the state of California, holder of

8    Certificate Number CSR 7304 issued by the Court

9    Reporters Board of California and which is in full

10   force and effect. [FED. R. DIV. P. 28 (A)].

11        I am authorized to administer oaths or

12   affirmations pursuant to California Code of Civil

13   Procedure, Section 2093(B) and prior to being

14   examined, the deponent was first duly sworn by me.

15   [FED. R. CIV. P. 28(A), 30(F)(1)].

16        I am not a relative or employee or attorney or

17   counsel of any of the parties, nor am I a relative

18   or employee of such attorney or counsel, nor am I

19   financially interested in this action. [FED. R. CIV.

20   P. 28].

21        I am the deposition officer that

22   stenographically recorded the testimony in the

23   foregoing deposition and the foregoing transcript

24   that is a true record of the testimony given by the

25   deponent. [FED. R. CIV. P. 30(F)(1)].

                                                  2394

1        Before completion of the deposition, review of

2   the transcript [XX] was [  ] was not requested.  If

3   requested, any changes made by the deponent (and

4   provided to the reporter) during the period allowed

5   are appended hereto. [FED. R. CIV. P. 30(E)].

6

7

8   Dated:  _April 15, 2010_

9

10

11

12

13   _Paula A. Pyburn_

14   PAULA A. PYBURN
       C.S.R. No. 7304, R.P.R.
       Certified LiveNote Reporter

15

16

17

18

19

20

21

22

23

24

25

2395