Case 2:04-cv-09049-DOC-RNB   Document 9963   Filed 02/17/11   Page 1 of 33   Page ID #:301246
CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                        )
10             Defendants.              )
     _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17               Santa Ana, California

18            Tuesday, February 15, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-15 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
             By:   JOHN B. QUINN
5                  MICHAEL T. ZELLER
                   WILLIAM PRICE
6                  Attorneys at Law
             865 South Figueroa Street
7            10th Floor
             Los Angeles, California 90017-2543
8            (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:   THOMAS S. MC CONVILLE
12                 Attorney at Law
             4 Park Plaza
13           Suite 1600
             Irvine, California 92614
14           (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:   ANNETTE L. HURST
17                 Attorney at Law
             405 Howard Street
18           San Francisco, California 94105
             (415) 773-5700

19             – AND –

20             KELLER RACKAUCKAS, LLP
21           BY:   JENNIFER L. KELLER
                   Attorney at Law
22           18500 Von Karman Avenue
             Suite 560
23           Irvine, California 92612
             (949) 476-8700

24

25

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

16

17

18

19

20

21

22

23

24

25
```

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

4

**I N D E X**

**STATUS CONFERENCE**

1          SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 15, 2011

2                        VOLUME 2 OF 3

3                        (1:44 p.m.)

4          THE COURT:  Then we are on the record.

5          I want you to explain number 10, aiding and

6     abetting and duty of loyalty.

7          I want to start with the statute for a moment, and

8     it states as follows:  It's California Labor Code Section

9     2863, and it states, "An employee who has any business to

10    transact on his own account similar to that entrusted to him

11    by his employer shall always give the preference to the

12    business of the employer."

13         Why is it called "duty of loyalty"?

14         Ms. Hurst?

15         MS. HURST:  It's not a duty of loyalty.  It's a

16    misnomer that's being carried over from the fiduciary duty,

17    and that error is reflected in Mattel's proposed

18    instructions where they repeatedly call it a duty of

19    undivided loyalty.  That's a preference and --

20         THE COURT:  How should this be entitled?

21         MS. HURST:  I think it should just be entitled

22    "Labor Code Section 2863."

23         THE COURT:  All right.  Let me hear from Mattel,

24    to begin with, and then we'll hear from MGA.

25         Counsel, Mr. Zeller?

