1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    SOUTHERN DIVISION AT SANTA ANA

4    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,                )
7                                     )
              PLAINTIFFS,             )
8                                     )
          vs.                         ) CV NO. 04-9049-DOC
9                                     ) STATUS CONFERENCE
MGA ENTERTAINMENT, INC., ET AL.,      ) VOLUME 3 of 3
10                                    )
              DEFENDANTS.             )
11   _____)

12

13

14    REPORTER'S TRANSCRIPT OF PROCEEDINGS

15    JURY TRIAL

16    SANTA ANA, CALIFORNIA

17    TUESDAY, FEBRUARY 15, 2011

18    6:30 P.M.

19

20
      DEBORAH D. PARKER, CSR 10342
21    OFFICIAL COURT REPORTER
      UNITED STATES DISTRICT COURT
22    411 WEST FOURTH STREET
      SUITE 1-053
23    SANTA ANA, CALIFORNIA 92701
      (714) 542-8409
24    D.PARKER@IX.NETCOM.COM

25

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE PLAINTIFF, MATTEL, INC.:

 3                        JOHN QUINN
                          WILLIAM PRICE
 4                        MICHAEL T. ZELLER
                          QUINN EMANUEL URQUHART
 5                        & SULLIVAN, LLP
                          865 S. FIGUEROA STREET
 6                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA 90017
 7                        (213) 443-3000

 8
           FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                          THOMAS S. MC CONVILLE
10                        ORRICK HERRINGTON & SUTCLIFFE, LLP
                          4 PARK PLAZA
11                        SUITE 1600
                          IRVINE, CALIFORNIA 92614
12                        (949) 567-6700

13
                          ANNETTE L. HURST
14                        ORRICK HERRINGTON & SUTCLIFFE, LLP
                          THE ORRICK BUILDING
15                        405 HOWARD STREET
                          SAN FRANCISCO, CALIFORNIA 94105
16                        (415) 773-5700

17
                          JENNIFER L. KELLER
18                        KELLER RACKAUCKAS, LLP
                          18500 VON KARMAN AVENUE
19                        SUITE 560
                          IRVINE, CALIFORNIA 92612
20                        (949) 476-8700

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                          MARK E. OVERLAND
                           LAW OFFICES OF MARK E. OVERLAND
 4                          100 WILSHIRE BOULEVARD
                           SUITE 950
 5                          SANTA MONICA, CALIFORNIA 90401
                           (310) 459-2830
 6

 7                          ALEXANDER H. COTE
                           SCHEPER KIM & HARRIS, LLP
 8                          601 WEST FIFTH STREET
                           12TH FLOOR
 9                          LOS ANGELES, CALIFORNIA 90071
                           (213) 613-4660
10

11
     ALSO PRESENT:
12
                           JEANINE PISONI
13                          MGA ENTERTAINMENT, INC.
                           16360 ROSCOE BOULEVARD
14                          SUITE 105
                           VAN NUYS, CALIFORNIA 91406
15

16                          ROBERT ECKERT, MATTEL CEO
                           ISAAC LARIAN, MGA CEO
17                          KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                           MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 15, 2011; 6:30 P.M.

2         *(The following proceedings were had outside the*

3         *presence of the jury:)*

4              THE COURT:  First, we're back on the record.

5    Counsel are present.

6              Let me take up Lisa Tonnu first, T-O-N-N-U.

7              Some of the evidence that you are seeking on

8    behalf of Mattel seeks to admit through Ms. Tonnu is

9    evidence about Omni 808, the forensic auditor and other

10   evidence, which I potentially reserve punitive damages.  I

11   think Saturday you raised Ms. Tonnu with me, if I'm not

12   mistaken.

13             MR. QUINN:  Yes.

14             THE COURT:  And the representation was that you

15   were going to delve into that until and if we got to

16   punitive damages; is that correct?

17             MR. QUINN:  That is correct, your Honor.

18             And also we're not going to use the Durkin report,

19   either.

20             THE COURT:  There's no reason not to put her on

21   the stand, so let's resolve that.  You can put her back on

22   the stand.

