ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone:  415-773-5700
Facsimile:   415-773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Telephone:  213-629-2020
Facsimile:   213-612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 DOC (RNBx)<br><br>Consolidated with Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**MGA PARTIES' TRIAL BRIEF REGARDING MGA MEXICO TESTIMONY ABOUT SEARCH AND SEIZURE OF MGA MEXICO'S OFFICE**<br><br>Trial Date: January 18, 2011<br>Judge:  Hon. David O. Carter |

1         The MGA Parties respectfully submit the attached May 5, 2010 transcript of

2    the 30(b)(6) deposition testimony of Susana Kuemmerle illustrating that Ms.

3    Kuemmerle was adequately prepared as a corporate witness and testified fully

4    regarding percipient knowledge of the raid of MGA Mexico's offices prior to the

5    date upon which Mr. Larian testified (July 7, 2010) regarding Category 10 of the

6    Court's June 14, 2010 Order.

7

8    Dated:  February 17, 2011        Respectfully submitted,

9                                   ORRICK, HERRINGTON & SUTCLIFFE LLP

10

11                                  By:  _____/s/ Annette Hurst_____

12                                          Annette Hurst
                                     Attorneys for MGA Parties

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


MATTEL, INC., A DELAWARE          )
CORPORATION,                      )
                                  ) CASE NO.
          PLAINTIFF,              ) CV 04-9049 DOC(RNBX)
                                  )
     V.                           ) CONSOLIDATED WITH
                                  ) CASE NO. 04-9059
MGA ENTERTAINMENT, INC.,          )     AND
                                  ) CASE NO. 05-2727
          DEFENDANT.              )
_____)
                                  )
AND CONSOLIDATED ACTION(S)    )
_____)


          CONFIDENTIAL - ATTORNEYS' EYES ONLY

          VIDEOTAPED 30(B)(6) DEPOSITION OF

          MGAE DE MEXICO S.R.L. DE C.V.

          (SUSANA KUEMMERLE), VOLUME VII,

          taken on behalf of Mattel, Inc., at

          600 West Santa Ana Boulevard,

          Santa Ana, California, commencing at

          9:07 a.m., Wednesday, May 5, 2010,

          before Paula A. Pyburn, CSR 7304,

          RPR, CLR

Susana Kuemmerle    May 5, 2010

1609

```
 1    APPEARANCES:
 2    THE DISCOVERY MASTER:
 3        ARENT FOX LLP
          BY:  DREW R. HANSEN, DISCOVERY MASTER
 4        (Where Indicated)
                         555 West Fifth Street
 5        48th Floor
          Los Angeles, California 90013-1065
 6        (213) 629-7400
 7
      FOR MATTEL, INC.:
 8
          QUINN EMANUEL URQUHART & SULLIVAN, LLP
 9        BY:  JON D. COREY, ESQ.
                  and
10        BY:  CYRUS S. NAIM, ESQ.
          865 South Figueroa Street
11        10th Floor
          Los Angeles, California 90017
12        (213) 443-3000
          joncorey@quinnemanuel.com
13        cyrusnaim@quinnemanuel.com
14
      FOR MGA ENTERTAINMENT, INC., AND THE WITNESS:
15
          ORRICK, HERRINGTON & SUTCLIFFE LLP
16        BY:  WILLIAM A. MOLINSKI, ESQ.
          777 South Figueroa Street
17        Suite 3200
                         Los Angeles, California 90017-5855
18        (213) 612-2256
          wmolinski@orrick.com
19
20    FOR GUSTAVO MACHADO:
21        SCHEPER KIM & HARRIS LLP
          BY:  ALEXANDER H. COTE, ESQ.
22        One Bunker Hill
          601 West Fifth Street
23        12th Floor
          Los Angeles, California 90071-2025
24        (213) 613-4660
          acote@scheperkim.com
25
```

1610

1    APPEARANCES:   (Continued)

2    ALSO PRESENT:

3        Steven Togami, JTV Litigations Services, Inc.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Susana Kuemmerle    May 5, 2010

1611

```
 1                    I N D E X

 2

 3    WITNESS:          EXAMINED BY:                PAGE:

 4    RULE 30(B)(6) DEPOSITION OF MGAE DE MEXICO
      S.R.L. de C.V., (SUSANA KUEMMERLE), VOLUME VII

 5

 6                     MR. COREY                    1614

 7

 8

 9    EXHIBITS PREVIOUSLY MARKED AND REFERRED TO:

10              (BOUND SEPARATELY)

11              NUMBER      PAGE

12              7153        1660

13

14

      EXHIBITS FOR IDENTIFICATION:  (BOUND SEPARATELY)

15

      Number:

16

      8077    Documents from CD, MGA 0139816 -      1684

17            MGA 0139930, 115 pages

18    8078    Documents from CD, MGA 0139598 -      1684

              MGA 0139663, 66 pages

19

      8079    Documents from CD, MGA 0139569 -      1684

20            MGA 0139597, 29 pages

21    8080    Documents from CD, MGA 0139949 -      1684

              MGA 0139966, 18 pages

22

      8081    Documents from CD, MGA 0140385 -      1684

23            MGA 0140395, 11 pages

24    8082    Documents from CD, MGA 0140099 -      1684

              MGA 0140127, 29 pages

25
```

Susana Kuemmerle   May 5, 2010

1612

```
1    EXHIBITS FOR IDENTIFICATION:  (CONTINUED)
2                   (BOUND SEPARATELY)
3    Number:
4    8083    Documents from CD, MGA 0140367 -      1684
                MGA 0140384, 18 pages
5
     8084    Documents from CD, MGA 0140030 -      1684
6                MGA 0140098, 69 pages
7    8085    Documents from CD, MGA 0140396 -      1684
                MGA 0140424, 29 pages
8
     8086    Documents from CD, MGA 0139967 -      1684
9                MGA 0139977, 11 pages
10   8087    Documents from CD, MGA 0140167 -      1684
                MGA 0140281, 115 pages
11
     8088    Documents from CD, MGA 0139978 -      1684
12               MGA 0140006, 29 pages
13   8089    3/5/10 Email from William Molinski    1684
                to Jon Corey, 2 pages
14
     8090    Document entitled "Documents With     1684
15               Carlos Aguirre's Initials," 1 page
16   8091    Email Chain, 2 pages                  1692
17
18
     INFORMATION REQUESTED:
19
                      (None)
20
21
     QUESTIONS UNANSWERED BY WITNESS:
22
                      PAGE   LINE
23
                      1645   10
24                    1668   17
25
```

1     SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 5, 2010

2                    9:07 A.M.

3

4          THE VIDEO TECHNICIAN:  Good morning.  We

5     are back -- excuse me.                            09:07:28

6          We are back on the record at 9:07 a.m.

7     Today's date is May 5th, 2010.  This is Tape No. 1

8     of Volume VII for the continued 30(b)(6) deposition

9     of MGA Entertainment de Mexico in the action

10    entitled "Mattel, Inc., vs. MGA Entertainment, Inc.,   09:07:48

11    et al."

12          May we please have introductions for the

13    record, beginning with the witness.

14          THE WITNESS:  Susana Kuemmerle.

15          MR. MOLINSKI:  Bill Molinski from Orrick,    09:07:59

16    representing the MGA parties.

17          MR. COTE:  Alexander Cote on behalf of

18    Gustavo Machado.

19          MR. NAIM:  Cyrus Naim for Mattel.

20          MR. COREY:  Jon Corey on behalf of Mattel.   09:08:11

21          THE VIDEO TECHNICIAN:  Thank you.

22          THE REPORTER:  Do you solemnly affirm the

23    testimony you are about to give in this deposition

24    shall be the truth, the whole truth, and nothing but

25    the truth?                                        09:08:23

Susana Kuemmerle   May 5, 2010

1614

```
 1          THE WITNESS:  I do.

 2

 3                    EXAMINATION

 4   BY MR. COREY:

 5       Q.   Good morning, Ms. Kuemmerle.          09:08:25

 6       A.   Good morning.

 7       Q.   Is there any reason you can't give your

 8   best testimony today?

 9       A.   No.

10       Q.   Do you understand that you're testifying on  09:08:30

11   behalf of MGA Mexico today?

12       A.   Yes.

13       Q.   What did you do to prepare for your

14   deposition?

15       A.   Met yesterday at the offices of       09:08:42

16   Mr. Molinski -- Molinski, very early at

17   eight o'clock.  Had several phone conversations with

18   teams -- members of my team in Mexico.  Called

19   Lourdes Aguilar.  We talked -- I talked with her for

20   maybe half an hour.  I also called Andrea Ramirez,  09:09:08

21   and -- and I talked with her maybe for another half

22   an hour.  I called Carlos Aguirre twice, maybe for

23   half an hour each time.

24          I reviewed the deposition that Gustavo had,

25   Mr. Machado's deposition.  I reviewed all of the    09:09:34
```

Susana Kuemmerle    May 5, 2010

1615

```
 1      depositions from Mr. Small, reviewed the copies of

 2      the -- hard copies that were found during the

 3      search.

 4              And at 8:30 at night I had a conference

 5      call with Mr. Cote and Mr. Molinski and Mr. Gustavo    09:09:58

 6      Machado.

 7              I tried to get in touched -- in touch with

 8      Mariana Trueba, but her attorney will not allow me

 9      to talk to her.

10              And that's basically what I recall.  It was    09:10:16

11      a long day.

12          Q.   Sounds like it.

13              Did you -- did you speak with anyone else

14      besides -- any of the former MGA Mexico employees

15      besides Ms. Aguilar, Ms. Ramirez and Mr. Aguirre,      09:10:28

16      and Mr. Machado?

17          A.   Say that again?  I didn't hear it.

18          Q.   Did you speak with any former MGA Mexico

19      employees in addition to Ms. -- Ms. Aguilar,

20      Ms. Ramirez, Mr. Aguirre, Mr. Machado?                 09:10:39

21          A.   No.

22          Q.   Those are the three -- the four that you

23      spoke to?

24          A.   Yes -- I mean -- yes, four.

25          Q.   Did you make any notes of these meetings?     09:10:47
```

Susana Kuemmerle   May 5, 2010

1616

```
 1        A.   No.

 2        Q.   What did you talk to Ms. Aguilar about?

 3        A.   I talked to Carlos regarding the documents

 4   that he signed.  At first --

 5             MR. MOLINSKI:  Hold off.  I think he said    09:11:09

 6   "Ms. Aguilar," and I think you're describing --

 7             THE WITNESS:  I understood Aguirre.

 8   BY MR. COREY:

 9        Q.   I -- then I -- I mis- -- I meant

10   Ms. Aguilar.  I can't remember what I said.          09:11:17

11        A.   Okay.  Lourdes Aguilar.  Okay.

12             With -- Lourdes didn't want to talk to

13   Mr. Small before, and so I ask her if she will give

14   me some time to discuss what happened during the day

15   of the raid.                                         09:11:33

16             We exchanged pleasantries, and she -- she

17   helped me out, understanding from her point of view

18   what happened, according to what she remember, on

19   the day -- the day of the raid.

20        Q.   What did she tell you?                     09:11:48

21        A.   She told me that she remembered around 15

22   to 20 people in suits arriving into our 15th floor

23   office.  They -- they are on the side of the office

24   where there are only cubicles, and she remembers

25   seeing the people going to the side of the offices   09:12:12
```

Susana Kuemmerle   May 5, 2010

1617

```
 1    where there are offices.  A coup- --
 2         Q.   I'm sorry.  You said -- you said "they"
 3    were on the side where there were cubicles.
 4              Are you talking about the people in suits
 5    or --                                          09:12:25
 6         A.   My team.
 7         Q.   -- or Ms. Aguilar?
 8         A.   My team.
 9         Q.   Okay.
10         A.   My -- Lourdes and the rest of the team.   09:12:28
11         Q.   And I apologize for interrupting.
12         A.   And she remembered there was a little bit
13    of tension in the area.  They were told to sit down,
14    not to touch the computers, do not use the
15    landlines, do not use their cell phones.        09:12:46
16              She told me that they were mostly
17    interested in -- in the offices, not in the cubicle
18    areas.  And she heard through rumor they were mostly
19    interested into checking Gustavo, Mariana's, and
20    Pablo's office.                                 09:13:06
21              And -- and I ask her if she -- she saw or
22    she realized that -- if the police found any- --
23    anything during the search.  And she said that she
24    only heard that a catalog was found.
25              I ask her if they search her side or her   09:13:21
```

```
 1    cubicle.  She told me no.

 2          I also asked her if she learned or if she

 3    ever knew that there were any documents that were

 4    Mattel's in her office.  And she said, No, never.

 5          And I ask her if she was allowed to move,      09:13:42

 6    to go to the restroom.  And she said yes, but she

 7    had to go accompanied.

 8          And that's basically the gist of the

 9    conversation.

10       Q.   Did you have a list of questions that you    09:13:55

11    were asking her, or a script --

12       A.   No.

13       Q.   -- that you were following?

14       A.   Because I reviewed Mr. Small's, and I tried

15    to -- tried to get to additional information that    09:14:04

16    was not available from Mr. Small's deposition.

17       Q.   You reviewed his deposition.  Did you

18    review his -- the note- -- the questions that he was

19    asking?

20       A.   Yes.  And tried to get additional           09:14:21

21    information to complement the deposition.

22       Q.   Did Ms. Aguilar tell you anything else?

23       A.   That I can recall at this time, no.

24       Q.   Did you ask her who -- who she heard that

25    the catalog was found from?                          09:14:39
```

Susana Kuemmerle    May 5, 2010

1619

```
 1        A.   She couldn't say.  It was through

 2   convoluted gossip, due to the occasion of the --

 3   what happened that day.

 4        Q.   Did Ms. Aguilar tell you anything else?

 5        A.   That I can recall, no.              09:14:53

 6        Q.   What was her position at the time?

 7        A.   She was an assistant in the marketing

 8   department.

 9             MR. MOLINSKI:  Objection; vague.

10             Slow down a little.  Give me a chance to   09:15:08

11   object.

12             I assume you meant her position at the time

13   of the raid?

14             MR. COREY:  At the time of the search,

15   yeah.                                        09:15:15

16             THE WITNESS:  Yeah.

17             Sorry.

18   BY MR. COREY:

19        Q.   Is she still employed by MGA Mexico?

20        A.   No, she's not.                      09:15:19

21        Q.   Are you --

22        A.   Her job is to be a mom now.

23        Q.   Are you still employed by MGA?

24        A.   Me?

25        Q.   Yes.                                09:15:27
```

Susana Kuemmerle    May 5, 2010

1620

1       A.    Yes, I am.

2       Q.    What did Ms. Ramirez tell you?

3       A.    Again, I called her and we exchanged

4    pleasantries.  She -- she was more comfortable

5    talking with me.  And I ask her to please explain to        09:15:49

6    me what happened the day of the raid.

