1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                 – – – – – – –

5

   MATTEL, INC., et al.,              )
6                                      )
              Plaintiffs,              )
7                                      )
       vs.                            ) No. CV 04-9049 DOC
8                                      )      Day 18
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                      )
                                       )
10            Defendants.              )
   _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                     Jury Trial

16                Santa Ana, California

17            Wednesday, February 16, 2011

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141
24

25  04cv9049 Mattel 2011-02-16 D18V1

Case 2:04-cv-09049-DOC-RNB Document 10024 Filed 02/18/11 Page 2 of 137 Page ID #:301895
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

2

```
1   APPEARANCES OF COUNSEL:

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:
3
            QUINN EMANUEL URQUHART & SULLIVAN
4           BY:  JOHN QUINN
                 WILLIAM PRICE
5                MICHAEL T. ZELLER
                 Attorneys at Law
6           865 South Figueroa Street
            10th Floor
7           Los Angeles, California 90017
            (213) 443-3000
8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12          ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
            BY:  THOMAS S. McCONVILLE
13               Attorney at Law
            4 Park Plaza
14          Suite 1600
            Irvine, California 92614
15          (949) 567-6700

16          - AND -

17          ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
            BY:  ANNETTE L. HURST
18               Attorney at Law
            405 Howard Street
19          San Francisco, California 94105
            (415)773-5700
20
            - AND -
21
            KELLER RACKAUCKAS
22          BY:  JENNIFER KELLER
                 Attorney at Law
23          18500 Von Karman Avenue
            Suite 560
24          Irvine, California 92612
            (949) 476-8700
25
```

Case 2:04-cv-09049-DOC-RNB Document 10024 Filed 02/18/11 Page 3 of 137 Page ID #:301896
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
              LAW OFFICES OF MARK E. OVERLAND
5             By:  MARK E. OVERLAND
                   Attorney at Law
6             100 Wilshire Boulevard
              Suite 950
7             Santa Monica, California 90401
              (310) 459-2830
8
              - AND -
9
              SCHEPER KIM & HARRIS LLP
10            BY:  ALEXANDER H. COTE
                   Attorney at Law
11            601 West 5th Street
              12th Floor
12            Los Angeles, California 90071
              (213) 613-4660
13

14   ALSO PRESENT:

15            MGA ENTERTAINMENT, INC.
              BY:  JEANINE PISONI
16                 Attorney at Law
              16360 Roscoe Boulevard
17            Suite 105
              Van Nuys, California 91406
18

19            ROBERT ECKERT, Mattel CEO

20            ISAAC LARIAN, MGA CEO

21            KEN KOTARSKI, Mattel Technical Operator

22            MIKE STOVALL, MGA Technical Operator

23            RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 4 of 137   Page ID #:301897
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

4

1                    I N D E X

2   WITNESSES                    DIRECT   CROSS   REDIRECT   RECROSS

3   LARIAN, Isaac

4
    By Ms. Keller                7
5

6

7                    EXHIBITS

8   EXHIBIT NO.                 IDENTIFICATION    IN EVIDENCE

9     540     E-mail from Mr. Larian                93
              to Mr. Lingg dated
10            11/18/2000

11    1307    E-mail from Mr. Tsang to            109
              Mr. Larian dated
12            12/8/2000

13    01905   E-mail from                         113
              Ms. Treantafelles to
14            Mr. Larian dated
              11/29/2000
15

16    10053   E-mail from Mr. Larian             115
              to Mr. Lee dated 12/15
17

      10105   E-mail chain from                   89
18            Ms. Treantafelles dated
              10/16/2000

19    11101   Document from Mr. Larian           127
              to Ms. Harris dated
20            12/28/2000

21    11205 Pg.1  E-mail from                    117
                 Mr. Larian to Mr. Medici
22

      11205 Pg.4  E-mail                         118
23

24    11338   E-mail from Mr. Larian             104
              to Ms. Brown dated
              12/6/2000
25

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

5

**EXHIBITS (Continued)**

EXHIBIT NO.                          IDENTIFICATION        IN EVIDENCE

11604   E-mail from                                        129
        Ms. Treantafelles to
        Mr. Larian dated 12/29

11647   E-mail from Paula Garcia                            75

11670   E-amil from Mr. Larian                              45
        to Mr. Bryant and return
        e-mail from Mr. Bryant
        to Mr. Larian

12037   E-mail from Mr. Larian                             120
        to Ms. Treantafelles
        dated 12/26/2000

12842   E-mail from Mr. Larian                              39
        to caymohr@aol.com dated
        6/27/2002

12845   Series of e-mails                                   58

13067   E-mail from Mr. Larian                             107
        to Mr. Lee dated
        12/10/2000

17281   E-mail from Mr. Yip to                             106
        PREL dated 12/14

17732   Pages 1 and 2 - photos                             134
        of sculpt

18462   E-mail chain containing                            35
        e-mail from Ms. O'Connor
        to Mr. Rosenbaum dated
        10/5/2000

35143   3/27/2001 Bratz focus                              69
        group evaluation

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

6

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 08:16 | 4 |
| 08:37 | 5 |
| 08:38 | 6 |
| 08:38 | 7 |
| 08:38 | 8 |
| 08:38 | 9 |
| 08:38 | 10 |
| 08:38 | 11 |
| 08:38 | 12 |
| 08:38 | 13 |
| 08:38 | 14 |
| 08:38 | 15 |
| 08:38 | 16 |
| 08:38 | 17 |
| 08:38 | 18 |
| 08:38 | 19 |
| 08:38 | 20 |
| 08:38 | 21 |
| 08:38 | 22 |
| 08:38 | 23 |
| 08:38 | 24 |
| 08:38 | 25 |

**SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 16, 2011**

**Day 18, Volume 1 of 3**

(8:37 a.m.)

*(Outside the presence of the jury.)*

THE COURT:  We're on the record.  All counsel are present.

Kathy, the court clerk, called the juror, Mr. O'Connor, at 8:00 o'clock this morning.  I did not speak to him.  Kathy spoke to him.  I was present.  And Kathy -- he said -- he actually didn't answer, but we had had a phone call into the Court a little earlier, and he stated the following:

THE CLERK:  He feels worse, and would not be able to come in.

THE COURT:  Counsel, are each of you willing to stipulate under those circumstances?

Ms. Keller?

MS. KELLER:  Yes, Your Honor.

THE COURT:  Mr. Quinn?

MR. QUINN:  Yes.

THE COURT:  All right.  We're going to thank and excuse him.

Would you call him back at his residence, thank him for his service, tell him how appreciated he is.  The jury and the Court sends their best wishes to get well.  And

CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:38 | 1 | his service is not longer required. |
| 08:38 | 2 | THE CLERK:  Sure. |
| 08:40 | 3 | THE COURT:  And, Mr. Overland, do you stipulate, |
| 08:40 | 4 | as well? |
| 08:40 | 5 | MR. OVERLAND:  Yes. |
| 08:40 | 6 | THE COURT:  Mr. Overland also stipulates.  Thank |
| 08:40 | 7 | you, Mr. Overland. |
| 08:40 | 8 | MR. OVERLAND:  By the way, Mr. Cote won't be with |
| 08:40 | 9 | us today.  He is sick.  He has strep throat. |
| 08:40 | 10 | THE COURT:  Okay.  Thank you. |
| 08:40 | 11 | *(Pause in the proceedings at 8:40 a.m.)* |
| 08:40 | 12 | *(Proceedings resumed at 8:47 a.m.)* |
| 08:47 | 13 | *(In the presence of the jury.)* |
| 08:47 | 14 | THE COURT:  Good morning.  And the jury's present. |
| 08:47 | 15 | All counsel are present.  The witness is present. |
| 08:47 | 16 | Counsel, thank you for your courtesy.  If you |
| 08:47 | 17 | would be seated. |
| 08:47 | 18 | And this is the continued examination by |
| 08:47 | 19 | Ms. Keller on behalf of MGA of Mr. Larian. |
| 08:47 | 20 | **ISAAC LARIAN, MATTEL'S WITNESS, PREVIOUSLY SWORN** |
| 08:47 | 21 | **RESUMED THE STAND** |
| 08:47 | 22 | **CROSS EXAMINATION (Resumed)** |
| 08:48 | 23 | BY MS. KELLER: |
| 08:48 | 24 | Q.   Good morning -- |
| 08:48 | 25 | THE COURT:  I apologize.  The record should |

| | | |
|---|---|---|
| 08:48 | 1 | reflect that the alternate juror, Mr. O'Connor, has been |
| 08:48 | 2 | excused.  And the reason for that is illness.  We received a |
| 08:48 | 3 | call this morning indicating that he was in worse condition |
| 08:48 | 4 | than he was yesterday.  So the duration of this flu is |
| 08:48 | 5 | unknown to us, and all counsel have stipulated to his |
| 08:48 | 6 | excuse. |
| 08:48 | 7 | Counsel, I'm sorry. |
| 08:48 | 8 | MS. KELLER:  Thank you. |
| 08:48 | 9 | BY MS. KELLER: |
| 08:48 | 10 | Q.   Mr. Larian, I think when we left off the other day we |
| 08:48 | 11 | were talking about your meeting with Carter Bryant, your |
| 08:48 | 12 | first meeting with him on September 1st, 2000.  Do you |
| 08:48 | 13 | remember that? |
| 08:48 | 14 | A.   Yes. |
| 08:48 | 15 | Q.   And I think you said Paula Garcia, Victoria O'Connor, |
| 08:48 | 16 | Victoria Marlow, and your daughter Jasmin were present? |
| 08:48 | 17 | A.   Veronica Marlow. |
| 08:48 | 18 | Q.   I'm sorry.  Veronica Marlow. |
| 08:48 | 19 | A.   Yes. |
| 08:48 | 20 | Q.   And you said you thought Mr. Bryant's drawings were -- |
| 08:48 | 21 | were interesting, but to you they were weird looking? |
| 08:48 | 22 | A.   Yes. |
| 08:48 | 23 | Q.   And your daughter -- but your daughter liked them? |
| 08:48 | 24 | A.   Yes, she had a sparkle in her eye. |
| 08:49 | 25 | Q.   The dummy doll that Mr. Bryant brought with him, what |

| | | |
|---|---|---|
| 08:49 | 1 | was your reaction to that? |
| 08:49 | 2 | A.   I thought it was alien-looking. |
| 08:49 | 3 | Q.   And I think you said last week that the fact that he |
| 08:49 | 4 | didn't bring a manufactural prototype is why you thought it |
| 08:49 | 5 | was not really fair to always call him the inventor of the |
| 08:49 | 6 | Bratz doll as opposed to the inventor of the Bratz drawings? |
| 08:49 | 7 | A.   That's correct. |
| 08:49 | 8 | Q.   Now, I want to discuss what Mr. Bryant said about when |
| 08:49 | 9 | he conceived of Bratz.  Okay? |
| 08:49 | 10 | What did he tell you at that first meeting about when |
| 08:49 | 11 | he came up with the Bratz drawings? |
| 08:49 | 12 | A.   He said that he came up with them in 1998 in Missouri |
| 08:49 | 13 | when he was not working for Mattel. |
| 08:49 | 14 | Q.   And you knew he had a day job in Missouri, right? |
| 08:50 | 15 | A.   Yes.  He told me he worked at Old Navy during the day. |
| 08:50 | 16 | Q.   And then when did he tell you he did the drawings? |
| 08:50 | 17 | A.   Nights and weekends. |
| 08:50 | 18 | Q.   And why did you care whether Mr. Bryant had done the |
| 08:50 | 19 | drawings at Mattel? |
| 08:50 | 20 | A.   Because if it had -- if he had done 'em at Mattel, I |
| 08:50 | 21 | didn't want to have anything to do with it.  I didn't want |
| 08:50 | 22 | to be sued by Mattel. |
| 08:50 | 23 | Q.   And is that why you inquired further and had your |
| 08:50 | 24 | lawyers inquire further? |
| 08:50 | 25 | A.   Yes, I did. |

| | | |
|---|---|---|
| 08:50 | 1 | Q.   Now, when you saw the drawings, what was your reaction |
| 08:50 | 2 | with respect to whether they could even be made into a doll? |
| 08:50 | 3 | A.   I didn't think just as drawings, the way they are, |
| 08:50 | 4 | could be manufactured, become a doll.  I didn't think so.  I |
| 08:50 | 5 | didn't think they can stand in those poses that he had drawn |
| 08:50 | 6 | them. |
| 08:50 | 7 | Q.   When you say you didn't think that they could stand in |
| 08:50 | 8 | the poses he had drawn, why was it you didn't think that you |
| 08:50 | 9 | could manufacture a doll that could stand in those poses? |
| 08:51 | 10 | A.   From my experience, I don't think -- if you show me a |
| 08:51 | 11 | drawing, I can tell you. |
| 08:51 | 12 | MS. KELLER:  Have we got that? |
| 08:51 | 13 | If we can see Exhibit 302, Your Honor, which is in |
| 08:51 | 14 | evidence. |
| 08:51 | 15 | THE COURT:  Thank you. |
| 08:51 | 16 | MS. KELLER:  See if we can put that up on your |
| 08:51 | 17 | screen. |
| 08:51 | 18 | *(Document displayed.)* |
| 08:51 | 19 | THE WITNESS:  Like -- can I get up and show this, |
| 08:51 | 20 | Your Honor? |
| 08:51 | 21 | MS. KELLER:  May Mr. Larian turn around and point? |
| 08:51 | 22 | THE COURT:  Certainly.  You may stand and just put |
| 08:51 | 23 | your back to me so the jury can see what you're pointing to. |
| 08:51 | 24 | THE WITNESS:  So the dolls -- there's no way that |
| 08:51 | 25 | you can make a doll that stands with her feet like this. |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 11 of 137   Page ID #:301904
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

11

| | | |
|---|---|---|
| 08:51 | 1 | I've never seen a doll that can stand in this position.  And |
| 08:51 | 2 | there are even more exaggerations on other drawings. |
| 08:51 | 3 | MS. KELLER:  Do we have some of the other drawings |
| 08:51 | 4 | that we can display? |
| 08:51 | 5 | *(Document displayed.)* |
| 08:51 | 6 | THE WITNESS:  Like here, you cannot have a doll |
| 08:51 | 7 | with her leg standing like this; it's not possible.  I mean, |
| 08:51 | 8 | it's possible to make one, but you cannot mass manufacture a |
| 08:52 | 9 | doll like this. |
| 08:52 | 10 | BY MS. KELLER: |
| 08:52 | 11 | Q.   And that's referring to Exhibit 302-5. |
| 08:52 | 12 | And why can't you manufacture a doll that stands -- |
| 08:52 | 13 | that one looks a little bit almost knock-kneed? |
| 08:52 | 14 | A.   Yes. |
| 08:52 | 15 | Q.   Why can't you manufacture a doll that stands that way? |
| 08:52 | 16 | A.   You can manufacture one as model, but not en masse |
| 08:52 | 17 | manufacturing, because that's not how the tooling and the |
| 08:52 | 18 | injection molding is done. |
| 08:52 | 19 | Q.   Okay.  Could you get closer to your microphone again? |
| 08:52 | 20 | There's probably still my laser pointer up there.  Do |
| 08:52 | 21 | you see it anywhere? |
| 08:52 | 22 | A.   I don't see a laser pointer. |
| 08:52 | 23 | Q.   Well, scratch one laser pointer. |
| 08:52 | 24 | Okay.  So why was it important for the doll to be able |
| 08:52 | 25 | to stand? |

| 08:52 | 1 | A.   You have to mass manufacture these dolls, and it |
| 08:52 | 2 | just -- how they stand, how they articulate is very |
| 08:52 | 3 | important.  And just standing was not the only concern I |
| 08:53 | 4 | had.  Was -- if you show that picture. |
| 08:53 | 5 | MS. KELLER:  Could we have that again, 302-5. |
| 08:53 | 6 | (Document displayed.) |
| 08:53 | 7 | THE WITNESS:  Again, in a 2-D drawing, you can |
| 08:53 | 8 | see -- in a 2-D drawing you see this little point looks like |
| 08:53 | 9 | just a dot.  That's like a nose.  But when we do this in |
| 08:53 | 10 | 3-D, doesn't come out like this.  Does not come out like |
| 08:53 | 11 | this.  So there were lot of concerns about -- for me, if |
| 08:53 | 12 | these dolls can be manufactured the way Carter Bryant had |
| 08:53 | 13 | drawn them. |
| 08:53 | 14 | BY MS. KELLER: |
| 08:53 | 15 | Q.   So if you manufactured a doll and you had that little |
| 08:53 | 16 | dot for a nose, you didn't think that would be a best |
| 08:53 | 17 | seller? |
| 08:53 | 18 | A.   Sometimes weird things happen, but I didn't think it |
| 08:53 | 19 | would. |
| 08:53 | 20 | Q.   What about the -- these dolls also were proposed to |
| 08:53 | 21 | have interchangeable hair? |
| 08:53 | 22 | A.   That's correct. |
| 08:53 | 23 | Q.   How did that factor into your questioning whether this |
| 08:53 | 24 | could be made into a doll? |
| 08:53 | 25 | A.   Uh, I thought that little girls will find it weird |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 13 of 137   Page ID #:301906
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

13

08:54  1   where you pull the hair out of a doll and you show literally

08:54  2   the inside of a brain, if you will, for them to change that.

08:54  3   And I just wanted -- and Paula and everybody else was

08:54  4   adamant about this.  I wanted to see an exploration to see

08:54  5   how it looks.  And when we looked at it, I didn't like it,

08:54  6   and I said, "No, we're not gonna do it with the hair

08:54  7   change."

08:54  8   Q.   When you say Paula and everybody was adamant about it,

08:54  9   is that that you were adamant about having the

08:54  10  interchangeable hair?

08:54  11  A.   Yes.  Paula and Carter Bryant wanted the

08:54  12  interchangeable hair.

08:54  13  Q.   And you didn't?

08:54  14  A.   Not that I didn't.  I liked it.  I wanted to do it, but

08:54  15  if it was aesthetically nice.  If it was not, I didn't want

08:54  16  to do it.  So that's why I wanted to see an exploration.  I

08:54  17  wanted to see a mockup made to see how it looks.

08:55  18  Q.   Okay.  At that September 1st first meeting, I think you

08:55  19  said you were excited about the drawings; you thought they

08:55  20  were interesting?

08:55  21  A.   I thought they were interesting.

08:55  22  Q.   Had you, um -- in your own mind, were you firmly

08:55  23  committed to make those dolls yet?

08:55  24  A.   No, I was not.

08:55  25  Q.   Now, who was it, who were the key people that you asked

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 14 of 137   Page ID #:301907
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

14

| | | |
|---|---|---|
| 08:55 | 1 | to follow up to see if the -- you said if this could be |
| 08:55 | 2 | actually made into a doll? |
| 08:55 | 3 | A.   I frankly didn't think they could be made to a doll. |
| 08:55 | 4 | Other people in the meeting thought they can.  And I told |
| 08:55 | 5 | Paula, "Okay.  Let's do -- let's spend some money.  Let's do |
| 08:55 | 6 | an exploration to see if can be made to a doll.  I want to |
| 08:55 | 7 | see a sculpt.  I want to see a clay model to see if they can |
| 08:55 | 8 | look like this or not. |
| 08:55 | 9 | Q.   And when you say "Paula," are you referring to Paula |
| 08:55 | 10 | Garcia? |
| 08:55 | 11 | A.   Yes. |
| 08:55 | 12 | Q.   What did you ask Victoria O'Connor to do on her end? |
| 08:55 | 13 | A.   To negotiate with Carter Bryant to make sure that what |
| 08:56 | 14 | he was telling us was true.  To hire a lawyer, David |
| 08:56 | 15 | Rosenbaum, to draw up a contract. |
| 08:56 | 16 | Q.   And, um, about a week after that meeting, you talked to |
| 08:56 | 17 | Mr. Bryant about possible terms? |
| 08:56 | 18 | A.   About a week after that meeting -- I don't remember |
| 08:56 | 19 | when we were talking but -- |
| 08:56 | 20 | Q.   Well, the next time that you talked to him about |
| 08:56 | 21 | possible terms, what was that discussion? |
| 08:56 | 22 | A.   My discussion was with Victoria. |
| 08:56 | 23 | Q.   Okay. |
| 08:56 | 24 | A.   And what should be his terms.  I wanted time -- I |
| 08:56 | 25 | wanted Carter Bryant to come to MGA as a fashion designer, |

| | | |
|---|---|---|
| 08:56 | 1 | as a full-time employee as a fashion designer.  And I told |
| 08:56 | 2 | him that if these drawings truly belonged to him and we make |
| 08:56 | 3 | these a doll, then -- then we will give him -- beside his |
| 08:56 | 4 | salary, we will also give him a royalty. |
| 08:56 | 5 | Q.   Okay.  So -- |
| 08:57 | 6 | A.   And going back to your earlier question on the |
| 08:57 | 7 | drawings, when I said they looked interesting, frankly, to |
| 08:57 | 8 | me, I think they looked little weird, in my first meeting |
| 08:57 | 9 | when I saw them. |
| 08:57 | 10 | Q.   But everybody else liked them? |
| 08:57 | 11 | A.   Yes. |
| 08:57 | 12 | Q.   Including your daughter? |
| 08:57 | 13 | A.   My daughter liked it, yes. |
| 08:57 | 14 | Q.   And so at this point, this is when you talked about |
| 08:57 | 15 | giving Mr. Bryant the $5500 a month for six months, 5,000 a |
| 08:57 | 16 | month more for three months while you took a look to see if |
| 08:57 | 17 | the doll could actually be made? |
| 08:57 | 18 | A.   I ask Carter Bryant how much money he was making at |
| 08:57 | 19 | Mattel.  And he says he was making $5,000 a month.  So I |
| 08:57 | 20 | offered him that for six months we will give him 10 percent |
| 08:57 | 21 | more, which is $5500 a month, and then after the end of the |
| 08:57 | 22 | six months, we'll cut him back down to $5000 a month.  And |
| 08:57 | 23 | then at the end of that nine month, there was no more |
| 08:57 | 24 | advances or moneys going to him, and the only thing he would |
| 08:58 | 25 | get is 3 percent royalty on the dolls that he has worked on, |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 16 of 137   Page ID #:301909
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

16

| | | |
|---|---|---|
| 08:58 | 1 | against that $48,000 that he had received. |
| 08:58 | 2 | Q.   So for sure you were going to make a $48,000 investment |
| 08:58 | 3 | in him? |
| 08:58 | 4 | A.   Yes. |
| 08:58 | 5 | Q.   In return for which he would let you try to develop his |
| 08:58 | 6 | drawings? |
| 08:58 | 7 | A.   That's correct. |
| 08:58 | 8 | Q.   And then if you were able to successfully develop the |
| 08:58 | 9 | drawings into dolls, he would get 3 percent of any dolls he |
| 08:58 | 10 | worked on? |
| 08:58 | 11 | A.   That's correct. |
| 08:58 | 12 | Q.   Now, um, you said Victoria O'Connor was handling it. |
| 08:58 | 13 | The, um -- when Victoria O'Connor dealt with Mr. Bryant and |
| 08:58 | 14 | dealt with the attorney, David Rosenbaum, was that at all |
| 08:58 | 15 | times at your direction? |
| 08:58 | 16 | A.   Yes.  Yes, it was. |
| 08:58 | 17 | Q.   And you heard Victoria O'Connor herself testify to this |
| 08:58 | 18 | when you were sitting here, right? |
| 08:58 | 19 | A.   Yes, she did. |
| 08:58 | 20 | Q.   And at one point, though, Mr. Bryant asked for |
| 08:59 | 21 | unacceptable deal terms.  And we've talked about that as |
| 08:59 | 22 | well, right? |
| 08:59 | 23 | A.   Yes, he did. |
| 08:59 | 24 | MS. KELLER:  If we could have Exhibit 16788. |
| 08:59 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 08:59 | 1 | *(Document provided to the witness.)* |
| 08:59 | 2 | BY MS. KELLER: |
| 08:59 | 3 | Q.   And this is the e-mail chain between you and Victoria |
| 08:59 | 4 | O'Connor.  You see at the bottom it says, "I knew it.  He |
| 08:59 | 5 | called and said he wanted to make sure that if we licensed |
| 08:59 | 6 | out Bratz, he would like a royalty."  And this is dated |
| 08:59 | 7 | September 12, 2000. |
| 08:59 | 8 | A.   Yes. |
| 08:59 | 9 | Q.   It said, "This was his original intention for the |
| 08:59 | 10 | property.  Do you want to tell him or me?" |
| 08:59 | 11 |      And your answer is, "Tell him licensing royalties is a |
| 08:59 | 12 | pie in the sky in the future.  We are going to risk and |
| 08:59 | 13 | spend millions making this brand and line happen.  Maybe it |
| 08:59 | 14 | does; maybe it does not.  If it does, we made the brand and |
| 08:59 | 15 | not him.  The answer is no.  Explain the above logic to |
| 08:59 | 16 | him." |
| 09:00 | 17 |      When you're talking about licensing royalties, what are |
| 09:00 | 18 | you referring to? |
| 09:00 | 19 | A.   When you license a product out after you have built the |
| 09:00 | 20 | brand -- when you license a product brand out, you usually |
| 09:00 | 21 | get royalties coming in.  But that's down the road.  That's |
| 09:00 | 22 | what I meant. |
| 09:00 | 23 | Q.   When you say "license it out," you mean give another |
| 09:00 | 24 | company the permission to make things with the Bratz -- |
| 09:00 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB  Document 10024  Filed 02/18/11  Page 18 of 137  Page ID #:301911
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

18

| 09:00 | 1 | Q.    -- label and the Bratz theme? |
|---|---|---|
| 09:00 | 2 | A.   Like, for example -- yes.  For example, we gave a shoe |
| 09:00 | 3 | manufacturer a license to make Bratz shoes.  We gave a |
| 09:00 | 4 | bedding manufacturer to make Bratz bedding.  We gave an |
| 09:00 | 5 | apparel manufacturer to make Bratz apparel for the girls to |
| 09:00 | 6 | wear.  That's what we're talking about. |
| 09:00 | 7 | Q.   So you said, no, he's not gonna get licensing |
| 09:00 | 8 | royalties; he'll just get royalties for the sale of the |
| 09:00 | 9 | actual dolls? |
| 09:00 | 10 | A.    Yes. |
| 09:00 | 11 | Q.   Now, after this, what was your understanding of the |
| 09:00 | 12 | back and forth between MGA and Mr. Bryant's lawyer about |
| 09:01 | 13 | contract drafts? |
| 09:01 | 14 | A.   They were going back and forth.  Again, I was not |
| 09:01 | 15 | involved with that.  Victoria was handling that on my |
| 09:01 | 16 | behalf, on behalf of the company, with David Rosenbaum.  It |
| 09:01 | 17 | was reported to me that David Rosenbaum -- |
| 09:01 | 18 |         MR. PRICE:  Objection.  This is hearsay. |
| 09:01 | 19 |         MS. KELLER:  Your Honor, he said she did |
| 09:01 | 20 | everything at his direction. |
| 09:01 | 21 |         THE COURT:  Overruled. |
| 09:01 | 22 | BY MS. KELLER: |
| 09:01 | 23 | Q.   It was reported back to you? |
| 09:01 | 24 | A.   That -- that Victoria O'Connor reported back to me that |
| 09:01 | 25 | David Rosenbaum had talked to Anne Wang, who was Carter |

| | | |
|---|---|---|
| 09:01 | 1 | Bryant's lawyer at the time.  And she had confirmed that he |
| 09:01 | 2 | had done the drawings in -- |
| 09:01 | 3 | Q.   Okay.  I'm just talking about the contract negotiations |
| 09:01 | 4 | right now. |
| 09:01 | 5 | A.   Yes. |
| 09:01 | 6 | Q.   Let's stick with that for a second. |
| 09:01 | 7 | A.   Oh, you're talking about the terms of the contract? |
| 09:02 | 8 | Q.   Yeah.  Let's look at Exhibit 9257, which is in |
| 09:02 | 9 | evidence. |
| 09:02 | 10 | *(Document provided to the witness.)* |
| 09:02 | 11 | *(Document displayed.)* |
| 09:02 | 12 | BY MS. KELLER: |
| 09:02 | 13 | Q.   And let's go to the earliest e-mail in the chain, which |
| 09:02 | 14 | is on the second page.  And that's an e-mail dated |
| 09:02 | 15 | September 19, 2000, from Mr. Rosenbaum to Carter Bryant with |
| 09:02 | 16 | copies to Victoria O'Connor and to you? |
| 09:02 | 17 | A.   Yes, it is. |
| 09:02 | 18 | Q.   And this says, "Dear Mr. Bryant, as you know, we |
| 09:02 | 19 | represent MGA Entertainment.  Attached for your review is a |
| 09:02 | 20 | draft of the above-referenced agreement.  Please review the |
| 09:02 | 21 | draft and have your attorney call me to discuss.  Please |
| 09:02 | 22 | note that inasmuch as our client has not had an opportunity |
| 09:02 | 23 | to review this correspondence and/or attachments hereto, I |
| 09:02 | 24 | must reserve their right to comment." |
| 09:02 | 25 | Um, so this is -- and this is at 12:23 a.m.? |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

