1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5

6    MATTEL, INC., ET AL.,            )
                                      )
7            Plaintiffs,              )
                                      )
8        vs.                          ) No. CV 04-9049-DOC
                                      )    Day 18
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 2 of 3
                                      )
10           Defendants.              )
     _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                Santa Ana, California

18            Wednesday, February 16, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-16 MattelV2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:   JOHN B. QUINN
 5                    MICHAEL T. ZELLER
                      WILLIAM PRICE
 6                    Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:   THOMAS S. MC CONVILLE
12                    Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:   ANNETTE L. HURST
17                    Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21              BY:   JENNIFER L. KELLER
                      Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             KEN KOTARSKI, Mattel Technical Operator

17             MIKE STOVALL, MGA Technical Operator

18             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 4 of 139   Page ID #:302034
CV 04-9049-DOC – 02/16/2011 – Day 18, Vol. 2 of 3

4

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| LARIAN, ISAAC By Ms. Keller | | 6 | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Defendants' No. 497 | | 27 |
| Defendants' No. 505 | | 70 |
| Defendants' No. 507 | | 71 |
| Defendants' No. 509 | | 72 |
| Defendants' No. 4509 | | 21 |
| Defendants' No. 4900 | | 32 |
| Defendants' No. 5511 | | 36 |
| Defendants' No. 9259A | | 114 |
| Defendants' No. 9856 | | 48 |
| Defendants' No. 11146 | | 7 |
| Defendants' No. 11636 | | 24 |
| Defendants' No. 11690 | | 14 |

I N D E X (Continued)

EXHIBITS

| Exhibit | Identification | Evidence |
|---|---|---|
| Defendants' No. 16531 | | 9 |
| Defendants' No. 16925 | | 45 |
| Defendants' No. 17252 | | 74 |
| Defendants' No. 17270 | | 127 |
| Defendants' No. 17272 | | 132 |
| Defendants' Nos. 23511 and 23512 | | 92 |
| Defendants' No. 23512 | | 78 |
| Defendants' No. 29172 | | 138 |
| Defendants' No. 35133 | | 126 |
| Defendants' No. 35135 | | 10 |
| Defendants' No. 35140 | | 16 |
| Defendants' No. 35141 | | 120 |
| Defendants' No. 35142 | | 74 |
| Defendants' No. 35213 | | 76 |
| Defendants' No. 35264 | | 96 |

1          SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 16, 2011

2                     DAY 18, VOLUME 2 OF 3

3                        (1:01 p.m.)

4          THE COURT:  All right.  We are back in session.

5     The jury is present, all counsel, the witness.

6          And Counsel, if you'd like to continue.

7          This is Ms. Keller on behalf of MGA and

8     Mr. Larian.

9          ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED

10                CROSS-EXAMINATION (Continued)

11    BY MS. KELLER:

12    Q    Mr. Larian, when we broke, we were discussing the final

13    sculpt, or it was called the final sculpt, but I think you

14    said the changes were made, even in Hong Kong, to the chin,

15    the nose, et cetera, correct?

16    A    Yes.

17    Q    Now, I'd like to go on to a new area.  I'd like to talk

18    to you about MGA's economics in the fall of 2000 and the

19    early part of 2001, and the risks that you took on Bratz,

20    okay?

21    A    (No audible response.)

22    Q    If we could have Exhibit 11146.

23    A    Okay.

24          MS. KELLER:  And if I can have just a moment.  I

25    forgot to bring my reading glasses up here with me, my key

1    tool.

2    BY MS. KELLER:

3    Q    Do you recognize this as an e-mail from you to Mike

4    Lingg dated December 22nd, 2000?

5    A    Yes.

6           MS. KELLER:  Your Honor, I'd move that 11146 be

7    admitted.

8           THE COURT:  Received.

9           *(Defendants' Exhibit No. 11146 is received in*

10         *evidence.)*

11   BY MS. KELLER:

12   Q    Now, again, would you remind us of whom Mr. Lingg is?

13   A    He was an independent sales rep for Target at the time.

14   Q    I'm sorry?

15   A    At the time.

16   Q    And the top e-mail, December 22nd, 2000, you're writing

17   to Mr. Lingg saying, "Mike, I will authorize 157,000 as long

18   as it is used in 2001 at 5 percent of her purchases for at

19   least four out of our seven TV items below.  Bratz, Jumpin

20   Jenny, Toddler Tabitha, Palm Puppies, Scooter Samantha,

21   Monkey See, Me and My Shadow 2.  I know that this is how

22   Tiger deals with their markdowns at Target and other

23   accounts.  Paul just did the same thing at TRU," T-R-U.

24        "If need be, I want Paul to fly there and work this

25   out, Isaac."

1          Now, that first line, it says, "four out of our seven
2     TV items."  What does TV stand for?
3     A     Product that -- we make a lot of toys, but we only TV
4     advertise certain number of them, and these were the seven
5     that we were planning to TV advertise.
6     Q     And so you are saying that you are authorizing 157,000
7     in markdown dolls conditioned on Target buying four of the
8     seven listed dolls; is that what this says?
9     A     Four of the TV -- TV items.  It says, "I will give you
10    $157,000 to be deducted 5 percent of your purchases if you
11    buy at least four of the seven items, Bratz, Jumpin Jenny,
12    Toddler Tabitha, Palm Puppies, Scooter Samantha, Monkey See,
13    and Me and My Shadow 2."
14    Q     So you are having to offer Target an incentive to buy
15    your toys?
16    A     Yes.
17    Q     And would it be fair to say, then, that at that point,
18    Bratz was certainly not a sure thing?
19    A     That's correct.
20    Q     And in fact, Bratz was just one of the toys listed on
21    this line, right?
22    A     That's correct.
23    Q     If we could see Exhibit 16531.
24          This is Deloitte and Touche financials 2000 versus
25    1999?

1    A    Yes.

2          MS. KELLER:  And your Honor, if it's not already

3    in, I would offer Exhibit 16531.

4          THE COURT:  Received.

5          *(Defendants' Exhibit No. 16531 is received in*

6    *evidence.)*

7    BY MS. KELLER:

8    Q    Look at page -- these are the independent auditor's

9    report of the company, correct?

10   A    Yes.

11   Q    ABC International Traders?

12   A    Yes.  It was the name of the company before we changed

13   to MGA.

14   Q    And let's look at page 3, and we see a $6,464,229 loss

15   in the year 2000?

16   A    Yes.

17   Q    Now, let's go to Exhibit 35135.

18         Is this an e-mail from you to Dave Malacrida dated

19   January 16th, 2001?

20   A    It is.

21   Q    And at the top it says, "We are tight on money and

22   might have to pass.  We'll discuss when I am back."

23         What were you referring to that you would have to pass

24   on because you were so tight on money --

25         MS. KELLER:  I'm sorry, your Honor, I would offer

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 10 of 139   Page ID #:302040
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

10

 1   35135 into evidence, that's this e-mail that we've been

 2   discussing dated January 16th, 2001, from Mr. Larian to Dave

 3   Malacrida.

 4            THE COURT:  Received.

 5            *(Defendants' Exhibit No. 35135 is received in*

 6       *evidence.)*

 7            THE WITNESS:  DSN stands for Discount Store News,

 8   it's a trade publication, and Dave Malacrida was saying that

 9   we should advertise there.  And if you look at the next

10   page, they were offering us a $12,000 for -- for a

11   four-color ad, and I was saying that we have to pass because

12   we don't have a lot of cash.

13   BY MS. KELLER:

14   Q    Let's go to the very bottom e-mail dated January 11th,

15   2001, it says, "From Blanges@DiscountStoreNews.com to D.

16   Malacrida."  That's Dave Malacrida at MGA?

17   A    Right.

18   Q    "Subject, toy fair."  And in this e-mail, DSN Retailing

19   Today is offering MGA a deal on, among other things,

20   advertising for the New York toy fair, right?

21   A    Yes.

22   Q    And they are going to give you a full-page, four-color

23   ad in the toy fair report in the Kmart issue and

24   participation in a panel as well for $12,000 net?

25   A    Yes.

1    Q    And plus a junior ad in both Walmart and Target for

2    23,160, right?

3    A    Yes.

4    Q    Or it says, "Three junior, four-color ads for Walmart,

5    Kmart and Target for 17,160 net"?

6    A    Yes.

7    Q    And that was something that would go to the people at

8    the toy fair who are listed in those publication -- that are

9    named in the -- in the e-mail, right?

10   A    Well, more than them.  It goes to -- DSN is a trade

11   publication that goes to all of the buyers and distributors

12   for toys, and other products, not only toys.

13   Q    So you would have had prominent advertising in this

14   publication that went to all these people at the New York

15   toy fair?

16   A    Yes, or outside of New York toy fair, because some

17   people don't show up at New York toy fair.

18   Q    But you couldn't afford it?

19   A    That's correct.

20   Q    So you couldn't even afford $12,000?

21   A    I just didn't want to spend the money on DSN at that

22   time.  We had -- we had very tight cash.

23   Q    But you still believed in your company?

24   A    Yes, I did.

25   Q    And you still thought that things were going to get

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 12 of 139   Page ID #:302042
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

12

1    better?

2    A    Yes, I did.

3    Q    Now, I'd like to turn to the time in 2001 when the

4    Bratz dolls or character art, rather, would be shown to the

5    trade, okay, the toy trade.

6        Now, you said you went to the Hong Kong toy fair in

7    January of 2001?

8    A    I did.

9    Q    And if we could have Exhibit 911.

10       Is this -- this is the picture of the setup for Bratz

11   for the Hong Kong toy fair?

12   A    It is.

13   Q    And the little dolls that we see in the boxes, those

14   were the ones that you said were -- were kind of cobbled

15   together with velcro and straight pins and hair that was put

16   on with scotch tape and all that?

17   A    Yes.

18   Q    And let's look at -- get a better look at it using page

19   3, 911-00003.

20           MS. KELLER:  Can we get that a little better on

21   the screen?

22   BY MS. KELLER:

23   Q    So because you didn't have dolls to give away, that's

24   what you had?

25   A    Yes, we had these four dolls.

1    Q    And if we could look at Exhibit 4.

2    A    Exhibit --

3    Q    We have the original up here.

4         Were those the so-called big boards and the original

5    character art?

6    A    I believe so, yes.

7    Q    And can you hold those up so the members of the jury

8    can see them.

9         That was part of the --

10   A    Okay.

11   Q    Okay.  All right.  Now, were these Mr. Bryant's

12   drawings with final fashions created later on?

13             MR. PRICE:  Objection.  Compound.  Ambiguous.

14             THE COURT:  Just restate it.

15             MS. KELLER:  Okay.

16   BY MS. KELLER:

17   Q    Were these Mr. Bryant's drawings even though they

18   didn't have final fashions on them?

19   A    Yes.

20             MR. PRICE:  Objection.  That assumes facts not in

21   evidence.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes, yes.

24   BY MS. KELLER:

25   Q    And let's see Exhibit 11690.

```
 1        Do you recognize this as an e-mail from you to Becky
 2   Harris and Julie Hamilton, with cc's to Patrick Williams and
 3   all in marketing on January 9th, 2001?
 4   A    Yes.
 5            MS. KELLER:  Your Honor, I move 11690 into
 6   evidence.
 7            THE COURT:  Received.
 8            (Defendants' Exhibit No. 11690 is received in
 9        evidence.)
10   BY MS. KELLER:
11   Q    Now, the subject line says "HK reaction so far."
12   A    Yes.
13   Q    Were you at the Hong Kong toy fair when you sent this?
14   A    Yes, I was.
15   Q    And what were you reporting on to these people?
16   A    We had met some customers already, and I was just
17   reporting the reaction I got from the buyers on different
18   products that we have in here.
19   Q    So you discussed a number of products?
20   A    Yes, I did.
21   Q    For example, let's look at number 8, it says, "New KC
22   games excellent"?
23   A    KC is key chain game.
24   Q    Key chain?
25   A    Yes.
```

1    Q    And what was that exactly?

2    A    Those are small LCD key chain games that we were

3    making.

4    Q    How did it -- and it says "excellent," so the buyers

5    seemed to like it?

6    A    Yes.

7    Q    How did it ultimately sell?

8    A    We didn't sell many.

9    Q    Let's look down at number 17.

10   A    Yes.

11   Q    It says, "Music, DJ mixer is the biggest winner.

12   Everybody will buy."

13        What happened to DJ mixer?

14   A    Everybody didn't buy.

15            *(Laughter.)*

16   BY MS. KELLER:

17   Q    Let's look at number 29, "Monkey, everybody loves"?

18   A    Everybody didn't love.

19   Q    You're an optimist.

20   A    Five people loved it.  I still love it.

21            *(Laughter.)*

22   BY MS. KELLER:

23   Q    And 31, it says, "Bratz, huge winner.  Barry, get new

24   packaging to Target planogram right away"?

25   A    Yes.

1    Q    And we know that was a huge winner, ultimately?

2    A    Yes.

3    Q    So you were pretty enthusiastic for a lot of your

4    products on this list?

5    A    I am.

6    Q    I see things, after-product names, like "excellent,"

7    "great," "very good," "great.

8         What role does enthusiasm play in actually selling your

9    products?

10   A    I'm an optimist.  I always see the glass half full.

11   Q    Now, let's look at Exhibit 35140.

12        Do you recognize this as an e-mail from you to Dave

13   Malacrida praising him for his good PR work in the year

14   2000?

15   A    Yes, I do.

16             MS. KELLER:  Your Honor, I would move 35140 into

17   evidence.

18             THE COURT:  Received.

19             *(Defendants' Exhibit No. 35140 is received in*

20        *evidence.)*

21   BY MS. KELLER:

22   Q    So this e-mail from you to Mr. Malacrida says, "You did

23   a fabulous job in PR and getting us out there in 2000"?

24   A    Yes.

25   Q    This is dated January 1st, 2001?

1   A    Yes.

2   Q    "We need to keep the fire going.  Here are the focus:

3   Monkey See Monkey Do."  That's the one that sold five?

4   A    Yes.

5   Q    "Palm Puppies and Palm Kitties, Insectobots, BR3D2,

6   Bratz, Scooter Samantha, Jump Rope Jenny, color 5X card

7   games, Prayer Angles."  Did you mean "Prayer Angels"?

8   A    Prayer Angels, that's what it says.

9   Q    "CBot 3, we also need to send these four awards, Family

10  Fun, Oppenheimer, et cetera."

11       And I think you talked about those awards a little

12  earlier, like the Family Fun Toy of the Year award.

13  A    Yes, and Oppenheimer is another one.

14  Q    So if you win those awards, is that something that's

15  helpful to the company in terms of building the company's

16  name and the brand's name?

17  A    Yes, it is.

18  Q    Now, according to what it looks like in this e-mail, it

19  doesn't look like you were pushing Bratz ahead of all the

20  other products being sold by your company?

21  A    I was not.

22  Q    Why is that?

23  A    Again, fashion doll business is very hard to get into.

24  As a matter of fact, some industry experts were calling me

25  stupid or things like that for trying to get into fashion

1    doll business.  Chris Burn was one of them.

2    Q    Chris who?

3    A    Chris Burn.

4    Q    And who is Chris Burn?

5    A    He is known in the industry --

6         MR. PRICE:  Your Honor, object.  This is hearsay.

7    Irrelevant.

8         THE COURT:  As to who Chris Burns is, overruled.

9         THE WITNESS:  Chris Burn is somebody who is known

10   as the "toy guy."  You might have seen him on TV.  And he

11   critiques about toys.  He's been around for a long time.

12   BY MS. KELLER:

13   Q    So Bratz was not universally predicted to be a big hit?

14   A    No, it was not.

15   Q    Including by a leading toy critic?

16   A    That's correct.

17   Q    Now, I want to talk to you again about packaging.

18        You said that fashion dolls were usually sold in

19   something a little bit like a shoe box?

20   A    Yes.

21   Q    A cardboard box with a little hole for an opening?

22   A    Even before that, it didn't even have the hole for the

23   opening.  It was just a closed box with the picture, picture

24   on the -- on the cardboard, and then when you took it home,

25   you didn't know what you were going to get in there.

1       Then later on, a lot of people opened the little window

2    with a little acetate so you can see a portion of the doll.

3    Q    So what was it --

4    A    That's just a doll, a toy.

5    Q    What was it that you decided needed to be different

6    about yours in terms of how open the package was?

7    A    We made great-looking products, I believe, and my view

8    was, let the consumer see what they are buying.  Let's just

9    open it up, so when they see that on the shelf, they know

10   what they were going to get into -- get when they go home.

11   Q    How many sides of the packages were open so that

12   somebody could look right in and maybe hold it up and

13   examine it?

14   A    On Bratz?

15   Q    Yes.

16   A    From three, five -- five sides.

17   Q    So everything but the back was open?

18   A    Yes.

19   Q    And could we have Exhibit 615.

20        This is an application to the United States Patent and

21   Trademark Office for the package that you were talking

22   about.  And let's just take a look at page 3, 615-3.

23        Is that what we were talking about?

24   A    I'm sorry?

25   Q    Is that what you were talking about?

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

20

1    A    Yes.

2    Q    And it had a little handle on the top so it can be

3    carried?

4    A    Yes, yes.

5    Q    What was your contribution to the invention?

6    A    I wanted to have all sides opened so you could see the

7    product.

8    Q    And did you -- was it your idea to use the acetate all

9    the way around?

10   A    Yes.  Yes, it was.

11   Q    Did you ever claim that you came up with the shape of

12   the packaging?

13   A    No.  And the handle was my idea also.

14   Q    Did MGA also receive some negative feedback from

15   retailers about the trapezoidal shape of this?

16   A    Yes, we did.

17   Q    What was the nature of that?

18   A    The retailers -- if you go to Target or a store, they

19   have the shelf space, and that shelf space is very important

20   for them.

21   Q    I'm sorry, I didn't hear you.

22   A    The shelf -- the shelves, whether it's at Target or

23   Walmart or Toys R Us, every inch of that shelf is very

24   important to them.  And if you put two -- do you have the

25   samples of -- if you put two of the packages for Bratz next

1    to each other, there is an empty space -- if I get the

2    sample, I'll show you -- in the middle, and they didn't want

3    that.  They said that's waste of selling shelf space.

4        See, if you put these two together, this area here, the

5    cavity is opened, and there is no merchandise or product.

6    Q    Did you stick with the packaging anyway?

7    A    Yes, I did.

8    Q    And ultimately was it a success?

9    A    It was a big success.

10   Q    Now, let's look at Exhibit 4509.

11       Do you recognize, just look at the top, an e-mail from

12   you to Rachel Harris dated Friday, January 12, 2001?

13   A    Yes.

14           MS. KELLER:  Your Honor, I move Exhibit 4509 into

15   evidence.

16           THE COURT:  Received.

17           (Defendants' Exhibit No. 4509 is received in

18       evidence.)

