1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3          **SOUTHERN DIVISION AT SANTA ANA**

4          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,                    )
7                                        )
              PLAINTIFFS,                )
8                                        )
          vs.                            ) CV NO. 04-9049-DOC
9                                        ) DAY 18
MGA ENTERTAINMENT, INC., ET AL.,         ) VOLUME 3 of 3
10                                       )
              DEFENDANTS.                )
11 _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       JURY TRIAL

16                  SANTA ANA, CALIFORNIA

17             WEDNESDAY, FEBRUARY 16, 2011

18                       4:23 P.M.

19

20
              **DEBORAH D. PARKER, CSR 10342**
21               **OFFICIAL COURT REPORTER**
              **UNITED STATES DISTRICT COURT**
22               **411 WEST FOURTH STREET**
                      **SUITE 1-053**
23           **SANTA ANA, CALIFORNIA 92701**
                    **(714) 542-8409**
24              **D.PARKER@IX.NETCOM.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF, MATTEL, INC.:

 3                           JOHN QUINN
                             WILLIAM PRICE
 4                           MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                           & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                           (213) 443-3000

 8
         FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                           (949) 567-6700

13
                             ANNETTE L. HURST
14                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                           (415) 773-5700

17
                             JENNIFER L. KELLER
18                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                           SUITE 560
                             IRVINE, CALIFORNIA 92612
20                           (949) 476-8700

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                          MARK E. OVERLAND
                            LAW OFFICES OF MARK E. OVERLAND
 4                          100 WILSHIRE BOULEVARD
                            SUITE 950
 5                          SANTA MONICA, CALIFORNIA 90401
                            (310) 459-2830
 6

 7                          ALEXANDER H. COTE
                            SCHEPER KIM & HARRIS, LLP
 8                          601 WEST FIFTH STREET
                            12TH FLOOR
 9                          LOS ANGELES, CALIFORNIA 90071
                            (213) 613-4660
10

11    ALSO PRESENT:
12
                            JEANINE PISONI
13                          MGA ENTERTAINMENT, INC.
                            16360 ROSCOE BOULEVARD
14                          SUITE 105
                            VAN NUYS, CALIFORNIA 91406
15

16                          ROBERT ECKERT, MATTEL CEO
                            ISAAC LARIAN, MGA CEO
17                          KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                            MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                        I N D E X

 2

 3   DEFENDANTS' WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    ISAAC LARIAN                  5

 5

 6                     E X H I B I T S

 7   DEFENDANTS' EXHIBITS:              IDENTIFICATION  EVIDENCE

 8    16532 DELOITTE & TOUCHE                            8

 9    27268 MGA ENTERTAINMENT, SALES BY                  6
            SKU 2001

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

5

```
 1        SANTA ANA, CALIFORNIA; WEDNESDAY, FEBRUARY 16, 2011;

 2                         4:23 P.M.

 3                      CROSS-EXAMINATION

 4   BY MS. KELLER:

 5   Q.   Can you see how much was being spent in October and

 6   November for advertising on Bratz?

 7   A.   $869,783 in October.  $773,705 in November.

 8   Q.   And if we go to page 3, we see total booked expense of

 9   2,046,589?

10   A.   I just have to line this up.

11   Q.   Looking about, not quite halfway down on the right-hand

12   column.

13   A.   Yes, I see that.

14   Q.   Now, was that advertising for all the products listed

15   here, or just for Bratz?

16   A.   Just for Bratz.  If you look at the same bill, we spent

17   $403,101.  If you add all those three columns -- October,

18   November and December -- you get to $2,046,589.

19   Q.   Now, let's look at Bratz sales for 2001.

20           MS. KELLER:  If we could have Exhibit 27268.

21   BY MS. KELLER:

22   Q.   And look at page 1.

23   A.   Yes.

24   Q.   And we see -- do you recognize this as a document from

25   MGA called Sales by Company by SKU, S-K-U, 2001?
```

1    A.   Yes.

2              MS. KELLER:  Your Honor, I would move 2246 -- I'm

3    sorry, 27268 into evidence.

4              THE COURT:  27268 received.

5         (Defendants' Exhibit 27268 received in evidence.)

6    BY MS. KELLER:

7    Q.   And if you look at page 1, does this list your

8    company's sales of the Bratz dolls and fashion packs and

9    shoe packs, et cetera?

10   A.   Some of it, yes.

11   Q.   Not all of it?

12   A.   The last column says "Packman."

13   Q.   Okay.  So the very last entry is "Packman."  But aside

14   from that, everything else is Bratz sales?

15   A.   Yes, it is.

16   Q.   Now, these sales, are these -- what do these represent?

17   In other words, do they represent total sales?  Do they

18   represent net profits?  Gross profits?

19   A.   These are just gross sales and is broken down:  Bratz

20   Doll Assortment and Bratz six-piece assortment

21   international.  It goes on.  Bratz English Association,

22   that's the one we ship to UK.  Bratz International

23   Assortment.  It just goes on.

24   Q.   And so, from -- looking at this then, in 2001, when you

25   finally managed to launch the Bratz, how was the brand

7

```
 1   doing?

 2   A.   It was okay.  It was good.

 3   Q.   Good, but not great yet?

 4   A.   No.  I think we did -- if my memory is correct, if you

 5   add all of those, close to $20 million.  $21 million.

 6   Somewhere below 25.

 7   Q.   Now, let's look at the MGA financials for 2001.

 8            You've already told us that toy sales were

 9   seasonal and they occurred mostly at Christmas when toys are

10   sold and shipped; right?

11   A.   Most toys, yes.

12   Q.   And so your financials for 2001 reflect performance of

13   Bratz dolls in the marketplace in holidays, end of the year;

14   right?

15   A.   That's correct.

16   Q.   Let's look at Exhibit 16532.  I think we looked at that

17   a little earlier.

18   A.   Yes.

19   Q.   This is the 2001 version of what we looked at earlier

20   for 2000.  Is this the Deloitte & Touche independent

21   auditor's report for 2001?

22   A.   It is dated 2002, but it is for 2001 financial.

23            MS. KELLER:  Your Honor, I move that Exhibit 16532

24   be admitted.

25            THE COURT:  Received.
```

```
 1          (Defendants' Exhibit 16532 received in evidence.)

 2    BY MS. KELLER:

 3    Q.   Let's look at page 3.  And if you look at page 3, you

 4    see MGA actually lost $605,869 in 2001.

 5          Do you see that?

 6    A.   Yes, we did.

 7    Q.   Not as much as you had lost the previous year, though?

 8    A.   No.

 9    Q.   Now, let's talk for a little bit about building the

10    brand.

11          So Bratz was off to a pretty decent start; right?

12    A.   It was a good start, yes.

13    Q.   But you still had some things to tackle.  How did you

14    handle worldwide distribution of those toys?

15          MR. PRICE:  I would object to the prologue.

16    Object to the introduction of the question.  Factual

17    statement.

18          THE COURT:  Well, sustained.  The initial portion

19    is stricken, counsel.

20          Just reask the question.

21          That was Bratz was off to a pretty decent start.

22          MS. KELLER:  Your Honor, I'm just wondering if

23    maybe this might be a good time to break.

24          THE COURT:  This would be a good time to recess.

25          You're admonished not to discuss this matter
```

```
 1    amongst yourselves, nor form or express any opinion about

 2    this case.

 3              We'll see you tomorrow morning at 8:00.

 4         (Jury out.)

 5          THE COURT:  Why don't you step down, Mr. Larian.

 6         (Pause.)

 7         (The following proceedings were had outside the

 8          presence of the jury:)

 9              THE COURT:  Counsel, I'll return in just a moment.

10    If you'll remain for just a moment, please.

11         (Pause.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SANTA ANA, CALIFORNIA; WEDNESDAY, FEBRUARY 16, 20011;

 2                          6:40 P.M.

 3                           -oOo-

 4          THE COURT:  All right.  Mr. Zeller.

 5          MR. QUINN:  Gone to get him, your Honor.

 6          THE COURT:  That's close enough.  I have his able

 7   assistant.

 8          Let's go on the record.  I need to know about Dale

 9   Cendali.

10          MR. QUINN:  Mr. Zeller, either -- he reported it

11   to me.  He either had a telephone conversation or an e-mail

12   exchange, and --

13          THE COURT:  There he is, right now.

14          Cendali, what's the latest information, because I

15   can't be of help.  I can't get people here, unless I get

16   people here.

17          MR. ZELLER:  Well, unfortunately, we were told

18   that she would not appear until March 1st, the earliest.

19   She said she had depositions and a vacation that precluded

20   her from appearing.

21          THE COURT:  Has she been subpoenaed?

22          MR. ZELLER:  She has.  And for the record --

23          THE COURT:  Do I have jurisdiction?

24          MR. ZELLER:  You do.  We heard this from her

25   attorney.
```

```
 1              THE COURT:  Is there a way we can resolve this
 2    without the court taking action?
 3              In other words, can we call her out of order?  Do
 4    I know when her vacation is starting?  Can we bring her in
 5    tomorrow, or the next day so she's not inconvenienced?
 6              In other words, we can do those things to help
 7    her, but the idea that she's just not appearing until --
 8              MR. ZELLER:  No, she --
 9              THE COURT:  Ms. Hurst has the solution.
10              MS. HURST:  Well, I don't know if I have a
11    solution.  I can elaborate on what I understand, maybe, her
12    schedule.  She was in deposition today and tomorrow.  She's
13    in New York, by the way.
14              THE COURT:  That's the United States.
15              MS. HURST:  It is.  But I mean -- well, anyway,
16    Friday she leaves for vacation, which is with her extended
17    family, including an aunt who's on her deathbed, or
18    something.  That's all.  That's what I've been told.  And
19    so, this is her, as I understand it from her.  Counsel,
20    first available date after the vacation, and she would come
21    here.  She is not fighting coming in person.
22              THE COURT:  And she hasn't been notified about a
23    date to come up to this time?
24              MS. HURST:  I don't know what they put in their
25    subpoena.  I haven't seen it.
```

```
 1              THE COURT:  Well, let me see the subpoena.

 2              MR. ZELLER:  Well, I will have to have a hard copy

 3    printed off, and I will.

 4              For the record, Judge, we've been trying to get

 5    her for weeks now.  And what we were told --

 6              THE COURT:  She would come out Friday.

 7              MR. ZELLER:  That's what we suggested.

 8              THE COURT:  Can she come Friday?

 9              MS. HURST:  I don't believe so.  I think that's

10    the day they're leaving on the vacation.  Since she's in

11    New York, there is no way for her to get here and be here

12    for the business day and attended her previously scheduled

13    and paid-for vacation.

14              THE COURT:  Could she come tomorrow?  We can put

15    her on the early evening and fly her out.

16              MS. HURST:  Your Honor, we are happy to stipulate

17    to take her out of order.  Once they put on Ms. McClusky and

18    establish whatever communications she had with Ms. Cendali,

19    we can stipulate to those.

20              THE COURT:  I don't know that we have

21    Ms. McClusky.  That was going to be my next --

22              MS. HURST:  She got on a plane today.  She will be

23    here tomorrow.

24              THE COURT:  Thank you very much.  I have that

25    information.  That's perfect.
```

13

1           MR. ZELLER:  So things are clear on this,

2   Ms. Cendali's counsel said that she was going on vacation on

3   Saturday.  We have, of course, said, *Well, she should be*

4   *here on Friday.*

5           But we have been given, frankly, the brush-off.

6   We've been given --

7           THE COURT:  I can't resolve it, unless I get

8   accurate information.

9           MR. ZELLER:  Sure.

10          THE COURT:  When is she going on vacation?

11          If it's Saturday, can she, please, be here on.

12          MS. HURST:  I've been told Friday.  I'll show you

13  the e-mail.  I mean, I just want the court to know.

14          THE COURT:  Just show it to me.

15          MS. HURST:  I have requested of her lawyer that

16  they attend in person.  They were asserting lack of

17  jurisdiction and so forth, and I personally requested on

18  behalf of MGA, that they be here.  So we -- I just want it

19  to be clear to the court --

20          THE COURT:  Who is her lawyer?

21          MS. HURST:  Kevin Rosen, at Gibson Dunn &

22  Crutcher.

23          THE COURT:  Where is he located?

24          MS. HURST:  Los Angeles.

25          THE COURT:  Ask him to be here at 7:30.  That will

1    resolve all the back and forth.

