1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                  – – – – – – –

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 19
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 4
                                        )
10            Defendants.               )
     _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Jury Trial

17              Santa Ana, California

18          Thursday, February 17, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-17 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
5                   MICHAEL T. ZELLER
                    WILLIAM PRICE
6                   Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               – AND –
20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 3 of 124   Page ID #:302613
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

3

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
5                 Attorney at Law
             601 West Fifth Street
6            12th Floor
             Los Angeles, California 90071
7            (213) 613-4660

8            - AND -

9            LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO

16           KEN KOTARSKI, Mattel Technical Operator

17           MIKE STOVALL, MGA Technical Operator

18           RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20           WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

**I N D E X**

**EVIDENTIARY HEARING**

**EXAMINATION OF CHARLOTTE MAIN**

                                                          <u>Page</u>

By Mr. Zeller                                              7
By Ms. Hurst                                              16

**EXAMINATION**

| <u>Witness Name</u> | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| LARIAN, ISAAC | | | | |
|   By Ms. Keller | | 18 | | |

**EXHIBITS**

| <u>**Exhibit**</u> | <u>Identification</u> | <u>Evidence</u> |
|---|---|---|
| Defendants' No. 3619 | | 53 |
| Defendants' No. 3622 | | 64 |
| Defendants' No. 6577 | | 105 |
| Defendants' No. 6766 | | 78 |
| Defendants' No. 6767 | | 47 |
| Defendants' No. 6769 | | 46 |
| Defendants' No. 6781 | | 49 |
| Defendants' No. 6793 | | 57 |
| Defendants' No. 6794 | | 60 |

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 5 of 124   Page ID #:302615
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

5

1           **I N D E X** (Continued)

2

3                **EXHIBITS**

4

5   <u>**Exhibit**</u>                    <u>**Identification**</u>     <u>**Evidence**</u>

6   Defendants' No. 6795                                   61

7   Defendants' No. 9231                                  116

8   Defendants' No. 9232                                  117

9   Defendants' No. 17358                                  24

10  Defendants' No. 17484                                  28

11  Defendants' No. 17485                                  29

12  Defendants' No. 17486                                  23

13  Defendants' No. 17489                                  25

14  Defendants' No. 18803                                  40

15  Defendants' No. 18867                                  21

16  Defendants' No. 18868                                  22

17  Defendants' No. 18869                                  23

18  Defendants' No. 18878                                  22

19  Defendants' No. 21070                                 111

20  Defendants' No. 21423                                 103

21  Defendants' No. 28835                                  36

22  Defendants' No. 29065                                  26

23  Defendants' No. 34863                                 120

24  Defendants' No. 35036                                  34

25  Defendants' No. 35075                                  82

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 6 of 124   Page ID #:302616
CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

6

1          **I N D E X** (Continued)

2

3                    **EXHIBITS**

4

5    <u>**Exhibit**</u>                    <u>**Identification**</u>          <u>**Evidence**</u>

6    Defendants' No. 35096                               20

7    Defendants' No. 35097                               25

8    Defendants' No. 35098                               38

9    Defendants' No. 35099                               39

10   Defendants' No. 35100                               40

11   Defendants' No. 35102                               41

12   Defendants' No. 35116                               27

13   Defendants' No. 35122                               30

14   Defendants' No. 35123                               32

15   Defendants' No. 35125                               35

16   Defendants' No. 35132                               36

17

18

19

20

21

22

23

24

25

1          SANTA ANA, CALIFORNIA, THURSDAY, FEBRUARY 17, 2011

2                    DAY 19, VOLUME 3 OF 4

3                          (12:39 p.m.)

4               *(The following proceedings is taken outside*

5          *the presence of the jury.)*

6               THE COURT:  Back on the record.

7               If you'd, once again, state your full name,

8    please.

9               And your full name, please.

10               THE WITNESS:  My name is Charlotte Kay Main,

11   M-a-i-n.

12               THE COURT:  Thank you.  This is the continued

13   examination.  Mr. Zeller?

14               MR. ZELLER:  Thank you.

15                 **CHARLOTTE MAIN, WITNESS, RESUMED**

16                    **EXAMINATION (Continued)**

17   BY MR. ZELLER:

18   Q    You and Ms. Prince discussed the fifth line of the

19   notary book entry specifically; is that true?

20   A    Yes, that is true.

21   Q    Please tell me everything that was said.

22   A    I believe that I told you everything I recalled this

23   morning, but what I do recall being said was that she spoke

24   with Mr. Carter -- or Mr. Bryant, excuse me, about his time

25   with his family in Missouri, and rekindling the relationship

1    with his family, and during that time period, having the

2    opportunity to also be creative during which he told her

3    that he prepared the drawings that she had notarized.

4            THE COURT:  In light of his question, let me ask

5    you one question:  There is a difference between you talking

6    about all five lines or talking about one line.  Did you

7    specifically talk, besides five lines, about the one line

8    which is the bottom line of the five lines in the notary

9    book?

10           THE WITNESS:  We specifically talked about her

11   conversation with Mr. Bryant about being in Missouri in

12   1998, and I believe that that was in connection with the

13   notation in her book.

14           THE COURT:  And would that be the last --

15           THE WITNESS:  The last line, yes, sir.

16           THE COURT:  Was there some concern about that

17   line?  In other words, I can understand a general

18   conversation about the five lines, I can understand the

19   general conversation.  My question is more explicit, was

20   there some concern or reason to single out the fifth line

21   for discussion?

22           THE WITNESS:  I believe that she -- let me see if

23   I can get this correct.

24           THE COURT:  You don't have to say it correct.

25   Just tell me what she said.

1          THE WITNESS:  What she said was that he told her

2     that he had prepared the drawings in 1998, and that she was

3     only certifying or only notarizing his signature as of that

4     date, which was not 1998, it was 1999, and that she

5     mentioned to him that what she was able to do was simply to

6     notarize his signature at that time, 1999, not 1998, but

7     that she could make that notation.

8          THE COURT:  Well, here's what it sounds like, from

9     my perspective, and that is, there must have been some

10    concern on the notary's part because Mr. Bryant was asking

11    her -- and this is speculation, was asking her to notarize

12    the drawings as of 1998 when, in fact, she, as a notary, is

13    putting down August 26th, 1999.

14         THE WITNESS:  I don't think that was her concern,

15    your Honor.

16         THE COURT:  Okay.  Well, she's going to be here,

17    and I'll talk to her about that.

18         I want to go back to my question, though.

19         THE WITNESS:  Okay.

20         THE COURT:  And think Mr. Zeller's question, there

21    is some concern about this fifth line, the last line, you

22    know that?

23         THE WITNESS:  Apparently, yes.

24         THE COURT:  There is some concern about this fifth

25    line.

1          THE WITNESS:  Uh-huh.

2          THE COURT:  And frankly, whether it was inserted

3     or not, that's Mattel's concern, okay?

4          THE WITNESS:  Okay.

5     BY MR. ZELLER:

6     Q    And so you saw that fifth line, and did you raise the

7     issue of the fifth line in the entry of the notary book or

8     did she, Ms. Prince?

9     A    I believe that she did.

10    Q    She didn't have an understanding about the lawsuit, as

11    you've said, correct?

12    A    I think what I said is I didn't have an understanding

13    about the lawsuit and that we did not discuss the lawsuit.

14         MS. HURST:  Lacks foundation.

15         THE COURT:  Overruled.

16    BY MR. ZELLER:

17    Q    Was it your understanding when you went there, that she

18    had already obtained information about the issues in the

19    lawsuit?

20    A    Not quite.  It was my understanding that she had

21    already obtained information regarding the matter.  I didn't

22    know what she knew at the time.

23    Q    Is it your understanding that the information she

24    received included information received -- she received from

25    Dale Cendali?

1              THE WITNESS:  That's correct.

2              THE COURT:  Just a moment.  Remaining counsel, you

3      are not required to be here.  If you want to keep your lunch

4      until 1:00, I apologize to you.  Lunch meant that I had

5      Mr. Zeller and Ms. Hurst here, but if other counsel want to

6      be here, you're welcome, you don't have to be, nor does

7      Mr. Larian, until 1:00.

8              Counsel?

9      BY MR. ZELLER:

10     Q    Is there anything else that you can remember discussing

11     with Ms. Prince concerning the fifth line in the entry of

12     the notary book?

13     A    Not that I recall.

14     Q    All right.  Was there anything else that you discussed

15     with her that you haven't told us about?

16     A    She explained to me where she kept the notary book, and

17     we discussed her move from California and packing up her

18     belongings, including the notary book, and where she kept

19     the notary book in her home in Lawrenceville, Georgia.

20             THE COURT:  You know, I'm going to be very general

21     for a moment, but you'll get the idea.

22             Did she express some concern about why are you

23     asking me for the notary book?

24             THE WITNESS:  She did not.

25             THE COURT:  You know, I'm a notary and I'm

1    required to keep this book and not give it up?

2            THE WITNESS:  No, she didn't.

3            THE COURT:  I'm being explicit, but you understand

4    the range of my question?

5            THE WITNESS:  I do.

6            THE COURT:  Okay.

7            THE WITNESS:  I do understand, I understand the

8    scope of the question, and no, she did not express that

9    concern.

10            THE COURT:  No concern.  Here it is.

11            THE WITNESS:  Yes.

12            THE COURT:  Here it is.

13            THE WITNESS:  Yes.

14            THE COURT:  Take my notary.

15            THE WITNESS:  Yes.  As I testified earlier, I

16    offered her a letter, which my impression of her reaction to

17    that letter was that it was favorable, that she appreciated

18    having a receipt of sorts.

19            THE COURT:  Somebody obviously had a conversation

20    with her before you got there?

21            THE WITNESS:  I believe so.

22            THE COURT:  Now, the next question is, I'll remind

23    you there is a huge difference about talking about five

24    lines and the difference of singling out one line, because

25    if you single out one line, frankly, there must be concern

1    about one line.  So I'm going to ask you again so I have

2    clarity, was one line singled out by her for discussion or

3    was this a general discussion of all five lines?

4                THE WITNESS:  It was a general discussion of all

5    five lines.

6                THE COURT:  All right.  I'll let Mr. Zeller ask

7    additional questions, then.

8    BY MR. ZELLER:

9    Q    What's your understanding as to how it is that MGA's

10   lawyers or Mr. Bryant's lawyers, whoever it was, learned

11   about the fact that Ms. Prince had this notary book in the

12   first place?

13               MS. HURST:  Objection.  Calls for attorney-client

14   communications and speculation.

15               THE COURT:  Just a moment.

16               Well, I'm not certain of that.

17               Question is MGA's lawyers or Mr. Bryant's lawyers,

18   whoever it was, learned about the fact that Ms. Prince had

19   this notary book in the first place.

20               I don't know what's about to come out.  First of

21   all, it's hearsay, but second, I'd like to have the Cendali,

22   is that her name?  I'd like to have her on the stand and ask

23   her that question and possibly in camera.

24               MR. ZELLER:  Can I maybe just ask a foundational

25   question, then, first?

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 14 of 124   Page ID #:302624
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

14

1    BY MR. ZELLER:

2    Q    Do you have any understanding as to how, whether it was

3    MGA lawyers or Bryant lawyers, not you, obviously, came to

4    some sort of understanding as to the fact that Ms. Prince

5    had a notary book that had some relevance to the case, this

6    is just yes or no?

7    A    Now, assuming I'm not waiving a privilege to my firm's

8    client, no, I don't have any knowledge or any understanding.

9    Q    You were not involved in that?

10   A    No.

11   Q    So please tell us what happened next in terms of the

12   physical possession of the notary book after you took it

13   from Ms. Prince?

14   A    I took it from Ms. Prince.  I returned to my car, drove

15   back to Littler's office in Atlanta, and the notary book

16   remained in my office within the Littler office in Atlanta

17   for approximately three days, and then I Federal Expressed

18   it to an associate working with Dale Cendali at O'Melveny.

19   Q    And who was that associate?

20   A    I believe her name was Alicia Meyer, A-L-I-C-I-A,

21   M-E-Y-E-R.

22   Q    Is that the last time you knew with some -- with any

23   personal knowledge as to where the notary book was

24   physically located until you saw it again here today?

25   A    Yes, sir.

1    Q    Was there any kind of record that was kept of the

2    shipment of the notary book by Fed-Ex to O'Melveny's

3    offices?

4    A    I don't know that personally, but I know that I chose

5    an overnight delivery service for the purpose of being able

6    to track the package should it become lost in the mail, to

7    avoid losing it in the mail.

8    Q    And was -- was Ms. Meyer at that time in the New York

9    office of O'Melveny or in Los Angeles?

10   A    I don't know.

11   Q    Do you remember where you shipped it to?

12   A    I know I shipped it to Ms. Meyer at O'Melveny.  I just

13   don't know which office.

14           THE COURT:  Counsel, a couple more questions, and

15   that will --

16           MR. ZELLER:  Sure, I think I'm actually on my last

17   one.

18   BY MR. ZELLER:

19   Q    So prior to today -- well, prior to the time you got up

20   earlier this morning about 7:40 or so and started to

21   testify, when was the last time you had seen the notary

22   book?

23   A    Oh, when I was sitting -- no, in my office and when I

24   have gave it to my secretary to be shipped.

25   Q    And then prior to the time that you testified, did you

1    see any copies or other entries from the notary book even if

2    it's not the original?

3    A    No.

4    Q    You did meet with MGA's lawyers prior to testifying?

5    A    They assisted me in locating the courthouse and letting

6    me know what time to be here, if that's what you mean by

7    "meet," yes.

8             THE COURT:  No, did you have any discussion about

9    the case with them?

10             THE WITNESS:  A limited discussion.

11             THE COURT:  Well, I don't know what that means.

12             THE WITNESS:  Well, we didn't discuss the notary

13   book itself.

14             THE COURT:  Thank you.

15             MR. ZELLER:  That's all I have.

16             THE COURT:  Okay.

17             Counsel, do you have questions?

18                        EXAMINATION

19   BY MS. HURST:

20   Q    Ms. Main, you have before you page 11 of Exhibit 60,

21   the original notary book; is that correct?

22   A    That's correct.

23   Q    When you took possession of that in July of 2004, it

24   had on it in handwriting the line "from 1998, Missouri,"

25   correct?

1    A    Correct.

2    Q    Did Ms. Prince indicate to you in any way, shape or

3    form that she had altered that notary entry subsequent to

4    the time of the notarization of drawings?

5    A    No.

6    Q    Was it your understanding at the time that Ms. Cendali

7    was a lawyer practicing in New York?

8    A    Yes.

9    Q    Do you know whether she was ever admitted to the

10   California bar?

11   A    I don't know.

12              MS. HURST:  No questions.

13              THE COURT:  All right.

14              Now, you are going to step down and talk to

15   Mr. Zeller and Ms. Hurst.  We are going to be courteous.

16   You can plan on going back today or tomorrow.

17              THE WITNESS:  Okay.

18              THE COURT:  Let me explain that they are in a

19   critical part of the case with Mr. Larian.  Mr. Price, who's

20   lead counsel, is not here, but I think he'd like to take

21   Mr. Larian in on -- strike that -- on redirect examination

22   as quick as possible, but that can go an hour or days.

23              THE WITNESS:  I understand.

24              THE COURT:  They will work that out with you.

25              THE WITNESS:  Okay.

CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

18

```
 1                THE COURT:  Because if they don't, then I'll step
 2   in and I'll make certain you testify, okay?
 3                THE WITNESS:  Okay.
 4                THE COURT:  All right.  Step down and talk with
 5   Ms. Hurst and Mr. Zeller.
 6                THE WITNESS:  Thank you, your Honor.
 7                THE COURT:  I'll give them the first option, then
 8   you will be returning to Atlanta.
 9                THE WITNESS:  Thank you.
10                THE COURT:  Thank you for your courtesy.
11                (Attorney discussion held off the record.)
12                (Recess.)
13                (The following proceedings is taken in the
14          presence of the jury.)
15                THE COURT:  Okay.  We are back in session.  The
16   jury is present, all counsel are present and the witness.
17                Ms. Keller, if you'd like to continue with your
18   cross-examination, please.
19                MS. KELLER:  Thank you, your Honor.
20                ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED.
21                   CROSS-EXAMINATION (Continued)
22   BY MS. KELLER:
23   Q    Mr. Larian, when we broke, we had been talking about a
24   line extension called Big Babyz that was introduced in 2006?
25   A    Yes.
```

1   Q    And in addition to the items you showed us, were there

2   also Bratz Big Babyz Dancers?

