UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING


```
MATTEL INC.,                    )
                                )
                Plaintiff,      )
                                )
         vs.                    ) No. CV 04-9049-DOC
                                )
MGA ENTERTAINMENT, INC.,        )
                                )
                Defendant.      )
_____)
```


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, FEBRUARY 17, 2011

VOLUME 4


Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                            BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
8                            SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                           BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                            (949)567-6700

14
                             KELLER RACKAUCKAS
15                           BY:  JENNIFER KELLER, ESQ.
                             18500 VON KARMAN AVENUE
16                           SUITE 560
                             IRVINE, CALIFORNIA 92612
17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                           BY:  MARK OVERLAND, ESQ.
                             100 WILSHIRE BLVD
20                           SUITE 950
                             SANTA MONICA, CA. 90401
21                           (310) 459-2830

22

23

24

25

```
 1                        - AND -

 2                        SCHEPER KIM & HARRIS LLP
                         BY:  ALEXANDER COTE, ESQ.
 3                        601 WEST 5TH STREET_12TH FLOOR
                         LOS ANGELES, CA. 90071
 4                        (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1      SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 17, 2011

2                          3:56

3          **THE COURT:**  Back in session.  The jury is present, all

4      counsel, the witness, parties.

5              And, Ms. Keller.

6                      CROSS-EXAMINATION (RESUMED)

7      **BY MS. KELLER:**

8      **Q**   Mr. Larian, the day you had your conversation with Jorge

9      Castilla about -- and the day that he revealed to you that he had

10     taken some materials from Mattel months earlier and had not told

11     you about it, the day you found out about the raid, all that

12     stuff, on Mr. Castilla, did he give you -- I'm sorry?

13     **A**   I'm not sure if it was a raid in Castilla.  FBI went to his

14     house.  That's what he said.

15     **Q**   You are right.  The day that he told you about the FBI having

16     gone his house, having taken his PDA and his laptop and all that,

17     that day, did you get him to type out a signed statement to you

18     memorializing the fact that -- well, memorializing what he told

19     but what had happened?

20     **A**   I did.

21     **Q**   And did you ask him to also memorialize in the statement, the

22     signed statement, that he had not brought anything to MGA that he

23     had taken from Mattel?

24     **A**   Yes.  I told him to put all the facts and the truth down on

25     the statement.

1  **Q**    And so basically you said, "Okay, what you told me today, I

2  want you to memorialize it in writing"?

3  **A**    That's correct.

4  **Q**    And sign it?

5  **A**    Yes.

6  **Q**    And is that found in Exhibit 9132?

7  **A**    Yes.

8             **MS. KELLER:**  Your Honor, I move 9132 into evidence.

9             **MR. QUINN:**  Objection.  Hearsay.

10             **THE COURT:**  Sustained.

11             **MS. KELLER:**  Offered to show the measures that were

12  taken, Your Honor.

13             **THE COURT:**  Thank you.  Sustained.

14  **BY MS. KELLER:**

15  **Q**    Did you advise Mr. Castilla to fully cooperate with the FBI?

16  **A**    100 percent.

17  **Q**    And did he memorialize that as well?

18  **A**    Yes, he did.

19  **Q**    In this letter?

20  **A**    Yes, he did.

21  **Q**    And was there anything in the letter that Mr. Castilla wrote

22  you that was not reflected in the conversation that you had with

23  him?

24             **MR. PRICE:**  Same Objection.  Hearsay.

25             **THE COURT:**  Sustained.

1    **BY MS. KELLER:**

2    **Q**    And why was it that you advised Mr. Castilla that you wanted

3    him to fully cooperate with the FBI?

4    **A**    Because I just wanted him to fully cooperate with the FBI.

5    There was an investigation and I asked him to fully cooperate with

6    the FBI.

7    **Q**    Now, I want to move on -- just to sum up, with respect to Mr.

8    Castilla and the issue of forecasting, did the forecasting at MGA,

9    when Mr. Castilla was in charge of forecasting, ever improve?

10   **A**    I'm sorry?

11   **Q**    Mr. Castilla and the issue of forecasting, to this day you

12   are still complaining about forecasting at MGA, aren't you?

13   **A**    Yes.  Forecasting is up and down.  It is becoming like the

14   weather, at MGA anyway.  Or other -- even other vendors and

15   retailers.

16   **Q**    It's not an exact science?

17   **A**    It's not.  You cannot forecast accurately, especially when

18   you are dealing with children.

19   **Q**    Now, if we could move on to a different topic.

20          You also were asked about a Mr. Cooney.  Do you remember

21   those questions?

22   **A**    Yes.

23   **Q**    Was Mr. Cooney another employee who came to work at MGA from

24   Mattel?

25   **A**    Yes.

Page 7

1   **Q**    Could we take a look at Exhibit 2153.

2            Do you recognize this as an e-mail from Mr. Cooney to

3   Ron Brawer dated April 24, 2006?

4   **A**    Yes.

5   **Q**    And again, who was Ron Brawer?

6   **A**    He was an executive vice president of sales and marketing at

7   one time.

8   **Q**    Who was Daniel Cooney?

9   **A**    Daniel Cooney, he became a sales person for MGA; he became

10  the VP of sales.  Before that -- he became a VP of sales for MGA,

11  for Toys R Us.  Before that he was working for Mattel, at Toys R

12  Us.

13  **Q**    If you look at Exhibit 2158, this is a document on MGA

14  letterhead dated April 27, 2006?

15  **A**    Yes, it is.

16  **Q**    Do you recognize this as a letter sent to Mr. Cooney from

17  Linda Whaley, the senior director of human resources.

18  **A**    Yes.

19            **MS. KELLER:**  Your Honor, I would move and I believe 2158

20  into evidence.

21            **THE COURT:**  Received.

22            (Exhibit 2158 received in evidence.)

23  **BY MS. KELLER:**

24  **Q**    And is this -- this letter is entitled "Re understanding

25  Regarding Compliance with Obligations to Former Employers."

Page 8

1          Do you see that?

2   **A**    Can you say that again?  Yes.

3   **Q**    Titled "Re Understanding Regarding Compliance with

4   Obligations to Former Employers."

5   **A**    Yes, it does.

6   **Q**    And does this letter restate MGA's policy, the same one I

7   read earlier?

8   **A**    Yes, it does.

9   **Q**    So, Mr. Cooney was stating that he was being offered

10  employment for the position of vice president of sales, national

11  accounts, and it recites the same thing.  He tells, "you have

12  informed us that you do not have a written employment agreement in

13  connection with your employment at Mattel," but he says he had a

14  confidentiality agreement; correct?

15  **A**    That's correct.

16  **Q**    And then MGA goes on to recite all the things that we talked

17  about.  You are to honor your obligations to Mattel; honor all

18  legally enforceable contractual obligations with any former

19  employer including Mattel; right?

20  **A**    Yes.

21  **Q**    Don't bring any confidential or proprietary information to

22  MGA with you?

23  **A**    Yes.

24  **Q**    Don't disclose any confidential or proprietary information to

25  MGA that you got from former employers?

Page 9

1    **A**    That's correct.

2    **Q**    And it tells him not to bring any information on his PDA or

3    Blackberry, or home, or lap top computer; right?

4    **A**    Yes.

5    **Q**    And not to retain any copies in either electronic or hard

6    copy form, all of that?

7    **A**    Yes.

8    **Q**    And if you look at the second page, is that Mr. Cooney's

9    signature?

10   **A**    It is.

11   **Q**    And do you see Linda Whaley's signature, too, the senior

12   director of human resources?

13   **A**    Yes.

14   **Q**    And what is the date that Mr. Cooney signs that agreement?

15   **A**    April 27, 2006.

16   **Q**    And in May of 2009, did Mr. Cooney leave MGA's employment?

17   **A**    He did.

18   **Q**    And do you remember what the circumstances were?

19   **A**    Yes.

20   **Q**    What were the circumstances of his leaving?

21   **A**    MGA was not doing very well.  He was concerned about his

22   family and the stability of the company, and he went to a company,

23   the name Jax Pacific.

24   **Q**    After he left in May 2009, in July 2009, was this when Mattel

25   first asserted that Mr. Cooney took Mattel information?

Page 10

1    **A**    Yes.

2    **Q**    Not before?

3    **A**    Any time.

4         **MS. KELLER:**  Thank you, Your Honor.  I have nothing

5    further.

6         **THE COURT:**  Do you need to switch out a number of

7    notebooks this evening?

8         **MR. PRICE:**  I think that's been done.  I think there is

9    going to be examination.

10        **THE COURT:**  I'm sorry.  My apologies.

11        Mr. Overland, questions, please, on behalf of

12   Mr. Machado.

13                        CROSS-EXAMINATION

14   **BY MR. OVERLAND:**

15   **Q**    This will be very brief, Mr. Larian.

16        I think you testified in answer to one of the questions

17   that was asked of you that Mr. Machado was employed by Mattel

18   Mexico.

19        Do you remember that?

20   **A**    Yes.

21   **Q**    Do you have any personal knowledge as to who employed

22   Mr. Machado?

23   **A**    I do.  Mattel Servicios.

24   **Q**    So when you said he was employed by Mattel Mexico --

25   **A**    I misspoke.

Page 11

1          **MR. OVERLAND:**  Thank you.  That's all.

2          **THE COURT:**  Do you want to proceed this evening?  Are

3    you prepared, or do you need binders changed out?

4          **MR. PRICE:**  I think we can use the next 20 minutes or

5    so.

6          **THE COURT:**  Redirect by Mr. Price on behalf of Mattel.

7                    REDIRECT EXAMINATION

8    BY MR. PRICE:

9    **Q**   Mr. Larian, you were testifying about some agreements you had

10   with Mr. Machado, Mr. Vargas, Ms. Trueba, Mr. Castilla,

11   Mr. Cooney.  And it's correct, and you were shown Exhibit 6793,

12   which had the provision from Mr. Machado, that he wasn't to bring

13   anything from Mattel.

14          Do you recall that?

15   **A**   Yes.

16   **Q**   And the same provision was in Ms. Vargas' contract as well?

17   **A**   Mr. Vargas, yes.

18   **Q**   The same provision was in Ms. Trueba's contract?

19   **A**   Yes.

20   **Q**   And then for Mr. Castilla, you also had a similar provision

21   in his contract?

22   **A**   Yes.

23   **Q**   In fact, you had a separate document, which over two pages

24   detailed that he was not to bring anything from Mattel; correct?

25   **A**   Yes.

1   **Q**   And you had a provision in Mr. Cooney's contract as well?

2   **A**   Yes.

3   **Q**   But you never enforced any of those provisions, did you?

4   **A**   What do you mean by that?

5   **Q**   I mean, you have the provision in the contract.  It's there.

6   But it's window-dressing.  You don't do anything about if a Mattel

7   employees steals from an employer?

8              **MR. OVERLAND:**  Objection.  Argumentative.

9              **THE COURT:**  That's as to window-dressing, but the

10   remainder of the question, Counsel.

11             **MS. KELLER:**  Your Honor, assumes facts not in evidence

12   as to Mr. Cooney, who was gone.

13             **THE COURT:**  Well, as to Mr. Cooney.

14   **BY MR. PRICE:**

15   **Q**   Let me limit it to Mr. Cooney a bit later.

16             Mr. Machado, Mr. Vargas, Ms. Trueba, Mr. Castilla, you

17   had these provisions on paper, which they signed, and you didn't

18   enforce them; right?

19   **A**   We didn't enforce them.  We told them not to bring anything.

20   **Q**   Now, when you say you told them not to bring anything, that

21   was before they brought something or after they brought something?

22   **A**   Before we hired them, we told them not to bring anything.

23   **Q**   So I'm talking about whether or not these are just words on a

24   piece of paper, or whether there is something that really matter

25   to you or MGA.  Okay?

1            And so with respect to Mr. Castilla, Mr. Machado,

2    Mr. Vargas, Ms. Trueba, you never enforced the words that were on

3    those pieces of paper which they signed?

4            **MR. OVERLAND:**  Object as to the word "enforce" as being

5    vague.

6            **THE COURT:**  Overruled.

7            **THE WITNESS:**  We had told these people not to bring

8    anything and, unfortunately, they did.  If you mean by enforcing

9    them, firing them, no, we did not fire them.

10   BY MR. PRICE

11   **Q**    Well, not just did you fire them, did you -- you didn't

12   discipline them in any way, did you?

13   **A**    We did.

14   **Q**    Who did you discipline?

15   **A**    All of them.  Told them not to do that; not to bring it.  Why

16   did you do that?

17   **Q**    So you had these words on all of their contracts saying they

18   weren't to bring anything from Mattel; correct?

19   **A**    Yes.

20   **Q**    And I guess you are telling us that you really meant it when

21   you asked them to sign those pieces of paper?

22   **A**    Yes.

23   **Q**    And you thought it would be very important for them not to

24   steal information from Mattel; correct?

25   **A**    Yes.

1   **Q**    You understood if they did steal information from Mattel,

2   that could reflect on their character?

3   **A**    They were -- if they were stealing things from Mattel against

4   our advice, they were breaching their agreement and their word to

5   MGA.

6   **Q**    And yet, when you found out that they stole from Mattel and,

7   you say, breached their agreement with MGA, the only thing you did

8   with all of them is say, "That's bad.  Don't do it again"?

9   **A**    Yes.

10  **Q**    Now, you said that you had a detailed discussion.  Was it

11  with Mr. Machado where he said that they didn't use any of the

12  Mattel information they took?

13  **A**    I don't know if it's Machado or with Susanna Kuemmerle, but

14  yes, they told me they did not use it.

15  **Q**    But at the same time you didn't ask them what they took?

16  **A**    I did not.

17  **Q**    And what they took they had in their desks at MGA?

18          **MR. OVERLAND:**  Objection.  Assumes facts not in

19  evidence.

20          **THE COURT:**  Overruled.  You can answer.

21          **THE WITNESS:**  I don't know what they had on their desk.

