1   ANNETTE L. HURST (State Bar No. 148738)
    ahurst@orrick.com
2   WARRINGTON S. PARKER III (State Bar No. 148003)
    wparker@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
4   405 Howard Street
    San Francisco, CA 94105
5   Tel: (415) 773-5700 / Fax: (415) 773-5759

6   WILLIAM A. MOLINSKI (State Bar No. 145186)
    wmolinski@orrick.com
7   ORRICK, HERRINGTON & SUTCLIFFE LLP
    777 South Figueroa Street, Suite 3200
8   Los Angeles, CA  90017
    Tel: (213) 629-2020 / Fax: (213) 612-2499
9
    THOMAS S. MCCONVILLE (State Bar No. 155905)
10  tmcconville@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
11  4 Park Plaza, Suite 1600
    Irvine, CA 92614-2258
12  Tel: (949) 567-6700 / Fax: (949) 567-6710

13  Attorneys for MGA Parties

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                  SOUTHERN DIVISION

17  CARTER BRYANT, an individual      | Case No. CV 04-9049 DOC (RNBx)
                                      | Consolidated with
        Plaintiff,                    | Case No. CV 04-9059
18                                    | Case No. CV 05-2727
        v.
19                                    | Hon. David O. Carter
    MATTEL, INC., a Delaware          | MGA PARTIES' SUPPLEMENTAL
20  corporation,                      | BRIEF IN SUPPORT OF MOTION *IN*
                                      | *LIMINE* NO. 30 TO EXCLUDE
21      Defendant.                    | REFERENCE TO AND USE OF
                                      | TESTIMONY PROFFERED BY
22                                    | MATTEL WITNESS MICHAEL J.
    AND CONSOLIDATED ACTIONS          | WAGNER
23
                                      | Hearing Date: February 26, 2011
24                                    | Time: 8:00 a.m.
                                      | Place: Courtroom 9D
25
26                                    | Trial Date: January 11, 2001
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ......................................................................................... 2

ARGUMENT ...................................................................................................... 3

I.  MR. WAGNER'S TESTIMONY REGARDING APPORTIONED DEFENDANT'S PROFITS FOR BRATZ SHOULD BE EXCLUDED ....... 3

    A.  Mr. Wagner's Industry "Benchmark" Approach Is Fundamentally Flawed And Misleading .............................................. 3

    B.  Mr. Wagner's Opinion Does Not Account For MGA's Contribution To Bratz ...................................................................... 11

    C.  Mr. Wagner Improperly Provides Damages Calculations Beyond the Court's Orders .................................................................. 17

II.  MR. WAGNER'S REASONABLE ROYALTY CALCULATION MAKES NO SENSE ........................................................................... 18

III.  MR. WAGNER'S CASTILLA TRADE SECRETS CALCULATIONS INCLUDE DISMISSED TRADE SECRETS ............................................. 22

IV.  MR. WAGNER'S TESTIMONY SHOULD BE EXCLUDED UNDER FRE 403 ........................................................................................... 24

V.  MR. WAGNER IS NOT YET FINISHED WITH REVISING HIS OPINIONS OR CALCULATIONS ............................................................ 25

CONCLUSION ................................................................................................ 27

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*In re Agent Orange Prod. Liab. Litig.*,
611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987) .......... 25

*American Booksellers Ass'n, Inc.* v. *Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ............................................................ 16

*Avocent Huntsville Corp.* v. *ClearCube Technology, Inc.*,
2006 WL 2109503 (N.D. Ala. July 28, 2006) ................................................. 17

*Bowers* v. *National Collegiate Athletic Ass'n*,
564 F. Supp. 2d 322 (D.N.J. 2008) ................................................................. 23

*Cacique, Inc.* v. *Robert Reiser & Co., Inc.*,
169 F.3d 619 (9th Cir. 1999) ........................................................................... 18

*Concord Boat Corp.* v. *Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ......................................................................... 16

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......................................................................... 1, 2, 10

*Elcock* v. *Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ............................................................................. 11

*Eleven Line, Inc.* v. *North Texas State Soccer Association, Inc.*,
213 F.3d 198 (5th Cir. 2000) ........................................................................... 10

*General Elec. Co.* v. *Joiner*,
522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ........................... 16, 25

*Georgia-Pacific* v. *U.S. Plywood*,
318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*,
446 F.2d 295 (2d Cir. 1970) ...................................................................... 18, 20

*Hilderman* v. *Enea Teksci, Inc.*,
2010 WL 546140 (S.D. Cal. Feb. 10, 2010)..................................................... 11

*In re Hanford Nuclear Reservation Litig.*,
534 F.3d 986 (9th Cir. 1998) ........................................................................... 24

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994), *cert. denied*, 513 U.S.
1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995)............................................. 3

*KW Plastics* v. *United States Can Co.*,
131 F. Supp. 2d 1289 (M.D. Ala. 2001) .......................................................... 12

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999) ..................................................................................... 1, 2

- ii -

1

**TABLE OF AUTHORITIES**

(continued)

2

**Page**

3 *Lithuanian Commerce Corp.* v. *Sara Lee Hosiery*,
  179 F.R.D. 450 (D.N.J. 1998)............................................................25

4

5 *MTX Communications Corp.* v. *LDDS/WorldCom, Inc.*,
  132 F. Supp. 2d 289 (S.D.N.Y. 2001) ...........................................11

6 *MicroStrategy Inc.* v. *Business Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2006)........................................................11

7

8 *O2 Micro Int'l Ltd.* v. *Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064
  (N.D. Cal. 2005) ................................................................................22

9 *Pharmacenetics, Inc.* v. *Aventis Pharmaceuticals, Inc.*,
  2005 WL. 6000369 (E.D.N.C. May 4, 2005) .................................23

10

11 *Schiller & Schmidt, Inc.* v. *Nordisco Corp.*,
   969 F.2d 410 (7th Cir. 1992) .........................................11, 12, 14

12 *Schultz* v. *Butcher*,
   24 F.3d 626 (4th Cir. 1994) ..............................................................24

13

14 *The Flintkote Co.* v. *Lysfjord*,
   246 F.2d 368 (9th Cir. 1957) ............................................................10

15 *Tyger Construction Co., Inc.* v. *Pensacola Construction Co.*,
   29 F.3d 137 (4th Cir. 1994) ..............................................................11

16

17 *U.S. ex rel. Miller* v. *Bill Harbert Intern. Const., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010) .........................................................24

18 *U.S.* v. *319.88 Acres of Land*,
   498 F. Supp. 763 (D. Nev. 1980) ....................................................17

19

20 *Unisplay S.A.* v. *American Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995) ............................................................21

21

**STATE CASES**

22

*Ajaxo Inc. v. E*Trade Financial Corp.*,
  187 Cal. App. 4th 1295 (2010) ........................................................18

23

**FEDERAL STATUTES**

24

Fed. R. Evid. 104(a) ...........................................................................3

25

Fed. R. Evid. 403.................................................................................24

26

Fed. R. Evid. 702 ......................................................................1, 2, 10

27

28

- iii -

**TABLE OF AUTHORITIES**
(continued)

**Page**

**CALIFORNIA STATUTES**

Cal. Civ. Code §3426.3 (b) ..................................................................... 18

MGA's Supplemental Brief ISO MIL No. 30 to
exclude testimony of Michael J. Wagner
CV-04-9049 DOC (RNBx)

