CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

1

1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3     **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  – – – – – – –

5

    MATTEL, INC., et al.,              )
6                                       )
              Plaintiffs,               )
7                                       )
         vs.                            ) No. CV 04-9049 DOC
8                                       )    Day 20
    MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                       )
                                        )
10             Defendants.              )
   _____ )
11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17            Friday, February 18, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-18 D20V1

1    **APPEARANCES OF COUNSEL:**

2

   FOR PLAINTIFF MATTEL, INC., ET AL.:

3

           QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
4          BY:   JOHN QUINN
                 WILLIAM PRICE
5                MICHAEL T. ZELLER
                 Attorneys at Law
6          865 South Figueroa Street
           10th Floor
7          Los Angeles, California 90017
           (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12           ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
             BY:   THOMAS S. McCONVILLE
13                 Attorney at Law
             4 Park Plaza
14           Suite 1600
             Irvine, California 92614
15           (949) 567-6700

16           - AND -

17           ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
             BY:   ANNETTE L. HURST
18                 Attorney at Law
             405 Howard Street
19           San Francisco, California 94105
             (415)773-5700

20           - AND -

21           KELLER RACKAUCKAS
22           BY:   JENNIFER KELLER
                   Attorney at Law
23           18500 Von Karman Avenue
             Suite 560
24           Irvine, California 92612
             (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 3 of 152   Page ID #:303032
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
          LAW OFFICES OF MARK E. OVERLAND
5         By:  MARK E. OVERLAND
               Attorney at Law
6         100 Wilshire Boulevard
          Suite 950
7         Santa Monica, California 90401
          (310) 459-2830
8
          - AND -
9
          SCHEPER KIM & HARRIS LLP
10        BY:  ALEXANDER H. COTE
               Attorney at Law
11        601 West 5th Street
          12th Floor
12        Los Angeles, California 90071
          (213) 613-4660
13

14

15
     ALSO PRESENT:
16
          MGA ENTERTAINMENT, INC.
17        BY:  JEANINE PISONI
               Attorney at Law
18        16360 Roscoe Boulevard
          Suite 105
19        Van Nuys, California 91406

20
          ISAAC LARIAN, MGA CEO
21
          KEN KOTARSKI, Mattel Technical Operator
22
          MIKE STOVALL, MGA Technical Operator
23
          RACHEL JUAREZ, Quinn Emanuel Urquhart, Oliver &
24                       Hedges

25

CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

4

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MAIN, Charlotte Kaye | | | | |
| By Mr. Zeller | 6 | | 17 | |
| By Ms. Hurst | | 11 | | |
| | | | | |
| LARIAN, Isaac | | | | |
| By Mr. Price | | | 19 | |

**EXHIBITS**

| EXHIBIT NO. | | IDENTIFICATION | IN EVIDENCE |
|---|---|---|---|
| 60 | Notary book of Jacqueline Prince | | 8 |
| 61 | Letter from Ms. Main to Ms. Prince dated 7/21/2004 | | 12 |
| 11889 | Page 11  E-mail to Ms. Malcolm dated 9/15/2000 re vendor set up | | 141 |
| 13626 | Meeting 2/28/2001 | | 80 |
| 22973 | Letter from Skadden, Arps to Mr. Corey at Quinn Emanuel | | 30 |
| 23956 | E-mail chain between Mr. Larian and Ms. Thompson, June 2000 | | 86 |
| 23964 | E-mail from Mr. Williams to Mr. Larian dated 4/9/2001 | | 57 |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, FRIDAY, FEBRUARY 18, 2011**       |
|       | 2  | **Day 20, Volume 1 of 3**                                  |
|       | 3  | (8:30 a.m.)                                                |
| 08:30 | 4  | *(In the presence of the jury.)*                           |
| 08:30 | 5  | THE COURT:  All right.  Good morning.  The jury's          |
| 08:30 | 6  | present.  All counsel are present.  The parties are present.|
| 08:30 | 7  | And, Counsel.                                              |
| 08:30 | 8  | MR. ZELLER:  Good morning, Your Honor.  Mattel             |
| 08:30 | 9  | calls Charlotte Main.                                      |
| 08:30 | 10 | THE COURT:  Thank you.                                     |
| 08:30 | 11 | Ms. Main, if you would step forward.                       |
| 08:30 | 12 | There's a witness who's going to be called out of          |
| 08:30 | 13 | order.  And all parties agreed that that way she can testify|
| 08:31 | 14 | today, and then Mr. Larian will go on with the examination.|
| 08:31 | 15 | Thank you very much.  If you would be kind enough          |
| 08:31 | 16 | to step forward, please.  Would you raise your right hand, |
| 08:31 | 17 | please.                                                    |
| 08:31 | 18 | **CHARLOTTE MAIN, MATTEL'S WITNESS, SWORN**                |
| 08:31 | 19 | THE WITNESS:  Yes.                                         |
| 08:31 | 20 | THE COURT:  Thank you very much.  If you would             |
| 08:31 | 21 | please be seated.                                          |
| 08:31 | 22 | State your full name for the jury, please.                 |
| 08:31 | 23 | THE WITNESS:  My name is Charlotte Kaye Main,              |
| 08:31 | 24 | M-A-I-N.                                                   |
| 08:31 | 25 | THE COURT:  This would be direct examination by            |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 6 of 152   Page ID #:303035
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

6

| 08:31 | 1 | Mr. Zeller on behalf of Mattel. |
| 08:31 | 2 | **DIRECT EXAMINATION** |
| 08:31 | 3 | BY MR. ZELLER: |
| 08:31 | 4 | Q.   Good morning. |
| 08:31 | 5 | A.   Good morning. |
| 08:31 | 6 | Q.   You are previously known as Charlotte McClusky? |
| 08:31 | 7 | A.   That's correct. |
| 08:31 | 8 | Q.   Please tell us what you do. |
| 08:31 | 9 | A.   I'm an attorney. |
| 08:31 | 10 | Q.   Where at? |
| 08:31 | 11 | A.   I work at Littler Mendelson's Atlanta office. |
| 08:32 | 12 | Q.   How long have you been there? |
| 08:32 | 13 | A.   I worked for Littler Mendelson since September 2001. |
| 08:32 | 14 | Q.   At some point you worked on the case that brings us |
| 08:32 | 15 | here today, Mattel v. MGA? |
| 08:32 | 16 | A.   I worked in a limited capacity.  I'm not sure exactly |
| 08:32 | 17 | what the case was, but, yes. |
| 08:32 | 18 | Q.   But you represented Carter Bryant at some point? |
| 08:32 | 19 | A.   That's correct. |
| 08:32 | 20 | Q.   And that was including in the 2004 actual period? |
| 08:32 | 21 | A.   Yes. |
| 08:32 | 22 | Q.   And during that time period, you worked with attorneys |
| 08:32 | 23 | who were representing MGA, as well? |
| 08:32 | 24 | A.   That's correct. |
| 08:32 | 25 | Q.   And one of those attorneys you worked with was MGA's |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 7 of 152   Page ID #:303036
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:32 | 1 | lead lawyer, named Dale Cendali? |
| 08:32 | 2 | A.   I worked with Ms. Cendali.  I didn't know if she was |
| 08:32 | 3 | the lead counsel or what her position was. |
| 08:32 | 4 | Q.   But you knew that she was an outside lawyer for MGA who |
| 08:32 | 5 | worked on this case? |
| 08:32 | 6 | A.   I did. |
| 08:32 | 7 | Q.   And at some point you were contacted by her and given |
| 08:32 | 8 | direction to do something? |
| 08:32 | 9 | A.   I was initially contacted by a shareholder in Littler's |
| 08:32 | 10 | L.A. office, that directed me, then, to speak with |
| 08:33 | 11 | Ms. Cendali. |
| 08:33 | 12 | Q.   And Ms. Cendali directed you to go and collect a notary |
| 08:33 | 13 | book from Jacqueline Prince? |
| 08:33 | 14 | A.   That's correct. |
| 08:33 | 15 | Q.   And that's something you did? |
| 08:33 | 16 | A.   Yes. |
| 08:33 | 17 | Q.   And -- and you went to her house, and where was it? |
| 08:33 | 18 | Lawrenceville, Georgia? |
| 08:33 | 19 | A.   That's correct. |
| 08:33 | 20 | Q.   And you actually picked up a notary book? |
| 08:33 | 21 | A.   I did. |
| 08:33 | 22 | Q.   If you could take a look at Exhibit 60.  It should be |
| 08:33 | 23 | the notary book. |
| 08:33 | 24 | A.   I believe this is Exhibit 60. |
| 08:33 | 25 | Q.   Do you recognize that as a notary book that you picked |

| | | |
|---|---|---|
| 08:33 | 1 | up from Ms. Prince? |
| 08:33 | 2 | A.   Yes. |
| 08:33 | 3 | MR. ZELLER:  I'd move Exhibit 60 into evidence, |
| 08:33 | 4 | Your Honor. |
| 08:33 | 5 | THE COURT:  Well, any objection? |
| 08:34 | 6 | MS. HURST:  No. |
| 08:34 | 7 | THE COURT:  Received. |
| 08:34 | 8 | *(Exhibit No. 60 received in evidence.)* |
| 08:34 | 9 | *(Document displayed.)* |
| 08:34 | 10 | BY MR. ZELLER: |
| 08:34 | 11 | Q.   And you went and picked this up in July of 2004 from |
| 08:34 | 12 | Ms. Prince? |
| 08:34 | 13 | A.   Yes. |
| 08:34 | 14 | Q.   Did you remember the exact date? |
| 08:34 | 15 | A.   I believe it was the 21st of July. |
| 08:34 | 16 | Q.   Of 2004? |
| 08:34 | 17 | A.   Of -- yes. |
| 08:34 | 18 | Q.   And, by the way, at that time in July of 2004, MGA and |
| 08:34 | 19 | Carter Bryant had something that was called a joint defense |
| 08:34 | 20 | agreement? |
| 08:34 | 21 | A.   That was my understanding. |
| 08:34 | 22 | Q.   And a joint defense agreement is something when parties |
| 08:34 | 23 | have common interests together? |
| 08:34 | 24 | A.   I can speak generally to the concept of a joint defense |
| 08:34 | 25 | agreement.  I have not seen or reviewed the agreement |

| 08:34 | 1 | between the parties in that case. |
| 08:34 | 2 | Q.   Tell us, generally, what your understanding is. |
| 08:34 | 3 | A.   What you described.  That there are parties with common |
| 08:34 | 4 | interests, who will have attorney-client privileged |
| 08:34 | 5 | information that needs to remain privileged. |
| 08:34 | 6 | Q.   And the lawyers and the parties work together in the |
| 08:34 | 7 | case, as well? |
| 08:34 | 8 | A.   Yes. |
| 08:35 | 9 | THE COURT:  This concerns one of the jurors who |
| 08:35 | 10 | approached me yesterday.  I have that person on the phone. |
| 08:35 | 11 | Counsel, I'm sorry for the interruption. |
| 08:35 | 12 | I need to go back and talk to an HR manager for |
| 08:35 | 13 | just a moment. |
| 08:35 | 14 | If I could just ask you to step back into the jury |
| 08:35 | 15 | room for just a moment.  I think we can resolve that issue |
| 08:35 | 16 | for the juror. |
| 08:35 | 17 | We'll be in recess. |
| 08:35 | 18 | *(Recess held at 8:35 a.m.)* |
| 08:40 | 19 | *(Proceedings resumed at 8:40 a.m.)* |
| 08:40 | 20 | *(In the presence of the jury.)* |
| 08:41 | 21 | THE COURT:  Thank you very much.  The jury's |
| 08:41 | 22 | present again, and I think that's been satisfactorily |
| 08:41 | 23 | resolved in terms of the juror. |
| 08:41 | 24 | Counsel, then we're once again in session.  If you |
| 08:41 | 25 | would like to continue your questioning. |

Case 2:04-cv-09049-DOC-RNB  Document 10042  Filed 02/22/11  Page 10 of 152  Page ID #:303039
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:41 | 1 | MR. ZELLER:  Thank you, Your Honor. |
| 08:41 | 2 | BY MR. ZELLER: |
| 08:41 | 3 | Q.   After you picked up the notary book, Exhibit 60, from |
| 08:41 | 4 | Ms. Prince, what did you do with it? |
| 08:41 | 5 | A.   I returned to my office and prepared a letter to an |
| 08:41 | 6 | attorney working with Ms. Cendali and sent the notary book |
| 08:41 | 7 | to that attorney. |
| 08:41 | 8 | Q.   Your intention was to send it to Dale Cendali, the |
| 08:41 | 9 | supervising attorney for MGA, we'll call her? |
| 08:41 | 10 | A.   Yes. |
| 08:41 | 11 | Q.   And the lawyer you actually sent it to was named Elyse |
| 08:41 | 12 | Meyers? |
| 08:41 | 13 | A.   That's correct. |
| 08:41 | 14 | Q.   You're not sure which office she was in at the time? |
| 08:41 | 15 | A.   I'm not sure. |
| 08:41 | 16 | Q.   Back in that time period, Littler Mendelson had about |
| 08:42 | 17 | how many lawyers? |
| 08:42 | 18 | MS. HURST:  Objection.  Relevance. |
| 08:42 | 19 | THE COURT:  Is this advertising for the firm or |
| 08:42 | 20 | what?  Who cares? |
| 08:42 | 21 | MR. ZELLER:  It certainly would be inadvertent if |
| 08:42 | 22 | it is.  I just want to establish the fact that it went to |
| 08:42 | 23 | the law firms; they're not sure where it went. |
| 08:42 | 24 | THE COURT:  You can ask that. |
| 08:42 | 25 | THE WITNESS:  If you're asking me how many |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 11 of 152   Page ID #:303040
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

11

| | | |
|---|---|---|
| 08:42 | 1 | officers Littler had? |
| 08:42 | 2 | BY MR. ZELLER: |
| 08:42 | 3 | Q.   Sure. |
| 08:42 | 4 | A.   In 2004, I believe Littler had approximately 30. |
| 08:42 | 5 | Q.   And do you know how many offices O'Melveny had back |
| 08:42 | 6 | then? |
| 08:42 | 7 | A.   I have no idea. |
| 08:42 | 8 | Q.   It was several as far as you knew? |
| 08:42 | 9 | A.   I honestly don't know. |
| 08:42 | 10 | MR. ZELLER:  Thank you. |
| 08:42 | 11 | **CROSS-EXAMINATION** |
| 08:42 | 12 | BY MS. HURST: |
| 08:43 | 13 | Q.   Good morning, Ms. Main. |
| 08:43 | 14 | A.   Good morning. |
| 08:43 | 15 | Q.   You have the notary book there in front of you? |
| 08:43 | 16 | A.   I do. |
| 08:43 | 17 | Q.   And it came in a satchel? |
| 08:43 | 18 | A.   It did. |
| 08:43 | 19 | Q.   And you took possession of all of that in July of 2004; |
| 08:43 | 20 | is that correct? |
| 08:43 | 21 | A.   That's correct. |
| 08:43 | 22 | Q.   I'd like to show you what's been marked as Exhibit 61. |
| 08:43 | 23 | *(Document provided to the witness.)* |
| 08:43 | 24 | THE WITNESS:  Okay. |
| | 25 | |

| | | |
|---|---|---|
| 08:43 | 1 | BY MS. HURST: |
| 08:43 | 2 | Q.   Do you recognize that? |
| 08:43 | 3 | A.   I do. |
| 08:43 | 4 | Q.   You were known as Charlotte McClusky in July of 2004; |
| 08:43 | 5 | is that correct? |
| 08:43 | 6 | A.   That's correct. |
| 08:43 | 7 | Q.   And is Exhibit 61 a letter that you sent to Ms. Prince |
| 08:43 | 8 | on July 21st, 2004? |
| 08:43 | 9 | A.   Yes. |
| 08:43 | 10 | Q.   And is that your signature on Exhibit 61? |
| 08:43 | 11 | A.   It is. |
| 08:44 | 12 | MS. HURST:  Move Exhibit 61 into evidence, |
| 08:44 | 13 | Your Honor. |
| 08:44 | 14 | THE COURT:  It's received. |
| 08:44 | 15 | *(Exhibit No. 61 received in evidence.)* |
| 08:44 | 16 | *(Document displayed.)* |
| 08:44 | 17 | MS. HURST:  Thank you. |
| 08:44 | 18 | BY MS. HURST: |
| 08:44 | 19 | Q.   Would you just read the letter for the jury, Ms. Main? |
| 08:44 | 20 | A.   Sure. |
| 08:44 | 21 | "Dear Ms. Prince, |
| 08:44 | 22 | "This letter will confirm that I have this day |
| 08:44 | 23 | personally taken receipt of your notary book.  We appreciate |
| 08:44 | 24 | your cooperation in this matter.  Should you have any |
| 08:44 | 25 | questions or concerns, please do not hesitate to contact me. |

| | | |
|---|---|---|
| 08:44 | 1 | Thank you." |
| 08:44 | 2 | And then I signed the letter. |
| 08:44 | 3 | Q.   And then you initialed it further to indicate that you |
| 08:44 | 4 | had taken custody of all of the materials enclosed in the |
| 08:44 | 5 | case; is that correct? |
| 08:44 | 6 | A.   That's correct.  Um, I prepared this letter before I |
| 08:44 | 7 | met with Ms. Prince, took it with me to her residence, and |
| 08:44 | 8 | when she gave me the satchel and everything else in it, we |
| 08:44 | 9 | modified the subject line to include that handwritten note. |
| 08:44 | 10 | Q.   All right.  So the receipt you gave her when you took |
| 08:45 | 11 | possession of the book? |
| 08:45 | 12 | A.   I did. |
| 08:45 | 13 | Q.   All right.  Would you go back to the notary book, which |
| 08:45 | 14 | is marked Exhibit 60. |
| 08:45 | 15 | A.   Okay. |
| 08:45 | 16 | Q.   And turn to what is marked page 11, the original |
| 08:45 | 17 | pagination. |
| 08:45 | 18 | A.   Okay. |
| 08:45 | 19 | Q.   Do you see there's an entry there in the top center of |
| 08:45 | 20 | the page under the heading "Document Kind or Type"? |
| 08:45 | 21 | A.   Yes. |
| 08:45 | 22 | *(Document displayed.)* |
| 08:45 | 23 | BY MS. HURST: |
| 08:45 | 24 | Q.   Now, when you met with Ms. Prince on July 21st, 2004, |
| 08:45 | 25 | you had a discussion with her; is that correct? |

| | | |
|---|---|---|
| 08:46 | 1 | A.   That's correct. |
| 08:46 | 2 | Q.   And you looked at the notary book during that |
| 08:46 | 3 | discussion, correct? |
| 08:46 | 4 | A.   Yes. |
| 08:46 | 5 | Q.   And you recognize this entry as one that you discussed |
| 08:46 | 6 | with Ms. Prince during that discussion? |
| 08:46 | 7 | A.   Yes. |
| 08:46 | 8 | Q.   And this entry looked exactly the same as it did when |
| 08:46 | 9 | you met with her on July 21st, 2004; is that correct? |
| 08:46 | 10 | A.   It is correct. |
| 08:46 | 11 | Q.   Including the line "from 1998 Missouri"? |
| 08:46 | 12 | A.   Yes. |
| 08:46 | 13 | Q.   Is it true that that day Ms. Prince recounted to you |
| 08:46 | 14 | the circumstances under which she had made the notarization |
| 08:46 | 15 | of Mr. Bryant's drawings? |
| 08:46 | 16 | A.   Yes. |
| 08:46 | 17 | Q.   Did she tell you that she had made that entire entry at |
| 08:46 | 18 | the time of the notarization? |
| 08:46 | 19 | A.   Yes. |
| 08:46 | 20 |         MR. ZELLER:  Hearsay. |
| 08:46 | 21 |         MS. HURST:  Prior consistent statement, |
| 08:46 | 22 | Your Honor.  Ms. Prince has been put at issue. |
| 08:47 | 23 |         THE COURT:  Well, she will be, apparently.  I'll |
| 08:47 | 24 | take it subject to a motion to strike.  But you can answer |
| 08:47 | 25 | now to save you from coming back. |

| | | |
|---|---|---|
| 08:47 | 1 | THE WITNESS:  Thank you. |
| 08:47 | 2 | Yes. |
| 08:47 | 3 | BY MS. HURST: |
| 08:47 | 4 | Q.   Did she indicate to you in any way, shape, or form that |
| 08:47 | 5 | she had done anything to alter that entry subsequent to the |
| 08:47 | 6 | time of the notarization? |
| 08:47 | 7 | A.   Not at all. |
| 08:47 | 8 | Q.   Now, you received a subpoena from Mattel to appear here |
| 08:47 | 9 | at this trial; is that correct? |
| 08:47 | 10 | A.   That's correct. |
| 08:47 | 11 | Q.   And you lived in Atlanta, Georgia, and you work in |
| 08:47 | 12 | Atlanta, George; is that correct? |
| 08:47 | 13 | A.   That's correct. |
| 08:47 | 14 | Q.   And Mattel gave you about a day's notice when they |
| 08:47 | 15 | demanded you come out here to testify; is that right? |
| 08:47 | 16 | MR. ZELLER:  Objection. |
| 08:47 | 17 | THE COURT:  Counsel, all parties are given short |
| 08:47 | 18 | notice or long notice.  Some are having difficulty finding |
| 08:47 | 19 | their way to California, but they'll all be here.  Like my |
| 08:47 | 20 | wife says, some people come through the front door, the back |
| 08:47 | 21 | door, but they'll all be here.  It doesn't matter what kind |
| 08:47 | 22 | of notice they get. |
| 08:47 | 23 | Okay.  Thank you, Counsel.  It's irrelevant. |
| 08:47 | 24 | BY MS. HURST: |
| 08:48 | 25 | Q.   Did Mattel tender fees for your expenses to travel here |

| | | |
|---|---|---|
| 08:48 | 1 | when they served you with the subpoena, Ms. Main? |
| 08:48 | 2 | MR. ZELLER:  Your Honor -- |
| 08:48 | 3 | THE WITNESS:  No, they refused to do so. |
| 08:48 | 4 | BY MS. HURST: |
| 08:48 | 5 | Q.   Did they refuse to pay your expenses -- |
| 08:48 | 6 | THE COURT:  Just a moment, Counsel. |
| 08:48 | 7 | You're to strike counsel's questions.  You're to |
| 08:48 | 8 | strike counsel's comments.  You're to strike any answer |
| 08:48 | 9 | pertaining to that.  It's improper. |
| 08:48 | 10 | Okay. |
| 08:48 | 11 | BY MS. HURST: |
| 08:48 | 12 | Q.   From your knowledge and your discussions with |
| 08:48 | 13 | Ms. Prince, do you have any reason to believe that there was |
| 08:48 | 14 | any alteration to that notary book? |
| 08:48 | 15 | A.   No reason at all. |
| 08:48 | 16 | MS. HURST:  Thank you. |
| 08:48 | 17 | THE COURT:  Now, just a moment.  Let's set that |
| 08:48 | 18 | record straight immediately.  I was approached by at least |
| 08:48 | 19 | counsel from Mattel earlier on and nobody knew what fees |
| 08:48 | 20 | were going to be paid by whom.  In all likelihood, they're |
| 08:48 | 21 | going to be split between the parties with this witness. |
| 08:48 | 22 | And you're to completely disregard those questions |
| 08:49 | 23 | concerning nonpayment and the length of time to appear. |
| 08:49 | 24 | Is that understood by the jury? |
| 08:49 | 25 | All right.  Thank you very much. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:49 | 1 | Counsel. |
| 08:49 | 2 | MR. ZELLER:  Thank you, Your Honor. |
| 08:49 | 3 | **REDIRECT EXAMINATION** |
| 08:49 | 4 | BY MR. ZELLER: |
| 08:49 | 5 | Q.   Prior to the time that you visited and met with |
| 08:49 | 6 | Ms. Prince, you understood that Dale Cendali had already |
| 08:49 | 7 | been in touch with Ms. Prince; is that correct? |
| 08:49 | 8 | A.   I believe so, yes. |
| 08:49 | 9 | Q.   And do you know if other people had been in touch with |
| 08:49 | 10 | her, other than Ms. Cendali, prior to the time that you went |
| 08:49 | 11 | and visited her? |
| 08:49 | 12 | A.   I don't know that.  I didn't know that then. |
| 08:49 | 13 | Q.   And I take it you don't have any knowledge, actual |
| 08:49 | 14 | knowledge, about what the condition was of the notary book |
| 08:49 | 15 | prior to the time you went and picked it up from her; is |
| 08:49 | 16 | that true? |
| 08:49 | 17 | A.   That's correct. |
| 08:49 | 18 | Q.   And after you shipped it to O'Melveny, you don't have |
| 08:49 | 19 | any idea what happened to it up until, of course, today and |
| 08:49 | 20 | yesterday when you saw it here in court? |
| 08:49 | 21 | A.   That's correct. |
| 08:50 | 22 | Q.   When you were asked questions about the entry, you were |
| 08:50 | 23 | going off of a memory from more than six years ago; is that |
| 08:50 | 24 | true? |
| 08:50 | 25 | A.   That's true. |

| | | |
|---|---|---|
| 08:50 | 1 | Q.   You hadn't seen the notary book in between the time you |
| 08:50 | 2 | picked it up in 2004 and yesterday when you saw it in Court; |
| 08:50 | 3 | is that true? |
| 08:50 | 4 | A.   That's true. |
| 08:50 | 5 | Q.   And, by the way, you also met with MGA's attorneys |
| 08:50 | 6 | prior to testifying here; is that true? |
| 08:50 | 7 | A.   Briefly, to coordinate the location of the courthouse |
| 08:50 | 8 | and what time to be here. |
| 08:50 | 9 | MR. ZELLER:  Thank you. |
| 08:50 | 10 | THE COURT:  Recross, please. |
| 08:50 | 11 | MS. HURST:  No questions, Your Honor. |
| 08:50 | 12 | THE COURT:  Did you have a planned vacation of |
| 08:50 | 13 | some type coming up? |
| 08:50 | 14 | THE WITNESS:  I have a trial coming up. |
| 08:50 | 15 | THE COURT:  That's right.  You informed us of |
| 08:50 | 16 | that. |
| 08:50 | 17 | THE WITNESS:  I do. |
| 08:50 | 18 | THE COURT:  I want to thank you for coming out on |
| 08:51 | 19 | such rapid notice.  That way we can accommodate your trial |
| 08:51 | 20 | schedule also, as you requested. |
| 08:51 | 21 | THE WITNESS:  Thank you. |
| 08:51 | 22 | *(Witness steps down subject to recall.)* |
| 08:51 | 23 | THE COURT:  Counsel, your next witness, please. |
| 08:51 | 24 | MR. PRICE:  Isaac Larian, Your Honor. |
| 08:51 | 25 | **ISAAC LARIAN, MATTEL'S WITNESS, PREVIOUSLY SWORN** |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:51 | 1 | **RESUMED THE STAND** |
| 08:52 | 2 | **REDIRECT EXAMINATION (Resumed)** |
| 08:52 | 3 | BY MR. PRICE: |
| 08:52 | 4 | Q.   Good morning, Mr. Larian. |
| 08:52 | 5 | A.   Good morning. |
| 08:52 | 6 | Q.   Yesterday we were talking about the search of the MGA |
| 08:52 | 7 | Mexico office.  And in the examination by Ms. Keller, she |
| 08:52 | 8 | asked you about being a 30(b)(6) witness.  Do you recall |
| 08:52 | 9 | those questions? |
| 08:52 | 10 | A.   Yes. |
| 08:52 | 11 | Q.   And you understood that as a 30(b)(6) witness, that |
| 08:52 | 12 | your answers were -- were as a representative of the |
| 08:52 | 13 | company, correct? |
| 08:52 | 14 | A.   Yes. |
| 08:52 | 15 | Q.   That it wasn't just your own personal knowledge, it |
| 08:52 | 16 | was -- you were supposed to learn information pertaining to |
| 08:52 | 17 | that -- the topics you were testifying about? |
| 08:53 | 18 | A.   Yes. |
| 08:53 | 19 | Q.   And your testimony would be binding on the corporation |
| 08:53 | 20 | with respect to those topics; you understood that? |
| 08:53 | 21 | A.   Yes. |
| 08:53 | 22 | Q.   And one of the items that you were to testify about was |
| 08:53 | 23 | the search and seizure of documents by Mexican authorities |
| 08:53 | 24 | from MGA's Mexico City offices and related communications as |
| 08:53 | 25 | set forth in Topic No. 36 of the fourth notice, whatever |

| | | |
|---|---|---|
| 08:53 | 1 | that means, right? |
| 08:53 | 2 | A.   I didn't memorize the court order. |
| 08:53 | 3 | Q.   Well, at the time of your deposition, you understood |
| 08:53 | 4 | that you were to testify about the search and seizure of |
| 08:53 | 5 | certain documents in Mexico City, correct? |
| 08:53 | 6 | A.   Again, it's possible, but I don't -- I didn't memorize |
| 08:53 | 7 | the court order. |
| 08:53 | 8 | Q.   Well, let's look at your testimony.  It's July 7, 2010, |
| 08:53 | 9 | at 2408. |
| 08:54 | 10 | A.   I'm sorry? |
| 08:54 | 11 | Q.   If you will look actually at 2409 -- |
| 08:54 | 12 | A.   Yes. |
| 08:54 | 13 | Q.   -- you see there's a question, "And just generally |
| 08:54 | 14 | speaking, you understand one topic that you're here to |
| 08:54 | 15 | testify about pertains to the search and seizure of certain |
| 08:54 | 16 | documents in Mexico City." |
| 08:54 | 17 | A.   Yes. |
| 08:54 | 18 | Q.   So that refreshes your recollection that at the time |
| 08:54 | 19 | you were testifying as a 30(b)(6) witness, that you were the |
| 08:54 | 20 | corporate spokesperson on the topic about the search and |
| 08:54 | 21 | seizure of certain documents in Mexico City, correct? |
| 08:54 | 22 | A.   Yes. |
| 08:54 | 23 | Q.   And as a 30(b)(6) witness, you understood that, uh, you |
| 08:54 | 24 | were supposed to review all information that was reasonably |
| 08:54 | 25 | available to the company, MGA, correct? |

| | | |
|---|---|---|
| 08:54 | 1 | A.   Yes. |
| 08:54 | 2 | Q.   And in connection with preparing for that deposition, |
| 08:55 | 3 | you looked at "Attorney's Eyes Only" documents? |
| 08:55 | 4 | A.   Yes, some. |
| 08:55 | 5 | Q.   The ones pertaining to that topic, correct? |
| 08:55 | 6 | A.   Yes. |
| 08:55 | 7 | Q.   You recall Ms. Keller asked you about "Attorney's Eyes |
| 08:55 | 8 | Only" documents.  Do you recall that? |
| 08:55 | 9 | A.   Yes. |
| 08:55 | 10 | Q.   But your understanding was that you were allowed to see |
| 08:55 | 11 | any "Attorney's Eyes Only" document that pertained to the |
| 08:55 | 12 | topic of the search and seizure of documents in Mexico City, |
| 08:55 | 13 | correct? |
| 08:55 | 14 | A.   Yes. |
| 08:55 | 15 | Q.   And you learned that MGA Mexico had made a copy on a |
| 08:55 | 16 | disk of the documents that were seized by the Mexican |
| 08:55 | 17 | authorities? |
| 08:55 | 18 | MR. OVERLAND:  Objection.  Hearsay as to |
| 08:55 | 19 | Mr. Machado. |
| 08:55 | 20 | MS. KELLER:  And objection.  Misstates the |
| 08:55 | 21 | testimony and the evidence. |
| 08:56 | 22 | THE WITNESS:  No, I did not. |
| 08:56 | 23 | THE COURT:  As to Mr. Machado, this would be |
| 08:56 | 24 | hearsay.  Mr. Machado apparently will be here, and he'll be |
| 08:56 | 25 | testifying. |

08:56    1            But the ruling -- or the objection by Ms. Keller

08:56    2    on behalf of Mr. Larian and MGA is overruled.

