UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,                )
                                     )
                Plaintiffs,          )
                                     )
        vs.                          )
                                     )
MGA ENTERTAINMENT, INC., et al.,     ) No. CV 04-9049-DOC (RNBx)
                                     )   Day 20
                                     )   Volume 3 of 3
                Defendants.          )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
FRIDAY, FEBRUARY 18, 2011


Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
021811 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 20 V3
02/18/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

UNITED STATES DISTRICT COURT

1    **APPEARANCES OF COUNSEL (Continued):**

2

3

4     FOR CARLOS GUSTAVO MACHADO GOMEZ:

5            LAW OFFICES OF MARK E OVERLAND
              BY: Mark E Overland
6                 Attorney at Law
              100 Wilshire Boulevard, Suite 950
7             Santa Monica, CA 90401
              310-459-2830
8
              -AND-
9
              SCHEPER KIM AND HARRIS LLP
10            BY: ALEXANDER H COTE
                  Attorney at Law
11            601 West Fifth Street, 12th Floor
              Los Angeles, CA 90071-2025
12            213-613-4655

13            ALSO PRESENT:

14            MGA ENTERTAINMENT, INC.
              BY: JEANINE PISONI
15                Attorney at Law
              16360 Roscoe Boulevard, Suite 105
16            Van Nuys, California 91406

17

18   ALSO PRESENT:

19            KEN KOTARSKI, Mattel Technical Operator

20            MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

# CHRONOLOGICAL INDEX

021811 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 20 V3
CV 04-9049 DOC

<u>**WITNESS:**</u>                                                                    <u>**PAGE:**</u>

**Isaac Larian**
REDIRECT EXAMINATION RESUMED
BY MR. PRICE...........................................     5
REDIRECT EXAMINATION RESUMED
BY MR. PRICE...........................................     9

1   SANTA ANA, CALIFORNIA; FRIDAY, FEBRUARY 18, 2011,

2   Day 20, Volume 3 of 3

3   P.M. SESSION

4   (Open court - jury present.)

5   **Isaac Larian**,

6   witness, called by Plaintiff(s), previously sworn

7   **REDIRECT EXAMINATION RESUMED**

8   BY MR. PRICE:

9   Q.   So whoever asked that should not have been implying that

10  he was not a fantastic lawyer at the time he worked for you

11  in 2003?

12  A.   Yes.

13  Q.   So Ms. Keller asked you questions about this and she

14  said something to the effect of, "Do you know why Mr. Rose

15  was having Mr. Bryant sign a declaration saying that he was

16  the inventor of the -- this interchangeable footwear?"

17       Do you recall questions to that effect?

18  A.   Can you repeat the question again, please.

19  Q.   Do you recall questions from Ms. Keller as to whether

20  you knew why Mr. Rose was asking Mr. Bryant to sign a

21  declaration that he was an inventor of this interchangeable

22  footwear?

23       Do you recall that?

24  A.   Yes, and I said I don't know why.

25  Q.   Well, actually, if you look at the declaration, the

```
 1    declaration is not to establish that Mr. Bryant's the

 2    inventor.

 3           Look at the declaration.  It begins on Page 5.

 4           Do you the see first line, "I am president of

 5    Carter Bryant Enterprises, 634 West Mount Vernon, Suite 264,

 6    Nixon, Missouri 65714, and I've been in the freelance design

 7    field for about eight years"?

 8    A.   Yes.

 9    Q.   Does that say he's the inventor of the interchangeable

10    footwear -- in connection with the interchangeable footwear

11    application patent that was filed for you?

12    A.   No.

13    Q.   How about the second paragraph:  "I am familiar with the

14    Bratz doll projects of MGA Entertainment and I have worked

15    with Isaac Larian, president of MGA Entertainment on the

16    Bratz doll project."

17           Do you see that?

18    A.   Yes.

19    Q.   Does that suggest he is the inventor in connection with

20    the patent application you're filing for you?

21    A.   No.

22    Q.   Okay.  The third paragraph:  "I am familiar with the

23    doll designs as shown in the attached drawings from the

24    above-identified patent application.  These dolls have

25    strap-type shoes, and the dolls have a snap-on feature at
```

```
 1    about the ankle of the dolls so that different footgear may

 2    be mounted on the doll.  Regarding the strap-type shoes, as

 3    disclosed in the patent application, the coloring of the skin

 4    tone on the exposed areas of the feet are matched to the

15:28 5    coloring of the lower legs of the dolls."

 6         Do you see that?

 7    A.   Yes.

 8    Q.   It doesn't suggest he's the inventor, does it?

 9    A.   No.

15:28 10   Q.   So then we have Paragraph 4, the next page:  "I was

11    actively involved with the release of the Bratz dolls of the

12    configuration as set forth in Paragraph 3 above, and this

13    release did not occur until the fall of the year 2002."

14         Do you see that?

15:28 15   A.   Yes.

16    Q.   It doesn't claim he's the inventor, does it?

17    A.   No.

18    Q.   So do you recall being asked, "Didn't you wish you had

19    been the one who had signed this declaration?"

15:29 20   A.   I don't remember.  I didn't say I wish I was the one to

21    write it.  I don't recall what you're talking about.

22    Q.   You don't recall yesterday being asked whether or not

23    you wanted to be the one to sign this declaration?

24    A.   No, I don't remember a question and answer like that.

15:29 25   Q.   You being asked whether you would have signed
```

1    this declaration?

2    A.    I'm sorry?

3    Q.    Do you remember being questioned about whether you would

4    have signed this declaration?

15:29   5    A.    I don't remember it being asked if I was signing this

6    declaration or not.

7           MS. KELLER:  I'm going to object that this

8    misstates the evidence, Your Honor.

9           THE COURT:  Overruled.

15:29   10          THE WITNESS:  I don't remember --

11          I was going to finish this, and then I want to take

12   a break.

13          No.  You go ahead and finish your question and we

14   can take a break.

15:29   15          MR. PRICE:  If you think it's impacting your

16   testimony we can take a break now.

17          THE COURT:  We're going to take a break.

18          Do not discuss this matter amongst yourselves nor

19   form or express any opinion about the case.

15:30   20          We're going to take a break and come back to get

21   you.

22          (Recess taken.)

23          (Open court - jury present.)

24          THE COURT:  We're back in session.

15:40   25          The jury is present, all counsel are present and

```
 1    the parties, and Mr. Price will continue redirect of

 2    Mr. Larian.

 3                REDIRECT EXAMINATION RESUMED

 4    BY MR. PRICE:

 5    Q.   Mr. Larian, do you recall the following answers and

 6    questions from yesterday:

 7             "Question:  And in fact, since you invented it you

 8    would have actually" -- I'm sorry.

 9             "Question:  And there would have been no problem in

10    having you sign the declaration, would there?

11             "Answer:  No.  I invented it.  There was no

12    problem.

13             "Question:  And, in fact, since you invented it you

14    would have actually preferred signing the declaration listing

15    yourself as the inventor and not Carter Bryant; true?

16             "Answer:  Yes."

17             So do you recall that as being the sworn testimony

18    you gave yesterday in front of the jury?

19    A.   Yes.

20    Q.   And going back to Exhibit 11898 and having looked

21    through this, there is no suggestion here that Mr. Bryant is

22    the inventor; correct?

23    A.   Yes.  It is not.

24    Q.   In fact, if you look at Page 5, 11898-0005, you look at

25    the top there, it says "in the United States patent and
```

         1    trademark office.  Applicant:  Isaac Larian."

         2            And then it has a "serial No."

         3            Do you see that?

         4    A.   Yes.

15:42    5    Q.   So this declaration lists you as the one applying for

         6    the patent; correct?

         7    A.   Yes.

         8    Q.   And when you said that you would have preferred signing

         9    this declaration yourself, you wouldn't have signed this

15:42   10    declaration, would you?

        11    A.   I'm sorry?

        12    Q.   You wouldn't have signed this declaration, would you?

        13    A.   I don't understand your question.

        14    Q.   Well, would you --

15:42   15    A.   If -- if there was declaration for me to sign regarding

        16    patent of something that I had done and it was done by my

        17    attorney, Alan Rose, I would have signed it.

        18    Q.   So you look at Paragraph 4 which says, "I was actively

        19    involved with the release of the Bratz dolls of the

15:43   20    configuration as set forth in Paragraph 3 above, and this

        21    release did not occur until the fall of the year 2002."

