1

2

3

4           UNITED STATES DISTRICT COURT

5           CENTRAL DISTRICT OF CALIFORNIA

6               SOUTHERN DIVISION

7                  - - -

8   THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

10  MATTEL, INC., et al.,
              Plaintiffs,
11    vs.
                              CV-04-9049-DOC
12  MGA ENTERTAINMENT, INC.,
    et al.,                   Volume 1 of 2
13            Defendants.

14  --------------------------

15

16

17       REPORTER'S TRANSCRIPT OF PROCEEDINGS

18            Santa Ana, California

19         Saturday, February 19, 2011

20

21             SHARON A. SEFFENS, RPR
22             United States Courthouse
               411 West 4th Street, Suite 1-1053
23             Santa Ana, CA  92701
               (714) 543-0870
24

25

1   APPEARANCES OF COUNSEL:

2   For Plaintiff MATTEL, INC., ET AL.:

3   JOHN B. QUINN
    MICHAEL T. ZELLER
4   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    865 South Figueroa Street, 10th Floor
5   Los Angeles, CA  90017
    (213) 443-3000

6

7   For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8   ORRICK HERRINGTON & SUTCLIFFE LLP
    4 Park Plaza, Suite 1600
9   Irvine, CA  92614
    (949) 567-6700

10

    ANNETTE HURST
11  ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
12  405 Howard Street
    San Francisco, CA  94105
13  (415) 773-4585

14  KELLER RACKAUCKAS LLP
    JENNIFER L. KELLER
15  18500 Von Karman Avenue, Suite 560
    Irvine, CA
16  (949) 476-8700

17  FOR CARLOS GUSTAVO MACHADO GOMEZ:

18  MARK E. OVERLAND
    100 Wilshire Boulevard, Suite 950
19  Santa Monica, CA  90401
    (310) 459-2830

20

21  ALEXANDER COTE
    SCHEPER KIM AND HARRIS LLP
22  601 West Fifth Street, 12th Floor
    Los Angeles, CA  90071-2025
23  (213) 613-4655

24

25

3

1

2                                    INDEX

3                                                            PAGE

4    JURY INSTRUCTION CONFERENCE                               4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SANTA ANA, CALIFORNIA; SATURDAY, FEBRUARY 19, 2011; 7:35
 2   A.M.
 3             (Jury not present.)
 4             THE COURT:  We are on the record.  Counsel are
 5   present:  Ms. Hurst, Ms. Keller, Mr. McConville,
 6   Mr. Overland, Mr. Quinn, Mr. Zeller.
 7             Who would like to argue the matter first?
 8             MR. QUINN:  It might make sense for Mattel to go
 9   first as the claimant on the trade secrets claim.
10             THE COURT:  All right, Mr. Zeller.
11             MR. ZELLER:  Obviously I am happy to address any
12   issues that the Court believes are best.  Let me start I
13   think with perhaps what we view as some of the highlights of
14   the disputes, perhaps the low lights, what really seem to be
15   the main points of contention over this particular claim.
16             No. 1, we believe that substantial factor
17   causation is what ought to be applied and instructed on
18   here.  This harkens back to the argument we had recently
19   over the conversion claim and the appropriate standard for
20   causation.  Based on the Rutherford case, the Bank of New
21   York case, as well as the BAJI instructions, we believe that
22   that is the proper standard that should be applied to
23   intentional torts, which of course also includes trade
24   secret.  This is from our perspective an important issue.
25             MGA seems to be arguing that basically if Mattel
```

1    would have suffered harm, even regardless of the

2    misappropriation or other intentional conduct of MGA, that

3    it can't recover.  That's clearly not the law in California.

4    For tort claims, intentional tort claims in particular, the

5    substantial factor test subsumes the but for test causation.

6    MGA is very explicitly advocating a but for causation type

7    standard.

8            From our view, that's inconsistent because

9    obviously any number of contributing causes, as long as the

10   defendants' conduct is a substantial factor in causing the

11   harm and bringing about the damage, is sufficient under

12   California law.  In fact, the Court will see that some of

13   the proposed instructions that MGA posits go so far as to

14   ask the jury to determine basically and even attempt to cut

15   off liability by saying, well, if Carter Bryant was a

16   substantial factor in bringing about the harm and damage to

17   Mattel that MGA's liability is cut off.

18           THE COURT:  Just a moment.  Occasionally I am

19   going to stop you because I want to think for a moment.  I

20   am going to stop for just a moment.

21           (Pause in proceedings.)

22           THE COURT:  Please continue.  Thank you.

23           MR. ZELLER:  Further to the causation point, it's

24   quite clear from the Ninth Circuit, as well as the

25   California Supreme Court, that "substantial factor" is

```
 1   defined expansively.  That's the term used by the Ninth
 2   Circuit.  Certainly anything that plays only an
 3   infinitesimal or theoretical part in bringing about the
 4   injury or damage is not a substantial factor, but it is a
 5   broader role of causality than the but for causation
 6   standard advocated by MGA.  We simply think that it's
 7   contrary to the Bank of New York case, the Rutherford case,
 8   as well as the BAJI instructions.
 9          For the record, what I was referring to in
10   particular is kind of the apportionment of responsibility
11   instruction that MGA is positing, what they call No. 406,
12   which is found at page 161 of their proposed jury
13   instructions.  This is the one where it says that if Bryant
14   was a substantial factor in causing harm that basically they
15   have to go and start apportioning that damage, and, that is,
16   No. 1, contrary to the law on substantial factor causation,
17   but, No. 2, it's also contrary to the principles of joint
18   and several liability among defendants.
19          Obviously one defendant can't point to the other
20   and simply say, well, we together acting in concert caused
21   damage, so now the jury needs to apportion between that
22   defendant and us.  If they have some claim against Carter
23   Bryant, that's a separate matter, but that has nothing to do
24   with what this jury should be instructed as to MGA's own
25   liability.  Whether it has a contribution claim or some
```

1    other claim against Carter Bryant is simply not part of

2    these instructions.

3              THE COURT:  Just a moment.

4              (Pause in proceedings.)

5              THE COURT:  Today I am not looking for volume.  If

6    I gave MGA's requested but for instruction, it is your view

7    that I would have to give an apportionment instruction as

8    well?  Take your time with that.  I am not interested in a

9    lot of volume today.  Think that out for a moment.  I don't

10   care if you take an hour.

11             (Plaintiffs' counsel conferring.)

12             MR. ZELLER:  As a reaction to that, Your Honor,

13   Mr. Quinn and I were were wondering -- we are starting to

14   see the connection between those two propositions.

15             THE COURT:  I am going read back to you

16   something -- I don't see the connection between, but --

17   quote, "Obviously one defendant can't point to the other and

18   simply say we together acted in concert and caused damage,

19   so now the jury needs to apportion between that defendant

20   and us."

21             When you made that statement, I immediately

22   thought that the natural and probable consequences of that

23   argument would be a further complication for the jury in

24   terms of an apportionment instruction that if liability was

25   found Carter Bryant was "X" amount and MGA was "X" amount.

1        MR. ZELLER:  I think how I am attempting to frame

2   this up is that the notion of apportionment is actually

3   contrary to two separate principles of law.

4        THE COURT:  I understand that.  Answer my

5   question.  I don't need a lot of volume.

6        Would this cause if I give a but for instruction

7   the Court having to give some type of apportionment

8   instruction?

9        MR. ZELLER:  No.

10       THE COURT:  Okay.  Please continue with your

11  argument.

12       MR. ZELLER:  The point that I am attempting to

13  make on this is that MGA has conflated apportionment,

14  causation, and joint and several liability principles

15  together into one instruction, and it's contrary to all of

16  those.  In particular, it wouldn't make any sense -- in

17  fact, in some ways MGA's own apportionment instruction is

18  intention and contrary to the notion of giving a but for

19  instruction.

20       The reason is this.  If Carter Bryant was in fact

21  a cause of the damage based upon misappropriation, that

22  would appear to exclude under MGA's theory MGA's own

23  liability, but that's not what they are even positing in

24  their apportionment instruction.  That's part of also what I

25  am trying to get across here.  The fact is that if Carter

 1    Bryant was in fact the cause, under a but for instruction,

 2    the way that MGA is attempting to argue it would basically

 3    be telling the jury if Carter Bryant is the person who is

 4    responsible, regardless of MGA's own responsibility as well,

 5    MGA's liability would be cut off.

 6         THE COURT:  Well, I'm going to assume that we are

 7    the jury now, and the jury believes that the substantial

 8    factor that caused this is Carter Bryant and not MGA, that

 9    the jury believes that Carter Bryant did not inform

10    Mr. Larian regardless of his going to work and

11    double-dipping from the juror's perspective the two weeks

12    between October 14 and October 19; that regardless of

13    whatever occurred on September 18, September 1, August, that

14    the jury is back in the jury room and goes through a thought

15    process where they say he is really going to devote

16    200 percent of his effort to MGA, but the contract looks

17    like it's a contract that gives him leeway as an independent

18    contractor.  In some ways, he looks like he is tied to MGA.

19    He has got a ten percent pay raise, but he could do work

20    according to this contract as long as it's not let's say

21    competitive work.

22         Therefore, they sit in the jury room, and they go

23    through a reasoning process where they believe that he has

24    devoted substantial time, but he is not punching a time

25    clock at MGA.  And Mr. Larian has no way of knowing under

```
1   that set of circumstances whether he is there as a normal
2   employee from 8:00 to 5:00, or there four hours a day, or if
3   his schedule varies during that two weeks, and what Carter
4   Bryant is really doing is douple-dipping.
5           He is only getting two weeks from Mattel by lying
6   to them.  He has devoted substantial effort from his
7   perspective to MGA, so in a sense, both entities are being
8   duped.  Mattel is being duped because they have a well-known
9   policy of walking people out the door the very same day if
10  you are working for a competitor, both for good reasons --
11  No. 1, we wouldn't want our secrets to be known from this
12  point forward, and, No. 2, let's demonstrate to our other
13  employees that they ought not go to work for a competitor.
14          On the other hand, everyone has lost track.
15  Certainly Paula Garcia is reporting to him.  Other people
16  are reporting to him, but as far as the actual hours that
17  Carter Bryant is on his duty station at MGA, they are
18  inconsequential.  Just devote 200 percent of your effort to
19  this project.  Do it now because this is your big business
20  break.
21          If I give substantial factor taking your position,
22  how do I avoid jury confusion if the jury believes that the
23  substantial factor has nothing to do with MGA, that they
24  flip that reasoning around and say, you know, the
25  substantial factor in this whole thing was Carter Bryant?
```

1           MR. ZELLER:  There's a lot packed in there.  No. 1

2      is that being -- the fact of Carter Bryant being a

3      substantial factor if that's what the jury were to determine

4      does not excludes MGA from also being a substantial factor.

5           THE COURT:  Let's freeze that thought for a

6      moment.  In giving a substantial factor analysis, how do I

7      avoid that confusion?  In other words, right now the

8      substantial factor test is really focused and directed

9      towards MGA.  They are the people being sued and Mr. Larian.

10     How do I make certain there is no confusion if the jury

11     starts saying substantial factor?  Carter Bryant is the

12     substantial factor.  How do we as the jury deal with that?

13          You see, that's what the but for in some way

14     remedies.  By the same token, I'm not certain it does.  So I

15     want to come back to that point.  If I give substantial

16     factor, how do I avoid confusion?

17          MR. ZELLER:  I think that the confusion is avoided

18     because the element that the Court is calling out as part of

19     this reasoning process of what the jury might think -- or at

20     least one avenue of jury thinking is is through the element

21     of improper means, because if MGA -- let's just make it

22     specific to Mr. Larian for a moment.  If he is the

23     individual defendant the jury were to conclude did not know,

24     didn't have reason to know --

25          THE COURT:  Here is what I am hearing your answer

1    is.  Judge, you shouldn't be concerned because the

2    substantial factor test would obviously apply to MGA and to

3    Larian.  They are the people being sued.

4              MR. ZELLER:  Correct.  That's one --

5              THE COURT:  So your scenario isn't going to get --

6              MR. ZELLER:  The scenario you are painting would

7    mean that as to a defendant who is found not to have reason

8    to know or to know that Mr. Bryant was improperly bringing

9    trade secrets to them would simply be there is no liability.

10   It's not an apportionment issue.  It's not a causation

11   issue.  It's just simply that kind of claim would fail to

12   meet an essential element.  So I think the Court's concern

13   is addressed by the other instructions, specifically on

14   improper means of acquiring trade secret.

15             In fact, the very scenario the Court is painting

16   also is exactly why the but for causation test should not be

17   given.  What that would mean is that -- if the jury

18   concluded that in fact Isaac Larian and MGA knew that Carter

19   Bryant was bringing to them Mattel trade secrets that they

20   could just -- MGA could hypothetically avoid liability by

21   the jury concluding or MGA arguing and the jury agreeing

22   that, well -- you know, that MGA was not really the but for

23   cause, but, rather, it was Carter Bryant doing this.  That

24   would actually virtually eliminate trade secret liability.

25             THE COURT:  If I gave the substantial factor test,

1    should I be consistent with every tort?

2              MR. ZELLER:  Yes.

3              THE COURT:  Why?

4              MR. ZELLER:  Because it is the same test that's

5    applied.  I mean, the Courts are very clear, and -- like the

6    Rutherford case, the Bank of New York case, where they talk

7    about -- particularly intentionally torts under California

8    law, which includes of course as we talked about recently

9    conversion.  It includes --

10             THE COURT:  With each tort, should I repeat the

11   substantial factor test, or is your position that that's

12   redundant, because you have taken the position before with

13   MGA that their redundancy instructions are prejudicial.

14   Here a generalized instruction could cause some confusion.

15   So should I be redundant with the substantial factor test as

16   to each tort?

17             MR. ZELLER:  Well, no, I don't think those are the

18   options.  I think that there should be a general substantial

19   factor explanation.  I think in terms of the context of

20   trade secret misappropriation the Court can simply refer to

21   the fact that "substantial factor" has been defined and then

22   include any special considerations for trade secret.

23             THE COURT:  Let me track back.  I would have one

24   instruction concerning substantial factor, and then I would

25   include the torts by name so there is no confusion?

```
 1            MR. ZELLER:  Right.

 2            THE COURT:  Please continue.

 3            MR. ZELLER:  I think that would help avoid

 4   repetition and undue emphasis.  I'm sure as the Court knows

 5   the Courts have been very clear about the fact that -- the

 6   "substantial factor" test is just defined expansively.  They

 7   really don't give a lot of guidance as to the contents of

 8   that other than, well, it needs to be more than an

 9   infinitesimal or trivial contribution to the damage.  The

10   Courts have actually gone out of their way to say generally

11   speaking in jury instructions we don't give a lot of content

12   to that.

13            THE COURT:  Okay.

14            MR. ZELLER:  Another issue -- this goes to MGA's

15   definition of the elements of trade secret is that they have

16   actually added in as a purported element something that we

17   don't believe should be instructed on at all, and that is

18   that it is required for trade secret misappropriation that

19   the plaintiff give a particularized identification of the

20   trade secrets.  That's a procedural requirement.  It's not a

21   substantive one.  That's not in the standard instructions.

22   It's just clearly cause confusion and undue prejudice.  I

23   mean, the fact is that ideas, concepts, and the like are

24   absolutely protectable as trade secrets.  To have the jury

25   try to define what needs to be sufficiently particularized
```

 1   as to whether it can therefore stand as a trade secret is

 2   really just -- is misguided.

 3             THE COURT:  Just a moment.

 4             (Pause in proceedings.)

 5             THE COURT:  Judge Larson had the case.  There was

 6   a very interesting discussion between Judge Larson and

 7   counsel.  Counsel from MGA was complaining that there was no

 8   particularization of the trade secret claims, and the quote

 9   from MGA's counsel was, "Judge, we are going to see you in

10   three years."  Judge Larson's response was basically, "No,

11   you won't."  And here we are four years later.

12             The same question I posed to counsel, Mr. Quinn,

13   earlier was as follows:  You have to show me how damages can

14   be broken down into what I call boxes, so that if this Court

15   is incorrect, the Circuit can remedy this Court if it finds

16   that the basic decision by the jurors is appropriate without

17   attacking the heart of the case.

18             I have to make it so easy for the Circuit to point

19   out my faults as a trial judge in the decisions I'm making

20   so that the core case if it's a viable case as far as the

21   Circuit -- and maybe to the Supreme Court -- can withstand

22   -- they can simply say, Judge Carter, this portion, this

23   portion, is coming back to you on the trade secrets.

24             Why wouldn't I take MGA's position that trade

25   secrets fall with the same rubric, that I should make it so

```
 1    easy for the Ninth Circuit to uphold or correct me in this
 2    requirement?  Also, why wouldn't MGA be put on notice as to
 3    what these trade secrets are?
 4              MR. ZELLER:  Being put on notice -- we agree with
 5    that.
 6              THE COURT:  Answer the question.
 7              MR. ZELLER:  I think I am.  I apologize.
 8              THE COURT:  No, you aren't.
 9              MR. ZELLER:  Giving MGA notice is not the same
10    thing as saying it is an essential element of a trade secret
11    claim that the jury has to find that it's sufficiently
12    particularizely stated under the code.  The code states a
13    procedural requirement to give notice as the Court is noting
14    to a defendant as to what is the trade secret.
15              THE COURT:  Here's what I am hearing, and I mean
16    to be as polite as possible.  You are going to resist that.
17    You really don't want -- and I am not finding fault with
18    that -- the Court to define what the trade secrets are.
19              MR. ZELLER:  No, we agree with that.  We
20    absolutely agree with that --
21              THE COURT:  Step over and show me these
22    instructions now.  The record is to reflect that we have set
23    out all the instructions on the table.
24              I want you now to show me the particularity --
25              MR. ZELLER:  Judge, it's not in the jury
```

1    instructions.  It's in the verdict form that we would

2    submit, and it would be based upon the trade secret

3    charge that the Court --

4              THE COURT:  I'm not dealing with mysticism

5    anymore.

6              MR. ZELLER:  No, it's not mysticism.

7              THE COURT:  Where is the difference in these

8    instructions between the parties so we deal with concrete?

9    I remind both counsel we are light years ahead of you

10   believe it or not in term of our research, and I don't mean

11   that to denigrate you in any way, but this is your one

12   chance to --

13             MR. ZELLER:  These are the instructions on trade

14   secret defined.  MGA includes as an extra element No. 2,

15   that the trade secret has been defined or identified with

16   particularity.  That's not an element of trade secret

17   misappropriation.

18             THE COURT:  As the courtesy to the Circuit, I'm

19   going to read in this instruction.  The difference is as

20   follows.  MGA proposes it to read:  "To prove that

21   information is a trade secret, the plaintiff must prove all

22   of the following:

23             "1.  That the information was secret."

24             There is no disagreement in that element no matter

25   how it's phrased?

```
1              MR. ZELLER:  Correct.

2              MR. HURST:  Correct.

3              THE COURT:  "2.  That the claimant has identified

4     its alleged trade secrets with reasonable particularity."

5              And there's the substantial between the two.

6              MR. HURST:  Correct.

7              MR. ZELLER:  Correct.

8              THE COURT:  "3.  That the information had actual

9     or potential independent economic value because it was a

10    secret."

11             No disagreement.  Substantially those are the

12    words.

13             MR. ZELLER:  Correct.

14             MR. HURST:  Correct.

15             THE COURT:  "4.  That the claimant made reasonable

16    efforts to keep the information secret."

17             No substantial agreement.

18             MR. HURST:  Correct.

19             MR. ZELLER:  Correct.

20             THE COURT:  Just in the wording, which might take

21    us years to work out -- I'm just kidding you.  With no

22    denigration to Mr. Machado, it somewhat matches up, except

23    Mr. Machado who is part of the party seems not to add the

24    element that MGA is requesting.

25             MR. HURST:  I believe Mr. Machado's counsel joins
```

```
 1    in our request that the trade secrets have to be identified

 2    with reasonable particularity.

 3              MR. OVERLAND:  Yes.

 4              THE COURT:  Mr. Machado's counsel initially

 5    submitted but has reconsidered.  The initial instruction

 6    from Mr. Machado was:

 7              "To prove that information is a trade secret, its

 8    owner must prove all of the following:

 9              "1.  As to each alleged trade secret that the

10    information was secret;

11              "2.  As to each alleged trade secret that the

12    information had actual or potential independent economic

13    value because it was a secret; and

14              "3.  As to each alleged trade secret that its

15    owner made reasonable efforts to keep the information

16    secret."

17              Mr. Machado's counsel would now like to add the

18    element that MGA describes to and, that is:

19              "That the claimant has identified its alleged

20    trade secrets with reasonable particularity."

21              Is that correct, Mr. Overland?

22              MR. OVERLAND:  Yes, Your Honor.

23              THE COURT:  Show me once again the but for -- the

24    substantial instruction.

25              MR. ZELLER:  We are referring to the parties'
```

1    proposed instructions, "Misappropriation of Trade Secrets –

2    Essential Factual Elements."  The difference is that Mattel

3    has proposed Element 5, which states:

4              "MGA's, MGA Mexico's, Mr. Larian's and/or

5    Machado's acquisition, use, or disclosure of the trade

6    secret was a substantial factor in causing the harm or the

7    unjust enrichment."

8              MGA has proposed under the same heading in Element

9    No. 6, which states that:

10             "The claimant's harm or the unjust enrichment of

11   the defendant would not have occurred in the absence of the

12   defendant's misappropriation of trade secrets."

13             MR. HURST:  Just to make clear for the record, as

14   we said on the prior argument on substantial factor, we

15   would be satisfied with the use of the "substantial factor"

16   language if we also used a separately drafted instruction,

17   Casey 430, with the bracketed language defining "substantial

18   factor" as "but for causation."

19             THE COURT:  And, Mr. Overland, on behalf of

20   Mr. Machado.

21             MR. OVERLAND:  Mr. Machado has an additional

22   objection, and, that is, under the facts of this case,

23   Mattel's instruction that the damages flow from

24   Mr. Machado's mere acquistion of any purported trade secrets

25   is not applicable, because under the facts of this case,

1    mere acquisition cannot give rise to any damages.

2           MR. HURST:  We join in that objection.

3           THE COURT:  Mr. Zeller, if you would like to

4    continue.

5           MR. ZELLER:  To simply close out the point, Your

6    Honor, we believe that it is a mistake to include the

7    "reasonable particularity" language as an element for a

8    trade secret claim because, No. 1, it's not an essential

9    element.  It's quite clear from the model instructions, as

10   well as the fact that there is no authority holding that it

11   is an essential element.  No. 2, it's quite clearly a

12   procedural requirement under California law.  It's not a

13   substantive one.  It certainly would be, No. 3, confusing to

14   the jury to be sent to -- for them to try and define what

15   even that means, and there is no further guidance, by the

16   way, given in MGA's proposed instruction.

17          Quite clearly this is a -- it is a procedure that

18   has been imposed by California law in order to guide

19   discovery.  To then try and shoehorn it into what a jury

20   must determine really exceeds its purpose, is unsupported,

21   and frankly something that the Court needs to determine as

22   to whether or not that procedural requirement has ever been

23   satisfied.

24          THE COURT:  Let me stop you just a moment.

25          Mr. Quinn, do you agree so far?  You have been the

1    trial counsel --

2           MR. QUINN:  I do agree, Your Honor.  What the

3    statute says in California is prior to commencing discovery

4    the parties shall identity its trade secrets with reasonable

5    particularity.  It's not a substantive element of the claim.

6           (Pause in proceedings.)

7           THE COURT:  Assuming the Court felt that you had

8    not prior to commencing discovery identified your trade

9    secret claims with particularity and we have now gotten to

10   the point of jury instructions, what remedy does the Court

11   have?

12          MR. ZELLER:  I don't think that the remedy flows

13   from the statute.  I think the remedy would simply be that

14   -- to the extent someone defines their trade secret in such

15   a way that it is overbroad, it's self-punishing.  The fact

16   is that a plaintiff would not be able to show that that

17   trade secret has been kept secret.

18          (Pause in proceedings.)

19          THE COURT:  My question back to you is how is that

20   self-punishing?  It seems quite the opposite, that by --

21   first of all, with no aspersions concerning the prior Court,

22   if the trade secrets were not defined prior to discovery

23   with particularity, it seems to me that that benefit of

24   nondefinition falls to Mattel, that the end result is by not

25   identify with particularity and then stating that the

```
 1    particularity is not a substantial element of the claim --
 2    while I may agree with you legally, this Court may find
 3    itself in the position of nondefined -- I'm not saying I
 4    do -- nondefined trade secret claims at the beginning, and
 5    because of that mistake, we now end up with a chance for
 6    breadth and nondefinition to strike at the very heart of
 7    this Court's concern for appellate review.
 8              I want you to take your time with that because it
 9    also is going to flow over into our discussion concerning
10    damages.  All of this is going tie together believe it or
11    not.  So you take your time with Mr. Quinn.  I'm not looking
12    for volume today.  I'm not snowed by the avalanche by either
13    side.  You think about that very carefully.  Talk for just a
14    moment, so I'm comfortable you have had a discussion, even
15    if you just say hello to each other.  Each of you are going
16    to live with this for a long time.
17              (Plaintiff's counsel conferring.)
18              THE COURT:  Mr. Quinn.
19              MR. QUINN:  Your Honor, the origins of the
20    requirement that prior to the commencement of discovery
21    trade secrets be identified with reasonable particularity --
22    the origin of that is in a perceived abuse that a trade
23    secret plaintiff would not identity trade secrets or be very
24    vague about it and then get discovery into the defendant's
25    files and say that's our trade secret, that was thought to
```

```
 1    be unfair.  That's the history of that.  So the idea is we
 2    are going to make the plaintiff identify with reasonable
 3    particularity what their trade secrets are before they get
 4    assess to the defendant's files so that they can't then say
 5    this is what we were talking about about.
 6              We really don't have -- this is not that type of
 7    situation.  This is not a situation where there is an issue
 8    of software code, or some type of formula, or some type of
 9    computer device where there was ever any potential that the
10    plaintiff was going to discover in the defendants' files
11    something that it would then claim --
12              THE COURT:  Where would I find that history?  In
13    other words, what would I -- first of all, I accept that
14    argument.  I accept your ethics.
15              Where do I go back and find that so I can quote
16    that fact to the Circuit and the Supreme Court if I take
17    that position?
18              MR. QUINN:  I'm sure we can get that for you in
19    the legislative history in the California version of the
20    Uniform Trade Secrets Act.  I'm sure we can pull that for
21    you.
22              THE COURT:  If you would, just pull it for me.
23    You don't need to reprint even, and I have got time to look
24    at that.
25              MR. QUINN:  Right.
```

1           THE COURT:  In other words, if this Court is

2   making a mistake, I want the Court to understand the mistake

3   that I have made, and I want the Circuit to know that at

4   least considered we have it, and I am just wrong.  That way

5   it makes it very easy.  I'm going to come back again to that

6   one essential element, so you are going to get me that

7   information for me.

8           MR. QUINN:  We will.  Absolutely, Your Honor.

9           THE COURT:  My greatest concern, though, is that

10  -- not my greatest concern -- a concern is that if I take

11  that position and the Circuit disagreed based upon this

12  record that the Circuit would be concerned enough to

13  overturn the entire case because the trade secrets weren't

14  defined, in other words, attack the heart of this case.

15  That of course has been my concern about damages.

16           Is there a remedy for my concern?

17           MR. QUINN:  I think the Court can take some

18  comfort from the fact that there is no case certainly that I

19  am aware of that says this reasonable particularity

20  requirement that has its origins in what I described is an

21  element of the claim.  That would be my first response.

22           The second response is I think we can address this

23  as the Court has suggested in the verdict form.  Actually we

24  have in preparation a verdict form which identifies in

25  buckets the claimed trade secrets as previously identified

1   to the Court two or three weeks ago.

2              THE COURT:  Just a moment.

3              (Pause in proceedings.)

4              THE COURT:  Take your time.  It's laborious.  I

5   want you to go down those buckets for me in your special

6   verdict form.  Of course my question is then going to be on

7   appeal appellate counsel raises the issue that the jury

8   wasn't properly instructed because a special verdict form is

9   not part of the proper instructions that the jury relies

10  upon.  That's the argument you are always going to hear,  so

11  I tend not to rely on a special verdict form.  Therefore, I

12  wonder if we are able to do that in buckets as I have

13  suggested why wouldn't I appropriately instruct in the body

14  of the instructions?

15             Ms. Hurst, I know you're anxious to speak.  Just

16  be patient.  This is not a volume day.

17             MR. HURST:  I totally understand.

18             THE COURT:  I'm not interested in the avalanche.

19             MS. HURST:  May I go to the restroom while they

20  are looking for that?

21             THE COURT:  Certainly.

22             (Recess.)

23             THE COURT:  Mr. Quinn.

24             MR. QUINN:  Your Honor, I have some authority on

25  that earlier point about the origins of this identification

1   with reasonable particularity.

2          THE COURT:  And the authority is?

3          MR. QUINN:  Perlam Theraputics versus Superior

4   Court, 178 Cal.App.4 1333.  The Court there discusses the

5   purpose of the prediscovery trade secret identification.

6   The Court will see that discussion.  We were also looking

7   into the legislative history, the actual minutes or bills or

8   testimony from the California Legislature.

9          THE COURT:  I now I will refer each of you back to

10  a case coming from Judge Sneed.  It's a Ninth Circuit Court

11  of Appeals case called IMAX Corporation versus Cinema

12  Technologies.  The Court in the discussion states:

13         "Summary judgment on IMAX's trade secret claim.

14  The heart of IMAX's appeal is the proprietary of the

15  District Court's ruling that the failure of IMAX to identify

16  the precise numerical dimensions and tolerances of its

17  projector of which its trade secrets consist defeats the

18  trade secrets claim.  IMAX's various assignments of error

19  presuppose a ruling that it not need not identify the

20  precise numerical dimensions and tolerances of its projector

21  in its interrogatory responses.

22         "First, did IMAX identify the numerical dimensions

23  and tolerances as trade secrets with sufficient

24  particularity?

25         "IMAX first contends that it identified in its

```
1    fourth supplemental response the precise numerical

2    dimensions and tolerances as trade secrets with sufficient

3    particularity.  We disagree.

4              "A plaintiff seeking relief for misappropriation

5    of trade secrets must identify the trade secrets and carry

6    the burden of showing that they exist.  A plaintiff should

7    describe the subject matter of the trade secret with

8    sufficient particularity to separate it from matters of

9    general knowledge in the trade or of special knowledge of

10   those persons skilled in the trade."

11             Then it goes on to define California law.  It

12   defines a "trade secret" as follows.

13             Judge Sneed goes on to write the majority.

14             "The District Court properly applied Federal Rule

15   of Civil Procedure 56."

16             Remember of course this was a summary judgment

17   matter.

18             "IMAX argues that the District Court failed to

19   consider all of the evidence that it was required to

20   consider under Federal Rule of Civil Procedure 56(c) and

21   failed to draw all reasonable inferences in its favor.  For

22   example, IMAX argues that the District Court improperly

23   ignored the Polinsky report, the Gere report, the Shaw

24   deposition, and the Kerr deposition, all of which allegedly

25   demonstrated that the dimensions of tolerances of various
```

```
 1   parts of the IMAX projector were in fact in the public
 2   domain.
 3           "We rejected this contention however.  Therefore,
 4   the District Court properly excluded such evidence due to
 5   IMAX's failure to allege trade secrets in the precise
 6   numerical dimensions and tolerances with sufficient
 7   particularity."
 8           Let me stop there for a moment.
 9           I want to assume for a moment hypothetically that
10   the trade secret claims were not defined with particularity
11   at the summary judgment phase before Judge Larson, and that
12   those trade secret claims passes passed through, which is
13   why I have the question and why I have been so concerned,
14   and, that is, what position is this Court in?
15           First, if the Circuit looked back and found that
16   these were not particularized claims regardless, then the
17   Circuit would strike I would think at the very heart of this
18   case finding that the Court's reasoning in perpetuating a
19   nonparticularized claim is potentially fatal.
20           Second, if the Court takes it upon itself to do
21   what might have been done before and, that is, to put these
22   into buckets as Mr. Quinn has stated, if there is a defect,
23   it's been cured by this Court's buckets, if you will.  So
24   the Circuit then can look back and find what's appropriate
25   and not, which in a sense rescues the overall findings and
```

1    doesn't cause in this Court's humble opinion a third trial.

2    That's why damages tie together with this idea of what are

3    the trade secrets?

4           If we do have buckets of trade secrets, the third

5    and final question is why aren't I instructing on those in

6    the body of the instructions?  Why am I simply leaving these

7    to the special verdict forms?

8           Now, Mr. Zeller, you have no idea how long the

9    Court has spent thinking about that.  Whether right or

10   wrong, these are not idle questions that I am proposing to

11   you.  I have been saying this informally to Mr. Quinn since

12   probably the second Saturday we spent together along with

13   counsel.

14          Take your time with this, Mr. Quinn, or,

15   Mr. Zeller, either one or both gentlemen.  It doesn't

16   matter.  Don't worry about the time.  Don't worry about

17   volume.

18          (Plaintiff's counsel conferring.)

19          THE COURT:  Remember also, Mr. Quinn, it's to

20   Mattel's benefit also because --

21          MR. QUINN:  We understand that.

22          THE COURT:  It does two things potentially.

23   Obviously I want the broadest amount of issues to go to the

24   jury and not curtail cases needlessly.  By the same token, I

25   want the Circuit to be able to reverse this Court so easily

1    and quickly if I am making a mistake.  So really take your

2    time and look at your buckets once again if you have to.

3            MR. QUINN:  Your Honor, we can respond on the

4    issue raised by the IMAX case if the Court wishes.  There is

5    authority on this proposition.

6            To the extent that the Court is concerned about

7    does it have to advert to or identify trade secrets in the

8    jury instructions as opposed to the verdict form or both --

9    let's suppose this was a real simple -- a much simpler case

10   where you had just had a very specific trade secret or

11   two --

12           THE COURT:  I'm going to joke with you.  It could

13   have been.

14           MR. QUINN:  -- I wouldn't think that the jury

15   instructions, which of course are the instructions of law

16   that set forth the elements and the law that is going to

17   guide the jury's deliberations and decision, need in

18   itself in any trade secret case sort of recite what the

19   claimed trade secrets are.  That's a factual matter.  The

20   jurors have heard that evidence.

21           I think it is useful in the jury instructions to

22   sort of give them a bunch of boxes where the claimed trade

23   secrets that are going to go to the jury are identified, and

24   they make decisions based on that, but I don't see reciting

25   those factual -- that evidence in the instructions.

1          In terms of the buckets, in response to the

2     Court's February 1, 2011, order, we filed at Docket 9829 a

3     very lengthy exposition of what we contend are those

4     buckets, if you will.

5          THE COURT:  Why don't you go down them.

6          MR. QUINN:  All right.

7          THE COURT:  I want it on the record because I know

8     all those associates and lead counsel have been very busy,

9     and I don't have a photographic memory.  I got it, but I'm

10    not sure if I fell asleep reading it.

11         MR. QUINN:  I'm sure you did.

12         THE COURT:  I read it, but I just don't recall the

13    buckets with particularity.

14         So Bucket 1.

15         MR. QUINN:  Bucket 1 is a shorthand -- it's

16    identified in shorthand fashion in the filing as the Bratz

17    concept.  That's defined to consist of the following, and I

18    am quoting now:  "A multi-ethnic group of hip, urban, edgy,

19    trendy teenage girls' fashion dolls and accessories,

20    collectively known as Bratz, including designs for large

21    oversized heads and feet, large eyes, large lips, small

22    almost nonexistent noses and small bodies.  The dolls are

23    four high school multi-ethnic friends with attitude.  Each

24    have distinctive names, nicknames, fashions, personalities,

25    fact stories, and icons descriptive of the dolls personal

1    mascot."

2           THE COURT:  The first generation of the dolls?

3           MR. QUINN:  Yes, that's really the concept that he

4    came with.  That's Bucket 1.

5           Bucket 2 is variation on Bucket 1.  In fact, it's

6    the same, except it does not include the word "Bratz."

7    Otherwise it's the same.

8           THE COURT:  I am going to stop you for just a

9    moment so I understand that bucket.

10          Does Bucket 2 simply add accessories?

11          MR. QUINN:  No.

12          THE COURT:  Does it add what I am going to call

13   derivative -- other generational dolls -- besides the first

14   generation of four dolls, does it add the other two dolls

15   that I found for jury consideration of the copyright claim?

16          MR. QUINN:  It doesn't add anything to the first

17   bucket.  It really deletes only the word "Bratz," so the

18   only difference --

19          THE COURT:  So give me an example of a doll.

20          MR. QUINN:  Every one of the teenage fashion dolls

21   that meet this description, certainly any Jade, any Cloe,

22   any Meygan, any Nevra --

23          THE COURT:  Sasha?

24          MR. QUINN:  Sasha, yes.

25          THE COURT:  Hallidae?

```
 1              MR. QUINN:  Your Honor --

 2              THE COURT:  In other words, I want to know what

 3    the jury believes they are deciding.

 4              (Plaintiff's counsel conferring.)

 5              MR. QUINN:  Your Honor, what we have described in

 6    both these buckets is a concept which would capture the core

 7    Bratz fashion dolls of any generation, not just first

 8    generation.

 9              THE COURT:  Repeat back to me then -- I took the

10    first bucket to be the first generational dolls, the four

11    dolls.

12              You believe that that first bucket is the Bratz

13    concept?

14              MR. QUINN:  As we described it, yes.

15              THE COURT:  As it's described, I would read that

16    as the first generation dolls, but let's go on.

17              The next bucket doesn't use "Bratz."  It simply is

18    multi-ethnic fashion dolls and accessories, and I would view

19    that as a very large bucket, all of the dolls that have any

20    relationship however I define that to the Bratz concept.  I

21    don't understand the difference between the two buckets.

22              MR. QUINN:  The reason there isn't the word

23    "Bratz" in the second bucket is if there is a determination

24    made that that is not a protectable element, we have an

25    alternative bucket that does not include that word for that
```

1    reason.

2              THE COURT:  Now, just a moment.  So Bratz is not a

3    protectable -- is that what you saying?

4              MR. QUINN:  If it were determined that the word

5    "Bratz" is not a protectable element --

6              THE COURT:  Just a moment.

7              (Pause in proceedings.)

8              THE COURT:  How does a jury make a determination

9    of what the damages should be when on one side of the ledger

10   and most favorable to Mattel we could go down yearly

11   accountings, and we see the name Bratz?  On the other

12   hand -- we will get to sculpts in just a moment, but it's

13   clear from MGA's perspective that there is a substantial

14   reduction for later generation of sculpts that don't have

15   the same unique characteristics.  The Circuit has already

16   found that there are many nonprotectable let's say features,

17   which is the wrong word, and I'm bound by that.  You are

18   going to have to find unique protectable elements.

19              Let me try to inartfully say this again.  Is the

20   jury to be shown from your perspective -- well, I know this

21   is not your perspective -- literally every doll in the doll

22   category to make a determination of whether damages should

23   flow, or do you believe that it's sufficient that you simply

24   present documentation that bears the name "Bratz"?  In other

25   words, I don't know how the jury decides this issue.  I

```
 1    would think Mattel's position -- once the name "Bratz" is
 2    mentioned in a document, once revenues flow from that,
 3    you're position is going to very broad.  We should get all
 4    the damages on the issue of trade secret misappropriation.
 5            I would think that MGA if the jury finds liability
 6    is going to take the position, for instance, with the
 7    sculpts, let alone dolls, that there are just some that
 8    couldn't possibly fit the original sculpt, which is why we
 9    went through the itty-bitty babies the other day.  In other
10    words, how is the jury going to make that determination?
11            MR. QUINN:  Your Honor, these descriptions do not
12    pick up itty-bitty babies.  As described, these are the
13    teenage core fashion dolls.
14            THE COURT:  I understand that.  The evidence -- we
15    are not far along.
16            Is your damage's expert going to point that out to
17    us?
18            MR. QUINN:  Exactly.
19            THE COURT:  Is that what I am missing right now?
20            MR. QUINN:  Yes.  He will pick up and he has
21    identified and isolated revenue and profits from all the
22    so-called -- for a shorthand term "core fashion dolls."
23            THE COURT:  Let me do this.  Are you then going to
24    match up those core fashion dolls to those yearly revenue
25    report documents that he can link to the core fashion dolls?
```

1          MR. QUINN:  That's what he has done, yes.

2          THE COURT:  That's the part I'm missing.  That's

3    why I needed that Daubert earlier rather than later.

4          MR. QUINN:  Right.

5          THE COURT:  What happens with MGA from your

6    perspective?  Do we have duling experts where their expert

7    comes back and says this category of bouncing beanie baby

8    doll doesn't fit, is the jury then to be shown these two

9    dolls and make an independent comparison, or is the jury in

10   the position of simply relying upon experts?  Am I going to

11   have a situation where the expert testifies the doll comes

12   up on behalf of Mattel, and then MGA's expert testifies as

13   to what they believe is the nonrelated doll, and it's put up

14   in front of jury?  How is that going to look?

15         MR. QUINN:  I assume that they can cross-examine

16   our expert.  If they disagree -- again, using the shorthand

17   "core teen fashion dolls," if they disagree with what he has

18   included in that bucket, they will cross him on it

19         THE COURT:  Let me restate that back.  So,

20   therefore, there might be a substantial amount of agreement,

21   and the jury may assume that unless MGA contradicts your

22   expert that these are damages that the should consider.

23   That's one way of looking at it, or it might be that MGA

24   decides that they are contesting everything, because

25   remember the Court also has found that there is four plus

1   two -- the first generation plus two.  So I would think

2   based upon the Court's decision concerning copyright that

3   they would feel that there is a certain symmetry, and that

4   they would virtually believe that every single doll but for

5   the first six should not properly be considered, and I think

6   we started with 44 dolls.

7           MR. QUINN:  We filed a brief on Monday of this

8   week, Your Honor, addressing that issue, as to why trade

9   secret protection is broader than copyright protection.

10          THE COURT:  I read that.

11          MR. QUINN:  Basically, our view is Carter Bryant

12  brought to MGA a complete concept for a doll line.  That was

13  embodied in these core fashion dolls.  Later the names --

14  they added some friends for the original four -- Nevra,

15  Meygan, the others -- but that original concept, those

16  fashion dolls are in this bucket of every generation because

17  there all embody and are derived from that concept, a fully

18  formed doll line concept which he brought to them.

19          THE COURT:  Bucket No. 3.

20          MR. QUINN:  Bucket No. 3 is the Bratz name.  It's

21  very simply, used in connection with a line of fashion dolls

22  and related accessories and products.

23          THE COURT:  Bucket No. 4.

24          MR. QUINN:  The name Jade used in connection with

25  a line of fashion dolls and related accessories and

```
 1    products.
 2            THE COURT:  Bucket No. 5.
 3            MR. QUINN:  Bucket No. 5 is the Bratz doll Trial
 4    Exhibit 1136-A.
 5            THE COURT:  Bucket No. 6.
 6            MR. QUINN:  Bratz sculpt Trial Exhibit 1141.
 7            THE COURT:  No. 7.
 8            MR. QUINN:  Bratz hero shot Trial Exhibit 302B-1.
 9            THE COURT:  Bucket No. 8.
10            MR. QUINN:  A large collection of Bratz drawings.
11    There is a list here of Bratz drawings.  Basically they are
12    all of the drawings that Carter Bryant created.
13            THE COURT:  Is that 302?
14            MR. QUINN:  302 is included, but it's a very long
15    list.  I am looking at the list that's on -- it would be our
16    filing Docket No. 9829, page one, footnote 5.  It lists
17    Carter Bryant drawings.  Probably I think 50 of them.
18            THE COURT:  No. 9.
19            MR. QUINN:  That's all the Bratz trade secrets.
20    Then we would go to the --
21            THE COURT:  Just a moment.
22            (Pause in proceedings.)
23            THE COURT:  Now, next.
24            MR. QUINN:  Next we go to the Mexico and Castilla.
25    These are the non-Bratz trade secrets.
```

```
 1            THE COURT:  Bucket No. 1 or 9?

 2            MR. ZELLER:  That bucket is basically defined

 3   by -- we will call it 9 because these are the non-Bratz

 4   trade secrets.  That's the bucket.

 5            THE COURT:  Then what is included in that

 6   bucket -- Mr. Overland is going to object in just a moment.

 7   In other words, that might not be what he is looking for.

 8            MR. ZELLER:  Right.  Then within the heading of

 9   that bucket -- we have defined the trade secrets within that

10   bucket by reference to the specific documents.

11            THE COURT:  Okay.  Just a moment.  I want to go

12   over those documents now.  What are they?

13            MR. ZELLER:  The listing runs --

14            THE COURT:  I have got lots of time.  We're going

15   down now them specifically because that will also help me

16   you understand tie back into this issue concerning the disk,

17   so we will do the hard work right now.

18            MR. ZELLER:  For the record, I'm referring to our

19   filing --

20            THE COURT:  I have got your filing.  Believe me, I

21   actually read it.  I just couldn't memorize it.  Go down

22   this list with me now.

23            MR. ZELLER:  Trial Exhibit 7072.

24            THE COURT:  Define it.

25            MR. ZELLER:  It's analysis by Mattel of the large
```

```
 1    dolls market in Mexico in 2003.  It includes forward-looking

 2    projections.

 3              THE COURT:  Okay.

 4              MR. ZELLER:  And discusses characteristics of

 5    successful large dolls.

 6              THE COURT:  Thank you.  This is all in Category 9?

 7              MR. ZELLER:  Yes.

 8              THE COURT:  Next.

 9              MR. ZELLER:  7073, which is a further analysis of

10    the large dolls market.

11              THE COURT:  What year?

12              MR. ZELLER:  For 2003.

13              THE COURT:  Is the prior for 2003?

14              MR. ZELLER:  Correct.

15              THE COURT:  That's a good enough description.

16              What's the next?

17              MR. ZELLER:  7074 and 8148.  It is a comparison by

18    Mattel of MyScene's sales, product line planning, and

19    forecasting information in 2003 as well as 2004.

20              THE COURT:  Next.

21              MR. ZELLER:  The next one is 7075.  It is an

22    analysis by Mattel of prior sales and sales forecasts in the

23    large doll segment in 2004.

24              THE COURT:  Next.

25              MR. ZELLER:  The next one is 7076, 8479, and 8866.
```

```
 1    This is a Mattel sales forecast and quota document by
 2    product and by customer.  It covers the 2003 and 2004 time
 3    period.
 4              THE COURT:  Next.
 5              MR. QUINN:  7077 and 8480.
 6              THE COURT:  Okay.
 7              MR. ZELLER:  This is a spreadsheet regarding
 8    Mattel sales in 2003 and plan sales in 2004.
 9              THE COURT:  Thank you.  Next.
10              MR. ZELLER:  The next one is 7078 and 8482.  This
11    is a document reflecting expected sales and inventory.  This
12    is for the 2003 time period.
13              THE COURT:  Thank you.  Next.
14              MR. ZELLER:  7079 and 8483.
15              THE COURT:  Which is?
16              MR. ZELLER:  The same category I just described.
17              THE COURT:  Sales and inventory for 2004?
18              MR. ZELLER:  Right.
19              The next one is 7080 and 8484.  It's the same type
20    of information.  It's just described also for 2004.
21              THE COURT:  Thank you.  Next.
22              MR. ZELLER:  The next one is 7081 and 8485.  This
23    shows expected sales inventories.
24              THE COURT:  So these are forecasts?
25              MR. ZELLER:  Yes.  It shows both pass and present.
```

```
 1              THE COURT:  Inventory for what year?

 2              MR. ZELLER:  This is divided on a weekly basis for

 3      2004.

 4              THE COURT:  Next.

 5              MR. ZELLER:  7082 and 8486, same category of

 6      information but for a different retailer.

 7              THE COURT:  Well, I don't understand.  Expected

 8      sales and inventory.  Who is the retailer?

 9              MR. ZELLER:  Some of these categories -- some of

10      this information relates to particular retailers.  All I am

11      saying is it's the same category as just described but a

12      different retailer is all.  I can give the names of the

13      retailers if that's --

14              THE COURT:  Yes.  I want to go back to 7078.  Who

15      is the retailer?

16              MR. ZELLER:  If we go back to the one that is

17      described as 7078 and 8482 togehter, that is a compilation

18      of the six largest retail customers.

19              THE COURT:  Just a moment.  That's Toys-R-Us,

20      Wal Mart, Target, et al.

21              MS. HURST:  Actually it's not because these all

22      concern Mexico.

23              MR. ZELLER:  If I could actually answer as opposed

24      to being interrupted constantly.

25              THE COURT:  She's not going to interrupt.  Go on.
```

44

```
 1              MR. ZELLER:  They are as reflected in this
 2    particular document Wal Mex, Bodega, Carrefour, Comercial
 3    Mexicana, Liverpool, Palacio De Hierro.
 4              THE COURT:  That then would apply to 7077, 8480,
 5    7078, 8482, or some compilation thereof?
 6              MR. ZELLER:  Yes.  Some of them are broken down
 7    individually by retailer.  It covers various slices of this
 8    type of data.
 9              THE COURT:  Next.
10              MR. OVERLAND:  The name of that one is Vega
11    Aurerra.
12              MR. ZELLER:  I have lost my place in going back --
13              THE COURT:  You were at 7082 and 8486, expected
14    sales and inventory, but I didn't get the year.
15              MR. ZELLER:  That's for 2004.
16              THE COURT:  Next.
17              MR. ZELLER:  7083 and 8487.  This is the sales and
18    inventory information.  This covers the period in 2004.
19              THE COURT:  Next.
20              MR. ZELLER:  7084 and 8488, the same as just
21    described for a different retailer.
22              THE COURT:  2004.
23              MR. ZELLER:  Right.
24              7085 and 8489, the same for another retailer in
25    2004.
```

1          THE COURT:  Retailer, as long as I hear that, I 'm

2    assuming it's one of the six.

3          MR. ZELLER:  Right.

4          THE COURT:  Next.

5          MR. ZELLER:  7086 and 8490.  This is the same for

6    2004 relating to retailer Sorana.

7          THE COURT:  Different from the original six?

8          MR. ZELLER:  Yes.

9          THE COURT:  Next.

10          MS. KELLER:  The next one is 7087 and 8491, which

11    is the same for 2004 for Wal Mart.

12          THE COURT:  Wal Mart or is Wal Mex?

13          MR. ZELLER:  Wal Mart.

14          THE COURT:  Next.

15          MR. ZELLER:  7088, 8466, and 8563, is the same for

16    2004 for Wal Mex.

17          THE COURT:  Next.

18          MR. ZELLER:  7089 and 8492.  This is an analysis

19    of retailer stores based on Mattel's sales, shelf space,

20    in-store marketing, and promotional activities broken out by

21    retail store for 2003.

22          THE COURT:  So shelf space.  What else?

23          MR. ZELLER:  In-store marketing.

24          THE COURT:  For 2003.

25          MR. ZELLER:  Right.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1          THE COURT:  And the retailers are?

2          MR. ZELLER:  It includes all of them.  It's a

3     whole analysis across retailers.

4          THE COURT:  Next.

5          MR. ZELLER:  The next one is 7090 and 8465.  This

6     is an internal Mattel analysis of the Mexican market in 2003

7     and 2004 that would potentially affect Mattel sales.  It

8     also includes sales performance data.

9          THE COURT:  Next.

10         MR. ZELLER:  7091 and 8493.  This is a historical

11    analysis concerning certain Mattel promotional investments

12    in 2003 and a forecast for the same in 2004.

13         THE COURT:  Next.

14         MR. ZELLER:  7095 and 8497.  Broadly speaking,

15    this document includes information about Mattel's commercial

16    strategies, including promotions planned for 2004, and it

17    gives specifics on upcoming promotions.

18         THE COURT:  Next.

19         MR. ZELLER:  7096 and 8562.  This provides

20    specific sales and inventory data relating to Wal Mex for

21    2004.

22         THE COURT:  Next.

23         MR. ZELLER:  7100 and 8501.  This is a spreadsheet

24    that ranks Mattel's Latin American customers in terms of

25    overall sales, sales by store, in 2001 and 2003.

```
 1              THE COURT:  Next.
 2              MR. ZELLER:  7104, 8149, and 8857.  This is
 3    Mattel's 2005 global line list.
 4              THE COURT:  What's a line list?
 5              MR. ZELLER:  The Court has seen the line list,
 6    which is -- it shows about a year or more in advance details
 7    about the upcoming products.  It includes, for example, what
 8    the product is, how it's going to be promoted, and so on.
 9              THE COURT:  That is for 7104 and relates to what
10    year?
11              MR. ZELLER:  That relates to 2005.  It's a
12    forward-looking document.
13              THE COURT:  Next.
14              MR. ZELLER:  7105 is a spreadsheet containing
15    marketing budgets in 2002 and 2004.
16              THE COURT:  Next.
17              MR. ZELLER:  7106 is another one of the same,
18    2004.
19              THE COURT:  Next.
20              MR. ZELLER:  7109.  This is a Mattel forecast
21    document for 2004.  It also includes historical information
22    for 2003.
23              THE COURT:  Next.
24              MR. ZELLER:  7110 and 8145.  This is a Mattel
25    worldwide strategy and guidelines for customized products
```

```
 1    for the fall of 2004.

 2              THE COURT:  Next.

 3              MR. ZELLER:  7112.  This is a strategy to compete

 4    with another fashion doll that would have been released by

 5    Wal Mart.  It relates -- they also includes Barbie product

 6    information -- specific information covering 2001 through

 7    2003.

 8              THE COURT:  Next.

 9              MR. ZELLER:  7113.  This is something called the

10    Worldwide Career Action Planning Policy.

11              THE COURT:  What's that?

12              MR. ZELLER:  It's an internal HR analysis and

13    strategy.

14              THE COURT:  What year?

15              MR. ZELLER:  It doesn't cover a specific time

16    period.

17              THE COURT:  Next.

18              MR. ZELLER:  7115 and 8143.  It's a compilation of

19    businesses used by Mattel brands.

20              THE COURT:  Next.

21              MR. ZELLER:  7116 is a grand strategy document for

22    Mattel's MAX Steel product line.  It's not specific as to

23    year.

24              THE COURT:  Up to this point, are all these

25    documents marked "Confidential."
```

```
 1              MR. ZELLER:  Yes, so far.

 2              THE COURT:  Next.

 3              MR. ZELLER:  7118 and 8506.

 4              I'm sorry.  Maybe I misunderstood the Court's

 5    question.  In terms of the actual marking on the document or

 6    our designations?  I would have to check that.

 7              THE COURT:  The actual marking of the document.

 8              MR. ZELLER:  I can find that out.  I don't have it

 9    on this chart.

10              THE COURT:  The second question is have you

11    personally reviewed this disk?

12              MR. ZELLER:  Yes.

13              THE COURT:  Are each of these thus far on this

14    disk?

15              MR. ZELLER:  Yes.

16              THE COURT:  Mr. Overland, have you personally

17    reviewed this disk?

18              MR. OVERLAND:  I have not.

19              THE COURT:  Do you know if each of these are on

20    this disk?

21              MR. OVERLAND:  Of personal knowledge, no.

22              THE COURT:  Okay, Counsel, 7118 and --

23              MR. ZELLER:  7118 and 8506.  This is a sales

24    volume document covering the periods 2003 and 2004.  So the

25    Court knows this is something called a sales cube document.
```

50

```
 1              THE COURT:  Next.
 2              MR. ZELLER:  7119 and 8481.  This is a compilation
 3    of retailers or expected sales and inventory for 2004.
 4              THE COURT:  Specific sales for what, throughout
 5    the Mexican market?
 6              MR. ZELLER:  This one is for the six largest
 7    retail customers.
 8              THE COURT:  Next.
 9              MR. ZELLER:  7120.  This is an analysis of sales
10    and forecasting data across all Mattel brands and subbrands
11    from 1998 to 2004.
12              THE COURT:  Next.
13              MR. ZELLER:  7121.  This is a document that has
14    information about Mattel in-store sales investment covering
15    the years 1998 to 2002.
16              THE COURT:  Next.
17              MR. ZELLER:  7122, 8144, and 8862.  This is a
18    marketing plan spreadsheet for 2004.
19              THE COURT:  Next.
20              MR. ZELLER:  7123.  This is a marketing and
21    promotion plan by month and quarter for 2004.
22              THE COURT:  Next.
23              MR. ZELLER:  7124 and 8507.  This includes a
24    forecast for sales and inventory for the first quarter of
25    2004.
```

```
1            THE COURT:  Next.
2            MR. ZELLER:  7126.  This is a spreadsheet
3    containing Mattel advertising and promotion budget
4    information covering the 2003 and 2004 time period.
5            THE COURT:  Next.
6            MR. ZELLER:  6754.  These include portions of the
7    presentation made by the three that the Court has heard
8    about.
9            THE COURT:  The W Hotel?
10           MR. ZELLER:  Right.
11           THE COURT:  Next.
12           MR. ZELLER:  7130.  This is a document comparing
13   actual and forecasted sales information from 2002 to 2004.
14           THE COURT:  Next.
15           MR. ZELLER:  7132.  This is a marketing and
16   product development strategy for boys' products.
17           THE COURT:  What year?
18           MR. ZELLER:  This isn't year specific.
19           THE COURT:  Next.
20           MR. ZELLER:  7133.  This is an analysis of Mattel
21   sales, and it's forward-looking information about how to
22   penetrate additional markets.
23           THE COURT:  Next.
24           MR. ZELLER:  7134.  This includes expected sales
25   and profit information.  It's another forward-looking
```

1    document.

2         THE COURT:  Next.

3         MR. ZELLER:  7138.  This is sales and inventory

4    information for several retail customers in Mexico from 2003

5    into 2004.

6         THE COURT:  Next.

7         MR. ZELLER:  7139.  This provides advertising and

8    promotion budget information in 2003.

9         THE COURT:  Next.

10        MR. ZELLER:  7140 and 8505.  This is a sales

11   strategy document.  It covers the time period in which it

12   was taken, 2003, 2004.

13        THE COURT:  Next.

14        MR. ZELLER:  7141.  It's a market research report

15   for the spring 2004, MAX Steel line.

16        THE COURT:  What year is that?

17        MR. ZELLER:  For the spring of 2004.

18        THE COURT:  Next.

19        MR. ZELLER:  7142.  These are sales and marketing

20   strategy information forward-looking to cover 2004 to 2008.

21        THE COURT:  What area, though?  Just sales for all

22   of Mexico, all retailers?

23        MR. ZELLER:  Actually overall sales and marketing

24   strategy.

25        THE COURT:  Next.

1              MR. ZELLER:  7148 and 8567.  This is sales and

2    expected sales and inventory information for the six largest

3    customers.  This covers a time period through August of

4    2003.

5              THE COURT:  Next.

6              MR. ZELLER:  7155 and 8566.  This is the same

7    category of information covering the same time period.

8              THE COURT:  Next.

9              MR. ZELLER:  7156.  The same description would

10   apply.

11             THE COURT:  Next.

12             MR. ZELLER:  6462.  The same description applies.

13             THE COURT:  Next.

14             MR. ZELLER:  6477 and 7160.  This includes

15   Mattel's sales strategy for the company as of February 2004.

16             THE COURT:  Next.

17             MR. ZELLER:  20301.  These are Mattel promotions

18   during 2004.

19             THE COURT:  Next.

20             MR. ZELLER:  20302.  This is a comparison of

21   Mattel MyScene sales between actual and forecasted in 2003

22   and 2004.

23             THE COURT:  Next.

24             MR. ZELLER:  20304.

25             THE COURT:  What is it?

```
 1              MR. ZELLER:  This is actual sales information by
 2   customer for 2003.
 3              MR. ZELLER:  8471.  It's a sales plan which
 4   includes historical information for 2003 as well as
 5   projections for 2004.
 6              THE COURT:  Next.
 7              MR. ZELLER:  6724 and 25927.
 8              THE COURT:  What is it?
 9              MR. ZELLER:  It's a forward-looking document
10   projecting Mattel Mexico sales.  It's broken down by product
11   line.
12              THE COURT:  How far does it project into the
13   future?
14              MR. ZELLER:  I would have to actually find that
15   document to answer that question.  I can do so.
16              THE COURT:  Okay, do so.
17              What's the next one?
18              MR. ZELLER:  6729.  This is a forecasting document
19   for expected sales for 2005.
20              THE COURT:  Next document.
21              MR. ZELLER:  6730 and 8472.
22              THE COURT:  Are all these on the disk up to this
23   time?
24              MR. ZELLER:  No.  Some are also hard copy
25   documents that were seized from Mr. Vargas's office.
```

```
 1              THE COURT:  I'm going to have eventually separate

 2   these out for me today but not right now.

 3              MR. ZELLER:  We do have them separated out for

 4   you.

 5              THE COURT:  Next.

 6              MR. ZELLER:  6730 and 8472.  This is something

 7   called the 2002 customer profile.  It's for the five largest

 8   customers in Mexico.

 9              THE COURT:  Next.

10              MR. ZELLER:  6733 and 8474.

11              THE COURT:  What is it?

12              MR. ZELLER:  This is historical discounting

13   information.

14              THE COURT:  Next.

15              MR. ZELLER:  6734.  It's a reasonable sales points

16   report for 2002 and 2003.

17              THE COURT:  2002 and 2003?

18              MR. ZELLER:  Right.

19              THE COURT:  Next.

20              MR. ZELLER:  6735 and 25929.  This is an

21   advertising and promotions budget for 2002, 2003, and 2004.

22              THE COURT:  Next.

23              MR. ZELLER:  6738 and 8475.  This is sell-in and

24   sell-through information for 2002 and 2003.

25              THE COURT:  What's that?
```

```
 1              MR. ZELLER:  Well, more specifically what it

 2    includes is information -- product that is sold into the

 3    various retailers, and then were selling through those

 4    retailers.

 5              THE COURT:  Next.

 6              MR. ZELLER:  8476.  This is something called a

 7    matrix.

 8              THE COURT:  What is it?

 9              MR. ZELLER:  This one shows Mattel distributor

10    sales by branch.

11              THE COURT:  By branch.  I don't understand.

12              MR. ZELLER:  Well, distributors of course are

13    selling Mattel product in some instances, so it's showing by

14    distributor branch what they are selling.  That's 2003 and

15    2004.

16              THE COURT:  Next

17              MR. ZELLER:  6739, 7161, 8461, and 15622.  This is

18    called the 2004 Girls' Full Year Mexico Viability Testing

19    Report.

20              THE COURT:  What year again?

21              MR. ZELLER:  2004.

22              THE COURT:  Next.

23              MR. ZELLER:  20586, 2117, and 2118.  This is the

24    merchant modeling optimization tool.

25              THE COURT:  What year?
```

```
 1              MR. ZELLER:  I will have to double-check.

 2              THE COURT:  I will put down approximately 2004

 3    with a question mark.

 4              MR. ZELLER:  Actually I think it's a bit later

 5    than that.

 6              THE COURT:  Next.

 7              MR. ZELLER:  6919.

 8              THE COURT:  What is it?

 9              MR. ZELLER:  This is something called an

10    month-over-month co-op planning document.

11              THE COURT:  Okay.  What's the date?

12              MR. ZELLER:  This one I believe -- I will have to

13    double-check, but I think this one covers 2004.  It's a

14    tool, so --

15              THE COURT:  Next.

16              MR. ZELLER:  6953, 8030, 20365.  This is something

17    called the waterfall charts.  It's an analysis of Mattel's

18    girls' business in 2003 and 2004.

19              THE COURT:  Next.

20              MR. ZELLER:  6948.  This document includes Mattel

21    Canada sales volumes.

22              THE COURT:  How does that end up into Mexico?

23              MR. ZELLER:  The last four that we have talked

24    about -- going back to 20586, we have now moved beyond the

25    misappropriation of Mexico.
```

```
 1              THE COURT:  Okay.  Now I want to stop.  The last
 2   alleged Mexico misappropriation is 6739, 7161, 8461, and
 3   15622.  Is that correct?
 4              MR. ZELLER:  Let me double-check.  I believe
 5   that's true.
 6              THE COURT:  Then I have a question for you.
 7              Ms. Hurst, have you reviewed this disk?
 8              MS. HURST:  I have not.
 9              THE COURT:  Ms. Keller, have you?
10              MS. KELLER:  I have not.
11              THE COURT:  Mr. McConville, have you?
12              MR. MCCONVILLE:  No, sir.
13              THE COURT:  Is that the last Mexico information?
14              MR. ZELLER:  It is.
15              THE COURT:  I want to stop there before we move on
16   to Canada or any other location.  I want you to go back very
17   quickly and just state for the record those items that you
18   just named that were found on the disk, and we will start
19   with 7072.  Was that found on the disk?
20              MR. ZELLER:  If you can bear with me for one
21   moment, I need to check on something.
22              THE COURT:  I'm going to call off the names, and
23   you're going to say yes or no.
24              MR. ZELLER:  I have to make sure that what I'm
25   looking at reflects what is on the disk.
```

```
 1              THE COURT:  While you are doing that, Mr. Overland
 2    will be listening.  Here is what I'm going to want to know.
 3    I want to know if there is anything extraneous that's found
 4    on that disk or whether it's literally self-authenticating
 5    because we have had this back and forth, and I don't know
 6    what's going to occur considering the conditional submission
 7    to the Court.  Therefore, that requires you to look at this
 8    disk.
 9              If I have got extraneous information, of course
10    I'm concerned about prejudice.  I don't know what that
11    information is.  The import is that this was gathered by the
12    police -- that's what I thought -- taken back to the police
13    station, somehow synthesized, and it's not a legitimate
14    disk.
15              I want to know in these in fact are Mattel
16    documents.  I want to know if there is a "Confidential"
17    stamp on the bottom of them.  I kind of forewarned that we
18    would be going through that, and I hope not to.  I hope to
19    have you go through it, but if we have to, we will sit here
20    in court and looking at them because somehow I am going to
21    have a very good record concerning this disk.
22              MS. KELLER:  When the Court says extraneous
23    evidence, are you thinking of things like personal items,
24    family photos --
25              THE COURT:  Yes.  I literally was under the
```

1    impression and even led to believe that a bunch of documents

2    were gathered off a desk.  Some of those were a disk.  Some

3    of those were extraneous documents.  Some of those were

4    legitimate documents that the officers -- they were taken

5    back to the Mexican Police Department and that there was a

6    disk created, and that this was what the Court was getting.

7           You kept hearing me say I'm really concerned that

8    MGA is being prejudiced because you are being presented a

9    disk that I didn't know if that was a sweep off of other

10   computers, et cetera.  I had never viewed the disk, and I

11   didn't know if counsel had.  So that's why you kept hearing

12   that repetition on my part.  My belief was that this was a

13   compilation of a lot of potentially extraneous material.  It

14   could be family photos.  It could be information that was

15   totally irrelvant to the case, rightfully obtained,

16   projection and reports from Mexico's office that have been

17   been created never taken from Mattel.

18          Now I am hearing that this is a disk along with

19   some other materials found allegedly on Machado's desk.  The

20   way I got that information was initially through Suzanne

21   Kimberly, who is not here yet, and a bunch representations

22   about depositional testimony from both sides, which was very

23   unclear.

24          If I have a disk and this is the sole amount of

25   information on that disk and there is nothing extraneous, I

1    would like to know that, and I think you realize that.

2    Otherwise, the impression is that the disk might have

3    thousands of items unrelated and they are generally

4    produced.

5         The second problem I have is this.  What are they?

6    In other words, are they truly trade secrets?  And what I'm

7    eventually lead to in a few moments is -- there has been a

8    claim by Mr. McConville but more by Mr. Overland that many

9    of these may not in fact be trade secrets, and the defense

10   has been that they are ever changing and almost worthless

11   the next day because they are taken at that moment in time

12   and only good for that moment in time.

13        The reason it passed summary judgment was I didn't

14   believe that.  On the documents that I focused on, which

15   were not all of these documents -- as I stated in the

16   summary judgment motion, some of these were forecasts going

17   forward.  No. 2, some of these appear to me to have

18   legitimate consequences and were valuable as to trade secret

19   because they not only show the historical perspective, but

20   they show the going-forward perspective in terms of

21   projections and forecasts.  I truthfully stopped after a

22   number of these because for some summary judgment purposes

23   that was the end of my discussion.

24        Mr. Keller.

25        MS. KELLER:  As far as personal reviewing it, my

1    high school Spanish is a little rusty.

2         Does the Court know how many of these are in

3    Spanish?

4         THE COURT:  I have no idea.  I'm about to find

5    out.  All I know is I hear the objection, but I don't hear

6    the remedy, so we are going to trot through a record for

7    appellate purposes on a close call by this Court.  Now I

8    find out -- I didn't know frankly that an office manager

9    signed off on those copies.  In other words, my issues have

10   narrowed now.

11        Now I'm hearing -- my fault again.  I'm not

12   blaming counsel, but I apparently was under a misperception.

13   I thought that they were literally removed and copied at the

14   police department.  Now I'm hearing that an officer manager

15   literally signs off.  For some period of time, whether

16   they're taken to some location inside the office -- I think

17   the better record by far is if somebody from Mexico would

18   just fly up here frankly, but I haven't seen that person.

19        By the same token, I think it's rather ludicrous

20   that these are all Mattel documents sitting on a disk, which

21   is obviously the import of the deposition, and, that is,

22   that Mr. Machado went back with a thumb drive and loaded and

23   unloaded on different occasions putting this on a disk.

24   This may be actually self-authenticating, and nobody

25   apparently has looked at it.

1            MS. KELLER:  I think Mr. Overland would like to be

2    heard a little bit on that because he has been looking into

3    this I know.

4            THE COURT:  Well, he is going to be looking at

5    this disk also.

6            MR. QUINN:  Your Honor, we have looked at the

7    disk.

8            THE COURT:  I understand that.  I'm sorry.  When I

9    said nobody, I mean nobody from MGA's or from Mr. Overland's

10   side.  So we'll end up -- that way we are not back and forth

11   on this federal discussion of what's it or not.  That's a

12   poor record for the Circuit.  Why am I taking a chance?  I'm

13   sustaining your objection so far, but I have admitted it

14   conditionally.  Why am I setting a record?  There's no

15   reason to, so we just do the work.

16           Mr. Overland.

17           MR. OVERLAND:  I think there is an additional

18   issue with respect to authentication, and, that is, when the

19   Court says just because it contains no extraneous material,

20   and it may be self-authenticating, the problem with that

21   that the only percipient witness to what happened with the

22   disk is Mr. Vargas.  Mr. Vargas, as I mentioned previously,

23   testified that the disk which we have was created by a

24   police officer or somebody -- a representative from the

25   D.A.'s Office in Mexico by downloading from his own personal

1    laptop, and we don't know what was on there.

2            THE COURT:  Well, that's why I want to know what's

3    on this disk.

4            MR. OVERLAND:  But whatever is on the disk is what

5    the officer downloaded from his laptop.

6            THE COURT:  But if they are all Mattel documents

7    and that all I have, then I want to know, and I want to set

8    my record.

9            MR. OVERLAND:  Even if they are all Mattel

10   documents, we don't know where those all Mattel documents

11   came from other than from the officer's laptop.

12           THE COURT:  I understand your concerning, but

13   we're fastly moving through that now.

14           All right, are we ready?

15           MR. QUINN:  If it's helpful, we could print out

16   everything that's on the disk and bring it to court if that

17   could be useful to the Court.

18           THE COURT:  They can look at the disk.  They have

19   got a copy.  There is no reason you have to do that.

20   Remember I'm conditionally going to receive this.  In other

21   words, you are going to be able to question about it.  I

22   think Mr. Machado will be here and eventually will help us.

23   The depositional testimony I read was that he created a disk

24   from a series of thumb drives.  I just want to know what's

25   on this disk.

```
 1              7072, is it on the disk?

 2              MR. ZELLER:  Yes.

 3              THE COURT:  7073?

 4              MR. ZELLER:  On the disk.

 5              THE COURT:  7074 and 8148?

 6              MR. ZELLER:  On the disk.

 7              THE COURT:  7075?

 8              MR. ZELLER:  On the disk.

 9              THE COURT:  7076?

10              MR. ZELLER:  On the disk.

11              THE COURT:  8479?

12              MR. ZELLER:  Yes.

13              THE COURT:  8866?

14              MR. ZELLER:  Yes.

15              THE COURT:  7077?

16              MR. ZELLER:  Yes.

17              THE COURT:  8480?

18              MR. ZELLER:  Yes.

19              THE COURT:  7078?

20              MR. ZELLER:  Yes.

21              THE COURT:  8482?

22              MR. ZELLER:  Yes.

23              THE COURT:  7079?

24              MR. ZELLER:  Yes.

25              THE COURT:  8483?
```

```
 1              MR. ZELLER:  Yes.

 2              THE COURT:  7080?

 3              MR. ZELLER:  Yes.

 4              THE COURT:  8484?

 5              MR. ZELLER:  Yes.

 6              THE COURT:  7081?

 7              MR. ZELLER:  Yes.

 8              THE COURT:  8485?

 9              MR. ZELLER:  Yes.

10              THE COURT:  7082?

11              MR. ZELLER:  Yes.

12              THE COURT:  8486?

13              MR. ZELLER:  Yes.

14              THE COURT:  7083?

15              MR. ZELLER:  Yes.

16              THE COURT:  8487?

17              MR. ZELLER:  Yes.

18              THE COURT:  7084?

19              MR. ZELLER:  Yes.

20              THE COURT:  8488?

21              MR. ZELLER:  Yes.

22              THE COURT:  7085?

23              MR. ZELLER:  Yes.

24              THE COURT:  8489?

25              MR. ZELLER:  Yes.
```

```
 1              THE COURT:  7086?

 2              MR. ZELLER:  Yes.

 3              THE COURT:  8490?

 4              MR. ZELLER:  Yes.

 5              THE COURT:  7087?

 6              MR. ZELLER:  Yes.

 7              THE COURT:  8491?

 8              THE COURT:  Yes.

 9              THE COURT:  7088?

10              MR. ZELLER:  Yes.

11              THE COURT:  8466?

12              MR. ZELLER:  Yes.

13              THE COURT:  8563?

14              MR. ZELLER:  Yes.

15              THE COURT:  7089?

16              MR. ZELLER:  Yes.

17              THE COURT:  8492?

18              MR. ZELLER:  Yes.

19              THE COURT:  7090?

20              THE COURT:  Yes.

21              THE COURT:  8465?

22              MR. ZELLER:  Yes.

23              THE COURT:  7091?

24              MR. ZELLER:  Yes.

25              THE COURT:  8493?
```

```
 1              MR. ZELLER:  Yes.

 2              THE COURT:  7095?

 3              MR. ZELLER:  Yes.

 4              THE COURT:  8497?

 5              MR. ZELLER:  Yes.

 6              THE COURT:  7096?

 7              MR. ZELLER:  Yes.

 8              THE COURT:  8562?

 9              MR. ZELLER:  Yes.

10              THE COURT:  7100?

11              MR. ZELLER:  Yes.

12              THE COURT:  8501?

13              MR. ZELLER:  Yes.

14              THE COURT:  7104?

15              MR. ZELLER:  Yes.

16              THE COURT:  8149?

17              MR. ZELLER:  Yes.

18              THE COURT:  8857?

19              MR. ZELLER:  Yes.

20              THE COURT:  7105?

21              MR. ZELLER:  Yes.

22              THE COURT:  7106?

23              MR. ZELLER:  Yes.

24              THE COURT:  7109?

25              MR. ZELLER:  Yes.
```

```
 1              THE COURT:  7110?

 2              MR. ZELLER:  Yes.

 3              THE COURT:  8145?

 4              MR. ZELLER:  Yes.

 5              THE COURT:  7112?

 6              MR. ZELLER:  Yes.

 7              THE COURT:  7113?

 8              MR. ZELLER:  Yes.

 9              THE COURT:  7115?

10              MR. ZELLER:  Yes.

11              THE COURT:  7116?

12              MR. ZELLER:  I actually have in between there --

13              THE COURT:  My apologies.  8143?

14              MR. ZELLER:  Yes.

15              THE COURT:  7116?

16              MR. ZELLER:  Yes.

17              THE COURT:  7118?

18              MR. ZELLER:  Yes.

19              THE COURT:  8506?

20              MR. ZELLER:  Yes.

21              THE COURT:  7119?

22              MR. ZELLER:  Yes.

23              THE COURT:  8481?

24              MR. ZELLER:  Yes.

25              THE COURT:  7120?
```

70

```
 1                MR. ZELLER:  Yes.

 2                THE COURT:  7121?

 3                MR. ZELLER:  Yes.

 4                THE COURT:  7122?

 5                MR. ZELLER:  Yes.

 6                THE COURT:  8144?

 7                MR. ZELLER:  Yes.

 8                THE COURT:  8862?

 9                MR. ZELLER:  Yes.

10                THE COURT:  7123?

11                MR. ZELLER:  Yes.

12                THE COURT:  7124?

13                MR. ZELLER:  Yes.

14                THE COURT:  8507?

15                MR. ZELLER:  Yes.

16                THE COURT:  7126?

17                MR. ZELLER:  Yes.

18                THE COURT:  6754?

19                MR. ZELLER:  Yes.

20                THE COURT:  7130?

21                MR. ZELLER:  Yes.

22                THE COURT:  7132?

23                MR. ZELLER:  Yes.

24                THE COURT:  7133?

25                MR. ZELLER:  Yes.
```

71

```
 1              THE COURT:  7134?

 2              MR. ZELLER:  Yes.

 3              THE COURT:  7138?

 4              MR. ZELLER:  Yes.

 5              THE COURT:  7139?

 6              MR. ZELLER:  Yes.

 7              THE COURT:  7140?

 8              MR. ZELLER:  Yes.

 9              THE COURT:  8505?

10              MR. ZELLER:  Yes.

11              THE COURT:  7141?

12              MR. ZELLER:  Yes.

13              THE COURT:  7142?

14              MR. ZELLER:  Yes.

15              THE COURT:  7148?

16              MR. ZELLER:  Yes.

17              THE COURT:  8567?

18              MR. ZELLER:  Yes -- sorry, my mistake.  On the

19   last couple -- the very last one, 7148, and 8567, that's the

20   beginning of the hard copy materials.

21              THE COURT:  I'm not interested in that -- oh, I

22   am.  I am going to state this back to you again.

23              Does the disk then contain from 7072 through 7142?

24              MR. ZELLER:  Let me check the beginning number.

25              (Pause in proceedings.)
```

1          MR. ZELLER:  7072 through 7142, correct.

2          THE COURT:  That's the disk?

3          MR. ZELLER:  That's the disk.

4          THE COURT:  All right.  Just a moment.

5          (Pause in proceedings.)

6          THE COURT:  After your review of this and before I

7   order MGA and Machado's counsel to review this or one of

8   them, is there anything else on that disk besides those

9   exhibits that you stated to me before?

10          MR. ZELLER:  Yes.

11          THE COURT:  Tell me what else is on that disk.

12          MR. ZELLER:  If the Court's wants the particulars,

13   I will have to get a separate list that I don't have in

14   front of me, but generally speaking, they include MGA

15   documents as an example.

16          THE COURT:  MGA documents?

17          MR. ZELLER:  Right.

18          THE COURT:  In other words, created by MGA.  Do

19   they have a "Confidential" stamp on the bottom of them?

20          MR. ZELLER:  I don't recall offhand.

21          THE COURT:  Tell me if you believe -- strike that.

22   I just want to make certain that my thoughts are clear.  On

23   this disk, I want to be absolutely certain that in your view

24   of this disk 7072 through 7141 -- that all of those

25   documents are contained on the disk.

```
 1              MR. ZELLER:  7142.

 2              THE COURT:  I'm sorry.  7142.  Is that correct?

 3              MR. ZELLER:  That's correct.  Those are the

 4    documents we are saying are on the disk that are Mattel

 5    trade secrets.

 6              THE COURT:  And those documents are documents on a

 7    disk that you believe that the manager of the Mexico office

 8    has signed?

 9              MR. ZELLER:  Yes.

10              THE COURT:  And then went to Susan Kimberly, and

11    then to O'Melveny, and then to Skadden & Arps back to

12    Quinn-Emanuel?

13              MR. ZELLER:  Right.

14              THE COURT:  And that has additional documents on

15    that disk that are MGA documents?

16              MR. ZELLER:  Right.

17              THE COURT:  Let me turn to MGA.  I want to get a

18    clear understanding from your perspective.  My information

19    from the deposition is that Mr. Machado took a series of

20    thumb drives, and because of the volume of the information

21    at least took those on numerous occasions from a Mattel hard

22    drive or from his computer, downloaded it, continued to

23    download it.  My assumption up to this time was that this

24    was the disk that contained that information and whatever

25    else that's unknown to the Court.
```

```
 1              Is that your understanding from the depositional
 2    testimony?
 3              MS. HURST:  No, because nobody knows how his disk
 4    was actually created.
 5              THE COURT:  Just a moment.  I'm sorry.  Was this
 6    disk found on Machado's desk?
 7              MS. HURST:  No.  The best information we have is
 8    what Mr. Overland just described, that it was created by the
 9    Mexican police.
10              THE COURT:  Inside the Mattel offices?
11              MS. HURST:  Inside MGA's offices on the day of the
12    search --
13              THE COURT:  Now, you have to understand before I
14    believed -- I was either told or believed by one of the
15    parties that this information actually taken out and taken
16    to a police department.  That's not true is it?  Wherever I
17    got that information, I'm incorrect?
18              MR. OVERLAND:  Can I respond?
19              THE COURT:  No.  I want to speak to Ms. Hurst for
20    a moment, and then, Mr. Overland, I'll be glad to come back
21    to you.  I don't want the constant interruptions.  I want
22    to speak one counsel at a time.
23              Ms. Hurst.
24              MS. HURST:  I'm not sure -- all I know is what
25    Mr. Vargas testified.  None of the other people who were
```

1   present for the search that day who were 30(b)(6) witnesses

2   interviewed were able to tell us anything about the creation

3   of that disk.

4          THE COURT:  Here is what I heard.  There were

5   numerous phone calls by Ms. Cumerle related back to Mr.

6   Larian.  Those phone calls basically said that there was a

7   search at the Mexican offices and that he made an inquiry --

8   you know, find out basically what is going on, what's

9   happening, and that Ms. Cumerle was calling down to some

10   unnamed person.  Remember this was early on in the case, and

11   then she basically didn't testify because of her concern

12   about being sued by Mattel.

13          My impression was that she was either talking to

14   Mattel or Vargas or -- that got very confusing at the time

15   because of the depositional status.  I have only heard from

16   Ms. Cumerle, and then we have 30(b)(6)'s, and then we

17   finally got Machado up, so this came to the Court in bits

18   and pieces.

19          How else whether this was -- if in fact this

20   information didn't leave the MGA offices in Mexico, how

21   else -- just speculate with me -- could this get on a disk

22   that was copied or from your perspective compiled?

23          MR. HURST:  There were 20 or so Mexican police

24   officers that day.  They were several Mattel representatives

25   outside in the plaza.  They brought in their own

1   computers -- the Mexican police brought in their own

2   computers.

3          THE COURT:  Stop.

4          Did the Mattel employees go inside the search

5   area?

6          MS. HURST:  I don't believe so.

7          THE COURT:  I was told that they did not.

8          MS. HURST:  I don't know.  I mean, I don't believe

9   so.  I don't think we have anybody who saw them there.

10          THE COURT:  Speculating with me, the Mexican

11   police were -- from your perspective that this is not an

12   authenticate compilation, the Mexican police were a part of

13   this?

14          MS. HURST:  If they took their own laptops in

15   there loaded Mattel information and had free access to all

16   the computers in the offices during the search for several

17   hours, which they did, loading disks into various computers

18   and their own, they could have burned anything onto that CD.

19          THE COURT:  I am going to repeat back to you what

20   I'm hearing, and, that is, the real problem from your

21   perspective and the best speculation is that Mattel

22   basically "paid off" for want of a better word the Mexican

23   police to go in with the Mattel information and download it

24   onto a disk?

25          MS. HURST:  We're talking about speculation.  You

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   have asked me to speculate with you.  I don't think they had
 2   to pay off a lot of people.  They only needed to have the
 3   person with laptop.
 4              THE COURT:  Mr. McConville.
 5              MR. MCCONVILLE:  I just have another source of
 6   speculation, which is oftentimes police in law enforcement
 7   -- in U.S. law enforcement, the police go in knowing what it
 8   is they are looking for.  If the information they knew that
 9   they were going to be looking for was provided by Mattel,
10   inadvertence could have led this person to say, well, here I
11   have created a disk with -- that the person who created this
12   disk, whomever it was, inadvertently put information on it.
13              THE COURT:  Now, before I was told initially -- I
14   have heard two things, that they were hours in on the
15   search, but I have heard that the information was only out
16   of their presence for a couple of minutes in relation to a
17   computer.
18              MS. HURST:  No, nobody saw the creation of the
19   disk.  Look, what Mr. Vargas testified is that he saw a disk
20   go into a police laptop and come out of a police laptop.  If
21   that's all that happened, then the contents of the disk had
22   to have been burned from a hard drive, a preexisting set of
23   data.  There is something wrong with that.  Now, maybe it's
24   that that was an incomplete observation of what occurred,
25   but if that is truly all that occurred, then there is
```

1    something wrong with it.  Remember this is Mr. Vargas now.

2            THE COURT:  What seems so far-fetched to me is

3    that the police would get these pieces of information from

4    different sources that took Machado a significant period of

5    time with various hard drives because the volume was so

6    great -- it seems rather preposterous frankly.

7            Now I want to hear from Mr. Overland.

8            MR. OVERLAND:  The one thing the Court is

9    forgetting is that this is Mexico.  Unlike the United

10   States, this search warrant was drawn up by Mr. Terbercio,

11   the lawyer for Mexico, which would never happen here in the

12   United States.  So we have this connection between the

13   search and Mattel from its inception.  This is not something

14   done independently by the prosecutor.  Then he presents

15   whatever probable cause or whatever is required in Mexico

16   for the search to the prosecutor.  So we have Mattel being

17   involved in that particular search from the inception.  It's

18   not something that they just happened to be there at the

19   time.  This is something created by Mattel.

20           THE COURT:  Well, I think the Circuit will now

21   have a much better record.

22           Starting with the hard copies at 7418, take me

23   down through the hard copy information, in other words, the

24   documents that weren't part of the disk.

25           MR. ZELLER:  Could I address this notion about the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    planting and everything else?  The evidence is quite clearly

2    to the contrary.  No. 1, MGA's own 30(b)(6) witness, as the

3    Court knows investigated the matter and found zero evidence

4    that anything was planted.

5             No. 2, we of course as pointed out and MGA had

6    omitted that two people there in Mexico, their own managers,

7    were witnesses to the search and signed for the materials.

8    I mean, frankly --

9             THE COURT:  Their names again, please.  I have one

10   of them.  I didn't know there was a second.

11            MR. ZELLER:  I apologize.  I don't have that in

12   front of me.

13            THE COURT:  Ms. Hurst, who are those two people?

14            MS. HURST:  I know Mr. Agere was the person who

15   signed the receipts.

16            THE COURT:  And there was another person?  Mr.

17   McConville.

18            MR. MCCONVILLE:  I don't know, Your Honor.

19            THE COURT:  Ms. Keller?

20            MS. KELLER:  I don't know, Your Honor.

21            THE COURT:  Mr. Overland?

22            MR. OVERLAND:  I'm not aware of any other.

23            THE COURT:  So we will stay with Agere because

24   that's the name I had.

25            MR. ZELLER:  I would frankly encourage the Court

1  to order them -- both of those gentlemen to come up here,

2  and they can testify.

3          THE COURT:  I don't know if I have jurisdiction.

4          MR. ZELLER:  They were MGA managers.  You can

5  order the party.

6          THE COURT:  All the inferences are falling against

7  MGA right now.  The end result of this is that at least the

8  Circuit is going to have a clear idea of where the dispute

9  is.  Before -- I'm the first to admit I thought the

10  representation was -- it's my fault.  I thought the

11  representation the material was taken out, but I'm mistaken.

12  I don't think there was a representation apparently.  I

13  don't know how I came into that information, but it's been

14  very beneficial now for the record.

15          MS. HURST:  On that point, I'm not sure how the

16  Court got that impression, but the reality is that the

17  police brought laptaps in with undisclosed information on

18  them.  That's the same thing as them having taken it out and

19  created elsewhere because that means they could bring

20  whatever they want there to create it.  It's the same thing.

21          MR. ZELLER:  We have also of course heard, Your

22  Honor, that -- and these are untrue statements -- that all

23  the MGA employees were sequestered, and none of them

24  witnessed the search.  We now know that those

25  representations being made my MGA as recently as yesterday

1    were not correct.

2          THE COURT:  Now, I will just say to Mattel I don't

3    know that there is going to be anything necessary based upon

4    this record just to show the chain up through the law firms,

5    but you're the ones taking the chance obviously.  I now have

6    a much clearer record and I think the Circuit has a much

7    clearer record that MGA -- where is Mr. Agere?  Is he still

8    employed by MGA?

9          MS. HURST:  No, and he hasn't been for quite some

10   time.

11         THE COURT:  And I assume that there were numerous

12   other people who must have been in the room.

13         MS. HURST:  No, they were not in the room.

14   Mr. Agere whenever we have talked to him has told us he did

15   not witness the creation of the disk.

16         THE COURT:  And the lawyer, what was his name?

17         MS. HURST:  Mr. Terbercio, Mattel's lawyer.

18   Mattel's security officer was there that day.

19         THE COURT:  I'll leave that to Mattel.  I don't

20   know if I'm going to go any further with this other than the

21   showing of the law firms.  The difficulty is if you have to

22   go through this, it looks like the law firms are involved,

23   which I have tried to stay away from.  Now, that -- if

24   everybody wants to fight about the chain, that's fine.

25         MS. HURST:  We have already agreed where the disk

```
1   came from in terms of how it got here.  The only thing we

2   are disputing --

3           THE COURT:  Ms. Hurst, I have not heard a

4   stipulation as to that.

5           MS. HURST:  I have stipulated repeatedly that is

6   went from Ms. Cumerle to O'Melveny, to Skadden, and it was

7   produced to them.  I have said that on the record

8   repeatedly.  I have repeatedly stated that what we dispute

9   is the authenticity because nobody knows how disk that went

10  through that chain was created.

11          THE COURT:  Well, you hear the argument that is

12  going to be made if this comes into evidence, Mr. Quinn.

13  You have it within the power to solve that last one percent

14  or less than one percent issue.  I have conditionally

15  accepted it at the present time.  I'll wait.  If you two

16  want to draw up a stipulation, this would probably be the

17  time to do it concerning Ms. Cumerle for over a year, and

18  then to O'Melveny for whatever period of time, and to

19  Skadden-Arps for whatever period of time, and the date you

20  receive it.

21          Now, do you really want to do that part of the

22  chain or not?

23          MS. HURST:  I'm not sure we agree on the over a

24  year part, but the from Ms. Cumerle to O'Melveny to Skadden

25  to them, I have no problem with.
```

1          MR. QUINN:  We'll do that.

2          THE COURT:  I think we have got depositional

3  testimony, but we will wait for Ms. Cumerle, and you can ask

4  her how long she maintained it.  It seems rather a silly

5  thing, and Ms. Hurst has been willing to stipulate to that,

6  but if you don't want to stipulate, you don't have to accept

7  it.  We can bring the law firms.

8          MR. QUINN:  We will accept the stipulation.

9          THE COURT:  Why don't you draft it right now then.

10          Who on the MGA side is going to look at this disk?

11  One of the three of you is volunteering.  You are going to

12  look at it.  That way I have got a clear record, and that

13  way if there is extraneous material, et cetera, we know what

14  that is.  You can object, and it can be excised.  I want to

15  guard people's privacy.  I want to know what else is on this

16  disk.

17          MR. MCCONVILLE:  I'll look at it, Your Honor.

18          THE COURT:  Okay, Mr. McConville.  That's

19  excellent.

20          And, Mr. Cote.

21          MR. OVERLAND:  Mr. Cote will look at it.

22          THE COURT:  Excellent.  Now, let's go back to the

23  hard copies.

24          7148 and 8567, I assume they are hard copies.

25          MR. ZELLER:  Yes.

```
 1              THE COURT:  7155 and 8566?

 2              MR. ZELLER:  Located in Vargas's office during the

 3   search.

 4              THE COURT:  Where was 7148 located?

 5              MR. ZELLER:  That we don't entirely know.  It was

 6   produced by MGA, but it has its origins from the thumb

 7   drive.

 8              THE COURT:  Just a moment.  Do you disagree with

 9   that, Ms. Hurst?

10              MS. HURST:  I'm neither agreeing or disagreeing at

11   this time.

12              THE COURT:  One of you is going to be arguing

13   this.  In other words, I don't want to take you out of the

14   argument, but whoever views this is going to be the one

15   arguing for MGA.

16              MS. HURST:  I thought we are just doing jury

17   instructions, not JMOLs today.  I mean, what is it exactly

18   that you want?

19              THE COURT:  I want to know where these came from.

20              MS. HURST:  We're not going to stipulate to that.

21              THE COURT:  I understand that.  Do you know where

22   they came from?  I'm asking you per the depositional

23   testimony.  You're not stipulating in front of the jury.

24   I'm asking for information.  Otherwise, you're going back to

25   work.
```

```
1              MS. HURST:  I wasn't clear about the Court's

2      question.  I'm trying to make sure I understand it.

3              THE COURT:  Well, you were framing it for me.  I

4      think you understood it, but we'll start again.

5              7148, can you help me?

6              MS. HURST:  There is no testimony about the origin

7      of that document.

8              THE COURT:  8567.

9              MS. HURST:  Mr. Vargas apparently testified based

10     on what I'm seeing here on Mattel's chart that I have not

11     independently verified that it came from his office.

12             THE COURT:  Who is going to do that?  In other

13     words, I'm done guessing by representations.  Each of you

14     are going to start gathering information, not the Court.  I

15     have got a lot to do also.

16             8567, where did that come from?

17             MR. ZELLER:  MGA produced it to us.  We can link

18     it back to the materials that were accessed by the three in

19     Mexico.

20             THE COURT:  Where did it come from?  Any

21     deposition testimony that will help the Court?

22             7155.

23             MR. ZELLER:  This is a document that was produced

24     by MGA and was located during the search in Vargas's office.

25             THE COURT:  Just a moment.  Can you help the
```

1  Court?  This is not a stipulation in front of the jury.  Do

2  you know what the depositional -- in other words, if there

3  is a disagreement -- what I don't want to hear is the back

4  and forth, no, it isn't, Judge, or, yes, it did.  Where did

5  it come from according to the deposition?

6        MS. HURST:  If you will give me one moment, I will

7  search and tell you.  7155?

8        THE COURT:  7155.

9        MS. HURST:  Mr. Vargas testified that was a

10 document located in his office during the search.

11       THE COURT:  8566.

12       MS. HURST:  That was the same.  Mr. Vargas did

13 identify that as a document taken from his office during the

14 search in his deposition.

15       THE COURT:  7156.

16       MR. ZELLER:  That was produced by MGA, and we can

17 link it back to the documents that they were accessing from

18 Mattel.

19       THE COURT:  But at the depositional testimony --

20 in other words, I'm trying to find out without bickering

21 between both sides.  There is no stipulation in front of the

22 jury.  I just need to know.

23       MS. HURST:  There is no depositional testimony on

24 this one.

25       THE COURT:  6462.

```
 1              MR. ZELLER:  The same.

 2              THE COURT:  6477 and 7160.

 3              MR. ZELLER:  Produced by MGA and located at

 4   Vargas's desk during the search.

 5              THE COURT:  By depositional testimony?

 6              MR. ZELLER:  Yes.

 7              THE COURT:  Any disagreement?

 8              While we are waiting, Mr. Overland, do you know

 9   how we're doing with Mr. Vargas?

10              MR. QUINN:  He will be here.

11              MS. HURST:  Yes, I agree that was the testimony of

12   Mr. Vargas.

13              THE COURT:  20301.

14              MR. ZELLER:  There is no depositional testimony on

15   this.  It's among the documents accessed --

16              THE COURT:  20302.

17              MS. HURST:  I find no depositional testimony on

18   that one.

19              THE COURT:  20304.  I am assuming these are all

20   hard copies again found on somebody's desk.

21              MR. ZELLER:  20302?

22              THE COURT:  Yes.

23              MR. ZELLER:  That one -- the evidence is it was

24   downloaded.  No depositional testimony.

25              THE COURT:  20304.
```

```
 1              MS. HURST:  No depositional testimony, Your Honor.

 2              THE COURT:  8471.

 3              MR. ZELLER:  Same.

 4              MS. HURST:  Hold on.  8471 has some testimony.

 5              MR. ZELLER:  Somebody took that page out if the

 6   Court has some additional questions about that.

 7              MS. HURST:  It looks like he did not confirm

 8   whether it was found in his office on the day --

 9              THE COURT:  6724.

10              MR. ZELLER:  Same.

11              THE COURT:  25927.

12              MR. ZELLER:  Same.

13              THE COURT:  6729.

14              MR. ZELLER:  Same.

15              MS. HURST:  When you say same, you mean there is

16   no testimony?

17              MR. ZELLER:  Correct, no depositional testimony.

18              THE COURT:  6730.

19              MR. ZELLER:  Vargas deposition testimony.

20              THE COURT:  8472.

21              MR. ZELLER:  Same, Vargas.

22              THE COURT:  So how do we know so far if, for

23   instance, 7156 came from Machado office's or Vargas's

24   office?

25              MR. ZELLER:  I'm sorry.  Which number again?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

 1            THE COURT:  Just take an example, 7156.  How do I
 2   know what office that came from?
 3            MR. ZELLER:  We will put in evidence -- well, 7156
 4   has two parts to it.  No. 1 is it was produced by MGA.
 5            THE COURT:  Okay.  That's fine, but I'm going to
 6   come back to my question.
 7            I will take 20302 then.  In other words, I can
 8   take any one of these.  What I am trying to find out -- not
 9   in front of the jury for a moment before we get in bickering
10   match between counsel -- is how do we match these up to
11   different offices?
12            MR. ZELLER:  Well, not all of them can be matched
13   up to what was located at the search.
14            THE COURT:  In other words, just the MGA Mexico's
15   offices in general?
16            MR. ZELLER:  Right.
17            THE COURT:  Because the police actually took them
18   out of different offices and with the hard copies?
19            MR. ZELLER:  There is a universe of documents that
20   were located at MGA's offices.
21            THE COURT:  You just said that.
22            THE COURT:  But there is more.  That's the point.
23   Then there was more information that was taken that was
24   never located during the search in which we have other
25   evidence apart from the fact that it was found at MGA by the

1    search that it was taken.  There are different categories of

2    how we intend to prove those additional documents were

3    taken.

4              THE COURT:  20302, what office did that come out

5    of?  I understand you can prove it was seized from the

6    general offices.  Do you know what office it came out of?

7              MR. ZELLER:  Some of these we will never show --

8              THE COURT:  I understand that.  23032, do you know

9    what office it came out of?  In other words, I'm just

10   anticipating my objections for next week.

11             MR. ZELLER:  This is what I was trying to explain

12   before.  The chain by which we will show this is different

13   from the search and seizure.

14             THE COURT:  I understand that.  I'm going to ask

15   it again.

16             20302, what office did it come out of, or is the

17   best you can do is it came out of the Mexico offices?

18             MR. ZELLER:  I don't understand the question.

19             THE COURT:  We have different offices.

20             MR. QUINN:  Can I ask a question of Mr. Zeller for

21   clarification?

22             THE COURT:  Yes.

23             (Plaintiff's counsel conferring.)

24             MR. QUINN:  What Mr. Zeller is saying is that -- I

25   believe that this document and others we know was taken, and

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    we can prove it was taken, but a hard copy was never found
 2    at MGA's offices, so there is a class where --
 3              THE COURT:  Oh, I see.  Let me repeat back.  A
 4    hard copy was taken from Mattel --
 5              MR. QUINN:  Well, it was -- yes.
 6              THE COURT:  Just take 20302 by way of example,
 7    was a hard copy found someplace in the Mexico offices?
 8              MR. ZELLER:  No.
 9              THE COURT:  Then what is 20302?  Is it on some
10    type of disk?
11              MR. ZELLER:  It is a -- no.  The answer is no.
12    It's not on some type of disk.  We have forensic evidence --
13    let me just step back for a moment.  When the three were
14    leaving Mattel, they downloaded huge quantities of
15    information onto a thumb drive.  Some of that we can
16    prove -- well, more than some.  All of it we can prove
17    because we have computer forensic evidence that they
18    accessed those documents before they left, and they were
19    downloaded --
20              THE COURT:  I now understand.  Let me repeat back
21    to you.  There are certain items in this bucket that we are
22    calling the No. 9, the Mexico Castillo non-Bratz trade
23    secrets that you have literally a disk.  You also have
24    certain hard copies starting with 7148, but you also can
25    prove in this No. 9 trade secret bucket that while you may
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

92

1   not have hard copies, you can basically show through

2   forensic evidence downloading of these trade secrets,

3   although they weren't found at the Mexico offices.  Do I

4   have that?

5               MR. ZELLER:  That's correct.

6               THE COURT:  All right.  I am going to stay with

7   6730 and 8472 because those obviously have to be hard copies

8   if they're found in Vargas's office, right?  They are

9   customer profiles, the five largest customers.

10              MR. ZELLER:  No, that was not located during the

11  search.

12              THE COURT:  6730 and 8472 were not located?

13              MR. ZELLER:  Vargas testified that he accessed it.

14              THE COURT:  Accessed it but no hard copies?

15              MR. ZELLER:  Right.

16              THE COURT:  6733.

17              MR. ZELLER:  No deposition testimony.

18              THE COURT:  But you will prove that through

19  forensics?

20              MR. ZELLER:  Correct.

21              THE COURT:  8474.

22              MR. ZELLER:  The same.

23              THE COURT:  6734.

24              MR. ZELLER:  The same.

25              THE COURT:  6735.

```
 1            MR. ZELLER:  The same.

 2            THE COURT:  25929.

 3            MR. ZELLER:  The same.

 4            THE COURT:  6738.

 5            MR. ZELLER:  The same.

 6            THE COURT:  8475.

 7            MR. ZELLER:  The same.

 8            THE COURT:  8476.

 9            MR. ZELLER:  Vargas's testimony but no hard copy

10   was found.

11            THE COURT:  6739.

12            MR. ZELLER:  Forensics.

13            THE COURT:  7161.

14            MR. ZELLER:  The same.

15            THE COURT:  8461.

16            MR. ZELLER:  The same.

17            THE COURT:  15622?

18            MR. ZELLER:  Same.

19            THE COURT:  I want to go back just from 7148 to

20   the last number which was 15622.  Show me or tell me which

21   of those exhibits are hard copies.

22            MR. ZELLER:  Starting with 7148 --

23            THE COURT:  Is that a hard copy?

24            MR. ZELLER:  We should be clear about when we say

25   hard copy.
```

```
 1              THE COURT:  That means it's something physically
 2    found inside the office and can be proved through forensics.
 3              MR. ZELLER:  This was produced to us by MGA, so,
 4    yes, a hard copy as produced by MGA.
 5              THE COURT:  Show me some others.  Just go down the
 6    list for me.
 7              MR. ZELLER:  In that category, it includes 7148,
 8    8567.
 9              THE COURT:  Thank you.
10              MR. ZELLER:  7155, 8566, 7156.
11              THE COURT:  That's a hard copy?  I had a question
12    mark by it before.  We just don't know office because there
13    is no depositional testimony?
14              MR. ZELLER:  Yes.  If I could just add the point
15    to make this very clear --
16              THE COURT:  I have got it.  Next one.
17              MR. ZELLER:  6462.
18              THE COURT:  Thank you.
19              6477.
20              MR. ZELLER:  No.  That's a separate category.
21              THE COURT.  7160.
22              MR. ZELLER:  Separate category.
23              THE COURT:  No hard copy?
24              MR. ZELLER:  I apologize.  On 6477 and 7160, it's
25    actually all three.  There is Vargas's testimony.  It was
```

95

```
 1    found at Vargas's offices, and MGA produced a hard copy.
 2              THE COURT:  So it's a hard copy.
 3              MR. ZELLER:  Right.
 4              THE COURT:  Next one.
 5              MR. ZELLER:  That may be complete it.  Let me
 6    double-check.
 7              THE COURT:  Check 6730 because Vargas testified to
 8    it at least and 8472.  See if those are hard copies.
 9              MR. ZELLER:  That concludes the ones that -- wait
10    a minute.  Actually 8476 was produced in hard copy by MGA.
11              THE COURT:  Does that complete the list?
12              MR. ZELLER:  That's it, yes.
13              THE COURT:  Now, that should complete all the
14    items or downloads from the Mexico offices, is that correct,
15    concerning trade secrets?
16              MR. ZELLER:  Yes, that's it.
17              THE COURT:  Okay.  The next category was 20586,
18    2117, 2118.  Am I starting with Canada?
19              MR. ZELLER:  Bear with me, Your Honor.
20              MR. ZELLER:  20586?
21              THE COURT:  Yes, and 2117 and 2118.  They are all
22    in the same category.
23              MR. ZELLER:  It is not Canada.  This is --
24              THE COURT:  Now, we had gotten through 6919, 6953,
25    8030, and 2065.  I then moved to 6948, and you said Mattel
```

96

1    Canada.

2              MR. ZELLER:  Actually Mattel Canada starts at

3    6919.

4              THE COURT:  Now, after 6948 -- what is 6948?

5              MR. ZELLER:  6948 is Canada.

6              THE COURT:  What is it?

7              MS. KELLER:  It's an e-mail generated by Griswold

8    that includes information about Mattel Canada's sales

9    volume.

10             THE COURT:  Okay.  What years?

11             MR. ZELLER:  I will have to double-check.

12             THE COURT:  Next.

13             MR. ZELLER:  The next one is 6949, and that's

14   Canada.

15             THE COURT:  Next.

16             MR. ZELLER:  8039 is Canada.

17             THE COURT:  Although they are Canada, what trade

18   secrets are they?  What is secret, nonpublic?

19             MR. ZELLER:  This includes information about

20   Mattel Canada's sales volumes.

21             THE COURT:  What year?

22             MR. ZELLER:  Again, these are related.  I don't

23   have the year in front of me on that.

24             THE COURT:  8039, is that Mattel sale volumes?

25             MR. ZELLER:  Correct.

```
1            THE COURT:  Do you know the year?
2            MR. ZELLER:  Again, these are all related.  I
3    don't know that year.
4            THE COURT:  Next.
5            MR. ZELLER:  The next one is Canada as well.  It's
6    the same category.
7            THE COURT:  What's the exhibit number?
8            MR. ZELLER:  That's 8037.
9            THE COURT:  Next.
10           MR. ZELLER:  The next one is 6914.
11           THE COURT:  Where are these found?
12           MR. ZELLER:  The Canadian materials are
13   essentially testimony.  There's forensic to back it up as
14   well.
15           THE COURT:  Well, I'm interested in what kind of
16   evidence is coming in.  So this is going to come in through
17   testimony.  It's part of your No. 9 trade secrets bucket.
18           MR. ZELLER:  Right.
19           THE COURT:  6914.
20           MR. ZELLER:  6914 is a Barbie Spring 2005 Point of
21   Sale Analysis.
22           THE COURT:  The next one.
23           MR. ZELLER:  6916.  It's a competitive review for
24   the Canadian marketplace.
25           THE COURT:  What years?
```

1            MR. ZELLER:  2006 it looks like.  By the way,

2    starting with the last one, 6914, this is computer

3    forensics.  There's not testimony on that one.

4            THE COURT:  Next.

5            MS. KELLER:  6917.  It's a sales analysis for the

6    first half of 2006.

7            MR. ZELLER:  6918.  It's a spreadsheet relating to

8    certain sales data to Wal Mart.

9            THE COURT:  What year?

10           MR. ZELLER:  Prior to 2006 for a 2004 and 2005

11   time period.

12           THE COURT:  Let me stop you for one moment.

13           Mr. Overland, do you have now any questions about

14   the nondefinition of "trade secrets" or "alleged trade

15   secrets" that Mattel is pursuing?  In other words, now we

16   have specific documents.  We have got numbers.  You have got

17   fair warning about where to attack, you know, what's public,

18   what's not public, and it can't come in this mushroom-shaped

19   cloud.  Do you need any more information?

20           MR. OVERLAND:  No, Your Honor.

21           THE COURT:  Are you sure?

22           MR. OVERLAND:  Yes.

23           THE COURT:  Because so far the complaint has been

24   we don't know what they are doing.

25           Mr. McConville, Ms. Hurst, do you need more

 1   information at least about Bucket No. 9 thus far?

 2           MS. HURST:  I'm assuming the Court is not asking

 3   about the argument on instructions now.

 4           THE COURT:  No, but I am going to come back to it.

 5   One of the reasons I'm doing it laboriously when I didn't

 6   plan on doing it frankly is this is going to tie right into

 7   the instructions.  Trust me.  I don't know any other way to

 8   do it.

 9           Is there any other information that you need from

10   this to attack Mattel about these not being trade secrets in

11   Bucket No. 9?  Do you need more depositional testimony

12   concerning this?  Is there some concern?  The complaint has

13   been that this has been a mushroom-shaped cloud, and they

14   haven't defined it.  I'm not talking about 1 though 8 now.

15   I'm just talking about 9.

16           (Defense counsel conferring.)

17           THE COURT:  Let's go off the record.

18           (Recess.)

19                            -oOo-

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1

2

3

4                                    CERTIFICATE

5

6              I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  February 20, 2011

14

15                              Sharon A. Seffens 2/20/11

16                              _____

17                              SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25