1

2

3

4                  UNITED STATES DISTRICT COURT

5                 CENTRAL DISTRICT OF CALIFORNIA

6                       SOUTHERN DIVISION

7                           - - -

8         THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

10        MATTEL, INC., et al.,
                      Plaintiffs,
11          vs.

                                       CV-04-9049-DOC
12        MGA ENTERTAINMENT, INC.,
          et al.,                      Volume 2 of 2
13                    Defendants.

14        --------------------------

15

16

17             REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                   Santa Ana, California

19               Saturday, February 19, 2011

20

21                       SHARON A. SEFFENS, RPR
                         United States Courthouse
22                       411 West 4th Street, Suite 1-1053
                         Santa Ana, CA  92701
23                       (714) 543-0870

24

25

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    QUINN EMANUEL URQUHART & SULLIVAN, LLP
     865 South Figueroa Street, 10th Floor
5    Los Angeles, CA  90017
     (213) 443-3000
6

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    ORRICK HERRINGTON & SUTCLIFFE LLP
     4 Park Plaza, Suite 1600
9    Irvine, CA  92614
     (949) 567-6700
10

     ANNETTE HURST
11   ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
12   405 Howard Street
     San Francisco, CA  94105
13   (415) 773-4585

14   KELLER RACKAUCKAS LLP
     JENNIFER L. KELLER
15   18500 Von Karman Avenue, Suite 560
     Irvine, CA
16   (949) 476-8700

17   FOR CARLOS GUSTAVO MACHADO GOMEZ:

18   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
19   Santa Monica, CA  90401
     (310) 459-2830
20

21   ALEXANDER COTE
     SCHEPER KIM AND HARRIS LLP
22   601 West Fifth Street, 12th Floor
     Los Angeles, CA  90071-2025
23   (213) 613-4655

24

25

3

1

2                                    INDEX

3                                                                    PAGE

4     JURY INSTRUCTION CONFERENCE (Resumed)                          4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    SANTA ANA, CALIFORNIA; SATURDAY, FEBRUARY 19, 2011; 11:10

2    A.M.

3                (Jury not present.)

4                THE COURT:  We are back on the record.  We will go

5    back to the jury instructions in just a moment because

6    Bucket No. 9 has all of these exhibits.

7                How would I handle in a special verdict form?  In

8    other words, let me turn to MGA for a moment.  The concern

9    is that it's not broken down.  In Category Nos. 1 and 2, I

10   am worried about whether it's broken down enough.  In

11   Category 9, I am not worried if it was broken down.  It's

12   overly broken down.  So give me a preview.  How does this

13   look in front of the jury?

14               MS. HURST:  I think we are bleeding over into the

15   instructions argument here from our perspective.

16               THE COURT:  We are.

17               MS. HURST:  Let me go back to the big picture for

18   a moment if I may.  CACI 4401 requires a description of each

19   trade secret in Element 1.  We basically gave a choice.  Our

20   form adding the reasonable particularity -- describe each

21   trade secret with reasonable particularity gives the Court

22   two options basically.  Either in the instruction itself

23   every item has to be described as set forth -- with

24   reasonable particularity as set forth in CACI 4401.  It's

25   absurd that that's not a substantive requirement, and I'm

1    not going to really say a lot more on that other than if it

2    wasn't a requirement to identify the trade secret with

3    reasonable particularity, then, one, how could you figure

4    out whether it was secret?  Two, how could you figure out

5    whether it had economic value?  Three, how could you figure

6    out whether it was taken or not?  Four, how could you figure

7    out whether there was any causational harm or unjust

8    enrichment?  So, of course, it has to be identified.  That's

9    silly.

10            THE COURT:  I agree.

11            MS. HURST:  There are two ways we can do it.  By

12    adding the extra element, essentially we were preserving the

13    option of having an exhibit, which is each party's list of

14    trade secrets, which could then be -- but the jury can judge

15    whether it's sufficient or not, right?

16            THE COURT:  That's what you forewarned me about

17    before.

18            MS. HURST:  Right.  So that's effectively the

19    choice.  Either every single one can be listed in the

20    instruction that it is attached or something like this, or

21    it can say each secret has to be identified with reasonable

22    particularity, and then each party can offer an exhibit and

23    say we say these are identified with reasonable

24    particularity, and here they are.

25            THE COURT:  How does the jury now decide that?  In

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   the real world, the jury is sitting back in the jury room,
 2   and we're trying to avoid this whole listed cloud for
 3   Mattel, but you're concerned about the particularity
 4   becoming so particular.  How does the jury wrestle with
 5   this?  Mr. Quinn requests experts on both sides.  I would
 6   think you would be somewhat concerned about that.
 7           MS. HURST:  I don't think experts are going to be
 8   adequate.  I mean, they want to try and do everything
 9   through experts.  Experts can't show this was actually
10   secret.
11           THE COURT:  I am paying you the courtesy of asking
12   you.  I hear the problems all the time.  Do you have a
13   solution?  What is your problem?
14           MR. HURST:  Are you talking about through the
15   instructions or as a matter of trial practice?
16           THE COURT:  Both.  Basically the instructions get
17   set up by the trial practice.
18           MS. HURST:  Right.  Well, assuming --
19           THE COURT:  Take a moment.  Just talk amongst
20   yourselves.
21           (Defense counsel conferring.)
22           MR. QUINN:  Your Honor, we are going to have the
23   same discussion when we get to their trade secrets.
24           THE COURT:  We are, but that's why we are doing it
25   now because however I instruct for one will be synonymous
```

```
 1   with the other.  In other words, it doesn't matter which
 2   side is presenting it to me.  We are going to come right
 3   back to the same point about instructions that cover this
 4   area for both parties.
 5           MS. HURST:  Just to be clear, though, we don't
 6   agree for a moment that the Bratz-related buckets have been
 7   defined with reasonable particularity, and I'm just going to
 8   leave it at that.
 9           THE COURT:  I'm not saying that they have been.  I
10   will say it's a lot better than what we were potentially
11   confronting before.  So we can't have it both ways.  We
12   can't have, Judge, we don't even have an idea what the trade
13   secrets are, and now they are either too well-defined -- I
14   understand Categories 1 and 2, you know, still from your
15   perspective are a mushroom-shaped cloud, but at least the
16   Circuit now -- whether I accept these buckets or not is a
17   different question.  I only got to Bucket No. 9.  We have 80
18   pages to go.  Believe or not, we went through most of these
19   exhibits, if not all of these exhibits, in summary judgment.
20   We spent 70 pages just on this issue.
21           (Defense counsel conferring.)
22           MS. HURST:  I guess, Your Honor, how they choose
23   to present their evidence is their business.  We object if
24   they try to do it solely through experts, and we're going to
25   address what we think are the legal requirements in the JMOL
```

```
 1    motions and in the instructions.

 2              THE COURT:  Which means there's no way to --

 3              MS. HURST:  I'm prepared to argue all sorts of

 4    things today.  I don't know what witnesses they are going to

 5    put on.  I don't what their witnesses are going to say.

 6              THE COURT:  I just asked them.  They are going to

 7    put on expert, and then they are going to put on somebody

 8    who will generally say these are trade secrets.

 9              MS. HURST:  We will object to that.  They cannot

10    do that.  There will be no causation established.  There

11    will be no value established.  None of the elements will

12    have been established.

13              THE COURT:  That leads into the following.  At the

14    summary judgment motion, you basically asked the Court to

15    sweep anything that was not marked "Confidential."  Do you

16    recall that?

17              MS. HURST:  Yes.

18              THE COURT:  There's two thoughts.  Something

19    marked "Confidential" doesn't mean that it is, and something

20    that's not marked "Confidential" doesn't mean that it is

21    not.  The Court eventually has to instruct on trade secrets,

22    and all that is basically given to the jury.  I don't know

23    that there should be a presumption, but that's probably

24    going to be left for argument.

25              I would imagine that Mattel would say everything
```

1    marked "Confidential" is confidential automatically because

2    we marked it "Confidential."  By the way, all these other

3    items that are marked -- or not marked are "Confidential"

4    also because.  I would imagine that you would argue

5    everything that's not marked "Confidential" is not

6    confidential, and everything that's marked "Confidential"

7    isn't confidential because.  That's exactly where we are

8    going to be left.

9          I don't think initially, Ms. Hurst, so you

10   understand why we have been doing this morning that you're

11   going to get the added request in your instructions by MGA

12   that the marking or unmarking of confidentiality has

13   anything to bear on this.  So that's one of the things we

14   have been going through to get to this point, but I'm going

15   to be open to your arguments in just a moment, but we are

16   going back to Mr. Zeller.

17         Mr. Zeller.

18         MR. QUINN:  Before Mr. Zeller goes further, Your

19   Honor, we have taken a quick look at that IMAX case, and we

20   will respond with something in writing, but that case dealt

21   with a camera and whether certain dimensions or tolerances

22   were sufficiently identified.  That was very important in

23   that case because they had to be identified specifically in

24   order to distinguish -- to see if it could be distinguished

25   from publicly available information concerning cameras and

1    dimensions, and apparently the plaintiff could never do

2    that, so he couldn't lay the predicate.

3            We still do not believe -- and we will submit some

4    research on this -- that there is any requirement as a

5    substantive matter under the Trade Secrets Act that you have

6    to be able to identify trade secrets with reasonable

7    particularity.  The definition of a "trade secret" -- and

8    there's lots of authority on this -- is as broad as it can

9    be, anything that has economic value by virtue of not being

10   generally known.

11           THE COURT:  Since we are going to get into a

12   philosophical discussion, that may make sense in California

13   for this reason.  California encourages mobility in the work

14   force, and the way that they protect is through your trade

15   secret misappropriation as a state claim, and it seems to be

16   fairly broad.  Other states don't give the same mobility to

17   their employee population, and they don't have a stringent

18   trade secret misappropriation claim.

19           So you can see the California Legislature

20   philosophically trying to encourage mobility but the trade

21   secret balancing that mobility.  I mean, that makes sense.

22   In the state of Washington, it's the opposite.  It's quite

23   the opposite if you look at their legislation, and that's

24   why Judge Kosinski -- if you go to the end of the the tape,

25   that last four-minute tape I played for you, Judge Kosinski

```
 1    takes a final position, which we didn't play for you, and,
 2    that is, he makes a comment that he is not a fan of these
 3    individual trade secret misappropriation claims compared to
 4    copyright, and he likes the federal fabric in a sense more.
 5            Now, how that influences the Court I'm not certain
 6    because I can't guess at one jurist.  By the same token, the
 7    Circuit has never sorted this out and the Supreme Court
 8    hasn't.  I don't know why this Court is going to be in a
 9    curtailing position as far as Mattel is concerned with trade
10    secret misappropriation.  I just wanted to get more
11    specificity, and I will say it again.  I think if Mattel
12    would have been required to set forth the trade secrets
13    earlier that the case might have been narrowed earlier.
14            The way that this case came up if you remember,
15    Mr. Quin -- let me talk to you.  It came up during a
16    discovery motion.  The way it came up was a dispute between
17    you and opposing counsel, and Judge Larson was inclined at
18    that time to cause at that junction anyway a better
19    definition of "trade secret" if you recall.  You argued at
20    that time -- it wasn't the Wild West argument.  It was
21    something about we'll throw it up against the wall.  I don't
22    have the exact words.  I have got it in the back.  I was
23    searching for it between the hot chocolate I got a couple of
24    minutes ago.
25            Eventually it never got dealt with either rightly
```

```
 1    or wrongly at the summary judgment phase, and by the time
 2    the Court got this, I'm not going to be trapped -- and I
 3    have warned you about that -- into a situation where because
 4    it wasn't resolved at the summary judgment phase through no
 5    fault of yours, because it's the Court's responsibility to
 6    do that, that I have got this huge amount of damages going
 7    with no definition, and I think from your perspective you
 8    filled the Court's request.  Than you.  You have got nine
 9    buckets.
10            Now, whether I accept each of those buckets, I
11    will look at later this weekend after I release you.  I'm
12    somewhat concerned about Buckets 1 and 2 and how they
13    interplay, which is why I was asking.  Bucket No. 9 I'm
14    extraordinary pleased.  There is no doubt where Mattel
15    stands on this position.  Thank you.
16            MR. QUINN:  Until we federalized trade secrets
17    law, federal judges sitting in front of cases that have
18    California state law trade secrets claims have to
19    unfortunately or fortunately deal with this statute that
20    says a trade secret can be anything.  If you look at the
21    leading treatise, Roger Milmgren on trade secrets, and look
22    at the things that cites in California that have been
23    found -- the amorphous things that have been found to be
24    trade secret, it's really stunning.
25            I'm really concerned about Buckets 1 and 2, Your
```

1   Honor, because from the terms of our trade secrets case,

2   that's the heart of the trade secrets case right there.  We

3   believe Carter Bryant came to MGA with a fully concepted

4   doll line which has all of those elements.  That's really

5   the heart of the trade secrets case.  I think that's more

6   than adequate under the California standard.

7         THE COURT:  I understand that.  It may be from

8   this Court's perspective -- I'll state again on the record

9   that I'm very, very concerned that if the verdict seems

10  disproportionate to the Circuit that the heart of the case

11  may get attacked.  There may be a certain imbalance from the

12  Circuit's perspective, and that in going through the stage

13  that I think should have taken at summary judgment frankly,

14  that's it is a way that the Court can give the Circuit a

15  clear a record and make it very easy to reverse this Court

16  in terms of different damages and still protect the verdict,

17  the guts of the case in a sense, so that's the effort.

18  Whether I choose to define that any further or make any

19  further requirement, I'm not certain.  I just need time to

20  look at that tonight, but you have done everything I have

21  asked.

22         MS. HURST:  May I address that on Buckets 1 and 2?

23  The IMAX case -- Buckets 1 and 2 are exactly the problem.  I

24  mean, give me a break, multi-ethnic fashion dolls?  Come on.

25  Fashion dolls, nobody ever heard of --

1            THE COURT:  I hear the problem.  You are welcome
2      to propose a solution.
3            MR. QUINN:  That's one of 20 elements.
4            MS. HURST:  I will tell you what the solution is.
5      This claim should not go to the jury.
6            THE COURT:  Now, assuming that the claim does go
7      to the jury for a moment, you can propose a solution.  So if
8      you can better define it, if you can help the Court, fine.
9      Otherwise, you have an objection, and it's noted on the
10     record.
11           Mr. Zeller, sorry for the interruption for the
12     last two hours.  Go back to your argument.
13           MR. ZELLER:  I take it that's sufficient on the
14     Bratz issue.
15           The next issue that I think is a point of
16     contention between the parties is whether or not the jury
17     should be instructed that the definition of "trade secret"
18     status and the particular economic value and the measures
19     taken to keep this trade secret secret should be judged as
20     of the time of the misappropriation.
21           We have proposed language to that effect to make
22     it very clear to the jury that that's the timing of it, and
23     that subsequent public disclosure doesn't of course destroy
24     the trade secret effect of -- or the trade secret value and
25     does not render a trade secret -- I will say retroactively

```
 1   not a trade secret because of the disclosures.  Some secrets
 2   of course such as Mattel's line list gets embodied in some
 3   way in actual released products.  That doesn't mean that
 4   that line list was not a trade secret when it was stolen.
 5           We think that some explanation of the timing needs
 6   to be made.  This will be picked up I think -- we have
 7   actually submitted some briefs on this issue and another
 8   issue, which is, to what degree can damages be obtained
 9   after a trade secret has been publicly disclosed?  From our
10   perspective very briefly -- and we can talk about this in
11   more detail later -- we don't think it can be the case that
12   the Bratz trade secrets -- that MGA could basically cut off
13   damages or any kind of monetary relief by arguing that we're
14   not entitled to anything after MGA -- the accused trade
15   secret misappropriator was the one that disclosed it
16   publicly.  We submitted a brief on that very issue.
17           The next significant issue I think that gets teed
18   up by the jury instructions on trade secret pertains to
19   actual use.  We propose an instruction whereby we tell the
20   jury that actual use by the trade secret holder is not an
21   element.  The fact is that MGA intends to argue to the
22   jury -- and we think it will be confusing to the jury if
23   this is not properly explained to them -- that Mattel would
24   have never exploited Bratz had it known about Bratz as a
25   trade secret.
```

```
 1              THE COURT:  Just a moment.
 2              (Pause in proceedings.)
 3              THE COURT:  I don't understand the last statement.
 4              MR. ZELLER:  MGA is going to argue that Mattel
 5    would have never used -- never released Bratz itself.  In
 6    other words, hypothetically --
 7              THE COURT:  I understand.  Now you are clear,
 8    because Mattel never would have released Bratz.
 9              MR. ZELLER:  Right.  So what we believe in order
10    to make sure that it's clear to the jury is that we have
11    proposed an instruction whereby they are told that it does
12    not matter whether or not the trade secret holder exploits
13    or plans to exploit the trade secret by what occurred here
14    by releasing a line of dolls.
15              There also appears to be a dispute, although I'm
16    not entirely clear really on MGA's position on this, but we
17    have proposed an instruction to make it clear to the jury
18    that concepts and ideas may be trade secrets under
19    California law as long as the other elements of a trade
20    secret are satisfied.  The Court has seen and Mr. Quinn has
21    alluded to the fact that there is apple authority on that
22    particular issue.
23              Also, the Court has already found --
24              THE COURT:  I'm going to stop you right there.
25    That's one of the critical questions of the case, so before
```

1   we just pass through that quickly, I have left that for the

2   jury to determine.

3           My question to both of you is the following.

4   Should that finding come at the very beginning along with

5   the statute of limitations in terms of the special verdict

6   form, and does that make a difference if they continue on,

7   which they obviously might if they make certain findings

8   concerning either the concept of ideas or the statute of

9   limitations?  In other words, there is an argument that we

10  don't go any farther depending upon what they are determine.

11  So the structure of this special verdict form becomes

12  extraordinarily important.

13          So now I am going to address that issue.  Statute

14  of limitations, should I have that at the beginning of the

15  verdict form?

16          MR. ZELLER:  I don't think so.

17          THE COURT:  Why?  If they find that the statute of

18  limitations hasn't been met, this case is over.

19          MR. ZELLER:  One can certainly take that

20  viewpoint.  I don't disagree with that, but I also think

21  that in the context of the amount of time and effort that

22  goes into this trial to have the jury make a finding on one

23  issue and call it a day seems to risk I think a retrial, and

24  the reason is that if error is found in connection with the

25  statute of limitations, whether -- you know, whatever that

```
1    is, whether it's legal or otherwise, that means that we have
2    no other findings --
3              THE COURT:  Let me stop you now.
4              Ms. Hurst, you heard -- of course your client is
5    at risk in terms of a new trial also.  It's burdensome for
6    Mattel, but it's more burdensome from my perspective even
7    for Mr. Larian and MGA.
8              Should I put this at the beginning, and if in fact
9    they don't reach the necessary findings, the case is over?
10             MS. HURST:  We think yes, and we are more than
11   satisfied that there would be no directed verdict standard
12   that could possibly apply to the statute of limitations.
13             THE COURT:  And I come back with a second
14   question.  I assume you have the same position on behalf of
15   Mattel concerning ideas.
16             MR. ZELLER:  Yes.
17             THE COURT:  Because that has a dramatic effect.
18             Ms. Hurst.
19             MS. HURST:  I'm sorry, ideas meaning what?
20             THE COURT:  Well, the concept of ideas.  If I am
21   going to require a special finding concerning ideas, I
22   assume that your position is the same.  You would like that
23   at the beginning of the verdict form.
24             MS. HURST:  Well, there are different issues
25   involving ideas.  One is the contract interpretation issue,
```

```
 1    and then a whole different is the trade secrets.  I don't
 2    think we need a special finding on whether an idea can be a
 3    trade secret or not.  The law is what it is.  They will be
 4    instructed on that.
 5              THE COURT:  Third, is there going to be a special
 6    finding concerning whether Mr. Larian acted on the advice of
 7    counsel?
 8              MR. ZELLER:  We don't think that would be
 9    appropriate.
10              THE COURT:  In other words, we would never know --
11    it's of no concern that a verdict would reflect their
12    thoughts in that regard?
13              MR. ZELLER:  Yes, but we of course don't think
14    that it's ever been properly asserted.
15              THE COURT:  As an affirmative defense or any other
16    defense.
17              MR. ZELLER:  Yes.
18              THE COURT:  We'll see.  I'm just going to sort out
19    all the questions today.
20              (Defense counsel conferring.)
21              THE COURT:  And remember the record that you have
22    is the first -- even though we might suspect advice of
23    counsel, that was never raised.  It had a lot to do with the
24    Court's decisionmaking in terms of privilege and
25    nonprivilege.
```

```
 1              MS. HURST:  We don't think there should be a
 2   special finding on it because it's not a dispositive element
 3   or a defense --
 4              THE COURT:  I agree.  I'm just raising issues.  We
 5   have agreement on that.
 6              Mr. Zeller, if you would like to continue.
 7              MR. ZELLER:  Just on the point about sometimes
 8   where you're calling them ideas, concepts, with respect to
 9   trade secret, the Court noted on summary judgment and in
10   fact denied summary judgment in MGA's favor specifically on
11   the proposition that doll names could be trade secret.  The
12   Court accepted at least the possibility that if it is shown
13   that the elements are met that they derive independent
14   economic value from not being generally known and otherwise
15   could be protected as trade secrets.
16              We do think that the law is pretty clear here, and
17   we think that the Court should instruct the jury on the law,
18   that concepts and ideas can be protected as trade secrets
19   subject to it meeting the elements for trade secret
20   protection.
21              We also on a related note submitted an instruction
22   that tells the jury about what sometimes people refer to as
23   combination trade secrets.  That's basically the combination
24   such as the Bratz concept that we have defined of various
25   elements making up that trade secret.  One reason why is
```

1   that the law on this is if a portion of the trade secret, or

2   perhaps even if all of them are individually known publicly,

3   they can still be a trade secret in combination in that

4   particular combination.  That's actually a basis for patent

5   law, and it's pretty well-recognized that -- you know, kind

6   of under the concept of if the information taken together

7   derives economic value from being kept secret and otherwise

8   meets the requirements of trade secret law, it is

9   protectable as a trade secret.

10          THE COURT:  There's some pretty stringent

11   requirements in patent law.  If you're going to cite that to

12   me as an example like in No. 6 concerning the absolute

13   similarities, that is not an amorphous concept.  Patent law

14   does not -- when I have a combination coming before the

15   Court, each element has to match.

16          MR. ZELLER:  They do for infringement.  I'm

17   talking about protectability.  I'm talking about trade

18   secret protectability and patent protectability.  I'm not

19   talking about the infringement analysis, because there is no

20   question that obviously in the patent context, the accused

21   device or whatever it is has to read upon the patent.  What

22   I am saying is in the first instance -- and this is true in

23   both trade secret as well as patent law -- that it's not

24   enough to just simply say, well, every element that's part

25   of your patent or trade secret you can find out there

```
 1    somewhere if the world separate.  It's not enough to say
 2    that because it's the combination that's protected.  That's
 3    the point.  MGA actually doesn't disagree that this exists
 4    under the law.  They just argue in many cases it will
 5    somehow be publicly known or generally known.  Whether
 6    that's the case or not doesn't define the law.  That's a
 7    factual dispute.
 8            The next issue I have down here is kind of a big
 9    picture issue, some disputes between the parties the Court
10    has already mentioned, which is whether or not the marking
11    of documents should be or should not be determinative.  We
12    have proposed an instruction that tracks what the Court has
13    already held as a matter of law, which is that the failure
14    to mark documents as "Confidential" does not preclude a
15    finding of reasonable efforts to keep the trade secret
16    secret.
17            Part of it is that MGA for its part -- this is
18    based on instructions -- says you should consider, jury,
19    whether or not any of the documents have been marked as
20    "Confidential."  We don't disagree with that as being a
21    factor to be considered, but to balance that, the Court
22    should also instruct the jury that that's not dispositive.
23    It's a factor for them to consider along with all the other
24    evidence on whether or not reasonable steps were taken to
25    protect and maintain the secrecy of the asserted trade
```

```
 1   secrets.
 2           THE COURT:  If I single out confidentiality simply
 3   by a stamp, why should I single out that factor?  In other
 4   words, it may be one factor but what other factors do I
 5   mention?  If I start mentioning that factor, the
 6   highlighting of that factor makes it appear that that is a
 7   sole factor to consider when there are many other factors,
 8   including the fact that many documents stamped
 9   "Confidential" are not trade secrets.
10           MR. ZELLER:  We would welcome that being balanced
11   out, too.  For the Court to say, look, you -- just because
12   it's marked "Confidential" doesn't mean that it's a trade
13   secret and vice-versa.  You need to consider all the
14   evidence.
15           THE COURT:  Show me the instructions on that.
16           MR. ZELLER:  Sure.
17           MS. HURST:  Our instruction is the form, and
18   whether it's marked with the confidentiality language is one
19   element in the form.
20           THE COURT:  What's the form?
21           MS. HURST:  CACI 4404.  It's the form instruction.
22   Element A is whether documents or computer files containing
23   the information were marked with confidentiality --
24           THE COURT:  It's one element?
25           MS. HURST:  Right.  It's one element.
```

```
 1              THE COURT:  What's the difference between your
 2    instruction and Mattel's instruction?
 3              MS. HURST:  Mattel as the Court indicated is
 4    unduly emphasizing one element.  They have a special
 5    instruction on it.
 6              THE COURT:  Now, this has just been added to our
 7    list.
 8              Was this just produced today?
 9              MR. ZELLER:  No.  It's sitting over there.  It's a
10    separate instruction.
11              THE COURT:  Now, this special instruction -- the
12    wording is appropriate.  The instruction singled out is not.
13    Therefore, the idea is not rejected.  It will be included in
14    one of these two instructions.
15              Now, what's the difference between MGA's proposed
16    instruction and Mattel's proposed instruction?
17              MS. HURST:  Your Honor, our instruction is nearly
18    verbatim to CACI 4404.
19              THE COURT:  I'm asking what the difference is from
20    Mattel's instruction.  Rather than me picking through the
21    minutia, you two can.
22              MS. HURST:  As best I can tell, the only
23    difference is that our instruction is generic as to whoever
24    the plaintiff and defendant are, whereas, theirs is specific
25    to Mattel or Mattel Mexico --
```

25

```
1              THE COURT:  Is that the only difference?
2              MR. ZELLER:  Yes.
3              THE COURT:  Take one more look.
4              MR. ZELLER:  This includes the point about the
5    timing that I was mentioning earlier.  Those are in more
6    than one instruction where we say "at the time of the
7    misappropriation" to make that point clear.  That is
8    included in our proposed instruction as to reasonable
9    efforts to protect secrecy.
10             THE COURT:  Is that included in MGA's instruction?
11             MR. ZELLER:  It is not.
12             MS. HURST:  It's not in the form instruction, Your
13   Honor, and we think there are issues here about whether
14   reasonable efforts were taken when the employees were
15   departing.
16             THE COURT:  Show me the timing section.
17             MR. ZELLER:  It's not necessarily in one.  I can
18   go through there.  It's in a couple of difference places.
19   One is here as I was mentioning, "reasonable efforts to
20   protect secrecy," and it says "at the time of
21   misappropriation."
22             THE COURT:  Which is not included in MGA's.
23             MR. ZELLER:  Correct.  Two other places that it is
24   also referenced is in Mattel's proposed instruction that is
25   entitled "Essential Factual Elements" and Trade Secret
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   Defined."  The timing issue is also included in the
 2   "Affirmative Defenses" instruction.  Information was readily
 3   ascertainable by proper means."
 4             For the record, I will note that the timing issue
 5   is also in misappropriation by disclosure that the parties
 6   proposed instructions both reflected, so "at the time of
 7   disclosure" is reflected in both.
 8             THE COURT:  Is there some disagreement with this
 9   instruction?
10             MR. ZELLER:  Obviously Mr. Machado has a different
11   one, but as between MGA and Mattel, the difference is just
12   simply in the references to the parties.  By the way, "at
13   the time of misappropriation" is in CACI 4401.
14             MS. HURST:  Plaintiff is wrong on this.  We object
15   to including the timing element and reasonable efforts,
16   4404.  It's not part of the form, and it would be confusing
17   and prejudicial here given MGA's theory of the case
18   because -- let's just take Mr. Castilla, for example.  When
19   he left, he had already misappropriated by downloading the
20   information.  Mattel knew it and during his exit interview
21   did not confront him or later inform MGA and give MGA an
22   opportunity to correct the situation.  By including that
23   language, it appears to limit reasonable efforts to the
24   timing of misappropriation.  The jury would likely be
25   confused into thinking that Mattel's failure to confront him
```

1    upon his exit interview was irrelevant when it is clearly

2    not.

3            MR. ZELLER:  We would welcome that before the

4    jury.  The fact is that we went to the FBI.  I think the

5    jury is entitled to determine whether or not that would

6    constitute reasonable efforts if MGA wants to put that at

7    issue.  The fact is that that is a correct statement of the

8    law which we would propose.  It's not reflected in 4404, but

9    it is reflected in 4401.

10           THE COURT:  Can you please pull that out.

11           MR. ZELLER:  4401 is right here.  This is the

12   essential factual elements.  MGA omits that language from

13   4401 in its proposed instruction for essential factual

14   element.

15           MS. HURST:  It's right there.  We included it in

16   4401.  The other concern that we have about both the

17   inclusion in 4404 and the language "at least as of the time

18   of the misappropriation" is that it could also rescue the

19   trade secret that had been previously disclosed by Mattel,

20   lost its trade secret status, but then thereafter they

21   attempted to regain that.  The language is also misleading

22   for that reason.  We included it in the form wherever it was

23   a form requirement.

24           MR. ZELLER:  Just so the record is clear, Element

25   No. 2 of 4401, ostensibly from MGA, misappropriation of

```
 1    trade secrets included as Element No. 2, is an element that
 2    does not exist at all.
 3          MS. HURST:  We already had the argument on that --
 4    you had your part of the argument on that.
 5          THE COURT:  Mr. Zeller, you may continue.
 6          MR. ZELLER:  Just to pick up on the last point
 7    briefly, for MGA to go and argue to the jury that Mattel
 8    didn't take reasonable steps to protect its trade secret
 9    information when Mr. Castilla took it and Mattel went to the
10    FBI, it really strikes me as rather extraordinary.  Frankly,
11    it just seems to me that they are signaling the fact that
12    they intend to make a statement to the jury that is clearly
13    just erroneous as a matter of law.
14          The idea that somehow the law required or they
15    could even infer that the failure to say to him at his
16    interview and -- by the way, Mr. Castilla denied at his
17    interview that he took anything.  He was confronted, was
18    asked, at his exit interview, and he said he did not take
19    anything.
20          Mattel enlisted the FBI.  The FBI was also lied to
21    initially by Mr. Castilla.  When they first visited
22    Mr. Castilla, he denied being able to find the PDA chip that
23    had the information.  Subsequently he claimed -- and this is
24    what the evidence will show -- it was found in his vacuum
25    cleaner.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1          We welcome that story if MGA wants to get into it.

2     The Court will recall that they were the ones that did not

3     want it to become known that there was an FBI investigation,

4     but clearly if they are going to make the argument that they

5     are here -- first of all, it certainly should not be allowed

6     into the jury instructions, but, No. 2 --

7          THE COURT:  It's already before the jury that the

8     FBI responded.

9          MR. ZELLER:  Not that they went and got the chip

10    from the PDA from Mr. Castilla, that he lied to them when he

11    did it.  Those facts have not been laid out as far as I

12    recall to the jury.

13         Another somewhat key issue here is that there

14    appears to be an issue as to the submission of a royalty

15    determination to the jury.  There is obviously a threshold

16    issue as to whether or not a reasonable royalty measure for

17    trade secret misappropriation is a jury issue or a Court

18    issue.  The Court may be aware that CACI 4409 basically says

19    to a jury, by the way, you don't calculate any amount of

20    royalty.  The Court will do it.  So there is that threshold

21    issue of whether or not we should just submit it to the jury

22    and ask them to come up with a reasonable royalty.

23         THE COURT:  What's your preference?

24         MR. ZELLER:  We think it should.

25         THE COURT:  Should just move to the jury?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1              MR. ZELLER:  Correct.

2              THE COURT:  And ask them to come up with a

3     reasonable royalty?

4              MR. ZELLER:  Correct.

5              THE COURT:  Based upon that, do they reach the

6     ultimate decision about what the damages are based upon that

7     reasonable royalty?

8              MR. ZELLER:  Well, I don't know that we have a

9     strong position on that.  I mean, I think either of those

10    could make sense.

11             THE COURT:  That's not helpful.  Do you have a

12    position?

13             MR. ZELLER:  Just a second.

14             (Plaintiff's counsel conferring.)

15             MR. ZELLER:  I will put it this way.  For reasons

16    of convenience, we think that the calculation entirely ought

17    to be done by the jury up to the time of the decision.

18             THE COURT:  Up to the time of the decision?  Up to

19    the time of the verdict?

20             MR. ZELLER:  Right.

21             MR. ZELLER:  Up until the time that they have

22    evidence for damages.  There may have to be some further

23    determination by the Court on a going-forward basis or a

24    time after evidence is submitted to the jury that would be

25    consistent with that determination.  The reason is we think

```
 1    this should go to the jury anyway on copyright, so they
 2    might as well make the same set of determinations on trade
 3    secret.
 4            THE COURT:  Thank you.
 5            MR. ZELLER:  Another major issue I think in terms
 6    of the instructions are that MGA has proposed -- and we have
 7    not because we don't think it's appropriate -- an
 8    instruction on Copyright Act preemption as it pertains to
 9    trade secret.
10            THE COURT:  Anything else?
11            MR. ZELLER:  The Court is aware that we have
12    pursuant to the Court's minute order submitted a brief on
13    MGA's motion for reconsideration on this issue of Copyright
14    Act preemption.
15            The parties appear to disagree on who bears the
16    burden of apportioning profits in a trade secret case.
17    Interestingly, MGA previously -- and this is in its
18    opposition to Mattel's Daubert motion, No. 2 -- appeared to
19    concede that the burden of apportioning profits falls upon
20    the party accused of trade secret misappropriation.  That's
21    a quote.  Now MGA appears to be taking a contrary position
22    in suggesting that Mattel is the one that bears the burden
23    on that.
24            THE COURT:  Just a moment.
25            (Pause in proceedings.)
```

```
 1              THE COURT:  All right, Mr. Zeller.

 2              MR. ZELLER:  Mattel has proposed an instruction

 3    which is based on CACI 4405, which is entitled

 4    "Misappropriation by Acquisition," and that is disputed by

 5    the MGA parties and I believe by Mr. Machado as well.

 6              THE COURT:  Just a moment.

 7              (Pause in proceedings.)

 8              THE COURT:  Mr. Zeller.

 9              MR. ZELLER:  Following up on that point, as the

10    Court is aware, there are different ways in which trade

11    secret misappropriation can occur.  It can be by

12    acquisition, by disclosure, and by use.  We believe that all

13    three should be properly instructed upon to the jury in this

14    case.  I don't think there is a substantive disagreement as

15    to what the content of such an instruction should be.  I

16    think the dispute is the applicability.

17              Another issue between the parties deals with the

18    instruction on ratification.  It won't be a surprise to the

19    Court based on the questioning so far that Mattel believes

20    that the jury should be instructed on ratification with

21    respect to the trade secret misappropriation.  That's

22    something that is recognized in the case law concerning

23    trade secret misappropriation.

24              One case that we have cited is Ajaxo, where the

25    Court found that there was -- and upheld -- a jury
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    determination that top management of the defendant had an
 2    opportunity to know of and either ignored or actually
 3    approved of the trade secret misappropriation.  In
 4    particular, as the Court is aware, MGA's basic position has
 5    been that they told these individuals simply to come with
 6    their brains, but subsequent conduct of MGA and Mr. Larian
 7    can constitute ratification.  We think the jury should be
 8    instructed on that issue.
 9              THE COURT:  Show me the instruction.
10              MR. ZELLER:  Yes.
11              THE COURT:  I will come over in just a minute.
12              MR. ZELLER:  These are somewhat separate
13    instructions that we have a proposal for, and there was not
14    a corresponding one.
15              THE COURT:  If I gave an instruction like this, I
16    don't know about the explicitness of the instruction.  I
17    tend to give general concept instructions in other words,
18    and I'm not saying I am, but "ratification" would be
19    defined, and it would be for you to argue what that means.
20              What else?
21              MR. ZELLER:  MGA has proposed a modification to
22    CACI 4420.
23              THE COURT:  Okay.
24              MR. ZELLER:  What they have done is they have the
25    word "any" inserted, and part of the problem is that --
```

34

```
 1              THE COURT:  Just a moment.  What are you referring
 2    to?
 3              MR. ZELLER:  It says "did not misappropriate any
 4    trade secret if the defendant proves that the information
 5    alleged to be a trade secret was readily ascertainable by
 6    proper means," and it continues on.
 7              The problem is by using the word "any" is that it
 8    suggests when you have a multiple trade secret theft claim
 9    like we have here that if one fails they all fail.
10              THE COURT:  Just a moment.
11              (Pause in proceedings.)
12              THE COURT:  So you prefer "a trade secret"?
13              MS. HURST:  So stipulated.
14              THE COURT:  So all that is left of 4420 is the
15    timing element.  That's the disagreement, at the time of the
16    alleged acquisition.  That's really the dispute.  Okay.
17              What else?
18              MR. ZELLER:  There are some issues pertaining to
19    the equitable defense instructions proposed by MGA.
20              THE COURT:  We will let MGA argue those first.  We
21    will come back to the defenses.
22              All right, I'm going to down the line of questions
23    for you for just a moment.  Then I will turn to Ms. Hurst.
24              Mattel's Special Jury Instruction No. 9, actual
25    use by trade secret holder not required, where does that
```

1    come from?

2            MR. ZELLER:  I separated out the authority sheets

3    based on what we did the last time.

4            THE COURT:  Put the authorities behind each one

5    when we are done today.

6            Let me turn to Ms. Hurst for a moment.  Ms. Hurst.

7            MS. HURST:  All right, let me just start at the

8    beginning, or is there something specific you want me to

9    start with?

10           THE COURT:  It would be helpful concerning --

11   well, if you have a particular order, that's fine.  It's

12   easier for me if you just retrace the issues in order.

13           The first is the definition of "trade secret"

14   status, and should it be adjudged at the time of the

15   misappropriation and not subsequent disclosures?  That is a

16   myriad of instructions on this table, but probably 4420 best

17   exemplifies that issue.

18           MS. HURST:  Right.  Mr. Zeller started today with

19   substantial factor causation.  Maybe I should go back to the

20   beginning.

21           THE COURT:  Go back to the beginning, the

22   substantial factor test.

23           MS. HURST:  Before I go there, let me say there

24   was one general -- two general principles that we approached

25   with our instructions.  First, we think that all of these

1    instructions -- since there are trade secret

2    misappropriation claims going both ways, they should all be

3    worded generically claimant and defendant.

4              THE COURT:  I agree.  First of all, that's get

5    that out of the way.  They will be.

6              MS. HURST:  Second, we tried to adhue to the forms

7    as much as possible, so ours are pretty close to the forms.

8              Having said those two things, let's me go back --

9    let me start here --

10             THE COURT:  Just a moment.  They will be as

11   generic as possible unless there are individual claims.  In

12   other words, if we have a trade secret misappropriation

13   going back and forth, it seems rather ridiculous to point

14   out different parties.  I'm just giving the instruction

15   twice.

16             MS. HURST:  Exactly.

17             So let me me start with this.  This gets somewhat

18   into contract interpretation, so if the Court wants to

19   address this in a different context, I'm sure you will say

20   so.  We don't think that the Bratz trade secret claim can be

21   submitted to the jury for numerous reasons, but one of the

22   reasons is the "as a result of" language in paragraph 1-A of

23   the inventions assignment by Carter Bryant.  The "as a

24   result of" language limits the trade secrets covered by the

25   agreement that are created by employees.  In other words,

1   the trade secrets created by an employee that are covered by

2   the agreement are the "as a result of" language, and it's in

3   direct contrast to 2-A, assignment and disclosure

4   obligations, which are worded in the same way, which are the

5   the "at any time during the period of my employment"

6   language as opposed to the "as a result of" language.

7          What this distinction in language between 1-A and

8   2-A means is either that Mattel is wrong about its scope of

9   the assignment provision and that that was always intended

10  to be restricted to things that were directly related to

11  employment, that is, akin to a work-made-for-hire concept,

12  or even if it's as broad as Mattel claims, then it must be

13  the case that the choice is "as a result of" and that 1-A

14  was intended to have a differentiating effect and meaning,

15  and either way, there is no Bratz trade secret because there

16  is no evidence at all and will never be any evidence -- and

17  they have never claimed -- that Bratz was created as a

18  result of Mr. Bryant's assignments for Mattel.

19          By the way, this makes sense, because as I think

20  Ms. Keller put it in opening statement, the Bratz trade

21  secret was so secret Mattel didn't even know about it.

22  That's just silly.  The way the contract is set up there are

23  trade secrets that are created by other employees around you

24  or things that you are exposed to in the workplace, and

25  those are covered, and then there are the things that you

```
 1    work on, and those are covered, and that makes sense.

 2              Now, Mattel wants to respond to this by saying,

 3    well, the definition of proprietary information in 1-B and

 4    1-C is so broad it covers anything, including something

 5    that's created by the employee pursuant to 2-A.  The problem

 6    with this response is that 1-B just tracks the language of

 7    the statute.  It's just a definition of "trade secret," and

 8    it can't be the case that that is completely untethered to

 9    the employment with the company or the circumstances which

10    the agreement is intended to cover.  That provision is not

11    intended to define what the nondisclosure obligation is.

12    It's simply intended to define what can be a trade secret.

13              If Mattel were right that the 1-B definition of

14    "proprietary information" somehow states the nondisclosure

15    obligation, then an employee would be violating their

16    contract with Mattel I guess by going and stealing the

17    formula for Coke on their off-hours and posting that on a

18    website.  That's silly.  That's obviously not what was

19    intended.

20              Instead, 1-A defines the nondisclosure obligation

21    with reference to the employment relationship, and it says

22    you are going to get exposed to two kinds of things, things

23    in the workplace around and things that you create as a

24    result of your employment, and you have an obligation not to

25    disclose any of that.  That makes sense.
```

```
 1          What does not make sense is they chose two
 2   different phrases in 1-A and 2-A, and they get to whipsaw it
 3   both ways somehow.  Either "as a result of" means something
 4   different than "at any time during the period of my
 5   employment" in which case Bratz is not a trade secret, or
 6   "at any time during the period of my employment" should be
 7   interpreted with reference to the language "as a result of,"
 8   which of course is our ultimate position, and they don't own
 9   it in which case it can't be a trade secret.  As the Court
10   noted in the summary judgment order, we shouldn't worry
11   about the problem of they don't own it, but they are still
12   claiming it's one of their trade secrets anyway.
13          Now, we are are going to have a million other
14   arguments about whether Bratz is a trade secret before we
15   get to the Rule 50 motion, but I did want to address that
16   one today.
17          A second point on the first two buckets, and this
18   goes to -- you know what, this goes to one of Mr. Zeller's
19   points, so why I don't go back now to Mr. Zeller's points,
20   and I will respond to them.
21          THE COURT:  Let me walk through them with you.
22          MS. HURST:  Okay, substantial factor causation.
23   Obviously, our belief that the law in California is but for
24   causation.  That's what the Mitchell case says.  It's what
25   Soule says.  It's what Viner versus Sweet says.  If they are
```

1    trying to get something less than but for causation with

2    substantial factor causation, then that is clearly legal

3    error.  Rutherford is an asbestos case.  That is not good

4    precedent in a situation like this where in those asbestos

5    cases you have the possibility of multiple exposures and

6    shifting burdens.

7              THE COURT:  Okay.

8              MS. HURST:  We have added -- I think Mr. Zeller

9    was objecting to this -- the concept of comparative fault.

10   This is not contrary to the law of tort or the law of joint

11   and several liability.  It's a standard comparative fault

12   instruction.  On its face, it says don't let this affect

13   your damages determination.  It's for the Court ultimately

14   to determine the significance of that.

15             Now, the Court asked a question if you give a but

16   for do you also have to give apportionment?  I'm assuming by

17   apportionment in that context the Court meant comparative

18   fault as I have just described it.

19             Our view obviously as a defendant here who is not

20   directly alleged to have misappropriated anything but only

21   to have acquired it through the departing employees is that

22   we would like to see but for and comparative fault.

23             The Court asked should it give the substantial

24   factor instruction each time or only one instruction

25   defining "substantial factor"?  The Court could make a

```
 1    determination depending on the theories applicable to each
 2    claim that in some instances the but for standard is really
 3    required.  There are limited circumstances where when there
 4    are multiple concurrent causes that the substantial factor
 5    without but for may be appropriate.  That's a very limited
 6    class of cases.  We don't think it's applicable here, but
 7    each tort does need to be considered independently.
 8            THE COURT:  Can you give me Mattel's -- not yours
 9    -- strongest argument as to which of the torts would have
10    certain substantial factors?  The easy answer is none.
11            MS. HURST:  None.  Thank you.
12            THE COURT:  We have had quite a bit of discussion
13    already on the issue of identification of the trade secrets.
14    Let me go back to the IMAX case.  The importance of
15    identification is that it separates the trade secret from
16    something that's not, from something that's already known,
17    from something that is part of ordinary skill or knowledge
18    in the trade.
19            As I previously noted, CACI 4401 does require on
20    its face a description of each claimed item of trade secret.
21    We put in the reasonable particularity to identify as a
22    alternative to that rather than listing out all of the trade
23    secrets in the instruction but allowing it to be done by
24    reference.  So those are the choices in our view.  Either it
25    says "reasonable particularity" and then in closing it can
```

```
 1   be argued this is my exhibit with all my trade secrets, and

 2   I have identified them in accordance with that standard, or

 3   the instruction has to set it out.  It is not in our view

 4   adequate to simply leave it to the verdict form, because

 5   putting it on a verdict for many reasons -- putting on a

 6   verdict form will make it seem as if they have passed muster

 7   and they have met the requirements when they haven't.

 8             THE COURT:  Okay.

 9             MS. HURST:  I think Bratz Buckets 1 and 12 are

10   just fine examples of the IMAX problem.

11             THE COURT:  Let me take the easy one, Bucket 3,

12   the Bratz name.

13             MS. HURST:  We don't think that can be -- that an

14   idea for a product name can be a trade secret as a matter of

15   law.

16             THE COURT:  Just a minute.

17             (Pause in proceedings.)

18             THE COURT:  I don't understand.  Let me divulge my

19   ignorance.  Bratz is copyrightable, whatever that means, but

20   it can't be a trade secret?

21             MR. HURST:  No --

22             THE COURT:  Why does it deserve protection under

23   the copyright laws when we actually have to purchase the

24   name from the prior holder, but it doesn't have the status

25   potentiality of being a trade secret?
```

```
 1            MS. HURST:  I'm assuming the Court means trademark
 2    law.
 3            THE COURT:  I apologize.  For the record, I have
 4    done that from the beginning of the case.  When I meant
 5    trade secret, I have oftentimes said trademark and vice
 6    versa.  I do apologize.
 7            MS. HURST:  I'm just trying to make sure I'm
 8    answering the right question.  In this case -- I mean, let's
 9    put aside every broad proposition of law.  In this case, as
10    the Court can see from our request for judicial notice,
11    which we haven't gotten to yet, but I'm sure we will
12    eventually, the name "Bratz," including Bratz with a "Z,"
13    was used repeatedly -- proposed as a trademark -- whether or
14    not it was used, it was repeatedly proposed as a trademark,
15    and that was publicly available information at the Trademark
16    Office as early as something like 1984 maybe.
17            There is also authority principally in the Second
18    Circuit that just general product concepts don't pass muster
19    as trade secrets.  Here the argument is that a product name
20    is not valuable until you use it, and you can't use it
21    without disclosing it.  So, by definition, it doesn't fit
22    the rubric of trade secret.  That's sort of a categorical
23    argument, but here specifically Bratz was previously
24    disclosed as a product name idea.  That information was
25    readily available, and --
```

1          THE COURT:  It was previously disclosed to Cosco

2     concerning clothing, and here you don't even have the same

3     channel.

4          MS. HURST:  Actually, in the request for judicial

5     notice, we demonstrate applications for use on dolls in the

6     Beverly Hills Bratz with a "Z."

7          THE COURT:  Okay.  Jade?

8          MS. HURST:  Same thing.  We will establish that

9     there were at least two prior fashion dolls in the market

10    using Jade, the Jason Wu doll.  I think we are going to do

11    that on recross with Mr. Larian, but, in addition, you have

12    those public filings at the Trademark Office with the name

13    Jade for dolls and accessories.  In that case, it was Jungle

14    Jade.

15         MS. HURST:  Your Honor, Mr. Linder's testimony

16    that he was paid no more than $200 for the idea for the

17    product name "Bratz" has to be weighed very heavily in the

18    balance here.

19         THE COURT:  The Bratz sculpt, which is 11360?

20         MS. HURST:  There is the "as a result of" language

21    in the contract.  Let's start there.  That sculpt was

22    created by Margaret Leahy.  I don't know how that can

23    possibly be a trade secret of Mattel.  It doesn't make any

24    sense at all.  At most, it could be jointly owned.

25    Obviously our position would be that it's solely -- whatever

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
1    intellectual property is in the sculpt is solely owned by
2    MGA, but at most, it could be jointly owned with us paying
3    for and directing Margaret Leahy's work.
4              THE COURT:  How about the hero shot?
5              MS. HURST:  Our review with respect to the hero
6    shot and the drawings is that preemption applies, because
7    when you're down to the trade secret is the specific
8    expression -- and this will also address Mr. Zeller's
9    comments regarding the combination of elements instruction.
10   When you're down to the specific particularized expression
11   that is the drawing, that is a copyright claim.  That is not
12   a trade secret claim.  That's just runs head-long into
13   conflict preemption to try to make a trade secret claim out
14   of that.
15             THE COURT:  The definition of "trade secret"
16   status, should it be judged at the time of misappropriation,
17   not subsequent?
18             MS. HURST:  The Castilla example is one that I
19   gave.  They chose to try -- they chose to go to the FBI so
20   that they could try to get Castilla to wear a wire at MGA.
21   Let me give the Court an example.  During the course of this
22   litigation, you have seen a Lala Loopsy.  It was initially
23   called Bitty Buttons.  They sent a cease and desist letter
24   on Bitty Buttons.  MGA looked at it because of their Bitty
25   Twins and some of their other Bitty dolls and American Girl.
```

```
 1    MGA looked at it and said, you know what, we don't want to
 2    fight about this.  Fine, we will change it.  So they changed
 3    it to Lalaloopsy.
 4             If Mattel had confronted Mr. Castilla specifically
 5    and more importantly told MGA that there was a problem, MGA
 6    would have acted when it could and not finding out about it
 7    a year later after the parties are already finding in
 8    litigation.
 9             Giving an instruction that it only has to be a
10    trade secret at the time of misappropriation will confuse
11    the jury as to whether reasonable efforts -- when they can
12    still be taken, even subsequent to the misappropriation,
13    are legally relevant or not, and here they are legally
14    relevant.
15             THE COURT:  But for Castilla, what other anomaly
16    do you see concerning -- in other words, you have given me
17    your strongest arguments concerning Castilla.  What else?
18             MS. HURST:  Griswold in Canada, her boss knew she
19    was still working from home on some projects that she had
20    outstanding.
21             THE COURT:  That's subject to argument.
22             MS. HURST:  Right, but if they make it as of the
23    time of the misappropriation, then what they are doing is
24    making it seem as if subsequent conduct is completely
25    irrelevant, which is not true.  That's the problem.
```

47

```
1              THE COURT:  I'm going to repeat back to you what I
2    heard, that trade secret misappropriation can be remedied by
3    subsequent conduct.
4              MS. HURST:  No.  Reasonable efforts include an
5    obligation to continue protecting your trade secret even
6    once the misappropriation has occurred.
7              THE COURT:  What I am hearing is that they didn't
8    try to do so.
9              MS. HURST:  They failed to confront people in a
10   timely fashion, not only that, but in Griswold's case
11   effectively consented to her continuing use.
12             THE COURT:  I'm going to just focus on Castilla
13   and come back to Griswold.  Let's take Castilla.  What
14   reasonable efforts did Mattel make?
15             MS. HURST:  They found out he was leaving on
16   Thursday or Friday.  They had their forensic guys in over
17   the weekend.  They imaged his computer and had a preliminary
18   forensic report no later than Monday morning saying he has
19   downloaded these files.  When they conduct the exit
20   interview, they said nothing to him about that.
21             THE COURT:  What's the requirement?  Why do they
22   have to?
23             MS. HURST:  If you know your trade secrets are
24   about to walk out the door --
25             THE COURT:  Continue.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MS. HURST:  The bottom line is we are on the form.
 2   We are here.  What they want to add is not in the form.
 3   It's got problems both ways, which is somehow it's
 4   suggesting reasonable efforts after the misappropriation has
 5   occurred, and if it's occurred prior to the departure from
 6   employment, that would mean you don't have a continuing duty
 7   even through the period of employment.  That's clearly not
 8   correct.
 9              The other problem with it is the way they have
10   worded it, "reasonable efforts at least as of the time of
11   the misappropriation," ignores prior disclosures as well.
12              THE COURT:  Let's move on to the next one.  The
13   actual use by trade secret holder is not an element.  They
14   have argued that you intend to argue that Mattel would have
15   never released Bratz but that -- Mattel wants an instruction
16   that they are proposing that the trade secret holder plans
17   to exploit the trade secret -- just a moment.  Let me see
18   that instruction for a moment.
19              MS. HURST:  There are a lot of problems with this
20   Special Instruction No. 9.  To start with the core of it, it
21   completely eviscerates the independent economic value
22   requirement.  It would be confusing and prejudicial with
23   respect to its effect on that requirement and does not
24   accurately state the law with respect to the requirement of
25   independent economic value.  In fact, there is a Sixth
```

49

```
 1    Circuit case pretty much on point that rejects the
 2    proposition that they have in Special Instruction No. 9.
 3    That's the Stromback case.
 4           In the Stromback case, the Sixth Circuit said the
 5    fact that you didn't use it and didn't intend to use it, in
 6    other words, that it can only be valuable by disclosure, was
 7    a reason why the Court held as a matter of law that it was
 8    not a trade secret.  That's 384 F.3d 283.  It should be
 9    submitted to the jury under the independent economic value
10    instruction.
11           THE COURT:  The next instruction, concepts and
12    ideas may be potentially trade secrets under California law.
13           MS. HURST:  Solvaka (phonetic) says the opposite.
14    Solvaka says ideas are not trade secrets.  We are better off
15    sticking to the statutory language in the form so that there
16    aren't any problems later on that front.  They can argue it
17    if they want to.  We can argue it if they want to.  If we
18    stick to the statutory language in the form instruction, we
19    are not going to be running head-long into Solvaka with
20    their proposed special instruction.
21           THE COURT:  Okay.  The idea of combination for
22    these elements to make up trade secrets, let me see that
23    instruction, too.
24           Is there going to be evidence of reverse
25    engineering?
```

```
1              MR. ZELLER:  I don't know yet.

2              THE COURT:  Which is No. 12.

3              MS. HURST:  So on the combination one, I guess at

4    the time this was first proposed we didn't have the buckets.

5    I guess now Buckets 1 and 2 are a combination of trade

6    secrets.  I'm very concerned.  This is very confusing with

7    the copyright instructions.  You have got elements language

8    here.  It's the elements language.  It's not really trade

9    secret language.  It's copyright language.  It's confusing

10   what they are talking about here.  It's not really

11   necessary.

12             If we come and say that one of their definitions

13   of "trade secret" has a lot of items that are disclosed,

14   they can argue that's true but the overall combination was

15   not known, and it's still valuable.  I don't know why we

16   need a special instruction on that, especially when you have

17   got one that is drafted that is going to run head-long into

18   copyright law.

19             THE COURT:  The marking of documents and the

20   import of marking documents "Confidential."

21             MS. HURST:  We're happy to rest on the form

22   instruction, which includes confidentiality marking, and on

23   its face has as the final sentence, "Each one of these is

24   not by itself dispositive."  It's exactly what the Court

25   said in the summary judgment order, and we will rest on the
```

1   form instruction.

2          I guess I will make a general comment here.

3   Basically every one of Mattel's arguments that they really

4   want to have special force with the jury they extract out

5   and make a special instruction for.  That whole practice is

6   just not proper.

7          THE COURT:  The royalty determination, 4409.

8          MS. HURST:  Our view is that the Court should

9   calculate the royalty and that no reasonable royalty

10  evidence should go to the jury.  The Georgia Pacific

11  hypothetical royalty is not available as a remedy under the

12  Copyright Act.  It's just not.

13         THE COURT:  What would the Court rely upon to make

14  a determination?

15         MS. HURST:  The Court would never get to the

16  issue, and this is the other reason.  It may be completely

17  unnecessary to make this determination.

18         THE COURT:  But if I did, what would I rely upon?

19         MS. HURST:  As to the Georgia Pacific analysis for

20  trade secret, our view is if you are assuming that there is

21  liability and you are assuming that they failed in their

22  proof on unjust enrichment and lost profit damages, which is

23  the scenario under which you would then get to reasonable

24  royalty -- our view is that for the name you would look at

25  the $200, and you could not look at anything more than lead

```
 1   time damages because Diva Starz -- I mean, it would be
 2   obviously in our view a nominal summary, but at most, you
 3   would have to obviously strongly consider Carter Bryant's
 4   agreement.  When you get to the Daubert, you will see their
 5   expert ignores all of that evidence, ignores the Carter
 6   Bryant agreement, ignores Linker, all of it.
 7             To get to reasonable royalty, which is not
 8   available under the Copyright Act -- and the jury could get
 9   really confused by that -- they have to get through
10   liability and a complete failure of proof on both damages
11   and unjust enrichment.  There is evidence in the record from
12   which that can be calculated.  If you just look at Linker's
13   testimony, fine, charge us $200 for the name "Bratz."
14   That's what it was worth or charge us $48,000 for part of
15   Bryant's contract based on something that was uncertain at
16   the time.
17             They are not entitled to a reasonable royalty
18   here, so we are never going to get there.  It's confusing to
19   the jury to have them consider it.  Our view is that should
20   not be submitted to the jury and probably will never become
21   a necessary determination.
22             THE COURT:  You have a motion for reconsideration
23   concerning the copyright preemption issue.
24             MS. HURST:  We do, but even apart from that, we
25   have offered an instruction specifically.  If the only trade
```

```
1    secret you find is the specific expression in the drawings,
2    then it's preempted.  Your Honor, our view is that
3    instruction has to be given.  In other words, you can't
4    award damages for the trade secret claim when you find the
5    only trade secret is the specific expression, because then
6    we really are dealing with having to use the copyright
7    standard there.  To award trade secret damages in addition
8    to the copyright damages under those circumstances would be
9    a real supremacy clause problem.
10              THE COURT:  The burden of apportioning profits.
11              MS. HURST:  The plaintiff bears the burden of
12   apportioning under the trade secret and the unjust
13   enrichment rubric.  That has to be the case given the Ninth
14   Circuit opinion in this case, and it is the law it appears
15   to us for unjust enrichment under both a restatement and
16   otherwise that the plaintiff has to apportion between the,
17   you know, sweat equity to use the term that the Court has
18   used in the past and the unjust portion, if any.  It would
19   basically be law of the case or even a mandate on that to
20   require them to apportion.
21              THE COURT:  There are a couple of others that were
22   mentioned, 4405 and the ratification issue.  Then let me
23   turn back to whatever else you want to say.
24              MS. HURST:  4405, as it says in the directions for
25   use, you don't very often have a case where you could prove
```

```
 1    either damages or unjust enrichment simply by acquisition,
 2    but, instead, this instruction should only be given if there
 3    are related disclosure or use that you can prove damages
 4    for.
 5              Mr. Overland, did you want to weigh in on that
 6    one?
 7              MR. OVERLAND:  Yes.  As to Mr. Machado on that
 8    one, it's clear that -- I objected to reference of any term
 9    to the "theft."  It's clear that there was no theft in the
10    traditional sense because Mattel wasn't deprived of the
11    documents.  Copies were made, and it was downloaded.  They
12    could still use them.  So it's not a situation where the
13    taking deprives Mattel of its property.
14              If you look at the use note, the use note states a
15    distinction between Civil Code 3426.1(b)(1), which defines
16    "misappropriation" as "improper acquisition," and (b)(2),
17    which defines it as "improper disclosure or use," that in
18    some cases mere acquisition of a trade secret as
19    distinguished from a related disclosure or use will not
20    result in damages, and the plaintiff will only be entitled
21    to injunctive relief.
22              That's the situation where acquisition deprives
23    the plaintiff of the property itself, which is not what
24    happened here.  Therefore, the only situation that involves
25    any misappropriation of trade secret with respect to
```

1    Mr. Machado is disclosure and use.

2          MS. HURST:  That was an excellent explanation.  I

3    think what it makes clear is that the only concept that that

4    can be relevant here to in the case would be the Bratz trade

5    secret, and their argument may well be that we were actually

6    deprived of any beneficial use of the Bratz trade secret

7    because Mr. Bryant didn't disclose them to us and instead

8    MGA acquired them.

9          If they are entitled to that instruction, then the

10   last vestige of the intentional interference with contract

11   claim has to go because the intentional -- the only

12   obligation left in that intentional interference with

13   contract claim is Carter Bryant's obligation to disclose it

14   to them.  Now we are talking about exactly the same type of

15   harm.  We acquired it, so he didn't disclose it to them.

16         THE COURT:  And the ratification.

17         MS. HURST:  Ratification is not consistent with

18   the statutory definition of "misappropriation."  You can't

19   give that one.  If somebody at MGA used with knowledge or

20   reason to know they had a Mattel trade secret, then that's a

21   misappropriation, but it's not -- they can argue to the jury

22   that the failure to discipline gives rise to an inference

23   that people didn't.  They absolutely can, but ratification

24   is a separate doctrine.  It's adoption after the fact.

25   That's not a misappropriation.  You have to show a

```
 1   continuing use with knowledge for there to be a
 2   misappropriation.  If they can show that, they will show
 3   misappropriation, but the doctrine of ratification plays no
 4   role here.
 5           THE COURT:  Since we are past summary judgment and
 6   you are concerned about what we are going to call Bucket 1
 7   and Bucket 2, are you asking the Court to resolve this at
 8   the Rule 50?
 9           MS. HURST:  Certainly.  I think it should be.
10           THE COURT:  Why, because there the standards are
11   far different?  Since it has gotten this far, I think that
12   Mattel would argue strenuously that it's a far different
13   standard under Rule 50 than we are dealing with on summary
14   judgment.
15           MS. HURST:  We moved to reconsider whether this
16   claim was even in the case, so -- I mean, that's still
17   hanging out there.  We don't even think the claim is in the
18   case.  We don't think it was ever pled.  What's the
19   significance of this?   One of the questions you asked and
20   Mr. Quinn answered was what's the legal significance of
21   having failed to identify your trade secret until we are
22   halfway through the trial?
23           I mean, we should get reconsideration on summary
24   judgment, but if the Court is not going to do that and is
25   going to consider it to be in the case and isn't going to
```

```
 1    grant JMOL, all of which we think are remedies for this
 2    situation, the absolute minimum that the Court has to do is
 3    preclude any assessment of willfulness.  If you don't put
 4    people on notice of what you're claiming the trade secret
 5    is, you cannot claim their willfulness later.
 6                THE COURT:  Just a moment.
 7                (Pause in proceedings.)
 8                THE COURT:  Ms. Hurst.
 9                MS. HURST:  Let me also add that Mr. Zeller at one
10    point argued that -- said that we can engage in wrongdoing
11    and profit by it because it's then no longer a trade secret.
12    I will have to invite the Court to look at our instruction.
13    The instruction says if it's disclosed by someone other than
14    the defendant then it's no longer a trade secret, and you
15    can't recover damages after that point.  We have never said
16    said anything such thing, that the alleged misappropriator
17    can profit by its own wrongdoing for its disclosure.  That's
18    silly.
19                What our instruction does say is if someone else
20    discloses then it's not a trade secret anymore.  It doesn't
21    have value anymore.  You can't keep recovering at that point
22    either damages or unjust enrichment.  This is applicable
23    here because of Diva Starz.  Even if you could assume these
24    first two buckets are really concept or trade secret -- Diva
25    Starz comes out I think in October 2000 at the same time we
```

58

1    are doing our deal.  At most, we have got a month of lead

2    time or something.  I don't know if you can get damages

3    frankly under those circumstances.

4            Diva Starz is a fashion doll.  It's multi-ethnic.

5    It's teenage, urban, edgy, got oversized heads and feet,

6    large eyes, large lips, small noses, small bodies.  There

7    are four of them.  They have attitude.  I think Mr. Eckert

8    actually testified they were kind of bratty.  They each have

9    names.  I mean, it reads right on the trade secret.  So that

10   instruction we are entitled to.  We have not misstated the

11   law by suggesting that the misappropriator is entitled to

12   benefit from its wrongdoing.

13           The Court also asked in that context how is the

14   Ninth Circuit's determination -- or it might have been in

15   another context -- how is the Ninth Circuit's determination

16   regarding original elements significant here?  That's

17   another reason why Buckets 1 and 2 and specific expression

18   claim have problems.  When the Ninth Circuit makes a

19   determination regarding the extrinsic test and what's

20   protectable and what's not, it's making a determination

21   about originality.  The implicit determination there is that

22   things that are unoriginal, are already known to the world,

23   or are so standard as to be expected, therefore are not

24   protectable.

25           The same is true for trade secret purposes.  If

```
 1    it's not secret, if it doesn't have independent economic
 2    value acquired through secrecy, if it can't even meet the
 3    standard for a copyright original element, by definition,
 4    those are effectively two sides of the same coin.  There is
 5    an implicit minimal novelty requirement under trade secret.
 6    The United States Supreme Court has even said that.
 7    California cases have supported it as well, which is why
 8    even in the customer list area they have said it's only that
 9    specific combination because it's only that compilation of
10    data with the little details about each customer, what their
11    preferences are, that could possibly be protected because
12    there is that minimal level of novelty required.
13            So the implication of the Ninth Circuit opinion on
14    these Bratz trade secret claims is no.  Certainly the
15    instruction -- I mean, as I said, I think Buckets 1 and 2
16    should go, but the instruction that if the only specific
17    thing protected they could even find here as a trade secret
18    here is the specific expression that is preempted has to be
19    given in order to be consistent with the Ninth Circuit's
20    determination.
21            I think that would just take me to whatever
22    comments I would make about our instructions that are in
23    addition to Mattel's.  It might take me a second to just --
24            THE COURT:  Ms. Hurst, show me on this table while
25    you are doing that where yours are.
```

```
 1          MS. HURST:  They are all in these piles.  I wrote
 2   on them with a red marker.
 3          (Pause in proceedings.)
 4          MS. HURST:  Actually, there are still some Mattel
 5   special instructions I haven't addressed.  Our instructions
 6   in addition to the basic elements include unclean hands,
 7   laches, and the statute of limitations of course.  We have
 8   as the Court directed after the last charging conference
 9   redrafted the statute of limitations instruction into a
10   single instruction, and we will file a separate short brief
11   on the relation-back issue in light of the Court's recent
12   minute order.  Our view on the relation-back date for all of
13   Mattel's claims should be November 20, 2006, because none of
14   them were compulsory counterclaims to MGA's complaint.
15   That's the way we have set it out.
16          In addition, other statute of limitations issues
17   that I will highlight for the Court that are implicated by
18   the unified instruction are -- some of the claims have an
19   actual injury standard.  Some of them have a discovery
20   standard.
21          Conversion is an injury standard in our view.
22   Trade secret misappropriation is a discovery standard as we
23   have drafted it using the CACI form for trade secret
24   misappropriation and statute of limitations.  It actually
25   has an excellent formulation of the discovery standard, so
```

1    we have just carried that throughout all of our other claims

2    that have a discovery standard.

3            In addition, with respect to the copyright statute

4    of limitations, our view is that in light of the Supreme

5    Court's decision in the TRW case that the discovery standard

6    does not apply under the Copyright Act.  Judge Kaplan in the

7    Auscap case from the Southern District of New York has

8    traced that all through now what the implications are for

9    the Supreme Court's decision in TRW, that you don't

10   automatically use a discovery standard under federal

11   statutory law anymore.  The Ninth Circuit didn't address

12   this issue.  It adopted the discovery standard in Polar Bear

13   in 2004 without citing or discussing TRW and did not deal

14   with TRW.  So we're just going to proffer under TRW that

15   it's an injury standard.  We have drafted alternative

16   language as well should the Court decide otherwise that

17   covers the discovery standard and the continuing injury rule

18   as well.

19           Our trade secret language on statutory limitations

20   comes from the CACI instruction.

21           I think that Mr. Zeller correctly identified the

22   main bone of contention between us on the remedies part of

23   trade secret misappropriation, which is the issue of burden

24   on apportionment.  We have cited a lot of cases in our

25   authorities on why it's the plaintiff's burden, but in all

```
 1    events, we think it's the case that Mattel has to apportion.

 2              I'm not going to repeat every single thing we have

 3    put in our objections to their instructions.  One thing that

 4    we noted in several places is that Mattel uses language such

 5    as "and/or," or it uses "their" rather than "its" or "his."

 6    Our concern on that is it belies the requirement to prove

 7    every single element as to -- by the plaintiff against each

 8    defendant.  We just want to make sure that those grammatical

 9    corrections are carried through so that it does not belie

10    the requirement that the plaintiff has to prove each element

11    as to each defendant.

12              Mattel has also offered what it calls CACI 3701,

13    liability for agent misappropriation.

14              THE COURT:  Just a moment.  Show me on the table

15    where that is.

16              MS. HURST:  I think it's over here on this end.

17    We object to the use of that instruction because it

18    improperly eliminates the requirements for actionable

19    misappropriation.  We do recognize that there are relevant

20    agency concepts that may pertain to this claim and the other

21    claims.  What we did was to propose the use of the Ninth

22    Circuit form instructions regarding principles of agency as

23    preliminary instructions, and we included those in our

24    submission and view that as the proper course of action with

25    respect to agency concepts.
```

```
 1              The other problem with Mattel's view of 3701 is
 2     that it -- the second paragraph on this key language "when
 3     the incident occurred," of course is critical.  The law is
 4     that a departing employee is not an agent simply because of
 5     having accepting a job or whatever -- including the language
 6     "when the incident occurred" reinforces that instruction.
 7              THE COURT:  Show me.
 8              MR. ZELLER:  Do you need CACI?  I have the CACI
 9     language.
10              THE COURT:  I will pull it off the -- I want the
11     whole book.
12              MS. HURST:  It's been modified substantially for
13     3701.  It's hard to identify all the modifications.  The
14     bottom line is we don't think that -- all these special
15     instructions they drafted trying to get around the statutory
16     requirements for known or should have known plus use,
17     disclosure, et cetera -- it's especially prejudicial for
18     Mr. Larian because then the suggestion is that somehow he
19     should be held responsible for the acts of others without
20     having met the requisite elements himself.  That's
21     especially problematic because he cannot be held
22     automatically liable for MGA's conduct.
23              To give an example --
24              THE COURT:  Give me an example of that, how you
25     differentiate between the two.
```

```
 1            MS. HURST:  There are several examples, but let's

 2     start with this.  Mr. Machado was hired by MGA.  He is not

 3     Mr. Larian's agent.

 4            THE COURT:  Well, that's a hard differentiation to

 5     make between MGA and Mr. Larian when Mr. Larian is flying

 6     down to Mexico.  I'm having trouble with that argument

 7     already.

 8            MS. HURST:  They can argue that Mr. Larian meets

 9     the statutory standard because he procured Mr. Machado's

10     acquisition, use, or disclosure, but they can't just say,

11     well, because Machado was an agent of MGA, now everybody is

12     liable.  That's what they are trying to do.  To the Court's

13     point, MGA is a separate corporate entity and employees

14     hundreds of people.  It pays its taxes, buys insurance.

15     It's not the same.  There is not an identity with

16     Mr. Larian.

17            THE COURT:  Thank you.

18            MS. HURST:  Anyway, as I noted, we have offered

19     the form agency instructions, which we think should go at

20     the beginning, and then they can be considered by the jury

21     as relevant to all claims on both sides.

22            Mattel is offering a Special Instruction 14 that

23     defines the Confidentiality Agreement as by law sufficient

24     to protect secrecy.  Again, this is pulling out a factor

25     giving it special emphasis and in our view legally
```

```
 1   unwarranted emphasis, and the reasonable efforts form
 2   instruction would be adequate, so we object to the giving of
 3   that instruction.
 4            I will just consult my notes here, and I believe I
 5   am finished.
 6            (Pause in proceedings.)
 7            MS. HURST:  All right, I have my last comments.
 8   Having reviewed the Perlam case cited by Mr. Quinn, it
 9   absolutely supports our position regarding the prior
10   failures to adequately identify trade secrets.  In fact, in
11   our view, having now had Mattel do so for the first time in
12   the middle of trial, the Court would be justified in
13   precluding them as a discovery sanction in addition to all
14   the other reasons that we have previously identified.
15            That is the last of my comments for today.
16            THE COURT:  I just want to come back briefly to
17   unclean hands, laches, and the statute of limitations.
18            MR. OVERLAND:  I have some additional comments.
19            THE COURT:  Mr. Overland.
20            MR. OVERLAND:  With respect to Mattel's Special
21   Instruction No. 9, use is not required.  I would object to
22   that on behalf of Mr. Machado for the reasons I stated
23   before, that use and disclosure are the only basis for
24   liability for Machado.
25            Also, Special Instruction No. 14 refers to Mattel
```

```
 1   employees in general and makes no distinction between --
 2            THE COURT:  Your argument again on 14?
 3            MR. OVERLAND:  I'm sorry?
 4            THE COURT:  No. 9, use is not required.
 5            MR. OVERLAND:  I must be looking at the previous
 6   version.
 7            THE COURT:  Well, you will have a chance to come
 8   back and argue that, so don't worry other than there are
 9   also special instructions submitted by Mr. Machado that
10   haven't been covered yet.  We can do that later.
11            All right, I suggest this.  I need some time to
12   look, to make a final decision, go through CACI, your
13   instructions, what I think is surplusage, and get some
14   initial thoughts but not a final decision.  If that's the
15   case, I am going to keep my word with all of you.  I am
16   going to meet Mr. Quinn on Monday at whatever time you set
17   and Mr. McConville on Monday.
18            MR. QUINN:  Can we do it in the afternoon?
19            THE COURT:  Yes.
20            MR. QUINN:  We will be only doing exhibits?
21            THE COURT:  I'm afraid of this.  I'm not going to
22   get to all the issues, and if I don't, I have brought you
23   all in needlessly.  I want to start picking these off one by
24   one in the evening, and if I have got additional questions,
25   I can ask you.  I mean, the briefing is there.
```

```
 1              MR. QUINN:  Could we do it at say 4:00?

 2              THE COURT:  Sure.

 3              MR. MCCONVILLE:  That's fine with me.

 4              THE COURT:  If I give you back time with your

 5    family and you are not down here unnecessarily -- I think

 6    that could give me enough time.

 7              This issue concerning Garcia -- I don't want to

 8    give you some tentative thoughts for either side right now

 9    because you are going to be jumping at whatever I say.  I

10    don't know when to inform you of what my final decision is

11    because I don't have a final decision right now on that.  Do

12    I inform you informally on Monday at 4:00?  Do I get a court

13    reporter down here to reargue that matter?  Your briefing is

14    in.  I just got a compilation from Mattel.  I want to be

15    fair to MGA.  How do I resolve that?

16              MS. HURST:  I don't think we have actually ever

17    argued the issue.  Mr. Quinn has a number of times.

18              THE COURT:  Then I need to get you here earlier

19    and on the record.  Then I have to go back.  I want a court

20    reporter.

21              MS. HURST:  I don't think I would have more than

22    20 minutes to say about that.  Whenever you want to do it is

23    fine, whatever the Court prefers.  Do you want to do it

24    right now?

25              THE COURT:  Do you want to do it right now?
```

```
 1              MS. HURST:  Yes.

 2              THE COURT:  I will inform you each informally on

 3   Monday what my decision is.

 4              MR. QUINN:  They have filed a brief.  I gave the

 5   Court a copy of it.  They filed it January 31.

 6              THE COURT:  Things have changed then.  The Court

 7   can't do this on Tuesday morning.  I have a huge calendar at

 8   7:30.  It will take me right up to 8:30.

 9              MS. HURST:  I'm not sure I have all my paperwork

10   here with me on this particular --

11              THE COURT:  I can have a court reporter, but I

12   don't want to bring her at 4:00.

13              THE COURT:  Let's go off the record.

14              (Off-the-record discussion.)

15              THE COURT:  Let's say 10:30 on Monday.  Thank you,

16   Counsel.

17                           -oOo-

18

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

69

1

2

3

4

5                              CERTIFICATE

6

7           I hereby certify that pursuant to Section 753,

8    Title 28, United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14   Date:  February 20, 2011

15

16

17                    Sharon A. Seffens 2/20/11
                      _____
18                    SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER