Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC.,                           )
                                       )
                    Plaintiff,         )
                                       )
          vs.                          ) No. CV 04-9049-DOC
                                       )
MGA ENTERTAINMENT, INC.,               )
                                       )
                    Defendant.         )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, FEBRUARY 21, 2011

VOLUME 1

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1   **APPEARANCES OF COUNSEL:**

2   **FOR THE PLAINTIFF:**   QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6
    FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                            BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
8                            SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
9

10
    FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                           BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                           (949)567-6700

14

15
    FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
16                           BY:  MARK OVERLAND, ESQ.
                             100 WILSHIRE BLVD
17                           SUITE 950
                             SANTA MONICA, CA. 90401
18                           (310) 459-2830

19                           -AND-

20                           SCHEPER KIM & HARRIS LLP
                             BY:  ALEXANDER COTE, ESQ.
21                           601 WEST 5TH STREET_12TH FLOOR
                             LOS ANGELES, CA. 90071
22                           (213) 613-4660

23

24

25

Page 3

1           SANTA ANA, CALIFORNIA; MONDAY, FEBRUARY 21, 2011

2                               11:16

3           THE COURT:  All counsel are present, the jury is not

4    present.

5           On instruction number 4401, in the CACI instructions, in

6    the second paragraph, that the information described above was a

7    trade secret at the time of the misappropriation, who owns the

8    documents downloaded in the Mattel in Mexico offices?  Is it owned

9    by Mattel and Mattel de Mexico?  Is it owned by Mattel de Mexico?

10   First question.

11          I'm eventually going to want those documents by

12   evidentiary number, just like an instruction you haven't seen

13   yet -- well, you have seen it, but it's going to be your 4401 and

14   some of the buckets that you have set forth.  So who owns the

15   downloaded documents in the Mattel offices in Mexico?

16          MR. ZELLER:  With respect to those documents, it

17   depends.  They are not all owned by the same entity or jointly by

18   both.  So I would have to provide the Court with a detailed list,

19   and we can do that, as to who is the "owner," of the particular

20   trade secret information document by document.

21          THE COURT:  That doesn't answer my question.  Are you

22   saying that some are owned by Mattel and some are owned by Mattel

23   de Mexico?

24          MR. ZELLER:  Yes.

25          THE COURT:  Because we're not dealing with that many

1    documents.  That's easy to separate.

2            **MR. ZELLER:**  Yes.  And that's what I'm saying, Your

3    Honor.  We will separate that for the Court.

4            **THE COURT:**  I'll need that done sometime today.

5            **MR. ZELLER:**  We will.

6            **THE COURT:**  In 4401, and referencing back to 430,

7    concerning the dispute you have about the substantial factor test,

8    which incorporates the but-for test.  The but-for test of the last

9    optional sentence does not apply to concurrent independent causes,

10   which are multiple forces operating at the same time at

11   independently, each which would have insufficient by itself to

12   bring about the same harm.  Accordingly, do not include the last

13   sentence in the case involving concurrent independent causes.

14           I haven't heard the evidence yet, but I thought that MGA

15   was going to argue, first, a congressional investigation that was

16   a part of the recall, and I believe that the lead paint issues

17   occurred in 2006 and 2007.

18           Allegations of mismanagement from 1998 and MGA's

19   argument may be to the present, but I think Mr. Eckert was hired

20   in 2000, I thought.  And I thought that MGA had documents, or

21   Mattel, showing up until 2003 that there were numerous issues

22   concerning failure of the brand, referring to Barbie.

23           Next, I thought that the My Scene doll line was launched

24   in 2002 and would be argued as a concurrent cause minimally up to

25   2006.  So I'd like to hear MGA's response to that for a moment

1    then Mattel's.

2         **MS. HURST:**  Your Honor, our view is that the harm

3    element in 4401 concerns the misappropriation itself.  None those

4    things go to do the misappropriation itself.  There are multiple

5    concurrent causes operating in this case related to the

6    misappropriation, and they're not independent.

7         So as I understand the Court's inquiry, with respect to

8    Mattel's damages claim -- not the unjust enrichment claim but the

9    damages claim -- they're claiming lost profits for lost Barbie

10   sales, let's say.  The things that the Court has identified we

11   believe go to explaining why they lost market share for Barbie but

12   are not related to what caused the misappropriation to occur.

13        So we would say this is not a concurrent independent

14   cause case, and but-for is the applicable standard.

15        **THE COURT:**  Are you going to present evidence about

16   these alleged issues of problems that Mattel was having as early

17   as 1999 and 2000 with management and also the lead recall and the

18   congressional hearings?  That just requires a "yes" or "no."

19        **MS. HURST:**  Yes, if they make a Barbie lost profits

20   claim.

21        **THE COURT:**  Thank you.

22        **MS. HURST:**  If they don't make a Barbie lost profit

23   claim, we won't.

24        **THE COURT:**  Thank you.  If in 4402 the Bratz concept is

25   disclosed to Alaska Mama in 2000, how can you argue, Ms. Zeller,

Page 6

1    that it's a secret?

2           And I think I answered my own question about you

3    allegedly recapturing secrecy, because in 4403, the secrecy

4    requirement, you add two words: "and expected."  I think

5    tentatively that this could be argued by both parties with the

6    existing instructions referring to the first sentence and the last

7    sentence which are adequate, to incorporate each of your

8    arguments.

9           Why do you disagree, Mr. Zeller?

10          **MR. ZELLER:**  I'm actually -- I agree that amendment is

11   fine from our perspective.

12          **THE COURT:**  It's not an amendment.  It's exact copying.

13   You amended it.

14          **MR. ZELLER:**  Yes.  Amendment to our instruction going

15   back to the model.

16          **THE COURT:**  Thank you.  If I give 4403 -- strike that,

17   if I give 4405, is there any disagreement between the parties that

18   I need to give 4408?

19          **MR. ZELLER:**  Not on Mattel's part, Your Honor.

20          **THE COURT:**  Any disagreement, Ms. Hurst?  This is it

21   because I'm not going to be interested in volume.  So.

22          **MS. HURST:**  Yes.  If the Court is giving 4405, it should

23   also give 4408.

24          **THE COURT:**  Concerning 4401 and the intermix with 4406,

25   which is disclosure, acquisition in use will be given.  The

Page 7

1   question is disclosure.  And initially, disclosure, or that

2   theory, only seems to pertain to Machado.  And I can't find anyone

3   other than Machado under that theory.  Brawer is not a defendant,

4   Castilla is not a defendant.

5          So I'm going to turn to Mattel.  And tell me, who else

6   fits the instruction under disclosure?

7          **MR. ZELLER:**  It applies to all the trade secrets

8   including the ones that we're asserting; including, number one,

9   Carter Bryant and his disclosure of the Bratz trade secrets to

10  MGA.

11         **THE COURT:**  MGA?

12         **MS. HURST:**  Disclosure should not be given reference to

13  any conduct by any of the MGA parties.  It's not the alleged

14  gravamen of any harm or unjust enrichment.

15         **THE COURT:**  One more opportunity, Mr. Zeller.

16         **MR. ZELLER:**  Yes, sir.  In fact, it is a critical aspect

17  of our theory in this case that MGA -- that Mr. Bryant improperly

18  disclosed the Bratz trade secrets to MGA; that MGA turned around

19  and disclosed them to the world.  And in particular, the Court

20  actually noted the damage that, under our view of the evidence,

21  caused to Mattel.  The very fact of the disclosure.  It meant that

22  Mattel was blocked from doing certain things out in the

23  marketplace by being denied its trade secret.

24         So this is actually an essential component of our theory

25  and it has been briefed in the past.  And it's one we have

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 8

1   continued to assert.

2          THE COURT:  Thank you.  Anything else?

3          MS. HURST:  Your Honor, that doesn't make any sense.  If

4   the trade secret is the concept and the drawings, it's not what

5   MGA did with the drawings that harmed Mattel.  It's its creation

6   of its own product.  They have never alleged any unjust enrichment

7   or lost profits by virtue of putting the drawings up on the wall

8   at the Hong Kong toy fair.

9          So what they're really saying is that the use of a

10  secret allegedly misappropriated by Carter Bryant that has led to

11  their harm, not the disclosure.

12         THE COURT:  What are the facts, Mr. Zeller, under your

13  17200 claim?  I want to hear what facts Mattel believes it has to

14  substantiate a 17200 claim.

15         MR. ZELLER:  As the Court has, as I understand it,

16  limited the 17200 claims by virtue of the summary judgment

17  decision, I thought what was left really pertained to the fact

18  that MGA was using then Mattel employees to compete with Mattel.

19  So we're really talking about the sample makers.  About Mr. Bryant

20  when he was working for Mattel and aiding MGA, as well as Ryan

21  Tumulian.

22         That's my understanding of how the Court has already

23  limited it.  Our view is that the theory should be more expansive,

24  but I'm obviously not intending to reargue that here.

25         THE COURT:  MGA?

1          **MS. HURST:**  That's my understanding of the summary

2     judgment order as well.

3          **THE COURT:**  I thought that Tumulian, or believed

4     Tumulian initially, for some reason, was just an extern floating

5     back and forth between MGA in what I perceived to be a summer

6     position and Mattel.  I'm finding that's not true now; that he is

7     a paid employee of Mattel.

8          **MR. ZELLER:**  Correct.  We'll put in the employment file.

9          **THE COURT:**  What years?  Can you help me?

10         **MR. ZELLER:**  I apologize, I do not have that in front of

11    me.  I can get the information quickly.

12         **THE COURT:**  But prior to his externship -- and I'm

13    sorry.  I reverse that.  He was employed by MGA.  Was he a paid

14    employee by MGA?

15         **MR. ZELLER:**  Yes, he was.  And what occurred is, is that

16    he first worked for MGA.  Then he began working for Mattel.  The

17    personnel file will show that he had actually told Mattel that he

18    was no longer working for MGA.  That's actually his own

19    documentation in the personnel file.

20         **THE COURT:**  Here is my confusion, because I haven't

21    heard the evidence yet, so I don't want to prejudge this

22    instruction.

23         He goes to work for MGA initially.  Is he an unpaid

24    extern initially?

25         **MR. ZELLER:**  That's not my understanding of his

1   position.  The reality is that from our perspective, it doesn't

2   matter what he was --

3           THE COURT:  I'm going to ask again.  It doesn't matter.

4   I want to ask that again.  When he initially goes to work for MGA,

5   was he paid or unpaid?

6           MR. ZELLER:  Yes.  That's my interpretation of the file.

7   The problem is, Judge --

8           THE COURT:  Stop, stop, stop.  "Yes, that's my

9   interpretation," means two things.  He was paid or unpaid.  Was he

10  paid or unpaid when he first went to work for MGA?

11          MR. ZELLER:  He was paid by MGA.

12          THE COURT:  Initially?

13          MR. ZELLER:  Yes.

14          THE COURT:  Okay.  What year did he go to work for MGA,

15  do you know?

16          MR. ZELLER:  I'll have to get the personnel file.

17          THE COURT:  Ms. Hurst, when he went to work for MGA,

18  since I haven't heard this evidence yet, was he initially paid by

19  MGA or was he an extern, unpaid?

20          MS. HURST:  I'm sorry, Your Honor.  I'm not sure.

21          THE COURT:  Okay.  And then he goes to Mattel.  And when

22  he initially goes to Mattel, is he an extern in an unpaid position

23  or is he immediately in a paid position?

24          MR. QUINN:  He is immediately in a paid position.

25          THE COURT:  Do you know how long he stays at Mattel?

1          MR. ZELLER:  Ball park, about four months.

2          THE COURT:  And do you know what he does within the

3    Mattel family?

4          MR. ZELLER:  He had a position that was a design

5    position.  He worked there in the Mattel design center.

6          THE COURT:  Doing what?

7          MR. ZELLER:  I'll have to get his employment file to

8    give the Court more specifics on that.

9          THE COURT:  Okay.  And then does he go back to MGA in a

10   paid position?  In other words, after Mattel, where does he go?

11         MR. ZELLER:  He was always still with MGA.  I don't know

12   where he went after that.

13         THE COURT:  I'm sorry.  I'm not being clear.  It's my

14   fault.

15         He is working with MGA.  He then goes over and gets a

16   paid position at Mattel for about four months.  After his Mattel

17   employment, does he go immediately back to MGA?

18         MR. ZELLER:  I don't know.  I don't know where he went

19   from Mattel.

20         THE COURT:  I'd going to note dates and times.  It's not

21   necessary for me to decide this today, but I'd like to get a good

22   understanding of this even before the evidence is presented.

23         MR. ZELLER:  We can absolutely get that for Your Honor.

24         THE COURT:  Now, hold on.  Why in instruction number 14,

25   confidential agreement that reasonable efforts to protect privacy,

Page 12

1    why isn't this for argument?  Why does the Court want to give the

2    impression that the confidentiality agreements are binding by

3    giving this instruction let alone get involved whether any single

4    paragraph or piece of evidence -- I'm sorry, that any single piece

5    of evidence, let alone potentially any paragraph, is dispositive?

6    And the instructions for the circuit reads as follows:

7              "If you find that Mattel or Mattel Mexico required its

8    employees to sign confidentiality agreements, that should be

9    considered in deciding whether Mattel or Mattel Mexico took

10   reasonable efforts to keep information secret, and you may find

11   that such agreements alone are sufficient if the information was

12   not disclosed by Mattel or Mattel de Mexico outside of the

13   companies."

14             I'm not precluding the argument.  I just want to lend

15   the preemptor that the Court is singling out this

16   invention/confidentiality agreement as a single piece of evidence,

17   but I'm not precluding either one of you from arguing.  In fact, I

18   expect that.  Why would the Court put itself in this position?

19             **MR. ZELLER:**  I think the short answer is because it's an

20   accurate statement of the law.  And while, of course, the Court

21   can tell the jury that they can determine whether or not these

22   agreements are binding, there are cases that say that these

23   confidentiality agreements or nondisclosure agreements themselves

24   can suffice to constitute reasonable measures to keep trade

25   secrets secret.

1      **THE COURT:**  Okay.

2      **MS. HURST:**  We disagree that the cases stand for that

3  proposition and note that this factor is found as factor E in 4404

4  where the form instruction also includes the language, "the

5  presence or absence of any one or more of these factors is not

6  necessarily determinative."

7          It would be inconsistent with 4404 with the way it's

8  currently drafted to give a separate instruction saying agreements

9  by themselves would be legally sufficient.

10          Clearly that wouldn't be correct when there are

11  opportunities to enforce them that are taken, or other

12  circumstances that maybe present here.  It's a matter for

13  argument, not a matter for instruction.

14      **THE COURT:**  In instruction number 11 it reads at

15  present, "Even if a portion or aspect of a claimed trade secret is

16  generally known or not secret, or even if all individual aspects

17  of a claimed trade secret are generally known as individual

18  elements, the claimed trade secret in its entirety may still be a

19  trade secret if the combination of elements that comprise it are

20  not generally known and meet the other requirements for trade

21  secret protection."

22          What?  What did you just say?

23      **MR. ZELLER:**  Well, it basically says that when you have

24  a trade secret, simply because part of it is publicly known does

25  not mean that as a combination trade secret it's no longer

1  protected.

2           **THE COURT:**  Okay.  Thank you.  MGA?

3           **MS. HURST:**  We don't think that instruction is a proper

4  statement of the law or should be given.  And if it were given, it

5  would demonstrate that the Bratz claim, to the extent it's limited

6  to a combination of elements is preempted by the copyright law.

7           **THE COURT:**  I received an amendment concerning what I'm

8  going to call your trade secret buckets on -- Sunday?

9           **MR. ZELLER:**  Yes.

10          **THE COURT:**  Sunday?

11          **MR. QUINN:**  Yes.

12          **THE COURT:**  I want to go over that with you.

13          Explain to me the difference in your -- the amendments

14  are what I'm going to call bucket one and two.  Explain to me the

15  difference.  Explain to me in simple words what happened.  What

16  are you doing?

17          **MR. QUINN:**  The argument -- we thought it was clear that

18  buckets one and two, as we originally described them, were the

19  concepts, Bratz concepts that were brought by Carter Bryant to

20  MGA.  We heard the argument last Friday that as described it was

21  really generic and it could be covered by Diva Starz, which we

22  don't think it does.  Counsel made the argument, as I understood

23  it, not that the idea for a doll line, or concept for a doll line

24  could not be trade secret, but that this was generic and that it

25  had already been disclosed by the Diva Starz line, which certainly

1   was not what we intended and we didn't think in context was a fair

2   interpretation of what we said.

3           So, we merely amended that to make clear by inserting

4   the words at the beginning of both buckets, the particular -- I

5   don't have the language in front of me -- configuration concept

6   presented by Carter Bryant consisting of -- and then it went

7   exactly the way it is.

8           It's not in any stretch of the imagination something

9   that was disclosed by Diva Starz.  And I would say, Your Honor,

10  that our best witness on this --

11          **THE COURT:**  Still to come?

12          **MR. QUINN:**  No.  He is on the stand.  Isaac Larian who

13  has twice testified that the Bratz concept was a trade secret.  He

14  has testified in this trial that before the Hong Kong toy fair, it

15  was an MGA trade secret; that the concept and idea for the doll

16  line was a trade secret.  I have the citations for the Court on

17  that.

18          **THE COURT:**  The exact amendment is category one.  "The

19  following concept for a doll line as presented by Carter Bryant to

20  MGA:  A multi-ethnic group of hip, urban, edgy, trendy teenage

21  girls, fashion dolls and accessories, collectively known as Bratz.

22  Including designs for large oversized heads and feet, large eyes,

23  large lips, small almost nonexistent noses and small bodies.  The

24  dolls are four high school, multi-ethnic friends with attitude;

25  each having distinctive names, nicknames, fashions, personalities,

1    back stories and icons descriptive of the doll's personal mascot."

2            Category two.  "The following concept for a doll line as

3    **presented by Carter Bryant to MGA:**  A multi-ethnic group of hip,

4    urban, edgy, trendy teenage girls fashion dolls and accessories,

5    including designs for large, oversized heads and feet, large eyes,

6    large lips, small" -- something or other.  What is the small what?

7    "Small, nonexistent noses."

8            **MR. QUINN:**   The only new language.

9            **THE COURT:**  "And small bodies.  The dolls are four high

10   school, multi-ethnic friends with attitude; each have distinctive

11   names, nicknames, fashions, personalities, back stories and icons

12   descriptive of the doll's personal mascot."

13           The difference once again?

14           **MR. QUINN:**  It's just that initial -- the initial phrase

15   that you read.

16           **THE COURT:**  Okay.  That makes sense.

17           **MR. QUINN:**  That the particular doll line presented by

18   Carter Bryant, which Mr. Larian in the trial has testified was a

19   trade secret of MGA.

20           **THE COURT:**  Now, I'm going to show you something that's

21   not final.  I'm going to have Mr. McConville and Ms. Hurst, this

22   is not a final instruction.  Why don't you come up to the lectern.

23   And I want you to look at some of the Court's work concerning this

24   instruction, which is 4401, and I want you to tell me how to

25   improve it.

1          **MS. HURST:**  May I respond to that argument?

2          **THE COURT:**  Please.

3          **MS. HURST:**  That argument is exactly everything that is

4    wrong with the way they have handled this so-called Bratz is a

5    trade secret case.  That is exactly the moving target that we have

6    said since day one.  I came in here and our last argument and

7    demonstrated the defectiveness of that trade secret in light of

8    the Diva Starz disclosure and what do they do?  Come back with

9    another amendment.

10         We move to strike everything that they have filed

11   pursuant to the Court's February 1 minute order.  We move to

12   strike everything that they have filed late after the deadline set

13   forth in that order, including this latest amendment.  And I note

14   for the record that if they are really down to now the argument

15   that the trade secret is the particularized expression of the

16   drawings, there is no doubt about copyright preemption.

17         And finally, Mr. Larian did not admit that Carter

18   Bryant's drawings were trade secrets.  He admitted that MGA's

19   execution and planned products were.

20         **THE COURT:**  I understand.  Go up and look.  That is not

21   the instruction I'm giving but is the start depending upon what I

22   do with bucket one and bucket two.  So I'm encouraging you to look

23   at bucket three through what I'm going to call nine.  I just want

24   a better suggestion conceptually.  All of the wordsmith, that's a

25   late at night product.

1          **MS. HURST:**  With your trade secret list that could be.

2          **THE COURT:**  Exactly.  I'm waiting for that from you

3     eventually.  So I'm only partially -- I'm trying to conceptualize

4     what this would look like from the jurors' standpoint.  And in

5     fact, when you see all the exhibit numbers, I don't know if I want

6     to give credence to exact exhibits.  But I wanted to do that for

7     my own effort so I recall what they were.  And if you look at

8     4401, they're simply asking for a brief description.

9          In other words, I'm a little concerned, which is why I

10    don't want to wordsmith this right now, but I'm putting it in

11    specific exhibit numbers.  So I'm doing that just for me.

12         Assuming for the moment that regardless of the moving

13    target that you were not -- that something is going to the jury in

14    these buckets.  Without conceding anything, how does that improve

15    other than bucket one and two?  From your standpoint, it can't be

16    included.  I understand that.  Let me take three, four, five, six,

17    seven, eight, nine, and not disregarding your trade secrets.

18         **MS. HURST:**  On three, that's the idea for the name

19    "Bratz."  And on both as a result of the contents of our request

20    for judicial notice, the Steven Linker testimony and the Lovins

21    and so forth, we don't think that that can go to the jury.

22         Otherwise, I think that this is -- we agree that this

23    would be the correct rubric for dealing with the form instruction

24    alternative to what we had said, which is it has to be described

25    with reasonable particularity.  In other words, everybody has to

1   put in what they say in the trade secret in the instructions.  Our

2   view, that's a correct approach.

3           **THE COURT:**  And of course, that's what I'm going to come

4   back and have you do at a later time concerning MGA's trade

5   secrets as well.  If you notice, these instructions are not now

6   drawn up generically.  There is no MGA, Mattel, Mattel de Mexico.

7   They're generic instructions which flow both ways on trade secret

8   misappropriation.

9           Don't worry about the wordsmithing.  I'll get to that

10  later.  I'm trying to conceptualize a few things now.  I don't

11  know if I'll let you participate in the wordsmith because nobody

12  has been able to reach an agreement.  So I'm finding it more

13  cumbersome than helpful right now.

14          Third, I agree with you, Mr. Zeller.  It seems to me

15  that if this Court put statute of limitations at the beginning and

16  the jury made an adverse finding and the circuit disagreed, what a

17  tragedy for both parties.  So somehow the statute of limitations

18  issue will be included, but I'm probably going to put those at the

19  end as a finding.  And I'm probably going to put the instructions

20  at the end, because I can use the jury in an advisory capacity

21  anyway, just like your argument against the 17200.

22          So you can't have it both ways.  Otherwise, if I was not

23  using the jury in an advisory fashion under 17200, I'm not too

24  certain conceptually I wouldn't draft it the other way and statute

25  of limitations, which I don't think is what Mattel wants.  And I

1    think, therefore, that way the circuit will have the benefit of

2    the jury's determination on all of these issues.

3              All right, next --

4              MR. OVERLAND:  Your Honor, since this affects

5    Mr. Machado, also, the previous one, can we be heard on that?

6              THE COURT:  Certainly.

7              MR. OVERLAND:  In terms of the acquisition instruction,

8    as I mentioned in our previous session, I don't think this applies

9    to Mr. Machado.  So I don't know how that's going to be carved

10   out.  Mr. Machado's liability is only based on use disclosure.

11             THE COURT:  It's easy for me to do.  I just carve it

12   out.

13             MR. OVERLAND:  I just want to make sure he is carved

14   out.

15             THE COURT:  So here are two tentative instructions,

16   which I haven't read, which I'll share with all parties.  Carve

17   them out.  Remember, these are not final instructions.  They are

18   just Saturday and late Saturday night and Sunday efforts.  So I

19   encourage Mattel to look at these also, and MGA.  And they're over

20   there with Mr. Overland.

21             Now, I'm not interested in your wordsmithing and picking

22   over a particular word amongst the parties.  We're all done with

23   that.  I'll do that; I just need the conceptualization.  Your best

24   draft, Mr. Overland.

25             MS. HURST:  I think if Mr. Machado is excluded, then MGA

1   Mexico should also be excluded.  Because the point is really that

2   the only relevant entities for the misappropriation by acquisition

3   claim are those involved in the Bratz acquisition.  So it would

4   just be MGA and Larian.  And MGA Hong Kong was never sued on the

5   trade secret misappropriation claim.  So it's not a proper party

6   either.

7           **THE COURT:**  And I want that in pencil.  You can have

8   your notes off to the side if you want to, but I don't want my

9   draft crossed out.  Just put your note off to the side and I want

10  them in pencil, not pen.

11          Concerning instruction number 13 by Mattel, this Court

12  is not going to be -- to have for that undue weight.  The general

13  CACI instructions is sufficient.  On 4420, I heard each of you

14  stipulate that the word "any" would be replaced by "a," and "trade

15  secrets" would be singular; is that correct?

16          **MS. HURST:**  Correct.

17          **MR. ZELLER:**  Yes.

18          **THE COURT:**  I want to take special instruction number

19  12.  Reverse engineering.  And I want to walk through why I think

20  Mattel is requesting this instruction.  And I want you to correct

21  me if I'm wrong.

22          I think you're concerned about the spreadsheet that

23  Cooney misappropriated, it was a spreadsheet I believed that was

24  provided by Toys R Us.  And while Mr. Cooney was still at MGA, he

25  decoded what could be referred to as reverse engineering and

1   reverse engineered this Toys R Us formula.  So I think Mattel is

2   concerned that MGA is going to argue that this is really a Toys R

3   Us trade secret.  It doesn't pertain to Mattel; is that correct

4   Mr. Zeller?

5           MR. ZELLER:  Yes, it is, with the caveat simply that we

6   think it's a little bit more complicated in the sense of it wasn't

7   just simply a spreadsheet provided by TRU.  Additional

8   calculations and the like were added in order to create the

9   formula that went into the spreadsheet.  But the nub of what the

10  Court is saying is correct.

11          THE COURT:  Okay.  Initially to me, this special

12  instruction number 12, is confusing and it reflects with 4408,

13  which is why I started our discussion about 4408 today.  And I

14  think not only 4408 covers it, but in the summary judgment I noted

15  a legislative committee note.  I don't think that's sufficient for

16  a jury instruction.  I'd like you to tell me why 4408 isn't

17  sufficient.

18          MR. ZELLER:  Well, in our view the special instruction

19  is the flip side of 4408.  What 4408 says is that it is not an

20  improper means to acquire trade secret information or knowledge of

21  the trade secret by means of proper reverse engineering.  So this

22  is the flip side because if, in fact, it doesn't go to trade

23  secret, can one acquire a trade secret protection in something

24  that is otherwise secret that had been the fruits of reverse

25  engineering itself.

1          So this in some ways is the -- it's more than a mirror.

2          **THE COURT:**  Why isn't that confusing?  4408 states,

3   "however, it is not proper to acquire a trade secret or knowledge

4   of the trade secret by," and then subsection two, "reverse

5   engineering."  That is, expecting or testing a product to

6   determine how it works by a person who has the right to possess

7   the product, which is Mattel.

8          **MR. ZELLER:**  Because our special instruction is asking

9   -- is making clear for the jury that the way in which Mattel

10  developed the trade secret, namely, through reverse engineering,

11  does not defeat the fact it can be a trade secret.

12         4408 says that it is not something that can give rights

13  to a defendant, a liability to obtain knowledge of a trade secret

14  by reverse engineering.  They're conceptually very different.

15         **THE COURT:**  MGA?

16         **MS. HURST:**  The instruction is improper because it tries

17  to cut off the proper definition of economic independent value and

18  secrecy.  What they're trying to do is give special weight to an

19  argument that having spent some time on something looking at

20  somebody else's data makes it protected as a trade secret.  But

21  that argument is covered already by the definitions of independent

22  economic value and of secrecy.

23         **THE COURT:**  Just two more questions.  I have got many

24  other questions for you later on, so you'll get back to your

25  respective arguments.  I'll be right back.

1          I want to walk through the 608(B) with you, Mr. Quinn,

2     for a moment.

3               (Brief pause in proceedings.)

4          **THE COURT:**  Concerning the Paula Garcia e-mail for a

5     moment, instead of hearing argument again, I want to run through

6     with you, Mr. Quinn, some concerns I have got.

7          First, for the record, when this e-mail came to the

8     Court, along with many others, the Court had to be cautious

9     concerning the attorney-client privilege.  I suspected that advice

10    of counsel would potentially open the door to many of these

11    documents being unprivileged.  But I could not assume that until

12    that occurred during trial, and is occurring on occasion.

13         Besides the attorney-client privilege, I was concerned

14    that this was a 608(B) issue concerning character for

15    untruthfulness.  This is an e-mail from Mr. Larian to Craig

16    Holden, who I believe is house counsel for MGA?

17         **MR. ZELLER:**  He was at one time.

18         **THE COURT:**  I believe he's house counsel at the time of

19    this e-mail?

20         **MR. QUINN:**  I believe so.

21         **THE COURT:**  Let's set our record because so much

22    information has been unknown.

23         Ms. Hurst was he house counsel at the time of this

24    e-mail?

25         **MS. HURST:**  Yes, Your Honor, and he was the liaison

 1  responsible for handling this matter.

 2          **THE COURT:**  The gist of the e-mail is make sure Paula is

 3  prepped and does not know about Mattel's seamstresses.

 4          My first concern, and I think one of the strongest

 5  arguments Mattel has is, how can you have an attorney-client

 6  privilege if the client is giving direction an attorney to do

 7  something?  Historically, attorney-client privileges are because

 8  we, as clients, seek advice from the attorney.  But where we have

 9  a client who is giving us advice, or using us as a shield pursuant

10  to deposition or trial litigation, Mattel has a strong argument

11  that this is not attorney-client privilege.

12          The second argument is one of consciousness of guilt.

13  The third is crime fraud.  So I'm going to walk through the

14  evidence I have heard and the reading the Court's done.  At our

15  trial, over the weekend, the Court went back and looked.  And

16  Paula Garcia stated that she has -- the words were very

17  interesting -- "it has now come to my understanding the

18  seamstresses were moonlighting," and she was referring for MGA.

19          In her April 21, 2010 deposition she said it had not

20  come to her attention that the seamstresses, or the sample makers

21  were moonlighting.  And Paula Garcia answered "no" to that

22  question.

23          One of the critical issues for the Court is, is Paula

24  Garcia telling the truth at this trial?  The e-mail, in contrast

25  to her testimony, makes Paula Garcia somewhat appear to be

1    truthful at this trial, but it appears that it is potentially

2    being sought as character evidence against Mr. Larian for his

3    advice in terms of nonpreparation, which has been referred to by

4    Mattel as potential witness tampering.

5         Second, if this is crime fraud, the Court doesn't take

6    the gigantic leap concerning Craig Holden until a number of things

7    happen:  First, I have the first prong to meet, just as I did with

8    Mr. Nolan.  Second, I hear Mr. Holden in camera.  And third, I

9    have all the e-mails, some of which may still be on a privilege

10   log disclosed to the Court prior to the time of this e-mail to see

11   what Mr. Holden's prior conversations were.

12        Now, to my knowledge we have gone back and searched

13   after you left on Saturday.  I don't have Craig Holden's prior

14   e-mails, if there are any, on this subject.  Are they still on a

15   privilege log?

16        **MS. HURST:**  Your Honor, this was in January 2008.  The

17   parties had agreed that communications after the commencement of

18   the litigation were not logged.  So that would fall within.

19        **THE COURT:**  I respect that.  I want to see these in

20   camera.

21        **MS. HURST:**  On what?

22        **THE COURT:**  On what I just said.  What did I just say?

23        **MS. HURST:**  I don't know.  That's why I asked.

24        **THE COURT:**  Are you here?  I'm just kidding you.

25        I want to see e-mails that pertain to the Paula Garcia

Page 27

1   conversation with Craig Holden, counsel.  I want to see what

2   precedes this.  If this is just Mr. Larian saying, "Make sure that

3   Paula is prepped and does not know about the Mattel seamstresses,"

4   and that comes from a client, I might have a significantly

5   different view than a conversation going back and forth between

6   counsel who may have started this conversation and I don't have

7   enough information.  I want to see all of those e-mails.

8          Now repeat back to me what I said.

9          MS. HURST:  You want every e-mail between Mr. Larian and

10  Mr. Holden related to this subject matter at the time.

11         THE COURT:  Excellent.  And I want that in camera for my

12  review.

13         MS. HURST:  Understood.

14         THE COURT:  Second, having gotten that information, then

15  I'm going to take up whether it's crime fraud.  But I don't have

16  enough information at the present time to know where the Court

17  stands, and I don't think I'm willing to take the gigantic leap,

18  which I informed Mr. Quinn that he might not have this information

19  at this time, but that Mr. Larian may be retaking the stand.  And

20  he obviously will be.

21         So it gives me time to get those e-mails and look at

22  them, because they haven't been disclosed to the Court.  And I'm

23  going to know who is the genesis of this is.

24         MS. HURST:  May I respond to the argument by Mattel?

25         THE COURT:  There is no argument by Mattel.  I'm

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1   ordering you to produce those.

2           **MS. HURST:**  I understand.  The substance of the issues.

3   That's all.

4           **THE COURT:**  You can't, but it won't do either of you any

5   good.  We'll take all day with them if you want.  I'm going to get

6   those e-mails in here just as fast as you can get them here.  But

7   I'm not going to meet Mr. Quinn's time frame.

8           I think my ruling is correct with the information I've

9   got up to this time.  But I want to go back through and look at

10  it.  Because it dawned on me if Mr. Larian is simply directing

11  counsel, especially in-house counsel, to do X, Y and Z, that's the

12  historical demarcation that this Court, and I think Judge Alsup is

13  the other one, who has felt rather strongly about in-house counsel

14  and whether they, in fact, were in a traditional attorney-client

15  relationship, or whether they had simply been subsumed and

16  absorbed by a corporation and become part of management structure

17  and, quite frankly, lost the right to the attorney-client

18  privilege when they crossed the lines -- and I don't mean that

19  unethically -- but crossed the lines when they sit in business

20  meetings, help make decisions, and then claim the attorney-client

21  privilege just because we have added an attorney.

22          And here, I need to know more about what these e-mails

23  are.  And if this is just Mr. Larian, I don't know what I'm going

24  to do about that.  That's my starting point.

25          When can you have it to me?

1          **MS. HURST:**  Can I send a few e-mails and get back to you

2     on that?

3          **THE COURT:**  Sure.  I'm going to take a recess in a

4     moment.  I want you to send those e-mails.  Be right back.

5               (Brief pause in proceedings.)

6          **THE COURT:**  Back on the record.

7          A constructive trust appears to be the equitable

8     analogue to trade secret misappropriation.  In other words, they

9     have the same exact elements.  And historically, the difference

10    between the parties has been that Mattel believes that the Ninth

11    Circuit did not address the trade secret misappropriation issue in

12    its brief, and MGA does believe that the opinion addresses this

13    issue and should carry over to trade secret misappropriation,

14    although the circuit had the issue of the constructive trust

15    solely before it.

16         If you listen again to that tape, Judge Wardlaw keeps

17    asking about where is trade secret misappropriation.  So I'm going

18    to read from the circuit's opinion.

19         "Even assuming that MGA took some ideas wrongfully, it

20    added tremendous value by turning the ideas into products and

21    eventually a popular and highly profitable brand.  The value added

22    by MGA's hard work and creativity dwarfs the value of the original

23    ideas Bryant brought with it, even recognizing the significance of

24    those ideas.

25         We infer that the jury made much the same judgment when

1   it awarded Mattel only a small fraction of the more than

2   $1 billion in interest adjusted profit MGA made from the brand.

3   From the ideas for the names Bratz and Jade, MGA created not only

4   the first generation of Bratz dolls -- Cloe, Yasmin, Sasha and

5   Jade -- but also many other Bratz characters:  Ciara, Dana, Diona,

6   Felicia, Fianna and so on, as well as subsequent generations of

7   the original four dolls, Bratz Flower Girls Cloe, Bratz on Ice

8   doll Yasmin, etcetera.

9        MGA also generated other doll lines such as the Bratz

10  Boyz, Bratz Petz and Bratz Babyz, and it made a variety of Bratz

11  doll accessories along with several Bratz video games and a movie.

12  These efforts significantly raised the profile of the Bratz brand

13  and increased the value of the Bratz trademarks.

14        It is not equitable to transfer this billion-dollar

15  brand, the value of which is overwhelmingly the result of MGA's

16  legitimate efforts, because it may have started with two

17  misappropriated names.  The district court's imposition of a

18  constructive trust forcing MGA to hand over its sweat equity was

19  an abuse of discretion and must be vacated."

20        Now, obviously the Court anticipates that Mattel, Mr.

21  Zeller, and Mr. Quinn, are going to argue that the Ninth Circuit

22  did not address trade secret misappropriation and we should

23  proceed with what you view as a disregarding of that concept for

24  trade secret misappropriation.  And the Court anticipates that MGA

25  is going to argue that the Ninth Circuit obviously dealt with

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1   trade secret misappropriation because the elements are the same.

2          So I'm going to open this discussion wherever you would

3   like to go with it.  And after you get done concluding your

4   arguments, I have two other areas that I want to cover.

5          So, Mr. Zeller.

6          **MR. ZELLER:**  Yes, Your Honor.  A couple of points I

7   think are really the major ones on this.

8          Number one, as Court notes and quoted, what the Ninth

9   Circuit was talking about was a remedy that was "not equitable"

10  under the facts as the Ninth Circuit viewed it.  That is -- and

11  this is, I think, very, very well-settled law -- is not sufficient

12  under the Seventh Amendment to deny Mattel a jury trial.

13          In fact, under Beacon, Dairy Queen and the like, the

14  Supreme Court has said that it is not proper for a court to

15  determine an equitable issue first where those same facts are

16  presented to a jury.

17          What has, of course, happened since then -- if the

18  jury's verdict had been upheld from phase one, there might very

19  well be some argument about those facts are determined by the jury

20  and there is not a Seventh Amendment issue.  But that is not where

21  we are.  The jury verdict from the phase one trial has been

22  vacated.  There is yet no jury determination on these facts.  We

23  have a Seventh Amendment right to have those facts adjudicated.  A

24  Court cannot make a determination under the rubric of equitable

25  relief in order to deny us that adjudication.

1       Again, I would reference cases such as Dairy Queen and

2   Beacon and a long line of Supreme Court and appellate cases that

3   make that very point.  The Court can't basically make the

4   equitable determinations first, including factual determinations

5   and then basically use that to deny the right to a jury

6   determination.  And I think that's exactly where we are right now.

7       Number two -- and we're going to provide a brief on this

8   to give the Court exactly the citations, but at one point the

9   Court sort of alluded to the fact that it believed Mattel had

10  conceded on appeal that it was not making a trade secret claim

11  over the Bratz name, B-r-a-t-z.  For the record, Your Honor, that

12  was an assertion made by MGA's counsel at a time during the

13  argument, because it was later on, Mattel's counsel never had the

14  opportunity to respond.  We're going to provide to transcripts to

15  the Court.  That assertion made by MGA's counsel, which we didn't

16  have a chance to rebut at the oral argument, is not factually

17  correct.

18      What occurred in front of Judge Larson was this:  MGA at

19  one point tried to make the argument that Mattel was asserting

20  Bratz name, B-r-a-t-s was the trade secret that it was asserting.

21  In these transcripts it's very clear what I say is no.  That's not

22  trade secret we're asserting.  Brats, B-r-a-t-s, is simply being

23  referenced for timing purposes just like with Toon Teenz.  Rather,

24  our trade secret claim is to the name Bratz, B-r-a-t-z, as

25  conceived of by Carter Bryant while a Mattel employee in

Page 33

1    connection with the doll line that he developed.

2            So that's part of the reason why there is this assertion

3    that's made by MGA's counsel that it was not correct, and it was

4    not our theory, and it was not a concession, that B-r-a-t-z was

5    not part of our trade secret claim.

6            That, as the Court has seen -- and, of course, there has

7    been briefing on this point extensively as the Court knows --

8    where we have, in fact, made very clear our view that B-r-a-t-z

9    has been part of our trade secret claim all along.

10           **THE COURT:**  Thank you very much.

11           Ms. Hurst?

12           **MS. HURST:**  The fact that Bratz, B-r-a-t-z was not part

13    of the trade secret misappropriation claim all along is

14    demonstrated by at least the following:  One, Carter Bryant was

15    never sued for trade secret misappropriation.  Ever.

16           Two, MGA Hong Kong was not named on a counterclaim

17    three, the trade secret misappropriation claim, but was named on

18    the copyright claim with its substantial role in the development

19    of the Bratz product.

20           Three, Bratz was long since disclosed at the time of the

21    filing of that counterclaim three.  There was no need to be coy or

22    fail to disclose what the contents of the trade secrets were in

23    the pleading.  And yet, the pleading does not expressly refer to

24    the Bratz trade secret at all.  And never did.

25           And I can go on and on with other examples.  The

Page 34

1    March 2, 2007 trade secret disclosure letter did not include any

2    identification of Bratz.  The statement in the pretrial

3    conference, which I think Mr. Zeller is now trying to argue,

4    concerned Brats with an S and not Bratz with a Z.  They never pled

5    Bratz as a trade secret.

6            Now, does the Ninth Circuit's opinion nonetheless have

7    significant implications to the level of law of the case if not

8    strictly jurisdictional in respect to the mandate for the trade

9    secret claim?  Yes.  First, our view would be really it is for the

10   mandate.  That the proceedings consistent with this opinion mean

11   they get to come back and try again on their contract theory, not

12   some other brand new, completely different theory.

13           Apart from that -- I think that Mattel is

14   mischaracterizing our argument.  We're not saying that the

15   equitable determination by the Ninth Circuit governs some set of

16   legal determinations with respect to the trade secret

17   misappropriation claim, but we are saying that the claim is

18   meritless for numerous reasons, and that at least to this extent,

19   first, if the Court holds that it is not compelled by the mandate

20   and that that theory is available, then the law of the case

21   required has a number of implications for the instruction.

22           First, constructive trust is off the table, period, as a

23   remedy anything.  But it's certainly off the table as a remedy for

24   the California uniform trade secret acts.

25           **THE COURT:**  Just a moment.

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1          (Brief pause in proceedings)

2          **MS. HURST:**  So as I was saying, it's our view that Bratz

3  has never been pled as are the past trade secret cases.  That

4  assuming that it's in the case at the moment -- there are two

5  reasons why it's inconsistent -- at least two reasons why it's

6  inconsistent with the mandate.  The mandate, the first line of the

7  opinion is who owns Bratz.  And the mandate limits the theories

8  for ownership of Bratz to the ones that are discussed in the Ninth

9  Circuit opinion.

10         Mattel had every opportunity to try this as a trade

11  secret case if they wanted to in phase one, and they didn't want

12  to for whatever reason.  But the reality now is that they are

13  trying to claim it's a trade secret, and they get a longer statute

14  of limitations as a result, which is prejudicial to MGA from where

15  we were before.  And if the Court finds that the mandate permits

16  this, then there are at least a number of implications for the law

17  of the case in the instructions.

18         First, a constructive trust is not available at all

19  under the -- both, because of the Ninth Circuit opinion, but also

20  because it's not a remedy under the California Uniform Trade

21  Secrets Act.  It is not a form of remedy available on the face of

22  that statute.  So constructive trust is simply off the table.

23         Second, as we have been discussing in this context, the

24  implication of the Ninth Circuit's extrinsic analysis with respect

25  to copyright is that those things excluded are not original and,

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1    therefore, cannot be trade secrets either because the reason

2    they're not original for copyright purposes is because everybody

3    knows about these things:  The human form, big exaggerated heads,

4    exaggerated feet, particular poses good for displaying fashion,

5    wearing too much makeup; little bit too much makeup on teenagers,

6    all these things, there's no originality there.  And there is also

7    no trade secret there.  And it's for the same reason.  Because all

8    these things are swirling out around in the public:  Scenes of

9    fair under copyright.  Not secret under trade secret.  Flip side

10   of the same coin.

11          So all of the concepts and that this Court then carried

12   through to its extrinsic analysis on the summary judgment with

13   respect to copyright have got to be invested in what can be a

14   trade secret and what can't.

15          Next we have the unjust enrichment.  Unjust enrichment,

16   under the Trade Secret Act, that's an equitable remedy.  The Ninth

17   Circuit's opinion, if it speaks to anything, definitely speaks to

18   equitable remedies, which means the burden has to be on Mattel to

19   apportion -- to apportion -- and I'll just use a shorthand here --

20   just from the unjust enrichment.  Or the sweat equity as this

21   Court has sometimes called it, that is clearly required.

22          Your Honor, in our view, what all that boils down to is

23   -- and I think Mr. Quinn's comments this morning -- that they

24   again amended their trade secret disclosure on Bratz to make it

25   the specific expression of this has to be preempted as well.

1        **THE COURT:**  "This" being the unjust enrichment?

2        **MS. KELLER:**  In other words, they can't get anything on

3    the trade secret claim that they can't get on the copyright claim

4    with respect to the Bratz trade secret.

5            Now, the one distinction that we have always made is we

6    have said there is a difference between the drawings and the ideas

7    for the -- and an idea for the product name.  Because an idea for

8    the product name would not be copyrightable subject matter.  Never

9    was, never could have been.  And it is also covered by another

10   body of intellectual property law, which is trademark law.

11           So we have always said that the idea for the product

12   name would not be covered by copyright and would not be preempted

13   and possibly could be the subject of one of these other claims.

14   But here, the Ninth Circuit language read by the Court has special

15   force.  That's exactly what the Ninth Circuit said, is if there is

16   some wrongful taking of an idea for a name here, it was MGA that

17   put all the value in it.  And we don't see it.  So that claim, the

18   very one that may not be preempted by copyright is the one most

19   forcefully addressed by the Ninth Circuit.

20           And there can be no doubt that at a minimum the Ninth

21   Circuit opinion requires there can be no constructive trust or

22   other injunctive relief, and that any claim of unjust enrichment

23   requires Mattel to apportion between the just and the unjust.

24   I'll stop there.

25           **THE COURT:**  Mr. Zeller?

1          MR. ZELLER:   MGA has no response to the Seventh

2     Amendment point.   It's been raised by the Court, it's been raised

3     here.   Having moved for a new trial and having prevailed, there is

4     no possibility that, consistent with the Seventh Amendment, that

5     Mattel can be precluded based upon any determination on equitable

6     relief.   There is simply no response to that.   There is no

7     authority that MGA is citing, or has cited, that would allow the

8     equitable relief determination regardless of how one interprets

9     it, regardless of what the scope is, to preclude us from being

10    able to go to this jury and ask for proper remedies based upon the

11    Ninth Circuit decision.   That's perfectly clear.

12          Number two, interestingly, MGA just said the

13    constructive trust is not a trade secret remedy which, of course,

14    necessarily means there could be no conflict between the remedy

15    that we're asking for here and going to the jury on our trade

16    secret claims.   I mean, MGA's admission right there precludes that

17    very point.

18          Number three, MGA just baldly asserted that there could

19    be no injunction here on any theory.   That is not what the Ninth

20    Circuit said.   The Ninth Circuit quite clearly says at the end of

21    its decision that it is not foreclosing equitable relief made upon

22    proper findings.   That's an explicit statement by the Ninth

23    Circuit.

24          So while, yes, any future proceedings in terms of

25    equitable relief have to be consistent with the Ninth Circuit

Page 39

1    decision, there is not sort of this implied disapproval that MGA

2    is now attempting to turn the Ninth Circuit decision into.   In

3    fact, the Ninth Circuit said exactly the opposite and said so very

4    explicitly.

5             The other points which I think are somewhat far afield

6    from really the main point that the Court started off with and was

7    asking about pertains to the identification of Bratz as a trade

8    secret.   This has already been briefed.   Mattel has prevailed on

9    that point.   MGA continues to rehash it.   It is simply not correct

10   that it was not in our pleading.   Mattel's pleading said several

11   times MGA stole Bratz and it continue stealing.   That was our

12   theory.   Those were the factual assertions that were made.

13            The fact that we didn't include particular defendants in

14   particular claims has no bearing on what the facts are that we

15   allege.   It has nothing to do with it.   There are many trade

16   secret claims we have asserted in this case where we did not add

17   individual defendants.

18            And I will note for the record that MGA just treats

19   everything in the world as being a Catch-22 here.   We name

20   individuals, we're persecuting them.   We don't name individuals it

21   means MGA should go scot-free.   They try to have it both ways on

22   this.   But there is absolutely no reasonable basis for saying --

23   for the Court reversing its prior decision and holding that we are

24   permitted to pursue our Bratz trade secret claims.

25            I also note here, Your Honor, that MGA has asserted far

1    more belated trade secret claims than the ones that they're

2    complaining about now.  There is simply no question about it.  The

3    Court allowed them to assert them.  And some of these were as late

4    as the August to October 2010 time frame.  The end of discovery.

5    Some of them after the close of discovery.  Even now, MGA

6    continues to try and assert new damages theories and claims as to

7    these new trade secrets.  We specifically filed a brief on this,

8    in fact, with their expert within just the past couple of weeks

9    now making damages claims, entirely new ones, for entirely new

10   trade secret theories.

11          So, for MGA to be complaining about a trade secret

12   theory that we disclosed years ago in that light, given those

13   circumstances, is really unfounded.

14          The other point I will note on MGA's claims -- and this

15   is why it is directly relevant -- MGA itself is asserting a trade

16   secret claim based upon Bratz against Mattel.  That claim was

17   asserted far later than the one that Mattel has asserted.  The

18   notion that somehow Mattel should be denied the opportunity to

19   pursue the Bratz trade secret claim when it asserted it far

20   earlier as supposedly being late when MGA is being permitted to

21   pursue a Bratz trade secret theft theory as well, literally years,

22   asserted years for the first time after Mattel had done so really

23   doesn't comport with either fairness or common sense.

24          The final point I will make is when MGA says unjust

25   enrichment is an equitable remedy for trade secret purposes,

Page 41

1    that's just wrong.  In fact, we know it's wrong because there are

2    jury instructions on unjust enrichment.  Unjust enrichment in the

3    context of trade secret is not talking about an equitable relief.

4    It's talking about the disgorgement of ill-gotten gains.  That is,

5    in fact, a legal remedy.

6           Moreover, it is not correct that Mattel has the burden

7    of apportionment.  The Ninth Circuit decision says no such thing.

8    It never puts the burden of apportionment on Mattel.  But

9    moreover, the restatement which MGA itself has relied upon for

10   this purpose is very clear.  And I would cite to Comment F to the

11   restatement third of unfair competition to section 45.  And it

12   says that, "The plaintiff has the burden of establishing the

13   defendant's sales.  The defendant has the burden of establishing

14   any portion of the sales not attributable to the trade secret and

15   any expenses to be deducted in determining net profits."

16          And as the Court is aware, that is the basic structure

17   that's followed in other aspects of intellectual property law,

18   whether it's copyright infringement, trademark infringement and

19   other analogous areas.

20          **THE COURT:**  Thank you very much, Mr. Zeller.

21          Ms. Hurst?

22          **MS. HURST:**  One moment, Your Honor.

23          **THE COURT:**  By the way, we're going to argue intentional

24   interference with contractual relations next.  I went back and

25   pulled some records, some prior transcripts, and I believe that

Page 42

1    Tumulian was an intern.  But I want you to check that out for me,

2    over at MGA.

3              You got his personnel file, don't you, Mr. Zeller?

4              **MR. ZELLER:**  Yes, sir.

5              **THE COURT:**  Let me take a look at it.  There is no rush.

6    I mean, it could be --

7              **MR. ZELLER:**  You don't need it this moment?

8              **THE COURT:**  No, thank you very much.  That's very nice

9    of you.  Just sometime today I'd like to look at that.

10             **MR. ZELLER:**  Yes, sir.

11             **THE COURT:**  It just helps me with a fact situation.  I'm

12   not sure it makes a huge amount of difference, but facts keep

13   flowing back and forth and I haven't heard that evidence yet.

14             **MS. HURST:**  I know both sides are going to submit more

15   briefing on this issue of relation, but our view remains that the

16   claim is not in the case and it was never properly pled.  And it

17   is far too late to do that in the middle of trial with a

18   disclosure that comes so late and continues to be a moving target,

19   even in the middle of jury instructions.  And that there is no

20   Seventh Amendment issue in the world for this Court to say it's

21   had enough with the moving target that is the Bratz trade secret,

22   especially in light of the Ninth Circuit's opinion.

23             **THE COURT:**  But conceptually Mattel has always held to

24   the theory regardless of how it's been pled that basically, for

25   want of a better word, trade secret items were stolen.  Now, they

Page 43

1    didn't allege it.  And it may be that they didn't allege it

2    because they were concerned, or they may not have even thought

3    about it, I don't know, but about supersession.  And so it may

4    have been a tactical decision from day one.

5          But that's caused confusion for Judge Wardlaw, and I

6    think the circuit.  They're really asking -- they asked at the

7    time of argument, where is this trade secret misappropriation

8    claim?  How did that occur?  And unfortunately -- well, that's a

9    bad word.  Let me strike "unfortunately."  Quinn Emanuel was not

10   the law firm who represented Mattel at the time of the appeal.  So

11   if you listen to the attorney who is arguing this on appeal, he

12   somewhat stumbles through that.

13         And I don't mean that in a derogatory fashion, but

14   Mattel would have been in a better position with a law firm that

15   represented them potentially at trial that could make that

16   argument.  Now I'm assuming appellate counsel knew that, but when

17   you listen to the tape, it left mass confusion for Judge Wardlaw

18   who is hitting the issue right on the button.  She absolutely

19   honed in on that issue.  And I don't think that that's adequately

20   been explained to the Ninth Circuit to this day.

21         **MS. HURST:**  Your Honor, if there had been a trade secret

22   claim, the others would have been superceded.  And then the

23   elements of that claim would have had to have been met, and the

24   constructive trust remedy never would have been on the table.

25         **THE COURT:**  But this came up, not in motion but in our

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1   reading, it came up at the time of discovery when Judge Larson

2   made his comments concerning this.

3          **MS. HURST:**  Well, you know, I think the record is pretty

4   clear that it wasn't until after the Ninth Circuit briefing that

5   they started explicitly claiming Bratz as a trade secret.  It was

6   in their interrogatory response served on July 31, 2009.

7          And if they had pled trade secret misappropriation

8   against Carter Bryant from the outset, then all of the aspects of

9   their other state law claims would have been superseded.  And the

10  effects of that were significant.  First, it would have limited

11  what could be a trade secret.

12         **THE COURT:**  Also, there is mass confusion concerning the

13  verdict.  Was it 100 million minus 10?  In a sense, 90 million?

14  Or was it 30 million?

15         **MS. HURST:**  If they had had a trade secret claim, they

16  would not have had a constructive trust available because the case

17  law and the commentary for the Uniform Trade Secrets Act said

18  that's not a remedy.

19         And it would have been -- so, it wasn't -- I mean, if

20  they thought of it and it wasn't just a mistake to omit it, it was

21  clearly a tactical choice.

22         And now having had the Ninth Circuit reject the remedy

23  that they probably made this tactical choice not to -- listen,

24  they make the tactical choice not to make the trade secret claim

25  because it can't get them a constructive trust remedy.

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1          **THE COURT:**  Just a moment.  Please continue.

2          **MS. HURST:**  So they don't plead this claim because they

3    cannot, under CUTSA, get the remedy of constructive trust.  Then

4    they get the constructive trust.  And then only when they're in

5    danger of losing it do they first give the inkling we're going to

6    make this a trade secret claim.  And only after they have, in

7    fact, lost it do they actually come to this Court and say, "Oh, by

8    the way, our amendment includes Bratz as a trade secret."

9          So only once they know they cannot get the constructive

10   trust remedy, which was the whole reason for trying to hang onto

11   these other tort claims and not plead a trade secret claim do they

12   come in with their trade secret claim.

13         That is the kind of tactical bandying that has been

14   prohibited by the Ninth Circuit in its case law, especially in

15   cases where it's come up and down again from the Ninth Circuit.

16         Now, does the Court say further equitable relief on

17   findings consistent with this opinion?  Yes.  But it's also clear

18   that under the eBay factors, giving this opinion, that, at most,

19   could mean a going forward reasonable royalty assuming that there

20   were continuing infringement.

21         **THE COURT:**  But in moving for a new trial and having the

22   Court grant a new trial, you have never responded to the Seventh

23   Amendment argument that's been raised.  And that is,

24   fundamentally, in the American system of jurisprudence Mattel has

25   never had the right to a jury trial on that issue.

1          **MS. HURST:**  I'm not saying the reason they are

2     foreclosed from having a jury trial on that issue is because of

3     this -- let me put it this way.  They're foreclosed -- there is no

4     Seventh Amendment right to get an amendment under rule 15 after

5     you have gone up and down in the Ninth Circuit and the mandate has

6     limited the issues.

7          **THE COURT:**  My next question for you is this:  We have

8     all watched the tape of the en banc panel, and there is an

9     absolute conflict and clash between trade secret misappropriation

10    and state claim and copyright.  And I want to just move there for

11    a moment.

12         If there is no guiding jurisprudence in that area that

13    Judge Kozinski admits is an extraordinarily difficult issue to

14    deal with, why wouldn't the Court take the view of what I'm going

15    to say is whatever traditional state trade secret misappropriation

16    is and federal copyright and give that back to the circuit in a

17    form that wouldn't cause a brand new four-month trial to the

18    Court?

19         In other words, let's just take your preemption argument

20    for a moment.  And let's say you prevailed and that copyright

21    preempted trade secret misappropriation.  And let's say the Ninth

22    Circuit either agreed or disagreed, but it went to the Supreme

23    Court and they eventually disagreed.  We're right back in a

24    four-month trial, frankly, when, in fact, you are asking the

25    Court -- which I'm quite capable of doing, by the way -- but you

1    are asking Court to find preemption; to in a sense limit, as Mr.

2    Zeller argues, Seventh Amendment right to a jury trial; to find

3    basically that federal law not only preempts, but -- well, for

4    want of a better word, really flies in the face state law

5    jurisprudence.

6              And if you believe in the American jury system, what

7    that really means is we're following a precedent that we have

8    tended not to want to go down the trail with.  We have done that

9    in limited cases involving intellectual property, maritime,

10   equitable relief.  But if you look at American jurisprudence,

11   that's apparently what makes us different.

12             So, that's obviously, besides a federal/state issue and

13   a Seventh Amendment issue, of tremendous concern to the Court.

14   And therefore, I might get, in a sense, contradictory -- not

15   contradictory verdicts, but contradictory amounts.  But that's why

16   I'm so interested in trying to break down on the trade secret

17   misappropriation what these "buckets" are.  And I recognize the

18   tremendous difficulty in bucket number one and two.  Bucket three

19   through nine so far isn't causing me sleepless nights.  Bucket

20   number one and two is.

21             So, I'm just wondering how you respond to Mr. Zeller's

22   arguments both in terms of state's rights causes of action and how

23   you respond in particular, though, to the Seventh Amendment.

24   Because in a sense, from Mattel's perspective, once you move for

25   new trial and this Court granted it, now their perception is --

Page 48

1   and regardless of their perception -- they have never had that

2   right to a jury trial.  So, in other words, why should I preempt

3   them?

4           MS. HURST:  The copyright laws clause is in the

5   constitution.

6           THE COURT:  Well, the California legislature made a

7   certain misappropriation clause.

8           MS. HURST:  Right.  A much more recent vintage.  And in

9   fact, before that statute was enacted and before the restatement

10  of unfair competition, there was no such thing as a trade secret

11  misappropriation claim.  At common law the claim was for the theft

12  of the materials, the tangible materials containing the

13  information, and there was no separate claim for the information

14  itself.

15          So, I mean if we're just talking from a historical

16  perspective, the copyright and the limitations on copyright, which

17  are also in clause 8 for a limited time -- it's in there -- is

18  much more venerable, much more jurisprudential.

19          THE COURT:  I don't know about that.  It may have

20  historical precedence, but remember, we didn't join into this

21  great union unless there were certain accommodations.  And one of

22  those was state rights.  And the balance, historically was, if you

23  really go into it, we'll give you two senators from every state.

24  But since we fear Massachusetts, New York and Virginia, we're

25  going to balance that out by supposedly one person, one vote in

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1    the house.

2           So we have always had that tension.  South Dakota may

3    have a million a half people and a million and a half sheep, they

4    still get two senators.  California may have 37 million people,

5    they still get two senators.  But that historic tension gets

6    balanced out in direct representation in the House.

7           And there has been a lot of 11th Amendment

8    jurisprudence, especially by this last Supreme Court concerning

9    state's rights, and a real pull-back from the federal government.

10   So I wouldn't be too quick to cast aside the right to California

11   or any other state.  Because, remember, I'm mandated to follow

12   some of these state law claims, which is why I have treated, quite

13   frankly, CACI with such adherence.  I have got a great group of

14   judges handing down these civil instructions in the case.

15          And I warn both of you right to begin with, get to CACI,

16   get to BAJI.  You're following the traditional.  Start watching

17   out when you are adding things because you have got good

18   committees.  And I think you have done that, frankly.

19          So please, go ahead.  You still haven't answered my

20   fundamental question:  Why Mattel is abrogated under the Seventh

21   Amendment from determination.

22          **MS. HURST:**  Here are three reasons:  First of all, you

23   are not entitled to a Seventh Amendment -- you are not entitled to

24   a trial on a claim you haven't pled.  Okay.  And rule 15 sets

25   forth the standard which the Court can absolutely use to deny

1    amendment to prevent this claim at this point in this case.

2         **THE COURT:**  Just a moment.  Why would I, when they have

3    put us on notice from the very beginning that they have been

4    consistently claiming that these were items misappropriated, let's

5    say, from them?  Your response would be, Judge, because it's

6    always been a moving target.  They've never been able to define

7    it, and they didn't plead it for tactical reasons.

8         **MS. HURST:**  Right.  And there was prejudice to MGA as a

9    result, including going all the way through the first trial up to

10   the Ninth Circuit back again on an equitable issue that would not

11   even have been available on that claim.

12        So you are not entitled to, under the Seventh Amendment,

13   to a trial on a claim you haven't pled.  And this Court would

14   absolutely be within its discretion, especially given that Bancorp

15   case, which says you don't back down off the Ninth Circuit appeal

16   and you change your theory to say no.

17        Second, there is no violation in the Seventh Amendment

18   when the Court issues a discovery sanction precluding something.

19   Even if you assume it was pled, the fact -- look at how long it

20   took us to get an identification.  And then we sat here for three

21   hours arguing this issue the other day.  And then what did they

22   do?  Amended it again.  And here we are a month into trial.

23   That's crazy.  The Court would absolutely be within its wide

24   discretion to preclude that as a discovery sanction.

25        Third, the rule 56 standards do not violate the Seventh

 1   Amendment.  I'm pretty sure there has been about a million cases

 2   saying you can grant judgment as a matter of law when you meet the

 3   rule 56 standard.  And we do here for the reasons that we

 4   previously described.  But let's just take previously defined

 5   buckets one and two, which read on Diva Starz.  In fact, we now

 6   have an implicit admission that it reads on Diva Starz because

 7   once I point that out, they went and amended it and tried to

 8   change it so they could preserve claim; the name Bratz.

 9            We have all of this evidence.  I mean, at a minimum it

10   would have to be limited to a $200 damages claim.  It's crazy.

11   But we have all this evidence about publicly available use, even

12   on dolls, of the name Bratz with a Z.

13            And so if the Court grants judgment consistent with rule

14   56 standards -- and none of this has anything to do with

15   preemption right now that I'm saying.  And then you add on top of

16   that, you have got two abuse of discretion standards, rule 15 and

17   rule 37; you have got a de novo review, which is, you know, a JMOL

18   standard; and then you have got preemption.  So you have four

19   different reasons to kick this thing, two of which are abuse of

20   discretion standards and two of which are de novo, and that's not

21   even counting what does the mandate mean and what did the Ninth

22   Circuit opinion mean, which clearly is in our favor.  So you have

23   got at least six different legal reasons that would justify

24   kicking this thing.

25            **THE COURT:**  Okay.  Intentional interference.  I'd like

Page 52

1    to hear from you concerning intentional interference this evening.

2    Do you want to take a break for a moment, get your notes?

3            **MR. ZELLER:**  Yes, please.

4            **THE COURT:**  Have about five or 10 minutes.

5                    (Recess taken, from  1:25 until 1:48.)

6            **THE COURT:**  Back on the record.  Counsel are present.

7    We're off the record.

8                    (Discussion held off the record.)

9            **THE COURT:**  Back on the record.

10           Counsel requested to go back in trade secret

11   misappropriation because we have had one round by each party but

12   they would like to address this issue again.

13           Mr. Quinn.

14           **MR. QUINN:**  Thank you very much, Your Honor.  The first

15   issue that Ms. Hurst raised on Saturday relates to the

16   construction of Carter Bryant's inventions agreement.  And the

17   first two paragraphs of that inventions agreement, the Court will

18   recall that the Court had requested briefing on this particular

19   issue; that is, how to resolve the "as a result of" language in

20   the first paragraph, the inventions agreement, with the broad

21   assignment language in the second paragraph; and whether the

22   second paragraph -- whether the language of the first paragraph

23   could be construed to kind of limit the disclosure obligation to

24   those inventions only arising as a result of his employment.

25               And both sides have briefed that issue.  Ms. Hurst very

Page 53

1    briefly briefed the issue.  And I'd like also briefly to respond

2    to that.

3            The first paragraph of the inventions agreement required

4    Bryant to maintain the confidentiality of all proprietary

5    information as defined owned by Mattel regardless of the

6    circumstances under which it's created.  So the duty of

7    confidentiality as described there is broad and includes

8    proprietary information developed as a result of his employment.

9            **THE COURT:**  Excuse me for one moment.  I apologize.

10           Mr. Overland, we started an argument without you here.

11   I'm going to have the argument repeated.  Mr. Quinn had just

12   started.

13       (Brief pause in proceedings)

14           **THE COURT:**  Back on the record.

15           Mr. Quinn, if you would like to continue.

16       **MR. QUINN:**  Thank you, Your Honor.

17           I was beginning about discussing the issue of the

18   reconciliation of the first two paragraphs of the inventions

19   agreement and whether the first paragraph by implication limits

20   Bryant's disclosure obligations.

21           **THE COURT:**  Let's go down to provisions related to trade

22   secrets.

23       **MR. QUINN:**  Paragraph 1 defines the scope of the

24   proprietary information broadly to include both information

25   already possessed by Mattel before Bryant joined the company; and

Page 54

1    two, new information that will be possessed by Mattel in the

2    future including --

3            **THE COURT:**  Show me.  I have the confidentiality

4    information inventions agreement.

5            **MR. QUINN:**  It's in paragraph 1.

6            **THE COURT:**  I know that.  A, B, C, or D?

7            **MR. QUINN:**  We're getting it, Your Honor.  I'm sorry, I

8    misplaced it.

9            **THE COURT:**  Just a moment.  It's in 1A.

10           **MR. QUINN:**  Right.

11           **THE COURT:**  Just a minute.

12           **MR. QUINN:**  Your Honor, perhaps I can come back to this.

13           **THE COURT:**  If we have -- I have got it.

14           **MR. QUINN:**  I can't believe -- there is probably 100

15   copies of it somewhere in this courtroom.

16           **THE COURT:**  Here is my copy.  I'll get another copy,

17   just a minute.

18           Mr. Quinn.

19           **MR. QUINN:**  Your Honor, the question that the Court had

20   raised before, and which the parties have briefed and which Ms.

21   Hurst addressed in her argument on Saturday, is whether the

22   language in paragraph 1A relating to "as a result of my

23   employment," where Bryant acknowledges that the company possesses

24   and will continue to develop and acquire valuable proprietary

25   information as defined, "including information that I may develop

1    or discover as a result of my employment," whether that last

2    phrase, "as a result of my employment" operates to limit the

3    disclosure obligations, we think that that really doesn't make any

4    sense, particularly in light of the very broad assignment

5    language, which appears in paragraph 2A, which is really

6    unqualified to any inventions of any kind during the course of his

7    employment.

8              **THE COURT:**  So they shouldn't be read in a contradictory

9    manner or limiting manner.  The intent of the document is not to

10   limit.  It's expansive.

11             **MR. QUINN:**  It says including.  It says including.  The

12   nub of argument would be two things.  One, it says including.  So

13   it's not limiting.  And two, it really wouldn't make any sense to

14   have the very broad assignment language to the company in

15   paragraph 2 and then to construe paragraph 1, the disclosure

16   obligation, to be more limited.  Why would anyone do that?

17             So we think the only reasonable construction, of course,

18   contract should be construed to the extent possible to try to make

19   sense out of them is not to interpret that first paragraph as

20   being -- having a limiting application, as I think the language

21   including cannot reasonably be construed to be.

22             And in any event, the final point I would make is I

23   think it's been -- the Ninth Circuit opinion does make pretty

24   clear that these are jury issues and not something that can be

25   resolved short of submission of the issue to the -- the issues to

Page 56

1   the jury.

2         **THE COURT:**  I have to be frank with you.  I tentatively

3   have reached that same decision, but I want to leave that open for

4   argument for both of you.  And I wanted to cover these issues for

5   the circuit so they saw the briefing as well as the argument.

6         That's not to discourage, Ms. Hurst.

7         Counsel?

8         **MR. QUINN:**  Second, in terms of the definition of the

9   trade secrets in the seven or nine buckets, whatever the number

10  is, I think the starting point for any consideration -- I think

11  everyone here is aware of this -- is the definition of "trade

12  secrets" that appears in the California version of the Uniform

13  Trade Secret Act, which is as broad as any definition of

14  proprietary information could be.  Civil Code Section 3426.1(d)

15  provides that, "any information that derives independent economic

16  value, actual or potential, from not being known to the public."

17        So any information.  It does not say -- it doesn't

18  qualify that with words like, "particular information," "detailed

19  information," "graphic information," "specific information."

20        It's quite literally anything that would have -- could

21  have, potentially or actual, independent economic value from not

22  being generally known.

23        This is to be distinguished from the separate

24  requirement of -- that's in the discovery code of section 2019.20,

25  which relates only to discovery.  And this is where we get this

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1    language "particularized," which says that a plaintiff in a trade

2    secrets case cannot commence discovery before -- without first

3    identifying the trade secrets they're suing on with reasonable

4    particularity.

5              THE COURT:  Just a moment.  4401 and those sections that

6    follow in the use notes also state some requirement of

7    particularity.

8              MR. QUINN:  Well, you have to be able to identify what

9    it is that you are suing over in a way that permits a factfinder

10   to address the issue.  But I don't think there is any quantum of,

11   or level of specificity that the statute, by its terms, requires,

12   or the case law requires.

13             I mean, if it's so general or amorphous, then you are

14   not going to have a claim that some totally amorphous concept

15   would have independent economic value.  How are you going to prove

16   that?

17             THE COURT:  There is also a policy reason behind it.

18   It's the same policy reason potentially that California has such a

19   broad 17200 claim.  Because we encourage mobility in the

20   workplace.  The way California chooses to balance that mobility in

21   the workplace is the protection through trade secret

22   misappropriation and unfair business practices, which tends to be

23   broad.

24             In other states where mobility is not included, you'll

25   find the inverse oftentimes; that the unfair competition and trade

Page 58

1    secret misappropriations are more restrictive.

2         **MR. QUINN:**  Well, I agree I think there is a symmetry

3    there.  On the one hand, in this state we do not enforce covenants

4    not to compete.  There is a very strong public policy in favor of

5    employees being able to move.  But on the other hand, technology

6    and creative industries are very, very important in this state.

7    And courts have given a broad reading to the scope of protection

8    of trade secret law.  So I think there is a balance there.

9         As I indicated before, addressing buckets one and two, I

10   think among the strongest pieces of evidence that we have that a

11   concept for a doll line, which is spelled out the way that this

12   one is and as described in our first two buckets, is subject to

13   trade secret protection as Mr. Larian's testimony in this trial.

14   On February 18, he testified in volume three, at pages 37 to 38.

15        **THE COURT:**  Just a moment.  Volume three.

16        **MR. QUINN:**  Volume three.

17        **THE COURT:**  Page 37.

18        **MR. QUINN:**  37 line 15 to 38 line 8.

19        **THE COURT:**  To line -- page 38, line 8.

20        **MR. QUINN:**  Right.  37/15 to 38, line 8.

21        **THE COURT:**  Why don't you read that?

22        **MR. QUINN:**  "Question by Mr. Price:  Mr. Larian, prior

23   to the Hong Kong toy fair, your belief was that your pursuit of

24   the Bratz doll was a trade secret; right?

25   "ANSWER:  I'm sorry?

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 59

1    "QUESTION:  Prior to Hong Kong Toy Fair --

2    "ANSWER:  Yes.

3    "QUESTION:  Prior to you revealing that you're pursuing the Bratz

4    dolls, your belief is that the fact that you are pursuing this

5    line was confidential; correct?

6    "ANSWER:  Yes.

7    "QUESTION:  Your thought was that this was a trade secret of MGA;

8    right?

9    "ANSWER:  The lines that we were coming up with, the lines that we

10   were coming up with before people had seen it?  Yes.

11   "QUESTION:  Including the Bratz line?

12   "ANSWER:  Yes.

13   "QUESTION:  So you thought that this was a trade secret, at least

14   up until January of 2001; right?

15   "ANSWER:  Yes.  Of MGA's."

16           And he says the same thing essentially on February 10,

17   page 90 lines 12 to 19.

18           **THE COURT:**  What was the first reading from?  What date?

19           **MR. QUINN:**  It was February 18.

20           **THE COURT:**  Thank you.

21           **MR. QUINN:**  February 10, volume one.

22           **THE COURT:**  February 10, eight days before?

23           **MR. QUINN:**  Yep.

24           **THE COURT:**  What does he say on February 10?

25           **MR. QUINN:**  "QUESTION:  Well, these -- these sample

Page 60

1    makers, they create samples that are on unreleased products;

2    right?

3    "ANSWER:  That's correct.

4    "QUESTION:  You have said that that's one of the most valuable

5    trade secrets that MGA had; correct?

6    "ANSWER:  What is?  The toy that has not been introduced?

7    "QUESTION:  The toy that hasn't been produced.  Right.

8    "ANSWER:  It is."

9         And Ms. Garcia testified to the same effect, that she

10   was questioned her testimony on day six, January 25, page 41, line

11   9 to 42, line 7.  I'll only read the last question and answer.

12   "QUESTION:  And it would be your understanding, even in

13   September 2000, that if your company had come up with a doll

14   concept and attached the name "Bratz" to it, that the name "Bratz"

15   in connection with that concept would be a trade secret?

16   "ANSWER:  Yes."

17        So I think we have an acknowledgment here from the

18   defense that the concept for a doll line as Carter Bryant brought

19   to them with particular characters, attitude, designs, names,

20   icons, the entire package, even if one might dissect that and say

21   well, particular elements are public, taken together, everything

22   comprising that bucket is a trade secret and protectable.

23        Now, in Ms. Hurst's discussion of this I did not

24   understand her to disagree with that proposition, that general

25   proposition, that a concept for a doll line having these

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 61

1    characteristics could be subject to trade secret protection.  What

2    I understood her to say was that well, what you have described is

3    something that's just very generic; something that even Diva Starz

4    could satisfy.  And you came out with Diva Starz.  So to the

5    extent that you are claiming that generic description as being a

6    trade secret, you have already published that to the world with

7    the Diva Starz line.

8            Don't think the Diva Starz line matches up with that

9    description.  There are some elements of the Diva Starz line that

10   they have in common with what Carter Bryant brought.  But I think

11   that that's -- that argument is a little bit disingenuous, because

12   we think we have always been clear that the claimed trade secret

13   was the concept for a doll line that Carter Bryant brought to MGA.

14   He didn't bring Diva Starz to MGA.  He brought the particular

15   concept.  We have all seen those exhibits.  We've all seen the

16   descriptions of the characters, their background, their pets,

17   their fashions, etcetera, etcetera.

18           So we thought that was clear from the context for the

19   avoidance of doubt.  Over the weekend we amended to add that

20   introductory phrase to the descriptions in paragraphs 1 and 2,

21   which has caused so much consternation here this morning.  There

22   was no surprise there.  We have always been very, very clear as to

23   what the Bratz trade secrets were.

24           I'll refer the Court to -- sometimes you get concerned

25   that if things get repeated often enough, just by repetition they

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 62

1    take on a certain amount of currency or credibility.  We have

2    consistently, in our interrogatory responses, described these

3    Bratz trade secrets in very much the terms that they're set forth

4    in buckets one and two.  And I'd refer the Court to our third

5    supplemental responses to interrogatory numbers 20 to 23 and 28,

6    dated January 11, 2010.  I can read that into the record.

7          THE COURT:  I wish you would.  It's helpful for the

8    circuit.

9          MR. QUINN:  That interrogatory response from January 11,

10   2010 stated, and I quote, "These documents and ideas constitute

11   the ideas, designs, conceptions and name of a fashion doll line

12   called Bratz which includes four hip, trendy, fashion doll girls,

13   named Zoe, Lupe, Halliday, and Jade.  The designs for these dolls

14   include large oversized heads and feet, large eyes, large lips,

15   and a small almost nonexistent nose and small doll bodies.  The

16   combined synergistic form created by these elements describe dolls

17   with a unique style and a distinct look and attitude, especially

18   as perceived by girls age seven to 12, the intended consumer

19   market.  These drawings, sculpts, and concepts include everything

20   necessary to begin development of a Bratz line of dolls."

21          That's over a year ago.  That is not very far from, I

22   think, the description that we put in this bucket.  And this Court

23   has recognized this in the order -- you may remember that for the

24   avoidance of doubt, Mattel moved to amend its complaint to say we

25   want to be clear, Bratz trade secrets are in this case.  Or in the

Page 63

1    alternative, made a motion to confirm that they are in this case.

2            And in granting our motion to confirm that the Bratz

3    trade secrets are part of the case -- that's docket number 8705,

4    the order dated September 4, 2010 -- the Court found that we had

5    identified the Bratz trade secrets with specificity.  The Court

6    stated in that order at page three, lines 17 to 20, and I quote,

7    "Mattel has identified as a trade secret" -- and this is an

8    internal quotation -- 'all information relating to any ideas,

9    designs, conceptions or names for Bratz including, but not limited

10   to, such ideas, designs, conceptions or names contained in the

11   following documents' -- end of internal quotation -- "in an

12   interrogatory response Mattel has identified dozens of documents

13   with specificity."

14           And the Court goes on to discuss the fact that there is

15   a history to this Bratz trade secrets claim.  I mean, it's -- it

16   should not be forgotten.  To me, it's surprising that any one of

17   us can forget this history, since it has been briefed so many

18   times.  But we proposes -- just to recap -- before the first trial

19   in the pretrial conference order, a Bratz trade secret claim.  MGA

20   objected to that.  MGA took the position Bratz trade secrets is

21   part of what was then termed "phase two."

22           THE COURT:  Just a moment.

23                (Brief pause in proceedings.)

24           THE COURT:  Please continue.

25           MR. QUINN:  We sought in a draft pretrial conference

Page 64

1  order to include reference to Bratz trade secrets claims.  We

2  similarly submitted proposed jury instructions in advance of the

3  first trial on trade secrets claims.  MGA objects.

4       **THE COURT:**  Just a moment.  Please continue.

5       **MR. QUINN:**  MGA objected to that; said trade secrets

6  claims are properly viewed as part of what was then termed "phase

7  two" which no one was ever sure we were ever going to get to.  And

8  so Judge Larson determined it's not part of phase one.  But that's

9  the history there.

10      And this Court, in its order of September 4, 2010,

11  docket 8705, recites that history and references the facts which I

12  have just referenced in confirming that the Bratz trade secret

13  claims are part of this case.

14      So I submit that the emphatically asserted claim of

15  surprise and prejudice that at the last minute, and continuing

16  right into trial, Mattel is surprising MGA with Bratz trade

17  secrets is kind of surprising and contrary to the record here.  It

18  may be because present counsel for MGA was not part of that

19  earlier proceeding, wasn't part of those discussions.  But the

20  record is what it is.

21      The Court called our attention to the IMAX case on

22  Saturday, the Ninth Circuit case relating to rolling loop

23  projectors and a claim of trade secrets relating to dimensions and

24  tolerances for rolling loop projectors and raised the question

25  whether that case does not support the conclusion that trade

1    secrets must be identified with a certain level of specificity and

2    particularity.

3              I believe the decision in that case, summary judgment

4    was granted in favor of the defendant and against the plaintiff on

5    the trade secrets claims, is really explained by the facts of that

6    case.

7              **THE COURT:**  Didn't Judge Sneed write for the majority?

8              **MR. QUINN:**  Judge Sneed did write for the majority and

9    Judge Kozinski was also on the panel.

10             But in that case the plaintiff was claiming trade

11   secrets in dimensions and tolerances relating to these projects

12   but flat out refused to state what the dimensions and tolerances

13   were in answers to interrogatories.  They refused to be pinned

14   down on what the so-called -- the trade secret dimensions and

15   tolerances were.  In that case, it really mattered, because as we

16   cited in the opinion, a number of these rolling loop projectors

17   had come off of patents and were now in the public domain.  So it

18   was essential to know exactly what the claim dimensions and

19   tolerances were.  And the defendant for whatever reason was just

20   unable or unwilling to be specific.

21             And the Court said, if you can't do that given this

22   scope of the information that's in the public domain, you simply

23   don't have a trade secret.  I don't think there is any analogue

24   here where we're talking about a doll line which you can't

25   describe in terms of dimensions and tolerances.  By definition

Page 66

1   we're talking about a concept, an idea, a back story, a look, an

2   attitude, certain names, certain pets, and the rest of it.

3          It's really not type of analogous situation.  And,

4   frankly, there can't be any doubt in anybody's mind what it is

5   that's claimed to be the trade secret here.  I mean, there are a

6   lot of other arguments that can be made.  But in terms of what

7   that constellation of elements is that is the Bratz trade secret,

8   I don't think there is any doubt in anybody's mind what it is.

9          I think those are the only points.  I think Mr. Zeller

10  was going to respond to the balance of Ms. Hurst's argument.

11          **MR. ZELLER:**  I think a number of the points that MGA had

12  made at the end of the last time we met have been addressed in the

13  course of prior discussions, including issues concerning

14  substantial factor and the like.  So I won't go through those

15  again.

16          A few additional issues that were raised by MGA that I

17  think are -- that we'll will respond to here involves the argument

18  that MGA was making about its objection to us including as part of

19  the instruction, the timing element.  Specifically, we wanted

20  language in there to make it clear that the trade secret was being

21  judged as of the time of the misappropriation, or the claimed

22  misappropriation.

23          And MGA basically made an argument about -- to the

24  effect that subsequent measures are legally relevant.  And I don't

25  think that that is a correct statement of the law.  The fact is,

Page 67

1    is that any number of occurrences -- it may very well be relevant

2    to an issue like damages, but it does not have any effect on

3    whether or not the conduct was in violation of the statute or not

4    as of the time of misappropriation.  That is what it has to be

5    judged by.

6           The example that MGA was giving I don't think really --

7    which was Mr. Castilla -- has any effect on what the substantive

8    law can or should be on this particular issue.  But MGA made the

9    point about how Mattel supposedly failed to confront him.  Those

10   were the words that MGA used in this particular argument.  But the

11   facts are different.  And I think the Court referenced this during

12   the course of the argument, that that's not really correct.  But

13   it's also not correct for additional reasons.

14          Mattel did ask Mr. Castilla at his exit interview, "Did

15   you return all the Mattel information that you had in your

16   possession?"  He stated he did.  He also, in fact, signed a form,

17   an agreement to that effect asserting, we now know falsely, that

18   he had returned that information.

19          Furthermore, to the extent that we are going to get into

20   this issue, if MGA wants to make this argument that somehow the

21   protectability of the trade secrets ought to be judged even after

22   Mr. Castilla took them, that is going to put us into the issue of

23   Mattel contacting the FBI as part of its steps to take reasonable

24   measures to protect its trade secrets.

25          **THE COURT:**  You have already done that.  That's already

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 68

1    before the jury.

2            **MR. ZELLER:**  Well, it's been somewhat limited, though.

3    I mean, the fact is that there is a lot more that has not been put

4    in front of the jury yet on that issue.  I mean, bear in mind, MGA

5    doesn't think any of it should come in.  That's been their

6    objection.  They don't think any of it should be in.  But this is

7    contrary to their own position, is really fundamentally the point.

8            But in any event, there is no authority for the notion

9    that what a party does down the road somehow renders, in a

10   retroactive way, information no longer trade secret.  If it was

11   trade secret as of the time of the misappropriation, a party is

12   obviously free to do whatever it wants, whether it's trade secret

13   information.

14           I would also note, in fact, this kind of concept that

15   MGA is arguing isn't even consistent with its own claims.  There

16   is no question that the very matters that MGA is claiming as trade

17   secrets, namely, these products that it was showing at toy fairs

18   were intended for public release and, in fact, in very short

19   order.  Our view is that all that stuff was public.  But setting

20   that aside, even taking MGA's own theory, MGA's own theory is not

21   consistent with this argument that it's making here.

22           MGA also made the argument that, essentially, actual use

23   of the trade secret by the owner was required because otherwise,

24   MGA's argument ran that without actual use, it would mean that the

25   economic value element of trade secret protection would be

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 69

1    eviscerated, I think is the word that she used.  "Eviscerated."

2            In reality -- and this is explicit from the statute --

3    the economic value of a trade secret, something that becomes a

4    trade secret because of its economic value from being kept secret,

5    is both actual and potential.  Those are the terms that are used,

6    "actual or potential."  The notion that a trade secret owner

7    actually has to be using or even plan to use the information in

8    order to give it economic value is contrary to that statutory

9    language.

10           But there is also another point I would say, which is

11   there is authority -- and I can provide some citations to it, but

12   I know we have cited it in the past -- which is that a trade

13   secret can have economic value even from a negative perspective.

14   In other words, this often comes up in the context of blind

15   alleys.

16           I know, for example, that I have spent X amount of money

17   pursuing a particular avenue that ends up being a blind alley.  It

18   doesn't provide me with a product, or a formula, or anything else

19   that I can actually use in my business.  A competitor knowing that

20   information itself can be valuable because it means they won't go

21   down that blind alley and spend that money.

22           So, far from holding that actual use of a trade secret

23   is something that's required in order to show that it has value,

24   courts have found exactly the opposite.  Not only because of the

25   statutory language, but because a trade secret can be anything,

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 70

1    even the negative sense where it gives value or has economic

2    value, potential or actual, to the trade secret owner.

3           MGA also argued about the reasonable royalty point and

4    argued that it shouldn't go to the jury; that the Georgia Pacific

5    factors are not appropriate and it's not available under copyright

6    law.

7           Number one, obviously we have sort of gone down this

8    road in terms of MGA's own position as to even equitable issues or

9    nonjury issues should go to the jury, in any event.  Courts have

10   seen that with 17200.

11          Number two, copyright law is, in fact, quite clear.

12   There is abundant authority.  And Judge Trott mentioned it during

13   oral argument that a royalty may very well be the appropriate

14   remedy here.  So it's, of course, we think pretty well-settled

15   that this is something that is an available copyright act remedy.

16   And moreover, of course, is, as Court is aware, reasonable royalty

17   is statutorily a recognized potential remedy for trade secret

18   misappropriation.

19          Another argument -- and this was very curious -- that

20   MGA was making is that essentially -- that one could not make out

21   a trade secret misappropriation claim by wrongful acquisition

22   where the party misappropriating the information had made copies

23   so as not to deprive the owner of its property.  That was pretty

24   much verbatim what MGA said.  And that's simply -- that's just not

25   anything that's an element of trade secret misappropriation.

1           Looking at the standard instructions, which I think the

2    Court agrees very well set forth the basic law in this area, say

3    nothing about deprivation of all copies as being an element for

4    trade secret misappropriation.  And logically, it doesn't really

5    make any sense and is not supported by authority, and MGA did not

6    cite any to support it.

7           Another point that MGA has made, and they have made it a

8    couple of times, pertains to the Ninth Circuit decision on

9    originality for copyright purposes and basically saying that that

10   necessarily means that there can be no trade secret protection

11   given either.  And they try and address this in the garb of a

12   requirement under trade secret law that there be novelty that's an

13   element for trade secret misappropriation.

14          There's actually a number of responses that can be

15   given, not the least of which is the Seventh Amendment argument

16   that we have already talked about.  But looking at the substance

17   of that argument, it really doesn't hold water.  And principally

18   that's because novelty is certainly sometimes referred to in court

19   decisions concerning trade secret, but it is not an element.  It

20   is something that's used as a shorthand.  And the restatement

21   actually recognizes this.

22          This is section 39, Comment F of the restatement third

23   of unfair competition.  And it says, "Trade secret cases sometimes

24   announce a novelty requirement, but that's synonymous with the

25   concepts of secrecy and value as are otherwise set forth in the

Page 72

1    elements for trade secret misappropriation."

2         So there is no independent novelty requirement that MGA

3    is attempting to assert here.  And also I would cite the Court to

4    Yield Dynamics versus TEA Systems Corp, which is a 2007 California

5    Court of Appeals decision.  This is 154, Cal App 4th at 562.

6         And part of what the Court says here is that, "Yield

7    assumes that this reflects a belief by the trial court that a

8    trade secret must be unique or novel in order to be protected.  We

9    join Yield in doubting that California law imposes any such

10   categorical requirement."

11        And I am unaware of any case that MGA can point to where

12   it says in the California decisions that it is an essential

13   element, an actual element of a trade secret claim that it be

14   novel.  And as Mr. Quinn has mentioned, the statute, in fact,

15   defines trade secrets very, very broadly.  And the Court, of

16   course, has noted as well that the California statute defines

17   trade secrets very, very broadly.  And it does not impose elements

18   beyond those that are set forth in the statute.

19        MGA also in connection with its trade secret arguments

20   made an argument about the Copyright Act Statute of Limitations.

21   And it specifically relied upon a Supreme Court decision.  And

22   this was the TRW decision, which is 534 U.S. 19, and then further

23   relied upon a Southern District of New York case that construed

24   the TRW Supreme Court case to hold that there is no discovery rule

25   for copyright infringement.

1         There is a number of points that one could make on this,

2    but I think the short answer is the Ninth Circuit has held to the

3    contrary in the Polar Bear case, which by the way, came after to

4    TRW.  It goes without saying the Southern Director of New York is

5    not in a position to overrule the Ninth Circuit.

6         The Ninth Circuit decision I'm citing to was decided

7    after TRW, which was the basis for that particular Southern

8    District of New York decision that MGA was citing.  The Polar Bear

9    case can be found at 384 F.3d 700, and specifically at page 706.

10        The Ninth Circuit wrote, "We conclude that section

11   507(b) permits damages occurring outside of the three-year window

12   so long as the copyright owner did not discover and reasonably

13   could not have discovered the infringement before the commencement

14   of the three-year limitation period."

15        And I'll also know that TRW case relied upon by MGA as

16   well as the Southern District of New York decision that they're

17   relying on, this Auscape case -- which, by the way, I'll note that

18   they miscite in their papers.  They're actually citing to the

19   wrong Auscape decision.  But the TRW decision is about the Fair

20   Credit Reporting Act.  And what the Supreme Court picked up on in

21   that particular decision was, is that there was actually an

22   exception where the discovery rule would actually apply.

23        And so the Court seeing that there was an exception,

24   construed that to mean that obviously the general rule for that

25   statute was -- is that there was no discovery resume.  There is no

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 74

1    such statutory language in the Copyright Act that's analogous here

2    to the Fair Credit Reporting Act.  And in fact, the Supreme Court

3    was very clear in this decision to say it was not deciding that

4    all federal statutes don't permit application of a discovery rule.

5           But the bottom line is the Ninth Circuit law, Polar Bear

6    and other cases is very clear, the discovery rule applies to

7    Copyright Act Statute of Limitations, and that is the state of the

8    law right now.  And I think MGA would have to agree with that

9    fundamental point.

10          The final point I'll make here is in response to MGA's

11   argument about agents.  And MGA has an objection to instructing

12   the jury on agency, at least I guess so far as it pertains to

13   trade secret law.  But I don't think there is any question that a

14   jury is going to have to be instructed in this case on agency law.

15   After all, people do and can act through their agents.  And

16   indeed, the Court -- indeed, as the Court undoubtedly recognizes

17   corporations can act only through its agents.

18          And there is also, I think, part of just fundamentally

19   what is wrong with MGA's arguments on agency is that it fails to

20   recognize that someone -- a person can be an agent of both Isaac

21   Larian and MGA simultaneously.  That's an issue for the jury to

22   determine; on whose behalf were the other individuals involved,

23   such as Mr. Machado, acting on behalf of.  That's a direct factual

24   issue that has been presented through the evidence in this case so

25   far.

1          And that's, of course, further to the ratification point

2    two, which is certainly based upon Mr. Larian's actions and MGA's

3    actions, or their respective inactions, the Court -- the jury

4    would be entitled to determine that Mr. Larian and/or MGA ratified

5    those actions and should be held liable for them.

6          **THE COURT:**  Please continue.

7          **MR. QUINN:**  We're done.  Thank you, Your Honor.

8          **THE COURT:**  You sure?

9          **MR. ZELLER:**  Yes.

10         **THE COURT:**  I mean that in a nice way.  Okay.

11         Ms. Hurst.

12         **MS. HURST:**  It's frustrating to be told repeatedly that

13   you haven't disputed something that you have plainly disputed.

14         I hope I can't be accused of mischaracterizing Mattel's

15   arguments to the degree to which they characterized MGA.

16         **THE COURT:**  Is that your argument?

17         **MS. HURST:**  No.  I'm trying to decide where to start.

18         **THE COURT:**  Why don't we start so you can both finish

19   and we'll go on to intentional interference with contractual

20   relationship.

21         **MS. HURST:**  I understand, Your Honor.

22         Mr. Quinn argued that the statutory definition of trade

23   secrets is as broad as it could possibly be.  The word

24   "information" has a definition.  It is not the same as ideas or

25   concepts.  In fact, the definitions of "information" make no

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 76

1    reference to ideas or concepts.  "Information" is knowledge

2    concerning particular facts or circumstances and is generally

3    factual-type data.

4         Had the California legislature desired to make the trade

5    secret statute cover ideas, it could easily have used that word.

6    But there is a legislative historical reason why it may well not

7    have chosen to do so.  And that is that in California, in 1947,

8    the legislative amended the Civil Code provisions regarding

9    products of the mind and deleted ideas as a form of property under

10   California law.  And that decision is described in both Disney and

11   Weizenkorn.  The decision of the legislature, I mean.

12        It is not the case that this is defined as broadly as it

13   is humanly possible to define it.  Rather, it is defined in

14   generally technical terms.  And although it is broad enough as the

15   Ninth Circuit held to cover designs -- the contract, pardon me,

16   was broad enough to cover designs, the statutory definition of

17   trade secret and the related corresponding provisions elsewhere in

18   the civil code are limited and evince an understanding of the

19   preemptive effect of Copyright Act.

20        And there are reasons why there are these limitations.

21   It is not as broad as it could possibly be.

22        Now, Mr. Quinn argues that the concept for a doll line

23   can be a trade secret; that we have conceded that it can be based

24   on the testimony that he ascribed to Mr. Larian and Ms. Garcia.

25   All of the quoted testimony there is exactly consistent with the

1  position that we're taking on the "as a result of" language in

2  section 1A.  All that quoted testimony was, if we came up with it

3  as part of what we were doing here, what we intended to exploit,

4  then yes, that would be a trade secret.  And that's exactly what

5  the Court wondered and what we say the "as a result of" language

6  means.

7          Now, is it just including?  Of course, it just has to be

8  including, because things that other people do are still covered

9  by 1A.  And we have not said otherwise.  But when they set out to

10  define the future proprietary information created by this employee

11  signing this contract as opposed to everything else they may be

12  subjected to in the course of employment, the words they chose

13  were "as a result of."

14          Now, Mr. Quinn argues this creates some kind of a

15  tension with section 2A.  It doesn't if you interpret 2A to have

16  the interpretation that we have offered.  Then they're perfectly

17  consistent, which is what 2A really means is as we have said it.

18  It's in the course and scope of employment; not something that has

19  nothing to do with employment.  It's the MGA side of the

20  interpretive equation offered by the Ninth Circuit.  And there is

21  perfect consistency there.

22          But whether or not the Court decides that issue which

23  the Court has found should be given to the jury in light of the

24  Ninth Circuit's opinion, whether or not the Court decides that

25  issue doesn't matter, because either way, "as a result of," the

1   plain meaning of that, there is no reasonable dispute about that

2   and there is no extrinsic evidence about it either, that they were

3   instructing employees that trade secrets were things that were not

4   part of their jobs done on nights and weekends.  There is not one

5   iota of evidence that they ever instructed an employee that was a

6   trade secret.

7          Mattel claims that there is no surprise they're claiming

8   Bratz as a trade secret and it's always been clear what they've

9   been claiming.  What I heard Mr. Quinn read as an interrogatory

10  response from the beginning of last year was different from the

11  four separate filings they have made in response to this Court's

12  February 1 minute order.  That means that there are at least five

13  occasions on which they have tried to define these trade secrets,

14  which are all different, including this weekend in between jury

15  instructions arguments.  That's not surprise and prejudice?  You

16  have got to be kidding me.

17         The mere fact that they have amended their so-called

18  notice of compliance, which was not in compliance with the Court's

19  minute order, four times demonstrates the problem; defines the

20  problem; embodies the problem.  This has nothing to do with me not

21  being counsel at the time of the first trial.  They were

22  sandbagging then, too.

23         They put it in their amended pretrial conference order,

24  not in their first pretrial conference.  Their amended pretrial

25  conference order.  And as the Court has previously found, when MGA

1   objected at that time, it wasn't agreeing that the claim should be

2   part of phase two, it was simply disputing whether it was properly

3   part of phase one given that it had not been pled.

4          And as the Court has twice previously found, it was not

5   previously pled.  The notion that Mattel simply chose not to name

6   Carter Bryant on a trade secret misappropriation claim is silly,

7   especially when you look at the history of this litigation going

8   up and down to the circuit on a copyright preemption issue, and

9   which the Court had jurisdiction over the claims against Carter

10  Bryant.

11         If they had thought that they had a state law claim that

12  could survive preemption the way this Court had found, they would

13  have named Carter Bryant on that to keep it in state court in a

14  dead minute.  That never happened.  And it wasn't until the

15  briefing in the Ninth Circuit that they served a discovery

16  response saying Bratz is a trade secret.  That was July 31, 2009.

17  Yes, we read that interrogatory response, but that doesn't mean

18  that we agreed it was part of the case.  And at no time did their

19  pleading ever say Bratz was a trade secret.  They were sandbagging

20  then and they're sandbagging now.

21         **THE COURT:**  You have already said that one time.

22         **MS. HURST:**  The words that Mr. Quinn uses to describe

23  this so-called trade secret are all of the things that the Ninth

24  Circuit expressly held were not protectable under copyright.

25         Now, we have all had in mind, since the Court had us

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1  listen to the Mons (phonetic) argument, section 301, the

2  preemption section, states that it preempts with respect to all of

3  section 102.  Now, what that means is that it doesn't just preempt

4  section 102(a) things that are capable of copyright, but it also

5  preempts as to section 102(b) things that are expressly precluded

6  from copyright, such as ideas, concepts and the like.

7        So, now if the trade secret definition is going to be

8  the particularized expression of this particular concept, then

9  there can be no doubt about preemption.  But just to be clear, we

10 absolutely object to their further amendment to that to try to

11 overcome the Diva Starz problem after it had already been

12 identified.

13       Mr. Zeller's argument that subsequent measures are

14 irrelevant ignores the difference between Mr. Castilla as the

15 trade secret misappropriator and MGA, or Mr. Larian as the alleged

16 trade secret misappropriator.  Perhaps the timing requirement

17 could be argued to apply to Mr. Castilla, but the failure to act

18 and prevent by notifying people of the alleged misappropriation is

19 relevant.

20       And Mr. Zeller's statement that there is no authority

21 for the proposition that what a party does down the road is

22 relevant to its trade secret status -- I tried to write that down

23 as a direct quote -- that is just so blatantly wrong I hardly know

24 where to go.  Of course, it's relevant that when the party

25 destroys the trade secret status, when it becomes publicly

Page 81

1   available, if there is a subsequent use, that's not a trade secret

2   misappropriation anymore.  It's right in the definition of the

3   statute.  An injunction can't last beyond the status of the

4   information as a trade secret.  Of course, it's relevant if the

5   trade secret status of the information is destroyed or is lost for

6   some other reason not relevant to the defendant's

7   misappropriation.  Because at that point there can be no further

8   misappropriation.

9        The form instructions in the statute all reflect that,

10  and that is why this particular form instruction -- remember,

11  they're the ones arguing for the addition of the timing language

12  and we're just going with the form here.  That's a careful choice

13  not to include the timing language in that one.

14       Mr. Zeller next argues that MGA's argument is that

15  actual use was required for independent economic value.  Again,

16  that is a complete mischaracterization of our position.  We simply

17  objected to their special instructions saying the opposite.

18       There is a form instruction on independent economic

19  value.  We don't need a special instruction saying actually use is

20  not required for independent economic value.  This is not a

21  negative trade secret case.  In a negative trade secret case, it's

22  the fact of something being a blind alley that's valuable because

23  then time is not wasted pursuing it.  There is no evidence that

24  Mattel thought Bratz was a blind alley.  Wouldn't even apply the

25  negative trade secret concept in this case.

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 82

1            Mattel argues that we can't we say they can't make out a

2    wrongful acquisition case.  Basically, Mr. Zeller's argument is

3    that harm is not a required element of the tort and there is no

4    authority for the proposition that wrongful acquisition cases are

5    limited.  It says so right in the use notes to the instructions;

6    that you don't usually have a wrongful acquisition case because

7    the plaintiff can't ordinarily prove damages or harm because the

8    plaintiff can't ordinarily prove that they have been deprived of

9    the property.  Mattel would simply eliminate the required element

10   of harm.

11           The case law discussing novelty in the trade secret

12   misappropriation context consistently expresses that concept as

13   aspects of both the secrecy and independent economic value

14   requirement.  That doesn't mean there is no requirement of

15   novelty.  It just means that it is expressed in the secrecy and

16   independent economic value elements acting together.

17           If the Ninth Circuit has held that something is not

18   original to be protected by copyright, there is -- that is because

19   it exists already out in the public for everyone else to use.  By

20   definition it can then neither be secret nor have independent

21   economic value under the trade secret misappropriation statute.

22           And in Yield Dynamics, the case they cited, the Court

23   held as a matter of law affirming a judgment for the defendant

24   that there was no independent economic value.

25           With respect to my discussion on statute of limitations

Page 83

1    for copyright, I expressly noted the Polar Bear case in my

2    discussion and described how Polar Bear had failed to discuss and

3    distinguish TRW.  TRW says that we are no longer going to apply an

4    automatic discovery rule for federal statutes.  It came out of the

5    Ninth Circuit.  It was a case strongly admonishing the Ninth

6    Circuit.  And then in Polar Bear, the Ninth Circuit simply ignored

7    it; ignored TRW.

8           So there is a problem there.  And as I believe I noted,

9    we are submitting an instruction to preserve the TRW issue; that I

10   certainly did identify Polar Bear and make the Court aware of the

11   issue.

12          The Ninth Circuit form instructions on agency principles

13   in our view are adequate, sufficient, and appropriate and should

14   be used.

15          And I'm not going to belabor the point on ratification

16   other than to say it's just not consistent with the statute.  They

17   can argue the failure to discipline gives rise to an inference of

18   misappropriation.  They cannot argue misappropriation after the

19   fact through a theory of ratification.  It is not consistent with

20   the statute.  This is an intentional tort.  It requires either

21   knowledge or having had reason to know, while at the same time

22   acting in a way inconsistent with the obligations of the statute.

23   That is not after the fact ratification.

24          I think Mr. Overland or Mr. Cote wanted to address the

25   wrongful acquisition issue.

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

1       **MR. COTE:** Ms. Hurst did an excellent job of pointing

2   out that it's in the use note.  CACI 4400.  It's the fourth

3   paragraph down in the use notes.  And they say, "In some cases the

4   mere acquisition of a trade secret as distinguished from a related

5   disclosure or use will not result in damages and will only be

6   relevant to injunctive relief, because generally the jury should

7   be instructed only on matters relevant to damage claims, do not

8   select acquiring in the second paragraph, unless there is evidence

9   that the acquisition resulted in damages, other than damages from

10  related disclosure or use."

11      That's the quote from the use notes.  That couldn't be

12  anymore clear that acquisition doesn't go to the jury unless there

13  is an allegation that the acquisition resulted in some sort of

14  harm.  And there is no allegation at least with respect to the

15  Mexico documents that the acquisition resulted in any harm to

16  Mattel at all.  Mattel is not making any claim for harm at all

17  over Mexico documents.  They're seeking solely unjust enrichment,

18  which by their lights is the cost to Mattel of making the

19  documents.

20      But they weren't deprived of those documents.  That's

21  not really a damage.  That's unjust enrichment theory or some sort

22  of restitution that they're pursuing but it's not a damage suit.

23  There is no damages resulting from the acquisition.

24      That's all I wanted to say about acquisition, that it

25  shouldn't go to the jury for those reasons.

Page 85

1       I would like to be heard on reasonable royalty but I'm

2   not sure Ms. Hurst is done with the rest of her argument.

3       **MS. HURST:**  Why don't you go ahead.

4       **MR. COTE:**  In addition to acquisition not going to the

5   jury and therefore not being included in the instruction,

6   something else Mr. Zeller said should also not go to the jury, and

7   that's reasonably royalty.

8       Again, you don't need to go any further other than the

9   use notes.  I'm looking at the use notes for CACI 4409 now, third

10  paragraph down.  Both the statute and case law indicate that the

11  question of a reasonable royalty should not be presented to the

12  jury.  In fact, CACI itself, the instructions which are in

13  brackets, the instructions say -- paraphrasing the plaintiff, and

14  here is the quote, "May still be entitled to a reasonable royalty

15  for no longer than the period of time the use could have been

16  prohibited."

17      **THE COURT:**  Then what was Judge Trott referring to?

18      **MR. COTE:**  "However, I will calculate the amount of any

19  royalty."

20      It's a judge question.  I'm not saying it's an

21  unavailable remedy in all circumstances.  We're talking about a

22  jury instruction.  This shouldn't be in the instructions at all

23  because the Court is going to decide that question.  California

24  Civil Code Section 3426.3 subpart B, 3426.3(b).

25      **THE COURT:**  Just a moment.  Are you saying that

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 86

1    reasonable royalty should not go to the jury under the Georgia

2    Pacific factors?  Or are you saying that the Court should solely

3    calculate what that royalty is if the jury makes a finding?

4           Let me repeat that to you.  Are you saying that the

5    issue of reasonable royalty and the finding of a jury concerning

6    the Georgia Pacific factors should not be a jury consideration as

7    well as damages?  Or are you saying that the simple -- I'm sorry.

8    Or the royalty is strictly a judicial decision and that the issue

9    should go to the jury?

10           Do you understand?

11           **MR. OVERLAND:**  I'm not entire sure.

12           **THE COURT:**  Okay.  There are two ways of viewing it.

13    The jury could make a finding under the Georgia Pacific factors

14    that there is a royalty to be applied, but they never make a

15    determination of what that royalty is.  They don't say 3 percent.

16    8 percent, 50 percent.  Or are you saying that the jury should

17    never consider and make a finding on whether there should be a

18    royalty or not?

19           Now, that's two concepts you just mushed together.

20           **MR. COTE:**  Can I confer with my esteemed counsel?

21           **THE COURT:**  I'd take some time with that.

22           (Counsel confer.)

23           **MR. COTE:**  The question of royalty should never go to

24    the jury at all.  And the reason why is because the royalty can be

25    awarded only if neither damages nor unjust enrichment caused by

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 87

1    the misappropriation are provable.  That comes out of the statute

2    I started to read earlier.

3           As a prerequisite to issuing the reasonable royalty, you

4    have to have a jury finding that it can't issue damages and can't

5    find unjust enrichment.

6           **MS. HURST:**  MGA agrees with that position it should

7    never go to the jury for the reasons stated and for the additional

8    reason that Georgia Pacific royalty is not available under the

9    Copyright Act.

10          What Judge Trott was referring to was the eBay equitable

11   analysis, which was for an injunction and whether to grant an

12   injunction or a constructive trust.  And what eBay required was

13   that alternatives -- in other words, call it a less restrictive

14   alternative type analysis.

15          **THE COURT:**  I think he might be referring to settlement.

16          **MS. HURST:**  He might have been, but in the legal context

17   at hand it was not damages under section 504 that he was

18   considering.  The hypothetical royalty analysis of Georgia Pacific

19   is not consistent with the dual causation requirements in section

20   504 of actual harm and damages attributable to the infringement.

21          **MR. COTE:**  Just to further answer your question.  There

22   was no jury verdict against Mr. Machado from the first case.  So

23   I'm sure Judge Trott wasn't thinking about this case in that

24   context.

25          Those were only two points I want to make; the

Page 88

1    reasonable royalty and acquisition should not go to the jury under

2    the plain terms of what CACI itself says.  And I think Ms. Hurst

3    was still going.

4             **MS. HURST:**  I'm finished.

5             **THE COURT:**  Okay.

6             **MR. ZELLER:**  Can I make a point on the royalty?  Which

7    is what they're overlooking is this:  It is a jury issue for

8    purposes of copyright infringement and whether or not a royalty

9    should be imposed and what rate.  It's considered a form of

10   damages.  And that's very clear from the decisions which have held

11   that is a royalty measure.

12            So regardless of whether the independent basis or the

13   independent merit would be, I should say, of whether or not on a

14   trade secret remedy royalty should go to the jury as opposed to

15   the Court, the fact is that the jury is going to be making factual

16   determinations that overlap with that issue.  It must go to the

17   jury.  Seventh Amendment requires it.

18            So I mean, if we had separate claims, only had one set

19   of claims, there might be more of a debate here.  But it's going

20   to the jury.  It has to under the Seventh Amendment for purposes

21   of the Copyright Act.

22            And so, our view is that it just needs to go to the

23   jury.  Obviously, the jury will make that determination of royalty

24   up until the time it has evidence.  In terms of whether further

25   royalties are imposed on the going-forward basis or to true-up or

1    anything that the jury did not cover, that's a separate issue and

2    that's something the courts traditionally have themselves

3    undertaken without any particular problem under the Seventh

4    Amendment, or whether it's an equitable versus legal remedy,

5    because the Court is being driven by what it is what the jury

6    already determined in simply entering further findings consistent

7    with that.  That's why those have not been a problem here.

8            The only other point I would make with respect to the

9    arguments that have been made is that Ms. Hurst has been saying

10   very emphatically about how they're being sandbagged by these

11   trade secret claims.  And I would direct the Court back to its

12   order from the order granting the motion to confirm where the

13   Court -- and we cited this in our papers and the Court quotes

14   it -- which is a statement by Ms. Hurst herself at the deposition

15   of Robert Eckert from December 17, 2009.  And this is found on

16   pages 3 to 4 of the Court's order, and at page 488 of the Bob

17   Eckert deposition transcript.

18           And this is what Ms. Hurst says herself contrary to what

19   she tries to tell us now well over a year later.  "Well, let me

20   say this.  It's part of phase two.  They had made a trade secret

21   misappropriation claim based on Bratz.  Let me say that again.

22   There is a trade secret misappropriation claim in phase two with

23   an allegation of willful misappropriation of trade secrets against

24   MGA Entertainment and Mr. Larian based on Bratz."

25           So the idea that somehow MGA is surprised, didn't know

1  about this claim has been rejected by the Court.  Repeatedly

2  rejected by the Court.  It's inconsistent with the record and

3  inconsistent with the very statements that MGA's counsel has made.

4  They took discovery on these claims and they took discovery on

5  them, frankly, for a lot longer than we were ever given the

6  opportunity to take discovery on MGA's, what they claim to be mere

7  image trade secret misappropriation claims.

8          **THE COURT:**  Conclusion then by MGA, Mr. Machado.

9          **MR. COTE:**  I'll go first.  Thank you.

10         The Seventh Amendment argument doesn't apply to anything

11  having to do with Mexico.  There are no copyright claims against

12  anybody having to do with anything that came out of Mexico.  All

13  that's left is trade secret misappropriation and, therefore, the

14  jury will not be deciding on the same issues.  There is no overlap

15  whatsoever.

16         Perhaps more importantly, the absence of a jury verdict

17  on damages, or put as the statute puts it, only if damages and

18  unjust enrichment are not provable, only then do you get to

19  reasonable royalty.  You don't start with reasonable royalty.

20  Reasonable royalty happens only after you decide you can't get

21  some other measure of damages.  It's a prerequisite.  It's not a

22  Seventh Amendment conflict issue because it's not the judge or the

23  Court changing or overruling a factual finding of the jury.  The

24  factual finding of the jury is the prerequisite for the Court

25  awarding the reasonable royalty.

Page 91

1          **THE COURT:**  Why isn't the jury instructed as to that?

2          **MR. COTE:**  In CACI the jury is informed the Court might

3     issue that remedy later.

4          **THE COURT:**  Does CACI preclude instructions about

5     finding damages first and thereby a preclusion of reasonable

6     royalties?  Or does CACI allow the Court to instruct the jury that

7     if damages aren't found, that royalties might be available?

8          **MR. COTE:**  No.  CACI says that the courts decides.  And

9     the statute says the Court decides.

10         **THE COURT:**  Does CACI -- or do we hold for the

11    proposition that the jury would still need to make that finding?

12    In other words, it would seem rather odd that the jury decides

13    that there are no damages and we are just left with a nonjury

14    determination under the Seventh Amendment that royalties might

15    apply.  Or if the jury reaches the decision there are no damages,

16    I think your argument would be since there has not been a jury

17    determination, that no damages, including royalty, would apply.

18         See, there is the Catch-22.  And I would think that if

19    damages don't apply, then the jury would be allowed to consider

20    royalty.

21         **MR. OVERLAND:**  I think the jury determination is that

22    there are no damages available.  There is no Seventh Amendment

23    issue here.  That is the trigger for the Court determining whether

24    or not to apply royalty.

25         **THE COURT:**  So in other words, I wouldn't hear this

Page 92

1    argument:  Judge, the jury reached a jury determination that there

2    are no damages.  You are precluded from now considering whether

3    there should be royalty.

4          MR. COTE:  No.  In fact, the opposite would be true.

5    Only until the jury finds no damages would we even be having a

6    discussion.

7          THE COURT:  I understand that.  I'm going to repeat that

8    back to you again.  I understand that.  You are not listening to

9    me.

10          Am I later going to hear an argument that if the jury

11    does not find damages, that this should have been submitted to the

12    jury in an alternative form indicating to the jury first that they

13    were to decide if there were, in fact, damages, but if there are

14    not damages, they should decide if there is a royalty to be

15    applied, leaving that royalty determination of the amount to the

16    Court?

17          MR. COTE:  You won't hear that argument.

18          THE COURT:  Will appellate counsel hear that argument?

19    Any appellate counsel?  I'm just kidding you for a moment.

20          MR. COTE:  No.

21          THE COURT:  Trial counsel but the appellate counsel will

22    be up there.  Okay.

23          MS. HURST:  He'll be locked in arms with me and no, you

24    won't hear that from him.

25          THE COURT:  Depending upon what the Court might award

Page 93

1    concerning a royalty I bet I would.

2           MS. HURST:  Well, no.  The Court would still be bound by

3    the eBay factors, and whether the jury could find damages or not

4    would be relevant to that.

5           THE COURT:  I want to thank each of you for your

6    well-reasoned arguments.

7           MS. HURST:  I would like to respond on the copyright

8    point briefly.

9           Mattel is conflating the indirect profits issue with the

10   royalty issue.  There is no copyright case awarding a lost royalty

11   as damages where there was no evidence of a royalty to be charged

12   for the work at issue.  None.  Not one.  For a royalty to be

13   actual damages under the Copyright Act, there has to be proof of a

14   lost royalty in the circumstance.

15          So in the Wall Data case, it was a software case, they

16   had an established schedule of licensing for copies of software, a

17   lost royalty damages measure was awarded.  Made sense.  On Davis

18   versus The Gap, the photographer proved a previous amount that he

19   had charged for use of the photograph.  Lost royalty.  Made sense.

20          In Polar Bear, the parties at issue had had a discussion

21   themselves about the amount to be charged.  The lost royalty based

22   on the actual facts in evidence made sense.

23          You cannot charge, based on a lost royalty actual

24   damages theory where there is no evidence.  And, whereas, here

25   Mattel admits they would never have licensed it.  Under those

Page 94

1    circumstances it's simply a hypothetical royalty.  It's not actual

2    damages.

3            THE COURT:  When will I hear the evidence so far in the

4    case that they would have never licensed it?

5            MS. HURST:  Wagner is going to tell you that.

6            THE COURT:  I have to wait for that.  Let's assume

7    that's true.  Okay.

8            MS. HURST:  So, in Maxi versus Riser (phonetic), the

9    Court rejected the award of a royalty.  So the only cases where

10   that royalty has been upheld is where there is clear evidence of a

11   lost royalty in a damages sense.  There was clearly the

12   opportunity to earn the money that was lost as a result of the

13   infringement and not paying instead of infringing.  That's the

14   only time that has been permitted.

15           The issue of a percentage of revenues for indirect

16   profits is a different issue, and they're often mixing up the two.

17   But here, for purposes the trade secret discussion -- we'll get to

18   that a later day -- for purposes of the trade secret discussion

19   Georgia Pacific should not go to the jury.  It should not go to

20   the jury under the Trade Secret Act because it's not a jury

21   question.  Because as Mr. Machado's counsel has urged, there has

22   to be a finding, first, of no damages or unjust enrichment before

23   any -- before the Court can consider the availability of the

24   royalty.  And to allow the jury to hear the evidence will be

25   extremely prejudicial.

1           So, for example, the jury right now could decide that

2    the amount by which MGA was unjustly enriched for the idea for the

3    product name Bratz was $200 based on Steven Linker's testimony.

4    And if the jury decides that, it should go ahead and do so and not

5    hear these much higher numbers for the supposed value for the

6    product name Bratz coming out of these hypothetical royalty

7    calculations when the actual evidence doesn't support those kinds

8    of numbers.

9           So the jury has evidence from which it can calculate

10   actual damages and/or unjust enrichment right now.  And the jury

11   should be given the opportunity to consider that without all the

12   other numbers swirling around, which were not jury questions under

13   trade secret or copyright, which is prejudicial to the defendants.

14           **MR. ZELLER:**  Could I read a portion from the Polar Bear

15   case which I think settles this issue?

16           **THE COURT:**  Certainly.

17           **MR. ZELLER:**  This is starting at page 709.  And this is

18   the discussion about, in fact, the reasonable royalty that was

19   awarded in the particular case.  And it is true that factually

20   there were discussions, but the Court actually makes very clear

21   that while that can be part of the background data, it is not

22   required.  And it goes on to specifically say -- and I'll quote it

23   here in a moment -- that the hypothetical negotiation framework is

24   also a proper way of determining reasonable royalty in the

25   copyright context.  And again, it starts at page 709.

1      "The jury heard the testimony of one of Polar Bear's

2  expert witnesses, Paul Sepp, a certified public accountant who

3  calculated a reasonable production and license fee by determining

4  their fair market value."

5      And it goes on to talk about what that entailed in the

6  particular context and proceeds to uphold it.  And then counter to

7  the argument that Timex made, here is what the Ninth Circuit said,

8  "Timex also challenges the license fee award as speculative

9  because Sepp based his valuations in part on consultations with

10  the principals of Polar Bear.  Common sense dictates that an

11  expert may confer with the copyright holder and that the

12  background data may be factored into calculations of actual

13  damages.  As the Seventh Circuit noted, 'It is not improper for a

14  jury to consider either a hypothetical lost license fee or the

15  value of the infringing use to the infringer to determine actual

16  damages provided the amount is not based on undue speculation.'"

17      And the Ninth Circuit there was quoting the McRoberts

18  Software decision and approved it from the Seventh Circuit.

19      So there is explicit language in Polar Bear that makes

20  it very clear that the hypothetical license negotiation is a

21  proper measure of actual damages under the Copyright Act.  That

22  means it goes to the jury.

23      **THE COURT:**  Okay.

24      **MS. HURST:**  We're going to have further argument when

25  they get to the copy instructions; right?

1        **THE COURT:**  Absolutely.  I want to make sure you are

2    both exhausted.

3        **MS. KELLER:**  McRoberts case is another software case

4    where there was an actual lost license fee.

5        **THE COURT:**  Anybody else?  Satisfied, Mr. Zeller?

6        **MR. ZELLER:**  I am satisfied.

7        **THE COURT:**  Mr. Quinn?

8        **MR. QUINN:**  Yes, Your Honor.

9        **THE COURT:**  Have enough time?

10       **MR. QUINN:**  Yes, Your Honor.  Thank you.

11       **THE COURT:**  Ms. Hurst?

12       **MS. HURST:**  Yes, thank you, Your Honor.

13       **THE COURT:**  Mr. McConville?

14       **MR. MCCONVILLE:**  Yes, Your Honor.

15       **THE COURT:**  Why don't you call Ms. Keller.  Oh, today is

16   Monday.  You are not going to church.

17       Mr. Overland, satisfied?

18       **MR. MCCONVILLE:**  This is a religious experience here,

19   Your Honor.

20       **THE COURT:**  Mr. Cote?

21       **MR. COTE:**  No.  Thank you, Your Honor.

22       **THE COURT:**  All right.  Now intentional interference.

23       **MR. OVERLAND:**  We have three of our special instructions

24   that I don't think we have covered.

25       **THE COURT:**  Okay.

1          MR. OVERLAND:  And the other thing, I don't know if the

2    Court wants to do this or not, but Mr. Cote has reviewed the

3    infamous disk and can tell the Court what its contents are.

4          THE COURT:  Okay.  First of all, let me see the three

5    special instructions.  Have you already put them on the table?

6    Here is an unclean hands by Machado.

7          MR. COTE:  Here is my copy.

8          THE COURT:  Mark them at the top, tear them out of that

9    long sheet.  You have unjust enrichment by Machado and you have a

10   disclosure issue concerning Machado and you have an acquisition

11   issue concerning Machado.

12         MR. OVERLAND:  I think the acquisition issue has been

13   resolved.

14         THE COURT:  What is the resolution?  It hasn't been

15   resolved.

16         MR. COTE:  It has been argued.

17         MR. OVERLAND:  I thought we changed that instruction.

18         THE COURT:  You just wrote in pencil.

19         Have they agreed, Mike?

20         MR. ZELLER:  With these?

21         THE COURT:  No.  Acquisition.

22         MR. ZELLER:  I didn't think so.

23         THE COURT:  Go over and talk to Mr. Overland.  He is

24   under the impression you have.

25         MR. ZELLER:  They did write a comment on that.

1          **THE COURT:**  Have you agreed to it or not?  I have got

2     it.

3          **MR. ZELLER:**  I thought the issue was just applicability

4     is all.

5          **THE COURT:**  We're on the record.  And we're on the

6     record in the matter of acquisition.

7          And what is your disagreement?

8          **MR. ZELLER:**  The disagreement, Your Honor, that

9     Mr. Machado has proposed, advocated, deleting the terms "MGA

10    Mexico" and "Machado," from the list of names with respect to

11    those who misappropriation by acquisition is being asserted.  And

12    we don't think that's proper.  We are making such a claim in this

13    particular instruction.  Where the court is identifying the

14    relevant defendants, or the parties against whom the claims are

15    being made, MGA Mexico and Mr. Machado are absolutely defendants

16    on that.

17         **THE COURT:**  Okay.  Mr. Overland?

18         **MR. OVERLAND:**  I think we have argued repeatedly the

19    claim against Mr. Machado cannot be based on acquisition.  Claim

20    is based on use or disclosure.  I think as I explained this is not

21    a theft case; this is a copying case.  And there is -- according

22    to the use note in 4400, there can be no liability arising from

23    acquisition in this case where Mattel de Mexico, Mattel Inc. or

24    Mattel Servicios has not been deprived of the ability to use the

25    documents that are the subject of the alleged misappropriation.

1            And following the use note of 4400, it's pretty clear

2     that acquisition is not a basis for liability as to Mr. Machado.

3     It's use and disclosure.

4            **THE COURT:**  Mr. Zeller?

5            **MR. ZELLER:**  I would direct the Court to the use note

6     4405, which is the appropriate one.  And it makes very clear that

7     obtaining secrets improperly, including by breach of a confidence,

8     is wrongful, inactionable misappropriation by acquisition.  It is,

9     in fact, a theory we have asserted.  There are damages we're going

10    to be seeking.  And we don't think there is any basis for MGA

11    saying that -- or excuse me, Mr. Machado saying that the Court

12    should simply, I guess, as a matter of law, rule that this claim

13    is unavailable to us.

14           We have consistently asserted misappropriation by

15    acquisition, by disclosure and by use all throughout.  It's

16    throughout our pleadings, our interrogatory responses, our damages

17    assessments.  It's been consistently asserted and we don't think

18    it would be right to take that away from the jury.

19           **THE COURT:**  Okay.

20           **MR. COTE:**  It's not a question of whether liability can

21    attach on acquisition.  It's a question of what remedies attach on

22    the acquisition.  And the use note for 4400 make clear that

23    acquisition, in most cases, leads to injunctive relief.  Thou

24    shalt not use the documents, or thou shalt return them or thou

25    shalt destroy them.

1       Juries don't give injunctions.  That's why the use note

2  says it doesn't go to the jury unless it's one of those oddball

3  cases where the acquisition is itself causing damages.

4       **THE COURT:**  Why doesn't this acquisition cause damages?

5       **MR. COTE:**  Because their theory of loss in this case is

6  that Mr. Machado was unjustly enriched in the amount of the cost

7  of creating the document.  Mattel did not lose any sales as a

8  result of taking this.  MGA did not gain any sales as a result of

9  taking this.  That's their theory.  As strange as it is, that's

10  what their allegation is.

11       And it's mere copying.  They were not deprived of use of

12  the trade secret on their own.  It's not as if someone took the

13  only copy of this information and they were no longer able to use

14  it and had to scramble to come up with a substitute.

15       That might be a case where acquisition gives rise to

16  damages, but that's not this case.

17       **MR. ZELLER:**  I have no idea how it is that Mr. Machado

18  obtained that impression that we're basing our claim against him

19  based on "mere copying."  Our claim has been far beyond that.

20  It's a trade secret misappropriation claim for acquisition, for

21  disclosure, and for use.

22       And what I would also say is that the portion that

23  they're relying on for these notes, for another section, 4400, of

24  course says in most cases.  It doesn't say in all cases.

25       And moreover, this is a situation because of, obviously,

1   where we find ourselves, and has been discussed rather

2   extensively, equitable issues are going to this jury.  So I mean,

3   regardless of what it is that Mr. Machado thinks that Mattel will

4   or will not be entitled to at the end of the day, these are

5   clearly determinations, in any event, that need to be made by the

6   jury.

7          **THE COURT:**  Okay.  Now Mr. Overland.

8          **MR. OVERLAND:**  This isn't an issue of what Mattel is

9   claiming.  We know what they're claiming.  It's what they're

10  entitled to under the law.  And it's pretty clear 4400 is the

11  basic section from which the other instructions flow.  And it's

12  crystal clear, anybody reading those use notes, that this is not a

13  case where that falls under the rubric of an independent cause of

14  action for liability for taking.  That only arises in the

15  situation where the taking deprives the owner of the trade secret

16  so that injunctive relief is available to get that back.

17         That's not this case.  This is a copying case.  And

18  therefore, acquisition, number one, has no relevance to any kind

19  of injunctive relief because they're seeking damages, number one.

20  And number two, the damages they're seeking, as Mr. Cote said, are

21  based on the cost of making the document; not on any lost profits

22  or anything like that.

23         So it seems to me to be pretty clear that they're not

24  entitled to claim any damages based on acquisition or any other

25  kind of --

Page 103

1    **THE COURT:**  If I went into the Coca-Cola safe and I

2    copied the formula for Coca-Cola, your position would be the same,

3    it's copying?

4    **MR. OVERLAND:**  And you can get injunctive relief.

5    **THE COURT:**  But it's copying?  You didn't answer my

6    question.  It's copying?

7    **MR. OVERLAND:**  It's copying, yes.

8    **MR. COTE:**  If you never use that copy, that's the story

9    we're talking about.  If you use the copy to make your own

10   Coca-Cola, now we're in the use or disclosure.  Different story.

11   **THE COURT:**  How I do know that Mr. Machado hasn't used

12   what he copied?

13   **MR. COTE:**  That's not the issue.  The issue is whether

14   the jury should be instructed on whether mere acquisition alone

15   gives rise to a remedy.

16   **MS. HURST:**  They're being instructed on use.

17   **MR. COTE:**  We don't dispute that they should be

18   instructed on use and disclosure, but they shouldn't be instructed

19   on acquisition.

20   **THE COURT:**  Is there an argument that because of the

21   uniqueness of a trade secret, that if I copy, there are some

22   situations where I also acquire that trade secret, because now I

23   have that?

24       In other words, is there an ability to have a duality

25   here?  That's not clear.  Let me say it again.  I can see by the

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 104

1    puzzlement on your face.  And I apologize.

2           Your belief is that acquisition can only be when I

3    literally take something and I deprive the owner of that.  For

4    instance, I take Carter Bryant's substantive drawings.  Yes or no?

5           **MR. COTE:**  Acquisition that goes to the jury, yes.  That

6    could be acquisition giving rise to an injunction of some other

7    kind.  But going to the jury, yes.

8           **THE COURT:**  Can there be a situation in which the person

9    has a document copied, retains that document, and we also have,

10   because of that person's ability to obtain that document

11   surreptitiously, an acquisition?  For as long as that document

12   remains under all circumstances, can we never have an acquisition?

13          **MR. OVERLAND:**  In a copying situation?

14          **THE COURT:**  No.  In a trade secret situation.

15          **MR. OVERLAND:**  No.  If you take the only copy that there

16   is, then you have an acquisition because you have deprived the

17   owner of the ability to use that.  If you are copying.

18          **THE COURT:**  That's not what I asked.  I'm asking if

19   anybody can think of a situation where the document is not

20   taken -- whether it's an original or a copy -- it's not taken, but

21   it is copied.  Can there ever be an acquisition in any fact

22   situation that you can propound to me?

23          **MR. COTE:**  There could be an acquisition.  The question

24   is whether that goes to the jury.  Maybe injunctive relief results

25   as a result of the scenario you are suggesting, but that doesn't

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 105

1    go to the jury.  And that's what the use note says.

2           **THE COURT:**  Excuse me.  I have read the use notes.

3    Thank you very much.  I've probably read them 15 times now.  So

4    that's the last time I'll hear the use notes.  Thank you.

5           **MR. OVERLAND:**  The question is, is there a scenario

6    where acquisition -- where copying a document can be an

7    acquisition?

8           **THE COURT:**  As well.

9           **MR. OVERLAND:**  Yes.  It certainly is an acquisition, but

10   whether or not that goes to the jury is a different issue.

11          **THE COURT:**  Which comes back to Mr. Cote's point.  There

12   can be an acquisition, but according to the use notes, might be

13   injunctive relief.  All right.  Thank you.

14          Mr. Zeller.

15          **MR. ZELLER:**  Here is the illustration I guess I would

16   use to try and show what the problem is with Mr. Machado's

17   argument and by extension, MGA's.

18          There is no question that one remedy that would be

19   available where you simply have mere acquisition -- pick up on the

20   Court's example of someone copying the formula for Coca-Cola but

21   leaving it in the safe still so Coca-Cola still has it.  And that

22   is a reasonable royalty.

23          The statute itself says you can get lost profits in our

24   hypothetical.  There are no lost profits yet because there is no

25   use or other disclosure.

1           Number two -- or at least under that hypothetical.

2    Number two, there wouldn't be unjust enrichment or any ill-gotten

3    gains.  Person just simply copied it.  However, that would still

4    permit a reasonably royalty measure of damages under that scenario

5    as well as an injunction.  It's a matter for the jury to

6    determine; what should be awarded for that.

7           And while MGA and Mr. Machado, I mean, presumably are

8    free to go and argue to the jury that all that happened was mere

9    copying and it wouldn't be fair in those circumstances to impose a

10   royalty kind of remedy on it, that's something for the jury to

11   determine.

12           THE COURT:  The reverse question to you.  Is Mattel due

13   any lost profits from Machado concerning the trade secret

14   misappropriation claim?

15           MR. ZELLER:  Not lost profits.

16           THE COURT:  So the answer is no.

17           MR. ZELLER:  Loss value of use we are.

18           THE COURT:  What is that value?

19           MR. ZELLER:  It includes the value and it is the value

20   that it took to create them.

21           THE COURT:  How much money is that?

22           MR. ZELLER:  I don't have those exact figures.  They

23   have been calculated out separately.

24           THE COURT:  Sure you do.  You are very well-prepared.

25           MR. ZELLER:  I can get the expert report.

Page 107

1            **THE COURT:**  $5000?  $10,000?  $200?  What?

2            **MR. ZELLER:**  It's more than that.

3            **THE COURT:**  How much?

4            **MR. ZELLER:**  I'll have to get the numbers, Your Honor.

5            **THE COURT:**  In other words, what are we talking about?

6            **MR. OVERLAND:**  6.7 million according to Wagner.

7            **THE COURT:**  27 million?

8            **MR. OVERLAND:**  6.7.

9            **THE COURT:**  Which is the only claim.  There we go.

10   Okay.  What are the three other instructions?

11           **MR. OVERLAND:**  We have our special number three.  This

12   is an instruction dealing with evidence that's -- which I suspect

13   Mattel wants to put in regarding the conflict questionnaire, code

14   of ethical business conduct, and conflict of interest manual.  And

15   the Court ruled on summary judgment that these do not create

16   contracts and therefore impose no duties, no contractual duties on

17   Mr. Machado, Mr. Vargas or Ms. Trueba.  And that's on page 81 of

18   its summary judgment.

19           **THE COURT:**  Special instruction number two.

20           **MR. COTE:**  Special instruction number two is the

21   instruction that Mr. Machado, Mr. Vargas and Ms. Trueba worked for

22   Mattel Servicios, not Mattel Inc. or Mattel Mexico were the only

23   parties to this case.  And that's important because with the

24   variety of Mattel employees or Mattel entities that are being

25   discussed in the case, I think it gets confusing for the jury.

1        It's also important because it goes to the question that

2   Mr. Overland just spoke about, which is the duty that these

3   employees owe to their employer, if any, would have to be limited

4   to?

5        **THE COURT:**  Number five.

6        **MR. COTE:**  Number five is an instruction that

7   Mr. Machado has not been present during some parts of trial in

8   this case and instructing the jury not to infer anything from

9   that.

10        This is a -- as the Court knows, Mr. Machado's

11   availability for trial is a direct result of the criminal

12   prosecution in Mexico that was instigated by Mattel against him in

13   Mexico.  His inability to attend trial thus far has been a result

14   of that criminal prosecution.  And although the Court has been

15   exceptionally helpful in trying to work around that problem, he

16   has not yet been able to attend because of the criminal

17   prosecution and difficulty in getting permission from the Court in

18   Mexico to let him come up here.

19        Mattel has objected to the instructions not only that

20   it's improper, but that they want to comment on the fact that

21   Mr. Machado is not here at trial, which they should not be

22   entitled to do because it's their doing that prevents him from

23   being here in the first place.

24        **THE COURT:**  Mattel?

25        **MR. ZELLER:**  Taking the second -- excuse me, the last

1  issue first, that instruction on Mr. Machado not being present is

2  at best premature.  And to decide to give it now would not be

3  appropriate.

4          **THE COURT:**  Number two.

5          **MR. ZELLER:**  If I just may on that point a little bit

6  more, Your Honor, which is we dispute that Mr. Machado can't come

7  here because of the prosecution.  We can put in evidence -- and

8  maybe we'll have to call a witness to do this -- but Mr. Machado

9  in the past when he wanted to go to MGA business meetings was able

10 to get approval in a day.  It wasn't this runaround about missing

11 addresses and everything else.  He was able to walk in, get

12 permission from a judge, get on a plane and go to MGA business

13 meetings.  So we completely dispute this characterization.

14         **THE COURT:**  First, Mr. Machado will probably be here.

15 Once he appears, Mr. Overland and Mr. Zeller or Mr. Quinn, why

16 would I allow any comment, in any argument, in any form about how

17 long he was here, for what period of time?

18             In other words, that's totally irrelevant.  So I expect

19 Machado to be here.  I expect this instruction, quite frankly, to

20 become moot with no comment by the Court and no comment by counsel

21 as to whether he was here one week or three weeks.  So I think it

22 will resolve itself.

23             Number two, this sole employer was Mattel Servicios.

24         **MR. ZELLER:**  We think that's unnecessary and misleading.

25 And in fact, Mr. Machado's counsel points out this is based upon

Page 110

```
1   contractual duties.  That was not the extent of Mr. Machado's

2   duties.  That instruction not only doesn't say so, but this gets

3   us exactly to the point the Court has made in rejecting other

4   Mattel instructions, is it's providing undue emphasis on

5   particular concepts.

6           There is no reason to do that.  We don't intend to

7   assert he had those specific contractual duties, but we certainly

8   do believe he had duties running to the plaintiffs in this case,

9   and we're entitled to argue that.

10          THE COURT:  Finally, instruction number three, no duty

11  owed to Mattel.

12          MR. OVERLAND:  May I respond to that, Your Honor?

13          THE COURT:  Certainly.

14          MR. OVERLAND:  I think that points to specifically what

15  they want to use that for, is to show that Mr. Machado had some

16  duty of loyalty to Mattel Inc. or Mattel Mexico, and that was

17  expressly rejected by this Court in summary judgment at page 89.

18  Mr. Machado had no duty of loyalty to those entities.

19          THE COURT:  Number three, no duty owed to Mattel Inc. or

20  Mattel Mexico.

21          MR. ZELLER:  I made the same points, Your Honor.

22          THE COURT:  Okay.

23          MR. OVERLAND:  Same reference to the Court's summary

24  judgment motion.

25          THE COURT:  Thank you very much.
```

0e6de8b8-101a-4d68-aea7-4be5dc38fe88

Page 111

1          Now, Maria, rest your hands.

2               (Whereupon the proceedings were adjourned at 4:00.)

3

4                              -oOo-

5

6                            CERTIFICATE

7

8          I hereby certify that pursuant to Section 753, Title 28,

9    United States Code, the foregoing is a true and correct transcript

10   of the stenographically reported proceedings held in the

11   above-entitled matter.

12

13   Date:  FEBRUARY 22, 2011

14

15

16   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132
17

18

19

20

21

22

23

24

25

0e6de8b8-101a-4d68-aea7-4be5dc38fe88