1                    **UNITED STATES DISTRICT COURT**

2                    **CENTRAL DISTRICT OF CALIFORNIA**

3                **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                          - - - - - - -

5
    MATTEL, INC., et al.,                )
6                                         )
                 Plaintiffs,              )
7                                         )
          vs.                             ) No. CV 04-9049 DOC
8                                         )     Day 21
    MGA ENTERTAINMENT, INC., et al.,      )     Volume 1 of 3
9                                         )
                                          )
10               Defendants.              )
    _____)
11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                          Jury Trial

16                    Santa Ana, California

17               Tuesday, February 22, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-22 D21V1

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 2 of 161   Page ID #:303634
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
             QUINN EMANUEL URQUHART & SULLIVAN
4            BY:  JOHN QUINN
                  WILLIAM PRICE
5                 MICHAEL T. ZELLER
                  Attorneys at Law
6            865 South Figueroa Street
             10th Floor
7            Los Angeles, California 90017
             (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12           ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
             BY:  THOMAS S. McCONVILLE
13                Attorney at Law
             4 Park Plaza
14           Suite 1600
             Irvine, California 92614
15           (949) 567-6700

16           - AND -

17           ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
             BY:  ANNETTE L. HURST
18                Attorney at Law
             405 Howard Street
19           San Francisco, California 94105
             (415)773-5700

20           - AND -

21           KELLER RACKAUCKAS
22           BY:  JENNIFER KELLER
                  Attorney at Law
23           18500 Von Karman Avenue
             Suite 560
24           Irvine, California 92612
             (949) 476-8700

25

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830

8            - AND -

9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660

13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406

18

19           ISAAC LARIAN, MGA CEO

20           KEN KOTARSKI, Mattel Technical Operator

21           MIKE STOVALL, MGA Technical Operator

22           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

1                          **I N D E X**

2   **WITNESSES**                    **DIRECT   CROSS   REDIRECT   RECROSS**

3   LARIAN, Isaac

4   By Mr. Price                                      8

5   By Ms. Keller                                                      88

6

7   ROSENBAUM, David

8   By Mr. Price              133

9

10

11                          **EXHIBITS**

12  **EXHIBIT NO.**                **IDENTIFICATION        IN EVIDENCE**

13    1318      (no description)                          86

14    1320      (no description)                          87

15    1321      (no description)                          86

16    5713      Document from Mr. Larian                  81
              to Ms. Tiffany
17
      7904      (no description)                          87
18
      7905      (no description)                          88
19
      7906      (no description)                          88
20
      7907      (no description)                          87
21
      7908      (no description)                          86
22
      8124-R-2-0001  E-mail string                        78
23
      8225      (no description)                          85
24
      8235      (no description)                          86
25
      8237      (no description)                          86

```
1                    EXHIBITS (Continued)

2    EXHIBIT NO.              IDENTIFICATION      IN EVIDENCE

3
      8241   (no description)                        87
4
      8243   (no description)                        88
5
      9826   Document from Mr. Larian               82
6            to Aporius Jens

7     9827   Document from Mr. Larian               82
             to Mel Woods
8
      9828   (no description)                        84
9
      9829   Document from Mr. Larian               81
10           to Ms. Johnson

11    9850   Proprietary information               17
             Agreement signed by
12           Mr. Tumaliuan

13   11179   (no description)                        85

14   11255   Document from Mr. Larian               83
             to Sandrine de Raspide
15
     11263   (no description)                        84
16
     11264   (no description)                        84
17
     11869   Document from Mr. Larian               83
18           to Mr. Lee

19   13794   (no description)                        85

20   13858   E-mail string                          38

21   13917   (no description)                        86

22   13918   (no description)                        86

23   20781   (no description)                        87

24   20817   (no description)                        84

25   20912   (no description)                        86
```

**EXHIBITS (Continued)**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 20917 | (no description) | 87 |
| 21289 | (no description) | 85 |
| 21314 | (no description) | 87 |
| 21315 | (no description) | 87 |
| 21463 | E-mail from Mr. Williams to Mr. Larian dated 5/18/2001 | 106 |
| 22020 | (no description) | 85 |
| 22032 | E-mail string between Mr. Larian, Mr. Ross, Mr. Williams and Ms. Garcia, March 2001 | 30 |
| 22051 | (no description) | 85 |
| 23946 | E-mail string between Mr. Larian and Mr. Wing, 2/3/2006 | 53 |
| 23947 | E-mail chain between Mr. Larian and Mr. Wing | 49 |
| 24017 | E-mail from Mr. Larian dated 5/27/2004 (redacted version) | 73 |
| 24034 | E-mail chain between Mr. Larian and Mr. Williams | 105 |
| 24035 | Document from Mr. Larian to Mr. Williams | 110 |
| 24062 | Proprietary Informatino Agreement signed by Ms. Ward | 12 |
| 24063 | Proprietary Information Agreement for Ms. Reed | 14 |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

7

1                    **EXHIBITS (Continued)**

2    **EXHIBIT NO.**                **IDENTIFICATION**        **IN EVIDENCE**

3      34768    Integrity Toys' Jade                      127
                doll
4
       34770    Jade doll by Jason Wu                     127
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 22, 2011**     |
|       | 2  | **Day 21, Volume 1 of 3**                                |
|       | 3  | (8:39 a.m.)                                               |
| 08:28 | 4  | *(In the presence of the jury.)*                         |
| 08:39 | 5  | THE COURT:  Good morning.                                 |
| 08:39 | 6  | Now, we're back on the record.  Counsel are              |
| 08:39 | 7  | present.  All the parties are present.  Mr. Larian's     |
| 08:39 | 8  | present.  The jury and the alternates are present.       |
| 08:39 | 9  | And, Counsel, Mr. Price.                                  |
| 08:39 | 10 | MR. PRICE:  Thank you.                                    |
| 08:39 | 11 | **ISAAC LARIAN, MATTEL'S WITNESS, PREVIOUSLY SWORN**     |
| 08:39 | 12 | **RESUMED THE STAND**                                     |
| 08:39 | 13 | **REDIRECT EXAMINATION (Resumed)**                       |
| 08:39 | 14 | BY MR. PRICE:                                             |
| 08:39 | 15 | Q.   Good morning, Mr. Larian.                           |
| 08:39 | 16 | A.   Good morning.                                        |
| 08:39 | 17 | Q.   I'd like you to look at Exhibit 13532.              |
| 08:39 | 18 | *(Document provided to the witness.)*                    |
| 08:39 | 19 | MR. PRICE:  And this is already in evidence.             |
| 08:39 | 20 | *(Document displayed.)*                                  |
| 08:39 | 21 | BY MR. PRICE:                                             |
| 08:39 | 22 | Q.   Do you recall this is the proprietary information   |
| 08:39 | 23 | agreement that was sent to all employees in August of 2000? |
| 08:39 | 24 | A.   Yes.                                                 |
| 08:39 | 25 | Q.   And this is the one that -- if you'd look at page 6 and |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:40 | 1 | 7, this is the one that had those provisions about not being |
| 08:40 | 2 | able to work for a competitive company for a year, not being |
| 08:40 | 3 | able to solicit customers and clients, not being able to |
| 08:40 | 4 | solicit MGA personal.  Do you recall that? |
| 08:40 | 5 | A.   Yes. |
| 08:40 | 6 | Q.   And you said that -- that this agreement was wrong, was |
| 08:40 | 7 | illegal, and never went into effect, correct? |
| 08:40 | 8 | A.   I said that we withdrew it. |
| 08:40 | 9 | Q.   Did you say, "This agreement never went into effect; it |
| 08:40 | 10 | was wrong"? |
| 08:40 | 11 | A.   Yes.  It is wrong and it didn't go to effect. |
| 08:40 | 12 | Q.   Did you say, "not one person at MGA ever signed this |
| 08:40 | 13 | agreement, not one"? |
| 08:40 | 14 | A.   It's possible that I said that, but I might have |
| 08:40 | 15 | misspoken, and some people might have signed it. |
| 08:40 | 16 | Q.   And did you review any documents, uh, in the last day? |
| 08:40 | 17 | A.   Five minutes ago I did. |
| 08:40 | 18 | Q.   Uh, and you know, in fact, that you did require some |
| 08:40 | 19 | employees to sign this agreement? |
| 08:40 | 20 | A.   No.  I saw two employees who have apparently signed it, |
| 08:40 | 21 | but those agreements never went into effect.  As a matter of |
| 08:41 | 22 | fact, Mercedeh Ward left MGA and went to Playhouse right |
| 08:41 | 23 | after that, so... |
| 08:41 | 24 | Q.   How long was Mercedeh Ward at MGA? |
| 08:41 | 25 | A.   I don't remember. |

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:41 | 1 | Q.   Well, she started in October of 2000? |
| 08:41 | 2 | A.   Yes. |
| 08:41 | 3 | Q.   Uh –– and, uh, she worked on the Bratz line? |
| 08:41 | 4 | A.   She did. |
| 08:41 | 5 | Q.   For how long did she work on the Bratz line? |
| 08:41 | 6 | A.   I don't remember exactly.  I think she was there |
| 08:41 | 7 | about –– maybe about a year. |
| 08:41 | 8 | Q.   And, of course, you understand that in this case, uh, |
| 08:41 | 9 | we haven't asked for or received all the personnel files at |
| 08:41 | 10 | MGA?  You understand that, correct? |
| 08:41 | 11 | MS. KELLER:  Objection.  Calls for a conclusion of |
| 08:41 | 12 | this witness about what was asked for. |
| 08:41 | 13 | He doesn't know. |
| 08:41 | 14 | BY MR. PRICE: |
| 08:41 | 15 | Q.   If you don't know, tell us you don't know. |
| 08:41 | 16 | THE COURT:  Well, thank you, Counsel. |
| 08:41 | 17 | I'm going to overrule the objection.  If you don't |
| 08:42 | 18 | know, tell us you don't know. |
| 08:42 | 19 | THE WITNESS:  I don't know. |
| 08:42 | 20 | THE COURT:  He doesn't know, Counsel. |
| 08:42 | 21 | Now, by the way, I'll pay the same courtesy to |
| 08:42 | 22 | Mr. Eckert.  Okay?  So both presidents of both companies are |
| 08:42 | 23 | at the top of the food chain in a sense, ladies and |
| 08:42 | 24 | gentlemen, so counsel can ask about their companies.  They |
| 08:42 | 25 | may not know.  It may be delegated to different |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 11 of 161   Page ID #:303643
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

11

| 08:42 | 1 | subordinates, but counsel from both sides have the right to |
|---|---|---|
| 08:42 | 2 | ask. |
| 08:42 | 3 | BY MR. PRICE: |
| 08:42 | 4 | Q.   So, Mr. Larian, it would be incorrect to suggest to the |
| 08:42 | 5 | jury that, uh, this agreement which you characterized as |
| 08:42 | 6 | wrong and illegal was not signed by anybody at MGA? |
| 08:42 | 7 |           MS. KELLER:  Objection.  Argumentative with |
| 08:42 | 8 | respect to suggesting to the jury. |
| 08:42 | 9 |           THE COURT:  Sustained.  That portion's stricken. |
| 08:42 | 10 | BY MR. PRICE: |
| 08:42 | 11 | Q.   It would be wrong to tell the jury that not one person |
| 08:42 | 12 | at MGA ever signed this agreement? |
| 08:42 | 13 |           THE COURT:  It would be the same objection, |
| 08:42 | 14 | Counsel.  It's sustained.  Just say "testified to the fact." |
| 08:42 | 15 |           MR. PRICE:  Okay.  I'll do that. |
| 08:42 | 16 | BY MR. PRICE: |
| 08:42 | 17 | Q.   So previously you testified to the fact not one person |
| 08:42 | 18 | at MGA ever signed the agreement, not one, correct? |
| 08:43 | 19 | A.   Yes. |
| 08:43 | 20 | Q.   And that statement would be incorrect? |
| 08:43 | 21 | A.   Yes. |
| 08:43 | 22 | Q.   And if you look at Exhibit 24062. |
| 08:43 | 23 |           *(Document provided to the witness.)* |
| 08:43 | 24 | BY MR. PRICE: |
| 08:43 | 25 | Q.   Particularly, if you look at the last page, page 12. |

| 08:43 | 1 | A.   Yes. |
|---|---|---|

08:43   1   A.   Yes.

08:43   2   Q.   Do you see that's a proprietary information agreement

08:43   3   signed by Ms. Ward and by you?

08:43   4   A.   Yes.

08:43   5   Q.   And that's October 18, 2000, correct?

08:43   6   A.   Yes.

08:43   7        MR. PRICE:  Your Honor, move Exhibit 24062 into

08:43   8   evidence.

08:43   9        THE COURT:  Received.

08:43   10       *(Exhibit No. 24062 received in evidence.)*

08:43   11        *(Document displayed.)*

08:43   12   BY MR. PRICE:

08:43   13   Q.   And if you look at page, uh, 6, you also see yours and

08:43   14   Ms. Ward's signature?

08:43   15   A.   Yes.

08:43   16   Q.   And that's dated July 25, 2000.  Do you see that?

08:44   17   A.   Well, my signature is July 25, but the one at the

08:44   18   bottom --

08:44   19   Q.   Hers is?

08:44   20   A.   -- is October 18.  So that was the fall.

08:44   21   Q.   So if we look at the terms of the agreement, if you

08:44   22   look at page 2, you have under paragraph 2, the provision

08:44   23   that for a period of one year following the termination,

08:44   24   she's -- uh, shall not directly or indirectly become

08:44   25   employed or provide services to or for any company or

| | | |
|---|---|---|
| 08:44 | 1 | business.  Do you see that? |
| 08:44 | 2 | A.    Yes. |
| 08:44 | 3 | Q.    And that's the provision we talked about earlier, |
| 08:44 | 4 | right? |
| 08:44 | 5 | A.    Yes. |
| 08:44 | 6 | Q.    And then paragraph 3 is can't solicit customers, |
| 08:44 | 7 | clients, and vendors.  Do you see that? |
| 08:44 | 8 | A.    Yes. |
| 08:44 | 9 | Q.    And then paragraph 4 is nonsolicitation of personnel. |
| 08:44 | 10 | Do you see that? |
| 08:44 | 11 | A.    Yes. |
| 08:44 | 12 | Q.    Now, is it your, uh, testimony that there were only two |
| 08:45 | 13 | agreements signed like this that said, uh, you can't work |
| 08:45 | 14 | for a year, you can't solicit customers, you can't solicit |
| 08:45 | 15 | personnel? |
| 08:45 | 16 | A.    No. |
| 08:45 | 17 | Q.    Uh, how many were, in fact, signed with these |
| 08:45 | 18 | provisions? |
| 08:45 | 19 | A.    I don't know. |
| 08:45 | 20 | Q.    Do you have any estimate like five, ten, twenty, |
| 08:45 | 21 | anything at all? |
| 08:45 | 22 | A.    Two. |
| 08:45 | 23 | Q.    Well, so you can tell us it's only two, or that's an |
| 08:45 | 24 | estimate? |
| 08:45 | 25 | A.    Two that I have seen. |

| | | |
|---|---|---|
| 08:45 | 1 | Q.   And those two that you've seen, you've seen in the last |
| 08:45 | 2 | 24 hours? |
| 08:45 | 3 | A.   Last five minutes. |
| 08:45 | 4 | Q.   So if you were shown five, you'd say you know five? |
| 08:45 | 5 | MS. KELLER:  Objection.  Argumentative. |
| 08:45 | 6 | THE COURT:  Overruled. |
| 08:45 | 7 | You can answer that question. |
| 08:45 | 8 | THE WITNESS:  Yes, yes. |
| 08:45 | 9 | BY MR. PRICE: |
| 08:45 | 10 | Q.   So I guess the fact of the matter is you really don't |
| 08:45 | 11 | know? |
| 08:45 | 12 | A.   Yes. |
| 08:45 | 13 | Q.   If you'd look at 24063. |
| 08:46 | 14 | *(Document provided to the witness.)* |
| 08:46 | 15 | BY MR. PRICE: |
| 08:46 | 16 | Q.   And do you recognize that as a proprietary information |
| 08:46 | 17 | agreement for Wendy Reed? |
| 08:46 | 18 | A.   Yes. |
| 08:46 | 19 | Q.   And that is, uh, your signature at, uh -- on the last |
| 08:46 | 20 | page of the document? |
| 08:46 | 21 | A.   Yes. |
| 08:46 | 22 | MR. PRICE:  Your Honor, move Exhibit 24063 into |
| 08:46 | 23 | evidence. |
| 08:46 | 24 | THE COURT:  Received. |
| 08:46 | 25 | *(Exhibit No. 24063 received in evidence.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

15

| 08:46 | 1 | *(Document displayed.)* |
|---|---|---|

08:46  2   BY MR. PRICE:

08:46  3   Q.   If you look at -- this is Ms. Reed's employment --

08:46  4   proprietary information agreement?

08:46  5   A.   Yes.

08:46  6   Q.   And it also has those provisions about not being able

08:46  7   to work for a year, not being able to solicit customers,

08:46  8   clients, and vendors not being able to solicit personnel,

08:46  9   correct?

08:46  10   A.   Yes.

08:46  11   Q.   What was Ms. Reed's position at MGA?

08:46  12   A.   I don't remember her.

08:46  13   Q.   She wasn't an executive, was she?

08:47  14   A.   I don't remember her.

08:47  15   Q.   Now, you recall, uh, we were talking a while ago about

08:47  16   the provision about not being able to solicit customers,

08:47  17   clients, and vendors and -- as having an impact on whether

08:47  18   or not someone can continue working in the toy industry.  Do

08:47  19   you recall that?

08:47  20   A.   Yes.

08:47  21   Q.   And I believe you said that that wouldn't have an

08:47  22   impact on being able to work in the toy industry if you

08:47  23   couldn't, you know, contact the vendors you worked for

08:47  24   before or the customers or the clients.  Do you recall that?

08:47  25   A.   I don't understand your question.

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:47 | 1 | Q.   Sure.  That is, if someone leaves MGA and goes to |
| 08:47 | 2 | another company -- |
| 08:47 | 3 | A.   Yes. |
| 08:47 | 4 | Q.   If someone leaves MGA and goes to another company and |
| 08:47 | 5 | they are prohibited for a certain period of time from using |
| 08:47 | 6 | the vendors MGA used or -- uh, or talking to the customers |
| 08:47 | 7 | they'd talked to before or soliciting those customers, that |
| 08:48 | 8 | could impact their ability to work in the toy industry? |
| 08:48 | 9 | A.   Yes. |
| 08:48 | 10 | Q.   And those kind of provisions, uh, you put into |
| 08:48 | 11 | agreements even with, uh, your interns? |
| 08:48 | 12 | A.   I don't know. |
| 08:48 | 13 | Q.   Well, look at Exhibit 9850. |
| 08:48 | 14 | (Document provided to the witness.) |
| 08:48 | 15 | BY MR. PRICE: |
| 08:48 | 16 | Q.   And specifically, page 24 of that exhibit. |
| 08:48 | 17 | A.   Go ahead. |
| 08:48 | 18 | Q.   And do you see that as a proprietary information |
| 08:48 | 19 | agreement, uh, executed by Mr. Tumaliuan? |
| 08:48 | 20 | A.   Yes. |
| 08:48 | 21 | Q.   And if you look at page 28, you see there's a date of |
| 08:49 | 22 | June 10, 2001? |
| 08:49 | 23 | A.   Yes -- 2002. |
| 08:49 | 24 | Q.   I'm sorry.  2002, you're correct. |
| 08:49 | 25 | MR. PRICE:  Your Honor, move, uh, Exhibit 9850, |

| | | |
|---|---|---|
| 08:49 | 1 | pages 24 through 28, into evidence. |
| 08:49 | 2 | THE COURT:  Received. |
| 08:49 | 3 | *(Exhibit No. 9850 received in evidence.)* |
| 08:49 | 4 | *(Document displayed.)* |
| 08:49 | 5 | BY MR. PRICE: |
| 08:49 | 6 | Q.   And Mr. Tumaliuan is the intern we had talked about |
| 08:49 | 7 | previously who was interning for Mattel over that summer. |
| 08:49 | 8 | Do you remember that? |
| 08:49 | 9 | A.   I remember, yes. |
| 08:49 | 10 | Q.   And here we have, if you look at page -- it's -- it's |
| 08:49 | 11 | 9850-25, you see that in this contract in 2002, you have the |
| 08:49 | 12 | provisions that Mr. Tumaliuan is prohibited for a year |
| 08:49 | 13 | period from soliciting customers, clients, vendors, and from |
| 08:49 | 14 | soliciting MGA's personnel if he goes somewhere else.  Do |
| 08:50 | 15 | you see that? |
| 08:50 | 16 | A.   Yes. |
| 08:50 | 17 | Q.   So now we're up to three? |
| 08:50 | 18 | A.   I don't think these agreements are the same, but, yes. |
| 08:50 | 19 | Q.   I mean, this one doesn't have the provision that you |
| 08:50 | 20 | can't actually work for a year, correct? |
| 08:50 | 21 | A.   I haven't read the whole agreement. |
| 08:50 | 22 | Q.   Okay.  You, uh, were saying in your, uh -- your |
| 08:50 | 23 | testimony with Ms. Keller, we talked about the profits that |
| 08:50 | 24 | MGA had made in 2000 and 2001, and on Friday I asked about |
| 08:50 | 25 | 2000.  And you remember the merchandise that was returned. |

18

| | | |
|---|---|---|
| 08:50 | 1 | Do you recall that? |
| 08:50 | 2 | A.   Merchandise profit?  I don't understand your question. |
| 08:50 | 3 | Q.   Yes.  Do you remember in 2000 you testified that there |
| 08:50 | 4 | was a 23 percent return rate on some electronic toys? |
| 08:50 | 5 | A.   Yes. |
| 08:50 | 6 | Q.   Okay.  And I want to ask you now about 2001.  I believe |
| 08:50 | 7 | you, uh, testified in response to questions from Ms. Keller |
| 08:50 | 8 | that you had a loss that year and it was because of the |
| 08:51 | 9 | investment in Bratz that you had the loss.  Do you recall |
| 08:51 | 10 | that? |
| 08:51 | 11 | A.   Investment in the company as a whole, yes, that we lost |
| 08:51 | 12 | money. |
| 08:51 | 13 | Q.   Well, didn't you testify that in 2001 that you had |
| 08:51 | 14 | spent a lot of money to advertise and build up Bratz and |
| 08:51 | 15 | that's why you lost money? |
| 08:51 | 16 | A.   Yes. |
| 08:51 | 17 | Q.   Uh, but previously when you were asked about why you |
| 08:51 | 18 | operated a loss in 2001, you said that it had to do |
| 08:51 | 19 | something with tax structure? |
| 08:51 | 20 | A.   It's possible. |
| 08:51 | 21 | Q.   Well, if you look at -- this is July 18, 2006, |
| 08:51 | 22 | page 171, lines 7 through 13. |
| 08:51 | 23 | *(Document provided to the witness.)* |
| 08:52 | 24 | THE WITNESS:  Yes. |
| 08:52 | 25 | MR. PRICE:  It's page 171, lines 7 through 13. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 19 of 161   Page ID
#:303651
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

19

| 08:52 | 1 | THE WITNESS:  Yes. |
| 08:52 | 2 | MR. PRICE:  Need to have the judge look at it. |
| 08:52 | 3 | THE COURT:  You may. |
| 08:52 | 4 | MR. PRICE:  (Reading:) |
| 08:52 | 5 | "QUESTION:  What about 2001 -- |
| 08:52 | 6 | "QUESTION:  And how about in 2001? |
| 08:52 | 7 | "ANSWER:  What about 2001? |
| 08:52 | 8 | "QUESTION:  Were you operating at a loss that |
| 08:52 | 9 | year, as well? |
| 08:52 | 10 | "ANSWER:  Yes, more loss.  I think it had to do |
| 08:52 | 11 | with -- again, I'm not an accountant, but I think it had to |
| 08:52 | 12 | do with tax structure, which I don't remember." |
| 08:53 | 13 | BY MR. PRICE: |
| 08:53 | 14 | Q.   You also testified in your examination by Ms. Keller |
| 08:53 | 15 | about giving, uh, lectures I think at UCLA or presentations |
| 08:53 | 16 | about licensing.  Do you recall that? |
| 08:53 | 17 | A.   UCLA and Cal State Los Angeles, yes. |
| 08:53 | 18 | Q.   And by that time, uh, you were testifying sort of as an |
| 08:53 | 19 | expert in, in licensing MGA's -- let me rephrase that. |
| 08:53 | 20 | At that time you were kind of giving presentations as |
| 08:53 | 21 | an expert of sorts in how to license and build a brand |
| 08:53 | 22 | through licensing? |
| 08:53 | 23 | A.   No. |
| 08:53 | 24 | Q.   Well, you were -- you were giving them your expertise |
| 08:53 | 25 | and your advice? |

| | | |
|---|---|---|
| 08:53 | 1 | A.   I was just volunteering to teach young kids. |
| 08:53 | 2 | Q.   Okay.  And one of the things that you said you talked |
| 08:53 | 3 | about that you -- that you taught them was that, uh, there |
| 08:54 | 4 | was a, uh -- you talked about a seed, right? |
| 08:54 | 5 | A.   No. |
| 08:54 | 6 | Q.   Didn't you say you talked about roots and a seed and -- |
| 08:54 | 7 | and -- and growing?  You remember saying that? |
| 08:54 | 8 | A.   No.  I talked about a tree.  I gave the analogy that a |
| 08:54 | 9 | brand is like a tree, and the licensing is like the roots of |
| 08:54 | 10 | the tree that keeps the brand in place.  That's what I |
| 08:54 | 11 | testified to. |
| 08:54 | 12 | Q.   You didn't say anything about a seed in your testimony? |
| 08:54 | 13 | A.   I don't remember if I talked about a seed or not. |
| 08:54 | 14 | Q.   All right.  Do you remember saying that a brand is like |
| 08:54 | 15 | a seed that grows to become a tree and that licensing is the |
| 08:54 | 16 | roots of the tree?  That ring a bell? |
| 08:54 | 17 | A.   Yeah.  Good. |
| 08:54 | 18 | Q.   And, uh, by the way, the licensing, uh, roots that you |
| 08:54 | 19 | were -- that you were telling the students about, uh, that |
| 08:54 | 20 | is something from the point of view of the licensor, you |
| 08:55 | 21 | know, licensing something.  That's something that MGA had no |
| 08:55 | 22 | experience with prior to Carter Bryant bringing the Bratz |
| 08:55 | 23 | designs to MGA, right? |
| 08:55 | 24 | A.   You're wrong. |
| 08:55 | 25 | Q.   If you'd look at Exhibit 630. |

| | | |
|---|---|---|
| 08:55 | 1 | *(Document provided to the witness.)* |
| 08:55 | 2 | *(Document displayed.)* |
| 08:55 | 3 | MR. PRICE:  And this is in evidence. |
| 08:55 | 4 | BY MR. PRICE: |
| 08:55 | 5 | Q.   And you see this is one of those e-mail interviews |
| 08:55 | 6 | where you write in the answer to written questions, correct? |
| 08:55 | 7 | A.   Yes. |
| 08:55 | 8 | Q.   And if you go to page, uh, 2 of this document, there's |
| 08:55 | 9 | a question about halfway down, which is:  "Had you been a |
| 08:55 | 10 | licensor before? |
| 08:56 | 11 | "Answer:  No.  This is the first time, but we have been |
| 08:56 | 12 | a licensee many times." |
| 08:56 | 13 | Do you see that? |
| 08:56 | 14 | A.   Yes. |
| 08:56 | 15 | Q.   And the licensee is where, you know, like, uh -- |
| 08:56 | 16 | DC Comics or -- or someone licenses you to create and sell |
| 08:56 | 17 | products, right? |
| 08:56 | 18 | A.   Yes. |
| 08:56 | 19 | Q.   And so as of June 30, 2003, you were telling, uh, the |
| 08:56 | 20 | press that MGA prior to Bratz had not been a licensor; that |
| 08:56 | 21 | is, used those roots to grow a brand, correct? |
| 08:56 | 22 | A.   Yes. |
| 08:56 | 23 | Q.   And the seed of this tree, the seed was Mr. Bryant's |
| 08:56 | 24 | designs and concept of Bratz, right? |
| 08:56 | 25 | A.   No. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 22 of 161   Page ID #:303654
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

22

| | | |
|---|---|---|
| 08:56 | 1 | Q.   Well, from -- from your point of view as -- as the CEO |
| 08:56 | 2 | of MGA, uh, you would think that it would be, uh, |
| 08:57 | 3 | inappropriate for an MGA employee to take a trade secret of |
| 08:57 | 4 | MGA to another company and then compete with MGA with that, |
| 08:57 | 5 | right? |
| 08:57 | 6 | MS. KELLER:  Objection.  Asked and answered many |
| 08:57 | 7 | times. |
| 08:57 | 8 | THE COURT:  Due to the weekend, Counsel, and |
| 08:57 | 9 | length of testimony, I'm going to let you ask it one more |
| 08:57 | 10 | time. |
| 08:57 | 11 | BY MR. PRICE: |
| 08:57 | 12 | Q.   Is that right? |
| 08:57 | 13 | A.   I'm sorry, I didn't -- can you repeat the question. |
| 08:57 | 14 | Q.   As the CEO of MGA -- |
| 08:57 | 15 | A.   Yes. |
| 08:57 | 16 | Q.   -- you think it would be inappropriate for an MGA |
| 08:57 | 17 | employee to take a trade secret of MGA, take it to a |
| 08:57 | 18 | competitor, and then use that to compete with MGA, right? |
| 08:57 | 19 | A.   Yes. |
| 08:57 | 20 | Q.   And that would hurt MGA if that competitor sold, you |
| 08:57 | 21 | know, even a small number of that competing idea, like a |
| 08:58 | 22 | hundred dollars' worth, right? |
| 08:58 | 23 | A.   I'm not so sure if hundred dollars' worth is gonna hurt |
| 08:58 | 24 | somebody.  But go ahead, yes. |
| 08:58 | 25 | Q.   Well, and the more that that competitor sold, the |

| | | |
|---|---|---|
| 08:58 | 1 | better they did with that trade secret? |
| 08:58 | 2 | A.    Yes. |
| 08:58 | 3 | Q.    The more they grew it into a tree, the more that would |
| 08:58 | 4 | harm MGA, right? |
| 08:58 | 5 | A.    Yes. |
| 08:58 | 6 | Q.    Now, you testified -- uh, you were shown a lot of |
| 08:58 | 7 | sculpts.  Do you remember that? |
| 08:58 | 8 | A.    Yes. |
| 08:58 | 9 | Q.    You can and, uh -- uh, sculpts for dogs -- not dogs -- |
| 08:58 | 10 | horses and babies and Bratz dolls.  Do you remember that? |
| 08:58 | 11 | A.    Yes. |
| 08:58 | 12 | Q.    Now, you recall that earlier, before the trial, you |
| 08:58 | 13 | testified that -- uh, that once you signed the contract with |
| 08:58 | 14 | Mr. Bryant and they were going to make the Bratz into a |
| 08:58 | 15 | doll, that at that point you didn't really get involved in |
| 08:59 | 16 | the details of the sculpts anymore.  Do you remember that? |
| 08:59 | 17 | A.    I don't remember. |
| 08:59 | 18 | Q.    But that's accurate, is it not? |
| 08:59 | 19 | A.    It's been so many years I don't remember.  But I |
| 08:59 | 20 | didn't -- at that time I did not -- I don't remember getting |
| 08:59 | 21 | involved with the aspects of the sculpt.  Actually, I did |
| 08:59 | 22 | get involved with the head movement.  Again, this portion of |
| 08:59 | 23 | the hair being moved.  I did get involved with that. |
| 08:59 | 24 | Q.    But in terms of the body sculpt and the face sculpt in |
| 08:59 | 25 | general, uh, after Mr. Bryant came aboard, you left that |

| 08:59 | 1 | mainly to other people, correct? |
| 08:59 | 2 | A.   Yes. |
| 08:59 | 3 | Q.   And you have talked about all these sculpts.  Uh, it's |
| 08:59 | 4 | true that not all these sculpts are equally -- equally |
| 08:59 | 5 | important in terms of sales at MGA, right? |
| 08:59 | 6 | A.   I don't even know if I understand your question. |
| 09:00 | 7 | Q.   Okay.  Well, you showed us, for example, uh, I think a |
| 09:00 | 8 | pony, and you said that's a different sculpt, right? |
| 09:00 | 9 | A.   Yes. |
| 09:00 | 10 | Q.   And you showed us -- I guess there was a porcelain |
| 09:00 | 11 | Bratz doll, a fairly large one.  Do you recall that? |
| 09:00 | 12 | A.   Yes. |
| 09:00 | 13 | Q.   And that's a different sculpt? |
| 09:00 | 14 | A.   Yes. |
| 09:00 | 15 | Q.   But MGA makes sales on -- on its various products and |
| 09:00 | 16 | keeps track of the sales that it makes of its products, |
| 09:00 | 17 | right? |
| 09:00 | 18 | A.   Yes. |
| 09:00 | 19 | Q.   And so my question is, when you showed us all these |
| 09:00 | 20 | sculpts, I mean, not all of these sculpts were equally |
| 09:00 | 21 | important as far as revenue to MGA, right? |
| 09:00 | 22 | A.   Yes. |
| 09:00 | 23 | Q.   And when we talk about, you know, the -- the teenage |
| 09:00 | 24 | Bratz dolls, uh, you know, the first four, Yasmin, Jade, |
| 09:00 | 25 | Cloe, Sasha, and then their -- you created friends for those |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

25

| 09:00 | 1 | four in the future, correct? |
|---|---|---|
| 09:00 | 2 | A.   Yes. |
| 09:00 | 3 | Q.   You created different characters, right? |
| 09:01 | 4 | A.   Yes. |
| 09:01 | 5 | Q.   And if you look at those dolls -- you referred to these |
| 09:01 | 6 | as the core dolls, right? |
| 09:01 | 7 | A.   Which dolls? |
| 09:01 | 8 | Q.   The -- the -- the first four Bratz dolls and the |
| 09:01 | 9 | characters that were developed later as their friends? |
| 09:01 | 10 | A.   The first four were the core dolls. |
| 09:01 | 11 | Q.   And then the friends, were they also part of the core |
| 09:01 | 12 | Bratz concept? |
| 09:01 | 13 | A.   No.   The first four were the core. |
| 09:01 | 14 | Q.   Okay.   Well, if you look at the teenage Bratz dolls. |
| 09:01 | 15 | A.   There was no such a product called "teenage Bratz |
| 09:01 | 16 | dolls," so I don't know.   Is that a brand-new product that |
| 09:01 | 17 | you're talking about? |
| 09:01 | 18 | Q.   I thought you said these dolls were teenagers, high |
| 09:01 | 19 | school students? |
| 09:01 | 20 | A.   Yes.   In research, yes.   I thought you mean there was |
| 09:01 | 21 | product called "teenage Bratz dolls." |
| 09:01 | 22 | Q.   No. |
| 09:01 | 23 | A.   I'm not familiar with that. |
| 09:01 | 24 | Q.   Okay.   Well, I'm talking about these -- these Bratz |
| 09:01 | 25 | dolls, like the first four and their friends which, you |

| | | |
|---|---|---|
| 09:01 | 1 | know, portrayed like teenage Bratz kids.  Okay? |
| 09:02 | 2 | A.   Okay.  Go ahead. |
| 09:02 | 3 | Q.   So if you look at those and went down your SKU list and |
| 09:02 | 4 | looked at your sales, what you'd find is over 95 percent of |
| 09:02 | 5 | your revenue from those dolls comes from the original |
| 09:02 | 6 | sculpts, right? |
| 09:02 | 7 | A.   I don't know if that's accurate or not.  I haven't |
| 09:02 | 8 | looked at that detail. |
| 09:02 | 9 | Q.   Well, one could do that by looking at the SKU's because |
| 09:02 | 10 | you -- you do, like, an SKU, item-by-item list of sales |
| 09:02 | 11 | associated with product, right? |
| 09:02 | 12 | A.   Yes. |
| 09:02 | 13 | Q.   And then the other -- |
| 09:02 | 14 | A.   But your -- but your, I guess, guesstimate or |
| 09:02 | 15 | assumption that 95 percent came from those four sculpts is |
| 09:02 | 16 | inaccurate. |
| 09:02 | 17 | Go ahead. |
| 09:02 | 18 | Q.   Well, I thought you just said you didn't know? |
| 09:02 | 19 | A.   Yeah.  But I just remembered, like, for example, the |
| 09:02 | 20 | Bratz Big Babyz, in one year we sold $2.5 million pieces of |
| 09:02 | 21 | those.  So, again, yes, I don't know, but I don't think your |
| 09:03 | 22 | assumption is accurate. |
| 09:03 | 23 | Q.   Well, let's break it out, because I think we might be |
| 09:03 | 24 | talking about two different things.  Uh, my question was, |
| 09:03 | 25 | first, if you look just at the Bratz teenaged dolls, |

| | | |
|---|---|---|
| 09:03 | 1 | including, you know, the first four and their friends -- if |
| 09:03 | 2 | you look at that, the revenues from that category, not the |
| 09:03 | 3 | Big Babyz and all that, the revenues from that is about the |
| 09:03 | 4 | 95 percent from that first sculpt? |
| 09:03 | 5 | A.   I don't know -- |
| 09:03 | 6 | MS. KELLER:  Objection.  Vague as to time. |
| 09:03 | 7 | THE COURT:  Overruled. |
| 09:03 | 8 | THE WITNESS:  I don't know.  And you keep throwing |
| 09:03 | 9 | the friends in there.  The friends all had different |
| 09:03 | 10 | sculpts.  A lot of 'em had different sculpts, so I know that |
| 09:03 | 11 | you like to lump 'em together, but the first four dolls were |
| 09:03 | 12 | Cloe, Yasmin, Sasha, and Jade. |
| 09:03 | 13 | BY MR. PRICE: |
| 09:03 | 14 | Q.   Well, uh, for example, there was a friend, Nevra? |
| 09:04 | 15 | A.   Yes. |
| 09:04 | 16 | Q.   And at that time did other friends come out? |
| 09:04 | 17 | A.   At what time? |
| 09:04 | 18 | Q.   At the time you produced Nevra? |
| 09:04 | 19 | A.   I don't remember.  Yes, probably. |
| 09:04 | 20 | Q.   And Nevra, for example, was the same sculpt? |
| 09:04 | 21 | A.   I don't remember if it was or not. |
| 09:04 | 22 | Q.   Do you recall it was the same facial sculpt? |
| 09:04 | 23 | A.   I don't recall if it was or not. |
| 09:04 | 24 | MR. PRICE:  Okay.  If we could -- this is June 6, |
| 09:04 | 25 | 2008.  This is page 6159, line 21, through 6160, line 5. |

| | | |
|---|---|---|
| 09:04 | 1 | *(Document provided to the witness.)* |
| 09:05 | 2 | MR. PRICE:  Oh, I'm sorry.  It's transposed, |
| 09:05 | 3 | August 6th.  August 6, 2008, 6159, 21, 6160, line 5. |
| 09:05 | 4 | Thanks. |
| 09:05 | 5 | THE WITNESS:  Go ahead.  What lines? |
| 09:05 | 6 | MR. PRICE:  It's line 21, 6159, to 6160, line 5. |
| 09:05 | 7 | THE WITNESS:  Yes. |
| 09:05 | 8 | MR. PRICE:  Your Honor? |
| 09:05 | 9 | THE COURT:  You may. |
| 09:05 | 10 | MR. PRICE:  (Reading:) |
| 09:05 | 11 | "QUESTION:  It's true that this other Bratz |
| 09:05 | 12 | character, Nevra, for example, has the same oversized head |
| 09:05 | 13 | as the original four Bratz dolls, correct? |
| 09:06 | 14 | "ANSWER:  It does. |
| 09:06 | 15 | "It has -- in fact, it's the exact same sculpt, |
| 09:06 | 16 | facial sculpt? |
| 09:06 | 17 | "ANSWER:  I'm not sure if it's a -- if it's the |
| 09:06 | 18 | same sculpt or not, but the face paint is for sure |
| 09:06 | 19 | different. |
| 09:06 | 20 | "QUESTION:  My question is, the sculpt is the |
| 09:06 | 21 | same, right? |
| 09:06 | 22 | "ANSWER:  I believe so, yes." |
| 09:06 | 23 | BY MR. PRICE: |
| 09:06 | 24 | Q.   These other sculpts, uh, Big Babyz, uh, the Ponyz, |
| 09:06 | 25 | these were things you were able to sell to extend the brand |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:06 | 1 | because you had the original seed, right? |
| 09:06 | 2 | A.   No, because we built a brand.  MGA's hard work and |
| 09:06 | 3 | sweat over years built the brand, and then six years later, |
| 09:06 | 4 | you came and sued us. |
| 09:07 | 5 | Q.   Not gonna chase that rabbit. |
| 09:07 | 6 | You could not have sold Bratz Babyz, Bratz Ponyz, Bratz |
| 09:07 | 7 | backpacks -- uh, you sold those because the core dolls were |
| 09:07 | 8 | successful.  That's what you needed to happen before you |
| 09:07 | 9 | could do that, right? |
| 09:07 | 10 | A.   Because we built the brand, yes.  MGA built the brand. |
| 09:07 | 11 | Q.   By the way in connection with -- uh, with that |
| 09:07 | 12 | building, Ms. Keller was asking you about your |
| 09:07 | 13 | relationships -- do you recall? -- with distributors and |
| 09:07 | 14 | vendors, and we talked about that a little bit on Friday. |
| 09:07 | 15 | Do you recall that? |
| 09:07 | 16 | A.   Yes. |
| 09:07 | 17 | Q.   Uh, also in that timeframe, in the |
| 09:07 | 18 | September/October 2000 timeframe, even as late as March of |
| 09:07 | 19 | 2001, uh, it was your belief that the retailers, uh, thought |
| 09:08 | 20 | that they could rely on Mattel for support for their |
| 09:08 | 21 | products, but they weren't sure they could rely on MGA? |
| 09:08 | 22 | A.   I don't recall if that's the case or not. |
| 09:08 | 23 | Q.   So, uh, could have been, might not have been; you just |
| 09:08 | 24 | don't remember? |
| 09:08 | 25 | A.   I just don't recall.  Something like that. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

30

| 09:08 | 1 | Q.   Let me show you Exhibit 22032. |
| 09:08 | 2 | *(Document provided to the witness.)* |
| 09:08 | 3 | THE WITNESS:  Go ahead. |
| 09:08 | 4 | BY MR. PRICE: |
| 09:08 | 5 | Q.   And you recognize this as an e-mail string in |
| 09:08 | 6 | March 2001 between you and Lon Ross, Patrick Williams and |
| 09:09 | 7 | Ms. Garcia? |
| 09:09 | 8 | A.   Yes. |
| 09:09 | 9 | MR. PRICE:  Your Honor, move Exhibit 22032 into |
| 09:09 | 10 | evidence. |
| 09:09 | 11 | MS. KELLER:  Objection.  Hearsay. |
| 09:09 | 12 | THE COURT:  Just a moment. |
| 09:09 | 13 | Is Mr. Larian on the chain? |
| 09:09 | 14 | MR. PRICE:  Yes. |
| 09:09 | 15 | THE COURT:  Overruled. |
| 09:09 | 16 | MS. KELLER:  Only on -- |
| 09:09 | 17 | THE COURT:  Overruled. |
| 09:09 | 18 | *(Exhibit No. 22032 received in evidence.)* |
| 09:09 | 19 | *(Document displayed.)* |
| 09:09 | 20 | BY MR. PRICE: |
| 09:09 | 21 | Q.   Let's start at the bottom, where it's from Ms. Garcia |
| 09:09 | 22 | to Mr. Ross, you, and Mr. Williams. |
| 09:09 | 23 | Q.   And the subject is Scooter commercial.  This is talking |
| 09:09 | 24 | about a product Scooter Samantha? |
| 09:09 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:09 | 1 | Q.   And on the bottom of the page, Ms. Garcia e-mails, "Are |
| 09:09 | 2 | we still advertising Scooter?  I think I still support the |
| 09:09 | 3 | strategy to drop the TV and retail and rely on Mattel's |
| 09:09 | 4 | commercials to drive consumers to the shelves". |
| 09:09 | 5 | Do you see that? |
| 09:09 | 6 | A.   Yes. |
| 09:09 | 7 | Q.   And what she's referring, there, as far as you |
| 09:09 | 8 | understood, was Mattel commercials for something called |
| 09:09 | 9 | "Scooter Shannon"? |
| 09:10 | 10 | A.   Yes. |
| 09:10 | 11 | Q.   And then the response from -- from Mr. Williams is, |
| 09:10 | 12 | "Now that people are coming back onboard, we need to move |
| 09:10 | 13 | forward with TV.  I think we can reduce the GRPs and buy -- |
| 09:10 | 14 | and ride the coattails of Mattel." |
| 09:10 | 15 | What do GRPs refer to? |
| 09:10 | 16 | A.   GRPs, uh, basically how much advertising you do.  More |
| 09:10 | 17 | frequency.  It has to do with frequency. |
| 09:10 | 18 | Q.   And so Mr. Williams is saying let's reduce the |
| 09:10 | 19 | frequency, and Mattel's ads will drive people to the stores? |
| 09:10 | 20 | A.   Yes. |
| 09:10 | 21 | Q.   And then Mr. Ross responds -- and, uh, I'm sorry, what |
| 09:10 | 22 | was Mr. Ross's position? |
| 09:10 | 23 | A.   Director of marketing. |
| 09:10 | 24 | Q.   Okay.  So Mr. Ross responds, "I agree with Pat.  From |
| 09:10 | 25 | what I understand, some of the flack coming from the |

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:10 | 1 | retailers to support their argument for dropping is that MGA |
| 09:11 | 2 | doesn't always follow through and that they can trust Mattel |
| 09:11 | 3 | to provide the support.  Now, more than ever we need to step |
| 09:11 | 4 | up to the plate and deliver what we said.  I suggest exactly |
| 09:11 | 5 | what Pat said:  Do the spot, show it to buyers, and then |
| 09:11 | 6 | scale back on the buy, and ride off of Mattel." |
| 09:11 | 7 | Do you see that? |
| 09:11 | 8 | A.   Yes. |
| 09:11 | 9 | Q.   And your response at the top there was, "I agree," |
| 09:11 | 10 | correct? |
| 09:11 | 11 | A.   Yes. |
| 09:11 | 12 | Q.   Now, uh -- and, uh, as a result of this, Mr. Williams |
| 09:11 | 13 | then communicated with some of the retailers concerning that |
| 09:11 | 14 | TV advertising; is that right? |
| 09:11 | 15 | A.   I don't know. |
| 09:11 | 16 | Q.   Let's look at 22036. |
| 09:12 | 17 | *(Document provided to the witness.)* |
| 09:12 | 18 | BY MR. PRICE: |
| 09:12 | 19 | Q.   And do you recognize that as an e-mail string between |
| 09:12 | 20 | you and Mr. Williams? |
| 09:12 | 21 | A.   Yes. |
| 09:12 | 22 | MS. KELLER:  Your Honor, we're gonna object as |
| 09:12 | 23 | irrelevant.  All this relates to Scooter Samantha. |
| 09:12 | 24 | THE COURT:  Does it have to do with retailing, |
| 09:12 | 25 | Counsel, and the ability of Mattel and MGA? |

09:12   1          MR. PRICE:  Yeah, this does.  This is the
09:12   2   follow-up to the letter.
09:12   3          THE COURT:  Overruled.
09:12   4          *(Document displayed.)*
09:12   5   BY MR. PRICE:
09:12   6   Q.   And you see the bottom e-mail is an e-mail which
09:12   7   Mr. Williams sent to Target.  Do you see that?
09:12   8   A.   Yes.
09:12   9   Q.   And it's concerning, among other things, the TV doll,
09:12  10   Scooter Samantha.
09:13  11   A.   I'm sorry?
09:13  12   Q.   It's concerning, among other things, what you refer as
09:13  13   a TV doll, Scooter Samantha?
09:13  14   A.   Yes.
09:13  15   Q.   If you look at the third paragraph of Mr. Williams'
09:13  16   letter, "I appreciate you taking the time to reconsider
09:13  17   Scooter Samantha.  As we discussed, history has shown,"
09:13  18   paren, "TRST" -- and what's that?
09:13  19   A.   For the fourth time, Toy Retail Sales Tracking System.
09:13  20   Q.   Thank you.  I'm sometimes a slow learner.
09:13  21          "And, two, TV dolls can succeed and have been very
09:13  22   successful in the past.  We believe this will be true for
09:13  23   both Scooter Samantha and Scooter Shannon, that combined TV
09:13  24   of MGA and Mattel will drive both of these dolls to the top
09:13  25   of the TV doll category for 2001.  As we discussed, we will

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:13 | 1 | do whatever it takes to make this happen." |
| 09:13 | 2 | And Mr. Williams is doing this under your instruction, |
| 09:13 | 3 | where you said you agreed with the strategy of doing a TV |
| 09:13 | 4 | spot and then cutting back on it and riding off the |
| 09:14 | 5 | coattails of Mattel? |
| 09:14 | 6 | A.   Yes. |
| 09:14 | 7 | MS. KELLER:  Objection.  Irrelevant.  Move to |
| 09:14 | 8 | strike. |
| 09:14 | 9 | THE COURT:  Overruled. |
| 09:14 | 10 | BY MR. PRICE: |
| 09:14 | 11 | Q.   Now, in connection with the Scooter Samantha, uh, doll, |
| 09:14 | 12 | Scooter Shannon was a product that -- uh, that's Mattel's |
| 09:14 | 13 | version of a product that Ms. Garcia had worked with while |
| 09:14 | 14 | she was at Mattel, correct? |
| 09:14 | 15 | A.   I don't know. |
| 09:14 | 16 | MS. KELLER:  Objection.  Calls for speculation. |
| 09:14 | 17 | THE WITNESS:  I don't know. |
| 09:14 | 18 | MS. KELLER:  And irrelevant. |
| 09:14 | 19 | THE COURT:  Just one minute. |
| 09:14 | 20 | MS. KELLER:  And irrelevant to any claim, |
| 09:14 | 21 | Your Honor. |
| 09:14 | 22 | THE COURT:  Counsel, the relevancy beyond the |
| 09:14 | 23 | retailers reliability? |
| 09:14 | 24 | MR. PRICE:  It's just the general looking at the |
| 09:14 | 25 | marketplace.  We went from there to, uh -- react in the |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 35 of 161   Page ID
#:303667
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

35

| | | |
|---|---|---|
| 09:14 | 1 | marketplace and -- and using the marketplace to inspire you |
| 09:14 | 2 | to do something. |
| 09:14 | 3 | MS. KELLER:  Then it's cumulative, Your Honor. |
| 09:14 | 4 | MR. PRICE:  In the same vein. |
| 09:15 | 5 | MS. KELLER:  Irrelevant. |
| 09:15 | 6 | THE COURT:  Because of the weekend, one more |
| 09:15 | 7 | question in this area, Counsel, and then let's move on. |
| 09:15 | 8 | BY MR. PRICE: |
| 09:15 | 9 | Q.  So with respect to Scooter Samantha and Scooter |
| 09:15 | 10 | Shannon, uh, is it correct that, uh, you were looking at the |
| 09:15 | 11 | market to see what Scooter Shannon's features were to see |
| 09:15 | 12 | whether or not you should take her with Scooter Samantha and |
| 09:15 | 13 | incorporate the same features? |
| 09:15 | 14 | A.  Yes. |
| 09:15 | 15 | Q.  And in connection with that, you were looking for, uh, |
| 09:15 | 16 | photographs of it or -- or -- or, uh -- or videos or |
| 09:15 | 17 | something like that? |
| 09:15 | 18 | MS. KELLER:  Objection.  Irrelevant. |
| 09:15 | 19 | THE COURT:  Counsel, I don't see the relevancy at |
| 09:15 | 20 | this juncture.  Retailers fine, but I'm not certain where |
| 09:16 | 21 | you're going with this.  An offer of proof would be fine. |
| 09:16 | 22 | I'd be happy to hear you. |
| 09:16 | 23 | MR. PRICE:  Yeah.  The offer of proof is it's an |
| 09:16 | 24 | example of going to creativity, looking at the market, |
| 09:16 | 25 | changing products. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 36 of 161   Page ID #:303668
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

36

| 09:16 | 1 | THE COURT:  I'm going to sustain the objection. |
| 09:16 | 2 | Counsel. |
| 09:16 | 3 | BY MR. PRICE: |
| 09:16 | 4 | Q.   Mr. Larian, a few minutes ago, I was asking you if you |
| 09:16 | 5 | agreed that the core of the brand were these dolls, the |
| 09:16 | 6 | Bratz dolls, and I think you said the core were the first |
| 09:16 | 7 | four.  Do you remember that? |
| 09:16 | 8 | A.   I don't remember every question you ever asked.  What |
| 09:16 | 9 | is your question? |
| 09:16 | 10 | Q.   I'm just asking you what I asked you about ten minutes |
| 09:17 | 11 | ago when I said, are the core of the brand these Bratz |
| 09:17 | 12 | dolls, and you said the core were the first four? |
| 09:17 | 13 | A.   Yes. |
| 09:17 | 14 | Q.   By 2002, did you still just have the first four dolls |
| 09:17 | 15 | on the market, or had you expanded to other Bratz dolls? |
| 09:17 | 16 | A.   Expanded. |
| 09:17 | 17 | Q.   Uh, and when did you expand to other Bratz dolls? |
| 09:17 | 18 | A.   I don't remember the date. |
| 09:17 | 19 | Q.   Before the end of 2001? |
| 09:17 | 20 | A.   I don't remember. |
| 09:17 | 21 | Q.   Okay.  If you'd look at Exhibit 13858. |
| 09:17 | 22 | *(Document provided to the witness.)* |
| 09:18 | 23 | BY MR. PRICE: |
| 09:18 | 24 | Q.   Do you recognize this as an e-mail string, uh, |
| 09:18 | 25 | involving you and -- is it Mr. Yokey *(phonetic)*? |

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

37

| 09:18 | 1 | A.   Can you just give me a minute to look at the... |
| 09:18 | 2 | Q.   Sure. |
| 09:18 | 3 | MS. KELLER:  Your Honor, we're gonna object that |
| 09:18 | 4 | this is irrelevant and beyond the scope. |
| 09:18 | 5 | THE COURT:  Overruled.  If this goes into |
| 09:18 | 6 | succeeding Bratz dolls or subsequent Bratz dolls –– I'm |
| 09:19 | 7 | sorry? |
| 09:19 | 8 | MR. PRICE:  It goes to –– |
| 09:19 | 9 | THE COURT:  –– especially using the same sculpt. |
| 09:19 | 10 | MR. PRICE:  Yeah, it –– it goes to the core, what |
| 09:19 | 11 | the core means. |
| 09:19 | 12 | MS. KELLER:  Your Honor, it goes to licensing for |
| 09:19 | 13 | a board game. |
| 09:19 | 14 | THE COURT:  Is this a board game, Counsel? |
| 09:19 | 15 | THE WITNESS:  It is. |
| 09:19 | 16 | MR. PRICE:  It concerns licensing a board game, |
| 09:19 | 17 | but it has Mr. Larian saying what the core of the brand is, |
| 09:19 | 18 | which is what I was asking about a few minutes ago, which is |
| 09:19 | 19 | not the board game. |
| 09:19 | 20 | THE COURT:  Just the core of the brand? |
| 09:19 | 21 | MR. PRICE:  Yes. |
| 09:19 | 22 | THE COURT:  All right.  Overruled. |
| 09:19 | 23 | THE WITNESS:  Go ahead. |
| 09:19 | 24 | BY MR. PRICE: |
| 09:19 | 25 | Q.   Is this an e-mail chain involving you and Mr. Yokey? |

| | | |
|---|---|---|
| 09:19 | 1 | A.    There's no such a person called "Mr. Yokey."  The |
| 09:19 | 2 | person is Dario Berte.  You can read that. |
| 09:19 | 3 | Q.    Ah.  And this is around March 15, 2002? |
| 09:19 | 4 | A.    Yes, it is. |
| 09:19 | 5 | MR. PRICE:  Your Honor, move this into evidence. |
| 09:19 | 6 | MS. KELLER:  Objection.  Irrelevant. |
| 09:20 | 7 | THE COURT:  Received, Counsel. |
| 09:20 | 8 | *(Exhibit No. 13858 received in evidence.)* |
| 09:20 | 9 | *(Document displayed.)* |
| 09:20 | 10 | BY MR. PRICE: |
| 09:20 | 11 | Q.    If you look at -- just go to the paragraph, I think |
| 09:20 | 12 | it's third up from the bottom, "at the same time"? |
| 09:20 | 13 | A.    I'm sorry, I can't -- |
| 09:20 | 14 | Q.    Do you see it? |
| 09:20 | 15 | A.    Yes.  Go ahead.  I see it. |
| 09:20 | 16 | Q.    "At the same time please understand that we will not |
| 09:20 | 17 | license every category," paren, this is for every territory |
| 09:20 | 18 | and not only Italy," closed paren," and every product right |
| 09:20 | 19 | away.  The core of the brand are the dolls, and we do not |
| 09:20 | 20 | want to harm the sales of the dolls.  We also plan to roll |
| 09:20 | 21 | out the licensing program slowly and not all products in one |
| 09:20 | 22 | time." |
| 09:20 | 23 | A.    What is the question? |
| 09:20 | 24 | Q.    Did I read that correctly? |
| 09:20 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 09:20 | 1 | Q.   Okay.  Now, on Friday, uh, I showed you Exhibit 22973 |
| 09:21 | 2 | which was the letter from Skadden, Arps, your attorneys, |
| 09:21 | 3 | attaching, uh, a copy of the disk in connection with the |
| 09:21 | 4 | search of MGA Mexico.  And we'll have that put in front of |
| 09:21 | 5 | you. |
| 09:21 | 6 | (Document provided to the witness.) |
| 09:21 | 7 | (Document displayed.) |
| 09:21 | 8 | THE WITNESS:  Go ahead. |
| 09:21 | 9 | BY MR. PRICE: |
| 09:21 | 10 | Q.   And you see the -- the last page there has a photocopy |
| 09:21 | 11 | of the disk.  Do you see that? |
| 09:21 | 12 | A.   Yes. |
| 09:21 | 13 | Q.   I think on Friday I gave you a copy of the copy, which |
| 09:21 | 14 | this looks like the photocopy.  It says "original" on it. |
| 09:21 | 15 | Do you see that? |
| 09:21 | 16 | A.   What? |
| 09:21 | 17 | Q.   I'm sorry.  You see this says -- this copy is a copy of |
| 09:21 | 18 | the disk, which has written on it "original."  Do you see |
| 09:22 | 19 | that? |
| 09:22 | 20 | A.   I see the word "original." |
| 09:22 | 21 | Q.   And it has MGA Bates number on it, 381-5506? |
| 09:22 | 22 | A.   Yes. |
| 09:22 | 23 | Q.   I'm going to bring up to you what we marked as 8858-A? |
| 09:22 | 24 | MR. PRICE:  Your Honor, may I approach? |
| 09:22 | 25 | THE COURT:  You may. |

| | | |
|---|---|---|
| 09:22 | 1 | *(Exhibit provided to the witness.)* |
| 09:22 | 2 | THE WITNESS:  Okay. |
| 09:22 | 3 | BY MR. PRICE: |
| 09:22 | 4 | Q.   And do you see that 8858-A appears to match the |
| 09:22 | 5 | photocopy that is attached to the letter from Skadden, Arps, |
| 09:22 | 6 | Exhibit 22973? |
| 09:22 | 7 | A.   I see a couple other words on it.  I have no idea what |
| 09:22 | 8 | this is. |
| 09:22 | 9 | Q.   Well, it has the same Bates number, MGA 381-5506, |
| 09:22 | 10 | correct? |
| 09:22 | 11 | A.   Yes. |
| 09:22 | 12 | Q.   Has the same marking, "original," correct? |
| 09:23 | 13 | A.   Yes.  The word "original" is there. |
| 09:23 | 14 | MR. PRICE:  I move Exhibit 8858-A into evidence. |
| 09:23 | 15 | MS. KELLER:  Objection.  No foundation. |
| 09:23 | 16 | THE COURT:  All right.  I'm going to take it |
| 09:23 | 17 | subject to a motion to strike, Counsel, as I did before. |
| 09:23 | 18 | You can continue to ask questions, and I'll wait a little |
| 09:23 | 19 | bit further foundation from the different law firms, as I |
| 09:23 | 20 | indicated before.  But I'm not going to preclude you from |
| 09:23 | 21 | questions in this area. |
| 09:23 | 22 | BY MR. PRICE: |
| 09:23 | 23 | Q.   Well, at this point I just have really one question. |
| 09:23 | 24 | Did you, in connection with your testimony as a –- as a |
| 09:23 | 25 | 30(b)(6) witness, ever review the contents of this disk? |

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

41

| | | |
|---|---|---|
| 09:23 | 1 | A.   No. |
| 09:24 | 2 | Q.   When Ms. Keller was examining you, you talked about, |
| 09:24 | 3 | uh, closing MGA Mexico.  Do you recall that? |
| 09:24 | 4 | A.   Yes. |
| 09:24 | 5 | Q.   And you, Isaac Larian, were able to close MGA Mexico |
| 09:24 | 6 | because you control MGA subsidiaries, right? |
| 09:24 | 7 | A.   I don't know all the structure that our accountants and |
| 09:24 | 8 | lawyers have set up.  But I'm –– I'm major shareholder of |
| 09:24 | 9 | MGA Mexico, either me or through my family trust, et cetera. |
| 09:24 | 10 | Q.   Well, what I'm talking about is –– is not just are you |
| 09:24 | 11 | a large shareholder, but that you have the ability on your |
| 09:24 | 12 | own to control the closing of a subsidiary, the flow of |
| 09:24 | 13 | funds from a subsidiary, how much money goes from a |
| 09:24 | 14 | subsidiary to MGA, USA, correct? |
| 09:25 | 15 | A.   Yes. |
| 09:25 | 16 | Q.   And, in fact, uh, you will, uh –– you have in the past, |
| 09:25 | 17 | uh, simply directed, uh, your chief finance officer to take |
| 09:25 | 18 | money out of a subsidiary so you can make distributions to |
| 09:25 | 19 | you and your sister, the shareholders of MGA USA? |
| 09:25 | 20 | MS. KELLER:  Objection.  Irrelevant.  Court's |
| 09:25 | 21 | prior ruling. |
| 09:25 | 22 | THE COURT:  Overruled. |
| 09:25 | 23 | You can answer that question. |
| 09:25 | 24 | THE WITNESS:  Yes. |
| | 25 | |

| | | |
|---|---|---|
| 09:25 | 1 | BY MR. PRICE: |
| 09:25 | 2 | Q.   And so I want to make sure we understand how that -- |
| 09:26 | 3 | how that worked in practice; that is, how you could control |
| 09:26 | 4 | the other subsidiaries to bring money to MGA USA.  And if |
| 09:26 | 5 | you'd look at Exhibit 22013 and, in particular, I want you |
| 09:26 | 6 | to look at page 7. |
| 09:26 | 7 | *(Document provided to the witness.)* |
| 09:26 | 8 | THE COURT:  Just a moment, Counsel.  I'm not sure |
| 09:26 | 9 | what 22013 is.  Now, I want to see it.  I'm going to allow a |
| 09:26 | 10 | certain amount of questions, as I indicated to you on the |
| 09:26 | 11 | weekend, about how money flows and whether alter ego is |
| 09:26 | 12 | involved and what the control mechanism is.  Specific |
| 09:26 | 13 | documents. |
| 09:26 | 14 | MR. PRICE:  Your Honor, there are two. |
| 09:26 | 15 | THE COURT:  I'll see that document. |
| 09:26 | 16 | MR. PRICE:  Sure.  And it's been redacted, |
| 09:26 | 17 | Your Honor. |
| 09:26 | 18 | THE COURT:  Okay.  Show me the page. |
| 09:26 | 19 | MR. PRICE:  It's 22013, page 7 and page 9. |
| 09:27 | 20 | *(Document provided to the Court.)* |
| 09:27 | 21 | THE COURT:  So those are the only pages you're |
| 09:27 | 22 | seeking? |
| 09:27 | 23 | MR. PRICE:  From this document, yes, Your Honor. |
| 09:27 | 24 | THE COURT:  You may question. |
| 09:27 | 25 | *(Document displayed.)* |

| 09:27 | 1 | BY MR. PRICE: |
|---|---|---|
| 09:27 | 2 | Q.   So, Mr. Larian, you see at 22013, at page 7 there's |
| 09:27 | 3 | a –– a graph showing sort of the structure of MGA as of |
| 09:27 | 4 | 2002.  Do you see that? |
| 09:27 | 5 | A.   I see that.  I don't know if that's the structure or |
| 09:27 | 6 | not. |
| 09:27 | 7 | Q.   Well, this was a structure that was presented to a |
| 09:27 | 8 | third party as being the structure of MGA, correct? |
| 09:27 | 9 | A.   I have no –– I don't know yes or no. |
| 09:27 | 10 | Q.   Well –– |
| 09:27 | 11 | A.   Yes.  I would say yes.  Go ahead. |
| 09:27 | 12 | Q.   If you want to look at the first page of the document, |
| 09:27 | 13 | that might refresh your memory. |
| 09:27 | 14 | A.   Doesn't refresh my memory, but I see this MGA document |
| 09:27 | 15 | so, yes. |
| 09:28 | 16 | Q.   What it says is U.S. individual shareholders, and |
| 09:28 | 17 | that's you and your sister, correct? |
| 09:28 | 18 | A.   And the other people, yes, my children, my children |
| 09:28 | 19 | trust, et cetera. |
| 09:28 | 20 | Q.   And it shows there's an MGA Hong Kong and an MGA U.S., |
| 09:28 | 21 | correct? |
| 09:28 | 22 | A.   Yes. |
| 09:28 | 23 | Q.   And it shows that MGA Hong Kong –– well, MGA U.S. would |
| 09:28 | 24 | make sales to customers, right? |
| 09:28 | 25 | A.   Where you see that? |

| | | |
|---|---|---|
| 09:28 | 1 | Q.   You see MGA U.S., and then there's a dotted line that |
| 09:28 | 2 | goes down to customers? |
| 09:28 | 3 | A.   Yes. |
| 09:28 | 4 | Q.   And then it's got MGA Hong Kong.  It says "sourcing |
| 09:28 | 5 | services."  Do you see that? |
| 09:28 | 6 | A.   Yes. |
| 09:28 | 7 | Q.   Okay.  And what does that refer to? |
| 09:28 | 8 | A.   They sold us the product from the vendors in China. |
| 09:28 | 9 | Q.   And in this chart, the profits end up with the USA |
| 09:29 | 10 | individual shareholders, correct? |
| 09:29 | 11 | A.   And how do you see that?  I don't see that in this |
| 09:29 | 12 | chart. |
| 09:29 | 13 | Q.   I'm asking you, isn't that what this -- let me ask you. |
| 09:29 | 14 | That's what happened, right? |
| 09:29 | 15 | A.   I don't know.  Again, we have accountants.  That's not |
| 09:29 | 16 | my area of expertise.  We have lawyers and accountants who |
| 09:29 | 17 | do this.  So I don't know how it's set up.  That's not my |
| 09:29 | 18 | area of expertise. |
| 09:29 | 19 | Q.   Well, when you say that's not your area of expertise, |
| 09:29 | 20 | you do know where the profits go to? |
| 09:29 | 21 | A.   I don't. |
| 09:29 | 22 | Q.   You do know that there are distributions by MGA USA to |
| 09:29 | 23 | you? |
| 09:29 | 24 | A.   Yes. |
| 09:29 | 25 | Q.   And you understand those are from profits from the |

| | | |
|---|---|---|
| 09:29 | 1 | operation of MGA's subsidiary and MGA USA? |
| 09:29 | 2 | A.   I don't know if it's from -- I don't know all the |
| 09:29 | 3 | details, but there is distribution from MGA to me, yes. |
| 09:29 | 4 | Q.   Well, let's look at 22013-0009. |
| 09:30 | 5 | A.   Okay.  Go ahead. |
| 09:30 | 6 | Q.   See, this is a chart from a different time period, |
| 09:30 | 7 | which is 2002 to September 2005? |
| 09:30 | 8 | A.   That's what it says. |
| 09:30 | 9 | Q.   Okay.  And the individual shareholders, that is, again, |
| 09:30 | 10 | 81-point-something percent you and then the rest, your |
| 09:30 | 11 | sister, correct? |
| 09:30 | 12 | A.   I'm not so sure if that's how it is structured in those |
| 09:30 | 13 | times.  I don't know. |
| 09:30 | 14 | Q.   Well, you previously testified about what percentage |
| 09:30 | 15 | you owned at MGA, right? |
| 09:30 | 16 | A.   At one time, yes. |
| 09:30 | 17 | Q.   And -- |
| 09:30 | 18 | A.   What time period are you talking about? |
| 09:30 | 19 | Q.   And then your shareholders of MGA USA, correct? |
| 09:30 | 20 | MS. KELLER:  I'm gonna object.  Vague as to time. |
| 09:30 | 21 | Unless this is the specific period being referred -- |
| 09:30 | 22 | THE COURT:  Well, it's 2002 to 2005 counsel's |
| 09:30 | 23 | referring to.  Overruled. |
| 09:30 | 24 | THE WITNESS:  I don't know if during that period |
| 09:31 | 25 | of time if I'm 81 percent or I'm not.  I don't know.  I |

| | | |
|---|---|---|
| 09:31 | 1 | don't have that information.  I leave that to our |
| 09:31 | 2 | accountants. |
| 09:31 | 3 | BY MR. PRICE: |
| 09:31 | 4 | Q.   Do you remember in 2000 -- |
| 09:31 | 5 | A.   Yes. |
| 09:31 | 6 | Q.   -- do you remember purchasing the interest of your |
| 09:31 | 7 | brother at MGA? |
| 09:31 | 8 | A.   Yes. |
| 09:31 | 9 | Q.   Uh, after that purchase, do you remember selling any of |
| 09:31 | 10 | your stock to anyone? |
| 09:31 | 11 | A.   Yes, I do. |
| 09:31 | 12 | Q.   Well, we can rely on whatever your previous testimony |
| 09:31 | 13 | is about how much you owned at MGA, correct? |
| 09:31 | 14 | A.   Yes. |
| 09:31 | 15 | Q.   Okay.  So, uh, we have MGA U.S., and then you see it |
| 09:31 | 16 | has MGA-M there? |
| 09:31 | 17 | A.   Yes. |
| 09:31 | 18 | Q.   And that's MGA Mauritius, right? |
| 09:31 | 19 | A.   I have no idea. |
| 09:31 | 20 | Q.   You know Mauritius is off the southeast coast of |
| 09:32 | 21 | Africa? |
| 09:32 | 22 | A.   I'm not too good in geography.  I get lost to come to |
| 09:32 | 23 | Santa Ana, so I don't know. |
| 09:32 | 24 | MS. KELLER:  Objection.  Relevance, Your Honor. |
| 09:32 | 25 | THE COURT:  Overruled. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 47 of 161   Page ID #:303679
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:32 | 1 | BY MR. PRICE: |
| 09:32 | 2 | Q.   Well, you see that MGA Mauritius would pay royalties to |
| 09:32 | 3 | MGA U.S., and MGA would license the products of Bratz, Bratz |
| 09:32 | 4 | products, to MGA Mauritius, right? |
| 09:32 | 5 | A.   I'm sorry?  I'm not following you. |
| 09:32 | 6 | Q.   The Bratz intellectual property? |
| 09:32 | 7 | A.   I don't even see the word "licensing" in here.  I don't |
| 09:32 | 8 | know where you're going. |
| 09:32 | 9 | Q.   Do you see it says "royalty"? |
| 09:32 | 10 | A.   Yes. |
| 09:32 | 11 | Q.   Okay.  You would get royalties for licensing your |
| 09:32 | 12 | intellectual property, right? |
| 09:32 | 13 | A.   Yes. |
| 09:32 | 14 | Q.   Okay.  And so what MGA USA would do would be to license |
| 09:32 | 15 | its intellectual property to MGA Mauritius for a royalty? |
| 09:32 | 16 | A.   I don't know.  Again, I am not familiar with this |
| 09:32 | 17 | structure.  Other people in my company are.  And I think |
| 09:33 | 18 | they are witnesses in this case.  You should ask them more |
| 09:33 | 19 | detail about this.  I can't -- I don't know. |
| 09:33 | 20 | Q.   Okay.  So what you know at a high level -- |
| 09:33 | 21 | A.   I think this -- |
| 09:33 | 22 | Q.   -- without -- without knowing the specifics of this |
| 09:33 | 23 | structure? |
| 09:33 | 24 | A.   I think Lisa Tonnu is a witness here, who knows about |
| 09:33 | 25 | this.  I think she's your next witness.  I think she can |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:33 | 1 | more accurately testify about this than I can.  I don't know |
| 09:33 | 2 | this structure. |
| 09:33 | 3 | Q.   So let's just talk about on a high level, then, as what |
| 09:33 | 4 | you would know.  And what you would know is that you could, |
| 09:33 | 5 | when you wanted to, direct your CFO to take profits out of |
| 09:33 | 6 | these other subsidiaries so they could be distributed to you |
| 09:33 | 7 | as a U.S. shareholder? |
| 09:33 | 8 | A.   No, I don't know if I could do that or not.  This is -- |
| 09:33 | 9 | I left this to accountants and other people to handle.  And |
| 09:34 | 10 | they are better to answer these questions than me.  I don't |
| 09:34 | 11 | know if you trying to trick me, what to do, but I don't know |
| 09:34 | 12 | about this document. |
| 09:34 | 13 | Q.   I'd like you to look at Exhibit 23947. |
| 09:34 | 14 | *(Document provided to the witness.)* |
| 09:34 | 15 | MS. KELLER:  Your Honor, we're gonna object, |
| 09:34 | 16 | Your Honor.  Court's prior ruling. |
| 09:34 | 17 | THE COURT:  Could I see that document? |
| 09:34 | 18 | MR. PRICE:  You may.  Of course. |
| 09:35 | 19 | *(Document provided to the Court.)* |
| 09:35 | 20 | THE COURT:  Overruled. |
| 09:35 | 21 | MS. KELLER:  Your Honor, just for the record, the |
| 09:35 | 22 | objection is 402, 403, and I thought the Court looked at |
| 09:35 | 23 | this, this weekend. |
| 09:35 | 24 | THE COURT:  I did, on Monday.  Monday. |
| 09:35 | 25 | MS. KELLER:  Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 49 of 161   Page ID #:303681
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:35 | 1 | THE COURT:  Monday.  Thank you very much. |
| 09:35 | 2 | BY MR. PRICE: |
| 09:35 | 3 | Q.   Mr. Larian, is this an e-mail exchange between you and |
| 09:35 | 4 | Brian Wing? |
| 09:35 | 5 | A.   Yes. |
| 09:35 | 6 | Q.   And who is Brian Wing at this time?  What's his |
| 09:35 | 7 | position in September of 2005? |
| 09:35 | 8 | A.   I think he was head of tax. |
| 09:36 | 9 | Q.   If you'd look at -- |
| 09:36 | 10 | MR. PRICE:  Your Honor, move Exhibit 23947 into |
| 09:36 | 11 | evidence. |
| 09:36 | 12 | THE COURT:  Received. |
| 09:36 | 13 | *(Exhibit No. 23947 received in evidence.)* |
| 09:36 | 14 | *(Document displayed.)* |
| 09:36 | 15 | BY MR. PRICE: |
| 09:36 | 16 | Q.   If you'd look at the last page of this, the last e-mail |
| 09:36 | 17 | here, it's from you to Mr. Wing and a Shirin Makabi, |
| 09:36 | 18 | "Subject, Taking Cash Out"? |
| 09:36 | 19 | A.   Yes. |
| 09:36 | 20 | Q.   "We got 60 million and more by the end of the year," |
| 09:36 | 21 | question mark, "Let's take some cash out now."  Do you see |
| 09:36 | 22 | that? |
| 09:36 | 23 | A.   Yes. |
| 09:36 | 24 | Q.   By that you're referring to let's get cash out of -- of |
| 09:36 | 25 | the subsidiaries to go to the U.S. to distribute to you? |

| | | |
|---|---|---|
| 09:36 | 1 | A.    No. |
| 09:36 | 2 | Q.    Let's look up on the string.  It says -- Brian Wing to |
| 09:36 | 3 | you, it says, "Yes, sincerely."  Do you see that? |
| 09:36 | 4 | A.    Yes. |
| 09:36 | 5 | Q.    And then we look at the next e-mail on page 2, it says |
| 09:37 | 6 | "When?" and "How much?"  Do you see that? |
| 09:37 | 7 | A.    Yes. |
| 09:37 | 8 | Q.    And then, if we go to the e-mail above that, from |
| 09:37 | 9 | Mr. Wing to you, "Probably after 1/1.  We may be able to do |
| 09:37 | 10 | it earlier, but we will need to keep a reserve to pay our |
| 09:37 | 11 | payables to Hong Kong on 12/31.  If we have a specific need |
| 09:37 | 12 | or want it sooner, let's talk.  I will monitor the cash as |
| 09:37 | 13 | it comes in over these heavy months." |
| 09:37 | 14 | Do you see that? |
| 09:37 | 15 | A.    Yes. |
| 09:37 | 16 | Q.    And then your response on the next page is "Let's get |
| 09:37 | 17 | 30 million out now.  We have more cash coming." |
| 09:37 | 18 | Do you see that? |
| 09:37 | 19 | A.    Yes. |
| 09:37 | 20 | Q.    And then let's look at Mr. Wing's response.  It says, |
| 09:38 | 21 | "Can we wait until after September 30?  We are depleting our |
| 09:38 | 22 | U.S. cash to pay HK, and then we will have some transfer |
| 09:38 | 23 | pricing adjustments to make to get cash out of U.S. at |
| 09:38 | 24 | 35 percent rate, into Netherlands," paren, "20 percent |
| 09:38 | 25 | combined effective rate.  We can then take the distribution |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:38 | 1 | out of NL and save at least 4.5 million in taxes." |
| 09:38 | 2 | Do you see that? |
| 09:38 | 3 | A.   Yes. |
| 09:38 | 4 | Q.   And NL there refers to the Netherlands? |
| 09:38 | 5 | A.   Yes. |
| 09:38 | 6 | Q.   And so the way this is going to work is that the cash |
| 09:38 | 7 | that you were asking for would come out of the subsidiary in |
| 09:38 | 8 | the Netherlands, right? |
| 09:38 | 9 | A.   I don't know how it was going to work.  He's also a |
| 09:38 | 10 | witness.  You should ask him. |
| 09:38 | 11 | Q.   Well, the way -- |
| 09:38 | 12 | A.   He was head of taxation in accounting, and I left it up |
| 09:39 | 13 | to him and my accounting department to decide that.  I am |
| 09:39 | 14 | not familiar with the structure.  Those are witnesses coming |
| 09:39 | 15 | here.  You should ask them.  Both Mr. Wing and Ms. Tonnu are |
| 09:39 | 16 | witnesses in this case. |
| 09:39 | 17 | Q.   Mr. Larian, I'm just talking about from your |
| 09:39 | 18 | perspective when you asked for cash. |
| 09:39 | 19 | A.   Yes. |
| 09:39 | 20 | Q.   You said I want, in this case, 30 million? |
| 09:39 | 21 | A.   Yes. |
| 09:39 | 22 | Q.   You understood, because you were told, that the way |
| 09:39 | 23 | that would work is that it would come out of the |
| 09:39 | 24 | subsidiaries that you controlled? |
| 09:39 | 25 | A.   No.  This is what he said in here, and my answer on the |

| | | |
|---|---|---|
| 09:39 | 1 | top is two words, okay?  I left it up to him to decide. |
| 09:39 | 2 | Look at the e-mail above. |
| 09:39 | 3 | Q.   Where you say, "Okay"? |
| 09:39 | 4 | A.   Yes. |
| 09:39 | 5 | Q.   Your understanding is that the distribution that was to |
| 09:39 | 6 | be paid for you was going to be coming out of -- let's go -- |
| 09:40 | 7 | the Netherlands, correct? |
| 09:40 | 8 | A.   I don't know.  Yes, that's what it says in here. |
| 09:40 | 9 | Q.   And -- and in that year, in 2005 -- let me go to 2006 |
| 09:40 | 10 | before we go there. |
| 09:40 | 11 | If you would look at Exhibit 23946. |
| 09:40 | 12 | *(Document provided to the witness.)* |
| 09:40 | 13 | THE COURT:  Counsel, continuing objection as to |
| 09:40 | 14 | all these documents? |
| 09:40 | 15 | MS. KELLER:  Yes, Your Honor. |
| 09:41 | 16 | THE COURT:  Overruled. |
| 09:41 | 17 | THE WITNESS:  Go ahead. |
| 09:41 | 18 | BY MR. PRICE: |
| 09:41 | 19 | Q.   And is this an e-mail string between you and Mr. Wing |
| 09:41 | 20 | on February 3, 2006? |
| 09:41 | 21 | A.   Yes. |
| 09:41 | 22 | MR. PRICE:  Move 23946 into evidence. |
| 09:41 | 23 | THE COURT:  I want to see each of these documents, |
| 09:41 | 24 | though.  I'm looking for a couple things, so I -- I think I |
| 09:41 | 25 | have those additions.  Just a moment.  I looked at them this |

| | | |
|---|---|---|
| 09:41 | 1 | weekend. |
| 09:42 | 2 | Thank you.  Let me see them. |
| 09:42 | 3 | *(Document provided to the Court.)* |
| 09:42 | 4 | THE COURT:  Yeah.  Overruled. |
| 09:42 | 5 | MR. PRICE:  Your Honor, move Exhibit 23946 into |
| 09:42 | 6 | evidence. |
| 09:42 | 7 | THE COURT:  Received. |
| 09:42 | 8 | *(Exhibit No. 23946 received in evidence.)* |
| 09:42 | 9 | *(Document displayed.)* |
| 09:42 | 10 | BY MR. PRICE: |
| 09:42 | 11 | Q.   And this is in February 2006.  If we could look at the |
| 09:42 | 12 | bottom e-mail from Mr. Wing to you, it says, "Isaac, after |
| 09:42 | 13 | the USA pays off HK, there isn't really much to distribute |
| 09:42 | 14 | right now without reducing our cash balances below a |
| 09:42 | 15 | reasonable cushion.  We will have about 48 million in cash |
| 09:42 | 16 | in the Netherlands at the end of February.  I think we |
| 09:42 | 17 | should leave at least 10 million in cash to fund our |
| 09:43 | 18 | European rollout and would recommend a dividend of no larger |
| 09:43 | 19 | than 38 million.  This is only taxed at 15 percent.  Please |
| 09:43 | 20 | advise how much you would like to take." |
| 09:43 | 21 | So he's asking you how much do you want to take out of |
| 09:43 | 22 | Netherlands to distribute to the U.S. to distribute to you? |
| 09:43 | 23 | A.   No.  He's just saying this is how much cash we have, we |
| 09:43 | 24 | have to pay Hong Kong, et cetera.  Look at the e-mail above. |
| 09:43 | 25 | And all I wanted to do was a $30 million distribution, and I |

| 09:43 | 1 | left it up to him to handle it. |
| 09:43 | 2 | Q.   The question from him was, "Please advise how much you |
| 09:43 | 3 | would like to take," given the information he's given you, |
| 09:43 | 4 | correct? |
| 09:43 | 5 | A.   He -- yes.  "How much would you like to take?" |
| 09:43 | 6 |      Now, go up, please. |
| 09:43 | 7 | Q.   We're going. |
| 09:43 | 8 | A.   Okay. |
| 09:43 | 9 | Q.   So -- so -- so the scenario is you want to take money |
| 09:43 | 10 | out of the Netherlands -- |
| 09:43 | 11 | A.   No, no. |
| 09:43 | 12 | Q.   -- he's telling you what the situation is -- |
| 09:43 | 13 | A.   No, no, no. |
| 09:43 | 14 | Q.   She can't take down both of us.  She can't take down |
| 09:44 | 15 | both of us. |
| 09:44 | 16 |      Okay.  You want to get a distribution.  He's telling |
| 09:44 | 17 | you how much you can take out of the Netherlands, and then |
| 09:44 | 18 | he says -- |
| 09:44 | 19 | A.   No. |
| 09:44 | 20 | Q.   -- so tell me how much you want. |
| 09:44 | 21 | A.   No, no, that's not what he's saying.  That's what you |
| 09:44 | 22 | want him to say, but that's not what he's saying.  Read the |
| 09:44 | 23 | e-mail carefully. |
| 09:44 | 24 | Q.   When he asked you here -- |
| 09:44 | 25 | A.   Don't put it in my eye. |

| | | |
|---|---|---|
| 09:44 | 1 | Q.   Ms. Ward is right in the line of fire. |
| 09:44 | 2 | -- "Please advise how much you would like to |
| 09:44 | 3 | take," the "how much" is referring to cash out of the |
| 09:44 | 4 | Netherlands, right? |
| 09:44 | 5 | A.   Are you afraid to show the top of that e-mail? |
| 09:44 | 6 | Q.   We can put 'em both in the same frame.  It might be |
| 09:44 | 7 | more difficult to read, but go ahead. |
| 09:44 | 8 | A.   No.  It's very clear to read. |
| 09:44 | 9 | Q.   As to when -- okay. |
| 09:45 | 10 | When he says, "Please advise how much you would like to |
| 09:45 | 11 | take" -- |
| 09:45 | 12 | A.   And I said -- |
| 09:45 | 13 | Q.   -- he's asking you -- |
| 09:45 | 14 | A.   And I say on the top -- can you highlight that, please? |
| 09:45 | 15 | Q.   -- do 30, please. |
| 09:45 | 16 | A.   Please. |
| 09:45 | 17 | Q.   And that's 30 million? |
| 09:45 | 18 | A.   And I'm referring to what he's saying in the bottom. |
| 09:45 | 19 | Q.   And so he's giving you the situation and asking you how |
| 09:45 | 20 | much would you like us to take out of the Netherlands so |
| 09:45 | 21 | that you can get a distribution? |
| 09:45 | 22 | A.   No.  I -- he's saying to me this is where the money is, |
| 09:45 | 23 | "How much do you want to take?"  And I say "Do 30 million, |
| 09:45 | 24 | please."  I left it up to him to decide.  Okay. |
| 09:45 | 25 | Q.   But it doesn't say you left it up to him.  It says you |

56

| | | |
|---|---|---|
| 09:45 | 1 | tell him to do 30 million? |
| 09:45 | 2 | A.   I did say, yes.  I did say do 30 million. |
| 09:45 | 3 | Q.   And in 2006, the total distributions to shareholders |
| 09:46 | 4 | were about 143 million? |
| 09:46 | 5 | A.   I don't remember.  It's possible. |
| 09:46 | 6 | Q.   It's whatever number is reflected in your books? |
| 09:46 | 7 | A.   Yes. |
| 09:46 | 8 | Q.   Yeah.  And that's from all of the subsidiaries, right? |
| 09:46 | 9 | A.   I don't know. |
| 09:46 | 10 | Q.   And then 2005, we looked at that -- the, uh, e-mail |
| 09:46 | 11 | earlier about how much to take in September of 2005.  The |
| 09:46 | 12 | total distributions to shareholders in 2005 from all the |
| 09:46 | 13 | subsidiaries was about 151.7 million? |
| 09:46 | 14 | A.   I don't know if it's from all the subsidiaries or not |
| 09:46 | 15 | but -- and I don't remember the amount. |
| 09:46 | 16 | Q.   Now, you said that you really didn't understand exactly |
| 09:46 | 17 | how this structure worked.  Uh, if we could show you -- |
| 09:46 | 18 | Let me see if we have copies. |
| 09:47 | 19 | And by the way, in that structure -- you know, we saw |
| 09:47 | 20 | the structure with Mauritius? |
| 09:47 | 21 | A.   Yes. |
| 09:47 | 22 | Q.   In 2005, Mauritius was replaced by the Netherlands, |
| 09:47 | 23 | right? |
| 09:47 | 24 | A.   I don't know. |
| 09:47 | 25 | THE COURT:  Counsel, the jurors need a restroom |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:47 | 1 | break. |
| 09:47 | 2 | MR. PRICE:  This would be a good time. |
| 09:47 | 3 | THE COURT:  Ladies and gentlemen, why don't you |
| 09:47 | 4 | take a restroom break.  We'll come and get you in 20 |
| 09:47 | 5 | minutes.  You're admonished not to discuss this matter |
| 09:47 | 6 | amongst yourselves nor form or express any opinion. |
| 09:47 | 7 | Counsel, right at 10 after.  Okay? |
| 09:47 | 8 | MR. PRICE:  Your Honor, could we talk with the |
| 09:47 | 9 | Court. |
| 09:47 | 10 | THE COURT:  We can do that now. |
| 09:47 | 11 | *(Jurors recess at 9:48 a.m.)* |
| 09:47 | 12 | *(Outside the presence of the jury.)* |
| 09:48 | 13 | THE COURT:  All right.  The jury's no longer |
| 09:48 | 14 | present.  All counsel are present. |
| 09:48 | 15 | Counsel. |
| 09:48 | 16 | MR. PRICE:  Uh, Your Honor, the only thing I would |
| 09:48 | 17 | like to do in addition to this is, uh, we have some more of |
| 09:48 | 18 | the copying type of documents in the marketplace, |
| 09:48 | 19 | particularly with respect to -- uh, a couple with respect to |
| 09:48 | 20 | MyScene and Flavas.  I just want to get them into evidence. |
| 09:48 | 21 | I don't want to really go through them in detail.  And we |
| 09:48 | 22 | have a number of documents where Mr. Larian's asking to get |
| 09:48 | 23 | Mattel folks in particular to be head of Italy and be head |
| 09:48 | 24 | of Germany and these subsidiaries, as well, to show that |
| 09:48 | 25 | that's what he wanted and that's one of the things he did to |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 58 of 161   Page ID #:303690
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:48 | 1 | build the brand. |
| 09:48 | 2 | THE COURT:  There's two separate concepts. |
| 09:48 | 3 | I had previously opened up this area of copying, |
| 09:49 | 4 | Counsel. |
| 09:49 | 5 | MR. PRICE:  Pardon? |
| 09:49 | 6 | THE COURT:  I'd previously opened up this area of |
| 09:49 | 7 | copying.  What's the concern? |
| 09:49 | 8 | MR. PRICE:  We want to go through that with |
| 09:49 | 9 | Scooter Shannon. |
| 09:49 | 10 | THE COURT:  Scooter Samantha? |
| 09:49 | 11 | MR. QUINN:  Scooter Shannon.  And the Court |
| 09:49 | 12 | indicated we might be taking too much time on that, and so |
| 09:49 | 13 | that part of that was to -- |
| 09:49 | 14 | THE COURT:  No, that was part of MGA's -- |
| 09:49 | 15 | MR. PRICE:  It may be part of their case, |
| 09:49 | 16 | but -- but it's part of our case in the sense that it is an |
| 09:49 | 17 | example of him looking at the marketplace, making changes, |
| 09:50 | 18 | you know, and the creativities inspired by Mattel. |
| 09:50 | 19 | THE COURT:  It may be, but I thought there was |
| 09:50 | 20 | somewhat of an agreement between each of you that they could |
| 09:50 | 21 | present their case. |
| 09:50 | 22 | MR. PRICE:  There is an agreement they can present |
| 09:50 | 23 | their case. |
| 09:50 | 24 | THE COURT:  Don't you have other examples of |
| 09:50 | 25 | copying, or are you resting your case on copying of Scooter? |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 59 of 161   Page ID #:303691
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:50 | 1 | MR. PRICE:  Oh, no, we've got -- |
| 09:50 | 2 | THE COURT:  I know you've got a myriad of copies? |
| 09:50 | 3 | MR. PRICE:  We've got myriad -- |
| 09:50 | 4 | THE COURT:  I think you're going to have that |
| 09:50 | 5 | opportunity.  I've let you stray over the line a little bit |
| 09:50 | 6 | regarding that, because I thought the areas were relevant. |
| 09:50 | 7 | But to take that on, I think that it's something that MGA |
| 09:50 | 8 | can have the same courtesy of building their case around. |
| 09:50 | 9 | You'll have cross-examination.  I think you've got plenty of |
| 09:50 | 10 | areas of copying already that I've opened up. |
| 09:50 | 11 | MR. PRICE:  The second thing with respect to that |
| 09:50 | 12 | is I remember last week, I think it was, we were discussing |
| 09:50 | 13 | off the record -- you had told Ms. Keller that in her |
| 09:50 | 14 | recross, she could reopen to talk about copying by Mattel. |
| 09:50 | 15 | And I think that if she's allowed to reopen about that |
| 09:50 | 16 | subject -- |
| 09:50 | 17 | THE COURT:  If she reopens about that, so be it. |
| 09:51 | 18 | There may be a few more questions you can ask.  You're not |
| 09:51 | 19 | going to be foreclosed from that. |
| 09:51 | 20 | MR. PRICE:  Right. |
| 09:51 | 21 | THE COURT:  But I thought that she was going to |
| 09:51 | 22 | bring Scooter Samantha, et al., during MGA's case, and I |
| 09:51 | 23 | thought that that was the agreement between the parties. |
| 09:51 | 24 | MS. KELLER:  And we are, Your Honor. |
| 09:51 | 25 | THE COURT:  So that solves it. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 60 of 161   Page ID #:303692
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:51 | 1 | MS. KELLER:  For the record, we're not even going |
| 09:51 | 2 | to introduce any copying right now. |
| 09:51 | 3 | MR. PRICE:  That -- that seems to solve that. |
| 09:51 | 4 | THE COURT:  In other words, both sides are going |
| 09:51 | 5 | to have an equal opportunity eventually.  It's just a matter |
| 09:51 | 6 | of each party being able to basically shape their case. |
| 09:51 | 7 | Because, remember, for my record, we could have the parties |
| 09:51 | 8 | sitting in the exactly opposite positions. |
| 09:51 | 9 | MR. PRICE:  Well, in that case, with respect to |
| 09:51 | 10 | other copying, Your Honor, I do have a number of documents. |
| 09:51 | 11 | All I wanna do is get them in. |
| 09:51 | 12 | THE COURT:  Certainly, I've opened that before, |
| 09:51 | 13 | but thank you for checking.  Appreciate the courtesy. |
| 09:51 | 14 | MR. PRICE:  It won't be scintillating. |
| 09:51 | 15 | MR. McCONVILLE:  Your Honor, if I could, I told |
| 09:51 | 16 | Ms. Keller what my understanding was of those tax-related |
| 09:52 | 17 | documents. |
| 09:52 | 18 | THE COURT:  I hadn't ruled on those.  I don't |
| 09:52 | 19 | recall making a ruling.  You objected to them, but I don't |
| 09:52 | 20 | recall -- and for my record, I'm gonna take you on, on that |
| 09:52 | 21 | one. |
| 09:52 | 22 | I understand that concerning the tax documents |
| 09:52 | 23 | there's an inference about tax consequences that flowed if |
| 09:52 | 24 | the IRS, which is the first page, is shown.  It was |
| 09:52 | 25 | represented to me on Monday, and it was also represented -- |

| | | |
|--|--|--|
| 09:52 | 1 | it came up another time when these documents were going to |
| 09:52 | 2 | be used that only certain pages were going to be used.  It |
| 09:52 | 3 | was relevant as far as the Court was concerned concerning |
| 09:52 | 4 | the flow of money and alter ego.  And I think I made that |
| 09:52 | 5 | clear to you at that time.  I didn't rule.  I heard your |
| 09:52 | 6 | objection.  I didn't rule on your objection. |
| 09:52 | 7 | All that is, is a notice provision.  If you |
| 09:52 | 8 | notice, I'm not making rulings.  I'm indicating and |
| 09:52 | 9 | inquiring, but oftentimes, I'm not making a ruling on that. |
| 09:52 | 10 | I'm leaving it for the trial. |
| 09:52 | 11 | In addition, 23947 I'll also note, so we go down |
| 09:53 | 12 | these one by one, has the same potential problem.  23947 is |
| 09:53 | 13 | allegedly taking cash out.  Quote, "We got 60 million and |
| 09:53 | 14 | more by the end of the year" -- and "end" is spelled E-N-S-D |
| 09:53 | 15 | in that e-mail, according to my notes -- "Let's get |
| 09:53 | 16 | 30 million out now.  We have more cash coming.  We're |
| 09:53 | 17 | depleting our cash to pay HK cash out of the subsidiary.  We |
| 09:53 | 18 | can take the distribution out of NL," which means the |
| 09:53 | 19 | Netherlands, "and save at least 4.5 million in taxes." |
| 09:53 | 20 | Now, I understand that that touches on a |
| 09:53 | 21 | prejudicial issue, and that's potential tax avoidance, but |
| 09:53 | 22 | that is counterbalanced, in this Court's opinion, by the |
| 09:53 | 23 | distribution to Larian and the flow of money that he |
| 09:53 | 24 | receives from Hong Kong, the Netherlands -- Larian.  It goes |
| 09:53 | 25 | to alter ego, and it goes to the structure of this |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 62 of 161   Page ID #:303694
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

62

| | | |
|---|---|---|
| 09:53 | 1 | organization.  That can easily be explained by both parties. |
| 09:53 | 2 | My ruling was that we're to stay away from what I |
| 09:53 | 3 | call the "Kadishian."  That's where I granted the summary |
| 09:54 | 4 | judgment motion.  And that's what I'm keeping counsel away |
| 09:54 | 5 | from at the present time.  Now, whether that opens the door |
| 09:54 | 6 | later on, if we get to a subsequent trial concerning |
| 09:54 | 7 | punitives, that's a different question for a different day. |
| 09:54 | 8 | So I think Mattel's obeyed the Court's admonition. |
| 09:54 | 9 | Now, in addition, so we set the record further so |
| 09:54 | 10 | you have a good record and a good ruling against you, 23946 |
| 09:54 | 11 | is the Larian/Wing e-mail.  This is the flow once again from |
| 09:54 | 12 | Hong Kong to the Netherlands.  This is 48 million in cash, |
| 09:54 | 13 | according to my notes.  This money shows the cash flow and |
| 09:54 | 14 | it shows alter ego.  It shows also the control that |
| 09:54 | 15 | Mr. Larian exercises in this.  He's certainly able to |
| 09:54 | 16 | dictate, regardless of the myriad of lawyers and |
| 09:54 | 17 | accountants, that he can take 30 million.  And the |
| 09:54 | 18 | distribution ties back into the 2006 distribution to |
| 09:55 | 19 | shareholders of which he was minimally 81 percent, according |
| 09:55 | 20 | to his testimony, of 143 million in 2006, and 2005, |
| 09:55 | 21 | 151 million. |
| 09:55 | 22 | That's the Court's ruling. |
| 09:55 | 23 | MR. McCONVILLE:  So if I could -- so those two |
| 09:55 | 24 | e-mails that you just addressed, my recollection was from |
| 09:55 | 25 | the weekend that you showed -- that they showed the e-mail |

| | | |
|---|---|---|
| 09:55 | 1 | and I said it would be wildly prejudicial to -- to introduce |
| 09:55 | 2 | this information when there's no claim in this case related |
| 09:55 | 3 | to tax avoidance, tax issues at all. |
| 09:55 | 4 | THE COURT:  That was your claim. |
| 09:55 | 5 | MR. McCONVILLE:  And I thought the Court -- and |
| 09:55 | 6 | this is where, obviously, my recollection is faulty.  I |
| 09:55 | 7 | thought you said they could not inquire as to those e-mails. |
| 09:55 | 8 | THE COURT:  No, they could not inquire as to the |
| 09:55 | 9 | first page or bringing in the tax consequences, and I was |
| 09:55 | 10 | shown, if you recall, the pages in question, at least one of |
| 09:55 | 11 | them, and that was page 7.  I don't recall seeing page 9. |
| 09:55 | 12 | MR. McCONVILLE:  I recall -- whatever. |
| 09:56 | 13 | THE COURT:  You can set your record.  I don't want |
| 09:56 | 14 | to be in disagreement.  If I'm wrong, I humbly apologize, |
| 09:56 | 15 | but I didn't make a ruling on this. |
| 09:56 | 16 | MR. McCONVILLE:  Your Honor, I appreciate that. |
| 09:56 | 17 | THE COURT:  You objected vociferously, let the |
| 09:56 | 18 | record reflect.  You were concerned about the problem |
| 09:56 | 19 | concerning the IRS, the prejudice to Mr. Larian, and you |
| 09:56 | 20 | forewarned the Court about a whole series of tax |
| 09:56 | 21 | consequences.  I think Mr. Quinn was here, and I think his |
| 09:56 | 22 | argument was, basically, that this showed alter ego and the |
| 09:56 | 23 | flow of cash, especially the Hong Kong subsidiary, and the |
| 09:56 | 24 | reason for that is, quite frankly, he'd forgotten to include |
| 09:56 | 25 | that. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 64 of 161   Page ID #:303696
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

64

| | | |
|---|---|---|
| 09:56 | 1 | MR. McCONVILLE:  Right.  Appreciate that, |
| 09:56 | 2 | Your Honor.  I'm just saying I recall those two specific |
| 09:56 | 3 | e-mails, and I thought you said you can't go into it. |
| 09:56 | 4 | THE COURT:  If I did, my apologies.  I just don't |
| 09:56 | 5 | recall that.  I'm not gonna say that I'm right or that |
| 09:56 | 6 | you're wrong.  I'm just going to leave it I don't recall you |
| 09:56 | 7 | couldn't go into it.  I recall saying you can't go into the |
| 09:56 | 8 | tax consequences.  You can't get into the IRS and an issue |
| 09:57 | 9 | being brought before the tax authorities, because that's |
| 09:57 | 10 | prejudicial.  It makes him look like a criminal.  It was a |
| 09:57 | 11 | collateral matter.  You would then have to come in with |
| 09:57 | 12 | accountants.  And I thought that that's where we left it, |
| 09:57 | 13 | but I'll bow to your wisdom and your memory.  It doesn't |
| 09:57 | 14 | matter. |
| 09:57 | 15 | That's my ruling. |
| 09:57 | 16 | MR. McCONVILLE:  Okay. |
| 09:57 | 17 | MR. PRICE:  Your Honor, there's one document which |
| 09:57 | 18 | is now relevant. |
| 09:57 | 19 | THE COURT:  By the way, you both are welcome to |
| 09:57 | 20 | have a court reporter on the weekends, if you'd like to, in |
| 09:57 | 21 | terms of documents.  I never want my credibility at issue on |
| 09:57 | 22 | something like this.  If we need to have a court reporter |
| 09:57 | 23 | here, if there's any question.  I've tried to avoid making |
| 09:57 | 24 | rulings.  I've only wanted to be alerted.  But I think I had |
| 09:57 | 25 | said very, very clearly:  Don't get into the fact that this |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 65 of 161   Page ID #:303697
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

65

| 09:57 | 1 | was an IRS issue.  Don't get into the transfer of funds when |
| 09:57 | 2 | I've already ruled concerning the transferring to Kadisha |
| 09:57 | 3 | and that whole $60 million nightmare that I ruled on in |
| 09:57 | 4 | summary judgment. |
| 09:57 | 5 | I don't recall ever ruling that they couldn't get |
| 09:57 | 6 | into the flow of funds and alter ego.  In fact, I simply |
| 09:57 | 7 | left that on the table, and I was shown page 7 of this |
| 09:58 | 8 | document.  But that's my memory.  But I may be wrong.  Now |
| 09:58 | 9 | we're moving along. |
| 09:58 | 10 | MR. PRICE:  Your Honor, because of Mr. Larian's |
| 09:58 | 11 | answers that he didn't know anything about Mauritius and |
| 09:58 | 12 | that he didn't understand this, there's another document |
| 09:58 | 13 | that we'd like to show him, which is not on our list.  If I |
| 09:58 | 14 | could show the Court. |
| 09:58 | 15 | THE COURT:  Show counsel. |
| 09:58 | 16 | I think they'll have an objection automatically. |
| 09:58 | 17 | MR. QUINN:  It is on the list. |
| 09:58 | 18 | MR. McCONVILLE:  And, Your Honor, just -- |
| 09:58 | 19 | Mr. Larian testified today that ultimately he's the one who |
| 09:58 | 20 | controls the subsidiaries and that the money flows out of |
| 09:58 | 21 | the subsidiaries to the U.S. as dividends to him.  So to the |
| 09:58 | 22 | extent -- I don't believe there's a dispute as to that |
| 09:58 | 23 | point.  To the extent that they're introducing evidence that |
| 09:58 | 24 | shows money coming out of the company, we believe it's 403 |
| 09:58 | 25 | and prejudicial. |

| | | |
|---|---|---|
| 09:58 | 1 | THE COURT:  There's another part of that, though, |
| 09:58 | 2 | and sometimes memory is a little bit hazy.  And that's |
| 09:58 | 3 | overruled.  You can inquire into Mauritius. |
| 09:58 | 4 | The last memory I was left with was he didn't |
| 09:58 | 5 | understand the structure; that Ms. Tonnu would be better |
| 09:59 | 6 | qualified; she was a witness and was supposed to be the next |
| 09:59 | 7 | witness, et cetera.  He didn't understand the accountants or |
| 09:59 | 8 | the lawyers, basically. |
| 09:59 | 9 | MR. PRICE:  And it's just the first e-mail in this |
| 09:59 | 10 | that we're gonna use, Your Honor. |
| 09:59 | 11 | THE COURT:  And this includes de Mexico.  And |
| 09:59 | 12 | where is Mauritius? |
| 09:59 | 13 | MR. PRICE:  At the top e-mail. |
| 09:59 | 14 | THE COURT:  Well, the flow of profits in |
| 09:59 | 15 | Mauritius.  Okay.  Now, the Court well understands the |
| 09:59 | 16 | prejudicial effect as well as the probative value; and the |
| 09:59 | 17 | prejudicial effect, so that MGA has an even better record, |
| 09:59 | 18 | is the minimization of taxes.  Okay.  The Court's taken that |
| 09:59 | 19 | into account, thinks that the probative effect far outweighs |
| 09:59 | 20 | the prejudicial effect of this, and it is going to allow you |
| 09:59 | 21 | to get into the structure and the flow of money, which you |
| 09:59 | 22 | have.  Okay? |
| 10:00 | 23 | MS. KELLER:  Your Honor, the problem is that all |
| 10:00 | 24 | these documents are being shown to Mr. Larian, and it |
| 10:00 | 25 | definitely does have a seriously prejudicial effect.  But |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 67 of 161   Page ID #:303699
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

67

| 10:00 | 1 | the problem is, in terms of probative value, he really |
| 10:00 | 2 | doesn't understand all the structures.  He can say that's |
| 10:00 | 3 | what this e-mail says, but he can't discuss intelligently, |
| 10:00 | 4 | and never has been able to, what the tax attorneys and |
| 10:00 | 5 | accountants have done to set up the structure.  And that's |
| 10:00 | 6 | why, in looking at the probative value of the document as to |
| 10:00 | 7 | Mr. Larian, um, we really do believe that the prejudicial |
| 10:00 | 8 | effect outweighs it.  I don't think there's ever been any |
| 10:00 | 9 | proof of any kind in this case that Mr. Larian really |
| 10:00 | 10 | understands the complexities of the tax structures that were |
| 10:00 | 11 | set up. |
| 10:00 | 12 | THE COURT:  That's for Mr. Larian to testify to. |
| 10:00 | 13 | MS. KELLER:  And he has. |
| 10:00 | 14 | THE COURT:  If he says he doesn't know, that's the |
| 10:00 | 15 | end of the discussion, apparently.  He doesn't know. |
| 10:00 | 16 | MS. KELLER:  Well, but it hasn't been the end of |
| 10:00 | 17 | the discussion.  There's e-mail after e-mail coming in about |
| 10:01 | 18 | minimizing tax consequences.  And that's really the purpose |
| 10:01 | 19 | of these; not to show that Mr. Larian's controlling |
| 10:01 | 20 | subsidiaries. |
| 10:01 | 21 | THE COURT:  Well, if you wanted to, you could |
| 10:01 | 22 | simply excise -- which has never been suggested to the |
| 10:01 | 23 | Court -- to minimize taxes, and it could be excised, but |
| 10:01 | 24 | nobody's ever made that suggestion to the Court.  You've |
| 10:01 | 25 | just placed me in an all-or-nothing position, and that's my |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 68 of 161   Page ID #:303700
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

68

| | | |
|---|---|---|
| 10:01 | 1 | ruling. |
| 10:01 | 2 | MS. KELLER:  Well, then I would ask now that any |
| 10:01 | 3 | portion having to do with taxes be excised. |
| 10:01 | 4 | THE COURT:  Well, on this e-mail, we're going to |
| 10:01 | 5 | minimize -- or to minimize taxes can be stricken. |
| 10:01 | 6 | MS. KELLER:  And then further down, it says, |
| 10:01 | 7 | "Please check with tax people and take charge of this and |
| 10:01 | 8 | make it happen," and that's obvious that that's the purpose |
| 10:01 | 9 | of that, is to minimize tax consequences. |
| 10:01 | 10 | THE COURT:  I disagree. |
| 10:01 | 11 | MR. PRICE:  Your Honor, we'll redact everything |
| 10:01 | 12 | but the top e-mail. |
| 10:01 | 13 | MS. KELLER:  But the top -- |
| 10:01 | 14 | THE COURT:  The top e-mail says to minimize taxes. |
| 10:02 | 15 | MR. PRICE:  It talks about Mauritius.  He knows |
| 10:02 | 16 | about the structure. |
| 10:02 | 17 | THE COURT:  Let's put the e-mail up on the screen, |
| 10:02 | 18 | and a good balance would be that we get away from the tax |
| 10:02 | 19 | consequences, as Ms. Keller suggests.  But since the Court |
| 10:02 | 20 | in this time's been put in a position of a 403 |
| 10:02 | 21 | determination, my ruling stands. |
| 10:02 | 22 | Now, how many more times would we like to discuss |
| 10:02 | 23 | that? |
| 10:02 | 24 | Hearing none; then the wise thing to do would be |
| 10:02 | 25 | to get Mr. Zeller's head out of the way of the screen and |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 69 of 161   Page ID #:303701
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

69

| | | |
|---|---|---|
| 10:02 | 1 | take out "to minimize taxes."  Simple as that.  It would end |
| 10:02 | 2 | with "to be in Mauritius," period. |
| 10:02 | 3 | MR. PRICE:  That's fine. |
| 10:03 | 4 | THE COURT:  Now, I don't know what's coming, |
| 10:03 | 5 | though. |
| 10:03 | 6 | Ms. Keller, if you're concern is redundancy.  You, |
| 10:03 | 7 | might step over and talk to Mr. Price and see how many more |
| 10:03 | 8 | of these they have.  Because then I might agree with it.  In |
| 10:03 | 9 | other words, we've shown the structure, but what I can't |
| 10:03 | 10 | catch are all the tax implications. |
| 10:03 | 11 | Mr. Price, Ms. Keller's coming over to see here. |
| 10:03 | 12 | You're going to show her how many more e-mails you have.  I |
| 10:03 | 13 | think there were quite a few. |
| 10:03 | 14 | MR. PRICE:  On this issue, there's just... |
| 10:03 | 15 | THE COURT:  Just this one?  Show her. |
| 10:03 | 16 | MR. PRICE:  There's one more. |
| 10:03 | 17 | THE COURT:  Show her.  Well, show her. |
| 10:04 | 18 | MS. KELLER:  Your Honor, the next proposed one is |
| 10:04 | 19 | 8124R2. |
| 10:04 | 20 | THE COURT:  Why don't you give me a copy of that. |
| 10:04 | 21 | MS. KELLER:  And it's about tax structure. |
| 10:04 | 22 | THE COURT:  As long as it flows to Mauritius, |
| 10:04 | 23 | Hong Kong, you're entitled to show alter ego.  I think I |
| 10:04 | 24 | agree with Ms. Keller in terms of reference to the tax |
| 10:04 | 25 | issues. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

70

| | | |
|---|---|---|
| 10:04 | 1 | MS. KELLER:  That's what this whole e-mail is, |
| 10:04 | 2 | Your Honor.  It's about the tax structure.  So it's |
| 10:05 | 3 | obviously not being offered for the stated purpose. |
| 10:05 | 4 | THE COURT:  No, it's not.  The second sentence. |
| 10:05 | 5 | "But HK pay a royalty to MGA Mauritius/MGA Holding," period. |
| 10:05 | 6 | All right.  You could put in simple words -- take |
| 10:05 | 7 | out "tax structure," still leave "small, adequate profits in |
| 10:05 | 8 | U.S. and move the excess profits to Hong Kong, but pay Hong |
| 10:05 | 9 | Kong royalty, MGA Mauritius/MGA Holding," period. |
| 10:05 | 10 | Mattel gets what it wants, and that is, the flow |
| 10:05 | 11 | of money, and MGA doesn't have the prejudice. |
| 10:05 | 12 | MR. PRICE:  Your Honor, I'm just not sure that |
| 10:05 | 13 | it's intelligible that way.  The fact that there's |
| 10:05 | 14 | tax-playing involved is -- |
| 10:05 | 15 | THE COURT:  It's intelligible.  You get the flow |
| 10:05 | 16 | of money out of Hong Kong. |
| 10:06 | 17 | MR. PRICE:  I mean, the -- |
| 10:06 | 18 | MR. QUINN:  "The structure is."  Take out the |
| 10:06 | 19 | words "current tax."  "In simple words, the structure is." |
| 10:06 | 20 | MR. PRICE:  "In simple words, the structure is to |
| 10:06 | 21 | leave small, adequate profits in USA and move the excess |
| 10:06 | 22 | profits to HK, but -- |
| 10:06 | 23 | THE COURT:  I would suggest:  "In simple words, |
| 10:06 | 24 | the current -- |
| 10:06 | 25 | MR. PRICE:  Structure. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

71

| | | |
|---|---|---|
| 10:06 | 1 | THE COURT:  -- "structure is to leave small, |
| 10:06 | 2 | adequate profits in U.S. and move the excess profits to HK." |
| 10:06 | 3 | That's what you're looking for. |
| 10:06 | 4 | You're also looking for "but HK pay royalty to MGA |
| 10:06 | 5 | Mauritius/MGA Holding," period. |
| 10:06 | 6 | And strike "and this reduces HK profits to a |
| 10:06 | 7 | minimum." |
| 10:06 | 8 | MR. QUINN:  But we need that last. |
| 10:06 | 9 | THE COURT:  No, no, my apologies.  That's more |
| 10:06 | 10 | than acceptable.  "And this reduces HK profits to a minimum |
| 10:06 | 11 | level."  That's entirely appropriate.  My mistake. |
| 10:06 | 12 | MR. PRICE:  So we're basically taking out the word |
| 10:06 | 13 | "tax." |
| 10:06 | 14 | THE COURT:  Ask Mr. Quinn.  I think he's got it. |
| 10:07 | 15 | Okay.  Next one? |
| 10:07 | 16 | MR. QUINN:  That's it. |
| 10:07 | 17 | MR. PRICE:  That's it on this topic. |
| 10:07 | 18 | THE COURT:  Ms. Keller?  Now, you can also rectify |
| 10:07 | 19 | the prior one if you're concerned with the same holding. |
| 10:07 | 20 | MS. KELLER:  I would like to do that, Your Honor. |
| 10:07 | 21 | THE COURT:  But remember this, if the parties are |
| 10:07 | 22 | going to place the Court in an all-or-nothing decision, |
| 10:07 | 23 | that's the way the Court's gonna rule.  In other words, this |
| 10:07 | 24 | is one time everybody's being rescued, but if it's simply to |
| 10:07 | 25 | introduce the document, and I'm taking it on a 403 issue, it |

| | | |
|---|---|---|
| 10:07 | 1 | came in. |
| 10:07 | 2 | Okay.  Anything else? |
| 10:07 | 3 | All right.  Now, I'm going to open the door in |
| 10:07 | 4 | three minutes, so I hope you use the restroom. |
| 10:07 | 5 | *(Recess held at 10:07 a.m.)* |
| 10:13 | 6 | *(proceedings resumed at 10:14 a.m.)* |
| 10:13 | 7 | *(In the presence of the jury.)* |
| 10:14 | 8 | THE COURT:  All right.  Mr. Price, if you would |
| 10:14 | 9 | like to continue your redirect examination, please. |
| 10:14 | 10 | BY MR. PRICE: |
| 10:15 | 11 | Q.   Mr. Larian, before the break, we were looking at the |
| 10:15 | 12 | chart at 22013-00009. |
| 10:15 | 13 | A.   Yes. |
| 10:15 | 14 | Q.   And, you remember, I was asking you -- asking you about |
| 10:15 | 15 | MGA Mauritius? |
| 10:15 | 16 | A.   It says, "MGA-M." |
| 10:15 | 17 | Q.   Well, you said that you didn't know anything about a |
| 10:15 | 18 | MGA Mauritius; you didn't understand that? |
| 10:15 | 19 | A.   We had an MGA Mauritius.  I don't know if that refers |
| 10:15 | 20 | to that or not. |
| 10:15 | 21 | Q.   Didn't you say, before the break, that you didn't know |
| 10:15 | 22 | anything about an MGA Mauritius? |
| 10:15 | 23 | A.   I don't know if that's what I said.  But we had an MGA |
| 10:15 | 24 | Mauritius.  You asked me if this is MGA Mauritius; I said I |
| 10:15 | 25 | don't know if this is or not. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:16 | 1 | Q.   Now, during the break you saw a document where you |
| 10:16 | 2 | write an e-mail about MGA Mauritius, right? |
| 10:16 | 3 | A.   I saw a document.  I wasn't paying attention.  I was |
| 10:16 | 4 | reading my e-mails to my company. |
| 10:16 | 5 | Q.   Okay.  You saw a document that showed that, in fact, |
| 10:16 | 6 | you did know about MGA Mauritius, and it's -- it's a place |
| 10:16 | 7 | in the structure. |
| 10:16 | 8 | A.   Why don't you show it to me, sir. |
| 10:16 | 9 | Q.   Okay.  Look at 24017. |
| 10:16 | 10 | (Document provided to the witness.) |
| 09:35 | 11 | BY MR. PRICE: |
| 10:16 | 12 | Q.   You see it's an e-mail from you to, among others, David |
| 10:17 | 13 | Peters, Valerie Grant, and Victor Cho, on May 27, 2004? |
| 10:17 | 14 | A.   Yes. |
| 10:17 | 15 | MR. PRICE:  I move the redacted copy in, |
| 10:17 | 16 | Your Honor. |
| 10:17 | 17 | THE COURT:  Received. |
| 10:17 | 18 | (Exhibit No. 24017 received in evidence.) |
| 10:17 | 19 | (Document displayed.) |
| 10:17 | 20 | BY MR. PRICE: |
| 10:17 | 21 | Q.   This is the document that you saw during the break, |
| 10:17 | 22 | right? |
| 10:17 | 23 | A.   Yes. |
| 10:17 | 24 | Q.   I mean, you were sitting here while we discussed this |
| 10:17 | 25 | document, right? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 74 of 161   Page ID #:303706
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

74

| | | |
|---|---|---|
| 10:17 | 1 | A.   Yes. |
| 10:17 | 2 | Q.   And listening to that conversation and seeing this |
| 10:17 | 3 | document, that's why you changed your testimony that, in |
| 10:17 | 4 | fact, you did know about an MGA Mauritius? |
| 10:17 | 5 | MS. KELLER:  Objection.  Argumentative. |
| 10:17 | 6 | THE COURT:  Overruled. |
| 10:17 | 7 | THE WITNESS:  No. |
| 10:17 | 8 | BY MR. PRICE: |
| 10:17 | 9 | Q.   Let's look at what the document says.  Now, this is |
| 10:17 | 10 | something that -- this part of the e-mail is a part that -- |
| 10:17 | 11 | that you wrote, right? |
| 10:17 | 12 | A.   Yes. |
| 10:17 | 13 | Q.   And could you tell us who David Peters is? |
| 10:17 | 14 | A.   I have no idea.  I don't remember him. |
| 10:17 | 15 | Q.   Or Valerie Grant? |
| 10:17 | 16 | A.   She was our controller at one time. |
| 10:18 | 17 | Q.   And Victor Cho? |
| 10:18 | 18 | A.   I don't remember him. |
| 10:18 | 19 | Q.   And you write, "Our goal is to sell at lowest price to |
| 10:18 | 20 | MGA Mexico," paren, "to have the lowest duty, et cetera, and |
| 10:18 | 21 | for MGA Mexico to sell at highest possible price and the |
| 10:18 | 22 | profits be in Mauritius." |
| 10:18 | 23 | You see that? |
| 10:18 | 24 | A.   Yes. |
| 10:18 | 25 | Q.   And so if we go back to 22013-0009, from the 2002 to |

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

75

| | | |
|---|---|---|
| 10:18 | 1 | 2005 timeframe, then the profits were going to basically be |
| 10:18 | 2 | put here, for you to take out for distribution when you |
| 10:18 | 3 | pleased? |
| 10:18 | 4 | A.   No.  I don't know how the structure worked.  I've said |
| 10:18 | 5 | that now few times. |
| 10:18 | 6 | Q.   You wrote this e-mail, Exhibit 24017, right? |
| 10:19 | 7 | A.   I did. |
| 10:19 | 8 | Q.   All right.  And, from your perspective, what you would |
| 10:19 | 9 | do is simply tell your CFO, your tax people, "I want to make |
| 10:19 | 10 | a distribution to" -- yeah -- "to the U.S. shareholders, me |
| 10:19 | 11 | and my sister, and here's what I want."? |
| 10:19 | 12 | A.   I'd tell them I want a distribution. |
| 10:19 | 13 | Q.   And in connection with that, you -- you understood that |
| 10:19 | 14 | these companies, these subsidiaries had boards of directors, |
| 10:19 | 15 | right? |
| 10:19 | 16 | A.   Yes. |
| 10:19 | 17 | Q.   They had bylaws, right? |
| 10:19 | 18 | A.   Yes. |
| 10:19 | 19 | Q.   But if you wanted distribution, you would simply say to |
| 10:19 | 20 | your CFO, your tax person, you know, just get the money to |
| 10:19 | 21 | the USA so we can distribute it? |
| 10:19 | 22 | A.   No.  I would ask for distribution. |
| 10:19 | 23 | Q.   You would say, "I want to take" -- a certain amount |
| 10:20 | 24 | out.  "Get it done," right? |
| 10:20 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

76

| | | |
|---|---|---|
| 10:20 | 1 | Q.   And you weren't involved in -- with, uh, uh, votes by |
| 10:20 | 2 | the board of directors at Mauritius or -- or going through |
| 10:20 | 3 | the bylaws of Mauritius or the Netherlands.  You just said, |
| 10:20 | 4 | "I want the distribution"? |
| 10:20 | 5 | A.   Yes. |
| 10:20 | 6 | Q.   You had control over how much of those profits came to |
| 10:20 | 7 | the U.S. and were distributed to you and your sister, right? |
| 10:20 | 8 | A.   Yes. |
| 10:20 | 9 | Q.   And that was true not just of Mauritius but whatever |
| 10:20 | 10 | subsidiary happened to have the profits? |
| 10:20 | 11 | A.   No, sir.  I left these all to our tax and accounting |
| 10:20 | 12 | people, professionals, to handle.  I did not get involved in |
| 10:20 | 13 | the detail of it.  I have now testified to this more than |
| 10:20 | 14 | five times. |
| 10:20 | 15 | Q.   Well, but the first time you testified you said you |
| 10:21 | 16 | didn't know anything about Mauritius, so we had to show you |
| 10:21 | 17 | that e-mail. |
| 10:21 | 18 | MS. KELLER:  Objection.  Argumentative, and |
| 10:21 | 19 | misstates the testimony. |
| 10:21 | 20 | THE COURT:  Sustained. |
| 08:59 | 21 | BY MR. PRICE: |
| 10:21 | 22 | Q.   Mr. Larian, I'm talking about your perspective.  I |
| 10:21 | 23 | don't care about the structure. |
| 10:21 | 24 | Just you, someone at the top, what you would do is |
| 10:21 | 25 | simply say, "I want money to distribute to the |

| | | |
|---|---|---|
| 10:21 | 1 | shareholders," right?  That was your participation? |
| 10:21 | 2 | A.    Yes. |
| 10:21 | 3 | Q.    And then it would be done. |
| 10:21 | 4 | A.    Yes. |
| 10:21 | 5 | Q.    And -- and you didn't care what subsidiary it came |
| 10:21 | 6 | from.  You just asked for the distribution, right? |
| 10:21 | 7 | A.    I asked for the distribution. |
| 10:21 | 8 | Q.    And you didn't care what subsidiary it came from, |
| 10:21 | 9 | correct? |
| 10:21 | 10 | A.    I asked for the distribution.  I left it to them to |
| 10:21 | 11 | decide how to do it. |
| 10:22 | 12 | Q.    Mr. Larian, I'm just gonna show you some documents now. |
| 10:22 | 13 | Uh, and the next document, 8124. |
| 10:22 | 14 | *(Document provided to the witness.)* |
| 10:22 | 15 | BY MR. PRICE: |
| 10:22 | 16 | Q.    And this version is 8124-R-2, the redacted version. |
| 10:22 | 17 | And, Mr. Larian, all I'm gonna ask you to look at, |
| 10:22 | 18 | because the rest has been redacted, is the first page. |
| 10:22 | 19 | A.    Yes. |
| 10:22 | 20 | Q.    And it's just the first two sentences -- down to the |
| 10:23 | 21 | first two sentences in the e-mail, at the bottom of that |
| 10:23 | 22 | page, and then the, uh -- Mr. Wing's response. |
| 10:23 | 23 | MS. KELLER:  Your Honor, we object. |
| 10:23 | 24 | Um, the same grounds as before and -- |
| 10:23 | 25 | THE COURT:  I'm looking at the same document we |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 78 of 161   Page ID #:303710
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:23 | 1 | discussed during the recess, aren't I? |
| 10:23 | 2 | MS. KELLER:  I -- |
| 10:23 | 3 | MR. PRICE:  Yes. |
| 10:23 | 4 | MS. KELLER:  Your Honor, this is -- |
| 10:23 | 5 | THE COURT:  Could I see the document once again. |
| 10:23 | 6 | I'm looking at 824-R (sic). |
| 10:23 | 7 | THE WITNESS:  R-2. |
| 10:23 | 8 | THE COURT:  Overruled. |
| 08:46 | 9 | BY MR. PRICE: |
| 10:23 | 10 | Q.   Mr. Larian, you recognize this as an e-mail string that |
| 10:23 | 11 | you were on? |
| 10:23 | 12 | A.   Yes. |
| 10:23 | 13 | MR. PRICE:  Your Honor, move 8124-R-2-0001 as |
| 10:24 | 14 | redacted. |
| 10:24 | 15 | THE COURT:  It's received. |
| 10:24 | 16 | *(Exhibit No. 8124-R-2-0001 received in* |
| 10:24 | 17 | *evidence.)* |
| 10:24 | 18 | *(Document displayed.)* |
| 10:24 | 19 | BY MR. PRICE: |
| 10:24 | 20 | Q.   You see this is an e-mail March 12, 2009, that you got |
| 10:24 | 21 | from Patrick Ma? |
| 10:24 | 22 | A.   Yes. |
| 10:24 | 23 | Q.   Could you tell us who Patrick Ma is? |
| 10:24 | 24 | A.   He's a controller, MGA Hong Kong. |
| 10:24 | 25 | Q.   And this is March 12, 2009? |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 79 of 161   Page ID #:303711
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

79

| 10:24 | 1 | A.   Yes. |
| 10:24 | 2 | Q.   It says, "Isaac, in simple words, the current structure |
| 10:24 | 3 | is to leave small," paren, "adequate profits in U.S. and |
| 10:24 | 4 | move the excess profits to HK, but HK pay royalty to MGA |
| 10:24 | 5 | Mauritius," slash, "MGA Holding, and this reduces HK profits |
| 10:24 | 6 | to a minimum level." |
| 10:24 | 7 | Do you see that? |
| 10:24 | 8 | A.   Yes. |
| 10:25 | 9 | Q.   And you see here, it says, "H" -- it says -- |
| 10:25 | 10 | *(Indicating with laser pen.)* |
| 10:25 | 11 | A.   I can see it here.  Please don't put that in my eyes. |
| 10:25 | 12 | Q.   I'm a better shot than that. |
| 10:25 | 13 | See where it says, "Royalty" there -- "HK pay royalty"? |
| 10:25 | 14 | A.   Yes. |
| 10:25 | 15 | Q.   What that's referring to is that Hong Kong would pay a |
| 10:25 | 16 | royalty for the use of MGA's intellectual property, Bratz, |
| 10:25 | 17 | to MGA Mauritius? |
| 10:25 | 18 | A.   Yes. |
| 10:25 | 19 | Q.   And then MGA Mauritius would pay, then, a royalty to |
| 10:25 | 20 | MGA USA? |
| 10:25 | 21 | A.   Where does it say that? |
| 10:25 | 22 | It says what it says. |
| 10:25 | 23 | Q.   Well, I mean, that's your understanding, that you |
| 10:25 | 24 | would -- you would park -- or put the royalties in MGA |
| 10:25 | 25 | Mauritius, and then, when you wanted distribution you could |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 80 of 161   Page ID #:303712
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

80

| | | |
|---|---|---|
| 10:25 | 1 | ask for that money to be paid to MGA USA? |
| 10:25 | 2 | A.   No.   They -- I left this to the accountants to do the |
| 10:25 | 3 | structure.   I am not familiar with the structure and how it |
| 10:25 | 4 | works. |
| 10:26 | 5 | Q.   Okay.   Mr. Larian, I'm going to show you some |
| 10:26 | 6 | documents, and the first are gonna be groups of documents |
| 10:26 | 7 | that pertain to hirings. |
| 10:26 | 8 | A.   Yes. |
| 10:26 | 9 | Q.   And I'm gonna first direct you to 5713.   I'm just gonna |
| 10:26 | 10 | have you identify them, and not spend much time on them. |
| 10:26 | 11 | A.   If you gonna ask me a question, I got to spend time to |
| 10:26 | 12 | look at 'em.   I'm not gonna be able to answer questions |
| 10:26 | 13 | without looking at them. |
| 10:26 | 14 | *(Document provided to the witness.)* |
| 09:59 | 15 | BY MR. PRICE: |
| 10:26 | 16 | Q.   Do you have 5713 in front of you? |
| 10:26 | 17 | A.   Yes, I do.   Give me a moment to read it. |
| 10:27 | 18 | Q.   And let me ask you a few questions. |
| 10:27 | 19 | Does that have MGA Bates number on it? |
| 10:27 | 20 | A.   Yes. |
| 10:27 | 21 | Q.   At the top, does it say, "From:  Isaac Larian, To: |
| 10:27 | 22 | Mary Claire Tiffany"? |
| 10:27 | 23 | A.   Yes. |
| 10:27 | 24 | MR. PRICE:  Your Honor, move Exhibit 5713 into |
| 10:27 | 25 | evidence. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

81

| | | |
|---|---|---|
| 10:27 | 1 | THE COURT:  Received. |
| 10:27 | 2 | *(Exhibit No. 5713 received in evidence.)* |
| 10:27 | 3 | THE WITNESS:  I need to read it. |
| 10:27 | 4 | BY MR. PRICE: |
| 10:27 | 5 | Q.   Mr. Larian, if you'd look at -- |
| 10:27 | 6 | A.   Now I need to read it if you gonna ask me questions. |
| 10:27 | 7 | Q.   I'm not.  I'm just getting it into evidence. |
| 10:27 | 8 | A.   Oh, okay. |
| 10:27 | 9 | Q.   Look at 9829. |
| 10:27 | 10 | *(Document provided to the witness.)* |
| 09:25 | 11 | BY MR. PRICE: |
| 10:27 | 12 | Q.   Do you see that as an MGA Bates stamp on it? |
| 10:27 | 13 | A.   Yes. |
| 10:27 | 14 | Q.   And it appears to be from you to Eve Johnson? |
| 10:27 | 15 | A.   Yes. |
| 10:27 | 16 | MR. PRICE:  Move 9829 into evidence. |
| 10:27 | 17 | THE COURT:  Received. |
| 10:27 | 18 | *(Exhibit No. 9829 received in evidence.)* |
| 07:59 | 19 | BY MR. PRICE: |
| 10:27 | 20 | Q.   If you'd look at 9827. |
| 10:27 | 21 | (Document provided to the witness.) |
| 11:59 | 22 | BY MR. PRICE: |
| 10:28 | 23 | Q.   Do you see that has an MGA Bates stamp on it? |
| 10:28 | 24 | A.   Yes. |
| 10:28 | 25 | Q.   Appears to be from you to a Mel Woods? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:28 | 1 | A.   Yes. |
| 10:28 | 2 | MR. PRICE:  Move 9827 into evidence, Your Honor. |
| 10:28 | 3 | THE COURT:  Received. |
| 10:28 | 4 | *(Exhibit No. 9827 received in evidence.)* |
| 07:59 | 5 | BY MR. PRICE: |
| 10:28 | 6 | Q.   If you'd look at 9826. |
| 10:28 | 7 | *(Documented provided to the witness.)* |
| 10:28 | 8 | THE WITNESS:  Yes. |
| | 9 | BY MR. PRICE: |
| 10:28 | 10 | Q.   That has an MGA Bates stamp on it? |
| 10:28 | 11 | A.   Yes. |
| 10:28 | 12 | Q.   Appears to be from you to Aporius Jens? |
| 10:28 | 13 | A.   Yes. |
| 10:28 | 14 | MR. PRICE:  Move 9826 into evidence. |
| 10:28 | 15 | THE COURT:  Received. |
| 10:28 | 16 | *(Exhibit No. 9826 received in evidence.)* |
| 10:28 | 17 | BY MR. PRICE: |
| 10:28 | 18 | Q.   Look at Exhibit 11255. |
| 10:28 | 19 | *(Document provided to the witness.)* |
| 10:29 | 20 | THE WITNESS:  Yes. |
| 09:09 | 21 | BY MR. PRICE: |
| 10:29 | 22 | Q.   It has an MGA Bates stamp on it. |
| 10:29 | 23 | A.   Yes. |
| 10:29 | 24 | Q.   Appears to be from you to a Sandrine de Raspide? |
| 10:29 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

83

| 10:29 | 1 | MR. PRICE: That's S-A-N-D-R-I-N-E. |
| 10:29 | 2 | THE COURT: That's all right, Counsel. You can |
| 10:29 | 3 | get those spellings during the lunch hour. This is time |
| 10:29 | 4 | running. |
| 10:29 | 5 | MR. PRICE: Move 11255 into evidence. |
| 10:29 | 6 | THE COURT: Received. |
| 10:29 | 7 | *(Exhibit No. 11255 received in evidence.)* |
| 09:12 | 8 | BY MR. PRICE: |
| 10:29 | 9 | Q. Look at 11869. |
| 10:29 | 10 | *(Document provided to the witness.)* |
| 10:29 | 11 | THE WITNESS: Yes. |
| 10:29 | 12 | BY MR. PRICE: |
| 10:29 | 13 | Q. It has an MGA Bates stamp on it? |
| 10:29 | 14 | A. Yes. |
| 10:29 | 15 | Q. Appears to be from you to Stephen Lee. |
| 10:29 | 16 | A. Yes. |
| 10:29 | 17 | MR. PRICE: Move 11869 into evidence. |
| 10:29 | 18 | THE COURT: Received. |
| 10:29 | 19 | *(Exhibit No. 11869 received in evidence.)* |
| 10:29 | 20 | MR. PRICE: Look at 20817. |
| 10:29 | 21 | *(Document provided to the witness.)* |
| 10:29 | 22 | MS. KELLER: Your Honor, we're going so fast, we |
| 10:29 | 23 | can't even get to the document, even with the computer. |
| 10:29 | 24 | THE COURT: These aren't going to be shown. We |
| 10:29 | 25 | can take them up over the lunch hour. This is time counting |

| 10:30 | 1 | against Mattel now. All right. So we can do that during |
|---|---|---|
| 10:30 | 2 | the lunch hour. Received. I know what those documents are, |
| 10:30 | 3 | Counsel. I looked at them this weekend -- |
| 10:30 | 4 | THE WITNESS: Go ahead. |
| 10:30 | 5 | THE COURT: -- with Mr. McConville present. |
| 10:30 | 6 | MR. PRICE: In that case, Your Honor, should we |
| 10:30 | 7 | just move them into evidence? |
| 10:30 | 8 | THE COURT: Yeah. 1 -- 20817 received. |
| 10:30 | 9 | *(Exhibit No. 20817 received in evidence.)* |
| 10:30 | 10 | MR. PRICE: Is that in evidence? |
| 10:30 | 11 | 11263. |
| 10:30 | 12 | THE COURT: 11263 received. |
| 10:30 | 13 | *(Exhibit No. 11263 received in evidence.)* |
| 10:30 | 14 | MR. PRICE: Uh, 9828. |
| 10:30 | 15 | THE COURT: 9828. |
| 10:30 | 16 | Now, Counsel, I'll receive those; but over the |
| 10:30 | 17 | lunch hour, we'll go back through each one of those and make |
| 10:30 | 18 | sure that you're satisfied. |
| 10:30 | 19 | *(Exhibit No. 9828 received in evidence.)* |
| 10:30 | 20 | MR. PRICE: And Exhibit 11264. |
| 10:30 | 21 | THE WITNESS: Should I look at these? |
| 10:30 | 22 | THE COURT: 11264 received. |
| 10:30 | 23 | *(Exhibit No. 11264 received in evidence.)* |
| 10:30 | 24 | MR. PRICE: 22020. |
| 10:30 | 25 | THE COURT: 22020 received. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 85 of 161   Page ID #:303717
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:30 | 1 | *(Exhibit No. 22020 received in evidence.)* |
| 10:30 | 2 | MR. PRICE:  And then 21289. |
| 10:30 | 3 | THE COURT:  21289.  It's received. |
| 10:30 | 4 | *(Exhibit No. 21289 received in evidence.)* |
| 10:30 | 5 | MR. PRICE:  And, apparently, 13794. |
| 10:30 | 6 | THE COURT:  13794 received. |
| 10:31 | 7 | *(Exhibit No. 13794 received in evidence.)* |
| 10:31 | 8 | THE COURT:  Ladies and gentlemen, what we'll do is |
| 10:31 | 9 | go over those at the lunchtime.  We looked at them |
| 10:31 | 10 | yesterday, but we'll make sure that each number matches up |
| 10:31 | 11 | with what counsel saw. |
| 10:31 | 12 | MR. PRICE:  And, Your Honor, the following |
| 10:31 | 13 | documents pertain to market observations concerning Mattel |
| 10:31 | 14 | products: |
| 10:31 | 15 | Exhibit 11179. |
| 10:31 | 16 | THE COURT:  All right.  Received. |
| 10:31 | 17 | *(Exhibit No. 11179 received in evidence.)* |
| 10:31 | 18 | THE COURT:  Received -- subject to our lunchtime |
| 10:31 | 19 | discussion, anyway. |
| 10:31 | 20 | MR. PRICE:  Exhibit 8225. |
| 10:31 | 21 | THE COURT:  8225 received. |
| 10:31 | 22 | *(Exhibit No. 8225 received in evidence.)* |
| 10:31 | 23 | MR. PRICE:  22051. |
| 10:31 | 24 | THE COURT:  Received. |
| 10:31 | 25 | *(Exhibit No. 22051 received in evidence.)* |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:31 | 1 | MR. PRICE:  20912. |
| 10:31 | 2 | THE COURT:  Received. |
| 10:32 | 3 | *(Exhibit No. 20912 received in evidence.)* |
| 10:32 | 4 | MR. PRICE:  8235. |
| 10:32 | 5 | THE COURT:  Received. |
| 10:32 | 6 | *(Exhibit No. 8235 received in evidence.)* |
| 10:32 | 7 | MR. PRICE:  8237. |
| 10:32 | 8 | THE COURT:  Received. |
| 10:32 | 9 | *(Exhibit No. 8237 received in evidence.)* |
| 10:32 | 10 | MR. PRICE:  7908. |
| 10:32 | 11 | THE COURT:  Received. |
| 10:32 | 12 | *(Exhibit No. 7908 received in evidence.)* |
| 10:32 | 13 | MR. PRICE:  1318. |
| 10:32 | 14 | THE COURT:  Received. |
| 10:32 | 15 | *(Exhibit No. 1318 received in evidence.)* |
| 10:32 | 16 | MR. PRICE:  13918. |
| 10:32 | 17 | THE COURT:  Received. |
| 10:32 | 18 | *(Exhibit No. 13918 received in evidence.)* |
| 10:32 | 19 | MR. PRICE:  13917. |
| 10:32 | 20 | THE COURT:  Received. |
| 10:32 | 21 | *(Exhibit No. 13917 received in evidence.)* |
| 10:32 | 22 | MR. PRICE:  1321. |
| 10:32 | 23 | THE COURT:  Received. |
| 10:32 | 24 | *(Exhibit No. 1321 received in evidence.)* |
| 10:32 | 25 | MR. PRICE:  7904. |

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

87

| | | |
|---|---|---|
| 10:32 | 1 | THE COURT:  Received. |
| 10:32 | 2 | *(Exhibit No. 7904 received in evidence.)* |
| 10:32 | 3 | MR. PRICE:  21314. |
| 10:32 | 4 | THE COURT:  Just a minute.  Received. |
| 10:32 | 5 | *(Exhibit No. 21314 received in evidence.)* |
| 10:33 | 6 | MR. PRICE:  21315. |
| 10:33 | 7 | THE COURT:  Received. |
| 10:33 | 8 | *(Exhibit No. 21315 received in evidence.)* |
| 10:33 | 9 | MR. PRICE:  20917. |
| 10:33 | 10 | MS. KELLER:  I'm sorry.  Counsel, what was that? |
| 10:33 | 11 | MR. PRICE:  20917. |
| 10:33 | 12 | THE COURT:  20917. |
| 10:33 | 13 | *(Exhibit No. 20917 received in evidence.)* |
| 10:33 | 14 | MR. PRICE:  20781. |
| 10:33 | 15 | THE COURT:  Received. |
| 10:33 | 16 | *(Exhibit No. 20781 received in evidence.)* |
| 10:33 | 17 | MR. PRICE:  1320. |
| 10:33 | 18 | THE COURT:  Received. |
| 10:33 | 19 | *(Exhibit No. 1320 received in evidence.)* |
| 10:33 | 20 | MR. PRICE:  8241. |
| 10:33 | 21 | THE COURT:  Received. |
| 10:33 | 22 | *(Exhibit No. 8241 received in evidence.)* |
| 10:33 | 23 | MR. PRICE:  7907. |
| 10:33 | 24 | THE COURT:  Received. |
| 10:33 | 25 | *(Exhibit No. 7907 received in evidence.)* |

| | | |
|---|---|---|
| 10:34 | 1 | MR. PRICE:  7906. |
| 10:34 | 2 | THE COURT:  Received. |
| 10:34 | 3 | *(Exhibit No. 7906 received in evidence.)* |
| 10:34 | 4 | MR. PRICE:  8243. |
| 10:34 | 5 | THE COURT:  Received. |
| 10:34 | 6 | *(Exhibit No. 8243 received in evidence.)* |
| 10:34 | 7 | MR. PRICE:  7905. |
| 10:34 | 8 | THE COURT:  Received. |
| 10:34 | 9 | *(Exhibit No. 7905 received in evidence.)* |
| 10:34 | 10 | MR. PRICE:  No further questions. |
| 10:34 | 11 | Thank you. |
| 10:34 | 12 | THE COURT:  All right. |
| 10:34 | 13 | Now, ladies and gentlemen, over the lunch hour, |
| 10:34 | 14 | all of those exhibits that the Court just received, some of |
| 10:34 | 15 | those may, in fact, come out as an exhibit.  Counsel just |
| 10:34 | 16 | needs time to once again look at these.  These have been |
| 10:34 | 17 | viewed by all counsel prior to this time, but they'll have |
| 10:34 | 18 | trouble matching up the number with the exact exhibit.  This |
| 10:34 | 19 | will save time for both parties. |
| 10:34 | 20 | Counsel, recross. |
| 10:34 | 21 | This is Ms. Keller. |
| 10:34 | 22 | **RECROSS-EXAMINATION** |
| 10:34 | 23 | BY MS. KELLER: |
| 10:35 | 24 | Q.   Mr. Larian, you've been asked a lot of questions over |
| 10:35 | 25 | the days, the past days, about all sorts of topics, and so |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 89 of 161   Page ID #:303721
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:35 | 1 | I'm gonna try to cover just a few of them with you. |
| 10:35 | 2 | You were shown an e-mail agenda, Exhibit 23964, from a |
| 10:35 | 3 | Pat Williams to you. |
| 10:36 | 4 | Do you remember that? |
| 10:36 | 5 | A.   Yes. |
| 10:36 | 6 | Q.   Actually, this is an e-mail -- can you see it? |
| 10:36 | 7 | A.   I can't. |
| 10:36 | 8 | Q.   Let's see if we can get you a paper copy. |
| 10:36 | 9 | (Document displayed.) |
| 10:36 | 10 | BY MS. KELLER: |
| 10:36 | 11 | Q.   Pat Williams was a guy that you hired to be the |
| 10:36 | 12 | executive vice president in charge of sales? |
| 10:36 | 13 | A.   I did. |
| 10:36 | 14 | Q.   How long did he last at MGA? |
| 10:36 | 15 | A.   Few month. |
| 10:36 | 16 | Q.   And Mr. Williams sent you a string of angry e-mails, |
| 10:36 | 17 | angry -- an agenda full of angry language; is that right? |
| 10:36 | 18 | A.   Yes. |
| 10:36 | 19 | MR. PRICE:  Objection.  Lack of foundation as to |
| 10:36 | 20 | "letter," and compound. |
| 10:36 | 21 | THE COURT:  Overruled. |
| 09:59 | 22 | BY MS. KELLER: |
| 10:36 | 23 | Q.   And among other things, he told you that the company |
| 10:36 | 24 | would be better off with you not in it, right? |
| 10:36 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 90 of 161   Page ID #:303722
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:36 | 1 | Q.   Did you point out to him that you actually owned the |
| 10:37 | 2 | company? |
| 10:37 | 3 | A.   Yes. |
| 10:37 | 4 | Q.   Did you point out to him that you were the CEO? |
| 10:37 | 5 | A.   Yes. |
| 10:37 | 6 | Q.   And ultimately, after giving him many chances, you |
| 10:37 | 7 | fired the guy? |
| 10:37 | 8 | MR. PRICE:  Objection.  Leading. |
| 10:37 | 9 | THE COURT:  Overruled. |
| 10:37 | 10 | THE WITNESS:  Yes. |
| 09:27 | 11 | BY MS. KELLER: |
| 10:37 | 12 | Q.   Now, to your knowledge, is there any allegation by |
| 10:37 | 13 | Mattel in this case of employment -- is there any cause of |
| 10:37 | 14 | action in this case to be decided about employment of Pat |
| 10:37 | 15 | Williams? |
| 10:37 | 16 | MR. PRICE:  Objection -- |
| 10:37 | 17 | THE WITNESS:  No. |
| 10:37 | 18 | MR. PRICE:  -- argumentative. |
| 10:37 | 19 | THE COURT:  Sustained. |
| 10:37 | 20 | MR. PRICE:  Move to strike, Your Honor. |
| 10:37 | 21 | THE COURT:  Stricken. |
| 09:28 | 22 | BY MS. KELLER: |
| 10:37 | 23 | Q.   Now, let's look at the exhibit introduced previously by |
| 10:37 | 24 | Mr. Price, 23964, this exhibit from Mr. Williams.  And let's |
| 10:38 | 25 | look at page 3. |

| 10:38 | 1 | (Document provided to the witness.) |
| 10:38 | 2 | (Document displayed.) |
| 10:38 | 3 | THE WITNESS:  Okay. |
| 10:38 | 4 | BY MS. KELLER: |
| 10:38 | 5 | Q.   An e-mail, April 7th, 2001. |
| 10:38 | 6 | A.   Yes. |
| 10:38 | 7 | Q.   And you're saying, "We all need to take these meetings |
| 10:38 | 8 | seriously so we can manage the business," right? |
| 10:38 | 9 | A.   Yes. |
| 10:38 | 10 | Q.   You all need to actively participate and do what you |
| 10:38 | 11 | take on responsibility to do, right? |
| 10:38 | 12 | A.   Yes. |
| 10:38 | 13 | Q.   You say you waited on purpose until late Friday to see |
| 10:38 | 14 | who had any agenda item and who had done what they committed |
| 10:38 | 15 | to do, right? |
| 10:38 | 16 | A.   Yes. |
| 10:38 | 17 | Q.   Then you give a list of what was done or not done or |
| 10:38 | 18 | you had not seen; is that right? |
| 10:38 | 19 | A.   Yes. |
| 10:38 | 20 | Q.   Now, let's look at page 4, 23964-4. |
| 10:38 | 21 | (Document displayed.) |
| 10:38 | 22 | BY MS. KELLER: |
| 10:38 | 23 | Q.   Here you're asking Mr. Williams for a detailed |
| 10:38 | 24 | spreadsheet of drop-dead dates for getting paper and orders |
| 10:39 | 25 | to achieve the forecast of 20 million in June and 17 million |

| 10:39 | 1 | in July, item by item; is that right? |
| 10:39 | 2 | A.   Yes. |
| 10:39 | 3 | Q.   And you want an International Orders Spreadsheet on the |
| 10:39 | 4 | forecast, and when. |
| 10:39 | 5 | A.   Yes. |
| 10:39 | 6 | Q.   Now, do you consider those unreasonable requests of an |
| 10:39 | 7 | executive vice president for sales? |
| 10:39 | 8 | A.   Absolutely not. |
| 10:39 | 9 | Q.   Is that part of his job? |
| 10:39 | 10 | A.   Yes. |
| 10:39 | 11 | Q.   And Mr. Williams replied, "Here is the information that |
| 10:39 | 12 | Dennis sent to you last Tuesday.  This gives you the total |
| 10:39 | 13 | dollars by account and item." |
| 10:39 | 14 | And above this, on 23964-3, you write, "The report |
| 10:39 | 15 | shows what are the balance to Chase.  It does not cover when |
| 10:39 | 16 | we talked about."  And you then asked him to provide what |
| 10:39 | 17 | was requested the following Monday, right? |
| 10:39 | 18 | A.   Yes. |
| 10:39 | 19 | Q.   And if you look at 23694-2 (sic), his reply begins, |
| 10:40 | 20 | "There will not be a spreadsheet that outlines a drop-dead |
| 10:40 | 21 | date of orders.  You and the previous management agreed to a |
| 10:40 | 22 | calendar that was not acceptable or achievable.  That was |
| 10:40 | 23 | your error in previous sales management, not mine.  I have |
| 10:40 | 24 | been here for 90 days, and you are out of control.  I will |
| 10:40 | 25 | not work under these conditions.  Never have; never will. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 93 of 161   Page ID #:303725
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

93

| 10:40 | 1 | If you want to severance me out of the company, please do |
|---|---|---|
| 10:40 | 2 | so, and you can get on with your out-of-control management |
| 10:40 | 3 | style.  I do not need this abuse from you or anyone else. |
| 10:40 | 4 | Decide what you want to do," question mark," et cetera. |
| 10:40 | 5 | Second paragraph says, "Please let me know so I can |
| 10:40 | 6 | advise Lisa and Janine and Martin.  Your style of micro |
| 10:40 | 7 | manage, abusive language, and yelling are not conducive to |
| 10:40 | 8 | building a team.  Your staff is ready to leave.  You do not |
| 10:40 | 9 | know.  Because of you (sic) style of management is 'I can |
| 10:40 | 10 | just find other people.'" |
| 10:40 | 11 | And then the third paragraph goes on with -- in a |
| 10:40 | 12 | similar -- |
| 10:40 | 13 | MR. PRICE:  I object.  There's no question.  And |
| 10:41 | 14 | the argument-ive (sic) acting. |
| 10:41 | 15 | THE COURT:  Argumentative accent? |
| 10:41 | 16 | MR. PRICE:  Acting. |
| 10:41 | 17 | THE COURT:  Oh, acting, yeah. |
| 10:41 | 18 | MS. KELLER:  Hard to read this one in a flat tone |
| 10:41 | 19 | of voice, Your Honor, given the rant. |
| 10:41 | 20 | THE COURT:  (To the jury:)  Counsel was just |
| 10:41 | 21 | delivering the Gettysburg address.  I'm just kidding you. |
| 10:41 | 22 | Just assume that was read in a flat voice, like an e-mail. |
| 10:41 | 23 | Okay? |
| 10:41 | 24 | All right.  And it was preparatory to the question |
| 10:41 | 25 | we're about to hear. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 94 of 161   Page ID #:303726
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:41 | 1 | BY MS. KELLER: |
| 10:41 | 2 | Q.   Then the third paragraph, he goes on to say, "This |
| 10:41 | 3 | company will never be the company that you say you want," |
| 10:41 | 4 | question mark.  "You spend money against the bottom line |
| 10:41 | 5 | that is really not acceptable." |
| 10:41 | 6 |      Um, did he co-own this company with you? |
| 10:41 | 7 | A.   No. |
| 10:41 | 8 | Q.   Did he ever own a company, to your knowledge? |
| 10:41 | 9 | A.   No. |
| 10:41 | 10 |         MR. PRICE:  Objection.  Lack of foundation. |
| 10:41 | 11 |         THE WITNESS:  No, he did not. |
| 10:41 | 12 |         I have foundation.  He did not. |
| 10:41 | 13 |         THE COURT:  Overruled. |
| 10:41 | 14 | BY MS. KELLER: |
| 10:41 | 15 | Q.   In the fourth paragraph, he says, "In 90 days I have |
| 10:41 | 16 | given you and your company more credibility than you know. |
| 10:41 | 17 | I am sure you will say this is not true.  However, pis- -- |
| 10:42 | 18 | perception is reality.  If you want to believe this, fine; |
| 10:42 | 19 | if not, fine." |
| 10:42 | 20 |      So he's been there three months when he's writing all |
| 10:42 | 21 | this? |
| 10:42 | 22 | A.   Yes. |
| 10:42 | 23 | Q.   And in the sixth paragraph, he says, "I have taken the |
| 10:42 | 24 | time to build a good team that can take this business |
| 10:42 | 25 | forward.  If you are gonna micro manage me because of |

| | | |
|---|---|---|
| 10:42 | 1 | JC Penney, you need to take sale (sic) over.  In addition, |
| 10:42 | 2 | you wanting to meet on Friday at 2:30 p.m. every week is |
| 10:42 | 3 | only because you do not have a life.  My son is very |
| 10:42 | 4 | important to me, and I spend time up in the Bay Area to see |
| 10:42 | 5 | him." |
| 10:42 | 6 | A.   We were here Friday.  I guess we don't have any life. |
| 10:42 | 7 | Q.   Well, was it a continuing problem for you that |
| 10:42 | 8 | Mr. Williams just didn't show up on Fridays? |
| 10:42 | 9 | A.   Yes. |
| 10:42 | 10 | Q.   Was it a continuing problem that he didn't show up on |
| 10:42 | 11 | other days, too? |
| 10:42 | 12 | A.   Yes. |
| 10:42 | 13 | Q.   Was it a continuing problem that he thought he should |
| 10:42 | 14 | be allowed to telecommute? |
| 10:42 | 15 | A.   Yes. |
| 10:42 | 16 | Q.   And what was your understanding when you hired him |
| 10:42 | 17 | about whether he could telecommute? |
| 10:43 | 18 | A.   He could not.  It was one condition -- because we had |
| 10:43 | 19 | previous sales manager who didn't live in L.A. -- and the |
| 10:43 | 20 | condition for him was to move to L.A. |
| 10:43 | 21 | He did not. |
| 10:43 | 22 | Q.   He did not move to L.A.? |
| 10:43 | 23 | A.   Never did. |
| 10:43 | 24 | Q.   And you responded, "Wow, Pat, we definitely have a |
| 10:43 | 25 | problem.  We definitely need to talk Monday." |

| | | |
|---|---|---|
| 10:43 | 1 | THE COURT:  This is a softer reading. |
| 10:43 | 2 | I'm just kidding you, Counsel. |
| 10:43 | 3 | MS. KELLER:  This is the really -- |
| 10:43 | 4 | THE COURT:  The voice modulates here.  All right? |
| 10:43 | 5 | MS. KELLER:  This is a reasonable response, |
| 10:43 | 6 | Your Honor, to the rant. |
| 10:43 | 7 | "Wow, Pat" -- |
| 10:43 | 8 | MR. PRICE:  Move to strike the characterization of |
| 10:43 | 9 | the acting. |
| 10:43 | 10 | THE COURT:  She's moving along now.  She's reading |
| 10:43 | 11 | with a level voice. |
| 10:43 | 12 | THE WITNESS:  Mr. Price was also acting when he |
| 10:43 | 13 | was -- |
| 10:43 | 14 | THE COURT:  Level voice. |
| 10:43 | 15 | MS. KELLER:  "Wow, Pat, we definitely have a |
| 10:43 | 16 | problem.  We definitely need to talk Monday.  All I have |
| 10:43 | 17 | asked for below is simple report that asks the head of sales |
| 10:43 | 18 | of the company to advise when we are going to get the orders |
| 10:43 | 19 | for June and July you have forecasted.  I think that this is |
| 10:44 | 20 | a very legitimate request any company can make from its head |
| 10:44 | 21 | of sales.  It looks like you don't know to have the answers, |
| 10:44 | 22 | so instead you have gone on attack, telling me 'you have no |
| 10:44 | 23 | life,' threaten to tell Lisa and Janine, whom you have no |
| 10:44 | 24 | idea who or what they were until I introduced you to them, |
| 10:44 | 25 | that Stephen Lee is put in a terrible situation, even though |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:44 | 1 | you saw him and talked to him for the first time for two to |
| 10:44 | 2 | three days in HK in January," exclamation point, "that I," |
| 10:44 | 3 | quote, "yell at you," unquote.  "I have never done that, |
| 10:44 | 4 | et cetera, et cetera." |
| 10:44 | 5 | BY MS. KELLER: |
| 10:44 | 6 | Q.   Now, why didn't you just fire him on the spot when you |
| 10:44 | 7 | got that e-mail from him? |
| 10:44 | 8 | A.   I thought we can -- it can be worked out. |
| 10:44 | 9 | Q.   So he responds -- |
| 10:44 | 10 | A.   I like challenge. |
| 10:44 | 11 | Q.   A challenge? |
| 10:44 | 12 | A.   I like challenge, I guess. |
| 10:44 | 13 | Q.   So he responds, "Never said that you have raised your |
| 10:45 | 14 | voice to me, nor did I say that Stephen has complained to |
| 10:45 | 15 | me.  I am stating information that I have received from |
| 10:45 | 16 | others.  I do not think these people would be giving me |
| 10:45 | 17 | false information," et cetera, et cetera. |
| 10:45 | 18 | And so he ends that by saying, "We will talk tomorrow." |
| 10:45 | 19 | And in your response, you say, "As Stephen Covey says, |
| 10:45 | 20 | 'First things first.'  I suggest that you worry and take |
| 10:45 | 21 | care of sales first before you waste your time listening and |
| 10:45 | 22 | believing what," quote "others say," unquote."  I was gonna |
| 10:45 | 23 | waste my time listening to what" -- |
| 10:45 | 24 | THE COURT:  It's too quick.  Slow down.  The |
| 10:45 | 25 | reporter is not getting the reading. |

| | | |
|---|---|---|
| 10:45 | 1 | MS. KELLER:  I will slow down. |
| 10:45 | 2 | "If I was going to waste my time listening to what |
| 10:45 | 3 | others say about you, for example, even before you came to |
| 10:46 | 4 | MGA, I would not be where I am, and you would not have been |
| 10:46 | 5 | at MGA.  I make my own decisions.  I asked –– simply asked |
| 10:46 | 6 | for a simple report with you, apparently hit a nerve.  One |
| 10:46 | 7 | of the nerves, reading between the lines below, is that you |
| 10:46 | 8 | simply want to take Fridays off and be with your son.  I |
| 10:46 | 9 | respect your dedication, and being a family man myself, |
| 10:46 | 10 | respect that.  Maybe we can work that out as long as we are |
| 10:46 | 11 | honest with each other and tell each other what our needs |
| 10:46 | 12 | are straightforward. |
| 10:46 | 13 | "As for Lisa and Janine, I have known each for |
| 10:46 | 14 | more than five to six years.  During these times, they have |
| 10:46 | 15 | always stated their desire to come to MGA, not because they" |
| 10:46 | 16 | quote, "love Isaac," end quote, "because MGA makes the most |
| 10:46 | 17 | innovative and cutting-edge toys out there.  One would find |
| 10:46 | 18 | it hard to believe that they, all of a sudden, fell in love |
| 10:46 | 19 | with a guy who they just meet and heard from literally a |
| 10:46 | 20 | month ago on advice from the," quote, "evil Isaac," unquote, |
| 10:46 | 21 | "and all of a sudden decided to jump on board." |
| 10:47 | 22 | BY MS. KELLER: |
| 10:47 | 23 | Q.   Um, so I take it that, at least in this e-mail string, |
| 10:47 | 24 | Mr. Williams was not appearing to accept the direction you |
| 10:47 | 25 | were trying to give him? |

| | | |
|---|---|---|
| 10:47 | 1 | A.   That's correct. |
| 10:47 | 2 | Q.   Now, also admitted previously was something -- |
| 10:47 | 3 | Exhibit 13626, a so-called agenda for February 28th, 2001. |
| 10:47 | 4 | And it lists a meeting between you, Pat Williams and Martin |
| 10:47 | 5 | Hitch. |
| 10:47 | 6 | Do you know if this agenda ever even got printed out? |
| 10:47 | 7 | A.   I don't. |
| 10:47 | 8 | Q.   Do you know if there was ever even a meeting covering |
| 10:47 | 9 | this agenda? |
| 10:47 | 10 | A.   I don't. |
| 10:47 | 11 | Q.   Do you think that, had you been given an agenda like |
| 10:47 | 12 | this from -- by Mr. Williams, that you would have remembered |
| 10:48 | 13 | it? |
| 10:48 | 14 | A.   Yes. |
| 10:48 | 15 | Q.   And why would you have remembered it? |
| 10:48 | 16 | A.   Because of all the things he says in here.  He's been |
| 10:48 | 17 | there only for a short while, and he's making a lot of |
| 10:48 | 18 | accusations which were not true.  I mean, he talks about |
| 10:48 | 19 | Lisa.  Lisa stills work for the company ten years later. |
| 10:48 | 20 | Janine worked until 2008.  So this guy was little bit out of |
| 10:48 | 21 | control, unfortunately. |
| 10:48 | 22 | Q.   So when this agenda's written, then he's only been |
| 10:48 | 23 | there -- what? -- a few weeks? |
| 10:48 | 24 | A.   I don't remember when he started. |
| 10:48 | 25 | Q.   Let's take a look at -- now Martin Hitch, you said, the |

| | | |
|---|---|---|
| 10:48 | 1 | other person listed, was head of international sales? |
| 10:48 | 2 | A.   Yes. |
| 10:48 | 3 | Q.   And he's still a friend of yours? |
| 10:48 | 4 | A.   He is. |
| 10:48 | 5 | Q.   And he still calls you for advice, you said? |
| 10:48 | 6 | A.   Yes. |
| 10:48 | 7 | Q.   Let's look at the part of this agenda on page 2 that |
| 10:48 | 8 | you were not shown that says, "International." |
| 10:49 | 9 | Anything controversial about this agenda? |
| 10:49 | 10 | A.   Let me read it.  No. |
| 10:49 | 11 | Q.   "Budget, forecast, focus on key countries, review cost |
| 10:49 | 12 | structure, implement new trading policies and practices, |
| 10:49 | 13 | review opening -- operating options." |
| 10:49 | 14 | And this would have been the part of the agenda that, |
| 10:49 | 15 | had it been produced, would have been Mr. Hitch's? |
| 10:49 | 16 | MR. PRICE:  Objection.  Calls for speculation that |
| 10:49 | 17 | Mr. Hitch didn't have anything to do with the previous... |
| 10:49 | 18 | THE COURT:  Well -- |
| 10:49 | 19 | MS. KELLER:  Well, there are three -- |
| 10:49 | 20 | THE COURT:  Let me see the top of the e-mail for |
| 10:49 | 21 | just a moment.  I think Mr. Hitch's name is mentioned. |
| 10:49 | 22 | THE WITNESS:  It is. |
| 10:49 | 23 | THE COURT:  Overruled. |
| 10:49 | 24 | You can cast your opinion about who would have |
| 10:49 | 25 | knowledge of the various sections. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

101

| | | |
|---|---|---|
| 10:49 | 1 | MS. KELLER:  Let's go -- |
| 11:59 | 2 | BY MS. KELLER: |
| 10:49 | 3 | Q.   Again, Martin Hitch was the head of international |
| 10:49 | 4 | sales, right? |
| 10:49 | 5 | A.   Yes.  And Mr. Price didn't show me this portion. |
| 10:49 | 6 | Q.   I know. |
| 10:49 | 7 | MR. PRICE:  Objection.  Move to strike.  That's |
| 10:49 | 8 | argumentative. |
| 10:49 | 9 | THE COURT:  Sustained.  Stricken. |
| 10:49 | 10 | BY MS. KELLER: |
| 10:50 | 11 | Q.   Let's look at this newly depicted portion entitled -- |
| 10:50 | 12 | MR. PRICE:  Objection.  Argumentative as well, |
| 10:50 | 13 | Your Honor. |
| 10:50 | 14 | THE COURT:  Stricken. |
| 10:50 | 15 | BY MS. KELLER: |
| 10:50 | 16 | Q.   Let's look at page 2. |
| 10:50 | 17 | *(Document displayed.)* |
| 10:50 | 18 | BY MS. KELLER: |
| 10:50 | 19 | Q.   Were you shown that page before? |
| 10:50 | 20 | A.   No. |
| 10:50 | 21 | Q.   And this is -- |
| 10:50 | 22 | MR. PRICE:  Your Honor, I object and move to |
| 10:50 | 23 | strike.  He read the whole thing. |
| 10:50 | 24 | THE WITNESS:  I did not. |
| 10:50 | 25 | You said not to read it. |

| | | |
|---|---|---|
| 10:50 | 1 | THE COURT:  Well, ladies and gentlemen, the whole |
| 10:50 | 2 | document's in evidence.  I don't know what Mr. Larian read. |
| 10:50 | 3 | I don't know if this particular portion was put back up on |
| 10:50 | 4 | the screen.  I can't remember.  It has a number of sections, |
| 10:50 | 5 | and I think we'll just move on with the next question. |
| 10:50 | 6 | BY MS. KELLER: |
| 10:50 | 7 | Q.   To back up, Mr. Hitch was the head of international |
| 10:50 | 8 | sales, right? |
| 10:50 | 9 | A.   Yes, yes. |
| 10:50 | 10 | Q.   So this portion, if there had been such an agenda |
| 10:50 | 11 | printed out, would have been Mr. Hitch's portion to address, |
| 10:50 | 12 | right? |
| 10:50 | 13 | A.   Yes. |
| 10:50 | 14 | Q.   Is there anything even controversial about any of the |
| 10:50 | 15 | topics or subheadings listed here? |
| 10:50 | 16 | A.   No. |
| 10:50 | 17 | Q.   Now, let's go back to page 1.  And it starts out, |
| 10:50 | 18 | "Overview of the Company.  Autocratic culture, fear factor, |
| 10:51 | 19 | confrontational environment, CYA mentality, priority is to |
| 10:51 | 20 | please IL," et cetera, "poorly planned and executed."  It |
| 10:51 | 21 | just goes on and on with very negative information, right? |
| 10:51 | 22 | A.   Yes. |
| 10:51 | 23 | Q.   Is that why you think you would have remembered it if |
| 10:51 | 24 | this had been printed out and given to you? |
| 10:51 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:51 | 1 | Q.   And now, in the previous exhibit that we looked at, |
| 10:51 | 2 | 23694 (sic), dated April 7, 2001, Mr. Williams says he's |
| 10:51 | 3 | been at the company 90 days. |
| 10:51 | 4 | Do you remember that? |
| 10:51 | 5 | A.   I don't have that in front of me. |
| 10:51 | 6 | Q.   Well, let's just look on the screen. |
| 10:51 | 7 | *(Document displayed.)* |
| 10:51 | 8 | BY MS. KELLER: |
| 10:51 | 9 | Q.   The previous exhibit dated April 7, 2001, he says he's |
| 10:51 | 10 | been there for 90 days, right? |
| 10:52 | 11 | A.   Yes. |
| 10:52 | 12 | Q.   And so -- |
| 10:52 | 13 | A.   The date -- I can't read the date on this, on the |
| 10:52 | 14 | screen. |
| 10:52 | 15 | MS. KELLER:  Can we enlarge the date? |
| 10:52 | 16 | *(Technician complies.)* |
| 10:52 | 17 | THE WITNESS:  Okay.  I'm sorry.  Go ahead. |
| 10:52 | 18 | BY MS. KELLER: |
| 10:52 | 19 | Q.   Okay.  So in that exhibit, Mr. Williams said he'd been |
| 10:52 | 20 | at the company 90 days as of April 7th, right? |
| 10:52 | 21 | A.   Yes. |
| 10:52 | 22 | Q.   So if we go back, then, to February 28th, 2001, the |
| 10:52 | 23 | date of this Exhibit 13626, Mr. Williams had not -- had been |
| 10:52 | 24 | there barely 50 days, right? |
| 10:52 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

104

| | | |
|---|---|---|
| 10:52 | 1 | Q.   And as a salesperson, um, was it his job, for example, |
| 10:52 | 2 | to supervise, um, the morale of your employees in the global |
| 10:53 | 3 | toy industry? |
| 10:53 | 4 | A.   I'm sorry? |
| 10:53 | 5 | Q.   Was it his job as a sales guy -- domestic sales guy to |
| 10:53 | 6 | supervise the morale of your employees globally? |
| 10:53 | 7 | THE COURT:  You're referring to Mr. Williams? |
| 10:53 | 8 | MS. KELLER:  Mr. Williams. |
| 10:53 | 9 | THE WITNESS:  His job was to bring sales. |
| 10:53 | 10 | BY MS. KELLER: |
| 10:53 | 11 | Q.   And let's -- |
| 10:53 | 12 | A.   That wasn't his job to do the morale.  We have a Human |
| 10:53 | 13 | Resources Department. |
| 10:53 | 14 | Q.   Or to analyze the structure of the company, or to |
| 10:53 | 15 | analyze whether you were asking for deadlines that he |
| 10:53 | 16 | thought were unreasonable. |
| 10:53 | 17 | A.   (No response.) |
| 10:53 | 18 | Q.   Now, do you know if Martin Hitch ever even saw this |
| 10:53 | 19 | agenda? |
| 10:53 | 20 | A.   I have no idea if he did or not. |
| 10:53 | 21 | Q.   And at the top of the agenda, Item Number 1 says |
| 10:54 | 22 | "Perception/performance to date of PW/MH-IL." |
| 10:54 | 23 | So the first agenda item was going to address the |
| 10:54 | 24 | performance to date of Pat Williams and Martin Hitch? |
| 10:54 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

105

| 10:54 | 1 | Q.   And you were gonna be the person providing that |
| 10:54 | 2 | evaluation, right? |
| 10:54 | 3 | A.   Yes. |
| 10:54 | 4 | Q.   Now, if we look at Exhibit 24034, is this an e-mail |
| 10:54 | 5 | chain between you and Pat Williams in April 2001? |
| 10:54 | 6 | A.   I don't have anything here. |
| 10:54 | 7 | *(Document provided to the witness.)* |
| 10:54 | 8 | THE WITNESS:  Yes, it is. |
| 10:54 | 9 | MS. KELLER:  Move 24034 into evidence, Your Honor. |
| 10:55 | 10 | THE COURT:  Received. |
| 10:55 | 11 | *(Exhibit No. 24034 received in evidence.)* |
| | 12 | BY MS. KELLER: |
| 10:55 | 13 | Q.   And let's look at the last paragraph of the most recent |
| 10:55 | 14 | e-mail from you to Mr. Williams. |
| 10:55 | 15 | And it says, "The important thing is that facts speak |
| 10:55 | 16 | for themselves.  The facts are that this company has grown |
| 10:55 | 17 | 30 to 40 percent a year and will somehow do the same this |
| 10:55 | 18 | year in an industry that has not grown more than 2 to |
| 10:55 | 19 | 3 percent a year for the past ten years.  This is what I am |
| 10:55 | 20 | proud of.  We make good, innovative products that sell. |
| 10:55 | 21 | Let's focus on building the business.  That is all I care |
| 10:55 | 22 | about." |
| 10:55 | 23 | A.   Yes. |
| 10:55 | 24 | Q.   And this was in response to yet another e-mail string |
| 10:55 | 25 | from Mr. Williams that was in the same tone as the agenda |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:56 | 1 | and the other e-mail we looked at? |
| 10:56 | 2 | A.   Yes, a whole series. |
| 10:56 | 3 | Q.   And you still didn't -- you still didn't fire him? |
| 10:56 | 4 | A.   I did not. |
| 10:56 | 5 | Q.   You hung in there with him until May 29th, 2001 -- or |
| 10:56 | 6 | actually even later, right? |
| 10:56 | 7 | A.   I don't remember. |
| 10:56 | 8 | Q.   Take a look at 24035. |
| 10:56 | 9 | A.   Yes. |
| 10:56 | 10 | MS. KELLER:  Oh, I'm sorry.  I accidently skipped |
| 10:56 | 11 | a document. |
| 10:56 | 12 | Let's look at 21463. |
| 10:56 | 13 | *(Document provided to the witness.)* |
| 10:56 | 14 | BY MS. KELLER: |
| 10:56 | 15 | Q.   And do you recognize that as an e-mail from |
| 10:56 | 16 | Mr. Williams to you? |
| 10:56 | 17 | A.   Yes. |
| 10:57 | 18 | Q.   And this is dated May 18, 2001, right? |
| 10:57 | 19 | A.   Yes. |
| 10:57 | 20 | MS. KELLER:  Move this into evidence, Your Honor, |
| 10:57 | 21 | 21463. |
| 10:57 | 22 | THE COURT:  Received. |
| 10:57 | 23 | *(Exhibit No. 21463 received in evidence.)* |
| 10:57 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

107

| | | |
|---|---|---|
| 11:59 | 1 | BY MS. KELLER: |
| 10:57 | 2 | Q.   Now, Mr. Williams is now barely five months into his |
| 10:57 | 3 | job and still hasn't been fired, right? |
| 10:57 | 4 | A.   Yes. |
| 10:57 | 5 | Q.   And it starts, "Please review the attached Word |
| 10:57 | 6 | document.  This is in follow-up to our discussion May 15th." |
| 10:57 | 7 | And the second paragraph says, "One month ago we met |
| 10:57 | 8 | and you said 'I need to know the top ten accounts.'  This is |
| 10:57 | 9 | reasonable and I agree.  However, the reason that we have |
| 10:57 | 10 | salespeople is to manage these accounts.  They should know |
| 10:57 | 11 | the account information inside and out, not me.  I will |
| 10:57 | 12 | expect that they know this information and can advise you or |
| 10:57 | 13 | me anytime we ask and want the information.  However, as we |
| 10:57 | 14 | discussed, I am not going to know all of the day-to-day |
| 10:57 | 15 | details at the secondary accounts. |
| 10:57 | 16 | "Should we go after these accounts and try to grow this |
| 10:58 | 17 | business?  Yes.  Again, this is the salesperson's job, not |
| 10:58 | 18 | the SVP of sales." |
| 10:58 | 19 | And if we go to page 3, another e-mail from |
| 10:58 | 20 | Mr. Williams to you. |
| 10:58 | 21 | *(Document displayed.)* |
| 10:58 | 22 | BY MS. KELLER: |
| 10:58 | 23 | Q.   Which, actually, is an attached Word document to the |
| 10:58 | 24 | e-mail we just saw. |
| 10:58 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

108

| 10:58 | 1 | Q.   This says, "This is in follow-up to our meeting |
|---|---|---|
| 10:58 | 2 | yesterday regarding the current state of the business at MGA |
| 10:58 | 3 | Entertainment. |
| 10:58 | 4 | "First, let me say I found the meeting to be offensive, |
| 10:58 | 5 | and I take great offense to the fact that you say that the |
| 10:58 | 6 | sales department is not doing their job.  If you want to |
| 10:58 | 7 | make a change at SVP of sales, make a change.  I will take |
| 10:58 | 8 | the severance and be gone tomorrow.  No, this is not a |
| 10:58 | 9 | resignation.  Let me say this is your year, as we discussed. |
| 10:58 | 10 | This year we discussed, before I accepted this job, is your |
| 10:59 | 11 | year and not Pat Williams' year," et cetera. |
| 10:59 | 12 | And then in the third full paragraph, on page 4, he |
| 10:59 | 13 | goes on and complains, "I would now -- I would like to now |
| 10:59 | 14 | address the people situation," and he complains about Lisa |
| 10:59 | 15 | and Janine. |
| 10:59 | 16 | A.   Yes. |
| 10:59 | 17 | Q.   And Lisa and Janine, who is he referring to? |
| 10:59 | 18 | A.   Lisa Saunders is our VP of sales.  She's been with the |
| 10:59 | 19 | company for over twelve years.  She's still with the |
| 10:59 | 20 | company. |
| 10:59 | 21 | Q.   She's still there? |
| 10:59 | 22 | A.   Yes.  She handles the Kmart account. |
| 10:59 | 23 | Q.   So she didn't follow Pat Williams out the door? |
| 10:59 | 24 | A.   No, she did not. |
| 10:59 | 25 | Q.   And what about Janine.  Who's Janine? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

109

| | | |
|---|---|---|
| 10:59 | 1 | A.    Janine Firth was our VP of sales for Walmart, and she |
| 10:59 | 2 | was at MGA until 2008. |
| 11:00 | 3 | Q.    And do you have a good relationship with her? |
| 11:00 | 4 | A.    I'm sorry? |
| 11:00 | 5 | Q.    Do you have a good relationship with her? |
| 11:00 | 6 | A.    I haven't talked to her lately, but, yes, I do. |
| 11:00 | 7 | Q.    And in this, he goes on and says that "Lisa and Janine |
| 11:00 | 8 | would not report directly to you and have said so to me.  I |
| 11:00 | 9 | am sure you do not believe this.  However, this is fact." |
| 11:00 | 10 | Lisa reports to you to this day? |
| 11:00 | 11 | A.    No.  She reports to her head of sales, but she did for |
| 11:00 | 12 | a while after Pat left. |
| 11:00 | 13 | Q.    And he says, um, "Believe what you want.  You do |
| 11:00 | 14 | anyway." |
| 11:00 | 15 | And he goes on to say that, "Martin and my loyalties |
| 11:00 | 16 | are to each other, not to you.  You have not delivered what |
| 11:00 | 17 | you told us you would do when you interviewed with this |
| 11:00 | 18 | company, et cetera." |
| 11:00 | 19 | And then the bottom paragraph, he says, "I would like |
| 11:00 | 20 | to now discuss your performance." |
| 11:01 | 21 | Now, did Mr. Williams supervise you somehow? |
| 11:01 | 22 | A.    He thought he did. |
| 11:01 | 23 | Q.    So he goes on to say, "You have selective hearing and |
| 11:01 | 24 | selective memory." |
| 11:01 | 25 | And then he finishes up with, "Your confrontation style |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

110

| | | |
|---|---|---|
| 11:01 | 1 | of managing people, managing by fear" -- again, he had only |
| 11:01 | 2 | been there about five months at this point? |
| 11:01 | 3 | A.   Yes. |
| 11:01 | 4 | Q.   And you didn't can him on the spot? |
| 11:01 | 5 | A.   I did not. |
| 11:01 | 6 | Q.   So -- Exhibit 24035, then. |
| 11:01 | 7 | (Document provided to the witness.) |
| | 8 | BY MS. KELLER: |
| 11:01 | 9 | Q.   After all of this -- and, by the way, did his showing |
| 11:01 | 10 | up at the office improve during that period? |
| 11:01 | 11 | A.   No. |
| 11:01 | 12 | Q.   He still was kind of missing, not just Fridays but |
| 11:01 | 13 | other days? |
| 11:01 | 14 | A.   Yes. |
| 11:01 | 15 | Q.   And on May 29, 2001, you sent him a 45-day Probationary |
| 11:01 | 16 | Period and Warning -- Final Warning Re: Termination? |
| 11:02 | 17 | A.   Yes. |
| 11:02 | 18 | Q.   And you explain to him the problems that you perceive |
| 11:02 | 19 | with his performance, right? |
| 11:02 | 20 | A.   Yes. |
| 11:02 | 21 | MS. KELLER:  Your Honor, I'd move 24035 into |
| 11:02 | 22 | evidence. |
| 11:02 | 23 | THE COURT:  Received. |
| 11:02 | 24 | (Exhibit No. 24035 received in evidence.) |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

|  | 1 | BY MS. KELLER: |
| 11:02 | 2 | Q.   And, among other issues, if you look at 24035, page 2. |
| 11:02 | 3 |     *(Document displayed.)* |
| 11:02 | 4 | BY MS. KELLER: |
| 11:02 | 5 | Q.   It says, "Contrary to your e-mail, we never discussed |
| 11:02 | 6 | and I never agreed that you take Friday May 18th off.  Since |
| 11:02 | 7 | you started at MGA, except for one Friday, you have found |
| 11:02 | 8 | excuse after excuse to not be at work at MGA on Fridays.  I |
| 11:02 | 9 | understand and appreciate that you love your son and want to |
| 11:02 | 10 | be with him as much as possible, but we have business to |
| 11:03 | 11 | run.  This will no longer be tolerated." |
| 11:03 | 12 |     And then you go on to say that -- that, if he's gonna |
| 11:03 | 13 | remain your employee, his first loyalty has to be to MGA and |
| 11:03 | 14 | to you and to the business of the company.  Is that -- |
| 11:03 | 15 | A.   Where is that? |
| 11:03 | 16 | Q.   That's the bottom -- that's 24035-2, where it says, |
| 11:03 | 17 | "You must convince me by your conduct," the middle |
| 11:03 | 18 | paragraph. |
| 11:03 | 19 | A.   Yes. |
| 11:03 | 20 | Q.   And the next paragraph says, "You must be more |
| 11:03 | 21 | accessible and available to the sales staff.  Because you |
| 11:03 | 22 | are not available to them on a consistent basis in person, |
| 11:03 | 23 | they constantly come to me with questions and issues that I |
| 11:03 | 24 | hired you to address.  As a condition of your employment, we |
| 11:03 | 25 | agreed that you would work in the headquarters office in |

| | | |
|---|---|---|
| 11:03 | 1 | person Monday through Friday, unless traveling on approved |
| 11:03 | 2 | business trips.  Yours not a telecommuting position.  You |
| 11:04 | 3 | must fix this problem." |
| 11:04 | 4 | And so you give him one more chance, even after all the |
| 11:04 | 5 | intemperate e-mails you had received, right? |
| 11:04 | 6 | A.   I did. |
| 11:04 | 7 | Q.   And so, finally, after all of this, did he improve? |
| 11:04 | 8 | A.   No. |
| 11:04 | 9 | Q.   Did you still keep getting nasty e-mails from him? |
| 11:04 | 10 | A.   Yes. |
| 11:04 | 11 | Q.   And what did you ultimately do? |
| 11:04 | 12 | A.   Fired him. |
| 11:04 | 13 | Q.   Now, I'd like to turn to a different area. |
| 11:04 | 14 | Um, you were asked about Exhibit 11245. |
| 11:04 | 15 | A.   Yes. |
| 11:04 | 16 | Q.   And 11245, you remember Mr. Price showing this document |
| 11:05 | 17 | to you Friday morning just before the lunch break? |
| 11:05 | 18 | A.   Yes. |
| 11:05 | 19 | Q.   And there are portions that you were shown where |
| 11:05 | 20 | Mercedeh Ward talks about having hip joints, a bent knee, |
| 11:05 | 21 | and arms like the Skipper doll. |
| 11:05 | 22 | Do you remember that? |
| 11:05 | 23 | A.   Yes, I do. |
| 11:05 | 24 | Q.   And now you've previously said that your people in |
| 11:05 | 25 | Hong Kong that you were working with were -- had made dolls |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:05 | 1 | for many years, right? |
| 11:05 | 2 | A.   They have. |
| 11:05 | 3 | Q.   And they were able to do pretty much what you asked of |
| 11:05 | 4 | them? |
| 11:05 | 5 | A.   Yes. |
| 11:05 | 6 | Q.   Let's look at the very last e-mail at the top of the |
| 11:05 | 7 | chain.  Well, first, you recognize the portion about -- that |
| 11:05 | 8 | Mercedeh Ward talked about having hip joints, a bent knee |
| 11:06 | 9 | and arms like Mattel's Skipper doll? |
| 11:06 | 10 | A.   I'm sorry.  I didn't pay attention to your question. |
| 11:06 | 11 | Q.   Do you remember the portions of this e-mail where |
| 11:06 | 12 | Mercedeh Ward talked about having hip joints -- |
| 11:06 | 13 | A.   Yes. |
| 11:06 | 14 | Q.   -- a bent knee and arms like the Skipper doll. |
| 11:06 | 15 | A.   Yes.  I apologize.  Yes. |
| 11:06 | 16 | Q.   Um, but you were not shown the very top -- the very |
| 11:06 | 17 | last e-mail at the top of the chain from Samuel Wong; is |
| 11:06 | 18 | that true? |
| 11:06 | 19 | A.   I was not. |
| 11:06 | 20 | MR. PRICE:  Objection, Your Honor.  Argumentative |
| 11:06 | 21 | as phrased. |
| 11:06 | 22 | THE COURT:  Sustained. |
| 11:06 | 23 | BY MS. KELLER: |
| 11:06 | 24 | Q.   Were you shown the very top e-mail in this chain from |
| 11:06 | 25 | Samuel Wong? |

| | | |
|---|---|---|
| 11:06 | 1 | MR. PRICE:  Again, objection, Your Honor.  He was |
| 11:06 | 2 | shown the entire -- |
| 11:06 | 3 | THE COURT:  (To the jury:)  Here's the difficulty |
| 11:06 | 4 | between both counsel right now:  The entire document's been |
| 11:06 | 5 | received into evidence, but different portions were |
| 11:06 | 6 | literally put up on the screen and referred to by different |
| 11:06 | 7 | counsel at different times.  So whether a witness had a |
| 11:06 | 8 | chance to look at, you know, three pages of an e-mail or |
| 11:06 | 9 | four sections or one section, you'll never be certain of. |
| 11:07 | 10 | So it really doesn't matter.  The point is he's being shown |
| 11:07 | 11 | this section at the present time. |
| 11:07 | 12 | So, Counsel, I hope that that resolves the issue |
| 11:07 | 13 | between the two of you. |
| 11:07 | 14 | MR. PRICE:  I'd hope. |
| 11:07 | 15 | THE COURT:  It doesn't? |
| 11:07 | 16 | MR. PRICE:  I had hope. |
| | 17 | BY MS. KELLER: |
| 11:07 | 18 | Q.   When you look at the top e-mail where Mr. Wong is |
| 11:07 | 19 | replying to Mercedeh Ward about looking at the Skipper doll, |
| 11:07 | 20 | and it says, "So far there is no misunderstanding here.  As |
| 11:07 | 21 | stated in Cecilia's previous e-mail, HK can make the |
| 11:07 | 22 | armatures according to the shape of the sculpture of the |
| 11:07 | 23 | Bratz.  This is correct and this is usually preferred by the |
| 11:07 | 24 | factory.  By doing so, factory can make sure the armature |
| 11:07 | 25 | are fit within the sculpture and perform the function that |

DEBBIE GALE, U.S. COURT REPORTER

| 11:07 | 1 | we required before they proceed to tooling stage.  Of |
| 11:07 | 2 | course, HK will review the prototype and send it to L.A. for |
| 11:07 | 3 | final approval before we let the factory to proceed |
| 11:07 | 4 | toolings.  The armature design is very common and widely |
| 11:07 | 5 | used for the doll that need articulated functions, so it |
| 11:08 | 6 | should not have any problem to handle..." |
| 11:08 | 7 | A.   "Here."  It says, "Handle here." |
| 11:08 | 8 | Q.   And what did that portion mean to you? |
| 11:08 | 9 | A.   It that this is very common:  Making armature on the |
| 11:08 | 10 | dolls is very, very common in the toy industry.  We don't |
| 11:08 | 11 | need a Skipper to do it.  We know how to do this in |
| 11:08 | 12 | Hong Kong and China. |
| 11:08 | 13 | Q.   And if you look at the paragraph, two down from there, |
| 11:08 | 14 | Mr. Wong says, "Both nylon and Celcon are all okay for use |
| 11:08 | 15 | on armature.  However, we usually use Celcon for armature |
| 11:08 | 16 | because it's more easy to control in molding process." |
| 11:08 | 17 |      What does that mean to you? |
| 11:08 | 18 | A.   It's a different -- they use two different material |
| 11:08 | 19 | for -- to make armature.  It's two different plastic type. |
| 11:08 | 20 | One is nylon.  The other one is Celcon. |
| 11:08 | 21 | Q.   So what does this e-mail tell you about whether |
| 11:08 | 22 | Mr. Wong thinks they even need to look at the Skipper doll? |
| 11:09 | 23 | A.   He doesn't need to do that.  He knew.  And we have made |
| 11:09 | 24 | dolls with armature in them for years. |
| 11:09 | 25 | Q.   Now, let's look at another e-mail that you were shown: |

| 11:09 | 1 | Exhibit 4905. |
|---|---|---|
| 11:09 | 2 | MS. KELLER:  And this is already in evidence. |
| 11:09 | 3 | *(Document displayed.)* |
| | 4 | BY MS. KELLER: |
| 11:09 | 5 | Q.   If you look at the top -- you remember being shown this |
| 11:09 | 6 | last week? |
| 11:09 | 7 | A.   Yes. |
| 11:09 | 8 | Q.   "Please note that I sent you the sample with broken |
| 11:09 | 9 | knee mechanism for your reference.  Isaac also insisted that |
| 11:09 | 10 | I send to you a sample of Barbie for you to reference as |
| 11:09 | 11 | standard per our expectations for our knee mechanism." |
| 11:09 | 12 | And this is April 25th, 2001, from Paula Treantafelles |
| 11:10 | 13 | to Cecilia Kwok and Samuel Wong in Hong Kong; is that right? |
| 11:10 | 14 | A.   Yes. |
| 11:10 | 15 | Q.   But underneath it, it says, "I know that you guys are |
| 11:10 | 16 | working hard to resolve this knee mechanism in time for PS, |
| 11:10 | 17 | but please do not put the dolls at risk.  If the mechanism |
| 11:10 | 18 | is even slightly questionable, do not implement immediately |
| 11:10 | 19 | into production.  Please consider rolling this mechanism in |
| 11:10 | 20 | as a running change when it is perfect." |
| 11:10 | 21 | What does that tell you about whether your people in |
| 11:10 | 22 | Hong Kong were coming up with their own ideas for this, |
| 11:10 | 23 | rather than simply copying Barbie? |
| 11:10 | 24 | A.   They said they could fix it.  And it also says, as of |
| 11:10 | 25 | April 25, 2001, we still didn't have a doll.  We still |

| 11:10 | 1 | didn't have a Bratz doll. |
| 11:10 | 2 | Q.   Right.  But in addition to that, what does it tell you |
| 11:10 | 3 | about whether they're merely gonna copy the Barbie |
| 11:10 | 4 | mechanism? |
| 11:10 | 5 | A.   They are not.  They are finding their own solutions. |
| 11:11 | 6 | Q.   Now, you were also asked about recruiting employees |
| 11:11 | 7 | from Mattel? |
| 11:11 | 8 | A.   Yes. |
| 11:11 | 9 | Q.   Is there anything wrong with that? |
| 11:11 | 10 | A.   It's not. |
| 11:11 | 11 | Q.   Even if you recruit lots of employees, anything wrong |
| 11:11 | 12 | with that? |
| 11:11 | 13 | A.   No. |
| 11:11 | 14 | Q.   Here in Orange County we have Knotts and Disneyland. |
| 11:11 | 15 | Would you find it strange, as a CEO of a company, if Knotts |
| 11:11 | 16 | Berry Farm recruited from Disneyland? |
| 11:11 | 17 | A.   No. |
| 11:11 | 18 | Q.   Would that also be true in Mexico? |
| 11:11 | 19 | A.   Everywhere, as far as I know, people can move freely |
| 11:11 | 20 | from one job to another, even law firms. |
| 11:11 | 21 | Q.   Now, you were shown a doll, a giant doll from 1986, |
| 11:11 | 22 | Exhibit 24031. |
| 11:11 | 23 | *(Exhibit provided to the witness.)* |
| 11:11 | 24 | BY MS. KELLER: |
| 11:11 | 25 | Q.   That was a big doll from Mattel? |

| 11:11 | 1 | A.   Yes. |
| 11:12 | 2 | Q.   And on the back of the box describing one of the |
| 11:12 | 3 | characters -- and if we can see it -- there's a phrase |
| 11:12 | 4 | "passion for fashion" in very small letters. |
| 11:12 | 5 | A.   It says, "I have a passion for fashion." |
| 11:12 | 6 | Q.   Okay.  Can we find that?  So each of the doll |
| 11:12 | 7 | characters is saying something in this; is that right? |
| 11:12 | 8 | A.   Yes.  But this one, for sure, doesn't have a passion |
| 11:12 | 9 | for fashion. |
| 11:12 | 10 | Q.   Well, I guess that's all a question of taste.  But |
| 11:12 | 11 | Mimi -- the Mimi doll, in 1986, is quoted in these very |
| 11:12 | 12 | small letters as saying, "I have a passion for fashion." |
| 11:12 | 13 | Now, does this doll have the same theme as the Bratz |
| 11:13 | 14 | dolls? |
| 11:13 | 15 | A.   What do you mean by that? |
| 11:13 | 16 | Q.   Well, I mean, is this doll the same size? |
| 11:13 | 17 | A.   It's not. |
| 11:13 | 18 | Q.   Is this doll a fashion doll? |
| 11:13 | 19 | A.   It's not. |
| 11:13 | 20 | Q.   Is this what -- how would you describe this -- this |
| 11:13 | 21 | product? |
| 11:13 | 22 | A.   An ugly doll. |
| 11:13 | 23 | Q.   Okay.  Apart from being ugly, what category would you |
| 11:13 | 24 | put it in? |
| 11:13 | 25 | A.   Large doll. |

| | | |
|---|---|---|
| 11:13 | 1 | Q.   Now, I want to ask you a little bit about |
| 11:13 | 2 | Exhibit 11220, and that's already into evidence. |
| 11:13 | 3 | *(Document provided to the witness.)* |
| 11:13 | 4 | *(Document displayed.)* |
| 11:13 | 5 | BY MS. KELLER: |
| 11:13 | 6 | Q.   You were shown a portion of this e-mail from Paula |
| 11:13 | 7 | Treantafelles. |
| 11:13 | 8 | A.   I'm sorry? |
| 11:13 | 9 | Q.   I said you were shown a portion of this e-mail.  And |
| 11:14 | 10 | I'd like to direct you to the bottom of page 2, 11220-2. |
| 11:14 | 11 | A.   Okay.  Go ahead. |
| 11:14 | 12 | Q.   And this is where Paula Garcia goes into some creative |
| 11:14 | 13 | ideas for your products. |
| 11:14 | 14 | A.   Yes. |
| 11:14 | 15 | Q.   It says -- for example, she says, "I do not have the |
| 11:14 | 16 | sample available to me right now.  It is the Barbie |
| 11:14 | 17 | convertible.  It is red, and it retail in the U.S. for nine |
| 11:14 | 18 | ninety-nine.  I would like to length the car."  And you're |
| 11:14 | 19 | referring here to the -- MGA's car? |
| 11:15 | 20 | A.   Where are you reading? |
| 11:15 | 21 | Q.   The bottom where it says, "Paula." |
| 11:15 | 22 | A.   Yes. |
| 11:15 | 23 | Q.   Bottom of page 2. |
| 11:15 | 24 | A.   Yes. |
| 11:15 | 25 | Q.   She says, "I would like to length the car so it is |

| | | |
|---|---|---|
| 11:15 | 1 | competitive in length to our competition, 18-inches long. |
| 11:15 | 2 | Please advise what opportunity we have to incorporate enough |
| 11:15 | 3 | room for a functional trunk.  Right now we would like you to |
| 11:15 | 4 | design/cost this concept, assuming a two-channel RC car, |
| 11:15 | 5 | with an incredible amount of aesthetic detail within the |
| 11:15 | 6 | car, i.e., functional glove compartment and stick shift, |
| 11:15 | 7 | et cetera.  If we find that that cost exceeds our target, |
| 11:15 | 8 | then I am willing to consider a one-channel RC function." |
| 11:15 | 9 | What she's talking about:  The one-channel RC function? |
| 11:15 | 10 | A.   You have radio-control cars.  They work on two |
| 11:15 | 11 | different frequencies.  So you -- usually, most |
| 11:15 | 12 | radio-control cars work on one frequency.  If you have two, |
| 11:15 | 13 | you can race them.  Two girls can play.  So one is 27 |
| 11:15 | 14 | millihertz the other one is 47 millihertz.  It's a radio |
| 11:16 | 15 | channel so you can basically race the two cars.  That's what |
| 11:16 | 16 | she's talking about. |
| 11:16 | 17 | Q.   So you wanted your car to be -- to have all the little |
| 11:16 | 18 | details that a real car would have, right? |
| 11:16 | 19 | A.   Yes. |
| 11:16 | 20 | Q.   And also to be able to be radio-controlled so it could |
| 11:16 | 21 | actually drive around with the dolls in it? |
| 11:16 | 22 | A.   Yes.  There are radio-control cars.  But what we wanted |
| 11:16 | 23 | here, again, was two different chances so two girls can play |
| 11:16 | 24 | with each other by racing the cars, if they were playing. |
| 11:16 | 25 | Q.   And then underneath that, it says, "please revise the |

| 11:16 | 1 | engineering drawings assuming all of the above.  In |
| 11:16 | 2 | parallel, I am going to seek a vendor that will put together |
| 11:16 | 3 | proper detailed control drawings representing different |
| 11:16 | 4 | angles of all sides of the car.  Jonathan mentioned in our |
| 11:16 | 5 | meeting today that EL has incredible experience with |
| 11:16 | 6 | replicating cars through their development with NASCAR.  I |
| 11:16 | 7 | am hoping that I can send to EL these control drawings for |
| 11:16 | 8 | replication in 3-D model form.  Is this reasonable to you?" |
| 11:17 | 9 | And it goes on and says, "The wheels look too small |
| 11:17 | 10 | when compared proportionally to the rest of the car." |
| 11:17 | 11 | What does this tell about whether you were just trying |
| 11:17 | 12 | to copy Mattel designs? |
| 11:17 | 13 | A.   We were not trying to copy Mattel's designs. |
| 11:17 | 14 | Q.   Why did you put so much effort into things like all |
| 11:17 | 15 | these little details, like whether the glove box opened, |
| 11:17 | 16 | whether the stick shift actually moved? |
| 11:17 | 17 | A.   Those are the details that we know that the consumers |
| 11:17 | 18 | were looking in -- for Bratz.  And those -- those details |
| 11:17 | 19 | are tedious but are important.  And I'm a product junky, so |
| 11:17 | 20 | I wanted to have all those details in there. |
| 11:17 | 21 | Q.   I want to ask you about another e-mail you were shown, |
| 11:17 | 22 | 22059, that was already admitted. |
| 11:17 | 23 | *(Document provided to the witness.)* |
| 11:17 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 11:17 | 1 | BY MS. KELLER: |
| 11:17 | 2 | Q.   And the top e-mail says -- from you to Dee Dee |
| 11:17 | 3 | Valencia, June 3d, 2003 -- says, "Polly is stupid." |
| 11:18 | 4 | You said Polly was a Mattel product? |
| 11:18 | 5 | A.   Yes. |
| 11:18 | 6 | Q.   "These are great ideas.  I have the same Bratz concern. |
| 11:18 | 7 | Let's sketch them out and do a focus group and find out." |
| 11:18 | 8 | Now, let's go to the e-mail below this from Dee Dee |
| 11:18 | 9 | Valencia to you.  And I want you to look at -- right under |
| 11:18 | 10 | where it says, "Okay.  Don't take this too literally but." |
| 11:18 | 11 | A.   I'm sorry? |
| 11:18 | 12 | Q.   Look at Dee Dee Valencia's June 2, 2003 e-mail to you, |
| 11:18 | 13 | right under yours to her at the top. |
| 11:18 | 14 | A.   Yes. |
| 11:18 | 15 | Q.   And she says, "If we really -- if we want to really |
| 11:18 | 16 | hurt Barbie business, which is truly targeted to 3- to |
| 11:18 | 17 | 6-year-olds, we could do toy electronics, knocking off all |
| 11:18 | 18 | top selling Barbie items, a SKU line with Lil Bratz.  I'm |
| 11:19 | 19 | still thinking this will hurt Bratz brand.  I am uncertain |
| 11:19 | 20 | and on the fence." |
| 11:19 | 21 | What did that mean? |
| 11:19 | 22 | A.   Bratz consumer are all the girls 7 to 11.  And her |
| 11:19 | 23 | concern was -- and it was validated -- if you make pretend |
| 11:19 | 24 | toys instead of real, actual working cordless phone or |
| 11:19 | 25 | radio, that we will lose that customer.  It will make the |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:19 | 1 | brand younger, and we didn't want to hurt the brand. |
| 11:19 | 2 | Q.   And you were asked just this morning about an e-mail |
| 11:19 | 3 | that described your product, Scooter Samantha, and Mattel's |
| 11:19 | 4 | product, Scooter Shannon. |
| 11:19 | 5 | Do you remember that? |
| 11:19 | 6 | A.   Yes. |
| 11:19 | 7 | Q.   And part of that e-mail said that, essentially, you |
| 11:19 | 8 | could coattail on Mattel's advertising to drive consumers to |
| 11:20 | 9 | the shelves. |
| 11:20 | 10 | Do you remember that? |
| 11:20 | 11 | A.   Yes. |
| 11:20 | 12 | Q.   And, um, so you had competing Scooter dolls on the |
| 11:20 | 13 | shelves? |
| 11:20 | 14 | A.   Yes. |
| 11:20 | 15 | Q.   Why was it that you thought, if consumers went to the |
| 11:20 | 16 | stores because of Mattel's advertising, that they would buy |
| 11:20 | 17 | your product instead of Mattel's? |
| 11:20 | 18 | A.   We had a much better product with a lot more detail. |
| 11:20 | 19 | The doll came off the scooter.  That's why. |
| 11:20 | 20 | Q.   So you thought that, even if they went to the store |
| 11:20 | 21 | because of a Mattel ad, if they saw your products side by |
| 11:20 | 22 | side, they were gonna buy yours? |
| 11:20 | 23 | A.   And indeed that's what happened. |
| 11:20 | 24 | Q.   And that's what that e-mail said? |
| 11:20 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

124

| 11:20 | 1 | Q.   So if Bratz products were just copies of Mattel's, |
| 11:20 | 2 | quote, "real thing," unquote, how do you account for the |
| 11:20 | 3 | fact that the Bratz dolls were such a great success? |
| 11:20 | 4 | A.   We -- |
| 11:20 | 5 |       MR. PRICE:  Object.  The question's ambiguous, the |
| 11:20 | 6 | first phrase. |
| 11:20 | 7 |       THE COURT:  Do you understand the question? |
| 11:21 | 8 |       THE WITNESS:  I do. |
| 11:21 | 9 |       THE COURT:  You can answer the question. |
| 11:21 | 10 |       THE WITNESS:  The Bratz brand became a success |
| 11:21 | 11 | because of the hard work and sweat of MGA spending millions |
| 11:21 | 12 | of dollars in advertising, marketing -- every detail that |
| 11:21 | 13 | goes into the product, every little detail that went into |
| 11:21 | 14 | the packaging, the handles for the packaging, the TV |
| 11:21 | 15 | commercials, that is what built the Bratz brand. |
| 11:21 | 16 | BY MS. KELLER: |
| 11:21 | 17 | Q.   Now, you were also asked about some of these contracts |
| 11:21 | 18 | that had proprietary information agreements, like 13532. |
| 11:21 | 19 |       *(Document provided to the witness.)* |
| 11:21 | 20 |       *(Document displayed.)* |
| 11:21 | 21 |       THE WITNESS:  Yes. |
| 11:21 | 22 | BY MS. KELLER: |
| 11:21 | 23 | Q.   And you said you thought not a single one had been |
| 11:21 | 24 | signed? |
| 11:21 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:21 | 1 | Q. And you were shown several that actually ended up being |
| 11:21 | 2 | signed? |
| 11:22 | 3 | A. I was shown two. |
| 11:22 | 4 | Q. Is the reason that you thought they hadn't been signed |
| 11:22 | 5 | because they were never enforced and they were withdrawn? |
| 11:22 | 6 | A. That's correct. This contract was never enforced. It |
| 11:22 | 7 | was withdrawn by me personally. |
| 11:22 | 8 | Q. So then whether somebody signed one was irrelevant |
| 11:22 | 9 | because you withdraw it? |
| 11:22 | 10 | A. Absolutely. This contract is not valid. It's not |
| 11:22 | 11 | legal. |
| 11:22 | 12 | Q. Now, wanna ask you about a trade -- an alleged trade |
| 11:22 | 13 | secret for a minute. |
| 11:22 | 14 | A trade secret is something that is secret, right? |
| 11:22 | 15 | A. Yes. |
| 11:22 | 16 | Q. And so once a product is out in the marketplace, it's |
| 11:22 | 17 | not a secret anymore, true? |
| 11:22 | 18 | A. That's correct. |
| 11:22 | 19 | Q. And, for example, the use of the name "Jade" with a |
| 11:22 | 20 | fashion doll, once somebody puts a fashion doll out on |
| 11:23 | 21 | market with the name "Jade," then that name "Jade" for a |
| 11:23 | 22 | fashion doll is not a trade secret, true? |
| 11:23 | 23 | A. True. |
| 11:23 | 24 | MR. PRICE: Objection. Calls for a legal |
| 11:23 | 25 | conclusion. |

| 11:23 | 1 | MS. KELLER:  Your understanding. |

11:23   1          MS. KELLER:  Your understanding.

11:23   2          THE COURT:  Overruled.

11:23   3          You can answer that question.

11:23   4          THE WITNESS:  It is true.  Once -- once a Jade

11:23   5   doll, a toy, is out, it no longer can be a trade secret.

11:23   6   It's common sense.

11:23   7          THE COURT:  Now, this is his opinion.  I'm going

11:23   8   to let him cast his opinion in terms of branding, et cetera,

11:23   9   if that's chosen to be asked as questions, and also trade

11:23  10   secret from his opinion.  But I'll instruct you on the law

11:23  11   concerning that.

11:23  12          Thank you.

11:23  13   BY MS. KELLER:

11:23  14   Q.   And if we look at Exhibit 34770, can you tell us what

11:23  15   that is.

11:23  16          (Exhibit provided to the witness.)

11:23  17          (Document displayed.)

11:23  18          THE WITNESS:  That's the Jade doll by Jason Wu,

11:23  19   who's a very famous fashion designer.

11:23  20   BY MS. KELLER:

11:24  21   Q.   And can you see what the date is on that box?

11:24  22   A.   2000.  It was in the market in 2000.

11:24  23   Q.   And if you'd look at Exhibit 34768.

11:24  24          (Exhibit provided to the witness.)

11:24  25          THE WITNESS:  Is this into evidence?

| | | |
|---|---|---|
| 11:24 | 1 | MS. KELLER:  Your Honor, I would move that into |
| 11:24 | 2 | evidence -- thank you, Mr. Larian -- 34770. |
| 11:24 | 3 | THE COURT:  Received 34770 is received. |
| 11:24 | 4 | *(Exhibit No. 34770 received in evidence.)* |
| 11:59 | 5 | BY MS. KELLER: |
| 11:24 | 6 | Q.   And now I would ask you to look at 34768.  Is this |
| 11:24 | 7 | Integrity Toys' Jade doll? |
| 11:24 | 8 | A.   Yes, it is. |
| 11:24 | 9 | Q.   Is that a fashion doll? |
| 11:24 | 10 | A.   Yes, it is. |
| 11:24 | 11 | Q.   And what is the date on that box? |
| 11:24 | 12 | A.   1996.  Are you moving it into evidence? |
| 11:24 | 13 | MS. KELLER:  Yes. |
| 11:24 | 14 | Your Honor, I would move that into evidence, as |
| 11:24 | 15 | well. |
| 11:24 | 16 | THE COURT:  Received. |
| 11:24 | 17 | *(Exhibit No. 34768 received in evidence.)* |
| 11:59 | 18 | BY MS. KELLER: |
| 11:25 | 19 | Q.   And, Mr. Larian, you were asked by Mr. Price about the |
| 11:25 | 20 | fact that Mattel sued you, but not in 2000, 2001, 2002 or |
| 11:25 | 21 | 2003; is that right? |
| 11:25 | 22 | A.   I'm sorry? |
| 11:25 | 23 | Q.   You were asked by Mr. Price about the fact that Mattel |
| 11:25 | 24 | sued, but not in 2000, 2001, 2002 or 2003, right? |
| 11:25 | 25 | A.   Yes.  They sued me in 2006. |

| | | |
|---|---|---|
| 11:25 | 1 | Q.    After Bratz had become a huge success in the |
| 11:25 | 2 | marketplace, true? |
| 11:25 | 3 | A.    Six years after, yes. |
| 11:25 | 4 | MS. KELLER:  Thank you. |
| 11:25 | 5 | Nothing further. |
| 11:25 | 6 | MR. PRICE:  Your Honor, could we have a quick |
| 11:25 | 7 | discussion before releasing the witness? |
| 11:25 | 8 | THE COURT:  He's not going to be released.  He's |
| 11:25 | 9 | going to be sitting right -- |
| 11:25 | 10 | MR. PRICE:  Well, I mean, before -- well, could we |
| 11:25 | 11 | have a quick break, I guess? |
| 11:25 | 12 | THE COURT:  Well, I assume you want to ask some |
| 11:25 | 13 | additional questions.  Why would I possibly gather that? |
| 11:25 | 14 | What do you want to ask?  His opinion about -- |
| 11:26 | 15 | MR. PRICE:  No, no.  It's just pure impeachment. |
| 11:26 | 16 | It will take two minutes -- |
| 11:26 | 17 | THE COURT:  Well -- |
| 11:26 | 18 | MR. PRICE:  -- on an area. |
| 11:26 | 19 | THE COURT:  (To the jury:) Could you just excuse |
| 11:26 | 20 | us for just one moment.  You just stay there.  There's no |
| 11:26 | 21 | reason to inconvenience you. |
| 11:26 | 22 | Counsel, could I see you. |
| 11:26 | 23 | (Sidebar proceedings reported as follows:) |
| 11:27 | 24 | MR. PRICE:  Your Honor, there was a lot of |
| 11:27 | 25 | examination that Mr. Hitch had nothing to do with the |

| | | |
|---|---|---|
| 11:27 | 1 | meeting agenda for February 28, 2001. |
| 11:27 | 2 | THE COURT:  Is this the alleged meeting that took |
| 11:27 | 3 | place, and the various sections, including the international |
| 11:27 | 4 | section -- |
| 11:27 | 5 | MR. PRICE:  Yes. |
| 11:27 | 6 | THE COURT:  -- as well as the other sections? |
| 11:27 | 7 | MR. PRICE:  And what we have is an e-mail from |
| 11:27 | 8 | Mr. Hitch, which has an attachment, "Meeting Agenda |
| 11:27 | 9 | 2/28/2001." |
| 11:27 | 10 | MS. KELLER:  But -- |
| 11:27 | 11 | MR. PRICE:  These were in MGA's files. |
| 11:27 | 12 | And then we have an e-mail exchange between |
| 11:27 | 13 | Mr. Hitch and a woman, Clementina Jarrin, where he talks on |
| 11:27 | 14 | March 7th -- |
| 11:27 | 15 | THE COURT:  Who's "he"? |
| 11:27 | 16 | MR. PRICE:  Martin Hitch, the other person on that |
| 11:27 | 17 | agenda. |
| 11:28 | 18 | THE COURT:  Because there's Larian on the |
| 11:28 | 19 | agenda -- |
| 11:28 | 20 | MR. PRICE:  And Williams. |
| 11:28 | 21 | THE COURT:  -- Hitch and Williams.  And when you |
| 11:28 | 22 | say "he," of course, I need to find out who "he" is.  I know |
| 11:28 | 23 | you're very excited about this piece of evidence. |
| 11:28 | 24 | MR. PRICE:  I'll calm down. |
| 11:28 | 25 | This is Mr. Hitch whose name is also on the |

130

| | | |
|---|---|---|
| 11:28 | 1 | agenda. |
| 11:28 | 2 | THE COURT:  Okay. |
| 11:28 | 3 | MR. PRICE:  And he talks about Ms. Jarrin, about |
| 11:28 | 4 | the meeting they had with Isaac, and talking about a number |
| 11:28 | 5 | of things. |
| 11:28 | 6 | THE COURT:  And the objection's going to be |
| 11:28 | 7 | hearsay, of course. |
| 11:28 | 8 | Just a moment.  Is Mr. Larian on that e-mail |
| 11:28 | 9 | chain? |
| 11:28 | 10 | MR. PRICE:  He is not. |
| 11:28 | 11 | THE COURT:  So the objection would be -- |
| 11:28 | 12 | MS. KELLER:  Hearsay. |
| 11:28 | 13 | THE COURT:  -- hearsay. |
| 11:28 | 14 | MR. PRICE:  But it is an MGA -- |
| 11:28 | 15 | THE COURT:  I know it's an MGA document. |
| 11:28 | 16 | MR. PRICE:  It's an e-mail on their system and, |
| 11:28 | 17 | uh, uh, that combined with that, that he had the e-mail |
| 11:28 | 18 | attaching the agenda, what appears to be 2/28/01 agenda, |
| 11:28 | 19 | which is the date on the agenda, seems to indicate he had an |
| 11:28 | 20 | involvement with this, and -- and I think that we're |
| 11:29 | 21 | entitled to show -- well, this one. |
| 11:29 | 22 | THE COURT:  Where is Mr. Hitch? |
| 11:29 | 23 | Where is Mr. Hitch? |
| 11:29 | 24 | MR. PRICE:  That, I don't know.  Mr. Larian said |
| 11:29 | 25 | she's a friend? |

| | | |
|---|---|---|
| 11:29 | 1 | MR. QUINN:  I don't know. |
| 11:29 | 2 | THE COURT:  Is he still employed? |
| 11:29 | 3 | MS. KELLER:  No. |
| 11:29 | 4 | THE COURT:  Where is Mr. Williams? |
| 11:29 | 5 | MR. QUINN:  We know he's not employed. |
| 11:29 | 6 | MR. McCONVILLE:  He's not employed. |
| 11:29 | 7 | THE COURT:  But has anyone sought Mr. Williams? |
| 11:29 | 8 | MS. KELLER:  No.  We didn't even know he was |
| 11:29 | 9 | coming up. |
| 11:29 | 10 | THE COURT:  Has anybody sought Mr. Hitch, with all |
| 11:29 | 11 | the time we've spent together? |
| 11:29 | 12 | MS. KELLER:  If I could point out a couple things, |
| 11:29 | 13 | Your Honor.  We didn't say he had nothing to do with the |
| 11:29 | 14 | agenda.  We said the second part, International, would have |
| 11:29 | 15 | been his.  And what we see in this barebones -- we don't see |
| 11:29 | 16 | the documents that go with it, but in this barebones |
| 11:29 | 17 | reference, we see "meeting, agenda, positions and |
| 11:29 | 18 | responsibilities, MGA International Doc, International Plan |
| 11:29 | 19 | Doc."  So that seems to indicate Mr. Hitch sent exactly the |
| 11:29 | 20 | portion that we've talked about.  And there's nothing in |
| 11:30 | 21 | this hearsay e-mail that talks about any of the incendiary |
| 11:30 | 22 | issues. |
| 11:30 | 23 | THE COURT:  I'm going to rule it unduly |
| 11:30 | 24 | consumptive of time at the present time.  I'm also going to |
| 11:30 | 25 | rule it's hearsay at the present time.  It's a collateral |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 132 of 161   Page ID #:303764
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

132

| 11:30 | 1 | issue at the present time. |
|---|---|---|
| 11:30 | 2 | Go find Mr. Hitch or go find Mr. Williams.  Okay? |
| 11:30 | 3 | And then we'll talk about that. |
| 11:30 | 4 | MR. PRICE:  Okay. |
| 11:30 | 5 | THE COURT:  And we'll avoid all sorts of hearsay |
| 11:30 | 6 | problems and collateral issues. |
| 11:30 | 7 | *(End of sidebar proceedings.)* |
| 11:30 | 8 | *(In open court.)* |
| 11:30 | 9 | *(In the presence of the jury.)* |
| 11:30 | 10 | THE COURT:  All right.  By agreement of counsel, |
| 11:30 | 11 | Mr. Larian, you may step down.  And it's represented that |
| 11:30 | 12 | Mr. Larian will be testifying again; is that correct, |
| 11:31 | 13 | Counsel? |
| 11:31 | 14 | MS. KELLER:  Yes, Your Honor. |
| 11:31 | 15 | THE COURT:  Counsel? |
| 11:31 | 16 | MR. PRICE:  Yes. |
| 11:31 | 17 | THE COURT:  All right.  Thank you very much.  You |
| 11:31 | 18 | may step down at the time, then.  Whatever other questions |
| 11:31 | 19 | may be asked, may be ask at that time. |
| 11:31 | 20 | *(Witness steps down subject to recall.)* |
| 11:31 | 21 | THE COURT:  Counsel, would you call your next |
| 11:31 | 22 | witness, please. |
| 11:31 | 23 | MR. PRICE:  Your Honor, we call Mr. Rosenbaum. |
| 11:31 | 24 | THE COURT:  Thank you. |
| 11:31 | 25 | Thank you, sir.  If you would step forward, |

| | | |
|---|---|---|
| 11:31 | 1 | please.  Now, sir would you stop at that location and raise |
| 11:31 | 2 | your right hand, please. |
| 11:31 | 3 | **DAVID ROSENBAUM, MATTEL'S WITNESS, SWORN** |
| 11:31 | 4 | THE WITNESS:  I do. |
| 11:31 | 5 | THE COURT:  Thank you. |
| 11:32 | 6 | Sir, would you state your full name for the jury |
| 11:32 | 7 | please. |
| 11:32 | 8 | THE WITNESS:  David Rosenbaum. |
| 11:32 | 9 | THE COURT:  Would you spell your last name, |
| 11:32 | 10 | please. |
| 11:32 | 11 | THE WITNESS:  R-O-S-E-N-B-A-U-M. |
| 11:32 | 12 | THE COURT:  Direct examination by Mr. Price on |
| 11:32 | 13 | behalf of Mattel. |
| 11:32 | 14 | MR. PRICE:  Thank you, Your Honor. |
| 11:32 | 15 | **DIRECT EXAMINATION** |
| 11:32 | 16 | BY MR. PRICE: |
| 11:32 | 17 | Q.   Mr. Rosenbaum, you are an attorney? |
| 11:32 | 18 | A.   Yes, I am. |
| 11:32 | 19 | Q.   And at some point you have worked for MGA or its |
| 11:32 | 20 | predecessors, correct? |
| 11:32 | 21 | A.   That's correct. |
| 11:32 | 22 | Q.   During what timeframe did you work for -- either as |
| 11:32 | 23 | outside counsel to MGA or its predecessors? |
| 11:32 | 24 | A.   Approximately 1996 to 2001/2002. |
| 11:32 | 25 | Q.   Now, in -- have you talked to anybody at MGA in |

| | | |
|---|---|---|
| 11:32 | 1 | connection with your testimony here today? |
| 11:32 | 2 | A.    I've spoken to their outside counsel. |
| 11:32 | 3 | Q.    How long have you spent speaking with them? |
| 11:32 | 4 | A.    I met with MGA's outside counsel on two occasions. |
| 11:33 | 5 | Q.    Who was it that you met with? |
| 11:33 | 6 | A.    I met with Mr. McConville and Ms. Hurst, and one of |
| 11:33 | 7 | their associates. |
| 11:33 | 8 | Q.    For how long -- how long were these meetings that you |
| 11:33 | 9 | had with them? |
| 11:33 | 10 | A.    Uh, each meeting was maybe an hour to 90 minutes long. |
| 11:33 | 11 | Q.    So, altogether, you're talking between two and three |
| 11:33 | 12 | hours? |
| 11:33 | 13 | A.    Give or take. |
| 11:33 | 14 | Q.    And when was the last time that you met with them? |
| 11:33 | 15 | A.    I met with Mr. McConville on Sunday -- a week ago, this |
| 11:33 | 16 | past Sunday. |
| 11:33 | 17 | Q.    And those meetings, did they show you documents to kind |
| 11:33 | 18 | of refresh your recollection about things that happened some |
| 11:33 | 19 | years ago? |
| 11:33 | 20 | A.    They showed me documents that are, I believe, exhibits |
| 11:33 | 21 | in this matter. |
| 11:33 | 22 | Q.    Did they say anything to you about the testimony of |
| 11:33 | 23 | Mr. Larian during the trial? |
| 11:33 | 24 | A.    Not to my recollection. |
| 11:34 | 25 | Q.    Did they tell you that, uh -- that, at some point, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:34 | 1 | Mr. Larian had is task you to make 100 percent sure that |
| 11:34 | 2 | Carter Bryant had created his intellectual property in 1998? |
| 11:34 | 3 | A.   No. |
| 11:34 | 4 | Q.   Well, let me ask you about -- about your role as MGA's |
| 11:34 | 5 | counsel.  In your role as MGA as outside counsel, have you |
| 11:34 | 6 | drafted agreements? |
| 11:34 | 7 | A.   Yes. |
| 11:34 | 8 | Q.   Was that your primary function as outside counsel to |
| 11:34 | 9 | MGA? -- drafting agreements. |
| 11:34 | 10 | A.   That's correct. |
| 11:34 | 11 | Q.   In 2000 -- sometime in September of 2000, you were |
| 11:34 | 12 | asked to draft a consulting agreement, right? |
| 11:34 | 13 | A.   Yes. |
| 11:34 | 14 | Q.   And then after you were given that task, you went about |
| 11:34 | 15 | doing what you needed to do to draft a consulting agreement, |
| 11:34 | 16 | right. |
| 11:34 | 17 | A.   That's correct. |
| 11:34 | 18 | Q.   Uh, so when you were asked to draft a consulting |
| 11:34 | 19 | agreement, uh, were you asked to make 100 percent sure that |
| 11:35 | 20 | Carter Bryant did certain intellectual property when he |
| 11:35 | 21 | wasn't working at Mattel. |
| 11:35 | 22 | A.   Um, I was not asked -- I was given some information |
| 11:35 | 23 | concerning the terms of the agreement between MGA and |
| 11:35 | 24 | Mr. Bryant, uh, and I was informed of the -- some of the |
| 11:35 | 25 | background on the matter, and proceeded accordingly. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:35 | 1 | Q.   And so I'm just trying to figure out the scope of your |
| 11:35 | 2 | agreement.  To do the agreement, you needed to have some |
| 11:35 | 3 | background about the terms, right? |
| 11:35 | 4 | A.   That's correct. |
| 11:35 | 5 | Q.   Because you were gonna put those terms in a legal |
| 11:35 | 6 | document that binds both parties, right. |
| 11:35 | 7 | A.   Yeah, That's correct. |
| 11:35 | 8 | Q.   And, uh -- and so you were given background by -- was |
| 11:35 | 9 | it Ms. O'Connor? |
| 11:35 | 10 | A.   I believe that's correct, yes. |
| 11:35 | 11 | Q.   Okay.  Uh, and in connection with -- with drafting that |
| 11:35 | 12 | agreement, uh, you used, uh, a form which you had used |
| 11:35 | 13 | before? |
| 11:35 | 14 | A.   Yes. |
| 11:35 | 15 | Q.   And it's not unusual in these types of situations where |
| 11:36 | 16 | one party is -- is conveying rights to another, that there |
| 11:36 | 17 | be a provision that's called like a warranties |
| 11:36 | 18 | indemnification clause? |
| 11:36 | 19 | A.   Correct. |
| 11:36 | 20 | Q.   And that sets out the relationship between those two |
| 11:36 | 21 | parties, right? |
| 11:36 | 22 | A.   Yes, that's correct. |
| 11:36 | 23 | Q.   In other words, in this case, it would be Mr. Bryant |
| 11:36 | 24 | making a representation to MGA, and then some sort of |
| 11:36 | 25 | indemnification provision concerning those representations, |

| | | |
|---|---|---|
| 11:36 | 1 | correct? |
| 11:36 | 2 | A.   Yes. |
| 11:36 | 3 | Q.   And those representations in the contract you were you |
| 11:36 | 4 | were drafting would have no impact on a third party who said |
| 11:36 | 5 | they owned that property, such as, in this case, Mattel? |
| 11:36 | 6 | A.   I'm not sure I follow your question. |
| 11:36 | 7 | Q.   Well, the agreement between Mr. Bryant and Mr. MGA -- |
| 11:36 | 8 | between Mr. Bryant and MGA involves their rights between |
| 11:36 | 9 | each other, correct? |
| 11:37 | 10 | A.   Yes. |
| 11:37 | 11 | Q.   Okay.  Uh, but if someone came forward and said, "no, |
| 11:37 | 12 | no.  We own those drawings," a third party -- Mattel or |
| 11:37 | 13 | Hasbro or whatever -- that agreement between MGA and |
| 11:37 | 14 | Mr. Bryant would not limit their rights? |
| 11:37 | 15 | A.   Um, it wouldn't prevent them from asserting a claim. |
| 11:37 | 16 | Q.   It wouldn't prevent them from proving a claim, right. |
| 11:37 | 17 | A.   Correct. |
| 11:37 | 18 | Q.   I mean, nothing you could do, in drafting this |
| 11:37 | 19 | agreement, could limit Mattel's rights, whatever they were, |
| 11:37 | 20 | in the Bratz drawings, correct? |
| 11:37 | 21 | A.   Correct. |
| 11:37 | 22 | Q.   So, uh, you -- you asked Ms. O'Connor, in connection |
| 11:37 | 23 | with this assignment, to, uh, ask Mr. Bryant to send you his |
| 11:37 | 24 | Mattel contracts, right? |
| 11:37 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:37 | 1 | Q.   And, uh, at that time, because you hadn't gotten any |
| 11:37 | 2 | information about Mr. Bryant's representations, you weren't |
| 11:38 | 3 | sure whether the Mattel contract applied to the situation, |
| 11:38 | 4 | correct? |
| 11:38 | 5 | A.   That's correct. |
| 11:38 | 6 | Q.   So, uh, let me ask you about what MGA told you. |
| 11:38 | 7 | Uh, did they tell you that for a couple years prior to |
| 11:38 | 8 | September of 2000 that they were trying to find a fashion |
| 11:38 | 9 | doll to use? -- I mean, to produce. |
| 11:38 | 10 | A.   No. |
| 11:38 | 11 | Q.   Did they tell you that they'd been trying |
| 11:38 | 12 | unsuccessfully to find a fashion doll, and that Mr. Bryant's |
| 11:38 | 13 | concepts were something they were excited about? |
| 11:38 | 14 | A.   The first time I heard of Mr. Bryant or the agreement |
| 11:38 | 15 | with Mr. Bryant was in September of 2000. |
| 11:38 | 16 | Q.   And at that time, in September of 2000, did they even |
| 11:38 | 17 | send to you the intellectual property they were talking |
| 11:38 | 18 | about, which is, you know, designs or prototypes or -- or to |
| 11:38 | 19 | dummy dolls, or anything like that? |
| 11:39 | 20 | A.   I did not review any of that material. |
| 11:39 | 21 | Q.   So, for example, if we could show you Exhibit 302, |
| 11:39 | 22 | which is in evidence. |
| 11:39 | 23 | *(Document provided to the witness.)* |
| 11:39 | 24 | BY MR. PRICE: |
| 11:39 | 25 | Q.   Now, Mr. Rosenbaum, I'm going to show you 302. |

| | | |
|---|---|---|
| 11:39 | 1 | (Document displayed.) |
| 11:39 | 2 | BY MR. PRICE: |
| 11:39 | 3 | Q.   There's been testimony that these -- this is what |
| 11:39 | 4 | Mr. Bryant presented in September 2000. |
| 11:39 | 5 | And if we can go to the first page of this. |
| 11:39 | 6 | A.   Okay. |
| 11:39 | 7 | Q.   And you see it has "Bratz," and it says, "All materials |
| 11:39 | 8 | copyright 2000, Carter Bryant." |
| 11:39 | 9 | Do you see that? |
| 11:39 | 10 | A.   Yes. |
| 11:39 | 11 | Q.   Okay.  So was this a document that you saw in |
| 11:39 | 12 | connection with drafting the agreement between MGA and |
| 11:39 | 13 | Mr. Bryant? |
| 11:39 | 14 | A.   No. |
| 11:40 | 15 | Q.   So at the time that you were -- you were drafting this |
| 11:40 | 16 | agreement, you had not been told that Mr. Bryant had |
| 11:40 | 17 | presented drawings, which he had said were copyrighted in |
| 11:40 | 18 | 2000? |
| 11:40 | 19 | A.   That's correct. |
| 11:40 | 20 | Q.   Did -- at this time -- uh, let me show you Exhibit 30. |
| 11:40 | 21 | And this is in evidence.  It's September 18, 2000 e-mail |
| 11:40 | 22 | from Mr. Bryant to Universal, where he represents he's with |
| 11:40 | 23 | MGA. |
| 11:40 | 24 | (Document provided to the witness.) |
| 11:40 | 25 | (Document displayed.) |

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | BY MR. PRICE:                                              |
| 11:40 | 2  | Q.   At any time prior to finishing the final draft of this |
| 11:40 | 3  | contract, were you told that, in the September timeframe,  |
| 11:40 | 4  | Mr. Bryant was contacting vendors and saying he was with   |
| 11:40 | 5  | MGA?                                                        |
| 11:40 | 6  | A.   No.                                                   |
| 11:40 | 7  | Q.   Uh, were you told that he was having conversations with |
| 11:40 | 8  | Ms. Garcia or Mr. Larian about his activities in September  |
| 11:41 | 9  | of 2000?                                                   |
| 11:41 | 10 | A.   No.                                                   |
| 11:41 | 11 | Q.   Your understanding was that, September of 2000,       |
| 11:41 | 12 | Mr. Bryant was, in fact, working at Mattel?               |
| 11:41 | 13 | A.   That's correct.                                       |
| 11:41 | 14 | Q.   And, uh, you have some general knowledge of the sorts |
| 11:41 | 15 | of provisions that are in, uh, confidentiality and         |
| 11:41 | 16 | proprietary agreements, right?                             |
| 11:41 | 17 | A.   Yes.                                                  |
| 11:41 | 18 | Q.   And you're aware that most of those would say that you |
| 11:41 | 19 | can't, you know, be assisting a competitor at the same time |
| 11:41 | 20 | you're working for your company?                           |
| 11:41 | 21 | A.   That's a common term, yes.                            |
| 11:41 | 22 | Q.   And so you weren't told that -- when you were drafting |
| 11:41 | 23 | this agreement, that Mr. Bryant was in any way in -- in     |
| 11:41 | 24 | August or September of 2000, assisting MGA?  You weren't    |
| 11:41 | 25 | told that, were you?                                       |

| | | |
|---|---|---|
| 11:41 | 1 | A.   I was not. |
| 11:41 | 2 | Q.   If you'd look at 593.  And this is in evidence. |
| 11:41 | 3 | *(Document provided to the witness.)* |
| 11:41 | 4 | *(Document displayed.)* |
| 11:41 | 5 | BY MR. PRICE: |
| 11:42 | 6 | Q.   Sir, it seems to be an invoice dated August 31, 2000, |
| 11:42 | 7 | to Paula Treantafelles –– Paula Garcia, we know her –– from |
| 11:42 | 8 | Carter Bryant.  You see it's three hours working on "angel |
| 11:42 | 9 | face hair designs." |
| 11:42 | 10 | Do you see that? |
| 11:42 | 11 | A.   Yes, I do. |
| 11:42 | 12 | Q.   So when you were asked and given your direction to –– |
| 11:42 | 13 | to draft this contract, were you told that Mr. Bryant had, |
| 11:42 | 14 | in August, performed work for MGA for which, in fact, he was |
| 11:42 | 15 | paid? |
| 11:42 | 16 | A.   No. |
| 11:42 | 17 | Q.   Were you told that in September of 2000 that he was |
| 11:42 | 18 | meeting with a sculptor, Margaret Leahy, to try to assist in |
| 11:42 | 19 | creating a sculpt for the designs that he had presented to |
| 11:42 | 20 | MGA in early September of 2000? |
| 11:42 | 21 | A.   I was not. |
| 11:43 | 22 | Q.   If you'd look at Exhibit 1112, which is in evidence. |
| 11:43 | 23 | *(Document provided to the witness.)* |
| 11:43 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:43 | 1 | BY MR. PRICE: |
| 11:43 | 2 | Q.   And you see there's an e-mail dated October 2, 2000? |
| 11:43 | 3 | A.   I see that, yes. |
| 11:43 | 4 | Q.   And by October 2, 2000, uh, Mr. Bryant had not yet |
| 11:43 | 5 | actually signed the contract with MGA, correct? |
| 11:43 | 6 | A.   I don't recollect the exact date. |
| 11:43 | 7 | Q.   Does "October 4" ring a bell for the signature date? |
| 11:43 | 8 | A.   I can't say today the exact -- that I recall the exact |
| 11:43 | 9 | date. |
| 11:43 | 10 | Q.   Okay. |
| 11:43 | 11 | A.   It was around that time. |
| 11:43 | 12 | Q.   I mean, when you were -- when you were meeting with |
| 11:43 | 13 | MGA's lawyers for that two to three hours, did they show you |
| 11:43 | 14 | the final contract that was signed? |
| 11:43 | 15 | A.   Yes, they did. |
| 11:43 | 16 | Q.   And I'll -- I'll show that to you in a second.  But you |
| 11:43 | 17 | see here, it says, "October 2, 2000," there's an e-mail from |
| 11:43 | 18 | Ms. Garcia to Maureen Mullen:  "Maureen, Carter is using her |
| 11:44 | 19 | for the small doll line I spoke to you about." |
| 11:44 | 20 |      Do you see that. |
| 11:44 | 21 | A.   Yes, I do. |
| 11:44 | 22 | Q.   Okay.  And, uh, did -- so did anyone tell you prior to |
| 11:44 | 23 | Mr. Bryant signing the agreement with MGA that he was using |
| 11:44 | 24 | a sculptor in connection with, uh, the Bratz doll line? |
| 11:44 | 25 | A.   No. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:44 | 1 | Q.   All right.  So I take it that you would agree that, as |
|---|---|---|
| 11:44 | 2 | an attorney, your advice can only be as good as the |
| 11:44 | 3 | information you're given? |
| 11:44 | 4 | A.   I would agree with that statement, yes. |
| 11:44 | 5 | Q.   And, uh, would it be -- have been a red flag for you, |
| 11:44 | 6 | if you had known that Carter Bryant was violating his Mattel |
| 11:44 | 7 | contract and assisting MGA, a competitor of Mattel, prior to |
| 11:44 | 8 | even signing an agreement with MGA? |
| 11:45 | 9 | MR. McCONVILLE:  Objection.  Misstates the |
| 11:45 | 10 | evidence.  Calls for hypothetical. |
| 11:45 | 11 | THE COURT:  It's overruled on those grounds, |
| 11:45 | 12 | Counsel. |
| 11:45 | 13 | The "red flag" is a problem.  But I think the jury |
| 11:45 | 14 | understands a warning of some type, that it was causing |
| 11:45 | 15 | concern, something of that nature. |
| 11:45 | 16 | THE WITNESS:  Would you repeat the question, |
| 11:45 | 17 | please? |
| 11:45 | 18 | MR. PRICE:  Sure. |
| 11:45 | 19 | BY MR. PRICE: |
| 11:45 | 20 | Q.   Would it have been a -- have led you to proceed with |
| 11:45 | 21 | more caution, been a red flag, if you had known, as you were |
| 11:45 | 22 | drafting this contract, that Mr. Bryant was breaching his |
| 11:45 | 23 | Mattel contract by assisting MGA in the months of September |
| 11:45 | 24 | and early October 2000? |
| 11:45 | 25 | MR. McCONVILLE:  Same objections. |

Case 2:04-cv-09049-DOC-RNB    Document 10061    Filed 02/23/11    Page 144 of 161    Page ID
#:303776
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

144

| | | |
|---|---|---|
| 11:45 | 1 | THE COURT:  Well, it assumes a fact and that, in |
| 11:45 | 2 | fact, that he was breaching. |
| 11:45 | 3 | I'll let counsel ask the hypothetical.  Lawyers |
| 11:45 | 4 | are experts in their particular field.  He can respond. |
| 11:45 | 5 | This is his opinion or non-opinion. |
| 11:45 | 6 | Counsel. |
| 11:45 | 7 | THE WITNESS:  Well, I don't know that what you've |
| 11:45 | 8 | recited constitutes a breach of his agreement with Mattel, |
| 11:46 | 9 | so I don't know that I could answer that beyond the concerns |
| 11:46 | 10 | that I raised, that once I was advised that he was |
| 11:46 | 11 | current -- at the time, a Mattel employee. |
| 11:00 | 12 | BY MR. PRICE: |
| 11:46 | 13 | Q.   Well, I think you told us, as part of -- it's your |
| 11:46 | 14 | experience that agreements with lawyers usually say you |
| 11:46 | 15 | can't assist a competitor at the same time you're working |
| 11:46 | 16 | with that employer, right? |
| 11:46 | 17 | A.   Um, that's your generalization of a provision, yes. |
| 11:46 | 18 | Q.   And -- and I think you said that kind of makes sense, |
| 11:46 | 19 | right? -- that sort of provision? |
| 11:46 | 20 | A.   I -- I said that -- I believe what I said was that |
| 11:46 | 21 | that's a customary provision in those kinds of agreements. |
| 11:46 | 22 | Q.   And so if -- if you have in mind the customary |
| 11:46 | 23 | provision and the customary agreement, then, uh, you would |
| 11:46 | 24 | agree that assisting a competitor while working for your own |
| 11:46 | 25 | company would, generally, customarily be a breach of your |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

145

| | | |
|---|---|---|
| 11:47 | 1 | agreement with your employer? |
| 11:47 | 2 | MR. McCONVILLE:  Same objections, Your Honor. |
| 11:47 | 3 | Beyond the scope of what this witness is here to testify |
| 11:47 | 4 | about, too. |
| 11:47 | 5 | THE COURT:  (Reading realtime:)  "If you have in |
| 11:47 | 6 | mind the customary provision and the customary agreement, |
| 11:47 | 7 | then, uh, you would agree that assisting a competitor while |
| 11:47 | 8 | working for your own company would, generally, customarily |
| 11:47 | 9 | be" -- |
| 11:47 | 10 | Sustained.  But not on those grounds, Counsel. |
| 11:47 | 11 | It's just not understandable. |
| 11:47 | 12 | MR. PRICE:  Okay. |
| 11:47 | 13 | THE COURT:  Counsel. |
| 11:47 | 14 | MR. PRICE:  I'll try to be understandable, then. |
| 11:47 | 15 | BY MR. PRICE: |
| 11:47 | 16 | Q.   In September 2000, you didn't know the activities |
| 11:47 | 17 | Mr. Bryant was undertaking in connection with the Bratz |
| 11:47 | 18 | project, right? |
| 11:47 | 19 | A.   That's correct. |
| 11:47 | 20 | Q.   Uh, and, uh, knowing what he was doing, uh, could have |
| 11:47 | 21 | had an impact on, uh, your view as to whether he should be |
| 11:47 | 22 | accepted at his word, right? |
| 11:47 | 23 | A.   Okay.  Yes. |
| 11:47 | 24 | Q.   You agree with that? |
| 11:47 | 25 | A.   Uh-huh. |

| | | |
|---|---|---|
| 11:47 | 1 | Q.   And in September 2000, you had no idea, no information, |
| 11:47 | 2 | that he was assisting MGA in the Bratz project while he was |
| 11:47 | 3 | still working at Mattel, correct? |
| 11:48 | 4 | A.   Correct. |
| 11:48 | 5 | Q.   Now, in connection with, uh, the agreement itself, uh, |
| 11:48 | 6 | you weren't allowed to talk directly -- communicate directly |
| 11:48 | 7 | with Mr. Bryant because he -- he obtained an attorney, |
| 11:48 | 8 | correct? |
| 11:48 | 9 | A.   That's correct. |
| 11:48 | 10 | Q.   So the way this communication would work, then, is that |
| 11:48 | 11 | Ms. O'Connor could contact Mr. Bryant directly, correct? |
| 11:48 | 12 | A.   Yes, she could. |
| 11:48 | 13 | Q.   And you could contact Mr. Bryant's attorney directly, |
| 11:48 | 14 | right? |
| 11:48 | 15 | A.   Yes. |
| 11:48 | 16 | Q.   But you couldn't contact Mr. Bryant himself because he |
| 11:48 | 17 | had an attorney? |
| 11:48 | 18 | A.   Not without his attorney's permission. |
| 11:48 | 19 | Q.   And do you remember during this timeframe ever getting |
| 11:48 | 20 | his attorney's permission? |
| 11:48 | 21 | A.   No. |
| 11:48 | 22 | Q.   So, uh -- so let's go through the process here. |
| 11:48 | 23 |      You -- uh, you came up with a draft, right? |
| 11:48 | 24 | A.   That's correct. |
| 11:48 | 25 | Q.   And if you'd look at Exhibit 9258. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:49 | 1 | *(Document provided to the witness.)* |
| 11:49 | 2 | *(Document displayed.)* |
| 11:49 | 3 | BY MR. PRICE: |
| 11:49 | 4 | Q.   And I want you to look at the -- it's the bottom e-mail |
| 11:49 | 5 | on that first page.  And then we'll kinda go up the page. |
| 11:49 | 6 | You see there's a -- there's a "To" and "From."  Way at the |
| 11:49 | 7 | bottom it says, "David Rosenbaum" -- and it says, "To: |
| 11:49 | 8 | Carter Bryant," copying Victoria O'Connor. |
| 11:49 | 9 | Do you see that? |
| 11:49 | 10 | A.   Yes, I do. |
| 11:49 | 11 | Q.   And it says, "Dear, Mr. Bryant.  As you know, we |
| 11:49 | 12 | represent MGA Entertainment.  Attached for your review is a |
| 11:49 | 13 | draft of the above-referenced agreement." |
| 11:49 | 14 | And the subject there is the consulting agreement? |
| 11:49 | 15 | A.   Yes. |
| 11:49 | 16 | Q.   Okay.  "Please review the draft and have your attorney |
| 11:49 | 17 | call me to discuss."  And then you say that, "Please note |
| 11:49 | 18 | that inasmuch as our client has not had an opportunity to |
| 11:49 | 19 | review this correspondence and/or attachments hereto, I must |
| 11:49 | 20 | reserve their rights to comment." |
| 11:50 | 21 | So -- you see that? |
| 11:50 | 22 | A.   Yes, I do. |
| 11:50 | 23 | Q.   So you sent out an initial draft on September 19th, |
| 11:50 | 24 | correct? |
| 11:50 | 25 | A.   That's correct. |

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

148

| | | |
|---|---|---|
| 11:50 | 1 | Q.   Uh, and then -- but that initial draft had |
| 11:50 | 2 | representations and warranties, right? |
| 11:50 | 3 | A.   Yes. |
| 11:50 | 4 | Q.   And had provisions where, uh, Mr. Bryant would |
| 11:50 | 5 | represent to MGA that he owned the material and that he |
| 11:50 | 6 | would indemnify them if there was ever a claim? |
| 11:50 | 7 | A.   That's correct. |
| 11:50 | 8 | Q.   At this point, again, you didn't -- you hadn't seen the |
| 11:50 | 9 | material, so you didn't know what it was, right? |
| 11:50 | 10 | A.   That's correct. |
| 11:50 | 11 | Q.   I mean, you didn't see, for example, the presentation |
| 11:50 | 12 | with the "copyright 2000" on it, right? |
| 11:50 | 13 | A.   That's correct. |
| 11:50 | 14 | Q.   Now, uh, if you go on up, then, in the e-mail chain, |
| 11:50 | 15 | you see Ms. O'Connor says, uh, "Thanks, David.  But you |
| 11:50 | 16 | didn't have to work until midnight." |
| 11:50 | 17 | You see that? |
| 11:50 | 18 | A.   Yes, I do. |
| 11:50 | 19 | Q.   It's always nice when clients appreciate your hard |
| 11:51 | 20 | work. |
| 11:51 | 21 | A.   It is. |
| 11:51 | 22 | Q.   And then we go up to your reply.  It's David Rosenbaum |
| 11:51 | 23 | to Victoria O'Connor.  "Thanks.  Would you make sure that |
| 11:51 | 24 | Carter has his lawyer call me to discuss the Mattel issue, |
| 11:51 | 25 | and we want to be able to address the warranties that he |

| 11:51 | 1 | will make regarding originality and ownership vis-a-vis |
| 11:51 | 2 | Mattel." |
| 11:51 | 3 | Do you see that? |
| 11:51 | 4 | A.   Yes, I do. |
| 11:51 | 5 | Q.   And again, you're communicating with Ms. O'Connor; |
| 11:51 | 6 | you're saying, "Have his lawyer call me," right? |
| 11:51 | 7 | A.   That's correct. |
| 11:51 | 8 | Q.   Because -- because, without his lawyer's permission, |
| 11:51 | 9 | you can't talk to him face-to-face, right? |
| 11:51 | 10 | A.   That's correct. |
| 11:51 | 11 | Q.   And what -- the subject here is, you're drafting these |
| 11:51 | 12 | warranties that Mr. Bryant's making to MGA, and you kind of |
| 11:51 | 13 | want to see what he's going to say about that? |
| 11:51 | 14 | A.   That's correct. |
| 11:51 | 15 | Q.   Um, so, uh, these warranties, though, that Mr. Bryant's |
| 11:51 | 16 | making to MGA, I mean, they don't convey title to MGA if |
| 11:52 | 17 | Mr. Bryant doesn't have it, right? |
| 11:52 | 18 | A.   Um, he would be in breach of his representation if he |
| 11:52 | 19 | didn't, in fact, have what he represented that he had. |
| 11:52 | 20 | Q.   Right.  But if he -- if he didn't have it, if the |
| 11:52 | 21 | facts -- if the truth were that they belonged to someone |
| 11:52 | 22 | else -- say Mattel, right? -- he couldn't convey title to |
| 11:52 | 23 | MGA, correct? |
| 11:52 | 24 | A.   He would be in breach of the representations, and MGA |
| 11:52 | 25 | would be entitled to indemnification for that breach. |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 150 of 161   Page ID #:303782
CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

150

| 11:52 | 1  | Q.   Because he had not conveyed anything to them 'cause he |
| 11:52 | 2  | didn't have the rights?  That's why he would be in breach? |
| 11:52 | 3  | A.   Because there would be a claim that someone else owned |
| 11:52 | 4  | the rights that he purported to convey to MGA. |
| 11:52 | 5  | Q.   And your understanding, when you were drafting these |
| 11:52 | 6  | agreements, is that for MGA to use that work product -- to |
| 11:52 | 7  | actually use it and -- and exploit it for commercial |
| 11:52 | 8  | advantage, it was your understanding that, to do that, MGA |
| 11:52 | 9  | actually had to have title to the work product; that is, it |
| 11:53 | 10 | couldn't belong to somebody else? |
| 11:53 | 11 |           MR. McCONVILLE:  Objection.  Vague. |
| 11:53 | 12 |           THE COURT:  Do you understand the question? |
| 11:53 | 13 |           THE WITNESS:  Not entirely. |
| 11:53 | 14 |           THE COURT:  Repeat it, please. |
| 11:53 | 15 |           MR. PRICE:  Sure. |
| 11:53 | 16 | BY MR. PRICE: |
| 11:53 | 17 | Q.   For MGA to take this work product -- you know, which |
| 11:53 | 18 | you had not seen -- to take that work product and exploit it |
| 11:53 | 19 | commercially -- you know, to do that, they needed to have |
| 11:53 | 20 | the right to that product, right? |
| 11:53 | 21 | A.   They needed to have a license or a grant of rights from |
| 11:53 | 22 | the other party, Mr. Bryant, yes. |
| 11:53 | 23 | Q.   Well, no.  They needed to have the title to that |
| 11:53 | 24 | product from whomever owned it, right? |
| 11:53 | 25 | A.   That would be Mr. Bryant, since he represented that he |

| | | |
|--|--|--|
| 11:53 | 1 | owned the property. |
| 11:53 | 2 | Q.   Okay.  But I'm not asking about his representation. |
| 11:53 | 3 | I'm talking about your -- your understanding, as a lawyer, |
| 11:53 | 4 | in this situation.  Okay? |
| 11:53 | 5 | If Mr. Bryant represented he owned it, and he didn't -- |
| 11:53 | 6 | right? -- then MGA would not be able to commercially exploit |
| 11:53 | 7 | that property without getting a transfer of title from the |
| 11:54 | 8 | true owner, right? |
| 11:54 | 9 | MR. McCONVILLE:  Objection.  Calls for an expert |
| 11:54 | 10 | opinion from a percipient witness. |
| 11:54 | 11 | THE COURT:  Overruled. |
| 11:54 | 12 | THE WITNESS:  If, in fact, he did not own that |
| 11:54 | 13 | which he represented he did own, then he would be |
| 11:54 | 14 | responsible for indemnifying MGA for, um, relying on his |
| 11:54 | 15 | representation. |
| 11:54 | 16 | BY MR. PRICE: |
| 11:54 | 17 | Q.   And -- and I know you said that you're talking about |
| 11:54 | 18 | the relationship between Mr. Bryant and MGA.  I'm asking you |
| 11:54 | 19 | a different question.  Okay? |
| 11:54 | 20 | If he didn't own the concept, the drawings, then MGA |
| 11:54 | 21 | would not have had title, the ownership of those drawings, |
| 11:54 | 22 | to exploit, right? |
| 11:54 | 23 | MR. McCONVILLE:  Objection.  Incomplete |
| 11:54 | 24 | hypothetical. |
| 11:54 | 25 | THE COURT:  Overruled. |

| | | |
|---|---|---|
| 11:54 | 1 | THE WITNESS:  If, in fact, he did not own that |
| 11:54 | 2 | which he claimed to own, then, yes, there would be -- MGA |
| 11:54 | 3 | would be without the necessary rights. |
| 11:54 | 4 | BY MR. PRICE: |
| 11:54 | 5 | Q.   So the warranties that you were drafting up that |
| 11:54 | 6 | Mr. Bryant was going to make to MGA, those warranties didn't |
| 11:55 | 7 | protect MGA from a claim of ownership by a third party such |
| 11:55 | 8 | as Mattel? |
| 11:55 | 9 | A.   I don't think that's a correct statement. |
| 11:55 | 10 | Q.   Well, they said Mr. Bryant -- the representation is |
| 11:55 | 11 | Mr. Bryant would have to indemnify MGA, right? |
| 11:55 | 12 | A.   Yes. |
| 11:55 | 13 | Q.   And I take it, you didn't do any -- look into how |
| 11:55 | 14 | wealthy Mr. Bryant was or what his financial situation was, |
| 11:55 | 15 | correct? |
| 11:55 | 16 | A.   Yes, that's correct. |
| 11:55 | 17 | Q.   Okay.  Uh, so you didn't know whether, as a practical |
| 11:55 | 18 | matter, Mr. Bryant could actually indemnify MGA if MGA used |
| 11:55 | 19 | this property and it turned out that Mr. Bryant didn't own |
| 11:55 | 20 | it, right? |
| 11:55 | 21 | MR. McCONVILLE:  Objection.  Incomplete |
| 11:55 | 22 | hypothetical. |
| 11:55 | 23 | THE COURT:  Do you understand the question? |
| 11:55 | 24 | THE WITNESS:  No, I don't. |
| 11:55 | 25 | THE COURT:  Repeat it. |

| | | |
|---|---|---|
| 11:55 | 1 |     MR. PRICE:  Sure. |
| 11:59 | 2 | BY MR. PRICE: |
| 11:55 | 3 | Q.   You didn't look to see whether or not Mr. Bryant had |
| 11:55 | 4 | the financial wherewithal to actually indemnify MGA for any |
| 11:56 | 5 | damages that might occur if MGA used this property, if it -- |
| 11:56 | 6 | if it didn't belong to Mr. Bryant? |
| 11:56 | 7 |     MR. McCONVILLE:  Same objection. |
| 11:56 | 8 |     THE COURT:  Do you understand yet? |
| 11:56 | 9 |     THE WITNESS:  Yes. |
| 11:56 | 10 |     I didn't see -- I didn't look at a financial |
| 11:56 | 11 | statement for Mr. Bryant.  Nevertheless, the contract |
| 11:56 | 12 | provided that, in the event of a claim, MGA could withhold |
| 11:56 | 13 | moneys that might otherwise be payable to Mr. Bryant and -- |
| 11:56 | 14 | to defray its expenses in the event of a third-party claim. |
| | 15 | BY MR. PRICE: |
| 11:56 | 16 | Q.   And these kinds of provisions, the indemnity |
| 11:56 | 17 | provisions -- or sometimes referred to as having the quality |
| 11:56 | 18 | of "one boatedness."  Have you heard that?  "One |
| 11:56 | 19 | boat-ed-ness," like one boat. |
| 11:56 | 20 | A.   I've never heard that phrase. |
| 11:56 | 21 | Q.   Okay.  Well, as a result of an indemnity -- an |
| 11:56 | 22 | indemnity provision, those parties, MGA and Mr. Bryant, |
| 11:57 | 23 | would have the same financial incentive if there was a |
| 11:57 | 24 | lawsuit brought by a third party saying that, "No, this |
| 11:57 | 25 | property actually belongs to us." |

| | | |
|---|---|---|
| 11:57 | 1 | MR. McCONVILLE:  Objection.  Vague. |
| 11:57 | 2 | THE COURT:  Do you understand the question? |
| 11:57 | 3 | THE WITNESS:  I don't. |
| 11:57 | 4 | THE COURT:  Sustained. |
| 11:57 | 5 | BY MR. PRICE: |
| 11:57 | 6 | Q.   So let me try it this way:  Your understanding is |
| 11:57 | 7 | that -- let's say if Mattel sued, saying, "This is our |
| 11:57 | 8 | property." |
| 11:57 | 9 | A.   Okay. |
| 11:57 | 10 | Q.   Here's the hypothetical.  Okay?  So your understanding |
| 11:57 | 11 | is that would subject Mr. Bryant to financial risk, if -- if |
| 11:57 | 12 | Mattel prevailed, because he would have to indemnify MGA, |
| 11:57 | 13 | correct? |
| 11:57 | 14 | A.   Yes, that's correct. |
| 11:57 | 15 | MR. McCONVILLE:  Objection.  That assumes a |
| 11:57 | 16 | conclusion. |
| 11:57 | 17 | THE COURT:  Do you understand the question again? |
| 11:57 | 18 | THE WITNESS:  In a hypothetical sense, I |
| 11:57 | 19 | understood the question. |
| 11:57 | 20 | THE COURT:  All right.  You can answer the |
| 11:57 | 21 | question. |
| 11:59 | 22 | BY MR. PRICE: |
| 11:57 | 23 | Q.   And -- and that would put MGA at some financial risk, |
| 11:57 | 24 | if it turned out that the property belonged to Mattel, |
| 11:57 | 25 | correct? |

DEBBIE GALE, U.S. COURT REPORTER

| 11:57 | 1 | A.   In your hypothetical, yes. |
| 11:57 | 2 | Q.   And so one of the effects of -- of the indemnity |
| 11:57 | 3 | provision is to put both Mr. Bryant and MGA to -- that they |
| 11:57 | 4 | have the same financial incentive if someone, like Mattel, |
| 11:58 | 5 | says -- sues and says, "Wait a minute.  That property |
| 11:58 | 6 | belongs to us." |
| 11:58 | 7 | MR. McCONVILLE:  Objection.  Vague. |
| 11:58 | 8 | THE COURT:  "And so one of the effects of -- of |
| 11:58 | 9 | the indemnity provision is to put both Mr. Bryant and MGA |
| 11:58 | 10 | to -- that they have the same financial incentive if someone |
| 11:58 | 11 | like Mattel" -- |
| 11:58 | 12 | Do you understand the question? |
| 11:58 | 13 | THE WITNESS:  I don't. |
| 11:58 | 14 | THE COURT:  Sustained. |
| 11:58 | 15 | BY MR. PRICE: |
| 11:58 | 16 | Q.   I'll break it down in a hypothetical.  Mattel sues MGA |
| 11:58 | 17 | saying they own the Bratz drawings. |
| 11:58 | 18 | That -- that puts Mr. Bryant at financial risk because |
| 11:58 | 19 | of the indemnity, right? |
| 11:58 | 20 | MR. McCONVILLE:  Objection.  Assumes facts not in |
| 11:58 | 21 | evidence in this case. |
| 11:58 | 22 | THE COURT:  Counsel, I don't understand the |
| 11:58 | 23 | question.  I'm sorry. |
| 11:58 | 24 | MR. PRICE:  Okay. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10061   Filed 02/23/11   Page 156 of 161   Page ID #:303788
CV 04-9049 DOC – 2/22/2011 – Day 21, Volume 1 of 3

156

| | | |
|---|---|---|
| 11:58 | 1 | BY MR. PRICE: |
| 11:59 | 2 | Q.   Mr. Bryant has to indemnify MGA, under the contract you |
| 11:59 | 3 | wrote, if it turns out that the property, his drawings, did |
| 11:59 | 4 | not belong to him and there's damage to MGA as a result, |
| 11:59 | 5 | right? |
| 11:59 | 6 | A.   If he breached his representation, MGA would be |
| 11:59 | 7 | entitled to indemnification, yes, that's correct. |
| 11:59 | 8 | Q.   And these warranties that you were drafting between |
| 11:59 | 9 | Mr. Bryant and MGA -- these warranties could not affect |
| 11:59 | 10 | Mattel's rights, if there were any, in any way, correct? |
| 11:59 | 11 | MR. McCONVILLE:  Objection.  Asked and answered, |
| 11:59 | 12 | and misstates the law. |
| 11:59 | 13 | THE COURT:  Do you have an opinion about that |
| 11:59 | 14 | question? |
| 11:59 | 15 | THE WITNESS:  I don't. |
| 11:59 | 16 | THE COURT:  I'm going to sustain the objection. |
| 11:59 | 17 | I don't think it misstates the law.  I don't -- |
| 11:59 | 18 | Counsel, you can reask in the same area one more |
| 11:59 | 19 | time. |
| 11:59 | 20 | BY MR. PRICE: |
| 11:59 | 21 | Q.   Let me ask it this way:  When you were drafting this |
| 12:00 | 22 | agreement between Mr. Bryant and MGA -- |
| 12:00 | 23 | With me so far? |
| 12:00 | 24 | A.   Yes. |
| 12:00 | 25 | Q.   Okay.  Uh, you weren't trying to put in any provisions |

| | | |
|---|---|---|
| 12:00 | 1 | or any clauses that would have any impact on whatever |
| 12:00 | 2 | Mattel's rights were, whatever they were? |
| 12:00 | 3 | MR. McCONVILLE:  That's vague. |
| 12:00 | 4 | THE COURT:  Overruled. |
| 12:00 | 5 | If you have an opinion, you can cast it. |
| 12:00 | 6 | THE WITNESS:  I -- I'm not really following your |
| 12:00 | 7 | question. |
| 12:00 | 8 | I was acting on a representation that Mr. Bryant |
| 12:00 | 9 | owned what he purported to own and, therefore, was not |
| 12:00 | 10 | concerned with Mattel in, I believe, the sense that you're |
| 12:00 | 11 | asking that question. |
| 12:00 | 12 | BY MR. PRICE: |
| 12:00 | 13 | Q.   So Mattel wasn't a party to the contract, right? |
| 12:00 | 14 | A.   Correct. |
| 12:00 | 15 | Q.   And your understanding, in drafting this, was that this |
| 12:00 | 16 | contract was not intended to affect Mattel's rights, |
| 12:00 | 17 | correct? |
| 12:00 | 18 | MR. McCONVILLE:  Objection.  Same issue, Your |
| 12:00 | 19 | Honor.  Calls for a legal conclusion that the witness just |
| 12:01 | 20 | said he's not comfortable giving. |
| 12:01 | 21 | THE COURT:  Well, I think the difficulty is simply |
| 12:01 | 22 | this:  Who's he representing? |
| 12:01 | 23 | MR. PRICE:  He's representing MGA. |
| 12:01 | 24 | THE COURT:  Well, thank you, Counsel. |
| 12:01 | 25 | And your question repeatedly is intended to show |

158

| | | |
|---|---|---|
| 12:01 | 1 | that he only represents MGA, and that he doesn't represent |
| 12:01 | 2 | Mattel. |
| 12:01 | 3 | MR. McCONVILLE:  We'll stipulate. |
| 12:01 | 4 | MR. PRICE:  No.  It's whether his intent, in |
| 12:01 | 5 | drafting this, was to affect Mattel's rights in any way. |
| 12:01 | 6 | MR. McCONVILLE:  Same objection. |
| 12:01 | 7 | MR. PRICE:  I mean, as a foundation -- |
| 11:59 | 8 | BY MR. PRICE: |
| 12:01 | 9 | Q.   You drafted this contract thinking it would affect |
| 12:01 | 10 | Mr. Bryant's rights, correct? |
| 12:01 | 11 | A.   Yes. |
| 12:01 | 12 | Q.   Yeah.  Because he was going to agree to certain |
| 12:01 | 13 | obligations and make certain representations, correct? |
| 12:01 | 14 | A.   Yes. |
| 12:01 | 15 | Q.   So even though you're representing MGA, you're drafting |
| 12:01 | 16 | a contract which your intent was to affect Mr. Bryant's |
| 12:02 | 17 | rights? |
| 12:02 | 18 | A.   Correct. |
| 12:02 | 19 | Q.   Okay.  So my question is -- is the following:  When |
| 12:02 | 20 | you're writing this, you had no intention to affect Mattel's |
| 12:02 | 21 | rights? |
| 12:02 | 22 | MR. McCONVILLE:  Objection.  Misstates the law. |
| 12:02 | 23 | THE COURT:  Well, whatever he's drafting, and Ann |
| 12:02 | 24 | Wong is drafting, is going to affect, it seems, a whole lot |
| 12:02 | 25 | of people.  And the difficulty is you're asking him about |

| | | |
|---|---|---|
| 12:02 | 1 | Mattel's rights. |
| 12:02 | 2 | MR. PRICE:  If any, right. |
| 12:02 | 3 | THE COURT:  Through this attorney. |
| 12:02 | 4 | MR. PRICE:  Whether he had the intent of doing |
| 12:02 | 5 | that, when he's drafting this. |
| 12:02 | 6 | MR. McCONVILLE:  It's irrelevant. |
| 12:02 | 7 | THE COURT:  No.  Overruled. |
| 12:02 | 8 | You can answer that question, if you have any |
| 12:02 | 9 | thought about that.  It's self-evident who you represent. |
| 12:02 | 10 | What counsel, I think, is asking -- or trying to ask is what |
| 12:02 | 11 | affect this is, obviously, on Mattel. |
| 12:03 | 12 | THE WITNESS:  I wasn't concerned with Mattel's |
| 12:03 | 13 | rights, because I was acting on the assumption that |
| 12:03 | 14 | Mr. Bryant owned the rights that he was conveying. |
| 12:03 | 15 | BY MR. PRICE: |
| 12:03 | 16 | Q.   Now, when you say you were acting on that assumption, |
| 12:03 | 17 | did you, in this case, do -- let me ask you this: |
| 12:03 | 18 | You heard of something called an "opinion letter." |
| 12:03 | 19 | A.   I've heard that phrase used from time to time, yes. |
| 12:03 | 20 | Q.   Have you ever done an opinion letter? |
| 12:03 | 21 | A.   No, I haven't. |
| 12:03 | 22 | Q.   Do you have some idea of what an opinion letter is? |
| 12:03 | 23 | A.   In a general sense, yes. |
| 12:03 | 24 | Q.   And could you tell us what's your general sense as to |
| 12:03 | 25 | what an attorney's opinion letter is? |

160

| | | |
|---|---|---|
| 12:03 | 1 | MR. McCONVILLE:  Objection.  Irrelevant. |
| 12:03 | 2 | THE COURT:  Overruled. |
| 12:03 | 3 | But at some point, choose a time to go to lunch, |
| 12:03 | 4 | just for the jury.  It doesn't have to be, by my suggestion, |
| 12:03 | 5 | at this time.  It can be whenever. |
| 12:03 | 6 | MR. PRICE:  Actually, this is as good a time as |
| 12:03 | 7 | any.  I don't want to cut into the time. |
| 12:03 | 8 | THE COURT:  (To the jury:)  Why don't you go to |
| 12:03 | 9 | lunch on the opinion letter.  I'm just kidding you.  And |
| 12:03 | 10 | we'll come back at 1:00 o'clock.  Okay? |
| 12:04 | 11 | You're admonished not to discuss this matter |
| 12:04 | 12 | amongst yourselves nor form or express any opinion |
| 12:04 | 13 | concerning the case. |
| 12:04 | 14 | Have a nice lunch.  We'll see you in about 55 |
| 12:04 | 15 | minutes. |
| 12:04 | 16 | *(Jury recesses at 12:04 p.m.)* |
| 12:04 | 17 | THE COURT:  Thank you, sir.  Why don't you step |
| 12:04 | 18 | down.  We'll see you promptly at 1:00 o'clock. |
| 12:04 | 19 | *(Further proceedings reported by Jane Rule* |
| 12:04 | 20 | *in Volume II.)* |
| 12:04 | 21 | -oOo- |
| 12:04 | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 12:04 | 1 | -oOo- |
| 12:04 | 2 | |
| 12:04 | 3 | CERTIFICATE |
| 12:04 | 4 | |
| 12:04 | 5 | I hereby certify that pursuant to Section 753, |
| 12:04 | 6 | Title 28, United States Code, the foregoing is a true and |
| 12:04 | 7 | correct transcript of the stenographically reported |
| 12:04 | 8 | proceedings held in the above-entitled matter and that the |
| 12:04 | 9 | transcript page format is in conformance with the |
| 12:04 | 10 | regulations of the Judicial Conference of the United States. |
| 12:04 | 11 | |
| 12:04 | 12 | Date:  February 22, 2011 |
| 12:04 | 13 | |
| 12:04 | 14 | |
| 12:04 | 15 | _____ |
| 12:04 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR |
| 12:04 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |