**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

– – – – – – –


| | |
|---|---|
| MATTEL, INC., ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | No. CV 04-9049-DOC |
| ) | Day 21 |
| MGA ENTERTAINMENT, INC., ET AL., ) | Volume 2 of 3 |
| ) | |
| Defendants. ) | |
| _____) | |


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Tuesday, February 22, 2011


Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-02-21 MattelV2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
              By:  JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   WILLIAM PRICE
 6                 Attorneys at Law
              865 South Figueroa Street
 7            10th Floor
              Los Angeles, California 90017-2543
 8            (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                 Attorney at Law
              4 Park Plaza
13            Suite 1600
              Irvine, California 92614
14            (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                 Attorney at Law
              405 Howard Street
18            San Francisco, California 94105
              (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21            BY:  JENNIFER L. KELLER
                   Attorney at Law
22            18500 Von Karman Avenue
              Suite 560
23            Irvine, California 92612
              (949) 476-8700

24

25
```

Case 2:04-cv-09049-DOC-RNB Document 10062 Filed 02/23/11 Page 3 of 173 Page ID #:303796
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

3

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
5                 Attorney at Law
             601 West Fifth Street
6            12th Floor
             Los Angeles, California 90071
7            (213) 613-4660

8            – AND –

9            LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO

16           KEN KOTARSKI, Mattel Technical Operator

17           MIKE STOVALL, MGA Technical Operator

18           RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20           WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 4 of 173   Page ID #:303797
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

4

1              **I N D E X**

2

3

4                   **EXAMINATION**

5

6     **Witness Name**       **Direct**    **Cross**    **Redirect**    **Recross**

7     ROSENBAUM, DAVID
         By Mr. Price                      14
8        By Mr. McConville                            41

9     CHAN, LISA
         By Mr. Quinn        130
10

11

12                    EXHIBITS

13

14    **Exhibit**                    **Identification**    **Evidence**

15    Defendants' No. 2201                                    53

16    Defendants' No. 2212                                    75

17    Plaintiffs' No. 2207                                    30

18    Defendants' No. 17239                                   61

19    Defendants' No. 18465                                   77

20    Plaintiffs' No. 21622                                  137

21    Plaintiffs' No. 23949                                  146

22    Plaintiffs' No. 24076                                  140

23    Plaintiffs' No. 24077              38                   39

24

25

1          SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 22, 2011

2                    DAY 21, VOLUME 2 OF 3

3                         (1:03 p.m.)

4              *(The following proceedings is taken outside*

5         *the presence of the jury.)*

6              THE COURT:  Okay.  We are on the record, and all

7     counsel are present, and the jury is not present.

8              Mr. Quinn?

9              MR. QUINN:  Yes, your Honor.  Just one concern

10    over that last examination and a comment the Court made.

11             Mr. Price was laboring to attempt to establish the

12    point that a contract between MGA and Mr. Bryant could not

13    affect the rights of Mattel or any other third party that

14    wasn't a party to the contract in terms of ownership of the

15    IP, and he -- he tried several times to get an answer.

16             THE COURT:  I didn't understand the question,

17    unfortunately, the way it was phrased, I think.

18             MR. QUINN:  Okay.  I trust the Court understands

19    the basic concept that there's a contract between A and B,

20    you know, that cannot affect the rights of C in the

21    property.

22             THE COURT:  Yeah, of course.

23             MR. QUINN:  And when there came a point when the

24    Court made a comment in front of the jury -- well, this --

25    in the context of it could affect the rights of Mattel, the

CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

6

```
 1    Court said something to the affect of, "Well, this contract
 2    could affect the rights of a lot of people."  And I thought
 3    in the context, it might be understood to mean including
 4    Mattel, which I don't think the Court intended.
 5              THE COURT:  No, I didn't.  If it was taken that
 6    way, certainly let's correct it.
 7              MR. QUINN:  So maybe we can give some thought to a
 8    simple sentence or two.
 9              THE COURT:  Just give me some wording.  Of course
10    I didn't intend that.
11              MR. QUINN:  Okay.
12              THE COURT:  It's not that you are precluded.  It's
13    just that I wasn't getting it when I was reading it back on
14    the screen.
15              MR. QUINN:  Okay.
16              THE COURT:  It was no fault of yours.  I just
17    couldn't tell if the witness could answer it.  So if you
18    think the Court made an inappropriate comment, it wasn't my
19    intention, and let's correct it.
20              MR. QUINN:  I know it wasn't, but thank you, your
21    Honor.
22              THE COURT:  Sure.
23              MR. MC CONVILLE:  Your honor, one other in just
24    the hypothetical line of questioning that's going on.  It's
25    my understanding that it's for the jury to decide what this
```

1    contract needs and who the rights are that are affecting it,

2    and so to ask a hypothetical that asks the conclusion about

3    what rights flow from the agreement in this case is an

4    improper hypothetical.

5           THE COURT:  I -- it's not only that, it's almost a

6    non-understandable question; that's the difficulty.  And I

7    think it's left for each of you to argue what the contract

8    means, but I do think it's appropriate that Mattel can

9    question this witness about what his representations were

10   concerning MGA.  I think you can question him about the

11   discussions or negotiations with Anne Hwang.  I'm having

12   trouble, and maybe it's me, when you carry that over to a

13   legal opinion about what the rights and duties of Mattel

14   are.

15          And so I want you to clarify that for me, because

16   I keep coming back to the question because I don't

17   understand it.  I think I understand where you are going,

18   but I just know it's difficult to -- not an adverse witness,

19   but a lawyer who obviously represents, in good faith, the

20   other side, or at least the negotiations.

21          So let me hear again how this is going to --

22          MR. PRICE:  The reason it's relevant, your Honor,

23   is that MGA has said that, you know, he was -- his job was

24   to make a hundred percent sure that this property belonged

25   to Mr. Bryant.  Our position is no, he was given a job.  He

 1    did that job.  He drafted the contract, he got

 2    representations.  His intent was simply to make the contract

 3    come together and to get the representations and warranties

 4    he created.  It wasn't his intent to draft anything that

 5    would affect Mattel's rights.  That wasn't even in his mind.

 6    It wasn't his intent to do an investigation about anything.

 7              THE COURT:  That's why the question was confusing

 8    to me.  I would think that anything he drafted had to take

 9    into account what the potential liability was because there

10    are numerous e-mails where he's concerned about Mattel, or

11    it appears that he's concerned about Mattel, so I can't

12    imagine counsel's ability to answer that question clearly.

13    I mean, if you ask me that question, I would say, "I

14    primarily represent my client.  I was most concerned with my

15    client's rights.  I negotiated with Anne Hwang, and, of

16    course, there was some concern about Mattel."  That's the

17    way I would answer it.

18              MR. PRICE:  And -- and what he was getting,

19    though, is simply a representation so he can have that

20    contract come together, not -- not trying to investigate

21    what Mattel's rights were.  All you need is the

22    representation to get the contract.  That's the Mattel

23    issue.

24              THE COURT:  But you are not being precluded from

25    that area.

 1          MR. PRICE:  No.  I understand.

 2          THE COURT:  I just want to know how you are

 3  getting there through this witness.  You are able to argue

 4  that the contract was, in fact, representation.  You are

 5  able to argue the provisions.  You are able to argue the

 6  obvious, from your standpoint.  I just don't know how you

 7  are going to get this out of this particular witness,

 8  frankly.

 9          MR. PRICE:  It -- it's sort of like proving a

10  negative, but what I would think he would say -- in fact, he

11  kind of said it in the middle of an answer, was, "I wasn't

12  really concerned about Mattel.  I was concerned about

13  Mr. Bryant's representations, and I was willing to draft a

14  contract based upon that," because that's his job.

15          THE COURT:  If he said, "I wasn't concerned about

16  Mattel," I'd attack, because he obviously is concerned about

17  Mattel.  There's e-mails to that effect.  The real question

18  is what was he concerned about and when.  Remember the first

19  draft comes September -- strike that, September 19th?

20          MR. PRICE:  Yes.

21          THE COURT:  That draft doesn't seemingly change

22  very much.  In other words, there's some notations on it,

23  but the import of that contract remains rather constant, or

24  the content does.

25          I understand the position you are in, but it's

1   difficult to make him an expert about what Mattel's position

2   is.

3           MR. PRICE:  Yeah.

4           THE COURT:  And that's why I was having trouble

5   with the question.  I understand where you're going.  I'm

6   just --

7           MR. MC CONVILLE:  And your Honor, from our

8   position, that's argument.  I appreciate it's a great

9   argument for Mattel, but to have this person on the witness

10  stand who I think the Court has said, you know, "We consider

11  lawyers experts," I don't know if you said it in front of

12  the jury now, but to have him opine the facts in this case

13  based on hypothetical facts in this case, rendering an

14  opinion, it takes the issue away from the jury, which is --

15  which is an improper hypothetical in this case.

16          THE COURT:  Well, also your objection was is he's

17  a primary a witness in this case --

18          MR. MC CONVILLE:  Right.

19          THE COURT:  -- so he's also casting an opinion,

20  and I'm not too certain you're not right about that, so --

21          MR. PRICE:  Well, all I'm trying to get at, and

22  I'm not doing it artfully, is what was his intent in doing

23  this?  Did he intend to reach beyond the two parties to the

24  agreement, and I think --

25          THE COURT:  Why don't you ask him that?

1           MR. MC CONVILLE:  He testified to that already.

2           THE COURT:  No.  Just a moment.  It's very

3  unclear.  The objections came rolling in, so I'm going to

4  give you a little bit of room on that, but was it your

5  intent to reach beyond your negotiations with Anne Hwang who

6  represents Mr. Bryant and MGA; yes or no?  "No," or "yes,"

7  and if so, what was in your mind?

8           MR. PRICE:  Okay.

9           THE COURT:  Very simple.  But one more round with

10 that, and I agree with you, the objections -- the questions

11 were confusing to the Court, the objections were rapid, of

12 course.  But as Mr. McConville said, let's not drive the

13 truck through the house with it, okay?  That's left for

14 argument.

15           All right.  Now, what else?

16           MR. MC CONVILLE:  Nothing for MGA, your Honor.

17           THE COURT:  No, no.  Mr. Quinn just handed

18 Mr. Price a note.  I want to make sure.

19           MR. PRICE:  No.  He just gave me an idea how to

20 phrase your Honor's question.

21           THE COURT:  Let me see that note.  I'm just

22 kidding you.

23           (Laughter.)

24           THE COURT:  All right.

25           Ms. Keller, do you want to take all these matters

1    up at 5:00 in terms of these numerous lists so we can go

2    through them?

3             MS. KELLER:  Thank you.

4             THE COURT:  There may be duration times you

5    remember.  I saw them as attack, and I, quite frankly, don't

6    know of the times.

7             The other thing we can do is this:  I can slow the

8    trial down, so let me ask you both something on the record.

9             I am not concerned about the 120 hours.  That's

10   more than enough time.  It's about double the time you'd

11   have in most courts, as we've laboriously looked at each

12   exhibit, which is why you are required to show me those

13   exhibits.  But remember I'm not memorizing them, and I can't

14   match up 40,000 numbers to a particular exhibit.  So I kind

15   of get an idea, for instance, in the area of copying with

16   the IRS problems we've had, et cetera.

17            If you want, we can slow it down, but it's both of

18   your times.  In other words, you can give me the exhibits

19   through your able staff, because what I can't do is turn

20   around to a row of 13 notebooks, stop and then fumble

21   through to that particular exhibit.  I'm not going to do

22   that.  So in past litigation, I've had counsel bring those

23   exhibits to me one at a time.

24            Now, remember, the clock is ticking, it's rolling

25   right along, and your primary concern is going to be -- one

1    or both of you will come to me about 20 hours before your

2    time is up, and it will be Mr. Zeller, I'm sure, and

3    Ms. Hurst, who you'll have talk to the Court, and the answer

4    is going to be no.

5              So it's how you spend that 120 hours, but I'm

6    happy to slow that down because what's happening is I'm

7    making my best ruling on what I've seen the night before,

8    but I can't match up the exact exhibit.  That's why

9    Ms. Keller gets in the situation, and you're right, that

10   exhibit that talks about tax could have been cleaned up,

11   okay?  No problem.  It's absolutely relevant, as far as I'm

12   concerned.  But I can't remember the word "tax" in the first

13   line of 40,000 exhibits.

14             And Mr. McConville and Mr. Zeller or Mr. Quinn

15   might want to put the Court in an all-or-nothing position.

16   If it's an all-or-nothing position, that document comes in.

17   If there's a request to excise it, I'll consider it.

18             MS. KELLER:  Perhaps we can mull this over and

19   take this up at 5:00.

20             THE COURT:  Okay.

21             MS. KELLER:  I'm just hoping to get a bite to eat.

22             THE COURT:  It's up to you.

23             MR. PRICE:  I'm voting for getting the bite to

24   eat.

25             THE COURT:  Okay.  Get a bite to eat.  See you in

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 14 of 173   Page ID #:303807
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

14

1   a half hour.

2           (Recess.)

3           (The following proceedings is taken in the

4       presence of the jury.)

5           THE COURT:  All right.  We are back on the record.

6   All counsel are still present, the parties, the witness.

7           And Mr. Price, if you'd continue with your

8   questions, please.

9           **DAVID ROSENBAUM, PLAINTIFFS' WITNESS, RESUMED**

10              **DIRECT EXAMINATION** (Continued)

11  BY MR. PRICE:

12  Q    Mr. Rosenbaum, we asked you before we left if you knew

13  what an opinion letter was; do you recall that?

14  A    Yes.

15  Q    And could you move the microphone a little closer to

16  you?

17       Thanks.

18       And I think you said that you don't do opinion letters;

19  is that right?

20  A    I have not done an opinion letter in my practice,

21  that's correct.

22  Q    Is there a reason why you don't do opinion letters?

23  A    I'm not -- I'm very rarely asked for opinion letters.

24  Q    And you said you are rarely asked, and you've never

25  done one, so my question --

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 15 of 173   Page ID #:303808
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

15

1   A    So I've done a limited opinion in connection with other

2   transactions.

3   Q    Now, during lunch, did you have time to think about

4   what an opinion letter was?

5   A    I'm aware, as a general matter, what an opinion of

6   counsel is, yes.

7   Q    Okay.  And can you tell us, in your understanding, what

8   is an opinion of counsel?

9         MR. MC CONVILLE:  Objection.  Irrelevance.  Calls

10  for speculation.

11        THE COURT:  No.  Overruled.  You want to see the

12  depth of his efforts.  Overruled.

13        THE WITNESS:  An opinion of counsel is where

14  either the client or a party to a transaction requires the

15  attorney representing one party or the other to provide some

16  opinion about either facts or compliance with some legal

17  requirement.

18  BY MR. PRICE:

19  Q    And in this case, in the job you were doing for MGA in

20  drafting this agreement, I mean, you believe you did a good

21  job, right?

22  A    Yes, I do.

23  Q    You did everything that was required of you to do your

24  job to draft the consulting agreement, correct?

25  A    Yes.

1   Q     Now, you weren't asked to give an opinion letter about

2   facts, right?

3   A     That's correct.

4   Q     And you weren't asked to collect proof about any

5   particular fact, correct?

6   A     I'm not quite sure what you are driving at.

7   Q     Okay.  Well, you understand what -- what "proof"

8   means?

9   A     Yes.

10  Q     And you've been in situations where you've had to prove

11  something, either to a court or to a client or to your

12  spouse or someone, right?

13            MR. MC CONVILLE:  Objection.  Vague.

14            THE COURT:  I'm going to sustain it.

15            In its present form, it's vague, Counsel.  You can

16  ask him if he collected proof, investigated facts that were

17  represented to him, but it's too general.  Sustained.

18            MR. PRICE:  Okay.

19  BY MR. PRICE:

20  Q     Let me ask you about your opinion letter.  An opinion

21  letter is something that you understand that people sometime

22  seek when they want to confirm ownership about something,

23  right?

24            MR. MC CONVILLE:  Objection.  Misstates his

25  testimony.

```
 1                THE COURT:  No.  Overruled.

 2                THE WITNESS:  An opinion could be on any sort of

 3     topic someone wants an attorney to confirm.

 4     BY MR. PRICE:

 5     Q    Right.  And one of the things you would write an

 6     opinion letter on is, or someone wants an attorney to

 7     confirm, is ownership of property, correct?

 8                MR. MC CONVILLE:  Objection.  Improper

 9     hypothetical.

10                THE COURT:  Overruled.

11                You can answer the question.

12                THE WITNESS:  I am not sure how you would prepare

13     an opinion about ownership questions.

14     BY MR. PRICE:

15     Q    So certainly you have never provided an opinion on

16     ownership questions, correct?

17     A    That's right.

18     Q    And in this case, you weren't asked by MGA to provide

19     an opinion about ownership questions, correct?

20     A    That's correct.

21     Q    What you were asked to do was to do what you needed to

22     do to make sure that you can draft a contract that the

23     parties would either agree to or reject, right?

24     A    Yes.

25     Q    And -- and in connection with that contract, one of the
```

```
 1   standard provisions in this type of contract would be
 2   representation and indemnity from Mr. Bryant to MGA,
 3   correct?
 4               MR. MC CONVILLE:  Objection.  Asked and answered.
 5               THE COURT:  Overruled.
 6               THE WITNESS:  Yes.
 7   BY MR. PRICE:
 8   Q    So you had to do what you could as an attorney to try
 9   to get that representation from Mr. Bryant to MGA, correct?
10   A    I am not sure I understand what you mean I had to do
11   whatever I had to do to answer that question.
12   Q    Okay.  Well, what you did was try to draft this
13   agreement, as trying to put it together, was to try to get a
14   representation from Mr. Bryant's side of the -- of the
15   negotiations, that his representation that the property
16   belonged to him and he would indemnify?
17   A    Yes.
18   Q    And you couldn't get that directly from Mr. Bryant
19   because you couldn't talk to him directly, you had to talk
20   to his attorney, right?
21   A    Yes.
22   Q    So let's look at, then, how this -- how this kind of
23   played out.  I think I showed you 925 -- 9258, which was
24   your September 19th -- the first time you sent out a draft,
25   do you recall that?
```

1   A   Yes, I do.

2   Q   And now I would like you to take a look at 9257.

3       And do you see this is an e-mail string, which starts

4   with that -- that first e-mail you sent to Mr. Bryant on

5   September 19th; do you see that?

6   A   Yes, I do.

7   Q   And if you go to the next e-mail above that, there is

8   some communication about -- from you concerning whether MGA

9   owns the trademark "Bratz"; do you see that?

10  A   Um --

11  Q   It starts on the first page and then goes over to the

12  second.

13  A   I don't believe I --

14  Q   I -- let me correct myself.

15      There is an e-mail from Mr. Medici to Ms. O'Connor

16  copying you which asks whether MGA owns the trademark

17  "Bratz"; do you see that?

18  A   Yes, I do.

19  Q   And then there's an e-mail from Ms. O'Connor to

20  Mr. Medici, copying you, saying, "It looks like we will

21  change the name since the TM is taken"; do you see that?

22  A   I do.

23  Q   And it goes -- by the way, do you know whether or not

24  this -- or what this is referring to at this point in

25  September of 2000?

1    A    I'm sorry, I don't understand what you mean by "this."

2    Q    The statement, "It looks like we will change the name

3    since the TM is taken"; do you know what that refers to?

4    A    I'm assuming Victoria was referring to whether or not

5    MGA could apply to register the name "Bratz" as a trademark.

6    Q    Do you know whether or not a trademark had issued at

7    this point, or whether there was just an application or

8    what?

9    A    I don't know.  I was not tasked with handling that

10   matter.

11   Q    Okay.  So let's focus on what you were tasked to do,

12   then.

13        On this e-mail, it says, "David, I spoke with Carter

14   this morning who was meeting with counsel on Wednesday.  He

15   hopes to execute the agreement by Friday"; do you see that?

16   A    I do.

17   Q    So by this time have you yet received any -- any

18   comments on your draft agreement?

19   A    I don't believe so.

20   Q    And then you see at the top, there is an e-mail to

21   Ms. O'Connor and -- and Mr. Medici from you, correct?

22   A    Yes.

23   Q    This is September 26th, right?

24   A    That's the date on the document.

25   Q    Yes, and it says, "Victoria, we still have the Mattel

```
 1   issue, which has not been addressed, which is why me having
 2   a conversation with his lawyer will try to address this in a
 3   semi-privileged way"; do you see that?
 4   A    I do.
 5   Q    And what you are referring to at that point, the Mattel
 6   issue, is whether or not Bryant will represent to you, make
 7   a representation and warranties, that he owns the property,
 8   right?
 9   A    Correct.
10   Q    Okay.  I mean, you weren't tasked to do an
11   investigation, you know, looking at, you know, objective
12   facts such as the property he's -- he's -- he's trying to
13   assign, you weren't tasked to do an investigation to see who
14   owned the property, were you?
15   A    I -- I was -- I was asked to speak to Mr. Bryant's
16   counsel and determine the origins of the property that he
17   was assigning to MGA.
18   Q    And my question is different.  Were you asked to do an
19   investigation so that you could give an opinion --
20   A    I was not.
21   Q    -- as to --
22        Let me finish the question.
23        Were you asked to do an investigation so you can give
24   an opinion as to who actually owned whatever property it was
25   that Mr. Bryant was conveying to MGA?
```

1    A    I was not.

2    Q    And so you were never asked to make 100 percent sure

3    that whatever it was that Mr. Bryant was purporting to

4    convey to MGA was, in fact, owned by Mr. Bryant, you just

5    weren't asked to do that?

6    A    That's correct.

7    Q    But what you were asked to do was to try to see if you

8    could draft an agreement that would bring Mr. Bryant and MGA

9    together in an agreement, correct?

10   A    Yes.

11   Q    Okay.  So after sending this e-mail to Ms. O'Connor and

12   Mr. Medici, you then called Ms. Hwang, Mr. Bryant's

13   attorney, to see whether or not she would relate to you the

14   representation that Mr. Bryant said he owned it, right?

15   A    I don't remember whether I called her or she called me,

16   but we did have a conversation.

17   Q    Okay.  And -- and the purpose of that conversation,

18   whether you called her or -- strike that.

19        One of the purposes of that conversation, whether you

20   called her or she called you, was to find out from her

21   whether or not Mr. Bryant would make that representation

22   because you couldn't talk to him directly, right?

23   A    The -- I needed to understand from his attorney that he

24   created the work outside the scope of his employment.

25   Q    And what you needed to understand wasn't that he did,

1    in fact, did it, because you weren't investigating that,

2    right?

3    A    I needed to understand the chronology.

4    Q    But you weren't investigating whether or not he

5    actually created these documents outside of his employment

6    at Mattel, correct?

7    A    Correct.

8    Q    Okay.  So what you were trying to get was a

9    representation that you could use for drafting the agreement

10   that he had created this work outside of Mattel, correct?

11   A    Yes.

12   Q    And in connection with that, at that time you didn't

13   know that he had worked at Mattel not just since the

14   beginning of '99, but he had also worked at Mattel like

15   between '95 and the beginning of '98, you didn't know that,

16   did you?

17   A    I didn't know there were two separate stints of

18   employment.

19   Q    And Ms. Hwang didn't tell you that, right?

20   A    She did not.

21   Q    And MGA didn't tell you that?

22   A    No.

23   Q    So -- so you had this conversation with Ms. Hwang,

24   right?

25   A    That's correct.

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 24 of 173   Page ID #:303817
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

24

1    Q    And you wrote an e-mail to Ms. O'Connor relaying the

2    conversation you had with Ms. Hwang?

3    A    Yes.

4    Q    So if we could look at -- let's see, I think we are

5    down to 18463, and if we can look at the e-mail that starts

6    this.

7         You see it says, "Victoria, I spoke with Carter's

8    lawyer this a.m. and e-mailed her a copy of the draft

9    agreement for her review"; do you see that?

10   A    I do.

11   Q    And she still hasn't given you comments, had she?

12   A    No.

13   Q    Double negative, I'm sorry.

14        Had she given you comments at this time?

15   A    No.

16   Q    And then you said, "I asked her specifically about the

17   Mattel issue, and she said she had reviewed the chronology

18   of the creation of this design and is satisfied that Carter

19   created this outside the scope of his employment at Mattel";

20   do you see that?

21   A    I do.

22   Q    And she said she understands the concerns here.

23   "Apparently he conceived this product in 1998, so I

24   recommend that your patent attorneys review this patent as

25   soon as possible to avoid any time limitations in the patent

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 25 of 173   Page ID #:303818
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

25

1    laws"; do you see that?

2    A    I do.

3    Q    And then she said, "I'll let you know the comments on

4    the draft as soon as I receive the same," correct?

5    A    Yes.

6    Q    Okay.  So let's look at this.  How long did this

7    conversation last?

8    A    I don't recall the exact length.

9    Q    Fairly short?

10   A    It was a brief conversation.

11   Q    And even after the conversation with her that you had,

12   you still didn't know what the work product was that -- that

13   Mr. Bryant and MGA were talking about, right?

14   A    Not with any specificity, that's correct.

15   Q    I mean, you didn't know, again, if it was designs or

16   prototype dolls, you just told them it was some sort of

17   property?

18   A    I'm sorry.  I said I was aware it was a concept

19   concerning the product.

20   Q    You said it was a concept concerning "Bratz"?

21   A    Yes.

22   Q    And during this conversation, you didn't know what

23   Ms. Hwang was basing her statement on when she said

24   "chronology," right?

25   A    I assumed she was basing it on her consultations with

1    her client.

2    Q    You thought she was basing it on what Mr. Bryant had

3    told her, right?

4    A    Or presumably, yes.

5    Q    And again, you had to put her in the middle because you

6    couldn't directly ask Mr. Bryant to tell you without her

7    permission, correct?

8    A    That's correct.

9    Q    Okay.  And so when she told you there was a chronology,

10   you didn't ask her, you know, what it was that she reviewed,

11   right?

12   A    I don't recall.

13   Q    Okay.  And you don't recall asking her any specifics at

14   all about dates in the chronology, correct?

15   A    She told me that he created it in 1998, and that's the

16   notes that I reported back to the client.

17   Q    And -- and you didn't inquire or ask anything beyond

18   then -- beyond that, right?

19   A    I don't recall doing so.

20   Q    Okay.  You don't recall asking any follow-up questions,

21   correct?

22   A    I don't recall.

23   Q    And you don't recall asking for any additional

24   information, correct?

25   A    I don't believe so.

1    Q    Okay.  And -- and because your job that you were tasked

2    to do was to draft the agreement and get a representation

3    from the Bryant side, because of that, you didn't think

4    there was a need to follow-up or ask more questions or do an

5    investigation, right?

6    A    It's been a while, but I didn't do a follow-up

7    investigation, so I would agree with your statement.

8    Q    And the reason you didn't do an investigation is

9    because that wasn't the job you were asked to do by MGA,

10   correct?

11   A    I was not asked to do a thorough investigation of the

12   property -- of the -- of his project.

13   Q    Well, you threw a word in there, "thorough," okay?

14        The fact of the matter is you were asked to do any

15   investigation as to who actually owned the property,

16   correct?

17   A    Yes, that's correct.

18   Q    So as far as you know, MGA collected no proof, did no

19   investigation with respect to whether or not Mattel actually

20   owned this property as opposed to Mr. Bryant, correct?

21   A    I don't -- I can't answer that -- I don't know that.

22   Q    Okay.  So I'll ask it this way:  Do you know of any

23   investigation that anyone did on behalf of MGA to determine

24   whether or not Mr. Bryant, in fact, owned this Bratz concept

25   that he was purporting to convey?

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 28 of 173   Page ID #:303821
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

28

1  A    I am not aware of any other investigation that was

2  done.

3  Q    Well, when you say "other investigation," you told us

4  you didn't do one, so are you aware of any investigation

5  that was done?

6  A    You asked me if I knew of any other investigation, and

7  I said I was not aware of any.

8  Q    Now, have you ever searched copyright records?

9  A    Occasionally.  Not very often.

10 Q    So are you aware that there are things that one can do

11 to do the investigation to see when someone created a design

12 or a drawing?

13 A    As a general manner, I -- that's assuming an

14 application was filed to register something for copyright.

15 Q    So you could see that something like that had been

16 filed, correct, that would be --

17 A    If it had -- the absence of a filing would not -- would

18 not have changed -- would not have altered a legal

19 conclusion.

20 Q    But -- but the fact of the filing might help you out?

21 A    It might.

22 Q    You could have asked if there were any notarized

23 designs that kind of put the design on a specific date, I

24 mean, that might have helped you out?

25 A    It might.

1    Q    You could, you know, ask if there had been any

2    communications with other companies that had these

3    designs -- that sent these designs at a time when

4    Mr. Bryant claims he invented them.  I mean, if you're doing

5    an investigation, those are some of the things you could

6    have asked, right?

7    A    I suppose so.

8    Q    Okay.  And when you say "I suppose so," I -- I -- this

9    is probably a little unfair, but that's just something that

10   you weren't asked to do, so you haven't really been given

11   that much thought, correct?

12   A    I did not give it that much thought at that time.

13   Q    Now, if you look at -- at the rest of this e-mail, this

14   is 9 -- I'm sorry, 18463.

15        So after relaying to her, to Ms. O'Connor, what

16   Mr. Bryant's counsel had said, she writes back, "Did she

17   give you an indication on when you would receive comments";

18   do you see that?

19   A    Yes.

20   Q    And there is a little frustration building up here as

21   to when there was going to be comments on this draft?

22   A    I'm not sure whose frustration you are referring to.

23   Q    Okay.  Do you recall either you or Ms. O'Connor being a

24   little frustrated that they hadn't gotten back to you with

25   comments on the draft?

1   A    I don't recall a particular level of frustration.

2   Q    Okay.  Let's go to the top, then, where it says on

3   September 26th, "No, she did not, but I will call her

4   tomorrow afternoon to follow-up"; do you see that?

5   A    I do.

6   Q    And that representing, "I'm going to call her and see

7   what's going on with this draft"?

8   A    Yes.

9   Q    So at that point, she then sends you back a draft with

10  some deletions and additions, right?

11  A    Sometime subsequent to this e-mail, she sent me back

12  her comments on the draft, yes.

13  Q    And if you'd look at 2207.

14       And if you'd flip through that, do you see that's a

15  draft of the contract which has some additions, some things

16  stricken out?

17  A    Yes.

18  Q    Okay.  And is that a communication that you received

19  from Ms. Hwang?

20  A    It appears to be.

21       MR. PRICE:  Your Honor, I am not sure if this is

22  in evidence.  I move 2207 into evidence.

23       THE COURT:  Received.

24       *(Plaintiffs' Exhibit No. 2207 is received in*

25       *evidence.)*

1    BY MR. PRICE:

2    Q    Now, one thing that she struck out was that you had

3    dated as of September 18, 2000 there; do you see that?

4    A    Yes.

5    Q    And you put that there because it was your

6    understanding, based upon your conversation with

7    Ms. O'Connor, that the essential terms of the contract were

8    agreed to as of September 18, 2000?

9              MR. MC CONVILLE:  Objection.  Misstates the

10   testimony.

11             MR. PRICE:  That's the first time I asked him

12   about that.

13             MR. MC CONVILLE:  You said it was a conversation,

14   and he said it was either an e-mail or a conversation.

15             You can withdraw and correct.

16             THE COURT:  Overruled.

17             THE WITNESS:  I'm sorry, could you --

18             MR. PRICE:  I'll correct it.

19             THE COURT:  Well, was there a conversation, or was

20   this simply an e-mail?

21             MR. PRICE:  That's what I was going to ask.

22   BY MR. PRICE:

23   Q    You concluded from either an e-mail or conversation

24   with Ms. O'Connor that the essential terms of the agreement

25   were agreed to between the parties as of September 18, 2000?

1   A     Yes.

2   Q     And that's why you put the date there?

3   A     That was my practice, yes.

4   Q     And in the final agreement, contrary to Ms. Hwang's

5   request, that stayed in the contract, it was dated as of

6   September 18, 2000, correct?

7   A     Yes.

8   Q     Okay.  And if you'd look at the page 4, 2207-0004, and

9   if you'd go to paragraph 5C --

10          MR. PRICE:  I think you just did 4C, Ken.  It's 5C

11   at the bottom.

12          There we go.

13   BY MR. PRICE:

14   Q     And this is under the "warranties and indemnity"

15   section that you had drafted, correct?

16   A     Yes.

17   Q     Okay.  And if we'd look at C, you had written, "The

18   Bryant work product shall be free of all liens and

19   encumbrances, and there will be no claims, demands or

20   actions pending or threatened with respect thereto; and that

21   the Bryant work product is original, and no part thereof

22   infringes or shall infringe upon any common law or statutory

23   rights or intellectual property rights of any third party

24   including, without limitation, contractual rights, patents,

25   copyrights, mass work rights, trade secrets, rights of

1    privacy, and other intellectual property rights; do you see

2    that?

3    A    I do.

4    Q    And that's how you originally drafted it?

5    A    Yes.

6    Q    And you received this after you had the phone call with

7    Ms. Hwang where she said that Mr. Bryant said was willing to

8    represent that this was done sometime in 1998?

9    A    Yes.

10   Q    So after that, you get this draft back, and she had

11   stricken out this language saying that -- that his work

12   product is original and that it doesn't infringe on anyone

13   else's claim to it, right?

14   A    Yes.

15   Q    And that was something which you didn't expect, right?

16   A    No.

17   Q    A double negative.

18        Did you -- did you expect that?

19   A    I did not.

20   Q    Okay.  And so at this point, after you received this

21   from -- from Ms. Hwang, you kind of stepped out of the

22   picture for a little bit, don't you, and that is

23   Ms. O'Connor begins talking directly with Mr. Bryant?

24   A    I -- I don't know that I -- I don't know what you mean

25   by stepping out of the picture.

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 34 of 173   Page ID #:303827
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

34

```
 1              MR. MC CONVILLE:  Objection.  Lacks foundation.

 2              MR. PRICE:  Let me ask it this way.

 3              THE COURT:  Technically sustained, but --

 4    BY MR. PRICE:

 5    Q    It's your understanding, based upon communications with

 6    Ms. O'Connor, that at this point she directly called

 7    Mr. Bryant about this provision, right?

 8    A    I -- I don't remember specifically if that -- if that

 9    occurred.  I do recall discussing these comments with

10    Victoria.

11    Q    And "Victoria," meaning Victoria O'Connor who's at

12    MGA?

13    A    Yes.

14    Q    And so let's take a look at -- I think it's 17251.

15         And do you see at the bottom there, there is an e-mail

16    from Anne Hwang to you on October 4; do you see that?

17    A    Yes.

18    Q    Where she says, "Hi David, I caught an inadvertent

19    omission in the version I sent by e-mail yesterday.

20    Therefore, please ignore that version and review the

21    attached version, (which is also in Word instead of

22    WordPerfect).  It may be difficult to reach me today, as I

23    will be in meetings throughout the day.  Look forward to

24    your comments"; do you see that?

25    A    Yes.
```

1    Q    Okay.  And by that time, you had not had time to

2    address all these changes she had made in her revisions,

3    right?

4    A    I can't say with exact certainty as to the specific

5    dates.

6    Q    Okay.  Well, if you look at the e-mail that is on the

7    top of this chain, you see it's to Anne Hwang from you and

8    also copying Victoria O'Connor; do you see that?

9    A    Yes, I do.

10   Q    It says, "Anne, I reviewed your proposed revisions with

11   my client, and they are, by and large, unacceptable"; do you

12   see that?

13   A    Yes.

14   Q    And then you say, "I understand that my client has

15   discussed these issues with Carter directly, and he has

16   agreed to withdraw most of the proposed changes"; do you see

17   that?

18   A    Yes, I do.

19   Q    Okay.  So your understanding was the first step was

20   that Ms. O'Connor called Mr. Bryant, and he agreed to

21   withdraw all these changes that Ms. Hwang had suggested?

22   A    I don't know what you mean by "first step."

23   Q    Well, here you say, "I understand" -- it says, "I

24   understand that my client had discussed these issues with

25   Carter."

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 36 of 173   Page ID #:303829
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

36

1   A    I see that, yes.

2   Q    Okay.  That obviously took place before you sent this

3   e-mail saying that the revisions were, by and large,

4   unacceptable, correct?

5   A    Yes.

6   Q    Okay.  And so the step before this e-mail is that

7   Ms. O'Connor called Mr. Bryant, right?

8   A    That's what this says.

9   Q    Which -- which you weren't permitted to do because he

10  had a lawyer, right?

11  A    Yes.

12  Q    And that Ms. O'Connor and Mr. Bryant agreed that he

13  would withdraw, by and large, most of those proposed

14  revisions to your draft.

15  A    As Ms. O'Connor informed me.

16  Q    Right.  And so then you sent this e-mail to her saying

17  that "it's imperative that the agreement be concluded today,

18  and please call me as soon as possible so that we may

19  conclude the matter," right?

20  A    Yes.

21  Q    And then you understood that sometime shortly after

22  that, there was a signed contract?

23  A    Yes.

24  Q    If fact, you communicated to Ms. O'Connor, "Hey, when

25  you get something signed, can you send it to me for my

1  files?"

2  A    I believe there is some correspondence to that effect,

3  yes.

4  Q    Okay.  So you believe that you accomplished the tasks

5  that you were asked to accomplish, right, in connection with

6  this matter, right?

7  A    Yes.

8  Q    And you didn't think you were qualified to do an actual

9  investigation as to who owned whatever intellectual property

10  it was that Mr. Bryant had, correct?

11  A    I --

12            MR. MC CONVILLE:  That was vague.

13            THE COURT:  Do you understand the question?

14            THE WITNESS:  I'm not quite sure by what he means

15  by "qualified."

16            THE COURT:  Sustained.

17  BY MR. PRICE:

18  Q    Well, do you hold yourself out as someone who searches

19  title or does factual investigations about ownership?

20  A    I don't do them on a regular basis like some other

21  trademark firms or other firms would do.

22  Q    I mean, do you think -- so it's not part of your

23  practice to do investigations into actual ownership; is that

24  correct?

25  A    On a regular basis, that's correct.

1    Q    And in this particular case, in doing the tasks that

2    you were assigned to do, you did not do an investigation as

3    to who actually owned the property, correct?

4    A    That's correct.

5              *(Attorney discussion held off the record.)*

6              MR. PRICE:  Your Honor, there are some time

7    records which we'd like to have marked that we just

8    received.

9              Your Honor, there are some time records we'd like

10   marked as 24077 for identification, and MGA's counsel has

11   copies of this.

12             THE COURT:  24077, thank you.

13             *(Plaintiffs' Exhibit No. 24077 is marked for*

14        *identification.)*

15             MR. PRICE:  We are going to bring a copy up to

16   your Honor.

17             THE COURT:  Thank you.

18   BY MR. PRICE:

19   Q    Mr. Rosenbaum, do you have what we have marked as 24077

20   in front of you?

21   A    Yes, I do.

22   Q    And do you recognize this as being your billing records

23   for -- in connection with the drafting of the agreement

24   between Mr. Bryant and MGA?

25   A    These appear to be billing records from my former firm

1    addressed to MGA for services rendered in September of 2000.

2    Q    And if you'd look at the entries, could you see that

3    those are entries concerning your drafting of the agreement

4    between Mr. Bryant and MGA?

5    A    There are entries about that, yes.

6            MR. PRICE:  Your Honor, I move Exhibit 24077 into

7    evidence.

8            THE COURT:  Received.

9            (Plaintiffs' Exhibit No. 24077 is received in

10       evidence.)

11   BY MR. PRICE:

12   Q    And if we look at the first page, this was your bill

13   for the month of September, which would have been sent out

14   around October 6th?

15   A    That's the date on the invoice.

16   Q    And that's for about 38-, almost $3,900?

17   A    I believe so.

18   Q    And if we'd look at the second page, these are your --

19   your specific records for reviewing correspondence and

20   follow up concerning the drafting of the agreement between

21   MGA and Mr. Bryant?

22   A    These are my billing records of my former employer,

23   yes.

24   Q    And at this time you worked for Fischbach Perlstein

25   firm, correct?

1   A    Yes, that correct.

2   Q    And I noticed on these bills that you don't have hours

3   attached to every entry, like you don't say half an hour, 15

4   minutes or two hours; is there a reason for that?

5   A    That was my firm's practice in it's billing.

6   Q    It didn't relay to the client how much time was

7   actually spent on the matter?

8   A    That was my firm's practice.

9   Q    Wow, okay.

10       And then we have the next page, do you see it shows the

11  previous balance of 3800 or 3890, and then further fees and

12  costs for a total of 5,983?

13  A    I see that, yes.

14  Q    And to the best of your recollection, that is the total

15  amount that you billed in connection with the drafting of

16  this agreement?

17  A    Well, there were other matters that were redacted

18  because they were unrelated to this particular agreement

19  and, it was matters that I've billed MGA for various

20  matters.

21  Q    I see.  So, in fact, it would have been -- it would

22  have been -- the amount billed on this particular matter

23  would have been actually less than the 5,983?

24  A    I expect that was the case.

25  Q    In fact, if we looked at -- do you see where is says

1    previous balance of 3980?

2    A     Yes, I see that.

3    Q     And if we look back at your September bill, it has that

4    previous balance, which is unrelated to this -- this

5    agreement, this drafting of the agreement, correct?

6    A     Yes.

7    Q     And so the most that you would have spent in September

8    in connection with the drafting this agreement was

9    charged -- I'm sorry, is $1,938 or 39 dollars, including the

10   costs there?

11   A     That was the charge for the services I rendered that

12   month.

13   Q     And then there was an extra two entries in October,

14   right?

15   A     Yes.

16   Q     And you -- you can't tell from your bill, because this

17   goes through October 31, you can't tell what portion of this

18   is for drafting of the Bryant/MGA agreement, correct?

19   A     I cannot.

20          MR. PRICE:  Nothing further, thank you.

21          THE COURT:  Cross-examination by Mr. McConville on

22   behalf of Mr. Larian and MGA.

23                      **CROSS-EXAMINATION**

24   BY MR. MC CONVILLE:

25   Q     Hello, Mr. Rosenbaum.

1    A     Hello.

2    Q     I want to look at an exhibit, 23855.

3          MR. MC CONVILLE:  And I'd ask you to put that in

4    front of Mr. Rosenbaum.

5          Is this in evidence already?

6    BY MR. MC CONVILLE:

7    Q     Okay.  Let's go to the first e-mail in the chain, which

8    is on page 3 of the exhibit, and it's an e-mail dated

9    September 12 from Victoria O'Connor to you, cc Dennis

10   Medici; do you see that?

11   A     I do.

12   Q     And can you tell us who Victoria O'Connor was at that

13   time?

14   A     She was in charge of licensing and related matters at

15   MGA.

16   Q     And for the -- for this particular agreement involving

17   Carter Bryant, was she your primary point of contact for

18   MGA?

19   A     Yes, she was.

20   Q     And let me ask you this:  At this time in

21   September 2000, were you performing any other work for MGA

22   at that time?

23   A     On a number of matters, yes.

24   Q     Okay.  And -- and let's look at the -- at the text of

25   the e-mail that says, "Hi David, we are hiring Carter Bryant

1    as a consultant for MGA and need a licensing/consultant

2    agreement, ASAP."  Now, was this the first time you heard

3    the name "Carter Bryant"?

4    A    I believe that's correct.

5    Q    "He will be" -- the next sentence says, "He will be

6    developing a line of fashion dolls called 'Bratz.'  He will

7    be receiving a 3 percent royalty.  He will receive an

8    advance of $5,500 per month for the first six months against

9    future royalties.  He will then receive an advance of $5,000

10   per month for the following three months, good against

11   future royalties."

12        These terms, did you have any -- do you recall a

13   conversation with Victoria O'Connor about these terms?

14   A    I don't recall a specific conversation.

15   Q    Do you recall a general discussion with her about

16   these?

17   A    I -- I have a general recollection that we spoke, but

18   at this point, the dates I can't say.

19   Q    Okay.  And these terms where you said you were doing

20   additional work for MGA at the time, were you doing any

21   negotiations with, as they call, "freelancers" to be doing

22   work for MGA at the same time?

23   A    I was asked to prepare similar agreements involving

24   other third parties.

25   Q    And those similar agreements, are these, you know,

1    based on your experience with MGA, would a 3 percent royalty

2    be typical for the agreements that MGA was negotiating with

3    the freelancers?

4            MR. PRICE:  Objection.  Lack of foundation.

5            THE COURT:  Would you repeat that question?

6            MR. MC CONVILLE:  Sure.  Let me ask a better

7    question.

8    BY MR. PRICE:

9    Q    You said you were doing other work for MGA --

10   A    Yes.

11   Q    -- at the time?

12   A    Yes, that's correct.

13   Q    Did any of those other agreements include a provision

14   where MGA would pay a royalty?

15   A    I can't say it was to a certainly at this date.

16   Q    Okay.  Did you have a general recollection that the

17   works that you had done for MGA in the past included royalty

18   payments?

19   A    Yes.

20   Q    And would your experience in the past with MGA have --

21   would you be able to conclude that a 3 percent royalty was

22   not out of the ordinary for MGA to offer a freelancer at

23   that time?

24           MR. PRICE:  Objection.  Lack of foundation as to

25   the other agreements.

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 45 of 173   Page ID #:303838
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

45

```
 1              THE COURT:  Sustained.
 2    BY MR. MC CONVILLE:
 3    Q    In any other agreement that you negotiated with MGA
 4    that included royalty payments, do you recall a royalty
 5    payment of 3 percent?
 6              MR. PRICE:  Same objection regarding type of
 7    agreement.
 8              THE COURT:  I just need to know how many -- I
 9    don't have any idea of what his expertise is in terms of
10    royalty payments.  That's the only problem.
11              MR. MC CONVILLE:  I was just asking him if there's
12    been any agreement where he's negotiated with MGA that
13    included a royalty payment.
14              THE COURT:  That wasn't the question.  Sustained.
15              MR. MC CONVILLE:  So --
16              THE COURT:  By the way, it's a proper area.  I
17    just need a foundation.
18              MR. MC CONVILLE:  Okay.
19    BY MR. MC CONVILLE:
20    Q    So how many agreements would you estimate that you
21    negotiated with -- on behalf of MGA while you were doing
22    work for them?
23    A    I can't say to a specific -- there were -- it was
24    several handfuls of agreement on any given occasion.
25    Q    Okay.  And I think you said that you began doing work
```

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 46 of 173   Page ID #:303839
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

46

1    for MGA in roughly -- I think you said 1998?

2    A    '96.

3    Q    '96, I'm sorry.

4         And the work continued through 2002?

5    A    Thereabouts, yes.

6         THE COURT:  And Counsel, you can inquire in that

7    area.  I didn't know what the number was.

8         MR. MC CONVILLE:  Okay.

9    BY MR. MC CONVILLE:

10   Q    And in those multiple handfuls of agreements that you

11   negotiated for MGA in that time period, did they include

12   provisions related to royalty payments?

13        MR. PRICE:  I'm going to object that, that he

14   couldn't specifically recall.  Lack of foundation.

15        THE COURT:  No.  Overruled.

16        THE WITNESS:  Yes.

17   BY MR. MC CONVILLE:

18   Q    And based on your past experience with MGA, was a

19   3 percent royalty bigger, smaller or in standard fair with

20   what MGA was negotiating at that time?

21        MR. PRICE:  Objection.  Irrelevant unless we know

22   the type of agreement.

23        THE COURT:  Overruled.

24        THE WITNESS:  It was consistent with the company's

25   practice.

```
 1    BY MR. MC CONVILLE:

 2    Q    Okay.

 3         Now, let's go back to the e-mail, and it says at the

 4    bottom, "Carter will work exclusively for MGA on the Bratz

 5    line only."  So you respond in the next e-mail in the chain,

 6    it's from to Victoria O'Connor cc Dennis Medici.

 7         By the way, who is Dennis Medici, if you know?

 8    A    I -- I -- I don't recall his exact title, but I

 9    believe he was chief financial officer of the company, or

10    controller.

11    Q    Okay.  And you respond to Victoria O'Connor, it says,

12    "Victoria, please send me the details of Carter and/or his

13    company, including address, phone, fax, e-mail and corporate

14    status of his company.  Also, you list him as the

15    licensing/consultant, and that he will develop the Bratz

16    line.  What exactly will his duties" -- "what exactly will

17    be his duties and responsibilities?"

18         So was it your understanding as of this time, whatever

19    agreement you were negotiating with Carter Bryant, he will

20    not ultimately become an MGA employee, correct?

21    A    Correct.

22    Q    And as of this time, September 12th, you didn't know

23    where he was working as of this time?

24    A    Not when I wrote that e-mail on the 12th at 10:00 a.m.

25    Q    Okay.  So let's look at the next e-mail in the chain
```

1    from Victoria O'Connor to you on September 12, 2000, at

2    10:25 a.m., and it says, "Carter is currently a Mattel

3    designer and will be resigning as soon as he executes his

4    contract."

5         And it goes on to say, "Carter will manage the design

6    and development of the small doll line, Bratz.  Not fashion

7    dolls; my mistake."

8         Was this -- if you recall, was this the first time you

9    learned that Bratz involved a doll line?

10   A    Well, I believe her initial e-mail a couple of days

11   earlier in the day said that it was a line of fashion dolls

12   called "Bratz."

13   Q    Fair point.  Thank you.

14        Okay.  Now let's go to the next in the chain of

15   e-mails, and this is from you back to Victoria, it's is a

16   very busy e-mail day on September 12th.  This one is at

17   11:04, and it says, "Is Carter" -- I'm sorry, it's from you

18   to Victoria O'Connor, cc Dennis Medici, "Is Carter under a

19   written employment agreement with Mattel?  If he is, we need

20   to know what it says about termination so you don't get

21   accused by Mattel of poaching."

22        Now, why did you want to see if he had a written

23   employment agreement with Mattel?

24   A    To make sure that MGA wasn't interfering with some

25   contractual relationship that would prevent him from leaving

1    Mattel and consulting for MGA.

2    Q    Is that a provision called a noncompete provision?

3    A    Well, no.  I wanted to know whether he was under a term

4    contractor or an at-will contract.

5    Q    And what's -- you use the term "at will."  What does

6    "at will" mean?

7    A    At-will employment means either the employee or the

8    employer could terminate the relationship at any time with

9    or without cause.

10   Q    And assuming that he was an at-will employee, how would

11   that have affected, you know, your question here about

12   whether there was a written agreement with Mattel?

13   A    Well, he'd be free to resign his employment and take on

14   other response -- take on the consulting work for MGA.

15   Q    Assuming that he was an at-will employee?

16   A    Correct.

17   Q    Okay.  And then we go up to the next line, next e-mail

18   in the chain, and it says from Victoria O'Connor to you, and

19   it says, "He does have a contract, but there is no mention

20   of termination at all.  Can we get a draft tomorrow?  I know

21   you're out of the office."

22       And then you respond -- it says from David Rosenbaum to

23   Victoria O'Connor.  Now, the date there is January 14, 1990.

24   Any thoughts why a document might have an incorrect date on

25   it like this?

CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

50

```
1    A    Absolutely -- absolutely none.

2    Q    Sometimes mistakes happen, right?

3    A    Uh -- yes.

4    Q    Okay.  In particular when it comes to dating documents,

5    right?

6              MR. PRICE:  Objection.  Ambiguous.

7              THE COURT:  Sustained.

8              MR. PRICE:  Move to strike.

9    BY MR. MC CONVILLE:

10   Q    Well, as it relates to dating this document?

11             THE COURT:  Stricken.

12   BY MR. MC CONVILLE:

13   Q    You write, "Victoria, I will try to get you a draft

14   tomorrow, certainly by Monday.  In the meantime, ask him to

15   send you a copy of his employment agreement.  I'm concerned

16   about any noncompete restrictions."

17        Now, what are noncompete restrictions that you

18   reference there?

19   A    Some sort of agreement on his part by which -- which

20   would prevent him from rendering consulting services to MGA.

21   Q    Okay.  In other words, he couldn't compete -- assuming

22   he's a Mattel employee, he couldn't then go compete against

23   Mattel in future work?

24   A    Correct.

25   Q    Next sentence, "Tell him he can redact the financial
```

1   terms of his contract, but we need to see everything else.

2   Who came up with the Bratz line of dolls?  Is he working on

3   anything at Mattel that could be arguably similar to this

4   product?"

5       And then Victoria O'Connor responds, "He came up with

6   Bratz."  Do you see that?

7   A    I do.

8   Q    Was this the first time that anyone at MGA had

9   communicated to you who was the creator of Bratz?

10  A    Yes.

11  Q    And so your communication came from Victoria O'Connor

12  concerning that Carter Bryant came up with the Bratz design?

13  A    Yes.

14  Q    And then her response is, "Mattel does not do or plan

15  to do anything similar.  It's too hip for them."

16      Did you speak to Victoria O'Connor about that statement

17  at all?

18  A    I don't recall.

19  Q    In your -- in the prior e-mail, you say, "Who came up

20  with the Bratz line of dolls?"  At this point, was there a

21  Bratz line of dolls, if you knew?

22  A    Only as to what was reflected in the prior

23  correspondence.

24  Q    Okay.  So to the extent if it were just a drawing, it

25  wouldn't necessarily be a doll; is that right?

```
 1              MR. PRICE:  Objection.  Argumentative.

 2              THE COURT:  Sustained.

 3   BY MR. MC CONVILLE:

 4   Q    Well, I think you said you hadn't seen whatever it was

 5   that Carter Bryant was pitching to MGA, right?

 6   A    That's correct.

 7   Q    So you didn't know what the intellectual property was

 8   that you were trying to negotiate from Carter Bryant -- for

 9   MGA to assign -- or MGA to purchase from Carter Bryant,

10   right?

11   A    I didn't know what form it was in at the time.

12   Q    You did not or did?

13   A    I did not know what form it was in at the time.

14   Q    Okay.  So in the first e-mail -- or the final e-mail

15   from Victoria O'Connor in that chain says, "He will fax you

16   his employment agreement today."

17        Okay.  So let's look at Exhibit 1 -- I'm sorry, 2201.

18   Do you recognize this document?

19   A    Yes, I do.

20   Q    And what is it?

21   A    It's a document that was faxed to me, to my attention

22   by Carter Bryant.  It includes his -- the offer letter he

23   got from Mattel dated December 11, 1998.

24              MR. MC CONVILLE:  Your Honor, I move its

25   admission.
```

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 53 of 173   Page ID #:303846
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

53

```
 1              THE COURT:  Received.

 2              (Defendants' Exhibit No. 2201 is received in

 3      evidence.)

 4   BY MR. MC CONVILLE:

 5   Q    Okay.  So let's look at the first page of the document,

 6   says, "To David Rosenbaum from Carter H. Bryant, total

 7   pages, four."

 8        This looks like a fax cover page to you?

 9   A    Yes.

10   Q    The next page in the document is a letter from Carter

11   Bryant that says, "Dear David, enclosed is a copy of my

12   original offer of employment with Mattel.  To the best of my

13   knowledge, other than an agreement of confidentiality, there

14   are no other expressed contracts that have been signed.  I

15   am unable to look into this too much further with our human

16   resources director without risking suspicion, but I am quite

17   certain this should suffice.

18        "Thank you very much."

19        Do you recall receiving this?

20   A    Yes, I do.

21   Q    Let me ask you this:  He says in here, "Enclosed is a

22   copy of my original offer of employment."  So let's go to

23   the next page of the exhibit, and it says -- it's dated

24   December 11, 1998.  This appears to be Carter Bryant's offer

25   of employment at Mattel?
```

1    A    Yes.

2    Q    And if you go to page dash 4 of the agreement, and you

3    go to the paragraph that begins, "of course," there is a

4    sentence that says, "Further, you understand that this

5    letter does not imply employment for a specific term, and

6    thus, your employment is at will.  Either you or the company

7    can terminate at any time with or without cause."

8         Now, do you recall focusing on that language that

9    Mr. Bryant had an at-will agreement with Mattel?

10   A    I recall -- I recall seeing it, yes.

11   Q    And what -- again, what does it mean if he is an

12   at-will employee at Mattel?

13   A    That means either he or Mattel can terminate their

14   employment relationship with or without cause at any time.

15   Q    And did that affect your approach to negotiating this

16   agreement with Mr. Bryant?

17   A    I'm sorry?

18   Q    Knowing that he was an at-will employee, did that

19   affect your approach to this agreement with Mr. Bryant?

20   A    Well, it meant that he was certainly free to enter into

21   the consulting agreement with MGA.

22   Q    Okay.  And in his letter he says to you, "I'm unable to

23   look into this too much further with our human resources

24   director without risking suspicion."

25        Did you have an understanding for what he meant by

1    "without risking suspicion"?

2    A    I assume --

3             MR. PRICE:  That's speculation, your Honor.

4             THE COURT:  Overruled -- well, it is speculation

5    as to Carter Bryant.  You can ask him what his state of mind

6    is.

7    BY MR. MC CONVILLE:

8    Q    What did you understand it to mean when he says he

9    could risk suspicion?

10   A    I --

11            THE COURT:  This is from the witness' perspective,

12   obviously, not Carter Bryant's.

13            THE WITNESS:  I assume that because he was

14   intending to resign, he didn't want to resign before he

15   meant to resign.

16   BY MR. MC CONVILLE:

17   Q    In other words, you don't want to quit your job before

18   you have another job lined up?

19   A    Precisely.

20   Q    Is that -- based on your experience, is that out of the

21   ordinary, for an employee to want to have a job in hand

22   before they quit their job with their current employer?

23   A    It's been my experience, yes.

24   Q    Okay.  And there's nothing nefarious about wanting to

25   have employment lined up before tendering notice to your

1    employer, right?

2              MR. PRICE:  Objection.  Argumentative.

3              THE COURT:  Well, I don't know that's within his

4    expertise, is it?

5    BY MR. MC CONVILLE:

6    Q    Based on your experience of negotiating these

7    agreements, is it commonplace for the person who is

8    attempting to secure future employment or future income

9    stream, to make sure that that agreement of future income

10   stream is completed before tendering notice at your prior

11   employer?

12   A    I think that's a common occurrence, yes.

13   Q    That really doesn't require an expert opinion, I am

14   just asking you, does that make sense?

15   A    Yes, it does.

16   Q    Okay.  Now, Mr. Bryant, as an at-will employee, I think

17   you said -- I'm sorry, I already asked you that question.

18   Never mind.  Let me move on to the next thing.

19        So after you received this fax from -- well, let me ask

20   you this, that exhibit, 2201, it's got a Bates number at the

21   bottom that says DR dash -- well, that page says 30; do you

22   understand who produced this document?

23   A    That was produced from my files.

24   Q    And do you recall whether this document was sent

25   directly from Carter Bryant to you, in other words, did he

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 57 of 173   Page ID #:303850
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

57

1    fax it directly to you, did Carter Bryant send it to you?

2    A    I believe so.

3    Q    Okay.  So in any event, we see that you began preparing

4    your agreement or the agreement that MGA would use with

5    Carter Bryant, so let's look at Exhibits 9258, which I

6    believe Mattel's counsel showed you already.  I just want to

7    talk about the timing of this.

8         So it says here at the bottom, the first e-mail, the

9    most distant e-mail in the chain at the bottom dated

10   September 19, 2000, at 12:23 a.m.; do you see that?

11   A    I do.

12   Q    You'll recall that we saw that the agreement ultimately

13   as drafted is dated as of September 18 --

14   A    Yes.

15   Q    -- 2000?

16        So September 18, 2000, would that appear to be the date

17   you also began drafting the agreement?

18   A    Yes.

19   Q    And on the same e-mail chain, it says -- the e-mail

20   dated September 19, it's the second one from the top, it

21   says, "Thanks.  Would you make sure that Carter has his

22   lawyer call me to discuss the Mattel issue, and that we want

23   to be able to address the warranties that he will make

24   regarding originality and ownership vis-a-vis Mattel?"

25        Now, prior to receiving this, I believe we've already

1    seen that Victoria O'Connor told you that Carter Bryant came

2    up with the Bratz concept, right?

3    A    That's correct.

4    Q    And we went over the issue of warranties, Mattel's

5    counsel asked you about that, but let me ask you this:  So

6    in the paragraph that ultimately gets written, it's called

7    Representations and Warranties, that's in the agreement that

8    ultimately is signed by Mr. Bryant, right?

9    A    Yes, words to that effect.

10   Q    Well, let's look at the exhibit.  It's Exhibit 15, and

11   I know that's in evidence.

12        And if you look at page 1 of that agreement, it

13   actually talks about ownership, right?

14   A    Yes.

15   Q    And then as you flip back on page 3 of the agreement,

16   it talks about warranties and indemnity; do you see that?

17   A    Yes, I do.

18   Q    So let me ask you this:  I think you said that you

19   prepared this agreement based on some prior document that

20   was in existence at the time, right?

21   A    I worked off a previous template.

22   Q    In prior templates in negotiating agreements of this

23   nature, do they include warranties and indemnity provisions?

24   A    Yes, they do.

25   Q    And -- so it's not uncommon to include about what the

 1    person who's signing the agreement is willing to represent

 2    as it relates to the ownership of the ideas, right?

 3    A    That's correct.

 4    Q    Or about the originality of the ideas, right?

 5    A    Yes.

 6    Q    Or about competing claims to the ideas, right?

 7    A    Yes.

 8    Q    But this -- in your experience, which is the more

 9    significant provision of paragraph 5, is it the warranty or

10    is it the indemnity?

11             MR. PRICE:  Objection.  Lack of foundation that he

12    has such an opinion.

13             THE COURT:  No, from your perspective, you can

14    answer that, if you have an opinion between the two.

15    Overruled.

16             THE WITNESS:  Well, I think the warranties are

17    important.

18    BY MR. MC CONVILLE:

19    Q    Right?

20    A    Clearly the indemnity is driven by the warranties.

21    Q    So if one were to stack these two provisions up on top

22    of each other, the warranty versus the indemnity, it's the

23    warranty that's really driving the agreement, right?

24    A    Well, it's -- it's a material term, and yes, the

25    indemnity entitles MGA in the case of a breach of that

1    agreement to remedies, so yes, it's important.

2    Q    Okay.  Let's go back to -- so this Exhibit 9258, you

3    ask -- you say, "I need to have a call with his lawyer," and

4    Victoria O'Connor responds, "I just left him a message

5    requesting him to do so."

6         Let me ask you this:  Do you recall in this time frame

7    having conversations with Isaac Larian about the agreement

8    with Carter Bryant?

9    A    I don't recall any conversations with Mr. Larian.

10   Q    Let's go to Exhibit 23856.  I think we looked at this

11   one, and I just want to ask you one question about this.  It

12   talks about, in the first page at the bottom, e-mail from

13   Victoria O'Connor, it says, "It looks like we will change

14   the name since the trademark is taken"; do you see that?

15   A    I do.

16   Q    And I think you said that the trademark would have

17   referred to the name Bratz, whether it was registered at

18   that time?

19   A    Yes.

20   Q    So do you recall that at some point, MGA had to

21   purchase the trademark Bratz from a man named Lovens

22   (phonetic)?

23             MR. PRICE:  Object to lack of foundation.

24   BY MR. MC CONVILLE:

25   Q    Do you know that?

```
 1                 THE COURT:  Overruled.

 2                 If you know that.

 3                 THE WITNESS:  I don't.

 4    BY MR. MC CONVILLE:

 5    Q    Okay.  You weren't involved in any negotiation with a

 6    man named Lovens to purchase the Bratz trade name?

 7    A    No.

 8    Q    And on the same e-mail, it says -- at the top it says,

 9    "I expect his attorney to call you on Thursday or Friday to

10    discuss," so let's -- let's go to the -- well, let me ask

11    you this:  I think you testified Carter Bryant was having

12    discussions at this point with Victoria O'Connor?

13    A    I believe so.

14    Q    Okay.  Do you know if he was having conversations with

15    Isaac Larian?

16    A    I don't know.

17    Q    All right.  Let's look at the next exhibit, which is

18    Exhibit 17239, and ask you to look at that, and let me know

19    if you recognize it.

20    A    It appears to be an e-mail from me to Anne Hwang.

21                 MR. MC CONVILLE:  Your Honor, I move it into

22    evidence.

23                 THE COURT:  Received.

24                 (Defendants' Exhibit No. 17239 is received in

25          evidence.)
```

1    BY MR. MC CONVILLE:

2    Q    So based on the e-mails you've been testifying, does

3    this appear to be the first draft you sent to Anne Hwang,

4    which would be September 28, 2000?

5    A    I believe that's correct.

6    Q    And who is Anne Hwang?

7    A    Carter Bryant's attorney.

8    Q    Prior to this Carter Bryant agreement, had you done any

9    work with Anne Hwang in the past?

10   A    No.

11   Q    Since that time, have you done any work with her since

12   2000?

13   A    No.

14         MR. PRICE:  Objection.  Relevance.

15         THE COURT:  Overruled.

16         THE WITNESS:  No.

17   BY MR. MC CONVILLE:

18   Q    So the -- attached to the e-mail is your first draft of

19   the agreement, right?

20   A    Yes.

21   Q    And let's go to that paragraph 5, that warranties and

22   indemnity.

23        Paragraph 5B says, "Neither the execution and delivery

24   of this agreement, nor the performance by Bryant of any of

25   his obligations hereunder will constitute a violation,

1    breach or default under any agreement, arrangement or

2    understanding or any other restriction of any kind to which

3    Bryant is a party or by which Bryant is bound."

4        Did I read that right?

5    A    Yes.

6    Q    What in essence does that paragraph say, in nonlegal

7    terms?

8    A    It means that his signing this agreement and rendering

9    consulting services to MGA would not put him in breach of a

10   then existing agreement or other obligation.

11   Q    And that would include any agreement he had with

12   Mattel?

13   A    Yes.

14   Q    So you were asked questions about whether or not this

15   agreement would affect third parties, right?

16   A    Yes.

17   Q    So one of the things this agreement in particular calls

18   out on MGA's behalf is that he's making representations as

19   it relates to third parties, right?

20   A    That he's not under any obligation to a third party

21   which would prevent him from performing the services.

22   Q    Okay.  And the next paragraph, paragraph C, says, "The

23   Bryant work product shall be free of all liens and

24   encumbrances and there will be no claims, demands or actions

25   pending or threatened with respect thereto, and that the

1    Bryant work product is original and no part thereof

2    infringes or shall infringe upon any common law or statutory

3    rights or intellectual property rights of any third party

4    including, without limitation, contractual rights, patents,

5    copyrights, mask work rights, trade secrets, rights of

6    privacy and other intellectual actual property rights."

7         What does that paragraph mean?

8    A    It means that no third party will have a claim or has

9    made a claim against what he had developed or would develop,

10   and that the work would not infringe third-party rights.

11   Q    And again, these are representations Carter Bryant is

12   making to MGA, right?

13   A    Yes.

14   Q    That you're proposing Carter Bryant make to MGA?

15   A    That's correct.

16   Q    So to the extent you were asked questions about third

17   parties, one of the third parties contemplated by this

18   agreement would include Mattel, right?

19   A    Yes.

20   Q    And I think you were asked a question about whether or

21   not -- whether or not representations would have any impact

22   on third parties, I believe that's a question you were

23   asked; do you remember that?

24   A    Yes.

25   Q    Let me ask you this:  Are you familiar with the concept

1    of a bona fide purchaser for value?

2    A    I am.

3    Q    What's a bona fide purchaser for value?

4            MR. PRICE:  I'm going to object.  Calls for legal

5    opinion.  He said he didn't consider it in connection with

6    this agreement.

7            MR. MC CONVILLE:  Your Honor, they asked multiple

8    questions about whether third parties could have rights, and

9    I'm just following up on the door they opened.

10           MR. PRICE:  The door was closed shut because he

11   said he didn't consider it.

12           THE COURT:  Overruled.

13           Well, strike that.

14           You may be right, Counsel.  I need to know whether

15   he considered this or not at the time in September when he's

16   involved.  So if he didn't consider it, I'm going to sustain

17   the objection.  If he did --

18           MR. MC CONVILLE:  Okay.

19           THE COURT:  -- I'm going to allow the question.

20   BY MR. MC CONVILLE:

21   Q    This warranty agreement that we're discussing here,

22   that references third parties, you were asked questions

23   about whether or not third parties would have any -- whether

24   they would have any claims or whether they would be

25   foreclosed from making any claims based on this provision;

1    do you remember those questions?

2    A    Yes, I do.

3    Q    And in considering your answer to those questions, did

4    you consider the concept of whether someone could be a

5    good-faith purchaser?

6            MR. PRICE:  Objection.  That's the wrong question.

7    Whether it's at the time he considered it.

8    BY MR. MC CONVILLE:

9    Q    Okay, at the time you wrote this, did you consider

10   whether MGA would be a good-faith purchaser, in other words,

11   believe that it was doing right when it executed this

12   agreement, and therefore, it forecloses Mattel from making a

13   claim; did you consider that?

14           MR. PRICE:  Objection.  That misstates the law.

15           MR. MC CONVILLE:  You were asking questions about

16   the law too.

17           THE COURT:  They are having a conversation amongst

18   themselves, so disregard counsel for a moment.

19           I'm going to sustain the objection in its present

20   form.

21           You can reask, it's the proper area.

22           MR. MC CONVILLE:  Okay.

23   BY MR. MC CONVILLE:

24   Q    At the time you negotiated this agreement, you were

25   representing MGA's interest?

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 67 of 173   Page ID #:303860
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

67

1    A    That's correct.

2    Q    And one of the things that you were attempting to do on

3    behalf of MGA was to limit its exposure, right?

4    A    That's correct.

5    Q    And part of the way you limit MGA's exposure is through

6    this warranties and indemnity provision, right?

7    A    That's correct.

8    Q    And one of the things that you are calling out in this

9    warranties provision are potential claims of third parties,

10   right?

11   A    Yes.

12   Q    And in considering, at that time, potential claims of

13   third parties, did you consider the concept of a bona fide

14   purchaser for value?

15   A    Not -- not in those exact words, but I certainly

16   considered that MGA was relying on Mr. Bryant's

17   representations, that what he had done was outside the scope

18   of his employment with Mattel.

19   Q    And assuming that to be the case, would MGA then have

20   an ability to fend off a claim from a third party based on

21   those representations?

22            THE COURT:  Counsel, that's a legal conclusion.

23   In his opinion or?

24            MR. MC CONVILLE:  In his opinion.

25            MR. PRICE:  Objection, 1, as to a legal

 1    conclusion, and 2, he hasn't said that's what he considered

 2    at the time.  The question is at the time, did he go through

 3    that thought process?

 4            THE COURT:  The real time went down, Jane.  That's

 5    the problem I'm having.  The real time is out.

 6            (Interruption in the proceedings.)

 7            THE COURT:  Just a minute, Counsel.

 8            I don't think we've ever gotten an answer to the

 9    time frame, Counsel.

10            MR. MC CONVILLE:  Okay.

11            THE COURT:  And whether he considered this or not.

12            MR. MC CONVILLE:  Okay.  Let me ask a follow-up.

13    BY MR. MC CONVILLE:

14    Q    At the time you prepared this, this agreement, I

15    believe you said it came from sort of a form agreement --

16    not a form but a preexisting agreement that you were working

17    from, right?

18    A    Yes.

19    Q    So at the time you wrote this, this wasn't the first

20    agreement that you had written concerning the assignment of

21    intellectual property rights?

22    A    That's correct.

23    Q    And based on your experience that informed your

24    drafting of intellectual property right assignments, did you

25    consider the affect that the agreement would have on

1    potential third parties to the claim -- to the agreement?

2              MR. PRICE:  Objection.  Still vague as to "this

3    time."

4              THE COURT:  Overruled.  "This time" means the time

5    of the drafting of the agreement, obviously.

6              MR. MC CONVILLE:  I'm sorry, yeah.

7              THE WITNESS:  Well, I considered whether MGA had a

8    basis to rely on the representations in -- if in the event a

9    third party asserted a claim that was contrary to

10   Mr. Bryant's reps and warranties.

11   BY MR. MC CONVILLE:

12   Q    Okay.  You were asked some questions about -- so

13   this -- this provision about warranties and indemnities that

14   ultimately ends up in the final agreement.  Is it -- based

15   on your experience, is it pretty standard to have that type

16   of a clause in an intellectual property assignment

17   agreement?

18   A    Yes.

19   Q    You were asked some questions about opinion letters; do

20   you recall those questions?

21   A    I do.

22   Q    Is it customary to get opinion letters in the

23   assignment of intellectual property rights such as the one

24   you drafted for MGA as it relates to Carter Bryant?

25   A    No.

1    Q    Okay.  Now, this -- this agreement that you drafted for

2    MGA in September 2000, it wasn't the only agreement you were

3    working on for MGA at that time?

4    A    It was not, that's correct.

5    Q    And I know this agreement has taken over -- has taken

6    phenomenal significance for some people since that time, but

7    did any -- did any other -- I'm sorry.

8            THE COURT:  It's stricken.

9    BY MR. MC CONVILLE:

10   Q    Did this agreement, was it any more or any less

11   significant than any of the other agreements you were

12   working on for MGA at that time involving intellectual

13   property rights?

14   A    No.

15           MR. PRICE:  Objection.  Relevance.  And as to

16   whom, him or MGA?  It's ambiguous.

17           THE COURT:  No, overruled.

18   BY MR. MC CONVILLE:

19   Q    I'm sorry, what --

20   A    There was nothing significant about this transaction at

21   the time.

22   Q    As it relates to your work for MGA?

23   A    That's correct.

24   Q    This wasn't like Isaac Larian calling you every day to

25   say, we must have this agreement done or else MGA will fail?

1    A     I never had that kind of conversation with him.

2    Q     At least as it relates to this agreement, right?

3    A     Correct.

4    Q     All right.  Let's look at -- let me see this, here.

5          Let's look at Exhibit 18463.  I believe this one is in

6    evidence already.

7          So we see that the -- you -- your e-mail to Anne Hwang

8    was dated September 28, 2000, at 11:50 a.m., that's the last

9    e-mail we looked at.  And this next e-mail is dated

10   September 28, 2000, at the bottom, as the first e-mail in

11   the chain, and it's dated September 28, 2000, at 11:55 a.m.,

12   so it's about five minutes after you sent the agreement to

13   Anne Hwang.

14         And we've already seen this language that says you

15   spoke with -- at the bottom, it says you spoke with Carter's

16   lawyer this a.m. and e-mailed her a copy of the draft

17   agreement for her review.  "I asked her specifically about

18   the Mattel issue."

19         What's the Mattel issue again?

20   A     Whether or not anything in his employment arrangement

21   with Mattel or his creation of the concept was within the

22   scope of his employment at Mattel.

23   Q     So that notion of whether Mattel would have a claim,

24   you were very focused on it, right?

25   A     I was focused on whether or not determining -- at least

1    be able to advise on whether or not it was within the scope

2    of his employment.

3    Q    I mean, you were asked questions about whether you did

4    an investigation related to whether or not Carter Bryant

5    created these drawings in 1998, right?

6    A    I believe so, yes.

7    Q    Right.  So, I mean, you were concerned about when

8    Carter Bryant created the drawings, right?

9    A    I was concerned about the timing of his work, yes.

10   Q    Because you were trying to represent your client,

11   right?

12   A    Yes.

13   Q    And you've identified it here as the Mattel issue?

14   A    That's correct.

15   Q    Okay.  So let's read this on.  It says, "I asked her

16   specifically about the Mattel issue, and she said she has

17   reviewed the chronology of the creation of this design and

18   is satisfied that Carter created this outside the scope of

19   employment at Mattel."  She says she understand the concerns

20   here.  "Apparently he conceived these products in 1998, so I

21   recommend that your patent attorneys review this project as

22   soon as possible to avoid any time limitations on patent

23   laws."

24        What was the reference there to patents?

25   A    Well, it's my general understanding that there is a

CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

73

1   period of time within which when an invention is created

2   or -- and when a patent application must be filed or the

3   invention would not be patentable.

4   Q    Okay.  In this case, you don't know whether the

5   intellectual properties had anything to do with the patent,

6   right?

7   A    I don't.

8   Q    Okay.  So when she -- when Anne Hwang represented to

9   you that Carter Bryant created this concept outside of

10  Mattel, what did that tell you as it related to the

11  warranties that Carter Bryant could make in an agreement?

12  A    Well, that he could make the warranties that I

13  proposed.

14  Q    Which were that he -- that he owned the agreement --

15  that he owned the drawings free and clear because he did

16  them in 1998?

17  A    That he owned his work product and that he created it

18  outside of his scope of employment in 1998.

19  Q    Let's assume that you had conducted an investigation of

20  whether or not 1998 could be confirmed by a forensic

21  document examiner.  Let's assume you hired a forensic

22  document examiner to come in and analyze these drawings to

23  determine whether or not those drawings were actually made

24  in 1998, and assume that same forensic document examiner

25  could reach no conclusion as to whether these drawings were

1    done in 1998, would that have affected your willingness to

2    accept the warranties of Mr. Bryant?

3              MR. PRICE:  Your Honor, I object.  My

4    hypotheticals were shot down.  This is inappropriate.

5              THE COURT:  Sustained.

6    BY MR. MC CONVILLE:

7    Q    Okay.  So going back to the e-mail.  When you received

8    this -- let me back up.

9         The reps and warranties that we've referred to that are

10   in the ultimate Carter Bryant agreement, you said those are

11   standard terms that you would expect in representing your

12   client before they engage in this transaction with Carter

13   Bryant, right?

14   A    Yes.

15   Q    And it's pretty common, based on your experience, to

16   include those reps and warranties if you are going to

17   recommend to your client to go forward with the transaction?

18   A    Yes.

19   Q    Now, is -- is the fact that Anne Hwang made a

20   representation to you, did that go farther than the reps and

21   warranties that are reflected in the agreement?

22   A    No, it was consistent.

23   Q    Did you have any reason to doubt what Anne Hwang was

24   telling you concerning the creation date of these drawings?

25   A    No.

1  Q    And in fact, it was consistent with what Victoria

2  O'Connor had already told you about who owned the Bratz

3  drawings, right?

4  A    Yes.

5  Q    Okay.  And at the top of this e-mail, it says -- you

6  say, "No, she, Anne Hwang, did not have comments, but I will

7  call her tomorrow afternoon to follow up," right?

8  A    Yes.

9  Q    So let's look at the next e-mail, which is

10 Exhibit 2212.

11     I ask if you recognize it.  I don't believe this is in

12 evidence yet, so do you recognize the e-mail?

13 A    It appears to be an e-mail that was from -- produced

14 from my file on this agreement.

15     MR. MC CONVILLE:  All right.  Your Honor, I move

16 it into evidence.

17     THE COURT:  Received.

18     *(Defendants' Exhibit No. 2212 is received in*

19     *evidence.)*

20 BY MR. MC CONVILLE:

21 Q    So if you look at the first e-mail in the string, which

22 is on page 2, that's that September 28 e-mail, you forwarded

23 the Carter Bryant agreement to Anne Hwang, right?

24 A    Yes.

25 Q    And then the next in time is an e-mail you sent of

1     September 29 to Anne Hwang that says, "Dear Anne, I'm

2     following up on the above matter.  Please let me know when

3     you will be in a position to give me your comments on the

4     proposed agreement."

5         Do you know if by this time, you'd had a conversation

6     with Anne Hwang?

7     A    Yes, that was subsequent to the conversation I had with

8     her.

9     Q    I'm sorry, this e-mail occurred after you had a

10    conversation with her?

11    A    Yes.

12    Q    Okay.  Oh, right, because in the conversation is when

13    she told you about the 1998?

14    A    Yes, that is correct.

15    Q    Okay.  Got it.

16        Okay.  And then the next e-mail in the chain is from

17    Anne Hwang back to you saying, "Dear David, thank you for

18    forwarding the agreement.  I hope to have a red-lined

19    version for you by the early part of next week."

20        What's a red-lined version?

21    A    That would be one where counsel for the other side

22    would mark -- either edit the document or make notes or mark

23    up proposed revisions.

24    Q    So it's the -- similar to the document that you were

25    shown by Mattel that showed her comments related to

1    particular terms, right?

2    A    That's the same document.

3    Q    Oh, okay.  So let's go to the next e-mail, which is

4    18465.  Please take a look at it.

5         Okay.  Do you recognize the Exhibit 18465?

6    A    It appears to be a document from my files.

7    Q    Who is it to?

8    A    Well, the e-mail at the very top is from me to Victoria

9    O'Connor.

10   Q    Okay.

11            MR. MC CONVILLE:  Your Honor, we move it in

12   evidence.

13            THE COURT:  Received.

14            (Defendants' Exhibit No. 18465 is received in

15        evidence.)

16   BY MR. MC CONVILLE:

17   Q    Let's go to the very first e-mail in the chain, which

18   is on page 2, it's from Anne Hwang to you, dated

19   October 3rd, 2000.  It says, "Dear David, attached is the

20   agreement red lined with our revisions which I have

21   designated as version 2.  Please call me to discuss in

22   further detail.  Anne Hwang."

23        And then attached to this e-mail is the red-lined

24   version, right?

25   A    Yes.

```
 1              (Attorney discussion held off the record.)

 2   BY MR. MC CONVILLE:

 3   Q    And if we look at the page DR00109 at the bottom; do

 4   you see that?

 5   A    No, I don't.

 6   Q    Oh.  There you go.

 7             MR. MC CONVILLE:  What was your exhibit number?

 8             MR. PRICE:  2207.

 9   BY MR. MC CONVILLE:

10   Q    Let's look at 2207, please.  This appears to be the

11   red-lined version that Ms. Hwang sent you?

12   A    Yes, it does.

13   Q    Okay.  At the top, we've already talked about the

14   September 18, 2000, date on the first page?

15   A    Yes.

16   Q    Now, in negotiating this transaction, who was Anne

17   Hwang representing?

18   A    Carter Bryant.

19   Q    You were representing MGA?

20   A    Yes.

21   Q    Are you familiar with the term "arm's length

22   transaction"?

23   A    Yes, I am.

24   Q    What is that?

25   A    It means it's a transaction that's negotiated by
```

1    parties at arm's length.

2    Q    Well, in other words, you were looking out for MGA's

3    best interest, right?

4    A    Correct.

5    Q    And Anne Hwang was looking out for Carter Bryant's best

6    interest?

7    A    That's correct.

8    Q    Okay.  So let's look at some of her proposed changes in

9    red line.  Let's go to paragraph 4, it's on page DR00111,

10   and under paragraph 4A, she strikes out language that says,

11   "Fully recoupable advances against any royalties that may be

12   payable to Bryant pursuant to paragraph 4B below."

13        Do you know what she was attempting to accomplish by

14   striking out that language?

15   A    She was attempting to make the monthly consulting

16   payments in addition to any royalty compensation.

17   Q    So she was trying to get more money for her client?

18   A    Yes.

19   Q    Okay.  Let's look at paragraph 4B.  "MGA shall pay to

20   Bryant a royalty of," she strikes out 3 and puts in

21   5 percent; do you see that?

22   A    I do.

23   Q    And what would be the effect of increasing the royalty

24   payment to Carter Bryant?

25   A    It would increase the amount of compensation he might

1   earn.

2   Q    And it would come at MGA's detriment, right?

3   A    It would be at their expense.

4   Q    At their expense, I'm sorry.

5        And then you were asked questions in particular about

6   the warranties provision that Ms. Hwang struck in

7   paragraph 5C, which is on page 6 of this agreement?

8   A    I see that.

9   Q    Now, what -- because it was an arm's length

10  transaction, did it give you concern that she was striking

11  that language?

12  A    Well --

13  Q    Well, let me ask you a better question.  Would it be

14  uncommon for someone in a negotiation to strike this type of

15  language?

16  A    No.

17            MR. PRICE:  Objection.  Vague.

18            THE COURT:  Well, generally speaking, you can

19  answer that question.

20            Overruled.

21            THE WITNESS:  It would not be uncommon for me to

22  see that kind of comment.

23  BY MR. MC CONVILLE:

24  Q    Why not?

25  A    She was representing her client, and the language that

1   she proposed to delete would reduce his risk on the deal.

2   Q    And it would increase?

3   A    It would increase MGA's risk on the deal.

4   Q    Okay.  With regard to the red-line changes which are in

5   this exhibit, did you, by and large, suggest to MGA to

6   reject them?

7   A    I did.

8   Q    Okay.  Let's look at Exhibit 17251.

9        By the way, when you forwarded this red-line version to

10  Victoria O'Connor, which we saw in one of these e-mails, did

11  you have a conversation with Victoria O'Connor about the

12  proposed changes?

13  A    I -- I believe so, but I can't recall to specificity

14  today.

15  Q    What do you generally recall about your conversation

16  with Victoria O'Connor?

17  A    I may have told her that I got comments from Anne and

18  that I was going to send them over, but I thought my -- my

19  recommendation would be to decline most of those proposals.

20  Q    Okay.  Let's look at the next exhibit here, which is

21  17251.

22           MR. MC CONVILLE:  Is that in evidence already?

23           Okay.

24  BY MR. MC CONVILLE:

25  Q    So at the top is your e-mail of October 4 to Anne

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 82 of 173   Page ID #:303875
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

82

1    Hwang, it says, "Anne, I reviewed your proposed revisions

2    with my client, and they are, by and large, unacceptable.

3        "I understand that my client has discussed these issues

4    with Carter directly, and he has agreed to withdraw most of

5    the proposed changes.  It is imperative that this agreement

6    be concluded today.  Please call me as soon as possible to

7    discuss."

8        As of October 4, you are saying here that the -- it's

9    imperative the agreement be concluded today?

10   A    Yes.

11   Q    Did you have any recollection as to a sense of urgency

12   surrounding this transaction?

13   A    No, I mean no more than the usual kind of client

14   impatience.

15   Q    Okay.

16           MR. MC CONVILLE:  Your Honor, can we take a break?

17           THE COURT:  Certainly.

18           You're admonished not to discuss this matter

19   amongst yourselves, nor form or express an opinion

20   concerning this case.  We'll come and get you at 3:00.  Have

21   a nice recess.

22           Thank you, sir.  You may step down.  See you at

23   3:00.

24           Counsel, 3:00, then.

25           (Recess.)

```
1            THE COURT:  All right.  We are back in session.
2    The jury is present, alternates, all counsel, the witness.
3    And this is the continued cross-examination by
4    Mr. McConville.
5            MR. MC CONVILLE:  Can we put in front of
6    Mr. Rosenbaum Exhibit 10477.
7          DAVID ROSENBAUM, PLAINTIFFS' WITNESS, RESUMED
8                  CROSS-EXAMINATION (Continued)
9    BY MR. MC CONVILLE:
10   Q    Mr. Rosenbaum, I think before the break, we were
11   looking at the e-mail at the bottom of this first page that
12   discusses the fact that the changes -- proposed changes
13   were, by and large, unacceptable; do you see that at the
14   bottom?
15   A    I do.
16   Q    And then the next e-mail in the chain is later that
17   same day of October 4, it's from you to Anne Hwang, and it
18   says, "Further to my e-mail below, I attach clean and
19   red-lined copies of the above agreement."
20          So it appears that you're sending back to Ms. Hwang
21   your comments to her version; is that right?
22   A    It would show those of her proposed changes that were
23   acceptable to MGA.
24   Q    Okay.  And then a clean version would mean what?
25   A    One that could be handed off to her client to be
```

1    signed.

2    Q    Okay.  Assuming that the changes that you had

3    negotiated were acceptable to both sides?

4    A    Correct.

5    Q    The next sentence says, "The changes indicated therein

6    represent all of the changes that my client will agree to

7    make to the agreement.  Please have Mr. Bryant sign at least

8    three copies of the agreement and return them to me so that

9    I may arrange for counter signature by MGA.  Please let me

10   know today if Carter Bryant will execute the agreement.  If

11   these changes are unacceptable, my client has advised me

12   that it will proceed with other product plans are," I assume

13   it means "and terminate its discussions with Mr. Bryant."

14        Did you have any -- do you recall any conversation with

15   Anne Hwang on October 4 concerning the terms in these draft

16   agreements?

17   A    No.

18   Q    And ultimately you know that Carter Bryant executed the

19   agreement on October 4, correct?

20   A    Yes.

21   Q    And I think we were looking at some of the proposed

22   changes before.  Do you remember whether MGA agreed to a

23   5 percent royalty?

24   A    No.

25   Q    And do you know whether MGA agreed that Carter Bryant

1   could strike certain provisions of the warranties

2   provisions?

3   A    That was not acceptable.

4   Q    And Carter Bryant signed the agreement as MGA proposed,

5   correct?

6   A    Yes.

7   Q    And do you recall whether Anne Hwang sent you a signed

8   version of this agreement?

9   A    I don't believe she did.

10  Q    Do you recall receiving notification that Carter Bryant

11  actually signed the agreement on October 4?

12  A    At the time, I don't recall the exact date I was told

13  it was signed and had to ask the client for a copy of the

14  signed agreement.

15  Q    Okay.  Let's look at Exhibit 18462.  I don't know if

16  it's in evidence yet, so why don't you take a look at it.

17          MR. MC CONVILLE:  Oh, it is in evidence?

18  BY MR. MC CONVILLE:

19  Q    Okay.  So the e-mail at the -- second to last e-mail on

20  the bottom of the first page says -- it's from Victoria

21  O'Connor to David Rosenbaum, and says, "He has signed the

22  contract"; do you see that?

23  A    I see it on the screen.

24  Q    Oh.  We are working hard to get you a copy.

25  A    I see it now.

1    Q    Okay.  The first e-mail from you says, "Send me a copy

2    of the fully executed contract for my files"; do you see

3    that?

4    A    I do.

5    Q    And as of October 4, it appears that Carter Bryant

6    executed the contract, right?

7    A    I learned that subsequently.

8    Q    You were asked some questions --

9    A    Let me be clear.  I learned that from this e-mail, but

10   in terms of the exact date, I learned that subsequently.

11   Q    Oh, okay.  But the e-mail reflects October 4, right?

12   A    Yes.

13   Q    And we can look at Exhibit 15, if you'd like, and go to

14   the last page of Exhibit 15, please, and the footer of the

15   document shows a date stamp of?

16   A    October 4th.

17   Q    October 4, okay.

18        Now, you were asked some questions by Mattel's counsel

19   concerning whether you were aware that Carter Bryant had

20   worked on a project called Prayer Angels.  Do you recall

21   looking at an invoice that Carter Bryant had submitted to

22   MGA while he was employed at Mattel?

23   A    I remember being shown an invoice this morning.

24   Q    Right.

25   A    Yes.

1    Q    That's what I'm talking about.

2    A    Yes.

3    Q    And so my question to you is, would it have affected

4    your preparation of this agreement between MGA and Carter

5    Bryant as it relates to the Bratz drawings if you had known

6    that Carter Bryant was moonlighting and doing work on the

7    side for MGA?

8    A    No.

9    Q    Okay.  You were asked some questions concerning whether

10   you were aware that Carter Bryant was still employed at

11   Mattel while attempting to sell his Bratz concept to MGA; do

12   you remember those questions?

13           MR. PRICE:  Objection.  Misstates the question.

14   BY MR. MC CONVILLE:

15   Q    Do you remember being asked questions about the timing

16   sequence of -- I believe the questions were posed to the

17   extent, if you knew Carter Bryant, while employed at Mattel,

18   was doing work on the Bratz project while still employed at

19   Mattel, whether that would affect your analysis; do you

20   remember questions along those lines?

21   A    Yes, I do.

22   Q    Let me ask you this:  You said Carter Bryant is an

23   at-will employee, correct?

24   A    Yes.

25   Q    Based on the letter that you saw from Carter Bryant on

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 88 of 173   Page ID #:303881
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

88

1   Mattel letterhead?

2   A    Yes.

3   Q    And as an at-will employee, he could have been

4   terminated at any time, right?

5   A    That's correct.

6   Q    And as an at-will employee, your understanding was he

7   could compete, that there would not be a noncompete

8   provision, based on your experience, right?

9   A    He could resign and take another position.

10  Q    Right.

11       Let me ask you this:  Are you familiar with the

12  concepts known as -- are you familiar with the notion that

13  an employee like Carter Bryant can take steps to compete

14  against Mattel before leaving his employment at Mattel?

15            MR. PRICE:  Objection.  Calls for legal opinion.

16            THE COURT:  Sustained.

17  BY MR. MC CONVILLE:

18  Q    You were asked questions concerning the investigation

19  that -- that you did not undertake; do you remember that,

20  about notarized documents?

21  A    Yes.

22  Q    And would it have affected your analysis to know that

23  documents were notarized that reflected that the drawings

24  were done in 1998?

25            MR. PRICE:  Objection.  Misstates the testimony.

1    BY MR. MC CONVILLE:

2    Q    I'm just building on the hypothetical that was posed to

3    you about the work that you did not do.  Assume the work you

4    did not do in not getting these notarized drawings, let's

5    assume that those notarized drawings that you did not get,

6    reflected that they were done in 1998, would that have

7    affected your analysis?

8              MR. PRICE:  That's an improper hypothetical.

9              THE COURT:  Just a moment.

10             I thought that counsel had previously asked issues

11   concerning what he could have investigated, copyright or if

12   the drawings had a copyright date or if he consulted or

13   inquired of other companies.  I sustained the objections

14   concerning other counsel's hypotheticals.  You can ask what

15   positive inquiries he made or what steps he undertook --

16             MR. MC CONVILLE:  Okay.

17             THE COURT:  -- that were satisfactory in his own

18   mind.

19             I'm going to sustain the objection.

20             MR. MC CONVILLE:  Okay.  I apologize.  I

21   misunderstood.

22   BY MR. MC CONVILLE:

23   Q    Let me ask you this:  Mr. Rosenbaum, how long have you

24   been a lawyer?

25   A    Thirty years.

1    Q    So this agreement was negotiated over 10 years ago?

2    A    Yes.

3    Q    You had been a lawyer for about 20 years at that point?

4    A    That's correct.

5    Q    And what sort of background do you have in negotiating

6    transactions to acquire intellectual property rights?

7              THE COURT:  Then or now?

8              MR. MC CONVILLE:  Then.

9              THE COURT:  Then.

10             THE WITNESS:  At that time, I had 20 years of

11   transactional experience working in the motion picture

12   industry and then in private practice.

13   BY MR. MC CONVILLE:

14   Q    And part of your experience in those 20 years relates

15   to a company acquiring intellectual property rights from a

16   creator, correct?

17   A    That's correct.

18   Q    And have you actually instructed on the topic of the

19   acquisition of intellectual property rights?

20   A    I -- I have spoken at MCLE events, and I teach a course

21   on video game law at Southwestern Law School, Los Angeles.

22   Q    And back in 2000, had you actually authored some

23   articles on the area of acquisition of intellectual property

24   rights?

25   A    I had written some articles which were published in a

1    trade publication about various aspects of licensing --

2    entertainment and brand licensing, three or four articles

3    about various provisions.  I don't remember which one was

4    which at this date.

5    Q    Well, based on -- on your experience, going into your

6    agreement or going into the contract that you negotiated for

7    MGA as it relates to the acquisition of the Bratz

8    property -- intellectual property rights from Carter Bryant,

9    did you -- did you believe it sufficient at that time in

10   representing your client to include the reps and warranties

11   in that contract to protect MGA's interest?

12   A    Yes, I did.

13   Q    And did you take an additional step and confirm with

14   the attorney, Anne Hwang, that these drawings, that this

15   Bratz intellectual property was conceived in 1998, outside

16   of Mattel?

17           MR. PRICE:  Objection.  Leading.

18           THE COURT:  Overruled.

19           You can answer that question.

20           THE WITNESS:  I'm sorry, could you repeat the

21   question?

22   BY MR. MC CONVILLE:

23   Q    Sure.  You took an additional step in this case, not

24   only reps and warranties, but you confirmed the -- the

25   creation time line of 1998 with opposing counsel, Anne

1    Hwang, correct?

2    A    Yes.

3           MR. PRICE:  Objection.  Assumes facts not in

4    evidence, which is that was an additional step.

5           THE COURT:  Overruled.  That would be a little

6    ambiguous, in other words, by phone call or is he relying on

7    the e-mails that the jury's already seen where Anne Hwang

8    allegedly says her client has confirmed this.

9           So I'm going to sustain the objection, just have

10   you reask that question so the jury's certainly not

11   confused, because if there is a phone call or something

12   else, we need to know.

13          MR. MC CONVILLE:  Understood.

14   BY MR. MC CONVILLE:

15   Q    In addition to the reps and warranties which Carter

16   Bryant signed in his agreement with MGA, you took an

17   additional step and had a conversation with Anne Hwang who

18   confirmed that Carter Bryant made these drawings in 1998,

19   correct?

20   A    Yes.

21   Q    And based on your many years of experience, did you

22   believe there was a need for MGA to do anything more than

23   get the reps and warranties that it received from Carter

24   Bryant and the assurances it received from Anne Hwang?

25          MR. PRICE:  Objection.  Improper opinion.

```
 1              THE COURT:  Just a moment.

 2              No, this is as to his state of mind.  This doesn't

 3    apply.  You are the fact finder, you'll decide these issues,

 4    but he can state in his own state of mind if he thought that

 5    this was sufficient.

 6              Overruled.

 7              Counsel.

 8              THE WITNESS:  At the time I was satisfied with

 9    what Ms. Hwang told me and didn't think I needed to do any

10    further investigation.

11    BY MR. MC CONVILLE:

12    Q    And what Anne Hwang told you was she confirmed that the

13    drawings were done in 1998; is that right?

14    A    She confirmed that he worked on that in 1998, and there

15    was no ambiguity in the conversation.

16    Q    Thank you.

17              MR. MC CONVILLE:  No further questions.

18              THE COURT:  This would be redirect examination by

19    Mr. Price on behalf of Mattel.

20                     REDIRECT EXAMINATION

21    BY MR. PRICE:

22    Q    Mr. Rosenbaum, you just said that you did no additional

23    investigation; do you recall that?

24    A    Yes.

25    Q    Okay.  When I questioned you, you said you didn't do
```

1   any investigation; do you recall that?

2   A    I -- I don't recall the exact words of my prior

3   testimony, but I recall you asking me about that.

4   Q    And you recall that you said that you could not talk to

5   Mr. Bryant to see if he would give you a representation so

6   you can draft the agreement; do you recall that?

7   A    I recall saying that I could not have conversations

8   with him because he was represented by counsel.

9   Q    And so you had to have the conversations with his

10  counsel to get that representation, correct?

11  A    To confirm that, yes.

12  Q    And that's what you did, you had the conversations with

13  his counsel to confirm that there would be a representation

14  from Mr. Bryant that this property, whatever it is, belonged

15  to him and not Mattel, correct?

16  A    That's correct.

17  Q    And you didn't investigate the truth of that, correct?

18  A    I took no additional steps beyond the conversation with

19  Ms. Hwang.

20  Q    Well, no, I'm -- I'm getting more specific here.  I

21  know you had the conversation with Ms. Hwang.  You told us

22  before that that, in your mind, doesn't constitute an

23  investigation, correct?

24  A    I don't think that was my testimony.

25  Q    You were only trying to get a representation, not make

1    an investigation, right?

2            MR. MC CONVILLE:  Objection.  He's arguing with

3    the witness.

4            THE COURT:  Overruled.

5            THE WITNESS:  Sorry, can you say that again,

6    please?

7    BY MR. PRICE:

8    Q    You were only trying to get a representation, not do an

9    investigation when you called Ms. Hwang?

10   A    I believe what I testified to was that I was attempting

11   to confirm with Ms. Hwang that Mr. Bryant would be able to

12   make the representations that were in the draft agreement.

13   Q    And because you were just trying to confirm that he

14   would make a representation, you didn't ask her what

15   chronology she was talking about, right?

16   A    I don't recall the specifics of the conversation.

17   Q    Well, you don't recall asking her about what chronology

18   she was talking about, what she was relying on, you didn't

19   ask follow-up questions, you didn't ask for additional

20   information, right?

21   A    I did not ask for additional information, that's

22   correct.

23   Q    Or have follow-up questions or ask what she was

24   referring to when she said a chronology, right?

25   A    I did not ask for additional information or follow-up

1    questions.

2    Q    And that's because you didn't need to do that if what

3    you were trying to do is just get a representation that he

4    would make the warranties and indemnities that you're

5    putting into the draft, right?

6    A    Well, I believe I just testified that from my -- my

7    recollection of the conversation with her was that she was

8    clear about her understanding that her client had created

9    the concept outside of the scope of his employment, and I

10   felt there was no ambiguity in what she told me.

11   Q    I am not asking you about if there was any ambiguity in

12   what she told you.  I am asking you why there would be no

13   follow up, no additional questions, no what are you

14   referring to with the chronology, what documents, et cetera.

15       The reason you didn't do anything beyond asking her to

16   tell you what she had observed with Mr. Carter -- Mr. Bryant

17   or what she learned from Mr. Bryant is because it didn't

18   matter to you.  All you wanted to know was that they would,

19   in fact, make that representation, right?

20             MR. MC CONVILLE:  Objection.  Asked and answered.

21             THE COURT:  Overruled.

22             THE WITNESS:  I believe what my testimony was, is

23   that I -- I consulted with her about his employment with

24   Mattel and whether the work he had done on Bratz was outside

25   the scope of his employment with Mattel, and I was satisfied

1    with her explanation, and I didn't pursue the matter any

2    further.

3    BY MR. PRICE:

4    Q    And -- and I'm asking the reason you didn't pursue at

5    all beyond getting the representation is because it wasn't

6    part of your task, you were simply trying to get a

7    representation so you could put them in a contract between

8    MGA and Mr. Bryant, right?

9    A    Yes.

10   Q    Okay.  And you said that there was nothing significant

11   about this agreement at the time.  Do you recall

12   Mr. McConville asking you, you know, that you've done a lot

13   of agreements and there was nothing particularly significant

14   about this particular one; do you remember that?

15   A    I do.

16   Q    Okay.  Well, did -- at the time you were drafting this,

17   did anyone from MGA tell you that this was the first time

18   they had seen a fashion doll in over two years of searching

19   that they wanted to pursue?

20   A    No.

21   Q    Did they tell you that they -- there was a rush because

22   the Hong Kong toy fair was coming up in January of 2001, and

23   they had to rush so they could have a fashion doll to show

24   to potential customers?

25   A    No.

1    Q    Did they tell you -- if you look at Exhibit 16788.

2          MR. PRICE:  And this is in evidence, Ken, so we

3    can put it up.

4    BY MR. PRICE:

5    Q    Did they tell you that as of October -- September 13,

6    2000, that Mr. Larian had said that he was going to risk and

7    spend millions making the brand happen, the brand and line

8    happen?

9    A    No.

10   Q    So when you say that you didn't know that this contract

11   was any more significant than any other contract, you didn't

12   know what MGA thought about how much it wanted to pursue

13   this doll line and how much it was willing to invest and how

14   quickly it had to get started to accomplish that, you didn't

15   know any of that, did you?

16         MR. MC CONVILLE:  Objection.  Compound.  Vague.

17         THE COURT:  Overruled.

18         THE WITNESS:  I didn't know of the company's

19   specific plans for the launch of the product line.

20   BY MR. PRICE:

21   Q    You also said -- Mr. McConville asked if it would

22   change your mind if Mr. Bryant was, and he used the phrase

23   "moonlighting"; do you recall that?

24   A    Yes.

25   Q    Is it fair to say that you were -- in September 2000,

1   you were in no position to judge Mr. Bryant's credibility?

2   A    That's fair to say.

3   Q    You, in fact, had never met the gentleman, correct?

4   A    That's correct.

5   Q    And you've told us that it would be commonplace for a

6   company like Mattel to have in its contracts with its

7   employees, provisions that they could not assist competitors

8   at the same time they are working with Mattel, right?

9   A    I don't recall you asking me that that question was

10  specific to Mattel or whether that was a general question.

11  Q    You would think -- generally, your experience is that

12  companies have provisions with their employees where they

13  are not allowed to assist a competitor while they are

14  working with that company?

15  A    I'm aware of that, yes.

16  Q    And you understood that MGA sold toys?

17  A    Yes.

18  Q    And dolls?

19  A    Yeah, I believe so.

20  Q    And Mattel had sold toys and dolls, right?

21  A    Yes.

22  Q    You understood that MGA was Mattel's competitor, right?

23  A    I understand that they are competitors, yes.

24  Q    And you understood that at the time?

25  A    Yes, I did.

1    Q    So wouldn't that affect your judgment as to the

2    integrity of Mr. Bryant if you knew that he was violating

3    his agreement with Mattel not to assist competitors and was

4    working with MGA to assist them in their projects?

5             MR. MC CONVILLE:  And objection, your Honor,

6    inappropriate hypothetical.

7             THE COURT:  Well, the integrity of Mr. Bryant

8    through this witness is improper, Counsel.  Sustained.

9    BY MR. PRICE:

10   Q    Well, in following up, you testified that you wouldn't

11   care if Mr. Bryant was assisting MGA in connection with a

12   project such as Prayer Angels even though at the time he was

13   employed at Mattel; isn't that what you testified to?

14   A    I don't know that I used the words "I wouldn't care,"

15   but that -- in answer to Mr. McConville's question, it

16   didn't concern me.

17   Q    Well, you say it didn't concern you.  It didn't concern

18   you at the time because you didn't know about it, right?

19   A    Right, but you posed it as a hypothetical as if I had

20   known it, would it concern me, and I said no.

21   Q    So just to be clear, if you had information, then --

22   and following up on Mr. McConville's hypothetical, if you

23   had information that Mr. Bryant in August and September of

24   2000 was violating his contract with Mattel and assisting a

25   competitor, if you knew that, that would not have affected

1   anything that you did in performing the tasks that were

2   given to you by MGA?

3           MR. MC CONVILLE:  Objection.  Inappropriate

4   hypothetical.

5           THE COURT:  Just a moment.

6           So just to be clear, if you had information,

7   then -- in following up on Mr. McConville's hypothetical, if

8   you had information about Mr. Bryant in September or August

9   that was violating his contract with Mattel in assisting a

10  competitor, if you knew that they would not affect anything

11  that you did in performing the tasks that were given to you

12  by MGA.

13          Just reask that.

14          MR. PRICE:  I'll reask that.

15  BY MR. PRICE:

16  Q    You told Mr. McConville that, hypothetically, if you

17  had known that Mr. Bryant was, quote, "moonlighting," that

18  would not have affected the way you performed your duties in

19  September and early October of 2000, correct?

20  A    Yes.

21  Q    Now, so I just want to be clear, then, that if you

22  had -- if you had learned that Mr. Bryant was breaching his

23  duties to Mattel by assisting MGA, a competitor, at the same

24  time he was working with Mattel, okay, if you knew that,

25  would that have changed the performance of your duties in

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 102 of 173   Page ID
#:303895
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

102

1    the September, October 2000 time frame?

2             MR. MC CONVILLE:  Same objection.  In addition,

3    it's vague.

4             THE COURT:  Overruled.  The performance of duties

5    may be vague, Counsel, but his opinion, his whatever.

6             MR. PRICE:  Sure.

7             THE WITNESS:  Well, I believe that your question

8    asks me to assume that the act of his moonlighting was a

9    breach of his agreement with Mattel whereas if he had

10   created the concept outside the scope of his employment and

11   his, quote/unquote, "moonlighting" was related to something

12   that was created outside the scope of his employment, which

13   Mattel didn't own, then I wouldn't consider the act of

14   moonlighting to be a concern in terms of the contract.

15   BY MR. PRICE:

16   Q    Now, you say "in terms of the contract," have you

17   reviewed MGA's contract with its employees?

18   A    I have not.

19   Q    Have you reviewed Mattel's contract with Mr. Bryant?

20   A    I only saw a copy of it when I was furnished the

21   exhibit book on Friday.

22   Q    So at the time, you hadn't seen what the contract was

23   between Mr. Bryant and Mattel, correct?

24   A    That's correct.

25   Q    And of course, to determine what Mr. Bryant's duties

1    and obligations were under his contract with Mattel, you'd

2    have to read the contract?

3    A    If it described those, yes.

4    Q    And you never saw that, because Mr. Bryant didn't

5    provide it to you, right?

6    A    That's correct.

7    Q    Okay.  But you had seen, had you not, contracts between

8    companies and their employees concerning who owns their work

9    product, right?

10              MR. MC CONVILLE:  Objection.  Irrelevant.

11              THE COURT:  Overruled.

12              THE WITNESS:  I have seen contracts to that

13   effect, yes.

14   BY MR. PRICE:

15   Q    Okay.  I'd like you to look at Exhibit 9924.

16        And this is in evidence, you see it's dated January 4

17   of '99, and if you'd look at 2A.

18   A    Okay.

19   Q    And you've seen provisions like this before, have you

20   not, where it says, "I agree to communicate to the company

21   as promptly and fully as practicable, all inventions, paren,

22   as defined below, conceived or reduced to practice by me,

23   paren, alone or jointly by others at any time during my

24   employment by the company, period.  I hereby assign to the

25   company and, slash, or its nominees all of my right, title

```
 1   and interest in such inventions."

 2        Do you see that?

 3   A    I do.

 4   Q    And you are familiar with those sorts of provisions,

 5   right?

 6   A    Yes.

 7   Q    And you look at paragraph B, you see it defines

 8   inventions as including but not limited to, under 2B, all

 9   discoveries, improvements, processes, developments, designs,

10   et cetera; do you see that?

11   A    I do.

12   Q    And you are familiar with that kind of provision,

13   right?

14   A    I am.

15   Q    And then you go down to C, it says, "Any provision in

16   this agreement requiring me to assign my rights in any

17   invention does not apply to an invention which qualifies

18   under the provision of Section 2870 of the California Labor

19   Code.  That section provides that the requirement to assign,

20   quote, shall not apply to an invention that the employee

21   developed entirely on his or her own time without using the

22   employer's equipment, supplies, facilities or trade secret

23   information except for those inventions that either, paren,

24   1, relate at the time of the conception or induction to

25   practice of the invention to the employer's business."
```

1      Do you see that?

2  A    I do.

3  Q    Okay.  And you've seen that sort of provision before as

4  well, correct?

5  A    Yes.

6  Q    So that if you are a toy designer working for a toy

7  company, are you with me so far, right?

8           MR. MC CONVILLE:  Your Honor, I'm going to object

9  to where this hypothetical is going.  It relates directly to

10 this evidence in this case and it's a jury issue.

11          THE COURT:  Overruled.

12 BY MR. PRICE:

13 Q    So you understood that Mattel is in the toy business,

14 correct?

15 A    Yes.

16 Q    You understood that it created dolls?

17 A    Yes.

18 Q    You understood that it had designers designing dolls?

19 A    Yes.

20 Q    And if you had seen this agreement, you would have

21 understood that whether something was done while sitting at

22 your desk or somewhere else, if you're employed by Mattel

23 and you create a design that relates to Mattel's business,

24 toys, designs of toys, et cetera, that belongs to Mattel

25 under this agreement?

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 106 of 173   Page ID #:303899
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

106

1      MR. MC CONVILLE:  Objection, your Honor.  Ninth

2    Circuit and improper hypothetical for this case.

3          THE COURT:  Overruled.  This is going to be his

4    opinion, it's limited to his opinion.  You'll decide what

5    this contract means or doesn't mean, amongst many issues.

6          THE WITNESS:  I don't think that your definition

7    of toys and games -- toys and dolls, it's too broad to say

8    that anything that he did inevitably was owned by Mattel.

9    BY MR. PRICE:

10   Q    And where you see that "relate at the time of the

11   conception or reduction to practice of the invention to the

12   employer's business"; do you see that?

13   A    I do.

14   Q    So tell us what you think the business of Mattel was.

15   A    The business of Mattel was to -- was the production of

16   specific toys in various product categories.

17   Q    And in fact, to do that, they had to design those toys,

18   right?

19   A    Yes.

20   Q    Okay.  Part of the business at Mattel was to design

21   toys to put on the market, right?

22   A    Yes.

23   Q    And that's what you read here as employer's business in

24   this context.  It would be -- it's the business partly of

25   designing toys to present to the marketplace, right?

```
 1              MR. MC CONVILLE:  Same objection, your Honor.
 2              THE COURT:  Overruled.
 3              THE WITNESS:  I think you are reading that too
 4    literally, and it's too broad of a description of Mattel's
 5    business.
 6    BY MR. PRICE:
 7    Q    And did you have that in mind in September 2000 when
 8    you were performing your task for MGA?
 9    A    I had this in general, yes, in mind, sure.
10    Q    But you didn't see this particular contract, right?
11    A    I did not.
12    Q    And in fact, what this contract said, you said didn't
13    matter to you because you were told by the client that he
14    did this when he wasn't working at Mattel, right?
15    A    I was told it was done outside the scope of his
16    employment.
17    Q    Well, the representation to you was that it was in
18    1998, right?
19    A    Yes.
20    Q    When this contract wouldn't apply at all?
21    A    Correct.
22    Q    Okay.  So if you'd look at the paragraph 3, do you see
23    where it says, "My employment with the company requires my
24    undivided attention and effort; therefore, during my
25    employment with the company, I will fully comply with the
```

1   company's conflict of interest policies as it may be amended

2   from time to time.  I shall not, without the company's

3   expressed written consent, engage in any employment or

4   business other than for the company or invest in or assist

5   in any manner any business competitive with the business or

6   future business plans of the company"; do you see that?

7   A   I do.

8   Q   Okay.  And you understood this was a fairly common

9   provision, right?

10  A   I've seen variations on this, yes.

11  Q   And so your understanding at the time, because you knew

12  these provisions were common, was that Mr. Bryant should not

13  be assisting MGA in any manner, right?

14          MR. MC CONVILLE:  Same objections.

15          THE COURT:  Overruled.

16          THE WITNESS:  I don't reach the same conclusion

17  that your question suggests.

18          THE COURT:  Just a moment.  Just a minute.  Just a

19  minute.  My apologies.

20          Your question was, so your understanding at the

21  time, because you knew these provisions were common, was

22  that Mr. Bryant should not be assisting MGA.  He never saw

23  this contract.  That's an incorrect ruling.  Sustained.

24  BY MR. PRICE:

25  Q   So my question is, your general understanding of these

 1    sorts of contracts, was it your general understanding that

 2    these contracts would commonly have a provision --

 3              THE COURT:  Just a moment, Counsel.  Here is where

 4    we are going far afield.  I'm going to allow you to ask if

 5    this would have changed his opinion or caused him to give

 6    other advice, but he didn't -- his testimony is he didn't

 7    see this contract, so relating the contract back is a little

 8    difficult, and I'm going to sustain every objection along

 9    those lines, but you are more than welcome to ask if these

10    provisions, if they were known, would have changed his

11    position.  I think it can still be simply asked.

12              MR. PRICE:  Okay.

13    BY MR. PRICE:

14    Q    I think you said in response to Mr. McConville's

15    questions --

16              THE COURT:  Counsel, don't repeat that, now.  I am

17    not interested in what you and Mr. McConville said.  Ask him

18    questions, now.

19              MR. PRICE:  All right.

20    BY MR. PRICE:

21    Q    In general, your knowledge in general at the time was

22    that employers had provisions in this industry saying that

23    their employees could not assist a competitor in any way

24    while they are employed with the employer, right?

25    A    I am familiar with that concept in general, yes, and at

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 110 of 173   Page ID #:303903
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

110

1    the time, I was familiar with that concept.

2            THE COURT:  Just a moment, Counsel.  My apologies.

3            Let me say to you, of course I'm interested in

4    what any attorney says, but what's happening on occasion is

5    that each counsel for each side is trying to recount the

6    question asked by other counsel.  That is almost an

7    impossibility.  I'll let them generally draw back into the

8    area, but the exact wording, you don't have before you.

9            So my apologies to both you and Mr. McConville.

10   You can ask in the area and recall the specific area if

11   you'd like to.

12   BY MR. PRICE:

13   Q    Do you recall an area of inquiry where you were asked

14   whether it would matter to you if Mr. Bryant was, quote,

15   "moonlighting"; do you recall that?

16   A    Yes.

17   Q    And I think you said just now that you are aware that

18   in general, that employers have contracts with their

19   employees saying that they can't assist competitors in any

20   manner while they are employed by the employer?

21   A    Yes.

22   Q    And did you know that, for example, Prayer Angels, it

23   was a project by MGA which they planned to put on the

24   market, on the toy market?

25   A    I didn't know of Prayer Angels until you presented me

1    with that invoice today.

2    Q    Okay.  You would think that a Mattel employee assisting

3    a competitor in putting a toy on the market, are you with me

4    so far?

5    A    Yes.

6    Q    It would be your view that if they did that while they

7    were a Mattel employee, it would be contrary to the terms

8    you would expect to see in the contract between Mattel and

9    the employee?

10   A    Not if the moonlighting was directed at a product or at

11   a concept or a project that was outside the scope of that

12   person's employment.

13   Q    Did you understand Mattel had babies on the market, toy

14   babies?

15   A    Yes.

16   Q    And did you understand Mr. Bryant was a doll designer?

17   A    I understood that in a general way, yes.

18   Q    Okay.  Well, these questions I've been asking you, they

19   weren't in your mind at the time in September and October of

20   2000, right?

21           MR. MC CONVILLE:  Objection.  Misstates his

22   testimony.

23   BY MR. PRICE:

24   Q    Let me be clear.  The question of what Mr. Bryant was

25   doing with MGA, the question of whether he was working on

1   project with them at the time, in August or September, those

2   weren't things you were thinking about in September of 2000,

3   correct?

4           MR. MC CONVILLE:  Objection.  Misstates his

5   testimony.

6           THE COURT:  Let me be clear, the question about

7   what Mr. Bryant was doing with MGA, the question of whether

8   he was working on projects with them at the time in August

9   or September, those weren't things you were thinking about

10  in September of 2000.

11          No, overruled.

12          You can answer that question.

13          THE WITNESS:  I wasn't thinking about what he

14  might be doing in anticipation of leaving Mattel.

15  BY MR. PRICE:

16  Q   Well, you weren't given any information at all as to

17  what he was doing with respect to MGA other than negotiating

18  this contract in September or October of 2000, that wasn't

19  on your radar screen, right?

20  A   That's correct.

21  Q   And in connection with your job, which was to draft

22  this agreement, you know, that didn't matter to you, right?

23  A   Yes, that's correct.

24  Q   Okay.  So let's focus in on questions, topics you were

25  asked in your examination about that agreement.

```
 1          You saw, you were shown 23855, and if you'd look at the
 2    last page, there, and the last e-mail.
 3               MR. PRICE:  Second to the last page, Ken.
 4    BY MR. PRICE:
 5    Q    It was your understanding from the client on
 6    September 12th, that these were the basic agreed-to terms
 7    between Mr. Bryant and MGA, correct?
 8    A    Yes.
 9    Q    And then at the top of this chain, Ms. O'Connor tells
10    you -- MGA tells you that Mr. Bryant -- that Mattel doesn't
11    plan to doing something similar, that he came up with Bratz,
12    et cetera, correct?
13    A    Yes.
14    Q    So -- so you're learning information from your client
15    so that you can do your job, right?
16    A    Yes.
17    Q    Okay.
18          So if you'd go to 2201.  This is a -- I think this is
19    not --
20               MR. PRICE:  I don't know if that's in our binder.
21               MS. JUAREZ:  It is.
22               MR. PRICE:  It is.  I know it wasn't --
23    BY MR. PRICE:
24    Q    And you testified this is what you received back from
25    Mr. Bryant, correct?
```

1    A    Yes.

2    Q    And this talks about him not having a copy of his

3    confidentiality agreement, right?

4    A    Yes.

5    Q    And then you looked at the letter attached, and you saw

6    that it was a confidentiality and inventions agreement,

7    correct?

8    A    I see the reference there, yes.

9    Q    Now, you were asked whether this came from your files;

10   do you recall that?

11   A    Yes.

12   Q    Okay.  If we can go to the first page.  How did you

13   receive this document?  Was it hand delivered, was it --

14             MR. PRICE:  Ken, go to the first page.

15   BY MR. PRICE:

16   Q    Hand delivered or mailed to you or faxed to you?

17   A    My recollection is it was faxed to me.

18   Q    Okay.  Do you recall, are you sure whether or not it

19   was faxed from Mr. Bryant or whether it was faxed by MGA?

20   A    I don't recall, but my -- my -- I believe my impression

21   at the time was that it came from Mr. Bryant.

22   Q    But sitting here, you can't tell us for sure that it

23   came from Mr. Bryant or from MGA, correct?

24   A    No, I cannot.

25   Q    So I'd like you to look at 1309.  And you see this is a

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 115 of 173   Page ID #:303908
CV 04-9049-DOC – 02/22/2011 – Day 21, Vol. 2 of 3

115

1    copy of the same document, the same pages, if you flip

2    through and tell us if you can verify that?

3    A    It looks to be the same document.

4    Q    And you see at the bottom, there, it says, "MGA's

5    files," right?

6    A    Yes.

7    Q    And if you'd look at the top, you see that says

8    September 14, '00, collectibles, and it gives a phone number

9    of some sort?

10   A    Yes.

11   Q    Okay.  And the copy that you have in your files does

12   not have that fax header on it that says that it came from

13   collectibles, correct?

14   A    That's correct.

15   Q    Would you expect if something had been faxed directly

16   to you that had been faxed from a business, that it would

17   have a fax header?

18   A    I can't say that for sure.  I don't remember focusing

19   on that at that time.

20   Q    Sure.  But it's your experience that faxes tend to have

21   fax headers, that's been your experience?

22   A    Generally you would see that, yes.

23   Q    So at this point, on September 14th, 2000, you didn't

24   think it was necessary for you to actually see the agreement

25   between Mr. Bryant and Mattel, correct?

1   A     No.

2   Q     I'm sorry, is that correct?

3   A     Yes, that's correct.

4   Q     And you were asking whether or not he was an at-will

5   employee, you had asked that question, right?

6   A     Yes.

7   Q     And you had been told that, yes, he was an at-will

8   employee, meaning that he could quit when he wanted to or he

9   could be let go when Mattel wanted him to, correct?

10  A     Yes.

11  Q     And so you had that assurance, correct?

12  A     Yes.

13  Q     And with that assurance, you were able, you thought, to

14  go on and begin the drafting of this agreement, right?

15  A     Yes.

16  Q     Because you didn't think he was required to stay at

17  Mattel for any certain period of time, correct?

18  A     Yes.

19  Q     Now, if you'd look at 17239.

20        In connection with -- I'm sorry.

21        This is the first time that you sent the draft to

22  Ms. Hwang, right?

23  A     I believe that's correct, yes.

24  Q     And I think you testified that you didn't know who

25  Ms. Hwang was when you sent this to her, correct?

1    A    I had never dealt with her before at that time, yes.

2    Q    And you haven't dealt with her since?

3    A    That's correct.

4    Q    And so you had no understanding one way or another if

5    she was a diligent or not diligent or a good attorney or an

6    okay attorney or, you know, you just had no knowledge about

7    her, correct?

8    A    No, I remember looking at her firm's website and seeing

9    that there -- she was with an IP firm and noticing that.

10   Q    Other than that, did you know anything about her?

11   A    I may have seen when she graduated, her credentials,

12   but -- and that she was with a firm that specialized in

13   intellectual property matters.

14   Q    Did you know anything else about her?

15   A    No.

16   Q    And you were pointed out -- you were asked about

17   paragraph 5B, and that was one of the indemnification

18   paragraphs or warranties paragraphs where Mr. Bryant

19   warranted that what he was doing was not constitute a breach

20   or default under any agreement; do you recall that?

21   A    Yes, I do.

22   Q    Your understanding at the time is if Mr. Bryant was

23   under an obligation to a third party, contrary to what's

24   written here, that his saying he wasn't wouldn't change

25   that, right?

1   A    Well, it depends on what obligation he was under.

2   Q    Well, if, in fact, for example, he was under an

3   obligation to -- not to reveal this property to MGA because

4   say he didn't own it, then just saying this under 5C

5   wouldn't change that obligation?

6            MR. MC CONVILLE:  Objection.  Vague.

7            THE COURT:  Do you understand the question?

8            THE WITNESS:  Well, no, I don't, actually.

9            THE COURT:  Okay.  Sustained.

10  BY MR. PRICE:

11  Q    Mr. Bryant saying he has no obligation in a contract

12  with MGA wouldn't change the fact of whether or not he, in

13  fact, had an obligation to someone else, it's just a

14  representation and warranty he's making, right?

15  A    If he had an obligation that -- it would not change

16  whatever obligations he had, but that wouldn't necessarily

17  mean that those obligations would put him in breach of a

18  representation.

19  Q    Yeah, okay.

20       And you were asked the topic of whether or not there

21  was reliance on this paragraph; do you remember that?

22  A    Yes, I do.

23  Q    And you said there was reliance on this paragraph,

24  correct?

25  A    That's correct.

```
 1   Q    And what -- what paragraph 5 does, is it gives the
 2   right of MGA to go against Mr. Bryant if he doesn't -- if he
 3   has breached his representations and warranties, right?
 4   A    Yes, that's correct.
 5   Q    Mr. McConville asked if you had -- well, let me
 6   rephrase that.
 7        You were asked about the topic of opinion letters,
 8   right?
 9   A    By you, yes.
10   Q    Now, you --
11   A    Yes.
12   Q    Okay.  I didn't want to say that specifically.
13        When you have -- you said there was a few times when
14   you have given opinion letters, right?
15             MR. MC CONVILLE:  Objection.  It misstates his
16   testimony.
17             THE WITNESS:  I did say that I have in very
18   limited circumstances.
19   BY MR. PRICE:
20   Q    And is it your understanding that when you gave an
21   opinion in these very limited circumstances, that you as the
22   attorney giving that opinion were undertaking some risk?
23   A    Yes.
24   Q    And -- and when you give an opinion, you undertake
25   risks to the extent the client can come back and say, we
```

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 120 of 173   Page ID #:303913
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

120

1    were relying on you, Mr. Rosenbaum, with respect to this

2    statement, and you are responsible if it's incorrect, right?

3    A    Well, it's my -- it's the party for whose benefit the

4    opinion is.

5    Q    Right.  So if it was your client, for example, MGA who

6    said we want an opinion letter with an opinion from you,

7    Mr. Rosenbaum, you would understand that that would expose

8    you to the risk that your client can come back and say you

9    were wrong; therefore, you have to make good on this?

10   A    Yes, I -- in general, I understand that.

11   Q    And -- and that's -- is that one of the reasons you

12   don't often give opinion letters?

13                MR. MC CONVILLE:  Objection.  Irrelevant.

14                THE COURT:  Overruled.

15                THE WITNESS:  Generally that's -- I don't like

16   giving those opinions if I don't have to.

17   BY MR. PRICE:

18   Q    In this case, it was your understanding that MGA was

19   not relying on your opinion about whether or not the

20   intellectual property here belonged to Mr. Bryant, correct?

21                MR. MC CONVILLE:  Objection.  Calls for

22   speculation as to what MGA understood.

23                THE COURT:  Overruled.  This is allowing an answer

24   concerning what his thought process is, not MGA's.

25                You can answer the question.

```
 1            THE WITNESS:  Well, I understood that they were --
 2   that the information that I provided to them, they were
 3   relying on, but in terms of an opinion as to the ownership,
 4   no, they were not.
 5   BY MR. PRICE:
 6   Q    Well, I -- I want to clarify what you are saying.  You
 7   called Ms. Hwang and asked whether or not there can be a
 8   representation by Mr. Bryant that he owned these drawings,
 9   correct?
10   A    Not in exactly those words.
11   Q    In substance?
12   A    In substance, yes.
13   Q    And she relayed to you information that she'd reviewed
14   a chronology, right?
15   A    Yes.
16   Q    She said 1998, correct?
17   A    Yes.
18   Q    She -- your e-mail, by the way, accurately reflects
19   what she told you, right?
20   A    I believe it does, yes.
21   Q    So she didn't say anything about nights and weekends,
22   right?
23   A    No.
24   Q    And as you've told us, you didn't ask her what she was
25   relying on or follow up or ask additional questions,
```

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 122 of 173   Page ID #:303915
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

122

1    correct?

2    A    That's correct.

3    Q    Okay.  And if you are going to give an opinion for your

4    client to rely on that these drawings were, in fact,

5    created, you know, outside of Mattel in 1998, if you were

6    going to give that opinion, you would have done an

7    investigation, right?

8              MR. MC CONVILLE:  Objection.  Improper

9    hypothetical.

10              THE COURT:  Overruled.

11              THE WITNESS:  If I were asked to give a formal

12   opinion, I would have done more investigation.

13   BY MR. PRICE:

14   Q    And did anyone at MGA ever tell you that they were

15   relying on any investigation you did to determine whether or

16   not Mr. Bryant's intellectual property actually belonged to

17   him?

18   A    No.

19              MR. PRICE:  No further questions.

20              THE COURT:  This is recross-examination by

21   Mr. McConville on behalf of MGA and Mr. Larian.

22                   **RECROSS-EXAMINATION**

23   BY MR. MC CONVILLE:

24   Q    Mr. Rosenbaum, you were asked some questions concerning

25   whether it would be appropriate -- or whether it would have

1    affected your analysis if you had known that Carter Bryant

2    was working at Mattel -- Mattel while at the same time

3    working at MGA; do you remember that -- roughly that

4    question?

5    A    Yes.

6    Q    Let me ask you this:  Would you have been concerned at

7    all about whether Carter Bryant was moonlighting in 2000

8    when you understood that he created something in 1998

9    outside of his employment at Mattel?

10   A    I would not have been concerned.

11   Q    And could you have conceived in 2000, that there was

12   any legal way for Mattel to grab that intellectual property

13   from Carter Bryant that he created on his own time?

14            MR. PRICE:  Objection.  Ambiguous.  In 1998?

15            THE COURT:  Do you understand the question?

16            THE WITNESS:  I -- if you'd rephrase it, that

17   would be helpful.

18   BY MR. MC CONVILLE:

19   Q    Sure.  Could you envision in 2000, a scenario under

20   which Mattel could claim ownership to Carter Bryant's 1998

21   concepts in 2000?

22            MR. PRICE:  I'll object.  It assumes facts not in

23   evidence about 1998 concepts, unless it's part of a

24   hypothetical.

25            THE COURT:  I think you are really asking about

1    his thought process back then?

2            MR. MC CONVILLE:  Yeah.

3            THE COURT:  Overruled.

4            THE WITNESS:  No.

5    BY MR. MC CONVILLE:

6    Q    All right.  You were asked some questions concerning

7    the meaning of Mattel's agreement with its employees; do you

8    remember those questions?

9    A    Yes.

10   Q    Are you familiar with any legal standard that's been

11   announced concerning how that agreement should be

12   interpreted?

13           MR. PRICE:  Objection.  Irrelevant.  Beyond the

14   time frame.

15           THE COURT:  I think maybe you might want to reword

16   that.

17           MR. MC CONVILLE:  Okay.

18           THE COURT:  Sustained.

19           MR. MC CONVILLE:  Hold on a minute.

20           (Attorney discussion held off the record.)

21   BY MR. MC CONVILLE:

22   Q    Suffice it to say that in 2000, when you were preparing

23   this agreement for MGA, you didn't have Carter Bryant's,

24   whatever agreement he had with Mattel, in your possession,

25   correct?

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 125 of 173   Page ID #:303918
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

125

```
 1   A    Other than the offer letter that he sent me.

 2   Q    Right, I'm sorry.  You had the offer letter in your

 3   possession, right?

 4   A    That's correct.

 5   Q    And the offer letter said that he was an at-will

 6   employee, right?

 7   A    That's correct.

 8   Q    So these terms that you were shown concerning

 9   inventions and assignments and all the other terms that you

10   were shown in that agreement that you never saw at the time

11   that you were drafting that agreement, did you conceive in

12   your mind of a scenario under which a Mattel doll designer

13   could possibly have every single one of their thoughts owned

14   by Mattel?

15             MR. PRICE:  Objection.  Argumentative.

16             THE COURT:  Overruled.

17             You can answer that question.

18             THE WITNESS:  No.

19   BY MR. MC CONVILLE:

20   Q    Just the notion that Mattel could own every -- their

21   employees' every thought didn't pop into your head?

22             THE COURT:  No.

23             MR. MC CONVILLE:  Okay.

24   BY MR. MC CONVILLE:

25   Q    You were asked some questions about what you knew at
```

1    the time and whether you investigated particular topics; do

2    you remember that?

3    A    Yes.

4    Q    Did part of your determination about what you would --

5    well, let me ask you a leading question.

6         During the course of your work as an attorney, have you

7    ever had occasion to negotiate a deal where Mattel is on the

8    other side of the transaction?

9              MR. PRICE:  Objection.  Irrelevant.

10             THE COURT:  What's the relevance?

11             MR. MC CONVILLE:  It's going to demonstrate his

12   thought process as to what Mattel requires when it

13   negotiates deals.

14             THE COURT:  Sustained.

15   BY MR. MC CONVILLE:

16   Q    You were asked about whether or not you had conducted

17   particular investigations, right?

18   A    Yes.

19   Q    Did you confirm that Carter Bryant's name was Carter

20   Bryant?

21             MR. PRICE:  Object.  Argumentative.

22             MR. MC CONVILLE:  Following up on factual

23   investigation he could have conducted.

24             THE COURT:  Well, I think the evidence was he

25   never talked to Carter Bryant; is that correct?

```
 1              MR. MC CONVILLE:  Right, but the further questions
 2    that were elicited were the steps he could have taken.
 3              MR. PRICE:  That's beyond --
 4              THE COURT:  You can ask that briefly, Counsel.
 5              MR. MC CONVILLE:  Thank you.
 6              MR. PRICE:  That's beyond the scope because that
 7    was my first --
 8              THE COURT:  Overruled.
 9              MR. MC CONVILLE:  Okay.
10    BY MR. MC CONVILLE:
11    Q    Did you confirm Carter Bryant's name was Carter Bryant?
12    A    I wasn't given proof of birth or citizenship.
13    Q    Okay.  Did you -- one of the things that Carter Bryant
14    was assigning were -- was property that you understood he
15    conceived in 1998, correct?
16    A    Yes.
17    Q    Did you request a brain scan of Carter Bryant at the
18    time?
19              THE COURT:  No.  Sustained.
20              (Laughter.)
21              THE COURT:  The raising of two hands means
22    sustained.
23    BY MR. MC CONVILLE:
24    Q    At the time you were -- you were asked questions about
25    Ms. Hwang's qualifications; do you remember that?
```

1    A    Yes.

2    Q    At the time, did you think that you needed to

3    investigate Anne Hwang as well?

4    A    Beyond just a general idea of what her practice was,

5    no.

6    Q    Did you request from Anne Hwang that she submit to a

7    lie detector test?

8                MR. PRICE:  Objection.

9                THE COURT:  Sustained.

10   BY MR. MC CONVILLE:

11   Q    At some point, Mr. Rosenbaum, in your experience for 20

12   years, when you negotiated this agreement, you accept that

13   people in an arm's lengths transaction are going to give you

14   reps and warranties, and that's what you need to do as a

15   attorney representing a client, correct?

16   A    Yes.

17               MR. MC CONVILLE:  No further questions.

18               THE COURT:  Now, we are going to place you on call

19   as we have all of the other witnesses.  I think I forgot to

20   inform one witness of that, but we'll make certain that

21   they're on call.

22               This case is going to conclude much earlier than

23   the date I'm going to give you, but I'm going to give you

24   May 7th, just to be absolutely certain, okay?  You go about

25   your planned vacations and your professional

 1    responsibilities, and if we need you, we'll find you.

 2            THE WITNESS:  Thank you.

 3            THE COURT:  You may step down.

 4            Counsel, your next witness, please.

 5            MR. QUINN:  Your Honor, the plaintiff calls Lisa

 6    Tonnu.

 7            THE COURT:  Lisa Tonnu.

 8            Thank you.  If you'd please step forward between

 9    the double doors.

10            And now will you please stop and raise your right

11    hand.

12                **LISA CHAN, PLAINTIFFS' WITNESS, SWORN**

13            THE WITNESS:  I do.

14            THE COURT:  Thank you.

15            If you'd come along the jury railing, and if you'd

16    be kind enough to come up and have a seat.

17            And after you are comfortably seated, would you --

18    that chair doesn't move very far, unfortunately.

19            THE WITNESS:  Okay.

20            THE COURT:  You are going to have to lean forward

21    a little bit and speak into the microphone, but will you

22    state your full name for the record, please.

23            THE WITNESS:  Lisa Chan.

24            THE COURT:  You may need a little help in moving

25    that chair.

```
 1              Okay.  Will you state your full name again,

 2   please.

 3              THE WITNESS:  Lisa Chan.

 4              THE COURT:  Would you spell your last name,

 5   please.

 6              THE WITNESS:  C-h-a-n.

 7              THE COURT:  Thank you.

 8              This is direct examination by Mr. Quinn on behalf

 9   of Mattel.
```

                                **DIRECT EXAMINATION**

```
11   BY MR. QUINN:

12   Q    Okay.  Your name now is Lisa Chan, I just learned?

13   A    That's correct.

14   Q    It was before Lisa Tonnu?

15   A    Yes.

16   Q    My name is John Quinn, and I'm counsel for Mattel.

17   Good afternoon.

18   A    Good afternoon.

19   Q    You formerly worked at MGA for a period of time?

20   A    Yes.

21   Q    Where are you working now?

22   A    DreamWorks Animation.

23   Q    And what is it that you do there?

24   A    I'm the head of tax.

25   Q    I'm sorry?
```

1    A      I'm the head of tax.

2    Q      Okay.

3           THE COURT:  We are going to have you move that

4    microphone a little bit closer, bend it down towards you,

5    and we are probably going to move you a little bit closer.

6           Thank you very much.

7           Counsel?

8    BY MR. QUINN:

9    Q      When you were previously employed by MGA, your

10   deposition was taken in this case?

11   A      Yes.

12   Q      And as I understand, it was taken several times?

13   A      Correct.

14   Q      At least once in your individual capacity and also in

15   something called as a 30(b)(6) witness; do you recall that?

16   A      Yes.

17   Q      And as a 30(b)(6) witness, you were designated by MGA

18   to testify on its behalf on particular topics, correct?

19   A      Yes.

20   Q      And part of that was, your responsibility was to get

21   educated to the extent reasonably possible as to the

22   information available to MGA on those topics and then be

23   able to testify on those subjects on MGA's behalf; is that

24   correct?

25   A      Yes.

1   Q    And one of the topics that you were designated to

2   testify on and did testify on as MGA's corporate

3   representative, was MGA's corporate structure since

4   January 1, 1999, including the relationship between MGA and

5   any of its predecessors, affiliates and subsidiaries; is

6   that correct?

7   A    I believe so, yes.

8   Q    All right.  So just a -- if we could give the jury a

9   quick rundown on your educational background.  You have a

10  college degree?

11  A    Yes.

12  Q    And you graduated from what institution?

13  A    I graduated from UC San Diego for undergraduate, and my

14  master degree was at San Diego State.

15  Q    And your master's degree is in what area?

16  A    Master's in accounting with emphasis in tax.

17  Q    And you got that in 1998?

18  A    Yes, I believe so.

19  Q    All right.  And before working for MGA, you worked for

20  one of the big accounting firms?

21  A    Yes.

22  Q    And that was Ernst & Young?

23  A    Yes.

24  Q    Which you joined after -- after graduating from

25  San Diego State; is that correct?

```
1    A     Correct.

2    Q     And you started in MGA in January of 2005 as director

3    of international taxation?

4    A     Correct.

5    Q     And after a year, you became the general director of

6    taxation?

7    A     Yes.

8    Q     And you held that position until April of 2007, when

9    you became vice president of taxation, correct?

10   A     Yes.

11   Q     And as vice president of taxation, you reported

12   directly to a gentleman by the name of Dennis, I may

13   mispronounce this, Jolicoeur?

14   A     Yes.

15   Q     Did I say that right or close?

16   A     I believe that's right.

17   Q     And he was the CFO; is that correct?

18   A     Yes.

19   Q     And you left MGA when?

20   A     I left MGA in September of 2010.

21   Q     Why did you leave MGA?

22   A     I received a better opportunity.

23   Q     And that was the DreamWorks position that you hold now?

24   A     Correct.

25   Q     So let's talk a little bit about your experience at
```

1    MGA.  What were your responsibilities as vice president of

2    taxation?

3    A    I basically manage the tax process for the company and

4    made sure the company was tax efficient.

5    Q    And you've told us that you were designated as their

6    30(b)(6) witness on the topic of the corporate structure,

7    correct?

8    A    Yes.

9    Q    How many shareholders were there at MGA -- or how many

10   shareholders has MGA had from 2002 up until the time you

11   left in April of 2010?

12           MR. MC CONVILLE:  Objection.  Vague as to which

13   entity.

14   BY MR. QUINN:

15   Q    I'm talking about big MGA.

16           THE COURT:  MGA USA or MGA de Mexico, Hong Kong or

17   I don't understand?

18           MR. MC CONVILLE:  That was my objection, your

19   Honor.

20           THE COURT:  Okay.

21   BY MR. QUINN:

22   Q    Okay.  I will be specific.  Let me ask you about MGA

23   Entertainment, Inc., the U.S. parent corporation; do you

24   have that in mind?

25   A    Yes.

1    Q    How many shareholders did that corporation have during

2    the period of 2002 up until the time you left in April of

3    2010?

4    A    I don't really recall the exact number of shareholders

5    for each of the respective years.

6    Q    Do you recall that -- I think we can probably help

7    refresh your recollection if you could look at Volume 1 of

8    your deposition at page 49.  Page 49, lines 3 to 11.  I know

9    this is a job ago, now.

10   A    I'm sorry, which line?

11   Q    Lines 3 to 11.

12        Do you recall how many shareholders MGA had during that

13   time period?

14        MR. MC CONVILLE:  Objection, your Honor.  The

15   testimony was three years prior than the time frame that

16   Mr. Quinn questioned about.

17        THE COURT:  I don't understand.  I'm sorry.

18        MR. MC CONVILLE:  The testimony was that it's

19   refreshed in 2007, but Mr. Quinn's question related from

20   2002 to 2010, so to the extent that there's three additional

21   years, I'm objecting to vague.

22        THE COURT:  Well, she's a 30(b)(6), though.  She's

23   designated to find these things out and educate herself.

24        Overruled.

25        MR. MC CONVILLE:  As of 2007.

1    BY MR. QUINN:

2    Q    Do you recall that MGA, big MGA, had two shareholders

3    during that period, Mr. Isaac Larian and Eli Jahangir

4    Makabi; do you recall that?

5    A    Yes.

6    Q    And their ownership interests at MGA were held in

7    various trusts?

8    A    Correct.

9    Q    And the percentage ownership interest between

10   Mr. Larian and Mr. Makabi was that Mr. Larian held

11   81.82 percent and Mr. Makabi had the remainder?

12   A    Yes.

13   Q    And do you recall that prior to 2002, the division

14   between the two of them was Mr. Makabi had 10 percent and

15   Mr. Larian had 90 percent; do you recall that?

16   A    I -- I believe that is the case, correct.

17   Q    But at least you're pretty confident that since 2002,

18   there have only been the two shareholders, and that is

19   Mr. Isaac Larian and Mr. Makabi, and the division was

20   81.82 percent and Mr. Makabi had the balance, correct?

21   A    Yes.

22   Q    And Mr. Makabi is Mr. Larian's brother-in-law?

23   A    Yes.

24   Q    I'd like you, if you would, please, to take a look at

25   Exhibit 21622.  21622.

```
 1         And is that an e-mail in which you're copied from Yoko
 2   Iyamura to William Beeson dated October 5, 2007?
 3   A    Yes.
 4   Q    And it attaches to that various shareholding charts and
 5   the charts setting forth the corporate structure of MGA and
 6   its affiliated companies, correct?
 7   A    Yes.
 8              MR. QUINN:  So I'd offer, your Honor,
 9   Exhibit 21622.
10              THE COURT:  Received.
11              (Plaintiffs' Exhibit No. 21622 is received in
12         evidence.)
13   BY MR. QUINN:
14   Q    And that's your name there shown on the top as a cc,
15   correct?
16   A    Yes.
17   Q    I'm sorry?
18   A    Correct.
19   Q    Your previous name?
20   A    Yes.
21   Q    Okay.  And then attached to that are various charts,
22   correct, showing ownership structure?
23              MR. MC CONVILLE:  I'm going to object to ownership
24   being irrelevant.
25              THE COURT:  Overruled.
```

```
 1              THE WITNESS:  Yes.
 2   BY MR. QUINN:
 3   Q    And if I'd ask you to turn to page 21622-6.
 4              MR. QUINN:  If you can give Ms. Chan a hand, if
 5   you can put that up on the screen.
 6   BY MR. QUINN:
 7   Q    And what we see here is the ownership structure of MGA
 8   Entertainment, Inc., U.S., as of the date of that e-mail,
 9   October 5th, 2007, and certain of the subsidiaries under it,
10   correct?
11   A    Correct.
12   Q    And did this continue to be -- what we were looking at
13   here, did that continue to be the ownership structure up
14   until the time you left in April of 2010?
15   A    I don't recall because it may change from year to year.
16              (Attorney discussion held off the record.)
17   BY MR. QUINN:
18   Q    As you sit here now, this is -- you would agree that
19   this appears to have been the structure that existed as of
20   the date of this e-mail, which is October 5, 2007?
21   A    Correct.
22   Q    Okay.  And are you thinking in your mind of some
23   changes that you think might have happened between the date
24   of that e-mail and the time that you left in April of 2010?
25   A    There may have been changes at the trust level.
```

1   Q    All right.  So at the trust level, what you are

2   referring to is, up here, these are the trusts that hold the

3   stock on behalf of Mr. Makabi and Mr. Isaac Larian, correct?

4   A    Correct.

5   Q    And then we have MGA USA there, that's the parent

6   company here, correct?

7   A    That's correct.

8   Q    And so what you are telling us is that you think there

9   may have been some changes among the trust in terms of the

10  share -- which trust actually held the stock on behalf of

11  the two shareholders, correct?

12  A    Right.

13  Q    But if we can go back and look at the rest of the

14  chart, in terms of these other entities, the subsidiaries

15  that are listed below here, MGA Entertainment Music

16  California, MGA Entertainment Productions, MGA Entertainment

17  Mexico, MGA Entertainment International and Little Tikes

18  USA, to the best of your recollection, was that the

19  structure that was still in place as of the time you left in

20  April of 2010?

21  A    Yes.

22  Q    And these entities at the bottom, there, those

23  subsidiaries, those are all subsidiaries which are wholly

24  owned, 100 percent owned by MGA USA?

25  A    Yes.

1    Q     Now, if we could take a look at Exhibit 24076.

2          This is a document which I understand you've been made

3    familiar with?

4    A     Yes.

5    Q     And this document lists the various directors of MGA

6    Entertainment and those various subsidiaries that we were

7    just looking at, correct, on that chart?

8    A     Correct.

9          MR. QUINN:  And I'd offer Exhibit 24076, your

10   Honor?

11         THE COURT:  Received.

12         (Plaintiffs' Exhibit No. 24076 is received in

13   evidence.)

14         MR. QUINN:  If we can put that up on the screen.

15   BY MR. QUINN:

16   Q     This lists the directors, starting at the top, with MGA

17   Entertainment, Inc., the large parent U.S. company, during

18   the period from May 18th, 2001, until February 15th, 2011,

19   correct?

20   A     Yes.

21   Q     All right.  So these are the actual individuals that

22   comprise the board of directors of MGA USA during that

23   period, correct?

24   A     Correct.

25   Q     And we see there at the top from May 18th, 2001, to

1    February 9th, 2004, the directors were Mr. Isaac Larian,

2    Mr. Jahangir Makabi and Morad Zarabi; is that correct?

3    A    Yes.

4    Q    Mr. Zarabi is Mr. Larian's uncle?

5    A    I don't know.

6    Q    A relative, in your understanding?

7    A    I don't know.

8    Q    You are not sure?

9    A    I don't know.

10   Q    And then during the period of February 9, 2004, to

11   April 11, 2007, the directors were Mr. Isaac Larian,

12   Mr. Makabi and Mr. Farahnik; is that correct?

13   A    Yes.

14   Q    And Mr. Farahnik is a good friend of Mr. Larian's?

15   A    I don't know.

16   Q    You're just not sure whether they're friends or not?

17   A    I don't know.

18         MR. MC CONVILLE:  Your Honor, I'm going to

19   interpose relevance objection to all these questions.

20         THE COURT:  Overruled.

21   BY MR. QUINN:

22   Q    And then from April 11, 2007, to April 17, 2007, there

23   are two directors, Mr. Larian and Mr. Makabi, correct?

24   A    Yes.

25   Q    And then from April 17th, 2007, through February 15th,

1    2011, there is a third director who joins, and that's Angela

2    Larian, correct?

3    A    Yes.

4    Q    And that's Mr. Isaac Larian's wife, correct?

5    A    Yes.

6    Q    And then we have listed under that, the directors of

7    those other entities that were listed down below, and in

8    each case, with the exception of Little Tikes, there have

9    only been two directors, Mr. Larian and Mr. Makabi, correct?

10   A    Yes.

11   Q    And in the case of Little Tikes, Mr. Farahnik is listed

12   as a third director, correct?

13   A    Yes.

14   Q    But all the others just have the two directors,

15   Mr. Larian and Mr. Makabi, correct?

16   A    I'm sorry, can you repeat that?

17   Q    Yeah, all these -- the other entities listed here, MGA

18   Entertainment, MGA Mexico, MGA Entertainment International,

19   MGA Entertainment Productions, those -- the directors were

20   always just two people, Mr. Makabi and Mr. Larian, correct?

21   A    Correct.

22   Q    And in fact, Little Tikes, after May 6, 2010,

23   Mr. Farahnik left the board, and the only two directors of

24   Little Tikes also were Mr. Larian and Mr. Makabi, correct?

25   A    Yes.

1   Q    For all these entities, for big MGA, and those U.S.

2   subsidiaries that we looked at in that chart, if we could go

3   back to it, Exhibit 21622-6, 21622-6, during the entire time

4   period that we've been talking about, the only directors on

5   the board of directors of any of those entities have been

6   basically Mr. Larian and family members, Mr. Farahnik and

7   Mr. Zarabi, correct?

8               MR. MC CONVILLE:  Objection.  Vague.  Misstates

9   the testimony.

10              THE COURT:  And also Angela Larian?

11              MR. QUINN:  And Angela Larian, correct.

12              THE COURT:  Overruled.

13              THE WITNESS:  Can you repeat the question?

14  BY MR. QUINN:

15  Q    Yeah.  For all these entities during this time period

16  going back to May of 2001, the only persons who have ever

17  been directors are Mr. Larian, his family members and

18  Mr. Farahnik and Mr. Zarabi, correct?

19              MR. MC CONVILLE:  Same objection.

20              THE COURT:  Overruled.

21              THE WITNESS:  Yes.

22  BY MR. QUINN:

23  Q    All right.  And you just don't know whether or not

24  Mr. Zarabi is a family member or not?

25  A    Correct.

1    Q    And you don't know whether Mr. -- the other gentleman's

2    name, Farahnik, is a friend of Mr. Larian's?

3    A    No, I do not know.

4    Q    Now, in your profession, you are familiar with the

5    concept of an independent director?

6    A    Yes.

7    Q    All right.  And so far as you know, are any of the

8    directors that any of these entities have ever had, an

9    independent director?

10            MR. MC CONVILLE:  Objection.  Relevance.

11   BY MR. QUINN:

12   Q    So far as you know?

13            THE COURT:  Overruled.

14            THE WITNESS:  I don't know the relationship

15   between -- other than Mr. Larian, Mrs. Larian and

16   Mr. Makabi.

17   BY MR. QUINN:

18   Q    All right.  So do you have information that Mr. Zarabi

19   or Mr. Farahnik is an independent director, do you have

20   information, or you just don't know one way or another?

21   A    I don't know one way or the other.

22   Q    Now, you -- well, what is an independent director?

23   It's his turn.

24   A    My understanding is an independent director is someone

25   who is -- does not have any -- is outside -- works outside

1    of the company, is not related to the company in any way.

2    Q    And so it doesn't have some type of connection with the

3    company or the majority shareholder?

4    A    That's correct.

5    Q    All right.  So when you were at MGA, you were actually

6    a corporate officer, correct?

7    A    Not at all times.

8    Q    But at least some of the time?

9    A    Correct.

10   Q    And that is, you were the assistant secretary?

11   A    For a certain entities.

12   Q    For certain entities.

13        And you were actually an assistant secretary for big

14   MGA, the parent company, correct?

15             MR. MC CONVILLE:  Objection.  Relevance.

16             THE COURT:  Overruled.

17             THE WITNESS:  Correct.

18   BY MR. QUINN:

19   Q    And what were your duties as an assistant secretary of

20   MGA USA and the other entities where you held that position?

21             MR. MC CONVILLE:  Objection.  Relevance.

22             THE COURT:  Overruled.

23             THE WITNESS:  There would be from time to time

24   where there were certain contracts that were required to be

25   signed or reviewed, also for tax purposes where I would be

1    able to sign the returns.

2    BY MR. QUINN:

3    Q    All right.  And did you also get involved at all in

4    reviewing or preparing minutes of board meetings?

5    A    No, not that I recall.

6    Q    Or giving notice of board meetings?

7    A    No.

8    Q    If you'd take a look, please, at Exhibit 23949 and ask

9    you if you would please look at the second page of that

10   document, 23949-2, and I'm going to ask you if you can

11   identify whether that is the signature of Mr. Larian.

12   A    It appears to be.

13   Q    Okay.  And above that is the signature of Mr. Makabi as

14   secretary?

15   A    Yes.

16           MR. QUINN:  So we'd offer this exhibit into

17   evidence, your Honor, Exhibit 23949.

18           THE COURT:  Received.

19           (Plaintiffs' Exhibit No. 23949 is received in

20       evidence.)

21           MR. QUINN:  If we could just show that to the jury

22   to see what we are looking at.

23   BY MR. QUINN:

24   Q    This is a certificate signed by Mr. Makabi, and by

25   Mr. Larian on the second page, certifying that they are

1   attaching true and correct copies of the articles of

2   incorporation of MGA and all amendments to the articles of

3   incorporation, as well as the bylaws of the corporation,

4   correct?  I think you can confirm that by looking at the

5   first page.

6           MR. QUINN:  If we can go back to the first page,

7   Ken.  And perhaps if we can blow up paragraph numbers 1 and

8   2.

9           THE WITNESS:  Yes.

10  BY MR. QUINN:

11  Q    All right.  And you can see those are attached, the

12  articles of incorporation and the bylaws attached there?

13  A    Correct.

14  Q    All right.  Now, as a -- did you ever -- the

15  shareholder -- the bylaws of the corporation actually

16  require that there be shareholder meetings every year; do

17  you recall that?

18  A    (No audible response.)

19  Q    If you could look at page dash 14?

20  A    Yes.

21  Q    23949-14, in the second paragraph there it says,

22  "annual meeting," and I quote, "The annual meeting of

23  shareholders shall be held each year on a date and at a time

24  designated by the board of directors," closed quote; did you

25  see that?

1    A    Yes.

2    Q    Did you ever attend any shareholder meetings?

3    A    No, I did not.

4    Q    Are you aware of any shareholder meetings ever taking

5    place?

6    A    No, but --

7              MR. MC CONVILLE:  Objection.  Foundation.

8              THE COURT:  Overruled.

9    BY MR. QUINN:

10   Q    Did you ever send out or see any notice of any

11   shareholder meetings?

12   A    No.

13   Q    Do you -- did you ever attend any board meetings of

14   MGA?

15   A    No.

16   Q    Under the bylaws, MGA was required to have an annual

17   board meeting to elect directors because they serve for a

18   one-year term; do you recall that?

19   A    No.

20   Q    We an take a look there at Exhibit 23949-22.  And then

21   section 3, there, it says, "Election and term of office of

22   directors," and it says, "Directors shall be elected at each

23   annual meeting of the shareholders to hold office until the

24   next annual meeting"; do you see that?

25   A    Yes.

```
 1   Q    Do you recall any of those annual board meetings ever

 2   taking place?

 3   A    I don't know.

 4   Q    Did you ever see any -- as the assistant secretary of

 5   the corporation, did you ever see any notice of any of those

 6   meetings?

 7   A    No.

 8   Q    Would it be fair to say that based on your experience

 9   and the fact that Mr. Larian, during the entire period you

10   are were at MGA, owned at least 81 percent of the stock of

11   MGA, that he could and did personally make every major

12   decision affecting the corporation?

13          MR. MC CONVILLE:  Objection.  Compound, vague,

14   overbroad.

15          THE COURT:  Overruled.

16          THE WITNESS:  Can you repeat the question?

17   BY MR. QUINN:

18   Q    Sure.  I mean, wasn't it -- was it your experience that

19   Mr. Larian, in his own -- you know, he personally could and

20   did make every major decision relating to MGA?

21          MR. MC CONVILLE:  Same objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  Well, Mr. Larian was the CEO, and

24   I -- he did have a lot of executives that did report up to

25   him to provide him advice.  So I don't know if that would be
```

1    my opinion.

2    BY MR. QUINN:

3    Q    All right.  So he got -- I mean, he certainly hired

4    people to help him, correct?

5    A    Yes.

6    Q    And I assume that he entertained different points of

7    view on different issues at different times; would that be

8    fair to say?

9    A    Yes.

10   Q    But ultimately, he could on his own, as CEO and as the

11   owner of 81 percent of the stock, make any major decision

12   himself?

13              MR. MC CONVILLE:  Objection.  Asked and answered.

14              THE COURT:  Overruled.

15              THE WITNESS:  I guess that is the case.

16   BY MR. QUINN:

17   Q    All right.  And wasn't that true -- isn't that what you

18   observed while you were there?

19              MR. MC CONVILLE:  That one is asked and answered.

20              THE COURT:  Overruled.

21              THE WITNESS:  No.

22   BY MR. QUINN:

23   Q    Okay.  Well, do you ever recall an occasion where, you

24   know, there was some dispute on the board of directors or

25   with Mr. Makabi or with somebody else, and Mr. Larian felt

1  very strongly about something but that he did not get his

2  way on it; do you recall that ever happening?

3  A    No.

4  Q    Now, on the board -- on the board of directors, each

5  shareholder would get -- I'm sorry -- each director would

6  each get one vote?

7  A    I don't know.

8  Q    So far as you -- I mean, did you ever hear from any

9  source that some directors got more votes than others?

10  A    No.

11  Q    All right.  And so far as you knew, each shareholder,

12  if anything, were submitted to the shareholders, each share

13  of stock would be worth one vote?

14  A    I would have to review the articles of incorporation in

15  the bylaws to confirm that.

16  Q    You just don't recollect one way or the other?

17  A    Correct.

18  Q    Did you ever recall any issue being submitted to a vote

19  of the shareholders of MGA?

20  A    I don't recall.

21  Q    If we could take a look at Exhibit 21622, and this

22  is -- we looked at this already.  This is the e-mail dated

23  October 5th, 2007.  And if we could turn to the chart at

24  21622-6.

25        Again, we looked at this.  These are MGA U.S.A., the

1   trust that holds the stock, and then the domestic U.S.

2   subsidiaries under it, correct?

3   A    Yes.

4   Q    Can you tell us how the money flows between the

5   subsidiaries and the parent corporation, at least, while you

6   were there?

7            MR. MC CONVILLE:  Objection.  Vague.

8            THE COURT:  Overruled.

9            THE WITNESS:  Well, we treated it as one large

10  corporation, because they are all disregarded for tax

11  purposes.

12  BY MR. QUINN:

13  Q    Right.  So you treated this as one entity, essentially,

14  correct?

15  A    Correct.

16  Q    Because those subsidiaries that we are looking at there

17  are all 100 percent owned by MGA U.S.A., correct?

18  A    Yes.

19  Q    And if one of those subsidiaries down below makes a

20  profit, that money goes up to big U.S.A., big MGA U.S.A.,

21  correct?

22  A    Yes, but there was not a separate accounting for each

23  of the separate legal entities, for the most part.

24  Q    Right.  So for the most part, you accounted for the

25  results of their operations all combined, correct?

1    A    Correct.

2    Q    As a unitary entity, correct?

3    A    That's correct.

4    Q    Turning now to -7, 21622-7, this is MGA international

5    corporate structure as of the date of the e-mail, October 5,

6    2007, correct?

7    A    Yes.

8    Q    And what we're looking at here, up at the top we have

9    MGA U.S.A., correct?

10   A    Yes.

11   Q    And below that are various foreign subsidiaries,

12   correct?

13   A    Yes.

14   Q    Reading from the top along the left hand, we have MGA

15   Entertainment Sweden, MGA Entertainment Benelux, MGA

16   Entertainment Germany, United Kingdom, Spain, France,

17   Canada.  And then there's two entities, MGA International

18   U.S., and then another one I can't read -- MGA Mexico; is

19   that correct?

20              MR. MC CONVILLE:  I'll stipulate he can't read.

21              (Laughter.)

22   BY MR. QUINN:

23   Q    Can you help me out there, Ms. Chan?

24   A    But the -- the two to the far right --

25   Q    Yes?

1    A    -- are not foreign entities.

2    Q    Okay.  Those are domestic U.S. entities, and that's why

3    they are shaded?

4    A    They are the ones that were on the first page, correct.

5    Q    All right.  Thank you.

6         So all the ones --

7            MR. QUINN:  And then if we can go back out, Ken.

8    BY MR. QUINN:

9    Q    All the ones that are not shaded are foreign entities,

10   correct?

11   A    Yes.

12   Q    And then so we've got kind of a waterfall here.  We

13   have the various foreign entities, and those along the top,

14   those are basically distribution companies in different

15   countries?

16   A    For the most part, yes.

17   Q    So they are getting involved in distributing MGA

18   products in those countries where they are incorporated,

19   correct?

20   A    Yes.

21   Q    And then over here on the right hand side, we have some

22   other foreign entities, correct?

23   A    Yes.

24   Q    And that includes Mexico, the Netherlands, and then

25   down at the bottom, MGA Shenzhen, a toy company in China,

```
 1   MGA Poland, MGA Netherlands, MGA Ireland, MGA Entertainment
 2   Hong Kong, correct?
 3   A    Correct.
 4   Q    And that was the MGA international corporate structure
 5   as of the date of this e-mail October 5, 2007, correct?
 6   A    Yes.
 7   Q    And as best as you can recall, did this chart change at
 8   all between then and the time that you left in April of
 9   2010?
10   A    I he don't believe so.
11   Q    You don't recall it changing?
12   A    I don't recall it changing.
13   Q    And as best as you can recall, this is the way it was
14   when you left?
15   A    Correct.
16   Q    And all the entities you were looking at are either
17   directly or indirectly 100 percent owned by the MGA parent
18   corporation, correct?
19          MR. MC CONVILLE:  Objection.  Vague, compound.
20          THE COURT:  Overruled.
21          You can answer the question.
22          THE WITNESS:  Yes.
23   BY MR. QUINN:
24   Q    So there isn't like some other non-MGA shareholder that
25   has any ownership interest in any entities in this
```

1    structure, correct?

2    A    Correct.

3    Q    And each of those entities that we are looking at in

4    this chart, they are ultimately controlled by MGA U.S.A.,

5    correct?

6    A    Yes.

7    Q    Can you tell us how the money flows among these

8    entities?

9            MR. MC CONVILLE:  Objection.  Vague.

10           THE COURT:  Overruled.

11           THE WITNESS:  Can you be a little more specific?

12   BY MR. QUINN:

13   Q    Well, if these foreign entities make a profit, it

14   ultimately ends -- it ultimately ends up at MGA U.S.A.?

15   A    No.

16   Q    Is there some -- is it your recollection that there --

17   was there cash just parked in subsidiaries or kept in bank

18   accounts for subsidiaries for indefinite periods of time?

19           MR. MC CONVILLE:  Objection.  Vague.

20           THE COURT:  Overruled.

21           THE WITNESS:  There were inner-company

22   transactions.  Most of these companies are distributing

23   companies, so if they had to buy products, they would buy

24   from the manufacturing companies.

25

1    BY MR. QUINN:

2    Q    Right.

3    A    But there wasn't a distribution or dividends from, per

4    se, from the distributing companies up to the parent

5    company.

6    Q    All right.  So if they had to buy product, like MGA

7    product, they would by it from, say, MGA Hong Kong?

8    A    Or Poland, potentially.

9    Q    All right.  Or that would be another entity that some

10   of these companies could buy MGA product from?

11   A    Correct.

12   Q    And that was like one MGA entity selling product to

13   another MGA entity?

14   A    Correct.

15   Q    And you did use some type of inter-company pricing for

16   that purpose in deciding what the prices would be?

17   A    Yes.

18   Q    And that's -- apply a markup of ranging from, like

19   what, 10 percent or 40 percent in terms of these sales from

20   one MGA company to another MGA company?

21   A    Yes.

22   Q    And that's something that people within MGA would

23   decide as to what they wanted to mark up, correct?

24          MR. MC CONVILLE:  Objection.  Vague as to people

25   within MGA.

```
 1              THE COURT:  Just reask it.

 2              MR. QUINN:  All right.

 3    BY MR. QUINN:

 4    Q    So that markup would be determined by people within

 5    MGA, correct?

 6              MR. MC CONVILLE:  Objection.  Which entities?

 7              THE COURT:  The same question, I think.

 8              MR. MC CONVILLE:  All right.

 9    BY MR. QUINN:

10    Q    Who would decide what the markup would be for these

11    inter-company sales?

12    A    We actually conduct transfer pricing study that's

13    prepared by an outside party as a basis to how we mark up

14    our inner-company pricing.

15    Q    Right, but when -- at the end of the day, you

16    consolidate the results, correct?

17    A    For what purpose?

18    Q    Well, for purposes of financial statements, your

19    financial statements.

20    A    Yes.

21    Q    And you kind of ignore all that inner-company pricing

22    for the purpose of the consolidated financial statements,

23    correct?

24    A    Yes.

25    Q    All right.  You wash all that out?
```

1    A    Correct.

2    Q    And the Poland manufacturers, as I understand it, is

3    product for Little Tikes product, not Bratz product,

4    correct?

5    A    Yes.

6    Q    And so all the Bratz product, if one of the MGA

7    companies is running low on Bratz product and wants to buy

8    some Bratz product, they buy that -- they'd buy that from

9    Hong Kong, correct?

10   A    Yes.

11   Q    So if MGA -- there's a company here MGAE de Mexico?

12   A    Yes.

13   Q    Is that one of the ones in -- that's right here, right

14   there (indicating), if it makes a profit, where do those

15   profits go?

16   A    It's -- it's retained at the subsidiary level.

17   Q    It's -- it's retained right there, at -- in the Mexico

18   entity?

19   A    If it had profits, yes.

20   Q    All right.  And does it stay there forever?  Is it ever

21   distributed out?

22   A    That's correct.  That company did not have access --

23   earnings to do any distributions.

24   Q    All right.  So it had sort of minimal earnings?

25   A    Correct.

1    Q    How about profits from MGA HK Limited?  That's down in

2    the lower right-hand corner here.  That's the company that

3    manufactures the Bratz product, correct?

4    A    Yes.

5    Q    And it sells it to other Bratz entities, correct?

6    A    Correct.

7    Q    And if it makes profits, what happens to those profits?

8    A    I don't recall dividends being paid up.

9    Q    Right.  Well, it did pay something called "royalties,"

10   right?

11   A    Yes.

12   Q    That's because the Bratz IP was licensed by big MGA,

13   MGA U.S.A., to a MGA Mauritius at a period of time, and then

14   was licensed in term from Mauritius to Hong Kong, correct?

15             MR. MC CONVILLE:  Objection.  Compound, vague.

16             THE COURT:  Overruled.

17             THE WITNESS:  Can you repeat the question?

18   BY MR. QUINN:

19   Q    Okay.  The Bratz IP -- are you with me so far?

20   A    Yes.

21   Q    There was a license from big MGA U.S.A. to an MGA

22   entity based on an Island off the South East Coast of Africa

23   called Mauritius, correct?

24   A    The trademark license was licensed to Mauritius.

25   Q    Right, but the IP, correct?

1    A    Yes.

2    Q    All right.  And then the Mauritius MGA entity, in turn,

3    licensed that to the Hong Kong entity, correct, this one

4    that we are looking at here?

5    A    Yes.

6    Q    All right.  And the way they got money out of Hong Kong

7    was it paid a royalty on that IP to Mauritius, correct?

8    A    There was a royalty payment to Mauritius for the rights

9    to manufacture those products.

10   Q    Right.  And again, this is -- the amount of that

11   royalty is something that one MGA -- the MGA people are

12   deciding within MGA how much that royalty should be,

13   correct?

14            MR. MC CONVILLE:  Objection.  Vague.

15            THE COURT:  Overruled.

16            THE WITNESS:  We also have a transfer pricing

17   study to determine those appropriate royalty rates.

18   BY MR. QUINN:

19   Q    Right.  But whatever they are, you've got money out of

20   Hong Kong by paying royalties to Mauritius, correct?

21   A    Yes.

22   Q    And then Mauritius, in turn, because it had licensed

23   the IP from MGA U.S.A., Mauritius paid royalties to big MGA,

24   MGA U.S.A. on its license, correct?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 162 of 173   Page ID #:303955
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

162

1   Q    Now, each of these subsidiaries that we are looking at

2   here has their own board of directors under their local law,

3   correct, or equivalent, whatever the local law calls the

4   board of directors?

5   A    Yes.

6   Q    And in almost every case, the directors are either just

7   Mr. Isaac Larian himself being the only director or Mr.

8   Isaac Larian and Mr. Jahangir Makabi, correct, in almost

9   every case?

10  A    I believe in some instances there were other directors

11  as well.

12  Q    Right, in some instances, and we will talk about those

13  now -- in just a minute.  But in almost every case, those

14  foreign entities we're looking at, either Mr. Larian was the

15  only director, or if there was more than one, it was him and

16  Mr. Makabi, his brother-in-law, correct?

17  A    I believe so.

18  Q    And you were actually a director of MGA Entertainment

19  Holdings Coorperatief; is that the correct name?  I think

20  that's this one right here (indicating).  You were a

21  director of that entity, weren't you?

22  A    I believe I was a director for the international

23  holdings, if I recall correctly.

24  Q    And is that the one above it, or is that the one below

25  it?

1    A    Correct.  I don't recall specifically which one, but I

2    believe it was the international holdings.

3    Q    It's one of these two, either MGA Entertainment

4    Holdings Coorperatief or MGA -- I'm sorry.  Ken is right,

5    I'm wrong.  MGA International Holdings Coorperatief, one of

6    those two, correct?

7    A    Yes.

8    Q    And those are both Netherlands entities?

9    A    Yes.

10   Q    Now, as a director of that entity, do you ever recall

11   having any board meetings?

12   A    Yes.

13   Q    And how many board meetings do you recall having in

14   that entity?

15   A    I don't recall the exact number.

16   Q    All right.  The directors of that entity were you,

17   Mr. Larian, and two local people, correct, two local

18   individuals?

19   A    At what point in time?

20   Q    At the time you were a director, there were two

21   additional local people?

22   A    That's correct.

23   Q    Right.  And that's because under local law, you had to

24   have some local directors?

25   A    Yes.

CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

164

1   Q    All right.  And do you recall as a director that that

2   board of that entity ever passed a resolution against

3   Mr. Larian's wishes, or he -- something that he opposed, and

4   the board went ahead and passed it notwithstanding the fact

5   that he opposed it; did that ever happen?

6   A    No.

7   Q    Okay.  I'd like to change subjects, now.

8        Another subject that you were -- in addition to

9   corporate structure, that you were designated to be a

10  30(b)(6) witness on was payments of money and other items of

11  value made by MGA to, for or on behalf of, Isaac Larian or

12  any family member of Isaac Larian since January 1st, 1999;

13  do you recall that?

14  A    I actually do not recall that.

15  Q    All right.  Maybe if you can take a look at your

16  deposition.  This would be Volume 4, page 741.

17          MR. MC CONVILLE:  Your Honor, this testimony will

18  be cumulative and is irrelevant.

19          THE COURT:  Thank you.

20  BY MR. QUINN:

21  Q    And if you'd look at the question beginning on page

22  741, line 24, carrying over onto the top of 742, and I'll

23  just ask if that refreshes your recollection.

24  A    Yes.

25  Q    And does that refresh your recollection that you were

 1   designated by MGA to be the person to testify -- to be

 2   educated and to testify on the subject of payments of money

 3   and any other item of value that were made by MGA to or for

 4   and on behalf of Isaac Larian or any family member; do you

 5   recall that, now?

 6   A    Yes.

 7   Q    And you are aware -- you are aware that there have been

 8   instances where Mr. Larian and his family members

 9   disregarded the separate corporate existence of MGA and

10   directed that payment be made directly by the corporation to

11   them or on their behalf?

12           MR. MC CONVILLE:  Objection.  Argumentative,

13   foundation, compound.

14           THE WITNESS:  No.

15           Oh, I'm sorry.

16           THE COURT:  Why don't we take a recess at this

17   point and send you home, okay?

18           You are admonished not to discuss this matter

19   amongst yourselves, nor form or express any opinion

20   concerning this case.  We'll see you tomorrow at 8:30.

21   Drive safely.

22              (The following proceedings is taken outside

23        the presence of the jury.)

24           THE COURT:  And counsel, have a seat for a moment.

25           I want to make certain where we are at with this

```
 1   testimony.  I've allowed the testimony to show the corporate

 2   structure, the flow of money, especially through Hong Kong,

 3   et cetera, but I don't want to get into the tax allegations.

 4   I think the prejudicial effect outweighs the probative

 5   value, so let me hear from you, Mr. Quinn.

 6            MR. QUINN:  I'm not going to get into the tax

 7   issue at all, your Honor.  The point is, and we looked at

 8   these documents with the Court before, there were

 9   millions -- this goes to the disregard of the separate

10   corporate entity.  There's been millions of dollars paid out

11   on Mr. Larian's direction to himself and to family members

12   for vacations, trips, clothing, a number of different

13   things, and this was -- it's based on a schedule that was

14   produced in connection with this witness' testimony, and

15   she's testified about it.  And it really goes to the

16   alter-ego issue about whether this was treated as a separate

17   corporate entity or essentially just as a piggy bank.

18            MR. MC CONVILLE:  Can I be heard?

19            THE COURT:  Just a moment.  I want to get more

20   information for just a moment.

21            Refer me to some documents that you are going to

22   rely on.

23            MR. QUINN:  Does the Court have the Court's Tonnu

24   binder?

25            THE COURT:  Along with the add-ons.
```

1        MR. QUINN:  Right.  On this subject, there were

2   three documents, 1354, 1364, and 8741.

3        THE COURT:  All right.  The question was:  "And

4   are you aware that there had been any instances where

5   Mr. Larian and his family members disregarded the separate

6   corporate existence of MGA and directed that payment be made

7   directly by the corporation to them or on their behalf?"

8        Walk me through a couple of the pages of 1354.

9        MR. QUINN:  1354, just for example, line 25, this

10  is one of those spreadsheets that you have to read across,

11  your Honor, so it requires turning pages to read across and

12  see what line 25 is, but --

13       THE COURT:  3503, distribution.

14       MR. QUINN:  Yes, and if you go to the next page,

15  line 25, distribution, $641,229.

16       THE COURT:  Okay.

17       MR. QUINN:  And then if we go to the next page,

18  line 25, it's for Shoreth Larian condo.

19       THE COURT:  Okay.

20       MR. QUINN:  Ms. Larian is -- Mr. Isaac Larian's

21  sister, as I understand it.  So money is directed to be paid

22  directly from the corporation to purchase a condo.

23       THE COURT:  Okay.  Now, take me through 1364.

24       MR. QUINN:  1364, the witness had identified this

25  in her deposition as a list of payments to, or on behalf of

1    Mr. Larian and his family members.  For example, if you turn

2    to -7, there are professional fees being paid for a Elias

3    Larian.

4              THE COURT:  Well, just a moment.

5              Take me through 8741.

6              MR. QUINN:  8741, again, is a schedule that was

7    produced by MGA, and this witness testified about it at her

8    deposition, and it reflects payments made on behalf of

9    Mr. Larian and family members for, among other things, trips

10   for his sister and mother to Nice, France, Rome, Monte

11   Carlo, Paris trips for his son to Hong Kong and Boston,

12   trips for Mr. and Mrs. Larian to Lake Tahoe.

13             THE COURT:  Now, tell me the relevance of these

14   three documents.  Where are we going with this, finally?

15             MR. QUINN:  It's relevant to the disregard of the

16   separate corporate existence.  I mean, this is not the

17   regular way.

18             THE COURT:  And how does this play into damages?

19             MR. QUINN:  It only plays into damages insofar as

20   it makes our case an alter ego, that the -- I mean, this is

21   all one unitary business, the separate corporateness should

22   be disregarded.

23             THE COURT:  So personal liability flows from this

24   because of the alter-ego theory?

25             MR. QUINN:  Yes.  We allege in the complaint that

1    these entities are all a -- the alter ego of Mr. Larian

2    himself.

3              THE COURT:  Okay.

4              Mr. McConville?

5              MR. MC CONVILLE:  Your Honor, a number of points.

6              First, Mr. Quinn is now, both in our private

7    sessions and off-the-record sessions and now currently in

8    court referring to this as Isaac Larian using MGA as a piggy

9    bank.  I can foresee exactly how this is going to be argued

10   to the jury in closing in just that manner.  In other words,

11   the intent is used to prejudice Mr. Larian, as confirmed

12   right now.

13             The reality of these transactions, your Honor, is

14   that they are distributions to shareholders.  In other

15   words, they are aren't treated as business expenses.  They

16   are treated as money that comes out of the company that goes

17   to Mr. Larian and his family to cover their expenses for

18   family vacations, or whatever they are, and then they get

19   trued-up by the end of the year and not treated as a

20   business expense, they are treated as a distribution to

21   Mr. Larian and his family.  So it does not show a piggy

22   bank.  It shows a record-keeping process by which the Larian

23   family tracks expenses --

24             THE COURT:  Was this under investigation by the

25   IRS?

Case 2:04-cv-09049-DOC-RNB   Document 10062   Filed 02/23/11   Page 170 of 173   Page ID #:303963
CV 04-9049-DOC - 02/22/2011 - Day 21, Vol. 2 of 3

170

```
 1              MR. MC CONVILLE:  No.

 2              THE COURT:  What was the issue concerning the IRS?

 3              MR. QUINN:  I believe that's Hong Kong.  There was

 4      an investigation.

 5              THE COURT:  No.  I'm speaking to Mr. McConville

 6      now.

 7              MR. MC CONVILLE:  The IRS field office conducted

 8      an audit.  So your Honor, with regard to the reason this is

 9      being introduced, Mattel has now found that if it uses the

10      term "alter ego," it can get any prejudicial argument -- it

11      argues that it can get any prejudicial argument.

12              The reality is Mr. Larian has testified about

13      distributions to him.  This witness has now testified about

14      corporate structure.  Mr. Larian has testified to hundreds

15      of millions of dollars of distributions.  Whatever they want

16      to argue with regard to how the corporate structure flowed

17      to Mr. Larian, they've got whatever evidence they need, and

18      this is just cumulative and prejudicial.

19              THE COURT:  Finally, Mr. McConville, since

20      Mr. Larian is a defendant in his individual capacity, and

21      MGA in their corporate capacity, why do you believe that

22      this has been shown by other documents, and what documents

23      are those?

24              MR. MC CONVILLE:  There were specific --

25              THE COURT:  What's the specific document?
```

1          Ms. Hurst will find it for you.  It's already been

2    received in evidence.

3          MR. MC CONVILLE:  Yes.

4          THE COURT:  Okay.  I want to see that document.

5    And I'll go back through my notes at the same time.

6          It came during Mr. Larian's testimony, and there

7    was an amount of 143 million, so let's go back to as late as

8    yesterday, and you'll find the testimony at Exhibit -- just

9    after Exhibit 23946.  So if you'd locate that, that's a

10   Larian to Wing e-mail, and there's a flow to Hong Kong to

11   the Netherlands.  There's 48 million in cash.  And the

12   question is, quote -- or the statement is, "Please advise

13   how much you would like to take," and then the response is

14   "30 million."

15         Now, the testimony that immediately followed was

16   as follows:

17         2006, there is a distribution to shareholders that

18   was $143 million in 2006, and a 2005 distribution of

19   $151 million.

20         So let me turn back to -- and there's more

21   testimony.  We actually went through portions of that twice.

22         Why doesn't that resolve this issue without

23   getting into specific condos and the sister-in-law --

24         MR. QUINN:  Your Honor, because that doesn't give

25   me -- the whole new purpose of this, which is the disregard

1    of the separate corporate entity.  There is a business-like

2    way of doing this, which respects the corporate

3    separateness.  You have a distribution.  You don't just say

4    write a check for Ferragamo shoes, write a check for a condo

5    for the sister, write a check for trips all over the world.

6            Now, I don't dispute what Mr. McConville says that

7    at the end of the day, this is trued-up and properly

8    accounted for.  My point is that the way business is done

9    here, this reflects a complete disregard of the separate --

10   of the, you know, corporate personality of the entity.  It's

11   a completely different point.  Of course the shareholders

12   get distributions.

13           *(Live reporter switch with Maria Dellaneve.)*

14                          -oOo-

15

16

17

18

19

20

21

22

23

24

25

1                                -oOo-

2                            **CERTIFICATE**

3

4           I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 23, 2011

12

13

14       _____

                JANE C.S. RULE, U.S. COURT REPORTER
15              CSR NO. 9316

16

17

18

19

20

21

22

23

24

25