# EXHIBIT A

COPY

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 90378)
     Michael T. Zeller (Bar No. 196417)
3  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017
   Telephone:   (213) 443-3000
4  Facsimile:   (213) 443-3100

5  Attorneys for Plaintiff
   Mattel, Inc.
6

7

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
      SUE GABB

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware corporation,      )   CASE NO.  BC 314398
                                               )
12                 Plaintiff,                   )
                                               )   COMPLAINT FOR:
13                                             )
                                               )   (1)  BREACH OF CONTRACT;
14          v.                                 )   (2)  BREACH OF FIDUCIARY
                                               )        DUTY;
15                                             )   (3)  BREACH OF DUTY OF
    CARTER BRYANT, an individual; and          )        LOYALTY;
16  DOES 1 through 10, inclusive,               )   (4)  UNJUST ENRICHMENT; AND
                                               )   (5)  CONVERSION
17                 Defendants.                  )
                                               )
18                                             )
                                               )
19  _____ )

20

21

22

23

24

25

26

27

28

07209/579342.1

                                                                    COMPLAINT

TX 22952-00001

Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as "defendants") and alleges as follows:

Parties

1.    Mattel is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in El Segundo, California.

2.    Mattel is informed and believes, and on that basis alleges, that defendant Bryant is an individual currently residing in Springfield, Missouri.

3.    The true names and capacities of defendants sued herein as Does 1 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such fictitious names. Mattel will amend this Complaint to allege their true names and capacities when the same are ascertained.

4.    Mattel is informed and believes, and on that basis alleges, that at all times relevant herein, defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other, and in doing the things alleged herein, each defendant was acting within the course and scope of his, her or its agency and was subject to and under the supervision of, and was acting with the knowledge of, his, her or its co-defendants.

Jurisdiction and Venue

5.    During the time of the acts complained of herein, Bryant was employed by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that are at issue in this action were executed, performed and breached by Bryant in Los Angeles County. In addition, defendants committed the tortious conduct alleged herein while physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

-2-

COMPLAINT

TX 22952-00002

1 | defendants' other wrongful acts in Los Angeles County. Accordingly, this Court has

2 | personal jurisdiction over defendants.

3 |       6.    Venue is proper pursuant to <u>Code of Civil Procedure</u> §§ 393 and 395(a),

4 | as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5 | incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6 | Bryant does not currently reside in California.

7 |

8 | <u>Factual Background</u>

9 |

10 |       7.    Mattel is a long standing and successful independent manufacturer and

11 | marketer of toys, dolls, games and stuffed toys and animals. Mattel was founded in 1945 by

12 | Elliot and Ruth Handler and Harold "Matt" Mattson. The name of the company was created

13 | by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating

14 | from the Handlers' garage in Southern California, the company greatly expanded its

15 | operations following World War II and soon began to thrive as its reputation for producing

16 | high-quality toys spread. During the next several decades, Mattel became world famous for

17 | producing high-quality products at reasonable prices. Today, some of Mattel's most famous

18 | brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19 |       8.    Critical to Mattel's success, and to the livelihood of its employees, is

20 | Mattel's ability to design and develop new products. Mattel invests many millions of dollars

21 | in product design and development annually, and it introduces hundreds of new products

22 | each year. In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23 | center that houses more than 850 designers, sculptors, painters and other artists, whom

24 | Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25 | which Mattel's business depends.

26 |       9.    Defendant Bryant was employed by Mattel from September 1995

27 | through April 1998, and then again from January 1999 through October 2000, as a product

28 | designer at Mattel's design center in El Segundo, California.

TX 22952-00003

10. On January 4, 1999, upon starting his second term of employment by Mattel, and as a condition of and in consideration for his employment, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employee Agreement"). Among other things, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of [Mattel]." Bryant further acknowledged that he held a position of trust with Mattel. In addition, Bryant assigned to Mattel all rights, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement with Mattel is attached as Exhibit A.

11. Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant specifically agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. The only conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time subsequently) concerned freelance work that is unrelated to the conduct alleged herein. A true and correct copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B.

12. In late November 2003, Mattel learned that Bryant had secretly aided, assisted and worked for a Mattel competitor, including without limitation by entering into an agreement with the competitor, during the time Bryant was employed by Mattel pursuant to the above-referenced agreements and was being paid by Mattel as a product designer. Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

TX 22952-00004

things, that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all work and services furnished by Bryant to the competitor under the agreement purportedly would be considered "works for hire"; and that all intellectual property rights to preexisting work by Bryant purportedly would be assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and the other defendants converted, misappropriated and misused Mattel property and resources for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

13.    During the time that he was employed by Mattel and thereafter, Bryant concealed these actions from Mattel, including without limitation by failing to notify his supervisor of his conflict of interest regarding the competitor and by making affirmative misrepresentations to Mattel management upon his departure from Mattel.  Because of Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked for the competitor while still employed by Mattel until late November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with the competitor and saw that the date of the agreement predated Bryant's departure from Mattel.

14.    As a consequence, Bryant breached his contracts with Mattel and violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have unlawfully aided and abetted his violation of such duties; and each of the defendants has been unjustly enriched and engaged in acts of conversion.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

15.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 14, above, as though fully set forth at length.

16.    Pursuant to his Mattel Employment Agreement, and for good and valuable consideration, Bryant agreed that he would not, without Mattel's express written

TX 22952-00005

consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest.  Bryant further promised that he would notify his superior immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

17.     The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

18.     Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel, without the express written consent of Mattel.

19.     As a consequence of Bryant's breach, Mattel has suffered and will in the future continue to suffer damages in an amount to be proven at trial.  Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by the competitor to Bryant as a result of the work he performed for the competitor during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked for the competitor; the value of information and intellectual property owned by Mattel which Bryant provided to the competitor; the value of the benefits the competitor obtained from Bryant during the time he was employed by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of the work he performed for the competitor during his Mattel employment.

COMPLAINT

TX 22952-00006

20.     Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

### SECOND CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

21.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22.     Bryant held a position of trust and confidence with Mattel.  In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties.  In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel.  Bryant confirmed his relationship of trust with Mattel in the Employee Agreement.  Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23.     Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged

COMPLAINT

TX 22952-00007

1    above, Bryant also breached the aforementioned duty by using Mattel property and resources

2    for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3            24.    The other defendants, acting with full knowledge of Bryant's obligations

4    to Mattel,  aided and abetted Bryant in such conduct.

5            25.    As a direct and proximate result of defendants' wrongful conduct,

6    Mattel has incurred damages in an amount to be determined at trial.

7            26.    Defendants acted with malice, fraud and oppression, and in conscious

8    disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages

9    against defendants in an amount to be determined at trial.

10           27.    Furthermore, defendants' conduct has caused, and unless enjoined will

11   continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12   money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel

13   is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or

14   restraining defendants from continuing to benefit from such breach.

15

16                          THIRD CLAIM FOR RELIEF

17                          (Breach of Duty of Loyalty)

18

19           28.    Mattel repeats and realleges each and every allegation set forth in

20   paragraphs 1 through 27, above, as though fully set forth at length.

21           29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to

22   Mattel, his employer.  Pursuant to this duty, Bryant could not compete with Mattel or assist

23   a competitor of Mattel during his employment with Mattel.  Pursuant to this duty, Bryant

24   was required to always give preference to Mattel's business over his own, similar interests

25   during the course of his employment with Mattel.

26           30.    Bryant breached his duty of loyalty to Mattel in that, while employed

27   by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

28   without limitation by entering into an agreement with a Mattel competitor.  As alleged

TX 22952-00008

above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

31.   The other defendants, acting with full knowledge of Bryant's obligations to Mattel, aided and abetted Bryant in such wrongful conduct.

32.   As a direct and proximate result of defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

33.   Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

34.   Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or restraining defendants from continuing to benefit from such breach.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

35.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 34, above, as though fully set forth at length.

36.   Defendants, by the aforementioned conduct, unfairly used and diverted Mattel property, resources and opportunities for the benefit of, and to aid and assist, themselves, all without authorization by or payment to Mattel for the same.  Defendants have been unjustly enriched as a result.

37.   Mattel is entitled to an award of all such amounts by which defendants have been unjustly enriched in an amount to be determined at trial.

07209/579342.1

-9-

TX 22952-00009

38.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

### FIFTH CLAIM FOR RELIEF

(Conversion)

40.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.     Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer.  However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment.  All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel.  Such services and property were provided by Bryant to others, including defendants, and used by them.

42.     Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

07209/579342.1

-10-

COMPLAINT

TX 22952-00010

43.   As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.   Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.   Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.   Award Mattel its damages;

B.   Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.   Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.   Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.   Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.   Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

TX 22952-00011

1          G.      Award such other and further relief as this Court deems just and proper.

2

3   DATED:  April 27, 2004         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

4

5

6                     By _____
                       Michael T. Zeller

7                       Attorneys for Plaintiff
                       Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-12-

COMPLAINT

TX 22952-00012

**Exhibit A**

TX 22952-00013

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that; (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development or its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

_Carter H. Bryant_
Employee Signature

_CARTER H. BRYANT_
Employee Name (print)

_01/04/99_
Date

MATTEL INC.
By: _Teresa Newcomb_
Signature

_TERESA NEWCOMB_
Name of Witness (print)

**EXHIBIT A PAGE 13**

TX 22952-00014

**Exhibit B**

TX 22952-00015

# CONFLICT OF INTEREST QUESTIONNAIRE

Name (Last, first, M.I.) _BRYANT, CARTER H._   Job Title _PROJECT DESIGNER_   Department

Instructions: The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES ● NO  1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES ● NO  2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES ● NO  3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES ○ NO  4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES ○ NO  5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES ● NO  6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES ● NO  7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES ● NO  8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES ● NO  9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

_4, 5, Freelance design & artwork in 1998,_
_from appx. 5/98 - 11/98 for the Ashton Drake_
_galleries_

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature _Carter H. Bryant_   Date _01/04/98_

# EXHIBIT B PAGE 14

TX 22952-00016

# EXHIBIT B

CONFIDENTIAL

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation,  )   CASE NO.
                                       )   CV 04-9059 DDP (AJWx)
                 Plaintiff,            )
                                       )
        vs.                            )
                                       )
CARTER BRYANT, an individual, and      )
DOES 1 through 10, inclusive,          )
                                       )
                 Defendants.           )
_____)
CARTER BRYANT, on behalf of himself,   )
all present and former employees of    )
Mattel, Inc., and the general public,  )
                                       )
                 Cross-Complainant,    )
                                       )
        vs.                            )
                                       )
MATTEL, INC., a Delaware corporation,  )
                                       )
                 Cross-Defendant.      )

VOLUME I
        THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
produced, sworn, and examined on Thursday, November 4, 2004,
at 9:10 a.m. of that day, pursuant to Notice to Take
Deposition at the University Plaza, Executive Boardroom,
333 South John Q. Hammons Parkway, in the City of Springfield,
County of Greene, State of Missouri, before Sherrie L. Hunt,
Certified Court Reporter, and Notary Public, in a certain
cause now pending in the United States District Court for the
Central District of California, wherein the parties are as
above set forth; taken on behalf of the Plaintiff and
Cross-Defendant.

COURT REPORTERS OF THE MIDWEST, INC.
P.O. Box 4282
Springfield, MO 65808 (417) 889-2079

TX 24126-00001

# EXHIBIT C

RECEIVED

DEC 1 0 2004

SEND

M. RANDALL OPPENHEIMER (S.B. #77649)
DIANA M. TORRES (S.B. #162284)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407

FILED
CLERK, U.S. DISTRICT COURT

DEC - 7 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware Corporation,<br><br>              Plaintiff,<br><br>      v.<br><br>CARTER BRYANT, an individual; and DOES 1 through 10, inclusive,<br><br>              Defendant. | Case No. CV 04-9059 NM (RNBx)<br><br>**STIPULATION PERMITTING MGA TO INTERVENE AS A PARTY TO THIS ACTION** *ↄ ↄRDEↄ*<br><br>Hon. Nora Manella |

DOCKETED ON CM

DEC - 8 2004

BY _____ 006

12/8            34

**STIPULATION PERMITTING MGA TO
INTERVENE AS A PARTY**

TX 22883-00001

1     WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit

2     against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of

3     contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and

4     unjust enrichment.

5     WHEREAS, MGA, believes, at this time, that it has a significantly

6     protectable interest relating to the subject matter of the action, that the disposition

7     of the action may impair or impede MGA's ability to protect its interest absent

8     intervention, and that MGA's interest is not adequately represented by the existing

9     parties.

10    WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as

11    a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

12    its rights, defenses or positions in this or any other action or to the Answer in

13    Intervention, including without limitation to Mattel's jurisdictional objections;

14    WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as

15    a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

16    his rights, defenses or positions in this or any other action;

17    NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to

18    this Court's approval, as follows:

19    1.      MGA may intervene as a party to this action; and

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

- 1 -

TX 22883-00002

2.     MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:      December 3, 2004       O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

Dated:      December___, 2004      QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP

By: _____
Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.

Dated:      December___, 2004      LITTLER MENDELSON, P.C.

By: _____
Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated:      December___, 2004

_____
Hon. Nora M. Manella
United States District Judge

- 2 -

TX 22883-00003

1    2.    MGA shall be permitted to file its Answer in Intervention, lodged

2    concurrently with this Stipulation.

3    Dated:        December___, 2004        O'MELVENY & MYERS LLP

4

5                                          By:_____

6                                             Diana M. Torres
                                              Attorneys for Applicant-Intervenor
7                                             MGA ENTERTAINMENT, INC.

8

9    Dated:        December___, 2004        QUINN EMANUEL URQUHART
                                            OLIVER & HEDGES LLP
10

11

12                                         By: _____
                                              Michael T. Zeller
13                                            Attorneys for Plaintiff
                                              MATTEL, INC.
14

15   Dated:        December___, 2004        LITTLER MENDELSON, P.C.

16

17                                         By:_____
                                              Keith A. Jacoby
18                                            Attorneys for Defendant
                                              CARTER BRYANT
19   IT IS SO ORDERED.

20

21   Dated:        December___, 2004

22                                         _____
                                              Hon. Nora M. Manella
23                                            United States District Judge

24

25

26

27

28

                                    - 2 -

TX 22883-00004

2.   MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:     December___, 2004      O'MELVENY & MYERS LLP


By:_____
         Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.


Dated:     December___, 2004      QUINN EMANUEL URQUHART
                                 OLIVER & HEDGES LLP


By:_____
         Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.


Dated:     December 3, 2004      LITTLER MENDELSON, P.C.


By:_____
         Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.


Dated:     December 7th, 2004    _____
                                 Hon. Nora M. Manella
                                 United States District Judge

- 2 -

1  M. RANDALL OPPENHEIMER (S.B. #77649)
   DIANA M. TORRES (S.B. #162284)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, California 90071-2899
   Telephone:  (213) 430-6000
4  Facsimile:  (213) 430-6407

5  Attorneys for Applicant-Intervenor
   MGA ENTERTAINMENT, INC.

6

7

8                UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11 MATTEL, INC., a Delaware              Case No. CV 04-9059 NM (RNBx)
   Corporation,
12                                       **MGA ENTERTAINMENT, INC.'S
                   Plaintiff,            ANSWER IN INTERVENTION TO
13                                       PLAINTIFF'S UNVERIFIED
        v.                               COMPLAINT**
14
   CARTER BRYANT, an individual;         Hon. Nora Manella
15 and DOES 1 through 10, inclusive,

16                 Defendant.

17

18

19

20

21

22

23

24

25

26

27

28
   LA2:730044
                                              ANSWER IN INTERVENTION TO
                                           PLAINTIFF'S UNVERIFIED COMPLAINT

#247

TX 22953-00001

1       As it has now become abundantly clear that its rights are directly at stake in

2  this action, MGA Entertainment, Inc. ("MGA") intervenes in this case as a

3  defendant. Plaintiff Mattel, Inc. ("Mattel") filed suit against Carter Bryant

4  ("Bryant"), a design consultant for MGA, asserting, among other claims, that he

5  "wrongfully converted Mattel property" for his own benefit and "the benefit and

6  gain of others" and seeking both monetary and injunctive relief. It is now evident

7  that Mattel's claims are based on Mattel's misguided theory that Bryant allegedly

8  converted intellectual property from Mattel and used it as the underlying work for

9  his own and MGA's benefit. MGA reaches this conclusion in light of at least the

10  following:

11      (a)   Mattel's recent registration for an unreleased project created in

12             approximately 1999 that it now calls "Toon Teens," from which Mattel

13             has asserted in the press Bryant "borrowed liberally" for his work on

14             "Bratz," and which is also the subject of the declaratory relief action

15             that Bryant has filed;

16      (b)   the questioning of Bryant at his recent deposition focusing on the

17             creation and development of "Bratz;"

18      (c)   Mattel's recent efforts to subpoena third parties who worked on

19             MGA's "Bratz" products and have no information concerning Bryant's

20             employment relationship with Mattel; and

21      (d)   Mattel's recent attempts to assist those who have infringed MGA's

22             rights in other countries to prove (falsely) that MGA does not own the

23             copyrights to its "Bratz" products.

24  Indeed, Mattel's purported conversion claim is nothing more than a copyright claim

25  in disguise. It is preempted by federal copyright law, accordingly, and must be

26  recast as a copyright claim under federal law. This copyright action necessarily

27  implicates MGA's rights, as MGA owns all intellectual property rights in "Bratz."

28  While MGA denies that Mattel is entitled to rights in any of MGA's intellectual

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00002

1   property, including, without limitation, MGA's copyrights in the "Bratz" line of

2   products, MGA must now intervene in this action to defend its intellectual property

3   rights. Therefore Defendant in Intervention MGA, as answer to the Complaint

4   herein, admits, denies, and alleges as follows:

5       1.      Upon information and belief, MGA admits that Mattel is a corporation

6   organized and existing under the laws of the State of Delaware and has a place of

7   business in El Segundo, California. Except as so admitted, MGA is without

8   sufficient information to admit the allegations of ¶ 1, and on that basis denies the

9   same.

10      2.      MGA admits that defendant Bryant is an individual currently residing

11  in Springfield, Missouri.

12      3.      MGA is without sufficient information concerning either Mattel's

13  knowledge or the identities of the Doe Defendants, if any, to enable it to admit the

14  allegations of ¶ 3, and on that basis denies the same.

15      4.      MGA denies the allegations of ¶ 4.

16      5.      MGA denies the allegations of ¶ 5.

17      6.      MGA admits that Bryant does not currently reside in California and

18  that Los Angeles County is a proper venue for this action. Except as so admitted,

19  MGA denies the allegations of ¶ 6.

20      7.      MGA is without information to admit the specific allegations of ¶ 7

21  and on that basis denies the same, but admits that reports from Mattel and other

22  public sources make assertions similar to those alleged in ¶ 7.

23      8.      MGA is without information to admit the specific allegations of ¶ 8

24  pertaining to Mattel's operations, and on that basis denies the same, but admits that

25  Mattel has a large facility in El Segundo, California, in which Mattel employs a

26  number of people.

27      9.      MGA is without information to admit the specific allegations of ¶ 9

28  pertaining to Mattel's operations, and on that basis denies the same, but admits that

TX 22953-00003

1  Bryant was employed by Mattel during two time periods.

2       10.    MGA is informed and on that basis admits that Bryant signed

3  documents during his employment at Mattel.  MGA alleges that Exhibit A speaks

4  for itself as to its contents.  MGA lacks information sufficient to enable it to

5  identify or authenticate Exhibit A and on that basis denies each and every allegation

6  in ¶ 10 purporting to describe the content of Exhibit A.  MGA further alleges that

7  the allegations in ¶ 10 purporting to describe the legal effect of Exhibit A consist of

8  legal argument and conclusions to which no response is required.

9       11.    MGA is informed and on that basis admits that Bryant signed

10  documents during his employment at Mattel.  MGA alleges that Exhibit B speaks

11  for itself as to its contents.  MGA lacks information sufficient to enable it to

12  identify or authenticate Exhibit B and on that basis denies each and every allegation

13  in ¶ 11 purporting to describe the content of Exhibit A.  MGA further alleges that

14  the allegations in ¶ 11 purporting to describe the legal effect of Exhibit B consist of

15  legal argument and conclusions to which no response is required.

16       12.    MGA admits that Bryant signed a contract with MGA on or about

17  October 4, 2000 that provided that Bryant would receive royalties in connection

18  with certain work to be performed by him thereafter under that agreement, and that

19  MGA would own all intellectual property rights in property for which Bryant

20  provided services, as well as in the work assigned thereunder by Bryant to MGA.

21  Except as so admitted, MGA denies the allegations of ¶ 12.

22       13.    MGA is without information sufficient to admit the allegations in ¶ 13

23  and on that basis denies the same.

24       14.    MGA denies the allegations of ¶ 14.

25       15.    In answer to ¶ 15, MGA repeats its answers to the allegations in

26  paragraphs 1 through 14, above.

27       16.    MGA is informed and on that basis admits that Bryant signed

28  documents during his employment at Mattel.  MGA alleges that any purported

LA2:730044              - 3 -          ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00004

1   "Mattel Employment Agreement" and "Conflict Questionnaire" speak for
2   themselves as to their contents.  MGA lacks information sufficient to enable it to
3   identify or authenticate the purported "Mattel Employment Agreement" and
4   "Conflict Questionnaire" and on that basis denies each and every allegation in ¶ 16
5   purporting to describe the contents of such documents.  MGA further alleges that
6   the allegations in ¶ 16 purporting to describe the legal effect of any purported
7   "Mattel Employment Agreement" or "Conflict Questionnaire" consist of legal
8   argument and conclusions to which no response is required.

9        17.    MGA alleges that any purported "Mattel Employment Agreement" and
10  "Conflict Questionnaire" speak for themselves as to their contents.  MGA lacks
11  information sufficient to enable it to identify or authenticate the purported "Mattel
12  Employment Agreement" and "Conflict Questionnaire" and on that basis denies
13  each and every allegation in ¶ 16 purporting to describe the contents of such
14  documents.  MGA further alleges that the allegations in ¶ 16 purporting to describe
15  the legal effect of any purported "Mattel Employment Agreement" or "Conflict
16  Questionnaire" consist of legal argument and conclusions to which no response is
17  required.  MGA is without sufficient information concerning Mattel's performance,
18  if any, and on that basis denies all allegations regarding the same.

19       18.    MGA denies the allegations of ¶ 18.

20       19.    MGA denies the allegations of ¶ 19 and affirmatively asserts that the
21  relief sought by Mattel in this paragraph indicates that Mattel's first cause of action
22  implicates federal copyright laws.  To the extent that Mattel herein purports to set
23  forth the allegations in support of its first cause of action to substantiate a federal
24  copyright claim, these allegations are also expressly denied.

25       20.    MGA denies the allegations of ¶ 20 except that MGA alleges that any
26  purported "Employment Agreement" speaks for itself as to its contents.  MGA
27  lacks information sufficient to enable it to identify or authenticate the purported
28  "Employment Agreement" and on that basis denies each and every allegation in ¶

TX 22953-00005

1  20 purporting to describe the contents of such document.  MGA further alleges that

2  the allegations in ¶ 20 purporting to describe the legal effect of any purported

3  "Employment Agreement" consist of legal argument and conclusions to which no

4  response is required.

5      21.    In answer to ¶ 21, MGA repeats its answers to the allegations in

6  paragraphs 1 through 20, above.

7      22.    MGA is without information sufficient to admit the allegations of ¶ 22,

8  and on that basis denies same except that MGA alleges that any purported

9  "Employee Agreement" speaks for itself as to its contents.  MGA lacks information

10 sufficient to enable it to identify or authenticate the purported "Employee

11 Agreement" and on that basis denies each and every allegation in ¶ 22 purporting to

12 describe the contents of such document.  MGA further alleges that the allegations in

13 ¶ 22 purporting to describe the legal effect of any purported "Employee

14 Agreement" consist of legal argument and conclusions to which no response is

15 required.

16     23.    MGA denies the allegations of ¶ 23 and affirmatively asserts that the

17 relief sought by Mattel in this paragraph indicates that Mattel's first cause of action

18 implicates federal copyright laws.  To the extent that Mattel herein purports to set

19 forth the allegations in support of its first cause of action to substantiate a federal

20 copyright claim, these allegations are also expressly denied.

21     24.    MGA denies the allegations of ¶ 24.

22     25.    MGA denies the allegations of ¶ 25.

23     26.    MGA denies the allegations of ¶ 26.

24     27.    MGA denies the allegations of ¶ 27.

25     28.    In answer to ¶ 28, MGA repeats its answers to the allegations in

26 paragraphs 1 through 27, above.

27     29.    MGA denies the allegations of ¶ 29.

28     30.    MGA denies the allegations of ¶ 30 and affirmatively asserts that the

LA2:730044

- 5 -

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00006

1   relief sought by Mattel in this paragraph indicates that Mattel's first cause of action

2   implicates federal copyright laws.  To the extent that Mattel herein purports to set

3   forth the allegations in support of its first cause of action to substantiate a federal

4   copyright claim, these allegations are also expressly denied.

5       31.   MGA denies the allegations of ¶ 31.

6       32.   MGA denies the allegations of ¶ 32.

7       33.   MGA denies the allegations of ¶ 33.

8       34.   MGA denies the allegations of ¶ 34.

9       35.   In answer to ¶ 35, MGA repeats its answers to the allegations in

10   paragraphs 1 through 34, above.

11      36.   MGA denies the allegations of ¶ 36 and affirmatively asserts that the

12   allegations in this paragraph indicate that Mattel's fourth cause of action implicates

13   federal copyright laws.  To the extent that Mattel herein purports to set forth the

14   allegations in support of its fourth cause of action to substantiate a federal copyright

15   claim, these allegations are also expressly denied..

16      37.   MGA denies the allegations of ¶ 37.

17      38.   MGA denies the allegations of ¶ 38.

18      39.   MGA denies the allegations of ¶ 39.

19      40.   In answer to ¶ 40, MGA repeats its answers to the allegations in

20   paragraphs 1 through 39, above.

21      41.   MGA denies the allegations of ¶ 41 and affirmatively asserts that the

22   allegations in this paragraph assert legal or equitable rights that are equivalent to

23   exclusive rights within the general scope of copyright protection and are, therefore,

24   expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be

25   recast as a federal question under copyright law.  To the extent that Mattel herein

26   purports to set forth the allegations in support of its fifth cause of action to support

27   a federal copyright claim, these allegations are also expressly denied.

28      42.   MGA denies the allegations of ¶ 42 and affirmatively asserts that the

LA2:730044                          - 6 -                ANSWER IN INTERVENTION TO
                                                PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00007

1  allegations in this paragraph assert legal or equitable rights that are equivalent to
2  exclusive rights within the general scope of copyright protection, which are
3  expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be
4  recast as a federal question under copyright law. To the extent that Mattel herein
5  purports to set forth the allegations in support of its fifth cause of action to
6  substantiate a federal copyright claim, these allegations are also expressly denied.

7       43.    MGA denies the allegations of ¶ 43 and affirmatively asserts that the
8  allegations in this paragraph assert legal or equitable rights that are equivalent to
9  exclusive rights within the general scope of copyright protection, which are
10  expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be
11  recast as a federal question under copyright law. To the extent that Mattel herein
12  purports to set forth the allegations in support of its fifth cause of action to
13  substantiate a federal copyright claim, these allegations are also expressly denied.

14       44.    MGA denies the allegations of ¶ 44.

15       45.    MGA denies the allegations of ¶ 45.

16

17                        **AFFIRMATIVE DEFENSES**

18       MGA asserts the following affirmative defenses:

19                     **FIRST AFFIRMATIVE DEFENSE**

20       1.    Plaintiff's Complaint and each purported claim for relief therein is
21  preempted by the Federal Copyright Act.

22                   **SECOND AFFIRMATIVE DEFENSE**

23       2.    Plaintiff's Complaint and each purported claim for relief therein fail to
24  state facts sufficient to constitute a claim for relief.

25                     **THIRD AFFIRMATIVE DEFENSE**

26       3.    Plaintiff's Complaint and each purported claim for relief therein are
27  barred by the equitable doctrine of unclean hands.

28

LA2:730044

- 7 -

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00008

**FOURTH AFFIRMATIVE DEFENSE**

4.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of waiver.

**FIFTH AFFIRMATIVE DEFENSE**

5.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of estoppel.

**SIXTH AFFIRMATIVE DEFENSE**

6.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of laches.

**SEVENTH AFFIRMATIVE DEFENSE**

7.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of consent.

**EIGHTH AFFIRMATIVE DEFENSE**

8.     Plaintiff's Complaint and each purported claim for relief therein, or some of them, are barred by the applicable statutes of limitations, including California Code of Civil Procedure sections 337, 339, 343 and 338(c) .

**NINTH AFFIRMATIVE DEFENSE**

9.     Plaintiff's Complaint and each purported claim for relief therein, or some of them, are barred because no Defendant owed a legal duty to Plaintiff or, if any legal duty arose, it was not breached by any Defendant.

**TENTH AFFIRMATIVE DEFENSE**

10.     Without admitting, and specifically denying, that any Defendant owed any duty to Plaintiff, any duty or obligation, contractual or otherwise, which Plaintiff claims was owed by any Defendant has been fully performed, satisfied and/or discharged.

**ELEVENTH AFFIRMATIVE DEFENSE**

11.     Plaintiff's Complaint and each purported claim for relief therein are barred because each Defendant has complied fully with his and/or its obligations, if

TX 22953-00009

1    any, under all applicable laws.

2    ### TWELFTH AFFIRMATIVE DEFENSE

3        12.   Plaintiff's Complaint and each purported claim for relief therein are

4    barred because Plaintiff has failed to exercise reasonable diligence in properly

5    mitigating its damages, if any in fact were suffered.

6    ### THIRTEENTH AFFIRMATIVE DEFENSE

7        13.   Plaintiff's Complaint and each purported claim for relief therein are

8    barred because the alleged losses or harms sustained by Plaintiff, if any, resulted

9    from causes other than any act or omission by any Defendant.

10   ### FOURTEENTH AFFIRMATIVE DEFENSE

11       14.   Plaintiff's Complaint and each purported claim for relief therein, or

12   some of them, are barred because to the extent Plaintiff has suffered any harm, and

13   Defendant in Intervention denies that Plaintiff has suffered any harm, it is due to

14   Plaintiff's own acts and omissions.

15   ### FIFTEENTH AFFIRMATIVE DEFENSE

16       15.   Plaintiff's Complaint and each purported claim for relief therein, or

17   some of them, are barred because any alleged contract between Plaintiff and

18   Defendant Bryant fails for lack of consideration, is vague and uncertain, and

19   therefore is void, voidable and/or unenforceable.

20   ### SIXTEENTH AFFIRMATIVE DEFENSE

21       16.   Plaintiff's Complaint and each purported claim for relief therein, or

22   some of them, are barred because any breaches of an alleged contract or duty,

23   which Defendant in Intervention denies, are excused by Plaintiff's acts or

24   omissions.

25   ### SEVENTEENTH AFFIRMATIVE DEFENSE

26       17.   To the extent Plaintiff's Complaint and any purported claim for relief

27   therein, or some of them, seek the remedy of injunctive relief, that remedy is barred

28   because Plaintiff's remedies at law are adequate and any alleged harms, and

LA2:730044          - 9 -        ANSWER IN INTERVENTION TO PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00010

1    Defendant in Intervention denies that there are harms, are not irreparable.

2    **EIGHTEENTH AFFIRMATIVE DEFENSE**

3    18. Plaintiff's Complaint and each purported claim for relief therein

4    cannot be maintained because any duties or obligations, contractual or otherwise,

5    which Plaintiff claims are owed by Defendant Bryant, are contrary to applicable

6    law.

7    **NINETEENTH AFFIRMATIVE DEFENSE**

8    19. Plaintiff is barred from recovering punitive and/or exemplary damages

9    from Defendant or Defendant in Intervention ("Defendants") because an award of

10   such damages would violate the United States and/or California Constitutions, and

11   applicable case law.

12   **TWENTIETH AFFIRMATIVE DEFENSE**

13   20. Defendant in Intervention does not presently know all facts concerning

14   the conduct of Plaintiff sufficient to state all affirmative defenses at this time.

15   Defendant in Intervention will seek leave of Court to amend this Answer in

16   Intervention should it later discover facts demonstrating the existence of additional

17   affirmative defenses.

18

19   **WHEREFORE**, Defendant in Intervention prays for judgment as follows:

20   1. Plaintiff's Complaint shall be dismissed in its entirety with prejudice;

21   2. Plaintiff shall take nothing by its action against Defendant;

22   3. Defendant in Intervention shall be awarded its costs of suit and

23   attorneys' fees incurred in this matter (to the extent permitted by applicable law);

24   and

25   4. Defendant in Intervention shall be awarded such other further relief as

26   may be deemed just and proper.

27

28

LA2:730044

- 10 -

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00011

1

2    Dated:        December 3, 2004

3                                          O'MELVENY & MYERS LLP

4                                          By: _____
                                               Diana M. Torres
5                                          Attorneys for Defendant-in-Intervention
6                                          MGA ENTERTAINMENT, INC.

7

8
     LA2:730044
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     LA2:730044
                                   - 11 -
                                                    ANSWER IN INTERVENTION TO
                                          PLAINTIFF'S UNVERIFIED COMPLAINT

TX 22953-00012

# EXHIBIT D

-FILED

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email:     dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05 - 02727  CBM (RZx )

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** |
| v. | |
| MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

**EXHIBIT**
4521
TOMIYAMA
2-27-08

1    Plaintiff MGA Entertainment, Inc. for its complaint against

2  Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4                              **PARTIES**

5       1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6  corporation organized and existing under the laws of the State of California, with a

7  principal place of business in Van Nuys, California.

8       2.    MGA is informed and believes, and based thereon alleges, that

9  Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10  of business in El Segundo, California.

11       3.    MGA is ignorant of the true names and capacities of the defendants

12  sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will

13  seek leave of court to amend this complaint to allege such names and capacities

14  when they are ascertained.  MGA is informed and believes, and based thereon

15  alleges, that each of the fictitiously named DOE defendants is responsible in some

16  manner for the wrongful conduct alleged herein.  MGA further alleges that each

17  defendant acted in concert with, as agent or representative for, or at the request or

18  on behalf of another or Mattel.  Each charging allegation contained herein is,

19  therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21                     **JURISDICTION AND VENUE**

22       4.    Through this action MGA asserts claims against Mattel arising under

23  the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24  Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25  Section 14330 and California common law.  This Court has original subject matter

26  jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27  1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

TX 04521-00002

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2  Section 1367(a).

3      5.      This Court has specific personal jurisdiction over Mattel, as it has

4  purposefully committed, within the State of California, the acts from which these

5  claims arise and/or has committed tortious acts outside California, knowing and

6  intending that such acts would cause injury to MGA within the state.  The Court

7  also has general personal jurisdiction over Mattel, as it conducts continuous,

8  systematic and routine business within the State of California and the County of

9  Los Angeles.

10     6.      Venue is proper in the United States District Court for the Central

11 District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                          **FACTUAL BACKGROUND**

14     7.      MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15 competition-by-intimidation and serial copycatting of MGA's products, which

16 Mattel has used in an unbridled effort to cause confusion in the market place and

17 eliminate MGA as a competitor in the toy and fashion doll market long dominated

18 and controlled by Mattel.

19     8.      MGA is a privately-held company in the San Fernando Valley that

20 began in 1979 as a small consumer electronics business.  In 1987, the company

21 made its first foray into the toy business when it secured rights to market handheld

22 LCD games featuring licensed Nintendo® characters.  Building on that small

23 success, the company began marketing products for popular licensed properties

24 such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25 successful company, however, was propelled into the limelight after its daring

26 release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27 "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28 contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

TX 04521-00003

1  sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2  new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3  has been able to seriously challenge "Barbie" for market share, and begin to loosen

4  Mattel's 50-year iron-fisted grip on the fashion doll market.

5       9.     Mattel has not taken kindly to the challenge. Either unable or

6  unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7  has, instead, taken a more expeditious approach, resorting to unfair and anti-

8  competitive business practices. Wielding its substantial clout and influence in the

9  toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11  suppliers and others in the industry – both in the U.S. and internationally – in order

12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13  from obtaining licensees, contracts and supplies for its products. Mattel has also

14  serially imitated and copy-catted the look of MGA products, trade dress,

15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16  line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17  competitive conduct and to recover the extensive damage that Mattel's illicit

18  behavior has caused, and continues to cause, MGA. Mattel's own website states:

19  "As the global leader in the toy industry, we believe that how we achieve success is

20  just as important as the success itself." It also proclaims that "unwavering integrity

21  defines our corporate culture on every level, guiding how we work and how we do

22  business." Mattel's own corporate governance standards require it to "play by the

23  rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24  speak louder than its words.

25

26

27

28

3

TX 04521-00004

## Mattel History and Performance

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

TX 04521-00005

reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later, it spent $700 million for the Pleasant Co., a mail-order doll company and maker of the "American Girl" doll collection.  And in December 1998, Mattel announced plans to fork out a monumental $3.5 billion to buy the Learning Company, followed quickly by Mattel's purchase, in March 1999, of a software company, Purple Moon.

14.    Despite these acquisitions, the company continued to struggle.  The retail environment and buying patterns had unquestionably changed, but Mattel had not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales languished.  Posting additional losses in the first quarter of 1999, Mattel announced that it would lay off 3,000 employees – 10% of its work force.

15.    Mattel's stock plummeted again in late 1999, dropping 30% on Mattel's announcement that it would fall as much as 55% short of analysts' earning estimates for the third quarter.  Mattel blamed its troubles primarily on its expensive, $3.5 billion acquisition of the Learning Company, which had turned out to be a disaster fraught with licensing and distribution problems, bad debt, high product returns and high advertising costs.

16.    By early 2000, Mattel's stock had crashed to as low as $8 per share, and some analysts considered Mattel vulnerable to a takeover.  Investors clamored for Ms. Barad's resignation, and got their wish.

17.    Jill Barad resigned from Mattel in February 2000.

18.    For three months, the company was without a permanent chief executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

5

TX 04521-00006

1    with reviving its ailing cheese business.  Investors looked for him to do the same

2    for Mattel.

3        19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5        20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8    bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands.  Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18       21.    Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23       23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring.  Finished products were first shipped in May 2001.  MGA introduced

26   the line to consumers in June 2001.

27

28

TX 04521-00007

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"









25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

TX 04521-00008

26.     Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

| **MGA's "BRATZ"** | **Mattel's "Barbie"** |
|---|---|
|  |  |

27.     Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.     The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

TX 04521-00009

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29.     Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30.     The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ".  With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

**Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

31.     Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own – indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers.  Mattel had to take a more expeditious route.

32.     Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind – to banish MGA from the market – or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

9

TX 04521-00010

**Mattel's serial copycatting and intellectual property infringement**

33.   Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.   The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

| Mattel's Traditional "Barbie" | Mattel's "My Scene" Doll | |
| --- | --- | --- |
| | circa 2002 | circa 2004 |

  

  

TX 04521-00011

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

11

TX 04521-00012

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

**BRUNETTE**

Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

12

TX 04521-00013

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|

  

  

38. The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

 

13

TX 04521-00014

39.    The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

        

40.    Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

TX 04521-00015

## BLONDE

| Mattel's<br>Traditional "Barbie" | Mattel's<br>Original "My Scene" | Mattel's<br>Recent "My Scene" |













## BRUNETTE

| Mattel's<br>Traditional "Theresa" | Mattel's<br>Original "My Scene" | Mattel's<br>Recent "My Scene" |

15

TX 04521-00016



16

TX 04521-00017

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging

 

43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

TX 04521-00018

44.   Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**



**Mattel's "My Scene"**
**"Chillin' Out" Packaging**



45.   Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**



**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**



18

TX 04521-00019

46.     In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.     As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.     For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.     When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.     When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

TX 04521-00020

51. Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52. Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53. For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54. Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55. As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

TX 04521-00021

|   **MGA's "BRATZ"**<br>**"Funky Fashion Makeover Head"**   |   **Mattel's "My Scene"**<br>**"Stylin' Head"**   |





56.     Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ".  The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."



Hairstyle practice

21

TX 04521-00022

57.     Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.     At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.     Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**          **Mattel's "My Scene" dog**

          

60.     And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.     Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line. It comes as no surprise that

22

TX 04521-00023

1    customers too have been confused.

2        62.   Indeed, Mattel's television commercials and "My Scene" products
3    have become so confusingly similar to MGA's that even advertising executives
4    have expressed concern. One went so far as to say that although imitation is the
5    best form of flattery, what the individual had seen at Mattel's showroom, and how
6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was
7    "shocking." This person further opined that it was clear that Mattel is intending to
8    confuse customers and capture "BRATZ" market share, and even asked MGA if it
9    was considering legal action.

10       63.   The press also has taken notice of Mattel's attempts to confuse
11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a
12   prominent news publication stated, "Oh my, I just came from Mattel's showroom
13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."
14   Another member of the press visiting MGA's showroom offered the unsolicited
15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like
16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like
17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had
18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.
19   On or about February 16, 2005, during an interview of a Mattel representative on
20   local network news in New York, "My Scene Barbie" was displayed by a Mattel
21   representative. During conversation about the dolls, the interviewer exclaimed that
22   they looked like "BRATZ". The Mattel representative just laughed – but this is no
23   laughing matter. This colloquy was available for replay and viewing, and was even
24   transcribed, on the internet.

25       64.   Customers too have been similarly confused. Some actually contacted
26   MGA seeking to purchase "My Scene" dolls.

27       65.   Mattel's conduct is planned, deliberate and intentional. Mattel has
28   systematically, copied, imitated and liberally borrowed many of the distinctive,

23

TX 04521-00024

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

| **MGA's "4-Ever Best Friends"** | **Mattel's "Wee 3 Friends"** |
|---|---|
|  |  |
| |  |

TX 04521-00025

69.    In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| MGA's <br> "Mommy's Little Patient" | Mattel's <br> "Little Mommy Potty Training Baby Doll" |
|---|---|
|  |  |

70.    Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

TX 04521-00026

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line. In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials. For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence. Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA. Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow." It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct. Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

75.   For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

TX 04521-00028

and falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to make such line less attractive to buyers and thereby attempt to increase sales of the competitive Mattel product and improve its own sales, at MGA's expense.

80.     Even supposedly unbiased and impartial industry organizations have fallen prey to Mattel's abusive wield of power, to MGA's detriment.

81.     NPD Funworld ("NPD"), for one, is the leading supplier of sales statistics in the toy industry.  Accurate NPD statistics are essential for efficient product-line management.  Without these statistics, it is difficult, if not impossible, for toy companies to assess and measure the relative success of their products in key categories.  It is, however, a subscription service, and NPD restricts the manner in which its subscribers may use the data it provides.

82.     Mattel has regularly ignored the restrictions – using NPD data about Mattel's comparative standing relative to other companies in press releases and in communications with retailers and financial investors who are not NPD subscribers.

83.     Mattel generates substantially more annual subscription revenue for NPD than does MGA, and carries more clout.

84.     After MGA had subscribed to the service for more than 12 years, NPD terminated MGA's subscription in 2003 theoretically on the grounds that MGA misused NPD data in a press release.

85.     MGA is informed and believes that the termination was the result of pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's restrictions.

86.     In addition to this, the market share numbers that NPD generates are heavily dependent on the category in which NPD places a particular product.  MGA is informed and believes that Mattel also pressured NPD into changing certain product classifications for its "BRATZ" products in order to manipulate the data

TX 04521-00029

1  and preserve Mattel's market share rankings in the critical fashion doll category –

2  and thereby lower MGA's.

3       87.   The Children's Advertising Review Unit ("CARU") is another

4  organization that, upon information and belief, appears to have been subject to

5  improper influence by Mattel.  CARU is the toy industry's supposedly independent

6  self-regulatory body in charge of maintaining standards in advertising.  CARU's

7  approval is considered critical within the toy industry to avoiding regulatory action

8  by the Federal Trade Commission.

9       88.   CARU is heavily subsidized by Mattel.

10       89.   Upon information and belief, Mattel has used its influence as a major

11  contributor to CARU's budget to induce CARU to place onerous restrictions on

12  MGA advertisements, and require MGA to amend aspects of commercials that have

13  gone unchallenged in other parties' commercials.

14       90.   As a result of CARU's restrictions, MGA has been forced to incur

15  unnecessary costs for reshooting and producing or re-editing its commercials.

16       91.   On several occasions, CARU has also either strongly suggested, if not

17  also required, that MGA respond to inquiries about its website policies and make

18  substantial changes to the "BRATZ" website notably and significantly in excess of

19  restrictions imposed on Mattel and others.

20       92.   Even TIA, the toy industry's trade association, is apparently not

21  untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-

22  the-Year Awards, the most prestigious of which had been the award for Toy of the

23  Year.  Winning the Toy of the Year Award is a significant achievement that not

24  only very likely increases the sales of the winning toy, but also denotes the winning

25  company as a leader in toy innovation and generates substantial goodwill with

26  retailers, distributors, licensees, and customers.

27       93.   For the years 2000 (the first year of the award), 2001 and 2002, the

28  Toy of the Year award was chosen by consumer vote.  The awards ceremony was

TX 04521-00030

then held the following year, at a dinner in New York. (For example, the awards dinner for the year 2000 award was held in February 2001). Leap Frog won the 2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002 People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award, however, the rules suddenly changed. Now, the award is selected by members of the industry.

94.   Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA.

95.   Perhaps not surprisingly given this change in the winner selection procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal Funk Super Stylin' Runway Disco."

96.   TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

97.   MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's "Kids' Choice Awards."

98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

99.   Mattel may not shield its illegal, unfair and unethical business practices from the public eye. It is time for the truth to be told, and the world to know of Mattel's unfair, unethical and illegal business practices and unfair competition. "Barbie" does not "play nice" with others (particularly her competitors), and needs to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

30

TX 04521-00031

1 | allowed to continue to be the playground bully and trample on the rights of others,

2 | including MGA.

3 |     100. As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4 | competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5 | lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6 | opportunities and other damages and harm for which there is no adequate remedy at

7 | law. Its ability to enter new markets and product lines has been hampered and

8 | delayed. Its production costs have increased, its reputation and relationships with

9 | important players in the industry have been negatively impacted, the value of its

10 | business has been diminished, and its ability to attract, hire and retain employees

11 | has been affected.

12 |

13 | **FIRST CLAIM FOR RELIEF**

14 | **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15 |     101. MGA repeats and realleges the allegations contained in paragraphs 1

16 | through 100 of this Complaint and incorporates them by reference as though fully

17 | and completely set forth herein.

18 |     102. MGA's "BRATZ" line has a unique and distinctive style and

19 | distinctive characteristics, such as the disproportionately large head, large dramatic

20 | eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21 | pouty, plump lips with a distinctive presentation (including the lip shape and make-

22 | up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"

23 | line is known for and recognized by the total image that is presented by its product

24 | and the style and arrangement of the packaging and display. This "*tout ensemble*"

25 | is representatively described and depicted herein. The characteristics of MGA's

26 | "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27 | and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress

28 | in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

TX 04521-00032

1    is not essential to the purpose, quality or source identifying attributes of the

2    aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3    acquired distinction within the meaning of the Lanham Act.

4        103.  Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5    has its own unique and distinctive characteristics, such as the humanlike eye and

6    unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7    line has become known for and recognized by the total image that is presented by

8    the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9    representatively described and depicted herein. The characteristics of MGA's

10   "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11   PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12   trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13   any utility exists, it is not essential to the purpose, quality or source identifying

14   attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15   inherently distinctive or has acquired distinction within the meaning of the Lanham

16   Act.

17       104.  Mattel's production, sale and marketing of "My Scene" dolls,

18   including styling heads and doll heads, and "My Scene" pets that are confusingly

19   similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20   permission or consent, constitutes designation and use of a term, symbol, device or

21   combination thereof that is false or misleading within the meaning of 15 U.S.C.

22   Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23   to the affiliation, connection, or association, or as to the origin, sponsorship, or

24   approval of Mattel's goods or commercial activities, within the meaning of 15

25   U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26       105.  Mattel's conduct has been intentional and willful, and is calculated

27   specifically to trade off the goodwill that MGA has developed in its successful

28   "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

TX 04521-00033

1   features of MGA's "BRATZ" line in connection with goods sold and distributed in

2   interstate commerce, Mattel has infringed and is likely to continue to infringe on

3   MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing,

4   Mattel has falsely represented and designated to the public generally and consumers

5   of fashion doll products specifically the source and origin of Mattel's "My Scene"

6   fashion doll products in violation of 15 U.S.C. § 1125(a).

7        106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8   wrongful conduct in an amount to be proven at trial.

9        107.  For each act of infringement, MGA is entitled to recover its actual

10   damages as well as Mattel's profits from such infringement.

11        108.  Monetary relief alone, however, is not adequate to address fully the

12   irreparable injury that Mattel's illegal actions have caused and will continue to

13   cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and

14   permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15   dress.

16                    **SECOND CLAIM FOR RELIEF**

17        **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18   **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19             **Code § 17200 *et seq.* and California Common Law)**

20        109.  MGA repeats and realleges the allegations contained in paragraphs 1

21   through 108 of this Complaint and incorporates them by reference as though fully

22   and completely set forth herein.

23        110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24   mimicked the make-up, appearance, features, trade dress, and image of MGA's

25   products, packaging and advertising, including its repackaging and refreshing of

26   older Mattel toys.  Mattel's actions were and are done with the intent to deceive

27   consumers, cause confusion and mistake, and interfere with the ability of

28   consumers to identify the source of goods by appearance and packaging.  By this

33

1   conduct, Mattel pirates and exploits, by subliminal or conscious association with

2   MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3       111.  Mattel has particularly and deliberately poached upon the commercial

4   magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct

5   has been intentional and willful, and is calculated specifically to trade off the

6   goodwill that MGA has developed in its successful "BRATZ" line.

7       112.  By its acts, including its intentional imitation of the distinctive features

8   of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9   well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13      113.  Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies.  Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20      114.  Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23      115.  As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage.  Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27      116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

34

TX 04521-00035

117.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.  MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

### THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.  MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.  The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.  Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

TX 04521-00036

123. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

### FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124. MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125. As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment. MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

### PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1. That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a. using confusingly similar trade dress;

    b. improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c. engaging in unfair competition and unfair business practices; and

    d. diluting MGA's trade dress;

2. For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3. For the disgorgement of all profits derived by Mattel for its acts of:

    a. false designation of origin or affiliation;

36

TX 04521-00037

1           b.     unfair competition and unfair business practices; and

2           c.     dilution;

3      4.    For costs of suit and reasonable attorneys' fees;

4      5.    For punitive and/or exemplary damages as a result of Mattel's willful

5  and malicious conduct to the extent allowable by law; and

6      6.    For such other and further relief as the Court deems just and proper.

7

8  Dated:     April 13, 2005           PATRICIA GLASER
9                                               CHRISTENSEN, MILLER, FINK,
                                             JACOBS, GLASER, WEIL &
10                                              SHAPIRO LLP

11                                              DALE M. CENDALI
                                             DIANA M. TORRES
12                                              PAULA E. AMBROSINI
                                             O'MELVENY & MYERS LLP

13

14

15                                              By: _____
                                                Diana M. Torres
16                                              Attorneys for Plaintiff
                                             MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

37

TX 04521-00038

1

## DEMAND FOR JURY TRIAL

2

3          MGA hereby demands a jury trial on all triable issues.

4

5   Dated:        April 13, 2005          PATRICIA GLASER
                                          CHRISTENSEN, MILLER, FINK,
6                                         JACOBS, GLASER, WEIL &
                                          SHAPIRO LLP
7
                                          DALE M. CENDALI
8                                         DIANA M. TORRES
                                          PAULA E. AMBROSINI
9                                         O'MELVENY & MYERS LLP

10

11                                        By:  _____
                                              Diana M. Torres
12                                        Attorneys for Plaintiff
                                          MGA ENTERTAINMENT, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

TX 04521-00039