1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5
   MATTEL, INC., et al.,              )
6                                     )
              Plaintiffs,             )
7                                     )
       vs.                            ) No. CV 04-9049 DOC
8                                     )    Day 22
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 4
9                                     )
                                      )
10             Defendants.            )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16                Santa Ana, California

17            Wednesday, February 23, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-23 D22V1

Case 2:04-cv-09049-DOC-RNB  Document 10087  Filed 02/28/11  Page 2 of 160  Page ID #:304609
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3
                QUINN EMANUEL URQUHART & SULLIVAN
4               BY:  JOHN QUINN
                     WILLIAM PRICE
5                    MICHAEL T. ZELLER
                     Attorneys at Law
6               865 South Figueroa Street
                10th Floor
7               Los Angeles, California 90017
                (213) 443-3000

8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12              ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                BY:  THOMAS S. McCONVILLE
13                   Attorney at Law
                4 Park Plaza
14              Suite 1600
                Irvine, California 92614
15              (949) 567-6700

16              - AND -

17              ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                BY:  ANNETTE L. HURST
18                   Attorney at Law
                405 Howard Street
19              San Francisco, California 94105
                (415)773-5700

20              - AND -

21              KELLER RACKAUCKAS
22              BY:  JENNIFER KELLER
                     Attorney at Law
23              18500 Von Karman Avenue
                Suite 560
24              Irvine, California 92612
                (949) 476-8700

25

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 10087  Filed 02/28/11  Page 3 of 160  Page ID #:304610
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830

8            - AND -

9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660

13

14    ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406

18

19           ISAAC LARIAN, MGA CEO

20           KEN KOTARSKI, Mattel Technical Operator

21           MIKE STOVALL, MGA Technical Operator

22           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

23

24

25

4

1                          **I N D E X**

2   **WITNESSES**                **DIRECT  CROSS  REDIRECT  RECROSS**

3   CHAN, Lisa

4   By Mr. Quinn                   6              49

5   By Mr. McConville                     39                   56

6

7   KUEMMERLE, Susana

8   By Mr. Quinn                  60

9

10

11                          **EXHIBITS**

12   **EXHIBIT NO.**                **IDENTIFICATION   IN EVIDENCE**

13      1354      Document showing                       11
14                payments from MGA to
                  family members

15      1364      Schedule of payments re               13
16                Larian family

        6754      Presentation                          79
17

        6770      E-mail string with                    98
18                Ms. Kuemmerle, Mr.
                  Larian, "plot04" e-mail
19                addresses, and Mr. Park

20      6774      E-mail between                         96
                  Ms. Kuemmerle and
21                "plot04" e-mail address

22      6802      E-mail string copying                113
                  Ms. Kuemmerle,
23                Mr. Gustavo, Mr. Larian,
                  Mr. Vargas, et al.

24

25

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

5

| 1 | **EXHIBITS** (Continued) | | |
|---|---|---|---|
| 2 | EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
| 3 | 6803 | E-mail from Mr. Vargas to Mr. Larian | 115 |
| 4 | | | |
| 5 | 8089 | List of document ID numbers for documents initialed by Mr. Aguirre | 148 |
| 6 | | | |
| 7 | 8129 | E-mail string starting from Mr. Wing to Mr. Ma, Ms. Hamzavi and Ms. Chan dated 11/7/2006 | 37 |
| 8 | | | |
| 9 | 8741 | Accounting of MGA due to/from for Larian Famiy Trust | 15 |
| 10 | | | |
| 11 | 21091 | E-mail string between Ms. Kuemmerle and Mr. Wing | 126 |
| 12 | | | |
| 13 | 21243 | Ms. Mendez contract in Spanish, with certified English translation | 101 |
| 14 | | | |
| 15 | 22013-R-7 | Chart of MGA international structure before December 2002 | 27 |
| 16 | | | |
| 17 | 22013-R-9 | Chart of MGA international structure October 2002 to September 2005 | 27 |
| 18 | | | |
| 19 | | | |
| 20 | 22013-16 | Chart of MGA internationalstructure October 2005 to April 2010 | 31 |
| 21 | | | |
| 22 | 22489 | E-mail from Ms. Kummerle to Mr. Larian, 3/17/2004 | 87 |
| 23 | | | |
| 24 | 24112 | E-mail string containing e-mail from Mr. Larian to Ms. Chan and Ms. Makabi | 8 |
| 25 | | | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 10087  Filed 02/28/11  Page 6 of 160  Page ID #:304613
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

6

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 23, 2011           |
|       | 2  | Day 22, Volume 1 of 4                                        |
|       | 3  | (8:34 a.m.)                                                   |
| 08:34 | 4  | *(In the presence of the jury.)*                             |
| 08:35 | 5  | THE COURT: The jury is present. All counsel are             |
| 08:35 | 6  | present. The witness is present.                             |
| 08:35 | 7  | Good morning.                                                 |
| 08:35 | 8  | Counsel, if you would like to proceed, Mr. Quinn,           |
| 08:35 | 9  | with your direct examination of Ms. Chan.                    |
| 08:35 | 10 | MR. QUINN: Thank you, Your Honor.                           |
| 08:35 | 11 | LISA CHAN, MATTEL'S WITNESS, PREVIOUSLY SWORN               |
| 08:35 | 12 | RESUMED THE STAND                                            |
| 08:35 | 13 | DIRECT EXAMINATION                                           |
| 08:35 | 14 | BY MR. QUINN:                                                 |
| 08:35 | 15 | Q.  Good morning, Ms. Chan.                                  |
| 08:35 | 16 | A.  Good morning.                                            |
| 08:35 | 17 | Q.  Just to back up on one of the subjects we talked about  |
| 08:35 | 18 | at trial yesterday, do you recall we went through the        |
| 08:35 | 19 | composition of the boards of directors of various of the MGA |
| 08:35 | 20 | entities, and there was a Mr. Farahnik, who was a director   |
| 08:35 | 21 | with Mr. Larian in many of the subsidiaries and in MGA at    |
| 08:35 | 22 | various times?  Do you recall that?                          |
| 08:36 | 23 | A.  Yes.                                                     |
| 08:36 | 24 | Q.  And I asked you who he was, whether he was a friend, or  |
| 08:36 | 25 | whether he was an independent director, and I think you said |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

7

| | | |
|---|---|---|
| 08:36 | 1 | you just weren't sure; do you recall that? |
| 08:36 | 2 | A.   Yes. |
| 08:36 | 3 | Q.   I'd like you, please, if you would, to take a look at |
| 08:36 | 4 | Exhibit 24112.  This is an e-mail string.  The top e-mail is |
| 08:36 | 5 | an e-mail from Mr. Larian to you and Shirin Makabi.  It's |
| 08:36 | 6 | dated April 16, 2007. |
| 08:36 | 7 | *(Document provided to witness.)* |
| 08:36 | 8 | THE WITNESS:  Yes. |
| 08:36 | 9 | BY MR. QUINN: |
| 08:36 | 10 | Q.   And do you see that your name is on some of these |
| 08:36 | 11 | e-mails here? |
| 08:36 | 12 | A.   Yes. |
| 08:36 | 13 | Q.   And you recognize this?  This has an MGA Bates number |
| 08:36 | 14 | in the lower right-hand corner.  Do you see that? |
| 08:36 | 15 | A.   Yes. |
| 08:36 | 16 | MR. QUINN:  We'd offer Exhibit 24112, Your Honor. |
| 08:37 | 17 | MR. McCONVILLE:  Objection.  Relevance.  Hearsay. |
| 08:37 | 18 | THE COURT:  Just a moment.  Can one of you quickly |
| 08:37 | 19 | retrieve that for me for just a moment. |
| 08:37 | 20 | MR. McCONVILLE:  We have no objection to showing |
| 08:37 | 21 | to refresh recollection if that's what it's being offered |
| 08:37 | 22 | for, but object to its introduction. |
| 08:37 | 23 | MR. QUINN:  The relevant part, Your Honor, is |
| 08:37 | 24 | really the first two e-mails in the chain at the back. |
| 08:37 | 25 | THE COURT:  At the back? |

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

8

| | | |
|---|---|---|
| 08:37 | 1 | MR. QUINN:  Yeah. |
| 08:37 | 2 | THE COURT:  On the last page? |
| 08:37 | 3 | MR. QUINN:  Yeah. |
| 08:38 | 4 | THE COURT:  And an e-mail from Shirin Makabi to |
| 08:38 | 5 | Mondana Hamzavi. |
| 08:38 | 6 | MR. QUINN:  Yes.  And then that's forwarded to |
| 08:38 | 7 | Ms. Chan. |
| 08:38 | 8 | THE COURT:  Does Mr. Larian eventually appear on |
| 08:38 | 9 | this e-mail chain on the first page? |
| 08:38 | 10 | MR. QUINN:  Yes.  He's on the top, Your Honor. |
| 08:38 | 11 | THE COURT:  Overruled. |
| 08:38 | 12 | And it's received. |
| 08:39 | 13 | *(Exhibit No. 24112 received in evidence.)* |
| 08:39 | 14 | *(Document displayed.)* |
| 08:39 | 15 | MR. QUINN:  Thank you, Your Honor. |
| 08:39 | 16 | And if we could begin by displaying the last page, |
| 08:39 | 17 | Ken. |
| 08:39 | 18 | BY MR. QUINN: |
| 08:39 | 19 | Q.   If we could enlarge those two e-mails in the middle of |
| 08:39 | 20 | the page.  There is an e-mail, it says from Mondana Hamvazi |
| 08:39 | 21 | (sic) to Sharin Makabi.  Do you know who Mondana -- I'm |
| 08:39 | 22 | sorry.  Hamvazi -- is -- -zavi? |
| 08:39 | 23 | A.   Hamzavi. |
| 08:39 | 24 | Q.   Yes.  Thank you. |
| 08:39 | 25 | A.   She was a former controller for the company. |

| | | |
|---|---|---|
| 08:39 | 1 | Q.    And Shirin Makabi? |
| 08:39 | 2 | A.    Shirin Makabi is one of the shareholders. |
| 08:39 | 3 | BY MR. QUINN: |
| 08:39 | 4 | Q.    And she writes, "Isaac's loan to Cookie, have no idea? |
| 08:39 | 5 | What is Cookie?" |
| 08:39 | 6 | Do you see that? |
| 08:39 | 7 | A.    Yes. |
| 08:39 | 8 | Q.    And then the next e-mail, Ms. Makabi responds, "Isaac's |
| 08:39 | 9 | loan to Cookie, Cookie his friend, aka Leon Farahnik." |
| 08:39 | 10 | Do you see that? |
| 08:40 | 11 | A.    Yes. |
| 08:40 | 12 | Q.    And that's forwarded to you on the next page.  You'll |
| 08:40 | 13 | see your name appears as a cc on the e-mail at the bottom of |
| 08:40 | 14 | the next page? |
| 08:40 | 15 | A.    Yes. |
| 08:40 | 16 | Q.    And this relates to a loan of some $3 million that |
| 08:40 | 17 | Mr. Larian had made to Mr. Farahnik? |
| 08:40 | 18 | If you could take a look at page dash 2, 24112-2, |
| 08:40 | 19 | the e-mail in the middle dated April 16, 2007.  You write |
| 08:40 | 20 | there, "Shirin, please see attached.  The total loan amount |
| 08:40 | 21 | is $3 million." |
| 08:40 | 22 | Do you see that? |
| 08:40 | 23 | A.    Yes. |
| 08:40 | 24 | Q.    Does that refresh your recollection that Mr. Farahnik |
| 08:40 | 25 | was a friend of Mr. Larian's? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 10 of 160   Page ID #:304617
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

10

| | | |
|---|---|---|
| 08:40 | 1 | A.   Yes. |
| 08:40 | 2 | Q.   Was known to him as Cookie? |
| 08:40 | 3 | A.   Yes. |
| 08:40 | 4 | Q.   Okay.  Thank you. |
| 08:41 | 5 | And yesterday when we broke, I think I had asked you |
| 08:41 | 6 | whether one of the subjects on which you had been appointed |
| 08:41 | 7 | as a 30(b)(6) witness to gather information and testify on |
| 08:41 | 8 | MGA's behalf was payments of money and any other items of |
| 08:41 | 9 | value that have been made to or for the benefit of Isaac |
| 08:41 | 10 | Larian or any of his family members since January 1, 1999. |
| 08:41 | 11 | Do you recall that? |
| 08:41 | 12 | A.   Yes. |
| 08:41 | 13 | Q.   And I know we looked at some of your deposition |
| 08:41 | 14 | testimony, and you were able to refresh your recollection |
| 08:41 | 15 | that that was one of subjects that you were a 30(b)(6) |
| 08:41 | 16 | witness on.  Do you recall that? |
| 08:41 | 17 | A.   Yes. |
| 08:41 | 18 | Q.   If you take a look at Exhibit 1354. |
| 08:42 | 19 | MR. McCONVILLE:  We'd object to this exhibit, |
| 08:42 | 20 | Your Honor, on 403 grounds and relevancy. |
| 08:42 | 21 | THE COURT:  Overruled. |
| 08:42 | 22 | BY MR. QUINN: |
| 08:42 | 23 | Q.   You recognize this document? |
| 08:42 | 24 | A.   Yes. |
| 08:42 | 25 | Q.   This is a document that reflects payments made on -- |

| | | |
|---|---|---|
| 08:42 | 1 | from MGA on behalf of various family members? |
| 08:42 | 2 | A.   Yes. |
| 08:42 | 3 | MR. QUINN:  We'd offer this into evidence, |
| 08:42 | 4 | Your Honor. |
| 08:42 | 5 | THE COURT:  It's received. |
| 08:42 | 6 | *(Exhibit No. 1354 received in evidence.)* |
| 08:42 | 7 | *(Document displayed.)* |
| 08:42 | 8 | BY MR. QUINN: |
| 08:42 | 9 | Q.   And just, for example, if we look at -- this is one of |
| 08:42 | 10 | those spreadsheets that goes wide horizontally.  If we |
| 08:42 | 11 | looked at the whole document in the format in which you'd |
| 08:42 | 12 | see it, it would be on broad kind of paper; is that right? |
| 08:42 | 13 | A.   It appears to be. |
| 08:42 | 14 | Q.   Yeah.  So we've got numbered lines on the left-hand |
| 08:42 | 15 | side, and to follow through what these things are, we are |
| 08:42 | 16 | gonna have to turn the pages and track that numbered line, |
| 08:43 | 17 | correct? |
| 08:43 | 18 | A.   Yes. |
| 08:43 | 19 | Q.   That's the way it works? |
| 08:43 | 20 | A.   Yes. |
| 08:43 | 21 | Q.   So on the first page, we see a numbered line, just for |
| 08:43 | 22 | example, 25, a 3/5/03 distribution.  Do you see that? |
| 08:43 | 23 | A.   Yes. |
| 08:43 | 24 | Q.   And if we track that through on the next page, that |
| 08:43 | 25 | numbered-line 25, it says it's for the $641,299.34, correct? |

| | | |
|---|---|---|
| 08:43 | 1 | That's on page dash 2. |
| 08:43 | 2 | A.   Correct. |
| 08:43 | 3 | Q.   And turn to page dash 3, numbered-line 25, that |
| 08:43 | 4 | indicates that was a payment made for a Shoren (sic) Larian |
| 08:43 | 5 | condo.  Do you see that? |
| 08:43 | 6 | A.   Yes. |
| 08:43 | 7 | Q.   Who is Shoren Larian? |
| 08:43 | 8 | A.   I believe "Shoreh" is Isaac's sister. |
| 08:44 | 9 | Q.   And so this represents a payment that was made from MGA |
| 08:44 | 10 | to purchase a condominium for Mr. Larian's sister? |
| 08:44 | 11 | MR. McCONVILLE:  Objection.  Misstates the |
| 08:44 | 12 | evidence. |
| 08:44 | 13 | THE COURT:  Overruled. |
| 08:44 | 14 | You can answer the question. |
| 08:44 | 15 | THE WITNESS:  I believe it's a distribution.  We |
| 08:44 | 16 | treated it as a distribution to Mr. Larian. |
| 08:44 | 17 | BY MR. QUINN: |
| 08:44 | 18 | Q.   So it's -- it ultimately appears in his distribution |
| 08:44 | 19 | account, correct? |
| 08:44 | 20 | A.   Correct. |
| 08:44 | 21 | Q.   At the end of the year, that's all trued up, correct? |
| 08:44 | 22 | A.   We treat it as a dividend distribution. |
| 08:44 | 23 | Q.   But the payment that's made out of the company was a |
| 08:44 | 24 | payment from company's accounts to purchase the condominium, |
| 08:44 | 25 | correct? |

DEBBIE GALE, U.S. COURT REPORTER

| 08:44 | 1 | A.  I don't know if it was paid directly or if it was a |
| 08:44 | 2 | distribution to Mr. Larian first. |
| 08:44 | 3 | Q.  But this indicates that -- this is a schedule of |
| 08:44 | 4 | payments made to or on behalf of Mr. Larian's family |
| 08:45 | 5 | members, correct? |
| 08:45 | 6 | A.  Yes. |
| 08:45 | 7 | Q.  If you'd take a look at Exhibit 1364. |
| 08:45 | 8 | THE COURT:  And, Counsel, the same objection? |
| 08:45 | 9 | MR. McCONVILLE:  Yes, Your Honor, same objection |
| 08:45 | 10 | to this exhibit. |
| 08:45 | 11 | THE COURT:  Received. |
| 08:45 | 12 | *(Exhibit No. 1364 received in evidence.)* |
| 08:45 | 13 | BY MR. QUINN: |
| 08:45 | 14 | Q.  Do you recognize this document? |
| 08:45 | 15 | A.  I believe so, yes. |
| 08:45 | 16 | Q.  And what is it? |
| 08:45 | 17 | A.  It looks like another schedule of payments. |
| 08:45 | 18 | Q.  Payments made to or on behalf of Larian family members? |
| 08:45 | 19 | A.  Yes. |
| 08:45 | 20 | Q.  And looking at 1364-7, if we could. |
| 08:45 | 21 | MR. QUINN:  I'd offer this in evidence, |
| 08:46 | 22 | Your Honor. |
| 08:46 | 23 | THE COURT:  Same objection, Counsel? |
| 08:46 | 24 | MR. McCONVILLE:  Yes, Your Honor. |
| 08:46 | 25 | THE COURT:  Overruled. |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

14

| | | |
|--|--|--|
| 08:46 | 1 | Received. |
| 08:46 | 2 | I'm sorry, did you say 871? |
| 08:46 | 3 | MR. QUINN:  This is Exhibit 1364, Your Honor. |
| 08:46 | 4 | THE COURT:  All right.  Thank you.  I've already |
| 08:46 | 5 | received that, Counsel. |
| 08:46 | 6 | *(Document displayed.)* |
| 08:46 | 7 | BY MR. QUINN: |
| 08:46 | 8 | Q.   So this -- if we look at page 1364-7, this appears to |
| 08:46 | 9 | reflect payments made to or on behalf of Elias Larian.  Do |
| 08:46 | 10 | you see that? |
| 08:46 | 11 | A.   Yes. |
| 08:46 | 12 | Q.   Can you tell us what those are for? |
| 08:46 | 13 | A.   It appears to be for professional fees. |
| 08:46 | 14 | Q.   Do you know who Elias Larian is? |
| 08:46 | 15 | A.   No. |
| 08:46 | 16 | Q.   Do you know whether he is a relative of Mr. Isaac |
| 08:46 | 17 | Larian's? |
| 08:46 | 18 | A.   I don't know for sure. |
| 08:46 | 19 | Q.   All right.  But you don't know what these professional |
| 08:46 | 20 | fees that this page indicates are being paid for; is that |
| 08:47 | 21 | true? |
| 08:47 | 22 | A.   No, I do not know. |
| 08:47 | 23 | Q.   Looking at page 1364-9, additional professional fees on |
| 08:47 | 24 | this page being paid for Elias Larian, correct? |
| 08:47 | 25 | A.   Correct. |

| 08:47 | 1 | Q.    If we could turn now to Exhibit 8741. |
| 08:47 | 2 | THE COURT:  And, Counsel, the same objection? |
| 08:47 | 3 | MR. McCONVILLE:  Yes, sir. |
| 08:47 | 4 | THE COURT:  All right.  Overruled. |
| 08:47 | 5 | Received. |
| 08:47 | 6 | *(Exhibit No. 8741 received in evidence.)* |
| 08:47 | 7 | MR. QUINN:  I don't think this is in evidence yet. |
| 08:47 | 8 | THE COURT:  I just received it. |
| 08:47 | 9 | MR. QUINN:  Okay.  Thank you, Your Honor. |
| 08:47 | 10 | *(Document displayed.)* |
| 08:47 | 11 | BY MR. QUINN: |
| 08:47 | 12 | Q.    Do you recognize Exhibit 8741?  Do you recognize this |
| 08:47 | 13 | exhibit, Ms. Chan? |
| 08:47 | 14 | A.    Yes. |
| 08:47 | 15 | Q.    And what is it? |
| 08:47 | 16 | A.    It's basically an accounting of our due to/from account |
| 08:47 | 17 | for a particular shareholder, Larian Family Trust. |
| 08:47 | 18 | Q.    That's one of the -- that's, obviously, one of the |
| 08:48 | 19 | trusts that holds the stock in MGA? |
| 08:48 | 20 | A.    Yes. |
| 08:48 | 21 | Q.    And this particular schedule just covers the period |
| 08:48 | 22 | 2008 to 2009? |
| 08:48 | 23 | A.    Yes. |
| 08:48 | 24 | Q.    And it reflects payments that are made to or on behalf |
| 08:48 | 25 | of Isaac Larian and his family from the accounts of MGA, |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 16 of 160   Page ID #:304623
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

16

| | | |
|---|---|---|
| 08:48 | 1 | correct? |
| 08:48 | 2 | A.   Correct. |
| 08:48 | 3 | Q.   And if we look at this, we can see -- for example, if |
| 08:48 | 4 | we look at the bottom, very bottom of the page, dash 1, |
| 08:48 | 5 | we'll see an entry, the second one from the bottom just for |
| 08:48 | 6 | example -- I'm not gonna be able to pronounce this:  "Shirin |
| 08:48 | 7 | Makabi, Aghdas and Shoreh Larian, 6/2, Nice, Rome; 6/4, |
| 08:48 | 8 | Rome, Florence." |
| 08:48 | 9 | Do you see that? |
| 08:48 | 10 | A.   Yes. |
| 08:48 | 11 | Q.   $3,634.98.  Do you see that? |
| 08:48 | 12 | A.   Yes. |
| 08:49 | 13 | Q.   And if can look at the top of the next page -- |
| 08:49 | 14 | MR. QUINN:  Ken, if we could enlarge, say, the |
| 08:49 | 15 | next three lines. |
| 08:49 | 16 | *(Technician complies.)* |
| 08:49 | 17 | BY MR. QUINN: |
| 08:49 | 18 | A.   -- it appears to reflect additional travel.  Paris. |
| 08:49 | 19 | "Changed to stay Paris longer." |
| 08:49 | 20 | "L.A." |
| 08:49 | 21 | "Boston." |
| 08:49 | 22 | "Shoreh Larian, Monte Carlo." |
| 08:49 | 23 | Do you see that? |
| 08:49 | 24 | A.   Yes. |
| 08:49 | 25 | Q.   And then in the middle of the page -- |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 17 of 160   Page ID #:304624
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

17

| 08:49 | 1 | MR. QUINN:  Ken, beginning with June 25, 2005, |
|-------|---|---|

08:49   1        MR. QUINN:  Ken, beginning with June 25, 2005,

08:49   2    entry.

08:49   3        *(Document displayed.)*

08:49   4    BY MR. QUINN:

08:49   5    Q.   -- we see "Aghdas and Shoreh Larian, France, Italy,

08:49   6    nonrefundable."

08:49   7        "Aghdas Larian and Shoreh Larian, added train and

08:49   8    flights within Europe."

08:49   9        Then, "Please arrange for them to go to Paris."

08:49   10        Do you see that?

08:49   11   A.   (No response.)

08:49   12   Q.   Do you see that in the middle --

08:49   13   A.   Yes.

08:49   14   Q.   -- of the June 25 entries?

08:49   15   A.   Yes.

08:49   16   Q.   And then in the middle of the page, we have some

08:49   17   American Express -- some payments to American Express for

08:50   18   $9,830, $6,507, et cetera?

08:50   19   A.   Yes.

08:50   20   Q.   And then just skipping down a couple of lines, there's:

08:50   21       "Shirin, Isaac, and Angela, Tahoe, airline.

08:50   22       "Shirin, Isaac, and Angela, Tahoe, hotel."

08:50   23       Right?  Do you see that?

08:50   24   A.   Yes.

08:50   25   Q.   And then down at the bottom, there's a reference to a

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

18

| | | |
|---|---|---|
| 08:50 | 1 | refund, I guess, a credit for some Ferragamo shoes.  Do you |
| 08:50 | 2 | see that, as well? |
| 08:50 | 3 | A.   (No response.) |
| 08:50 | 4 | Q.   It's towards the bottom of the page.  It's December 31, |
| 08:50 | 5 | 2008. |
| 08:50 | 6 | A.   Yes. |
| 08:51 | 7 | Q.   So at the end of the year, I think what you've told us |
| 08:51 | 8 | is that these payments are all trued-up and treated as |
| 08:51 | 9 | distributions and accounted for properly as distributions to |
| 08:51 | 10 | the shareholders; is that correct? |
| 08:51 | 11 | A.   Yes. |
| 08:51 | 12 | Q.   But during the year, that formality is ignored and |
| 08:51 | 13 | actual payments for personal expenses were made from MGA |
| 08:51 | 14 | accounts to or on behalf of the Larian family members; is |
| 08:51 | 15 | that true? |
| 08:51 | 16 |         MR. McCONVILLE:  Objection.  Compound. |
| 08:51 | 17 |         THE COURT:  Overruled. |
| 08:51 | 18 |         THE WITNESS:  No. |
| 08:51 | 19 | BY MR. QUINN: |
| 08:51 | 20 | Q.   Well, when you true -- what does it mean to "true up"? |
| 08:51 | 21 | When I say "true up" at the end of the year, what does that |
| 08:51 | 22 | mean? |
| 08:51 | 23 | A.   Well, I guess this account, basically, we track the |
| 08:51 | 24 | amounts that we disburse on their behalf as loans or amounts |
| 08:51 | 25 | they do, that they owe back to the company.  And at the end |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 19 of 160   Page ID #:304626
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

19

| | | |
|---|---|---|
| 08:51 | 1 | of the year, once we settle up, we basically recharacterize |
| 08:51 | 2 | them as distributions. |
| 08:51 | 3 | Q.   Okay. |
| 08:51 | 4 | A.   Or dividends to the shareholders. |
| 08:51 | 5 | Q.   And that's something that you do at the end of the |
| 08:52 | 6 | year.  You kind of add up all the amounts that have either |
| 08:52 | 7 | been advanced or paid on behalf of the shareholders, |
| 08:52 | 8 | correct? |
| 08:52 | 9 | A.   I don't recall the timing of all these true-ups.  It |
| 08:52 | 10 | could have been during the year, middle of the year, end of |
| 08:52 | 11 | the year.  It was done periodically. |
| 08:52 | 12 | Q.   All right.  So periodically, all these payments for |
| 08:52 | 13 | personal things, periodically would be allocated to the |
| 08:52 | 14 | proper accounts.  Would you agree with that? |
| 08:52 | 15 | A.   Well, I -- I do believe they were allocated correctly |
| 08:52 | 16 | during the year before the distribution, because we do track |
| 08:52 | 17 | them as amounts owed by the shareholders to the company. |
| 08:52 | 18 | Q.   But they are, um -- they are collected and actually |
| 08:52 | 19 | accounted for as distributions periodically during the year? |
| 08:52 | 20 | A.   Correct. |
| 08:52 | 21 | Q.   And in the meantime, during the year, who is it who |
| 08:52 | 22 | decides, for example, if the company is going to, you know, |
| 08:52 | 23 | advance moneys or pay moneys for travel or for shoes or for |
| 08:52 | 24 | anything like that?  Who decides whether the company's gonna |
| 08:52 | 25 | make a payment like that? |

| 08:53 | 1 | A. I'm not really sure. |
|---|---|---|
| 08:53 | 2 | Q. Mr. Larian decides, doesn't he? |
| 08:53 | 3 | A. Well, I guess it depends. Because there's a director |
| 08:53 | 4 | of travel. |
| 08:53 | 5 | Q. He or she works for Mr. Larian? |
| 08:53 | 6 | A. Correct. |
| 08:53 | 7 | Q. All right. Did you ever hear that there was any |
| 08:53 | 8 | dispute between the director of travel and Mr. Larian about, |
| 08:53 | 9 | you know, whether or not a trip to Monte Carlo or Paris or |
| 08:53 | 10 | someplace like that should be paid for out of an MGA |
| 08:53 | 11 | account? |
| 08:53 | 12 | A. I'm not aware of that. |
| 08:53 | 13 | Q. I'd like to show you -- so the director of travel is an |
| 08:53 | 14 | MGA employee? |
| 08:53 | 15 | A. Yes. |
| 08:53 | 16 | Q. And his -- is it "his" or "her," when you were there? |
| 08:53 | 17 | A. She. |
| 08:53 | 18 | Q. She. She was paid a salary by MGA? |
| 08:54 | 19 | A. Yes. |
| 08:54 | 20 | Q. Presumably? |
| 08:54 | 21 | A. Yes. |
| 08:54 | 22 | Q. And the director of travel was Shirin Makabi? |
| 08:54 | 23 | A. Yes. |
| 08:54 | 24 | Q. One of the shareholders, correct? |
| 08:54 | 25 | A. Correct. |

| | | |
|---|---|---|
| 08:54 | 1 | Q.   And she, presumably, I think you've said, received a |
| 08:54 | 2 | salary for -- from MGA for being director of travel? |
| 08:54 | 3 | A.   Yes. |
| 08:54 | 4 | Q.   And that's a business function that's intended for |
| 08:54 | 5 | business expenses, the work that the director of travel |
| 08:54 | 6 | does, correct? |
| 08:54 | 7 | A.   Correct. |
| 08:54 | 8 | Q.   So you wouldn't really -- the director of travel wasn't |
| 08:54 | 9 | also supposed to be a director of travel for personal travel |
| 08:54 | 10 | for Larian family members? |
| 08:54 | 11 | MR. McCONVILLE:  Objection.  Argumentative. |
| 08:54 | 12 | THE COURT:  Overruled. |
| 08:54 | 13 | THE WITNESS:  Not necessarily, no. |
| 08:54 | 14 | BY MR. QUINN: |
| 08:54 | 15 | Q.   All right.  I'd like to show you now Exhibit 8124-R-2, |
| 08:54 | 16 | which is in evidence. |
| 08:54 | 17 | *(Document provided to the witness.)* |
| 08:54 | 18 | *(Document displayed.)* |
| 08:55 | 19 | MR. QUINN:  This is in evidence.  Received |
| 08:55 | 20 | yesterday, Your Honor. |
| 08:55 | 21 | And if we could just enlarge the e-mail in the |
| 08:55 | 22 | middle from Patrick Ma. |
| 08:55 | 23 | BY MR. QUINN: |
| 08:55 | 24 | Q.   This e-mail -- who is Mr. Ma? |
| 08:55 | 25 | A.   I believe his title is controller for our Hong Kong |

| | | |
|---|---|---|
| 08:55 | 1 | subsidiary. |
| 08:55 | 2 | Q.   Okay.  And he writes here to Isaac, "In simple words, |
| 08:55 | 3 | the current structure is to leave small," paren, "adequate, |
| 08:55 | 4 | closed quote, "profits in US and move excess profits to |
| 08:55 | 5 | UK -- HK," sorry, "but HK pay royalty to MGA Mauritius," |
| 08:55 | 6 | slash, "MGA holdings, and this reduces HK profits to a |
| 08:55 | 7 | minimum level."  Do you see that? |
| 08:56 | 8 | A.   Yes. |
| 08:56 | 9 | Q.   And so -- I mean, you understand what this means, don't |
| 08:56 | 10 | you?  That, as we discussed yesterday, the intellectual |
| 08:56 | 11 | property, the trademark, was licensed from MGA U.S. to MGA |
| 08:56 | 12 | Mauritius and then in turn licensed from MGA Mauritius to |
| 08:56 | 13 | MGA Hong Kong, correct? |
| 08:56 | 14 | A.   Yes. |
| 08:56 | 15 | Q.   And then MGA Hong Kong would pay royalties for that |
| 08:56 | 16 | license -- and it's the intellectual property for Bratz, the |
| 08:56 | 17 | trademark, correct? |
| 08:56 | 18 | A.   It's the trademark. |
| 08:56 | 19 | Q.   And MGA Hong Kong would pay royalties, pay money to MGA |
| 08:56 | 20 | Mauritius for that license, correct? |
| 08:56 | 21 | A.   Yes. |
| 08:56 | 22 | Q.   And then, in turn, MGA Mauritius would pay royalties to |
| 08:56 | 23 | MGA U.S., correct? |
| 08:56 | 24 | A.   Yes. |
| 08:56 | 25 | Q.   And that's how -- by paying these royalties, that's how |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 23 of 160   Page ID #:304630
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

23

| | | |
|---|---|---|
| 08:56 | 1 | the money gets out of Hong Kong upstream to MGA U.S., |
| 08:57 | 2 | correct? |
| 08:57 | 3 | MR. McCONVILLE:  Objection.  Vague. |
| 08:57 | 4 | THE COURT:  Overruled. |
| 08:57 | 5 | THE WITNESS:  Well, Hong Kong does settle its |
| 08:57 | 6 | intercompany payable with Mauritius or holdings for that |
| 08:57 | 7 | royalty payment. |
| 08:57 | 8 | BY MR. QUINN: |
| 08:57 | 9 | Q.  Right.  So it makes those payments to the accounts on |
| 08:57 | 10 | behalf of Mauritius, correct? |
| 08:57 | 11 | A.  Yes. |
| 08:57 | 12 | Q.  So what is happening here is MGA Hong Kong manufactures |
| 08:57 | 13 | Bratz products pursuant to a license for intellectual |
| 08:57 | 14 | property that finds its origin in MGA U.S., correct? |
| 08:57 | 15 | A.  Can you repeat the question? |
| 08:57 | 16 | Q.  MGA Hong Kong arranges to manufacture -- enters into |
| 08:57 | 17 | contracts with Chinese manufacturers to make Bratz products, |
| 08:57 | 18 | correct? |
| 08:57 | 19 | A.  Yes. |
| 08:57 | 20 | Q.  And they can do that using the Bratz trademark because |
| 08:57 | 21 | of this intellectual property assignment, correct? |
| 08:57 | 22 | A.  The license of the rights. |
| 08:57 | 23 | Q.  The license, right.  And then MGA Hong Kong sells |
| 08:57 | 24 | products to other -- some other MGA distributor companies, |
| 08:58 | 25 | correct? |

| | | |
|---|---|---|
| 08:58 | 1 | A.   Yes.  It also sold on its own behalf, as well. |
| 08:58 | 2 | Q.   Right.  And it also sells to some third parties in |
| 08:58 | 3 | countries, say, where MGA does not have a distributor, |
| 08:58 | 4 | correct? |
| 08:58 | 5 | A.   Correct. |
| 08:58 | 6 | Q.   And so for selling that product, MGA Hong Kong collects |
| 08:58 | 7 | revenue for selling that product both to other MGA companies |
| 08:58 | 8 | and to third parties, correct? |
| 08:58 | 9 | A.   Correct. |
| 08:58 | 10 | Q.   And then MGA Hong Kong pays royalties upstream, first |
| 08:58 | 11 | to MGA Mauritius? |
| 08:58 | 12 | A.   Yes.  But it also has to pay the Chinese manufacturers, |
| 08:58 | 13 | as well. |
| 08:58 | 14 | Q.   Of course, it has costs? |
| 08:58 | 15 | A.   Correct. |
| 08:58 | 16 | Q.   But after it's paid its costs -- it's collected revenue |
| 08:58 | 17 | for sales of Bratz products and it's paid its costs, then it |
| 08:58 | 18 | pays royalties upstream, correct? |
| 08:58 | 19 |           MR. McCONVILLE:  Vague. |
| 08:58 | 20 |           THE COURT:  Overruled. |
| 08:58 | 21 |           THE WITNESS:  For whatever amount it owes to the |
| 08:58 | 22 | IP company. |
| 08:58 | 23 | BY MR. QUINN: |
| 08:58 | 24 | Q.   Right.  And that, then -- that money, then, turns |
| 08:58 | 25 | around -- whether it's Mauritius or, later, the Netherlands |

08:59   1    entity, pays royalties to the U.S., correct?

08:59   2    A.   For whatever amount that that particular entity owes to

08:59   3    the U.S.

08:59   4    Q.   But the object is to keep the -- as Mr. Ma says here,

08:59   5    the object is to keep the Hong Kong profits to a minimum

08:59   6    level, correct?

08:59   7    A.   I believe it's to keep the profits that's required

08:59   8    under local law under transfer pricing rules.

08:59   9    Q.   But, again, the -- there are some local requirements

08:59   10   about what must be retained I think is what you're telling

08:59   11   us?

08:59   12   A.   That's correct.

08:59   13   Q.   But beyond that, the object of this structure is, as

08:59   14   Mr. Ma writes here, to reduce Hong Kong profits to a minimum

09:00   15   level, correct?

09:00   16   A.   Yes.

09:00   17   Q.   And if you'd look at the -- page 8124-6 of this

09:00   18   exhibit.

09:00   19          MR. QUINN:  I don't want to put this on the

09:00   20   screen, Ken.

09:00   21   BY MR. QUINN:

09:00   22   Q.   Beginning on that page, there's a presentation that

09:00   23   Mr. Wing prepared that was -- accompanied this e-mail.  Do

09:00   24   you see that?

09:00   25   A.   I don't believe he prepared it.

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

26

| 09:00 | 1 | Q.   Well, it's a presentation, then, that -- who did |
| 09:00 | 2 | prepare it? |
| 09:00 | 3 | A.   This was prepared by an outside accounting firm. |
| 09:00 | 4 | Q.   That MGA engaged to help it with this matter? |
| 09:00 | 5 | A.   Correct. |
| 09:00 | 6 | Q.   All right.  And this is something that, in fact, MGA |
| 09:00 | 7 | used, correct?  I mean, this is a presentation that MGA |
| 09:01 | 8 | actually used? |
| 09:01 | 9 | A.   Yes. |
| 09:01 | 10 | Q.   And I think you'll find a better copy at Exhibit |
| 09:01 | 11 | 22013-R.  If I could ask you, please, to turn to that. |
| 09:01 | 12 | (Document provided to the witness.) |
| 09:01 | 13 | BY MR. QUINN: |
| 09:01 | 14 | Q.   Do you see that? |
| 09:01 | 15 | A.   Yes. |
| 09:01 | 16 | Q.   And that is a better copy of the same presentation we |
| 09:01 | 17 | were just looking at? |
| 09:01 | 18 | A.   Appears to be. |
| 09:01 | 19 | Q.   And if you'd turn to page dash 7, 22013-R-7. |
| 09:01 | 20 | MR. QUINN:  I believe this is already in evidence, |
| 09:01 | 21 | Your Honor.  If we could put that on the screen. |
| 09:01 | 22 | (Document displayed.) |
| 09:01 | 23 | BY MR. QUINN: |
| 09:01 | 24 | Q.   And this describes MGA's international structure |
| 09:02 | 25 | related to Bratz before September 2002, correct? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:02 | 1 | MR. McCONVILLE:  Your Honor, I don't know if this |
| 09:02 | 2 | actually is in evidence. |
| 09:02 | 3 | THE COURT:  I thought that this was, Counsel. |
| 09:02 | 4 | Maybe it's just the evening sessions where I'd seen it. |
| 09:02 | 5 | MR. QUINN:  I believe 7 is in evidence.  Used with |
| 09:02 | 6 | Mr. Larian. |
| 09:02 | 7 | THE COURT:  7 and 9 I thought were both received |
| 09:02 | 8 | into evidence.  If not, it's re-received.  So that resolves |
| 09:02 | 9 | it. |
| 09:02 | 10 | (Exhibit No. 22013-R-7 received in evidence.) |
| 09:02 | 11 | (Exhibit No. 22013-R-9 received in evidence.) |
| 09:02 | 12 | BY MR. QUINN: |
| 09:02 | 13 | Q.   So what we're looking at here is MGA's international |
| 09:02 | 14 | structure relating to Bratz before December 2002, correct? |
| 09:02 | 15 | A.   Yes. |
| 09:02 | 16 | Q.   And what happened then was that you had MGA Hong Kong |
| 09:02 | 17 | over here, which entered in contracts with the PRC, the |
| 09:02 | 18 | Chinese vendors, correct? -- to actually manufacture |
| 09:02 | 19 | product. |
| 09:02 | 20 | A.   Yes. |
| 09:02 | 21 | Q.   And they would -- the product would then be sold to MGA |
| 09:03 | 22 | U.S. over here, correct? |
| 09:03 | 23 | A.   Correct. |
| 09:03 | 24 | Q.   And then the final sale would be made from MGA U.S. |
| 09:03 | 25 | directly to customers, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 28 of 160   Page ID #:304635
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

28

| | | |
|---|---|---|
| 09:03 | 1 | A.   Correct. |
| 09:03 | 2 | Q.   And when it says here that MGA U.S. -- it said -- |
| 09:03 | 3 | there's a line here "sourcing services."  I assume that that |
| 09:03 | 4 | refers to the fact that MGA Hong Kong was, in effect, |
| 09:03 | 5 | helping MGA U.S. find manufacturers and similar things in |
| 09:03 | 6 | China? |
| 09:03 | 7 | MR. McCONVILLE:  Objection.  Vague. |
| 09:03 | 8 | THE COURT:  Overruled. |
| 09:03 | 9 | THE WITNESS:  Yes. |
| 09:03 | 10 | BY MR. QUINN: |
| 09:03 | 11 | Q.   And presumably they would get -- there would be some |
| 09:03 | 12 | payment or credit for that? |
| 09:03 | 13 | A.   Yes. |
| 09:03 | 14 | Q.   And then, if we could turn to page dash 9, which is |
| 09:03 | 15 | also in evidence.  We go to a different time period now -- |
| 09:03 | 16 | *(Document displayed.)* |
| 09:03 | 17 | BY MR. QUINN: |
| 09:03 | 18 | Q.   -- when the structure became a little bit more |
| 09:03 | 19 | complicated, correct? |
| 09:03 | 20 | A.   Correct. |
| 09:03 | 21 | Q.   From October -- this portrays the international |
| 09:03 | 22 | structure related to Bratz from October 2010 to |
| 09:04 | 23 | September 2005? |
| 09:04 | 24 | A.   Yes. |
| 09:04 | 25 | Q.   I'm sorry, October 2002 -- apologize -- to |

| | | |
|---|---|---|
| 09:04 | 1 | September 2005, correct? |
| 09:04 | 2 | A.   Yes. |
| 09:04 | 3 | Q.   And what we see here is this is the structure that |
| 09:04 | 4 | we've been describing:  The MGA Hong Kong, here, is selling |
| 09:04 | 5 | product to MGA U.S.  Is that what that represents? |
| 09:04 | 6 | A.   Yes. |
| 09:04 | 7 | Q.   And MGA U.S. has licensed the Bratz trademark to MGA |
| 09:04 | 8 | Mauritius, and MGA Mauritius has, in turn, licensed it to |
| 09:04 | 9 | MGA Hong Kong? |
| 09:04 | 10 | A.   Correct. |
| 09:04 | 11 | Q.   And MGA Hong Kong, then, is getting money out -- you're |
| 09:04 | 12 | getting money out of MGA Hong Kong by paying a royalty for |
| 09:04 | 13 | that license to MGA Mauritius, and then from MGA Mauritius |
| 09:04 | 14 | to another royalty payment to MGA U.S., correct? |
| 09:05 | 15 | A.   Yes. |
| 09:05 | 16 | Q.   And you have final sales being made by MGA U.S. to U.S. |
| 09:05 | 17 | customers and non-U.S. customers being made out of MGA |
| 09:05 | 18 | Hong Kong, correct? |
| 09:05 | 19 | A.   Yes. |
| 09:05 | 20 | Q.   And what we have over there at the left -- don't want |
| 09:05 | 21 | to shoot Mr. Gray there in the eye with this laser -- you |
| 09:05 | 22 | have the PRC vendors, who are actually doing the |
| 09:05 | 23 | manufacturing, correct? |
| 09:05 | 24 | A.   Yes. |
| 09:05 | 25 | Q.   Now, MGA Mauritius, did MGA sell a lot of toys in |

| | | |
|---|---|---|
| 09:05 | 1 | Mauritius? |
| 09:05 | 2 | A.   I don't know. |
| 09:05 | 3 | Q.   Was that -- did they have employees there in Mauritius? |
| 09:05 | 4 | A.   No. |
| 09:05 | 5 | Q.   But this structure, then, um, changed -- in fact, MGA |
| 09:05 | 6 | Mauritius paid over $174 million to MGA U.S. under this |
| 09:05 | 7 | structure before it changed; isn't that correct? |
| 09:05 | 8 | A.   I don't recall. |
| 09:05 | 9 | Q.   If we could just refresh your recollection, if you'd |
| 09:06 | 10 | look at page dash 32, and look at the first bullet there on |
| 09:06 | 11 | page dash 32. |
| 09:06 | 12 | THE COURT:   Counsel, would you repeat back the |
| 09:06 | 13 | number of the document, please. |
| 09:06 | 14 | MR. QUINN:   This is Exhibit 22013-R, and we're |
| 09:06 | 15 | looking at page 32. |
| 09:06 | 16 | BY MR. QUINN: |
| 09:06 | 17 | Q.   And then my question to you, ma'am, is whether seeing |
| 09:06 | 18 | this refreshes your recollection that MGA Mauritius and then |
| 09:06 | 19 | its successor in this structure, MGA Netherlands, paid MGA |
| 09:06 | 20 | U.S. royalties of approximately $174 million during the |
| 09:06 | 21 | 2003/2005 time period. |
| 09:06 | 22 | A.   Yes. |
| 09:06 | 23 | Q.   All right.   So these royalty payments -- I mean, this |
| 09:07 | 24 | was a substantial amount of money, the $174 million? |
| 09:07 | 25 | A.   Yes. |

09:07  1   Q.   And these aren't just bookkeeping entries; this is real

09:07  2   cash, correct?

09:07  3   A.   That I don't know.

09:07  4   Q.   Well, you do know that MGA U.S. was paid substantial

09:07  5   amounts and did receive substantial amounts in cash for

09:07  6   royalty payments?

09:07  7   A.   Yes.

09:07  8   Q.   And then, if we could turn, please, to page 22013-16.

09:07  9        *(Document provided to the witness.)*

09:07  10  BY MR. QUINN:

09:07  11  Q.   This reflects after October 5 -- October of 2005, the

09:07  12  structure became still more complicated, correct?

09:08  13           MR. McCONVILLE:  Objection.  Argumentative.

09:08  14           THE COURT:  Overruled.

09:08  15           THE WITNESS:  There was a new structure.

09:08  16  BY MR. QUINN:

09:08  17  Q.   And that's depicted here on this page that we're

09:08  18  looking at, dash 16?

09:08  19  A.   Yes.

09:08  20           MR. QUINN:  I'd offer page 22013-16, Your Honor.

09:08  21           THE COURT:  Received.

09:08  22        *(Exhibit No. 22013-16 received in evidence.)*

09:08  23         *(Document displayed.)*

09:08  24  BY MR. QUINN:

09:08  25  Q.   And this chart reflects the Bratz international

| | | |
|---|---|---|
| 09:08 | 1 | structure from October 2005 up until the time you left, I |
| 09:08 | 2 | think, April of 2010? |
| 09:08 | 3 | A.   No. |
| 09:08 | 4 | Q.   I'm sorry? |
| 09:08 | 5 | A.   No. |
| 09:08 | 6 | Q.   It changed? |
| 09:08 | 7 | A.   Yes. |
| 09:08 | 8 | Q.   All right.  Could you tell us how it changed before you |
| 09:08 | 9 | left? |
| 09:08 | 10 | A.   We went through the structure yesterday.  There was two |
| 09:08 | 11 | new entities -- |
| 09:08 | 12 | Q.   All right. |
| 09:08 | 13 | A.   -- above that -- the current Dutch company in the |
| 09:08 | 14 | middle. |
| 09:08 | 15 | Q.   All right.  So other than the fact that those two new |
| 09:08 | 16 | Dutch entities were there, were there any other differences? |
| 09:09 | 17 | A.   There were also the various foreign distribution |
| 09:09 | 18 | companies. |
| 09:09 | 19 | Q.   Yeah, that we looked at, those onces in a horizontal |
| 09:09 | 20 | line? |
| 09:09 | 21 | A.   Correct. |
| 09:09 | 22 | Q.   But other than that, this basically represents the |
| 09:09 | 23 | structure as it existed when you left in April of 2010? |
| 09:09 | 24 | A.   Well, there was also the Polish manufacturing company, |
| 09:09 | 25 | as well. |

| | | |
|---|---|---|
| 09:09 | 1 | Q.   Right.  And we looked at that chart yesterday.  Other |
| 09:09 | 2 | than that, this is -- basically represents the flow of funds |
| 09:09 | 3 | among these various entities that we're looking at? |
| 09:09 | 4 | MR. McCONVILLE:  Objection.  Misstates her |
| 09:09 | 5 | testimony. |
| 09:09 | 6 | THE COURT:  Overruled. |
| 09:09 | 7 | THE WITNESS:  I think the -- there were other |
| 09:09 | 8 | entities other than what's here.  And I think we talked |
| 09:09 | 9 | about the structure yesterday. |
| 09:09 | 10 | BY MR. QUINN: |
| 09:09 | 11 | Q.   Right.  I recognize that there are other entities and |
| 09:09 | 12 | we did look at a different chart yesterday.  But these |
| 09:09 | 13 | entities existed that we're looking at here as of the time |
| 09:09 | 14 | that you left? |
| 09:09 | 15 | A.   Yes. |
| 09:09 | 16 | Q.   And what this shows us here is that MGA U.S. still |
| 09:10 | 17 | makes sales to U.S. customers, what we see along here, |
| 09:10 | 18 | correct? |
| 09:10 | 19 | A.   Yes. |
| 09:10 | 20 | Q.   And like before, MGA Hong Kong makes sales to non-U.S. |
| 09:10 | 21 | customers, down here, correct? |
| 09:10 | 22 | A.   Yes. |
| 09:10 | 23 | Q.   And by this time, instead of going through Mauritius, |
| 09:10 | 24 | MGA had decided to replace the Mauritius entity with an |
| 09:10 | 25 | entity in the Netherlands; is that correct? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

34

| | | |
|---|---|---|
| 09:10 | 1 | A.   Yes. |
| 09:10 | 2 | Q.   And we see that here, MGA Netherlands; is that correct? |
| 09:10 | 3 | A.   Yes. |
| 09:10 | 4 | Q.   And so now, before, the money going through Mauritius, |
| 09:10 | 5 | it goes through -- it would go through the Netherlands, |
| 09:10 | 6 | correct? |
| 09:10 | 7 | A.   Yes. |
| 09:10 | 8 | Q.   All right.  So the license, the Bratz trademark |
| 09:11 | 9 | license, instead of going to a Mauritius entity, went first |
| 09:11 | 10 | from MGA U.S. to MGA Netherlands to MGA Hong Kong, correct? |
| 09:11 | 11 | A.   No. |
| 09:11 | 12 | Q.   Where did it go? |
| 09:11 | 13 | A.   It went first from the U.S. to Ireland, Ireland to the |
| 09:11 | 14 | Netherlands, and then Netherlands to Hong Kong. |
| 09:11 | 15 | Q.   So another step that isn't reflected here. |
| 09:11 | 16 | And with each of those licenses, there would be |
| 09:11 | 17 | corresponding royalty payments going upstream, correct? |
| 09:11 | 18 | A.   Yes. |
| 09:11 | 19 | Q.   All right.  And that's what we see here, the references |
| 09:11 | 20 | to the royalties here, from Hong Kong -- oh, I see, we've |
| 09:11 | 21 | got Ireland over here; it's reflected here.  So we've got |
| 09:11 | 22 | royalty payments going up to MGA Netherlands and then onto |
| 09:11 | 23 | MGA U.S. from those entities, correct? |
| 09:11 | 24 | A.   It went from Hong Kong, Netherlands, Ireland, and then |
| 09:11 | 25 | to the U.S. |

| | | |
|---|---|---|
| 09:11 | 1 | Q.   In any event, that's where the cash comes from that's |
| 09:12 | 2 | ultimately distributed to the MGA shareholders? |
| 09:12 | 3 | A.   Well, the U.S. also distributed, as well. |
| 09:12 | 4 | Q.   All right.  So their sales, that we see along the |
| 09:12 | 5 | right-hand side, is one source of cash; the other source of |
| 09:12 | 6 | cash is these large royalty payments we were talking about, |
| 09:12 | 7 | correct? |
| 09:12 | 8 | A.   Yes. |
| 09:12 | 9 | Q.   And those include the proceeds of sales of Bratz |
| 09:12 | 10 | product made by MGA Hong Kong, correct? |
| 09:12 | 11 | A.   Correct. |
| 09:12 | 12 | Q.   And the reality of the structure is that because |
| 09:12 | 13 | Mr. Larian was a director on every board on all these |
| 09:12 | 14 | different entities, in many cases the only director, and was |
| 09:12 | 15 | an 81 percent shareholder, he could instruct that money be |
| 09:12 | 16 | moved around in this structure; isn't that true? |
| 09:13 | 17 | MR. McCONVILLE:  Objection.  Vague. |
| 09:13 | 18 | THE COURT:  Do you understand the question? |
| 09:13 | 19 | THE WITNESS:  No. |
| 09:13 | 20 | THE COURT:  Just repeat it, Counsel. |
| 09:13 | 21 | BY MR. QUINN: |
| 09:13 | 22 | Q.   Mr. Larian could instruct -- for example, if he decided |
| 09:13 | 23 | that he wanted to get some money out of MGA Netherlands, |
| 09:13 | 24 | say, $30 million, he could contact Brian Wing, the CFO, and |
| 09:13 | 25 | say, "Get me $30 million"?  He could do that? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

36

| | | |
|---|---|---|
| 09:13 | 1 | A.   Yes. |
| 09:13 | 2 | Q.   All right.  And he could direct that money be moved |
| 09:13 | 3 | around these various entities, correct? |
| 09:13 | 4 | A.   Yes. |
| 09:13 | 5 | Q.   And that did, in fact, happen, that money was just |
| 09:13 | 6 | moved around in circles; isn't that true? |
| 09:13 | 7 | MR. McCONVILLE:  Objection.  Argumentative. |
| 09:13 | 8 | THE COURT:  Overruled. |
| 09:13 | 9 | THE WITNESS:  Well, it was done to settle |
| 09:13 | 10 | intercompany balances. |
| 09:13 | 11 | BY MR. QUINN: |
| 09:13 | 12 | Q.   Let's take a look at Exhibit 8129. |
| 09:13 | 13 | *(Document provided to the witness.)* |
| 09:14 | 14 | BY MR. QUINN: |
| 09:14 | 15 | Q.   Is this is an e-mail string in which you were copied? |
| 09:14 | 16 | If you look at the bottom on the first page. |
| 09:14 | 17 | A.   Yes. |
| 09:14 | 18 | Q.   And that's an e-mail from Brian Wing dated November 7, |
| 09:14 | 19 | 2006, correct? |
| 09:14 | 20 | A.   At the very bottom, yes. |
| 09:14 | 21 | MR. QUINN:  We'd offer this, Your Honor. |
| 09:14 | 22 | MR. McCONVILLE:  Objection.  Cumulative. |
| 09:14 | 23 | Relevance.  403. |
| 09:14 | 24 | THE COURT:  Could I see 8129 for just a moment, |
| 09:14 | 25 | Counsel. |

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

37

| | | |
|---|---|---|
| 09:15 | 1 | *(Document provided to the Court.)* |
| 09:15 | 2 | THE COURT:  Overruled. |
| 09:15 | 3 | It's received. |
| 09:15 | 4 | *(Exhibit No. 8129 received in evidence.)* |
| 09:15 | 5 | *(Document displayed.)* |
| 09:15 | 6 | MR. QUINN:  If we could put Exhibit 8129 up on the |
| 09:15 | 7 | screen, and I would like to start with the bottom e-mail, |
| 09:15 | 8 | which starts at the bottom on the first page. |
| 09:15 | 9 | *(Technician complies.)* |
| 09:15 | 10 | BY MR. QUINN: |
| 09:15 | 11 | Q.   It's an e-mail from Brian Wing, dated November 7, 2006, |
| 09:15 | 12 | to Patrick Ma, Mondana Hamzavi, and to you, correct? |
| 09:15 | 13 | A.   Yes. |
| 09:15 | 14 | Q.   And then if we could look at the text of the e-mail |
| 09:15 | 15 | that's on the top of the second page. |
| 09:15 | 16 | MR. QUINN:  If you can enlarge that, Ken. |
| 09:15 | 17 | *(Technician complies.)* |
| 09:15 | 18 | BY MR. QUINN: |
| 09:15 | 19 | Q.   Mr. Wing, at this time, was he the CFO? |
| 09:15 | 20 | A.   No. |
| 09:15 | 21 | Q.   What was his title? |
| 09:15 | 22 | A.   Senior VP of finance and taxation. |
| 09:16 | 23 | Q.   What he writes here, "We're going to need to clear our |
| 09:16 | 24 | U.S. payables, the HK to Netherlands payables, our NL" -- |
| 09:16 | 25 | that's Netherlands, would you think? |

| | | |
|---|---|---|
| 09:16 | 1 | A.   Yes. |
| 09:16 | 2 | Q.   -- "to Ireland payables, and our Ireland to U.S. |
| 09:16 | 3 | payables by circling cash before tax payments in the U.S. |
| 09:16 | 4 | are due.  We're going to send you $20 million to pay down |
| 09:16 | 5 | the accounts payable between the U.S. and HK.  I need you to |
| 09:16 | 6 | pay down 20 million of the AP" -- that's accounts payable, |
| 09:16 | 7 | right? |
| 09:16 | 8 | A.   Yes. |
| 09:16 | 9 | Q.   -- "between HK and Coop" -- C-O-O-P, that's a |
| 09:16 | 10 | Netherlands entity? |
| 09:16 | 11 | A.   Yes. |
| 09:16 | 12 | Q.   Which you were a director of? |
| 09:16 | 13 | A.   Yes. |
| 09:16 | 14 | Q.   -- "with the same funds.  Coop is going to pay down its |
| 09:16 | 15 | AP with Ireland with the same 20 million, and Ireland will |
| 09:16 | 16 | pay done its AP with the U.S. with the same 20 million.  We |
| 09:17 | 17 | will do this a few times.  Thanks for your help on this." |
| 09:17 | 18 | And then he lists some balances in these various |
| 09:17 | 19 | entities, correct? |
| 09:17 | 20 | A.   Correct. |
| 09:17 | 21 | Q.   And so what he's saying here is that money's gonna be |
| 09:17 | 22 | paid from among -- in a circle, right? |
| 09:17 | 23 | A.   Yes. |
| 09:17 | 24 | Q.   All right.  Among these various MGA entities, |
| 09:17 | 25 | $20 million? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 39 of 160   Page ID #:304646
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

39

| | | |
|---|---|---|
| 09:17 | 1 | A.   Yes. |
| 09:17 | 2 | Q.   And we're gonna -- he says, "We are going to do this |
| 09:17 | 3 | circle a few times," right? |
| 09:17 | 4 | A.   Yes. |
| 09:17 | 5 | Q.   And that's the kind of thing that you can do if you |
| 09:17 | 6 | have one consolidated ownership structure that's basically |
| 09:17 | 7 | run by one person, correct? |
| 09:17 | 8 | MR. McCONVILLE:  Objection.  Vague. |
| 09:17 | 9 | THE COURT:  Overruled. |
| 09:17 | 10 | THE WITNESS:  I don't know. |
| 09:18 | 11 | MR. QUINN:  Nothing further.  Thank you. |
| 09:18 | 12 | THE COURT:  Cross-examination, please, by |
| 09:18 | 13 | Mr. McConville on behalf of Mr. Larian and MGA. |
| 09:18 | 14 | **CROSS-EXAMINATION** |
| 09:18 | 15 | BY MR. McCONVILLE: |
| 09:18 | 16 | Q.   Hello, Ms. Chan. |
| 09:18 | 17 | A.   Hello. |
| 09:18 | 18 | Q.   Are you a CPA currently? |
| 09:18 | 19 | A.   No. |
| 09:18 | 20 | Q.   Okay.  But you do -- what is your master's in? |
| 09:18 | 21 | A.   Accounting and taxation. |
| 09:18 | 22 | Q.   Okay.  So are you familiar with the difference between |
| 09:19 | 23 | a publicly traded company versus a private company? |
| 09:19 | 24 | A.   Yes. |
| 09:19 | 25 | Q.   And tell us what's a publicly traded company? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

40

09:19    1    A.    A publicly held company is usually they have shares
09:19    2    that are issued to shareholders in the public, whether it's
09:19    3    held through SEC requirements, and so people can basically
09:19    4    acquire shares through the market.
09:19    5    Q.    And the owners of the publicly traded company would be
09:19    6    the shareholders that purchase the shares, right?
09:19    7    A.    That's correct.
09:19    8    Q.    And tell us what a privately held company is.
09:19    9    A.    A privately held company is usually owned by nonpublic
09:19   10    shareholders, and usually it's closely held by -- closely
09:19   11    held by family or smaller investors.
09:19   12    Q.    And in this case, MGA Entertainment was a privately
09:19   13    held company, right?
09:20   14    A.    Yes.
09:20   15    Q.    And you mentioned that publicly held companies -- you
09:20   16    mentioned that they might have to comport with SEC
09:20   17    obligations; is that right?
09:20   18    A.    That's correct.
09:20   19    Q.    And those obligations are designed for publicly traded
09:20   20    companies, right?
09:20   21    A.    Correct.
09:20   22    Q.    But those similar obligations that apply to publicly
09:20   23    traded companies don't apply to privately held companies,
09:20   24    right?
09:20   25    A.    Not necessarily, no.

09:20    1    Q.   You were asked some questions yesterday about whether,
09:20    2    um, MGA had independent directors.  Do you remember that?
09:20    3    A.   Yes.
09:20    4    Q.   Now, independent directors would be required for a
09:20    5    publicly traded company, right?
09:20    6    A.   Yes.
09:20    7    Q.   But independent directors are not required for
09:20    8    privately traded companies, right? -- for privately held
09:20    9    companies.  I'm sorry.
09:20   10    A.   I'm not aware of that, no.
09:21   11    Q.   So to conflate the obligations that the SEC imposes on
09:21   12    a publicly traded company would be wrong to apply those same
09:21   13    standards to a privately held company, right?
09:21   14    A.   Yes.
09:21   15    Q.   So in the case of MGA, the family that owns it is the
09:21   16    Larian family, right?
09:21   17    A.   And the Makabis.
09:21   18    Q.   I'm sorry.  And the Makabi family, right?
09:21   19    A.   Yes.
09:21   20    Q.   And so the Makabis and the Larians own MGA, right?
09:21   21    A.   Yes.
09:21   22    Q.   But the public doesn't own MGA, correct?
09:21   23    A.   Yes.
09:21   24    Q.   Now, you were asked some questions about money circling
09:21   25    the globe.  Do you remember those questions?

| | | |
|---|---|---|
| 09:22 | 1 | A.   Yes. |
| 09:22 | 2 | Q.   And how it was a really complicated structure in order |
| 09:22 | 3 | to effectuate the money circling the globe.  Do you remember |
| 09:22 | 4 | those questions? |
| 09:22 | 5 | A.   Yes. |
| 09:22 | 6 | Q.   Now, let me ask you this:  When you were at MGA, did |
| 09:22 | 7 | they employ -- well, are you familiar with a company called |
| 09:22 | 8 | Deloitte & Touche? |
| 09:22 | 9 | A.   Yes. |
| 09:22 | 10 | Q.   And what is Deloitte & Touche? |
| 09:22 | 11 | A.   It's a public accounting firm. |
| 09:22 | 12 | Q.   And what does a public accounting firm do in general? |
| 09:22 | 13 | A.   They provide various areas of expertise in accounting, |
| 09:22 | 14 | whether it's audit, tax services. |
| 09:22 | 15 | Q.   And when you were at MGA, did MGA use the services of |
| 09:22 | 16 | Deloitte & Touche? |
| 09:22 | 17 | A.   Not while I was at MGA. |
| 09:22 | 18 | Q.   But while you were at MGA you learned that Deloitte & |
| 09:22 | 19 | Touche did, in fact, consult with MGA, correct? |
| 09:22 | 20 | A.   Yes. |
| 09:22 | 21 | Q.   Do you know -- you said Deloitte & Touche are -- they |
| 09:22 | 22 | are professionals who consult in order to assist companies |
| 09:23 | 23 | in setting up, you know, accounting and corporate structures |
| 09:23 | 24 | for tax purposes, right? |
| 09:23 | 25 | A.   Yes. |

| 09:23 | 1 | Q.   And you learned that MGA employed this professional |
| 09:23 | 2 | company, Deloitte & Touche, to consult for MGA, right? |
| 09:23 | 3 | A.   Yes. |
| 09:23 | 4 | Q.   And are you aware -- can you tell us who advised MGA to |
| 09:23 | 5 | set up the Mauritius structure? |
| 09:23 | 6 | A.   It was Deloitte & Touche. |
| 09:23 | 7 | Q.   Okay.  So this wasn't a plan that Isaac Larian hatched |
| 09:23 | 8 | in order to devise some way to get money to Mauritius, based |
| 09:23 | 9 | on your understanding? |
| 09:23 | 10 | A.   No, it was not. |
| 09:23 | 11 | Q.   Okay.  And Deloitte & Touche, are they a reputable |
| 09:23 | 12 | firm? |
| 09:23 | 13 | A.   Yes, I believe so. |
| 09:23 | 14 | Q.   Okay.  Well, based on your experience, right? |
| 09:23 | 15 | A.   Correct. |
| 09:23 | 16 | Q.   Now, you also heard questions regarding a complicated |
| 09:23 | 17 | circling the globe structure that involved the Netherlands |
| 09:24 | 18 | and Ireland.  Do you remember those questions? |
| 09:24 | 19 | A.   Yes. |
| 09:24 | 20 | Q.   And are you familiar with a company called Ernst & |
| 09:24 | 21 | Young? |
| 09:24 | 22 | A.   Yes. |
| 09:24 | 23 | Q.   And what is Ernst & Young? |
| 09:24 | 24 | A.   They are also a public accounting firm. |
| 09:24 | 25 | Q.   A reputable accounting firm? |

| | | |
|---|---|---|
| 09:24 | 1 | A.   Yes. |
| 09:24 | 2 | Q.   They also provide consulting on accounting and tax |
| 09:24 | 3 | structures, right? |
| 09:24 | 4 | A.   Yes. |
| 09:24 | 5 | Q.   And did you become aware that MGA set up -- that MGA |
| 09:24 | 6 | consulted with Ernst & Young? |
| 09:24 | 7 | A.   Yes. |
| 09:24 | 8 | Q.   And are you aware of who advised MGA to establish the |
| 09:24 | 9 | Netherlands and Ireland corporate structure? |
| 09:24 | 10 | A.   It was Ernst & Young. |
| 09:24 | 11 | Q.   Okay.  So this wasn't Isaac Larian, to the best of your |
| 09:24 | 12 | knowledge, setting up a corporate structure in order to |
| 09:24 | 13 | circle money around the globe, right? |
| 09:24 | 14 | A.   No, it was not. |
| 09:24 | 15 | Q.   Okay.  And so part of the structure that Deloitte & |
| 09:24 | 16 | Touche and Ernst & Young advised on was to put MGA's |
| 09:25 | 17 | intellectual property into holding companies, right? |
| 09:25 | 18 | A.   Yes. |
| 09:25 | 19 | Q.   And based on your experience, is it common for |
| 09:25 | 20 | companies to put their intellectual property in holding |
| 09:25 | 21 | companies? |
| 09:25 | 22 | A.   Yes. |
| 09:25 | 23 | Q.   And Ernst & Young and Deloitte & Touche, based on your |
| 09:25 | 24 | experience, wouldn't be advising MGA to do something |
| 09:25 | 25 | illegal, would it? |

09:25    1    A.    No.

09:25    2    Q.    Okay.  And in fact, MGA paid them for their

09:25    3    professional services, right?

09:25    4    A.    Yes.

09:25    5    Q.    You provided some testimony on -- you referred to as

09:25    6    transfer pricing rules.  Do you remember that?

09:25    7    A.    Yes.

09:25    8    Q.    Can you describe what transfer pricing rules are?

09:25    9    A.    Basically, we have -- in the tax world we have to make

09:25    10   sure that any related-party transactions are done at arm's

09:26    11   length, similar to what we would engage a third-party

09:26    12   pricing, for example, for products we would have to pay

09:26    13   similar prices to which we will pay a third party, or

09:26    14   royalty rate similar to what you would pay to a third party.

09:26    15   We tend to conduct studies and look at comparables to make

09:26    16   sure that we are within those comparable ranges of what

09:26    17   third parties would earn.  That's in a nutshell what

09:26    18   transfer pricing is.

09:26    19   Q.    I appreciate the nutshell.  But let me see if I can

09:26    20   state it back to you to make sure I understand.

09:26    21        So, in essence, because there is no third party for the

09:26    22   MGA to conduct this transaction with, it sets up a

09:26    23   transaction that would mirror a third-party transaction?

09:26    24   A.    Yes.

09:26    25   Q.    You hesitated.  You can correct me.  I'm just trying to

| | | |
|---|---|---|
| 09:26 | 1 | make sure I understood. |
| 09:26 | 2 | A.   There would be instances where we would have |
| 09:27 | 3 | third-party transactions.  We would like to make sure that |
| 09:27 | 4 | what we do on a related-party transaction mirrors those |
| 09:27 | 5 | third-party transactions. |
| 09:27 | 6 | Q.   But the point is to try to set up the transfer pricing |
| 09:27 | 7 | rules to reflect what a third-party transaction would be for |
| 09:27 | 8 | MGA if they were to engage a third party? |
| 09:27 | 9 | A.   Yes. |
| 09:27 | 10 | Q.   Okay.  You were shown some documents reflecting |
| 09:27 | 11 | distributions by MGA on behalf of the Larian family.  Do you |
| 09:27 | 12 | remember those documents? |
| 09:27 | 13 | A.   Yes. |
| 09:27 | 14 | Q.   And you stated that the money is -- that these |
| 09:28 | 15 | transactions are -- I guess you were asked whether they were |
| 09:28 | 16 | trued-up at the end of the year.  Can you explain what true |
| 09:28 | 17 | up at the end of the year means? |
| 09:28 | 18 | A.   We -- basically, like I said before, we accounted for |
| 09:28 | 19 | all the transactions that were done on behalf of the |
| 09:28 | 20 | shareholders through our due to/from account, and |
| 09:28 | 21 | periodically, not necessarily at the end of the year, we |
| 09:28 | 22 | would make sure that, um, whether we wanted to treat it as |
| 09:28 | 23 | distributions or retain them in their due to/from account as |
| 09:28 | 24 | still payable or due from the shareholder back to the |
| 09:28 | 25 | company. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 47 of 160   Page ID #:304654
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

47

| | | |
|---|---|---|
| 09:28 | 1 | Q.   And as a result of tracking these payments, were you |
| 09:28 | 2 | able to, at the end of the year, reach a conclusion as to -- |
| 09:28 | 3 | as to what the distributions were for the Larian family? |
| 09:28 | 4 | A.   Yes.  We, basically, tracked all the transactions and |
| 09:29 | 5 | treated the distributions accordingly. |
| 09:29 | 6 | Q.   And then they were accounted for properly, the books |
| 09:29 | 7 | and records? |
| 09:29 | 8 | A.   Yes. |
| 09:29 | 9 | Q.   Now, you said that during the course of the year, they |
| 09:29 | 10 | were actually allocated correctly, right? |
| 09:29 | 11 | A.   Yes. |
| 09:29 | 12 | Q.   And what does it mean to allocate something correctly? |
| 09:29 | 13 | A.   If something was identified as being paid on behalf of |
| 09:29 | 14 | a particular shareholder, we made sure that it was accounted |
| 09:29 | 15 | for in that particular shareholder's due to/from account. |
| 09:29 | 16 | Q.   So you were tracking the payments to make sure that |
| 09:29 | 17 | they to -- that they were accounted for properly? |
| 09:29 | 18 | A.   Yes. |
| 09:29 | 19 | Q.   On an ongoing basis throughout the year? |
| 09:29 | 20 | A.   Correct. |
| 09:29 | 21 | Q.   Okay.  One of the expenses -- or one of the expenses |
| 09:29 | 22 | that was highlighted for you related to a trip to Rome and |
| 09:29 | 23 | Florence.  Do you remember those questions? |
| 09:29 | 24 | A.   Yes. |
| 09:29 | 25 | Q.   Are you aware of the reason for the trip to Florence |

DEBBIE GALE, U.S. COURT REPORTER

48

| | | |
|---|---|---|
| 09:30 | 1 | for Mr. Larian? |
| 09:30 | 2 | A.   No. |
| 09:30 | 3 | Q.   Were you aware that Mr. Larian was named U.S. |
| 09:30 | 4 | entrepreneur of the year? |
| 09:30 | 5 | MR. QUINN:  Lacks foundation.  It's irrelevant. |
| 09:30 | 6 | THE COURT:  Overruled. |
| 09:30 | 7 | THE WITNESS:  Yes. |
| 09:30 | 8 | BY MR. McCONVILLE: |
| 09:30 | 9 | Q.   Do you remember when he was named U.S. entrepreneur of |
| 09:30 | 10 | the year? |
| 09:30 | 11 | A.   I do not recall. |
| 09:30 | 12 | Q.   And do you recall that, as part of the |
| 09:30 | 13 | entrepreneur-of-the-year process, he traveled overseas to |
| 09:30 | 14 | see if he could be the worldwide entrepreneur of the year? |
| 09:30 | 15 | A.   Yes. |
| 09:30 | 16 | Q.   And would these expenses that we've been discussing |
| 09:30 | 17 | relate to that trip? |
| 09:30 | 18 | A.   Potentially. |
| 09:30 | 19 | Q.   Okay.  You're not sure? |
| 09:30 | 20 | A.   No, I'm not. |
| 09:30 | 21 | Q.   Okay.  Now, you were -- you were -- as part of this due |
| 09:30 | 22 | to/from, you were shown that MGA -- or that MGA was making |
| 09:30 | 23 | payments on behalf of the Larian family, right? |
| 09:31 | 24 | A.   Yes. |
| 09:31 | 25 | Q.   Are you aware whether at times MGA needed to get |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 49 of 160   Page ID #:304656
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

49

| | | |
|---|---|---|
| 09:31 | 1 | additional money to put into the company? |
| 09:31 | 2 | A.   Yes. |
| 09:31 | 3 | Q.   And are you aware that at those times the person who |
| 09:31 | 4 | would loan money to the company was Isaac Larian? |
| 09:31 | 5 | A.   It was the shareholders. |
| 09:31 | 6 | Q.   The shareholders, right, who would include Mr. Larian |
| 09:31 | 7 | and the Makabi family? |
| 09:31 | 8 | A.   Yes. |
| 09:31 | 9 | Q.   And so those loans that Mr. Larian made back to the |
| 09:31 | 10 | company, those would be accounted for, as well? |
| 09:31 | 11 | A.   Yes. |
| 09:31 | 12 | MR. McCONVILLE:  One second, please. |
| 09:32 | 13 | No further questions, Your Honor. |
| 09:32 | 14 | THE COURT:  Redirect please. |
| 09:32 | 15 | **REDIRECT EXAMINATION** |
| 09:32 | 16 | BY MR. QUINN: |
| 09:32 | 17 | Q.   Ms. Chan, whether a corporation is a public corporation |
| 09:32 | 18 | subject to SEC rules or a private corporation, you're aware |
| 09:32 | 19 | that there are certain corporate formalities that must be |
| 09:32 | 20 | observed, correct? |
| 09:32 | 21 | A.   Yes. |
| 09:32 | 22 | Q.   I mean, even private corporations are required to |
| 09:32 | 23 | recognize in their recordkeeping and in their operations and |
| 09:32 | 24 | the way they conduct themselves the separate corporate |
| 09:32 | 25 | existence of the corporation, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 50 of 160   Page ID #:304657
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

50

| | | |
|---|---|---|
| 09:32 | 1 | A.    Yes. |
| 09:32 | 2 | Q.    All right.  That is to say, if they want to keep what |
| 09:32 | 3 | they want to be recognized as a -- if the owners of the |
| 09:32 | 4 | corporation want it to be recognized as a corporation with |
| 09:32 | 5 | limited liability as a separate entity, there are certain |
| 09:33 | 6 | requirements and observances that have to be followed in |
| 09:33 | 7 | terms of recordkeeping and other things, correct? |
| 09:33 | 8 | A.    I believe so. |
| 09:33 | 9 | Q.    And that's true for private companies as well as public |
| 09:33 | 10 | companies, correct? |
| 09:33 | 11 | A.    Yes. |
| 09:33 | 12 | Q.    And although Deloitte & Touche, I think you said, |
| 09:33 | 13 | helped set up this structure that you described to them -- |
| 09:33 | 14 | for us -- is that correct? |
| 09:33 | 15 | A.    Yes. |
| 09:33 | 16 | Q.    They didn't actually monitor how it worked in practice, |
| 09:33 | 17 | correct? |
| 09:33 | 18 | A.    They actually helped us with our transfer pricing |
| 09:33 | 19 | study, which would document the intercompany transactions |
| 09:33 | 20 | related to the structure. |
| 09:33 | 21 | Q.    But in terms of how payments are made and accounted |
| 09:33 | 22 | for, that's not something -- on these shareholder accounts, |
| 09:33 | 23 | that's not something -- or things paid on behalf of |
| 09:33 | 24 | shareholders, that's not something that Deloitte & Touche |
| 09:33 | 25 | would be looking at and deciding -- saying whether it |

| 09:34 | 1 | approved of it or disapproved of it, correct? |
| 09:34 | 2 | A.    Not the shareholder transactions. |
| 09:34 | 3 | Q.    And you've indicated that at the end of the year, these |
| 09:34 | 4 | various payments to family members or on behalf of family |
| 09:34 | 5 | members would all be trued-up and properly accounted for, |
| 09:34 | 6 | correct? |
| 09:34 | 7 | A.    Yes. |
| 09:34 | 8 | Q.    But during the course of the year, it would be possible |
| 09:34 | 9 | for somebody like Isaac Larian to cause the company to pay |
| 09:34 | 10 | for a pair of Ferragamo shoes, correct? |
| 09:34 | 11 | A.    Yes. |
| 09:34 | 12 | Q.    And that sort of thing did happen? |
| 09:34 | 13 | MR. McCONVILLE:  Objection.  Vague. |
| 09:34 | 14 | THE COURT:  Overruled. |
| 09:34 | 15 | THE WITNESS:  Yes. |
| 09:34 | 16 | BY MR. QUINN: |
| 09:34 | 17 | Q.    And Ms. Makabi, who's the director of travel, you said |
| 09:34 | 18 | her entire salary was paid by the company, correct? |
| 09:34 | 19 | A.    Yes. |
| 09:34 | 20 | Q.    Was some portion of her salary allocated to the |
| 09:34 | 21 | shareholders because of time she spent arranging travel for |
| 09:34 | 22 | family members? |
| 09:34 | 23 | A.    No. |
| 09:35 | 24 | Q.    So, although the structure is -- we've looked at is |
| 09:35 | 25 | complicated and is something that you had professional help |

| 09:35 | 1 | in setting up, the truth of the matter is that Mr. Larian is |
|---|---|---|
| 09:35 | 2 | the one who decided when money would be moved from one |
| 09:35 | 3 | company to another, correct? |
| 09:35 | 4 | A.    No. |
| 09:35 | 5 | Q.    Well, he decided when cash would be distributed? |
| 09:35 | 6 | A.    Yes. |
| 09:35 | 7 | Q.    Let's take a look at -- if we could, at Exhibit 23947 |
| 09:35 | 8 | in evidence. |
| 09:35 | 9 | *(Document provided to the witness.)* |
| 09:35 | 10 | *(Document displayed.)* |
| 09:35 | 11 | BY MR. QUINN: |
| 09:36 | 12 | Q.    And if you would -- if I could ask you, please, to look |
| 09:36 | 13 | at the bottom, the first e-mail on the string.  It's an |
| 09:36 | 14 | e-mail from Mr. Larian to Mr. Wing.  Do you see that? |
| 09:36 | 15 | A.    Yes. |
| 09:36 | 16 | Q.    And the subject is "Taking Cash Out."  Do you see that? |
| 09:36 | 17 | A.    Yes. |
| 09:36 | 18 | Q.    And he writes, "We got 60 million and more by the end |
| 09:36 | 19 | of the year," question mark.  "Let's take some cash out |
| 09:36 | 20 | now."  Do you see that? |
| 09:36 | 21 | It's in that same e-mail, the first one. |
| 09:36 | 22 | A.    Yes. |
| 09:36 | 23 | Q.    "Let's take some cash out now."  Do you see that? |
| 09:36 | 24 | A.    Yes. |
| 09:36 | 25 | Q.    What he's talking about -- if you can skip forward to |

| | | |
|---|---|---|
| 09:36 | 1 | the first page, the e-mail in the middle from Brian Wing, |
| 09:37 | 2 | he's talking about getting cash out of Hong Kong and out of |
| 09:37 | 3 | the Netherlands, correct? |
| 09:37 | 4 | MR. McCONVILLE:  I'm gonna object on foundation |
| 09:37 | 5 | grounds, Your Honor. |
| 09:37 | 6 | THE COURT:  Overruled. |
| 09:37 | 7 | MR. McCONVILLE:  She's not on this e-mail. |
| 09:37 | 8 | THE COURT:  Overruled. |
| 09:37 | 9 | BY MR. QUINN: |
| 09:37 | 10 | Q.   Below that, Mr. Larian says, "Let's get 30 million out |
| 09:37 | 11 | now.  We have more cash coming."  Do you see that? |
| 09:37 | 12 | A.   Yes. |
| 09:37 | 13 | Q.   And Mr. Wing responds, "Can we wait until after 9/30? |
| 09:37 | 14 | We are depleting our U.S. cash to pay HK.  And then we will |
| 09:37 | 15 | have some transfer pricing adjustments to make to get cash |
| 09:37 | 16 | out of U.S. at 35 percent rate into Netherlands, 20 percent |
| 09:38 | 17 | combined effective rate.  We can then take the distribution |
| 09:38 | 18 | out of Netherlands and save at least 4.5 million in tax." |
| 09:38 | 19 | Do you see that? |
| 09:38 | 20 | A.   Yes. |
| 09:38 | 21 | Q.   And then if you would look at -- and Mr. Larian says at |
| 09:38 | 22 | the top there, he says, "Okay," in the top e-mail? |
| 09:38 | 23 | A.   Yes. |
| 09:38 | 24 | Q.   And then if you'd look at Exhibit 23946, this is |
| 09:38 | 25 | another e-mail exchange. |

| 09:38 | 1 | MR. QUINN:  It's in evidence.  If we could put |
|-------|---|------|
| 09:38 | 2 | that on the screen. |
| 09:38 | 3 | *(Document provided to the witness.)* |
| 09:38 | 4 | *(Document displayed.)* |
| 09:38 | 5 | BY MR. QUINN: |
| 09:38 | 6 | Q.   You'll see in the middle of the page from Brian Wing to |
| 09:38 | 7 | Isaac Larian, he says, "Isaac, after the U.S. pays off |
| 09:38 | 8 | Hong Kong, there isn't really much to distribute right now |
| 09:38 | 9 | without reducing our cash balances below a reasonable |
| 09:38 | 10 | cushion.  We'll have about 48 million in cash in the |
| 09:38 | 11 | Netherlands at the end of the February.  I think we should |
| 09:38 | 12 | leave at least $10 million in cash to fund our European |
| 09:38 | 13 | rollout and would recommend a dividend of no larger than |
| 09:39 | 14 | 38 million.  This is only taxed at 15 percent.  Please |
| 09:39 | 15 | advise how much you would like to take." |
| 09:39 | 16 | Do you see that? |
| 09:39 | 17 | A.   Yes. |
| 09:39 | 18 | Q.   And Mr. Larian responds in the top e-mail, "Do 30, |
| 09:39 | 19 | please," correct? |
| 09:39 | 20 | A.   Yes. |
| 09:39 | 21 | Q.   And is this consistent with your experience while you |
| 09:39 | 22 | were at MGA, that when Mr. Larian needed to get some money |
| 09:39 | 23 | out of one of the subsidiaries, he could instruct Mr. Wing |
| 09:39 | 24 | to take the money out? |
| 09:39 | 25 | MR. McCONVILLE:  Objection.  Misstates the |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 55 of 160   Page ID #:304662
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

55

| | | |
|---|---|---|
| 09:39 | 1 | evidence. |
| 09:39 | 2 | THE COURT:  Overruled. |
| 09:39 | 3 | THE WITNESS:  Yes. |
| 09:39 | 4 | BY MR. QUINN: |
| 09:39 | 5 | Q.   You had some -- counsel asked you about the |
| 09:39 | 6 | entrepreneur of the year award.  That was an award that was |
| 09:39 | 7 | given by -- was it Ernst & Young? |
| 09:39 | 8 | A.   Yes. |
| 09:39 | 9 | Q.   And Ernst & Young were MGA's auditors, correct? |
| 09:39 | 10 | A.   Yes. |
| 09:39 | 11 | Q.   And MGA paid Ernst & Young a lot of money for auditing |
| 09:40 | 12 | and consulting services, correct? |
| 09:40 | 13 | A.   Relatively, yes. |
| 09:40 | 14 | Q.   All right.  And they're the ones that gave him this |
| 09:40 | 15 | award in the U.S., correct? |
| 09:40 | 16 | A.   Yes. |
| 09:40 | 17 | Q.   And the -- the money that came from the sales of Bratz |
| 09:40 | 18 | product by Hong Kong, after payment of Hong Kong's costs, |
| 09:40 | 19 | the Hong Kong manufacturers, ultimately found its way up to |
| 09:40 | 20 | MGA U.S., correct? |
| 09:40 | 21 | A.   Yes. |
| 09:40 | 22 | MR. QUINN:  Nothing further.  Thank you. |
| 09:40 | 23 | THE COURT:  Recross. |
| | 24 | |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 56 of 160   Page ID #:304663
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

56

| | | |
|---|---|---|
| 09:40 | 1 | **RECROSS-EXAMINATION** |
| 09:40 | 2 | BY MR. McCONVILLE: |
| 09:40 | 3 | Q.   Let's just go with those two e-mails that you were just |
| 09:41 | 4 | shown, for example. |
| 09:41 | 5 | THE COURT:  23947, 23946? |
| 09:41 | 6 | MR. McCONVILLE:  Yes, sir. |
| 09:41 | 7 | BY MR. McCONVILLE: |
| 09:41 | 8 | Q.   Let's just go with 23947. |
| 09:41 | 9 | MR. McCONVILLE:  And if we could blow up the |
| 09:41 | 10 | middle e-mail on the first page. |
| 09:41 | 11 | *(Document displayed.)* |
| 09:41 | 12 | BY MR. McCONVILLE: |
| 09:41 | 13 | Q.   From Brian Wing to Isaac Larian. |
| 09:41 | 14 | Ms. Chan, isn't this Brian Wing giving advice to Isaac |
| 09:41 | 15 | Larian about what can and cannot be done in an accounting |
| 09:41 | 16 | function? |
| 09:41 | 17 | A.   Yes. |
| 09:41 | 18 | Q.   And let's look at Exhibit 23946, e-mail entitled |
| 09:41 | 19 | dividends. |
| 09:41 | 20 | MR. QUINN:  And you can blow up the part from |
| 09:41 | 21 | Brian Wing to Isaac Larian. |
| 09:41 | 22 | *(Technician complies.)* |
| 09:41 | 23 | BY MR. McCONVILLE: |
| 09:41 | 24 | Q.   And who's Brian Wing, again?  What was his title? |
| 09:41 | 25 | A.   Senior VP of finance and taxation. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 57 of 160   Page ID #:304664
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

57

| | | |
|---|---|---|
| 09:42 | 1 | Q.   Okay.  And if you look at the e-mail there that's |
| 09:42 | 2 | actually originated by Mr. Wing to Mr. Larian, is he, again, |
| 09:42 | 3 | providing Mr. Larian with some accounting and tax advice? |
| 09:42 | 4 | A.   Yes. |
| 09:42 | 5 | Q.   Okay.  Let's look at another e-mail you were shown, |
| 09:42 | 6 | which is 8129.  That's up on the screen in front of you.  I |
| 09:42 | 7 | want you to take your time and look at this e-mail because |
| 09:42 | 8 | you were asked questions about circling the globe.  And I |
| 09:42 | 9 | want you to look at the e-mail and tell me where Isaac |
| 09:42 | 10 | Larian's name is on this e-mail? |
| 09:42 | 11 | *(Document displayed.)* |
| 09:42 | 12 | THE COURT:  Counsel, over your objection, I |
| 09:42 | 13 | allowed it as a 30(b)(6). |
| 09:42 | 14 | MR. McCONVILLE:  I'm just asking her if she sees |
| 09:42 | 15 | Isaac Larian's name on the e-mail. |
| 09:42 | 16 | THE COURT:  Certainly. |
| 09:42 | 17 | THE WITNESS:  I do not. |
| 09:42 | 18 | BY MR. McCONVILLE: |
| 09:42 | 19 | Q.   Okay.  But the people who are on this e-mail, these are |
| 09:43 | 20 | the people who deal with accounting issues for MGA; is that |
| 09:43 | 21 | right? |
| 09:43 | 22 | A.   Yes. |
| 09:43 | 23 | Q.   You were asked some questions about -- about whether |
| 09:43 | 24 | Ernst & Young and Deloitte & Touche assisted or monitored |
| 09:43 | 25 | MGA after the structures were put in place that they |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 58 of 160   Page ID #:304665
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

58

| | | |
|---|---|---|
| 09:43 | 1 | recommended.  Do you remember that? |
| 09:43 | 2 | A.    Yes. |
| 09:43 | 3 | Q.    And I think you said they did, in fact, assist.  So |
| 09:43 | 4 | could you describe for us what that was? |
| 09:43 | 5 | A.    They, on an annual basis, would look at our |
| 09:43 | 6 | intercompany transactions to make sure that they were in par |
| 09:43 | 7 | with the transfer pricing rules.  They conducted transfer |
| 09:43 | 8 | pricing studies for us. |
| 09:43 | 9 | Q.    And at some point Ernst & Young or Deloitte & Touche |
| 09:43 | 10 | actually comes into MGA and does an audit, right? |
| 09:43 | 11 | A.    That's correct. |
| 09:43 | 12 | Q.    And as a result of those audits, they prepare reports, |
| 09:43 | 13 | right? |
| 09:43 | 14 | A.    Yes. |
| 09:43 | 15 | Q.    And are you aware who Mattel uses for its outside |
| 09:44 | 16 | accounting? |
| 09:44 | 17 | A.    No. |
| 09:44 | 18 | MR. McCONVILLE:  Okay.  Nothing further, |
| 09:44 | 19 | Your Honor. |
| 09:44 | 20 | THE COURT:  All right.  We're asking all of the |
| 09:44 | 21 | witnesses to remain on call, Ms. Chan, until May 7th.  The |
| 09:44 | 22 | case is going to conclude sometime in March, though.  But |
| 09:44 | 23 | just in an abundance of caution, I don't want subpoenas to |
| 09:44 | 24 | have to go across the United States or go across the world |
| 09:44 | 25 | again.  Go about your professional responsibilities.  If you |

Case 2:04-cv-09049-DOC-RNB  Document 10087  Filed 02/28/11  Page 59 of 160  Page ID #:304666
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

59

| | | |
|---|---|---|
| 09:44 | 1 | have a planned vacation, for goodness' sake, take it.  If we |
| 09:44 | 2 | need you, we'll get you away from your vacation.  I'm just |
| 09:44 | 3 | kidding you.  You can step down now. |
| 09:44 | 4 | (Witness steps down subject to recall.) |
| 09:44 | 5 | THE COURT:  Counsel, would you call your next |
| 09:44 | 6 | witness, please. |
| 09:44 | 7 | MR. QUINN:  Your Honor, Susana Kuemmerle. |
| 09:44 | 8 | THE COURT:  Susana Kuemmerle. |
| 09:44 | 9 | MR. QUINN:  We may need just a minute to get |
| 09:44 | 10 | organized, Your Honor. |
| 09:44 | 11 | THE COURT:  Certainly. |
| 09:45 | 12 | Ms. Kuemmerle, if you would step forward, please. |
| 09:45 | 13 | Thank you. |
| 09:45 | 14 | And now would you be kind enough to stop and raise |
| 09:45 | 15 | your right hand, please. |
| 09:45 | 16 | **SUSANA KUEMMERLE, MATTEL'S WITNESS, SWORN** |
| 09:45 | 17 | THE WITNESS:  I do. |
| 09:45 | 18 | THE COURT:  Thank you.  If you would come along |
| 09:45 | 19 | the jury rail, please.  And if you would enter the witness |
| 09:46 | 20 | box.  And if you would be seated, please. |
| 09:46 | 21 | Would you be kind enough to turn and face the |
| 09:46 | 22 | jury, and would you state your full name for the jurors, |
| 09:46 | 23 | please. |
| 09:46 | 24 | THE WITNESS:  Susana Kuemmerle. |
| 09:46 | 25 | THE COURT:  Would you spell your last name, |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 60 of 160   Page ID #:304667
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

60

| | | |
|---|---|---|
| 09:46 | 1 | please. |
| 09:46 | 2 | THE WITNESS:  K-U-E-M-M-E-R-L-E. |
| 09:46 | 3 | THE COURT:  Thank you. |
| 09:46 | 4 | Direct examination by Mr. Quinn on behalf of |
| 09:46 | 5 | Mattel. |
| 09:46 | 6 | MR. QUINN:  Thank you. |
| 09:46 | 7 | **DIRECT EXAMINATION** |
| 09:46 | 8 | BY MR. QUINN: |
| 09:46 | 9 | Q.   Is it Kuemmerle?  Did I say that right? |
| 09:46 | 10 | A.   Kuemmerle.  Kuemmerle, yes. |
| 09:46 | 11 | Q.   Kuemmerle.  Good morning.  My name is John Quinn and I |
| 09:46 | 12 | represent Mattel. |
| 09:46 | 13 | You testified in depositions in this case? |
| 09:46 | 14 | A.   Yes. |
| 09:46 | 15 | Q.   And you, in fact, have been designated by MGA as what |
| 09:46 | 16 | we've all come to know as a 30(b)(6) witness? |
| 09:46 | 17 | A.   Yes. |
| 09:47 | 18 | Q.   Which means that you agreed and were designated by MGA |
| 09:47 | 19 | to get educated on certain topics based on all information |
| 09:47 | 20 | reasonably available to MGA on those topics and then to |
| 09:47 | 21 | testify on those topics, correct? |
| 09:47 | 22 | A.   Yes. |
| 09:47 | 23 | Q.   And there were quite a number of topics that you |
| 09:47 | 24 | were -- you were fortunate enough or unfortunate enough to |
| 09:47 | 25 | be designated as a witness on, correct? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

61

| | | |
|---|---|---|
| 09:47 | 1 | A.   Several. |
| 09:47 | 2 | Q.   Yeah.  And one of those related to a search and seizure |
| 09:47 | 3 | down in Mexico City, correct? |
| 09:47 | 4 | MS. KELLER:  Your Honor, for correction of the |
| 09:47 | 5 | record, can we make sure that this is MGA Mexico we're |
| 09:47 | 6 | talking about, not MGA? |
| 09:47 | 7 | MR. QUINN:  Okay.  She's designated by MGA Mexico. |
| 09:47 | 8 | MS. KELLER:  Thank you. |
| 09:47 | 9 | BY MR. QUINN: |
| 09:47 | 10 | Q.   So you were designated by the MGA Mexico subsidiary as |
| 09:47 | 11 | a 30(b)(6) witness, correct? |
| 09:47 | 12 | A.   MGA Mexico office, yes. |
| 09:47 | 13 | Q.   And one the topics -- one of these many topics that you |
| 09:47 | 14 | were designated by MGA Mexico on related to a search and |
| 09:48 | 15 | seizure down in Mexico City, correct? |
| 09:48 | 16 | A.   Yes. |
| 09:48 | 17 | Q.   At MGA Mexico's offices, correct? |
| 09:48 | 18 | A.   In Mexico City, yes. |
| 09:48 | 19 | Q.   Yes.  And to prepare for that, to testify about that |
| 09:48 | 20 | search and seizure as MGA Mexico's 30(b)(6) witness, you |
| 09:48 | 21 | reviewed various items of information, correct? |
| 09:48 | 22 | A.   Yes. |
| 09:48 | 23 | Q.   You reviewed some documents? |
| 09:48 | 24 | A.   Some. |
| 09:48 | 25 | Q.   And you spoke to some people? |

| | | |
|---|---|---|
| 09:48 | 1 | A.   Yes. |
| 09:48 | 2 | Q.   To do what you could to get educated about those |
| 09:48 | 3 | events, that search and seizure down at MGA Mexico's |
| 09:48 | 4 | offices, right? |
| 09:48 | 5 | A.   As much as I could. |
| 09:48 | 6 | Q.   Right.  And the lawyers for MGA helped you in that |
| 09:48 | 7 | effort, true? |
| 09:48 | 8 | A.   Yes. |
| 09:48 | 9 | Q.   I mean, they helped assemble the information which they |
| 09:48 | 10 | thought that you needed in order to be able to testify as |
| 09:48 | 11 | MGA Mexico's representative on that subject, correct? |
| 09:48 | 12 | A.   As best as we could. |
| 09:49 | 13 | Q.   All right.  So just to get some background here, um, |
| 09:49 | 14 | from around February 2002 to June 2004, you working on |
| 09:49 | 15 | behalf of MGA and reporting to Mr. Larian on behalf of MGA's |
| 09:49 | 16 | distributors in Latin America; is that correct? |
| 09:49 | 17 | A.   No. |
| 09:49 | 18 | Q.   What's incorrect about that? |
| 09:49 | 19 | A.   I was a sales rep.  I did not work for MGA. |
| 09:49 | 20 | Q.   Okay.  So you were kind of an independent person?  You |
| 09:49 | 21 | weren't an employee? |
| 09:49 | 22 | A.   Yes. |
| 09:49 | 23 | Q.   All right.  But during that period from |
| 09:49 | 24 | February 2002 to June 2004, you were a sales -- you were a |
| 09:49 | 25 | sales rep for MGA? |

| | | |
|---|---|---|
| 09:49 | 1 | A.   Yes. |
| 09:49 | 2 | Q.   And you were -- were you supporting MGA distributors in |
| 09:49 | 3 | Latin America? |
| 09:49 | 4 | A.   I was working with Latin American distributors to sell |
| 09:49 | 5 | the MGA line. |
| 09:49 | 6 | Q.   Right.  And then from June 2004 to November 2009, you |
| 09:50 | 7 | were the vice president of MGA de Mexico and Latin American |
| 09:50 | 8 | sales of MGA Mexico, correct? |
| 09:50 | 9 | A.   Can you repeat the date, please? |
| 09:50 | 10 | Q.   What I've got is June 2004 to November 2009. |
| 09:50 | 11 | A.   Yes. |
| 09:50 | 12 | Q.   So at that point you -- did you actually become an |
| 09:50 | 13 | employee? |
| 09:50 | 14 | A.   In June 2004, yes. |
| 09:50 | 15 | Q.   And you continued -- and what was the entity that |
| 09:50 | 16 | employed you?  Was it MGA U.S.A.?  MGA Mexico? |
| 09:50 | 17 | A.   MGA Mexico. |
| 09:50 | 18 | Q.   Did you continue to be employed during that entire |
| 09:50 | 19 | period, June 2004 to November 2009? |
| 09:50 | 20 | A.   I continued to be employed until May 2010. |
| 09:50 | 21 | Q.   All right.  So until -- |
| 09:51 | 22 | A.   But my position changed. |
| 09:51 | 23 | Q.   Okay.  All right.  So what was the first position that |
| 09:51 | 24 | you had? |
| 09:51 | 25 | A.   Until, I believe it was October or November 2009, I was |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 64 of 160   Page ID #:304671
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

64

| | | |
|---|---|---|
| 09:51 | 1 | the VP of MGA Mexico and Latin America. |
| 09:51 | 2 | Q.   And then your position changed? |
| 09:51 | 3 | A.   To VP Latin America. |
| 09:51 | 4 | Q.   Can you tell us what your job duties were as -- in the |
| 09:51 | 5 | first position for vice president of sales for MGA Mexico? |
| 09:51 | 6 | A.   I was in charge of the Mexican subsidiary.  Anything |
| 09:51 | 7 | that related to the Mexican subsidiary as well as on my own |
| 09:51 | 8 | I handled the rest of sales for Latin America. |
| 09:51 | 9 | Q.   All right.  So that would be, you know, Mexico, Central |
| 09:51 | 10 | America, and South America? |
| 09:51 | 11 | A.   All of the Latin American countries. |
| 09:51 | 12 | Q.   All right.  And then you -- you say your position |
| 09:51 | 13 | changed, and you were vice president for Latin America |
| 09:51 | 14 | sales? |
| 09:51 | 15 | A.   Yes.  I was asked to return to the U.S., and I only |
| 09:52 | 16 | handle Latin America, without Mexico. |
| 09:52 | 17 | Q.   Okay.  And in that position, what were your job duties? |
| 09:52 | 18 | A.   Anything from Mexico, south. |
| 09:52 | 19 | Q.   Okay.  And, again, relating to sales? |
| 09:52 | 20 | A.   Yes. |
| 09:52 | 21 | Q.   All right.  So back in 2004, you had some discussions |
| 09:52 | 22 | with Mr. Larian about starting up MGA Mexico; is that true? |
| 09:52 | 23 | A.   I don't remember the exact date, but, yes, Mr. Larian |
| 09:52 | 24 | and I started to talk about it. |
| 09:52 | 25 | Q.   And you suggested to Mr. Larian that MGA Mexico should |

| | | |
|---|---|---|
| 09:52 | 1 | be started up by hiring some employees from Mattel Mexico, |
| 09:52 | 2 | correct? |
| 09:52 | 3 | A.   I don't know if I suggested, but that was the idea of |
| 09:52 | 4 | opening a subsidiary.  We needed to start by hiring the key |
| 09:53 | 5 | personnel for the subsidiary. |
| 09:53 | 6 | Q.   If we could take a look at Exhibit 3601. |
| 09:53 | 7 | MR. QUINN:  This, I'm informed, is already into |
| 09:53 | 8 | evidence. |
| 09:53 | 9 | *(Document provided to the witness.)* |
| 09:53 | 10 | *(Document displayed.)* |
| 09:53 | 11 | THE WITNESS:  Yes. |
| 09:53 | 12 | BY MR. QUINN: |
| 09:53 | 13 | Q.   And this is a -- it's an e-mail string.  And is your |
| 09:53 | 14 | e-mail address -- was it argentrade@aol.com?  Is that you? |
| 09:53 | 15 | A.   That was me. |
| 09:53 | 16 | Q.   So this is dated in -- what is the date?  This is in |
| 09:53 | 17 | February of 2004? |
| 09:53 | 18 | A.   Yes. |
| 09:54 | 19 | BY MR. QUINN: |
| 09:54 | 20 | Q.   If we can enlarge the bottom e-mail, you write to |
| 09:54 | 21 | Mr. Larian, "Yes, we can pull the best from Mama Mexico, |
| 09:54 | 22 | ex-Tyco employees that I know.  I have some information |
| 09:54 | 23 | already.  Where are you?"  That's what you wrote? |
| 09:54 | 24 | A.   That's correct. |
| 09:54 | 25 | Q.   And he responded, "*Undale*," which I think -- |

| | | |
|---|---|---|
| 09:54 | 1 | A.    Misspelled. |
| 09:54 | 2 | Q.    I'm sorry? |
| 09:54 | 3 | A.    It's misspelled. |
| 09:54 | 4 | Q.    Mr. Larian's spelling of Spanish needs some |
| 09:54 | 5 | improvement? |
| 09:54 | 6 | A.    A little bit. |
| 09:54 | 7 | Q.    I'm sorry.  I'm told I said, "Mama Mexico."  What you |
| 09:54 | 8 | actually wrote is "Mama Mattel Mexico"? |
| 09:54 | 9 | A.    That's correct. |
| 09:54 | 10 | Q.    So he wrote, "Undale.  Let's go.  Give me the names," |
| 09:54 | 11 | correct? |
| 09:54 | 12 | A.    Yes. |
| 09:54 | 13 | Q.    So he, Mr. Larian, agreed that MGA Mexico should be |
| 09:54 | 14 | started up by hiring employees from Mattel Mexico? |
| 09:55 | 15 | A.    No.  It's important to notice that in the e-mail I |
| 09:55 | 16 | write, "ex-Tyco employees that I know."  And by that I was |
| 09:55 | 17 | referring to a coworker that I had when I work at Tyco.  And |
| 09:55 | 18 | then I work with him again at Toy Biz. |
| 09:55 | 19 | Q.    And that person's name was? |
| 09:55 | 20 | A.    Gustavo Machado. |
| 09:55 | 21 | Q.    Okay.  Just so there's no confusion, Tyco was a toy |
| 09:55 | 22 | company, right? |
| 09:55 | 23 | A.    That's right. |
| 09:55 | 24 | Q.    And you worked at Tyco? |
| 09:55 | 25 | A.    I work at Tyco, and at that particular time, |

| 09:55 | 1 | Mr. Machado was in charge of marketing for the Tyco and |
| 09:55 | 2 | Sueño subsidiary in Mexico.  And when I have stop working at |
| 09:55 | 3 | Tyco, I worked at another toy company called Toy Biz, which |
| 09:55 | 4 | is the company that makes toys for Marvel, and he and I work |
| 09:55 | 5 | on a project together again. |
| 09:55 | 6 | Q.   Okay.  But at some point Tyco, where Mr. Machado |
| 09:55 | 7 | worked, became part of Mattel, correct? |
| 09:56 | 8 | A.   Yes, but -- |
| 09:56 | 9 | Q.   All right. |
| 09:56 | 10 | A.   That's right. |
| 09:56 | 11 | Q.   And so when you wrote to Mr. Larian that "We can pull |
| 09:56 | 12 | the best from Mama Mattel Mexico," you were referring to the |
| 09:56 | 13 | employees that you knew there, who used to be at Tyco, were |
| 09:56 | 14 | now part of Mattel, since Tyco became part of Mattel, |
| 09:56 | 15 | correct? |
| 09:56 | 16 | A.   I was referring to my coworker from Tyco, Gustavo |
| 09:56 | 17 | Machado. |
| 09:56 | 18 | Q.   All right.  Who at that time was employed by Mattel? |
| 09:56 | 19 | A.   Yes.  I was referring to Tyco. |
| 09:56 | 20 | Q.   But you were, um -- you -- and I think you've indicated |
| 09:56 | 21 | the person you were thinking of is this Mr. Gustavo Machado, |
| 09:56 | 22 | correct? |
| 09:56 | 23 | A.   That's the person I remember that I work with for many |
| 09:56 | 24 | years. |
| 09:56 | 25 | Q.   And you sent an e-mail to Mr. Larian saying, "I'm sure |

| | | |
|---|---|---|
| 09:56 | 1 | I can get the personnel to start it and the right sales |
| 09:56 | 2 | group to make it happen.  Mattel will not be happy, but, oh, |
| 09:57 | 3 | well," correct? |
| 09:57 | 4 | A.   I don't know where you are. |
| 09:57 | 5 | Q.   Let's take a look at Exhibit 6769. |
| 09:57 | 6 | MR. QUINN:  I don't think this is evidence yet. |
| 09:57 | 7 | I'm informed this is in evidence, Your Honor. |
| 09:57 | 8 | *(Document displayed.)* |
| 09:57 | 9 | BY MR. QUINN: |
| 09:57 | 10 | Q.   If we look at the bottom here, the bottom e-mail is an |
| 09:57 | 11 | e-mail from you to Mr. Larian, dated October 17th, 2003 -- |
| 09:57 | 12 | I'm sorry -- October 27th, 2003. |
| 09:57 | 13 | A.   Yeah. |
| 09:57 | 14 | Q.   "Subject:  Latin America." |
| 09:57 | 15 | You write, "Hi, Isaac. |
| 09:57 | 16 | "It was very nice to see you in Hong Kong.  Regarding |
| 09:57 | 17 | what we talked about, I have some thoughts I want to share |
| 09:57 | 18 | with you before I move forward.  Maybe we should talk in |
| 09:58 | 19 | person, but here I go.  MGA Mexico sounds like a great idea. |
| 09:58 | 20 | I am sure I can get the personnel to start it and the right |
| 09:58 | 21 | sales group to make it happen. |
| 09:58 | 22 | "Mattel will not be happy, but, oh, well." |
| 09:58 | 23 | That's what you wrote to Mr. Larian at that time? |
| 09:58 | 24 | A.   That's what I wrote on the e-mail. |
| 09:58 | 25 | Q.   And, um, then in February of 2004, Mr. Larian called |

| | | |
|---|---|---|
| 09:58 | 1 | you to say that he was serious about starting up MGA Mexico, |
| 09:58 | 2 | and he wanted your help, correct? |
| 09:58 | 3 | A.   Around that date. |
| 09:58 | 4 | Q.   Right? |
| 09:58 | 5 | A.   Yes. |
| 09:58 | 6 | Q.   And after this discussion -- after that discussion with |
| 09:58 | 7 | Mr. Larian, you reached out to Gustavo Machado, correct? |
| 09:58 | 8 | A.   After I knew that Mr. Larian was really serious about |
| 09:58 | 9 | opening the subsidiary, and this is in October and then |
| 09:58 | 10 | again in February -- in January in Hong Kong, and he call me |
| 09:59 | 11 | again, yes, then, I contacted Gustavo. |
| 09:59 | 12 | Q.   Right.  In 2004, you arranged a meeting between |
| 09:59 | 13 | Mr. Larian and Mr. Machado, correct? |
| 09:59 | 14 | A.   After I received the okay to arrange the meeting, yes. |
| 09:59 | 15 | Q.   That was in February 2004? |
| 09:59 | 16 | A.   Yes. |
| 09:59 | 17 | Q.   And you remember that because it was at New York toy |
| 09:59 | 18 | fair, correct? |
| 09:59 | 19 | A.   Yes. |
| 09:59 | 20 | Q.   And you were at that meeting? |
| 09:59 | 21 | A.   Yes. |
| 09:59 | 22 | Q.   And Mr. Larian was there, and Mr. Machado, then a |
| 09:59 | 23 | Mattel employee, was also there, correct? |
| 09:59 | 24 | A.   Yes. |
| 09:59 | 25 | Q.   And in that meeting Mr. Larian discussed with |

| | | |
|---|---|---|
| 09:59 | 1 | Mr. Machado the possibility of opening an MGA subsidiary in |
| 09:59 | 2 | Mexico? |
| 09:59 | 3 | A.   Yes. |
| 09:59 | 4 | Q.   And he was -- and Mr. Larian asked Mr. Machado if he |
| 09:59 | 5 | would be interested in helping MGA launch that subsidiary, |
| 10:00 | 6 | correct? |
| 10:00 | 7 | A.   Yes.  It was a very short meeting.  There was immediate |
| 10:00 | 8 | chemistry between Mr. Machado and Mr. Larian.  And it was a |
| 10:00 | 9 | very exciting meeting.  And Mr. Larian said to Gustavo about |
| 10:00 | 10 | the idea -- Mr. Machado, sorry -- about the idea of opening |
| 10:00 | 11 | a subsidiary in Mexico, and he asked Mr. Machado if he was |
| 10:00 | 12 | interested.  And it was very good body language. |
| 10:00 | 13 | And, um, Gustavo said that he was very much interested, |
| 10:00 | 14 | and, um, I was kind of moved far from the two of them.  And |
| 10:00 | 15 | Mr. Larian said to Gustavo, "Forget about Mattel.  We don't |
| 10:00 | 16 | want anything that has to do with Mattel.  We want you. |
| 10:00 | 17 | Susana speaks very well of you.  We think that you can be a |
| 10:00 | 18 | good fit." |
| 10:00 | 19 | MR. QUINN:  Your Honor, I think this is beyond the |
| 10:00 | 20 | question. |
| 10:01 | 21 | THE COURT:  Sustained.  Stricken.  Just reask the |
| 10:01 | 22 | question.  It's narrative. |
| 10:01 | 23 | BY MR. QUINN: |
| 10:01 | 24 | Q.   Ms. Kuemmerle, I'm gonna try to ask you questions that |
| 10:01 | 25 | I hope will be clear to you.  If my question isn't ever |

Case 2:04-cv-09049-DOC-RNB  Document 10087  Filed 02/28/11  Page 71 of 160  Page ID #:304678
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

71

| | | |
|---|---|---|
| 10:01 | 1 | clear, please let me know. |
| 10:01 | 2 | A.   Okay. |
| 10:01 | 3 | Q.   And your counsel will have a chance to question you |
| 10:01 | 4 | afterwards if there's some other things that you think |
| 10:01 | 5 | haven't come out. |
| 10:01 | 6 | A.   Okay. |
| 10:01 | 7 | Q.   But I would appreciate it if you could try to answer -- |
| 10:01 | 8 | if you would, please, try to answer my questions.  Okay? |
| 10:01 | 9 | A.   Okay. |
| 10:01 | 10 |        MR. OVERLAND:  Your Honor, object to the reference |
| 10:01 | 11 | of "your counsel." |
| 10:01 | 12 |        THE COURT:  Overruled. |
| 10:01 | 13 | BY MR. QUINN: |
| 10:01 | 14 | Q.   So after that meeting -- in the meeting in New York, I |
| 10:01 | 15 | gather that Mr. Larian asked Mr. Machado would he be |
| 10:01 | 16 | interested to help opening an MGA subsidiary, and |
| 10:01 | 17 | Mr. Machado said, yes, he would? |
| 10:01 | 18 | A.   He was interested in the opportunity. |
| 10:01 | 19 | Q.   Right.  And you, then, arranged a meeting in Mexico |
| 10:01 | 20 | City so that Mr. Machado and two other Mattel Mexico |
| 10:01 | 21 | employees, a Mr. Vargas and a Ms. Trueba, could be |
| 10:02 | 22 | interviewed, correct? |
| 10:02 | 23 | A.   We arranged a trip to Mexico City to interview for |
| 10:02 | 24 | several positions for the prospective office. |
| 10:02 | 25 | Q.   All right. |

| | | |
|---|---|---|
| 10:02 | 1 | A.    There were several candidates. |
| 10:02 | 2 | Q.    Okay.  But among the people that you arranged to be |
| 10:02 | 3 | interviewed were Mr. Machado, Mr. Vargas, and Ms. Trueba, |
| 10:02 | 4 | correct? |
| 10:02 | 5 | A.    Among all of the candidates, yes. |
| 10:02 | 6 | Q.    All right.  And that meeting took place in March 2004? |
| 10:02 | 7 | A.    I don't recall the date.  But it -- March seems to be |
| 10:02 | 8 | the right time. |
| 10:02 | 9 | Q.    Okay.  And it was at the W Hotel in Mexico City? |
| 10:02 | 10 | A.    W Hotel in Mexico City. |
| 10:02 | 11 | Q.    That's a "Yes"? |
| 10:02 | 12 | A.    Yes. |
| 10:02 | 13 | Q.    Thank you.  You were there?  You were at this meeting? |
| 10:02 | 14 | A.    I was there. |
| 10:02 | 15 | Q.    And Mr. Larian was there? |
| 10:02 | 16 | A.    Mr. Larian was there. |
| 10:02 | 17 | Q.    And a gentleman by the name of Tom Park was there? |
| 10:02 | 18 | A.    That's correct. |
| 10:02 | 19 | Q.    Tell us who Tom Park is. |
| 10:02 | 20 | A.    At that particular time, Mr. Park was the COO of the |
| 10:03 | 21 | company. |
| 10:03 | 22 | THE COURT:  Would this be a good time for a break? |
| 10:03 | 23 | MR. QUINN:  Certainly. |
| 10:03 | 24 | THE COURT:  Ladies and gentlemen, you're |
| 10:03 | 25 | admonished not to discuss this matter amongst yourselves, |

| | | |
|---|---|---|
| 10:03 | 1 | nor form or express any opinion. |
| 10:03 | 2 | We'll come and get you in 15 minutes. |
| 10:03 | 3 | If you'd like to step down.  And if you would be |
| 10:03 | 4 | seated promptly at 20 minutes after the hour. |
| 10:03 | 5 | THE WITNESS:  Yes. |
| 10:03 | 6 | THE COURT:  Counsel, we'll see you in 15 minutes. |
| 10:03 | 7 | *(Recess held at 10:03 a.m.)* |
| 10:03 | 8 | *(Out of the presence of the jury.)* |
| 10:04 | 9 | THE COURT:  All right.  We're on the record, |
| 10:04 | 10 | Debbie.  All counsel are present.  And, Counsel, as the |
| 10:04 | 11 | Court was leaving to take the recess, Counsel asked the |
| 10:04 | 12 | Court to go back into session. |
| 10:04 | 13 | Counsel. |
| 10:04 | 14 | MS. KELLER:  Your Honor, we just wanted to avoid |
| 10:04 | 15 | interrupting the witness's testimony, to put it on the |
| 10:04 | 16 | record -- put on the record our continuing objection if this |
| 10:04 | 17 | witness is asked about things in her capacity as a 30(b)(6) |
| 10:04 | 18 | witness that she has no personal knowledge for, can't lay a |
| 10:04 | 19 | foundation for, or things which are hearsay.  And the |
| 10:05 | 20 | grounds for that are while somebody can testify as a |
| 10:05 | 21 | 30(b)(6) witness for discovery purposes, the rules of |
| 10:05 | 22 | evidence are not abrogated thereafter for that person's |
| 10:05 | 23 | testimony at trial.  That's all, Your Honor. |
| 10:05 | 24 | THE COURT:  Mr. Overland. |
| 10:05 | 25 | MR. OVERLAND:  Yes, Your Honor.  We would join in |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 74 of 160   Page ID #:304681
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

74

| | | |
|---|---|---|
| 10:05 | 1 | that.  And in addition to that, we would object to any |
| 10:05 | 2 | testimony elicited from Ms. Kuemmerle as a 30(b)(6) witness, |
| 10:05 | 3 | specifically with respect to the search of the MGA offices, |
| 10:05 | 4 | among other things, but specifically with respect to the |
| 10:05 | 5 | search of the MGA offices on the grounds that she's not |
| 10:05 | 6 | Mr. Machado's 30(b)(6) witness. |
| 10:05 | 7 | THE COURT:  She was designated by this Court.  I |
| 10:05 | 8 | think we've gone through this now a number of times about |
| 10:05 | 9 | search and seizure of the Mexico offices. |
| 10:05 | 10 | And so I'll -- Mr. Price or Mr. Quinn? |
| 10:05 | 11 | MR. QUINN:  It's my understanding that the whole |
| 10:06 | 12 | point of 30(b)(6) is an entity designates someone to testify |
| 10:06 | 13 | on their behalf and that binds the entity. |
| 10:06 | 14 | THE COURT:  But it was designated on behalf of MGA |
| 10:06 | 15 | Mexico, wasn't it? |
| 10:06 | 16 | MS. KELLER:  Yes, Your Honor. |
| 10:06 | 17 | THE COURT:  Yeah.  Let me look back for just a |
| 10:06 | 18 | moment.  Do either one of you have that order in front of |
| 10:06 | 19 | you?  I think it was Category 10, and it reads as follows: |
| 10:06 | 20 | The search and seizure of documents by Mexican authorities |
| 10:06 | 21 | from MGA's Mexico City offices and related communications." |
| 10:06 | 22 | This is MGA Mexico's 30(b)(6) witness designation, I |
| 10:06 | 23 | believe. |
| 10:06 | 24 | MR. McCONVILLE:  Your Honor, I think that |
| 10:06 | 25 | category -- do you have the date on that order? |

| | | |
|---|---|---|
| 10:06 | 1 | THE COURT:  It is this particular order amongst |
| 10:07 | 2 | the 150 orders the Court's put out for discovery purposes. |
| 10:07 | 3 | This is -- was June 14, 2010. |
| 10:07 | 4 | MR. McCONVILLE:  I think that's after Susana |
| 10:07 | 5 | Kuemmerle testified.  That's why I asked for the date. |
| 10:07 | 6 | THE COURT:  Let's get the record straight.  She |
| 10:07 | 7 | refused to testify. |
| 10:07 | 8 | MR. McCONVILLE:  My point is her testimony |
| 10:07 | 9 | wouldn't apply to that category.  That's all. |
| 10:07 | 10 | THE COURT:  Okay.  Thank you. |
| 10:07 | 11 | Anything else? |
| 10:07 | 12 | MR. OVERLAND:  And as to Mr. Machado, it's |
| 10:07 | 13 | inapplicable.  He doesn't have a 30(b)(6) witness, even if |
| 10:07 | 14 | this were admissible at trial. |
| 10:07 | 15 | THE COURT:  Okay.  You have that admonition ready |
| 10:07 | 16 | for me? |
| 10:07 | 17 | MR. OVERLAND:  I will write it out, yes. |
| 10:07 | 18 | THE COURT:  Thank you.  Okay. |
| 10:07 | 19 | MS. KELLER:  And we have nothing further, |
| 10:07 | 20 | Your Honor. |
| 10:07 | 21 | THE COURT:  Okay.  Counsel, anybody have anything |
| 10:07 | 22 | further? |
| 10:07 | 23 | MR. QUINN:  No, Your Honor. |
| 10:07 | 24 | THE COURT:  All right.  We'll see you in six |
| 10:07 | 25 | minutes.  I'm sorry, it was 20 after.  My apologies. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 76 of 160   Page ID #:304683
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

76

| | | |
|---|---|---|
| 10:07 | 1 | 11 minutes. |
| 10:07 | 2 | *(Recess held at 10:08 a.m.)* |
| 10:21 | 3 | *(Proceedings resumed at 10:21 a.m.0* |
| 10:21 | 4 | *(In the presence of the jury.)* |
| 10:21 | 5 | THE COURT:  All right.  Then we're back in |
| 10:21 | 6 | session.  The jury is present.  All counsel are present. |
| 10:21 | 7 | And if you would like to continue with your direct |
| 10:21 | 8 | examination, please. |
| 10:21 | 9 | MR. QUINN:  Thank you, Your Honor. |
| 11:59 | 10 | BY MR. QUINN: |
| 10:22 | 11 | Q.   Ms. Kuemmerle, we were talking about a meeting that |
| 10:22 | 12 | took place at the W Hotel in Mexico City, which you helped |
| 10:22 | 13 | arrange. |
| 10:22 | 14 | A.   Yes. |
| 10:22 | 15 | Q.   And I think you indicated there was some other |
| 10:22 | 16 | candidates that were being considered, but Mr. Machado, was |
| 10:22 | 17 | there to be considered as was a Mr. Vargas and a Ms. Trueba, |
| 10:22 | 18 | correct? |
| 10:22 | 19 | A.   Among other candidates, yes. |
| 10:22 | 20 | Q.   And they were all Mattel Mexico employees at the time |
| 10:22 | 21 | of that meeting? |
| 10:22 | 22 | A.   At the time of that meeting, yes. |
| 10:22 | 23 | Q.   And you knew that Mattel employees intended to give a |
| 10:22 | 24 | presentation to Mr. Larian and the other folks from MGA, |
| 10:22 | 25 | correct? |

| | | |
|---|---|---|
| 10:22 | 1 | A.   A presentation of the country, yes. |
| 10:22 | 2 | Q.   Well, a presentation about the toy business in the |
| 10:22 | 3 | country, correct? |
| 10:22 | 4 | A.   I only saw the first two pages or three pages of the |
| 10:23 | 5 | presentation.  And what I saw was the country, the states, |
| 10:23 | 6 | and how it was divided, and then I had to leave. |
| 10:23 | 7 | Q.   Well, if you'd take a look at –– you say you only saw |
| 10:23 | 8 | the first couple of pages of the presentation.  But you knew |
| 10:23 | 9 | there were more pages to the presentation, right? |
| 10:23 | 10 | A.   I had to leave. |
| 10:23 | 11 | Q.   You had to leave.  But, I mean, you didn't think they |
| 10:23 | 12 | were there to present some type of travelogue or information |
| 10:23 | 13 | about Mexican cooking or music or anything like that, did |
| 10:23 | 14 | you? |
| 10:23 | 15 | A.   I saw the three pages, four pages, and then I had to |
| 10:23 | 16 | leave.  I'm assuming that presented reference to the toy |
| 10:23 | 17 | mark, yes. |
| 10:23 | 18 | Q.   In Mexico? |
| 10:23 | 19 | A.   Yes. |
| 10:23 | 20 | Q.   And if you would look, please, at, um –– you knew, in |
| 10:23 | 21 | fact, that they intended to present information concerning |
| 10:23 | 22 | the retail toy business in Mexico, correct? |
| 10:24 | 23 | A.   I don't remember.  I remember that there was going to |
| 10:24 | 24 | be a presentation. |
| 10:24 | 25 | THE COURT:  Now, is this the appropriate time to |

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

78

| | | |
|---|---|---|
| 10:24 | 1 | read this instruction requested by Mr. Machado? |
| 10:24 | 2 | MR. QUINN:  I think it's something we need to |
| 10:24 | 3 | discuss, Your Honor. |
| 10:24 | 4 | THE COURT:  All right.  Tell me when we get to |
| 10:24 | 5 | that point.  We may need to excuse the jury for a few |
| 10:24 | 6 | moments. |
| 10:24 | 7 | BY MR. QUINN: |
| 10:24 | 8 | Q.   If you could take a look, please, Ms. Kuemmerle, at |
| 10:24 | 9 | Exhibit 22408. |
| 10:24 | 10 | *(Document provided to the witness.)* |
| 10:24 | 11 | MR. QUINN:  I'm not sure this is in evidence. |
| 10:25 | 12 | It is in evidence. |
| 10:25 | 13 | *(Document displayed.)* |
| 10:25 | 14 | BY MR. QUINN: |
| 10:25 | 15 | Q.   And this is some e-mails between you and Mr. Larian, |
| 10:25 | 16 | correct? |
| 10:25 | 17 | A.   Yes. |
| 10:25 | 18 | Q.   And what you write –– this is an e-mail that you write |
| 10:25 | 19 | before the meeting at the W Hotel, that you write to |
| 10:25 | 20 | Mr. Larian, correct? |
| 10:25 | 21 | A.   Yes. |
| 10:25 | 22 | Q.   And what you write to Mr. Larian is that, "The people |
| 10:25 | 23 | in Mexico want to show us some retail points during the |
| 10:25 | 24 | weekend.  Is anybody interested in seeing this?" |
| 10:25 | 25 | Correct? |

| | | |
|---|---|---|
| 10:25 | 1 | A.   Yes. |
| 10:25 | 2 | Q.   And the people being referred to here were the Mattel |
| 10:25 | 3 | Mexico -- the Mattel Mexico employees, correct? |
| 10:25 | 4 | A.   It would be safe to assume, but -- yes. |
| 10:25 | 5 | Q.   And the retail points relate obviously to the retail |
| 10:25 | 6 | toy business in Mexico, correct? |
| 10:25 | 7 | A.   Yes. |
| 10:25 | 8 | Q.   And Mr. Larian's response, up at the top -- "Is anybody |
| 10:25 | 9 | interested in seeing this?"  His answer is "Yes," correct? |
| 10:25 | 10 | A.   Yes. |
| 10:26 | 11 | Q.   So if you'd take a look at Exhibit 6754 -- and I know |
| 10:26 | 12 | you've told us you didn't see the entire presentation, but |
| 10:26 | 13 | if you'd take a look at Exhibit 6754. |
| 10:26 | 14 | *(Document provided to witness.)* |
| 10:26 | 15 | *(Document displayed.)* |
| | 16 | BY MR. QUINN: |
| 10:26 | 17 | Q.   Does this appear to you to be a version of the |
| 10:26 | 18 | presentation that was made? |
| 10:26 | 19 | A.   Yes.  It seems to be, because I remember the country |
| 10:26 | 20 | and the states. |
| 10:26 | 21 | MR. QUINN:  We'd offer this, Your Honor. |
| 10:26 | 22 | THE COURT:  Received. |
| 10:26 | 23 | THE WITNESS:  Page No. 3. |
| 10:26 | 24 | THE COURT:  It's received. |
| 10:26 | 25 | *(Exhibit No. 6754 received in evidence.)* |

| 10:26 | 1 | BY MR. QUINN: |
|---|---|---|

10:26    1    BY MR. QUINN:

10:26    2    Q.    And at the time that -- this is a presentation that's

10:27    3    been made by Mattel Mexico employees, correct?

10:27    4    A.    By Gustavo, Pablo, Maria and I, yes.

10:27    5    Q.    Mattel Mexico employees, correct?

10:27    6    A.    Yes.

10:27    7    Q.    And at that time they're presenting this information to

10:27    8    Mr. Larian and Mr. Parks (sic), MGA did not yet at that time

10:27    9    have a subsidiary in Mexico, correct?

10:27   10    A.    No.  It was in the process of being opened.

10:27   11    Q.    And they were trying to identify people who would staff

10:27   12    that, correct?

10:27   13    A.    That's the reason we were at the W.

10:27   14    Q.    Because, in the past, MGA had been selling or

10:27   15    distributing its product in Mexico through Hasbro, correct?

10:27   16    A.    Yes.

10:27   17    Q.    So at the time, without a subsidiary there in Mexico,

10:27   18    MGA, at that time, did not have subscriptions to marking

10:27   19    information in Mexico like ANTAD, A-N-T-A-D, Nielsen or

10:28   20    Mindshare?

10:28   21    A.    I don't know.

10:28   22    Q.    Let's take this one at a time.  You know there was no

10:28   23    MGA Mexico subsidiary at the time of this presentation,

10:28   24    correct?

10:28   25    A.    Yes.

| | | |
|---|---|---|
| 10:28 | 1 | Q.    And you do know what Nielsen is? |
| 10:28 | 2 | A.    Yes. |
| 10:28 | 3 | Q.    What is Nielsen? |
| 10:28 | 4 | A.    I'm not an expert in marketing, but it's to read retail |
| 10:28 | 5 | trends. |
| 10:28 | 6 | Q.    Right.  So that's a subscription service that you pay |
| 10:28 | 7 | for that gets you information about retail trends, correct? |
| 10:28 | 8 | A.    Yes. |
| 10:28 | 9 | Q.    And you can pay for that and buy that information for |
| 10:28 | 10 | retail toy trends, correct? |
| 10:28 | 11 | A.    Yes. |
| 10:28 | 12 | Q.    And what's Mindshare? |
| 10:28 | 13 | A.    Um, I don't know.  Again, I'm not an expert in |
| 10:28 | 14 | marketing, but it's also to read trends.  So my |
| 10:28 | 15 | description -- |
| 10:28 | 16 | Q.    All right.  So Mindshare and ANTAD, A-N-T-A-D, those |
| 10:28 | 17 | are other things, subscription services, that you can pay |
| 10:28 | 18 | for to get information about toy trends in a market, |
| 10:29 | 19 | correct? |
| 10:29 | 20 | A.    I don't know about those two.  I know about Nielsen. |
| 10:29 | 21 | Q.    All right.  But you indicated you thought Mindshare |
| 10:29 | 22 | was -- was similar? |
| 10:29 | 23 | A.    It is my understanding, yes. |
| 10:29 | 24 | Q.    And is it your understanding that ANTAD is also |
| 10:29 | 25 | similar? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 82 of 160   Page ID #:304689
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

82

| | | |
|---|---|---|
| 10:29 | 1 | A.   Yes. |
| 10:29 | 2 | Q.   Now, at that point, since there was no MGA Mexico, you |
| 10:29 | 3 | certainly would not expect that -- you didn't know of any |
| 10:29 | 4 | MGA entity in Mexico that had paid for subscriptions to |
| 10:29 | 5 | these, uh, you know, marketing trends or sales trends |
| 10:29 | 6 | services, so far as you knew. |
| 10:29 | 7 |         MS. KELLER:  Objection.  Assumes facts not in |
| 10:29 | 8 | evidence. |
| 10:29 | 9 |         THE WITNESS:  I don't understand. |
| 10:29 | 10 |         THE COURT:  Just a moment. |
| 10:29 | 11 |         Overruled. |
| 10:29 | 12 |         THE WITNESS:  Can you say that again, please. |
| 10:29 | 13 | BY MR. QUINN: |
| 10:29 | 14 | Q.   Sure.  I mean, did you -- were you aware of the |
| 10:30 | 15 | existence of -- at that time, of any MGA entity/corporation |
| 10:30 | 16 | in Mexico that could have had a subscription or paid for a |
| 10:30 | 17 | subscription to one of those services in Mexico? |
| 10:30 | 18 | A.   I didn't know, no. |
| 10:30 | 19 | Q.   Did you think that these Mattel employees who made this |
| 10:30 | 20 | presentation -- Mr. Machado, Mr. Vargas, and Ms. Trueba -- |
| 10:30 | 21 | had their own personal -- as opposed to Mattel, their own |
| 10:30 | 22 | personal subscriptions that they had paid for, for these |
| 10:30 | 23 | services? |
| 10:30 | 24 | A.   I don't know. |
| 10:30 | 25 | Q.   Well, you would assume, wouldn't you, that if they |

| | | |
|---|---|---|
| 10:30 | 1 | presented information from one of these paid subscription |
| 10:30 | 2 | services, these Mattel employees -- you would assume that |
| 10:30 | 3 | this information must have come from a service that Mattel |
| 10:31 | 4 | paid for, correct? |
| 10:31 | 5 | MS. KELLER:  Objection.  Calls for speculation -- |
| 10:31 | 6 | THE COURT:  Overruled. |
| 10:31 | 7 | MR. COTE:  Also argumentative. |
| 10:31 | 8 | MS. KELLER:  -- and assumption. |
| 10:31 | 9 | THE COURT:  Overruled. |
| 10:31 | 10 | You can answer the question. |
| 10:31 | 11 | THE WITNESS:  I don't know.  I -- I only saw the |
| 10:31 | 12 | three pages and then I left.  I don't know what was |
| 10:31 | 13 | presented after that. |
| 10:31 | 14 | BY MR. QUINN: |
| 10:31 | 15 | Q.  Let me ask you this question:  Would it cause you to |
| 10:31 | 16 | question the honesty or integrity of these Mattel employees |
| 10:31 | 17 | if, at that time, they made a presentation using information |
| 10:31 | 18 | they had gotten from a subscription service that Mattel had |
| 10:31 | 19 | paid for in making this presentation to a competitor? |
| 10:31 | 20 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:31 | 21 | evidence. |
| 10:31 | 22 | THE COURT:  Sustained. |
| 10:31 | 23 | BY MR. QUINN: |
| 10:31 | 24 | Q.  Well, let's take a look in this -- in Exhibit 6754.  If |
| 10:32 | 25 | you could look at page dash 27. |

| | | |
|---|---|---|
| 10:32 | 1 | *(Document provided to the witness.)* |
| 10:32 | 2 | *(Document displayed.)* |
| | 3 | BY MR. QUINN: |
| 10:32 | 4 | Q.   And in the lower right, there's some sales growth data |
| 10:32 | 5 | there.  You see that? |
| 10:32 | 6 | A.   Yes. |
| 10:32 | 7 | Q.   And in the lower right, it says, "Source:  ANTAD, |
| 10:32 | 8 | Walmex included." |
| 10:32 | 9 | Do you know what Walmex is? |
| 10:32 | 10 | A.   Yes. |
| 10:32 | 11 | Q.   Walmart Mexico?  Just wild guess. |
| 10:32 | 12 | A.   Yes. |
| 10:32 | 13 | Q.   And it says "Source:  ANTAD."  Do you see that? |
| 10:32 | 14 | A.   Yes. |
| 10:32 | 15 | Q.   And then, if you'd look at page dash 40. |
| 10:32 | 16 | A.   40? |
| 10:32 | 17 | Q.   40.  Four, oh. |
| 10:32 | 18 | This is some information on what is called "toy |
| 10:33 | 19 | seasonality." |
| 10:33 | 20 | A.   Yes. |
| 10:33 | 21 | Q.   That is to say, I guess, toy sales at various points |
| 10:33 | 22 | during the year, correct? |
| 10:33 | 23 | A.   Yes. |
| 10:33 | 24 | Q.   And it says in the lower left, "Source:  Nielsen." |
| 10:33 | 25 | Do you see that? |

| | | |
|---|---|---|
| 10:33 | 1 | A.    Yes. |
| 10:33 | 2 | Q.    So let me go back to my question to you. |
| 10:33 | 3 |      Would it cause you to question the integrity of Mattel |
| 10:33 | 4 | employees who came and made a presentation to a competitor |
| 10:33 | 5 | using information derived from a service that their employer |
| 10:33 | 6 | had paid for? |
| 10:33 | 7 |         MS. KELLER:  Objection.  Calls for speculation and |
| 10:33 | 8 | irrelevant. |
| 10:33 | 9 |            MR. COTE:  Also argumentative. |
| 10:33 | 10 |            THE COURT:  Sustained. |
| 10:33 | 11 |            MR. COTE:  And lacks foundation. |
| 10:33 | 12 |            THE COURT:  Sustained. |
| 08:40 | 13 | BY MR. QUINN: |
| 10:33 | 14 | Q.    Well, let me ask it this way, then:  As far as you're |
| 10:34 | 15 | concerned, ma'am -- I mean, you were involved in getting |
| 10:34 | 16 | Mr. Larian and these employees together -- these Mattel |
| 10:34 | 17 | employees together, correct? |
| 10:34 | 18 | A.    The prospective candidates -- |
| 10:34 | 19 | Q.    Right. |
| 10:34 | 20 | A.    -- yes. |
| 10:34 | 21 | Q.    As far as you were concerned, would it be perfectly all |
| 10:34 | 22 | right for them to use information that Mattel had paid for |
| 10:34 | 23 | in making a presentation to a competitor? |
| 10:34 | 24 |         MS. KELLER:  Same objection, Your Honor. |
| 10:34 | 25 |            MR. COTE:  Join. |

| | | |
|---|---|---|
| 10:34 | 1 | THE COURT:  I don't see how her -- she's relevant |
| 10:34 | 2 | concerning their credibility.  I'm going to sustain the |
| 10:34 | 3 | objection. |
| 08:43 | 4 | BY MR. QUINN: |
| 10:34 | 5 | Q.   Well, after this -- after the presentation, Mr. Larian |
| 10:34 | 6 | and Mr. Park interviewed Mr. Machado, Mr. Vargas and |
| 10:34 | 7 | Ms. Trueba, correct? |
| 10:34 | 8 | A.   And several other candidates, yes. |
| 10:34 | 9 | Q.   And you were present during those interviews? |
| 10:34 | 10 | A.   No. |
| 10:34 | 11 | Q.   Some of the interviews? |
| 10:34 | 12 | A.   I was present with two -- I don't remember.  It's so |
| 10:35 | 13 | long ago -- two candidates for finance, a lady for |
| 10:35 | 14 | licensing, and then, in the beginning, introductory part of |
| 10:35 | 15 | the interview of Mariana, and then a little bit on the |
| 10:35 | 16 | beginning part of Gustavo. |
| 10:35 | 17 | Q.   All right.  So Mariana is? |
| 10:35 | 18 | A.   Ms. Trueba.  I am sorry. |
| 10:35 | 19 | Q.   Okay.  So you were there at least for part of the |
| 10:35 | 20 | interview of Ms. Trueba and at least part of the interview |
| 10:35 | 21 | of Mr. Machado? |
| 10:35 | 22 | A.   In the presentation. |
| 10:35 | 23 | Q.   Right. |
| 10:35 | 24 | A.   And then I had to leave. |
| 10:35 | 25 | Q.   And then after that meeting -- after these meetings |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 87 of 160   Page ID #:304694
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

87

| | | |
|---|---|---|
| 10:35 | 1 | were finished, your recommendation -- what you told |
| 10:35 | 2 | Mr. Larian was that he should hire Mr. Machado, Ms. Trueba, |
| 10:35 | 3 | and Mr. Vargas, correct? |
| 10:35 | 4 | A.   I don't know if that's what I said.  I don't recall. |
| 10:35 | 5 | Q.   Let's take a look at Exhibit 22489. |
| 10:36 | 6 | *(Document provided to the witness.)* |
| 08:46 | 7 | BY MR. QUINN: |
| 10:36 | 8 | Q.   Exhibit 22489 is an e-mail from you to Mr. Larian. |
| 10:36 | 9 | A.   Yes. |
| 10:36 | 10 | MR. QUINN:  I'd offer that, Your Honor. |
| 10:36 | 11 | THE COURT:  Received, Counsel. |
| 10:36 | 12 | *(Exhibit No. 22489 received in evidence.)* |
| 10:36 | 13 | MR. QUINN:  If we could put the first part of your |
| 10:36 | 14 | e-mail from the first page up on the screen. |
| 10:36 | 15 | *(Document displayed.)* |
| 10:36 | 16 | BY MR. QUINN: |
| 10:36 | 17 | Q.   This is an e-mail that you write to Mr. Larian on |
| 10:37 | 18 | March 17, 2004. |
| 10:37 | 19 | That is after the meeting and presentation at the |
| 10:37 | 20 | W Hotel, correct? |
| 10:37 | 21 | A.   Yes, I think so. |
| 10:37 | 22 | Q.   And what you say is, |
| 10:37 | 23 | "Hi, I hope everything is going okay.  You sound very |
| 10:37 | 24 | worried.  I've been thinking about the entire Mexico thing |
| 10:37 | 25 | and these are my thoughts: |

| | | |
|---|---|---|
| 10:37 | 1 | "You told me you think the salaries they requested are |
| 10:37 | 2 | too high.  Like I said on the phone, I feel that if they are |
| 10:37 | 3 | going to jump to your camp," parentheses, "a camp that is |
| 10:37 | 4 | empty right now," closed paren, "they have to feel that they |
| 10:37 | 5 | are not losing too much.  They have to know that the |
| 10:37 | 6 | commitment is mutual.  You know that they are extremely |
| 10:37 | 7 | capable and are very excited and ready to do this.  And |
| 10:37 | 8 | moreover, because they are professionals, they will not let |
| 10:37 | 9 | you down.  So I feel that, if we give them some of the |
| 10:37 | 10 | things they want, and the rest, the big" -- dollar sign -- |
| 10:38 | 11 | "rest as part of a very hefty performance bonus at the end |
| 10:38 | 12 | of the year, they will jump in a minute. |
| 10:38 | 13 | "You saw the excitement they have.  They are young and |
| 10:38 | 14 | ready to go get the market for you.  I work listening very |
| 10:38 | 15 | closely to my gut, and it tells me this is exactly the way |
| 10:38 | 16 | to go.  If we go around in circles, nothing will get done |
| 10:38 | 17 | and the fizzle of this champagne will disappear." |
| 10:38 | 18 | And then on the -- if we could turn to the second page. |
| 10:38 | 19 | *(Document displayed.)* |
| 07:59 | 20 | BY MR. QUINN: |
| 10:38 | 21 | Q.   In the third paragraph you write, "Gustavo, Mariana, |
| 10:38 | 22 | and Pablo" -- those are the three Mattel employees we've |
| 10:38 | 23 | been discussing, right? |
| 10:38 | 24 | A.   Yes. |
| 10:38 | 25 | Q.   "-- are ready to look at the line.  If we have to take |

| | | |
|---|---|---|
| 10:38 | 1 | the line to Walmart Canada, I understand." |
| 10:38 | 2 | What's "the line" refer to there? |
| 10:38 | 3 | A.    The toy line. |
| 10:38 | 4 | Q.    Okay.  At this point, they're still employed by Mattel |
| 10:39 | 5 | Mexico, correct? |
| 10:39 | 6 | A.    Yes. |
| 10:39 | 7 | Q.    I mean, they haven't even received job offers yet, |
| 10:39 | 8 | correct? -- as of this point. |
| 10:39 | 9 | A.    I believe they already started talking with Mr. Larian, |
| 10:39 | 10 | but I -- yes. |
| 10:39 | 11 | Q.    My statement is correct? |
| 10:39 | 12 | A.    Yes. |
| 10:39 | 13 | Q.    "They're ready to go look at the line.  If we have to |
| 10:39 | 14 | take the line to Walmart Canada, I understand.  We need to |
| 10:39 | 15 | give them the package, have them accept, and then set the |
| 10:39 | 16 | date for the line presentation.  In the middle of all this, |
| 10:39 | 17 | you have holy week.  Latins go out for the entire week, so |
| 10:39 | 18 | here is most wasted time." |
| 10:39 | 19 | And Mr. Larian responds at the top. |
| 10:39 | 20 | *(Document displayed.)* |
| 10:39 | 21 | THE WITNESS:  You want me to read it?  I'm sorry. |
| 10:39 | 22 | BY MR. QUINN: |
| 10:39 | 23 | Q.    I can read it. |
| 10:39 | 24 | A.    "I think the same way.  We will send offers tomorrow." |
| 10:39 | 25 | Q.    Right.  So does this refresh your recollection, then, |

| | | |
|---|---|---|
| 10:39 | 1 | that, in fact, after the meeting and presentation in -- at |
| 10:40 | 2 | the W Hotel in Mexico, you know, you were urging Mr. Larian, |
| 10:40 | 3 | that:  You ought to get going.  These people are ready -- |
| 10:40 | 4 | all ready to start looking at the toy line and getting |
| 10:40 | 5 | involved in this Walmart Canada thing.  These are the |
| 10:40 | 6 | people.  These Mattel employees are the ones you should |
| 10:40 | 7 | hire. |
| 10:40 | 8 | That's what you were recommending? |
| 10:40 | 9 | MS. KELLER:  Could we correct that, "Mattel |
| 10:40 | 10 | Servicios employees," Counsel? |
| 10:40 | 11 | MR. QUINN:  Mattel Mexico. |
| 10:40 | 12 | MR. COTE:  Same objection. |
| 10:40 | 13 | THE COURT:  Overruled. |
| 10:40 | 14 | THE WITNESS:  Can you say that again, please? |
| 10:40 | 15 | BY MR. QUINN: |
| 10:40 | 16 | Q.   Does this refresh your recollection that these Mattel |
| 10:40 | 17 | Mexico employees you were urging Mr. Larian to hire, you |
| 10:40 | 18 | thought they were the right people? |
| 10:40 | 19 | A.   I thought they were the right people for -- |
| 10:40 | 20 | Q.   And you made that recommendation to him? |
| 10:40 | 21 | A.   He and I agreed on it. |
| 10:40 | 22 | Q.   And he said, "I think the same way.  I will send offers |
| 10:40 | 23 | tomorrow," right? |
| 10:40 | 24 | A.   That's the answer, yes. |
| 10:40 | 25 | Q.   And indeed, after that, Mr. Larian did hire |

| | | |
|---|---|---|
| 10:41 | 1 | Mr. Machado, Ms. (sic) Vargas, and Ms. Trueba, correct? |
| 10:41 | 2 | That did happen? |
| 10:41 | 3 | A.    That did happen. |
| 10:41 | 4 | Q.    But in the meantime, there were some communications, |
| 10:41 | 5 | some e-mail communications going back and forth relating to |
| 10:41 | 6 | the terms on which they would be hired, right? |
| 10:41 | 7 | A.    It is my understanding. |
| 10:41 | 8 | Q.    And while they were being recruited -- or while these |
| 10:41 | 9 | discussions were going on between MGA and these individuals |
| 10:41 | 10 | about starting MGA Mexico, they communicated with you and |
| 10:41 | 11 | Mr. Larian with an e-mail address, which was plot04@aol.com, |
| 10:41 | 12 | correct? |
| 10:41 | 13 | A.    That's the e-mail address, yes. |
| 10:41 | 14 | Q.    And if you would look at Exhibit 3609 -- by the way, do |
| 10:41 | 15 | you know who chose this address:  Plot04? |
| 10:41 | 16 | A.    No. |
| 10:41 | 17 | Q.    Wasn't you? |
| 10:42 | 18 | A.    I had Argentrade. |
| 10:42 | 19 | Q.    Okay.  Well, you told Mr. Larian that this plot04@yahoo |
| 10:42 | 20 | was the e-mail address that he should use to communicate |
| 10:42 | 21 | with these employees, correct? |
| 10:42 | 22 | THE COURT:  Did you say before "plot04@aol.com"? |
| 10:42 | 23 | MR. QUINN:  Let me clarify. |
| 10:42 | 24 | THE COURT:  And now it's "plot04@yahoo"? |
| 10:42 | 25 | MR. QUINN:  Let me clarify that. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 92 of 160   Page ID #:304699
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

92

| | | |
|--|--|--|
| 12:59 | 1 | BY MR. QUINN: |
| 10:42 | 2 | Q.   There are actually two e-mails addresses:   One |
| 10:42 | 3 | "plot04@aol" and one "plot04@yahoo," correct? |
| 10:42 | 4 | A.   Yes.  Here, yes. |
| 10:42 | 5 | Q.   And you're the one that told Mr. Larian, "Look, these |
| 10:42 | 6 | Mattel employees -- this is the e-mail address you outta use |
| 10:42 | 7 | to communicate with them," right? |
| 10:42 | 8 | A.   Where is the? -- yes. |
| 10:43 | 9 | MR. QUINN:  Is this in evidence, Exhibit 3609? |
| 10:43 | 10 | MATTEL TECHNICIAN:  It is, yes. |
| 10:43 | 11 | MR. QUINN:  Okay.  If we look at the last e-mail |
| 10:43 | 12 | in the string. |
| 10:43 | 13 | *(Document displayed.)* |
| 09:00 | 14 | BY MR. QUINN: |
| 10:43 | 15 | Q.   You write "Hi, Isaac.  This is the e-mail address that |
| 10:43 | 16 | Pablo, Mariana and Gustavo have access to.  Let me know if |
| 10:43 | 17 | you need me to do anything else." |
| 10:43 | 18 | Correct? |
| 10:43 | 19 | A.   "Let me know if you need anything else." |
| 10:43 | 20 | Q.   Okay. |
| 10:43 | 21 | A.   Yes. |
| 10:43 | 22 | Q.   And then, if we go to the second page -- if we go to |
| 10:43 | 23 | the first page of the exhibit, the e-mail at the bottom, |
| 10:43 | 24 | it's from a Carlos Fuentes at plot04@yahoo.com. |
| 10:43 | 25 | Do you see that? |

| | | |
|---|---|---|
| 10:43 | 1 | A.   Yes. |
| 10:43 | 2 | Q.   And that's to Mr. Larian, right? |
| 10:43 | 3 | A.   Yes. |
| 10:43 | 4 | Q.   And "Carlos Fuentes," that's a fake name? |
| 10:44 | 5 | A.   I don't know. |
| 10:44 | 6 | Q.   Well, you know that there wasn't a Carlos Fuentes that |
| 10:44 | 7 | was being recruited here? |
| 10:44 | 8 | A.   I don't know. |
| 10:44 | 9 | Q.   Isn't that Gustavo Machado who's using the name "Carlos |
| 10:44 | 10 | Fuentes"? |
| 10:44 | 11 | A.   Could be, yes.  I don't know. |
| 10:44 | 12 | MR. OVERLAND:  Objection.  Move to strike. |
| 10:44 | 13 | Speculation. |
| 10:44 | 14 | THE COURT:  Overruled. |
| 10:44 | 15 | BY MR. QUINN: |
| 10:44 | 16 | A.   Well, let's see. |
| 10:44 | 17 | It says, "Dear Isaac, |
| 10:44 | 18 | Don't worry.  We understand your mind is with your dad |
| 10:44 | 19 | now.  Please receive our best wishes for his prompt |
| 10:44 | 20 | recovery.  We look forward to hear from you on Thursday. |
| 10:44 | 21 | "Best personal regards, |
| 10:44 | 22 | "Gustavo, Mariana, Mary Carmen, and Pablo." |
| 10:44 | 23 | Who's Mary Carmen? |
| 10:44 | 24 | A.   Mary Carmen Mendez was a lady that was hired to do |
| 10:44 | 25 | recruiting and to look for officers. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 94 of 160   Page ID #:304701
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

94

| | | |
|---|---|---|
| 10:44 | 1 | Q.   So she was like a recruiter, an independent recruiter? |
| 10:45 | 2 | A.   Yes. |
| 10:45 | 3 | Q.   She's not somebody who worked for Mattel? |
| 10:45 | 4 | A.   No. |
| 10:45 | 5 | Q.   And they write a PS here: |
| 10:45 | 6 | "We are very excited too," exclamation mark, "and ready |
| 10:45 | 7 | for war," three exclamation marks. |
| 10:45 | 8 | "We are ready to travel on March 25 at night.  Please |
| 10:45 | 9 | confirm if this date is okay with you." |
| 10:45 | 10 | Correct? |
| 10:45 | 11 | A.   Yes. |
| 10:45 | 12 | Q.   And what they're talking about is already going up to |
| 10:45 | 13 | Walmart -- I mean, at this point, they haven't started work |
| 10:45 | 14 | yet, correct? |
| 10:45 | 15 | A.   No. |
| 10:45 | 16 | Q.   They haven't -- at this point, they haven't even signed |
| 10:45 | 17 | contracts yet, correct? |
| 10:45 | 18 | A.   I don't believe so. |
| 10:45 | 19 | Q.   Right.  But they're already starting about going up to |
| 10:45 | 20 | Walmart Canada for MGA, correct? |
| 10:45 | 21 | A.   Not Walmart Canada, no. |
| 10:45 | 22 | Q.   All right.  Where were they -- in your understanding, |
| 10:45 | 23 | what does this refer to -- about this trip? |
| 10:45 | 24 | A.   To review the line in our offices here in California. |
| 10:45 | 25 | Q.   Okay.  And that's before the line went to -- was shown |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 95 of 160   Page ID #:304702
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

95

| | | |
|---|---|---|
| 10:46 | 1 | in Walmart Canada? |
| 10:46 | 2 | A.   I do not know if that was before or after.  Don't |
| 10:46 | 3 | recall. |
| 10:46 | 4 | Q.   And then, if we could look at Exhibit 3617, which is in |
| 10:46 | 5 | evidence. |
| 10:46 | 6 | *(Document displayed.)* |
| 09:02 | 7 | BY MR. QUINN: |
| 10:46 | 8 | Q.   This is, um -- e-mails between you and Mr. Larian? |
| 10:46 | 9 | A.   Yes. |
| 10:46 | 10 | MR. QUINN:  And if we could enlarge the middle |
| 10:46 | 11 | e-mail there from -- |
| 10:46 | 12 | *(Technician complies.)* |
| 10:46 | 13 | BY MR. QUINN: |
| 10:46 | 14 | Q.   From you, Argentrade@aol, to Mr. Larian. |
| 10:47 | 15 | It says, "Just arrived" -- this is dated April 14th -- |
| 10:47 | 16 | "Just arrived from South America and talked with Gustavo |
| 10:47 | 17 | Machado.  As of today, they have not received the contracts. |
| 10:47 | 18 | Gustavo talked with the Mexican lawyers, and he was told |
| 10:47 | 19 | that they do not have a power of attorney to handle these |
| 10:47 | 20 | contracts. |
| 10:47 | 21 | "Gustavo, Mariana and Pablo want to resign," |
| 10:47 | 22 | parentheses, "all at the same time, and you can't believe my |
| 10:47 | 23 | smile," exclamation mark, closed paren, "next Wednesday, but |
| 10:47 | 24 | without a contract signed, they will not be able to." |
| 10:47 | 25 | Do you see that? |

| | | |
|---|---|---|
| 10:47 | 1 | A.    Yes. |
| 10:47 | 2 | Q.    And then Mr. Larian responds, "Tom told me" -- that's |
| 10:47 | 3 | presumably Tom Parks *(sic)*? |
| 10:47 | 4 | A.    That's on the e-mail, yes. |
| 10:47 | 5 | Q.    "Tom told me contract is done. |
| 10:47 | 6 | "Tom, please follow up." |
| 10:47 | 7 | Right? |
| 10:47 | 8 | A.    Yes. |
| 10:48 | 9 | Q.    And then if we could look at Exhibit 6774. |
| 10:48 | 10 | Is this an e-mail between you, Mr. Larian and the |
| 10:48 | 11 | plot04 folks? |
| 10:48 | 12 | A.    Yes. |
| 10:48 | 13 | MR. QUINN:  Offer this, Your Honor. |
| 10:48 | 14 | THE COURT:  Received. |
| 10:48 | 15 | *(Exhibit No. 6774 received in evidence.)* |
| 10:48 | 16 | MR. QUINN:  If we could blow that up. |
| 10:48 | 17 | *(Document displayed.)* |
| 09:00 | 18 | BY MR. QUINN: |
| 10:48 | 19 | Q.    Mr. Larian writes, "Gustavo" -- we're now at April 3 -- |
| 10:48 | 20 | oh, this is back, March 23, 2004. |
| 10:48 | 21 | "Gustavo, thanks. |
| 10:48 | 22 | "Congratulations to Mariana.  She better stop smoking. |
| 10:48 | 23 | The package, we offered to give all of you the same or |
| 10:48 | 24 | more" -- money -- "than what you asked for.  It just has a |
| 10:49 | 25 | performance clause, bonuses based performance.  That's a |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 97 of 160   Page ID #:304704
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

97

| | | |
|---|---|---|
| 10:49 | 1 | company policy.  We do not give anyone signing bonus. |
| 10:49 | 2 | "Tom is traveling to Canada and be back Thursday and |
| 10:49 | 3 | will explain the offer." |
| 10:49 | 4 | Do you have a recollection that Mr. Larian was actually |
| 10:49 | 5 | willing to offer these Mattel employees even more money than |
| 10:49 | 6 | what they asked for? |
| 10:49 | 7 | MS. KELLER:  Misstates the e-mail, Your Honor.  It |
| 10:49 | 8 | says, "the same or more." |
| 10:49 | 9 | THE COURT:  Overruled.  Well, you're technically |
| 10:49 | 10 | right, Counsel. |
| 10:49 | 11 | "All of you the same or more." |
| 10:49 | 12 | MR. QUINN:  I'm asking for her recollection. |
| 10:49 | 13 | THE WITNESS:  I was not -- I don't have a |
| 10:49 | 14 | recollection one way or the other.  That was handled between |
| 10:49 | 15 | Mr. Larian and Mr. Machado, Mr. Vargas and Ms. Trueba. |
| 09:04 | 16 | BY MR. QUINN: |
| 10:49 | 17 | Q.  All right.  I mean, do you have an understanding that |
| 10:49 | 18 | they did, in fact, get significant raises when they went to |
| 10:49 | 19 | MGA over what they had been making at Mattel? |
| 10:49 | 20 | MR. COTE:  Objection.  Vague. |
| 10:50 | 21 | THE WITNESS:  At a later date -- |
| 10:50 | 22 | THE COURT:  Overruled. |
| 10:50 | 23 | THE WITNESS:  -- much later. |
| 10:50 | 24 | BY MR. QUINN: |
| 10:50 | 25 | Q.  But in terms of their -- in total starting salary, the |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

98

| | | |
|---|---|---|
| 10:50 | 1 | package, was it your understanding that it was more than |
| 10:50 | 2 | what they were making at Mattel Mexico? |
| 10:50 | 3 | A.   I assume that when you change jobs it's for a better |
| 10:50 | 4 | salary. |
| 10:50 | 5 | Q.   Right. |
| 10:50 | 6 | A.   And I learned the terms when I was hired as the |
| 10:50 | 7 | director of the office -- de Mexico office. |
| 10:50 | 8 | Q.   If you would look at Exhibit 6770.  Is this an e-mail |
| 10:51 | 9 | string on which you were copied, including Mr. Larian, the |
| 10:51 | 10 | plot04 people, and Tom Park? |
| 10:51 | 11 | A.   On the bottom part, the other e-mails, I am not copied. |
| 10:51 | 12 | Q.   And the other e-mails are all redacted out.  They're |
| 10:51 | 13 | blank, right? |
| 10:51 | 14 | A.   Yes. |
| 10:51 | 15 | MR. QUINN:  All right.  So we'd offer |
| 10:51 | 16 | Exhibit 6770, Your Honor. |
| 10:51 | 17 | THE COURT:  Received. |
| 10:51 | 18 | *(Exhibit No. 6770 received in evidence.)* |
| 10:51 | 19 | *(Document displayed.)* |
| 10:51 | 20 | MR. QUINN:  If we can enlarge the e-mail at the |
| 10:51 | 21 | bottom. |
| 10:51 | 22 | *(Technician complies.)* |
| 08:35 | 23 | BY MR. QUINN: |
| 10:51 | 24 | Q.   This is from Ms. Mendez.  She's the person you |
| 10:51 | 25 | identified as the local recruiter down there who was helping |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:51 | 1 | recruit these folks? |
| 10:51 | 2 | A.   Yes. |
| 10:51 | 3 | Q.   It says, "Sorry for the delay, but I really went deep |
| 10:51 | 4 | in my files to find my contract.  The document attached is |
| 10:51 | 5 | in Spanish, and it is the original contract used for my |
| 10:51 | 6 | hiring in Mattel.  Please let me know if you need |
| 10:51 | 7 | translation." |
| 10:51 | 8 | Do you see that? |
| 10:51 | 9 | A.   Yes. |
| 10:51 | 10 | Q.   So what's happening here is Ms. Mendez, who apparently |
| 10:52 | 11 | worked at one point for Mattel, is actually sending |
| 10:52 | 12 | Mr. Larian her form of a contract that she had with Mattel, |
| 10:52 | 13 | correct? |
| 10:52 | 14 | A.   It's what the e-mail says. |
| 10:52 | 15 | Q.   And we have that contract.  She says she attaches it. |
| 10:52 | 16 | And we find that over on Exhibit 21243.  If you would take a |
| 10:52 | 17 | look at that, please. |
| 10:52 | 18 | *(Document provided to the witness.)* |
| 10:52 | 19 | BY MR. QUINN: |
| 10:52 | 20 | Q.   And you can see that the -- this has an MGA Bates |
| 10:53 | 21 | number.  You see, down at the bottom, there's one of these |
| 10:53 | 22 | numbers, "MGA," and there's a number there. |
| 10:53 | 23 | Do you see that? |
| 10:53 | 24 | A.   Yes. |
| 10:53 | 25 | Q.   And if you actually look back, you can see that -- that |

| | | |
|---|---|---|
| 10:53 | 1 | Bates No. "56" there.  Do you see it ends in a "56"? |
| 10:53 | 2 | A.   Yes. |
| 10:53 | 3 | Q.   That's actually consecutive, right after the e-mail we |
| 10:53 | 4 | just looked at from Ms. Mendez, which ends with "55." |
| 10:53 | 5 | Do you see that? |
| 10:53 | 6 | MS. KELLER:  Your Honor, there's no foundation for |
| 10:53 | 7 | this witness to know any of these issues. |
| 10:53 | 8 | THE COURT:  Overruled. |
| 10:53 | 9 | THE WITNESS:  Yes. |
| 10:53 | 10 | BY MR. QUINN: |
| 10:53 | 11 | Q.   All right.  So she says she's sending her contract. |
| 10:53 | 12 | And we've got a contract here with an MGA Bates number on |
| 10:53 | 13 | it, which is Bates number stamped -- you know, immediately |
| 10:53 | 14 | consecutively, from 55 to 56, correct? |
| 10:53 | 15 | A.   Yes. |
| 10:53 | 16 | Q.   And then, if we look at the top of the contract, we see |
| 10:53 | 17 | that, in fact, it is a contract with Carmen Mendez, correct? |
| 10:53 | 18 | A.   It's in Spanish. |
| 10:53 | 19 | Q.   Yes.  And, fortunately for some of us, we have at the |
| 10:54 | 20 | back a certified translation. |
| 10:54 | 21 | If you would turn over to -- turn back to page dash 4. |
| 10:54 | 22 | You see there's an English translation.  And at dash 7, |
| 10:54 | 23 | there's a certificate of accuracy for the translation. |
| 10:54 | 24 | Do you see that? |
| 10:54 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:54 | 1 | MR. QUINN:  Your Honor, we would offer |
| 10:54 | 2 | Exhibit 21243, the Mendez contract in Spanish, with the |
| 10:54 | 3 | English -- certified English translation annexed. |
| 10:54 | 4 | THE COURT:  Received. |
| 10:54 | 5 | *(Exhibit No. 21243 received in evidence.)* |
| 10:54 | 6 | *(Document displayed.)* |
| 10:54 | 7 | BY MR. QUINN: |
| 10:54 | 8 | Q.   So Ms. Mendez sent Mr. Larian the form of Mattel |
| 10:54 | 9 | contract so he would know the nature of the obligations that |
| 10:54 | 10 | Mattel employees had to their employer, correct? |
| 10:54 | 11 | MR. COTE:  Objection.  Calls for speculation as a |
| 10:54 | 12 | state of mind. |
| 10:55 | 13 | THE COURT:  Overruled. |
| 10:55 | 14 | THE WITNESS:  I guess.  I don't know.  She sent |
| 10:55 | 15 | it. |
| 10:55 | 16 | BY MR. QUINN: |
| 10:55 | 17 | Q.   All right.  But in any event, the contract -- the |
| 10:55 | 18 | contract does provide -- it does specify certain obligations |
| 10:55 | 19 | of Mattel employees, correct? |
| 10:55 | 20 | MS. KELLER:  Could we correct the record that this |
| 10:55 | 21 | is Mattel Servicios. |
| 10:55 | 22 | THE COURT:  Well, that's a matter of proof.  We've |
| 10:55 | 23 | been discussing that during the evening. |
| 10:55 | 24 | MS. KELLER:  It's in the contract, Your Honor. |
| 10:55 | 25 | It's on the contract. |

| | | |
|---|---|---|
| 10:55 | 1 | MR. COTE:  First sentence of the contract, |
| 10:55 | 2 | Your Honor. |
| 10:55 | 3 | THE COURT:  That's cross-examination. |
| 10:55 | 4 | In other words, we know -- all of us know about |
| 10:55 | 5 | our private discussions.  That's still a matter of proof. |
| 10:55 | 6 | So, overruled. |
| 10:55 | 7 | BY MR. QUINN: |
| 10:55 | 8 | Q.   So if you look, please, at -- in Exhibit 21243, page |
| 10:55 | 9 | dash 5, in the English translation, to the paragraphs |
| 10:55 | 10 | "Tenth" and "Eleventh." |
| 10:55 | 11 | MR. QUINN:  Ken, if we could put those up on the |
| 10:56 | 12 | screen. |
| 10:56 | 13 | *(Document displayed.)* |
| 10:56 | 14 | BY MR. QUINN: |
| 10:56 | 15 | Q.   This Mattel contract, which was sent to Mr. Larian, |
| 10:56 | 16 | says: |
| 10:56 | 17 | "TENTH:  The employee acknowledges that all documents |
| 10:56 | 18 | and information received as part of the work relationship |
| 10:56 | 19 | are the exclusive property of the employer, including what |
| 10:56 | 20 | the employer *(sic)* prepares or elaborates in relation to |
| 10:56 | 21 | services rendered, and is therefore obligated to keep them |
| 10:56 | 22 | in good state and deliver them to the employer when required |
| 10:56 | 23 | or when this contract is terminated for whatever reason." |
| 10:56 | 24 | Then Paragraph "ELEVENTH:  The employee shall not |
| 10:56 | 25 | disclose any of the business aspects of the employer, and |

| | | |
|---|---|---|
| 10:56 | 1 | shall not provide third parties, orally or in writing, any |
| 10:56 | 2 | direct or indirect information whatsoever regarding any |
| 10:56 | 3 | systems or activities observed during fulfillment of duties |
| 10:56 | 4 | with the employer, or regarding the relationship of the |
| 10:57 | 5 | latter with other companies or with clients." |
| 10:57 | 6 | Correct? |
| 10:57 | 7 | A.   Yes. |
| 10:57 | 8 | Q.   So as of the date of this e-mail, Exhibit 6770, from |
| 10:57 | 9 | Ms. Mendez to Mr. Larian, transmitting this contract, |
| 10:57 | 10 | Mr. Larian and MGA knew that Mattel Mexico employees were |
| 10:57 | 11 | subject to certain confidentiality obligations, correct? |
| 10:57 | 12 | MS. KELLER:  Objection. |
| 10:57 | 13 | MR. COTE:  Objection. |
| 10:57 | 14 | MS. KELLER:  Calls for speculation, Your Honor. |
| 10:57 | 15 | MR. COTE:  Almost misstates the evidence. |
| 10:57 | 16 | Misstates the document. |
| 10:57 | 17 | MS. KELLER:  And no foundation for this witness to |
| 10:57 | 18 | speculate about Mr. Larian's state of mind. |
| 10:57 | 19 | THE COURT:  She's designated as a 30(b)(6); is |
| 10:57 | 20 | that correct? |
| 10:57 | 21 | Overruled. |
| 10:57 | 22 | You can answer the question. |
| 10:57 | 23 | MR. OVERLAND:  Your Honor, this would be the point |
| 10:57 | 24 | to instruct with respect to Mr. Machado. |
| 10:57 | 25 | THE COURT:  All right.  That's what I was waiting |

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

104

| 10:57 | 1 | for.  Thank you.  Now -- |
| 10:57 | 2 | MR. QUINN:  My issue with that is she's also a |
| 10:57 | 3 | percipient witness as to Mr. Machado. |
| 10:58 | 4 | THE COURT:  Well, she is.  But this is asking her |
| 10:58 | 5 | opinion. |
| 10:58 | 6 | MR. QUINN:  Right. |
| 10:58 | 7 | THE COURT:  In other words, she can testify about |
| 10:58 | 8 | all of her percipient witnessing events:  I saw, I heard, I |
| 10:58 | 9 | was there, but -- |
| 10:58 | 10 | MR. QUINN:  Tasted. |
| 10:58 | 11 | THE COURT:  (To the jury:)  This is very |
| 10:58 | 12 | technical, very complicated.  I have an outstanding jury, so |
| 10:58 | 13 | you'll understand it. |
| 10:58 | 14 | Ms. Kuemmerle was MGA Mexico's corporate |
| 10:58 | 15 | designee -- you've commonly heard that referred to as a |
| 10:58 | 16 | 30(b)(6) witness -- on certain topics.  And her testimony |
| 10:58 | 17 | is, therefore, binding upon MGA de Mexico on those topics. |
| 10:58 | 18 | However, she does not represent MGA, or MGA |
| 10:58 | 19 | Hong Kong, or Mr. Larian, or Mr. Machado, who are also |
| 10:58 | 20 | defendants to Mattel's claims, when she's testifying as this |
| 10:58 | 21 | 30(b)(6) designated witness. |
| 10:58 | 22 | Now, I want to disregard her testimony as to those |
| 10:58 | 23 | other defendants when she's testifying as a 30(b)(6) |
| 10:59 | 24 | witness.  And it's up to counsel to designate that and tell |
| 10:59 | 25 | us clearly.  But you can accept her testimony in all |

| 10:59 | 1 | particulars when she's a percipient witness, when she's |
|---|---|---|
| 10:59 | 2 | there, she hears, she sees, or she discusses something with |
| 10:59 | 3 | another witness in this matter. |
| 10:59 | 4 | Now, Counsel, is that sufficient? |
| 10:59 | 5 | Well, I know each of would you like more, but |
| 10:59 | 6 | let's turn to Mattel. |
| 10:59 | 7 | MR. QUINN:  Sufficient, Your Honor. |
| 10:59 | 8 | MS. KELLER:  With the reservation of our prior |
| 10:59 | 9 | objection, Your Honor, yes. |
| 10:59 | 10 | THE COURT:  All right. |
| 10:59 | 11 | Mr. Overland? |
| 10:59 | 12 | MR. OVERLAND:  Yes, Your Honor.  And I take it, by |
| 10:59 | 13 | that, it's up to us to make a 30(b)(6) objection? |
| 10:59 | 14 | THE COURT:  Exactly.  Because it's going to cause |
| 10:59 | 15 | confusion in the jury's mind.  And that's what I warned all |
| 10:59 | 16 | of you about a week ago, and last evening; and that is, I'm |
| 10:59 | 17 | going to read this limiting instruction, but I don't think |
| 10:59 | 18 | the jury should be confused.  They can consider evidence |
| 10:59 | 19 | when she's present, heard things, had a discussion, or has a |
| 11:00 | 20 | reasonable opinion herself. |
| 11:00 | 21 | But she's not a 30(b)(6) witness as to |
| 11:00 | 22 | Mr. Machado, Mr. Larian, or to Hong Kong, or MGA.  And I |
| 11:00 | 23 | read the first limiting instruction because I thought it was |
| 11:00 | 24 | better drafted than your second limiting instruction. |
| 11:00 | 25 | MR. OVERLAND:  Well, that's fine. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 106 of 160   Page ID #:304713
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

106

| | | |
|---|---|---|
| 11:00 | 1 | THE COURT:  Okay? |
| 11:00 | 2 | MR. OVERLAND:  That's fine. |
| 11:00 | 3 | THE COURT:  All right. |
| 11:00 | 4 | (To the jury:)  Now, we'll come back and remind |
| 11:00 | 5 | you of that at certain times.  But just remember, when |
| 11:00 | 6 | you're designated as a 30(b)(6) witness, you're supposed to |
| 11:00 | 7 | educate yourself and you're supposed to know a topic, |
| 11:00 | 8 | because you're speaking on behalf of that corporation, that |
| 11:00 | 9 | entity.  And you have a duty to educate yourself |
| 11:00 | 10 | appropriately. |
| 11:00 | 11 | By the same token, she was only designated as |
| 11:00 | 12 | 30(b)(6) witness for MGA Mexico. |
| 11:00 | 13 | But when she's present, she sends an e-mail, she |
| 11:00 | 14 | discusses things with other people, or she's in a position |
| 11:01 | 15 | to know, herself, as a witness, or to cast a reasonable |
| 11:01 | 16 | opinion, as that witness, then it applies to all the |
| 11:01 | 17 | parties. |
| 11:01 | 18 | Okay.  Counsel. |
| 11:01 | 19 | MR. QUINN:  Thank you, Your Honor. |
| 11:01 | 20 | BY MR. QUINN: |
| 11:01 | 21 | Q.   So you were copied on Exhibit 6770, the e-mail by which |
| 11:01 | 22 | Ms. Mendez transmitted to Mr. Larian a copy of her Mattel |
| 11:01 | 23 | employment agreement, right? |
| 11:01 | 24 | A.   Yes, I'm copied. |
| 11:01 | 25 | Q.   Right.  So, I mean, you know that you -- 'cause you |

| 11:01 | 1 | were copied, as well as Mr. Larian, as another recipient, |
|---|---|---|
| 11:01 | 2 | was on notice of the confidentiality obligations that Mattel |
| 11:01 | 3 | Mexico employees owe to their employer? |
| 11:01 | 4 | MS. KELLER: Objection. No foundation. |
| 11:01 | 5 | THE COURT: Overruled. |
| 11:01 | 6 | MR. COTE: Objection. Calls for a legal |
| 11:01 | 7 | conclusion. |
| 11:01 | 8 | THE COURT: Overruled. |
| 11:01 | 9 | MR. COTE: Misstates the document. |
| 11:01 | 10 | THE COURT: Overruled. |
| 11:01 | 11 | You can cast your opinion. |
| 11:01 | 12 | THE WITNESS: I received the e-mail. I don't |
| 11:01 | 13 | remember seeing -- receiving the contract. But it's here. |
| 11:02 | 14 | I don't know what I remember. |
| 11:02 | 15 | BY MR. QUINN: |
| 11:02 | 16 | Q. All right. I realize this is some time ago, and you |
| 11:02 | 17 | may just simply not remember -- |
| 11:02 | 18 | A. No, I don't. |
| 11:02 | 19 | Q. -- whether you read the attachment, or whether there |
| 11:02 | 20 | was an attachment, I guess, is what you're telling us, |
| 11:02 | 21 | correct? |
| 11:02 | 22 | A. I don't remember if the attachment was there. I don't |
| 11:02 | 23 | remember if I saw the attachment. I was working. I don't |
| 11:02 | 24 | remember. |
| 11:02 | 25 | Q. Right. But if you had read the attachment, you would |

| | | |
|---|---|---|
| 11:02 | 1 | know what obligations -- confidentiality obligations Mattel |
| 11:02 | 2 | employees owed to their employer? |
| 11:02 | 3 | A.   As I -- |
| 11:02 | 4 | MR. COTE:  Objection. |
| 11:02 | 5 | THE WITNESS:  -- read it here?  Yes. |
| 11:02 | 6 | MR. COTE:  Argumentative. |
| 11:02 | 7 | THE COURT:  Overruled. |
| 11:02 | 8 | Now, I'm not sure the jury heard the answer, |
| 11:02 | 9 | Counsel, because there was an objection, which is overruled. |
| 11:02 | 10 | So if you want to repeat the question.  It came right in the |
| 11:02 | 11 | middle, I'm not sure that the answer was clear. |
| 11:02 | 12 | MR. QUINN:  Okay. |
| 11:02 | 13 | BY MR. QUINN: |
| 11:02 | 14 | Q.   I realize you may not -- you don't remember whether the |
| 11:02 | 15 | attachment was there or whether you read the attachment, if |
| 11:03 | 16 | it was there; but had you read it, you would understand what |
| 11:03 | 17 | confidentiality obligations Mattel Mexico employees owed to |
| 11:03 | 18 | their employer, correct? |
| 11:03 | 19 | A.   As I read it here now, I understand. |
| 11:03 | 20 | Q.   Now, MGA Mexico was formed as a company in 2004? |
| 11:03 | 21 | A.   In 2004, yes. |
| 11:03 | 22 | Q.   And, uh, when they first started work, MGA Mexico |
| 11:03 | 23 | didn't actually -- when it first started, it didn't have any |
| 11:03 | 24 | offices in the beginning.  Do you recall that? |
| 11:03 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:03 | 1 | Q.   For the first few weeks, the employees worked out of |
| 11:03 | 2 | their homes? |
| 11:03 | 3 | A.   Yes. |
| 11:03 | 4 | Q.   And initially you continued to work out of your home |
| 11:03 | 5 | which was in New Jersey; is that right? |
| 11:03 | 6 | A.   Yes. |
| 11:03 | 7 | Q.   And sometime in May 2004, a temporary office for MGA |
| 11:03 | 8 | Mexico was opened, right? |
| 11:03 | 9 | A.   Around that time, yes. |
| 11:04 | 10 | Q.   And then maybe three or four months later, roughly, |
| 11:04 | 11 | approximately in 2004, MGA Mexico moved into a permanent |
| 11:04 | 12 | office.  Do you recall that? |
| 11:04 | 13 | A.   Around that time, yes. |
| 11:04 | 14 | Q.   And the week of April 26th, 2004, was the week that |
| 11:04 | 15 | Mr. Machado, Ms. Trueba and Mr. Vargas joined MGA, correct? |
| 11:04 | 16 | A.   No. |
| 11:04 | 17 | Q.   What's your recollection of the week they joined -- or |
| 11:04 | 18 | the time they joined? |
| 11:04 | 19 | A.   It is my recollection that they joined April 19th. |
| 11:04 | 20 | Q.   All right.  So a little bit earlier than what I said? |
| 11:04 | 21 | A.   Yes. |
| 11:04 | 22 | Q.   The week of April 26th, you attended meetings in |
| 11:04 | 23 | Los Angeles at the MGA offices? |
| 11:04 | 24 | A.   Yes. |
| 11:05 | 25 | Q.   Is it true that Mr. Machado, Mr. Vargas and Ms. Trueba |

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

110

| | | |
|---|---|---|
| 11:05 | 1 | were the first MGA Mexico employees? |
| 11:05 | 2 | A.   Yes. |
| 11:05 | 3 | Q.   And at the beginning they were the only MGA Mexico |
| 11:05 | 4 | employees, correct? |
| 11:05 | 5 | A.   At that time, yes. |
| 11:05 | 6 | Q.   And, actually, Mr. Machado's contract -- all their |
| 11:05 | 7 | contracts are dated April 26th; isn't that right? |
| 11:05 | 8 | A.   I don't know. |
| 11:05 | 9 | Q.   If you could take a look at Exhibit 6793. |
| 11:05 | 10 | *(Document provided to the witness.)* |
| 11:05 | 11 | MR. QUINN:  Is this in evidence? |
| 11:05 | 12 | It's in evidence. |
| 11:05 | 13 | *(Document displayed.)* |
| | 14 | BY MR. QUINN: |
| 11:05 | 15 | Q.   Is this Mr. Machado's contract? |
| 11:05 | 16 | A.   Yes. |
| 11:05 | 17 | Q.   And do you see the date of the contract? |
| 11:06 | 18 | A.   Where is the date? |
| 11:06 | 19 | Q.   We have -- so we have an English translation here |
| 11:06 | 20 | that's included in this exhibit.  The English translation |
| 11:06 | 21 | begins at, you'll see, at dash 11. |
| 11:06 | 22 | Do you see that? |
| 11:06 | 23 | A.   Yes. |
| 11:06 | 24 | Q.   And there's a Certification of Accuracy of the |
| 11:06 | 25 | Translation at dash 21.  Do you see that? |

| | | |
|---|---|---|
| 11:06 | 1 | A.   Yes. |
| 11:06 | 2 | Q.   And if you turn to page dash 13 in the English |
| 11:06 | 3 | translation of Mr. Machado's contract, in the middle of the |
| 11:06 | 4 | page, "Term," it says, "This contract will enter into effect |
| 11:06 | 5 | as of April 26, 2004." |
| 11:06 | 6 |      Do you see that? |
| 11:06 | 7 | A.   Yes. |
| 11:06 | 8 | Q.   Does that refresh your recollection that Mr. Machado |
| 11:07 | 9 | actually started April 26th, 2004? |
| 11:07 | 10 |      MS. KELLER:  Objection.  Misstates the document, |
| 11:07 | 11 | Your Honor. |
| 11:07 | 12 |      THE WITNESS:  It's -- the date here -- sorry. |
| 11:07 | 13 |      MS. KELLER:  Your Honor, this misstates -- |
| 11:07 | 14 |      THE COURT:  Just one minute, Counsel. |
| 11:07 | 15 |      MS. KELLER:  -- the document's signature date. |
| 11:07 | 16 |      THE COURT:  Just one moment. |
| 11:07 | 17 |      MR. QUINN:  I think I can resolve the objection, |
| 11:07 | 18 | Your Honor. |
| 11:07 | 19 |      THE COURT:  All right. |
| 11:07 | 20 | BY MR. QUINN: |
| 11:07 | 21 | Q.   If you'd turn to -- I see what Counsel's getting at. |
| 11:07 | 22 |      If you turn to page dash 20, it says -- the parties are |
| 11:07 | 23 | signing the contract on April 16th, right? |
| 11:07 | 24 | A.   Yes. |
| 11:07 | 25 | Q.   And then, but on page dash 13, it says it goes into |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 112 of 160   Page ID #:304719
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

112

| | | |
|---|---|---|
| 11:07 | 1 | effect April 26th? |
| 11:07 | 2 | A.   Yes. |
| 11:07 | 3 | Q.   Do you have any recollection or understanding as to why |
| 11:07 | 4 | that difference in dates? |
| 11:07 | 5 | A.   No. |
| 11:07 | 6 | Q.   All right.  Well, the week of April 26th, you attended |
| 11:08 | 7 | meetings in Los Angeles at MGA's offices.  Do you recall |
| 11:08 | 8 | that? |
| 11:08 | 9 | A.   Around that date, yes. |
| 11:08 | 10 | Q.   And as part of these meetings, uh, there were |
| 11:08 | 11 | discussions about business plans and business -- terms for |
| 11:08 | 12 | doing business in Mexico -- for MGA Mexico.  Do you recall |
| 11:08 | 13 | that? |
| 11:08 | 14 | A.   Yes. |
| 11:08 | 15 | Q.   And the discussions included setting the terms and |
| 11:08 | 16 | conditions for MGA Mexico customers.  Do you recall that? |
| 11:08 | 17 | A.   I don't recall.  There were many meetings, and we were |
| 11:08 | 18 | doing line reviews, too. |
| 11:08 | 19 | Q.   Right.  Well, perhaps if you could look at |
| 11:08 | 20 | Exhibit 6802. |
| 11:09 | 21 | Do you recognize this as an e-mail string on which |
| 11:09 | 22 | you're copied, Gustavo Machado's copied, Isaac Larian, Pablo |
| 11:09 | 23 | Vargas, and others? |
| 11:09 | 24 | A.   Yes. |
| 11:09 | 25 | MR. QUINN:  We'd offer this in evidence, |

| | | |
|---|---|---|
| 11:09 | 1 | Your Honor. |
| 11:09 | 2 | THE COURT:  Received. |
| 11:09 | 3 | *(Exhibit No. 6802 received in evidence.)* |
| 11:09 | 4 | *(Document displayed.)* |
| 11:09 | 5 | BY MR. QUINN: |
| 11:09 | 6 | Q.   And if you'd look at the -- at page dash 2, the e-mail |
| 11:09 | 7 | in the lower half, an e-mail from Pablo Vargas to Mr. Larian |
| 11:09 | 8 | and Mr. Park and to you, and copying Ms. Trueba, Mr. Machado |
| 11:09 | 9 | and others.  You see that? |
| 11:09 | 10 | A.   Yes. |
| 11:10 | 11 | Q.   And Mr. Vargas says, |
| 11:10 | 12 | "Dear Isaac, |
| 11:10 | 13 | "Please find attached our plan for this year.  We |
| 11:10 | 14 | consider this an aggressive plan for what the Mexican market |
| 11:10 | 15 | can take this year.  We are not covering our asses.  We made |
| 11:10 | 16 | some changes to the prices in order to be more strategically |
| 11:10 | 17 | correct with the market and our main competitor." |
| 11:10 | 18 | Now "main competitor," you understood that meant |
| 11:10 | 19 | Mattel. |
| 11:10 | 20 | A.   A main competitor, yes. |
| 11:10 | 21 | Q.   And then there's some information there on pricing and |
| 11:10 | 22 | the like.  You see that? |
| 11:10 | 23 | A.   Yes. |
| 11:10 | 24 | Q.   And then, if you'd turn to page dash 1, and Mr. Larian |
| 11:10 | 25 | had asked some questions, and then on page dash 1 there's an |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 114 of 160   Page ID #:304721
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

114

| 11:10 | 1 | e-mail from Gustavo Machado responding to Mr. Larian. |
| 11:10 | 2 | Do you see that? |
| 11:10 | 3 | A.   Yes. |
| 11:10 | 4 | Q.   And it says, |
| 11:10 | 5 | A.   "Isaac, to answer your questions, the specials agreed |
| 11:10 | 6 | with you are already in the forecast.  We don't have the |
| 11:10 | 7 | cost because we're working backwards from retail price, as |
| 11:11 | 8 | agreed with you, as well.  We listed all the price |
| 11:11 | 9 | rationales, and you can find them below.  There is also a |
| 11:11 | 10 | price structure spreadsheet in the file sent, which we glad |
| 11:11 | 11 | go through together. |
| 11:11 | 12 | "Funk Out won't be sold.  The quantity you see in the |
| 11:11 | 13 | forecast is to be allocated to Style-It and Strut-It.  The |
| 11:11 | 14 | TV plan is also already included in the file.  Pablo has |
| 11:11 | 15 | already talked to the buyers, and they are ready to see us |
| 11:11 | 16 | next week.  For this, we need price list and determine sales |
| 11:11 | 17 | payment terms and conditions.  Our proposal is stated in the |
| 11:11 | 18 | mail below." |
| 11:11 | 19 | Do you see that? |
| 11:11 | 20 | A.   Yes. |
| 11:11 | 21 | Q.   And do you recall that there was some discussion that, |
| 11:11 | 22 | you know, in order to, uh -- you know, in order to strike |
| 11:11 | 23 | deals with the buyers on behalf of this new company, MGA |
| 11:11 | 24 | Mexico, they needed sales -- sales payment terms and |
| 11:12 | 25 | conditions were needed. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 115 of 160   Page ID #:304722
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

115

| | | |
|---|---|---|
| 11:12 | 1 | Do you recall that? |
| 11:12 | 2 | A.   It's on the e-mail.  I don't remember. |
| 11:12 | 3 | Q.   And then, if you'd look at Exhibit 6803.  This is an |
| 11:12 | 4 | e-mail in which you were copied from Mr. Vargas to |
| 11:12 | 5 | Mr. Larian? |
| 11:12 | 6 | A.   Yes. |
| 11:12 | 7 | MR. QUINN:  I'd offer this exhibit, Your Honor. |
| 11:12 | 8 | THE COURT:  Received. |
| 11:12 | 9 | *(Exhibit No. 6803 received in evidence.)* |
| 11:12 | 10 | *(Document displayed.)* |
| 11:12 | 11 | BY MR. QUINN: |
| 11:12 | 12 | Q.   And this is another e-mail chain discussing the MGA -- |
| 11:12 | 13 | new MGA Mexico 2004 business plan, correct? |
| 11:13 | 14 | A.   Yes. |
| 11:13 | 15 | Q.   And up at the top he refers to the major retail |
| 11:13 | 16 | customers:  Walmart, Gigante, Soriana, Liverpool, and the |
| 11:13 | 17 | others there -- listed there.  Those are the major retailer |
| 11:13 | 18 | customers? |
| 11:13 | 19 | A.   Yes. |
| 11:13 | 20 | Q.   And then if you skip, he says, "While all of them are |
| 11:13 | 21 | excited with our entrance to the market, they have the |
| 11:13 | 22 | following concerns." |
| 11:13 | 23 | And there's information there about delivery dates and |
| 11:13 | 24 | bookings.  You see that? |
| 11:13 | 25 | A.   Yes. |

11:13  1    Q.   And then it says, "Payment terms.  They trust" --

11:13  2         "They" meaning the -- these big retailers, right?

11:13  3    A.   Safe, yes.

11:13  4    Q.   "They trust that we will offer them good terms, better

11:13  5    than Mattel's, and this is key for them to open their

11:13  6    budgets to us."

11:14  7         Do you see that?

11:14  8    A.   Yes.

11:14  9    Q.   So do you recall that in getting this business off the

11:14  10   ground, one of the key things was arriving at the terms that

11:14  11   would be offered to the retailers in Mexico?

11:14  12   A.   Good payment terms was one of the key elements.

11:14  13   Q.   Right.  And they apparently wanted better -- better

11:14  14   terms even than they were getting from Mattel, correct?

11:14  15   A.   Clients always want great terms.

11:14  16   Q.   Right.  And while you were -- you told us you were in

11:14  17   Los Angeles at these meetings where the business plan was

11:14  18   being discussed.

11:14  19        While you were there, Mr. Vargas told you that he and

11:14  20   Mr. Machado were using Mattel -- Mattel sales forecast

11:14  21   documents to generate the suggested orders for the MGA

11:14  22   business plan.

11:14  23   A.   No.  He didn't say that.  I don't remember that, no.

11:15  24   Q.   While you were in Los Angeles, you saw Mr. Vargas

11:15  25   actually using the flash drive with Mattel files on it,

| 11:15 | 1 | correct? |
| 11:15 | 2 | A.   No.  I don't remember that, no. |
| 11:15 | 3 | Q.   You don't remember that? |
| 11:15 | 4 | A.   No. |
| 11:15 | 5 | Q.   The business plan that you and Mr. Vargas and |
| 11:15 | 6 | Mr. Machado presented to Mr. Larian was created using some |
| 11:15 | 7 | information from Mattel documents, correct? |
| 11:15 | 8 | MS. KELLER:  Objection.  No foundation. |
| 11:15 | 9 | THE COURT:  Overruled. |
| 11:15 | 10 | You can answer the question. |
| 11:15 | 11 | THE WITNESS:  The business plan was generated |
| 11:15 | 12 | after we saw the line.  We had the description of the line, |
| 11:15 | 13 | and we put numbers of prospective -- what we call "quotas" |
| 11:15 | 14 | for the rest of the year.  That's how the business plan was |
| 11:15 | 15 | generated. |
| 11:15 | 16 | BY MR. QUINN: |
| 11:15 | 17 | Q.   But the -- the business plan was also generated using |
| 11:15 | 18 | information that was derived from Mattel documents that had |
| 11:15 | 19 | been taken by Mr. Machado, Mr. Vargas, and Ms. Trueba, |
| 11:16 | 20 | correct? |
| 11:16 | 21 | MS. KELLER:  Objection.  No foundation.  Calls for |
| 11:16 | 22 | speculation. |
| 11:16 | 23 | THE COURT:  Overruled. |
| 11:16 | 24 | And, once again, this refers to 30(b)(6), to her |
| 11:16 | 25 | designation, Mattel Mexico. |

| 11:16 | 1 | Overruled. |
|---|---|---|
| 11:16 | 2 | THE WITNESS: No. It was generated by putting |
| 11:16 | 3 | numbers next to the listing of our product. |
| 11:16 | 4 | BY MR. QUINN: |
| 11:16 | 5 | Q. Well, is it true that later that year, in July of 2004, |
| 11:16 | 6 | Mr. Vargas approached you and was asking you to approve |
| 11:16 | 7 | payment terms like those that were used at Mattel Mexico? |
| 11:16 | 8 | Do you recall that? |
| 11:16 | 9 | A. Yes. He approached me to approve payment terms, which |
| 11:16 | 10 | instead, I had to get approved from the U.S. |
| 11:16 | 11 | That's all I remember. |
| 11:16 | 12 | Q. And those payment terms that he was -- the information |
| 11:16 | 13 | he had, the benchmarks he had as to payment terms were based |
| 11:16 | 14 | on information he had taken with him from Mattel Mexico, |
| 11:17 | 15 | correct? |
| 11:17 | 16 | MS. KELLER: Objection. No foundation. |
| 11:17 | 17 | THE COURT: Overruled. |
| 11:17 | 18 | THE WITNESS: He showed me payment terms. He was |
| 11:17 | 19 | in charge of sales. I trusted that those are the payment |
| 11:17 | 20 | terms that we needed. And that's what he gave me: Payment |
| 11:17 | 21 | terms that he needed for our clients. |
| 11:59 | 22 | BY MR. QUINN: |
| 11:17 | 23 | Q. Well, didn't he tell you that he had with him a file |
| 11:17 | 24 | that he had taken from Mattel Mexico that had the details |
| 11:17 | 25 | concerning Mattel Mexico's payment terms? |

| | | |
|---|---|---|
| 11:17 | 1 | A.   No. |
| 11:17 | 2 | Q.   Well, as it turned out, MGA Mexico did, in fact, use |
| 11:17 | 3 | those payment terms that Mr. Vargas suggested, correct? |
| 11:17 | 4 | A.   I don't remember with what payment terms we ended up. |
| 11:17 | 5 | Whatever I got approved from Los Angeles is what we used. |
| 11:17 | 6 | Q.   All right.  And, I mean, you do recall that you got |
| 11:17 | 7 | some information from Mr. Vargas in terms of payment terms, |
| 11:17 | 8 | right? |
| 11:17 | 9 | A.   His suggestions, yes. |
| 11:18 | 10 | Q.   Right.  And, uh, it's true, isn't it, that his |
| 11:18 | 11 | suggestions ended up being approved; that the details of |
| 11:18 | 12 | those payment terms that he proposed were what was actually |
| 11:18 | 13 | adopted at MGA Mexico? |
| 11:18 | 14 | A.   I don't remember what was approved.  But whatever I |
| 11:18 | 15 | received approval for is what we used. |
| 11:18 | 16 | Q.   Right.  And is what you're telling us that it might |
| 11:18 | 17 | have been what Mr. Vargas proposed; it might not have been; |
| 11:18 | 18 | you just don't recall?  Is that -- |
| 11:18 | 19 | A.   I don't remember. |
| 11:18 | 20 | Q.   -- true? |
| 11:18 | 21 |       MR. COTE:  Argumentative. |
| 11:18 | 22 |       THE COURT:  Restate the question, Counsel. |
| | 23 | BY MR. QUINN: |
| 11:18 | 24 | Q.   I'm just trying to understand the state of your |
| 11:18 | 25 | recollection. |

| | | |
|---|---|---|
| 11:18 | 1 | THE COURT:  The question's appropriate.  The |
| 11:18 | 2 | question's overruled.  I don't know that the jury heard the |
| 11:18 | 3 | last part of the question. |
| 11:18 | 4 | BY MR. QUINN: |
| 11:18 | 5 | Q.   Okay.  Is it true, ma'am, that you just don't recall |
| 11:18 | 6 | one way or another whether the detail payment terms that |
| 11:18 | 7 | were ultimately adopted for MGA Mexico were those that |
| 11:18 | 8 | Mr. Vargas had proposed? |
| 11:18 | 9 | MS. KELLER:  Objection.  Assumes facts not in |
| 11:18 | 10 | evidence that she knew to begin with. |
| 11:18 | 11 | THE COURT:  Overruled. |
| 11:19 | 12 | THE WITNESS:  I don't recall. |
| 11:19 | 13 | BY MR. QUINN: |
| 11:19 | 14 | Q.   So are you in a position, um -- are you in a position |
| 11:19 | 15 | to tell us that -- I take it Ms.-- Mr. Machado, Ms. Trueba |
| 11:19 | 16 | and Mr. Vargas were involved in preparing the business plan |
| 11:19 | 17 | for MGA Mexico; is that true? |
| 11:19 | 18 | A.   We were all involved, yes. |
| 11:19 | 19 | Q.   All right.  And are you in a position -- I mean, you |
| 11:19 | 20 | know -- you now know that, in fact, those individuals had |
| 11:19 | 21 | taken with them confidential Mattel information when they |
| 11:19 | 22 | left Mattel.  You now know that, true? |
| 11:19 | 23 | A.   I learned that -- |
| 11:19 | 24 | MR. COTE:  Objection.  30(b)(6) objection, |
| 11:19 | 25 | Your Honor. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 121 of 160   Page ID #:304728
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

121

| | | |
|---|---|---|
| 11:19 | 1 | THE COURT:  Overruled. |
| 11:19 | 2 | Now do you want me to read that admonition again? |
| 11:20 | 3 | MR. OVERLAND:  Yes. |
| 11:20 | 4 | THE COURT:  As to Machado? |
| 11:20 | 5 | MR. COTE:  Yes. |
| 11:20 | 6 | MR. OVERLAND:  Yes. |
| 11:20 | 7 | MR. COTE:  Yes, please. |
| 11:20 | 8 | THE COURT:  All right.  Then, Counsel, you can |
| 11:20 | 9 | reask the question again. |
| 11:20 | 10 | MR. QUINN:  Okay. |
| 11:20 | 11 | THE COURT:  'Cause I don't want there to be any |
| 11:20 | 12 | confusion. |
| 11:20 | 13 | (To the jury:)  Once again, remember, she's a |
| 11:20 | 14 | 30(b)(6) witness and designated as such for MGA Mexico. |
| 11:20 | 15 | Therefore, she's expected to prepare and educate herself |
| 11:20 | 16 | about these topics that pertain to MGA Mexico.  And she's |
| 11:20 | 17 | been designated as such.  And her testimony is binding upon |
| 11:20 | 18 | MGA Mexico. |
| 11:20 | 19 | However, she does not represent, and was not |
| 11:20 | 20 | designated as a 30(b)(6) witness for MGA, commonly referred |
| 11:20 | 21 | to as "MGA Entertainment, Inc." or "MGA."  You've heard it |
| 11:20 | 22 | referred to "United States," or MGA Hong Kong, which you've |
| 11:20 | 23 | heard about, or Mr. Larian, individually, or Mr. Machado, |
| 11:20 | 24 | individually.  In other words, she wasn't expected to |
| 11:20 | 25 | prepare herself and educate herself. |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 122 of 160   Page ID #:304729
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

122

| | | |
|---|---|---|
| 11:21 | 1 | Now, I'm gonna instruct you to disregard her |
| 11:21 | 2 | testimony as it applies to these other defendants. |
| 11:21 | 3 | But as far as MGA Mexico is concerned, you can |
| 11:21 | 4 | consider that. |
| 11:21 | 5 | Counsel. |
| 11:21 | 6 | MR. QUINN:  Thank you, Your Honor. |
| 11:21 | 7 | BY MR. QUINN: |
| 11:21 | 8 | Q.   So you now know, Ms. Kuemmerle, that Mr. Machado, |
| 11:21 | 9 | Mr. Vargas, Ms. Trueba, when they left Mattel Mexico and |
| 11:21 | 10 | went to what became MGA Mexico, they took with them |
| 11:21 | 11 | confidential and proprietary Mattel business information. |
| 11:21 | 12 | You now know that, right? |
| 11:21 | 13 | A.   I learned that after the search that took place in our |
| 11:21 | 14 | offices in 2005. |
| 11:21 | 15 | Q.   And you've told us that they were involved -- would you |
| 11:22 | 16 | say intimately involved in developing the business plan for |
| 11:22 | 17 | MGA Mexico? |
| 11:22 | 18 | A.   We all worked it out together. |
| 11:22 | 19 | Q.   And, um, are you in a position to testify that you know |
| 11:22 | 20 | for a fact that, in putting together that business plan, |
| 11:22 | 21 | they made no use of the confidential and proprietary Mattel |
| 11:22 | 22 | Mexico information that they brought with them? |
| 11:22 | 23 | MS. KELLER:  Objection.  Your Honor, that calls |
| 11:22 | 24 | for speculation. |
| 11:22 | 25 | THE COURT:  Overruled. |

| | | |
|---|---|---|
| 11:22 | 1 | THE WITNESS: I can say that we put that plan |
| 11:22 | 2 | together, the three of us at that time, and we used a form |
| 11:22 | 3 | that we put together at that time. That's all I can say. |
| 11:22 | 4 | BY MR. QUINN: |
| 11:22 | 5 | Q. All right. But in terms of the data, the |
| 11:22 | 6 | suggestions -- like the payment terms that Mr. Vargas made, |
| 11:22 | 7 | for example -- in making those suggestions, in coming up |
| 11:23 | 8 | with the other contributions and data that they suggested, |
| 11:23 | 9 | you wouldn't know if, outside your presence, they had |
| 11:23 | 10 | consulted that confidential and proprietary Mattel |
| 11:23 | 11 | information, correct? |
| 11:23 | 12 | A. Can you say that again? |
| 11:23 | 13 | Q. Yeah. You wouldn't know what they had consulted |
| 11:23 | 14 | outside your presence, obviously, correct? |
| 11:23 | 15 | A. I don't know what they were doing outside my presence. |
| 11:23 | 16 | Q. And do you know -- did you ever discuss with |
| 11:23 | 17 | Ms. Trueba, for example, what criteria she used in deciding |
| 11:23 | 18 | what information to take with her? |
| 11:23 | 19 | A. No. |
| 11:23 | 20 | Q. How about with Mr. Machado: Did you ever discuss with |
| 11:23 | 21 | him why he selected the particular confidential and |
| 11:23 | 22 | proprietary documents that he chose to take with him? |
| 11:24 | 23 | A. On a much later date, when I was being deposed in May. |
| 11:24 | 24 | Q. All right. |
| 11:24 | 25 | A. In preparation for my deposition. |

| | | |
|---|---|---|
| 11:24 | 1 | Q.   In preparation for your deposition, you spoke to him at |
| 11:24 | 2 | that time? |
| 11:24 | 3 | A.   Yes. |
| 11:24 | 4 | Q.   And you asked him why he chose the particular items of |
| 11:24 | 5 | confidential and proprietary information that he choses?  Is |
| 11:24 | 6 | that when you asked him then? |
| 11:24 | 7 | A.   I asked him what was the method to select the items |
| 11:24 | 8 | that were found on CD, and he said -- |
| 11:24 | 9 | Can I give the answer? |
| 11:24 | 10 | Q.   Sure. |
| 11:24 | 11 | A.   -- there was a need for him to empty his private |
| 11:24 | 12 | computer, and there was no rhyme to reason as to what he was |
| 11:24 | 13 | putting on that CD. |
| 11:24 | 14 | Q.   So you're saying it was just -- is it your |
| 11:24 | 15 | understanding, then, that it was just happenstance that he |
| 11:24 | 16 | happened to have confidential and proprietary Mattel |
| 11:24 | 17 | information with him? |
| 11:24 | 18 | A.   I -- I'm a foreigner, so you need to explain to me |
| 11:25 | 19 | "happenstance." |
| 11:25 | 20 | Q.   Was it just -- my kids would say "Random," but was |
| 11:25 | 21 | it -- you know, just a misfortune or an accident that he |
| 11:25 | 22 | happened to have with him confidential and proprietary |
| 11:25 | 23 | Mattel information?  Is that what he told you? |
| 11:25 | 24 | A.   I'm quoting what Mr. Machado told me.  There was no |
| 11:25 | 25 | rhyme -- no rhyme to reason as to what information was on |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 125 of 160   Page ID #:304732
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

125

| | | |
|---|---|---|
| 11:25 | 1 | that CD. |
| 11:25 | 2 | Q.   Okay.  You know that the CD was found in his office, |
| 11:25 | 3 | correct? |
| 11:25 | 4 | A.   I learned that at a much later date in preparation for |
| 11:25 | 5 | my depositions. |
| 11:26 | 6 | Q.   All right.  And you knew it was found in his office |
| 11:26 | 7 | when the search and seizure took place over a year after he |
| 11:26 | 8 | joined MGA, correct? |
| 11:26 | 9 | A.   I learned that a CD was found in preparation for my |
| 11:26 | 10 | deposition. |
| 11:26 | 11 | Q.   But that was –– and that happened over a year after he |
| 11:26 | 12 | joined MGA Mexico? |
| 11:26 | 13 | A.   Around October 2005. |
| 11:26 | 14 | Q.   All right.  So roughly a year and a half after? |
| 11:26 | 15 | A.   Yes. |
| 11:26 | 16 | Q.   Okay.  All right.  So let's talk about that. |
| 11:26 | 17 | And you've already indicated that you were MGA Mexico's |
| 11:26 | 18 | Rule 30(b)(6) designee on the topic of the search and |
| 11:26 | 19 | seizure of documents by Mexican authorities from the MGA |
| 11:26 | 20 | Mexico office in Mexico, correct? |
| 11:27 | 21 | A.   Yes. |
| 11:27 | 22 | Q.   And you've already told us that you did various things |
| 11:27 | 23 | to educate yourself on that subject, right? |
| 11:27 | 24 | A.   As much as I could. |
| 11:27 | 25 | Q.   Okay.  And what you know and what you've learned is |

| | | |
|---|---|---|
| 11:27 | 1 | that on October 27th, 2005, the Mexican police executed a |
| 11:27 | 2 | search warrant and searched the offices of MGA Mexico, |
| 11:27 | 3 | correct? |
| 11:27 | 4 | A.   That's the understanding, yes. |
| 11:27 | 5 | Q.   All right.  And at the time you actually weren't there. |
| 11:27 | 6 | You were, as I understand it, at your home in New Jersey? |
| 11:27 | 7 | A.   That's right. |
| 11:27 | 8 | Q.   And you received an e-mail from Brian Wing, the senior |
| 11:27 | 9 | vice president of finance and taxation for MGA.  And he told |
| 11:27 | 10 | you that the search was going on, correct? |
| 11:27 | 11 | A.   Yes. |
| 11:27 | 12 | Q.   And he told you that somehow this search related to |
| 11:27 | 13 | some Mattel lawsuit.  Do you recall that? |
| 11:27 | 14 | A.   I don't remember what he told me. |
| 11:27 | 15 | Q.   Let's take a look at Exhibit 21091.  21091. |
| 11:28 | 16 | *(Document provided to the witness.)* |
| 11:28 | 17 | BY MR. QUINN: |
| 11:28 | 18 | Q.   And is this -- these are some e-mails between you and |
| 11:28 | 19 | Mr. Wing. |
| 11:28 | 20 | A.   Yes. |
| 11:28 | 21 | MR. QUINN:  I'd offer this, Your Honor. |
| 11:28 | 22 | THE COURT:  Received. |
| 11:28 | 23 | *(Exhibit No. 21091 received in evidence.)* |
| 11:28 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 11:28 | 1 | BY MR. QUINN: |
| 11:28 | 2 | Q.   If we could look at the first e-mail in the string, on |
| 11:28 | 3 | the second page, Mr. Wing contacts you and he writes you, |
| 11:28 | 4 | and he says, "Susana, the police are at your offices now |
| 11:28 | 5 | regarding some Mattel lawsuit.  I am on the line with Daphne |
| 11:28 | 6 | now." |
| 11:28 | 7 | Now, "Daphne," that's Daphne Gronich, who's the |
| 11:28 | 8 | in-house lawyer, the general counsel of MGA? |
| 11:28 | 9 | A.   Yes. |
| 11:28 | 10 | Q.   And was there some lawsuit going on between Mattel and |
| 11:29 | 11 | MGA in Mexico at the time, so far as you knew? |
| 11:29 | 12 | A.   Not that I was aware, no. |
| 11:29 | 13 | Q.   And then you respond, "Apologize.  No idea this was |
| 11:29 | 14 | happening.  Hope everything is okay.  Sorry for the bad time |
| 11:29 | 15 | with this."  Right? |
| 11:29 | 16 | A.   Yes. |
| 11:29 | 17 | Q.   And then Mr. Wing responds, "We're trying to get our |
| 11:29 | 18 | arms around this now.  Jean Paul is sending two lawyers from |
| 11:29 | 19 | his firm to the offices now." |
| 11:29 | 20 | Now, who's Jean Paul? |
| 11:29 | 21 | A.   Jean Paul is the -- one of the lawyers that was |
| 11:29 | 22 | retained to open the subsidiary. |
| 11:29 | 23 | Q.   Right.  So they were lawyers in Mexico City? |
| 11:29 | 24 | A.   Yes. |
| 11:29 | 25 | Q.   Who were involved in organizing MGA Mexico? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

128

| | | |
|---|---|---|
| 11:29 | 1 | A.   It's my understanding. |
| 11:29 | 2 | Q.   So when the police came and this started going down, |
| 11:29 | 3 | you contacted the local -- your local Mexican lawyers, |
| 11:29 | 4 | apparently, and they went over to the premises, correct? |
| 11:30 | 5 | A.   I don't know who contacted who. |
| 11:30 | 6 | Q.   All right.  Well, somebody contacted 'em. |
| 11:30 | 7 | You do know that MGA had lawyers who were there present |
| 11:30 | 8 | during the day of the search? |
| 11:30 | 9 | MS. KELLER:  Objection.  Vague as to "during the |
| 11:30 | 10 | search" or at some later time. |
| 11:30 | 11 | MR. QUINN:  During the search. |
| 11:30 | 12 | THE COURT:  Overruled. |
| 11:30 | 13 | THE WITNESS:  Eventually, I learned, in |
| 11:30 | 14 | preparation, that attorneys showed up at our offices. |
| 11:30 | 15 | BY MR. QUINN: |
| 11:30 | 16 | Q.   MGA Mexico's attorneys? |
| 11:30 | 17 | A.   Yes. |
| 11:30 | 18 | Q.   Showed up during the search? |
| 11:30 | 19 | A.   Yes. |
| 11:30 | 20 | Q.   And after you got this e-mail from Mr. Wing, one of the |
| 11:30 | 21 | first things you did was to call and speak to Pablo Vargas, |
| 11:30 | 22 | who was there in the MGA Mexico office, right? |
| 11:30 | 23 | A.   I tried immediately after I read this, yes. |
| 11:30 | 24 | Q.   And you did reach him? |
| 11:30 | 25 | A.   After couple of tries, yes. |

| 11:31 | 1 | Q.   All right.  And you learned from him, then, that you |
| 11:31 | 2 | knew that the Mexico authorities were searching MGA Mexico's |
| 11:31 | 3 | office for documents or materials from Mattel, correct? |
| 11:31 | 4 | A.   I learned that there was a search, a raid, and that |
| 11:31 | 5 | there were police in the office, and that papers were |
| 11:31 | 6 | served.  I don't remember if he said "related to Mattel." |
| 11:31 | 7 | Q.   Well, I mean, you do recall that you knew at the time |
| 11:31 | 8 | that what the police were looking for were documents and |
| 11:31 | 9 | information relating to Mattel, right? |
| 11:31 | 10 | A.   I learned that at a later date, yes. |
| 11:31 | 11 | Q.   Was it your -- let's take -- are you saying that at the |
| 11:31 | 12 | time you learned about the search, you didn't know they were |
| 11:31 | 13 | looking for Mattel documents? |
| 11:31 | 14 | A.   I don't remember if Pablo said -- he said that there |
| 11:32 | 15 | were police, armed police, and that they were looking for |
| 11:32 | 16 | papers. |
| 11:32 | 17 | Q.   Well, let's see if we can refresh your recollection. |
| 11:32 | 18 | This was sometime ago.  If you can look at your deposition, |
| 11:32 | 19 | page 118, line 7, January 28th, 2008. |
| 11:32 | 20 | *(Document provided to the witness.)* |
| 11:32 | 21 | BY MR. QUINN: |
| 11:32 | 22 | Q.   Page 118, line 7, to 119, line 3. |
| 11:32 | 23 | A.   What line?  Sorry. |
| 11:32 | 24 | Q.   118, line 7, to 119, line 3. |
| 11:32 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

130

| | | |
|---|---|---|
| 11:32 | 1 | Q.   And does that refresh your recollection that at the |
| 11:33 | 2 | time you had an understanding, based upon your |
| 11:33 | 3 | conversations, that what the police were looking for were |
| 11:33 | 4 | documents from Mattel? |
| 11:33 | 5 | A.   After I talked to Pablo and -- not during the call, |
| 11:33 | 6 | because I don't remember if he said that or not. |
| 11:33 | 7 | Q.   Okay.  But at some point during that day, or close to |
| 11:33 | 8 | that time -- I mean, you -- while the search was going down, |
| 11:33 | 9 | you knew the police were looking for documents from Mattel? |
| 11:33 | 10 | A.   It is clear that that's what they were looking -- and |
| 11:33 | 11 | now I know that, yes. |
| 11:33 | 12 | Q.   Right.  And now you know, because you've investigated |
| 11:33 | 13 | this as a 30(b)(6) witness, that Mr. Machado -- Mr. Machado, |
| 11:33 | 14 | before he left Mattel, had downloaded some information from |
| 11:33 | 15 | computers, correct? |
| 11:33 | 16 | A.   In preparation for being a 30(b)(6), I learned that, |
| 11:33 | 17 | yes. |
| 11:33 | 18 | Q.   Right.  And having some familiarity with computers |
| 11:33 | 19 | yourself, you would know that that action of downloading |
| 11:33 | 20 | would lead -- leave some type of electronic trail, which |
| 11:34 | 21 | somebody at Mattel could discover the fact that Mr. Machado |
| 11:34 | 22 | had downloaded things? |
| 11:34 | 23 | A.   I'm not that savvy.  Thank you for that. |
| 11:34 | 24 | But now I know that everything is possible, yes. |
| 11:34 | 25 | Q.   Okay.  And as part of your research as a 30(b)(6) |

| | | |
|---|---|---|
| 11:34 | 1 | witness, you did learn that people at Mattel -- after |
| 11:34 | 2 | Mr. Machado, Ms. Trueba and Mr. Vargas left -- because of |
| 11:34 | 3 | some circumstances, did a forensic computer investigation |
| 11:34 | 4 | and actually found out -- found electronic evidence that |
| 11:34 | 5 | information had been downloaded.  You learned that as part |
| 11:34 | 6 | of your investigation, correct? |
| 11:34 | 7 | A.   Yes. |
| 11:34 | 8 | Q.   And so that day, the police searched the MGA Mexico |
| 11:34 | 9 | office, right? |
| 11:34 | 10 | A.   Yes. |
| 11:34 | 11 | Q.   And you learned that from a -- among other people, you |
| 11:35 | 12 | learned that from an MGA Mexico employee by the name of |
| 11:35 | 13 | Carlos Aguirre? |
| 11:35 | 14 | A.   Yes. |
| 11:35 | 15 | Q.   And who is Mr. Aguirre? |
| 11:35 | 16 | A.   Mr. Aguirre was an assistant manager in the Logistics |
| 11:35 | 17 | Department. |
| 11:35 | 18 | Q.   And he is also an attorney, it turns out? |
| 11:35 | 19 | A.   Yes. |
| 11:35 | 20 | Q.   And he was in the MGA Mexico offices during the search, |
| 11:35 | 21 | correct? |
| 11:35 | 22 | A.   Upon preparation for this deposition, I learned that he |
| 11:35 | 23 | was there, yes. |
| 11:35 | 24 | Q.   Right.  And MGA Mexico employees accompanied -- you've |
| 11:35 | 25 | learned again -- as part of your research as a 30(b)(6) |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

132

| | | |
|---|---|---|
| 11:35 | 1 | witness, you've learned that MGA Mexico employees |
| 11:35 | 2 | accompanied the Mexican authorities during their search of |
| 11:35 | 3 | the offices, correct? |
| 11:35 | 4 | A.   I learned that. |
| 11:35 | 5 | Q.   And Mr. Aguirre was one of the employees who |
| 11:35 | 6 | accompanied the Mexican authorities as they did the search |
| 11:35 | 7 | of the MGA Mexico offices, right? |
| 11:36 | 8 | A.   He said that, yes. |
| 11:36 | 9 | Q.   And as he indicated before, MGA Mexico had their |
| 11:36 | 10 | lawyers actually turn up during -- while the search was |
| 11:36 | 11 | still in progress, right? |
| 11:36 | 12 | A.   I don't know the timing, but they did show up, yes. |
| 11:36 | 13 | Q.   Right.  They arrived, actually, I think around noon |
| 11:36 | 14 | you've said? |
| 11:36 | 15 | A.   I don't know. |
| 11:36 | 16 | Q.   You just don't recall? |
| 11:36 | 17 | A.   I don't recall. |
| 11:36 | 18 | Q.   If you'd take a look at your deposition -- see if we |
| 11:36 | 19 | can refresh your recollection.  I know it was a while ago -- |
| 11:36 | 20 | page 262, lines 2 to 10, December 7th, 2009, 262, lines 2 to |
| 11:36 | 21 | 10. |
| 11:36 | 22 | *(Document provided to the witness.)* |
| | 23 | BY MR. QUINN: |
| 11:36 | 24 | Q.   And if you could just read that to yourself and see if |
| 11:37 | 25 | that doesn't refresh your recollection as to when MGA's |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

133

| 11:37 | 1 | lawyers arrived on the premises. |
| 11:37 | 2 | A.   What line did you say? |
| 11:37 | 3 | Q.   We're looking at page 262, lines 2 to 10. |
| 11:37 | 4 | A.   Yeah.  I mention around 11:00, 12:00. |
| 11:37 | 5 | Q.   Right. |
| 11:37 | 6 | A.   Around that time.  I don't know if that's the right |
| 11:37 | 7 | time. |
| 11:37 | 8 | Q.   Well, when you testified before, that was your |
| 11:37 | 9 | recollection:  That MGA's lawyers arrived at around 11:00 or |
| 11:37 | 10 | 12:00 that day, correct? |
| 11:37 | 11 | A.   Yes. |
| 11:37 | 12 | Q.   And, um, they stayed the whole day, up till the search |
| 11:37 | 13 | ended about 6:00 p.m.? |
| 11:37 | 14 | A.   I don't know. |
| 11:38 | 15 | Q.   So, in any event, while the search is being done, MGA, |
| 11:38 | 16 | at least from 11:00 o'clock in the morning or around noon, |
| 11:38 | 17 | had its own lawyers there accompanying the authorities, |
| 11:38 | 18 | correct? |
| 11:38 | 19 | A.   Seems to be, yes. |
| 11:38 | 20 | Q.   Yeah.  And also, Mr. Aguirre and other MGA Mexico |
| 11:38 | 21 | employees were there accompanying the authorities during the |
| 11:38 | 22 | search, correct? |
| 11:38 | 23 |       MS. KELLER:  Objection to the phrase |
| 11:38 | 24 | "accompanying" Your Honor.  That misstaters the evidence. |
| 11:38 | 25 |       THE COURT:  Well, "accompanying"? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 134 of 160   Page ID #:304741
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

134

| 11:38 | 1 | In attendance?  What?  What's the proper word?  On |
| 11:38 | 2 | site? |
| 11:38 | 3 | MS. KELLER:  Accompanying implies that they were |
| 11:38 | 4 | following along with the police everywhere they went. |
| 11:38 | 5 | MR. QUINN:  I'm sticking with "accompanying," |
| 11:38 | 6 | Your Honor.  I'd like an answer on "accompanying." |
| 11:39 | 7 | THE COURT:  Overruled. |
| 11:39 | 8 | THE WITNESS:  I don't know the translation |
| 11:39 | 9 | probably is not right, but they were with the police. |
| 11:39 | 10 | That's what I was told. |
| 11:39 | 11 | BY MR. QUINN: |
| 11:39 | 12 | Q.   All right. |
| 11:39 | 13 | A.   If they were tagged one-on-one, I don't know. |
| 11:39 | 14 | Q.   All right.  So there was also a Mr. Menotti? |
| 11:39 | 15 | A.   Emilio Menotti. |
| 11:39 | 16 | Q.   Who was that? |
| 11:39 | 17 | A.   Director of Logistics. |
| 11:39 | 18 | Q.   And he accompanied the police, as well, during the |
| 11:39 | 19 | search? |
| 11:39 | 20 | A.   He was there, too. |
| 11:39 | 21 | THE COURT:  Counsel, for each of you, just look at |
| 11:39 | 22 | lines 8 through 10, on page 262.  I think that resolves the |
| 11:39 | 23 | issue. |
| 11:39 | 24 | All right.  Please continue, Counsel. |
|  | 25 |  |

| | | |
|---|---|---|
| 11:39 | 1 | BY MR. QUINN: |
| 11:39 | 2 | Q.   If you could take a look at page 262, lines 8 to 10. |
| 11:39 | 3 | A.   (Witness complies.) |
| 11:39 | 4 | Q.   Does that refresh your recollection that at least the |
| 11:39 | 5 | outside lawyers accompanied the police who were doing the |
| 11:39 | 6 | search? |
| 11:39 | 7 | A.   It says they were there. |
| 11:40 | 8 |      How were they there?  Together?  I don't know. |
| 11:40 | 9 | Q.   But the word "accompanies" -- |
| 11:40 | 10 | A.   The word is here. |
| 11:40 | 11 | Q.   -- is in your deposition? |
| 11:40 | 12 | A.   Yes. |
| 11:40 | 13 | Q.   Did you give your deposition in English or Spanish? |
| 11:40 | 14 | A.   English.  Bad English, but English. |
| 11:40 | 15 | Q.   Pretty good. |
| 11:40 | 16 |      Now, on the day of the search, as it happens, you were |
| 11:40 | 17 | with -- Mr. Machado was with you, correct? |
| 11:40 | 18 | A.   At a later time, yes. |
| 11:40 | 19 | Q.   I mean, a day -- time of day? |
| 11:40 | 20 | A.   Yes. |
| 11:40 | 21 | Q.   All right.  But at least the day the search happened, |
| 11:40 | 22 | that -- |
| 11:40 | 23 | A.   October 27th. |
| 11:40 | 24 | Q.   -- October 27th, at some point that day, he's actually |
| 11:40 | 25 | present with you back in New Jersey or New York, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 136 of 160   Page ID #:304743
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

136

| 11:40 | 1 | A.   In my house. |
|---|---|---|
| 11:40 | 2 | Q.   At your house? |
| 11:40 | 3 | A.   Yes. |
| 11:40 | 4 | Q.   And at that time, he admitted to you that he had a |
| 11:40 | 5 | CD –– a CD in his office at MGA Mexico that he should not |
| 11:41 | 6 | have had there, and that that could be what the authorities |
| 11:41 | 7 | were searching for. |
| 11:41 | 8 | That's what he told you on that day, correct? |
| 11:41 | 9 | A.   He told me that he had a CD with antiquated information |
| 11:41 | 10 | that was in his office.  That's what he told me. |
| 11:41 | 11 | Q.   And he told you that that might be what the authorities |
| 11:41 | 12 | were looking for, correct? |
| 11:41 | 13 | A.   I don't remember if he said that. |
| 11:41 | 14 | Q.   Well, if you could take –– didn't he tell you that –– I |
| 11:41 | 15 | mean, you –– you specifically asked him what it is they're |
| 11:41 | 16 | searching for, and if he had anything that did not belong in |
| 11:41 | 17 | the office and that he shouldn't have.  And what he told you |
| 11:41 | 18 | is that he had this CD; isn't that true? |
| 11:41 | 19 | A.   It is in my deposition, yes.  I don't remember. |
| 11:41 | 20 | Q.   But that's consistent with –– |
| 11:42 | 21 | A.   He told me he had a CD. |
| 11:42 | 22 | Q.   And he told you, when he was with you at this time, |
| 11:42 | 23 | that the CD had Mattel information –– that this CD that was |
| 11:42 | 24 | in his office in Mexico City had Mattel information on it, |
| 11:42 | 25 | correct? |

| | | |
|---|---|---|
| 11:42 | 1 | A.   He told me it had his resumé, letter of employment, |
| 11:42 | 2 | pictures, and some Mattel information on the CD -- |
| 11:42 | 3 | Q.   And that's -- |
| 11:42 | 4 | A.   -- his contract, Mariana's contract, Pablo's contract, |
| 11:42 | 5 | all of their resumés, Pablo's and Mariana's, too. |
| 11:42 | 6 | Q.   Just to be clear, you're not denying that this CD had |
| 11:42 | 7 | confidential and proprietary Mattel information on it, are |
| 11:42 | 8 | you?  Are you denying that? |
| 11:42 | 9 | A.   I'm not denying that the CD existed.  I didn't know |
| 11:43 | 10 | what was on the CD. |
| 11:43 | 11 | Q.   But when you asked Mr. Machado, is there -- and you're |
| 11:43 | 12 | talking with him about what it is the police might be |
| 11:43 | 13 | looking for, and "Do you have anything that you shouldn't |
| 11:43 | 14 | have?" he told you he had a CD with Mattel information on |
| 11:43 | 15 | it, true? |
| 11:43 | 16 | A.   I do not know how the conversation went.  I asked him |
| 11:43 | 17 | "What, if anything, do you have?"  And he told me he had a |
| 11:43 | 18 | CD. |
| 11:43 | 19 | Q.   Well, let's take a look at your deposition, page 1641. |
| 11:43 | 20 | The date is May 5, 2010, lines 16 to 19. |
| 11:44 | 21 |         THE WITNESS:  What page?  I'm sorry. |
| 11:44 | 22 |         MR. QUINN:  1641. |
| 11:44 | 23 |     (Document provided to the witness.) |
| 11:44 | 24 | BY MR. QUINN: |
| 11:44 | 25 | Q.   It's true, isn't it, that he told you that he had a CD |

| | | |
|---|---|---|
| 11:44 | 1 | with Mattel information on it in his office, correct? |
| 11:44 | 2 | A.   Yes. |
| 11:44 | 3 | Q.   And he told you there were Mattel-authored documents on |
| 11:44 | 4 | that CD, correct? |
| 11:44 | 5 | A.   This he told me after I interviewed him for the -- for |
| 11:44 | 6 | this particular deposition. |
| 11:44 | 7 | Q.   And he -- he told you that he had copied onto that CD |
| 11:44 | 8 | documents that he or Mr. Vargas or Ms. Trueba took from |
| 11:44 | 9 | Mattel using a USB drive, correct? |
| 11:44 | 10 | That's what he told you? |
| 11:44 | 11 | A.   He used -- he copied onto the CD a lot of information, |
| 11:44 | 12 | and among that information there was Mattel information. |
| 11:45 | 13 | Q.   Right.  And he had -- first off, he had taken it off of |
| 11:45 | 14 | a Mattel IT system using a USB drive.  He told you that, |
| 11:45 | 15 | correct? |
| 11:45 | 16 | A.   Yes. |
| 11:45 | 17 | Q.   And then he said he copied it on -- he had copied it |
| 11:45 | 18 | onto a CD, right? |
| 11:45 | 19 | A.   No. |
| 11:45 | 20 | Q.   He had used the USB drive to copy it onto the CD? |
| 11:45 | 21 | A.   No. |
| 11:45 | 22 | Q.   All right.  You tell me the relationship between the |
| 11:45 | 23 | USB drive and the CD.  What did he tell you about that? |
| 11:45 | 24 | A.   For the examination that I had with him, for this |
| 11:45 | 25 | deposition, he said that, on the USB, Gustavo, Pablo and |

| | | |
|---|---|---|
| 11:45 | 1 | Marina -- Mr. Machado, Ms. Trueba and Mr. Vargas -- put |
| 11:45 | 2 | information on a USB.  And then he put that information onto |
| 11:45 | 3 | his personal computer at home, a VIA computer. |
| 11:46 | 4 | Q.   Okay.  So it went -- download from the Mattel computer, |
| 11:46 | 5 | VIA, to a USB device, right? |
| 11:46 | 6 | A.   Yes. |
| 11:46 | 7 | Q.   From a USB device to a laptop? |
| 11:46 | 8 | A.   To his VIA computer, yes. |
| 11:46 | 9 | Q.   Right.  And then from there, he downloaded it to the |
| 11:46 | 10 | CD, correct? |
| 11:46 | 11 | A.   And then he told me that -- |
| 11:46 | 12 | Q.   Well, first, let me -- is that correct? |
| 11:46 | 13 | A.   That's the sequence. |
| 11:46 | 14 | Q.   To the CD? |
| 11:46 | 15 | A.   Yes. |
| 11:46 | 16 | Q.   And then that's the CD that was in his office the day |
| 11:46 | 17 | of the search, correct? |
| 11:46 | 18 | A.   That was the CD, yes. |
| 11:46 | 19 | Q.   And you know, in fact, that the Mexican authorities did |
| 11:46 | 20 | find the CD in Mr. Machado's office, correct? |
| 11:46 | 21 | A.   I don't know for a fact.  I know that they found a CD. |
| 11:46 | 22 | Q.   Well, Mr. Menotti, the MGA Mexico logistics person who |
| 11:47 | 23 | you referred to, told you that the Mexican police found the |
| 11:47 | 24 | CD in Mr. Machado's office; isn't that correct?  He told you |
| 11:47 | 25 | that? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

140

| | | |
|---|---|---|
| 11:47 | 1 | A.   I don't remember but... |
| 11:47 | 2 | Q.   Let's take a look at your deposition, page 271. |
| 11:47 | 3 | A.   What date? |
| 11:47 | 4 | MS. KELLER:  Can we have the date, Counsel. |
| 11:47 | 5 | MR. QUINN:  December 7th, 2009. |
| 11:47 | 6 | *(Document provided to the witness.)* |
| 11:47 | 7 | THE WITNESS:  271, yes. |
| 11:47 | 8 | MR. QUINN:  271, line 14, to 272, line 1. |
| 11:48 | 9 | And I'd call your attention, in particular, to |
| 11:48 | 10 | lines 20 and 21 on page 271. |
| 11:48 | 11 | THE WITNESS:  Yes. |
| 11:48 | 12 | BY MR. QUINN: |
| 11:48 | 13 | Q.   Does that refresh your recollection that Mr. Menotti |
| 11:48 | 14 | told you that the Mexican authorities found the CD in |
| 11:48 | 15 | Mr. Machado's office? |
| 11:48 | 16 | MS. KELLER:  Objection. |
| 11:48 | 17 | MR. COTE:  Objection, Your Honor.  Sorry. |
| 11:48 | 18 | MS. KELLER:  I think we've got stereo going here. |
| 11:48 | 19 | Your Honor, I think the question was "found the |
| 11:48 | 20 | CD," and I think this says "a CD." |
| 11:48 | 21 | MR. COTE:  My objection is hearsay, and the |
| 11:48 | 22 | 30(b)(6) objection. |
| 11:48 | 23 | THE COURT:  Well, just a moment. |
| 11:48 | 24 | So your objection is "the CD" versus "a CD"? |
| 11:48 | 25 | MS. KELLER:  The depo testimony specifically says |

| | | |
|---|---|---|
| 11:48 | 1 | they found "a CD." |
| 11:48 | 2 | THE COURT:  That's correct, on line 20. |
| 11:49 | 3 | MR. QUINN:  Line 7. |
| 11:49 | 4 | THE COURT:  Just a moment.  Well, you had me read |
| 11:49 | 5 | from line 14 through, 1. |
| 11:49 | 6 | Now where would you like me to read? |
| 11:49 | 7 | MR. QUINN:  Well, if Your Honor could start at |
| 11:49 | 8 | line 5. |
| 11:49 | 9 | THE COURT:  Line 5.  Okay.  Just a moment. |
| 11:49 | 10 | MR. QUINN:  I'm sorry.  I'm being told I'm |
| 11:49 | 11 | referring you to a different deposition. |
| 11:49 | 12 | THE COURT:  Well, just a moment. |
| 11:49 | 13 | MR. QUINN:  Ignore what I said.  Forget what I |
| 11:49 | 14 | said. |
| 11:49 | 15 | THE COURT:  All right.  I've just ignored it. |
| 11:49 | 16 | The question -- so why don't you just reask the |
| 11:49 | 17 | question. |
| 11:49 | 18 | MR. QUINN:  All right. |
| 11:49 | 19 | BY MR. QUINN: |
| 11:49 | 20 | Q.   I mean, you know there was a CD that was found in |
| 11:49 | 21 | Mr. Machado's office; you learned that, correct? |
| 11:49 | 22 | A.   Yes. |
| 11:49 | 23 | MR. COTE:  Objection.  Hearsay 30(b)(6). |
| 11:49 | 24 | THE COURT:  All right. |
| 11:49 | 25 | (To the jury:)  Now, I've already instructed you |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 142 of 160   Page ID #:304749
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

142

| | | |
|---|---|---|
| 11:49 | 1 | on that. |
| 11:49 | 2 | Counsel, would you like me to instruct again at |
| 11:49 | 3 | this time?  And then, I'm go to have counsel reask it so the |
| 11:49 | 4 | question's clear.  So I'm happy to instruct. |
| 11:49 | 5 | MR. COTE:  No.  No re-instruction, Your Honor. |
| 11:49 | 6 | THE COURT:  Then, I'm going to allow you to reask |
| 11:50 | 7 | the question regardless, so it's clear. |
| 11:50 | 8 | MR. QUINN:  Okay. |
| 11:50 | 9 | BY MR. QUINN: |
| 11:50 | 10 | Q.   A CD/the CD was found in Mr. Machado's office, correct? |
| 11:50 | 11 | A.   A CD, yes. |
| 11:50 | 12 | Q.   All right.  And that's the CD -- and you know, as a |
| 11:50 | 13 | result of the research you've done, that's the CD that |
| 11:50 | 14 | Mr. Machado told you about that he took that had Mattel |
| 11:50 | 15 | confidential and proprietary information on it, correct? |
| 11:50 | 16 | MS. KELLER:  Objection. |
| 11:50 | 17 | MR. COTE:  Same objection, Your Honor. |
| 11:50 | 18 | MS. KELLER:  Objection to the phrase, "He told you |
| 11:50 | 19 | it had confidential and proprietary information."  I doubt |
| 11:50 | 20 | very much Mr. Machado said that. |
| 11:50 | 21 | THE COURT:  Well, that's a speaking objection. |
| 11:50 | 22 | (To the jury:)  I'm going to have you disregard |
| 11:50 | 23 | Counsel's comment. |
| 11:50 | 24 | You can answer that question. |
| 11:50 | 25 | Overruled. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 143 of 160   Page ID #:304750
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

143

| | | |
|---|---|---|
| 11:50 | 1 | THE WITNESS:  Can you ask again, please? |
| 11:50 | 2 | MR. QUINN:  Okay. |
| 11:50 | 3 | BY MR. QUINN: |
| 11:50 | 4 | Q.   Did you discuss multiple contract's with Mr. Machado on |
| 11:50 | 5 | this day in New York when the search is going down? |
| 11:50 | 6 | A.   We discussed about a CD. |
| 11:50 | 7 | Q.   Right.  And that CD –– he told you, and you know as a |
| 11:51 | 8 | result of your research, you've told us that that CD had |
| 11:51 | 9 | confidential and proprietary Mattel information on it, |
| 11:51 | 10 | right? |
| 11:51 | 11 | A.   That CD had a lot of information on it. |
| 11:51 | 12 | Q.   Okay.  But among that information was confidential and |
| 11:51 | 13 | proprietary Mattel information, correct? |
| 11:51 | 14 | MR. COTE:  Objection.  30(b)(6) objection. |
| 11:51 | 15 | THE WITNESS:  I don't use those terms among the |
| 11:51 | 16 | information that was in the CD. |
| 11:51 | 17 | THE COURT:  I'm sorry.  I'm going to cut you off. |
| 11:51 | 18 | THE WITNESS:  I'm sorry. |
| 11:51 | 19 | THE COURT:  I apologize. |
| 11:51 | 20 | I'm happy to reinstruct, but then I'm going to |
| 11:51 | 21 | have Counsel to continue to ask the question, because the |
| 11:51 | 22 | jury's never hearing the response.  Okay?  So –– but I think |
| 11:51 | 23 | I'm gonna stop the time running right now for Mattel because |
| 11:51 | 24 | of the numerous objections. |
| 11:51 | 25 | (To the jury:)  So I'll reinstruct you.  But we're |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

144

| 11:51 | 1 | gonna have the question reasked, or reasked, if we need to, |
|---|---|---|
| 11:51 | 2 | many times. |
| 11:51 | 3 | Okay.  Ms. Kuemmerle, once again, was an MGA |
| 11:51 | 4 | corporate designee.  She's a 30(b)(6) witness.  She's |
| 11:52 | 5 | expected to prepare herself concerning MGA Mexico and |
| 11:52 | 6 | developments surrounding it.  And she's been designated as |
| 11:52 | 7 | such and, therefore, her testimony is binding on MGA Mexico. |
| 11:52 | 8 | However, she does not represent, and was not |
| 11:52 | 9 | designated, as this 30(b)(6) witness concerning MGA, |
| 11:52 | 10 | MGA Mexico, Hong Kong, Mr. Larian, or Mr. Machado. |
| 11:52 | 11 | Now, Counsel? |
| 11:52 | 12 | MR. COTE:  Thank you, Your Honor. |
| 11:52 | 13 | THE COURT:  Counsel, I've stopped the time because |
| 11:52 | 14 | of the objections, so this time is not counting against |
| 11:52 | 15 | Mattel. |
| 11:52 | 16 | You can ask the question again. |
| 11:52 | 17 | MR. QUINN:  All right. |
|  | 18 | BY MR. QUINN: |
| 11:52 | 19 | Q.   When you're -- the day the search was going down, |
| 11:52 | 20 | you're in New York with Mr. Machado, right? |
| 11:52 | 21 | A.   New Jersey. |
| 11:52 | 22 | Q.   New Jersey.  And you asked him, "Is there something -- |
| 11:52 | 23 | do you have any idea what they might be looking for?  Is |
| 11:52 | 24 | there something that you have that you're not supposed to |
| 11:52 | 25 | have?"  You asked him words to that effect, correct? |

| | | |
|---|---|---|
| 11:52 | 1 | A.   Along those lines. |
| 11:52 | 2 | Q.   Yeah.  And he tells you, "There's a CD"? |
| 11:53 | 3 | A.   Yes. |
| 11:53 | 4 |         THE COURT:  Okay.  Now, we'll start the time |
| 11:53 | 5 | running again. |
| 11:53 | 6 |         MR. QUINN:  All right. |
| 11:53 | 7 | BY MR. QUINN: |
| 11:53 | 8 | Q.   And he doesn't tell you there's multiple CD's.  He |
| 11:53 | 9 | refers to "a CD," correct? |
| 11:53 | 10 | A.   A CD, yes. |
| 11:53 | 11 | Q.   And then later on, as a result of your -- the research |
| 11:53 | 12 | that you did as a 30(b)(6) witness, you acquired some |
| 11:53 | 13 | information about the CD that we're discussing, correct? |
| 11:53 | 14 | A.   Yes. |
| 11:53 | 15 | Q.   And one of the things that you learned is that, on that |
| 11:53 | 16 | CD, the CD, was confidential Mattel information? |
| 11:53 | 17 |         MS. KELLER:  Objection.  Calls for a legal |
| 11:53 | 18 | conclusion. |
| 11:53 | 19 |         THE COURT:  Overruled. |
| 11:53 | 20 |         THE WITNESS:  I learned that there was information |
| 11:53 | 21 | from MGA, information from Mattel, personal information from |
| 11:53 | 22 | Gustavo Pablo, Mariana, job-offer letters, resumés, funny |
| 11:53 | 23 | pictures.  That's what I learned. |
| 11:53 | 24 | BY MR. QUINN: |
| 11:53 | 25 | Q.   Okay.  Let's -- let's focus on what you said about |

| | | |
|---|---|---|
| 11:53 | 1 | Mattel. |
| 11:53 | 2 | You learned as part of -- in your role as a 30(b)(6) |
| 11:54 | 3 | witness that he had Mattel documents on that CD which he |
| 11:54 | 4 | should not have had, correct? |
| 11:54 | 5 | A.   I learned that there was Mattel information on the CD. |
| 11:54 | 6 | Q.   Right.  And are you telling me now -- you know, I asked |
| 11:54 | 7 | "information he should not have had." |
| 11:54 | 8 | Are you telling me now that you think it was, based on |
| 11:54 | 9 | your research, perfectly all right for him to take that |
| 11:54 | 10 | Mattel information? |
| 11:54 | 11 | A.   That's not what I'm saying. |
| 11:54 | 12 | Q.   No.  Because you know he had information he should not |
| 11:54 | 13 | have had, correct? |
| 11:54 | 14 | A.   He had information that it was Mattel's information. |
| 11:54 | 15 | Q.   And he should not have had it, correct? |
| 11:54 | 16 | A.   No. |
| 11:54 | 17 | Q.   Is my statement correct? |
| 11:54 | 18 | A.   Yes. |
| 11:54 | 19 | Q.   In addition to the CD, the Mexican authorities found |
| 11:54 | 20 | certain hard copy documents in Ms. Trueba's office, correct? |
| 11:54 | 21 | A.   That's my understanding. |
| 11:55 | 22 | Q.   And those hard copy documents included other Mattel |
| 11:55 | 23 | documents, correct? |
| 11:55 | 24 | A.   Yes. |
| 11:55 | 25 | Q.   And the Mexican authorities also found documents in |

| 11:55 | 1 | Mr. Vargas's office, correct? |
| 11:55 | 2 | A.   Yes. |
| 11:55 | 3 | Q.   And the -- what we're talking about are other Mattel |
| 11:55 | 4 | documents, hard copy documents that were found in |
| 11:55 | 5 | Mr. Vargas's office, correct? |
| 11:55 | 6 | A.   Yes. |
| 11:55 | 7 | Q.   And you learned on the day of these -- you actually |
| 11:55 | 8 | learned on the day of the search that these materials had |
| 11:55 | 9 | been located in those employees' offices, right? |
| 11:55 | 10 | A.   Can you say that again, please? |
| 11:55 | 11 | Q.   You learned on the day of the search that those |
| 11:55 | 12 | documents had been found in those employees' offices, right? |
| 11:55 | 13 | A.   I believe I did, yes. |
| 11:55 | 14 | Q.   And the Mexican authorities took possession of hard |
| 11:56 | 15 | copy documents, correct? |
| 11:56 | 16 | A.   Uh, yes. |
| 11:56 | 17 | Q.   And Mr. Aguirre, the logistics employee who you |
| 11:56 | 18 | referred to, actually initialed the documents that the |
| 11:56 | 19 | Mexican authorities took so there would be a record of what |
| 11:56 | 20 | was found and what the Mexican authorities took during the |
| 11:56 | 21 | search, correct? |
| 11:56 | 22 | A.   Yes. |
| 11:56 | 23 | Q.   And you've seen these documents that Mr. Aguirre |
| 11:56 | 24 | initialed bearing his initials, correct? |
| 11:56 | 25 | A.   In preparation, yes. |

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

148

| | | |
|---|---|---|
| 11:56 | 1 | Q.   And if you'd look at -- please look at Exhibit 8089. |
| 11:57 | 2 | *(Document provided to the witness.)* |
| 11:57 | 3 | BY MR. QUINN: |
| 11:57 | 4 | Q.   You've seen this document as part of your work as a |
| 11:57 | 5 | 30(b)(6) witness? |
| 11:57 | 6 | A.   Yes. |
| 11:57 | 7 | Q.   And you know that this is a list of the Bates |
| 11:57 | 8 | numbers -- the identification numbers of the documents that |
| 11:57 | 9 | Mr. Aguirre initialed, correct? |
| 11:57 | 10 | A.   That I reviewed the initial, yes. |
| 11:57 | 11 | MR. QUINN:  We'd offer Exhibit 8089, Your Honor. |
| 11:57 | 12 | THE COURT:  Received. |
| 11:57 | 13 | *(Exhibit No. 8089 received in evidence.)* |
| 11:57 | 14 | *(Document displayed.)* |
| 11:57 | 15 | BY MR. QUINN: |
| 11:57 | 16 | Q.   And you know that these -- this list of Bates numbers |
| 11:57 | 17 | which identify numbers for the documents were scanned on to |
| 11:58 | 18 | another CD, correct? |
| 11:58 | 19 | A.   It's my understanding, yes. |
| 11:58 | 20 | Q.   Right.  And that other CD was sent to Mr. Aguirre, |
| 11:58 | 21 | correct? |
| 11:58 | 22 | A.   Um, I believe so, yes. |
| 11:58 | 23 | Q.   All right. |
| 11:58 | 24 | A.   Don't remember. |
| 11:58 | 25 | Q.   And -- and you've spoken with Mr. Aguirre, and you've |

DEBBIE GALE, U.S. COURT REPORTER

11:58  1   confirmed with him that his initials actually appear on

11:58  2   these documents, indicating that these are the document --

11:58  3   these are documents that were found in MGA Mexico's offices,

11:58  4   and they are documents that the police took, correct?

11:58  5   A.   In preparation for my deposition, yes, I called

11:58  6   Mr. Aguirre.

11:58  7   Q.   And then you've actually seen copies of those documents

11:58  8   bearing his initials, right?

11:58  9   A.   I reviewed the signature on each page.

11:58  10  Q.   And if we could -- and just so the -- and Mr. Aguirre

11:58  11  actually got copies of these documents -- Mr. Aguirre, you

11:59  12  know, was actually sent a CD containing the hard copies of

11:59  13  the documents bearing his initials, right?

11:59  14  A.   It is my understanding, yes.

11:59  15  Q.   And, um -- and he actually reviewed that CD?

11:59  16  A.   I believe so, yes.

11:59  17  Q.   And he reviewed the scanned copies of the documents

11:59  18  bearing his initials on the CD?

11:59  19  A.   It is my understanding, yes.

11:59  20  Q.   And he confirmed to you that all the documents on

11:59  21  this -- that were scanned onto that CD, that his initials,

11:59  22  in fact, appeared indicating that they were found in the MGA

11:59  23  Mexico offices?

11:59  24  A.   He confirmed that his initials were on those documents

11:59  25  that he received.

CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

150

| | | |
|---|---|---|
| 11:59 | 1 | Q.   And you reviewed them all yourself and confirmed that |
| 11:59 | 2 | they were all signed by –– with his initials, right? |
| 11:59 | 3 | A.   I reviewed that the signature was there. |
| 11:59 | 4 | Q.   And if we could look at some of these exhibits. |
| 11:59 | 5 | Exhibit 7148. |
| 12:00 | 6 | *(Document provided to the witness.)* |
| 12:00 | 7 | THE COURT:  Counsel, if you're going to start |
| 12:00 | 8 | going through a series of exhibits, do you want to send the |
| 12:00 | 9 | jury to lunch, for both parties? |
| 12:00 | 10 | MR. QUINN:  I think that would be a good idea. |
| 12:00 | 11 | THE COURT:  Mr. Overland?  Mr. Cote? |
| 12:00 | 12 | MR. COTE:  Yes, Your Honor. |
| 12:00 | 13 | THE COURT:  All right. |
| 12:00 | 14 | Then we'll see you at 1:00 o'clock. |
| 12:00 | 15 | You're admonished not to discuss the matter |
| 12:00 | 16 | amongst yourselves nor form or express any opinion |
| 12:00 | 17 | concerning the case. |
| 12:00 | 18 | We'll see you at 1:00. |
| 12:00 | 19 | Ms. Kuemmerle, if you would have a seat for just a |
| 12:00 | 20 | moment. |
| 12:00 | 21 | *(Jury recesses for lunch at 12:00 p.m.)* |
| 12:00 | 22 | *(Outside the presence of the jury.)* |
| 12:00 | 23 | THE COURT:  Counsel, if you would have a seat for |
| 12:00 | 24 | just a moment. |
| 12:00 | 25 | For my record, there's been quite a discussion |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:00 | 1 | about the authenticity of the disk that Mattel is seeking to |
| 12:00 | 2 | get into evidence. |
| 12:01 | 3 | It's apparent that this disk, however it was |
| 12:01 | 4 | created, went from Mr. Aguirre to O'Melveny Meyer -- I'm |
| 12:01 | 5 | sorry -- to you, apparently, Ms. Kuemmerle, or at least I've |
| 12:01 | 6 | heard this representation by counsel that you kept it some |
| 12:01 | 7 | period of time, possibly up to a year.  Then it went to |
| 12:01 | 8 | O'Melveny Meyer, and then allegedly on to Orrick, and then, |
| 12:01 | 9 | from that law firm, to Quinn Emanuel. |
| 12:01 | 10 | Now, I'm still not certain, because of the |
| 12:01 | 11 | multiple representations by counsel, how this disk was |
| 12:01 | 12 | prepared.  And I'm going to repeat back to you what I heard |
| 12:01 | 13 | concerning your testimony; and that is, you saw these Bates |
| 12:01 | 14 | numbers in Exhibit 8089. |
| 12:01 | 15 | So if you look at that document.  Do you see 8089? |
| 12:02 | 16 | THE WITNESS:  It's not here, Your Honor. |
| 12:02 | 17 | THE COURT:  One of the counsel will help you |
| 12:02 | 18 | immediately.  Thank you. |
| 12:02 | 19 | *(Document provided to the witness.)* |
| 12:02 | 20 | THE COURT:  And that these Bates numbers match up |
| 12:02 | 21 | to, apparently, what I understood to be documents, some of |
| 12:02 | 22 | which were found -- well, strike that.  You tell me.  In |
| 12:02 | 23 | other words, eventually, there's going to be a CD disk. |
| 12:02 | 24 | Were there also individual items taken into |
| 12:02 | 25 | custody -- from your understanding as a 30(b)(6) witness, |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 152 of 160   Page ID #:304759
CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

152

| | | |
|---|---|---|
| 12:02 | 1 | individual documents from the desk of Mr. Machado? |
| 12:02 | 2 | THE WITNESS:  I'm -- |
| 12:02 | 3 | THE COURT:  That just requires a yes or no. |
| 12:02 | 4 | THE WITNESS:  I'm confused what you're asking me. |
| 12:02 | 5 | THE COURT:  Well -- |
| 12:02 | 6 | THE WITNESS:  What I learned -- |
| 12:02 | 7 | THE COURT:  -- I'll be very clear, because I've |
| 12:02 | 8 | been confused by the representations of counsel, and I've |
| 12:02 | 9 | been confused by your testimony. |
| 12:03 | 10 | THE WITNESS:  So what I found is that a CD was |
| 12:03 | 11 | found and hard copies. |
| 12:03 | 12 | THE COURT:  And hard copies were found.  Also |
| 12:03 | 13 | paper documents? |
| 12:03 | 14 | THE WITNESS:  Printed documents. |
| 12:03 | 15 | THE COURT:  Now, were those paper documents -- and |
| 12:03 | 16 | I expected you to be prepared as a 30(b)(6). |
| 12:03 | 17 | THE WITNESS:  Yes. |
| 12:03 | 18 | THE COURT:  Were those payment documents, then, |
| 12:03 | 19 | somehow transferred or added to the CD that was found in the |
| 12:03 | 20 | office? |
| 12:03 | 21 | THE WITNESS:  It was never cleared.  I know that |
| 12:03 | 22 | there was -- |
| 12:03 | 23 | THE COURT:  Just a moment. |
| 12:03 | 24 | THE WITNESS:  Yes. |
| 12:03 | 25 | THE COURT:  From your understanding as a 30(b)(6) |

| | | |
|---|---|---|
| 12:03 | 1 | witness, was the CD initialed for, by Mr. Aguirre while the |
| 12:03 | 2 | Mexican police were still in MGA de Mexico offices? |
| 12:03 | 3 | THE WITNESS:  It is my understanding, Your Honor. |
| 12:03 | 4 | THE COURT:  All right.  Were the documents somehow |
| 12:04 | 5 | scanned and added to this CD, or do you know? |
| 12:04 | 6 | THE WITNESS:  I do not know that, Your Honor. |
| 12:04 | 7 | THE COURT:  Why don't you know? |
| 12:04 | 8 | THE WITNESS:  I was only requested to find out if |
| 12:04 | 9 | the CD was signed and printed documents were signed. |
| 12:04 | 10 | THE COURT:  Who made that limited request to you? |
| 12:04 | 11 | THE WITNESS:  That was my understanding. |
| 12:04 | 12 | THE COURT:  Who made that limited request to you? |
| 12:04 | 13 | THE WITNESS:  That, I don't remember. |
| 12:04 | 14 | But I can say that -- |
| 12:04 | 15 | THE COURT:  I'm not asking any additional |
| 12:04 | 16 | questions right now.  I don't really care that you volunteer |
| 12:04 | 17 | information to me. |
| 12:04 | 18 | THE WITNESS:  Okay. |
| 12:04 | 19 | THE COURT:  It's apparent to me that, if the CD |
| 12:04 | 20 | was found, and there is information that was additionally |
| 12:04 | 21 | transferred to that CD, from counsel's back and forth |
| 12:04 | 22 | representations to me outside the presence of the jury, I've |
| 12:05 | 23 | formed the initial opinion that that would have had to have |
| 12:05 | 24 | been done inside the MGA Mexico offices while the police |
| 12:05 | 25 | were there.  Because after all, I've heard that Mr. Aguirre |

| | | |
|---|---|---|
| 12:05 | 1 | initialed and signed for the CD the same day the police were |
| 12:05 | 2 | there. |
| 12:05 | 3 | Is that true?  In other words, did Mr. Aguirre |
| 12:05 | 4 | sign the CD with his initials, the CD, the same day the |
| 12:05 | 5 | police were there? |
| 12:05 | 6 | THE WITNESS:  That's my -- |
| 12:05 | 7 | THE COURT:  He was given a copy, wasn't he? |
| 12:05 | 8 | THE WITNESS:  That's my understanding, Your Honor. |
| 12:05 | 9 | THE COURT:  Now, to transfer additional |
| 12:05 | 10 | information onto the CD, I think we'd have to scan a paper |
| 12:05 | 11 | document, wouldn't we? |
| 12:05 | 12 | THE WITNESS:  I agree. |
| 12:05 | 13 | THE COURT:  Did MGA offices have scanning |
| 12:05 | 14 | equipment? |
| 12:05 | 15 | THE WITNESS:  Yes, we do -- we did. |
| 12:05 | 16 | THE COURT:  Now, in your inquiry as a 30(b)(6) |
| 12:05 | 17 | witness, did you inquire about who had custody of the |
| 12:05 | 18 | separate documents taken from Mr. Machado's office, |
| 12:06 | 19 | minimally, possibly, the -- we'll call 'em paper |
| 12:06 | 20 | documents -- from Mr. Vargas or Mr. -- |
| 12:06 | 21 | THE WITNESS:  Ms. Trueba. |
| 12:06 | 22 | THE COURT:  -- or Ms. Trueba's office?  Did you |
| 12:06 | 23 | inquire who had custody of these? |
| 12:06 | 24 | THE WITNESS:  I did.  And my understanding is that |
| 12:06 | 25 | everything was gathered and taken into the conference room. |

| | | |
|---|---|---|
| 12:06 | 1 | THE COURT:  Okay.  Now, when it's gathered and |
| 12:06 | 2 | taken into the conference room, who took the paper copies |
| 12:06 | 3 | into the conference room? |
| 12:06 | 4 | THE WITNESS:  I do not know.  It was -- |
| 12:06 | 5 | THE COURT:  Why don't you know? |
| 12:06 | 6 | THE WITNESS:  It was not clear. |
| 12:06 | 7 | THE COURT:  Did you make an inquiry? |
| 12:06 | 8 | THE WITNESS:  It was -- I asked, and it was not |
| 12:06 | 9 | clear as to who took the documents to the conference room. |
| 12:06 | 10 | THE COURT:  Who did you ask? |
| 12:06 | 11 | THE WITNESS:  I asked Mr. Aguirre.  And I believe |
| 12:06 | 12 | I asked Mr. Menotti. |
| 12:06 | 13 | THE COURT:  And nobody was clear? |
| 12:06 | 14 | THE WITNESS:  No. |
| 12:06 | 15 | THE COURT:  Were the MGA lawyers present in the |
| 12:06 | 16 | conference room with these documents and the Mexican police? |
| 12:07 | 17 | THE WITNESS:  I don't know. |
| 12:07 | 18 | THE COURT:  Did you ask? |
| 12:07 | 19 | THE WITNESS:  I don't remember. |
| 12:07 | 20 | THE COURT:  Why didn't you ask? |
| 12:07 | 21 | THE WITNESS:  Didn't occur to me. |
| 12:07 | 22 | THE COURT:  Was there scanning equipment inside |
| 12:07 | 23 | the conference room? |
| 12:07 | 24 | THE WITNESS:  No. |
| 12:07 | 25 | THE COURT:  After the Mexican police were inside |

| | | |
|---|---|---|
| 12:07 | 1 | the conference room with these loose paper documents from |
| 12:07 | 2 | all three or any one of the offices, at what point in time |
| 12:07 | 3 | or location was Mr. Aguirre signing for the disk? |
| 12:07 | 4 | THE WITNESS:  I'm sorry.  I don't understand. |
| 12:07 | 5 | THE COURT:  Okay.  He signed for a disk.  We know |
| 12:07 | 6 | that. |
| 12:07 | 7 | THE WITNESS:  Yes. |
| 12:07 | 8 | THE COURT:  The disk. |
| 12:07 | 9 | THE WITNESS:  Yes. |
| 12:07 | 10 | THE COURT:  Did he sign for the disk inside the |
| 12:07 | 11 | conference room? |
| 12:07 | 12 | THE WITNESS:  Uh, he told me that he had five |
| 12:07 | 13 | minutes to sign everything that was in the conference room. |
| 12:07 | 14 | THE COURT:  And, therefore, am I to assume that he |
| 12:08 | 15 | signed -- |
| 12:08 | 16 | THE WITNESS:  In the conference room. |
| 12:08 | 17 | THE COURT:  -- in the conference room? |
| 12:08 | 18 | THE WITNESS:  Yes. |
| 12:08 | 19 | THE COURT:  Were MGA lawyers present when he |
| 12:08 | 20 | signed? |
| 12:08 | 21 | THE WITNESS:  I do not know. |
| 12:08 | 22 | THE COURT:  Have you seen this disk? |
| 12:08 | 23 | THE WITNESS:  I saw a disk that was in my office. |
| 12:08 | 24 | THE COURT:  Have you viewed the contents of the |
| 12:08 | 25 | disk? |

CV 04-9049 DOC - 2/23/2011 - Day 22, Volume 1 of 4

157

| | | |
|---|---|---|
| 12:08 | 1 | THE WITNESS: I put it in my laptop. |
| 12:08 | 2 | THE COURT: I asked you did you view the contents. |
| 12:08 | 3 | I didn't ask you if you put it in the laptop. |
| 12:08 | 4 | Did you view the contents? |
| 12:08 | 5 | THE WITNESS: Not all of the contents. |
| 12:08 | 6 | THE COURT: How much? |
| 12:08 | 7 | THE WITNESS: I can tell you that I reviewed the |
| 12:08 | 8 | job offers, the contracts. I saw the pictures. |
| 12:08 | 9 | THE COURT: Now, I've been told that there are |
| 12:08 | 10 | approximately 50 downloaded documents that pertain to |
| 12:08 | 11 | Mattel -- and eventually we're going to sort out which of |
| 12:08 | 12 | those documents are trade secrets and which aren't -- and |
| 12:09 | 13 | another 24 documents that I think Counsel will be |
| 12:09 | 14 | stipulating to that are Mattel documents, but that are not |
| 12:09 | 15 | claimed to be trade secrets. And there's going to be a |
| 12:09 | 16 | contention between the parties that some of those |
| 12:09 | 17 | documents -- of the first 50 that I mentioned -- were, in |
| 12:09 | 18 | fact, either Mattel documents or Mattel de Mexico documents. |
| 12:09 | 19 | I know that there are extraneous items on that -- |
| 12:09 | 20 | personal pictures, et cetera -- that have no relevance to |
| 12:09 | 21 | this lawsuit. I'm gonna ask you about all of the Mattel |
| 12:09 | 22 | documents, which should be 50, and I think it's 24 or 26 -- |
| 12:09 | 23 | a total of 74 to 76 documents. |
| 12:09 | 24 | Have you seen each one of those? |
| 12:09 | 25 | THE WITNESS: Not all of them, Your Honor. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:09 | 1 | THE COURT:  Why didn't you view them? |
| 12:09 | 2 | THE WITNESS:  I only review the documents on this |
| 12:09 | 3 | e-mail to assert the signature of Mr. Aguirre. |
| 12:09 | 4 | THE COURT:  You are a 30(b)(6) witness.  I'm going |
| 12:09 | 5 | to ask you again.  You represented, and I ordered you to |
| 12:10 | 6 | prepare, as a 30(b)(6) witness.  That doesn't mean that you |
| 12:10 | 7 | do that partially.  You're duty-bound to educate yourself. |
| 12:10 | 8 | Why didn't you view these? |
| 12:10 | 9 | THE WITNESS:  I -- there was a problem with me |
| 12:10 | 10 | reviewing all of the documents related to -- |
| 12:10 | 11 | THE COURT:  What was the problem? |
| 12:10 | 12 | THE WITNESS:  I didn't want to be looking at |
| 12:10 | 13 | documents. |
| 12:10 | 14 | THE COURT:  Why? |
| 12:10 | 15 | THE WITNESS:  In the sense that I am afraid that |
| 12:10 | 16 | then I will be sued at a later time. |
| 12:10 | 17 | THE COURT:  And that's why the 30(b)(6) was cut |
| 12:10 | 18 | off at that time?  You were afraid of Mattel suing you; is |
| 12:10 | 19 | that correct? |
| 12:10 | 20 | THE WITNESS:  Yes, sir. |
| 12:10 | 21 | THE COURT:  And that's the last, I think, contact |
| 12:10 | 22 | I had with you and Counsel at that time. |
| 12:10 | 23 | THE WITNESS:  That's correct. |
| 12:10 | 24 | THE COURT:  Because you refused -- now I |
| 12:10 | 25 | understand.  You'd refused to answer the questions on that |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 159 of 160   Page ID #:304766
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

159

| | | |
|---|---|---|
| 12:10 | 1 | date -- |
| 12:10 | 2 | THE WITNESS:  Because of a lawsuit. |
| 12:10 | 3 | THE COURT:  -- because of a lawsuit. |
| 12:10 | 4 | You understand, though, that you are a properly |
| 12:10 | 5 | designated 30(b)(6) witness concerning MGA Mexico? |
| 12:10 | 6 | THE WITNESS:  Yes. |
| 12:10 | 7 | THE COURT:  Okay. |
| 12:10 | 8 | All right.  Counsel, 1:00 o'clock, please. |
| 12:10 | 9 | Thank you. |
| 12:10 | 10 | Ms. Kuemmerle, 1:00 o'clock, please, if you would |
| 12:11 | 11 | be seated. |
| 12:11 | 12 | THE WITNESS:  Yes. |
| 12:11 | 13 | THE COURT:  Thank you. |
| 12:11 | 14 | *(Lunch recess held at 12:11 p.m.)* |
| 12:11 | 15 | *(Further proceedings reported by Jane Sutton* |
| 12:11 | 16 | *Rule in Volume II.)* |
| 12:11 | 17 | -oOo- |
| 12:11 | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10087   Filed 02/28/11   Page 160 of 160   Page ID #:304767
CV 04-9049 DOC – 2/23/2011 – Day 22, Volume 1 of 4

160

12:11   1                              -oOo-

12:11   2

12:11   3                           CERTIFICATE

12:11   4

12:11   5          I hereby certify that pursuant to Section 753,

12:11   6   Title 28, United States Code, the foregoing is a true and

12:11   7   correct transcript of the stenographically reported

12:11   8   proceedings held in the above-entitled matter and that the

12:11   9   transcript page format is in conformance with the

12:11  10   regulations of the Judicial Conference of the United States.

12:11  11

12:11  12   Date:  February 23, 2011

12:11  13

12:11  14
12:11
12:11  15   _____
12:11
12:11  16        DEBBIE GALE, U.S. COURT REPORTER
                 CSR NO. 9472, RPR

12:11  17

12:11  18

12:11  19

       20

       21

       22

       23

       24

       25