1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4              - - - - - - -

5

6   MATTEL, INC., ET AL.,              )
                                       )
7            Plaintiffs,               )
                                       )
8        vs.                           ) No. CV 04-9049-DOC
                                       )    Day 22
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 4
                                       )
10           Defendants.               )
    _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Jury Trial

17              Santa Ana, California

18          Wednesday, February 23, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-23 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                  Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              – AND –

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                 Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             KEN KOTARSKI, Mattel Technical Operator

17             MIKE STOVALL, MGA Technical Operator

18             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

1                            **I N D E X**

2

3

4                         **EXAMINATION**

5

6    **Witness Name**        **Direct**    **Cross**    **Redirect**    **Recross**

7    KUEMMERLE, SUSANA
        By Mr. Quinn          6
8       By Ms. Keller                      45

9

10

11                          EXHIBITS

12

13   **Exhibit**                    **Identification**    **Evidence**

14   Defendants' No. 3610                                  72

15   Plaintiffs' No. 7148                                  13

16   Plaintiffs' No. 7150                                  14

17   Plaintiffs' No. 7151                                  20

18   Plaintiffs' No. 7152                                  16

19   Plaintiffs' No. 7153                                  16

20   Plaintiffs' No. 7154                                  17

21   Plaintiffs' No. 7155                                  17

22   Plaintiffs' No. 7156                                  17

23   Plaintiffs' No. 7157                                  18

24

25

1            **I N D E X** (Continued)

2

3

4                    **EXHIBITS**

5

6   <u>**Exhibit**</u>                    <u>**Identification**</u>   <u>**Evidence**</u>

7   Plaintiffs' No. 7158                              19

8   Plaintiffs' No. 7159                              19

9   Plaintiffs' No. 7160                              19

10  Plaintiffs' No. 12834                             20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 23, 2011

 2                        DAY 22, VOLUME 2 OF 4

 3                          (1:06 p.m.)

 4            (The following proceedings is taken in the

 5       presence of the jury.)

 6            THE COURT:  Okay.  We are on the record, and all

 7       counsel are present, all parties are present, the witness

 8       and the jury.

 9                 Please be seated, and thank you for your courtesy.

10                 And Counsel, if you'd like to continue with your

11       examination.

12            MR. QUINN:  Thank you, your Honor.

13            SUSANA KUEMMERLE, PLAINTIFFS' WITNESS, RESUMED

14                     DIRECT EXAMINATION (Continued)

15       BY MR. QUINN:

16       Q    Ms. Kuemmerle, you left the employment of MGA, when was

17       it?

18       A    May 2010.

19       Q    And are you presently represented by any attorney here?

20       A    No.  I don't know.

21       Q    You don't know?

22       A    I don't have a personal attorney here.  The team of MGA

23       attorneys.  I don't have a personal attorney here.

24       Q    So have you been meeting with MGA attorneys?

25       A    Yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 7 of 107   Page ID #:304774
CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

7

1    Q    Did you speak to them over lunch?

2    A    We had lunch together, yes.

3    Q    And did you speak at all about your testimony?

4    A    No, actually, no.

5    Q    It didn't come up at all?

6    A    We were talking about Buenos Aires.

7    Q    All right.  And since you came to Los Angeles, have you

8    spent any other time with MGA lawyers?

9    A    Yes.

10   Q    And when did you arrive here in Los Angeles?

11   A    On Sunday night, I think.

12   Q    Okay.

13   A    No.  Saturday night.

14   Q    And did you spend any time Saturday night with the MGA

15   lawyers?

16   A    No.

17   Q    How about Sunday?

18   A    Yes.

19   Q    How much time did you spend with them on Sunday?

20   A    Six hours, around that time.

21   Q    And how about Monday, did you spend any time with them

22   on Monday?

23   A    Yes.

24   Q    How much time did you spend with them on Monday?

25   A    Around five, six hours.

1    Q    And then Tuesday, did you spend any time yesterday?

2    A    Yes, waiting.

3    Q    With the MGA lawyers?

4    A    Yes.

5    Q    Now, in those conversations on Sunday, Monday, Tuesday,

6    did you talk at all about, you know, what your testimony

7    might be?

8    A    About my testimony?  Yes.

9    Q    Yes.

10        And did they tell you the kinds of questions they

11   thought you might be asked and the types of questions that

12   they intended to ask you?

13   A    Yes.

14   Q    And did they go over what your answers might be with

15   you?

16   A    We went over my depositions and about listening to the

17   question and giving the correct answer, yes.

18   Q    Okay.  And you -- they talked also about, you know,

19   what kinds of questions you might be asked and how you might

20   respond to those, correct?

21   A    We had a training as to what kind of questions, and my

22   answers got to be the correct answer.

23   Q    Right.

24        And they helped you do that, to get correct answers,

25   correct?

1   A    I come here to say the truth, and so my answer is what

2   I recall from what happened.

3   Q    All right.  And you went over the subjects of your

4   testimony with MGA's lawyers, correct?

5   A    Say that again.

6   Q    You went over the subjects of your testimony with MGA's

7   lawyers, correct?

8   A    Yes.

9   Q    For a total of 12 to 15 hours?

10   A    More or less, yes.

11   Q    All right.  We were looking at Exhibit 8089.

12          MR. QUINN:  If we could put that up on the screen.

13   BY MR. QUINN:

14   Q    And I think that you told us that what's listed here,

15   these Bate -- Bates ranges refer to documents which have

16   been signed by Mr. Aguirre at the MGA offices?

17          MR. QUINN:  If we could put that up, Ken.

18   BY MR. QUINN:

19   Q    Is that correct?

20   A    That was agreed between Mr. Molinski and Mr. Khouri

21   that that's the list of documents.

22   Q    Right.

23   A    Where Carlos confirmed to me that he signed.

24   Q    All right.  But it's not only the lawyers that agreed.

25   You actually looked at the documents, and you saw the

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 10 of 107   Page ID #:304777
CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

10

1    initials on the documents, correct?

2    A    Yes.

3    Q    And maybe I can clear up a little bit of confusion,

4    here.  This -- potential confusion.  This refers at the top

5    to a list of Bates ranges on CD; do you see that?

6    A    Yes.

7    Q    And what that refers to is another CD that was created

8    in 2010, correct?

9    A    It is my understanding that a CD with this documents

10   was created for Carlos Aguirre to review.

11   Q    All right.  And that was done last year, 2010?

12   A    2010.

13   Q    Right.  And that's so these documents that bore his

14   initials were scanned onto this CD and sent to him so he

15   could look at them and confirm that those, in fact, were his

16   initials, right?

17   A    Yes.

18   Q    And you reviewed that -- those documents as well

19   yourself?

20   A    Yes.

21   Q    So that CD, which we might call the 2010 CD, that's a

22   completely different CD than the CD that was found at the

23   time of the search and seizure in Mr. Machado's office,

24   correct?

25   A    That's my understanding.

1    Q    Okay.

2          THE COURT:  And can the two of you clear that up

3    for us by agreement or stipulation.  The CD that's been in

4    question in this case is marked as an exhibit number --

5    we'll find that, but is this the --

6          MR. QUINN:  8855A.

7          THE COURT:  8855A.

8          Is this what you referred to as the 2010?

9          MR. QUINN:  No.

10         THE COURT:  Or is it the 2005?

11         MR. QUINN:  2005.

12         THE COURT:  Okay.

13         MR. QUINN:  2005.

14         THE COURT:  Is this allegedly --

15         MR. QUINN:  It's 2004 that the search took place,

16   your Honor.

17         MR. PRICE:  No.  2005 the search took place.

18         MR. QUINN:  Okay.  The search is 2005, but the CD

19   was made in 2004.

20         MR. PRICE:  Again, no, the CD was not made in

21   2004.

22         MS. KELLER:  Our understanding is that the CD was

23   made in 2010 to compile a CD of some of these hard copies --

24         MR. COTE:  No.

25         (Laughter.)

```
 1              THE COURT:  That's why we're having a lot of
 2    evening hours.  I'm joking with the jury for a moment.
 3    Don't worry about it.  They will explain this to us
 4    perfectly.
 5              Counsel, your next question.
 6              Both sides will make this clear to us.
 7    BY MR. QUINN:
 8    Q    All right.  So there is a CD -- once upon a time --
 9              (Laughter.)
10              MR. MC CONVILLE:  Can this be the objection, your
11    Honor, just put the hands up in the air?
12    BY MR. QUINN:
13    Q    Once upon a time, seriously, there was a CD that was
14    found in Mr. Machado's office at the time of the search in
15    2005, correct?
16    A    Yes.
17    Q    That's not the CD that's referred to here on this
18    Exhibit 8089, correct?
19    A    Yes.
20    Q    What the exhibit that's referred to on 8089 has on it,
21    the hard copy doc -- images of the hard copy documents
22    initialed by Mr. Aguirre, correct?
23    A    Yes.
24    Q    And those are the hard copy documents that were found
25    in Mexico MGA's offices at the time of this search, correct?
```

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 13 of 107   Page ID #:304780
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

13

1    A    That is my understanding.

2    Q    And actually, this CD that's referred to in this

3    Exhibit 8089 was made by the attorneys for MGA,

4    Mr. Molinski, to send to Mr. Aguirre so he can confirm his

5    signature, correct?

6    A    It was made by Orrick to send to Mr. Aguirre.

7    Q    So he could confirm his signature and then he could

8    confirm that to you, correct?

9    A    Yes.

10   Q    Okay.  All right.  So if we could look at some of these

11   exhibits that are referenced here, 71- -- beginning with

12   7148.

13       You see Mr. Aguirre's initials here on Exhibit 7148?

14   A    Yes.

15            MR. QUINN:  We'd offer that, your Honor.

16            THE COURT:  Received.

17            MR. COTE:  Objection.  30(b)(6) objection.  No

18   foundation as to Mr. Machado.

19            THE COURT:  Okay.

20            (Plaintiffs' Exhibit No. 7148 is received in

21       evidence.)

22   BY MR. QUINN:

23   Q    And that indicates to you the fact that it is signed --

24   can you point out where the initials are, is that --

25   A    Sort of like a T in the lower -- there.

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 14 of 107   Page ID #:304781
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

14

1   Q    All right.  And so the -- the presence of that

2   signature, based upon your research, indicates to you and

3   you are testifying that this is one of the hard copy

4   documents that were found at the time of the search in 2005

5   at MGA Mexico's offices, correct?

6   A    Based on my research, yes.

7   Q    And then if we could look at Exhibit 7149.

8   A    7149?

9   Q    Yes.

10  A    I'm not crazy, it's not in there.

11  Q    We are going to skip that one right now.

12       7150.

13  A    71- --

14  Q    7150.  Do you see Mr. Aguirre's signature there on that

15  document?

16  A    On the second page, yes.

17          MR. QUINN:  And we'd offer that as well, your

18  Honor.

19          MR. COTE:  Same objection.

20          THE COURT:  Received.

21          *(Plaintiffs' Exhibit No. 7150 is received in*

22       *evidence.)*

23          THE COURT:  And Counsel, do you want me to give an

24  admonition after each one or at the end?

25          MR. COTE:  At the end, please.

```
 1                THE COURT:  Okay.  I'll receive it and then give a
 2    general admonition.
 3                MR. COTE:  Thank you.
 4    BY MR. QUINN:
 5    Q    So this was another one of the documents found in MGA
 6    Mexico's offices at the time of the search?
 7    A    Yes.
 8    Q    And this is approximately -- it begins on -- it's --
 9    this document is 67 pages in length, if you look at the
10    numbers down at the bottom.
11    A    Yes.
12    Q    Then if we could look at Exhibit 7152.
13    A    Yes.
14    Q    Do you see Mr. Aguirre's signature there?
15    A    Yes.
16    Q    Again, indicating that this is another document that
17    was found in MGA Mexico's offices?
18    A    Yes.
19    Q    Okay.
20                MR. QUINN:  We'd offer Exhibit 7152, your Honor.
21                MR. COTE:  Same objection.
22                THE COURT:  Received.
23                And once again, do you want me to give the general
24    admonition at the end?
25                MR. COTE:  At the end is fine, thank you.
```

```
 1            THE COURT:  I'm going to assume you are objecting
 2     to each one of those for the record.
 3            MR. COTE:  Okay.  Thank you.
 4            THE COURT:  All right.
 5            (Plaintiffs' Exhibit No. 7152 is received in
 6        evidence.)
 7            MR. QUINN:  Okay.  If we can put up on the screen
 8     the first page, Ken.
 9     BY MR. QUINN:
10     Q    And this document is 24 pages in length?
11     A    Yes.
12     Q    And then if we could look at Exhibit 7153.
13        Do you see Mr. Aguirre's initials on this as well?
14     A    Yes.
15            MR. QUINN:  And we'd offer that, your Honor.
16            THE COURT:  Received.
17            (Plaintiffs' Exhibit No. 7153 is received in
18        evidence.)
19     BY MR. QUINN:
20     Q    And this document is 18 pages in length?
21     A    I'm sorry.  Yes.
22     Q    And then 7154?
23     A    Yes.
24     Q    Do you see Mr. Aguirre's initials on this as well?
25     A    Yes.
```

CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

17

```
 1                MR. QUINN:  We'd offer 7154.

 2                THE COURT:  Received.

 3                (Plaintiff's Exhibit No. 7154 is received in

 4       evidence.)

 5     BY MR. QUINN:

 6     Q    And this document is 23 pages in length?

 7     A    Yes.

 8     Q    And then 7155, do you see Mr. Aguirre's signature on

 9     7155?

10     A    Yes.

11                MR. QUINN:  We'd offer 7155.

12                THE COURT:  Received.

13                (Plaintiffs' Exhibit No. 7155 is received in

14       evidence.)

15     BY MR. QUINN:

16     Q    And that is 20 pages in length?

17     A    Yes.

18     Q    And then 7156, do you see Mr. Aguirre's signature

19     there?

20     A    Yes.

21                MR. QUINN:  I'd offer 7156.

22                THE COURT:  Received.

23                (Plaintiffs' Exhibit No. 7156 is received in

24       evidence.)

25
```

18

1    BY MR. QUINN:

2    Q    And that is 19 pages in length?

3    A    Yes.

4    Q    And then 7157, do you see Mr. Aguirre's signature on

5    7157?

6    A    How many pages do you have?

7         MR. QUINN:  If you can help.

8    BY MR. QUINN:

9    Q    It's 7157, it's a 130 -- 135-page document.

10   A    Okay, yes.

11   Q    Do you see his initials there on the first page?

12   A    Yes.

13        MR. QUINN:  So we offer 7157.

14        THE COURT:  Received.

15        *(Plaintiff's Exhibit No. 7157 is received in*

16   *evidence.)*

17        THE WITNESS:  We have a translation, sorry.  Yes.

18   BY MR. QUINN:

19   Q    So with the translation?

20   A    Yes, it's 135 pages.

21   Q    So 7158, do you see Mr. Aguirre's signature on that

22   exhibit?

23   A    Yes.

24        MR. QUINN:  We'd offer Exhibit 7158.

25        THE COURT:  Received.

```
 1              (Plaintiff's Exhibit No. 7158 is received in

 2         evidence.)

 3    BY MR. QUINN:

 4    Q    And that's 18 pages in length?

 5    A    Yes.

 6    Q    And 7159, do you see Mr. Aguirre's signature on that

 7    document?

 8    A    Yes.

 9              MR. QUINN:  We'd offer Exhibit 7159.

10              THE COURT:  Received.

11              (Plaintiffs' Exhibit No. 7159 is received in

12         evidence.)

13    BY MR. QUINN:

14    Q    That is 47 pages in length?

15    A    With the translation, yes.

16    Q    And then 7160, do you see Mr. Aguirre's signature on

17    that document?

18    A    Yes.

19              MR. QUINN:  We'd offer that.

20              THE COURT:  Received.

21              (Plaintiffs' Exhibit No. 7160 is received in

22         evidence.)

23    BY MR. QUINN:

24    Q    And that document is, with the translation, 33 pages in

25    length?
```

1    A    Yes.

2    Q    And then I was told I skipped 7151, so I'd ask you to

3    go back.

4    A    Seven what?

5    Q    Five one.

6    A    Yes.

7    Q    Do you see Mr. Aguirre's signature on that document?

8    A    Yes.

9         MR. QUINN:  And we'd offer 7151.

10        THE COURT:  Received.

11        *(Plaintiffs' Exhibit No. 7151 is received in*

12    *evidence.)*

13   BY MR. QUINN:

14   Q    And that document is five pages, including the

15   translation?

16   A    Yes.

17   Q    And then if we can look at Exhibit 12834, 12834.

18   A    Yes.

19   Q    Do you see Mr. Aguirre's signature on that document?

20   A    Yes.

21        MR. QUINN:  We'd offer 12834, your Honor.

22        THE COURT:  Received.

23        *(Plaintiffs' Exhibit No. 12834 is received in*

24    *evidence.)*

25

1    BY MR. QUINN:

2    Q    And that document is 16 pages in length?

3    A    Yes.

4    Q    You've already told us that Mr. -- excuse me --

5         MR. COTE:  Excuse me, your Honor, if Mr. Quinn's

6    done with that list of documents, we'd like that instruction

7    now, please.

8         THE COURT:  Once again, the same instruction,

9    Counsel?

10        MR. COTE:  Yes, please.

11        THE COURT:  Once again, Ms. Kuemmerle was MGA

12   Mexico's corporate designee pursuant to 30(b)(6) on certain

13   topics.  Her testimony, of course, is binding upon MGA

14   Mexico as to those topics; however, she does not represent,

15   pursuant to this 30(b)(6) testimony, MGA, MGA Hong Kong,

16   Mr. Larian or Mr. Machado, who are also defendants to

17   Mattel's claims.

18        So I'm instructing you to disregard evidence as to

19   those Defendants when she's testifying as a 30(b)(6)

20   witness.  When she's not, then that other evidence is

21   relevant to all parties.

22        MR. COTE:  Thank you, your Honor.  Your Honor,

23   specifically we'd like the instruction that the documents

24   are not admissible against Mr. Machado, not just not

25   irrelevant.

```
 1              THE COURT:  And they are not admissible against
 2  Mr. Machado.
 3              MR. QUINN:  Unless there is some foundation other
 4  than.
 5              THE COURT:  Unless there is some foundation in the
 6  future other than.
 7              MS. KELLER:  And your Honor, that would also be
 8  true as against Mr. Larian, MGA United States.
 9              THE COURT:  Same ruling.  To be specific, not
10  admissible against Mr. Larian at this time or Mr. Machado
11  until there is additional foundation.
12              MR. QUINN:  Beyond the 30(b)(6).
13              THE COURT:  Beyond the 30(b)(6).
14  BY MR. QUINN:
15  Q    But you're here also as a percipient witness in
16  addition to a 30(b)(6) witness, correct?
17       I mean, there are some things you know of your own
18  personal knowledge?
19  A    I don't know what "percipient" is.
20  Q    All right.  There are some things you know because you
21  saw it, you heard it, conversations you participated in,
22  correct?
23  A    Yes.
24  Q    So these various -- these hard copies of documents, the
25  list that we've just gone through, these were part of some
```

1    random things that Mr. Machado, Ms. Trueba and Mr. Vargas

2    chose to take with them when they left Mattel Mexico and

3    went to MGA Mexico, correct?

4              MR. COTE:  Objection.  Argumentative.

5              MS. KELLER:  Join, your Honor.

6              THE COURT:  Well, eventually I know that both

7    counsel will get before the Court those actual documents by

8    a number, but what you mean is this is a sampling or random?

9    I don't understand.

10   BY MR. QUINN:

11   Q    These documents that we've just gone through which

12   Mr. Aguirre initialed, these documents were all found --

13             THE COURT:  Okay.

14   BY MR. QUINN:

15   Q    -- in MGA Mexico's offices, correct?

16   A    Yes.

17   Q    And it's your understanding that they were brought to

18   MGA Mexico's offices by Mr. Machado, Ms. Trueba and

19   Mr. Vargas, correct?

20   A    Yes.

21   Q    All right.  And so though -- they are among -- let's

22   put it this way, they are among the, shall we say, random

23   documents, random Mattel documents that those people chose

24   to bring with them to MGA Mexico, correct?

25             MS. KELLER:  Objection.  Argumentative.

```
 1              THE COURT:  I believe she used those words,
 2    though, in her testimony.
 3              Overruled.
 4              THE WITNESS:  Yes.
 5    BY MR. QUINN:
 6    Q    Did Mr. Machado tell you that these were just random
 7    documents?
 8    A    He told me that he just -- with no rhyme to reason, he
 9    just put documents on a CD, that's what he told me.
10    Q    But do you recall him using the word, you know, that
11    these were just random documents or documents he
12    accidentally happened to get?
13    A    We talk in Spanish.  I am just translating to the best
14    of my capability.
15    Q    But these particular documents, your understanding,
16    were not on the CD found in Mr. Machado's office.  These are
17    documents which were found in hard copy and Mr. Aguirre
18    initialed, correct?
19    A    That's my understanding.
20    Q    Okay.  So let's set the CD aside.  We'll talk about
21    that some more.
22         These hard copy documents are among the documents that
23    Mr. Machado, Ms. Trueba and Mr. Vargas selected to bring
24    with them from Mattel Mexico to Mattel MGA, correct?
25    A    Yes.
```

1    Q    Now, Mr. Menotti, who you told us was one of the people

2    in logistics at Mattel MGA, told you that MGA Mexico

3    employees insisted on making a copy of the information that

4    the Mexican authorities took, correct?

5    A    Along those lines.  The wording, I don't remember, but

6    they requested copies.

7    Q    And they did get copies of the things the police took,

8    correct?

9    A    That's my understanding.

10   Q    And as a matter of fact, with the authorities present

11   with -- in the presence of the authorities, the MGA

12   personnel made copies of the information that was taken,

13   correct?

14            MS. KELLER:  Objection.  Misstates the evidence.

15            THE COURT:  Overruled.

16            THE WITNESS:  I do not know who made the copies.

17   I do know that copies were made.

18   BY MR. QUINN:

19   Q    Let's take a look at your deposition, page 130.

20            MR. QUINN:  December 7th, 2009, Counsel.

21            January 28th, 2008.

22   BY MR. QUINN:

23   Q    Page 130, line 21.

24   A    What line did you say, please?

25   Q    If you could look, please, at page 2 -- I'm sorry,

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 26 of 107   Page ID #:304793
CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

26

1    line 21 -- page 130, line 21, to 131, line 5.

2        I mean, is it true that with the authorities present,

3    MGA people made copies of the information that was taken?

4    A    That's what I was told, and that is my understanding.

5    Q    And in fact, Mr. Menotti told you that a copy had been

6    made of everything that the police were going to take,

7    correct?

8            MS. KELLER:  Objection.  Vague as to whether this

9    is the hard copy or the CD that we are talking about, your

10   Honor.

11           MR. QUINN:  Everything, everything the police were

12   going to take.

13   BY MR. QUINN:

14   Q    Mr. Menotti told you when you did your work as a

15   30(b)(6) witness, that a copy was made of everything the

16   police were going to take?

17   A    Yes.

18   Q    And MGA's copy of the materials that were taken,

19   including the hard copies of the documents and the CD was

20   set on your desk, correct?

21   A    Yes.

22   Q    And that was your desk in MGA Mexico, correct?

23   A    Yes.

24   Q    And MGA's copy of the documents, the documents

25   themselves, the hard copy documents, was approximately

1    6-inches thick, correct?

2    A    I don't know.  It was thick.  It was thick.

3    Q    It was thick.  Six inches, give or take?

4    A    I don't know.

5    Q    All right.  And it included -- you also had a copy of

6    the CD there at your desk, correct?

7    A    Yes.

8    Q    And you put these materials at some point on the floor

9    of your office?

10   A    Yes.

11   Q    And they stayed there for many months, there on the

12   floor of your office, correct?

13   A    I don't remember how long, but it stayed there.

14   Q    For some period of time?

15   A    Yes.

16   Q    And then you were -- you sent the CD and the hard copy,

17   copies of the documents to MGA's attorneys in Los Angeles,

18   O'Melveny & Myers, correct?

19   A    I was told to do that, yes.

20   Q    And you did that?

21   A    Yes.

22   Q    Okay.  Let's go back to the day of the search, and I'm

23   going to ask you some questions about the conversations that

24   you had with Mr. Larian.

25         You spoke to him, Mr. Larian, on the day of the search

CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

28

1   and told him about it, correct?

2   A    I don't remember who called who, but we did talk to

3   Mr. Larian and Ms. Gronich.

4   Q    And on the day of the search, Mr. Machado told

5   Mr. Larian about the CD that was found in the MGA Mexico

6   offices, right?

7   A    Yes.

8   Q    But you decided, notwithstanding these events, that MGA

9   Mexico should move forward with business as usual, right?

10  A    Yes.

11  Q    And while you were the vice president of MGA Mexico,

12  you never asked Mr. Machado, Mr. Vargas or Ms. Trueba if

13  they used Mattel information that had been discovered during

14  the search; you never asked them that, correct?

15  A    Yes, I did ask them.

16  Q    Let's take a look at your deposition, January 28th,

17  '08, page 135, lines 8 to 20.

18          MS. KELLER:  Your Honor, for clarity of the

19  record, could we know whether the question is being asked of

20  her in her individual capacity or as a 30(b)(6) witness?

21  I'm afraid there could be some confusion in terms of whether

22  she asked them eventually versus whether she asked them at

23  the time.

24          THE COURT:  I'm --

25          MR. QUINN:  This is in her individual deposition,

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 29 of 107   Page ID #:304796
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

29

1    your Honor, it's before she ever testifies as a 30(b)(6)

2    witness.

3              THE COURT:  Yeah, overruled.

4              MR. QUINN:  So I request permission to read, your

5    Honor, from page 135, lines 8 to 20.

6              THE COURT:  You may.

7    BY MR. QUINN:

8    Q    Question:  "Did you ask Mr. Machado whether he had used

9    the information on the CD while he was an MGA de Mexico

10   employee?"

11        Answer:  "No."

12        Question:  "Did you ask Ms. Vargas?"

13        Answer:  "No."

14        Question:  "Did you ask Mr. --"

15        Answer:  "Ms. Trueba."

16        Question:  "Excuse me.  Did you ask Ms. Trueba?"

17        Answer:  "No."

18        "Did you ask Mr. Vargas?"

19        Answer:  "No."

20        You didn't even ask Mr. Machado why the CD was in the

21   MGA Mexico office, correct?

22   A    I didn't ask him at that particular time, but in

23   conversation with Mr. Machado, Ms. Vargas -- Ms. Trueba and

24   Mr. Vargas and their counsel, I did ask them.

25   Q    At the time of the search back then, you didn't even

1    ask him why the CD was there, correct?

2    A    No, correct.

3    Q    And in fact, you didn't care?

4    A    That's not correct.

5    Q    Look at your deposition volume 2, December 8th, 2009,

6    page 298, 298, line 18, to 299, 6.

7    A    298, line 18 --

8    Q    At this point, you are --

9              MR. QUINN:  Does she have the deposition before

10   her?

11   BY MR. QUINN:

12   Q    At this point you've been designated as a 30(b)(6)

13   witness for MGA Mexico, correct?

14   A    Yes.

15   Q    Beginning at line 18, page 298:

16        Question:  "How do you think the CD got to MGA de

17   Mexico offices?"

18        Answer:  "I have no opinion on how it got there."

19        Question:  "Do you think -- do you think Mr. Machado

20   took it there?"

21        Answer:  "As I said, I have no idea how it got there,

22   and I don't care how it got there."

23              MS. KELLER:  Your Honor, for completeness, may we

24   have lines 8 through 13 read as well?

25              THE COURT:  Counsel?

```
 1                 MR. QUINN:  I'm sorry?

 2                 THE COURT:  It's on page 299.

 3                 MR. QUINN:  299 --

 4                 THE COURT:  Lines 8 through 13.

 5                 MR. QUINN:  She can do that, your Honor, in her

 6     time if she wants.

 7                 THE COURT:  All right.  You can come back and read

 8     that at the time, Counsel.

 9     BY MR. QUINN:

10     Q    Did you -- you did not ask Mr. Machado how any of the

11     documents, the hard copy documents, got there either, did

12     you?

13     A    No.

14     Q    You never asked Mariana Trueba or Carlo Vargas how the

15     hard copy documents got in their offices either, did you?

16     A    No.

17     Q    And while you were the vice president of MGA Mexico

18     after the search, you did not search the MGA Mexico offices

19     to see if there was any more Mattel information at those

20     offices, correct?

21     A    No.

22     Q    Is my statement correct?

23     A    Yes.

24     Q    And while you were the vice president of MGA Mexico,

25     after the search, you did not ask whether anyone had used
```

1    the Mattel information at the MGA Mexico offices, correct?

2    A    No.

3    Q    Is my statement correct?

4    A    No.  I asked -- I didn't ask that specific question,

5    no.

6    Q    So you took no steps, no steps while you were vice

7    president of MGA Mexico to find out if that Mattel

8    information had been used, right?

9    A    No.

10   Q    Is my statement correct?

11   A    I said "no."

12   Q    I'm sorry, I think we've got a double negative.

13        Did you take any steps while you were vice president of

14   MGA Mexico to find out if any of that Mattel information had

15   been used?

16   A    No.

17   Q    And you -- while you were vice president of MGA Mexico,

18   you never searched to determine whether MGA -- any MGA

19   employee had any other Mattel documents or files from the CD

20   on their computers, you didn't do that, did you?

21   A    No.

22   Q    You never disciplined or reprimanded Mr. Machado,

23   Mr. Vargas or Ms. Trueba for having taken Mattel information

24   to MGA Mexico, correct?

25   A    No.

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 33 of 107   Page ID
#:304800
CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

33

1    Q     I'm sorry?

2    A     No.

3    Q     Is my statement correct?

4    A     Yes.

5    Q     They didn't have their pay cut, correct?

6    A     Yes.

7    Q     My statement is correct?

8    A     Yes.

9    Q     They got bonuses?

10   A     They deserved them.  They worked very hard.

11   Q     All right.  So notwithstanding the fact that they had

12   taken Mattel information -- how many times -- have you in

13   your employment in any job ever been in the situation where

14   police have raided the offices where you worked and seized

15   information, has that ever happened before to you?

16   A     No.

17   Q     So you understood that this was an extremely serious

18   matter, correct?

19          MS. KELLER:  Objection.  Assumes facts not in

20   evidence.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes.

23   BY MR. QUINN:

24   Q     In fact, you know criminal proceedings in Mexico were

25   brought against these individuals, correct?

1    A    Yes.

2    Q    And still they were paid bonuses?

3    A    Yes.

4    Q    Let's look at Exhibit 6766.

5         MR. QUINN:  This is in evidence, your Honor.

6    BY MR. QUINN:

7    Q    And this is an e-mail string in which you participate,

8    and the subject is whether bonuses should be paid for what

9    you term "your people," correct?

10   A    Yes.

11   Q    And if we could begin on page 6766-2, the e-mail in the

12   middle -- I mean, you've raised the question, "Are these

13   people, your people, Mr. Machado, Mr. Vargas, Ms. Trueba,

14   are they going to be paid bonuses, what's going on here?"

15   That's a question that had you raised, correct?

16   A    No.

17   Q    You asked -- if you look at page dash 3, the e-mail at

18   the top, you write Mr. Wing, you say, "Sorry to be a pest, I

19   know it's not you, but I need to proceed with my people and

20   do what is right."  Do you think you can push this -- do you

21   think you can push to get this paid by this Friday; do you

22   see that?

23   A    Yes.

24   Q    And what you are talking about is push to get bonuses

25   paid, correct?

1    A    For the entire team.

2    Q    All right.  Including Mr. Machado, Ms. Trueba and

3    Mr. Vargas, correct?

4    A    Yes.

5    Q    And Mr. Villette, who's executive vice president of

6    operations, responds to you in page dash 2, in the middle,

7    he says, "Susanna, we have taken a look at the bonus

8    schedule and are almost good to go.  We still have one

9    issue.  We've incurred so far roughly $114,000 in legal

10   expenses, re Pablo, Gustavo and Mariana.  I believe they

11   need to bear some of these costs as they created the

12   situation in the first place.  Individual share, if fully

13   charged back, would be just under $38,000.  What would you

14   suggest"; do you see that?

15   A    Yes.

16   Q    But you were against that, right?

17   A    Yes.

18   Q    You were against not only charging back some of the

19   costs, you were in favor of paying them their full bonuses,

20   correct?

21   A    And the rest of the e-mail says that if we were to --

22   in the last paragraph, if we were to do something to

23   reprimand Gustavo, Pablo, Mariana, we should have done it on

24   October 28th, 2005, the day after the search in our offices.

25   To do it now, we -- when we have to pay our bonuses, seems

1    unfair and unethical to me, especially when Gustavo was

2    about to go to L.A. and we are closing Christmas sales.

3    Q    Right.

4    A    That's my belief.

5    Q    Right.  So not only were you against them bearing any

6    of the cost, you were in favor of their being paid -- you

7    were in favor of their being paid their full bonuses,

8    correct?

9    A    Yes.

10   Q    And that's because you thought business considerations,

11   the impact on their selling efforts if they weren't paid the

12   bonuses, was more important than the thefts they

13   participated in, correct?

14            MS. KELLER:  Objection.  Argumentative.

15            ALL DEFENSE COUNSEL:  Objection.

16            *(Interruption in the proceedings.)*

17            MS. KELLER:  Argumentative, your Honor.

18            MR. COTE:  Joined, particularly the word "theft."

19            THE COURT:  Just restate the question.

20   BY MR. QUINN:

21   Q    You were more concerned with the fact that if they

22   weren't paid bonuses, it would affect their morale and it

23   would impact their sales efforts than you were about the

24   ethics of their having taken these documents, true?

25   A    No.

1    Q    Well, let's look at what you wrote in the e-mail at the

2    bottom of the first page, you say, "Eric, although you and I

3    just talked about this, it is because I am at the head of

4    MGAE de Mexico."  You are the head of this subsidiary,

5    correct?

6    A    Yes.

7    Q    "I felt I need to put this in writing and on the

8    record.  I see and respect your point of view and understand

9    the global implications that this may have in the future.

10   However, I disagree completely to this suggestion even when

11   it is clear that a stupid mistake was made, and it's also

12   clear that neither one of us ever imagined that this

13   particular witch hunt" -- what's a "witch hunt"?

14   A    Searching for witches, searching for scapegoats, and

15   that's the way I used it here.

16   Q    Right.  It's like searching for witches where witches

17   don't exist, right?

18   A    Searching for something that does not exist.

19   Q    But here, it existed, right?  There were confidential

20   Mattel documents in the offices of MGA Mexico, correct?

21           MR. COTE:  Objection.  Argumentative.  Lacks

22   foundation as to confidentiality and proprietary.

23           THE COURT:  Overruled.

24           THE WITNESS:  This is my phrase and I chose it --

25           MR. COTE:  30(b)(6) objection as well.

```
 1              THE COURT:  And I'll get that later on.
 2              MR. COTE:  Thank you.
 3              THE COURT:  That's acceptable.
 4              I don't know if you can even remember the question
 5    now, can you?
 6              THE WITNESS:  No.  Can you please say it again,
 7    please.
 8              MR. QUINN:  Your Honor, she is testifying in her
 9    individual capacity at this point, has nothing do with it.
10              THE COURT:  And I haven't given that admonition
11    yet.
12              MR. QUINN:  All right.
13    BY MR. QUINN:
14    Q    Ma'am --
15    A    Can you repeat the question?
16    Q    Yes.  This was not a witch hunt, was it, as you've
17    defined it?  It was not a witch hunt, correct?
18    A    No.  For me it was a witch hunt.
19    Q    There were confidential Mattel documents that were
20    found in MGA Mexico's offices, correct?
21    A    Yes.
22    Q    It wasn't a figment of the Mexican police's or Mattel's
23    or anyone else's imagination, right?  You know they were
24    there?
25              MR. COTE:  Objection.  Hearsay.
```

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Documents were there, yes.

 3    BY MR. QUINN:

 4    Q    Then what you go on to say, is, "Like I mentioned to

 5    you, if we were to do something to reprimand Gustavo, Pablo

 6    and Mariana, we should have done it on October 26th, 2005,

 7    the day after the search in our offices."

 8         Did you suggest the day after the search, that they be

 9    reprimanded or something must be done; did you make that

10    suggestion?

11    A    No.

12    Q    Did you discuss that with Mr. Larian or anyone else?

13    A    No.

14    Q    Did that come up at that time when this search that

15    resulted in criminal proceedings took place and these

16    documents were found, did it come up that maybe these people

17    should be reprimanded?

18    A    No.

19    Q    Or that any action should be taken?

20    A    No.

21    Q    So far as you know, was any action ever taken?

22    A    No.

23    Q    Well, you say, "It seems unfair and unethical to me,

24    especially when Gustavo is about to move to L.A. and Pablo

25    is closing Christmas bookings," you didn't want Pablo's
```

1    morale to be affected by not getting a bonus because that

2    might affect his Christmas bookings, correct?

3    A    No, that's not right.

4    Q    Well, you tell me.  What did that mean, when you say

5    you were concerned that Pablo is closing Christmas bookings?

6    A    Pablo was closing Christmas sells, and yeah, that was

7    the time of the year, I didn't find that it was right to

8    reduce their bonuses that they earned from their prior year

9    for legal fees, and that's what I wrote on the e-mail.

10   Q    It's not just legal fees, you wanted to see that they

11   got their bonuses, right?

12   A    They worked very hard.

13   Q    Well, you go on to say, "I ask you all with what mood

14   is Gustavo going to move," meaning move to L.A., "and Pablo

15   is going to keep on pushing sales in Mexico," that's what

16   you have wrote, correct?

17   A    That's what I wrote, yes.

18   Q    I mean, you were concerned about their morale, right?

19   A    No, I was concerned that they get their bonuses.

20   Q    What do you mean by "mood"?

21   A    Mood.

22   Q    Like?

23   A    Feeling, mood.

24   Q    Right.  So you were concerned about how they felt, how

25   Pablo, for example, felt in closing Christmas bookings and

```
 1    pursuing Christmas bookings, you were concerned about that,

 2    right?

 3    A    I was concerned that they get their bonuses that they

 4    deserved.

 5    Q    And you were more concerned about that than the issue

 6    of whether any -- any type of negative employment action

 7    should be taken than you were -- because of the -- the fact

 8    that these documents had been found, you were more concerned

 9    about that than -- than you were concerned about what had

10    been discovered in the search, correct?

11    A    Can you say that again, please?

12    Q    You were concerned about sales, correct?

13    A    I was concerned of moving my company and growing the

14    business.  And they worked very hard, and I was concerned

15    for the entire team to get their bonuses.  It has been -- we

16    were a month late.

17    Q    What you said -- you referred to the fact that Pablo is

18    closing Christmas bookings, correct?

19    A    Yes.

20    Q    And that Pablo is going to keep on pushing sales,

21    correct?

22    A    Yes.

23    Q    You were concerned about sales, correct?

24    A    I was concerned for the entire team that we were one

25    month late from the rest of the company in paying their
```

1    bonuses.

2    Q    And -- and you were more concerned about that than you

3    were about the ethics of having Mattel information taken

4    from Mattel and brought over to MGA Mexico, correct?

5    A    This is May 9, 2006, bonuses were to be paid by the end

6    of March.  That was my frame of mind when I wrote this

7    e-mail.

8    Q    Did your frame of mind at all include any concern for

9    the ethics of their having taken information from Mattel

10   Mexico over to MGA Mexico, did your frame of mind include

11   that at all?

12   A    No.

13   Q    Did it occur to you -- I mean, you know that MGA has

14   hired over the years and had hired as of this time numerous

15   Mattel employees, correct?

16   A    That's my understanding, yes.

17   Q    Did it occur to you that paying bonuses to these people

18   in this circumstance would send the wrong message, that is

19   that it's okay to come to MGA and bring information from a

20   competitor; did that occur to you?

21   A    No.

22   Q    You had another reason not to offend Mr. Machado,

23   Mr. Vargas and Ms. Trueba, MGA had another reason not to

24   want to offend them, correct?

25   A    I don't understand.

1    Q    Well, there was a potential risk that Mr. Machado,

2    Mr. Vargas and Ms. Trueba would go to Mattel and tell the

3    truth, right?

4            MR. COTE:  Objection.  Argumentative.

5            THE WITNESS:  That never --

6            THE COURT:  Just a moment.

7            THE WITNESS:  Sorry.

8            THE COURT:  What's that based on?  Some

9    depositional testimony of some type?  Has it been inquired?

10           MR. QUINN:  It's the circumstance, your Honor.

11           THE COURT:  But you are asking her to put herself

12   in their position, their mind set.

13           MR. QUINN:  No, her own mind set, what she was

14   concerned about.

15           THE COURT:  Overruled.

16           You can answer the question.

17           THE WITNESS:  That never entered my mind.

18   BY MR. QUINN:

19   Q    Okay.  It never entered your mind, you were never

20   concerned about the fact that these people might go to

21   Mattel and go off the reservation?

22   A    No.  By the way they worked, the hours that we put in,

23   no.

24   Q    Well, they were provided lawyers?

25   A    Yes.

| | | |
|---|---|---|
| 1 | Q | By MGA? |
| 2 | A | MGA de Mexico, yes. |
| 3 | Q | Both in the criminal proceedings in Mexico? |
| 4 | A | They had lawyers. |
| 5 | Q | In the criminal proceedings in Mexico, correct? |
| 6 | A | For Mexico.  I don't know the name of the technical -- |
| 7 | Q | And they were also provided U.S. lawyers for this case, |

8    in their testimony in this case?

| | | |
|---|---|---|
| 9 | A | That's my understanding, yes. |
| 10 | Q | And those lawyers were paid by MGA? |
| 11 | A | Yes. |
| 12 | Q | Who selected those lawyers? |
| 13 | A | What lawyers? |
| 14 | Q | The lawyers that represented these individuals in the |

15   criminal proceedings in Mexico and represented them in this

16   case here in the U.S., the lawyers who represented them, who

17   selected those lawyers?

| | | |
|---|---|---|
| 18 | A | I don't remember, to be honest with you. |
| 19 | Q | You know that those individuals didn't select those |

20   lawyers, they were selected by MGA, correct?

21              MR. OVERLAND:  It assumes facts not in evidence.

22              THE WITNESS:  I don't know about -- sorry?

23              THE COURT:  That was a question.

24              MR. QUINN:  Yes.

25              THE WITNESS:  Answer?

```
 1              THE COURT:  You may.

 2              THE WITNESS:  I don't know.  I don't remember, to

 3     be honest.

 4              MR. QUINN:  Nothing further.

 5              THE COURT:  Cross-examination, please.

 6              MS. KELLER:  Yes, your Honor.  May I have just one

 7     moment?

 8              THE COURT:  Certainly.

 9                         CROSS-EXAMINATION

10     BY MS. KELLER:

11     Q    Good afternoon.

12     A    Good afternoon.

13     Q    Ms. Kuemmerle, you were asked a lot of questions about

14     meetings with MGA's lawyers; do you remember that?

15     A    Yes.

16     Q    And you prepared with Bill Molinski from the law firm

17     of Orrick Herrington for this trial testimony today, right?

18     A    That's right.

19     Q    And you have been deposed five times altogether?

20     A    Yes.

21     Q    And did Mr. Molinski go over those deposition

22     transcripts with you?

23     A    We reviewed them, yes.

24     Q    And you have in the course of this lawsuit been shown

25     hundreds of pages of documents, maybe thousands?
```

```
 1    A    Yes.

 2    Q    And did Mr. Molinski go over some of those with you?

 3    A    Some of them, yes.

 4    Q    And you just met me today, didn't you?

 5    A    Yes.

 6    Q    And I'm not with the firm of Orrick Herrington, I'm

 7   with the firm of me, okay?

 8    A    Yes.

 9    Q    And do you remember when we talked at the break?

10    A    Yes.

11    Q    Remember my advice about answering questions?

12    A    Yes.

13    Q    What did I tell you?

14         MR. QUINN:  Is this going to be a waiver of the

15   privilege?  I'd just like to know, your Honor.

16         THE COURT:  Sustained.

17         I don't think we want to go there, do we, Counsel?

18   I mean, your choice, but -- Counsel, you can.  That's up to

19   you.

20   BY MS. KELLER:

21    Q    Has anybody, in preparing you, told you what to say, in

22   other words, put words in your mouth?

23    A    No.

24    Q    Have you reviewed all the documents that your lawyers

25   at least gave you to look at?
```

1    A    Yes.

2    Q    Are you trying to do the best you can to remember?

3    A    Yes, and it's a lot of information.

4    Q    Are you trying to do the best you can to tell the

5    truth?

6    A    Yes.

7    Q    Now, a lot was asked about this co -- it's Code of

8    Civil Procedure Rule 30(b)(6) that allows a company to

9    designate somebody to get prepared and to get educated about

10   a topic.  You've heard about that, right?

11   A    Yes.

12   Q    And because you were the head person in MGA de Mexico,

13   you were the person who was designated, at least at the

14   beginning, to try to get educated about the search of the

15   offices; do you remember that?

16   A    Yes.

17   Q    And not too long after you started trying to do that,

18   you became afraid that if you looked at documents that

19   Mattel was claiming were trade secrets, that you might get

20   sued by Mattel?

21   A    Absolutely.

22   Q    Did that scare you?

23   A    To no end.

24   Q    Why on earth would you think Mattel would sue you?

25          MR. QUINN:  Objection.  This is irrelevant.

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 48 of 107   Page ID #:304815
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

48

```
 1              MS. KELLER:  It goes to --

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I never look at those documents, and

 4    I didn't want to get involved in anything that could

 5    jeopardize me, and I know that they -- they are sue happy,

 6    and I don't want to be sued, and I refuse to look at the

 7    documents.  I didn't want to look at the documents.  I was

 8    afraid I was going to end up being sued.

 9    BY MS. KELLER:

10    Q    And you informed MGA of that?

11              MR. QUINN:  Your Honor, I move to strike the

12    answer, at least get instruction.  That comes in only for

13    her state of mind and not for the truth.

14              THE COURT:  Yeah, I agree.

15              This is her just state of mind.  This is not for

16    the truth of the matter asserted.  I think the statement was

17    "sue happy"; her state of mind.

18    BY MS. KELLER:

19    Q    And after that, you know, don't you, that MGA went out

20    and hired a retired FBI agent by the name of Bud Small?

21    A    That's correct.

22    Q    And designated Mr. Small at that point to be MGA's

23    30(b)(6) witness on the issue of investigating what had

24    happened, right?

25    A    Yes.
```

```
 1    Q    And Mr. Small went down to MGA Mexico and interviewed

 2    all of the employees in depth, didn't he?

 3    A    He interviewed all of the available employees in there.

 4    Q    He looked at many, many documents, right?

 5             MR. QUINN:  Lacks foundation, your Honor.

 6    BY MS. KELLER:

 7    Q    To your knowledge?

 8             THE COURT:  Sustained.

 9             MR. QUINN:  No foundation.

10             THE COURT:  I think you can testify about what

11    your understanding is, but we ought to find out if she had a

12    conversation with Mr. Small first.

13             MS. KELLER:  Well --

14             THE COURT:  How she has this information.  She's

15    certainly a 30(b)(6) concerning MGA, but she is not a

16    30(b)(6) concerning Mr. Small.

17    BY MS. KELLER:

18    Q    In connection with preparing for this trial and

19    reviewing everything that you thought you needed to review

20    because you knew you might be asked some questions about

21    this 30(b)(6) business, right?

22    A    Yes.

23    Q    Did you review Mr. Small's deposition transcript?

24    A    Yes.

25    Q    And he was deposed by Mattel at some length, right?
```

1    A    Yes.

2    Q    And so you know that he made, for example, extensive

3    notes of those interviews and turned those over to Mattel,

4    right?

5    A    Yes.

6    Q    And you know that Mattel questioned him extensively,

7    true?

8    A    Yes.

9    Q    Now, I am going to ask you about something that just

10   came up.  You were asked about the statement that you made

11   in Exhibit 7166, this e-mail, this statement that you made

12   that you saw what Mattel was doing as a witch hunt, right?

13   A    Yes.

14             MR. MC CONVILLE:  6766.

15             MS. KELLER:  I'm sorry.

16             MR. MC CONVILLE:  6766.

17             MS. KELLER:  6766.

18   BY MS. KELLER:

19   Q    And do you stand by that characterization?

20   A    Say that again, please.

21   Q    Do you still think that's true?

22   A    Yes.

23   Q    And did you think that only because of the search or

24   for other reasons, too?

25   A    The search, the constant serving of papers, the fact

1    that Mr. Machado, Mr. Vargas and Ms. Trueba had to go to

2    court every Monday to sign and put their fingerprint and get

3    their picture taken, the -- the media reports, yes, I still

4    stand by my comment.

5    Q    And you knew that Mattel, because of Mexican law, was

6    able to initiate the criminal prosecution, right?

7    A    Yes.

8    Q    You knew that in Mexico, if somebody is a victim of a

9    crime, that they can prosecute somebody criminally

10   themselves using the police and the authorities, right?

11            MR. QUINN:  Your Honor, this can't come in for

12   truth.  She is not an expert on Mexican law.

13            THE COURT:  Sustained.  She can cast her opinion,

14   as she can talk about what her state of mind is, but it's

15   not for the truth.

16   BY MS. KELLER:

17   Q    Well, Ms. Kuemmerle, you had done business in Mexico

18   for many, many years, had you not?

19   A    Yes.

20   Q    And is it fair to say that the way the law is

21   administered in Mexico could be a little different than the

22   way it's administered here in the United States?

23            MR. QUINN:  Lacks foundation.  Vague and

24   ambiguous.

25            THE COURT:  Sustained.

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 52 of 107   Page ID #:304819
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

52

1          We can get people up from Mexico, can't we?

2          MS. KELLER:  Well, she was asked extensive

3    questions about this, your Honor, and her state of mind, so

4    I'll try to ask that.

5          THE COURT:  She wasn't asked about the state of

6    Mexican law, she was asked about the search and the facts

7    surrounding the search.  I don't recall Mexican laws.  I'll

8    go back to my notes if you want me to.

9          MS. KELLER:  Well, I'll just ask this question, if

10   I may, your Honor.

11         THE COURT:  No.  Just a moment.  If I'm wrong,

12   I'll certainly stand corrected.

13         Where would that occur, Counsel?  In other words,

14   just tie it into an exhibit number, I'll be happy to look

15   for it, but I don't recall it.

16         MS. KELLER:  Your Honor, she was asked by

17   Mr. Quinn about the criminal prosecution in Mexico and

18   whether she was willing to go ahead and pay these people

19   bonuses even though they were criminally prosecuted, and

20   this goes directly to her state of mind.

21         THE COURT:  Well, that goes to what she did.  That

22   does not go to Mexican law.  You can get an expert up here

23   on Mexican law for either side, but that goes to what she

24   did and why she did it.  So that's far beyond the scope of

25   who's prosecuting down in Mexico.  That's a matter for your

1    case.

2    BY MS. KELLER:

3    Q    You recall being asked about the fact that you were

4    willing to give these people bonuses even though they were

5    criminally prosecuted; do you remember that?

6    A    Yes.

7    Q    And you have said that you were, right?

8    A    Yes.

9    Q    And can you explain why that is?

10   A    Why was I worried?

11   Q    No.  Why was it that even though these people were

12   criminally prosecuted in Mexico --

13           THE COURT:  No, she.

14   BY MS. KELLER:

15   Q    -- you were willing to give them bonuses?

16           MS. KELLER:  That was the question asked by

17   Mr. Quinn.

18           THE COURT:  That's right.

19           THE WITNESS:  Because I knew they were working

20   very hard at their jobs, put in a lot of hours and very

21   small staff, very limited group of people, to work and to

22   get things done.  And I know -- I'm not an expert, but I'm

23   Hispanic, and I know the way things work.  So I'm not saying

24   that I'm a lawyer, but I know that things can be pushed and

25   accommodated.

1        So that's the reason when I wrote that e-mail, I

2   used the word "witch hunt," and that's the reason that I

3   said that we still have to pay the bonuses, because they

4   worked very hard to earn them.

5        THE COURT:  Now, that's appropriate.  That's the

6   right response to the question asked by Mr. Quinn, but about

7   the workings of Mexican law, there is lack of foundation.

8        MS. KELLER:  I -- I understand.

9   BY MS. KELLER:

10  Q    And I understand you are not an expert.

11  A    No.

12  Q    Let me ask you this, though:  Was the fact that these

13  people were criminally prosecuted, in your mind, did that

14  mean that they must have done something wrong?

15  A    No, not in my mind, no.

16  Q    Now, there were some other things that Mattel Servicios

17  had done to Mattel -- to MGA de Mexico that made you also

18  think that they were on a form of a witch hunt; is that

19  true?

20  A    Yes.

21  Q    Had there been threats to businesses and retailers by

22  Mattel if those people carried MGA products?

23       MR. QUINN:  Your Honor, this is their case.

24       THE COURT:  Yeah, sustained.

25       MR. QUINN:  I object.  Hearsay.

```
 1            THE COURT:  I've cautioned you that each party can
 2    sit in the other party's position.  In other words, MGA can
 3    be at the Mattel table, Mattel can be MGA's table.  This is
 4    part of MGA's case if they choose to put it on.
 5            Counsel.
 6    BY MS. KELLER:
 7    Q    Well, you were asked about all of the reasons that you
 8    didn't discipline these people for having some documents
 9    that originated at Mattel in their possession, right?
10    A    Yes.
11    Q    And you were also asked, "Even though they were
12    criminally prosecuted, you didn't do anything," right?
13    A    Yes.
14    Q    And you were asked about your use of the term "witch
15    hunt" as if that was some sort of fallacy or that that was
16    an error on your part; do you remember that?
17    A    Yes.
18    Q    And the fact of the matter is that in addition to this
19    raid on your offices and in addition to these people getting
20    criminally prosecuted, that Mattel had been doing a lot of
21    very damaging things to your company?
22            MR. QUINN:  Your Honor, same objection, your
23    Honor.
24            MS. KELLER:  Your Honor, it's all open -- the door
25    was opened by Mr. Quinn.
```

```
 1              THE COURT:  Not to that extent, Counsel.
 2              Sustained.
 3   BY MS. KELLER:
 4   Q    Well, let's go back to when you started with MGA.
 5        You had quite a background in the business world
 6   already, didn't you?
 7   A    I'm a very old woman.
 8   Q    Okay.  I didn't mean that.  I meant you had a very
 9   solid background in the business world, right?
10   A    Right.
11   Q    And I'm older than you are, so please don't.
12        So your first job in the toy industry was with Tyco
13   Toys?
14   A    That's correct.
15   Q    And you were assistant manager for export business in
16   the Latin American territory?
17   A    Yes.
18   Q    And the Latin American territory is a pretty big
19   territory?
20   A    Yes.
21   Q    With lots of children in it?
22   A    Many.
23   Q    Who buy and use toys?
24   A    Yes.
25   Q    And how long were you there with Tyco Toys?
```

1    A    Approximately two years.

2    Q    And then for four years, you were director of

3    international sales for Latin America in the Iberic

4    Peninsula for ToyBiz, which is a division of Marvel.  And

5    the Iberic Peninsula is?

6    A    Spain and Portugal.

7    Q    So you were director for all of Latin America and then

8    for Spain and Portugal as well?

9    A    Spanish-speaking countries and Portuguese.

10   Q    What about Brazil?

11   A    Brazil too.

12   Q    And Brazil because of the Portuguese, okay.

13        And then from 2001 to 2004, you had your own company,

14   Argentrade?

15   A    That's right.

16   Q    And you were acting as a sales agent throughout Latin

17   America?

18   A    Yes, for several toy companies.

19   Q    Which toy companies were those?

20   A    MGA, Playwell, Fundex, and I don't remember the other

21   one.

22   Q    Now, in 2002, you started being a sales representative

23   for Playwell?

24   A    I don't remember the -- I think around that time.

25   Q    How did you first learn about MGA?

1    A    Through a friend of mine.  We were -- she was working

2    for Mr. Larian in Hong Kong, and I was working there as a

3    rep.  She and I had breakfast together, and I think we met

4    Mr. Larian at the breakfast area.

5    Q    Do you know if Lisa Saunders, by the way, is still at

6    MGA?

7    A    Yes, that's my friend.

8    Q    Now, you first talked to her about maybe coming to MGA

9    at the Hong Kong toy fair?

10   A    No, no.  We were just yacking.

11   Q    Yacking?

12   A    Yeah, gossiping.

13   Q    And --

14   A    Mr. Larian was there, too, and Lisa introduced me to

15   him.

16   Q    Now, since you had already been a sales rep for MGA

17   Latin America, you had some kind of relationship already

18   with MGA, right?

19   A    No.  I believe Mr. Larian asked Lisa who I was and what

20   was I doing, and we met again in February toy fair, and

21   Mr. Larian offered me the line.

22   Q    Now, as a sales representative, what -- what were

23   your -- when you say he "offered me the line," what does

24   that entail as a job?

25   A    To sell the line, to sell the line properly in each

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 59 of 107   Page ID #:304826
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

59

1   country and make sure you have the right assortments because

2   seasons are different, to put TV, to make sure that they buy

3   a lot, make sure that I put orders correctly, forecast, ship

4   correctly, payments correctly, everything.

5   Q    And when you say the seasons are different, they are

6   literally reversed, for example, in Argentina?

7   A    Yes.  What you can have in the United States as a

8   summer assortment doesn't qualify in the south because it's

9   wintertime, and vice versa.

10  Q    So there is a lot to keep track of?

11  A    Yes.

12  Q    And how many -- when you were a sales rep for MGA, how

13  many countries did you deal with altogether?

14  A    All of them with the exception where MGA had

15  distribution agreement with Hasbro, I was allowed to sell

16  whatever else MGA had except Bratz.

17  Q    Did you create -- did you help create marketing plans

18  for those countries?

19  A    With the local distributors, yes.

20  Q    So you'd work with the distributors to create, for

21  example, pricing structures --

22  A    TV strategy, point of sale printed material, help

23  arrange the demonstrators and the merchandisers, help them

24  with the shipments, make sure the order was placed properly,

25  full containers.

CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

60

```
1    Q    So you help organize the shipping as well?

2    A    Yeah, yeah, everything.

3    Q    Now, when Mr. Larian asked you to be an MGA sales rep

4    for Latin America in -- when he asked you that in February

5    of 2002, who was MGA's distributor in Mexico?

6    A    Hasbro.

7    Q    And did Hasbro remain the distributor for MGA right up

8    until the time MGA de Mexico was formed?

9    A    Yes.

10   Q    Now, MGA de Mexico, did that ever manufacturer toys?

11   A    In Mexico?

12   Q    Uh-huh.

13   A    No.

14   Q    Did you ever have, for example, teams of doll designers

15   and engineers and sample makers working in Mexico?

16   A    No.

17   Q    So it would -- if I understand it, then, the whole

18   purpose of creating MGA de Mexico was to create a

19   distributor for MGA's products?

20   A    And to distribute it -- distribute our product

21   domestically in Mexico, meaning that we, MGA de Mexico, will

22   bring the product and we'll distribute it there to clients.

23   Q    Now, in January of 2004, do you remember chatting again

24   with Mr. Larian in the Hong Kong fair toy showroom?

25   A    Yes.
```

1    Q    And was that when he told you he was thinking of

2    opening this subsidiary in Mexico?

3    A    Yes.

4    Q    And what were his main thoughts as to -- that were

5    conveyed to you as to why he wanted to do that?

6    A    Well, he -- Mr. Larian knew that Mexico is a very

7    important market.  There were also discussions of doing the

8    same for Brazil.  He said that Walmart is very much

9    interested, and I said, okay, and this is between

10   appointments instead of, okay, we can talk more, and I went

11   back to my appointments.

12   Q    What was your understanding as to why -- why Mr. Larian

13   wanted to replace Hasbro in that role, since Hasbro was

14   distributing the MGA toys in Mexico at the time?

15   A    I believe that he was not satisfied with the way the

16   business -- MGA -- the Bratz business was growing.  He was

17   not happy with the growth of sales, and he wanted to start

18   his own operation there, to be more aggressive.

19   Q    And did you know a person named Deyanira Rubio?

20   A    Absolutely.

21   Q    Who was that?

22   A    She was the buyer, the girls' buyer -- the buyer for

23   Walmart for the girls' category, dolls category.

24   Q    Did she have any particular liking for any of the MGA

25   products?

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 62 of 107   Page ID #:304829
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

62

1    A    She adores the Bratz dolls, and she has been an

2    invaluable partner with us.

3    Q    So was she supportive of this idea that maybe MGA de

4    Mexico should be started up?

5    A    Absolutely.

6    Q    Now, around the end of January, you spoke with

7    Mr. Larian again by telephone?

8    A    Yes.

9    Q    Was that the time when he actually asked you to help

10   open the subsidiary and run it?

11   A    Around -- yeah, the end of January, the beginning of

12   February, yes.

13   Q    And why were you willing to take that on?

14   A    This will sound very corny, but I believe in the vision

15   that Isaac has, and I get like psyched from his passion on

16   things, and I thought it was the right decision for the

17   company at the time.

18   Q    Now, any new enterprise needs employees?

19   A    Definitely.  The right employees.

20   Q    And who -- who was going to be responsible for finding

21   those people, Mr. Larian or you?

22   A    Mr. Larian asked me for help, and I knew perfectly the

23   right fit.

24   Q    And when you say you knew perfectly the right fit, what

25   do you mean?

```
1    A    I just had the privilege of working with Gustavo so

2    many times in such a successful manner, that I knew that

3    that is the person that needed to be in the MGA de Mexico

4    organization.

5    Q    You're talking about Gustavo Machado?

6    A    Gustavo Machado, I'm sorry.

7    Q    How did you -- when did you first work with him?

8    A    I don't know, 1995, for along those years, we --

9    Gustavo was in Tyco Ensueno, and he would come to our main

10   office in New Jersey.  We are Latins.  I was the only Latin

11   person in the New Jersey office, so whenever the Mexico or

12   the Spain subsidiary came over, I will be with them, and

13   there is a connection, but I respect tremendously his

14   professionalism and his passion for toys.

15   Q    Is that an important quality to have for somebody who

16   is in the toy business, a real passion for toys?

17   A    And for MGA passion, it's very important.

18   Q    Are there a lot of grownup little kids in the toy

19   business who still like to play with toys?

20   A    Yeah.

21   Q    One of them is sitting over here?

22   A    Big boy, yes.

23   Q    Now, when you knew Mr. Machado, you said he worked with

24   you at Tyco, did he also work with you at a company called

25   ToyBiz?
```

CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

64

1   A    I was in ToyBiz, and he was working for Mattel de

2   Mexico.

3   Q    How much contact did you have with him when you were at

4   ToyBiz?

5   A    Very regularly.

6   Q    Why was that?

7   A    Because I knew I was going to resign, and I wanted to

8   leave a distribution agreement for ToyBiz for Latin America

9   because they were not going to hire a replacement.

10       So once again, I went to Gustavo, and he coming from

11  the action figures world, he handled boys' toys, and we were

12  action figures, Spiderman toys.  I went to him, and I went

13  to Mattel de Mexico offices, and I presented an entire line

14  to Gustavo and their superior -- superiors, and they came

15  back with a plan for distribution of the entire land -- for

16  the entire Latin American territory.

17  Q    So he did boys' marketing, Mr. Machado did not sell

18  dolls?

19  A    No.

20  Q    And in terms of his marketing abilities, what did you

21  think?  How good was he at marketing?

22  A    Excellent.  Gustavo is very well liked in the marketing

23  world.  He has many friends in many different kinds of

24  companies, marketing research, media, TV, in the TV world,

25  and he is very well respected.

1    Q    Does he strike you as somebody who can only succeed if

2    he stole information?

3    A    No.

4    Q    Is he a person who you have seen originate a lot of

5    ideas?

6    A    Very many.

7    Q    Now, you told Mr. Machado that you were going to be

8    part of a new venture and asked if he was interested in

9    joining?

10   A    I told Mr. Machado that I was helping Isaac in this new

11   venture, and I asked him if he will be interested in joining

12   in.

13   Q    What did he say?

14   A    He says that for some sort of reason, "I'm a believer

15   in this, this was the right time that you had called me

16   because I am starting to look for a new job."  And I said,

17   "why?"  "Because" -- and he said, "Because I am not happy

18   with the career path that I have right now, and I'm putting

19   my resume together as we speak."

20   Q    Now, after you talked to Mr. Machado, did you convey

21   that information to Mr. Larian?

22   A    I believe I did.

23   Q    And what did you tell Mr. Larian about hiring

24   Mr. Machado?

25   A    I told him that I knew somebody that was a person most

1    important passionate for toys and extreme intelligent

2    marketing professional, somebody that is very likable, very

3    well regarded in the industry in Mexico, and that I believe

4    is a good fit for what he was trying to do.

5    Q    Did you arrange a meeting for Mr. Larian and

6    Mr. Machado at the New York toy fair in 2004?

7    A    Yes, I did.

8    Q    Were you at that meeting?

9    A    Yes, I was.

10   Q    How did the meeting go?

11   A    Perfect.  The chemistry between Mr. Machado and Mr. --

12   and Isaac was instant.  There was positive body language,

13   they were laughing.  Isaac gave a general idea of what he

14   was trying to do, and -- and there was laughing and there

15   was good chemistry, and it was a great meeting.

16        And I remember very specifically, I don't know how the

17   conversation went, but hearing Isaac saying, "Forget about

18   Mattel.  We don't want anything about Mattel.  Just come on

19   over.  This is MGA.  We think differently here.  We don't

20   have the resources.  Come on over.  This is MGA.  We are

21   different."  And Gustavo was very, very excited.

22   Q    So Mr. Larian didn't say, ah, you work at Mattel de

23   Mexico, let's see how many things you can steal and bring to

24   MGA?

25   A    Not at all.

1    Q    It was the opposite?

2    A    Forget about Mattel, that's what he said.

3    Q    Now, how did you come to meet Mariana Trueba and Pablo

4    Vargas?

5    A    At the W Hotel in Mexico City, along with all of the

6    other candidates that were there.

7    Q    And when you say "all of the other candidates," had you

8    hired a -- a headhunter to go and look for people?

9    A    Mary Carmen Mendez was -- she had her own company, I

10   still believe she has it, where she does recruiting for

11   different companies.

12   Q    Did -- when was it that you met Mariana Trueba and

13   Pablo Vargas, was it then at the W?

14   A    Yes.

15   Q    And they came on shortly thereafter?

16   A    I don't know if they came separate or together.  I just

17   saw them at the place we were at.

18   Q    Now, Mr. Larian, and we've heard Mr. Park mentioned,

19   were they -- did they come down to Mexico to meet all of

20   these potential candidates?

21   A    As well as looking for office space.

22   Q    The -- in addition to the candidates that we just

23   talked about, you were looking for people for finance,

24   right?

25   A    Yes.

1    Q    Were -- were they hired?

2    A    No.

3    Q    You were looking for some people from -- who were in

4    marketing but weren't from Mattel, right?

5    A    Yes.

6    Q    And do you remember altogether about how many

7    interviews there were for those positions?

8    A    That I was there, two people -- two people in finance,

9    a lady that had a ton of makeup for licensing, Gustavo,

10   Pablo, Mariana, and I believe that they talked to Mary

11   Carmen Mendez to come and do human resources.

12   Q    And so when Mary Carmen Mendez was hired to go out and

13   find candidates, was she told, we only want to talk to

14   Mattel people?

15   A    Oh, no.

16   Q    So she was just told to go out and find good people for

17   you to interview?

18   A    Candidates.

19   Q    Now, do you remember Mr. Machado and Ms. Trueba and

20   Mr. Vargas giving a presentation on the demographics in

21   Mexico?

22   A    Yes.

23   Q    Did you know in advance what presentation they were

24   going to give?

25   A    We just showed that -- I knew that there was a

1   presentation.  This is so long ago.  I knew there was a

2   presentation about Mexico.  I saw the first three slides --

3   slides, and then I -- I still was working as a rep, so I had

4   to go answer e-mails, make sure the distributors had what

5   they needed, so I kind of left.

6   Q    And right after the -- well, when Mr. Larian recapped

7   the meeting with you later, did he tell you right away he

8   wanted to hire them, those three?

9   A    No.

10  Q    When did you find that out?

11  A    He told me he loved Gustavo, immediately he loved him.

12  I believe he -- he -- he knew it was a good fit in New York.

13  He thought that Mariana had the passion, and she's

14  passionate, "she's passionate," that's what Isaac kept on

15  saying, and I say, "Yes, she's passionate and she loves

16  toys."  But he was not sure about Pablo Vargas.

17  Q    And why is that?

18  A    He told me he didn't believe he had what it was needed

19  to be a sales director.

20  Q    But what did you think about Mr. Vargas?

21  A    I told him that I think that maybe in comparison with

22  personalities, Gustavo -- if you interview Gustavo first and

23  then Mariana with all that tons of passion, to have Pablo

24  interview at the end, which is more even, it's not a good

25  perception of his personality, but I believe that he is

1    knowledgeable, I believed he had good presence, which is

2    needed to be a good salesperson, and I asked him to give him

3    a consideration, and if he changed his mind in three months,

4    he could replace him.

5    Q    And did Mr. Vargas also have an MBA degree?

6    A    Yes.

7    Q    And --

8    A    That's true.

9    Q    And were both of these people, people Mr. Machado

10   recommended, did he also recommend Ms. Trueba and did he

11   also recommend Mr. Vargas?

12   A    Yes.

13            MS. KELLER:  And your Honor, would this be a good

14   time for a break?

15            THE COURT:  Yes, it appears it would be.

16            You're admonished not to discuss this matter

17   amongst yourselves, nor form or express any opinions

18   concerning this case.

19            Fifteen minutes?  I will come back and get you in

20   15 minutes.

21            Why don't you step down and take a break for 15

22   minutes.

23            THE WITNESS:  Me too?

24            THE COURT:  Counsel, thank you.  See you in 15

25   minutes.

```
 1              (Recess.)

 2              THE COURT:  Back in session.  The jury is present,

 3      all counsel are present, the parties.

 4              Ms. Kuemmerle, if you'd be kind enough to have a

 5      seat.

 6              Thank you for your courtesy, counsel.

 7              And Ms. Keller is continuing on with her

 8      cross-examination.

 9              At 3:45, one of you as jurors raise your hand,

10      because that's when we are leaving, correct?

11              (No audible response.)

12              THE COURT:  Excellent.

13              Counsel?

14              MS. KELLER:  Thank you, your Honor.

15          SUSANA KUEMMERLE, PLAINTIFFS' WITNESS, RESUMED

16                  CROSS-EXAMINATION (Continued)

17      BY MS. KELLER:

18      Q    Now, Ms. Kuemmerle, there were some negotiations over

19      the hiring of all of you; is that right?

20      A    Yes.

21      Q    And if we can look at Exhibit 3610.

22      A    3610?

23      Q    Let's talk about the hiring for -- this is -- this is a

24      memo from you to Mr. Larian, and I think this is in

25      evidence, but if not, do you recognize this as a memo from
```

1    you -- I'm sorry, a memo from the three, Gustavo Machado,

2    Mariana Trueba, Pablo Vargas, about their hiring, which you

3    were copied on the e-mail and what's attached to it.  Do you

4    recognize 3610?

5    A    Yes.

6             MS. KELLER:  And your Honor, I'd move that into

7    evidence.

8             THE COURT:  Received.

9             (Defendants' Exhibit No. 3610 is received in

10       evidence.)

11   BY MS. KELLER:

12   Q    And if we could look at page 2, and it starts, "Dear

13   Isaac," and that refers to Mr. Larian, does it not?

14   A    Yes.

15   Q    There is a -- if you look overall at this document, you

16   can see that this has to do with the compensation to be paid

17   those three; is that right?

18   A    Yes.

19   Q    And so at the top it says that the total package --

20   this is numeral one, "Total package represents 16 percent

21   above what we currently have before bonus in both cases as

22   you are eliminating benefits, such as saving fund, food and

23   gas vouchers."

24        Those additional benefits were worth some money,

25   weren't they?

1    A    Yes.

2    Q    Now, also, the three people were taking a risk by

3    quitting secure jobs and going to a start-up operation,

4    right?

5    A    Completely.

6    Q    Let's look also -- if you go down to numeral three, it

7    says, "There is no signing bonus.  This is a very important

8    issue for us, considering what seniority costs by law in our

9    country.  Let us explain.  Severance by law in Mexico

10   includes 90 days, plus 20 days per year worked in the

11   company, all based in integrated daily salary, includes all

12   benefits."  And it shows that the current cost of the

13   seniority for Mr. Machado would have been 88,000, for

14   Ms. Trueba, 68,000, and for Mr. Vargas, 41,000.

15       It says, "That's why we are asking for a signing bonus

16   that somehow compensates what we will be giving up.  We are

17   open to negotiate this point on an individual basis"; do you

18   remember that?

19   A    Yes.

20   Q    And do you remember Mr. Larian's reply that -- that MGA

21   didn't give signing bonuses, but they would certainly be

22   compensated if they did a really great job?

23   A    Yes.

24   Q    And those were the sorts of bonuses that you were

25   talking about in the e-mail that Mr. Quinn asked you about,

1    right?

2    A    Yes.

3    Q    So they actually gave up quite a bit to come to MGA?

4    A    Quite a bit.

5    Q    Now, in addition, you were hired in May 2004, right?

6    A    Yes.

7    Q    You were paid much more than Mr. Machado, Ms. Trueba or

8    Mr. Vargas, right?

9    A    More.

10   Q    About 190,000 in U.S. dollars?

11   A    Yes.

12   Q    Plus a car allowance?

13   A    Yes.

14   Q    Apartment rental?

15   A    Yes.

16   Q    Bonus?

17   A    Yes.

18   Q    Three weeks' vacation?

19   A    Yes.

20   Q    Nobody ever accused you of taking any information from

21   Mattel, did they?

22   A    No.

23   Q    Even to this very day, right?

24   A    That's right.

25   Q    So needless to say, Mr. Larian did not ask you to take

1    any information either, did he?

2    A    He never asked me for anything like that.

3    Q    Now, you were asked about the day Mr. Larian was

4    informed, this phone call that you had with him where he was

5    informed that MGA in Mexico has been raided and that the

6    police had seized these items, one of which was a CD that

7    Mr. Var- -- Mr. Machado had; do you remember that?

8    A    Yes.

9    Q    But what you were not asked was how did Mr. Larian

10   react?

11   A    Oh, my God --

12        MR. QUINN:  Objection.  Argumentative, your Honor.

13        THE COURT:  No.  Overruled.

14        MS. KELLER:  How did Mr. Larian --

15        THE COURT:  In terms of what he said, his tone of

16   voice?

17        MR. QUINN:  "What you were not asked."

18        THE COURT:  Well, the real time went down, Jane.

19   That's why I can't capture the question back.  Can you put

20   that back up?

21        I may not have heard that.  Do you want to reask

22   that question?

23        MS. KELLER:  I'll reask it without any offending

24   verbiage.

25

1   BY MS. KELLER:

2   Q    How did Mr. Larian react on that phone call when he was

3   told about the raid and about the fact that your employees

4   had some items that originated from Mattel in the MGA

5   offices?

6   A    His tone was -- he was very angry, and he said -- it's

7   a bad word, "Why the hell did you do that?  I told you not

8   to do that."  And Gustavo said, "It was there, it was

9   sitting there."  And he didn't want to talk.  He didn't want

10  a conversation.  He wanted to ask questions, and he just

11  wanted short answers.  And then when he was done, I said

12  "Can I say something?"  And I said, "I'm going to open the

13  office tomorrow.  I'm going to go as business as usual."

14  And he totally agreed with me.

15  Q    Now, before this day that this raid occurred, did you

16  know that Mr. Machado, Ms. Trueba or Mr. Vargas had brought

17  any documents from Mattel with them?

18  A    No.

19  Q    Was the first you learned of it that day in October of

20  2005 when the raid happened?

21  A    Absolutely.

22  Q    And you were -- you were in New Jersey?

23  A    In my house.

24  Q    And when you and Mr. Larian and Mr. Machado were on the

25  phone, if you can -- if you can quantify it on a scale of 1

1   to 10, 10 being the most angry, 1 being not angry, where was

2   Mr. Larian's anger level that you detected?

3   A    A 9, 11.

4   Q    And what did Mr. Machado tell Mr. Larian about the

5   contents of the CD?

6   A    He told him that there was some Mattel documents,

7   MGA documents, the job offer letters of Mr. Vargas,

8   Ms. Trueba, Mr. Machado; the contracts for Mr. Machado,

9   Mr. Vargas and Ms. Trueba; funny pictures of running

10   customs, and then some other personal information.  I don't

11   remember.

12   Q    Now, when you told Mr. Larian that you were going to

13   continue, you were going to open up and do business the very

14   next day, why did you tell him you were going to do that?

15   A    Because I wasn't going to stoop to the level that I was

16   going to be closed and be scared.  We were going to continue

17   working very hard, moving forward, doing what we needed to

18   do, and I wasn't going to go to that level.  I wasn't going

19   to go to the media the way they -- they entered in the

20   building, all armed with safety vests.  We are on the 15th

21   floor.  All of the other tenants were going to ask, and I

22   was going to open the office, and I was going to continue

23   moving forward.

24   Q    Did you tell Mr. Larian that you believed Mattel was

25   using this to shut down MGA de Mexico?

CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

78

```
1              MR. QUINN:  Your Honor, I object.  They previously
2    asserted the privilege as to this conversation because the
3    general counsel, Daphne Gronich was involved.  We weren't
4    permitted to learn anything about this conversation.
5              MS. KELLER:  This is page 281 to 282 of the
6    December 7th, 2009 depo, and page 296 to 297 --
7              THE COURT:  Could I see those?
8              MS. KELLER:  Pardon?
9              THE COURT:  Could I see those?
10             MS. KELLER:  It's the December 8th, 2009 --
11             THE COURT:  Not until I get those, Counsel.
12             MS. KELLER:  I'm -- I'm giving those to my
13   assistant, your Honor.
14             THE COURT:  Just wait until I get those.
15             MS. KELLER:  Was it --
16             THE COURT:  The page?  She's looking for the page.
17   She didn't hear your page.
18             MS. KELLER:  Pages 296 to 297 and 281 to 282.
19             THE COURT:  Great, thank you.
20             All right.  Thank you very much.  I appreciate it.
21             And let's see the first one.  The first one is --
22   that's the second one, thank you.
23             This is the first -- and you want me to look at
24   page 281 --
25             MS. KELLER:  To 282.
```

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 79 of 107   Page ID #:304846
CV 04-9049-DOC – 02/23/2011 – Day 22, Vol. 2 of 4

79

```
 1              THE COURT:  Okay.  Line what on 281?

 2              MS. KELLER:  I don't have the lines, your Honor,

 3   I'm sorry.

 4              THE COURT:  Is this your copy?

 5              MS. KELLER:  It is.

 6              THE COURT:  Give this back to counsel.

 7              All right.  Now, give that back to Ms. Keller.

 8              And you've got your copy back, so show me the

 9   lines, please.

10              MS. KELLER:  It's lines 3 through 16 on that page.

11              THE COURT:  Okay.  On page 281?

12              MS. KELLER:  281.

13              And your Honor, I am not seeing that exact

14   portion, but I am seeing no assertion of a privilege on

15   either page.

16              THE COURT:  Well, just a moment.

17              Okay.  I've read 281 and 282, and you want me to

18   read 296 and 297?

19              MS. KELLER:  Yes, your Honor.  And there is no

20   assertion of the privilege on any page.

21              THE COURT:  And you wouldn't mind if I read them,

22   would you?

23              MS. KELLER:  (No audible response.)

24              THE COURT:  Overruled.

25              MR. QUINN:  Your Honor, this is subject to a
```

1    filing we made to the Court.

2            THE COURT:  No.  We can take it up outside the

3    presence of the jury.  Overruled.

4            Your question.

5    BY MS. KELLER:

6    Q    What did you mean when you told Mr. Larian that you

7    were going to proceed as business as usual?

8    A    Again, I wasn't going to close the office.  I wasn't

9    going to go to the fighting level.  Everybody saw in the

10   building what happened.  It looked horrible, and I wasn't

11   going to just stand there and close the office and run

12   scared, so I was going to continue business as usual.

13   Q    Did you tell Mr. Larian that this was a very

14   disrespectful and unethical way of doing things in Mexico,

15   and that you were not going to stoop to that level?

16   A    Yes.

17   Q    And when you said "disrespectful," who do you think was

18   being disrespectful to MGA de Mexico and all of you?

19   A    Everybody.

20   Q    Now, how many armed police came in on that raid?

21           MR. QUINN:  Objection.  Lacks foundation.

22           THE COURT:  It's the 30(b)(6).

23           (Laughter.)

24           THE COURT:  I don't know.  Anyway, let's find out.

25           How many armed police?

```
 1              THE WITNESS:  Between 18 to 20 people.
 2    BY MS. KELLER:
 3    Q    And they were -- did they have their guns out; is that
 4    your understanding?
 5    A    They were armed.  I was told that some of them have, I
 6    don't know, big -- big arms.
 7    Q    You mean "guns"?
 8    A    Like big arm guns, like -- I don't know.  The repeated
 9    guns.  I don't know the name.
10    Q    Machine guns?
11    A    Yes.  Oozies kind of thing, and they had security
12    vests, and it was a very scary moment, especially --
13              THE COURT:  Now, this is pursuant to 30(b)(6); is
14    that correct?
15              MS. KELLER:  Yes, your Honor.
16              THE COURT:  So do you want the admonition for
17    Mr. Machado?  It doesn't apply to Mr. Machado and
18    Mr. Larian?
19              (No audible response.)
20              THE COURT:  The testimony you're about to hear
21    only applies to her position as a 30(b)(6) witness only to
22    MGA de Mexico.  This does not carry over or apply to
23    Mr. Larian, Mr. Machado, MGA?  Am I missing anybody?
24              MR. QUINN:  Me, your Honor.
25              THE COURT:  Okay.
```

1          MR. QUINN:  Your Honor, they can't use 30(b)(6)

2    testimony as to them.  It's not admission.  It's hearsay as

3    to them.

4          THE COURT:  That's my concern also.

5          MR. QUINN:  It's hearsay.

6    BY MS. KELLER:

7    Q    I'm just going into the question that you were asked --

8          MR. QUINN:  Move to strike that testimony, your

9    Honor.

10         THE COURT:  Sustained.

11   BY MS. KELLER:

12   Q    I want to ask you a little bit about your answer to a

13   question that you were asked by Mr. Quinn.

14       Mr. Quinn said that -- he brought up your statement

15   that you were going to continue doing business as usual,

16   right; do you remember that?

17   A    Yes.

18   Q    And when you said you were going to continue doing

19   business as usual, you weren't saying, "Oh, big deal, who

20   cares whether we got raided and whether employees took these

21   documents," true?

22   A    No, I was not doing that.

23         THE COURT:  Excuse me for a moment.

24         I'm going to sort this out tonight.  I think the

25   witness may be back tomorrow, so I'm going to ask you to

1    strike the testimony at the present time concerning, you

2    know, how many police, whether they were armed, oozies,

3    guns, et cetera.  Strike it from this testimony.  Let me

4    sort that out with counsel tonight so I'm certain, okay?

5              Thank you, Counsel.

6    BY MS. KELLER:

7    Q    Okay.  I'm only going asking you about one thing.

8    Remember when Mr. Quinn asked you about your statement to

9    Mr. Larian that you were going to continue doing business as

10   usual, right?

11   A    Yes.

12   Q    And you know how that sounded to people, don't you?

13   A    Yes.

14   Q    Kind of cavalier?

15   A    Yes.

16   Q    That's not what you meant at all, was it?

17   A    No, that's not what I meant at all.

18   Q    What you meant was that you were not going to be

19   intimidated out of doing business in Mexico even if a bunch

20   of armed police came in to your high-rise building with

21   machine guns and tried to scare everybody, correct?

22   A    That's exactly what I mean.

23   Q    Okay.

24   A    "Meant."

25   Q    Okay.  Now, you were also asked about why you didn't

1    fire these three people after finding out that they had some

2    items taken from Mattel in their possession; do you remember

3    that?

4    A    Yes.

5    Q    Now, did they assure you that they didn't use the

6    information at MGA?

7    A    At one point they did, and I believed -- I believed in

8    their words, and I -- if anything, I believed, and I

9    believed what they say was the truth.

10   Q    When you were working with them in Mexico, did you ever

11   see them, as you were planning things, using documents that

12   had "Mattel" stamped on them?

13   A    No.

14   Q    Now, in the toy business, information about sales that

15   are coming up, you know, people's product lines and all

16   that, it's pretty important stuff, right?

17   A    Yes.

18   Q    Is it important stuff a few months after the lines come

19   out?

20   A    No, it's not important once the line is out there with

21   the public because it's obsolete information.

22   Q    And the information that -- the information that --

23   your understanding of the information that was on this disk,

24   was it mostly obsolete information?

25           MR. QUINN:  It lacks any foundation, your Honor.

```
 1              THE COURT:  Sustained.

 2              Her testimony was that she hadn't looked at it,

 3    Counsel.

 4    BY MS. KELLER:

 5    Q    Well, did you look at any of the contents of the disk

 6    at all?

 7    A    I looked at the items that I had to recognize

 8    Mr. Aguirre's signature.  Some of them have the Mattel logo.

 9    Q    And were you able to see what the document caption was?

10    A    I don't remember, but I remember seeing 2003, 2002,

11    2000 -- the year.

12    Q    And some of them were later than that, right?

13    A    I don't remember.  Probably, yes.

14    Q    But for example, there is one document that I think

15    we -- is now in evidence that looked like a 2005 line of

16    Mattel's, but this was already 2005 at the time that the

17    raid occurred, right?

18    A    Yes.

19    Q    Now, the first year that you had MGA de Mexico, you

20    were selling year-old products, weren't you?

21    A    Yes.

22    Q    Why was that?

23    A    We were trying -- well, could you repeat?  Why was I

24    selling year-old product?

25    Q    Yeah.  The first year that you had MGA de Mexico, you
```

1    were selling a line of MGA's that was already a year old in

2    the United States, right?

3    A    Yes.

4    Q    Why?

5    A    We were trying to help the U.S -- I'm sorry -- move

6    some of the inventory that we had here, and also we took

7    over the inventory that -- upon agreement between Hasbro and

8    MGA that Hasbro had in Mexico.

9    Q    But Mattel in Mexico was using a brand new line, right?

10   A    Yes.  I don't -- I don't even remember.  Yes.

11   Q    So at least for that first year, you were a year behind

12   in terms of your products in Mexico, right?

13   A    Yes.

14   Q    You were selling stuff that Mattel had seen a year

15   earlier in the U.S., right?

16   A    Yes.

17   Q    And you're selling it in Mexico, and what was your

18   opinion about whether that was a good idea?

19   A    We were trying to help the U.S. and to help place that

20   inventory and to penetrate the market with whatever product

21   we had available because it was very late in 2004, and there

22   was no time to manufacture new products.

23   Q    And how did that go over with the Mexican customers

24   getting products that was already a year old in the U.S.?  I

25   mean, did people in Mexico know they were getting products

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 87 of 107   Page ID #:304854
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

87

 1   that were a year old?

 2   A    I believe that some of the clients understood that, but

 3   we were able to give them good prices, good prices at

 4   retail, support with TV that the line didn't have in the

 5   prior years with Hasbro.  We developed a close relationship

 6   with all of our clients, and the pricing was good, the

 7   marketing was good, so they supported us.

 8            THE COURT:  Did you say Mattel or MGA products,

 9   Counsel?

10            MS. KELLER:  One-year-old MGA products, competing

11   with brand new --

12            THE COURT:  Actually, the record will reflect that

13   you said Mattel at one point.

14            MS. KELLER:  Well, I --

15            THE COURT:  You meant MGA.

16            MS. KELLER:  I appreciate that, your Honor.

17            THE COURT:  Okay.  You'll see that in the

18   transcript, so why don't you correct that.

19   BY MS. KELLER:

20   Q    So what I'm getting at here is that first year, anyway,

21   Mattel had a huge competitive advantage against you because

22   they had brand new products and you had year-old products,

23   right?

24   A    Very huge, and also we needed to wait until the MGA

25   Hasbro agreement was properly finalized, because our clients

CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

```
 1   didn't want to have any conflict between companies, and I
 2   had to go visit all of our clients again with that agreement
 3   properly finalized, so we were very, very late.
 4   Q    So that first year, anyway, even if you had a 2005,
 5   say, Mattel price list, it really wasn't going to do you
 6   much good, was it?
 7   A    It didn't do absolutely no good whatsoever.  We knew
 8   that we needed to price our product competitively, and we --
 9   we all went out at retail to see what was out there in the
10   marketplace, and we can't compare and we priced our product
11   that it was old competitively.
12   Q    And let me ask you a little bit about this exhibit
13   here, Exhibit 8089.  This is in evidence.  And you were
14   asked about this a little earlier by Mr. Price, and this
15   was -- I'm sorry, Mr. Quinn.
16        Mattel, MGA, Mr. Price, Mr. Quinn -- I'm losing it.
17        Okay.  You were asked about this 8089 a little earlier,
18   right?
19   A    Yes.
20   Q    And this is a list of a whole bunch of documents that
21   you said were -- documents that had Mr. Aguirre's initials
22   or signature on them, right?
23   A    Yes.
24   Q    And that indicated to you that these were documents
25   that came out of the MGA Mexico offices and ended up getting
```

1    put on a CD, right?

2    A    Yes.

3    Q    Now, if you would take a look -- you were shown some of

4    these, but I just want to show you eight of them.

5    A    Okay.

6    Q    First of all, of this group of 25, 12 of these

7    documents are actually MGA documents, aren't they?

8    A    Yes.

9    Q    And of the remaining 13, we have a bunch of duplicates,

10   right?

11   A    Yes.

12   Q    So if you look at Exhibit 7148 that was put into

13   evidence, and Exhibit 7156 --

14   A    I have 56 here.

15   Q    -- those are the same documents, right?

16   A    Yes.

17   Q    Okay.  Now, if you'd look at 7150 and 7157 --

18   A    Yes.

19   Q    -- those are duplicates of each other as well, right?

20   A    Yes.

21         THE COURT:  Just a moment.  7150 was supposed to

22   have 67 pages, 7157 was called out as 135 pages.

23         MS. KELLER:  I don't know whether it was a portion

24   or what, your Honor.

25         THE WITNESS:  Yeah.

```
 1              THE COURT:  I'm sorry.  Just a moment.
 2              MS. KELLER:  I'm sorry, one is with the
 3    translation version.
 4              THE COURT:  Okay, I see.
 5              7148 was called out.  I didn't have any pages in
 6    my notes, but noticed 7156 had 19 pages, including the
 7    translation.
 8              MS. KELLER:  Some of these have both the
 9    translation and the Spanish version and others just the
10    Spanish.
11              THE COURT:  Thank you.
12    BY MS. KELLER:
13    Q    And if you look at 7153 and 7158 --
14    A    Okay, yes.
15    Q    -- those are duplicates also, right?
16    A    Yes.
17    Q    And if you look at 7154 and 7159, those are duplicates
18    too, right?
19    A    Sorry, yes.
20    Q    So 12 of the 25 are MGA documents, that leaves 13, but
21    of these 8 that are Mattel documents, 4 are duplicates.  So
22    we end up with 9 that are actually -- not even.  At most, 9
23    documents are actually Mattel documents; is that right?
24    A    More or less, yes.  My math --
25    Q    And some of these documents -- for example, there's a
```

 1    document in there, 7150, that's from -- that's from an

 2    organization called Soriana?

 3    A    That's correct.

 4    Q    And what is Soriana?

 5    A    A client of ours with the headquarters in Monterrey.

 6              THE COURT:  In Monterrey?

 7              THE WITNESS:  Monterrey.

 8    BY MS. KELLER:

 9    Q    And when you say "a client of ours," MGA's?

10    A    Yes.

11    Q    Also with Mattel's?

12    A    Yes.

13    Q    And if your company asks Soriana for data on how sales

14    are going, Soriana will give it to you?

15    A    Yes.

16    Q    How -- how useful is that data once it gets to be a

17    little stale, like a year old, six months old?

18    A    Not useful at all.

19    Q    In fact, all of this kinds -- kind of data, plans for

20    various categories, price lists, data on how sales went last

21    year, it's all useless once it's a little stale, right?

22              MR. QUINN:  Objection.  Vague and overbroad.

23    Vague and ambiguous.

24              THE COURT:  Do you understand the question?

25              THE WITNESS:  Yes.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Yes, it's all useless information.

 3   BY MS. KELLER:

 4   Q    You --

 5   A    Outdated.

 6   Q    And is that especially true when you are matching a

 7   line of year-old toys against a line of brand new toys?

 8   A    Completely.

 9   Q    And that's the situation you were in at MGA de Mexico

10   the first year you were in operation?

11   A    Running an operation with four people, yes.

12   Q    Is that another reason why you didn't really think that

13   this was such a horrendous -- horrendous breach of

14   confidentiality and business ethics?

15   A    I didn't have time.  We were so busy.  We would go to

16   the office at 7:00 in the morning and leave at 2:00,

17   3:00 driving alone in Mexico City.  We were so busy.  This

18   is all stuff -- one thing has nothing to do with the other.

19   Q    Were you pretty confident in your own mind that none of

20   this information that turned up on that disk or that turned

21   up in the little group that we just saw, were you pretty

22   confident in your own mind that that hadn't been used at MGA

23   de Mexico when you were there?

24   A    Absolutely.  Stuff that we were dealing with was what

25   we could see in retail.  We all went to, what I call, the
```

```
 1    streets and look and see what competitors -- and by that I

 2    mean Mattel, by that I mean private label that Mexico has,

 3    any other doll that was in the market, and that's the

 4    information that we use.

 5    Q    But you were -- you couldn't have been too happy to

 6    find out there was anything that even had the "Mattel" stamp

 7    on it found in your office?

 8    A    I was very upset, but then I'd have to get back to the

 9    string of things and start working.  I didn't have time to

10    dwell on this.  I had to move forward.  I was very upset,

11    but I have to continue to do what I was doing.

12    Q    And you were upset because you knew that even if it

13    wasn't useful to you, that it could be useful to Mattel to

14    use against you, right?

15              MR. QUINN:  It's leading, your Honor.

16              THE COURT:  It's leading.  It's a difficult

17    position because she is called as an adverse witness but she

18    is subject to cross-examination.

19              Leading, you can ask leading questions on

20    cross-examination, but remember, here -- let me try to talk

21    to the jury a moment about this.

22              Normally on direct examination, leading questions

23    can't be asked, but if a person is really an adverse witness

24    or really in the other party's purview, in a sense, counsel

25    on direct examination can actually ask a leading question.
```

```
 1    So if your view is that a witness might properly be on the

 2    MGA ledger, or side, and I don't mean "ledger," but in a

 3    sense properly in the MGA camp or Mattel camp, that's what's

 4    causing the confusion.

 5           Technically on cross-examination, you are always

 6    able to ask leading questions, but the weight of these

 7    answers sometimes depends upon you, the jury, figuring out

 8    are witnesses being led.  We want to hear from witnesses as

 9    much as possible about what they are saying, okay?

10           So I'll leave that to counsel.  The objection is

11    overruled.  I'm going to caution the jury that, you know --

12    BY MS. KELLER:

13    Q    You've probably forgotten the question, I bet?

14    A    Yes, sorry.

15           THE COURT:  That's because I gave you a

16    long-winded explanation for the jury, so my apologies.

17    BY MS. KELLER:

18    Q    I'm going to ask you an either/or question.

19           You said you were very upset with them that they

20    brought anything from Mattel, okay?  Were you upset with

21    them because you thought they had done something terrible

22    and breached business ethics, or were you upset with them

23    because they had exposed MGA de Mexico to Mattel's ability

24    to retaliate?

25    A    I was upset because this disrupted what I was there to
```

 1    do.  I -- I was there to open a subsidiary and to make it

 2    grow.  I never, in a million years, would have imagined that

 3    this -- the raid was going to take place, and this disrupted

 4    the rhythm of my business.  I also knew that there was

 5    global litigation between both companies, and I just --

 6              MR. QUINN:  Objection, your Honor.  It's a

 7    narrative, now.  Move to strike.

 8              THE COURT:  I'm going to strike that answer,

 9    ladies and gentlemen.  You're to disregard the answer, and

10    I'm going to strike the entire answer.

11              You can reask the question, Counsel.

12    BY MS. KELLER:

13    Q    In Exhibit 7- -- 677 -- 6766, which is already in

14    evidence, where you referred to a witch hunt, you also

15    referred to a bad history between both companies, okay?

16    A    Yes.

17    Q    And I'm going to ask you a leading question here, so I

18    don't get in trouble, all right?

19              THE COURT:  You are not going to get in trouble,

20    Counsel.

21    BY MS. KELLER:

22    Q    The bad -- whatever that may have been, whatever was in

23    your head, the bad history between the companies was

24    something else that you factored in that worried you and

25    upset you about finding out that there was this Mattel

1    information in your office, true?

2    A    Yes.

3          THE COURT:  All right.  Now, I'm not limiting you

4    in asking questions about the history between the companies.

5    It was the prior question I was concerned about.

6          MS. KELLER:  The prior question or the prior

7    answer, your Honor?

8          THE COURT:  Just before the recess, we got into an

9    area that I didn't think was appropriate, but if this is

10   part of her belief and history, you can ask her about this

11   area.

12   BY MS. KELLER:

13   Q    Well, I think we'll leave it for right now.

14        There was just bad blood between the two companies,

15   right?

16   A    Bigtime, yes.

17   Q    And you felt that if your employees brought anything

18   from Mattel with them, that that was exposing MGA de Mexico

19   to potential retaliatory action by Mattel, right?

20   A    And I didn't want to get there.

21   Q    And when you saw -- when you heard, rather, about 15 or

22   20 armed policemen in the high-rise in Mexico City, that's

23   something that worried you, right?

24        MR. QUINN:  That assumes facts not in evidence.

25   That was stricken, your Honor.

```
 1              THE COURT:  Stricken.
 2   BY MS. KELLER:
 3   Q    Well, you do know there was a police raid, right?
 4   A    Yes.
 5   Q    And you heard a lot of things about that, right?
 6   A    Yes.
 7   Q    And in fact, at Mattel's request, you even looked into
 8   it and interviewed people and talked to people about it,
 9   right?
10   A    Yes.
11   Q    And although you are not allowed to tell us now what
12   that was, in your mind, you had knowledge of what had
13   happened in your offices, in your high-rise in downtown
14   Mexico City, that was the very sort of thing that had
15   worried you, right.
16              MR. QUINN:  Objection.  Argumentative.
17              THE COURT:  No.  Overruled.
18              You can answer that question.
19              THE WITNESS:  Yes, very much so.
20   BY MS. KELLER:
21   Q    Now, you said also that you thought, in fairness to
22   your employees because of how hard they worked, they
23   deserved their bonuses.  And can you tell us, when you say
24   they worked hard, what are you talking about?
25   A    We all worked hard.  We were -- at that time -- at the
```

1    time of the bonuses, a 17-people team doing a country that

2    is big and multi-tasking and doing 13,000 things at the same

3    time, and they did work very hard, everybody worked very

4    hard.  And when I was asking for the bonuses, I was asking

5    for the bonuses of everybody, and they deserved the bonus.

6    Q    Did your people actually increase sales in Mexico

7    between 2004 and 2005?

8    A    Yes.

9    Q    And did you increase market share?

10   A    Yes.

11   Q    What do you attribute that to?

12   A    Hard work, a lot of hard work, very close relationship

13   with our clients, going out there and talking to everybody,

14   stretching as much as we could, our marketing dollars, to do

15   the right combination of product at retail and the right TV

16   and a lot of long hours.

17   Q    Even though you were selling product that was outdated

18   by international standards, right?

19   A    Absolutely.

20   Q    And did you work closely with your advertising company?

21   A    Very much so.

22   Q    What -- what did you do in terms of advertising?

23   A    We -- this is so long ago.  Gustavo was able to get

24   very good rates.  We were able to -- to put TV on the right

25   times so the little girls could see our product.  We did a

1    very aggressive, very funky, entertaining with good music TV

2    campagne, very aggressive with funky and entertaining music

3    brand awareness campagne.  We did a luncheon event where we

4    invited little girls.  And I went all over the place to try

5    to visit with clients.  I developed a very good relationship

6    with the people at TBS to place products.  It was a lot of

7    work.  It was exciting work.  A lot of work, but exciting

8    work.

9    Q    And what did you do with respect to your merchandisers

10   and demonstrators, did you work with them at all?

11   A    We had very limited resources, so we have to make sure

12   that we maximize their efforts, and we used their services

13   in the important points of sale.  So we had to balance that

14   expenditure to use it very wisely, and we worked with them

15   very closely.  We told them how to put the product at

16   retail.  How to put the -- the printed material and how to

17   demonstrate, how to approach customers.

18   Q    And with Hasbro out as the middleman, were you able to

19   give the retailers better prices?

20   A    We were able to obtain better prices, although I was

21   not quite happy with the prices we were having at that time,

22   but we were able to obtain better prices, and we were able

23   to obtain a little better margin for retailers, and the

24   retailers were excited that we were coming in.

25   Q    Now, the bonus -- back to the bonus issue again.  Am I

Case 2:04-cv-09049-DOC-RNB   Document 10088   Filed 02/28/11   Page 100 of 107   Page ID
#:304867
CV 04-9049-DOC - 02/23/2011 - Day 22, Vol. 2 of 4

100

1    correct that Mr. Machado and Ms. Trueba and Mr. Vargas only

2    received bonuses once in 2006?

3    A    Once in 2006, yes.

4    Q    And those were partial bonuses?

5    A    Because of we are based on their collected sales, yes.

6    Q    And you did the annual performance reviews for

7    Mr. Machado, didn't you?

8    A    Yes.

9    Q    How did he do?

10   A    He always did amazing work with me, a true loyal

11   employee, extremely hard working with a lot of innovative

12   ideas.  He's passionate about the toy industry.  He loves

13   toys.  I think he's a little kid at heart.

14   Q    Now, even though you were able to increase sales, did

15   MGA Mexico make any profits in 2004?

16   A    No.

17   Q    And you lost 6.4 million?

18   A    Yes.

19   Q    Did you make any profits in 2005?

20   A    No.

21   Q    Lost 7.8 million?

22   A    Yes.

23   Q    Did you make any in 2006?

24   A    We broke even.

25   Q    And how about 2007, did you make money or lose money?

1    A    We lost money.

2    Q    Now, if you were able to increase sales and market

3    share how is it that you were not able to make profits?

4    A    Some of the products did not perform as we anticipated.

5    Forecasting is very difficult to reduce, and we had returns

6    that moved into the following year, and that hurt us very

7    much.

8    Q    So you had some forecasting problems?

9    A    Yes.

10   Q    And so you weren't able to take some stolen forecasting

11   program from Mattel and turn that into a tool to use at MGA

12   Mexico?

13   A    No.  When I'm referring to forecasting is -- once we

14   enter a forecast, it goes into planning, and production

15   starts.  You fit us in there.  You cannot reduce it.  It's

16   very difficult, so we needed to work and be creative with

17   the product that we have.  We can't reduce our forecasting.

18   Q    So you had some problems with some products, you had

19   some returns on some of those?

20   A    Yes.  Two lines did not perform very well, and we were

21   sold on the idea when we came to see the review, the line

22   review, and we were very excited about Bratz the movie, and

23   we thought it was going to be a huge hit, and so we

24   forecasted very much to that movie.  It didn't do well.  And

25   then the economy didn't go well, so there is a lot of

1    factors.

2    Q    So the worldwide economy began going south also in

3    2007?

4    A    Yes.

5    Q    And did MGA Mexico end up having to close?

6    A    Yes.

7    Q    And were the employees laid off?

8    A    Yes.

9    Q    That was in 2010?

10   A    And 2009.

11   Q    2009.

12        Just a few questions that I have left for you.

13        After the raid, you called a meeting of all of the

14   people employed at MGA Mexico?

15   A    I called a conference call, yes.

16   Q    And what did you tell people on the conference call?

17   A    I called -- somebody gathered them all in the

18   conference room, I called from my house, and first I said

19   that I'm very sorry for the bad moment that everybody went

20   through, especially to the ladies, that I was sorry that I

21   was not there.  And I told them that if anybody at that

22   particular time had any document that does not belong to MGA

23   de Mexico, and I don't care if it's Mattel or XYZ company,

24   to turn it over immediately to my office without any

25   reprimand.  But if I found any other document that did not

1  belong to MGA de Mexico after my return, that was going to

2  be cause for immediate dismissal.

3      I also told them -- the commentary on this situation is

4  that there is no commentary.  We are not going to talk to

5  the media.  We are not going to talk to the rest of the

6  tenants of the building, and we are going to continue with

7  business as normal.

8  Q    Did you also ask Mr. Machado, Ms. Trueba and Mr. Vargas

9  whether they had used any of the Mattel information that was

10 found in the office while they were at MGA?

11 A    I believe I did.

12 Q    And what did they tell you?

13 A    And I was always reassured that that was never used.

14 Q    And when you got back to Mexico, the CD was on your

15 desk, a CD?

16 A    A CD and a pile of papers.

17 Q    And would it be true that you don't know yourself, your

18 personal knowledge, how that CD came to be made?

19 A    It's true, I don't know how it came to be made.

20 Q    Or who made it?

21 A    No, I don't know.

22 Q    Or when?

23 A    I believe it's on the date of the search.

24 Q    And you sent it ultimately to the law firm of

25 O'Melveny & Myers at their request?

1    A    Yes.

2    Q    I --

3            *(Attorney discussion held off the record.)*

4    BY MS. KELLER:

5    Q    MGA de Mexico, did it have any customers at all in the

6    United States?

7    A    No.

8    Q    Did it have its own bank account in Mexico?

9    A    Yes.

10   Q    Was it a separate entity from MGA Entertainment?

11   A    Yes, it was MGA de Mexico SRL.

12   Q    And it was formed under Mexican law?

13   A    Yes.

14          MS. KELLER:  I may have just one more thing, your

15   Honor, if I can have one second, here.

16   BY MS. KELLER:

17   Q    You were asked earlier about some deposition testimony

18   that you gave, and I'm referring to pages 298 and 299 of

19   your December 8th, 2009 deposition.  If we could get you

20   page 298.

21        And the question was read by Mr. Quinn, "Do you

22   think -- do you think Mr. Machado took it there?"  And it's

23   referring to the CD.

24        The witness:  "As I said, I have no idea how it got

25   there, and I don't care how it got there."

1           MS. KELLER:  Your Honor, I would now ask

2   permission to read the following lines, 8 through 13.

3           THE COURT:  You may.

4           MS. KELLER:  Question:  "What do you mean you

5   don't care how it got there?

6           Answer:  "It was there, and the police in a

7   terrible and untasteful and a sponsored search found

8   something that they say they found.  We don't know what they

9   found, and I don't know how it got there."

10  BY MS. KELLER:

11  Q    Is that still true?

12  A    Yes.

13          MS. KELLER:  Nothing further, your Honor.

14          THE COURT:  Recross by Mr. Quinn on behalf of

15  Mattel.

16          MR. COTE:  Your Honor --

17          MR. MC CONVILLE:  Your Honor --

18          THE COURT:  Oh, my apologies.  Mr. Overland and

19  Mr. Cote said they would say when they would like to

20  examine, and this is an appropriate time for Mr. Cote to

21  examine.

22                    **CROSS-EXAMINATION**

23  BY MR. COTE:

24  Q    Good afternoon, Ms. Kuemmerle.

25  A    Hello.

1    Q     Am I your lawyer?

2    A     No.

3    Q     Did we prepare for your questions today?

4    A     No.

5    Q     Did you have any conversations with Mr. Overland about

6    the questions you were going to be asked today?

7    A     No.

8    Q     Do you work for any MGA company now?

9    A     No.

10   Q     Not in the U.S. or Mexico?

11   A     No.

12   Q     Do you remember being shown a presentation on direct

13   examination?

14   A     Yes.

15              *(Live reporter switch with Maria Dellaneve.)*

16                          -oOo-

17

18

19

20

21

22

23

24

25

1             -oOo-

2           **CERTIFICATE**

3

4        I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  February 24, 2011

12

13

14   _____
                                JANE C.S. RULE, U.S. COURT REPORTER
15                              CSR NO. 9316

16

17

18

19

20

21

22

23

24

25