UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

| | | |
|---|---|---|
| MATTEL INC., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DAY 22 |
| vs. | ) No. | CV 04-9049-DOC |
| | ) | VOLUME 3 OF 4 |
| MGA ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

WEDNESDAY, FEBRUARY 23, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:   QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                           BY:  MICHAEL ZELLER, ESQ.
 3                         and  JOHN QUINN, ESQ.
                           865 S. FIGUEROA
 4                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
 5                         (213)443-3000

 6
      FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
 7                         BY:  ANNETTE HURST, ESQ.
                           405 HOWARD STREET
 8                         SAN FRANCISCO, CALIFORNIA 94105
                           (415)773-5700
 9

10
      FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                         BY:  THOMAS MCCONVILLE, ESQ.
                           4 PARK PLAZA
12                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
13                          (949)567-6700

14
                           KELLER RACKAUCKAS
15                         BY:  JENNIFER KELLER, ESQ.
                           18500 VON KARMAN AVENUE
16                         SUITE 560
                           IRVINE, CALIFORNIA 92612
17

18
      FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                         BY:  MARK OVERLAND, ESQ.
                           100 WILSHIRE BLVD
20                         SUITE 950
                           SANTA MONICA, CA. 90401
21                         (310) 459-2830

22

23

24

25
```

1              - AND -

2              SCHEPER KIM & HARRIS LLP
               BY:  ALEXANDER COTE, ESQ.
3              601 WEST 5TH STREET_12TH FLOOR
               LOS ANGELES, CA. 90071
4              (213) 613-4660

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    I N D E X

2

   PLAINTIFF'S                                                                VOIR
3  WITNESS                   DIRECT   CROSS   REDIRECT   RECROSS   DIRE

4  SUSANA KUEMMERLE                     5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f9a8ad4a-bbd4-4729-9bba-d20f8a5a0176

1           SANTA ANA, CALIFORNIA; WEDNESDAY, FEBRUARY 23, 2011

2                               -oOo-

3                         CROSS-EXAMINATION

4    BY MR. COTE

5    **Q**    You said you only saw the first three slides of that

6    presentation; is that right?

7    **A**    Yes.

8    **Q**    You had to step out of the meeting for some reason?

9    **A**    Yes.

10   **Q**    Do you remember what you had to do?

11   **A**    I was our sales rep, so I had to take care of Latin America.

12   **Q**    You had to answer phone calls?

13   **A**    I don't know if it was that, or e-mail, or Blackberry, or all

14   of the above.

15   **Q**    You were shown some e-mails to that presentation that seemed

16   to indicate that the information came from a company called

17   Mindshare.

18            Do you remember seeing those pages?

19   **A**    Yes.

20   **Q**    And Mindshare is in the business of selling information?

21   **A**    Yes.

22   **Q**    Information of the toy companies in Mexico in particular?

23   **A**    Yes.

24   **Q**    Can anyone buy that information as long as they pay for it?

25   **A**    Yes.

1    **Q**    It's not a secret?

2    **A**    No.

3    **Q**    You were also asked about an organization called Nielsen?

4    **A**    Yes.

5    **Q**    Nielsen also sells information to toy companies in Mexico?

6    **A**    Yes.

7    **Q**    To anyone who is willing to pay for it?

8    **A**    Yes.

9    **Q**    What they sell is not a secret either?

10   **A**    That's true.

11   **Q**    A company called Antaad, A-n-t-a-a-d, is the information they

12   sell a secret?

13   **A**    No.

14   **Q**    Did you see the name "Carlos Fuentes" on an e-mail that you

15   were shown earlier today?

16   **A**    Yes.

17   **Q**    You ever heard the name "Carlos Fuentes" in connection with a

18   famous Mexican author?

19   **A**    To be honest, no.

20   **Q**    I want to draw your attention to an exhibit you saw earlier

21   today, which is Exhibit 21243.  You were shown, in particular,

22   paragraphs 10 and 11 in this contract; is that right?

23   **A**    Yes.

24   **Q**    And the tenth paragraph reads that, "The employee

25   acknowledges that all documents and information received as part

Page 7

1    of the work relationship are the exclusive property of the

2    employer."

3              Do you see that sentence?

4    **A**    Yes.

5    **Q**    And you were asked whether that put you on notice of duties

6    owed to Mattel de Mexico; right?

7    **A**    Yes.

8    **Q**    If you could turn one page earlier, I want to ask you to look

9    at the very, very first sentence of this document.  That says,

10   "Labor contract entered into by Mattel Servicios S.A. de C.V.

11   henceforth referred to as the employer."

12             Do you see that?

13   **A**    Yes.

14   **Q**    Was it your understanding, when you saw this document, that

15   the employer referenced in the tenth paragraph was a company

16   called Mattel Servicios?

17   **A**    I don't remember what my understanding is -- was at that

18   time.

19   **Q**    You see in the tenth paragraph "the employer" is capitalized?

20   **A**    Yes.

21   **Q**    And on the very first sentence of the document on the

22   previous page "the employer" is in quotes?

23   **A**    That's right.

24   **Q**    Did you have an understanding of whether Mr. Machado worked

25   for this company, Mattel Servicios, or whether he worked for a

Page 8

1    company called Mattel de Mexico?

2    **A**    At that time?

3    **Q**    At any time.

4    **A**    Later on I came to understand there were two companies, and

5    that he was working for Mattel Servicios S.A. de C.V.

6    **Q**    You understood that was a company in Mexico that Mr. Machado

7    worked for?

8    **A**    Yes.  Later on I learned to understand that.

9    **Q**    And did you understand that Ms. Trueba worked for that same

10   company, Mattel Servicios?

11   **A**    Much later.

12   **Q**    Same with Mr. Vargas?

13   **A**    That's true.

14          **THE COURT:**  Counsel, that's confusing.  Is it that she

15   understood much later?  Or that she went to work for these

16   companies -- I'm sorry, that they went to work for these companies

17   much later?  That's very unclear.

18   BY MR. COTE

19   **Q**    Before April of 2004, you understood that Mr. Machado,

20   Mr. Vargas and Ms. Trueba worked for a Mattel company; right?

21   **A**    Correct.

22   **Q**    My question was, you understand today that that company they

23   worked for was Mattel Servicios; right?

24   **A**    Today I understand that.

25   **Q**    They did not work for Mattel de Mexico?

1    **A**    Today I understand that they worked for Mattel Servicios.

2    **Q**    Going back to the tenth paragraph, it's entitled "10," the

3    second line there says that the information received is the

4    exclusive property of the employer; right?

5    **A**    Yes.

6    **Q**    You understood that to mean the exclusive property of

7    Servicios, who is defined as the employer in this agreement?

8    **A**    Now I understand it.

9    **Q**    The definition of "employer" on the very first page of this

10   agreement doesn't include Mattel Inc. as employer; right?

11   **A**    No.  It's Mattel Servicios.

12   **Q**    Ms. Keller asked you -- I think she used the phrase "startup"

13   when they talked about MGA de Mexico.

14          Did you regard MGA de Mexico as a startup?

15   **A**    Yes.

16   **Q**    What do you mean by that?

17   **A**    We started from zero.  So that's what I mean.

18   **Q**    Did you mean it was a riskier place to work than, say, the

19   biggest toy company in the world?

20   **A**    Completely.

21   **Q**    Was it a possibility that MGA de Mexico could lose money?

22   **A**    Absolutely.

23   **Q**    In fact, it did lose money?

24   **A**    Yes.

25   **Q**    Possibility it could go out of business?

1    **A**    Yes.

2    **Q**    Did it go out of business?

3    **A**    Yes.

4    **Q**    I want to draw your attention to Exhibit 6802, please.  This

5    is in evidence.  This is an e-mail chain that you were copied on;

6    right?

7    **A**    Yes, until the last part.

8    **Q**    Okay.  I'm looking at the second page, and I'm looking at the

9    e-mail that starts about halfway down the second page from

10   Mr. Vargas.

11           You are copied on that e-mail in particular; right?

12   **A**    Yes.

13   **Q**    Now, this e-mail says, after the salutation "Dear Isaac," and

14   then the sentence after that says, "We made some changes to the

15   prices in order to be more strategically correct with the market

16   and our main competitors."  Right?

17   **A**    Yes.

18   **Q**    And the bullet points that follow talk about some of those

19   price changes; is that right?

20   **A**    Yes.

21   **Q**    Did you understand that Mr. Vargas needed to get permission

22   from someone in Los Angeles before he could change the prices on

23   the Bratz dolls?

24   **A**    Yes.

25   **Q**    And, in fact, Mr. Larian's response to that question is, "Why

1    so much lower prices?"

2    **A**    That's right.

3    **Q**    Did he give you some push-back on lowering the prices?

4    **A**    He was not happy.

5    **Q**    Did you have to convince him to lower the prices?

6    **A**    A little bit, yes.

7    **Q**    On the first page of that document, or that exhibit,

8    Mr. Machado notes in the third bullet point that, "We listed all

9    the price rationales."

10            Do you see that?

11   **A**    Yes.

12   **Q**    Do you know what he is talking about there?

13   **A**    The reason why we were lowering pricing.

14   **Q**    You had to give reasons to Mr. Larian why to lower the

15   prices?

16   **A**    Well, he is our boss and we needed to show him the reasons

17   why.

18   **Q**    So setting prices was a team effort?

19   **A**    Yes.

20   **Q**    Both in Mexico and in the United States?

21   **A**    Yes.

22   **Q**    If I can ask you to flip to the very next exhibit in the

23   binder that you have there, which is 6803.  This is an e-mail from

24   Mr. Vargas dated May 7?

25   **A**    Yes.

Page 12

1    **Q**    And in the section -- there is a section in the indented part

2    of the text that says "payment terms," and talking about

3    retailers, demands for retailers' expectations for what MGA's

4    payment terms would be; is that right?

5    **A**    Yes.

6    **Q**    Did retailers ask you for better terms?

7    **A**    They always do.

8    **Q**    They always ask you for better terms.  The payment terms can

9    always be better?

10   **A**    Absolutely.

11   **Q**    They ask to be better than what?

12   **A**    Than Mattel, than Hasbro, than whatever they can use so they

13   get better terms.

14   **Q**    Better than the competition?

15   **A**    Whatever they can use so they can get better terms.

16   **Q**    So that includes Hasbro?

17   **A**    Yes.

18   **Q**    Includes Mattel?

19   **A**    It includes Fotorama.  It includes any other toy company.

20   Whatever they can use to show that they have better terms.

21   **Q**    And when they're trying to get better terms from you, do they

22   ever tell you what the other company's terms are?

23   **A**    All the time.  And I'm sure they use our payment terms for

24   other companies.

25   **Q**    You personally have seen payment terms between competitors

1    and other retailers that the retailers have given; right?

2    **A**    I have not seen it myself, but I know that that's what

3    happens.

4    **Q**    We heard a lot of questions about the search that happened in

5    October of 2005; right?

6    **A**    Yes.

7    **Q**    Were you present for any part of that search?

8    **A**    No.

9    **Q**    Did you have any personal knowledge about what, if anything,

10   was actually found by the police during that search?

11   **A**    Only from interviews.

12   **Q**    So as far as your personal knowledge goes, you don't know

13   what documents were found, if any, during that search; right?

14   **A**    Only through interviews.

15   **Q**    But you don't have any personal knowledge about whether any

16   of those documents were confidential; right?

17   **A**    No.

18   **Q**    Do you have any personal knowledge about whether any of those

19   documents were proprietary?

20   **A**    I don't even know what "proprietary" means.

21   **Q**    Do you have any personal knowledge about where any of the

22   documents were found?

23   **A**    From interviews, yes.

24   **Q**    From interviews, but not from your personal knowledge?

25   **A**    Not from my personal knowledge.

Page 14

1   **Q**    When I say "where," I meant in which offices.

2   **A**    Yes.

3   **Q**    Do you have any personal knowledge about which offices any of

4   the documents were found?

5   **A**    From interviews.

6   **Q**    Only interviews; right?

7   **A**    Yes.

8   **Q**    Do you have any personal knowledge about how any of the

9   specific files got to the MGA office?

10  **A**    From interviews.

11  **Q**    Only interviews.  Apart from the interviews, do you have any

12  personal knowledge about when they came to the MGA offices?

13  **A**    From interviews.

14  **Q**    Do you have any personal knowledge, apart from interviews,

15  about whether Mr. Machado, or Ms. Trueba, or Mr. Vargas selected

16  the documents, or whether they were random as you were asked?

17  **A**    From interviews.

18  **Q**    Only interviews?

19              **THE COURT:**  The jury requested, counsel, to leave 3:45.

20              Ladies and gentlemen, then good evening.  We'll see you

21  tomorrow at 8:30.  You are admonished not to discuss this matter

22  or form or express any opinion concerning the case.

23                          (Jury out.)

24              **THE COURT:**  I have a 4:00 o'clock phone call that I need

25  to take.  Otherwise, I'm going to be with you as long as you need

Page 15

1    the Court this evening.

2          I want to take the matter that's caused quite a bit of

3    discussion amongst the parties, and that's I believe it's 7 -- or

4    6766, the witch hunt.  Let's get that out.  Would you put that up

5    on the screen for just a moment.  Let's discuss this for just a

6    moment.

7          As you know, I'm happy to listen to counsel outside the

8    presence of the jury.  On direct examination this was referred to

9    by Mr. Quinn, and an explanation was given concerning the witch

10   hunt and whether, in fact, this was, in fact, a witch hunt or if

11   that was a form of expression.

12         On cross-examination, apparently MGA, Ms. Keller

13   believes that that door has been opened.  I have made a prior

14   ruling that this wasn't going to be an area concerning litigation

15   to death between the parties.  And I hadn't felt, when I made that

16   ruling, that the door had been opened by reference to a witch hunt

17   used in an e-mail.

18         If you recall, the witness volunteered that Mattel was

19   sue-happy, and at that time, if my memory is correct, Mr. Quinn

20   asked for a --

21         **MR. QUINN:**  Could we ask that the witness be excused?

22         **THE COURT:**  Certainly.  Have her wait outside.  I'm not

23   done with her this evening.  She can wait out in the room.

24         Was sue-happy.  So now, apparently, MGA believes that

25   through the leading questions that they're entitled to ask, that

1    apparently you can bring out this litigation-to-death scenario

2    that the Court previously ruled was --

3         **MS. KELLER:**  Your Honor, that's not the case.

4         **THE COURT:**  I'm going to finish my statement and then

5    I'll hear from you and make certain that my concerns are not

6    well-taken.

7         There is a lot of possible answers regardless of your

8    intent.  And I don't know what this witness is going to say to the

9    jury and neither do you.  I'm concerned that this witness will

10   state that Mattel was suing lots of people, lots of folks, lots of

11   different parties besides MGA.  And obviously there is bad blood

12   between MGA and Mattel, and you are more than welcome to bring

13   that out in the second part of the e-mail.  But not knowing what

14   this witness is going to say, here is my concern:

15        I'm going to shortly hear, if she answers about other

16   litigation and Mattel being sue-happy with other parties, the

17   following from Mattel:  Mattel will come back and tell the Court

18   that it is unfair and that MGA sues lots of people also.  That now

19   the Hong Kong litigation will be in question, let alone the

20   Central District, let alone London.  And the next thing is somehow

21   this will get tied to a similarity comparison, and on and on and

22   on.

23        If you know the answer to that, Ms. Keller, if you are

24   sitting in the witness chair, I have no problems.  But you don't

25   know the answer that she is going to say at the present time.  And

Page 17

1   that's why the objection was sustained.

2          Now, if you want to go there blindsided, that's fine.
3   But here comes the Hong Kong litigation.  And that's why I stopped
4   this for a moment, and I was not going to let her go this evening
5   until we had that answer.

6          Number two, you are not precluded, either of you, from
7   the second portion of this e-mail.  And that is, obviously you can
8   refer to the bad history between both parties, but you'd better
9   make certain that that answer that's about to come out on that
10  stand is the bad blood between Mattel and MGA.  Because if I hear
11  any other answer, then it's not fair to Mattel and we're going to
12  spin right off in the Hong Kong litigation and MGA being sue-happy
13  with lots of other parties also.

14         So we're going to take our time.  You are going to have
15  plenty of time this evening.

16         Number two, I want to talk to you about this confusion
17  that has occurred over this disk and the hard copies.  And I'm
18  going to do my best to walk through what I understand, and I will
19  not have Mr. Zeller's help this evening.  I'll only speak to lead
20  counsel Mr. Price and Mr. Quinn about this.

21         Ms. Hurst is not present.  I will only speak to Ms.
22  Keller and Mr. McConville about this.

23         My understanding from her testimony is that when the
24  police entered the MGA offices, there were a number of what I'm
25  going to call documents -- not the disk that's been referred to --

1   on different disks.  It's been hard from the representations of

2   counsel to this Court to discern which copies were on which disks.

3   But it was apparent to this Court, through the representations of

4   counsel as the depositions developed with different witnesses and

5   confusion literally between the witnesses and certainly the

6   information being given to this Court over the last year, that

7   those hard copies were taken some place in the MGA offices.

8   Apparently I'm hearing that was a conference room.

9           It had previously been represented to the Court that MGA

10  attorneys had responded, but I was never concerned how or if those

11  copies were put on to a disk.  And there has been mass confusion

12  between the 2005 created disk and what I'm going to call the 2010

13  created disk.

14          My understanding, after listening to this testimony, is

15  that this was a 2010 disk created.  That that disk is a disk that

16  actually contains many of the hard copy documents, if not all of

17  the hard copy documents, taken off the different disks, and that

18  that disk was the disk that Mr. Malackowski sent back, amongst

19  other disks, to Carlos Aguirre who put his initials apparently on

20  these documents for verification.

21          There is a second disk.  That disk apparently was a disk

22  that existed at the time of the 2005 search.  That disk allegedly

23  is found on Machado's desk.  And that disk appears to be

24  self-authenticating.

25          The difficulty has been the objection by Machado and MGA

 1    that this disk lacks foundation and is not authenticated.  On top

 2    of that, Ms. Kuemmerle was poorly prepared for her 30(B)(6) depo.

 3    Regardless of the protestations that she was afraid of Mattel,

 4    being sued, Ms. Kuemmerle was a 30(B)(6) witness and should have

 5    been prepared even if she chose not to answer these questions by

 6    looking at these disks and knowing the information that was

 7    seized.

 8              So therefore, although the Court understands and dealt

 9    with Ms. Kuemmerle over a year ago and her concern that, quote

10    unquote, Mattel was going to sue her so she was not going to

11    testify at the deposition, this Court had always felt that she had

12    poorly prepared herself for the deposition.

13              It's not an excuse that the Court issued a ruling

14    concerning the 30(B)(6) and the parties choose to not educate the

15    particular deponent coming before the parties at a deposition.

16              Third, coupled with all of that is apparently the chain

17    from Carlos Aguirre who at least signs the hard copies with his

18    initials.  And I think, if I could see the tape, 87 -- I want to

19    see the disk, the disk.  I said the tape; I want to see the disk.

20         **MR. QUINN:**  They have what was sent.  We only have a

21    copy.

22         **THE COURT:**  I want to see the disk.

23         **MR. MCCONVILLE:**  You are talking about the original disk

24    that was sent to O'Melveny?  Is that the disk you are talking

25    about?  Or do you want to see a copy of it?

1          **THE COURT:**  I want to see the disk, the original disk.

2          **MR. MCCONVILLE:**  Okay.

3          **THE COURT:**  Where is it?

4          **MR. MCCONVILLE:**  The short answer is I believe it's in

5     ILS's custody because it was sent in for an examination.  I've

6     sent e-mails, while we have been sitting here, trying to find

7     where the thing is.

8          **THE COURT:**  So we have the original disk some place.

9          **MS. KELLER:**  When the Court says the original disk,

10    that's the problem.  We have the disk that was given to us by the

11    Mexican police.

12         **THE COURT:**  No.  There was a disk found on Machado's

13    desk.

14         **MR. COTE:**  That's in the possession of the Mexican

15    police.

16         **THE COURT:**  Thank you.  That's still in the possession

17    of the Mexican police.

18         **MR. COTE:**  That's right.

19         **THE COURT:**  So therefore Mattel believes that we have an

20    exact copy for one reason.  And that is what I'm hearing, is that

21    a copy was shown to Carlos Aguirre in the offices that day and he

22    initialed that copy.

23         **MR. COTE:**  I don't believe that's true.  It's not true.

24    It was copied by the police.  This is a story that Mattel has been

25    telling.

1        **THE COURT:**  I'm sorry.  I thought I just said that.  Let

2   me say that again.

3        I don't care if it was copied by Snow White.  There was

4   a copy made -- so you don't quibble with me -- by somebody inside

5   the MGA de Mexico offices and it was given to Carlos Aguirre.  And

6   my understanding from the testimony was he either compared it or

7   he signed that it was an exact copy.

8        MR. COTE:  No.

9        **MR. OVERLAND:**  No, that's not correct.

10       **THE COURT:**  One of you.  Which one is going to take over

11  and speak?  Mr. Overland is.

12       Mr. Cote, thank you for your participation.  You are

13  done.

14       **MR. OVERLAND:**  The only evidence we have as to what

15  happened was from Mr. Vargas.  And Mr. Vargas testified at his

16  deposition that he was present when a police officer or a member

17  of the Mexican DA's office inserted a disk into a laptop that he

18  had brought with him, put that disk in.  That disk stayed in that

19  laptop, according to his testimony, five to six or seven minutes.

20  The disk was taken out, and that was the disk that Mr. Aguirre

21  signed.  There is no evidence that an exact copy of the disk was

22  made or not.

23       **THE COURT:**  Why then did Mr. Aguirre sign that on the

24  representation that that was an exact copy?  Is your claim that

25  this isn't an exact copy?  That Mr. Aguirre, who is a lawyer and

Page 22

1   the manager at the office?

2           MR. OVERLAND:  I think the premise is wrong.  He didn't

3   sign it as a representation that it was an exact copy.  He was

4   asked by the Mexican police to sign all the documents and a disk.

5   And that's what he did.  There was no representation by initialing

6   it that that is an exact copy of the disk.

7           THE COURT:  And finally, aren't most of the documents on

8   that disk self-authenticating?  Now, whether they're a trade

9   secret or not is a different question.

10           MR. OVERLAND:  When you say self-authenticating, you

11   mean --

12           THE COURT:  It's going to show that it's a Mattel

13   forecasting or a Mattel document of some type, that has to be,

14   even if it's a compilation; even if your worse fears are true and

15   your speculation is that the Mexican police somehow planted

16   information -- I find that a little far-fetched -- that the

17   Mexican police are going into the MGA offices with outside

18   material and planting it on a computer.

19           MR. OVERLAND:  I find it far-fetched that they would

20   come with 18 armed officers.

21           THE COURT:  That's a wonderful answer.  I'm going to

22   come back to it.

23           That, from my standpoint, is speculation.  And I'm not

24   interested in 18 armed police for just a moment.  I'm interested

25   in the tape.  So I'm not going to go down that road with you.  I'm

Page 23

1  going to come back right back to this tape.

2          **MR. OVERLAND:**  When you say --

3          **THE COURT:**  And I said tape.  Disk.

4          **MR. OVERLAND:**  When you say documents on the disk are

5  self-authenticating, they are in terms of being Mattel documents

6  or MGA documents, whatever it is.  But they're not

7  self-authenticating in terms of being on the disk that was found

8  on Mr. Machado's desk.

9          **THE COURT:**  But they had to come from inside the MGA

10  offices, unless I buy into your argument, and that is, that the

11  police came in and planted these documents.  I mean, that's really

12  your argument.

13          **MR. OVERLAND:**  The argument is a chain of custody.

14          **THE COURT:**  No.  Your argument is that the only way that

15  these got on there is the police planted them.  That's what you

16  are asking me to speculate.

17          **MR. OVERLAND:**  I think "planted" is a word that has an

18  intentional connotation.  The way they got on there is from that

19  officer's laptop on to the disk.

20          **THE COURT:**  So the officer had to have prior Mattel

21  documents on his laptop when he went into the MGA offices; is that

22  correct?

23          I want to understand this because you have been laboring

24  with this now for over a year with representations back and forth

25  from different depositions, depending upon who testified and

Page 24

1    different representations in Court.

2             MR. OVERLAND:   All I can tell you is as far as the

3    criminal complaint that was filed in Mexico, there are allegations

4    in that complaint by Mr. Tiburcio representing Mattel, who

5    prepared the complaint, that documents were different to the

6    Mexican police in preparation for the filing of the complaint

7    which occurred April of 2005, and the search occurred in October

8    of --

9             THE COURT:   Stay with me now.   It has to be from your

10   perspective that these documents existed on a police officer's

11   computer before he or she went into the Mexican offices.   And I

12   don't care about the complaint.   The complaint comes after.

13            MR. OVERLAND:   No, no, no.

14            THE COURT:   Came before?

15            MR. OVERLAND:   The complaint was filed in April of 2005.

16            THE COURT:   So therefore, the arrest warrant issued

17   first and it's a complaint that was filed first.

18            MR. OVERLAND:   Yes.

19            THE COURT:   Yes or no?

20            MR. OVERLAND:   Yes.   The search occurred in October, the

21   complaint was filed in April.

22            THE COURT:   So let me repeat this.   You fear that

23   because these documents were apparently given to an officer for

24   the investigative purposes that lead to a complaint, that leads to

25   the warrant that leads to the raid, that these documents were

1   already on the officer's computer and somehow either inadvertently

2   or intentionally they got transferred to the disk that Carlos

3   Aguirre signed.  Is that it?

4          **MR. OVERLAND:**  That's it.

5          **THE COURT:**  Now, what about the separate documents?  I'm

6   going to switch from the disk to the separate documents that were

7   compiled on what I'm going to call the 2010 disk.

8          **MR. OVERLAND:**  The separate documents, there will be

9   testimony by individuals as to where those documents were located.

10  That's a different issue.  And I'm not concerned with that.

11         **THE COURT:**  Now, Mr. Cote, let me be polite.  Let me ask

12  you if you have anything further to say on behalf of Mr. Machado.

13         **MR. COTE:**  Nothing further.  Thank you.

14         **THE COURT:**  Now, Ms. Keller?

15         **MS. KELLER:**  Your Honor, we don't have any affirmative

16  proof of what was done.  But by the same token, we don't have any

17  unassailable chain of custody.  And I do find the -- that I

18  disagree with the Court's comments about Mexico.  I think we all

19  are aware, all of us who live close to the Mexican border, are

20  aware of the fact that even the Mexican federal government has

21  found endemic corruption in police all over Mexico; absolutely

22  endemic to the point that there are people concerned that Mexico

23  could be a failed state.  And not just because of narcotics

24  trafficking, but because of all kinds of corruption.

25              When you couple that with the fact that in the Mexican

Page 26

1    system prosecution is not necessarily done by independent

2    prosecutors, brought information by independent police, but is in

3    this case and in many cases, actually initiated by a private

4    party -- in this case, a private party with tremendous

5    resources -- it is not something I consider far-fetched --

6    although we have no proof of it -- it is not something I consider

7    far-fetched that something like that could happen.

8            And that's why --

9            THE COURT:  Just one moment.  I'm expecting a phone call

10   at 4:00 o'clock so I'll have to interrupt.  But please continue.

11           MS. KELLER:  I don't consider it far-fetched under those

12   circumstances that something like that could happen.  I would

13   consider it far-fetched if it happened here.

14           THE COURT:  Mr. McConville, I want to make sure that you

15   join this now.

16           MR. MCCONVILLE:  I was just going to address the issue

17   of the second CD created in 2010.  That one, just looking at these

18   records, it appears it was created by our firm, sent to

19   Mr. Aguirre so that whomever was testifying as a 30(B)(6), he

20   could have the documents in front of him and say yeah, that's my

21   signature.

22           THE COURT:  Is there any contention about the 2010 disks

23   and the documents contained it?

24           MR. MCCONVILLE:  There are contentions I think regarding

25   whether they're trade secrets.

1          **THE COURT:**  I'm sorry.  I misspoke.  I apparently wasn't

2     clear.  Is there any disagreement concerning the authenticity of

3     those documents?

4          **MR. MCCONVILLE:**  Well --

5          **THE COURT:**  In other words, the documents were found

6     inside the MGA Mexico offices.

7          **MR. MCCONVILLE:**  I don't believe there is.

8          **THE COURT:**  Are there or not, yes or no?  Five attorneys

9     are looking at each other.

10          Counsel, I'll be right back.  Counsel, you are ordered

11     to remain.

12          (Brief pause in proceedings.)

13          **THE COURT:**  Back on the record.  Does that mean that the

14     physical documents are no longer in contention concerning

15     authenticity?  The physical documents?

16          **MR. OVERLAND:**  I'm sorry, are you addressing me?

17          **THE COURT:**  I don't care who I address.  I'm just

18     looking for some response.  In other words, we're going to narrow

19     this down to the disk or the physical documents, and then we're

20     going to go through each physical document.  Because at some point

21     there is a requirement that we know what documents are subject to

22     trade secret.  We have been asking for that, and I have given

23     Mattel time so we're going to get down to that now.

24          **MR. MCCONVILLE:**  There is no dispute that the documents

25     that have Mr. Aguirre's signature were documents that he signed at

Page 28

1    MGA Mexico's office?

2              THE COURT:  Are you objecting to their introduction into

3    evidence?

4              MR. MCCONVILLE:  Yes.

5              THE COURT:  Why?

6              MR. MCCONVILLE:  Because we don't now how they got to

7    the offices.

8              THE COURT:  How they got to the office?

9              MR. MCCONVILLE:  Correct.

10             THE COURT:  Although they're found in the office?

11             MR. MCCONVILLE:  Right.

12             THE COURT:  Thank you very much.

13             Ms. Keller, so I don't miss anybody.  You are not tired.

14             MS. KELLER:  You called on me at just the wrong second.

15             No, Your Honor, we don't.  I agree with Mr. McConville.

16             THE COURT:  And that's let for argument obviously.

17             Mr. Overland?

18             MR. OVERLAND:  No.  The only issue is what office they

19   were found, and that's going to come out through testimony.

20             THE COURT:  Mr. Cote?

21             MR. COTE:  I agree with Mr. Overland.

22             THE COURT:  Just isolating on those documents then, Mr.

23   Quinn, that takes all of those documents, it seems.  And let's go

24   over those for a moment.  Bear with me.

25             This has only taken a year.  I know that there's

Page 29

1    potentially duplicates argued by the other side, but I want to

2    take 7148.  I'm going to start down just hard copies for a moment,

3    and I'm going to read back to you.

4            7148, 7149, 7150, 7151.  By the way, 7150 is 67 pages.

5    7151, five pages.  7152, 24 pages.  And these are inclusive of the

6    Spanish translation.  I didn't have a page count for 7148, and no

7    page count was mentioned for 7149.

8            7153, 7154, 7155, 7156, 7157, 7158, 7159, 7160, 12834.

9    Respectively 7150 has 16 pages.  7151 has five pages.  7152, you

10   stated has 24 pages.  7153 has 18 pages.  7154 has 23 pages.  7155

11   has 20 pages.  7156 has 19 pages.  7157 has 135 pages.  7158 has

12   18 pages.  7159 has 47 pages.  7160 has 33 pages.  12834 has 16

13   pages.

14           I well understand on cross-examination that the

15   contention is that 7148 and 7156 are duplicates.  You contend that

16   7150 and 7157 are duplicates.  You seem to contend in front of the

17   jury that 7153 and 7158 are duplicates.

18           Finally, according to my notes, 7154 and 7159 are

19   duplicates.

20           What other physical documents seized in any of the three

21   offices are you contending are trade secrets?

22           **MR. QUINN:**  That's all, Your Honor.

23           **THE COURT:**  Not "that's all."

24           **MR. QUINN:**  None.  None others.  Only those.

25           **THE COURT:**  The grand total is nine.  Is Ms. Keller's

1   math correct?  I went to a public school so I'll have you add it

2   up for me.

3          MR. MCCONVILLE:  Your Honor, 7149 was never actually --

4   is not in the book.  It was ever actually shown or presented.

5   That was 7149.

6          THE COURT:  In my notes I have 7148 and 71 -- strike

7   that.  7148 was received.  7149 I never received.

8          MR. MCCONVILLE:  Yes.

9          THE COURT:  Mr. Cote, bear with me.  We're going to go

10  through these in just a moment.  We're going to see if they can

11  separate those out for 4401 purposes.

12         MR. QUINN:  We're going to offer 7149 tomorrow.

13  Counting that, we would have 10.

14         THE COURT:  Excellent.

15         Mr. Corey, come up and join us if you want to.  You can

16  be part of the record this evening because I know the hard work

17  you have been doing down in Mexico.

18         Of those, how do we divide between Mattel or Mattel de

19  Mexico documents where the claim is this is a Servicios employer?

20  In other words, Mr. Cote's request is that this be further broken

21  down.

22         For the record, Mr. Cote, why don't you state that again

23  because maybe Mr. Corey wasn't here.

24         MR. COTE:  Certainly.  We had made a request -- and I

25  don't want to put words in the Court's mouth -- but I understood

1    the Court made an order -- I may have misunderstood that, but I

2    thought we were going to receive a list from Mattel listing all of

3    the trade secrets that they were claiming, and then which of the

4    two plaintiffs or counterclaimants Mattel and Mattel de Mexico,

5    which of the two owned each of the documents.

6            THE COURT:  This is as far as I've gotten.  And I stated

7    to you this informally and to the other parties.  I had gone as

8    far as being worried about what was on the disk.  I don't know

9    what else in terms of extraneous material was on the disk.  Now

10   I'm convinced that upon representation of counsel there are 50

11   Mattel exhibits or contentions concerning --

12           MR. COREY:  May I approach?

13           THE COURT:  Yes.

14           MR. COREY:  I believe Mattel's contention is that there

15   are -- of the 110 documents on the disk, there are 50 that Mattel

16   contends form the basis of its --

17           THE COURT:  That's what I heard the other evening, there

18   were 50.  And then there was some number, 24 or 26, that were

19   Mattel documents of some type, but they weren't contended to be

20   trade secrets.

21           MR. COREY:  27, Your Honor.

22           THE COURT:  Thank you very much.  And that would leave

23   77 from 110?

24           MR. COREY:  There are 77 --

25           THE COURT:  77 minus 110?

 1            MR. COREY:  33.

 2            **THE COURT:**  Excellent.  So 33 just extraneous,

 3    nonrelevant documents that are not contended to be the Mattel

 4    documents or trade secrets.

 5            **MR. COREY:**  They're not contended to be Mattel documents

 6    or trade secrets.  I believe 20 of those are MGA-related

 7    documents.

 8            **THE COURT:**  So 20 are MGA-related documents.

 9            **MR. COREY:**  And the remaining are specific to

10    Mr. Machado as far as we can tell.

11            **THE COURT:**  So 13 additional are specific to Machado,

12    pictures or whatever?

13            **MR. COREY:**  Yes, Your Honor.

14            **THE COURT:**  Now, just a moment.  Excellent.  Thank you.

15            Of the 50 contended documents, how I do identify those?

16    In other words, on the disk I'm going to have 50 documents that

17    are contended to be trade secrets, individually.  How I do

18    designate those?  How do I refer to them?

19            **MR. COREY:**  What we did during discovery, and what we

20    have done with the trial exhibit list is the disk was produced to

21    us with a specific Bates number.  I can't remember exactly what

22    that was.  For use in depositions, we have printed out those in a

23    format we could use and could easily be read with the Bates number

24    designation; the prefix of what the Bates number and then ordered

25    them consecutively.

1          **THE COURT:**  Do I have 50 of those right now?

2          **MR. COREY:**  I don't know if you have them in the

3     courtroom.  We have 50 of those in our office.

4          **THE COURT:**  And those are the trade secrets that you are

5     concerned about?

6          **MR. COREY:**  Of the ones on the CD, correct.

7          **THE COURT:**  Excellent.  Do you have those, Mr. Cote?

8          **MR. COTE:**  Do I know the list?

9          **THE COURT:**  Yes.

10         **MR. COTE:**  I know the list.  And I agree with Mr.

11    Corey's count of 50 claimed trade secrets.  I think we would

12    quibble about how the remaining 60 are broken up and categorized.

13    My counts are different than his.  But I agree, there are 50

14    claimed and 60 not.

15         **THE COURT:**  Just a moment.  I'll be right back.

16              (Brief pause in proceedings.)

17         **THE COURT:**  Back on the record.

18         Now I'm going to focus on the disk for a moment and

19    isolate the issues.  My understanding is that there is no

20    disagreement about the chain from Mr. Aguirre to -- just this

21    chain now -- from Aguirre to O'Melveny, to Orrick, to Quinn

22    Emanuel.  Is that true or untrue?

23         **MR. QUINN:**  I think that it's accurate as far as it

24    goes, but you left out Kuemmerle.

25         **THE COURT:**  I'm sorry.  You are right.

Page 34

1          MR. QUINN:  And Skadden.

2          MR. MCCONVILLE:  Right.  There is no dispute as to that

3     chain.

4          THE COURT:  Let's walk through it again.  Aguirre to

5     Kuemmerle on her office floor, whatever period of time, to

6     O'Melveny.  Next.

7          MR. QUINN:  Yes.

8          THE COURT:  To Nolan or to Skadden?

9          MR. MCCONVILLE:  Yes.

10         THE COURT:  To Orrick?

11         MR. MCCONVILLE:  Quinn Emanuel.

12         THE COURT:  I thought it passed to Orrick and then to

13    Quinn Emanuel.

14         MR. MCCONVILLE:  No.

15         THE COURT:  Okay.  Concerning that chain, that portion,

16    is there any disagreement, or do you believe that a further

17    foundation needs to be laid by Quinn Emanuel and Mattel?

18         MR. QUINN:  Your Honor, just one amendment.  We didn't

19    get -- we got a copy, so we shouldn't be on the end of that chain.

20         THE COURT:  So Skadden.

21         MR. QUINN:  Skadden to Orrick, I believe.

22         THE COURT:  Skadden to Orrick.

23         MR. QUINN:  Skadden to Orrick to ILS is what I heard

24    today.

25         MR. MCCONVILLE:  So Your Honor, the parties actually

1   agree to a stipulation on this chain of custody issue.  I can read

2   it into the record what the parties --

3           **THE COURT:**  Have I ever read that to the jury?

4           MR. MCCONVILLE:  No.

5           **THE COURT:**  Have I even seen it?

6           MR. MCCONVILLE:  No.

7           **MR. ZELLER:**  We just agreed to it about 15 minutes.

8           **THE COURT:**  That's wonderful news.  Read it.

9           **MR. ZELLER:**  Here is the stipulation that's being

10  submitted in writing.

11          "Exhibit 8855-A is an identical copy of a data storage

12  disk signed for by Carlos Aguirre, an MGAE de Mexico employee,

13  before the Mexican police on October 27, 2005, the day of the

14  search conducted by the Mexican police of the MGAE de Mexico

15  offices.  Mr. Aguirre put the disk in Susana Kuemmerle's office.

16  She later forwarded to the law firm of O'Melveny & Myers.

17          **THE COURT:**  Later meaning what period of time?

18          **MR. ZELLER:**  There was not -- it's not stated in the

19  stipulation, and the testimony is a little ambiguous in the sense

20  that it was some months later.  That's at least her testimony.

21          Continuing with the stipulation.  Picking up, rather.

22  "She later forwarded it to the law firm of O'Melveny & Myers then

23  counsel for MGAE de Mexico.  O'Melveny & Myers gave it to the law

24  firm of Skadden Arps.  Then counsel for MGAE de Mexico and Skadden

25  Arps produced an identical copy of it to the law firm of Quinn

1    Emanuel, counsel for Mattel.  The parties are not stipulating to

2    facts regarding the creation of the disk.

3              Exhibit 8855-A contains 110 files.  Of these 110 files,

4    Mattel contends that 50 of these files contain trade secrets owned

5    or possessed by Mattel."

6              And that concludes the stipulation.

7              THE COURT:  Stipulated to by Quinn Emanuel and Mattel?

8              MR. ZELLER:  It is.

9              THE COURT:  And by Orrick?

10             MR. MCCONVILLE:  And MGA.

11             THE COURT:  And by Mr. Overland, Mr. Cote, on behalf of

12   Mr. Machado?

13             MR. COTE:  Yes, Your Honor.

14             THE COURT:  All right.  So then finally the one isolated

15   issue is whether there is a sufficient chain and authenticity

16   concerning the disk and what occurred at the Mexico offices; is

17   that correct?

18             MR. ZELLER:  That's right.

19             THE COURT:  Mr. Corey, I made a request through Mr.

20   Quinn.  I'm just curious.  Have we placed a call down to Mexico?

21   Do we have any cooperation from Mexican police?

22             MR. COREY:  We don't have any cooperation yet.

23             THE COURT:  Okay.  Are we working on it?

24             MR. COREY:  Absolutely.

25             THE COURT:  Give me your best guesstimate of when we

Page 37

1  would have, a "yes" or a "no."  In other words, the fewer issues I

2  raise for the circuit, those that can be easily resolved, the

3  better.

4          MR. COREY:  Can I ask to report back tomorrow?

5          THE COURT:  Excellent.

6          Mr. Cote?

7          MR. COTE:  One point, we need to backup a little bit to

8  the hard copy documents.  That's exhibits 7148 through 60, and

9  then there is also Exhibit 12834.  There was representation made

10  that those are claimed trade secrets.  That's not correct.

11  They're not.  Four of those 14 documents are claimed trade

12  secrets.

13          THE COURT:  Just separate those out for me tonight.

14          MR. COTE:  I can do it right now.

15          THE COURT:  No.  You work with Mr. Corey and you'll do

16  the whole thing for me instead of all this piecemeal because I'm

17  just keeping counsel needlessly.  The sooner you get it done, the

18  quicker I can get you out of here.

19          MR. COTE:  Just wanted to state that objection.

20          THE COURT:  You're taking time right now for work that

21  can be accomplished.

22          So there is no objection.  Just get together and get it

23  done.

24          All right.

25          MR. MCCONVILLE:  Your Honor, Susana Kuemmerle is still

Page 38

1    in the hallway.

2            THE COURT:  I want her in the hallway.  She is to

3    remain.

4            What other information in your opinion, Mr. Quinn, could

5    be asked of Susana Kuemmerle to give Mattel a better record if the

6    Court decided to accept this disk?

7            MR. QUINN:  Nothing further, Your Honor.

8            THE COURT:  What other evidence would you seek to elicit

9    on behalf of MGA and Mr. Larian to authenticate this disk?

10   Obviously the police officer who seized it and what occurred in

11   the conference room.  That's a given.  Anything else?

12           MS. KELLER:  On behalf of MGA and Mr. Larian, Your

13   Honor, we can't think of any additional information we can get out

14   of Ms. Kuemmerle in that she wasn't there.

15           THE COURT:  Let me ask you a question.  I have heard

16   testimony that MGA counsel were present.  Were MGA counsel inside

17   the conference room when the police took these documents into the

18   conference room, or do we know?

19           MS. KELLER:  May I have a moment?

20               (Counsel confer)

21           MS. KELLER:  I don't think we have the answer to that,

22   Your Honor.

23           THE COURT:  Okay.  Mr. Cote, do you know?

24           MR. COTE:  I don't know the answer.

25           THE COURT:  Let me turn back to -- I heard that there

Page 39

1    was a laptop involved allegedly; is that correct?

2            MR. QUINN:  I heard that as well, Your Honor.

3            THE COURT:  How do you copy on a laptop?  Just a moment.

4    Think about that for a moment.  If a disk goes into the laptop,

5    how do you make a copy on a laptop?  I want somebody to show me

6    how that's done.

7            MR. ZELLER:  You can provide a demonstration.  With the

8    right answer software and hardware with a laptop, you can take

9    files, like Mr. Machado apparently did from the laptop, via

10   laptop, copy them down to and have them burnt to a CD.

11           THE COURT:  Off of a laptop?

12           MR. ZELLER:  Correct.

13           MS. KELLER:  And if you take a CD that has information

14   on it and you stick it in a laptop, it's easy to copy it.  You

15   copy it to the laptop's C drive.  And then if you wanted to burn

16   another copy or add more stuff that's on the laptop already, you

17   just burn another CD and out comes that CD.

18           THE COURT:  Lastly, if Mr. Machado is here on March 1st

19   as promised, does this issue resolve itself for the Court?  In

20   other words, are we still going to be in the same position after

21   his testimony?

22           MR. COTE:  He wasn't there for the search, Your Honor.

23   He was in New Jersey with Ms. Kuemmerle.

24           THE COURT:  But it's his disk.  He downloaded,

25   supposedly, on to it.  And he should know what personal

Page 40

1    information he has, if not item by item number.  And he should

2    have a good idea of what items are on that disk.  At least if not

3    all 50 plus 27 Mattel items, he should have some indication and

4    some knowledge that would give it more authenticity.  And that's

5    what I have been waiting for.  I have been waiting for Machado.

6              MR. OVERLAND:  He knows about some, but not all.

7              THE COURT:  It seems to me this is going to resolve

8    itself very quickly when Mr. Machado is here.

9              MR. OVERLAND:  Not as to all 50.

10             THE COURT:  It may not as to all 50, but it is probably

11   going to be enough authenticity to give the Court a little bit

12   better feeling about this one way or the other.  And what the

13   neglect is, is Mr. Machado not coming, quite frankly, in a timely

14   fashion.

15             I think Mattel can expect that the Court is going to

16   receive this into evidence.  And I'm going to give the defense one

17   more opportunity to produce Machado as promised.  So therefore,

18   I'm going to conditionally receive it at the present time still as

19   I had before.  And I'm not going to limit any questioning

20   concerning the disk by Mattel at this time.

21             So therefore, I would expect that Mr. Machado might be

22   in a position to contradict that.  So I have still got an open

23   mind.  But on the present record I would be receiving this into

24   evidence.

25             Now, that doesn't preclude any party from arguing in a

Page 41

1   sense how that came into being.  That's for argument if you all

2   think there is sufficient authenticity and chain.  But I'm fairly

3   well-satisfied at the present time, at least on the state of this

4   record, although I certainly would like a better record.  And I

5   think literately without the police officer here, there is some

6   small risk that Mattel is taking, but it seems to the Court de

7   minimus on this record.

8           I want to take up three other matters and then send you

9   to dinner.

10          I think the Court might consider instructions on two

11  areas.  First, whether it was wrong to take nontrade secret

12  information on the disk, which has always been a concern,

13  Mr. Cote, of yours, and of Mattel and Mr. Larian's.  And second,

14  whether Mattel Servicios was the sole employer of Machado, Trueba,

15  and Vargas.

16          I have resolved each of those matters on summary

17  judgment, and a number of those rulings have become law of the

18  case.  But by the same token -- or findings by this Court.  But by

19  the same token, I think it's a lot safer that that is a part of

20  this record.  And I think you have established enough today

21  concerning Servicios.  But I'm not certain.  So I want to raise

22  this with you.

23          First, you had objected, Mr. Cote, earlier today, but it

24  was unclear to this Court whether you were objecting about who the

25  employer was or the distinct issue of who owns the claimed trade

f9a8ad4a-bbd4-4729-9bba-d20f8a5a0176

Page 42

1    secret documents.  The later -- the claimed trade secrets

2    documents have not been resolved yet.  And that's what you and Mr.

3    Corey are going to work on this evening.

4           The concern with the employer was disposed of at summary

5    judgment in large part because the employment agreements say

6    Mattel Servicios, and because also Mr. Zeller had represented to

7    the Court at the summary judgment hearing that Mr. Machado was

8    employed by Mattel Servicios.  I have simply waited to hear that

9    in front of this jury so I have an even better record.

10          I think if I take some time to go back through my notes,

11   which I don't think I have to, you have established that now with

12   the three employment contracts.  But I want to make certain you

13   now look at your notes and you represent to me that each of those

14   service agreements have, in fact, been received into evidence.

15   And I want the number on them.

16          **MR. COTE:**  They have not, Your Honor.

17          **THE COURT:**  Then it's premature.  And therefore, if

18   there is no stipulation, you have some work to do.  Once you

19   establish in front of this jury, then it will be consistent with

20   my prior rulings at summary judgment and I would then read an

21   instruction.

22          Now, I recognize there has been specific testimony today

23   about one of these employment contracts and what I heard as

24   partial testimony under 30(B)(6) designation of Ms. Kuemmerle as

25   to the specific employer of both Vargas, Ms. Trueba, and Machado

Page 43

1   being employed by Mattel Servicios, but I'd like to see those

2   documents come into the record so they're part of the record.

3          And then I think I would be inclined to read the

4   following:  That one of the claims in this case alleges trade

5   secrets misappropriation in a violation of a statute called the

6   California Uniform Trade Secrets Act.  Mattel and Mattel de Mexico

7   claim that one or both of them own some of the information on the

8   compact disk being referred to in Ms. Kuemmerle's testimony.  You

9   must resolve a dispute between the parties as to would whether

10  about 50 of the documents on the disk are trade secrets.

11         So I have said "about" to give everybody wiggle room in

12  case you didn't have the exact number tomorrow.  However, I have

13  already determined that all other Mattel information on the disk

14  was not a trade secret and the disclosure, acquisition, or use of

15  this information does not give rise to a claim in this case.

16         Now, that can be further broken down into whatever

17  wording you like, because there are 27 other documents that are

18  not contended to be trade secrets and you don't want those mixed

19  up in a trade secret claim, obviously.  And Mattel is not pushing

20  for that.  There are other extraneous material that has nothing to

21  do with any Mattel document or MGA-created documents or personal

22  documents, as Mr. Corey represented.

23         So I can reword that instruction.  So I'm waiting.

24         Also, I'm prepared to instruct that Mr. Machado, Ms.

25  Trueba, Mr. Vargas were employees of a company called Mattel

Page 44

1    Servicios.  Mattel Servicios is distinct from both Mattel Mexico

2    and Mattel.  But to complete my record, I need those documents

3    brought into evidence to be consistent with the summary judgment

4    ruling, although that's basically the law of the case.

5            Now, I want to also resolve tentatively hearsay

6    objection by Mr. Quinn to the use of Ms. Kuemmerle's 30(B)(6)

7    testimony on cross-examination.

8            Ms. Hurst, you raised this very concern in the motion to

9    dismiss hearing, and you called it a "one-way ratchet" when you

10   use 30(B)(6) testimony against MGA Mexico while objecting to the

11   use of such testimony by MGA Mexico in its own defense.  It was an

12   issue that went to the second prong of the Supreme Court's

13   personal jurisdiction test in Burger King Corporation versus

14   Rudzewicz, R-u-d-z-e-w-i-c-z.

15           I ruled at the time in page 29, line 22, that the

16   30(B)(6) testimony of MGA Mexico would be allowed in for both

17   sides under the residual exception hearsay rule.

18           I'll say to Mattel, if I had not reached that ruling,

19   this Court might very well have found that it lacked jurisdiction

20   over MGA Mexico at that time.  I'm going to hold to that ruling.

21   I listened to you last evening.  I listened to your concerns.

22   This residual exception to the hearsay rule provides that a

23   hearsay statement may be offered into evidence if, one, the

24   statement is offered as evidence of a material fact; and two,

25   statement is probative on the point for which it is offered than

Page 45

1   any other evidence which the proponent can procure through

2   reasonable efforts; and three, the general purposes of these rules

3   in the interest of justice would best be served by admission of

4   the statement into evidence, citing Federal Rule of Procedure 807.

5        All three requirements this Court finds have been met

6   here.  In addition, all parties have been on notice since the

7   motion to dismiss stage that MGA Mexico would be using its own

8   30(B)(6) testimony in its defense at trial.

9        Finally, Mr. Quinn, you have raised what I call the

10  it's-not-fair-argument.  And I want to address that for a moment

11  and give you a chance to go back in the transcripts.  You have

12  argued that MGA should not be able to read deposition transcripts

13  in its cross-examination of Mattel's expert Michael Wagner;

14  however, last evening I went back after all of you left and tried

15  to look at the statute for the 15th time, but also to look at some

16  case law.  Rule 32(a)(3) allows the use of adverse deposition

17  testimony for any purpose when the deponent was the adverse

18  party's officer, director, managing agent or 30(B)(6) designee.

19        Mr. Quinn, you argued and protested yesterday evening

20  that it was not -- that you were precluded from reading

21  Ms. Garcia's deposition testimony.  I don't agree with you.  I

22  allowed the reading of Ms. Garcia's testimony for the truth of the

23  matter asserted and for impeachment purposes.

24        What I did not allow was the playing of a videotape.  I

25  felt that the reading of the deposition was more appropriate and

Page 46

1    fair to both sides because a deposition has a different setting

2    than a jury trial.

3            I think everyone should recognize that a judge is not

4    present at a deposition; a jury is not present.  Substantial

5    objections are usually made, and it is rather a one-sided affair

6    with the opposing party doing most of the questioning.  The real

7    true similarity between a jury trial and a deposition is that the

8    witness is under oath.  Therefore, I don't believe that Mattel has

9    been prejudiced.  And in fact, Mattel will have the same

10   opportunity through this ruling to avail itself of rule 32 (a)(3)

11   with MGA's experts.

12           Now, I'm going to request that you go back through Paula

13   Garcia's transcripts.  And don't argue it this evening.  I have

14   heard your argument.  And you can use Mr. Zeller or whomever.

15   Point out with specificity to me where you think that that's some

16   type of equitable imbalance, okay?  Where this Court might have

17   made a mistake.  And we'll see if we can either rectify that if I

18   have.  But otherwise, that's the ruling.

19           Now, I don't think that that's the case, though.  And so

20   I'm inviting you, as I am MGA, on some of the Court's rulings to

21   go back through the record.  It's never too late to correct a

22   mistake.

23           Now, Ms. Keller, last evening, with your photographic

24   memory, you objected to a number of exhibits.  I'm going to read

25   those off to you.  You wanted time to go through the following

Page 47

1    because they occurred very quickly.  And neither you nor I had

2    time to sort through those.  And I don't propose to use Mattel's

3    time.  I think most of these are appropriate and proper.  But

4    remember, when I'm looking at them in the evening, I'm going

5    through the first page, the second page.  I'm just trying to get a

6    general idea of what is going to confront the Court with 40,000

7    documents.

8              8124.

9              **MS. KELLER:**  I don't have my stack in front of me.

10             **THE COURT:**  You will.  Just write these down.  I have

11   got excellent notes.  8124, 5173, 9829, 9827, 9826, 11,255.

12   That's an easy way to summarize it, or 11255.  11869, 20817,

13   11,263, 9828, 11,264, 22,020, 2-2-0-2-0.  21,280.  That could be a

14   nine.  I think it's 21,289.  13,794.

15             Now, the market observations that came in after that,

16   subject to a discussion with you are as follows:  1179, 8225,

17   22051, 20192, 8235, 8237, 7908, 1318, 13,918, 13,917, 1321, 7904,

18   21,314, 21,315, 20,917, 20,781, 1320, 8241, 7907, 7906, 8243,

19   7905.

20             You don't have to do that this evening.  But go back

21   through those if you have don't have the documents and material

22   with you.  The jury hasn't seen these yet.  They just know

23   numbers.

24             The next --

25             **MR. PRICE:**  Your Honor, it is nine.

1          **THE COURT:** Mr. Price, thank you for taking such good

2    notes. I couldn't read my own handwriting, and I apologize on

3    that nine.

4          Next, I want to go over some dates I heard today and I

5    want to be corrected, although this is what I believe is in front

6    of the jury. That the signed document that is 6973 at pages 11

7    and 13 were actually signed on April 16, 2004, which is when

8    Machado, Vargas, and Trueba allegedly joined MGA Mexico. But they

9    didn't go into effect until April 26, 2004; is that correct?

10         **MR. QUINN:** That's what the document says. Except for

11   the middle point you made about when they actually went to work, I

12   think that may be a little bit ambiguous in the record.

13         **THE COURT:** So that I have a signed document as of

14   April 16, 2004, going into effect April 26, 2004.

15         **MR. QUINN:** Right.

16         **THE COURT:** What does that mean? Isn't that similar to

17   what you have been contending between the parties about

18   September 18, 2007, and a document signed October 4?

19         Now, there is a number of reasons that MGA says that

20   this didn't occur. But I mean, I have really got the same kind of

21   pattern for whatever reason, don't I?

22         **MR. MCCONVILLE:** It's actually a little different

23   because this document is dated -- it's signed on a date and then

24   its effective at a later date, whereas the Carter Bryant agreement

25   is signed on a date and effective on an earlier date. So it's

f9a8ad4a-bbd4-4729-9bba-d20f8a5a0176

Page 49

1   actually two different issues.

2          THE COURT:  Let me look back through my notes and see

3   what else the concerns of the parties were.

4          MR. COTE:  Your Honor, on Mr. Machado's contract, he

5   signed it on April 16, which was a Friday afternoon and he

6   resigned on Monday the 19th.  He started working at MGA following

7   Monday.

8          THE COURT:  How do we know he resigned on the 19th?

9          MR. COTE:  He'll testify to that.

10         THE COURT:  As far as the documents are concerned, is

11  what I have heard so far I'm tracking correctly, April 16; is that

12  correct?

13         MR. MCCONVILLE:  Yes.

14         MR. COTE:  I don't have the exhibit number, Your Honor,

15  but that's what I remember from this afternoon.

16         THE COURT:  Look at 6793, Mr. Cote.  I want you to look

17  at page 11 and 13.

18         MR. COTE:  I have it in front of me.

19         THE COURT:  Read the dates on them, out loud.

20         MR. COTE:  I'm not seeing the date on 11, Your Honor.

21  I'm sorry.  I see his date of birth at the bottom.  That's not

22  what you are asking about; right?

23         THE COURT:  No.  Supposedly signed on April 16, going

24  into effect April 26, 2004.

25         MR. MCCONVILLE:  It's on page 20, Your Honor, that

Page 50

1   signature.

2              THE COURT:  Is that correct, Mr. Cote?

3         MR. COTE:  Yes, that's what it says.

4              THE COURT:  All right.  One last question.  6770 was

5   referred to which is between a C. Mendez and Larry something.  I

6   would like to know what 6770 is.  The document attached is in

7   Spanish, and it is the original contract.  And you marked it as

8   21243.  And it was used for hiring purposes.  The original

9   contract, I believe it's with Carmen Mendez.  I believe that's C.

10  Mendez.  And I think this is sent from C. Mendez, and I think this

11  is Mr. Larian who has the communication with the attached

12  contract; is that correct?

13        MR. QUINN:  In 6770, C. Menendez, which I believe was

14  Carmen Menendez, was the testimony, is transmitting to Mr. Larian.

15  Carmen Menendez has her own employment contract with Mattel.

16             THE COURT:  Okay.

17        MR. QUINN:  That came into evidence as a separate

18  exhibit.

19             THE COURT:  Thank you.  Can we go of the record and talk

20  informally for a moment?

21             Is that acceptable, Ms. Keller?

22        MS. KELLER:  Sure.

23             THE COURT:  See where we are at.

24             (Discussion held off the record.)

25  (Whereupon there was a change in reporters and DEBORAH PARKER

f9a8ad4a-bbd4-4729-9bba-d20f8a5a0176

Page 51

1    reported the 6:00 P.M. session.)

2

3                              -oOo-

4

5                           CERTIFICATE

6

7          I hereby certify that pursuant to Section 753, Title 28,

8    United States Code, the foregoing is a true and correct transcript

9    of the stenographically reported proceedings held in the

10   above-entitled matter.

11

12   Date:  FEBRUARY 24, 2011

13

14

15   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132
16

17

18

19

20

21

22

23

24

25