QUINN EMANUEL URQUHART & SULLIVAN, LLP
   John B. Quinn (Bar No. 090378)
   johnquinn@quinnemanuel.com
   William C. Price (Bar No. 108542)
   (williamprice@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
   (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc. and
Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, and Mattel de Mexico, S.A. de C.V., a Mexico entity,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>          Defendants.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx) Consolidated with Case No. CV 04-09059 Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S OPPOSITION TO MGA'S SUPPLEMENTAL MOTION TO EXCLUDE MICHAEL WAGNER**<br><br>Hearing Date:          TBD<br>Time:                       TBD<br>Place:                      Courtroom 9D<br><br>Pre-trial Conference:  January 4, 2011<br>Trial:                       January 18, 2011 |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................... 1

LEGAL STANDARD ..................................................................................... 2

ARGUMENT .................................................................................................. 3

I.   MR. WAGNER'S APPORTIONMENT ANALYSIS PROPERLY APPLIES AN APPROPRIATE AND RECOGNIZED METHODOLOGY ................................................................................. 3

    A.   Mr. Wagner's Apportionment Analysis Applies an Appropriate Benchmark in an Appropriate Calculation ............................... 3

        1.   Wagner's Methodology Is Accepted ........................... 4

        2.   Wagner Properly Applies His Methodology ................ 4

    B.   Mr. Wagner's Apportionment Analysis Properly Apportions Bratz Profits Between Returns To MGA's Sweat Equity And Mattel's Intellectual Property ............................................. 10

    C.   Mr. Wagner's Damages Analysis Does Not Go Beyond Any of the Court's Orders ................................................................ 13

II.  MR. WAGNER'S REASONABLE ROYALTY CALCULATION MEETS THE DAUBERT STANDARD .......................................... 14

    A.   Mr. Wagner's Methodology ................................................. 15

    B.   Mr. Wagner's Testimony Comports with the Daubert Standards ........ 16

III. MATTEL'S DAMAGES CALCULATION RELATING TO THE CASTILLA TRADE SECRETS WAS BASED ENTIRELY ON THE TRADE SECRET DOCUMENTS THAT WERE STOLEN, AND WAS NOT AFFECTED BY THE SUMMARY JUDGMENT ORDER ....... 19

IV.  MR. WAGNER'S TESTIMONY SATISFIES RULE 403 ........................... 21

V.   MGA'S CLAIMS REGARDING THE TIMING OF MR. WAGNER'S WORK ARE BASELESS ................................................................ 22

CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## Cases

Adidas Am., Inc. v. Payless Shoesource, Inc.,
2008 WL 4279812 (D. Or. Sept. 12, 2008).............................................................16

Armored Group, LLC v. Supreme Corp.,
2010 WL 4736312 (D. Ariz. Nov. 16, 2010) ..........................................................18

Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.,
2009 WL 1046354 (M.D. Fla. Apr. 20, 2009) .........................................................19

Brown v. Brewer,
2010 WL 2472182 (C.D. Cal. June 17, 2010)....................................................10, 18

Burns v. Anderson,
123 Fed. App'x 543, 549 (4th Cir. 2004)..................................................................18

Cartel Asset Mgmt. v. Ocwen Fin. Corp.,
249 Fed. App'x 63, 79 (10th Cir. 2007)................................................................5, 10

Cornell Univ. v. Hewlett-Packard Co.,
2008 U.S. Dist. LEXIS 41848, Case. No. 01-CV01974, * 4
(N.D.N.Y. May 27, 2008)..........................................................................................15

Cyclone USA, Inc. v. LL&C Dealer Srvcs., LLC,
2010 WL 2104935 (C.D. Cal. May 24, 2010)............................................................6

Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993) ..............................................1, 2, 3, 10, 16, 17, 18, 21, 23

Dukes v. Wal-Mart Stores, Inc.,
603 F.3d 571 (9th Cir. 2010) ......................................................................................2

Eleven Line, Inc. v. N. Tex. State Soccer Assoc., Inc.,
213 F.3d 198 (5th Cir. 2000) ..................................................................................7, 8

Flavor Dry, Inc. v. Lines (In re James E. O'Connell Co., Inc.),
799 F.2d 1258 (9th Cir. 1986) ....................................................................................9

Flintkote Co. v. Lysfjord,
246 F.2d 368 (9th Cir. 1957) ......................................................................................7

Frank Music Corp. v. Metro-Goldwyn-Mayer,
772 F.2d 505 (9th Cir. 1985) ...........................................................................5, 10, 14

Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.,
2004 WL 5495590 (W.D. Tex. Oct. 21, 2004) ........................................................19

Georgia-Pacific v. U.S. Plywood,
318 F. Supp. 1116 (S.D.N.Y. 1970) .............................................................14, 15, 16

MATTEL'S OPPOSITION TO MGA'S SUPPLEMENTAL MOTION TO EXCLUDE MICHAEL WAGNER

Glenwood Farms, Inc. v. Ivey,
    397 F. Supp. 2d 46 (D. Me. 2005)........................................................................ 19

Hemmings v. Tidyman's Inc.,
    285 F.3d 1174, 1184 (9th Cir. 2002) ..................................................................... 2

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999) ................................................................................. 1, 2, 3

Lucent Techs. Inc. v. Gateway Inc.,
    580 F.3d 1301 (Fed. Cir. 2009) ...................................................................... 15, 16

Maier Brewing Co. v. Fleischmann Distilling Corp.,
    359 F.2d 156 (9th Cir. 1966) .............................................................................. 6

McKesson Info. Solutions LLC v. Trizetto Group, Inc.,
    2006 WL 5207233 (D. Del. Apr. 5, 2006) ........................................................ 1, 21

McMillan v. Mass. Soc. for Prevention of Cruelty To Animals,
    140 F.3d 288 (1st Cir. 1998) ............................................................................. 19

MicroStrategy Inc. v. Bus. Objects, S.A.,
    429 F.3d 1344 (Fed. Cir. 2006) ......................................................................... 12

Mister v. Ill. Cent. Gulf R.R. Co.,
    832 F.2d 1427 (7th Cir. 1987) ............................................................................. 9

Nat'l. Gypsum Co. v. Steel Sys. Int'l, Inc.,
    1988 WL 105622 (D. Or. Oct. 5, 1988) ................................................................. 4

Newell P.R. Ltd. V. Rubbermaid Inc.,
    20 F.3d 15 (1st Cir. 1994) ................................................................................. 21

In re Paoli R.R. Yard PCB Litig.,
    35 F.3d 717 (3d Cir. 1994) ................................................................................. 9

Papadopoulos v. Fred Meyer Stores, Inc.,
    2006 WL 3249198 (W.D. Wash. Nov. 8, 2006) .................................................... 21

Primiano v. Cook,
    2010 WL 1660303 (9th Cir. Apr. 27, 2010)......................................................... 2, 3

Sands, Taylor & Wood v. Quaker Oats Co.,
    34 F.3d 1340, 1350 (7th Cir. 1994) ..................................................................... 16

Saxon v. Blann,
    968 F.2d 676 (8th Cir 1992) ............................................................................... 6

Schiller & Schmidt, Inc. v. Nordisco Corp.,
    969 F.2d 410 (7th Cir. 1992) ......................................................................... 12, 13

Sinclair Refining Co. v. Jenkins Petroleum Process Co.,
    289 U.S. 689 (1933) ........................................................................................ 16

MATTEL'S OPPOSITION TO MGA'S SUPPLEMENTAL MOTION TO EXCLUDE MICHAEL WAGNER

Southland Sod Farms v. Stover Seed Co.,
    108 F.3d 1134 (9th Cir. 1997)..................................................................18, 21

St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.,
    2004 WL 2213562 (D. Del. Sept. 28, 2004) ........................................... 1, 16

In re Static Random Access Memory (SRAM) Antitrust Litig.,
    2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) ..........................................18, 21

Stilwell v. Smith & Nephew, Inc.,
    482 F.3d 1187 (9th Cir. 2007).......................................................................2

TWM Mfg. Co., Inc. v. Dura Corp.,
    789 F.2d 895 (Fed. Cir. 1986).......................................................................4

Tektronix, Inc. v. United States,
    552 F.2d 343 (Ct. Cl. 1977)..........................................................................4

United States v. Smith,
    519 F.2d 516 (9th Cir. 1975).......................................................................21

United States. v. Smith,
    520 F.3d 1097 (9th Cir. 2008).......................................................................2

United States v. Turner,
    287 Fed. App'x 426, 434 (6th Cir. 2008).....................................................18

Veritas Operating Corp. v. Microsoft Corp.,
    2008 WL 7404617 (W.D. Wash. Feb. 26, 2008) ..................................... 1, 16

Wiles v. Dep't of Educ.,
    2008 WL 6808427 (D. Haw. Oct. 7, 2008)..................................................21

Wolfe v. Nat'l Lead Col.,
    272 F.2d 867 (9th Cir. 1959) .........................................................................6


**Statutes**

Fed. R. Evid.
    Rule 403...................................................................................................21, 22
    Rule 702.............................................................................................2, 3, 16

### Preliminary Statement

MGA does not, and could not, challenge Michael J. Wagner's knowledge or experience qualifying him as an expert on damages calculations.[1]  As in Veritas Operating Corp. v. Microsoft Corp., 2008 WL 7404617, at *2 (W.D. Wash. Feb. 26, 2008),  MGA "seeks to bar Mr. Wagner's testimony … based on alleged irrelevancy and unreliability of the methods by which Mr. Wagner conducted his analyses."  As in Veritas and similar cases challenging Mr. Wagner on reliability grounds, the challenge is without merit.  MGA's objections may be made to the jury, through its own witnesses and through cross-examination, but they are not a sufficient basis to exclude Mr. Wagner from testifying.  See, e.g., Veritas Operating Corp., 2008 WL 7404617, at *3-5 (denying motion to exclude Mr. Wagner's testimony); McKesson Info. Solutions LLC v. Trizetto Group, Inc., 2006 WL 5207233, at *1 (D. Del. Apr. 5, 2006) (same); St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc., 2004 WL 2213562, at *3 (D. Del. Sept. 28, 2004) (same).

Indeed, despite its packaging as a challenge to Mr. Wagner's testimony under Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), MGA's motion is premised on its *disagreement* with Mr. Wagner's *conclusions*, rather than the *relevance* and *reliability* of his testimony.  This fundamental error – laced throughout its arguments – is fatal to its efforts to discredit and exclude Mr. Wagner's testimony.  As another federal court has aptly stated in admitting Mr. Wagner's testimony, such putative concerns are "the fodder for cross examination,

---

[1]  As other courts in this Circuit have recognized, Mr. Wagner has "considerable experience in the area of evaluating commercial damages involving intellectual property."  Veritas Operating Corp. v. Microsoft Corp., 2008 WL 7404617, at *2 (W.D. Wash. Feb. 26, 2008).

1  not for a <u>Daubert</u> analysis." <u>McKesson Info. Solutions L.L.C.</u>, 2006 WL 5207233,
2  at *1.

3  **<u>Legal Standard</u>**

4    <u>Federal Rule of Evidence</u> 702 "permits testimony by experts qualified by
5  'knowledge, skill, expertise, training, or education' to testify 'in the form of an
6  opinion or otherwise' based on 'scientific, technical, or other specialized knowledge'
7  if that knowledge will 'assist the trier of fact to understand the evidence or to
8  determine a fact in issue.'" <u>Stilwell v. Smith & Nephew, Inc.</u>, 482 F.3d 1187, 1191-
9  1192 (9th Cir. 2007) (quoting <u>Fed. R. Evid.</u> 702). "The expert's testimony must be
10  'based upon sufficient facts or data,' 'the product of reliable principles and methods,'
11  and the expert must appl[y] the principles and methods reliably to the facts of the
12  case.'" <u>Id.</u>

13    Thus, "Rule 702 embodies 'the twin concerns of "reliability" . . . and
14  "helpfulness."'" <u>Id.</u> at 1192 (citation omitted).  "'Whether testimony is helpful
15  within the meaning of Rule 702 is in essence a relevancy inquiry.'" <u>Id.</u> (quoting
16  <u>Hemmings v. Tidyman's Inc.</u>, 285 F.3d 1174, 1184 (9th Cir. 2002)).  <u>Accord</u>
17  <u>Primiano v. Cook</u>, 2010 WL 1660303, at *4 (9th Cir. Apr. 27, 2010) ("The
18  requirement that the opinion testimony 'assist the trier of fact' goes primarily to
19  relevance.") (citation and internal quotation marks omitted)).  "Expert opinion
20  testimony is relevant if the knowledge underlying it has a 'valid . . . connection to
21  the pertinent inquiry.'" <u>U.S. v. Smith</u>, 520 F.3d 1097, 1105 (9th Cir. 2008).

22    With respect to reliability, the test "'is not the correctness of the expert's
23  conclusions but the soundness of his methodology.'" <u>Stilwell</u>, 482 F.3d at 1192
24  (quoting <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 43 F.3d 1311, 1318 (9th Cir. 1995)
25  (<u>Daubert</u> II)); <u>Primiano</u>, 2010 WL 1660303, at *3-4 (discussing <u>Daubert</u>, 509 U.S.
26  579 and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137).  Although the Court must
27  assess the reasoning or methodology of scientific opinion, it is not to "admit or
28  exclude evidence based on its persuasiveness." <u>Dukes v. Wal-Mart Stores, Inc.</u>, 603

F.3d 571, 602 (9th Cir. 2010).  Even "shaky" evidence "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, *not exclusion*."  Primiano, 2010 WL 1660303, at *4 (emphasis added).  In short, where "an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony."  Id.

Under these standards, the testimony of Mr. Wagner is clearly admissible under Rule 702, Daubert and Kumho.  MGA's attempts to claim otherwise are without merit, and its motion *in limine* should therefore be denied.

### Argument

## I. MR. WAGNER'S APPORTIONMENT ANALYSIS PROPERLY APPLIES AN APPROPRIATE AND RECOGNIZED METHODOLOGY

Contrary to MGA's argument (Motion at 03:12-19), Mr. Wagner's apportionment analysis does precisely what was suggested by the Ninth Circuit and by this Court: it allocates to MGA the part of MGA's profits that are attributable to its "sweat equity" in the Bratz enterprise.  Although MGA faults Wagner for not going SKU by SKU to apportion profits from the sales of each SKU (Motion at 13:20-28), not even MGA identifies particular MGA contributions that it thinks have been undervalued in the apportionment analysis, let alone does it do so on a SKU by SKU basis.  Mr. Wagner's apportionment analysis is reliable and should be admitted.

### A. Mr. Wagner's Apportionment Analysis Applies an Appropriate Benchmark in an Appropriate Calculation

The economic rationale of Mr. Wagner's apportionment analysis is a well-recognized one.  MGA earned profits on the Bratz enterprise.  Those profits that MGA earned on the Bratz enterprise can be disaggregated into "normal" profits (earned by top toy companies on their products) and excess profits – beyond the

industry standard – which are attributable to intellectual property.   This methodology is both accepted and was properly applied here.

### 1.   Wagner's Methodology Is Accepted

MGA argues that the methodology of subtracting an industry benchmark profit from an infringer's or misappropriator's profit to determine excess profits attributable to intellectual property is not peer reviewed or cited in any intellectual property cases.  (Motion at 03:16-19, 03:22-04:05, 10:01-08.)  That is not correct. In fact, this methodology is well-established in apportioning profits between normal returns to a business's "sweat equity" and the value contributed by intellectual property.  See, e.g., TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 898-901 (Fed. Cir. 1986); Tektronix, Inc. v. United States, 552 F.2d 343, 349-350 (Ct. Cl. 1977); Nat'l. Gypsum Co. v. Steel Sys. Int'l, Inc., 1988 WL 105622, at *3 (D. Or. Oct. 5, 1988).

In TWM Mfg., the infringer's profit rate on the infringing product was estimated to be in the range between 37% and 42%.  The Court found that the industry standard or benchmark profit was between 6.56% and 12.5%.    To determine the value contributed by the infringed intellectual property, the Court subtracted the normal profit from the infringer's profit.  789 F.2d at 899.  Similarly, in Nat'l. Gypsum Co., the Court accepted a damages analysis in which "the acceptable net profit realized in an industry is subtracted from the anticipated profit of the infringer, giving a royalty rate of 15% (25%-10%) in this case."  1988 WL 105622, at *3. This is the methodology used by Mr. Wagner.  And in Tektronix, the method used was to "start with the infringer's selling price, deduct its costs in order to find its gross profit, then allocate to the infringer its normal profit, and end up with the residual share of the gross profit which can be assigned to the patentee as its royalty."  552 F.2d at 349.  That is, effectively, what Mr. Wagner does in his report as well.

### 2.   Wagner Properly Applies His Methodology

1    Beyond incorrectly criticizing the methodology used by Mr. Wagner, MGA

2    argues that Mr. Wagner erred in applying the methodology.  Specifically, MGA

3    argues that Mr. Wagner overstates MGA's actual profits by failing to subtract certain

4    fixed and overhead costs and, due to the same claimed mistake, misleadingly

5    compares industry EBIT and MGA's profits even though those are "apples and

6    oranges" because the industry EBIT includes fixed costs and overhead, while

7    MGA's profits do not include all fixed costs and overhead.  MGA's argument

8    confuses the facts and is wrong on the law.

9    <u>Wagner Properly Calculates MGA's Profits.</u>  To determine the costs that

10   should be deducted from MGA's revenues to calculate profits, Mr. Wagner relied on

11   MGA's financial records.  He went through three basic steps to ensure that he

12   captured all relevant costs.  First, he captured and deducted *all* of the costs that

13   MGA's financial records themselves identify with the Bratz product lines.  He then

14   did a regression analysis on remaining MGA costs to determine which of those costs

15   varied with the production of products in the Bratz line, thereby capturing indirect

16   costs – costs that MGA itself had not associated directly with Bratz – but which

17   actually did vary with Bratz production.  Finally, recognizing that Bratz was a very

18   substantial part of MGA's total production, Mr. Wagner went through the remaining

19   fixed and overhead costs – i.e., those that MGA did not itself identify as Bratz costs

20   and that the regressions showed were not indirect costs that varied with the

21   production of Bratz – and made additional allocations to Bratz, deducting more than

22   $100 million more.  Wagner Report, November 12, 2010, at ¶¶ 24, 25.

23   According to MGA, all of that was insufficient because Wagner should have

24   subtracted more for fixed and overhead expenses.  But MGA cites no authority for

25   its premise that Mr. Wagner had to do so, and the law is to the contrary.  In fact, any

26   overhead to be deducted must be attributable to Bratz, and *MGA* bears the burden to

27   show that these costs are attributable to Bratz.  "Defendant bears the burden of

28   explaining, at least in general terms, how claimed overhead actually contributed to

the production of the infringing work."  Frank Music Corp. v. Metro-Goldwyn-Mayer, 772 F.2d 505, 515-516 (9th Cir. 1985); see also Cartel Asset Mgmt. v. Ocwen Fin. Corp., 249 Fed. App'x 63, 79 (10th Cir. 2007) (overturning district court's ruling that plaintiff's damages expert's testimony was improper and noting that "[t]he plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.") (quoting Restatement (Third) of Unfair Competition § 45 (1995)).

Nowhere in MGA's motion does MGA meet its burden to demonstrate that any unallocated costs are in fact attributable to Bratz.  In any case, MGA's own expert has conducted his own analysis of MGA profits, and MGA can make whatever points it wishes to make on this issue through him and through cross-examination.  Corrected Expert Report of James E. Malackowski, dated Nov. 5, 2010.[2]

With regard to MGA's particular criticism that Mr. Wagner did not allocate any part of MGA's legal cost to the overhead charges deducted in calculating MGA's profits, MGA once again overlooks controlling precedent.  It is settled that such legal expenses should not be so allocated.  See Wolfe v. Nat'l Lead Col., 272 F.2d 867, 873 (9th Cir. 1959) (finding that attorneys' fees and costs paid by the defendant in connection with the trademark litigation were not proper deductions), cert. denied, 362 U.S. 950 (1960), overruled in part on other grounds Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156 (9th Cir. 1966); Cyclone USA, Inc. v.

---

[2]   MGA's motion also fails to acknowledge the established law that a party such as MGA, who has infringed with actual or constructive knowledge of the infringed copyright, is not entitled to deduction of overhead in calculating its profits from infringement.  "Overhead may not be deducted from gross revenues to arrive at profits when an infringement was deliberate or willful."  Saxon v. Blann, 968 F.2d 676, 681 (8th Cir 1992), citing Frank Music, 772 F.2d at 515.

LL&C Dealer Srvcs., LLC, 2010 WL 2104935, at *1 (C.D. Cal. May 24, 2010) ("attorneys' fees and associated expenses incurred by an infringer in unsuccessfully defending against a trademark infringement claim are not deductible when calculating an infringer's profits, even though such expenses are directly related to the sale of the infringing goods."). It is for that reason that even MGA concedes – without offering contrary authority – that "there may be some dispute as to whether or not it is appropriate to allow MGA to deduct legal expenses related to this litigation as a cost attributable to Bratz." (Motion at 8-9.) Moreover, even if they were subject to allocation – which they are not – MGA fails to disclose what percentage of its legal costs were covered by insurance and therefore what percentage was actually paid by MGA.

MGA's citations to authorities are unavailing. In Flintkote Co. v. Lysfjord, 246 F.2d 368, 393-94 (9th Cir. 1957), the Court of Appeals overturned a jury verdict because "the sole evidence as to loss of profits [was] the testimony of the plaintiffs," noting that "no attempt whatsoever was made to introduce comparative figures of other [comparable] business during the period in issue" and that "the record [was] devoid of any evidence of what any other similar business did during any period." The Court thus reversed because the very evidence that Mr. Wagner now offers was absent. If anything, this case supports the need for Mr. Wagner's testimony.

In Eleven Line, Inc. v. N. Tex. State Soccer Assoc., Inc., 213 F.3d 198, 208-209 (5th Cir. 2000), the expert sought to estimate the plaintiff's *future lost profits* based on a yardstick representing an industry norm, rather than constructing projections that were based on facts "as nearly identical to [Plaintiff's] as possible." Like many other cases, Eleven Line recognizes that a particular company's performance is often not most accurately predicted by an industry average, insofar as there are often many facts particular to a company that would be expected to lead to performance different from an industry average. Those cases have no relevance here because Mr. Wagner is not using the industry benchmark as an indicator or

predictor of MGA's performance.  Instead, Mr. Wagner is using industry norms to estimate a normal competitive level of profit in the industry.  The problem in <u>Eleven Line</u> was using an average to predict an individual firm's performance, while Mr. Wagner is using an average to estimate an average.  This exercise does not even present the issues as to whether an individual is in identifiable ways different from the average – the analysis actually identifies that difference and analyzes it.

Unable to properly contest Wagner's methods, MGA asserts that Mr. Wagner's estimate of MGA profits from Bratz is unreasonable because it would leave MGA with losses in its remaining business operations.  (Motion at 09:19-25.)  But that challenge to Wagner's conclusions is immaterial; his methods are reliable, which is what matters.  Moreover, MGA has never, before or since, made a product even approaching Bratz in terms of success and profits; there is nothing implausible about a calculation that leaves MGA losing money on the rest of its business.  <u>See</u> Section B, infra.

Indeed, if Wagner's conclusions are what his analysis is to be measured by, that is all the more reason to *admit* his testimony.  MGA's own expert estimates a *higher* profit rate for Bratz than did Mr. Wagner.  In opining purported lost MGA profits on Bratz through 2015, Mr. Malackowski calculates the lost operating profits as $1,484,207,000 in lost operating profit on revenues of $4,895,824,000 ($4,542,112,000 (product revenues) + $342,261,000 (licensing revenue) + $11,451,000 (entertainment revenue)).  Using these numbers, MGA's operating profit on Bratz was 30.3%.  If Mr. Wagner, instead of using his own calculation of MGA's operating profits adopted that proffered by Mr. Malackowski, MGA's estimated profits would be more than $1 billion (30% of $3.6 billion in revenues), rather than the more conservative $792 million calculated by Mr. Wagner.

<u>Wagner Properly Calculates The Industry Benchmark Profits.</u>  MGA challenges the benchmark profits calculations primarily on the same grounds.  According to MGA, the problem with Wagner's benchmark industry profits

calculations is not so much that they are wrong, but that they include the types of overhead costs which are not included in the assessment of MGA profits.

To calculate the industry benchmark profits, Mr. Wagner reviewed dozens of companies in the toy industry before selecting Mattel, Hasbro and JAKKS as comparable companies, reasoning that they all have strong brand recognition for their products, extensive distribution networks and spend significant money for advertising.[3]  Wagner Supplemental Expert Report, December 24, 2010, at ¶¶ 7-11. Mr. Wagner then calculated the average EBIT earned by these companies between 2000 and 2010 and used that as the industry benchmark for profits.  Mr. Wagner's reliance on these companies' EBIT, the only publically available data for such calculations, is wholly proper and reasonable.  See Mister v. Ill. Cent. Gulf R.R. Co., 832 F.2d 1427, 1430 (7th Cir. 1987) ("The plaintiff's expert used the best data available . . . we agree with the district court that the data at hand were good enough even though imperfect."); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect."); Flavor Dry, Inc. v. Lines (In re James E. O'Connell Co., Inc.), 799 F.2d 1258, 1261-62 (9th Cir. 1986) (declining to overturn lost profit award based on expert testimony supported by financial statements, data pertaining to similar businesses, and market forecasts).  Nor does it create an "apples to oranges" comparison as MGA contends.  MGA argues that EBIT deducts overhead costs, but so too does Wagner's analysis of Bratz profits; MGA just disagrees with how much was deducted, a challenge it can raise before the jury.

---

[3]  Mr. Wagner also provided several alternative groupings of comparable companies, including a grouping of 16 public toy companies that includes Mattel, Hasbro and JAKKS and a grouping of Hasbro and JAKKS where Mattel is excluded (in recognition of the fact that Mattel has one of the most successful fashion dolls in the toy industry).

1   MGA faults Wagner for not "adjust[ing] for certain one-time events that

2   impact the profitability of the industry average benchmark," like a recall at JAKKS,

3   without even disclosing most of the "certain one-time events" MGA believes should

4   have been considered or that Bratz too had a product recall.  (Motion at 9.)  This

5   quibbling is not a basis for exclusion; at most these arguments go to the weight of

6   the evidence, not admissibility.  <u>Brown v. Brewer</u>, 2010 WL 2472182, at *29-30

7   (C.D. Cal. June 17, 2010) (denying <u>Daubert</u> motion to exclude expert opinion on

8   valuation based on alleged flaw in multiplier used by expert because it did not

9   "render[] a comparable company analysis fundamentally unreliable" and any such

10  criticism "is properly explored on cross examination.").

11      **B.**   **<u>Mr. Wagner's Apportionment Analysis Properly Apportions Bratz</u>**

12          **<u>Profits Between Returns To MGA's Sweat Equity And Mattel's</u>**

13          **<u>Intellectual Property</u>**

14  MGA's assertion that Mr. Wagner "fails to account for MGA's actual

15  contribution to Bratz and, instead, attributes to Bryant's drawings all of the profits

16  that would be derived from the sale of Bratz" (Motion at 11:18-20) misreads his

17  report.  MGA may disagree about the amount, but the fact is that under the Mattel

18  benchmark, for example, Mr. Wagner allocated 53.9% of Bratz profits to MGA to

19  account for MGA's contributions in connection with Mattel's trade secret claims and

20  75.4% of Bratz profits to MGA to account for MGA's contributions in connection

21  with Mattel's copyright claims.  <u>See</u> Second Supplemental Wagner Report, February

22  7, 2011, at Figures 5 and 7 and accompanying text.  And Wagner made these

23  allocations even though MGA (not Mattel) bears the burden of proving

24  apportionment under established law.  <u>Frank Music Corp.</u>, 772 F.2d, at 515-516;

25  <u>Cartel Asset Mgmt.</u>, 249 Fed. App'x at 79.

26  MGA's real argument seems to be that Wagner's allocation to MGA of

27  industry benchmark profits is insufficient because MGA's professed creative genius

28  (and not Mattel's property) caused it to earn supra-normal profits.  According to

MGA, "Mr. Wagner's approach ignores the reality that whatever MGA did was more than just normal, and there were many things that MGA did that caused it to perform better than average or normal." (Motion at 14.)  But Wagner *did* account for that very possibility.  In fact, Mr. Wagner evaluated each factor suggested by MGA through its expert, Mr. Malackowski.  Mr. Wagner considered MGA's suggestion that its excess profits could be attributed to its advertising (Wagner Sup. Report at ¶42); product development and marketing expenses (Wagner Sup. Report at ¶43); and other creative work to develop the first four dolls (Wagner Sup. Report at ¶¶ 50-52).  Mr. Wagner carefully evaluated these contributions and determined that they were properly included within the enterprise that generated a normal level of profit, and that MGA had failed to proffer any basis for concluding that any of these contributions would contribute to excess profits.

Moreover, Mr. Wagner also analyzed sales from MGA's top 10 products from 2001 to 2009.  See Wagner Second Supplemental Report, dated February 7, 2011, Section E.  Based on this analysis, Bratz was responsible for 67% percent of the revenue while the next most successful product, Little Tikes, an established brand MGA acquired in 2006, was responsible for only 17%.  The remaining eight products were responsible for 2% or less each.  Id.  MGA has made no showing that the unnamed "many things that MGA did" that purportedly caused it to earn supra-normal profits were done only on Bratz; they were presumably done on all its products.  Yet *only* Bratz earned supra-normal profits.  It is reasonable for Wagner to deduce that it was, in fact, Mattel's property that led to those supra-normal profits.

MGA's insistence that "Mr. Wagner's assumption that MGA's successful performance must be attributable to the purported 'intellectual property' is without foundation" (Motion at 14:02-17) thus combines a misstatement of Mr. Wagner's opinion with a failure to recognize that it is MGA's burden to show that some other factor beyond what Mr. Wagner has considered merits a further apportionment of profits.  Mr. Wagner does not assume that MGA's successful performance is

attributable to the purported intellectual property.  In fact, he assumes that MGA could have successfully earned the median rate of profitability for the strongest companies in the industry absent the intellectual property, and then checks that assumption to see if MGA would have earned greater profits by considering the financial performance of MGA's other products.  There is factual foundation for Mr. Wagner's allocation; there is evidence in the record that MGA's profits were obtained by its unlawful conduct.  It is MGA, not Mr. Wagner, who bears the burden of proving that a greater profit apportionment should be given.  It can seek to prove that greater apportionment at trial, but Wagner's disagreement with MGA is not a basis for exclusion.

Neither of the cases cited by MGA addresses the problem of apportionment of profits between the defendant's contributions and the contributions of stolen intellectual property.  In fact, MGA has not cited a single case excluding apportionment opinions.  MicroStrategy Inc. v. Bus. Objects, S.A., 429 F.3d 1344 (Fed. Cir. 2006), was not an apportionment case at all and instead involved a failure to link lost profits to the claimed torts.  The Court simply found that the expert's testimony "did not accurately link the alleged damages to the torts" because "other market factors caused most, if not all, of the damage to MicroStrategy."  Id. at 1355. Here, on the other hand, Wagner conducted multiple analyses expressly to consider the effect of factors other than Mattel's property on MGA's profits from Bratz, including the industry benchmark analysis and the analysis of MGA's performance on other products.  MGA does not even point to any factors that Mr. Wagner did not consider.

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992), also did not involve apportionment of profits.  The plaintiff in that case sought damages as a result of the theft and use by a competitor of its mailing list.  The plaintiff's sales had declined after the theft of the mailing list.  Plaintiff's damages expert assumed that *the entire decline in plaintiff's sales* was attributable to the use by the

defendant-competitor of the stolen mailing list.  The court found this unreasonable, given several key facts: (1) "95 percent of the names on the list came from mailing lists compiled by product manufacturers and purchasable by any catalog house"; (2) "most of [defendant]'s initial sales were not catalog sales at all but were direct sales to large customers of Schiller that [defendant] took with him-perfectly lawfully"; and (3) "It is plain enough that the real harm to Schiller has nothing to do with the misconduct charged in this suit.  The cause was Rybak's quitting and taking his father (who apparently had good customer contacts) with him and setting up in competition with Schiller-all of which was perfectly lawful."  <u>Id.</u> at 415.  Thus, on its facts, <u>Schiller</u> is entirely different from this case.  It is also entirely distinct on the law.  The plaintiff in <u>Schiller</u> did not seek unjust enrichment as a remedy, and the <u>Schiller</u> court noted that if he had "it would be [defendant]'s burden to prove how much less" than defendant's total profits from the infringing enterprise were attributable to the stolen mailing list.  <u>Id.</u> at 415.  Again, nothing in MGA's motion even acknowledges – much less satisfies – that burden.

MGA last claims that Figure 6 "is connected to existing data only by the ipse dixit of the expert."  (Motion at 15:06-16:14.)  But that assertion ignores that this table contains Mr. Wagner's estimate of MGA's profits from Bratz – a number that cannot be characterized as ipse dixit, but is instead a number developed through painstaking analysis of MGA's financial data, as outlined at great length in Mr. Wagner's November 12, 2010 expert report – and augments that calculation with calculations that could aid a trier of fact in discounting Mr. Wagner's profit estimates if the trier of fact were to disagree with Mr. Wagner's opinion on apportionment.  This chart could be useful to the jury.

## C.   <u>Mr. Wagner's Damages Analysis Does Not Go Beyond Any of the Court's Orders</u>

MGA perfunctorily challenges Wagner's consideration of products other than the first generation dolls and the Ooh La la Cloe and Formal Funk Dana dolls.

1   Contrary to MGA's claims, and as Mattel has shown elsewhere, there is nothing
2   "legally untenable" about Mattel's damages claims as to Bratz products other than
3   those enumerated dolls.  MGA continues to ignore that Mattel's trade secret claim is
4   not so limited, and it continues to ignore that Mattel is entitled to recover as
5   damages indirect profits earned by MGA on products *other than* those directly
6   benefiting from the stolen Mattel intellectual property.  Frank Music Corp., 886 F.2d
7   at 1550.  Thus, this challenge also fails.

8   **II.    MR. WAGNER'S REASONABLE ROYALTY CALCULATION**
9           **MEETS THE DAUBERT STANDARD**

10          MGA's efforts to attack the reliability of Mr. Wagner's royalty calculation are
11  fundamentally flawed and should be rejected.  At the outset, MGA merely rehashes
12  its untenable claim that a "hypothetical negotiation under Georgia-Pacific v. U.S.
13  Plywood, 318 F. Supp. 1116 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d
14  Cir. 1970), is not a viable approach under Section 504 of the Copyright Act."
15  (Motion at 18 (citing Dkt. #9759).)  As Mattel has already conclusively shown, this
16  assertion is specious.  See Mattel's Response to MGA's Trial Brief On Copyright
17  Damages and the Unavailability of Georgia-Pacific Hypothetical Negotiation
18  Royalty Under 17 U.S.C. § 504, February 15, 2011 (showing that a hypothetical
19  negotiation is such a well-established measure of copyright damages that it is
20  expressly incorporated into the Ninth Circuit Model  Instruction 17.23); see id.
21  (citing MGA's lack of *any* case rejecting Georgia-Pacific factors as basis to
22  determine damages award for copyright infringement).  MGA also erroneously
23  attacks Mr. Wagner's reliance on the "Book of Wisdom" in determining the royalty
24  that Mattel and MGA would have agreed to.  According to MGA, the royalty
25  determination is based on what the parties would have voluntarily agreed "as of the
26  date of first infringement." (Motion at 18.)  Yet, that is what Mr. Wagner did, using
27  methodology that is firmly rooted in the case law and provides a reliable basis from
28  which to calculate actual damages.

A.      **Mr. Wagner's Methodology**

Mr. Wagner calculated the reasonable royalty amount, "defined as the amount a willing licensor and licensee would bargain for at an arm's length hypothetical negotiation occurring on the date infringement began (e.g. the date of the first sale of the first infringing product) or first use (i.e. use of name at trade shows and in advertising before first product sold) or when misappropriated.  (Tab A, Wagner Report, ¶ 147, at 58.)  "The hypothetical negotiation is based on the assumption that the intellectual property at issue is deemed unquestionably valid and enforceable and will be infringed by the licensee absent a negotiated license." Id.

Mr. Wagner's report indicated that there were "two factors 'central to the reasonable royalty calculation' – the royalty base (the product sales which would be subject to the reasonable royalty), and the royalty rate." Id., ¶ 148 & n.189 (quoting Cornell Univ. v. Hewlett-Packard Co., 2008 U.S. Dist. LEXIS 41848, Case. No. 01-CV01974, * 4 (N.D.N.Y. May 27, 2008)).  "Once the royalty rate and the royalty base are determined, it is a simple multiplication exercise." Id.  Additionally, the report factored in pre-judgment interest, which "should place the intellectual property holder in the same position that it would have enjoyed if the infringer had entered into a license agreement with regular payments." Id.

Because the "determination of a reasonable royalty rate in trade secret and copyright cases is not as well developed as in the patent area," (id., ¶ 149, at 59), Mr. Wagner applied "concepts from the patent case law with appropriate adjustments to accommodate the differences between trade secrets and copyrights from patents." Id.  In calculating the appropriate reasonable royalty rate, Mr. Wagner determined the date of the hypothetical negotiation and analyzed the factors set forth in Georgia-Pacific, as well as the Federal Circuit's recent decision in Lucent Techs. Inc. v. Gateway Inc., 580 F.3d 1301, 1333 (Fed. Cir. 2009), to determine the baseline royalty rate.  Additionally, Mr. Wagner "considered facts known at the time of the hypothetical negotiation as well as factual developments

1  occurring after the date of the hypothetical negotiation" – an inquiry known as the
2  "book of wisdom." Id., ¶ 150.

3        **B.        Mr. Wagner's Testimony Comports with the Daubert Standards**

4        Mr. Wagner's analysis fully satisfies the Daubert standard.  In a similar
5  challenge against Mr. Wagner's "book of wisdom" methodology, a federal court in
6  Delaware concluded that "nothing in Mr. Wagner's methodology conflicts with the
7  settled law in this area or violates the requirements of Rule 702."  St. Clair
8  Intellectual Prop. Consultants, 2004 WL 2213562, at *2.  While "[a] reasonable
9  royalty must be calculated on the date infringement began…, courts may consider
10 events after the date of infringement began as a basis for inferring what the pre-
11 infringement negotiated value of a license would have been." Id.  (citing Sinclair
12 Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933) (noting
13 that subsequent experience to correct patent damage estimates is "a book of wisdom
14 that courts may not neglect. We find no rule that sets a clasp upon its pages, and
15 forbids us to look within.")

16       Although MGA attempts to limit the relevance of the Georgia-Pacific factors
17 and the "book of wisdom" to the patent context (Motion at 21), this methodology
18 cannot be so cabined, since it also has been used to assess damages in trademark
19 infringement, breach of contract and other contexts.  See, e.g., Veritas Operating
20 Corp., 2008 WL 7404617, at *2-3 (holding that reasonable royalty methodology was
21 appropriate to assess trademark infringement and breach of contract damages and
22 that Mr. Wagner correctly applied Georgia-Pacific factors in determining an
23 appropriate royalty rate); Adidas Am., Inc. v. Payless Shoesource, Inc., 2008 WL
24 4279812, at *12 (D. Or. Sept. 12, 2008) (holding that "[a] reasonable royalty based
25 on a hypothetical negotiation can be a measure of actual damages in a trademark
26 infringement case") (citing Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d
27 1340, 1350 (7th Cir. 1994) ("one measure of actual damages that, if ascertained with
28

reasonable certainty, could be said to reflect the actual loss of [the trademark owner]- the cost of a reasonable royalty") (emphasis supplied)).

Despite MGA's attempt to configure its motion as a <u>Daubert</u> challenge, at bottom, MGA's attacks reflect a *disagreement* over the way he calculated the reasonable royalty – not its relevance or reliability.   MGA's criticisms go to the weight accorded the testimony, not its admissibility, and are properly addressed on cross examination or rebuttal.  Specifically, MGA claims that Mr. Wagner:

- Disregarded the agreement between MGA and Carter Bryant to pay him 3% of net sales for the products that he worked on, which MGA claims "is obviously the most pertinent piece of evidence in the case as to what a willing buyer and willing seller would have agreed for the purchase of the Bryant's drawings," (Motion at 19);

- Disregarded "Stephen Linker's testimony that he was paid by Mattel for the idea to use the BRATS product name for a fashion doll (which ultimately became Diva Starz) at no more than $200 . . ., as well as MGA's purchase of the Bratz trademark from Lovin's in September 2002 for an upfront advance of $75,000 and a license thereafter of 3% of net sales, <u>id.</u>;

- Focused on the "time period when MGA enjoyed its peak popularity and success" which it claims is "akin to valuing a lottery ticket that would later become a winner of millions of dollars as to the time of purchase, rather than the $1,00 price willing paid (sic) and accepted by the ticket's buyer and seller," <u>id.</u>;

- Erroneously concluded that "MGA would be willing to pay an 8% royalty for copyright, 15% for trade secrets including the Bratz name; 10% for trade secrets excluding the Bratz name and 5% to the Bratz name trade secret only.  <u>Id.</u>  MGA complains that "[t]his amounts to, in some scenarios, *more in a license than the company as a whole made in net pretax profits*," <u>id.</u> (citation omitted) (emphasis supplied)).

Although Mattel can certainly respond in equal detail to each of these critiques, this <u>Daubert</u> opposition is not the place to do so.  These are questions which MGA can, and no doubt will, pose to Mr. Wagner in its examination.  Neither the criticisms nor Mattel's responses to them are relevant to the <u>Daubert</u> questions before this Court, however.  As numerous cases have held, including those in which Mr. Wagner's methodology was challenged, such critiques "do not demonstrate unreliability, and instead go to the weight of [the] evidence, which may be addressed through cross examination at trial."  <u>In re Static Random Access Memory (SRAM) Antitrust Litig.</u>, 2010 WL 5071694, at *5 (N.D. Cal. Dec. 7, 2010).  <u>Accord</u> <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1143 (9th Cir. 1997) (holding party's challenge to Mr. Wagner's apportionment analysis in Lanham Act context, which was based on comparative sales and an apportioned increased in sales went "to the weight, and not the admissibility, of Wagner's testimony"); <u>Burns v. Anderson</u>, 123 Fed. App'x 543, 549 (4th Cir. 2004) (denying <u>Daubert</u> motion on the ground that complaints against expert "address the proper weight to afford Bergman's testimony, not its admissibility," and noting that "the potential rate of error in conducting a valuation may be large, and differences in valuation opinions may be great, however . . . this is a weight issue") (ellipsis in original)); <u>Brown</u>, 2010 WL 2472182, at *29-30 (denying <u>Daubert</u> motion to exclude expert opinion on valuation based on an alleged flaw in the methodology used by the expert, which the court stated "turns on a difference of professional opinion, not some fatal methodological flaw. . . .") (internal quotations omitted); <u>Armored Group, LLC v. Supreme Corp.</u>, 2010 WL 4736312, at *1 (D. Ariz. Nov. 16, 2010) (denying motion to exclude damages expert under <u>Daubert</u> and holding the standard for assessing expert opinion "'is not the correctness of the expert's conclusions but the soundness of his methodology.'") (quoting <u>Daubert II</u>, 43 F.3d at 1318; <u>Daubert</u>, 509 U.S. at 596); <u>United States v. Turner</u>, 287 Fed. App'x 426, 434 (6th Cir. 2008) (affirming admission of government's forensic impression expert where the defense's expert

disagreed as to the best method of analysis, which the court held went "to the weight of the evidence rather than its admissibility"); <u>Glenwood Farms, Inc. v. Ivey</u>, 397 F. Supp. 2d 46, 47-48 (D. Me. 2005) (same); <u>McMillan v. Mass. Soc. for Prevention of Cruelty To Animals</u>, 140 F.3d 288, 302-303 (1st Cir. 1998) (holding that "whatever 'infirmities' existed in [the expert's regression] analysis, none was so substantive that no reasonable jury could have relied on it," but that "it was up to defendants to exploit and discredit the analysis during cross examination").

In short, despite MGA's attempt to recast its disagreement with Mr. Wagner's *conclusions*, this Court "should not be lured by arguments disguised as Daubert challenges that actually attack the weight of the expert testimony, not its admissibility." <u>Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.</u>, 2004 WL 5495590, at *4-5 (W.D. Tex. Oct. 21, 2004).  MGA has not shown, and cannot show, that Mr. Wagner's "testimony is so fundamentally unsupported that it cannot possibly help the factfinder." <u>Id.</u>  Rather, "[t]o the extent Defendants find fault with the assumptions underlying the opinions, that is not an attack on the methodology, but on the application of an established methodology to a disputed set of facts." <u>Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.</u>, 2009 WL 1046354, at *5 (M.D. Fla. Apr. 20, 2009). Accordingly, defendant's motion should be denied.

## III. MATTEL'S DAMAGES CALCULATION RELATING TO THE CASTILLA TRADE SECRETS WAS BASED ENTIRELY ON THE TRADE SECRET DOCUMENTS THAT WERE STOLEN, AND WAS NOT AFFECTED BY THE SUMMARY JUDGMENT ORDER

MGA's argument that some of the Castilla trade secrets that Mr. Wagner's damages calculation included upon were dismissed at summary judgment is demonstrably false.  Mr. Wagner's damages estimate related to the Castilla thefts is, and always has been, based entirely on the documents that were stolen.

Mr. Wagner clearly stated in his report:  "[t]here is substantial overlap and interrelationships amongst the *documents* stolen by Jorge Castilla and therefore, I

have valued *groups of documents* to avoid overstating damages."  Wagner Report, at ¶412 (emphasis added).  The way he did this is set forth in Schedule 11 of Tab B15 to his report.  Mr. Wagner grouped the documents according to the systems, processes or projects from which the trade secret information in those documents sprang and identified that information, on a document-by-document basis, in Schedule 11.  Mr. Wagner then calculated the cost to develop the body of information in those documents by costing the elements of the systems, processes or projects that made those documents possible.  All of the damages are based on the documents, and not a single dollar claimed was based on the theft of a non-document trade secret.[4]

For example, Mr. Castilla stole several documents setting forth or reflecting the specific learnings of the Manugistics pilot program, including the Revised Vision Fit Gap Analysis (Castilla Trade Secret No. 38) and the Global Sales Planning Business Requirements (Castilla Trade Secret No. 22).  Those learnings, and the documents reflecting them, could not exist were it not for the Manugistics Pilot Program, and were a direct result of the Manugistics Pilot Program.  Thus, the proper way to determine the cost to create them (and to avoid double-counting) is to determine the cost of the Manugistics Pilot program.  The fact that the program was not identified with sufficient particularity under California trade secret law to survive as an independent trade secret in this case is irrelevant here, because Mr. Wagner never considered it to be a trade secret, and used its value only as a step in determining damages for the stolen documents.  Mr. Wagner had no reason to

---

[4]   The Court's Amended Order dismissed  five intangible (non-document-based) trade secrets and sent all of the trade secret documents stolen by Mr. Castilla to the jury.  See Amended Order on Motions for Summary Judgment, dated Jan. 5, 2011 (Dkt. No. 9600), at 43-48.

1  amend his report when the five intangible claimed trade secrets were dismissed from
2  the case because he had never included any of them in his evaluations.

3      In any case, MGA's disagreement with Mr. Wagner's calculation of the trade
4  secret damages does not provide any basis for exclusion of his testimony, and only
5  goes to the weight such testimony should be accorded.   In short, as with its other
6  claims, MGA provides no credible basis to exclude Mr. Wagner's testimony based
7  on his trade secrets calculations.

8  **IV.    MR. WAGNER'S TESTIMONY SATISFIES RULE 403**

9      Damages expert opinions are not commonly excluded on <u>Rule</u> 403 grounds.
10 <u>See</u> <u>Newell P.R. Ltd. V. Rubbermaid Inc.</u>, 20 F.3d 15, 21 (1st Cir. 1994) (affirming
11 decision not to exclude damages expert testimony on Rule 403 grounds because
12 "Mr. Villamil was Newell's only expert as to damages"); <u>Wiles v. Dep't of Educ.</u>,
13 2008 WL 6808427, at *3 (D. Haw. Oct. 7, 2008) (rejecting challenge under <u>Fed. R.</u>
14 <u>Evid.</u> 403 to evidence of expert witnesses as to causation and damages);
15 <u>Papadopoulos v. Fred Meyer Stores, Inc.</u>, 2006 WL 3249198, at *2 (W.D. Wash.
16 Nov. 8, 2006) (same).

17     MGA's characterization of Mr. Wagner's opinions as *ipse dixit* is unfounded.
18 Mr. Wagner's opinions are based on reliable, sound methods that experts have relied
19 on in the past.  As for MGA's complaints, those are for trial, where Mr. Wagner will
20 be questioned on the assumptions behind his numbers, which will allow the jury to
21 decide for itself whether his assumptions are credible.  MGA's criticisms, such as
22 whether Mr. Wagner failed to properly apportion overhead costs or whether Mr.
23 Wagner's royalty calculations are unreasonable because they exceed MGA's EBIT,
24 should go "to the weight of the expert's testimony, and to his truthfulness and
25 integrity, and the ultimate worth of his testimony," not whether the evidence is
26 admissible.   <u>See</u> <u>United States v. Smith</u>, 519 F.2d 516, 521 (9th Cir. 1975)
27 (affirming admission of expert testimony); <u>McKesson Info. Solutions L.L.C.</u>, 2006
28 WL 5207233, at *1.  The proper venue for MGA to address its concerns is cross-

1  examination at trial, not a <u>Daubert</u> motion.   <u>Id.</u>; <u>In re Static Random Access</u>
2  <u>Memory (SRAM) Antitrust Litig.</u>, 2010 WL 5071694, at *5.   Accordingly, Mr.
3  Wagner should not be precluded form testifying pursuant to <u>Rule</u> 403.

4  **V.    <u>MGA'S CLAIMS REGARDING THE TIMING OF MR. WAGNER'S</u>**
5         **<u>WORK ARE BASELESS</u>**

6         MGA complains that it did not have sufficient time to review Mr. Wagner's
7  Second Supplemental Report and question him during his deposition.   (Motion at
8  26.)   However, MGA in fact questioned Mr. Wagner extensively on his report,
9  spending in excess of two hours and dedicating at least fifty pages of deposition
10 transcript to questioning Mr. Wagner on the report and the schedules thereto.   (<u>See</u>
11 <u>generally</u> Wagner Depo. Tr., Vol. 5).   MGA's counsel acknowledged that he did not
12 "inten[d] to revisit things that we covered in prior depositions, only to the extent that
13 they're contained in the two subsequently served documents."   (Deposition
14 Transcript of Michael J. Wagner, Vol. 5, dated Feb. 8, 2011, at 884:17-885:5.)[5]

15        MGA appears totally unaware of the irony of its complaints regarding the
16 timing of Mr. Wagner's supplemental reports given that it has frequently served
17 expert reports as "late" or later than these.   Indeed, MGA has served numerous
18 supplemental reports from its damages expert, including one recently, just prior to
19 his deposition and well into trial.   Mr. Malackowski's first corrective report came the
20 day after MGA served the initial report.   MGA then served a "supplemental" report
21 on January 28, 2011, two weeks into trial, which asserted for the first time that an
22 additional thirty-some Mattel products purportedly used MGA trade secret
23 information.   To compound this, on the eve of his deposition and after trial was well

24
25        [5]   Notably, the report upon which MGA alleged it did not have an opportunity to
26 question Mr. Wagner about was marked as a deposition exhibit within two minutes
   of commencing the deposition.   <u>See</u> Depo. Exh. 35229; Wagner Depo. Tr., Vol. 5, at
27 885:22-886:9.
28

1 underway, MGA served an amended set of all 52 of Mr. Malackowski's exhibits.
2 Unlike Mr. Wagner's supplemental report, Mr. Malackowski's new report added
3 entirely new trade secret misappropriation theories to MGA's case never before
4 disclosed to Mattel.  Mr. Malackowski's new report is dated January 28, 2011, and
5 his corrections to that new report and amended exhibits were served just 13 hours
6 before Mattel served Mr. Wagner' Second Supplemental Report.

7      MGA also alleges that Mr. Wagner's expert reports are inconsistent with
8 Mattel's recent notices of compliance and exhibits thereto identifying its trade
9 secrets.  (Motion at 26.)   Remarkably, MGA does not identify with even the
10 slightest specificity what it claims are the inconsistencies.  Despite MGA's implicit
11 charge that Mattel hurried to surreptitiously revise its list of Bratz trade secrets on
12 the heels of Mr. Wagner's deposition, it does not and cannot dispute that the same
13 SKUs appear in each of the submissions to the Court.  That is, Exhibit A to Mattel's
14 Third Notice of Compliance contains the same nearly 4,000 SKUs as did the
15 original notice and corrections.  (See Dkt. Nos. 9800-1, 9801-1, 9803-1, 9829-1.)

16      Further, MGA's bald assertion without any specificity that "several" products
17 do not match up between Mr. Wagner's schedules and Mattel's submissions to the
18 Court does little to call into question the propriety of Mr. Wagner's opinions.
19 According to MGA, "one need only look at" two schedules attached to Mr.
20 Wagner's report to see this supposed inconsistency.  (Motion at 26.)   However,
21 MGA fails to even remotely explain how these two schedules, each approximately
22 400 pages, show an alleged inconsistency.

23      Most damaging, MGA's complaints, alone or together, provide no basis for
24 concluding that Mr. Wagner's testimony fails to meet the Daubert standards for
25 relevancy and reliability subjecting it to exclusion. Nor does MGA proffer any case
26 law supporting the exclusion of expert testimony on such grounds.  Accordingly,
27 MGA's motion in limine should be denied based on these deficiencies as well.

28

1

## **Conclusion**

2          MGA's motion *in limine* to exclude Mr. Wagner's testimony should be denied.

3

4    DATED:  February 28, 2011          QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
5

6                                       By   /s/ John B. Quinn
7                                          John B. Quinn
                                           Attorneys for Mattel, Inc. and
8                                          Mattel de Mexico. S.A. de C.V.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28