Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 1 of 127   Page ID #:305010
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

1

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                 - - - - - - -

5
  MATTEL, INC., et al.,              )
6                                    )
              Plaintiffs,            )
7                                    )
       vs.                           ) No. CV 04-9049 DOC
8                                    )    Day 23
  MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                    )
                                     )
10            Defendants.            )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16              Santa Ana, California

17           Thursday, February 24, 2011

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141
24

25  04cv9049 Mattel 2011-02-24 D23V1

 1    **APPEARANCES OF COUNSEL:**

 2

      FOR PLAINTIFF MATTEL, INC., ET AL.:
 3
                   QUINN EMANUEL URQUHART & SULLIVAN
 4                 BY:  JOHN QUINN
                        WILLIAM PRICE
 5                      MICHAEL T. ZELLER
                        Attorneys at Law
 6                 865 South Figueroa Street
                   10th Floor
 7                 Los Angeles, California 90017
                   (213) 443-3000
 8

 9

10

11    FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12                 ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                   BY:  THOMAS S. McCONVILLE
13                      Attorney at Law
                   4 Park Plaza
14                 Suite 1600
                   Irvine, California 92614
15                 (949) 567-6700

16                 – AND –

17                 ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                   BY:  ANNETTE L. HURST
18                      Attorney at Law
                   405 Howard Street
19                 San Francisco, California 94105
                   (415)773-5700
20
                   – AND –
21
                   KELLER RACKAUCKAS
22                 BY:  JENNIFER KELLER
                        Attorney at Law
23                 18500 Von Karman Avenue
                   Suite 560
24                 Irvine, California 92612
                   (949) 476-8700
25

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 3 of 127   Page ID #:305012
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
         LAW OFFICES OF MARK E. OVERLAND
5        By:  MARK E. OVERLAND
               Attorney at Law
6        100 Wilshire Boulevard
         Suite 950
7        Santa Monica, California 90401
         (310) 459-2830
8
         - AND -
9
         SCHEPER KIM & HARRIS LLP
10       BY:  ALEXANDER H. COTE
               Attorney at Law
11       601 West 5th Street
         12th Floor
12       Los Angeles, California 90071
         (213) 613-4660
13

14   ALSO PRESENT:

15       MGA ENTERTAINMENT, INC.
         BY:  JEANINE PISONI
16             Attorney at Law
         16360 Roscoe Boulevard
17       Suite 105
         Van Nuys, California 91406
18

19       ISAAC LARIAN, MGA CEO

20       KEN KOTARSKI, Mattel Technical Operator

21       MIKE STOVALL, MGA Technical Operator

22       RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 4 of 127   Page ID #:305013
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

4

1                          **I N D E X**

2   **WITNESSES**                **DIRECT  CROSS  REDIRECT  RECROSS**

3   KUEMMERLE, Susana

4   By Mr. Cote                          5                  40

5   By Mr. Quinn                                 11

6   By Ms. Keller                                          32

7

8   AGINSKY, Valery

9   By Mr. Quinn                  44

10

11

12                          **EXHIBITS**

13  **EXHIBIT NO.**              **IDENTIFICATION   IN EVIDENCE**

14     4598     Printout of GC-MS                  109
               chromatograms
15
       4600-6   Copy of notary book from           113
16              Dr. Aginsky's notes

17     4600-7   Copy of notary book from           113
               Dr. Aginsky's notes
18
       6462     Document                            22
19
       7149     Mattel 2006 price list              23
20
       13578    Digital photo showing               68
21              fragment of "from 1998
               Missouri"
22
       23496    Copies of pages 11 and              86
23              12 of notary book with
               circles and numbers
24

25

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 5 of 127   Page ID #:305014
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

5

|   |   |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
| 08:40 | 4 |
| 08:40 | 5 |
| 08:40 | 6 |
| 08:40 | 7 |
| 08:40 | 8 |
| 08:40 | 9 |
| 08:40 | 10 |
| 08:40 | 11 |
| 08:40 | 12 |
| 08:40 | 13 |
| 08:40 | 14 |
| 08:40 | 15 |
| 08:40 | 16 |
| 08:40 | 17 |
| 08:40 | 18 |
| 08:40 | 19 |
| 08:40 | 20 |
| 08:40 | 21 |
| 08:40 | 22 |
| 08:40 | 23 |
| 08:40 | 24 |
| 08:40 | 25 |

**SANTA ANA, CALIFORNIA, THURSDAY, FEBRUARY 24, 2011**

**Day 23, Volume 1 of 3**

(8:40 a.m.)

THE COURT:  Okay.  We're back in session.  The

jury's present.  The counsel are present.  The witness is

present.

And, Counsel, if you would like to continue with

your examination.  This is Mr. Cote on behalf of

Mr. Machado.

MR. COTE:  Thank you, Your Honor.

**SUSANA KUEMMERLE, MATTEL'S WITNESS, PREVIOUSLY SWORN**

**RESUMED THE STAND**

**CROSS-EXAMINATION (Resumed)**

BY MR. COTE:

Q.   Good morning, Ms. Kuemmerle.

A.   Good morning.

Q.   Yesterday when we broke for the evening, I was asking

you some questions about your personal knowledge about the

search at MGA de Mexico's offices?

A.   Yes.

Q.   When I used the word "personal knowledge," I meant

things that you had personally seen or personally observed

yourself.

Did you understand that's what I meant?

A.   Yes.

DEBBIE GALE, U.S. COURT REPORTER

| 08:40 | 1 | Q. Are you comfortable with the word "personal knowledge"? |
| 08:41 | 2 | A. Yes. |
| 08:41 | 3 | Q. Okay. And you didn't see what was copied by anyone |
| 08:41 | 4 | during the actual search in the offices, right? |
| 08:41 | 5 | A. No. |
| 08:41 | 6 | Q. And you don't know who did the copying, if any copying |
| 08:41 | 7 | was actually done, right? |
| 08:41 | 8 | A. With my two eyes, no. |
| 08:41 | 9 | Q. And with your two eyes, you have no way of knowing if |
| 08:41 | 10 | the copies that were made are accurate copies? |
| 08:41 | 11 | A. No. |
| 08:41 | 12 | Q. If anything was added or taken away from the original |
| 08:41 | 13 | when it was turned into a copy? |
| 08:41 | 14 | A. No. |
| 08:41 | 15 | Q. And Mr. Quinn asked you some questions about a criminal |
| 08:41 | 16 | prosecution that arose out of what was found during the |
| 08:41 | 17 | search. |
| 08:41 | 18 | Do you have an understanding of what Mattel's role in |
| 08:41 | 19 | the criminal prosecution was? |
| 08:42 | 20 | MR. QUINN: Lacks foundation. |
| 08:42 | 21 | THE COURT: Overruled. |
| 08:42 | 22 | THE WITNESS: No. |
| 08:42 | 23 | BY MR. COTE: |
| 08:42 | 24 | Q. Did you have any belief as to what Mattel's role in the |
| 08:42 | 25 | related prosecution was when you learned about the search? |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 7 of 127   Page ID #:305016
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:42 | 1 | MR. QUINN:  Calls for speculation. |
| 08:42 | 2 | THE COURT:  Overruled. |
| 08:42 | 3 | Wasn't that elicited on direct examination? |
| 08:42 | 4 | MR. COTE:  It was, Your Honor. |
| 08:42 | 5 | THE COURT:  Yeah.  Overruled. |
| 08:42 | 6 | THE WITNESS:  Can you repeat the question? |
| 08:42 | 7 | BY MR. COTE: |
| 08:42 | 8 | Q.   Sure.  What did you think Mattel's involvement was in |
| 08:42 | 9 | the criminal prosecution, if any, at the time of the search? |
| 08:42 | 10 | A.   My thoughts? |
| 08:42 | 11 | Q.   Yes, please. |
| 08:42 | 12 | A.   Not because of legal understanding.  I think -- |
| 08:42 | 13 | THE COURT:  Now, this is confined to her thought. |
| 08:42 | 14 | THE WITNESS:  I think that they were, again, going |
| 08:42 | 15 | on -- looking for something in a manner that it was handled |
| 08:42 | 16 | a little bit incorrectly, and they came -- I don't know how |
| 08:42 | 17 | they got -- how they served those papers and how they got to |
| 08:43 | 18 | present that to the authorities to get a search warrant of |
| 08:43 | 19 | that level and with that much action. |
| 08:43 | 20 | And I think that, again, it was a witch hunt. |
| 08:43 | 21 | BY MR. COTE: |
| 08:43 | 22 | Q.   It sounds like you had a belief that Mattel was somehow |
| 08:43 | 23 | involved in the prosecution; is that right? |
| 08:43 | 24 | A.   That's my personal belief, yes. |
| 08:43 | 25 | Q.   And somehow was behind getting the search to take place |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:43 | 1 | in the first place? |
| 08:43 | 2 | A.   That's my personal belief. |
| 08:43 | 3 | Q.   And you were thinking that at the time that you were |
| 08:43 | 4 | directing the employees in MGA Mexico in the following weeks |
| 08:43 | 5 | about what to do about the consequences of the search, |
| 08:43 | 6 | right? |
| 08:43 | 7 | A.   Yes. |
| 08:43 | 8 | Q.   And you were thinking that when you recommended that -- |
| 08:43 | 9 | strike that. |
| 08:44 | 10 | Mr. Quinn showed you an e-mail where you were talking |
| 08:44 | 11 | about -- strike that.  Sorry. |
| 08:44 | 12 | Let me back up just a little bit. |
| 08:44 | 13 | Mr. Quinn asked you questions about your conversation |
| 08:44 | 14 | with Mr. Machado on the day of the search, about a CD. |
| 08:44 | 15 | Do you remember those questions? |
| 08:44 | 16 | A.   Yes. |
| 08:44 | 17 | Q.   And I believe the phrase Mr. Quinn used was did -- he |
| 08:44 | 18 | asked you if Mr. Machado told you that files on the CD came |
| 08:44 | 19 | from Mattel's IT system. |
| 08:44 | 20 | Do you remember those questions? |
| 08:44 | 21 | A.   Yes. |
| 08:44 | 22 | Q.   Mr. Machado ever use those words? |
| 08:44 | 23 | A.   No. |
| 08:44 | 24 | Q.   He never said he got files from Mattel's IT system? |
| 08:44 | 25 | A.   No. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:45 | 1 | Q.   We spoke a little bit yesterday about MGA Mexico being |
| 08:45 | 2 | what you call the "start-up"? |
| 08:45 | 3 | A.   Yes. |
| 08:45 | 4 | Q.   A risky venture that may or may not have succeeded? |
| 08:45 | 5 | A.   Yes. |
| 08:45 | 6 | Q.   And you were trying to attract employees from Mattel |
| 08:45 | 7 | Mexico and their operations in Mexico, right? |
| 08:45 | 8 | A.   Yes.  As well as other places, too. |
| 08:45 | 9 | Q.   As well as other places.  Other established toy |
| 08:45 | 10 | companies? |
| 08:45 | 11 | A.   Yes. |
| 08:45 | 12 | Q.   And with respect to Mr. Machado and Mr. Vargas and |
| 08:45 | 13 | Ms. Trueba, at the time that they were being hired, they |
| 08:45 | 14 | were gonna be the top people at MGA de Mexico, or at least |
| 08:45 | 15 | they were gonna be the first people, right? |
| 08:45 | 16 | A.   They were gonna be the people of MGA. |
| 08:45 | 17 | Q.   And you were later hired to be their boss? |
| 08:45 | 18 | A.   Yes. |
| 08:45 | 19 | Q.   And to be the boss of the whole MGA de Mexico |
| 08:45 | 20 | enterprise, right? |
| 08:45 | 21 | A.   Yes. |
| 08:45 | 22 | Q.   And they were gonna report directly to you? |
| 08:45 | 23 | A.   Yes. |
| 08:46 | 24 | Q.   Did you understand that Mr. Machado was gonna have a |
| 08:46 | 25 | more senior position at MGA Mexico than he had at Mattel? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 10 of 127   Page ID #:305019
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:46 | 1 | A.   Yes. |
| 08:46 | 2 | Q.   When I say Mattel, I mean -- |
| 08:46 | 3 | A.   Mattel de Servicios. |
| 08:46 | 4 | Q.   You understand the same thing about Mr. Vargas? |
| 08:46 | 5 | A.   Yes. |
| 08:46 | 6 | Q.   Same thing about Ms. Trueba? |
| 08:46 | 7 | A.   Yes. |
| 08:46 | 8 | Q.   Greater responsibility? |
| 08:46 | 9 | A.   Yes, much greater. |
| 08:46 | 10 | Q.   And if they're working for a riskier venture, they're |
| 08:46 | 11 | going to have more responsibility, greater titles, and |
| 08:46 | 12 | reporting to the head of the entire country -- or the entire |
| 08:46 | 13 | country's operations.  Does that explain why they were being |
| 08:46 | 14 | offered more money than they were earning at Mattel? |
| 08:46 | 15 | A.   Absolutely. |
| 08:46 | 16 | Q.   Is there anything wrong with hiring a competitor's |
| 08:47 | 17 | employees in Mexico? |
| 08:47 | 18 | A.   No. |
| 08:47 | 19 | Q.   And do you know that the Mexican constitution actually |
| 08:47 | 20 | provides a right to move from company to company, a right of |
| 08:47 | 21 | mobility? |
| 08:47 | 22 | A.   I learned that, yes. |
| 08:47 | 23 |       MR. COTE:  I have no further questions. |
| 08:47 | 24 |       Thank you, Your Honor. |
| 08:47 | 25 |       THE WITNESS:  Thank you. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 11 of 127   Page ID #:305020
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

11

| 08:47 | 1 | THE COURT:  Redirect -- |
| 08:47 | 2 | MR. QUINN:  Thank you. |
| 08:47 | 3 | THE COURT:  -- by Mr. Quinn on behalf of Mattel. |
| 08:47 | 4 | MR. QUINN:  Thank you. |
| 08:47 | 5 | **REDIRECT EXAMINATION** |

08:47  6   BY MR. QUINN:

08:47  7   Q.   Good morning, Ms. Kuemmerle.

08:47  8   A.   Good morning.

08:47  9   Q.   You were just asked some questions about Mattel's

08:47 10   involvement in a search warrant.

08:47 11       If Mattel had found that documents had been downloaded

08:47 12   by former employees who went to work for a competitor, it

08:47 13   really wouldn't surprise you if they decided to bring that

08:47 14   to the attention of the law enforcement authorities, would

08:47 15   it?

08:47 16           MS. KELLER:  Objection.  Argumentative.

08:48 17           MR. COTE:  Objection.

08:48 18           THE COURT:  Overruled.

08:48 19           This is your personal thought.

08:48 20           THE WITNESS:  I don't know what Mattel did or --

08:48 21   rights, so, yeah.

08:48 22   BY MR. QUINN:

08:48 23   Q.   I'm not asking what Mattel did.

08:48 24   A.   Okay.

08:48 25   Q.   When you're asking questions about, your state of mind

| | | |
|---|---|---|
| 08:48 | 1 | and thought process, right? |
| 08:48 | 2 | THE COURT:  This is confined once again to her |
| 08:48 | 3 | state of mind. |
| 08:48 | 4 | Both counsel on both sides want to inquire. |
| 08:48 | 5 | BY MR. QUINN: |
| 08:48 | 6 | Q.   So thinking now about your state of mind and your |
| 08:48 | 7 | thought process, if Mattel could tell from the electronic |
| 08:48 | 8 | record that employees who left Mattel, in their last days of |
| 08:48 | 9 | employment -- and went to work for a competitor -- had |
| 08:48 | 10 | downloaded substantial amounts of proprietary and |
| 08:48 | 11 | confidential information, it would not surprise you that |
| 08:48 | 12 | they would go to the law enforcement authorities, would it? |
| 08:48 | 13 | A.   Nope. |
| 08:48 | 14 | Q.   In fact, that's what you would expect, right? |
| 08:48 | 15 | A.   Yes. |
| 08:48 | 16 | Q.   And you've made clear, I think, your feelings about the |
| 08:48 | 17 | criminal prosecution and the way the search was handled. |
| 08:49 | 18 | But putting that -- the criminal prosecution aside, you know |
| 08:49 | 19 | that these employees did something that they shouldn't have |
| 08:49 | 20 | done, don't you? |
| 08:49 | 21 | A.   Yes. |
| 08:49 | 22 | Q.   All right.  Mr. Machado, Ms. Trueba, Mr. Vargas, you |
| 08:49 | 23 | know that they took confidential information from Mattel to |
| 08:49 | 24 | MGA, correct? |
| 08:49 | 25 | A.   I learned that, yes. |

| | | |
|---|---|---|
| 08:49 | 1 | Q.   All right.  And, in fact, Mr. Machado admitted that to |
| 08:49 | 2 | you, correct? |
| 08:49 | 3 | A.   Upon interviewing him, yes. |
| 08:49 | 4 | Q.   All right.  And he admitted it to you on the day of the |
| 08:49 | 5 | search, when you asked him, "Mr. Machado" -- or Gustavo -- |
| 08:49 | 6 | did you call him Gustavo or Gus? |
| 08:49 | 7 | A.   Well, he wanted Mr. Machado, so... |
| 08:49 | 8 | Q.   When you asked him -- you know, the authorities are |
| 08:49 | 9 | there searching -- "Do you have any idea what they might be |
| 08:49 | 10 | searching for?" he had a response for you, right? |
| 08:50 | 11 | A.   Yes. |
| 08:50 | 12 | Q.   And he told you that he had a CD with information on it |
| 08:50 | 13 | he had taken from Mattel that was in his office at MGA |
| 08:50 | 14 | Mexico, correct? |
| 08:50 | 15 | A.   Yes. |
| 08:50 | 16 | Q.   Now, so it's really -- I would not be accurate to say |
| 08:50 | 17 | that you have no idea how those -- that CD and the Mattel |
| 08:50 | 18 | documents got to MGA's place of business in Mexico.  That |
| 08:50 | 19 | would not be accurate, would it? |
| 08:50 | 20 | A.   It would be accurate, because I learned all the way -- |
| 08:50 | 21 | the way it was created and how it ended up on the desk upon |
| 08:50 | 22 | my examination with getting ready for my testimony. |
| 08:50 | 23 | Q.   All right.  So let's take this one step at a time.  As |
| 08:50 | 24 | a 30(b)(6) witness in researching this matter, talking to |
| 08:51 | 25 | people, reviewing documents, reviewing testimony, you did |

DEBBIE GALE, U.S. COURT REPORTER

08:51   1   learn how these Mattel documents and the CD with proprietary
08:51   2   information got to Mattel's offices in Mexico?
08:51   3            MS. KELLER:  Objection.
08:51   4   BY MR. QUINN:
08:51   5   Q.   You did learn that, correct?
08:51   6            MS. KELLER:  Argumentative.  Assumes facts not in
08:51   7   evidence about proprietary information.
08:51   8            THE COURT:  Just a moment.
08:51   9            Overruled.
08:51  10            You can answer the question.
08:51  11   BY MR. QUINN:
08:51  12   Q.   At MGA's offices, you did learn how that information
08:51  13   got to MGA's offices, correct?
08:51  14   A.   I did learn how the CD was created, approximately the
08:51  15   time when it was created, and approximately of the time when
08:51  16   the CD ended in the MGA de Mexico's office.
08:51  17   Q.   And you know how it came to be in MGA Mexico at the
08:51  18   office, correct?
08:51  19   A.   Upon interviewing Gustavo, yes.
08:51  20   Q.   And, in fact, he told you that on the day of the
08:52  21   search, right?
08:52  22   A.   Yes.
08:52  23   Q.   And you also know -- I mean, that's something that you
08:52  24   know he told you -- you know that personally, as counsel
08:52  25   used that term -- you know that because he admitted that to

Case 2:04-cv-09049-DOC-RNB  Document 10101  Filed 03/01/11  Page 15 of 127  Page ID #:305024
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

15

| | | |
|---|---|---|
| 08:52 | 1 | you, correct? |
| 08:52 | 2 | A.   I know because I've interviewed him and that's what he |
| 08:52 | 3 | told me. |
| 08:52 | 4 | Q.   Right.  And you know these other hard copy documents |
| 08:52 | 5 | that we've gone through, you also know how those got to MGA |
| 08:52 | 6 | Mexico's office from Mattel, correct? |
| 08:52 | 7 | A.   I only learned from the copies that they were found in |
| 08:52 | 8 | Gustavo's, not in Mariana's, nor in Pablo's. |
| 08:52 | 9 | Q.   But in your research, you learned that those documents |
| 08:52 | 10 | were there and they had been brought from Mattel Mexico, |
| 08:52 | 11 | correct? |
| 08:52 | 12 | MR. COTE:  Objection, Your Honor.  The 30(b)(6) |
| 08:52 | 13 | objection. |
| 08:52 | 14 | THE COURT:  Overruled. |
| 08:52 | 15 | You can answer the question. |
| 08:52 | 16 | THE WITNESS:  Say that again, please? |
| 08:52 | 17 | BY MR. QUINN: |
| 08:52 | 18 | Q.   You learned, based on your research, how those hard |
| 08:52 | 19 | copy documents ended up in MGA Mexico's office? |
| 08:52 | 20 | THE COURT:  Now, just a moment.  We're referring |
| 08:53 | 21 | to -- this gets very technical. |
| 08:53 | 22 | Again, we're referring to her personal knowledge |
| 08:53 | 23 | from the interviews? |
| 08:53 | 24 | MR. QUINN:  Yes. |
| 08:53 | 25 | THE COURT:  The persons involved or her 30(b)(6)? |

| | | |
|---|---|---|
| 08:53 | 1 | MR. QUINN:  From any source.  And then we'll break |
| 08:53 | 2 | it down. |
| 08:53 | 3 | BY MR. QUINN: |
| 08:53 | 4 | Q.   Did you learn from any source how these hard copy |
| 08:53 | 5 | documents ended up in MGA Mexico's offices? |
| 08:53 | 6 | MR. COTE:  Objection.  Hearsay. |
| 08:53 | 7 | THE COURT:  Just a moment. |
| 08:53 | 8 | Once again, this is gonna get very technical for |
| 08:53 | 9 | the jury.  Whatever she personally heard, for instance, |
| 08:53 | 10 | pertaining to conversation with Machado or things about the |
| 08:53 | 11 | offices that she saw or conversations, of course, is not |
| 08:53 | 12 | pursuant to this 30(b)(6) objection that's continually -- |
| 08:53 | 13 | but if that's learning this in her 30(b)(6) capacity, then |
| 08:53 | 14 | the objection is appropriate and the same admonition |
| 08:53 | 15 | applies. |
| 08:53 | 16 | Counsel. |
| 08:53 | 17 | MR. QUINN:  Thank you. |
| 08:53 | 18 | THE WITNESS:  You gonna have to ask me again.  I'm |
| 08:53 | 19 | sorry. |
| 08:53 | 20 | BY MR. QUINN: |
| 08:53 | 21 | Q.   Okay.  Then, you learned how these confidential Mattel |
| 08:53 | 22 | documents got to MGA Mexico's offices, correct? |
| 08:54 | 23 | A.   I learned that the hard copies were in the Mexico |
| 08:54 | 24 | office.  I did not learn how they got to the Mexico office. |
| 08:54 | 25 | Q.   So you're telling us now that you don't know that |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:54 | 1 | Ms. Trueba, Mr. Machado, and Mr. Vargas brought those |
| 08:54 | 2 | documents with them? |
| 08:54 | 3 | Is that what you're telling us? |
| 08:54 | 4 | MR. COTE:  Objection.  Assumes facts. |
| 08:54 | 5 | THE COURT:  Overruled. |
| 08:54 | 6 | THE WITNESS:  It is an assumption.  I only learned |
| 08:54 | 7 | how the CD came to the office.  I learned that they were |
| 08:54 | 8 | copies on their offices, but how the copies got there, who |
| 08:54 | 9 | brought them, what date, I do not know that. |
| 08:54 | 10 | BY MR. QUINN: |
| 08:54 | 11 | Q.   Do you have somebody else in mind who you think might |
| 08:54 | 12 | have brought them there other than Mr. Machado, Mr. Vargas, |
| 08:54 | 13 | and Ms. Trueba? |
| 08:54 | 14 | MR. COTE:  Objection.  Argumentative. |
| 08:54 | 15 | THE COURT:  Overruled. |
| 08:54 | 16 | MR. COTE:  Calls for speculation. |
| 08:54 | 17 | THE COURT:  Overruled. |
| 08:54 | 18 | THE WITNESS:  I don't know. |
| 08:54 | 19 | BY MR. QUINN: |
| 08:54 | 20 | Q.   You know they were found in those three individual's |
| 08:54 | 21 | offices, correct? |
| 08:55 | 22 | A.   I said that already, yes. |
| 08:55 | 23 | Q.   Now, I may have misheard yesterday, Ms. Kuemmerle, but |
| 08:55 | 24 | I thought you said -- and correct me if I'm wrong -- in |
| 08:55 | 25 | answer to one of Ms. Keller's questions that you inquired |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

18

08:55 | 1 | and you satisfied yourself that no use had been made of the

08:55 | 2 | confidential Mattel information; is that correct?

08:55 | 3 | A.   That's what I was told and that's what I believed.

08:55 | 4 | Q.   Let's take a look at your deposition, December 8, 2009.

08:55 | 5 | By the way, who told you that, that it was never used?

08:55 | 6 | A.   I don't remember.  Mr. Machado -- I don't remember.

08:55 | 7 | Q.   Mr. Machado, Ms. Trueba?

08:55 | 8 | A.   Yes.  But I don't remember.

08:55 | 9 | Q.   Mr. Vargas?

08:55 | 10 | A.   Could very well be.  The three of them, I don't

08:56 | 11 | remember.

08:56 | 12 | Q.   But you asked them, and they said, "We never used

08:56 | 13 | this," right?

08:56 | 14 | A.   Yes.

08:56 | 15 | MR. QUINN:  Deposition, December 8, 2009, page

08:56 | 16 | 308, line 19, to 309, line 2.

08:56 | 17 | *(Document provided to the witness.)*

08:56 | 18 | THE WITNESS:  Line 19?

08:56 | 19 | MR. QUINN:  308-19 to 309, line 2.

08:56 | 20 | THE COURT:  You may read, Counsel.

08:56 | 21 | MR. QUINN:  (Reading:)

08:56 | 22 | "QUESTION:  Did you ever ask Mr. Machado

08:56 | 23 | specifically if he used any of the information that he had

08:56 | 24 | from Mattel?

08:56 | 25 | "ANSWER:  No, I never asked him.

| | | |
|---|---|---|
| 08:56 | 1 | "QUESTION:  Did you ever ask Ms. -- Ms. Trueba |
| 08:56 | 2 | that question? |
| 08:56 | 3 | "ANSWER:  No, I never asked her. |
| 08:56 | 4 | "QUESTION:  Did you ever ask Mr. Vargas that |
| 08:57 | 5 | question? |
| 08:57 | 6 | "ANSWER:  No, I never asked him." |
| 08:57 | 7 | BY MR. QUINN: |
| 08:57 | 8 | Q.   Now, that was deposition testimony that you gave on |
| 08:57 | 9 | December 8, 2009, correct? |
| 08:57 | 10 | A.   Yes. |
| 08:57 | 11 | Q.   Now, you also said -- and again, correct me if I got |
| 08:57 | 12 | this wrong -- I thought you said yesterday in response to |
| 08:57 | 13 | one of Ms. Keller's questions that you satisfied yourself |
| 08:57 | 14 | that all the information on the CD that was found in |
| 08:57 | 15 | Mr. Machado's office was old, outdated, antiquated |
| 08:57 | 16 | information that had no value.  Was that your testimony? |
| 08:57 | 17 | A.   From what I could see, yes. |
| 08:57 | 18 | Q.   Well, the truth of the matter is that you never even |
| 08:57 | 19 | looked at what was on the CD, correct? |
| 08:57 | 20 | MR. COTE:  Objection.  Argumentative. |
| 08:57 | 21 | THE COURT:  Overruled. |
| 08:57 | 22 | THE WITNESS:  Not all of it, no. |
| 08:57 | 23 | BY MR. QUINN: |
| 08:57 | 24 | Q.   Let's take a look at your deposition on May 5, 2010, |
| 08:58 | 25 | page 1637, lines 16 to 18. |

| 08:58 | 1 | *(Document provided to the witness.)* |
| 08:58 | 2 | THE COURT:  You may read, Counsel. |
| 08:58 | 3 | MR. QUINN:  (Reading:) |
| 08:58 | 4 | "QUESTION:  Have you looked at the CD, the |
| 08:58 | 5 | documents on the CD? |
| 08:58 | 6 | "ANSWER:  No." |
| 08:58 | 7 | BY MR. QUINN: |
| 08:58 | 8 | Q.   Of course, to the extent that you didn't actually look |
| 08:58 | 9 | at documents on the CD, you really couldn't say whether or |
| 08:58 | 10 | not it's old, antiquated, useless information, right? |
| 08:58 | 11 | A.   I said that I looked -- at a later deposition, that I |
| 08:58 | 12 | put the CD in my computer.  I opened it.  I saw resumés.  I |
| 08:58 | 13 | saw job offer letters.  I saw pictures, and then I saw one |
| 08:59 | 14 | or two things that said 2000 or 2001, or around those years, |
| 08:59 | 15 | and I said, "This is old stuff."  I took it off, and I put |
| 08:59 | 16 | it on the floor. |
| 08:59 | 17 | Q.   All right.  But there are something like |
| 08:59 | 18 | 120 documents -- there are something like 110 files on that |
| 08:59 | 19 | CD; isn't that correct? |
| 08:59 | 20 | A.   I don't know. |
| 08:59 | 21 | Q.   So, of course, you wouldn't be in a position to say |
| 08:59 | 22 | that -- whether or not things you'd never looked at were |
| 08:59 | 23 | valuable or out of date -- outdated, anything like that? |
| 08:59 | 24 | A.   From what I say, that's what I said.  What I looked at, |
| 08:59 | 25 | it was 2000, 2001, or 2003, and I thought it was antiquated |

| | | |
|---|---|---|
| 08:59 | 1 | stuff.  I took it out and I put it back on the floor. |
| 08:59 | 2 | Q.   So when was it that you did this, what you've just told |
| 08:59 | 3 | us? |
| 08:59 | 4 | A.   I don't remember the date.  When I returned to -- when |
| 08:59 | 5 | I returned to Mexico and when I had time after doing things |
| 09:00 | 6 | that I had to do with work, I took two minutes.  I don't |
| 09:00 | 7 | remember the date. |
| 09:00 | 8 | Q.   So would it have been, say, within six months of the |
| 09:00 | 9 | search? |
| 09:00 | 10 | A.   I don't remember the date. |
| 09:00 | 11 | Q.   Well, can you tell us the year?  What year was it that |
| 09:00 | 12 | you did this? |
| 09:00 | 13 | A.   Probably the same year. |
| 09:00 | 14 | Q.   2004? |
| 09:00 | 15 | A.   Five. |
| 09:00 | 16 | Q.   2005; is that correct? |
| 09:00 | 17 | A.   That's when the search took place. |
| 09:00 | 18 | Q.   We just read from your deposition.  Would you tell the |
| 09:00 | 19 | jury where you said that you never looked at the CD -- the |
| 09:00 | 20 | documents on the CD.  What is the date of that deposition? |
| 09:00 | 21 | A.   I don't know.  2010? |
| 09:00 | 22 | Q.   Yes. |
| 09:00 | 23 | MR. QUINN:  Your Honor, there's a couple of those |
| 09:00 | 24 | additional documents that we would like to move in. |
| 09:00 | 25 | THE COURT:  Okay. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 22 of 127   Page ID #:305031
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

22

| | | |
|---|---|---|
| 09:00 | 1 | MR. QUINN:  One is Exhibit 6462, if that would be |
| 09:00 | 2 | placed before the witness, please. |
| 09:00 | 3 | *(Document provided to the witness.)* |
| 09:01 | 4 | BY MR. QUINN: |
| 09:01 | 5 | Q.   And my question to you, like yesterday, is simply |
| 09:01 | 6 | whether you see Mr. Aguirre's signature or initials on |
| 09:01 | 7 | Exhibit 6462? |
| 09:01 | 8 | THE WITNESS:  Yes, I do. |
| 09:01 | 9 | THE COURT:  Received. |
| 09:01 | 10 | *(Exhibit No. 6462 received in evidence.)* |
| 09:01 | 11 | *(Document displayed.)* |
| 09:01 | 12 | BY MR. QUINN: |
| 09:01 | 13 | Q.   And again, that's to indicate you know that that's |
| 09:01 | 14 | something that was found at the MGA Mexico offices at the |
| 09:01 | 15 | time of the search and that Mr. Aguirre confirmed that by |
| 09:01 | 16 | initialing that, correct? |
| 09:01 | 17 | A.   Yes. |
| 09:01 | 18 | Q.   And then, if you could look, please -- |
| 09:01 | 19 | MR. QUINN:  If the witness could be shown |
| 09:01 | 20 | Exhibit 7149. |
| 09:01 | 21 | *(Document provided to the witness.)* |
| 09:01 | 22 | BY MR. QUINN: |
| 09:01 | 23 | Q.   Again, that's -- my only question to you on this will |
| 09:01 | 24 | be whether that also bears Mr. Aguirre's initials. |
| 09:02 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:02 | 1 | Q.   It does. |
| 09:02 | 2 | MR. QUINN:  By the way, perhaps if we can put that |
| 09:02 | 3 | on the screen. |
| 09:02 | 4 | THE COURT:  Received. |
| 09:02 | 5 | MR. COTE:  Objection.  Foundation and 30(b)6. |
| 09:02 | 6 | THE COURT:  Thank you.  Received. |
| 09:02 | 7 | *(Exhibit No. 7149 received in evidence.)* |
| 09:02 | 8 | *(Document displayed.)* |
| 09:02 | 9 | BY MR. QUINN: |
| 09:02 | 10 | Q.   You talked about some of this information being really |
| 09:02 | 11 | old.  This is a Mattel 2006 price list, isn't it? |
| 09:02 | 12 | A.   It seems, yes. |
| 09:02 | 13 | Q.   Right.  And so –– I mean, it's –– this would not have |
| 09:02 | 14 | been old information, right? |
| 09:02 | 15 | A.   No. |
| 09:02 | 16 | Q.   And if we could look at Exhibit 12834 already in |
| 09:02 | 17 | evidence.  12834. |
| 09:02 | 18 | And by the way, 2006 price lists, toy companies plan a |
| 09:02 | 19 | year or more ahead, correct? –– in terms of their toy lines |
| 09:02 | 20 | and their prices? |
| 09:02 | 21 | A.   That's a first semester price list. |
| 09:02 | 22 | Q.   All right. |
| 09:02 | 23 | A.   So it's six months prior. |
| 09:02 | 24 | Q.   All right.  And because of the nature of the toy |
| 09:03 | 25 | business, toy companies plan their lines like a year or more |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

24

09:03    1    ahead; isn't that true?

09:03    2    A.    More or less.

09:03    3    Q.    Yeah.  So if we look at Exhibit 12834, this is another

09:03    4    one of those documents with Mr. Aguirre's signature, which

09:03    5    indicates that it was found in MGA Mexico offices, right?

09:03    6    A.    Yes.

09:03    7    Q.    And that's a 2006 Mattel line list.  Is that what that

09:03    8    is?

09:03    9    A.    Yes.

09:03   10    Q.    And I think you indicated yesterday that there was

09:03   11    another -- in response to one of Ms. Keller's questions,

09:03   12    that there was also a 2005 Mattel line list that was found

09:03   13    that Mr. Aguirre's signature -- signed.  Do you recall that?

09:04   14    A.    I don't recall.  I don't remember what I said, but if

09:04   15    you said so, yes.

09:04   16    Q.    All right.  You're just not sure as you sit here now?

09:04   17    A.    I don't remember what I said yesterday.

09:04   18    Q.    All right.  So a 2005 -- these three employees left

09:04   19    Mattel Mexico in 2004, right?

09:04   20    A.    Yes.

09:04   21    Q.    And as of the time they left in 2004, the projected

09:04   22    2005 Mattel line list would not be old information, would

09:04   23    it?

09:04   24    A.    No.

09:04   25    Q.    And then you were asked some questions about a customer

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:04 | 1 | called Soriana and some information about that customer, |
| 09:04 | 2 | Soriana, that was among one of these hard copy documents |
| 09:04 | 3 | that was found.  Do you recall that? |
| 09:04 | 4 | A.   Yes. |
| 09:04 | 5 | Q.   And Soriana, that customer, does not give MGA its data |
| 09:05 | 6 | on Mattel sales, does it? |
| 09:05 | 7 | A.   No. |
| 09:05 | 8 | Q.   I mean, Soriana might give MGA information on MGA's |
| 09:05 | 9 | sales with Soriana, but not Mattel's sales, correct? |
| 09:05 | 10 | A.   Supposedly, no. |
| 09:05 | 11 | Q.   And you told us when you got back you had this meeting |
| 09:05 | 12 | with the employees, and you said, "Look, if there's any more |
| 09:05 | 13 | Mattel information or competitive information here, if |
| 09:05 | 14 | anything is found, it will be cause for immediate |
| 09:05 | 15 | termination."  Do you recall telling us that? |
| 09:05 | 16 | A.   Yes. |
| 09:05 | 17 | Q.   But the truth of the matter is you never -- you didn't |
| 09:05 | 18 | do anything to look or search to see whether there was any |
| 09:05 | 19 | other information there, correct? |
| 09:05 | 20 | A.   No. |
| 09:05 | 21 | Q.   Is my statement correct? |
| 09:05 | 22 | A.   Yes. |
| 09:05 | 23 | Q.   And although you said that, about it would be cause for |
| 09:06 | 24 | immediate termination, you thought Mr. Machado, Mr. Vargas, |
| 09:06 | 25 | Ms. Trueba shouldn't be terminated, disciplined, or lose any |

| | | |
|---|---|---|
| 09:06 | 1 | bonuses because it would be bad for business, correct? |
| 09:06 | 2 | A.   That's not what I said.  I said their bonuses -- their |
| 09:06 | 3 | legal fees should not be deducted from their bonuses. |
| 09:06 | 4 | Q.   Well, you thought they should be paid their full |
| 09:06 | 5 | bonuses -- |
| 09:06 | 6 | A.   Yes. |
| 09:06 | 7 | Q.   -- correct? |
| 09:06 | 8 |      Correct? |
| 09:06 | 9 | A.   Yes. |
| 09:06 | 10 | Q.   And that's -- you were concerned about sales? |
| 09:06 | 11 | A.   No.  I was concerned that everybody got their bonuses |
| 09:06 | 12 | paid because of their work, their hard work the year prior. |
| 09:06 | 13 | Q.   There was some -- also some questions that you were |
| 09:06 | 14 | asked about the Nielsen data, the data from the company that |
| 09:06 | 15 | you can buy a subscription to and they will sell you |
| 09:06 | 16 | information concerning retail sales.  Do you recall that? |
| 09:07 | 17 | A.   Yes. |
| 09:07 | 18 | Q.   You were asked questions about whether that is secret. |
| 09:07 | 19 | Do you recall being asked that? |
| 09:07 | 20 | A.   Yes. |
| 09:07 | 21 | Q.   Of course, if you have to pay for a subscription |
| 09:07 | 22 | service like that, that type of information does have value; |
| 09:07 | 23 | would you agree with that? |
| 09:07 | 24 | A.   Yes. |
| 09:07 | 25 | Q.   And only people who actually pay for that are supposed |

| | | |
|---|---|---|
| 09:07 | 1 | to get that kind of information, right? |
| 09:07 | 2 | MR. COTE: Objection. Lacks foundation. |
| 09:07 | 3 | THE COURT: Overruled. |
| 09:07 | 4 | THE WITNESS: Supposedly, yes. |
| 09:07 | 5 | BY MR. QUINN: |
| 09:07 | 6 | Q. And you said that there was some -- Ms. Keller pointed |
| 09:07 | 7 | out that there was some duplicates of some of the hard copy |
| 09:07 | 8 | documents found there at the MGA Mattel offices; do you |
| 09:07 | 9 | recall that? |
| 09:07 | 10 | A. Yes. |
| 09:07 | 11 | Q. Now, duplicates might be useful so that, you know, more |
| 09:07 | 12 | than one person could have copies of the documents and use |
| 09:07 | 13 | them. Would you agree with that? |
| 09:07 | 14 | A. Yes. |
| 09:07 | 15 | Q. And you indicated that you were very concerned about |
| 09:08 | 16 | reading some of this. When you became a 30(b)(6) witness, |
| 09:08 | 17 | you were very concerned about reading some of the |
| 09:08 | 18 | confidential Mattel information. Do you recall telling us |
| 09:08 | 19 | that? |
| 09:08 | 20 | A. Yes. |
| 09:08 | 21 | Q. But you understood, I assume, that as a 30(b)(6) |
| 09:08 | 22 | witness, you were permitted to, and, in fact, required to |
| 09:08 | 23 | read all that confidential information, right? |
| 09:08 | 24 | MS. KELLER: Objection. Assumes facts not in |
| 09:08 | 25 | evidence. |

| | | |
|---|---|---|
| 09:08 | 1 | THE COURT:  Overruled. |
| 09:08 | 2 | THE WITNESS:  I, um -- I understood that I had to |
| 09:08 | 3 | be prepared, and I requested that another 30(b)(6) witness |
| 09:08 | 4 | be prepared on the reading of the documents, because I still |
| 09:08 | 5 | stand by my belief that if I read them I was at risk of |
| 09:08 | 6 | being sued. |
| 09:08 | 7 | BY MR. QUINN: |
| 09:08 | 8 | Q.   But did -- did counsel or anyone tell you that actually |
| 09:08 | 9 | this was something that you were required to do as a |
| 09:09 | 10 | 30(b)(6) witness? |
| 09:09 | 11 | MS. KELLER:  I think, Your Honor, yesterday any |
| 09:09 | 12 | advice given by counsel was objected to by Mr. Quinn.  So I |
| 09:09 | 13 | think I'll reiterate his objection to that. |
| 09:09 | 14 | Privilege. |
| 09:09 | 15 | MR. QUINN:  Sustained, Your Honor? |
| 09:09 | 16 | THE COURT:  You can ask her state of mind. |
| 09:09 | 17 | BY MR. QUINN: |
| 09:09 | 18 | Q.   Was it your understanding, ma'am -- |
| 09:09 | 19 | THE COURT:  By the way, sustained. |
| 09:09 | 20 | BY MR. QUINN: |
| 09:09 | 21 | Q.   Was it your understanding that because you were a |
| 09:09 | 22 | 30(b)(6) witness, you were permitted and, in fact, required |
| 09:09 | 23 | to read all that confidential information? |
| 09:09 | 24 | A.   It was my obligation to be prepared.  And I did not |
| 09:09 | 25 | want to look at those documents, and I requested that |

| | | |
|---|---|---|
| 09:09 | 1 | another 30(b)(6) witness be brought up for that particular |
| 09:09 | 2 | part because I was not comfortable and I did not know if I |
| 09:09 | 3 | was going to be sued. |
| 09:10 | 4 | Q.   Okay.  That's not my question. |
| 09:10 | 5 | A.   And that's my state of mind. |
| 09:10 | 6 | Q.   Okay.  Let me ask about another part of your state of |
| 09:10 | 7 | mind. |
| 09:10 | 8 | A.   Uh-huh. |
| 09:10 | 9 | Q.   Was it your understanding that as a 30(b)(6) witness, |
| 09:10 | 10 | you were required -- it was part of your job, and you were |
| 09:10 | 11 | permitted -- it was perfectly okay for you to read the |
| 09:10 | 12 | necessary confidential information to be a witness?  Was |
| 09:10 | 13 | that your understanding? |
| 09:10 | 14 | A.   I was assured and overly assured that what you said is |
| 09:10 | 15 | right. |
| 09:10 | 16 | Q.   That you were permitted to do it and it was perfectly |
| 09:10 | 17 | okay; you were assured of that? |
| 09:10 | 18 | A.   But if we're talking about my state of mind, I didn't |
| 09:10 | 19 | want to do it.  And another 30(b)(6) was brought in. |
| 09:10 | 20 | Q.   So -- but you were assured that it was okay to review |
| 09:10 | 21 | those documents and you were permitted to do it, right? |
| 09:10 | 22 | A.   I was assured, yes. |
| 09:10 | 23 | Q.   Now, yesterday you defined a witch hunt for me as -- I |
| 09:11 | 24 | think you said looking for witches where -- when witches |
| 09:11 | 25 | aren't there, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 30 of 127   Page ID #:305039
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

30

| 09:11 | 1 | A.    That's a straight translation from my Spanish, yes. |
| 09:11 | 2 | Q.    Okay.  But you came to understand that Mattel was able |
| 09:11 | 3 | to determine that these -- Mr. Machado -- these other |
| 09:11 | 4 | employees had downloaded information before they have left |
| 09:11 | 5 | Mattel.  You understood that? |
| 09:11 | 6 | MR. COTE:  Objection.  30(b)(6). |
| 09:11 | 7 | THE COURT:  Overruled. |
| 09:11 | 8 | THE WITNESS:  On a much later date, yes. |
| 09:11 | 9 | BY MR. QUINN: |
| 09:11 | 10 | Q.    Okay.  And it turned out that Mattel was correct, |
| 09:11 | 11 | right? |
| 09:11 | 12 | A.    Yes. |
| 09:11 | 13 | Q.    And the police were looking for Mattel documents at the |
| 09:11 | 14 | MGA offices.  You knew that also? |
| 09:11 | 15 | A.    At a later date I learned, yes. |
| 09:11 | 16 | Q.    And, in fact, Mattel documents were there, correct? |
| 09:11 | 17 | A.    Yes. |
| 09:11 | 18 | Q.    So witches were found where the police and Mattel |
| 09:12 | 19 | thought they would be, correct? |
| 09:12 | 20 | A.    Yes. |
| 09:12 | 21 | Q.    At MGA's offices? |
| 09:12 | 22 | A.    Yes. |
| 09:12 | 23 | Q.    So even without these criminal proceedings, based upon |
| 09:12 | 24 | your conversations with Mr. Machado and others, you knew |
| 09:12 | 25 | that they had done something wrong, correct? |

DEBBIE GALE, U.S. COURT REPORTER

| 09:12 | 1 | A.    Yes. |
| 09:12 | 2 | Q.    And you knew they had done something wrong when you |
| 09:12 | 3 | wrote Exhibit 6766 -- |
| 09:12 | 4 | MR. QUINN:  If we could put that up on the screen. |
| 09:12 | 5 | *(Document provided to the witness.)* |
| 09:12 | 6 | *(Document displayed.)* |
| 09:12 | 7 | BY MR. QUINN: |
| 09:12 | 8 | Q.    So at the time that you wrote this e-mail -- |
| 09:12 | 9 | MR. QUINN:  And if we could enlarge the -- we've |
| 09:12 | 10 | got it there. |
| 09:12 | 11 | *(Technician complied.)* |
| 09:12 | 12 | BY MR. QUINN: |
| 09:12 | 13 | Q.    At the time you wrote this e-mail, where you refer to |
| 09:13 | 14 | witch hunt, you knew they had done something wrong, correct? |
| 09:13 | 15 | A.    It's clear that a stupid mistake was made, yes. |
| 09:13 | 16 | Q.    Not just a stupid mistake; something that was wrong? |
| 09:13 | 17 | MS. KELLER:  Objection.  Argumentative. |
| 09:13 | 18 | THE COURT:  Overruled. |
| 09:13 | 19 | THE WITNESS:  That's what I wrote.  Stupid |
| 09:13 | 20 | mistake. |
| 09:13 | 21 | BY MR. QUINN: |
| 09:13 | 22 | Q.    And you knew it was wrong? |
| 09:13 | 23 | A.    Stupid mistake. |
| 09:13 | 24 | Q.    But even though you knew they had made a stupid |
| 09:13 | 25 | mistake, you didn't want them to lose any of their bonus |

| | | |
|---|---|---|
| 09:13 | 1 | because you were concerned about "Pablo's closing of |
| 09:13 | 2 | Christmas bookings."  Is that what you wrote? |
| 09:13 | 3 | A.   Yes, that's what I wrote. |
| 09:13 | 4 | Q.   And on the next page, "Pablo's continuing to push for |
| 09:13 | 5 | sales in Mexico"? |
| 09:13 | 6 | A.   Yes. |
| 09:13 | 7 | Q.   And "Gustavo's morale when he moves to Los Angeles," |
| 09:13 | 8 | correct? |
| 09:13 | 9 | A.   Yes. |
| 09:13 | 10 | Q.   That's what you were concerned about? |
| 09:13 | 11 | A.   No. |
| 09:14 | 12 | MR. QUINN:  Nothing further. |
| 09:14 | 13 | THE COURT:  Recross-examination by Ms. Keller on |
| 09:14 | 14 | behalf of MGA and Mr. Larian. |
| 09:14 | 15 | **RECROSS-EXAMINATION** |
| 09:14 | 16 | BY MS. KELLER: |
| 09:14 | 17 | Q.   Good morning. |
| 09:14 | 18 | A.   Good morning. |
| 09:14 | 19 | Q.   Ms. Kuemmerle, I want to ask you about a couple of |
| 09:14 | 20 | these documents Mr. Quinn just mentioned.  6462 is one of |
| 09:14 | 21 | them. |
| 09:14 | 22 | *(Document provided to the witness.)* |
| 09:14 | 23 | *(Document displayed.)* |
| 09:14 | 24 | MS. KELLER:  And if we could get out 7155, also. |
| 09:14 | 25 | *(Documents provided to the witness.)* |

| | | |
|---|---|---|
| 09:14 | 1 | THE WITNESS:  Thank you. |
| 09:14 | 2 | BY MS. KELLER: |
| 09:14 | 3 | Q.   If you'd take a look at Exhibit 6462 and 7155, that's |
| 09:15 | 4 | another duplicate, right? |
| 09:15 | 5 | A.   Yes. |
| 09:15 | 6 | Q.   And so 7155 was introduced yesterday, and 6462 is the |
| 09:15 | 7 | same document now introduced again today, right? |
| 09:15 | 8 | *(Document displayed.)* |
| 09:15 | 9 | THE WITNESS:  Yes. |
| 09:15 | 10 | BY MS. KELLER: |
| 09:15 | 11 | Q.   Now, let's also talk about the other document Mr. Quinn |
| 09:15 | 12 | just showed you, 7149. |
| 09:15 | 13 | *(Document provided to the witness.)* |
| 09:15 | 14 | *(Document displayed.)* |
| 09:15 | 15 | MS. KELLER:  We just got that this morning. |
| 09:15 | 16 | BY MS. KELLER: |
| 09:15 | 17 | Q.   Now, let's look -- this says "lista de precios," and |
| 09:15 | 18 | it's dated Semestre 2006. |
| 09:15 | 19 | A.   Yes.  Price list for Semester 2006. |
| 09:15 | 20 | Q.   And Mr. Quinn asked you about the fact that that would |
| 09:15 | 21 | be very valuable because that was current at the time, |
| 09:15 | 22 | right? |
| 09:15 | 23 | A.   Yes. |
| 09:16 | 24 | Q.   Look at the bottom of the page, at the very bottom, |
| 09:16 | 25 | little tiny letters, it says, 6 Septiembre? |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 34 of 127   Page ID #:305043
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

34

09:16   1   A.   Yes, that's 6 September 2005.

09:16   2   Q.   And that indicates this was produced in September of

09:16   3   2005?

09:16   4   A.   That's correct.

09:16   5   Q.   Now, the employees that you had left Mattel Servicios

09:16   6   in --

09:16   7        MR. QUINN:  I move to strike the last answer as

09:16   8   being without foundation, Your Honor.

09:16   9        MS. KELLER:  I'll ask it a different way.

09:16   10  BY MS. KELLER:

09:16   11  Q.   What does that little date on the bottom of this price

09:16   12  list indicate to you as somebody familiar with these price

09:16   13  lists in the business?

09:16   14  A.   That the list was generated September 6, 2005.

09:16   15  Q.   And it was projecting prices for 2006, right?

09:16   16  A.   For the first semester.

09:16   17  Q.   But your employees left Servicios -- Mattel Servicios

09:16   18  in 2004, right?

09:16   19  A.   Yes.

09:16   20  Q.   So is it reasonable to assume, then, that this is not

09:17   21  information they took with them when they left in 2004?

09:17   22  A.   Absolutely.

09:17   23  Q.   So somehow this information was obtained, but not by

09:17   24  their taking it with them when they left?

09:17   25  A.   Absolutely.

| | | |
|---|---|---|
| 09:17 | 1 | Q.   Now, retailers get these price lists, don't they? |
| 09:17 | 2 | A.   Yes. |
| 09:17 | 3 | Q.   And Mattel hands out the price list to the retailers in |
| 09:17 | 4 | advance, true? |
| 09:17 | 5 | MR. QUINN:  Lacks foundation. |
| 09:17 | 6 | THE COURT:  Overruled. |
| 09:17 | 7 | THE WITNESS:  Correct. |
| 09:17 | 8 | BY MS. KELLER: |
| 09:17 | 9 | Q.   In fact, all the -- all of the companies do that, |
| 09:17 | 10 | right? |
| 09:17 | 11 | A.   As well as we did. |
| 09:17 | 12 | Q.   And so is it reasonable to believe that one of the ways |
| 09:17 | 13 | this price list found itself into your offices is that a |
| 09:17 | 14 | retailer could have given it to your people? |
| 09:17 | 15 | MR. QUINN:  Calls for speculation. |
| 09:17 | 16 | THE COURT:  Sustained. |
| 09:17 | 17 | BY MS. KELLER: |
| 09:17 | 18 | Q.   In your experience in the business, do retailers |
| 09:17 | 19 | sometimes give other companies price lists to the company |
| 09:17 | 20 | they're negotiating with in an effort to get a better deal? |
| 09:17 | 21 | A.   All the time. |
| 09:17 | 22 | Q.   And so, for example, somebody may come to you and say, |
| 09:18 | 23 | okay, you want nine ninety-five for this Bratz doll.  Well, |
| 09:18 | 24 | look at this:  Mattel is willing to give me a similar doll |
| 09:18 | 25 | for eight ninety-five. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 36 of 127   Page ID #:305045
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:18 | 1 | A.   Absolutely. |
| 09:18 | 2 | Q.   So it's pretty common, isn't it? |
| 09:18 | 3 | A.   All the time. |
| 09:18 | 4 | Q.   And, in fact, that's primarily how the negotiating |
| 09:18 | 5 | takes place with the retailers.  They tell you what the |
| 09:18 | 6 | competitors are offering them and ask you to beat the price, |
| 09:18 | 7 | right? |
| 09:18 | 8 | A.   All the time. |
| 09:18 | 9 | Q.   So this trade secret that could only have come from |
| 09:18 | 10 | Mattel's internal files through their IT department, that |
| 09:18 | 11 | doesn't make sense to you, does it? |
| 09:18 | 12 | A.   Not at all. |
| 09:18 | 13 | Q.   And the same with these other price lists that were |
| 09:18 | 14 | found on the CD.  These other price lists, they could easily |
| 09:18 | 15 | come from other retailers, right? |
| 09:18 | 16 | A.   Absolutely. |
| 09:18 | 17 | Q.   Now, back to the witch hunt.  Okay.  You were asked |
| 09:19 | 18 | about that again.  Were you looking at this search in Mexico |
| 09:19 | 19 | of your offices in a vacuum, or were you looking at it as |
| 09:19 | 20 | part of a bigger picture of what Mattel had been trying to |
| 09:19 | 21 | do to your company? |
| 09:19 | 22 | MR. QUINN:  I object to the question, Your Honor, |
| 09:19 | 23 | for the reasons discussed yesterday. |
| 09:19 | 24 | THE COURT:  No, as long as it's defined between |
| 09:19 | 25 | Mattel and MGA.  Because I think if you put that -- let's |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 37 of 127   Page ID #:305046
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

37

| | | |
|---|---|---|
| 09:19 | 1 | put that e-mail back up for just a moment so you both can |
| 09:19 | 2 | see it.  It should be 6766, for a moment. |
| 09:19 | 3 | *(Document displayed.)* |
| 09:20 | 4 | THE COURT:  Would you put that up for a moment, |
| 09:20 | 5 | please. |
| 09:20 | 6 | I'm letting both counsel inquire into this e-mail, |
| 09:20 | 7 | ladies and gentlemen of the jury.  There's been quite a |
| 09:20 | 8 | discussion even with a bad history between both companies, |
| 09:20 | 9 | so we'll confine it to that. |
| 09:20 | 10 | Counsel. |
| 09:20 | 11 | MR. QUINN:  The objection, Your Honor, relates to |
| 09:20 | 12 | the shaping of the trial, the understanding that has |
| 09:20 | 13 | prevailed up to this point.  I think I know what's coming. |
| 09:20 | 14 | THE COURT:  Oh, I see.  Counsel, I thought that we |
| 09:20 | 15 | indicated that was more appropriate for the presentation of |
| 09:20 | 16 | your case. |
| 09:20 | 17 | MS. KELLER:  We will be presenting that evidence |
| 09:20 | 18 | later, Your Honor.  I'm asking about this witness's state of |
| 09:20 | 19 | mind if, and I will not go into specifics. |
| 09:20 | 20 | THE COURT:  Well, if we go beyond my discussions |
| 09:20 | 21 | last evening, I would suggest that we not do that, that |
| 09:20 | 22 | that's for your case.  In other words, if we get into the |
| 09:20 | 23 | particulars, Ms. Kuemmerle can come back. |
| 09:20 | 24 | MS. KELLER:  I was going to merely ask about a |
| 09:20 | 25 | couple summary questions, Your Honor.  I'm not getting into |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

38

| | | |
|---|---|---|
| 09:20 | 1 | any details. |
| 09:20 | 2 | THE COURT:  Let me hear the question first. |
| 09:20 | 3 | BY MS. KELLER: |
| 09:20 | 4 | Q.   You also refer in the same e-mail to a history of bad |
| 09:21 | 5 | blood between the two companies; is that right? |
| 09:21 | 6 | A.   Yes. |
| 09:21 | 7 | Q.   Were there a number of other things -- |
| 09:21 | 8 | MR. QUINN:  Your Honor, here we go. |
| 09:21 | 9 | THE COURT:  Yeah.  Sustained. |
| 09:21 | 10 | We'll be having you come back, Ms. Kuemmerle. |
| 09:21 | 11 | Thank you.  Counsel, move on now. |
| 09:21 | 12 | BY MS. KELLER: |
| 09:21 | 13 | Q.   And you were also asked about this business of fear of |
| 09:21 | 14 | being sued personally, right?  Even though if you knew that |
| 09:21 | 15 | under the rules of the statute that we've been talking |
| 09:21 | 16 | about -- we keep throwing it around -- 30(b)(6) -- you knew |
| 09:21 | 17 | that you were allowed to review the allegedly confidential |
| 09:21 | 18 | information that Mattel had -- I mean, that was on this |
| 09:21 | 19 | disk, right? |
| 09:21 | 20 | A.   Yes. |
| 09:21 | 21 | Q.   Now, in this case you have testified to some things as |
| 09:21 | 22 | a 30(b)(6) witness, right? |
| 09:21 | 23 | A.   Yes. |
| 09:21 | 24 | Q.   And you've testified to some things based on what you |
| 09:21 | 25 | saw and heard yourself, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 39 of 127   Page ID #:305048
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

39

| | | |
|---|---|---|
| 09:21 | 1 | A.   Yes. |
| 09:21 | 2 | Q.   And let me ask you, after all these depositions and |
| 09:21 | 3 | mixing the two back and forth, is it sometimes hard for you |
| 09:21 | 4 | to keep straight what you've testified to as an individual |
| 09:22 | 5 | human being who saw or heard something versus what you have |
| 09:22 | 6 | testified to as a person who investigated, interviewed |
| 09:22 | 7 | people, got information from others, including hearsay, |
| 09:22 | 8 | looked at documents -- is it hard to keep those two things |
| 09:22 | 9 | straight? |
| 09:22 | 10 | A.   Completely.  Very hard. |
| 09:22 | 11 | Q.   And sometimes you get asked questions about something |
| 09:22 | 12 | you said -- "Ah-ha!  You said you didn't know, but over here |
| 09:22 | 13 | in this transcript, you said you did know," and the |
| 09:22 | 14 | transcript where you said you did know was because you were |
| 09:22 | 15 | a 30(b)(6) witness then, right? |
| 09:22 | 16 | A.   Yes. |
| 09:22 | 17 | Q.   Okay.  It's confusing, isn't it? |
| 09:22 | 18 | A.   Completely confusing. |
| 09:22 | 19 | Q.   And is -- was it your state of mind that you didn't |
| 09:22 | 20 | want to read all this stuff that Mattel was claiming was a |
| 09:22 | 21 | trade secret and was suing over -- okay -- you didn't want |
| 09:22 | 22 | to read all this stuff because you didn't want to have to |
| 09:22 | 23 | worry later on about what you had or hadn't seen and when? |
| 09:22 | 24 | A.   That's exactly what I told the attorneys, yes. |
| 09:23 | 25 | Q.   You didn't want to be accused of having known about |

09:23   1    something earlier merely because you found out about it

09:23   2    later and had trouble keeping the two separate, right?

09:23   3    A.   I was very scared, yes.

09:23   4    Q.   And that's why the former FBI agent, Bud Small, was put

09:23   5    in charge of that part of that, right?

09:23   6    A.   That is correct.

09:23   7    Q.   Do you think you made a good decision?

09:23   8    A.   Yes.

09:23   9           MS. KELLER:  Nothing further.

09:23   10          THE COURT:  We have for Mr. Machado, Mr. Cote,

09:23   11   recross.

09:23   12          MR. COTE:  Thank you, Your Honor.

09:23   13                    **RECROSS-EXAMINATION**

09:23   14   BY MR. COTE:

09:23   15   Q.   If I understand your testimony, we've been talking

09:23   16   about two different groups of -- or two different things

09:23   17   found during the search.  There's the CD and there's the

09:23   18   paper documents, right?

09:23   19   A.   Yes.

09:23   20   Q.   Okay.  On the day of the search when you had the

09:23   21   conversation with Mr. Machado, he told you about the CD,

09:23   22   right?

09:24   23   A.   Yes.

09:24   24   Q.   Did he tell you anything about the paper documents?

09:24   25   A.   No.

| 09:24 | 1 | Q.   Did he not tell you anything about the paper documents |
| 09:24 | 2 | because they came from the retailers, as Ms. Keller just |
| 09:24 | 3 | asked you? |
| 09:24 | 4 | A.   Yes. |
| 09:24 | 5 |         MR. QUINN:  Move to strike.  It calls for |
| 09:24 | 6 | speculation as to why. |
| 09:24 | 7 |         THE COURT:  Just a moment. |
| 09:24 | 8 |         Sustained.  Stricken. |
| 09:24 | 9 | BY MR. COTE: |
| 09:24 | 10 | Q.   About the CD, Mr. Machado told you that the files were |
| 09:24 | 11 | old and antiquated? |
| 09:24 | 12 | A.   Yes. |
| 09:24 | 13 | Q.   Did he ever tell you they were confidential? |
| 09:24 | 14 | A.   No. |
| 09:24 | 15 | Q.   Did he ever tell you they were proprietary? |
| 09:24 | 16 | A.   No. |
| 09:24 | 17 | Q.   He didn't use those words at all? |
| 09:24 | 18 | A.   We didn't even know what it was. |
| 09:24 | 19 | Q.   When you expressed your concern about being sued by |
| 09:25 | 20 | Mattel, you also knew that there was a criminal prosecution |
| 09:25 | 21 | in Mexico, right? |
| 09:25 | 22 | A.   That's my understanding, yes. |
| 09:25 | 23 | Q.   And you lived and worked in Mexico, right? |
| 09:25 | 24 | A.   Yes. |
| 09:25 | 25 | Q.   And were you scared that you might be criminally |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

42

| 09:25 | 1 | charged in Mexico for looking at those documents? |
| 09:25 | 2 | A.   I was afraid, yes. |
| 09:25 | 3 | MR. COTE:  No further questions.  Thank you. |
| 09:25 | 4 | THE COURT:  All right.  We're having all the |
| 09:25 | 5 | witnesses remain on call, Ms. Kuemmerle, until May 7th. |
| 09:25 | 6 | Let me talk to you as jurors for just a moment. |
| 09:25 | 7 | There have been certain rulings by the Court |
| 09:25 | 8 | outside your presence in terms of the presentation of the |
| 09:25 | 9 | case.  By having the respective parties sit at different |
| 09:25 | 10 | tables, I've tried to consistently say to you that the |
| 09:25 | 11 | parties could be interchangeable; that Mattel's suing MGA, |
| 09:25 | 12 | but you'll find that MGA is also suing Mattel. |
| 09:25 | 13 | And as such, there's been a presentation that I've |
| 09:25 | 14 | determined that would be appropriate for both parties. |
| 09:25 | 15 | That's why you've heard on occasion Mattel |
| 09:25 | 16 | objecting; you've heard on occasion MGA, and neither party |
| 09:26 | 17 | is intending to cross that line.  All of the evidence is |
| 09:26 | 18 | going to come out.  It's just the way it comes out in an |
| 09:26 | 19 | appropriate fashion. |
| 09:26 | 20 | You may be coming back to court. |
| 09:26 | 21 | I want you to remain out in the hallway for a |
| 09:26 | 22 | moment.  At the recess, I want to speak to you and counsel. |
| 09:26 | 23 | I think we're going to need to arrange a date for your |
| 09:26 | 24 | return. |
| 09:26 | 25 | And Mattel, as I've said, you will not be |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:26 | 1 | precluded, nor, Ms. Keller, your questions concerning her |
| 09:26 | 2 | that you wish to delve in today, you will not be precluded. |
| 09:26 | 3 | But you are expected to be available.  Thank you |
| 09:26 | 4 | very much.  You may step down now. |
| 09:26 | 5 | And I'll speak to you at the recess. |
| 09:26 | 6 | (Witness steps down.) |
| 09:26 | 7 | THE COURT:  Counsel, we'll work out a convenient |
| 09:26 | 8 | time, and that's the date she will return. |
| 09:26 | 9 | Your next witness, please. |
| 09:26 | 10 | MR. QUINN:  Your Honor, Mattel calls Valery |
| 09:26 | 11 | Aginsky. |
| 09:26 | 12 | THE COURT:  Thank you. |
| 09:27 | 13 | Thank you, sir.  If you would step forward, |
| 09:27 | 14 | quickly, please, between the double doors, sir. |
| 09:27 | 15 | Now, if you would stop and raise your right hand, |
| 09:27 | 16 | please. |
| 09:27 | 17 | **VALERY AGINSKY, MATTEL'S WITNESS, SWORN** |
| 09:27 | 18 | THE WITNESS:  Yes. |
| 09:27 | 19 | THE COURT:  Thank you, sir.  If you would be kind |
| 09:27 | 20 | enough to walk along the jury rail.  The quicker you walk, |
| 09:27 | 21 | the better it is, because time's running. |
| 09:27 | 22 | Sir, if you would be seated, please. |
| 09:27 | 23 | THE WITNESS:  Thank you. |
| 09:27 | 24 | THE COURT:  Now, sir, would you face the jury, and |
| 09:27 | 25 | would you state your full name, and please spell your last |

| | | |
|---|---|---|
| 09:27 | 1 | name. |
| 09:27 | 2 | THE WITNESS:  My name is Valery Aginsky. |
| 09:27 | 3 | THE COURT:  Would you spell your last name, sir. |
| 09:27 | 4 | THE WITNESS:  A-G-I-N-S-K-Y.  V-A-L-E-R-Y. |
| 09:28 | 5 | THE COURT:  Thank you. |
| 09:28 | 6 | Direct examination by Mr. Quinn on behalf of |
| 09:28 | 7 | Mattel. |
| 09:28 | 8 | MR. QUINN:  Thank you, Your Honor. |
| 09:28 | 9 | **DIRECT EXAMINATION** |
| 09:28 | 10 | BY MR. QUINN: |
| 09:28 | 11 | Q.   Good morning, Mr. Aginsky. |
| 09:28 | 12 | A.   Good morning. |
| 09:28 | 13 | Q.   What is it that you do? |
| 09:28 | 14 | A.   I'm a forensic chemist specializing in the field of |
| 09:28 | 15 | forensic document examination. |
| 09:28 | 16 | Q.   And what does a forensic chemist specializing in the |
| 09:28 | 17 | field of forensic document examination do? |
| 09:28 | 18 | A.   We analyze ink and paper mostly to determine the age of |
| 09:28 | 19 | ink and documents and also to compare different inks on |
| 09:28 | 20 | documents. |
| 09:28 | 21 | Q.   Were you retained by Mattel to examine a notary book in |
| 09:28 | 22 | this case? |
| 09:28 | 23 | A.   Yes. |
| 09:28 | 24 | Q.   And do we have Exhibit 60 there? |
| 09:29 | 25 | *(Document provided to the witness.)* |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

45

| 09:29 | 1 | (Document displayed.) |
| 09:29 | 2 | MR. QUINN:  Do we have the original available? |
| 09:29 | 3 | (Exhibit provided to the witness.) |
| 09:29 | 4 | BY MR. QUINN: |
| 09:29 | 5 | Q.   The original of Exhibit 60 is being placed before you, |
| 09:29 | 6 | Mr. Aginsky, and I ask you whether you recognize this |
| 09:29 | 7 | exhibit? |
| 09:29 | 8 | A.   Yes, I do. |
| 09:29 | 9 | Q.   And is that the notary book that you examined in this |
| 09:29 | 10 | case? |
| 09:29 | 11 | A.   Yes. |
| 09:29 | 12 | Q.   Did you reach any conclusions as a result of your |
| 09:29 | 13 | examination of Exhibit 60? |
| 09:29 | 14 | A.   Yes. |
| 09:29 | 15 | Q.   Before we get to those, I'd like to get some |
| 09:29 | 16 | information about your background. |
| 09:29 | 17 | Can you -- first, telling the jury a little bit about |
| 09:29 | 18 | how you became a forensic chemist, okay? |
| 09:29 | 19 | A.   Yes.  I received master of science degree, and then |
| 09:30 | 20 | Ph.D in analytical chemistry in Moscow in the former Soviet |
| 09:30 | 21 | Union. |
| 09:30 | 22 | Q.   So I think everybody's picked up on the fact that |
| 09:30 | 23 | English is not your mother tongue, correct? |
| 09:30 | 24 | A.   That's exactly correct, yes. |
| 09:30 | 25 | Q.   All right.  And are you comfortable communicating in |

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:30 | 1 | English? |
| 09:30 | 2 | A.   Uh, I more comfortable to communicate using chemical |
| 09:30 | 3 | terms and technical language, but not colloquial English. |
| 09:30 | 4 | Q.   So why is it that you're more comfortable with |
| 09:30 | 5 | technical and scientific terms in English? |
| 09:30 | 6 | A.   Because I only –– mostly I speak English when I discuss |
| 09:30 | 7 | some chemical matters with my –– either colleagues at |
| 09:30 | 8 | scientific conferences or with my clients. |
| 09:30 | 9 | THE COURT:  Do we need an interpreter? |
| 09:30 | 10 | MR. QUINN:  Do not believe so, Your Honor.  Pretty |
| 09:30 | 11 | confident we don't. |
| 09:31 | 12 | THE COURT:  Do you speak Russian? |
| 09:31 | 13 | MR. QUINN:  (Speaks Russian).  That's the full |
| 09:31 | 14 | extent of it. |
| 09:31 | 15 | THE COURT:  If we need an interpreter, I want to |
| 09:31 | 16 | know and get one in here.  All this counts against Mattel's |
| 09:31 | 17 | time.  Okay? |
| 09:31 | 18 | THE WITNESS:  Thank you. |
| 09:31 | 19 | THE COURT:  I'm not going to be in a position in |
| 09:31 | 20 | cross-examination that suddenly you don't understand a |
| 09:31 | 21 | question.  Understood? |
| 09:31 | 22 | THE WITNESS:  Yes. |
| 09:31 | 23 | THE COURT:  You understood me? |
| 09:31 | 24 | THE WITNESS:  Yes. |
| 09:31 | 25 | THE COURT:  All right. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:31 | 1 | BY MR. QUINN: |
| 09:31 | 2 | Q.   So at any point, Mr. Aginsky, if you don't understand |
| 09:31 | 3 | one of my questions or if I speak too fast or if counsel -- |
| 09:31 | 4 | when you're asked questions by MGA's counsel, you don't |
| 09:31 | 5 | understand or want a question repeated, would you please |
| 09:31 | 6 | stop and let us know?  Okay? |
| 09:31 | 7 | A.   Okay. |
| 09:31 | 8 | Q.   All right.  So you indicated that you've got a master's |
| 09:31 | 9 | degree and a Ph.D in analytical chemistry from an |
| 09:31 | 10 | institution in Moscow? |
| 09:31 | 11 | A.   Yes.  From a military academy in Moscow. |
| 09:31 | 12 | Q.   And are you originally from Moscow? |
| 09:31 | 13 | A.   I was born in the Ukraine, and at the age of 17, I |
| 09:31 | 14 | moved to Moscow and became a student at the military |
| 09:32 | 15 | academy. |
| 09:32 | 16 | Q.   And what -- at what year did you receive your degree |
| 09:32 | 17 | from that military academy? |
| 09:32 | 18 | A.   In 1977, master of science, and in 1980, Ph.D. |
| 09:32 | 19 | Q.   And at this military academy, did you only do -- were |
| 09:32 | 20 | you only trained in military work, or did you also do |
| 09:32 | 21 | civilian and commercial work as well? |
| 09:32 | 22 | A.   Approximately 70 percent of our studies were related to |
| 09:32 | 23 | civilian work and 30 to the military. |
| 09:32 | 24 | Q.   And after you obtained your degrees, did you go to work |
| 09:32 | 25 | somewhere? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 48 of 127   Page ID #:305057
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

48

| 09:32 | 1 | A.   Yes.   In 1980, I was employed by the Ministry of the |
| 09:32 | 2 | Interior.   I became a senior forensic chemist at the |
| 09:32 | 3 | Forensic Science Center of Ministry of the Interior in the |
| 09:32 | 4 | former Soviet Union. |
| 09:32 | 5 | Q.   You said you became a senior -- |
| 09:33 | 6 | A.   Forensic chemist. |
| 09:33 | 7 | Q.   Senior forensic chemist at the Forensic Science Center; |
| 09:33 | 8 | is that correct? |
| 09:33 | 9 | A.   Uh, yes.   More specifically, I was a senior research |
| 09:33 | 10 | chemist, but I was dealing with forensics. |
| 09:33 | 11 | Q.   And was this within a particular institution or |
| 09:33 | 12 | organization? |
| 09:33 | 13 | A.   It was in the Forensic Science Center of the Ministry |
| 09:33 | 14 | of the Interior. |
| 09:33 | 15 | Q.   And how long did you work at the Forensic Science |
| 09:33 | 16 | Center at the Ministry of the Interior in Moscow? |
| 09:33 | 17 | A.   Approximately 20 years. |
| 09:33 | 18 | Q.   And what was -- what was -- is -- if it still exists, |
| 09:33 | 19 | the Ministry of the Interior? |
| 09:33 | 20 | A.   It is a law enforcement agency, similar to a |
| 09:33 | 21 | combination of FBI and police. |
| 09:33 | 22 | Q.   And you were within, you said, the Forensic Science |
| 09:33 | 23 | Center at the Ministry of Interior? |
| 09:34 | 24 | A.   Yes. |
| 09:34 | 25 | Q.   And what is the Forensic Science Center? |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 49 of 127   Page ID #:305058
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

49

| 09:34 | 1 | A.    That's a federal forensic laboratory in the Ministry of |
| 09:34 | 2 | the Interior. |
| 09:34 | 3 | Q.    And what kind of work was done there? |
| 09:34 | 4 | A.    Our duty were primarily to develop new methods, |
| 09:34 | 5 | forensic methods, to conduct most complex case examinations, |
| 09:34 | 6 | and to train local experts throughout the country. |
| 09:34 | 7 | Q.    And what type of forensic techniques or methods are you |
| 09:34 | 8 | talking about? |
| 09:34 | 9 | A.    Forensic methods are methods that are designed to be |
| 09:34 | 10 | used for the examination of forensic evidence such as |
| 09:34 | 11 | documents, explosives, firearms, and, et cetera. |
| 09:34 | 12 | Q.    Were you recruited to join a particular department in |
| 09:34 | 13 | the Forensic Science Center? |
| 09:35 | 14 | A.    Yes.  My first employment there was -- I was recruited |
| 09:35 | 15 | by the explosives department. |
| 09:35 | 16 | Q.    And so this is in 1980 when you first go out into the |
| 09:35 | 17 | workforce? |
| 09:35 | 18 | A.    Yes. |
| 09:35 | 19 | Q.    And what kind of work did you do in the explosives |
| 09:35 | 20 | department? |
| 09:35 | 21 | A.    I developed some new methods for determining the -- |
| 09:35 | 22 | what type of explosives was used to detect the explosives in |
| 09:35 | 23 | postexplosion debris.  And also I conducted some case |
| 09:35 | 24 | examinations and -- most complex case examinations and |
| 09:35 | 25 | trained local experts in the country how to use these |

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:35 | 1 | techniques. |
| 09:35 | 2 | Q.   Did you receive recognition for the work that you did |
| 09:35 | 3 | in your first position there in explosives? |
| 09:35 | 4 | A.   Yes.  In 1982, I received the Best Forensic Chemist of |
| 09:35 | 5 | the Year award from the Ministry of the Interior. |
| 09:36 | 6 | Q.   And at some point were you recruited for another |
| 09:36 | 7 | position at the Forensic Science Center? |
| 09:36 | 8 | A.   Yes.  A year later, in 1983, I -- I joined the forensic |
| 09:36 | 9 | document examination unit as their head of chemical group. |
| 09:36 | 10 | Q.   And that was in 1983? |
| 09:36 | 11 | A.   Yes. |
| 09:36 | 12 | Q.   And how did it come about that you joined the forensic |
| 09:36 | 13 | document examination section? |
| 09:36 | 14 | A.   At that time they were facing some challenges, and the |
| 09:36 | 15 | major of which was to determine the age of ink in documents. |
| 09:36 | 16 | And they were looking for someone who could help them to -- |
| 09:36 | 17 | to solve this problem. |
| 09:36 | 18 | Q.   Determining the age of ink on documents? |
| 09:36 | 19 | A.   Yes.  That was the major challenge.  There were some |
| 09:36 | 20 | others, like ink comparison, but that was the major. |
| 09:36 | 21 | Q.   And what -- what type of work did you -- I mean, what |
| 09:37 | 22 | position did you assume when you joined that new department? |
| 09:37 | 23 | A.   I was the head of the chemical group. |
| 09:37 | 24 | Q.   In the forensic document examination unit? |
| 09:37 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:37 | 1 | Q.   And what type of work did you do as the head of the |
| 09:37 | 2 | chemical group in the forensic document examination unit? |
| 09:37 | 3 | A.   I developed new methods for ink comparison and dating, |
| 09:37 | 4 | conducted most complex case examinations, and then again, I |
| 09:37 | 5 | trained experts from other laboratories in the country. |
| 09:37 | 6 | Q.   Did you have any particular achievements or |
| 09:37 | 7 | accomplishments as head of the chemical group in the |
| 09:37 | 8 | forensic document examination unit? |
| 09:37 | 9 | A.   Yes.  In 1993, I received the award, the first prize |
| 09:37 | 10 | award for the -- for developing new techniques for dating |
| 09:38 | 11 | ink in documents. |
| 09:38 | 12 | Q.   And who did you receive that award from, or what |
| 09:38 | 13 | institution? |
| 09:38 | 14 | A.   It was again from the Minister of the Interior. |
| 09:38 | 15 | Q.   And that's a first prize just in chemical analysis, or |
| 09:38 | 16 | does that -- did that -- out of a number of different |
| 09:38 | 17 | sciences or specialties? |
| 09:38 | 18 | A.   It's out of all forensic specialties that we had, |
| 09:38 | 19 | including what I mentioned, DNA and some other. |
| 09:38 | 20 | Q.   Do you know if -- you indicated that you had developed |
| 09:38 | 21 | some new methods for dating ink? |
| 09:38 | 22 | A.   Yes. |
| 09:38 | 23 | Q.   All right.  Do you know if any of the new methods you |
| 09:38 | 24 | have developed for dating ink or analyzing ink have been |
| 09:38 | 25 | accepted by forensic chemists in your field? |

DEBBIE GALE, U.S. COURT REPORTER

| 09:38 | 1 | A.   Yes.  These methods have been published in peer review |
| 09:38 | 2 | journals, favorably discussed at international forensic |
| 09:38 | 3 | science meetings, and they are used by a number of forensic |
| 09:39 | 4 | chemists in different countries, including United States, |
| 09:39 | 5 | Canada, Germany, China, and, of course, Russia. |
| 09:39 | 6 | Q.   What is a peer review journal? |
| 09:39 | 7 | A.   A peer review is -- it's a high level of publication. |
| 09:39 | 8 | In order for an article to be published, it should be |
| 09:39 | 9 | considered by peers, specialists in the field, and they will |
| 09:39 | 10 | decide whether it's good for publication or not. |
| 09:39 | 11 | Q.   Besides training forensic chemists in the former Soviet |
| 09:39 | 12 | Union, have you trained forensic chemists in other |
| 09:39 | 13 | countries? |
| 09:39 | 14 | MR. QUINN:  By the way, do you need some water up |
| 09:39 | 15 | there?  We can get you some. |
| 09:39 | 16 | THE WITNESS:  Yes. |
| 09:39 | 17 | THE COURT:  We'll get you some in just a second. |
| 09:39 | 18 | BY MR. QUINN: |
| 09:39 | 19 | Q.   In addition to training chemists in the former Soviet |
| 09:40 | 20 | Union, have you trained forensic chemists in other |
| 09:40 | 21 | countries? |
| 09:40 | 22 | A.   Yes.  In the United States, Canada, Turkey, and Israel. |
| 09:40 | 23 | Q.   Have you received other recognition in forensic |
| 09:40 | 24 | chemistry besides the awards you've mentioned for your work |
| 09:40 | 25 | in explosives and determining the age of ink? |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 53 of 127   Page ID #:305062
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:40 | 1 | A.   Yes.  I was asked to serve as a coach at the |
| 09:40 | 2 | International Meetings Conference in Forensic Document |
| 09:40 | 3 | Examination. |
| 09:40 | 4 |           THE COURT:  Those have been run together, Counsel. |
| 09:40 | 5 | If he's going to be qualified, I want to hear about ink |
| 09:40 | 6 | also.  Explosives and ink; it's hard for me to determine. |
| 09:40 | 7 |           MR. QUINN:  Okay. |
| 09:40 | 8 | BY MR. QUINN: |
| 09:40 | 9 | Q.   All right.  So let's focus now on recognition you've |
| 09:40 | 10 | received for your field, in your study and achievements in |
| 09:40 | 11 | ink analysis.  Okay? |
| 09:40 | 12 | A.   Yes. |
| 09:40 | 13 | Q.   Okay.  So could you tell us whether you've received any |
| 09:40 | 14 | recognition, besides the awards you've mentioned, for work |
| 09:41 | 15 | in -- with respect to ink analysis? |
| 09:41 | 16 | A.   Yes.  With respect to ink analysis and dating, I served |
| 09:41 | 17 | as a co-chair at three international forensic document |
| 09:41 | 18 | examinations, at meetings in Düsseldorf, in Moscow, and in |
| 09:41 | 19 | Tokyo. |
| 09:41 | 20 | Q.   And could you remind us when it was that you left the |
| 09:41 | 21 | explosives unit and started doing the chemical work with |
| 09:41 | 22 | ink? |
| 09:41 | 23 | A.   It was in the middle of 1983. |
| 09:41 | 24 | Q.   And since then, has that been your area of focus:  Ink |
| 09:41 | 25 | analysis? |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:41 | 1 | A.   Yes. |
| 09:41 | 2 | Q.   At some point did you leave the Ministry of the |
| 09:41 | 3 | Interior? |
| 09:41 | 4 | A.   Yes.  In April of 2000.  In April of 2000. |
| 09:41 | 5 | Q.   And did you continue with your work as a forensic |
| 09:41 | 6 | chemical specialist specializing in forensic document |
| 09:41 | 7 | examination after you left the Ministry of the Interior? |
| 09:42 | 8 | A.   Yes. |
| 09:42 | 9 | Q.   And what did you do next? |
| 09:42 | 10 | A.   I have been working with the private company -- |
| 09:42 | 11 | forensic document examination company based in Lansing, |
| 09:42 | 12 | Michigan.  The name of the company was Riley, Welch & |
| 09:42 | 13 | Associates.  Then, in 2005, it turned to Riley, Welch & |
| 09:42 | 14 | Aginsky.  And two years ago, I started my own consultant |
| 09:42 | 15 | business in this area of ink analysis and dating. |
| 09:42 | 16 | Q.   So did you come -- move from Russia to this country? |
| 09:42 | 17 | A.   Yes.  I moved from Russia to the United States in |
| 09:42 | 18 | December of 2000. |
| 09:42 | 19 | Q.   And you brought your family with you? |
| 09:42 | 20 | A.   Yes.  My wife and my daughter. |
| 09:42 | 21 | Q.   All right.  You moved to Lansing, Michigan? |
| 09:42 | 22 | A.   Yes. |
| 09:42 | 23 | Q.   The weather was like Moscow; is that how you chose |
| 09:42 | 24 | that? |
| 09:42 | 25 | A.   I -- I didn't choose.  I simply was asked to join the |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 55 of 127   Page ID #:305064
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:43 | 1 | company that was based in Lansing, Michigan. |
| 09:43 | 2 | Q.   All right.  And that company was, I think you said, the |
| 09:43 | 3 | Riley, Welch firm? |
| 09:43 | 4 | A.   Riley, Welch & Associates. |
| 09:43 | 5 | Q.   And what was the business of that firm?  What did they |
| 09:43 | 6 | do? |
| 09:43 | 7 | A.   The full name is Riley, Welch & Associates Forensic |
| 09:43 | 8 | Document Examination, Incorporated. |
| 09:43 | 9 | Q.   How did you happen to get together with these folks in |
| 09:43 | 10 | Lansing, Michigan? |
| 09:43 | 11 | A.   I received an e-mail from Tom Riley in 1998, and he |
| 09:43 | 12 | said that he had read, and his partner -- they had read my |
| 09:43 | 13 | publications, and they would like to offer me a position as |
| 09:43 | 14 | their ink chemist. |
| 09:43 | 15 | Q.   And then did you start to work with them and then |
| 09:43 | 16 | ultimately come to this country and join their firm? |
| 09:44 | 17 | A.   Yes.  They sent me a contract, and I read it and agreed |
| 09:44 | 18 | and that was -- I started. |
| 09:44 | 19 | Q.   The rest is history? |
| 09:44 | 20 | A.   Yes. |
| 09:44 | 21 | Q.   So since you came to this country, what type of work |
| 09:44 | 22 | have you been doing? |
| 09:44 | 23 | A.   I analyzed ink and paper, and specifically for |
| 09:44 | 24 | determining -- in comparison and dating. |
| 09:44 | 25 | Q.   And do you do this in connection with litigations, |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

56

| 09:44 | 1 | lawsuits? |
| 09:44 | 2 | A.  Yes.  I -- I testified in civil cases, and I did |
| 09:44 | 3 | examinations for criminal cases and testified in |
| 09:44 | 4 | arbitrations, too. |
| 09:44 | 5 | Q.  And in approximately how many cases have you prepared |
| 09:44 | 6 | formal reports of forensic ink examination or dating? |
| 09:44 | 7 | A.  At least 500. |
| 09:44 | 8 | Q.  And approximately in how many cases? |
| 09:44 | 9 | MS. HURST:  Objection.  Your Honor, I'd like to |
| 09:44 | 10 | get separated out "dating" from other types of ink analysis |
| 09:45 | 11 | for reasons that will become clear if the Court permits me |
| 09:45 | 12 | to voir dire before the qualification. |
| 09:45 | 13 | THE COURT:  I won't be permitting that. |
| 09:45 | 14 | But you can ask that question.  Separate out the |
| 09:45 | 15 | two. |
| 09:45 | 16 | MR. QUINN:  I'm happy to do that, Your Honor. |
| 09:45 | 17 | BY MR. QUINN: |
| 09:45 | 18 | Q.  In terms of -- you've indicated that you prepared about |
| 09:45 | 19 | 500 formal reports on ink examination or dating.  Can -- is |
| 09:45 | 20 | it possible for you to break those 500 down as to how many |
| 09:45 | 21 | involved dating versus other aspects of ink analysis?  Is it |
| 09:45 | 22 | possible? |
| 09:45 | 23 | A.  Dating is a broad term.  When the task is to determine |
| 09:45 | 24 | whether the document is -- is as purports -- is as old as it |
| 09:45 | 25 | purports to be or whether any changes have occurred since |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 57 of 127   Page ID #:305066
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

57

09:45   1   the initial production of the document, to examine a
09:45   2   document for this purpose, I could use either direct
09:46   3   engaging methods that would be -- that would be for dating
09:46   4   to determine whether the ink is still aging, and if the ink
09:46   5   is still aging, then I could specifically say that the ink
09:46   6   is younger than two years or younger than one year or
09:46   7   younger than eight months or six months or three months.
09:46   8   But also, I can analyze the ink -- if for some reason the
09:46   9   aging analysis cannot be used, if the ink is not aging, then
09:46  10   the ink composition also could tell the -- let's say the
09:46  11   relative succession in which the documents -- certain
09:46  12   particular entry -- entries were prepared on the document.
09:46  13   And, um, then the ink comparison can be -- is used.  It is
09:46  14   called "ink comparison," but it is used for ink dating to
09:46  15   determine what, let's say, two entries or multiple entries
09:46  16   were written contemporaneously, or one of them or more than
09:47  17   one of them was not written contemporaneously with the --
09:47  18   with the rest of the entries on the documents.
09:47  19       Another approach, which is also within the broad term
09:47  20   of dating, it is to determine whether the ink was
09:47  21   commercially available at the time that corresponds to the
09:47  22   date on the document.  Let's say the document is dated in
09:47  23   2000 and the ink was first commercially available in 2003.
09:47  24   That would mean that this document could not be -- let's say
09:47  25   the signature -- means that the document could not be signed

| 09:47 | 1 | in 2000 because the ink was first commercially available |
| 09:47 | 2 | three years later. |
| 09:47 | 3 | So all these are different aspects of the dating and |
| 09:47 | 4 | ink analysis. |
| 09:47 | 5 | It's very difficult to separate them.  So I would say |
| 09:47 | 6 | that out of 500 cases, I had both ink aging and ink analysis |
| 09:47 | 7 | in comparison in most of them.  But some of the cases were |
| 09:48 | 8 | just only ink aging.  And some of the cases were ink |
| 09:48 | 9 | comparison. |
| 09:48 | 10 | I simply cannot say how many or what percentage it was. |
| 09:48 | 11 | Q.   So if I understand what you've just told us, is it true |
| 09:48 | 12 | that the question of analyzing the composition of ink from |
| 09:48 | 13 | an expert standpoint often overlaps with the aging -- the |
| 09:48 | 14 | question of how old an ink marking is? |
| 09:48 | 15 | A.   Yes.  That's correct. |
| 09:48 | 16 | Q.   And approximately how many times have you testified on |
| 09:48 | 17 | issues of forensic ink examination or dating? |
| 09:48 | 18 | A.   Approximately 40 times. |
| 09:48 | 19 | Q.   Have you ever -- has there ever been an occasion where |
| 09:48 | 20 | a Court has found you not to be qualified as an expert in |
| 09:48 | 21 | this area? |
| 09:48 | 22 | A.   No. |
| 09:48 | 23 | MS. HURST:  Objection.  Assumes facts not in |
| 09:48 | 24 | evidence. |
| 09:48 | 25 | THE COURT:  Overruled. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 59 of 127   Page ID #:305068
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:48 | 1 | BY MR. QUINN: |
| 09:48 | 2 | Q.   Beyond your chemical analyses, do you have experience |
| 09:49 | 3 | with other methods of questioned document examination? |
| 09:49 | 4 | A.   Yes.  I have been trained to examine documents using |
| 09:49 | 5 | other methods, not only chemical, but physical methods. |
| 09:49 | 6 | And -- |
| 09:49 | 7 | Q.   What would be some examples of those other methods? |
| 09:49 | 8 | A.   There are a number of methods that I have been trained |
| 09:49 | 9 | to use, but some of them were the methods that I used in |
| 09:49 | 10 | this case.  They included visual examination, microscopic |
| 09:49 | 11 | examination, under the microscope, and infrared examination. |
| 09:49 | 12 | Q.   Do you belong to any professional organizations in your |
| 09:49 | 13 | field? |
| 09:49 | 14 | A.   Yes.  I'm -- I'm a member of American Society of |
| 09:49 | 15 | Questioned Document Examiners, International Association for |
| 09:49 | 16 | Identification, International Association of Forensic |
| 09:50 | 17 | Sciences, and American Society for Testing and Materials. |
| 09:50 | 18 | Q.   What is the American Society of Questioned Document |
| 09:50 | 19 | Examiners? |
| 09:50 | 20 | A.   This is the most prestigious professional organization |
| 09:50 | 21 | of forensic document examiners.  It includes active and |
| 09:50 | 22 | retired government forensic document examiners that have |
| 09:50 | 23 | been properly trained. |
| 09:50 | 24 | Q.   When you say it's the most prestigious forensic |
| 09:50 | 25 | document examination organization, are you saying just in |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:50 | 1 | the United States or in the world or what? |
| 09:50 | 2 | A.   It is based in the United States, but it includes a |
| 09:50 | 3 | number of forensic document examiners from government |
| 09:50 | 4 | laboratories from many countries; from Europe, Australia, |
| 09:51 | 5 | um, from South America and, of course, from Canada, a lot |
| 09:51 | 6 | of... |
| 09:51 | 7 | Q.   Would you say it is regarded as the most prestigious |
| 09:51 | 8 | organization in your field? |
| 09:51 | 9 | A.   Yes. |
| 09:51 | 10 | Q.   And why is that? |
| 09:51 | 11 | A.   Because this is -- this organization, they have a very |
| 09:51 | 12 | high level of standard.  It is not easy to become a member. |
| 09:51 | 13 | Q.   What did you have to do to become a member? |
| 09:51 | 14 | A.   To become a member, one needs to -- to obtain two |
| 09:51 | 15 | references, and then his or her candidacy will be discussed |
| 09:51 | 16 | at an annual meeting -- closed-door discussion at annual |
| 09:51 | 17 | meeting out of the organization, and then, finally, it will |
| 09:52 | 18 | be voting using secret ballot. |
| 09:52 | 19 | Q.   When did you become a member of this organization? |
| 09:52 | 20 | A.   In August of 2008. |
| 09:52 | 21 | Q.   And how many forensic chemists specializing in forensic |
| 09:52 | 22 | document examination have been accepted into the American |
| 09:52 | 23 | Society of Questioned Document Examiners? |
| 09:52 | 24 | A.   Two.  Me and another specialist from the Secret |
| 09:52 | 25 | Service. |

| | | |
|---|---|---|
| 09:52 | 1 | Q.   That's the United States Secret Service? |
| 09:52 | 2 | A.   Yes. |
| 09:52 | 3 | Q.   And you say there are only two of you in the whole |
| 09:52 | 4 | world that have been accepted in this organization? |
| 09:52 | 5 | A.   So far, yes, only two. |
| 09:52 | 6 | MR. QUINN:  All right.  We offer Dr. Aginsky as an |
| 09:52 | 7 | expert in the field of forensic ink examination and dating. |
| 09:52 | 8 | THE COURT:  You may proceed. |
| 09:52 | 9 | BY MR. QUINN: |
| 09:52 | 10 | Q.   Have you formed any opinions as to the preparation of |
| 09:52 | 11 | the entry relating to Carter Bryant's drawings in the notary |
| 09:53 | 12 | book which has been received in evidence as Exhibit 60? |
| 09:53 | 13 | A.   Yes. |
| 09:53 | 14 | Q.   If we could put up Exhibit 60-19 and -20. |
| 09:53 | 15 | *(Document displayed.)* |
| 09:53 | 16 | BY MR. QUINN: |
| 09:53 | 17 | Q.   Can you tell us, please, what types of work did you do |
| 09:53 | 18 | in order to reach the opinions that you reached? |
| 09:53 | 19 | It should be on the screen also in front of you, |
| 09:53 | 20 | Dr. Aginsky. |
| 09:53 | 21 | A.   Yes. |
| 09:53 | 22 | Q.   What types of work did you do to reach your opinions? |
| 09:53 | 23 | A.   I conducted a number of examinations.  Specifically, I |
| 09:53 | 24 | conducted three physical examinations that included what I |
| 09:53 | 25 | mentioned:  Visual examination, microscopic examination, and |

09:53    1    infrared examination, and two chemical examinations.

09:53    2    Q.   And what were those two chemical examinations?

09:54    3    A.   They included thin-layer chromatography and gas

09:54    4    chromatography-mass spectrometry.

09:54    5    Q.   And what was the purpose of these examinations?

09:54    6    A.   I was asked to determine whether or not -- whether the

09:54    7    questioned notation "from 1998 Missouri" *(Indicating)*,

09:54    8    whether it was written contemporaneously with the rest of

09:54    9    the entry dated August 26, 1999*, (Indicating)*, or was it

09:54    10    written at a later date.

09:54    11    Q.   And did you reach an -- opinions on that subject?

09:54    12    A.   Yes.

09:54    13    Q.   And what are your opinions?

09:54    14    A.   My --I have two opinions.

09:54    15    One is that this notation "from 1998 Missouri" was not

09:55    16    written contemporaneously with the rest of the entry on

09:55    17    pages 11 and 12, that entry dated August 26, 1999, and it

09:55    18    was written at a later date.

09:55    19    And my second opinion is that this entry was added to

09:55    20    the -- to this document, to page 11, after all the other

09:55    21    entries were written on these pages.

09:55    22    Q.   All the other entries on those two pages, pages 11 and

09:55    23    12?

09:55    24    A.   Yes, pages 11 and 12.

09:55    25    Q.   So let's talk about your methods of examination that

| | | |
|---|---|---|
| 09:55 | 1 | you used to reach these opinions.  And have you made some |
| 09:55 | 2 | slides to help you to explain the work that you did to the |
| 09:55 | 3 | jury? |
| 09:56 | 4 | A.   Yes, I have. |
| 09:56 | 5 | Q.   If you'd take a look, please, at Exhibit 23962-1. |
| 09:56 | 6 | *(Document displayed.)* |
| 09:56 | 7 | BY MR. QUINN: |
| 09:56 | 8 | Q.   What is 23962-1? |
| 09:56 | 9 | A.   This is a slide that shows the methods that I used, |
| 09:56 | 10 | five methods that I used in this case. |
| 09:56 | 11 | Q.   Could you please identify for the jury what those five |
| 09:56 | 12 | methods are? |
| 09:56 | 13 | A.   These are visual examination, microscopic examination, |
| 09:56 | 14 | and infrared examinations.  These are three physical |
| 09:56 | 15 | examinations that I did. |
| 09:56 | 16 |      And also two chemical examinations included thin-layer |
| 09:56 | 17 | chromatography, and the gas chromatography-mass |
| 09:56 | 18 | spectrometry. |
| 09:56 | 19 | Q.   Are all of these methods used by forensic document |
| 09:56 | 20 | examiners in conducting analysis as to whether a writing has |
| 09:57 | 21 | been added to a document? |
| 09:57 | 22 | A.   Yes.  They are widely used for this. |
| 09:57 | 23 | Q.   Can all of these methods be used to compare or |
| 09:57 | 24 | distinguish inks? |
| 09:57 | 25 | A.   Yes. |

09:57    1    Q.    So let's start with the first physical method that you

09:57    2    referred to in the upper left there.  Visual examination.

09:57    3    What is visual examination?

09:57    4    A.    Visual examination is when we examine the document with

09:57    5    a naked eye, and it's used for many purpose by forensic

09:57    6    document examiners.  But most often it is used to -- to

09:57    7    compare visual inks on the page, to see whether there are

09:57    8    any differences in the color or, um, like ink tint, hue,

09:57    9    saturation.  So any -- any features that could be noticed by

09:58   10    visual that would show that there is more than one ink

09:58   11    present on the page.

09:58   12    Q.    So visual examination can be used in some cases to

09:58   13    determine or to distinguish between two inks?

09:58   14    A.    Yes, of course.

09:58   15    Q.    And what would you look for by -- in using visual

09:58   16    examination to determine whether inks are the same or

09:58   17    different?

09:58   18    A.    This would be the -- what I just mentioned.  The ink

09:58   19    would be different in color, and that would be obvious by --

09:58   20    just visual examination would tell that ink one is different

09:58   21    from ink two.  They also could be similar in color, but they

09:58   22    might have some different tints.

09:58   23          Also, if a writing instrument was used, a different

09:58   24    writing instrument was used, let's say, the same ink

09:58   25    manufacturer, but one pen was a fine point and another was

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

65

| 09:58 | 1 | medium point and another was bold, of course we could just |
|---|---|---|
| 09:59 | 2 | immediately determine that the geometrical parameters of the |
| 09:59 | 3 | line are different. |
| 09:59 | 4 | So these are a few examples when visual examination can |
| 09:59 | 5 | be very effective. |
| 09:59 | 6 | Q. Is it always possible to determine whether two inks are |
| 09:59 | 7 | the same or different just from visual examination? |
| 09:59 | 8 | A. No. |
| 09:59 | 9 | Q. Why not? |
| 09:59 | 10 | A. From my experience, in most cases when a document is |
| 09:59 | 11 | amended, then, usually the preparer of the document is |
| 09:59 | 12 | trying to match the pre-existing color and the type of the |
| 09:59 | 13 | ink that was used before. Therefore visual examination |
| 09:59 | 14 | might not determine the difference. |
| 09:59 | 15 | Q. All right. When you conducted the visual examination |
| 09:59 | 16 | of Exhibit 60, the original notary book, what were you |
| 09:59 | 17 | looking for? |
| 09:59 | 18 | A. I was comparing the ink lines by -- to see whether they |
| 10:00 | 19 | of the same color, the ink was of the same color, and |
| 10:00 | 20 | whether there was any difference that would show that -- |
| 10:00 | 21 | maybe any peculiar characteristic of writing instrument that |
| 10:00 | 22 | would show that particular entry was written with a |
| 10:00 | 23 | different writing instrument. |
| 10:00 | 24 | Q. All right. If we could take a look, please, at |
| 10:00 | 25 | Exhibit 239 -- 23962-3. |

| | | |
|---|---|---|
| 10:00 | 1 | *(Document displayed.)* |
| 10:00 | 2 | *(Document provided to the witness.)* |
| 10:00 | 3 | MR. QUINN:  Perhaps we could enlarge that one |
| 10:00 | 4 | section there. |
| 10:00 | 5 | *(Technician complies.)* |
| 10:00 | 6 | BY MR. QUINN: |
| 10:00 | 7 | Q.   Can you tell us what we're looking at here? |
| 10:00 | 8 | A.   This is –– this exhibit shows a notary book as if it |
| 10:00 | 9 | was opened and pages 11 and 12, we can see them both.  And I |
| 10:00 | 10 | highlighted the area with yellow that includes the |
| 10:01 | 11 | questioned notation, "from 1998 Missouri." |
| 10:01 | 12 | Q.   All right.  So based on your visual examination, were |
| 10:01 | 13 | you able to distinguish between any of the inks there in |
| 10:01 | 14 | that entry that you've highlighted in yellow? |
| 10:01 | 15 | A.   No. |
| 10:01 | 16 | Q.   All right.  You've said you also did a microscopic |
| 10:01 | 17 | examination? |
| 10:01 | 18 | A.   Yes. |
| 10:01 | 19 | Q.   What is microscopic examination? |
| 10:01 | 20 | A.   It's another type of optical examination, but we help |
| 10:01 | 21 | our eye to see more details on the page by using different |
| 10:01 | 22 | magnifications. |
| 10:01 | 23 | Q.   Can microscopic examination be used to distinguish |
| 10:01 | 24 | between different inks? |
| 10:01 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 67 of 127   Page ID #:305076
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

67

| 10:01 | 1 | Q. Is it always possible to determine whether two inks are |
| 10:01 | 2 | the same or different based on microscopic examination? |
| 10:01 | 3 | A. No. |
| 10:01 | 4 | Q. Can microscopic examination help one determine what |
| 10:02 | 5 | type of ink the ink is, what type of ink it is that you're |
| 10:02 | 6 | looking at? |
| 10:02 | 7 | A. Yes. It's -- microscopic examination is very helpful |
| 10:02 | 8 | for this because we can see more details under the |
| 10:02 | 9 | microscope, and based on this, it is -- it may be possible |
| 10:02 | 10 | to discriminate between different types of ink, writing ink. |
| 10:02 | 11 | Q. And what would be some examples of different types of |
| 10:02 | 12 | ink that you could distinguish based on microscopic |
| 10:02 | 13 | examination? |
| 10:02 | 14 | A. Most clear example is conventional ballpoint inks, like |
| 10:02 | 15 | this one which on my witness stand, and it contains an oil |
| 10:02 | 16 | base ink. And this ink has like a pastelike appearance. |
| 10:02 | 17 | It's a pastelike material. And when we write on paper, |
| 10:02 | 18 | it -- the line is very -- it's not homogenous. So it |
| 10:03 | 19 | doesn't -- the ink doesn't cover the ink line evenly, |
| 10:03 | 20 | uniformly. And under the microscope, we can see that some |
| 10:03 | 21 | particles of the ballpoint ink, they -- they lay on top |
| 10:03 | 22 | of -- of fibers of cellulose in the paper. So we have -- |
| 10:03 | 23 | like we have mountains and valleys. It's very -- it's not |
| 10:03 | 24 | homogenous. |
| 10:03 | 25 | But if a water-based ink is used, it -- um, for |

| | | |
|---|---|---|
| 10:03 | 1 | example, fountain pen ink or gel ink or rollerball ink, a |
| 10:03 | 2 | felt tip ink, they would, if it's a water-based composition, |
| 10:03 | 3 | the ink is evenly distributed within -- within the ink line; |
| 10:04 | 4 | and under the microscope, we can easily discriminate between |
| 10:04 | 5 | conventional ballpoint ink and, for example, gel ink or |
| 10:04 | 6 | rollerball ink. |
| 10:04 | 7 | Q.   Would you turn, please, to Exhibit 13578 in your book, |
| 10:04 | 8 | and I ask you what this is, 13578? |
| 10:04 | 9 | A.   This is a digital photo that I took under the |
| 10:04 | 10 | microscope, and it shows a fragment of a questioned notation |
| 10:04 | 11 | "from 1998 Missouri." |
| 10:04 | 12 | MR. QUINN:  We'd offer this, Your Honor. |
| 10:04 | 13 | MS. HURST:  No objection. |
| 10:04 | 14 | THE COURT:  Received. |
| 10:04 | 15 | *(Exhibit No. 13578 received in evidence.)* |
| 10:04 | 16 | *(Document displayed.)* |
| 10:04 | 17 | BY MR. QUINN: |
| 10:04 | 18 | Q.   So this is a photograph that you took using a |
| 10:04 | 19 | microscope? |
| 10:04 | 20 | A.   Yes. |
| 10:04 | 21 | Q.   And based upon your microscopic examination of the |
| 10:05 | 22 | notary book, did you draw any conclusions concerning the |
| 10:05 | 23 | type of ink that was used on these pages? |
| 10:05 | 24 | A.   Yes.  I concluded that this is definitely water-based |
| 10:05 | 25 | ink because there is -- the ink is evenly distributed within |

| | | |
|---|---|---|
| 10:05 | 1 | the ink line and this is a typical characteristic of |
| 10:05 | 2 | water-based ink, not conventional ballpoint ink. |
| 10:05 | 3 | And I determined that it is either a rollerball ink or |
| 10:05 | 4 | gel ink. |
| 10:05 | 5 | Q.   What do you mean by -- I think, the gel ink or |
| 10:05 | 6 | rollerball ink?  What is that?  What are those? |
| 10:05 | 7 | A.   These are two types of water-based inks that also use a |
| 10:05 | 8 | ball-like -- a conventional ballpoint ink at the tip of the |
| 10:05 | 9 | writing instrument.  But they are water-based.  Instead of |
| 10:06 | 10 | oil, they use water as a major component of their -- their |
| 10:06 | 11 | major solvent that was used for the manufacturing. |
| 10:06 | 12 | And they are -- they are different.  Historically, they |
| 10:06 | 13 | were very different because the rollerball inks were where |
| 10:06 | 14 | they contain a lot of percentage of water.  And because of |
| 10:06 | 15 | that, they penetrated -- they bleeded into paper, and |
| 10:06 | 16 | therefore, we could see the writing on the back.  And nobody |
| 10:06 | 17 | liked it.  Therefore, ink manufacturers started improving |
| 10:06 | 18 | the technology. |
| 10:06 | 19 | On the other hand, they made something like a hybrid |
| 10:06 | 20 | between water-based ink and the conventional ballpoint ink, |
| 10:06 | 21 | and it is called "gel ink."  It is water-based, but it has |
| 10:06 | 22 | some features of a conventional ballpoint ink.  And this |
| 10:07 | 23 | type of ink, it may or may not have specific peculiar |
| 10:07 | 24 | characteristics that would allow me or someone else to |
| 10:07 | 25 | definitely determine that this is a gel ink. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:07 | 1 | For example, one of the most known characteristics of a |
| 10:07 | 2 | gel ink is they have -- if you look under the microscope, we |
| 10:07 | 3 | would see -- we cannot see it on this -- but assuming this |
| 10:07 | 4 | is gel that would show this characteristic, we would see |
| 10:07 | 5 | like a tracklike appearance, as if two rails in the |
| 10:07 | 6 | railroad.  Because the -- there will be a small amount of |
| 10:07 | 7 | ink here in between, and the ink will be concentrated on the |
| 10:07 | 8 | edges, on the edges of the line.  So I don't see this |
| 10:07 | 9 | particular characteristic. |
| 10:07 | 10 | Therefore, what I see under the microscope is |
| 10:07 | 11 | consistent with the ink being either gel or roller ball or a |
| 10:07 | 12 | hybrid between them. |
| 10:07 | 13 | Q.   And just in summary, how was it -- what did you observe |
| 10:08 | 14 | under the microscope that led you to conclude it was either |
| 10:08 | 15 | a gel or rollerball ink or one of these hybrid inks that you |
| 10:08 | 16 | just described? |
| 10:08 | 17 | A.   What I mentioned is that the ink is evenly distributed |
| 10:08 | 18 | within the ink line, and the character -- these |
| 10:08 | 19 | characteristics are -- they are characteristics of a |
| 10:08 | 20 | water-based ink.  And they are different than -- for |
| 10:08 | 21 | example, another water-based ink would be a fountain pen |
| 10:08 | 22 | ink.  But fountain pen ink would contain a completely |
| 10:08 | 23 | different appearance under the microscope.  Like it would be |
| 10:08 | 24 | similar to gel ink.  It would be a tracklike appearance |
| 10:08 | 25 | under the microscope. |

| | | |
|---|---|---|
| 10:08 | 1 | Q.    In your microscopic examination, did you notice |
| 10:08 | 2 | anything about the quality of the ink lines when examining |
| 10:08 | 3 | this notary book entry? |
| 10:08 | 4 | A.    Yes.  I -- I observed under the microscope that, uh, |
| 10:08 | 5 | some of the lines in the questioned notation, "from 1998 |
| 10:09 | 6 | Missouri," they are wider than the adjacent lines of the -- |
| 10:09 | 7 | another entry in the book.  And also, we can see some -- the |
| 10:09 | 8 | ink is spreading into the paper like outwards from the ink |
| 10:09 | 9 | line to a greater degree than what we can see in the -- in |
| 10:09 | 10 | the other entries on these pages, on pages 11 and 12. |
| 10:09 | 11 | So that -- |
| 10:09 | 12 | Q.    Just for clarity, what we're looking at here, |
| 10:09 | 13 | Exhibit 13578, that's all taken from that fifth line?  This |
| 10:09 | 14 | is a blow-up of a portion of that fifth line, "from |
| 10:09 | 15 | Missouri"? |
| 10:09 | 16 | A.    Yes, that's "from 1998 Missouri."  It's the fifth line |
| 10:09 | 17 | in that particular cell of the table, and this is the fourth |
| 10:09 | 18 | line, a fragment of the fourth line. |
| 10:09 | 19 | Q.    All right.  And what, if anything, did you conclude |
| 10:09 | 20 | from these observations about the quality of the ink lines? |
| 10:10 | 21 | A.    This -- some differences between the quality of the ink |
| 10:10 | 22 | lines is -- based on these differences, I concluded that |
| 10:10 | 23 | either the questioned notation, "from 1998 Missouri," was |
| 10:10 | 24 | written slower and, therefore, more ink was deposited on the |
| 10:10 | 25 | page, or it's a different ink. |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

72

| | | |
|---|---|---|
| 10:10 | 1 | Q.   And on the exhibit here we're looking at, there are two |
| 10:10 | 2 | white circles.  Can you tell us what those are? |
| 10:10 | 3 | A.   Yes.  These two circles are the -- the holes that -- |
| 10:10 | 4 | the result of the sampling.  The ink was sampled for the |
| 10:10 | 5 | chemical analysis and the -- using like a micro punch that |
| 10:11 | 6 | takes approximately half a millimeter in diameter, which is |
| 10:11 | 7 | 1/50th of an inch.  It takes the ink from the document for |
| 10:11 | 8 | the analysis. |
| 10:11 | 9 | Q.   All right.  Based upon this microscopic examination, |
| 10:11 | 10 | could you distinguish between the -- just on that, could you |
| 10:11 | 11 | distinguish between the inks in the entry? |
| 10:11 | 12 | A.   No. |
| 10:11 | 13 | Q.   All right.  You mentioned you did a third type of |
| 10:11 | 14 | physical examination: infrared absorption? |
| 10:11 | 15 | A.   Yes. |
| 10:11 | 16 | Q.   Could you please explain to the jury what infrared |
| 10:11 | 17 | absorption is? |
| 10:11 | 18 | A.   It's another optical method, and it examines the |
| 10:11 | 19 | behavior of -- of ink in the near infrared region of the |
| 10:11 | 20 | electromagnetic spectrum.  That's using the equipment that |
| 10:12 | 21 | is similar to what we can see in the movies like night -- |
| 10:12 | 22 | night-vision tools. |
| 10:12 | 23 | Q.   Can infrared absorption be used to distinguish between |
| 10:12 | 24 | different inks? |
| 10:12 | 25 | A.   Yes, it can. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 73 of 127   Page ID #:305082
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:12 | 1 | Q.   Can it always help you determine whether two inks are |
| 10:12 | 2 | the same or different? |
| 10:12 | 3 | A.   No. |
| 10:12 | 4 | Q.   Why is that? |
| 10:12 | 5 | A.   Because some ink might have the same pigment, and they |
| 10:12 | 6 | would look -- they would give the same response in the |
| 10:12 | 7 | infrared region.  But they might have some other components |
| 10:12 | 8 | not active in the -- in this particular analysis in the |
| 10:12 | 9 | infrared. |
| 10:12 | 10 | And so there will be no difference between the inks, |
| 10:12 | 11 | though, in fact, the inks are different. |
| 10:12 | 12 | THE COURT:  Sorry. |
| 10:12 | 13 | Counsel, the jury needs a bathroom break. |
| 10:12 | 14 | So you're admonished not to discuss this matter |
| 10:12 | 15 | amongst yourselves, nor to form or express any opinion |
| 10:12 | 16 | concerning the case. |
| 10:12 | 17 | We'll come and get you in 20 minutes. |
| 10:13 | 18 | Thank you. |
| 10:13 | 19 | *(Recess was held at 10:13 a.m.)* |
| 10:13 | 20 | THE COURT:  Thank you, sir.  You may step down. |
| 10:13 | 21 | *(Outside the presence of the jury.)* |
| 10:13 | 22 | *(Mr. Marlow appearing telephonically.)* |
| 10:13 | 23 | THE COURT:  Counsel, we're still in session. |
| 10:13 | 24 | First, my record should reflect that MGA is not |
| 10:13 | 25 | precluded from examining Susana Kuemmerle about the Hasbro, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 74 of 127   Page ID #:305083
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

74

| 10:13 | 1 | et al., questions that Ms. Keller called to the Court's |
| 10:13 | 2 | attention last evening.  Ms. Susana Kuemmerle will be |
| 10:13 | 3 | returning during MGA's case and an adequate opportunity will |
| 10:13 | 4 | be provided. |
| 10:13 | 5 | So, counsel, you can work that out informally. |
| 10:13 | 6 | You each know your time schedule, but otherwise, |
| 10:13 | 7 | Ms. Kuemmerle's ordered to remain on the premises of this |
| 10:13 | 8 | courthouse. |
| 10:13 | 9 | So if you would get up, Ms. Hurst, Mr. Zeller, go |
| 10:13 | 10 | back and talk to Ms. Kuemmerle, and tell me when she's |
| 10:14 | 11 | returning. |
| 10:14 | 12 | MS. HURST:  Is it okay if Mr. McConville does |
| 10:14 | 13 | that? |
| 10:14 | 14 | THE COURT:  Mr. McConville, of course. |
| 10:14 | 15 | And you two move toward Ms. Kuemmerle and give her |
| 10:14 | 16 | the courtesy of a definite date. |
| 10:15 | 17 | MS. KELLER:  Your Honor, while this is being |
| 10:15 | 18 | handled, may I avail myself of the bathroom break? |
| 10:16 | 19 | THE COURT:  No.  Let's handle this for a moment. |
| 10:16 | 20 | Let's get your associate and lead counsel to make a decision |
| 10:16 | 21 | here. |
| 10:16 | 22 | Okay.  What date?  I'm going to specifically order |
| 10:16 | 23 | her back.  What date? |
| 10:16 | 24 | MR. McCONVILLE:  I can't project. |
| 10:16 | 25 | THE COURT:  Ms. Kuemmerle, you're ordered to |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 75 of 127   Page ID #:305084
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

75

| | | |
|---|---|---|
| 10:16 | 1 | remain.  Counsel will work this out.  We'll see you at the |
| 10:16 | 2 | lunch hour. |
| 10:16 | 3 | MR. ZELLER:  We have an agreement, Your Honor.  We |
| 10:16 | 4 | have agreed to a range of dates. |
| 10:16 | 5 | THE COURT:  What is the range, then? |
| 10:16 | 6 | MR. McCONVILLE:  March 9th through the 11th. |
| 10:16 | 7 | THE COURT:  Ms. Kuemmerle, you're to be available |
| 10:16 | 8 | and ordered back to this court on March 9th. |
| 10:16 | 9 | MR. McCONVILLE:  Or March 14 to 18. |
| 10:16 | 10 | THE COURT:  Make a decision so she's not |
| 10:16 | 11 | inconvenienced. |
| 10:16 | 12 | MR. McCONVILLE:  Okay.  Your Honor. |
| 10:16 | 13 | THE COURT:  That way she has a definite date, and |
| 10:16 | 14 | she's ordered back on that date. |
| 10:16 | 15 | MR. McCONVILLE:  March 24th. |
| 10:17 | 16 | THE COURT:  Ms. Kuemmerle, you're ordered back to |
| 10:17 | 17 | the court on March 24th.  We'll put you on the stand that |
| 10:17 | 18 | day, that morning.  Thank you very much. |
| 10:17 | 19 | All right.  Counsel, about 15 minutes. |
| 10:17 | 20 | *(Recess held at 10:17 a.m.)* |
| 10:21 | 21 | THE COURT:  All right.  On the record. |
| 10:21 | 22 | Mr. Marlow, this is Judge Carter. |
| 10:21 | 23 | MR. MARLOW:  Good morning, Judge Carter. |
| 10:22 | 24 | THE COURT:  Good morning, sir.  You're expected in |
| 10:22 | 25 | my court. |

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

76

| | | |
|---|---|---|
| 10:22 | 1 | MR. MARLOW:  Thank you very much. |
| 10:22 | 2 | THE COURT:  Immediately.  Is that understood? |
| 10:22 | 3 | MR. MARLOW:  Yes, I will be. |
| 10:22 | 4 | THE COURT:  Get in that car and get down to my |
| 10:22 | 5 | court, sir.  Thank you. |
| 10:22 | 6 | MR. MARLOW:  I'm sorry, I didn't hear. |
| 10:22 | 7 | THE COURT:  Thank you. |
| 10:22 | 8 | *(Recess held at 10:22 a.m.)* |
| 10:31 | 9 | *(Proceedings resumed at 10:31 a.m.)* |
| 10:31 | 10 | *(Outside the presence of the jury.)* |
| 10:31 | 11 | THE COURT:  All right.  We're on the record. |
| 10:31 | 12 | The Court had placed a phone call to Mr. Marlow. |
| 10:31 | 13 | Apparently, Mr. Marlow had submitted a letter, which was, |
| 10:31 | 14 | once again, the quibbling by witnesses and counsel. |
| 10:31 | 15 | Mr. Marlow was told basically by this Court to get in the |
| 10:31 | 16 | car and get down here now. |
| 10:31 | 17 | This was counsel's schedule.  He's available. |
| 10:31 | 18 | This is public money, jurors who are serving four months |
| 10:31 | 19 | with minimal pay, and Mr. Walker -- I'm sorry -- Mr. Marlow |
| 10:32 | 20 | has been kind enough, apparently, to get in his car. |
| 10:32 | 21 | Neither counsel are to mention the phone call by |
| 10:32 | 22 | the Court. |
| 10:32 | 23 | Is that understood? |
| 10:32 | 24 | MR. QUINN:  Understood. |
| 10:32 | 25 | THE COURT:  Is that understood? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 77 of 127   Page ID #:305086
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

77

| | | |
|---|---|---|
| 10:32 | 1 | MR. ZELLER:  Understood. |
| 10:32 | 2 | THE COURT:  This Court's not going to be taken |
| 10:32 | 3 | advantage of by interceding, and then being drawn into this |
| 10:32 | 4 | lawsuit. |
| 10:32 | 5 | MR. QUINN:  Understood. |
| 10:32 | 6 | THE COURT:  What did I just say, Mr. Quinn? |
| 10:32 | 7 | MR. QUINN:  You said:  No counsel is to mention |
| 10:32 | 8 | the phone call that the Court made. |
| 10:32 | 9 | THE COURT:  What did I say? |
| 10:32 | 10 | MR. McCONVILLE:  No counsel is to mention the |
| 10:32 | 11 | phone call that the Court made. |
| 10:32 | 12 | THE COURT:  Now, that would have been the first |
| 10:32 | 13 | warrant that the Court issued.  And I'm very pleased that |
| 10:32 | 14 | we're not having to issue that warrant.  But these witnesses |
| 10:32 | 15 | should be lined up in the hallway. |
| 10:32 | 16 | If there's any additional problems, you notify the |
| 10:32 | 17 | Court.  I'll get them here. |
| 10:32 | 18 | All right. |
| 10:32 | 19 | *(Brief pause in the proceedings.)* |
| 10:33 | 20 | *(In the presence of the jury.)* |
| 10:33 | 21 | THE COURT:  Sir, if you would be kind enough to |
| 10:33 | 22 | retake the stand.  Thank you. |
| 10:33 | 23 | The jury is once again present.  All counsel are |
| 10:33 | 24 | present.  The witness is present. |
| 10:33 | 25 | Mr. Quinn, if you would like to continue with your |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 78 of 127   Page ID #:305087
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:33 | 1 | direct examination, please. |
| 10:33 | 2 | MR. QUINN:  Thank you, Your Honor. |
| 10:33 | 3 | BY MR. QUINN: |
| 10:33 | 4 | Q.   Dr. Aginsky, when we broke, I think you told us that |
| 10:33 | 5 | you were unable to distinguish between the inks in the |
| 10:33 | 6 | notary book based on the infrared absorption examination |
| 10:33 | 7 | alone; is that correct? |
| 10:33 | 8 | A.   That's correct. |
| 10:33 | 9 | Q.   So let's -- we've now talked about -- |
| 10:33 | 10 | MR. QUINN:  If we can put up on the screen |
| 10:34 | 11 | 23962-1. |
| 10:34 | 12 | *(Document displayed.)* |
| 10:34 | 13 | BY MR. QUINN: |
| 10:34 | 14 | Q.   And we have now talked about the three kinds of |
| 10:34 | 15 | physical examination that you did on the inks, correct? |
| 10:34 | 16 | A.   Yes. |
| 10:34 | 17 | Q.   And now we'll talk about the two different types of |
| 10:34 | 18 | chemical examination that you did.  Okay? |
| 10:34 | 19 | A.   Okay. |
| 10:34 | 20 | Q.   What specific types of chemical analyses did you |
| 10:34 | 21 | conduct on the notary book? |
| 10:34 | 22 | A.   Two types of chemical analysis:  One, a thin-layer |
| 10:34 | 23 | chromatography, and the other is gas chromatography-mass |
| 10:34 | 24 | spectrometry. |
| 10:34 | 25 | Q.   Is there kind of a shorthand way to refer that's used |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 79 of 127   Page ID #:305088
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

79

| | | |
|---|---|---|
| 10:34 | 1 | in your profession to refer to those terms? |
| 10:34 | 2 | A.   Yes.  The first method is referred to as "TLC," and the |
| 10:34 | 3 | other -- |
| 10:34 | 4 | Q.   That's Tender Loving Care? |
| 10:34 | 5 | A.   Yeah, thin-layer chromatography.  And the other is |
| 10:35 | 6 | GC-MS. |
| 10:35 | 7 | Q.   Why did you conduct these two chemical examinations? |
| 10:35 | 8 | A.   These are two chemical methods that are widely used all |
| 10:35 | 9 | over the world for purposes of ink comparison. |
| 10:35 | 10 | Q.   And what do these types of chemical tests show or |
| 10:35 | 11 | measure? |
| 10:35 | 12 | A.   They measure -- the TLC method measures the colored |
| 10:35 | 13 | components of the ink; and the GC-MS method measures the |
| 10:35 | 14 | noncolored components of the ink, which are also called the |
| 10:35 | 15 | vehicle of the ink, that mainly consists of solvents and |
| 10:35 | 16 | resins, and also may consistent of a number of proprietary |
| 10:35 | 17 | additives, including fragrances. |
| 10:35 | 18 | Q.   I just want to make sure we understood you.  Did you |
| 10:36 | 19 | say "color components" and "noncolor components"? |
| 10:36 | 20 | A.   Yes.  TLC measures colored components, and GC-MS |
| 10:36 | 21 | noncolored. |
| 10:36 | 22 | Q.   And you used the term "vehicle" with respect to the |
| 10:36 | 23 | GC-MS? |
| 10:36 | 24 | A.   Yes.  Sometimes in the ink industry the known colored |
| 10:36 | 25 | components of inks -- of an ink are called or named a |

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

80

| | | |
|---|---|---|
| 10:36 | 1 | vehicle of the ink. |
| 10:36 | 2 | Q.   If we could look, please, at the same exhibit, dash 5, |
| 10:36 | 3 | could you please tell us what this slide shows. |
| 10:36 | 4 | *(Document displayed.)* |
| 10:36 | 5 | THE WITNESS:  This slide shows a schematical |
| 10:36 | 6 | illustration of how the samples are taken from the |
| 10:36 | 7 | documents.  We saw one example on the real -- on the |
| 10:36 | 8 | document, in this case, a notary book.  But this is just a |
| 10:37 | 9 | schematical.  The microplugs are punched out of the document |
| 10:37 | 10 | using a syringe needle or a micropunch. |
| 10:37 | 11 | And each microplug is -- what I mentioned: |
| 10:37 | 12 | Zero -- half a millimeter, 0.5 millimeter in diameter, or |
| 10:37 | 13 | 1/50th of an inch -- a very small amount of paper that is |
| 10:37 | 14 | taken for the analysis.  Then these microplugs are placed |
| 10:37 | 15 | into microvial, in this case with a conical shape interior. |
| 10:37 | 16 | And finally, a small amount of an appropriate solvent is |
| 10:37 | 17 | added to the -- to these microplugs to extract ink and paper |
| 10:37 | 18 | components from the microplugs. |
| 10:37 | 19 | Q.   What does "extract" mean in this context? |
| 10:38 | 20 | A.   It means -- "extract" means to dissolve.  So whatever |
| 10:38 | 21 | can be dissolved from the ink or from the paper, will be -- |
| 10:38 | 22 | will go into the solution -- into the solution, and the |
| 10:38 | 23 | solution will be analyzed either by TLC for colored |
| 10:38 | 24 | components or by GC-MS for noncolored components. |
| 10:38 | 25 | Q.   So after you've extracted those components, what's the |

| | | |
|---|---|---|
| 10:38 | 1 | next step in the chemical examination? |
| 10:38 | 2 | A.   The next step is use the extract that was obtained. |
| 10:38 | 3 | And it could be analyzed either by TLC, if we are looking |
| 10:38 | 4 | for how many colored components are present in the ink, or |
| 10:38 | 5 | by GC-MS, when we analyze noncolored components, such as |
| 10:39 | 6 | solvents and the other proprietary additives. |
| 10:39 | 7 | Q.   And is there a machine that's used for this purpose? |
| 10:39 | 8 | A.   Yes.  For GC-MS analysis, there is a machine.  It's |
| 10:39 | 9 | called -- it is combination of gas chromatograph and mass |
| 10:39 | 10 | spectrometry as a detector. |
| 10:39 | 11 | Q.   Once the components have been extracted, separated, and |
| 10:39 | 12 | analyzed, can you tell if the two inks are different? |
| 10:39 | 13 | A.   It depends on the -- whether there is a difference. |
| 10:39 | 14 | When there is a difference, of course, yes, it is possible |
| 10:39 | 15 | to determine that, that the inks are different. |
| 10:39 | 16 | Q.   And how does that appear in this type of analysis? |
| 10:39 | 17 | A.   That would -- for example, if one ink contains one or |
| 10:39 | 18 | more components that are not present in the other ink, that |
| 10:40 | 19 | would mean that Ink 1 and Ink 2 are different. |
| 10:40 | 20 | Q.   Are -- these types of chemical examinations, have they |
| 10:40 | 21 | been accepted in the field of ink analysis? |
| 10:40 | 22 | A.   Yes.  They are widely accepted, and they are used all |
| 10:40 | 23 | over the world, published in many textbooks, and in the -- |
| 10:40 | 24 | in the American Standards for Testing and Materials.  The |
| 10:40 | 25 | standards that are adopted have been adopted by forensic ink |

| | | |
|---|---|---|
| 10:40 | 1 | chemists in the world. |
| 10:40 | 2 | Q.   Can the TLC and GC-MS tests always analyze all the |
| 10:40 | 3 | components of the ink or paper? |
| 10:40 | 4 | A.   It depends whether -- whether ink and/or paper contain |
| 10:40 | 5 | extractable components. |
| 10:40 | 6 | Q.   So sometimes you can't extract a component? |
| 10:40 | 7 | A.   Yes.  Like if an ink is -- doesn't have an extractable |
| 10:41 | 8 | component -- let's say, like, in this case, we're dealing |
| 10:41 | 9 | with water-based inks.  And there are -- water-based inks |
| 10:41 | 10 | might have dyes as colored component or pigments.  In this |
| 10:41 | 11 | case, it is a pigment, and it is not extractible.  Most |
| 10:41 | 12 | likely, it's a carbon black inorganic pigment. |
| 10:41 | 13 | Q.   Black?  The color "black," are you saying? |
| 10:41 | 14 | A.   Yes.  So if there are extractible components, then, |
| 10:41 | 15 | yes, these methods are very powerful. |
| 10:41 | 16 | Q.   Even if the components can be extracted, can you always |
| 10:41 | 17 | detect differences between inks using these tests? |
| 10:41 | 18 | A.   No.  Sometimes there are different inks with the same |
| 10:42 | 19 | extractable components, and they may show the same results, |
| 10:42 | 20 | but they are different. |
| 10:42 | 21 | Q.   Is it typical to use both the TLC and the GC-MS |
| 10:42 | 22 | together when you're testing ink? |
| 10:42 | 23 | A.   Yes.  It's -- it's typical and it's considered a |
| 10:42 | 24 | powerful combination.  And I wrote about this in peer review |
| 10:42 | 25 | literature, and some of my colleagues, too.  Because the TLC |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 83 of 127   Page ID #:305092
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

83

| | | |
|---|---|---|
| 10:42 | 1 | gives -- analyzes one part of the ink, and the GC-MS |
| 10:42 | 2 | analyzes the other part of the ink.  So taken together, they |
| 10:42 | 3 | could give us a combination that could be considered as a |
| 10:42 | 4 | chemical fingerprint of an ink. |
| 10:42 | 5 | Q.   All right.  Besides comparing ink, can these chemical |
| 10:42 | 6 | tests be used in some cases to determine the age of an ink |
| 10:42 | 7 | sample? |
| 10:42 | 8 | A.   Yes.  In some cases the GC-MS analysis could be used |
| 10:43 | 9 | for determining the age of an ink on paper. |
| 10:43 | 10 | Q.   Did you do that in this case? |
| 10:43 | 11 | A.   I did not. |
| 10:43 | 12 | Q.   Why not? |
| 10:43 | 13 | A.   Because it was my understanding, at the time when I did |
| 10:43 | 14 | the examination, that the document -- and I did it in |
| 10:43 | 15 | 2008 -- that the document was -- the questioned notation, |
| 10:43 | 16 | "from 1998 Missouri," was discussed in a deposition in 2004. |
| 10:43 | 17 | Q.   Why is that significant?  The fact that, you know, |
| 10:43 | 18 | you're doing this analysis in 2008, but yet the entry |
| 10:43 | 19 | obviously exists because it's being discussed in a |
| 10:43 | 20 | deposition in 2004, why was that significant to you as to |
| 10:43 | 21 | whether you could do an aging analysis? |
| 10:43 | 22 | A.   This is significant because, based on what is published |
| 10:43 | 23 | in the literature -- and I have done a number of researches |
| 10:44 | 24 | in the field -- no ink, irrespective of the ink formulation, |
| 10:44 | 25 | would continue aging if it's older than two years.  So two |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:44 | 1 | years, it's like life expectancy for ink on paper.  If I |
| 10:44 | 2 | could use this knowledge for people:  It's like -- almost |
| 10:44 | 3 | like 100 years. |
| 10:44 | 4 | Q.   So after two years, it's not possible to, with any |
| 10:44 | 5 | degree of certainty, date ink; is that fair to say? |
| 10:44 | 6 | A.   Yeah, that's fair to say.  After two years, uh, it |
| 10:44 | 7 | doesn't matter what ink aging parameter we are going to |
| 10:44 | 8 | measure, it will not be changing.  It will just be a |
| 10:44 | 9 | horizontal line, so no -- no signals, nothing. |
| 10:44 | 10 | Q.   So did you take any of these microplugs from the notary |
| 10:44 | 11 | book in this case? |
| 10:44 | 12 | A.   Yes. |
| 10:44 | 13 | Q.   And where did you take the microplugs from? |
| 10:44 | 14 | A.   I took microplugs of ink and paper from 17 different |
| 10:45 | 15 | areas on pages 11 and 12, including the area of -- that |
| 10:45 | 16 | contains "from 1998 Missouri" notation.  And another two |
| 10:45 | 17 | sets of microplugs I took from two areas from paper that |
| 10:45 | 18 | didn't contain any writing ink on it.  And these are paper |
| 10:45 | 19 | blank samples. |
| 10:45 | 20 | Q.   So you took 17 microplugs, which had ink, and two that |
| 10:45 | 21 | were just on paper? |
| 10:45 | 22 | A.   Yes.  17 sets of microplugs from ink areas and two sets |
| 10:45 | 23 | of microplugs from paper. |
| 10:45 | 24 | Q.   Did you make any handwritten notes of how many |
| 10:45 | 25 | microplugs you took from each area of the notary book in |

| | | |
|---|---|---|
| 10:45 | 1 | this case? |
| 10:45 | 2 | A.   I did not make any handwritten notes, but I took a |
| 10:45 | 3 | digital photo of high resolution after I took samples from |
| 10:46 | 4 | the documents, or microplugs.  And these would simply show |
| 10:46 | 5 | how many and from where I took the samples. |
| 10:46 | 6 | Q.   If we could take a look, please, at Exhibit 23496-1. |
| 10:46 | 7 | *(Document provided to the witness.)* |
| 10:46 | 8 | BY MR. QUINN: |
| 10:46 | 9 | Q.   What is Exhibit 23496? |
| 10:46 | 10 | A.   It is copies of pages 11 and 12 of the notary book with |
| 10:46 | 11 | some areas that are circled and numbered.  These are the |
| 10:46 | 12 | areas from which I took samples or microplugs. |
| 10:46 | 13 | Q.   Is this a copy of the high-resolution photograph that |
| 10:46 | 14 | you just referred to that you took? |
| 10:47 | 15 | A.   Yes.  It looks like it's a copy.  It's not -- not the |
| 10:47 | 16 | first generation, so it's probably not easy to say |
| 10:47 | 17 | definitively, but it looks like it is a copy of the photo |
| 10:47 | 18 | that I took, yes. |
| 10:47 | 19 | Q.   And does it -- does this indicate where -- the areas |
| 10:47 | 20 | where you took the microplugs? |
| 10:47 | 21 | A.   Yes.  All the 17 areas that I mentioned from which I |
| 10:47 | 22 | took 17 sets of microplugs of ink on paper are circled and |
| 10:47 | 23 | numbered.  And the two areas from which I took paper blank |
| 10:47 | 24 | samples also are circled and numbered accordingly. |
| 10:47 | 25 | MR. QUINN:  Your Honor, we offer 23496. |

Case 2:04-cv-09049-DOC-RNB  Document 10101  Filed 03/01/11  Page 86 of 127  Page ID #:305095
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:47 | 1 | THE COURT:  Received. |
| 10:47 | 2 | MR. QUINN:  If we could -- |
| 10:47 | 3 | THE COURT:  That's page 1? |
| 10:47 | 4 | MR. QUINN:  Page 1, yes, Your Honor.  It's a |
| 10:47 | 5 | two-page document.  We'd offer two, both pages, Your Honor. |
| 10:47 | 6 | THE COURT:  1 and 2, received. |
| 10:47 | 7 | *(Exhibit No. 23496 received in evidence.)* |
| 10:47 | 8 | MR. QUINN:  If we can put those on the screen. |
| 10:48 | 9 | Maybe just do the first page, Ken, first, dash 1. |
| 10:48 | 10 | *(Document displayed.)* |
| 07:59 | 11 | BY MR. QUINN: |
| 10:48 | 12 | Q.   Can you explain this document to the jury, Dr. Aginsky? |
| 10:48 | 13 | A.   Yes.  What I mentioned, that I took samples from 17 |
| 10:48 | 14 | different areas on the document. |
| 10:48 | 15 | And, for example, you can see that's first area was |
| 10:48 | 16 | this one, the entry of the date, and it is circled and |
| 10:48 | 17 | numbered as number one.  And I have 17 areas of ink samples |
| 10:48 | 18 | taken accordingly.  *(Indicating.)* |
| 10:48 | 19 | And this is one of the paper blanks.  *(Indicating.)* |
| 10:48 | 20 | Q.   You told us you took two blank paper samples? |
| 10:48 | 21 | A.   Yes.  One paper blank we can see here.  *(Indicating.)* |
| 10:48 | 22 | This is -- one paper black with four microplugs.  So we |
| 10:48 | 23 | can see, even on this copy, that the four microplugs were |
| 10:49 | 24 | taken from this area of paper that didn't contain any |
| 10:49 | 25 | writing on it.  *(Indicating.)* |

| | | |
|---|---|---|
| 10:49 | 1 | And another four microplugs were taken from this area |
| 10:49 | 2 | of the document that also didn't contain any writing on it. |
| 10:49 | 3 | *(Indicating.)* |
| 10:49 | 4 | Q.   And I notice that each of these -- there's a number |
| 10:49 | 5 | attached.  You've circled each in red, and you've written a |
| 10:49 | 6 | number there.  Can you explain to us what that is? |
| 10:49 | 7 | A.   Each number corresponds to the -- what I mentioned:  17 |
| 10:49 | 8 | different areas from which I took 17 sets of inks -- ink |
| 10:49 | 9 | microplugs.  So -- and this is the number that shows the |
| 10:49 | 10 | number of the area. |
| 10:49 | 11 | Q.   So these are 17 sets of ink samples and then two sets |
| 10:49 | 12 | of paper samples? |
| 10:49 | 13 | A.   Yes. |
| 10:49 | 14 | Q.   Is that correct? |
| 10:49 | 15 | A.   Yes. |
| 10:49 | 16 | Q.   And when was it that you took these 17 samples of the |
| 10:49 | 17 | writing and ink and the two samples of the paper? |
| 10:50 | 18 | A.   I took them on the 4th of January of 2008. |
| 10:50 | 19 | Q.   And each of these sets consists of multiple plugs? |
| 10:50 | 20 | A.   Yes.  The sets are from -- from eight plugs.  Some |
| 10:50 | 21 | contain eight.  Like, for example, this one, I took eight |
| 10:50 | 22 | plugs from here. *(Indicating)*.  And from these four lines, I |
| 10:50 | 23 | took ten plugs. |
| 10:50 | 24 | The largest amount of plugs that I took was from Area |
| 10:50 | 25 | No. 17, and it is on page 12 -- that we don't see on this |

| | | |
|---|---|---|
| 10:50 | 1 | slide –– and it was 15 microplugs from that –– yes, from |
| 10:50 | 2 | Area No. 17 that includes two-line entry. |
| 10:50 | 3 | Q.   So you say you took the largest number of plugs from |
| 10:50 | 4 | there.  Was there a reason for that? |
| 10:50 | 5 | A.   No.  I was not restricted in the amount of plugs that I |
| 10:50 | 6 | could take –– could took –– or could take.  And I simply |
| 10:51 | 7 | decided, at that stage, when I did it, that maybe eight to |
| 10:51 | 8 | ten would be enough.  I didn't want to take unnecessarily |
| 10:51 | 9 | large amount of plugs, in order –– because this is a |
| 10:51 | 10 | semi-destructive analysis.  So the writing becomes –– |
| 10:51 | 11 | legible, but still I'm taking some information, some ink |
| 10:51 | 12 | from the document, so I always try to be conservative not to |
| 10:51 | 13 | take more plugs than necessary for the analysis. |
| 10:51 | 14 | Q.   So when you took these plugs on –– January 4, 2008, I |
| 10:51 | 15 | think you said? |
| 10:51 | 16 | A.   Yes. |
| 10:51 | 17 | Q.   Approximately how many plugs, in total, individual |
| 10:51 | 18 | plugs, did you take at that time? |
| 10:51 | 19 | A.   Approximately, it was over 160 microplugs. |
| 10:51 | 20 | Q.   When you took these microplugs, was there any |
| 10:51 | 21 | representative of MGA present? |
| 10:51 | 22 | A.   Yes.  It was an intern from Speckin Forensic |
| 10:52 | 23 | Laboratories. |
| 10:52 | 24 | Q.   What is Speckin Forensic Laboratories?  Who are they? |
| 10:52 | 25 | A.   They were consultants for MGA. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 89 of 127   Page ID #:305098
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:52 | 1 | Q.    And why was this intern from the Speckin Laboratories |
| 10:52 | 2 | there when you took these plugs? |
| 10:52 | 3 | A.    In accordance with the -- with the court order, it was |
| 10:52 | 4 | my understanding that both parties had the right to be |
| 10:52 | 5 | present when the other side expert would be taking |
| 10:52 | 6 | microplugs from the documents in order to object if they |
| 10:52 | 7 | would see something that they don't like. |
| 10:52 | 8 | Q.    All right.  Is that -- in your experience, is that |
| 10:52 | 9 | common to have an objector present when microplugs are |
| 10:53 | 10 | taken? |
| 10:53 | 11 | MS. HURST:  Objection.  Relevance. |
| 10:53 | 12 | THE COURT:  Overruled. |
| 10:53 | 13 | You can answer the question, sir. |
| 10:53 | 14 | THE WITNESS:  It is very rare because there is |
| 10:53 | 15 | actually nothing to observe.  After the samples are taken |
| 10:53 | 16 | from the document, the document is photographed and -- and |
| 10:53 | 17 | the same image that I could obtain after one minute after I |
| 10:53 | 18 | completed the sampling, it would be the same if I take |
| 10:53 | 19 | another photo of this document after one year.  So the |
| 10:53 | 20 | document speaks for itself. |
| 10:53 | 21 | The plugs are taken, and we can calculate the |
| 10:53 | 22 | amount of plugs that have been taken immediately after the |
| 10:53 | 23 | examination done or at any time after that. |
| 10:53 | 24 | BY MR. QUINN: |
| 10:53 | 25 | Q.    So, basically, there was an observer present just to |

| | | |
|---|---|---|
| 10:53 | 1 | watch you use this instrument to take -- make tiny holes? |
| 10:54 | 2 | MS. HURST:  Objection.  Argumentative. |
| 10:54 | 3 | MR. QUINN:  Well -- |
| 10:54 | 4 | THE COURT:  Overruled. |
| 10:54 | 5 | I don't know about "tiny holes" but -- |
| 10:54 | 6 | MR. QUINN:  How big -- |
| 10:54 | 7 | THE COURT:  Counsel, let's move on. |
| 10:54 | 8 | BY MR. QUINN: |
| 10:54 | 9 | Q.  All right.  While this intern was there, did he say or |
| 10:54 | 10 | do anything? |
| 10:54 | 11 | MS. HURST:  Objection.  Hearsay. |
| 10:54 | 12 | THE COURT:  Overruled. |
| 10:54 | 13 | You can answer the question. |
| 10:54 | 14 | THE WITNESS:  No, he didn't say anything.  He was |
| 10:54 | 15 | sitting approximately 3 yards from me at the table when I |
| 10:54 | 16 | was taking the samples.  And when I completed -- when I took |
| 10:54 | 17 | all the samples, I took digital photos of the resulting |
| 10:54 | 18 | pages.  And then he came up and also -- he used his camera |
| 10:54 | 19 | and also he took digital photos. |
| 08:57 | 20 | BY MR. QUINN: |
| 10:54 | 21 | Q.  All right.  At some point after this -- after this |
| 10:54 | 22 | occasion on January 4, 2008, when you took over 160 plugs, |
| 10:55 | 23 | at some point afterwards, did you take any additional |
| 10:55 | 24 | microplugs from the notary book? |
| 10:55 | 25 | A.  Yes.  In ten days, I took four additional microplugs. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 91 of 127   Page ID #:305100
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

91

| | | |
|---|---|---|
| 10:55 | 1 | Q.   So that was ten days later? |
| 10:55 | 2 | A.   Yes.  On the 14th of January of 2008. |
| 10:55 | 3 | Q.   And what area of the notary book -- which of those |
| 10:55 | 4 | numbered areas did you take those additional plugs from ten |
| 10:55 | 5 | days later? |
| 10:55 | 6 | A.   I took four additional microplugs from the questioned |
| 10:55 | 7 | notation, "From 1998 Missouri." |
| 10:55 | 8 | Q.   All right.  So was there any restriction on the number |
| 10:55 | 9 | of microplugs that you could take as part of your |
| 10:55 | 10 | examination? |
| 10:55 | 11 | MS. HURST:  Objection.  Lacks foundation.  Calls |
| 10:55 | 12 | for a legal conclusion. |
| 10:55 | 13 | THE COURT:  Overruled. |
| 10:55 | 14 | MR. QUINN:  I'm sorry? |
| 10:55 | 15 | THE COURT:  You can answer the question, sir. |
| 10:55 | 16 | THE WITNESS:  No.  No restrictions. |
| | 17 | BY MR. QUINN: |
| 10:55 | 18 | Q.   When you took these four additional microplugs ten days |
| 10:56 | 19 | later, was a representative of MGA present? |
| 10:56 | 20 | A.   No. |
| 10:56 | 21 | Q.   Now, you've told us that there was a court order in |
| 10:56 | 22 | place that said that a representative was supposed to have |
| 10:56 | 23 | an opportunity to be there when either side took microplugs, |
| 10:56 | 24 | correct? |
| 10:56 | 25 | A.   Correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 92 of 127   Page ID
#:305101
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

92

| | | |
|---|---|---|
| 10:56 | 1 | Q.   And did you have the Court's or MGA's permission to |
| 10:56 | 2 | take those four microplugs ten days later outside the |
| 10:56 | 3 | presence of an MGA observer? |
| 10:56 | 4 | A.   No, I did not. |
| 10:56 | 5 | Q.   Did you ask or notify Mattel's counsel that you planned |
| 10:56 | 6 | to take four more microplugs? |
| 10:56 | 7 | A.   No. |
| 10:56 | 8 | Q.   So why did you take these four additional microplugs |
| 10:56 | 9 | ten days later? |
| 10:56 | 10 | A.   By that time, I received an important results -- |
| 10:56 | 11 | result -- that showed that the ink in the -- in this area -- |
| 10:56 | 12 | (Indicating) -- No. 8 is different from any other ink there |
| 10:57 | 13 | is that I had analyzed by that day.  And I wanted to do a |
| 10:57 | 14 | confirmatory test.  I wanted to do another test, and to -- |
| 10:57 | 15 | to take another four plugs, four microplugs from the areas |
| 10:57 | 16 | of the ink that contained more ink.  So I needed to, um, to |
| 10:57 | 17 | do this confirmatory test to confirm the results that I had |
| 10:57 | 18 | obtained. |
| 10:57 | 19 | THE COURT:  Counsel, he's pointing with a pointer |
| 10:57 | 20 | and the record doesn't indicate where. |
| 10:57 | 21 | MR. QUINN:  Yes. |
| 10:57 | 22 | THE WITNESS:  And it's clear where I took the four |
| 10:57 | 23 | additional plugs from ten days later. |
| 11:59 | 24 | BY MR. QUINN: |
| 10:57 | 25 | Q.   You took the four additional plugs from the area |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 93 of 127   Page ID #:305102
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

93

| | | |
|---|---|---|
| 10:57 | 1 | circled "8" on Exhibit 23496; is that correct? |
| 10:57 | 2 | A.   That's correct. |
| 10:57 | 3 | Q.   And that's where it says, "From 1998 Missouri"? |
| 10:58 | 4 | A.   Yes. |
| 10:58 | 5 | Q.   Why did you not call anyone or seek permission before |
| 10:58 | 6 | taking these four additional plugs? |
| 10:58 | 7 | A.   I thought that -- I needed to do this confirmatory test |
| 10:58 | 8 | as close in time -- in as close proximity in time to the |
| 10:58 | 9 | previous two tests. |
| 10:58 | 10 | Q.   Why did that matter:  The proximity in time? |
| 10:58 | 11 | A.   There are more than one reasons for that.  But I would |
| 10:58 | 12 | say that the performance of the GC-MS machine can never be |
| 10:58 | 13 | stable.  In other words, it is stable, but depending on |
| 10:58 | 14 | the -- depending on the type of material that I analyze, the |
| 10:59 | 15 | performance of the machine might slightly change.  That |
| 10:59 | 16 | would require for me to do an additional maintenance.  And |
| 10:59 | 17 | any maintenance might require for me to decrease the length |
| 10:59 | 18 | of the column. |
| 10:59 | 19 | We haven't discussed it yet, but one of the major part |
| 10:59 | 20 | of the GC-MS machine is a column, chromatographic column, |
| 10:59 | 21 | which is like 100 feet long. |
| 10:59 | 22 | But during the -- when the machine is used, after some |
| 10:59 | 23 | time, it might -- the column might be -- might show some |
| 10:59 | 24 | indications that the initial portion of the column contains |
| 10:59 | 25 | some residue from the substances that I injected in the |

| | | |
|---|---|---|
| 10:59 | 1 | chromatograph.  And I would need to remove that part of the |
| 10:59 | 2 | column. |
| 10:59 | 3 | When I will do that, then the resulting chromatogram |
| 11:00 | 4 | might -- the peaks would shift a little bit because the |
| 11:00 | 5 | length of the column is one of the parameters which is very |
| 11:00 | 6 | important for the analysis.  So, in other words, what is -- |
| 11:00 | 7 | generally, what I -- what I do is I always try to do the |
| 11:00 | 8 | analysis in -- as close to the -- if I do a set of analysis, |
| 11:00 | 9 | like in this case, I have 17 sets of -- that I took from the |
| 11:00 | 10 | document.  I wanted to analyze them as one set.  And if I |
| 11:00 | 11 | needed to do repetitive measurements, I also wanted these |
| 11:00 | 12 | repetitive measurements to be included into that set of the |
| 11:00 | 13 | analysis that I did. |
| 11:00 | 14 | At that time, I had two other cases in January of 2008. |
| 11:00 | 15 | And I needed to complete those two other cases.  If I wait, |
| 11:00 | 16 | I would have to analyze the samples from other cases, and |
| 11:00 | 17 | then I would mixed the samples.  And I simply didn't want to |
| 11:01 | 18 | do it. |
| 11:01 | 19 | I never start a new case before I completed the |
| 11:01 | 20 | previous one. |
| 11:01 | 21 | Q.  Why is that?  Are you saying you like to do one case at |
| 11:01 | 22 | a time using the -- this machine -- what's it called again? |
| 11:01 | 23 | A.  A GC-MS machine. |
| 11:01 | 24 | Q.  All right.  You like to do one case at a time and |
| 11:01 | 25 | complete your work with the machine one at a time? |

| 11:01 | 1 | A. Yes. That's a -- that's a good practice: To do one |
|---|---|---|
| 11:01 | 2 | type of examination, and then to start another one. Because |
| 11:01 | 3 | we never know what kind of samples will be in the next case. |
| 11:01 | 4 | Q. And you had two other cases to work on. And you were |
| 11:01 | 5 | concerned that if you ran those cases before you finished |
| 11:01 | 6 | with the confirmatory plugs here, that there might be some |
| 11:01 | 7 | potential risk of affecting the measurements; is that |
| 11:01 | 8 | correct? |
| 11:01 | 9 | A. Yes. The worst case scenario would be that I will have |
| 11:01 | 10 | to redo all the analysis that I have -- had done for that -- |
| 11:02 | 11 | in this case. So if, let's say I did -- out of 17, I |
| 11:02 | 12 | analyzed the first eight. And if I then started analyzing |
| 11:02 | 13 | other samples from another case, and I will then have to do |
| 11:02 | 14 | some maintenance to the machine. Then it might be that I |
| 11:02 | 15 | will have to redo the previous eight that I had already |
| 11:02 | 16 | analyzed, which -- which is not good. |
| 11:02 | 17 | Q. So you wanted to, while the machine was stable and you |
| 11:02 | 18 | were analyzing this one set of plugs -- ink from this one |
| 11:02 | 19 | notary book -- you wanted to complete that all at once, |
| 11:02 | 20 | correct? |
| 11:02 | 21 | A. That's correct. |
| 11:02 | 22 | Q. And was there another reason why you didn't think, |
| 11:02 | 23 | "Boy, I better get this observer here for these final four |
| 11:02 | 24 | plugs I'm gonna pull"? |
| 11:03 | 25 | A. I thought at that time that -- that I had already taken |

DEBBIE GALE, U.S. COURT REPORTER

| 11:03 | 1 | more than 160 microplugs in the presence of the observer, |
| 11:03 | 2 | and I thought that just four additional plugs may not be a |
| 11:03 | 3 | big deal. |
| 11:03 | 4 | Q.   And when you had taken those 160 plugs back on |
| 11:03 | 5 | January 4th, ten days before, the observer hadn't been |
| 11:03 | 6 | involved in the process at all? |
| 11:03 | 7 | A.   No. |
| 11:03 | 8 | Q.   And you said the observer sat some number of yards away |
| 11:03 | 9 | from you, was not at the table where you were doing the |
| 11:03 | 10 | work? |
| 11:03 | 11 | A.   That's correct. |
| 11:03 | 12 | Q.   At the time you did this, were you thinking -- you've |
| 11:03 | 13 | told us there was a court order that you knew about that |
| 11:03 | 14 | said, you know, each side was supposed to have an |
| 11:03 | 15 | opportunity to have an observer there, right? |
| 11:03 | 16 | A.   Yes. |
| 11:03 | 17 | Q.   And were you thinking about that at the time that you |
| 11:03 | 18 | pulled these four additional plugs? |
| 11:03 | 19 | A.   Yes, I did. |
| 11:03 | 20 | Q.   If you could do it over again, would you have done it |
| 11:04 | 21 | differently? |
| 11:04 | 22 | A.   Yes, of course.  I now realize that I should have -- |
| 11:04 | 23 | should have handled the situation better. |
| 11:04 | 24 | Q.   And, by the way, do you know whether -- you mentioned |
| 11:04 | 25 | the name of Erich -- of Speckin Laboratory? |

CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

97

| | | |
|---|---|---|
| 11:04 | 1 | A.    Yes. |
| 11:04 | 2 | Q.    You mentioned that name? |
| 11:04 | 3 | A.    Yes. |
| 11:04 | 4 | Q.    And you're aware that Erich Speckin is a question |
| 11:04 | 5 | document examiner expert who's been retained by MGA?  You're |
| 11:04 | 6 | aware of that? |
| 11:04 | 7 | A.    Yes. |
| 11:04 | 8 | Q.    And you're aware that -- |
| 11:04 | 9 |         MS. HURST:  Objection, Your Honor.  Improper |
| 11:04 | 10 | rebuttal. |
| 11:04 | 11 |         THE COURT:  I'm not sure where this is going. |
| 11:04 | 12 |         Continue on.  Ask your question. |
| 11:04 | 13 |         MR. QUINN:  All right. |
| 11:04 | 14 | BY MR. QUINN: |
| 11:04 | 15 | Q.    Are you aware whether or not Mr. Speckin took some |
| 11:04 | 16 | plugs from some drawings before Mattel or you ever learned |
| 11:04 | 17 | about that? |
| 11:04 | 18 |         MS. HURST:  Objection.  Irrelevant. |
| 11:04 | 19 |         THE COURT:  Sustained. |
| | 20 | BY MR. QUINN: |
| 11:05 | 21 | Q.    Are you aware that -- |
| 11:05 | 22 |         THE COURT:  He'll be testifying; is that correct, |
| 11:05 | 23 | counsel? |
| 11:05 | 24 |         MS. HURST:  Pardon? |
| 11:05 | 25 |         THE COURT:  Your expert, Speckin? |

| | | |
|---|---|---|
| 11:05 | 1 | MS. HURST:  No, no. |
| 11:05 | 2 | THE COURT:  Well, wait. |
| 11:05 | 3 | Go back to it. |
| 11:05 | 4 | MR. QUINN:  All right. |
| 11:05 | 5 | BY MR. QUINN: |
| 11:05 | 6 | Q.   You have seen some plugs, microplug holes, taken out of |
| 11:05 | 7 | some original Bratz drawings? |
| 11:05 | 8 | MS. HURST:  Objection -- |
| 11:05 | 9 | THE WITNESS:  Yes. |
| 11:05 | 10 | MS. HURST:  -- irrelevant to this witness's |
| 11:05 | 11 | opinions. |
| 11:05 | 12 | THE COURT:  Unless he relied upon it for his |
| 11:05 | 13 | opinion, it's irrelevant. |
| 11:05 | 14 | BY MR. QUINN: |
| 11:05 | 15 | Q.   All right.  Let's talk about the TLC testing. |
| 11:05 | 16 | Which areas of the notary book indicated on |
| 11:05 | 17 | Exhibit 23496 did you use -- did you test using the TLC |
| 11:05 | 18 | chemical analysis method? |
| 11:05 | 19 | A.   All of them.  All the areas that are circled and |
| 11:05 | 20 | numbered. |
| 11:05 | 21 | Q.   And what, if anything, did you observe from the TLC |
| 11:05 | 22 | test? |
| 11:05 | 23 | A.   I determined that the inks that I took from these 17 |
| 11:06 | 24 | areas that I circled and numbered on the document, none of |
| 11:06 | 25 | them contains any extractible components that can be |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 99 of 127   Page ID #:305108
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

99

| | | |
|---|---|---|
| 11:06 | 1 | analyzed by TLC.  So most probably the -- this ink contains |
| 11:06 | 2 | a pigment that is not extractible, and it's probably a |
| 11:06 | 3 | carbon black. |
| 11:06 | 4 | Q.   What is "carbon black"?  That's the second time you've |
| 11:06 | 5 | mentioned that. |
| 11:06 | 6 | A.   It's an inorganic pigment that is widely used for |
| 11:06 | 7 | manufacturing black -- black writing instrument, black inks, |
| 11:06 | 8 | and in many other areas of human activity. |
| 11:06 | 9 | Q.   Based on the TLC analysis alone, were you able to |
| 11:06 | 10 | distinguish between any of the inks on these two pages of |
| 11:06 | 11 | the notary book? |
| 11:06 | 12 | A.   No. |
| 11:06 | 13 | Q.   Could you turn, please, to Exhibit 23962-6. |
| 11:07 | 14 | *(Document displayed.)* |
| 11:07 | 15 | BY MR. QUINN: |
| 11:07 | 16 | Q.   And can you tell us what's portrayed here? |
| 11:07 | 17 | A.   This is illustration of the GC-MS process.  I mentioned |
| 11:07 | 18 | already the column.  The column is approximately 100 feet, |
| 11:07 | 19 | and each loop is approximately one foot.  So the sample, |
| 11:07 | 20 | what we discussed earlier, when the microplug of ink and |
| 11:07 | 21 | paper is extracted, then the extract is injected into this |
| 11:07 | 22 | injector.  And the injector has a very high temperature |
| 11:07 | 23 | inside.  Due to this temperature, the components that were |
| 11:08 | 24 | extracted, they -- they become -- they become volatile, so |
| 11:08 | 25 | like vapors. |

100

| | | |
|---|---|---|
| 11:08 | 1 | And then the compressed helium pushes these vapors |
| 11:08 | 2 | through the column.  And all these components, they travel |
| 11:08 | 3 | through the column; and when they are traveling through the |
| 11:08 | 4 | column, they separate due to some physical and chemical |
| 11:08 | 5 | differences in the -- due to differences in their chemical |
| 11:08 | 6 | structures.  And the result of that -- so let's say -- here, |
| 11:08 | 7 | we can see five peaks.  *(Indicating.)* |
| 11:08 | 8 | That -- these five peaks represent five components that |
| 11:08 | 9 | were injected in the -- into the injector.  And when they |
| 11:09 | 10 | travel through the column, they have separated into -- into |
| 11:09 | 11 | individual zones, and each zone is represented as a peak by |
| 11:09 | 12 | the detector.  The detector, Mass Spectrometer, detected |
| 11:09 | 13 | them, and we can see the result.  And this is the result. |
| 11:09 | 14 | *(Indicating.)* It's called "GC-MS chromatogram." |
| 11:09 | 15 | So on the GC-MS chromatogram, each peak represent a |
| 11:09 | 16 | particular chemical substance that was separated during this |
| 11:09 | 17 | chromatographic process. |
| 11:09 | 18 | Q.   So, basically, this process separates out components in |
| 11:09 | 19 | the ink? |
| 11:09 | 20 | A.   Yes, components of an ink or paper.  Because we -- it's |
| 11:09 | 21 | a microplug of ink and paper, so we have a mixture of both. |
| 11:09 | 22 | Q.   So if we could turn back to 23496-1 and -2. |
| 11:10 | 23 | MR. QUINN:  If we can put both of those back up |
| 11:10 | 24 | here. |
| 11:10 | 25 | *(Documents displayed.)* |

| | | |
|---|---|---|
| 11:10 | 1 | BY MR. QUINN: |
| 11:10 | 2 | Q.   Which of the circled areas, here in the notary book, |
| 11:10 | 3 | did you test using this GC-MS process, which you just |
| 11:10 | 4 | described? |
| 11:10 | 5 | A.   I -- analyzed all the circled area -- all the 17, and |
| 11:10 | 6 | also the paper blanks. |
| 11:10 | 7 | Q.   And how many GC-MS tests did you run from plugs in each |
| 11:10 | 8 | area indicated there on Exhibit 23496? |
| 11:10 | 9 | A.   It was either one -- either one run, or two or three. |
| 11:10 | 10 | Q.   So you tested each area in some cases multiple times? |
| 11:10 | 11 | A.   Yes.  And two areas were tested multiple times. |
| 11:10 | 12 | Q.   Which were those areas? |
| 11:10 | 13 | A.   The Area No. 4, I tested using GC-MS two times.  And |
| 11:10 | 14 | Area No. 8 that contains the questioned notation, I tested |
| 11:11 | 15 | three times:  Initially two, plus another confirmatory test |
| 11:11 | 16 | that we just discussed. |
| 11:11 | 17 | Q.   Those were the four plugs that you pulled ten days |
| 11:11 | 18 | later? |
| 11:11 | 19 | A.   Yes. |
| 11:11 | 20 | Q.   Did you keep records of each of the GC-MS tests that |
| 11:11 | 21 | you conducted? |
| 11:11 | 22 | A.   Yes. |
| 11:11 | 23 | Q.   And what were those records that you kept? |
| 11:11 | 24 | A.   They were two types of records.  One is my handwritten |
| 11:11 | 25 | notes.  It's working notes.  And the other is the GC-MS |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 102 of 127   Page ID #:305111
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

102

| 11:11 | 1 | chromatograms. |

11:11   1   chromatograms.

11:11   2   Q.   The chromatogram, that's what we saw the printout at

11:11   3   the end, with the peaks that you're referring to?

11:11   4   A.   Yes.

11:11   5   Q.   If we could look, please, at Exhibit 4600.  And I'll

11:11   6   ask you what that is.

11:11   7        *(Document provided to the witness.)*

11:12   8        THE WITNESS:  This is a copy of my working notes.

11:12   9        MR. QUINN:  Offer 4600, Your Honor.

11:12  10        MS. HURST:  Hearsay.

11:12  11        THE COURT:  Just a moment.

11:12  12        4600.  Can one of you bring that to me.  Are these

11:12  13   his notes?

11:12  14        MR. QUINN:  His notes, yes.

11:12  15        THE COURT:  Counsel, aren't these hearsay?

11:12  16        MR. QUINN:  No.  They're his notes of what he did

11:12  17   contemporaneously.  They're his records.

11:12  18        THE COURT:  Counsel?

11:12  19        MS. HURST:  That makes them hearsay, Your Honor.

11:12  20   They're being offered for the truth of what he did.  He's

11:12  21   here.  He can testify to that.  If he needs his notes to

11:12  22   refresh he can look at them, but that doesn't make 'em

11:12  23   admissible.

11:13  24        THE COURT:  Technically, they're hearsay, Counsel.

11:13  25        Counsel?

| | | |
|---|---|---|
| 11:13 | 1 | MR. QUINN:  I mean, they're offered as a record of |
| 11:13 | 2 | what he did, Your Honor.  And he can testify about them. |
| 11:13 | 3 | THE COURT:  Not for the truth? |
| 11:13 | 4 | MR. QUINN:  Not for the truth. |
| 11:13 | 5 | THE COURT:  Just to establish that he undertook |
| 11:13 | 6 | this -- |
| 11:13 | 7 | MR. QUINN:  These are the things that he did. |
| 11:13 | 8 | These are the contemporaneous records that he made. |
| 11:13 | 9 | THE COURT:  We can take that up over the lunch |
| 11:13 | 10 | hour.  But, in all likelihood, I'll allow them in for a |
| 11:13 | 11 | limited purpose, and that is, just so you can see that he |
| 11:13 | 12 | took notes and what the depth of his analysis was, but not |
| 11:13 | 13 | for the truth.  I don't think you can read 'em anyway.  I'm |
| 11:13 | 14 | just kidding you. |
| 11:13 | 15 | We'll take that up over the lunchtime. |
| 11:13 | 16 | MR. QUINN:  Okay.  Your Honor, may I display them? |
| 11:13 | 17 | THE COURT:  You may proceed with questions. |
| 11:13 | 18 | MR. QUINN:  May I display the notes, Your Honor? |
| 11:13 | 19 | THE COURT:  Yes. |
| 11:13 | 20 | MS. HURST:  Your Honor, I object to the display of |
| 11:13 | 21 | the notes.  If they're being offered as a record of what he |
| 11:13 | 22 | did, they're being offered for the truth of the matter |
| 11:13 | 23 | asserted. |
| 11:13 | 24 | THE COURT:  Well, I need to do a little research. |
| 11:13 | 25 | Sometimes police reports are allowed in, in civil cases |

| | | |
|---|---|---|
| 11:13 | 1 | literally, and it's hearsay.  So I've got to do research on |
| 11:13 | 2 | that.  And that catches me a little offguard, frankly.  So |
| 11:14 | 3 | I'll admit that to counsel. |
| 11:14 | 4 | So do we stop here and send the jury to lunch over |
| 11:14 | 5 | this critical question? |
| 11:14 | 6 | MR. QUINN:  I don't think we need to stop here. |
| 11:14 | 7 | Let me ask him some foundation -- |
| 11:14 | 8 | THE COURT:  I'll do a little research over lunch, |
| 11:14 | 9 | Counsel. |
| 11:14 | 10 | MR. QUINN:  Business records, Your Honor?  Let me |
| 11:14 | 11 | take -- |
| 11:14 | 12 | THE COURT:  Let me do research over lunch.  Okay? |
| 11:14 | 13 | MR. QUINN:  All right. |
| 11:14 | 14 | THE COURT:  Now, I can send the jury to lunch |
| 11:14 | 15 | right now. |
| 11:14 | 16 | MS. HURST:  He can describe what he did. |
| 11:14 | 17 | THE COURT:  Well, thank you very much, Counsel. |
| 11:14 | 18 | MR. QUINN:  The Court would prefer I not proceed |
| 11:14 | 19 | with attempting to lay a foundation? |
| 11:14 | 20 | THE COURT:  Well, I just -- I don't know the |
| 11:14 | 21 | answer to that without doing some research.  I know police |
| 11:14 | 22 | reports oftentimes, believe it or not, in civil cases are |
| 11:14 | 23 | admitted.  They're not hearsay. |
| 11:14 | 24 | So I've got to go back and look at some case law. |
| 11:14 | 25 | MR. QUINN:  Your Honor -- |

| | | |
|---|---|---|
| 11:14 | 1 | THE COURT:  So if this is an inconvenient place, |
| 11:14 | 2 | and you can't go on -- |
| 11:14 | 3 | MR. QUINN:  No.  I can go on, Your Honor.  What |
| 11:14 | 4 | I'm asking is can I ask foundation questions without -- |
| 11:14 | 5 | THE COURT:  Certainly. |
| 11:14 | 6 | MR. QUINN:  -- showing it to the jury? |
| 11:14 | 7 | THE COURT:  Certainly. |
| 11:14 | 8 | MR. QUINN:  All right. |
| 11:14 | 9 | THE COURT:  Certainly. |
| 11:14 | 10 | BY MR. QUINN: |
| 11:14 | 11 | Q.   So, Mr. Aginsky, Exhibit 4600, is this a record that |
| 11:14 | 12 | you created this in the ordinary course of your business, as |
| 11:15 | 13 | a question document examiner? |
| 11:15 | 14 | A.   Yes.  This is what I typically do.  I -- |
| 11:15 | 15 | Q.   Don't go beyond.  Let me just ask the questions. |
| 11:15 | 16 | And is it part of your practice to maintain records |
| 11:15 | 17 | like this? |
| 11:15 | 18 | A.   Yes, of course. |
| 11:15 | 19 | Q.   And do you make records like this, um, so that you can |
| 11:15 | 20 | rely on them in the course of your business and refer back |
| 11:15 | 21 | to them? |
| 11:15 | 22 | A.   Yes. |
| 11:15 | 23 | Q.   And do you rely on the truth and accuracy of the |
| 11:15 | 24 | notations that you make in records like this? |
| 11:15 | 25 | A.   Of course. |

11:15   1   Q.   And you maintain/retain these records in the ordinary

11:15   2   course of business?

11:15   3   A.   Yes.

11:15   4        MR. QUINN:  All right.  I offer them as a business

11:15   5   record, Your Honor.

11:15   6        THE COURT:  Not at this time.  Not until I do the

11:15   7   research.

11:15   8        MR. QUINN:  All right.

11:15   9        THE COURT:  My apologies, ladies and gentlemen.

11:15   10  That's my fault, totally my responsibility.  I wasn't quite

11:15   11  certain that objection would be made.  So it's not counsel's

11:15   12  responsibility for this inconvenience -- counsel for either

11:15   13  party.

11:15   14  BY MR. QUINN:

11:16   15  Q.   I take it, Mr. Aginsky, that, without looking at this,

11:16   16  you do not have any specific -- without looking at this, you

11:16   17  do not have any specific recollection of the sequence in

11:16   18  which you ran these tests on these areas, the numbered areas

11:16   19  in the exhibit that we've looked at?

11:16   20        THE COURT:  Just a moment.  Counsel, he can look

11:16   21  at his notes.  He can refresh his recollection.  It's just

11:16   22  the notes coming into evidence, that's all.

11:16   23        MR. QUINN:  I'm trying to lay a foundation:  Past

11:16   24  recollection recorded, Your Honor.

11:16   25        THE COURT:  Counsel, they're not coming in until I

| 11:16 | 1 | do research. |
|---|---|---|

11:16  1    do research.

11:16  2              MR. QUINN:  All right.

11:16  3              THE COURT:  I don't want you wasting the time.

11:16  4              MR. QUINN:  All right.

11:16  5              THE COURT:  I can send the jury to lunch.  I don't

11:16  6    want to take any time off your clock.  And you can question

11:16  7    him about his notes.  You can question him about the

11:16  8    sequence.  It's only a matter of whether they come into

11:16  9    evidence or not.

11:16  10             MR. QUINN:  I will question him without the notes

11:16  11   at this point.

11:16  12             THE COURT:  Are you sure?

11:16  13             MR. QUINN:  Yes.

11:16  14             THE COURT:  Okay.  Next question, then.

11:17  15             *(Ms. Hurst and Mr. Quinn confer.)*

11:17  16             THE COURT:  Now, stop the clock running for a

11:17  17   minute.  Don't run this against Mattel.  Just stop.

11:17  18   BY MR. QUINN:

11:17  19   Q.   So let me just ask you --

11:17  20             THE COURT:  Start it again.

11:17  21             MS. HURST:  That was brief.

11:59  22   BY MR. QUINN:

11:17  23   Q.   You did keep records of each of the tests that you ran,

11:17  24   these GC-MS tests on each of these plugs?

11:17  25   A.   Yes.

| | | |
|---|---|---|
| 11:17 | 1 | Q.   And you kept -- you made those records at the time that |
| 11:17 | 2 | you did them? |
| 11:17 | 3 | A.   Yes. |
| 11:17 | 4 | Q.   And you can tell from your notes which area of the |
| 11:17 | 5 | notary book corresponds to each plug; is that right? |
| 11:17 | 6 | A.   Yes.  There's a clear connection between the notes and |
| 11:17 | 7 | the results. |
| 11:17 | 8 | Q.   Okay. |
| 11:17 | 9 | THE COURT:  Ladies and gentlemen, you understand |
| 11:17 | 10 | that he can refresh his recollection.  He can look down at |
| 11:17 | 11 | his notes. He can testify.  It's just whether these actual |
| 11:18 | 12 | notes are coming before you.  That will just take me the |
| 11:18 | 13 | lunch hour.  That's all. |
| 11:18 | 14 | Okay.  Counsel. |
| 11:18 | 15 | Counsel will be happy to join me at the lunch |
| 11:18 | 16 | hour. |
| 11:18 | 17 | MR. QUINN:  Yes, Your Honor.  I'm accustomed to |
| 11:18 | 18 | that. |
| 09:16 | 19 | BY MR. QUINN: |
| 11:18 | 20 | Q.   So if we could take -- what is a "chromatogram"? |
| 11:18 | 21 | You've used that term. |
| 11:18 | 22 | A.   It is a -- it is like responsive printout from the |
| 11:18 | 23 | GC-MS machine that shows the amount of compounds that were |
| 11:18 | 24 | separated by the -- during the chromatographic process.  And |
| 11:18 | 25 | each compound is represented by a peak on the chromatogram. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 109 of 127   Page ID #:305118
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

109

| | | |
|---|---|---|
| 11:18 | 1 | Q.   If you'd look, please, at Exhibit 4598.  My question to |
| 11:19 | 2 | you will be, can you identify this document, please. |
| 11:19 | 3 | *(Document provided to the witness.)* |
| 11:19 | 4 | THE WITNESS:  Yes, yes.  That's -- these are all |
| 11:19 | 5 | my GC-MS chromatograms in this exhibit that I obtained when |
| 11:19 | 6 | I -- when examining the notary book. |
| 11:00 | 7 | BY MR. QUINN: |
| 11:19 | 8 | Q.   So are these printouts from that machine that we -- |
| 11:19 | 9 | that you described to us? |
| 11:19 | 10 | A.   Yes. |
| 11:19 | 11 | MR. QUINN:  We'd offer Exhibit 4598, Your Honor. |
| 11:19 | 12 | THE COURT:  Received. |
| 11:19 | 13 | *(Exhibit No. 4598 received in evidence.)* |
| 11:19 | 14 | MR. QUINN:  If we could put up 4598-1. |
| 11:19 | 15 | *(Document displayed.)* |
| 11:19 | 16 | BY MR. QUINN: |
| 11:19 | 17 | Q.   So this is one of -- dash 1 shows two of those peaks |
| 11:19 | 18 | that you're referring to, the printouts? |
| 11:19 | 19 | A.   *(No response.)* |
| 11:19 | 20 | Q.   This is an example of one of the chromatograms? |
| 11:20 | 21 | A.   Yes.  But we are looking at the upper portion only. |
| 11:20 | 22 | Q.   All right.  So let's turn to -- which, if any, of these |
| 11:20 | 23 | chromatograms in Exhibit 4598 represents your result from |
| 11:20 | 24 | the test of Area 14? |
| 11:20 | 25 | A.   Area 14, that was my first analysis that I did.  I |

| | | |
|---|---|---|
| 11:20 | 1 | started testing the 17 sets of microplugs that I took from |
| 11:20 | 2 | this notary book.  And the first area that I tested by GC-MS |
| 11:20 | 3 | was Area No. 14. |
| 11:20 | 4 | Q.   Could you take a look at page dash 18. |
| 11:20 | 5 | A.   Yes, at this page? |
| 11:20 | 6 | *(Document displayed.)* |
| 11:20 | 7 | BY MR. QUINN: |
| 11:20 | 8 | Q.   Dash 18. |
| 11:20 | 9 | A.   This is the printout from the -- of the GC-MS |
| 11:20 | 10 | chromatogram, and for the ink that I took from Area No. 14. |
| 11:21 | 11 | Q.   All right.  And how do you know that this is the result |
| 11:21 | 12 | of the test from Area 14? |
| 11:21 | 13 | A.   It's very easy to see:  It is in the file name. |
| 11:21 | 14 | Q.   Right up at the top? |
| 11:21 | 15 | A.   Yes.  The first line, the file name that starts with |
| 11:21 | 16 | "C:\" and ends with "14.D." |
| 11:21 | 17 | "D stands for "data," meaning data -- it's a data file |
| 11:21 | 18 | that is acquired by the GC-MS machine.  And also, there is |
| 11:21 | 19 | a -- the file name, the left portion of the file name is |
| 11:21 | 20 | here:  Meaning that -- "14" means that that was the analysis |
| 11:21 | 21 | for Area No. 14. |
| 11:21 | 22 | Q.   All right.  So, can you tell from each of these -- can |
| 11:21 | 23 | you tell us from the information on each of these |
| 11:21 | 24 | chromatograms that's printed out at the top what area from |
| 11:22 | 25 | the notary book that particular chromatogram relates to? |

| 11:22 | 1 | A.   Yes.  It is always -- clearly and unambiguously, this |
| 11:22 | 2 | number related to the number that is of the area.  The areas |
| 11:22 | 3 | were circled and numbered.  And one of the circled and |
| 11:22 | 4 | numbered area was No. 14.  So that's the analysis for that |
| 11:22 | 5 | particular area. |
| 11:22 | 6 | Q.   And can you -- can you tell from the chromatograms in |
| 11:22 | 7 | Exhibit 4598 the order in which the tests were conducted? |
| 11:22 | 8 | A.   Yes.  It's much easier to do if I could use that -- my |
| 11:22 | 9 | working notes. |
| 11:22 | 10 | THE COURT:  Sir, just a moment.  You can refer to |
| 11:22 | 11 | your working notes.  You can look down at them. |
| 11:22 | 12 | Look at them.  See 'em? |
| 11:22 | 13 | Now, what you can't do, though, right now, is put |
| 11:22 | 14 | them into evidence in front of the jury. |
| 11:22 | 15 | And it makes no difference.  Okay?  So look at |
| 11:23 | 16 | your notes. |
| 11:23 | 17 | MR. QUINN:  -- if he needs to, I assume, |
| 11:23 | 18 | Your Honor? |
| 11:23 | 19 | If he can answer -- |
| 11:23 | 20 | THE COURT:  That's fine.  There's no harm to |
| 11:23 | 21 | either party.  I'm just gonna have the lunch hour. |
| 11:23 | 22 | BY MR. QUINN: |
| 11:23 | 23 | Q.   So the question is whether you can tell the order in |
| 11:23 | 24 | which the tests were conducted from these printouts.  And I |
| 11:23 | 25 | think you were telling us how you can do that. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:23 | 1 | A.   Yes.  From the printout, if we look at the Line No. 3, |
| 11:23 | 2 | from top, it's acquired line.  This is what the machine puts |
| 11:23 | 3 | in automatically. |
| 11:23 | 4 | Q.   So that's not something that you type in; the machine |
| 11:23 | 5 | puts that in automatically? |
| 11:23 | 6 | A.   No.  No, that's -- the machine shows that -- this |
| 11:23 | 7 | particular analysis, when I started the first analysis in |
| 11:23 | 8 | this case -- first GC-MS analysis -- was on the 12th of |
| 11:23 | 9 | January of 2008.  And the -- I injected the -- the extract |
| 11:23 | 10 | that I took from Area No. 14 at this particular time, |
| 11:23 | 11 | "20:56," which is almost like 9:00 p.m. |
| 11:24 | 12 | MR. QUINN:  Your Honor, maybe now we ought to |
| 11:24 | 13 | break? |
| 11:24 | 14 | THE COURT:  This would be a good time to go to |
| 11:24 | 15 | lunch. |
| 11:24 | 16 | Ladies and gentlemen, I'm going to send you early. |
| 11:24 | 17 | That way we're not wasting time.  My apologies to you. |
| 11:24 | 18 | That's completely my responsibility and my fault.  Neither |
| 11:24 | 19 | Mattel or MGA are responsible for this. |
| 11:24 | 20 | Could we just meet back at 12:30?  Would that be |
| 11:24 | 21 | acceptable? |
| 11:24 | 22 | Okay.  Have a nice lunch. |
| 11:24 | 23 | Please, don't discuss this matter nor form any |
| 11:24 | 24 | opinion or express anything concerning this case. |
| 11:24 | 25 | *(Jury recesses for lunch at 11:24 a.m.)* |

CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

113

| | | |
|---|---|---|
| 11:24 | 1 | THE COURT: Counsel, if you would have a seat. |
| 11:24 | 2 | Sir, if you would have a seat, and remain with us |
| 11:24 | 3 | also for just a moment. |
| 11:24 | 4 | *(Outside the presence of the jury.)* |
| 11:24 | 5 | THE COURT: All right. Part of the confusion is |
| 11:24 | 6 | the easy thing to resolve; and that is, look at 4600-6 and |
| 11:24 | 7 | 4600-7. Those do not appear to necessarily be notes. I |
| 11:25 | 8 | think that's a company of the notary book with notations. |
| 11:25 | 9 | Are you objecting to that on behalf of MGA? Or is |
| 11:25 | 10 | it just up to 1 through 5? |
| 11:25 | 11 | MS. HURST: Just 1 through 5, Your Honor. |
| 11:25 | 12 | THE COURT: 1 through 5. |
| 11:25 | 13 | Not 6 through 7? So those are going to be |
| 11:25 | 14 | received. |
| 11:25 | 15 | *(Exhibit No. 4600-6 received in evidence.)* |
| 11:25 | 16 | *(Exhibit No. 4600-7 received in evidence.)* |
| 11:25 | 17 | THE COURT: Now, if you would remain, I'll be back |
| 11:25 | 18 | as soon as I do my research. |
| 11:25 | 19 | MS. HURST: Your Honor, can I hand up -- |
| 11:25 | 20 | THE COURT: Thank you. |
| 11:25 | 21 | Sir, if you would be kind enough to step down. |
| 11:25 | 22 | *(Witness steps down.)* |
| 11:25 | 23 | *(Pause in the proceedings at 11:25 a.m.)* |
| 11:27 | 24 | *(Proceedings resumed at 11:57 a.m.)* |
| 11:57 | 25 | *(Outside the presence of the jury.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 114 of 127   Page ID #:305123
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

114

| 11:57 | 1 | THE COURT: Okay. Then, we're on the record. All |
|---|---|---|
| 11:57 | 2 | counsel are present. |
| 11:57 | 3 | First, many years ago, I was shocked to learn that |
| 11:58 | 4 | actually police reports are allowed in civil actions |
| 11:58 | 5 | pursuant to 803, subsection 8(c). |
| 11:58 | 6 | But, concerning notes, the Court believes that |
| 11:58 | 7 | they're hearsay. These notes do not come under any business |
| 11:58 | 8 | record exception to the hearsay rule because they were not |
| 11:58 | 9 | created in the regular course of business, but, quote, "If |
| 11:58 | 10 | not in advance of litigation, at least in the midst of |
| 11:58 | 11 | litigation," citing *Clark v. California*, and that comes from |
| 11:58 | 12 | Chuck Breyer up in the Northern District, September 16, |
| 11:58 | 13 | 2010. |
| 11:58 | 14 | The only other remotely applicable exception I |
| 11:58 | 15 | could think of was Rule 803, subsection 1, "present-sense |
| 11:59 | 16 | impression exception," and I'm going to accept arguments |
| 11:59 | 17 | concerning that at the present time. |
| 11:59 | 18 | Mr. Quinn. |
| 11:59 | 19 | MR. QUINN: Your Honor, I don't think it's a |
| 11:59 | 20 | present-sense impression. |
| 11:59 | 21 | THE COURT: I don't either. |
| 11:59 | 22 | MR. QUINN: I think it qualifies under 803 -- and |
| 11:59 | 23 | the Court has -- is not persuaded under 6 it's a business |
| 11:59 | 24 | record. |
| 11:59 | 25 | But 803-5, "recorded recollection," this is |

| | | |
|---|---|---|
| 11:59 | 1 | something that, you know, he couldn't remember now in |
| 11:59 | 2 | detail -- the order in which he ran these tests. |
| 11:59 | 3 | THE COURT:  Okay. |
| 11:59 | 4 | MR. QUINN:  But he would be able to say that, you |
| 11:59 | 5 | know, he did make these notes accurately, contemporaneously |
| 11:59 | 6 | at the time.  And it would have been his practice at this to |
| 11:59 | 7 | make them accurately at the time.  So the bottom line there |
| 11:59 | 8 | is the document doesn't come in; but, if admitted, it may be |
| 11:59 | 9 | read into evidence, but may not, itself, be received as an |
| 11:59 | 10 | exhibit, unless offered by an adverse party. |
| 11:59 | 11 | That's the last sentence of 803-5. |
| 12:00 | 12 | THE COURT:  This is being offered, though. |
| 12:00 | 13 | You've offered the whole document.  And what |
| 12:00 | 14 | confused me were two parts: |
| 12:00 | 15 | First, the last two pages seem to be acceptable. |
| 12:00 | 16 | The first five initially did not, and they got lumped |
| 12:00 | 17 | together in one exhibit. |
| 12:00 | 18 | MR. QUINN:  Right. |
| 12:00 | 19 | THE COURT:  We've resolved that. |
| 12:00 | 20 | MR. QUINN:  We have. |
| 12:00 | 21 | THE COURT:  The next thing you referred me to was |
| 12:00 | 22 | a business record under the *Clark* case.  And I don't believe |
| 12:00 | 23 | it's a business record. |
| 12:00 | 24 | MR. QUINN:  I hear you, Your Honor. |
| 12:00 | 25 | THE COURT:  And I'm trying to find if it's a |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 116 of 127   Page ID #:305125
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

116

| 12:00 | 1 | "sense impression."  You don't think it is. |
| 12:00 | 2 | MR. QUINN:  I don't think it is. |
| 12:00 | 3 | THE COURT:  I'll go back and do some more |
| 12:00 | 4 | recollection, then. |
| 12:00 | 5 | And you think it comes in under "recorded |
| 12:00 | 6 | recollection." |
| 12:00 | 7 | MR. QUINN:  803-5. |
| 12:00 | 8 | THE COURT:  Now, is it the document coming into |
| 12:00 | 9 | evidence or the ability to read portions of that document |
| 12:00 | 10 | into evidence? |
| 12:00 | 11 | There's a big difference.  Because, so far, you've |
| 12:00 | 12 | asked for the whole document to be received. |
| 12:00 | 13 | MR. QUINN:  Right.  What that last sentence |
| 12:00 | 14 | says -- of that section, says, "If admitted, the memorandum |
| 12:00 | 15 | of record may be read into evidence but may not itself be |
| 12:01 | 16 | received." |
| 12:01 | 17 | So the rule seems to suggest that it gets |
| 12:01 | 18 | admitted, but not like an exhibit is usually admitted, and |
| 12:01 | 19 | received, itself, into evidence, but may be read into |
| 12:01 | 20 | evidence, which I guess we have to -- |
| 12:01 | 21 | THE COURT:  I have to go do some more research. |
| 12:01 | 22 | MR. QUINN:  It says it gets read in if qualifies. |
| 12:01 | 23 | The logic of that escapes me. |
| 12:01 | 24 | THE COURT:  All right. |
| 12:01 | 25 | Ms. Hurst. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 117 of 127   Page ID #:305126
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

117

| | | |
|---|---|---|
| 12:01 | 1 | MS. HURST:  Your Honor, I think it confirms the |
| 12:01 | 2 | document should not be admitted.  We've said he can refer to |
| 12:01 | 3 | it if he needs to. |
| 12:01 | 4 | I would note, in addition, that pages 2 through 5 |
| 12:01 | 5 | have nothing to do with the gas chromatograms.  They're not |
| 12:01 | 6 | records of his tests, and so those aren't relevant in any |
| 12:01 | 7 | way to the opinions that he's offering. |
| 12:01 | 8 | And, Your Honor, I would also add we filed a brief |
| 12:01 | 9 | a little while ago on some of the other exhibits being |
| 12:01 | 10 | offered by Dr. Aginsky.  This was the issue I raised last |
| 12:02 | 11 | night. |
| 12:02 | 12 | THE COURT:  You did. |
| 12:02 | 13 | MS. HURST:  Your Honor, under 703, the second |
| 12:02 | 14 | sentence says you can't use expert's hearsay -- you know, |
| 12:02 | 15 | bases that can be relied on under 703.  You can't publish |
| 12:02 | 16 | those to prove a fact.  It's presumptively hearsay and |
| 12:02 | 17 | cannot be published to prove a fact. |
| 12:02 | 18 | And, Your Honor, in the Ninth Circuit there's a |
| 12:02 | 19 | case, *Turner v. Burlington Northern,* 338 F.3d 1058. |
| 12:02 | 20 | THE COURT:  Just a moment. |
| 12:02 | 21 | What's the cite? |
| 12:02 | 22 | MS. HURST:  It's 338 F.3d 1058. |
| 12:02 | 23 | THE COURT:  I'll go back in chambers and read it. |
| 12:02 | 24 | MS. HURST:  In that case, there's an arson report |
| 12:02 | 25 | and the expert tries to rely on a third-party report |

| | | |
|---|---|---|
| 12:02 | 1 | regarding the presence of gasoline.  It's almost directly on |
| 12:02 | 2 | point, Your Honor.  The court confirms that the presumption |
| 12:02 | 3 | in the second sentence was properly applied in that case to |
| 12:02 | 4 | exclude what is effectively unexamined hearsay factual |
| 12:03 | 5 | evidence. |
| 12:03 | 6 | THE COURT:  All right.  Now -- |
| 12:03 | 7 | MR. QUINN:  Your Honor, if I can address that |
| 12:03 | 8 | case. |
| 12:03 | 9 | That's a case where the investigator took some |
| 12:03 | 10 | debris from the site of a fire, sent it to a third-party |
| 12:03 | 11 | lab, got back a report saying in the debris there was some |
| 12:03 | 12 | petroleum residue which was consistent with gasoline; and |
| 12:03 | 13 | based solely on that, wanted to get on the stand and opine |
| 12:03 | 14 | that this was arson.  In other words, the person on the |
| 12:03 | 15 | stand did no work at all.  He was relying on something |
| 12:03 | 16 | somebody else did. |
| 12:03 | 17 | That's really not the situation here at all.  This |
| 12:03 | 18 | man did do some work.  He's relying on the very same types |
| 12:03 | 19 | of communications that their expert relied on.  You're |
| 12:03 | 20 | gonna -- the Court will learn that there's an issue about |
| 12:03 | 21 | the existence of these menthol-based inks. |
| 12:03 | 22 | Their expert relied on the same kind of |
| 12:03 | 23 | communications with ink manufacturers.  Mr. Aginsky had |
| 12:03 | 24 | communications to determine that there were such ink -- you |
| 12:04 | 25 | know, and this is the type of thing -- he communicated with |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 119 of 127   Page ID #:305128
CV 04-9049 DOC - 2/24/2011 - Day 23, Volume 1 of 3

119

| | | |
|---|---|---|
| 12:04 | 1 | manufacturers.  This is reliable.  They have no -- these are |
| 12:04 | 2 | third parties who have no reason to distort the information |
| 12:04 | 3 | they're providing about whether there's menthol in their |
| 12:04 | 4 | ink, and when it was available. |
| 12:04 | 5 | There's just -- you know, they have no bias or no |
| 12:04 | 6 | skin in the game here.  So to -- this is the kind of |
| 12:04 | 7 | thing -- it is probative, and there's no reason to question |
| 12:04 | 8 | the reliability of it. |
| 12:04 | 9 | I mean, he has -- he's given his opinion.  He's |
| 12:04 | 10 | done his work.  This is the type of -- you know, if an |
| 12:04 | 11 | expert could no rely on this type of data collection -- |
| 12:04 | 12 | THE COURT:  Just a moment. |
| 12:04 | 13 | Now we've left the notes. |
| 12:04 | 14 | MR. QUINN:  Yeah. |
| 12:04 | 15 | THE COURT:  Now, we're over into the -- |
| 12:04 | 16 | MR. QUINN:  Yeah.  Ms. Hurst changed the subject. |
| 12:04 | 17 | And I would like to get back to the notes before |
| 12:04 | 18 | we're done but -- if an expert had to come to the stand and |
| 12:04 | 19 | come to court with knowledge of all the details and the |
| 12:04 | 20 | potential permutations and combinations, and couldn't do |
| 12:05 | 21 | research like this by making inquiries out into the real |
| 12:05 | 22 | world as to things like this, then there would be very few |
| 12:05 | 23 | experts that would be ever be able to get up there and |
| 12:05 | 24 | testify. |
| 12:05 | 25 | So -- I mean, I do invite the Court to take a look |

| | | |
|---|---|---|
| 12:05 | 1 | at the case they describe, because that expert relies |
| 12:05 | 2 | completely on work that was done elsewhere. |
| 12:05 | 3 | I think our best case, Your Honor, on past |
| 12:05 | 4 | recollection recorded is *Fortier*, F-O-R-T-I-E-R. |
| 12:05 | 5 | THE COURT:  Okay. |
| 12:05 | 6 | MR. QUINN:  747 F.2d 1324. |
| 12:05 | 7 | THE COURT:  On what?  The proposition concerning |
| 12:05 | 8 | notes? |
| 12:05 | 9 | MR. QUINN:  As to what's an expert witness's past |
| 12:05 | 10 | recollection recorded. |
| 12:05 | 11 | THE COURT:  Okay. |
| 12:05 | 12 | MR. QUINN:  And, Your Honor, we also have a brief |
| 12:05 | 13 | on this issue of what an expert can rely on under Evidence |
| 12:05 | 14 | Rule 703.  If I could bring it up to the Court? |
| 12:06 | 15 | THE COURT:  Is that docketed? |
| 12:06 | 16 | MR. QUINN:  This is not.  We will docket it now. |
| 12:06 | 17 | THE COURT:  Would you docket that? |
| 12:06 | 18 | MR. QUINN:  Yeah. |
| 12:06 | 19 | THE COURT:  So we're operating on a wing and a |
| 12:06 | 20 | prayer right now? |
| 12:06 | 21 | MR. QUINN:  Wing and a prayer. |
| 12:06 | 22 | MS. HURST:  Your Honor, may I respond to |
| 12:06 | 23 | Mr. Quinn's -- |
| 12:06 | 24 | THE COURT:  As long as you like.  My time is |
| 12:06 | 25 | limitless. |

| | | |
|---|---|---|
| 12:06 | 1 | MS. HURST:  Your Honor, it is like the *Turner v.* |
| 12:06 | 2 | *Burlington Northern* case, because what we have here is a |
| 12:06 | 3 | situation where he says he's found menthol, and he's trying |
| 12:06 | 4 | to exclude contamination.  Okay?  The only way he can |
| 12:06 | 5 | exclude contamination is if the fact -- not the opinion -- |
| 12:06 | 6 | the fact of the existence of a pen that could have been used |
| 12:06 | 7 | is proved. |
| 12:06 | 8 | THE COURT:  Now, we're not on the notes any |
| 12:06 | 9 | longer?  We're on the upcoming pen? |
| 12:06 | 10 | MS. HURST:  We're on the upcoming pen.  We're on |
| 12:06 | 11 | the upcoming pen. |
| 12:06 | 12 | So this is a fact.  It's not an opinion.  It's |
| 12:06 | 13 | unexamined hearsay.  It's e-mails to Japanese companies in |
| 12:07 | 14 | Japanese, for God's sake.  They -- he never even obtained |
| 12:07 | 15 | the pen from the company.  This is completely unreliable. |
| 12:07 | 16 | And if they thought it was that important, they |
| 12:07 | 17 | have all the resources in the world; they could have |
| 12:07 | 18 | subpoenaed this. |
| 12:07 | 19 | This guy's been looking for a pen for three years |
| 12:07 | 20 | that matches this description.  And now he's gonna come here |
| 12:07 | 21 | and testify, based on e-mails exchanged with some Japanese |
| 12:07 | 22 | company, without ever having gotten the pen, that it in fact |
| 12:07 | 23 | exists.  That is, under 703, the second sentence, absolutely |
| 12:07 | 24 | impermissible, and that is on point with the *Burlington* |
| 12:07 | 25 | *Northern* case. |

| | | |
|---|---|---|
| 12:07 | 1 | THE COURT:  Mr. Vargas is coming from Japan |
| 12:07 | 2 | anyway. |
| 12:07 | 3 | MR. QUINN:  He can bring a pen with him, |
| 12:07 | 4 | Your Honor. |
| 12:07 | 5 | MS. HURST:  He can bring a pen, Your Honor. |
| 12:07 | 6 | Back to the notes.  They cannot offer them into |
| 12:07 | 7 | evidence. |
| 12:07 | 8 | THE COURT:  Mr. Gordon, are you -- it's always a |
| 12:07 | 9 | pleasure to have you here, sir.  Are you in charge of this |
| 12:07 | 10 | witness? |
| 12:07 | 11 | MR. GORDON:  *(Stands up.)* |
| 12:07 | 12 | THE COURT:  Good.  Go do the research, then. |
| 12:07 | 13 | Right now it's hearsay.  Notes are not coming in. |
| 12:08 | 14 | MS. HURST:  All right. |
| 12:08 | 15 | THE COURT:  Okay.  Now, always welcome to |
| 12:08 | 16 | reconsider it, but not in the next 20 minutes. |
| 12:08 | 17 | MR. GORDON:  We admit the notes are hearsay. |
| 12:08 | 18 | THE COURT:  Just a moment.  No, we don't. |
| 12:08 | 19 | MR. GORDON:  Pardon me? |
| 12:08 | 20 | THE COURT:  You just think under 803-5 that they |
| 12:08 | 21 | come in. |
| 12:08 | 22 | MR. GORDON:  As an exception. |
| 12:08 | 23 | THE COURT:  Unfortunately, I haven't had time to |
| 12:08 | 24 | research that.  I looked at 8.  I looked at all the case law |
| 12:08 | 25 | I can find.  Right now it's hearsay. |

| 12:08 | 1 | MR. GORDON:  Oh, no.  I'm saying we admit it's |
| 12:08 | 2 | hearsay. |
| 12:08 | 3 | THE COURT:  And they're not coming in. |
| 12:08 | 4 | MR. GORDON:  That's what -- you know, that's what |
| 12:08 | 5 | we're fighting about. |
| 12:08 | 6 | THE COURT:  I've done past recollection recorded |
| 12:08 | 7 | now.  I've looked at business records.  I've tried to look, |
| 12:08 | 8 | during the recess, at sense-impression.  And, hopefully in |
| 12:08 | 9 | the next few moments, I'll try to go back and look at |
| 12:08 | 10 | subsection 5, and look at case law on it. |
| 12:08 | 11 | But right now, it's hearsay.  Now, that doesn't |
| 12:08 | 12 | mean they don't come in.  And for the life of me, I don't |
| 12:08 | 13 | see the prejudice right now.  You're able to look at the |
| 12:09 | 14 | notes.  You're able to match them up. |
| 12:09 | 15 | You're pushing. |
| 12:09 | 16 | No.  Not under 5.  Not until I do the research. |
| 12:09 | 17 | Not until I'm certain. |
| 12:09 | 18 | MR. GORDON:  I understand. |
| 12:09 | 19 | MR. QUINN:  I understand, Your Honor. |
| 12:09 | 20 | THE COURT:  But if I'm wrong, or if they can come |
| 12:09 | 21 | in under that -- hopefully, from Mattel's perspective -- |
| 12:09 | 22 | glad to admit them at a later time.  But I don't see any |
| 12:09 | 23 | inability for Mr. Quinn to continue his examination.  The |
| 12:09 | 24 | witness can certainly refer to his notes, if there's any |
| 12:09 | 25 | disagreement. |

Case 2:04-cv-09049-DOC-RNB   Document 10101   Filed 03/01/11   Page 124 of 127   Page ID #:305133
CV 04-9049 DOC – 2/24/2011 – Day 23, Volume 1 of 3

124

| | | |
|---|---|---|
| 12:09 | 1 | And if the notes are called into question in terms |
| 12:09 | 2 | of either authenticity or reliability, we're back with the |
| 12:09 | 3 | same subject. |
| 12:09 | 4 | MR. GORDON:  We understand. |
| 12:09 | 5 | THE COURT:  But that rule applies co-equally. |
| 12:09 | 6 | Co-equally. |
| 12:09 | 7 | MS. HURST:  Thank you, Your Honor. |
| 12:09 | 8 | THE COURT:  Okay.  Now, if you'd like to have |
| 12:09 | 9 | lunch, I'll see you in 20 minutes.  Okay? |
| 12:09 | 10 | MR. QUINN:  Thank you, Your Honor. |
| 12:09 | 11 | THE COURT:  Okay.  Thank you very much. |
| 12:09 | 12 | MR. McCONVILLE:  Your Honor, I see Mr. Marlow |
| 12:09 | 13 | here. |
| 12:09 | 14 | THE COURT:  Mr. Marlow, pleasure to have you here, |
| 12:09 | 15 | sir.  Thank you for responding so quickly. |
| 12:09 | 16 | Now let me talk to you for just a moment.  This is |
| 12:10 | 17 | on the record. |
| 12:10 | 18 | First of all, I deeply appreciate you coming down |
| 12:10 | 19 | here.  I know that you perceive that you have been -- you |
| 12:10 | 20 | know, frustrated, et cetera.  That has nothing to do with |
| 12:10 | 21 | counsel.  That has to do with the Court.  I have |
| 12:10 | 22 | hard-working American women and men, who are serving at less |
| 12:10 | 23 | than $50 a day, at great detriment.  So I appreciate your |
| 12:10 | 24 | attendance. |
| 12:10 | 25 | We will get you on the stand today, but neither |

| 12:10 | 1 | counsel can gauge how long those parties will be here. |

12:10   1   counsel can gauge how long those parties will be here.

12:10   2   Okay?

12:10   3           I'm very pleased that I didn't issue a warrant for

12:10   4   your arrest.  That's to have no chilling effect.  I was

12:10   5   prepared to do so.  I want you to know that.

12:10   6           Thank you very much, sir.  Pleasure to have you

12:10   7   here.

12:10   8           MS. HURST:  Your Honor, I'd be perfectly happy to

12:10   9   break between Mr. Aginsky's direct and cross so that we can

12:10   10   get Mr. Marlow out of here.

12:10   11           THE COURT:  No.  Absolutely not.

12:10   12           MS. HURST:  Okay.

12:10   13           THE COURT:  We'll take the witnesses in order.

12:10   14   Thank you for the offer.  No.

12:10   15           Mattel and you will be allowed to present your

12:10   16   case basically in the order that you choose.

12:10   17           His inconvenience is not well-taken by the Court.

12:10   18           MS. HURST:  Understood.

12:10   19           THE COURT:  Understood?

12:10   20           All right.  Okay.  Twenty minutes, then, Counsel.

12:11   21           Now, also for the record, I want the note that the

12:11   22   gentleman sent me as part of this record.  And this note

12:11   23   from Mr. Marlow -- so the Circuit has some idea, this note

12:11   24   from Mr. Marlow will be made a part of the Court record and

12:11   25   will be placed under seal.  That way the Circuit will see

12:11   1   why Mr. Marlow was ordered into Court.

12:11   2          Once again, it's a bickering between counsel, and

12:11   3   apparently the witness believing that he was inconvenienced

12:11   4   yesterday, deciding not to come to court today, which is

12:11   5   unacceptable.

12:11   6          *(Lunch recess held at 12:11 p.m.)*

12:12   7          *(Further proceedings reported by Maria*

12:12   8       *Dellaneve in Volume II.)*

12:12   9                  -oOo-

12:12   10

     11

     12

     13

     14

     15

     16

     17

     18

     19

     20

     21

     22

     23

     24

     25

-oOo-


CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  February 24, 2011



_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR