UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,                )
                                    )
                Plaintiff,          )
                                    )       DAY 23
            vs.                     ) No. CV 04-9049-DOC
                                    )       2 OF 3
MGA ENTERTAINMENT, INC.,            )
                                    )
                Defendant.          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

THURSDAY, FEBRUARY 24, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Page 2

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                            BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
8                            SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                           BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                            (949)567-6700

14
                             KELLER RACKAUCKAS
15                           BY:  JENNIFER KELLER, ESQ.
                             18500 VON KARMAN AVENUE
16                           SUITE 560
                             IRVINE, CALIFORNIA 92612

17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                           BY:  MARK OVERLAND, ESQ.
                             100 WILSHIRE BLVD
20                           SUITE 950
                             SANTA MONICA, CA. 90401
21                           (310) 459-2830

22

23

24

25

```
 1                         - AND -

 2                    SCHEPER KIM & HARRIS LLP
                      BY:  ALEXANDER COTE, ESQ.
 3                    601 WEST 5TH STREET_12TH FLOOR
                      LOS ANGELES, CA. 90071
 4                    (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              I N D E X

2
     PLAINTIFFS'                                          VOIR
3    WITNESS              DIRECT   CROSS   REDIRECT  RECROSS  DIRE

4    VALERY AGINSKY          6      54       83

5

6    PETER MARLOW          101

7

8

9

10                            EXHIBITS

11
     PLAINTIFF'S                          FOR          IN
12   EXHIBIT  DESCRIPTION             IDENTIFICATION  EVIDENCE

13     4600                                             7
       5592                                            121
14     5593                                            125
       5723                                            111
15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1        SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 24, 2011

2                                -oOo-

3        **THE COURT:**  We're on the record.

4            First, the plug notes are hearsay.  These notes do not

5    come in under the business record exception as the Court

6    previously stated and with the additional research that the

7    Court's done in the last 20 minutes again because they were not

8    created in the regular course of business, but if not in advance

9    of litigation, at least in the midst of litigation pursuant to

10   Clark versus California.  Nothing in the Court's research changes

11   this Court's opinion concerning its prior research.

12           However, Mr. Gordon, you may have come to the rescue.

13   This Court is inclined, under 803.5, to allow the notes as

14   reliable if I hear the foundation concerning two issues.  First,

15   whether the notes were made or adopted by the witness when the

16   matter was fresh in his mind.  And second, whether the notes

17   reflect the witness' prior actual knowledge, 803.5 may fit that

18   hearsay exception.

19           Concerning the motion regarding the pen.  The evidence

20   is excluded.  The evidence is not, at the present time, based upon

21   your briefing, "of a type reasonably relied upon by experts in the

22   particular field in forming opinions or inferences upon the

23   subject."

24           These were e-mails as well as a marketing and sales

25   brochure from a Japanese company regarding its production of a pen

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

Page 6

1    in 2002 or early 2003.  Many are not in English and these kind of

2    materials, especially marketing materials, are not the type of

3    evidence reasonably relied upon by experts.  Mattel is free to

4    subpoena the Japanese company or bring a witness here.

5           Sir, if you would be kind enough, would you take the

6    stand, please.

7                         (Jury in.)

8           **THE COURT:**  Counsel, thank you for your courtesy.

9           First of all, thank you, ladies and gentlemen.  I want

10   to say to you that counsel for both sides have been

11   extraordinarily helpful to the Court.  It's been a good education

12   for the Court over the recess.

13          And the last two pages of Exhibit 4600 are received.

14   That's a seven-page document.  If the Court hears a little more

15   foundation, which I have notified counsel about, the other five

16   pages may be coming into evidence also as an exception to the

17   hearsay rule.

18          Counsel.

19                  DIRECT EXAMINATION (RESUMED)

20   BY MR. QUINN

21   **Q**   Mr. Aginsky, if you could look, please, at Exhibit 4600,

22   which I think you have told us are your notes of the test that you

23   ran.

24          Do you see that?

25   **A**   Yes.

1   **Q**    And did you make these notes at the time that you did the

2   test?

3   **A**    Yes.

4   **Q**    And did you make the notes when that was fresh in your mind,

5   the information set forth here?

6   **A**    Yes.  Before I examined each area, I wrote it down.  So, the

7   first analysis, Area 14; and the second analysis, Area 4, and so

8   forth.

9           **THE COURT:**  And the witness' notes reflect the witness'

10  knowledge accurately?

11  BY MR. QUINN

12  **Q**    Do these notes accurately reflect the information reflected

13  here as noted by you?

14  **A**    Yes.

15          **THE COURT:**  I'm going to receive these notes into

16  evidence.

17          Now we'll have the entire document.  4600 is received.

18              (Exhibit 4600 received in evidence.)

19  BY MR. QUINN

20  **Q**    If we could enlarge what we see on the left-hand side there.

21          Mr. Aginsky, can you tell us what we're looking at here?

22  **A**    This is a part of my handwritten notes relating to the GC-MS

23  test that I did.

24  **Q**    And that do you see the heading "GC-MS" there up at the top?

25  **A**    Yes.

1   **Q**    And what is the list that's underneath that?

2   **A**    The vertical line and then this horizontal line, it includes

3   the chronological order in which I analyzed or examined the areas

4   by GC-MS.

5          So, the first analysis was Area 14, and I used three

6   plugs, three microplugs of ink or paper for this particular -- the

7   first GC-MS test.

8   **Q**    And then the next one, Area 4, is that?

9   **A**    Yes.  That's Area 4.  Then it was the first analysis of the

10  questioned notation, which is Area 8.  And each Area 8 is marked

11  as Q, question, one, two and three; three analysis.

12  **Q**    I don't think we have to go all the way down, but basically

13  did you list in order here the areas from the ledger in the

14  sequence in which you ran the test?

15  **A**    Yes, that's correct.

16  **Q**    And the right-hand side, did you write the number of plugs

17  that you tested for each area?

18  **A**    Yes.

19  **Q**    And so what we're looking at is the areas identified in

20  Exhibit 23496-1, which we looked at before where you talk about

21  the numbered areas.

22          That's what you are referring to there; correct?

23  **A**    Yes, correct.  The first was the analysis of Area 14 and then

24  the analysis of Area 4 and so forth.

25  **Q**    And then you showed us -- if we could go back to

1  Exhibit 4598-18 -- you showed us up at the top a file name and a

2  number at the end, which this one is 14, which also corresponds to

3  that area in the notary book; correct?

4  **A**   Yes.

5  **Q**   So these numbers of the areas which are in the notary book,

6  Exhibit 23496, your notes Exhibit 4600, and in your chromatographs

7  in Exhibit 4598, they all referred to the same numbered areas.

8  You used the same numbering sequence in all those documents; is

9  that correct?

10  **A**   That's exactly correct.  Yes.

11  **Q**   With respect to the -- we were talking about this just before

12  we broke for lunch.  If we could go back to Exhibit 4598, which

13  you have identified as the chromatograms.  And you have described

14  for us the use of that file field at the top and the acquired

15  field in the heading on each page.

16          Would you remind us what the acquired field shows us?

17  **A**   Yes.  This third line, "acquired field," shows the date when

18  the analysis was done and the time when the analysis started.

19  **Q**   Again, I think you said that's something that the machine

20  creates automatically; correct?

21  **A**   Yes.  When the analysis started, I had pushed the note, the

22  start note, and the machine acquires this automatically.

23  **Q**   So what other information is up there in the header?  We have

24  looked at the file field, we have looked at the acquired feature.

25  What other information is up there?

Page 10

1   **A**   Other lines, which this is my name.

2   **Q**   That doesn't change, presumably?

3   **A**   No.  And the other lines contain some, I would call it

4   secondary information for my convenience, for my future reference.

5   **Q**   And is it important for -- is that information in that field

6   important for identifying the tested area that's reflected in the

7   chromatogram?

8   **A**   No.  The only important area that identifies the tested area

9   is the file name.

10  **Q**   And do you always fill out that information there that you

11  just referred to, that you say you sometimes fill out for your

12  convenience?

13  **A**   No.  I don't often fill it out.

14  **Q**   Why is that?

15  **A**   Because especially when I have many documents to analyze, and

16  when I switch from one or many areas to analyze like in this case,

17  when I switch from one area to another, sometimes I forget to

18  delete this information from the previous analysis to type in a

19  new one and I have a carry-over from the previous analysis.

20  **Q**   So that entry there, that's something that you actually have

21  to manually enter yourself; that's not something that the machine

22  completes; is that true?

23          **MS. HURST:**  Objection.  Vague as to which entry.

24          **THE COURT:**  Well, is the entry on the board?

25

1    BY MR. QUINN

2    **Q**    Could you explain to us what entry you say you sometimes fill

3    out for your convenience but sometimes don't?  What one are you

4    referring to?

5    **A**    I'm referring to two lines:  Sample name and miscellaneous

6    information line.  And they are like defaulted.  They are blank.

7    And they can -- or may or may not be filled out.  That's for a

8    future reference, or for convenience of the analyst.

9    **Q**    So, if there is going to be information there, you would have

10   to enter it; right?

11   **A**    If I think that I need to include some information that will

12   be helpful for me in the future, yes, I would.

13   **Q**    Did you go back in this case to determine whether that sample

14   name field was correctly referenced in the chromatograms, which

15   are in Exhibit 4598?  Did you go back and check?

16   **A**    Yes.

17   **Q**    Which ones?

18   **A**    All of them.

19   **Q**    Was the sample name there correctly entered on page --

20   Exhibit 4598-1?  If we could put that up on the screen.

21   **A**    For this particular analysis, that was a -- I analyzed paper

22   blank sample.  Therefore, the file says PB.  And before that, I

23   analyzed the -- I did the first analysis of the Area 8, and I

24   forgot to delete this information and to type a new one, that this

25   is just a paper blank.  Therefore, it's a carry-over from the

1   previous analysis.  Instead of paper, it says that it's black ink.

2   **Q**   That's wrong?

3   **A**   That's wrong.

4   **Q**   What you have got up here on the upper right-hand corner is

5   paper blank with one of the blank paper plugs?

6   **A**   Yes.  That's the file name, and that's the most important

7   information, that clearly.  So instead of what was analyzed.

8   **Q**   That's something that the machine generated?

9   **A**   The machine generated the acquired field.  And the machine

10  would not accept the previous file name, therefore, I would -- if

11  I tried to -- if I forgot to change the file name, the machine

12  will say that this file already exists.  So I will need to change

13  it.

14  **Q**   And so you said that this was a carry-over?  This sample name

15  here, you had previously tested a plug from that other area?

16  **A**   Yes.  Immediately before this analysis, I analyzed Area No.

17  8.  That was the first analysis.  And it's clearly seen on my

18  handwritten notes.

19  **Q**   That's Exhibit 4600 that we just looked at, your handwritten

20  notes which have the sequence?

21  **A**   Yes.  They show chronological succession in which I analyzed

22  the areas.  And paper blank was analyzed.  It was analysis number

23  four.  And analysis number three was the first analysis of the

24  questioned entry.

25  **Q**   So that was something that that's a mistake?

Page 13

1   **A**   Yes.

2   **Q**   How do you know which area was tested immediately before each

3   of these tests?

4   **A**   There are two ways to determine this.  One is most -- more

5   complex way is to look at the acquired field and to compare this

6   information that I did the paper blank analysis on the 13th of

7   January.  And that's the time.

8           And if we look at all the chromatograms, we will see

9   before that I analyzed the chromatogram or zone number eight.  But

10  also, if you look at my handwritten notes, they simply show the

11  chronological sequence in which I examined the 17 areas.

12  **Q**   Can you point that out to us, the sequence here?

13  **A**   Yes.  After I examined Area 14 and 4, then I did the first

14  analysis for the questioned notation.  And after that, I did the

15  analysis of the paper blank.  And I forgot to change the sample

16  name on miscellaneous information.  Therefore it was a carry-over

17  from here to here.

18  **Q**   That's why in the case we just looked at where it said paper

19  blank in the upper right-hand corner, the sample still described

20  notary 1998 Missouri; right?

21  **A**   Yes.

22  **Q**   If we could look at Exhibit 4598-6.  Which area of the notary

23  book was tested to produce this chromatogram we see here in

24  4598-6?

25  **A**   This was first test that I did for Area No. 4, and I analyzed

1  the ink from Area No. 4 two times.

2  **Q**    Let's take a look at Area 4.  If we could look at 23496-1.

3  So we're looking at the chromatogram for one of the areas that you

4  did on number four; is that correct?

5  **A**    Yes.  That's one of the chromatograms that I did for Area No.

6  4.  The first chromatogram that I did for Area 4 was labeled --

7  it's file name was four and the second was 4-1.

8  **Q**    Let's go back and look at chromatogram 4598-6, which you have

9  told us was the analysis of the -- of a plug taken from Area No.

10  4.  And could you please give us a -- if we could enlarge the

11  whole thing -- could you give us a detailed explanation of what is

12  depicted here in this chromatogram, 4598-6?

13  **A**    Yes.  The chromatogram shows -- the horizontal line here is

14  the time line.  It shows how much time elapsed since the analysis

15  started.

16        So we can see that, for example -- and there is a number

17  of peaks on the chromatograms and which each peak corresponds to a

18  particular chemical compound that was extracted from the ink and

19  paper and then separated by the GC-MS machine.  So this particular

20  compound has a retention time 9.8.

21  **Q**    What does that mean, what does "retention time" mean?

22  **A**    That means that the time that elapsed since the analysis

23  started.  After 9.8 minutes, this particular component went

24  through the column and was detected by the detector.

25  **Q**    What is the relationship between the components and the

1    passage of time, which is plotted here along the horizontal axis?

2    **A**    The relationship is usually in gas-chromatography, that's one

3    of the important parameters that shows when a particular chemical

4    substance exits a column, it correlates to its chemical structure.

5    **Q**    So the chemical structure will determine in what -- how long

6    it takes for that component to exit the column?

7    **A**    Yes.  There is correlation between the molecular weight or

8    between polarity of a particular chemical substance.  Depending on

9    all these physical and chemical properties, it will travel through

10   the column at a different rate.

11   **Q**    And in maybe grossly inadequate layman's terms, they come out

12   the other end at different periods of time depending upon what

13   it's made of?

14   **A**    Yes.  If I could use this analogy:  Like when a bus and a car

15   and a cyclist would start going through a tunnel, then they will

16   go at different rates and they will come from the tunnel one by

17   one, not all together.

18   **Q**    Are the peaks here in the chromatogram showing components of

19   both the ink and the paper here in this 4598-6?

20   **A**    No.  This particular chromatogram that was obtained for the

21   Area No. 4 doesn't contain any ink components.  All the peaks that

22   we can see here are the paper components.

23   **Q**    Why are there no ink components here?

24   **A**    Because the ink in the Area 8 didn't contain any extractable

25   components that could be extracted and then separated by the GC-MS

Page 16

1   machine.

2   **Q**   Is this an odd result in a test like this only to detect

3   paper?

4   **A**   No, not for this particular type of ink.  The water-based

5   inks, they do not have many extractable components that can be

6   separated and detected by the GC-MS machine.

7   **Q**   If we could look at 23496-1.  If you could go back, I think

8   you just said Area 8.  If we could look at that 4598-6.

9        Does that relate to Area 8 or Area 4?

10  **A**   The file name shows that it relates to Area 4.

11  **Q**   All right.  So if we can go back to 23496-1, which of these

12  areas on 23496 refers to "from 1998 Missouri," that notation?

13  **A**   This is area number eight.

14  **Q**   What, if anything, did you observe from the GC-MS test you

15  conducted in this case about the ink used to write the fifth line

16  from 1998 Missouri in Area 8?

17  **A**   I determined that the chemical composition of the ink that

18  was used to produce this particular entry is different from the

19  chemical composition of the inks.

20  **Q**   All other areas that you tested in the notary book?

21  **A**   That's correct.

22  **Q**   And what was the particular composition or chemical component

23  that you found was different there in that Area 8?

24  **A**   The GC-MS test -- and I ran three separate GC-MS tests

25  including the confirmatory test that I mentioned -- all of them

1    shows the presence of a component of an ink component that is not

2    present in the ink in any of the other 16 areas.

3    **Q**    What was that component?

4    **A**    It was a derivative of cyclohexanol.

5    **Q**    Is there a common name for that chemical?

6    **A**    Yes.  It's commonly known as menthol.

7    **Q**    What is menthol?

8    **A**    Menthol is a chemical substance that gives a taste and

9    fragrance to many materials.

10   **Q**    Why would menthol be in ink?

11   **A**    As a fragrance.

12   **Q**    How did you determine the presence of menthol in Area 8 from

13   your chromatograms?

14   **A**    On each of the three chromatograms that I -- each of the

15   three GC-MS analysis that I conducted for this area, there was

16   specific peak with a particular retention time that was the peak

17   of menthol.

18   **Q**    If we could go back to Exhibit 45598, the collection of

19   chromatograms, could you tell us which chromatograms show this

20   result?

21   **A**    The three chromatograms that I just mentioned, they are on

22   pages 10, 11 and 12.

23   **Q**    Have you put those together, those three together in one

24   place so we can look at them all at once?

25   **A**    Yes.  I made a slide.

1   **Q**    If we could look at 23962-7, and I'd ask you to please

2   explain what we're looking at here.

3   **A**    The slide shows the three chromatograms, GC-MS chromatograms

4   that I obtained for when testing ink in the area number eight from

5   1998 Missouri.  That was the first test.  It is labeled just

6   eight.  And the file name is eight.

7          The second test was eight -- file name was 8-1.  And the

8   third test which was a confirmatory test, it's file name is 8-2.

9   **Q**    Do each of those show a peak at a particular point in time

10  that was of interest to you?

11  **A**    Yes.  The peak that is highlighted was green on each

12  chromatogram with the retention time of 8.58 minutes.

13  **Q**    That green highlighting, that's something you added; right?

14  **A**    Yes.

15  **Q**    And did you analyze that -- what did you say the retention

16  time on that was?

17  **A**    8.58 minutes.

18  **Q**    And did you analyze that peak to determine what chemical

19  compound would correspond with that?

20  **A**    Yes.  I analyzed this peak using the mass spectrometer and it

21  was identified as menthol.

22  **Q**    What is a mass spectrometer?

23  **A**    Mass spectrometer is a detector that was used in the GC-MS

24  machine.  And it creates a mass spectrum for each substance that

25  was separated during the GC-MS process.

1          Like for each peak that we see on the chromatogram, each

2     peak can be measured by the mass spectrometer.  And for each peak,

3     mass spectrometer can determine the mass spectrum.  And mass

4     spectrum, it could be considered like bar code for a chemical

5     substance.  And then the mass spectrometer compares the bar code

6     that was obtained for the real and for the -- during the analysis

7     with the bar codes of other compounds that are in the memory of

8     the computer, of the mass spectrometer.

9          And the mass spectrometer can identify the -- by

10    comparing this mass spectrum, by comparing these bar codes, and

11    can determine that, like in this case, that this particular peak

12    on the three chromatograms belongs to a -- or corresponds to

13    menthol.

14    **Q**    The spectrometer then as part of it has some type of database

15    which it references to see what compound or component this would

16    correspond to?

17    **A**    Yes.  The mass spectrometer has a database, and the largest

18    database which is available now in the world -- and I believe I

19    have this one -- contains mass spectra for 200,000 different

20    organic substances.

21          It's interesting that it sounds like a big number, but

22    the amount of organic substances that are known is 10 million,

23    meaning that 200,000 is just 2 percent of what is available

24    potentially.  Simply this 200,000, a collection of substances

25    which are used more -- have been analyzed most often.

1  **Q**    In any event, the database did include this information for

2  the substance which we commonly know as menthol?

3  **A**    Yes.

4  **Q**    And after you analyzed it with the mass spectrometer and

5  determined that it was menthol, did you do anything to confirm

6  that conclusion?

7  **A**    Yes.  In addition to the identification by mass spectrometer,

8  I did additional, like manual identification by comparing the mass

9  spectrum that I obtained for this peak, for the menthol peak, with

10  the mass spectra that is available in public records.  And some

11  reference samples from like National Institute of Standards and

12  Technology, they have this information.  And some published

13  articles that also show the mass spectrum of menthol.

14        So I just wanted to be double sure, and I definitively

15  determined that that's menthol.

16  **Q**    If you turn to Exhibit 23962-8 -- if we could put that up --

17  what is depicted here on this slide?

18  **A**    This is just a closeup of these three peaks of menthol that

19  we saw on these three chromatograms.  We can see that the

20  retention time is exactly the same; 8.58 on all three

21  chromatograms.

22  **Q**    Why is the peak so much higher in the last GC-MS test you

23  performed on microplugs from Area 8 of the notary book?

24  **A**    This is because when I did the confirmatory test, I took four

25  plugs of ink from the areas that contained more ink.  So I did it

1   deliberately to increase the concentration of the ink.

2   **Q**   So where would there be more ink?  What would you be looking

3   at?  What are you talking about?

4   **A**   I was looking for points of where two lines crossed and we

5   have one line above the other, or where two lines overlapped.

6   Like retracing when we write, let's say P, down and then up.  Or

7   where simply writing instrument dwelt for a while more than in

8   other areas.  And as a result of that, the ink -- the more amount

9   of ink was deposited on paper.

10  **Q**   If we could go back to the previous slide, -7, 2390-7 and

11  looking at these three chromatograms for Area 8, do any of the

12  peaks that are not at a retention time of 8.58 -- which you say

13  corresponds to menthol -- appear different in the third sample

14  from that area, sample 8-82?

15  **A**   Yes.  Other peaks, which are not highlighted on this

16  chromatogram, they have -- some of the peaks, they are higher

17  comparing with these chromatograms and some are lower, have low

18  intensity compared with chromatograms one and two.

19  **Q**   Are any of these other peaks that are not at the retention

20  time of 8.58, which you have told us is associated with menthol,

21  do any of those peaks correspond with ink components?

22  **A**   Only the green area.  That's the ink component.  Everything

23  that is white, paper component.

24  **Q**   Can you explain that?  Can you explain why these paper

25  components appear different in the chromatogram for sample 8-2 as

Page 22

1   compared with the sample for 8 and 8-1?

2   **A**   There are at least three reasons for this:  One is that paper

3   is very non-homogeneous.  It's like a solid solution.  It's not

4   like a true solution when we have a liquid.  But a solid solution

5   has some components of the paper.  They are -- let's say if we try

6   to map the concentration of a particular component, we will have

7   larger concentrations, large or small.  It's like a mosaic in the

8   paper.

9           And then depending from -- because the sampling is

10  random, we don't know whether we are taking larger some amount or

11  smaller amount.  Therefore, there is a natural variation when we

12  analyze such a material like paper.  That's one reason.

13          Another one was that when I did a confirmatory test, I

14  used a different extraction time.  So for these two, I used one

15  hour.  For this I used 20 minutes.

16  **Q**   Why did you do that?  Why did you use a different extraction

17  time for that third sample of Area 8?

18  **A**   There was a confirmation test and was going to analyze these

19  particular peaks.  I have these two peaks which are peaks of

20  menthol, but I wanted to increase the concentration of the ink to

21  facilitate this task for the mass spectrometer.  To get a more --

22  the mass spectrum would be more intense and it would be easier for

23  the mass spectrometer to identify that particular component.

24  **Q**   Is there a peak at extraction time?  Is that the term,

25  "extraction time?"

1    **A**    That's retention time.

2    **Q**    Retention time.  Is there a peak at 11.54 retention time?

3    **A**    Yes.  On these two chromatograms, it has a high intensity.

4    On this chromatogram, it has low intensity.

5    **Q**    Can you tell us what that is?

6    **A**    This particular component, it's a paper component that has a

7    retention time of 11.54 minutes.  And it's a particular derivative

8    of phenol.

9    **Q**    When you first saw this peak, did you think it was from the

10   ink or from the paper?

11   **A**    First I thought that it is from the ink.

12   **Q**    Do you still believe that component is from the ink?

13   **A**    No.  This is a component of the paper.

14   **Q**    And how did you come to conclude that the phenol, did you say

15   --

16   **A**    It's a derivative of phenol.

17   **Q**    How did you come to conclude that the derivative of phenol

18   was likely part of the paper rather than an ink component?

19   **A**    After I completed testing in this case in 2008, since then

20   for another couple of years, I analyzed a number of documents in

21   which I found phenomenal that some paper components, including

22   this one, which is a derivative for phenol that I identified in

23   this case, which the one that has 11.54 retention time, they are

24   extracted from the paper to a greater degree when the ink is

25   present.

1          In other words, if I compare two samples, I take a paper

2    blank and ink on paper, the component of the paper will be

3    extracted from the paper, let's say, 5 percent of the component

4    only will be extracted, because it has a very restricted

5    extractability in the solvent that I used in this case,

6    chloroform.  But when the ink is present on the microplug, ink

7    catalyzes the extractability of the solvent.  In other words,

8    facilitated or promotes the extractability of this particular

9    component and, therefore, let's say 90 or 95 percent or 100

10   percent of the component will be extracted from the paper.

11   **Q**    If this phenol was, in fact, a component of the ink rather

12   than the paper, would it have any bearing on your opinion about

13   the ink from Area 8 having a different composition from the ink in

14   all the other amounts that you took from the notary book?

15   **A**    No, it will not have any bearing, no significance in that

16   because this particular component was retention time 11.54.  I

17   detected it in all 17 areas and in the paper blank.  It will

18   just -- it will be present in all the samples.  Therefore, it

19   doesn't show any difference between the inks.

20   **Q**    Let me ask you about the equipment you used then.  Was the

21   GC-MS machine you were using in good working order when you did

22   your testing in this case?

23   **A**    Yes.

24   **Q**    Do you recall whether or when you last calibrated the mass

25   spectrometer before running your test in this case?

1   **A**    I don't.  It is called automatic tuning, not calibration.

2   But I don't recall when.

3   **Q**    Why wouldn't you remember that?

4   **A**    Because the mass spectrometer is very stable and doesn't need

5   to be calibrated often.  And I know from my experience through

6   many years using this and also the manufacturer recommendations,

7   they say tune as needed.

8   **Q**    And how often do you calibrate it or tune it, as you put it?

9   **A**    Not more often than once a month.

10  **Q**    Was your mass spectrometer proper calibrated when you

11  conducted your testing for this case?

12  **A**    Yes.

13  **Q**    If we could look at 23962-6 and -7.  What, if anything, would

14  you say is the most important thing you do that affects the proper

15  examination and identification of substances detected by your

16  GC-MS machine?

17  **A**    The most important thing is to make sure that the GC-MS

18  machine is clean and inert.

19  **Q**    What do you mean by "clean and inert?"

20  **A**    When the machine is new, the manufacturer of the machine,

21  they -- all the parts, they deactivate all the parts.  So

22  therefore the injector, all the parts in the injector, the column

23  and the detector, everything in this chromatogram path is

24  deactivated.  That's very important.

25          When it's not deactivated, or when, during the usage of

1    the machine, some components, when we inject sample and some

2    components would not go through the column -- and because they are

3    not completely volatile, so they are like more like a solid

4    component -- they will start building residue.  And this build-up

5    here and in the initial part of the column would activate this

6    part.

7           So it was deactivated.  It was inert.  But then it will

8    not be any longer inert.  And because this build-up is like -- it

9    will activate this area.  And because of that, when polar

10   compounds -- there are polar and nonpolar chemical compounds.

11   Most chemical compounds are polar.  And when polar compounds

12   travel through the area which are not inert, they just spread over

13   the column.  It's the worst case scenario they will never appear

14   from the column.  They will be buried in the column and eventually

15   escape from it as a noise, as a background that we saw in the

16   chromatogram.

17          So we have a background, then we have a peak, then

18   another noise, and again peak.

19          So that's very important.  And I was -- I always

20   maintain the machine in a condition that it should be clean and

21   inert.  And the best way to make sure that machine is clean is

22   inert is to look at the peaks, at the shape of the peaks of the

23   for polar compounds.

24          If we could look at my three chromatograms here.

25   Q    Yes.

Page 27

1    **A**    Then this menthol is a polar compound.

2            **MS. HURST:**  Object at this point.  Narrative.

3            **THE COURT:**  Sustained.

4    BY MR. QUINN

5    **Q**    Your machine was clean and inert at the time that you ran the

6    test?

7    **A**    Yes.  It was clean and inert.  And the best indicator of

8    this, the shape of the peak of menthol.  Menthol is a polar

9    compound.  If machine was not clean and inert, we would never --

10           **MS. HURST:**  Objection, Your Honor, nonresponsive.

11           **THE COURT:**  Sustained.

12   BY MR. QUINN

13   **Q**    How would the shape of the peak for the menthol be different

14   if the machine was not clean and inert?

15   **A**    Instead of the sharp triangle, we would see -- the left part

16   of the peak would be like it's shown here.  But then it will be

17   much smaller than this and then it will stop trailing.

18           So the right portion of the peak, it will go like this.

19   So it will be a long tail, and that would be an indication that

20   the machine is not inert.

21   **Q**    So if we could put up Exhibit 23962, pages 9 and 10.  These

22   are the -- these show the numbered areas of the notary book that

23   you tested; right?

24   **A**    Yes.

25   **Q**    And then if we could look at -11, 32962-11.  What does this

1   slide show?

2   **A**   This slide shows all the areas that I tested.  And the Area

3   No. 8 is highlighted with green because to show that ink in the

4   Area No. 8 is different.  The ink contains menthol and none of the

5   other 16 areas on pages 11 and 12, none of them contain menthol.

6   **Q**   If we could look at pages -12 and -13, what do these show?

7               Technical difficulties.

8               So we've got -12 and -13 here.  What does these two

9   slides show?

10   **A**   These are the same slides.  But we can see that all the

11   areas, all the 16 areas other than eight from which I took ink

12   samples, they do not contain menthol.  And to symbolize this, I

13   used different color; yellow color.

14   **Q**   And -14 from the same Exhibit?

15   **A**   This is same slide, but also the area from which I took paper

16   blank samples also yellow, showing there is no menthol in the

17   paper, too .

18   **Q**   Do you know of your own personal knowledge -- your own

19   personal knowledge -- based on your work as an expert in ink,

20   whether there are pens, there are pens in the market that use

21   menthol scented ink?

22   **A**   Yes, of course.

23   **Q**   And that's something you have known for some time?

24   **A**   Yes.  I know about this.

25   **Q**   Let's turn back to your test of the notary book.

1          Did you draw any conclusion about the ink used in the

2    other 16 areas besides Area 8?

3    **A**    Yes.  My conclusion is that the issuus that were in the other

4    16 areas besides Area 8 are likely of the same formulation.

5    **Q**    Why did you reach that conclusion?

6    **A**    Based on the all five types of analysis of examinations that

7    I did, they all give me the results that allow me to come to this

8    conclusion.

9    **Q**    Had you tested black water-based ink with menthol in it

10   before you saw it in this case?

11   **A**    No, not as I know.

12   **Q**    Were you surprised then to find the presence of menthol in

13   Area 8?

14   **A**    No.  I was not surprised.

15   **Q**    Were you aware that fragrances were often used in water-based

16   inks and have been for years?

17   **A**    Yes.  I'm aware of that, and fragrances has been used in a

18   number of different writing in inks.  And even in inkjet printing

19   inks.  So I knew about that, yes.

20   **Q**    And including menthol as a fragrance?

21   **A**    Yes, including menthol as a fragrance.

22   **Q**    How did you know at the time that menthol could be a

23   fragrance in water-based inks?

24   **A**    I have reviewed a number of patents that described the use of

25   different fragrances, including menthol for water-based writing

1    ink.

2    **Q**    How confident are you that menthol is a component of the ink

3    that appeared in Area 8?

4    **A**    I'm very confident.  It is based on the three separate GC-MS

5    analysis, each of which showed definitively that menthol is a

6    component of the ink in Area 8.

7    **Q**    Can you describe the concentration of menthol that was

8    detected by the GC-MS test?

9    **A**    The concentration of menthol was significant, and we can --

10   what we saw in the three chromatograms for Area No. 8, the signal

11   to noise ratio is very significant.

12   **Q**    What do you mean by "signal to noise ratio?"

13   **A**    If we consider -- this is the -- if we measure the height of

14   the peak, that would be a signal.  And if we measure half of the

15   height of the noise, that's how the noise is measured.  And it is

16   used in many areas of human activity, including in chromatography,

17   in radio signal.  In many areas.

18              So we just measure the ratio of this value to -- of the

19   height of the peak to the half of the height of the noise, which

20   is close to the peak.  And we can see this is a huge ratio.

21              For this particular confirmatory test, it is much more

22   than 100 signal to noise ratio.  For the other two that I did

23   before that, though the peak is smaller, but still it is more than

24   10.  The signal to noise ratio is more than 10.

25              And that simply shows that this is a significant peak on

1    a chromatogram, not just a noise or a spike.

2    **Q**    Did you consider other theories to explain how the menthol

3    could have appeared in the notary book?

4    **A**    Yes.  I considered at least two theories.  The internal

5    contamination and external contamination.

6    **Q**    So why did you consider contamination as a theory?

7    **A**    It was suggested by MGA expert that menthol that I detected

8    in the Area No. 8, in the ink in the Area No. 8 is not an ink

9    component but actually a contaminant.

10   **Q**    That's Dr. Lyter.  He was the ink expert retained by MGA?

11   **A**    Yes.

12           **MS. HURST:**  Object to this as a hearsay and improper

13   rebuttal.

14           **THE COURT:**  Overruled.  You can rely upon one expert.

15   You can also rely upon the difference in the experts.

16   BY MR. QUINN

17   **Q**    So Dr. Lyter didn't question the fact that these

18   chromatograms actually did reflect menthol in his report?

19           **MS. HURST:**  Objection.  Calls for hearsay.

20           **THE COURT:**  This is sustained, counsel.

21   BY MR. QUINN

22   **Q**    You said you considered the potential?

23           **THE COURT:**  You can ask him why he conducted the test

24   and considered contamination, but not into the doctor's --

25

Page 32

1   BY MR. QUINN

2   **Q**    You said you considered the possibility of internal and

3   external contamination as accounting for the presence of menthol?

4   **A**    Yes.

5   **Q**    In your opinion could the presence of menthol in this case

6   have been caused by contamination within your machine?

7   **A**    It's my opinion that it's not possible that that would be the

8   result of the contamination that came from my machine.

9   **Q**    Let's take a look at your notes, Exhibit 4600.  And using

10  Exhibit 4600, can you explain why the presence of menthol in this

11  case could not have been caused by contamination within your

12  machine?

13           **MS. HURST:**  Your Honor, this is an improper hearsay

14  purpose for these notes, which were limited which were admitted

15  only for a limited purpose.

16           **THE COURT:**  I agree, counsel.  He can read from these

17  notes.  He can state what they are.

18  BY MR. QUINN

19  **Q**    Well, can you explain for us --

20           **THE COURT:**  Take the notes down, please.  Thank you.

21  BY MR. QUINN

22  **Q**    Can you explain for us why the presence of menthol could not

23  have been caused by contamination within your machine?

24  **A**    Yes.  I did the analysis of the -- of all the areas in the

25  succession that I know and which succession I did the analysis.

1   And for example, the first analysis for Area 8 was done after the

2   analysis of Area 4.  After Area 8, it was paper blank.  After

3   paper blank, it was another test for Area 8.  After the second

4   test for Area 8, I did area -- analyzed Area 4, 7, 6 and 5.

5           And after that, it was a confirmatory test for Area 8.

6   And after that, there was a number of other areas that I analyzed

7   starting from Area 11.

8           So if one were to assume that the menthol was hiding

9   somewhere in my machine, then it would be very fascinating

10  scenario that menthol will just contaminate the analysis, the

11  three analysis that I did for Area 8 and didn't contaminate any

12  analysis for any area that I analyzed before, in between, or

13  after.

14  **Q**   Is it possible for the appearance of menthol to be the result

15  of an external contaminant rather than a component of the ink as

16  you've concluded?

17  **A**   No.  It is my opinion that it is not possible.

18  **Q**   Did you prepare a slide to explain why you think that's not

19  possible?  If we could look at -18, 23962-18.

20  **A**   Yes.

21  **Q**   What does this slide show?

22  **A**   This slide shows four reasons why menthol cannot be a

23  contaminant and is a component of the ink that was used to produce

24  the notation from 1998 Missouri.

25  **Q**   Can you explain the first reason?

1   **A**     The first reason is what I mentioned.  I analyzed the ink

2   that is sampled from Area No. 8 three times.  And each time

3   menthol was reliably detected.

4   **Q**     And the second reason?

5   **A**     The second reason is that menthol was not detected in any of

6   the other 16 areas.  And specifically, it was not detected in Area

7   7 that was in the intimate proximity to Area No. 8.

8   **Q**     Was that the fourth line just above in that box?

9   **A**     Yes.

10  **Q**     If we could look at 23962-19 and 23962-18.  What is 23962-19?

11  **A**     It shows the fragment of the questioned document with the

12  Area No. 8 including the "from 1998 Missouri."  And the line above

13  it starts with Lupe, Hallidae, Jade, two males.  And these two

14  lines are so close to each other that they actually overlapped.

15       And though I found menthol in this, in Area No. 8, all

16  three separate tests show that definitively menthol was here in

17  the ink.  However, I didn't find any menthol in this line.  And we

18  can see that the mass spectrum for Area 8 shows the presence of

19  menthol highlighted in green.  And the mass spectrum for Area 7,

20  we can look at this area highlighted in green and there is no even

21  indication that there is even a trace amount of menthol present in

22  this line.

23  **Q**     If we can go back to -18, what was the third reason you

24  concluded that the detection or presence of menthol in the ink

25  could not be caused by external contamination?

1    **A**    The reason is that I also saw no physical evidence of

2    contamination.  And I mean that if, for example, someone would

3    accidentally drop a drop of medicine that would contain menthol,

4    then I would see either a rim when the drop was dry completely; it

5    might be a rim left on paper.

6             Then another thing which I have seen many times in my

7    career, which something similar happens accidentally or

8    deliberately to a document, then the paper in that area that was

9    contacted with the liquid, it would warp.  It would not be as

10   horizontal as it was before.

11            So I didn't see any evidence of that.

12   **Q**    The fourth reason?

13   **A**    And the fourth reason is that the -- so I conducted some

14   tests trying to actually contaminate the ink or paper.

15   **Q**    How did you do that?  You actually tried to contaminate it?

16   **A**    Yes.  And those tests showed results inconsistent with what I

17   saw on the document.  I tried to -- I was thinking about possible

18   way.  In other words, though, I didn't think that it is plausible

19   that external contamination could be the reason for the presence

20   of menthol in the ink, in the Area 8, anyway, I decided to check

21   this contamination theory to see whether scientific experiment or

22   scientific test would either support this contamination theory or

23   disprove it.

24   **Q**    So what did you do?

25            **MS. HURST:**  Your Honor, I'm going to object and move to

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

Page 36

1   strike that answer and this portion of the witness' testimony on

2   the grounds this particular aspect of the opinion is not supported

3   by any peer reviewed evidence or other accepted methodologies.

4          THE COURT:  More foundation, counsel.  Concerning the

5   contamination.

6          MS. HURST:  Right.

7          THE COURT:  Thank you, counsel.  No more speaking

8   objection.

9   BY MR. QUINN

10  Q   What was your reason for doing this contamination, trying to

11  deliberately contaminate the notary or the book or the test, what

12  was your reason for trying to do that?

13  A   The reason was because MGA expert Dr. Lyter, his opinion is

14  that menthol is not a component of the ink in Area 8 and it is

15  contaminant.  He didn't offer any scenarios how that could happen.

16  Therefore -- and there is no protocol published in the world that

17  would allow any ink chemist to use that protocol to see that if

18  you are looking for an external contaminant, you need to take this

19  particular standard and follow this particular procedure.

20         Because there is nothing like that published and no

21  ideas from Dr. Lyter, therefore, I had to think myself what I

22  would think would be most probably ways, in my opinion, to

23  contaminate either ink or the area in the Area No. 8 with the

24  menthol containing material.

25  Q   Is this something that you have done before when there has

1   been a question about whether there is contamination, you have

2   tried to figure out what contamination might look like and to try

3   to measure that and compare that with the results that you had

4   received in your test?

5          **MS. HURST:**  Objection.  Irrelevant and the same

6   objection, 702.

7          **THE COURT:**  Overruled.

8          You can answer the question, sir.

9          **THE WITNESS:**  Yes.  If you could please rephrase the

10  question.

11  BY MR. QUINN

12  **Q**   The suggestion was made that this menthol might have come

13  from some outside contamination; is that correct?

14  **A**   Yes.

15  **Q**   And when you have been analyzing ink in your career before,

16  have there ever been other circumstances where questions have been

17  raised about whether there was some outside contamination?

18  **A**   I don't remember.  I have done a lot of cases in my career.

19  I don't remember a similar situation.

20  **Q**   You indicated that there wasn't any kind of established

21  protocol for trying to replicate what outside contamination might

22  look like.  What do you mean by that?

23  **A**   I mean that there is no -- there is nothing that was

24  published.  No protocol, no recommendations what should be done in

25  a similar situation.

Page 38

1  **Q**    So as a scientist, was it meaningful to you to try to

2  replicate what contamination might look like and compare that to

3  the actual results that you achieved?

4  **A**    Yes.  That's a typical scientific work.  If something has not

5  been studied, then someone would decide to do it and that someone

6  would start thinking, "How I'm am going to do it?"  That's a

7  typical way of thinking when you start any scientific project.

8  **Q**    And how did you go about determining how to conduct this

9  contamination test to test this other theory?  How did you go

10  about it?

11        **MS. HURST:**  Your Honor, can I request a sidebar under

12  702 under this particular aspect of the opinion, or object and

13  move to --

14        **THE COURT:**  Why don't we take a recess with the jury and

15  give you that opportunity out of the presence of the jury.

16        Now, ladies and gentlemen, I may need a little bit time

17  with counsel, maybe 20 minutes to 30 minutes.  Why don't you plan

18  on a 30-minute recess just so we have time to discuss the matter,

19  then we can use the restroom also.

20        You are admonished not to discuss this matter among

21  yourselves or form or express any opinion concerning the case.

22                         (Jury out.)

23        **THE COURT:**  Now, the first issue is the Court received

24  this exhibit concerning 4600, and I don't think it should be

25  received.  I think it should have been admitted and then read into

1   the record.  So I'm going to, at this time, await further research

2   this evening.  And I'm going to tell the jury that it can be read.

3   So I'll put counsel on notice if you want to read the portion in,

4   I think the last line is absolutely correct, and I misstated it

5   and received the evidence.  So I'll clarify that.

6          Number two, the record should reflect it was briefly

7   shown up on the screen.  So for the record that will be noted.

8          Second, your objection concerning 702 and the doctor --

9   or the witness' apparently testifying in light of some objections

10  that MGA expert had concerning contamination.

11         Ms. Hurst.

12         **MS. HURST:**  Your Honor, the witness is going to offer a

13  series of theoretical experiments he ran trying to exclude the

14  possibility of contamination.  As the Court has already heard, the

15  witness has conceded that he followed no accepted protocol in the

16  field, and that what he did was based on no peer-reviewed

17  literature for any kind of an acceptable procedure for the

18  exclusion of contamination.

19         Basically, this is a guy who likes to think of new

20  methods and he conducted some experiments.  That does not meet

21  702.  And this part of the witness' opinions are impermissible and

22  unreliable under 702 and should be excluded.

23         **THE COURT:**  Mr. Quinn?

24         **MR. QUINN:**  Your Honor, he has said that there is no

25  accepted protocol for testing to say the menthol might have come

1   from some place else, as Dr. Lyter, their expert, said.  There is

2   no book you can go to.  No learned treatise.  No peer-reviewed

3   journal that says this is how you check that.  But he gave the

4   common sense answer of a scientist.

5          He said yes, this would be meaningful to me as a

6   scientist to test the proposition.  And he is going to describe

7   how he went about testing it to see whether this could be

8   accounted for by menthol coming from outside in various ways.

9          I mean, that was his testimony.  As a scientist he says

10  it's common sense that's what you would do.  You would try to test

11  the theory and see -- compare it to the results you got and see if

12  that's an adequate explanation.

13          THE COURT:  I think in light of the criticism and the

14  concerns with the opposing expert, that he is allowed to go

15  through whatever test he did conduct, and MGA is allowed to

16  conduct an examination about what he didn't do, in other words.

17          MS. HURST:  Your Honor, we haven't offered that

18  criticism.  I objected to that as hearsay.  We may never bring Dr.

19  Lyter.  So they're using a bootstrapping hearsay.  We didn't put

20  this evidence in.  He used an unreliable method.  There is no

21  indicia of reliability here whatsoever.

22          THE COURT:  I don't understand why in light of Dr.

23  Lyter's report he can't go through what he attempted to do.  And

24  it may be insufficient.

25          MS. HURST:  Your Honor --

1          **THE COURT:**  Are you going to produce Dr. Lyter?

2          **MS. HURST:**  We may or may not.

3          **THE COURT:**  Then if he was back on rebuttal, you would

4     have no objection.

5          **MS. HURST:**  I would still have an objection because it's

6     not reliable under 702.  There is no evidence whatsoever that the

7     methodology he is about to describe is a scientifically,

8     repeatable method, that it's the appropriate method.  That it's in

9     any way --

10         **THE COURT:**  What methodology is that?

11         **MS. HURST:**  Basically he spit on his fingers, run a pen

12    through it.  He rubbed a pen in some compounds.  He just made

13    stuff up.  That's what the Court is about to hear.  He made things

14    up.

15         He started thinking, well, what are all the ways that

16    maybe something can get contaminated.  Except he didn't.  He

17    excluded an entire class of ways that something might get

18    contaminated because he didn't test by putting things on the

19    paper.  So what the Court is going to hear is a whole variety of

20    goofy scenarios of running -- spitting on his fingers and running

21    pens through things.  And it's going to sound scientific because

22    it's coming from a guy with a Ph.D.  It's going to sound like it's

23    legitimate, and it's not.

24         There is no evidence that this is an appropriate

25    methodology.  He's conceded there is no protocol.  He has conceded

Page 42

1    there's no peer-reviewed literature.  He is just experimenting.

2            THE COURT:  Is the concern on Mattel's part that you are

3    going to argue contamination as a scenario at the end of the case?

4    And are you, in fact, going to argue contamination?

5            In other words, I haven't heard your cross yet.  I can

6    always wait to redirect.

7            MS. HURST:  I am going to argue contamination.

8            THE COURT:  There is the answer.

9            MS. HURST:  That doesn't make his test admissible.

10           THE COURT:  And it may not be sufficient.  In other

11   words, it goes to sufficiency -- it goes to weight; I don't think

12   it goes to sufficiency.  He can certainly comment about what he

13   did.  You may find it insufficient.  You can certainly cross-

14   examine him.  So your motion is denied.  Thank you.

15           Now, I would suggest each of you take a recess because

16   you didn't get much of a lunch.

17           MR. QUINN:  Your Honor, we have a problem.  Bill Price

18   is sick.  He didn't sleep last night.  And he came down -- he

19   slept this morning.  Came down here, got sick again, has gone back

20   to the hotel.  He was going to do the exam tonight, the Wagner

21   exam.

22           THE COURT:  Mr. Zeller?

23           MR. ZELLER:  Mr. Price was preparing for it.  He has the

24   flu.

25           THE COURT:  No.  It's going around.  I know.  Half the

Page 43

1    courthouse has it.

2            **MR. ZELLER:**  So it's something that's temporary,

3    obviously, but he was the one who was preparing with Mr. Wagner

4    and everything else.

5            **THE COURT:**  Let's talk informally.  Obviously what are

6    we going to do with Mr. Wagner then tomorrow?  In other words --

7            **MS. HURST:**  Personally I am -- it's my witness.  As the

8    Court can maybe hear, I actually lost my voice last night.

9            **THE COURT:**  This is good.

10           **MS. HURST:**  I knew you were going to say that.

11           **THE COURT:**  I'm joking with you.  If I can get all

12   attorneys to lose their voice.  No.  Let's talk informally for a

13   moment.

14                   (Recess taken, from 1:42 to 2:05.)

15           **THE COURT:**  The jury is present, all counsel are

16   present.

17                   Counsel, thank you for your courtesy.

18                   Sir, if you would have a seat please.  Thank you.

19                   Ladies and gentlemen, concerning 4600, I misstated, and

20   the document's admitted.  It's seven pages.  The last two pages

21   you are going to be able to see.  The other five pages may be read

22   into evidence, but they may not be received as an exhibit at the

23   present time.

24                   So therefore, if counsel wants to read portions in, he

25   may.  But that's the evidentiary code.  You have seen that briefly

1  published up on the screen, but you probably won't get that

2  document concerning his actual notes unless there is further

3  discussion between the Court and the parties.

4  Counsel.

5  BY MR. QUINN

6  **Q**  Dr. Aginsky, we were talking about efforts you made to try to

7  test the suggestion from Dr. Lyter that external contaminants

8  could have accounted for the menthol that your test detected;

9  correct?

10  **A**  Yes.

11  **MS. HURST:**  Object to the form with the reference to

12  hearsay, Your Honor.

13  **THE COURT:**  This goes to his state of mind.  In other

14  words, he conducted some test concerning alleged contamination.

15  Whether they're sufficient or not will be for you to decide and

16  subject to cross-examination.  But the reasons he is doing that is

17  apparently from an adverse witness.  And we don't know if that

18  witness is going to be called as an expert or not.  But at least

19  we need to know what experiments he conducted, if any.

20  Counsel, contamination.

21  BY MR. QUINN

22  **Q**  I think you testified, Dr. Aginsky, as far as you know, there

23  were no established protocol for conducting the type of

24  contaminant test that you wanted to do; is that correct?

25  **A**  Correct.

1    **Q**    So how did you go about deciding whether you could test this

2    idea that external contamination could have been the explanation

3    for the menthol that your test detected?

4    **A**    I was trying to -- I was thinking about possible ways, even

5    theoretical, menthol containing material could somehow contaminate

6    either the tip of the writing instrument or the paper in the Area

7    No. 8.  And I created -- conducted these experiment prepared test

8    samples and then examined those test samples by GC-MS.

9    **Q**    And what products containing menthol did you use in your

10   contamination test?

11   **A**    I used three products:  Chewing gum with menthol, cough drops

12   with menthol, and Vicks Vaporub ointment containing high

13   concentration of menthol.

14   **Q**    And what test did you design using the gum, the cough drops,

15   and the Vicks Vaporub?

16   **A**    There were various tests, but some of them were like, I would

17   start chewing gum and when I feel the smell of menthol and it's

18   cold in my mouth, because menthol has this ability to cause this

19   feeling of coldness, I immediately used the gel pen, actually the

20   cartridge.  That's the main part of the pen.  Not the barrel but

21   the cartridge inside that contains the ink.  And I just touched my

22   tongue with saliva in it.  So by doing this I contaminated the tip

23   of the writing instrument.  And I prepared test sample.  And I did

24   it several times to prepare more than one sample.

25            Then I did the same with the using cough drops.  It was

Page 46

1   technically the same but the material was different.  Again, when

2   I felt that menthol starts releasing from the cough drop, I would

3   do the same.  And prepared a number of samples.

4   **Q**    Don't tell me you put the Vicks Vaporub in your mouth?

5   **A**    No.  I didn't think that someone would do this.  And the

6   reason why I used -- when I tested the saliva is because some

7   people, they have this habit, like they lick the pen before they

8   write.  It used to be a habit when we used other types of writing

9   instruments, but even now with this ballpoint pens, still some

10  people do it.  And I just wanted to check whether that's a

11  possibility to if I do this, whether I can contaminant the writing

12  instrument to the point that I will detect menthol in the writing.

13          And then, when I used vaporub, that's an ointment in the

14  used for like people -- rub it on -- if I rub it on my chest, if I

15  have a sinus problem and I will just breathe it in, and it will

16  facilitate the breathing.

17          Or also it is a cough suppressant.  Menthol has this

18  ability to suppress cough.  So what I did, I two types of

19  experiments.  One what I call casual contamination and the other I

20  called direct.

21          For casual examination, I just rub the rub the ointment

22  first on my chest, as I did it.  And then when I -- when some

23  ointment was still on my finger, I saw it was still glossy because

24  it was partial absorbed in the finger, but not completely; the

25  finger was not dry.  So again, I used another cartridge and just

1   made a scribble note on my finger.  And after I contaminated the

2   point of this writing instrument, I prepared a sample.  And I did

3   it again more than one time.

4           And finally, I did -- that was a casual contamination,

5   what I call.  But direct contamination, I decided to integrate the

6   point where probably never occur in the real life just to see that

7   even this experiment, even -- whether this experiment would show

8   something.  And I put a drop of -- so it was a thick layer on my

9   finger of the ointment.  And I just submerged the writing

10  instrument into it; just dipped it inside, and made a scribble

11  note.

12          So after that, it was covered with the ointment.  And I

13  started writing to prepare the samples for this test.  And

14  finally, I also used another drop of the ointment.  And I rubbed a

15  significant amount of the ointment.  And I rubbed it into the

16  paper, just like if I would do it on my chest, to see what would

17  be the contamination, the level of contamination in the paper if I

18  did this.

19  **Q**   And then did you run your chemical test as part of that after

20  you did that?

21  **A**   Yes.  And all these samples that I prepared, I then took a

22  sample from the contaminated area and analyzed these samples by

23  GC-MS.

24  **Q**   What conclusion, if any, did you draw from your contamination

25  test?

Page 48

1   **A**    My conclusion was that, first of all, the casual

2   contamination, what I explained before when I used my saliva and

3   then when I used the level of the ointment that was partial

4   absorbed in my finger, that in those experiments I didn't find any

5   menthol.  So no detectable amount of menthol was in the samples

6   that I prepared in test samples.

7   **Q**    Dr. Aginsky, if I can just interrupt you.  You prepared a

8   slide to illustrate the results of these tests?

9   **A**    Yes, I did.

10  **Q**    If we could put Exhibit 23962-21 up on the screen.

11           If you could briefly tell us what the results were of

12  your contamination test.

13  **A**    Yes.  What I just mentioned, the casual contamination didn't

14  show any menthol.

15           The direct contamination, what I found was first of all,

16  the pen, due to the presence of this ointment of grease, the pen

17  couldn't write normally.  And when I started writing, the initial

18  portion of the writing just skipped and I couldn't see any ink in

19  that.  So only in that area that skipped I found certain amount of

20  menthol, which was actually less than in the questioned notation

21  from 1998 Missouri.

22           But I saw no evidence pen skipping in the "from 1998

23  Missouri."  So that was not -- I didn't see it in the questioned

24  entry.

25           Then when I analyzed these samples, when I said where

Page 49

1   the pen skipped and also when I rubbed ointment into the paper, I

2   determined that there was menthol there, but also there was a lot

3   of other components.  And most of all, there were components of

4   petroleum jelly, which is the basis the main component, known

5   active component of this vapor rub, which it's a mixture of

6   hydrocarbons.

7            And finally, even in this direct contamination test, I

8   found that the concentration of menthol, when I rubbed into the

9   paper or when the pen skipped in that particular line, that didn't

10  show any ink but just a skipping.  Even in that line, the

11  concentration of menthol was less than in the ink line that I

12  tested from 1998 Missouri.

13  **Q**   So then to summarize your opinion, sir, if we could look at

14  23962-12 and 13.  If we could put those two slides up.

15           To summarize briefly, how did your examination lead you

16  to your conclusion that the words "from 1998 Missouri" notation

17  was added after the other parts of the August 26, 1999, entry on

18  pages 19 and 20 of Exhibit 60C?

19  **A**   To answer this question, can I have the general view?

20           So I determined "from 1998 Missouri" is a different ink;

21  different from the ink that was used to produce the other entries

22  that we -- the other 16 areas that I tested.

23           So if one were to assume that everything was done in

24  logical succession, then the notary would write in the first

25  column, in the second column, in the third column.  And then in

Page 50

1    the fourth line of this fourth column, then she would change, take

2    a different pen, and she would write with a different pen this

3    particular notation "from 1998 Missouri."  And she would return to

4    the, again, to the first pen, and she would complete the other

5    part of this August 26, 1999, Missouri.  So we have a sequence pen

6    one up to here, pen two; and again, pen one.

7            It is very unlikely that someone would complete the

8    document in such an unusual succession.  Therefore, my conclusion

9    is that it was not done contemporaneously.

10   **Q**    What lead to your conclusion the "from 1998 Missouri"

11   notation was added after all the other entries on the same page?

12   **A**    Similar reasons.  Again, if we could return to the -- the ink

13   that was used to produce all other entries other than this

14   questioned entry was likely of the same formulation.  So what we

15   have, we have again ink one was used.  We have ink one, ink two

16   and again ink one.

17           **THE COURT:**  That's very unclear for the record, counsel.

18   BY MR. QUINN

19   **Q**    Dr. Aginsky, could you explain what you're referring to when

20   you say, "we have ink one and ink two."

21           You are referring first, on the first line across the

22   notary page book, pages 11 and 12, that's all ink one except for

23   that fifth line in the fourth box?

24   **A**    Yes.  Everything that is highlighted was yellow, is what I

25   call ink one.

1  **Q**    And then other areas which are highlighted in yellow on those

2  two pages, similar all are what you have referred to as ink one;

3  correct?

4  **A**    Yes.  Everything that is highlighted in the yellow is ink one

5  and in the middle we have ink two.

6  **Q**    And when you say, "in the middle," you are referring to what

7  you have circled in green, which is what you have identified?

8  **A**    Yes.  Area 8 is somewhere in the middle on this page.

9  **Q**    Thank you.

10         **MR. QUINN:**  With the Court's permission I would like to

11  read into evidence a portion of the notes, Exhibit 4600.

12  BY MR. QUINN

13  **Q**    And Dr. Aginsky, just in case I misread your handwriting, I'd

14  appreciate if you could follow along with me.  I'll read.

15         **THE COURT:**  Let me repeat for my record that it's

16  admitted, but I am not receiving it.  I previously received it.  I

17  misstated.

18         Counsel.

19  BY MR. QUINN

20  **Q**    So we have here the list of areas which you have tested from

21  top to bottom in the sequence in which you tested them; right?

22  **A**    Yes.

23  **Q**    And next to each are the number of plugs that you tested?

24  **A**    That's correct.

25  **Q**    And so the sequence is Area 14, three plugs.  Area 4, same

Page 52

1    number.  Area 8, same number.

2              PB that refers to what?

3    **A**    Paper blank.

4    **Q**    Paper blank also three plugs.  Then we have 8.1?

5    **A**    This is the second analysis for Area No. 8.

6    **Q**    All right.  And that's also three plugs; correct?

7    **A**    Yes.

8    **Q**    4.1, that's the second test for Area 4?

9    **A**    Correct.

10   **Q**    Three plugs.  And then Area 7, 6, 5, all three plugs;

11   correct?

12   **A**    Yes.

13   **Q**    Then 8.2, that's the third test for Area 8; correct?

14   **A**    That's confirmatory test, yes.

15   **Q**    That's four plugs?

16   **A**    Yes.

17   **Q**    And then 11, four plugs?

18   **A**    Yes.

19   **Q**    And then what is the next number?  Is that 12, below 11?

20   It's not a very good copy.

21   **A**    12.

22   **Q**    Four plugs; right?

23   **A**    Yes.

24   **Q**    Then 14, four plugs?

25   **A**    17.

Page 53

1   **Q**   17, four plugs.  Then 13, four plugs?

2   **A**   Yes.

3   **Q**   Then is that a nine?

4   **A**   Nine.

5   **Q**   Four plugs.  10, four plugs?

6   **A**   Yes.

7   **Q**   One, four plugs?

8   **A**   Yes.

9           **MR. QUINN:**  Then, Your Honor, I'd like to move into

10  evidence from Exhibit 23962 -- I'm sorry.  4600, there is a final

11  line which I overlooked.

12  BY MR. QUINN

13  **Q**   That's Areas 2, 3, 15, 16.  A total of five plugs?

14  **A**   That's correct.

15          **MR. QUINN:**  I would like to move into evidence from

16  23962, Your Honor, pages -1, -2, -3, -5 through 14.

17          **THE COURT:**  Just a moment.  Counsel.

18          **MR. QUINN:**  And then 18 and 19 and 21.

19          **MS. HURST:**  They're demonstratives.

20          **THE COURT:**  Some are admissible, some are not, counsel.

21  We can take that up at a later time.

22          **MR. QUINN:**  Thank you, Your Honor.  Nothing further.

23          **THE COURT:**  All right.  Cross-examination, please.

24          Ms. Hurst on behalf of MGA and Mr. Larian.

25

Page 54

1                          CROSS-EXAMINATION

2    BY MS. HURST

3    **Q**    Good afternoon, Dr. Aginsky.

4    **A**    Good afternoon.

5    **Q**    My name is Annette Hurst.  I represent MGA and Mr. Larian.

6           You were first retained by Mattel in about November of

7    2004; is that right?

8    **A**    Yes.

9    **Q**    And the hourly rate that you bill for services in connection

10   with this matter is $400 an hour; correct?

11   **A**    At that time it was less.

12   **Q**    Currently it's $400 an hour?

13   **A**    Correct.

14   **Q**    What is the total amount that you have billed to Mattel to

15   date for your services in this matter?

16   **A**    I might be wrong.  I don't remember the exact number.  Two

17   years ago probably.  I don't know, like 30,000 overall.

18   **Q**    And since then?

19   **A**    And since then, again, I don't remember exactly, but probably

20   like 40,000.

21   **Q**    So as of two years ago, you had billed Mattel approximately

22   $30,000; since then you have been billed them another $40,000; is

23   that correct?

24   **A**    As far as I remember.  I don't have any documents in front of

25   me to refresh my memory.

Page 55

1    **Q**    Your best estimate stated that you have been billed Mattel

2    about $70,000; is that correct?

3    **A**    I don't know whether it's correct, but it's what I remember.

4    **Q**    It's your best estimate as you sit here today?

5    **A**    Yes.

6    **Q**    $70,000; correct?

7    **A**    I think I said that this is what I remember.

8    **Q**    You have issued a number of reports in connection with your

9    work on this matter; is that correct?

10   **A**    That's correct.

11   **Q**    And you reported at one time that you found a derivative of

12   the chemical phenol in the ink in the notary book; correct?

13   **A**    Yes.

14   **Q**    And you testified under oath, in deposition, that the

15   derivative of phenol was a component of the ink in the samples in

16   the notary book?

17   **A**    That's correct.

18   **Q**    You concluded that the derivative of phenol was typical for

19   substances, which are components of ink resins; correct?

20   **A**    That was my evaluation at that time, yes.

21   **Q**    In fact, you said you were "absolutely sure," absolutely sure

22   that the phenol derivative you detected was a component of the ink

23   and not a component of the paper, didn't you?

24   **A**    That's correct.

25   **Q**    You were wrong?

Page 56

1   **A**    I was wrong, yes.

2   **Q**    That was a mistake you made in connection with your analysis

3   in this matter?

4   **A**    Yes.

5   **Q**    And you didn't admit that mistake until your second

6   deposition in December of 2010; isn't that right?

7   **A**    That's correct.

8   **Q**    Could we see, Mike, Exhibit 60?  Put up those two pages, 11

9   and 12.

10          Dr. Aginsky, you recognize this Exhibit 60, pages 11 and

11  12, as the pages upon which you performed your testing and

12  examination; correct?

13  **A**    Yes.

14  **Q**    And that journal contains preprinted lines on it; is that

15  right?

16  **A**    That's right.

17  **Q**    Those lines create the different cells in which the notary

18  writes the information?

19  **A**    Yes.

20  **Q**    When you took your samples from Area 8 -- let me just pause

21  there.  Area 8 is the area of greatest interest in connection with

22  your analysis in this matter; is that right?

23  **A**    That was a question that -- yes.

24  **Q**    Area 8 was the questioned entry, the fifth line "from 1998

25  Missouri"; correct?

Page 57

1    **A**    Yes.

2    **Q**    And when you took your first set of plugs, the one that was

3    observed by MGA's representative, you wanted to test the ink used

4    in Area 8; correct?

5    **A**    I wanted to test all the inks in all the 17 areas, including

6    Area 8.

7    **Q**    When you were taking plugs from Area 8, you were hoping to

8    get samples that would enable you to test the ink in that area;

9    correct?

10   **A**    Are you asking me about the confirmatory test that I did?

11   **Q**    No.  The first set of plugs.

12   **A**    Yes.  The first set of plugs, I took those plugs to -- I

13   could compare the ink in Area 8 with any other areas.  It was any

14   other of the 16 areas from which I took ink microplugs.

15   **Q**    You also wanted to test the blank paper from the journal; is

16   that right?

17   **A**    That's right.

18   **Q**    And when you took the samples of blank paper, you tried to

19   avoid those preprinted lines; is that right?

20   **A**    Yes.  Generally I try to avoid it, yes.

21   **Q**    And that's because the preprinted lines might contain

22   chemicals not found in the ink and might contaminate your blank

23   paper sample; is that right?

24   **A**    Yes.  If it's colored not black, then yes, it might show the

25   components that would, call it components of the preprinted ink.

1    Or even if it's black but it was produced using the -- not using

2    the solid black, like a carbon black, but if it's -- it was a

3    three-color printing and it was cyan, magenta and yellow, then I

4    would extract those cyan, magenta and yellow components and they

5    would show up on the TLC chromatogram.

6    **Q**    So the answer was yes, you were trying to avoid the

7    preprinted line so you wouldn't contaminate your sample; is that

8    right?

9    **A**    I would say I wouldn't contaminate my sample, but it's better

10   not to take preprinted line, if it's possible, not to complicate

11   for the evaluation of the results.

12   **Q**    And so you tried hard not to plug one of the preprinted

13   lines; isn't that true?

14   **A**    That's true, yes.

15   **Q**    In fact, it's very important in your line of work to be as

16   precise as possible; isn't that right?

17   **A**    Yes, of course, it's very important.

18   **Q**    And it's very important to be as accurate as possible; isn't

19   that true?

20   **A**    Yes.

21   **Q**    In attempting to be as precise and accurate as possible in

22   this matter, you nonetheless plugged one of the preprinted lines;

23   isn't that right?

24   **A**    That's correct.

25   **Q**    Do you have the original of Exhibit 60 up there with you, Dr.

1    Aginsky?

2    **A**    I do.

3    **Q**    The notary book?

4    **A**    Yes.

5    **Q**    Now, could you look at pages 10 and 11, please.  You have

6    those before you, sir?

7    **A**    Yes.

8    **Q**    Pages 10 and 11 are the two sides of the same page; correct?

9    **A**    Correct.

10   **Q**    And page 10 is the back side of page 11; right?

11   **A**    Yes.

12   **Q**    And page 11 is the page with the disputed entry in Area 8

13   from 1998 Missouri; correct?

14   **A**    Yes.

15   **Q**    And that single line of text was of the greatest interest to

16   you in conducting your examination in this matter; isn't that

17   true?

18   **A**    I don't know what I would qualify it as the greatest

19   interest, but that was a questioned entry that I was going to

20   compare it with all the other unquestioned entries.

21   **Q**    And when you plugged the preprinted line on page 10, you went

22   right through the number nine "from 1998 Missouri" on page 11;

23   isn't that right?

24   **A**    That's right.

25   **Q**    So that mistake you made directly affects Area 8, the area of

Page 60

1   the greatest interest to your examination; isn't that true?

2   **A**    No.

3   **Q**    The mistake you made in plugging the preprinted line and

4   going through went right through into Area 8; correct?

5              **MR. QUINN:**  Argumentative.  Assumes facts not in

6   evidence.

7              **THE COURT:**  Overruled.

8   BY MS. HURST

9   **Q**    Is that right?

10  **A**    Could you please repeat your question?

11  **Q**    When you accidentally plugged the preprinted line on page 10,

12  you went through the page and into a nine in the "from 1998

13  Missouri" entry; correct?

14  **A**    Yes.

15  **Q**    So you mistakenly plugged in Area 8; correct?

16  **A**    I wouldn't say it's mistakenly.  I didn't intend to it.  But

17  it proved to be that one of the 14 microplugs that I took from the

18  Area No. 8, only one of 14 contained the preprinted line on the

19  back of the microplug that I took from a page 11.

20  **Q**    So you didn't intend to do it but it wasn't a mistake?

21  **A**    I don't know how can one qualify it, but I wouldn't consider

22  it's a mistake.

23  **Q**    What would you consider it?

24  **A**    Just as something that I needed to deal with.

25  **Q**    Something that you needed to fix, like a mistake?

Page 61

1    **A**    Not to fix, but just the fact that it was a preprinted line

2    on one of the 14 samples, 14 microplugs that I took from the

3    questioned entry doesn't mean anything, because I found the

4    presence of menthol in three separate tests.  And this one

5    preprinted line, one microplug with one preprinted line could not

6    be divided into three and somehow miraculously get into three

7    GC-MS subsets -- into three subsets of three plugs, three plugs,

8    and four plugs that I examined using GC-MS.

9              **MS. HURST:**  Your Honor, move to strike and ask that the

10   Court direct the witness to answer my questions.

11             **THE COURT:**  Re-ask it, counsel.

12   BY MS. HURST

13   **Q**    Dr. Aginsky, let me ask you to look at some of your GC-MS

14   tests for this matter, Exhibit 23631.  Do you have that before

15   you, 23631?  Turn to page 16 of that, please.

16   **A**    Which page?

17   **Q**    16, please.

18   **A**    Yes.

19   **Q**    And that's a test that you did on December 11, 2010; is that

20   correct?

21   **A**    That's correct.

22   **Q**    And that was after your last deposition; correct?

23   **A**    No.  It was before my last deposition.

24   **Q**    In this test you -- this GC-MS test reflects your work to put

25   gel ink on paper after Vicks' direct contact; correct?

Page 62

1    **A**    Yes.

2    **Q**    And are those your handwritten notes on the page?

3    **A**    Yes.

4    **Q**    And did they say there might be traces of menthol at a level

5    that is so low that no reliable detection is possible?

6    **A**    That's correct.

7    **Q**    And you have written a little arrow there to the spike at the

8    menthol retention time in connection with those notes; is that

9    right?

10   **A**    These are not retention times.  These are different masses in

11   the mass spectrum.

12   **Q**    The top graph, isn't that retention times?

13        **MR. QUINN:**  Vague and ambiguous as to what is "top,"

14   Your Honor.

15        **THE COURT:**  Sustained.  The top of the page?

16   BY MS. HURST

17   **Q**    Top of the page.

18        Dr. Aginsky, do you see two graphs on page 16 of Exhibit

19   23631?

20   **A**    Yes.

21   **Q**    And the top is a retention time graph; is that correct?

22   **A**    The top is the GC-MS chromatogram.

23   **Q**    And the spikes on that, just like the other ones you looked

24   at with Mr. Quinn, show the retention time peaks; is that correct?

25   **A**    They show peaks, but they did not show any retention times

Page 63

1    above.

2    **Q**    In other words, you didn't write it; you didn't actually note

3    the retention time on the peak; is that right?

4    **A**    I didn't ask the machine to do an integration and to put the

5    retention time above each peak.

6    **Q**    But there is a peak at about 8.58 on that graph; correct?

7    **A**    Yes.

8    **Q**    And that's the one that you indicated in your note may be

9    traces of menthol; correct?

10   **A**    No.  Not this peak.  The arrow that shows that it might be

11   traces of menthol relates to the noise, to the right of that peak.

12   That peak is not the menthol.  It's a different component.  But

13   there was some noise to the right of that peak that have a couple

14   of masses that are consistent with them being from menthol.  But

15   because it is not a peak, it's just noise, I cannot say whether

16   there is menthol there or not.

17              I simply was looking for menthol in this contamination

18   test.  But there was no peak for menthol.  There was just a noise.

19   So maybe something hidden in the noise under the baseline would be

20   trace amount of menthol, but it cannot be reliably detected.

21   **Q**    Is it true that when you have a small peak on your GC-MS

22   test, that that might be either a component of the ink or a

23   contaminant, when you have a small peak?

24   **A**    It depends on how small the peak is.

25   **Q**    Would you turn to Exhibit 4598, please.  And you have 45981

Page 64

1    there; is that correct?

2    **A**    Yes.

3    **Q**    Turn to 45982, please.  Do you have 45982 before you, sir?

4    **A**    Yes.

5    **Q**    And you see there the first peak and a retention time labeled

6    about 8.14?  Do you see that?

7    **A**    Yes.

8    **Q**    And that is a peak with an abundance of what, sir?

9    **A**    To calculate the abundance it is not to ingrate the peak, the

10   area under the peak.  But simply on the -- if we use very

11   approximately, if I start from the baseline up to the end of the

12   peak, that would be from 4000 to slightly above 6000.  So I don't

13   know how can I say what the abundance is, but it is from between

14   4000 the 6000.

15   **Q**    You would agree that that is not a significant peak, wouldn't

16   you?

17   **A**    No, I wouldn't agree.  It's a peak that is present in all the

18   chromatograms, which has a peak of -- for a particular paper

19   component.

20   **Q**    Okay.  Let me ask you to turn to page 125 of your deposition

21   please.  And, sir, if you would start reading --

22              **THE COURT:**  Not yet, counsel.  I'm sorry.  You tell him

23   where to read.  Not yet.  You can tell him direct him where to go

24   but not until I see it.  Lines?

25              **MS. HURST:**  124/21 through 125/21.

Page 65

1   BY MS. HURST

2   **Q**   Dr. Aginsky, have you had an opportunity to read those lines?

3   **A**   Which lines?

4   **Q**   124 line 21, through 125 line 21.

5   **A**   (Witness reads document.)

6          Yes, I have read it.

7   **Q**   And that's a small peak, isn't it?  That peak at 8.14 on page

8   2 of Exhibit 4598?

9   **A**   It is small comparing with the other peaks on the

10  chromatogram, yes.

11  **Q**   And a small peak like that may reflect either an unimportant

12  compound in the ink or a contaminant; correct?

13  **A**   No.

14  **Q**   Okay.  Let me ask you to continue reading in your deposition

15  at page 125 line 22, do you have that?

16  **A**   Yes.

17  **Q**   Through 126, 8, line 8.

18  **A**   (Witness reads document.)

19  **Q**   Have you read those two lines, sir?

20  **A**   Yes.

21  **Q**   Isn't it true that a small peak like that could reflect

22  either a minor component to the ink or a contaminant?

23  **A**   It could.

24  **Q**   Now, let me ask you to look at Exhibit 4598, page 10.  Do you

25  have that before you?  Let's put page 2 and 10 up there at the

Page 66

1    same time.

2            Now, page 2, that was the sample that you just looked at

3    and agreed was a small peak that could reflect either a minor

4    component of the ink or a contaminant; correct?

5    **A**    Yes, if it's an ink component.  It's a paper component.  But

6    the peak is small, correct.

7    **Q**    I just asked you if a small peak like that on page 2, if it's

8    true that that small peak could reflect either a minor component

9    of the ink or a contaminant and you said yes; isn't that right?

10   **A**    It could, yes.

11   **Q**    And that's the one we see on the left on the screen before

12   you right now; is that correct?  That's small peak on the left on

13   page 2?

14   **A**    Yes.

15   **Q**    Now, there is also a small peak at retention time 8.14 on

16   page 10; correct?

17   **A**    8.58, yes.

18   **Q**    Let's just start with 8.14.

19   **A**    Okay.  Yes.

20   **Q**    Right?

21   **A**    Yes.

22   **Q**    Both of those are small peaks; right?

23   **A**    Comparing with the other three, yes.

24   **Q**    They're about the same size as the peak on page 2; right?

25   **A**    Yes.

Page 67

1   **Q**    The one that you just agreed with me could reflect either a

2   minor component of the ink or a contaminant; correct?

3   **A**    That's a possibility, yes.

4   **Q**    Now, on the right, that page 10, that small peak at retention

5   time 8.58, do you see that?

6   **A**    Yes.

7   **Q**    That's the one you say reflects the menthol in Area 8;

8   correct?

9   **A**    That's correct.

10          **THE COURT:**  Do you want to use that laser beam?  They'll

11   share it.  Mr. Quinn is happy to share that with you.  That way

12   both of them have wands.  Thank you very much.

13          **MS. HURST:**  Thank you all so much.

14   BY MS. HURST

15   **Q**    So I'm pointing now at the 8.58 retention time; is that

16   correct?

17   **A**    That's correct.

18   **Q**    And that's on page 10 of Exhibit 4598; correct?

19   **A**    Correct.

20   **Q**    And that is one of your tests of a sample from Area 8;

21   correct?

22   **A**    Yes.

23   **Q**    Just to remind everybody, Area 8, that's from 1998 Missouri;

24   right?

25   **A**    Yes.

Page 68

1   **Q**   And that's a small peak; right?

2   **A**   Small comparing with the other three, yes.

3   **Q**   All right.  Now, let's look at Exhibit 4598, page 1.  And you

4   see there is your file name PB-1; correct?

5   **A**   Yes.

6   **Q**   Now, actually that's both paper blanks that you tested in

7   that sample; correct?

8   **A**   That's correct.

9   **Q**   Not just PB1, but PB2 as well?

10  **A**   That's correct.

11  **Q**   But as you noted, the sample name describes Area 8; correct?

12  **A**   Yes.

13  **Q**   And you had to look at your notes to know which one it was;

14  isn't that true?

15  **A**   No.  I needed to look at the file name.

16  **Q**   Well, the file name and the sample name are inconsistent;

17  isn't that right?

18  **A**   Yes, but file name is important and sample name is not.

19  **Q**   Okay.  So I just want to make sure I understand your

20  testimony of the same name pertaining to Area 8 was unimportant to

21  you when you were conducting your GC-MS tests?

22  **A**   That's correct.

23  **Q**   And Area 8 is the disputed entry in question; correct?

24  **A**   Maybe I misunderstood your previous question.

25  **Q**   I don't think so.  Area 8 is from 1998 Missouri, isn't it,

Page 69

1   Dr. Aginsky?

2   **A**   No.   That's -- you are right.   But I think that I answered

3   your previous question.   I didn't understand.   But, okay.

4   **Q**   So this is another mistake that you made that concerns Area 8

5   in connection with this matter; isn't that right?   Leaving this

6   entry supposedly in here with the description Area 8 associated

7   with the blank paper?

8   **A**   Yes, that was a mistake when I --

9   **Q**   That's fine, Dr. Aginsky.   Yes, that's a mistake.   That will

10  do.   Thank you.   That's an answer.

11         Could we see also Exhibit 4598 page 11.   And this again

12  is one of your initial samples from Area 8; correct, Dr. Aginsky?

13  **A**   That's the second set of microplugs that I examined by GC-MS

14  from Area 8, yes.

15  **Q**   From the second set; right?   Which you labeled 8-1 in the

16  file name?

17  **A**   Yes.   That's correct, yes.

18  **Q**   And you found a peak at retention time 8.58; right?

19  **A**   Yes.

20  **Q**   And that's a small, peak isn't it, Dr. Aginsky?

21  **A**   Relative to other paper components, yes.

22  **Q**   Did you say relative to the other paper components?

23  **A**   Yes.   To other paper components.

24  **Q**   In fact, earlier when you were looking at your chromatogram

25  for the sample from Area 4, you said it showed only paper

Page 70

1    components and no ink; isn't that right?

2    **A**    That's right.

3    **Q**    But there is handwriting in Area 4, isn't there?

4    **A**    Yes.

5    **Q**    You weren't trying to plug blank paper when you plugged the

6    handwriting in Area 4, were you?

7    **A**    Could you repeat it, please?

8    **Q**    You were trying to plug the handwriting when you plugged Area

9    4; correct?

10   **A**    Yes, of course.

11   **Q**    Now, your first two tests on the samples from Area 8 produced

12   small peaks at retention time 8.58; correct?

13   **A**    Relatively small, yes.

14   **Q**    Now, you knew that there was a court order governing your

15   plugging in that notary book, didn't you?

16   **A**    Yes.

17   **Q**    And after you found those two small peaks, without telling

18   counsel, without informing the Court, you secretly went back and

19   plugged Area 8 again; isn't that true?

20   **A**    Yes, I took the plugs without anybody being present.

21   **Q**    And you didn't tell anybody either?

22   **A**    That's correct.

23   **Q**    You kept it a secret that you went back and plugged those

24   additional samples out of Area 8; isn't that true?

25   **A**    I didn't intend to make it a secret.  I simply didn't ask

Page 71

1    anybody for anybody's permission.

2    **Q**    You also didn't tell anybody before you did it, did you?

3    **A**    That's correct.

4    **Q**    And you knew that MGA wanted to test that sample and get

5    enough ink to perform its own testing when you secretly took the

6    third set of plugs out of Area 8; isn't that right?

7    **A**    I thought that MGA expert would do the analysis after me,

8    yes.

9    **Q**    And you knew that that was semi-destructive testing, didn't

10   you?

11   **A**    These sampling of ink from documents is considered a

12   semi-destructive, yes.

13   **Q**    And you were aware when you took that third sample from Area

14   8 that you were violating the Court's order; isn't that true?

15   **A**    That's true.

16   **Q**    After you only got two small peaks which might be

17   contaminant; isn't that right?

18   **A**    No.  I was virtually sure at that point that it's not a

19   contaminant.  It's an ink component.

20   **Q**    It's true, isn't it, Dr. Aginsky, that a small peak can

21   represent either a minor component of ink or a contaminant?

22   Haven't you answered that question yes three times here today on

23   my examination?

24            **MR. QUINN:**  Compound, Your Honor.  Two questions.

25            **THE COURT:**  Overruled.

Page 72

1           Do you understand the question, sir?  Do you understand

2    the question?

3              **THE WITNESS:**  Yes.

4              **THE COURT:**  You may answer.

5              **THE WITNESS:**  A small peak may represent a true

6    component.  And the fact that it is small doesn't mean it is not

7    an ink component.  It simply depends on the concentration of that

8    particular component in the samples, in the ink line from which I

9    took samples.

10   BY MS. HURST

11   **Q**    Are you changing your answer again about whether a small peak

12   might reflect a contaminant?

13   **A**    No I'm not changing my answer.

14   **Q**    It's true that a small peak may reflect a contaminant; isn't

15   that right?

16   **A**    It may or may not.

17   **Q**    But it may; isn't that true?

18   **A**    It's a possibility.

19   **Q**    And after getting two small peaks, you went and secretly

20   plugged the area in question knowing you were violating a court

21   order; isn't that right?

22   **A**    Yes, this is what I did.  But I wouldn't say that it was

23   secretly and it was sinister plan.

24   **Q**    How much had you been paid by Mattel at that point?  About

25   $40,000?

Page 73

1   **A**     I don't think so.

2   **Q**     25?

3   **A**     At that time I was retained.  So I was paid my retainer.  I

4   don't think that I was paid for my work that I have not completed

5   yet.

6   **Q**     After you got what you thought was a reading for menthol in

7   Area 8 and you went back and secretly took the confirmatory plugs

8   from that area, did you go back and get a second set of plugs from

9   any of the other areas in order to try to determine whether you

10  could find menthol in any of those?

11  **A**     I did not.

12  **Q**     So you only -- other than Area 4, you took one set of plugs

13  from all the other areas; correct?

14  **A**     That's correct.

15  **Q**     And after you got the menthol result, you didn't go back and

16  try to see whether you could get menthol from any other ink; isn't

17  that true?

18  **A**     That's true.

19  **Q**     Now, it's true, isn't it, that you have never had any formal

20  training in ink analysis?

21  **A**     I had an introductory training, but not a formal training.

22  **Q**     You studied at the Military Academy of Chemical Defense in

23  Russia; correct?

24  **A**     In the former Soviet Union, yes.

25  **Q**     And you received a master's of science at the Military

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

Page 74

1    Academy of Chemical Defense; correct?

2    **A**    That's correct.

3    **Q**    Did you hold a military rank there?

4    **A**    I was military student.

5    **Q**    Did you hold a rank?

6    **A**    There was no rank, but I had a uniform.

7    **Q**    So you were a military student in chemical defense or the

8    Academy of Chemical Defense when you received your degrees in

9    chemistry; correct?

10   **A**    That's correct.

11   **Q**    And after that, you worked for the Soviet Ministry of the

12   Interior for many years?

13   **A**    Yes.  For 20 years.

14   **Q**    And a significant percentage of your work for the Soviet

15   Ministry for the Interior involved assisting law enforcement in

16   criminal prosecution matters; correct?

17   **A**    That's correct.

18   **Q**    Ever since you have been an ink chemist, you have been

19   collecting pens for testing; isn't that true?

20   **A**    Yes.  I tried to collect them.  I didn't do it all the time,

21   but from time to time, yes.

22   **Q**    How many pens have you personally collected and tested over

23   the years?

24   **A**    It's approximately over 1000.

25   **Q**    Now, the ink in Area 8, if we assume it had menthol in it,

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

Page 75

1    had three characteristics that you have described.  It was

2    water-based, black, and it had menthol; correct?

3    **A**    Yes.  Generally correct, yes.

4    **Q**    And you have never personally collected or tested a pen with

5    those three characteristics; isn't that true?  Yes or no, if you

6    can answer it please, sir.

7    **A**    No.

8    **Q**    Yes.  It's true, am I correct?

9    **A**    No.  I said no.

10   **Q**    You have a pen with black water-based ink and menthol in it?

11            **MR. QUINN:**  The question was compound, Your Honor.  I

12   was slow to object.

13            **THE COURT:**  It's a negative.  Restate the question,

14   counsel.  I think we have an answer that's somewhat confusing.

15   Just restate it.

16   BY MS. HURST

17   **Q**    Have you ever personally obtained and tested, had in your

18   possession and performed a test on a pen that you determined was

19   black water-based gel with menthol?

20   **A**    No.

21   **Q**    It's true, isn't it, that there are many widely available

22   commercially prepared substances containing menthol?

23   **A**    That's correct.

24   **Q**    It's commonly found in chewing gum, toothpaste, shampoo,

25   soap, cosmetics, mouth wash, medicines, tea, ice cream, candy, lip

Page 76

1    balm, cough syrup, cigarettes.  All of those; isn't that true?

2    **A**    That's correct.

3    **Q**    Menthol is all around us including here in the courtroom

4    where several of us have been sick lately; isn't that true?

5    **A**    That's correct.

6    **Q**    Did you try coughing on a piece of paper to see what the test

7    results would come out as?

8            **THE COURT:**  Let's not do that, counsel.  You can ask the

9    question.

10   BY MS. HURST

11   **Q**    Did you try coughing?

12   **A**    No.

13   **Q**    Did you try sneezing?

14   **A**    Not yet.

15   **Q**    Have you noticed that when people cough or yawn, sometimes

16   they create a small droplet of sprays?

17   **A**    It could be.

18   **Q**    So let me just summarize.  You have been paid approximately

19   $70,000 by Mattel in connection with this matter; correct?

20   **A**    Yes.

21   **Q**    And you made a mistake by calling a derivative of phenol an

22   ink component rather than a paper component; correct?

23   **A**    Yes.

24   **Q**    And you erroneously plugged a preprinted line in Area 8;

25   correct?

Page 77

1    **A**    Correct.

2    **Q**    You secretly took samples in violation of a court order;

3    correct?

4    **A**    Again, I'm not sure whether I did it secretly, but yes I

5    didn't ask for permission.

6    **Q**    And you did it knowing you were violating a court order?

7    **A**    I did.

8    **Q**    And you mislabeled at least one of your tests results;

9    correct?

10   **A**    That was a nonimportant secondary information; correct.

11   **Q**    You mislabeled one of your tests; isn't that right?

12   **A**    It's not right because the label means the file name.

13   **Q**    When you saw sample name on there, that's not part of the

14   label?

15   **A**    It's not.

16   **Q**    Your premise after all of that activity, however you want to

17   characterize it, is that the fifth line in that journal entry was

18   written in a different pen; isn't that right?

19   **A**    I determined that, yes, the pen is different for sure.

20   **Q**    And furthermore, you have gone so far as to say that that

21   entry was written after all the other dated entries on the page;

22   isn't that right?

23   **A**    That's correct.

24   **Q**    And you understand that the notary who made that entry is

25   going to testify in this case that she made all five lines at the

Page 78

1   same time; isn't that true?

2   **A**    I don't know whether she will testify, but yes.

3   **Q**    You assume that she were to testify that she made all five

4   lines of that entry at the same time, that would be inconsistent

5   with your opinions in this matter; isn't that right?

6   **A**    Completely inconsistent, yes.

7   **Q**    So you're calling Ramona Prince a liar; isn't that right?

8            **MR. QUINN:**  Argumentative, Your Honor.

9            **THE COURT:**  Sustained.

10   BY MS. HURST

11   **Q**    Ink-aging analysis, that was your original experiment; is

12   that correct?

13   **A**    I wouldn't say my original.  It's one of my specialties, yes.

14   **Q**    And you could not do an ink-dating analysis on this journal;

15   is that correct?

16   **A**    I didn't do any ink-aging analysis.

17   **Q**    You didn't do it at all; right?

18   **A**    Yes.  As I said, no ink-aging analysis was possible in this

19   case.

20   **Q**    And that was because you decided in advance that that would

21   be fruitless; right?

22   **A**    Yes, because I knew the ink is older than two years and it

23   would be useless to even start this ink-aging analysis.

24   **Q**    You understand there is some difference of opinion as to how

25   long an ink-age may occur; isn't that true?

1    **A**    It might be some differences.

2    **Q**    In fact, some people think ink-aging analysis can be done up

3    to five years after an entry; is that true?

4    **A**    It's true, but there's never been substantiated experimental

5    data published in peer review journals.

6    **Q**    If this entry was made in 1999 and you were retained in 2004,

7    at least some people think that you could have done testing then

8    and perhaps done a real ink-dating analysis; isn't that right?

9    **A**    Even if I assume that those some people right, this can't be

10   right to this type of ink.  The water-based ink, they age much

11   faster than oil-based ink.  And it will take much less than two

12   years for any water-based ink to stop aging.

13   **Q**    You didn't even try?

14   **A**    Because it was useless.

15   **Q**    And you didn't try in 2004 either; isn't that right?

16   **A**    I didn't receive this document in 2004.

17   **Q**    But you knew of its existence in 2004 when you were retained;

18   right?

19   **A**    I'm not sure at that time I was told about existence of this

20   document.  I just was retained.

21   **Q**    You never told anybody time is of the essence in your

22   analysis of the notary journal; is that right?

23   **A**    I usually tell my clients about this.  I don't remember

24   whether I told someone who initially contacted me in November of

25   2004 about this.

Page 80

1   **Q**    That was Diane Hutnyan from Quinn Emanuel who contacted you?

2          **MR. QUINN:**  Your Honor, there actually is a stipulation

3   between the parties about reciprocity regarding communication of

4   experts.

5          **MS. HURST:**  I haven't asked if the subjects.  I just

6   asked for the fact of the communication.

7          **MR. QUINN:**  Your Honor, I think that's --

8   BY MS. HURST

9   **Q**    Was it Diane Hutnyan know who contacted you on behalf of

10  Quinn Emanuel in 2004?

11  **A**    No.

12  **Q**    Who was it?

13  **A**    Tanya Krebs.

14  **Q**    And subsequently did you deal with Diane Hutnyan at Quinn

15  Emanuel?

16         **MR. QUINN:**  Your Honor, I think a deal is a deal.

17         **THE COURT:**  You can take that up, counsel, outside the

18  presence of the jury.

19  BY MS. HURST

20  **Q**    You actually stated on the record here today that the ink in

21  Area 8 did not have any extractable components; isn't that true?

22  **A**    I think I was -- it was for Area No. 4, and I just said

23  instead of four, I said eight.

24  **Q**    If there were no extractable components from the ink in Area

25  8, then your entire analysis would be wrong; isn't that true?

1    **A**    Yes.  If one were to assume that there was no menthol in Area

2    No. 8, then theoretically my analysis was incorrect.

3    **Q**    Was that a Freudian slip?

4             **MR. QUINN:**  Objection.  Argumentative.

5             **THE COURT:**  Sustained.

6             **MR. QUINN:**  Something.

7             **THE COURT:**  Just restate the question, counsel.

8             **MR. QUINN:**  Wrong science.

9             **THE COURT:**  I have sustained it as to Freud.

10            I'm going to joke with the jury.  You can see counsel

11   are on their last feet.

12            By the way, a compliment on the record to both sides;

13   they have been working very hard.  I promise you.  They have

14   driven the Court to the new heights of enjoyment.  So we enjoy our

15   time together.

16   BY MS. HURST

17   **Q**    It's consistent with your analysis that someone could have

18   coughed on to the paper and you would have found menthol in the

19   samples; isn't that true?

20   **A**    No.

21   **Q**    It's not consistent with your analysis that someone with a

22   cough drop in their mouth containing menthol, cough on Area 8 and

23   you later found menthol, is that your testimony that could not

24   have happened?  You are absolutely sure that could not have

25   happened?

1   **A**    I wouldn't say I'm absolutely sure, but I'm virtually sure.

2   **Q**    About as sure that you were that phenol was a component of

3   the ink and not of the paper; right?

4   **A**    I don't know whether I can compare that, but I'm virtually

5   sure that coughing on the document would not create the results

6   that I obtained in this case.

7   **Q**    But if two years ago when you had testified that phenol was a

8   component of the ink and not the paper and then you did some more

9   testing and later you came up with a different result; right?

10  **A**    Yes.  It's a different -- I evaluated the data.  The results

11  are the same, but simply based on my additional examination for

12  the last two years I realized that this is a paper component and

13  not the ink component.

14  **Q**    And maybe if you keep thinking up new experiments for the

15  next two years you'll decide that menthol was a contaminant.  You

16  can't exclude that possibility, can you, Dr. Aginsky?

17  **A**    I'm virtually certain this is not a possibility.

18  **Q**    About as certain as you were two years ago that phenol was a

19  component of the ink as well?

20           **MR. QUINN:**  Asked and answered.

21           **THE COURT:**  Sustained.

22           **MS. HURST:**  No further questions.

23           **THE COURT:**  Mr. Overland, Mr. Cote?

24           **MR. COTE:**  No thank you, Your Honor.

25           **MR. OVERLAND:**  No, Your Honor.

1          **THE COURT:**  Okay.  Mr. Quinn.

2                         REDIRECT EXAMINATION

3     BY MR. QUINN

4     **Q**    Dr. Aginsky, just to be clear, were there extractable ink

5     components in Area 8?

6     **A**    Yes.  That component was menthol.

7     **Q**    And supposed somebody coughed or sneezed with a menthol cough

8     drop in their mouth, is it likely that it just would have hit Area

9     8 and not Area 7 just above it?

10    **A**    It's very unlikely.

11    **Q**    So you didn't find any evidence of menthol in Area 7, the

12    four lines above; correct?

13    **A**    Correct.

14    **Q**    Let's talk a little bit about the preprinted ink.  Those are

15    the lines that are in the notary book; is that right?

16    **A**    Yes.

17    **Q**    Can the preprinted ink of the type found in this notary book

18    affect a GC-MS analysis?

19    **A**    It will not.  The only possible effect would be when I

20    extract the microplug, and if microplug of ink and paper contains

21    preprinted ink on the back, the pigment from the preprinted ink

22    might separate from the paper during the extraction process, and

23    that create like black rain, and those particles.

24    **Q**    Like a what?

25    **A**    Black rain.

Page 84

1  **Q**    Black rain?

2  **A**    Because it's pigment is black.  And it's like a suspension

3  consisting of black particles of the pigments in the solution.

4  And then when I take a portion of the solution for the analysis,

5  it might including my syringe or when I inject the -- this sample,

6  it might clog my eventually -- not one analysis, but eventually if

7  I do it routinely and analyze this preprinted ink many times, then

8  it might complicate the injector of the GC-MS machine and I will

9  have to do maintenance after that.

10         So this is more like a technical problem.  But it would

11  -- it could not and did not introduce any additional components

12  that would interfere with my analysis, especially if definitely

13  did not introduce menthol.

14  **Q**    Can the preprinted ink of the type found in this notary book,

15  does it contain any extractable vehicle components that would show

16  up in a chromatogram?

17  **A**    It didn't contain any extractable components that I could see

18  on the chromatogram.  Yes, it did not.

19  **Q**    And how long have you been doing GC-MS testing on preprinted

20  inks?

21  **A**    From time to time for the last over 20 years I have been

22  analyzing different printing inks.

23  **Q**    Let me go on to the next question.

24         Have you ever seen preprinted ink produce extractable

25  vehicle components that can be detected by GC-MS?

Page 85

1  **A**    Only for one type of printing inks.

2  **Q**    What is that type of ink?

3  **A**    It is ink jet printing ink.  Water-based ink jet printing

4  ink.  And only when the ink is relatively fresh on paper it still

5  keeps some solvents in the printed lines.

6  **Q**    Did you come across in this notary book, did you come across

7  any freshly printed ink jet printing ink in your analysis of the

8  notary book?

9  **A**    No.  That was definitely not on ink jet printing ink.

10  **Q**    And counsel has pointed out that in at least some of the

11  plugs, you did pick up some of the preprinted lines in the plug;

12  right?

13  **A**    Yes.

14  **Q**    And did this interfere with or change the results of your

15  GC-MS analysis?

16  **A**    No.  Not at all.  As I mentioned, even if just theoretically

17  we assume menthol was in that preprinted ink, which it is not, but

18  just theoretically, then only one plug out of 14 contains

19  preprinted line on the back of the microplug.  But three analysis

20  could not show the same result.  But three analysis showed that

21  menthol is in the ink in the Area 8.  So just one plug with a

22  preprinted ink could not be the source of menthol for three

23  separate analysis.

24  **Q**    So in Area 8 you took a total of how many plugs?

25  **A**    14.

Page 86

1    **Q**    And one of those picked up a preprinted line on the back

2    page?

3    **A**    Yes.

4    **Q**    But you didn't notice any difference in terms of the presence

5    of menthol, just that it wasn't just in that one plug; right?

6    **A**    Yes.  Could you rephrase the question, please?

7    **Q**    How many different samples did you take out of that Area 8?

8    **A**    14.

9    **Q**    And you found the presence of menthol in those that -- in the

10   one that was -- had the preprinted line as well as the others?

11               **MS. HURST:**  Objection.  Misstates the testimony.

12               **THE COURT:**  Well, I don't know that is the testimony.

13   You can answer the question.

14               **THE WITNESS:**  Yes, I found the presence of menthol in

15   three sets of microplugs.  The first analysis included three

16   microplugs, the second GC-MS analysis included another three

17   microplugs.  And the third confirmatory test included four

18   microplugs.

19               I don't know even if that microplug was the preprinted

20   ink.  It was in one of these three sets that I tested separately

21   by GC-MS.

22   BY MR. QUINN

23   **Q**    Was there any correlation between the one that had the

24   preprinted line on it and the others with respect to the presence

25   of menthol?

Page 87

1   **A**    All three sets showed the presence of menthol.

2   **Q**    And that was a total of 14 plugs out of Area 8?

3   **A**    Yes.  Three sets.  It was a total of 10.  And another four

4   plugs I used for TLC analysis.  So it could be that that sample

5   with a preprinted ink was used for the TLC analysis.

6   **Q**    You were asked some questions about the four additional plugs

7   that you took without an observer being present.

8          Did you keep that a secret?

9   **A**    No, I didn't consider that as a secret.  I just did it and

10  then completed the analysis.  And after I completed the analysis,

11  I reported my results.

12  **Q**    And you reported your results in a report that you issued;

13  correct?

14  **A**    Yes.

15  **Q**    And in your report you referred to these four additional

16  plugs that you had taken; correct?

17  **A**    Yes, I believe so.

18  **Q**    And you provided that to the other side?

19  **A**    Yes.  The report is a part of the -- yes, everything was

20  provided to the other side.

21  **Q**    And then you were asked some questions about small peaks and

22  whether a small peak can represent a contaminant or a component of

23  the ink.  Do.

24          You recall that, those questions?

25  **A**    Yes.

1   **Q**    And can you explain what you meant when you say sometimes a

2   small peak might reflect a contaminant versus a component of the

3   ink?

4   **A**    Yes.

5   **Q**    Can you explain what you meant by that?

6   **A**    Merely the intensity of the peak does not mean that it is a

7   contaminant.  Any material contains ingredients in different

8   concentrations.  And if a fragrance is added to the ink when, it's

9   added to the ink to make a scented ink, of course, it is not a

10  major component of the ink.  The major components of ink are

11  solvents, dyes or pigment, and resins.  And they make up to

12  95 percent of the composition.  The rest, 5 percent, could be many

13  different proprietary components that are very essentially

14  components of the ink.  They are responsible for how ink will

15  perform, how the line will be -- how smooth the line will be on

16  paper.  How quickly the ink will dry on paper.

17          And if the ink is scented, then it should be a smell

18  that can be smelled at the time when someone would write.

19          But the amount of those additional components, it's

20  relatively small comparing with the major components like solvent,

21  resin and pigment.

22  **Q**    That would account for a small peak that represents a

23  chemical that's in the ink?

24  **A**    Yes.

25  **Q**    Why did you conclude that the menthol was a component of the

Page 89

1   ink rather than a contaminant?

2   **A**   First of all, because there are three separate tests shows

3   the presence of menthol.  Second, when I did the confirmatory

4   test, I took the ink from the areas that contained larger deposit

5   of the ink, like from where the ink -- whether the lines

6   overlapped or whether simply the ink writing instrument dwelled

7   and left more ink on paper.

8           And because of that, the intensity of the peak increased

9   substantially.  So if it's a contaminant from paper, the fact that

10  I took more ink on the plug or less ink on the plug will not

11  change anything, because if it's a contaminant in the paper, there

12  will be the same result.  But because I increased the amount of

13  the ink, the peak for menthol increased too.  Simply showing this

14  is a component of the ink.  The more ink we have, the more -- the

15  larger the peak for menthol was there.

16          And then I determined that menthol was not anywhere on

17  these pages 11 and 12, not in the adjacent Area 7 that touches the

18  fifth line.  So the fourth line.  Not in any other written entries

19  on paper.  Not in the paper blanks samples.  And not even the

20  preprinted ink, because many of the samples like paper blank

21  samples were taken from the shading area, other than lines that

22  were printed, lines of table.

23          There are also some columns there.  They contain

24  preprinted ink as a shading.  And no menthol was detected in those

25  areas that were shaded.

1   **Q**     And you read Dr. Lyter's report, the expert retained by MGA?

2   **A**     Yes.

3   **Q**     And your understanding that although he took plugs of ink

4   after you did, he was able to take those plugs?

5   **A**     Yes.

6         **MS. HURST:**  Objection.  Hearsay.  Improper rebuttal.

7   Move to strike.

8         **THE COURT:**  Sustained.  Stricken.  Disregard the answer

9   and the question.

10        **MR. QUINN:**  Your Honor, I request that Dr. Aginsky look

11  at his report February 8, 2008.

12        **THE COURT:**  One of you get that report for me also so I

13  have a copy of it in front of me.

14        **MR. QUINN:**  Which is Exhibit 4595.  I'm sorry.

15  June 3rd, 2008 report.  Amended report, June 3rd, 2008.

16        Your Honor, we would belatedly request permission to

17  mark as an exhibit -- it appears that neither party marked as an

18  exhibit Dr. Aginsky's amended report February 8, 2008.

19        **THE COURT:**  I haven't seen it yet, have I?

20        **MR. QUINN:**  I'm sorry.  June 3, 2008.

21        **THE COURT:**  Have I seen it before?

22        MR. QUINN:  No.

23        **THE COURT:**  Did we go over it during the evening

24  session?

25        **MR. QUINN:**  We did not, Your Honor.

Page 91

1          **THE COURT:**  It's denied.

2    BY MR. QUINN

3    **Q**    Do you recall we were discussing the additional plugs that

4    you took 10 days later, Dr. Aginsky?

5    **A**    Yes.

6    **Q**    And I asked you about whether you advised the other side

7    about that and put that in your report.  I asked you that

8    question?

9    **A**    Yes.

10   **Q**    And do you recall that you submitted an amended report dated

11   June 3rd, 2008, where you identified those plugs, do you recall?

12          **THE COURT:**  Date, counsel, June 3, 2008?

13          **MR. QUINN:**  Yes, Your Honor.

14          **MS. HURST:**  Objection.  Leading.

15          **THE COURT:**  Overruled.  You can lead a witness who is an

16   expert.  Also children and also infirmed people.

17          **MR. QUINN:**  I apologize, Your Honor.

18          **MS. HURST:**  I'll stipulate to that.

19          **THE COURT:**  Leading, the old rule was you could lead

20   children, people with infirmities, experts.

21          Believe it or not, ladies and gentlemen, back to the

22   1970s you weren't even around, but the evidentiary rules have

23   changed over the years.  So it doesn't have anything to do with

24   this case.  But leading questions are broad and you can ask them.

25   Yes.

1          Now, June 3rd, 2008.

2    BY MR. QUINN

3    **Q**    Do you recall that in your amended report dated June 3, 2008,

4    you identified these?

5              **MS. HURST:**  Your Honor, he is publishing hearsay and I

6    don't even have a copy of it.

7              **THE COURT:**  I don't either.  That's the problem.  Maybe

8    we could go over that and invite him back.  I haven't seen that

9    report.  So I'm not precluding you.  I'm not going to just have it

10   handed to me, counsel.  I need to see what it is.  So why don't we

11   have him wait out in the hallway.  Call the next witness and

12   invite him back.

13             **MR. QUINN:**  Tomorrow?

14             **THE COURT:**  No.  Tonight.

15             **MR. QUINN:**  Do we have other copies here?

16             **THE COURT:**  No.  Tomorrow.  That way we look it.

17   Otherwise, it's just a Wing and a prayer on my part.  I don't want

18   to do that.  I'll be in a difficult position between both parties

19   objecting.  It's not fair to either of you.

20             Dr. Aginsky, you are ordered back at 8:00 o'clock

21   tomorrow.  I'm sorry.  8:30.  My apologies, sir.  Thank you very

22   much.

23             Counsel, call your next witness, please.  One of the

24   jurors needs a short break.

25             You are admonished not to discuss this matter among

1  yourselves or form or express any opinion concerning this case.

2  Have a nice recess.

3          Counsel, would you remain for just a moment.  I want to

4  talk to both of you.

5                          (Jury out.)

6          **THE COURT:**  Counsel, have a seat for just a moment.

7          I want to understand something that I'm not certain of

8  and I need your help.  The first test results are three microplots

9  and they came back 8.8.  That's our menthol; correct?

10         **MR. QUINN:**  I don't think that's the right number.

11         **THE COURT:**  8.14 and there is an 8.53.  But three plots

12 come back I thought 8.58.  Because you have 17.

13         **MR. QUINN:**  8.58, Your Honor.

14         **THE COURT:**  And that should be Exhibit 60, which is the

15 notebook, Area 8, which refers to line 5, and it comes back for

16 menthol at 8.58.

17         **MR. QUINN:**  Right.

18         **THE COURT:**  Okay.  Now, there are three more microplots,

19 8.58.

20         **MR. QUINN:**  He does three sets.

21         **THE COURT:**  Three sets.

22         **MR. QUINN:**  Total of three sets, each of which consist

23 of multiple plugs.

24         **THE COURT:**  Now, we're going to go through each of those

25 and the confirming sets.  Bear with me.

1            I heard he took three sets, and I added up 10 so far.

2    Let's go through them and make certain I'm right.  The three

3    are -- I'm just going to call them plots.  Three plots.  I'm going

4    to call those the first results.  And they come back 8.14 which is

5    not menthol.  They come back 8.58 which is in the 6000 line, and

6    there are three plots.

7            **MR. QUINN:**  I don't think that's right, Your Honor.

8            **THE COURT:**  How many in the first test result?

9            **MR. QUINN:**  There were three plugs.

10           **THE COURT:**  Three plugs.

11           **MR. QUINN:**  Yes.

12           **THE COURT:**  Okay.  My misstatement.  Then there is a

13    second test.

14           **MR. QUINN:**  Just three more.

15           **THE COURT:**  Make me do the work.  I'm supposed to be

16    following it.  Make me do the work.  There are three more plugs --

17    plots, plugs, comes back 8.58; right?

18           **MR. QUINN:**  I think it is 8.58, yes, Your Honor.

19           **THE COURT:**  Now then, there are four more that are

20    tested.  Are those four, the four that he went back in violation

21    supposedly of the Court and tested?  Or is it the following four?

22    Bear with me.  There are three, three, four, and four.

23           **MR. QUINN:**  Three, three, four.  Three sets.

24           **THE COURT:**  No.  I think there is a confirming, isn't

25    there?  One more set of four.  Okay.  Then bear with me.  Is the

1   four that's being referred to the four from Area 8 that he went

2   back and got?

3           **MR. QUINN:**  Yes.

4           **THE COURT:**  Okay.  The word "semi-destructive" was used.

5   Is the difficulty between the two of you that you know that MGA

6   had enough left in Area 8, which is line 5 of Exhibit 60, to test

7   at one time?

8           **MR. QUINN:**  Yes.

9           **THE COURT:**  Bear with me.  After the doctor got the last

10  four, because there's much to do about the court order being

11  violated, did MGA's expert come back and have enough product left

12  to take the plugs?

13          **MR. QUINN:**  He did take plugs and tested them.

14          **THE COURT:**  How many?

15          **MR. QUINN:**  That, I don't know the answer to.

16          **THE COURT:**  Ms. Hurst, how many?

17          **MS. HURST:**  I'm checking right now, Your Honor.

18          **THE COURT:**  Okay.  Is that expert here on the other

19  side?  In the courtroom?

20          **MS. HURST:**  No, Your Honor.

21          **THE COURT:**  How many plugs were taken after the alleged

22  violation of the Court order?

23          **MS. HURST:**  I don't know, Your Honor.  I'm sorry.

24          **THE COURT:**  Were the plugs taken sufficient to test?

25          **MS. HURST:**  He couldn't find menthol.

1          **THE COURT:**  That's a simple question.  Let me put it

2    this way.  Did MGA run a test?

3          **MS. HURST:**  Yes.

4          **THE COURT:**  I'm going to ask you both of you, is there

5    enough of whatever we're going to call product in line 5 to run

6    any further test?

7          **MR. QUINN:**  I don't know.

8          **MS. HURST:**  I don't know either.

9          **THE COURT:**  We're in this huge disagreement when, in

10   fact, there may be enough product left to run an additional test.

11         **MS. HURST:**  We're not looking for further testing.

12         **THE COURT:**  I know you are not.  Believe me.  I

13   understand that.  I'm asking Mr. Quinn for a moment.  This is a

14   huge difficulty because the peremptory is that he has violated a

15   Court order.  And I'm hearing it through your questioning that the

16   insinuation is there was enough product left for MGA to come back

17   and get additional samples that were tested.

18         And, of course, the hearsay objections is appropriate so

19   I have sustained that objection, which only leaves you one choice:

20   Calling their expert which you probably don't want to do.

21         And I'm hearing that Ms. Hurst may not call their

22   expert, leaving the parties in the position to argue first -- I

23   can hear it coming -- just like Mr. McConville worried about the

24   piggy bank.  On the other side it's there was a violation of the

25   Court order and there wasn't enough sample left.

1           Now, I don't know that yet.  So I'm asking you, is there

2     enough sample left to do a test today?  I don't mean today

3     literately but at present.

4           **MR. QUINN:**  Dr. Lyter took 12 samples from Area 8 and

5     tested them.

6           **THE COURT:**  Subsequent to the last four.

7           **MR. QUINN:**  Yes.  I guess it's -- we can all look at

8     that with our naked eyes and as amateurs see ink there.

9           **THE COURT:**  But the end result is you don't know.

10          **MR. QUINN:**  I suppose that's -- a scientist has to

11    answer that.

12          **THE COURT:**  And your doctor hasn't been asked either?

13          MS. HURST:  No.

14          **THE COURT:**  What is rather incredible to the Court is

15    that we're left in the position of the Court wanting to give you

16    the broadest argument and the end result is that the tactics

17    between the two parties leave the jury never knowing if there is

18    enough sample left to be tested.

19          And the impression is, one, your client or -- strike

20    that, your expert violated a court order either intentionally or

21    unintentionally.  It doesn't matter.

22          And number two, the impression is that when you use the

23    word "semi-destructive," I don't know that the jury knows what

24    that means.  And if there is no further ability to test, this

25    would have come before the last four samples in violation of the

Page 98

1    Court order, I think the Court would be rather concerned.

2            MR. QUINN:  I have been handed a --

3            THE COURT:  Now, it's apparent that it came after, and

4    12 were taken; correct?

5            MR. QUINN:  Yes.

6            THE COURT:  That's what you're representing as far as

7    Mattel is concerned.

8            MR. QUINN:  Ten or 12 that Dr. Lyter --

9            THE COURT:  Let me ask, what is the result -- and either

10   one of you can share with me -- what is the result of Dr. Lyter's

11   analysis.

12           MR. QUINN:  No menthol.

13           MS. HURST:  Dr. Lyter says there is no menthol.

14           THE COURT:  No menthol.  So we have directly opposite

15   conclusions; is that correct?

16           MS. HURST:  That's correct.

17           THE COURT:  What is that area out that hasn't been

18   tested in New Mexico?  Is that area 51?  I'm just joking with you.

19   Okay.

20           MR. QUINN:  There is enough ink left to do further

21   testing, according to Dr. Aginsky.  I have been just been handed a

22   note.

23           MS. HURST:  He shouldn't be in here.

24           THE COURT:  He is not.  I saw Mr. Gordon get up and run

25   outside real quick.  Dr. Aginsky isn't here, so it's apparent to

Page 99

1   me what just occurred.  They went out and checked just as I was

2   asking the question.

3           Is that right, Mr. Gordon?

4           **MR. GORDON:**  Correct, Your Honor.

5           **THE COURT:**  That's obvious what is happening here.

6           I leave that to each of you.  Your objection is

7   appropriate.  It's hearsay.

8           **MR. QUINN:**  Your Honor, shouldn't he be able to comment

9   on the other expert's opinion and the fact that the other expert's

10  report indicates that he did, in fact, take microplugs?  Because

11  the suggestion has been left by the questioning, by Ms. Hurst,

12  that he hogged all the ink and --

13          **THE COURT:**  He is usually able to comment on the other

14  expert's opinion.  The question is, is this part of his, quote

15  unquote, opinion.  I'm going to go back and look.  I'm going to go

16  back and think about that.

17          **MS. HURST:**  He could offer an opinion.  He could state

18  in his view there was sufficient ink after he finished the third

19  test.  There is no reason why he can't say that.  But he can't

20  comment on the report or Dr. Lyter's opinion or the hearsay.

21          **THE COURT:**  He is coming back tomorrow.  Okay.  We have

22  got time.

23          **MS. HURST:**  Can we --

24          **THE COURT:**  Now --

25          **MR. QUINN:**  We now have copies of that amended report

1  dated June 30, 2008.

2          THE COURT:  Let me see what you wanted -- first of all,

3  have both of you had this report or is this just something that is

4  being turned over now?  I never quite know between the parties.

5  Have you ever had this report?

6          MS. HURST:  It was not in any of our preparation

7  materials.

8          THE COURT:  That's not what I asked.

9          MS. HURST:  And I don't know the answer to your

10  question.

11          THE COURT:  No.  Mr. Quinn, take it back.  No.  The

12  record is not going to demonstrate that she just got it.

13          MR. QUINN:  No, Your Honor.  They have had this for two

14  years.

15          THE COURT:  You're going to go back and look, because

16  the impression that I got was that you were popping up with not

17  only something that we hadn't examined, but that they had never

18  gotten the report.  Those are two different things.

19          So if we haven't examined it, we can do that this

20  evening.  The question I have got of Ms. Hurst is, have you had

21  this report prior to today?

22          MS. HURST:  I don't know, but I'll accept Mr. Quinn's

23  representation.

24          THE COURT:  No.  I want a good record about that.  I

25  don't want there to be any disagreement up in the circuit.  So

Page 101

1    we'll check tonight and make sure you have it.  It's not

2    sufficient that you didn't have it in terms of preparation.

3            We're going to call the next witness in just a moment.

4    That's the gentleman who I ordered to come to Court today.  We're

5    going to get him on the stand.  I understand we're not going to

6    finish, but we're going to have him up on the stand.  Get the

7    jury.

8                        (Jury in.)

9            **THE COURT:**  Jury is present, all counsel are present.

10           Counsel, if you would be seated.

11           And Kathy -- I'm sorry, counsel, would you call your

12   next witness.

13           **MR. ZELLER:**  Mattel calls Peter Marlow.

14           **THE COURT:**  Mr. Marlow is on the stand.

15           PETER MARLOW, PLAINTIFF'S WITNESS, SWORN

16           **THE COURT:**  Sir, would you state your full name?

17           **THE WITNESS:**  Peter Andrew Marlow.  M-a-r-l-o-w.

18           **THE COURT:**  Direct examination by Mr. Zeller on behalf

19   of Mattel.

20                     DIRECT EXAMINATION

21   BY MR. ZELLER

22   **Q**   Good afternoon, Mr. Marlow.

23   **A**   Good afternoon.

24   **Q**   You have never worked for Mattel; is that correct?

25   **A**   That's right.

1   **Q**   And you're testifying because Mattel subpoenaed you; is that

2   true?

3   **A**   Yes.

4   **Q**   You are married to Veronica Marlow?

5   **A**   Yes.

6   **Q**   She's also been your business partner; is that true?

7   **A**   Yes.

8   **Q**   And Veronica Marlow has performed work for MGA from time to

9   time over the years?

10  **A**   Yes.

11  **Q**   And that included the 2000 to 2005 time period; correct?

12  **A**   Correct.

13  **Q**   Your wife, Veronica Marlow has performed work for MGA through

14  various company names; is that true?

15  **A**   Yes.

16  **Q**   One of those companies is called Doll Bag?

17  **A**   Right.

18  **Q**   Two words d-o-l-l, new word b-a-g?

19  **A**   Yes.

20  **Q**   And there is another one called Marlow Technologic?

21  **A**   Yes.

22  **Q**   Spell that one for us.

23  **A**   M-a-r-l-o-w, t-e-c-h-n-o-l-o-g-i-c.

24  **Q**   And she's also done work for MGA under her name own, Veronica

25  Marlow?

1    **A**    Right.

2    **Q**    And since the 2000 time period, have you been the person who

3    has been principally responsible for the books and records of

4    Veronica Marlow companies as well as her individual work for MGA?

5    **A**    Yes.

6    **Q**    And in fact, it's fair to say that your wife Veronica Marlow

7    doesn't really have much to do with your books and records.  You

8    are the person?

9    **A**    Yes.

10    **Q**    In fact, if we were to call her here and ask her questions

11    about the books and records of the company, she really wouldn't

12    know much?

13    **A**    Correct.

14    **Q**    And of course, you're personally familiar with the operations

15    of Veronica Marlow's businesses as they have related to MGA work?

16    **A**    Yes.

17    **Q**    By the way, you yourself have personally performed work for

18    MGA in the past?

19    **A**    I don't recall.  It may be a little bit.

20    **Q**    You recall doing work from time to time to some degree on

21    Bratz projects and helping out your wife?

22    **A**    Yes, I did help my wife with some of her --

23    **Q**    And that was on behalf of MGA?

24    **A**    Yes.

25    **Q**    Veronica Marlow did work for Mattel at some point; is that

1   true?

2   **A**   Yes.

3   **Q**   And she left Mattel about March of 2000?

4   **A**   I don't know if she was an employee at the time or a

5   contractor, but that would have been her last contact with Mattel.

6   **Q**   After she ended her employment with Mattel, she began working

7   with MGA at some point in 2000; is that true?

8   **A**   Yes.

9          **MR. MCCONVILLE:**  Objection.  Vague, "working for MGA."

10          **THE COURT:**  You mean in terms of an independent

11   contractor status or working for -- sustained.

12   BY MR. ZELLER

13   **Q**   At some point in 2000, your wife, Veronica Marlow, started

14   doing some sort of work on behalf of or along with MGA?

15   **A**   Correct.

16   **Q**   Now, as part of preparing and managing the books and records

17   for Veronica Marlow and her companies, you personally handled

18   payments that were made to people who worked on the Bratz project

19   during the 2000 to 2005 time period; is that true?

20   **A**   Yes.

21   **Q**   And as part of that, you personally handled the payments that

22   were made to the people who worked on Bratz during that time

23   period?

24   **A**   Correct.

25   **Q**   And you generated records?

Page 105

1   **A**   Yes.

2   **Q**   That reflect those payments?

3   **A**   Yes.

4   **Q**   Could you please take a look at Exhibit 606.  This is in

5   evidence.  Page 5-5.

6   **A**   I see it on the screen.

7   **Q**   You recognize this is an invoice that you prepared and

8   generated in connection with the Bratz project back in

9   November 2000; is that correct?

10  **A**   Correct.

11  **Q**   And you'll see in the description it says, "Bratz Dolls,

12  third-party services from October 13, 2000 to October 20, 2000."

13           Do you see that?

14  **A**   Correct.

15  **Q**   And then there are two entries?

16  **A**   Yes.

17  **Q**   One is for 49 hours, and another one is for 32 hours?

18  **A**   Yes.

19  **Q**   And it talks about third party sewing and pattern making

20  support services?

21  **A**   Right.

22  **Q**   And this is all work that was done on the Bratz project prior

23  to October 20, 2000; correct?

24  **A**   Correct.

25  **Q**   And it totals up to 81 hours?

Page 106

1   **A**    Yes.

2   **Q**    And you personally put that information into this invoice;

3   correct?

4   **A**    Correct.

5   **Q**    And you prepared it from information that you had received in

6   connection with running Veronica Marlow's businesses; correct?

7   **A**    Correct.

8   **Q**    And there are time sheets that correspond to these third

9   party sewing and pattern making services; is that true?

10  **A**    Yes.

11  **Q**    And what you did is you took those time records and the

12  people who provided the actual services, you put them together and

13  you prepared this invoice?

14  **A**    Correct.

15  **Q**    And so you yourself know what underlies this third party

16  sewing and pattern making support reference; is that correct?

17  **A**    Yes.

18  **Q**    And at least one of the people who was doing this 81 hours of

19  third party services prior to October 20, 2000 was a Mattel

20  employee at the time; correct?

21  **A**    I'm not sure.

22  **Q**    Let's take a look at the transcript from June 24, 2008, page

23  3629, starting at line 23 of 3629 and continuing to 3630 line 13.

24  Please review that.

25  **A**    Okay.

1  **Q**    Does reviewing that refresh your recollection that at least

2  one person who provided these services, this 81 hours of services,

3  prior to October 20, 2000 was at the time a Mattel employee?

4  **A**    You know, I didn't personally see her working at Mattel.  I

5  don't have any direct knowledge of that.  This is secondhand

6  information that I have.  I worked with her as somebody I have

7  worked with before for many years as a professional seamstress,

8  professional sewing contractor.

9          And so my relationship with her was more on that level.

10  I have been working with this person since 1992 as a professional

11  seamstress when my wife had other sewing businesses and made

12  clothes for little girls.  So I know her from that.  I'm not

13  really sure exactly when she was a Mattel employee.  I think she

14  was because I have been told that by my wife, but my relationship

15  with her wasn't that I would have a direct knowledge of her

16  employment by Mattel.

17  **Q**    Isn't it true that you know a Maria Salazar?

18  **A**    Yes.

19  **Q**    And in fact, you know that she was a Mattel employee during

20  2000 and 2001; correct?

21  **A**    You know, I don't have direct experience with that.  I don't

22  recall that from any -- I never was at Mattel.  I never saw her

23  there.  This is secondhand information.  I believe that maybe she

24  was at some period there.  I don't know exactly what period.  But

25  I knew her as a sewing contractor.

Page 108

1  **Q**    Please take a look at page 3624 of the June 24, 2008

2  transcript, starting with line 7, and then read down to line 22.

3  **A**    Page 3624?

4  **Q**    Yes.  Page 3624, line 7, through 22.  Do you see that?

5  **A**    Right.  So you produced some documents that showed that Maria

6  Elena Salazar was an employee of Mattel.  Is that right?

7  **Q**    Have you read the testimony?

8  **A**    I'm reading it now.

9  **Q**    You recognize this is your prior testimony under oath;

10  correct?

11  **A**    Right.

12  **Q**    Does seeing this refresh your recollection that Maria Salazar

13  was a Mattel employee during 2000 and 2001?

14  **A**    I would have to see those documents.  I don't recall these

15  documents.  You showed me some documents indicating that she was a

16  Mattel employee.  I don't recall right now what those documents

17  are.  I don't recall seeing them.  I don't recall when I first saw

18  them.  If you could show me those documents again, I would be glad

19  to tell you.

20  **Q**    Let's be clear about something first.  Are you saying that

21  Maria Salazar was not a Mattel employee in 2000 and 2001?

22          **MR. MCCONVILLE:**  Objection.  Misstates his testimony.

23          **THE COURT:**  Just a question.  Overruled.

24          **THE WITNESS:**  I'm saying I don't know.

25

1    BY MR. ZELLER

2    **Q**    You did know at one time; correct?

3    **A**    I believe that she may have been because of what I have been

4    told by others, but I don't have any direct understanding of that

5    through my own personal experience.

6              So for me, that would be hearsay, it would be secondhand

7    information, so that's all I have.

8    **Q**    Now, you do recognize that you previously testified under

9    oath that you did understand that Maria Salazar was a Mattel

10   employee during 2000 and 2001; correct?

11   **A**    I see here that I testified that I wasn't sure, and you

12   produced a document that indicated what she was.  Apparently I

13   came to a knowledge that she was at least at that time.

14   **Q**    I'm not asking you about a document.  I'm asking about your

15   testimony.

16              **THE COURT:**  Counsel, you both want to stipulate to read

17   that page?

18              **MR. MCCONVILLE:**  That's fine.

19              **THE COURT:**  Mr. Zeller?

20              **MR. ZELLER:**  Yes, sir.

21              **THE COURT:**  Mr. McConville?

22              **MR. MCCONVILLE:**  That's fine.

23              **THE COURT:**  Makes it very easy.  Won't you just read --

24   if there is a stipulation, why don't you read from line 7 down to

25   line 23?

Page 110

1              **MR. MCCONVILLE:**  I think it's just line 16 to 22.

2              **MR. ZELLER:**  I'm fine with 16 to 22.

3              **THE COURT:**  16 to 22.

4      BY MR. ZELLER

5      "QUESTION:  And does that help refresh your recollection as to

6      whether or not Maria Salazar was working at Mattel in the 2000 and

7      2001 time period?

8      "ANSWER:  I see that she says she was.

9      "QUESTION:  And that refreshes your recollection that was a time

10     period when she was working for Mattel; isn't that correct?

11     "ANSWER:  Yes."

12              Isn't it true -- returning to Exhibit 606-5 -- that

13     Maria Salazar was one of the individuals who provided these third

14     party services on Bratz prior to October 20, 2000?

15     **A**     Yes.

16     **Q**     This invoice we're talking about, Exhibit 606-5, was an

17     invoice that you sent to MGA and MGA paid; correct?

18     **A**     Correct.

19     **Q**     Please take a look at Exhibit 5723.  Do you recognize these

20     as records from your files relating to work on Bratz from the 2000

21     and 2001 time period?

22     **A**     I recognize the handwriting.  It's the handwritten of her

23     husband, Pedro Salazar.

24              **MR. ZELLER:**  I'd offer Exhibit 5723, Your Honor.

25              **THE COURT:**  Received.

Page 111

1            (Exhibit 5723 received in evidence.)

2         **THE COURT:**  Did you want 3624 received also?

3         **MR. MCCONVILLE:**  That was a page number, Your Honor,

4   from a deposition transcript.

5         **THE COURT:**  My apologies.  You are absolutely correct.

6   606, counsel?

7         **MR. ZELLER:**  606 is in evidence, Your Honor.

8         **THE COURT:**  Thank you very much.

9         **MR. MCCONVILLE:**  Just my objection on this is relevance.

10        **THE COURT:**  Overruled.

11   BY MR. ZELLER

12   **Q**   You recognize this first page, Exhibit 5723, as a time record

13   for Maria Salazar?

14   **A**   Yes.

15   **Q**   And this is, in fact, a time-keeping record of the hours that

16   Ms. Salazar spent on the Bratz project starting by October 13,

17   2000?

18   **A**   Yes.

19   **Q**   And this is the time card that relates to some of the work

20   that was on that invoice, Exhibit 606-5, that we just talked

21   about?

22   **A**   I believe it is.

23   **Q**   And that's the invoice that you sent to MGA for services

24   rendered prior to October 20, 2000; correct?

25   **A**   Correct.

Page 112

1   **Q**   Now, this time card that we have, Exhibit 5723, you'll see

2   there that it shows a total of 70 hours of work?

3   **A**   Yes.

4   **Q**   That Ms. Salazar did on Bratz from October 13, 2000 to

5   October 23, 2000; is that correct?

6   **A**   Yes.

7   **Q**   Now, it also shows that Ms. Salazar did 42 hours of this

8   sample-making work on Bratz from October 13, 2000, to October 19,

9   2000; is that correct?

10  **A**   How are you getting that number?  I don't know.  Are you just

11  adding up those numbers for that week?

12  **Q**   Let's walk through these.  By the way, you believe that this

13  is an accurate record of the time that Maria Salazar spent on the

14  Bratz project in October of 2000; correct?

15  **A**   Yes.

16  **Q**   So let's look at the first line.  You'll see there the date

17  of 10/13/2000, and it shows seven hours of work on Bratz that

18  Ms. Salazar did; correct?

19  **A**   Yes.

20  **Q**   Next line is 10/14/2000, it shows three hours?

21  **A**   Right.

22  **Q**   Next line is 10/1/5000 and shows 8.5 hours?

23  **A**   Yes.

24  **Q**   10/16/2000 shows 4.5 hours?

25  **A**   Yes.

Page 113

1   **Q**   10/17/2000 shows 4.5 hours?

2   **A**   Yes.

3   **Q**   And then you'll see October 18, 2000, which was a Wednesday,

4   10.5 hours?

5   **A**   Yes.

6   **Q**   And then the next entry is October 19, 2000 and it shows

7   another four hours?

8   **A**   Right.

9   **Q**   I'll represent to you that adds up to be 42 hours.

10          And you don't have any reason to doubt that is work that

11   Maria Salazar actually did on Bratz during that time period

12   October 13, 2000 to October 19, 2000; correct?

13   **A**   Correct.

14   **Q**   And by the way, you see this entry here for October 18, 2000,

15   a Wednesday?

16   **A**   Yes.

17   **Q**   That wasn't a holiday, was it?  That was a regular workday?

18   **A**   I don't know.

19   **Q**   You don't have any reason to dispute that?

20   **A**   No.

21   **Q**   Do you know how it is that Maria Salazar worked 10 1/2 hours

22   on a regular business day while also working at Mattel?

23          **MR. MCCONVILLE:**  Objection.  Mischaracterizes the

24   testimony.  He says he doesn't know.

25          **MR. ZELLER:**  I'm asking if he --

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

Page 114

1        **MR. MCCONVILLE:**  He says he doesn't know, then he asks

2   do you know if he was working on a workday.

3        **THE COURT:**  Overruled.

4        You can answer the question.

5        **THE WITNESS:**  Repeat question, please.

6   BY MR. ZELLER

7   **Q**    Do you have any information -- do you have any explanation

8   for how it is that Maria Salazar worked 10.5 hours on Bratz during

9   a weekday while also working at Mattel?

10  **A**    I told you I didn't know that she worked at Mattel.  I

11  really -- I can't explain it.

12  **Q**    Your wife Veronica Marlow and you are, in fact, friends with

13  Maria Salazar; true?

14  **A**    Yes.

15  **Q**    And you have been friends with her since at least 2000;

16  right?

17  **A**    Maybe 2001 or 2002 -- I'm sorry, 1991 or 1992.

18  **Q**    So you have known her for while?

19  **A**    Yes.

20  **Q**    You don't have any idea she was working at Mattel in 2000 or

21  2001?

22  **A**    I know I believe she worked at Mattel.  I never saw her

23  there.  So from what I have been told by others, I believe she

24  worked at Mattel but I can't pin it down to a certain period.  I

25  don't remember exactly when she worked there.

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

Page 115

1  **Q**    Now, turning back to the first page of Exhibit 5723, you'll

2  see that there is a kind of a handwritten reference there where it

3  says invoice G000626 at the bottom?

4  **A**    Right.

5  **Q**    And you know that corresponds to the invoice number

6  Exhibit 606-5 that we talked about; right?

7  **A**    Yes, I suppose so.

8  **Q**    And also you'll see a reference there where it says paid to

9  Pedro Salazar $1520.  Do you see that?

10  **A**    Yes.

11  **Q**    And who is Pedro Salazar?

12  **A**    That's Maria Elena Salazar's husband.

13  **Q**    And so the money that was paid for Maria Salazar's work on

14  Bratz that is reflected on this page was actually paid to Pedro

15  Salazar; is that true?

16  **A**    Yes.  He was her business manager much the same way I was my

17  wife's business manager.

18  **Q**    And by the way, you previously denied under oath that Maria

19  Salazar had worked on Bratz prior to October 20, 2000; true?

20  **A**    I don't recall that.

21  **Q**    Please take a look at your transcript of June 24, 2008, page

22  3627, specifically lines 18 through 20?

23  **A**    I see that.  Would you like me to explain it?

24          **MR. MCCONVILLE:**  What page, I'm sorry?

25          **MR. ZELLER:**  3627 lines 18 through 20.  It's of the

Page 116

1    June 24, 2008 transcript.

2         **MR. ZELLER:**  I'd like to publish, Your Honor.

3         **MR. MCCONVILLE:**  Your Honor, there is no impeachment.

4    He said, "Do you recall it?"

5         **THE COURT:**  Just a moment.  Question was, "And by the

6    way, you previously denied under oath that Maria Salazar had

7    worked on Bratz prior to October 20, 2000; true?"

8         "Answer:  I don't remember."

9         You may publish it.  Overruled.

10   BY MR. ZELLER

11   "QUESTION:  Isn't it true that Maria Salazar worked on Bratz

12   before October 20, 2000?

13   "ANSWER:  That's not true."

14   **A**   Right.  You know, I think what I heard in my mind was that

15   you implied she worked on Bratz before October 13.  I wasn't sure

16   exactly.  At the time that I gave this deposition, it had already

17   many years later.  I shouldn't sure as to the exact date.  I

18   thought that you were implying that she worked before October 13

19   when I gave that answer.

20   **Q**   You understand that this testimony is something you gave on

21   June 24, 2008.  It was not a deposition; correct?

22   **A**   I don't recall.

23   **Q**   You had -- in fact, were aware that Exhibit 5723, these time

24   records showing that, in fact, Maria Salazar worked on Bratz

25   existed; true?

Page 117

1    **A**    Yes.  There is no question about that.  I'm just saying that

2    when this question was first asked of me, I must have had the

3    impression in my mind you were referring to October 13 instead of

4    October 20.  It's a simple mistake I made.

5    **Q**    You understand the question asked October 20, 2000; right?

6    **A**    Yes.

7    **Q**    And you now acknowledge that that was not correct testimony;

8    true?

9    **A**    Because I see the data in front of me.  At the time I was

10   asked this question originally in 2008 I didn't have this in front

11   of me and my recollection was not perfect.

12   **Q**    My question was, is that you previously testified that Maria

13   Salazar did not work on Bratz prior to October 20, 2000 and that

14   testimony was incorrect; right?

15   **A**    That's correct.

16   **Q**    And it's true that Ms. Salazar began working on Bratz no

17   later than October 13, 2000 and continued to work on Bratz all the

18   way to the end of 2001; true?

19   **A**    I don't know when she finished working on Bratz.

20   **Q**    You do understand, based on your records, that Maria Salazar

21   continued to work on Bratz at least until the end of 2001;

22   correct?

23   **A**    I don't have a recollection of that.  If you show me the

24   records, it may help me remember.

25   **Q**    What do you think -- just tell us, generally speaking, what

f80e22f3-d73a-4b37-b32e-72745e0e1eb6

1   was Ms. Salazar doing on Bratz in 2000 and 2001?

2   **A**    If she was still working on Bratz during that time period,

3   she would have been making sewing samples for the fashions that my

4   wife was designing with Carter Bryant.

5   **Q**    What are samples?

6   **A**    Prototype fashions for the dolls.

7   **Q**    By the way, is that something that's a skilled kind of

8   service?

9   **A**    Yes.

10   **Q**    It requires, in fact, a lot of skill to make these samples

11   for dolls?

12   **A**    Correct.

13   **Q**    And would you equate that kind of service to like being a

14   housekeeper?

15   **A**    Well, the housekeeping that I have done I don't think is on

16   that level.

17   **Q**    You understand it's a skill to be a sample maker?

18   **A**    Right.

19   **Q**    If you could please take a look at 3634 of the June 24, 2008

20   transcript.  And by the way, also sample making involves -- that

21   was something that other Mattel employees, while they were still

22   employed by Mattel, worked on Bratz as well under Veronica

23   Marlow's supervision; is that true?

24          **MR. MCCONVILLE:**  Objection.  Vague.

25          **THE COURT:**  Do you understand the question, sir.

1          **THE WITNESS:**  Not really.  Could you repeat that?

2     BY MR. ZELLER

3     **Q**    Maria Salazar -- let me ask this first.

4          Do you admit that Maria Salazar, while she was a Mattel

5     employee, worked on Bratz?

6     **A**    You have asked me that question before and I really couldn't

7     give you a certain answer.  I don't know for sure, but I believe

8     from what I have heard is that she was a Mattel employee, and that

9     she did possibly work on Bratz while she was a Mattel employee.

10    **Q**    I'm not asking possibly.  You know that's the case; right?

11         **MR. MCCONVILLE:**  Objection.  Asked and answered.

12         **THE COURT:**  Well, the question is, does he know it now

13    or did he know it then.

14         **MR. ZELLER:**  I'm asking now.

15         **THE COURT:**  You can answer the question, sir.

16    Overruled.

17         **THE WITNESS:**  I'm sorry?

18         **THE COURT:**  You can answer the question.

19         **THE WITNESS:**  I only know that she is a Mattel -- or she

20    was a Mattel employee now because of the things that I have heard

21    and seen in trial, or connected with this trial.

22    BY MR. ZELLER

23    **Q**    I'm asking about what you know today.

24         Isn't it true that you know Maria Salazar worked on

25    Bratz while she was a Mattel employee?

Page 120

1   **A**     If you say so, I'll believe you.

2                **MR. MCCONVILLE:**  Objection.  Asked and answered.

3                **THE COURT:**  Overruled.

4                **THE WITNESS:**  I mean, people have told me that, but I

5   still have never seen her working at Mattel.  I'm not a witness of

6   that.

7   BY MR. ZELLER

8   **Q**     Certainly discussed with your wife, didn't you?

9   **A**     She was one of the people that told me, the one that I trust

10  and I believe her.  I'm not saying she wasn't a Mattel employee.

11  I'm just saying I don't have a personal witness of that.

12  **Q**     So let's break this down to make sure we're clear about this.

13               You are saying you don't know for sure one way or the

14  other whether Maria Salazar was ever employed by Mattel in any

15  capacity at any time; is that true?

16               **MR. MCCONVILLE:**  Objection.  Asked and answered.

17               **THE COURT:**  Overruled.

18               **THE WITNESS:**  I believe she was.  I'm just saying I

19  can't have 100 percent certainty.  I wasn't a witness to that.

20  BY MR. ZELLER

21  **Q**     You know she worked on Bratz?

22  **A**     I do.  I saw her working on Bratz.

23  **Q**     And you do know that other Mattel employees, while they were

24  employed by Mattel, worked on Bratz as well; correct?

25               **MR. MCCONVILLE:**  Objection.  Vague.

Page 121

1           THE COURT:  Overruled.

2           THE WITNESS:  Again, this same principle applies.  I

3   never saw anyone working at Mattel except for my wife when I would

4   drive her there, because I worked in a nearby company in the same

5   town and we would carpool together, and I would leave her there at

6   Mattel.  And I know that she worked there.  But I never saw anyone

7   working there that's related to this case.

8   BY MR. ZELLER

9   Q   Please take a look at Exhibit 5592.

10          MR. MCCONVILLE:  Your Honor, object on relevance.  These

11  records don't reflect anyone who's ever been employed by Mattel.

12  BY MR. ZELLER

13  Q   Do you have Exhibit 5592 in front of you?

14  A   Yes.

15  Q   And you recognize these pages as records from Veronica Marlow

16  and your businesses?

17  A   Yes.

18          MR. ZELLER:  Move Exhibit 5592 into evidence, Your

19  Honor?

20          THE COURT:  Objection overruled.  Received.

21              (Exhibit 5592 received in evidence.)

22  BY MR. ZELLER

23  Q   Please take a look at 5592-5.  You'll see that this says that

24  payments were made for Pedro Salazar.

25          Do you see that?

Page 122

1    **A**    Yes.

2    **Q**    It also says that the payments were made, "for independently

3    contracted sewing and pattern making services done by me from

4    March 22, 2001, through March 20, 2001."

5          Do you see that?

6    **A**    Um-hmm.

7    **Q**    In fact, these services were not provided by Pedro Salazar at

8    all here; correct?

9    **A**    Pedro Salazar was his wife's business partner.  So I don't

10   know how much of that was actually done by him and how much by his

11   wife.  They both were professional sewing contractors.  They both

12   had a garage full of professional sewing machines.  They had done

13   work together.

14          So I don't know who did exactly what, but Pedro was the

15   business manager, received all the payments.

16   **Q**    Isn't it true that this page reflects work that Maria Salazar

17   did and did on Bratz?

18   **A**    I don't know.  It could have been done by her husband.

19   **Q**    Isn't it true that these payments were made by you and

20   Veronica Marlow for work that Maria Salazar did on Bratz while she

21   was an employee Mattel in March of 2001?

22          **MR. QUINN:**  Objection.  Asked and answered.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  Repeat the question.

25

Page 123

1    BY MR. ZELLER

2    **Q**    Isn't it true that this page reflects payments that you and

3    Veronica Marlow made to -- well, made for work that Maria Salazar

4    did on Bratz while she was a Mattel employee in March 2001?

5    **A**    I don't know how much of this work was done by Maria Salazar

6    or how much was done by her husband Pedro Salazar.

7    **Q**    Let's please take a look at Exhibit 5723-7.  This is already

8    in evidence.  Do you have that page in front of you?

9    **A**    Yes.

10   **Q**    Do you recognize 5723-7 as handwritten time sheets for Maria

11   Salazar's work on the Bratz project?

12   **A**    Yes.

13   **Q**    So let's also then, let's pull up -- let's keep that page up

14   and pull it up side-by-side with 5592-5.  And you'll see that on

15   the left we have Maria Salazar's time records; right?

16   **A**    Yes.

17   **Q**    And you'll see that it has particular entries, for example,

18   March 22, 2001 for 5 hours, continues on to March 30, 2001, where

19   it has 11 hours.

20            Do you see that?

21   **A**    Correct.

22   **Q**    It totals up to be 65 hours.

23            Do you see that?

24   **A**    Right.

25   **Q**    And comparing it then to 5592-5, you see all those entries

Page 124

1    correspond; right?

2    **A**    Yes.

3    **Q**    So in fact, where it says on 5592-5 that the work was done by

4    Pedro Salazar, in fact, it was done by Maria Salazar; correct?

5    **A**    I don't know that because I recognize the handwriting on this

6    time record as being the handwriting of Pedro Salazar, and I don't

7    know that Maria Elena did all the work, or just to keep things

8    simple he put her name down on that time card because he preferred

9    to keep one time card for the work both of them maybe did.

10   **Q**    Do you have a record a time record showing that Pedro Salazar

11   did this work from March 22, 2001 through March 30, 2001 that

12   corresponds to those exact entries?

13          Do you have such a record?

14   **A**    I don't know.

15   **Q**    You are not aware of one, are you?

16   **A**    No.

17   **Q**    Please take a look at Exhibit 5593.  Do you recognize these

18   records?

19   **A**    5593, yes.

20   **Q**    The entire -- just generally speaking, do you recognize this

21   set of documents?

22   **A**    Yes.

23   **Q**    You recognize this as your business records pertaining to

24   work that Maria Salazar did on Bratz in 2001?

25   **A**    Again, I'm not sure who did what between the two of them,

Page 125

1    Pedro Salazar or Maria Salazar.  They worked on this together.

2          **MR. ZELLER:**  I would move 5593 into evidence, Your

3    Honor.

4          **THE COURT:**  Received.

5                (Exhibit 5593 received in evidence.)

6    (Whereupon there was a change in reporters and DEBORAH PARKER

7    reported the 4:30 session.)

8

9                          -oOo-

10

11                        CERTIFICATE

12

13          I hereby certify that pursuant to Section 753, Title 28,

14   United States Code, the foregoing is a true and correct transcript

15   of the stenographically reported proceedings held in the

16   above-entitled matter.

17

18   Date:  FEBRUARY 24, 2011

19

20   _____

21   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

22

23

24

25