1

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **SOUTHERN DIVISION AT SANTA ANA**

4    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
     MATTEL, INC., ET AL.,                )
7                                         )
                  PLAINTIFFS,             )
8                                         )
             vs.                          ) CV NO. 04-9049-DOC
9                                         ) DAY 23
     MGA ENTERTAINMENT, INC., ET AL.,     ) VOLUME 3 of 3
10                                        )
                  DEFENDANTS.             )
11   _____)

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       JURY TRIAL

16                  SANTA ANA, CALIFORNIA

17              THURSDAY, FEBRUARY 24, 2011

18                       4:33 P.M.

19

20
                 **DEBORAH D. PARKER, CSR 10342**
21               **OFFICIAL COURT REPORTER**
                 **UNITED STATES DISTRICT COURT**
22               **411 WEST FOURTH STREET**
                 **SUITE 1-053**
23               **SANTA ANA, CALIFORNIA 92701**
                 **(714) 542-8409**
24               **D.PARKER@IX.NETCOM.COM**

25

```
 1   APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF, MATTEL, INC.:

 3                           JOHN QUINN
                             WILLIAM PRICE
 4                           MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                           & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                           (213) 443-3000

 8
         FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                           (949) 567-6700

13
                             ANNETTE L. HURST
14                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                           (415) 773-5700

17
                             JENNIFER L. KELLER
18                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                           SUITE 560
                             IRVINE, CALIFORNIA 92612
20                           (949) 476-8700

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                              MARK E. OVERLAND
                               LAW OFFICES OF MARK E. OVERLAND
 4                              100 WILSHIRE BOULEVARD
                               SUITE 950
 5                              SANTA MONICA, CALIFORNIA 90401
                               (310) 459-2830
 6

 7                              ALEXANDER H. COTE
                               SCHEPER KIM & HARRIS, LLP
 8                              601 WEST FIFTH STREET
                               12TH FLOOR
 9                              LOS ANGELES, CALIFORNIA 90071
                               (213) 613-4660
10

11
     ALSO PRESENT:
12
                               JEANINE PISONI
13                              MGA ENTERTAINMENT, INC.
                               16360 ROSCOE BOULEVARD
14                              SUITE 105
                               VAN NUYS, CALIFORNIA 91406
15

16                              ISAAC LARIAN, MGA CEO
                               KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
17                              MIKE STOVALL, MGA TECHNICAL OPERATOR

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                          I N D E X

 2

 3   PLAINTIFF'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    PETER MARLOW                  5

 5

 6                       E X H I B I T S

 7   PLAINTIFF'S EXHIBITS:             IDENTIFICATION  EVIDENCE

 8    10729 SALAZAR TIMESHEET                            14

 9    11967 WORK TIMESHEET                               15

10    11976 WORK TIMESHEET                               15

11    11980 WORK TIMESHEET                                6

12    11996 WORK TIMESHEET AND PAYMENTS                  16

13    23962-1, -3, -5, -6, -7, -8, -9, -10, -11, -12, -13,  34
           -14, -19 and -21 CHARTS
14
     11972 WORK TIMESHEET                               18
15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1            SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 24, 2011;

 2                           4:33 P.M.

 3           (The following proceedings were had in open court

 4            in the presence of the jury:)

 5                        DIRECT EXAMINATION

 6    BY MR. ZELLER:

 7    Q.   Let's pull up the first page of 5593, which is 5593-1.

 8             Now, it says that it's services performed by Maria

 9    Salazar; correct?

10    A.   Uh-huh.  Yes.

11    Q.   And it says these are services by Maria Salazar in

12    November and December of 2000; correct?

13    A.   Correct.

14    Q.   Now, do you have any kind of a receipt signed by Maria

15    Salazar that corresponds -- I'm sorry, let me rephrase that.

16             Do you have any handwritten time records that

17    correspond to the first page of 5593, showing that Maria

18    Salazar did this work?

19    A.   I don't know.

20    Q.   You're not aware of one, are you?

21    A.   I don't recall.

22    Q.   Please take a look at Exhibit 11980.

23    A.   (Witness so complies.)

24             MR. MCCONVILLE:  I'll object on relevance grounds.

25    This one, your Honor.
```

1   BY MR. ZELLER:

2   Q.   What is this document?

3   A.   It is a time record of work done by Pedro and/or Maria

4   Salazar.

5            THE COURT:  Overruled.

6            MR. ZELLER:  I would move this into evidence,

7   11980.

8            THE COURT:  Received.

9        (Plaintiff's Exhibit 11980 received in evidence.)

10  BY MR. QUINN:

11  Q.   This is a document you actually created; right?

12  A.   Right.

13  Q.   And you're telling us, now, that you just don't know

14  whether this is work performed by Maria Salazar on these

15  dates, or Pedro Salazar; is that correct?

16  A.   That's correct.  As I indicated earlier, Pedro Salazar

17  was Maria Salazar's business partner and business manager

18  for the finances, so I would pay him for work that, perhaps,

19  both of them did.  I don't know how they divided up their

20  time during this -- doing this labor.

21  Q.   Well, let's break this down a little bit.  You agree

22  with me that this page reflects work that was done on the

23  Bratz project in the September of 2001 time period; right?

24  A.   Correct.

25  Q.   And you're saying you just don't know whether it

1   relates to Pedro Salazar or Maria Salazar; is that true?

2   A.   Correct.

3   Q.   And, by the way, was Pedro Salazar -- he was a skilled

4   sample maker, just like Ms. Salazar?

5   A.   Yes.

6   Q.   And so, why is it you didn't keep track of, as you are

7   claiming now, work that Pedro did versus what work Maria

8   did?

9           MR. MCCONVILLE:  Objection.  Argumentative.

10          THE COURT:  As to "claiming now"?

11          MR. MCCONVILLE:  Yes.

12          THE COURT:  Sustained.

13   BY MR. ZELLER:

14   Q.   Please tell us why it is you don't have records that

15   show what work Pedro did, you're saying Pedro did, versus

16   what work Maria did?

17   A.   Because they were a husband and wife team, as well as

18   business partners, and it wasn't important to them to

19   discriminate that.  They never discriminate it for me, so I

20   didn't feel a need to do that.

21   Q.   During 2000 and 2001, some of these payments that you

22   made to Maria Salazar for work that Maria Salazar did,

23   whether it was to Pedro or Maria directly, was done in cash;

24   right?

25   A.   Correct.

8

1   Q.   Some was done by check?

2   A.   Correct.

3   Q.   And, by the way, when you say it didn't really matter,

4   you understand you had a responsibility to report income

5   that you were paying to them to the IRS; right?

6            MR. MCCONVILLE:  Objection.  Relevance.

7            THE COURT:  Overruled.

8            THE WITNESS:  My assumption is that they filed

9   jointly.

10  BY MR. ZELLER:

11  Q.   That's not my question.  My question is:  Isn't it true

12  that you knew you had an obligation back in 2000 and 2001 to

13  report to the IRS what money was being paid to what

14  individuals on the Bratz project?

15           MR. MCCONVILLE:  Same objection.

16           THE COURT:  Overruled.

17           THE WITNESS:  I don't recall if I was aware of

18  that.  Clearly, at that time, I was new to the business.

19  BY MR. ZELLER:

20  Q.   You were new to the business.  But let's move forward a

21  little bit.

22           You handled the books and records for the

23  sample-making work that was done on Bratz from 2000 to 2005;

24  right?

25  A.   Right.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    Q.   How much money did you and your wife receive from MGA
2    directly for those services?
3    A.   She worked for those five years probably making about a
4    total receipts, that included all her expenses, probably
5    about $300,000 a year, maybe, to a total of about
6    $1.5 million for five years.
7    Q.   $1.5 million.  That's just from MGA; right?
8    A.   Right.
9              THE COURT:  When you say "she," counsel, who are
10   you referring to?
11   BY MR. ZELLER:
12   Q.   Well, I'll rephrase that then.  You say $1.5 million.
13   A.   Right.
14   Q.   That was the amount that you and your wife, Veronica
15   Marlow, received directly from MGA for the sample-making
16   services over that five-year time period; correct?
17   A.   That was our gross income.
18   Q.   But that's not all the money you received --
19   A.   Correct.
20   Q.   -- from the Bratz project; right?
21   A.   Right.
22   Q.   How much more did you receive?  Both you and your wife?
23   A.   When Carter Bryant was first contracted by MGA, he
24   promised my wife 10 percent of his income as kind of a --
25   because she helped him find that job.  It was kind of a
```

1    finder's fee, perhaps, and he honored that.  He kept that

2    promise.  And even after 2005 when my wife stopped working

3    on the dolls, he paid her, probably, about $3 million total.

4    Q.   So you and your wife made off with the Bratz project

5    between -- starting about 2000, a total of how much, then,

6    from both Carter Bryant and MGA?

7    A.   Well, how much we made is different from how much we

8    received, so, of course, we would have to subtract our

9    business expenses.

10   Q.   I apologize.  I'll start that question over.

11        Please tell us then what's the total amount that

12   you received, you and your wife received, from MGA and

13   Carter Bryant since 2000 on Bratz?

14   A.   I believe about $4 1/2 million.

15   Q.   And during the time period from 2000 to 2005 when you

16   were keeping these books and records that you now say you

17   can't tell whether it's Pedro Salazar versus Maria Salazar

18   who did this work, had you had experience in business up

19   until that point?

20   A.   No.

21   Q.   This was the first time you ever did anything out in

22   the business world; is that true?

23   A.   Well, I did have a business in another country during

24   the -- from 1984 to about 1999.  I had a music recording

25   studio in Brazil, but it didn't -- it wasn't anything like

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    this.  It wasn't, you know -- it was --

2    Q.   Just so I understand this then, you're saying it was

3    beyond your abilities, your business acumen to be able to

4    keep records that reflected whether Maria Salazar versus

5    Pedro Salazar did the actual sample-making work you were

6    paying for in 2000 and 2001; correct?

7            MS. GLASER:  Objection.  Argumentative.

8            THE COURT:  Overruled.

9            THE WITNESS:  You know, I didn't see it as

10   something I needed to do.  It was -- it was a very informal

11   kind of arrangement.  It was for our friends, and I didn't

12   see a need to separate exactly who got what, or who did

13   what, whether it was Pedro or Maria.  They're our friends.

14   They are married.  And as far as we're concerned, they're

15   one person.

16   BY MR. ZELLER:

17   Q.   How much work in total did Maria Salazar do on Bratz

18   during 2000 and 2001?

19   A.   I don't recollect the exact amount.

20   Q.   Can you tell us any amount?

21   A.   How much work?  Do you mean how many dolls, or how much

22   money, or what?

23   Q.   Any way you can quantify it?

24   A.   Probably about -- when you say Maria Salazar, I'm

25   assuming Maria Salazar and Pedro Salazar as a unit.

```
 1   Q.   No, I'm asking about Maria Salazar specifically.
 2   A.   I can't say.  I don't know.
 3   Q.   So during 2000 and 2001, did she work on 10 Bratz
 4   projects?
 5   A.   I don't recall.
 6   Q.   50?
 7   A.   I don't recall.
 8   Q.   100?
 9   A.   I don't recall.
10   Q.   How much did you pay her for 2000 and 2001?  I'm
11   talking about her, individually?
12   A.   I didn't pay her individually.
13   Q.   How much did you pay Pedro Salazar, or anyone else for
14   the work that Maria Salazar did in 2000?
15   A.   I don't recall.
16   Q.   Or for 2001?
17   A.   I don't recall.
18   Q.   And if I understand you correctly, you can't possibly
19   answer those questions based on your business records; is
20   that true?
21   A.   Well, I gave you all my business records.  You have all
22   my records, a very complete record.  I kept all my records,
23   and you have them.  So I mean, if you would like to show me,
24   I can tell you what I know from what I've seen, but I can't
25   recollect any exact numbers.
```

 1   Q.   We've been talking about your books and records; right?

 2   A.   Right.

 3   Q.   My question to you isn't what I have.  My question to

 4   you is this:  Can you tell from your own books and records

 5   how much money was paid for the work that Maria Salazar did

 6   on Bratz during 2000 and 2001?

 7          MS. GLASER:  Objection.  Asked and answered.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  If I had those records in front of

10   me, I might be able to have a rough idea.  But then it

11   wouldn't be for Maria Salazar, individually.  It would be

12   for her and her husband working together.

13   BY MR. ZELLER:

14   Q.   I'm asking about Maria Salazar individually.

15   A.   I don't have that information.

16   Q.   And you wouldn't be able to tell from your own books

17   and records.  True?

18   A.   Correct.

19   Q.   Please take a look at Exhibit 10729.

20   A.   *(Witness so complies.)*

21   Q.   Is this another one of your business records?

22   A.   Yes.

23          MR. ZELLER:  I would move this Exhibit 10729 into

24   evidence.

25          THE COURT:  Received.

```
 1              MR. MCCONVILLE:  Objection.  Relevance.

 2              THE COURT:  Received.

 3         (Plaintiff's Exhibit 10729 received in evidence.)

 4    BY MR. ZELLER:

 5    Q.   And I take it, if I asked you the same questions about

 6    whether this is work that Maria Salazar did versus Pedro

 7    Salazar on the Bratz project you couldn't tell?

 8    A.   That's right.

 9    Q.   Because you didn't keep those records?

10    A.   I didn't think it was important.

11    Q.   You didn't keep those records?

12    A.   That's right.

13    Q.   So all of this could very well be -- it's reflected on

14    this exhibit -- work that Maria Salazar did.

15              True?

16    A.   It could be.

17    Q.   You can't exclude that?

18    A.   That's right.

19    Q.   Is that true?

20    A.   Yes.

21    Q.   Please take a look at Exhibit 1197 -- excuse me, 11967.

22    A.   (Witness so complies.)

23    Q.   Do you recognize this as another one of your business

24    records?

25    A.   Yes.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              MR. ZELLER:  I would move this into evidence, your
2    Honor.
3              THE COURT:  Received.
4              MR. MCCONVILLE:  Objection.  Relevance.
5              THE COURT:  Received.
6              Overruled.
7         (Plaintiff's Exhibit 11967 received in evidence.)
8    BY MR. ZELLER:
9    Q.  If I asked you the same questions about this record,
10   you would give me the same answers:  You don't know?
11   A.  Right.
12   Q.  Please take a look at 11976.
13   A.  (Witness so complies.)
14   Q.  This is another one of your business records?
15   A.  Yes.
16             MR. ZELLER:  I'd move this into evidence, your
17   Honor.
18             THE COURT:  Received.
19             MR. MCCONVILLE:  Relevance.
20             THE COURT:  Overruled.
21        (Plaintiff's Exhibit 11976 received in evidence.)
22   BY MR. ZELLER:
23   Q.  If I ask you the same questions about this record, you
24   give me the same answers:  You don't know?
25   A.  Right.
```

```
 1   Q.   Please take a look at 11996.

 2   A.   (Witness so complies.)

 3   Q.   Do you recognize this as another one of your business

 4   records?

 5   A.   Yes.

 6           MR. ZELLER:  I would move this into evidence, your

 7   Honor.

 8           THE COURT:  Objection?

 9           MR. MCCONVILLE:  I'm sorry.  Which one?

10           THE COURT:  11996.  Received.

11           MR. MCCONVILLE:  Relevance.

12           THE COURT:  Overruled.

13       (Plaintiff's Exhibit 11996 received in evidence.)

14   BY MR. ZELLER:

15   Q.   If I ask you the same questions about this document,

16   you would give me the same answers?

17   A.   Yes.

18   Q.   Do you have any explanation as to why you don't have

19   any records in this format that we have up here, this kind

20   of sheet showing job, date, hours started, the amount, the

21   date, pay and the like for Maria Salazar as opposed to

22   Pedro?

23   A.   Yes.

24   Q.   You do have them?

25   A.   I'm sorry.  Can you ask the question again?
```

| | |
|---|---|
| 1 | Q.   Do you have a record in the same format that we're |
| 2 | showing you as Exhibit 11996 that shows work that Maria |
| 3 | Salazar did as opposed to Pedro? |
| 4 | A.   I don't know. |
| 5 | Q.   Are you aware of any? |
| 6 | A.   I don't recall.  I may have produced the same records |
| 7 | with her name on it for their bookkeeping purposes.  I don't |
| 8 | know, but I think, there was a point in -- at some point |
| 9 | they wanted me to change the name on the records to |
| 10 | reflect -- I don't know, just for the bookkeeping reason.  I |
| 11 | don't understand why they would have asked me for that, but |
| 12 | I think that there was some duplication of records there |
| 13 | with that change of name on it. |
| 14 | Q.   I'm not asking about what they asked you for.  There is |
| 15 | a particular format of document that you created as part of |
| 16 | your business records that we have up here; right? |
| 17 |       Do you recognize that? |
| 18 | A.   Yes. |
| 19 | Q.   And this is something that you actually have created? |
| 20 | A.   Right. |
| 21 | Q.   And it's something you created as part of your business |
| 22 | records; right? |
| 23 | A.   Right. |
| 24 | Q.   And its purpose was, is to track payments and work that |
| 25 | was done on the Bratz project; correct? |

1    A.    Right.

2    Q.    And you'll see that the ones that we've looked at have

3    "Pedro Salazar" on them; right?

4    A.    Right.

5    Q.    Are there any such sheets like this that have Maria

6    Salazar's name on them, as opposed to Pedro's?

7              MR. MCCONVILLE:  Objection.  Asked and answered.

8              THE COURT:  Overruled.

9              THE WITNESS:  There may be.  I don't recall.

10   BY MR. ZELLER:

11   Q.    There is none that you know of; is that true?

12   A.    I have a vague recollection that there are.

13   Q.    Just to make sure.  Have you looked at Exhibit 11972?

14              You can go back to that just for a moment.

15   A.    Okay.

16   Q.    Do you recognize this as a business record of yours?

17   A.    Yes.

18              MR. ZELLER:  I would move this into evidence, too.

19              MR. MCCONVILLE:  Same objection, your Honor.

20              THE COURT:  Overruled.

21              Received.

22        (Plaintiff's Exhibit 11972 received in evidence.)

23   BY MR. ZELLER:

24   Q.    Sir, let me ask you directly:  Were you creating

25   records in this manner in order to hide the fact that Maria

1    Salazar was working on Bratz while she was a Mattel

2    employee?

3             MS. GLASER:  Objection.  Assumes facts not in

4    evidence.

5             THE COURT:  Overruled.

6             THE WITNESS:  No.

7    BY MR. ZELLER:

8    Q.   You certainly knew as early as 2000 that if there was a

9    Mattel employee who was working on Bratz while a Mattel

10   employee, that person would be fired by Mattel; right?

11   A.   I would suppose so.

12   Q.   That was certainly your understanding at least as early

13   as 2000; right?

14   A.   I don't know.

15   Q.   Well, you have that understanding as you sit here now,

16   don't you?

17   A.   That somebody who worked at Mattel and worked on Bratz

18   would be fired from their job at Mattel?

19   Q.   Let me rephrase the question.  Let me try it this way.

20   Isn't it true that you told MGA in 2005 that if these sample

21   makers who were then Mattel employees were discovered to be

22   working on Bratz, a competitive project, while they are

23   Mattel employees they would be fired?

24   A.   I didn't tell that to MGA.

25   Q.   Please look at Exhibit 13223.

```
 1   A.   (Witness so complies.)

 2            MR. MCCONVILLE:  I'm sorry.  What number?

 3            THE COURT:  13223.

 4            MR. ZELLER:  And I believe this is in evidence.

 5   Let's just double-check.

 6            MR. MCCONVILLE:  Yes.  It's already in.

 7   BY MR. ZELLER:

 8   Q.   You recognize this as an e-mail that you sent to Paula

 9   Garcia and Isaac Larian and Carter Bryant?

10   A.   Yes.

11   Q.   On June 20, 2005?

12   A.   Right.  Yes.

13   Q.   Directing your attention to -3, which is the last page

14   of this e-mail --

15   A.   Yes.

16   Q.   -- you see here where it says -- and this is the first

17   full paragraph.  It says:  We pay them very generously,

18   because they are risking their day jobs, even a nice

19   retirement to work for us.  If they were ever discovered,

20   they'd certainly be painfully humiliated and fired.

21            Do you see that?

22   A.   Yes.

23   Q.   Those are words that you wrote?

24   A.   Yes.

25   Q.   This is an e-mail that you sent to MGA?
```

```
 1   A.    Right.
 2   Q.    The people you were talking about here were at the time
 3   Mattel employees who were secretly working on Bratz.
 4          True?
 5   A.    That's what I believed at the time, yes.  But I didn't
 6   make any reference to Mattel in this, and I never told MGA,
 7   of course, that they were Mattel employees.
 8   Q.    Well, in fact, you believed that MGA knew that the
 9   sample makers, who Veronica Marlow had working on Bratz,
10   were Mattel employees no later than 2000; correct?
11   A.    No.
12   Q.    You thought that because your wife, Veronica Marlow,
13   helped Maria Salazar get a job at MGA in 2003; correct?
14          MR. MCCONVILLE:  Objection.  Compound.  Vague.
15          THE COURT:  Overruled.
16          THE WITNESS:  Would you repeat the question?
17   BY MR. ZELLER:
18   Q.    Your wife helped Maria Salazar get a job at MGA in
19   2003; correct?
20   A.    I think so.
21   Q.    Please take a look at your deposition transcript,
22   May 2nd, 2008, page 102.
23   A.    (Witness so complies.)  Okay.
24          THE COURT:  Counsel, why don't you pick a
25   convenient time this evening for the jury.
```

```
1              MR. ZELLER:  I'm sorry, your Honor?

2              THE COURT:  Pick a logical breaking point.

3              MR. ZELLER:  Sure.  Absolutely.

4    BY MR. ZELLER:

5    Q.   If you could, please, take a look at page 102, lines 11

6    through 23.

7    A.   Uh-huh.

8              MR. ZELLER:  And I would ask to publish this, your

9    Honor.

10             THE COURT:  You may.

11             MR. ZELLER:  (Reading):

12         QUESTION:  Did you and your wife ever inform MGA

13         of the identity of third parties who you used to

14         work on the Bratz dolls?

15         ANSWER:  Yes.

16         QUESTION:  How did you do that?

17         ANSWER:  I didn't do that.  My wife did.

18         QUESTION:  How was that achieved?

19         ANSWER:  She helped a friend get a job there.

20         QUESTION:  Who was that?

21         ANSWER:  Maria Elena Salazar.

22         QUESTION:  And where did she -- where did Maria

23         Salazar get a job at?

24         ANSWER:  At MGA.

25    ////
```

1   BY MR. ZELLER:

2   Q.   Isn't it true that Maria Salazar got that job at MGA in

3   2003?

4   A.   I don't know.  And can I clarify something I said here?

5   Q.   If MGA's counsel wants to ask you questions, they are

6   certainly free to do that.

7          As a matter of fact, MGA has paid your wife's and

8   your legal fees; isn't that true?

9   A.   I didn't know that.

10  Q.   What's your knowledge of that today?

11  A.   I saw some paperwork in a notebook that you gave me

12  recently, indicating that was the case, but I only learned

13  that a few weeks ago.  My assumption until then was that

14  Carter Bryant was helping us.

15  Q.   Please look at your transcript from June 24th, 2008,

16  page 3642.

17  A.   *(Witness so complies.)*

18  Q.   And, specifically, lines 22 to 24.

19          MR. ZELLER:  And I ask to publish, your Honor.

20          MR. MCCONVILLE:  This isn't impeaching.  It's

21  consistent with what he just said.

22          THE COURT:  The lines again, Counsel?

23          MR. ZELLER:  Lines 22 to 24.

24      *(Pause.)*

25          THE COURT:  And the date of this deposition?

1           MR. ZELLER:  This is June 24th, 2008.

2           THE COURT:  Overruled.

3           You may publish.

4           MR. ZELLER:  (Reading):

5      QUESTION:  *MGA is paying your attorney's fees,*

6      *right, for you and Veronica Marlow in this case?*

7      *ANSWER: No.*

8  BY MR. ZELLER:

9  Q.    I would direct your attention to Exhibit 5561.

10 A.    *(Witness so complies.)*

11          MR. ZELLER:  And this is in evidence, your Honor.

12          THE COURT:  Just a moment.  Just a moment.

13     *(Pause.)*

14          THE COURT:  I'm going to reverse that prior

15 ruling.  That's an incorrect ruling by the court.

16          The question was, Counsel:  *If MGA's counsel wants*

17 *to ask you questions --*

18          *As a matter of fact, MGA has paid your wife's and*

19 *your legal fees; isn't that true?*

20          *Answer:  I don't know.*

21          I'm sorry.  It remains.

22          MR. ZELLER:  Just to be clear, 5561, I can still

23 display?

24          THE COURT:  Yes.

25          MR. ZELLER:  If we can put 5561 up, please.

| | |
|---|---|
| 1 | BY MR. ZELLER: |
| 2 | Q.   And this states here that MGA is paying legal fees for |
| 3 | you and your wife in connection with the MGA versus Bryant |
| 4 | lawsuit. |
| 5 | Do you see that? |
| 6 | A.   Yes. |
| 7 | Q.   And, by the way, this is addressed to the law firm of |
| 8 | Sidley and Austin; right? |
| 9 | A.   I suppose so.  I don't know. |
| 10 | Q.   Do you see that? |
| 11 | A.   I see it now. |
| 12 | Q.   Sidley and Austin represented you in this case.  True? |
| 13 | A.   I don't recall.  It's so long ago. |
| 14 | Q.   Did you ever see a bill from Sidley and Austin? |
| 15 | A.   No. |
| 16 | Q.   Another attorney who represented you in this case was |
| 17 | named Larry McFarland. |
| 18 | True? |
| 19 | A.   Correct. |
| 20 | Q.   And did you ever see a bill from Larry McFarland? |
| 21 | A.   No. |
| 22 | Q.   Who was paying his bills? |
| 23 | A.   I didn't know. |
| 24 | Q.   Isn't it true that he has been a longstanding outside |
| 25 | attorney for MGA? |

1          MS. GLASER:  Objection.  Foundation.

2          THE COURT:  If you know the answer, you can

3     respond, sir.

4          THE WITNESS:  I don't know.

5          MR. ZELLER:  Let's please pull up 505, which is in

6     evidence, -3.

7     BY MR. ZELLER:

8     Q.   This is 505-3.  It's already in evidence.

9          And if you look at that box at the bottom -- it's

10    actually boxes 8 and 9 -- you'll see there is a reference to

11    Larry McFarland?

12    A.   Right.

13    Q.   It refers to him as being a lawyer for MGA.

14         Do you see that?

15    A.   I see it now.

16    Q.   And it never came to your attention at any time over

17    the years that Larry McFarland was a lawyer for MGA?

18    A.   I didn't know who was paying him, or who he worked for.

19    I knew that he was trying to help me.  That's all I knew.

20    Q.   So the answer is:  No one ever told you; is that right?

21    A.   That's right.

22    Q.   And you never asked?

23    A.   That's right.

24         MR. ZELLER:  Now is a good time to break, your

25    Honor.

1          THE COURT:  All right.  Ladies and gentlemen, you

2    are admonised not to discuss this matter amongst yourselves,

3    nor form or express any opinion concerning the case.

4          Have a nice evening, and we'll see you tomorrow at

5    8:30.

6       (Jury out.)

7          THE COURT:  Mr. Marlow, I'll order you back

8    promptly at 8:30.  You'll be seated at that time, sir.

9          Thank you.

10       (The following proceedings were had outside the

11       presence of the jury:)

12          THE COURT:  Now, let's take up the matter -- I

13    want to go right back to the doctor's testimony.

14          Let me speak to Mr. Quinn.  The difficulty is that

15    an expert can consider hearsay.  But then, I have to give an

16    instruction that it's not for the truth of the matter, and

17    that's what Ms. Hurst --

18          MS. HURST:  Right.

19          THE COURT:  -- is going to ask for, obviously.

20    That means that the truth of the matter that additional

21    samples were taken by the MGA expert never comes in front of

22    this jury for that truth.  And now we know that that's

23    truthful.  So the end result is it gives a misimpression to

24    the jury.  They can't consider it for the truth of the

25    matter.  In other words, I can instruct that the evidence

```
 1    can come in, but I don't think that that's what Mattel is
 2    seeking because it's not for the truth that they actually
 3    took the sample.  And, yet, that is the truth.  Additional
 4    samples were taken after the doctor took the additional four
 5    samples apparently in violation of the court order.
 6              Now, apparently, MGA is not willing to
 7    stipulate -- correct, Ms. Hurst -- that additional samples
 8    were taken subsequent to the doctor taking the four samples?
 9              MS. HURST:  Give me a second, your Honor.
10              THE COURT:  I mean, take a sample (sic).  Because
11    what's being perpetuated here is, quite frankly, a
12    misimpression, Mr. Quinn, that's damaging to Mattel; and
13    that is, that the doctor took the samples.  No additional
14    samples could be taken when, in fact, the truth of the
15    matter is the samples were taken.  But the court has to
16    instruct if there's a hearsay objection that it's not for
17    the truth of the matter asserted, and I don't think that
18    that's the position Mattel wants to be in.
19              MR. QUINN:  Correct.
20              THE COURT:  So we can jump through the hoops, but
21    let's find out what we have to do.  Because it's a complete
22    misimpression for the jury.
23         (Pause.)
24              THE COURT:  Wasn't that a fun day?
25              MR. QUINN:  I suppose I could have him look at the
```

```
 1    notary book and count the plug holes.

 2            THE COURT:  Well, the point is:  Why do you have

 3    to do that?  The truth is --

 4            A lie walks around on legs.  The truth doesn't

 5    have to go anyplace.  It's not a lie.  It's just an easy way

 6    to get this resolved; and that is, this misimpression that,

 7    no additional samples were taken by MGA when, quite frankly,

 8    the samples were.

 9            Now, the problem is, I asked MGA -- and they took

10    the position that they don't know that they are going to

11    call the expert, which would then have one the counsel

12    arguing that the doctor destroyed or went through

13    semi-destruction, whatever that's meant, and that the

14    impression would be that no additional samples were taken.

15            MS. HURST:  We'll offer a stipulation that

16    additional samples were taken and no methanol was found.

17            THE COURT:  There we go.

18            MS. HURST:  No menthol, sorry.

19            THE COURT:  That's fine.  I thought you were gong

20    to say no methamphetamine.  The court reporter is confused.

21    One is methanol.  The other is methamphetamine.

22            Now, we're going to get the correct designation

23    for you.

24            MS. HURST:  We offer a stipulation that additional

25    samples were taken and no menthol was found.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:  No menthol was found.

2          MR. QUINN:  We'll have him look at the notary book

3   and tell the jury how many plug holes are there, one.

4          Two, we'll also ask him:  *When you were done was*

5   *there enough ink left in your professional opinion that*

6   *somebody else, like a Mr. Lyter, could have come and done*

7   *testing*?

8          THE COURT:  But you have to understand you have to

9   do that, because if you don't, you're left in the tactical

10  position of a hearsay objection that the court has already

11  stated is correct, and then it's not for the truth of the

12  matter asserted and counsel can argue that, which is a

13  misimpression.  So I think we can resolve that easily and

14  quickly tomorrow on redirect for both parties.

15         MS. HURST:  Your Honor, we have asked that

16  Dr. Aginsky produce the original photographs of the two sets

17  of samples for inspection.

18         THE COURT:  That's more than reasonable.  And,

19  also, this evening could I now look at that document,

20  Mr. Quinn, because we've got time.

21         MR. QUINN:  Right.

22         THE COURT:  So we can resolve that.

23         MS. HURST:  Can I get a copy?

24         THE COURT:  We're going to do all that tonight and

25  then try to get you some rest, because it sounds like you're

1    getting sick.

2              MR. QUINN:  Your Honor, I have a news flash.

3              THE COURT:  This is going to be good.

4              MR. QUINN:  Aginsky witnessed Lyter taking plugs.

5              MS. HURST:  There you go.  The whole problem is

6    solved.

7              THE COURT:  Well, I think that's going to resolve

8    it in about one sentence tomorrow, isn't it?

9              And Mr. Gordon looks like he's racing back and

10   forth through the double doors as fast as he can.

11             All right.  Now, finally, Mr. Overland is leaving

12   tonight.  And Happy Anniversary.

13             MR. OVERLAND:  I think it's a birthday.

14             THE COURT:  Happy birthday to your wife.

15             And Mr. Cote is remaining.

16             Can we work out a schedule with Mr. Price being

17   ill, because the doctor was going to be -- strike that.

18             Mr. Wagner was going to be here this evening.

19   Mr. Price was going to take him on direct examination, which

20   makes it impossible.

21             Ms. Hurst was going to do -- or Ms. Keller?

22   Ms. Hurst was going to do the cross-examination.

23             When are we going to do this, then?  In other

24   words, do I put off the jury instructions on Sunday and get

25   right back to Wagner?

1          Let's do this:  Let's calculate the time so you

2     see where both of you are tactically for a moment; and then,

3     let's just have an informal discussion.  Maybe I can get

4     everybody out of here, and if you need to use the restroom,

5     or want to take a break and go use the restroom, we'll see

6     you in about 10 minutes.

7          MS. HURST:  Thank you.

8        *(Recess taken from 5:08 p.m. to 5:49 p.m.)*

9          THE COURT:  We're on the record.

10         We've gone through, informally, a number of

11    demonstratives and exhibits that the doctor relied upon in

12    23962.

13         Ms. Hurst is concerned and objects to each one of

14    the items.

15         MS. HURST:  I don't object to 1.

16         THE COURT:  Not to 1.

17       *(Pause.)*

18         THE COURT:  We're on the record.

19         We're discussing 23962.  And there are a series of

20    exhibits that the doctor relied upon, some of which are

21    relevant for comparison purposes, some of which are

22    demonstratives, or arguments concerning his conclusions.

23         Ms. Hurst is objecting to all of the items in this

24    exhibit, with the exception of page -1.  So 23962-1, there

25    is no objection.  But for each of the others from 23962-2

1  through 23962-31, there is an objection.

2        Ms. Hurst.

3        MS. HURST:  I don't understand Mr. Quinn to be

4  offering all those pages.

5        THE COURT:  Well, he's not; but I'm going to go

6  through the informal discussion in a moment and those pages

7  that he didn't offer and those pages that he offered that

8  the court is not receiving and those pages that I am

9  receiving, some are demonstratives and shouldn't come in but

10 can be used in a chart and can be argued.  And during

11 argument, you can flip those up in conjunction with these

12 items.

13       MS. HURST:  Your Honor, my argument is that the

14 remainder of the illustrative exhibits are duplicative -- to

15 the extent admissible at all are duplicative of

16 Exhibits 4593, 13578 and 23496 already in evidence, and that

17 to admit the illustratives or demonstratives in addition to

18 that is unduly argumentative, adds nothing for the jury, is

19 not evidence of the expert's firsthand observations and

20 examinations and to the extent that is already in evidence

21 elsewhere and this is just argument.

22       THE COURT:  Anything further?

23       MS. HURST:  No.

24       THE COURT:  Here is what we'll be receiving.

25       First, the court understands that a few of these

1    are duplicative.  There is an extraordinary amount of

2    duplicative evidence already between the parties and,

3    therefore, it's harmless.  And without it coming in some

4    semblance of order through this witness, these would not

5    make sense.

6            I'm going to allow 23962-1, -3.

7            Mr. Quinn is not requesting -2.  He's not

8    requesting-4.

9            I'm allowing -5, -6, -7, -8, -9, -10, -11, -12,

10   -13, -14.

11           I don't believe Mr. Quinn requested -15.

12           MR. QUINN:  I did not.

13           THE COURT:  I don't believe Mr. Quinn requested

14   -16.

15           MR. QUINN:  I did not.

16           THE COURT:  Or -17, or -18.

17           MR. QUINN:  I did not.

18           THE COURT:  -19 is also received.

19           MR. QUINN:  That's the last one I requested, your

20   Honor.

21           THE COURT:  You also requested dash --

22           MR. QUINN:  Oh, I'm sorry.  21.

23           THE COURT:  21.

24       (Plaintiff's Exhibits 23962-1, -3, -5, -6, -7, -8,

25       -9, -10, -11, -12, -13, -14, -19 and -21 received

 1          *in evidence.)*

 2               THE COURT:  And from 20 to the end is left for

 3     argument.

 4               You can use the demonstrative when you argue in

 5     front of the jury, but they seem to be in argument form.

 6     And 21 is simply the conclusion of his summary.

 7               MS. HURST:  So that's out; right?  21?

 8               THE COURT:  21 is not coming in.

 9               Anything else on the record tonight?

10               MR. COTE:  There are demonstratives for

11     Mr. Kinrich, who I understand is going to be testifying

12     tomorrow.  I think we should go through the same process for

13     these demonstratives just to find out which ones the court

14     is allowing to be shown to the jury.

15               THE COURT:  I'll going to wait until I hear from

16     Mr. Kinrich tomorrow.

17          *(Pause.)*

18               MR. COTE:  Ms. Hurst has corrected me on the

19     procedure.

20               MR. QUINN:  Your Honor --

21               THE COURT:  We're back on the record.

22               MR. QUINN:  This doesn't have to be on the record.

23               THE COURT:  We're off the record.

24          *(Pause.)*

25          *(At 5:55 p.m., proceedings were adjourned.)*

36

1                              -oOo-

2                           CERTIFICATE

3              I hereby certify that pursuant to Section 753,

4     Title 28, United States Code, the foregoing is a true and

5     correct transcript of the stenographically reported

6     proceedings held in the above-entitled matter and that the

7     transcript page format is in conformance with the

8     regulations of the Judicial Conference of the United States.

9

10    Date:  February 24, 2011

11

12

13    _____

14                              Deborah D. Parker, Official Reporter

15

16

17

18

19

20

21

22

23

24

25