```
 1              MR. ZELLER:  The case law, in fact, refers to this
 2   as a duty of loyalty.  That is how it is described uniformly
 3   by the courts.  It will, in our view, be confusing and,
 4   frankly, esoteric to --
 5              THE COURT:  And what case will you cite for that?
 6              MR. ZELLER:  An example would be --
 7              THE COURT:  Not an example.  Give me your best
 8   case.
 9              MR. ZELLER:  Huong Que, Q-u-e, Inc. v. Luu, L-u-u,
10   150 Cal.App.4th, 400 at page 413, 2007.
11              THE COURT:  Okay.  Thank you.
12              Please continue.
13              MR. ZELLER:  That's -- there are other authorities
14   that use the same terminology, but to call it a matter of
15   preference, in fact, is misleading.  And it's misleading
16   because it doesn't -- it makes it sounds like it's
17   precatory, not that it is, in fact, an actual duty.  We
18   think it's properly described.  It's been described that way
19   throughout the case without any -- without any issue.
20              THE COURT:  And your argument concerning the
21   instructions and the disagreements you have with MGA?
22              MR. ZELLER:  On behalf of Mattel?
23              THE COURT:  On behalf of Mattel.
24              MR. ZELLER:  I don't -- I think that the main
25   issue that we were left with on the instructions as they
```

1    were proposed by MGA, and this is going to be true more than

2    just this particular instruction, but it's that it repeats

3    over and over the statute of limitations defense and has a

4    separate one for literally every single one of the defenses.

5            THE COURT:  And you think that that's prejudicial

6    because of the number of times it's repeated?

7            MR. ZELLER:  Right.  I think it places --

8            THE COURT:  If it was set forth one time in the

9    instructions, and it was a reference back to the specific

10   claims that it applies to, would that be satisfactory?

11           MR. ZELLER:  It would, your Honor.

12           THE COURT:  Is the present drafting of the statute

13   of limitations satisfactory other than the redundancy?

14           MR. ZELLER:  On that -- on that claim, yes.

15           THE COURT:  Okay.  And --

16           MR. ZELLER:  Well, let me caveat that.

17           There is a disagreement about whether or not the

18   conversion statute of limitations starts from -- from breach

19   as opposed to whether the discovery rule applies to it.

20   This has been briefed many times in this case, as the Court

21   is aware, so I won't belabor the point, but their

22   instruction does not reflect application of the discovery

23   rule.

24           What I would think is that at the end of the day,

25   we will have a single instruction on MGA's statute of

 1  limitations defense.  Tell the jury, of course, what it is,

 2  what the time periods are for each of the defenses it

 3  applies to, and we would have the -- of course, the argument

 4  and the substantive debate about whether or not it is

 5  subject to the discovery rule.

 6          Our view is all of these are subject to the

 7  discovery rule, but in any event, certainly fraudulent

 8  concealment would apply as well.

 9          THE COURT:  Okay.  Any other comments concerning

10  the instructions concerning Claim 10, which is what you've

11  referred to as breach of duty of loyalty, aiding and

12  abetting?

13          MR. ZELLER:  No, not on Claim 10, your Honor.

14          THE COURT:  On Claim 11, the conversion claim?

15          MR. ZELLER:  There, we, of course, had the same

16  statute of limitations issue.  Also as I was mentioning, you

17  know, whether or not the discovery rule applies, here, the

18  principal disagreement, and maybe I'll start with the

19  portion where I think the parties agree, which is, we did

20  come up with an agreed-upon damages instruction for

21  conversion, and so I think -- I think everyone agrees on

22  that.

23          The main area of disagreement on the conversion

24  claim, Claim 11, is whether or not the -- how substantial

25  factor causation should be described.  MGA's instruction

1    includes an essential factual element, Element Number 5,

2    which the first part of it does track the model

3    instructions, and I think the parties agree up until that

4    point, whereas one element is that the conduct was a

5    substantial factor in causing harm to Mattel.  The dispute

6    is over what does substantial factor mean.

7           The -- the -- I think the short argument on this,

8    from Mattel's perspective, is that the California Supreme

9    Court case of Rutherford makes very clear and says

10   explicitly that the applicable BAJI instructions, those

11   model instructions, accurately state the law of California,

12   and it's a tort case.

13          Furthermore, the Ninth Circuit in the Bank of

14   New York case makes very clear, too, that the substantial

15   factor test, and it cites Rutherford as well, among other

16   authorities from California, applies to California State

17   intentional tort claims.  Trade secret misappropriation,

18   conversion, these other claims that we are making fall in

19   that category.

20          So I mean, basically between Rutherford and Bank

21   of New York, it covers the whole array of the tort field,

22   and it makes very clear that those types of claims are

23   governed by substantial factor, causation.  Both of those

24   cases also provide the content to it.

25          Number one, as I mentioned, that BAJI is the

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

10

```
 1    appropriate governing standard and articulates the proper
 2    jury instruction for that, but number two, that, in fact, to
 3    try and equate it, as MGA does, and this is the nub of the
 4    dispute between the parties, but to reduce substantial
 5    factor causation to but-for causation is error, that is
 6    simply wrong.  And that is where the fight is, because what
 7    MGA relies upon is the CACI 430 bracketed language, this
 8    isn't even part of the model instruction, but rather
 9    bracketed language that they're trying to insert in there to
10    make an argument to the jury that substantial factor is
11    really the same thing as but-for causation, and that's just
12    mistaken.
13             THE COURT:  Now, I'll come back to you in just a
14    moment.  Let me hear from MGA.
15             Ms. Hurst?
16             MS. HURST:  Do you want me to start with
17    conversion or duty of loyalty, your Honor?
18             THE COURT:  Duty of loyalty.
19             MS. HURST:  With respect to duty of loyalty, your
20    Honor, we think the instructions need to do five things.
21    They need to set out the scope of the duty, including
22    anything that would be privileged conduct or excluded from
23    the duty --
24             THE COURT:  Okay.
25             MS. HURST:  -- such as the right to obtain new
```

 1   employment, preparations to compete, and we've offered

 2   specific instructions on those points.

 3           THE COURT:  All right.

 4           MS. HURST:  Then we think it needs to say, you

 5   know, breach -- say breach of the duty is an element.  We

 6   need the aiding and abetting element to be fairly defined,

 7   which means it needs to include the inverse relationship

 8   between knowledge and participation, and it needs to be

 9   clear that knowledge means knowledge of wrongdoing, and that

10   is that knowledge while assisting an act that is known to be

11   a violation of the duty.

12           Mattel's instructions don't do any of those

13   things.  In fact, their instruction on the duty of loyalty,

14   it reads in the past tense in a way that would make it

15   appear that an employee could violate this so-called duty

16   long after they were employed there, so it's not coterminous

17   with the employment, which, of course, it needs to be.

18           We think this instruction needs to limit -- be

19   limited clearly --

20           THE COURT:  I'm sorry.  Let me focus on that.

21           Did you just argue that while obviously the duty

22   of loyalty has to be coterminous with the prior employment,

23   we also recognize that oftentimes a breach of duty of

24   loyalty is not discovered until there is usually new

25   employment?

  1              MS. HURST:  I think the issue of discovery for

  2      statute of limitations is a different issue.  I'm just

  3      saying what can actually be the breach, and it's -- the way

  4      Mattel's instruction is worded, it's not clear that the act

  5      would have to be occurring during the employment, and that

  6      the employment relationship would have to be in effect in

  7      order for a breach to occur.  So I'm not talking about

  8      statute of limitations at all there.

  9              THE COURT:  This isn't a statute of limitations

 10      issue I raised.

 11              MS. HURST:  Okay.

 12              THE COURT:  It's an attempt to make certain that

 13      the jury isn't confused, that it would be recognized in the

 14      instructions, that obviously the breach has to be

 15      coterminous with employment, but usually breaches of duty of

 16      loyalty are discovered after the person has accepted new

 17      employment.

 18              MS. HURST:  That may be.  That may be.

 19              THE COURT:  And that's what you need to be clear

 20      in the instructions about.

 21              MS. HURST:  Additionally, we think that this

 22      instruction needs to be clearly limited only to those

 23      employees who are at issue on the duty of loyalty claim, as

 24      the Court has previously held, it's Bryant, the three

 25      seamstresses and Tumaliuan, because we don't want there to

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

13

```
 1    be confusion about whether the trade secret claims somehow
 2    bleed over into this.
 3              THE COURT:  So they should be specifically named?
 4              MS. HURST:  Yes.
 5              THE COURT:  Agreed.
 6              MS. HURST:  And then we think on damages, it needs
 7    to be clear that the measure of damages for this is lost
 8    services or something else that's tied to the failure to
 9    perform in accordance with the obligation under 2863, that
10    is the giving preference obligation, but that ownership of
11    Bratz or lost opportunity related to Bratz and the like is
12    not a remedy on this claim.
13              And we're very concerned about that point because
14    we do think the verdict in the first trial reflected
15    probably some confusion in that regard, because certainly
16    Mattel argued in closing argument that the harm for this
17    claim in particular, as well as the other tort claims, was
18    Bratz, was the conveyance of Bratz, if you will.
19              So those are the general principles that in order
20    for these instructions to be adequate, in MGA's view, have
21    to be followed.
22              We -- as I noted, I think Mattel's instruction
23    does not adequately meet these requirements in a number of
24    respects.  First, it improperly defines a duty as a duty of
25    undivided loyalty, that's a fiduciary duty.  If the Court
```

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

14

1   looks at the Huong Que case cited by Mr. Zeller, it will

2   find that that is a fiduciary duty case.  It's an

3   owner/officer case.  It is not a rank and file employee

4   case.  There is no rank and file employee cases.  None of

5   these cases have really examined what 2863 means in the

6   context of a rank and file employee, but Huong Que is a

7   fiduciary duty case.

8              Mattel's instructions do not define privileged or

9   excluded areas of activity, and here, your Honor, we

10  certainly have no problem with defining that once and then

11  indicating which claims they go to.  So, for example, I gave

12  the Court several instructions of excluded or privileged

13  area of activity over the weekend.  Those would also be

14  relevant to the intentional interference of contractural

15  relations claim.  We are not suggesting they have to be

16  repeated -- repeated every time.  They just have to be

17  defined once, and then it needs to be made clear in the main

18  body of the instruction pertaining to each claim that the

19  jury must consider the duty of loyalty with reference to

20  privileged areas of conduct, including preparations to

21  compete, the right to obtain new employment, the privilege

22  of competition and the like, to the extent those are held to

23  be applicable, as all of them should be here with respect to

24  the duty of loyalty claim.

25              Let me see if I have any other comments about duty

Case 2:04-cv-09049-DOC-RNB   Document 9963   Filed 02/17/11   Page 15 of 33   Page ID #:301260
CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

15

1    of loyalty before I move on to conversion.

2              I think that's it for duty of loyalty, your Honor.

3              THE COURT:  Okay.

4              MS. HURST:  With respect to conversion, first, we

5    don't think any conversion claim should be submitted to the

6    jury.  There is no basis in the record for a finding that

7    Mattel owns any tangible object that is at issue in this

8    case.

9              The inventions agreement concerns inventions.

10   Those are the intangible intellectual property interests,

11   the products of the mind and the like.  There is no basis

12   for concluding that drawings created by Bryant, the physical

13   objects, were ever conveyed by Mattel -- to Mattel by

14   Bryant.  And with respect to the sculpts created by Margaret

15   Leahy, MGA paid for those sculpts pursuant to a

16   work-for-hire agreement with Ms. Leahy.  There is no basis

17   for finding that Mattel ever had a right to possession of

18   those tangible objects.

19             So I'm not sure the degree to which in these

20   charging conferences we're supposed to be preserving our

21   claims that particular instructions are inapplicable, but I

22   did want to make that point clear.

23             Going to the instruction itself, we think that the

24   tangible property requirements should be repeated so that

25   there is no confusion with the intellectual property

CV 04-9049-DOC – 02/15/2011 – Vol. 2 of 3

16

```
 1    interests that are at issue.  And as Mr. Zeller has noted,
 2    there is a difference of opinion on the causation of harm
 3    issue.
 4            With respect to the causation element, we offered
 5    point 5 in the essential elements that the harm to Mattel
 6    would not have occurred in the absence of the conduct of
 7    MGA, MGA Hong Kong or Mr. Larian.
 8            Under Soule v. G.M. and Viner v. Sweet, both of
 9    which are cited in the comments to CACI 430, it's error not
10    to give the "but-for" bracketed sentence in CACI 430 where
11    there is a theory of the case that makes it applicable.
12    There are multiple theories of the case that make the
13    but-for causation instruction applicable here, and I'll
14    revert to duty of loyalty as well on this point.
15            In the conversion context, it is our contention,
16    of course, that Mr. Bryant made the decision to withhold his
17    drawings from Mattel long before he ever encountered MGA,
18    and therefore, MGA is not a but-for causation of conversion
19    or even his -- his obligation to disclose under the
20    intentional interference claim, because he had made that
21    decision independently of and apart from and long before MGA
22    ever came into contact with him, as evidenced by his
23    notarization with Ms. Prince, the sending of things to
24    Alaska Momma, and so forth.
25            On the duty of loyalty claim, similarly, that
```

1    Veronica Marlow, working with the seamstresses, could have

2    found them any number of objects of employment independent

3    of whether MGA engaged them to work on Bratz, that we

4    believe the evidence will show that they were moonlighting,

5    you know, to feed their families and that they would have

6    pursued those opportunities irrespective of MGA, and that,

7    again, but for causation under those circumstances is a

8    required -- that the bracketed language in CACI 430 is

9    required to be given.

10          THE COURT:  All right.  Then let me turn back to

11   Mattel for your last argument, and then back to MGA.

12          MR. ZELLER:  As the Court is aware, our view is,

13   is on the various, what we'll call defenses to the duty of

14   loyalty instructions that were proposed by MGA, including

15   preparation to compete, looking for alternative employment,

16   competitor privilege and the like, those are inapplicable as

17   they are drafted for that particular claim, the duty of

18   loyalty.

19          It does appear that the parties are in agreement

20   that those basic defenses, which are going to be asserted by

21   both parties in response to claims, should be instructed on

22   generically, but that's not what MGA has proposed in terms

23   of its written instructions for the duty of loyalty.

24          The Court will recall that what they did is they

25   said -- they're calling out the sample makers by name and

```
 1    the like saying, you know, they could be found to just

 2    simply be preparing for -- to compete or for new employment.

 3    That's inapplicable here.  There's simply no evidence that

 4    would allow a jury to apply those defenses, but to call it

 5    out specifically really seems unwarranted, in particular.  I

 6    mean, if MGA wants to go and, I guess, try and shoe horn it

 7    in as part of their closing argument, I guess maybe they can

 8    try.  But I think it -- it places undue emphasis, and

 9    almost, in fact, those instructions more or less suggest to

10    the jury that they could, in fact, so find, even though

11    there is really no factual basis.  And in any event, it just

12    simply, again, would result in repetitive, over and over

13    instructions for every one of these defenses, yet again, in

14    response to every claim and just places undue emphasis on

15    it, and it's prejudicial.

16            It will have the jury hearing over and over, you

17    know, the opportunity to compete or the preparing to compete

18    and privileged conduct, and it will sound to the jury like

19    the Court is essentially signaling them, to the jury, that

20    that's how they should rule.  So that's our main problem

21    with those defenses.  It's not the generic concept of having

22    them instructed on because, undoubtedly, they will be fairly

23    argued as to some claims, but particularly the duty of

24    loyalty instructions and how they are framed up by MGA, we

25    do have an objection to.
```

 1           THE COURT:  Could you -- if I took that
 2   position -- while I'm working on the remaining of the
 3   instructions concerning Claims 10 and 11, could the two of
 4   you draft that, in other words, to save some time?
 5           MR. ZELLER:  I think so.  Yeah.
 6           What I'll also say is, is that -- and I think this
 7   is also true of the conversion instructions that MGA is
 8   offering here, but the duty of loyalty instructions that are
 9   being offered are far afield from the model instructions.
10           They -- what we have submitted -- and by the way,
11   I will say, your Honor, this is Mattel's proposed
12   instruction on duty of loyalty.  I mean, we do call out the
13   particular individuals involved, Carter Bryant, Ryan
14   Tumaliuan and so on, so we do identify them specifically,
15   and we don't have a problem with that.  The issue, however,
16   is is that MGA is attempting to interject a number of
17   elements and a number of, we'll just call it "spin" into the
18   instructions that are not there in the model instructions.
19           Our instructions hue very closely, other than
20   calling out the names of the individuals, as we all agree is
21   the appropriate thing to do here, hue very, very closely to
22   the model instructions.
23           What MGA is now trying to put in are other
24   matters, like, for example, that somehow damages should be
25   limited to lost services.  And in fact, the case law is

1    very, very clear on this that it's not only the deviation

2    from the standard instruction that MGA is asking for, but

3    the case law is very, very clear that lost profits that are

4    incurred as a result of a breach of the duty of loyalty are

5    available.  That's -- that's a matter of law.  There is no

6    limitation for -- for such a breach to what MGA is

7    hypothesizing as lost services.  It's not found in the model

8    instructions and it's not supportable by the law.

9            Turning to the knowledge of wrongdoing aspect,

10   it's a little hard to understand what MGA thinks that it's

11   offering here that isn't in the model instruction.  The

12   model instruction makes very clear, and this is based on

13   CACI 3610, that there is a knowledge element.  MGA's

14   elaboration of it is not found in the model instructions,

15   and it's unwarranted.  It places undue emphasis on it, and

16   there is no need to deviate from the standard instructions

17   in that regard.

18           Turning to the conversion instructions, it's

19   obviously, in our view, not a correct reading of the

20   contract that only intangibles are covered by the Mattel

21   inventions agreement.  I mean, in fact, there are provisions

22   in it that specifically call out the obligation of the

23   employee to return and to make known to Mattel tangibles.  I

24   mean, that's very, very clear and, in fact, repeatedly

25   called out.

```
 1              In any event, these contract issues, as we all
 2      recognize by virtue of the Ninth Circuit decision, is going
 3      to the jury.  So if they want to make that argument about
 4      what our contract does or does not permit for the conversion
 5      claim, I suppose that's their prerogative, but it certainly
 6      should not be instructed on as a matter of law.  The Court
 7      is very aware that that was one problem that the Ninth
 8      Circuit had with the instructions the last time.  So I -- I
 9      think that that is a jury issue, and it should -- if they
10      want to make it an argument, but it's not a matter of
11      instructions.
12              The other point that MGA has made goes to the
13      substantial factor test.  I -- I didn't really hear a
14      response to what I think is the dispositive authority of
15      Rutherford, Bank of New York in these circumstances as well
16      as the fact that the California Supreme Court was absolutely
17      explicit in saying that BAJI, not CACI, for this instruction
18      was the proper model.  And that's what MGA is offering, is
19      simply that -- that CACI, but even more so, they are
20      offering bracketed language that is not -- not something
21      that is necessary as part of those model instructions.
22              THE COURT:  Okay.  Thank you.
23              Ms. Hurst?
24              MS. HURST:  Briefly, your Honor, on the last point
25      first, if I didn't make it clear, Soule and Viner v. Sweet
```

Case 2:04-cv-09049-DOC-RNB   Document 9963   Filed 02/17/11   Page 22 of 33   Page ID #:301267
CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

22

1    are California Supreme Court cases, Soule v. G.M., 8 Cal.4th

2    548, which is decided a year after -- or pardon me, before

3    Rutherford, says it would be error not to give the but-for

4    instruction where the defendant's theory of the case

5    warrants it.  Viner v. Sweet, 30 Cal.4th 1232, decided six

6    years after Rutherford, says that but-for is California law,

7    and so the problem is substantial factor doesn't make clear

8    to the jury except, at best, by implication that but-for is

9    the requirement, and that's the problem that's been

10   recognized over and over and over again.  So we do think we

11   are entitled to a but-for instruction under those

12   circumstances were, in fact, warranted, as here.

13          Mr. Zeller's comments about model instructions and

14   the duty of 20- -- well, I'm just going to call it 2863, the

15   2863 context are completely misguided.  There are no form

16   instructions on the 2863 claim.

17          Mr. Zeller is talking about fiduciary duty

18   instructions, which are found in CACI beginning, I think, at

19   4100, but that's --that's not the same law.  It's completely

20   different body of law.

21          We are really talking about 2863 here.  There is

22   no form instructions on 2863.  And these are rank and file

23   employees, so the fiduciary duty instructions are not good

24   analogues.

25          Mr. Zeller in saying that lost opportunity damages

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

23

 1    are available on the 2863 claim has two -- two problems, one

 2    is a legal problem, which is that there is no authority for

 3    the proposition that 2863 -- violation of 2863 would support

 4    a lost opportunity claim, but second, it's showing that they

 5    really do mean to try to get the Bratz camel nose in under

 6    the tent with that duty of loyalty claim.  They want to try

 7    to run their 800 million or billion-dollar lost opportunity,

 8    "We would have exploited Bratz if Carter Bryant had just

 9    told us about a claim, there," which, your Honor, as a

10    matter of law, cannot go to the jury.  There is no evidence

11    they would have exploited Bratz, and that's just factually

12    completely at odds with the record, but it's also an

13    improper legal measure.

14            What they could get for a 2863 violation is, these

15    people showed up at work the next day, and they were asleep

16    at their desks for eight hours and Mattel paid them anyway,

17    or they were doing MGA business at their desks and depriving

18    Mattel of their services, of which there is no evidence, by

19    the way, or they didn't show up for work but Mattel paid

20    them anyway for that period of time when they were actually

21    pursuing, transacting business on their own account in the

22    language of the statute, therefore, violating statute and

23    not giving the required preference.  But there is no lost

24    opportunity measure that's available for that.

25            THE COURT:  All right.  Mr. Price, is that

CV 04-9049-DOC – 02/15/2011 – Vol. 2 of 3

24

```
1    satisfactory?
2              MR. PRICE:  Your Honor?
3              THE COURT:  Do you have anything you'd like to
4    add?
5              MR. PRICE:  No, your Honor.
6              THE COURT:  Mr. Quinn?
7              MR. QUINN:  Satisfactory, your Honor.
8              THE COURT:  And Mr. Zeller?
9              MR. ZELLER:  Satisfactory, your Honor.
10             THE COURT:  And let me turn to Ms. Keller.
11             Are you satisfied?
12             MS. KELLER:  Yes, your Honor.
13             THE COURT:  Mr. McConville?
14             MR. MC CONVILLE:  Yes.
15             THE COURT:  And Ms. Hurst?
16             MS. HURST:  Thank you, your Honor.
17             THE COURT:  Okay.  I'm going to ask you to start
18   word processing just the introductory and the conclusionary
19   instructions.  It's just busy work while I go back and work
20   on the instructions for about a half an hour.  I'll give
21   those to you, and if you could set those up in the format
22   that I showed you, and I'll give it to you, Counsel.
23             (Recess.)
24             THE COURT:  We're on the record.
25             I'd like to request that you research the
```

1   genealogy of the duty of loyalty tort.  My concern is in

2   distinguishing a fiduciary duty from a duty of loyalty.

3   Both seem to encompass similar duties, but the former, the

4   fiduciary duty, is limited to individuals in whom some sort

5   of trust is reposed, even though the latter, the duty of

6   loyalty, is not.  The restatement "third of agency" may be a

7   beginning place or a good place to start.

8           You may want to go back farther into the

9   California Supreme Court Jurisprudence.  Whatever you do, I

10  want a really clear explanation of where this tort comes

11  from and how it's different from a fiduciary duty claim.  I

12  don't think I'm going to be persuaded or convinced by other

13  district court cases, like Otsuka v. Polo Ralph Lauren, or

14  even California Court of Appeal cases like Huong Que v. Luu.

15  Please find me supreme court cases.

16          Now, my initial inclination is to limit this claim

17  to a violation of the California Labor Code Section 2863,

18  but I'm really asking for your research this evening, and

19  I'd like to get your arguments -- well, later this evening.

20  So tell me how long you think it would take to go through

21  this research for me.

22          MR. ZELLER:  I think until about 8:00, your Honor.

23          THE COURT:  Okay.

24          What do you think, Ms. Hurst?

25          MS. HURST:  (No audible response.)

 1          THE COURT:  Well, let's do this --

 2          MS. HURST:  That's fine.

 3          THE COURT:  Let's do this:  Could I have that by

 4   tomorrow?  Because what I'm concerned about is I've got the

 5   trial counsel sitting here, and I want you as fresh as

 6   possible tomorrow on your redirect and, Ms. Keller, on your

 7   continuation of Larian.  This is one of the critical

 8   witnesses.  Let's get you home, and that way I can release

 9   the court reporter tonight.  And I don't think that this has

10   the emergency where I have to be obstinate and close this

11   out this evening.  I really want that research in a

12   thoughtful manner.  So noon tomorrow?  5:00 tomorrow?

13   Because we originally -- hold on.

14          We originally said we were going to argue some of

15   this tomorrow evening, and I conflated conversion and the

16   duty of loyalty.  So why don't we just say by 5:00 tomorrow

17   instead of this evening, we'll go back on the record

18   tomorrow evening on this, and that will give you a day to

19   research it.

20          MS. HURST:  Why don't we say noon, and then we can

21   look at each other's submissions, and then we can be ready

22   to argue at 5:00.

23          MR. ZELLER:  That's fine with us, your Honor.

24          THE COURT:  Is that okay with you?

25          MR. ZELLER:  It is.

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

```
 1              THE COURT:  Then why don't I excuse you this
 2     evening.
 3              MS. HURST:  That's great.
 4              THE COURT:  Okay.  Is there anything else we need
 5     to take up this evening?  And if so, I'd like to do that
 6     now.
 7              MR. QUINN:  Your Honor, we do have some issues,
 8     which I know the Court has on its agenda.  I don't know that
 9     they need to be resolved this evening.  We have the issue
10     about Anna Rhee, whether she will be called.
11              THE COURT:  I just got that briefing.
12              MR. QUINN:  You've gotten that briefing.  I think
13     it came in yesterday.
14              THE COURT:  Okay.
15              MR. QUINN:  We also have the issue about this
16     so-called Frankenstein dolls, which we submitted a
17     supplemental brief on today.
18              THE COURT:  I got that today.
19              MR. QUINN:  There is an issue teed up about the
20     testimony of Dale Cendali.  I understand the other side had
21     filed a motion to quash, and we responded to it.  I think
22     that's been briefed.
23              THE COURT:  Now, let me go back in just a moment
24     because I've been working on jury instructions.
25              I saw the first, but I don't recall Cendali, yet.
```

1    It's not your problem.  Let me go back in chambers and find

2    it, because that's what I'm going to do when you leave.

3           MR. QUINN:  And I don't know if we need to do this

4    tonight, your Honor, but we are prepared to go through

5    additional Larian exhibits, Tonnu exhibits and Rosenbaum

6    exhibits when the Court would like to do that.

7           THE COURT:  We'll go through that tonight, but let

8    me go back and see if I have those three briefs.  I have two

9    of them that I've seen back there and looked at, but I don't

10   have the third.

11          MR. QUINN:  And your Honor, can I give you to take

12   back a brief we filed this afternoon which represents our

13   best thinking, or our efforts to come up with our best

14   thinking on this question of the intersection of trade

15   secret law and copyright law.  We put a lot of effort and

16   scholarship in trying to come up with something that would

17   be helpful to the Court.

18          THE COURT:  Just give the opposition a copy.

19          You formally filed that?

20          MR. QUINN:  Yes, we have.

21          THE COURT:  Okay.

22          MS. KELLER:  And your Honor, we also have a letter

23   from Mr. Berman, the attorney for Anna Rhee --

24          THE COURT:  Thank you.  I appreciate it.

25          MS. KELLER:  -- who says neither he nor his client

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

29

have any documents that fall within the scope of the Court's

order, which is odd because in the transcript excerpt that

we have to the Court, he refers to an e-mail that he sent to

Mattel, and he was invoking the privilege as to the e-mail,

so --

THE COURT:  Why don't you invite him and put him

under oath?  In other words, I'll go through the extra step,

just as I am with the metadata for Mattel, and subject to

penalty of perjury, he can make that statement on the stand,

and that will resolve the issue.  If there's nothing

further, then that's the end of it.

MR. MC CONVILLE:  In the transcript and actually

in the briefing that he filed, he references that he

actually sent the e-mail to Mattel.  So, presumably, they

have a copy of it as well?  I mean, can we just get them to

give us a copy of it?

MS. KELLER:  Since the Court has already found

there was no privilege?

THE COURT:  I've already found there is no

privilege, so --

MR. ZELLER:  Well -- well, let me just cut to the

chase, your Honor.  It's not within the scope of what the

Court's order is, but we are happy to give them a copy of

this e-mail exchange.  That's not -- it doesn't have

anything to do -- it's not one with Anna Rhee, just so it's

CV 04-9049-DOC - 02/15/2011 - Vol. 2 of 3

30

1    clear.  I mean, this is a different e-mail, but I have no

2    problem giving it to MGA.

3            THE COURT:  Well, I don't want to violate the

4    attorney-client privilege.

5            MR. MC CONVILLE:  It can't be a privilege between

6    them.

7            THE COURT:  Right.

8            MS. KELLER:  Well, if it doesn't involve Anna

9    Rhee, I am not sure what it would involve.

10           MR. ZELLER:  I'm sorry, it involved -- it speaks

11   to Anna Rhee, but it is not a communication with Anna Rhee.

12   That's what I was trying to make clear.  It's an e-mail

13   exchange between me and Mr. Berman addressing these

14   allegations concerning the witness contact.  That's the

15   e-mail that Mr. Berman was mentioning in court.

16           Now, my view is that that e-mail is not

17   privileged, but it's not within the scope of what the Court

18   was addressing.  That was communications between Mr. Berman

19   and the witness.  But to avoid any issue, I am happy to give

20   them that e-mail.

21           MS. KELLER:  We would like a copy.

22           THE COURT:  Okay.

23           MS. KELLER:  Counsel, can you provide that to us

24   tonight?

25           MR. ZELLER:  Yes, I will send it to counsel within

1    the hour.

2              MS. KELLER:  Thank you.

3              THE COURT:  Now, if you want counsel in here, put

4    him under oath, that's fine.

5              MS. KELLER:  Well, let's take a look at the e-mail

6    first, and then we'll --

7              THE COURT:  Do you want me to wait and make sure

8    that this has been accomplished and that there are no

9    additional problems?

10             MS. HURST:  Can you just forward it to us right

11   now, Mike?

12             MR. MC CONVILLE:  Your Honor --

13             THE COURT:  No, just stop.

14             MR. MC CONVILLE:  Okay.

15             MR. ZELLER:  It takes a moment searching through

16   the Blackberry.

17             MR. MC CONVILLE:  Your Honor, my only thinking was

18   that if he's going to be under oath, then maybe tomorrow

19   morning would be better so we don't put the --

20             THE COURT:  Do you want to get ahold of him

21   tonight and have him here at 7:30 tomorrow instead of

22   tonight?

23             MS. HURST:  That's fine.  Let's have him here at

24   7:30.

25             MR. MC CONVILLE:  So the court reporter --

```
 1              THE COURT:  Who is going to call him to be here at
 2     7:30?
 3              MR. MC CONVILLE:  Well, we can --
 4              THE COURT:  How do you know you can get ahold of
 5     him tonight?
 6              MS. HURST:  We'll e-mail him and find out.
 7              THE COURT:  Okay.  E-mail him and find out.  I
 8     mean, I don't want to bring in a court reporter in to sit
 9     for an hour.
10              Now, while you are doing that, why don't you all
11     remain, and let me go back and make certain I've got all of
12     the documents I have to read this evening.
13              (Recess.)
14              (Volume III of the proceedings is reported by
15        Deborah Parker.)
16                              -oOo-
17
18
19
20
21
22
23
24
25
```

1                                    –oOo–

2                            **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 16, 2011

12

13

14                    _____

                      JANE C.S. RULE, U.S. COURT REPORTER
15                    CSR NO. 9316

16

17

18

19

20

21

22

23

24

25