23             I want to take Dale Cendali, and the Rule 37 issue

24   that's been raised.  Apparently, MGA's former lead counsel

25   is Ms. Cendali from the O'Melveney law firm.  And it's my

1    understanding that you want to put her on the stand to

2    establish the chain of custody for the notary book.  Even

3    though she's not on the witness stand and even though she

4    wasn't listed, I understand that the problems that are

5    occurring are simply chain problems; in other words, who had

6    possession of this person (sic).  She doesn't seem to be a

7    substantive person.  There's no attorney-client privilege.

8    I can see no reason why you wouldn't be allowed to present

9    her.

10            In fact, whatever happened to this notary book,

11   we've always known that the notary book was a critical piece

12   of evidence, and she seems to be a chain person.

13            Now, let me talk to MGA about that.  So,

14   Mr. McDonald --

15            I'm sorry, Ms. Hurst.

16            MS. HURST:  Ms. Cendali is presently adverse to

17   MGA in ongoing litigation in the state court, of which I

18   believe the court is aware.

19            THE COURT:  I'm aware of that.  There's a

20   $10 million lawsuit up in -- or 20 million up in Superior

21   Court, up in Los Angeles.

22            MS. HURST:  And she never had possession of the

23   notary book.  There was another lawyer at Littler Mendelson

24   in Atlanta who took possession of the notary book.

25            THE COURT:  How do you know all this?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

6

```
 1              In other words, how do I get people in there so we
 2    can trace the notary book and who had possession of it?
 3              MS. HURST:  They should bring the Atlanta lawyer.
 4    Not Ms. Cendali who never had possession of it.
 5              Look, we're not --
 6              THE COURT:  Just a moment.  Remember this, I don't
 7    know who had possession of the notary book.
 8              MS. HURST:  I understand, but I don't --
 9              THE COURT:  I want Ms. Cendali in here.  I want
10    her under oath, and I want to find out about the notary
11    book.  It's very simple.  So she's going to come down.  I'm
12    going to get firsthand information about whether she had it
13    or not.  And if she doesn't, she's going to be excused.
14              MS. HURST:  Can you ask them to make a
15    representation about whether they really think she had
16    possession of the notary book?  Would you?
17              THE COURT:  Well, that's the only purpose she
18    would be called for.  I'm going to hear her out of the
19    presence of the jury.
20              MS. HURST:  Before we drag her here from New York,
21    an adverse witness never disclosed on six witness lists, who
22    has never been deposed, for whom we have an attorney-client
23    privilege --
24              THE COURT:  I'm sorry.  I'm going to cut you off.
25              That falls on deaf ears.  I want the chain on the
```

1    notary book.

2         Now, if Cendali is not the person, she shouldn't

3    be here.  So, hold on.  I'll make the inquiry for you now.

4         Is Cendali involved in the chain?  Because that's

5    the only purpose she will be produced for.

6         MR. ZELLER:  That's correct.  And she is.  She was

7    the lead counsel.  She directed people to pick it up.  She

8    directed people as to where it should go.  She spoke with

9    Ms. Prince, personally.

10        THE COURT:  Stop.  She directed people.

11        Who in addition to her actually got the book?

12        MR. ZELLER:  There was the Atlanta lawyer.

13        THE COURT:  Who is that?

14        MR. ZELLER:  I might be able to come up with a

15   name here in a second, but she was at Mendelson Littler in

16   Atlanta.

17        THE COURT:  I don't care.  I want the name.

18        MR. ZELLER:  I will get the name.

19        THE COURT:  Okay.  Get the name.

20        For my record, I think the court is confronted

21   with a constant interchange of bad information, quite

22   frankly.  This has gone on and on.  I'm going to get to the

23   bottom of this, because I think it's critical who had or

24   directed the notary book to leave the notary's hands.  I'm

25   not going to waste any more time with this.

1                Cendali is going to be in my court.  I want to

2     question her outside the presence of the jury and have

3     counsel question her.  That's the end of the discussion.

4                Number two, I want the person who actually got the

5     notary book.  If it's not Cendali in physical possession, I

6     want that person in my court, and I want to question that

7     person outside the presence of the jury, or have you

8     question that person.  These are people from major law firms

9     with major litigation.  They can certainly come from across

10    the United States.  This is not a great inconvenience.

11               Now, when can they be here, and have you contacted

12    them, and are they under subpoena?

13               MR. ZELLER:  Dale Cendali is.  We have contacted

14    her.

15               THE COURT:  What can Cendali be here?

16               MR. ZELLER:  They've refused to tell us.

17               THE COURT:  Well, who is "they"?

18               MR. ZELLER:  "They" is MGA.  And also they

19    claim --

20               THE COURT:  Just a moment.  I heard that -- why

21    would MGA be in control of Cendali when Ms. Hurst just

22    represented to me that Ms. Cendali has an adverse position

23    and I know that there is a major litigation going on between

24    her law firm and MGA?

25               I can't imagine why Ms. Hurst has any control.

9

```
1              MR. ZELLER:  Well, they do, your Honor.  And it's
2    not true that she is, quote, adverse.
3              Ms. Cendali, their former lead counsel, left
4    O'Melveney.  She is now at the law firm of Kirkland & Ellis.
5    This is simply --
6              THE COURT:  Stop now.  I want Cendali in my court.
7    I want the person from Atlanta in my court.  I want to know
8    if Cendali directed the transfer of this notary book.  I
9    want the person who physically obtained the notary book, if
10   all that's true, and I'm tired of dealing in speculation.
11   If Cendali is not involved, I'll have firsthand information.
12   She won't be testifying, and she'll be back on the plane.
13             If there is an attorney-client privilege involved,
14   I'll be able to ferret that out, if she's present.  But all
15   of this is a guesstimate between both parties, and it's
16   difficult for the court to tell on this record.
17             So when will she be here?  You'll tell me
18   tomorrow.
19             MR. ZELLER:  I will send them further e-mails.
20             THE COURT:  Now, if not, I assume Kirkland &
21   Ellis?
22             MR. ZELLER:  Yes.
23             THE COURT:  I think that they're a firm that
24   practices in this court.
25             MR. ZELLER:  They certainly do.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:  Well, I think, then, we won't have any

2    problems.  But I'm not waiting on this, because if she is

3    going to be inconvenienced, we need to get her out here; and

4    if she's not relevant, I want to put her right back on the

5    plane.

6          Third, Anna Rhee.  I don't understand why Anna

7    Rhee would be called to the stand to testify about what

8    Mr. Pootipong said that Mr. Larian said.  That's hearsay.

9    That's not even dealing with the 608(b) issue, yet.

10          So it appears to me that Pootipong would be the

11    person who would be called to the stand.  Second, there's

12    two instances that the court's concerned about.  In

13    Mr. Larian's testimony, he stated that he never said to

14    Pootipong or made the comment that Mattel was going to sue

15    Anna Rhee.  And second, the inconsistency was that he never

16    said or made the statement that he said to Pootipong that

17    Anna Rhee lied at the last trial, although he did say he

18    felt is that she had lied at the last trial.  And all the

19    particulars, his testimony seemed to be consistent.

20          I agree with Mattel to this limited extent.  You

21    may call Pootipong for consciousness of guilt, but you may

22    not call Pootipong until I'm absolutely satisfied that MGA

23    has deposed Ms. Rhee and/or her counsel, pursuant to the

24    order finding the waiver that I made earlier tonight.

25    Therefore, I'll take that matter up.  But this isn't a rush

1   to get either Rhee back on the stand or Pootipong back on

2   the stand until I'm certain about counsel who represented

3   Ms. Rhee on the stand.  So it's in Mattel's court.  The

4   quicker we get that information or the quicker we get

5   counsel in here, the sooner you may be able to put her --

6   Mr. Pootipong back up on the stand.

7           MR. QUINN:  Your Honor, may I address the hearsay

8   issue?

9           THE COURT:  Certainly.

10          MR. QUINN:  I think it's undisputed that

11  Mr. Larian gave Mr. Pootipong a task.  He admits that.  He

12  directed Mr. Pootipong to do something.  He was acting as

13  Mr. Larian's and MGA's agent.  Therefore, what Mr. Pootipong

14  said to Ms. Rhee is not hearsay.  It comes in as a party

15  admission.  An admission by an agent who was specifically

16  directed to make a certain call.

17          MS. KELLER:  The problem is there is a dispute as

18  to what was said.

19          THE COURT:  Yeah, yeah, yeah.  I may allow you to

20  put Rhee on.  I may allow you to put Pootipong on, but I

21  need to make certain before I ever get to that final

22  decision.  And I'm telling you I think that in terms of

23  consciousness of guilt, you've got a good argument.  I'm

24  going to require that counsel either be deposed, or I know

25  more about what counsel have said, and that's in Mattel's

1  ballpark.  So you're not going foreclosed.  I'm just making

2  you fulfill that requirement.  And until that happens,

3  neither Pootipong nor Rhee will go back on the stand.  So I

4  can leave that to another day, frankly, about whether this

5  is an admission of a party opponent.

6          So the sooner you get the information to MGA and

7  the sooner you have a chance to make a further record

8  concerning that information, the sooner I can make a

9  decision.

10          MS. KELLER:  Should we, your Honor, just go ahead

11  and schedule the deposition?

12          THE COURT:  I would suggest as early as tomorrow,

13  but that's up to you.  But I think that should be scheduled

14  almost immediately.

15          MS. KELLER:  We can do that.

16          MR. ZELLER:  And we can certainly contact

17  Mr. Berman.  I do think the court ought to put some time

18  limit on it.

19          THE COURT:  You had five hours with counsel

20  yesterday.  Five hours with Mr. Berman.  Now, if there are a

21  bunch of objections, et cetera, as I heard yesterday, I

22  thought that you may have a good point, Robert O'Brien will

23  be right across the street and everybody can come over.

24          So, let's start with five hours and see where we

25  are.

1          MR. ZELLER:  In that case, I do want to raise what
2     happened yesterday, because a lot of time was wasted by
3     opposing counsel.
4          THE COURT:  That's consistent with what happened
5     yesterday.  In other words, five hours is all you got with
6     other counsel.  I'm giving five hours.
7          MR. ZELLER:  It's actually not.  And the reason
8     it's not apples to apples, your Honor, is that what the
9     witness yesterday, Mr. Olson did, he did a full-blown
10    interview of this witness.  There's only one issue with
11    Mr. Berman.  I'm just concerned that five hours --
12         THE COURT:  Five hours, and Mr. Berman will check
13    in with Mr. O'Brien before he leaves.  So this isn't going
14    to be a situation.  And if, in fact, the deposition isn't
15    going well and you don't have what you need, make it for the
16    record.  I'm not remiss to keeping him here, but I'm not
17    remiss, also, to the constant questioning.  In other words,
18    ask a question.  He responds; and if he doesn't, then we'll
19    be here a while.
20         So let's start with five hours.  Let's start at
21    10:00.  Let Robert O'Brien come down here, but I want it
22    across the street.  That way, everybody has got access over
23    here, and I'm certain he's not being harassed that way.  By
24    the same token, you're going to be certain to get the
25    answers, and he's going to be responsive, and Robert O'Brien

```
 1    will tell me.
 2           MR. ZELLER:  It's hard to imagine a deposition on
 3    one issue could go five hours without being harassing.  I'm
 4    just concerned that MGA is pressing on this, and -- you
 5    know, we're -- we have been far more limited in the time we
 6    have been afforded depositions than five hours on one issue.
 7    I mean, that's really the nub of --
 8           THE COURT:  I think this is such an
 9    inconsequential conversation.  You're hearing that the court
10    is more than happy to expand that.  I just want a record of
11    why I'm doing that.  I think this is minutia, okay?
12           Just get that deposition going and then get it
13    across to this court if you're dissatisfied.  You know, I'm
14    happy to extend that into evening hours.
15           MR. ZELLER:  Yes.
16           THE COURT:  So let's not go any further with that.
17    I think it's silly.
18           MR. ZELLER:  Understood.
19           THE COURT:  All right.  I think you've got some
20    phone calls to make.  Lisa Tonno, apparently, will be
21    coming.  I need Dale Cendali.
22           I need whoever the person is from Atlanta whose
23    name is?
24           MR. ZELLER:  Charlotte McClusky.
25           THE COURT:  Charlotte McClusky.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. ZELLER:  That's M-C-C-L-U-S-K-Y.

 2              THE COURT:  Okay.  Charlotte McClusky from

 3    Atlanta.

 4              What law firm is she with?

 5              MR. ZELLER:  She's with the law firm of Littler

 6    Mendelson, which, of course, practices in your court.

 7              THE COURT:  Certainly.  I don't think there's

 8    going to be any issue.  The question is how quickly you can

 9    get people here.

10              MR. ZELLER:  We've been stymied on that, your

11    Honor.  So I will make further efforts this evening.  I will

12    make clear what the court has said.  We have been trying to

13    get them -- well, certainly, Ms. Cendali here for some

14    period of time and did not receive satisfactory responses,

15    which is why we raised it with the court in the first

16    instance.

17              THE COURT:  Now, two other issues were raised.  I

18    want a record of this.

19              On Saturday, there was some concern by MGA's

20    counsel, Ms. Keller, that she felt she was being limited

21    concerning the brand.  I indicated, informally, on Saturday

22    that didn't think that the court was limiting the

23    development of the brand, but that the court sustained an

24    objection to what I thought was a nonrelevant area, and that

25    were the questions involving the year 2006 and the
```

1   development of Rescue Pets, robotic doll, Spiderman and the

2   Shrek license and electronic toys that didn't seem to have

3   anything to do with the brand involving Bratz.

4          So I want the record clear.  You're not being

5   curtailed or narrowed in terms of those attempts to develop

6   the brand.

7          Second, there had been a lengthy discussion

8   Saturday.  I had not ordered the reporters in concerning the

9   Hong Kong litigation.  I'm still of the opinion that this is

10  a collateral matter, unduly consummative of time, and it is

11  a red light warning to this court concerning similarity.

12  And I don't think the Ninth Circuit could be any clearer,

13  and I think it would be circumvention of the Ninth Circuit's

14  ruling at least at this time.

15         I'm not limiting Mattel from developing evidence

16  either through Mr. Larian or Hong Kong representatives

17  concerning the aggressive and repeated efforts by MGA

18  Hong Kong and MGA USA and Mr. Larian to protect his

19  intellectual property regardless of how farfetched it is.

20         I think that that accomplishes, on one hand, the

21  ability of Mattel to counter Mr. Larian's gratuitous

22  statement about Mattel protecting their intellectual

23  property -- the impression is that he is being somewhat put

24  upon -- and trying to walk that very delicate balance in

25  terms of the Ninth Circuit's ruling and the warning to this

```
 1    court concerning similarity.

 2              The other issue --

 3              MR. QUINN:  Your Honor, before we move on, can I

 4    ask a question about the court's direction?

 5              THE COURT:  Certainly.

 6              MR. QUINN:  In terms of showing through Mr. Larian

 7    how farfetched or assertive he is enforcing what he sees to

 8    been his intellectual property rights, may we show him the

 9    doll, the doll that was the subject of his correspondence?

10              THE COURT:  That's what I've been struggling with.

11    And my question back to you is:  Why?

12              I want you to be able to show his assertiveness.

13    It seems to me that the showing of the doll does the very

14    thing that the Ninth Circuit is warning me about, and that

15    is a similarity comparison, if you will.  I realize that the

16    doll may have some ridiculous aspects to it.  I think this

17    is the monster?

18              MR. QUINN:  Well, we used that as a shorthand,

19    your Honor.  There's actually several that were the subjects

20    of cease and desist and litigation proceedings.  All of

21    which are very dissimilar than the drawings.  But, your

22    Honor, this is the one similarity issue that the

23    Ninth Circuit expects this court to make.  It's unavoidable.

24              THE COURT:  Would you show me that in the opinion?

25              MR. QUINN:  We'll get the opinion, your Honor.
```

THE COURT:  Underline it for me.  Just let me get off the bench for a moment, and let me look at it.

MS. KELLER:  Your Honor, before the court does, could we just respond to something Mr. Quinn said?

THE COURT:  Certainly.

MS. KELLER:  Mr. Larian blurts out on the stand that -- *and Mattel stifles competition*, or words to that effect *and comes after people.*

If the response is to be able to say, *Well, so do you, so there's really no difference between us.  You aggressively sue people, too, if you think they're taking your intellectual property,* that's one thing.

And, frankly, your Honor, that was already asked. Mr. Price went into that at some length with Mr. Larian, and Mr. Larian agreed that he does protect his intellectual property, and that if he thinks somebody is, you know, infringing on his products that he does protect it.

So that's already out there.  But to say that that has opened the door to permit them to go into particulars of litigation, comparisons of dolls, or to show, quote, how farfetched it is that he will go, none of that, none of that is relevant.  It doesn't rebut what Mr. Larian said.  You know, if he said, *You do this, so do you,* the "so do you" has already been done.  And the "so do you" could still be done, I guess.

1            But going beyond that is doing what the

2     Ninth Circuit said not to do, and it becomes -- it becomes

3     an exercise in trying to show --

4            And as Mr. McConville, my colleague has just

5     pointed out to me, then what's the next step after that?

6            *Okay, you say I'm farfetched.  How about the way*

7     *you litigate people to death?  How about all these lawsuits*

8     *by you*, which opens up a Pandora's box*?*

9            THE COURT:  The real danger comes in the lost

10    profits area.  The real danger later on is that the more

11    farfetched the protection of intellectual property -- and

12    let's just refer to it as, quote, unquote, the monster doll,

13    which is not the appropriate name.  It means that the

14    argument could be made when we're involved with lost profits

15    that the nexus between lost profits and all doesn't have to

16    be great.  In other words, the carryover is far beyond just

17    the individual decision about admitting a doll.

18            And I don't understand, although Mattel is

19    constantly trying to explain to the court, why the court is

20    going to fly in the face of the Ninth Circuit's ruling, or

21    what I perceive it is, which I'm going to look at again,

22    because you are going to underline that for me, and gets

23    into a similarity comparison because the purpose of holding

24    up the doll is just that.  It appears to be a similarity

25    comparison which then segues into the argument that when we

1   get to lost profits, look how ridiculous MGA's protection of

2   their intellectual property is and, therefore, Pandora's box

3   is open to even completely nonrelated items.

4           MS. KELLER:  And I think we might at that point,

5   also, then be forced to call an expert in Hong Kong law to

6   say, *Look, under Hong Kong law there are all these things*

7   *that are protectable that aren't protectable here.  There*

8   *are all these things that are --*

9           THE COURT:  Just a moment.

10           MS. KELLER:  And damages are different there, and

11   the jury shouldn't draw the conclusion that damages are the

12   same, because they're not.  They are very different in

13   Hong Kong.  And all of this after, basically, they have

14   already been satisfied in their rebuttal, so to speak,

15   because Mr. Larian has already agreed, *Yes, I aggressively*

16   *protect my intellectual property.  Yes, I sued somebody in*

17   *Hong Kong.*

18           THE COURT:  Well, the end result of all that is

19   that Mattel doesn't have everything that it seeks, but I'm

20   convinced it does have the offset of everybody's protecting

21   their, quote, unquote, intellectual property, even to some

22   ridiculous extent, probably, by both companies.  And I don't

23   know why the similarity is relevant.

24           I think it's unduly consumptive of time.  I think

25   it's confusing.  I think it's potentially prejudicial as it

```
 1   carries over into the lost profits analysis, and I think it
 2   flies in the face of the circuit.  But I've been corrected
 3   before by counsel and here comes the opinion.
 4          And now, Mr. Quinn, Mr. Quinn, Mr. Quinn -- thank
 5   you -- is now underlining the portions that he thinks is
 6   relevant.  And since I have read the whole opinion, he will
 7   not be underlining the whole opinion.
 8          Underline the pages for a few moments with the
 9   lines with Mr. Zeller's help, and that will be the end of
10   this discussion.
11          Now, the next issue -- because I want to get
12   Mr. Price on his way tonight, if I can -- what else remains
13   that I haven't resolved that you asked me about in case
14   Ms. Keller ends tomorrow and you're back in the position of
15   redirect?
16          And what else remains for MGA that I haven't
17   resolved tonight, so that you're prepared to go forward?
18          MR. QUINN:  Thank you, your Honor.
19          Both sides have some additional Larian exhibits
20   which we would both like to show the court.
21          THE COURT:  I'm going to look at that with you and
22   Mr. McConville so I can get my lead counsel out of here in a
23   few moments so they can rest.
24          MR. QUINN:  And then, after the analysis of the
25   metadata comes back, we still think that there is a crime
```

 1    fraud issue regarding that e-mail, you know, "Tell Paula not

 2    to know about."

 3              I mean, I've heard this court say words to the

 4    effect that *There's not going to be any perjury in my*

 5    *courtroom.*

 6              And we think the direction to -- even to a lawyer

 7    to make sure a witness doesn't know about something --

 8              THE COURT:  Well, I think I'm rather consistent in

 9    that.  I'm finding that you, probably, have every right if

10    you do this correctly, and I get the Advice of Counsel

11    Discovery to recall Mr. Pootipong and, possibly, Ms. Rhee

12    for consciousness of guilt.

13              MR. QUINN:  I was changing the subject to the

14    "Paula," "Make sure Paula," which is the subject of the

15    meta --

16              THE COURT:  I understand.  But you also threw in a

17    gratuitous comment which I accept as a compliment; and that

18    is, the court does not condone perjury.  So it's rather

19    consistent.  I'm not finding Mr. Larian perjured himself,

20    but I do find and have made a record that there are two

21    strikingly dissimilar comments in portions of testimony that

22    Mr. Larian testified to, concerning Anna Rhee and

23    Mr. Pootipong.  But you have to supply that Advice of

24    Counsel Discovery to MGA before they are ever going to get

25    back on the stand.  But there is every likelihood that one

1   or both will be back on the stand under consciousness of

2   guilt.

3          That means you're prevailing on that issue.

4          MS. KELLER:  Your Honor --

5          THE COURT:  On that issue.  No.

6          MS. KELLER:  I'm sorry.

7          THE COURT:  And how soon you do that is dependent

8   upon when and if they are back on the stand.

9          MR. QUINN:  Understood, your Honor.

10          THE COURT:  Number two, you have an additional

11   problem.  You need to get Lisa Tonnu here.  You need to get

12   Dale Cendali here, so I can question her outside the

13   presence of the jury and make certain that there's no

14   attorney-client issues.  I need to know more about the

15   contradictory information I'm getting from both sides, which

16   is difficult for me to sort out.  I thought she was a party

17   to the chain.  Now, I'm hearing that she might have given

18   the advice to get the book.  I don't know.  I'm going to

19   have her on the stand with Mattel's representation, and I'm

20   going to get Charlotte McClusky here.  And I need you to act

21   quickly to get them here.

22          What else?  You are not prevailing on the

23   similarity comparisons of the dolls coming from Hong Kong.

24   I think I'm closing the door on that, until after I read

25   this opinion one more time tonight.

24

```
 1            MR. PRICE:  I think that's it, your Honor.

 2            THE COURT:  Now, you are sure?

 3            MR. QUINN:  Yes, your Honor.

 4            THE COURT:  Now, let me turn to MGA.

 5            What gets you into trial posture again tomorrow?

 6            MS. KELLER:  Your Honor, I don't know about

 7     tomorrow, but the only remaining issue that we had is the

 8     supplemental report from the expert, Mr. Wagner.  We don't

 9     have a date for that yet.  And if he really is going to be

10     hitting the stand next week, we need to have that report

11     certainly no later than Friday.

12            THE COURT:  You know, I'm available this week.  So

13     if you both agree, I can turn my decision about having

14     simultaneous depositions and have Mr. Wagner here earlier

15     and then take Mr. Mendel?

16            MS. HURST:  Malackowski.

17            THE COURT:  Malackowski who is, apparently, on a

18     trip and has a son who has cancer, you said?

19            MS. HURST:  Yes, your Honor.

20            THE COURT:  We're not going to disturb that,

21     certainly.  That way everybody would be prepared.  We can do

22     that, if you like.

23            MS. KELLER:  That would be great, your Honor.  We

24     still need a supplemental report, though, before we even

25     depose him.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  I know that.
 2              MR. ZELLER:  If I may, your Honor.
 3              I actually worked pretty extensively with
 4    Mr. Wagner to set aside those days that we talked about.
 5    This was in reliance on working with counsel.  I
 6    accommodated their expert in order to do this.
 7              Now, to require me to go back for, literally, the
 8    fourth time and ask --
 9              THE COURT:  Well, this is what we'll do.  This is
10    easily resolved.  This is what I do in the criminal matters,
11    and this occurs all the time.  This is not the first time;
12    and that is, if there's something that shows unpreparedness,
13    what's happened on direct examination is, I'll simply hold
14    him.  In other words, I don't see how MGA is inconvenienced
15    because you're not forced into a posture of
16    cross-examination that day.  So you can reserve it, if he's
17    not prepared, but you've got the benefit of direct
18    examination.  You don't have to take him on at that moment.
19    And, I think, that that's another technique I have used in
20    the past.
21              MR. ZELLER:  I think --
22              THE COURT:  So let's just do that.  Let's just
23    leave the door open.  If Mr. Wagner is taking the stand next
24    week, if that was the agreement, if that's what your plan
25    is, that doesn't mean he's leaving the stand next week.
```

1    Let's see how his testimony develops.

2              MR. ZELLER:  Understood.

3              THE COURT:  I can't do all the would-have

4    could-have should-haves.  I'm offering to take him in a

5    deposition, the Saturday -- strike that, Kuhmo-Dalbert

6    hearing, this Saturday.  If you say he's not available, I

7    want to pay him the same courtesy that I paid to MGA,

8    although MGA's expert is farther in the future.  But that

9    doesn't mean he's leaving the stand, and it doesn't mean

10   that he's not coming back for cross-examination.  And what

11   you hear the court say, if there's some satisfaction, is:

12   *Thank you, very much, sir.  You're ordered to return in five*

13   *days, or three days.*

14             MS. KELLER:  Your Honor --

15             MR. ZELLER:  I think I can cut through part of

16   this because, again, this was agreed upon, and we will

17   provide the report in sufficient time to allay counsel's

18   concerns.

19             I will get it, yet, again.  Go back.  They could

20   have raised this earlier in terms of when I was

21   communicating with Mr. Wagner, find out exactly when it is.

22   We can --

23             THE COURT:  That's true.  I'm not finding fault

24   with counsel.  Remember, I have been asking for a long time

25   both parties in the Kuhmo-Dalbert area to set up a hearing

1    date with the court.

2              MR. ZELLER:  All I'm suggestion, your Honor, is,

3    is that it is not productive from my perspective for counsel

4    to ask for accommodations for me to give them to work on

5    this and then to have them raise something new and then try

6    to upset what that agreement was.  I mean, if those are the

7    ground rules, so be it.  I will not work with them to do

8    this.  But what I'm going to say to the court is, is that

9    we've already scheduled this.  I think we ought to abide by

10   that schedule.  I will find out from Mr. Wagner a specific

11   time when they can expect the supplemental report.  I can

12   guarantee it will be in sufficient time to satisfy them, but

13   I do want to talk with him about that.

14             They have not paid me that courtesy, and that's

15   really what I'm ultimately complaining about.  For them to

16   spring it on me and on the court, I don't think is right.

17   They could have asked me or asked John Quinn, *What's a date*

18   *certain?*, rather than doing it kind of ambushing me on the

19   record.

20             THE COURT:  You know what Woody Allen said?  *80*

21   *percent of life is showing up.*

22             Let's not worry about it this evening.  I can get

23   a whole parade of horribles.  Just keep the case moving as

24   best we can.

25             MS. HURST:  Your Honor, just to be clear for the

1   record, this is a report that should have been served eons

2   ago.  The self-executing exclusion under Rule 37 of an

3   expert opinion not previously disclosed is presently

4   operative.  We're doing them a favor by accepting these late

5   reports and deposing and trying to get ready, because we

6   understand the court's basic posture has been:  *Let it in as*

7   *long as there is no showing of prejudice and you get a*

8   *deposition.*

9           This is long past due.  The witness testified in

10  his second deposition 10 days ago that he was about to

11  produce another report.  We did ask for this before lunch.

12  I believe Mr. Zeller has forgotten that, and we didn't get

13  an answer.  We're not trying to undo any deals here.  But

14  that report is already well past due.

15          THE COURT:  Now, the court appreciates that.  It

16  will resolve itself, I'm sure, after I hear from Mr. Wagner,

17  okay?

18          I have lots of remedies to make certain neither

19  side is prejudiced.  That's the end of the discussion

20  concerning Mr. Wagner this evening.

21          Now, what else do we have to do tonight?

22          Ms. Keller, why don't I excuse you, so you're

23  fresh.  Mr. Price, get home and get some rest so both of you

24  are fresh tomorrow for Mr. Larian's continued testimony.

25          I'm going to stay with Mr. Quinn and

1    Mr. McConville, and let's get back on the exhibits for

2    tomorrow, so we know what's coming.

3          All right.

4       *(At 7:04 p.m., proceedings were adjourned.)*

5

6                              -oOo-

7

8                         CERTIFICATE

9          I hereby certify that pursuant to Section 753,

10   Title 28, United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings held in the above-entitled matter and that the

13   transcript page format is in conformance with the

14   regulations of the Judicial Conference of the United States.

15

16   Date:  February 16, 2011

17

18

19                    _____

20                         Deborah D. Parker, Official Reporter

21

22

23

24

25