7            More or less she said that people in

8    suits -- men in suits showed up.  She also said

9    something along the lines between 15 and 20, but she

10   couldn't specify the amount of people.  She also           09:16:09

11   sits on the side of the office with cubicles.

12           I ask her if she can tell me if they were

13   polite or how she was treated.  And she said that

14   they were strong and -- and strict, but they were

15   never disrespectful.                                        09:16:28

16           I ask her if they were -- what were they

17   wearing.  She told me they were wearing suits, as

18   far as she remembers.

19           She was told to stay in her area, to not

20   use the phones, to not use the landlines, cell             09:16:44

21   phones, do not use the computers.

22           And I ask her if she knew what they were

23   looking for.  And she also said that, through gossip

24   and noise, she could hear that they were mostly

25   interested in checking the offices, and more               09:17:00

Susana Kuemmerle    May 5, 2010

1621

```
 1    specifically the offices of Gustavo, Pablo, and

 2    Mariana.

 3           I -- I ask her if she knows if something

 4    was retrieved, and she couldn't specify.  She

 5    doesn't remember.                              09:17:19

 6           And I also asked her if she ever recalled

 7    using any documents during, before, or after the

 8    raid that belonged to Mattel.  And she said, No,

 9    never.

10           And then I ask her about her family and...  09:17:35

11      Q.   What was -- what was Ms. Ramirez's position

12    at the time of the search?

13      A.   In MGA Mexico she was a key account

14    manager.

15      Q.   For which account?                       09:17:50

16      A.   She handled Walmart.

17      Q.   You said, when you asked her about whether

18    things were located during the search, you said she

19    couldn't specify or didn't recall.

20      A.   She didn't remember.                      09:18:08

21      Q.   She didn't remember whether anything had

22    been --

23      A.   No.

24      Q.   -- located during the search or not?

25      A.   No.                                       09:18:13
```

```
 1        Q.   Did either Ms. Aguilar or Ms. Ramirez

 2   witness any of the offices being searched?

 3        A.   No.

 4        Q.   Did Ms. Ramirez tell you anything else?

 5        A.   She was nervous and very shook up.        09:18:23

 6             And that's -- that's all, basically, what

 7   we talked about, other than family stuff.

 8        Q.   And then you said you spoke to Mr. Aguirre.

 9        A.   Yes, I did.

10        Q.   What did he tell you?                      09:18:47

11        A.   I wanted to clarify and specify if the

12   signature that was on the documents, the hard-copy

13   documents that were retrieved, was his signature.

14             And my understanding is that Mr. Small saw

15   similarities but couldn't attest.                   09:19:05

16             So an exercise was run, and copy of those

17   documents was sent to Mr. Aguirre for his review.

18        Q.   Do you know which documents were sent to

19   him?

20        A.   The hard copies.  The -- the paper copies  09:19:22

21   of the documents he signed.

22             He reviewed everything, and he confirmed to

23   me that that is his signature.

24             He also confirmed to me the way he had to

25   sign those documents.  He confirmed to me that it    09:19:43
```

Susana Kuemmerle    May 5, 2010

1623

 1    was approximately a stack of, like, maybe two inches

 2    of papers that were retrieved from offices -- he

 3    could not recall specifically from which office --

 4    and that they were then moved to the table at our

 5    conference room.                                    09:20:08

 6          At which time, towards the end of the raid,

 7    one of the officers said that they needed a witness

 8    that those papers were going to be retrieved, and

 9    they gave him approximately less than five minutes

10    for him to sign each page, reason for which he said  09:20:26

11    the pages are only initialed instead of having his

12    full signature.

13      Q.   And he confirmed for you that the documents

14    that had been sent to him, each -- each page

15    contained his signature?                            09:20:47

16      A.   No, ac- -- on the CD?  Yes.  On the -- on

17    the -- on the CD that we sent for him to reconfirm

18    the signature of those hard copies.

19          Am I explaining myself?

20      Q.   You -- you --                                09:20:56

21          MR. MOLINSKI:  So it doesn't get confused

22    here --

23          THE WITNESS:  Yes.

24          MR. MOLINSKI:  -- we sent them to him in

25    the format of a CD that would be easier for him to  09:20:59

```
 1     review than sending actually the full paper

 2     documents.  We scanned them on and sent them.

 3           MR. COREY:  Right.  And then did you have a

 4     list of the exhibits that were sent to him?  I mean,

 5     I'm happy -- I'm happy to show them to her, if        09:21:10

 6     that's -- if that's a faster way to get where we

 7     need to go.

 8           MR. MOLINSKI:  It's the complete set

 9     that -- that was shown to him that day.  But, yeah,

10     I'm happy to give you a list.  I'm sure Andre has     09:21:19

11     got it.

12           MR. COREY:  Okay.

13           MR. MOLINSKI:  I presume --

14           MR. COREY:  All right.  And then --

15           MR. MOLINSKI:  -- we gave each of those        09:21:32

16     documents a separate exhibit number in the past;

17     right?

18           MR. COREY:  Right.

19           MR. MOLINSKI:  Okay.

20     BY MR. COREY:                                         09:21:36

21        Q.  And so just to make sure, what you're

22     saying is that Mr. -- Mr. Aguirre was sent a CD

23     containing the -- the hard-copy documents?

24        A.  Scanned hard-copy documents.

25        Q.  The scanned hard-copy documents.             09:21:46
```

```
 1         A.   That's what I was informed, yes.

 2         Q.   And he reviewed the CD?

 3         A.   Exactly.  Those scanned copies in that CD,

 4    yes.

 5         Q.   Okay.  And he confirmed that for all of      09:21:54

 6    those documents, the scanned documents on that CD,

 7    his initials appeared?

 8         A.   Yes, they are his.

 9         Q.   Okay.  And then did you look at the

10    hard-copy documents?                                   09:22:04

11         A.   I reviewed that they were -- only to see if

12    they were all signed, and they are all signed in the

13    corner.

14              MR. COREY:  I actually -- can we have --

15    can we just have a copy of the CD, have Andre make a   09:22:19

16    copy of the CD, bring it over, and we'll just mark

17    that?

18              MR. MOLINSKI:  Yeah.  We asked him to send

19    it back.  So as soon as it's sent back to us, which

20    we should have in the next day or two, we can do       09:22:29

21    that.  I don't know if we have it today, but I can

22    check.

23              MR. COREY:  Okay.

24              MR. MOLINSKI:  Per your request, we told

25    him, once he reviewed it --                            09:22:37
```

```
 1            MR. COREY:  Right.

 2            MR. MOLINSKI:  -- send it back.  So...

 3   BY MR. COREY:

 4       Q.    What else did Mr. Aguirre tell you?

 5       A.    During that conversation, he told me     09:22:52

 6   that -- I also asked about the day of the raid, and

 7   he -- I wanted to get his point of view as to what

 8   happened.

 9            (The discovery master joins the

10            proceedings.)                             09:23:09

11            THE WITNESS:  And he confirmed that

12   approximately -- his number is 20 to 25 people --

13   showed up.  That Alma Delia [phonetic] received

14   them, received the search, the order.

15            And somehow he got in to the front, and  09:23:24

16   he -- he was with the police at that particular

17   time.  He confirmed that they were mostly interested

18   in entering the private offices, more specifically

19   Gustavo, Pablo, and Mariana's offices.

20   BY MR. COREY:                                      09:23:46

21       Q.    And -- and I don't mean to interrupt.  You

22   said he moved his way to the front at the time.

23            Is that at that time that -- that Ms. Delia

24   received the -- the order?

25       A.    He heard commotion, and he just moved to --  09:23:53
```

Susana Kuemmerle    May 5, 2010

1627

1    to the front to see what was going on.

2         Carlos sits in the back of the office,

3    towards the side of the cubicles.

4         Q.   Okay.

5         A.   And he -- he confirmed that there were         09:24:08

6    groups of, maybe, three to five people, he couldn't

7    specify the amount of people, that entered each

8    office, looking specifically in computers and

9    cabinets or whatever you call -- I don't --

10   credenzas, drawers, desks.  He was not able to be in    09:24:32

11   all the places at all times, but basically that's --

12   that's what happened.

13        They were told to not use phone, cell

14   phones, laptops, or anything else.

15        Q.   Was he with -- was he with the people who      09:24:50

16   were conducting the search the entire time the

17   search was being conducted?

18        MR. MOLINSKI:   Objection; calls for

19   speculation.

20        THE WITNESS:   He said he was with the             09:25:00

21   people, but not with a specific person all the time.

22   BY MR. COREY:

23        Q.   Do you -- do you know whether the offices

24   were all searched at the same time?

25        A.   That's --                                     09:25:10

Susana Kuemmerle   May 5, 2010

1628

```
 1          MR. MOLINSKI:  Objection; vague.

 2          THE WITNESS:  He said that there were

 3     groups of three to five people entering.  And my --

 4     my -- my feeling was that they were divided and

 5     entering different places at the -- at the same      09:25:22

 6     time.  But that's my own personal opinion, for what

 7     I understood.

 8     BY MR. COREY:

 9          Q.   And you said that he -- he saw them looking

10     at people's computers?                               09:25:31

11          A.   Computers, desks, drawers, the top

12     cabinet -- and it has a name, but I can't think of

13     it -- credenzas, everything.

14          Q.   Did he tell you that they were actually

15     looking for information on the computers?  Were they 09:25:50

16     using it to look at information on the CDs?

17          MR. MOLINSKI:  Objection; compound.

18          THE WITNESS:  He told me that they were

19     looking at computers.  That's all I -- if they were

20     looking inside the computers, I do not know.         09:26:02

21     BY MR. COREY:

22          Q.   Did he tell you -- or do you know whether

23     the search was conducted of any offices other than

24     Mr. Machado's, Mr. Vargas's, and Ms. Trueba's?

25          A.   It is my understanding that they entered my 09:26:15
```

1629

```
 1    office, he said.  And also Amelia's and the finance

 2    person.

 3         Q.   Did they search those offices?

 4         A.   I could not tell you.  I didn't ask.

 5    They -- they say that they search all of the private   09:26:28

 6    offices.

 7         Q.   And who said that?

 8         A.   Carlos.

 9         Q.   And was all of this -- all of this during

10    the first conversation that you had with              09:26:48

11    Mr. Aguirre?

12         A.   Yes.  As far as I remember, yes.

13         Q.   Did he tell you anything else in the first

14    conversation?

15         A.   Again, I ask him if they were rude or       09:26:55

16    ignorant or -- and he said that they were strong,

17    determined.  He recalled some with suits, some with

18    uniform, but no, they were not rude.

19              And I said -- I ask -- I ask him, Have you

20    ever worked or saw any Mattel documents before the    09:27:17

21    raid or after the raid?

22              And he said if it was other than samples of

23    toys that we buy, no.

24         Q.   Did he tell you anything else during the

25    first conversation that you remember?                 09:27:39
```

Susana Kuemmerle   May 5, 2010

1630

```
 1        A.   No.  As far as what I remember, this is

 2   more or less.

 3        Q.   Did he tell you that the -- the hard-copy

 4   documents that had been scanned on the CD that had

 5   his initials on were the documents located during     09:27:46

 6   the search?

 7             MR. MOLINSKI:  Objection; speculation,

 8   vague.

 9             THE WITNESS:  He told me that that stack

10   was in the conference room, and he only had five --   09:27:55

11   five -- less than five minutes to sign them.  He

12   doesn't know.

13   BY MR. COREY:

14        Q.   But he -- he signed those on the day of the

15   search?                                               09:28:03

16        A.   Yes.

17        Q.   Had he ever -- did you ask him whether he

18   had ever done anything like that before, signed a

19   whole bunch of documents or a stack of documents

20   with his initials on each page?                       09:28:25

21        A.   I don't understand your question.

22        Q.   On the day -- on the day of the raid, he

23   was asked to sign about two inches of documents on

24   each page.

25        A.   Uh-huh.                                     09:28:37
```

```
 1        Q.   And some of those documents had the Mattel
 2   logo on them; right?
 3        A.   I -- that's what he said.
 4        Q.   Had he ever done that before?
 5        A.   Signed documents?                          09:28:45
 6        Q.   Signed documents with the initials on each
 7   page that had the Mattel logo on it.
 8        A.   The Mattel logo?
 9        Q.   Yes.
10        A.   No.  I'm sure he signed our documents for   09:28:54
11   work.
12        Q.   Right.  And my question's a little bit
13   different.  I'm -- I'm sure that he -- I'm sure that
14   he signed -- I mean, he was -- he was an employee of
15   MGA Mexico.  I'm sure he signed documents for MGA --   09:29:05
16        A.   Absolutely.
17        Q.   -- Mexico all the time.
18             My question is:  Has he ever signed -- did
19   you ask him whether he's ever signed a stack of
20   documents, initials on each page, that had the        09:29:15
21   Mattel logo on them?
22             MR. MOLINSKI:  Objection; vague.
23             THE WITNESS:  No.  I ask him if he signed
24   the documents that were on the CD.
25   ///
```

```
 1    BY MR. COREY:

 2         Q.   And he said yes?

 3         A.   Yes.  According to his review of the CD, of

 4    the scanned copies.

 5         Q.   Did you ask him if he knew -- or do you        09:29:34

 6    know where the hard-copy documents were found during

 7    the search?

 8         A.   Yes, I did.  And he couldn't recall.  He

 9    just said that those -- that stack of two inches,

10    more or less, of papers was in the conference room     09:30:17

11    table.

12         Q.   Do you remember anything else that

13    Mr. Aguirre told you in this first conversation that

14    you had with him?

15         A.   I believe I said -- told you everything I     09:30:45

16    remember.

17         Q.   Why did you talk to Mr. Aguirre a second

18    time?

19         A.   That was late -- later in the day.  I just

20    wanted to understand also if he recalls signing, as    09:30:55

21    a witness, a CD.  And so I called him back, and I --

22    I wanted to get information of that.

23              And I said -- I ask him if he remembers

24    anything else that were with that stack of paper.

25    And he said, Yes, a CD.                                 09:31:20
```

Susana Kuemmerle   May 5, 2010

1633

```
 1            I said, So what's going on?  What happened
 2    with that CD?  Did you have to sign for it?
 3            And he said, Yes, I did have to sign for
 4    it.
 5            I said, Where did you sign for it?  Because    09:31:31
 6    did it have a paper cover?  Where did you sign for
 7    the CD?
 8            And he said that he was requested to sign
 9    on the CD per se, and he signed it.
10       Q.   And did he tell you anything else in the      09:31:54
11    second conversation you had with him?
12       A.   That's -- I wanted to know about -- if
13    there was a CD.
14       Q.   Did you ask him if he -- about any of the
15    characteristics of the CD, what it looked like, what    09:32:18
16    color it was?
17       A.   No.  A CD's a CD.  Gray.
18       Q.   Did he tell you anything else in this
19    conversation?
20       A.   Not that I can remember at this time.  But     09:32:40
21    if I remember, I'll get back to you.
22       Q.   Did you review any documents to prepare for
23    your deposition today, in addition to the deposition
24    of Mr. Machado -- the deposition transcript of
25    Mr. Machado and the deposition transcripts of          09:33:01
```

```
 1      Mr. Small?

 2          A.    Any other documents that --

 3              MR. MOLINSKI:   Objection; misstates the

 4      prior testimony.

 5              And in addition to the hard copies that she    09:33:18

 6      said she reviewed?

 7              THE WITNESS:   Exactly.

 8              MR. COREY:   Right.

 9              THE WITNESS:   No.

10      BY MR. COREY:                                          09:33:18

11          Q.    Did you review prior -- your prior

12      transcripts?

13          A.    No.

14          Q.    And you said you also spoke with

15      Mr. Machado.   What did Mr. Machado tell you?          09:33:33

16          A.    It was later in the day.   We -- we tried to

17      get in touch with Mariana, and Mariana's attorney

18      denied our petition.

19              And then, later in the day, we were able to

20      get into -- enter into a conference call with          09:33:54

21      Gustavo.   And what I wanted to understand is the

22      process of how the information was retrieved and how

23      it did end up in a CD.

24              And I asked Gustavo if he could explain to

25      me how the process was, to which he told me that       09:34:17
```

Susana Kuemmerle   May 5, 2010

1635

1   there was a USB that -- where he uploaded

2   information, Mariana uploaded information, and Pablo

3   uploaded information.  And this -- this USB, he took

4   to his house, where he uploaded that information

5   into his personal computer, I believe it was a VAIO      09:34:45

6   or something like that.

7        And that eventually, because Gustavo has a

8   ton of iTunes music in his computer, his hard drive

9   was very, very full.  And without any criteria,

10  specific criteria, he proceed to remove some of --      09:35:09

11  some files that he had on his VAIO onto a CD.  And

12  that's how the C- -- a CD was born.

13       And then I ask him if he could tell me what

14  kind of information he remembers uploading into that

15  CD.  And, again, he mentioned that, without any         09:35:33

16  criteria, he remembers uploading pictures; an HR

17  form that was generated in Mattel, he couldn't tell

18  me what kind of -- name of that HR form was; some

19  Nielsen information; some POS information, he

20  doesn't remember what -- what format and what           09:36:07

21  version, he doesn't remember.

22       And that's basically what he could remember

23  at that time.

24       Q.   What else did Mr. Machado tell you?

25       A.   If he remembers ever using that CD, and he    09:36:26

```
 1    said that he used mostly the part of the HR form

 2    that he couldn't remember the name, and I don't know

 3    what it is, to update, improve his resumé, because

 4    it had a good description of what he did, what his

 5    functions and what he did.                      09:36:52

 6              And then he also remembers some information

 7    regarding the boys category.  And he said that he

 8    took that because he generated it, he was proud of

 9    the way it looked.

10              And that's basically what he told me he    09:37:06

11    could remember.

12        Q.   And the -- the Nielsen information, the POS

13    information, the HR form, and the boys category

14    presentations or documents, those were all Mattel

15    documents; right?                                09:37:38

16              MR. MOLINSKI:  Objection; misstates the

17    testimony, vague.

18              THE WITNESS:  He told me that they were

19    those documents; I don't know.

20    BY MR. COREY:                                    09:37:47

21        Q.   Was -- well, was it your understanding that

22    those were Mattel documents?

23        A.   I --

24              MR. MOLINSKI:  Objection --

25              MR. COTE:  Objection.                  09:37:50
```

Susana Kuemmerle   May 5, 2010

1637

```
 1          MR. MOLINSKI:  -- calls for speculation.

 2          MR. COTE:  Join.

 3          THE WITNESS:  I -- I only understand it

 4     about the HR form, because he said that was a

 5     description of his job description in Mattel.        09:37:59

 6     BY MR. COREY:

 7          Q.   Did he tell you what type of information

 8     he, Mr. Vargas, and Ms. Trueba downloaded on the USB

 9     drive?

10          A.   He was able to remember that -- more or     09:38:22

11     less that listing that I gave you.  And he couldn't

12     specify what kind of information Ms. Trueba and

13     Mr. Vargas loaded.  He just remember what -- that

14     listing that I gave you.  That's what he remembers,

15     and that's what he told me.                          09:38:44

16          Q.   Have you looked at the CD, the documents on

17     the CD?

18          A.   No.

19          Q.   And so you don't know whether there's MGA

20     POS information on there or Mattel POS information    09:38:52

21     on there; right?

22          A.   I could not --

23          MR. MOLINSKI:  Objection; vague.

24          THE WITNESS:  I could not tell you.

25     ///
```

1638

```
 1   BY MR. COREY:
 2       Q.   And you don't know whether the Nielsen
 3   information that he referred to is Mattel or MGA;
 4   right?
 5       A.   I could not tell you.                    09:39:04
 6       Q.   Do you know when the CD was created?
 7       A.   He told me that it was approximately after
 8   Three Kings Day in 2005; that's in January, the
 9   beginning.  I don't -- he couldn't specify, really,
10   a date.                                           09:39:30
11       Q.   Had he done any boys work at MGA by January
12   of 2005?
13       A.   No.
14       Q.   So the boys category information that he
15   took, that was -- that was Mattel information;     09:39:44
16   right?
17           MR. MOLINSKI:  Objection --
18           THE WITNESS:  It will be --
19           MR. MOLINSKI:  -- speculation.
20           MR. COTE:  Join.                           09:39:51
21           THE WITNESS:  -- your speculation.
22   BY MR. COREY:
23       Q.   You would be speculating?
24       A.   Well, that's what you said.
25       Q.   Well, I -- I thought I heard that's what   09:39:58
```

Susana Kuemmerle   May 5, 2010

1639

1    you said.

2        A.   Well, I will not speculate one way or the

3    other.

4        Q.   You said I would be speculating.  I

5    misheard you.                                        09:40:08

6            Did Mr. Machado tell you anything else?

7        A.   I can't remember.  It was very late last

8    night, and I'm on Eastern standard time, so...

9            THE REPORTER:  And what?

10           THE WITNESS:  I am on Eastern standard      09:40:24

11   time, so -- I wanted to know mostly about how the CD

12   was generated, and we -- we dedicated time to that.

13           And I do know he -- Gustavo has more than

14   25,000 songs on his computer; so he needed the

15   space.                                              09:40:45

16   BY MR. COREY:

17       Q.   How do you know that?

18       A.   Because he charges my iPod -- or he charged

19   my iPod, brand-new I bought.

20       Q.   He gave you some songs?                    09:41:00

21       A.   25,000.

22       Q.   So he may actually have more than that?

23       A.   That's all my iPod will fit in my Mexico

24   apartment.  I could go years without repeating a

25   song.                                               09:41:30

```
 1        Q.    Did you ask him what criteria he used to

 2   decide what to put on the CD?

 3        A.    No.  He said without any criteria.

 4        Q.    And is the information that you're giving

 5   me, is that from his conversation, or is that from      09:42:05

 6   reviewing his deposition transcript, or both?

 7        A.    It's from the -- what I just talked about,

 8   it's about the conversation we had last night.

 9        Q.    Okay.  What else did Mr. Machado tell you?

10        A.    That's all I can remember at this           09:42:20

11   particular time, other than the pleasantries.

12        Q.    Did he tell you what he did with the CD?

13        A.    What do you mean?

14            MR. MOLINSKI:  Objection; vague.

15   BY MR. COREY:                                          09:42:35

16        Q.    Was the CD that you were talking to him

17   about the CD that he took to the offices of

18   MGA Mexico?

19        A.    I cannot assume one way or the other, but

20   that was a CD that he took to -- to work with his --   09:42:46

21   on his resumé.  If it is that CD, I do not know.

22        Q.    Well, it's the CD that he said -- that he

23   took to his office -- that he took to the office at

24   MGA Mexico --

25        A.    Uh-huh.                                     09:43:00
```

Susana Kuemmerle   May 5, 2010

1641

```
 1        Q.    -- that he said was to work on his
 2   resumé --
 3        A.    Yes.
 4        Q.    -- right?
 5            MR. MOLINSKI:  Make sure you wait for him      09:43:06
 6   to finish his question.  You're starting to answer
 7   midway through with uh-huhs, so --
 8            THE WITNESS:  Okay.
 9   BY MR. COREY:
10        Q.    And is that the CD that, on the day of the   09:43:13
11   search, he told you was in his office, while you
12   were both in New York?
13            MR. MOLINSKI:  Objection; vague.
14            THE WITNESS:  I do not know.
15   BY MR. COREY:                                           09:43:22
16        Q.    But he told you -- he told you when you
17   were in New York that he had a CD with Mattel
18   information on it in the office; right?
19        A.    Yes.
20        Q.    And -- and is it that CD that he told you    09:43:29
21   about -- strike that.
22            Did he tell you that there were Mattel-
23   authored documents on the CD?
24            MR. MOLINSKI:  Objection; vague.
25            THE WITNESS:  Yes.                             09:43:51
```

```
 1    BY MR. COREY:

 2        Q.   And did he tell you that those Mattel-

 3    authored documents that -- that he copied to the CD

 4    were documents that he or Mr. Vargas or Ms. Trueba

 5    took from Mattel using the USB drive?              09:44:04

 6            MR. MOLINSKI:  Objection; vague.

 7            MR. COTE:  Vague as to time.

 8            THE WITNESS:  Some of those documents, yes.

 9    BY MR. COREY:

10        Q.   Did he tell you that the CD with the       09:44:30

11    Mattel-authored documents was the one that he took

12    to the offices of MGA Mexico to work on his resumé?

13            MR. MOLINSKI:  Objection; vague.

14            THE WITNESS:  He took a CD with documents

15    to MGA Mexico offices to work with a -- to work with  09:44:53

16    his resumé.

17    BY MR. COREY:

18        Q.   Did you talk to him about any other CD?

19        A.   No.

20        Q.   So the CD that Mr. Machado created because  09:45:45

21    he needed more space on his computer for his iTunes

22    song -- songs was the one that was located in his

23    office on the day of the search; correct?

24            MR. COTE:  Objection --

25            MR. MOLINSKI:  Objection.              09:46:07
```

Susana Kuemmerle   May 5, 2010

1643

```
 1          MR. COTE:  -- calls for speculation.
 2          THE WITNESS:  I do not know.  I know a CD
 3   was found during the search.  If it was that CD, I
 4   do not know.
 5   BY MR. COREY:                                  09:46:16
 6      Q.   Do you know whether it was a CD with
 7   Mattel-authored information on it?
 8      A.   There was a CD that was found that ended up
 9   in the conference room that Carlos Aguirre signed
10   for, and that a copy of it I believe I found in my   09:46:24
11   desk, and then I sent to O'Melveny.  I don't know if
12   there is the same CD.
13      Q.   Does that CD that Mr. Aguirre signed for
14   have Mr. Machado's HR form from Mattel on it?
15      A.   He does- --                             09:46:46
16          MR. MOLINSKI:  Objection; calls for
17   speculation.
18          THE WITNESS:  He doesn't know.  He just
19   signed a CD.
20   BY MR. COREY:                                  09:46:53
21      Q.   Do you know?
22      A.   No, I do not know.
23      Q.   Have you looked?
24      A.   Looked at what?
25      Q.   At the CD, to see if that -- the CD that   09:46:57
```

Susana Kuemmerle   May 5, 2010

1644

```
 1    you sent to O'Melveny?
 2            MR. MOLINSKI:  Objection; vague.
 3            THE WITNESS:  No.
 4    BY MR. COREY:
 5       Q.   Have you looked at the CD that was sent to    09:47:07
 6    O'Melveny to see if it has Mattel's -- Mattel
 7    information from Nielsen on it?
 8            MR. MOLINSKI:  Objection; vague as to time.
 9            THE WITNESS:  I do not know.  Like I said
10    before, I looked, I saw resumés that I said that I    09:47:21
11    have in my personal files, the picture that was
12    funny.  I said, I don't need this, took it out, and
13    shipped it to -- I can never say their name --
14    O'Melveny or whatever.
15    BY MR. COREY:                                         09:47:40
16       Q.   Did you look at the CD to see if it had
17    Mattel point-of-sale information on it?
18            MR. MOLINSKI:  Objection; asked and
19    answered.
20            THE WITNESS:  No.                             09:47:48
21    BY MR. COREY:
22       Q.   Did you look at the CD to see if it had
23    Mattel boys market information -- marketing
24    information on it?
25            MR. MOLINSKI:  Same objection.               09:47:54
```

Susana Kuemmerle   May 5, 2010

1645

```
 1              THE WITNESS:  No.
 2    BY MR. COREY:
 3        Q.   Why did you send -- why did you send the CD
 4    to O'Melveny?
 5        A.   I was told to do so.              09:48:01
 6        Q.   Who told you that?
 7        A.   Counsel.
 8        Q.   Which counsel?
 9        A.   I believe it was Daphne Gronich.
10        Q.   And did Ms. Gronich also tell you to send   09:48:09
11    the hard-copy materials?
12              MR. MOLINSKI:  Hold off.  I think we are
13    getting into privileged communications.
14              These are conversations with counsel, so
15    I'm -- I'm going to instruct not to answer.       09:48:26
16              THE WITNESS:  Can't answer.
17    BY MR. COREY:
18        Q.   Did you send the materials to O'Melveny, or
19    did you have an assistant or somebody else in your
20    office send them?                          09:49:01
21        A.   I sent it.  I don't have an assistant.
22        Q.   Do you -- do you recall how you sent it?
23        A.   I don't remember.
24        Q.   Do you recall who at O'Melveny you sent it
25    to?                                        09:49:21
```

Susana Kuemmerle   May 5, 2010

1646

```
 1        A.   I can't -- I can't think of their names.

 2    It's five years ago.

 3        Q.   As you sit here today, can you identify any

 4    of the -- can you identify the CD that you sent to

 5    him?                                              09:49:42

 6        A.   What do you mean?

 7        Q.   If I showed you the CD, do you think you

 8    could identify it?

 9            MR. COTE:  Calls for speculation.

10            THE WITNESS:  For me, all CDs are exactly   09:49:50

11    the same.

12    BY MR. COREY:

13        Q.   No.  No.  If I put it on a computer and let

14    you look at it.

15            MR. COTE:  Same objection.              09:49:56

16            THE WITNESS:  I don't think so, no.

17    BY MR. COREY:

18        Q.   Could you identify any of the hard-copy

19    documents?

20            MR. MOLINSKI:  Objection; vague.         09:50:02

21            THE WITNESS:  What?

22            MR. COTE:  Calls for speculation.

23    BY MR. COREY:

24        Q.   That you sent to O'Melveny?

25        A.   The copies, I just only reviewed those    09:50:08
```

Susana Kuemmerle    May 5, 2010

1647

```
 1    copies yesterday, just to check the signature.  No,

 2    I cannot identify anything like that.

 3        Q.   But what you sent to O'Melveny were the

 4    documents with Mr. Aguirre's signature on them;

 5    right?                                              09:50:23

 6        A.   Yeah, the --

 7             MR. MOLINSKI:  Objection; vague.

 8             Go ahead.

 9             THE WITNESS:  Like two inches of paper,

10    more or less.                                       09:50:28

11    BY MR. COREY:

12        Q.   All right.  We'll look at those -- we'll

13    look at those in just a minute.

14             What else did Mr. Machado tell you?

15        A.   That's -- I think that's -- I told you    09:50:34

16    everything that we were able to discuss.

17        Q.   Did you ask him whether he used any of the

18    Mattel information on the CD?

19        A.   Oh, yes, I did.  And he said no.

20        Q.   Did you ask him about the hard-copy        09:50:49

21    documents that were located in his office at all?

22        A.   Yes.  That he recall any hard-copy

23    documents that were in his office.

24             And he remembers a price list, a 2006 price

25    list.                                               09:51:13
```

```
 1        Q.   Did he remember anything else?  Any other

 2   hard-copy documents that were found in his office?

 3        A.   No.  He just mentioned the 2006 price list.

 4        Q.   Did he tell you how he got it?

 5        A.   No.  I ask him.  He didn't -- I said, How   09:51:30

 6   did you get that?

 7             And he said it was through a customer, but

 8   he couldn't remember the name of the customer.  And

 9   he didn't get it directly.

10        Q.   He was clear on that?                         09:51:42

11        A.   Say that again?

12        Q.   He was clear on that?

13        A.   He just told me --

14             MR. MOLINSKI:  Objection; vague.

15             THE WITNESS:  -- he didn't get it directly.   09:51:47

16   I'm not saying anything that...

17   BY MR. COREY:

18        Q.   Did you ever see Mattel price lists while

19   you were at MGA Mexico?

20        A.   No.                                           09:51:57

21        Q.   Did you ask him if he had ever used the

22   price list?

23        A.   No, I didn't.

24        Q.   Did you know that Mr. Machado had a Mattel

25   2006 price list?                                        09:52:14
```

Susana Kuemmerle    May 5, 2010

1649

```
 1        A.   No.
 2        Q.   Did you ask Mr. Machado if he had any
 3   additional Mattel-authored documents, other than
 4   what was located during the search?
 5        A.   I don't understand what you mean.        09:52:35
 6        Q.   During this conversation with Mr. Machado,
 7   did you ask him whether -- strike that.
 8            Did you ever ask Mr. Machado whether he had
 9   any additional Mattel-authored documents, other than
10   what was located during the search?                09:52:53
11            MR. MOLINSKI:  Objection; vague.
12            THE WITNESS:  Yeah.  And he said that's all
13   he can remember.
14   BY MR. COREY:
15        Q.   You asked him that during this            09:53:03
16   conversation?
17        A.   Yeah.  I said, Is there anything else you
18   want to tell me?
19            And he said no, that's all he can remember.
20        Q.   During your conversation with Mr. Machado,  09:53:12
21   did you ask him about Mr. Vargas or Ms. Trueba at
22   all?
23            MR. MOLINSKI:  Objection; vague.
24            THE WITNESS:  No.
25   ///
```

```
 1    BY MR. COREY:

 2        Q.   About what they may have had or what they

 3    may have done?

 4        A.   No.

 5        Q.   Did you ask Mr. Aguirre if he knew or heard    09:54:04

 6    or had any conversations with any of the people who

 7    were in the office on the day of the search about

 8    copies being made of either the CD or the documents

 9    that were located in the search?

10        A.   After the search?  I don't understand your    09:54:30

11    question, to be honest.

12        Q.   Did you ask Mr. Aguirre if he knew that

13    copies were made of the CD and the documents that

14    were located during the search?

15            MR. MOLINSKI:  Objection; vague.              09:54:51

16            THE WITNESS:  I ask him if he saw anybody

17    making copies of anything, and he didn't know.

18    BY MR. COREY:

19        Q.   Did he hear about copies being made?

20            MR. MOLINSKI:  Calls for speculation.         09:55:07

21            THE WITNESS:  I don't know.

22    BY MR. COREY:

23        Q.   Did Ms. Aguilar or Ms. Ramirez hear about

24    copies being made of the documents located during

25    the search and the CD located during the search?      09:55:23
```

Susana Kuemmerle   May 5, 2010

1651

```
 1            MR. MOLINSKI:  Calls for speculation.

 2            THE WITNESS:  I don't know.

 3   BY MR. COREY:

 4       Q.   You -- you didn't ask them that?

 5       A.   I believe that I didn't, no.          09:55:32

 6            MR. MOLINSKI:  I also object as outside the

 7   scope.

 8   BY MR. COREY:

 9       Q.   Did you make an effort to get in touch with

10   Mr. Vargas?                                     09:55:50

11       A.   Mr. Vargas won't talk to me, and you know

12   why.

13       Q.   So the answer is no?

14       A.   Exact.

15       Q.   You tried to get in touch with Ms. Trueba.  09:56:10

16   Who did you speak with?

17       A.   An email was sent to -- I don't know his

18   name -- her attorney here, and the reply was no,

19   that I couldn't.

20       Q.   Her attorney in the United States?        09:56:34

21       A.   I believe so, yes.  But I don't know the

22   name.

23       Q.   Did you see the email?

24       A.   Yes, the reply.

25            MR. COREY:  Do you have that, Bill?        09:56:49
```

```
 1            MR. MOLINSKI:  I can get it.

 2      BY MR. COREY:

 3          Q.   Was it to -- was -- was the reply from

 4      Mr. -- a Mr. Bienert or a Mr. Feldstein?

 5          A.   I don't know.                        09:57:01

 6          Q.   What -- what did the reply say?

 7          A.   That due to current legal situation, she

 8      will not -- I don't remember exactly the text, but

 9      their reply was no.

10          Q.   Do you recall -- the reply was no.  But can  09:57:13

11      you remember any of the why?

12          A.   Because of the current legal situation

13      and --

14            MR. MOLINSKI:  And -- and let me -- before

15      we go further down this road, and also with the    09:57:29

16      production, let me just get from you, Jon, that this

17      isn't going to be a waiver of any privilege by --

18            MR. COREY:  Agreed.

19            MR. MOLINSKI:  -- discussing this.

20            MR. COREY:  Agreed.                       09:57:39

21            MR. MOLINSKI:  Okay.

22            So you can go ahead.  The --

23            MR. COREY:  Well -- and before we go on --

24      but let me -- let me make clear, I don't -- I'll

25      agree that it's not a waiver, but it's -- it's     09:57:52
```

1653

```
 1   not -- because it was information used to prepare

 2   the witness, I don't think it's privileged in the

 3   first place.

 4          I think that's been Mattel's consistent

 5   position, but I'm not going to argue that --          09:58:01

 6          MR. MOLINSKI:  That's --

 7          MR. COREY:  -- that there's been a waiver

 8   of something else.

 9          MR. MOLINSKI:  That's fine.

10   BY MR. COREY:                                          09:58:10

11      Q.   Do you need me to ask the question again?

12      A.   Yes, please.

13      Q.   Okay.  I think you said you understood the

14   reply was no, you would not be able to speak with

15   Ms. Trueba.                                            09:58:38

16          Can you remember the why, of why you

17   couldn't do that?

18      A.   And I'm not using any legal terminology.

19   My understanding is that she was not deposed yet,

20   and until that happens, no.                            09:58:47

21          This is layman's understanding.

22          MR. MOLINSKI:  Jon, are you at a good

23   breaking point?

24          MR. COREY:  Yeah --

25          THE WITNESS:  Yes, please.                      09:59:09
```

```
 1              MR. COREY:  -- that's fine.

 2              THE VIDEO TECHNICIAN:  Going off the record

 3      at 9:59 a.m.

 4              (A recess was taken from 9:59 a.m.

 5              to 10:09 a.m.)                          10:08:14

 6              THE VIDEO TECHNICIAN:  Going back on the

 7      record at 10:09 a.m.

 8      BY MR. COREY:

 9         Q.   I just remind you, Ms. Kuemmerle, that you

10      are still under oath.                           10:09:30

11              Did the reply that you saw from

12      Ms. Trueba's counsel reference her right against

13      self-incrimination?

14         A.   I know it was a no.  I don't know the legal

15      terminology.                                    10:09:42

16         Q.   To prepare for your deposition, did you

17      look at the -- did you look at a CD, the documents

18      on a CD?

19         A.   No.

20              MR. MOLINSKI:  Objection; vague.        10:10:12

21              THE WITNESS:  No.

22      BY MR. COREY:

23         Q.   Well, you -- you looked at the -- did you

24      look at the -- at the scanned documents on the CD

25      that was sent to Mr. Aguirre, or did you look at the  10:10:21
```

Susana Kuemmerle   May 5, 2010

1655

```
 1    hard-copy documents?

 2         A.   I look at paper copies.

 3         Q.   Okay.  And -- and you didn't look at the CD

 4    to prepare for your deposition; right?

 5         A.   No.                                     10:10:33

 6              MR. MOLINSKI:  Objection; vague.

 7    BY MR. COREY:

 8         Q.   As -- as you sit here today, can you

 9    identify any of the documents -- any of the

10    Mattel-authored documents that were located during   10:11:11

11    the search?

12              MR. MOLINSKI:  Objection; vague.

13              THE WITNESS:  No.

14    BY MR. COREY:

15         Q.   Can you identify -- well, strike that.   10:11:18

16              What's -- what is -- what's Andre's timing

17    on the exhibits, getting that list?

18              MR. MOLINSKI:  Want to take a short --

19              THE WITNESS:  Sorry.

20              MR. MOLINSKI:  -- break and I'll call?   10:11:36

21              MR. COREY:  Yeah.  Let -- let's take a

22    break, 'cause -- because that's -- that's -- let's

23    go off the record.

24              THE VIDEO TECHNICIAN:  Going off the record

25    at 10:11 a.m.                                    10:11:42
```

Susana Kuemmerle   May 5, 2010

1656

```
 1            (A recess was taken from 10:11 a.m.

 2            to 10:20 a.m.)

 3            THE VIDEO TECHNICIAN:  Going back on the

 4     record at 10:20 a.m.

 5     BY MR. COREY:                               10:20:12

 6       Q.   Ms. Kuemmerle, you also looked at the

 7     transcript for Mr. Small and Mr. Machado for their

 8     depositions.

 9            Why did you do that?

10       A.   To prepare for my deposition.           10:20:21

11       Q.   Did you look at any of the exhibits

12     attached to their transcripts or just the

13     transcripts themselves?

14       A.   That's something I wanted to clarify.  Yes,

15     I look at some of the exhibits; so, therefore, I did  10:20:31

16     look at some of the documents.

17       Q.   Which exhibits did you look at?

18       A.   I don't remember the numbers.

19       Q.   Can -- but can you remember generally what

20     the document was?                              10:20:44

21       A.   I looked at one document that looked like

22     POS information.  I looked at the first page of a

23     document that read "Nielsen."

24            Oh, my God.  I -- a document that relates

25     to a boys category.                            10:21:01
```

Susana Kuemmerle   May 5, 2010

1657

```
 1            And if I remember something else, I -- I'm
 2    drawing a blank -- I will -- I'll make sure I'll add
 3    to it.
 4        Q.   Was the POS information that you looked at
 5    Mattel POS information?                        10:21:15
 6        A.   It had the Mattel logo, but it was Walmart
 7    Mexico.
 8        Q.   It was -- it was -- at least the -- the
 9    first page had the Mattel logo on it, and it was a
10    record of -- some of the information was a record of  10:21:34
11    Mattel product sales at Walmart; right?
12        A.   Yes.
13        Q.   And was the boys category information, was
14    it a boys marketing presentation related to Mattel
15    products?                                     10:21:49
16        A.   It had Hot Wheels in it, so...
17        Q.   Did the Nielsen report that you looked at
18    also have the Mattel logo on it?
19        A.   No, that page had only Nielsen.
20        Q.   Did you look at any other exhibits?   10:22:10
21        A.   Yeah, I did, but I just don't remember at
22    this particular time what else.
23        Q.   And did you look at any other -- well, let
24    me just ask the broader question:  Did you look at
25    any other documents?                          10:22:31
```

Susana Kuemmerle   May 5, 2010

1658

```
 1        A.   Well, like I said, the printed -- the
 2   hard-copy documents to establish the validity of
 3   Carlos Aguirre's signature.
 4            And it was a long day.  And I -- I know I
 5   look at some documents, but I don't -- those are the    10:22:45
 6   ones that I recall.
 7        Q.   Right.  And what I was trying to ask is
 8   whether -- whether, in addition to the point-of-sale
 9   information, the Nielsen report, and the boys
10   category document, there were any other documents       10:23:04
11   that you looked at that you hadn't identified for
12   me.
13        A.   No.  What I mostly remember is looking at
14   documents that Gustavo recognized during his
15   deposition.                                             10:23:07
16        Q.   Had you seen any of those documents before?
17        A.   No.
18        Q.   And did you read -- did you read the
19   entirety of Mr. Machado's transcript, or only
20   portions?                                               10:23:21
21        A.   No, the entirety of his deposition.
22        Q.   Was there anything in there that you
23   thought was incorrect or inaccurate in any way?
24            MR. MOLINSKI:  Objection; beyond the
25   scope --                                                10:23:32
```

1659

```
 1              MR. COTE:  Calls for speculation.

 2              MR. MOLINSKI:  -- vague.

 3              THE WITNESS:  That I remember, no.

 4    BY MR. COREY:

 5         Q.   Did you read -- did you read the entirety   10:23:38

 6    of Mr. Small's transcripts?

 7         A.   Yes.

 8         Q.   And did you see anything in there that was

 9    incorrect or inaccurate in any way?

10              MR. MOLINSKI:  Objection; vague, beyond the   10:23:57

11    scope, calls for speculation.

12              MR. COTE:  Join.

13              THE WITNESS:  As I remember, no.

14    BY MR. COREY:

15         Q.   Have you ever met Mr. Small?              10:24:05

16         A.   In person?

17         Q.   Yes.

18         A.   No.

19         Q.   Have you ever spoken with him?

20         A.   Yes.                                     10:24:11

21         Q.   When did you speak with him?

22         A.   I don't remember the exact date, to be

23    honest with you.

24         Q.   Have you ever seen Mr. Aguirre's signature

25    before?                                           10:24:21
```

Susana Kuemmerle   May 5, 2010

1660

1    A.   I'm --

2         MR. MOLINSKI:   Objection; vague.

3    BY MR. COREY:

4    Q.   When you worked with him?

5    A.   I'm sure I did, but I cannot pinpoint it.   10:24:26

6    Q.   You couldn't recognize it based on your

7    prior experience?

8    A.   No.

9    Q.   If I showed you the documents that

10   Mr. Aguirre signed, would you be able to recognize   10:24:57

11   them as documents off of the -- scanned onto the CD?

12   A.   I don't understand your question.

13   Q.   Yeah, no.  I'm just trying to --

14        Hold on just a second.  I'm going to show

15   you what's been marked Exhibit 7153.   10:27:17

16        (Exhibit 7153 previously marked.)

17   BY MR. COREY:

18   Q.   Do you recognize Exhibit 7153,

19   Ms. Kuemmerle?

20   A.   I only recognize what it seems to be,   10:27:41

21   Gus- -- Carlos's initials in the corner --

22        THE VIDEO TECHNICIAN:  Jon...

23        MR. COREY:  I'm sorry.

24        THE WITNESS:  -- and that's it.

25   ///

```
 1    BY MR. COREY:
 2        Q.   You recognize Mr. Aguirre's signature on
 3    the upper right-hand corner --
 4        A.   Like --
 5        Q.   -- on -- on each of these pages?          10:28:08
 6        A.   -- like -- like, what it looks like, a T
 7    kind of thing?  Yes.
 8        Q.   And is this one of the documents that he --
 9    he told you that he had signed?
10        A.   If this was one of the scanned documents   10:28:18
11    that were sent on the CD, yes.
12        Q.   So you need to refer back to identification
13    of what was on the CD to be able to -- to do that?
14        A.   If it was on that CD, he told me that those
15    are documents he signed.                          10:28:34
16        Q.   All right.  Well, we'll get to that.
17             Do you know whether hard-copy documents
18    were found in Ms. Trueba's office during the search?
19        A.   I do not know.
20        Q.   Do you know whether hard-copy documents     10:29:03
21    were found in Mr. Vargas's office during the search?
22        A.   I do not know.
23        Q.   Do you know whether -- do you know how any
24    of the Mattel-authored documents that were located
25    in Ms. Trueba's office came to be in Ms. Trueba's   10:29:13
```

Susana Kuemmerle    May 5, 2010

1662

1    office?

2         MR. MOLINSKI:  Objection; assumes facts.

3         THE WITNESS:  I do not know.

4    BY MR. COREY:

5         Q.   Do you know how any of the hard-copy        10:29:22

6    Mattel-authored documents that were found in

7    Mr. Vargas's office came to be there?

8         MR. MOLINSKI:  Assumes facts.

9         THE WITNESS:  I do not know.

10   BY MR. COREY:                                          10:29:31

11        Q.   How did the CD come to arrive at

12   MGA Mexico's office?

13        MR. MOLINSKI:  Objection; vague as to "the

14   CD."

15   BY MR. COREY:                                          10:30:06

16        Q.   The one that Mr. Machado told you about.

17        MR. COTE:  Asked and answered.

18        THE WITNESS:  I -- Gustavo told me that he

19   took the CD to work on his resumé.  When, I do not

20   know.                                                  10:30:19

21   BY MR. COREY:

22        Q.   You don't know how long it had been in

23   MGA Mexico's offices?

24        A.   No.

25        Q.   Do you know how long the hard-copy          10:30:25

```
 1    documents found in Mr. Machado's office had been

 2    located in MGA Mexico's offices?

 3            MR. MOLINSKI:  Objection; vague.

 4            THE WITNESS:  And I can't -- I didn't

 5    understand.  Can you repeat, please?            10:30:35

 6    BY MR. COREY:

 7        Q.   Mr. Machado told you that there was at

 8    least one Mattel price list in his office?

 9        A.   Yes.

10        Q.   How long had that been there, as of -- as  10:30:42

11    of the day of the search?

12        A.   I really do not know.

13        Q.   What did -- at any time did MGA -- strike

14    that.

15            In addition to the CD and the document --   10:31:08

16    the Mattel price list in Mr. Machado's office that

17    he identified for you, are you aware of any other

18    Mattel-authored documents that were in MGA Mexico's

19    office at any time?

20        A.   No.                                        10:31:31

21            MR. MOLINSKI:  Objection; vague.

22            MR. COTE:  Misstates testimony.

23            THE WITNESS:  I -- you need to ask me that

24    again, because it was long.

25    ///
```

1    BY MR. COREY:

2        Q.    Sure.

3        A.    Please.

4        Q.    You told me that the CD that Mr. Machado

5    told you about was in his office as of the date of    10:31:41

6    the search; right?

7        A.    That's what he said.

8        Q.    Well -- and -- and you, speaking on behalf

9    of MGA Mexico, that's what you're saying; right?

10       A.    I -- yes.    10:31:54

11           MR. MOLINSKI:  Objection; vague.

12           THE REPORTER:  What was the answer?

13           THE WITNESS:  Yes.

14   BY MR. COREY:

15       Q.    And you told me that there was also a    10:31:58

16   Mattel price list in Mr. Machado's office on the day

17   of the search; right?

18           MR. MOLINSKI:  Objection; misstates the

19   prior testimony.

20           THE WITNESS:  That's what Mr. Machado said.    10:32:08

21   BY MR. COREY:

22       Q.    And speaking on behalf of MGA Mexico,

23   that's what you're saying; right?

24       A.    That's right.

25           MR. MOLINSKI:  Objection; calls for a legal    10:32:17

Susana Kuemmerle   May 5, 2010

1665

1    conclusion, vague.

2    BY MR. COREY:

3       Q.   And my question is:  On behalf of

4    MGA Mexico, are you aware of any other

5    Mattel-authored document being in the offices of        10:32:29

6    MGA Mexico at any time?

7       A.   No.

8       Q.   Okay.  After the search -- after the search

9    executed by the -- strike that.

10           After the search warrant was executed by        10:32:46

11   the Mexican officials on October 27th, 2005, did MGA

12   or MGA Mexico at any time search for any additional

13   Mattel-authored documents in the offices of

14   MGA Mexico?

15           MR. MOLINSKI:  Objection; vague.  We're         10:33:09

16   getting into work product in terms of a search that

17   was conducted at the direction of counsel, in

18   response to discovery requests and otherwise.

19           This came up in the deposition of

20   Mr. Brawer as a 30(b)(6), and the way we proceeded      10:33:37

21   was that I'd allow her to answer this -- allow her

22   to answer with respect to whether there was a search

23   and what the results of it were, but not the details

24   of how the search was conducted, et cetera, so long

25   as you're agreeing that it's not a waiver of any        10:33:56

1  privilege for her to say that there was a search and

2  what the results of it were.

3          So with that agreement, I'm happy to have

4  her answer that.  But without, then I'd instruct on

5  the grounds of work product.                    10:34:08

6          MR. COREY:  I -- I don't think that what

7  was done -- and I think that there are prior rulings

8  on this -- what was done in connection with the

9  search, whether it was directed -- a search, whether

10  it was directed by counsel or not, is privileged.    10:34:20

11          But because I don't think it's privileged,

12  I'm not going to argue that it was -- that by her

13  answering the questions is -- is a waiver in any

14  way.  And we'll just see where we go with the

15  specific questions.                             10:34:33

16          Does that address your concern?

17          MR. MOLINSKI:  Yeah.  So long as you're

18  saying her answering this is -- that you're going to

19  take the position that it's a waiver, then -- then

20  she can answer the question.                    10:34:42

21          MR. COTE:  Jon, we still have the same

22  agreement that I join in all of Bill's objections?

23          MR. COREY:  Yeah.  Yeah, that's fine.

24          THE WITNESS:  And before I answer anything,

25  I need to understand what you two agreed upon,    10:34:50

Susana Kuemmerle   May 5, 2010

1667

```
 1    because I don't get it.

 2              MR. COREY:  Well --

 3              MR. MOLINSKI:  Well, all you need --

 4              THE WITNESS:  Sorry.

 5              MR. MOLINSKI:  -- to know is you can answer   10:34:56

 6    the question, which is -- well, why don't we have

 7    the question read back.

 8              THE WITNESS:  Okay.

 9              THE DISCOVERY MASTER:  Make sure you pause

10    in this line of inquiry, because there may be some    10:35:03

11    subset of questions where he'll -- he could take the

12    position that he doesn't want you to answer.  So

13    don't -- don't rush your answers in this series of

14    questions.

15              THE WITNESS:  I understand.  But I do not    10:35:13

16    understand what was agreed upon, and so I want to

17    understand.

18    BY MR. COREY:

19       Q.  I'll ask you the question that I think I

20    asked you again.                                      10:35:24

21              MR. MOLINSKI:  Well, why don't we -- to

22    allay her concerns, why don't I just take a short

23    break --

24              THE WITNESS:  Yes.

25              MR. MOLINSKI:  -- so she understands.       10:35:29
```

```
 1              THE WITNESS:  Because I need to understand.

 2              THE VIDEO TECHNICIAN:  Going off the record

 3    at 10:35 a.m.

 4              (A discussion was held between the

 5              witness and her attorney outside of        10:35:33

 6              the room.)

 7              THE VIDEO TECHNICIAN:  Going back on the

 8    record at 10:39 a.m.

 9    BY MR. COREY:

10       Q.   Ms. Kuemmerle, at any time after the search  10:39:32

11    on October 27th, 2005, was a search conducted by MGA

12    or MGA Mexico to determine whether there were any

13    additional Mattel-authored documents in its

14    possession -- or their possession?

15       A.   I can only say that I learned this through   10:39:51

16    counsel:  A search was done, and nothing was found.

17       Q.   When was the search done?

18              MR. MOLINSKI:  Object.

19              Instruct not to answer.

20              THE WITNESS:  I can't answer.             10:40:08

21              MR. COREY:  I mean, on work product

22    grounds?

23              MR. MOLINSKI:  Yeah.

24              MR. COREY:  I don't think that's work

25    product.                                            10:40:10
```

```
 1            I would ask for a ruling on that.
 2            THE DISCOVERY MASTER:  Did -- were -- just
 3       the specific date or time frame that --
 4            MR. MOLINSKI:  Yeah.  I mean, these were
 5       conducted at the direction of counsel.  And I --     10:40:22
 6       there are prior rulings now that say that what
 7       they're entitled to is any facts -- and this is what
 8       Judge Carter just ruled -- any facts that were
 9       uncovered or documents located during any searches.
10            But the details of the searches are            10:40:37
11       privileged.  The who, what, when, and where is the
12       details of the search.  And that was all done by
13       counsel or at the direction of counsel.
14            THE DISCOVERY MASTER:  And it's your
15       position that the -- that the time frame is not      10:40:53
16       fact, that that's a detail of the investigation
17       itself?
18            MR. MOLINSKI:  That -- that is a detail of
19       the investigation itself.
20            Now, I mean, I can tell you this witness        10:41:03
21       isn't going to know the answers to the details
22       anyway, but -- so if it gets us around this hump and
23       there's not a waiver, I'm happy to have her answer
24       these.
25            But I want to make clear that there's no        10:41:17
```

1  waiver of any privilege by her doing so, which is

2  kind of what we did with Brawer.  He didn't know the

3  answers, and so we let him answer with a nonwaiver

4  agreement.

5        But -- so if you want to go down that        10:41:26

6  direction, you can.

7        THE DISCOVERY MASTER:  Are you willing, I

8  mean, to resolve this?  You know, I'm not -- I mean,

9  I -- if the Court's issued an order and, you know --

10  I mean, I think that it's -- that -- that MGA has     10:41:38

11  a -- has a point, that it's not a fact that's

12  uncovered by the investigation, if that's the -- the

13  position.

14        But I think that this is a -- a solution

15  around it, to avoid any --                           10:41:54

16        MR. COREY:  Which --

17        THE DISCOVERY MASTER:  -- issue going up to

18  Carter.

19        MR. COREY:  Sorry.  I didn't mean to

20  interrupt.                                           10:41:59

21        THE DISCOVERY MASTER:  No.  Go ahead.

22        MR. COREY:  Which order are you referring

23  to?

24        MR. MOLINSKI:  It came out about a week,

25  maybe a week and a half ago.  And it was a motion to  10:42:04

Susana Kuemmerle    May 5, 2010

1671

```
 1     compel that you guys filed, motion to compel on

 2     investigations on any internal investigations

 3     conducted at MGA.

 4            And the result of the ruling was you get

 5     any facts that come out of it.                    10:42:23

 6            THE REPORTER:  The result of the ruling?

 7            MR. MOLINSKI:  The result of the ruling is

 8     that you get only whatever facts are discovered as a

 9     result of it.

10            We can't rely, for example, on privilege,   10:42:30

11     he says in the order, to withhold a document that

12     may have been located during a search.

13            But the actual investigation, interviews of

14     people, he says, that would be privileged.  You --

15     you can also depose the people who we interviewed to  10:42:45

16     find out what they know, the facts.  But the

17     investigation itself is privileged.

18            At least, that's my understanding of the

19     order.

20            MR. COREY:  Yeah, and that's -- that's       10:42:57

21     actually -- that's not actually how I read the

22     order.  But I -- I --

23            THE DISCOVERY MASTER:  Well, what -- I

24     would suggest this.  I mean, I think there may be a

25     route around it, regardless of the interpretation of  10:43:08
```

Susana Kuemmerle   May 5, 2010

1672

```
 1    the order, but maybe we can get a copy of the order

 2    for me to review as well, if that would be helpful.

 3           But I mean, I think that he's offered

 4    something that -- that potentially may resolve it.

 5    Obviously, if she answers the questions in a -- in a     10:43:20

 6    different way, then --

 7           MR. COREY:  No.  And that's -- and that's

 8    what I was going to say.  I -- I don't think the

 9    kind of basic facts -- I mean, they're the same kind

10    of basic facts that you would -- they're kind of the     10:43:29

11    foundational facts for an assertion of privilege.  I

12    mean, I don't think that kind of information is --

13    falls within the scope of the work -- of work

14    product.  And so I won't argue that that's -- that

15    that's a waiver.                                         10:43:44

16           I mean -- and then, frankly, if she doesn't

17    know the answer to the questions, it's kind of a

18    moot point anyway.

19           MR. MOLINSKI:  But if -- if you want to

20    establish that, so long as you're not going to take     10:43:55

21    the position it's a waiver, that's -- that's fine.

22           MR. COREY:  Yeah, that's fine.

23           MR. MOLINSKI:  Okay.

24    BY MR. COREY:

25        Q.  Ms. -- Ms. Kuemmerle, you said that a -- a       10:44:09
```

Susana Kuemmerle    May 5, 2010

1673

```
 1    search was done.  Was that -- strike that.

 2          A search was done on behalf of MGA or

 3    MGA Mexico to determine whether any additional

 4    Mattel-authored documents were in its possession.

 5          Do you know whether it was one search or      10:44:32

 6    more than one search?

 7          A.   I do not know.

 8          Q.   Do you know when the search or searches

 9    were conducted?

10          A.   No.                                      10:44:44

11          Q.   Were you personally involved in any of

12    those searches?

13          A.   No.

14               MR. MOLINSKI:  And also, I'm going to

15    object to this line of questions, in addition, as   10:44:53

16    being outside the scope.  As the discovery master

17    knows, we've handed him an order, the order is

18    fairly limited in what she is here to testify to

19    today.  But -- so I want to preserve that objection,

20    that this is outside the scope of -- of that.       10:45:08

21               MR. COREY:  You have made your objection.

22    I -- I -- I disagree.  I mean, we can -- we can have

23    a colloquy about that, but I don't -- you've made

24    your objection.

25               But I think efforts that were made to find 10:45:20
```

Susana Kuemmerle   May 5, 2010

1674

1    out what may or may not have been in the possession

2    of -- of -- what Mattel trade secrets may or may not

3    have been in the possession of MGA Mexico clearly

4    fall within the scope of that order.

5         MR. MOLINSKI:  Well, I think the order very    10:45:34

6    clearly says that she's here to testify to how any

7    Mattel information got to the company, and that's --

8    that's it, and this is clearly outside of that.

9    BY MR. COREY:

10        Q.   Do you know when that search or searches    10:45:51

11   were conducted?

12        A.   What?

13        Q.   Do you know when the search or searches

14   were conducted?

15        A.   No.                                         10:46:01

16        Q.   Do you know what was searched?

17        A.   No.

18        Q.   Do you know whether the offices -- the

19   file -- physical files in the offices of MGA Mexico

20   were searched?                                        10:46:41

21        A.   No.

22        Q.   Do you know whether your office was

23   searched?

24        A.   I do not know.

25        Q.   How long did you have the materials --      10:46:50

Susana Kuemmerle   May 5, 2010

1675

```
 1    strike that.

 2            Do you know whether your computer was

 3    searched?

 4        A.   I don't know.

 5        Q.   Do you know whether Mr. Machado used his --   10:46:57

 6    his VAIO laptop for work -- for MGA work while he

 7    was with MGA?

 8            MR. MOLINSKI:  Objection; outside the

 9    scope, calls for speculation.

10            THE WITNESS:  I don't know.                   10:47:50

11    BY MR. COREY:

12        Q.   Do you know if the search included requests

13    to MGA employees -- or MGA Mexico employees, excuse

14    me, to see if they had Mattel-authored documents in

15    their possession outside of work?                    10:48:23

16            MR. MOLINSKI:  Objection; vague, outside

17    the scope.

18            THE WITNESS:  And I don't understand.

19    BY MR. COREY:

20        Q.   Sure.  Sometimes you worked on the road or  10:48:37

21    in your -- or in your home; right?

22            MR. MOLINSKI:  Objection; vague.

23            THE WITNESS:  Yes.

24    BY MR. COREY:

25        Q.   And sometimes some of the MGA Mexico        10:48:59
```

```
 1    employees also worked at home; right?

 2            MR. MOLINSKI:  Objection; vague.

 3            THE WITNESS:  I assume so.

 4    BY MR. COREY:

 5       Q.   And sometimes you would get emails from      10:49:06

 6    them at 1:30 in the morning or 12:30 at night?

 7       A.   No.

 8       Q.   Cyrus sends me emails at 1:30 in the

 9    morning.

10       A.   That's his problem.  Really bad.          10:49:21

11       Q.   Sometimes some of the MGA Mexico employees

12    worked at home; right?

13       A.   Sometimes.

14       Q.   Did you ever ask them if they -- during

15    this -- strike that.                             10:49:33

16            Do you know if during the search they were

17    asked whether they had Mattel-authored documents in

18    their possession at home?

19       A.   I do not know.

20       Q.   Okay.  Do you know if during the search any 10:49:50

21    effort was made to determine whether any of the

22    documents were used -- the Mattel-authored documents

23    were used by MGA Mexico or MGA employees as -- for

24    formatting or templates?

25            MR. MOLINSKI:  Objection; vague, outside   10:50:23
```

Susana Kuemmerle   May 5, 2010

1677

```
 1    the scope.
 2          THE WITNESS:  And you have to say that all
 3    over again, please.
 4    BY MR. COREY:
 5      Q.   Sure.  Did you -- strike that.          10:50:38
 6          Do you know whether during the search an
 7    effort was made to identify any documents created
 8    using the Mattel-authored documents as templates?
 9      A.   I don't know.
10      Q.   Did Mr. Machado, Mr. Vargas, or Ms. Trueba  10:50:52
11    help you locate office space --
12          MR. MOLINSKI:  Objection --
13    BY MR. COREY:
14      Q.   -- for MGA Mexico before they were employed
15    by Mattel?                                     10:51:38
16          MR. MOLINSKI:  -- vague, outside the scope.
17          THE WITNESS:  You have to ask me --
18    BY MR. COREY:
19      Q.   Excuse me.  Before they were employed by
20    MGA.                                           10:51:45
21      A.   You have to -- I'm sorry.  You have to
22    repeat that.  I don't understand.
23      Q.   When you went with Mr. Larian and Mr. Park
24    to interview Mr. Machado, Mr. Vargas, and Mr. -- and
25    Ms. Trueba at The W Hotel, you looked for office    10:52:04
```

Susana Kuemmerle   May 5, 2010

1678

```
 1    space on the same day; right?
 2          MR. MOLINSKI:  Objection; outside the
 3    scope, vague.
 4          THE WITNESS:  Yes.  I already testified to
 5    that, yes.                                      10:52:15
 6    BY MR. COREY:
 7       Q.   And -- and my question is:  Did
 8    Mr. Machado, Mr. Vargas, or Ms. Trueba help or
 9    provide guidance in selecting office space --
10          MR. MOLINSKI:  Objection --              10:52:27
11    BY MR. COREY:
12       Q.   -- for MGA Mexico?
13          MR. MOLINSKI:  Objection --
14          Hold off.
15          We are very clearly outside the scope at  10:52:31
16    this point, Counsel.  We've had seven days of
17    deposition of 30(b)(6).  We're down to a very narrow
18    topic that Judge Carter has ordered continued
19    deposition on.  This isn't a repeat of all of the
20    other topics for the 30(b)(6) for today that we have  10:52:45
21    gone into at length.
22          I'm -- I'm going to have to ask for a
23    ruling if we're going to continue on, on this line.
24    If you've got a limited number of questions on this,
25    that's fine, but I don't want this to be a repeat    10:53:01
```

```
 1    and the filling in of gaps of seven days of

 2    deposition.  That's not what the order provided for.

 3           MR. COREY:  I would like an answer to the

 4    question.

 5           MR. MOLINSKI:  Can I get a ruling?         10:53:13

 6           THE DISCOVERY MASTER:  Could I -- could you

 7    repeat the question first.

 8               (The record was read by the court

 9               reporter as follows:

10               "Q.  And my question is:  Did

11               Mr. Machado, Mr. Vargas, or

12               Ms. Trueba help or provide guidance

13               in selecting office space for

14               MGA Mexico?")

15           THE DISCOVERY MASTER:  I'm happy to hear     10:53:41

16    oral argument, but I'm not sure how that relates to

17    the topic that the Court identified in its

18    April 22nd, 2010, order.

19           MR. COREY:  Sure.  I mean, the -- the

20    witness is -- the witness is here.  The thing that    10:53:54

21    came up at Mr. Machado's --

22           THE REPORTER:  I'm sorry.  I can't hear

23    you.

24           MR. COREY:  The witness is here.  The

25    witness -- the things that came up at Mr. Machado's   10:54:02
```

Susana Kuemmerle    May 5, 2010

1680

```
 1    deposition, shedding things in a little bit
 2    different light, I have one or two questions about
 3    things like this, and it's not going to make the
 4    deposition go any longer than it otherwise would be.
 5             THE DISCOVERY MASTER:  I mean, if -- if      10:54:15
 6    you'll restrict it to one or two questions, it
 7    sounds like Mr. Molinski is -- is willing to allow
 8    you that -- to -- to ask those limited questions.
 9             But I -- we will watch this closely.  And
10    if you go beyond that, I don't see how it's relevant  10:54:29
11    to the order to -- for her to be here today.  So I
12    mean, I'll allow the question and, you know, a
13    couple in this -- in this kind of vein, but
14    certainly want to try to stick to what she was
15    ordered to reappear for deposition today.            10:54:45
16             MR. MOLINSKI:  And -- and let me just
17    preserve my objection that I do believe this is
18    outside the scope.  So any answers she does give on
19    the one or two questions are not answers that she's
20    giving as a corporate representative at this point.  10:54:59
21             But if there's one or two questions, that's
22    fine.
23    BY MR. COREY:
24       Q.   Do you want me to ask the question again?
25       A.   Yes.                                         10:55:14
```

```
 1        Q.   Before Mr. Machado, Mr. Vargas, and

 2   Ms. Trueba were hired, did they provide any guidance

 3   or assistance in identifying or locating office

 4   space for MGA Mexico?

 5        A.   I only -- no.  I don't know.  I only know      10:55:36

 6   that when we went to Mexico, we visited office

 7   space.

 8        Q.   Did Mr. Machado, Mr. Vargas, or Ms. Trueba

 9   accompany you on those visits?

10           MR. MOLINSKI:  Same objections.                 10:55:57

11           THE WITNESS:  I don't recall.

12   BY MR. COREY:

13        Q.   They could have?  They couldn't have?  You

14   just can't remember?

15        A.   I don't remember.  This is...                 10:56:02

16           MR. COREY:  Bill, we got your -- we got

17   your set.  About, it looks like, six or seven of the

18   documents that you sent to Mr. Aguirre had not been

19   previously marked.  And so we're -- we're getting

20   those made, and then we can mark those as exhibits,    10:56:34

21   just so we have a complete set.  And then we can

22   deal with that, that way.

23           MR. MOLINSKI:  So we were actually

24   overinclusive.  Excellent.

25           THE WITNESS:  Spiritude of teamwork.           10:56:49
```

Susana Kuemmerle   May 5, 2010

1682

1    MR. MOLINSKI:  Yeah.  And I would like to

2    also preserve on that issue the objection that,

3    while we have had her do that exercise and

4    authenticate the signatures for you to avoid any

5    future disputes, I think a fair reading of          10:57:02

6    Judge Carter's order is that he denied your motion

7    on that ground, because that was one of the specific

8    things you had asked her to do in follow-up.  He

9    didn't order it in his order.

10    But that being -- so I'm going to object     10:57:13

11    any answer she gives as being outside the scope on

12    that topic.  But I'm not going to stop you from

13    asking, because that was one of the few things you

14    did specifically raise in the motion.

15    MR. COREY:  And that, I'm actually -- that,  10:57:34

16    I'm actually going to have to ask for a ruling on,

17    because I think it's clearly contemplated within the

18    scope of the order.

19    The order -- the order reads:  "The

20    purported" -- "the purported appearance of Mattel   10:57:50

21    trade secret documents in MGA Mexico's offices."

22    I think it's clearly contemplated within

23    the scope of that, that the -- the identification

24    of -- of those documents.  I mean, I think that's

25    the exercise that we're going through with -- with   10:58:18

Susana Kuemmerle    May 5, 2010

1683

| | |
|---|---|
| 1 | Mr. Aguirre.  And so I -- I do think that needs to |
| 2 | be testimony on behalf of MGA Mexico by this |
| 3 | designee. |
| 4 | MR. MOLINSKI:  All right.  On that limited |
| 5 | topic, I will withdraw my objection.  That's fine.    10:58:23 |
| 6 | MR. COREY:  I can't remember if there's a |
| 7 | question pending or not. |
| 8 | Q.   Okay.  Just -- just to make -- just to make |
| 9 | sure that they're -- they're clear, that the |
| 10 | record's clear, you said you didn't remember whether    10:59:13 |
| 11 | Mr. Machado, Mr. Vargas, and Ms. Trueba accompanied |
| 12 | you on the visits to the office space. |
| 13 | Then I asked you whether they could have, |
| 14 | they couldn't have, you just can't remember. |
| 15 | And you said, "I don't remember."  And then    10:59:32 |
| 16 | you started to say something, "This is" -- I just |
| 17 | wanted to make sure that you'd -- you are welcome to |
| 18 | look at the -- you're welcome to look at the |
| 19 | transcript, but I just wanted to make sure that you |
| 20 | finished answering your -- the question.    10:59:48 |
| 21 | A.   I just don't remember.  That's my -- my |
| 22 | answer. |
| 23 | MR. COREY:  Okay.  All right.  Why don't we |
| 24 | take a quick break, and we'll get this -- we should |
| 25 | get this squared away.    11:00:05 |

```
 1              THE VIDEO TECHNICIAN:  This is the end of
 2     Tape No. 1.  Going off the record at 11 a.m.
 3              (A recess was taken from 11:00 a.m.
 4              to 11:47 a.m.)
 5              (Exhibits 8077 through 8088 marked.)        11:47:12
 6              THE VIDEO TECHNICIAN:  This is the start of
 7     Tape No. 2.  Going back on the record at 11:47 a.m.
 8              MR. COREY:  Okay.  Can I get this marked?
 9     I should have done this while we were off the
10     record.                                             11:47:28
11              (Exhibits 8089 and 8090 marked.)
12              THE REPORTER:  You have -89 and -90; right?
13              MR. MOLINSKI:  I have -89 and -90, yep.
14     8090.
15     BY MR. COREY:                                       11:48:31
16        Q.   Ms. Kuemmerle, we've put in -- I've put in
17     front of you a number of exhibits, and what I would
18     like you to focus on is 8089, which is an email from
19     Mr. Molinski, who's here today, to me, dated
20     Wednesday, March 5th, 2010, 10:14, and it has a list 11:48:50
21     of Bates ranges on CD sent to Mr. Molinski by
22     Mr. De La Cruz.
23              Do you see that?
24        A.   Yes, I do.
25        Q.   And do you understand that the list of      11:49:03
```

```
 1    Bates ranges on the CD to be a reference to the

 2    scanned hard-copy documents on the CD that was sent

 3    to Mr. Aguirre?

 4        A.   I understand it, yes.

 5        Q.   On behalf of -- on behalf of MGA Mexico,      11:49:17

 6    that's what you understand the list of

 7    Bates numbers to be; right?

 8        A.   That's what I understand, yes.

 9        Q.   And it's these Bates numbers,

10    MGA 0139534-552, running down about a third of the     11:49:34

11    page -- excuse me -- these Bates-numbered documents

12    that Mr. Aguirre told you each contain his initials

13    on the page?

14        A.   I -- there are -- I don't know the numbers,

15    but I will assume that, yes, they are.                 11:49:55

16        Q.   Well -- and -- and you're relying on this

17    information that was provided by your counsel, and

18    so on behalf of MGA Mexico, it's the documents

19    identified by these Bates numbers that Mr. Aguirre

20    identified as having his initials on each page;        11:50:08

21    correct?

22             MR. MOLINSKI:  Objection; vague.

23             THE WITNESS:  Relying on counsel's

24    information, yes.

25             MR. COREY:  And, Bill, and so we're clear,     11:50:17
```

Susana Kuemmerle   May 5, 2010

1686

```
 1     what's -- what's the basis for the vagueness

 2     objection?

 3            MR. MOLINSKI:  I thought the question was

 4     vague.  I thought it was not clear.

 5     BY MR. COREY:                                    11:50:32

 6        Q.   Ms. -- did you under- -- did you understand

 7     my question?

 8        A.   I believe I did.  And I'm relying on the

 9     information provided by counsel, and -- yes.

10        Q.   And the information that you have from      11:50:39

11     counsel is that the Bates numbers listed in 8089 are

12     the Bates numbers of the documents that were

13     provided to Mr. Aguirre; correct?

14            MR. MOLINSKI:  I -- objection; vague.

15     And -- and I assume there's no waiver of any       11:50:51

16     privileges incurred.

17            MR. COREY:  Right.  We're not -- we're not

18     waiving any privi- -- I mean, I'm not going to argue

19     that any of -- any of the information provided to

20     the witness to testify on behalf of MGA Mexico from  11:50:59

21     counsel is -- is a waiver in any way.

22            THE WITNESS:  Can you repeat, then, please?

23     BY MR. COREY:

24        Q.   On behalf of MGA Mexico, are the documents

25     with the Bates numbers listed in Exhibit 8089 the    11:51:31
```

Susana Kuemmerle    May 5, 2010

1687

```
 1     documents provided to Mr. Aguirre?
 2         A.    It will be a safe assumption, yes.
 3         Q.    Well, I'm not -- I'm not -- I can't accept
 4     an assumption answer.  You're testifying on behalf
 5     of MGA Mexico.                                         11:51:47
 6             MR. MOLINSKI:  Well, I mean, I think the
 7     difficulty here is I'm -- I'm telling you these are
 8     the documents that were sent to Mr. Aguirre.  So
 9     she --
10             MR. COREY:  So she shouldn't --              11:51:59
11             MR. MOLINSKI:  She isn't relying on
12     something I told her earlier; she's hearing it for
13     the first time, like you are.  These -- this is the
14     first time in this format she's seen this list of
15     documents.                                            11:52:10
16             MR. COREY:  Right.  And I think you just
17     need to tell her that, so she can say that and we're
18     done.
19             MR. MOLINSKI:  Okay.
20             I can represent on the record, these list     11:52:17
21     of documents are the list of documents that were
22     sent to Mr. Aguirre for his review.
23             THE WITNESS:  And --
24             MR. COREY:  Thank you.
25             MR. MOLINSKI:  Sure.                          11:52:25
```

1688

```
 1              THE WITNESS:  That's the answer.

 2              MR. COREY:  I apologize if I skipped a

 3      step, but that's -- I thought that had been -- that

 4      had been taken care of.

 5          Q.   Okay.  Now, to make sure we're -- we have a   11:52:41

 6      clean record, in Exhibit 8089, the documents

 7      containing the Bates numbers there are the documents

 8      that were provided to Mr. Aguirre; correct?

 9          A.   As advised by counsel, yes.

10          Q.   And you're -- you -- you are -- your           11:52:51

11      understanding is that those Bates numbers are the

12      documents that were provided to Mr. Aguirre --

13              MR. MOLINSKI:  Objection; asked and

14      answered.

15      BY MR. COREY:                                          11:53:07

16          Q.   -- in Exhibit 8089?

17          A.   And my answer is:  As advised by counsel,

18      yes, this is the list.

19          Q.   And by "counsel" you're referring to

20      Mr. Molinski?                                          11:53:15

21          A.   Yes.

22          Q.   Counsel for MGA Mexico?

23          A.   Yes.

24          Q.   And the exhibits -- excuse me -- the

25      documents with the Bates numbers in Exhibit 8089 are   11:53:25
```

1    the documents that Mr. Aguirre told you each contain

2    his initials on each page; right?

3         A.   Yes.

4         Q.   And then, if you can take a look at

5    Exhibit 8090.                                    11:53:45

6         Exhibit 8090, so that the record is

7    complete, we have -- we have identified by

8    deposition exhibit number the documents that were

9    provided to Mr. Aguirre by Bates number.  And

10   counsel has checked those against his list, and     11:54:15

11   we've put the marked exhibits -- the new marked

12   exhibits in -- in front of you.

13        Is that agreeable, Counsel?

14        MR. MOLINSKI:  That's -- that's agreeable.

15   BY MR. COREY:                                    11:54:46

16        Q.   Now, feel free to look at any of the -- any

17   of the documents that you need to that are in front

18   of you.

19        Ms. Kuemmerle, do you know where, on the

20   day of the search, any of the hard-copy documents     11:55:06

21   that were provided to Mr. Aguirre were located?

22        A.   Specifically, as to the location, no.

23        Q.   Yes.  And the location within MGA Mexico's

24   offices.  Is that what you understood?

25        A.   Yes.  And my answer is no.              11:55:22

Susana Kuemmerle   May 5, 2010

1690

```
 1          Q.   And do you know how any of the hard-copy
 2    documents containing Mr. Aguirre's signature arrived
 3    at the offices of MGA Mexico?
 4          MR. MOLINSKI:  Objection; vague.
 5          MR. COTE:  Asked and answered.          11:55:37
 6          THE WITNESS:  No.
 7          And I'm sorry.  I apologize.
 8    BY MR. COREY:
 9          Q.   Do you need to get that?
10          A.   No.  I'll turn it off.  Sorry.     11:55:44
11          MR. MOLINSKI:  I assume you're excluding
12    the one that she talked about earlier.
13          MR. COREY:  That was my next question.
14    That was --
15          Q.   And -- and you had already told me that   11:55:54
16    there was a 2006 Mattel price list that Mr. Machado
17    had told you he had received from a customer, I
18    believe you said; is that right?
19          A.   I believe that that was my answer, yes.
20          MR. COTE:  Objection; misstates testimony.   11:56:09
21    BY MR. COREY:
22          Q.   So other than that -- other than that
23    hard-copy document, you can't identify where any of
24    the -- how any of the other hard-copy documents with
25    Mr. Aguirre's initials on arrived at the offices of   11:56:19
```

1   MGA Mexico; correct?

2       A.   Correct.

3       Q.   Do you know whether any of the documents

4   with Mr. Aguirre's initials were ever used or

5   disclosed by anyone, either at MGA or MGA Mexico?       11:56:34

6       A.   Can you ask again, please?

7       Q.   Sure.

8            Do you know whether any of the documents

9   with Mr. Aguirre's initials on them were used by

10  anyone at MGA Mexico?                                   11:56:46

11           MR. MOLINSKI:   Objection; vague, outside

12  the scope.

13           THE WITNESS:   And I don't know.

14  BY MR. COREY:

15      Q.   Do you know whether they were disclosed to     11:56:52

16  anyone at MGA Mexico?

17      A.   I don't know.

18      Q.   Do you know whether they were used by

19  anyone at MGA?

20           MR. MOLINSKI:   Outside the scope, vague.       11:57:00

21           THE WITNESS:   I --

22           THE REPORTER:   Pardon?

23  BY MR. COREY:

24      Q.   Do you know whether they were --

25      A.   I do not know.                                  11:57:09

Susana Kuemmerle   May 5, 2010

1692

```
 1        Q.   Do you know whether they were disclosed to
 2   anyone at MGA?
 3             MR. MOLINSKI:  Same objection.
 4             THE WITNESS:  I don't know.
 5   BY MR. COREY:                                    11:57:18
 6        Q.   I'm going to mark what's been -- I'm going
 7   to hand you what's going to be marked as
 8   Exhibit 8090.
 9        A.   -91.
10        Q.   -91.                                   11:57:31
11             (Exhibit 8091 marked.)
12   BY MR. COREY:
13        Q.   Exhibit 8091 is an email from Mr. Molinski
14   to me, dated May 5th, 2010, at 11:37 a.m.  And it
15   forwards an email from a Mr. Feldstein to          11:58:00
16   Mr. Molinski, dated May 4th at 11:11 a.m.
17             Can you take a look at that, Ms. Kuemmerle?
18        A.   Yes.
19        Q.   Have you seen that before?
20        A.   Not in paper format, but I've seen the    11:58:19
21   reply from Mr. Feldstein now.
22        Q.   And is this the email that you were
23   referring to this morning from Ms. Trueba's attorney
24   explaining why Ms. Trueba was not willing to speak
25   to you in connection with your deposition?          11:58:37
```

Susana Kuemmerle   May 5, 2010

1693

1       A.   Yes.

2       Q.   Is this the only communication that you had

3   with Ms. Trueba's attorneys?

4       A.   Yes.

5       Q.   Did you speak to Ms. Trueba about your          11:58:56

6   deposition?

7       A.   No.

8            MR. COREY:   I don't have any more

9   questions.

10           I do have some issues with the preparation,     11:59:25

11   but if it's acceptable with the discovery master,

12   I'll reserve -- I'll reserve those until after the

13   deposition of Ms. -- of Ms. Trueba.  I don't know if

14   that's acceptable or not, but that's -- that's what

15   I would propose.                                        11:59:41

16           MR. MOLINSKI:   That makes sense to me.

17           THE DISCOVERY MASTER:   That's fine with me.

18           MR. COREY:   I just -- I don't want to be

19   waiving anything, if we have to get a ruling from

20   you right now.                                          11:59:48

21           MR. MOLINSKI:   I will not take the position

22   you're waiving anything by waiting after

23   Ms. Trueba's deposition, since I think that makes an

24   infinite amount of sense.

25           THE DISCOVERY MASTER:   I think that's          11:59:59

Susana Kuemmerle   May 5, 2010

1694

```
 1    sufficient for -- for Mattel.  Correct?

 2              MR. COREY:  That works for me.

 3              THE DISCOVERY MASTER:  Okay.

 4              MR. COTE:  Before we finish -- I'll agree

 5    to that stipulation also.  But before we finish, can   12:00:06

 6    I just have a minute to talk with Bill?

 7              MR. COREY:  Okay.

 8              MR. MOLINSKI:  Let's go off the record.

 9              THE VIDEO TECHNICIAN:  Going off the record

10    at 12 p.m.                                             12:00:14

11              (A discussion was held off the record.)

12              THE VIDEO TECHNICIAN:  Going back on the

13    record at 12:04 p.m.

14              MR. MOLINSKI:  Okay.  I -- I have no

15    questions.                                             12:04:22

16              MR. COREY:  Mattel's going to designate the

17    transcript attorneys' eyes only.

18              I propose that the -- the witness will have

19    30 days to sign under penalty of perjury.

20    Mr. Molinski will let me know five days after that     12:04:39

21    of any changes and provide me with the signed

22    original.  The original will go to Mr. Molinski.  In

23    the event that the original is lost or otherwise

24    unavailable, a certified copy can be used in its

25    stead.  And the original will be made available upon   12:04:57
```

Susana Kuemmerle   May 5, 2010

1695

1    reasonable request.  The court reporter is relieved

2    of her custodial responsibilities.

3            MR. MOLINSKI:  That's -- that's agreed.

4            And also, I'll join in the AEO designation.

5            MR. COTE:  Agreed.                          12:05:08

6            So stipulated.

7            THE VIDEO TECHNICIAN:  This is the end of

8    Tape No. 2 and marks the conclusion of today's

9    30(b)(6) deposition of MGA Entertainment de Mexico.

10   The time is 12:05 p.m.  We are off the record.     12:05:22

11            (Whereupon, at the hour of

12            12:05 p.m., the proceedings were

13            adjourned.)

14                        -oOo-

15

16

17

18

19

20

21

22

23

24

25

Susana Kuemmerle   May 5, 2010

1696

1   DECLARATION OF WITNESS

2

3       I certify under penalty of perjury under the

4   laws of the State of California that the foregoing

5   is true and correct.

6

7

8   Executed at ___NEW JERSEY___, on ___8/20/2010___,

                  (PLACE)              (DATE)

9

10

                    (SIGNATURE OF WITNESS)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A&E COURT REPORTERS (213) 955-0070  FAX: (213) 955-0077

Attachment Page 90

```
 1              Deposition Officer's Certificate
 2      United States District Court      )
 3                                        ) SS.
 4      Central District of California    )
 5          I, PAULA A. PYBURN, hereby certify:
 6          I am a duly qualified certified shorthand
 7      reporter in the state of California, holder of
 8      Certificate Number CSR 7304 issued by the Court
 9      Reporters Board of California and which is in full
10      force and effect. [FED. R. DIV. P. 28 (A)].
11          I am authorized to administer oaths or
12      affirmations pursuant to California Code of Civil
13      Procedure, Section 2093(B), and prior to being
14      examined, the deponent was first duly sworn by me.
15      [FED. R. CIV. P. 28(A), 30(F)(1)].
16          I am not a relative or employee or attorney or
17      counsel of any of the parties, nor am I a relative
18      or employee of such attorney or counsel, nor am I
19      financially interested in this action. [FED. R. CIV.
20      P. 28].
21          I am the deposition officer that
22      stenographically recorded the testimony in the
23      foregoing deposition and the foregoing transcript
24      that is a true record of the testimony given by the
25      deponent. [FED. R. CIV. P. 30(F)(1)].
```

Susana Kuemmerle    May 5, 2010

1698

1    Before completion of the deposition, review of

2  the transcript [xx] was [  ] was not requested.  If

3  requested, any changes made by the deponent (and

4  provided to the reporter) during the period allowed

5  are appended hereto. [FED. R. CIV. P. 30(E)].

6

7

8            Dated: _____

9

10

11

12

13         _____

    PAULA A. PYBURN

14  CSR No. 7304, RPR

    Certified LiveNote Reporter

15

16

17

18

19

20

21

22

23

24

25

DEPOSITION ERRATA
Bryant v. Mattel and Consolidated Actions,
Case No.: 2:04-CV-9049-DOC, C.D. Cal., Santa Ana

30(b)(6) Deposition of MGAE de Mexico
Susana Kuemmerle, Volume VII, taken on May 5, 2010

| PAGE | LINE | DESCRIPTION OF CHANGE |
|------|------|------------------------|
| 1630 | 9 | ADD: A STACK THAT LOOKED LIKE THE STACK OF DOCUMENTS THAT WAS ON THE C.D |
| 1630 | 16 | ADD: YES, HE SIGNED A STACK OF DOCUMENTS THAT WAS ON THE CONFERENCE ROOM TABLE |
| 1632 | 4 | ADD: THAT WERE SENT TO HIM |
| 1657 | 12 | ADD: YES, IT IS SAFE TO ASSUME |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct and that I have read my deposition and have made the necessary corrections, additions or changes to my answers which I deem necessary.

Executed on this ___ day of ___, 2010.     20/8/2010

_____
Susana Kuemmerle