20

| | | |
|---|---|---|
| 09:02 | 1 | A.    It is. |
| 09:02 | 2 | Q.    Now, the next e-mail up the chain begins on the first |
| 09:03 | 3 | page, which is 9257-1. |
| 09:03 | 4 | (Document displayed.) |
| 09:03 | 5 | THE WITNESS:  No.  The next e-mail is right above |
| 09:03 | 6 | it. |
| 09:03 | 7 | BY MS. KELLER: |
| 09:03 | 8 | Q.    Yeah.  But it begins on the first page of this exhibit, |
| 09:03 | 9 | I think, the next e-mail.  And that's September 25th, 2000, |
| 09:03 | 10 | at 12:16? |
| 09:03 | 11 | A.    No.  There is one before that. |
| 09:03 | 12 | Q.    Okay.  Am I missing one? |
| 09:03 | 13 | A.    Yes. |
| 09:03 | 14 | Q.    You're right.  It starts, "We must" -- this is |
| 09:03 | 15 | September 25th, at 12:10 p.m.  To Victoria O'Connor from |
| 09:03 | 16 | Dennis Medici, with a copy to David Rosenbaum.  And you said |
| 09:03 | 17 | Dennis Medici was? |
| 09:03 | 18 | A.    Excuse me, Ms. Keller.  I think the sequence is the |
| 09:03 | 19 | e-mail you read to me, then Victoria O'Connor forwards. |
| 09:03 | 20 | Q.    Ah, this says, "FYI"? |
| 09:03 | 21 | A.    And then Dennis Medici, who was our CFO at the time, |
| 09:03 | 22 | responds on top. |
| 09:04 | 23 | Q.    Okay.  So this is Dennis Medici, the CFO, to Victoria |
| 09:04 | 24 | O'Connor, CC David Rosenbaum. |
| 09:04 | 25 | And it says, "We must have all third-party work have a |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:04 | 1 | purchase order obtained with an approved, not-to-exceed |
| 09:04 | 2 | budget.  Does MGA own the trademark," quote, "Bratz," |
| 09:04 | 3 | unquote, "and any licensing of such name?" |
| 09:04 | 4 | So the company policy was that third party vendors had |
| 09:04 | 5 | to have a purchase order? |
| 09:04 | 6 | A.   Yes.  For the work that they do. |
| 09:04 | 7 | Q.   Or some sort of a consulting agreement in place with |
| 09:04 | 8 | the company? |
| 09:04 | 9 | A.   They had to have an approval, right, to do any work. |
| 09:04 | 10 | Q.   So if Carter Bryant was gonna do any work for MGA, then |
| 09:04 | 11 | he was gonna have to have a purchase order? |
| 09:04 | 12 | A.   Yes. |
| 09:04 | 13 | Q.   And is that similar to what we saw earlier in trial |
| 09:04 | 14 | with Anna Rhee, who had purchase orders with Mattel? |
| 09:04 | 15 | A.   That's correct.  And with MGA, I believe. |
| 09:04 | 16 | Q.   So then as of this September 25th, 2000 date there was |
| 09:04 | 17 | no agreement between MGA and Carter Bryant? |
| 09:05 | 18 | A.   There was not. |
| 09:05 | 19 | Q.   So -- and the ownership issue hadn't been resolved |
| 09:05 | 20 | either? |
| 09:05 | 21 | A.   That's correct. |
| 09:05 | 22 | Q.   Now, let's look at Exhibit 18463, which is in evidence. |
| 09:05 | 23 | *(Document provided to the witness.)* |
| 09:05 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 09:05 | 1 | BY MS. KELLER: |
| 09:05 | 2 | Q.   And this is an e-mail chain between Victoria O'Connor |
| 09:05 | 3 | and David Rosenbaum.  And at the very top, we see |
| 09:05 | 4 | Mr. Rosenbaum e-mails Ms. O'Connor on September 28th, 2000, |
| 09:05 | 5 | and you are CC'd on that chain.  You see that? |
| 09:05 | 6 | A.   Yes. |
| 09:05 | 7 | Q.   Now, let's look at the bottom of 18463-1 and on to |
| 09:05 | 8 | 18463-2. |
| 09:05 | 9 | *(Document displayed.)* |
| 09:05 | 10 | BY MS. KELLER: |
| 09:05 | 11 | Q.   And this was an e-mail from David Rosenbaum to Victoria |
| 09:05 | 12 | O'Connor sent September 28, 2000, at 11:55 a.m., "Subject: |
| 09:05 | 13 | Carter Bryant." |
| 09:05 | 14 |     And this says, "Victoria, I spoke with Carter's lawyer |
| 09:06 | 15 | this a.m. and e-mailed her a copy of the draft agreement for |
| 09:06 | 16 | her to review.  I asked her specifically about the Mattel |
| 09:06 | 17 | issue, and she said she has reviewed the chronology of the |
| 09:06 | 18 | creation of this design and is satisfied that Carter created |
| 09:06 | 19 | this outside the scope of his employment at Mattel.  She |
| 09:06 | 20 | says she understands the concerns here.  Apparently, he |
| 09:06 | 21 | conceived this product in 1998, so I recommend that your |
| 09:06 | 22 | patent attorneys review this project as soon as possible to |
| 09:06 | 23 | avoid any time limitation in the patent laws.  I will let |
| 09:06 | 24 | you know her comments on the draft as soon as I receive |
| 09:06 | 25 | same." |

| 09:06 | 1 | And then e-mail No. 2 is Victoria O'Connor's response, |
| 09:06 | 2 | sent September 28, 2000, "Did she give you an indication on |
| 09:06 | 3 | when you would receive comments?"  Do you see that? |
| 09:06 | 4 | A.   I do. |
| 09:06 | 5 | Q.   And you were CC'd on that? |
| 09:06 | 6 | A.   Yes, I was. |
| 09:06 | 7 | Q.   And then the reason that you were CC'd is because |
| 09:07 | 8 | Ms. O'Connor was acting at your direction? |
| 09:07 | 9 | A.   Absolutely. |
| 09:07 | 10 | Q.   Okay.  So as of this date, September 28, 2000, then, |
| 09:07 | 11 | you knew that Mr. Bryant's lawyer had made a representation |
| 09:07 | 12 | about when Bratz was created, right? |
| 09:07 | 13 | A.   Yes. |
| 09:07 | 14 | Q.   And you also knew that Mr. Bryant's lawyer said he had |
| 09:07 | 15 | conceived the idea in 1998, right? |
| 09:07 | 16 | A.   Yes. |
| 09:07 | 17 | MR. PRICE:  Objection.  Leading.  Objection. |
| 09:07 | 18 | THE COURT:  Overruled. |
| 09:07 | 19 | THE WITNESS:  Yes. |
| 09:07 | 20 | BY MS. KELLER: |
| 09:07 | 21 | Q.   You knew that Mr. Bryant's lawyer had said that he had |
| 09:07 | 22 | conceived the idea in 1998? |
| 09:07 | 23 | A.   Yes. |
| 09:07 | 24 | Q.   Outside the scope of his employment at Mattel? |
| 09:07 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:07 | 1 | Q.   Was -- did you believe that at the time -- |
| 09:07 | 2 | A.   Yes. |
| 09:07 | 3 | Q.   -- that he did the development of Bratz outside Mattel? |
| 09:07 | 4 | A.   Yes. |
| 09:07 | 5 | Q.   And did you believe that you got a legal representation |
| 09:07 | 6 | of this from David Rosenbaum? |
| 09:07 | 7 | A.   This to me is a representation from him.  He's trying |
| 09:07 | 8 | to protect MGA's interest. |
| 09:07 | 9 | Q.   So -- but -- and you knew he was relying on Anne Wang, |
| 09:07 | 10 | right? |
| 09:07 | 11 | A.   Yes. |
| 09:07 | 12 | Q.   Now, Anne Wang -- I think it was pointed out to you -- |
| 09:08 | 13 | had a duty to her client, Carter Bryant, right? |
| 09:08 | 14 | A.   Yes. |
| 09:08 | 15 | Q.   And who did you think David Rosenbaum owed his duty to? |
| 09:08 | 16 | A.   To MGA and to Isaac Larian. |
| 09:08 | 17 | Q.   And what did you expect David Rosenbaum to tell you if |
| 09:08 | 18 | he thought this was a problem? |
| 09:08 | 19 | A.   To tell us there is a problem; don't do it. |
| 09:08 | 20 | Q.   And you were aware that if Mattel wanted to sue you and |
| 09:08 | 21 | claim this product as its own, that it would do so and could |
| 09:08 | 22 | do aggressively, right? |
| 09:08 | 23 | A.   Yes, I do. |
| 09:08 | 24 | Q.   So with respect to Victoria O'Connor, what did you |
| 09:08 | 25 | expect her to be doing for you in this respect? |

| 09:08 | 1 | A.   To do her job.  To do all the due diligence to make |
| 09:08 | 2 | sure that what Carter Bryant had told us was true, when he |
| 09:08 | 3 | said he did 'em in 1998 in Missouri when he was not working |
| 09:08 | 4 | at Mattel, and to negotiate the agreement through David |
| 09:09 | 5 | Rosenbaum at my direction. |
| 09:09 | 6 | Q.   Now, you didn't know what all Anne Wang's conversations |
| 09:09 | 7 | had been with her client, right? |
| 09:09 | 8 | A.   I have no idea, no. |
| 09:09 | 9 | Q.   And you had no way of getting that information because |
| 09:09 | 10 | it was privileged, true? |
| 09:09 | 11 | A.   I'd never talked to Anne Wang.  I don't know who she |
| 09:09 | 12 | is. |
| 09:09 | 13 | Q.   Would you even recognize her if you saw her? |
| 09:09 | 14 | A.   No, I don't. |
| 09:09 | 15 | Q.   And why is it that you relied on David Rosenbaum? |
| 09:09 | 16 | A.   He's my lawyer.  He was paid to protect MGA's interest. |
| 09:09 | 17 | He was told to make sure 100 percent what Carter Bryant was |
| 09:09 | 18 | saying is true, because we don't want to have an issue or |
| 09:09 | 19 | lawsuit at Mattel or anybody else. |
| 09:09 | 20 | Q.   Did you rely on what Victoria O'Connor and David |
| 09:09 | 21 | Rosenbaum did when you signed the agreement with Mr. Bryant? |
| 09:09 | 22 | A.   I did. |
| 09:09 | 23 | Q.   If Mr. Bryant lied to you about the creation of these |
| 09:09 | 24 | documents, did you think it would be fraud? |
| 09:09 | 25 | A.   If he lied to me? |

| | | |
|---|---|---|
| 09:09 | 1 | Q.   Yeah. |
| 09:09 | 2 | A.   Yeah.  If he lied, it would be fraud. |
| 09:10 | 3 | Q.   And if Anne Wang, an attorney, lied to you about the |
| 09:10 | 4 | creation of these documents on Mr. Bryant's behalf, what -- |
| 09:10 | 5 | in your mind, what would that be? |
| 09:10 | 6 | A.   She's an officer of the court.  I think if she lied, |
| 09:10 | 7 | yes, that would be a big problem for me. |
| 09:10 | 8 | Q.   And did you believe that Anne Wang had had a duty to |
| 09:10 | 9 | keep her client out of trouble with Mattel? |
| 09:10 | 10 | A.   I think all lawyers are -- my experience is their duty |
| 09:10 | 11 | is to protect their client and make sure that they don't -- |
| 09:10 | 12 | they don't do something wrong. |
| 09:10 | 13 | Q.   You thought David Rosenbaum would keep MGA out of |
| 09:10 | 14 | trouble with Mattel? |
| 09:10 | 15 | A.   Yes.  That was his goal.  That's his goal. |
| 09:10 | 16 | Q.   Now, at the time of this e-mail, Exhibit 18463, on |
| 09:10 | 17 | September 28th, 2000, there was still no deal with |
| 09:10 | 18 | Mr. Bryant? |
| 09:10 | 19 | A.   There was no deal, no. |
| 09:10 | 20 | Q.   And let's look at the top of the chain, the e-mail from |
| 09:10 | 21 | Mr. Rosenbaum to Victoria O'Connor, September 28, 2000.  It |
| 09:11 | 22 | says -- oh, I'm sorry.  We have to look at the one right |
| 09:11 | 23 | before that.  Victoria O'Connor to David Rosenbaum, |
| 09:11 | 24 | September 28, 2000, at 3:32, 3:32 p.m., CC'd to you. |
| 09:11 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

| | | |
|---|---|---|
| 09:11 | 1 | Q.   "Did she give you an indication on when you would |
| 09:11 | 2 | receive comments?" |
| 09:11 | 3 | So that's Victoria O'Connor asking the lawyer, David |
| 09:11 | 4 | Rosenbaum, whether Ms. Wang had told him when she would |
| 09:11 | 5 | receive -- when he would receive her comments? |
| 09:11 | 6 | A.   Yes. |
| 09:11 | 7 | Q.   And then look right above that, same date, 4:04 p.m. |
| 09:11 | 8 | Victoria O'Connor to you.  Victoria O'Connor to -- David |
| 09:11 | 9 | Rosenbaum to Victoria O'Connor, CC to you.  And |
| 09:11 | 10 | Mr. Rosenbaum said, "No, she did not, but I will call her |
| 09:11 | 11 | tomorrow to follow up." |
| 09:11 | 12 | A.   Tomorrow afternoon to follow up. |
| 09:11 | 13 | Q.   "Tomorrow afternoon to follow up," you're right. |
| 09:12 | 14 | So then, again, as of the date of that e-mail, still no |
| 09:12 | 15 | deal with Carter Bryant? |
| 09:12 | 16 | A.   That's correct. |
| 09:12 | 17 | Q.   Now, if we could look at 17251.  This is also admitted. |
| 09:12 | 18 | *(Document provided to the witness.)* |
| 09:12 | 19 | *(Document displayed.)* |
| 09:12 | 20 | BY MS. KELLER: |
| 09:12 | 21 | Q.   This is another e-mail chain.  If we look at the top, |
| 09:12 | 22 | we see it's an e-mail from David Rosenbaum to Victoria |
| 09:12 | 23 | O'Connor, September 29th, 2000. |
| 09:12 | 24 | A.   Can you give me a moment, please? |
| 09:12 | 25 | Q.   Sure. |

| | | |
|---|---|---|
| 09:12 | 1 | A.   Yes, go ahead. |
| 09:12 | 2 | Q.   And then we see the e-mail at the bottom is an |
| 09:12 | 3 | October 4th, 2000 e-mail from Anne Wang to Mr. Rosenbaum. |
| 09:12 | 4 | Subject:  Bryant, slash, MGA agreement? |
| 09:13 | 5 | A.   Yes. |
| 09:13 | 6 | Q.   And so this says, "Hi, David, I caught an inadvertent |
| 09:13 | 7 | omission in the version I sent by e-mail yesterday. |
| 09:13 | 8 | Therefore, please ignore that version and review the |
| 09:13 | 9 | attached, the version, which is also -- which also is in |
| 09:13 | 10 | Word instead of Word Perfect.  It may be difficult to reach |
| 09:13 | 11 | me today as I will be in meetings throughout the day.  Look |
| 09:13 | 12 | forward to your comments.  Anne Wang." |
| 09:13 | 13 | So in this October 4th e-mail, Ms. Wang is referencing |
| 09:13 | 14 | a draft of the agreement sent back to Mr. Rosenbaum, right? |
| 09:13 | 15 | A.   Yes. |
| 09:13 | 16 | Q.   And then at the top, the October 4th e-mail from |
| 09:13 | 17 | Mr. Rosenbaum to Anne Wang, we see that he has responded to |
| 09:13 | 18 | Anne Wang with a CC to Victoria O'Connor, and he says, |
| 09:13 | 19 | "Anne, I reviewed your proposed revisions with my client and |
| 09:13 | 20 | they are by and large unacceptable." |
| 09:14 | 21 | When he says "my client," he's referring to MGA? |
| 09:14 | 22 | A.   Yes. |
| 09:14 | 23 | Q.   "I understand that my client has discussed these issues |
| 09:14 | 24 | with Carter directly and he has agreed to withdraw most of |
| 09:14 | 25 | the proposed changes.  It is imperative that this agreement |

| | | |
|---|---|---|
| 09:14 | 1 | be concluded today.  Please call me as soon as possible so |
| 09:14 | 2 | that we may conclude this matter." |
| 09:14 | 3 | So when Mr. Rosenbaum said it is imperative that this |
| 09:14 | 4 | agreement be concluded today, what was the nature of the |
| 09:14 | 5 | problem for you in wanting to conclude it right away? |
| 09:14 | 6 | A.   My recollection is that he still was asking -- Carter |
| 09:14 | 7 | Bryant was still asking for royalties on out-licensed |
| 09:14 | 8 | products.  And it was late now.  It was in October.  And I |
| 09:14 | 9 | had told him and David Rosenbaum and Victoria O'Connor that |
| 09:15 | 10 | I said today's the deadline.  If we don't have a deal, we |
| 09:15 | 11 | just gonna move on because we have to rush to get ready for |
| 09:15 | 12 | Hong Kong toy fair and we have nothing right now to do so. |
| 09:15 | 13 | Q.   When was the Hong Kong toy fair going to be? |
| 09:15 | 14 | A.   January 4, 2001. |
| 09:15 | 15 | Q.   So this -- in your mind, then, this was the latest you |
| 09:15 | 16 | could get a deal in place and still come up with something |
| 09:15 | 17 | to show at the Hong Kong toy fair in January? -- if you even |
| 09:15 | 18 | could produce anything? |
| 09:15 | 19 | A.   Actually, even this was -- this date was already late. |
| 09:15 | 20 | Q.   So if you were able to do a deal, then you were gonna |
| 09:15 | 21 | have to really rush -- |
| 09:15 | 22 | A.   That's correct. |
| 09:15 | 23 | Q.   -- to get it done? |
| 09:15 | 24 | So had you conveyed that to Victoria O'Connor, that if |
| 09:15 | 25 | we don't get a deal today, forget it, I don't want to waste |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:15 | 1 | any more time on this? |
| 09:15 | 2 | A.    I did. |
| 09:15 | 3 | Q.    And if you weren't able to come to an agreement with |
| 09:15 | 4 | Mr. Bryant and you didn't do a deal, what were you gonna do? |
| 09:16 | 5 | Just move on? |
| 09:16 | 6 | A.    Move on.  Do other products. |
| 09:16 | 7 | Q.    And it says -- Mr. Rosenbaum says in here that his |
| 09:16 | 8 | understanding is that "My client has discussed these issues |
| 09:16 | 9 | with Carter directly."  Do you know who it was in MGA who |
| 09:16 | 10 | talked to Mr. Bryant directly? |
| 09:16 | 11 | A.    I don't recall exactly.  I remember my own discussion |
| 09:16 | 12 | with him.  But most likely, also Victoria O'Connor has |
| 09:16 | 13 | talked with him. |
| 09:16 | 14 | Q.    And that was in the past about the licensing issue? |
| 09:16 | 15 | A.    About the licensing issue, correct. |
| 09:16 | 16 | Q.    And -- |
| 09:16 | 17 | A.    The licensing issue -- I mean, him asking for royalties |
| 09:16 | 18 | on product that we will license out. |
| 09:16 | 19 | Q.    So did you have any conversation with Mr. Bryant around |
| 09:16 | 20 | that time where you told him, basically, either sign it or |
| 09:16 | 21 | we go our separate ways? |
| 09:16 | 22 | A.    I did. |
| 09:16 | 23 | Q.    When was that conversation? |
| 09:16 | 24 | A.    On October 3rd. |
| 09:16 | 25 | Q.    And what did you tell him with respect to if he signed |

| | | |
|---|---|---|
| 09:17 | 1 | it?  In other words, if you sign the deal, then what do you |
| 09:17 | 2 | have to do? |
| 09:17 | 3 | A.   We have to work very hard.  He has to work very hard. |
| 09:17 | 4 | Everybody has to work very hard to make this happen so we |
| 09:17 | 5 | can have some samples to show in Hong Kong toy fair.  That |
| 09:17 | 6 | was the latest time; otherwise, we would lose one more year. |
| 09:17 | 7 | Q.   And what did you tell him he'd have to do about his |
| 09:17 | 8 | Mattel employment? |
| 09:17 | 9 | A.   I told him that once he signs this, he has to resign. |
| 09:17 | 10 | Leave Mattel the same day and start working full-time, |
| 09:17 | 11 | 200 percent on this project with MGA's team. |
| 09:17 | 12 | Q.   What did he tell you when you said that to him? |
| 09:17 | 13 | A.   That he will do that. |
| 09:17 | 14 | Q.   That if you had a deal, he would quit Mattel |
| 09:17 | 15 | immediately and work full-time? |
| 09:17 | 16 | A.   That he will resign, immediately leave, and work |
| 09:17 | 17 | full-time on this. |
| 09:17 | 18 | Q.   I'm sorry.  I didn't mean to cut you off. |
| 09:17 | 19 | A.   Together with everybody at MGA.  We had put a whole |
| 09:18 | 20 | team together.  Hong Kong, L.A, et cetera. |
| 09:18 | 21 | Q.   Let's look at Exhibit 14077.  This is also in evidence. |
| 09:18 | 22 | *(Document provided to the witness.)* |
| 09:18 | 23 | *(Document displayed.)* |
| 09:18 | 24 | BY MS. KELLER: |
| 09:18 | 25 | Q.   And is this another e-mail from Mr. Rosenbaum to |

| | | |
|---|---|---|
| 09:18 | 1 | Ms. Wang on October 4th 2000, with Victoria O'Connor copied? |
| 09:18 | 2 | A.   It is. |
| 09:18 | 3 | Q.   And here it looks like Mr. Rosenbaum is sending a |
| 09:18 | 4 | revised version of the agreement back and asking for Carter |
| 09:18 | 5 | Bryant to sign three copies and send them back.  Do you see |
| 09:18 | 6 | that? |
| 09:18 | 7 | A.   Yes. |
| 09:18 | 8 | Q.   And this is -- he also wrote -- and this is the e-mail |
| 09:18 | 9 | at the top.  "Please let me know today if Carter will |
| 09:18 | 10 | execute the agreement.  If these changes are unacceptable, |
| 09:18 | 11 | my client has advised me that it will proceed with other |
| 09:19 | 12 | product plans 'are' (*sic*) terminate its discussions with |
| 09:19 | 13 | Mr. Bryant." |
| 09:19 | 14 | Do you see that? |
| 09:19 | 15 | A.   I do. |
| 09:19 | 16 | Q.   Is that what you were talking about that you were just |
| 09:19 | 17 | gonna move on and go on to the next project? |
| 09:19 | 18 | Q.   Now, at this point the deal was still not done? |
| 09:19 | 19 | A.   It was not done. |
| 09:19 | 20 | Q.   So all parties -- you, Mr. Bryant -- you were both free |
| 09:19 | 21 | to walk away? |
| 09:19 | 22 | A.   Yes, we were. |
| 09:19 | 23 | Q.   And if we could see Exhibit 15.  That's the final |
| 09:19 | 24 | signed copy of MGA's agreement with Carter Bryant. |
| 09:19 | 25 | *(Document provided to witness.)* |

Case 2:04-cv-09049-DOC-RNB    Document 10024    Filed 02/18/11    Page 33 of 137    Page ID #:301926
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

33

| | | |
|---|---|---|
| 09:19 | 1 | (Document displayed.) |
| 09:19 | 2 | THE WITNESS: Yes, it is. |
| 09:19 | 3 | BY MS. KELLER: |
| 09:19 | 4 | Q. And the footer on this is dated October 4th, 2000. |
| 09:19 | 5 | When we talk about the footer, we mean at the end. |
| 09:20 | 6 | A. Yes. |
| 09:20 | 7 | Q. And so is there any question in your mind that this |
| 09:20 | 8 | document was actually executed on October 4th, 2000? |
| 09:20 | 9 | A. There's no question. If you look further down, there's |
| 09:20 | 10 | a fax line, it says "October 4" -- it's upside down -- at |
| 09:20 | 11 | 4:38 p.m. |
| 09:20 | 12 | Q. And it says "final" in the upper left-hand portion on |
| 09:20 | 13 | the first page? |
| 09:20 | 14 | A. Yes. |
| 09:20 | 15 | Q. And then on the last page, Exhibit 15-00006, it's got |
| 09:20 | 16 | both Carter Bryant's signature and MGA's signature? |
| 09:20 | 17 | A. It's my signature, yes. |
| 09:20 | 18 | Q. And Section 5 of that final agreement contains what |
| 09:20 | 19 | we've referred to as the representation and warranty clause, |
| 09:20 | 20 | the reps and warranties? |
| 09:20 | 21 | A. Yes. |
| 09:20 | 22 | Q. That the Bryant drawings were original to Carter Bryant |
| 09:20 | 23 | and didn't infringe on anyone else's right? |
| 09:21 | 24 | A. Yes. |
| 09:21 | 25 | Q. And let's look at Paragraph 5-C. And that's -- says, |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 34 of 137   Page ID #:301927
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:21 | 1 | "The Bryant work product shall be free of all liens and |
| 09:21 | 2 | encumbrances, and there will be no claims, demands, or |
| 09:21 | 3 | actions pending or threatened with respect thereto, and that |
| 09:21 | 4 | the Bryant work product is original and no part thereof |
| 09:21 | 5 | infringes or shall infringe upon any common law or statutory |
| 09:21 | 6 | rights or intellectual property rights of any third party, |
| 09:21 | 7 | including, without limitation, contractual rights, patents, |
| 09:21 | 8 | copyrights, mask-work rights, trade secrets, rights of |
| 09:21 | 9 | privacy, and other intellectual property rights." |
| 09:21 | 10 | And, um, you had had a lot of experience over the years |
| 09:22 | 11 | in licensing, right? |
| 09:22 | 12 | A.   Yes. |
| 09:22 | 13 | Q.   And the reps and warranties are what you would usually |
| 09:22 | 14 | get when you were doing a licensing deal? |
| 09:22 | 15 | A.   Yes.  It's very standard in the industry.  When you |
| 09:22 | 16 | license something, you get always reps and warranties. |
| 09:22 | 17 | Q.   In addition to the reps and warranties, is it standard |
| 09:22 | 18 | to get a lawyer involved to try to check out the ownership? |
| 09:22 | 19 | A.   It's not. |
| 09:22 | 20 | Q.   So that was an extra step? |
| 09:22 | 21 | A.   That's correct. |
| 09:22 | 22 | Q.   And Section 5 of the agreement also contained a |
| 09:22 | 23 | provision that Carter Bryant agreed to indemnify MGA if it |
| 09:22 | 24 | turned out he wasn't the owner.  And indemnify means to pay |
| 09:22 | 25 | MGA any costs that it would incur, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:22 | 1 | A.   Yes. |
| 09:22 | 2 | Q.   And was that an additional assurance that you were |
| 09:22 | 3 | trying to get, that Carter Bryant was telling you the truth |
| 09:22 | 4 | and he truly owned the property? |
| 09:22 | 5 | A.   Yes.  Again, that's also standard language. |
| 09:22 | 6 | Q.   Now, let's look at Exhibit 18462. |
| 09:23 | 7 | *(Document provided to witness.)* |
| 09:23 | 8 | BY MS. KELLER: |
| 09:23 | 9 | Q.   And this is another e-mail chain.  And you said |
| 09:23 | 10 | Victoria O'Connor was at all times acting at your direction |
| 09:23 | 11 | with respect to negotiating with Mr. Rosenbaum, right? |
| 09:23 | 12 | A.   Yes. |
| 09:23 | 13 | Q.   And this is an October 5th, 2000, e-mail from Victoria |
| 09:23 | 14 | O'Connor to David Rosenbaum? |
| 09:23 | 15 | A.   On the top, yes. |
| 09:23 | 16 | Q.   And then at the bottom, an October 4th e-mail? |
| 09:23 | 17 | A.   Yes. |
| 09:23 | 18 | Q.   And that was from Mr. Rosenbaum to Victoria O'Connor? |
| 09:23 | 19 | A.   Yes. |
| 09:23 | 20 | MS. KELLER:  Your Honor, I'd move |
| 09:23 | 21 | Exhibit 18462 into evidence. |
| 09:23 | 22 | THE COURT:  Received. |
| 09:23 | 23 | *(Exhibit No. 18462 received in evidence.)* |
| 09:23 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 09:23 | 1 | BY MS. KELLER: |
| 09:23 | 2 | Q.   Now, if we look at 18462-2, this is an e-mail from |
| 09:24 | 3 | Victoria to Mr. Rosenbaum, October 4th, 2000. |
| 09:24 | 4 | A.   Yes. |
| 09:24 | 5 | Q.   And it says, "Would you please e-mail Carter the final |
| 09:24 | 6 | contract.  Sophiesays@hotmail.com." |
| 09:24 | 7 | A.   Yes. |
| 09:24 | 8 | Q.   "I still haven't received your e-mail.  Thanks." |
| 09:24 | 9 | A.   Yes. |
| 09:24 | 10 | Q.   And then if we look at that same page, on the bottom |
| 09:24 | 11 | and going to the top of 18462-2, we see an e-mail from David |
| 09:24 | 12 | Rosenbaum to Victoria O'Connor, October 4th, 2000.  And it |
| 09:24 | 13 | says, "As discussed, since Carter is represented by an |
| 09:24 | 14 | attorney, I am not permitted to communicate with him |
| 09:24 | 15 | directly without his lawyer's permission.  I sent her copies |
| 09:24 | 16 | that are signable by Carter." |
| 09:24 | 17 | And then if you look at the next e-mail, 18462-1, from |
| 09:25 | 18 | Victoria O'Connor to David Rosenbaum, 4:49 p.m., |
| 09:25 | 19 | October 4th, 2000, it says, "He has signed the contract." |
| 09:25 | 20 | You see that? |
| 09:25 | 21 | A.   Yes. |
| 09:25 | 22 | Q.   And the next e-mail from Rosenbaum to O'Connor, |
| 09:25 | 23 | October 5th, 2000, says, "Send me a copy of the fully |
| 09:25 | 24 | executed contract for my files." |
| 09:25 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 37 of 137   Page ID #:301930
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

37

| | | |
|---|---|---|
| 09:25 | 1 | Q.   And then the final e-mail from Victoria O'Connor to |
| 09:25 | 2 | David Rosenbaum, October 5th, 2000, she says, "I will as |
| 09:25 | 3 | soon as I get it.  Tomorrow I am receiving a license |
| 09:25 | 4 | agreement for the final fantasy movie from Dan Kletzky over |
| 09:25 | 5 | at ELA." |
| 09:25 | 6 | A.   Yes. |
| 09:25 | 7 | Q.   "He said you guys are friends." |
| 09:25 | 8 | A.   Yes. |
| 09:25 | 9 | Q.   So in any of these e-mail chains that you've seen, do |
| 09:26 | 10 | you remember Ms. O'Connor expressing a high level of concern |
| 09:26 | 11 | about Mr. Bryant's employment at Mattel? |
| 09:26 | 12 | A.   No. |
| 09:26 | 13 | Q.   And would you have expected her to raise a red flag if |
| 09:26 | 14 | she was concerned? |
| 09:26 | 15 | A.   Absolutely.  That was her job. |
| 09:26 | 16 | Q.   If Mr. Rosenbaum had expressed any concern, would you |
| 09:26 | 17 | have considered that a red flag? |
| 09:26 | 18 | A.   I would never had signed the contract if David |
| 09:26 | 19 | Rosenbaum or Victoria O'Connor had said there was an issue. |
| 09:26 | 20 | Q.   And did either one of them ever say that they were |
| 09:26 | 21 | concerned about an issue here? |
| 09:26 | 22 | A.   Never. |
| 09:26 | 23 | Q.   Now, let's look at Exhibit 13621. |
| 09:26 | 24 | *(Document provided to the witness.)* |
| 09:26 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 09:26 | 1 | BY MS. KELLER: |
| 09:26 | 2 | Q.   Was it standard practice to execute multiple -- to have |
| 09:26 | 3 | multiple executed originals so that both parties would have |
| 09:26 | 4 | an original? |
| 09:26 | 5 | A.   Yes. |
| 09:26 | 6 | Q.   And do you think you signed a second execution copy of |
| 09:27 | 7 | the contract? |
| 09:27 | 8 | A.   Yes. |
| 09:27 | 9 | Q.   And if you look at Exhibit 13621, going to the final |
| 09:27 | 10 | page, do you see Mr. Bryant's signature and your signature? |
| 09:27 | 11 | A.   I do. |
| 09:27 | 12 | Q.   And do you see a date down by the numeral 6 on the |
| 09:27 | 13 | left-hand side? |
| 09:27 | 14 | A.   Yes. |
| 09:27 | 15 | Q.   And what does that date say? |
| 09:27 | 16 | A.   It's 10/04/2000 at 3:05 p.m.  That's date contract was |
| 09:27 | 17 | sent. |
| 09:27 | 18 | Q.   What did you understand the significance of that |
| 09:27 | 19 | October date to be in legal terms? |
| 09:27 | 20 | A.   That was the final date that the contract was signed. |
| 09:27 | 21 | That's the date we had a contract. |
| 09:27 | 22 | Q.   So before that? |
| 09:27 | 23 | A.   We did not. |
| 09:27 | 24 | Q.   Let's look -- |
| 09:27 | 25 | A.   We did not even have it as of that time, 3:05.  We had |

| | | |
|---|---|---|
| 09:27 | 1 | it later on when he signed it.  I think you saw it before. |
| 09:28 | 2 | It was after 4:40 p.m. |
| 09:28 | 3 | Q.   Okay.  And so you made sure, though, that two |
| 09:28 | 4 | versions -- that the contract was signed two times.  There |
| 09:28 | 5 | was two copies and each one was an original:  One for MGA, |
| 09:28 | 6 | one for Carter Bryant? |
| 09:28 | 7 | A.   That's correct. |
| 09:28 | 8 | Q.   And that was standard practice? |
| 09:28 | 9 | A.   It was.  It is. |
| 09:28 | 10 | Q.   Now, let's look at Exhibit 12842. |
| 09:28 | 11 | (Document provided to the witness.) |
| 09:28 | 12 | BY MS. KELLER: |
| 09:28 | 13 | Q.   Do you recognize this as an e-mail chain with the top |
| 09:28 | 14 | e-mail from you? |
| 09:28 | 15 | A.   Yes. |
| 09:28 | 16 | Q.   And this was dated June 27, 2002, and it's to |
| 09:28 | 17 | caymohr@aol.com and CC to Richard Cruz and Fabienne |
| 09:28 | 18 | Chonavel? |
| 09:28 | 19 | A.   Yes. |
| 09:28 | 20 | MS. KELLER:  Your Honor, I would move |
| 09:28 | 21 | Exhibit 12842 into evidence. |
| 09:29 | 22 | THE COURT:  Received. |
| 09:29 | 23 | (Exhibit No. 12842 received in evidence.) |
| 09:29 | 24 | (Document displayed.) |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 40 of 137   Page ID #:301933
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:29 | 1 | BY MS. KELLER: |
| 09:29 | 2 | Q.   Now, the bottom e-mail, the second one, appears to be |
| 09:29 | 3 | from Fabienne Chonavel to you, and that's dated June 26, |
| 09:29 | 4 | 2002.  Now, who is Fabienne Chonavel? |
| 09:29 | 5 | A.   I think she was in our -- I don't recall her exactly, |
| 09:29 | 6 | but she -- she was in MGA, I think either as product manager |
| 09:29 | 7 | or marketing. |
| 09:29 | 8 | Q.   Okay.  And it says, "Subject:  Bratz presentation"? |
| 09:29 | 9 | A.   Yes. |
| 09:29 | 10 | Q.   And does this e-mail concern the FOX Production Company |
| 09:29 | 11 | and rights for a movie? |
| 09:29 | 12 | A.   Yes.  DVD and a movie, correct. |
| 09:29 | 13 | Q.   And it says, Isaac -- it says, "Hi, Isaac, here's the |
| 09:29 | 14 | presentation for FOX.  Rick started it -- thanks, Rick -- |
| 09:29 | 15 | and I finished it from here.  Isaac, I'm concerned you |
| 09:29 | 16 | changed Bratz intro date to October 200 (sic).  Do you want |
| 09:29 | 17 | to keep that or not?  Rick, please make changes according to |
| 09:30 | 18 | Isaac's answer.  Please, Rick, send this to Isaac's contact. |
| 09:30 | 19 | Isaac to provide name tomorrow, Thursday.  This is urgent," |
| 09:30 | 20 | et cetera. |
| 09:30 | 21 | A.   Yes. |
| 09:30 | 22 | Q.   And do you see your reply to her? |
| 09:30 | 23 | A.   Yes. |
| 09:30 | 24 | Q.   And what does it say? |
| 09:30 | 25 | A.   It says, "October 2000 for legal purposes." |

| | | |
|---|---|---|
| 09:30 | 1 | Q.   And why are you saying that the legal date of ownership |
| 09:30 | 2 | is October 2000? |
| 09:30 | 3 | A.   Because there was no contract, no agreement, nothing |
| 09:30 | 4 | regarding Bratz with Carter Bryant until October 4, 2000, |
| 09:30 | 5 | when the contract was signed. |
| 09:30 | 6 | Q.   Let's go back and look at -- I want to move to a |
| 09:30 | 7 | different topic.  And this is the topic of Mr. Bryant |
| 09:30 | 8 | working for both companies, apparently simultaneously for a |
| 09:30 | 9 | couple weeks.  Let's look at the first page of his |
| 09:30 | 10 | consulting contract with MGA, 15-1. |
| 09:30 | 11 | A.   Yes. |
| 09:30 | 12 | Q.   And we see in the first paragraph that it says, "We're |
| 09:31 | 13 | setting forth the terms and conditions upon which we, |
| 09:31 | 14 | hereinafter MGA, are retaining you, Bryant, to consult and |
| 09:31 | 15 | advise MGA in the design and development of certain products |
| 09:31 | 16 | which MGA wishes to manufacture and distribute." |
| 09:31 | 17 | And this is called the MGA consulting agreement? |
| 09:31 | 18 | A.   Yes. |
| 09:31 | 19 | Q.   And so his agreement with MGA was to consult and advise |
| 09:31 | 20 | in the design and development of such projects -- products, |
| 09:31 | 21 | right? |
| 09:31 | 22 | A.   That's correct. |
| 09:31 | 23 | Q.   Now, let's look at the second paragraph.  It says, "MGA |
| 09:31 | 24 | retains Bryant to provide his services to consult with MGA |
| 09:31 | 25 | and advise MGA on the design and development by MGA of a |

| | | |
|---|---|---|
| 09:31 | 1 | line of dolls presented known as Bratz, the MGA products. |
| 09:31 | 2 | Bryant will render his services at such locations and times |
| 09:31 | 3 | as may be reasonably" -- um, I think it's "may be reasonably |
| 09:32 | 4 | designated by MGA"? |
| 09:32 | 5 | A.   Yes. |
| 09:32 | 6 | Q.   Um, "It is understood and agreed that Bryant shall |
| 09:32 | 7 | provide his services on a top priority basis." |
| 09:32 | 8 | A.   Yes. |
| 09:32 | 9 | Q.   "As his services pertain to other clients of Bryant." |
| 09:32 | 10 | A.   Yes. |
| 09:32 | 11 | Q.   So in this agreement you're saying that Bryant is gonna |
| 09:32 | 12 | work at various locations, right? |
| 09:32 | 13 | MR. PRICE:  Objection.  Leading. |
| 09:32 | 14 | THE WITNESS:  It's -- |
| 09:32 | 15 | THE COURT:  Well, technically that's sustained. |
| 09:32 | 16 | It's -- ladies and gentlemen, a leading question is a |
| 09:32 | 17 | question that basically suggests the answer, but sometimes |
| 09:32 | 18 | it will sound like a leading question because the answer is |
| 09:32 | 19 | so obvious.  So technically, it's sustained, Counsel.  I |
| 09:32 | 20 | think you're right. |
| 09:32 | 21 | Counsel, just reask it. |
| 09:32 | 22 | BY MS. KELLER: |
| 09:32 | 23 | Q.   What was your understanding of where Mr. Bryant was |
| 09:32 | 24 | going to work?  Was it only at MGA, or could he work other |
| 09:32 | 25 | places? |

| 09:32 | 1 | A. He could work at home. He could work other places. |
| 09:32 | 2 | And, indeed, he did. |
| 09:32 | 3 | Q. Is that why it says "at such locations and times," |
| 09:33 | 4 | et cetera, "as may be reasonably designated"? |
| 09:33 | 5 | A. That's correct. |
| 09:33 | 6 | Q. Now, the next clause says, "It is understood and agreed |
| 09:33 | 7 | that Bryant shall provide his services on a top priority |
| 09:33 | 8 | basis as his services pertaining to other clients of |
| 09:33 | 9 | Bryant." |
| 09:33 | 10 | A. Yes. |
| 09:33 | 11 | Q. When it says, "other clients of Bryant," did that |
| 09:33 | 12 | indicate your understanding that he was a consultant for |
| 09:33 | 13 | you, but he would have other clients? |
| 09:33 | 14 | A. Yes. He was never an employee of MGA. He never wanted |
| 09:33 | 15 | to be an employee of MGA. He wanted to be a consultant, and |
| 09:33 | 16 | he wanted to have free time to work for other people. And |
| 09:33 | 17 | we said that's fine, but you gotta give our project the top |
| 09:33 | 18 | priority. |
| 09:33 | 19 | Q. Okay. And you said that you told him to quit his job |
| 09:33 | 20 | immediately when he signed this consulting agreement, right? |
| 09:33 | 21 | A. I did. |
| 09:33 | 22 | Q. And you sent him a couple e-mails on this, didn't you? |
| 09:33 | 23 | A. I did. I don't remember all the e-mails. |
| 09:33 | 24 | Q. Let's look at Exhibit 16789. |
| 09:34 | 25 | *(Document provided to the witness.)* |

| | | |
|---|---|---|
| 09:34 | 1 | *(Document displayed.)* |
| 09:34 | 2 | BY MS. KELLER: |
| 09:34 | 3 | Q.   And this is an October 5th, 2000 e-mail chain -- |
| 09:34 | 4 | A.   Yes. |
| 09:34 | 5 | Q.   -- from you to Carter Bryant? |
| 09:34 | 6 | A.   Yes. |
| 09:34 | 7 | Q.   And this is a day after the contract is signed.  This |
| 09:34 | 8 | is October 5th, 2000, right? |
| 09:34 | 9 | A.   It is. |
| 09:34 | 10 | Q.   So if we look at the first e-mail at 11:32 a.m. on |
| 09:34 | 11 | October 5th, you're saying, "Carter, now that we have the |
| 09:34 | 12 | agreement in place, we need you and Paula to focus |
| 09:34 | 13 | 200 percent on getting this done.  Think different.  Think |
| 09:34 | 14 | the fashion.  Think and design the accessories.  Think about |
| 09:34 | 15 | the commercial.  Think about the New York showroom |
| 09:34 | 16 | presentation.  We are thinking a cat walk.  Think about all |
| 09:34 | 17 | the royalty you are going to make.  Carter, this is your big |
| 09:34 | 18 | break in business life.  I have put my whole resources, |
| 09:34 | 19 | money, people, development, et cetera, on this to make your |
| 09:34 | 20 | dream happen because I believe in young people's dream. |
| 09:35 | 21 | Now, it is up to you.  You need to put 16 hours a day |
| 09:35 | 22 | starting now on this and nothing else.  That is the only way |
| 09:35 | 23 | it will happen.  Let's do it.  Isaac." |
| 09:35 | 24 | Now, what was the reason that you told him to think |
| 09:35 | 25 | about the royalties he was gonna make? |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 45 of 137   Page ID #:301938
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

45

09:35   1   A.   To encourage him to really work hard and to help us
09:35   2   make this happen now that the contract was signed, because
09:35   3   we needed to rush and have prototype, samples, things to
09:35   4   show in Hong Kong toy show.  That was our only chance to get
09:35   5   product out in 2001, or it would not happen.
09:35   6   Q.   And when you said you wanted him to work 16 hours a day
09:35   7   on this and focus 200 percent, were you factoring in that he
09:35   8   might keep his job at Mattel?
09:35   9   A.   Absolutely, I thought he had resigned, as I had told
09:35  10   him, and left Mattel the same day.
09:36  11   Q.   Let's look at Exhibit 11670.
09:36  12          *(Document provided to the witness.)*
09:36  13   BY MS. KELLER:
09:36  14   Q.   And this is the responsive e-mail from Mr. Bryant to
09:36  15   you at 4:52 p.m., October 5th.  And it says, "Hi, Isaac" --
09:36  16   oh, I'm sorry.
09:36  17          MS. KELLER:  Your Honor, um --
09:36  18   BY MS. KELLER:
09:36  19   Q.   This is from you, Mr. Larian, to Carter Bryant?
09:36  20   A.   The top portion is from me to Mr. Bryant.  The bottom
09:36  21   is from him to me.
09:36  22          MS. KELLER:  Your Honor, I would move
09:36  23   Exhibit 11670 into evidence.
09:36  24          THE COURT:  Received.
09:36  25          *(Exhibit No. 11670 received in evidence.)*

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:36 | 1 | (Document displayed.) |
| 09:36 | 2 | BY MS. KELLER: |
| 09:36 | 3 | Q.   And the first e-mail from him says, "Hi, Isaac, I just |
| 09:36 | 4 | want to thank you for your message earlier, and mostly, I |
| 09:36 | 5 | want to thank you for this incredible opportunity and for |
| 09:36 | 6 | believing in me enough to make this happen.  I have a great |
| 09:36 | 7 | story line for a commercial, which I will work up a bit for |
| 09:36 | 8 | you all to see, as well as a great song in mind for it.  I |
| 09:37 | 9 | also have a lot of great ideas for the entire line.  And |
| 09:37 | 10 | this is gonna be big.  Thanks again, Carter." |
| 09:37 | 11 | And your response is above that: |
| 09:37 | 12 | "Carter, you are very creative, and I believe this |
| 09:37 | 13 | line, if done with focus and strategic thought, will be |
| 09:37 | 14 | huge.  Please arrange to meet with Paula ASAP and work on |
| 09:37 | 15 | this full time, and let's make it happen.  Also, Mercedeh |
| 09:37 | 16 | will be starting at MGA next Tuesday." |
| 09:37 | 17 | Now, you have "full time" in caps? |
| 09:37 | 18 | A.   Yes. |
| 09:37 | 19 | Q.   And why did you put full time in capital letters? |
| 09:37 | 20 | A.   Because I wanted him as -- right after he had signed |
| 09:37 | 21 | the contract to really put all his efforts together with |
| 09:37 | 22 | Paula and everybody else -- and we had just hired |
| 09:37 | 23 | Mercedeh -- so we could have product to show, a sample to |
| 09:37 | 24 | show in Hong Kong and going to production later on in 2001, |
| 09:37 | 25 | which we did, in May 2001. |

| 09:37 | 1 | Q.   And when you found out in this litigation that |
| 09:38 | 2 | Mr. Bryant had actually given two weeks' notice and was |
| 09:38 | 3 | working at Mattel and, apparently, also, in his off hours |
| 09:38 | 4 | from Mattel, working for MGA, what was your reaction? |
| 09:38 | 5 |             MR. PRICE:  Objection.  Assumes facts not in |
| 09:38 | 6 | evidence. |
| 09:38 | 7 |             THE COURT:  I'm sorry? |
| 09:38 | 8 |             MR. PRICE:  Object.  It assumes facts not in |
| 09:38 | 9 | evidence. |
| 09:38 | 10 |             MS. KELLER:  I'll rephrase it. |
| 09:38 | 11 |             THE COURT:  Okay. |
| 09:38 | 12 | BY MS. KELLER: |
| 09:38 | 13 | Q.   When you found out that there was an overlap between |
| 09:38 | 14 | Mr. Bryant signing this contract and when he actually left |
| 09:38 | 15 | Mattel, what was your reaction? |
| 09:38 | 16 | A.   I found out on April 27 or 28, 2004.  I got a call from |
| 09:38 | 17 | *Wall Street Journal* reporter telling me that Mattel has |
| 09:38 | 18 | filed a lawsuit against Carter Bryant and had given them an |
| 09:38 | 19 | advanced copy and if I knew about it.  And I said, "I have |
| 09:38 | 20 | no idea.  I don't know.  What's it about?" |
| 09:38 | 21 |     She sent me a copy.  And when I looked at it -- it says |
| 09:39 | 22 | that Carter Bryant had worked at Mattel from October 4 to |
| 09:39 | 23 | October 19, giving 'em two weeks notice.  And I called |
| 09:39 | 24 | Carter Bryant and asked him, did he do that.  And he said he |
| 09:39 | 25 | did.  And I was very disappointed. |

| | | |
|---|---|---|
| 09:39 | 1 | Q.   In addition to being disappointed, were you very |
| 09:39 | 2 | worried? |
| 09:39 | 3 | A.   I was very disappointed and I was worried, yes, because |
| 09:39 | 4 | now I had -- Mattel pulled us into this lawsuit. |
| 09:39 | 5 | Q.   And although Mattel sued Carter Bryant initially, the |
| 09:39 | 6 | lawsuit against Carter Bryant potentially jeopardized MGA's |
| 09:39 | 7 | ownership rights, right? |
| 09:39 | 8 | A.   Yes.  Because the lawsuit against Carter Bryant was the |
| 09:39 | 9 | way by Mattel to get to us and -- because we had Bratz.  We |
| 09:39 | 10 | owned Bratz. |
| 09:39 | 11 | Q.   And so MGA later on intervened in that lawsuit to |
| 09:39 | 12 | protect its rights? |
| 09:39 | 13 | A.   We did. |
| 09:40 | 14 | Q.   Now, let's go back to Exhibit 15, and that's |
| 09:40 | 15 | Mr. Bryant's contract with MGA.  If we look at the second |
| 09:40 | 16 | page, 15-2. |
| 09:40 | 17 | (Document displayed.) |
| 09:40 | 18 | BY MS. KELLER: |
| 09:40 | 19 | Q.   And we look at Paragraph 4, composition costs.  This |
| 09:40 | 20 | lays out that monthly sum he was gonna be paid, right? |
| 09:40 | 21 | A.   Yes. |
| 09:40 | 22 | Q.   And then Paragraph 4(b), that has the 3 percent |
| 09:40 | 23 | royalties of the net sales receipts from the sales by MGA of |
| 09:40 | 24 | any of the MGA products developed by MGA on which Bryant |
| 09:40 | 25 | provided his consulting services.  Do you see that? |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 49 of 137   Page ID #:301942
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:40 | 1 | A.   Yes. |
| 09:40 | 2 | Q.   So this agreement doesn't state anywhere that |
| 09:40 | 3 | Mr. Bryant's gonna be paid 30- to $35 million, right? |
| 09:41 | 4 | A.   It does not. |
| 09:41 | 5 | Q.   Why was that? |
| 09:41 | 6 | A.   Because, again, this was a big thing, big risk by MGA |
| 09:41 | 7 | or any other toy company, to get into fashion doll business. |
| 09:41 | 8 | Nobody has done it successfully before, and we didn't know |
| 09:41 | 9 | if this is gonna become a success or not.  And the contract |
| 09:41 | 10 | was worth $48,000.  And if there was gonna be any sales and |
| 09:41 | 11 | if the product line was successful, he would receive |
| 09:41 | 12 | 3 percent after paying back that $48,000 against that |
| 09:41 | 13 | royalty.  So there was no guarantee that he would make |
| 09:41 | 14 | $35 million.  The total guarantee of this contract was |
| 09:41 | 15 | $48,000. |
| 09:41 | 16 | Q.   And if the doll couldn't get made, he made nothing in |
| 09:41 | 17 | addition to that? |
| 09:41 | 18 | A.   That's correct. |
| 09:41 | 19 | Q.   And if the doll got made but didn't sell, he made |
| 09:41 | 20 | nothing in addition to that? |
| 09:41 | 21 | A.   That's correct. |
| 09:41 | 22 | Q.   Now, let's look at Exhibit 305. |
| 09:41 | 23 | *(Document displayed.)* |
| 09:42 | 24 | *(Document provided to the witness.)* |
| | 25 | |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:42 | 1 | BY MS. KELLER: |
| 09:42 | 2 | Q.   And this -- let's look at the oldest e-mail in this |
| 09:42 | 3 | chain, which is from Dennis Medici to Victoria O'Connor on |
| 09:42 | 4 | October 10th, 2000. |
| 09:42 | 5 | A.   Yes. |
| 09:42 | 6 | Q.   And it says, "Victoria, please reply what amount we |
| 09:42 | 7 | should pay Carter and have Isaac approve.  Thanks." |
| 09:42 | 8 | And then, if you look right above that, you see |
| 09:42 | 9 | Victoria O'Connor e-mails Paula Garcia on Tuesday, |
| 09:42 | 10 | October 10th, at 8:11 a.m., "Please let me know how many |
| 09:42 | 11 | hours Carter has worked and the day he started meetings with |
| 09:42 | 12 | you.  Thanks." |
| 09:42 | 13 | Now, so far, do you see anything in this e-mail where |
| 09:42 | 14 | Victoria O'Connor expresses any concern about the fact that |
| 09:42 | 15 | Mr. Bryant had been employed by Mattel in September? |
| 09:42 | 16 | A.   No. |
| 09:42 | 17 | Q.   Now, the next e-mail says -- from Paula Garcia back to |
| 09:43 | 18 | Victoria O'Connor, says, "I would say that Carter has worked |
| 09:43 | 19 | an average, about four hours a day, and we began working on |
| 09:43 | 20 | this line the first part of September." |
| 09:43 | 21 | And let's look right above that, where Victoria |
| 09:43 | 22 | O'Connor sends an e-mail to you, copy to Dennis Medici that |
| 09:43 | 23 | same day, October 10th, about two hours later, 10:56 a.m., |
| 09:43 | 24 | "Do you want to start his salary for the month of October |
| 09:43 | 25 | since he began in September?  Please advise." |

09:43  1        And do you see anywhere in this e-mail, again, where
09:43  2   Victoria O'Connor has expressed any concern whatsoever about
09:43  3   the fact that Mr. Bryant had been employed by Mattel in
09:43  4   September?
09:43  5   A.    No.
09:43  6   Q.    And at the very top of the e-mail chain, you say to
09:43  7   Victoria O'Connor, copy to Mr. Medici, "from the day he
09:43  8   signed the contract."
09:43  9   A.    Hum, yes.
09:44  10  Q.    And why didn't you say, oh, sure, pay him for his work
09:44  11  in September?
09:44  12  A.    Because any work, if he had done, he had done on his
09:44  13  own to try to pitch and sell his concept to us, and we were
09:44  14  not gonna pay for it.  We did not have a contract until
09:44  15  October 4, and I was not gonna pay him for any work, if he
09:44  16  had done anything prior to that.
09:44  17  Q.    So even if he had -- let's assume for a minute.  Let's
09:44  18  say he had worked four hours a day.  And you don't know how
09:44  19  many hours a day he worked in September, true?
09:44  20  A.    I did not know.
09:44  21  Q.    But let's say he had.  In your mind, he was working on
09:44  22  his own project to try to pitch it to you, true?
09:44  23              MR. PRICE:  Objection.
09:44  24              THE WITNESS:  That's correct.
09:44  25              MR. PRICE:  Leading.

| 09:44 | 1 | THE COURT: I'm sorry? |
|---|---|---|
| 09:44 | 2 | MR. PRICE: Objection. Leading. |
| 09:44 | 3 | THE COURT: Sustained. Strike the answer. |
| 09:44 | 4 | Reask the question. |
| 09:44 | 5 | BY MS. KELLER: |
| 09:44 | 6 | Q. In your own mind, any work he did in September was |
| 09:44 | 7 | about what? |
| 09:44 | 8 | A. He was just doing it on his own, try to pitch and sell |
| 09:44 | 9 | his concepts to MGA so we can license it. He was doing it |
| 09:45 | 10 | on his own, with his own risk. We were not gonna pay for |
| 09:45 | 11 | it. We did not pay for it. |
| 09:45 | 12 | Q. And had you not gone through with the contract -- which |
| 09:45 | 13 | we saw in that series of e-mails? |
| 09:45 | 14 | A. Right. |
| 09:45 | 15 | Q. Had you not gone through with the contract, were you |
| 09:45 | 16 | gonna pay him anything for September? |
| 09:45 | 17 | A. No. And we did not. |
| 09:45 | 18 | Q. Now, was there ever any purchase order or authorization |
| 09:45 | 19 | by you for Mr. Bryant to be paid anything in September? |
| 09:45 | 20 | A. No, there was not. |
| 09:45 | 21 | Q. Did you ever authorize anybody at MGA to agree on your |
| 09:45 | 22 | behalf to pay Mr. Bryant before the contract was signed? |
| 09:45 | 23 | A. No, I did not. |
| 09:45 | 24 | Q. And had MGA paid Mr. Bryant anything in September and |
| 09:45 | 25 | then had the deal fallen through, would Mr. Bryant have |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 53 of 137   Page ID #:301946
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:45 | 1 | still had that money in his pocket? |
| 09:46 | 2 | A.   We were just not gonna pay him for something if we |
| 09:46 | 3 | didn't have a contract.  I was never gonna approve that. |
| 09:46 | 4 | And I did not. |
| 09:46 | 5 | Q.   Now, let's move on to development of the product in the |
| 09:46 | 6 | fall of 2000.  Who was the person at MGA who had the |
| 09:46 | 7 | responsibility for getting the product developed? |
| 09:46 | 8 | A.   Paula Treantafelles was the lead person. |
| 09:46 | 9 | Q.   And in the e-mail a second ago, you mentioned Mercedeh |
| 09:46 | 10 | Ward. |
| 09:46 | 11 | A.   Yes. |
| 09:46 | 12 | Q.   What was Mercedeh Ward's job? |
| 09:46 | 13 | A.   Mercedeh Ward is a mechanical engineer, who has a lot |
| 09:46 | 14 | of experience in doll manufacturing, the mechanics of making |
| 09:46 | 15 | a doll work.  And we had hired her to work on this and other |
| 09:46 | 16 | products for MGA. |
| 09:46 | 17 | Q.   And you were gonna need packaging, right? |
| 09:46 | 18 | A.   That's correct. |
| 09:46 | 19 | Q.   Who did you hire to work on that? |
| 09:46 | 20 | A.   We had packaging people, but we also hired a lady by |
| 09:46 | 21 | the name of Rachel Harris. |
| 09:47 | 22 | Q.   And who was Rachel Harris? |
| 09:47 | 23 | A.   She became the head of our graphic and packaging |
| 09:47 | 24 | department at MGA. |
| 09:47 | 25 | Q.   Now, you were asked a series of questions about the |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 54 of 137   Page ID #:301947
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

54

| 09:47 | 1 | fact you had discussed investing millions in the Bratz |
| 09:47 | 2 | project, even though you only had Mr. Bryant's designs in |
| 09:47 | 3 | September of 2000.  Do you recall that? |
| 09:47 | 4 | A.    Yes, I do. |
| 09:47 | 5 | Q.    And at that time did you have a pretty good |
| 09:47 | 6 | understanding of the toy marketplace? |
| 09:47 | 7 | A.    I did. |
| 09:47 | 8 | Q.    And did you have a pretty good understanding of your |
| 09:47 | 9 | company's position in the toy marketplace? |
| 09:47 | 10 | A.    I did. |
| 09:47 | 11 | Q.    And, had you previously marketed successfully larger |
| 09:47 | 12 | dolls with fashions? |
| 09:47 | 13 | A.    Many of them. |
| 09:47 | 14 | Q.    What was your established international operational |
| 09:47 | 15 | capability at that time? |
| 09:48 | 16 | A.    What do you mean by that?  I don't understand. |
| 09:48 | 17 | Q.    Well, did you know that you had established |
| 09:48 | 18 | relationships with Chinese manufacturers? |
| 09:48 | 19 | A.    Yes.  We had MGA Hong Kong office, and we had long |
| 09:48 | 20 | established relationship with many factories that goes back |
| 09:48 | 21 | over 25, 30 years, including the largest toy maker in China. |
| 09:48 | 22 | Q.    And as well as manufacturers, what were your |
| 09:48 | 23 | relationships with distributors and retailers at that point? |
| 09:48 | 24 | A.    I personally had a great relationship with all the |
| 09:48 | 25 | major retailers in USA as well as distributors in other |

| | | |
|---|---|---|
| 09:48 | 1 | countries. |
| 09:48 | 2 | Q.   And when it came to Barbie, the fashion doll Barbie, |
| 09:48 | 3 | what was your view of Barbie in 2000 as far as whether there |
| 09:48 | 4 | might be a niche market? |
| 09:48 | 5 | A.   Barbie sales had declined over the past few years. |
| 09:48 | 6 | Mattel was in a turmoil.  They had just hired, fired Jill |
| 09:49 | 7 | Barad, who was the chairman and CEO of Mattel.  She was |
| 09:49 | 8 | brilliant. |
| 09:49 | 9 | Q.   What was the name? |
| 09:49 | 10 | A.   Jill Barad. |
| 09:49 | 11 | MR. PRICE:  Your Honor, I would move to strike for |
| 09:49 | 12 | lack of foundation or ask for an instruction that this does |
| 09:49 | 13 | not go to the truth. |
| 09:49 | 14 | THE COURT:  This does not go to the truth.  This |
| 09:49 | 15 | is his understanding of what Mattel's position was and why |
| 09:49 | 16 | he took subsequent actions or what his knowledge was of the |
| 09:49 | 17 | toy market. |
| 09:49 | 18 | BY MS. KELLER: |
| 09:49 | 19 | Q.   And how did you know about this information that you're |
| 09:49 | 20 | telling us? |
| 09:49 | 21 | A.   It was all over the news.  It was all over the toy |
| 09:49 | 22 | industry.  Jill Barad had bought the company called "The |
| 09:49 | 23 | Learning Company" prior to that -- it was all over the |
| 09:49 | 24 | news -- for over $3 billion.  That had become a disaster. |
| 09:49 | 25 | And Barbie sales were declining.  Again, it was all over the |

| | | |
|---|---|---|
| 09:49 | 1 | news and the toy industry.  And indeed, they fired her in |
| 09:49 | 2 | 2000. |
| 09:50 | 3 | Q.   And what was your view at the time, in 2000, about |
| 09:50 | 4 | whether Barbie was capturing -- what market Barbie was |
| 09:50 | 5 | capturing? |
| 09:50 | 6 | A.   It -- young, young girls, ages of 4 to 6. |
| 09:50 | 7 | Q.   And then the Barbie Collectibles were capturing? |
| 09:50 | 8 | A.   They were for collectors, older people, older ladies |
| 09:50 | 9 | who were collecting Barbie.  They still do. |
| 09:50 | 10 | Q.   So at the time did you think you had some good |
| 09:50 | 11 | employees at MGA? |
| 09:50 | 12 | A.   Yes, we did. |
| 09:50 | 13 | Q.   And did you think -- did you have a desire to create |
| 09:50 | 14 | things? |
| 09:50 | 15 | A.   Yes. |
| 09:50 | 16 | Q.   Now, Mr. Price showed you Exhibit 11277. |
| 09:50 | 17 | *(Document provided to the witness.)* |
| 09:50 | 18 | MS. KELLER:  That's in evidence. |
| 09:50 | 19 | *(Document displayed.)* |
| 09:50 | 20 | BY MS. KELLER: |
| 09:50 | 21 | Q.   And this is an October 31st, 2000 e-mail from you to |
| 09:50 | 22 | Franki Tsang, CC to Stephen Lee. |
| 09:51 | 23 | Q.   And you were actually shown only one e-mail, the last |
| 09:51 | 24 | one in this chain, your e-mail to Franki Tsang, October 31, |
| 09:51 | 25 | 2000.  Do you recall that? |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:51 | 1 | A.   Yes. |
| 09:51 | 2 | Q.   And this is where you complain that Cecilia Kwok has |
| 09:51 | 3 | never developed product, and you said you needed someone |
| 09:51 | 4 | with doll development experience on this product.  Do you |
| 09:51 | 5 | remember Mr. Price asking you about that? |
| 09:51 | 6 | A.   Yes. |
| 09:51 | 7 | Q.   But you were not shown what came after that, true? |
| 09:51 | 8 | A.   I was not. |
| 09:51 | 9 | Q.   So let's look -- and this e-mail that you were shown |
| 09:51 | 10 | talks about how "I need someone with doll development |
| 09:51 | 11 | experience on this product." |
| 09:51 | 12 | A.   Yes. |
| 09:51 | 13 | Q.   I will not -- and then at the bottom of it you say, "I |
| 09:52 | 14 | will not have a lot of patience on this issue and will not |
| 09:52 | 15 | allow for MGA to be dragged down, get the right horses in |
| 09:52 | 16 | place.  I hope I am making this very clear."  Right? |
| 09:52 | 17 | A.   Yes. |
| 09:52 | 18 | Q.   Now, let's look at Exhibit 12845. |
| 09:52 | 19 | *(Document provide to the witness.)* |
| 09:52 | 20 | BY MS. KELLER: |
| 09:52 | 21 | Q.   This begins with an e-mail from Stephen Lee to you, |
| 09:52 | 22 | dated November 2nd. |
| 09:52 | 23 | MS. KELLER:  Your Honor, I would move |
| 09:52 | 24 | Exhibit 12845 into evidence. |
| 09:52 | 25 | THE WITNESS:  Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:52 | 1 | THE COURT:  Received. |
| 09:52 | 2 | *(Exhibit No. 12845 received in evidence.)* |
| 09:52 | 3 | *(Document displayed.)* |
| 09:52 | 4 | BY MS. KELLER: |
| 09:52 | 5 | Q.   Let's go to the last page, page 3, and that's the |
| 09:52 | 6 | e-mail that I just showed you, right? |
| 09:52 | 7 | A.   Yes. |
| 09:52 | 8 | Q.   The one Mr. Price showed you earlier? |
| 09:52 | 9 | A.   Yes. |
| 09:52 | 10 | Q.   Now, this begins -- this is from you to Mr. Tsang, and |
| 09:52 | 11 | it begins, "Franki, please listen to me carefully.  This is |
| 09:53 | 12 | a fashion doll.  We project 25 million in sales.  Cecilia |
| 09:53 | 13 | has never developed any product, let alone a fashion doll. |
| 09:53 | 14 | I need someone with doll development experience on this |
| 09:53 | 15 | product.  We don't have time to teach.  Our company is |
| 09:53 | 16 | getting too big to hire inexperienced people, and we are |
| 09:53 | 17 | suffering.  I need to see a change there in HK in R&D people |
| 09:53 | 18 | quickly.  I want experienced people hired and replace the |
| 09:53 | 19 | ones who don't have experience.  I will not have a lot of |
| 09:53 | 20 | patience on this issue and will not allow for MGA to be |
| 09:53 | 21 | dragged down.  Get the right horses in place.  I hope I am |
| 09:53 | 22 | making this very clear.  Isaac." |
| 09:53 | 23 | Now, let's look at the very bottom of the first page |
| 09:53 | 24 | and see what that is responding to.  And this e-mail is from |
| 09:54 | 25 | Franki, saying to you -- sent November 1st -- I'm sorry, |

| | | |
|---|---|---|
| 09:54 | 1 | sent November -- yeah, sent November 1st, 2000. |
| 09:54 | 2 | A.   Yes, he's replying to the previous e-mail. |
| 09:54 | 3 | Q.   And in this e-mail did Mr. Tsang explain that he |
| 09:54 | 4 | believed Ms. Kwok was adequate to do the task? |
| 09:54 | 5 | A.   Franki -- e-mail -- I don't remember reading all of it. |
| 09:54 | 6 | I just referred to him.  I said work with Stephen Lee. |
| 09:54 | 7 |      Yes.  He says on that page Cecilia just a project |
| 09:54 | 8 | executive.  Page 2. |
| 09:54 | 9 | Q.   And the next e-mail, 12845-1, is from you to Franki |
| 09:55 | 10 | Tsang, November 2nd, 2000? |
| 09:55 | 11 | A.   Yes. |
| 09:55 | 12 | Q.   Saying, "Franki, Stephen Lee is the managing director |
| 09:55 | 13 | of HK, and I am going to defer this to him to handle." |
| 09:55 | 14 | A.   Yes. |
| 09:55 | 15 | Q.   Now, did you agree to defer to Stephen Lee's judgment |
| 09:55 | 16 | on the issue of whether Ms. Kwok would stay on? |
| 09:55 | 17 | A.   Yes. |
| 09:55 | 18 | Q.   And Mr. Tsang thought Ms. Kwok was adequate to the |
| 09:55 | 19 | task, right? |
| 09:55 | 20 | A.   Yes.  But he said that she's just a project executive |
| 09:55 | 21 | coordinating the doll project.  If you look at page 02. |
| 09:55 | 22 | Q.   I see that.  And let's look a little further down, |
| 09:56 | 23 | where it says "Miles and Cecilia" and his e-mail to you, |
| 09:56 | 24 | which is -- |
| 09:56 | 25 | A.   Right. |

| 09:56 | 1 | Q.    -- that November 2nd e-mail.  And it's about two-thirds |
| 09:56 | 2 | of the way down the page. |
| 09:56 | 3 | A.    Yes. |
| 09:56 | 4 | Q.    It says, "Miles and Cecilia." |
| 09:56 | 5 | And under "Cecilia," it says, "She is just a project |
| 09:56 | 6 | executive coordinating the doll projects.  Since you are |
| 09:56 | 7 | taking the Bratz design subject to deliver this ultimatum |
| 09:56 | 8 | and specifically pointing out that she is not qualified for |
| 09:56 | 9 | the job.  This is not true since you don't have a clear |
| 09:56 | 10 | picture of the departmental hierarchy, and I wonder how far |
| 09:56 | 11 | did you read Mercedeh's e-mail before putting up the critic |
| 09:56 | 12 | to us.  Victor has commented, and I would like to copy this |
| 09:56 | 13 | for your information.  Cecilia has to stay with the team and |
| 09:56 | 14 | contribute backup and relieve the doll's team loading.  See |
| 09:56 | 15 | attached." |
| 09:56 | 16 | So Mr. Tsang basically wrote back and defended Ms. Kwok |
| 09:57 | 17 | to you? |
| 09:57 | 18 | A.    She did. |
| 09:57 | 19 | Q.    And -- |
| 09:57 | 20 | A.    He did. |
| 09:57 | 21 | Q.    And he said she's -- you know, she's staying on, right? |
| 09:57 | 22 | A.    Yes. |
| 09:57 | 23 | Q.    And you deferred to him? |
| 09:57 | 24 | A.    I deferred to Stephen Lee. |
| 09:57 | 25 | Q.    And Ms. Kwok, did she, in fact, handle her job during |

| | | |
|---|---|---|
| 09:57 | 1 | the development of Bratz? |
| 09:57 | 2 | A.   Yes. |
| 09:57 | 3 | Q.   Did you have confidence in MGA's ability to execute and |
| 09:57 | 4 | deliver as one of the things you knew when you decided to |
| 09:57 | 5 | invest -- |
| 09:57 | 6 | A.   Yes. |
| 09:57 | 7 | Q.   -- in this brand? |
| 09:57 | 8 | A.   Yes, and we did deliver. |
| 09:57 | 9 | Q.   And Samuel Wong is mentioned in here.  Who is Samuel |
| 09:57 | 10 | Wong? |
| 09:57 | 11 | A.   Samuel Wong was the most experienced person we had with |
| 09:57 | 12 | many years of doll design experience at MGA.  And Cecilia |
| 09:57 | 13 | reported to him. |
| 09:57 | 14 | Q.   So at the time of this e-mail, then, did you -- were |
| 09:57 | 15 | Stephen Lee and Franki Tsang and Samuel Wong and Cecilia |
| 09:57 | 16 | Kwok all in place already? |
| 09:58 | 17 | A.   They are. |
| 09:58 | 18 | Q.   And how well did they handle the Hong Kong end of |
| 09:58 | 19 | things for you? |
| 09:58 | 20 | A.   They did a fantastic job. |
| 09:58 | 21 | Q.   Including Cecilia Kwok? |
| 09:58 | 22 | A.   As a team, they worked -- they did fantastic job.  They |
| 09:58 | 23 | delivered. |
| 09:58 | 24 | Q.   Now, let's talk about the name "Bratz" if we can for a |
| 09:58 | 25 | little bit, where that came up -- who came up with that and |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 62 of 137   Page ID #:301955
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

62

| | | |
|---|---|---|
| 09:58 | 1 | when. |
| 09:58 | 2 | THE WITNESS:  Your Honor, can I take -- I need to |
| 09:58 | 3 | take a break. |
| 09:58 | 4 | THE COURT:  All right.  You're admonished not to |
| 09:58 | 5 | discuss this matter amongst yourselves, nor form or express |
| 09:58 | 6 | any opinion concerning the case.  We'll come and get you in |
| 09:58 | 7 | about 15 minutes, though. |
| 09:58 | 8 | We're gonna try to get some time back. |
| 09:58 | 9 | Thank you. |
| 09:58 | 10 | All right.  Counsel, 15 minutes.  Why don't we |
| 09:58 | 11 | resume at quarter after the hour. |
| 09:58 | 12 | *(Recess held at 9:58 a.m.)* |
| 10:09 | 13 | *(Proceedings resumed at 10:17 a.m.)* |
| 10:17 | 14 | *(In the presence of the jury.)* |
| 10:18 | 15 | THE COURT:  All right.  Then we're back in |
| 10:18 | 16 | session.  Counsel are present.  Thank you for your courtesy. |
| 10:18 | 17 | The parties are present.  Mr. Larian's on the witness stand. |
| 10:18 | 18 | This is continued cross-examination by Ms. Keller. |
| 10:18 | 19 | **CROSS-EXAMINATION (Continued)** |
| 10:18 | 20 | BY MS. KELLER: |
| 10:18 | 21 | Q.   Mr. Larian, before we broke, I had said I wanted to |
| 10:18 | 22 | start talking with you on a different topic, and this one, |
| 10:18 | 23 | the name "Bratz."  Okay? |
| 10:18 | 24 | A.   Yes. |
| 10:18 | 25 | Q.   If you can look at Exhibit 3487 (sic). |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 63 of 137   Page ID #:301956
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

63

| | | |
|---|---|---|
| 10:18 | 1 | *(Document provided to the witness.)* |
| 10:18 | 2 | BY MS. KELLER: |
| 10:18 | 3 | Q.   This is an e-mail from you or from -- let's see -- |
| 10:18 | 4 | we've got a whole chain here.  Let's see if I can unravel |
| 10:18 | 5 | this. |
| 10:18 | 6 | The e-mail chain starts with an e-mail from you -- |
| 10:18 | 7 | A.   No. |
| 10:18 | 8 | Q.   -- dated -- I'm sorry? |
| 10:18 | 9 | A.   No.  The e-mail starts with -- I think it's from -- |
| 10:19 | 10 | Q.   Okay.  We'll go to the bottom, then, where it starts, |
| 10:19 | 11 | September 20th, 2000, e-mail from Lucy Arant to Kerri Legg, |
| 10:19 | 12 | "Re: Trademark Searches," and then later on you are copied |
| 10:19 | 13 | on that chain. |
| 10:19 | 14 | A.   Yes. |
| 10:19 | 15 | Q.   You see that at the top? |
| 10:19 | 16 | A.   Yes, I am. |
| 10:19 | 17 | MS. KELLER:  And this is already in evidence. |
| 10:19 | 18 | *(Document displayed.)* |
| 10:19 | 19 | BY MS. KELLER: |
| 10:19 | 20 | Q.   So the Lucy Arant, who testified in this court, you had |
| 10:19 | 21 | had her conduct a trademark search for Bratz? |
| 10:19 | 22 | A.   Yes. |
| 10:19 | 23 | Q.   And do you see in Lucy Arant's e-mail, the |
| 10:19 | 24 | September 20th e-mail -- |
| 10:19 | 25 | And who's Kerri Legg, by the way, that she's writing |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 64 of 137   Page ID #:301957
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

64

| | | |
|---|---|---|
| 10:19 | 1 | to? |
| 10:19 | 2 | A.   I think she's now called Kerri Brode.  She got married. |
| 10:19 | 3 | She works at MGA for many years. |
| 10:20 | 4 | Q.   What's her position?  Or what department does she work |
| 10:20 | 5 | in? |
| 10:20 | 6 | A.   I think she works in operations. |
| 10:20 | 7 | Q.   So -- |
| 10:20 | 8 | A.   Today she works in operations. |
| 10:20 | 9 | Q.   So if we look at this e-mail, this says, |
| 10:20 | 10 | "From:  Lucy Arant. |
| 10:20 | 11 | "To:  Kerri Legg. |
| 10:20 | 12 | "Subject:  Trademark. |
| 10:20 | 13 | "Re: Trademark Searches. |
| 10:20 | 14 | "Reply to:  Re:  Trademark Searches." |
| 10:20 | 15 | And it says, "Hi, Kerri.  As per your request, we have |
| 10:20 | 16 | conducted trademark searches for PEN ARCADE and Bratz in |
| 10:20 | 17 | connection with your prospective products." |
| 10:20 | 18 | You see the use of the term "prospective"? |
| 10:20 | 19 | A.   Yes, I do. |
| 10:20 | 20 | Q.   What does that mean to you? |
| 10:20 | 21 | A.   It means something that you consider to do later on. |
| 10:20 | 22 | Q.   So in case you ended up signing the Bratz deal, you |
| 10:20 | 23 | already wanted to see if the name was available? |
| 10:20 | 24 | A.   That's correct. |
| 10:20 | 25 | Q.   And if you look down in the e-mail about, oh, |

| | | |
|---|---|---|
| 10:20 | 1 | three-quarters of the way down, it says, "Due to the fact |
| 10:21 | 2 | that the dominant portion of Bratz and the mark 'Bratty |
| 10:21 | 3 | Babies' are nearly identical and the goods are considered |
| 10:21 | 4 | identical for trademark purposes, we do not believe Bratz is |
| 10:21 | 5 | available for use and registration at this time." |
| 10:21 | 6 | And that's referring to a portion above -- |
| 10:21 | 7 | A.   I'm sorry? |
| 10:21 | 8 | Q.   It's referring to a portion in this e-mail -- it says, |
| 10:21 | 9 | "Unfortunately, we do not recommend filing an application |
| 10:21 | 10 | for Bratz due to the presence on the principal register of |
| 10:21 | 11 | the earlier filed application for Bratty Babies" -- |
| 10:21 | 12 | A.   Yes. |
| 10:21 | 13 | Q.   -- "for many toys, including dolls owned by Fox Family |
| 10:22 | 14 | Properties.  This application has been allowed by the |
| 10:22 | 15 | trademark office and will be published for opposition |
| 10:22 | 16 | shortly." |
| 10:22 | 17 | And then it says, "Due to the fact that the dominant |
| 10:22 | 18 | portion of Bratz and the mark 'Bratty Babies' are nearly |
| 10:22 | 19 | identical and the goods are considered identical for |
| 10:22 | 20 | trademark purposes, we do not believe Bratz is available for |
| 10:22 | 21 | use in registration at this time." |
| 10:22 | 22 | Now, um, what's this process all about, to your -- best |
| 10:22 | 23 | of your understanding, when you have somebody check to see |
| 10:22 | 24 | if a name is already taken, say? |
| 10:22 | 25 | A.   When you want to make a product, you do what is called |

Case 2:04-cv-09049-DOC-RNB  Document 10024  Filed 02/18/11  Page 66 of 137  Page ID #:301959
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

66

| | | |
|---|---|---|
| 10:22 | 1 | a trademark search.  And they go -- I don't know how they do |
| 10:22 | 2 | it, but they go, I think, online.  They check with the |
| 10:22 | 3 | trademark office and -- to see, A, if that name is |
| 10:22 | 4 | available, or, B, like here, if somebody already prior to |
| 10:22 | 5 | you has tried to register name -- the name and use it. |
| 10:23 | 6 | And here, looks like Fox Family was filing Bratty |
| 10:23 | 7 | Babies for a series of products including toys. |
| 10:23 | 8 | Q.  Now, let's look at the e-mail above.  This is Kerri |
| 10:23 | 9 | Legg, "forward" to you, the trademark search results.  And |
| 10:23 | 10 | it says, |
| 10:23 | 11 | "From:  Kerri Legg. |
| 10:23 | 12 | "To:  Isaac Larian, Paula Treantafelles. |
| 10:23 | 13 | "Here is the trademark search results for Bratz. |
| 10:23 | 14 | Please discuss and let me know if you want to file the |
| 10:23 | 15 | application." |
| 10:23 | 16 | And then let's look at your e-mail dated October 4th, |
| 10:23 | 17 | at 11:00 a.m. |
| 10:23 | 18 | A.  Yes. |
| 10:23 | 19 | Q.  Where you say, "Paula, no Bratz.  How about Babz"? |
| 10:23 | 20 | B-A-B-Z. |
| 10:23 | 21 | A.  I meant Babez, yes. |
| 10:23 | 22 | Q.  Oh, Babez.  Yeah, "Babz" doesn't have the same ring to |
| 10:23 | 23 | it. |
| 10:23 | 24 | Now, again, you were doing some advance checking in |
| 10:24 | 25 | case you could get the deal done with Carter Bryant? |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 67 of 137   Page ID #:301960
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

67

| | | |
|---|---|---|
| 10:24 | 1 | A.    That's right.  At October 4, we still -- at 11:00 a.m., |
| 10:24 | 2 | we still didn't have a deal. |
| 10:24 | 3 | Q.    And that's why Lucy Arant's e-mail says, "in connection |
| 10:24 | 4 | with your prospective products"? |
| 10:24 | 5 | A.    Yes. |
| 10:24 | 6 | Q.    And now, ultimately, was the Bratz name available? |
| 10:24 | 7 | A.    Yes. |
| 10:24 | 8 | Q.    And before then, you discussed a lot of other names, |
| 10:24 | 9 | didn't you? |
| 10:24 | 10 | A.    We did. |
| 10:24 | 11 | Q.    How did you make -- how did you do that?  How did you |
| 10:24 | 12 | sit down and try to come up with names? |
| 10:24 | 13 | A.    We had a brainstorming session, where we got whole |
| 10:24 | 14 | bunch of people together.  And we had drawings on the wall |
| 10:24 | 15 | and said, "Let's brainstorm and come up with different |
| 10:24 | 16 | names." |
| 10:24 | 17 |       And I remember that one of the new employees that we |
| 10:24 | 18 | had hired looked at the drawings and says, "We should -- |
| 10:24 | 19 | they look like little brats." |
| 10:25 | 20 | Q.    So you thought about B-R-A-T-S, as well? |
| 10:25 | 21 | A.    Yes. |
| 10:25 | 22 | Q.    And, um, but Carter Bryant had called them Bratz with a |
| 10:25 | 23 | "Z"? |
| 10:25 | 24 | A.    That's correct. |
| 10:25 | 25 | Q.    And this person called them Brats with an "S"? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:25 | 1 | A.   Just called it brats, yes, like they little brats. |
| 10:25 | 2 | Q.   And how did you ultimately decide to go with the name |
| 10:25 | 3 | B-R-A-T-Z anyway? |
| 10:25 | 4 | A.   I decided to go with the name Bratz. |
| 10:25 | 5 | Q.   Just liked it? |
| 10:25 | 6 | A.   I liked it.  It had five letters.  It had a tone to it. |
| 10:25 | 7 | Most brands which are out there that are popular have |
| 10:25 | 8 | between four to five or six letters to them.  Had a good |
| 10:25 | 9 | ring to it, so I said that we gonna call it Bratz. |
| 10:25 | 10 | Q.   Now, you remember being -- I'm gonna turn your |
| 10:25 | 11 | attention to something a little different:  The topic of |
| 10:25 | 12 | focus groups. |
| 10:25 | 13 |     You remember Mr. Price asking you about whether there |
| 10:26 | 14 | were focus groups for Bratz as early as October 2000? |
| 10:26 | 15 | A.   I do. |
| 10:26 | 16 | Q.   And you used the term "kitchen sink research"? |
| 10:26 | 17 | A.   Yes, yes. |
| 10:26 | 18 | Q.   Can you tell us what that refers to? |
| 10:26 | 19 | A.   This is something we use at MGA.  Usually, when we get |
| 10:26 | 20 | either product or a drawing, we just take it around to the |
| 10:26 | 21 | employees at the company who have little girls, little boys, |
| 10:26 | 22 | and show it to them, and ask them for their opinion, uh, |
| 10:26 | 23 | if -- to show it to their daughters to see if they like it |
| 10:26 | 24 | or not. |
| 10:26 | 25 |     Also, uh, my kids have, between them, 28 -- I think now |

| | | |
|---|---|---|
| 10:26 | 1 | 29 cousins.  Every other Friday night we get together, and I |
| 10:26 | 2 | call them "my kitchen sink."  They know me as Uncle Toy.  So |
| 10:26 | 3 | I ask 'em what do they think about different toy concepts, |
| 10:26 | 4 | different things that we have. |
| 10:26 | 5 | Q.   So you actually use those Friday night family sessions |
| 10:27 | 6 | with the cousins to show them ideas -- the kids? |
| 10:27 | 7 | A.   Yes, I do. |
| 10:27 | 8 | Q.   What are the age ranges of the kids? |
| 10:27 | 9 | A.   They are now from, I think, 11 month to 37. |
| 10:27 | 10 | Q.   So when you talk about kitchen sink focus groups, it's |
| 10:27 | 11 | not anything formal? |
| 10:27 | 12 | A.   No.  It's just the kitchen sink. |
| 10:27 | 13 | Q.   Now, let's look at the March 27th -- if we can look at |
| 10:27 | 14 | Exhibit 35143. |
| 10:27 | 15 | *(Document provided to the witness.)* |
| 08:53 | 16 | BY MS. KELLER: |
| 10:27 | 17 | Q.   Do you recognize this as a March 27, 2001 Bratz focus |
| 10:27 | 18 | group evaluation? |
| 10:27 | 19 | A.   Yes. |
| 10:27 | 20 | MS. KELLER:  Move this into evidence, Your Honor. |
| 10:27 | 21 | THE COURT:  Received. |
| 10:27 | 22 | *(Exhibit No. 35143 received in evidence.)* |
| 10:27 | 23 | *(Document displayed.)* |
| 10:27 | 24 | BY MS. KELLER: |
| 10:27 | 25 | Q.   Was this the first formal actual focus group analysis |

| | | |
|---|---|---|
| 10:27 | 1 | that was ever done? |
| 10:27 | 2 | A.   It is. |
| 10:28 | 3 | Q.   So up until now there were informal -- show something |
| 10:28 | 4 | to a few kids, maybe show a drawing to a few kids, show a |
| 10:28 | 5 | concept to a few kids? |
| 10:28 | 6 | A.   Right. |
| 10:28 | 7 | Q.   Um, but this was the only one where you actually had a |
| 10:28 | 8 | traditional focus group put together? |
| 10:28 | 9 | A.   Yes. |
| 10:28 | 10 | Q.   And this is -- what? -- about six pages long? |
| 10:28 | 11 | A.   Yes. |
| 10:28 | 12 | Q.   And does this actually go into all the different kids |
| 10:28 | 13 | who were shown the dolls? |
| 10:28 | 14 | A.   What do you mean? |
| 10:28 | 15 | Q.   Well, does it talk about the different children and age |
| 10:28 | 16 | groups who were shown the dolls. |
| 10:28 | 17 | A.   We did not have dolls there.  We had -- still at that |
| 10:28 | 18 | time even, we had prototypes. |
| 10:28 | 19 | Q.   Okay.  Prototypes of the dolls then? |
| 10:28 | 20 | A.   That's correct.  Handmade prototypes that we had made, |
| 10:29 | 21 | that we had shown in MGA Hong Kong in January. |
| 10:29 | 22 | Q.   So you still didn't have a production doll yet? |
| 10:29 | 23 | A.   We did not. |
| 10:29 | 24 | Q.   Now, why is it important for the focus group to give |
| 10:29 | 25 | the kids a prototype of the doll instead of a drawing of the |

| | | |
|---|---|---|
| 10:29 | 1 | doll? |
| 10:29 | 2 | A.   So they can touch it.  They can play with it.  They can |
| 10:29 | 3 | look -- look at it, and give you their true opinion. |
| 10:29 | 4 | Q.   And what did the focus group show, in sum, about how |
| 10:29 | 5 | popular you thought this might be? |
| 10:29 | 6 | A.   I haven't read this completely for a long time, but I |
| 10:29 | 7 | think, overall, it was good. |
| 10:29 | 8 | Q.   Pretty positive? |
| 10:29 | 9 | A.   Yes. |
| 10:29 | 10 | Q.   Now, I'm gonna show you another document that you were |
| 10:29 | 11 | shown. |
| 10:29 | 12 | MS. KELLER:  And if we could have Exhibit 11276, |
| 10:29 | 13 | another document Mr. Price showed you. |
| 10:29 | 14 | (Document provided to the witness.) |
| 10:29 | 15 | (Document displayed.) |
| 10:29 | 16 | BY MS. KELLER: |
| 10:29 | 17 | Q.   This was an e-mail chain ending with your e-mail on |
| 10:30 | 18 | October 16th, 2000? |
| 10:30 | 19 | A.   Yes. |
| 10:30 | 20 | Q.   And the chain begins with your e-mail on October 15th, |
| 10:30 | 21 | 2000, at 11:44 a.m.? |
| 10:30 | 22 | A.   Yes. |
| 10:30 | 23 | Q.   And it's addressed to "All in Product Development L.A, |
| 10:30 | 24 | All in Product Development HK." |
| 10:30 | 25 | And "HK" is Hong Kong, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 72 of 137   Page ID #:301965
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

72

| | | |
|---|---|---|
| 10:30 | 1 | A.   Yes. |
| 10:30 | 2 | Q.   Now, by this date, October 15th, you said you had told |
| 10:30 | 3 | Mr. Bryant to quit his job at Mattel and work 16 hours a day |
| 10:30 | 4 | on the Bratz project? |
| 10:30 | 5 | A.   I told him to do that on the day he signed the |
| 10:30 | 6 | contract, yes. |
| 10:30 | 7 | Q.   As of this e-mail did you think he was actually doing |
| 10:30 | 8 | that? |
| 10:30 | 9 | A.   Doing what? |
| 10:30 | 10 | Q.   Did you think he had quit and was actually working |
| 10:30 | 11 | 16 hours a day? |
| 10:30 | 12 | A.   Well, I -- I was assuming that he had quit and left |
| 10:30 | 13 | Mattel; but he didn't work at MGA, so I didn't check and see |
| 10:30 | 14 | if he's working 16 hours or 20 hours. |
| 10:30 | 15 | Q.   You just trusted him to be doing that? |
| 10:30 | 16 | A.   Right. |
| 10:30 | 17 | Q.   Okay.  So this e-mail, October 15th, from you, says |
| 10:31 | 18 | "Yes.  It is time we brainstorm and start developing |
| 10:31 | 19 | 2002 line.  We need a very strong Spring 2002 line first." |
| 10:31 | 20 | A.   Yes. |
| 10:31 | 21 | Q.   "As for dolls, I have identified what we will develop |
| 10:31 | 22 | so far for 2002 Spring and Fall.  I also want to incorporate |
| 10:31 | 23 | my idea of added value, e.g., a sit and turn for the little |
| 10:31 | 24 | girl, a cell phone walkie-talkie for the little girl, |
| 10:31 | 25 | marketing idea." |

| | | |
|---|---|---|
| 10:31 | 1 | A.   Yes. |
| 10:31 | 2 | Q.   "We also need to research and add more good products to |
| 10:31 | 3 | the sport activity, Jump To It, to present as a line for |
| 10:31 | 4 | 2002 Spring.  Let's brainstorm and let's do research. |
| 10:31 | 5 |      "Franki:  On my trip to HK next week, I want to get |
| 10:31 | 6 | some of the 2002 line started. |
| 10:31 | 7 |      "Kerri:  Set up three days brainstorm.  We will do this |
| 10:31 | 8 | by category this year.  We will turn the showroom to a war |
| 10:32 | 9 | room for this with all key competitor products, new and |
| 10:32 | 10 | past, category by category for this brainstorm.  We will do |
| 10:32 | 11 | the categories in following order: |
| 10:32 | 12 |      "1.  Sports activity. |
| 10:32 | 13 |      "2.  Dolls. |
| 10:32 | 14 |      "3.  Games. |
| 10:32 | 15 |      "4.  Feature plush. |
| 10:32 | 16 |      "5.  Smart toys. |
| 10:32 | 17 |      "6.  Music. |
| 10:32 | 18 |      "7.  Others. |
| 10:32 | 19 |      "Jeremy:  Please make a list of top 25 best selling |
| 10:32 | 20 | items from Feb. to July for 2000, 1999, 1998, 1997, 1996, |
| 10:32 | 21 | 1995, 1994.  Send to everyone.  We should use this to |
| 10:32 | 22 | identify trends of what kids like. |
| 10:32 | 23 |      "Victoria:  Where is our Hot Hot 2 licenses for 2002?" |
| 10:32 | 24 |      And you see that Paula Garcia then sends you an e-mail |
| 10:32 | 25 | asking, "What about the line extension to Bratz?" |

| | | |
|---|---|---|
| 10:33 | 1 | And you rely, "Yes. Everything." |
| 10:33 | 2 | A. Yes. |
| 10:33 | 3 | Q. Can you explain what you meant by that? |
| 10:33 | 4 | A. Everything I had listed here -- sports activity, |
| 10:33 | 5 | dolls -- not Bratz -- but we made a line of sports activity |
| 10:33 | 6 | product. We made a line of dolls, such as Dream Baby, |
| 10:33 | 7 | Singing Bouncy Baby, Giddyup. We made a whole line of |
| 10:33 | 8 | games, handle games, Pac-Man, Star Wars, et cetera. We made |
| 10:33 | 9 | whole line of plush, feature plush. For example, one that |
| 10:33 | 10 | comes to my mind is Me And My Shadow. We made -- I wanted |
| 10:33 | 11 | to have a brainstorm on smart toys because that's where -- |
| 10:33 | 12 | the area, educational learning -- the trend was going. Line |
| 10:33 | 13 | of music, such as piano, keyboards, trumpet, et cetera, and |
| 10:33 | 14 | other products. |
| 10:33 | 15 | So when I replied to "Everything," she was asking me |
| 10:33 | 16 | about the line extension for Bratz, and when I said, "Yes. |
| 10:33 | 17 | Everything," it meant everything that MGA was going to make, |
| 10:34 | 18 | including Bratz for 2002. |
| 10:34 | 19 | Q. So this e-mail dated October 16, 2000 -- and earlier, |
| 10:34 | 20 | you were just asked about that, "What about the line |
| 10:34 | 21 | extension to Bratz." That wasn't in isolation? |
| 10:34 | 22 | A. It was not. It included all the products MGA was |
| 10:34 | 23 | planning to make. |
| 10:34 | 24 | Q. When we look at the whole e-mail chain? |
| 10:34 | 25 | A. That's correct. |

| 10:34 | 1 | Q.   Now, I would like to talk a little bit about your role, |
| 10:34 | 2 | personally, in certain key product development decisions |
| 10:34 | 3 | about Bratz.  Okay? |
| 10:34 | 4 | A.   Yes. |
| 10:34 | 5 | Q.   Let's look at 11647. |
| 10:34 | 6 | *(Document provided to the witness.)* |
| 09:25 | 7 | BY MS. KELLER: |
| 10:34 | 8 | Q.   Now, you see at the bottom of this, there is an e-mail |
| 10:34 | 9 | from Paula Garcia to several people and you are CC'd on it. |
| 10:35 | 10 | Do you see that? |
| 10:35 | 11 | A.   Yes. |
| 10:35 | 12 | MS. KELLER:  Your Honor, I would move 11647 into |
| 10:35 | 13 | evidence. |
| 10:35 | 14 | THE COURT:  Received. |
| 10:35 | 15 | *(Exhibit No. 11647 received in evidence.)* |
| 10:35 | 16 | *(Document displayed.)* |
| 10:35 | 17 | BY MS. KELLER: |
| 10:35 | 18 | Q.   And the date of the e-mail from Ms. Garcia to you is |
| 10:35 | 19 | December 19, 2000? |
| 10:35 | 20 | A.   Yes. |
| 10:35 | 21 | Q.   The subject is "Bratz coming soon web page"? |
| 10:35 | 22 | A.   Yes. |
| 10:35 | 23 | Q.   And this e-mail says, "Guys, the Bratz names are final. |
| 10:35 | 24 | Bratz:  Cloe, Sasha, Yasmin, Jade." |
| 10:35 | 25 | Now, where did those names come from? |

| | | |
|---|---|---|
| 10:35 | 1 | A.   Came from brainstorming session that we had.  And I |
| 10:35 | 2 | wanted to have two of the names named after my daughter, |
| 10:35 | 3 | Jasmin. |
| 10:35 | 4 | Here is "Yasmin" is the Farsi spelling of it.  It means |
| 10:35 | 5 | a flower, Jasmin flower. |
| 10:35 | 6 | Q.   Okay.  So "Jasmin" is the English version and "Yasmin" |
| 10:36 | 7 | would be the Persian version? |
| 10:36 | 8 | A.   Yes. |
| 10:36 | 9 | Q.   Okay.  And then where did the name "Sasha" come from? |
| 10:36 | 10 | A.   Sasha is Jasmin's best friend. |
| 10:36 | 11 | Q.   And the brainstorming sessions that you had, who was |
| 10:36 | 12 | involved in those, do you remember, about the names? |
| 10:36 | 13 | A.   Oh, God.  Everybody was involved:  Colleen, Rachel |
| 10:36 | 14 | Harris, Ron, Paula, Becky Harris -- a lot of people. |
| 10:36 | 15 | Q.   But two of the names you picked for your daughter and |
| 10:36 | 16 | her best friend? |
| 10:36 | 17 | A.   Yes. |
| 10:36 | 18 | Q.   Now, this was mid December.  And the names of the |
| 10:36 | 19 | individual dolls were just finalized, then, December 19th? |
| 10:36 | 20 | A.   That's correct. |
| 10:36 | 21 | Q.   Why -- what was your -- you saw, the original doll that |
| 10:36 | 22 | became Sasha looked African-American, but the ultimate doll |
| 10:36 | 23 | that became Sasha looked a little less -- little less easily |
| 10:37 | 24 | typeable. |
| 10:37 | 25 | Do you know what I mean? |

| | | |
|---|---|---|
| 10:37 | 1 | MR. QUINN:  Objection.  It's not a question.  It's |
| 10:37 | 2 | a preamble. |
| 10:37 | 3 | MS. KELLER:  I'm sorry.  I -- I misstated that. |
| 10:37 | 4 | THE COURT:  Sustained. |
| 10:37 | 5 | BY MS. KELLER: |
| 10:37 | 6 | Q.   The original drawing -- the drawing of the doll that |
| 10:37 | 7 | became, after several iterations, Sasha, looked more |
| 10:37 | 8 | African-American than Sasha? |
| 10:37 | 9 | A.   Yes. |
| 10:37 | 10 | Q.   Why was that? |
| 10:37 | 11 | A.   I -- for me, I didn't want -- I've lived here in this |
| 10:37 | 12 | country since 1971.  And Los Angeles, America, is melting |
| 10:37 | 13 | pot.  And it just didn't want to have the stereotypes that |
| 10:37 | 14 | this doll is African-American, this doll is Chinese, this |
| 10:37 | 15 | doll is Caucasian.  I just wanted to have -- my goal was |
| 10:37 | 16 | that leave it to the imagination of the girls to decide who |
| 10:38 | 17 | these dolls are to resemble who they are.  And that was my |
| 10:38 | 18 | goal.  And I -- on purpose, I made sure that we don't |
| 10:38 | 19 | stereotype 'em and just call 'em "African-American" or |
| 10:38 | 20 | "Latin" or "Asian." |
| 10:38 | 21 | I traveled around the world with the -- with the Bratz |
| 10:38 | 22 | dolls.  And it was fascinating for me.  For example, you |
| 10:38 | 23 | know, I would -- |
| 10:38 | 24 | MR. PRICE:  Your Honor, objection.  This is beyond |
| 10:38 | 25 | the scope of the question. |

| | | |
|---|---|---|
| 10:38 | 1 | THE COURT: Sustained. |
| 10:38 | 2 | BY MS. KELLER: |
| 10:38 | 3 | Q. Now, in your own experience, showing the dolls to |
| 10:38 | 4 | girls, do the girls tend to all -- did little girls that you |
| 10:38 | 5 | showed these dolls to from different ethnic groups tend to |
| 10:38 | 6 | identify them in some way? |
| 10:38 | 7 | A. Yes. |
| 10:38 | 8 | MR. PRICE: Objection. |
| 09:59 | 9 | BY MS. KELLER: |
| 10:38 | 10 | Q. And what is that? |
| 10:38 | 11 | MR. PRICE: Objection. It's irrelevant, and it's |
| 10:38 | 12 | hearsay. |
| 10:38 | 13 | MS. KELLER: Well, it doesn't -- it's not offered |
| 10:39 | 14 | for the truth. It's offered to show his, um, decision. |
| 10:39 | 15 | THE COURT: Overruled. |
| 10:39 | 16 | THE WITNESS: I lost the question. |
| 10:39 | 17 | BY MS. KELLER: |
| 10:39 | 18 | Q. Okay. When you show these dolls to little girls, how |
| 10:39 | 19 | do they tend to react in terms of identifying the ethnicity |
| 10:39 | 20 | of the dolls? |
| 10:39 | 21 | MR. PRICE: Object. It's offered to show his |
| 10:39 | 22 | decision. There should be a timeframe before December 2000. |
| 08:51 | 23 | BY MS. KELLER: |
| 10:39 | 24 | Q. Well, even up until today, in the later iterations of |
| 10:39 | 25 | the dolls that you've done. |

| 10:39 | 1 | THE COURT:  Well -- |
| 10:39 | 2 | MS. KELLER:  Or say up until 2007 even. |
| 10:39 | 3 | THE COURT:  The disagreement between the two of |
| 10:39 | 4 | you is this should be his decision-making process at the |
| 10:39 | 5 | time.  But he can't -- the jury is not going to be able to |
| 10:39 | 6 | discern that because the feedback comes at a later |
| 10:39 | 7 | timeframe -- you know, later on.  So I don't see how this |
| 10:39 | 8 | goes to his state of mind at that time. |
| 10:39 | 9 | I'm going to sustain the objection. |
| 10:39 | 10 | MS. KELLER:  I'll rephrase it. |
| 04:59 | 11 | BY MS. KELLER: |
| 10:39 | 12 | Q.   In terms of sticking with your decision to make the |
| 10:39 | 13 | dolls not reflect any one ethnicity, did you tend to stick |
| 10:39 | 14 | with that after 2000, say in 2001, 2002? |
| 10:39 | 15 | A.   Yes, always. |
| 10:39 | 16 | Q.   And what kind of feedback did you get from little girls |
| 10:40 | 17 | about how they identified these dolls ethnicities? |
| 10:40 | 18 | A.   For example, when I traveled -- |
| 10:40 | 19 | MR. PRICE:  Your Honor, objection.  It's |
| 10:40 | 20 | irrelevant after December 2000. |
| 10:40 | 21 | THE COURT:  I'm going to sustain it.  In other |
| 10:40 | 22 | words, counsel, he can state what his intent was, how he |
| 10:40 | 23 | felt about it, how ethnicity played into it, but the |
| 10:40 | 24 | feedback is irrelevant. |
| 10:40 | 25 | MS. KELLER:  I'm thinking, Your Honor, in terms of |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 80 of 137   Page ID #:301973
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

80

| | | |
|---|---|---|
| 10:40 | 1 | developing the brand.  Perhaps I could ask it that way. |
| 10:40 | 2 | BY MS. KELLER: |
| 10:40 | 3 | Q.   In terms, Mr. Larian, of continuing to develop your |
| 10:40 | 4 | brand -- |
| 10:40 | 5 | THE COURT:  For the brand? |
| 10:40 | 6 | MS. KELLER:  Yes. |
| 10:40 | 7 | THE COURT:  Okay.  Thank you. |
| 10:40 | 8 | BY MS. KELLER: |
| 10:40 | 9 | Q.   In terms of continuing to develop your brand, how did |
| 10:40 | 10 | feedback that you got from little girls on this topic play |
| 10:40 | 11 | into that? |
| 10:40 | 12 | A.   It was very important.  My goal always was that, when |
| 10:40 | 13 | people look at these dolls, they can identify with them as |
| 10:40 | 14 | who they are.  So if, for example, you go to -- |
| 10:41 | 15 | I mean, can I talk about my own experiences or? |
| 10:41 | 16 | Q.   Yes. |
| 10:41 | 17 | A.   Like, for example, when I went to Brazil, and I met -- |
| 10:41 | 18 | we had a press conference -- met with a whole bunch of |
| 10:41 | 19 | girls, they thought Yasmin was Brazilian.  When I went to |
| 10:41 | 20 | Dubai in Middle East, and they thought she was Middle |
| 10:41 | 21 | Eastern.  When I went to Spain and Portugal, they thought |
| 10:41 | 22 | she is Spanish. |
| 10:41 | 23 | So my goal was not to stereotype the brand, say -- |
| 10:41 | 24 | okay, like Jade, say she's Chinese.  She's not Chinese. |
| 10:41 | 25 | She's just Asian looking.  So she could be Chinese.  She |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 81 of 137   Page ID #:301974
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

81

| | | |
|---|---|---|
| 10:41 | 1 | could be Thai.  She could be Vietnamese.  She could be |
| 10:41 | 2 | Korean.  She could be Japanese. |
| 10:41 | 3 | It's -- all I wanted to make sure part of the brand |
| 10:41 | 4 | should be all in the imagination of the little girls so they |
| 10:41 | 5 | can identify with it. |
| 10:41 | 6 | Q.   And what -- in terms of the success of toys, this is a |
| 10:42 | 7 | very broad question -- but why is the imagination of the |
| 10:42 | 8 | children in using the toys so important? |
| 10:42 | 9 | A.   Because they identify with it.  They want to -- my |
| 10:42 | 10 | experience is they want to buy toys that really looks like |
| 10:42 | 11 | them, or something that they can refer to it with their own |
| 10:42 | 12 | personalities and upbringing. |
| 10:42 | 13 | And if you just put the doll and say -- let's say, |
| 10:42 | 14 | Cloe.  If you just called it she's Danish.  Then, other kids |
| 10:42 | 15 | would not be able to identify with it, say, okay, she's from |
| 10:42 | 16 | Canada.  She's from USA.  She's from Finland.  She's from |
| 10:42 | 17 | Netherlands.  I just didn't want to have that limitation. |
| 10:42 | 18 | Q.   Now, in addition to your involvement in things like the |
| 10:42 | 19 | dolls' names and whether the dolls should have sort of a |
| 10:42 | 20 | multi-ethnic look, I want to talk to you a little bit about |
| 10:42 | 21 | your decisions that you made about manufacturing and sales |
| 10:42 | 22 | and marketing, those other areas.  All right? |
| 10:43 | 23 | How involved were you in decisions about the cost of |
| 10:43 | 24 | manufacturing? |
| 10:43 | 25 | A.   Very involved. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:43 | 1 | Q.   And can you explain that, please. |
| 10:43 | 2 | A.   In order to sell toys, you have to have successful -- |
| 10:43 | 3 | you have to have certain price point, I mean, by retail. |
| 10:43 | 4 | For example, you can sell lot more of a $10 doll at |
| 10:43 | 5 | retail than you can sell, believe it or not, at $11.  That |
| 10:43 | 6 | one dollar makes a big difference in decision-making of a |
| 10:43 | 7 | parent to buy a toy. |
| 10:43 | 8 | So I just want to make sure that we had a certain cost |
| 10:43 | 9 | so we can make our margin and the retailers can have the |
| 10:43 | 10 | product, and being retailed at a certain manufacturer |
| 10:43 | 11 | suggested retail price that would -- will increase sales. |
| 10:43 | 12 | Q.   Now, was this a brainstorming issue, too? |
| 10:43 | 13 | A.   About? |
| 10:44 | 14 | Q.   About the cost of the manufacturing, how much you'd |
| 10:44 | 15 | have to have the doll made for. |
| 10:44 | 16 | Or was that a decision you made? |
| 10:44 | 17 | A.   I -- I made the decisions on the pricing. |
| 10:44 | 18 | Q.   Okay.  So you made the decision about how much it would |
| 10:44 | 19 | have to cost to manufacture? |
| 10:44 | 20 | A.   Yes. |
| 10:44 | 21 | Q.   Did you also make the decision about how much the sales |
| 10:44 | 22 | price would have to be? |
| 10:44 | 23 | A.   I did. |
| 10:44 | 24 | Q.   Was there any brainstorming involved in that? |
| 10:44 | 25 | A.   No.  I made the decisions. |

| | | |
|---|---|---|
| 10:44 | 1 | Q.   Okay.  Who made the decisions about marketing the doll? |
| 10:44 | 2 | A.   I made a decision about the marketing, ultimately, but |
| 10:44 | 3 | we had a whole team. |
| 10:44 | 4 | Q.   So what would -- tell us about how you decided on how |
| 10:44 | 5 | to market this doll? |
| 10:44 | 6 | A.   We wanted to TV advertise -- few things.  First of all, |
| 10:44 | 7 | in the packaging, we wanted to make sure the packaging is |
| 10:44 | 8 | very different and pops off the shelf, and different from |
| 10:44 | 9 | anything else which is out there. |
| 10:44 | 10 | Before that, most dolls were sold, what we call in the |
| 10:44 | 11 | industry, in shoeboxes or -- another word for it is like a |
| 10:45 | 12 | coffin.  It was all covered up with cardboard.  And I |
| 10:45 | 13 | thought we made fantastic, beautiful product, so -- and my |
| 10:45 | 14 | point was, let's open up the package.  Let's show the |
| 10:45 | 15 | consumer what we are selling.  So that was one part of the |
| 10:45 | 16 | marketing.  I wanted the shape of the package to be |
| 10:45 | 17 | different, so it pops, so it's not just square.  And that's |
| 10:45 | 18 | why we came up with the trapezoid package, after looking at |
| 10:45 | 19 | many different packaging. |
| 10:45 | 20 | And I wanted our TV commercial to be very different |
| 10:45 | 21 | than all other TV commercials which are out there.  Usually, |
| 10:45 | 22 | TV advertising is done in Fall.  And when you look at them, |
| 10:45 | 23 | most of the TV commercials just -- they just blend.  They're |
| 10:45 | 24 | all the same, and gets lost.  And I wanted to have a TV |
| 10:45 | 25 | commercial that stood out from the crowd and got the |

| | | |
|---|---|---|
| 10:45 | 1 | attention of the mothers and the kids. |
| 10:45 | 2 | Q.   How did you manage to go about producing a TV ad that |
| 10:46 | 3 | would grab the attention of the mothers and the kids? |
| 10:46 | 4 | A.   When we hired -- first company called "Four Corner," |
| 10:46 | 5 | who was not from the toy industry -- and they make the TV |
| 10:46 | 6 | commercials for Kia cars, et cetera -- and ask them to do a |
| 10:46 | 7 | TV commercial.  They produced a TV commercial, and we looked |
| 10:46 | 8 | at it.  I didn't like it.  So we scrapped that and did a new |
| 10:46 | 9 | one. |
| 10:46 | 10 | Q.   Was that expensive? |
| 10:46 | 11 | A.   Yeah.  It cost over $400,000. |
| 10:46 | 12 | Q.   The one that you scrapped? |
| 10:46 | 13 | A.   Yes. |
| 10:46 | 14 | Q.   And so, then, how much did the new commercial cost? |
| 10:46 | 15 | A.   Cost about that much, also. |
| 10:46 | 16 | Q.   Now, do you define your product first with all the |
| 10:46 | 17 | features that you want, or do you first settle on the price |
| 10:46 | 18 | point that you're gonna have to hit? |
| 10:46 | 19 | A.   No.  We don't do price point.  That's something that |
| 10:46 | 20 | MGA does different than other toy companies. |
| 10:47 | 21 | I -- I believe creative people have a gift.  It's a |
| 10:47 | 22 | God-given gift that they have.  And, uh, that's why a lot of |
| 10:47 | 23 | creative people work at MGA and come up year after year with |
| 10:47 | 24 | great products, because I tell them, "You come up with the |
| 10:47 | 25 | best product idea and design.  Then, we'll decide -- I will |

Case 2:04-cv-09049-DOC-RNB  Document 10024  Filed 02/18/11  Page 85 of 137  Page ID
#:301978
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:47 | 1 | decide what price we gonna sell it for, and how and where." |
| 10:47 | 2 | Q.   And -- |
| 10:47 | 3 | A.   So I give -- I give designers a lot of freedom. |
| 10:47 | 4 | Q.   How do you decide on a retail price? |
| 10:47 | 5 | A.   When -- when you look at -- when they come up with the |
| 10:47 | 6 | final product, then we go and look at the comparative |
| 10:47 | 7 | products which are at the market, and see what's the retail |
| 10:47 | 8 | price that they have.  And then we look at POS.  It's -- POS |
| 10:47 | 9 | stands for Proof of Sales.  When we sell something, for |
| 10:47 | 10 | example, Toys R Us or Walmart, you can get that information |
| 10:48 | 11 | on the computer on regular basis, see how product is selling |
| 10:48 | 12 | or not.  Subscribe to NPD, which is a tracking service. |
| 10:48 | 13 | They have a service called "TRSTS."  Stands for Toy Tracking |
| 10:48 | 14 | Retail Services -- no, probably doesn't -- toy -- I have to |
| 10:48 | 15 | write it down.  Toy Retail -- I have to write it down to |
| 10:48 | 16 | get -- |
| 10:48 | 17 | Q.   That's okay.  What does it do? |
| 10:48 | 18 | A.   Basically, trademarking sales of a product.  And then |
| 10:48 | 19 | you go to Toys R Us, you go to Walmart, and see what -- how |
| 10:48 | 20 | is the product selling, not selling.  You look at newspaper |
| 10:48 | 21 | articles, look at advertisement that the retailers do, and |
| 10:48 | 22 | you say, "Okay.  This product is kind of similar to this |
| 10:48 | 23 | product which is already in the market."  This is -- is a |
| 10:49 | 24 | plush horse, for example, that's selling for $29 retail, and |
| 10:49 | 25 | you have one that does different functions.  But, you say, |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 86 of 137   Page ID #:301979
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

86

| 10:49 | 1 | "Okay, average consumer will not pay more than $29 for this |
| 10:49 | 2 | product.  So we gonna set up the manufacturer's suggested |
| 10:49 | 3 | retail price at 29," and then work it backward. |
| 10:49 | 4 | Q.   And what's -- how involved were you in setting the |
| 10:49 | 5 | retail price of these dolls? |
| 10:49 | 6 | A.   I was very involved. |
| 10:49 | 7 | Q.   And what about -- what's the concept of "margin" to |
| 10:49 | 8 | retailer?  What is all that? |
| 10:49 | 9 | A.   The retailers -- the margin that they make is called |
| 10:49 | 10 | the "profit margin."  So they want to make anywhere between |
| 10:49 | 11 | 20 to 50 percent on the product when you sell it to them. |
| 10:49 | 12 | So, for example, if you sell something to a retailer |
| 10:50 | 13 | for $10, and they retail it for 15, the retail margin is |
| 10:50 | 14 | that $5 divided by the selling price that you sell it to |
| 10:50 | 15 | them at 10 -- I'm sorry -- it's 5 divided by 15, the retail |
| 10:50 | 16 | price, so that's becomes the margin. |
| 10:50 | 17 | Q.   And the margin, I guess, is really involved with trying |
| 10:50 | 18 | to get the right price point that will get the customer to |
| 10:50 | 19 | buy the toy, let you make a profit, and let the store make a |
| 10:50 | 20 | profit? |
| 10:50 | 21 | A.   Yes, basically, coming up with pricing is very |
| 10:50 | 22 | important that we have enough margin as a manufacturer to |
| 10:50 | 23 | make/market our product, as well as the retailers to be able |
| 10:50 | 24 | to make their margin requirements. |
| 10:50 | 25 | Q.   And when a business is known as a high-margin business, |

| | | |
|---|---|---|
| 10:51 | 1 | what does that mean? |
| 10:51 | 2 | A.   Some businesses in the toy industry have high profit |
| 10:51 | 3 | margin.  For example, usually in the plush toys or things |
| 10:51 | 4 | that are not TV advertised, the retailers now want 45 to |
| 10:51 | 5 | 55 percent profit margin.  So if you buy something, for |
| 10:51 | 6 | example, a plush toy at Toys R Us for $20, usually you can |
| 10:51 | 7 | figure out that they paid about $10 for it. |
| 10:51 | 8 |      But on the TV-advertised product, where you spend |
| 10:51 | 9 | marketing, they take lower profit margin:  20, 25 percent. |
| 10:51 | 10 | Sometimes 30, 35 percent. |
| 10:51 | 11 | Q.   Now, you also had had experience in the consumer |
| 10:51 | 12 | electronic business, right? |
| 10:51 | 13 | A.   Yes, I did. |
| 10:51 | 14 | Q.   And so what's -- what's the difference in terms of the |
| 10:51 | 15 | margin, you know, that -- you said the toy industry is a |
| 10:51 | 16 | high-margin business. |
| 10:51 | 17 | A.   Yes.  Consumer electronic is different model.  They |
| 10:51 | 18 | work on the quantities.  For example, on a TV product, when |
| 10:52 | 19 | you buy TV at Costco, you can, for sure, say that they only |
| 10:52 | 20 | make 12 percent profit on it -- or between 10 to 15 percent, |
| 10:52 | 21 | whether you go to Best Buy, et cetera -- if these are like |
| 10:52 | 22 | TV, radio, et cetera. |
| 10:52 | 23 |      But if you buy the accessories, like headphones or |
| 10:52 | 24 | for -- a case for a BlackBerry, they work on higher margin. |
| 10:52 | 25 | But on the BlackBerry, itself, or iPhone, by itself, the |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 88 of 137   Page ID #:301981
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:52 | 1 | margins are anywhere between 10 to 20 percent. |
| 10:52 | 2 | Q.   Now, this knowledge that you have today, did you have |
| 10:52 | 3 | that knowledge in the year 2000? |
| 10:52 | 4 | A.   I did. |
| 10:52 | 5 | Q.   And were you involved -- all these concepts we've been |
| 10:52 | 6 | talking about, including the margin, the retail margin, were |
| 10:52 | 7 | you involved in all of those? |
| 10:52 | 8 | A.   I am, and I was. |
| 10:53 | 9 | Q.   And how involved were you in 2000? |
| 10:53 | 10 | A.   Very involved. |
| 10:53 | 11 | Q.   Who made the final decision about all those issues? |
| 10:53 | 12 | A.   I did. |
| 10:53 | 13 | MS. KELLER:  If we could look at Exhibit 10105. |
| 10:53 | 14 | *(Document provided to the witness.)* |
| 10:53 | 15 | MS. KELLER:  This is an October 16, 2000 e-mail |
| 10:53 | 16 | from Paula -- the bottom one from Paula Treantafelles to |
| 10:53 | 17 | you, October 13th, 2000. |
| 10:53 | 18 | THE WITNESS:  Yes. |
| | 19 | BY MS. KELLER: |
| 10:53 | 20 | Q.   And the subject was "Bratz:  Targets costs."  And I see |
| 10:53 | 21 | CC'd on that is Cecilia Kwok, Franki Tsang, and Samuel Wong. |
| 10:53 | 22 | A.   Yes. |
| 10:53 | 23 | Q.   This says, "Isaac, I need you to confirm the target |
| 10:53 | 24 | costs for all of the Bratz price points." |
| 10:53 | 25 | And then we see 499 dress packs. |

Case 2:04-cv-09049-DOC-RNB  Document 10024  Filed 02/18/11  Page 89 of 137  Page ID #:301982
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:53 | 1 | Underneath it —— it says 105 —— oh, I'm sorry. |
| 10:53 | 2 | MS. KELLER:  Your Honor, I'd move Exhibit 10105 |
| 10:54 | 3 | into evidence. |
| 10:54 | 4 | THE COURT:  Received. |
| 10:54 | 5 | *(Exhibit No. 10105 received in evidence.)* |
| 10:54 | 6 | *(Document displayed.)* |
| 09:04 | 7 | BY MS. KELLER: |
| 10:54 | 8 | Q.  Let's look at that bottom e-mail where Ms. Garcia is |
| 10:54 | 9 | telling you that she needs you to confirm the target costs |
| 10:54 | 10 | for all of the Bratz price points. |
| 10:54 | 11 | A.  Yes. |
| 10:54 | 12 | Q.  And I see —— there will be, um —— it says "$4.99, dress |
| 10:54 | 13 | packs"? |
| 10:54 | 14 | A.  Yes. |
| 10:54 | 15 | Q.  Brackets, "Isaac Larian"? |
| 10:54 | 16 | A.  Yes. |
| 10:54 | 17 | Q.  And then underneath that it says, a dollar five? |
| 10:54 | 18 | A.  Yes.  That's the target cost I wanted for that product. |
| 10:54 | 19 | Q.  Okay.  So which of these numbers is which?  What does |
| 10:54 | 20 | the four ninety-nine represent? |
| 10:54 | 21 | A.  Four ninety-nine is the manufacturers suggested retail |
| 10:54 | 22 | price.  That's the price that we think Toys R Us or Walmart |
| 10:54 | 23 | or target is gonna sell it.  And I want to have |
| 10:54 | 24 | manufacturing costs of one, oh, five. |
| 10:54 | 25 | And the one below it is for the hair packs.  Nine |

| | | |
|---|---|---|
| 10:54 | 1 | ninety-nine retail.  I want a manufacturing cost of two |
| 10:55 | 2 | dollars.  That's my targets.  And the one below it is the |
| 10:55 | 3 | doll packs at twelve ninety-nine manufacturer's suggested |
| 10:55 | 4 | retail price. |
| 10:55 | 5 | Q.   What does "doll pack" mean? |
| 10:55 | 6 | A.   The doll pack -- because we sold the Bratz dolls as an |
| 10:55 | 7 | assortment -- we didn't sell 'em all at one -- like, we |
| 10:55 | 8 | didn't sell Cloe by itself.  We sold 'em as an assortment, |
| 10:55 | 9 | with Cloe, Sasha, Yasmin, Jade.  So that's what's called |
| 10:55 | 10 | pack. |
| 10:55 | 11 | Q.   So you could manufacture the -- you wanted that |
| 10:55 | 12 | manufactured for a dollar eighty-five? |
| 10:55 | 13 | A.   Yes. |
| 10:55 | 14 | Q.   And did you get close to that? |
| 10:55 | 15 | A.   No, I did not. |
| 10:55 | 16 | Q.   Cost a lot more to manufacture it? |
| 10:55 | 17 | A.   It did. |
| 10:55 | 18 | Q.   And then, under that, it says fourteen ninety-nine |
| 10:55 | 19 | carry case? |
| 10:55 | 20 | A.   Yes. |
| 10:55 | 21 | Q.   And you wanted that manufactured for two |
| 10:55 | 22 | seventy-five -- $2.75? |
| 10:55 | 23 | A.   Yes. |
| 10:55 | 24 | Q.   Where did you come up with those figures? |
| 10:55 | 25 | A.   Again, I just worked it backward.  For example, I took |

| | | |
|---|---|---|
| 10:56 | 1 | four ninety-nine for fashion packs.  I know that Toys R Us, |
| 10:56 | 2 | for example, wants to make 40 percent profit margin on that. |
| 10:56 | 3 | So I multiplied four ninety-nine times point 6 to get |
| 10:56 | 4 | roughly where their margin was gonna be.  And then I |
| 10:56 | 5 | multiplied that again by the margin that we wanted to make. |
| 10:56 | 6 | Let's say 55 or 65 percent.  I don't have a calculator to do |
| 10:56 | 7 | this.  And that's what I came up with. |
| 10:56 | 8 | And then I took some off of that, because I know that, |
| 10:56 | 9 | with the Chinese factories, you always have to negotiate, so |
| 10:56 | 10 | I left some room for negotiations. |
| 10:56 | 11 | Q.   And, for example, the doll packs, do you remember |
| 10:56 | 12 | roughly what those ended up costing? |
| 10:56 | 13 | A.   Four twenty-five. |
| 10:56 | 14 | Q.   A little higher than a dollar eighty-five? |
| 10:56 | 15 | A.   Yes. |
| 10:56 | 16 | Q.   Did you stick with the twelve ninety-nine retail |
| 10:56 | 17 | suggested manufacturer's price? |
| 10:56 | 18 | A.   No.  We raised that to fourteen ninety-nine. |
| 10:56 | 19 | Q.   And that was all your decision? |
| 10:56 | 20 | A.   Yes. |
| 10:57 | 21 | Q.   Now, if we look at the next e-mail above that, that's |
| 10:57 | 22 | from you to Ms. Treantafelles? |
| 10:57 | 23 | A.   Yes. |
| 10:57 | 24 | Q.   And you're saying -- that's October 13th, 2000.  You're |
| 10:57 | 25 | saying, "Paula, what you have listed here are retail prices, |

| 10:57 | 1 | no selling price, right, see below." |
| 10:57 | 2 | And that's when you layed out what you thought the |
| 10:57 | 3 | various prices would be? |
| 10:57 | 4 | A.   Right. |
| 10:57 | 5 | Q.   As those prices got adjusted, as you went along in the |
| 10:57 | 6 | process and negotiated with the Chinese manufacturers and |
| 10:57 | 7 | all that, who made the decisions as you negotiated about |
| 10:57 | 8 | what the prices would be? |
| 10:57 | 9 | A.   I did. |
| 10:57 | 10 | MS. KELLER:  Let's look at Exhibit 1236. |
| 10:57 | 11 | (Document provided to the witness.) |
| 10:57 | 12 | *(Document displayed.)* |
| 10:57 | 13 | BY MS. KELLER: |
| 10:58 | 14 | Q.   Let's look -- do you recognize this as an October 24th, |
| 10:58 | 15 | 2001 (sic), e-mail from you to Paula Garcia and Cecilia |
| 10:58 | 16 | Kwok, discussing target costs of the dolls? |
| 10:58 | 17 | A.   Yes. |
| 10:58 | 18 | MS. KELLER:  Your Honor, I think that's already -- |
| 10:58 | 19 | yes, that's already in evidence. |
| 10:58 | 20 | BY MS. KELLER: |
| 10:58 | 21 | Q.   Now, were you monitoring sales meetings with retailers? |
| 10:58 | 22 | A.   I was. |
| 10:58 | 23 | Q.   And was one of the issues how many of each doll should |
| 10:58 | 24 | be manufactured, and whether some would be more popular than |
| 10:58 | 25 | others? |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

93

| | | |
|---|---|---|
| 10:58 | 1 | A.   Yes, we were, at that time -- yes, we were. |
| 10:58 | 2 | THE COURT:  Just one moment. |
| 10:59 | 3 | Counsel, the date's wrong. |
| 10:59 | 4 | MS. KELLER:  It says, "October 24th, 2000." |
| 10:59 | 5 | BY MS. KELLER: |
| 10:59 | 6 | Q.   This e-mail is all about -- okay.  All right. |
| 10:59 | 7 | And again, one of the issues was how many of each doll |
| 10:59 | 8 | should you manufacture, whether some would be more popular |
| 10:59 | 9 | than others. |
| 10:59 | 10 | A.   It has a lot of things in it, but that's one of 'em. |
| 11:00 | 11 | Q.   Let's go next to Exhibit 540, which is dated |
| 11:00 | 12 | November 18, 2000, from you to a Mike Lingg, L-I-N-G-G. |
| 11:00 | 13 | A.   Yes. |
| 11:00 | 14 | MS. KELLER:  Your Honor, I would move Exhibit 540 |
| 11:00 | 15 | into evidence. |
| 11:00 | 16 | THE COURT:  Received. |
| 11:00 | 17 | *(Exhibit No. 540 received in evidence.)* |
| 11:00 | 18 | *(Document displayed.)* |
| 09:18 | 19 | BY MS. KELLER: |
| 11:00 | 20 | Q.   Who was Mike Lingg? |
| 11:00 | 21 | A.   He was our independent sales rep.  Independent sales |
| 11:00 | 22 | reps are -- they don't work for you as an employee.  They |
| 11:00 | 23 | sell your product to retailers for a commission.  And he was |
| 11:00 | 24 | our independent sales rep for Target at the time. |
| 11:00 | 25 | Q.   And this says, "Subject:  Meeting Notes From Target |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 94 of 137   Page ID #:301987
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

94

| | | |
|---|---|---|
| 11:00 | 1 | Line Review, November 14, 2000." |
| 11:00 | 2 | A.   Yes. |
| 11:00 | 3 | Q.   Let's look at the second page, 540-2. |
| 11:01 | 4 | (Document displayed.) |
| 11:01 | 5 | BY MS. KELLER: |
| 11:01 | 6 | Q.   Let's look at, under -- it says, "What does this mean? |
| 11:01 | 7 | Please explain more, Isaac." |
| 11:01 | 8 | It says, "Bratz.  Laura finally came to life when these |
| 11:01 | 9 | were shown.  She feels that we are right on track.  She did |
| 11:01 | 10 | not have any direct thoughts regarding the assortment.  She |
| 11:01 | 11 | asked that we list all of them in the assortment.  If she |
| 11:01 | 12 | buys the item, she will bring them in even and watch the |
| 11:01 | 13 | numbers and adjust accordingly." |
| 11:01 | 14 | A.   Yes. |
| 11:01 | 15 | Q.   So is Laura the Target -- the buyer for Target? |
| 11:01 | 16 | A.   She was at the time. |
| 11:01 | 17 | Q.   And when it says that the Target buyer will "bring them |
| 11:01 | 18 | in even and watch the numbers and adjust accordingly," what |
| 11:01 | 19 | does that mean? |
| 11:01 | 20 | A.   We ship -- when you ship a toy product, it's -- you |
| 11:02 | 21 | don't sell a single doll by itself.  You ship it in what you |
| 11:02 | 22 | call a shipper carton.  So, like, four or six dolls goes to |
| 11:02 | 23 | a carton.  And then those goes to a bigger carton called |
| 11:02 | 24 | "master" -- master carton. |
| 11:02 | 25 | So she was talking about that we gonna sell this |

| 11:02 | 1 | assortment, the shipper carton.  If there's gonna be four, |
| 11:02 | 2 | she's gonna put one of each -- one Cloe, one Sasha, one |
| 11:02 | 3 | Yasmin, one Jade -- in that assortment.  That's what she's |
| 11:02 | 4 | talking about. |
| 11:02 | 5 | Q.   Up until then, what had Walmart wanted to buy? |
| 11:02 | 6 | A.   What is date of this?  Walmart didn't -- Walmart did |
| 11:02 | 7 | not want to buy yet. |
| 11:02 | 8 | Q.   When they ultimately did want to buy, did they express |
| 11:02 | 9 | a desire to just buy the doll, Cloe? |
| 11:02 | 10 | A.   At the beginning yes, that's what -- the only one, I |
| 11:02 | 11 | think -- the only thing Ron Stover wanted to buy was Cloe. |
| 11:03 | 12 | Q.   So Target's buyer wanted them in a four-pack? |
| 11:03 | 13 | A.   Yes. |
| 11:03 | 14 | Q.   And you said that refers to the shipping carton? |
| 11:03 | 15 | A.   That's correct. |
| 11:03 | 16 | Q.   And then how would they be sold on the shelves in the |
| 11:03 | 17 | store? |
| 11:03 | 18 | A.   When they take 'em out of the box -- for example, when |
| 11:03 | 19 | you go to Target, they just set -- they throw away the |
| 11:03 | 20 | shipping pack, and put 'em right next to each other, so it's |
| 11:03 | 21 | like -- you know, Sasha would be at the end; Yasmin would be |
| 11:03 | 22 | in front of it; Jade will be in front of that; and Cloe will |
| 11:03 | 23 | be in front of it. |
| 11:03 | 24 | Q.   Now, as it turned out, did you always sell them in |
| 11:03 | 25 | packs, or did you end up selling the dolls individually? |

| | | |
|---|---|---|
| 11:03 | 1 | A.   We -- I was very adamant that we sell these as an |
| 11:03 | 2 | assortment, as a pack.  At the end, I think with -- I think |
| 11:03 | 3 | that's how we sold them.  Except, I think, at Walmart and |
| 11:03 | 4 | maybe another retailer, we had one of the dolls, Sasha, sold |
| 11:04 | 5 | separately. |
| 11:04 | 6 | Q.   And when she says, "Let's watch the sales and adjust |
| 11:04 | 7 | accordingly," is she referring to how much more they might |
| 11:04 | 8 | buy? |
| 11:04 | 9 | A.   No.  What she's referring to is, when you put the |
| 11:04 | 10 | product in there, they track their sales on a regular basis. |
| 11:04 | 11 | And so they can find out if Cloe is selling more than |
| 11:04 | 12 | Yasmin, or Jade is selling more than Sasha.  So then she |
| 11:04 | 13 | will come back to us and say, okay, adjust the shipper pack |
| 11:04 | 14 | and the master carton based on how the sales are tracking. |
| 11:04 | 15 | Q.   Now, the Hong Kong toy fair, I think you've mentioned |
| 11:04 | 16 | before, scheduled for January 2001, why is that such an |
| 11:04 | 17 | important event? |
| 11:04 | 18 | A.   It is the first time that you formally show all your |
| 11:05 | 19 | products to the retailers and the distributors worldwide. |
| 11:05 | 20 | And, especially in Hong Kong, you -- one of the reasons you |
| 11:05 | 21 | go to Hong Kong is to do "DI" or direct import sales, where |
| 11:05 | 22 | the retailer buy your product, what you call "FOB Hong Kong" |
| 11:05 | 23 | or "FOB China."  So they look at it and they place orders |
| 11:05 | 24 | there. |
| 11:05 | 25 | Q.   Do the vendors come to those meetings? |

| | | |
|---|---|---|
| 11:05 | 1 | A.   What do you mean? |
| 11:05 | 2 | Q.   I -- well, do the -- I mean, do you have manufacturers |
| 11:05 | 3 | come?  Do you have retailers come? |
| 11:05 | 4 | A.   We have -- we have -- we have retailers and |
| 11:05 | 5 | distributors come.  Sometimes manufacturers that you do |
| 11:05 | 6 | business with come, because we sit down with them and |
| 11:05 | 7 | negotiate pricing. |
| 11:05 | 8 | Q.   Do any of the independent sales reps show up to look at |
| 11:05 | 9 | the products? |
| 11:05 | 10 | A.   Yes, they do. |
| 11:05 | 11 | Q.   And how big are these things?  I mean, how many people |
| 11:05 | 12 | show up at the Hong Kong toy fair? |
| 11:05 | 13 | A.   Hong Kong toy fair is broken into -- there is one |
| 11:05 | 14 | called "Hong Kong TDC."  It's -- it's put together by |
| 11:06 | 15 | Hong Kong Trade Development Council, which is in the |
| 11:06 | 16 | convention center, where you have open booth.  And then |
| 11:06 | 17 | there are private showrooms. |
| 11:06 | 18 |      We had a private showroom.  And we would have |
| 11:06 | 19 | appointments from a lot of people who would come, by |
| 11:06 | 20 | appointment, to see our product line. |
| 11:06 | 21 | Q.   But -- but I guess what I'm getting at is how many |
| 11:06 | 22 | people there are.  Fifty?  A hundred?  A thousand? |
| 11:06 | 23 | A.   No.  I think it's -- I think more -- if you look at -- |
| 11:06 | 24 | combined, both of them, it's more than ten thousand. |
| 11:06 | 25 | Q.   More than ten thousand people come? |

| | | |
|---|---|---|
| 11:06 | 1 | A. Right, to Hong Kong toy show every year. |
| 11:06 | 2 | Q. Um, how does it rank in terms of toy fairs around the |
| 11:06 | 3 | world in importance? |
| 11:06 | 4 | A. I think it is the -- either the second or third largest |
| 11:06 | 5 | most important show. |
| 11:06 | 6 | Q. What would be the most important? |
| 11:06 | 7 | A. Well, there is a debate whether it's Nuremberg in |
| 11:06 | 8 | Germany or New York toy fair in New York, which was just -- |
| 11:07 | 9 | it's happening right now. |
| 11:07 | 10 | Q. So those are the three biggest? |
| 11:07 | 11 | A. That's correct. |
| 11:07 | 12 | Q. And, by the way, are you just back this last weekend |
| 11:07 | 13 | from the New York toy fair? |
| 11:07 | 14 | A. Yes, I was -- Saturday and Sunday. |
| 11:07 | 15 | Q. Now, let's look at Exhibit 11203. |
| 11:07 | 16 | *(Document provided to the witness.)* |
| 11:07 | 17 | *(Document displayed.)* |
| 11:07 | 18 | BY MS. KELLER: |
| 11:07 | 19 | Q. And do you recognize this as an e-mail chain involving |
| 11:07 | 20 | you and Eric Yip? |
| 11:07 | 21 | A. Yes. |
| 11:07 | 22 | Q. And who is Eric Yip? |
| 11:07 | 23 | A. Eric Yip was in charge of our sales administration in |
| 11:07 | 24 | MGA Hong Kong. He coordinated appointments. He coordinated |
| 11:07 | 25 | all the code sheets. |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 99 of 137   Page ID #:301992
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

99

| | | |
|---|---|---|
| 11:07 | 1 | "Code sheet" is when a customer wants a product, you |
| 11:07 | 2 | have to send 'em a specification -- like how many goes to a |
| 11:07 | 3 | carton, what's the price, what's the approximate shipping |
| 11:07 | 4 | cost, what's the package size, et cetera.  He was in charge |
| 11:08 | 5 | of that. |
| 11:08 | 6 | Q.   And if you look at page 1, at the top, we see a |
| 11:08 | 7 | November 30th, 2000 e-mail from you to Mr. Yip, CC, Helene |
| 11:08 | 8 | Bartels. |
| 11:08 | 9 |      And who is Helene Bartels? |
| 11:08 | 10 | A.   Helene Bartels was originally my secretary.  Later on, |
| 11:08 | 11 | I moved her to -- into sales for Walmart.  She was handling |
| 11:08 | 12 | Walmart sales. |
| 11:08 | 13 | Q.   And if we look at the earlier e-mails in the chain -- |
| 11:08 | 14 | let's start at page 11203-0004 -- actually, I guess, we'd |
| 11:08 | 15 | start at page 3 -- all these e-mails in this chain are |
| 11:08 | 16 | leading up to the importance of getting a meeting with a guy |
| 11:09 | 17 | named "Ron Stover," right? |
| 11:09 | 18 | A.   Yes. |
| 11:09 | 19 | Q.   And who was Ron Stover? |
| 11:09 | 20 | A.   Ron Stover was the girls toy buyer at Walmart, was |
| 11:09 | 21 | there for over 20 years until she -- until he retired. |
| 11:09 | 22 | Q.   And you said Walmart was one of the biggest toy buyers |
| 11:09 | 23 | in the world? |
| 11:09 | 24 | A.   It is. |
| 11:09 | 25 | Q.   It is the biggest? |

| | | |
|---|---|---|
| 11:09 | 1 | A.   It is the biggest. |
| 11:09 | 2 | Q.   And so if we look at this, let's see.  Start on page 2. |
| 11:09 | 3 | There's a message from Mr. Yip to you, dated November 29th, |
| 11:09 | 4 | 2000. |
| 11:09 | 5 | And he starts out, "After several discussions with |
| 11:09 | 6 | PREL, they eventually gave me a tentative schedule for some |
| 11:09 | 7 | buyers as below." |
| 11:10 | 8 | What does P-R-E-L stand for? |
| 11:10 | 9 | A.   PREL -- it's called PREL.  And they used to be the |
| 11:10 | 10 | buying agent for Walmart in China and Hong Kong.  They made |
| 11:10 | 11 | all their appointments and they arranged for all their |
| 11:10 | 12 | shipping, purchasing, et cetera. |
| 11:10 | 13 | Q.   And it lists an "Andy Prince," a "Cynthia Ramm," and |
| 11:10 | 14 | "Mark Driver." |
| 11:10 | 15 | Do you know who those people are? |
| 11:10 | 16 | A.   Yes. |
| 11:10 | 17 | Q.   Who are they? |
| 11:10 | 18 | A.   Andy Prince is a buyer at Walmart, still is, for boys |
| 11:10 | 19 | toys.  Cynthia Ramm was another buyer.  I forgot what she |
| 11:10 | 20 | used to buy.  And Mark Driver was another buyer. |
| 11:10 | 21 | Q.   At Walmart? |
| 11:10 | 22 | A.   Yes, all three are Walmart. |
| 11:10 | 23 | Q.   And then underneath that, it says, "For Kmart, please |
| 11:10 | 24 | see below tentative schedule: |
| 11:10 | 25 | "Christine Heldt. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:10 | 1  | "Paulette Prim." |
| 11:10 | 2  | A.   Yes. |
| 11:10 | 3  | Q.   Are they with Kmart? |
| 11:10 | 4  | A.   Yes, they are. |
| 11:10 | 5  | Q.   Were these people you were going to meet with yourself? |
| 11:10 | 6  | A.   Myself, yes. |
| 11:10 | 7  | Q.   So this wasn't something you were delegating? |
| 11:10 | 8  | A.   No. |
| 11:11 | 9  | Q.   And then, let's look at the e-mail above that, the |
| 11:11 | 10 | November 28, 2000 e-mail: |
| 11:11 | 11 | "From:  Jennifer Maurus. |
| 11:11 | 12 | "To:  Eric Yip. |
| 11:11 | 13 | "Subject:  Kmart Appointments." |
| 11:11 | 14 | A.   Okay.  I'm sorry.  I'm lost. |
| 11:11 | 15 | Q.   Okay.  I'm looking at the bottom of page 3, |
| 11:11 | 16 | 11203-00003. |
| 11:11 | 17 | A.   Yes. |
| 11:11 | 18 | Q.   And we see, "From:  Jennifer Maurus," sent "Tuesday, |
| 11:11 | 19 | November 28th."  And she's talking about requesting |
| 11:11 | 20 | appointments with Kmart people. |
| 11:11 | 21 | A.   Yes. |
| 11:11 | 22 | Q.   And then, if we go up to -- let's go to the first page, |
| 11:11 | 23 | November 30th.  This is the bottom of the page.  This is |
| 11:11 | 24 | another message from you to Mr. Yip, dated November 30th, |
| 11:11 | 25 | and it's copied to Stephen Lee, Paula Warner, Helene |

| | | |
|---|---|---|
| 11:11 | 1 | Bartels, Shirin Makabi -- |
| 11:11 | 2 | Who is Shirin Makabi? |
| 11:12 | 3 | A.   Shirin Makabi is my sister. |
| 11:12 | 4 | Q.   And Didi Brown -- Who's Didi Brown? |
| 11:12 | 5 | A.   She used to be my secretary. |
| 11:12 | 6 | Q.   Colleen O'Higgins, who's that? |
| 11:12 | 7 | A.   She was my marketing manager. |
| 11:12 | 8 | Q.   Victoria O'Connor, Franki Tsang, Clementina Jarrin -- |
| 11:12 | 9 | who was that? |
| 11:12 | 10 | A.   Clementina was in charge of sales to Latin America. |
| 11:12 | 11 | Q.   And Cyndi Kwan, who was that? |
| 11:12 | 12 | A.   Cyndi Kwan worked for Eric Yip, and he was -- she was |
| 11:12 | 13 | also in sales administration -- |
| 11:12 | 14 | Q.   And in this -- |
| 11:12 | 15 | A.   -- in Hong Kong. |
| 11:12 | 16 | Q.   I'm sorry? |
| 11:12 | 17 | A.   In Hong Kong. |
| 11:12 | 18 | Q.   And in this e-mail, you're asking all these various |
| 11:12 | 19 | people to do certain tasks:  Lay out the showroom, set up |
| 11:12 | 20 | the showroom.  And then it says, "Eric, we need the |
| 11:12 | 21 | following appointments:  Walmart, Ron Stover for Bratz and |
| 11:12 | 22 | Mrs. Field Oven." |
| 11:12 | 23 | A.   Yes. |
| 11:12 | 24 | Q.   What's the "Mrs. Field Oven" reference? |
| 11:12 | 25 | A.   Mrs. Field Oven is -- are you familiar with Easy-Bake |

| 11:12 | 1 | Oven?  So this was another version of Easy-Bake Oven.  It's |
| 11:13 | 2 | from Hasbro.  But this was Mrs. Field, so you could cook -- |
| 11:13 | 3 | bake cookies in it. |
| 11:13 | 4 | Q.   Okay.  So you're telling -- you're telling Eric Yip |
| 11:13 | 5 | that he needs to get you an appointment with Ron Stover for |
| 11:13 | 6 | Bratz and Mrs. Field Oven? |
| 11:13 | 7 | A.   Yes. |
| 11:13 | 8 | Q.   Okay.  Now let's go to the next e-mail up from that, |
| 11:13 | 9 | which is your e-mail, again, to Mr. Yip, dated |
| 11:13 | 10 | November 30th. |
| 11:13 | 11 |     And it says, "Eric:  Regarding Walmart.  We need Ron |
| 11:13 | 12 | Stover for sure for Bratz, which is a huge part of our |
| 11:13 | 13 | business.  We need at least 30 minutes.  If PREL says no, |
| 11:13 | 14 | Helene must go to Ron. |
| 11:13 | 15 |     "To:  Fran.  He promised us this year that, for sure, |
| 11:14 | 16 | he will come to our showroom.  We have more than few things |
| 11:14 | 17 | for him.  If PREL said no, I need to know, and I will go to |
| 11:14 | 18 | Fran." |
| 11:14 | 19 |     Who's Fran? |
| 11:14 | 20 | A.   Fran Craven was a buyer for several categories of toys |
| 11:14 | 21 | at Walmart. |
| 11:14 | 22 | Q.   So these e-mails -- all these meetings that you want |
| 11:14 | 23 | set up, those are meetings for you to have with these |
| 11:14 | 24 | people? |
| 11:14 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 104 of 137   Page ID #:301997
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

104

| | | |
|---|---|---|
| 11:14 | 1 | Q.   And why did you not delegate those meetings to others |
| 11:14 | 2 | so you didn't have to fly off to Hong Kong? |
| 11:14 | 3 | A.   I go to Hong Kong all the time.  I'm involved in sales, |
| 11:14 | 4 | with the top four customers:  Walmart, Target, Kmart, |
| 11:14 | 5 | Toys R Us, even today. |
| 11:14 | 6 | Q.   Even today? |
| 11:14 | 7 | A.   Yes. |
| 11:14 | 8 | Q.   Now, let's look at Exhibit 11338. |
| 11:14 | 9 | *(Document provided to the witness.)* |
| 11:14 | 10 | BY MS. KELLER: |
| 11:14 | 11 | Q.   And is this an e-mail from you to Didi Brown |
| 11:15 | 12 | December 6th, 2000, about setting up the Hong Kong toy fair |
| 11:15 | 13 | showroom? |
| 11:15 | 14 | A.   Yes. |
| 11:15 | 15 | MS. KELLER:  Your Honor, I'd move 11338 into |
| 11:15 | 16 | evidence. |
| 11:15 | 17 | THE COURT:  Received. |
| 11:15 | 18 | *(Exhibit No. 11338 received in evidence.)* |
| 11:15 | 19 | *(Document displayed.)* |
| 11:15 | 20 | BY MS. KELLER: |
| 11:15 | 21 | Q.   And this e-mail is –– and attachments are many pages |
| 11:15 | 22 | long.  They are –– let's see –– ten pages? |
| 11:15 | 23 | A.   Yes. |
| 11:15 | 24 | Q.   And at the end there is a map of the proposed set up of |
| 11:15 | 25 | the proposed showroom on page 10 –– |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

105

| | | |
|---|---|---|
| 11:15 | 1 | A.   Yes. |
| 11:15 | 2 | Q.   -- do you see that? |
| 11:15 | 3 | A.   Yes. |
| 11:15 | 4 | Q.   Was this the private showroom you were talking about? |
| 11:15 | 5 | A.   Yes. |
| 11:15 | 6 | Q.   So could anybody at the toy fair just walk into that |
| 11:15 | 7 | showroom? |
| 11:15 | 8 | A.   No.  If they did not have an appointment they would not |
| 11:16 | 9 | be allowed in. |
| 11:16 | 10 | Q.   And who was allowed to make an appointment? |
| 11:16 | 11 | A.   The salespeople. |
| 11:16 | 12 | Q.   Did you have to be convinced that they were, you know, |
| 11:16 | 13 | real salespeople who were actually looking to buy toys? |
| 11:16 | 14 | A.   No.  Our salespeople were setting up the appointments. |
| 11:16 | 15 | But this was -- these were appointments for buyers. |
| 11:16 | 16 | Q.   Okay.  For -- okay -- for buyers? |
| 11:16 | 17 | A.   That's correct. |
| 11:16 | 18 | Q.   Now, you were involved in setting up even the plan for |
| 11:16 | 19 | that toy fair? |
| 11:16 | 20 | A.   The floor -- |
| 11:16 | 21 | Q.   The plan for the map? |
| 11:16 | 22 | A.   Yes, I was. |
| 11:16 | 23 | Q.   And you were planning to meet with the buyers, as well, |
| 11:16 | 24 | who came into the showroom? |
| 11:16 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

106

| | | |
|---|---|---|
| 11:16 | 1 | Q.   And -- |
| 11:16 | 2 | A.   This is how I wanted the showroom to look. |
| 11:16 | 3 | Q.   And without going into this too much, your comments are |
| 11:16 | 4 | basically all over these pages; is that true? |
| 11:16 | 5 | A.   It is. |
| 11:16 | 6 | Q.   Now, if we can go to Exhibit 17281. |
| 11:16 | 7 | *(Document provided to the witness.)* |
| | 8 | BY MS. KELLER: |
| 11:17 | 9 | Q.   This is a December 14th e-mail from Eric Yip to PREL, |
| 11:17 | 10 | P-R-E-L, for Ron Stover? |
| 11:17 | 11 | A.   Yeah.  To Eling Poon at PREL, yes. |
| 11:17 | 12 | Q.   Eling Poon, who was that person? |
| 11:17 | 13 | A.   She was the person in charge of our account at PREL. |
| 11:17 | 14 | She works for PREL. |
| 11:17 | 15 | Q.   Okay.  Let's go on to Exhibit 13067. |
| 11:17 | 16 | MS. KELLER:  Your Honor, could we move 17281 into |
| 11:17 | 17 | evidence? |
| 11:17 | 18 | THE COURT:  Received. |
| 11:17 | 19 | *(Exhibit No. 17281 received in evidence.)* |
| 11:17 | 20 | MS. KELLER:  Let's look at Exhibit 13067. |
| 11:17 | 21 | *(Document provided to the witness.)* |
| 11:17 | 22 | BY MS. KELLER: |
| 11:17 | 23 | Q.   This is a December 10th, 2000 e-mail from you to |
| 11:18 | 24 | Stephen Lee? |
| 11:18 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:18 | 1 | MS. KELLER:  Your Honor, I'd move 13067 into |
| 11:18 | 2 | evidence. |
| 11:18 | 3 | THE COURT:  Received. |
| 11:18 | 4 | *(Exhibit No. 13067 received in evidence.)* |
| 11:18 | 5 | *(Document displayed.)* |
| 11:59 | 6 | BY MS. KELLER: |
| 11:18 | 7 | Q.   Now, if we look at the bottom, this is from Stephen Lee |
| 11:18 | 8 | to you, December 10th. |
| 11:18 | 9 | A.   Right. |
| 11:18 | 10 | Q.   And various people CC'd. |
| 11:18 | 11 | A.   And it says, "Dear Isaac, with reference to your verbal |
| 11:18 | 12 | instruction per our phone discussion last Friday, this is to |
| 11:18 | 13 | confirm that we will release Bratz to Early Light." |
| 11:18 | 14 | Q.   Okay.  What does that mean? |
| 11:18 | 15 | A.   Early Light is biggest manufacturer of toys in China. |
| 11:18 | 16 | They have over 50,000 employees who make -- make toys.  And |
| 11:18 | 17 | he was saying that we gonna give -- he was asking for my |
| 11:18 | 18 | permission to give Bratz to Early Light to manufacture. |
| 11:18 | 19 | Q.   And there was another factory that had been in the |
| 11:18 | 20 | running for manufacturing, wasn't there? |
| 11:19 | 21 | A.   Yes, Wah Shing, W-A-H, S-H-I-N-G. |
| 11:19 | 22 | Q.   And why did you pick Early Light over Wah Shing? |
| 11:19 | 23 | A.   Early Light gave us better pricing. |
| 11:19 | 24 | Q.   Now, if we look at your answer, whether you're |
| 11:19 | 25 | confirming that -- your answer on top, December 11th, 2000, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:19 | 1 | you're answer is, "Yes."  So you're agreeing with him that |
| 11:19 | 2 | Early Light will manufacture Bratz? |
| 11:19 | 3 | A.   Yes.  But I'm saying that we still need to work on our |
| 11:19 | 4 | final cost with one hair. |
| 11:19 | 5 | Q.   Okay.  What does that mean, "We still need to work out |
| 11:19 | 6 | final cost with one hair"? |
| 11:19 | 7 | A.   The original Bratz was supposed to have two hairs so |
| 11:19 | 8 | you can remove the hair.  By this time, we had decided we |
| 11:19 | 9 | not gonna do the two hair because it didn't look good.  And |
| 11:19 | 10 | I was telling him that we still have to work out the price |
| 11:19 | 11 | when I come to Hong Kong, get the final price. |
| 11:20 | 12 | Q.   So when you decided to go -- I mean, I'm relieved it |
| 11:20 | 13 | wasn't just one hair on the doll's head. |
| 11:20 | 14 | But when you decided to go with one hairstyle instead |
| 11:20 | 15 | of two -- |
| 11:20 | 16 | A.   We didn't have hair change anymore. |
| 11:20 | 17 | Q.   So was that gonna be rooted? |
| 11:20 | 18 | A.   Yes, they rooted hair. |
| 11:20 | 19 | Q.   And let's look at Exhibit 1307. |
| 11:20 | 20 | *(Document provided to the witness.)* |
| 11:20 | 21 | BY MS. KELLER: |
| 11:20 | 22 | Q.   Do you recognize this as a December 8th, 2000 e-mail |
| 11:20 | 23 | from you to Franki Tsang and Becky Harris with a number of |
| 11:20 | 24 | people copied, including Samuel Wong, Cecilia Kwok, Stephen |
| 11:20 | 25 | Lee -- a lot of other people -- Mercedeh Ward? |

| 11:20 | 1 | A.   Yes. |
| 11:20 | 2 | MS. KELLER:  Your Honor, I would move 1307 into |
| 11:20 | 3 | evidence. |
| 11:20 | 4 | THE COURT:  Received. |
| 11:20 | 5 | *(Exhibit No. 1307 received in evidence.)* |
| 11:20 | 6 | *(Document displayed.)* |
| 11:20 | 7 | BY MS. KELLER: |
| 11:20 | 8 | Q.   Now, if we look at the original message from Franki |
| 11:21 | 9 | Tsang, sent December 8th, 2000, he's describing difficulty |
| 11:21 | 10 | in getting multiple samples of Bratz manufactured in time |
| 11:21 | 11 | for buyers to see at the Hong Kong toy fair; is that right? |
| 11:21 | 12 | A.   Where are you looking at? |
| 11:21 | 13 | Q.   I'm looking at the very bottom of the page. |
| 11:21 | 14 | A.   "Small Dolls"? |
| 11:21 | 15 | Q.   It says, "Small doll Bratz assortment." |
| 11:21 | 16 | A.   Right. |
| 11:21 | 17 | Q.   It says, "We are going to develop one style -- one set |
| 11:21 | 18 | of four style dolls" -- |
| 11:21 | 19 | A.   Right. |
| 11:21 | 20 | Q.   -- "with articulated arms and legs" -- |
| 11:21 | 21 | And that means the arms and legs can move, right? |
| 11:21 | 22 | A.   That's correct. |
| 11:21 | 23 | Q.   -- "plus 11 each dummy samples.  Need to know how far," |
| 11:21 | 24 | slash, "good LA can support the outfits and hair.  Since |
| 11:22 | 25 | Isaac has confirmed to move forward with Early Light, we |

11:22  1   have to switch the mockup development to Early Light in a

11:22  2   fast pace and transfer the roto head skin-master from WS to

11:22  3   EL once done at our cost.  Need Mercedeh's help to make

11:22  4   things happened (sic), and HK will sit on top of EL to back

11:22  5   up additional outfits and hairs under LA direction.  Just

11:22  6   one set of samples from LA won't entertain the huge demand

11:22  7   from buyers during the HKTF time if this project selling,"

11:22  8   parentheses, "Mercedeh," slash "Samuel," hyphen, "Cecilia,"

11:22  9   closed parentheses.

11:22  10  A.   Yes.

11:22  11  Q.   So Franki Tsang is describing the difficulty in getting

11:22  12  multiple samples of Bratz manufactured in time for the

11:22  13  Hong Kong toy fair, right?

11:22  14  A.   He's not talking about manufacture.  He's making dummy

11:23  15  samples.

11:23  16  Q.   I'm sorry.  Yes.  Having them made?

11:23  17  A.   That's correct.

11:23  18  Q.   Making up some dummies in time --

11:23  19  A.   The model makers, that's correct.

11:23  20  Q.   And --

11:23  21  A.   That's December -- December 8 of 2000.

11:23  22  Q.   And that was one of the worries that you said you had

11:23  23  about signing the contract so late with Carter Bryant,

11:23  24  right?

11:23  25           MR. PRICE:  Objection.  Vague and ambiguous and

| | | |
|---|---|---|
| 11:23 | 1 | leading. |
| 11:23 | 2 | THE COURT:  Sustained. |
| 11:23 | 3 | Now, let me talk to the jury in both your presence |
| 11:23 | 4 | for a moment. |
| 11:23 | 5 | (To the jury:)  The counsel calling a witness |
| 11:23 | 6 | cannot lead that witness, technically.  And there's a lot of |
| 11:23 | 7 | controversy about what a leading question is.  The party on |
| 11:23 | 8 | cross-examination can lead a witness. |
| 11:23 | 9 | But here, obviously, you're having different |
| 11:23 | 10 | parties call witnesses who may be adverse to their |
| 11:24 | 11 | positions.  So, in a sense, Mattel has called Mr. Larian. |
| 11:24 | 12 | And the Court has allowed Mattel and counsel to ask somewhat |
| 11:24 | 13 | leading questions on occasion because normally Mr. Larian |
| 11:24 | 14 | would, from your perspective, often be called in MGA's case. |
| 11:24 | 15 | The question becomes can counsel for MGA ask their |
| 11:24 | 16 | own client leading questions? |
| 11:24 | 17 | I think we'd prefer not to, so we hear the |
| 11:24 | 18 | response from the witness.  But on some occasions leading |
| 11:24 | 19 | questions can be asked. |
| 11:24 | 20 | This is not one of those, though. |
| 11:24 | 21 | Counsel. |
| 11:24 | 22 | BY MS. KELLER: |
| 11:24 | 23 | Q.   How does the difficulty described in this e-mail of |
| 11:24 | 24 | coming up with a prototype relate to what you said earlier |
| 11:24 | 25 | about the lateness of signing the contract with Carter |

| | | |
|---|---|---|
| 11:24 | 1 | Bryant? |
| 11:24 | 2 | A.   Well, here it's already December 8, 2000.  Hong Kong |
| 11:24 | 3 | toy fair is less than a month away.  And Franki Tsang, who |
| 11:25 | 4 | is in charge of our product development in Hong Kong, is |
| 11:25 | 5 | saying that we gonna have a tough time to have even dummies |
| 11:25 | 6 | available to show to the retailers and customers. |
| 11:25 | 7 | And when he talks about the huge number of people, |
| 11:25 | 8 | because they have a lot of customers coming to the showroom, |
| 11:25 | 9 | and if they select -- usually what happens is that, if they |
| 11:25 | 10 | select a product, they ask for a sample and a package to be |
| 11:25 | 11 | sent to their offices or hotel rooms in Hong Kong.  The next |
| 11:25 | 12 | step is for them to sit down with their bosses, merchandise |
| 11:25 | 13 | managers and make a decision. |
| 11:25 | 14 | So here, he's saying that if we have only these many |
| 11:25 | 15 | pieces and we have a tough time even making those, how we |
| 11:25 | 16 | gonna -- he's raising a concern how we gonna deal with it. |
| 11:25 | 17 | Q.   And how did you deal with it? |
| 11:25 | 18 | A.   We just had, at the end, four dummies that Hong Kong -- |
| 11:26 | 19 | I call them "magicians."  They put together -- made the |
| 11:26 | 20 | hair.  Couldn't root the hair because the dummies had a hard |
| 11:26 | 21 | sculpt; they were not rotocast.  So we used double-sided |
| 11:26 | 22 | scotch tape to -- to attach the hair to the head.  And the |
| 11:26 | 23 | fashions were not sewn, so we used -- what do you call those |
| 11:26 | 24 | pins? -- the tip at the end.  I forgot what they call |
| 11:26 | 25 | them -- pin -- pin needles -- to attach the fashions to the |

| | | |
|---|---|---|
| 11:26 | 1 | doll. We had Velcro on the back. And we had four mockups, |
| 11:26 | 2 | and some packaging to show to the customers. |
| 11:26 | 3 | Q. So you weren't able to give any of those people at the |
| 11:26 | 4 | Hong Kong toy fair, the buyers, samples to take back to |
| 11:26 | 5 | their hotel rooms? |
| 11:26 | 6 | A. We did not. |
| 11:26 | 7 | Q. Just couldn't get it done in time? |
| 11:26 | 8 | A. We could not. |
| 11:26 | 9 | Q. Let's look at Exhibit 1905. |
| 11:27 | 10 | *(Document provided to the witness.)* |
| 11:27 | 11 | BY MS. KELLER: |
| 11:27 | 12 | Q. And that's a -- starts with an e-mail from Paula |
| 11:27 | 13 | Treantafelles to you, dated November 29, 2000. |
| 11:27 | 14 | You see that? |
| 11:27 | 15 | A. Yes. |
| 11:27 | 16 | MS. KELLER: Your Honor, I'd move Exhibit 19 -- |
| 11:27 | 17 | 01905 into evidence. |
| 11:27 | 18 | THE COURT: Received. |
| 11:27 | 19 | *(Exhibit No. 01905 received in evidence.)* |
| 11:27 | 20 | *(Document displayed.)* |
| 11:27 | 21 | BY MS. KELLER: |
| 11:27 | 22 | Q. And at the bottom, this says, "Colleen and Isaac, since |
| 11:27 | 23 | Ayzenberg will not be supporting us on Bratz, will we still |
| 11:27 | 24 | have the opportunity to generate a Bratz website separate |
| 11:27 | 25 | from the extension on the MGA site?" |

| | | |
|---|---|---|
| 11:27 | 1 | And you answered the same day, couple minutes later, |
| 11:27 | 2 | "Yes." |
| 11:27 | 3 | A.   Yes. |
| 11:27 | 4 | Q.   "Yes.  And Dave/Rachel should handle this." |
| 11:28 | 5 | A.   Yes. |
| 11:28 | 6 | Q.   Now, who's the Dave being referred to? |
| 11:28 | 7 | A.   Dave Malacrida. |
| 11:28 | 8 | Q.   What was his job? |
| 11:28 | 9 | A.   He was in charge of PR, but also website, a lot of |
| 11:28 | 10 | things.  We were small company, so people did many things. |
| 11:28 | 11 | THE COURT:  Counsel, repeat the exhibit number for |
| 11:28 | 12 | just a moment. |
| 11:28 | 13 | MS. KELLER:  01905. |
| 11:28 | 14 | THE COURT:  01905? |
| 11:28 | 15 | MS. KELLER:  Yes, Your Honor. |
| 11:28 | 16 | THE COURT:  Thank you very much. |
| | 17 | BY MS. KELLER: |
| 11:28 | 18 | Q.   And who was -- Rachel Harris is listed on this.  Who's |
| 11:28 | 19 | Rachel Harris? |
| 11:28 | 20 | A.   She was in charge of graphics at MGA. |
| 11:28 | 21 | Q.   Why did you think it was important to generate a Bratz |
| 11:28 | 22 | website separate from the MGA site? |
| 11:28 | 23 | A.   Because, again, at that time -- now we're talking in |
| 11:28 | 24 | 2000/2001 time -- we wanted to have social networking.  And |
| 11:28 | 25 | Internet was becoming prevalent and more and more kids were |

CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

115

| | | |
|---|---|---|
| 11:28 | 1 | going on it, so we wanted to have -- we wanted the kids to |
| 11:28 | 2 | have another way to play, not only just with the dolls, but |
| 11:29 | 3 | go on the website and play with games and other things that |
| 11:29 | 4 | we had. |
| 11:29 | 5 | Q.   Let's look at Exhibit 11205. |
| 11:29 | 6 | *(Document provided to the witness.)* |
| 11:29 | 7 | MS. KELLER:  I don't think we have that exhibit. |
| 11:29 | 8 | I think we're going to go on to another exhibit. |
| 11:29 | 9 | THE WITNESS:  I have it here. |
| 11:29 | 10 | BY MS. KELLER: |
| 11:29 | 11 | Q.   Let's go to Exhibit 10053. |
| 11:29 | 12 | *(Document provided to the witness.)* |
| 11:29 | 13 | BY MS. KELLER: |
| 11:29 | 14 | Q.   And this is a December 15th e-mail from you to Stephen |
| 11:29 | 15 | Lee, with copies to Franki Tsang, Samuel Wong, and Victor |
| 11:30 | 16 | Lee. |
| 11:30 | 17 | A.   Yes. |
| 11:30 | 18 | MS. KELLER:  Your Honor, I would move 10053 into |
| 11:30 | 19 | evidence. |
| 11:30 | 20 | THE COURT:  Received. |
| 11:30 | 21 | *(Exhibit No. 10053 received in evidence.)* |
| 11:30 | 22 | *(Document displayed.)* |
| 11:30 | 23 | BY MS. KELLER: |
| 11:30 | 24 | Q.   Now, this is entitled "Early Light Sales Forecast"? |
| 11:30 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:30 | 1 | Q.   And if we look at -- it looks like this was an original |
| 11:30 | 2 | message from Stephen Lee to you? |
| 11:30 | 3 | A.   Yes. |
| 11:30 | 4 | Q.   And then you put a lot of your comments into it? |
| 11:30 | 5 | A.   That's correct. |
| 11:30 | 6 | Q.   And when we see the bracketed "Isaac Larian," is that |
| 11:30 | 7 | where you have inserted your comments into the e-mail? |
| 11:30 | 8 | A.   Right below it, yes. |
| 11:30 | 9 | Q.   So this says, "I need Francis and Wilson to come up |
| 11:30 | 10 | with a production planning to support us, thus I need some |
| 11:30 | 11 | realistic sales forecast from you to support my discussion. |
| 11:30 | 12 | Thanks." |
| 11:30 | 13 |    What was he talking about there? |
| 11:30 | 14 | A.   Francis Choi is the CEO and owner of Early Light. |
| 11:31 | 15 | Wilson Ng is -- N-G, spelled N-G -- is the general manager |
| 11:31 | 16 | of manufacturing at Early Light.  And what he's talking |
| 11:31 | 17 | about is that, because the factories have to set up |
| 11:31 | 18 | production plan for the year, he's asking me what kind of |
| 11:31 | 19 | sales are we gonna have, and if -- because these are the |
| 11:31 | 20 | products that we were gonna give to Early Light to make so |
| 11:31 | 21 | they can plan their assembly line production, et cetera. |
| 11:31 | 22 | Q.   And if we look down at the bottom of this page, you |
| 11:31 | 23 | were considering upping the sales quota of Bratz in 2001 to |
| 11:31 | 24 | two million units if it could be shipped by June 1st. |
| 11:32 | 25 |    Is that what that means? |

| | | |
|---|---|---|
| 11:32 | 1 | A.   Yes. |
| 11:32 | 2 | Q.   And do you have -- you have a number of other toys on |
| 11:32 | 3 | here other than Bratz? |
| 11:32 | 4 | A.   I do. |
| 11:32 | 5 | Q.   Let's look back, if we can, for a moment at |
| 11:32 | 6 | Exhibit 11205. |
| 11:32 | 7 | *(Document provided to the witness.)* |
| 11:32 | 8 | BY MS. KELLER: |
| 11:32 | 9 | Q.   And this is an e-mail from you to Mr. Medici three days |
| 11:32 | 10 | before the one we just looked at, 10053. |
| 11:32 | 11 | A.   Yes. |
| 11:32 | 12 | Q.   Now, in this e-mail, if we look at -- let's look at |
| 11:32 | 13 | page 1. |
| 11:32 | 14 | A.   Yes. |
| 11:32 | 15 | Q.   That's the cover sheet. |
| 11:32 | 16 | MS. KELLER:  Your Honor, I'd ask that page 1 be |
| 11:32 | 17 | admitted. |
| 11:32 | 18 | THE COURT:  Received. |
| 11:32 | 19 | *(Exhibit No. 11205 Page 1 received in* |
| 11:32 | 20 | *evidence.)* |
| 11:32 | 21 | *(Document displayed.)* |
| 11:33 | 22 | MS. KELLER:  Page 2 looks like it's blank. |
| 11:33 | 23 | And let's go to page 4. |
| 11:33 | 24 | *(Document displayed.)* |
| 11:33 | 25 | MS. KELLER:  And, Your Honor, I'd ask that page 4 |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 118 of 137   Page ID #:302011
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

118

| | | |
|---|---|---|
| 11:33 | 1 | be admitted. |
| 11:33 | 2 | THE COURT:  Received. |
| 11:33 | 3 | *(Exhibit No. 11205 Page 4 received in* |
| 11:33 | 4 | *evidence.)* |
| 01:59 | 5 | BY MS. KELLER: |
| 11:33 | 6 | Q.   This estimates the sales of Bratz -- if you look at the |
| 11:33 | 7 | top -- at one million, allocating among various retailers. |
| 11:33 | 8 | Do you see that? |
| 11:33 | 9 | A.   I can't find it. |
| 11:33 | 10 | Q.   If you look on the screen, you'll see it. |
| 11:33 | 11 | A.   Yes.  Yes.  Go ahead.  I'm sorry. |
| 11:33 | 12 | Q.   And so within the next three days you decided to double |
| 11:33 | 13 | that? |
| 11:33 | 14 | A.   If they could ship by June. |
| 11:33 | 15 | Q.   If they could ship by June? |
| 11:33 | 16 | A.   Yes. |
| 11:33 | 17 | Q.   Now, are there a few items in here of your other toys |
| 11:33 | 18 | where you may have been a little too optimistic? |
| 11:33 | 19 | A.   On many of 'em I was too optimistic. |
| 11:33 | 20 | Q.   Let's look down, for example, at where it says, |
| 11:34 | 21 | "No. 11, monkey." |
| 11:34 | 22 | Was that the Monkey-See Monkey-Do doll? |
| 11:34 | 23 | A.   No.  This was, I think, another monkey.  But also |
| 11:34 | 24 | Monkey-See Monkey-Do is on this list. |
| 11:34 | 25 | Q.   And how many did you estimate Monkey-See Monkey-Do |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 119 of 137   Page ID #:302012
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

119

| | | |
|---|---|---|
| 11:34 | 1 | would sell? |
| 11:34 | 2 | A.   Probably same thing:  300,000 pieces. |
| 11:34 | 3 | Q.   How many actually sold? |
| 11:34 | 4 | A.   Five. |
| 11:34 | 5 | Q.   So some of these -- some of these forecasts were just a |
| 11:34 | 6 | tad off? |
| 11:34 | 7 | A.   Yes. |
| 11:34 | 8 | Q.   Who was making all these forecasts? |
| 11:34 | 9 | A.   I was. |
| 11:34 | 10 | Q.   And you were just relying on what?  Instinct?  Data |
| 11:34 | 11 | that you had?  What were you relying on? |
| 11:34 | 12 | A.   I loved these toys, so I always thought that they all |
| 11:34 | 13 | gonna be successful, so I would put big numbers, and I was |
| 11:34 | 14 | hoping the salespeople would sell it and the buyers would |
| 11:34 | 15 | buy 'em. |
| 11:34 | 16 | Q.   And would it be fair to say that that wasn't the only |
| 11:35 | 17 | toy on here that fell a little short of your projections, |
| 11:35 | 18 | without going down your list? |
| 11:35 | 19 | A.   Yeah.  Many of them failed.  Some of 'em didn't even |
| 11:35 | 20 | make it -- Jumping Jenny, No. 5, we didn't even make that |
| 11:35 | 21 | toy. |
| 11:35 | 22 | Q.   And other toys on here -- |
| 11:35 | 23 | A.   And I had -- |
| 11:35 | 24 | Q.   -- other toys on here did make it, right? |
| 11:35 | 25 | A.   Yes.  But I was forecasting 500,000 pieces on Jumping |

| | | |
|---|---|---|
| 11:35 | 1 | Jenny.  We made zero. |
| 11:35 | 2 | Q.   Now, let's look at Exhibit 12037. |
| 11:35 | 3 | *(Document provided to the witness.)* |
| 11:35 | 4 | BY MS. KELLER: |
| 11:35 | 5 | Q.   This is a December 26, 2000 e-mail -- if we look at the |
| 11:35 | 6 | top -- from you to Paula Treantafelles and Mercedeh Ward and |
| 11:35 | 7 | a number of people copied on that; is that right? |
| 11:35 | 8 | A.   Yes. |
| 11:35 | 9 | Q.   And this says -- if we look at the second e-mail down, |
| 11:36 | 10 | from Paula, it says, "Isaac, sales forecasts was one million |
| 11:36 | 11 | units.  This was before we learned of our competition." |
| 11:36 | 12 | A.   Yes. |
| 11:36 | 13 | MS. KELLER:  Oh, I'm sorry, Your Honor.  Could I |
| 11:36 | 14 | move 12037 into evidence? |
| 11:36 | 15 | THE COURT:  Received. |
| 11:36 | 16 | *(Exhibit No. 12037 received in evidence.)* |
| 11:36 | 17 | *(Document displayed.)* |
| 11:36 | 18 | BY MS. KELLER: |
| 11:36 | 19 | Q.   "Isaac, sales forecast was one million units.  This was |
| 11:36 | 20 | before we learned of our competition.  I checked with Jim. |
| 11:36 | 21 | He advised that there is not a forecast for Bratz per sales. |
| 11:36 | 22 | Please advise how/if you want to revise this quota of one |
| 11:36 | 23 | million pieces.  Please, also advise the minimum number of |
| 11:36 | 24 | units you expect to ship four weeks after PS of 6/15." |
| 11:36 | 25 | What does "PS" stand for? |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

121

| | | |
|---|---|---|
| 11:36 | 1 | A.    Production start date. |
| 11:36 | 2 | Q.    So that's the date after which they've actually been |
| 11:36 | 3 | manufactured? |
| 11:36 | 4 | A.    That's correct. |
| 11:36 | 5 | Q.    And you've stopped the production run? |
| 11:36 | 6 | A.    Start. |
| 11:36 | 7 | Q.    "Start."  Okay.  Production start. |
| 11:36 | 8 | So you expected to start production June 15th? |
| 11:37 | 9 | A.    Paula was saying production start's gonna be June 15. |
| 11:37 | 10 | I was pushing for earlier. |
| 11:37 | 11 | Q.    And then on the top, your answer to her, December 26th, |
| 11:37 | 12 | 12:42 p.m., says, "Forecast is still the same.  We need to |
| 11:37 | 13 | ship 100K four weeks after PS." |
| 11:37 | 14 | A.    Yes. |
| 11:37 | 15 | Q.    So you're telling her you want to ship a hundred |
| 11:37 | 16 | thousand pieces four weeks after production starts? |
| 11:37 | 17 | A.    Yes.  Even though we had no sales forecast at the time |
| 11:37 | 18 | because -- I don't want to volunteer.  Go ahead. |
| 11:37 | 19 | Q.    So you just didn't have a forecast.  You were just |
| 11:37 | 20 | going on instinct? |
| 11:37 | 21 | A.    Yes.  Our -- our salespeople didn't think we can sell |
| 11:37 | 22 | Bratz dolls because there was another fashion doll that |
| 11:37 | 23 | had -- had the major market share.  They didn't think so.  I |
| 11:37 | 24 | still believed that we can. |
| 11:38 | 25 | Q.    Is that what Paula was referring to when she said, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 122 of 137   Page ID #:302015
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:38 | 1 | "This was before we learned of our competition"? |
| 11:38 | 2 | A.   The competition she was referring to is a company |
| 11:38 | 3 | called Blue Box, which we learned was coming also with a |
| 11:38 | 4 | doll with a big head, big eyes, big lips, et cetera. |
| 11:38 | 5 | Q.   And so your salespeople -- why were they not optimistic |
| 11:38 | 6 | about being able to sell Bratz? |
| 11:38 | 7 | A.   Because they didn't think they can get shelf space away |
| 11:38 | 8 | from our major competitor who had 90 percent market share. |
| 11:38 | 9 | Q.   So why did you say, then, "Forecast is still the same," |
| 11:38 | 10 | and you're telling her, basically: I don't care.  We're |
| 11:38 | 11 | sticking with this plan? |
| 11:38 | 12 | A.   I believed -- I believed that -- humbly, I have to say |
| 11:38 | 13 | that I have good eye for toy product.  And I believed that |
| 11:38 | 14 | this product would sell, and I still wanted to go forward |
| 11:39 | 15 | with it. |
| 11:39 | 16 | Q.   So you were willing to risk your money?  'Cause you own |
| 11:39 | 17 | the company, right? |
| 11:39 | 18 | A.   I own a portion of the company. |
| 11:39 | 19 | Q.   Now, let's look at Exhibit 12037-2. |
| 11:39 | 20 |             (Document displayed.) |
| 11:39 | 21 | BY MS. KELLER: |
| 11:39 | 22 | Q.   And that's the last e-mail in this chain.  And this was |
| 11:39 | 23 | dated December 22nd, so this was four days before your |
| 11:39 | 24 | e-mail saying, "Forecast is still the same." |
| 11:39 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:39 | 1 | Q.   And this is from Samuel Wong in Hong Kong to Mercedeh |
| 11:39 | 2 | Ward.  And he's saying, "Please advise your approval for the |
| 11:39 | 3 | following tooling quote so that we can advise factory |
| 11:39 | 4 | according.  We will send you the TRA for your sign-off on |
| 11:39 | 5 | 12/27." |
| 11:39 | 6 | What's a TRA? |
| 11:39 | 7 | A.   It's form that we have.  It's called Toy Release |
| 11:40 | 8 | Authorization.  So you sign off the form so they can go |
| 11:40 | 9 | spend money and start tooling.  When I –– that I discussed |
| 11:40 | 10 | last week. |
| 11:40 | 11 | Q.   And it says –– so you're still trying to get a quote |
| 11:40 | 12 | for the tooling in late December? |
| 11:40 | 13 | A.   That's correct. |
| 11:40 | 14 | Q.   And if we look at the bottom of 1237 (sic), page 1, |
| 11:40 | 15 | continuing on to 12372 (sic). |
| 11:40 | 16 | THE REPORTER:  Dash 2?  I'm sorry.  Counsel, I |
| 11:40 | 17 | have 1237, page 1, and 12372. |
| 11:41 | 18 | MS. KELLER:  12037-2. |
| 11:41 | 19 | BY MS. KELLER: |
| 11:41 | 20 | Q.   So if we look at the e-mail on the bottom of 12037-1, |
| 11:41 | 21 | from Paula Treantafelles, dated December 26, she's sending |
| 11:41 | 22 | this to Mercedeh Ward and copying various people "Re: |
| 11:42 | 23 | Tooling costs for Bratz." |
| 11:42 | 24 | It says, "Mercedeh, I need your help.  Can you please |
| 11:42 | 25 | advise HK on your approval comments on tooling costs noted |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 124 of 137   Page ID #:302017
CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:42 | 1 | below." |
| 11:42 | 2 | A.    I'm sorry? |
| 11:42 | 3 | Q.    "Per our short discussion" -- |
| 11:42 | 4 | A.    Okay. |
| 11:42 | 5 | Q.    -- "last Friday, there seem to be some issues found |
| 11:42 | 6 | with the digital photos of the body submitted by HK.  We are |
| 11:42 | 7 | still waiting on the physical sample, which I hope we |
| 11:42 | 8 | receive today.  I'll need your support in commenting and |
| 11:42 | 9 | directing HK on to proceed with this body." |
| 11:42 | 10 | A.    Yes. |
| 11:42 | 11 | Q.    So it's now December -- December 26th, 2000, and |
| 11:42 | 12 | there's still no product, right? |
| 11:42 | 13 | A.    There's not even a final sculpt at that time. |
| 11:42 | 14 | Q.    And still -- so still no body?  No final sculpt? |
| 11:42 | 15 | A.    That's correct. |
| 11:42 | 16 | Q.    And the next e-mail is from Mercedeh Ward to Paula |
| 11:42 | 17 | Garcia, dated December 26, 2000, and she says, "We can |
| 11:43 | 18 | decide on the tooling after we see the marketing quota and |
| 11:43 | 19 | requirement." |
| 11:43 | 20 | A.    Yes. |
| 11:43 | 21 | Q.    And then in response to that, Paula Garcia says, in the |
| 11:43 | 22 | e-mail above that, "Sales forecast was one million units. |
| 11:43 | 23 | This was before we have learned of our competition." |
| 11:43 | 24 | A.    Yes. |
| 11:43 | 25 | Q.    And "the competition" here does not refer to Mattel, |

| | | |
|---|---|---|
| 11:43 | 1 | right? |
| 11:43 | 2 | A.   No.  It's Blue Box. |
| 11:43 | 3 | Q.   And then, as we discussed, your response is that the |
| 11:43 | 4 | forecast stays the same, even though you still had no -- no |
| 11:43 | 5 | final sculpt, right? |
| 11:43 | 6 | A.   Yes. |
| 11:43 | 7 | Q.   No -- |
| 11:43 | 8 | MR. PRICE:  Objection.  Leading, Your Honor. |
| 11:43 | 9 | THE COURT:  Sustained. |
| 11:43 | 10 | Reask it. |
| 11:43 | 11 | BY MS. KELLER: |
| 11:43 | 12 | Q.   When was it that you hoped to get a final sculpt of the |
| 11:43 | 13 | doll? |
| 11:43 | 14 | A.   We didn't get a final sculpt for the doll, to the best |
| 11:44 | 15 | of my recollection, until early January 2001, if not later. |
| 11:44 | 16 | Q.   Now, can you tell us what is a "sell sheet"? |
| 11:44 | 17 | A.   Sell sheet is like a catalogue sheet that you make for |
| 11:44 | 18 | the retailers, where you put the specification for your -- |
| 11:44 | 19 | for the toy on. |
| 11:44 | 20 | Q.   And when you say you put the specifications for the |
| 11:44 | 21 | toy, and -- like what?  What specifications? |
| 11:44 | 22 | A.   Put the picture of the product.  You put how many goes |
| 11:44 | 23 | to inner carton, how many goes to master carton, what's the |
| 11:44 | 24 | UPC number -- UPC is what you scan at retail when -- that |
| 11:44 | 25 | bar code -- information like that -- how many goes to |

| 11:44 | 1 | container, if you selling it FOB Hong Kong. |
| 11:44 | 2 | Q.   Did you need those documents to give to retailers at |
| 11:45 | 3 | the Hong Kong toy fair? |
| 11:45 | 4 | A.   To make a code sheet, yes. |
| 11:45 | 5 | Q.   Okay.  When you say "to make a code sheet" -- we just |
| 11:45 | 6 | discussed a sell sheet.  What's a code sheet? |
| 11:45 | 7 | A.   If they are buying -- if Walmart, for example, is |
| 11:45 | 8 | buying product FOB Hong Kong, they ask you to fill up a code |
| 11:45 | 9 | sheet.  And the code sheet gives a lot more information. |
| 11:45 | 10 | How many -- what's the cube volume, because they were |
| 11:45 | 11 | producing the container.  So they want to know how many goes |
| 11:45 | 12 | in container. |
| 11:45 | 13 | Usually, a container from China to USA costed $2,600 |
| 11:45 | 14 | for 20-foot container.  So they want to divide that and find |
| 11:45 | 15 | out how much will it cost for freight per doll to import it. |
| 11:45 | 16 | And so they wanted to have all that information in order to |
| 11:45 | 17 | set up the item in their own computer system, if they were |
| 11:45 | 18 | gonna buy it. |
| 11:45 | 19 | Q.   So they were gonna want, you said, a picture, a |
| 11:46 | 20 | description, price for delivery? |
| 11:46 | 21 | A.   Price -- selling price.  But they wanted to know how |
| 11:46 | 22 | many goes to a container. |
| 11:46 | 23 | Q.   Okay. |
| 11:46 | 24 | A.   It's like -- basically, like a spreadsheet.  And |
| 11:46 | 25 | figures are based on that:  What would be the cost of |

CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

127

| | | |
|---|---|---|
| 11:46 | 1 | freight; if there was a duty, what would be the duty -- on |
| 11:46 | 2 | toys there is no duty -- so how much does it cost for them |
| 11:46 | 3 | to land it in -- in the port.  Because then they have to |
| 11:46 | 4 | pick it up from the port, take it to their warehouses; and |
| 11:46 | 5 | then, from their warehouses, to distribute to the Walmart |
| 11:46 | 6 | stores or Toys R Us stores around the country. |
| 11:46 | 7 | Q.   I'd like you to take a look at 11101. |
| 11:46 | 8 | *(Document provided to the witness.)* |
| 11:46 | 9 | BY MS. KELLER: |
| 11:46 | 10 | Q.   And it says, "From:  Isaac Larian. |
| 11:46 | 11 | "To:  Rachel Harris. |
| 11:46 | 12 | "Re:  Sales Sheets and Key Products." |
| 11:47 | 13 | And it's dated December 28th, 2000. |
| 11:47 | 14 | Do you recognize that? |
| 11:47 | 15 | A.   I do. |
| 11:47 | 16 | MS. KELLER:  Your Honor, I'd move 11101 into |
| 11:47 | 17 | evidence. |
| 11:47 | 18 | THE COURT:  Received. |
| 11:47 | 19 | *(Exhibit No. 11101 received in evidence.)* |
| 11:47 | 20 | *(Document displayed.)* |
| 11:47 | 21 | BY MS. KELLER: |
| 11:47 | 22 | Q.   Now, is -- this is the original message here -- right |
| 11:47 | 23 | below your name and date is the original message from Rachel |
| 11:47 | 24 | Harris to you that same day, December 28th, 2000. |
| 11:47 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:47 | 1 | Q.   And it says, "Isaac, I am sorry to hear about your |
| 11:47 | 2 | family's loss.  I hope the recent e-mails from here are not |
| 11:47 | 3 | putting too much stress on you." |
| 11:47 | 4 | What is she referring to? |
| 11:47 | 5 | A.   My aunt was hit by a -- by a car and passed away. |
| 11:47 | 6 | Q.   And underneath that, it says, "sell sheets.  We met |
| 11:48 | 7 | yesterday on the sell sheets, and I explained to Becky that |
| 11:48 | 8 | we created the sell sheets based on info we received for the |
| 11:48 | 9 | PM's." |
| 11:48 | 10 | What is a PM? |
| 11:48 | 11 | A.   Product managers. |
| 11:48 | 12 | Q.   "When I gave these to Julie, they were meant to be for |
| 11:48 | 13 | her to send to Mike." |
| 11:48 | 14 | Who is Mike? |
| 11:48 | 15 | A.   Mike Lingg that we talked about, the independent sales |
| 11:48 | 16 | rep for Target. |
| 11:48 | 17 | Q.   "Just for him to see what the products look like.  They |
| 11:48 | 18 | were nowhere near completion.  I believe Becky assumed these |
| 11:48 | 19 | were almost final and panicked.  I am sorry.  I can only |
| 11:48 | 20 | spare one person to work on the sell sheets at this point. |
| 11:48 | 21 | I am helping as well. |
| 11:48 | 22 | "I spoke to Franki.  He can get these printed in HK in |
| 11:48 | 23 | time for toy fair if we Fed Ex no later than Friday.  We are |
| 11:48 | 24 | working on them as fast we can to meet this deadline." |
| 11:48 | 25 | So, um, as of December 28th, 2000, were you having |

| | | |
|---|---|---|
| 11:48 | 1 | trouble getting the sell sheets done in time for the |
| 11:49 | 2 | Hong Kong toy fair? |
| 11:49 | 3 | A.   Yes, we did. |
| 11:49 | 4 | Q.   Let's look at Exhibit 11604. |
| 11:49 | 5 | *(Document provided to the witness.)* |
| 11:49 | 6 | BY MS. KELLER: |
| 11:49 | 7 | Q.   And is this a December 29th e-mail from Paula |
| 11:49 | 8 | Treantafelles to you, and to Samuel Wong, Cecilia Kwok, and |
| 11:49 | 9 | various others? |
| 11:49 | 10 | A.   It is. |
| 11:49 | 11 |        MS. KELLER:  Your Honor, I would move |
| 11:49 | 12 | Exhibit 11604 into evidence. |
| 11:49 | 13 |        THE COURT:  Received. |
| 11:49 | 14 |        *(Exhibit No. 11604 received in evidence.)* |
| 11:49 | 15 |         *(Document displayed.)* |
| 11:49 | 16 | BY MS. KELLER: |
| 11:49 | 17 | Q.   Now, if you could just take -- this is a seven-page |
| 11:49 | 18 | document. |
| 11:49 | 19 | A.   Yes. |
| 11:49 | 20 | Q.   So it's gonna take a little bit to go over.  But let's |
| 11:49 | 21 | look at the last two pages.  So 11604-5 and -6. |
| 11:50 | 22 |      We just looked at -- we just looked at this e-mail |
| 11:50 | 23 | dated December 26th.  That's in the middle of the page, |
| 11:50 | 24 | where it says, "Forecast is still the same." |
| 11:50 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:50 | 1 | Q.   And we saw, previously, Ms. Treantafelles's e-mail to |
| 11:50 | 2 | you -- you know, the one that says, "This is before we |
| 11:50 | 3 | learned of our competition." |
| 11:50 | 4 | A.   Yes. |
| 11:50 | 5 | Q.   Um, now, look above that.  And this appears to be an |
| 11:50 | 6 | e-mail from Mercedeh Ward on December 26th to Victor Lee, |
| 11:50 | 7 | Samuel Wong, various others are copied on it, including you. |
| 11:50 | 8 | And it says, "Just a simple question.  Will our |
| 11:51 | 9 | manufacturer be able to make 100K in four weeks and have |
| 11:51 | 10 | them shipped?  No ramp up or any ramp down?" |
| 11:51 | 11 | And it's signed, "Mercedeh Ward." |
| 11:51 | 12 | What does that mean? |
| 11:51 | 13 | A.   She's asking Hong Kong can our manufacturer make |
| 11:51 | 14 | hundred thousand pieces in four weeks. |
| 11:51 | 15 | Usually, what happens in the toy industry, when you |
| 11:51 | 16 | make the product, you have to ship it from Hong Kong -- like |
| 11:51 | 17 | by end of May, early June, and -- to different retailers. |
| 11:51 | 18 | They take it, and then they set up what's called a Fall |
| 11:51 | 19 | planogram.  They move -- the store changes from Spring to |
| 11:51 | 20 | Fall.  And usually, you need that kind of quantity to set up |
| 11:51 | 21 | the planogram. |
| 11:51 | 22 | And she's asking:  Are you sure we can make 100 pieces |
| 11:51 | 23 | in four weeks and ship them without any ramp up?  Because |
| 11:52 | 24 | "ramp up" means when you start manufacturing, usually like |
| 11:52 | 25 | the first time -- because the workers were not trained, |

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

131

| | | |
|---|---|---|
| 11:52 | 1 | et cetera -- let's say you can make 500 pieces the first |
| 11:52 | 2 | day.  The next day they learning more; they go to a |
| 11:52 | 3 | thousand.  As they grow, they can make more of it.  So |
| 11:52 | 4 | that's what she's talking about, the ramp up. |
| 11:52 | 5 | Q.   So she's questioning whether this could even be done? |
| 11:52 | 6 | A.   Yes. |
| 11:52 | 7 | Q.   And that's, uh -- that's as late as December 26th? |
| 11:52 | 8 | A.   That's correct. |
| 11:52 | 9 | Q.   Now, on 11604-4 we see some e-mails addressing the |
| 11:52 | 10 | issue of different doll sales estimates for the tooling. |
| 11:52 | 11 | A.   Yes. |
| 11:52 | 12 | Q.   And, for example, in the middle of the page, we see a |
| 11:53 | 13 | message from you dated December 26th. |
| 11:53 | 14 | A.   Yes. |
| 11:53 | 15 | Q.   "To:  Paula, Mercedeh Ward, Victor Lee, Samuel Wong" |
| 11:53 | 16 | and three other people copied, saying, "What" -- and it's |
| 11:53 | 17 | "Subject:  Retooling cost for Bratz." |
| 11:53 | 18 |       And you say, "What do you think are the best seller |
| 11:53 | 19 | dolls?  The tools must be made accordingly.  More for most |
| 11:53 | 20 | popular, and less for least.  Quota for fashion pack is 300K |
| 11:53 | 21 | with 50K by 6/15." |
| 11:53 | 22 |       What does that mean? |
| 11:53 | 23 | A.   Well, the first part, we going to decide -- we had no |
| 11:53 | 24 | idea on the four dolls which one is gonna sell better, which |
| 11:53 | 25 | one is not gonna sell better.  So I'm asking them to tell me |

| | | |
|--|--|--|
| 11:53 | 1 | what do they think that's gonna be more popular.  Is Cloe |
| 11:53 | 2 | gonna be more popular than Yasmin or vice versa?  I'm asking |
| 11:53 | 3 | for their opinion. |
| 11:53 | 4 | And on the bottom, where I put "quota for fashion |
| 11:54 | 5 | packs," those are the separate fashion packs that we made |
| 11:54 | 6 | for the dolls so the kids can buy them and change the |
| 11:54 | 7 | dresses.  And I'm saying that the quota is gonna be 300K -- |
| 11:54 | 8 | 300,000 pieces -- with 50K -- 50,000 pieces -- to be shipped |
| 11:54 | 9 | by June 15. |
| 11:54 | 10 | Q.  And if you look above that, in Paula's e-mail, it says, |
| 11:54 | 11 | "As you know, I have not done quantitative research, but my |
| 11:54 | 12 | expectations are" -- and then she has the four dolls listed. |
| 11:54 | 13 | And she has: |
| 11:54 | 14 | "Cloe," in parentheses, "White." |
| 11:54 | 15 | "Sasha," in parentheses, "AA." |
| 11:54 | 16 | "Yasmin, in parentheses, "Hispanic." |
| 11:54 | 17 | "Jade," in parentheses, "Asian." |
| 11:54 | 18 | By the way, Paula is describing these dolls as having a |
| 11:54 | 19 | specific ethnicity? |
| 11:54 | 20 | A.  She is.  And she's ranking 'em here. |
| 11:54 | 21 | Q.  And was -- that's not -- but according to what you |
| 11:54 | 22 | said, that's not what they ended up being, right? |
| 11:55 | 23 | A.  No.  I was completely against it.  I didn't want to |
| 11:55 | 24 | have them named white or Hispanic or Asian. |
| 11:55 | 25 | Q.  Now, if you look above that, you see it says, "Tool" -- |

CV 04-9049 DOC – 2/16/2011 – Day 18, Volume 1 of 3

133

| | | |
|---|---|---|
| 11:55 | 1 | this is a message from you -- |
| 11:55 | 2 | A.   Right. |
| 11:55 | 3 | Q.   -- to Paula and various others. |
| 11:55 | 4 | And it says, "Tool:  65 percent, Cloe; 15 percent, |
| 11:55 | 5 | Sasha; 10 percent, Yasmin; 10 percent Jade." |
| 11:55 | 6 | A.   Yes. |
| 11:55 | 7 | Q.   And what did you base that on? |
| 11:55 | 8 | A.   I just guessed that Cloe, which was blonde doll, would |
| 11:55 | 9 | probably sell more.  So I said tool more -- this was -- I |
| 11:55 | 10 | was just guessing.  So make more tooling for Cloe. |
| 11:55 | 11 | 65 percent of tooling put on Cloe; put 15 percent on Sasha; |
| 11:55 | 12 | put 10 percent on Yasmin, and put 10 percent on Jade. |
| 11:55 | 13 | Q.   And by the top e-mail of this exhibit on page 1, |
| 11:56 | 14 | 11604-1, as of December 19th, 2000, there's still no |
| 11:56 | 15 | tooling, right? |
| 11:56 | 16 | A.   That's correct. |
| 11:56 | 17 | Q.   You don't know how many are gonna go in the carton, |
| 11:56 | 18 | right? |
| 11:56 | 19 | A.   Yes. |
| 11:56 | 20 | Q.   Don't know how -- what the ratio-to-manufacture is? |
| 11:56 | 21 | You're just guessing? |
| 11:56 | 22 | A.   Yes. |
| 11:56 | 23 | Q.   Don't even know how many tools you would need, true? |
| 11:56 | 24 | A.   Absolutely correct. |
| 11:56 | 25 | Q.   Page 1 refers -- it says -- about a third of the way |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

134

| | | |
|---|---|---|
| 11:56 | 1 | down, it says -- Paula's comment is, "We will proceed with |
| 11:56 | 2 | both mouth versions." |
| 11:56 | 3 | What does this mean? |
| 11:56 | 4 | A.   We wanted these dolls to look different, not have one |
| 11:56 | 5 | face.  Different face painting.  So we had some of the dolls |
| 11:57 | 6 | with the mouth a little open, and some of 'em closed, so |
| 11:57 | 7 | give 'em differentiation. |
| 11:57 | 8 | Q.   And could we look at Exhibit 17732. |
| 11:57 | 9 | *(Exhibit provided to the witness.)* |
| 11:57 | 10 | THE WITNESS:  Yes. |
| 11:57 | 11 | BY MS. KELLER: |
| 11:57 | 12 | Q.   And is that the open-mouth sculpt that was used with |
| 11:57 | 13 | the Yasmin and Sasha doll? |
| 11:57 | 14 | A.   Yes.  There is little opening here.  And when you put |
| 11:57 | 15 | make up on it, there's more -- you can see it better. |
| 11:57 | 16 | MS. KELLER:  And, Your Honor, I would move 17732, |
| 11:57 | 17 | pages 1 and 2 into evidence. |
| 11:57 | 18 | THE COURT:  Received. |
| 11:57 | 19 | *(Exhibit No. 17732 received in evidence.)* |
| 11:57 | 20 | *(Document displayed.)* |
| 11:57 | 21 | BY MS. KELLER: |
| 11:57 | 22 | Q.   Is this the open-mouth sculpt that we were talking |
| 11:57 | 23 | about with Yasmin and Sasha? |
| 11:57 | 24 | A.   Yes. |
| 11:57 | 25 | Q.   Why did you want to have different faces sculpted? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 135 of 137   Page ID #:302028
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

135

| | | |
|---|---|---|
| 11:57 | 1 | A.   Because everybody doesn't look the same -- |
| 11:58 | 2 | Q.   So you -- |
| 11:58 | 3 | A.   -- in the real world. |
| 11:58 | 4 | Q.   Okay.  And how many times in the process of developing |
| 11:58 | 5 | the first generation of Bratz dolls did you change these |
| 11:58 | 6 | sculpts? |
| 11:58 | 7 | A.   Many.  Many.  I cannot tell you how many.  Many times. |
| 11:58 | 8 | Q.   Some of these changes were very small, weren't they? |
| 11:58 | 9 | A.   Yes.  But very important.  Small change is very |
| 11:58 | 10 | important.  The kids notice them very -- the kids notice any |
| 11:58 | 11 | small changes. |
| 11:58 | 12 | Q.   And even the so-called final sculpt, when it went to |
| 11:58 | 13 | Hong Kong for production, were changes still made? |
| 11:58 | 14 | A.   Yes. |
| 11:58 | 15 | Q.   To the chin? |
| 11:58 | 16 | A.   To the chin, to the nose, yes. |
| 11:58 | 17 | Q.   Right up until manufacturing time? |
| 11:58 | 18 | A.   Yes. |
| 11:58 | 19 |         MS. KELLER:  Your Honor, would this be a good |
| 11:58 | 20 | place for a break? |
| 11:58 | 21 |         THE COURT:  All right. |
| 11:58 | 22 |         Ladies and gentlemen, you're admonished not to |
| 11:58 | 23 | discuss this matter amongst yourselves nor to form or |
| 11:58 | 24 | express any opinion concerning this case. |
| 11:58 | 25 |         We'll see you at 1:00 o'clock. |

Case 2:04-cv-09049-DOC-RNB   Document 10024   Filed 02/18/11   Page 136 of 137   Page ID #:302029
CV 04-9049 DOC - 2/16/2011 - Day 18, Volume 1 of 3

136

11:58    1             Have a nice recess.

11:59    2              *(Jury recesses at 11:58 a.m.)*

11:59    3             THE COURT:  Sir, you may step down.  Thank you.

11:59    4             And, Counsel, do we need to be in session over the

11:59    5    noon hour?

11:59    6             MR. QUINN:  Not that we know of, Your Honor.

11:59    7             THE COURT:  All right.  Then have a nice lunch.

11:59    8    We'll see you at 1:00 o'clock.

11:59    9              *(Lunch recess held at 11:59 a.m.)*

11:59   10              *(Further proceedings reported by Jane Sutton*

11:59   11        *Rule in Volume II.)*

11:59   12                                -oOo-

11:59   13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

11:59   1                              -oOo-

11:59   2

11:59   3                           CERTIFICATE

11:59   4

11:59   5          I hereby certify that pursuant to Section 753,

11:59   6   Title 28, United States Code, the foregoing is a true and

11:59   7   correct transcript of the stenographically reported

11:59   8   proceedings held in the above-entitled matter and that the

11:59   9   transcript page format is in conformance with the

11:59   10  regulations of the Judicial Conference of the United States.

11:59   11

11:59   12  Date:  February 16, 2011

11:59   13

11:59
11:59
11:59   14
11:59
11:59   15  _____
11:59              DEBBIE GALE, U.S. COURT REPORTER
11:59   16          CSR NO. 9472, RPR

11:59   17

        18

        19

        20

        21

        22

        23

        24

        25