19   BY MS. KELLER:

20   Q    Now, if you look at the bottom e-mail, the first one,

21   January 11th, 2001, to Rachel Harris from you, cc Paula

22   Treantafelles, Colleen O'Higgins, it says, "Bratz packaging.

23   Customers love the packaging.  It looks great.  There is

24   only one concern.  When you put them on the shelves next to

25   each other, there is a gap in the middle.  The Kmart buyer

1    suggested that we look at how Mattel has done their package,

2    for modularity purpose only, for Olsen Twins and 2001

3    Skipper (a Barbie friend)?

4         "Please buy these and look at them, but it is important

5    that we keep the edgy-looking package you have done.  No

6    square boxes.  Please let me know."

7    A    Yes.

8    Q    And then the e-mail above that from Rachel Harris to

9    you dated January 11th, says, "We have the Olsen Twins box

10   and a Skipper.  We can use a little less of an angle, but if

11   we do too much, it will loose the uniqueness of the package

12   and become too square.  We will play with it."

13        And then if you look at your response at the top dated

14   January 12th, 2001, you say, "I want to see it when I'm

15   back.  We cannot lose uniqueness."

16        Was that what you were referring to a moment ago when

17   you said that some of the retailers weren't happy with the

18   space it took up?

19   A    Right.

20   Q    Now, in this case, did you -- again, did you stick with

21   the shape of your packaging even though you looked at, as

22   the Kmart buyer had requested, the packaging for Skipper and

23   the other one?

24   A    We did.

25   Q    What did you mean by modularity purpose, here?

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

23

1    A    "Modularity" means, again, if you have -- you don't

2    have square boxes here.  For example, if you look at this

3    and the other box is the same size, and it just fits right

4    there, that because modular.  If there is a gap or one box

5    is shorter than the other one, it is no longer modular.

6    Q    So the bottom line is that even though retailers were

7    pressuring you to change the packaging, you stuck with the

8    way you were doing it?

9    A    I did.

10   Q    Now, did you also struggle with the retail price point

11   a little bit in order to make your dolls competitive with

12   dolls by Mattel and other doll makers?

13   A    What do you mean by that?

14   Q    Well, let's look at Exhibit 11636.

15        Do you recognize this as an e-mail chain between you,

16   Colleen O'Higgins, Jeremy Davis and others about the price

17   point that was proposed, and this is dated January 12th,

18   2001?

19   A    Yes.

20        MS. KELLER:  Your Honor, I would move 11636 into

21   evidence.

22        THE COURT:  Received.

23        (Defendants' Exhibit No. 11636 is received in

24   evidence.)

25

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

24

1    BY MS. KELLER:

2    Q    Now, if you start with the e-mail from Jeremy Davis on

3    the bottom half on which you were copied, it says, "Colleen,

4    I recently discovered that Bratz may have to go to retail

5    with a price point of $20.  I would just like to point out

6    that based on my research of the mini doll and fashion doll

7    categories, this would appear to be a considerably

8    disadvantageous price point for Bratz.

9         "Historical sales data, according to TRSTS, indicates

10   that the $15 price point gives Bratz the greatest

11   opportunity for success.  Please note this excerpt from my

12   review of the fashion doll category."

13        And then in the next paragraph, he points out that the

14   non-Barbie price point seems to have focused in on around

15   $15; do you see that?

16   A    Yes.

17   Q    Now, who was Jeremy Davis?

18   A    He was in our research department.

19   Q    And then if we go one e-mail up, we see Colleen

20   O'Higgins answering him.  And who is she?

21   A    She was our marketing manager.

22   Q    And she says, "Jeremy, thanks" -- "thank you for your

23   research.  I agree with you that 14.99 is the best price

24   point to be at.  We can definitely move more units at that

25   retail.  Unfortunately with the TV ads and development

1    costs, it's unlikely that retailers would be out at that

2    retail initially.  However, we do believe, please correct me

3    if I'm wrong, Isaac, that the retailers will have these out

4    at a sales price of 14.99."

5         Then if we go up and see your answer on January 12th,

6    you say, "Retailers will sell these at 12.99 on ad and 14.99

7    regularly."

8         And so this was -- and if we go to the very last line

9    on page 2 of this exhibit, 11636-2, we see Jeremy Davis had

10   summed up his first January 12th e-mail saying, "I

11   understand if there are issues that may necessitate retail

12   pricing at $20, but all of my research points strongly

13   toward maintaining a retail of 14.99 to achieve sales

14   success in stores."

15        So people at MGA were going back and forth, then, on

16   what retail price to pick, right?

17   A    That's correct.

18   Q    What did you ultimately pick?

19   A    14.99 regular manufactured suggested retail price.

20   Q    So exactly what you were talking about in your top

21   e-mail?

22   A    Yes, for the basic dolls.

23   Q    So as of January 12th, 2001, you still didn't even have

24   the pricing done for sure, right?

25   A    We had not.

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

26

1    Q    Now, after the Hong Kong toy fair on the calendar comes

2    the New York toy fair; is that right?

3    A    Yes.

4    Q    When is that?

5    A    It's in February, usually around Valentine's Day.

6    Q    The one that you just went to?

7    A    Yes.

8    Q    And would you tell us, what is the New York toy fair

9    all about?  Is it the same as Hong Kong only set in New York

10   or is it different?

11   A    It's a little different in -- during the time in 2001,

12   many, many companies had their own private showrooms.  We

13   had ours.  Other competitors had their private showrooms

14   where we show product by appointment only to the buyers, but

15   then there was also another show in what's called Javits

16   Center, which is in New York, where most, not all, but most

17   of the showrooms are opened for people to walk into.

18   Q    And how -- how big is the New York toy fair, how many

19   people attend?

20   A    Oh, at that time the -- the number of people who attend

21   toy fair -- New York toy fair has come down, but at that

22   time, close to 100,000 people.

23   Q    So even bigger than the Hong Kong toy fair?

24   A    Yes, for sure.

25   Q    And the retailers, did you meet with retailers at the

1   New York toy fair that year?

2   A    I did.

3   Q    Let's turn to March 2001.  Did you also attend the

4   Tokyo toy fair?

5   A    I don't remember if I was in Tokyo toy fair or not.

6   Q    Let's look at Exhibit 497, which is also known as

7   Exhibit 13520.

8        Is this a document that Victoria O'Connor sent to you

9   and to Paula Treantafelles that is the March 2001 business

10  plan for MGA?

11  A    Yes, it is.

12           MS. KELLER:  Your Honor, I'd move 497 into

13  evidence.

14           THE COURT:  Received.

15           (Defendants' Exhibit No. 497 is received in

16       evidence.)

17  BY MS. KELLER:

18  Q    And this first page shows the cover page from Victoria

19  O'Connor?

20  A    Yes, it does.

21  Q    Now, in March 2001, there was a little bit of buzz

22  around Bratz already, wasn't there?

23  A    Yes.

24  Q    And by "buzz," I mean there were some interest from

25  retailers?

1   A    Yes, we had passed -- we had now just passed New York

2   toy fair.

3   Q    And the people at the New York toy fair liked what they

4   saw?

5   A    Yes, and we had advertising, we had four girls dressed

6   up like Bratz standing in front of the -- in front of the

7   New York toy fair and pass, what you call it, those

8   invitation cards.

9   Q    Now, was Ms. O'Connor drafting the business plan?

10  A    I think it was Lon Ross was doing it, but they were

11  working together as a collaboration.

12  Q    And was the idea to try to attract capital?

13  A    No, it was not.

14  Q    What was the idea of this business plan?

15  A    I wanted us to have a business plan road map to see

16  what we were going to do with this -- with this brand.

17  Q    And when you say "with this brand," you mean with the

18  Bratz brand?

19  A    Yes.

20  Q    Well --

21  A    It's possible that we were also looking for capital,

22  but I don't remember.

23  Q    Was there any concern at all expressed in this business

24  plan about whether MGA actually owned the rights to Bratz?

25  A    I'm sorry?

1   Q    Was there any concern at all expressed in this business

2   plan about whether MGA actually owned the rights to Bratz?

3   A    No, it does not.

4   Q    Was there any -- any concern at all expressed in this

5   plan that there might be a lawsuit that MGA would have to

6   deal with over Bratz?

7   A    No, it does not.

8   Q    If we looked at -- if we look at 497-6, if you could

9   turn to page 6 where it says, "Market environment."

10       And this says, "The fashion doll marketplace has been

11  stagnant for 30 years.  We are now poised to introduce a

12  fashion doll that Mattel does not understand.  Barbie's

13  target demographic is girls four to six years old.

14       "In August 2000, Mattel introduced an electronic mini

15  doll line, Diva Starz.  In 2000, Diva Starz sold over

16  21 million MPD, TSRTS, at an average selling price of 27.37

17  per doll.  Diva Starz target demographic is girls five to

18  seven years old.

19       "ABC's Bratz combine the classic play pattern of Barbie

20  and the extreme, contemporary play of Diva Starz.  It is in

21  this offering, ABC can create a new category.  ABC's core

22  target market is girls 7 to 11 years old.  Bratz creates a

23  niche that appeals to girls that Barbie does not understand

24  and Diva Starz simply does not appeal to."

25       So this business plan discusses a new category for

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

30

1    older girls who no longer play with Barbie, true?

2    A    Yes.

3    Q    And that was a result of research that you had done?

4    A    It was based on our instinct looking at the market, a

5    lot of things.

6    Q    Now, we saw that the first focus group was -- we saw

7    earlier today in the morning, that the first focus group was

8    March 27th, 2001?

9    A    That's correct.

10   Q    And the product was not finalized until after you got

11   the results of that focus group, right?

12            MR. PRICE:  Objection.  Leading.  Ambiguous.

13            MS. KELLER:  I'll rephrase.

14   BY MS. KELLER:

15   Q    What was the purpose of the focus group?

16   A    To find out if these products are going to be

17   acceptable to girls and their mothers, are they going to buy

18   them, are they not going to buy them, what are the strength

19   of the toy, what's the weaknesses against -- compared to

20   products which were already in the market.

21   Q    And once you find out what the weaknesses are, what do

22   you do, if anything, before you produce a final version?

23   A    You tweak the product, marketing, packaging,

24   commercial.

25   Q    Is that what you did?

1    A    I don't remember that far back, all the things I did.

2    Q    Well, you know the product was finalized and

3    manufactured when?

4    A    May 2001.

5    Q    And in June 2001, there was a New York licensing fair?

6    A    Licensing show.

7    Q    Licensing show?

8    A    Yes.

9    Q    Did you attend that?

10   A    I did.

11   Q    And what happened there?

12   A    We had a little booth at the end of the -- we had a

13   little booth at the end of the -- at the end of the show.

14   We had made two large statues like Bratz, we had a table and

15   we had, I think, four dolls and some fashion packs.  And it

16   was me and Victoria O'Connor and we were trying to pitch

17   people to get the license for it.  People thought we were

18   crazy.

19   Q    Now, if we could see Exhibit 4900.

20        Do you recognize this document as a June 29th, 2001

21   e-mail that you sent to all the people in your sales

22   department?

23   A    Yes, I did.

24            MS. KELLER:  Your Honor, I move to admit 4900 into

25   evidence.

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 32 of 139   Page ID #:302062
CV 04-9049-DOC – 02/16/2011 – Day 18, Vol. 2 of 3

32

 1              THE COURT:  Received.

 2              (Defendants' Exhibit No. 4900 is received in

 3         evidence.)

 4    BY MS. KELLER:

 5    Q    And this e-mail from you, Friday, June 29th, 2001,

 6    says, "Subject:  Bratz.  MGA has full, free and clear rights

 7    to Bratz trademark in Bratz dolls.  I have been advised that

 8    Mattel is spreading rumors that there are legal issues

 9    regarding Bratz.  This is untrue.  We are and will deliver

10    our full capacity of Bratz products with no delays.  If you

11    or your customers have any questions, please call me

12    directly.  Happy selling."

13         And you sign it "Isaac Larian."

14         What did you base that on, that you had heard -- you

15    had been advised that Mattel was spreading rumors that there

16    were legal issues regarding Bratz?

17              MR. PRICE:  Object.  This calls for hearsay.

18              MS. KELLER:  I'm asking what he based --

19              THE COURT:  It's not offered for the truth.  This

20    will show allegedly why this e-mail is written and what the

21    state of mind is of Mr. Larian at the time, so you are not

22    to regard that for the truth.  You can regard his answer as

23    what he's thinking, therefore, what's he doing and writing

24    at the time.

25              Counsel?

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

33

1   BY MS. KELLER:

2   Q    What did you base your -- what was your statement based

3   on when you said, "I've been advised that Mattel is

4   spreading rumors that there are legal issues regarding

5   Bratz"?

6   A    Our head of service, his name was Paul Warner, had told

7   me that Deborah Terrell, who was a buyer for dolls at Toys R

8   Us, had given him advice that Mattel was telling Toys R Us

9   that Bratz infringes something that Mattel has, and they

10  are -- they are going to sue us.

11          THE COURT:  Remind the jury, once again, that's

12  hearsay upon hearsay upon hearsay almost.  We don't have

13  those people in front of us, but that will attempt to show

14  the state of mind.  Whether that's true or not, we don't

15  know.

16          Okay.

17  BY MS. KELLER:

18  Q    And was that -- hearing that, was that what motivated

19  you to send this e-mail?

20  A    Yes.

21  Q    And where were you physically when you heard those

22  things; do you remember?

23  A    I don't remember.

24  Q    Now, as time passed, did you continue to hear more

25  rumors?

1    A    Yes.

2    Q    And same topic?

3    A    Same topic.

4    Q    Now, I want to move on to another topic for a moment.

5         You recall being asked by counsel about an e-mail that

6    referred to a certain person, Carter Bryant?

7    A    Yes.

8              MS. KELLER:  Could we have Exhibit 7055.

9    BY MS. KELLER:

10   Q    And in October of 2002, you had answered questions from

11   a Natalie Riesen of the French magazine Capital?

12   A    Yes.

13   Q    And if we could look down to the bottom e-mail on

14   page 1, and that's the e-mail we're talking about?

15   A    Yes.

16   Q    And it says, "Born September 2000," right?

17   A    Yes.

18   Q    And then if you go up to -- up farther, you see, "Don't

19   you think we should say Bratz was born in October when a

20   certain person was no longer with their company"; do you see

21   that?

22   A    I do.

23   Q    And then your reply at the top, "Good point.  Thanks"?

24   A    Yes.

25   Q    Now, one question for you is, if you were trying to

1   fool the world about Carter Bryant, why did you tell this

2   magazine person that Bratz was born in September of 2000?

3   A    I was never --

4            MR. PRICE:  Objection.  It's argumentative as

5   phrased.

6            THE COURT:  Just a moment.

7            It's argumentative in its present form.

8   Sustained.

9   BY MS. KELLER:

10  Q    Do you recall being asked by counsel about the fact

11  that your lawyers made a decision to withhold this e-mail;

12  do you remember that?

13  A    Yes, I do.

14  Q    And Mr. Price asked you whether you believe, quote,

15  "you control your lawyers," unquote; do you remember that?

16  A    I do.

17  Q    And do you remember Mr. Price showed you a page from

18  Exhibit 5511 where you said you controlled your lawyers; do

19  you remember that?

20  A    I don't remember Exhibit 5511.

21  Q    Okay.  I apologize.  I should have told you what it

22  was, but let's look at 5511.

23           MS. KELLER:  And, your Honor, 5511 is in evidence,

24  but not all the pages are in evidence.  I would ask that

25  5511, pages 1 through 5, all be received into evidence.

1          THE COURT:  Received.

2          MS. KELLER:  The entire e-mail chain.

3          THE COURT:  Received.

4          *(Defendants' Exhibit No. 5511 is received in*

5     *evidence.)*

6   BY MS. KELLER:

7   Q    Now, this was an e-mail chain with your brother, wasn't

8   it?

9   A    I somewhat remember it was a family, yes.

10  Q    Well, let's look at page 2.  And what you were shown

11  was the second e-mail on the page where it's dated

12  March 31st, that's to your brother, and there are copies to

13  your sister, brother-in-law, and I don't know who Albert

14  Talassazan is?

15  A    Another brother-in-law.

16  Q    Another brother?

17  A    Brother-in-law.

18  Q    And it says, "Fred, you and I control our lawyers and

19  not the other way around.  Please, if you are sincere to

20  resolve this once and for all, then tell your lawyers, as I

21  did, to accept what I propose, mutual release of all

22  evidence and documents to the other side, getting a mutually

23  accepted by your and my attorney of a professional retired

24  judge to decide the matter.  This proposal is fair.  If you

25  don't think it is, then tell me which part is not.  This

1   does not need to wait until Don is back from vacation."

2       Don was your brother's lawyer?

3   A   Yes.

4   Q   "I am sure Don has access to phone, e-mail and fax and

5   can execute on your direct instructions.  Copy to mom and

6   Angela."

7   A   Yes.

8   Q   Now, when you said you and I control our lawyers, you

9   weren't saying that you make legal decisions for all of your

10  lawyers, were you?

11  A   No.  If you look at the subject matter of this e-mail,

12  it says, "Releasing evidence."  I just didn't want to have

13  this dispute with my baby brother, and he was wrong.  At the

14  end, he did apologize, and I said, okay, let's show all the

15  documents.  You have a whole bunch of evidence.  We have a

16  whole bunch of evidence.  Let's just go ahead and release it

17  to the other side, and let's get a retired judge to look at

18  it and decide who's right and who's wrong.

19      And he was saying that Don Howers (phonetic), who was

20  his lawyer, was on vacation and couldn't respond.  And I was

21  telling him that he has a fax, et cetera, and you can't --

22  by controlling him, you can tell him, you can tell Don,

23  please release this to the other side.

24  Q   Okay.  So you were saying, I'll give you everything I

25  have, you give me everything you have, and we'll have a

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 38 of 139   Page ID #:302068
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

38

1    retired judge decide it, right?

2    A    Yes.

3    Q    Because you felt if all the facts came out, your

4    brother would dismiss the suit?

5    A    And he did.

6    Q    Now, let's look at the fifth page of this that you were

7    not previously shown, dated March 25th, 2004.

8    A    What's the Bates number, sorry?

9    Q    It's 5511-00005.

10   A    Okay.

11   Q    From Fred Larian to you dated Thursday, March 25th,

12   2004.

13   A    Yes.

14   Q    And it says, "Dear Isaac, when I saw you at the

15   hospital, you asked me, if I release all of the evidence and

16   it proves you have not been cheated, will you apologize to

17   me in front of everybody.  My answer is an obvious and

18   indefinite yes, so please go ahead and release all of the

19   evidence that I have previously requested.  Thank you,

20   Farhad."

21        Now, the bottom line is, this was not a document about

22   whether you control your lawyers or your lawyers control you

23   in general, right?

24             MR. PRICE:  Objection.  Leading.

25             THE COURT:  Overruled.

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

39

1           THE WITNESS:  Absolutely not.  I don't control my

2    lawyers.

3    BY MS. KELLER:

4    Q    It was just you telling your brother, this is between

5    us, you can decide what you want to do?

6    A    Exactly.  It's family.  Let's not bring the lawyers in

7    the middle.

8    Q    Did it have anything whatsoever to do with whether you

9    assert attorney-client privilege on -- on a document in this

10   case?

11   A    Absolutely had not.

12   Q    You were asked a lot of questions by Mr. Price about

13   that -- that privilege issue, okay.

14        Who makes the decision on whether to release a document

15   or not, you or the lawyers?

16   A    The lawyers make the decision.

17   Q    Were you the one who decided to withhold or produce

18   this e-mail or was your former law firm, Skadden Arps?

19   A    I was not told by anybody to withhold any documents.

20   Q    Without revealing what you discussed with Mr. Nolan,

21   your lawyer from that firm, what were the circumstances

22   surrounding the conversation you had with Mr. Nolan about

23   that document?

24   A    I don't know how I can answer that without -- the

25   circumstances was --

 1          MR. PRICE:  Your Honor, I object to being
 2    irrelevant.
 3          MS. KELLER:  It goes to state of mind, your Honor,
 4    and that was made much of in cross-examination.
 5          THE COURT:  Well, Counsel, I --
 6          MS. KELLER:  His state of mind, your Honor, was
 7    specifically inquired.
 8          THE COURT:  I understand what occurred.  I'm just
 9    wondering if we can move on at the present time to another
10    area and discuss this outside the presence of the jury.
11          MS. KELLER:  That's fine.
12          THE COURT:  I am not excluding it.  I just want to
13    be very careful and see what the response would be by Mattel
14    if we get into this area.
15    BY MS. KELLER:
16    Q    Well, let's go back to the e-mail that we were talking
17    about, the so-called certain person e-mail, okay?  And
18    that's Exhibit 7055.
19    A    Yes.
20    Q    Who used the phrase "a certain person," you or Victoria
21    O'Connor?
22    A    Victoria O'Connor.
23    Q    And by this time in October 23rd, 2002, you said you
24    had already heard rumors that Mattel might sue you?
25    A    Yes.

1   Q    And you had -- you had discussed that with people at

2   MGA?

3   A    Yes, we had.

4   Q    And we saw one of the e-mails to that effect, correct?

5   A    Yes.

6   Q    Now, you were asked about this document at a deposition

7   in December of 2009?

8   A    I don't know.  I don't remember.

9   Q    You were asked about it in April of 2010; do you

10  remember that?

11  A    I've been asked about it many times.

12  Q    Well, you know you were asked about it in front of this

13  jury, correct?

14  A    Yes.

15  Q    Now, had there been any agreement by any group of

16  people at MGA to try to hide the fact that Carter Bryant

17  had -- that you had first seen Bratz in September of 2000

18  while Carter Bryant was still working at Mattel, had you

19  tried to hide that?

20  A    Absolutely not.

21  Q    And can you tell me why it was that you gave the

22  September 2000 date to a reporter?

23  A    I'm sorry?

24  Q    Can you tell me why you gave the September 2000 date to

25  a reporter?

1    A    I was just being cute, the product had hit the market

2    in U.S.A. in July, so I was counting nine month back trying

3    to say it's like a baby being born, and coming to that date,

4    September.

5    Q    And in 7 -- Exhibit 7055, page 1, that's what you said,

6    born September 2000, nine month to develop, like a baby?

7    A    Yes.

8    Q    And when Victoria O'Connor used the term "a certain

9    person," looking at that now, do you think that hides the

10   identity of Carter Bryant from anyone?

11   A    It does not.

12   Q    Did you think that then?

13   A    No, never.

14   Q    And did you think that this language would hide the

15   fact that "no longer with their company" referred to Mattel?

16   A    She was referring to Mattel.

17   Q    I know.  Did you think that that language would somehow

18   hide the fact that it referred to Mattel?

19   A    No.

20   Q    Now, if we could see Exhibit 17281.

21        And this was an e-mail from Eric Yip to Eling Poon

22   that's already in evidence?

23   A    Yes.

24   Q    And the subject was, fashion dolls, Bratz, per Ron

25   Stover dated -- this was sent December 14, 2000?

1    A    Yes.

2    Q    And we already talked about the fact that Ron Stover

3    was -- was he the head buyer for Walmart?

4    A    For girls toys.

5    Q    So he was the final decision maker on any major

6    purchase for Walmart girls toys?

7    A    Yes.

8    Q    And who, again, would you remind us, is Prel, P-r-e-l?

9    A    It used to be the buying agent for Walmart in Hong Kong

10   and China.

11   Q    Now, on the first page it says, "Eling, please see

12   attached pictures and photos for the fashion dolls that we

13   are going to present to Ron in January.  In fact, this

14   series of dolls is one of our key items for 2001.  Please

15   note that" these -- "those pictures are preliminary concept

16   drawings and are for your reference only.  The final

17   products may vary when we put these into production.

18   However, we will have mockups, working samples available in

19   Jan toy show."

20        And then it says, "Please keep these in your record,

21   and let me know the appointment schedule once you have an

22   idea.  Thanks."

23        Now, on the second page is a Bratz drawing, right?

24   A    Yes.

25   Q    And on the side, if we could rotate that so that the --

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

44

1     it's portrait.

2          On the bottom, it says, "All materials," and it has a

3     little copyright symbol, "All materials 2000, Carter A.

4     Bryant"?

5     A    It does.

6     Q    And who were you sending this to again?

7     A    Walmart, the world's largest retailer.

8     Q    And -- so you weren't trying to hide Carter Bryant's

9     involvement in creating these drawings from Walmart?

10    A    We were not.

11    Q    Were you trying to hide the fact that you were

12    developing Bratz dolls?

13    A    We were not.

14    Q    Let's look at Exhibit 16925.  And if you look at the

15    first page of this document.  Do you recognize what this

16    document represents?

17    A    This is the New York toy fair schedule.

18    Q    And you attended that toy fair?

19    A    I did.

20          MS. KELLER:  Your Honor, I move 16925 into

21    evidence.

22          THE COURT:  16925 is received.

23          *(Defendants' Exhibit No. 16925 is received in*

24     *evidence.)*

25

1    BY MS. KELLER:

2    Q    So New York toy fair, February 8th, 2001, and now go to

3    page 15, so 16925-015.

4    A    Go ahead.

5    Q    And you see at the top, there is a column that says

6    "customer"?

7    A    Yes.

8    Q    And then there is another column on the far left that

9    says "MGA personnel"?

10   A    Yes.

11   Q    So this is a document that you're -- you produced

12   showing all the different MGA people, who the customer was,

13   the buyer's name, and any comments; is that right?

14   A    Yes.

15   Q    And potential buyer, right?

16   A    Yes.

17   Q    So if you go to 35, MGA personnel, it says "Martin"; do

18   you know who that is?

19   A    Martin Hitch.

20   Q    Who was Martin Hitch?

21   A    He was head of our international sales at the time.

22   Q    And it looks like the time for this appointment is

23   3:00?

24   A    Yes.

25   Q    And who is the customer?

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

46

```
 1   A    Mattel Mexico.

 2   Q    And under comments or buyer -- buyer name, it says,

 3   "Mateo Romano and his boss."  Who was Mateo Romano?

 4   A    Mateo Romano was head of Mattel Mexico, and his boss, I

 5   just don't remember his boss.  Jerry Cleary probably, but I

 6   don't remember his boss.

 7   Q    And the person from MGA, Martin Hitch, was he

 8   responsible for international sales?

 9   A    He was.

10   Q    And what was the purpose of Mr. Hitch inviting Mattel

11   Mexico to a 3:00 meeting?

12   A    To, again, pitch to them to buy Bratz and other

13   products for distribution in Latin America.  We had done

14   that already in January, now again in February.

15   Q    So when you say we had done that in January, you had

16   tried to get them to distribute Bratz in Latin America, in

17   Mexico?

18   A    In January 2000 -- January 4, 2001, we invited Mattel,

19   Mateo Romano, his boss, I think there were a couple of

20   people from Mattel El Segundo also to see the Bratz product

21   as well as other MGA products that we made, for them to

22   consider to distribute in Latin America.

23   Q    And why didn't you distribute it yourself in Latin

24   America?

25   A    We didn't have a distribution, we didn't have
```

1    infrastructure in Latin America.

2    Q    And did Mateo Romano come and meet with Mr. Hitch and

3    look at the Bratz dolls?

4    A    Yes, for the second time in New York.

5    Q    Did Mattel agree to distribute those Bratz dolls for

6    you?

7    A    At the end, they did not.

8    Q    And when you say "at the end," was there some period of

9    time where there were discussions that they were considering

10   it?

11   A    Mateo was very interested about it, and again, during

12   this litigation, I have seen --

13          MR. PRICE:  Objection.  Your Honor, talking about

14   hearsay now.

15          THE COURT:  Sustained.

16          Kathy.

17   BY MS. KELLER:

18   Q    Was Mattel interested in potentially being a

19   distributor of the Bratz dolls in Latin America?

20   A    They were.

21   Q    And if we could see Exhibit 9856.

22          And do you recognize this as an e-mail from Martin

23   Hitch, your international sales head?

24   A    Yes.

25   Q    To Mateo Romano?

1    A    Yes.

2    Q    At Mattel?

3    A    Yes.

4    Q    And this is dated January 16, 2001?

5    A    Yes, it is.

6            MS. KELLER:  Your Honor, move 9856 into evidence.

7            THE COURT:  Received.

8            *(Defendants' Exhibit No. 9856 is received in*

9    *evidence.)*

10   BY MS. KELLER:

11   Q    And this begins, "Dear Mateo, it was great to see you

12   again in Hong Kong.  Thanks for taking the time to visit our

13   showroom.  I believe we have some fantastic products that

14   offer great opportunity in the South American market, and I

15   would very much like to work with Mattel to maximize the

16   potential of our TV advertised lines.  Per our discussions,

17   the following lines were of interest."

18       And you list a bunch of toys, including Bratz and Bratz

19   fashions?

20   A    Yes.

21   Q    And it says, "I have attached November TRSTS data for

22   large dolls and feature plush showing the success of My

23   Dream Baby and Me and My Shadow.  These two products are the

24   cornerstone of our business in 2001 and should be a

25   priority."  He notes at the bottom that he looks forward to

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 49 of 139   Page ID #:302079
CV 04-9049-DOC – 02/16/2011 – Day 18, Vol. 2 of 3

49

1   hearing from you and meeting again at NYTF, and that's

2   New York toy fair?

3   A    Yes, and TRSTS stands for Toy Retail Sales Tracking

4   System.

5   Q    Okay.  So if we can look at Exhibit 9856 --

6        MS. KELLER:  Oh, I'm sorry, that was it.

7   BY MS. KELLER:

8   Q    So it was your understanding, then, that Martin Hitch

9   and Mateo Romano of Mattel had met twice, once at the

10  New York toy fair and once at the Hong Kong toy fair, and

11  talked about the Bratz line there as well, true?

12  A    Yes, this was January after Hong Kong toy fair and

13  February is New York toy fair.

14  Q    Now, I want to also move to a different area.  Did you

15  at some point, when I say "you," I mean MGA, undertake to

16  copyright registration for the Bratz -- original Bratz in

17  Brazil?

18  A    I did.

19  Q    And if we could see Exhibit 1703.

20       Do you recognize this as a September 2nd -- I'm sorry,

21  September 2002 copyright registration in Brazil?

22  A    Yes.

23  Q    And --

24       MS. KELLER:  And your Honor, we have a

25  certified -- an affidavit of translation by a federal court

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

50

```
 1    certified translator that I would ask to have admitted as

 2    1703A, and that's pages 1 through 9.  And I have the

 3    translator's affidavit on the front of the exhibit.

 4              MR. PRICE:  I'm going to object to the relevance

 5    of the Brazil filing.

 6              THE COURT:  I am not sure of the relevance either,

 7    Counsel.

 8              MS. KELLER:  Well, let me ask you some questions,

 9    then.

10    BY MS. KELLER:

11    Q    The Brazil copyright registration that was --

12              THE COURT:  Do we have different standards, the

13    same problem we've gotten into before?

14              MS. KELLER:  No, it's a different issue, your

15    Honor.

16              THE COURT:  I know it's a different issue, but am

17    I going to end up in the same place with different standards

18    in terms of copyright, registration --

19              MS. KELLER:  No, I'm offering it for one purpose,

20    and I'll just ask that question directly.

21    BY MS. KELLER:

22    Q    In the registration dated September 26, 2002, did you

23    repeatedly disclose that Carter H. Bryant was the author of

24    the drawings that you registered?

25    A    Yes, we did.
```

```
 1              MR. PRICE:  I'm going to object.  That's
 2   irrelevant unless this is a public document.
 3              THE COURT:  Yeah, I'm not sure I understand.  I'm
 4   going to sustain the objection.  We'll take that up out of
 5   the presence of the jury.
 6              Ladies and gentlemen, you're to disregard the
 7   comment.  It's stricken.
 8              End of question.
 9   BY MS. KELLER:
10   Q    In 2002, were you trying to hide the fact that Carter
11   Bryant was the author of the drawings?
12   A    We were not.
13   Q    And did you direct your attorneys to keep Carter
14   Bryant's name out of any public filings?
15   A    No, I did not.
16   Q    Did you direct your attorneys that Carter Bryant was
17   not to be listed anywhere as the author of the drawings in
18   any public record in any country?
19   A    No, to the contrary.
20   Q    If we could go to Exhibit 1C --
21              THE WITNESS:  Your Honor?
22              THE COURT:  Do you want to take a break?
23              THE WITNESS:  (No audible response.)
24              THE COURT:  Okay.  You are admonished not to
25   discuss this matter amongst yourselves, nor form or express
```

1   any opinion concerning this case.  We need to take a

2   restroom break.  We will come and get you in about 20

3   minutes.  Thank you.

4            *(The following proceedings is taken outside*

5         *the presence of the jury.)*

6            THE COURT:  All right.  We are back on the record.

7   The jury is no longer present.  The counsel are present.

8            Counsel, if you'd have a seat for just a moment.

9            First, I want to take up the concern that each

10   counsel have in the question that's asked of Mr. Larian

11   about apparently the state of mind that he was in

12   surrounding the time that Mr. Nolan came to talk to him.

13   This is obviously the time of Mr. Larian's father's death.

14   The Court's aware of this from prior in camera proceedings,

15   so there's a complete record concerning Mr. Nolan's

16   testimony in that in camera proceeding.

17            My view is this is designed to do one thing, and

18   that's to invoke sympathy in an effort to show that

19   Mr. Larian is distraught, and I can't see how that's

20   relevant when Mr. Larian's testimony is that his privilege

21   is that -- that it was invoked solely by his attorney.  So

22   let me hear from Ms. Keller.

23            MS. KELLER:  That would have been and was our

24   position.  The problem is that that position was overruled,

25   and Mr. Larian was subjected to a series of questions, and

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 53 of 139   Page ID #:302083
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

53

 1    each time, my objection was overruled and it was repeatedly

 2    held that it went to Mr. Larian's state of mind.

 3             THE COURT:  Uh-huh.

 4             MS. KELLER:  And that state of mind was

 5    actually -- it wasn't just that there was an overruling of

 6    it, the jury was also told, expressly, that Mr. Larian's

 7    state of mind was an issue, so while I --

 8             THE COURT:  Okay.

 9             MS. KELLER:  While I agree that none of that

10    should have been relevant, I think the problem is, we have a

11    jury that's been told essentially that, at least implicitly,

12    that Mr. Larian was up to something nefarious, and the fact

13    that this was mentioned to him by Mr. Nolan at his father's

14    home the day his father died while he was sitting shiva for

15    his father's -- to mourn his father, it may invoke sympathy.

16    I hope it does, but it goes to his state of mind, which was

17    put in issue by opposing counsel and by the ruling of the

18    Court.

19             THE COURT:  Okay.  Previously the Court had, I

20    think, issued a five-page, at least, concern and had

21    indicated that the Court believed it committed error in

22    disclosing to Mattel the September 14th, 2009 in camera

23    submission that contains attorney-client communications.

24             I had received over the evening hours or weekend

25    hours, a series of depositions from Mr. Quinn in which he

 1    believed that that privilege had been waived.

 2            I'd also offered to MGA a series of options, the

 3    statement by Ms. Hurst and Ms. Keller was that this was

 4    error fatal and that there was no cure.  I then proposed to

 5    read an instruction, which I have not read to the jury, but

 6    indicated on Friday that I would, and that is that during

 7    Mr. Larian's direct examination on Tuesday, February 9th,

 8    Mattel inquired into whether Mr. Larian and his attorneys

 9    discussed a particular e-mail.  And although I instructed

10    you at the time to consider the testimony for a limited

11    purpose, my further research has revealed that I should not

12    have allowed that line of questioning for any purpose.

13            Much like in the context of the doctor-patient

14    relationship, communications with our attorneys are private,

15    protected by the attorney-client privilege, and we do not

16    have to share those communications.

17            I should have not ordered Mr. Larian to respond to

18    these questions.  You may not consider the questions and

19    answers about Mr. Larian's conversations with his attorneys.

20    MGA has declined, of course, or apparently to have the Court

21    read that.

22            Having done so, I've decided over the weekend that

23    it would be inappropriate for me to do that sua sponte.

24    Even though I'm concerned, my view is that without the

25    consent of MGA, the Court's further compounding, if this is

 1    error, it's error, and I don't choose to try to unring the

 2    bell by red lighting or bright lighting this issue.

 3            Last evening, I had indicated to Mr. McConville

 4    after lead counsel had left and Mr. Quinn that my

 5    inclination was not to read this because I thought a sua

 6    sponte reading would cause further prejudice, and I'd let

 7    the Circuit decide if this was error, and if so, whether it

 8    was harmless error or egregious error on this Court's part.

 9            In addition, Mr. Quinn has argued that this was

10    waived and certainly waived for these proceedings, and so

11    I've decided not to read it and leave the record simply as

12    it is.

13            If you are going to get into this area, it's going

14    to open a lot of issues, Ms. Keller, and I'm going to simply

15    counsel you.

16            Well, you go ahead.

17            MS. KELLER:  I'm waiting to see --

18            THE COURT:  No, I want you to finish your

19    conversation with Mr. McConville, so I'm going to stop

20    because I want to be polite.  You finish your conversation

21    first.

22            MS. KELLER:  No, Your Honor, Mr. McConville was

23    just informing me that Annette Hurst has the portion of the

24    depo where there was what was purported to be a waiver --

25            THE COURT:  I have the portion of the depo.  I

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 56 of 139   Page ID #:302086
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

56

1    don't need Ms. Hurst's help.

2            Now, you finish your conversation.

3            MS. KELLER:  It's finished, your Honor, and I

4    apologize.

5            THE COURT:  You don't have to apologize.  I want

6    you to finish your conversations, but I'm not going to speak

7    until I have your attention.

8            MS. KELLER:  You have my full attention.

9            THE COURT:  All right.  Therefore, I'm going to

10   let the record stand exactly as it is, and I'm going -- I

11   took the recess for only one reason, to pay you the courtesy

12   of forwarning you that if this goes any further, this could

13   potentially be opening the door, and that's your choice.

14           Now, I've been very careful concerning the

15   attorney-client privilege of Mr. Nolan, and I suggest that

16   since you're late to this case, that you take full and full

17   consideration of that.  I am not warning you.  I'm just

18   telling you to read that proceeding.

19           Ms. Hurst, I believe, was here, correct?

20           MS. HURST:  Yes.

21           THE COURT:  Mr. McConville, and all I'm saying is

22   there will be recross and thoroughly think that out.  If you

23   have, then proceed, but proceed at your own risk.

24           Number two, Mr. McConville informed me last

25   evening that after you attempt this rehabilitation, you'd

```
 1    now be asking the Court to read this instruction.  I decline
 2    to do so, and the reason for that is it's tactical.
 3             What it would do is give the jury the impression
 4    after your rehabilitation through now asking the Court to
 5    read the instruction that I was willing to read first thing
 6    today before we got into this rehabilitative effort, that
 7    somehow I'm siding with MGA's perspective and I think that
 8    that's prejudicial, frankly.
 9             The timing of that gives the import to the jury
10    that now after the rehabilitation and your request,
11    apparently, that's going to be forthcoming to read to the
12    jury this curative instruction if the Court's committed
13    error, it makes it look like I'm taking your position, which
14    I decline to do.
15             All right.  The second issue --
16             MS. KELLER:  May I respond before the Court moves
17    on?
18             THE COURT:  Certainly.
19             MS. KELLER:  Your Honor, the problem is that we
20    find ourselves essentially between the devil and the deep.
21    Mr. Larian the other day was asked the introductory
22    controlling your lawyers question, and then was extensively,
23    and I use the term carefully, grilled about his attorney's
24    nondisclosure of the information, and essentially it was
25    clearly -- the point was clearly made to the jury that
```

1    Mr. Larian had directed his attorneys not to disclose it and

2    that games were being played with withholding the e-mail.

3            And Mr. Larian was handcuffed, and we were

4    handcuffed, there was really nothing we could do, and

5    that -- that's the state of the record now, I think.

6            I mean, there -- I thought that trying to

7    rehabilitate Mr. Larian was the only possible thing we could

8    do, and obviously if we could have a curative instruction,

9    too, we did want one, because I do think that this is one of

10   those areas where the damage is serious damage.  It really

11   is, because the aspersions have been cast, not just on

12   Mr. Larian, but on his lawyers.  And so the credibility of

13   his counsel as well as himself has been severely impugned.

14           I thought long and hard about how to try to deal

15   with that.  And I think one of the ways to deal with it was

16   to try to make it clear that it's a lawyer's decision, not

17   his, which the Court, I know, agrees with, it's ultimately

18   the lawyer's decision whether to turn something over.  And I

19   know that the Court has been unhappy with both sides at

20   various points in this litigation because of what the Court

21   has seen as abuses of privilege logs, for example.

22           And this is -- this is a very difficult, very

23   difficult dilemma.  It's not something that I'm doing

24   cavalierly, and I don't want the Court to think that.  We

25   talked about it at length.  I was aware of the Court's

 1    comments.

 2            Mr. McConville and Ms. Hurst and I had talked

 3    about how to try to deal with it and how to try to at least

 4    take some of the bad odor surrounding it away, and that

 5    was -- if I understand what the Court is saying, I mean, if

 6    the Court is saying that -- in so many words, that if I

 7    attempt to rehabilitate Mr. Larian, I'm going to be opening

 8    the door and the whole -- even the in camera proceeding will

 9    be unsealed and given to everybody, then that's another

10    problem for me.

11            THE COURT:  I don't recall saying that.

12            MS. KELLER:  I know you don't, your Honor, but I

13    also appreciate your warning to me --

14            THE COURT:  No, my only warning is instead of

15    proceeding, a recess was in order.  In other words, I'm

16    trying to get that to the recess so that you can talk that

17    out as a team, and that's why I've stopped.  I'm not being

18    impolite to you.  If you want to have a conversation with

19    Mr. Hurst -- or Ms. Hurst and Mr. McConville, I welcome you

20    in doing that.  I'm just not going to talk over the top of a

21    conversation.

22            The second thing is, I think it was very unwise to

23    make that snap decision because I don't know where this

24    takes.  Mattel is going to be very aggressive coming back

25    and continue to assert that this privilege has, in fact,

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 60 of 139   Page ID #:302090
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

60

1    been waived.

2           Mattel in the long run may be right about that.  I

3    made a different determination, and I thought that this

4    Court was in error, I took five pages to sort that out.  I

5    tried to admit my error to counsel, or what I thought that

6    was.  I'm going to stand on that.

7           But what I'm not going to do is having offered a

8    curative instruction and be told by Ms. Hurst that that's

9    fatal, in other words, that the Court is helpless to do

10   anything unless I act sua sponte, is now to move in after

11   reflection and heighten that by reading a sua sponte

12   instruction that I had informed you on Friday I was going to

13   read without your consent.  And I'll simply rest on the

14   record because I think it's a very close call, quite

15   frankly, and maybe Mattel is going to prevail on the

16   depositional transcript.

17          So I was being cautious with the attorney-client

18   privilege, was happy to strike it.  I'm not now.  Because

19   now I'm realizing that this is a difficult position for you,

20   but having called that to the attention of the Circuit, I'm

21   not about to now bright light or red light that issue

22   without your consent, and I'm not going to do that now in a

23   tactical position where you're now curing it and then

24   apparently about to jump up and ask the Court in front of

25   the jury or at side bar to now read the instruction.  You

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 61 of 139   Page ID #:302091
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

61

1   had that offer.  You've declined it.  You believe it's

2   fatal.  So be it.  If the Circuit feels that way, then we'll

3   try it.

4           Now, as far as rehabilitating, I haven't precluded

5   you.  If you listen very carefully to what I said, your

6   choice.  All I've done is said, Counsel, we ought to take

7   that up at the recess outside the presence of the jury.

8   We've done that.

9           MS. KELLER:  Your Honor, here's the problem that I

10  have in addition to the problems that we've discussed so

11  far.

12          I didn't keep count, but the number of times that

13  Mr. Larian's state of mind was invoked as a rationale for

14  permitting that to be gone into was -- was --

15          THE COURT:  Counsel, you're welcome to go there.

16  I am not precluding you.

17          MS. KELLER:  I understand that the Court is not

18  precluding me, and I'm trying to walk a very fine line, I

19  really am.  I'm not trying -- as I said, this is a really

20  difficult issue for all of us, and I know it is for the

21  Court, and I greatly appreciate the Court's reconsidering

22  and making the determination that it did, and I know very

23  few judges who do that, but by the same token, I'm trying to

24  figure out how can -- how can I get across to this jury that

25  this wasn't Mr. Larian's fault, that it wasn't a cold,

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 62 of 139   Page ID #:302092
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

62

1    calculated decision to hide a document that he made.

2          THE COURT:  I thought the curative instruction

3    would be helpful on that regard, but I've been told that

4    that's fatal.  I'll rest on that record.

5          MS. KELLER:  Well, obviously, your Honor, at this

6    point we can use all the help we can get ameliorating the

7    damage, and I would be grateful for the curative

8    instruction.

9          And your Honor, in light of everything that we've

10   discussed, there was only one final thing I was going to ask

11   Mr. Larian, and I don't think it opens any doors.  And what

12   I was going to ask him is, you provided all these documents,

13   including this one, to your prior counsel.  Your prior

14   counsel made a determination not to turn it over and invoke

15   privilege.  You provided the documents to your new counsel,

16   Orrick Herrington.  Orrick Herrington made a different

17   determination and turned the documents over, and that's why

18   the documents are now before the Court.  In both cases was

19   that the decision of your lawyers?

20         THE COURT:  Counsel, I'm not precluding you from

21   this area, and I'm not going to give you any further

22   guidance.  I made the offer on Friday concerning a curative

23   instruction, it wasn't accepted, I was told it was fatal,

24   that's the position the Court was left in.

25         I spent, I think, Saturday and Sunday with

 1    counsel, that was apparently their position.  Last evening

 2    after primary counsel had left, I had a discussion with

 3    Mr. Quinn, Mr. McConville, realized, you know, that we

 4    hadn't finished that discussion yesterday amongst our many

 5    other discussions, and I think I was given the depositional

 6    testimony on Saturday sometime in the afternoon by

 7    Mr. Quinn.

 8             MS. KELLER:  Your Honor, in light of all that, I

 9    would just ask that the Court give the curative instruction

10    and not -- and I will not ask any more questions in this

11    area, and I will move on.

12             THE COURT:  I'm not going to at this time.  I'm

13    going to go back, and I think that there's another round of

14    examination on cross -- or I'm sorry, on redirect and

15    recross.  I'm going to look at that whole issue again.

16             I've gone back and forth with this issue a number

17    of times and tried to do some reflection.  I'm going to look

18    at the deposition transcript again.  You'll have another

19    opportunity.

20             The only thing I tried to do, quite frankly, was

21    gain a little bit of time just to have this discussion with

22    you.  I didn't want Mattel then in the position saying that

23    the door was opened, that your attempt to cure was a further

24    exacerbation, because from their standpoint, they think that

25    the Court is wrong.  And you are certainly welcome to go

 1    there.

 2            I just suggested that we needed a recess, and I'll

 3    do a little bit more reflection on it, but I am not going to

 4    make a final ruling.  You've got a five-page ruling already.

 5    I tried to make that a part of the transcript.  The Circuit

 6    has that, and I'll just leave the record as it is, I think.

 7            The real question is going to be whether Mattel is

 8    going to be capable of arguing that in the future in light

 9    of the Court's ruling.  And the real question is if you want

10    to take that curative position right now in front of the

11    jury, your choice.  Do I choose to read that sua sponte

12    instruction at the present time?  No.  I've been told it was

13    fatal.  Now I think it has the potentiality of being

14    tactical, I accept your words, but that decision could have

15    been made this morning.  Will I read it later, I'm not

16    certain.  Possibly so.

17            MS. KELLER:  Your Honor, the problem is I think if

18    the Court reads it later, the force is going to be

19    completely lost on this jury.  They still remember this from

20    last week.  This was explored at length, and I think that if

21    I understand everything the Court has said and I understand

22    the Court's been in a difficult position too, but I really

23    feel like right now -- I understand the Court says I have a

24    choice, but I feel like the choice is frankly between the

25    frying pan and the fire, and I would ask at this point, I

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 65 of 139   Page ID #:302095
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

65

 1    will not go into it anymore and I would ask the Court to

 2    give the curative instruction, not sua sponte but at the

 3    request of MGA, and then I will move on.

 4            THE COURT:  Okay.  Thank you.  Concerning the

 5    record will stand as it is.  I am declined to do that at the

 6    present time.  I may do that later, Counsel, but not at this

 7    tactical moment.  I was going to do it this morning, but I'm

 8    not certain I'm willing to do it now.

 9            Concerning 4509, there is an e-mail of

10    January 11th, 2009, and my question is, what's going to

11    happen on redirect examination concerning questioning about

12    the Skipper doll and the Olsen twin box?  There is going to

13    be a claim by Mattel that this has opened the door, and

14    there is going to be a claim by MGA that somehow this has

15    breached their agreement that they can present their case

16    first, so before we get into that, Mr. Price, I want to have

17    a discussion with you out of the presence of the jury and

18    MGA.

19            Now, I'm going to get the jury in five minutes.

20    Counsel.  Thank you very much.

21            (Recess.)

22            (The following proceedings is taken outside

23        the presence of the jury.)

24            THE COURT:  All right.  We're back on the record.

25            In addition to the comments by Ms. Keller, this

1   Court doesn't find that MGA's, quote unquote, in the box

2   that Ms. Keller had argued to this Court.

3          MGA and Mr. Larian can waive the privilege at any

4   time and put Mr. Nolan on the witness stand, and although

5   Ms. Keller was not a part of the case during those in camera

6   proceedings, in fact, this Court found at the hearing that

7   Mr. Nolan's testimony was not crime fraud and made that

8   conclusion, so MGA now controls its own fate.  The Court

9   declines the curative instruction at least at this time.  I

10  might give it at the end of the testimony, but I'll leave

11  that to Ms. Hurst, now, after her statements, and

12  Ms. Keller.

13         Get the jury.

14         MS. KELLER:  Your Honor, there is one other

15  matter, if we -- the issue that I had asked Mr. Larian about

16  the disclosure of Mr. Carter Bryant's name in 2002 and

17  Brazilian copyright registration.  Those are public records,

18  and all I -- I didn't intend to go into any copyright law at

19  all, just to ask him whether he repeatedly disclosed Carter

20  Bryant's name in that filing, that was all.

21         THE COURT:  Now we get into the same problems.  I

22  don't have enough background to know how open and notorious

23  Brazil is.  I don't know the standard.  That hasn't been

24  presented to me outside the presence of the jury.

25         I'm a little hesitant to go there at the present

1   time without having any knowledge, and right now, I'm going

2   to go back in session, and you can be heard this evening,

3   and I assume Mr. Larian will be subject to recross at some

4   point, so we will have a hearing this evening so I have a

5   little greater wisdom about what the standards are.

6           Number two, I don't know that this open and

7   notoriousness that you claim is especially relevant

8   concerning Brazil.  I just don't know about the claim

9   that -- or Mattel should have been put on notice about this

10  or the world would down in Brazil, I don't know, so I'm

11  going to hear you this evening.

12          MS. KELLER:  I understand.

13          THE COURT:  Now, get the jury.

14          *(The following proceedings is taken in the*

15      *presence of the jury.)*

16          THE COURT:  The jury is present, all counsel are

17  still present.  Thank you for your courtesy.  Counsel, if

18  you'd please be seated.  Mr. Larian.  And Counsel, this is

19  Ms. Keller continuing with her cross-examination.

20          MS. KELLER:  Thank you, your Honor.

21  BY MS. KELLER:

22  Q    Mr. Larian, if you could look at Exhibit 1C already in

23  evidence.  Do you remember this as a Wall Street Journal

24  article that you were asked about previously by Mr. Price?

25  A    Yes.

1    Q    And this is dated July 18th, 2003?

2    A    Yes, it is.

3    Q    And it may be a silly question, but how widely read, in

4    your understanding, is the Wall Street Journal by CEOs,

5    people in the toy industry and related areas?

6    A    I think it's one of the widest read newspapers in the

7    world, worldwide.

8    Q    Now, in this article, did you say that the Bratz were

9    created by Carter Bryant?

10   A    I did.  Not the Bratz, I said the drawings.

11   Q    Okay.  Were you quoted, though, or rather was MGA

12   quoted as saying that Carter Bryant was the designer?

13   A    I don't have the whole article in front of me.

14   Q    If you look at page 1C-0002?

15   A    Yes, he designed.

16   Q    In fact, it says, "Carter Bryant, a former member of

17   the Barbie team"?

18   A    Yes.

19   Q    So at least as to the Wall Street Journal, you were not

20   trying to conceal Carter Bryant as the person who came up

21   with the drawings, correct?

22   A    Yes, correct.

23   Q    Now, drawing your attention to Exhibit 505, this is --

24   I talked with you a little bit about U.S. copyright

25   registration filings?

1    A    Yes.

2    Q    In December of 2003, did you file with the U.S.

3    Copyright Office a registration for the -- and I'm now

4    looking at 505-0001.

5    A    Yes.

6    Q    For the Jade drawing?

7    A    Yes.

8    Q    And the date it was deposited was December 22nd, 2003?

9    A    Deposited with the Copyright Office, yes.

10   Q    And this is before Mattel had sued anybody in this

11   litigation, either Carter Bryant or you or MGA, right?

12   A    That's correct.

13   Q    And if you look at the second page, Exhibit 505-0002,

14   under --

15          MS. KELLER:  Your Honor, I ask that 505 be

16   admitted.

17          THE COURT:  Received.

18          *(Defendants' Exhibit No. 505 is received in*

19      *evidence.)*

20   BY MS. KELLER:

21   Q    Let's look at the second page, and it says that you're

22   registering the Jade drawing; do you see that at the top?

23   A    Yes.

24   Q    And who did you list as the author of the drawing?

25   A    Carter Bryant.

1           MS. KELLER:  Could we highlight that?

2    BY MS. KELLER:

3    Q    And this -- this isn't with a foreign country.  This is

4    in the United States, the U.S. Copyright Office?

5    A    Yes, it is.

6    Q    And if we could have Exhibit 507.

7         Is this -- is 507 another filing for the Copyright

8    Office of the United States, and this one registering the

9    Sasha drawing, December 22nd, 2003?

10   A    Yes, it is.

11   Q    And if you look at the first page -- I'm sorry, let's

12   go to the second page.

13           MS. KELLER:  Your Honor, I ask that 507 be

14   admitted.

15           THE COURT:  Received.

16           *(Defendants' Exhibit No. 507 is received in*

17       *evidence.)*

18   BY MS. KELLER:

19   Q    Who is named as the author of the Sasha drawing?

20   A    Carter Bryant.

21   Q    If we could have Exhibit 509.

22        Is this a copyright registration of the Cloe drawing,

23   December 22nd, 2003?

24   A    Yes.

25           MS. KELLER:  Your Honor, I ask that 509 be

1    admitted.

2              THE COURT:  Received.

3              (Defendants' Exhibit No. 509 is received in

4         evidence.)

5    BY MS. KELLER:

6    Q    Who do you name as the author of the Cloe drawing?

7    A    Carter Bryant.

8    Q    And if we could have Exhibit 511.

9         Is this the copyright registration dated December 22nd,

10   2003, for the Yasmin drawing?

11   A    It is.

12   Q    And who did you list --

13             MS. KELLER:  And your Honor, I'd ask that 511 be

14   moved into evidence.

15             THE COURT:  Received.

16             (Defendants' Exhibit No. 511 is received in

17        evidence.)

18   BY MS. KELLER:

19   Q    And who is listed on page 2 as the author of that

20   drawing?

21   A    Carter Bryant, December 22, 2003.

22   Q    Now, I want to ask you some questions about a letter

23   that you received from Mattel known as a cease and desist

24   letter.  This is Exhibit 17252?

25   A    Yes.

1   Q    And do you recognize this letter as a letter that was

2   sent to you by the law firm of Quinn Emanuel?

3   A    Yes.

4   Q    On behalf of Mattel?

5   A    Yes.

6   Q    And this is dated February 7th, 2002?

7   A    Yes, it is.

8   Q    And it begins, "Dear Mr. Larian, we are counsel to

9   Mattel, Inc.  We are writing to request that MGA

10  Entertainment immediately and permanently cease infringing

11  Mattel's Barbie and Diva Starz trademarks.  Marks are being

12  infringed by the Bratz Yahoo discussion group websites.

13  Enclosed is a copy of the home page from one such site.  The

14  key words designated by MGA include Barbie and Diva Star.

15  Thus when internet users search Yahoo for discussion groups

16  related to Mattel's Barbie and Diva Starz dolls, the Bratz

17  discussion group sites are identified."

18       And it goes on to talk about legal actions that could

19  be taken, right?

20  A    Yes.

21  Q    And if you go to the second page, the last paragraph,

22  it says, "Accordingly, Mattel must request that MGA

23  Entertainment provide written confirmation within one week

24  that all key words on Bratz sites that consist of terms

25  identical or confusingly similar to Mattel marks have been

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 73 of 139   Page ID #:302103
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

73

 1    removed, and that MGA Entertainment will not again use

 2    Mattel's marks in such manner.  Absent such confirmation,

 3    Mattel will not hesitate to pursue its legal remedies.

 4    Please let us hear from you promptly," and it's signed David

 5    Quinto.

 6         Do you see that?

 7    A    Yes.

 8    Q    And when they say "Mattel will not hesitate to pursue

 9    its legal remedies," did you understand that to mean you'd

10    get sued?

11    A    Yes.

12    Q    By Mattel?

13    A    Yes.

14    Q    Now, let's -- and they enclosed a Yahoo website, if we

15    could look at page 3, that was not an MGA website, right?

16    A    It's not.

17    Q    This was some fan who had set this up?

18    A    That's correct.

19    Q    And over whom you didn't have any control, correct?

20    A    That's correct.

21    Q    Now, let's look at Exhibit 35213.

22    A    Two --

23    Q    I'm sorry, 3 --

24              (Attorney discussion held off the record.)

25

1    BY MS. KELLER:

2    Q    If we could look at Exhibit 35142.  We've previously

3    heard that you had a lawyer named Patty Glaser, right?

4    A    Yes.

5            MS. KELLER:  And your Honor, may --

6    BY MS. KELLER:

7    Q    This is a February 11th, 2002, letter from Ms. Glaser

8    responding to Mr. Quinto's letter?

9    A    Yes.

10           MS. KELLER:  Your Honor, I move 35142 into

11   evidence.

12           THE COURT:  Received.

13           *(Defendants' Exhibit No. 35142 is received in*

14       *evidence.)*

15           THE COURT:  I believe I received 17252, but if

16   not, I'll receive it also, the cease and desist letter.

17           *(Defendants' Exhibit No. 17252 is received in*

18       *evidence.)*

19           MS. KELLER:  Thank you, your Honor.

20   BY MS. KELLER:

21   Q    Do you see at the bottom that you are cc'd on this

22   letter?

23   A    Yes.

24   Q    And this letter says, "Dear Mr. Quinto, we represent

25   MGA Entertainment, MGA.  We are responding to your letter

1   February 7th, 2002, sent to Isaac Larian at MGA regarding

2   alleged infringement of Mattel's Barbie and Diva Starz

3   trademarks on the Bratz Yahoo discussion group websites.

4   Please be advised that MGA possesses no ownership or control

5   of the above-referenced websites; therefore, it cannot

6   accommodate your request that it remove key words from those

7   websites.

8        "However, MGA would be pleased to cooperate in Mattel's

9   efforts to end any alleged infringement.  Please contact me

10  or my associate, Caroline Mankey, to discuss any ways in

11  which we can be of assistance on behalf of MGA.  This letter

12  is not a complete statement of our client's position and is

13  written without waiver or prejudice to any of its rights and

14  remedies, all of which are reserved."

15       Now, if we can have Exhibit 35213.

16       Do you recognize this as a fax from Ms. Glaser's law

17  firm to you?

18  A    Yes.

19  Q    And this is attached to -- the fax header says

20  February 14th, '02?

21  A    Yes.

22  Q    And it is a -- accompanies a letter from Mr. Quinto

23  back to Ms. Glaser dated February 13th, 2002; is that right?

24  A    Yes.

25            MS. KELLER:  Your Honor, I move 35213 into

1    evidence.

2          THE COURT:  Received.

3          (Defendants' Exhibit No. 35213 is received in

4    evidence.)

5    BY MS. KELLER:

6    Q    And this letter says, "Dear Ms. Glaser, thank you for

7    your February 11th letter conveying MGA's offer to cooperate

8    in Mattel's efforts to end the infringement.  To that end,

9    we would like to know what information MGA Entertainment has

10   concerning the ownership and operation of the Bratz Yahoo

11   discussion group websites.  Please let us hear from you this

12   week."

13         And you see that line that -- conveying MGA's offer to

14   cooperate in Mattel's efforts to end the infringement; do

15   you see that?

16   A    I'm sorry?

17   Q    The line in this letter --

18   A    Yes, yes, I'm sorry, I see it.

19   Q    And of course, that leaves out Ms. Glaser's statement

20   to Mr. Quinto that you had no control over these websites

21   whatsoever?

22   A    That's correct.

23         MR. PRICE:  Objection, your Honor.  This is

24   argument.

25         THE COURT:  I'll sustain it in its present form.

 1    BY MS. KELLER:

 2    Q    Does this letter omit the things Ms. Glaser put in her

 3    letter that essentially said that you didn't own or control

 4    the website?

 5    A    It does.

 6    Q    And is this letter worded in such a way that it only

 7    refers to MGA's effort to cooperate in Mattel's efforts to

 8    end the infringement?

 9              MR. PRICE:  Objection.  Leading.  Argumentative.

10              THE COURT:  Overruled.

11              You can answer that question, sir.

12              THE WITNESS:  Yes.

13    BY MS. KELLER:

14    Q    And did Ms. Glaser reply to this letter?

15    A    She did not.

16    Q    And the Bratz Yahoo -- and I -- without getting into

17    it, was there a colorful phrase offered by Ms. Glaser in

18    response to this letter?

19              MR. PRICE:  Objection.  Hearsay.  Irrelevant.

20              THE COURT:  Overruled.

21              THE WITNESS:  Yes, it was.

22    BY MS. KELLER:

23    Q    And she then did not respond to it, correct?

24    A    That's correct.

25    Q    Now, Carter Bryant had also been mentioned on that

1    Bratz Yahoo website previously, had he not?

2    A    Yes, he has.

3    Q    And you had learned he was pretty upset about it?

4    A    Yes.

5    Q    And if we could have Exhibit 23512.

6         Is this another e-mail chain beginning with the top

7    e-mail from Victoria O'Connor to several people including

8    you?

9    A    Yes.

10         MS. KELLER:  I'd ask that 23512 be admitted, your

11   Honor.

12         THE COURT:  Received.

13         *(Defendants' Exhibit No. 23512 is received in*

14      *evidence.)*

15   BY MS. KELLER:

16   Q    Let's go to the second page, 23512-2, and the very

17   bottom e-mail, and that's from Bryant598@CS.com; do you

18   recognize that e-mail I.D.?

19   A    I don't recognize the I.D., but at the bottom, it says

20   Carter.

21   Q    So this is an e-mail from Mr. Bryant to Paula

22   Treantafelles; is that right?

23   A    Yes.

24   Q    Subject, David Dees fan club?

25   A    Yes.

1   Q    And it says, "David Dees wrote something to the fan

2   club or something like that and mentioned that I created the

3   Bratz.  I know that by now, everyone knows that I created

4   them, but I do not want my name mentioned to the fan club or

5   anyone else.  I just want to be anonymous.  Please tell him

6   to retract his statements or something.  I was furious when

7   I read his letter, which he forwarded to me, and

8   unfortunately, I've already deleted it.  Thanks, Carter."

9        And this is dated March 10th, 2002?

10  A    Yes.

11  Q    And the next e-mail is from Paula Treantafelles to you

12  and several others, including Carter Bryant?

13  A    Yes.

14  Q    And it says, "Subject, David Dees Bratz Fan Club," and

15  this is dated March 11th, 2002.  "Isaac and Beth, FYI, this

16  is not acceptable.  I would like to call him personally.

17  Please advise."

18       Now, we go up one more, and we see your e-mail,

19  March 11th, 2002, back to Paula, to Carter Bryant, Beth

20  Cahill and Dianna Eisenberg and Dave Malacrida, "Who the

21  hell is David Dees, and why are we telling people this

22  information and about where the dolls came from anyway?  I

23  don't want to see anything said or told or written about

24  Bratz without my written approval ever again.  No one should

25  give an interview either.  Send them all to me."

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 80 of 139   Page ID #:302110
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

80

 1      Now, the next e-mail is from Abe Mirza, and who is Abe

 2   Mirza?

 3   A    He was our CFO and operation at the time.

 4   Q    I take it back.  I skipped an e-mail from you to Abe

 5   Mirza, and others, including Dianna Eisenberg.  And who is

 6   Dianna?

 7   A    Dianna Eisenberg is packaging designer at MGA.

 8   Q    It says, "Dianna, is this guy reporting to you?"  And

 9   who do you mean by "is this guy"?

10   A    David Dees.

11   Q    So he was working at MGA?

12   A    I have no idea who this guy is.  I never met him.

13   Q    But it says, "Dianna, is this guy reporting to you?  I

14   need this taken Carter out of all written material,

15   internet, et cetera, now"; do you see that?

16   A    I do.

17   Q    And was that because you were trying to hide Carter

18   Bryant's identity?

19   A    No, it was not.

20   Q    Why was it?

21   A    Because Carter Bryant wanted to be private, and the

22   second reason is that in the toy industry, you just don't

23   disclose the name of your designers to the public, to the

24   world because your competitors will come and approach them.

25   Q    So you don't put them on websites?

1    A    We don't.

2    Q    And you have to put them in things like copyright

3    registrations, right?

4    A    Yes.

5    Q    But you don't -- I take it you don't assume that --

6    that possibly hundreds of thousands of people look at

7    copyright registrations?

8    A    I don't know how many people look at them.

9    Q    Now, the next e-mail up is from you to -- or from Abe

10   Mirza to you and others saying -- this is March 12th also,

11   "From now on, all communications on the MGA sites are to be

12   approved by me and if needed, approved by Isaac.  Margo,

13   please communicate to everyone that is involved in this

14   process.  Immediately I want this removed from the fan club.

15   Margo, please advise.  Thanks."

16        And then the next e-mail up, Margo back to Abe and you

17   and Dianna Eisenberg, March 14th, 2002.  "I e-mailed Yahoo

18   today requesting the procedure of a club that is in

19   violation of their rules," quote unquote.  "As soon as I get

20   a response with your permission, I will try to get this club

21   shut down.  Margo."

22        Now, the next e-mail is the one from you that I think

23   you were asked about previously, and from you to Margo

24   Chazenz, Abe Mirza, Dianna Eisenberg, March 15th, saying, "I

25   think we need to call this person and nicely ask her to

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 82 of 139   Page ID #:302112
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

82

1   voluntarily shut down her site because of legal liabilities

2   for MGA."

3   A    Yes.

4   Q    And then if we go up one more -- and that wasn't

5   referring to Carter Bryant, that was referring to legal

6   liabilities, right?

7   A    It was referring to the letter -- the threatening

8   letter I had received from Quinn Emanuel saying shut this

9   down within a week or else.

10  Q    So you just did not want this third-party Yahoo Bratz

11  fan club floating around causing you potential legal

12  liability, true?

13  A    Yes.

14  Q    And then the next couple e-mails, there is one

15  saying -- from Margo Chazenz saying, "Would you like for me

16  to make the phone call provided I can get her phone number?

17  Margo."  And then one on top of it from Victoria O'Connor,

18  "Beth has already taken care of this."

19       Were any of those people involved -- any of those

20  people on that e-mail chain that we just saw involved in a

21  plot to conceal Carter Bryant's identity as the designer of

22  the drawings from Mattel?

23  A    There has never been a plot to hide Carter Bryant's

24  involvement with Bratz, never.

25  Q    So then by March 11th, 2002, you knew that Carter

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 83 of 139   Page ID #:302113
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

83

```
 1   Bryant didn't want to be mentioned on the Bratz fan club
 2   site, and had asked for David Dees to retract his
 3   statements, right?
 4   A    Yes.
 5   Q    And you knew that in February, Mattel and Quinn Emanuel
 6   had been threatening legal action even though MGA had
 7   nothing to do with that Bratz Yahoo site, true?
 8          MR. PRICE:  Objection.  This is leading and
 9   argumentative.
10          THE COURT:  It's kind of a summary.
11          It's sustained, Counsel.
12   BY MS. KELLER:
13   Q    Did you take additional efforts to try to make sure
14   there was no mention of Carter Bryant or any Mattel product
15   on any of the sites related to Bratz?
16   A    Yes, Beth -- here Victoria said Beth took care of it,
17   and I think they did.
18   Q    Well, let me -- let's take a look at Exhibit 4507.
19   A    This is it?
20   Q    And I think you were asked earlier about this as well.
21   This is another e-mail chain from you to Victoria O'Connor,
22   Dave Malacrida, Aileen Storer, Paula Treantafelles and
23   various others, and this is exhibit -- this is already in
24   evidence, I believe.
25          And now, I think you were asked about the top e-mail
```

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 84 of 139   Page ID #:302114
CV 04-9049-DOC – 02/16/2011 – Day 18, Vol. 2 of 3

84

 1    where it says, it starts out, "Victoria, Dave, who gave

 2    David Dees info and what he does for us to this Yahoo lady

 3    and why?  This Yahoo lady is giving us too much legal grief

 4    even though she doesn't mean it.  Please do not send any

 5    information or reply to her e-mails unless you have cleared

 6    it with me.

 7        "Julie, Beth, Abe, there must be no mention about

 8    Mattel or any of their properties, Carter, any MGA Bratz

 9    arts, et cetera.  I need to know what is in there."

10        Now, again, was this part of a plot to conceal Carter

11    Bryant's identity from Mattel as the designer of the

12    drawings?

13    A    There has never been a plot to keep Carter Bryant's

14    name away from Bratz, ever.

15    Q    Now, let's go to the bottom of this e-mail, which

16    starts on page 4507-1, and it continues to 4507-4, and this

17    is from David Dees, and it's to Carter Bryant.  And this is

18    the e-mail that begins, "Hi Carter, I thought you would

19    enjoy this letter I wrote to the Bratz world club on Yahoo.

20    It starts off with the club leader introducing it, Dees."

21        And he goes on about the awesome art that they love to

22    look at on the Bratz website and on posters and wherever

23    Bratz girls are.

24        And it says, "He always likes it that MGA communicates

25    with Bratz fans."  And then page 2 says, up toward the top,

1    "Make sure you also check out his portfolio for all the

2    other stuff he does.  You've probably seen lots of it.  He's

3    extremely talented.  Okay.  Enough for me.  I'll post his

4    letter right after this."

5         And the next letter was a fan letter, "Hello, my name

6    is Christian, I'm a girl, and I do a fan list for the Bratz

7    dolls," and they go into how much they like the art.  It's a

8    big part of the fun of Bratz.

9         And then if we go down from there, now we see the

10   letter that had created some flurry of e-mails at MGA, and

11   it begins, "Hi Christian, thanks so much for your letter in

12   the interest of the world of Bratz.  I talked to the art

13   director at MGA and she said that, of course, I'm not the

14   one to be releasing any Bratz art ahead of time, so I will

15   check and see if I can post some of the older airbrush" --

16             THE COURT:  Just a moment, Counsel.  Just a

17   moment.

18             I don't think that the screen is matching what you

19   are reading right now.

20             MS. KELLER:  I'm sorry.  I'm reading --

21             THE COURT:  Just a minute.  Look up at the screen,

22   and maybe I'm incorrect.

23             MS. KELLER:  Yes, it is.

24             THE COURT:  It is?  My apologies.

25             Please continue.

1    BY MS. KELLER:

2    Q    Looking at that first paragraph looking under, "Hi

3    Christian, thanks so much for your letter and interest in

4    the world of Bratz.  I talked to the art director at MGA,

5    and she said that, of course, I'm not the one to be

6    releasing any Bratz art ahead of time.  So I will check and

7    see if I can post some of that older airbrush art for you.

8         "She also said MGA is in the process of building a new

9    website that's going to be packed to the hilt with cool art

10   and all of the new fashions, and believe me, they are wild

11   and colorful, as I just finished about 30 new pieces of art

12   that will amaze you.  I work freelance as an illustrator and

13   have my own studio at home where I paint at my leisure, but

14   if a job comes in, you can be sure that it is usually being

15   rushed.

16        "My immediate live-in family consists of two furry

17   felines, a cross-eyed Siamese mix named Buddy and a female

18   red-striped tabby named Goose."

19             *(Interruption in the proceedings.)*

20             MS. KELLER:  "My immediate live-in family consists

21   of two furry felines, a cross-eyed Siamese mix named Buddy

22   and a female red-striped tabby named Goose.

23             "I'm swamped right now with colorizing lots of the

24   new whacky funk styles and there are new hats and boas and

25   tops that I got a kick out of.  However, I can't take credit

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 87 of 139   Page ID #:302117
CV 04-9049-DOC – 02/16/2011 – Day 18, Vol. 2 of 3

87

1    for creating Bratz dolls or even the first Bratz

2    illustrations.  For that honor, we go to a fellow named

3    Carter Bryant, who is truly a genius of fashion and the sole

4    and only person who first drew those great pouty lips and

5    that extreme look that only our heroes share.  I have never

6    met him personally, but on the phone and e-mails, he is

7    certainly the nicest, sincere fellow ever, and very

8    optimistic and complimentary about my art in his approach.

9              "It felt good early on when he would tell me I was

10   doing a good job bringing them to life.  Can you tell I am a

11   fan of his as well?

12             "Let me tell you about MGA.  It is located in

13   North Hills, California, at the west end of the beautiful

14   San Fernando Valley, where I lived for many years, but now I

15   live in Salt Lake where the Olympics just were.

16             "Anyway, when you walk into the big, high-ceiling

17   lobby, there is a real pretty receptionist with

18   reddish-brown hair and that sometimes wears leopard prints,

19   and if you look to the left, you will see the stairs wind up

20   to the second floor where all the cool stuff happens.  And

21   as you start up them, there is, to the right, a little rock

22   garden with plants, and it always has some of the new toys

23   like robot dogs, Insectobots or baby dolls sitting in there

24   as if they are playing.

25             "As you get to the top of the stairs, that is if

1   you can get permission to come up to this top-secret place,

2   the first thing you notice to your right is two big doors

3   opening into a spacious office with a fancy glass desk

4   usually covered with toys, and sitting there working busily

5   away is a great fellow named Isaac, who is the owner,

6   president and creator of most of the MGA toys.  He always

7   seems to leave his doors open, and when I stop by to pick up

8   a job, I glance in and wave if he happens to look up.

9           "The first big area past there has lots of low,

10  partition cubicles with all the business people who keep the

11  finances working, but then the next rows are the package and

12  advertising designers which is sort of the front line of the

13  creativity.  And as you continue up the steps, there is a

14  silly sign hanging that says 'Design Farm,' and that is the

15  beginning of the art studios.

16          "It always freaks me out to go in there because

17  it's a busy beehive of toy ideas and designers flying around

18  like a tornado.  It is a big open room with black walls and

19  bright lights shining down, spot lighting the work areas,

20  and colorful toys and whacky new ideas and drawings lining

21  the walls.

22          "The middle area has a long work table covered

23  with new toy packages being assembled for the first time,

24  with most of the mocked-up packages being created by cutting

25  and pasting by hand, and only after the idea is shown

1    through many approval lines, it is mass produced.

2         "Sometimes a whole new line of Bratz accessories

3    will be displayed, and I'm amazed at the details in the

4    clothes at such a small scale.  When I pop in, I am usually

5    asked for my opinion about new toys, such as if I think they

6    will be popular or how to promote them, and I am always

7    happy to put in my two cents.  There are about a dozen or so

8    design areas with computers that surround a work table, and

9    at each station is someone with more talent than you can

10   imagine all corralled into one group.  That is why they come

11   up with such great stuff.

12        "There is also a window on one wall, and whenever

13   I look out of it, it is stunning to look down into the

14   warehouse, which is -- which quite a large expanse of big

15   boxes and lifts carrying around.  I guess that is the tour."

16        And then he goes on to say a few more things about

17   coloring of the art.  And he even goes on toward the end of

18   the letter to say, "You can do a Google.com search under

19   Carter Bryant, and you can see some things he has done."

20   And then it says, "Wow, what a cool letter" -- under that it

21   says, "Wow, what a cool letter.  I'd have to say, again,

22   that everyone so far involved with the Bratz company is so

23   cool and responds personally and actually takes some time.

24   As to Carter Bryant, I searched and searched and came up

25   with nothing.  So if anyone finds his website, can you post

1    the URL?  Many thanks."

2            So this is -- this letter was dated March 9th,

3    2002.

4    BY MS. KELLER:

5    Q    Now, after you saw all the information that was being

6    given out about MGA and the exact setup and exactly how the

7    design center was set up and the business and everything

8    else, what was your reaction?

9    A    I was very concerned because he's -- somebody is

10   putting a letter on the internet literally where we are

11   located, where the office is, where is the design farm, what

12   do people do, what do we have coming.  I was concerned about

13   that.

14   Q    So you had at this -- during this same period, then,

15   you had this being posted with a lot of kind of insider

16   information, right?

17   A    Yes.

18   Q    You were receiving the cease and desist and "we are

19   going to sue you" letter from Mattel's lawyers, right?

20   A    Two times, yes.

21   Q    You had the -- Mr. Bryant complaining that he wanted to

22   be anonymous, and he didn't want to be on any websites,

23   right?

24   A    Yes.

25   Q    And so when we go to the top of this 4507, and we wrap

```
 1    all these things together, when you say, "This Yahoo lady is
 2    giving us too much legal grief even though she does not mean
 3    it," you weren't referring to, "Oh, my gosh, Carter Bryant's
 4    identity is out of the bag," right?
 5            MR. PRICE:  Objection.  Argumentative and leading,
 6    the whole string.
 7            THE COURT:  Sustained.
 8    BY MS. KELLER:
 9    Q    When you wrote that, what were you referring to,
10    altogether?
11    A    I was referring to this Yahoo lady fan who really
12    didn't mean any harm, but she was getting all this
13    information and posting it, and the law firm of Quinn
14    Emanuel obviously was -- and Mattel who were monitoring her
15    and writing us these letters, but I was also concerned that
16    this guy, David Dees, is talking about MGA and what do we
17    do, what -- and our company information.  I don't want that
18    in the public, and then Carter Bryant didn't want his name
19    out.
20    Q    Now, let's look at Exhibit 23511, and this is yet
21    another e-mail chain.  This one is from you to Dianna
22    Eisenberg, Abe Mirza and Eve Johnson, March 12th, 2002,
23    regarding David Dees, right?
24    A    Yes, yes.
25    Q    And this contains many of the same e-mails as
```

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

92

1    Exhibit 23512, right?

2    A    Yes.

3    Q    Now, for example, there is a March 11th, 2002 e-mail

4    from Abe Mirza in both 23512 and 23511, right?

5    A    I'm sorry, I'm lost.

6    Q    Okay.  I want you to put 23511 and 23512 side by side.

7    A    I have it.  Yes, go ahead.

8    Q    Now, 23511 contains many of the same e-mails as 23512,

9    right?

10   A    Yes.

11   Q    For example, there is a March 11th, 2002 e-mail from

12   Abe Mirza that's in both 23512 and 23511, right?

13   A    Hold on.

14         MS. KELLER:  And your Honor, I'd ask that they

15   both be admitted.

16         THE COURT:  Received.

17         (Defendants' Exhibit Nos. 23511 and 23512 are

18         received in evidence.)

19         THE WITNESS:  I am not sure if they are --

20         THE COURT:  I think 23512 is received, and 23511

21   is received also.

22         THE WITNESS:  Okay.  Hold on.  Let me see.

23         THE COURT:  4507 was previously received.

24         THE WITNESS:  It looks like they're two different

25   e-mails from Abe Mirza

1    BY MS. KELLER:

2    Q    I'm saying there is a 3/11/02 e-mail from Abe Mirza in

3    both 23512 and 23511, right?

4    A    Yes, two separate ones, correct.

5    Q    But the two e-mails after this in 23511 are different

6    from the ones after 23512, right?

7    A    I'm sorry?

8    Q    Okay.  I'm just going -- I'm going to go on.

9         Let's look at 23511, look at the first e-mail, which

10   is -- let's look at the e-mail at the middle of the page

11   from Diane Eisenberg sent Monday March 11th, 2002.

12   A    Okay.

13   Q    And this says, "Isaac and Abe, please know that I have

14   never hired or worked with David Dees.  I only came into the

15   picture because he was hired by my predecessor and was never

16   paid by MGA because he did not have any PO's."

17        What's a PO?

18   A    Purchase order.

19   Q    Purchase order?

20   A    Purchase order, right.

21   Q    "I came in contact with him on only one occasion.  I

22   found him videotaping the creative department at the end of

23   October last year, and later that day, I found him looking

24   through our kitchen cabinets for no apparent reason."

25        So this was a guy who was not an employee, right?

1    A    He was not.

2    Q    And he was videotaping and looking in your kitchen

3    cabinets?

4    A    Yes.

5    Q    "This incident was brought up about the time that we

6    originally discussed getting a new security system for the

7    company and enforcing sign-in policy for all visitors.

8    That is my only knowledge of David Dees today"; do you see

9    that?

10   A    Yes.

11   Q    And at the top of the e-mail chain, you reply, "This is

12   of great concern to me.  Videotaping our design department?

13   Please set up strict security procedures in place and make

14   sure it is followed.  Too many strangers and temps are

15   roaming around MGA.  FYI, at Mattel, no one is allowed in

16   the company past security desk without a badge and escort.

17        "All visitor bags are checked at reception.  No one is

18   allowed with a PC or a camera in the building.  They need to

19   leave it at reception.  All employees have a card pass

20   badge.  All employees who were fired," et cetera.

21        And at the end you say, "Maybe it's time for MGA to put

22   some of these into effect."

23   A    Yes.

24   Q    So this is another problem with David Dees around this

25   time.  You find out that somebody has been allowed to wonder

1    into your company and videotape, right?

2    A    Yes.

3    Q    You don't know what he was videotaping?

4    A    Where it says "design department."

5    Q    But I mean, what specific products or anything?

6    A    No, I don't know.

7    Q    So were all of these issues that were coming together

8    at around the time that you decided you wanted to start

9    having a little control over who came in and out and who put

10   what on what websites?

11   A    Yes.

12   Q    Now, if you could -- I want to turn to a different

13   topic, and that's the patent application you've been asked

14   about, Exhibit 500.  It's in evidence.

15        Now, let's go to the tenth page, 0500-00010.

16   A    Go where?  Okay.

17   Q    And figure 2 shows a patent drawing?

18   A    Yes.

19        MS. KELLER:  And if we could see Exhibit 302, and

20   more specifically, 302-4, which is in evidence.  And could

21   we have these side by side?

22        THE WITNESS:  Yes.

23   BY MS. KELLER:

24   Q    Can you explain how -- well, let's see.

25   A    Can you make that bigger?

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 96 of 139   Page ID #:302126
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

96

1    Q    Let's put Exhibit 35264 up that I think shows these

2    side by side; do you have that?

3    A    I'm sorry?

4          MS. KELLER:  Your Honor, if we could have

5    Exhibit 35264 admitted, which is -- it does the same thing.

6    It shows these two side by side but on one page.

7          THE COURT:  That will be received, Counsel.

8          (Defendants' Exhibit No. 35264 is received in

9          evidence.)

10   BY MS. KELLER:

11   Q    Now, this is a comparison of that doll drawing that we

12   just saw in Exhibit 302-00004 through Exhibit 500, the

13   patent -- the invention for the patent?

14   A    Yes.

15   Q    Can you explain when and how this shoe invention came

16   about?

17          THE WITNESS:  Your Honor, can I get up and show

18   this?

19          THE COURT:  (No audible response.)

20          THE WITNESS:  Carter Bryant's drawing was just

21   basically a tip on the shoe that we drew in a little cavity

22   in the leg, and because it did not have a tip on it, it

23   would fall off.  So what I did is, first of all, put the tip

24   on the leg of the shoe and created this tip, here, the

25   little cavity inside the shoe.  So when it would go in, it

1    would fit and it would be hard for it to fall off.  That was

2    my invention.

3    BY MS. KELLER:

4    Q    So you are the person who actually came up with the

5    solution?

6    A    I did.

7    Q    And you are a civil engineer by training and education?

8    A    Yes.

9    Q    And had you actually tried to produce any dolls with

10   this foot that we see on the left-hand side of 35264?  In

11   other words, have you tried to produce any dolls with that

12   foot, and then have the foot fall off?

13   A    I don't remember if we did or not.  There could have

14   been some.  I just don't remember.

15   Q    Now, had there been any customer complaints about it?

16   A    We have customer complaints --

17            MR. PRICE:  I object to about -- about what?

18            THE COURT:  About the foot.

19            MS. KELLER:  The shoe falling off the foot

20   slash --

21            MR. PRICE:  It's -- it's ambiguous at which design

22   we're talking about, left or right.

23            MS. KELLER:  I'll make it clear.

24   BY MS. KELLER:

25   Q    The original design on the left.

1   A    I don't remember if it was on the left or on the right,

2   but we had some complaints --

3   Q    I mean, right behind you on the left.

4   A    I can see that.  I just don't remember.

5   Q    Okay.

6   A    We had complaint about the shoes falling off.  I don't

7   know if this was in the area of production of the shoes with

8   this -- with Carter Bryant's design on it or not.  I just

9   don't have a recollection of that.

10   Q    So this patent that you put in, did you ever -- that

11   you put in for, did you ever say to list Carter Bryant as

12   the inventor of this shoe patent?

13   A    I'm sorry?

14   Q    Did you ever tell your lawyer to list Carter Bryant as

15   the inventor of that shoe patent?

16   A    Which shoe patent?

17   Q    The one we just looked at.

18   A    The one that I did?

19   Q    Yes.

20   A    No, I did not.

21        MR. PRICE:  Your Honor, I'm going to object and

22   move to strike.  They've assumed privilege over those

23   communications.

24        MS. KELLER:  I'll withdraw the question, your

25   Honor.

```
 1              THE COURT:  Just a moment.

 2              Are you withdrawing the question?

 3              MS. KELLER:  Yes.

 4              THE COURT:  Okay.

 5              MR. PRICE:  And so we move to strike the answer,

 6   your Honor.

 7              THE COURT:  Strike the answer.  The answer is

 8   stricken.

 9   BY MS. KELLER:

10   Q    Exhibit 11898, which is in evidence, this is a letter

11   from Alan Rose to Carter Bryant asking him to sign the

12   declaration for the patent application; do you see that?

13   A    Yes.

14   Q    And you said Alan Rose was 92 at the time?

15   A    Yes.

16              MR. PRICE:  Objection.  Irrelevant.

17              MS. KELLER:  Your Honor, I'm going to tie it up in

18   a second.

19              THE COURT:  Overruled.

20              THE WITNESS:  Yes, he was.

21   BY MS. KELLER:

22   Q    And this says, "Dear Mr. Bryant, thank you for

23   discussing the above matter with me.  We are enclosing the

24   declaration for your signature.  Please sign and fax back

25   for your background information.  Enclosed is the article
```

1    relied on by the U.S. Patent Office"; do you see all that?

2    A    I do.

3    Q    And so this is referring to that shoe patent we just

4    looked at, right?

5    A    Yes.

6    Q    Look at page 2 --

7            THE COURT:  Well, just a moment.  Just a moment.

8            Are you objecting because of the age; is that the

9    difficulty?

10           MR. PRICE:  Yes.

11           THE COURT:  I'll strike that.

12           Whether you are 92 or 18, if you've passed the

13   bar, that's it; you are a practicing lawyer, okay?

14   BY MS. KELLER:

15   Q    Turn to page 2, please.

16   A    Go ahead.

17   Q    Do you have any idea what the heck those are?

18   A    I have no idea.

19   Q    Do you have any idea why Mr. Rose put those in the

20   letter?

21   A    I have no idea.

22   Q    Did they have anything whatsoever to do with your shoe

23   patent application?

24   A    I don't see any.  I don't see any relevance of that.

25   Q    Do these have anything whatsoever do with Bratz?

1   A    No.

2   Q    Did you ever ask Carter Bryant to sign a declaration

3   for this patent application?

4   A    I did not.

5   Q    And there would have been no problem having you sign

6   the declaration, would there?

7   A    No.  I invented it.  There was no problem.

8   Q    And in fact, since you invented it, you would have

9   actually preferred signing the declaration listing yourself

10  as the inventor and not Carter Bryant, true?

11  A    Yes.

12           MR. PRICE:  Objection.  That's leading.

13           THE COURT:  I'm going to sustain the objection.

14           You can ask the same question, Counsel, in a

15  non-leading fashion.

16  BY MS. KELLER:

17  Q    Was there any reason that you can think of why you

18  wouldn't have wanted to sign the declaration listing

19  yourself as the inventor of this patent?

20           MR. PRICE:  I object.  It assumes facts not in

21  evidence that the declaration says he's the inventor.

22           THE COURT:  Overruled.

23           You can answer the question.

24           THE WITNESS:  Actually, there was no -- I was

25  proud of the invention, even though it was a simple

1    invention.

2    BY MS. KELLER:

3    Q    At the time this was done, did you even know that Alan

4    Rose had sent a declaration to Mr. Bryant for him to sign

5    saying that he was the inventor?

6    A    No, I did not.

7    Q    And Alan Rose was supposed to be working for MGA?

8    A    Yes.

9    Q    And you said he's now deceased?

10   A    He is.

11   Q    Did you first become -- when did you first become aware

12   of this, this patent application that had been made with the

13   name "Carter Bryant" on the declaration as the inventor of

14   the patent?

15             MR. PRICE:  Objection.  That misstates the

16   evidence.  It assumes facts not in evidence.

17             MS. KELLER:  I'm asking when he became aware of

18   it.

19             MR. PRICE:  It assumes --

20             THE COURT:  There is a preamble to it.  I'll

21   sustain it.

22   BY MS. KELLER:

23   Q    Well, let's look at page 1.

24   A    Page 1 of what?

25   Q    Of this -- this exhibit, 11- --

1   A    What exhibit?

2   Q    Okay.  Do you see on page 1, it says, "Dear

3   Mr. Bryant," and then it says, "We are enclosing the

4   declaration for your signature"?

5   A    Yes.

6   Q    Now, let's look at page 11898-0005, and you see a

7   declaration from Carter Bryant saying he's familiar with the

8   doll design?

9   A    Yes.

10  Q    And he says, "I was actively involved with the release

11  of the Bratz dolls of the configuration as set forth in

12  paragraph 3 above, and this release did not occur until the

13  fall of the year 2002"; do you see that, going on to page 6?

14  A    Yes.

15  Q    Did you set Mr. Bryant up to be the so-called "fall

16  guy" to sign this declaration because you didn't want to

17  yourself?

18  A    I did not.

19  Q    Do you have any idea how or why Mr. Bryant was ever

20  asked to sign this declaration by Mr. Rose?

21  A    I have no idea.

22  Q    And by the same token, you don't have any idea how page

23  2 came to be placed in here?

24  A    I have no idea.

25  Q    And page 2, I think we --

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

104

1   A    Page 2 is that drawing with the baby being drawn.  I

2   have no idea what's the connection of that to any patent.

3   Q    Now, let's look -- I want to turn to -- to something

4   else you were asked about.  Do you remember being asked some

5   questions about a communication from Peter Marlow, and that

6   was with respect to the pattern makers, sample makers, the

7   seamstresses sewing the little fashions?

8   A    Yes.

9   Q    And that's Exhibit 13624.

10  A    Go ahead.

11  Q    Now, this was in response to -- Mr. Marlow, you said,

12  was the husband of Veronica Marlow --

13  A    He is.

14  Q    -- and she was a freelancer who had some sample makers

15  and seamstresses working for her?

16  A    I don't know who she had working for her, but Peter

17  Marlow is the husband of Veronica Marlow who -- Veronica

18  Marlow was a freelance vendor to MGA.

19  Q    And she was a person that you had hired to do some

20  fashions for you?

21  A    MGA had hired, yes.

22  Q    But you didn't know who her employees were?

23  A    I had no idea, no.

24       Your Honor?  Sorry, I have to go --

25            THE COURT:  Okay.

```
 1              You are admonished not to discuss this matter

 2      amongst yourselves, nor form or express any opinion

 3      concerning the case.

 4              We'll take a recess, counsel.  Resume in about 15

 5      to 20 minutes.

 6              Thank you.

 7              (Recess.)

 8              (The following proceedings is taken outside

 9         the presence of the jury.)

10              THE COURT:  We are back on the record.

11              All counsel are present, the jury is not present.

12              I was informed as I stepped off the bench that

13      Mr. Larian is not feeling well.

14              Counsel?

15              MS. KELLER:  Yes, your Honor, Mr. Larian appears

16      to have come down with a fever.  It's getting worse.  I

17      actually informed the Court earlier that he had a fever,

18      and it appears to have gotten worse.  He doesn't look very

19      good.

20              He had suggested that he would rather keep going

21      even though he doesn't feel good.  He has taken some Advil.

22      Mr. Price and I talked about it, and Mr. Price, his

23      preference would be to go ahead and recess rather than have

24      Mr. Larian testify for another hour, then take a break, and

25      then perhaps not get to him.  And I'm for days, but I'm
```

```
 1    happy to do either, your Honor, either -- frankly, I

 2    think --

 3              THE COURT:  What's your agreement?  Is there one

 4    or not?

 5              MS. KELLER:  Well, I think it would be better if

 6    Mr. Larian just went home right now.  I don't want to get

 7    everybody else sick, including the jurors, including us,

 8    but --

 9              MR. PRICE:  That was what we discussed, and after

10    we discussed that, Mr. Larian said he could soldier on

11    but --

12              THE COURT:  It's up to you.  Is there an agreement

13    or not?  Are we going forward or not?

14              MS. KELLER:  I think it would be better not to.

15              MR. PRICE:  And we agree to that.

16              THE COURT:  All right.  So do we have any other

17    witnesses that we can call today?

18              MR. PRICE:  We don't have anyone here today.

19              THE COURT:  Well, that means we would recess at

20    this time?

21              MR. PRICE:  Yes.

22              THE COURT:  If that's the agreement by counsel,

23    then that's what we'll do.

24              Now, will you call the jury in, please.

25              Just a moment.  Counsel, we're still on the
```

1    record.  Am I going to inform the jury why?

2              MS. KELLER:  I would prefer that, your Honor.

3    Otherwise, it makes no sense.

4              THE COURT:  Mr. Price, am I going to or not?

5              MR. PRICE:  I would just say we have to recess.

6              MS. KELLER:  Ms. Keller?

7              *(Attorney-client discussion held off the*

8        *record.)*

9              THE COURT:  Just a moment.  Let's take another

10   moment.  Why don't you two discuss that quietly.

11             Apparently, Mr. Larian wants to go on, and counsel

12   needs to discuss this with Mr. Larian.

13             *(Attorney-client discussion held off the*

14       *record.)*

15             MS. KELLER:  Your Honor, I will tell you what

16   Mr. Larian is concerned about.  If the jury is not told the

17   reason he's leaving is because he has a fever, that they are

18   going to think that he has done something wrong, and I can't

19   say that that's an irrational fear.  So if the jury isn't

20   going to be --

21             THE COURT:  I'm not going to take a position on

22   that.  I accept Mr. Larian is sick.  By the same token, I'm

23   not going to make a comment upon that.  It just remains

24   neutral.

25             MS. KELLER:  In that case, he wants to continue,

1    your Honor.

2            THE COURT:  All right.  Take the stand.

3            And get the jury.

4            *(The following proceedings is taken in the*

5        *presence of the jury.)*

6            THE COURT:  All right.  Counsel, if you'd please

7    be seated.  Thank you for your courtesy.

8            Mr. Larian, thank you for your courtesy.

9            All counsel are present, the parties are present,

10   Mr. Larian and the jury.

11           And Ms. Keller, if you'd like to continue with

12   your examination, please.

13           ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED

14                  **CROSS-EXAMINATION (Continued)**

15   BY MS. KELLER:

16   Q    Mr. Larian, before we broke, I was asking you about an

17   e-mail between Peter Marlow and you about Mr. Marlow's

18   negotiations for money on behalf of his wife, who was

19   employing all of these sample makers; do you understand what

20   I'm talking about?

21   A    Yes.

22   Q    And do you have Exhibit 13624 in front of you?

23   A    Yes, I do.

24   Q    And this is dated January 27th, 2003.

25           Now, you were asked about this by Mr. Price, and you

```
 1   were asked about some statements in this e-mail made by
 2   Mr. Marlow; do you recall that?
 3   A    Yes.
 4   Q    And one of the things that he did was he was extolling
 5   the sample makers talking about how skilled they were,
 6   right?
 7   A    I'm sorry, say that again?
 8   Q    He was talking about how skillful the sample makers
 9   were, right?
10   A    Yes.
11            MR. PRICE:  Objection.  Mr. Marlow was.
12   BY MS. KELLER:
13   Q    Mr. Marlow was in this letter?
14   A    Yes.
15   Q    He was saying they had over a hundred plus -- they
16   would put in a hundred-plus-hour weeks for Bratz; do you
17   remember that?  That would be in the last paragraph on page
18   2.
19   A    That's what he -- that's what he says.
20   Q    He says a lot of things in here about how Veronica and
21   her team of three helpers could accomplish in three days
22   what a team that you might hire would take 10 days to do,
23   right?
24   A    That's what he says.
25   Q    And you were asked a lot of questions about the skill
```

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 110 of 139   Page ID #:302140
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

110

1    and the creativity and the excellence of these sample makers

2    based on this letter, right, the letter from Mr. Marlow to

3    you?

4             MR. PRICE:  Objection.  That's argumentative.

5             THE COURT:  Just restate the question, Counsel.

6    BY MS. KELLER:

7    Q    Do you recall being asked a number of questions about

8    how this letter from Mr. Marlow to you praised the sample

9    makers for their skill and their many years of experience

10   and their efficiency?

11   A    Yes.

12   Q    When you got this e-mail from Mr. Marlow, how did you

13   regard it?  What did you think Mr. Marlow was trying to

14   convey to you in this e-mail?

15   A    He was trying to tell us to keep Veronica Marlow to do

16   what she was doing.  He was making a sales pitch, basically,

17   for us to keep his wife as a -- as a contractor for MGA.

18   Q    And at the time, she was being paid hundreds of

19   thousands of dollars a year?

20   A    A lot of money, yes.

21   Q    And so you had -- you had decided that you were going

22   to try to see if you could bring some people in-house?

23   A    I wanted -- my biggest concern was the cost, and I

24   wanted to control the cost.  I thought she was being paid

25   too much money, and we could have done it in-house.

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 111 of 139   Page ID #:302141
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

111

1    Q    So when you read this letter from Mr. Marlow that was

2    referred to, were you thinking of it as a statement of fact?

3    A    No.  Just sales pitch.

4    Q    You didn't have any complaints about the quality of the

5    sample makers' work, did you?

6    A    I had no idea, sample makers.  I had no complaint about

7    Veronica Marlow or her work.  I had a complaint about how

8    much she was charging.

9    Q    Now, if we could go back to Exhibit 4900, this is the

10   June 29th, 2001, e-mail that we talked about a little bit

11   earlier where you were assuring people that MGA had full

12   free and clear rights to the Bratz trademark and Bratz dolls

13   and telling them that you had been advised that Mattel was

14   spreading rumors that there were legal issues regarding

15   Bratz; do you recall that?

16   A    I do.

17   Q    And did you also send some e-mails to Patty Glaser,

18   your attorney, expressing some concern about the possibility

19   of being sued by Mattel?

20   A    Yes.

21   Q    And if we see Exhibit 9855, do you recall being

22   questioned about this earlier by Mr. Price?

23   A    Yes.

24   Q    And this says, "Carter, the inventor, has a roommate,

25   Richard, who witnessed Carter designing and developing the

```
 1   Bratz line at his free time outside Mattel on weekends or

 2   evenings.  Should we get him to do and sign a declaration to

 3   this effect now, just in case"?

 4        Do you remember sending that?

 5   A    Yes.

 6   Q    And this is dated June 29th, 7:44 p.m., right?

 7   A    Yes.

 8   Q    Let's look at the e-mail you wrote Ms. Glaser at

 9   5:58 p.m. on July 29th, 2001, just before this, 9259A; do

10   you recognize that?

11   A    Yes.

12   Q    Was this written a couple hours before this

13   Exhibit 9855?

14   A    It was.

15   Q    The one that Mr. Price showed you?

16   A    Yes.

17        MS. KELLER:  Your Honor, I would move Exhibit 9855

18   into evidence.

19        THE COURT:  Received.

20        MS. KELLER:  I'm sorry, 9259A.

21        THE COURT:  985 -- I'm sorry.

22        MR. PRICE:  And your Honor, we only object to it

23   for the truth of the statements therein.

24        THE COURT:  9825 --

25        MS. KELLER:  9259A.
```

```
 1                THE COURT:  9259A, it's received.

 2                And Counsel, just a moment.  I may make a further

 3     admonition.  Let's see where the testimony takes us.

 4     BY MS. KELLER:

 5     Q    Now, this was earlier the same day to the one that we

 6     were just talking about that Mr. Price showed you, correct?

 7     A    I sent Exhibit 04900 on June 29 at 2:39 p.m., and then

 8     I sent on the same date this letter to Patty Glaser at

 9     4:58 p.m.

10                MS. KELLER:  Your Honor, I would move 9259A into

11     evidence.

12                MR. PRICE:  It's just our request for the

13     limitation, your Honor.

14                THE COURT:  And could I get that out of one of

15     your binders quickly, please?

16                And what's the limitation you'd like, Counsel?

17                I'm sorry.  Just a moment.

18                And that is, what, it goes to his mental state?

19                MR. PRICE:  Yes, the part about the rumors.  We've

20     already dealt with this, that that doesn't come in for the

21     truth, just for his mental state.

22                MS. KELLER:  And it's offered to explain the chain

23     of events, your Honor, including the next e-mail.

24                THE COURT:  Yeah, overruled.

25                THE WITNESS:  I'm sorry.  Go ahead.
```

```
 1              MS. KELLER:  So 9259A is in evidence, your Honor?

 2              THE COURT:  9259A is, but there is one portion,

 3    once again, about the rumors.  That portion technically

 4    could be hearsay.  We don't know if those rumors are, in

 5    effect, truly rumors at that time, whether there are rumors

 6    at that time, but it does go to his state of mind, and why

 7    this letter is going back and forth.

 8              (Defendants' Exhibit No. 9259A is received in

 9         evidence.)

10              THE COURT:  Counsel?

11              THE WITNESS:  This doesn't say "A," by the way.

12    BY MS. KELLER:

13    Q    Hang on a sec.

14         We've handwritten that in because there is a 09259, and

15    this is -- this is one part of it, okay?

16              MS. KELLER:  So if we could display that.

17    BY MS. KELLER:

18    Q    This it's dated June 29th, 2001, and this is to -- it

19    says "Christensen White."  Was that Ms. Glaser's law firm --

20    A    Yes.

21    Q    It says, "Attorney-client privilege.  I just heard a

22    rumor that Mattel is about to take legal action against MGA

23    for Bratz.  I heard this from Deborah Terrell of Toys R Us

24    through Paul Warner, our salesperson.  Bratz is being very

25    successful at retail and a threat to Barbie, and that is
```

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 115 of 139   Page ID #:302145
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

115

1   what getting Mattel nervous" -- "that is what getting Mattel

2   nervous.  FYI, Bratz was brought to MGA by an inventor,

3   Carter Bryant, who at one time worked at Mattel."

4        Now, let me back up a second.

5        Do you remember Victoria O'Connor claiming that you

6   told her to white out "Barbie collectibles" on a fax from

7   Carter Bryant?

8   A    Yes.

9   Q    Did you ever try to conceal from Patty Glaser that

10  Carter Bryant worked at Mattel before he worked for you?

11  A    No.  I mentioned here, Barbie, and Mattel right here in

12  this e-mail.

13           THE COURT:  Just a moment.

14           One thing I want to be clear of, in light of

15  Mr. Price's objection, and that is he's correct.  The

16  portion about rumors, we need to be very careful about.

17  Eventually you're going to decide an issue concerning

18  statute of limitations, and I'll explain that further in the

19  instructions.

20           So this portion concerning rumors and what Mattel

21  did or didn't know or what MGA did or didn't know, you'll

22  find later on, and instructions will become one of the

23  issues you may be called upon to decide.  So that portion is

24  hearsay, and the rest is for the truth of the matter.

25           Counsel?

1   BY MS. KELLER:

2   Q    And this says, "Carter did the development of Bratz

3   outside of Mattel."

4        Now, we've heard you use the phrase "outside Mattel" in

5   e-mails a number of times.  What do you mean by "outside

6   Mattel"?

7   A    Missouri, that's where he was, 1998.  He told us that

8   day one.  He said that again and again here in the previous

9   trial.  His lawyer confirmed that --

10        MR. PRICE:  Objection to about the previous trial,

11   et cetera.  Move to strike.  It's nonresponsive to the

12   question.

13        THE COURT:  Sustained.  It's stricken.

14   BY MS. KELLER:

15   Q    When you say "outside Mattel," what do you mean?

16   A    It means what he had told us before in Missouri in

17   1998, when he was not working for Mattel.

18   Q    And when he was not at his job at Old Navy?

19   A    That's correct.

20        MR. PRICE:  Objection.  That's leading.

21        THE COURT:  Sustained.  Stricken.

22   BY MS. KELLER:

23   Q    And you go on to say, "We made sure of this and got a

24   legal representation of this.  David Rosenbaum wrote the

25   contract.  According to the rumors, Mattel is about to take

1  legal action against MGA, A, claiming that Bratz was

2  developed at Mattel, it did not; B, claiming that Bratz

3  infringes Diva Starz' copyright, and it looks like Diva

4  Starz.  It clearly does not.  Even if Mattel has no

5  intention of suing MGA, by talking about this with the

6  retailers, they're hurting MGA because the mighty Mattel is

7  telling them this, and the retailers are afraid to buy.

8  This is FYI for now."

9       And so if we go back to 9855, you are following up a

10  couple hours later?

11  A    Yes.

12  Q    And telling her that Mr. Bryant had a roommate who had

13  witnessed him designing and developing the Bratz line at his

14  free time outside Mattel on weekends or evenings?

15  A    That's what each has told me, yes.

16  Q    When you talked with -- you said you had talked about

17  this with Richard Irman at a cocktail party?

18  A    It was a birthday party --

19  Q    A birthday party.

20  A    -- in spring of -- spring/summer, sometime in 2001.

21  Q    Do you remember when he talked about on weekends or

22  evenings, do you remember if he said he saw him working on

23  it in L.A., or he saw him working on it in Missouri; do you

24  remember at all?

25  A    No.  I knew that they were together for many years.

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 118 of 139   Page ID #:302148
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

118

1    Q    So you didn't inquire further?

2    A    I did not.

3    Q    Now, if we could go back to Exhibit 18463.

4    A    Okay.

5    Q    Which, I believe, is in evidence.

6         And we look at the last e-mail in the chain at the

7    bottom of 18463-1 from David Rosenbaum to Victoria O'Connor

8    on September 28th 2000.  This says, "I spoke with Carter's

9    lawyer this morning" -- "this a.m. and e-mailed her a copy

10   the draft agreement for his review.  I asked her

11   specifically about the Mattel issue.  She's said she's

12   reviewed the chronology, et cetera.  It goes on.  Satisfied

13   that Carter created this outside the scope of his employment

14   at Mattel, and he says he apparently conceived the project

15   in 1998."

16        So, here, Mr. Rosenbaum is telling you that Mr. Bryant

17   created the drawings outside the scope of his employment at

18   Mattel in 1998; is that correct?

19   A    Yes.

20             MR. PRICE:  Objection.  Leading.

21             THE COURT:  Sustained.

22             MS. KELLER:  It's just preliminary, your Honor.

23   BY MS. KELLER:

24   Q    The statement in this e-mail that Mr. Bryant created

25   the drawings outside the scope of his employment at Mattel,

1   is this what you were referring to when you wrote Patty

2   Glaser in June of 2001 and used the same phrase?

3   A    I did.

4          MR. PRICE:  Objection.  That's leading.

5          THE COURT:  Well, technically it is, Counsel, but

6   I think we can ask what his thoughts are.  I'll sustain the

7   objection.

8   BY MS. KELLER:

9   Q    When you saw that Mr. Rosenbaum wrote "outside Mattel,"

10  what did you think that meant?

11  A    1998 in Missouri, nights and weekends.  He was

12  working -- Carter Bryant told me that he was working at Old

13  Navy during the day.

14  Q    And when you wrote Patty Glaser in June of 2001 and

15  used the phrase that said that Mr. Bryant did the

16  development of Bratz outside Mattel, and that you got a

17  legal representation of this from David Rosenbaum, what were

18  you referring to?

19  A    This is what I was referring to, Exhibit 18463.

20  Q    I want to turn to the topic of when your product went

21  on sale in Spain in July of 2001.  Could we see -- well,

22  what -- when the product was released in Spain, what -- when

23  was that released relative to when it was released other

24  places?

25  A    I think it was released in Spain first.  It was in

1    either June or July 2001.

2    Q    If we can see -- how did it do in Spain?

3    A    We did good.

4    Q    And what do you mean by that?

5    A    It was a hit when it hit Toys R Us in Spain, and we

6    heard about it.

7    Q    They have Toys R Us in Spain?

8    A    They have Toys R Us everywhere, almost.

9    Q    If we could see Exhibit 35141.

10   A    Yes.

11   Q    And is this an e-mail from Paula Treantafelles to

12   Christine Daily and Samuel Wong and Cecilia Kwok with a copy

13   to you?

14   A    It is.

15   Q    And it's entitled "Bratz fall 2002 fashion and doll

16   packs"?

17   A    Yes.

18          MS. KELLER:  Your Honor, I move Exhibit 35141 into

19   evidence.

20          THE COURT:  It's received.

21          *(Defendants' Exhibit No. 35141 is received in*

22      *evidence.)*

23   BY MS. KELLER:

24   Q    Now, so when it says, "Attachment, PDF, Bratz fall '02

25   doll pack doc," "PDF Bratz fall '02 fashion pack doc," what

1    do those refer to?

2    A    It's -- PDF stands for product development form, and

3    basically it's a form that you put in there what is going to

4    be the specs for the product, that this goes to Hong Kong

5    for them to be ready to produce the product.

6    Q    So it goes to the factory, the manufacturer?

7    A    It goes to MGA Hong Kong first, and MGA Hong Kong

8    starts communicating with the factories.

9    Q    And this says, "Please note the above PDFs.  I

10   apologize.  I was certain that I already released them.  In

11   any case, here they are again.  I will follow by end of day

12   with themed 19.99 doll pack."  What does that mean?

13   A    Yes.

14   Q    And what did that mean?

15   A    We had a theme doll -- after the first year, we came up

16   with different themed dolls, like Winter Wonderland, Summer,

17   a lot of different themes, and one of the dolls, she -- as a

18   pack, I told you about the assortment, was going to retail

19   for 19.99.

20   Q    And then the product went on the shelves in the U.S.

21   when?

22   A    Which product?

23   Q    The first generation of dolls, when did they go on the

24   shelves in the United States?

25   A    I think July of 2001.

1    Q    And July, August, are you sure which one?

2    A    I'm not so sure.  July -- I think actually it's -- I

3    take that back.  I think it's in August because that's when

4    the retailers set their fall planogram.

5    Q    Okay.  And when you say that's when the retailers set

6    their fall planogram, what does that mean?

7    A    Retailers have two sets of planograms, one is for

8    spring and the other one is for fall.

9    Q    What's a planogram?

10   A    A planogram is like a simulated store that they have at

11   their headquarters, and they start almost a year in advance

12   and start selecting product and setting it up.  It's like a

13   simulated Walmart or Target or Toys R Us store, and you send

14   all your products that you hope that the retailers would

15   buy, and the buyers go in there and -- and set the product

16   on the shelves, take a look at it, take a look at the

17   costing, pricing, et cetera, then they finalize it.  And

18   when the spring season is over, like, for example, if you go

19   to a Target, you shop at a Target, you would see that

20   usually in June, July they start having big sales and

21   clearances because they want to clear out the spring line,

22   and then in August -- first week of August, they start

23   setting up product that's going to be sold in fall.

24   Q    So they have these stores, you said there are like a --

25   it's like a simulated store?

1    A    Yes.

2    Q    And they would have the shelves set up just like it

3    would be in a real store?

4    A    Not exactly like the same as a store.  It's like a

5    warehouse with all the shelves divided by different --

6    different type of product.  One shelf is for food.  There is

7    a section for toys.  There is a section for electronics,

8    so --

9    Q    Do they all have that?  I mean, does Walmart have one?

10   A    Walmart has one, Target has one, Kmart has one, Toys R

11   Us has one.  They call it different thing called -- Walmart

12   and target -- sorry, Toys R Us calls it their concept lab.

13   Q    So you wanted to get the product on the shelves in time

14   for that fall line?

15   A    No.  You get the product into the planogram -- again,

16   planograms are set up almost a year ahead before consumers

17   sees a product in the store, so --

18   Q    Okay.

19   A    But they have a time line.  If you don't ship your

20   product, the mockups, packaging, et cetera, on time to the

21   retailer, they make the decision, because then they have to

22   move on to the next -- the next season.

23   Q    And so the first generation of dolls, you think, were

24   released in the U.S. in August of 2001?

25   A    That's correct.

1    Q    And if we could see Exhibit 17558, that's Sasha?

2    A    Yes.  So this, for example, was set up at Walmart's

3    planogram in January of 2001.  That's in Hong Kong.  They

4    have planogram rooms also in Hong Kong.  So they made a

5    decision in January of 2001, for example -- I'm just giving

6    you an example that they are going to buy this, and then

7    they give you orders.  We ship in May, and the product

8    comes.  They clear the spring product line and start putting

9    the fall product line, and usually that happens in the first

10   week of August.

11   Q    Okay.  And Exhibit 12286 is Cloe?

12   A    Yes, it is.

13   Q    And Exhibit 17561 is Yasmin?

14   A    Yes, it is.

15   Q    Exhibit 17551 was Jade?

16   A    Yes, it is.

17   Q    And in 2001, there were also fashion packs that came

18   out for the dolls, right?

19   A    Yes, there was.

20        MS. KELLER:  Let's see Exhibit 35133.

21   BY MS. KELLER:

22   Q    Do you recognize this as a photograph of four fashion

23   packs?

24   A    I don't recognize anything yet.

25   Q    Okay.  I'm sorry.

1    A    Yes, they are.

2    Q    You just, a couple minutes ago, said something about

3    January 2001 at the Walmart planogram, but your dolls

4    weren't ready then, were they?

5    A    No.  They set up the planogram with mockups and mockup

6    packaging.  We had those four dolls that I mentioned to you

7    before, that they selected them, so what you do is -- can I

8    have one of the other dolls?

9    Q    You are talking about the ones with scotch tape and --

10   A    We had only four, so we couldn't send it to them.  So

11   what we did was we took one of these packages and built it

12   up with foam, with like paper dolls inside, so they can use

13   to set up planogram.

14   Q    But it had the right size package?

15   A    That's right.  The package was like this, but the --

16   there was no product inside of it.

17   Q    Now, look at Exhibit 35133.

18   A    Yes.

19   Q    And is that a group photograph of the fashion packs

20   we've been talking about?

21   A    Yes, the four fashion packs.

22          MS. KELLER:  Your Honor, I'd ask that

23   Exhibit 35133 be admitted.

24          THE COURT:  Received.

25

```
 1              (Defendants' Exhibit No. 35133 is received in

 2        evidence.)

 3    BY MS. KELLER:

 4    Q    And Exhibit 17804, I think that's already in evidence.

 5    Is that another example of a fashion pack?

 6    A    It doesn't have an exhibit number on it.

 7         Oh, sorry.  Yes, it is.

 8    Q    Now fashion packs and shoe packs were not depicted in

 9    Carter Bryant's portfolio that he presented to you

10    September 1st, 2000, right?

11    A    That is correct.

12    Q    I want to talk to you about the advertising for a

13    little bit.

14         When did you start advertising for these products on

15    television?

16    A    I don't remember the exact date, but fall -- fall of

17    2001.

18    Q    And what's the importance of television advertising for

19    products like these?

20    A    It's very important.  It tells the kids and the parents

21    that there is a product which is in the stores to go --

22    please go and buy.

23    Q    If we can have you take a look at Exhibit 17270.

24         Is this an October 9th, 2001 e-mail from you to Margo

25    Eldridge with a copy to Paula Treantafelles?
```

```
 1    A    Yes, it is.

 2              MS. KELLER:  Your Honor, I ask that 17270 be

 3    admitted.

 4              THE COURT:  Received.

 5              (Defendants' Exhibit No. 17270 is received in

 6        evidence.)

 7    BY MS. KELLER:

 8    Q    And this, at the top, says, "Thanks, Margo.  I had

 9    heard some rumors about Mattel and Bratz.  Please let me

10    know what else you hear.  Let's see how Bratz will really do

11    with the commercial on.  If it gets really hot and we have

12    the money," dollar sign, "we will consider doing a new

13    spring/summer commercial.  Thanks."

14        And below that --

15              MR. PRICE:  Your Honor, I'm going to object to the

16    bottom part of this as being hearsay.

17              THE COURT:  Well, I don't have that in front of

18    me, Counsel.

19              MR. PRICE:  And state of mind in this regard is

20    irrelevant.

21              THE COURT:  I'm sorry.  I don't have that in front

22    of me.  Would you bring it up, please.

23              Which bottom portion?

24              MR. PRICE:  It's next to the last paragraph

25    beginning with "Here's."
```

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 128 of 139   Page ID #:302158
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

128

1          MS. KELLER:  And your Honor, it's --

2          THE COURT:  That would be hearsay, but it's

3  allowed for his state of mind, Counsel.

4          MR. PRICE:  State of mind in this time frame, I

5  believe, is irrelevant.

6          MS. KELLER:  Your Honor, it all goes to the later

7  e-mails.

8          THE COURT:  No, I'm going to --

9          MR. PRICE:  Earlier --

10          THE COURT:  The e-mail will be received, the last

11  paragraph beginning with "Here's a piece of knowledge" is

12  hearsay.  It's only being allowed for state of mind.

13  BY MS. KELLER:

14  Q    This is dated Monday, October 8th, 2001, and it's to

15  you from Eldridge, it says.

16  A    Yes.

17  Q    This is Margo Eldridge.

18  A    It is.

19  Q    And it says, "Hi, Isaac.  Thanks for your time today.

20  I'm glad the music is resolved.  I'll get it off to the

21  stations ASAP.  I wanted you to meet Brian so that in the

22  future, we can be sure everybody is on board with everything

23  we do.

24      "Somehow I got the idea we were going to shoot the

25  spring Bratz commercial so that it would be similar to the

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 129 of 139   Page ID #:302159
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

129

1    one we just did, a campagne, so to speak.  That's why I was

2    pushing for a November shoot date.  I put Andy Galerani

3    (phonetic), Lynn Carlson, doll stylist, and the other

4    indispensable people on hold for that date.  I didn't want

5    to be caught unprepared.  I'm cancelling them all.

6         "Here's a piece of knowledge you probably already have,

7    but Mattel is coming after Bratz in a big way.  They are

8    counting on Bratz having an early impact.  They don't think

9    you will continue to support it.  The buzz on the commercial

10   production grapevine is that they are going all out to nail

11   you.  I have no way of verifying this.  Both Andy and I have

12   had many calls to see the Bratz commercial.  We haven't

13   responded, but the minute it goes on the air, you know VMS

14   will send it out to whoever wants it.  Paula said she would

15   call me as soon as she has a meeting set with Corey.

16        "All my best, Margo."

17             THE COURT:  And let me remind you that that last

18   paragraph is hearsay.  It's only being allowed because it's

19   part of the e-mail string, and it will explain or give -- it

20   will allow Mr. Larian to testify about why he took action,

21   or whatever his conduct was in relation to this.

22             Counsel?

23   BY MS. KELLER:

24   Q    And Mr. Larian, when you read that e-mail, what did you

25   think?

1    A    She was asking us to do a new commercial.  She was also

2    telling us she's very well connected.  Actually, she now

3    works for Mattel.  But that -- when you make TV commercials,

4    there's only a certain group of actors, actresses, song

5    writers, directors who do TV commercials, and that she was

6    hearing that Mattel has taken notice of this, of Bratz, and

7    they are going to come after us.

8    Q    Did that worry you?

9    A    Of course.

10   Q    And is that one of the reasons that you felt you might

11   end up needing legal help?

12   A    Yes.

13            MR. PRICE:  Objection.  Leading.

14            THE COURT:  No.  Overruled.  That doesn't suggest

15   the answer.  It's relatively obvious, Counsel.  Overruled.

16   BY MS. KELLER:

17   Q    Now, you said in here you were taking a wait-and-see

18   attitude regarding further commercials?

19   A    Yes, we didn't know -- it's now October 2001.  We had

20   just finished the commercial.  We haven't advertised it.  We

21   have sold the product to the retailers.  We don't know at

22   this time if the product line is going to be successful or

23   not, so I just didn't want to go ahead and spend money to

24   make a new commercial for spring before seeing how -- how

25   the product we have in the stores for fall is going to do.

```
1    Q    So again, you weren't certain it was going to be a hit?

2    A    I didn't know it was going to be a hit, no.  That's

3    what I say in here.

4    Q    Now, October of 2001, did the Bratz win some sort of an

5    award?

6    A    October 2001?

7    Q    Uh-huh.

8    A    No, we didn't win anything in 2001.

9    Q    Let's look at Exhibit 17272.

10   A    17272?

11   Q    And --

12   A    I don't have it.  I don't have that here.

13   Q    He is going to get that for you, 17272.

14        Okay.  Do you have it now?

15   A    Yes, go ahead.

16   Q    Okay.  Look at the bottom of page 2.

17   A    Yes.

18   Q    And --

19   A    Okay.  I got it.

20   Q    This is, at the very bottom, from Leon Djiguerian?

21   A    Yes.

22   Q    To you, and it says, "Subject:  Family Fun."

23   A    Yes.

24   Q    And do you see there's three of MGA's products, "Bratz,

25   DJ Mixer and Mrs. Field are winners of the Family Fun toy
```

1    business Oscars"; do you see that?

2    A    Yes.

3            MS. KELLER:  Your Honor, we'd ask that Exhibit

4    17272 be admitted.

5            THE COURT:  It's received.

6            *(Defendants' Exhibit No. 17272 is received in*

7        *evidence.)*

8    BY MS. KELLER:

9    Q    Now, it says, "Furthermore, two of MGA's toys, Bratz

10   Number 3 and DJ Mixer Number 10, made the top 10

11   best-selling overall toys.  The giant, Mattel, had three

12   toys on the top 10.  After Mattel, MGA had the biggest

13   number of awards for any single company."

14           This was an e-mail -- looks like it was a forward by

15   you to Michael Block at Hasbro of a message you had gotten

16   about these awards; is that --

17   A    Yes, and I want to explain my previous answer when you

18   asked me had MGA won an award in October, and the answer is

19   yes, we had, and I want to explain to the jury how does this

20   work.

21           Family Fun and other publications, Oppenheimer, et

22   cetera, they come to New York Toy Fair, they go through

23   every --

24           MR. PRICE:  Objection.  This is a narrative.

25           THE COURT:  Sustained.

1   BY MS. KELLER:

2   Q    Can you explain what the Family Fun toy award is all

3   about?

4   A    Okay.  Family Fun comes to -- they give awards.  They

5   are known as the Oscars of the toy industry.  They come to

6   New York toy fair.  They go to almost every toy vendor

7   showroom, and they see different products, and they select

8   certain products as a contestant for toy of the year award.

9        The next thing they do is they take the toys that they

10   have selected, and they take it to kindergartens around the

11   country, many, many different kindergartens and children,

12   and literally give them these toys to play with and rank.

13   They get the ranking, and then every October, they publish

14   Family Fun Toy of the Year Edition where basically, based on

15   what the consumers -- these kids in the kindergartens who

16   have ranked this product, were the winners.

17        Then they take it further, they count the votes,

18   because you win an award in, let's say, the doll category,

19   in the vehicle category, in action figure category, but then

20   they tabulate the votes one more time, and they come up with

21   the top 10 best-selling toys overall, and we won -- that

22   year, we won, Bratz and DJ Mixer and Mrs. Field oven.

23   Q    That was the Mrs. Field oven we talked about earlier?

24   A    Yes.

25   Q    Now, if you go up to -- to the top of that page 2, do

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 134 of 139   Page ID #:302164
CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

134

1    you see Mr. Block from Hasbro saying, "That's great.

2    Congratulations.  Look forward to seeing you in Hong Kong.

3    All the best, Mike"; do you see that?

4    A    Yes, I do.

5    Q    And then if you go up to the next e-mail above that,

6    that is your e-mail back to Mr. Block, Wednesday,

7    October 10th, 2001, "Hi Michael, thanks for the nice words.

8    I heard from two people today that Mattel has vowed to

9    destroy Bratz because it is taking a big bite out of Barbie.

10   See you next week.  Isaac."

11            MR. PRICE:  Your Honor, I'm going to object and

12   move that it be stricken.

13            THE COURT:  Sustained.

14            It's, once again, to show his conduct and what

15   he's doing, but it's not for the truth of the matter

16   asserted concerning these rumors and statements about what

17   Mattel has vowed to do.

18   BY MS. KELLER:

19   Q    If you go to the e-mail above that, Mr. Block says,

20   "Keep up the fight.  Nice to see someone hitting them.

21   Looking forward to seeing you next week.  Did you speak to

22   Francis?"

23        And then if you look at the e-mail above that, your

24   e-mail back to Mr. Block, "Hi Michael, it's hard for baby

25   sheep to fight off a lion with unlimited resources, but I'm

CV 04-9049-DOC - 02/16/2011 - Day 18, Vol. 2 of 3

135

1    a street fighter and will fight."

2         Were you referring to expecting a fight with Mattel?

3    A    Yes.

4    Q    "I'm calling Francis tonight.  Travel safe.  Isaac."

5         Now, when you were being careful in some of these other

6    e-mails that we see about, for example --

7              THE COURT:  Counsel, what was the e-mail number?

8              MS. KELLER:  17272, your Honor.

9              THE COURT:  Okay.  Thank you very much.

10   BY MS. KELLER:

11   Q    When you were being careful about Mattel in some of the

12   other e-mails that we saw, how did all these rumors of a

13   lawsuit coming your way affect you in terms of your wanting

14   to be careful?

15             MR. PRICE:  Your Honor.  Objection.  It's

16   overbroad.  There is no timing.  We don't know which e-mails

17   she is talking about.

18             THE COURT:  Overruled.  I'm assuming it's 2001 and

19   around October.

20             MS. KELLER:  Yes, your Honor, and into 2002, early

21   2002 as well.

22             THE COURT:  You may answer.

23             THE WITNESS:  I lost the question.

24             THE COURT:  He lost the question, Counsel.

25

Case 2:04-cv-09049-DOC-RNB   Document 10025   Filed 02/18/11   Page 136 of 139   Page ID #:302166
CV 04-9049-DOC – 02/16/2011 – Day 18, Vol. 2 of 3

136

1   BY MS. KELLER:

2   Q    When you heard all these rumors -- and by the way, did

3   the rumors come to you only once or twice, or were you

4   hearing them fairly continuously?

5   A    I was hearing it continuously.

6   Q    And how did they affect your desire to be careful about

7   Mattel with things like the website that we saw, the Yahoo

8   lady's website?  In other words, the rumors that Mattel was

9   going to sue you, how did that affect your thinking?

10  A    I just didn't want to be sued by Mattel.  I know they

11  sued many people.  I just didn't want to be sued by Mattel.

12          MR. PRICE:  Your Honor, objection.  Move to

13  strike.

14          THE COURT:  I'm going to sustain the objection,

15  and I'm going to strike the response, which is gratuitous.

16  You are to disregard that they've sued by many people -- or

17  were suing many people.

18  BY MS. KELLER:

19  Q    Let me ask you directly, you were scared that you were

20  going to be sued, you, right?

21  A    I was scared of being sued by Mattel, yes.

22  Q    Now -- now, at some point around this time of

23  October 2001, did MGA enter into a distribution relationship

24  with Hasbro for Mexico distribution?

25  A    Hasbro Mexico and Latin America, yes.

1          MS. KELLER:  And could we have Exhibit 16901.

2          THE WITNESS:  Go ahead.

3     BY MS. KELLER:

4     Q    And do you recognize this as an e-mail chain from

5     Martin Hitch, your international sales director, to Hasbro,

6     including Michael Block, the gentleman we just talked about?

7     A    Yes.

8     Q    And that's referencing MGA entering into a distribution

9     deal with Hasbro for Latin America?

10    A    Yes.

11    Q    And around the same time, were you starting to spend

12    some money on advertising?

13    A    I'm sorry?  I lost -- I lost the question again.

14    Q    I want to talk to you a little bit about all the things

15    you were doing in 2001 to try to advance the brand, okay?

16    One of them being advertisings.

17         So we just talked about getting the international

18    distribution to South America and Mexico, right?

19    A    Yes, with Hasbro.

20    Q    And now I want to ask you about advertising

21    expenditures in 2001.

22    A    Yes.

23         MS. KELLER:  So if we could have Exhibit 21972.

24         THE WITNESS:  Yes.

25

1    BY MS. KELLER:

2    Q    And if you look at page 2 of that document entitled

3    "MGA Entertainment 2001 Immediate Expenditures"; do you

4    recognize that?

5    A    Yes, I do.

6    Q    And if we look at page 3 of 29172 --

7            MS. KELLER:  And your Honor, I'd ask that this be

8    admitted.

9            THE COURT:  Received.

10           *(Defendants' Exhibit No. 29172 is received in*

11    *evidence.)*

12    BY MS. KELLER:

13    Q    Let's look at page 3 where it says, "Total booked

14    expense," and you've got $2,046,589?

15    A    Yes.

16    Q    And let's look back to -- let's look back to page 2.

17    A    Yes.

18           *(Live reporter switch with Deborah Parker.)*

19                          -oOo-

20

21

22

23

24

25

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  February 17, 2011

12

13

14          _____

              JANE C.S. RULE, U.S. COURT REPORTER
15            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25