2         MS. HURST:  Your Honor, we have a date certain for

3    her appearance, which is March 1st.

4         THE COURT:  I'm ordering you, or one of you -- I'm

5    getting frustrated with this -- to get on that phone and

6    call the lawyer and tell him to get down here.  And that

7    way, I will know accurately whether she's going on Saturday,

8    or she's going on Friday.  And the court is taking too much

9    time with inaccurate information back and forth between the

10   two of you.  So get the counsel down here so I hear

11   firsthand, and I would suggest if there's any possible way

12   that we get her here, since she is under subpoena, that that

13   would be the appropriate thing.  And we'll bend everything

14   under the world to get her back in time.

15        MS. HURST:  Your Honor, I can tell the court what

16   was represented to us.  She is in -- by the lawyers at

17   Gibson, Dunn & Crutcher.  She is in deposition tomorrow and

18   leaves Friday for a prepaid vacation out of the country with

19   family and extended family, including an aunt with serious

20   lung cancer.

21        THE COURT:  Now, go show that to Mr. Zeller.

22        Mr. Zeller, step over to the computer.  Look at

23   that, and, apparently, she's not leaving on Saturday.  She's

24   leaving on Friday.

25        *(Pause.)*

```
 1              MR. ZELLER:  This is not an e-mail from --

 2              MS. HURST:  It's an e-mail from --

 3         This is his e-mail reporting to me his

 4   conversation with Dale Cendali's lawyer about her schedule.

 5              THE COURT:  Just a moment.  How do you both think

 6   the court, instead of me making such harsh demands, should

 7   resolve this?

 8         On one hand, I don't want to disturb the

 9   presentation of Mattel's case.  You are entitled to put your

10   case on in a timely fashion in the order of presentation

11   within reason.  You are not entitled to change witnesses

12   without notifying the other side, at least egregiously so

13   there's preparation.  By the same token, I really don't want

14   to disturb Ms. Cendali's vacation.

15              MR. ZELLER:  We suggest she be ordered to be here

16   on Friday.

17              THE COURT:  Well, just a moment.  If she's going

18   on vacation -- remember the inaccurate information that I'm

19   getting between the two of you -- I can't tell if she's

20   leaving Friday, or not.  I think that's a little harsh of

21   the court just to say, *Cancel your vacation and get out here*

22   *on Friday.*

23         Now, this is the first information I've gotten

24   that she's not available on a certain day.  This is the

25   first information I know that she's going on vacation.
```

1    She's going with a loved one that, apparently, has cancer.

2    I think that's awfully harsh of the court to step in and

3    start making demands.

4              So I would like to speak to her counsel, and I

5    don't know why I'm getting resistance about this.

6              MR. ZELLER:  I've sent a message telling him to be

7    down here at 7:30 a.m.

8              THE COURT:  Why don't we get him on the phone.

9              MR. ZELLER:  That would also, I think -- I will

10   find his contact information.

11             THE COURT:  Why don't you both talk to him and

12   tell him the judge would like him here at 7:30 tomorrow.

13   And then, if you get resistance in this phone call you're

14   placing to him, then I'll resolve that.  But let's try to be

15   polite to begin with, because every time I make a demand I

16   find a new reason for noncompliance and my harshness in this

17   regard may be ill-taken.

18             MR. ZELLER:  It's not, Judge.  We've been trying

19   for weeks to get her here.

20             THE COURT:  Quit complaining and get on the phone.

21             MR. ZELLER:  I understand.

22       (Pause.)

23             THE COURT:  She sounds like she's such a minimal

24   witness for such a short period of time that we can

25   literally turn her around and get her back on the plane, and

```
 1    she probably wouldn't be re-called by either party, if we
 2    can just get her out here.  But I don't think it's fair,
 3    also, on behalf of Mattel, if you have been brushed aside,
 4    remember, I can't --
 5                Get her on the phone.
 6                MR. ZELLER:  I'm turning it on.
 7                THE COURT:  Press the button.
 8                MR. ZELLER:  I turn it on when we're --
 9                THE COURT:  Turn it back on, and then press the
10    button.
11                I don't think it's right that I try to bring
12    somebody out who I'm hearing for the first time within one
13    or two days is being requested, even if you have been
14    brushed off.  And that's why I keep saying, I need to know
15    beforehand.
16                We've got witnesses here.  We've got Kuemmerle
17    coming.  We have Machado coming, in all likelihood, and
18    Vargas.  Everything is working out very well.  But I think
19    it's a little precipitous of me to tell her to get out here
20    in 24 hours.  I think it's a little harsh to tell her she's
21    not going on vacation and assert the court's power.
22                MS. HURST:  Does the court want the number of her
23    attorney?
24                THE COURT:  I want her attorney.
25                MR. ZELLER:  I'm calling him right now.
```

1          THE COURT:  And I want you two to get on the phone

2     with him, and I want you two --

3          Ms. Hurst, I want you two to talk to him together,

4     and let's politely ask if she can be here on Friday; and if

5     can't and she has the vacation, then I would like to know.

6     But I don't want to go back and forth with whether she's

7     leaving Saturday or Friday.  It sounds to me like neither

8     one of you know, but I expect her attorney would.

9          Now, there's three hours' difference in New York,

10    now it's 10:00 o'clock.  Since she's lawyered up and

11    represented by counsel, he's the only one I can rely upon.

12        *(Pause.)*

13         MR. ZELLER:  I contacted Chris Jennings, who is

14    the associate who works for the partner on this.  He says

15    that Mr. Rosen is out of town in Chicago.

16         THE COURT:  And that's the lawyer for?

17         MR. ZELLER:  For Ms. Cendali.  That's the partner

18    who is handing the representation.

19         THE COURT:  Well, ask him if he can reach him.

20         MR. ZELLER:  I'm sorry?

21         THE COURT:  Ask him if he can reach him.

22        *(Pause.)*

23         THE COURT:  It's only 9:00 o'clock in Chicago.

24        *(Pause.)*

25         MS. HURST:  Mr. Jennings, the associate counsel

```
 1    for Ms. Cendali, has represented that she is departing the
 2    country on Friday for her preplanned family vacation and
 3    would come on March the 1st.  And we will stipulate to take
 4    her out of order.
 5            And once Ms. McClusky testifies, I'm sure we'll be
 6    able to stipulate to the content of the letters involving
 7    Ms. Cendali as well.
 8            THE COURT:  The way we're going, it will still
 9    probably be Mattel's case in March, or so.
10            MR. ZELLER:  That wasn't our plan.
11            THE COURT:  I can inform --
12            First of all, I don't see how you could be
13    prejudiced in this sense.  In all likelihood, you are going
14    to have a lawyer who picked up the notebook who is
15    testifying to physically picking that up.
16            What you probably want to get is the direction
17    given to the lawyer to pick it up and why.  Now, the
18    question, of course, arises:  Do I have an attorney-client
19    privilege problem, because if that request was made by
20    Mr. Larian, then you may have a crime fraud issue.  I mean,
21    I have a whole set of things that I can't anticipate, which
22    is why I wanted to hear these lawyers out of the presence of
23    the jury.
24            So I doubt that Mr. Larian gave that direction.  I
25    doubt that that occurred.  You're probably entitled to ask
```

1  why since usually a notary book stays with the notary in

2  California.

3          MR. ZELLER:  It's required by law.

4          THE COURT:  And so since that person employed by

5  Mattel, the actual notary -- I mean, by MGA, I think Mattel

6  would have every reason to be suspicious of why the

7  notebook.

8          So all I'm trying to do is get the lawyers here.

9  So I think that under the circumstances I see no reason why

10 the court should be harsh or abrupt.  I don't think I should

11 be in a position of making a demand when the information is

12 coming to me on today's date, even though I know Mattel has

13 tried.  I'm ordering her to be here on Friday, but she has

14 got the planned vacation, and she represents that she'll be

15 here March 1st.

16         Second, I don't know how you would be prejudiced

17 since the other lawyer, in all likelihood, would be

18 testifying that she was given direction, or she picked up

19 the book for whatever reason.  So if you could help me with

20 why you would be prejudiced by not putting her on March 1st,

21 other than being frustrated --

22         MR. ZELLER:  No, it's not frustration, your Honor.

23 It's just I wanted the record to be clear that this is

24 not --

25         From our perspective, we've been asking for some

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    period of time.  So while it's unfortunate and, obviously,

2    we respect the fact that she has a vacation; that she has

3    other obligations, but --

4             THE COURT:  Let's have her keep it without any

5    more stress on her.

6             And then March 1st, counsel?  March 1st?

7             MS. HURST:  Agreed.

8             THE COURT:  Take her out of order.  Please convey

9    back to her through her counsel, Chris, or whoever you

10   talked to, that she should go and enjoy her vacation with

11   the loved one, and she'll be here on March 1st.

12            MS. HURST:  Will do.

13            MR. ZELLER:  And then, it's understood that even

14   if we rested, then we'll have to reopen -- it will be

15   subject to reopen on that.

16            THE COURT:  That's not uncommon.

17            MR. ZELLER:  Yes.

18            THE COURT:  Okay.  But that almost guarantees,

19   though, that the Rule 50 doesn't get decided.

20            So the end result is the detriment goes both ways.

21   MGA would like to have a decision on the Rule 50, and the

22   court usually doesn't do that; in this case, it might have

23   to.

24            All right.  The second thing is, tell me the name

25   of the lawyer in Atlanta once again.

1           MR. ZELLER:  It's Charlotte McClusky.

2           THE COURT:  Charlotte McClusky.

3           MR. ZELLER:  And she can currently goes by the

4    last name Main, M-A-I-N.

5           THE COURT:  First of all, you thank her for coming

6    out on such short notice.

7           And could you tell me what time she would be here

8    tomorrow.  Do I hear from her tomorrow evening?

9           MR. ZELLER:  She actually intended to be here

10   today.  We asked her to contact us when she arrived, and we

11   were going to try and coordinate with the court as to really

12   what's the best time.

13          THE COURT:  Well, if you tell me, I'll reconvene

14   at 7:30 tomorrow.  If she's got nothing to be here, though,

15   there is no reason for the court reporter to sit here from

16   7:30 to 8:30.  And if not, then I would have to take her

17   probably tomorrow, probably after court, which extends her

18   time here until Friday morning.

19          MR. ZELLER:  What we hoped could occur -- and this

20   is subject to confirmation with her once she actually

21   arrives -- is in, in fact, that she would appear at 7:30.

22   We could take the testimony outside the presence of the

23   jury.

24          THE COURT:  Just a moment.  I'll give you court at

25   7:30, if I know there is a reason to.  So we'll be here a

1    little bit into this evening.  So, if you can stay on the

2    phone and possibly contact her, I'm happy to reconvene the

3    court at 7:30; but if she's not here and we're just sitting

4    here, I'm not.

5           MR. ZELLER:  Understood.

6           THE COURT:  All right.  Now, the second thing is,

7    there is a dispute that's broken out, apparently, across the

8    street because the special master called me.  I'm not

9    certain of what that dispute entails.  But maybe Mr. Quinn,

10   or Mr. Price, or Ms. Keller, or Mr. McConville, you'll be

11   arguing this matter.  So consult with whoever your

12   associates are, because you'll be the counsel arguing, not

13   Ms. Hurst and not Mr. Zeller.  And that way if we have a

14   genuine dispute, that's fine.  If these are just associates

15   who can't make decisions, you'll find that out as lead

16   counsel.  So you will control it.

17          All right.  The next issue this evening is this:

18   The briefs filed by both parties agree concerning the aiding

19   and abetting claim, which is Count 10, that there is no

20   California Supreme Court or published Ninth Circuit

21   authority discussing, quote, *duty of loyalty owed by*

22   *employees.*

23          On behalf of MGA, you've argued that the

24   California Supreme Court has only discussed fiduciary

25   duties, but that doesn't really get me anywhere.

1          Mattel's argument can, I think, be summarized to
2     suggest that all employees owe the extent of loyalty
3     expected of fiduciaries, and they have quoted to me the
4     *Huong Que, Inc. versus Luu* case.  It's a Court of Appeal
5     case issued by Justice Rushing.  In fact, I think I met
6     Judge Rushing at the California Judges College, in 1984.
7     And he's relied almost exclusively on the Restatement Third
8     of Agency, which discusses fiduciaries and agents,
9     interchangeably.  That discussion was never appealed to the
10    California Supreme Court, and I think that it may conflict
11    with the California Supreme Court's decision in *Committee on*
12    *Children's Television, Inc. versus General Foods*
13    *Corporation*, at 35 Cal.3d 197, 221 (1983), which held that
14    not all employees or agents are fiduciaries.
15         There are a number of other Court of Appeals cases
16    that you've cited.  I've handed out copies of the key cases
17    to you, and I'm going to talk you through a couple of my
18    concerns in just a moment.
19         First, look at the *Stokes versus Dole Nut Company,*
20    court of appeal case, which stands for the proposition that,
21    quote, *an employer has the right to expect the undivided*
22    *loyalty of its employees,* unquote.  That quote can be found
23    on page 295 of the decision.  As a citation for that
24    proposition, the *Stokes* case cites *Fowler versus Varian*
25    *Associates.*

1              When you turn to *Fowler,* which was actually a

2    wrongful discharge case, it's nevertheless useful.  On

3    page 41, that case quotes *Sequoia Vacuum Systems versus*

4    *Stransky* and *Bancroft-Whitney Company versus Glenn*, on this

5    issue about undivided loyalty.  I think you've got copies of

6    both the *Sequoia Vacuum* and the *Bancroft* cases that I handed

7    you about 5:00 or 6:00 o'clock.

8              *Sequoia* Vacuum is the first case -- and it's a

9    California Court of Appeal case -- that that was a fiduciary

10   duty case, and it involved, on page 286, quote:  *Directors*

11   *and officers of a corporation.*  That case cites no law,

12   treatise, or any other authority for this proposition about

13   undivided loyalty.  I, basically, treat that as a dead-end.

14   It's a court of appeal case about duties owed by corporate

15   officers with very few citations or authority.

16             So that, initially, leaves you with *Bancroft*, the

17   Supreme Court case, that is the common ancestor to all of

18   these court of appeal cases and the Supreme Court case that

19   all of the court of appeal cases try to interpret.

20             The problem is you may notice is that Bancroft was

21   explicitly talking about fiduciary duties and special

22   relationships.  It was not talking about duties of loyalties

23   and duties owed by employees.  The first sentence of that

24   opinion begins, quote:  *This is an action for breach of*

25   *fiduciary duty*, end of quote.  The opinion later states on

1    page 345, quote:  *The question here is whether the president*

2    *of a corporation is liable for the breach of fiduciary duty,*

3    end of quote.  It then very specifically discusses the

4    duties owed by corporate officers and directors, stating on

5    page 345, quote:  *Corporate officers and directors are not*

6    *permitted to use their position of trust and confidence to*

7    *further their private interests.  While technically not*

8    *trustees, they stand in the fiduciary relationship to the*

9    *corporation and the stockholders,* end of quote.

10           Of course, it's black letter law that common

11   employees do not automatically stand in a position of trust

12   and confidence as to their employers.  In fact, that was

13   what the court held at summary judgment and in the order

14   granting a new trial.

15           So here are a couple of tentative conclusions

16   subject to your arguments.  It seems to me that there is no,

17   quote, unquote, *duty of loyalty.*  Like any other tort, there

18   must be some duty imposed by the common law, or by statute.

19   And the Restatement, under subsection E, states that*:  The*

20   *relationship between two parties defines the scope of that*

21   *duty.*  However, the Restatement discusses fiduciaries and

22   employees interchangeably.  Even though the California

23   Supreme Court has been very clear in stating that all

24   employees are not fiduciaries.

25           I note that the 28 U.S. Supreme Court cases to use

1    the term "duty of loyalty" have only used the term in

2    describing the duty owed by fiduciaries, like trustees,

3    attorneys, or corporate officers and directors.  These cases

4    are not binding authority on issues of state law.  But, of

5    course, I'm not inclined to completely disregard the

6    language used by our nation's highest court.

7            So, ultimately, I'm left with the California Labor

8    Code Section 2863, which is the only binding authority that

9    discusses the duties assumed by common employees.  I thought

10   about reading both the Labor Code and the Restatement to the

11   jury.  However, I'm uncomfortable reading the Restatement,

12   which is not the law in the state.  And in any event, I

13   wouldn't know what section of the Restatement to be read.

14           So, now, I'm inviting either Mr. Zeller or

15   Ms. Hurst, if you want to argue.  I'm not restricting this

16   to lead counsel.  Lead counsel can argue the matter, if you

17   would like to.  But I would like to hear a case, and I do

18   not want to hear what another federal district court found.

19           Now, take your time with this, because we're

20   pretty far down the line.  And I can step off the bench.  I

21   can give you half an hour to collect your thoughts.  But

22   really be careful about the argument this evening, because

23   this is going to close the door tonight on the subject.

24           So would you like me to take a little bit of

25   recess, just five minutes even, so you can talk as a group?

 1    I'm happy to do that.

 2              MS. KELLER:  We are ready whenever the court is.

 3              THE COURT:  Okay.  If you're comfortable, that's

 4    fine.

 5              MR. ZELLER:  We'll take a few minutes.

 6              THE COURT:  Let me take a few minutes, okay.

 7         *(Pause.)*

 8              THE COURT:  We're back on the record.

 9              Lead counsel have been excused this evening.

10    Mr. McConville remains for MGA, Ms. Hurst.

11              Mr. Quinn and Mr. Zeller.

12              And Mr. McConville, I understand that this has

13    been resolved, whatever it was?

14              MR. MCCONVILLE:  Yes, sir.

15              THE COURT:  By the special master at 8:00 o'clock

16    this evening.  I want lead counsel to argue these disputes,

17    so associate counsel --

18              Then, who would like to begin this argument this

19    evening?

20              You're going to have a couple of rounds, so nobody

21    is disadvantaged.

22              MR. ZELLER:  I think it probably makes sense for

23    Mattel to go first.

24              THE COURT:  Please.

25              MR. ZELLER:  It's not Mattel's position that all

```
 1    employees owe a fiduciary duty.  What we're talking about is
 2    a particular duty, a duty of loyalty.  And for reasons I'll
 3    get to in a moment, some of this is kind of mixed up in what
 4    we'll say is a semantic debate.  Just because the duty of
 5    loyalty is owed by fiduciaries doesn't mean that fiduciaries
 6    are the only one who owe a duty of loyalty.
 7              What we're really talking about sort of goes back
 8    to the origins of master/servant, which then was determined
 9    to be instead -- and this is how the Ninth Circuit talks
10    about it -- is instead more in the nature of
11    employer/employee.  And that's the language that the
12    Restatement ended up using.
13              And then, ultimately, the way that the
14    Ninth Circuit puts it is, is:  Look, employees are a form of
15    agent.  Agents owe duties.  And so that is -- that's why
16    some of this gets wrapped up in somewhat confusing
17    terminology from time to time.  And the case that I would
18    refer the court to is this Ninth Circuit decision Schmidt,
19    S-C-H-M-I-D-T, 605 F.3d, at 690, footnote 3.  And it's
20    somewhat of a mundane principle, but it just sets forth the
21    notion that the Restatement Third uses employer and
22    employee, rather than the traditional master/servant, and
23    then ultimately they're just simply talking about agency
24    law.  And that's really the important -- the important
25    principle here.
```

1          And it can't be disputed that agents, agents of

2     every kind owe some duties, common law duties to the

3     principal.  I don't think that there is a single case that

4     MGA will be able to cite that says agents have no common law

5     duties.  That would be rather surprising, I think, given the

6     history.

7          So in some respects, kind of the analysis that's

8     being done here is too formalistic, because it's getting

9     wrapped up in the notion of:  Some cases talk about

10    fiduciaries, but just because they are talking about

11    fiduciaries doesn't mean that those duties are restricted

12    only to fiduciaries.  And I think that's really kind of the

13    nub of the logical quandary that we get into.  But I think

14    we can avoid that by just kind of focusing on the fact that

15    employees are agents.  Agents owe certain kinds of duties

16    that I'll get to in a second.

17         And here is what I would also cite, your Honor,

18    is:  This is the Restatement Third, Section 8.04.  And what

19    it states is -- and this gets us to the point of what agents

20    owe duties.  All agents owe this duty:  *Throughout the*

21    *duration of an agency relationship, an agent has a duty to*

22    *refrain from competing with the principal, and from taking*

23    *action on behalf of or otherwise assisting the principal's*

24    *competitors.*

25         And then, it goes on to talk about preparations to

1    compete are acceptable.  And, frankly, your Honor, in direct

2    response to the court's question about what section of the

3    Restatement would be read, potentially, as a jury

4    instruction here, I think this would be the candidate.

5              But to give some sense of the scope of this --

6              THE COURT:  8.0?

7              MR. ZELLER:  8.04.  And it's called competition.

8    And interestingly here's the -- it's called: *Chapter 8,*

9    *Duties of Agent and Principal to Each Other.*  Topic one,

10   *Agent's Duties to Principal.*  And then, underneath that,

11   it's *Title B, Duties of Loyalty.*

12             So we're talking about type of duty that all

13   agents owe to their principal.  And, also, there's an

14   illustration that's given that I think is very, very

15   telling, particularly, to our case.  Because, of course, MGA

16   makes arguments about how these are all rank-and-file,

17   low-level employees.  Obviously, we dispute that.  But let's

18   just sort of take that as a starting point for what MGA's

19   position is.  But even if one accepts that, these employees

20   as agents still owe this duty of loyalty that I just recited

21   from Section 8.04.  And here's the illustration that's

22   given:  *P Corporation, a food products business, employs A*

23   *as a traffic manager to arrange for the transportation of*

24   *P Corporation products, principally canned tuna and ham and*

25   *fresh poultry.  A's duties include making arrangements with*

1   *common carriers, coordinating shipping schedules,*

2   *negotiating shipping rates and supervising warehouse*

3   *employees who load trucks.*

4           Clearly, we're talking about a rank-and-file kind

5   of employee.  It gives some more.  It says:  *A becomes*

6   *familiar with the identity of P Corporation's suppliers,*

7   *customers and common carriers, as well as delivery routes*

8   *and rates.  Without telling anyone else at P Corporation, A*

9   *organizes a business that A operates out of A's home through*

10  *which A sells fresh poultry.  A has breached A's duty to*

11  *P Corporation.  A is competing with P Corporation in one of*

12  *its lines of business.*

13          So we're clearly talking about this kind of

14  rank-and-file employee, and that that duty that all agents

15  have is applied here.

16          THE COURT:  And that's without an Inventions

17  Agreement?

18          MR. ZELLER:  That's correct.  There's no facts

19  suggesting that there is a written contract or that there is

20  a special relationship between the traffic manager, as he is

21  described here, and P Corporation.  It's that the employee,

22  rank-and-file employee working out of a warehouse for the

23  corporation is competing out of his home with his employer.

24          And, also, your Honor, I don't think that the

25  court should dismiss *Stokes* and *Fowler* just because they

```
 1    cite fiduciary duty cases.  Both of those cases recognize
 2    the duty of agents in the context of non-fiduciaries.
 3    That's California law.  And those cases have not been
 4    narrowed in a way that the court is contemplating doing, at
 5    least in terms of its initial thoughts.  These are
 6    recognized, long-standing court of appeal authority.
 7    In fact, it's out of two different districts, making this
 8    determination.  They haven't been overruled, and these are
 9    the holdings of these decisions that employees owe this duty
10    to their employer.  And I think ultimately it makes sense.
11    I mean, we have a long common law history here of agents,
12    masters, of course, and servants owing duties to one
13    another, going back literally centuries.
14             So I just don't think that those can be set aside
15    and particularly based upon the kinds of arguments that MGA
16    is making here.
17             At the end of the day, MGA is not going to be able
18    to cite -- I feel with some confidence to see what MGA has
19    to say, but they are not going to be able to cite a single
20    case that we're aware of that says it is acceptable for a
21    rank-and-file employee to compete with his or her employer.
22    We're unaware of that kind of case.  There is a recognized
23    exception for preparation to compete that is specifically
24    and narrowly circumscribed, under the law has particular
25    standards.  But, by the way, just the very existence of that
```

1    exception states the rule that if you are doing more than

2    preparing to compete with your employer, it is not lawful.

3         THE COURT:  Do you have even a stronger argument

4    than the *Huong Que* case you cited?

5         Let me restate that.  I think it's recognized that

6    not all employees may have a duty of loyalty, or a fiduciary

7    duty.  By virtue of being an employee, I don't think the

8    courts could draw such a blanket rule.  But here, even over

9    and above the common law doctrine, you have some facts that

10   might be strong:  One is the Inventions Agreement, and the

11   agreement signed that would seem to indicate that this was

12   an important enough employee with some specialized skill,

13   regardless of the argument on the other side, that the court

14   should treat that with more, let's say, dignity and more

15   concern than an argument that we have an inability to show a

16   breach of the duty of loyalty.

17        I think if I was a common ox carrier that you

18   would have a difficult time persuading me that I had a duty

19   of loyalty to an employer.  And I'm wondering if our fact

20   situation is one in which some of the concerns about *Stokes*

21   and the *Committee on Children's Television*, wherein the

22   *Committee on Children's Television* held that not all

23   employees or agents are fiduciaries, that's what I call a

24   negative.  Just because it holds that doesn't mean that that

25   shouldn't be submitted to the jury.

1          The question really is when I turn to MGA:  Why?

2   In other words, I have a code section directly -- or statute

3   directly on point.  And the question becomes:  Why?

4          Is the language of the statute that should

5   control, so what we really do is attach a label that may be

6   of no consequence but is in a sense.  When you're talking

7   about the duty of loyalty, you come up with an immediate

8   assumption in the jury's mind about what that means, and

9   hopefully they are going to read the statute and the

10  instruction, but --

11         I want to turn to MGA for a moment.  Mattel is

12  going to have another round.

13         MS. HURST:  The fundamental fallacy of the

14  argument made by Mattel is the equation equating the

15  employment relationship with the relation of agency.

16  California law does not define it that way.  California

17  Labor Code Section 2295 defines what it means to be an agent

18  under California law.  The definition, agency -- quote:

19  Agent, what period?

20         *An agent is one who represents another called the*

21  *principal in dealings with third persons,* period.  *Such*

22  *representation is called agency.*

23         In contrast, there is another statute that defines

24  the employment relation.  That is Labor Code Section 2750.

25  Labor Code Section 2750 defines employment, as follows:  *The*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

*contract of employment is a contract by which one who is*
*called the employer engages another who is called the*
*employee to do something for the benefit of the employer or*
*a third person, that is, a benefit services in exchange for*
*compensation.*

Agency requires a power to bind the principal in dealing with third parties.  Of course, that carries a fiduciary duty.  But an employee -- especially not the employees we have remaining in issue here:  Bryant, Cabrerra, Salazar and Morales.

THE COURT:  Tumaliuan.

MS. KELLER:  Tumaliuan, an intern.  Not even actually an employee, frankly.

-- are not persons with power to bind Mattel in dealing with third parties.

THE COURT:  Wait a minute.  Just a moment.

Let's assume for the moment that I agree with you concerning Tumaliuan.  How do I resolve that?

MS. HURST:  Well, I'm just going to address Bryant since that is more to the court's point.  Let me provide the court with the California appellate case noting this distinction, expressly noting this distinction:  This is *Rivera versus Southern Pacific Transportation,* 217 Cal. App.3d 294 (1990).  At page 301, the court says: *The agency relationship must be distinguished from the*

1   *relationship of employer/employee.  An employee is one who*

2   *is subject to the absolute control and direction of his*

3   *employer in regard to any act, labor, or work to be done in*

4   *the course and scope of his employment.  An agent is defined*

5   *by Section 2295 of the civil code as follows.*

6          And then it goes on to quote the section that I've

7   already quoted by the court.  So this is absolutely, you

8   know, good California appellate authority that makes a clear

9   distinction between the relation of agency and the status of

10  employment.

11         Now, why is this significant?  Because then that

12  brings us to Section 2863, which any reasonable

13  plain-meaning interpretation makes clear that it is okay to

14  transact business for the employee to transact business of

15  the same type entrusted to him by the employer on his own

16  account.  Only the requirement is to give preference to the

17  business of the employer.  The dictionary definition of the

18  word "preference" is a priority of ranking.  A priority of

19  ranking can only exist in circumstances where there is one

20  more -- more than one opportunity that has to be ranked.  In

21  other words, this statute on its face permits moonlighting.

22  Nothing in the cases cited by Mattel suggest otherwise.

23         Not only are they all fiduciary duty cases, but

24  *Fowler* and *Stokes* on their face distinguish the wrongful

25  discharge situation; that is, you know, I was entitled to

1   fire you for this conduct from imposition of a tort duty.

2   And here it's important for all of us to remember, the

3   California Supreme Court said some 30 years ago, in *Foley*

4   *versus Interactive Data*, we're not going to routinely allow

5   the imposition of tort duties arising out of what are

6   otherwise contractual relationship.  We are not going to

7   allow that.

8           In recognition of that, baseline bedrock principle

9   of California law in *Stokes*, the court says, quote:

10  *Plaintiff's argument assumes that the standard for*

11  *termination with cause is identical to the standard for*

12  *tortious behavior by an employee.  However, we have found no*

13  *authority for the proposition that to constitute cause for*

14  *termination an employee's conduct must amount to a criminal*

15  *or civil wrong.*

16          The court expressly distinguished in *Stokes* a tort

17  duty and in that passage, the court was talking about the

18  *Bancroft Whitney* case, which is really the seminal

19  California Supreme Court case on preparations to compete,

20  which also involved fiduciaries.

21          So, the Restatement uses agent and employment

22  interchangeably in many respects, but that is not the law of

23  California.  California defines agents.  It defines

24  employment.  It expressly provides for employees to transact

25  business on their own account similar to that entrusted to

1    them by the employer as long as they give the first
2    preference to the employer.
3            And even Witkin, venerable treatise in California
4    law, recognizes that many times it will not matter, this
5    distinguish between agency and employee.  And I'm looking
6    now at Chapter 4, *Summary of California Law, Agency and*
7    *Employment, Section 4:  Agent Distinguished From Employee.*
8    And Witkin says, the Restatement uses it interchangeably.
9    Many times it will not matter, but quote:  *The two*
10   *relationships are not considered identical,* end quote.
11           This is one of those times when it matters.  We
12   have statutes expressly on point.  There is no authority
13   that's been cited for a duty of loyalty under California law
14   that does not involve a fiduciary and does involve an
15   affirmative claim for violation of tort duty.
16           *Stokes* and *Fowler* are both wrongful discharge
17   cases.  On its face*, Stokes* distinguishes that from a tort
18   duty.  We know that the California Supreme Court doesn't
19   believe in the imposition of tort duties.  And, frankly,
20   your Honor, you know, with respect to Bryant --
21           I mean, I don't want to get into an argument about
22   the facts of agency, or whatever at this point.  But if
23   that's where we're going to go, he didn't even have the
24   authority to greenlight a design to go to the next stage of
25   development.  That required multiple levels of executive

```
 1    approval.  He couldn't even proceed with the development of
 2    the products, the specific tasks that he was assigned
 3    without multiple levels of executive approval.  And there is
 4    no evidence otherwise, and there is not going to be any
 5    evidence otherwise.  And he wasn't special.
 6            When Ms. Freed comes to testify, she will testify
 7    700 employees in the design center all signed the same
 8    contract.  700 employees.  Everybody in the design center
 9    signed that contract.  But that does raise the issue of the
10    intentional interference claim.  And if Mattel can meet the
11    requisition of the intentional interference crime, if they
12    have impose by contract, an obligation that varies from
13    2863, we'll assume for purposes of argument tonight they can
14    do that and that doesn't violate public policy, then they
15    still have their intentional interference claim.  But a
16    common law tort duty of loyalty doesn't exist.
17            Let me just add one more point:  How can it
18    possibly be said that Mr. Larian or MGA would have knowledge
19    that somebody was violating a duty that this court, all the
20    lawyers in this court on this case, the Ninth Circuit and
21    everyone who has been litigating this issue aren't really
22    even sure exists.
23            THE COURT:  Okay.  Just a moment.
24            Does Committee on Children's Television hold to
25    the proposition that you just stated?
```

1            MS. HURST:  That not all employees are agents?

2            Clearly, that's the import of CCTV and also other

3    California cases which say the ordinary employer/employee

4    relationship does not create fiduciary duty.

5            THE COURT:  What do I do with *Huong Que* and Judge

6    Rushing's case?

7            MS. HURST:  *Huong Que* is clearly a fiduciary case.

8    It's a majority owner officer.  There's no doubt that that

9    was a fiduciary.

10           THE COURT:  Are you suggesting in a case that

11    employees owe the extent loyalty expected of fiduciaries --

12           MS. HURST:  You're talking about the -- you're

13    talking about *Huong Que*?

14           THE COURT:  Yes.

15           MS. HURST:  At best that's dicta when you are

16    dealing with somebody who is really is a fiduciary.

17           You know, the court does not take account in that

18    case of the plain language of Section 2863 and offer any

19    explanation as to what it would mean in a situation like

20    this.  In that case, it was a high-ranking officer and owner

21    who had sold the corporation, continued to work there in an

22    officer capacity.

23           THE COURT:  Can you cite a case that's gone to a

24    jury where instead of the rubric of either fiduciary duty

25    are duty of loyalty, the case went basically citing the

1    statute involved in this case?

2            MS. HURST:  No.

3            THE COURT:  I can't either.  I've never

4    historically seen that.  And let me repeat that.  Ladies and

5    gentlemen, we have a statute defined as --

6            I usually see rubric to be the fiduciary duty or

7    duty of loyalty that's gone to the jury.  That's been the

8    rubric.  Now, right or wrong, that's what I've historically

9    seen involving California law.

10            I've never seen the simple statute being cited as

11    a statutory number in a sense, or section, I'm sorry, and

12    submitted to the jury in that form.  Why?  Everybody is

13    mistaken?

14            MS. HURST:  I think that it's been largely

15    overlooked.  The statute has been on the books since 1872.

16            THE COURT:  So we would be the first court to ever

17    discern this.

18            MS. HURST:  I think that -- I mean, if you look at

19    it on its face, it's part of the chapter in the labor code

20    regarding employment relationships.  It's part of the

21    article defining the obligations of employee.  I mean, there

22    can be no doubt that it's on point.  I don't know why it

23    hasn't been taken notice of, frankly.  But all those other

24    cases are fiduciary cases, and I think frankly that most of

25    the disputes do involve fiduciaries.  That's the reason why.

1    You almost --

2            I mean, the proposition that low-level employees

3    have duties of the type that Mattel is trying to impose on

4    them here --

5            THE COURT:  I'll come back --

6            MS. HURST:  -- is one rarely asserted.

7            THE COURT:  I'm going to come back and ask the

8    same question of you that I asked Mr. Zeller, okay?

9            I would agree, potentially, if this was just

10   simply a common law situation and I was an ox carrier.  What

11   do you do with a case that's an employee, potentially, on

12   steroids?  Not from your position, but an employee that is

13   important enough -- although your argument would be:

14   Everybody had to sign this.  Seamstresses had to sign it.

15   Everybody at Mattel had to sign that contract.  I expect

16   that argument.

17           By the same token, I can make an argument that

18   everybody in a very sophisticated industry, an industry even

19   much more sophisticated than Mattel, making lasers, every

20   one of those employers, it could be argued, might have a

21   duty of loyalty or a fiduciary duty because they might all

22   be high-paid engineers in a high-tech job.  And there the

23   restatement wouldn't make any sense, the common law

24   Restatement.

25           So what do I do with at least is, arguably, from

1    Mattel's position, a skilled fashion designer, a doll

2    designer?  I know that your response will be:  *No, he's not.*

3    *He's just one of the run of the mill employees in a*

4    *sweatshop in 2,000 people in an open air hangar, with*

5    *cubicles around him, who has to go through three layers of*

6    *bureaucracy.*

7            Yet, he's a person of such import that his name is

8    put on a box.  His profile is put on a box.  He's used for

9    advertising, or marketing purposes.  In other words, whoever

10   Carter Bryant was, Mattel chose in a sense to front him as a

11   face in a marketing campaign at some point.  And so, while

12   you diminish him in a sense, and Mattel tries to enhance

13   him, I'm just wondering about the strangeness of just having

14   this go to the jury when I'm historically used to dealing

15   with California law, duty of loyalty, or breach of fiduciary

16   duty, which are such common terms.

17           Now, maybe this hasn't been well thought out in

18   the past, and I understand the safer course of conduct is

19   simply the statutory language.  I don't get reversed on

20   that.  It's just a very strange rubric.  And I'm a little

21   cautious that this is the first court, you know, that would

22   be so discerning as to ferret this out.  I'm a little

23   concerned that I got Judge Rushing who conflates these two.

24   And I'm a little concerned that I don't have cases that

25   explicitly exclude.  In other words, what occurs on

1  *Committee and Children's Television*, it simply holds that

2  *not all employees are agents* -- I'm sorry, *or agents are*

3  *fiduciaries.*

4          But it really doesn't answer the question from you

5  from my perspective.  So I'm going to turn that back over to

6  you one more time; and then, let me turn it back to

7  Mr. Zeller.

8          MS. HURST:  Let me say this first, without getting

9  into the issue of diminishing or aggrandizing Carter Bryant,

10  the law --

11          THE COURT:  Take your time.  No, that's fine.

12  In fact, I want that.  I'm encouraging that.

13          The only thing that frustrates me sometimes is

14  when I'm talking to counsel and counsel are having meetings.

15  Then, I want to stop.  I do want you over there.  I want all

16  the input, this time.

17          Please don't be shy about this.

18          MS. HURST:  I appreciate that, your Honor.

19          Two things:  There's no need to either diminish or

20  aggrandize Mr. Bryant to say these things, which are

21  fundamental truths.  One, he can be obligated by contract

22  directly; and two, trade secret misappropriation always

23  applies.

24          And so the court's concern, I think, in giving the

25  laser example, is:  What I am doing with these people who

1    are really privy to highly technical trade secrets, really,

2    is what we're talking about now.  Absolutely, that law is

3    still going to apply.

4            THE COURT:  Let me tell you a view I have of

5    Carter Bryant for a moment, because it will help shape your

6    arguments.

7            I don't believe that when Mattel takes him he may

8    have been the highest skilled of all the designers that were

9    taken back, but I think he's an important enough person that

10   Mattel was interested in having him back after his first

11   employment period with Mattel.  So while he didn't, quote,

12   unquote, make or break the company, he was certainly a

13   person who was invited back because of his skill.

14           The second thing is, I can't help to be struck --

15   to be struck by the fact that I don't think there are that

16   many designers that I have seen who appear on boxes, and

17   maybe that's not because -- maybe that's just my

18   unfamiliarity with the toy industry.  I don't fine that a

19   rarity.  I don't think that makes him "Designer of the

20   Year," but it was a nice accolade to the young man and his

21   creative skills that Mattel chose to put him on a box.

22           The third thing is everybody speaks about his

23   brilliance.  So when you talk to me about the machinations

24   he'd have to go through to exercise his creative ability, on

25   the other hand, I'm hearing the counterargument and that is

1    that he was really given quite a bit leeway, maybe not as

2    much leeway as he wanted to exercise.  And so I'm --

3          I understand the safest course of action, quite

4    frankly, is that I simply define it in statutory terms.  But

5    it's such an oddity, and it typically hasn't happened, and

6    it's causing me a tremendous amount of caution to draw back

7    and wonder why I would be taking that position in light of

8    the *Huong Que* case, whether I think that it's rightly or

9    wrongfully decided.  It conflated the two.  Conrad Rushing

10   put those two together.  I don't see any other case that

11   excludes it.  I see cases that speak to all employees or

12   agents are not necessarily -- all employees are not

13   necessarily agents or fiduciaries.  Those are some of my

14   initial concerns.

15         MS. HURST:  And, your Honor, if the court is

16   looking for, I think, a case that either expressly includes

17   or excludes, let's call it a non-fiduciary employee duty of

18   loyalty, I don't think it exists.  I don't think it exists

19   for Mattel.  It doesn't exist for MGA.  There are certainly

20   a bunch of cases saying the *bare employment relationship*

21   *does not create a fiduciary relationship.*  We've cited those

22   in the past.  *Amid versus Hawthorne Community Medical Group,*

23   212 Cal.App.3d, 1383 at 1391.  It says, quote:  *A bare*

24   *employer/employee relationship does not create a*

25   *confidential relationship,* end quote.

```
 1          THE COURT:  We know he's not a director.  He's not

 2    an officer.  But what happens if I view him as, whatever

 3    this means, a skilled employee?

 4          MS. HURST:  This is where the court also has to,

 5    you know, consider Labor Code Section 16600 and the policies

 6    of California that everyone is entitled to take their skills

 7    and go elsewhere.  Yes, he was on a box.  I understand why

 8    the court might view that as significant.  When we get one

 9    of their employees on the stand to talk about their

10    contracts, the court will see that the contract they adopted

11    for March 2004, for the entire Mattel brand division of the

12    company, had a form broiler plate provision in it requiring

13    each and every individual to give up their likeness and

14    their right of publicity to be used by the company at any

15    time, a provision that many people objected to at the time.

16          So, is that special?  Certainly, we'll have

17    evidence that it was not so special.  Did he have enough

18    skill to be invited back?  Yes.

19          THE COURT:  If I recall, he was explicitly

20    solicited.

21          MS. HURST:  I'm not sure the evidence was he was

22    solicited, as opposed to he was ready to get out of Missouri

23    and he reached out to them.

24          THE COURT:  No, I disagree.  Remember the

25    correspondence that went on?  I'll find it later, but there
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    was an affirmative --

2        MS. HURST:  That was the offer letter, after he

3    had come from the interviews; right?

4        And, I think, that evidence is that he reached

5    out.  But either way, he got an offer.  He came back.

6    People will come and testify -- if they come, assuming they

7    will -- that he was viewed as a designer of, quote, unquote,

8    generic glamor.  Some people will testify, like Vice

9    President Matt Turetzky, that he was kind of a pain in the

10    butt, that he was extremely emotional, and he didn't take

11    criticism well.

12        Those in his group will testify that, you know, he

13    was good; others will testify he was a middling designer.

14    I'm summarizing for the court the deposition testimony.  I

15    mean, obviously, we don't know how many of these end up

16    getting on the stand before the end of the trial.  But, you

17    know, he was not --

18        I mean, look, he certainly has a skill set, and he

19    was employed for that skill set.  It did not give him the

20    authority to bind Mattel in any way, shape, or form with

21    respect to anything.  And he's not an agent as a result.  I

22    mean, Mattel, the evidence will show, had schedules of

23    corporate authority, you know, where certain level people

24    could sign and bind Mattel to certain levels of expenditure,

25    to just take as an example.  They, themselves, considered

1    only director level and above employees to be, quote,

2    unquote, executives who had authority for the company.  He

3    was never even a director-level employee, and they had those

4    in the design group.  They had director-level employees in

5    the design group.

6            So, you know, I understand the court's concern

7    about, maybe, he was kind of special.  I think the evidence

8    will show otherwise, but most --

9            THE COURT:  Even if it does, even if it's

10   arguable, it's like a summary judgment.  There is a material

11   issue of fact.

12           MS. HURST:  Right.

13           THE COURT:  Why does that limit me by definition

14   to simply sending a statutory code section back.

15           MS. HURST:  Because it's not -- you can't just

16   have quasi-duty.

17           THE COURT:  No, I understand that.

18           MS. HURST:  You know, and so -- you know,

19   personally, do I think we should get summary judgment under

20   2863?  Yes.  But is there a problem submitting a 2863

21   instruction to the jury?  No.

22           And my able colleagues have found a case,

23   apparently, while we've been sitting here, where a

24   2863-style thing was submitted to a jury.  It's an

25   unpublished case:  *Levin versus Canon Business Solutions.*

1          THE COURT:  Do you know what Judge Kozinski thinks
2     of unpublished case?
3          MS. HURST:  The court's question was:  Is there
4     one that ever went to a jury?  That's all we could find.
5          THE COURT:  *Levin versus Canon*?
6          MS. HURST:  It is 2010 Cal. App., un-pub Lexus
7     1582.  But just so the court knows, there is -- it's not
8     completely crazy, right?  It has -- so there's not --
9          I mean, there's no support for the notion of a,
10    sort of, duty, or even a semi-duty, or even a sliding-scale
11    duty here based on skill.  You know, any skilled worker then
12    could be said to be subject to this duty, and that would
13    include the seamstresses.  I mean, you know, as Mr. Price
14    has argued through his question, they're skilled workers as
15    well.
16         THE COURT:  What do I do if I determine, in my own
17    mind, that Bryant is arguably under the rubric of a duty of
18    loyalty but Tumaliuan is not?  In other words, I have got an
19    intern, a summer intern that is not being paid, on one hand,
20    lumped with Bryant who is at the other end of the spectrum,
21    arguably, and I haven't heard concerning how skilled the
22    seamstresses are yet, or how much they get paid -- although
23    I have seen some documents that informed me on Saturday --
24    they seem to be well prepared and well paid, but I'm not
25    certain of that.  I've heard that they are highly skilled

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    from Mattel's prospective, and I don't know what MGA's

2    perspective is going to be.  So I haven't heard them yet.

3    So, maybe, I'm premature in making this decision.

4              In other words, I got all three spectrums.  I'll

5    ask one time:  What do I do when I believe that you have,

6    potentially, a very strong argument under 2863 concerning

7    Tumaliuan, but I'm not as enamored with your argument

8    concerning Bryant?

9              MS. HURST:  Well, Tumaliuan shouldn't be submitted

10   to the jury.

11             THE COURT:  Now that we've resolved that, what do

12   I do with it?

13             MS. HURST:  Well, I think the court has two

14   choices:  It can either define two different duties, or it

15   can give some kind of sliding scale instruction and let the

16   jury decide.

17             THE COURT:  What do I do with the seamstresses?

18             MS. HURST:  I think it's the same thing.  They fit

19   into the sliding scale.  But, your Honor, I just want to --

20   I just want to remind the court that Mr. Bryant --

21             THE COURT:  You know, the sliding scale is not

22   good for you.

23             MS. HURST:  Well, no.  I mean, but Mr. Bryant is

24   not at the only end of the spectrum here, okay?  Of all the

25   people in this case, Ron Brawer, a senior vice president of

1   customer marketing --

2          THE COURT:  Well, just a moment.  That's the easy

3   one.  We're not talking about Brawer.  He's not included in

4   this.

5          MS. HURST:  But the court has found that Carter

6   Bryant was not -- as a matter of law not fiduciary and that

7   was a correct holding under *City of Hope* --

8          THE COURT:  I'm not speaking about a fiduciary

9   now, so I don't want your argument to say, *Well, that's not*

10  *even on the table.*

11         MS. HURST:  All right.  Well, our view would be,

12  you just give them the statutory language at 2863.

13         THE COURT:  Let me turn back to Mattel.

14         MR. ZELLER:  Although this, perhaps, is not the

15  most exciting part of the argument at this point, let me

16  just correct one misperception that MGA has been

17  propagating, including through its witnesses.  Ryan

18  Tumaliuan was not a, quote, intern, end quote.  He was a

19  full time paid employee.  We're going to put his employee

20  file into evidence.

21         MGA has, you know, attached this label to him,

22  undoubtedly, to try and minimize that portion of the

23  misconduct.

24         THE COURT:  Is that because I've only seen those

25  e-mails thus far where he had a summer extern job, and I'm

```
 1   later going to find out he's a full-time employee?
 2               MR. ZELLER:  Exactly.  And that's because you've
 3   seen MGA e-mails trying to characterize him as an intern.
 4   But that is not, in fact, what his employment status was.
 5   He has an employee file.  He signed an Inventions Agreement.
 6   He signed the conflict of interest questionnaire.  He was an
 7   employee, so we will establish those things.
 8               THE COURT:  Everybody signed the Inventions
 9   Agreement.
10               MR. ZELLER:  I'm sorry?
11               THE COURT:  Didn't everybody at Mattel sign the
12   Inventions Agreement?
13               MR. ZELLER:  That is the policy, yes.
14               THE COURT:  The one that Judge Trott couldn't
15   read?
16               MR. ZELLER:  Right.
17               THE COURT:  That I can't read?
18               MR. ZELLER:  Well, we have the original now.
19               THE COURT:  That's amazing.  That's good.
20               MR. ZELLER:  So that one is legible.
21               THE COURT:  I think both Judge Trott and I will be
22   ecstatic over that.
23               MR. ZELLER:  I do think that there is an aspect of
24   this in which, you know, MGA is getting way ahead of itself
25   in terms of its factual arguments and asking the court to,
```

1    essential, buy into its characterizations of the facts.  We

2    obviously disagree.  Carter Bryant --

3              Regardless of how many layers of bureaucracy they

4    want to try and throw over him, the fact is, is that he was

5    a designer.  He had discretion in what he created.  Whether

6    or not it ended up in the marketplace might have had to go

7    through layers of approval, that scarcely can be the

8    standard for whether or not an employee should be permitted

9    to compete with his or her employer.  And as a matter of

10   fact, you know, it looks like Carter Bryant is actually

11   going to have to come back sooner rather than later, if it

12   looks like, you know, in some way the legal standards here

13   are going to be defined in a way that's different, because

14   you'll have to call him back to establish that, in fact, he

15   did have dealings with third parties.  He did have

16   discretion in how he performed his duties.

17             THE COURT:  -- calling him back anyways.

18             MR. ZELLER:  So, anyways, I don't want to get too

19   sidetracked by the fact that there are numerous areas in

20   which we absolutely disagree with MGA's characterization of

21   the facts here and certainly, also, as to the sample makers

22   who were making in excess of 40-, $50,000 a year.  They,

23   too, were working in the Mattel Design Center.  By the way,

24   of course, as the court is aware, the Mattel Design Center

25   is where people can walk around freely, seeing what is in

```
 1    development there at Mattel.  This is not an inconsequential
 2    type of position to be -- you know, type of access that
 3    people are given to the company's future products.
 4            The court has heard that undeveloped products or,
 5    you know, products that are not yet released in the market,
 6    MGA itself says are the most valuable thing in the toy
 7    industry.  You heard that from Paula Garcia.
 8            So in any event, moving beyond that, there's still
 9    core duties here that are undisputed that employees owe an
10    employer.  Regardless of how it's characterized -- duty of
11    loyalty, or whatever -- that they are not to compete with
12    their employer; that they are not to assist a competitor.
13    That's set forth in Stokes, in Fowler.  Regardless of
14    whether one wants to look at the underpinnings of those
15    decisions and say, Well, perhaps they could have been better
16    reasoned; or, perhaps, they don't -- they have ultimately a
17    dead end, the fact is, is that's evolution of the law.
18            This is two Court of Appeals decisions
19    articulating California law.  These are holdings.  They're
20    not -- so I don't think that it's something that can be set
21    aside, simply because we think, perhaps, the court should
22    have done something else to try and rationalize or explain
23    its decision.  I would even say, of course, in some
24    respects, it's actually -- I don't find it troubling at all
25    that any of these cases are discussing fiduciary duty cases.
```

```
1   I mean, reasoning by analogy occurs in court decisions all
2   the time.  It is a completely proper and accepted form of
3   legal reasoning.
4           And, again, at the end of the day, that is stating
5   what the law is.  Perhaps, we think it could have been
6   better articulated, could have been better reasoned, but
7   that's no reason to set it aside and, particularly, when we
8   have well-recognized authorities like the Restatement Third
9   of Agency saying the same thing.
10          And she still -- MGA has still not found a case
11  that says it is okay for an employee to compete with his or
12  her employer, or to assist a competitor while employed.  One
13  thing I would also say is that --
14          The problem with, just simply reading 2863 to the
15  jury, is that, number one, in our view, it's too narrow.
16  It's not clear.  It doesn't say clearly these kinds of
17  duties and obligations not to compete with an employer and
18  not to aid an competitor.  It just does not state that very
19  clearly.  And it -- in fact, that's set forth in these other
20  cases.
21          THE COURT:  How do I deal in the jury instruction,
22  if I do this, with having the jury decide whether in fact a
23  duty of loyalty even applies?  In other words, how do I
24  construct?
25          Besides defining the duty of loyalty, do I
```

```
 1    construct an instruction that calls upon the jury to make

 2    the decision whether this claim is even applicable, based

 3    upon Carter Bryant's position?

 4            Or do I just assume and skip that portion of it

 5    and define it, this is a duty of loyalty?  Because if I just

 6    define it this is a duty of loyalty, what I've really told

 7    the jury is:  He either is, or he isn't.  And I don't think

 8    that they are going -- I think the assumption is that he is

 9    an employee, that this section should apply to.

10            And I think what MGA is arguing is:  The section

11    shouldn't even apply to him.  So it would seem to me if I do

12    this, I have one other step to take; and that is, I have to

13    give to the jury the initial determination of whether this

14    claim even applies, based upon his stature, let's say, with

15    the company.

16            MR. ZELLER:  Certainly our view is, is that it

17    applies as a matter of law.

18            THE COURT:  I understand.  And their view is it

19    doesn't as a matter of law.

20            MR. ZELLER:  I do agree to the extent that the

21    court doesn't determine it to be a matter of law.  At a very

22    bare minimum, it is a jury issue for the jury to decide.

23    Certainly one thing we can say, I think, with some

24    confidence is, is that what the evidence will show could not

25    possibly exclude the imposition of those kinds of duties.
```

    1              So all we're really into a debate about is, is

    2    whether or not there is a predicate that the court will have

    3    to instruct on to say, you, the jury, must first determine

    4    whether this duty applies to a given employee.  Obviously,

    5    we don't believe that that should be given.  But the other

    6    side of the coin is, is even if you're convinced by MGA's

    7    arguments or troubled in any way by any of this, it's still

    8    a factual issue for the jury.

    9              The next point I would say about -- and here is

   10    another troubling aspect of MGA's position that it wants

   11    2863 to simply be read to the jury, and you heard the

   12    argument from Ms. Hurst.  She actually says on its face it

   13    permits moonlighting.  Her interpretation was, is because it

   14    uses the word "preference."  In fact, that's just simply

   15    confusing, and I'm afraid it will be confusing to the

   16    layperson.  But look what the language of it actually says.

   17    It isn't preparatory in that way.  It says: *An employee who*

   18    *has any business to transact on his own account similar to*

   19    *that entrusted to him by his employer shall always give the*

   20    *preference to the business of the employer.*

   21              Now, going back to my first point, this is too

   22    narrowly framed.  That's actually our largest concern about

   23    applying this section.  But it is simply not the case that

   24    MGA should be permitted to argue to the jury from 2863's

   25    language that somehow it's, maybe, the employee just has to

1    show a preference.  It's very disconcerting to hear that

2    this is how, apparently, this legal argument is going to be

3    used.  And, obviously, we don't think that that's proper.

4            What I would also point out here is, is that we

5    haven't really had ultimately any response to the fact that

6    these duties are recognized as applying to employees under

7    common law.  Again, perhaps, we can be somewhat skeptical or

8    maybe their origins are not 100 percent clear, but that's

9    the established case law, and I don't think we can disregard

10   it for that reason.  And one reason --

11           You know, the court was saying earlier that it

12   just finds all this an oddity.  An oddity of kind of MGA's

13   position, because you're exactly right.  We have seen this

14   kind of duty talked about with respect to employees for

15   literally decades.  There is nothing that -- the oddity is

16   simply MGA now suddenly -- and I think you heard them

17   acknowledge this during the course of the argument -- that

18   this would be the first court to ever, essentially, say that

19   this kind of duty simply does not apply to employees.  And

20   it would be, frankly, I think a tremendous surprise to

21   employers in California to find out that their employees are

22   at liberty to set up competing businesses from their home,

23   to aid competitors regardless of whether it's from within

24   the company, or at home, or in some other way.  That doesn't

25   strike me as something that's a novel proposition.

1          Ms. Hurst, actually, goes so far as to say, *Well,*

2    *could MGA have knowledge of some legal principle while we*

3    *are all struggling with it?*

4          But the reality is, it's right here in the

5    Restatement.  It's in California Court of Appeals decisions.

6    This is a principal that is known.  And Mr. Larian,

7    actually -- you know, he's not entirely consistent about it,

8    of course, but he has acknowledged from the stand on more

9    than one occasion that he understood it's wrong.  You are

10   not supposed to hire the employees of your competitors.  And

11   he certainly doesn't want -- and have them working for the

12   competitor and working for him at the same time.  And he

13   certainly doesn't want his own employees to do that.  So.

14          the idea that somehow now we're going to be into

15   a defense about the law wasn't clear to us, you know, is, I

16   think, somewhat far afield, but I just don't think it holds

17   any water at all.  But, ultimately, there's just -- there's

18   no support whether in common sense, whether in the case law,

19   or just simply what one would expect that if you were to do

20   a street poll what you would find out and think what people

21   will understand to be the obligations employees owe to

22   employers, that they are just simply free to compete.  That

23   is really the position that MGA is taking here, and it

24   doesn't have support.

25          What I think we have to sort of focus on here,

1    too, is that once we go through all of the, kind of,

2    semantic unraveling of the terminology that's sometimes used

3    in the cases, what MGA is actually saying to the court is

4    that employees should be permitted to compete with their

5    employers while employed.  There is no authority for that

6    proposition, regardless of the level of the employee.  And,

7    you know, one can certainly -- and I take the court's point

8    in some ways, too, that, perhaps, there could be some

9    theoretical exception for someone who is so completely low

10   level, or a particular kind of job.  But we aren't anywhere

11   near that kind of debate in this particular case.

12           These are employees working in a secure design

13   center where the toy company, their employer, is developing

14   its future toys.  This is not somebody sacking groceries.

15   This is not someone, I think -- I'm probably not as smooth

16   with the terminology as the court is, but you were using,

17   sort of, the ox example.  But there may be some level of

18   employee that just, hypothetically, some day in another

19   case, perhaps, the court might say, *Well, we won't impose*

20   *that kind of duty,* because it sort of exceeds the rationale

21   for doing it, but these are not this kind of employees.

22           THE COURT:  Okay.  Mr. Quinn, are you satisfied

23   with the argument?

24           MR. QUINN:  I am, your Honor.

25           THE COURT:  Anything you would like to add, sir?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. QUINN:  No, your Honor.

2          THE COURT:  Let me turn back to Ms. Hurst.

3          MS. HURST:  Basically, what Mattel is asking you

4   to do is ignore the California legislature.  There is a

5   statute on point here.  It's been in existence since 1872.

6   It was reenacted as part of the Labor Code in 1937.  It is

7   in effect, and as --

8          THE COURT:  Just a moment.  But why am I limited

9   to that?  The courts oftentimes takes legislative acts and

10  give instructions in such a way.

11         MS. HURST:  Because in the case of this

12  legislative act on point, it makes clear that certain kinds

13  of conduct is authorized.  And what Mattel is trying to do

14  is argue the opposite.  In other words, they're trying to

15  create a common law duty that is inconsistent with the

16  language of the statute.  That you cannot do.  If the answer

17  here is, *Wow!  You know, that employee at McDonald's should

18  not able to work the second shift at Burger King because

19  that's competing with his employer*, then take it up with the

20  California legislature, because they said more than 100

21  years ago --

22         THE COURT:  Did the employer at Burger King cite a

23  noncompete agreement?

24         MS. HURST:  That's a different issue.  A

25  noncompete wouldn't be enforceable in the state of

1   California.

2           THE COURT:  Understood.  By the way, it would be

3   in Washington, just a little north of us.

4           MS. HURST:  Could be.

5           THE COURT:  It is.

6           MS. HURST:  But that would be a matter of contract

7   between employer and employee.  And it might be a basis for

8   discharge.  And it might be a defense to a claim for

9   wrongful discharge as in *Stokes* and *Fowler*.

10          With all due respect, Mr. Zeller is just wrong

11  when he says that those cases hold that there is this type

12  of tort duty.  They clearly say we're not saying there's a

13  tort duty, so --

14          They pursued a contract theory against Mr. Bryant,

15  and they settled it.  They can always pursue the contract

16  theory.  They can always fire people.  They have a trade

17  secret claim.  They have an intentional interference of

18  contract claim.  But to say there is an additional tort duty

19  at common law, which is not just an elaboration of, but

20  is -- they are arguing will be applied inconsistent with the

21  meaning of this statute -- impermissible.  And it's

22  especially impermissible when you consider *Foley versus*

23  *Interactive Data* and, frankly, just basic principles of

24  separation of powers and the construction of statutes and so

25  forth.  And I'm sure if I go away from here, I can come back

1    with 10 cases for the court saying you can't just create a

2    common law duty that's inconsistent with legislative

3    enactment.

4              This statute on its face contemplates the employee

5    transacting business on his own account similar to that

6    entrusted to him by his employer so long as he gives the

7    preference always to the business employer.  Carter Bryant

8    went to work.  The seamstresses went to work.  They did

9    their duties.  There is no allegation or evidence that they

10   failed to perform their duties because of working for MGA.

11   And if there were, then that would be relevant under this

12   statute.  But that is not the case that we have here.  This

13   is --

14             Right.  As Mr. McConville points out, this statute

15   is part of the whole statutory framework about the

16   employment relationship.  That whole division and chapter of

17   the Labor Code has a whole series of provisions defining the

18   employment relationship.  It defines the obligations of the

19   employer.  It defines the obligations of the employee, and

20   it includes Section 2870 about inventions.  The California

21   legislation has comprehensively addressed the subject

22   matter, and it has separately addressed the subject matter

23   of agency and defined an agent.

24             And this brings me back to *Huong Que*, your Honor.

25   In *Huong Que*, in the purchase and sale agreement for that

1  business, that -- I think it was a greeting card business,

2  ironically.  In that agreement, they accepted that they

3  were, quote, unquote, managing agents.  Managing agents.

4  They accepted expressly a position of agency.  Of course,

5  there is a duty of loyalty for an expressed agency

6  relationship.  That's *Huong Que*.  They expressly accepted a

7  position of agency in the purchase and sale agreement.

8  Beyond that, they agreed not to compete and that was the

9  sale of business, so it's one of the few situations under

10  California law where the noncompete is enforceable.  So that

11  case is completely different from what we have here.  And

12  given the express acceptance of an agency relationship in

13  *Huong Que* is not different from all the other fiduciary

14  cases.  It is disputed that this is a duty.  I don't know

15  why Mattel always wants to characterize things as

16  undisputed.  It's disputed.  And it would be -- they may

17  call Carter Bryant back, but to --

18         I mean, they have lots of other people who can

19  come and testify about what his duties were.  If they are so

20  right about this, where are all of his bosses?  Where is

21  Ann Driskill?  When is Ron Longsdorf?  Where is Cassidy

22  Park?  Where is any Mattel executive, past or present, to

23  come and testify about what his duties were?

24         He's not the only person who has knowledge of

25  that.  We've not seen a single one of their witnesses, yet.

1   So, I mean, to suggest that they can call the witness back

2   because they failed to get what they needed from him in the

3   first place is absurd.

4          But putting that aside, Mr. Zeller acknowledges

5   that the statute is, quote, *too narrowly framed*, end quote,

6   to get the result that they want.  The answer for that is

7   not for the court to make up a duty.  It's to apply the

8   statute and dispose of the claims.

9          I'm looking in the peanut gallery to see if they

10  have anything they want me to add.

11         THE COURT:  Let me see if I can articulate the

12  last question I have.  In California, we encourage mobility,

13  unlike the state of Washington.  California law, apparently,

14  believes that it is a dynamic workforce, especially in

15  places like the Silicon Valley and the ability of highly

16  skilled creative people to change jobs enhances the business

17  climate in the economy.  Other states take a contra

18  position.

19         If a company is allowed to take the thought that I

20  had and simply by virtue of requiring, in this case, an

21  Inventions Agreement that any company by virtue of even the

22  commonness employee would at least stifle what seems to be

23  the legislative intent, allowing employee mobility.  And if

24  that were the case, the argument could be made that the

25  California courts would readily adopt the position that this

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   was an adhesion contract.  Because the policy would be so
 2   strong for mobility in this state that these blanket
 3   contracts would mean very little, I think, and we would have
 4   the effect of, probably, the courts in California, looking
 5   at these as adhesion contracts.
 6          I don't know if that bears any relation to the
 7   argument tonight.  I think I'm done with my questions this
 8   evening before I turn to the 17200 claims, but I want to
 9   make certain that I let Mr. Zeller and Ms. Hurst have any
10   further comments, and we'll close the door on this for
11   tonight.
12          MR. ZELLER:  Just very briefly, your Honor.
13          With respect to the mobility issue, number one,
14   is, is that prohibiting an employee from not competing with
15   the employer during the term of employment is no effect on
16   mobility, whatsoever.  I mean, they can simply leave; and
17   then, they can go and compete.
18          And number two --
19          THE COURT:  And there's no duration in this
20   contract that was signed by Mattel, unlike MGA's contract
21   that had a year provision in a sense.  The other argument,
22   though, is that your contract was for an indefinite period
23   of time.  So it could be argued either way that your
24   contract could be more adhesive.
25          MR. ZELLER:  I'm simply talking, right now, the
```

```
 1    common law duty for an employee.  But imposing a common law

 2    duty on employees not to compete during the term of the

 3    employment with the employer would have no effect on

 4    mobility, because the employee can, of course, simply leave

 5    and compete is what I'm saying.  It provides no barrier to

 6    leaving.

 7              And, in fact, if anything, that kind of interest

 8    is accommodated by the preparing to compete.  In fact, in

 9    some ways -- and this is, perhaps, an irony of this whole

10    argument -- MGA, itself, has relied rather heavily on this

11    exception rule, call it this principle, where an employee is

12    allowed to engage in preparations to compete.  But the very

13    fact that that's allowed and the proper circumstances shows

14    that just simply outright competing with your employer is

15    not proper.  There would be no need for that allowance.  If

16    the law simply said one could compete all the time with

17    one's employer, you wouldn't need allowances for mere

18    preparations to compete.  It wouldn't exist.  So that's the

19    point I wanted to make about mobility.

20              Number two, for the first time MGA is now making

21    this, really, as an argument about statutory preclusion, or

22    preemption, or -- however one wants to characterize it.  The

23    fact is, is that this statute that MGA is relying on, 2863,

24    nowhere says that it's exclusive.  There is nothing that MGA

25    cites for the proposition that, as counsel put it, that the
```

 1    legislature of California intended to occupy the field; that

 2    it was simply to completely supplant any common law duties.

 3    There is no court that has said that.  There is zero

 4    authority by the courts, nothing in the legislative history

 5    that has been cited by MGA that this statute was intended to

 6    be the full spectrum and the only statement of what an

 7    employee's duties are to the employer.  That's just simply

 8    completely unsupported.

 9          The final point, I think, that I would make, your

10    Honor, is, is that in fact it's very -- everywhere in the

11    Silicon Valley, everywhere in Hollywood, everywhere in the

12    toy industry, all types of creative industries rely upon

13    these kinds of contracts that we are talking about, so it's

14    no small thing to just simply set them aside.  I mean, this

15    is something that had very far ranging ramifications, and

16    the court has been seeing evidence in this case.  It's, of

17    course, coming from MGA as well that these kinds of

18    principles, these kinds of contracts are recognized.  As the

19    court has pointed out, MGA has provisions that are far more

20    onerous than anything contemplated by Mattel's contracts.

21          And by the way, as I understood it, MGA in any

22    event has dropped its unconscionability defense to the

23    contract.  There was only one small part of it, I thought --

24    I understood was even viable to begin with, which was to the

25    extent that it sought to assign ideas.  But I believe,

1   undoubtedly, because MGA's own contract provides for that as

2   well, they've dropped their unconscionability defense.

3   Because, obviously, the consequences to MGA would be is that

4   its contracts are gone as well for it to try to mount that

5   kind of offense.

6           At the end of day, your Honor, what I was really

7   talking about is, was what we think are these common law

8   duties.  It's certainly well taken and we certainly agree

9   that the contracts also provide for these duties on Mattel

10  employees as well.  But I think in terms of the duty of

11  loyalty, what we're really focused on is, is that there is a

12  common law duty here and there is also one that, at least in

13  part, is defined by the statute, a nonexclusive statute that

14  helps define what those employee duties are.

15          Thank you.

16          THE COURT:  Ms. Hurst?

17          I'm sorry.  Mr. Quinn, anything else?

18          MR. QUINN:  No, your Honor.  Thank you.

19          MS. HURST:  I mean, the sliding scale concept is

20  just a backdoor way of imposing a fiduciary duty, which is

21  what they really are ultimately trying to do here, and they

22  have contract.  They have trade secret.  They have

23  interference with contract.  MGA, you know, by Mr. Larian's

24  own admission, doesn't think he can enforce anything that is

25  tantamount to owning people 24 hours a day, and that's

1    correct.  There are cases invalidating contracts like this

2    as unlawful noncompete provisions, not on the point we're

3    presently discussing but on the assignment.  One of them is

4    the *Applied Materials* case correctly invalidating an

5    assignment provision where it could have the effect of

6    reaching post-employment.

7            So those principles, the employee mobility

8    principles clearly are implicated by this.  It's not

9    consistent when you got the legislature who has carefully

10   calibrated this, 16600, and these other provisions.  I'm not

11   saying that they occupied the field, and there's no room for

12   any judicial, you know, interpretation.  I did not say that.

13   But there is a carefully calibrated scheme here that has

14   time and again been recognized as very important to the

15   economic progress and health of the state.  And they don't

16   cite a single case imposing a duty of loyalty on somebody

17   who is not a fiduciary.  They just don't.

18           *Huong Que* is a managing agent, express agency, a

19   fiduciary.  So, in the absence of that, your Honor, the

20   statutory language should control, and that's what the jury

21   should be charged with.

22           THE COURT:  I think I'm satisfied concerning the

23   conversion and the aiding and abetting arguments this

24   evening.

25           Were we going to argue unfair compensation claims

1    this evening?  17200?

2            I thought we were.

3            MR. ZELLER:  The court orders indicated that.

4            THE COURT:  I would like to just start anyway and

5    maybe finish with it.

6            Before we get into the argument about the

7    potential instructions, you noted informally on Saturday

8    that MGA wanted this submitted to the jury for an advisory

9    opinion and that Mattel did not.  And I think your positions

10   should be on the record concerning that.

11           MR. ZELLER:  Yes, thank you.  And the court is

12   correct on that.

13           We think that -- just as a preface to this, the

14   court is aware that MGA's 17200 claims are a sprawling,

15   amorphous grab bag of complaints, everything from moving

16   things on shelves, to licenses, to you name it.  It is

17   something that, frankly, from our perspective, has been just

18   simply, you know -- to use the court's the expression -- a

19   mushroom-shaped cloud, and it only gets worse.  It has not

20   gotten better.  It has not gotten narrow.  It's just

21   literally every complaint that Isaac Larian has ever had

22   about anything that Mattel has done, and it's put into that

23   claim.

24           We, obviously, have -- we move for summary

25   judgment on it.  We don't think that it's proper.  So I

```
 1    won't rehash that part of it.  But it is certainly the case
 2    that to allow, kind of, free form kind of complaints by MGA,
 3    under the guise of being, you know, essentially, an
 4    undefined 17200 claim, simply to trash and dirty up Mattel,
 5    is not right.  It's unfair.  It is going to, from our
 6    perspective, be essentially an effort to derail the trial.
 7    Even more importantly -- and there is authority to this
 8    effect, which is:  When you have that kind of situation
 9    where the equitable -- the evidence that goes to the
10    equitable claims is inserted, it can taint the
11    deliberations, and it can distract the jury from making the
12    determinations they are required to make.  There are certain
13    determinations this jury must make as a matter of Seventh
14    Amendment law that is absolutely required.  That is their
15    task.  To then have evidence about equitable considerations
16    put into that mix where they are going to be, you know,
17    asked for the advisory verdict or not simply runs the
18    risk -- and we think a very severe risk -- that they will
19    make determinations that will be influenced by that kind of
20    evidence.  And they should not be.
21         The court is going to be faced with, literally, a
22    parade of 403 problems from our perspective.  Is it really
23    the case that the jury should hear testimony from MGA about
24    some complaint that someone rearranged some shelf space in
25    Europe?
```

1          That is by definition very far afield from the

2     issues that the jury is going to have in front of it and

3     must actually decide.  So we're very concerned that this

4     kind of mushroom-shaped cloud is going to taint the

5     deliberations, and that is our -- that's our concern about

6     unfair prejudice.  And MGA undoubtedly will come back and

7     say, *Well, this is all deserved.  Mattel did all these*

8     *terrible things and, therefore, the jury ought to hear about*

9     *it.*

10          That simply does not follow.  This is not a

11     determination that they ultimately will be making.  These

12     are equitable claims, and there will be equitable defenses

13     as well heard by the court.

14          Also, the court has already on -- somewhat

15     complicating this as well is that the court has already made

16     determinations on some of the equitable defenses.  Some of

17     them are gone.  MGA's abandonment and waiver defenses are

18     gone.  The unclean hands defense of MGA has been limited so

19     that it cannot be asserted as against the Carter Bryant

20     related claims that are being made by Mattel, which means

21     that the jury has got to be instructed on all of that.  So

22     that creates more complications.  There will be *in limine*

23     instructions.  And, frankly, given the amount of effort it's

24     going to take to try to police all this in front of the

25     jury, you know, and the real prospect that it will taint the

1    deliberations, from our prospective, makes this completely

2    unnecessary.  And we, of course, recognize that our

3    equitable claims and defenses would fall within the same

4    boat, we'll say, that they would have -- that we would

5    accept the same kind of result; namely, that they would not

6    be put in front of the jury for an advisory verdict, or for

7    any other reason.

8           So we would contemplate that it would be -- it

9    would run both ways, your Honor.

10          THE COURT:  Thank you.

11          MGA?

12          MS. HURST:  Thank you, your Honor, yes.

13          As the court may recall, Mattel did move *in limine*

14   on this and that motion was denied to prevent this claim

15   from going to the jury.  We did discuss this claim in

16   opening statement in two particulars.  The Kohl's evidence,

17   which as the court will recall, involved Mattel crowing

18   about an illegal exclusive arrangement that it reached with

19   a retailer which literally caused MGA's business with that

20   retailing to plummet from more than $5 million to nothing

21   overnight, as well as the interference with licensing

22   issues.

23          Now, these are relevant to legal issues insofar as

24   they relate to unclean hands and to Mattel's damages claims.

25   But this should go to the jury.  And it's not undue

1    prejudice, or unwarranted prejudice.  It's the effect of

2    their conduct that they fear, which is exactly what the

3    court ruled on the motion *in limine*.  That's not unfair

4    prejudice.  That's you engaged in a bad act and now you're

5    being held to account for it.

6            So this should go to the jury.  And the court had

7    previously ruled that it would go to the jury.  It would be

8    prejudicial to MGA now, if the court alters its decision

9    because the jury has heard about this issue in opening.

10   And, you know, if now we're not able to follow up on that,

11   that will be problematic from MGA's perspective.

12           And the risk of the mushroom-shaped cloud, well,

13   you know what?  We've seen every kind of document put on the

14   table for Mr. Larian's examination, and we're not afraid of

15   the hard work necessary to sit here and go through the

16   documents and discuss them with the court and figure out

17   what's in and what's out.

18           So this should be submitted to the jury as the

19   court has previously ruled it would be.

20           THE COURT:  Just a moment.

21       *(Pause.)*

22           THE COURT:  All right.  Let's leave this for

23   tomorrow.  Let's get you home tonight, so you get a little

24   bit of rest.

25           What should we take up tomorrow evening?  We're

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1   going to come back to the 17200 claim.  I'm going to leave

 2   that for the evening tonight.

 3              Intentional interference, tomorrow night?

 4              MS. KELLER:  Sure.

 5              MR. ZELLER:  Sure.

 6              THE COURT:  How's that?

 7              And then, we'll leave those two -- that will be it

 8   for tomorrow night, on Thursday.

 9              MR. ZELLER:  So tomorrow, your Honor, we'll be

10   able to complete the argument then on --

11              THE COURT:  17200.

12              MR. ZELLER:  -- including whether it goes to the

13   jury?

14              Because I just want to make sure I had an

15   opportunity to respond.

16              THE COURT:  Oh, you're going to have plenty of

17   time.  I'll start with just the first portion; and that is,

18   unfair competition claims brought pursuant to 17200 are

19   equitable.  There's no corresponding right to a jury trial,

20   *Bank of West versus Superior Court*, 2 Cal.4th 1256, at 1265

21   through -66:  However, the court has discretion to seek an

22   advisory opinion ... equitable claims and defenses under

23   *Traxler versus Multnomah County*, at 596 F.3d 1007 and 1013,

24   Ninth Circuit 2010.  And just setting the parameters, the

25   court may exercise this discretion in seeking an advisory

```
 1    opinion on a statutory unfair competition claim, but I'm
 2    free to, ultimately, disregard the jury's advisory findings
 3    under Contra Costa County versus Cowell Portland Cement
 4    Company, 126 Cal. App. 267, 276 and 277.
 5            What I'm -- well, let's just wait until tomorrow
 6    morning.  We're going to start off again.  I haven't made a
 7    decision.  Obviously, I've indicated I'm going to submit
 8    this to the jury, but that doesn't mean I still won't have
 9    an open mind on it, so let's start fresh tomorrow night on
10    that.
11            Let's go off the record for a second, and we'll
12    see you tomorrow.
13        (Off the record.)
14            THE COURT:  Let's go back on the record.
15            MR. QUINN:  This is a Funky Tweenz.
16            THE COURT:  Funky Tweenz.  Exhibit number?
17            MR. QUINN:  It's got an exhibit number right there
18    on the front, your Honor.
19            THE COURT:  13714.
20            MR. QUINN:  So, your Honor, MGA has said in sworn
21    statements that that Funky Tweenz is a reproduction, quote,
22    unquote, of Carter Bryant's drawings.  There were.  I can
23    say that without getting into Hong Kong law.  I can say that
24    without getting into infringement.
25            THE COURT:  Just a moment.
```

```
 1          (Pause.)
 2               THE COURT:  Okay.
 3               MR. QUINN:  The point is, on the one hand, first
 4     generation Bratz -- this gets back to that --
 5               First generation Bratz are not at all similar,
 6     according to Paula Garcia, to Carter Bryant's drawings.
 7     They made huge changes.  On the other, this is a
 8     reproduction, according to MGA, of Carter Bryant's drawings.
 9               THE COURT:  Where do I find that in the record?
10     In other words --
11               MR. QUINN:  The reproduction?
12               THE COURT:  No.
13               MR. QUINN:  Garcia's testimony?
14               THE COURT:  This is a reproduction of Carter
15     Bryant's --
16               MR. QUINN:  MGA has said that this is a
17     reproduction of Carter Bryant's drawing.
18               THE COURT:  Where do I find this?
19               MR. QUINN:  No, no.  This is in sworn statements,
20     in filings in this other litigation.
21               THE COURT:  In what?  Hong Kong?
22               MR. QUINN:  Yes.  This is Hong Kong litigation.
23     And I think we have actually filed that a couple of times
24     with the court in a couple of different briefs.
25               So we think, as a matter of admission and judicial
```

```
 1    estoppel, the jury is entitled to consider in contrast to
 2    the position that they have taken in this case that first
 3    generation Bratz is not at all like Carter Bryant's
 4    drawings, so that even if we own them, there is no copyright
 5    infringement.  Again, that's the one issue that a judgment
 6    on similarity will have to be made.  And consider that in
 7    light of their position that, for example, Funky Tweenz is a
 8    reproduction of the drawings.  Funky Tweenz which is, you
 9    know, miles away from the first generation.
10            THE COURT:  How far away?
11            MR. QUINN:  You can look at it.  I mean, we can
12    get a first generation Bratz doll out -- they are in
13    evidence up here -- and set it down right next to this
14    (indicating), and it speaks for itself.
15            THE COURT:  Okay.  MGA?
16            MS. HURST:  It is ludicrous to say that you don't
17    have to get into infringement or Hong Kong law to understand
18    the assertion that something is a reproduction.  The
19    reproduction right is one of the copyright rights.  A client
20    does not -- and by the way, none of these declarations were
21    signed by Mr. Larian, or Ms. Garcia.
22            But putting that aside, a client representative
23    does not sign a declaration tailored to particular legal
24    points without input and feedback from the lawyers under the
25    local and relevant law.  Of course, this was tailored to
```

1    Hong Kong law and what would be infringement under Hong Kong

2    law.  And it is absolutely circumventing the extrinsic

3    analysis under copyright to put in the evidence of the

4    accused product from Hong Kong and argue that, *Wow, these*

5    *are MGA* -- and I heard Mr. Quinn say twice, *Wow, MGA took*

6    *the position* -- not made a sworn factual admission, because

7    this is a legal conclusion -- *took the position that this is*

8    *close to the drawings.*

9            That was the position taken.  It was a legal

10   position.  And they've got no evidence of MGA taking such a

11   legal position in any way inconsistent with the assertions

12   that were made to the Ninth Circuit.

13           To the contrary, MGA stood up in this court and

14   dropped its affirmative trade dress claims in the

15   recognition that that was the proper and consistent course

16   of conduct to take in light of the arguments it was making

17   in the Ninth Circuit and the Ninth Circuit's rulings about

18   what was protected and what isn't.

19           So this is absolutely an attempt to circumvent the

20   extrinsic analysis conducted by the Ninth Circuit about what

21   is protectable and what isn't, about the careful extrinsic

22   analysis conducted by this court at summary judgment.  It is

23   prejudicial, because it will bleed over into the indirect

24   profits case, if they are permitted to submit one.  And it

25   is going -- it's prejudicial, because it creates a trial

```
 1    within a trial.  And now we got to call our Hong Kong
 2    lawyers over here to explain it.  We get to say, Well, we've
 3    taken fully consistent positions in this case by dropping
 4    our trade dress claims once the Ninth Circuit tells us
 5    what's protectable and what's not.  You just can't do it.
 6    It is a mushroom cloud.  It's prejudicial.  And most
 7    importantly, it is a direct means of trying to circumvent
 8    what the Ninth Circuit has said is the law of this case
 9    about the elements that can fairly be compared and those
10    that cannot.
11              THE COURT:  All right.  We'll see you tomorrow.
12              Now, what time do you need to be here?  8:30, or
13    earlier?
14              Do we have the party coming?
15              MR. ZELLER:  Yes.
16              THE COURT:  What time?
17              MR. ZELLER:  Well, she, apparently, still hasn't
18    landed.  But let me just say this, your Honor:  When we last
19    talked to her, her expectation was, is that she would be
20    here at 7:30 tomorrow morning.
21              THE COURT:  Deborah, I'll need a court reporter
22    here at 7:30.
23              Okay.  We'll be here at 7:30.
24              MR. ZELLER:  And for whatever reason, when we
25    eventually hear from her --
```

84

```
 1              THE COURT:  That's our best effort, since she's
 2    not here.  So we'll be here.
 3              (At 9:07 p.m., proceedings were adjourned.)
 4                          -oOo-
 5
 6                        CERTIFICATE
 7              I hereby certify that pursuant to Section 753,
 8    Title 28, United States Code, the foregoing is a true and
 9    correct transcript of the stenographically reported
10    proceedings held in the above-entitled matter and that the
11    transcript page format is in conformance with the
12    regulations of the Judicial Conference of the United States.
13
14    Date:  February 17, 2011
15
16
17                        _____
18
19
20
21
22
23
24
25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*