3   A    Yes.

4   Q    Bratz Big Babyz Bubble Trouble?

5   A    Yes.

6   Q    Bratz Big Super Babyz?

7   A    Yes.

8   Q    Bratz Big Babyz Boys?

9   A    Yes.

10  Q    And were all of those -- were all those dolls made

11  from -- or were all those dolls formulated based on sculpts

12  that had been made after sculpts for the original four dolls

13  were made?

14  A    (No audible response.)

15  Q    All the ones we just mentioned?

16  A    Yes.

17  Q    Were those all new sculpts for those dolls?

18  A    They were.

19  Q    They were not the same sculpts as were used for the

20  original four characters, right?

21  A    Right.

22  Q    Now, was there also a line extension called Bratz Lil'

23  Angelz?

24  A    Yes, there was.

25  Q    And was that introduced around 2004 to 2006?

1    A    I don't remember the exact date.

2    Q    If we could see Exhibit 35096.

3    A    I'm sorry, yes.

4    Q    Is that a photograph of a group of the Bratz Lil'

5    Angelz?

6    A    It is.

7         MS. KELLER:  Your Honor, I would move

8    Exhibit 35096 into evidence.

9         THE COURT:  Received.

10        *(Defendant's Exhibit No. 35096 is received in*

11   *evidence.)*

12        MS. KELLER:  And if we could just zoom in on any

13   one of those and get kind of a close-up of it.

14   BY MS. KELLER:

15   Q    And what was -- what were the Lil' Angelz supposed to

16   represent?

17   A    They were like Lil' Angelz, Bratz dolls, and they came

18   with two pets.

19   Q    Two heads?

20   A    Two pets.

21   Q    Two pets, okay.

22        In the picture we have up, can you see what those pets

23   are?

24   A    Yes, to the -- to the right.

25   Q    And what are they?

1   A    These are two different dogs with the bobble head, the

2   head moved.

3   Q    Now, if we could see Exhibit 81 -- 18867,

4   Exhibit 18867.  Is that a sculpt for Lil' Angelz with rooted

5   hair?

6   A    Yes, it is.

7          MS. KELLER:  And can you show that to his Honor as

8   well.

9          I'd ask that that be received, your Honor.

10          THE COURT:  Received, 18867.

11          *(Defendant's Exhibit No. 18867 is received in*

12      *evidence.)*

13   BY MS. KELLER:

14   Q    And if you can see Exhibit 18878, is that a packaged

15   doll called Heavenly Hair Dana?

16   A    Yes.

17   Q    And --

18   A    It's Lil' Angelz -- it's Lil' Angelz Heavenly Hair.

19   Q    Lil' Angelz Heavenly Hair Dana.

20   A    Yeah.

21   Q    And that doll was made using the sculpt that we see in

22   Exhibit 18867?

23   A    Yes.

24          MS. KELLER:  And your Honor, I would move 18878

25   into evidence.

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 22 of 124   Page ID #:302632
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

22

1           THE COURT:  Received.

2              (Defendant's Exhibit No. 18878 is received in

3        evidence.)

4    BY MS. KELLER:

5    Q    And these Lil' Angelz were also made with molded hair?

6    A    Yes, they were.

7              MS. KELLER:  Can we see the sculpt, Exhibit 18868.

8              THE WITNESS:  Yes.

9    BY MS. KELLER:

10   Q    Is that a sculpt for Lil' Angelz with molded hair?

11   A    Just the body, yes.

12   Q    The body.

13             MS. KELLER:  And your Honor, I would move 18868

14   into evidence.

15             THE COURT:  Received.

16             (Defendant's Exhibit No. 18868 is received in

17       evidence.)

18   BY MS. KELLER:

19   Q    Now, if we show you Exhibit 17486, is that the package

20   doll, Lil' Angelz Catia, that corresponds to that sculpt,

21   18868?

22   A    Yes.

23             MS. KELLER:  Your Honor, I move 17486 into

24   evidence.

25             THE COURT:  Received.

 1          *(Defendant's Exhibit No. 17486 is received in*

 2      *evidence.)*

 3   BY MS. KELLER:

 4   Q    Was there also a line extension called Lil' Bratz

 5   introduced in 2003?

 6   A    Yes.

 7   Q    And did that come in a version with molded hair?

 8   A    The Lil' Bratz, no, they had -- they had rooted hair.

 9   Q    Okay.  Let's look at Exhibit 18869.

10      Is that the sculpt for Lil' Bratz?

11   A    Yes, it is.

12          MS. KELLER:  Your Honor, I'd move 18869 into

13   evidence.

14          THE COURT:  Received.

15          *(Defendant's Exhibit No. 18869 is received in*

16      *evidence.)*

17   BY MS. KELLER:

18   Q    And if you look at the packaged doll, 17358, is this

19   Lil' Bratz Nighttime Style?

20   A    Yes, all four of them together.

21   Q    I'm sorry?

22   A    All four dolls together, four different dolls.

23   Q    And do those dolls correspond to the sculpt we just

24   looked at, 18869?

25   A    Yes.

```
 1                MS. KELLER:  I'd move 17358 into evidence, your
 2    Honor.
 3                THE COURT:  Received.
 4                (Defendant's Exhibit No. 17358 is received in
 5         evidence.)
 6    BY MS. KELLER:
 7    Q    And there were -- there were other Lil' Bratz dolls as
 8    well from -- that were modeled using that -- formulated on
 9    that sculpt?
10    A    Yeah, there were many.
11    Q    So as we go along, we're just giving examples of these
12    dolls?
13    A    That's -- that's correct.
14    Q    And were there also within Lil' Bratz, a group of dolls
15    known as Lil' Boyz?
16    A    Yes, they had boys.
17    Q    If we can take a look at Exhibit 17489, is that a
18    packaged doll Lil' Bratz Packs Mikko?
19    A    Yes.
20    Q    And what was that doll all about, by the way?
21    A    It's a boy version of the Lil' Bratz, and it's a new
22    character called Mikko.
23    Q    And if we could see --
24                MS. KELLER:  And I move Exhibit 17489 into
25    evidence.
```

1          THE COURT:  Received.

2              (Defendant's Exhibit No. 17489 is received in

3      evidence.)

4    BY MS. KELLER:

5    Q    And if we could see Exhibit 35097.

6         Is that a group photo of two of the Lil' Boyz including

7    Mikko?

8    A    Yes, it is.

9              MS. KELLER:  I move 35097 into evidence.

10              THE COURT:  It's received.

11              (Defendant's Exhibit No. 35097 is received in

12      evidence.)

13    BY MS. KELLER:

14    Q    And Mikko is on the left?

15    A    Yes.  And Colin is on the right.

16    Q    And Colin is on the right?

17    A    Yes.

18    Q    And these dolls we've just been talking about, the Lil'

19    Bratz, Lil' Boyz, none of those were formulated using the

20    original sculpt for the first four characters, correct?

21    A    They are not.

22    Q    Now, did you also have some play sets for the Lil'

23    Bratz?

24    A    We did.

25    Q    Can you take a look at Exhibit 29065.

1    A    Yes.

2    Q    And what is that?

3    A    That's a loft that the Lil' Bratz lived in, it has an

4    elevator, et cetera.  We had the elevators that would go to

5    the second floor.

6    Q    So that's Lil' Bratz lounge and loft?

7    A    Yes.

8    Q    And what was the idea of that -- of that accessory?

9    A    This was a house that the Lil' Bratz lived in.

10   Q    Complete with elevator?

11   A    It had a string elevator.

12   Q    Did you also have a line extension called Itsy Bitsy

13   Bratz?

14   A    Yes, we did.

15   Q    And take a look at group photo Exhibit 35116.

16        MS. KELLER:  Oh, I'm sorry, your Honor, I need to

17   move in --

18        THE COURT:  29065?

19        MS. KELLER:  Yes, your Honor.

20        THE COURT:  Received.

21        *(Defendant's Exhibit No. 29065 is received in*

22        *evidence.)*

23   BY MS. KELLER:

24   Q    And do you recognize 35116 as a group photo of the Itsy

25   Bitsy Bratz?

1    A     Itsy Bitsy Bratz and Itsy Bitsy Petz.

2           MS. KELLER:  Your Honor, I move Exhibit 35116 into

3    evidence.

4           THE COURT:  Received.

5           *(Defendant's Exhibit No. 35116 is received in*

6       *evidence.)*

7           MS. KELLER:  And if we could blow up the Itsy

8    Bitsy Bratz on the left.

9    BY MS. KELLER:

10   Q     This is a group of four little tiny Bratz dolls sold

11   together?

12   A     Itsy Bitsy Bratz, yes.

13   Q     And is this the one that you said appealed more to

14   younger children?

15   A     Yes.

16   Q     In what age group?

17   A     Four to six.

18   Q     How did these sell?

19   A     They were very good.

20   Q     And let's look at Itsy Bitsy Petz on the right-hand

21   side.

22   A     Yes.

23   Q     It says, "Reptile Roller Derby"?

24   A     Yes.

25   Q     What is this pet supposed to be?

```
1    A    It's a reptile.

2          MS. KELLER:  Your Honor, I'd move -- no, that's

3    already in, okay.

4    BY MS. KELLER:

5    Q    Let's look at Exhibit 17484, package doll, is this Itsy

6    Bitsy City Vanessa Popparoni Pizza?

7    A    Yes.

8          MS. KELLER:  Your Honor, I would move 17484 into

9    evidence.

10          THE COURT:  Received.

11          (Defendant's Exhibit No. 17484 is received in

12      evidence.)

13    BY MS. KELLER:

14    Q    What is the idea behind Itsy Bitsy City Vanessa's

15    Popparoni Pizza?

16    A    It was -- if you look here, this is like little places

17    like the pizza, and when you put the doll in there, we have

18    a little mechanism in the bottom, and you turn like you turn

19    the pizza.

20          MS. KELLER:  I'd move 17484 into evidence.

21          THE COURT:  Received.

22          (Defendant's Exhibit No. 17484 is received in

23      evidence.)

24    BY MS. KELLER:

25    Q    And if you look at 17483, which is already in evidence,
```

1   is this Itsy Bitsy Babyz So Cute?

2   A     Yes.

3   Q     And what was the idea of this particular item?

4   A     This is just collectible with four dolls together so

5   you can basically buy four dolls and collect them.

6   Q     And let's look at the packaged doll 17485, the Itsy

7   Bitsy Petz Reptile Roller Derby.

8   A     Yes.

9   Q     This one takes some explaining, the Reptile Roller

10  Derby, what is that all about?

11  A     It's a reptile, but if you look inside, there's like a

12  roller blade there, and you can put the pet inside here, and

13  it would go around and around on the play set.

14  Q     And did he have roller skates on?

15  A     It has -- yes, it has roller skates.  I don't know if

16  you can see that.  It's not on the screen.

17           MS. KELLER:  And I'd move 17485 into evidence.

18           THE COURT:  Received.

19           (Defendant's Exhibit No. 17485 is received in

20       evidence.)

21  BY MS. KELLER:

22  Q     Now, in addition to all these various pets and dolls,

23  were there also nondoll items that MGA manufactured that

24  were also line extensions of Bratz?

25  A     Yes, we did.

1    Q    Did you produce some vehicles?

2    A    We did.

3    Q    Do you remember when the FM Cruiser was launched?

4    A    2001, I believe.

5    Q    Let's --

6    A    I believe 2001 or 2002.  I don't remember exactly.

7              MS. KELLER:  And, your Honor, I'd like to --

8    well --

9    BY MS. KELLER:

10   Q    Do you recognize 35122 as a group photo of the Bratz

11   Boyz motorcycle, the FM Cruiser and the Formal Funk FM Limo?

12   A    Yes, I do.

13             MS. KELLER:  Your Honor, I'd move 35122 into

14   evidence.

15             THE COURT:  35122, received.

16             *(Defendant's Exhibit No. 35122 is received in*

17             *evidence.)*

18   BY MS. KELLER:

19   Q    Now, would you describe what these show?

20   A    The one on the top is a motorcycle.  It was really -- a

21   motorcycle with the Bratz doll that it was riding.  The one

22   in the middle is the FM Cruiser, it's a car, it's a

23   convertible, but it also had an FM radio, so you could

24   actually listen to actual music on the radio in this car.

25   That's why we call it FM Cruiser.

1  Q    And this says on the package, "horn beeps"; did the

2  horn actually work?

3  A    Yes, the horn actually worked also.

4  Q    And it says, "Doors and trunk open and close"?

5  A    Yes, all the doors opened and the trunk opened and it

6  had an FM radio also.

7  Q    And then if you look at the bottom, it says, "Formal

8  Funk FM Limo"?

9  A    Yes.

10 Q    And it says to the right of it, "It's a party on

11 wheels."  What was that -- what was that toy?

12 A    Again, Formal Funk was based on prom, so this is a

13 limousine that's really -- the replica of a limousine that

14 the dolls -- I think it took four dolls inside, and it has

15 an FM radio for music, et cetera.

16 Q    So the dolls could go to the prom in the limo?

17 A    That's correct.

18 Q    And if we take a look at Exhibit 29063, is that the

19 packaged product for Motorcycle Style?

20 A    Yes, that's motorcycle.

21 Q    How did these -- how well did these products do in the

22 market?

23 A    They were excellent.

24 Q    What kind of profit margins did they have?

25 A    I don't really remember the exact margin, but these are

1    very hot sellers, very hot sellers, we sold millions of

2    them.

3    Q    Now, was another line extension Bratz playsets?

4    A    Yes.

5    Q    What are playsets?

6    A    Playsets are like, for example, we had a dance studio,

7    we had a house, we called it pad, that they live in, that

8    they play in.

9    Q    If you'd take a look at Exhibit 35123.  Is that a group

10   photo of an ice-skating rink, loft, a room, a house, a tent,

11   a makeup shop and a Jeannie?

12   A    A Jeannie bottle.

13   Q    A Jeannie bottle?

14   A    Yes.

15   Q    Is that what that is?

16   A    Yes, it's a Jeannie bottle.

17        MS. KELLER:  Your Honor, I'd move Exhibit 35123

18   into evidence.

19        THE COURT:  Received.

20        (Defendant's Exhibit No. 35123 is received in

21        evidence.)

22   BY MS. KELLER:

23   Q    So these were all the things that you were talking

24   about as playsets?

25   A    Yes.

1   Q    If we take a look in the upper right, is that the --

2   the beauty shop?

3   A    Yes.

4   Q    Kiss and make up, and we see a little shampoo bowl?

5   A    Yes.

6   Q    As well as mirror and various -- and shelves with

7   various things on them?

8   A    Like a real salon, yes.

9   Q    And can you put the doll -- you would put the doll

10  right into the playset?

11  A    Yes.

12  Q    So, for example, if a little girl wanted to play

13  makeup, she could put the doll in the playset and take some

14  of the makeup off the shelf and start applying it?

15  A    That's correct.

16  Q    And if you look in the bottom left where it says,

17  "Bratz World House"?

18  A    Yes.

19  Q    We see what looks like maybe a living room with the

20  girls lounging around it?

21  A    Actually just opened up to a real house with different

22  areas, with an actual bath, chairs, furniture, everything.

23  Q    All that came with it?

24  A    Yes.

25  Q    And if you take a look at Exhibit 35036, is that the

CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

34

```
 1    packaged product, the Wild Life Tent playset released in

 2    2 -- we don't have that?

 3         Well, I guess we won't be taking a look at the Wild

 4    Life Tent.

 5         But there was also a Wild Life Tent playset where the

 6    doll that we've seen, Wild Life Bratz, could go and --

 7    A    Yeah, actually the picture was on the previous exhibit.

 8         MS. KELLER:  Then I would move 35036 into

 9    evidence, your Honor.

10         THE COURT:  Received.

11         (Defendant's Exhibit No. 35036 is received in

12         evidence.)

13         THE WITNESS:  Yeah, this is an actual little

14    miniature tent made with cloth, and it would -- literally

15    you could set it up quickly, and this is for them to go

16    wild-life camping, et cetera.

17         We had -- it even has a lantern here, it has

18    little fireplace, a sleeping bag, it has binoculars, it even

19    had a little place for a fire pit and marshmallow.

20    BY MS. KELLER:

21    Q    Now, in addition to the playsets, and again, this is

22    just a sampling of some of the playsets that you

23    manufactured?

24    A    Yes.

25    Q    In addition to the playsets, were there line extensions
```

1    of various accessories for the dolls themselves, like

2    sunglasses, perfume?

3    A    Yes.

4    Q    Could we see Exhibit 35125?  Is that a photo of some of

5    the hair accessories, sunglasses, design materials and

6    fragrance?

7    A    That went with the doll, yes.

8    Q    That went with the doll.

9         MS. KELLER:  And I would ask that that be

10   admitted, your Honor?

11        THE COURT:  Received.

12        *(Defendant's Exhibit No. 35125 is received in*

13        *evidence.)*

14   BY MS. KELLER:

15   Q    And take a look at, for example, on the upper right,

16   Sunkist Bratz, Sunkist Cloe?

17   A    Yes, it actually came with the UV-coated sunglass for

18   the kid to wear.

19   Q    So the sunglasses were for the child?

20   A    That's correct.

21   Q    And then if we look in the lower right, we see Bratz

22   Fashion Designer?

23   A    Yes.  It came with everything here with -- with paper

24   that you could draw fashions on, you could cut, make

25   patterns, it comes with a little scissor, some -- some

1    fabrics so you can cut and make your own fashions.

2    Q    And if we take a look at 28835.

3         Is that the packaged product Fashion Designer?

4    A    Yes.

5         MS. KELLER:  I'd move 28835 into evidence, your

6    Honor.

7         THE COURT:  Received.

8         *(Defendant's Exhibit No. 28835 is received in*

9    *evidence.)*

10   BY MS. KELLER:

11   Q    Now, in addition, did you have line extensions that

12   consisted of electronics from at least 2003?

13   A    Yes, we did.

14   Q    Take a look at Exhibit 35132.

15   A    Yes.

16   Q    Do you recognize those as electronics that were part of

17   the line extensions?

18   A    Yes, some of them, yes.

19        MS. KELLER:  Your Honor, I would move that into

20   evidence.

21        THE COURT:  Received.

22        *(Defendant's Exhibit No. 35132 is received in*

23   *evidence.)*

24   BY MS. KELLER:

25   Q    Now, click on the left-hand side, that says, "Bratz

1    learning math in the mall"?

2    A    Right.

3    Q    "Math has never been so styling," it says at the

4    bottom?

5    A    Yes.

6    Q    What was this game all about?

7    A    This -- you plug this to your TV, as you can see here,

8    and basically it taught you math, different -- in a fun way.

9    Q    And --

10   A    It was a learning game.  It was a learning game.

11   Q    And if we move to the right to Electric Funk, Casual,

12   Cool Cordless Phone, what was that?

13   A    It was an actual working cordless phone, real -- real

14   cordless phone.

15   Q    That the girl could use in her own house?

16   A    Yes, or the mother could use, anybody could use.

17          MS. KELLER:  And your Honor, I would move, if I

18   haven't already, 35132 into evidence.

19          THE COURT:  Received.

20          (Defendant's Exhibit No. 35132 is received in

21      evidence.)

22   BY MS. KELLER:

23   Q    Now, if you look at Exhibit 35098, do you recognize

24   that as another line extension in the electronics group?

25   A    Yes, I do.

1           MS. KELLER:  Move 35098 into evidence, your Honor.

2           THE COURT:  Received.

3           *(Defendant's Exhibit No. 35098 is received in*

4       *evidence.)*

5   BY MS. KELLER:

6   Q    What is that on the left?

7   A    It's an actual working 35-millimeter camera with a

8   flash.  It took actual pictures.

9   Q    And what is the item on the right?

10  A    It's an actual working MP3 player.

11  Q    And it says, "I Bratz skinny MP3 player"?

12  A    Yes.

13  Q    And it had a real LED backlit display?

14  A    Yes.

15  Q    How did those -- how did that item do?

16  A    We had two different versions of this.  The other one

17  did better than this.  The other one looked like a lipstick,

18  but it was actually an MP3 player, you could plug it into

19  your USB and download music --

20  Q    That looked like a lipstick?

21  A    Yes.

22  Q    Let's -- if we could take a look at Exhibit 18803.

23       Is that the packaged product Bratz Electric Funk Phone?

24  A    Cordless phone, that's a cordless phone.

25  Q    And did you also produce, as a line extension, a sewing

1   machine?

2   A    Yes, we did.

3   Q    Take a look at Exhibit 35099.

4   A    Yes.

5   Q    Is that it?

6   A    Yes, this was an actual working sewing machine.

7            MS. KELLER:  Move to admit that, your Honor.

8            THE COURT:  Received.

9            (Defendant's Exhibit No. 35099 is received in

10       evidence.)

11  BY MS. KELLER:

12  Q    And this says it includes everything you need, it

13  includes a sewing machine?

14  A    Yes.

15  Q    An AC adaptor, a foot pedal, how-to-sew instructional

16  booklet, this really has everything you need?

17  A    Yes, it does.

18  Q    And it says, "Use with all the Bratz design-your-own

19  sewing kits?

20  A    Yes.

21  Q    Were there fab -- were there fashions that the girls

22  could sew themselves?

23  A    Yes, they could.

24  Q    That were also -- what did you sell, patterns or the

25  material or --

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 40 of 124   Page ID #:302650
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

40

1    A    The other -- this came with some patterns, but it

2    has -- I mean, as you can see here, it has everything in it,

3    but we sold patterns separately also.

4              MS. KELLER:  And your Honor, I would, if I haven't

5    moved 35099 into evidence, move that into evidence.

6              THE COURT:  Received.

7              *(Defendant's Exhibit No. 35099 is received in*

8         *evidence.)*

9              MS. KELLER:  And also, just in case I haven't

10   moved 18803 into evidence, that was the electric funk phone.

11             THE COURT:  Received.

12             *(Defendant's Exhibit No. 18803 is received in*

13        *evidence.)*

14   BY MS. KELLER:

15   Q    Now, did you also have a line extension that included a

16   scooter?

17   A    Yes.

18   Q    Take a look at 35100.

19   A    Yes.

20   Q    Is that the scooter?

21   A    Yes, it was a real scooter.

22             MS. KELLER:  Move it into evidence, your Honor.

23             THE COURT:  Received.

24             *(Defendant's Exhibit No. 35100 is received in*

25        *evidence.)*

1    BY MS. KELLER:

2    Q    This is a foldable aluminum scooter?

3    A    Yes.

4    Q    That says, "Roll with enchanting style."  Did these

5    sell relatively well?

6    A    Yes, they did.

7    Q    Was there also a line extension called "Livin' Bratz"?

8    A    Yes.

9    Q    Take a look at Exhibit 35102.

10   A    Yes.

11   Q    And do you recognize that as some of the home

12   accessories from Livin' Bratz?

13   A    Yes.

14           MS. KELLER:  Move 35102 into evidence.

15           THE COURT:  Received.

16           *(Defendant's Exhibit No. 35102 is received in*

17      *evidence.)*

18   BY MS. KELLER:

19   Q    At the top we see "Designer Canopy"?

20   A    Yes, it's a bed canopy.

21   Q    A bed canopy?

22   A    Yes.

23   Q    And then bottom left, Livin' Bratz Glow Lamp?

24   A    Yes, it was an actual lamp, a working lamp, that glow,

25   the light went up and down, changed.

```
 1   Q    And then on the right, we see Livin' Bratz Neon Hot
 2   Clock?
 3   A    Yeah, this is a clock that around it had soft goods,
 4   like fur, and the neon light up, and it was an actual
 5   working clock.
 6   Q    Now, as -- I want to move to a different area and talk
 7   a little bit about hiring at MGA over the years.
 8        After 2001, your sales increased quite a bit, didn't
 9   they?
10   A    Yes, they did.
11   Q    And what did that do to your need for additional
12   employees?
13   A    We needed to hire a lot more employees.
14   Q    What types of employees?
15   A    Everything, accounting, design, packaging, marketing,
16   advertising, shipping.
17   Q    And what sources did you use to find those employees?
18   A    We ran ads on Monster.com, we used word of mouth, asked
19   people for names.  We used recruiters.
20   Q    So headhunters?
21   A    Recruiters is the same for me, yes.
22   Q    Did the employees that you recruited tend to come from
23   other toy companies?
24   A    Some came from a lot of different toy companies.
25   Q    Such as?
```

1    A    Mattel, Hasbro, Play Hot, Playmate, Bandai.

2    Q    Disney?

3    A    Disney.

4    Q    Crayola?

5    A    Crayola, Little Tikes before we owned them, a lot of --

6    a lot of different toy companies.

7    Q    And what was the biggest toy company in the immediate

8    geographic area?

9    A    Mattel is the biggest.

10   Q    Now, did employees of yours look to people they knew

11   from Mattel and see if they could recruit them?

12   A    Yes, they did.

13   Q    Anything wrong with that, in your opinion?

14   A    No.

15   Q    And why were Mattel employees attracted to you, if they

16   were?

17   A    They are the biggest employer of -- they are the

18   biggest toy company in the world, they are the biggest

19   employer, and it was just natural, a lot of people there, a

20   lot of people available.

21   Q    Would you sometimes get suggestions from some of the

22   retailers that you sold to for Mattel employees?

23   A    Yes, we did.

24   Q    Can you give me an example?

25   A    Yes, Walmart introduced us to a salesman to hire, which

1   we did.

2   Q    And that was a Mattel person?

3   A    Yes.

4   Q    And from 1999 to 2007 --

5   A    And also Toys R Us, I mean all the retailers.  Toys R

6   Us recommended two people, which we hired, they both worked

7   at Mattel.

8   Q    From 1999 to 2007, did you end up hiring 786 employees?

9   A    A lot -- I don't remember the exact number, but a lot

10  of employees.

11  Q    Okay.  Do you remember whether -- what percentage came

12  from Mattel, 10, 15, 20 percent?

13  A    Less than 10 percent.

14  Q    Is that just an estimate?

15  A    Yes.

16  Q    Could it have been 15 percent?

17  A    Yes.

18  Q    Now, the -- I want to talk to you for a moment about

19  your hiring policies.

20       Did you have any policy -- at the very beginning, did

21  you have any policy of requiring new hires to sign

22  something, including those from Mattel, to sign something

23  saying that they wouldn't take any of their former

24  employer's property or confidential information?

25  A    I'm sorry, I don't understand the question.

1   Q    Let me just limit it.  Let me just say in 2000.

2   A    Yes.

3   Q    In the year 2000, did you have a policy of requiring

4   all new hires from toy or entertainment industries,

5   including those from Mattel, to agree that they would not

6   take any of their former employer's property or confidential

7   information?

8   A    We always had that policy.

9   Q    And that was -- they had to agree to that in writing?

10  A    I don't remember if it was in 2000 in writing or not,

11  but that was a requirement all the time.

12  Q    And so any employee who came from Mattel as well as any

13  other toy company had to agree they are not taking anything

14  of their employer's property or confidential information?

15  A    That's correct.

16  Q    And what did you instruct new recruits you wanted them

17  to bring with them?

18  A    Bring their brain, bring their experience, nothing

19  else.

20  Q    Now, I want to ask you some questions for a moment

21  about MGA Mexico.

22       If we could take a look at Exhibit 6769; do you have

23  that in front of you?

24  A    No.

25       Yes.

```
 1   Q    Do you see an e-mail from you to, it says, "Susana,"

 2   and in parentheses it says "Argentrade" or "Arhentade."  I

 3   can't tell.  Was it "Arhentrade"?

 4   A    Argentrade.

 5   Q    "Argentrade."  That's what I get for trying to

 6   pronounce something.

 7        Now, who was that person?

 8   A    Susana Kuemmerle.  She was from Argentina, so she

 9   called herself from Argentrade.

10        MS. KELLER:  Your Honor, may we move 6769 into

11   evidence.

12        THE COURT:  Received.

13        (Defendant's Exhibit No. 6769 is received in

14        evidence.)

15   BY MS. KELLER:

16   Q    And so this was -- this person was also known as Susana

17   Kuemmerle?

18   A    Yes, she's Susana Kuemmerle, Argentrade is the name of

19   the company she had.

20   Q    I see.  So always Susana Kuemmerle, but she's with

21   Argentrade?

22   A    She was at that time.

23   Q    And in November of 2003, did you tell Susana Kuemmerle

24   that you wanted to open a Mexico subsidiary and get rid of

25   Hasbro as a distributor?
```

1    A    I -- I wanted to do that, yes.

2    Q    Let's take a look at Exhibit 6767.

3         Is this from Susana Kuemmerle to you?

4    A    It is.

5    Q    And that's dated November 21, 2003?

6    A    It is.

7         MS. KELLER:  And your Honor, we would move 6767

8    into evidence.

9         THE COURT:  Received.

10        *(Defendant's Exhibit No. 6767 is received in*

11        *evidence.)*

12   BY MS. KELLER:

13   Q    This says, "Isaac, I have not heard from you regarding

14   Latin America as discussed in Hong Kong in my follow-up

15   e-mail, so here I am again.  This is what I think we should

16   do:  One, establish ASAP MGA Mexico.  I have a pool of

17   people to hire to make this happen, and I know the area

18   where the office should be located.

19        "Two, forget about MGA Brazil.  If Mattel did not make

20   it happen there and Hasbro had the same difficulties, why

21   reinvent the wheel?  We can manage the territory maybe with

22   a joint venture.  We can discuss this.  It is too much of an

23   investment with too much risk."

24        Do you know what she was taking about in number two?

25   A    Yes, she was talking Brazil was a very difficult market

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

48

```
 1    to get into.  A lot of duties, a lot of regulations, a lot

 2    of protectionism for imported toys, so she was saying that's

 3    a difficult market to get into.

 4    Q    And then number three, it says, "To manage the rest of

 5    Latin America, I believe we have to have a showroom and open

 6    MGA Latin America in Miami.  Again, we can do this from

 7    scratch or do a joint venture.  If we decide to go for a

 8    joint venture, I have the people to do it with.  This will

 9    lower expenses."  And it goes on a little bit.

10         So in number two, Susana Kuemmerle is talking to you

11    about Hasbro and Mattel having difficulties with Brazil; is

12    that right?

13    A    Yes.

14    Q    And at some point, did you and Susana Kuemmerle decide

15    that you wanted to open a Mexico subsidiary?

16    A    Yes.

17    Q    And if we could see Exhibit 6781.

18         Is this from you to Scot Rank, CC Walmart.  And who is

19    Scot Rank?

20    A    I don't remember him.

21    Q    This is dated 4/1/2004?

22    A    Scot Rank was at Walmart, I'm sorry, he was senior vice

23    president at Walmart.

24    Q    Was Walmart --

25    A    Walmart Mexico, I think.  Maybe not.  Hold on one
```

1    second.

2         No, he was senior vice president U.S.A. but in charge

3    of Mexico and Latin America.

4    Q    And was Walmart suggesting to you that you needed to

5    launch MGA Mexico?

6    A    Yes.

7    Q    Why was that?

8    A    Because when you go through a distributor, for example,

9    a doll that you usually sell for -- retailing -- if you sell

10   a doll yourself to retailer for $15, when you go through

11   distributor, because they have to add their own markup on

12   it, it becomes 20, $25, and Walmart wanted to buy directly

13   and don't go through a third party so they could have a

14   lower price.

15   Q    And let's look at page 3 of 6781.

16        MS. KELLER:  And your Honor I would move that into

17   evidence.

18        THE COURT:  Received.

19        *(Defendant's Exhibit No. 6781 is received in*

20        *evidence.)*

21   BY MS. KELLER:

22   Q    This is dated March 10th, 2004.

23   A    Yes.

24   Q    And it says, "To Randy Cameron, Mark Clark.  Subject:

25   Mexico."

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

50

```
 1        "Dear Randy and Mark, I am in Mexico right now.  We are
 2    going to launch MGA Mexico to do direct business to Walmart
 3    as you requested."
 4    A    Yes.
 5    Q    "In order to be able to do this successfully, we need
 6    Walmart Mexico's top management support for Bratz brand.  We
 7    also want to do a Bratz licensing expo for Walmart Mexico as
 8    we did for Walmart U.S.A. and will do for Walmart Canada on
 9    March," it says, "222."
10        Can you -- it concludes, "Can you please send a message
11    and help us with introduction of key people at Walmart
12    Mexico so we can launch this successfully."
13        So Walmart wanted you to establish MGA Mexico --
14    A    Yes.
15    Q    -- so that you could -- so that they could end up
16    lowering their cost of selling your product?
17    A    That's correct.
18    Q    And who was your distributor at that point?
19    A    Hasbro.
20    Q    And the rest of this e-mail chain all concerns getting
21    MGA Mexico up and running?
22    A    Yes.
23    Q    Now, if we look -- let's look at -- let's look at the
24    bottom of 6781?
25    A    What page?
```

1   Q    Page 1, onto 6781 page 2, and this is where Scot Rank

2   of Walmart --

3   A    Yes.

4   Q    -- says to you, "We look forward to bringing your

5   properties to Mexico through Walmart."

6   A    Yes.

7   Q    And then if we look at the top of the e-mail chain,

8   that's your e-mail to Scot Rank, April 1st, 2004, saying, it

9   looks -- if you look at the second paragraph, "It looks like

10  MGA Mexico is going to be up and running by mid-May, please

11  keep this confidential.  We are doing this mostly for

12  Walmart, and we really need Walmart Mexico's support to

13  succeed."

14  A    Yes.

15  Q    And this was kind of a major undertaking for you to set

16  up MGA Mexico, wasn't it?

17  A    It was.

18  Q    But it was worth doing because Walmart was such a good

19  customer?

20  A    Yes.

21  Q    In February 2004, did you ask Susana Kuemmerle to do

22  anything for you?

23  A    I was asking her if she knows people that we can hire

24  to start MGA Mexico.

25  Q    And where was she physically?

```
 1    A     In February, it was in New York toy fair.

 2    Q     And why was it that you asked her to locate employees

 3    for your new MGA Mexico subsidiary?

 4    A     She was an agent selling -- independent sales rep agent

 5    for Latin America, Mexico, and she knew everybody.  She knew

 6    a lot of people.

 7    Q     Did she speak Spanish?

 8    A     Yes, she does.

 9    Q     Fluently?

10    A     Yes.

11    Q     And at the New York toy fair, which was -- what month

12    was that, February?

13    A     In February.

14    Q     Did she introduce you to someone?

15    A     Yes.

16    Q     Who was that?

17    A     Gustavo Machado.

18    Q     And can you tell us a little bit about Mr. Machado?

19    A     Gustavo Machado was at the time an employee of Mattel

20    Mexico, and Susana introduced her -- introduced him to me.

21    He -- she brought him to our showroom in MGA New York, and

22    we had a short meeting.

23    Q     Was he a prospective employee for MGA Mexico?

24    A     Yes.

25    Q     And what did she suggest would be his role?
```

1    A    A marketing -- he was a marketing executive.

2    Q    And if we look at Exhibit 3619.

3    A    Yes.

4    Q    So Exhibit 3619, is this a continuation of the e-mail

5    chain we just saw in 6781?

6    A    Yes.

7         MS. KELLER:  Your Honor, I'd move 3619 in

8    evidence.

9         THE COURT:  Received.

10         *(Defendant's Exhibit No. 3619 is received in*

11    *evidence.)*

12   BY MS. KELLER:

13   Q    And if we look at 3619-2.

14   A    Yes.

15   Q    Do you see the same April 1st, 2004 e-mail we just saw

16   where you say you were opening up MGA Mexico mostly for

17   Walmart and you really need Walmart's Mexico support to

18   succeed?

19   A    Yes.

20   Q    Now, if we go to 3619-1 at the bottom and onto 3619-2.

21   A    Yes.

22   Q    Responding to what you have said, Scot Rank of Walmart

23   writes, Isaac, please coordinate with Doug Dager, that's

24   D-A-G-E-R?

25   A    David Dager.

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 54 of 124   Page ID #:302664
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

54

1   Q    With David Dager and his team?

2   A    Yes.

3   Q    Now, what was your understanding at this point of

4   whether you were going to get Walmart's support as you had

5   requested?

6   A    Yes.  Here Scot was David's boss, and he was saying,

7   yes, coordinate with them to get the support for Mexico for

8   your line of products.

9   Q    Now, did you interview some more prospective employees

10  other than Mr. Machado?

11  A    Later on, I did, yes.

12  Q    How much later on?

13  A    I don't remember exactly.

14  Q    Roughly?

15  A    April or something like that.

16  Q    And --

17  A    March or April.

18  Q    And where did you interview the people?

19  A    In Mexico City.

20  Q    Do you remember who set up the interview for you?

21  A    Susana and a lady named Carmen, who unfortunately I

22  don't remember her last name.

23  Q    Who were the people that you interviewed --

24  A    Mary Carmen.

25  Q    Mary Carmen?

1    A    Yes.

2    Q    Who were the people that you interviewed in Mexico City

3    other than -- well, did you interview Mr. Machado?

4    A    I interviewed Mr. Machado, I interviewed Pablo Vargas

5    and I interviewed Mariana Trueba.

6    Q    And what did you interview them for, in other words,

7    what jobs were you considering them for?

8    A    Mariana for girls' marketing and Pablo for sales.

9    Q    What were their references?

10   A    What do you mean "what were their references"?

11   Q    What were you told were their backgrounds?

12          THE COURT:  Just a moment.  The jury is now going

13   to have trouble with Pablo matching up a last name, so

14   Machado or Vargas or Trueba, so reask the question.

15          THE WITNESS:  Pablo Vargas, I am not very good

16   with the spelling of the names.

17          THE COURT:  It's not the spelling.  I don't think

18   they know who Pablo is.  Counsel knows it's Pablo Vargas,

19   but the jury doesn't, so let's use last names, now.

20   BY MS. KELLER:

21   Q    Is Pablo, Pablo Vargas?

22   A    Yes.

23   Q    So there is Pablo Vargas, Gustavo Machado?

24   A    And Mariana Trueba.

25   Q    Is it Trueba?

```
1    A     Trueba.

2    Q     Mariana?

3    A     Yes.

4    Q     Okay.

5              THE COURT:  Refer to them by last name, Counsel.

6              MS. KELLER:  I am going to, your Honor.

7              THE COURT:  Thank you.

8    BY MS. KELLER:

9    Q     And so you interviewed Mr. Machado, Ms. Trueba and

10   Mr. Vargas in Mexico City?

11   A     Yes, I did.

12   Q     And where?  Where was that in Mexico City?

13   A     At the W Hotel in Mexico City.

14   Q     After you interviewed them, what was your impression of

15   them in terms of whether you wanted to hire them?

16   A     I thought they were good, they had experience.

17   Q     And what was the nature of their experience?

18   A     Mariana was in -- in girls' marketing, and Pablo was in

19   sales services.  They used to work at Mattel.  They were

20   working at Mattel Mexico when I interviewed them.

21   Q     Were there any negotiations over their contracts --

22   potential contracts with you?

23   A     Yes, there was.

24   Q     And did they ultimately enter into a contract with you?

25   A     Yes, they did.
```

1    Q    When they entered into their contracts, did they

2    promise that they would not take any Mattel confidential

3    information when they came to work for you?

4    A    Yes.

5              MS. KELLER:  Could we see Exhibit 6793.

6              THE WITNESS:  Yes.

7    BY MS. KELLER:

8    Q    Now, I know that this is in Spanish, but is this

9    Mr. Machado's contract?

10   A    It's in Spanish.  I don't read Spanish.

11   Q    Well, there's Spanish at the beginning, and then if you

12   look at the back, you'll see some English, but look -- look

13   at 6793, page 10.

14             MS. KELLER:  And your Honor, I'd move this into

15   evidence.

16             THE WITNESS:  Yes.

17             THE COURT:  Received.

18             *(Defendant's Exhibit No. 6793 is received in*

19        *evidence.)*

20   BY MS. KELLER:

21   Q    And you see where it says, "El empleado Carlos Machado

22   Gomez"?

23   A    Yes.

24   Q    And then under "la empresa," you see a signature "Por:

25   Thomas Park"?

1    A    Yes.

2    Q    Who's Thomas Park?

3    A    Thomas Park was our chief operating officer at the

4    time.

5    Q    And then if you turn to page 11, does this look like an

6    English version of that contract?

7    A    Yes.

8    Q    And if you turn to the signature -- signature page on

9    this contract is not signed, correct, page 20?

10   A    It's not.  It's a trans --

11   Q    So this is a translation of the Spanish-language

12   contract, right?

13   A    Yes.

14   Q    Do you need a break, Mr. Larian?

15   A    No, I'm okay.

16   Q    And if you look at -- if you look at the English

17   version.

18   A    Yes.

19   Q    6793, page 12.

20   A    Yes.

21   Q    Part I.

22   A    Yes.

23   Q    It says that the employee, quote, "that he does not

24   have any legal impediment arising from an agreement or

25   contract executed with a third party that would prevent his

 1    from doing the work for which he is contracted by the

 2    company.

 3         "The employee undertakes not to use, for the work to be

 4    done at the company, the privileged information known to his

 5    due to work, position or title, practice of his profession

 6    or business relationship known to any other company or

 7    individual and which is considered an industrial secret

 8    pursuant to the law under a contract agreement or

 9    understanding he may have executed."

10         And if you look at Exhibit 6793-20, you'll see a

11    confirmation that after the parties read this contract in

12    full, they confirmed and signed it in token of agreement in

13    Mexico Federal District on the 16th day of April, 2004.

14    A    Correct.

15    Q    And if you'd look back to 6793, page 10, and put those

16    side by side, you see the Spanish version of that, correct?

17    A    Yes.

18    Q    Now, let's -- let's take a look at Exhibit 6794.

19    A    Go ahead.

20    Q    Is this the Spanish language version with an English

21    translation immediately afterwards of Pablo Vargas'

22    contract?

23    A    Yes.

24         MS. KELLER:  Your Honor, I would move 6794 into

25    evidence.

```
 1            THE COURT:  Received.

 2            (Defendant's Exhibit No. 6794 is received in

 3       evidence.)

 4    BY MS. KELLER:

 5    Q    And if you'd look at the signature page on page 10,

 6    6794-10, you see under "el empleado," the employee, Pablo

 7    Vargas San Jose?

 8    A    Yes.

 9    Q    Is that the Mr. Vargas you've been talking about?

10    A    Yes.

11    Q    And on the signature page for MGA de Mexico, do you see

12    "Por:  Thomas Park"?

13    A    Yes.

14    Q    And that's the Thomas Park you just mentioned?

15    A    Yes.

16    Q    And does Mr. Vargas' contract contain, on page 13 of

17    the translated portion, the same clause that we just read in

18    Mr. Machado's contract?

19    A    Yes.

20    Q    So he is promising, as Mr. Machado did, that he's not

21    going to bring to the new company anything that is

22    considered an industrial secret from his old company, any

23    privileged information, et cetera?

24    A    Yes.

25    Q    And it's -- does it appear to you to be the identical
```

1    clause?

2    A    Yes.

3    Q    And was his contract also, if you'd look at page 21,

4    also signed on April 16th, 2004?

5    A    Yes.

6    Q    Now, if you can turn to Exhibit 6795.

7    A    Yes.

8    Q    Do you recognize that as the contract for Mariana

9    Trueba?

10   A    Yes.

11   Q    And if you'd look at page 10.

12   A    Yes, I'm there.

13          MS. KELLER:  Your Honor, I'd ask that 6795 be

14   admitted.

15          THE COURT:  Received.

16          (Defendant's Exhibit No. 6795 is received in

17   evidence.)

18   BY MS. KELLER:

19   Q    Under "el empleado," do you see Mariana Trueba Almada?

20   A    Yes.

21   Q    And that's the same person you've been describing as

22   Mariana Trueba?

23   A    Yes.

24   Q    And then if you look to the left, you see, signed on

25   behalf of la empresa MGA de Mexico is Thomas Park?

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 62 of 124   Page ID #:302672
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

62

1    A    Yes.

2    Q    Or "Por:  Thomas Park"?

3    A    Yes.

4    Q    And is the clause in Ms. Trueba's contract, that she

5    also has no legal impediment arising from an agreement or

6    contract executed with a third party that would prevent her

7    from doing work contracted by the company, and I'm referring

8    to 6795-12, same clause?

9    A    Yes.

10   Q    And does she also promise not to bring privileged

11   information from her old company or anything that's

12   considered an industrial secret pursuant to the law under a

13   contract agreement or understanding she may have executed?

14   A    Yes.

15   Q    So that's the same clause in all three contracts?

16   A    Yes, it is.

17   Q    And in addition to that, you said you told all three of

18   them orally not to bring anything from Mattel?

19   A    I did.

20   Q    How clear do you think you were about that?

21   A    Extremely clear.

22   Q    And did you say that to them more than once?

23   A    I did.

24   Q    Now, if we can go back to Exhibit 3619, and that's the

25   e-mail from you to Scot Rank?

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 63 of 124   Page ID #:302673
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

63

1    A    Yes.

2    Q    And we look at the top e-mail, you are telling Mr. Rank

3    and David Dager, it says, Dear David -- well, yeah, it says

4    from Isaac Larian to Scot Rank, but it begins, "Dear David,

5    MGA Mexico will be opened in 15 days.  We'd like to invite

6    you and all Walmart buyers to come to L.A. and see our full

7    fall 2004 line, including all Bratz.  We have products for

8    toys, stationery, sporting goods, electronics, party goods."

9         So you were inviting the Walmart buyers to come to L.A.

10   to see your fall 2004 line, right?

11   A    I was.

12   Q    And you continued to receive Walmart support for the

13   new Mexico subsidiary?

14   A    Yes, they were one of our biggest customers.

15   Q    Now, did any of the three people that you interviewed

16   in that meeting in Mexico and who signed contracts with MGA

17   de Mexico, did any of those three disclose any Mattel

18   information to you during your meetings with them?

19   A    No.

20   Q    Let's look at Exhibit 3622.  And this is an e-mail from

21   you to Gustavo Machado Gomez, with CCs to, among others,

22   Mr. Vargas and Ms. Trueba, dated December 24th, 2004; is

23   that correct?

24   A    Yes.

25              MS. KELLER:  I move to have that admitted, your

1    Honor.

2              THE COURT:  Received.

3              (Defendant's Exhibit No. 3622 is received in

4        evidence.)

5    BY MS. KELLER:

6    Q    Now, you were unhappy about the lack of profitability

7    of MGA Mexico in this e-mail; is that right?

8    A    I was.

9    Q    And in October of 2005, you learned that there had been

10   a raid on the MGA Mexico offices --

11   A    Yes.

12   Q    -- that month, right?

13   A    Yes.  Yes, I was.

14   Q    Was this the first that you or MGA had learned that

15   Mr. Machado, Ms. Trueba or Mr. Vargas had taken any

16   documents from Mattel?

17   A    In this e-mail?

18   Q    No, when you learned in October of 2005, was that the

19   first you heard of it?

20   A    Yes.

21   Q    And that was the first you or MGA had learned about the

22   raid?

23   A    Yes.

24   Q    You were asked some questions about why you didn't just

25   fire all three of them; do you remember that?

1   A    Yes.

2   Q    What did they tell you about whether they had used

3   anything they took from Mattel?

4            MR. PRICE:  Your Honor.  Object.  It's hearsay if

5   offered for the truth.

6            MS. KELLER:  It's offered to show his actions,

7   your Honor.

8            THE COURT:  Overruled.

9            First of all, it's -- once again, it's not offered

10  for the truth.  It's offered to show his subsequent conduct

11  or what he said or did in relation to the information he's

12  receiving, but we don't have Mr. Machado on the stand at the

13  present time, Ms. Trueba or Mr. Vargas, so it's technically

14  hearsay, there's an exception to that rule, so it goes to

15  his state of mind and his conduct.

16  BY MS. KELLER:

17  Q    What did they tell you about whether they took anything

18  at all from Mattel that they then used in their employment

19  at MGA?

20  A    They told me they haven't used anything from Mattel at

21  MGA.

22  Q    How carefully did you question them about that?

23  A    I don't remember.  It was me, together with Daphne

24  Gronich, but I questioned them extensively on this, and they

25  promised me that they haven't used anything from Mattel at

1    MGA.

2    Q    Were you angry?

3    A    I was angry.

4            MR. PRICE:  Your Honor, I am going to object.

5    Move to strike.  My understanding is they've asserted

6    privilege on that communication.

7            THE COURT:  Now, Counsel, just a moment.

8            Counsel, just a minute.

9            This probably would be a good time for recess.

10   Would this be a good time for recess?

11           MS. KELLER:  Yes, your Honor.

12           THE COURT:  This would be a good time for recess.

13           Remind you not to discuss this matter amongst

14   yourselves, nor form or express any opinion concerning this

15   case.  We'll come get you in about 20 minutes.

16           Thank you.

17           Counsel, will you be seated, please.

18           *(The following proceedings is taken outside*

19       *the presence of the jury.)*

20           THE COURT:  The question was that Mr. Larian was

21   told that they had not used anything from this raid.

22           Mr. Price?

23           MR. PRICE:  The question involved a conversation

24   where Ms. Gronich, the general counsel, was present.

25           THE COURT:  And the privilege has been asserted by

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 67 of 124   Page ID #:302677
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

67

1    MGA concerning the --

2            MR. PRICE:  I'll defer to Mr. Zeller on that.

3            THE COURT:  Do you want to wait for just a moment

4    for Mr. Zeller?

5            MR. ZELLER:  We are getting for the transcript,

6    but I also know that they did decline to produce documents

7    and the like on these communications when the lawyers were

8    involved.

9            In fact, the Court will recall that we had moved

10   during discovery to get MGA's so-called investigation into

11   these trade secret thefts, and they asserted privilege over

12   that, as the Court will recall, and the Court sustained it.

13           So regardless of what little we've been given, the

14   Court definitely upheld their assertion of privilege and

15   they vigorously asserted privilege over that investigation

16   issue, if you recall.

17           MS. HURST:  Your Honor, may I, your Honor?

18           Mr. Larian has repeatedly testified about this

19   particular conversation on the day of the search.  We had

20   not asserted privilege over that.  He testified that

21   Ms. Kuemmerle participated and Mr. Machado had participated

22   and others have testified about that conversation as well.

23           What outside counsel did separately, we have

24   asserted privilege on that, but this particular

25   conversation, it's been testified about.

 1          I'm looking for the cites right now, your Honor,

 2   and I hope to have them shortly.

 3          THE COURT:  Okay.

 4          MR. ZELLER:  We'll get the transcript.  But

 5   regardless, it's clearly now a selective waiver, whatever it

 6   is that they are trying to assert.  They have not given us

 7   complete, full discovery into those communications.

 8          THE COURT:  It depends.  I need to go back and

 9   look at those documents surrounding Ms. Gronich in this

10   area.  I don't have them on the bench with me.  I'll do that

11   during the evening hours, in all likelihood.  I don't

12   recall, quite frankly, what those documents were at the

13   moment, but I will see them this evening.

14          So that shouldn't hold up a conversation

15   concerning the privilege, if there even is one.

16          So let me look at those documents in an abundance

17   of caution, and there is no reason not to continue on with

18   the questioning.

19          MS. HURST:  Just to be clear, your Honor, there is

20   no document that we're aware of memorializing that

21   conversation that's been withheld.  I just wanted to be

22   clear about that, so --

23          THE COURT:  Well, I'll go back and look.  I don't

24   recall, but it would be wise if I just went back with the

25   volume of information and looked again.

```
 1                MS. KELLER:  Your Honor, it's hard to go on and
 2    ask about what was done or not done with respect to those
 3    employees if I can't ask Mr. Larian about his conversation
 4    with them.  And Ms. Hurst assures me that he's testified
 5    about that conversation repeatedly without an assertion of
 6    privilege.
 7                THE COURT:  Okay.
 8                MS. KELLER:  But I don't want to run afoul of the
 9    Court's directive if I'm supposed to wait.
10                THE COURT:  You are not.  That's your choice.
11    Remember, you asserted the privilege, you also have the
12    ability to waive the privilege.
13                MS. KELLER:  We did not assert the privilege.
14    That's what I'm saying.  He's testified about this
15    conversation repeatedly.
16                THE COURT:  No, concerning Gronich.
17                MS. HURST:  Yes, this particular conversation.  It
18    was Ms. Gronich, Ms. Kuemmerle, Mr. Machado and Mr. Larian
19    were all on the telephone call --
20                THE COURT:  Excuse me, what don't you think I
21    understand about that?
22                (Laughter.)
23                THE COURT:  I don't see why everybody is so
24    emotionally involved.  What don't you think I don't
25    understand?
```

1          MS. HURST:  I apologize, your Honor.  It struck

2    me that the Court -- I misunderstood, I thought the Court

3    was confused.

4          THE COURT:  Why don't you come up and make a

5    couple of rulings for me, then.

6          I'm just kidding.

7          Now, listen, the only thing I care about is if

8    there is any e-mail that hasn't been disclosed wherein

9    there's a memorialization by Ms. Gronich of this

10   conversation, and if there is such an e-mail that has not

11   been disclosed, I need to go back and look at the content

12   and see if she's giving advice or simply memorializing the

13   conversation, it's very simple.  Will you let me do that?

14         MS. HURST:  Your Honor, may I provide the page and

15   line cites from the transcript?

16         THE COURT:  You may, but I'm going to go back and

17   look at the e-mails and see if there's anything back there.

18         MS. HURST:  Understood.

19         THE COURT:  Now page and line?  Why don't you just

20   give it to me.

21         MS. HURST:  I will.

22         THE COURT:  Just print it out.

23         Now, I would suggest that you just take about a

24   12-minute recess.  I'll open the doors in 12 minutes.

25              *(Recess.)*

```
 1              (The following proceedings is taken outside

 2         the presence of the jury.)

 3              THE COURT:  We are back on the record.  The jury

 4    is not present.

 5              I don't see Mr. Zeller.

 6              Okay.  Mr. Zeller, I think we can gather this

 7    information quickly.  I need all -- I mean all, not just

 8    piecemeal, but all the deposition transcripts in which MGA

 9    raised the privilege.  And I'd like to get the docket number

10    of Mattel's motion and the docket number of the order in

11    which I supposedly sustained MGA's implication of the

12    privilege.  In other words, that's how I can gather it

13    quickly.

14              My immediate recollection and thought was the same

15    as when I got off the bench, and that is that the Court

16    forced MGA to produce its work product discussing its

17    attorney-client interviews with Pablo Vargas.  Now, all I

18    need is some time to go back and check that.  It's easily

19    resolved.  I can do it in a half an hour, but I don't want

20    to stop the proceedings today.

21              So don't -- I can't represent to you, Ms. Keller,

22    but I'm not going to take that document from you piecemeal

23    right now, okay?  We are going to go right back in session,

24    and if you have to move on to another area, please do so,

25    but I'll need about a half an hour to look at it.
```

1          MS. KELLER:  Your Honor, I'm going to be done

2     before the afternoon is out, and I have a deposition here

3     where Ms. Hurst is specifically not asserting the privilege,

4     and he's answering the question, and I --

5          THE COURT:  So just a moment.  So where is the

6     problem?

7          MS. HURST:  There isn't a problem.

8          MS. KELLER:  There isn't a problem.  We didn't

9     assert a privilege to that conversation.

10         THE COURT:  Just a moment.  Did you see me make

11    any contrary ruling?  I just took a recess, that's all I

12    did, to let everybody tell me what was on their mind.  So

13    I'm going to go back in session.

14         MS. KELLER:  So, your Honor, may I ask the

15    question about the conversation that I was asking?

16         THE COURT:  I never said you couldn't.  All I

17    heard was Mr. Price say there is a privilege, and I took a

18    recess.  So Mr. Price thinks that there's a privilege.

19         MR. ZELLER:  And they did assert privilege over a

20    part --

21         THE COURT:  Okay.  Thank you very much.  Now we

22    are now back in session.

23              *(The following proceedings is taken in the*

24         *presence of the jury.)*

25         THE COURT:  All right.  The jury is present.  All

 1   counsel are present.  The witness is present.

 2         Ms. Keller, if you'd like to continue on with your

 3   cross-examination, please.

 4         MS. KELLER:  Thank you, your Honor.

 5              **ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED**

 6                  **CROSS-EXAMINATION (Continued)**

 7   BY MS. KELLER:

 8   Q    Mr. Larian, before we broke, I was asking you about

 9   your having heard in October of 2005 about there having been

10   a raid on the MGA Mexico offices; do you remember that?

11   A    Yes.

12   Q    And you said that was the first you had heard of it?

13   A    Yes.

14   Q    Who did you hear about it from?

15   A    Susana Kuemmerle.

16   Q    And what did Susana tell you?  Did she call you?  Did

17   she meet with you in person?

18   A    No.  It was a phone call.

19   Q    And what did she tell you?

20   A    She told me --

21         MR. PRICE:  Your Honor, this part would be hearsay

22   as well, unless it's offered for another purpose.

23         THE COURT:  No.  It goes to his state of mind, to

24   his conduct.  The exception is the same that I've applied

25   before in this area, Counsel, so overruled.

```
 1              Now, Susana Kuemmerle will testify?

 2              MR. QUINN:  Yes.

 3              THE COURT:  That will resolve that problem also,

 4   but right now it's not for the truth.  We don't have Susana

 5   Kuemmerle on the stand, but she'll be here.

 6              Counsel?

 7   BY MS. KELLER:

 8   Q    What did you find out from Susana?

 9   A    She told me that Mattel Mexico has instigated the

10   Mexican police to raid MGA Mexico, and that they were there,

11   and they were taking a lot of things out of MGA Mexico.

12   Q    And specifically --

13              MR. PRICE:  I object.  Ambiguity as to "they."

14              THE WITNESS:  Mexican police.

15              THE COURT:  I'm assuming it's the Mexican police,

16   so overruled.

17              MR. PRICE:  She said and Mattel, so I didn't know

18   what she meant.

19              THE COURT:  "Mattel" is Mattel and "they" is the

20   Mexican police.

21   BY MS. KELLER:

22   Q    Okay.  Just to clarify, so Ms. Kuemmerle told you that

23   Mattel Mexico had instigated an investigation?

24   A    A raid.

25   Q    A raid.  And that the Mexican authorities had gone to
```

1    MGA's offices, and the Mexican authorities had been doing

2    what?

3    A    Mexican police, they were taking a lot of things out of

4    MGA Mexico.  They had search warrant, and they had gun in

5    there, and they were taking a lot of things out of MGA

6    Mexico.

7              THE COURT:  Now, just a moment.  Let me just

8    caution you, just to be certain.  Once again, Ms. Kuemmerle

9    is not on the stand.  She is not subject to

10   cross-examination right now.  And whether this was an

11   instigation, we have no idea, and whether even if, in fact,

12   the word "raid," we have no idea.  So this is simply

13   information that Mr. Larian is testifying to that he

14   received, and the only purpose is to show his conduct and

15   state of mind at that time.

16             Counsel?

17             MS. KELLER:  Thank you.

18   BY MS. KELLER:

19   Q    And by the way, Mr. Larian, you've testified about this

20   topic before?

21   A    I have.

22   Q    And so was it after that that you found out that some

23   of the things taken, seized by the Mexican police from the

24   MGA offices have been documents apparently taken from Mattel

25   by one or more of those three employees?

1    A    Yes.

2    Q    And was it Ms. Kuemmerle who told you that as well?

3    A    No.

4    Q    Now, after you found that out, how did you react?

5    A    I was really shocked and disappointed.

6    Q    And why is that?

7    A    Because I had told these people repeatedly in front of

8    Tom Parks, in front of Susana Kuemmerle, in front of Mary

9    Carmen, "Just come with your brain.  Don't bring anything.

10   Just come with your brain.  Don't bring anything."

11   Q    So you were asked by Mr. Price, then, why didn't you

12   fire them?

13   A    Yes.

14   Q    Why didn't you fire them?

15   A    Because they -- I talked to them later on.  They said

16   they have not used any of these at MGA Mexico, and they were

17   sorry that they had not followed my direction.

18   Q    Did they explain to you what it was that they had

19   brought with them?

20   A    They did not.

21   Q    So they just told you they hadn't used anything?

22   A    Right.

23   Q    And did that -- was that -- did that satisfy you?

24   A    I wasn't happy that they hadn't followed my direction,

25   but I didn't take anymore disciplinary action against them

1    because they were remorseful, they had families, kids, et

2    cetera.  I just didn't want to go ahead and fire them,

3    whether it's them or somebody else at my company.  I have a

4    soft spot.

5    Q    Well, you have other employees at your company that

6    you've let go in the past, right?

7    A    Yes.

8    Q    And have you had other employees that you've let go in

9    any similar situation?

10   A    What kind of situation?

11   Q    Well, when you let employees go in the past, what would

12   have been the circumstances?

13   A    Not working out, not following company policy, but I've

14   always given people a second chance, a third chance, and

15   that's -- that's my soft spot.

16   Q    Did Mr. Machado assure you that he hadn't used any

17   Mattel confidential information?

18   A    I don't recall.

19   Q    You just remember that all three of them, more or less,

20   told you that?

21   A    Yes.

22   Q    Now, Exhibit 6766, if you could take a look at that.

23   A    Yes, go ahead.

24   Q    Do you recognize this as an e-mail chain where Susana

25   Kuemmerle, the head of MGA Mexico, was asking whether or not

1    her people would get bonuses?

2    A    Yes.

3    Q    And this is dated May 9th, 2006?

4    A    Yes.

5         MS. KELLER:  Your Honor, I'd ask that 6766 be

6    admitted.

7         THE COURT:  Received.

8         *(Defendants' Exhibit No. 6766 is received in*

9         *evidence.)*

10   BY MS. KELLER:

11   Q    And if you'd go to the middle of the page on page 2,

12   you'll see an e-mail from Eric Villette, executive vice

13   president of operations to Susana Kuemmerle --

14   A    Yes.

15   Q    -- dated May 9th, 2006?

16   A    Yes.

17   Q    And it says, "Susana we've taken a look at the bonus

18   schedule, and we are almost good to go.  We still have one

19   issue.  We have incurred so far roughly 114,000 in legal

20   expenses re: Pablo Gustavo and Mariana.  I believe they need

21   to bear some of these costs, as they created the situation

22   in the first place."

23        What did he mean, in your understanding, by "they

24   created the situation in the first place"?

25   A    They didn't follow my direction and Tom Parks'

1    direction and our head of human resources' direction not to

2    bring anything from Mattel, "just come with your brain."

3    Q    And then he goes on, "Individual share, if fully

4    charged back, would be just under 38K.  What would you

5    suggest?"

6         "Brian, all the 114K related to just the employee

7    defense or MGA and employees."

8         What's your understanding why he was asking that?

9    A    Because I think Mattel sued also MGA Mexico, and I

10   think he was asking is that all for the defense because we

11   decided to defend these three employees.  Mattel sued them.

12   I don't know if they sued them all.  They sued Gustavo.  I

13   really don't remember, but they were -- they had issues,

14   now, with the Mexican authorities.  They didn't have money

15   or lawyers, so we were providing them legal service.

16   Q    So in that -- your understanding, then, of that

17   sentence is he's trying to figure out how much of this

18   relates to the defense of MGA versus the individuals?

19   A    That's correct.

20   Q    Now, if you look at Ms. Kuemmerle's reply on page 1,

21   dated May 9th, 2006, she says, "Eric, although you and I

22   just talked about this, it is because I am head of MGA de

23   Mexico, I felt I needed to put this in writing and on the

24   record.  I see and respect your point of view and understand

25   the global implications this may have in the future.

1   However, I disagree completely on this suggestion.  Even

2   when it is clear that a stupid mistake was made, and it is

3   also clear that neither one of us ever imagined that this

4   particular witch hunt was going to take place in Mexico,

5   even with the bad history between both companies.

6        "Like I mentioned to you, if we were to do something

7   to, quote, 'reprimand,' unquote, Gustavo, Pablo and Mariana,

8   we should have done it on October 28th, 2005, the day after

9   the search in our offices.  To do it now, when we have to

10  pay our bonuses, seems unfair and unethical to me,

11  especially when Gustavo is about to move to L.A. and Pablo

12  is closing X-mas bookings.  I think we must put in the

13  balance the effects of this decision.

14       "I ask you all with what mode is Gustavo going to move

15  and Pablo going to keep on pushing sales in Mexico.

16       "Lastly, and as I mentioned to you, if this is the

17  order you and Isaac give me, then this is what I will have

18  to do and we will proceed immediately."

19       So what was your understanding of what Ms. Kuemmerle's

20  position was about whether they should be deprived of their

21  bonuses because of the raid?

22  A    She didn't want -- she didn't want us to withhold their

23  bonuses.

24  Q    So you were also asked about -- I'm sorry.

25       Let's look at the top of that e-mail chain, and this is

1    from Eric Villette, the executive vice president of

2    operations, to you and Ms. Kuemmerle.

3    A    Right.

4    Q    And he says, "Susana feels strongly about this, as she

5    should as head of Mexico.  A potential solution is to defer

6    the decision on the potential charge until next year.  Pay

7    the bonus for 2005, but have a frank discussion with Pablo

8    and Gustavo on whether they feel accountable and are willing

9    to defray partially the costs.

10        "After thinking about it, we should not tie the two

11   issues, as they are separate.  However, whether now or at a

12   later stage, I strongly believe we need to take some action

13   at the corporate level, as the number of former Mattel

14   employees will likely continue to increase, it must be made

15   clear that anyone who breaks his/her engagement in writing

16   not to bring anything confidential will be held

17   accountable."

18        So what was your understanding of what your executive

19   vice president was responding back to Ms. Kuemmerle?

20   A    Not to tie the bonus with -- with the legal fees that

21   we were paying for these people's stupid act and -- but --

22   they have to be kept accountable.

23   Q    So by "kept accountable," have that reinforced, that if

24   they did anything like that in the future, stupid like that,

25   that they would pay the?

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 82 of 124   Page ID #:302692
CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

82

```
 1              MR. PRICE:  Objection.  Leading.

 2              THE COURT:  Sustained.

 3   BY MS. KELLER:

 4   Q    Held accountable how?

 5   A    I made it very clear that if there were anymore contact

 6   whatsoever from any of them with anybody at Mattel, former

 7   friends, et cetera, then they would be fired.

 8   Q    But you didn't fire them then?

 9   A    I didn't fire them at that moment, no.

10   Q    Now, you recall being asked about the fact that

11   Mr. Machado was transferred to the United States?

12   A    He was.

13   Q    If you could take a look at Exhibit 35075.

14   A    Yes.

15   Q    And look at the second page.

16        Is this an e-mail from Ron Brawer to you and copies to

17   Brian Wing, Eric Villette, the person we were just talking

18   about, and somebody named Jay Wagner, dated August 24th,

19   2005?

20   A    Yes.

21              MS. KELLER:  Your Honor, I ask to admit 35075.

22              THE COURT:  It's received.

23         (Defendants' Exhibit No. 35075 is received in

24         evidence.)

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 83 of 124   Page ID #:302693
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

83

1   BY MS. KELLER:

2   Q    Now, if you look at the second page, this is a

3   discussion of Mr. Machado having been asked by Ron Brawer to

4   transfer to the U.S.; is that right?

5   A    Yes.

6   Q    Who was Ron Brawer?

7   A    He was an executive vice president of sales and

8   marketing.

9   Q    In the U.S.?

10  A    Yes.

11  Q    And this says, "I spoke to Gustavo twice before I read

12  this note.  He wants a very clear description of what it is

13  we want him to do in L.A.  I told him the core job was head

14  of brand marketing for Bratz, but I was not crystal clear.

15  For example, I cannot promise the position reported to me.

16      "Two, Gustavo let on that he would like to help build

17  subsidiaries, so I then tried to assure him that his job

18  would be global and it could move him, eventually, to Spain

19  or Europe.

20      "Three, he suggested he is best serving the company" --

21  that b-l-d-i-n-g spells "building" -- "the Vivid of Latin

22  America.  I told him he could still do this from L.A., and

23  he disagreed.

24      "Next steps, A, I can give him some kind of a job

25  write-up but would like team input; B, wants to sit down

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

84

```
 1    with Isaac when he is in Mexico on September 9th.  Ron."
 2         So this was not a reward to Mr. Machado to come to the
 3    United States, correct?
 4              MR. PRICE:  Objection.  Leading.
 5              THE COURT:  Sustained.
 6    BY MS. KELLER:
 7    Q    Was this a reward to Mr. Machado to come to the United
 8    States?
 9    A    Absolutely not.
10    Q    What was your understanding of whether he wanted to
11    come to the U.S. or not?
12    A    He didn't want to come to the U.S.  He wanted to do
13    these Vivid -- he refers to a company called Vivid
14    Imagination, which is a distributor in -- a very successful
15    distributor in UK, and his mind was we set up something like
16    this to handle all of Latin America, and he didn't want to
17    do it out of L.A.
18    Q    So was his transfer to Los Angeles and his -- well,
19    let's take it one at a time.
20         Was paying him his bonus a reward for him stealing
21    Mattel information?
22    A    It was not.
23    Q    Was his transfer to Los Angeles a reward for stealing
24    Mattel information?
25    A    It was not.  He didn't even want to come to
```

```
 1    Los Angeles.

 2    Q    Now, in the years 2004 to 2007, did MGA Mexico make

 3    money or lose money?

 4    A    We lost money.

 5    Q    And we're talking about millions of dollars?

 6    A    Millions.

 7    Q    6,486,000 in the period ending December 31st, 2004?

 8    A    And counting, yes.

 9    Q    And then it up to over 7 million?

10    A    Yes.  It's still going.

11    Q    And kept going up?

12    A    It's still going, yes.

13    Q    And what was the reason that MGA Mexico was losing

14    money?

15    A    Bad management.  They were selling product at not

16    correct pricing.  Just bad management.

17    Q    Was there a problem with too much TV advertising

18    relative to the income?

19    A    Yes, all of those.  I mean, I call that also bad

20    management.  They were spending more money on TV than we had

21    sales coming in.

22    Q    When did you -- at some point did you shut down MGA

23    Mexico?

24    A    Yes.

25    Q    And when was that?
```

1    A    Either 2009 or 2010.  I don't remember exactly.

2    Q    And what did you do with respect to Mr. Machado,

3    Ms. Trueba and Mr. Vargas?

4    A    I laid them all off.

5    Q    Now, Mr. Price also showed you Exhibit 8466, which is

6    in evidence.

7         And do you remember seeing what document?

8    A    Yes, I did.

9    Q    And you told Mr. Price you didn't know where these came

10   from?

11   A    Yes.

12   Q    And he told you it was found in the MGA Mexico offices?

13   A    That's what he said.

14   Q    And what about Exhibit 7104; same thing?

15   A    I don't have that.

16   Q    Well, let's take a look, here.  And that's also already

17   admitted.

18   A    Yes.

19   Q    And this was another one that Mr. Price told you was

20   found in the MGA Mexico offices?

21   A    Yes.

22   Q    And Exhibit 8466, the first one that you have there, is

23   that 883 pages?

24   A    I don't know how many pages.  It's this many pages

25   (indicating).

1    Q    Look at the first page of 8466.

2    A    Yes.

3    Q    Okay.  Looking at it now, and I think you saw that for

4    the first time the other day on the witness stand?

5    A    I did.

6    Q    Is this Mattel's information?

7    A    No.  This is Walmart Mexico's information.

8    Q    And how is this data collected?  Can you tell from

9    looking at this?

10   A    Yes.  Walmart has something called "Retail Link"

11   that -- for example, when we are a vendor to Walmart, we get

12   a code.  We can go on Walmart and find out how our product

13   is selling, how much inventory they have.  They basically

14   want you to manage their business, and we have similar

15   reports like this.

16   Q    So Walmart, when you say they want you to manage the

17   business, they -- they let you have access to this document,

18   and you can see how much is selling everywhere and how much

19   they have in their inventory?

20   A    Yes.

21             MR. PRICE:  Objection.  It's ambiguous as to

22   "you."

23             MS. KELLER:  All right.

24             THE COURT:  Sustained.

25             MS. KELLER:  Okay.

1   BY MS. KELLER:

2   Q    Let's say you, MGA, would request Walmart -- or you

3   would be given access to Walmart's data, right?

4   A    That's correct.

5   Q    And then if you looked at Walmart's --

6            MR. PRICE:  I -- I'll object.  It's ambiguous as

7   to "Walmart's data," it came to MGA, other competitors, et

8   cetera.

9            THE COURT:  Let's clear that up, Counsel.

10   BY MS. KELLER:

11   Q    Let's say Walmart says to you, MGA, "MGA, we want you

12   to start helping us manage our inventory a little better of

13   your products" --

14   A    Yes.

15   Q    -- "because we are running out of some things, and

16   others we have too many of" --

17   A    Yes.

18   Q    -- "and it's on you, MGA, we want you to manage this

19   for us."

20   A    Yes.

21   Q    Okay.  They are big enough that they can do that,

22   right?

23   A    Mattel is -- I mean not Mattel -- Walmart is, yes, but

24   they are too cheap.  They want you to do their work for

25   them.

1    Q    But what I'm saying is they're big enough that if they

2    say "jump," you say "how high," right?

3    A    Yes, we do.

4    Q    So if Walmart wants you to manage your inventory, is

5    this the document you, MGA, would go to?

6    A    That's correct.

7    Q    And let's just pretend it doesn't say Mattel, let's

8    pretend it says MGA.

9    A    Yes.

10   Q    And so you would, then, go to a site, a website that

11   Walmart has, right?

12   A    It's called "Retail Link."

13   Q    Retail Link, and you would look and see how much each

14   thing you needed to replenish?

15   A    Right.

16   Q    And how much of each thing they had too much of?

17   A    Yes, and also moving from one store to another, tell

18   the buyer they need to buy more of this, tell the buyer they

19   need to buy less of that.  But there's two different

20   categories.  In certain areas -- well, I don't want to

21   volunteer.  Go ahead.

22   Q    Tell the buyer that their Riverside store is selling

23   more of one thing than the Fountain Valley store?

24   A    I prefer not to use Riverside, but yes.

25   Q    Okay.  So that information is useful to Walmart, true?

```
 1    A    Yes, it's for them.
 2    Q    And it's information that you, MGA, could use to manage
 3    your relationship with Walmart, right?
 4    A    That's correct.
 5    Q    And if somebody else gets that information,
 6    particularly later on, is it useful to that other person?
 7    If another company finds out how -- whether you've got to
 8    replenish your stock at a given Walmart store, does that
 9    help that other --
10             THE COURT:  Just a moment.  "Later on," that's --
11             MS. KELLER:  Okay.  Then let's say "at the time."
12             THE COURT:  Okay.  It doesn't matter.  Just define
13    what "later on" is.
14    BY MS. KELLER:
15    Q    Let's say another company learns at the time that you
16    have not been managing your inventory very effectively, is
17    that tremendously valuable information to that other
18    company?
19             MR. PRICE:  Objection.  Ambiguous.  Calls for
20    speculation.
21             THE COURT:  No.  You can answer the question.
22             THE WITNESS:  I'm going to give you an analogy.
23    It's like milk.  This information is fluid.  It changes
24    every day because every day millions of people go to Walmart
25    to buy product.  It's like buying milk.  If the milk stays,
```

```
 1    after a few days it goes bad, it's worthless, and this is
 2    the same information.  This information is good for the day
 3    you get it.  The day after, it's spoiled.  It's like
 4    watermelon that goes spoiled.
 5            I don't know if -- I use some Persian analogy.
 6    I'm sorry.
 7    BY MS. KELLER:
 8    Q    No, no.  That's -- that's fine.
 9            It's -- so for example, a week later or -- or even five
10    days later, the whole inventory picture could have changed?
11    A    It changes on less than five days later because
12    Walmart, so many -- or Target, so many customers are
13    shopping 24 hours a day, it changes by the minute.  It
14    changes every hour.  That information changes every hour.  I
15    got this information -- if you -- if somebody got it an hour
16    later, it would be different than what's in here.  An hour
17    after that, it would be different than what's in here.  It
18    just keeps changing.  It's no value to this information.
19    Q    But it looks pretty bad that your employees had
20    anything that they got out of Mattel, right?
21            MR. PRICE:  Objection.  Leading.  Argumentative.
22            THE COURT:  I'll sustain it.
23    BY MS. KELLER:
24    Q    Now, let me ask you a little different question.  If,
25    for some reason, you wanted this data, if for some reason
```

1    you wanted to find out if Mattel was not managing its -- its

2    inventory or sales very well with Walmart, they had too much

3    of one doll in one store and not enough of another doll in

4    another store on a given Monday, would you be able to

5    collect that information somewhere else?

6    A    You can go to the store.  You can ask the buyers.  You

7    can check that.  There is no -- yes, you can.

8    Q    And if you want to get really meaningful information,

9    not day-to-day how much product is on the shelves, but if

10   you want to get really meaningful information about, say,

11   Mattel's sales, can you buy that from independent

12   organizations that gather it?

13          MR. PRICE:  Your Honor, the question is

14   argumentative because of the word "meaningful."

15          MS. KELLER:  I'll try to rephrase, your Honor.

16   BY MS. KELLER:

17   Q    If you want to get information that you can actually

18   use to gain a competitive advantage --

19   A    Yes.

20   Q    -- something that is meaningful to your business in a

21   competitive sense about Mattel sales, can you go and buy it

22   somewhere?

23   A    Yes, you can.  You can --

24   Q    Where can you by it?

25   A    In U.S.A., it's called MPD or TRSTS, total retail sales

1    data.  In Mexico it's called Nielsen.  You'll have the

2    Nielsen ratings that rank the TVs, how many people are

3    watching, what channel.  That company provides the same

4    service in Mexico, in Canada, there is another one in

5    Australia called GFK.  Again, they get the data, and they

6    sell it to you.

7    Q    So this data -- is this data on competitors' sales --

8    A    Yes.

9    Q    -- over certain periods of time?

10   A    Compare the sales at retail level.

11   Q    Over a certain period of time?

12   A    Yes.

13   Q    So what would those periods be?

14   A    Usually like in U.S.A., MPD now issues quarterly.  I

15   don't remember -- I don't remember how GFK or Nielsen does

16   it.  I don't know.

17   Q    And so is that --

18   A    It's for sure annually.

19   Q    And is that information something that people --

20   competitors actually use to decide how to compete?

21   A    Yes, they do.

22   Q    And they pay money for that?

23   A    Yes.

24   Q    In deciding how to compete, do competitors try to get

25   information about how much inventory somebody has on its

 1   shelf at Walmart on a given day?

 2   A    I'm sorry, I don't understand.

 3   Q    In deciding to compete with Mattel, do you, MGA, try to

 4   go out and find out how much the inventory levels are on any

 5   given day at Mattel -- I mean, at the Walmart?

 6   A    Actually, Mattel, they just had their quarterly report

 7   where --

 8            MR. PRICE:  Objection.  This goes beyond the scope

 9   of the question and --

10            (Interruption in the proceedings.)

11            MR. PRICE:  I'm sorry.  Beyond the scope of the

12   question and voluntary hearsay.

13            MS. KELLER:  I'll move on.

14            THE COURT:  Just reask the question.

15            MS. KELLER:  Okay.

16   BY MS. KELLER:

17   Q    Well, just to wrap up, this data, now that you've seen

18   it, now that you know what it was, was it of any use to you?

19   A    No.  It's worthless.

20   Q    Now, let's look at Exhibit 7104.

21        Do you see what that document is?

22   A    Yes.

23   Q    This is one of the other ones that you were shown the

24   other day that you were told was taken from the Mattel

25   Mexico -- taken from Mattel Mexico by the MGA employees?

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 95 of 124   Page ID #:302705
CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

95

1    A    Or rather, found at MGA Mexico.

2    Q    Found at MGA Mexico.

3         And does this include suggested prices for spring 2005

4    product set?

5    A    I can't find it in here.

6         I don't know where you're looking.  I don't see

7    suggested -- what did she call it?

8    Q    Nevermind.  I am not even going to ask you about that.

9    I'm going to ask you something else.

10        From what you see of what this document purports to be,

11   does it look like something that would be of any value to

12   you?

13            MR. PRICE:  Objection.  Lacks foundation.

14            THE COURT:  Overruled.

15            You can answer that question.

16            THE WITNESS:  It depends -- it depends when was

17   this obtained.

18   BY MS. KELLER:

19   Q    To the best you could tell, what is that document?

20   A    It says "Barbie 2005 preliminary line list."

21   Q    And what's a preliminary line list?

22   A    For Mattel or for MGA?  I know for MGA, it's a line

23   list we plan to come up with later on.

24   Q    When are -- when are suggested prices for spring 2005

25   products set?

```
1    A    I don't know about Mattel, but we set it up -- we have

2    a pre -- a pre-toy show, like we have one coming out in

3    April, and that's when we set up the suggested retail

4    pricing for spring of the year later.

5    Q    And would you have a preliminary line list with

6    suggested prices for 2005 before April 2004, would you?

7    A    I'm sorry?

8    Q    Would you have a preliminary line list with suggested

9    prices for 2005 before April of 2004?

10   A    I doubt it because that's not when the shows happen.

11   Q    Mr. Machado, Mr. Vargas and Ms. Trueba left Mattel

12   Mexico in April of 2004?

13   A    Yes.

14   Q    And if you can assume for a moment that this has

15   suggested prices for 2005 in it, then could this document

16   have been downloaded when they left Mattel?

17   A    I have no idea how they got this document and how it

18   found its way to MGA Mexico.  I have no idea and when.

19   Q    You were also asked about some testimony as to MGA's

20   knowledge of the documents seized in Mexico; do you remember

21   that?

22   A    I don't remember every question asked.

23   Q    Do you remember Mr. Price asking you about the contents

24   of the documents that were seized from MGA Mexico?

25   A    Well, he showed me these two documents, I believe.
```

1   Q     Right, and you said you hadn't seen it before, right?

2   A     Yes, I had not seen it.

3   Q     And you said you didn't know what they were, true?

4   A     I did not.

5   Q     Now, you were also --

6   A     I did not before I testified, but now I've looked at

7   them.

8   Q     Right, but you were also asked about having been

9   something called a 30(b)(6) witness on behalf of MGA; do you

10  remember that?

11  A     Yes, I do.

12  Q     And under the Federal Rules of Civil Procedure, is it

13  your understanding that a 30(b)(6) witness is a corporate

14  representative who is willing to become educated about a

15  particular topic?

16  A     Yes.

17  Q     So it doesn't necessarily mean that you have any

18  knowledge of the topic in advance, it just means that you

19  are willing to learn it so that you can testify to that

20  topic, right?

21          MR. PRICE:  Objection.  It misstates the legal

22  standard, your Honor.

23          THE COURT:  Well, this is his understanding of

24  what a 30(b)(6) is, and if he's designated himself such a

25  witness, then it's relevant to show what his understanding

```
 1   is of the duties and responsibilities that he has.  But if I

 2   need to define that for you at a later time, I will.

 3          Counsel?

 4   BY MS. KELLER:

 5   Q    Now, have you reviewed the portions of your deposition

 6   testimony on July 7th, 2010, that deal with the search and

 7   seizure of documents from MGA's subsidiary MGA Mexico?

 8   A    I don't -- I didn't.

 9   Q    And were you designated as a 30(b)(6) witness to

10   testify about your knowledge of the search and seizure, in

11   other words, of what happened when the police came to MGA

12   Mexico?

13   A    I was not.

14   Q    Were you designated to testify about -- here is what

15   I'm asking:  Were you designated to testify about the fact

16   that there was a raid?

17   A    Yes, I -- I was designated to know about the raid, but

18   I was not designated to know what happened during the raid

19   and after the raid.

20          MR. PRICE:  Your Honor, I object and move to

21   strike.  That's getting into an area of law and --

22          MS. KELLER:  I'm asking for his understanding,

23   your Honor.

24          MR. PRICE:  His understanding is irrelevant.

25          MS. KELLER:  It's what he was asked about on
```

 1   cross, which is why I'm asking him.

 2            *(Attorney discussion held off the record.)*

 3            THE COURT:  This is going to get into a number of

 4   the rulings, Counsel.  I want to forewarn both parties

 5   and --

 6            MS. KELLER:  I will just ask a different question,

 7   your Honor.

 8            THE COURT:  Well, you don't have to.  If you want

 9   to continue, please do so, but I don't know that I'm going

10   to curtail that from Mattel.

11            Counsel?

12   BY MS. KELLER:

13   Q    Mr. Larian, were you personally present in Mexico when

14   the offices were raided?

15   A    I was not.

16   Q    Were you personally given copies by the Mexican police

17   of what they took from MGA Mexico?

18   A    No.  I wasn't there.  I wasn't given --

19   Q    And would it be true that whether sitting as a

20   witness -- an ordinary witness or as a witness under

21   30(b)(6) of the rules, you only know about that raid what

22   others have told you?

23   A    Yes.

24   Q    And would it also be true that you only know, in terms

25   of what documents were taken, what you have seen here in

1    court, and anything else that you have been asked to read

2    for this -- for this trial?

3    A    Yes.

4    Q    And so when you said the other day that you were seeing

5    those documents Mr. Price gave you for the first time, was

6    that the truth?

7    A    Yes.

8    Q    And I'm talking about 7104 and 8466.

9    A    Yes.

10   Q    And in this case, unless there is an exception either

11   by court order or because somebody is designated to be able

12   to see documents, are there documents that have been

13   designated "attorneys' eyes only"?

14          MR. PRICE:  Objection.  That's irrelevant for the

15   30(b)(6).

16          THE COURT:  Sustained.

17   BY MS. KELLER:

18   Q    Well, you've seen some documents come up on the screen

19   that said "attorneys' eyes only"; is that right?

20   A    I have.

21   Q    And that means that unless there's an exception for

22   someone who has been designated as a 30(b)(6) witness on

23   that topic or the -- the attorneys are, in fact, the ones

24   looking that no one can look at those documents, right?

25          MR. PRICE:  Objection.  Irrelevant in this case.

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 101 of 124   Page ID #:302711
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

101

```
 1              THE COURT:  Well, it goes to his -- I'm going to
 2     reverse my prior ruling.  It goes to his knowledge, Counsel.
 3              You can ask.
 4              THE WITNESS:  To my knowledge, there's three ways.
 5     One is when a court -- when a judge de-designates something
 6     that was marked AEO, "attorney eyes only," it becomes
 7     public, then I have seen those before.  That's one way.
 8     Another one is when -- when I was being prepared for
 9     30(b)(6), I was shown certain documents to get prepared for
10     my testimony, and sometimes not all the documents, only a
11     portion that the counsel chose who said that's relevant to
12     my testimony to read, and those were AEO.
13     BY MS. KELLER:
14     Q    Now, was it your understanding -- I am just asking what
15     was in your head.  Was it your understanding that you were
16     not designated as a 30(b)(6) witness on the issue of what
17     was actually in the documents seized from Mexico?
18              MR. PRICE:  Object.  That's irrelevant as a matter
19     of law.
20              MS. KELLER:  That's what he was asked about the
21     other day, your Honor.
22              THE COURT:  Overruled.
23              THE WITNESS:  Yes, I was not designated on that,
24     and I remember my deposition, and that issue came over and
25     over, and I just looked at my deposition again during the
```

1    break.

2    BY MS. KELLER:

3    Q    And is that why you never read any of the documents

4    that were seized from MGA Mexico's offices?

5    A    I was not even given those documents to read,

6    Ms. Keller.

7    Q    So it's not that you are pretending to not know,

8    correct?

9             MR. PRICE:  Objection.  Leading.  Argumentative.

10            THE COURT:  Sustained.

11   BY MS. KELLER:

12   Q    Are you pretending not to know what's in the document?

13   A    I'm not.

14   Q    Are you claiming that you didn't want to read them --

15   are you -- are you claiming that you didn't read them as a

16   way to be evasive?

17   A    I did not.  I just want to make clear that when I said

18   I did not, I did not try to be evasive.

19   Q    I understand.

20            Now, I want to move on to another topic, probably to

21   the great relief of all.  I want to talk to you about Jorge

22   Castilla, okay?

23   A    Yes.

24   Q    Who is Jorge Castilla?

25   A    What do you mean who is --

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 103 of 124   Page ID #:302713
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

103

```
 1    Q    Who is Jorge Castilla, and who was he in 2006?

 2    A    He was a previous Mattel employee who came to MGA.

 3    Q    MGA United States or MGA Mexico?

 4    A    MGA U.S.A.

 5    Q    And if you could take a look at Exhibit 21423.

 6    A    Yes.

 7    Q    Is this an e-mail chain that includes e-mails from

 8  Jorge Castilla to human resources at MGA and from a Linda

 9  Whaley -- or from a Scuyler Bacon to a Linda Whaley?

10    A    Scuyler Bacon.

11    Q    Scuyler Bacon?

12    A    Yes.

13    Q    And who is Scuyler Bacon?

14    A    She used to be a recruiter at MGA U.S.A., worked for

15  MGA as an employee.

16    Q    And who is Linda Whaley?

17    A    She was, at one time, head of human resources of MGA.

18    Q    And that top e-mail was dated February 27th, 2006?

19    A    Yes, it is.

20         MS. KELLER:  Your Honor, I'd move 21423 into

21  evidence.

22         THE COURT:  Received.

23         (Defendants' Exhibit No. 21423 is received in

24    evidence.)

25
```

BY MS. KELLER:

Q    Now, in February of 2006, Mr. Castilla responded to a

job listing for an international business analyst?

A    Yes.

Q    Who interviewed him?

A    Nicole Coleman, I believe.

Q    And did you ultimately interview him, too?

A    I think I saw him for a few minutes, yes.

Q    Now, in March 2000 -- of 2006, did you authorize pay of

$90,000 for him?

A    I'm sorry?

Q    In March 2006, did you authorize that he could be paid

$90,000 for his position?

A    I don't recall if I did or not.

Q    Did Mr. Castilla accept the job offer he was given at

MGA?

A    Yes, he works at MGA.

Q    And if you look at Exhibit 21423, and you look at a

February 25th, 2006 letter from Mr. Castilla, is this his

e-mail applying for the position?

A    Yes, it is.

Q    And this is addressed to human resources?

A    It is.

Q    And if you'd look a little farther down, you'll see

it's MGA?

1    A    Yes.

2    Q    What does an international business analyst do?

3    A    Basically analyzing our sales and inventories on the

4    international level.

5    Q    And according to Mr. Castilla's resume, starting at

6    page 3 and going on to page 4, he had experience in that

7    area?

8    A    Yes.

9    Q    Now, if we look at Exhibit 6577 -- do you recognize

10   6577 as an e-mail from Jorge Castilla to Scuyler Bacon dated

11   March 13th, 2006?

12   A    Yes.

13           MS. KELLER:  Your Honor, I'd offer that.

14           THE COURT:  Received.

15           *(Defendants' Exhibit No. 6577 is received in*

16       *evidence.)*

17   BY MS. KELLER:

18   Q    Now, if you'd look at the first page, you see that

19   Mr. Castilla is accepting the offer?

20   A    Yes.

21   Q    And this is the offer of employment that he received

22   from MGA for the position of manager sales planning?

23   A    Yes.

24   Q    And if you'd go to the bottom paragraph on this page --

25   I'm sorry.  If you'd go to the bottom paragraph on page 4 --

CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

106

1    A    Page -- yes, go ahead.

2    Q    This is the actual offer of employment letter.  Let's

3    look at the very top where it says, "Dear Jorge, it is our

4    pleasure to extend an offer."

5    A    Yes, it is.

6    Q    And then if you'd go to the bottom, it says, "Your

7    offer of employment with MGA is based upon the understanding

8    that upon your assumption of full-time duties for MGA, one,

9    you will be able to perform all of your duties at and for

10   MGA fully and completely without violating any enforceable

11   contractual or other legal obligations that you owe to our

12   former employers, including Mattel; and number two, you have

13   not and will not violate any legally enforceable terms of

14   your agreement with Mattel or any other existing commitments

15   that you have to your former employers or to Mattel."

16        Is that -- was that standard language that MGA used?

17   A    As of when?

18   Q    Oh, as of 2006?

19   A    Yes.

20   Q    Let's look at the next page, 6577-5, at the very top

21   paragraph.  "In this regard, if you accept MGA's offer of

22   employment, among other things, you should not retain and

23   should not bring to MGA any of your former employers or

24   Mattel's property or confidential or proprietary

25   information, including customer-related information, (or any

1    information regarding perspective customers or pricing), and

2    you should not use or disclose your former employers' or

3    Mattel's property and/or confidential and proprietary

4    information in connection with those employment at MGA or

5    otherwise."

6        And at the very bottom of 70 -- 6577, page 5, you see

7    that it says, "I understand and accept the above offer of

8    employments on the above-stated terms," and it's signed

9    "Jorge R. Castilla," dated March 13th, 2006.

10   A    Yes.

11   Q    And now let's go to page 6.  There's even another

12   document that Mr. Castilla is given to sign entitled

13   "Understanding regarding compliance with obligations to

14   former employers," and that's also dated March 10th, 2006;

15   do you see that?

16   A    I do.

17   Q    And this says, "Dear Jorge, you are currently receiving

18   MGA Entertainment Inc.'s, MGA's or the company, offer of

19   employment for the position of manager sales planning.  You

20   have informed us that you do not have a written employment

21   agreement in connection with your employment with Mattel.

22   You have also advised that you signed a confidentiality

23   agreement with Mattel, (the confidentiality agreement), but

24   that you do not presently have copies in your possession.

25        "It is MGA's policy to honor the agreements of a

1    competitive company to the fullest extent required by

2    applicable state and federal law.  Therefore, your offer of

3    employment with MGA is based upon the understanding that

4    upon your assumption of duties for the company, one, you

5    will be able to perform all of your duties at the company,

6    fully and completely, without violating any enforceable

7    contractual or other legal obligations that you owed to your

8    former employers, including Mattel; and two, you have not

9    and will not violate any legally enforceable term of your

10   agreement with Mattel or any other existing commitments you

11   may have to your former employers or to Mattel."

12        And then it goes on even more.

13        "In this regard, if you accept MGA's offer of

14   employment, among other things, you should not," bold

15   letters, "retain and should not," bold letters, "bring to

16   MGA any of your former employers' or Mattel's property or

17   confidential and proprietary information, including

18   customer-related information or any information regarding

19   perspective customers, nor should you use or disclose your

20   former employers' or Mattel's property and/or confidential

21   and proprietary information in connection with your

22   employment at MGA or otherwise.

23        "All of Mattel's property and confidential and

24   proprietary information must be returned to Mattel before

25   you commence work for MGA.  And to the extent that any

1    confidential and proprietary information of your former

2    employers or Mattel, including customer-related information,

3    (or any information) regarding perspective customers, is

4    stored on your personal digital assistant, (PDA), and/or

5    Blackberry and/or home and/or laptop computers or in

6    personal files, all such information must be left at or

7    returned to Mattel, and you should not retain any copies in

8    a hard copy or in an electronic form.

9         "In addition, you should not solicit any of your former

10   colleagues or customers to leave Mattel or sever ties with

11   Mattel to join or establish a relationship with MGA or

12   otherwise.

13        "Likewise, to the fullest extent required by applicable

14   law, the company will not knowingly ask you to violate any

15   enforceable terms of your agreement with Mattel and will not

16   ask you to disclose or use the confidential and proprietary

17   information of your former employers' or Mattel, including

18   customer or prospective customer-related information.

19        "If someone at MGA asks you to engage in any act that

20   you believe may violate any enforceable terms of your

21   agreement with or obligations to your former employers or

22   Mattel or any other legal obligation under applicable law,

23   you should contact the company's general counsel or me

24   immediately to resolve this issue before taking such action

25   or making any such disclosure.

1          "Jorge, we hope you will join our team at MGA.  If you

2     have any questions regarding any of these matters, please

3     call me."  And this is signed, "Sincerely, Linda Whaley,

4     Director of Human Resources."  And you see that Mr. Castilla

5     had signed this document, too?

6     A    Yes.

7     Q    Now, if we can look at Exhibit 21070.

8          Do you see that as an e-mail from Mr. Castilla to Nancy

9     Kopang?

10    A    Yes.

11    Q    And the e-mail right under that is from you to

12    Mr. Castilla?

13    A    I'm sorry?

14    Q    And the e-mail right under that is a December 7th,

15    2006 --

16    A    Yes.

17    Q    -- e-mail from you to Mr. Castilla?

18    A    It starts from the bottom up.  It's an e-mail from

19    Castilla to me, and then it goes to Nancy.

20    Q    And who is Nancy Kopang?

21    A    She's my assistant.

22              MS. KELLER:  Your Honor, I'd move 21070 in

23    evidence.

24              THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 111 of 124   Page ID #:302721
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

111

1              *(Defendants' Exhibit No. 21070 is received in*

2         *evidence.)*

3    BY MS. KELLER:

4    Q    Now, if I look at the bottom e-mail, the first one in

5    the chain, that's Mr. Castilla e-mails you to tell you, "Hi

6    Isaac, need to meet with you urgently regarding legal

7    matters I may need to deal with tomorrow regarding MGA.  I

8    am at home now but can come see you either outside or during

9    business hours.  Don't want to discuss this via e-mail,

10   phone.  Thanks."

11        And you e-mailed him back on December 7th, 2006, "Okay,

12   tomorrow."

13        And then you see an e-mail from Mr. Castilla to Nancy

14   Kopang on December 8th, 2006, "Hi Nancy, please let me know

15   when you can squeeze me in for 15 minutes with Isaac.  I am

16   flexible but need to speak with him urgently during the

17   a.m."

18        Now, when Mr. Castilla met with you, did he tell you

19   that he had taken some documents from Mattel?

20   A    He told me more than that.

21   Q    Okay.  What did he tell you?

22             MR. PRICE:  Your Honor.  I object if this is

23   offered for the truth but not for state of mind.

24             THE COURT:  Once again, it's from Mr. Larian's

25   state of mind and any conduct he took or action he took in

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 112 of 124   Page ID #:302722
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

112

1    relation to the conversation.  Mr. Castilla hasn't

2    testified, so we don't have the ability to cross-examine up

3    to this time.

4              Counsel?

5    BY MS. KELLER:

6    Q    When he met with you, what did Mr. Castilla tell you?

7    A    He told me that when he left Mattel and went home,

8    there were FBI agents waiting for him when he got there on

9    his last day, and they asked him for his PDA and computers

10   and that he had -- and they took it from him because he had

11   taken some information from Mattel, and somehow they knew

12   and they had taken it from him.  I told him why are you --

13   should I say what happened, the whole thing?

14   Q    Well, let me ask you some questions.

15        So he told you that he had taken some documents from

16   Mattel?

17   A    Yes.

18   Q    And he told you he had been visited by the FBI?

19   A    Right.  He didn't tell me what he had taken.  He just

20   told me some documents.

21   Q    Did he tell you whether he had used those documents at

22   all at MGA?

23   A    Well, I've got to tell you the whole conversation.

24   Q    Okay.

25              MR. PRICE:  Your Honor, I object.  It's now a

1    narrative.

2           THE COURT:  Sustained.

3    BY MS. KELLER:

4    Q    After Mr. Castilla told you that the FBI had come and

5    taken his computer and PDA, what did you say or what did he

6    say next?

7    A    First thing I said is, "Why the hell did you do that

8    when we told you not to do anything, not to bring anything?"

9    The second thing I asked, "Have you brought any of that

10   information to MGA?"  And he said no, he has not.

11   Everything was taken by FBI.

12   Q    Before he even had a chance to bring it to MGA?

13   A    Before he even started working at MGA.

14   Q    And did he tell you when this was that the FBI had

15   visited him and taken these things?

16   A    The day he had left Mattel.

17   Q    And he had left Mattel when?

18   A    I don't remember when.

19   Q    Was that back in March when we saw the offer of

20   employment?

21   A    Yes.  This was a month -- a month later, and the other

22   thing I asked him is "Why are you telling me this now?"

23   Q    "Why didn't you tell me at the time"?

24   A    Yes.

25   Q    What did he say?

1    A    He said that he didn't want to get in trouble.  He

2    didn't want to lose his job.  And then I asked, "Why are you

3    telling me now?"

4    Q    Now, did he tell you that the thumb drive containing

5    those documents was in the hands of the authorities before

6    he ever started at MGA?

7    A    Yes, I -- I just testified to that, that he said that

8    FBI took everything that he had right there at his home.

9    Q    And you now know that the documents he just took

10   included some forecasting materials?

11   A    I have no idea.  I don't know.  I have never seen it.

12   Yes, I have heard from this litigation that he had some

13   forecasting.

14   Q    You've heard it, but you haven't seen them?

15   A    Never seen it.

16   Q    And Mr. Price asked you about that the other day,

17   didn't he, about whether the forecasting materials were

18   taken?

19   A    I don't remember what he asked.

20   Q    Now, Mr. Castilla signed two separate documents

21   agreeing not to take anything from Mattel when he left,

22   right?

23   A    That's correct.

24   Q    And did you talk to him about that?

25   A    Yes.

1    Q    Did you say, "Hey, you signed two separate documents

2    saying you weren't taking anything from Mattel"?

3    A    Yes.  I was very upset.  And now, six months, seven

4    months later, he was coming to me and telling me that he had

5    taken some documents from Mattel even though we told him not

6    to do it.

7    Q    And what was his explanation for why he took the

8    documents?

9    A    Some of the work that he -- his explanation was "This

10   is the work, the spreadsheets, et cetera, that I had created

11   myself, and I wanted to have a sample of my own work."

12   Q    After Mr. Castilla came to work at MGA, did your

13   forecasting get better?

14   A    It has not.

15   Q    And did your forecasting from April 2006, when he came

16   to work there, has it improved or has it gotten worse?

17   A    Our forecasting, in my opinion, now is worse than it's

18   been ever.

19   Q    Did you ever ask Jorge Castilla to take anything from

20   Mattel?

21   A    To the contrary.  We told him -- I personally told him

22   in the 5, 10 minute interview that I had with him to

23   "Please, don't even bring a paper clip.  Please just come

24   with your brain."

25   Q    At the time you interviewed Mr. Castilla, you were very

1    sensitive about that issue, weren't you?

2    A    Yes.  We were already in a lawsuit with Mattel.  I just

3    didn't want one, and here I am.

4    Q    Now, if we take a look at Exhibit 9231, is that --

5    A    I'm sorry, go ahead.

6    Q    Okay.  This is Exhibit 9231.  Is this an April 17th,

7    2007 e-mail from you to Mr. Castilla and copying others,

8    including Ron Brawer?

9    A    Yes.

10        MS. KELLER:  Your Honor, I'd ask that that be

11   admitted.

12        THE COURT:  Received.

13        *(Defendants' Exhibit No. 9231 is received in*

14   *evidence.)*

15   BY MS. KELLER:

16   Q    And if you'd look at page 1, you are saying, "ZAPF

17   should be a 40 million-dollar line.  They did $17 million

18   last year with no TV and no new product.  What's wrong with

19   our sales and forecast guys"; do you see that?

20   A    I do.

21   Q    And the whole e-mail chain concerns shipping date

22   problems, doesn't it?

23   A    I have to read it.

24   Q    Oh, I'm sorry, in this e-mail -- this e-mail chain is

25   basically all about how forecasting has to get better; is

1    that right?

2    A    It is, and selling.

3    Q    And this is well after Mr. Castilla had come on board

4    in April of 2006?

5    A    Yes, this is already April of 2007, a year later.

6    Q    And if we could look at 9730 -- 9232.

7    A    9232, I have it here.

8    Q    Is this an e-mail chain, the top e-mail of which is

9    from you to Ron Brawer, dated August 4th, 2006?

10   A    Yes.

11           MS. KELLER:  And your Honor, may I move this into

12   evidence?

13           THE COURT:  Received.

14           *(Defendants' Exhibit No. 9232 is received in*

15       *evidence.)*

16           THE WITNESS:  Go ahead.

17   BY MS. KELLER:

18   Q    What does this whole e-mail chain refer to?

19   A    It's forecast meeting recap.

20   Q    What do you mean by "forecast meeting recap"?

21   A    A meeting that they have to talk about the forecast,

22   recap.  I don't know how to explain it.

23   Q    All right.  Does this e-mail chain concern problems

24   with shipping dates and missed shipping dates, among other

25   things?

1   A    Yes.

2   Q    And losing sales because of missing delivery dates and

3   shipping dates?

4   A    Yes.

5   Q    And it details quite a few problems with quite a few

6   stores; is that right?

7   A    Retailers, yes.

8   Q    Now, what does that have to do with forecasting?  Can

9   you explain?

10  A    Because the forecasting department has to do the

11  forecast so Hong Kong -- MGA Hong Kong can place orders with

12  the factory so they can -- the factory can produce it so we

13  can ship it to the customer during the time that they want

14  it.  So it's very, very important.  It's like a 360-degree

15  cycle.

16  Q    So the forecaster is supposed to project how much of a

17  product you think you are going to need?

18  A    That's correct.

19  Q    And how much of a product you'll think you'll need by

20  what date?

21  A    Yes.

22  Q    And to what stores it may be going?

23  A    The retail -- not store by store, but per chain.

24  Q    So Walmart might need this many, Target might need this

25  many of this item?

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 119 of 124   Page ID #:302729
CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

119

1   A    Right, but Walmart has 3,300 stores, so --

2   Q    Okay.  I don't mean to use the term "store."  Just per

3   retailer?

4   A    Right.

5   Q    So if your forecasting is way off, what happens to your

6   shipping?

7   A    We made shipments, we'd either have too much inventory

8   or too little inventory, we lose sales, we lose ads.  When

9   the ads that you see, for example, the Target circular, et

10  cetera, those are planned way ahead, and if the ad breaks

11  and Target doesn't have the merchandise --

12  Q    So this -- these e-mails are from July all the way up

13  to August 2006?

14  A    Yes, they are.

15  Q    And so the period right after Mr. Castilla has come to

16  work there, your shipping dates are all off, right?

17  A    Yes.

18           MR. PRICE:  Objection.  Leading and ambiguous.

19           THE COURT:  No.  Overruled.

20           Your answer?

21           THE WITNESS:  They are off, yes.

22  BY MS. KELLER:

23  Q    And then a year later, we saw that they are still way

24  off, right?

25  A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10030   Filed 02/18/11   Page 120 of 124   Page ID #:302730
CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

120

1   Q    Let's look at Exhibit 34863.  And is this document

2   labeled "Walmart Replenishment Monthly and Quarterly Recap"?

3   A    Yes, it is.

4   Q    And this is covering 2007, 2008 and 2009?

5   A    Yes, it is.

6           MS. KELLER:  Your Honor, I'd move 34863 into

7   evidence.

8           THE COURT:  It's received.

9           *(Defendants' Exhibit No. 34863 is received in*

10      *evidence.)*

11  BY MS. KELLER:

12  Q    Can you tell us –– can you explain what this document

13  is all about?

14  A    This, again, goes to replenishment of forecasting.  If

15  you go to the column where it says "fill rate" or

16  "missed," do you see that?

17          *(Interruption in the proceedings.)*

18          MS. KELLER:  Fill rate, f-i-l-l, or missed,

19  m-i-s-s-e-d.

20          THE WITNESS:  Let's go to the column called "Total

21  Order."  Let's show that, please.

22  BY MS. KELLER:

23  Q    Do you want a particular year?

24  A    Just any year.  Just total order.  It says "January,

25  5,222,000."  Do you see that at the top?

1    Q    Okay.  So that's for 2008.

2    A    Okay.  So here, we received an order for $5,222,480

3    from Walmart in 2008, and that's just the month of January.

4    It's not even the peek season.  And we only shipped

5    $4.8 million of that.  We missed $394,000.  So basically we

6    filled only 92 percent of that order.  That shows our

7    forecasting was wrong.  And it goes -- it goes on and on.  I

8    mean, looked -- looked at -- this doesn't have column

9    numbers that go to December -- do you see the December?

10   Q    And that's the big month of the year for you?

11   A    Yes, November or December.

12        Could you highlight that, please, Mike?  It's in red.

13        Can you just go across to "total shipping" in November.

14        Order received, 9.583; do you see that?

15        Yes, here.

16        Okay.  So we received an order from Walmart in November

17   of 2008 for 9.5 million -- 5 -- $9,583,075, and we only

18   shipped $6,825,563.  We had a fill rate --

19        Can you go one column forward?

20        We missed their forecast and their orders by almost --

21   by more than 40 percent.  We only shipped 58 percent.

22   Q    So this November -- this November total order, it says

23   "16,408,638" --

24   A    Where do you see 16 million?

25   Q    Under "total order."

1    A    Right, and we only shipped 9 million of it, so

2    that's --

3    Q    So you missed $6,825,563?

4    A    Right.

5    Q    That's a missed shipment.

6         What happened -- what does that mean in terms of the

7    cost to you?

8    A    It's huge, because in November -- October, November,

9    December are the most important months of the year.  It's

10   Christmas season.  That's when toy companies really make

11   their money.  We work on 40, 45 percent profit margin, so

12   losing almost a 7 million-dollar order means loss of profit

13   of $2.8 million just for that month, if you just take

14   40 percent.

15   Q    And at that point, November of 2008, when you had that

16   terrible fill rate, Mr. Castilla had been with you for over

17   two years?

18   A    Yes, and it gets worse.  The next month it's only

19   49 percent.  They only shipped half of the orders.

20   Q    Do you have any information whatsoever that

21   Mr. Castilla ever used any forecasting material that he took

22   from Mattel?

23   A    I do.  He did not.

24   Q    And that's because the FBI seized it before he came to

25   Mattel -- I mean, MGA?

1    A    Not only that, but we hired forensic examiners to

2    look --

3              MR. PRICE:  Object.  We are now getting into

4    hearsay, your Honor.

5              THE COURT:  Sustained.

6    BY MS. KELLER:

7    Q    Did you take any steps to see if there was any

8    possibility that Mr. Castilla had used anything?

9         Did you ever double check with Mr. Castilla and asked

10   him again whether he had used any data whatsoever that he

11   had taken from Mattel in doing any forecasting for MGA?

12   A    I did.

13   Q    And what did he say?

14   A    No.  He swore on his newborn baby and his wife that he

15   had never used it.

16   Q    Now, let's look at Exhibit 3487 -- 34867.

17             THE WITNESS:  I'm sorry, I need --

18             THE COURT:  Okay.  We are going to take a recess.

19   You are admonished not to discuss this matter amongst

20   yourselves, nor form or express any opinions about this

21   case.

22             Counsel, come back in about 15 or 20 minutes.

23             (Recess.)

24                            -oOo-

25

1                              –oOo–

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  February 18, 2011

12

13

14          _____

                JANE C.S. RULE, U.S. COURT REPORTER
15              CSR NO. 9316

16

17

18

19

20

21

22

23

24

25