22  I wasn't in Mexico.

23  **BY MR. PRICE:**

24  **Q**    Well, when you had this discussion with them about this

25  important matter, about stealing information from Mattel, did you

1   ask them -- did you bring this information into the MGA offices?

2   **A**   I did not.

3   **Q**   Well, you understood from the phone call that there had been

4   Mattel property that was found in the MGA's office?

5          **MR. OVERLAND:**  Your Honor, again, object in terms of the

6   admission of this for all purposes.  If it's just for state of

7   mind, it's all right.  But I'd ask the jury be so instructed.

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  Can you reread the question again?

10  **BY MR. PRICE:**

11  **Q**   You learned that there was, in fact, Mattel information that

12  had been brought into the MGA offices; correct?

13  **A**   No.  When they called me, they told me -- and I'm talking

14  specifically about Susanna Kuemmerle -- that there was a raid in

15  MGA Mexico instigated by Mattel, and they were there with the

16  search warrant and were taking everything; taking everything from

17  all the offices.

18  **Q**   You said that you talked with someone -- either Mr. Machado,

19  Ms. Trueba, Mr. Vargas or Ms. Kuemmerle -- and were told they said

20  they didn't use any Mattel information?

21  **A**   Not on that call.  The first call, I thought you referring to

22  the first call when I received.  And that's what I was testifying

23  about.  The first call I received was from Susanna Kuemmerle

24  telling me that MGA Mexico was raided by Mexican police; that

25  Mattel Mexico had instigated that.  And they were taking --

Page 16

1    Mexican police were taking everything from MGA offices.

2    **Q**    Let me rephrase my question then.  You said at some point you

3    spoke with Mr. Machado, Ms. Trueba and Mr. Vargas and they said

4    they didn't use Mattel information at MGA?

5    **A**    I didn't say I have talked to all of them.  I remember

6    talking to Gustavo and him saying that he didn't use any of that

7    information at MGA Mexico.

8    **Q**    First when you talked to Mr. Machado and he said that they

9    didn't use any information at MGA Mexico, did you ask him, was it

10   in the MGA Mexico offices?  Did you bring it there?

11   **A**    I'm sorry.  I don't understand your question.

12   **Q**    When you talked to Mr. Machado and he said to you, "We didn't

13   use any of this Mattel information," did you ask him, "Well, did

14   you bring it into the MGA offices?"

15   **A**    Yes, I believe he said he had brought it to MGA offices.

16   **Q**    Did you ask him, "What was it you brought?"

17   **A**    I don't recall if I did ask or not.

18   **Q**    Did you ask him, "Well, if you brought it into the MGA

19   offices and it was Mattel property, and you didn't use it, why did

20   you steal it to begin with?"

21            **MR. OVERLAND:**  Object to the term "stealing," Your

22   Honor.

23            **THE COURT:**  Overruled.

24            **THE WITNESS:**  I didn't ask that question.

25

1  BY MR. PRICE

2  **Q**    Well, if he is going to tell you -- first of all, you know at

3  this point he has lied to you -- you say MGA -- because he said he

4  wasn't going to bring anything from Mattel; correct?

5  **A**    Yes.

6  **Q**    And then when he tells you, "we didn't use any of this" --

7  **A**    Yes.

8  **Q**    -- didn't you think you should ask him, why did you take it?

9  **A**    No.

10  **Q**    Well, when he said, "Yes, we did steal this, and we didn't

11  tell you, and I was dishonest with you," didn't you think -- I'll

12  strike the question.

13  **A**    He didn't say, "I stole this, I was dishonest with you."  He

14  didn't say any of those words.

15  **Q**    No, but that's what you thought when you talked to him;

16  right?

17  **A**    No.  What I asked him is that why -- first question I asked

18  is, "Why did you bring anything to MGA when I told you, when Tom

19  Parks told you, everybody told you just come with your brain?  And

20  have you used any of that in MGA?"  And he said he hasn't.

21  **Q**    And according to you, at that time you understood that he had

22  been dishonest with you when he told you he wasn't going to bring

23  anything; right?

24  **A**    Yes.

25  **Q**    And according to you, you understood at that time he had been

1   dishonest with Mattel because he had stolen some things?

2   **A**   I didn't know if he had stolen things or not, but he was

3   dishonest, yes, for doing that; for bringing stuff to MGA when I

4   had told him personally not to bring it, when Tom Parks had told

5   him not to bring it.  And by doing so, yes, he was wrong.

6   **Q**   And so according to you, believing he was wrong and dishonest

7   to with respect to MGA and Mattel, you just took his word for it

8   that he hasn't used any of the information he had stolen from

9   Mattel and taken into the MGA offices?

10  **A**   I did.

11  **Q**   So have you told us everything you can recall about this

12  conversation with Mr. Machado about whether or not he had taken

13  any Mattel internal information or trade secrets?

14  **A**   I'm sorry?

15  **Q**   Have you told us everything you recall about the conversation

16  you had with Gustavo Machado concerning whether he had taken any

17  Mattel trade secrets or Mattel internal information?

18  **A**   As I recall right now, yes.

19          **MR. PRICE:**  Your Honor, if I could read from Mr.

20  Larian's deposition.  This is volume three, December 10, 2009.

21  This is page 681, lines 15 through 18.

22          **THE COURT:**  You may.

23  **BY MR. PRICE:**

24  **Q**   Again, this is December 10, 2009.

25  "QUESTION:  Have you ever spoken with Gustavo Machado concerning

1    whether or not he had ever taken or used any Mattel trade secret

2    or Mattel internal information?

3    "ANSWER:  I don't recall if I did or not."

4            **MR. PRICE:**  And then, Your Honor, if we could read from

5    708, lines 17 through 25.  It's the same day.

6            **THE WITNESS:**  17 to?

7    **BY MR. PRICE:**

8    **Q**    17 through 25.

9            **THE COURT:**  You may.

10   **BY MR. PRICE:**

11   "QUESTION:  Has it ever come to your attention that there were

12   Mattel internal documents that were there at the MGA Mexico

13   office?

14   "ANSWER:  Just through my attorneys.

15   "QUESTION:  Is that something you have ever discussed with Susan

16   Kuemmerle?

17   "ANSWER:  Not that I recall.

18   "QUESTION:  Or Gustavo Machado?

19   "ANSWER:  No."

20           Now, Mr. Larian, you have said three or four, maybe five

21   times you have used the word, I think, "instigated," that Mattel

22   instigated the raid is the way you put it; correct?

23   **A**    Yes.

24   **Q**    But it's your understanding that there was, in fact, Mattel

25   property in the MGA office?

Page 20

1    **A**    There was some property in MGA offices yes.

2    **Q**    And you saw, I think it's an e-mail from Ms. Kuemmerle.  I

3    believe it's Exhibit 6766, if we can put that up.  If we can look

4    at the e-mail at the bottom of that first page there for

5    Ms. Kuemmerle.

6    **A**    Yes.

7    **Q**    And you recall that Ms. Keller read this out loud.  And the

8    second paragraph where it talks about, "Neither one of us ever

9    imagined that this particular" -- and all caps -- "WITCH HUNT was

10   going to take place in Mexico."

11        Do you see that?

12   **A**    I do.

13   **Q**    Now, in response to this, did you call Ms. Kuemmerle and say,

14   "But, Susan, Mattel internal documents were, in fact, in the MGA

15   Mexico offices brought there by these former Mattel employees"?

16   **A**    No.

17        **MS. KELLER:**  Objection.  Assumes facts not in evidence

18   that he knew that at the time, Your Honor.

19        **THE COURT:**  Overruled.

20   **BY MR. PRICE:**

21   **Q**    Let's look at then her discussion about reprimanding Gustavo,

22   Pablo and Mariana.  You see that's in the third paragraph there?

23   **A**    Yes.

24   **Q**    And she says, "We should have done it on October 28, 2005,

25   (day after the search in our offices); to do it now when we have

Page 21

1    to pay our bonuses seems unfair and unethical to me, especially

2    when Gustavo was about to move to L.A. and Pablo is closing

3    Christmas bookings!  I think we must put in the balance the

4    effects of this decision."

5           Do you see that?

6    **A**    I do.

7    **Q**    And what she was worried about is that if you reprimand

8    Pablo, for example, at this time, your Christmas bookings might

9    not be as big as they otherwise would?

10   **A**    Yes.

11   **Q**    And so the reason she is telling you not to reprimand him is

12   because it would hurt business?

13   **A**    Yes.

14   **Q**    And you thought that was a legitimate reason not to even

15   reprimand someone who had stolen information from Mattel and

16   brought it to MGA Mexico?

17           **MS. KELLER:**  Objection.  Assumes facts not in evidence

18   that he knew there was any information stolen.

19           **THE COURT:**  I understand, Counsel.  Overruled.

20           **THE WITNESS:**  I'm sorry.  Can you repeat the question?

21   **BY MR. PRICE:**

22   **Q**    You thought that that business reason was reason alone not to

23   even reprimand Pablo --

24   **A**    Yes.

25   **Q**    -- for stealing Mattel information and bringing it into MGA's

eb0f115d-d9f3-41ce-9d97-fa11034ac770

Page 22

1    office?

2    **A**    That's not correct.

3    **Q**    You were copied on this e-mail; correct?

4    **A**    I was.

5    **Q**    And did you send any response to the effect of the fact that

6    it would hurt our business is no reason not to reprimand Pablo?

7    **A**    No.

8    **Q**    And at this point was he reprimanded?

9    **A**    No.

10   **Q**    But when you read this, and Ms. Kuemmerle said we shouldn't

11   reprimand Mr. Pablo because it might hurt or Christmas bookings,

12   what did you think?

13   **A**    I don't remember what I thought.  I know that I was not happy

14   that these guys had broken their promise to MGA.  I know that for

15   sure.

16   **Q**    Okay.  But I think you told Ms. Keller that you read this at

17   the time you got it?

18   **A**    Yes.

19   **Q**    And you certainly remember, because there is this e-mail with

20   capital letters "WITCH HUNT."  Do you remember that; right?

21   **A**    That's not why I remember it, it has capital letter "WITCH

22   HUNT."

23   **Q**    In this situation when Mr. Vargas had stolen information from

24   MGA Mattel and brought it to MGA, did you think that the business

25   of MGA was more important than the ethics of the situation?

Page 23

1    **A**    No.

2    **Q**    But you understood that was exactly what Ms. Kuemmerle was

3    saying?

4    **A**    That's not what she is saying.

5    **Q**    She is saying don't reprimand him because it's going to hurt

6    our Christmas bookings; right?

7    **A**    That's one of the things she is saying, yes.

8    **Q**    That is putting business over what is right; correct?

9    **A**    Well, yes.

10   **Q**    And then if you look at the next page, the next line, "I ask

11   you all, with what mood is Gustavo going to move and Pablo is

12   going to keep on pushing sales in Mexico."

13             Do you see that?

14   **A**    I do.

15   **Q**    By that you understood that if they reprimanded in any way

16   because of what they did, this could affect MGA's business?

17   **A**    Well, it could affect Gustavo's mood, whatever that means and

18   the sales of Mexico, yes.

19   **Q**    You thought it was in MGA's best interest for Mr. Machado to

20   move to Los Angeles; right?

21   **A**    Yes.

22   **Q**    And you previously testified that you considered that to be a

23   promotion; correct?

24   **A**    I don't remember what I testified to, but, yes, I think we

25   promoted him to move to L.A.

Page 24

1   **Q**    And you were afraid that if they had been reprimanded in any

2   way, that might interfere with MGA's business plans?

3   **A**    No.

4   **Q**    If you look at the top of this, it's the e-mail from

5   Mr. Villette dated May 9, 2006.  And in the second paragraph he

6   says, "After thinking about it, we should not tie the two issues

7   as they are separate."

8          And you understood what he was talking about with

9   respect to the two issues?

10  **A**    Can you keep that up there?

11  **Q**    Sure.

12  **A**    Where are you referring to?

13  **Q**    See the second paragraph where he says, "After thinking about

14  it, we should not tie the two issues as they are separate"?

15  **A**    Yes.

16  **Q**    And did you understand what those two issues were?

17  **A**    Yes.

18  **Q**    What were they?

19  **A**    The reprimand and the bonus are two separate issues.

20  **Q**    And was that your belief, that whether they should get a

21  bonus was a separate issue from what should happen to them as a

22  result of this discovery that they had stolen information from

23  Mattel and brought it into MGA's offices?

24  **A**    I'm sorry.  I'm not sure if I understand your question.  Was

25  it my belief?

Page 25

1   **Q**    Was it your belief those two issues were separate; that they

2   weren't somehow intertwined as to whether they should get a bonus

3   in light of the fact that they had stolen Mattel information and

4   brought it to MGA Mexico?

5   **A**    They should not have stolen.  Stealing is very hard word, but

6   they should not have brought Mattel information to MGA.  They were

7   wrong by doing that.

8   **Q**    And didn't you think that that issue was not separate from

9   but, in fact, should be related to whether or not they got

10  bonuses?

11  **A**    I don't remember my state of mind at that time, no.

12  Actually, no.

13  **Q**    You agree that you don't discipline someone by giving them a

14  bonus?

15  **A**    That's right.  You don't.

16  **Q**    And you don't discipline someone by giving them a promotion?

17  **A**    Yes.

18  **Q**    So if you look at the rest of this where it says, "However,

19  whether now or at a later stage, I strongly believe we need to

20  take some action at the corporate level.  As the number of former

21  Mattel employees will likely continue to increase, it must be made

22  clear anyone who breaks his or her engagement in writing not to

23  bring anything confidential, will be held accountable."

24          Do you see that?

25  **A**    Yes.

Page 26

1  **Q**    You understood those were just words on a paper?

2  **A**    No.  It was future.  What Eric Villette was saying, that we

3  really need to take this a lot more seriously going forward.

4  **Q**    And if you are going to send a message that you actually take

5  it seriously and it's just not meaningless words, you would have

6  disciplined Mr. Machado, Mr. Vargas, Ms. Trueba; correct?

7  **A**    By that time Mr. Machado, Mr. Vargas, and Ms. Trueba had done

8  what they had done, but going forward I don't believe anybody

9  who's come from Mattel has ever done something like that.  I mean,

10  from Mattel to MGA.

11  **Q**    Well, you learned that Mr. Machado, Ms. Trueba, and

12  Mr. Vargas, you learned in October, 2005, that they had brought

13  information from Mattel to MGA Mexico offices; correct?

14  **A**    No.  In October 2005, I was told that there was a raid of MGA

15  Mexico instigated by Mattel Mexico.

16  **Q**    When were you told that information was found in the MGA

17  Mexico offices that was Mattel property?

18  **A**    At a later date.  I don't remember the date.

19  **Q**    So Mr. Castilla joined you, I guess, in March 2006?

20  **A**    Yes.

21  **Q**    That's after the search of the MGA Mexico offices?

22  **A**    Yes.

23  **Q**    Are you aware of any instances that you can think of where

24  MGA has disciplined any employee for taking Mattel information?

25  **A**    I can't recall.  There have been a handful of people who have

1    done that and those handful that I remember I don't think we have

2    disciplined them to a point of firing them, etcetera.

3    **Q**    Or you do you know any instances where MGA has disciplined

4    employees for taking information from other competitors?

5    **A**    We haven't had people taking information from other

6    competitors.

7    **Q**    And where you did know of Mattel former Mattel employees

8    taking information from Mattel when they left, in all the

9    situations that you know about, those employees got bonuses;

10   right?

11   **A**    I'm sorry.  First of all, I didn't know when they left

12   whether they have taken any information.  That was the first part

13   of your question.  We found out later on.

14            Did they all get bonuses?  I know from these papers that

15   at least the three Mexican got bonuses, I don't know if the other

16   ones got bonuses or not.  I don't remember.  Maybe they did, maybe

17   they didn't.  I don't remember.

18   **Q**    So --

19   **A**    It is possible that they got bonuses.

20   **Q**    Why would anyone take your admonition not to take Mattel

21   information when they left Mattel and joined MGA, why would anyone

22   take it seriously if they never enforced it?

23            **MS. KELLER:**  Objection.  Argumentative.

24            **THE COURT:**  Overruled.

25            **THE WITNESS:**  I don't know why people do that.  Human

Page 28

1    nature.  It's not a good thing, but people do that.

2    BY MR. PRICE:

3    Q   My question was, why would anyone take seriously what you put

4    into your accounts and what you say you tell people about not

5    taking information from Mattel when they join MGA, why would

6    anyone take that seriously if you don't discipline people who do

7    that and, in fact, you give them bonuses and promotions?

8                MS. KELLER:  Objection.  Objection to linking to, Your

9    Honor.

10               THE COURT:  Overruled.

11               THE WITNESS:  We have over thousand employees.  Looks

12   like five of them, five of the thousand did not take it seriously.

13   And shame on them for not doing that.  But they didn't kill

14   anybody.

15   BY MR. PRICE:

16   Q   My question is a bit different.  You know about several

17   Mattel employees who stole information from Mattel and then worked

18   for MGA; right?

19   A   You keep using the word "stolen."  I mean, I can go through

20   what I know, but the fact is that some of these employees brought

21   information, whether it's valuable or not, to MGA.  And they broke

22   the rule, the promise to me and to the company by doing that and

23   that's not appropriate.

24   Q   So going forward, why would anyone take these provisions in

25   your contract seriously if they knew that on the instances when

1  you knew people took information from Mattel, you did nothing

2  about it?

3  **A**    I can't guess, but I can tell you that of over a thousand

4  employees, there have been this handful who have done it.  It's

5  not been right.  But I just can't control everybody as much as we

6  push them not to do it.

7  **Q**    One way to control people, one way to send a message it's

8  wrong is when you find out that it happens, you actually take --

9             **MS. KELLER:**  Objection.  Argumentative.  Asked and

10  answered repeatedly, Your Honor.  Badgering this witness.

11             **THE COURT:**  Overruled.

12             **THE WITNESS:**  Yes.  That's one of the ways.  I did not

13  do that.

14             **MR. PRICE:**  Your Honor, would this be a good time to

15  break?

16             **THE COURT:**  This would be a good time to break.

17             All right, ladies and gentlemen, you are admonished not

18  to discuss this matter among yourselves or form or express any

19  opinion concerning the case.  Have a nice evening.  We'll see you

20  tomorrow at 8:30.

21                         (Jury out.)

22             **THE COURT:**  Counsel, I'd like to speak to the juror

23  number three, Ms. Nealon, about the best way to approach her

24  employer.  And I'm wondering with all of you present if we could

25  do that informally, because if we capture that on the record,

1    perhaps her employer might be a little chagrined.  There might be

2    enforcement provisions that could be enacted, but I don't want to

3    put her in that position of being between her and her immediate

4    employer.

5           And I certainly would have all of you present, but I can

6    put all of that on the record.  So you tell me how you would like

7    me it to handle it.  But I would like her to make some suggestions

8    about how we could artfully approach either her manager or the

9    president of the corporation since they seem to do a lot of

10   business in federal court, and hopefully get their acquiescence.

11   I just don't want to jump over an immediate supervisor because it

12   causes hard feelings.  And I'm just wondering if she has a

13   suggestion how we could go about that.

14          If I put that on the record, everybody can come back and

15   see how she might make a suggestion.  And I don't think she wants

16   any future problems.  She is doing a public service.  But I leave

17   that to you.

18          **MS. KELLER:**  We're perfectly happy to have the Court

19   talk to her informally.

20          **MR. PRICE:**  Yes.

21          **THE COURT:**  With all of you present.  Be acceptable?  I

22   don't want any ex parte communicate with the Court in any way.  I

23   just think it might save her some embarrassment.

24          Second, do each of you want her as a juror?

25          **MS. KELLER:**  She has been very attentive, Your Honor.

Page 31

1   We would like to keep her.

2          THE COURT:  Would it help, so I don't put you in that

3   position, we're going to have her anyway?

4          MR. QUINN:  Thank you, Your Honor.

5          THE COURT:  She has been a good juror, so we won't pick

6   and choose between our jurors.  Was that a yes by Mattel?

7          MR. QUINN:  That's what I heard, Your Honor.

8          THE COURT:  Thank you very much.  Ask her to come in.

9              (Whereupon Juror No. 3 was summoned to the

10  courtroom.)

11         THE COURT:  How are you today?  We're going to go off

12  the record with consent of all counsel.

13             (Discussion held off the record.)

14         THE COURT:  All counsel are present.  The jury is not

15  present.  The record should reflect that counsel came with the

16  Court into chambers and we placed a call to the regional manager

17  of the company that the juror works for, who is not in.  We'll

18  follow up with another phone call tomorrow to see if we can speak

19  to the person.  It's obvious that the contract or the human

20  resources document that we have seen sets forth that the company

21  will pay the difference between the amount for jury service and

22  her salary.  But I think all of us understands there are difficult

23  relationships that could occur between a juror and her immediate

24  supervisor.  So hopefully this will work out in an amicable manner

25  tomorrow.  And I think once we're able to speak to the regional

Page 32

1  manager it will.

2        There are a number of items to cover this evening, but

3  first, Mr. Overland, let me pay you the courtesy of taking your

4  matter.

5        **MR. OVERLAND:**  Your Honor, I made an objection with

6  respect to Mr. Price's questions that are prefaced by the

7  characterization of what happened in Mexico as stealing.

8        Number one, I think that's an inflammatory way to phrase

9  the question, number one.

10        **THE COURT:**  What would your suggestion be?

11        **MR. OVERLAND:**  I think taking or copying.  That's what

12  happened.  Stealing is irrelevant to a claim of misappropriation

13  of trade secret.

14        **THE COURT:**  I think thought Mr. Larian said he was

15  incensed, and I thought those were his own words that he used when

16  he was involved in the discussion with Mr. Castilla.  But I'll go

17  back and look in the record.  And I agree with you, it could be

18  toned down substantially.

19        **MR. OVERLAND:**  Thank you.

20        **THE COURT:**  But we'll see.

21        What else, Mr. Overland?

22        **MR. OVERLAND:**  I have nothing further.

23        **THE COURT:**  Okay.  You might want to remain, though.  I

24  have some thoughts about this 30(B)(6) issue, because it's

25  becoming somewhat redundant and I think counsel need guidance.  So

Page 33

1    can I take that matter up with counsel, the 30(B)(6), and this

2    quagmire we're in?

3           When the case first came to this Court, one of the

4    initial witnesses that appeared at the deposition was Susanna

5    Kuemmerle.  And there, because of some concerns about a lawsuit

6    being brought against her, I remember and recall spending a long

7    period of time trying to sort out what was happening at a

8    deposition across the street with her concern about suit and being

9    sued.  She was previously designated not only a 30(B)(6), but was

10   a percipient witness to these events.

11          My recollection is, before Ms. Keller joined us, and Mr.

12   McConville and Ms. Hurst were counsel at the time, was that other

13   30(B)(6) witnesses were going to be proposed.  And, in fact, it

14   was represented to the Court that they would be well-prepared.

15   And it turned out, if my memory is correct, they were absolute

16   empty vessels, which has been expressed more than one time

17   informally.  And that Mattel had always maintained the consistent

18   concern and frustration that they weren't getting any information

19   out of Mexico.

20          And at that time I think Mr. McConville was the first

21   counsel that informed the Court about the peculiar situation of

22   Mattel, from your perspective, having brought the action in Mexico

23   and enlisted the police.

24          So the Court was faced with items that had been moved

25   from Mattel to MGA Mexico.  After going through a series of very

Page 34

1    frustrating hearings, I thought my record was absolutely clear at

2    the time, but Ms. Hurst has been very gracious in saying that

3    perhaps she read that too narrowly.  And my impression is that Ms.

4    Hurst is able counsel and willing to take the bullet for what I

5    think is an absolutely clear order.

6           I can't imagine being anymore clear in this, and I don't

7    know why it needs any interpretation at all.  I'm going to read

8    this order into the record.

9           Category 10.  "Seeks testimony concerning the search and

10   seizure of documents by Mexican authorities from MGA's city

11   offices that related communications."

12          I'm going to stop with the first line in just a moment

13   and tell you exactly what that means.  Courts don't have to go

14   further and say "search" means open the door and walk in the lobby

15   and, therefore, I'm going to further define "search" as going

16   inside a drawer and behind a bookcase.  And "seizure" is not

17   further defined, nor is it necessary to define it as where was it

18   found and what was it.  End of discussion.

19          So if Ms. Hurst chooses to read this order narrowly, so

20   be it.

21          Now, to continue on to absolutely make clear what I

22   meant, MGA argues the topic is cumulative of MGA Mexico's 30(B)(6)

23   testimony.  And I give you that background; it not only wasn't

24   cumulative, this Court was getting very concerned about the lack

25   of information coming from the most percipient witness that could

Page 35

1    possibly be involved, and that's Susanna Kuemmerle.

2           I heard what Mr. McConville was saying at the time about

3    the tickly situation that Kuemmerle was in fearing to be sued in

4    the future.  I rejected it.  The parties reached some kind of

5    accommodation and came to the Court with this idea of a 30(B)(6).

6    And we went through a whole series of 30(B)(6) empty vessels and

7    numerous subjects.

8           The next line, the third line, "while the argument is

9    better suited to this category than category seven and nine, the

10   Court nevertheless rejects it."

11          I don't know how I can be more clear.  MGA lost.  "There

12   is no evidence that MGA Mexico's 30(B)(6) designees interviewed

13   any individuals other than former and present MGA Mexico

14   employees.  MGA's knowledge of the events at its subsidiary office

15   remains undiscovered.  The Court therefore grants the motion as to

16   category 10."

17          I don't think I can write anymore clearly than that,

18   unless I start qualifying what "search" means and "seizure" means,

19   and the Court doesn't have to do that.

20          Now, it gets even more peculiar, though, because this

21   eventually got designated attorneys' eyes only because Mattel came

22   forward and didn't want disclosure of this information because

23   they apparently feel their trade secrets would become knowledge.

24   So the Court now has a record of Mattel seeking to keep this

25   information limited.  And it became, I believe, attorneys' eyes

Page 36

1   only, which then placed the parties in the situation of supposedly

2   Mr. Larian being unprepared.

3         I'm not certain why Mattel should be curtailed in any

4   way in asking these questions because, first, regardless of the

5   30(B)(6) designation, I would expect that Mr. Larian, faced with

6   this kind of concern in an office with the FBI, has every

7   possibility or probability of making an inquiry regardless of his

8   30(B)(6).

9         And what happens is that, on the Mattel side of the

10  fence, what I'm really hearing is that MGA wants to stop all

11  questioning in this area of the 30(B)(6) designation and their

12  confusion.  I think the questions are appropriate.  I think this

13  has been read too narrowly by MGA.  And I think the truth doesn't

14  have to walk around on legs like a lie does.

15        Here is the position you are going to potentially be in.

16  One, tentatively -- and, of course, I'll always listen to you

17  after an initial statement -- I think you are going to be allowed

18  to read category 10 of the Court's order.

19        Second, you are going to be allowed to ask Mr. Larian

20  questions, both in his position as president of the company who

21  apparently had conversations minimally with Susanna Kuemmerle and

22  others on or about the date of the break-in.  Because it goes to

23  his credibility and how much he asked and why he didn't ask.

24        Third, even independent of that, my expectation is I

25  meant exactly what I wrote, and I intended that "seizure" means

eb0f115d-d9f3-41ce-9d97-fa11034ac770

1   what and where, and he should have answered those questions at the

2   30(B)(6).

3          Now, second, who holds the privilege?  MGA does.  MGA

4   can rescue themselves.  Mr. Larian can waive that if he chooses

5   and say, "This was on my advice of counsel.  My counsel advised

6   me."  And, of course, if they do, then it can obviously be brought

7   out that Mattel was the one seeking nondisclosure of your trade

8   secrets, and that you placed yourself in the position of an

9   attorney's-eyes-only situation as well as MGA, and the jury will

10  have a full and complete picture of what occurred.

11         Now, that's just the tentative thought.  So having that

12  tentative thought, now I'm going to have you correct me and

13  explain your position, because as you know I'll go back and spend

14  an hour and think through that again, and I'll come out.  And,

15  that, by the way, will be my order when I come out.

16         **MR. ZELLER:**  The one thing I would add, Your Honor, is

17  that the Court did order and, in fact, ordered more than once

18  beginning as early as Susanna Kuemmerle's 30(B)(6) deposition,

19  that 30(B)(6) designees were required to be prepared on AEO

20  material.  So not only were they entitled to access, in fact, the

21  Court ordered it.

22         And, I mean, a cynic among us might suggest the reason

23  why Mr. Larian was designated a 30(B)(6) to begin is with is

24  because the Court will recall he had made repeated requests as an

25  individual to have access to Mattel's AEO information.  And after

1    the Court made the ruling that I reference, which required

2    30(B)(6) designees to prepare themselves using AEO materials, Mr.

3    Larian was designated AEO.

4            So the one elaboration that we would request, Your

5    Honor, is not only be able to read to the witness and the jury

6    category number 10 of the Court's order and make it clear it is a

7    Court order, but also the Court's order saying he was required as

8    a 30(B)(6) witness to prepare himself with AEO materials.  He's

9    always raised that issue.

10           **THE COURT:**  Second, you have to remember this:  This

11   Court doesn't want to become a part of the lawsuit.  Therefore, if

12   it's read, I don't want it coming from this Court.  But the

13   reality is you have to remember I inherited this issue coming from

14   Judge Larson's court.  This wasn't a fresh issue.  This was an

15   ongoing dispute when it came to me between MGA and Mattel that has

16   been lasting some period of time.

17           What it's not going to be is Judge Carter ordered the

18   following, if we get that far.

19           Let me hear from MGA.

20           **MS. HURST:**  Numerous 30(B)(6) witnesses testified about

21   all of the information that they could glean regarding what

22   happened during the search and seizure in Mexico.  We engaged

23   Mr. Small who interviewed every former employee of MGA Mexico who

24   was willing to talk to him and reported the results of those

25   interviews regarded what happened that day during the search.

1        Mr. Machado was deposed for days about what he removed

2    from Mattel Mexico and how it ended up on his desk.  Ms. Kuemmerle

3    was deposed for days about whether she had any knowledge of what

4    there was at MGA Mexico that might have been brought there by

5    Mr. Machado.

6        She was not present at the search.  She was in New

7    Jersey at her home on the day of the search.  Mr. Machado was not

8    present at the search.  He does not know personally what was

9    seized during the search.  All of the employees of MGA Mexico who

10   were there present that day were rounded up and put into a

11   conference room and were not permitted to observe all of the

12   aspects of the search.

13       How it is that either MGA Mexico or MGA proper in the

14   United States could possibly testify from personal knowledge as to

15   what was seized during that search is incomprehensible.  I am not

16   taking a bullet for anybody, and if the Court is suggesting that I

17   am prevaricating I do not appreciate that.

18       **THE COURT:**  No, that wasn't the suggestion so apparently

19   I have got you in the same position I had Mr. Price.  Your

20   statement was that you read this too narrowly.  So let's be

21   absolutely accurate.  Your statement on the record was "I may have

22   read this too narrowly."

23       So this is not an aspersion on you, and I certainly mean

24   it as an aspersion on Mr. Price.  If you want to take it

25   personally, so be it.

Page 40

1       **MS. HURST:**  Mr. Larian was designated on this topic, as

2   I understood it -- obviously incorrectly in the Court's view --

3   because he was the one who, on behalf of MGA, received MGA's

4   knowledge; not its subsidiary's knowledge, which is what the

5   sentence says.  "MGA's knowledge of the events at its subsidiary's

6   office remains undiscovered."

7           The reason -- I'm sorry, our interpretation at the time,

8   and today, was the reason that the Court wrote the sentence that

9   way was because there had been reams of testimony about this

10  already.  Ms. Kuemmerle was deposed for five days.  Mr. Small went

11  and interviewed all of those people.  Mr. Machado testified.

12  Mr. Vargas testified.  Ms. Trueba testified.  We paid to get them

13  here from Mexico under compulsion.

14          I understand the Court remembers parts of the history of

15  this.

16      **THE COURT:**  I remember the entire history, and I'll say

17  it to you and I'll break this conversation off very quickly.  I

18  have repeatedly been frustrated and have expressed that informally

19  on more than one occasion -- and I hope on the record -- that I

20  thought that these were a series of empty vessels and it was

21  ludicrous.

22          We have gone through 30(B)(6) after 30(B)(6) after

23  30(B)(6) on different witnesses who were ill-prepared.  And you

24  know my frustration at the time and we spent weekends on that as

25  well.

1        **MS. HURST:**  And the same was true of Mattel who produced

2   empty vessel Mr. Keith Story to testify for 10 days.

3        **THE COURT:**  Just a moment.  We're not going to move over

4   to Mattel because I'm speaking to MGA.  I expect equal -- I stated

5   equal frustration about Mattel's preparation as well.  In fact, I

6   think I made the statement numerous times that if I would have the

7   Court (sic) from the beginning, I would have started imposing

8   sanctions a long time ago.  But I didn't choose to do that coming

9   into the case at a late date.

10        In fact, I think I also expressed to both parties that

11   one or both parties would have had terminal sanctions, in my

12   opinion, with some of the things that occurred.  Now, I chose not

13   to because when I got this, it was already prepared pretty far

14   down the line.

15        So, this is not one-sided, but on this issue you know

16   and I know that I expressed my frustration numerous times on this.

17   So if you want to create that record, you are going to get a

18   pretty strong response from the Court.  I total disagree with that

19   statement by counsel.

20        **MS. HURST:**  There is absolutely no reason why at that

21   deposition of Mr. Larian, Mr. Zeller could not have put every

22   single one of these documents in front of him and asked him

23   questions about them.  They are not prejudiced in any way by Mr.

24   Larian's failure to examine the contents of that CD.  There is no

25   testimony that he has offered about the contents of the CD.  Hat

Page 42

1    they couldn't have gotten at that deposition, because his

2    testimony is, "I never saw the documents."

3           Their complaint is that they cannot authenticate the CD.

4    That is not something that MGA ever would have had knowledge of.

5    Nobody from MGA was there that day.  All of the MGA Mexico people

6    testified about it.  If their complaint is that they can't

7    authenticate the CD, that is a situation that was procured by

8    Mattel.

9           They're the ones who went in with law enforcement

10   authorities and had it seized.  Were it not for that, the normal

11   discovery processes in this litigation would have resulted in the

12   materials being collected by the lawyers and turning them over.

13   This is a situation procured by Mattel in Mexico.  Apparently they

14   can't get the original back from the law enforcement authorities

15   despite their close relationship.

16          To impugn Mr. Larian's credibility on this issue when

17   they have procured the situation that has created it is completely

18   unfair.  It is absolutely unfair.  There is no reason why they

19   couldn't have asked him questions in the deposition about the

20   documents.  But to force us to stipulate, which is effectively

21   what they were saying they were entitled to.  Here is what they're

22   saying they were entitled to in that deposition:  Basically to

23   admit the authenticity of that CD.  And we're not required to

24   admit that.  There are serious doubts about the authenticity of

25   that CD.

1        **THE COURT:**  And I haven't allowed it into evidence yet.

2        **MS. HURST:**  Right.  So that's the only thing at issue

3    here in terms of preparedness.  He has not offered any testimony

4    that prejudices them in any way about the contents of the CD.  He

5    testified about the three documents they put in front of him.  He

6    answered questions about them even though he lacked foundation

7    about it, and they got to cross-examine on it.  Mr. Zeller could

8    have done that at the deposition as well.  I didn't instruct him

9    not to answer questions about those documents.

10        So, really, at this point, I don't understand what is

11    the complaint other than authentication of the CD.  They don't

12    like the fact that Mr. Larian says he has never seen this, but

13    there is absolutely no evidence that he ever did.  There is no

14    evidence that Mr. Larian was ever privy to or used these documents

15    in any way.  No one will say that.  His computers have been

16    examined out the wazoo.  Millions of documents have been produced.

17    Every e-mail the man has ever written -- I think the Court has

18    seen them in our off-the-record sessions.  There is no evidence

19    that he was privy to these documents.

20        So to impugn his credibility on that issue, which is

21    what is going to happen, is completely unfair.

22        Now, they opened the door on this by using their

23    characterization of topic 10 from their letter, which was not the

24    same as the Court's order.  And at the time we tried to make a

25    rule of completeness and we fumbled it and we didn't get it done

1    in time.  Basically, the examination on cross was to complete the

2    rule of completeness and address that and do nothing more.  It was

3    strictly limited to the contents of the deposition.

4            That was all that was, was a rule of completeness on

5    cross.  That does not open the door to further inquiry or

6    impugning Mr. Larian's credibility on this issue.

7            **THE COURT:**  Ms. Keller, I'll provide each of you an

8    opportunity.

9            **MS. KELLER:**  I have been very concerned by watching Mr.

10   Larian being beaten over the head with these documents that he

11   hasn't seen, that there is no foundation for, that there is no

12   foundation that he has ever seen and hearing them come in under

13   the guise of both that he was a 30(B)(6) witness as to the search

14   and seizure in Mexico when I know, having seen the deposition

15   transcript, that there was an objection that he was not designated

16   as to the contents of the documents, but only as to the fact of

17   the search and seizure.

18           And I know from reading the deposition transcript that

19   that was the advice of his counsel.  And I know that apparently

20   there was no further motion to compel or anything, or even any

21   examination or attempt to examine him on the contents of the

22   documents he is being hit with now.  I know that.

23           And I know that he has been made to look like he is

24   either evasive or his lawyers are evasive, which neither one of

25   those is the case.  And I know the Court is frustrated.  I know

1   there is a long history.  I understand I wasn't here, but I have

2   heard Court say it enough times that I understand the Court's

3   position.

4           But I agree with Ms. Hurst.  I don't think it's fair.  I

5   don't think that she deliberately intended in any way to evade the

6   Court's order.

7           **THE COURT:**  Let's stop that now.  I didn't intend that,

8   but if you're going to keep repeating it, the protestations start

9   taking on credibility.  Don't go there.  Don't create that record

10  for yourself unless you choose to.  That was not intended.  But

11  those were the exact words I heard from Ms. Hurst.  I didn't take

12  that as to credibility.  But if you want to keep going there, I'm

13  warning you, you are building your own record just like Mr. Price

14  did with his silliness the other evening.

15          Your turn.

16          **MS. KELLER:**  Then I'll limit myself to what I have

17  observed in the courtroom.  And what I have observed is Mr. Larian

18  being hit with documents he has never seen and being implicitly

19  accused of either deliberately evading reading them, pretending he

20  doesn't know anything about them when he does or should.

21          And the net effect on the jury, I think, is the intended

22  one by Mattel.  I think the net effect is that it appears to the

23  jurors that either he or his lawyer or both, are deliberately

24  being evasive, when the reality is he doesn't know thing one about

25  these documents, was not instructed by his counsel to delve into

Page 46

1    these documents.  And as Ms. Hurst told the Court the other day as

2    an intellectual property practitioner, she took care not to expose

3    him unnecessarily to anything that Mattel was claiming to be a

4    trade secret.

5         Now, I think one of the problems in the case is the

6    backdrop.  I think one of the real problems is the very backdrop.

7    And I know I came in late, Your Honor.  I know I haven't seen all

8    the abuses that Your Honor saw and has discussed with us, but

9    sometimes, sometimes things really aren't related to that.  And I

10   don't think this is, from everything I have seen.  But I'm very

11   worried that Mr. Larian, both in his individual capacity --

12   because he is an individual defendant.  And Mattel, frankly, to

13   put it in the unvarnished -- to say the unvarnished truth, wants

14   to wipe him out financially.  Wipe him out.  And they want to wipe

15   out his company financially.

16        He is a pivotal -- he is the pivotal witness right now,

17   and he is certainly one of the one or two pivotal witnesses in the

18   whole case.  And I have watched with great alarm as I think he is

19   being made out to be, in front of the jury, something that he is

20   not.  I'm not saying he has been a great witness.  I will not say

21   there haven't been times when I have been very disappointed, but

22   I'm saying on this issue, just this one issue, I don't think that

23   this is a question of MGA playing games.  I don't think it's a

24   question of Mr. Larian playing games.  I know it's not a question

25   of his counsel -- and I'm including myself -- playing games.  I

Page 47

1    really do think, Your Honor, in this particular case that it's an

2    unfairness to him.

3            **THE COURT:**   Okay.   Let me tell you a couple concerns and

4    have you respond.

5            And I'm going to pay you the same courtesy, Ms. Hurst.

6    I don't intend to besmirch you or Mr. Price's reputation.   And if

7    you want part of this under camera, you can go through tonight's

8    proceedings and I'll pay you the same courtesy of taking out any

9    of my initial comments if you feel this harm's your professional

10   reputation.

11           First, who has this information?   From day once since I

12   got this case, MGA or somebody inside MGA.   Let's start with that

13   proposition.   Mattel doesn't have the information.   MGA has it.   I

14   have no information that Mattel employees were at the search

15   scene.   They certainly weren't the police that day.   Even if they

16   caused the search, I don't know how they can control the seizure

17   of the evidence with police officers even if they set this in

18   motion.

19           Second, I know you have read everything and you have

20   been very conscientious.   Go back and look at Kuemmerle.   Go back

21   and look at exactly what the Court was faced with, with the

22   absolute percipient witness who is talking to Machado; who is

23   getting the phone calls in when she is in New York; who is the

24   most knowledgeable.

25           Third, where is Machado?   You say that there are so many

Page 48

1    other ways to accomplish this.  Look around the courtroom.  Where

2    is Machado, Vargas or Trueba?

3              Fourth, whether the person is a 30(B)(6) witness or not,

4    if someone was inside your offices and you got a call that the FBI

5    was there, I think you would be the first to ask, or at least I

6    would on your behalf, what do they want?  What are they taking?

7    Where is it coming from?

8              And I think what I'm really hearing is an effort to

9    preclude all questions concerning this.  In other words, the wall

10   gets drawn that if the person is not a 30(B)(6) witness, that Mr.

11   Larian can't be expected to have even asked these minimal

12   questions under these circumstances.  I think that regardless of

13   30(B)(6), those are normal questions that the head of a

14   corporation or a company would ask when their offices are being

15   searched.

16             So I'm having a very, very difficult time when I look at

17   who is the holder of the information and who controls this

18   wondering why Mr. Larian can't be questioned on this.  Now, I

19   haven't admitted the disk yet because apparently there's other

20   information on that disk and I don't know what that is.  I have

21   offered to go through that.  Nobody has taken me up on that.  I

22   have reserved that ruling until the end of the examination by both

23   parties.

24             But at some point I don't know that it's going to be

25   precluded, because my greatest concern isn't the information that

1   is on it that's seized from the office.  I don't know what else is

2   on is that wasn't seized from the office.

3          So if there are things on that disk that weren't seized

4   from the office or the Mexican police put a conglomeration of

5   items in that, that would be unfair, because it looks like you got

6   2,000 items when there may only be four or five documents.

7          I, frankly, was waiting to see if Mr. Machado would

8   grace us with his presence.  He hasn't doesn't yet.  Because he

9   could have answered a lot of those questions and maybe the

10  foundation would be here.  Look around.  Where is Mr. Machado?

11         Now, Mr. McConville we'll come back and argue,

12  rightfully so, judge, they set all this in motion and they have

13  caused this problem by bringing the allegation.  Why can't they?

14  If something is taken from their offices, why can't they?  So

15  that's some of my concerns.

16         Finally, I'm not casting aspersion on any present

17  counsel, but this has absolutely been frustrating from the time

18  I've gotten this, to the abuse of privilege logs -- I'm going to

19  say it to you -- to putting things on privilege logs for both

20  parties that have absolutely no privilege to them, this is

21  absolutely replete with abuse.

22         And I do promise you -- and I'll put this on the

23  record -- if I would have had this case from the beginning, I

24  would have started sanctions early on, and they would have been

25  escalating.  And they could have led to terminal sanctions.  I'm

Page 50

1    not saying they would.  But when I got this case, it was so abused

2    by the time I got this case, there was no place to start.  Who was

3    the bad person?  So I left it alone.

4           All right, Mr. McConville.

5           **MR. MCCONVILLE:**  Just one point, Your Honor.  In looking

6    at category 10, this is the point of how it could be misread, and

7    just --

8           **THE COURT:**  I don't even want to go through it with Ms.

9    Hurst.

10          **MR. MCCONVILLE:**  I'm not going there with Ms. Hurst.  I

11   just want to look at this, Your Honor.  It refers to another

12   category, which is category seven.  And it talks about

13   communications at MGA Mexico.  But then it says what has not been

14   discovered is MGA's knowledge of the events at its subsidiary's

15   office and that remains undiscovered.  So Isaac Larian was put up

16   to articulate what MGA knew about the search, and what he knew

17   about the search is what he heard from Kuemmerle and the others.

18          **THE COURT:**  I'm not disagreeing.  Look at what I wrote.

19   What did I say about category seven?  Just read it back to me.  I

20   took it into account.  In other words, I didn't want there to be

21   any confusion.  So what I said was, "While the argument is better

22   suited to this category, the category seven through nine, the

23   Court nevertheless rejects it."

24          I couldn't have been more clearly.  I thought that out.

25          Number two, courts don't write orders on search and

Page 51

1   seizure.  And you know it in criminal law.  When I sign a warrant,

2   I don't qualify the word "search and seizure."  A search is, I'm

3   going to inside the building.  And a seizure is, not only are we

4   going to take the items, we're going to make a record of where we

5   took the items and from the location, and in fact, you are even

6   going to return a receipt to me.

7          Seizure is absolutely clear.  It doesn't need to be

8   further defined.

9          MR. MCCONVILLE:  Totally agree.  Your Honor, I wasn't

10  taking -- I agree with you.  Search and seizure, abundantly clear.

11  My point isn't that.  My point is it requests MGA Van Nuys'

12  knowledge of that search and seizure.  Not that there wasn't a

13  search and seizure, but what did MGA Van Nuys know about it.

14         And I think that's where the breakdown -- from just

15  watching this discussion, the breakdown seems to be our

16  interpretation to Isaac Larian was this order requires MGA Van

17  Nuys' knowledge; not that there wasn't a search and seizure, but

18  headquarter's knowledge versus what the subsidiary knew.  That's

19  all.

20         THE COURT:  Why didn't people come to the court?

21         MR. MCCONVILLE:  I don't know, Your Honor.

22         THE COURT:  What gives either party a free

23  interpretation of this question?  It's not my lack of

24  availability.

25         MR. MCCONVILLE:  Absolutely not.

1      **THE COURT:**  Number two -- please, no aspersion on

2   present counsel -- I have got an absolute history when the circuit

3   goes through the in-camera hearings of different counsel

4   interpreting --

5      **MR. MCCONVILLE:**  Understood.

6      **THE COURT:**  -- what they think that the Court order

7   means.  This order is completely clear.

8      **MR. OVERLAND:**  Your Honor, may I be heard just in

9   response to the Court's comments about Mr. Machado?  Mr. Machado

10  was not present at the execution of the warrant.  He was not at

11  the scene.  He has no personal knowledge.

12     **THE COURT:**  I understand he wasn't present at the scene.

13  But some of these items were allegedly Mr. Machado's.

14     **MR. OVERLAND:**  And he was questioned about them at his

15  deposition.

16     **THE COURT:**  And he potentially knows where they are in

17  his desk, etcetera.

18     **MR. OVERLAND:**  There were no items on his desk.  What

19  we're talking about is the content of the CD.  And I was referring

20  more as to the authenticity of the CD, which he has no clue about

21  as he has no clue about what was seized at the time.

22     **THE COURT:**  This whole difficulty started over a disk.

23  And apparently I'm starting to believe there may not be a

24  foundation for the introduction of a disk with a bunch of compiled

25  information.  Nobody apparently wants to go through it with me.  I

1   can't get a record of what is on that disk.  I can't get an

2   excision or an agreement between any counsel.

3          But apparently it appears there are numerous items on

4   the disk that were, in fact, seized.  It's the compilation of that

5   that's the concern.  And I'll repeat to you, it's not what is on

6   the disk.  It is what may be on the disk that's extraneous, that

7   makes it looks like Mr. Machado or somebody else took more than

8   they allegedly did.

9          And because I don't know what is on the disk, I don't

10  want to put MGA and Mr. Machado in the position, unless a

11  foundation is laid, of a bunch of extraneous material that the

12  Mexican police may have compiled on a disk.  I have no idea if

13  they took every item from every office, innocuous or not, put it

14  all on one disk from four, three, ten offices -- I have no idea

15  what the location looks like -- and Mattel then comes in with

16  3,000 items a disk and says, "Look, we have 3000 items on a disk."

17         That's what is holding me back, is the prejudicial

18  effect to MGA, Larian, and Machado.  But it's starting to appear

19  that there are relevant items that were moved.  And I don't know

20  what those are.  I know what they are, but I don't know what else

21  is on there.

22         Now, so I'm going to turn to Mattel for a moment.

23         Mr. Zeller.

24         **MR. ZELLER:**  Judge, there is no evidence that that disk

25  contains extraneous information.

Page 54

1          **THE COURT:**  There is no evidence that it does.

2          **MR. ZELLER:**  That's not correct either.  What we have is

3    a situation where we are facing the kind of bandying 30(B)(6) was

4    designed to eliminate.  Mr. Machado looked at the disk.  He

5    absolutely confirmed some of the materials on it.  He has amnesia

6    as to the rest of it.

7          What they also said, by the way -- and it was very

8    carefully put -- and they were trying to basically say they aren't

9    required to admit the authenticity of this disk.  This is what

10   this is really about.  They just simply want to fight over this

11   disk that MGA produced.

12         Ms. Kuemmerle testified that -- as a 30(B)(6), that the

13   disk was a copy of what it is that the Mexican authorities took.

14   No qualification.  Nothing.  So there is, in fact, evidence to

15   substantiate that what is on the disk is what was seized from

16   MGA's Mexico City offices.

17         Now, look, if they come forward and if there is some

18   legitimate complaint, I mean, that's obviously something we would

19   listen to, if there is something actually on that disk.  But we

20   aren't facing that situation.  We're simply playing a game.  And I

21   don't know of any other way of putting it, because they want to

22   defeat our ability to put disk in front of the jury.

23         **THE COURT:**  They want to defeat more than that.  If you

24   really listen to this -- and this is the Court's opinion

25   tentatively -- they want to cut off all examination of Mr. Larian

1  on this subject.

2        So it's two pronged.  It's first, he doesn't meet the

3  30(B)(6) requirement.  And second, because he doesn't, you can't

4  ask him any questions about this.

5        Even on the second argument if the 30(B)(6) was not on

6  the table, the Court finds it hard to believe that Mattel isn't in

7  the position of asking, "Were you knowledgeable?  And if not, why

8  not?"

9        Wouldn't these be questions you'd be expected to be

10  asked when the FBI is standing in your offices, either of

11  Kuemmerle or anybody else?  And in later conversations wouldn't

12  you expect to ask somebody, like Machado who has come to the

13  United States, or Vargas, or Trueba, at some point, "What

14  happened?"  Or Kuemmerle.

15        So that's the problem I'm having.  It's two-pronged.

16  And I'm going to hold, by the way, Mr. Eckert equally

17  knowledgeable and subject him to the same ability of MGA to ask

18  him questions about, "Why didn't you know?  If you say you don't

19  know, why didn't you know that there were offices on the fourth

20  floor involved in sneaking product or sneaking into showrooms?"

21        **MR. ZELLER:**  We would expect --

22        **THE COURT:**  I don't care what you expect.  I'm just

23  saying that some place the buck stops.  And I think it's awfully

24  logical if I'm the head of a major corporation -- and I don't mean

25  that personally -- and I have got the FBI standing in my offices,

Page 56

1    I would logically ask, what are they doing there?  What are they

2    after?  What did they take?  Where did they get it from?

3           So apparently everybody is going to squabble over the

4    30(B)(6), and I think when the circuit is it going to look at

5    this, they're going to see the obfuscation on both sides, frankly,

6    throughout this trial.  But I'll just leave that neutral for the

7    time being.

8           Mr. Quinn.

9           **MR. QUINN:**  I had to react to the comment by Ms. Keller

10   that Mattel was out to destroy Mr. Larian.  She knows and the

11   Court knows that that's not true from conversations that we have

12   had.

13          **THE COURT:**  Mr. Price.

14          **MR. PRICE:**  No comment.

15          **THE COURT:**  Okay.  Now, I'm going to give you one more

16   go-round and then make the decision.  But then what I come out,

17   that's the final decision.

18          Mr. Price, the transcripts await you.  I really didn't

19   mean any personal affront the other evening with my comments.

20          And let me assure you, Ms. Hurst, I don't mean any

21   personal comments.  But if each of take it that way, that's your

22   choice.

23          Now, my ruling when I come out, will be my ruling, so

24   it's nothing personal with you.

25          Ms. Keller?

1        **MS. KELLER:**  Your Honor, I don't disagree with the

2    Court, that it's proper to ask a witness, well, why didn't you

3    ask?  Why didn't you inquire?  Why didn't you demand to know

4    exactly what was taken?  But that's not what we're talking about.

5    What we're talking about is a disk created by the Mexican police

6    that's full of stuff that Mr. Larian doesn't know the contents of

7    that disk; wasn't there at the time; wasn't supervising it.

8        We don't know that what the integrity of that disk is.

9    We don't know how it was produced by the Mexican police.  As the

10   Court said, we don't know if it was a compilation of materials

11   from a bunch of different offices.  None of us really knows what

12   the integrity of that disk is.

13       **THE COURT:**  Are these questions aimed at the disks?  I

14   don't think that they were aimed at the disk.  I thought they were

15   aimed at specific pieces of information that ended up on the disk.

16   So it's not the disk.

17       **MS. KELLER:**  Well, specific pieces of information that

18   are on the disk.  And we don't know exactly what the genesis is of

19   those pieces of information.  We don't know exactly how they got

20   on to the disk.  But one thing we do know is that Mr. Larian

21   doesn't know anything about them.

22       Now it's one thing to say, "You should have asked.  You

23   are the head guy.  You are the CEO.  Why didn't you ask?  Why

24   didn't you ask Mr. Machado?  I want to know exactly what it is

25   that you got from Mattel.  I want to know what you brought into my

1   office."

2          I don't think there is any dispute about that being a

3   proper question for Mr. Larian.  But my problem is taking

4   something off is that disk, sticking it in front of him with no

5   foundation whatsoever and demanding to know of him what is this,

6   what does it say, what is it about, and purporting to impeach him

7   with it, demanding to know how did it get into MGA's Mexico

8   offices.  All of those are things for which there is absolutely no

9   foundation.  There just isn't any foundation for it.

10          **THE COURT:**  They're not going to be able to put the disk

11   in front of him.  What they're going to be able to do potentially

12   is ask what information was inside the office.  They can't waive

13   the disk in front of him like a bloody knife.

14          **MS. KELLER:**  I understand that, Your Honor.  I'm talking

15   about the contents of the disk.

16          **THE COURT:**  I am too.  So let's confine it to the

17   contents.

18          The contents of the disk shouldn't be what is on the

19   disk.  It should be why didn't you know about.  And let's go to

20   34863, which was the forecasting by Walmart initially.  And what

21   it was showing was the motivation to take Mattel forecasting

22   documents.  Now, 34863 is simply a Walmart replenishment recap,

23   according to my notes.  But what it was designed to do was to take

24   into account -- somebody will have to help me with the number.

25          **MR. MCCONVILLE:**  Your Honor, 8466 is a Mattel Mexico

Page 59

1    document and 7104 is a Mattel Mexico document.

2              THE COURT:  Just a moment.  7104?

3              MR. MCCONVILLE:  Yes, sir.

4              THE COURT:  What about 8466?  That's the 883 pages.  I'm

5    sorry.  I listed it twice.  That's a good example.  The parties

6    could easily control their own future here.  They really could.

7              MR. ZELLER:  But Your Honor is saying, "Why don't you

8    know about this?"  Because he didn't know about it; because he

9    wasn't in Mexico; because he didn't know the document existed;

10   because he wasn't asked to review it, including by Mattel, or by

11   his own lawyers.  In fact, he was told not to.  And no one moved

12   to compel.  No one even stuck the document in front of his nose

13   and said, "Tell us about this."

14             THE COURT:  You are speaking from the 30(B)(6) position

15   and I'm not.  I'm also speaking from a second position, and you

16   are not accepting that from the Court.  And that is, your greatest

17   concern also, besides 30(B)(6), was he should have been prepared

18   on frankly.  That's a very clear order by the Court.

19             The second is I would expect that he would have asked.

20             MS. KELLER:  And I agree.

21             THE COURT:  It's illogical that Mattel is cut off from

22   questioning on the grounds that he wasn't properly prepared as a

23   30(B)(6).

24             MS. KELLER:  I agree that -- I agree that that's a

25   legitimate question.  The difference is -- it's like -- let's say

Page 60

1    I have some things seized from my house and one of them is a phone

2    book.  And somebody says to me what is in that phone book?  And I

3    say, "I don't know.  I never looked at it.  I never read it.  I

4    never examined the phone book.  I didn't go through it."

5            "Well, why didn't you go through it?"

6            "I don't know.  I just didn't."

7            And then starts opening the phone book and reading page

8    after page to me and every phone number and every name.  I didn't

9    read it.  Maybe I should have, but I didn't.  It's almost -- to

10   me, that's this huge Walmart document, for example, the WalMex

11   replenishment report.  It isn't even in dispute that Mr. Larian

12   has never laid eyes on that thing.  And no one has ever showed it

13   to him, including Mattel.

14           If this was an important document, either in his

15   capacity as CEO or in his individual defendant capacity, or in his

16   capacity as 30(B)(6) witness, why didn't somebody ever show it to

17   him?  I mean, it seems to me --

18           **THE COURT:**  What will come out in evidence eventually,

19   as long as we get down to the truth, is that because Mattel

20   thought it contained some trade secrets and some confidential

21   information and finally requested it be designated attorneys' eyes

22   only.

23           **MS. KELLER:**  But considering it's a WalMex replenishment

24   report from quite a while ago and it's only information that is

25   valuable when it's fresh.  And it's not a Mattel trade secret.

1          **THE COURT:**  That's for jury to decide.  That's your

2    position, but that's for the jury to decide the value.

3          Mr. McConville?

4          **MR. MCCONVILLE:**  Nothing.  Thank you.

5          **THE COURT:**  Mr. Zeller, this is the last go-round.

6          **MR. ZELLER:**  Sure.

7          **MR. OVERLAND:**  Excuse me, Your Honor.  You forgot me.

8          **THE COURT:**  Mr. Overland, I apologize.  You said you

9    would speak up whenever you wanted to be heard.

10         **MR. OVERLAND:**  There is an issue with respect to the

11   admissibility of this as to Mr. Machado.  Even if the Court were

12   to admit it for purposes of probing Mr. Larian's state of mind, I

13   would ask that when he is -- if he is asked about certain specific

14   documents and the failure to consider the documents, that there be

15   an instruction to the jury that they're not to consider that these

16   documents were actually found during the search because an

17   adequate foundation has to be laid for that.  And contrary to what

18   Mr. Zeller said, that adequate foundation can't be established at

19   trial through any 30(B)(6) witness, but has to be established

20   through a percipient witness.

21         So therefore, if the Court should allow that, I would

22   ask for an instruction that this is not to be considered by the

23   jury as evidence that these documents were, in fact, found.

24         **THE COURT:**  Part of what I have been waiting for is the

25   agreement with Ms. Keller that there is a potential lack of

Page 62

1    foundation concerning the disk.  That's why, when it was sought by

2    Mr. Price, I delayed that.  By the same token, I haven't had the

3    percipient witnesses who should be in this Court like Mr. Machado

4    to state what -- just a moment -- what was on his computer or what

5    wasn't.  He's not made an appearance.  It's going to draw an

6    adverse inference, eventually, from the Court.

7            So therefore, I decided, since we're being very candid,

8    to wait and to see if Mr. Machado was finally going grace us with

9    his presence, because there is the foundation.  Or if there is

10   some disagreement over what was taken, at least I have got the

11   adversarial position or activity between the parties.

12           Barring that, if I have to give an adverse inference, if

13   Mr. Machado isn't here or somebody like Ms. Kuemmerle, which I

14   have been asking counsel for a long time to produce, I was

15   prepared to not only give an adverse inference, but to allow the

16   evidence to come in on that disk.

17           So I have been waiting, because that adverse inference,

18   if it flows, is going to be very strong.  Now, I don't think I

19   have to.  It's been represented to me that Kuemmerle is going to

20   be here.  I think that will partially resolve the issue.  It's

21   been represented to me that Mr. Machado is going to be here.  And

22   I was going to listen to your arguments once again in case I was

23   wrong.  And in fashioning that adverse inference against MGA, they

24   were going to have all the input in the world.

25           But I have every intent ever backing up exactly what I

Page 63

1    said, and that is there are going to be repercussions for people

2    who control a person or have employed person or have nexus to a

3    person who doesn't appear.  Now that threat is gone.  I don't

4    think I even have to go there because Kuemmerle is going to be

5    here and Machado is going to be here, and I have accepted the

6    argument from MGA that this isn't the proper foundation because

7    nobody knows apparently what is on that disk.

8            So the disk isn't going to be waived in front of Mr.

9    Larian.  But whether he is a 30(B)(6), or whether he is the head

10   of a corporation who's had at least telephone conference and

11   in-person discussion with minimally one or more of these people, I

12   think he is subject to being questioned about this.

13           All right.  I'm going to close off the arguments.

14           Now, on the criminal matter, if you would come forward

15   please.

16                 (Brief pause in proceedings)

17           **THE COURT:**  Now, we can do a couple other things, too.

18   We can argue these additional motions this evening while I have

19   still got the court reporter, and then send her home instead of

20   having her come 8:00 o'clock tonight.  So let's go back to the

21   17200.

22                 (Brief pause in proceedings.)

23           **THE COURT:**  Back on the record.  First, I want Mattel to

24   be aware that this disk may never be coming into evidence.  So you

25   are running a risk not getting the Mexican police up here to

Page 64

1    explain what occurred.  And Mr. Corey has been intimately been

2    involved.  Why can't we get him here?  There's a whole myriad of

3    problems.

4              **MR. ZELLER:**  The disk was made by MGA.  That is their

5    testimony.  That is the 30(B)(6) testimony of Susanna Kuemmerle.

6    And they produced it.  We can call him.

7              **THE COURT:**  Hold on.  Explain that to me once again.

8              **MR. ZELLER:**  Mexican police searched MGA's offices.

9    Mexican police allowed MGA to make a copy of everything and

10   anything that MGA wanted to copy.  One of the things that was

11   located was a disk, a CD that was obviously associated with

12   Gustavo Machado.  The Mexican police, before taking it, allowed

13   MGA to make a copy.  Susanna Kuemmerle testified to this.  MGA

14   made a copy.

15             It then was in Susanna Kuemmerle's possession for about

16   a year sitting in her office.  She then received a call from an

17   attorney at O'Melveny & Meyers in the United States.  There may

18   have been interim steps.  She may have heard from in-house

19   counsel.  But in any event, she shipped it to O'Melveny.

20   O'Melveny then gave it to Skadden.  Skadden produced it to us.

21             **THE COURT:**  I'm going repeat that back to you, but just

22   one moment.  When the offices were searched, it was my

23   understanding that a disk was taken, but other information was

24   obtained.  And I thought that there was loose information besides

25   the disk.

Page 65

1          MR. ZELLER:  That's not our information.

2          THE COURT:  There was one disk.

3          MR. ZELLER:  That --

4          THE COURT:  I'm going to say this again.  You are the

5     Mexican police and you are inside the office.  You have a bunch

6     documents, I thought.  Some of those on Mr. Machado's desk.  Those

7     originally were not in a disk form.  They were different

8     documents.  I thought that a disk was then made by the Mexican

9     police.

10         MR. ZELLER:  That's not our information, Judge.  And

11    that's not what MGA has testified to.  There was a disk that was

12    found, in addition to other materials.  But there was a disk.

13    Gustavo Machado, by the way --

14         THE COURT:  Just a moment.  Don't jump on me now.  Is

15    this disk a copy of the disk found in Machado's office?

16         MR. ZELLER:  Yes.  That is our information.

17         THE COURT:  Why am I under the impression that the

18    Mexican police took the material back to their office and a disk

19    was made?

20         MR. ZELLER:  I don't know.  What I can say is that Mr.

21    Machado himself testified -- and this is actually -- it was a

22    combination of Kuemmerle and Machado.  They had a conversation on

23    the day when the Mexican police -- or it may have been the day

24    after the Mexican police were there.  And Mr. Machado said, in

25    substance in this conversation, "By the way, there is a disk that

Page 66

1    I have at my desk of Mattel materials."

2         So, I mean --

3         THE COURT:  Just a moment.  When the police came into

4    the offices, what did they seize?

5         MR. ZELLER:  I can get a complete listing of it.

6         THE COURT:  No, no.  Just a moment.  Slow down.  I want

7    to see what that complete list was.  And the question is very

8    simple.  I was under the impression that the police combined a

9    number of items, put them on a disk.  And my concern has always

10   been that the compilation had extraneous material that would

11   potentially prejudice Mattel -- I'm sorry.  MGA.

12        I want to know in the police actually brought material

13   together into a disk that they created or if this is a disk taken

14   off the desk, and if this is a copy of the disk that's passed

15   through numerous hands, from Susanna Kuemmerle from law firm to

16   law firm to law firm.

17        MR. ZELLER:  If I can have just a moment.

18        THE COURT:  I was going to meet somebody at 5:00 o'clock

19   today and I apologize.

20             (Brief pause in proceedings.)

21        THE COURT:  I want a very clear understanding from each

22   side and I'll take the time to look at the depos again.

23        My impression was that there was different pieces of

24   information coming from a variety of offices, one of which was Mr.

25   Machado's office.  And that that information was compiled by the

Page 67

1   Mexican authorities and put on a disc.  I'm going to call that a

2   master disk.

3          And the reason for my hesitancy in allowing this to be

4   introduced into evidence was, I thought the proper chain from

5   argument by MGA, or the proper foundation, was getting somebody up

6   from the Mexican police to get this into evidence.  Am I hearing

7   now that the disk in front of the Court is a disk found in

8   Machado's desk that's then given to Susanna Kuemmerle, or taken by

9   Susanna Kuemmerle and it flows through a series of law offices and

10  is finally turned over to Mattel?

11          **MR. ZELLER:**  Yes, sir.  That is what the testimony is.

12          **THE COURT:**  Just a moment.  Let's see if we have an

13  agreement on the facts.

14          **MS. KELLER:**  May we have a moment?

15          **THE COURT:**  Because if that's the case, this is a silly

16  dispute.  We didn't even have to go here.

17          (Brief pause in proceedings.)

18          **THE COURT:**  But I want some accuracy on this now.

19  Because that was my impression.  And this whole discussion was

20  never needed if that's the case.

21          Ms. Hurst, before you speak, if that's the case, we

22  never had to even get into this discussion, because it would have

23  gone from Susanna Kuemmerle.  This would have come into evidence

24  very easily without us even going here.  So be very careful on

25  both sides.  I want accurate information.  Which is it?

Page 68

1           MS. HURST:  There is no doubt that the CD we produced

2    was a CD that was sent by Susanna Kuemmerle to the lawyers.

3    That's absolutely true.  How that CD was created is the area of

4    dispute.

5           THE COURT:  Of course Susan Kuemmerle wouldn't testify

6    or --

7           MS. HURST:  She wasn't there that day.  It was handed to

8    her by the people who took the documents and the CD from the

9    police.

10          THE COURT:  Who handed it to her?

11          MS. HURST:  Mr. Carlos Aguirre is the employee who

12   signed the receipts for what was provided by the police and our

13   30(B)(6) witnesses.

14          THE COURT:  Just a minute.  It goes from Carlos Aguirre,

15   to Susanna Kuemmerle, to whom?

16          MS. HURST:  To Ms. Kuemmerle and then to O'Melveny &

17   Meyers.

18          THE COURT:  To whom at O'Melveny & Meyers.

19          MS. HURST:  We don't know who it was exactly.  We

20   couldn't find a cover letter.

21          THE COURT:  From O'Melveny & Meyers to whom?

22          MS. HURST:  If Mr. Zeller's recitation was accurate,

23   then it was handed over and produced in discovery.

24          THE COURT:  To whom?

25          MS. HURST:  I thought it was produced by O'Melveny

Page 69

1    before Skadden came into the actually.  But I could be

2    misrecollecting that.  But it was definitely produced either by

3    O'Melveny or Skadden.

4            THE COURT:  How do you believe chain goes?  Carlos

5    Aguirre to?

6            MR. ZELLER:  This is Susanna Kuemmerle's testimony.

7    Mexican police are there.  They find a disk.  MGA makes a copy of

8    that disk.  She takes possession of it -- this is her 30(B)(6)

9    testimony -- she takes possession of it.  Yes, it's true that the

10   manager -- he is not just an employee, by the way, who they named.

11   He is actually, I think, the manager of that office who was

12   present.

13           THE COURT:  Disk is found in the MGA offices.  That

14   disk, a copy is made.  Where is the copy made?  Back at the police

15   department?

16           MR. ZELLER:  No, sir.  It's made at MGA.

17           THE COURT:  Just a moment.  Is that the disk that's

18   before the -- is that the copy of the disk before the Court now?

19           MR. ZELLER:  It is.  It is.

20           THE COURT:  From the copy of that disk in the MGA

21   offices, is that Carlos Aguirre who is in the office at the time?

22           MR. ZELLER:  He is.  And he is the person who signed for

23   it.

24           THE COURT:  He signed for the copy.

25           MR. ZELLER:  Correct.

Page 70

1          **THE COURT:**  So he is an employee, MGA employee?

2          **MR. ZELLER:**  He is.

3          **THE COURT:**  And it then goes to Susanna Kuemmerle who

4     keeps it for a year.

5          **MR. ZELLER:**  Yes.

6          **THE COURT:**  Or some period of time.  Then it goes to

7     O'Melveny & Meyers, or we think it does, and then Skadden Arps.

8     And then to you through discovery.

9          **MR. ZELLER:**  Right.  One other piece on this, to give

10    the Court comfort, that this is exactly the disk that it purports

11    to be.  The Court will recall that there was an issue as to

12    whether or not the copy that we had received was the same copy

13    that MGA still had in its possession of this same disk that was

14    submitted to Judge Smith.  Judge Smith had those two disks

15    compared.

16         **THE COURT:**  I was just about to say I can have this

17    analyzed very quickly.

18         **MR. ZELLER:**  It's already been done.  And they're

19    identical.

20         **THE COURT:**  How did we get here?

21         **MR. ZELLER:**  Because MGA wants to equate "I haven't

22    seen" by Mr. Larian, to meaning there is no authenticity.  That's

23    why.  That is really where the debate is.  They're attempting to

24    impugn the authenticity of this by raising questions as -- and by

25    the way, when they say things like, "we don't know the integrity

Page 71

1    of the disk" --

2            **THE COURT:**  Why am I laboring, Ms. Hurst, under the

3    impression that this disk was a compilation of material?

4            **MS. HURST:**  Your Honor, the testimony of -- first of

5    all, 30(B)(6) testimony compiled from numerous witness interviews

6    is not all consistent.  But the bottom line is there is one

7    consistent thread.  Fifteen to 20 police officers came in that

8    day.  They focused on the offices of Mr. Vargas, Mr. Machado, and

9    Ms. Trueba.  They found a number of disks and were sticking them

10   in computers and looking at them.  And they were examining things

11   on computers while the MGA Mexico employees were sequestered in a

12   conference room.

13           At some point there were hard-copy documents, between

14   100 and 150 hard-copy documents, and a disk that was left behind

15   by the police.  How that disk got created has not been testified

16   to either by hearsay or personal knowledge or otherwise.  That's

17   the problem.  It's not the chain of custody once the disk got

18   created that's the issue.  Never been the issue.  The issue is how

19   did the disk get created in the first place.

20           And there was a process whereby the Mexican police were

21   going around the offices sticking disks in computers.  I mean,

22   this is completely forensically unsound.  That's not the issue,

23   but you can picture it.  They're sticking disks in computers.  We

24   have no idea how this copy was supposedly made.  That's the

25   problem.

1    So there is a compilation of materials on the disk as

2   well.  There are literally hundreds of files on that disk.  And

3   Mr. Machado testified that he created a disk at some point, and he

4   was able to identify at least some of the materials on the disk as

5   having come from him.

6    So that may be why the Court has an impression about the

7   compilation based on the contents of the disk plus Mr. Machado's

8   testimony about recognizing it and his full testimony about how he

9   remembers creating a disk, why he created the disk, because he was

10   making space on his computer; he was taking everything off, he was

11   putting it on a disk.  There was a whole raft, days of testimony

12   about that.

13    But the problem is -- and that may be sufficient when he

14   comes to testify to authenticate this disk.  It may well be

15   sufficient.  And we have never said that Mr. Larian can't be

16   questioned about it.  We just said that when he says he doesn't

17   have a foundation for it, that should be the end of it, and his

18   credibility should not be impugned based on the 30(B)(6) status.

19   That's it.  We're not saying he can't be questioned about it.

20    But the problem is beyond that --

21    **THE COURT:**  That's your fall-back position.  Initially

22   the objection came from you.  And the initial objection was he

23   shouldn't be questioned at all because he wasn't properly

24   designated as a 30(B)(6) witness.  Now today I'm hearing from Ms.

25   Keller, of course, he can be questioned.

1          **MS. HURST:**  I believe I did say that the other day as

2    well, Your Honor.  I don't want to quarrel.  I did say that.  But

3    I understand.

4          So with respect to the disk then, the other problems are

5    the disk has myriad stuff on it that does not in any way, shape,

6    or form, claim to be a Mattel trade secret.  Right?  Including

7    lots of MGA information.

8          **THE COURT:**  That's an exact copy of the original

9    information found on his desk.  So what?

10          **MS. HURST:**  So what is, now we have a motion in

11    limine 43 -- order in motion in limine 43 and a 403 problem.

12    Because if the disk just comes in, they get to say there are

13    17,000 files on this disk, then we have an enormous problem going

14    through one by one by one and showing these are not Mattel trade

15    secrets.

16          What they should be doing is taking off of the disk

17    whatever they say are the Mattel trade secrets, establishing that,

18    and asking questions about it.

19          **THE COURT:**  No.  Because then you have an authenticity

20    problem.  Your first objection if they did that would be that

21    there is no authenticity to it.

22          **MS. HURST:**  We're not going to have a problem if they

23    take something off -- we're able to verify that.  That's not an

24    issue.  If they take something off the disk that we have a copy

25    of, we can verify that.  But if they put in a disk, it's got, you

1    know, what they claim are 17,000 files on it.  Now we have got --

2    and just wave it around like it's a Mattel trade secret, that's a

3    big problem.

4              **THE COURT:**  Where is Carlos Aguirre?

5              **MS. HURST:**  He is a resident of Mexico and he has long

6    since not been an employee of MGA.

7              **THE COURT:**  Did he sign for this disk?

8              **MS. HURST:**  Yes.  And we authenticated that signature in

9    the 30(B)(6) testimony.

10             **THE COURT:**  Is Mr. Zeller correct, that this disk was

11   copied while he was -- or by the police while they were at the MGA

12   offices?

13             **MS. HURST:**  I think the honest answer is we don't know

14   how it was created.

15             **THE COURT:**  Did they go off the premises?

16             **MS. HURST:**  We don't know.  Everybody was sequestered in

17   a conference room.  If they handed it to somebody who walked out a

18   door, there's no way to know.

19             **THE COURT:**  I guess then I'm back to my original

20   concern.  Who controls this information?  Certainly a former

21   employee of MGA Mexico, you are uniquely the people who have got

22   this information, or had it, or should have it.

23             **MS. HURST:**  The Mexican police are uniquely the people

24   who have this information.

25             **THE COURT:**  Not if it's copied on the premises.

Page 75

1          **MR. ZELLER:**  It was.  Judge, she keeps on saying

2    everyone was sequestered so they couldn't possibly know.  In fact,

3    Carlos Aguirre, the manager, as well as Emilio Menotti, witnessed

4    the entire search.  So the idea that somehow MGA was blinded and

5    could not see what occurred is simply incorrect.  Ms. Kuemmerle

6    testified --

7          **THE COURT:**  I happen to know that has to be a fact,

8    because in Mexico you have to have two witnesses to a search.

9    Period.

10          **MR. ZELLER:**  Right.  And moreover, Ms. Kuemmerle

11   testified very clearly that MGA made the copies.  If MGA wants to

12   go down this road, here is what I would ask the Court to order:

13   Not only for both of those gentlemen to appear here to testify --

14   we'll start right there with the chain of custody -- but also to

15   tell and order MGA to bring here the computers that were used to

16   copy the materials.  Because that could be forensically examined.

17   We can find out to a certainty what computer was used in order to

18   make the copies, who made it, who logged in to do it and how it

19   was done.

20          So if they want to go down that forensic chain -- I

21   mean, there is a lot that can be done, but as the Court points

22   out, it's all in their possession.  And I think you are hearing

23   moving-target arguments by MGA.  It's very clear.  They're now --

24   as far as I can ascertain, they now appear to concede it's an

25   authenticity disk.  If they want to go and dispute as to whether

1   or not Mr. Machado was using the material or whatever, that's

2   obviously something --

3          **THE COURT:**  This is what I'm hearing, frankly, between

4   both of you:  And that is, MGA has it in their offices; it's

5   copied in their offices; it's signed over to a manager of their

6   office.  But that the dispute is we don't know how it was copied.

7   Everything else in the chain seems to be complete.  I think MGA

8   controls its own future on this, frankly.

9          Let me go back and think a little bit more about this.

10   Are there any other depositions you want me to look at once again?

11          **MR. ZELLER:**  We will submit the entire chain of what we

12   have, Your Honor.

13          **THE COURT:**  If there is going to be a prejudice, it will

14   be --

15          **MS. HURST:**  We would like to submit additional

16   depositions.

17          May I just inquire of Mr. Zeller, he keeps saying

18   Ms. Kuemmerle testified to a certain thing regarding the creation

19   of the CD.  May I inquire the page and line cite for that

20   proposition?

21          **THE COURT:**  You can talk about it.  Thank you very much.

22                  (Brief pause in proceedings.)

23

24          **THE COURT:**  This is the final ruling by the Court.

25   We're on the record.

1          Based upon the representation of counsel this evening

2     that the disk copied from the disk seized at MGA Mexico was given

3     to Carlos Aguirre, an MGA Mexico office manager who signed for the

4     copy that was then given to Susanna Kuemmerle and then passed to

5     O'Melveny & Meyers and then to Skadden Arps and then to Quinn

6     Emanuel, the Court is going to conditionally admit this disk

7     subject to further arguments after Susanna Kuemmerle and Gustavo

8     Machado testify.

9          The Court infers that the disk seized is limited to

10    materials that Mattel claims is trade secrets in the lawsuit and

11    infers that the disk contained Mr. Machado's materials.

12    Therefore, it's reasonable for the Court to admit this subject to

13    a motion to strike and allow the testimony of Mr. Larian

14    concerning this disk.

15         This Court's order was clear that Mr. Larian voluntarily

16    designated himself as a 30(B)(6) witness.  I was previously

17    concerned about a party also being a 30(B)(6) witness, and Mr.

18    Larian voluntarily chose to designate himself as such and have

19    expressed that to the parties before.  Though the Court issued an

20    order finding MGA Mexico's 30(B)(6) adequately prepared, I also

21    expressly found that MGA, the parent's 30(B)(6) was not.

22         Independent of a 30(B)(6) designation, there is reason

23    to question Mr. Larian since he spoke with minimally Machado and

24    Kuemmerle about the search and seizure of MGA Mexico's offices.

25         Upon the Court's earlier ruling that this information be

Page 78

1    disclosed by MGA, I want the record clear that Mattel objected

2    arguing that its trade secrets deserved protection.  Judge block

3    and Judge Larson entered a stipulated protective order allowing

4    the parties to designate materials as attorneys' eyes only.  This

5    Court repeatedly asked the parties to negotiate a lifting of the

6    protective order.  I've numerous times cited the tremendous

7    burdens on both parties, all witnesses and the Court staff caused

8    by under-seal filings and improper decisions.

9          Both parties strenuously resisted the Court's

10   invitation.  They have created this predicament themselves.  The

11   easiest way out is the truth, and the truth is that Larian was a

12   properly designated 30(B)(6) witness.  This Court's order was

13   readily understandable and clear.

14         To the extent MGA seeks to rely on advice of counsel to

15   explain Mr. Larian's inability to testify about certain subject

16   matter encompassed by topic 10, MGA is free to waive its

17   privilege.  If MGA and Larian show so choose to testify, they're

18   also free to bring forth the fact that Mattel continued to assert

19   that this was attorneys' eyes only because of their desire not to

20   allow the public to view what they perceived were trade secrets.

21         This Court finds that Mattel will be prejudiced

22   potentially by not being allowed to ask Mr. Larian about the

23   contents of this disk while he is on the witness stand.  If these

24   questions are delayed and Isaac Larian was called back to the

25   witness stand, there is a concern by this Court that it will

1    unduly highlight this portion of testimony and be detrimental to

2    MGA who might raise the issue of prejudice if he was called back.

3         The Court notes that it formerly believed that these

4    were different pieces of information taken out of MGA offices to

5    the Mexican police department's offices and combined on a disk.

6    This Court has previously been concerned that a synthesized disk

7    with extraneous information would unduly prejudice MGA.  Since it

8    is fairly clear from the representations of both counsel this

9    evening based on the depositional testimony, and since Susanna

10   Kuemmerle indicated that she was not going to testify initially

11   and it was represented that she was someplace in Brazil, and since

12   Machado has not yet appeared, the Court found itself in quite a

13   predicament.

14        I will also allow Mattel to question Ms. Kuemmerle

15   concerning the chain, counsel from O'Melveny, and counsel from

16   Skadden about the authenticity unless there is a stipulation read

17   to the jury about the facts that counsel agreed to about the chain

18   of custody.  The Court is also encouraging -- and Mr. Corey, you

19   are here.  This is a strong encouragement.  You may be 90 percent

20   or 99 percent here, but you're agreeing an arguable issue on

21   appeal that's unnecessary.

22        So I'm going to encourage, in fact, order Mattel to have

23   a police officer subpoenaed, or at least make the attempt to show

24   the Court that you have made that attempt.  Because the Court

25   believes a better record would be for Mexican law enforcement to

Page 80

1   complete the authentication.  But I don't it's necessarily a

2   prerequisite for the admission of the compact disk.

3               That's the final order of the Court.  Thank you,

4   Counsel.

5               Now, on the 17200 claim.  In denying Mattel's motion in

6   limine number seven, I expressly reserved the issue of the

7   admissibility of evidence solely relevant to MGA's equitable claim

8   in defenses.  I adopted Mattel's position that the conduct

9   relating to Mattel's market intelligence group was solely relevant

10  to the trade secret misappropriation counterclaim, which is a

11  legal claim, not an equitable claim.  The specific language used

12  by Mattel's 20th motion in limine which this Court agreed with was

13  MGA cannot relitigate its trade secret misappropriation claim

14  under the guise or guide of unjust enrichment and unfair

15  competition.

16              I next noted that some categories of evidence had

17  already been excluded in the context of other motions in limine.

18  For example, the litigate to death evidence and the litigation

19  misconduct.  Moreover, other categories of evidence relevant to

20  MGA's equitable claims and defenses were also relevant to the

21  legal claims.

22              First, evidence of moonlighting or evidence of other

23  Mattel employee contracts was extrinsic evidence relevant to the

24  interpretation of the inventions agreement.

25              Second, Mattel's dissemination of form letters to MGA

Page 81

1    about its former employees, Mattel's investigation of Brisbois and

2    Castilla, and Mattel's efforts to conduct video surveillance of

3    Ron Brawer were relevant to its trade secret misappropriation

4    counterclaim as this Court had already noted at the time of the

5    summary judgment.

6          Third, Mattel's delay in filing this lawsuit is relevant

7    to the statute of limitations issue as noted by the order on

8    Mattel's second motion in limine.  That leaves evidence like the

9    kill it or let it slide e-mail sent by Mattel CEO; Mattel's

10   efforts to tamper with retailer displays; Mattel's contact with

11   vendors, and Mattel's contract with trade groups like MPD, TIA and

12   CARU.

13         I'm inclined to think that the jury is entitled to hear

14   this evidence with respect to damages, since it paints a full

15   picture of how the market operates and how factors other than

16   simple doll design can impact sales.

17         Putting that aside, I'm tentatively inclined to seek an

18   advisory opinion from the jury on MGA's making equitable claims

19   and defenses anyway.  I have wide discretion to do so under

20   Federal Rule of Civil Procedure 39(c)(1).  Also, Allen versus

21   Tobacco Superstore Inc. at 475 F.3d 931, 941, Eighth circuit,

22   2007.

23         The last thing I want to do is excuse the jury after it

24   reaches a verdict and then go through yet another proceeding

25   involving this extra evidence.  It's uneconomical, and this will

Page 82

1   constitute notice under 39(c).

2           So what I'm going to leave you with to decide eventually

3   is whether you want the jury's advisory opinion to be binding

4   pursuant to Federal Rule of Civil Procedure 39(c)(2).  Now, that

5   leaves you the option.  I know that Mattel is in opposition to

6   that.  You don't have to participate.  I can draft my own 17200

7   instruction.  But if you do choose to participate in the

8   instruction process, I want the record to note that that in no way

9   waives your objection.  In other words, it's a participation after

10  the Court finds against you.

11          Let me hear from Mattel.

12          **MR. ZELLER:**  Yes, sir.  Just to finish up on the

13  argument from last night, in fact --

14          **THE COURT:**  We're done with that argument.  We're now in

15  the 17200 argument.  I'll come back to it in a moment.  You'll

16  have time later.  Not now.

17          **MR. ZELLER:**  So we're then talking about the

18  instructions?

19          **THE COURT:**  Well, you have noted your opposition.

20          **MR. ZELLER:**  Right.

21          **THE COURT:**  I declined to go with you on that.  And you

22  are welcome to participate or you are welcome to just hold that

23  that's error; that it's prejudicial.  That the 17200 claim allows

24  an additional vehicle over and above the trade secret

25  misappropriation, which I think stands on its own feet.  Or you

Page 83

1    can participate.  But your participation is not a waiver.

2         **MR. ZELLER:**  The reason I'm confused, Judge, is that

3    simply last night you said we would finish up on the argument of

4    whether it goes to the jury.  So I want to make sure we're beyond

5    that and now --

6         **THE COURT:**  I apologize.  I thought you were back on

7    claim number 10.

8         **MR. ZELLER:**  Where we ended up last night --

9         **THE COURT:**  No.  You don't understand.  If you're still

10   with me on the 17200 whether that should go to the jury or not,

11   I'm open to argument and you can finish up.  I thought you were

12   lopping back to either claim 10 or 11.  That's closed.

13        **MR. ZELLER:**  I'm not.

14        **THE COURT:**  My apologies, then.  Why don't you go

15   forward with your argument about whether it should be submitted to

16   the jury.  I think I heard you last night, but I'm certainly

17   willing to hear you again tonight.

18        **MR. ZELLER:**  You'll just recall we somewhat stopped in

19   the middle; is that Ms. Hurst made an argument.  I wanted to

20   respond at least to that part, as to this threshold issue of

21   whether it should go to the jury.

22        In some ways the Court's remarks somewhat emphasized to

23   me what our concern is.  The example that MGA gave was the Kohl's

24   example.  And here is what she said:  Basically it caused these

25   plummeting sales.  I mean, the fact is as a matter of law, that is

Page 84

1    improper recovery under 17200.  Lost profits, our profits, as a

2    matter of law are improper.  The jury will have to be instructed

3    that those cannot be recovered.

4              And what we're concerned about, and where we think the

5    unfair prejudice comes about is one of two things:  They're going

6    to either say well, gee, that's not fair.  So we're going to have

7    to make it up to MGA in some other way.  If they're going to hear

8    evidence about MGA saying, we lost $5 million -- I'm just picking

9    a number -- but they're going to make some multi-million dollar

10   claim on what they supposedly lost for Kohl's, which is not

11   legally relevant to the determination, they're going to say we

12   should be able to put it in because we have to show we lost money

13   or property, I don't think that would satisfy it either.  But

14   setting that aside, quantifying it is unnecessary.

15             Let them say they lost a sale.  But part of the

16   parameters here I think have to be -- because MGA is being very

17   explicit about it.  They want to go to the jury, say we lost X

18   millions of dollars on a claim they cannot recover monetary loss

19   of that kind on.

20             So that inevitably is going to either have the jury

21   think that's just terribly unfair.  How can that possibly be?

22   Maybe we don't understand what our real task is here and award the

23   money anyway.  Or number two, recognize that this is what the

24   instruction says and then make it up in some other way on the

25   legal claims, which is also improper.  So that's our fear and

Page 85

1    that's our concern.

2            And in some ways, too, when the Court talks about these

3    other kinds of issues like -- I don't know, I guess the Brawer

4    video being still part of some 17200 claim, it's hard to imagine

5    how, but if MGA is going to go to a jury and say they're entitled

6    to restitution on that kind of claim, I mean there is literally no

7    basis for it.

8            But all this sort of underscores our concern that this

9    is going to turn into this grab-bag of whatever random complaint

10   MGA has about Mattel.

11           **THE COURT:**  There are three ways advisory juries can be

12   used:  You don't use them; you use them including remedies; or you

13   use them simply a finding concerning of claim.

14           **MR. ZELLER:**  And I think that's a very important

15   distinction, of course.  I mean, from our perspective, one way

16   perhaps of dealing with our concerns about prejudice is that

17   whatever the restitution is supposed to be, they be told they're

18   just going to make a finding up or down, yes or no.  This

19   occurred, this didn't occur.  Because I'm sure the Court intended

20   to make it clear that these were allegations against Mattel, not

21   found facts.

22           And so an up-or-down determination would certainly, I

23   think, go a long way in eliminating the kind of prejudice that I'm

24   very, very concerned about.  Because they are going to have a

25   damages expert, so-called, get up there and say, gee, through the

1    Kohl's deal MGA lost $5 million in profit.  I'm ball parking

2    whatever that number is.  It's changed over time.  But they're

3    going to pick some multi-million-dollar number, they're going to

4    put it out in front of the jury, and it will be irrelevant.  The

5    number itself will be irrelevant as a matter of law.  And it

6    causes the risk of tremendous prejudice.

7            So I do think again the Court's point is well-taken,

8    that perhaps the real issue may be if this goes as an advisory

9    verdict, how does it go.  And certainly we would be more

10   comfortable with the idea of just up or down kind of vote on

11   liability as to particular categories of whatever this conduct is

12   that they're going to allege.

13           I also do think as part of this -- and I don't want to

14   necessarily sound like I'm trying to delay the jury instructions,

15   but one concern I do have about crafting 17200 jury instructions

16   as well is that I'm hard-pressed to understand the full scope of

17   17200 claims that MGA has made.  I mean, the Court is aware that

18   they filed 40-plus --

19           THE COURT:  They're hard-pressed on your trade secret

20   misappropriation claim.

21           MR. QUINN:  Right.  I mean, the trade secret

22   misappropriation claim.  But the original 2005 complaint, which is

23   what these allegations are based on runs more than 40 pages.  It

24   ranges from everything from the retail shelving issues to the

25   Court has recited some of these.  But it is a far ranging spectrum

Page 87

1  of activity.

2        So I mean, one problem in terms of trying to draft jury

3  instructions at this juncture is that some of this conduct, like

4  say, for example, the Kohl's conduct that there they're

5  complaining about, that is a different kind of claim.  I mean,

6  exclusivity is not illegal.  You can have these kind of deals.

7  The law recognizes that these kinds of deals are, in fact, and can

8  be legal.

9        So that's going to require particular instructions if

10  MGA is actually going to go down that road.  Right now their claim

11  is as amorphous and vague as well, you did a deal that's exclusive

12  with Kohl's; it froze us out; we lost money; unfair competition.

13  That is literally how this has been presented.  There is no

14  recognition at all.  Certainly one can scour their rogs, their

15  other discovery, their 30(B)(6), and it's never been provided as

16  to how it is that that could be, say, for example, sufficient to

17  threaten a violation of the antitrust laws.

18        They have added those kind of instructions in, by the

19  way, even though that kind of formulation of their claims has

20  never been articulated pretrial.  I mean, well, I should say

21  during discovery.  Whether it's in the pretrial conference order

22  may be a different issue.

23        My point is that we're facing what I think are -- I

24  don't think it's an unkind characterization, of these evolving,

25  changing claims.  They have not been very clear or precise.  They

Page 88

1    certainly have not been cabined in terms of what allegations we

2    are really going to be looking at on this.

3            I mean, I do think when we get to -- and perhaps this is

4    part of the prejudice I want to articulate, but also I do think

5    it's something that the Court can avoid if steps are taken.  But

6    I'm concerned we're going to be sitting here when their case

7    starts, and we're going to be hearing about some new allegation

8    every single day, and we're going to have to scramble to figure

9    out what this is, because there are so many of these that have

10   been thrown out over time.  And I think they ought to be required

11   at a minimum to disclose it.

12           But that's another concern that I have, in terms of

13   being in front of a jury, that we're going to be having Isaac

14   Larian up there and saying here are 40 things that they did to me.

15           **THE COURT:**  I somehow have heard this argument before

16   about the overbreadth.  It sounds familiar to me.

17           All right, counsel on behalf of MGA.

18           **MS. HURST:**  This is a -- I'm just going to focus on the

19   there is no restitutionary relief available on this claim piece,

20   because that's both a rehash of an argument the Court rejected at

21   the summary judgment stage and premature argument of the

22   restitution definition instruction that we're about to engage in.

23           The Court ruled that these preexisting business

24   relationships qualify as property, money or property in the

25   context of this restitutionary statute.  That was correct.  We

Page 89

1    drafted our instructions in accordance with that holding in the

2    summary judgment order.  We just went right to what we thought the

3    Court said.  That's correct.  All the rest of this the jury can

4    decide.

5            It's unfair, unlawful, fraudulent business acts and

6    practices.  There is no pro-competitive justification for an

7    exclusive relationship with a retailer.  If we're going to argue

8    antitrust law, I'll do it.  There is no justification for that.

9    And you know what?  They produced that Kohl's e-mail in or about

10   September.  It was either moments before or moments after the

11   close of discovery.  If they're complaining that that was a new

12   allegation, they have no one but themselves to blame.

13           In fact, just last night or the night before, they

14   produced the contract with Kohl's in which they apparently agreed

15   to pay them millions of dollars to keep us off the shelf.

16           So they have got no one to blame but themselves if they

17   think that is a late injected allegation.

18           As for the rest of it, are you kidding me?  They had

19   year of discovery on interference with licensing, monkeying with

20   products on the shelves, CARU.  All those people up deposed years

21   ago.  I don't want to get into -- go anywhere further on that.

22           The issue of restitution was addressed by the Court in

23   the summary judgment order.  It will be addressed in instructions.

24   The whole claim should be submitted.  I'm done.  Thank you.

25           **THE COURT:**  Let me share a piece of information.  I

Page 90

1    think I'll leave the instructions open.  I think I'm fairly far

2    down the line in terms of the decision, but I'm going to wait to

3    finalize the instructions on the 17200 until I see more

4    information.  I just think it would be wiser.  I'm going to take

5    you up on your offer.  Also the remedies.

6              Judge Smith e-mailed this afternoon.  You must be aware

7    of it.  There is a report from the technical adviser who is, of

8    course, Diane.  And I'll simply read it into the record.

9              Have you received it yet from, Judge Smith?

10    **MS. HURST:**  Yes.

11    **MR. ZELLER:**  Yes.

12    **THE COURT:**  Then you're aware of it.  I don't need to

13    read it to you.  I got that about 3:00 o'clock this afternoon as a

14    preliminary.  He said he would put that out unless I had a

15    disagreement.

16              Then intentional interference.  Counsel?

17    **MS. HURST:**  May I inquire, are we doing contract

18    interpretation as part of this tonight, like the --

19    **THE COURT:**  You know something?  Let's wait.  I'll tell

20    you why.  Let's get you home tonight.  Larian is still one of the

21    most, if not the most important witness, besides Eckert, et

22    cetera.  Whatever we're doing tonight for the 45 minutes to three

23    hours doesn't matter.  Not tonight.  Go home and rest.  Okay.  We

24    can worry about that tomorrow night, we can worry about that

25    Saturday.

Page 91

1          Good night.  See you tomorrow.

2               (Whereupon the proceedings were adjourned at 7:37

3      p.m..)

4

5                              -oOo-

6

7                          CERTIFICATE

8

9          I hereby certify that pursuant to Section 753, Title 28,

10     United States Code, the foregoing is a true and correct transcript

11     of the stenographically reported proceedings held in the

12     above-entitled matter.

13

14     Date:  FEBRUARY 18, 2011

15

16     _____

17     MARIA DELLANEVE, U.S. COURT REPORTER
       CSR NO. 9132
18

19

20

21

22

23

24

25