1

**INTRODUCTION**

Plaintiffs' damages expert Michael Wagner has now submitted 4 separate expert reports in an attempt to have this Court allow his testimony (a fifth was served at 10:09 p.m. on Sunday, February 20, 2011)[1] as to the damages allegedly owed to Mattel.  His first report, and subsequent Corrected Report, were the initial subjects of MGA's MIL #30.  Among other deficiencies, Mr. Wagner explicitly stated that he just disagreed with the Ninth Circuit's ruling that any award of damages in this case must take into account the value added by MGA to the Bratz brand and merchandise.[2]

Bowing to the inevitable, on December 24, 2010, Mr. Wagner submitted a Supplemental Expert Rebuttal Report that purports to attempt to apportion damages.  With his deposition relating to that report set for February 8, 2011, at 2:20 a.m. that morning, Mr. Wagner submitted yet another report (the "Second Supplemental Expert Report"), making further changes, including (for the first time) calculations relating to the first four Bratz dolls along with Ooh La La Cloe and Formal Funk Dana.  Mr. Wagner's new reports, however, do not cure the defects from the earlier iterations, and his testimony should be excluded on the grounds that his opinions are unreliable and do not meet the requirements of Fed. R. Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Indeed, Mr. Wagner's flawed methodology in his Supplemental Expert Rebuttal Report and Second Supplemental Expert Report makes his damages testimony unreliable and misleading to the jury.  The Court should not allow Mr.

---

[1] Mattel served a Third Supplemental Expert Report at 10:09 p.m. on Sunday, February 20, 2011.  This late submission, a month into trial and five days before the *Daubert* hearing to exclude Mr. Wagner, is highly prejudicial to MGA.  MGA has not had time to analyze in detail Mr. Wagner's latest report.  However, at first glance, the Third Supplemental Expert Report does not cure any of the underlying methodological problems that make Mr. Wagner's opinions and calculations excludable under *Daubert* and/or FRE 702.

[2] Declaration of Cynthia Lock ("Lock Decl."), Ex. 1 at 471:12-18, 474:4-9, 478:24-479:5, 484:12-485:22, 604:16-605:7, 621:2-11.

1  Wagner to testify as to his estimate of apportioned defendant's profits (unjust

2  enrichment) related to Bratz, reasonable royalty calculations related to Bratz (both

3  trade secret misappropriation and copyright infringement damages), unjust

4  enrichment related to the Castilla trade secrets, nor a reasonable royalty related to

5  the Castilla trade secrets.

6  First, Mr. Wagner's unjust enrichment calculation is marred by an utter

7  failure to apportion damages based on MGA's contribution to Bratz.  Rather, Mr.

8  Wagner constructs a wholly meaningless calculation by comparing the EBIT of

9  other toy companies, with the "incremental profit" of the Bratz product line.  This

10  misdirection is simply another way of ignoring the Ninth Circuit's direction to the

11  Court.  Moreover, Mr. Wagner continues to attempt to offer damages calculations

12  based on all Bratz merchandise, rather than confining his opinions to the first

13  generation of dolls and Ooh La La Cloe and Formal Funk Dana.

14  Second, even assuming a *Georgia-Pacific* hypothetical royalty were

15  available in this case, Mr. Wagner applies a reasonable royalty percentage that

16  improperly assumes a hypothetical negotiation between competitors with the

17  benefit of 20/20 hindsight, rather than applying a reasonable royalty to the potential

18  licensing of an unknown, untested product, such as the Bratz dolls.

19  Third, Mr. Wagner improperly proffers an opinion on damages based on

20  items allegedly taken by Castilla that are now out of this case.

21  ## LEGAL STANDARD

22  Fed. R. Evid. 702 governs the admissibility of expert testimony.  Under Rule

23  702: 1) the proffered testimony must be based upon sufficient facts or data; 2) the

24  testimony must be the product of reliable principles and methods; and 3) the

25  witness must apply the principles and methods reliably to the facts of the case.

26  Rule 702 is read in conjunction with the Supreme Court's decisions in *Daubert* and

27  *Kumho Tire Co.*  Under *Daubert* and *Kumho Tire*, the Court serves as the

28  gatekeeper for expert testimony and must determine if an expert's methodology is

reliable, whether the methodology was applied reliably to the facts and whether the expert's testimony will be relevant and helpful to the trier of fact.

As the proponent of the expert testimony here, Mattel has the burden under Fed. R. Evid. 104(a) of proving by a preponderance of the evidence that Mr. Wagner's opinions are reliable. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995). As set forth in its initial briefing and below, Mattel cannot meet this burden; therefore; Mr. Wagner's testimony and report must be excluded.

## ARGUMENT

### I. MR. WAGNER'S TESTIMONY REGARDING APPORTIONED DEFENDANT'S PROFITS FOR BRATZ SHOULD BE EXCLUDED.

Both the Ninth Circuit and this Court have held that any damages analysis relating to Bratz must include a discussion of the value or "sweat equity" added by MGA to Bratz. Mr. Wagner does not purport to attempt to supply the Court or the fact-finder with such an analysis.

Instead, Mr. Wagner sets up a straw man by asking and (purportedly) answering a different (and irrelevant) question: What profit would MGA be expected to earn based on the average rate of return for comparator companies? Lock Decl. Ex. 1 at 1032:8-1033:4.

#### A. Mr. Wagner's Industry "Benchmark" Approach Is Fundamentally Flawed And Misleading

To answer his own (irrelevant) question, in his Supplemental Expert Rebuttal Report and in his Second Supplemental Expert Report, Lock Decl. Exs. 2 and 3, Mr. Wagner performs calculations allegedly to apportion defendant's profits both for trade secret misappropriation related to Bratz and for copyright infringement. According to Mr. Wagner, the purpose of his apportionment analysis is to isolate the portion of the profits that are attributable to the intellectual property at issue, as compared to the profits attributable to other contributors to profits, such as MGA's

1   internal infrastructure, physical production, its distribution network, its financial

2   resources necessary to produce dolls and make sales, and its creative contributions

3   in areas such as packaging, marketing, advertising, and later additions and

4   modifications to the dolls.  Lock Decl. Ex. 2 (Supplemental Expert Rebuttal

5   Report) ¶5; *id.* Ex. 1 at 886:13-20, 889:25-891:13.

6   Mr. Wagner's apportionment calculation begins with profits.  He first

7   calculates an estimate of Bratz's "incremental profits."[3] Dkt. # 9478 Ex. 71

8   (Corrected Expert Report) ¶¶21-27.  He then "apportions" these purported

9   incremental profits by comparing the profit margin of MGA's Bratz business

10  (profit as a percentage of sales) with the profit margin of other businesses based on

11  publicly available EBIT (the "Benchmark Businesses").[4]  Finally, he takes the

12  resulting figure and attributes <u>all</u> of the difference solely to the purported

13  intellectual property at issue (the claimed Bratz trade secrets and the Bratz

14  copyrights). Lock Decl., Ex. 1 at 889:25-891:13.  In summary, he constructs the

15  following equation:

16

17

18  _____
    [3] "Incremental profits" is a subjective calculation of profit that is created by 1)
19  beginning with sales/revenue, and then 2) deducting from revenue only those costs
    that are "variable" (also called "incremental"), as described in Mr. Wagner's book,
    *Litigation Services Handbook*:

20      "Total Cost = Fixed Cost + (Variable Cost x Number of Units)

21      Fixed costs do not vary with different levels of production or activity,
22      although they may vary for other reasons.  Variable costs change with each
        additional unit of production."
23      *Litigation Services Handbook*, Third Edition, Chapter 7.4.

24  By only deducting from revenue the incremental costs, and not all of the costs
    incurred in running a business, incremental profits do not show the profit of a
25  business as a whole, by virtue of the failure to account for all of the costs necessary
    to run a business.  By comparison, because EBIT is a calculation that does not filter
26  out fixed costs, but instead includes all costs, it provides a more accurate measure
    of the bottom line profit of a business.

27  [4] "EBIT" is an acronym for "Earnings Before Interest and Taxes."  It represents a
28  company's net revenue less <u>all</u> expenses other than interest or taxes.

A: *Bratz Profit Margin*

– *B: Benchmark/Normal Profit Margin*
*C: Profit Margin Above Benchmark (Attributed Solely to Trade Secrets/Copyrights)*

There are significant problems in Mr. Wagner's methodology.[5]  First, Mr. Wagner claims to have compared apples to apples, using the *same* profit measure both for Bratz and the Benchmark Businesses' EBIT—but this is plainly incorrect. Lock Decl. Ex. 2 (Supplemental Expert Rebuttal Report) ¶7.  According to Mr. Wagner, the Bratz Profitability Above Industry/Benchmark Returns is the value of the purported intellectual property in question (*i.e.*, the claimed trade secrets or the copyrights), which he concludes is the amount of defendant's profits owed to Mattel.  Lock Decl. Ex. 1 at 889:25-891:13.  Figure 5 of Mr. Wagner's Second Supplemental Expert Report illustrates his calculations:

| | BENCHMARKS | | | | |
| --- | --- | --- | --- | --- | --- |
| | Mattel, Hasbro, JAKKS | Mattel | Hasbro, JAAKS | "Pure Toy" Industry | MGA Non-Bratz |
| Bratz Profit before Taxes | $792,413,513 | $792,413,513 | $792,413,513 | $792,413,513 | $792,413,513 |
| Less: Benchmark Returns | $365,480,861 | $427,199,081 | $334,693,780 | $195,403,510 | $96,970,112 |
| *Benchmark Returns as % of Bratz* | *46.1%* | *53.9%* | *42.2%* | *24.7%* | *12.2%* |
| **Bratz Profitability Above Benchmark Returns** | $426,932,652 | $365,214,433 | $457,719,733 | $597,010,003 | $695,443,401 |
| *Bratz Excess Profitability %* | *53.9%* | *46.1%* | *57.8%* | *75.3%* | *87.8%* |
| **2/3 Apportionment to Bratz Drawings, Concepts, Sculpt, and Hero Shot Trade Secrets** | $284,621,768 | $243,476,288 | $305,146,489 | $398,006,669 | $463,628,934 |
| **1/3 Apportionment to Bratz Name Trade Secret** | $142,310,884 | $121,738,144 | $152,573,244 | $199,003,334 | $231,814,467 |

Put another way, according to Mr. Wagner, MGA's contribution to Bratz is no greater than what MGA could have earned as an average rate of return of certain

---

[5] Mr. Wagner performs a number of alternative variations on this general approach, comparing the profit margin that he calculates for Bratz with the profit margin of "Pure" Toy Companies (*i.e.*, those that sell only toys, including Mattel, Hasbro, and JAKKS).  In another scenario using this same general approach, Mr. Wagner compares the profit margin on MGA's Bratz business with its profit margin on its non-Bratz business.

MGA's Supplemental Brief ISO MIL No. 30 to exclude testimony of Michael J. Wagner
CV-04-9049 DOC (RNBx)

1    other toy businesses.  *Id.*[6]

2         While Mr. Wagner states in his Supplemental Expert Rebuttal Report that he

3    compares Bratz EBIT to the Benchmark EBIT to reach this conclusion, that is *not*

4    what he does.  He instead compares EBIT of the Benchmark "Pure" Toy

5    Companies calculated from publicly available sources with the Bratz *incremental*

6    *profits* (a figure that Mr. Wagner subjectively calculates and which is

7    systematically higher than EBIT because it excludes fixed costs while EBIT

8    includes them).[7]  As Mr. Wagner conceded at his deposition, he is not comparing

9    apples to apples.  Lock Decl., Ex. 1 at 908:14-25, 917:16-918:21.

10        In his reports, Mr. Wagner states that he determined a Normal Industry

11   Return by comparing the EBIT margins of 17 Pure Toy Companies, including

12   Mattel, Hasbro and JAKKS, to those of MGA, Bratz, and non-Bratz EBIT margins.

13   Lock Decl. Ex. 2 (Supplemental Expert Rebuttal Report) ¶7.  Several of the

14   schedules showing his calculations refer to "Bratz EBIT."  *See*, *e.g.*, Lock Decl.,

15   Ex. 4, Tab B2, Schedules 1.0, 2.0, 3.0a, 3.0b, 4.0 and 5.0 from Supplemental

16   Expert Rebuttal Report; Ex. 5, Revised Tab B1, Schedules 1.0, 2.0, 3.0a, 3.0b, 4.0

17   and 5.0 from Second Supplemental Expert Report.

18        But Mr. Wagner admitted in deposition that he actually compared EBIT

19   margins of the "Pure" Toy Companies to the *incremental profits* of Bratz, not the

20   EBIT of Bratz.  Mr. Wagner testified:

21        Q.   So this number, we can get to the – to the quality of that
          figure separately.  But you're comparing this number, which, I think,
22        you refer to as incremental value?
          A.   I would say that those are the incremental profits generated
23        by Bratz product line to the MGA organization.
24        Q.   But it's not EBIT; it's incremental value, incremental
25

26   ───────────────
     [6] As the Court can see from the charts, Mr. Wagner also makes a further wholly
27   arbitrary "apportionment" of two-thirds to Bratz Drawings, Concepts, Sculpt and
     Hero Shots, and one-third to the Bratz name.
     [7] Of the many ridiculous aspects of Wagner's opinions, labeling Mattel as a
28   ""pure"" toy company is high on the list.

profits, but it's not EBIT as you describe it with respect to Mattel, JAKKS and Hasbro?

A.   Oh, I agree with that statement.

(Lock Decl., Ex. 1 at 908:14-25)

Q.   So at the end of the day, what you're calling the MGA Bratz product EBIT is $792 million?

A.   You are correct.

Q.   Which is the net revenues that doesn't back out attorneys' fees and other items of costs.  It's your increment – it's still your incremental revenue -- sorry -- your incremental profit number.  What you're calling the Bratz EBIT number for these calculations is your incremental profit number, correct?

A.   You are correct.

Q.   So, once again, coming back to it, your incremental profit number or your Bratz EBIT number, whatever you want to say, is not – you're not looking at the same thing as you are looking at when you're looking at the EBIT number for Mattel and JAKKS and Hasbro, correct?

A.   They are different calculations, but they're both trying to measure the profits generated from the business.

Q.   But they're not the same thing.  You've got an EBIT for the publicly-traded companies that cleans out every bit of expense that they incur before interest and taxes, correct?

A.   That is correct.

(Lock Decl., Ex. 1 at 917:16-918:21)

Wagner thus conceded that what he refers to in his report as EBIT for Bratz is not really EBIT, but rather incremental profit, which does *not* include all of the same costs as EBIT – either MGA's EBIT or that which he used for any of the 17 "Pure" Toy Companies.

Rather than breaking out all expenses, or even a percentage of expenses commensurate with the percentage of MGA income related to Bratz in performing this "incremental profit" analysis, Mr. Wagner looked first to MGA's internal financial records and determined which cost line items (*e.g.,* Ad Media Expense)

were tracked in a way that Mr. Wagner felt was adequate to include the costs specifically relating to Bratz, as compared to the rest of the business.

> "From these same reports, MGA reported the direct costs of producing and selling those products.  And the extent that MGA was able to capture those direct costs in their financial reporting system, I subtracted those costs from the revenues that I had calculated.  Then there are certain common costs that MGA incurs that benefits both Bratz and other product lines, and I generally used statistical regression to estimate the incremental costs of the Bratz product line.  But because this product line was such a large percentage of MGA's business, I believe that understated the incremental costs.  And so I made various adjustments to that to reflect that."

(Lock Decl. Ex. 1 at 906:18-907:10)

By using the regression technique, not all costs associated with the Bratz business are included, but rather only those that increase with an increase in unit sales of Bratz.[8]  The regression functions by estimating which costs change when Bratz sales volumes increase – these are estimated to be "variable" costs.  Any cost that does not change (a "fixed" cost) is not included as an incremental cost – even if this cost relates to Bratz.  In other words, if the cost for a subscription to a sales data tracking source does not change over time when sales volumes change, it is not a "variable" cost, and is not included in the Incremental Profit calculation.

The obviously manipulated effect of this analysis is to transfer most – and in some cases all – of MGA fixed expenses to MGA's Non-Bratz businesses.

The most striking example of this is found in the legal expenses line item.  Out of the actual legal expenses of $148,233,058, Mr. Wagner allocates $0 to Bratz, with 100% of this line item charged to MGA's Non-Bratz business.  *Compare* Lock Decl. Ex. 6 (Corrected Expert Report) Tab B1, Schedule 1.1 and Ex. 8 (Corrected Expert Report) Tab B1, Schedule 4.2.  While there may be some

---

[8] Mr. Wagner's calculations and costs are set forth in Tab B1, Schedule 1.1 (Lock Decl., Ex. 6) and Tab B1, Schedules 5.1 - 5.15 (Lock Decl., Ex. 7) of his Corrected Expert Report.

dispute as to whether or not it is appropriate to allow MGA to deduct legal expenses related to this litigation as a cost attributable to Bratz, it is not appropriate to saddle the rest of MGA with 100% of the $148 million in legal expenses and then to compare the profitability of the Bratz business with the EBIT of other businesses that factor in those very legal expenses regardless of the reasons they were incurred.[9]

The effect of Mr. Wagner's improper allocation of costs makes Bratz appear to be more profitable than it was and non-Bratz less profitable than it was.  This in turn skews all of Mr. Wagner's "apportionment" calculations.  While it is true that MGA's Bratz was successful, Mr. Wagner measurement of his improper calculation of Bratz incremental profits against "Normal Industry Returns" makes it appear that Bratz performed at a disproportionately higher level than "normal."

Moreover, Mr. Wagner's calculations also do not adjust for certain one-time events that impact the profitability of the industry average benchmark, such as a recall of products by JAKKS in 2009 resulting in EBIT margin of -56.82% or Smart Union Group Holdings Limited EBIT margin of -2258.66% in 2008.  Lock Decl. Ex. 1 at 895:1-16; Ex. 4 (Supplemental Expert Rebuttal Report), Tab B2, Schedule 1.2.

Indeed, as a further test, Mr. Wagner's analysis is inconsistent with the fact that Bratz accounted for 67% of the revenue of MGA over the 2001-2009 time period.  *See* Lock Decl., Ex. 3 (Second Supplemental Expert Report) at p. 19.  In fact, by mixing the EBIT and incremental profit analyses, Mr. Wagner concludes that Bratz made MGA incremental pretax profits of $792 million from 2000 to 2010 (2010 estimated), which given MGA's total company EBIT of $386 million,[10] means that MGA's non-Bratz business lost $407 million.

---

[9] This same analysis is applicable to every cost item in which Mr. Wagner does not use a direct cost.

[10] Lock Decl., Ex. 4 (Supplemental Expert Rebuttal Report), Tab B2, Schedule 1.3.

Accordingly, Mr. Wagner's use of a purported industry benchmark as a measure of determining the value attributable to the "intellectual property" at issue fails to pass muster under Rule 702 and *Daubert*. Mr. Wagner admits that his methodology is not peer reviewed (Lock Decl. Ex. 1 at 1033:5-8),[11] and he cannot cite any intellectual property case (other than this matter) where his methodology of comparing EBIT with incremental profits to determine the value of intellectual property in a calculation of defendant's profits. *Id.* at 1033:12-23. This alone calls into question the validity of his analysis.

But, as shown, his apples-to-oranges comparison is not helpful to the jury and, if anything, will confuse the jury by attempting to place large numbers in front of the jury that have no meaning. In similar lost profits cases, courts require that the damages expert compare comparable companies and take into account other factors that may affect the profitability of the companies. Where the damages expert fails to do this, courts uniformly reject the analysis. As one court reasoned, "To apply those arenas' average "rates of return" indiscriminately to [PBSC] is like arguing that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average." *Eleven Line, Inc. v. North Texas State Soccer Association, Inc.*, 213 F.3d 198, 208-09 (5th Cir. 2000); *see also*, *The Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392-93 (9th Cir. 1957). By not taking into account other facts that may affect the profitability of MGA relative to the other toy companies, Mr. Wagner improperly measured Bratz against a rate of return that may or may not have been "normal."

Mr. Wagner's opinion is doubly unreliable. It is unreliable because it unfairly excludes fixed expenses associated with Bratz. It is unreliable because it unfairly includes such expenses for the "pure" companies and also ignores

---

[11] Mr. Wagner's testimony in his deposition that "No one does peer-review work of damage expert's work" is not only wrong, it is incredible. Lock Decl. Ex. 1 at 1033:8-9. He is himself the author of numerous articles on damages issues and is one of the original editors and authors of the *Litigation Services Handbook*, which is now in its Fourth Edition.

1   numerous significant economic events in those companies which skew their

2   purportedly "pure" rate of return.

3        This purported apportionment analysis is "lacking in sufficient indicia of

4   reliability to be put before the jury."  *MTX Communications Corp. v.*

5   *LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 293 (S.D.N.Y. 2001).  Further, as is

6   apparent from his use of the benchmark methodology, Mr. Wagner's assumptions

7   are unsupported and unsubstantiated.  This is precisely the type of testimony that

8   should not be permitted.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir.

9   2000) ("Permitting such a witness to offer an opinion unsupported by a sufficient

10  factual foundation would significantly increase the risk of misleading the jury and

11  confusing the issues, the very dangers against which Rule 403 defends."); *Tyger*

12  *Construction Co., Inc. v. Pensacola Construction Co.*, 29 F.3d 137, 144 (4th Cir.

13  1994) ("Although McCoy's methods are unusual, the greater danger is that the jury

14  may accept as fact not just the faulty assumptions on which he relied, but may also

15  accept the conclusions that are drawn through his use of these assumptions.").

16       **B.    Mr. Wagner's Opinion Does Not Account For MGA's**
              **Contribution To Bratz**

17

18       Second, and as noted above, Mr. Wagner fails to account for MGA's actual

19  contribution to Bratz and, instead, attributes to Bryant's drawings *all* of the profits

20  that would be derived from the sale of Bratz.  This failure to separate lawful from

21  allegedly unlawful conduct has been roundly rejected.  *See MicroStrategy Inc. v.*

22  *Business Objects, S.A.*, 429 F.3d 1344, 1353-56 (Fed. Cir. 2006) (expert failed to

23  consider significant factors that might have contributed to the losses); *Schiller &*

24  *Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992) ("The expert

25  should have tried to separate the damages that resulted from the lawful entry of a

26  powerful competitor [the defendant] from the damages that resulted from particular

27  forms of misconduct allegedly committed by that competitor, of which the theft of

28  the mailing list, however morally reprehensible, was the slightest."); *Hilderman v.*

MGA's Supplemental Brief ISO MIL No. 30 to
exclude testimony of Michael J. Wagner
CV-04-9049 DOC (RNBx)

1   *Enea Teksci, Inc.*, 2010 WL 546140, at *2 (S.D. Cal. Feb. 10, 2010) (no basis for

2   concluding that the entirety of defendant's profits is attributable to the value of the

3   misappropriated trade secrets); *KW Plastics v. United States Can Co.*, 131 F. Supp.

4   2d 1289, 1294-95 (M.D. Ala. 2001) (unjust enrichment in trade secrets case

5   excluded where expert assumed that "each and every penny that KW gained

6   constitutes unjust enrichment.").

7          Mr. Wagner's analysis suffers from similar issues discussed in *Schiller &*

8   *Schmidt, Inc.*, 969 F.2d 410.  In that case, there was no dispute that the claimed

9   trade secret – a mailing list – was misappropriated.  The plaintiff's damages expert

10  calculated damages by subtracting the plaintiff's catalog sales revenues between

11  the date that the defendant entered the market (1983) and the date of trial (1991)

12  from the revenues that the plaintiff would have enjoyed had its sales remained at

13  the 1983 level.  *Schiller & Schmidt, Inc.*, 969 F.2d at 415.  The expert ascribed the

14  entire difference of $1.1 million to the defendant's misconduct and none to the

15  defendant's lawful competition.  *Id.*  The expert also did not take into account the

16  fact that 95% of the names on the mailing list came from lists that could have been

17  purchased and that later the defendant did purchase.  *Id.*  The district court limited

18  the award of damages to the first year of the defendant's operation and attributed

19  only one-third of the loss to the theft of the mailing list.  *Id.*

20         Judge Posner observed that the district court's award was "generous; zero

21  would have been a better guess (but [the defendant] has not cross-appealed."  *Id.*

22  In affirming the district court's damages award, the Court focused on the fact that

23  the harm to the plaintiff emanated from lawful competition, not the

24  misappropriation of the mailing list, as well as the plaintiff's poor response to the

25  competition by hiring a colorblind catalog designer.  *Id.*  The Court noted, "The

26  theft of the mailing list may have given [the defendant] a bit of a headstart."  *Id.*

27  However, the evidence before the district court demonstrated that most of the initial

28  sales were based on lawful competition, not the mailing list.  *Id.*

The Court went on to criticize the damages expert's analysis:

> "For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. [citations omitted]   *Post hoc ergo propter hoc* will not do; nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge. The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor-[the defendant]-from the damages that resulted from particular forms of misconduct allegedly committed by that competitor, of which the theft of the mailing list, however morally reprehensible, was the slightest. No such effort was made.

*Id.* at 415-16.

Mr. Wagner's analysis suffers from similar problems as the analysis in *Schiller & Schmidt, Inc.* The basis for Mr. Wagner's "benchmark" approach is his belief that MGA is not entitled to any credit for its efforts beyond a "Normal Industry Return." Lock Decl. Ex. 2 (Supplemental Expert Rebuttal Report) at ¶4. In other words, Mr. Wagner assumes that all of the difference is attributable to the claimed "intellectual property." Mr. Wagner believes that it is sufficient for him to include MGA's contribution within his calculation of what MGA should have earned without the purported "intellectual property" at issue.

> Q.   When you're using the term "apportionment" – let's talk about the first six dolls.
>      This comparison using the benchmark returns of these various toy companies, that is the only way you are evaluating the amount of value MGA added to the success of the product, correct?
> A.   Correct.
> Q.   You were not attempting on sort of a product by -- sort of SKU-by-SKU basis to determine the amount of value that Mattel -- strike that -- that MGA added to each of these products other than by this benchmark comparison?
> A.   That is correct.

1  (Lock Decl. Ex. 1 at 936:12-937:2; *see also* Lock Decl. Ex. 1 at 1030:22-1033:4)

2  Mr. Wagner's assumption that MGA's successful performance must be

3  attributable to the purported "intellectual property" is without foundation.  Other

4  than pointing to the fact that MGA had higher incremental profits on Bratz than the

5  average or median EBIT earned by publicly traded Pure Toy Companies, Mr.

6  Wagner cites no evidence that MGA's higher incremental profits were the result of

7  the allegedly misappropriated trade secrets or infringed copyrights.  As observed in

8  *Schiller & Schmidt, Inc.*, this "*post hoc ergo propter hoc*" type opinion should be

9  rejected by this Court.  *Schiller & Schmidt, Inc.*, 969 F.2d at 415.

10  Mr. Wagner's approach ignores the reality that whatever MGA did was more

11  than just normal, and there were many things that MGA did that caused it to

12  perform better than average or normal.  This is the very issue that the Ninth Circuit

13  addressed in its opinion and with which Mr. Wagner disagrees.  Lock Decl. Ex. 1 at

14  471:12-18, 478:24-479:5.  Mr. Wagner not only ignores the Ninth Circuit's

15  statements, but also significant evidence produced in this case, including his own

16  client's belief that something more than just the purported "intellectual property" at

17  issue contributed to the success of Bratz.

18  Importantly, Mr. Wagner's analysis ignores that Mattel's trade secret

19  submission to this Court (Dkt. ###9800, 9801, 9803, 9829) reads on Mattel's Diva

20  Starz product released in October 2000.  In these submissions, Mattel defines its

21  trade secret as:

22
23  "A multi-ethnic group of hip, urban, edgy, trendy teen age girls fashion dolls and accessories, including designs for large,

24  oversized heads and feet, large eyes, large lips, small, almost non-existent noses, and small bodies. The dolls are four high school,

25  multi-ethnic friends with attitude; each have distinctive names, nick names, fashions, personalities, back stories and icons

26  descriptive of the doll's personal mascot."

27

28  This description fits Diva Starz, a product that Mattel released a month after

- 14 -

1  Bryant allegedly revealed the Bratz drawings to MGA.  Mattel's own description of

2  its purported Bratz trade secret demonstrates that, at most and at best, Mattel would

3  be entitled to one month of damages based on a slight headstart, similar to the

4  possible headstart noted by Judge Posner in *Schiller & Schmidt, Inc.* in connection

5  with the misappropriated mailing list.

6          As further evidence of his utter disdain for any meaningful apportionment

7  analysis, Mr. Wagner has even included figures in his analysis that he admits are

8  not developed by any scientific method, but are instead simply unfounded numbers

9  that counsel asked him to include in a schedule.  In his Figure 6 of his Second

10  Supplemental Expert Report, Mr. Wagner starts with his calculation of Bratz

11  profits ($792 million) and, rather than applying the apportionment percentages he

12  developed, he applies percentages he admits to be arbitrary as a measure of MGA's

13  contribution to Bratz.  For example, if MGA is determined to contribute 10% to the

14  success of Bratz, then the remaining 90% ($713 million) would, by deduction, be

15  attributable to the intellectual property at issue.

16

17

| Bratz Profits | $792,413,513 |
|---|---|
| MGA Apportionment % | Mattel Amount |
| 10% | $713,172,162 |
| 20% | $633,930,810 |
| 30% | $554,689,459 |
| 40% | $475,448,108 |
| 50% | $396,206,757 |
| 60% | $316,965,405 |
| 70% | $237,724,054 |

24

25  Q.   So then in Figure 6, again, using your 792 number, you then use --
    just give a varying apportionment, what is the purpose of – this really
26  seems arbitrary, just picking, you know, percentage numbers out of the
    sky and assigning them to the Bratz profit number.
27          Is that what you did?
28  A.   Yeah.  I did this because I was asked to do a table like this.

MGA's Supplemental Brief ISO MIL No. 30 to
exclude testimony of Michael J. Wagner
CV-04-9049 DOC (RNBx)

1
2
3
4
5
6
7

Q.   Do you believe there's any kind of – there's any kind of scientific methodology to this, in terms of determining what kind of value MGA added to each SKU item?
A.   No.  There's no science to this.  What this is is -- I believe -- although you'd have to ask others -- that this possibly may be presented at trial that, after the jury has heard all the evidence in the case, if they, in their judgment, make a different determination than either I or Mr. Malackowski give them, they have already laid out to them in simple deciles a way to come up with a number of what they may want to award in the way of damages.

8
9

(Lock Decl., Ex. 1 at 946:15-947:12)

10
11
12
13
14

This too is a classic example of an expert opinion "which is connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).  In short, "there is simply too great an analytical gap between the data and the opinion proffered" and the opinion must be excluded.  *Id.*

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mr. Wagner makes several assumptions that are belied by the actual evidence.  These assumptions make any conclusions made by Mr. Wagner highly speculative and unreliable.  The speculative nature of Mr. Wagner's opinion, which is based on assumptions known not to be true, cannot be said to "assist the trier of fact" as required by Rule 702.  As such, Mr. Wagner's opinion should be excluded as unreliable.  Because Mr. Wagner has failed to take into account actual evidence, his opinion should be excluded.  *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000) (expert's "opinion should not have been admitted because it did not incorporate all aspects of the economic reality of the stern drive engine market and because it did not separate lawful from unlawful conduct."); *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal. 2001) (expert's model contained "entirely too many assumptions and simplifications that are not supported by real-world evidence" rendering the opinion "too speculative to support a jury verdict.").

C.      **Mr. Wagner Improperly Provides Damages Calculations Beyond the Court's Orders**

Both the Ninth Circuit and this Court have made clear that the relevant damages analysis relates to (a) the first generation of Bratz dolls plus Ooh La La Cloe and Formal Funk Dana (b) apportioned to take into account the value added by MGA.  Yet, Mr. Wagner proposes to present to the jury a damages analysis based on <u>all</u> of MGA's profit from Bratz relating to <u>every</u> item ever sold relating to Bratz.  Mr. Wagner's (and Mattel's) refusal to comport with the Ninth Circuit and this Court's orders are further reason to ban his testimony.

Indeed, only in his most recent Second Supplemental Report did Mr. Wagner provide a calculation for the first generation of dolls plus Ooh La La Cloe and Formal Funk Dana.  The Court can see why, as even using Mr. Wagner's flawed Benchmark methodology, the unjust enrichment damages for those 6 dolls (counting every single penny of profit and without apportionment) range only between $21.6 million $31.2 million -- a far cry from the hundreds of millions of dollars in damages Mattel would like Mr. Wagner to present using all of MGA's Bratz revenue.  Lock Decl., Ex. 3 (Second Supplemental Report), Figures 1 and 2.

As Mr. Wagner and Mattel insists on presenting legally untenable damage calculations to the jury, his testimony in wholly unreliable and must be stricken under *Daubert*.  *Avocent Huntsville Corp. v. ClearCube Technology, Inc.*, 2006 WL 2109503, *19-23 (N.D. Ala. July 28, 2006) (damages expert's opinion regarding reasonable royalty calculations excluded on grounds that it was based on an incorrect legal assumption); *see also*, *U.S. v. 319.88 Acres of Land*, 498 F. Supp. 763, 766 (D. Nev. 1980) ("Where opinion of an expert is based on erroneous assumptions of fact or law, the evidence is incompetent and insufficient to support a verdict.").

## II.   MR. WAGNER'S REASONABLE ROYALTY CALCULATION MAKES NO SENSE

Mr. Wagner's reasonable royalty calculations fare no better than his unjust enrichment calculation.  MGA has already demonstrated that a hypothetical negotiation under *Georgia-Pacific v. U.S. Plywood*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1970), is not a viable approach under Section 504 of the Copyright Act.  Dkt. #9759.  Additionally, reasonable royalty becomes relevant under CUTSA only if Mattel fails in its proof regarding damages and unjust enrichment.  Cal. Civ. Code §3426.3 (b); *Ajaxo Inc. v. E*Trade Financial Corp.*, 187 Cal. App. 4th 1295, 1299 (2010); *Cacique, Inc. v. Robert Reiser & Co., Inc.*, 169 F.3d 619, 620 (9th Cir. 1999) (holding that a trade secret plaintiff can recover a reasonable royalty only when both actual damages and unjust enrichment are unprovable).  Even if the Court finds that Mattel can offer the alternative reasonable royalty analysis under CUTSA, Mr. Wagner's analysis is fundamentally flawed and misleading, and should be excluded.

Mr. Wagner's reasonable royalty opinion critically relies on the presumption that the "Book of Wisdom" applies, the effect of which is to permit Mr. Wagner to use the benefit of hindsight in concluding that as of the time that Bratz was launched in 2000, Mattel and MGA would have agreed to a royalty far greater than is appropriate for the purported "intellectual property" that is actually at issue in this case.  As Mr. Wagner indicates, the so-called "Book of Wisdom" is a doctrine that finds its roots in patent case law.  Dkt. #9478, Ex. 71 (Corrected Expert Report) ¶¶155-159.  The so-called "Book of Wisdom" violates a basic tenet of the reasonable royalty construct: it is supposed to be a royalty to which the parties would have voluntarily agreed *as of the date of first infringement*.  Dkt. #9478, Ex. 71 (Corrected Expert Report), ¶147.

As of the date of MGA's first use of Bryant's drawings in the fall of 2000, the commercial success was unknown.  On October 3, 2000, MGA was prepared to

1  walk away from the deal with Bryant over a dispute whether to include licensing

2  revenue in the royalty base.  Ultimately, MGA agreed to pay Carter Bryant 3% of

3  net sales for *the products that he worked on*.  Mr. Wagner completely disregards

4  this agreement, even though it is obviously the most pertinent piece of evidence in

5  the case as to what a willing buyer and willing seller would have agreed for the

6  purchase of the Bryant's drawings.  Mr. Wagner also completely ignores Stephen

7  Linker's testimony that he was paid by Mattel for the idea to use the BRATS

8  product name for a fashion doll (which ultimately became Diva Starz) at no more

9  than $200, (1/26/11 Tr. at 56:18-22), as well as MGA's purchase of the Bratz

10  trademark from Lovin's in September 2002 for an upfront advance of $75,000 and

11  a license thereafter of 3% of net sales.  Mr. Wagner systematically ignores the most

12  pertinent facts occurring both before and after the date of first use of the purported

13  trade secret.

14        Rather, Mr. Wagner focuses on the time period when MGA enjoyed its peak

15  popularity and success.  To use hindsight in valuing the purported trade secrets as

16  of October 2000, including the magnitude of the unprecedented commercial

17  success of Bratz over the following years, is akin to valuing a lottery ticket that

18  would later become a winner at millions of dollars as of the time of purchase,

19  rather than the $1.00 price willing paid and accepted by the ticket's buyer and

20  seller.  In the instant case, it is even worse, as per Mr. Wagner's conclusion that

21  MGA would be willing to pay an 8% royalty for copyright, 15% for trade secrets

22  including the Bratz name, 10% for trade secrets excluding the Bratz name and 5%

23  to the Bratz name trade secret only.  This amounts to, in some scenarios, *more in a*

24  *license than the company as a whole made in net pretax profits*. *See* Lock Decl.,

25  Ex. 4 (Supplemental Rebuttal Report), Tab B2, Schedule 1.3, and Ex. 3 (Second

26  Supplemental Expert Report), Figure 11, shown below.

27

28

| Category | Royalties |
|---|---|
| Copyrights | $317,165,316[27] |
| Trade secrets (including Bratz name trade secret) | $594,684,968[28] |
| Trade secrets (excluding Bratz name trade secret) | $395,591,751[29] |
| Bratz name trade secret only | $199,093,217[30] |

Mr. Wagner's calculations ignore reality.  The actual pre-tax profits of MGA between 1999-2010 (2010 estimated) were $386 million,[12] excluding interest expense and the company's failed Smoby transaction.

For scenarios in which Mattel is to receive the 15% royalty proffered by Mr. Wagner (for example, when there is a finding of a misappropriation of a sculpt and the Bratz trade name and the royalty base is all Bratz revenue), the royalty due to Mattel is $595 million.  The absurd conclusion is that that MGA would willingly enter into a royalty agreement knowing that if it was to execute one of the most successful toy product launches in decades, as well as investing significant time, energy and money, its reward would be for MGA as a whole to *lose $209 million*. Even if MGA's management team was willing to enter into such an agreement, it would not have been able to obtain the financing necessary to run the company for the time in question as it not reasonable to expect a lender would be willing to finance such an operation.

Besides failing the blush test for common sense and reasonableness, Mr. Wagner's analysis is contrary to the *Georgia-Pacific* Factors 13 and 15 that he cites.  *See* Dkt. #9478 Ex. 71 (Corrected Expert Report) ¶¶284-294.  Under these factors, the reasonably royalty to be applied should leave the licensee with a "reasonable profit."  *Georgia-Pacific*, 318 F. Supp. at 1120.

Even under the patent laws, calculation of "'reasonable royalty' damages based upon a hypothetical negotiation between the patentee and the infringer when

---

[12] Lock Decl., Ex. 4 (Supplemental Rebuttal Report), Tab B2, Schedule 1.3.

- 20 -

1    the infringement began," does not mean that an expert may engage in rampant

2    speculation in providing an opinion as to the hypothetical negotiation.  *See*

3    *Unisplay S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).

4    There must be "some factual basis for a determination of a reasonable royalty.  Any

5    rate determined by the trier of fact must be supported by relevant evidence in the

6    record."  *Id.*

7        By defining a reasonable royalty to be as much as $595 million (75% of the

8    $792 million incremental profit Mr. Wagner calculates), he actually exceeds

9    MGA's EBIT ($386 million, which includes a deduction from sales of all of the

10   costs, not just the ones Mr. Wagner "calculates" with his regression technique).

11       It is of little consequence that the $595 million reasonable royalty figure is

12   greater than that for scenarios in which the royalty base is smaller (*e.g.*, revenue on

13   the first six dolls, rather than all Bratz revenue), because the same faulty

14   methodology is used.  In the case of the first six dolls, the result is that MGA would

15   still be expected to agree to a royalty rate that caused the company to lose money

16   as a whole for as long as those products sold, which conclusion is obviously

17   unreasonable.  Lock Decl., Ex. 3 (Second Supplemental Expert Report), Figure 8.

18       In applying his methodology, Mr. Wagner has offered an opinion that is not

19   only legally impermissible, but also at odds with the reality that MGA would have

20   to contribute much beyond the intellectual property to make Bratz a successful

21   product.  The Court should exclude Mr. Wagner's opinion on this basis alone.

22       Importantly, the Court should also consider that Mr. Wagner's own

23   calculations demonstrate that the use of the *Georgia-Pacific* factors in this case is

24   wholly inappropriate.  This case is not a patent case.  This is a case where Mattel

25   claims misappropriation of purported trade secrets involving dolls.  Mr. Wagner's

26   own book recognizes that the use of the *Georgia-Pacific* factors in a trade secret

27   case may be "useful <u>if</u> the case involves a technical trade secret or otherwise

28   resembles subject matter similar to that found in patents."  *Litigation Services*

1    *Handbook*, Fourth Edition, Chapter 20.7(d) (emphasis added).  Indeed, trade secret

2    cases that apply the *Georgia-Pacific* factors are those involving technical matters

3    or those where a patent infringement claim was also asserted.  *E.g.*, *O2 Micro Int'l*

4    *Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005).

5          Finally, Mr. Wagner concludes that the royalty rate for all of the non-Brand

6    trade secrets at issue (including all drawings, sculpts, Bratz Concept 2, and Hero

7    Shot) is 10% of net sales.  *See* Lock Decl., Ex. 3 (Second Supplemental Expert

8    Report), Figure 10.  However, on a finding that only one of these trade secrets (*e.g.*,

9    one drawing) has been misappropriated, the royalty rate remains the same: 10%.

10   This assumption/conclusion is both unreasonable and lacks any evidentiary

11   support.

12   **III.   MR. WAGNER'S CASTILLA TRADE SECRETS CALCULATIONS**
13   **       INCLUDE DISMISSED TRADE SECRETS**

14         The Court's December 22, 2010 Summary Judgment Order dismissed many

15   of the Castilla trade secrets for which Mr. Wagner calculated damages in his

16   Corrected Expert Report dated November 12, 2010.  Two days after this Court's

17   original order on summary judgment, Mr. Wagner served his Supplemental Expert

18   Report, but did not revise any calculations related to the Castilla trade secrets.  Mr.

19   Wagner's Second Supplemental Expert Report dated February 7, 2011 also does

20   not include any revisions to the Castilla trade secrets damages.  As of the date of

21   his last deposition, Mr. Wagner had not revised his calculations as to the non-Bratz

22   trade secrets calculations.  Lock Decl., Ex. 1 at 1025:5-11.

23         Mr. Wagner calculated the Castilla trade secrets to be worth two-thirds of the

24   cost for Mattel to develop categories of documents that Mr. Wagner chose to group

25   together.  Mr. Wagner calculates that Mattel is entitled to two-thirds of

26   $11,961,191, calculated as follows:

27

28

1

2

Figure 31: Summary of MGA's and Isaac Larian's Unjust Enrichment Related to Inventory and Forecasting System Documents and International Strategic Plan[477]

3

4

5

6

7

8

| | |
|---|---|
| Manugistics | $3,367,311 |
| Sales Planning Original | $235,600 |
| Sales Planning Enhancement | $678,660 |
| ISIS / Omni Gap Analysis | $92,320 |
| EDW | $2,335,000 |
| EDW F&P | $3,959,820 |
| IDW | $600,000 |
| Inventory Reports | $22,680 |
| Strategic Plan Meetings International Overview | $669,800 |
| **Total Cost to Develop Stolen Trade Secrets** | **$11,961,191** |

9

10      Mr. Wagner admitted in his deposition that he had no intention of including

11 in his calculation of trade secret damages claims that had been dismissed.  Lock

12 Decl., Ex. 1 at 1021:3-10, 1025:2-20.  However, that is precisely what is currently

13 before the Court.  In the nearly two months since the Court dismissed the vast

14 majority of the Castilla trade secrets, Mr. Wagner has issued two reports that do not

15 address the Court's dismissal of the Castilla trade secrets.

16      Federal courts have excluded expert testimony on damages from claims or

17 causes of action that are no longer in the case or have been disallowed by the

18 Court.  *Bowers v. National Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322, 350-51

19 (D.N.J. 2008) (excluding plaintiff's expert testimony on damages where the Court

20 had issued an order precluding damages from defendant's use of drugs and

21 plaintiff's expert's report included damages from drug use and did not disentangle

22 damages from other impairments from damages from drug use); *Pharmacenetics,*

23 *Inc. v. Aventis Pharmaceuticals, Inc.*, 2005 WL 6000369, *7-*11 (E.D.N.C. May 4,

24 2005) (excluding as irrelevant damages testimony where the expert's model was

25 premised upon claims and causes of action that were dismissed on summary

26 judgment; even with regard to claims remaining in the litigation, expert's damages

27 model was misleading and should be excluded because it improperly assumed that

28 all lost sales were caused by defendant's conduct, while the Court's summary

1  judgment order recognized that some lost sales may be attributed to defendant's

2  conduct).

3        Determining which of the Castilla trade secrets should not be included in Mr.

4  Wagner's calculation of damages is not as simple as deducting certain lines in

5  Figure 31.  Other than the Manugistics category, there simply is no way of merely

6  deducting certain groups of documents as it is not clear which of the Castilla

7  documents belong in which category.  In short, Mr. Wagner's calculations do not

8  provide the jury with any meaningful guidance for determining damages.

9        Because Mr. Wagner's opinions and calculations include dismissed trade

10  secrets, and he has admitted that counsel has not asked him to revise his opinion,

11  his opinion as to the Castilla trade secrets is unreliable and should be excluded.

12  **IV.   MR. WAGNER'S TESTIMONY SHOULD BE EXCLUDED UNDER**
      **FRE 403**

13

14        Fed. R. Evid. 403 provides for the exclusion of evidence if its probative

15  value "is substantially outweighed by the danger of unfair prejudice, confusion of

16  the issues, or misleading the jury, or by consideration of undue delay, waste of

17  time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

18  Evidence is excluded under Federal Rule of Evidence 403 "to protect the jury from

19  drawing improper inferences."  *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir.

20  1994).  In excluding Mattel's expert Frank Keiser, this Court recognized the danger

21  in allowing an expert to testify where his testimony would be unfairly prejudicial.

22  *See* Dkt. #9758, citing *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc*., 608

23  F.3d 871, 895 (D.C. Cir. 2010) ("As *Daubert* explained, Rule 403 exclusion based

24  on unfair prejudice is particularly important in the case of expert evidence, which

25  can be both powerful and quite misleading because of the difficulty in evaluating

26  it.") (internal quotations omitted); *In re Hanford Nuclear Reservation Litig.*, 534

27  F.3d 986 (9th Cir. 1998) ("The district court has discretion to exclude evidence

28  when its probative value is substantially outweighed by the danger of misleading

- 24 -

1   the jury or confusing the issues. This is especially true with respect to expert

2   witnesses.") (internal citations omitted).

3   Mr. Wagner offers testimony "which is connected to existing data only by

4   the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Even worse, in some

5   instances it is flatly contradicted by the evidence, or his methodology

6   systematically overstates amounts due to Mattel. In short, "there is simply too

7   great an analytical gap between the data and the opinion proffered" and the opinion

8   must be excluded. *Id.* Since Mr. Wagner intends to testify to analyses and figures

9   that are unsupported, methodologically unsound and untested, and flatly

10  contradicted by the evidence, the overwhelming prejudice that MGA will suffer

11  from the significant risk of jury being confused and misled compels the Court to

12  exclude his testimony.

13  Moreover, since Mr. Wagner's testimony does not pass muster under

14  *Daubert* or Rule 702, his testimony would be a waste of the Court and jury's time.

15  *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1256 (E.D.N.Y. 1985),

16  *aff'd*, 818 F.2d 187 (2d Cir. 1987) ("The waste-of-time ground for exclusion is

17  particularly persuasive when detailed rebuttal testimony would be necessary to

18  establish that the proffered evidence lacks probative worth.") (citations omitted).

19  This is not a case where MGA should be required to address its concerns

20  about Mr. Wagner's opinions during cross-examination. Mr. Wagner's opinions do

21  not pass the threshold requirement of admissibility under Rule 702. Accordingly,

22  MGA should not be required to resort to traditional devices for refuting expert

23  testimony, such as cross-examination or opposing expert testimony. *Lithuanian*

24  *Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 458-59 (D.N.J. 1998).

25  **V.   ANY FURTHER OPINIONS FROM MR. WAGNER SHOULD BE**
       **EXCLUDED.**

26

27  At 2:20 a.m. on the day of Mr. Wagner's deposition on February 8, 2011,

28  Mattel served Mr. Wagner's Second Supplemental Expert Report along with

1   thousands of pages of revised schedules.  Because MGA was served with this

2   report at 2:20 a.m., MGA did not have sufficient time to analyze the report such

3   that it could examine Mr. Wagner on that report.  Additionally, Mr. Wagner

4   disclosed at his deposition that he was continuing to revise his calculations.  Lock

5   Decl. Ex. 1 at 887:5-19.  The Third  Supplemental Expert Report was served at

6   10:09 p.m. on Sunday, February 20, 2011.

7        Notably, Mr. Wagner's expert reports are inconsistent with any and all of

8   Mattel's submissions to the Court identifying its trade secrets.  Dkt. ## 9800 (filed

9   February 4, 2001), 9801 (Filed February 5, 2011), 9803 (filed February 6, 2011)

10  and 9829 (filed February 8, 2011, a few hours after Mr. Wagner's deposition

11  adjourned).  Indeed one need only look at Tab B6, Schedule 1.0 and Tab B9,

12  Schedule 2 of Mr. Wagner's schedules attached to his February 8 report to see this

13  inconsistency.  Lock Decl., Exs. 9 and 10.[13]  Those Tabs purport to calculate

14  damages on a SKU-by-SKU basis.  However, Mr. Wagner calculates damages for

15  several products that Mattel does not claim as trade secrets in either Exhibit A or B

16  to its trade secret submission.  Additionally, Exhibits A and B include categories of

17  trade secrets that do not appear anywhere in Mr. Wagner's Tabs or expert report.

18  Whether or not this inconsistency is due to Mattel revising its trade secrets three

19  hours after Mr. Wagner's deposition adjourned is irrelevant.  What is known is that

20  MGA and this Court have no idea what the scope of Mattel's damages claims are

21  for trade secrets misappropriation or copyright infringement based on Mr.

22  Wagner's multiple reports and thousands of pages of schedules.

23       Mr. Wagner's Third Supplemental Report does not appear to cure any of the

24  fundamental problems underlying his methodology and calculations.  It also

25  appears to remain inconsistent with Mattel's revised identification of trade secrets.

26  In short, a month into the trial, there is no clarity to Mattel's damages claims.

27  _____

28  [13] Because both schedules are voluminous, MGA attaches only the first few pages of each schedule.  At the request of the Court, MGA will provide the Court with complete copies.

MGA'S SUPPLEMENTAL BRIEF ISO MIL NO. 30 TO
EXCLUDE TESTIMONY OF MICHAEL J. WAGNER
CV-04-9049 DOC (RNBx)

1   MGA reserves the right to challenge Mr. Wagner's opinions, schedules and

2   calculations in his Second Supplemental Expert Report, Third Supplemental Expert

3   Report, and any additional calculations, reports and schedules that he issues.

4                           **CONCLUSION**

5        For the foregoing reasons, the Court should grant MGA's Motion and

6   exclude all testimony and evidence offered by Mr. Wagner.

7

8   Dated:  February 21, 2011            Respectfully submitted,

9                                        ORRICK, HERRINGTON & SUTCLIFFE LLP

10

11                                       By:  _____/s/ *Annette L. Hurst*_____

12                                            Annette L. Hurst
                                             Attorneys for MGA PARTIES

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28