08:56    3            MR. OVERLAND:  Your Honor, may the record reflect

08:56    4    a continuing objection on behalf of Mr. Machado to these

08:56    5    questions on the same grounds?

08:56    6            THE COURT:  Yes, it may.

08:56    7            THE WITNESS:  The answer is, no, I did not know

08:56    8    that MGA had made a copy.

08:56    9    BY MR. PRICE:

08:56   10    Q.   In preparation for the deposition, did you read

08:56   11    Ms. Kuemmerle's deposition testimony?

08:56   12    A.   A portion of it that was given to me by my lawyer.

08:56   13    Q.   And you believe that was the portion given to you

08:56   14    pertaining to the search and seizure of documents in Mexico

08:56   15    City, right?

08:56   16    A.   I don't remember it.  I don't remember what portion it

08:56   17    was.  Please show it to me.

08:56   18    Q.   You understood "search" to mean the act of entering

08:57   19    into a place and doing a search, correct?

08:57   20    A.   Yes.

08:57   21    Q.   And you understood "seizure" to mean what you take from

08:57   22    that search?

08:57   23    A.   Yes.

08:57   24    Q.   And at the time of your 30(b)(6) deposition, your

08:57   25    testimony was that you had no knowledge, either from

| 08:57 | 1 | reviewing documents, reviewing depositions, reviewing |
|---|---|---|

08:57   1   reviewing documents, reviewing depositions, reviewing

08:57   2   "Attorney's Eyes Only" documents -- that you had no

08:57   3   knowledge of what was actually taken in the search in Mexico

08:57   4   City?

08:57   5   A.   I knew that they had taken a lot of things from MGA.  I

08:57   6   didn't know the specifics, no.

08:57   7   Q.   So in connection with being the corporate spokesperson

08:57   8   on this issue, you weren't given any information about what

08:57   9   documents were seized at the MGA Mexico City office,

08:57   10  correct?

08:57   11  A.   I don't recall being given that, no.

08:58   12  Q.   Well, let's look -- not as a 30(b)(6) witness, but just

08:58   13  as the CEO of MGA, when you spoke with Ms. Kuemmerle and she

08:58   14  said there was a search --

08:58   15  A.   Yes.

08:58   16  Q.   -- and then you later learned that Mattel information

08:58   17  was in MGA's office, Mattel documents.  Did you ever ask

08:58   18  anyone "What kind of documents are you talking about?  What

08:58   19  did you take?"

08:58   20  A.   I don't recall if I did or not.

08:58   21  Q.   Well, you said that you had to consider whether there

08:58   22  should be any discipline for Mr. Machado or Mr. Vargas or

08:58   23  Ms. Trueba, correct?

08:58   24  A.   I'm sorry?

08:58   25  Q.   You said you had to consider whether there should be

CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

24

| | | |
|---|---|---|
| 08:58 | 1 | any discipline for Mr. Machado or Ms. Trueba or Mr. Vargas, |
| 08:58 | 2 | correct? |
| 08:59 | 3 | A.   Yes. |
| 08:59 | 4 | Q.   So in considering that, as someone who's the head of |
| 08:59 | 5 | MGA, wouldn't you want to ask them, you know, what did you |
| 08:59 | 6 | take from Mattel and bring to the MGA offices? |
| 08:59 | 7 | A.   At that time we were already in litigation with Mattel. |
| 08:59 | 8 | And I turn –– I turned it over to the attorneys. |
| 08:59 | 9 | Q.   Did the attorneys decide whether or not to discipline |
| 08:59 | 10 | Mr. Machado, Mr. Vargas, or Ms. Trueba? |
| 08:59 | 11 | MS. KELLER:  Objection.  Calls for privileged |
| 08:59 | 12 | information, Your Honor, as to what the attorneys decided. |
| 08:59 | 13 | THE COURT:  Just a moment. |
| 09:00 | 14 | Counsel, why wouldn't that be privileged and |
| 09:00 | 15 | speculative? |
| 09:00 | 16 | MR. PRICE:  I'll ask it another way. |
| 09:00 | 17 | BY MR. PRICE: |
| 09:00 | 18 | Q.   You said that you were in litigation and your attorneys |
| 09:00 | 19 | handled it.  Yesterday you testified about why you did not |
| 09:00 | 20 | fire Mr. Machado, Mr. Vargas, or Ms. Trueba, why some of 'em |
| 09:00 | 21 | got bonuses, why Mr. Machado was promoted.  Were those your |
| 09:00 | 22 | decisions? |
| 09:00 | 23 | A.   It was collective.  I was part of the decision. |
| 09:00 | 24 | Q.   When you say "collective," you mean with other people |
| 09:00 | 25 | at MGA? |

| 09:00 | 1 | A.   Yes.  Eric Villette, Susanna Kuemmerle, those are the |
| 09:00 | 2 | ones I remember. |
| 09:00 | 3 | Q.   Okay.  And Ms. Kuemmerle was the one saying you |
| 09:01 | 4 | shouldn't take any disciplinary action because it might hurt |
| 09:01 | 5 | MGA's business? |
| 09:01 | 6 | A.   That's not exactly what she said.  But we saw that |
| 09:01 | 7 | e-mail yesterday. |
| 09:01 | 8 | Q.   So I'm just asking about you, the decisions you made. |
| 09:01 | 9 | A.   Uh-huh. |
| 09:01 | 10 | Q.   In making a decision as to whether or not Mr. Machado |
| 09:01 | 11 | or Mr. Vargas or Ms. Trueba should get bonuses or be |
| 09:01 | 12 | promoted, as opposed to, say, being fired, wouldn't you want |
| 09:01 | 13 | to know what they had taken from Mattel and brought in to |
| 09:01 | 14 | the MGA Mexico City offices?  Wouldn't you want to know |
| 09:01 | 15 | that? |
| 09:01 | 16 | A.   No. |
| 09:01 | 17 | Q.   So it wouldn't matter to you if -- if they had taken |
| 09:01 | 18 | Mattel's future business plans for the next two years? |
| 09:01 | 19 | A.   They didn't take Mattel's future plans for the next two |
| 09:01 | 20 | years.  I learned during this litigation.  You saw what they |
| 09:02 | 21 | took. |
| 09:02 | 22 | Q.   We'll get into that.  But you didn't know that -- you |
| 09:02 | 23 | said you didn't even ask at the time -- that you were giving |
| 09:02 | 24 | them promotions or raises or promoting them, right? |
| 09:02 | 25 | MS. KELLER:  Objection.  Asked and answered, today |

Case 2:04-cv-09049-DOC-RNB  Document 10042  Filed 02/22/11  Page 26 of 152  Page ID #:303055
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

26

| | | |
|---|---|---|
| 09:02 | 1 | and yesterday. |
| 09:02 | 2 | THE COURT:  Overruled. |
| 09:02 | 3 | THE WITNESS:  I'm sorry.  Can you repeat your |
| 09:02 | 4 | question? |
| 09:02 | 5 | BY MR. PRICE: |
| 09:02 | 6 | Q.   I'm gonna take you back to the time when you had a |
| 09:02 | 7 | decision to make as to what to do with three individuals who |
| 09:02 | 8 | took stuff from Mattel, brought it to MGA.  Okay?  I'm |
| 09:02 | 9 | taking you back to that timeframe.  Okay? |
| 09:02 | 10 | A.   Yes. |
| 09:02 | 11 | Q.   Now, what MGA should do after learning that would |
| 09:02 | 12 | depend somewhat, would you think, about what they took? |
| 09:02 | 13 | A.   Not necessarily.  I -- again, we were in litigation |
| 09:02 | 14 | with Mattel, and I turned the whole matter to the lawyers to |
| 09:02 | 15 | deal with. |
| 09:02 | 16 | Q.   But, Mr. Larian, you didn't turn the matter over to the |
| 09:02 | 17 | lawyers as to what to do with these three individuals, |
| 09:02 | 18 | whether to fire them or promote them or give them bonuses. |
| 09:02 | 19 | You didn't turn that over to the lawyers, did you? |
| 09:03 | 20 | MS. KELLER:  Objection.  Argumentative. |
| 09:03 | 21 | THE COURT:  Overruled. |
| 09:03 | 22 | THE WITNESS:  I just turned it over to the |
| 09:03 | 23 | lawyers. |
| 09:03 | 24 | BY MR. PRICE: |
| 09:03 | 25 | Q.   I'm trying to find out what you turned over. |

| | | |
|---|---|---|
| 09:03 | 1 | Did you turn over to the lawyers the decision as to |
| 09:03 | 2 | whether or not to promote or fire or give bonuses to these |
| 09:03 | 3 | three individuals? |
| 09:03 | 4 | A.   I turned the whole matter over to the lawyers, because |
| 09:03 | 5 | we were in litigation with Mattel at the time. |
| 09:03 | 6 | Q.   So your decision to promote Mr. Machado after you |
| 09:03 | 7 | learned about this theft, that was something which you |
| 09:03 | 8 | turned over to the lawyers for them to decide? |
| 09:03 | 9 | A.   No. |
| 09:03 | 10 | Q.   Your decision to give bonuses to Mr. Machado, |
| 09:03 | 11 | Ms. Trueba, Mr. Vargas, was that turned over to the lawyers? |
| 09:03 | 12 | A.   No. |
| 09:03 | 13 | Q.   Your decision not to fire those three individuals, was |
| 09:03 | 14 | that turned over to the lawyers? |
| 09:03 | 15 | A.   No. |
| 09:03 | 16 | Q.   So I'm talking to you about the decisions that you kept |
| 09:03 | 17 | to yourself. |
| 09:03 | 18 | A.   Let me take that back.  I'm not so sure if that portion |
| 09:04 | 19 | of it was -- again, I don't want to get into attorney-client |
| 09:04 | 20 | privilege.  I cannot answer your question in regards to a |
| 09:04 | 21 | decision to fire them or not to fire them, I guess, based on |
| 09:04 | 22 | attorney-client privilege. |
| 09:04 | 23 | Q.   Okay.  So let's just focus, then, on what you |
| 09:04 | 24 | acknowledge are decisions that you made with Ms. Kuemmerle's |
| 09:04 | 25 | assistance -- and I forgot the other person's -- Eric -- |

| | | |
|---|---|---|
| 09:04 | 1 | what was the third person? |
| 09:04 | 2 | A.   Eric Villette. |
| 09:04 | 3 | Q.   Eric Villette.  So focusing on the decisions you made |
| 09:04 | 4 | in deciding whether or not to promote or give bonuses to |
| 09:04 | 5 | these individuals who had taken items from Mattel and |
| 09:04 | 6 | brought them to MGA Mexico and you making those decisions -- |
| 09:04 | 7 | A.   Yes. |
| 09:04 | 8 | Q.   -- didn't you want to know what they had taken? |
| 09:04 | 9 | A.   No. |
| 09:04 | 10 | Q.   Well, if you wanted to know, could you have asked? |
| 09:05 | 11 | A.   Yes. |
| 09:05 | 12 | Q.   And you chose not to ask? |
| 09:05 | 13 | A.   I didn't ask. |
| 09:05 | 14 | Q.   I'm going to show you -- I think I have the actual disk |
| 09:05 | 15 | here -- Exhibit 22973 and 8855. |
| 09:05 | 16 | (Exhibit provided to the witness.) |
| 09:05 | 17 | THE WITNESS:  Yes. |
| 09:06 | 18 | BY MR. PRICE: |
| 09:06 | 19 | Q.   And first you see 22973? |
| 09:06 | 20 | A.   I'm sorry? |
| 09:06 | 21 | Q.   You see 22973, the document? |
| 09:06 | 22 | Ms. Juarez is gonna put that in front of you. |
| 09:06 | 23 | (Document provided to the witness.) |
| 09:06 | 24 | THE WITNESS:  Yes. |
| | 25 | |

| 09:06 | 1 | BY MR. PRICE: |
| 09:06 | 2 | Q.   And you see that's a -- a letter written by the law |
| 09:06 | 3 | firm of Skadden, Arps? |
| 09:06 | 4 | A.   Yes. |
| 09:06 | 5 | Q.   In January 2008? |
| 09:06 | 6 | A.   Yes. |
| 09:06 | 7 | Q.   And they were your counsel at the time? |
| 09:06 | 8 | A.   Yes. |
| 09:06 | 9 | Q.   And you see this is, uh, a letter to Mr. Corey of our |
| 09:06 | 10 | firm, Quinn Emanuel? |
| 09:06 | 11 | A.   Yes. |
| 09:06 | 12 |         MR. PRICE:  Your Honor, move Exhibit 22973 into |
| 09:06 | 13 | evidence. |
| 09:06 | 14 |         MS. KELLER:  Objection.  Your Honor, no foundation |
| 09:06 | 15 | for the whole exhibit.  No foundation for the CD from which |
| 09:07 | 16 | it came. |
| 09:07 | 17 |         THE COURT:  Could I see that letter for just a |
| 09:07 | 18 | moment. |
| 09:07 | 19 |         Is this part of the chain, Counsel? |
| 09:07 | 20 |         MR. PRICE:  Yes. |
| 09:07 | 21 |         THE COURT:  Is this part of the chain? |
| 09:07 | 22 |         MR. PRICE:  Yes. |
| 09:07 | 23 |          *(Document provided to the witness.)* |
| 09:07 | 24 |         THE COURT:  Overruled. |
| 09:07 | 25 |         It's received, Counsel. |

| | | |
|---|---|---|
| 09:07 | 1 | *(Exhibit No. 22973 received in evidence.)* |
| 09:07 | 2 | *(Document displayed.)* |
| 09:07 | 3 | BY MR. PRICE: |
| 09:07 | 4 | Q.   Now, in January -- |
| 09:07 | 5 | MS. KELLER:  Your Honor, may I clarify.  Is just |
| 09:07 | 6 | this letter received, or is the entire exhibit received? |
| 09:07 | 7 | THE COURT:  The letter is received at the present |
| 09:07 | 8 | time. |
| 09:07 | 9 | MS. KELLER:  Thank you, Your Honor. |
| 09:07 | 10 | BY MR. PRICE: |
| 09:07 | 11 | Q.   Mr. Larian, January 24, 2008, Skadden, Arps was acting |
| 09:07 | 12 | as your counsel, correct? |
| 09:07 | 13 | A.   Yes. |
| 09:07 | 14 | Q.   They were acting on your behalf? |
| 09:07 | 15 | A.   Yes. |
| 09:07 | 16 | Q.   And you see in this letter, January 24, 2008, to |
| 09:07 | 17 | Mr. Corey, it says, "Dear Mr. Corey, we have available for |
| 09:07 | 18 | your inspection the CD that Ms. Tonnu referenced in her |
| 09:08 | 19 | deposition." |
| 09:08 | 20 | Could you tell us who Ms. Tonnu is? |
| 09:08 | 21 | A.   Ms. Tonnu was -- Lisa Tonnu was an employee at MGA in |
| 09:08 | 22 | the accounting department. |
| 09:08 | 23 | Q.   What was her title? |
| 09:08 | 24 | A.   I don't remember her title. |
| 09:08 | 25 | |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

31

09:08    1    Q.   And when it says the CD referenced in Ms. Tonnu's

09:08    2    deposition, do you know what that's referring to?

09:08    3    A.   I have no idea.

09:08    4    Q.   "In addition, we had our discovery vendor prepare a,"

09:08    5    quote, "forensically sound, "closed quote, paren, "as you

09:08    6    have explained the term," close paren, "copy of the disk,

09:08    7    which is enclosed and Bates-numbered MGA 381-5506.  Let us

09:08    8    know if you would still like to inspect the CD.  In light of

09:08    9    the foregoing, please confirm that Mattel will withdraw its

09:08    10    motion to compel and avoid burdening Judge Infante with

09:08    11    needless motion practice.

09:08    12       "Very truly yours, Andrew C. Temkin."

09:08    13       Do you see that?

09:09    14    A.   Yes.

09:09    15    Q.   And you see that there's a photocopy on the second page

09:09    16    which appears to be a photocopy of the disk?

09:09    17    A.   Actually, there are some differences in it.  But...

09:09    18    Q.   Just looking at the document now.

09:09    19         *(Document displayed.)*

09:09    20       THE WITNESS:  Yes.

09:09    21    BY MR. PRICE:

09:09    22    Q.   Second page of the document?

09:09    23    A.   Yes, oh, yes.

09:09    24    Q.   Where it says Bryant v. Mattel, et cetera?

09:09    25    A.   Yes.

09:10    1    Q.    Mr. Larian, do you have Exhibit 8855 in front of you?

09:10    2    A.    Yes.

09:10    3    Q.    Have you ever, in any connection, reviewed documents

09:10    4    taken from the MGA Mexico offices, copies of which were put

09:10    5    on a CD?

09:10    6    A.    I have never seen the CD.  I saw those documents that

09:10    7    you gave me here.

09:10    8    Q.    Let me ask you a little bit about the documents that

09:10    9    you looked at that I asked you questions about and

09:10   10    Ms. Keller asked you questions about.

09:10   11    A.    Yes.

09:10   12    Q.    And one of 'em was 8466.

09:11   13              *(Document displayed.)*

09:11   14              THE WITNESS:  I don't have that, Counsel.

09:11   15              MR. PRICE:  I think it might be in their binders.

09:11   16              We'll bring you a large amount of information.

09:11   17              *(Documents provided to the witness.)*

09:12   18              THE WITNESS:  Go ahead.  I got my workout today.

09:12   19    BY MR. PRICE:

09:12   20    Q.    Yesterday I think you testified that you believe that

09:12   21    8466 was information that Walmart would convey to Mattel

09:12   22    concerning, basically, its inventory in its offices, its

09:12   23    stores?

09:12   24    A.    No.  This -- what I said is that looking at this --

09:12   25    again, I haven't gone over all, what, 8-, 900 pages of this

| | | |
|---|---|---|
| 09:12 | 1 | document, but from the look of it, it's from Retail Link, |
| 09:12 | 2 | where it's Walmart information provided to the vendors. |
| 09:12 | 3 | Q.   Now, let me ask you, if you look at the first page, you |
| 09:13 | 4 | received information from Walmart for MGA, correct? |
| 09:13 | 5 | A.   Yes. |
| 09:13 | 6 | Q.   So you've seen the format that Walmart provides |
| 09:13 | 7 | information to MGA about its products in the Walmart stores, |
| 09:13 | 8 | correct? |
| 09:13 | 9 | A.   I personally don't, no, I have not. |
| 09:13 | 10 | Q.   So you don't know what format Walmart sends data |
| 09:13 | 11 | concerning MGA's products at Walmart, correct? |
| 09:13 | 12 | A.   It didn't give you printout like this.  You go on |
| 09:13 | 13 | Retail Link, which is a computer link, and you can format |
| 09:13 | 14 | and look at different things.  And this is from Walmart. |
| 09:13 | 15 | Q.   Well, you have to do -- doesn't MGA do analysis of the |
| 09:13 | 16 | data it gets from Walmart? |
| 09:13 | 17 | A.   Yes, we do. |
| 09:13 | 18 | Q.   Isn't that what the first several pages of this are, is |
| 09:13 | 19 | Mattel's analysis of the data from Walmart and not just a |
| 09:13 | 20 | copy of the data? |
| 09:13 | 21 | A.   Yeah, probably are.  Yeah, you're right. |
| 09:13 | 22 | Q.   And with respect to -- MGA does analysis of the data |
| 09:13 | 23 | Walmart gives MGA? |
| 09:14 | 24 | A.   Yes. |
| 09:14 | 25 | Q.   And does MGA give that analysis to its competitors? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 34 of 152   Page ID #:303063
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:14 | 1 | A.   No. |
| 09:14 | 2 | Q.   You said that's a link where MGA can get information |
| 09:14 | 3 | about MGA.  Is there a link where MGA can get information |
| 09:14 | 4 | about Mattel? |
| 09:14 | 5 | A.   No. |
| 09:14 | 6 | Q.   And this large document contains fairly detailed |
| 09:14 | 7 | information about how the Mattel products are -- are |
| 09:14 | 8 | performing at Walmart, right? |
| 09:14 | 9 | A.   On the moment, on the -- every second over 60 million |
| 09:14 | 10 | people shop Walmart every minute.  So this is a very live |
| 09:14 | 11 | document.  It changes literally every minute. |
| 09:14 | 12 | Q.   So you have a new one of these every minute?  We're |
| 09:14 | 13 | talking about 8466. |
| 09:14 | 14 | A.   If you want to. |
| 09:14 | 15 | Q.   But the information MGA gets, it analyzes? |
| 09:15 | 16 | A.   I'm sorry? |
| 09:15 | 17 | Q.   It analyzes that data, correct? |
| 09:15 | 18 | A.   Yes. |
| 09:15 | 19 | Q.   It makes decisions based upon that data? |
| 09:15 | 20 | A.   Yes. |
| 09:15 | 21 | Q.   Yesterday you said that, uh, you can get this data for |
| 09:15 | 22 | a competitor by going to the stores.  You remember saying |
| 09:15 | 23 | that? |
| 09:15 | 24 | A.   Going to stores, I didn't say that. |
| 09:15 | 25 | Q.   You can go to the stores and -- and -- and look and see |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 35 of 152   Page ID #:303064
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

35

| | | |
|---|---|---|
| 09:15 | 1 | what's on the shelves.  Do you remember saying that? |
| 09:15 | 2 | A.   Yeah.  No.  The portion about what inventory is in the |
| 09:15 | 3 | stores or not in the stores, you can literally walk to a |
| 09:15 | 4 | Walmart and a Target and go to the section.  When the shelf |
| 09:15 | 5 | is empty, you can see, okay, they don't -- they don't have |
| 09:15 | 6 | merchandise.  Either they didn't get shipment or the product |
| 09:15 | 7 | was sold.  Yeah, you can look, go to a Walmart and Target. |
| 09:15 | 8 | And usually when you go and see if the shelves are full, |
| 09:15 | 9 | then you think the product's not selling.  If you see if the |
| 09:16 | 10 | shelves are empty, the products are selling.  You can get |
| 09:16 | 11 | that information. |
| 09:16 | 12 | Q.   So by going to a Walmart store, you can get the |
| 09:16 | 13 | information that's contained in this printout? |
| 09:16 | 14 | A.   No.  I was just talking about having inventory.  I |
| 09:16 | 15 | think the question was regarding if there is merchandise in |
| 09:16 | 16 | that store or not.  That's what I was answering. |
| 09:16 | 17 | Q.   So, uh, it's true that you can't, just by going to |
| 09:16 | 18 | Walmart store, get the detailed information that's contained |
| 09:16 | 19 | in 8466, correct? |
| 09:16 | 20 | A.   Correct. |
| 09:16 | 21 | Q.   And you -- you'd have to go to a number of stores, |
| 09:16 | 22 | right? |
| 09:16 | 23 | A.   What do you mean by that? |
| 09:16 | 24 | Q.   Well, the -- is it your understanding this is just one |
| 09:16 | 25 | store's data? |

| 09:16 | 1 | A.   No.   It's probably for all the stores -- Walmart |
| 09:16 | 2 | stores. |
| 09:16 | 3 | Q.   And that would be quite a job to go to all the Walmart |
| 09:16 | 4 | stores and -- and scope out what's on their shelves and get |
| 09:16 | 5 | data on that, right? |
| 09:16 | 6 | A.   Yes. |
| 09:16 | 7 | Q.   Now, the other thing you said is you can buy this data |
| 09:17 | 8 | from uh, NPD? |
| 09:17 | 9 | MS. KELLER:   Objection.   Misstates the testimony. |
| 09:17 | 10 | THE COURT:   Overruled. |
| 09:17 | 11 | THE WITNESS:   I didn't say you can buy this data |
| 09:17 | 12 | from NPD.   I said that you can find out -- there are two -- |
| 09:17 | 13 | there are different services.   USA, it's call NPD.   In |
| 09:17 | 14 | Mexico, it's called Nielsen.   In Australia, it's called GfK. |
| 09:17 | 15 | That you can go buy that information.   And they give you |
| 09:17 | 16 | what's selling, what's not selling for your product as well |
| 09:17 | 17 | as all your competitors, for special categories. |
| 09:17 | 18 | BY MR. PRICE: |
| 09:17 | 19 | Q.   So just to be clear, when you said that you can go |
| 09:17 | 20 | to -- I guess in Mexico it's Nielsen? |
| 09:17 | 21 | A.   Right. |
| 09:17 | 22 | Q.   -- and get that information, are you talking about the |
| 09:17 | 23 | detailed information that you see in Exhibit 8466? |
| 09:17 | 24 | A.   Some of it, yes. |
| 09:17 | 25 | Q.   How much of it? |

| | | |
|---|---|---|
| 09:17 | 1 | A.   What's selling, what's not selling. |
| 09:18 | 2 | Q.   And, uh, do you understand how Nielsen gets their |
| 09:18 | 3 | information? |
| 09:18 | 4 | A.   I think they get it from -- I don't know how they do it |
| 09:18 | 5 | in Mexico.  But they have -- I know in USA now what NPD does |
| 09:18 | 6 | is -- it's like Nielsen ratings.  They have whole bunch of |
| 09:18 | 7 | people who -- who give them information of what they're |
| 09:18 | 8 | buying and what they're not buying.  It's like taking an |
| 09:18 | 9 | election poll.  Basically, they get a sample.  And |
| 09:18 | 10 | statistically, they figure out what is a market share, |
| 09:18 | 11 | what's not a market share; what is selling, what's not |
| 09:18 | 12 | selling. |
| 09:18 | 13 | Q.   So what they do is they, like, talk to people as they |
| 09:18 | 14 | leave the store? |
| 09:18 | 15 | A.   No, they don't do that.  No. |
| 09:18 | 16 | Q.   Uh, I thought you testified when I asked you that |
| 09:18 | 17 | Walmart didn't participate in -- in NPD? |
| 09:18 | 18 | A.   In USA.  Now, they don't.  They don't give directly the |
| 09:19 | 19 | information to NPD.  But there are -- again, like NPD hires |
| 09:19 | 20 | a lot of people, like Nielsen ratings on TV series here. |
| 09:19 | 21 | They don't -- they get -- from what I understand, I think |
| 09:19 | 22 | there are like 2,000 people in America who have their TVs |
| 09:19 | 23 | coded, and every time they go to a channel, like say they go |
| 09:19 | 24 | and see *Friends*, they give that information directly to |
| 09:19 | 25 | Nielsen, and then Nielsen figures out what the ratings is. |

| | | |
|---|---|---|
| 09:19 | 1 | So that's the same time of a feature. |
| 09:19 | 2 | Q.   Does Walmart participate? |
| 09:19 | 3 | A.   In what? |
| 09:19 | 4 | Q.   In this information that you said that you could buy |
| 09:19 | 5 | from Nielsen and NPD. |
| 09:19 | 6 | A.   I don't know what they do in Mexico.  I know in USA |
| 09:19 | 7 | Walmart doesn't give their information to NPD anymore, |
| 09:19 | 8 | directly, no. |
| 09:20 | 9 | Q.   And if you look at the first page of this document -- |
| 09:20 | 10 | A.   Yes. |
| 09:20 | 11 | Q.   -- and particularly, let's say the -- there's a column, |
| 09:20 | 12 | 1, 2, 3, 4, 5 -- 7 columns in, where it says, "Mattel |
| 09:20 | 13 | Shippings," "Mattel shipments to customer." |
| 09:20 | 14 | Do you see that? |
| 09:20 | 15 | A.   Yes. |
| 09:20 | 16 | Q.   That's not Walmart information, is it?  That's Mattel's |
| 09:20 | 17 | information. |
| 09:20 | 18 | A.   What they have shipped to Walmart.  But it comes out of |
| 09:20 | 19 | Walmart system. |
| 09:20 | 20 | Q.   This information is internal Mattel information, isn't |
| 09:20 | 21 | it? |
| 09:20 | 22 | A.   No.  It's -- look at the right-hand corner, left-hand |
| 09:20 | 23 | corner, in red. |
| 09:20 | 24 | Q.   You see where it says -- |
| 09:20 | 25 | A.   What -- |

| | | |
|---|---|---|
| 09:20 | 1 | Q.   I'm sorry.  Go ahead. |
| 09:20 | 2 | A.   If you go to the -- *(Indicating)*.  Can you highlight |
| 09:20 | 3 | this here? |
| 09:21 | 4 | "Mexico customers, Walmex."  That's Walmart Mexico. |
| 09:21 | 5 | That information is from Walmart Mexico as of April 11, |
| 09:21 | 6 | 2004, updated April 11, 2004.  You can get it updated every |
| 09:21 | 7 | day. |
| 09:21 | 8 | Q.   What's the column "TLP Quota"? |
| 09:21 | 9 | A.   I have no idea what TLP Quota is. |
| 09:21 | 10 | Q.   That's a forecast from Mattel, isn't it? |
| 09:21 | 11 | A.   I don't know. |
| 09:21 | 12 | Q.   That wouldn't be Walmart information, would it? |
| 09:21 | 13 | A.   I don't know what TLP quota is on this document. |
| 09:21 | 14 | Q.   I think you've told us you don't even look at the data |
| 09:21 | 15 | that's provided by Walmart to MGA? |
| 09:21 | 16 | A.   Personally?  Personally, I do once in a while, but I |
| 09:21 | 17 | haven't done it for past few years, no.  We have other |
| 09:21 | 18 | people who do that. |
| 09:21 | 19 | Q.   So to -- to buy this information, obviously, you have |
| 09:21 | 20 | to pay for it? |
| 09:22 | 21 | A.   Buy what information? |
| 09:22 | 22 | Q.   You -- you said you could buy this sort of information |
| 09:22 | 23 | from Nielsen and -- and NPD.  So, obviously, you're paying |
| 09:22 | 24 | for this? |
| 09:22 | 25 | A.   If -- if you want to get that information from NPD or |

40

| | | |
|---|---|---|
| 09:22 | 1 | Nielsen, you have to pay for it, yes. |
| 09:22 | 2 | Q.   So there's some market value for even the information |
| 09:22 | 3 | that NPD and Nielsen has, correct? |
| 09:22 | 4 | A.   I don't understand your question. |
| 09:22 | 5 | Q.   Well, you said you can buy it? |
| 09:22 | 6 | A.   Yes. |
| 09:22 | 7 | Q.   That suggests there's some value to it if people are |
| 09:22 | 8 | paying for it, right? |
| 09:22 | 9 | A.   Yes. |
| 09:22 | 10 | Q.   And what they're paying for with Nielsen and NPD would |
| 09:22 | 11 | be far less detailed than what you see in Exhibit 8466, |
| 09:22 | 12 | correct? |
| 09:22 | 13 | A.   Again, I haven't gone through every page of this. |
| 09:22 | 14 | First time I saw this, during the first trial, so I couldn't |
| 09:22 | 15 | even tell you.  But I know, generally, that this information |
| 09:22 | 16 | is basically spoiled every minute.  It changes every minute |
| 09:23 | 17 | because of the number of customers who shop Walmart every |
| 09:23 | 18 | minute. |
| 09:23 | 19 | Q.   So if that's true, then, certainly no one would pay for |
| 09:23 | 20 | this information? |
| 09:23 | 21 | A.   I'm sorry? |
| 09:23 | 22 | Q.   If that's true, then no one would pay for it? |
| 09:23 | 23 | A.   Pay for this whole document? |
| 09:23 | 24 | Q.   Or any portion of it.  No one would pay for it? |
| 09:23 | 25 | A.   No, some portion of the POS data, of course, is |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 41 of 152   Page ID #:303070
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

41

09:23   1   valuable, because you look at that to figure out trends, to

09:23   2   find out what's selling for you, for your competitor,

09:23   3   et cetera.  That's valuable.  You pay for it.

09:23   4   Q.   Look at Exhibit 7104.

09:23   5            (Document provided to the witness.)

09:23   6            (Document displayed.)

09:24   7   BY MR. PRICE:

09:24   8   Q.   Do you have that in front of you?

09:24   9   A.   Yes, I do.

09:24   10  Q.   Can you see if that has an MGA production number?

09:24   11  A.   Yes, it does.

09:24   12  Q.   And this is something called the "All World List."  Do

09:24   13  you see at the bottom where it has "Toy Fair 2004/2005 All

09:24   14  Worlds"?

09:24   15  A.   I can't find it.

09:24   16  Q.   It's in the bottom left.

09:24   17            MR. PRICE:  Ken, if you can -- right above

09:24   18  "confidential."

09:24   19            THE WITNESS:  Okay.  Yes, it says, "All Worlds

09:25   20  XLS."

09:25   21  BY MR. PRICE:

09:25   22  Q.   In preparation for your 30(b)(6) deposition, you said

09:25   23  you read depositions to become acquainted with what was

09:25   24  seized?

09:25   25  A.   I read a portion of deposition.

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 42 of 152   Page ID #:303071
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

42

09:25   1    Q.   And do you understand that Mr. Machado had information

09:25   2    from Mattel on his computer, which he later then put into a

09:25   3    disk?

09:25   4              MS. KELLER:  Objection.  Misstates the evidence,

09:25   5    Your Honor.

09:25   6              THE COURT:  Overruled.

09:25   7              THE WITNESS:  I have no idea what he had in a

09:25   8    computer and what he did or did not put on his disk.

09:25   9    BY MR. PRICE:

09:25  10    Q.   Do you know, generally, that when someone transfers

09:25  11    data, that it will sometimes put a stamp on at the time it's

09:25  12    transferred?

09:25  13    A.   I don't.  It's possible.

09:25  14    Q.   So let's look at 7104.  You've been in court and heard

09:26  15    testimony from Mr. Bryant that Mattel often plans a year or

09:26  16    so ahead of time, correct?

09:26  17    A.   Everyone plans what a year?

09:26  18    Q.   Its lines?

09:26  19    A.   Yes.

09:26  20    Q.   And so you understand that even as early as

09:26  21    February/March, 2004, Mattel is planning for its lines for

09:26  22    the coming year?

09:26  23    A.   I have no idea when Mattel plans for their line ahead.

09:26  24    I know about MGA.  I have no idea about Mattel.

09:26  25    Q.   Well, you said when you heard Mr. Bryant testify that

| | | |
|---|---|---|
| 09:26 | 1 | those plans can be up to a year in advance, right? |
| 09:26 | 2 | A.   I'm sorry.  I didn't memorize everything that |
| 09:26 | 3 | Mr. Bryant said. |
| 09:26 | 4 | Q.   Well, didn't you testify that one of the advantages of |
| 09:26 | 5 | your operation is that you were quicker? |
| 09:27 | 6 | A.   To -- I don't think I've done it here, but we are |
| 09:27 | 7 | quicker to the market, yes. |
| 09:27 | 8 | Q.   This document, Exhibit 7104, tells you what Mattel is |
| 09:27 | 9 | thinking of doing for its entire product line for the next |
| 09:27 | 10 | year, for 2005? |
| 09:27 | 11 | A.   I don't see that in there.  No, I'm sorry. |
| 09:27 | 12 | Q.   Well, do you see it says "Barbie 2005, prelim line |
| 09:27 | 13 | list"? |
| 09:27 | 14 | A.   Yes. |
| 09:27 | 15 | Q.   At the top? |
| 09:27 | 16 | A.   Yes. |
| 09:27 | 17 | Q.   So this is a preliminary list as to what's going to |
| 09:27 | 18 | be -- what is going to be projected in the Barbie line for |
| 09:27 | 19 | the year 2005? |
| 09:27 | 20 | A.   I don't know.  I assume so.  That's a Mattel document. |
| 09:27 | 21 | Q.   It's a Mattel document that was in MGA Mexico's hands? |
| 09:28 | 22 | A.   Apparently, yes. |
| 09:28 | 23 | Q.   I mean, you were asked about estimates of price.  This |
| 09:28 | 24 | also estimates, uh, the specific lines that Mattel plans to |
| 09:28 | 25 | come out with, right? |

| | | |
|---|---|---|
| 09:28 | 1 | A.   I'm sorry?  What does this -- I'm lost at your |
| 09:28 | 2 | question. |
| 09:28 | 3 | Q.   Sure.  With Ms. Keller you said -- I think she asked |
| 09:28 | 4 | you questions about price on this.  But what this does is, |
| 09:28 | 5 | is tell you in detail what Mattel plans to come out with a |
| 09:28 | 6 | year later, the products? |
| 09:28 | 7 | A.   No, it doesn't.  It doesn't tell me that.  I don't read |
| 09:28 | 8 | it that way.  Maybe it does, but that's not how I read it. |
| 09:28 | 9 | Q.   Well, look at, for example, page 9, 7104-00009. |
| 09:28 | 10 | A.   Yes. |
| 09:28 | 11 | Q.   You see there's something Tea Party Princess? |
| 09:29 | 12 | A.   I have to find it. |
| 09:29 | 13 | Q.   It's 7104-00009. |
| 09:29 | 14 | A.   I'm on that page. |
| 09:29 | 15 | Q.   And you see it says "Tea Party Princess."  Do you see |
| 09:29 | 16 | that? |
| 09:29 | 17 | A.   I apologize.  I can't find it there.  Oh, okay. |
| 09:29 | 18 | Q.   It's right at the top there. |
| 09:29 | 19 | A.   For some reason I don't see that on this page. |
| 09:29 | 20 | Q.   See if Ms. Juarez can -- |
| 09:29 | 21 | A.   Okay.  Too many different numbers.  I have a wrong |
| 09:29 | 22 | page. |
| 09:29 | 23 | Q.   That's okay. |
| 09:29 | 24 | A.   Yes, I see it. |
| 09:29 | 25 | Q.   And it goes into detail about that line, right? |

| | | |
|---|---|---|
| 09:29 | 1 | MS. KELLER:  Calls for speculation, Your Honor. |
| 09:29 | 2 | THE COURT:  Overruled. |
| 09:29 | 3 | THE WITNESS:  I can't even read this, frankly.  I |
| 09:29 | 4 | don't know what these are.  I can't even read 'em on the |
| 09:29 | 5 | copy in front of me, nor can I read it on the screen. |
| 09:29 | 6 | BY MR. PRICE: |
| 09:29 | 7 | Q.   Okay.  Well, look at the one below that.  It says, |
| 09:29 | 8 | "princess fall theme TBD, awaiting movie results."  Do you |
| 09:30 | 9 | see that? |
| 09:30 | 10 | A.   Yes. |
| 09:30 | 11 | Q.   So that's something they're forecasting, but they're |
| 09:30 | 12 | gonna have to wait until they get movie results, right? |
| 09:30 | 13 | A.   I have no idea.  I have no idea. |
| 09:30 | 14 | Q.   Safe to say that Mr. Machado would have had a pretty |
| 09:30 | 15 | good idea of what this document was, right? |
| 09:30 | 16 | MR. OVERLAND:  Objection.  Calls for speculation. |
| 09:30 | 17 | THE COURT:  Overruled. |
| 09:30 | 18 | THE WITNESS:  I have no idea. |
| 09:30 | 19 | BY MR. PRICE: |
| 09:30 | 20 | Q.   Would it be valuable information to MGA to know a year |
| 09:30 | 21 | ahead of time what Mattel planned to put on the market? |
| 09:30 | 22 | A.   Yes. |
| 09:30 | 23 | Q.   Would you consider that among the most valuable |
| 09:30 | 24 | information MGA could get about Mattel; that is, what |
| 09:30 | 25 | product lines it plans to introduce on the market in a year? |

| 09:30 | 1 | A.    Yes.  Or any other company. |
| 09:31 | 2 | Q.    Now, you -- you, uh, testified a bit in my examination |
| 09:31 | 3 | about -- and I think Ms. Keller's, about planograms? |
| 09:31 | 4 | A.    Yes. |
| 09:31 | 5 | Q.    I think you said those usually take place a couple of |
| 09:31 | 6 | weeks after toy fairs? |
| 09:31 | 7 | A.    No.  Different times.  They're two different seasons. |
| 09:31 | 8 | Q.    When you spoke with Mr. Machado, when he told you that |
| 09:31 | 9 | he had brought Mattel property in MGA Mexico, why didn't you |
| 09:31 | 10 | ask him if he'd taken anything as important as Mattel's |
| 09:31 | 11 | projections for what it was gonna put on market the next |
| 09:32 | 12 | year? |
| 09:32 | 13 | A.    I didn't even know -- I didn't know this document about |
| 09:32 | 14 | something -- I mean, it's Mattel is gonna bring to the |
| 09:32 | 15 | market next year or not, so I didn't ask that question. |
| 09:32 | 16 | Q.    Well -- |
| 09:32 | 17 | A.    If you're asking me if I asked that question, I did |
| 09:32 | 18 | not. |
| 09:32 | 19 | Q.    Well, did he and Ms.-- Mr. Vargas -- at least |
| 09:32 | 20 | Mr. Vargas and Ms. Trueba continued working at MGA Mexico |
| 09:32 | 21 | for how long after this search? |
| 09:32 | 22 | A.    What was date of the search again?  I'm sorry. |
| 09:32 | 23 | Q.    October 2005. |
| 09:32 | 24 | A.    I think they worked to 2007 or '8. |
| 09:32 | 25 | Q.    And you don't know one way or another whether they, uh, |

| 09:32 | 1 | used this information in pursuing MGA Mexico's business |
| 09:32 | 2 | plans? |
| 09:32 | 3 | A.   They told me they didn't use it.  As a matter of fact, |
| 09:33 | 4 | Mariana Trueba swore on her mother and her children that she |
| 09:33 | 5 | has never used it.  And I believe her. |
| 09:33 | 6 | Q.   Did she swear that she didn't take information? |
| 09:33 | 7 | A.   No. |
| 09:33 | 8 | Q.   And you've -- you've reviewed her deposition in |
| 09:33 | 9 | preparation for your 30(b)(6)? |
| 09:33 | 10 | A.   I don't recall if I did or not. |
| 09:33 | 11 | Q.   Let me ask you about Mr. Castilla.  For Mr. Castilla, |
| 09:34 | 12 | did you ever try to find out from him what kind of |
| 09:34 | 13 | information he took from Mattel? |
| 09:34 | 14 | A.   I did not. |
| 09:34 | 15 | Q.   Do you know whether or not he took from Mattel, uh, a |
| 09:34 | 16 | five-year strategic plan? |
| 09:34 | 17 | A.   I have no idea what he took.  Never brought anything to |
| 09:34 | 18 | MGA.  FBI took it before he came to MGA. |
| 09:34 | 19 | Q.   So when he came to you and said, you know, basically, |
| 09:34 | 20 | there's this -- there's this issue that's come up -- you |
| 09:34 | 21 | recall that? |
| 09:34 | 22 | A.   Yes. |
| 09:34 | 23 | Q.   You -- you asked him what he did? |
| 09:34 | 24 | A.   Yes. |
| 09:34 | 25 | Q.   Okay.  Uh, so did you ask him why he downloaded |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 48 of 152   Page ID #:303077
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:34 | 1 | Mattel's information before he left Mattel? |
| 09:34 | 2 | A.   I did. |
| 09:34 | 3 | Q.   And he said that -- tell us what he said. |
| 09:34 | 4 | A.   He said, "These are sample of some of the works that I |
| 09:34 | 5 | had done before.  I want to have a copy for myself."  I |
| 09:35 | 6 | didn't think about it. |
| 09:35 | 7 | Q.   Do you know whether or not his work at Mattel included |
| 09:35 | 8 | doing five-year strategic plans? |
| 09:35 | 9 | A.   I have no idea. |
| 09:35 | 10 | Q.   So your testimony now is that you did talk to |
| 09:35 | 11 | Mr. Castilla about whether or not he had taken or used any |
| 09:35 | 12 | Mattel trade secret or internal Mattel information? |
| 09:35 | 13 | A.   I'm sorry? |
| 09:35 | 14 | Q.   Your testimony now is that you did speak with |
| 09:35 | 15 | Mr. Castilla about whether or not he had taken or used |
| 09:35 | 16 | Mattel trade secrets or internal Mattel information? |
| 09:35 | 17 |           MS. KELLER:  Objection.  Compound. |
| 09:35 | 18 |           THE COURT:  Overruled. |
| 09:35 | 19 |           THE WITNESS:  I'm sorry.  I don't understand the |
| 09:35 | 20 | question. |
| 09:35 | 21 |           THE COURT:  Reask it. |
| 09:35 | 22 | BY MR. PRICE: |
| 09:35 | 23 | Q.   Have you ever spoken with Mr. Castilla -- |
| 09:35 | 24 | A.   Yes. |
| 09:35 | 25 | Q.   -- about whether or not he had taken or used any Mattel |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:35 | 1 | trade secrets or internal Mattel information? |
| 09:36 | 2 | A.   At MGA -- okay.  You're asking has he taken information |
| 09:36 | 3 | or has he used it?  You're asking me two, three different |
| 09:36 | 4 | questions in one time.  That's my difficulty of |
| 09:36 | 5 | understanding and answering. |
| 09:36 | 6 | Q.   Have you ever spoken -- |
| 09:36 | 7 | A.   If you could break it down, I would be happy to answer |
| 09:36 | 8 | that. |
| 09:36 | 9 | Q.   Have you ever spoken to Mr. Castilla about whether or |
| 09:36 | 10 | not he had taken any Mattel trade secrets or internal Mattel |
| 09:36 | 11 | information? |
| 09:36 | 12 | A.   He told me that he did take information from Mattel |
| 09:36 | 13 | before he came to MGA. |
| 09:36 | 14 | Q.   So you -- you spoke to him about that? |
| 09:36 | 15 | A.   Yes. |
| 09:36 | 16 | Q.   Okay.  Have you ever spoken with him about whether or |
| 09:36 | 17 | not he used any trade secrets or internal Mattel |
| 09:36 | 18 | information? |
| 09:36 | 19 | A.   At MGA, you mean? |
| 09:36 | 20 | Q.   Yes. |
| 09:36 | 21 | A.   Yes.  He said he has not. |
| 09:36 | 22 | Q.   So you spoke to him about both subjects? |
| 09:36 | 23 | A.   To the best of my recollection, yes. |
| 09:36 | 24 | MR. PRICE:  If we could read, Your Honor, from |
| 09:36 | 25 | Mr. Larian's deposition.  This is December 10, 2009.  This |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

50

09:37  1    is page 718, lines 16 through 20.

09:37  2              *(Document provided to the Court.)*

09:37  3              THE COURT:  You may.

09:37  4              THE WITNESS:  Yes, go ahead.

09:37  5              MR. PRICE:  (Reading:)

09:37  6              "QUESTION:  Have you spoken with Mr. Castilla

09:37  7    about whether or not he had taken or used any Mattel trade

09:37  8    secrets or internal Mattel information?

09:37  9              "ANSWER:  I don't recall.  I don't recall one --

09:37  10   one way or another.  I don't recall it."

09:37  11   BY MR. PRICE:

09:37  12   Q.   And it's fair to say that you yourself did not take any

09:38  13   steps to determine whether or not Mr. Castilla, in fact,

09:38  14   stole internal Mattel information; is that true?

09:38  15   A.   Personally, no, I turned everything over to the

09:38  16   lawyers.

09:38  17   Q.   And it's true that you yourself haven't taken any steps

09:38  18   to determine whether or not Mr. Castilla, in fact, used the

09:38  19   internal Mattel information that he stole?

09:38  20   A.   True.  I have not personally done that.

09:38  21   Q.   You -- uh, you did tell us, though, you thought it was

09:38  22   uh, a bad thing that Mr. Castilla did; it was wrong?

09:38  23   A.   Yes.  Because I told him not to bring anything, and he

09:39  24   was wrong no matter what.  Even if he had his work sample

09:39  25   that he was talking about, he shouldn't have done it.

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:39 | 1 | Q.   Let me focus on -- I want to focus on your testimony |
| 09:39 | 2 | with Ms. Keller. |
| 09:39 | 3 | A.   Excuse me for one second. |
| 09:39 | 4 | Q.   Sure. |
| 09:39 | 5 | A.   Go ahead. |
| 09:39 | 6 | Q.   Mr. Larian, I want to talk to you about your testimony |
| 09:39 | 7 | in Mr. Keller's examination about -- about MGA in 2000/2001, |
| 09:39 | 8 | that timeframe.   Okay? |
| 09:39 | 9 | A.   Yes. |
| 09:39 | 10 | Q.   And you testified for us, a period of time, about how |
| 09:39 | 11 | MGA grew, how many employees it had at one time.   Do you |
| 09:40 | 12 | remember that? |
| 09:40 | 13 | A.   Yes. |
| 09:40 | 14 | Q.   And what's the peak in terms of MGA's employees? |
| 09:40 | 15 | A.   What do you mean?   How many employees did we have? |
| 09:40 | 16 | Q.   Yes. |
| 09:40 | 17 | A.   God, I think at one time we had over 2000 employees |
| 09:40 | 18 | worldwide. |
| 09:40 | 19 | Q.   So let's focus now in 2000.   And in 2000, I think you |
| 09:40 | 20 | had somewhere over 50 employees? |
| 09:40 | 21 | A.   Yes, somewhere 50 to a hundred.   Less than a hundred. |
| 09:40 | 22 | Q.   And you showed the jury a number of -- of dolls that |
| 09:40 | 23 | MGA had made prior to, uh, 2000, or in the 2000 timeframe. |
| 09:40 | 24 | Do you remember that? |
| 09:40 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 52 of 152   Page ID #:303081
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

52

| | | |
|---|---|---|
| 09:40 | 1 | Q.   And, uh, I think you testified for a number of those |
| 09:40 | 2 | dolls that they were, in your words, successful? |
| 09:40 | 3 | A.   Which dolls you talking about?  Like Singing Bouncy |
| 09:40 | 4 | Baby?  My Dream Baby?  Me and My Shadow? |
| 09:40 | 5 | Q.   The ones that you had made prior to ever meeting |
| 09:40 | 6 | Mr. Bryant. |
| 09:41 | 7 | A.   Yes. |
| 09:41 | 8 | Q.   Now, if we're gonna look at success of a company, one |
| 09:41 | 9 | thing to look at is whether or not it's making money, |
| 09:41 | 10 | correct? |
| 09:41 | 11 | A.   Yes. |
| 09:41 | 12 | Q.   And in your direct examination -- your |
| 09:41 | 13 | cross-examination, Ms. Keller's examination, you answered |
| 09:41 | 14 | questions about the financials of MGA in 2000 and 2001.  Do |
| 09:41 | 15 | you remember that? |
| 09:41 | 16 | A.   Yes. |
| 09:41 | 17 | Q.   And do you recall being asked by Ms. Keller -- first of |
| 09:41 | 18 | all, you testified that MGA lost money in both 2000 and |
| 09:41 | 19 | 2001, correct? |
| 09:41 | 20 | A.   We did. |
| 09:41 | 21 | Q.   And you told me when I did my examination of you that |
| 09:42 | 22 | MGA had declared bankruptcy in '97; is that right? |
| 09:42 | 23 | A.   Yes. |
| 09:42 | 24 | Q.   And you recall being asked by Ms. Keller why was it you |
| 09:42 | 25 | lost money in 2000/2001? |

| 09:42 | 1 | A.   I don't remember. |
| 09:42 | 2 | Q.   Do you remember saying, "We lost money because we had |
| 09:42 | 3 | to spend lot of money to advertise and build it up," |
| 09:42 | 4 | referring to Bratz? |
| 09:42 | 5 | A.   In 2001, yes. |
| 09:42 | 6 | Q.   Well, she said -- she asked you, "Why did you lose |
| 09:42 | 7 | money in 2000/2001?" and you said, "Because we had to spend |
| 09:42 | 8 | a lot of money to advertise and build it up." |
| 09:42 | 9 | A.   No, she asked about 2001.  And I said, "In 2001 we |
| 09:42 | 10 | invested a lot of money to build the brand, advertising it |
| 09:42 | 11 | to build the brand."  And we did.  We spent a lot of money |
| 09:42 | 12 | to build the brand. |
| 09:42 | 13 | Q.   Do you recall saying, "We lost money in both years 2000 |
| 09:42 | 14 | and 2001"? |
| 09:42 | 15 | "QUESTION:  That's because of what? |
| 09:42 | 16 | "ANSWER:  Because we had to spend a lot of money to |
| 09:42 | 17 | advertise and build it up.  I remember that in October of |
| 09:43 | 18 | 2000" -- you corrected this -- "Toys R Us canceled |
| 09:43 | 19 | $6.3 million order of Bratz because they said it's not |
| 09:43 | 20 | selling well at retail. |
| 09:43 | 21 | "QUESTION:  That was in 2001? |
| 09:43 | 22 | "ANSWER:  That's correct. |
| 09:43 | 23 | "QUESTION:  October 2000 -- because you said October of |
| 09:43 | 24 | 2000." |
| 09:43 | 25 | And your answer was:  "I made a mistake." |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:43 | 1 | Do you recall that? |
| 09:43 | 2 | A.   I did. |
| 09:43 | 3 | Q.   So let me ask you, then, about 2000. |
| 09:43 | 4 | A.   Yes. |
| 09:43 | 5 | Q.   Because you didn't understand her to be asking why you |
| 09:43 | 6 | lost money in both years. |
| 09:43 | 7 | A.   I'm sorry.  I answered her questions, whatever she |
| 09:43 | 8 | asked. |
| 09:43 | 9 | Q.   Well, in 2000, the reason you lost money is because the |
| 09:43 | 10 | mechanical toys that you had sent out, you had a -- a defect |
| 09:44 | 11 | rate of, uh, over 23 percent? |
| 09:44 | 12 | A.   On one of them, we did, yes. |
| 09:44 | 13 | Q.   You lost money because, uh, two or three merchandise |
| 09:44 | 14 | that were high tech had shipped to the market, did not work |
| 09:44 | 15 | well so there were returns, major returns, correct? |
| 09:44 | 16 | A.   Yes, correct. |
| 09:44 | 17 | Q.   So your loss in 2000 had nothing to do with Bratz, |
| 09:44 | 18 | right? |
| 09:44 | 19 | A.   There was no Bratz in 2000, correct. |
| 09:44 | 20 | Q.   It had nothing to do with investing and people or |
| 09:44 | 21 | advertising or -- or prototyping or anything, right? |
| 09:44 | 22 | A.   Yes. |
| 09:44 | 23 | Q.   It had to do with selling the products that you had |
| 09:44 | 24 | created prior to meeting Mr. Bryant, right? |
| 09:44 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 55 of 152   Page ID #:303084
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:44 | 1 | Q.   And if you could also look at Exhibit 23964. |
| 09:45 | 2 | A.   Yes. |
| 09:45 | 3 |           *(Document provided to the witness.)* |
| 09:45 | 4 | BY MR. PRICE: |
| 09:45 | 5 | Q.   Do you recognize that as an e-mail string between you |
| 09:45 | 6 | and Mr. Patrick Williams? |
| 09:45 | 7 | A.   Yes, I do. |
| 09:45 | 8 | Q.   Mr. Williams was the head of international sales? |
| 09:45 | 9 | A.   No.  He was head of sales. |
| 09:45 | 10 | Q.   And in Ms. Keller's examination, you recall that you |
| 09:45 | 11 | talked about, uh, what it was like to work at MGA in the |
| 09:45 | 12 | year 2000? |
| 09:45 | 13 | A.   I don't remember her asking that. |
| 09:46 | 14 | Q.   You recall you talked about your open-door policy? |
| 09:46 | 15 | A.   My door is always open. |
| 09:46 | 16 | Q.   You were talking about how, you know, designers can |
| 09:46 | 17 | come to you and talk to you at any time? |
| 09:46 | 18 | A.   I don't know if I did that or not, but designers can |
| 09:46 | 19 | come and talk to me at any time; that's true. |
| 09:46 | 20 | Q.   You were talking about how it was kind of a creative |
| 09:46 | 21 | environment that you were proud of? |
| 09:46 | 22 | A.   I am proud of creative environment at Mattel -- at MGA. |
| 09:46 | 23 | Q.   And that you had good relationships with your |
| 09:46 | 24 | employees? |
| 09:46 | 25 | A.   I do. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 56 of 152   Page ID #:303085
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

56

| | | |
|---|---|---|
| 09:46 | 1 | MS. KELLER:  Objection.  Your Honor, this is much |
| 09:46 | 2 | broader than what I asked about.  I asked about the |
| 09:46 | 3 | open-door policy with designers. |
| 09:46 | 4 | THE COURT:  Thank you. |
| 09:46 | 5 | Overruled. |
| 09:46 | 6 | BY MR. PRICE: |
| 09:46 | 7 | Q.  Well, she asked you specifically about your management |
| 09:46 | 8 | style, right? |
| 09:46 | 9 | A.   I don't think she did. |
| 09:46 | 10 | MS. KELLER:  No -- objection, Your Honor. |
| 09:46 | 11 | Misstates the testimony. |
| 09:46 | 12 | THE COURT:  Well, there was a lot of conversation |
| 09:46 | 13 | about the management style back in 2000, 2001.  Both asked |
| 09:46 | 14 | and both volunteered, Counsel. |
| 09:46 | 15 | Overruled. |
| 09:47 | 16 | BY MR. PRICE: |
| 09:47 | 17 | Q.  Do you remember saying that MGA's a small entrepreneur |
| 09:47 | 18 | type of company; we don't have a lot of bureaucracy; we |
| 09:47 | 19 | don't have red tape; decisions are fast; people are given |
| 09:47 | 20 | freedom; marketing, pricing; use your imagination?  Do you |
| 09:47 | 21 | remember testifying all about that in Ms. Keller's -- |
| 09:47 | 22 | A.   And that's true, yes. |
| 09:47 | 23 | Q.  So this e-mail that you got from Mr. Williams, the head |
| 09:47 | 24 | of sales, it's dated April 9, 2001.  Do you recall that? |
| 09:47 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:47 | 1 | MR. PRICE:  Your Honor, move Exhibit 23964 into |
| 09:47 | 2 | evidence. |
| 09:47 | 3 | THE COURT:  Received. |
| 09:47 | 4 | *(Exhibit No. 23964 received in evidence.)* |
| 09:47 | 5 | *(Document displayed.)* |
| 09:47 | 6 | BY MR. PRICE: |
| 09:47 | 7 | Q.   I first want to go on the first e-mail -- it's actually |
| 09:47 | 8 | the last in the string, but the first on this page -- from |
| 09:47 | 9 | you to Mr. Williams, sent April 9, 2001.  It says, "Re |
| 09:47 | 10 | Monday staff meeting."  Do you see that? |
| 09:47 | 11 | A.   Yes. |
| 09:47 | 12 | Q.   Now, at this point I just want to call your attention |
| 09:47 | 13 | to -- there's a paragraph, it's the, uh, second from the |
| 09:48 | 14 | bottom of your e-mail.  It says, "as for profits."  Do you |
| 09:48 | 15 | see that? |
| 09:48 | 16 | A.   Yes. |
| 09:48 | 17 | Q.   And you write, "As for profits, MGA has made a profit |
| 09:48 | 18 | for the past 20 years."  Do you see that? |
| 09:48 | 19 | A.   I do. |
| 09:48 | 20 | Q.   "We did not make as much last year because of one major |
| 09:48 | 21 | issue:  23 percent defectives on a budget of 3 percent."  Do |
| 09:48 | 22 | you see that? |
| 09:48 | 23 | A.   Yes. |
| 09:48 | 24 | Q.   It says, "I'm a quick learner, and most of the time, |
| 09:48 | 25 | don't make the same mistake twice."  Correct? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 58 of 152   Page ID #:303087
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

58

| 09:48 | 1 | A.   Yes. |
| 09:48 | 2 | Q.   It's accurate that you had 23 percent defectives on a |
| 09:48 | 3 | budget of 3 percent in 2000? |
| 09:48 | 4 | A.   Yes. |
| 09:48 | 5 | Q.   Now, if you look at the beginning of this e-mail |
| 09:48 | 6 | string? |
| 09:48 | 7 | A.   Yes. |
| 09:48 | 8 | Q.   If you go to page 3. |
| 09:48 | 9 | (Document displayed.) |
| 09:48 | 10 | THE WITNESS:  Go ahead. |
| 09:48 | 11 | BY MR. PRICE: |
| 09:48 | 12 | Q.   April 6, 2001 -- |
| 09:48 | 13 | A.   Yes. |
| 09:48 | 14 | Q.   -- there's an e-mail from you to Mr. Williams and |
| 09:48 | 15 | others.  April 6, 2001. |
| 09:49 | 16 | A.   Yes. |
| 09:49 | 17 | Q.   Where it says, "We all need to take these meetings |
| 09:49 | 18 | seriously so we can manage business." |
| 09:49 | 19 | Do you see that? |
| 09:49 | 20 | A.   Yes, I do. |
| 09:49 | 21 | Q.   And before the number "1" there, it says "Here are the |
| 09:49 | 22 | list that was not done or I have not seen." |
| 09:49 | 23 | A.   Yes. |
| 09:49 | 24 | Q.   And on that list, Number 2 on the next page -- |
| 09:49 | 25 | (Document displayed.) |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 59 of 152   Page ID #:303088
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:49 | 1 | BY MR. PRICE: |
| 09:49 | 2 | Q.   -- you see, "Pat, detailed spreadsheet of exact |
| 09:49 | 3 | drop-dead dates.  We'll get the paper and orders to achieve |
| 09:49 | 4 | forecasted 20 million in June and 17 million in July by |
| 09:49 | 5 | account by item." |
| 09:49 | 6 |       Do you see that? |
| 09:49 | 7 | A.   I do. |
| 09:49 | 8 | Q.   And then with respect to Mr. Williams, he responds in |
| 09:49 | 9 | the next e-mail -- this is April 7, 2001. |
| 09:49 | 10 |       *(Document displayed.)* |
| 09:49 | 11 | BY MR. PRICE: |
| 09:49 | 12 | Q.   7:53 a.m.  "Here is the information that Dennis sent to |
| 09:49 | 13 | you last Tuesday."  Who's Dennis? |
| 09:50 | 14 | A.   I think it was Dennis Medici, who was our CFO. |
| 09:50 | 15 | Q.   "This gives you the total dollars by account and item. |
| 09:50 | 16 | Again, this was sent to you last Tuesday." |
| 09:50 | 17 |       Do you see that? |
| 09:50 | 18 | A.   I do. |
| 09:50 | 19 | Q.   And then you respond on April 8th, 10:13, "This report |
| 09:50 | 20 | shows what are the balance to chase.  It does not cover what |
| 09:50 | 21 | we talked about and is requested below.  Detailed |
| 09:50 | 22 | spreadsheet of exact drop-dead dates.  We will get the paper |
| 09:50 | 23 | and orders to achieve forecasted 20 million in June and |
| 09:50 | 24 | 17 million in July by account by item." |
| 09:50 | 25 |       Do you see that? |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

60

| 09:50 | 1 | A. I do. |
| 09:50 | 2 | Q. And then Mr. Williams responded on April 8th at about |
| 09:50 | 3 | 6:00 p.m., correct? |
| 09:50 | 4 | A. Yes. |
| 09:50 | 5 | Q. Now, as of April 8th, 2001 -- |
| 09:50 | 6 | A. Yes. |
| 09:50 | 7 | Q. -- how long had Mr. Williams been with MGA? |
| 09:50 | 8 | A. Few month. |
| 09:50 | 9 | Q. And how did you find him? |
| 09:50 | 10 | A. I don't remember. I think -- I don't remember how we |
| 09:51 | 11 | found him. |
| 09:51 | 12 | Q. Why is it you put him in as -- as a -- you said head of |
| 09:51 | 13 | sales? |
| 09:51 | 14 | A. He was for sure head of sales, yes. |
| 09:51 | 15 | Q. How long was he head of sales? |
| 09:51 | 16 | A. I think he lasted at MGA for about eight, nine months, |
| 09:51 | 17 | by memory. He was incompetent. We fired him. |
| 09:51 | 18 | Q. Where did you hire him from? |
| 09:51 | 19 | A. I have no idea where he worked before. I don't |
| 09:51 | 20 | remember. |
| 09:51 | 21 | Q. Is there -- |
| 09:51 | 22 | A. I don't think he was employed at the time. |
| 09:51 | 23 | Q. Is there a gentleman -- is it Martin Hitch? |
| 09:51 | 24 | A. Yes. |
| 09:51 | 25 | Q. What was his position at this time? |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 61 of 152   Page ID #:303090
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

61

| | | |
|---|---|---|
| 09:51 | 1 | A.   He was head of international sales. |
| 09:51 | 2 | Q.   Okay.  So you got Mr. Williams head of sales, and |
| 09:51 | 3 | Mr. Hitch was head of international sales? |
| 09:51 | 4 | A.   That's correct. |
| 09:51 | 5 | Q.   So those were your top two salespeople at MGA? |
| 09:51 | 6 | A.   At the time, yes. |
| 09:51 | 7 | Q.   Okay.  And this is in April of 2001, before Bratz |
| 09:51 | 8 | actually hit the market? |
| 09:51 | 9 | A.   That's correct. |
| 09:51 | 10 | Q.   So uh, Mr. Williams, your head of sales, writes you on |
| 09:52 | 11 | April 8th, 2001, "There will not be a spreadsheet that |
| 09:52 | 12 | outlines a drop-dead date of orders.  You and the previous |
| 09:52 | 13 | management agreed to a calendar that was not acceptable or |
| 09:52 | 14 | achievable.  This was your error in previous sales |
| 09:52 | 15 | management, not mine.  I have been here for 90 days and you |
| 09:52 | 16 | are out of control.  I will not work under these conditions; |
| 09:52 | 17 | never have, never will.  And if you want to severance me out |
| 09:52 | 18 | of the company, please do so, and you can get on with your |
| 09:52 | 19 | out-of-control management style.  I do not need this abuse |
| 09:52 | 20 | from you or anyone else.  Decide what you want to do.  I |
| 09:52 | 21 | have had many people come to my office and say how happy |
| 09:52 | 22 | they are that I'm here and hopefully can change your |
| 09:52 | 23 | management style." |
| 09:52 | 24 |         MS. KELLER:  And, Your Honor, I would object that |
| 09:52 | 25 | this is hearsay and ask that the Court instruct as such. |

| 09:52 | 1 | MR. PRICE:  It's a business record, Your Honor. |
| 09:52 | 2 | MS. KELLER:  The statements contained within this |
| 09:52 | 3 | e-mail. |
| 09:52 | 4 | THE COURT:  Well, we don't have Mr. -- |
| 09:53 | 5 | THE WITNESS:  Williams. |
| 09:53 | 6 | THE COURT:  -- Mr. Williams here.  And it's |
| 09:53 | 7 | somewhat like the issue concerning the rumors the other day |
| 09:53 | 8 | about Mattel's alleged impending lawsuit or to get |
| 09:53 | 9 | Mr. Larian. |
| 09:53 | 10 | By the same token this is a business record, and |
| 09:53 | 11 | it's not hearsay once, two, three times removed.  So I'm |
| 09:53 | 12 | going to overrule the objection, but I'm asking you to treat |
| 09:53 | 13 | this with caution because you don't know the full |
| 09:53 | 14 | circumstances behind this.  We don't have Mr. Williams to |
| 09:53 | 15 | cross-examine. |
| 09:53 | 16 | MS. KELLER:  And, Your Honor -- |
| 09:53 | 17 | THE COURT:  This is a business record, but with a |
| 09:53 | 18 | caution to you to treat it gingerly. |
| 09:53 | 19 | MS. KELLER:  Your Honor, for the record, may we |
| 09:53 | 20 | object that this is not a business record and ask to be |
| 09:53 | 21 | heard at the break? |
| 09:53 | 22 | THE COURT:  You may.  Before I receive it, |
| 09:53 | 23 | Counsel, you may. |
| 09:53 | 24 | It's subject to motion to strike. |
| 09:53 | 25 | MS. KELLER:  Thank you. |

63

| 09:53 | 1 | THE COURT: Subject to motion to strike. |
| 09:53 | 2 | THE WITNESS: Can we, after this line of |
| 09:53 | 3 | questioning, take a break? |
| 09:53 | 4 | THE COURT: Why don't we do that right now. |
| 09:53 | 5 | And why don't I hear counsel's concerns whether |
| 09:53 | 6 | this is a business record. |
| 09:53 | 7 | Thank you very much. Ladies and gentlemen, you're |
| 09:54 | 8 | admonished not to discuss this matter amongst yourselves, |
| 09:54 | 9 | nor form are or express any opinion concerning this case. |
| 09:54 | 10 | Thank you. |
| 09:54 | 11 | *(Jury recesses at 9:54 a.m.)* |
| 09:54 | 12 | *(Outside the presence of the jury.)* |
| 09:54 | 13 | THE COURT: All right. The jury's no longer |
| 09:54 | 14 | present. |
| 09:54 | 15 | I'm inclined, Ms. Keller, as you argue this to |
| 09:54 | 16 | admit it as a business record for this reason: |
| 09:54 | 17 | First, although it technically, from your |
| 09:54 | 18 | perspective, might not contain business indicia, this is the |
| 09:54 | 19 | testimony concerning Mr. Larian's management style, that |
| 09:54 | 20 | basically this was a happy, creative company; that he gave |
| 09:54 | 21 | great authority and creativity to his employees, when, in |
| 09:54 | 22 | fact, the impression from some of this e-mail and some of |
| 09:54 | 23 | the information may be significantly different. |
| 09:55 | 24 | But I want you to be heard because, of course, |
| 09:55 | 25 | there's a tremendous danger in this. |

09:55   1          MS. KELLER:  Yes, Your Honor.

09:55   2          Ms. Hurst is looking for the citation.  And we'll

09:55   3   find it momentarily, I think, that, um -- and she informs me

09:55   4   that there's --

09:55   5          THE COURT:  Ms. Hurst is looking at Mr. McConville

09:55   6   who is looking back at Ms. Hurst.  Just joking.

09:55   7          MS. KELLER:  She informs me there's a Ninth

09:55   8   Circuit case holding that e-mails are not business records.

09:55   9   And the problem with this particular e-mail --

09:55   10         THE COURT:  Well, each of you have been letting in

09:55   11  a lot of business records so far as e-mails.

09:55   12         MS. KELLER:  Well, the case is in Monotype

09:55   13  Corporation, PLC v. Inter. (sic) Typeface Corporation,

09:55   14  43 F.3d, 443, at 450, and this is a Ninth Circuit case

09:55   15  (1994).

09:55   16         THE COURT:  I'll be glad to look at it this

09:55   17  evening.

09:55   18         MS. KELLER:  That holds that e-mail messages fail

09:56   19  to satisfy the requirements of the business records

09:56   20  exception to the hearsay rule.  But beyond just that --

09:56   21         THE COURT:  Let's stop there for a moment.

09:56   22  Remember, we've fallen into almost a habit/pattern with most

09:56   23  of these e-mails, which there have been hundreds of, and I

09:56   24  somewhat forewarned counsel before we began that in the past

09:56   25  many e-mails in other cases I haven't treated as business

09:56   1    records.  In other words, we've had limited e-mails in some

09:56   2    other cases where it was hearsay, or if they did come in, it

09:56   3    came in for a limited purpose.

09:56   4              But here, the parties have fallen into this

09:56   5    habit/pattern, and this is being really raised for the first

09:56   6    time.

09:56   7              MS. KELLER:  Well, I don't think so.  Because the

09:56   8    other day Mattel raised a hearsay objection to content of a

09:56   9    business record, and the Court instructed the jurors several

09:56   10   times that rumors about Mattel's planning to sue were not --

09:57   11             THE COURT:  I think that's significantly different

09:57   12   for this reason:  Those were rumors that didn't pertain, if

09:57   13   you will, to management style or what's going on inside a

09:57   14   company.

09:57   15             And that struck directly at the statute of

09:57   16   limitations issue, and it was two and three times removed.

09:57   17             Here, this drives at the management style that was

09:57   18   elicited by MGA and was somewhat gratuitous on Mr. Larian's

09:57   19   part about the management style that he had throughout the

09:57   20   company.

09:57   21             MS. KELLER:  Your Honor, the problem here is this

09:57   22   guy is not saying, "Isaac, in my opinion -- in my opinion

09:57   23   alone, your management style stinks."  What he's saying is

09:57   24   many people have come to me and said X, without saying who

09:57   25   those people are.

| 09:57 | 1 | THE COURT: Now, just a moment. We can certainly |
| 09:57 | 2 | treat that as hearsay, that portion. |
| 09:57 | 3 | MS. KELLER: Yes. |
| 09:57 | 4 | THE COURT: The direct comment, that's no |
| 09:57 | 5 | different than rumors, from my opinion, at least |
| 09:57 | 6 | tentatively. |
| 09:57 | 7 | But his comments about how he feels Mr. Larian's |
| 09:57 | 8 | management style don't appear to be anything other than a |
| 09:58 | 9 | business record. |
| 09:58 | 10 | MS. KELLER: And the hearsay that I objected to |
| 09:58 | 11 | was when he began -- when Mr. Price began reading from the |
| 09:58 | 12 | portion about how others have come to him, et cetera, and |
| 09:58 | 13 | said -- |
| 09:58 | 14 | THE COURT: Yeah. |
| 09:58 | 15 | MS. KELLER: Unspecified, unidentified others. |
| 09:58 | 16 | THE COURT: I tentatively agree with that. In |
| 09:58 | 17 | other words, when I first saw the e-mail, um, I think we |
| 09:58 | 18 | fell into the habit-pattern of here's another e-mail. I |
| 09:58 | 19 | didn't hear an objection at that time. When we got partway |
| 09:58 | 20 | through it, others coming to him is perhaps no different |
| 09:58 | 21 | than the second, third, and fourth time removed hearsay |
| 09:58 | 22 | that, obviously, we should be concerned about, but I think |
| 09:58 | 23 | I've cautioned the jury, and I'm glad to do so concerning |
| 09:58 | 24 | "others." |
| 09:58 | 25 | MS. KELLER: Thank you. I think that's all I |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 67 of 152   Page ID #:303096
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

67

| | | |
|---|---|---|
| 09:58 | 1 | wanted, Your Honor. |
| 09:58 | 2 | MR. PRICE:  If I can be heard.  The difference |
| 09:58 | 3 | here is you have an officer of the company, the head of |
| 09:58 | 4 | sales, and, of course, part of his duties is to report to |
| 09:58 | 5 | Mr. Larian what's going on in the company. |
| 09:58 | 6 | THE COURT:  Sure. |
| 09:58 | 7 | MR. PRICE:  So this isn't like "I've heard |
| 09:59 | 8 | rumors."  His job is to report his -- what his sales team is |
| 09:59 | 9 | doing, how good they're doing, why they're doing well; and |
| 09:59 | 10 | so in that connection, this is not hearsay.  This is his |
| 09:59 | 11 | job. |
| 09:59 | 12 | THE COURT:  All right.  It's going to be admitted |
| 09:59 | 13 | as a business record.  I'm going to caution the jury just as |
| 09:59 | 14 | I did a moment ago to be careful about "others" because it's |
| 09:59 | 15 | removed and we don't have those people here.  But certainly |
| 09:59 | 16 | he can state his opinion. |
| 09:59 | 17 | It's a business record.  It's going to be |
| 09:59 | 18 | received. |
| 09:59 | 19 | MR. PRICE:  My only point is it's also an |
| 09:59 | 20 | admission because of his position in the company and it's |
| 09:59 | 21 | his duty to do that. |
| 09:59 | 22 | THE COURT:  Okay.  Now. |
| 09:59 | 23 | MS. KELLER:  And, Your Honor, can we provide you |
| 09:59 | 24 | with any -- beyond the citation that we gave you, is there |
| 09:59 | 25 | anything else you need from us on whether this is actually a |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 68 of 152   Page ID #:303097
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

68

| | | |
|---|---|---|
| 09:59 | 1 | business record? |
| 09:59 | 2 | THE COURT:  No.  Just to alert me the night before |
| 09:59 | 3 | what your concerns are going to be.  Remember, we've fallen |
| 09:59 | 4 | into this incredible habit/pattern of hundreds and hundreds |
| 09:59 | 5 | of e-mails, and I can't keep track of the case and go |
| 09:59 | 6 | through those e-mails at the same time.  I'm somewhat |
| 10:00 | 7 | dependent on both of you.  Although I'm happy to do that |
| 10:00 | 8 | with you the night before.  But that's why we're requiring |
| 10:00 | 9 | that everything come before the Court.  So I, quite frankly, |
| 10:00 | 10 | didn't see the middle of that e-mail, and I'm glad to |
| 10:00 | 11 | caution the jury about that. |
| 10:00 | 12 | MS. KELLER:  Thank you, Your Honor. |
| 10:00 | 13 | THE COURT:  What do you want to do now for the |
| 10:00 | 14 | next ten minutes? |
| 10:00 | 15 | MS. KELLER:  Go to the bathroom. |
| 10:00 | 16 | MR. QUINN:  I have some gifts for the Court. |
| 10:00 | 17 | THE COURT:  No. |
| 10:00 | 18 | MR. QUINN:  The Court had asked about the rebrief |
| 10:00 | 19 | that you couldn't find. |
| 10:00 | 20 | THE COURT:  Oh, those gifts.  Yes, I would like to |
| 10:00 | 21 | see those rebriefs, but they have to be filed. |
| 10:00 | 22 | MR. QUINN:  They have been filed.  They are filed. |
| 10:00 | 23 | THE COURT:  Today? |
| 10:00 | 24 | MR. QUINN:  No, no.  They were filed some time |
| 10:00 | 25 | ago. |

| | | |
|---|---|---|
| 10:00 | 1 | THE COURT:  Okay.  We need the docket number. Give |
| 10:00 | 2 | 'em to Kathy, because I –– I was looking for them last |
| 10:00 | 3 | evening again. |
| 10:00 | 4 | Now, let's clear up this problem with Ms. Main. |
| 10:00 | 5 | I was caught a little bit by surprise.  I thought |
| 10:00 | 6 | that Ms. Main –– I was told that Ms. Main was requesting –– |
| 10:00 | 7 | first of all, she was going to come out.  Mattel's case was |
| 10:00 | 8 | ending sometime in the next year.  I'm just joking with you. |
| 10:01 | 9 | But it was her –– it was –– the information to me was that, |
| 10:01 | 10 | regardless, she wanted to come out now because she had a |
| 10:01 | 11 | trial and depositions going. |
| 10:01 | 12 | MS. HURST:  Mr. Zeller represented to her that the |
| 10:01 | 13 | Court had ordered her to appear on one day's notice, and |
| 10:01 | 14 | then when she asked for reimbursement of the travel |
| 10:01 | 15 | expenses, he refused. |
| 10:01 | 16 | THE COURT:  Well, the information that came to me |
| 10:01 | 17 | was that she was requesting that we get her out here, if she |
| 10:01 | 18 | was going to come out here, because she had depositions. |
| 10:01 | 19 | So –– |
| 10:01 | 20 | MR. ZELLER:  That's true, Your Honor.  We did ask |
| 10:01 | 21 | her, we said the Court wanted her here promptly. |
| 10:01 | 22 | THE COURT:  Absolutely. |
| 10:01 | 23 | MR. ZELLER:  I didn't put a date on it.  I just |
| 10:01 | 24 | said, "When can you come here?  Get here as soon as you |
| 10:01 | 25 | can." |

| | | |
|---|---|---|
| 10:01 | 1 | THE COURT:  Yeah, there was no time limit.  The |
| 10:01 | 2 | request came back to me and the information that she had a |
| 10:01 | 3 | deposition, and I was willing to accommodate her if she came |
| 10:01 | 4 | out; otherwise, she was gonna come out next week.  And that |
| 10:01 | 5 | was her concern. |
| 10:01 | 6 | MS. HURST:  I have the e-mail exchange here |
| 10:01 | 7 | between her and Mr. Zeller. |
| 10:01 | 8 | THE COURT:  Share it with each other, then. |
| 10:01 | 9 | MS. HURST:  Is the order of the Court that they |
| 10:02 | 10 | share her expenses so that I can make sure that Mr. Zeller |
| 10:02 | 11 | pays his fair share here, Your Honor? |
| 10:02 | 12 | THE COURT:  Absolutely.  You two will split it. |
| 10:02 | 13 | MS. HURST:  Thank you. |
| 10:02 | 14 | MR. ZELLER:  And for the record, Your Honor, it's |
| 10:02 | 15 | outrageous for her to say "so Mr. Zeller would pay." MGA is |
| 10:02 | 16 | the one -- |
| 10:02 | 17 | THE COURT:  We're off the record.  Well, no, keep |
| 10:02 | 18 | it on the record.  This is entertaining. |
| 10:02 | 19 | MR. ZELLER:  This is absurd.  Spurious |
| 10:02 | 20 | allegations. |
| 10:02 | 21 | THE COURT:  No, no.  Keep going.  Make sure both |
| 10:02 | 22 | you feel that you've had it. |
| 10:02 | 23 | MR. ZELLER:  Thank you. |
| 10:02 | 24 | THE COURT:  Have a nice recess. |
| 10:02 | 25 | MS. HURST:  I just want to make sure he pays. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 71 of 152   Page ID #:303100
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

71

| | | |
|---|---|---|
| 10:02 | 1 | That's all. |
| 10:02 | 2 | *(Recess held at 10:02 a.m.)* |
| 10:02 | 3 | *(Proceedings resumed at 10:15 a.m.)* |
| 10:11 | 4 | *(In the presence of the jury.)* |
| 10:15 | 5 | THE COURT:  All right.  The jury's present.  All |
| 10:15 | 6 | counsel are present.  The parties are present.  The witness |
| 10:15 | 7 | is present. |
| 10:15 | 8 | Ladies and gentlemen, concerning the last e-mail, |
| 10:15 | 9 | the e-mail's going to come in as a business record.  It's |
| 10:15 | 10 | also the state of mind of the manager as he's complaining to |
| 10:15 | 11 | Mr. Larian. |
| 10:15 | 12 | But there's one part that the Court's concerned |
| 10:15 | 13 | about, and it's really double and triple hearsay about what |
| 10:15 | 14 | other employees are saying to him.  There's a part of that |
| 10:15 | 15 | e-mail where he says, you know, "Besides my opinion, other |
| 10:15 | 16 | employees are telling me the following."  I'm going to |
| 10:15 | 17 | caution you that that's hearsay.  It's two and three steps |
| 10:15 | 18 | removed. |
| 10:15 | 19 | So, Counsel -- but the document will come into |
| 10:15 | 20 | evidence. |
| 10:15 | 21 | BY MR. PRICE: |
| 10:15 | 22 | Q.   Mr. Larian, you expected your head of sales, |
| 10:15 | 23 | Mr. Williams, to report to you on a regular basis about how |
| 10:15 | 24 | his people were doing, right? |
| 10:16 | 25 | A.   No.  I knew how his people were doing.  I was pretty |

| | | |
|---|---|---|
| 10:16 | 1 | much involved with them. |
| 10:16 | 2 | Q.   Well, did you expect Mr. Williams to manage his people? |
| 10:16 | 3 | A.   Yes. |
| 10:16 | 4 | Q.   How many folks did you have working under him at the |
| 10:16 | 5 | time? |
| 10:16 | 6 | A.   I don't know.  Maybe five, six, seven people. |
| 10:16 | 7 | Q.   You had weekly meetings with Mr. Williams and others to |
| 10:16 | 8 | discuss the direction of the company, correct? |
| 10:16 | 9 | A.   I don't remember if we did or not. |
| 10:16 | 10 | Q.   Well, you had regular meetings with your head of sales |
| 10:16 | 11 | and head of international sales to discuss what was going on |
| 10:16 | 12 | with respect to sales and their staff, correct? |
| 10:16 | 13 | A.   I don't think so.  I don't think -- I don't remember if |
| 10:16 | 14 | we did or not. |
| 10:16 | 15 | Q.   Did you have meetings every Friday afternoon? |
| 10:16 | 16 | A.   I don't remember.  It's possible. |
| 10:16 | 17 | Q.   One of Mr. Williams' duties was to, uh, manage the |
| 10:16 | 18 | morale of those who worked for him, correct? |
| 10:16 | 19 | A.   No. |
| 10:16 | 20 | Q.   Well, he wasn't supposed to be concerned about the |
| 10:16 | 21 | morale of the people who worked for him? |
| 10:17 | 22 | A.   No.  He was supposed to get sales.  That's what we |
| 10:17 | 23 | hired him for.  We had Human Resources for morale. |
| 10:17 | 24 | Q.   But he was the boss of, you say, about five people, |
| 10:17 | 25 | right? |

| | | |
|---|---|---|
| 10:17 | 1 | A.    Yeah.  Some of who are still working at MGA. |
| 10:17 | 2 | Q.    And I guess you were the boss of everybody, directly or |
| 10:17 | 3 | indirectly, right? |
| 10:17 | 4 | A.    Yes. |
| 10:17 | 5 | Q.    And you were concerned about morale, right? |
| 10:17 | 6 | A.    Yes. |
| 10:17 | 7 | Q.    And he should be concerned about the morale of the |
| 10:17 | 8 | people who worked for him too, right? |
| 10:17 | 9 | A.    Yes. |
| 10:17 | 10 | Q.    Okay.  And if we go to that letter, then.  I think we |
| 10:17 | 11 | were on the April 8th letter. |
| 10:17 | 12 | We had stopped with, "I have had many people come to my |
| 10:17 | 13 | office and say how happy that -- they are that I am here and |
| 10:17 | 14 | hopefully can change your management style." |
| 10:17 | 15 | And then it continues, "I cannot, even though you say |
| 10:17 | 16 | you want to change, you cannot always -- and will always do |
| 10:17 | 17 | what you want when you want.  I know that you do not want to |
| 10:17 | 18 | hear this, but the best thing for this company would be for |
| 10:18 | 19 | someone else to run this business.  People will continue to |
| 10:18 | 20 | leave on a regular basis with you in control. |
| 10:18 | 21 | "Second, please let me know so I can advise Lisa and |
| 10:18 | 22 | Janine and Martin.  Your style of micro-manage, abusive |
| 10:18 | 23 | language and yelling are not conducive to building a team. |
| 10:18 | 24 | Your staff inside is ready to leave.  You do not know, |
| 10:18 | 25 | because 'you' style of management is, 'I can just find other |

| | | |
|---|---|---|
| 10:18 | 1 | people.'  This company will never be the company that you |
| 10:18 | 2 | say you want.  You spend money against the bottom line that |
| 10:18 | 3 | is really not acceptable.  Your tooling cost is out of |
| 10:18 | 4 | control.  You have put the people in Hong Kong," comma, |
| 10:18 | 5 | "Stephen Lee, in a terrible situation.  He has called in all |
| 10:18 | 6 | of his favors and now is stretched to the max.  I question |
| 10:18 | 7 | this.  We need to talk tomorrow and decide where are you |
| 10:18 | 8 | going and if you want me to be part of this. |
| 10:18 | 9 | "In 90 days I have given you and your company more |
| 10:19 | 10 | credibility than you know.  I'm sure you will say this is |
| 10:19 | 11 | not true.  However, perception is reality.  If you want to |
| 10:19 | 12 | believe this, fine; if not, fine. |
| 10:19 | 13 | "You need to make decisions.  I will not take this |
| 10:19 | 14 | abuse from you or anyone else.  I have taken the time to |
| 10:19 | 15 | build a good team that can take this business forward.  If |
| 10:19 | 16 | you are going to micro-manage me because of JC Penney, you |
| 10:19 | 17 | need to take sales over. |
| 10:19 | 18 | "In addition, you wanting to meet on Friday at |
| 10:19 | 19 | 2:30 p.m. every week is only because you do not have a life. |
| 10:19 | 20 | I have a life.  My son is very important to me, and I spend |
| 10:19 | 21 | time up in the Bay Area to see him." |
| 10:19 | 22 | By the way, at this time, you understood that Mattel, |
| 10:19 | 23 | uh, that the employees got off at 1:00 p.m. on Fridays, |
| 10:19 | 24 | correct? |
| 10:19 | 25 | A.   They have a life, yes.  I don't. |

| | | |
|---|---|---|
| 10:19 | 1 | Q.   So the answer is, yeah, Mattel gets off at 1:00 on |
| 10:19 | 2 | Fridays? |
| 10:19 | 3 | A.   That's what I understand, yes. |
| 10:19 | 4 | Q.   And the next page, "You wanting me to attend a meeting |
| 10:19 | 5 | on Friday at 2:30 p.m. every week is a micro-manage control |
| 10:20 | 6 | thing.  I work everyday, seven days a week.  If someone is |
| 10:20 | 7 | not in the office next to you, you have a problem.  Either |
| 10:20 | 8 | you need to get over this, or decide this is okay. |
| 10:20 | 9 | "Not to beat a dead horse, however, I have run |
| 10:20 | 10 | businesses that are much larger than this with a tremendous |
| 10:20 | 11 | amount of success.  You need to decide what you want with |
| 10:20 | 12 | this company. |
| 10:20 | 13 | "I have to say that you cannot run a profitable |
| 10:20 | 14 | company.  You spend out of control on getting product to |
| 10:20 | 15 | market and tooling.  Your sales team has discussed this with |
| 10:20 | 16 | me many times.  They know there is not a chance that they |
| 10:20 | 17 | will make EBIT because of you and out-of-control spending." |
| 10:20 | 18 | "EBIT" is Earnings Before Interest and Taxes? |
| 10:20 | 19 | A.   Yes. |
| 10:20 | 20 | Q.   "I'm sorry to give you the real facts someone -- |
| 10:20 | 21 | however, someone must.  Make a decision and let's either go |
| 10:20 | 22 | forward or you can do what you want:  Spend money out of |
| 10:20 | 23 | control and lose people. |
| 10:20 | 24 | "Barry Harris is awaiting a call from me, and I will |
| 10:21 | 25 | call him tomorrow based on your decision.  I will advise |

| | | |
|---|---|---|
| 10:21 | 1 | that he should not come to work for this company or he |
| 10:21 | 2 | should.  Your call." |
| 10:21 | 3 | You got this on a Sunday? |
| 10:21 | 4 | A.   Yes. |
| 10:21 | 5 | Q.   And, uh -- |
| 10:21 | 6 | A.   And I think he's talking about Becky Harris, not Barry |
| 10:21 | 7 | Harris. |
| 10:21 | 8 | Q.   And he's kind of sticking his neck out there sending |
| 10:21 | 9 | this to his boss, isn't he? |
| 10:21 | 10 | MS. KELLER:  Objection.  Mischaracterizing the |
| 10:21 | 11 | e-mail. |
| 10:21 | 12 | THE COURT:  Overruled. |
| 10:21 | 13 | You can answer that.  That's a common sense |
| 10:21 | 14 | question. |
| 10:21 | 15 | Overruled. |
| 10:21 | 16 | THE WITNESS:  What do you mean by "he's sticking |
| 10:21 | 17 | his neck out"? |
| 10:21 | 18 | BY MR. PRICE: |
| 10:21 | 19 | Q.   Well, these are pretty harsh things to say to your |
| 10:21 | 20 | boss. |
| 10:21 | 21 | A.   Yes. |
| 10:21 | 22 | Q.   And he seems to recognize that, as a result of saying |
| 10:21 | 23 | this, he may not be around much longer, right? |
| 10:21 | 24 | A.   Well, as a result of saying this, he was asking "Give |
| 10:21 | 25 | me a severance.  I been here 90 days.  Give me some money to |

| | | |
|---|---|---|
| 10:22 | 1 | go."  That's what he's saying.  You read that a little bit |
| 10:22 | 2 | higher up, right? |
| 10:22 | 3 | Q.   You don't think that he recognizes that this might cost |
| 10:22 | 4 | him his job? |
| 10:22 | 5 | A.   No.  He was looking for a severance.  He was |
| 10:22 | 6 | incompetent and the people who he mentions here are still |
| 10:22 | 7 | working at MGA twelve years later:  Becky Harris, Lisa |
| 10:22 | 8 | Saunders. |
| 10:22 | 9 | Q.   Was Martin Hitch, your head of international sales, |
| 10:22 | 10 | also incompetent? |
| 10:22 | 11 | A.   He was not. |
| 10:22 | 12 | Q.   And, um, you see this, uh, this e-mail talks about, uh, |
| 10:22 | 13 | these regular meetings that you would have? |
| 10:22 | 14 | A.   Yes, it talks about it. |
| 10:22 | 15 | Q.   And sometimes there would be agendas for these |
| 10:22 | 16 | meetings, right? |
| 10:22 | 17 | A.   I don't remember. |
| 10:22 | 18 | Q.   Well, uh -- |
| 10:22 | 19 | A.   I don't remember having meetings. |
| 10:22 | 20 | He didn't want to be at MGA on Friday afternoons.  He |
| 10:22 | 21 | lived in San Francisco. |
| 10:23 | 22 | Q.   Well, MGA would -- would keep records of the agendas of |
| 10:23 | 23 | meetings that you would have with your sales staff, correct? |
| 10:23 | 24 | A.   I don't know if we did or not. |
| 10:23 | 25 | Q.   You don't know one way or the other? |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 78 of 152   Page ID #:303107
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:23 | 1 | A.    I don't. |
| 10:23 | 2 | Q.    Now let me show you Exhibit 13626. |
| 10:23 | 3 | *(Document provided to the witness.)* |
| 10:23 | 4 | THE WITNESS:  Yes. |
| 10:23 | 5 | BY MR. PRICE: |
| 10:23 | 6 | Q.    Do you see at the bottom this has an MGA Bates stamp |
| 10:23 | 7 | number? |
| 10:23 | 8 | A.    It does. |
| 10:23 | 9 | Q.    And your understanding is that -- that the earliest |
| 10:23 | 10 | this could have been produced was, uh, 2004/2005, the |
| 10:23 | 11 | absolute earliest? |
| 10:23 | 12 | A.    I really have no idea. |
| 10:24 | 13 | Q.    You see there's a date on it of February 28, 2001? |
| 10:24 | 14 | A.    On the top it says -- yes, 2001. |
| 10:24 | 15 | Q.    And, uh, this is a document that MGA had in its files |
| 10:24 | 16 | at least three or four years later, right? |
| 10:24 | 17 | A.    Apparently, yes. |
| 10:24 | 18 | Q.    Because you would want to keep things in your files |
| 10:24 | 19 | that were important to the running of the business, correct? |
| 10:24 | 20 | MS. KELLER:  Objection.  Misstates the reason we |
| 10:24 | 21 | retained all these documents, Your Honor. |
| 10:24 | 22 | THE COURT:  I'm going to sustain it in its present |
| 10:24 | 23 | form, Counsel. |
| 11:59 | 24 | BY MR. PRICE: |
| 10:24 | 25 | Q.    This document appears to have been created in 2001, |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 79 of 152   Page ID #:303108
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

79

| | | |
|---|---|---|
| 10:24 | 1 | correct? |
| 10:24 | 2 | A.   I have no idea when it was created, but I see a date. |
| 10:24 | 3 | Somebody wrote "2001" on it. |
| 10:24 | 4 | Q.   Uh, If you look at the timing, Mattel and MGA were not |
| 10:24 | 5 | involved in this lawsuit until sometime in 2004, correct? |
| 10:24 | 6 | A.   April 27, 2004 is when you sued Carter Bryant. |
| 10:24 | 7 | Q.   And we'll go over that in a second -- maybe more than a |
| 10:25 | 8 | second, but we'll go over that before I sit down. |
| 10:25 | 9 | So this is -- at least this document, on its face, was |
| 10:25 | 10 | at least -- created at least three years before that? |
| 10:25 | 11 | A.   Before you sued Carter Bryant? |
| 10:25 | 12 | Q.   Yes. |
| 10:25 | 13 | A.   Yes, three years and two month. |
| 10:25 | 14 | Q.   So it was in MGA's files for that period of time, |
| 10:25 | 15 | correct? |
| 10:25 | 16 | A.   I assume so, yes. |
| 10:25 | 17 | Q.   And -- and during that time -- entire time you were the |
| 10:25 | 18 | chief executive officer of MGA, correct? |
| 10:25 | 19 | A.   Yes. |
| 10:25 | 20 | Q.   And if you'd look, on its face, this seems to be an |
| 10:25 | 21 | agenda concerning a meeting on February 28, 2001, with -- a |
| 10:25 | 22 | meeting with you, Pat Williams, and Martin Hitch, correct? |
| 10:25 | 23 | A.   It says, "Agenda." |
| 10:25 | 24 | Q.   And, by the way, in your examination by Ms. Keller, do |
| 10:25 | 25 | you recall that you also, uh -- in addition to testifying |

| | | |
|---|---|---|
| 10:25 | 1 | about, uh, kind of the atmosphere within MGA, you talked |
| 10:25 | 2 | about uh, uh, the good relationships that you had with uh, |
| 10:26 | 3 | uh, vendors and with uh, uh, retailers and distributors and |
| 10:26 | 4 | inventors.  Do you remember that? |
| 10:26 | 5 | A.   I didn't say anything about inventors.  I said with the |
| 10:26 | 6 | retailers, with vendors.  I did say that.  I don't think I |
| 10:26 | 7 | said inventors. |
| 10:26 | 8 | Q.   Well, designers.  Did you say you had good |
| 10:26 | 9 | relationships with designers so they would come in and feel |
| 10:26 | 10 | free and be able to create toys? |
| 10:26 | 11 | A.   Yes. |
| 10:26 | 12 |           MR. PRICE:  Your Honor, I'd like to move exhibit |
| 10:26 | 13 | 13626 into evidence. |
| 10:26 | 14 |           MS. KELLER:  Objection.  Irrelevant.  Hearsay. |
| 10:26 | 15 |           THE COURT:  Could I see it for just a moment? |
| 10:26 | 16 |           MS. KELLER:  403, Your Honor. |
| 10:26 | 17 |           THE COURT:  Could I see it for just a minute? |
| 10:26 | 18 |            *(Document provided to the Court.)* |
| 10:26 | 19 |           THE COURT:  Overruled. |
| 10:26 | 20 |           It's received. |
| 10:27 | 21 |            *(Exhibit No. 13626 received in evidence.)* |
| 10:27 | 22 |            *(Document displayed.)* |
| 08:31 | 23 | BY MR. PRICE: |
| 10:27 | 24 | Q.   Now, February 28, 2001, that's a couple of months |
| 10:27 | 25 | before Mr. Williams sent his April 8, 2001 -- correct? |

| | | |
|---|---|---|
| 10:27 | 1 | A.   Yes. |
| 10:27 | 2 | Q.   And this is a meeting, not just with Mr. Williams, but |
| 10:27 | 3 | also your head of international sales, correct? |
| 10:27 | 4 | A.   I don't remember if there was a meeting.  They had just |
| 10:27 | 5 | sent this.  But I don't know if there was a meeting or not. |
| 10:27 | 6 | I don't think there was a meeting. |
| 10:27 | 7 | Q.   When you said, "They had just sent this," this is |
| 10:27 | 8 | something they sent to you? |
| 10:27 | 9 | A.   Apparently -- |
| 10:27 | 10 |       MS. KELLER:  I'm gonna object to the |
| 10:27 | 11 | characterization that "they" sent it, Your Honor.  This was |
| 10:27 | 12 | a Pat Williams production. |
| 10:27 | 13 |       MR. PRICE:  That's what he said. |
| 10:27 | 14 |       THE COURT:  Well, overruled. |
| | 15 | BY MR. PRICE: |
| 10:27 | 16 | Q.   I think you said, "they" had sent it to you. |
| 10:27 | 17 | A.   Pat William probably sent it.  And I don't remember |
| 10:27 | 18 | this -- this e-mail.  And definitely I don't recall a |
| 10:27 | 19 | meeting. |
| 10:27 | 20 | Q.   Now, you're -- you're sitting here today and saying you |
| 10:27 | 21 | think Pat Williams probably sent it, but haven't you |
| 10:28 | 22 | testified earlier you have no recollection whatsoever of |
| 10:28 | 23 | this? |
| 10:28 | 24 | A.   I don't.  I still don't. |
| 10:28 | 25 | Q.   It -- wouldn't you agree this kind of a list, uh, that |

| | | |
|---|---|---|
| 10:28 | 1 | involves your head of sales and international head of sales |
| 10:28 | 2 | is something that you might remember? |
| 10:28 | 3 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:28 | 4 | evidence:  That it involved Martin Hitch. |
| 10:28 | 5 | THE WITNESS:  I just don't remember. |
| 10:28 | 6 | THE COURT:  Overruled. |
| 11:59 | 7 | BY MR. PRICE: |
| 10:28 | 8 | Q.   Well, let's look at the first item:  "Perception," |
| 10:28 | 9 | slash, "Performance to date of PW/MH-IL." |
| 10:28 | 10 | Do you see that? |
| 10:28 | 11 | A.   Yes. |
| 10:28 | 12 | Q.   And that's talking about the perception/performance to |
| 10:28 | 13 | date of Pat Williams and Martin Hitch, correct? |
| 10:28 | 14 | A.   Yes. |
| 10:28 | 15 | Q.   And then "IL" -- you're gonna be the one giving that |
| 10:28 | 16 | part of the talk.  That's the idea of the agenda? |
| 10:28 | 17 | A.   I have no idea.  He -- he probably wrote it.  But "IL" |
| 10:29 | 18 | stands for my initials, if that is your question. |
| 10:29 | 19 | Q.   You say -- you keep saying "he."  You have no reason to |
| 10:29 | 20 | think that Pat Williams is the only one who wrote this, do |
| 10:29 | 21 | you? |
| 10:29 | 22 | A.   No, I don't. |
| 10:29 | 23 | Q.   You -- you don't want the jury to think that Martin |
| 10:29 | 24 | Hitch had anything to do with this, right? |
| 10:29 | 25 | A.   I really don't mind if Martin Hitch had anything to do |

| | | |
|---|---|---|
| 10:29 | 1 | with it or not.  Doesn't concern me. |
| 10:29 | 2 | Q.   Okay.  Let's go to the second item:  "Overview of the |
| 10:29 | 3 | company," and it says, slash, "PW/MH."  That's Pat Williams |
| 10:29 | 4 | and Martin Hitch.  Do you see that? |
| 10:29 | 5 | A.   I do. |
| 10:29 | 6 | Q.   "a.    Autocratic culture. |
| 10:29 | 7 | "i.  Fear factor. |
| 10:29 | 8 | "ii.  Confrontational environment. |
| 10:29 | 9 | "iii.  CYA mentality." |
| 10:29 | 10 | You know what that means? |
| 10:29 | 11 | A.   Yes. |
| 10:29 | 12 | Q.   "iv.  Priority is to please IL." |
| 10:29 | 13 | That's referring to you, correct? |
| 10:29 | 14 | A.   Yes. |
| 10:29 | 15 | Q.   "v.  Every decision has to be sanctioned by IL." |
| 10:30 | 16 | And that's you, correct? |
| 10:30 | 17 | A.   Yes. |
| 10:30 | 18 | Q.   "vi.  Flat reporting structure avoids accountability." |
| 10:30 | 19 | Do you see that? |
| 10:30 | 20 | A.   Yes. |
| 10:30 | 21 | Q.   And do you have an understanding as to what "flat |
| 10:30 | 22 | reporting structure" refers to? |
| 10:30 | 23 | A.   I've no idea what he meant by that. |
| 10:30 | 24 | Q.   When you say "he," do you mean "they"? |
| 10:30 | 25 | A.   No.  I mean, "he," because probably these are the |

CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:30 | 1 | words -- now comparing this to the other e-mail -- it came |
| 10:30 | 2 | from Pat Williams.  But that's my guess.  It doesn't matter |
| 10:30 | 3 | if it came from both. |
| 10:30 | 4 | Q.   Well, would it matter if your international head of |
| 10:30 | 5 | sales, uh, thought this was the case; that there was an |
| 10:30 | 6 | autocratic culture, with fear factor and confrontational |
| 10:30 | 7 | environment? |
| 10:30 | 8 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:30 | 9 | evidence. |
| 10:30 | 10 | THE COURT:  Overruled. |
| 10:30 | 11 | THE WITNESS:  I don't think he does. |
| 10:30 | 12 | As a matter of fact, he has his own business now. |
| 10:30 | 13 | He still calls me for consultation and help -- Martin Hitch. |
| 10:30 | 14 | BY MR. PRICE: |
| 10:30 | 15 | Q.   So, you've known about this document for years? |
| 10:30 | 16 | A.   I have not. |
| 10:31 | 17 | Q.   Well, you saw it at least two years ago? |
| 10:31 | 18 | A.   Probably at my depositions Mr. Zeller showed me, maybe, |
| 10:31 | 19 | or Mr. Quinn. |
| 10:31 | 20 | Q.   So did you ever, uh, contact Martin Hitch and say, |
| 10:31 | 21 | "What was up with this?" |
| 10:31 | 22 | A.   I did not. |
| 10:31 | 23 | Q.   So let's, uh, go on.  You see it says, |
| 10:31 | 24 | "b.  Poorly planned and executed. |
| 10:31 | 25 | "Development schedule puts pressure on all. |

| | | |
|---|---|---|
| 10:31 | 1 | "ii. Last minute changes for late," slash, |
| 10:31 | 2 | "expensive action. |
| 10:31 | 3 | "iii. Financials are closely guarded. |
| 10:31 | 4 | "iv. No induction plan to L.A. office." |
| 10:31 | 5 | Do you see that? |
| 10:31 | 6 | A. Yes. I don't know what that means. |
| 10:31 | 7 | Q. Well, let's go to, |
| 10:31 | 8 | "c. No trust in the L.A. office. |
| 10:31 | 9 | "i. Accusations of e-mail/voice mail monitoring." |
| 10:32 | 10 | Do you know what that's referring to? |
| 10:32 | 11 | A. I have no idea. Probably to his experience at Mattel. |
| 10:32 | 12 | Q. Well, actually, didn't you threaten to fire someone |
| 10:32 | 13 | because they were leaking the fact that there was such |
| 10:32 | 14 | monitoring? |
| 10:32 | 15 | A. I don't remember if I did or not. |
| 10:32 | 16 | Q. If you'd look at Exhibit 23956. |
| 10:32 | 17 | *(Document provided to the witness.)* |
| 09:08 | 18 | BY MR. PRICE: |
| 10:32 | 19 | Q. Do you recognize 23956 as an e-mail exchange in June of |
| 10:32 | 20 | 2000, between you and Michele Thompson? |
| 10:33 | 21 | A. Yes. |
| 10:33 | 22 | Q. Who is Michele Thompson? |
| 10:33 | 23 | A. She was in our Human Resources. |
| 10:33 | 24 | MR. PRICE: Your Honor, I move 23956 into |
| 10:33 | 25 | evidence. |

| | | |
|---|---|---|
| 10:33 | 1 | THE COURT:  Received. |
| 10:33 | 2 | MS. KELLER:  Objection.  403, Your Honor. |
| 10:33 | 3 | THE COURT:  Thank you. |
| 10:33 | 4 | *(Exhibit No. 23956 received in evidence.)* |
| 10:33 | 5 | *(Document displayed.)* |
| 10:33 | 6 | BY MR. PRICE: |
| 10:33 | 7 | Q.   You see at the bottom, on June 12, 2000, it's from |
| 10:33 | 8 | Michele Thompson to you: |
| 10:33 | 9 | "Urgent. |
| 10:33 | 10 | "Isaac.  Apparently, Paul is aware of the e-mails I |
| 10:33 | 11 | copied off Jennifer's system.  I don't know how.  I did not |
| 10:33 | 12 | tell anyone," all caps.  "Paul called Becky and said he |
| 10:33 | 13 | wanted to send an e-mail to everyone in his department |
| 10:33 | 14 | regarding e-mail confidentiality.  He told Becky," quote "a |
| 10:33 | 15 | little bird," closed quote, "made him aware of certain |
| 10:33 | 16 | things.  And that employees need to be reminded that e-mail |
| 10:33 | 17 | can be monitored.  I am worried that he has told her about |
| 10:33 | 18 | the situation." |
| 10:33 | 19 | Do you see that? |
| 10:33 | 20 | A.   Yes. |
| 10:34 | 21 | Q.   And there are circumstances where it's appropriate for |
| 10:34 | 22 | a company to monitor the e-mails of its employee, correct? |
| 10:34 | 23 | A.   Yes. |
| 10:34 | 24 | Q.   And your response, "See my earlier e-mail.  Tell Paul |
| 10:34 | 25 | he cannot do that, and he should read the company policy and |

| | | |
|---|---|---|
| 10:34 | 1 | will be fired if he does." |
| 10:34 | 2 | You see that? |
| 10:34 | 3 | A.   Yes. |
| 10:34 | 4 | Q.   And Paul is the person who wanted to send an e-mail to |
| 10:34 | 5 | everyone about e-mail confidentiality and reminding them |
| 10:34 | 6 | that the e-mail could be monitored? |
| 10:34 | 7 | A.   Yes. |
| 10:34 | 8 | Q.   And you believe that reminding employees that e-mails |
| 10:34 | 9 | could be monitored was an offense for which Paul could be |
| 10:34 | 10 | fired? |
| 10:34 | 11 | A.   I just didn't want to create chaos and things in the |
| 10:34 | 12 | company.  And that's what I told him, yes. |
| 10:34 | 13 | Q.   Okay.  Let's -- let's go back, then -- |
| 10:34 | 14 | A.   I mean, I didn't tell him.  I told Michele Thompson. |
| 10:35 | 15 | Q.   Your head of ER (sic)? |
| 10:35 | 16 | A.   I don't know if she was the head of HR, but she was in |
| 10:35 | 17 | Human Resources, yes. |
| 10:35 | 18 | Q.   Okay.  So let's go back to 13626.  And so we have "2, |
| 10:35 | 19 | c, i."  It talked about the accusations of e-mail/voice mail |
| 10:35 | 20 | monitoring. |
| 10:35 | 21 | And you see, "ii.  Deny if it's not in writing |
| 10:35 | 22 | approach"? |
| 10:35 | 23 | A.   Yes. |
| 10:35 | 24 | Q.   Do you recall a month or so earlier you had sent that |
| 10:35 | 25 | e-mail saying, you know, "That's not in writing.  I didn't |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 88 of 152   Page ID #:303117
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:35 | 1 | say it," et cetera, correct? |
| 10:35 | 2 | A.   Yes. |
| 10:35 | 3 | Q.   And that's what that's referring to, is that that was, |
| 10:35 | 4 | in fact, your approach? |
| 10:35 | 5 | A.   I don't know what he was referring to.  It's possible. |
| 10:35 | 6 | Q.   "iii," Performance is no guarantee of stability." |
| 10:35 | 7 |     And, "iv.  Disbelief of all communicated financial |
| 10:35 | 8 | information." |
| 10:35 | 9 |     Now, I want you to look at "d."  And in your |
| 10:35 | 10 | examination from Ms. Keller you talked about how -- what |
| 10:36 | 11 | good relationships you had with -- with inventors or |
| 10:36 | 12 | designers and, uh, distributors, retailers? |
| 10:36 | 13 | A.   Yes. |
| 10:36 | 14 | Q.   You see, "d."  It says, "No trust from the global toy |
| 10:36 | 15 | industry." |
| 10:36 | 16 | A.   Yes. |
| 10:36 | 17 | Q.   "IL, employees" -- |
| 10:36 | 18 |     MS. KELLER:  And, Your Honor, could we have the |
| 10:36 | 19 | Court note our continuing objection that this is all |
| 10:36 | 20 | hearsay -- multiple, multiple, multiple hearsay -- as well |
| 10:36 | 21 | as all the other problems with it? |
| 10:36 | 22 |     THE COURT:  All right.  I'll note your objection, |
| 10:36 | 23 | Counsel. |
| 10:36 | 24 |     Overruled. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 89 of 152   Page ID #:303118
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

89

| | | |
|---|---|---|
| 09:08 | 1 | BY MR. PRICE: |
| 10:36 | 2 | Q.   "IL," that's you, Isaac Larian, correct? |
| 10:36 | 3 | A.   Yes. |
| 10:36 | 4 | Q.   "Employees, retailers, distributors, licensors, |
| 10:36 | 5 | inventors."  You see that? |
| 10:36 | 6 | A.   I do. |
| 10:36 | 7 | Q.   By the way, did -- did -- are you aware of any writing |
| 10:36 | 8 | that -- that responds to this agenda? |
| 10:37 | 9 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:37 | 10 | evidence that this was ever even printed out or became an |
| 10:37 | 11 | agenda, Your Honor. |
| 10:37 | 12 | THE COURT:  Sustained, Counsel. |
| 08:57 | 13 | BY MR. PRICE: |
| 10:37 | 14 | Q.   Were you aware of any e-mail from you that refers to |
| 10:37 | 15 | this document? |
| 10:37 | 16 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:37 | 17 | evidence, that it was -- |
| 10:37 | 18 | THE COURT:  You can answer that question. |
| 10:37 | 19 | THE WITNESS:  No. |
| 08:48 | 20 | BY MR. PRICE: |
| 10:37 | 21 | Q.   And then there's. |
| 10:37 | 22 | "e.  Unethical business practices. |
| 10:37 | 23 | "i.  Not acknowledging license territory |
| 10:37 | 24 | restrictions." |
| 10:37 | 25 | And you were here when Ms. O'Connor testified about -- |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 90 of 152   Page ID #:303119
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:37 | 1 | about -- she quit because of the way -- the territorial |
| 10:37 | 2 | rights of the -- of licensees was being, uh, treated by you? |
| 10:37 | 3 | A.   I don't think she testified like that, no. |
| 10:38 | 4 | Q.   You don't recall the reason why she said she quit? -- |
| 10:38 | 5 | specifically license for pillows. |
| 10:38 | 6 | A.   No.  That's not what she said.  You should read the |
| 10:38 | 7 | record. |
| 10:38 | 8 | Q.   Is it true that you weren't acknowledging license |
| 10:38 | 9 | territory restrictions in 2001? |
| 10:38 | 10 | A.   I don't even know what this means. |
| 10:38 | 11 | Q.   Well, you understand that -- that, uh, you usually give |
| 10:38 | 12 | a licensee, uh, some sort of geographical territory in which |
| 10:38 | 13 | they can -- they can sell their products? |
| 10:38 | 14 | MS. KELLER:  Objection.  Irrelevant, Your Honor. |
| 10:38 | 15 | THE COURT:  Yeah.  I'm not sure, Counsel. |
| 10:38 | 16 | Ladies and gentlemen, I think there's a struggle |
| 10:38 | 17 | taking place between the prior testimony that this was |
| 10:38 | 18 | basically a creative, happy management style company, and |
| 10:38 | 19 | that it wasn't.  Some of the information may be relevant in |
| 10:38 | 20 | that determination. |
| 10:38 | 21 | Concerning the unethical business practices, |
| 10:38 | 22 | et cetera, I don't know if that pertains to Carter Bryant, |
| 10:38 | 23 | the drawings, et cetera.  I don't believe it does, from |
| 10:39 | 24 | reading this, but I'll leave that to you. |
| 10:39 | 25 | Judges can comment upon the evidence at any time. |

| | | |
|---|---|---|
| 10:39 | 1 | But there's creations occurring on both sides.  Mr. Larian's |
| 10:39 | 2 | testified that this is a happy company about this time.  And |
| 10:39 | 3 | this is a business record, and it might indicate otherwise. |
| 10:39 | 4 | I'll leave that to you. |
| 10:39 | 5 | Counsel, I'll let you continue.  It's received as |
| 10:39 | 6 | a business record. |
| 09:03 | 7 | BY MR. PRICE: |
| 10:39 | 8 | Q.   Let's go to -- |
| 10:39 | 9 | THE COURT:  Now, once again, let me remind you, we |
| 10:39 | 10 | don't have these people here testifying.  We don't have that |
| 10:39 | 11 | great truth-teller: Cross-examination.  But it's allowed as |
| 10:39 | 12 | a business record 'cause it comes from inside the company, |
| 10:39 | 13 | and came from, apparently, MGA. |
| 10:39 | 14 | Counsel. |
| | 15 | BY MR. PRICE: |
| 10:39 | 16 | Q.   "e. ii.  Untruthful packaging markings related to |
| 10:39 | 17 | testing." |
| 10:39 | 18 | A.   I have no idea what that means. |
| 10:39 | 19 | Q.   "iii.  Refusing to take responsibility for domestic |
| 10:40 | 20 | returns." |
| 10:40 | 21 | A.   Yes.  I don't know what he means. |
| 10:40 | 22 | Q.   Well, you -- you do know what "domestic returns" mean? |
| 10:40 | 23 | A.   Domestic returns on what?  Yes -- on merchandise, when |
| 10:40 | 24 | it comes back from the retailer, yes. |
| 10:40 | 25 | Q.   "Abusing distributor partnerships on returns," slash, |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 92 of 152   Page ID #:303121
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

92

| | | |
|---|---|---|
| 10:40 | 1 | "IC charges." |
| 10:40 | 2 | A.   Yes. |
| 10:40 | 3 | Q.   Perhaps you can tell us, what does "IC charges" refer |
| 10:40 | 4 | to? |
| 10:40 | 5 | A.   I have no idea what -- what that means. |
| 10:40 | 6 | Q.   "3.  Company Objective and Mission Statement, All. |
| 10:40 | 7 | "a.  Float or be acquired? |
| 10:40 | 8 | "i.  Reality is that floating is not an option at |
| 10:40 | 9 | present. |
| 10:40 | 10 | "ii.  Acquisition is driven by proven profitable |
| 10:40 | 11 | growth, not TRSTS data." |
| 10:40 | 12 | Do you know what TRSTS data is? |
| 10:40 | 13 | A.   Yes. |
| 10:40 | 14 | Q.   What is that? |
| 10:40 | 15 | A.   Toy Retail Sales Tracking System.  It's part of NPD. |
| 10:40 | 16 | Q.   Uh, "iii.  Reputation is everything." |
| 10:41 | 17 | And "b.  How do we reach our objective? |
| 10:41 | 18 | "i.  Company focus. |
| 10:41 | 19 | "ii.  Employees are critical. |
| 10:41 | 20 | "iii.  Reputation is everything." |
| 10:41 | 21 | You see that? |
| 10:41 | 22 | A.   Yes. |
| 10:41 | 23 | Q.   Now, I don't want to read the whole thing. |
| 10:41 | 24 | A.   Go ahead.  There's only little bit left.  Go ahead, |
| 10:41 | 25 | read it. |

| 10:41 | 1 | Q. I'm on a clock. Uh, but there's -- there's a |
| 10:41 | 2 | particular -- if there's a particular part of this after |
| 10:41 | 3 | that, that you would like me to read, I will. |
| 10:41 | 4 | A. It's up to you. It's your time. |
| 10:41 | 5 | Q. I just don't want you to think that I'm -- I'm not |
| 10:41 | 6 | talking about something that's in the -- in the agenda. If |
| 10:41 | 7 | there's something you want me to read, I will. |
| 10:41 | 8 | A. Go ahead. |
| 10:41 | 9 | Q. Uh -- so, uh, so I want to focus, then, on this -- on |
| 10:42 | 10 | the time before you came out with Bratz? |
| 10:42 | 11 | A. Are we still talking about this document? |
| 10:42 | 12 | Q. Not the document itself. |
| 10:42 | 13 | A. Okay. |
| 10:42 | 14 | Q. I'm talking about the timeframe, uh, let's say, uh, at |
| 10:42 | 15 | this point, let's say prior to September of 2000, okay, |
| 10:42 | 16 | prior to you meeting Mr. Bryant. |
| 10:42 | 17 | A. Yes. |
| 10:42 | 18 | Q. At that point, I think you said you had 50 or so |
| 10:42 | 19 | employees, correct? |
| 10:42 | 20 | A. Yes. Below a hundred. |
| 10:42 | 21 | Q. You, uh, lost -- were losing money that year because |
| 10:42 | 22 | you got a bunch of defective product back at the beginning |
| 10:42 | 23 | of the year, correct? |
| 10:42 | 24 | A. I'm sorry. 2001? |
| 10:42 | 25 | Q. I'm sorry. 2000. This is before September of 2000. |

| 10:42 | 1 | A.   No.  We got the returns early 2001, after Christmas. |
| 10:43 | 2 | We had sold the product -- I'll let you ask the question. |
| 10:43 | 3 | Q.   Pardon? |
| 10:43 | 4 | A.   I'll let you go ahead and ask your question, but your |
| 10:43 | 5 | statement is correct -- it's not correct. |
| 10:43 | 6 | Q.   Okay.  Okay.  You, at that time, by that time, had not |
| 10:43 | 7 | successfully found a fashion doll design, correct? -- by |
| 10:43 | 8 | September of 2000. |
| 10:43 | 9 | A.   We had not. |
| 10:43 | 10 | Q.   Uh, and, uh, uh, despite the fact that you had been |
| 10:43 | 11 | looking, right? |
| 10:43 | 12 | A.   Yes. |
| 10:43 | 13 | Q.   And so at -- September 2000, when Mr. Bryant, uh, came |
| 10:43 | 14 | into your, uh -- it was your office, correct? |
| 10:43 | 15 | A.   Yes. |
| 10:43 | 16 | Q.   And he said he was a Mattel employee and he had |
| 10:43 | 17 | designs, you know, that he worked at that time at Mattel, |
| 10:43 | 18 | uh, I think you testified that you were concerned that you |
| 10:43 | 19 | didn't want anything from Mattel, because you thought, if |
| 10:44 | 20 | you took Mattel's property, that they would sue you.  That's |
| 10:44 | 21 | what you told Ms. Keller on your examination, correct? |
| 10:44 | 22 | A.   I told you, I told Ms. Keller, I've said that now for |
| 10:44 | 23 | the past, God knows how many years:  If there was something |
| 10:44 | 24 | that belonged to Mattel, I didn't want to have anything to |
| 10:44 | 25 | do with it.  That was true then.  That is true now. |

| | | |
|---|---|---|
| 10:44 | 1 | Q.   And -- and when you said you didn't want to have |
| 10:44 | 2 | anything of Mattel's 'cause they would -- they would sue |
| 10:44 | 3 | you -- I mean, MGA has sued because it thinks other |
| 10:44 | 4 | companies have taken its intellectual property, correct? |
| 10:44 | 5 | A.   We have sued people for taking intellectual property. |
| 10:44 | 6 | Q.   Trademarks, infringing trademarks, infringing |
| 10:44 | 7 | copyright -- things of that nature, correct? |
| 10:44 | 8 | A.   We have sued people for infringing our trademark and |
| 10:44 | 9 | copyright.  We have. |
| 10:44 | 10 | Q.   I mean, you've done that -- you've done that dozens of |
| 10:44 | 11 | times? |
| 10:44 | 12 | A.   We have done it, yes. |
| 10:44 | 13 | Q.   And -- and that's something which you think a company |
| 10:45 | 14 | should do to protect its rights, correct? |
| 10:45 | 15 | A.   Yes. |
| 10:45 | 16 | Q.   And I -- I think you said in your examination that, in |
| 10:45 | 17 | that first meeting, you told Mr. Bryant that, if this is |
| 10:45 | 18 | from Mattel, uh, you want nothing to do with it, correct? |
| 10:45 | 19 | A.   If it is from Mattel or anybody else, I don't want to |
| 10:45 | 20 | have anything to do with it.  I told him that. |
| 10:45 | 21 | Q.   It's not true, is it? |
| 10:45 | 22 | MS. KELLER:  Objection.  Objection. |
| 10:45 | 23 | Argumentative. |
| 10:45 | 24 | THE COURT:  Sustained. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 96 of 152   Page ID #:303125
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:45 | 1 | BY MR. PRICE: |
| 10:45 | 2 | Q.   Look at the -- Mr. Larian's testimony on March 26, |
| 10:46 | 3 | 2008, page 439, line 7 through line 14. |
| 10:46 | 4 | *(Document provided to the witness.)* |
| 10:46 | 5 | THE WITNESS:  Go ahead. |
| 10:46 | 6 | MR. PRICE:  If I could read that, Your Honor? |
| 10:46 | 7 | THE COURT:  You may. |
| 10:46 | 8 | MR. PRICE:  (Reading:) |
| 10:46 | 9 | "QUESTION:  Now, during that meeting, did you tell |
| 10:46 | 10 | Carter Bryant that if he had made any of those drawings that |
| 10:46 | 11 | he was showing you during the time he was a Mattel employee, |
| 10:46 | 12 | that MGA did not want them? |
| 10:46 | 13 | "ANSWER:  I don't recall having that -- having |
| 10:46 | 14 | said that. |
| 10:46 | 15 | "QUESTION:" -- |
| 10:46 | 16 | THE WITNESS:  At that meeting. |
| 10:47 | 17 | MR. PRICE:  (Reading:) |
| 10:47 | 18 | -- "Was that ever conveyed to him? |
| 10:47 | 19 | "ANSWER:  I don't know.  I don't think so." |
| 10:47 | 20 | BY MR. PRICE: |
| 10:47 | 21 | Q.   Did I read that correctly? |
| 10:47 | 22 | A.   You did. |
| 09:09 | 23 | BY MR. PRICE: |
| 10:47 | 24 | Q.   After that meeting, you asked that a -- a contract be |
| 10:47 | 25 | drawn up between MGA and Mr. Bryant, correct? |

| 10:47 | 1 | A.   I asked -- I directed Victoria O'Connor, not right |
| 10:47 | 2 | after that meeting, but while -- after -- for sure, after |
| 10:47 | 3 | the meeting.  Sometime after the meeting, I directed |
| 10:47 | 4 | Victoria O'Connor to negotiate the terms and hire lawyer to |
| 10:47 | 5 | draw up a contract, yes. |
| 10:48 | 6 | Q.   And at the time of the meeting, you knew that MGA |
| 10:48 | 7 | shouldn't try to build a profitable -- profitable brand if |
| 10:48 | 8 | it was inspired to do so by looking at Mattel's property. |
| 10:48 | 9 | You knew that at the time? |
| 10:48 | 10 | A.   I knew that if that belonged to Mattel, and Carter |
| 10:48 | 11 | Bryant had done that at Mattel as part of his job, he should |
| 10:48 | 12 | not have brung it to MGA, and MGA should not have it. |
| 10:48 | 13 |      Now, I have testified to this, I think, multiple times. |
| 10:48 | 14 | Q.   So I think you testified, when Ms. Keller was asking |
| 10:48 | 15 | you, that you wanted to, therefore, make 100 percent sure |
| 10:48 | 16 | that Mr. Bryant owned these drawings and didn't create them |
| 10:48 | 17 | while he was at Mattel, right? |
| 10:48 | 18 | A.   I -- yes. |
| 10:49 | 19 | Q.   In fact, you've testified it wouldn't have been a |
| 10:49 | 20 | problem if Mr. Bryant had created or made these drawings |
| 10:49 | 21 | when he was employed by Mattel, correct? |
| 10:49 | 22 | A.   I don't remember if I testified to that or not. |
| 10:49 | 23 |      MR. PRICE:  Uh, April 26, 2008, 450, lines 10 |
| 10:49 | 24 | through 17. |
| 10:49 | 25 |      *(Document provided to the witness.)* |

Case 2:04-cv-09049-DOC-RNB  Document 10042  Filed 02/22/11  Page 98 of 152  Page ID #:303127
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

98

| | | |
|---|---|---|
| 10:49 | 1 | THE COURT:  You may. |
| 10:49 | 2 | MR. PRICE:  (Reading:) |
| 10:49 | 3 | "QUESTION:  Would it have been a problem if Carter |
| 10:49 | 4 | Bryant had created or made any of his drawings when he was |
| 10:49 | 5 | employed by Mattel, in your view? |
| 10:49 | 6 | "ANSWER:  No. |
| 10:50 | 7 | "QUESTION:  Why not? |
| 10:50 | 8 | "ANSWER:  Because I don't think, whether it's MGA |
| 10:50 | 9 | or Mattel, we own the people, especially the creative people |
| 10:50 | 10 | forever." |
| 10:50 | 11 | THE WITNESS:  I'm sorry.  This is not what I'm -- |
| 10:50 | 12 | is in front of me.  Page 450? |
| 10:50 | 13 | MR. PRICE:  It's March 26, 2008. |
| 10:50 | 14 | THE WITNESS:  Line 1 through what? |
| 10:50 | 15 | MR. PRICE:  I just read lines 10 through 17, sir. |
| 10:50 | 16 | THE WITNESS:  Oh, I'm sorry.  You skipped line 1 |
| 10:50 | 17 | through 10. |
| 10:50 | 18 | Okay.  Go ahead. |
| 10:50 | 19 | *(Document displayed.)* |
| 10:50 | 20 | BY MR. PRICE: |
| 10:51 | 21 | Q.   If you were not gonna go into this deal unless -- you |
| 10:51 | 22 | required 100 percent proof that these designs belonged to |
| 10:51 | 23 | Carter Bryant.  You never could have gone into the deal, |
| 10:51 | 24 | right? |
| 10:51 | 25 | A.   I'm sorry? |

| | | |
|---|---|---|
| 10:51 | 1 | Q.   You said you wanted to be 100 percent sure, right? |
| 10:51 | 2 | A.   Yes.  And we got that assurance. |
| 10:51 | 3 | Q.   Pardon? |
| 10:51 | 4 | A.   And we did get that assurance. |
| 10:51 | 5 | Q.   "100 percent sure," you said? |
| 10:51 | 6 | A.   Yes. |
| 10:51 | 7 | Q.   And certainly, uh, there could be -- if these drawings |
| 10:51 | 8 | were created at a time Mr. Bryant was not at Mattel, there |
| 10:51 | 9 | could be, uh, evidence of that, correct?  I mean, |
| 10:51 | 10 | documentary evidence -- |
| 10:51 | 11 | A.   I'm sorry.  You're talking too fast for me, and I'm |
| 10:51 | 12 | missing some of it.  Can you please -- |
| 10:51 | 13 | Q.   Sure.  I'll slow down.  I'm sorry. |
| 10:51 | 14 | If you wanted to see if there was proof that Mr. Bryant |
| 10:51 | 15 | created these drawings when he wasn't at Mattel, there's |
| 10:51 | 16 | certain types of documents you could -- you could ask him |
| 10:51 | 17 | for or look for, correct? |
| 10:52 | 18 | A.   Probably, yes or no.  I don't know.  But the fact is |
| 10:52 | 19 | that we did our due diligence above and beyond.  And his |
| 10:52 | 20 | information was accurate; he was not lying. |
| 10:52 | 21 | Q.   Well, look at Exhibit 302.  This is -- 302 is the |
| 10:52 | 22 | presentation Mr. Bryant made to you. |
| 10:52 | 23 | (Document provided to the witness.) |
| 10:52 | 24 | (Document displayed.) |
| 10:52 | 25 | THE WITNESS:  I remember that -- the pitch book -- |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 100 of 152   Page ID #:303129
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:52 | 1 | yes. |
| 09:09 | 2 | BY MR. PRICE: |
| 10:52 | 3 | Q.   And on the first page of the materials he presented to |
| 10:52 | 4 | you -- |
| 10:52 | 5 | A.   Yes. |
| 10:52 | 6 | Q.   -- it says, "Copyright 2000."  Do you see that? |
| 10:52 | 7 | A.   Yes. |
| 10:52 | 8 | Q.   And MGA has -- has received copyrights, correct? |
| 10:52 | 9 | A.   Yes. |
| 10:52 | 10 | Q.   If someone asked you for a copyright registration, you |
| 10:52 | 11 | could -- you could present it to them to show that, at least |
| 10:52 | 12 | as of this date, you had created something, correct? |
| 10:52 | 13 | A.   If they ask, yes. |
| 10:52 | 14 | Q.   All right.  And so you -- one thing you could do with |
| 10:52 | 15 | Mr. Bryant is say, "Could you show us a copyright |
| 10:52 | 16 | registration showing that these were created when you |
| 10:53 | 17 | weren't at Mattel," right? |
| 10:53 | 18 | A.   Yes. |
| 10:53 | 19 | Q.   That would be a simple thing to ask? |
| 10:53 | 20 | A.   It's something that you can ask, yes. |
| 10:53 | 21 | Q.   Uh -- or, uh, you could ask 'em whether or not he had |
| 10:53 | 22 | any of these drawings notarized to prove that they were -- |
| 10:53 | 23 | that they were created in 1998, when he wasn't at Mattel, |
| 10:53 | 24 | correct? |
| 10:53 | 25 | A.   No. |

| | | |
|---|---|---|
| 10:53 | 1 | Q.   You couldn't have asked him that? |
| 10:53 | 2 | A.   I'm sorry.  I could have asked him.  We didn't.  That's |
| 10:53 | 3 | not what you do in the -- in the toy business. |
| 10:53 | 4 | Q.   When you say, "that's not what you do," you had never |
| 10:53 | 5 | been presented with a situation where a competitor's |
| 10:53 | 6 | designer, then working at the competitor's design |
| 10:53 | 7 | department, came to you to try to sell you designs? |
| 10:53 | 8 | A.   I don't know if we had or not.  But, uh, we didn't ask |
| 10:53 | 9 | that question:  If he had notarized it or not.  And that's |
| 10:53 | 10 | not what people do in the toy industry, as your own people |
| 10:53 | 11 | will testify. |
| 10:53 | 12 | Q.   Well, are you saying that it's your understanding that |
| 10:53 | 13 | Mattel's been in the situation where a designer from a |
| 10:54 | 14 | competitive company, then working at that competitive |
| 10:54 | 15 | company, comes to Mattel with designs and says, "No, I |
| 10:54 | 16 | didn't create these while I been working now, or when I been |
| 10:54 | 17 | working before, but in this narrow period of time when I |
| 10:54 | 18 | wasn't working for the other company"? |
| 10:54 | 19 | MS. KELLER:  Objection.  Argumentative. |
| 10:54 | 20 | THE COURT:  Do you understand the question? |
| 10:54 | 21 | THE WITNESS:  Kind of. |
| 10:54 | 22 | THE COURT:  You can answer it. |
| 10:54 | 23 | THE WITNESS:  I don't know. |
| 09:13 | 24 | BY MR. PRICE: |
| 10:54 | 25 | Q.   I mean, you have to admit this is a unique situation |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 102 of 152   Page ID #:303131
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

102

| | | |
|---|---|---|
| 10:54 | 1 | that you had never faced before and have never faced since, |
| 10:54 | 2 | right? |
| 10:54 | 3 | A.   If you're asking if it's a unique situation that I have |
| 10:54 | 4 | been sued by a company like Mattel?  And -- no, I have not. |
| 10:54 | 5 | Q.   But let me be a little more specific.  It's a unique |
| 10:54 | 6 | situation when a competitor's designer comes to you with |
| 10:54 | 7 | designs while still working with a competitor, and says, "I |
| 10:54 | 8 | own them."  That's a situation that hadn't happened to you |
| 10:54 | 9 | before or since, right? |
| 10:54 | 10 | A.   I don't know if it has or not. |
| 10:55 | 11 | Q.   I mean, you'll admit that has red flags all over it. |
| 10:55 | 12 | MS. KELLER:  Objection.  Argumentative. |
| 10:55 | 13 | THE COURT:  Sustained. |
| 10:55 | 14 | BY MR. PRICE: |
| 10:55 | 15 | Q.   You'll admit that's a situation which might cause some |
| 10:55 | 16 | suspicion, when a competitor's designer, working competitor |
| 10:55 | 17 | comes to you with designs and says, "I own them"? |
| 10:55 | 18 | MS. KELLER:  Objection.  Asked and answered |
| 10:55 | 19 | multiple times. |
| 10:55 | 20 | THE COURT:  Overruled. |
| 10:55 | 21 | THE WITNESS:  Yes. |
| 10:55 | 22 | BY MR. PRICE: |
| 10:55 | 23 | Q.   And so, in that situation, before you were going to |
| 10:55 | 24 | invest millions of dollars, before you were going to devote |
| 10:55 | 25 | your company to that property, you would want to do what you |

DEBBIE GALE, U.S. COURT REPORTER

| 10:55 | 1 | could to make sure that it didn't belong to your competitor, |
| 10:55 | 2 | correct? |
| 10:55 | 3 | MS. KELLER:  Objection.  Asked and answered. |
| 10:55 | 4 | THE COURT:  Overruled. |
| 10:55 | 5 | THE WITNESS:  Yes. |
| 10:55 | 6 | BY MR. PRICE: |
| 10:55 | 7 | Q.   And so when I asked you, "Could you have asked, for |
| 10:55 | 8 | example, 'Do you have any drawings notarized while you're |
| 10:55 | 9 | not at Mattel that shows these were created then?" I mean, |
| 10:55 | 10 | you could have asked that, right? |
| 10:55 | 11 | A.   Yes. |
| 10:56 | 12 | Q.   Or, uh, or you could have asked, "Do you have any |
| 10:56 | 13 | communications with other toy companies who you're trying to |
| 10:56 | 14 | sell these -- these drawings, uh, sometime when you weren't |
| 10:56 | 15 | working for Mattel?"  Correct? |
| 10:56 | 16 | A.   I suppose I could have asked that, yes. |
| 10:56 | 17 | Q.   But you say what you did, instead, was you asked your |
| 10:56 | 18 | attorney, in connection with drafting a contract, to talk to |
| 10:56 | 19 | Mr. Bryant's attorney? |
| 10:56 | 20 | A.   I directed our head of licensing, Victoria O'Connor, as |
| 10:56 | 21 | part of her job to do complete due diligence and make sure |
| 10:56 | 22 | that these, in fact, belong to Carter Bryant and he did 'em |
| 10:56 | 23 | in 1998, in Missouri, when he was not working at Mattel, on |
| 10:56 | 24 | nights and weekends, when he was working during the day at |
| 10:56 | 25 | Old Navy.  And -- and that came back as accurate. |

| | | |
|---|---|---|
| 10:57 | 1 | I believed my lawyer to protect me.  And I believe |
| 10:57 | 2 | Carter Bryant's lawyer would do everything to protect him. |
| 10:57 | 3 | This is my understanding of the real life. |
| 10:57 | 4 | Q.   Mr. Larian, you thought that getting a representation |
| 10:57 | 5 | from Mr. Bryant's lawyer and your lawyer would not impact at |
| 10:57 | 6 | all Mattel's rights, whatever they were, in those designs? |
| 10:57 | 7 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:57 | 8 | evidence, argumentative, and calls for a legal opinion. |
| 10:57 | 9 | THE COURT:  Just a moment. |
| 10:57 | 10 | Restate the question, Counsel.  It's confusing. |
| 08:59 | 11 | BY MR. PRICE: |
| 10:57 | 12 | Q.   It was your understanding at the time that you received |
| 10:57 | 13 | the e-mail from Mr. Rosenbaum relaying what Mr. Bryant's |
| 10:57 | 14 | lawyer had said -- it was your understanding that that |
| 10:57 | 15 | representation by Mr. Bryant's lawyer had no significance at |
| 10:58 | 16 | all on the issue of whether or not Mattel owns those |
| 10:58 | 17 | designs? |
| 10:58 | 18 | THE COURT:  I'm going to overrule the objection, |
| 10:58 | 19 | Counsel. |
| 10:58 | 20 | You can answer that question, sir. |
| 10:58 | 21 | THE WITNESS:  Your assumption is wrong.  No.  We |
| 10:58 | 22 | relied on Carter Bryant's statement and his lawyer, as well |
| 10:58 | 23 | as reps and warranties that we received, which is customary |
| 10:58 | 24 | in the toy industry. |
| | 25 | |

| | | |
|---|---|---|
| 09:13 | 1 | BY MR. PRICE: |
| 10:58 | 2 | Q.   So your testimony is that you believed that |
| 10:58 | 3 | Mr. Rosenbaum, relaying to you Ms. Wang's representation, |
| 10:58 | 4 | had an impact on whether or not Mattel had rights to those |
| 10:58 | 5 | drawings? |
| 10:58 | 6 | A.   Mattel has no right to those drawings -- if that's the |
| 10:58 | 7 | question you're asking. |
| 10:58 | 8 | Q.   No.  My question was different. |
| 10:58 | 9 | You said you wanted to make 100 percent sure.  You |
| 10:59 | 10 | recall that? |
| 10:59 | 11 | A.   Yes. |
| 10:59 | 12 | Q.   And that's because you don't want to spend millions of |
| 10:59 | 13 | dollars working on property, trying to develop a brand, if |
| 10:59 | 14 | that, in fact, belongs to Mattel, correct? |
| 10:59 | 15 | A.   I didn't want to go ahead, spend money, and develop a |
| 10:59 | 16 | brand if those rights belonged to somebody else, and now be |
| 10:59 | 17 | sued for seven years, sitting in the courtrooms over and |
| 10:59 | 18 | over.  I did not, you're right. |
| 10:59 | 19 | Q.   But at that time, it was your understanding -- your own |
| 10:59 | 20 | personal understanding -- that what Ms. Wang relayed to |
| 10:59 | 21 | Mr. Rosenbaum, who relayed to you, for one thing, wasn't |
| 10:59 | 22 | proof of anything? |
| 10:59 | 23 | MS. KELLER:  Objection.  Asked and answered. |
| 10:59 | 24 | THE COURT:  It's becoming argumentative, Counsel. |
| 10:59 | 25 | I think it's been asked and answered a number of times. |

| | | |
|---|---|---|
| 09:13 | 1 | BY MR. PRICE: |
| 10:59 | 2 | Q.   You thought that what Ms.-- Mr. Bryant's lawyer said to |
| 10:59 | 3 | Mr. Rosenbaum, that was related to you, had no significance |
| 11:00 | 4 | as to whether or not Mattel might have rights to those |
| 11:00 | 5 | drawings? |
| 11:00 | 6 | MS. KELLER:  Objection.  Asked and answered today |
| 11:00 | 7 | and other days. |
| 11:00 | 8 | THE COURT:  You can answer the question, sir. |
| 11:00 | 9 | THE WITNESS:  I'm sorry.  Can you ask the question |
| 11:00 | 10 | again? |
| 09:25 | 11 | BY MR. PRICE: |
| 11:00 | 12 | Q.   Your belief was that what Ms. Wang told Mr. Rosenbaum, |
| 11:00 | 13 | relayed to you, didn't have any significance with respect to |
| 11:00 | 14 | whether Mattel had rights? |
| 11:00 | 15 | A.   I don't think I've ever said that. |
| 11:00 | 16 | What she said confirmed what he had said, and he said |
| 11:00 | 17 | it over and over and over again:  He did these drawings in |
| 11:00 | 18 | 1998 in Missouri, when he was not working for Mattel.  And |
| 11:00 | 19 | that's the truth, and you know it. |
| 11:00 | 20 | Q.   I -- well, I can't comment.  But I'm just asking you |
| 11:00 | 21 | your thought at the time. |
| 11:00 | 22 | Well, let me ask you this:  You knew that if the |
| 11:00 | 23 | property was belonged -- owned -- was owned by Mattel, |
| 11:00 | 24 | Mr. Bryant saying that it wasn't would not affect Mattel's |
| 11:01 | 25 | rights? |

| | | |
|---|---|---|
| 11:01 | 1 | A.    Sorry.  If? |
| 11:01 | 2 | Q.    If the property was owned by Mattel -- |
| 11:01 | 3 | A.    It did not belong to Mattel.  It does not belong to |
| 11:01 | 4 | Mattel.  It will never belong to Mattel. |
| 11:01 | 5 | Q.    But you were worried about that in September because |
| 11:01 | 6 | you didn't know; you wanted to be 100 percent sure, right? |
| 11:01 | 7 | MS. KELLER:  Objection.  Asked and answered. |
| 11:01 | 8 | THE COURT:  Overruled. |
| 11:01 | 9 | THE WITNESS:  I wanted to be 100 percent sure, |
| 11:01 | 10 | yes. |
| | 11 | BY MR. PRICE: |
| 11:01 | 12 | Q.    So I'm talking about at that time, wanting to be |
| 11:01 | 13 | 100 percent sure. |
| 11:01 | 14 | If that's what you wanted, you knew that having |
| 11:01 | 15 | Mr. Bryant's lawyer tell Mr. Rosenbaum to relay something to |
| 11:01 | 16 | you wouldn't have any impact on whether or not Mattel owned |
| 11:01 | 17 | those drawings? |
| 11:01 | 18 | MS. KELLER:  Objection.  Assumes facts not in |
| 11:01 | 19 | evidence, calls for a legal conclusion, and assumes that he |
| 11:01 | 20 | knows what the lawyers were doing. |
| 11:01 | 21 | THE COURT:  Overruled.  This is his state of mind. |
| 11:01 | 22 | You can answer that question. |
| 11:01 | 23 | THE WITNESS:  And I really don't understand his |
| 11:02 | 24 | question.  I mean, he has asked the same question 500 |
| 11:02 | 25 | different times.  I don't understand it.  I don't -- |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

108

| 11:02 | 1 | THE COURT: I won't comment upon that. |
| 11:02 | 2 | THE WITNESS: I just don't know how else to answer |
| 11:02 | 3 | it, Your Honor, beside what I've answered. |
| 11:02 | 4 | THE COURT: All right. Thank you. |
| 11:02 | 5 | MR. PRICE: Okay. Your Honor, let me just read |
| 11:02 | 6 | from his deposition, then. |
| 11:02 | 7 | THE COURT: Let me see the deposition. |
| 11:02 | 8 | MR. PRICE: This is March 26, 2008, 459-12, to |
| 11:02 | 9 | 460-20. |
| 11:02 | 10 | *(Document provided to the witness.)* |
| 11:02 | 11 | THE COURT: 459-12? |
| 11:02 | 12 | MR. PRICE: Yes, Your Honor. 459-12 to 460-20. |
| 11:02 | 13 | THE WITNESS: Go ahead. |
| 11:02 | 14 | MS. KELLER: Improper impeachment, Your Honor. |
| 11:02 | 15 | THE COURT: Just a minute. |
| 11:03 | 16 | THE WITNESS: I think it's good. You should read |
| 11:03 | 17 | it. |
| 11:03 | 18 | THE COURT: Counsel, is there an objection? |
| 11:03 | 19 | MS. KELLER: Improper impeachment. |
| 11:03 | 20 | THE COURT: It's sustained. |
| 11:03 | 21 | MR. PRICE: Just down to "no." See that answer |
| 11:03 | 22 | "no"? In fact, I could just read that question and answer. |
| 11:04 | 23 | THE COURT: Just a moment, counsel. |
| 11:04 | 24 | MR. PRICE: Where it says, "Well, you thought." |
| 11:04 | 25 | MS. KELLER: Your Honor, then it's out of context. |

| | | |
|---|---|---|
| 11:04 | 1 | THE COURT:  Just a minute. |
| 11:04 | 2 | Well, just a moment.  Page 460, Counsel? |
| 11:04 | 3 | MR. PRICE:  Yes. |
| 11:04 | 4 | THE COURT:  Line 3? |
| 11:04 | 5 | MR. PRICE:  It begins, Your Honor, with "Well, you |
| 11:04 | 6 | thought that would have some significance." |
| 11:04 | 7 | THE COURT:  You know, I'm gonna reverse my |
| 11:04 | 8 | finding.  I'm gonna allow a reading. |
| 11:04 | 9 | (To the jury:)  One of the reasons for that is I |
| 11:04 | 10 | want you to have the interpretation of what that answer is. |
| 11:04 | 11 | There may be clarity or nonclarity to it.  The answer and |
| 11:04 | 12 | question goes on about a page, and it depends upon which |
| 11:04 | 13 | portion you think is important in this matter. |
| 11:04 | 14 | So you may read, Counsel. |
| 11:04 | 15 | MS. KELLER:  Then, Your Honor -- |
| 11:04 | 16 | THE COURT:  (To the jury:)  This is not |
| 11:04 | 17 | necessarily for impeachment purposes.  Part of it may be. |
| 11:04 | 18 | Part of it not. |
| 11:05 | 19 | Do you want to add some portions? |
| 11:05 | 20 | MS. KELLER:  Yes.  I would ask for a rule of |
| 11:05 | 21 | completeness -- |
| 11:05 | 22 | THE COURT:  Sure. |
| 11:05 | 23 | MS. KELLER:  -- that 459-6, line 6. |
| 11:05 | 24 | THE COURT:  459, line 6. |
| 11:05 | 25 | MS. KELLER:  Through -- and it would be through |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 110 of 152   Page ID #:303139
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

110

| | | |
|---|---|---|
| 11:05 | 1 | 460, line 20. |
| 11:05 | 2 | THE COURT:  460, line 20.  And that's the last |
| 11:05 | 3 | portion, Counsel.  So you're adding line 6, fine. |
| 11:05 | 4 | Read that portion. |
| 11:05 | 5 | MR. PRICE:  Beginning with line 6: |
| 11:05 | 6 | "QUESTION:  Do you what assurances Carter" -- |
| 11:05 | 7 | THE WITNESS:  Is this gonna be on the screen so I |
| 11:05 | 8 | can follow it? |
| 11:05 | 9 | *(Document displayed.)* |
| 11:05 | 10 | MR. PRICE:  (Reading:) |
| 11:05 | 11 | "QUESTION:  Do you know what assurances Carter |
| 11:05 | 12 | Bryant's lawyer gave? |
| 11:05 | 13 | "ANSWER:  In general, I remember that -- saying, |
| 11:05 | 14 | yes, that he did these in 1998, in Missouri, when he was not |
| 11:05 | 15 | working at Mattel and that he, indeed, himself, did it. |
| 11:05 | 16 | "QUESTION:  Was the fact that Carter Bryant's |
| 11:06 | 17 | lawyer represented to MGA that Carter Bryant had done the |
| 11:06 | 18 | drawings in 1998 in Missouri, when he was not a Mattel |
| 11:06 | 19 | employee, have any significance to you at that time? |
| 11:06 | 20 | "ANSWER:  It, uh -- he confirmed what Carter |
| 11:06 | 21 | Bryant had told us. |
| 11:06 | 22 | "QUESTION:  And did you find some comfort in this? |
| 11:06 | 23 | "ANSWER:  Of course. |
| 11:06 | 24 | "QUESTION:  And why was that? |
| 11:06 | 25 | "ANSWER:  Because, you know, I hope the lawyers in |

DEBBIE GALE, U.S. COURT REPORTER

11:06    1    court, your profession, tell the truth.

11:06    2        "QUESTION:  Well, you thought that it would have

11:06    3    some significance to whether or not Mattel might have rights

11:06    4    to those drawings; is that true?

11:06    5        "ANSWER:  No.

11:06    6        "QUESTION:  Well, then please tell me what comfort

11:06    7    you derived from the fact that this, as you describe it,

11:06    8    confirmed what Carter Bryant had told you about creating

11:06    9    these drawings in 1998, in Missouri, when he was not

11:06   10    employed by Mattel?

11:06   11        "ANSWER:  Beside what I just testified, I have

11:06   12    nothing else to add.

11:07   13        "QUESTION:  So you were just comforted by the fact

11:07   14    that he had told you the truth?

11:07   15        "ANSWER:  And his lawyer confirmed it.

11:07   16        "QUESTION:  And beyond that, it had no

11:07   17    significance to you; is that true?

11:07   18        "ANSWER:  That's true."

11:07   19    BY MR. PRICE:

11:07   20    Q.   Mr. Larian --

11:07   21    A.   Thank you for reading that.

11:07   22    Q.   You're welcome.  You said, in your examination by

11:07   23    Ms. Keller, that you had directed Mr. Rosenbaum to confirm

11:07   24    100 percent that this property did not belong to Mattel,

11:07   25    right?

| | | |
|---|---|---|
| 11:07 | 1 | A.   I'm sorry.  Can you repeat the question? |
| 11:07 | 2 | Q.   Yes.  You testified in your -- in Ms. Keller's |
| 11:07 | 3 | examination, that you had told Mr. Rosenbaum to confirm |
| 11:07 | 4 | 100 percent that these designs were not owned by Mattel, |
| 11:07 | 5 | correct? |
| 11:07 | 6 | A.   I don't think I said something like that. |
| 11:07 | 7 | Q.   Well, uh, you do have a contract with Mr. Bryant that |
| 11:07 | 8 | provided an indemnification clause, correct? -- where he is |
| 11:08 | 9 | to reimburse you if there's any judgment or costs associated |
| 11:08 | 10 | with him not owning these designs, correct? |
| 11:08 | 11 | A.   We have a clause on it called "Reps and warranties."  I |
| 11:08 | 12 | didn't memorize the whole clause. |
| 11:08 | 13 | Q.   And, in fact, because of that clause, uh, you stopped |
| 11:08 | 14 | paying royalties to Mr. Bryant in 1997? |
| 11:08 | 15 | MS. KELLER:  Objection.  This calls for a number |
| 11:08 | 16 | of legal conclusions and opinions, Your Honor.  And the |
| 11:08 | 17 | Court's prior ruling on this matter is invoked, as well. |
| 11:08 | 18 | THE COURT:  I'm afraid I'm not -- |
| 11:08 | 19 | MR. PRICE:  I'm sorry.  Actually, let me -- |
| 11:08 | 20 | actually, I gave the wrong date.  I meant 2007, which is |
| 11:08 | 21 | before. |
| 11:08 | 22 | THE COURT:  Well, I think it's the same objection, |
| 11:08 | 23 | regardless. |
| 11:08 | 24 | MS. KELLER:  That's right. |
| 11:08 | 25 | THE COURT:  Yeah.  I think I need to take this up |

| | | |
|---|---|---|
| 11:08 | 1 | outside the presence of the jury. |
| 11:08 | 2 | Is there another area you can move to, Counsel? |
| 11:09 | 3 | MR. PRICE:  Unrelated to Mr. Bryant, yes. |
| 11:09 | 4 | THE COURT:  Okay. |
| 09:21 | 5 | BY MR. PRICE: |
| 11:09 | 6 | Q.   Let me ask you this:  Have you ever sought any |
| 11:09 | 7 | indemnification or anything from Mr. Rosenbaum? |
| 11:09 | 8 | MS. KELLER:  Same objection, Your Honor.  I assume |
| 11:09 | 9 | he means from Mr. Bryant. |
| 11:09 | 10 | MR. PRICE:  No.  I mean from Mr. Rosenbaum. |
| 11:09 | 11 | THE COURT:  No.  I'd like to take that whole area |
| 11:09 | 12 | up outside the jury.  I'm just not really sure where we're |
| 11:09 | 13 | at concerning indemnification. |
| 11:09 | 14 | So the contract's clear.  You can question on the |
| 11:09 | 15 | contract, his thoughts and feelings about it. |
| 11:09 | 16 | MR. PRICE:  Okay. |
| 09:26 | 17 | BY MR. PRICE: |
| 11:09 | 18 | Q.   Is it your understanding that there's any, uh, contract |
| 11:09 | 19 | in existence, uh, that provides that Mr. Rosenbaum is to |
| 11:09 | 20 | indemnify you if Mattel owns the Bratz designs? |
| 11:09 | 21 | MS. KELLER:  Same objection, Your Honor. |
| 11:10 | 22 | THE COURT:  That's overruled. |
| 11:10 | 23 | You can answer that. |
| 11:10 | 24 | THE WITNESS:  I'm not aware of -- every day, I |
| 11:10 | 25 | learn something knew.  I'm not aware -- I'm not aware of |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 114 of 152   Page ID #:303143
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

114

| | | |
|---|---|---|
| 11:10 | 1 | that. |
| | 2 | BY MR. PRICE: |
| 11:10 | 3 | Q.   Are you aware of any contract or agreement anywhere |
| 11:10 | 4 | that says Ms. Wang, uh, is obligated to indemnify you if it |
| 11:10 | 5 | turns out that Mr. Bryant did not own these designs? |
| 11:10 | 6 | A.   No, I'm not. |
| 11:10 | 7 | Q.   In connection with the events that took place in |
| 11:10 | 8 | September of 2000, uh, did you ask Mr. Rosenbaum or Ms. Wang |
| 11:10 | 9 | to give you some sort of indemnification that they would |
| 11:10 | 10 | have some financial responsibility if it turned out that |
| 11:10 | 11 | Mr. Bryant did not own the designs that he presented to you |
| 11:10 | 12 | in September 2000? |
| 11:10 | 13 |         THE COURT:  After listening, I'm going to sustain |
| 11:10 | 14 | the objection.  We'll take this -- you'll move on to another |
| 11:11 | 15 | section now. |
| 11:11 | 16 |         MR. PRICE:  I will. |
| 11:11 | 17 |         THE COURT:  I'm going to sustain the objection. |
| 11:11 | 18 |         Ladies and gentlemen, you're to disregard that |
| 11:11 | 19 | line of questioning concerning Mr. Rosenbaum and Ms. Wang. |
| 11:11 | 20 | It's not relevant. |
| 11:11 | 21 |         THE WITNESS:  For the record, I don't know |
| 11:11 | 22 | Ms. Wang. |
| 11:11 | 23 | BY MR. PRICE: |
| 11:11 | 24 | Q.   Mr. Larian, another thing you said in Ms. Keller's |
| 11:11 | 25 | examination was that, in this September 2000 meeting, you |

| | | |
|---|---|---|
| 11:11 | 1 | saw these designs and you didn't think they could become |
| 11:11 | 2 | dolls. |
| 11:11 | 3 | Do you recall that? |
| 11:11 | 4 | A.   Yes. |
| 11:11 | 5 | Q.   And I think you said that -- let me ask you, how many |
| 11:11 | 6 | e-mails do you -- |
| 11:11 | 7 | MS. KELLER:  Your Honor, that misstates the |
| 11:11 | 8 | testimony.  I believe he said he didn't know whether, so he |
| 11:11 | 9 | explored it. |
| 11:12 | 10 | THE COURT:  Overruled. |
| 11:12 | 11 | BY MR. PRICE: |
| 11:12 | 12 | Q.   Well, let me ask you this -- |
| 11:12 | 13 | THE COURT:  Counsel, I overruled the objection. |
| 11:12 | 14 | You can ask the question. |
| 11:12 | 15 | MR. PRICE:  I think he answered it, actually. |
| 11:12 | 16 | Your Honor, was there an answer? |
| 11:12 | 17 | THE COURT:  Yeah.  He answered, "yes." |
| 11:12 | 18 | MR. PRICE:  That's what I thought. |
| 11:12 | 19 | BY MR. PRICE: |
| 11:12 | 20 | Q.   Uh, so how many e-mails do you -- at that time did you |
| 11:12 | 21 | send per day? |
| 11:12 | 22 | A.   I don't remember.  A lot of e-mails. |
| 11:12 | 23 | Q.   Are you aware of any e-mail in the September or October |
| 11:12 | 24 | timeframe where you say, you know, "I don't know if this can |
| 11:12 | 25 | be made into a doll"? |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

116

| | | |
|---|---|---|
| 11:12 | 1 | A.   I'm not aware of it, no. |
| 11:12 | 2 | Q.   In fact, by -- by September 12th, you had the idea that |
| 11:12 | 3 | you, in fact, wanted to make this into a brand, right? |
| 11:12 | 4 | A.   We were going parallel path.  I wanted to make sure, |
| 11:12 | 5 | first of all, if this can be made to a doll; and secondly, |
| 11:12 | 6 | if it could be made to a doll, then, yes, I wanted to make |
| 11:13 | 7 | it a brand.  But we were going parallel path. |
| 11:13 | 8 | Q.   So on the one path -- you need a drink? |
| 11:13 | 9 | A.   Excuse me for one second. |
| 11:13 | 10 | Go ahead. |
| 11:13 | 11 | Q.   So the one path, you were saying, was you wanted to |
| 11:13 | 12 | make it into a brand, if it could be made into a doll, |
| 11:13 | 13 | correct? |
| 11:13 | 14 | A.   My goal was, yes, to make -- make a brand. |
| 11:13 | 15 | Q.   And we have e-mails reflecting that, correct? |
| 11:13 | 16 | A.   Yes. |
| 11:13 | 17 | Q.   But we have no e-mails reflecting a concern or a belief |
| 11:13 | 18 | that it could not be made into a doll, correct? |
| 11:13 | 19 | A.   I don't know if we do or not. |
| 11:13 | 20 | Q.   And you testified with Ms. Keller that there was a rush |
| 11:13 | 21 | to sign this contract by October 4th so that MGA could be |
| 11:13 | 22 | ready by toy fair to present a Bratz doll or prototype, |
| 11:13 | 23 | correct? |
| 11:13 | 24 | A.   I didn't say there was a rush to sign it by October 4. |
| 11:14 | 25 | What I said is that we needed to have a deal in place if we |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:14 | 1 | were going to make these, yes or no, by October 4th, 'cause |
| 11:14 | 2 | it was already too late, 'cause you had to make mockups, |
| 11:14 | 3 | et cetera, to show in January 4, 2001, in Hong Kong toy fair |
| 11:14 | 4 | to have a chance to get placement. |
| 11:14 | 5 | Q.   So you don't recall using the word "rush"? |
| 11:14 | 6 | A.   I don't.  Maybe I did. |
| 11:14 | 7 | Q.   Well, whether you used that word or another word, there |
| 11:14 | 8 | was some, uh, reason to try to get the contract signed as |
| 11:14 | 9 | soon as possible, right? |
| 11:14 | 10 | A.   I'm sorry? |
| 11:14 | 11 | Q.   Do you recall saying, "If we don't have a deal, we just |
| 11:14 | 12 | gonna move on 'cause we have to rush to get ready for |
| 11:14 | 13 | Hong Kong toy fair, and we have nothing right now to do so"? |
| 11:15 | 14 | Do you recall saying that? |
| 11:15 | 15 | A.   Yes. |
| 11:15 | 16 | Q.   So by October 4th, you were in this mindset of you were |
| 11:15 | 17 | going to have to rush to get a doll ready for Hong Kong toy |
| 11:15 | 18 | fair, correct? |
| 11:15 | 19 | A.   No.  We had to rush to get product, in general -- not |
| 11:15 | 20 | just a doll -- all of our products ready for Hong Kong toy |
| 11:15 | 21 | fair.  Hong Kong toy fair is a big, big endeavor.  It takes |
| 11:15 | 22 | a lot of time, a lot of work to do.  And we were not just |
| 11:15 | 23 | showing one product.  We had to get ready for Hong Kong toy |
| 11:15 | 24 | fair. |
| 11:15 | 25 | Q.   But you testified, when Ms. Keller was examining you, |

| 11:15 | 1 | that you wanted to conclude the contract right away because |
| 11:15 | 2 | you wanted to rush to get ready for the Hong Kong toy fair, |
| 11:15 | 3 | and you didn't have the right to -- to make the Bratz until |
| 11:15 | 4 | the contract was signed. |
| 11:15 | 5 | Do you recall that? |
| 11:15 | 6 | A.   Yes. |
| 11:15 | 7 | Q.   Okay. |
| 11:15 | 8 | A.   That's correct.  That's true. |
| 11:15 | 9 | Q.   And so, uh, by October 4, at least, then, you wanted to |
| 11:15 | 10 | make dolls for the Hong Kong toy fair that were Bratz dolls? |
| 11:16 | 11 | A.   After October 4 -- if we didn't have a contract with |
| 11:16 | 12 | Carter Bryant signed on October 4th, we were gonna move on. |
| 11:16 | 13 | Q.   Were there any feasibility studies that you're aware of |
| 11:16 | 14 | that had been done as of October 4? |
| 11:16 | 15 | A.   What do you mean by "feasibility studies"? |
| 11:16 | 16 | Q.   Whether it could be done, whether you could make these |
| 11:16 | 17 | designs into dolls.  Had you done any feasibility studies -- |
| 11:16 | 18 | A.   Yeah, we had -- |
| 11:16 | 19 | Q.   -- before October 4? |
| 11:16 | 20 | A.   Yeah, we had.  I believe Paula Garcia had Margaret |
| 11:16 | 21 | Leahy start working on a clay sample to see if those |
| 11:16 | 22 | drawings could be turned to a doll.  Yes.  That was an |
| 11:16 | 23 | exploration that we were doing. |
| 11:16 | 24 | Q.   And that was an exploration that took place before the |
| 11:16 | 25 | contract was actually signed by Mr. Bryant, correct? |

| | | |
|---|---|---|
| 11:16 | 1 | A.   Yes. |
| 11:16 | 2 | Q.   And the -- the creation of that -- of that first |
| 11:17 | 3 | sculpt -- |
| 11:17 | 4 | A.   It wasn't the first sculpt. |
| 11:17 | 5 | Q.   The creation of that clay model -- |
| 11:17 | 6 | A.   Yes. |
| 11:17 | 7 | Q.   The creation of that clay model was done with the |
| 11:17 | 8 | assistance of Mr. Bryant? |
| 11:17 | 9 | A.   I believe Mr. Bryant had some assistance to it, |
| 11:17 | 10 | correct. |
| 11:17 | 11 | Q.   Okay.  So, uh, according to you, then, Mr. Bryant was |
| 11:17 | 12 | assisting MGA in creating, uh, this, uh, clay figure, uh, |
| 11:17 | 13 | uh, to assist MGA in determining whether it should go |
| 11:17 | 14 | forward? |
| 11:17 | 15 | A.   If -- he was assisting to see if he can -- his project |
| 11:17 | 16 | can be sold and made to a doll.  He was working on his own |
| 11:17 | 17 | trying to make a sales pitch and selling his product. |
| 11:17 | 18 |      I got to take some cough drop or something.  I'm sorry. |
| 11:17 | 19 |           THE COURT:  Okay.  Do you want a brief recess? |
| 11:17 | 20 |           You're admonished not to discuss this matter |
| 11:17 | 21 | amongst yourselves, nor form or express any opinion |
| 11:17 | 22 | concerning the case. |
| 11:17 | 23 |           We'll come back and get you pretty quick, though, |
| 11:17 | 24 | about 10 minutes. |
| 11:18 | 25 |           *(Jury recesses at 11:18 a.m.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 120 of 152   Page ID #:303149
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

120

| | | |
|---|---|---|
| 11:18 | 1 | *(Outside the presence of the jury.)* |
| 11:18 | 2 | THE COURT:  All right.  Counsel, I'll open those |
| 11:18 | 3 | doors at 11:30. |
| 11:18 | 4 | MR. PRICE:  Your Honor, could we address |
| 11:18 | 5 | Ms. Keller's objection to Ms. Wang and Mr. Rosenbaum and |
| 11:19 | 6 | whether they gave -- |
| 11:19 | 7 | THE COURT:  Oh, certainly.  Certainly. |
| 11:19 | 8 | The concern that I heard was to a series of |
| 11:19 | 9 | questions and of asking about indemnification of Rosenbaum |
| 11:19 | 10 | and Wang.  This Court knows of no situation where counsel |
| 11:19 | 11 | have been indemnified.  They're private actors, in a sense, |
| 11:19 | 12 | and they can be sued, so -- |
| 11:19 | 13 | MS. KELLER:  And, in fact, they don't have -- |
| 11:19 | 14 | THE COURT:  I thought the 403 value was starting |
| 11:19 | 15 | to become of concern.  When I heard the first question, I |
| 11:19 | 16 | didn't know where counsel was going.  After the |
| 11:19 | 17 | indemnification issues became apparent, and you were talking |
| 11:19 | 18 | about attorneys being indemnified -- I haven't heard of a |
| 11:19 | 19 | client indemnifying us.  Have you? |
| 11:19 | 20 | MR. PRICE:  Client indemnifying me? |
| 11:19 | 21 | THE COURT:  Yeah.  Are you indemnified?  I don't |
| 11:19 | 22 | think you are. |
| 11:19 | 23 | MR. PRICE:  I'm not.  It was the other way around. |
| 11:19 | 24 | It's if Mr. Larian is saying, "I relied on my attorney and |
| 11:19 | 25 | Ms. Wang" -- that he got communication from Mr. Bryant, his |

| | | |
|---|---|---|
| 11:20 | 1 | representations.  What he got from Ms. Wang was a |
| 11:20 | 2 | representation.  He says he got a representation from |
| 11:20 | 3 | Mr. Rosenbaum. |
| 11:20 | 4 | THE COURT:  You can argue that, but what you can't |
| 11:20 | 5 | bring out, I think, is whether they were indemnified or not. |
| 11:20 | 6 | MR. PRICE:  No.  It's whether he -- they were |
| 11:20 | 7 | indemnifying him. |
| 11:20 | 8 | THE COURT:  I know. |
| 11:20 | 9 | MR. PRICE:  And, uh -- and -- and I think it's |
| 11:20 | 10 | relevant that he had no expectation to rely on. |
| 11:20 | 11 | THE COURT:  Well, you can argue that he had no |
| 11:20 | 12 | expectation, that there were no repercussions, that the |
| 11:20 | 13 | attorneys were privately contracted, but the indemnification |
| 11:20 | 14 | isn't appropriate. |
| 11:20 | 15 | MS. KELLER:  Your Honor, there's -- first of all, |
| 11:20 | 16 | there's no duty flowing from Mr. Wang to Mr. Larian.  But, |
| 11:20 | 17 | quite apart from all that, as the Court pointed out, lawyers |
| 11:20 | 18 | can be sued for malpractice.  And lawyers don't have the |
| 11:20 | 19 | option of putting in an agreement a waiver of that ability |
| 11:20 | 20 | to sue.  It's not permitted under the Rules of Professional |
| 11:20 | 21 | Conduct. |
| 11:20 | 22 | THE COURT:  I thought I'd sustained and eventually |
| 11:20 | 23 | struck it.  But if you want me to change my mind?  Counsel, |
| 11:21 | 24 | I thought it was clear. |
| 11:21 | 25 | MS. KELLER:  Your Honor, we have one other issue, |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 122 of 152   Page ID #:303151
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:21 | 1 | if this is complete, and that's the Exhibit 13626. |
| 11:21 | 2 | The Court has characterized it as a business |
| 11:21 | 3 | record and admitted it as such because it came from the MGA |
| 11:21 | 4 | files.  But it doesn't meet the standards of a business |
| 11:21 | 5 | record under the Federal Rules of Evidence. |
| 11:21 | 6 | There's no authentication.  We don't know why it |
| 11:21 | 7 | was prepared.  We don't know that it was prepared in the |
| 11:21 | 8 | ordinary course of business.  We really don't know anything |
| 11:21 | 9 | about it.  And I have not seen Patrick Williams on the |
| 11:21 | 10 | witness list, nor have I seen, frankly, Martin Hitch on the |
| 11:21 | 11 | witness list.  We don't know if this agenda was ever printed |
| 11:21 | 12 | out.  We don't know that it ever became a meeting.  We don't |
| 11:21 | 13 | know how it was preserved.  We know nothing about it, other |
| 11:21 | 14 | than it was in someone's computer.  And, apparently, this |
| 11:22 | 15 | came from Fred Larian.  This is how it surfaced. |
| 11:22 | 16 | So it's our position it does not meet the standard |
| 11:22 | 17 | of a business record, and we would ask that it be stricken. |
| 11:22 | 18 | But, Your Honor, beyond that -- |
| 11:22 | 19 | THE COURT:  I'm going to continue with my ruling. |
| 11:22 | 20 | I'm going to continue to receive it as a business record. |
| 11:22 | 21 | Mr. Larian's credibility concerning that will be left to the |
| 11:22 | 22 | jury about what he can and can't recall. |
| 11:22 | 23 | What I'm concerned about is Paragraph (e), the |
| 11:22 | 24 | ethics section.  That's the damaging part where the |
| 11:22 | 25 | prejudicial effect outweighs the probative value. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 123 of 152   Page ID #:303152
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

123

| | | |
|---|---|---|
| 11:22 | 1 | MS. KELLER:  And, Your Honor, the problem is the |
| 11:22 | 2 | Court also made the comment to the jury that it would be |
| 11:22 | 3 | left to the jurors to determine if the unethical business |
| 11:22 | 4 | practices included anything about Carter Bryant. |
| 11:22 | 5 | THE COURT:  And I'm not hearing it, after the |
| 11:22 | 6 | testimony. |
| 11:22 | 7 | MS. KELLER:  And what it says under this -- in |
| 11:22 | 8 | this agenda -- whoever created it -- is, it says, "Not |
| 11:23 | 9 | acknowledging license territory restrictions, untruthful |
| 11:23 | 10 | packaging markings relating to testing, refusing to take |
| 11:23 | 11 | responsibility for domestic returns, abusing distributor |
| 11:23 | 12 | partnerships in return/IC charges." |
| 11:23 | 13 | There is nothing to even suggest that this agenda, |
| 11:23 | 14 | whoever created it or whatever it was about, had anything to |
| 11:23 | 15 | do with Carter Bryant.  And I'm concerned that that comment |
| 11:23 | 16 | by the Court could lead the jurors to believe that there (a) |
| 11:23 | 17 | is something; that, (b), there could be something the Court |
| 11:23 | 18 | knows that the jurors don't, or that we don't. |
| 11:23 | 19 | I'm very, very worried about that. |
| 11:23 | 20 | THE COURT:  It's quite the opposite.  In light of |
| 11:23 | 21 | his questions, I don't think it's relevant to Carter Bryant |
| 11:23 | 22 | after hearing the testimony. |
| 11:23 | 23 | Now, Counsel. |
| 11:23 | 24 | MR. PRICE:  It's not relevant to Carter Bryant. |
| 11:23 | 25 | It's relevant to Mr. Larian's testimony, in his examination |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 124 of 152   Page ID #:303153
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:23 | 1 | by Ms. Keller, that he had great relationships with his |
| 11:23 | 2 | licensees and with his distributors. |
| 11:23 | 3 | THE COURT: I understand that. In fact, I'm not |
| 11:24 | 4 | going to reverse my ruling. |
| 11:24 | 5 | I think counsel's concerned about my comment, and |
| 11:24 | 6 | rightfully so, as it pertains to Subsection (e), the ethics |
| 11:24 | 7 | section. That portion of the e-mail, the prejudicial effect |
| 11:24 | 8 | does seem to outweigh the probative value. It's got nothing |
| 11:24 | 9 | to do with ethics. And after listening to it, it's got |
| 11:24 | 10 | nothing to do with Carter Bryant. I think Counsel's |
| 11:24 | 11 | correct. That leaves the impression with the jury that it |
| 11:24 | 12 | might have, so I can correct that very easily. |
| 11:24 | 13 | MR. PRICE: And what I'd request, if you're |
| 11:24 | 14 | considering that, Your Honor, is little "i" and little "iv," |
| 11:24 | 15 | which is not acknowledging -- |
| 11:24 | 16 | THE COURT: Can I have the document back, then. |
| 11:24 | 17 | MS. KELLER: The problem is, this doesn't prove |
| 11:24 | 18 | any of those things that Counsel says it proves. For |
| 11:24 | 19 | example, you know, the bad relationships with licensees. |
| 11:24 | 20 | This isn't from a licensee. This comes out of |
| 11:24 | 21 | some file of MGA's. I think it's fairly obvious, given the |
| 11:24 | 22 | timing and the wording and everything, that it's from |
| 11:24 | 23 | Patrick Williams, who's listed at the top. But it |
| 11:24 | 24 | doesn't -- it isn't from a licensee. It doesn't establish a |
| 11:25 | 25 | bad relationship with licensee. And it's -- this whole |

| | | |
|---|---|---|
| 11:25 | 1 | thing is nothing more than a character assassination.  We |
| 11:25 | 2 | have no foundation for it. |
| 11:25 | 3 | So, I mean, it -- I could type up anything and |
| 11:25 | 4 | save it in my Word file on my computer.  Anything.  I can |
| 11:25 | 5 | caption it anything.  I can put any rant I want into it. |
| 11:25 | 6 | But if it just stays there, it isn't -- it doesn't prove |
| 11:25 | 7 | anything, other than maybe my own thoughts at the time. |
| 11:25 | 8 | We don't have Mr. Williams here. |
| 11:25 | 9 | THE COURT:  Thank you. |
| 11:25 | 10 | MR. PRICE:  Your Honor? |
| 11:25 | 11 | THE COURT:  Kathy, in four minutes, you're going |
| 11:25 | 12 | to get the jury.  Okay? |
| 11:25 | 13 | MR. PRICE:  Oh, gosh.  Should I respond? |
| 11:25 | 14 | THE COURT:  You're more than welcome to. |
| 11:25 | 15 | MR. PRICE:  Okay.  First of all, Your Honor, a |
| 11:25 | 16 | sufficient showing has been made to show it's a business |
| 11:25 | 17 | record and to show it's authentic.  I mean, you can't have |
| 11:25 | 18 | companies saying, "I didn't do it.  You didn't do it," |
| 11:25 | 19 | et cetera.  This is in MGA's files.  It concerns a meeting |
| 11:26 | 20 | with the heads of sales.  It's produced to us. |
| 11:26 | 21 | And not only is it a business record, but it's a |
| 11:26 | 22 | party admission.  This is the sort of thing -- the reason |
| 11:26 | 23 | you have party admissions is so they can come back and say, |
| 11:26 | 24 | "No, no, here's what it really is."  You know, the reason |
| 11:26 | 25 | for the party admissions rule is so the party has to come |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:26 | 1 | back and say, "Let me explain."  Because we're entitled to |
| 11:26 | 2 | get trustworthiness from the fact it came from a party. |
| 11:26 | 3 | Now with respect the unethical business practices, |
| 11:26 | 4 | little "i," "not acknowledging license territory |
| 11:26 | 5 | restrictions," goes to an issue that was raised in this |
| 11:26 | 6 | trial.  It goes to Mr. Larian's credibility.  It goes to |
| 11:26 | 7 | Ms. O'Connor's credibility. |
| 11:26 | 8 | Number 4 there, "abusing distributor partnerships |
| 11:26 | 9 | and returns," slash, "IC charges," goes again to what |
| 11:26 | 10 | Mr. Larian was saying about the great relationships he had. |
| 11:26 | 11 | So I would -- I would think that at least those two should |
| 11:26 | 12 | remain, if you're going to redact this document, at all, |
| 11:27 | 13 | because they pertain to Mr. Larian's credibility on, uh, you |
| 11:27 | 14 | know, the great infrastructure he had built up, uh, prior |
| 11:27 | 15 | to, uh, manufacturing Bratz. |
| 11:27 | 16 | MS. KELLER:  You know, the problem is not |
| 11:27 | 17 | everything that comes out of a company's files is ipso facto |
| 11:27 | 18 | automatically -- or out of a company's computers -- is |
| 11:27 | 19 | automatically a business record.  That's not what the |
| 11:27 | 20 | Federal Rules of Evidence say.  It has to be authenticated. |
| 11:27 | 21 | There has to be a foundation for it.  We have to know who |
| 11:27 | 22 | produced it, for what purpose, and that it was maintained in |
| 11:27 | 23 | the ordinary course of business. |
| 11:27 | 24 | If somebody at Mattel writes a memo saying, "Bob |
| 11:27 | 25 | Eckert is a big fat creep and a big fat liar, and his |

| | | |
|---|---|---|
| 11:27 | 1 | management style sucks, and he is a tyrant," and on and on |
| 11:27 | 2 | and on, and then that turns up in a production, that doesn't |
| 11:27 | 3 | make it admissible as a business record.  And that's pretty |
| 11:27 | 4 | much what this is. |
| 11:27 | 5 | THE COURT:  Doesn't Martin Hitch call Mr. Larian |
| 11:28 | 6 | all the time to seek his advice? |
| 11:28 | 7 | MS. KELLER:  That's what he said just now. |
| 11:28 | 8 | And we don't know who produced this.  But I think |
| 11:28 | 9 | it's pretty obvious, if you compare it with the e-mail by |
| 11:28 | 10 | Pat Williams, that he produced it.  We don't know whether |
| 11:28 | 11 | Martin Hitch ever even laid eyes on this.  The only portion |
| 11:28 | 12 | of this, Your Honor -- |
| 11:28 | 13 | THE COURT:  We can certainly find out if there was |
| 11:28 | 14 | a meeting, couldn't we? |
| 11:28 | 15 | MS. KELLER:  There's no evidence that there was. |
| 11:28 | 16 | There -- Patrick Williams has never been deposed.  Nobody's |
| 11:28 | 17 | ever asked about it.  This document is just out of thin air. |
| 11:28 | 18 | It's off of somebody's hard drive.  That's it. |
| 11:28 | 19 | THE COURT:  Counsel? |
| 11:28 | 20 | MR. PRICE:  Stand on the record. |
| 11:28 | 21 | THE COURT:  Mr. McConville? |
| 11:28 | 22 | MR. McCONVILLE:  I'm okay. |
| 11:28 | 23 | THE COURT:  Ms. Hurst?  Mr. Zeller? |
| 11:28 | 24 | MR. ZELLER:  Nothing, Your Honor. |
| 11:28 | 25 | THE COURT:  Mr. Quinn? |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 128 of 152   Page ID #:303157
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

128

| 11:28 | 1 | MR. QUINN:  Submitted, Your Honor. |
|---|---|---|
| 11:28 | 2 | THE COURT:  All right.  The ruling's going to |
| 11:28 | 3 | stand.  It's going to be received.  The Court's not |
| 11:29 | 4 | necessarily satisfied, without casting any aspersion, with |
| 11:29 | 5 | this repeated lack of recollection. |
| 11:29 | 6 | And while I agree with Ms. Keller, partially.  We |
| 11:29 | 7 | can certainly cure that because apparently Mr. Larian's on |
| 11:29 | 8 | the witness stand.  Martin Hitch is available to tell us if |
| 11:29 | 9 | a meeting ever occurred.  Either party can call him.  And I |
| 11:29 | 10 | think that there's some ability of MGA –– I'll certainly |
| 11:29 | 11 | strike this if it's incorrect, but it does come from MGA's |
| 11:29 | 12 | files.  It seems to be prepared on or about the date.  It |
| 11:29 | 13 | seems to speak to many of the issues Mr. Larian raised, in |
| 11:29 | 14 | fact, gratuitously. |
| 11:29 | 15 | Concerning the ethical business practices, though, |
| 11:29 | 16 | I'm concerned –– Ms. Keller I think you're absolutely right. |
| 11:29 | 17 | The Court's comments might lead the jury to believe that |
| 11:29 | 18 | this is related to Carter Bryant.  That portion's going to |
| 11:29 | 19 | be stricken. |
| 11:29 | 20 | MS. KELLER:  Will the Court also –– |
| 11:29 | 21 | THE COURT:  Now, thank you very much. |
| 11:29 | 22 | Bring in the jury. |
| 11:29 | 23 | That's the ruling. |
| 11:30 | 24 | *(In the presence of the jury.)* |
| 11:30 | 25 | THE COURT:  All right.  Then we're back in |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:30 | 1 | session. |
| 11:30 | 2 | Counsel, if you would have a seat for just a |
| 11:30 | 3 | moment.  Thank you for your courtesy.  The jury's present. |
| 11:30 | 4 | There was a document, 13626.  And the Court's |
| 11:30 | 5 | concerned about a comment it made that might 'cause you to |
| 11:30 | 6 | assume something that I'm not finding nor have any opinion |
| 11:30 | 7 | about. |
| 11:30 | 8 | The Counsel had gone over three sections of the |
| 11:30 | 9 | document.  Can somebody put that back up on the screen for a |
| 11:30 | 10 | moment.  13626. |
| 11:30 | 11 | *(Document displayed.)* |
| 11:30 | 12 | THE COURT:  And you can look at "a.  Autocratic |
| 11:30 | 13 | culture; b.  Poorly planned and executed; c.  No trust in |
| 11:30 | 14 | the L.A. office; and, d.  No trust from the global toy |
| 11:30 | 15 | industry." |
| 11:30 | 16 | It's the last portion concerning the unethical |
| 11:30 | 17 | business practices where I didn't know where the questions |
| 11:30 | 18 | were going, and I said to the jury that you can see whether |
| 11:31 | 19 | in relates to Carter Bryant or not. |
| 11:31 | 20 | I'm not hearing any testimony that that section |
| 11:31 | 21 | relates to Carter Bryant.  It certainly doesn't go to the |
| 11:31 | 22 | atmosphere surrounding the company. |
| 11:31 | 23 | And once again let me caution you, we certainly |
| 11:31 | 24 | don't have Martin Hitch nor Pat Williams, but I'm allowing |
| 11:31 | 25 | the rest of it as a business record.  And it will be |

| | | |
|---|---|---|
| 11:31 | 1 | received into evidence.  That last portion will simply be |
| 11:31 | 2 | whited out.  You've already heard it, but I would like to |
| 11:31 | 3 | simply unring the bell, though.  Okay? |
| 11:31 | 4 | All right.  Thank you. |
| 11:31 | 5 | Counsel. |
| 11:31 | 6 | BY MR. PRICE: |
| 11:31 | 7 | Q.   Mr. Larian, I'd like you to look at Exhibit 9626. |
| 11:31 | 8 | *(Document provided to the witness.)* |
| 11:31 | 9 | BY MR. PRICE: |
| 11:32 | 10 | Q.   And do you recognize that as an e-mail chain between |
| 11:32 | 11 | you and Mr. Brawer? |
| 11:32 | 12 | A.   Can you give me one moment? |
| 11:32 | 13 | Q.   Sure. |
| 11:32 | 14 | A.   Yes. |
| 11:32 | 15 | Q.   And -- |
| 11:32 | 16 | MR. PRICE:  Your Honor, move Exhibit 9626 into |
| 11:32 | 17 | evidence. |
| 11:32 | 18 | MS. KELLER:  Objection.  Irrelevant. |
| 11:32 | 19 | THE COURT:  Would somebody bring me 9626, please? |
| 11:33 | 20 | And what is it, Counsel?  Is it the employment |
| 11:33 | 21 | contract? |
| 11:33 | 22 | MR. PRICE:  No.  It's an e-mail exchange between |
| 11:33 | 23 | Mr. Brawer and Mr. Larian concerning, uh -- well, I'll let |
| 11:33 | 24 | you read it. |
| 11:33 | 25 | THE COURT:  Just a moment. |

| | | |
|---|---|---|
| 11:33 | 1 | Overruled.  You can -- this will be received into |
| 11:33 | 2 | evidence.  But I spoke to both counsel about limiting this. |
| 11:33 | 3 | This is 2005. |
| 11:33 | 4 | MR. PRICE:  Bureaucracy. |
| 11:33 | 5 | THE COURT:  It relates back, though, to |
| 11:33 | 6 | bureaucracy and management style and whether it's consistent |
| 11:33 | 7 | or not. |
| 11:33 | 8 | MR. PRICE:  Right. |
| 11:33 | 9 | THE COURT:  But, once again, there's a struggle |
| 11:33 | 10 | going on, obviously, between both parties about what the |
| 11:33 | 11 | generalized workplace and management style is of Mr. Larian. |
| 11:34 | 12 | This is a document that goes far beyond the |
| 11:34 | 13 | 2001/2002 era.  But it's, from counsel's perspective, |
| 11:34 | 14 | apparently from Mattel, there's some consistency in the |
| 11:34 | 15 | efforts that they're trying to make to show or balance out |
| 11:34 | 16 | the statements that this was a happy workplace by |
| 11:34 | 17 | Mr. Larian. |
| 11:34 | 18 | I'll allow it for that limited purpose, but this |
| 11:34 | 19 | will be the end of it. |
| 11:34 | 20 | Counsel. |
| 11:34 | 21 | BY MR. PRICE: |
| 11:34 | 22 | Q.  Mr. Larian, you see that Mr. Brawer was -- what was his |
| 11:34 | 23 | position? |
| 11:34 | 24 | A.  Executive Vice President, Sales and Marketing. |
| 11:34 | 25 | Q.  And how long -- what timeframe was he an employee of |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 132 of 152   Page ID #:303161
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

132

| | | |
|---|---|---|
| 11:34 | 1 | MGA?  Or is he still an employee? |
| 11:34 | 2 | A.   He's not employed at MGA anymore. |
| 11:34 | 3 | Q.   For what timeframe was he an employee? |
| 11:34 | 4 | A.   I don't remember the dates. |
| 11:34 | 5 | Q.   Do you remember how many years? |
| 11:34 | 6 | A.   More than two, three years, four years.  I think more |
| 11:34 | 7 | than four years. |
| 11:35 | 8 | Q.   And you see at the -- at the bottom of the first page, |
| 11:35 | 9 | there's an e-mail from him to you about a, uh, international |
| 11:35 | 10 | sales candidate? |
| 11:35 | 11 | A.   The e-mail starts on the previous page.  The e-mail |
| 11:35 | 12 | starts on page 002. |
| 11:35 | 13 | Q.   Okay.  Let's go to the second page.  And you're writing |
| 11:35 | 14 | to Mr. Brawer about an international sales candidate where |
| 11:35 | 15 | you ask, "Is he working now?  Where is his international |
| 11:35 | 16 | experience?  Why is he leaving Maui?" |
| 11:35 | 17 | A.   Yes. |
| 11:35 | 18 | Q.   And then you see, from Mr. Brawer, he says, "Currently |
| 11:35 | 19 | at Maui.  Ran international for Maui.  Got a glowing review |
| 11:35 | 20 | from Nick.  He wants a bigger, more stable company.  Go |
| 11:35 | 21 | figure." |
| 11:35 | 22 | And, by the way, who is Nick? |
| 11:35 | 23 | A.   Nick Austin, who was our distributor at -- in UK. |
| 11:36 | 24 | Vivid imagination. |
| 11:36 | 25 | Q.   And then, above that, it's, uh, from you to Mr. Brawer, |

| | | |
|---|---|---|
| 11:36 | 1 | "How does Nick know him?" |
| 11:36 | 2 | A.   Yes. |
| 11:36 | 3 | Q.   And then you have, from Mr. Brawer to you, "Nick |
| 11:36 | 4 | Austin," dash, "Todd represents Maui.  I'm losing my |
| 11:36 | 5 | stamina.  Every commercial, every listing, every markdown, |
| 11:36 | 6 | every interview, nine e-mails on the UK market share and the |
| 11:36 | 7 | low U.S. volume, five e-mails on how bad Kendall is," paren, |
| 11:36 | 8 | "just to make a point," closed paren." |
| 11:36 | 9 | Who is Kendall? |
| 11:36 | 10 | A.   We had a toy that did horrible. |
| 11:36 | 11 | Q.   "I have a great sense of accomplishment for what I have |
| 11:36 | 12 | done with MGA in less than a year, but your involvement on |
| 11:36 | 13 | every execution is just a different form of bureaucracy.  We |
| 11:37 | 14 | can talk later in the week.  Thanks." |
| 11:37 | 15 | See that? |
| 11:37 | 16 | A.   Yes.  And read the one on the top. |
| 11:37 | 17 | Q.   And then you -- you try to diffuse the situation? |
| 11:37 | 18 | A.   No.  You can read it. |
| 11:37 | 19 | Q.   Okay.  "Take a nap and take some SAM-E when you get |
| 11:37 | 20 | home.  You are doing a great job." |
| 11:37 | 21 | A.   SAM-E. |
| 11:37 | 22 | Q.   Pardon? |
| 11:37 | 23 | A.   It's not "same."  It's natural remedy called SAM-E. |
| 11:37 | 24 | Q.   Ah, okay.  "You are doing a great job.  Things are |
| 11:37 | 25 | good.  Have a good trip." |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 134 of 152   Page ID #:303163
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

134

| | | |
|---|---|---|
| 11:37 | 1 | Mr. Brawer was a really good employee, wasn't he? |
| 11:37 | 2 | A.   Yes.  And down at the bottom, it says, "Our success |
| 11:37 | 3 | comes from the passion of our great people." |
| 11:37 | 4 | Q.   Did you tend to put quotes on your e-mails? |
| 11:37 | 5 | A.   I did. |
| 11:37 | 6 | Q.   Were they rotated, or were they individualized? |
| 11:37 | 7 | A.   Changed them.  I changed them once in a while. |
| 11:37 | 8 | Q.   Okay.  But it wasn't like you picked a tagline for a |
| 11:37 | 9 | particular e-mail, correct? |
| 11:37 | 10 | A.   No. |
| 11:37 | 11 | Q.   I'm sorry.  It was a double negative. |
| 11:37 | 12 | You didn't pick a tagline for a particular -- I did it |
| 11:37 | 13 | again. |
| 11:37 | 14 | Did you create a tagline for a particular e-mail? |
| 11:38 | 15 | A.   No.  I sent the code to motivate people every once in a |
| 11:38 | 16 | while. |
| 11:38 | 17 | THE COURT:  All right.  Now, I think you have a |
| 11:38 | 18 | flavor for the management style, for the jury.  You've got |
| 11:38 | 19 | back-and-forths.  We can probably go back and through |
| 11:38 | 20 | e-mails over a number of years that would both be good and |
| 11:38 | 21 | bad for both sides.  It's unduly consumptive of time now. |
| 11:38 | 22 | We're going to move to another area. |
| 11:38 | 23 | Okay.  Another area, Counsel. |
| 11:38 | 24 | BY MR. PRICE: |
| 11:38 | 25 | Q.   Another thing you said, when you were examined with |

| | | |
|---|---|---|
| 11:38 | 1 | Ms. Keller, was that, uh, when you saw the presentation in |
| 11:38 | 2 | Exhibit 302, that you didn't like the idea of the hair; that |
| 11:38 | 3 | is, that you thought that they looked weird? |
| 11:38 | 4 | A.   That -- no, no, no, no, no.  That -- I thought the |
| 11:38 | 5 | whole concept looked weird, looked alien, these dolls.  Not |
| 11:38 | 6 | the hair.  The hair change issue came on later. |
| 11:38 | 7 | Q.   Well, so -- you didn't -- you didn't, uh, mean to |
| 11:38 | 8 | suggest that when you saw this presentation you thought it |
| 11:39 | 9 | was, uh, going to look strange, that -- that, uh, that you |
| 11:39 | 10 | have a change of hair and then the doll's bald? |
| 11:39 | 11 | A.   No, no, not at that meeting. |
| 11:39 | 12 | Q.   And, in fact, as late as December 2000, you wanted to |
| 11:39 | 13 | do, uh, both hairs? |
| 11:39 | 14 | A.   I did. |
| 11:39 | 15 | Q.   And it was Ms. Garcia who said, you know, "Let's, uh, |
| 11:39 | 16 | sell the Bratz without the feature, and then if it works, |
| 11:39 | 17 | great.  We can surprise them later with this added bonus." |
| 11:39 | 18 | Correct? |
| 11:39 | 19 | A.   Yes. |
| 11:39 | 20 | Q.   So at the time that you were presented this, you didn't |
| 11:39 | 21 | think that the hair feature was, um, something that gave you |
| 11:39 | 22 | concern -- |
| 11:39 | 23 | A.   No. |
| 11:39 | 24 | Q.   -- correct?  That's correct? |
| 11:39 | 25 | A.   That's correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 136 of 152   Page ID #:303165
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

136

| | | |
|---|---|---|
| 11:39 | 1 | Q.   Now, you were asked questions about, uh, whether or not |
| 11:39 | 2 | you were trying to, uh, hide information from Ms. Glaser |
| 11:40 | 3 | about Mr. Bryant.  Do you recall that? |
| 11:40 | 4 | A.   Yes. |
| 11:40 | 5 | Q.   And, uh, clearly, you weren't trying to hide the fact |
| 11:40 | 6 | that Mr. Bryant once worked at Mattel from -- from |
| 11:40 | 7 | Ms. Glaser, right? |
| 11:40 | 8 | A.   I did not, or from anybody else. |
| 11:40 | 9 | Q.   Uh, and, I mean, she's your attorney at the time, |
| 11:40 | 10 | right? |
| 11:40 | 11 | A.   She's an attorney, and she's a family friend for over |
| 11:40 | 12 | 20 years. |
| 11:40 | 13 | Q.   So, uh, you didn't want to -- you did not want to hide |
| 11:40 | 14 | from her that Mr. Bryant had previously worked at Mattel, |
| 11:40 | 15 | correct? |
| 11:40 | 16 | A.   Yes. |
| 11:40 | 17 | Q.   You didn't want to hide from her that there was, uh -- |
| 11:40 | 18 | that you had, uh, uh -- had a conversation with Mr. Irman, |
| 11:40 | 19 | correct? |
| 11:40 | 20 | A.   I didn't want to hide anything from her or anybody |
| 11:40 | 21 | else. |
| 11:40 | 22 | Q.   But the document that you sent to her, one of the |
| 11:40 | 23 | things that was whited out was that -- that "as of |
| 11:40 | 24 | September 18" date, correct? |
| 11:41 | 25 | A.   I did not send her that document.  Victoria O'Connor |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 137 of 152   Page ID #:303166
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

137

| | | |
|---|---|---|
| 11:41 | 1 | sent that document to her, and she whited it out on her own. |
| 11:41 | 2 | Q.   You do understand that the document that was sent to |
| 11:41 | 3 | Ms. Glaser, that had that, "As of September 18, 2000" date |
| 11:41 | 4 | whited out? |
| 11:41 | 5 | A.   I have seen it in this proceeding, yes. |
| 11:41 | 6 | Q.   And you've -- you've seen that there is no fax header |
| 11:41 | 7 | from Barbie Collectibles dated October 4, 2000, correct? |
| 11:41 | 8 | A.   I have seen that, yes. |
| 11:41 | 9 | Q.   And, uh, that information would tell someone that |
| 11:41 | 10 | Mr. Bryant was actually at Mattel as of the effective date |
| 11:41 | 11 | of the contract and actually in Mattel's offices when he |
| 11:41 | 12 | signed the written contract, correct? |
| 11:41 | 13 | A.   If -- I'm sorry?  If -- I don't understand your |
| 11:41 | 14 | question. |
| 11:41 | 15 | Q.   That information -- |
| 11:41 | 16 | A.   Yes. |
| 11:41 | 17 | Q.   -- as of September 18, 2000 -- |
| 11:41 | 18 | A.   Yes. |
| 11:41 | 19 | Q.   -- the fax header coming from Barbie Collectibles -- |
| 11:41 | 20 | A.   Yes. |
| 11:41 | 21 | Q.   -- that information would tell someone not just that |
| 11:41 | 22 | Mr. Bryant had been a Mattel employee, but that he was a |
| 11:41 | 23 | Mattel employee at the time of the effective date of the |
| 11:42 | 24 | contract, and was in the Mattel offices when he signed it. |
| 11:42 | 25 | MS. KELLER:  Objection.  Calls for speculation, |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 138 of 152   Page ID #:303167
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

138

| | | |
|---|---|---|
| 11:42 | 1 | Your Honor. |
| 11:42 | 2 | THE COURT:  Overruled. |
| 11:42 | 3 | But do you understand the question? |
| 11:42 | 4 | THE WITNESS:  I don't. |
| 11:42 | 5 | THE COURT:  Reask the question, Counsel. |
| 11:42 | 6 | MR. PRICE:  I'll break it up. |
| 11:42 | 7 | BY MR. PRICE: |
| 11:42 | 8 | Q.   The "As of September 18, 2000" -- |
| 11:42 | 9 | A.   Yes. |
| 11:42 | 10 | Q.   -- if that were sent to someone, that would tell them, |
| 11:42 | 11 | if they knew his employment dates, that he was a Mattel |
| 11:42 | 12 | employee as of the effective date of the contract, right? |
| 11:42 | 13 | A.   No.  How did they know if -- who he was, and was he an |
| 11:42 | 14 | employee of Mattel or was he not employee of Mattel?  I |
| 11:42 | 15 | disagree with you. |
| 11:42 | 16 | Patty Glaser, reading this e-mail, saying |
| 11:42 | 17 | "September 18," saying Carter Bryant worked at Mattel, |
| 11:42 | 18 | didn't work at Mattel, how would she know? |
| 11:42 | 19 | Q.   Well, the fax header from Barbie Collectibles, that |
| 11:42 | 20 | would tell someone that he faxed the agreement that he |
| 11:42 | 21 | signed while he was sitting there at Barbie Collectibles, |
| 11:42 | 22 | right? |
| 11:42 | 23 | A.   It would tell somebody that that fax came from some -- |
| 11:43 | 24 | from Barbie Collectibles.  Yes, that would -- that would say |
| 11:43 | 25 | that that fax came from Barbie Collectibles. |

| | | |
|---|---|---|
| 11:43 | 1 | Q.   So let me switch, then, back to your -- the September |
| 11:43 | 2 | timeframe. |
| 11:43 | 3 |      Uh, you testified with Ms. Keller that, uh, Mr. Bryant |
| 11:43 | 4 | had to be set up as a vendor before he could receive any |
| 11:43 | 5 | payments, right? |
| 11:43 | 6 | A.   Not only Mr. Bryant.  Anybody.  We had -- we had a |
| 11:43 | 7 | policy at MGA that anybody who wanted to become a vendor for |
| 11:43 | 8 | MGA, they had to get purchase order.  And that was one of |
| 11:43 | 9 | the ways to try to control the cost. |
| 11:43 | 10 | Q.   He was set up as a vendor in mid September, |
| 11:43 | 11 | September 15th, right? |
| 11:43 | 12 | A.   I don't know when he was set up as a vendor. |
| 11:43 | 13 | Q.   Look at Exhibit 11899 -- 11889. |
| 11:44 | 14 |           (Document provided to the witness.) |
| 11:44 | 15 |      THE WITNESS:  I can't say from this.  I'm sorry. |
| 11:44 | 16 |      MR. PRICE:  I think this is in evidence already, |
| 11:44 | 17 | Your Honor. |
| 11:44 | 18 | BY MR. PRICE: |
| 11:44 | 19 | Q.   Do you have 11889 in front of you? |
| 11:44 | 20 | A.   Yes.  Multipages.  Yes, go ahead. |
| 11:44 | 21 | Q.   If you look at page 11. |
| 11:44 | 22 |      MR. PRICE:  I'm told page 11 is not in evidence. |
| 11:44 | 23 | BY MR. PRICE: |
| 11:44 | 24 | Q.   Do you see page 11? |
| 11:44 | 25 | A.   I see page 11. |

| | | |
|---|---|---|
| 11:44 | 1 | Q.   And do you see that's an e-mail produced by MGA? |
| 11:44 | 2 | A.   Yes. |
| 11:44 | 3 | Q.   Uh, from, uh, uh -- appears to be from a Kerri Legg? |
| 11:44 | 4 | A.   Yes. |
| 11:44 | 5 | Q.   And Ms. Legg worked where? |
| 11:45 | 6 | A.   MGA. |
| 11:45 | 7 | Q.   What was her position? |
| 11:45 | 8 | A.   At the time, I don't know what she was doing. |
| 11:45 | 9 | Q.   Did she, uh, approve expenses? |
| 11:45 | 10 | A.   No. |
| 11:45 | 11 | Q.   Did she receive expense reports from, uh, vendors? |
| 11:45 | 12 | A.   I don't know if she did or not. |
| 11:45 | 13 | Q.   Who was Barbara Malcolm? |
| 11:45 | 14 | A.   She works at our accounting department.  She's been |
| 11:45 | 15 | there over 20 years. |
| 11:45 | 16 | Q.   And does this appear to be an e-mail from Ms. Legg to |
| 11:45 | 17 | Ms. Malcolm concerning a new vendor? |
| 11:45 | 18 | A.   That's what it says. |
| 11:45 | 19 | Q.   Dated September 15, 2000? |
| 11:45 | 20 | A.   That's what it says. |
| 11:45 | 21 | Q.   And, uh, is that what would happen with MGA; that is, |
| 11:45 | 22 | as you're setting up a new vendor, you would have to issue a |
| 11:45 | 23 | notification, and give information, such as name, address, |
| 11:45 | 24 | Social Security number? |
| 11:45 | 25 | A.   I am not familiar with how they do it in our accounting |

CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:45 | 1 | department. |
| 11:45 | 2 | Q.   Well, I believe you said, in your examination from |
| 11:46 | 3 | Ms. Keller, that you had to be set up as a vendor before you |
| 11:46 | 4 | would be paid anything, and then do a -- uh, like a purchase |
| 11:46 | 5 | order. |
| 11:46 | 6 | A.   I believe I said that you had to have a purchase order |
| 11:46 | 7 | to do a job, and get paid. |
| 11:46 | 8 | Q.   And you have to be set up as a vendor to be a vendor, |
| 11:46 | 9 | right? |
| 11:46 | 10 | A.   Yes. |
| 11:46 | 11 | MR. PRICE:  Your Honor, I move Exhibit 11889, |
| 11:46 | 12 | page 11 into evidence. |
| 11:46 | 13 | THE COURT:  Received. |
| 11:46 | 14 | (Exhibit No. 11889 Page 11 received in |
| 11:46 | 15 | evidence.) |
| 11:46 | 16 | (Document displayed.) |
| 11:59 | 17 | BY MR. PRICE: |
| 11:46 | 18 | Q.   And you see this is dated September 15, 2000. |
| 11:46 | 19 | "Barbara, |
| 11:46 | 20 | "Please set up the following as a new vendor.  I do not |
| 11:46 | 21 | have the Social Security number yet, but I will forward it |
| 11:46 | 22 | to you as soon as I receive it," and then it has Carter |
| 11:46 | 23 | Bryant and his address. |
| 11:46 | 24 | Do you see that? |
| 11:46 | 25 | A.   I do. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 142 of 152   Page ID #:303171
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

142

| | | |
|---|---|---|
| 11:46 | 1 | Q.   And you were in the courtroom when Mr. Bryant |
| 11:46 | 2 | testified, correct? |
| 11:46 | 3 | A.   I was. |
| 11:46 | 4 | Q.   Uh, uh, do you, uh, disagree with his testimony that he |
| 11:47 | 5 | told you during September what he was doing? |
| 11:47 | 6 | A.   That what?  That he worked at Mattel as a fashion |
| 11:47 | 7 | designer in Barbie Collectibles? |
| 11:47 | 8 | MS. KELLER:  Objection.  Your Honor, that's |
| 11:47 | 9 | argumentative. |
| 11:47 | 10 | THE COURT:  Sustained. |
| 11:47 | 11 | It's also unclear, Counsel.  It's ambiguous. |
| 11:47 | 12 | MR. PRICE:  Well, I won't try to make it |
| 11:47 | 13 | clearer -- argumentative question -- so let me ask it this |
| 11:47 | 14 | way. |
| 11:47 | 15 | BY MR. PRICE: |
| 11:47 | 16 | Q.   During September was Mr. Bryant informing you that he |
| 11:47 | 17 | was contacting vendors, that he was working with sculptors, |
| 11:47 | 18 | that he was working with Ms. Garcia? |
| 11:47 | 19 | A.   No. |
| 11:47 | 20 | Q.   Did Ms. Garcia ever tell you that during September he |
| 11:47 | 21 | was working, uh, four hours a day in connection with Bratz? |
| 11:47 | 22 | A.   No. |
| 11:47 | 23 | Q.   Isn't that what she told you in Exhibit 405? |
| 11:47 | 24 | MR. PRICE:  Put that up. |
| 11:47 | 25 | *(Document provided to the witness.)* |

| 11:48 | 1 | (Document displayed.) |
|---|---|---|

11:48    2        THE WITNESS:  She told -- I remember that.  And I

11:48    3    remember, on the top, I said, "From the day of the contract,

11:48    4    October 4, 2000."

11:48    5    BY MR. PRICE:

11:48    6    Q.   You see the e-mail where she says, "I would say that

11:48    7    Carter has worked an average of about four hours a day, and

11:48    8    we began working on this line the first part of September."

11:48    9        Do you see that?

11:48   10    A.   I do.

11:48   11    Q.   And you're asked, uh, "Do you want to" -- uh, uh --

11:48   12    "start his salary" -- I can't see that very well -- "for the

11:48   13    month of October since he began in September?  Please

11:48   14    advise."

11:48   15        Do you see that?

11:48   16    A.   It says, "Do you want to start his salary for the month

11:48   17    of October since he began in September?  Please advise."

11:48   18        My advice is right there, above.  It says, "From the

11:48   19    date he signed the contract."

11:48   20        He signed the contract on October 4th, 2000.

11:48   21    Q.   And that question to you was do you want to start his

11:49   22    salary.  That question, by itself, didn't make sense to you,

11:49   23    did it?

11:49   24    A.   Yeah.  He wasn't salaried employee.

11:49   25    Q.   So he doesn't get a salary, right?

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 144 of 152   Page ID #:303173
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

144

| | | |
|---|---|---|
| 11:49 | 1 | A.    He never got a salary, correct. |
| 11:49 | 2 | Q.    He just got advances, and then royalties, right? |
| 11:49 | 3 | A.    He got advances for his $48,000 contract against the |
| 11:49 | 4 | royalties. |
| 11:49 | 5 | Q.    And you agree that, in your view, it's possible that |
| 11:49 | 6 | there was work done on these drawings and doll designs |
| 11:49 | 7 | pertaining to Bratz in September of 2000? |
| 11:49 | 8 | A.    I'm sorry?  If there was some work done? |
| 11:49 | 9 | Q.    You agree that that -- that is -- is it, in fact, |
| 11:49 | 10 | possible, in your recollection, that there was work done on |
| 11:49 | 11 | these drawings and doll designs in September 2000? |
| 11:49 | 12 | MS. KELLER:  Objection.  Compound. |
| 11:49 | 13 | THE COURT:  Do you understand the question? |
| 11:49 | 14 | THE WITNESS:  I don't. |
| 11:49 | 15 | THE COURT:  All right.  Restate it. |
| 11:49 | 16 | BY MR. PRICE: |
| 11:49 | 17 | Q.    In September 2000, was there any work at all done on |
| 11:49 | 18 | these drawings or on these doll designs, uh, after the |
| 11:50 | 19 | meeting? |
| 11:50 | 20 | MS. KELLER:  Objection.  Compound. |
| 11:50 | 21 | THE WITNESS:  I don't know if there was or not. |
| 11:50 | 22 | THE COURT:  Well, I'm gonna sustain the objection. |
| 11:50 | 23 | THE WITNESS:  I'm sorry? |
| 11:50 | 24 | THE COURT:  The drawings and doll designs, ask |
| 11:50 | 25 | each one separately.  That should resolve it. |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 145 of 152   Page ID #:303174
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

145

| | | |
|---|---|---|
| 11:50 | 1 | BY MR. PRICE: |
| 11:50 | 2 | Q.   On September 2000, was there any work at all done on |
| 11:50 | 3 | the drawings? |
| 11:50 | 4 | A.   I'm sorry? |
| 11:50 | 5 | Q.   In September 2000, was there any work at all done on |
| 11:50 | 6 | the drawings? |
| 11:50 | 7 | A.   I don't know if it was or not. |
| 11:50 | 8 | Q.   In September 2000, was there any work done on the doll |
| 11:50 | 9 | designs pertaining to Bratz? |
| 11:50 | 10 | A.   From what I've learned in this litigation, they were |
| 11:50 | 11 | working on exploratory, uh, clay model with Margaret Leahy. |
| 11:50 | 12 | Q.   You also said, uh, I think with respect to your |
| 11:50 | 13 | impression -- you okay? |
| 11:50 | 14 | A.   Yeah.  Go ahead. |
| 11:50 | 15 | Q.   I think you also said, in reference to the first |
| 11:51 | 16 | meeting that, when you looked at these designs, you didn't, |
| 11:51 | 17 | uh, like them because they seemed to be somewhat |
| 11:51 | 18 | stereotyping. |
| 11:51 | 19 | Do you recall that? |
| 11:51 | 20 | A.   No.  I didn't say that.  I said they look -- to me, |
| 11:51 | 21 | they looked alien and weird. |
| 11:51 | 22 | Q.   Well, do you remember saying that you thought that |
| 11:51 | 23 | these dolls would have to be changed because you didn't want |
| 11:51 | 24 | them associated with a particular ethnicity, such as |
| 11:51 | 25 | African-American or -- or, uh -- |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 146 of 152   Page ID #:303175
CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

146

| 11:51 | 1 | MS. KELLER: Objection. Vague as to time, and |
| 11:51 | 2 | misstates the testimony. |
| 11:51 | 3 | THE COURT: Well, it's the relation back to the |
| 11:51 | 4 | prior questions that's causing the problem. I don't have |
| 11:51 | 5 | those questions in front of me and I'm not gonna scramble |
| 11:51 | 6 | into the daily and get it, Counsel. |
| 11:51 | 7 | So whatever he recalls, you can ask. I'm not |
| 11:51 | 8 | precluding you from that. But to go back and get the exact |
| 11:51 | 9 | statement, it's almost impossible. |
| 11:51 | 10 | MR. PRICE: Sure. |
| 11:59 | 11 | BY MR. PRICE: |
| 11:51 | 12 | Q.  Do you recall having a concern that the drawings, uh, |
| 11:52 | 13 | as drawn by Mr. Bryant were, uh, too ethnic? |
| 11:52 | 14 | A.  No. |
| 11:52 | 15 | Q.  Do you recall testifying -- well, did you have a |
| 11:52 | 16 | concern that Hallidae, for example, uh, looked too ethnic? |
| 11:52 | 17 | A.  No. |
| 11:52 | 18 | Q.  Did you have any concerns about how Hallidae looked |
| 11:52 | 19 | as -- as drawn by Mr. Bryant? |
| 11:52 | 20 | A.  No. |
| 11:52 | 21 | Q.  You remember, in your examination, you were shown |
| 11:52 | 22 | 11647? |
| 11:52 | 23 | MR. PRICE: And this is already in evidence, |
| 11:52 | 24 | Your Honor. |
| 11:52 | 25 | *(Document displayed.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 147 of 152   Page ID #:303176
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

147

| | | |
|---|---|---|
| 11:52 | 1 | THE WITNESS:  Is that on the screen? |
| 11:52 | 2 | *(Document provided to the witness.)* |
| 11:53 | 3 | MR. PRICE:  Actually, I think I've given you the |
| 11:53 | 4 | wrong exhibit.  I'll get you the right exhibit in a second. |
| 11:59 | 5 | BY MR. PRICE: |
| 11:53 | 6 | Q.  So after the meeting, September 2000, going into |
| 11:53 | 7 | October 2000, MGA didn't have any experience making this |
| 11:53 | 8 | type of doll, that is, a fashion doll of that size, right? |
| 11:53 | 9 | A.  When you make dolls, you can make 'em any size you |
| 11:53 | 10 | want.  We made dolls this big.  *(Indicating.)*  Dream Baby |
| 11:53 | 11 | was about 24-inches tall.  And we had made Prayer Angels, |
| 11:53 | 12 | who were six and a half inch. |
| 11:54 | 13 | So I don't understand your question. |
| 11:54 | 14 | Q.  Well, you talked, in your examination by Ms. Keller, |
| 11:54 | 15 | about injection molding? |
| 11:54 | 16 | A.  Yes. |
| 11:54 | 17 | Q.  You understand there's also something called insertion |
| 11:54 | 18 | molding? |
| 11:54 | 19 | A.  Yes. |
| 11:54 | 20 | Q.  And that's where you have like a skeleton that's |
| 11:54 | 21 | created with joints, and then you put skin on top of that? |
| 11:54 | 22 | A.  No, it's not.  And whoever taught you that, I think, |
| 11:54 | 23 | was wrong. |
| 11:54 | 24 | Q.  I'm a bad learner sometimes.  Maybe they were right and |
| 11:54 | 25 | I was wrong. |

| | | |
|---|---|---|
| 11:54 | 1 | A.   You're a great lawyer. |
| 11:54 | 2 | Q.   I appreciate that. |
| 11:54 | 3 | Is there something called "insertion molding" which is |
| 11:54 | 4 | used on the legs and armatures of the Bratz dolls? |
| 11:54 | 5 | A.   I'm not familiar with something called "insertion |
| 11:54 | 6 | molding." |
| 11:54 | 7 | Q.   Okay.  Well, with each doll, there have to be some sort |
| 11:54 | 8 | of -- there's safety features that you have to -- safety |
| 11:54 | 9 | parameters that you have to meet, correct? |
| 11:54 | 10 | A.   With any toy you make you have to meet safety.  For |
| 11:54 | 11 | example, you have to make sure that they don't have lead in |
| 11:54 | 12 | 'em -- |
| 11:54 | 13 | Q.   Well, you have to make sure -- |
| 11:54 | 14 | A.   -- or they don't have magnets that kill kids.  You have |
| 11:55 | 15 | to make sure of that. |
| 11:55 | 16 | Q.   You have to make sure their arms don't come off? |
| 11:55 | 17 | A.   That's one of the things you got to do. |
| 11:55 | 18 | Q.   So, for example, on a larger doll, you gotta make sure |
| 11:55 | 19 | that, with a sufficient amount of force, the arms don't fall |
| 11:55 | 20 | off so kids can choke or something, right? |
| 11:55 | 21 | A.   No.  Just have to -- that has nothing to do with it. |
| 11:55 | 22 | Q.   Well, the smaller the doll, you have to make design |
| 11:55 | 23 | changes to make sure the little arm doesn't come off, right? |
| 11:55 | 24 | A.   You have to make designs for the doll to stand together |
| 11:55 | 25 | and be -- be strong so, when you take it home, just doesn't |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:55 | 1 | break apart and you gotta buy a new one. |
| 11:55 | 2 | Q.   And then, the face -- |
| 11:55 | 3 | A.   But that has nothing to do with the safety.  Lead does. |
| 11:55 | 4 | Q.   Anything else you want to volunteer? |
| 11:55 | 5 |         MR. PRICE:  Move to strike. |
| 11:55 | 6 |         THE WITNESS:  No, but you ask safety.  I was |
| 11:55 | 7 | answering your question about safety. |
| 11:55 | 8 |         MR. PRICE:  Move to strike as nonresponsive. |
| 11:55 | 9 |         THE COURT:  Stricken. |
| 11:55 | 10 | BY MR. PRICE: |
| 11:55 | 11 | Q.   The faces on the smaller dolls, like Bratz, they have |
| 11:55 | 12 | to be painted more carefully than on the larger dolls, |
| 11:56 | 13 | right?  Because that's smaller space to paint them, right? |
| 11:56 | 14 | A.   There's a spray-painting process that goes on.  We have |
| 11:56 | 15 | a video that maybe you want to show the jury.  I think it's |
| 11:56 | 16 | fascinating. |
| 11:56 | 17 | Q.   My question is different.  Do you want to answer that? |
| 11:56 | 18 | A.   I am trying to answer your question.  I don't |
| 11:56 | 19 | understand what you want.  How else do you want me to answer |
| 11:56 | 20 | it? |
| 11:56 | 21 | Q.   Okay.  For the smaller faces on these small dolls, the |
| 11:56 | 22 | fashion dolls -- |
| 11:56 | 23 | A.   Right. |
| 11:56 | 24 | Q.   -- you have to be more careful about the face painting |
| 11:56 | 25 | because there's less room for tolerance, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 150 of 152   Page ID #:303179
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

150

| | | |
|---|---|---|
| 11:56 | 1 | A.   No.  It's the same process.  It's done by hand.  It's |
| 11:56 | 2 | done by spray in China.  It's a very delicate process.  The |
| 11:56 | 3 | factories do that.  And Early Light is the biggest factory |
| 11:56 | 4 | who makes dolls for MGA, as well for Mattel. |
| 11:56 | 5 | Q.   The fashions on the smaller dolls, I mean, they have to |
| 11:56 | 6 | drape, right? -- means they have to fit properly on these |
| 11:56 | 7 | small dolls? |
| 11:56 | 8 | A.   Yes. |
| 11:56 | 9 | Q.   And, obviously, the sewing's more intricate? |
| 11:57 | 10 | A.   Yes. |
| 11:57 | 11 | Q.   Okay.  And, as of October -- uh, in order to get this |
| 11:57 | 12 | off the ground, in order to -- to build the joint, the |
| 11:57 | 13 | armatures, the knee mechanisms -- you had to send to your |
| 11:57 | 14 | factory a Mattel doll to say this is how you should do it, |
| 11:57 | 15 | right? |
| 11:57 | 16 | A.   No.  The factory that we used, Early Light and Wah |
| 11:57 | 17 | Shing, has been making dolls for over 30, 40 years.  They |
| 11:57 | 18 | didn't need to have a Mattel doll or an MGA doll to make it. |
| 11:57 | 19 | They been doing that for a long time.  Samuel Wong, who |
| 11:57 | 20 | worked at MGA office, is -- was a 20-year experienced |
| 11:57 | 21 | designer, who had made dolls and doll armature.  We didn't |
| 11:57 | 22 | need to send something down there. |
| 11:57 | 23 | Q.   If you'd look at Exhibit 11245. |
| 11:57 | 24 | *(Document provided to the witness.)* |
| 11:58 | 25 | THE WITNESS:  Can you give me moment to read that, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10042   Filed 02/22/11   Page 151 of 152   Page ID #:303180
CV 04-9049 DOC – 2/18/2011 – Day 20, Volume 1 of 3

151

11:58  1   please?

11:58  2            THE COURT:  Counsel, how long -- since you're on

11:58  3   the clock, do you want me to take the recess now, and he can

11:58  4   read it over the lunch hour?

11:58  5            MR. PRICE:  That's a good idea.

11:59  6            THE COURT:  All right.

11:59  7            Ladies and gentlemen, you're admonished not to

11:59  8   discuss this matter amongst yourselves nor form or express

11:59  9   an opinion concerning the case.

11:59  10           Why don't you go to lunch.  Today, take an extra

11:59  11   15 minutes.  Take until 1:15.  Okay?  We'll see you at 1:15,

11:59  12   not 1:00 o'clock.

11:59  13               *(Jury recesses at 11:59 a.m.)*

11:59  14               *(Outside the presence of the jury.)*

11:59  15           THE COURT:  All right.

11:59  16           Then, Counsel, 1:15, please.

11:59  17               *(Lunch recess held at 11:59 a.m.)*

11:59  18               *(Further proceedings reported by Jane Sutton*

11:59  19       *Rule in Volume II.)*

11:59  20                              -oOo-

11:59  21

       22

       23

       24

       25

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

152

11:59  1                          -oOo-

11:59  2

11:59  3                       CERTIFICATE

11:59  4

11:59  5          I hereby certify that pursuant to Section 753,

11:59  6    Title 28, United States Code, the foregoing is a true and

11:59  7    correct transcript of the stenographically reported

11:59  8    proceedings held in the above-entitled matter and that the

11:59  9    transcript page format is in conformance with the

11:59  10   regulations of the Judicial Conference of the United States.

11:59  11

11:59  12   Date:  February 19, 2011

11:59  13

11:59
11:59
11:59  15   _____
11:59             DEBBIE GALE, U.S. COURT REPORTER
11:59  16          CSR NO. 9472, RPR

11:59  17

       18

       19

       20

       21

       22

       23

       24

       25

DEBBIE GALE, U.S. COURT REPORTER