        22            Do you see that?

        23    A.   Yes.

        24    Q.   Now, you were certainly actively involved with the

15:43   25    release of the Bratz dolls of the configuration set forth in

1    Paragraph 3; right?

2    A.    Yes.

3    Q.    So that part of the statement would be true?

4    A.    Yes.

15:43 5    Q.    But the second part is false, which is this release did

6    not occur until the fall of the year 2002?

7    A.    Yes.

8    Q.    So what you were saying yesterday is that you would have

9    preferred signing this declaration that made a false

15:43 10   statement under penalty of perjury?

11   A.    No.

12   Q.    Well -- well, when you answered Ms. Keller that you

13   would have preferred signing the declaration and you saw no

14   problem with signing the declaration, do you see that there

15:44 15   would be a problem with signing this declaration, making a

16   false statement under penalty of perjury?

17   A.    If I had given it -- I'd have to go back how many years?

18   Eight years, nine years -- if I was presented with this

19   declaration and if I had read and I had seen it says "2002" I

15:44 20   would have changed it to 2001, but I'm thinking I just gave

21   you a lot of "if"s.

22   Q.    And if you had signed this declaration and put in that

23   the release didn't occur until the fall of 2001, you know you

24   never would have gotten the patent?

15:45 25   A.    We never got the patent regardless.  It doesn't matter.

1    Q.    Well, I'm talking about the time.

2          At the time in August 11, 2003, when this letter

3    was sent, you did not know whether the US patent office was

4    going to grant the patent; right?

15:45 5    A.    I didn't know if they were or not.  We were asking for a

6    patent.

7    Q.    You were filing an application attempting to get a

8    patent; correct?

9    A.    Yes.

15:45 10    Q.    And you knew that if the release was back in 2001, that

11    you wouldn't get the patent, but if it was in 2002 you might?

12    A.    No, I don't remember anything like that.

13    Q.    Well, if you look at the first page of 11898, and you

14    see the fourth paragraph:  "Our patent application was filed

15:45 15    on February 24, 2003, so a release back in 2001 would be

16    anticipatory, while a release in the fall of 2002 would be

17    within the one-year grace period."

18          Do you see that?

19    A.    Yes.

15:46 20    Q.    And this is something that your attorney is saying -- is

21    sending to Mr. Bryant, who was not his client?

22    A.    Yes.

23    Q.    You were Mr. Rose's client; correct?

24    A.    MGA was, yes.

15:46 25    Q.    And you were aware that there would be a problem with

1    getting the patent if your invention was in the market in

2    2001 as opposed to 2002?

3    A.   No.

4    Q.   So this is something that Mr. Bryant was told in August

15:46 5    of 2003 that you had -- knew nothing about?

6    A.   Yes.

7    Q.   But so we're clear, if you had seen this declaration and

8    read it, you would not have signed it because it would have

9    subjected you to perjury penalties; right?

15:47 10         MS. KELLER:  Objection; calls for -- calls for a

11   legal conclusion, Your Honor.

12         THE COURT:  Overruled.

13         THE WITNESS:  If I had -- I testified this, before

14   now, if I was presented with this declaration and it says

15:47 15   "2002" instead of "2001" I would have corrected it to 2001 --

16   if I had read it now.

17         A lot of times I don't read the declaration

18   prepared by my lawyers.  I trust my lawyers.  Do they make

19   mistakes?  Yes.  Did Alan Rose probably make a mistake?  Yes.

15:47 20   He's a human being.  He was a human being.  A good human

21   being.

22   Q.   BY MR. PRICE:  So you believe Mr. Rose made a mistake?

23   Is that what you just said?  He's a human being, but he made

24   a mistake?

15:48 25   A.   It's possible that he made a mistake.

CV 04-9049 DOC - 02/18/2011   Volume 3 of 3

```
 1    Q.   And apparently Mr. Bryant also made a mistake?

 2    A.   I don't know about that.  Mr. Bryant testified for days

 3    here so his testimony is -- it is what it is.

 4    Q.   You'll recall yesterday that you looked at some e-mails

 5    in 2001 and 2002 where you were talking about rumors about

 6    getting sued by Mattel.

 7              Do you recall that?

 8    A.   Yes.

 9    Q.   And do you recall that that -- that came in to show your

10    state of mind in the time frame of 2001 to 2002; correct?

11    A.   Yes.

12    Q.   So -- so let me talk about that.

13              Mattel didn't sue you in connection with Bratz in

14    2001; correct?

15    A.   No, they did not.

16    Q.   Is that correct?

17    A.   Correct.

18    Q.   Did Mattel sue you in 2002 in connection with Bratz?

19    A.   They did not.

20    Q.   And in 2003 did they sue you in connection with Bratz?

21    A.   They did not.

22    Q.   And you've seen a -- a cease-and-desist letter from

23    Mr. Quinto.

24              Do you recall that?

25    A.   Who works for Mr. Quinn, yes.
```

UNITED STATES DISTRICT COURT

Q.   From the Quinn Emanuel law firm, but Mr. Quinto signed
it.

         Do you recall that?

A.   Yes.

Q.   And that was to cease and desist using trademarks of
Mattel in connection with that -- that fan site?  Do you
recall that?

A.   Yes.

Q.   And so in 2001, 2002, 2003, did you receive a -- a --
a -- a cease-and-desist letter from Mattel in connection with
Bratz?

A.   We received those two -- two cease-and-desist letters.
Those are the ones I remember getting from Mr. Quinn's
office.

Q.   No, I'm asking about, not in connection with using
Mattel's trademarks or anything like that.

         I'm saying in 2001, 2002, 2003, did you receive any
cease-and-desist letters from anyone in connection with
Mattel about this sale of Bratz?

A.   No.

Q.   And then on April 27, 2004, Mattel sued Carter Bryant.
Do you recall that?

A.   Yes.

Q.   Now, you became aware that Carter Bryant's contract with
MGA had become available to Mattel; correct?

1    A.    Yes.

2    Q.    And that was in connection with some litigation in

3    Hong Kong; right?

4    A.    Yes, or litigation from my brother; either one.

15:51  5    Q.    And if you say "litigation from my brother," if you look

6    at 21714 and the bottom e-mail there, you understood that's

7    what your brother was referring to when he said, "Mattel

8    filed the attached in court.  MGA filed its Bratz-related

9    case in HK long before I filed mine.  I have been curious why

15:51 10    this signed agreement does not have Bates numbers and where

11    Mattel obtained it.  Is it possible that MGA filed this in HK

12    action and Mattel obtained it from there?"

13          And it goes on, "Had I known anything about Mattel,

14    I would have obviously told Howarth not to file the unsigned

15:52 15    CB agreement in court."

16          You understand that's what he's referring to, the

17    fact that Mattel somehow got a copy of Mr. Bryant's contract

18    with MGA?

19    A.    That's what he's saying.

15:52 20    Q.    And it is true that you filed that contract in

21    Hong Kong; right?

22    A.    Yes.

23    Q.    And that Mattel got it around November of 2003?

24    A.    I don't know when --

15:52 25          MS. KELLER:  Objection; no foundation.

 1          THE WITNESS:  I don't know when we got it.

 2   Q.   BY MR. PRICE:  Do you know when you filed it in

 3   Hong Kong?

 4   A.   I don't remember, no.

15:52  5   Q.   So let's look at that contract which Mattel got either

 6   through the Hong Kong action or your brother's action; but

 7   when did your brother file his action?

 8   A.   I don't remember.

 9   Q.   Let's look at Exhibit 15.

15:53 10   A.   Yes.

11   Q.   Now, you have become aware -- you say, at least in this

12   litigation, by the time -- 2008 -- that Mr. Bryant was

13   working with Mattel up through October 19th?

14   A.   I found out after we sued him that he had given Mattel

15:53 15   two weeks' notice from October 4 to October 19 without

16   telling us.

17   Q.   Your understanding now is that he was at the Mattel

18   design center working as a Mattel employee through

19   October 19th; correct?

15:54 20   A.   I don't know if it was in the design center or not.  I

21   know that he had given two weeks' notice to Mattel, and we

22   didn't know about it -- he didn't tell us -- until we got

23   your complaint against him in 2004.

24   Q.   So look at the front page of this contract.  You see it

15:54 25   says "dated as of September 18, 2000"?

CV 04-9049 DOC - 02/18/2011 - Volume 3 of 3

1    A.   Yes.

2    Q.   And if -- if MGA saw a contract with a competitor, with

3    one of its employees, that was dated as of the time that that

4    employee was working with MGA --

15:55  5    A.   Is there something funny about your question?

6    Q.   No, I'll start again.

7              If MGA --

8    A.   Yes.

9    Q.   -- found a contract between one of its former employees

15:55  10   and a competitor and saw that the effective date of that

11   contract was the same time that that employee was working

12   with MGA --

13   A.   I don't see saying "effective date."  It says "dated as

14   of September 18, 2000."

15:55  15   Q.   Would that cause MGA to become suspicious that maybe

16   that employee breached his contract with MGA?

17             MS. KELLER:  Objection; asked and answered at least

18   half a dozen times, Your Honor.

19             THE COURT:  It has been asked and answered,

15:55  20   Counsel.

21             One more time.

22             THE WITNESS:  I've never been --

23             THE COURT:  Well, we'll have an answer.

24             THE WITNESS:  I've never been involved in something

15:55  25   like this.  I don't know how to answer that.  I have

---

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 02/18/2011   Volume 3 of 3

```
 1   not been --
 2          THE COURT:  Now you can ask it again, Counsel.
 3   Q.   BY MR. PRICE:  Does MGA think that its employees should
 4   abide by their contracts?
 5   A.   Yes.
 6   Q.   Does MGA think that its employees should be working for
 7   a competitor at the same time it's working for MGA?
 8   A.   No.
 9   Q.   Okay.  So if you had found the contract like this --
10   Exhibit 15 -- that was dated as of a time when your employee
11   was still working with you and he was contracted to provide
12   services to MGA on a top-priority basis, you would have
13   thought that that employee had breached his obligations to
14   MGA; right?
15   A.   I haven't been in something like this.  I don't know how
16   to answer it.
17          Probably, yes.
18   Q.   And when I say "top priority basis," if you look at
19   Paragraph 1 and you go down, one, two, three, four, five
20   lines, there is a section that says "in addition, Brian" --
21   "Bryant" -- I'm sorry.  It's the sentence above that.  I
22   mean, "is understood."
23          Sorry, Ken.
24          "It is understood and agreed that Bryant shall
25   provide his services on a top priority basis as his services
```

1    pertain to other clients of Bryant."

2            Do you see that?

3    A.    Yes.

4    Q.    And, I think, yesterday you said that Bryant could work

15:57 5    for other companies because he was a consultant and not an

6    employee?

7    A.    Go a little slower, please.

8    Q.    Sure.

9            I think -- yesterday I think you said that

15:57 10   Mr. Bryant could work for other companies because he was a

11   consultant with MGA and not an employee?

12   A.    After October 4, yes.

13   Q.    But you see there is a Paragraph 2 there that says

14   term/exclusivity?

15:58 15   A.    Yes.

16   Q.    And I think it's the third line there that says "during

17   the term of this agreement" --

18   A.    Yes.

19   Q.    This is Paragraph 2.

15:58 20           -- "Bryant will not provide consulting services to

21   any person, firm or corporation engaged in the design,

22   development and manufacture and sale of dolls or similar

23   products."

24            Do you see that?

15:58 25   A.    Yes.

1    Q.   Now, I asked you about that September 18 effective date,

2    and if you go to the last page, 15-0006, you see on the

3    bottom there -- further down, Ken.  Right there.

4         It has that October 4th date on it.

15:59  5    A.   Yes.

6    Q.   All right.  Now, I asked you about September 18, if MGA

7    saw that one of its employees entered into a contract with

8    its competitor that was dated at a time when the employee

9    still worked for MGA, signed at that time, and that employee

15:59 10   was supposed to give MGA his work on a top priority basis,

11   MGA would think that that employee had breached some

12   obligation to MGA; right?

13        MS. KELLER:  Objection; asked and answered.

14        THE COURT:  Overruled.

15:59 15        THE WITNESS:  I'm sorry.  This was the biggest,

16   longest question I've ever heard in my life, so please

17   repeat.

18   Q.   BY MR. PRICE:  I've asked you longer, but I'll shorten

19   it.

15:59 20        If MGA discovered that an employee -- MGA

21   employee -- had signed a contract with a competitor --

22   A.   Okay.

23   Q.   -- to give the competitor his services on a "top

24   priority basis" --

16:00 25   A.   Yes.

 1    Q.    -- and he had signed that while he was still working for

 2    MGA --

 3    A.    Yes.

 4    Q.    -- you would think that employee had breached his

16:00 5    obligation to MGA; right?

 6    A.    Just by signing the agreement, no.

 7    Q.    By signing it and obligating himself to work on a top

 8    priority basis with the competitor?

 9    A.    Just not by signing the agreement I don't think that's a

16:00 10   breach.  People get a job there.  They are -- they are

 11   working at your law firm.  They go interview for

 12   Skadden Arps, for example, and they sign an agreement before

 13   they go work for Skadden Arps and sign an agreement before

 14   you go there, I don't think they're breaching the contract by

16:00 15   doing that.  It's the same thing here.

 16         People go for job -- job interviews.  Bob Eckert

 17   used to work at Kraft.  He had an employment agreement, from

 18   what I understand, and then he went ahead and worked --

 19   interviewed, got a job at Mattel.  He signed his agreement

16:01 20   while he was working at Kraft.

 21         Did he breach his agreement?  I don't think so.

 22         So just by signing an agreement, it does -- it's

 23   not a breach of any agreement.  That's my opinion.

 24   Q.    Now how about this agreement?  Your understanding at

16:01 25   least from October 4th on, was that Mr. Bryant had obligated

         1    himself legally to perform services for MGA.  October 4th --

         2    A.   Yes.

         3    Q.   -- on a top priority basis; correct?

         4    A.   Yes.

16:01    5    Q.   And that was exclusive?  He couldn't work with any other

         6    company engaged in the manufacture and sale of dolls;

         7    correct?

         8    A.   Yes.  Per the agreement, he could not after October 4.

         9    Q.   And -- and this isn't an interview; this is a contract

16:01   10    he'd signed with MGA; right?

        11    A.   Yes.

        12    Q.   So, see if you can think about this again.

        13         If MGA had discovered an employee had done that,

        14    which is working for MGA, and at the same time obligating

16:02   15    himself legally to work for a competitor on an exclusive

        16    basis, MGA would think that employee has breached his

        17    obligations to us?

        18         MS. KELLER:  Objection; misstates the testimony,

        19    and asked and answered.

16:02   20         THE COURT:  Overruled.

        21         THE WITNESS:  Again, you're asking me if

        22    Carter Bryant, by signing this agreement, just the signing of

        23    this, while he was still working at Mattel, to come and work

        24    and do consulting work for MGA after he had left Mattel, is

16:02   25    that something wrong?  The answer is no.

```
 1    Q.   BY MR. PRICE:  You're changing a part of my
 2    hypothetical.  I'm not saying "after he left Mattel."  I'm
 3    saying while he was still working at Mattel, while he still
 4    went and worked at Mattel?
16:02  5    A.   If he was working at Mattel, working at MGA, that would
 6    be wrong.
 7    Q.   So --
 8    A.   But signing the agreement, by itself, is not wrong.
 9    That's the distinction I'm trying to make.  I hope I'm
16:02 10    answering your question.
11    Q.   So in connection with -- with the lawsuit filed by
12    Mattel on April 27, 2004 --
13    A.   Right.
14    Q.   -- okay.  Again, you understand Mattel had access to
16:03 15    this contract --
16    A.   Yes.
17    Q.   -- as a result of either the Hong Kong litigation or
18    your brother's; right?
19    A.   Yes.
16:03 20    Q.   And on April 27, 2004, Mattel sued Carter Bryant for
21    breach of contract, breach of fiduciary duty, breach of duty
22    to loyalty, unjust enrichment, and conversion.
23         Do you recall that?
24         MS. KELLER:  Your Honor, this is improper
16:03 25    questioning.
```

CV 04-9049 DOC - 02/18/2011 Volume 3 of 3

```
 1                THE COURT:  Yeah, I'm going to sustain it, Counsel.
 2           How are we going to get this resolved tonight?
 3           You've asked the same question three times.
 4      Sometimes there has been a response, sometimes the answer's
16:03 5      been changed.
 6                MR. PRICE:  I'm moving on from that question.
 7           I'm trying to get into he said we sued him, and I
 8      want to get into that chronology.
 9                THE COURT:  Okay.  You can ask him.
16:04 10     Q.   BY MR. PRICE:  So this is why I'm trying get into the
11      chronology.
12           On April 27, 2004, Mattel sued Carter Bryant;
13      right?
14      A.   Yes.
16:04 15     Q.   On April 27, 2004, Mattel did not sue MGA; correct?
16      A.   Yes.
17      Q.   And you said that you recalled, from reading the
18      complaint, that Mattel had -- had gotten the copy of the
19      contract between MGA and Carter Bryant?
16:04 20     A.   I'm sorry?
21      Q.   I think you said by reading the complaint you could tell
22      that Mattel had gotten a copy of the contract between MGA and
23      Carter Bryant?
24      A.   I think so, yes.
16:05 25     Q.   Now, would you agree that this contract, just looking at
```

```
 1    it, it doesn't say that MGA knew Carter Bryant was an

 2    employee when Carter Bryant did work for MGA?  The contract

 3    doesn't say that?

 4    A.   It doesn't.

 5    Q.   But after Mr. Bryant was sued, MGA represented him,

 6    correct? -- their attorneys?

 7    A.   Yes.

 8    Q.   And after he was sued -- in fact, in November of 2004,

 9    do you recall that around that time frame Mr. Bryant's first

10    deposition was taken where he testified under oath in

11    connection with the lawsuit against him?

12    A.   I don't remember when he -- he took his deposition,

13    first, last, I don't remember.  I wasn't there.

14    Q.   Well, your attorneys were there; correct?

15    A.   Yes.

16              THE COURT:  Do you two want to stipulate to the

17    date?

18              MR. PRICE:  Well, I'll stipulate.

19              THE COURT:  It's such an easy, discernible thing.

20              MS. KELLER:  That's fine, Your Honor.

21              THE COURT:  All right.  Was it in November?

22              MR. PRICE:  November 4, 2004.

23              THE COURT:  Now, just a moment.  Let's make sure

24    that there is a stipulation between both parties.

25              MS. KELLER:  Yes.
```

```
 1              THE COURT:  Okay.

 2              MR. PRICE:  Yes.

 3              THE COURT:  And the date again will be --

 4              MR. PRICE:  November 4, 2004.

16:06  5         THE COURT:  2004.  That's when the deposition --

 6   the first deposition was taken of Carter Bryant.

 7              That's stipulated to by the parties.

 8              That just saved us a half hour.

 9              (Laughter.)

16:06 10         THE WITNESS:  Thank you.

11   Q.  BY MR. PRICE:  And did you learn that at his deposition,

12   his first deposition, that Mr. Bryant testified that when he

13   met with you in September of 2000, he told you that he worked

14   for Mattel?

16:07 15         MS. KELLER:  Objection; irrelevant.

16              THE COURT:  Sustained.

17   Q.  BY MR. PRICE:  Well, let me jump ahead.

18   A.  Jump.  Go ahead.

19   Q.  From November 4, 2004, to December 7, 2004; all right?

16:07 20  A.  November --

21   Q.  No.  December 7.

22              I'm focusing now on December 7.  We have

23   Mr. Bryant's testimony on November 4 and then I want you to

24   focus about a month later on December 7, 2004.

16:07 25  A.  Yes.
```

```
 1   Q.   About a month after Mr. Bryant's deposition was taken --

 2   A.   Yes.

 3   Q.   -- on December 7, 2004, MGA intervened in the lawsuit,

 4   that is, it appeared as a party.

 5   A.   I don't remember the date.  Please stipulate so we can

 6   get going.

 7            Can you talk to the other side and stipulate?

 8            MS. KELLER:  We'll stipulate.

 9   Q.   BY MR. PRICE:  Okay.  So is it your understanding --

10            THE COURT:  Well, let's make sure there is a

11   stipulation.

12            MS. KELLER:  Yes, Your Honor.

13            We will stipulate that on December 7, 2004, MGA

14   intervened for procedural purposes only in the lawsuit.

15            THE COURT:  Well, now, just a moment.  That's not

16   just the stipulation that was just blurted out.

17            You two can talk to each other.  We'll stop the

18   time running for a moment, okay, as you two gather in the

19   back of the courtroom and quietly discuss this amongst

20   yourselves.

21            THE WITNESS:  Can I stand up for a short moment?

22            THE COURT:  Certainly.

23            (Discussion held off the record.)

24            MS. KELLER:  Apparently we don't have a

25   stipulation, Your Honor.
```

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | THE COURT:  I didn't expect that. |
| 2 | (Laughter.) |
| 3 | THE COURT:  Counsel, your next question. |
| 4 | MR. PRICE:  Sure. |
| 16:09 5 | Q.  Is it your understanding that it was not until after |
| 6 | Mr. Bryant's sworn testimony in November 2004 that MGA became |
| 7 | a party to this lawsuit? |
| 8 | A.  I have -- |
| 9 | MS. KELLER:  Objection; irrelevant. |
| 16:09 10 | THE COURT:  Overruled. |
| 11 | THE WITNESS:  I have no understanding when and if. |
| 12 | I have no understanding of that.  The lawyers are handling |
| 13 | everything. |
| 14 | THE COURT:  Ladies and gentlemen, eventually this |
| 16:09 15 | will go to the statement of whether, in fact, Mr. Larian was |
| 16 | sued or whether there was an intervention in this matter, and |
| 17 | I'm going to allow questions in this area. |
| 18 | Q.  BY MR. PRICE:  Well, Mr. Larian, let me ask you this: |
| 19 | At some point you had an understanding that Mattel was also |
| 16:10 20 | suing MGA; right? |
| 21 | A.  Yeah, you sued me in 2006. |
| 22 | Q.  And I'm talking about MGA, so just to be clear -- |
| 23 | A.  Me and MGA, you sued in 2006. |
| 24 | Q.  So that was after -- |
| 16:10 25 | A.  You left my wife out. |

UNITED STATES DISTRICT COURT

```
 1    Q.    Anything else you want to volunteer?

 2    A.    No, go ahead.

 3                MR. PRICE:  Your Honor, I move to strike.

 4                THE COURT:  Well, I'm not sure which portion,

16:10 5    Counsel.

 6                MR. PRICE:  The "wife."

 7                THE COURT:  All right.

 8                Well, in fact, was his wife sued?

 9                MR. PRICE:  Oh, gosh, no.

16:10 10                THE COURT:  Counsel, I don't recall his wife being

11    sued.

12                MS. KELLER:  That's correct.

13                We'll stipulate to that.

14                THE COURT:  All right.  We're going to strike that

16:10 15    portion.  The gratuitous statement is stricken.

16                His wife was not sued.

17    Q.    BY MR. PRICE:  So, Mr. Larian, it's your belief that

18    Mattel did not sue you or your company until after Mr. Bryant

19    testified in deposition under oath; correct?

16:11 20    A.    I don't know when he testified under oath.  I know --

21    all I know is that Mattel sued --

22                MR. PRICE:  Your Honor, I strike anything after

23    that.

24                THE COURT:  No, sir.  You can finish your answer.

16:11 25                THE WITNESS:  All I know is Mattel sued MGA in
```

CV 04-9049 DOC - 02/18/2011 - Volume 3 of 3

```
 1    2006.  I don't remember the month.
 2    Q.   BY MR. PRICE:  So yesterday you also testified about the
 3    Hong Kong toy fair and you recall that you -- you were shown
 4    some -- some logs that showed that there were individuals
 5    from Mattel who attended your showroom in the Hong Kong toy
 6    fair in 2001.
 7             Do you remember that?
 8    A.   Actually, the logs that were shown to me were February
 9    2001.  Not -- not the Hong Kong schedules.
10    Q.   Okay.  Were there folks from Mattel in the Hong Kong toy
11    fair?
12    A.   There were.
13    Q.   And were there folks from Mattel at the New York toy
14    fair?
15    A.   Yes.
16    Q.   And that was at least January -- those two were
17    January/February 2001?
18    A.   Yes.
19    Q.   And -- and at that point you weren't trying to hide from
20    the world that you were planning on making a Bratz doll;
21    right?
22    A.   No.
23    Q.   I mean, after the Hong Kong toy fair in January of 2001,
24    were you ever trying to hide from anyone that you were
25    thinking about making these Bratz dolls?
```

16:11 5
16:12 10
16:12 15
16:12 20
16:12 25

1    A.    No.

2    Q.    So let's go to the second issue, then, about whether --

3    whether you wanted people to know that Mr. Bryant had

4    designed the dolls; right?  And I think you said yesterday,

16:13 5    in response to Ms. Keller's questions, that you didn't want

6    people to be able to poach your designers; right?

7    A.    Yes.

8    Q.    And then let me go to the third step, then:  Whether you

9    wanted anyone to know that Carter Bryant was working with

16:14 10   MGA, assisting in September of 2000.

11             Did you want people to think that, that is,

12   Carter Bryant was assisting MGA in September of 2000?

13   A.    He was not assisting MGA in September 2000.  He was

14   doing what he was doing on his own, to sell his -- pitch his

16:14 15   idea.

16   Q.    Well, certainly, then, you didn't want anyone to

17   think -- erroneously, you believe -- that Mr. Bryant was

18   working or assisting MGA in September 2000?  You think that

19   would be incorrect?

16:14 20   A.    I -- I'm sorry.  I'm not understanding your question.  I

21   don't know what -- what you're asking me.

22   Q.    Well, it's the end of the day on Friday, so it's my

23   fault.

24             Did you ever say to anyone that Mr. Bryant had

16:14 25   worked for MGA at the same time he worked for Mattel?  Did

```
  1   you ever say that prior to 2008?

  2   A.   No.

  3   Q.   Did you ever say to anyone that Mr. Bryant assisted MGA

  4   in September of 2000?

16:15  5   A.   No.

  6   Q.   So you've testified -- you remember there was the Wall

  7   Street Journal article where you identified Mr. Bryant as

  8   working -- working on Bratz?

  9        Do you recall that?

16:15 10   A.   Yes.

 11   Q.   And you didn't, in that article, say that he had signed

 12   a contract while he was still working with Mattel or anything

 13   like that; correct?

 14   A.   No.

16:15 15   Q.   That was a double-negative.

 16        I mean, is my statement correct?

 17   A.   Yes.

 18   Q.   And did you ever state publically before 2008 that

 19   Mr. Bryant --

16:15 20   A.   2008?

 21   Q.   I'm sorry, yes.  Actually, before 2008.

 22        -- did you ever say that Mr. Bryant had created

 23   Bratz designs in 2000?

 24   A.   I'm sorry.  I don't understand your question.

16:16 25   Q.   Yeah.  Did you -- before -- well, let's -- at any time,
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10044   Filed 02/22/11   Page 34 of 59   Page ID #:303298
CV 04-9049 DOC - 02/18/2011   Volume 3 of 3

34

```
 1    have you said that Mr. Bryant created Bratz' designs in 2000?

 2                MS. KELLER:  Objection; vague as to what Bratz'

 3    designs, Your Honor.

 4                THE COURT:  Overruled.

 5                You can answer that question.

 6                THE WITNESS:  I don't know if I have or not, and

 7    what Bratz' designs.  He designed -- he continued to design

 8    Bratz babies, Bratz Kidz, Bratz Itsy Bitsy -- a lot of these

 9    things here throughout the years, long after he had left

10    Mattel.

11    Q.   BY MR. PRICE:  So look at Exhibit 302, and we can -- we

12    can put the first page up on the screen.

13                THE COURT:  Well, Counsel, excuse me, that -- that

14    may be -- you may be entirely correct on behalf of MGA.

15                Bratz designs covers a long period of time.

16                I assumed that that was referring, basically, to

17    maybe the first generation.

18                MS. KELLER:  Yeah, and --

19                THE COURT:  I'm going to sustain the objection,

20    Counsel.  I think that that is ambiguous.

21                Also, Ladies and gentlemen, I'm going to counsel

22    you, you'll be the judge of statements that are made.

23                I think counsel can easily stipulate who was sued

24    in a few moments and whether Mr. Larian's wife was included;

25    but remember if -- or sued, either male or female, usually
```

1    our spouse is involved, so you can have a good-faith belief,

2    actually, that it carries over to your family.

3              So I'll let counsel clear that up for both sides;

4    but I think we can get a stipulation, can't we, Counsel,

16:17 5    about these different dates?

6              MR. PRICE:  I think we have stipulated to --

7              THE COURT:  We haven't stipulated to the

8    intervention.  I think we're quibbling about intervention for

9    procedural purposes versus intervention, and I think we can

16:18 10    get a stipulation as to all these dates, quite frankly.  Can

11    we?

12             MS. KELLER:  We ought to be able to, but whether we

13    can, that's another story.

14             THE COURT:  Okay.  I'll let counsel continue, then.

16:18 15             Counsel.

16   Q.   BY MR. PRICE:  Mr. Larian you -- you said you had an

17    understanding that Mattel came in possession of that -- that

18    contract between you and Mr. Bryant because of the Hong Kong

19    litigation or your -- or your brother's litigation; right?

16:18 20   A.   I don't know how you came up about it, but that's what

21    you said.  That's what you guys said in this litigation and

22    that's what I believe.  So I don't know how you got it, but I

23    have read that your people said that they got it from

24    Hong Kong.

16:18 25   Q.   So if you look at 302 --

A.   Are they telling the truth or not?  I don't know.

Q.   Well, if you look at 302, this is the first page of the presentation.

Is it your understanding that Mattel also obtained access to Mr. Bryant's -- some of Mr. Bryant's drawings, including the one here with the copyright on it of 2000?

A.   It's very possible you did.

Q.   And is it your understanding that was obtained at the same time that the contract was?

A.   No.  My understanding is that we sent these with Carter Bryant's name, et cetera, to Prel, who is Wal-Mart's agent in Hong Kong, and Mattel employee's are the category captain for the fashion dolls, and they see everything, including everything from your competitor, so it's very possible that Mattel got -- saw this in 2000 when we sent it to Wal-Mart.

Q.   Do you know of -- of any evidence other than -- than -- than the speculation that you just volunteered, that Mattel received these drawings prior to them being filed in connection with the Hong Kong action?

MS. KELLER:  Objection, Your Honor.  Mr. Larian is being consistently asked to speculate.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.

THE COURT:  The question was if you had

         1    had any information.

         2            Just reask it, Counsel.

         3            THE WITNESS:  The information I had was what I just

         4    told you and the jury, and I've said that now for seven

16:20    5    years.

         6            We sent Carter Bryant's drawings, this drawing,

         7    to -- to Prel in Hong Kong to get an appointment with

         8    Ron Stover.  And I know from being in the industry for so

         9    long, that Mattel is the category captain for fashion dolls,

16:20   10    and as a category captain for fashion dolls they see

        11    everything from the competitors.

        12            Have they seen this?  Do I know for sure if they

        13    have seen it or not?  I don't.  But it's very possible that

        14    they have.

16:21   15    Q.    BY MR. PRICE:  Mr. Larian, prior to the Hong Kong toy

        16    fair, your belief was that your pursuit of the Bratz dolls

        17    was a trade secret; right?

        18    A.    I'm sorry?

        19    Q.    Prior to the Hong Kong toy fair --

16:21   20    A.    Yes.

        21    Q.    -- prior to you revealing that you're persuing the Bratz

        22    dolls, your belief is that the fact that you are pursuing

        23    this line was confidential; correct?

        24    A.    Yes.

16:21   25    Q.    Your thought was that this was a trade secret

 1    of MGA; right?

 2    A.    The lines that we were coming up with before people had

 3    seen it; yes.

 4    Q.    Including the Bratz line?

16:21 5    A.    Yes.

 6    Q.    So you thought that this was a trade secret, at least up

 7    until January of 2001; right?

 8    A.    Yes, of MGA's.

 9    Q.    And you said that in November of 2000 you sent to

16:21 10   Mr. Stover some of Mr. Bryant's drawings; correct?

 11   A.    I don't know if it was November or December.  I don't

 12   have the document in front of me.

 13         Please show it to me and I'll tell you the exact

 14   date.

16:22 15        What was that exhibit number?

 16   Q.    They're looking for it because I can't juggle exhibit

 17   numbers.

 18         But do you recall yesterday you talked about

 19   sending something to Mr. Stover which included some of

16:22 20   Mr. Bryant's drawings; right?

 21   A.    Actually, I said we sent it.  The document is in the

 22   evidence.

 23         We sent his drawings to Prel, who was the agent for

 24   Wal-Mart, to give to Ron Stover so we can get him to get an

16:22 25   appointment to come and see the line in 2000 -- in January of

1    2001 at MGA Hong Kong.  That drawing and that e-mail had this

2    page attached to it.

3    Q.    And you would not have sent that to anyone with the

4    expectation that they would then make it public to your

16:22  5    competitor?

6    A.    That's correct; yes.

7    Q.    So at the time you sent that, you didn't expect someone

8    at Wal-Mart to make public to your competitor that you had

9    this unreleased doll line that you were working on called

16:23  10    "Bratz"; right?

11    A.    I didn't expect him to do that, but I know how the toy

12    industry works and I know that Mattel is the category captain

13    for fashion dolls and they see all of competitor's

14    information before they hit the market.  That is the fact.

16:23  15    Q.    If you thought that when you sent this out to

16    Wal-Mart -- because you wanted to keep your trade secret --

17    you never would have sent it?

18    A.    We were not trying to hide something -- anything.

19    That's why we sent it.

16:23  20    Q.    No, no, no.  You didn't want competitors to know that

21    you were working on a new doll line called "Bratz" at the

22    time that you sent it.  You didn't want to reveal that;

23    right?

24    A.    Yes.

16:24  25    Q.    And you never would have sent it if you thought the act

1    of sending that would reveal to your competitors what you

2    were doing before the toy fair; right?

3    A.   Yes.

4          MR. PRICE:  Your Honor, on a Friday afternoon would

16:24 5    this be a -- or an hour ago been a good time to --

6          THE COURT:  It probably would be.

7          At 8:00 tomorrow, Counsel?

8          ALL RESPONSE:  Yes.

9          THE COURT:  You can go home for the weekend.  You

16:24 10   are admonished not to discuss this matter amongst yourselves

11   nor form or express any opinion about the case.

12         You have a nice weekend, all right?  And we'll see

13   you Tuesday at 8:00.

14         8:30.  Did I say 8:00?

16:24 15   Yes, 8:30.

16         Thank you very much.

17         Thank you, Mr. Larian.

18         THE WITNESS:  Thank you.

19         THE COURT:  Counsel, if you would remain for a few

16:24 20   moments.

21         (Open court - jury not present.)

22         THE COURT:  First, now that the jury is no longer

23   present, what is the distinction concerning intervention?  Is

24   it intervention that Mattel would like to get in or is it

16:25 25   intervention for procedural purposes only that MGA would like

UNITED STATES DISTRICT COURT

```
 1    to get in?
 2            Is that the disagreement I'm hearing behind the
 3    scenes?
 4            MS. KELLER:  It is.
 5            THE COURT:  Isn't the point that there is simply an
 6    intervention of some type?
 7            In other words, Mr. Larian had testified that, in
 8    fact, he was sued.
 9            That's not the case.  He intervened, and it's a
10    simple, simple matter.
11            Now, his view of that may be that he was sued, but
12    my understanding was that he wasn't sued in his personal
13    capacity until --
14            MS. HURST:  The motion for filing leave to amend he
15    testified to was November 2006.
16            THE COURT:  It said 2006.
17            MS. HURST:  Right.
18            THE COURT:  So it seems a rather silly distinction
19    to take all this time over, but I'll leave that to the two of
20    you.  You only have 120 hours and I forewarned everybody,
21    when that's done, you're done with your lawsuit.
22            Now, how are you holding up?
23            I don't care how your case is going for either
24    side, but how are you holding up?
25            MR. QUINN:  Well, it's nice -- TGIF, Your Honor.
```

```
 1            THE COURT:  I'd better get you out of here, then,

 2   and warn the California Highway Patrol that you're all out

 3   there having dinner together.

 4            I'm just teasing.

16:26  5     How are you holding up?

 6            MS. KELLER:  We're still here, Your Honor.  Still

 7   sitting upright.

 8            THE COURT:  Yeah, well, okay.

 9            Now, who is going to be with me tomorrow on these

16:26 10  motions?

11            We're going to start at 8:00 in the morning and

12   I'll reserve the court for the day.  So we're going to cover

13   trade secret misappropriation, intentional interference

14   tomorrow.  I'll leave the copyright issues until Tuesday.

16:26 15     Okay.  Monday -- you're going to have Sunday off.

16   You wanted Sunday off?

17            MR. QUINN:  That would be great, Your Honor.

18            THE COURT:  You wanted Sunday off?

19            MS. HURST:  Please.

16:27 20     THE COURT:  Okay.  Then you have Sunday off.

21            Monday we'll be back in session, though; but do I

22   need a court reporter for Monday?

23            MR. QUINN:  No, I think we've just got some

24   exhibits to go through, Your Honor.

16:27 25     THE COURT:  Just exhibits?
```

1          MR. QUINN:  Yeah.

2          THE COURT:  Just exhibits.

3          I don't care which counsel trades off with me.  In

4     other words, Mr. Price, if you want to stay home and get

16:27 5     prepared and Mr. Quinn's here along with Mr. Zeller, that's

6     fine.

7          Ms. Keller, I don't care if you're here or

8     Mr. McConville, but one lead counsel.  And if you want to

9     tradeoff, that's fine.

16:27 10          You're not all required to be here tomorrow, but

11     tomorrow's argument, unless I invite additional argument,

12     will probably culminate a lot of the decisions I'm going to

13     make in different areas concerning the jury instructions.

14          So you'll certainly have an open record of the

16:27 15     future and I'll keep examining those instructions in light of

16     the testimony, obviously; but I wanted to say to you we're

17     going to be pretty far down the line in terms of the

18     decisions I'm making in chambers by, probably, Sunday.

19          Now, what else do we -- we need to resolve,

16:28 20     especially with the court reporter present?

21          MR. QUINN:  Your Honor, there are -- first, not to

22     "resolve" but you began the day by asking of Mr. Zeller about

23     a -- a brief concerning the Rhee -- Witness Rhee matter.

24          THE COURT:  Yes.  Was that docketed?

16:28 25          MR. QUINN:  Yes, it was.  And I have given Kathy

```
 1   copies of all the Rhee briefs and they will have on the top

 2   the docket number so the court will see that.

 3           THE COURT:  We saw portions of that when it was

 4   initially raised; but I apologize, I couldn't find it last

 5   evening.

 6           Number two, if we're going through a crime-fraud

 7   process and I need to start through that process -- that's

 8   quite a process.  There are prongs, et cetera.  We've been

 9   through that with Mr. Nolan, I believe, and Mr. Corey.  That

10   isn't just a court snapping through a crime-fraud decision,

11   Counsel, so I think that's worthy of a discussion tomorrow

12   also.

13           MR. QUINN:  Understood, Your Honor.

14           I assume the court is referring to the pitch I made

15   last night regarding, make sure Paula's prepared not to

16   remember.

17           I have brought -- because I know the court has

18   received many, many briefs -- copies of all the briefing on

19   that subject, which has already been made --

20           THE COURT:  Thank you.

21           MR. QUINN:  -- as well as the testimony of

22   Brian Wing who testifies that Paula told him she knew the

23   sample makers were working for Mattel.

24           THE COURT:  Thank you very much.

25           That's a nice courtesy.  I appreciate it.
```

1          Now, I just need to make certain that everything's

2     docketed so we can keep track.

3          Now, what else from Mattel's side needs to be

4     decided, Mr. Price, while you're here? because you're still

16:29  5     lead counsel concerning Mr. Larian's testimony.

6          MR. PRICE:  Well, I think just a -- a -- a couple

7     of things.

8          One is I was going to ask Mr. Larian -- but did not

9     because I wanted to check with the court first -- in

16:30 10     connection with Mr. Castilla, Mr. Larian has testified that

11     what he did was wrong, he didn't, you know, approve of that,

12     although he paid his attorneys' fees and bonuses, and I am --

13     I wanted to ask him -- if I can clear it with the court --

14     you know, that not only did you pay his bonuses and fees but

16:30 15     you also threatened to prosecute, because his testimony is --

16          THE COURT:  Just a moment.  That's a gigantic leap.

17     I thought we were just at attorneys and fees.

18          MR. PRICE:  That's why I wanted to clear it with

19     you.

16:30 20          THE COURT:  Now we're jumping -- now this is

21     getting interesting -- I'm just kidding you -- what is all

22     this about?

23          MR. PRICE:  Well, in his deposition he said he went

24     to the US Attorney's Office and said he thought they had been

16:30 25     controlled by Mattel, and he wanted to go public and make

```
 1    these accusations.
 2              THE COURT:  With a prosecutor?
 3              MR. PRICE:  Yeah, with an Assistant US Attorney.
 4              THE COURT:  I have a hard time believing that an
 5    Assistant United States Attorney, if they were threatened,
 6    wouldn't throw the "threatenor" in jail.
 7              So I find that a little bizarre.
 8              MR. PRICE:  Well, that's -- that's his testimony.
 9              THE COURT:  Well, that's nice.
10         (Laughter.)
11              THE COURT:  Were the prosecutor's going to say he
12    was threatened?
13              MR. PRICE:  Oh, I don't think -- we haven't taken
14    her deposition yet.
15              THE COURT:  Well, let's find out.  Just a moment.
16              Who was the prosecutor?  This ought to be
17    entertaining.
18              MR. QUINN:  I don't remember.
19              THE COURT:  I want to see the threatened prosecutor
20    who cowers into the courtroom so shaken by Mr. Larian.
21              MR. PRICE:  I think she said "you can take a hike."
22              THE COURT:  Let's not go there.
23              You know, that's kind of a legal ruling.  No.
24              MR. PRICE:  That's why I wanted to clear it.
25              THE COURT:  Thank you very much.
```

```
 1        MR. PRICE:  And the second area, Your Honor, that

 2   I'm worried about is Mr. Larian a couple of times volunteered

 3   about magnets and killing children and lead paint, and --

 4        THE COURT:  I think that was universal to the

 5   industry, including his own products.  I didn't take that as

 6   a personal slight to Mattel.

 7        Now, I know that Mattel was sued or there was some

 8   issue involving paint or lead, but I don't think that the

 9   jury is --

10        MS. KELLER:  Your Honor, Mr. Quinn mentioned in his

11   opening statement, he said that -- that we would probably

12   argue that Mattel's damages or that their loss of market

13   share in the toy industry wasn't due to our actions but to

14   lead paint recall.  And I didn't mention it in my opening

15   statement, but that was out there, and the court has ruled on

16   that, that it can come in.

17        So Mr. Larian was being asked about safety issues

18   involving toys when he said "and lead was an issue."

19        MR. PRICE:  No.  Your Honor, it can come in for

20   damages, but Mr. Larian said -- and if you'll look at the

21   transcript -- it was that things that kill children, like

22   lead and magnets.  And I certainly didn't get the impression

23   he was talking about the industry.

24        THE COURT:  What do you want to ask him?

25        MR. PRICE:  Well, one, of course I'd like an
```

 1    instruction to the jury that, you know, there's no evidence

 2    Mattel has harmed anybody.

 3              And, second, you know, there's the evidence that he

 4    sent products that were unsafe that could not be sold in the

16:33 5    United States to other countries because he knew he couldn't

 6    sell them in the United States.  That is communication

 7    from --

 8              THE COURT:  Who is that, Mr. Larian?

 9              MR. PRICE:  Yes.

16:33 10             And we've got those e-mails.

 11             THE COURT:  The prejudicial effect outweighs the

 12   probative value.  I think it's better to have a curative

 13   instruction or something from the court that informs the jury

 14   that that's irrelevant, and you can draft it for me and give

16:33 15   it to me tomorrow or give it to me through Mr. Quinn.

 16             MR. PRICE:  Very good.

 17             THE COURT:  Okay.

 18             Now, what else on behalf of Mattel?

 19             MR. ZELLER:  One thing is I wanted to just alert

16:33 20   the court that we submitted -- lodged -- excerpts from

 21   depositions and other materials as the court had directed

 22   yesterday.

 23             THE COURT:  Thank you.

 24             MR. ZELLER:  -- concerning the invocation of the

16:34 25   privilege as to the investigation as well as the conversation

| | |
|---|---|
| 1 | that Mr. Larian had testified to. The court will recall that |
| 2 | had been a matter of controversy, so we now have submitted |
| 3 | that material. |
| 4 | THE COURT: Okay. Thank you. |
| 16:34 5 | Mr. Quinn. |
| 6 | MR. QUINN: And one other thing, Your Honor, during |
| 7 | the middle of the week the court issued a minute order in |
| 8 | which the court indicated that it was changing the ruling |
| 9 | that had been made pretrial concerning relation back -- |
| 16:34 10 | THE COURT: That's correct. |
| 11 | MR. QUINN: -- of the trade secrets claims -- |
| 12 | THE COURT: That's correct. |
| 13 | MR. QUINN: -- and I think that was something the |
| 14 | court did sua sponte. I don't believe that was the result of |
| 16:34 15 | any recent briefing. |
| 16 | THE COURT: I'm happy to accept briefing on it. |
| 17 | I'm just worried that Judge Larsen made, frankly, a |
| 18 | mistake. I think he would have reached the same decision, |
| 19 | and the court has reached the same decision; but you may want |
| 16:35 20 | to protect yourself for appellate purposes. We're certainly |
| 21 | open to briefing and you're certainly able to have that heard |
| 22 | again. |
| 23 | MR. QUINN: I appreciate that, Your Honor. |
| 24 | THE COURT: You have two prongs, otherwise you |
| 16:35 25 | might have a finding resting on one prong and that might be |

UNITED STATES DISTRICT COURT

1    dangerous for appellate purposes, and you're more than

2    welcome to brief it and we can take it up at the Rule 50 or

3    whenever.

4              MR. QUINN:  Thank you.

16:35 5        THE COURT:  Now, Mr. Price, anything else?

6              MR. PRICE:  No, Your Honor.

7              THE COURT:  Mr. Quinn, until tomorrow?

8              MR. QUINN:  Yes.

9              THE COURT:  Who will be with me?  Mr. Quinn?

16:35 10       MR. QUINN:  I will be here.

11             THE COURT:  Mr. Zeller?

12             MR. ZELLER:  Yes.

13             THE COURT:  Okay.  Let's start with Ms. Hurst.

14             MS. HURST:  Your Honor, we'd like to take the

16:35 15  deposition of Michele McShane.  We looked for her throughout

16   the discovery process.

17             The court might recall this is the former in-house

18   counsel at Mattel who was responsible for the investigation

19   in early 2002, had changed her name and disappeared off the

16:35 20  face of the earth and had -- you know, not had a permanent

21   residence.

22             We were able to serve her with a trial subpoena

23   finally --

24             THE COURT:  Concerning the statute of limitations.

16:36 25       MS. HURST:  Correct; and she's acknowledged the

```
 1    subpoena and has indicated that she will appear, and so given

 2    that we would like permission to take her deposition since we

 3    were not able to find her previously.

 4              THE COURT:  I think that's more than reasonable.

 5              Now what else?

 6              MR. ZELLER:  There is a similar --

 7              THE COURT:  Oh, no, no.  Did you notice I was

 8    speaking to MGA?

 9              MR. ZELLER:  Sorry.

10              THE COURT:  Thank you.

11              MS. HURST:  Would it be possible for us to end by

12    1:00 tomorrow?

13              THE COURT:  It depends on how quick we get to the

14    arguments.

15              We spent a long time last Saturday.  That was my

16    fault.  I wanted to listen to Judge Kozinski in your presence

17    again.  That took about two hours.

18              MS. HURST:  The only reason I ask is that the last

19    nonstop flight to San Francisco is at 2:10.

20              So I'll just ask.  If we can, we can; if we can't,

21    we can't.

22              THE COURT:  Would you like to start at

23    7:00 instead?

24              MS. HURST:  That's fine with me.

25              THE COURT:  Hold on for a second.
```

Line timestamps: 16:36 (5), 16:36 (10), 16:36 (15), 16:36 (20), 16:37 (25)

 1          The only person I care about -- although I care for

 2    all of you coequally -- is the court reporter.

 3          MS. HURST:  Yeah.

 4          THE COURT:  So I don't want to inconvenience

16:37 5    Sharon, without asking Sharon.

 6          So if Sharon is willing to -- but, Kathy, that's

 7    not -- that's not an order or anything of that type.  That's

 8    just a very humble question, "how early would she like to

 9    start?"  In fact, ask her that question instead of suggesting

16:37 10   7:00.

 11          Now, while we're waiting, Ms. Keller.

 12          MS. KELLER:  Can we confer?

 13          THE COURT:  Yes.

 14          (Discussion held off the record.)

16:37 15          THE COURT:  Mr. Overland.

 16          MR. OVERLAND:  Your Honor, I just wanted to clarify

 17    something with respect to the discs that we talked about

 18    yesterday.

 19          I went back and looked at the deposition testimony

16:38 20   of Mr. Vargas, and that's at Pages 700, Line 21, to 702,

 21    Line 15.

 22          THE COURT:  Okay.

 23          MR. OVERLAND:  Mr. Vargas is the -- actually, the

 24    only one who was present at the actual search and seizure.

16:38 25          THE COURT:  Mr. Machado would know what was

1    on his desk.

2              MR. OVERLAND:  That's correct, but -- but -- and he

3    could testify to that --

4              THE COURT:  That's right.

16:38  5        MR. OVERLAND:  -- but I'm talking about the

6    contents of the disc and the admissibility of the disc.

7    There's two different things.

8              There's whether there was any documents,

9    hardcopies, and then the disc itself and the contents of that

16:38 10   disc.

11             With respect to the disc, Vargas' testimony was

12   that he saw somebody from the DA's office take a disc, put it

13   in a laptop that he had brought and left the disc in there

14   for about six to seven minutes, and then he took out the disc

16:39 15   and he left it on the side for about -- he wasn't sure, he

16   thought maybe about 15 minutes.  He didn't see -- he didn't

17   watch that disc for the whole time.  And that was the disc

18   that had a signature by Mr. Aguirre, and that disc was the

19   disc that was sent to O'Melveny, and that disc is the disc

16:39 20   that --

21             THE COURT:  Went to Skadden Arps.

22             MR. OVERLAND:  Yes.

23             THE COURT:  -- and then to Mattel and then to the

24   court.

16:39 25        MR. OVERLAND:  Right; and unless we have that

```
 1    officer who downloaded whatever it was from his laptop,

 2    there's really no way to tell what he downloaded onto that

 3    disc.

 4              THE COURT:  Thank you.

16:39 5          MR. McCONVILLE:  Your Honor, so one -- one thing,

 6    Mr. Quinn continues to characterize an e-mail that is

 7    privileged, so, A, we object to that because the court's

 8    found it privileged; but, B, the characterization of the

 9    content of that e-mail is inaccurate, so -- for that -- the

16:40 10  other issue, if we could, is get an estimate as to when

11    Mr. Price believes he can actually conclude his examination.

12              And, second, if we could just figure out who their

13    next handful of witnesses are, and in order, so we can

14    prepare.

16:40 15          THE COURT:  Okay.

16              MR. PRICE:  The best estimate, I would say, is in

17    an hour to an hour and a half, but my team might say less.

18              THE COURT:  All right.

19              An hour and a half to -- or less?

16:40 20          I'm not holding Mr. Price to that.

21              MR. McCONVILLE:  And the order of witnesses,

22    Your Honor, if we could --

23              THE COURT:  Well, not the order but at least

24    generally speaking who -- who would -- we know that we have a

16:40 25  Witness Kuemmerle who is going to be here on Tuesday who it
```

```
 1    was represented to me initially, was in Brazil, nobody could
 2    find her.  But didn't she have the house in New Jersey?
 3             MS. HURST:  Yeah.  But she does have a trip to --
 4    out of the country next week on Thursday, so we would really
16:41  5    like to get her on.
 6             THE COURT:  Well, we'll do our best.
 7             That's up to each of you.
 8             MR. QUINN:  And we would really like to do
 9    Mr. Rosenbaum before --
16:41 10             THE COURT:  Mr. Rosenbaum will be next.
11             MR. QUINN:  He's been waiting around for a couple
12    of days.
13             THE COURT:  Rosenbaum's next.
14             MR. QUINN:  And so we'll do Rosenbaum and then
16:41 15    Kuemmerle.
16             THE COURT:  Okay.  That should resolve the problem,
17    shouldn't it?  Kuemmerle?
18             MS. HURST:  Hopefully.  I don't know how long
19    they're going to take with her.
16:41 20             THE COURT:  Or vice-versa.  So that's not an issue.
21             Kuemmerle will be after Rosenbaum.
22             MR. QUINN:  Tonnu.
23             THE COURT:  Tonnu.
24             MR. McCONVILLE:  We actually filed a motion to
16:41 25    exclude her testimony, Your Honor.
```

```
 1              MR. QUINN:  Which was already denied.

 2              MR. McCONVILLE:  Thank you.

 3              MR. QUINN:  Well, we've got Mr. Marlow.

 4              THE COURT:  Mr. Marlow.

 5              MR. QUINN:  Who has also had some waiting time

 6      here.

 7              THE COURT:  Okay.  Marlow.

 8              MR. QUINN:  Aginsky.

 9              THE COURT:  Okay.

10              MR. QUINN:  Ikin, McComb.

11              THE COURT:  I think that's good enough, isn't it,

12      for Monday, and then we can talk about it?

13              MR. McCONVILLE:  Yeah.

14              THE COURT:  You have a fairly good idea for

15      preparation now on Tuesday or Wednesday.

16              You're not tied to that specific order, except

17      Rosenbaum's next and then Kuemmerle.  Let's get her on the

18      plane --

19              MR. QUINN:  We forgot Machado.  Machado -- I don't

20      know if Machado's coming, but we had tentatively said

21      Machado, Wednesday.  Our view on that is when Machado gets

22      here we'll put him up.  If he gets here on Wednesday, we'll

23      do him Wednesday.

24              THE COURT:  If he's here there won't be a rush

25      because we'll have him for two weeks.  The judge in Mexico
```

Line timestamps: 16:42 (5), 16:42 (10), 16:42 (15), 16:42 (20), 16:43 (25)

```
 1    had given his permission.

 2            The problem again is Mr. Overland informed me again

 3    that --

 4            MR. OVERLAND:  No letter.

16:43  5            THE COURT:  Now, I've sent three letters, haven't

 6    I?

 7            MR. OVERLAND:  Yes.

 8            THE COURT:  Do you want me to send another letter?

 9            MR. OVERLAND:  No.  I would suggest just tracking

16:43 10    the last one to see if it was delivered.

11            THE COURT:  Okay.

12            MR. McCONVILLE:  Can you send the marshals,

13    Your Honor?

14            THE COURT:  Counsel, we'll reconvene because of

16:43 15    Sharon being so gracious at 7:00 tomorrow morning.  Okay?

16            We'll start at 7:00.

17            And would you -- Kathy, would you personally thank

18    Sharon and tell her that that's very gracious of her.

19            Let me stay with MGA for just a moment.

16:43 20            Anything further this evening? because one of you

21    apparently won't be here tomorrow, so --

22            (Pause in the proceedings.)

23            THE COURT:  Do you want air tomorrow?

24            MR. QUINN:  Does it cost extra?

16:44 25            (Laughter.)
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Well, the oxygen does, but the air
 2     doesn't.
 3              I'm just kidding.
 4              (Laughter.)
16:44  5              THE COURT:  Yeah; see if we can get air until
 6     6:00 tomorrow night, just to be safe.
 7              Although I'm not planning on until 6:00, make your
 8     reservation and hopefully we will resolve most of the
 9     arguments.
16:44 10              Anything else on behalf of MGA?
11              MS. KELLER:  No, I can't think of anything,
12     Your Honor.
13              THE COURT:  Okay.  Now let's do this.
14              Finally, I'd really like you to be prepared on the
16:45 15     copyright issues on Tuesday evening, and if I start down the
16     issue of crime fraud and I don't continue to close that door
17     on Mattel, I don't think logistically I will be able to get
18     to that by the time, Mr. Price, that you conclude, because
19     the process and procedure of going through the crime-fraud
16:45 20     process requires the first prong, obviously an in-camera
21     hearing with the attorney involved, et cetera.  So, just
22     logistically I don't see how that really occurs, at least in
23     the time frame.
24              I think that resolves all the issues the court has
16:46 25     this evening.  So we'll see you all tomorrow at
```

CV 04-9049 DOC - 02/18/2011 Volume 3 of 3

```
 1    7:00 with one exception.

 2            I want to publically thank, and on the record, the

 3    outstanding support staff for both sides.  I think for Mattel

 4    and for MGA, you young people have just done absolutely an

16:46 5    incredible job getting documents to the court, and I want

 6    that appreciation by the court to be expressly on the record.

 7    With a case of this magnitude and this many documents and as

 8    complex as it is, I think you've done your very best to get

 9    me the information in a timely fashion.

16:46 10            We are off the record.

11            (Proceedings concluded at 16:46 on 02-18-2011.

12    Next proceedings reported by Sharon Seffens.  Proceedings

13    concluded until Saturday, February 19, 2011, 7:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT