CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                 – – – – – – –

5

   MATTEL, INC., et al.,              )
6                                      )
             Plaintiffs,              )
7                                      )
        vs.                           ) No. CV 04-9049 DOC
8                                      )    Day 24
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 2
9                                      )
                                       )
10           Defendants.               )
   _____)
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17           Friday, February 25, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-25 D24V1

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

2

```
1    APPEARANCES OF COUNSEL:

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
               QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
4              BY:  JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6              865 South Figueroa Street
               10th Floor
7              Los Angeles, California 90017
               (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700
20
               - AND -
21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700
25
```

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 3 of 168   Page ID #:305300
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
            LAW OFFICES OF MARK E. OVERLAND
5            By:  MARK E. OVERLAND
                 Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             - AND -
9
             SCHEPER KIM & HARRIS LLP
10            BY:  ALEXANDER H. COTE
                 Attorney at Law
11            601 West 5th Street
             12th Floor
12            Los Angeles, California 90071
             (213) 613-4660
13

14

15
     ALSO PRESENT:
16
             MGA ENTERTAINMENT, INC.
17            BY:  JEANINE PISONI
                 Attorney at Law
18            16360 Roscoe Boulevard
             Suite 105
19            Van Nuys, California 91406

20
             ISAAC LARIAN, MGA CEO
21
             KEN KOTARSKI, Mattel Technical Operator
22
             MIKE STOVALL, MGA Technical Operator
23
             RACHEL JUAREZ, Quinn Emanuel Urquhart, Oliver &
24                           Hedges

25

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

4

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARLOW, Peter | | | | |
| By Mr. Zeller (con't) | 7 | | 99 | |
| By Mr. McConville | | 76 | | 116 |
| | | | | |
| AGINSKY, Valery (resumed) | | | | |
| | | | | |
| By Mr. Quinn | | | 120 | |
| By Ms. Hurst | | | | 134 |

**EXHIBITS**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 5594 | Marlow company business record | 31 |
| 5599 | Marlow company business record | 35 |
| 5667 | Marlow company business records | 25 |
| 5668 | Marlow company business record | 27 |
| 6024 | Documents | 37 |
| 11983 | Marlow company business record | 27 |
| 11986 | Marlow company business record | 27 |
| 11989 | Marlow company business record | 27 |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

5

**EXHIBITS** (Continued)

| | EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|---|
| 3 | 11994 | Marlow company business record | 26 |
| 4 5 | 11998 | Marlow company business record | 27 |
| 6 | 12002 | Marlow company business record | 33 |
| 7 8 | 12005 | Marlow company business record | 33 |
| 9 | 12008 | Marlow company business record | 33 |
| 10 11 | 12012 | Marlow company business record | 32 |
| 12 13 | 13423 | E-mail from Mr. Marlow to Mr. Larian and Ms. Garcia | 54 |
| 14 15 | 13425 | E-mail from Mr. Marlow to Ms. Garcia (2002) | 57 |
| 16 | 13647 | Record of Veronica Marlow projects | 66 |
| 17 | 23962-1 | Document | 132 |
| 18 | 23962-3 | Document | 132 |
| 19 | 23962-5 | Document | 132 |
| 20 | 23962-6 | Document | 132 |
| 21 | 23962-7 | Document | 132 |
| 22 | 23962-8 | Document | 132 |
| 23 | 23962-9 | Document | 133 |
| 24 | 23962-10 | Document | 133 |
| 25 | 23962-11 | Document | 133 |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

6

| | | | |
|---|---|---|---|
| 1 | **EXHIBITS (Continued)** | | |
| 2 | **EXHIBIT NO.** | **IDENTIFICATION** | **IN EVIDENCE** |
| 3 | | | |
| 4 | 23962-12 Document | | 133 |
| 5 | 23962-13 Document | | 133 |
| 6 | 23962-14 Document | | 133 |
| 7 | 23962-19 Document | | 133 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 7 of 168   Page ID #:305304
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

7

|  |  |  |
|---|---|---|
|  | 1 | **SANTA ANA, CALIFORNIA, FRIDAY, FEBRUARY 25, 2011** |
|  | 2 | **Day 24, Volume 1 of 2** |
|  | 3 | (8:51 a.m.) |
| 08:51 | 4 | *(In the presence of the jury.)* |
| 08:51 | 5 | THE COURT:  All right.  Then we're back in |
| 08:51 | 6 | session.  The jury's present, the alternates, all counsel, |
| 08:52 | 7 | the witness. |
| 08:52 | 8 | And, Counsel, if you would like to continue with |
| 08:52 | 9 | your examination, please. |
| 08:52 | 10 | MR. ZELLER:  Thank you, Your Honor. |
| 08:52 | 11 | THE COURT:  This is Mr. Zeller on behalf of |
| 08:52 | 12 | Mattel. |
| 08:52 | 13 | PETER MARLOW, MATTEL'S WITNESS, PREVIOUSLY SWORN |
| 08:52 | 14 | RETAKES THE STAND |
| 08:52 | 15 | **DIRECT EXAMINATION (Resumed)** |
| 08:52 | 16 | BY MR. ZELLER: |
| 08:52 | 17 | Q.   Good morning, Mr. Marlow. |
| 08:52 | 18 | A.   Good morning. |
| 08:52 | 19 | Q.   You recognize you're still under oath? |
| 08:52 | 20 | A.   Yes. |
| 08:52 | 21 | Q.   We ended yesterday talking about the relationship |
| 08:52 | 22 | between MGA on the one hand and then you and Veronica Marlow |
| 08:52 | 23 | on the other hand; do you recall that? |
| 08:52 | 24 | A.   Yes. |
| 08:52 | 25 | Q.   And you and Veronica Marlow had an almost six-year |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

8

| | | |
|---|---|---|
| 08:52 | 1 | business relationship with MGA, correct? |
| 08:52 | 2 | A.   Correct. |
| 08:52 | 3 | Q.   And MGA paid you and your wife at least a million and a |
| 08:52 | 4 | half dollars for work on Bratz between 2000 and 2005, right? |
| 08:52 | 5 | A.   Right. |
| 08:52 | 6 | Q.   And then you and your wife received another $3 million |
| 08:52 | 7 | or more from Carter Bryant in connection with Bratz, true? |
| 08:52 | 8 | A.   True. |
| 08:52 | 9 | Q.   MGA paid attorney's fees for you and Veronica Marlow in |
| 08:52 | 10 | this lawsuit, correct? |
| 08:52 | 11 | A.   That's what I learned here. |
| 08:52 | 12 | Q.   Well, you certainly acknowledge now that you know -- |
| 08:52 | 13 | A.   Yes. |
| 08:53 | 14 | Q.   -- MGA paid attorney's fees for your wife and you in |
| 08:53 | 15 | this case, correct? |
| 08:53 | 16 | A.   Correct. |
| 08:53 | 17 | Q.   And now, you said you never received a bill from the |
| 08:53 | 18 | lawyers who represented you and Ms. Marlow in this case; do |
| 08:53 | 19 | you recall that? |
| 08:53 | 20 | A.   Actually, I did.  I -- I'm sorry.  I did receive a |
| 08:53 | 21 | bill.  I didn't recall that yesterday, but I had. |
| 08:53 | 22 | Q.   Well, did you ever receive a bill from Mr. McFarland, |
| 08:53 | 23 | who we saw in a document yesterday was an outside attorney |
| 08:53 | 24 | for MGA? |
| 08:53 | 25 | A.   No. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

9

| | | |
|---|---|---|
| 08:53 | 1 | Q.   Did you ever receive a bill from the Sidley and Austin |
| 08:53 | 2 | firm, which we saw in that letter was authorized to |
| 08:53 | 3 | represent you and have MGA pay for your fees? |
| 08:53 | 4 | A.   No. |
| 08:53 | 5 | Q.   Well, focusing on that representation, then, other than |
| 08:53 | 6 | in those two situations with Mr. McFarland and Sidley and |
| 08:53 | 7 | Austin, have you ever had an occasion where you and your |
| 08:53 | 8 | wife were represented by an attorney, but never received a |
| 08:54 | 9 | bill? |
| 08:54 | 10 | A.   No.  There was one other attorney that we were |
| 08:54 | 11 | represented by, and we did pay them out-of-pocket. |
| 08:54 | 12 | Q.   I'm sorry? |
| 08:54 | 13 | A.   There was another attorney that we paid ourselves. |
| 08:54 | 14 | Q.   I'm not asking about them.  I'm asking about the times |
| 08:54 | 15 | when MGA was paying for your legal fees.  Do you have that |
| 08:54 | 16 | in mind? |
| 08:54 | 17 | A.   Um, yes. |
| 08:54 | 18 | Q.   So I'm asking about Mr. McFarland, and I'm asking about |
| 08:54 | 19 | the Sidley and Austin firm. |
| 08:54 | 20 | A.   What I'm saying is it was the same time period.  It was |
| 08:54 | 21 | during that same trial.  It was during the same time period. |
| 08:54 | 22 | Q.   I understand.  So I'm asking -- I'm asking a different |
| 08:54 | 23 | question. |
| 08:54 | 24 | Has there ever been a situation, other than with |
| 08:54 | 25 | Mr. McFarland and other than with the Sidley and Austin |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

10

| | | |
|---|---|---|
| 08:54 | 1 | firm, where you had lawyers who were representing you, but |
| 08:54 | 2 | never sent you a bill? |
| 08:54 | 3 | A.   No. |
| 08:54 | 4 | Q.   That's the only time that that's ever happened, right? |
| 08:54 | 5 | A.   Yes, yes. |
| 08:54 | 6 | THE COURT:  We didn't hear the answer. |
| 08:54 | 7 | MR. ZELLER:  I thought he answered.  I apologize. |
| 08:54 | 8 | Go ahead. |
| 08:54 | 9 | THE WITNESS:  I said, "Yes." |
| 08:55 | 10 | BY MR. ZELLER: |
| 08:55 | 11 | Q.   You did have that happen other occasions? |
| 08:55 | 12 | A.   I'm sorry, I lost my train here.  That what happened |
| 08:55 | 13 | other occasions? |
| 08:55 | 14 | Q.   Let me restate this.  Other than the occasions in which |
| 08:55 | 15 | Mr. McFarland and Sidley and Austin represented you, other |
| 08:55 | 16 | than those two occasions, did you ever have a situation |
| 08:55 | 17 | where a lawyer was representing you or Ms. Marlow, but never |
| 08:55 | 18 | sent you a bill? |
| 08:55 | 19 | A.   No. |
| 08:55 | 20 | Q.   Did you ever wonder why it was that Sidley and Austin |
| 08:55 | 21 | and Mr. McFarland were representing you, but not sending you |
| 08:55 | 22 | a bill? |
| 08:55 | 23 | A.   No. |
| 08:55 | 24 | Well, actually I did wonder about that, yeah. |
| 08:55 | 25 | Q.   And you understood that MGA was paying your fees, |

| | | |
|---|---|---|
| 08:55 | 1 | correct? |
| 08:55 | 2 | A.   I didn't understand that at the time. |
| 08:56 | 3 | Q.   It never crossed your mind, correct? |
| 08:56 | 4 | A.   I wondered.  Like I just said, you know, I thought |
| 08:56 | 5 | about it, but, um, I didn't know, and... |
| 08:56 | 6 | Q.   I'm not asking about what you knew.  It crossed your |
| 08:56 | 7 | mind that one possibility, the people who were paying these |
| 08:56 | 8 | bills for these lawyers who were representing you, but never |
| 08:56 | 9 | charging you, was MGA, correct? |
| 08:56 | 10 | A.   It crossed my mind. |
| 08:56 | 11 | Q.   And you never asked anyone; is that true? |
| 08:56 | 12 | A.   I don't recall.  I may have asked.  I may have asked |
| 08:56 | 13 | those lawyers, but they didn't tell me. |
| 08:56 | 14 | Q.   The lawyers didn't know who was paying? |
| 08:56 | 15 | A.   They didn't tell me. |
| 08:56 | 16 | Q.   Now, you did meet with MGA lawyers, people who you knew |
| 08:56 | 17 | were MGA lawyers prior to the time you testified in this |
| 08:56 | 18 | case back in 2008, correct? |
| 08:56 | 19 | A.   Yes. |
| 08:56 | 20 | Q.   And the MGA lawyers told you to keep confidential what |
| 08:56 | 21 | it is that you and those MGA lawyers discussed, correct? |
| 08:56 | 22 | A.   I don't recall. |
| 08:57 | 23 | Q.   Well, let's, please look at your transcript of June 16, |
| 08:57 | 24 | 2008.  This is page 314. |
| 08:57 | 25 | *(Document provided to the witness.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 12 of 168   Page ID #:305309
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

12

| | | |
|---|---|---|
| 08:57 | 1 | BY MR. ZELLER: |
| 08:57 | 2 | Q.   Page 314-19 through 315-20, and just read that to |
| 08:57 | 3 | yourself. |
| 08:57 | 4 | Does that refresh your recollection that when you met |
| 08:57 | 5 | with the MGA lawyers, they told you to keep what they |
| 08:57 | 6 | discussed confidential? |
| 08:57 | 7 | A.   That never came up in that conversation.  I don't |
| 08:57 | 8 | recall that happening.  I mean, we talked and it just seemed |
| 08:57 | 9 | like a friendly conversation.  It wasn't anything of real |
| 08:57 | 10 | import being discussed at that meeting. |
| 08:58 | 11 | Q.   So you're saying that that didn't happen?  They didn't |
| 08:58 | 12 | tell you to keep it confidential? |
| 08:58 | 13 | A.   I don't recall.  It's been about five years, and I |
| 08:58 | 14 | don't recall anything particularly sensitive or that had to |
| 08:58 | 15 | be kept confidential.  I don't recall being instructed to |
| 08:58 | 16 | keep anything confidential at that meeting. |
| 08:58 | 17 | Q.   And reviewing this transcript doesn't refresh your |
| 08:58 | 18 | recollection? |
| 08:58 | 19 | A.   Well, we just mentioned the meeting.  The transcript |
| 08:58 | 20 | doesn't say anything about the meeting. |
| 08:58 | 21 | MR. ZELLER:  Your Honor, I'd like to publish |
| 08:58 | 22 | page 314, line 23, through 315, line 20. |
| 08:59 | 23 | THE COURT:  But in those sections, is this |
| 08:59 | 24 | referring to the meeting being kept confidential, or your |
| 08:59 | 25 | questions surrounding MGA lawyers -- |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

13

| | | |
|---|---|---|
| 08:59 | 1 | MR. ZELLER:  It's -- |
| 08:59 | 2 | THE COURT:  -- remaining confidential and |
| 08:59 | 3 | representing him? |
| 08:59 | 4 | MR. ZELLER:  The salient part, Your Honor, I |
| 08:59 | 5 | really want is the part about 315, line 15 through 20, but I |
| 08:59 | 6 | think it needs a bit of context to make it clear. |
| 08:59 | 7 | THE COURT:  I do, too, at the present time.  But |
| 08:59 | 8 | I'm not certain where this mentions lawyers.  Could you |
| 08:59 | 9 | point that out to me for just a moment. |
| 08:59 | 10 | MR. ZELLER:  It mentions Mr. Nolan, who is -- and |
| 08:59 | 11 | I think I can establish is an MGA lawyer. |
| 08:59 | 12 | THE COURT:  You may. |
| 08:59 | 13 | *(Document displayed.)* |
| 08:59 | 14 | BY MR. ZELLER: |
| 08:59 | 15 | Q.   So you recall that you were being asked questions about |
| 09:00 | 16 | a meeting that you had with MGA lawyers in this passage, |
| 09:00 | 17 | right? |
| 09:00 | 18 | A.   Right. |
| 09:00 | 19 | Q.   And one MGA lawyer who you were meeting with was named |
| 09:00 | 20 | Tom Nolan, correct? |
| 09:00 | 21 | A.   (No response.) |
| 09:00 | 22 | Q.   So then picking up with your testimony, it says, |
| 09:00 | 23 | starting at line 23: |
| 09:00 | 24 | "Or anybody affiliated with MGA? |
| 09:00 | 25 | "ANSWER:  I had a meeting Saturday with Tom Nolan. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:00 | 1 | "QUESTION:  That was two days ago? |
| 09:00 | 2 | "ANSWER:  Yes. |
| 09:00 | 3 | "QUESTION:  Who else was at that meeting? |
| 09:00 | 4 | "ANSWER:  My wife, my lawyer, Larry McFarland, my tax |
| 09:00 | 5 | lawyer, Steve Goldsobel, and Christian Dowell, and I think |
| 09:00 | 6 | that's it. |
| 09:00 | 7 | "QUESTION:  Where did that meeting take place? |
| 09:00 | 8 | "ANSWER:  Saturday at -- I think it -- I think it was |
| 09:00 | 9 | around noon. |
| 09:00 | 10 | "QUESTION:  Where did that take place? |
| 09:00 | 11 | "ANSWER:  At the offices of Skadden. |
| 09:00 | 12 | "QUESTION:  The law firm that represents MGA? |
| 09:00 | 13 | "ANSWER:  Yes. |
| 09:00 | 14 | "QUESTION:  How long did that meeting last for? |
| 09:00 | 15 | "ANSWER:  About two to two and a half hours. |
| 09:01 | 16 | "QUESTION:  Did anybody tell you that the information |
| 09:01 | 17 | that was discussed at that meeting had to remain |
| 09:01 | 18 | confidential? |
| 09:01 | 19 | "ANSWER:  Yes. |
| 09:01 | 20 | "QUESTION:  Who told you that? |
| 09:01 | 21 | "ANSWER:  Tom Nolan." |
| 09:01 | 22 | You and Ms. Marlow also claimed to have a joint defense |
| 09:01 | 23 | with MGA in this case, correct? |
| 09:01 | 24 | A.   Um, I don't think we claimed that; I think they claimed |
| 09:01 | 25 | that. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

15

| | | |
|---|---|---|
| 09:01 | 1 | Q.   I'm sorry, who claimed it? |
| 09:01 | 2 | A.   I think MGA claimed that I don't recall claiming that. |
| 09:01 | 3 | Q.   Well, you know MGA claimed to have a joint defense with |
| 09:01 | 4 | you and your wife, Ms. Marlow, correct? |
| 09:01 | 5 | A.   Right. |
| 09:01 | 6 | Q.   But your lawyer also claimed to have one too, right? |
| 09:01 | 7 | A.   I don't recall. |
| 09:01 | 8 | Q.   Let's look at your deposition transcript.  This is |
| 09:01 | 9 | June 16, 2008, pages 316 through 317. |
| 09:02 | 10 | (Document provided to the witness.) |
| 09:02 | 11 | BY MR. ZELLER: |
| 09:02 | 12 | Q.   If you can please look at 316, line 18, through 317, |
| 09:02 | 13 | line 1, and I ask you if that refreshes your recollection |
| 09:02 | 14 | that on your behalf, your attorney asserted that you had a |
| 09:02 | 15 | joint defense with MGA? |
| 09:02 | 16 | MR. McCONVILLE:  Your Honor, in the interest of |
| 09:02 | 17 | completeness, I'd ask that pages from that same depo, |
| 09:02 | 18 | page 441, lines 13 to 24, be shown to the witness. |
| 09:02 | 19 | MR. ZELLER:  I'm just asking -- |
| 09:02 | 20 | THE COURT:  I'll let you do that on redirect.  I |
| 09:02 | 21 | know that there won't be much more time, but otherwise, it's |
| 09:02 | 22 | counting against Mattel's time. |
| 09:02 | 23 | You can do that in just a moment. |
| 09:02 | 24 | BY MR. ZELLER: |
| 09:02 | 25 | Q.   Does that refresh your recollection that on your behalf |

| | | |
|---|---|---|
| 09:02 | 1 | your lawyer asserted at that point that you had a joint |
| 09:02 | 2 | defense with MGA? |
| 09:02 | 3 | A.   Yes. |
| 09:03 | 4 | Q.   And that was what he said, correct? |
| 09:03 | 5 | A.   Yes. |
| 09:03 | 6 | Q.   Now, you and Veronica Marlow have been good friends |
| 09:03 | 7 | with Paula Garcia of MGA over the years, correct? |
| 09:03 | 8 | A.   Correct. |
| 09:03 | 9 | Q.   If you can please take a look at Exhibit 13172 in |
| 09:03 | 10 | evidence. |
| 09:03 | 11 | (Document provided to the witness.) |
| 09:03 | 12 | (Document displayed.) |
| 09:03 | 13 | BY MR. ZELLER: |
| 09:03 | 14 | Q.   This is a check for $8,000 that you gave to -- you and |
| 09:03 | 15 | your wife, Veronica Marlow, gave to Paula Garcia, who was |
| 09:03 | 16 | then known as Paula Treantafelles? |
| 09:03 | 17 | A.   Correct. |
| 09:03 | 18 | Q.   Why? |
| 09:03 | 19 | A.   She was getting married, and we thought that we would |
| 09:03 | 20 | give her a gift for her wedding.  It's the only time we ever |
| 09:03 | 21 | gave her anything, and I thought that would be a nice |
| 09:03 | 22 | gesture. |
| 09:03 | 23 | Q.   Now, during times when you've been waiting here to |
| 09:03 | 24 | testify at the courthouse, you've waited over at MGA's |
| 09:03 | 25 | conference room, correct? |

| | | |
|---|---|---|
| 09:03 | 1 | A.   I wandered in there briefly to get some snacks and some |
| 09:03 | 2 | water.  That's about it. |
| 09:04 | 3 | Q.   Now, by the way, you know it would be bad for MGA if |
| 09:04 | 4 | you were to testify and to admit that Mattel employees |
| 09:04 | 5 | worked on Bratz while they're Mattel employees, correct? |
| 09:04 | 6 | A.   I don't think that's such a bad thing. |
| 09:04 | 7 | Q.   Well, let's talk about the Mattel employees who you |
| 09:04 | 8 | know worked on Bratz while they were Mattel employees. |
| 09:04 | 9 | A.   They also worked on Mattel property while they were |
| 09:04 | 10 | working for us, and I didn't mind that. |
| 09:04 | 11 | Q.   Well, let's break this down. |
| 09:04 | 12 | A.   Okay. |
| 09:04 | 13 | Q.   You know a Marina Salazar, correct? |
| 09:04 | 14 | A.   Right. |
| 09:04 | 15 | Q.   And she was employed by Mattel from August 1996 until |
| 09:04 | 16 | March of 2001, true? |
| 09:04 | 17 | A.   I don't know. |
| 09:04 | 18 | Q.   Sorry? |
| 09:04 | 19 | A.   I don't know. |
| 09:04 | 20 | Q.   Well, focus on that time period.  August of 1996 until |
| 09:04 | 21 | March of 2001, where did you think your friend Maria Salazar |
| 09:04 | 22 | worked? |
| 09:04 | 23 | A.   I believe my wife helped her get a job at Mattel |
| 09:05 | 24 | shortly after she got a job there.  And, um, and she worked |
| 09:05 | 25 | there. |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

18

| | | |
|---|---|---|
| 09:05 | 1 | Q.   So that was your understanding during this time period, |
| 09:05 | 2 | 1996 through March of 2001, correct? |
| 09:05 | 3 | A.   Right. |
| 09:05 | 4 | Q.   Is that true? |
| 09:05 | 5 | A.   Yes. |
| 09:05 | 6 | Q.   And it's true that Maria Salazar, while a Mattel |
| 09:05 | 7 | employee, worked on the Bratz clothing from at least the |
| 09:05 | 8 | 2000 and 2001 time period, correct? |
| 09:05 | 9 | A.   Correct. |
| 09:05 | 10 | Q.   Now, another person who worked on Bratz while a Mattel |
| 09:05 | 11 | employee was Ana Cabrera, correct? |
| 09:05 | 12 | A.   Correct. |
| 09:05 | 13 | Q.   And Ana Cabrera, while a Mattel employment, worked on |
| 09:05 | 14 | Bratz from the 2000 to 2005 time period, correct? |
| 09:05 | 15 | A.   Correct. |
| 09:05 | 16 | Q.   Another person who worked on Bratz while a Mattel |
| 09:05 | 17 | employee was Beatriz Morales, correct? |
| 09:05 | 18 | A.   Correct. |
| 09:06 | 19 | Q.   And Beatriz Morales, while a Mattel employee, worked on |
| 09:06 | 20 | Bratz from at least the 2001 through 2005 time period, |
| 09:06 | 21 | correct? |
| 09:06 | 22 | A.   Correct. |
| 09:06 | 23 | Q.   So there were at least three sample makers who worked |
| 09:06 | 24 | on the Bratz project, on Bratz clothing, during the 2000 to |
| 09:06 | 25 | 2005 time period while they were Mattel employees, true? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:06 | 1 | A.    True. |
| 09:06 | 2 | Q.    And it's true that for those services that were |
| 09:06 | 3 | provided by those three, you and Veronica Marlow billed MGA |
| 09:06 | 4 | for those services, correct? |
| 09:06 | 5 | A.    Correct. |
| 09:06 | 6 | Q.    And MGA paid for them, true? |
| 09:06 | 7 | A.    True. |
| 09:06 | 8 | Q.    Now, you had mentioned that you didn't think it was |
| 09:06 | 9 | such a bad thing -- |
| 09:06 | 10 | A.    Right. |
| 09:06 | 11 | Q.    -- if these Mattel employees were working on Bratz |
| 09:06 | 12 | while Mattel employees; is that your testimony? |
| 09:07 | 13 | A.    Yes.  Because they were primarily sewing contractors, |
| 09:07 | 14 | in my eyes.  I saw them -- I never saw them working at |
| 09:07 | 15 | Mattel.  I saw them as sewing contractors.  They had a |
| 09:07 | 16 | garage full of professional sewing machines.  They did a lot |
| 09:07 | 17 | of jobs on the side, and we were just one of their |
| 09:07 | 18 | customers. |
| 09:07 | 19 | Q.    Just one of the customers? |
| 09:07 | 20 | A.    Yeah. |
| 09:07 | 21 | Q.    Isn't it true that on many occasions they worked |
| 09:07 | 22 | 15-hour-plus days? |
| 09:07 | 23 | A.    Well, during the period that they worked on Bratz, they |
| 09:07 | 24 | worked almost exclusively, um -- when they did their extra |
| 09:07 | 25 | work, they worked almost exclusively with us on Bratz.  But |

| | | |
|---|---|---|
| 09:07 | 1 | prior to working on Bratz, they did work for lots of other |
| 09:07 | 2 | people, and they continued doing work for other people. |
| 09:07 | 3 | Q.   I'm not asking about other people, you understood that, |
| 09:07 | 4 | don't you? |
| 09:07 | 5 | A.   Right. |
| 09:07 | 6 | Q.   So why are you interjecting this? |
| 09:07 | 7 | A.   Because it's relevant because it shows that they were |
| 09:07 | 8 | contractors; they weren't only employees. |
| 09:07 | 9 | Q.   You know that we're on a clock here, right? |
| 09:07 | 10 | A.   Yes. |
| 09:07 | 11 | MR. McCONVILLE:  Objection.  Argumentative. |
| 09:07 | 12 | THE COURT:  Overruled. |
| 09:08 | 13 | BY MR. ZELLER: |
| 09:08 | 14 | Q.   So I would appreciate it if you would answer my |
| 09:08 | 15 | questions. |
| 09:08 | 16 | A.   Okay. |
| 09:08 | 17 | Q.   If MGA thinks that there's important information to get |
| 09:08 | 18 | out, they can use their time and get it from you.  Do you |
| 09:08 | 19 | understand that? |
| 09:08 | 20 | MR. McCONVILLE:  Objection.  Argumentative. |
| 09:08 | 21 | THE COURT:  Overruled. |
| 09:08 | 22 | MR. McCONVILLE:  Improper question. |
| 09:08 | 23 | THE COURT:  Overruled. |
| 09:08 | 24 | BY MR. ZELLER: |
| 09:08 | 25 | Q.   Well, you wrote in 2005 -- this is going back to this |

| | | |
|---|---|---|
| 09:08 | 1 | point about it's not such a bad thing if they were Mattel |
| 09:08 | 2 | employees working on Bratz at the same time. |
| 09:08 | 3 | A.   Uh-huh. |
| 09:08 | 4 | Q.   Isn't it true that in 2005 you told MGA that if they |
| 09:08 | 5 | were discovered, these Mattel employees, while working for a |
| 09:08 | 6 | competitor on Bratz, that they would be fired? |
| 09:08 | 7 | A.   That's right. |
| 09:08 | 8 | Q.   You said that they would lose their good jobs if they |
| 09:08 | 9 | were discovered, correct? |
| 09:08 | 10 | A.   I don't know if those were the words I used. |
| 09:08 | 11 | Q.   Well, that was the gist of it, true? |
| 09:08 | 12 | A.   Um, not necessarily. |
| 09:09 | 13 | Q.   Well, let's look at your e-mail from yesterday. |
| 09:09 | 14 | MR. ZELLER:  Do you have that exhibit number, Ken? |
| 09:09 | 15 | This is the 2005 one.  13223. |
| 09:09 | 16 | Please pull that up. |
| 09:09 | 17 | *(Document displayed.)* |
| 09:09 | 18 | BY MR. ZELLER: |
| 09:09 | 19 | Q.   You recognize this is an e-mail that you wrote in 2005 |
| 09:09 | 20 | and sent to Mr. Larian here? |
| 09:09 | 21 | A.   Yes. |
| 09:09 | 22 | Q.   If we can go to the third page. |
| 09:09 | 23 | *(Document displayed.)* |
| 09:09 | 24 | BY MR. ZELLER: |
| 09:09 | 25 | Q.   And do you see here where you say to him that "they |

| | | |
|---|---|---|
| 09:09 | 1 | only moonlight for Veronica"?  Do you see that? |
| 09:09 | 2 | A.    Yes. |
| 09:09 | 3 | Q.    Those are words you wrote? |
| 09:09 | 4 | A.    Right. |
| 09:09 | 5 | Q.    You didn't write about them working for a variety of |
| 09:09 | 6 | other companies, true? |
| 09:10 | 7 | A.    Well -- |
| 09:10 | 8 | Q.    Yes or no? |
| 09:10 | 9 | A.    Well, you're misstating my intent with these words. |
| 09:10 | 10 | Q.    Those are words you wrote, correct? |
| 09:10 | 11 | A.    I wrote them with the intent to say that they only |
| 09:10 | 12 | moonlight for Veronica, not that they moonlight only for |
| 09:10 | 13 | Veronica. |
| 09:10 | 14 | Q.    I understand.  You didn't say they're working for MGA |
| 09:10 | 15 | and Veronica Marlow on Bratz as well as a whole bunch of |
| 09:10 | 16 | other non-Mattel companies, true? |
| 09:10 | 17 | A.    It wasn't relevant to bring that up in this e-mail. |
| 09:10 | 18 | Q.    I'm not asking you what's relevant or wasn't.  Isn't |
| 09:10 | 19 | that what you wrote? |
| 09:10 | 20 | A.    That's what I wrote. |
| 09:10 | 21 | Q.    Then you look down further in your e-mail, and you say, |
| 09:10 | 22 | "they are risking their day jobs."  Now, the "they" you're |
| 09:10 | 23 | referring to are the Mattel sample makers, correct? |
| 09:10 | 24 | A.    Right. |
| 09:10 | 25 | Q.    "Even a nice retirement to work for us.  If they were |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

23

| | | |
|---|---|---|
| 09:10 | 1 | ever discovered, they'd certainly be painfully humiliated |
| 09:10 | 2 | and fired."  Do you see that? |
| 09:10 | 3 | A.   Yes.  Those were prophetic words, weren't they?  Shall |
| 09:10 | 4 | we talk about what happened a year later when Mattel -- |
| 09:11 | 5 | MR. ZELLER:  I'd move to strike, Your Honor. |
| 09:11 | 6 | THE COURT:  Strike the comment by the witness. |
| 09:11 | 7 | BY MR. ZELLER: |
| 09:11 | 8 | Q.   Those are the words you wrote, true? |
| 09:11 | 9 | A.   Uh-huh. |
| 09:11 | 10 | THE COURT:  Yes or no. |
| 09:11 | 11 | THE WITNESS:  Yes. |
| 09:11 | 12 | BY MR. ZELLER: |
| 09:11 | 13 | Q.   So please tell us how is it it was a -- it was not a |
| 09:11 | 14 | bad thing for these Mattel employees to be working for a |
| 09:11 | 15 | competitor for years on behalf of MGA? |
| 09:11 | 16 | A.   Because a person can get fired for doing things that |
| 09:11 | 17 | are not necessarily wrong.  For example, um, you might |
| 09:11 | 18 | decide that -- or anyone can decide that they disagree with |
| 09:11 | 19 | their boss and choose to do something different and get |
| 09:11 | 20 | fired for it.  It's not necessarily a bad or a wrong thing. |
| 09:11 | 21 | Q.   Well, sir, they weren't doing something different; |
| 09:11 | 22 | these were Mattel employees working for a competitor |
| 09:11 | 23 | secretly, true? |
| 09:11 | 24 | MR. McCONVILLE:  Objection.  Misstates the |
| 09:11 | 25 | evidence. |

DEBBIE GALE, U.S. COURT REPORTER

| 09:11 | 1 | THE COURT:  Overruled. |
| 09:11 | 2 | THE WITNESS:  Yes, true. |
| 09:11 | 3 | BY MR. ZELLER: |
| 09:11 | 4 | Q.   And you knew that these Mattel employees had contracts |
| 09:12 | 5 | with Mattel, correct? |
| 09:12 | 6 | A.   I didn't know that. |
| 09:12 | 7 | Q.   Well, did you ask? |
| 09:12 | 8 | A.   No. |
| 09:12 | 9 | Q.   Did it matter to you? |
| 09:12 | 10 | A.   It never occurred to me.  I was not thinking that they |
| 09:12 | 11 | could have contracts. |
| 09:12 | 12 | Q.   Well, as a matter of fact, you knew that when your wife |
| 09:12 | 13 | worked at MGA -- or excuse me, at Mattel, she had a contract |
| 09:12 | 14 | with Mattel, correct? |
| 09:12 | 15 | MR. McCONVILLE:  Objection.  Relevance. |
| 09:12 | 16 | THE COURT:  Overruled. |
| 09:12 | 17 | THE WITNESS:  I didn't understand contracts.  I |
| 09:12 | 18 | didn't think she had a contract with them.  I thought she |
| 09:12 | 19 | just worked there. |
| 09:12 | 20 | BY MR. ZELLER: |
| 09:12 | 21 | Q.   You do know that you previously testified that you were |
| 09:12 | 22 | aware she had a contract? |
| 09:12 | 23 | MR. McCONVILLE:  Objection.  Improper impeachment. |
| 09:12 | 24 | THE COURT:  Overruled. |
| 09:12 | 25 | THE WITNESS:  I do not recall.  I didn't know she |

| | | |
|---|---|---|
| 09:12 | 1 | had a contract.  I thought she just had a job there. |
| 09:12 | 2 | BY MR. ZELLER: |
| 09:12 | 3 | Q.   So you had no understanding at any time up until the |
| 09:12 | 4 | time you wrote this e-mail in 2005 that we've been |
| 09:12 | 5 | discussing, Exhibit 13223, that Mattel employees were not |
| 09:13 | 6 | permitted to work for competitors under their contracts?  Is |
| 09:13 | 7 | that your testimony? |
| 09:13 | 8 | A.   Um, could you repeat that? |
| 09:13 | 9 | Q.   Is it your testimony that you had no idea anytime up |
| 09:13 | 10 | until this time when you wrote the e-mail, Exhibit 13223, in |
| 09:13 | 11 | 2005 that Mattel employees had contracts that would not |
| 09:13 | 12 | permit them to work for competitors? |
| 09:13 | 13 | A.   I don't recall. |
| 09:13 | 14 | Q.   Now, the work that Ana Cabrera did on Bratz when she |
| 09:13 | 15 | was a Mattel employee was sample making, correct? |
| 09:13 | 16 | A.   Correct. |
| 09:13 | 17 | Q.   Please take a look at Exhibit 5667. |
| 09:14 | 18 | *(Document provided to the witness.)* |
| 09:14 | 19 | BY MR. ZELLER: |
| 09:14 | 20 | Q.   You recognize these as your business records? |
| 09:14 | 21 | A.   Yes. |
| 09:14 | 22 | MR. ZELLER:  I would move Exhibit 5667 into |
| 09:14 | 23 | evidence. |
| 09:14 | 24 | THE COURT:  Received. |
| 09:14 | 25 | *(Exhibit No. 5667 received in evidence.)* |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

26

| | | |
|---|---|---|
| 09:14 | 1 | *(Document displayed.)* |
| 09:14 | 2 | BY MR. ZELLER: |
| 09:14 | 3 | Q.   Now, you recognize these records as showing some of the |
| 09:14 | 4 | work that Ana Cabrera did on Bratz, spanning approximately |
| 09:14 | 5 | the November 12, 2000, to April 2005 time period, correct? |
| 09:14 | 6 | A.   Correct. |
| 09:14 | 7 | Q.   Now, you also prepared other types of records showing |
| 09:14 | 8 | that Ms. Cabrera worked on Bratz while a Mattel employee, |
| 09:14 | 9 | true? |
| 09:14 | 10 | A.   Um, yes. |
| 09:14 | 11 | Q.   Please look at Exhibit 11994. |
| 09:14 | 12 | THE COURT:  Counsel, did you say November 12, |
| 09:15 | 13 | 2000, to April 2000? |
| 09:15 | 14 | MR. ZELLER:  Yes. |
| 09:15 | 15 | THE WITNESS:  Okay. |
| 09:15 | 16 | BY MR. ZELLER: |
| 09:15 | 17 | Q.   And do you recognize that as one of your business |
| 09:15 | 18 | records? |
| 09:15 | 19 | A.   Yes. |
| 09:15 | 20 | MR. ZELLER:  I would move this into evidence, |
| 09:15 | 21 | Your Honor. |
| 09:15 | 22 | THE COURT:  Received. |
| 09:15 | 23 | *(Exhibit No. 11994 received in evidence.)* |
| 09:15 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

27

| | | |
|---|---|---|
| 09:15 | 1 | BY MR. ZELLER: |
| 09:15 | 2 | Q.   And this is another kind of business record you created |
| 09:15 | 3 | showing that Ana Cabrera was working on Bratz while a Mattel |
| 09:15 | 4 | employee, correct? |
| 09:15 | 5 | A.   Correct. |
| 09:15 | 6 | I said, "correct." |
| 09:15 | 7 | Q.   Please, then, look at Exhibits 5668, 11983, 11986, |
| 09:15 | 8 | 11989, and 11998. |
| 09:16 | 9 | *(Documents provided to witness.)* |
| 09:16 | 10 | MR. McCONVILLE:  What's the one after 5663? |
| 09:16 | 11 | MR. ZELLER:  I said 5668. |
| 09:16 | 12 | MR. McCONVILLE:  Oh, eight? |
| 09:16 | 13 | MR. ZELLER:  These are Exhibits 5668, 11983, |
| 09:16 | 14 | 11986, 11989, and 11998. |
| 09:16 | 15 | BY MR. ZELLER: |
| 09:16 | 16 | Q.   And you recognize these as additional business records |
| 09:16 | 17 | of yours, correct? |
| 09:16 | 18 | A.   Correct. |
| 09:16 | 19 | MR. ZELLER:  Move those into evidence, Your Honor. |
| 09:16 | 20 | THE COURT:  Received. |
| 09:16 | 21 | *(Exhibit No. 5668 received in evidence.)* |
| 09:16 | 22 | *(Exhibit No. 11983 received in evidence.)* |
| 09:16 | 23 | *(Exhibit No. 11986 received in evidence.)* |
| 09:16 | 24 | *(Exhibit No. 11989 received in evidence.)* |
| 09:16 | 25 | *(Exhibit No. 11998 received in evidence.)* |

| | | |
|---|---|---|
| 09:16 | 1 | *(Documents displayed.)* |
| 09:16 | 2 | BY MR. ZELLER: |
| 09:16 | 3 | Q.   And these records reflect additional work than Ana |
| 09:16 | 4 | Cabrera did on various Bratz dolls during 2001 and 2002 when |
| 09:16 | 5 | she was a Mattel employee, correct? |
| 09:16 | 6 | A.   Correct. |
| 09:16 | 7 | Q.   Do you know Rosalba, R-O-S-A-L-B-A, Cabrera? |
| 09:16 | 8 | A.   No. |
| 09:16 | 9 | Q.   She was Ana Isabel Cabrera's sister? |
| 09:17 | 10 |         MR. McCONVILLE:  Objection.  Foundation. |
| 09:17 | 11 |         THE WITNESS:  I don't know. |
| 09:17 | 12 |         THE COURT:  Overruled. |
| 09:17 | 13 | BY MR. ZELLER: |
| 09:17 | 14 | Q.   Well, at some point you began creating records that |
| 09:17 | 15 | used Rosalba Cabrera's name for work on Bratz that Ana |
| 09:17 | 16 | Cabrera did, right? |
| 09:17 | 17 | A.   Right. |
| 09:17 | 18 | Q.   And this was even though Rosalba Cabrera didn't do any |
| 09:17 | 19 | work on Bratz, correct? |
| 09:17 | 20 | A.   I didn't know that.  I just assumed that she was |
| 09:17 | 21 | involved in the business issues. |
| 09:17 | 22 | Q.   The reason you did that was that you were attempting to |
| 09:17 | 23 | hide the fact that Ana Cabrera, while a Mattel employee, was |
| 09:17 | 24 | working on Bratz, correct? |
| 09:17 | 25 | A.   I was just following instructions.  I didn't attempt to |

| | | |
|---|---|---|
| 09:17 | 1 | hide anything.  Ana Cabrera asked me to do that, and I did |
| 09:17 | 2 | it according to her wishes, and I simply was -- she was |
| 09:17 | 3 | working together with her in a business capacity. |
| 09:17 | 4 | Q.   Now, have you had other instances where people have |
| 09:18 | 5 | instructed you to create false records using false names |
| 09:18 | 6 | where it wasn't such a bad thing? |
| 09:18 | 7 | MR. McCONVILLE:  Objection.  Argumentative. |
| 09:18 | 8 | Assumes facts. |
| 09:18 | 9 | THE COURT:  Overruled. |
| 09:18 | 10 | THE WITNESS:  I -- I didn't think anything was |
| 09:18 | 11 | false about it. |
| 09:18 | 12 | BY MR. ZELLER: |
| 09:18 | 13 | Q.   You were using a false name in your business records |
| 09:18 | 14 | reflecting work that -- that Ms. Cabrera, Ana Isabel |
| 09:18 | 15 | Cabrera, actually did, right? |
| 09:18 | 16 | MR. McCONVILLE:  Same objection. |
| 09:18 | 17 | THE COURT:  Overruled. |
| 09:18 | 18 | THE WITNESS:  As far as I know, there's nothing |
| 09:18 | 19 | false about it. |
| 09:18 | 20 | BY MR. ZELLER: |
| 09:18 | 21 | Q.   Rosalba Cabrera did no work on Bratz, true? |
| 09:18 | 22 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 09:18 | 23 | THE COURT:  Overruled. |
| 09:18 | 24 | THE WITNESS:  I don't know that.  She could have |
| 09:18 | 25 | helped.  She could have been doing some of the business end |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

| | | |
|---|---|---|
| 09:18 | 1 | of it.  I don't know if she did any of the creative work for |
| 09:18 | 2 | it. |
| 09:18 | 3 | BY MR. ZELLER: |
| 09:18 | 4 | Q.   Please look at June 16, 2008, deposition transcript, |
| 09:18 | 5 | page 450. |
| 09:19 | 6 | A.   Okay. |
| 09:19 | 7 | MR. ZELLER:  I'd like to publish lines 16 through |
| 09:19 | 8 | 18, Your Honor. |
| 09:19 | 9 | THE COURT:  You may. |
| 09:19 | 10 | *(Document displayed.)* |
| 09:19 | 11 | MR. ZELLER:  (Reading:) |
| 09:19 | 12 | "QUESTION:  And did Rosalba Cabrera ever do any |
| 09:19 | 13 | work for you and your wife on Bratz? |
| 09:19 | 14 | "ANSWER:  No." |
| 09:19 | 15 | THE WITNESS:  I made an assumption there, and I |
| 09:19 | 16 | wasn't certain, and, you know, looking back on it, I really |
| 09:19 | 17 | didn't know.  I shouldn't have given that answer then. |
| 09:19 | 18 | MR. ZELLER:  I would move to strike, Your Honor. |
| 09:19 | 19 | THE COURT:  Stricken. |
| 09:19 | 20 | MR. ZELLER:  And also, I would ask for the |
| 09:19 | 21 | instruction on credibility at this point. |
| 09:19 | 22 | THE COURT:  I'll leave that to the jury to |
| 09:19 | 23 | determine.  But you'll strike the gratuitous statement by |
| 09:19 | 24 | the witness. |
| 09:19 | 25 | Mattel or MGA can ask on their time if they have |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

31

| 09:20 | 1 | inquiries into this area. |
| 09:20 | 2 | Counsel. |
| 09:20 | 3 | BY MR. ZELLER: |
| 09:20 | 4 | Q.   Please look at Exhibit 5594.  Is this another one of |
| 09:20 | 5 | your business records? |
| 09:20 | 6 | A.   Yes. |
| 09:20 | 7 | MR. ZELLER:  I'd move this into evidence, |
| 09:20 | 8 | Your Honor. |
| 09:20 | 9 | MR. McCONVILLE:  Relevance, Your Honor. |
| 09:20 | 10 | THE COURT:  Received. |
| 09:20 | 11 | *(Exhibit No. 5594 received in evidence.)* |
| 09:20 | 12 | *(Document displayed.)* |
| 09:20 | 13 | BY MR. ZELLER: |
| 09:20 | 14 | Q.   And please tell us what this is. |
| 09:20 | 15 | A.   It's a signed receipt for work done or for a payment |
| 09:20 | 16 | made. |
| 09:20 | 17 | Q.   This is a receipt that you prepared -- |
| 09:20 | 18 | A.   Uh-huh. |
| 09:20 | 19 | Q.   -- using the name of Rosalba Cabrera to show purported |
| 09:20 | 20 | work on Bratz, correct? |
| 09:20 | 21 | A.   Right. |
| 09:20 | 22 | Q.   Even though she never did any work on Bratz, true? |
| 09:20 | 23 | A.   You know, looking back on it, I can't say that for |
| 09:20 | 24 | certain.  I don't know what she did and how involved she |
| 09:21 | 25 | was. |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 32 of 168   Page ID #:305329
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

32

| | | |
|---|---|---|
| 09:21 | 1 | Q.   Well, you recognize that previously you testified she |
| 09:21 | 2 | did no work on Bratz, true? |
| 09:21 | 3 | A.   I recognize that, but as I explained, I could have been |
| 09:21 | 4 | in error.  I really didn't know. |
| 09:21 | 5 | Q.   Another Mattel employee who worked on Bratz, who we've |
| 09:21 | 6 | discussed, was Beatriz Morales, right? |
| 09:21 | 7 | A.   Correct. |
| 09:21 | 8 | Q.   And Ms. Morales started working on Bratz while a Mattel |
| 09:21 | 9 | employee no later than 2001, correct? |
| 09:21 | 10 | A.   Um, I think so. |
| 09:21 | 11 | Q.   And Ms. Morales continued to work on Bratz while a |
| 09:21 | 12 | Mattel employee through the 2005 time period, right? |
| 09:21 | 13 | A.   Right. |
| 09:21 | 14 | Q.   Please take a look at Exhibit 12012.  Do you recognize |
| 09:21 | 15 | these as your business records? |
| 09:21 | 16 | *(Document provided to the witness.)* |
| 09:22 | 17 | THE WITNESS:  Yes. |
| 09:22 | 18 | BY MR. ZELLER: |
| 09:22 | 19 | Q.   And these -- |
| 09:22 | 20 | MR. ZELLER:  I'd move Exhibit 12012 into evidence, |
| 09:22 | 21 | Your Honor. |
| 09:22 | 22 | THE COURT:  Received. |
| 09:22 | 23 | *(Exhibit No. 12012 received in evidence.)* |
| 09:22 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

33

| | | |
|---|---|---|
| 09:22 | 1 | BY MR. ZELLER: |
| 09:22 | 2 | Q.   And these are records that you've created showing work |
| 09:22 | 3 | that Ms. Morales did on Bratz in the November and |
| 09:22 | 4 | December 2001 time period; is that correct? |
| 09:22 | 5 | A.   Correct. |
| 09:22 | 6 | Q.   Please take a look at Exhibits 12002, 12005, and 12008. |
| 09:22 | 7 | *(Documents provided to the witness.)* |
| 09:22 | 8 | THE WITNESS:  All right. |
| 09:22 | 9 | BY MR. ZELLER: |
| 09:22 | 10 | Q.   Do you recognize these as your business records? |
| 09:22 | 11 | A.   Yes. |
| 09:22 | 12 | MR. ZELLER:  I'd move these into evidence, |
| 09:22 | 13 | Your Honor. |
| 09:22 | 14 | THE COURT:  Received. |
| 09:22 | 15 | *(Exhibit No. 12002 received in evidence.)* |
| 09:23 | 16 | *(Exhibit No. 12005 received in evidence.)* |
| 09:23 | 17 | *(Exhibit No. 12008 received in evidence.)* |
| 09:23 | 18 | *(Documents displayed.)* |
| 09:23 | 19 | BY MR. ZELLER: |
| 09:23 | 20 | Q.   Do you know who Gonzalez (sic) Morales is? |
| 09:23 | 21 | A.   Yes. |
| 09:23 | 22 | Q.   He's a relative of Beatriz Morales? |
| 09:23 | 23 | A.   Her husband. |
| 09:23 | 24 | Q.   At some point you began creating false records that |
| 09:23 | 25 | used the name of Gonzalez (sic) Morales for work on Bratz |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

34

| | | |
|---|---|---|
| 09:23 | 1 | that Beatriz Morales did, true? |
| 09:23 | 2 | MR. McCONVILLE:  Objection.  Argumentative. |
| 09:23 | 3 | THE COURT:  Overruled. |
| 09:23 | 4 | THE WITNESS:  No.  I wouldn't call them false |
| 09:23 | 5 | records. |
| 09:23 | 6 | BY MR. ZELLER: |
| 09:23 | 7 | Q.  Isn't it true that you began creating records |
| 09:23 | 8 | reflecting work that was done on Bratz by Beatriz Morales |
| 09:23 | 9 | that actually had the name of Gonzalez (sic) Morales |
| 09:23 | 10 | instead? |
| 09:23 | 11 | A.  He may have helped her too.  I didn't know. |
| 09:23 | 12 | Q.  Please look at -- well, let me ask you directly. |
| 09:23 | 13 | Mr. Gonzalez -- Mr. Gonzalo Morales did not do any work |
| 09:24 | 14 | on Bratz, true? |
| 09:24 | 15 | A.  I don't know.  I mean, I helped my wife with her work |
| 09:24 | 16 | on Bratz. |
| 09:24 | 17 | Q.  Let's look at your June 16, 2008 deposition, page 453. |
| 09:24 | 18 | THE COURT:  Lines? |
| 09:24 | 19 | MR. ZELLER:  Lines 14 through 22. |
| 09:24 | 20 | And I'd ask to publish them, Your Honor. |
| 09:24 | 21 | THE COURT:  You may. |
| 09:24 | 22 | *(Document displayed.)* |
| 09:24 | 23 | MR. ZELLER:  (Reading:) |
| 09:24 | 24 | "QUESTION:  Can you explain, please? |
| 09:24 | 25 | "ANSWER:  These are records for payments made to |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

35

| | | |
|---|---|---|
| 09:24 | 1 | Beatriz Morales in the name of her husband, Gonzalo Morales. |
| 09:25 | 2 | "QUESTION:  Who did the work on Bratz in this |
| 09:25 | 3 | regard, in this instance? |
| 09:25 | 4 | "ANSWER:  Beatriz Morales. |
| 09:25 | 5 | "QUESTION:  Not Gonzalez -- Gonzalo Morales? |
| 09:25 | 6 | "ANSWER:  No." |
| 09:25 | 7 | BY MR. ZELLER: |
| 09:25 | 8 | Q.  Please take a look at Exhibit 5599. |
| 09:25 | 9 | THE COURT:  Document provided to the witness. |
| 09:25 | 10 | MR. McCONVILLE:  Object on relevance grounds, |
| 09:25 | 11 | Your Honor. |
| 09:25 | 12 | THE COURT:  Overruled. |
| 09:25 | 13 | BY MR. ZELLER: |
| 09:25 | 14 | Q.  Do you recognize this as one of your business records? |
| 09:25 | 15 | A.  Yes. |
| 09:25 | 16 | MR. ZELLER:  I'd move this into evidence, |
| 09:25 | 17 | Your Honor. |
| 09:25 | 18 | THE COURT:  Received. |
| 09:25 | 19 | *(Exhibit No. 5599 received in evidence.)* |
| 09:25 | 20 | *(Document displayed.)* |
| 09:25 | 21 | BY MR. ZELLER: |
| 09:25 | 22 | Q.  And this is a record that you prepared reflecting work |
| 09:25 | 23 | that was done on Bratz, right? |
| 09:25 | 24 | A.  Uh-huh. |
| 09:25 | 25 | Q.  Correct? |

| | | |
|---|---|---|
| 09:25 | 1 | A.    Yes. |
| 09:25 | 2 | Q.    And it's in the name of Gonzalez -- Gonzalo, rather, |
| 09:25 | 3 | Morales, correct? |
| 09:25 | 4 | A.    Just the same way that I did work on Bratz that was |
| 09:26 | 5 | paid in my wife's name. |
| 09:26 | 6 |           MR. ZELLER:  Move to strike. |
| 09:26 | 7 |           THE COURT:  Stricken. |
| 09:26 | 8 | BY MR. ZELLER: |
| 09:26 | 9 | Q.    The name that you put on this record reflecting work on |
| 09:26 | 10 | Bratz was Gonzalo Morales, correct? |
| 09:26 | 11 | A.    Correct. |
| 09:26 | 12 | Q.    And, in fact, you used Gonzalez (sic) Morales' name |
| 09:26 | 13 | even though it was actually Bratz work that was done by |
| 09:26 | 14 | Beatriz Morales during this time period, correct? |
| 09:26 | 15 | A.    I don't know that.  It could have been done by Gonzalo |
| 09:26 | 16 | Morales. |
| 09:26 | 17 | Q.    Well, by this time period, did you have any |
| 09:26 | 18 | sophistication about tax payments that were supposed to be |
| 09:26 | 19 | made and tax reporting to the IRS? |
| 09:26 | 20 | A.    I was learning about that. |
| 09:26 | 21 | Q.    And by this time you had a tax attorney, did you not? |
| 09:26 | 22 | A.    No. |
| 09:26 | 23 | Q.    You didn't?  Well, let's look at Exhibit 6024.  Do you |
| 09:27 | 24 | recognize this? |
| 09:27 | 25 | A.    Yes. |

09:27   1   Q.   This is an annual summary and transmittal of U.S.

09:27   2   information returns that you submitted on behalf of -- um,

09:27   3   payments that you and your wife made?

09:27   4   A.   Correct.

09:27   5            MR. ZELLER:  I'd move Exhibit 6024 into evidence.

09:27   6            THE COURT:  Received.

09:27   7            *(Exhibit No. 6024 received in evidence.)*

09:27   8             *(Document displayed.)*

09:27   9   BY MR. ZELLER:

09:27   10  Q.   And let me ask you this.  I mean, by 2008, certainly,

09:27   11  you were sophisticated in tax matters?

09:27   12  A.   I wouldn't say so.

09:27   13  Q.   Well, you had a tax attorney by then, right?

09:27   14  A.   Uh, yeah.

09:27   15  Q.   Well, let's look at this tax -- let's look at this

09:27   16  summary.  Now, let's look at the second page.  This is

09:28   17  6024-2.

09:28   18             *(Document displayed.)*

09:28   19  BY MR. ZELLER:

09:28   20  Q.   And you generally recognize what this document is.

09:28   21  You're reporting to the IRS payments that were made to those

09:28   22  who were working for Veronica Marlow in your businesses

09:28   23  during the 2005 calendar year, correct?

09:28   24  A.   Right.

09:28   25  Q.   And you submitted this document in 2008 to the IRS,

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 38 of 168   Page ID #:305335
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

38

| | | |
|---|---|---|
| 09:28 | 1 | right? |
| 09:28 | 2 | A.   Correct. |
| 09:28 | 3 | Q.   So you see the first name reflecting payments that were |
| 09:28 | 4 | made in 2005 is for Ana Cabrera, right? |
| 09:28 | 5 | A.   Uh-huh. |
| 09:28 | 6 | Q.   Then you see further down below it says "Beatriz |
| 09:28 | 7 | Morales"? |
| 09:28 | 8 | A.   Uh-huh. |
| 09:28 | 9 | Q.   Right? |
| 09:28 | 10 | A.   Right. |
| 09:28 | 11 | Q.   It reflects payments made there? |
| 09:28 | 12 | A.   Right. |
| 09:28 | 13 | Q.   Then look at page 4.  You'll see that it references |
| 09:28 | 14 | Ms. Cabrera again? |
| 09:28 | 15 | A.   Right. |
| 09:28 | 16 | Q.   You see that? |
| 09:28 | 17 | A.   Uh-huh. |
| 09:28 | 18 | Q.   And then the next two pages, they reference Ana Cabrera |
| 09:29 | 19 | and Beatriz Morales again.  Do you see that? |
| 09:29 | 20 | A.   Uh-huh, right. |
| 09:29 | 21 | Q.   There's no reference to making payments to Gonzalo |
| 09:29 | 22 | Morales in this document you sent to the IRS for work that |
| 09:29 | 23 | was done in 2005, true? |
| 09:29 | 24 | A.   True. |
| 09:29 | 25 | Q.   And the work that Ana Cabrera did on Bratz while she |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

39

| | | |
|---|---|---|
| 09:29 | 1 | was a Mattel employee was sample-making as well, correct? |
| 09:29 | 2 | A.   Yes. |
| 09:29 | 3 | Q.   Now, isn't it true that at least one of the Mattel |
| 09:29 | 4 | sample makers worked on every Bratz doll that was developed |
| 09:29 | 5 | from the October 2000 time period until at least the June of |
| 09:29 | 6 | 2005 time period? |
| 09:29 | 7 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:29 | 8 | THE COURT:  Overruled. |
| 09:29 | 9 | THE WITNESS:  I don't think so. |
| 09:29 | 10 | MR. ZELLER:  Please look at Exhibit 13223 in |
| 09:30 | 11 | evidence. |
| 09:30 | 12 | *(Document provided to the witness.)* |
| 09:30 | 13 | BY MR. ZELLER: |
| 09:30 | 14 | Q.   Please take a look at the second page.  You see where |
| 09:30 | 15 | it says "dolls"? |
| 09:30 | 16 | A.   Uh-huh. |
| 09:30 | 17 | Q.   And you'll see that it references the number of dolls |
| 09:30 | 18 | that Veronica Marlow and at least one of the Mattel sample |
| 09:30 | 19 | makers worked on for MGA during the 2002 through 2005 time |
| 09:30 | 20 | period, right? |
| 09:30 | 21 | A.   Um, still looking for where you're referring to. |
| 09:30 | 22 | Q.   It's up there. |
| 09:30 | 23 | A.   Okay.  Right.  Uh-huh. |
| 09:30 | 24 | Q.   Do you see that? |
| 09:30 | 25 | A.   Yeah. |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

40

| | | |
|---|---|---|
| 09:30 | 1 | Q.   Now, these numbers correspond to, not the actual |
| 09:30 | 2 | delivery date of that number of dolls, but rather when you |
| 09:30 | 3 | invoiced for that work, right? |
| 09:31 | 4 | A.   I believe so. |
| 09:31 | 5 | Q.   And just so we're clear on this, the number of dolls |
| 09:31 | 6 | that we're referencing there are the number of dolls that |
| 09:31 | 7 | Veronica Marlow and at least one of the Mattel sample makers |
| 09:31 | 8 | worked on from the 2002 through mid-2005 time period, |
| 09:31 | 9 | correct? |
| 09:31 | 10 | MR. McCONVILLE:  Objection.  Vague. |
| 09:31 | 11 | THE COURT:  Overruled. |
| 09:31 | 12 | THE WITNESS:  I think there were -- we had help |
| 09:31 | 13 | from, um, Maria Elena Salazar.  I mean, she working for us |
| 09:31 | 14 | full-time at some point there that, um, she wasn't a Mattel |
| 09:31 | 15 | employee. |
| 09:31 | 16 | BY MR. ZELLER: |
| 09:31 | 17 | Q.   That's not my question.  My question is:  Isn't it true |
| 09:31 | 18 | that with respect to these dolls that were referenced there, |
| 09:31 | 19 | from the 2002 to 2005 time period, mid-2005, that these are |
| 09:31 | 20 | the number of dolls that Veronica Marlow and at least one -- |
| 09:31 | 21 | whether it was Ms. Cabrera or Ms. Morales -- also worked on? |
| 09:32 | 22 | MR. McCONVILLE:  Objection.  Ms. Morales was gone |
| 09:32 | 23 | from Mattel in 2001. |
| 09:32 | 24 | THE COURT:  Overruled. |
| 09:32 | 25 | THE WITNESS:  No. |

| 09:32 | 1 | BY MR. ZELLER: |
|---|---|---|
| 09:32 | 2 | Q.   Well, take a look at Note 3. |
| 09:32 | 3 | A.   Okay. |
| 09:32 | 4 | Q.   You see where it says, "includes all Bratz Boyz, Little |
| 09:32 | 5 | Bratz, and Lipstixx, et cetera."  Do you see that? |
| 09:32 | 6 | A.   Yes. |
| 09:32 | 7 | BY MR. ZELLER: |
| 09:32 | 8 | Q.   And this was referring to the fact that Veronica Marlow |
| 09:32 | 9 | and others worked on every single Bratz doll that was in |
| 09:32 | 10 | development from 2002 until 2005, correct? |
| 09:32 | 11 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:32 | 12 | THE COURT:  Overruled. |
| 09:32 | 13 | THE WITNESS:  I don't know if they worked on every |
| 09:32 | 14 | single Bratz doll.  I mean, MGA may have had other designers |
| 09:32 | 15 | and other people working on dolls during that time too. |
| 09:32 | 16 | BY MR. ZELLER: |
| 09:32 | 17 | Q.   These are words you wrote, true? |
| 09:32 | 18 | A.   But that doesn't mean they're correct. |
| 09:33 | 19 | Q.   These are words you wrote, right? |
| 09:33 | 20 | A.   They are. |
| 09:33 | 21 | Q.   And it's referring to dolls that Veronica Marlow and |
| 09:33 | 22 | the Mattel sample makers worked on when they were Mattel |
| 09:33 | 23 | employees, true? |
| 09:33 | 24 | A.   Not necessarily. |
| 09:33 | 25 | Q.   I didn't ask if it was necessarily.  I'm asking you a |

| | | |
|---|---|---|
| 09:33 | 1 | fact; isn't that true? |
| 09:33 | 2 | A.    It's not true. |
| 09:33 | 3 | Q.    So you're denying it? |
| 09:33 | 4 | A.    That's right. |
| 09:33 | 5 | Q.    How many dolls, Bratz dolls, did Ana Cabrera work on |
| 09:33 | 6 | during the five-year time period? |
| 09:33 | 7 | A.    I don't know. |
| 09:33 | 8 | Q.    You can't tell me if it was one? |
| 09:33 | 9 | A.    I can give you a rough number.  Maybe between a hundred |
| 09:33 | 10 | and 200 or 300.  I don't know. |
| 09:33 | 11 | Q.    So it's anywhere north of a hundred, true? |
| 09:33 | 12 | A.    Probably. |
| 09:33 | 13 | Q.    Well, it's more than probably.  That's true? |
| 09:33 | 14 | A.    I'm not sure.  I don't have an exact number in my mind. |
| 09:33 | 15 | Q.    Please tell us your best estimate. |
| 09:34 | 16 | A.    150. |
| 09:34 | 17 | Q.    How many Bratz dolls did Ms. Morales work on while she |
| 09:34 | 18 | was a Mattel employee?  Your best estimate, please. |
| 09:34 | 19 | A.    Maybe 80. |
| 09:34 | 20 | Q.    I'm sorry? |
| 09:34 | 21 | A.    80. |
| 09:34 | 22 | Q.    Could be more? |
| 09:34 | 23 | A.    Well, there was a time that she would -- spent a lot of |
| 09:34 | 24 | time working on these dolls when she was not a Mattel |
| 09:34 | 25 | employee.  So I don't know when exactly, you know, the |

| | | |
|---|---|---|
| 09:34 | 1 | transition happened, but... |
| 09:34 | 2 | Q.   I'm asking about Ms. Morales. |
| 09:34 | 3 | A.   Uh-huh. |
| 09:34 | 4 | Q.   Ms. Morales worked on the Bratz dolls for at least a |
| 09:34 | 5 | four-year time period while she was a Mattel employee, |
| 09:34 | 6 | correct? |
| 09:34 | 7 | A.   I don't think she was a Mattel employee during that |
| 09:34 | 8 | whole four-year time period. |
| 09:34 | 9 | Q.   Ms. Morales was a Mattel employee from October of 2001 |
| 09:35 | 10 | until June of 2006, correct? |
| 09:35 | 11 | A.   I don't know. |
| 09:35 | 12 | Q.   Focusing on that time period, October 2001 through June |
| 09:35 | 13 | of -- I'm sorry, I apologize.  I actually need to restate |
| 09:35 | 14 | that. |
| 09:35 | 15 | Beatriz Morales worked for Mattel from November 1998 |
| 09:35 | 16 | until 2008, correct? |
| 09:35 | 17 | A.   I don't think so. |
| 09:35 | 18 | Q.   You know that she worked there for several years, |
| 09:35 | 19 | right? |
| 09:35 | 20 | A.   I don't know how long she worked there. |
| 09:35 | 21 | Q.   And she worked on Bratz dolls from at least |
| 09:35 | 22 | October 2001 until June of 2006, correct? |
| 09:35 | 23 | A.   No. |
| 09:35 | 24 | Q.   When did she end? |
| 09:35 | 25 | A.   I think our work on Bratz ended in 2005. |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 44 of 168   Page ID #:305341
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

44

| | | |
|---|---|---|
| 09:35 | 1 | Q. So she worked on the Bratz dolls from at least October |
| 09:35 | 2 | of 2001 through June of 2005, right? |
| 09:36 | 3 | A. Um, she did.  I think so. |
| 09:36 | 4 | Q. Focusing on that time period, June of 2001 through June |
| 09:36 | 5 | of 2005, how many Bratz dolls did Beatriz Morales work on? |
| 09:36 | 6 | A. Throughout that whole time period, she probably worked |
| 09:36 | 7 | on about maybe a hundred and -- a hundred. |
| 09:36 | 8 | Q. Could be more? |
| 09:36 | 9 | A. It could be more.  It could be less; I don't know. |
| 09:36 | 10 | Q. Your best estimate is a hundred? |
| 09:36 | 11 | A. Yeah. |
| 09:36 | 12 | Q. Is that right? |
| 09:36 | 13 | A. Yes. |
| 09:36 | 14 | Q. And these 150 dolls, Bratz dolls that you mentioned |
| 09:36 | 15 | Ms. Cabrera worked on while a Mattel employee, these were |
| 09:36 | 16 | different themes, right? |
| 09:36 | 17 | A. Yes. |
| 09:36 | 18 | Q. And the same is true of the hundred or your best |
| 09:36 | 19 | estimate of the dolls that Beatriz Morales worked on when |
| 09:36 | 20 | she was a Mattel employee, correct? |
| 09:36 | 21 | A. Correct. |
| 09:37 | 22 | Q. And so between them, between Ms. Cabrera and |
| 09:37 | 23 | Ms. Morales, during these time periods when they were Mattel |
| 09:37 | 24 | employees, they worked on every single fashion of Bratz |
| 09:37 | 25 | dolls during that time period that were in development, |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

45

| | | |
|---|---|---|
| 09:37 | 1 | right? |
| 09:37 | 2 |    MR. McCONVILLE:  Objection.  Foundation. |
| 09:37 | 3 |    THE WITNESS:  No. |
| 09:37 | 4 |    THE COURT:  Overruled. |
| 09:37 | 5 | BY MR. ZELLER: |
| 09:37 | 6 | Q.   I'm sorry? |
| 09:37 | 7 | A.   I said, "No." |
| 09:37 | 8 | Q.   Well, how many were there? |
| 09:37 | 9 | A.   Well, as I stated, Beatriz Morales was not a Mattel |
| 09:37 | 10 | employee, as far as I can recall, during that whole time |
| 09:37 | 11 | period. |
| 09:37 | 12 | Q.   I'm focusing on the time periods when they were Mattel |
| 09:37 | 13 | employees.  Do you have that in mind? |
| 09:37 | 14 | A.   I don't know when they were Mattel employees. |
| 09:37 | 15 | Q.   Well, you'd mentioned that Ana Cabrera worked on at |
| 09:37 | 16 | least 150 Bratz dolls of different themes? |
| 09:38 | 17 | A.   Right. |
| 09:38 | 18 | Q.   During the time she was a Mattel employee, right? |
| 09:38 | 19 | A.   Yes. |
| 09:38 | 20 | Q.   You've also said, said here this morning, that |
| 09:38 | 21 | Ms. Morales, while she was a Mattel employee, worked on -- |
| 09:38 | 22 | your best estimate was 100 Bratz dolls with different themes |
| 09:38 | 23 | as well, right? |
| 09:38 | 24 | A.   Right. |
| 09:38 | 25 | Q.   So that's a total between the two of them of some 250 |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

46

| 09:38 | 1 | different-themed, fashion-themed Bratz dolls, correct? |
| 09:38 | 2 | MR. McCONVILLE:  Objection.  Vague. |
| 09:38 | 3 | THE COURT:  Well, Counsel, there could be overlap. |
| 09:38 | 4 | I don't know if that's 150 and they worked on the same dolls |
| 09:38 | 5 | or -- I'm going to sustain the objection. |
| 09:38 | 6 | BY MR. ZELLER: |
| 09:38 | 7 | Q.   Let me try it this way.  What they were working on were |
| 09:38 | 8 | the fashions for the Bratz fashion dolls, right? |
| 09:38 | 9 | A.   Right. |
| 09:38 | 10 | Q.   And these are very important to the success of fashion |
| 09:38 | 11 | dolls, right? |
| 09:38 | 12 | A.   I suppose so. |
| 09:39 | 13 | Q.   That's your understanding, isn't it? |
| 09:39 | 14 | A.   Yes. |
| 09:39 | 15 | Q.   And during the time that they were working on -- |
| 09:39 | 16 | Ms. Cabrera was working on -- your best estimate was 150 |
| 09:39 | 17 | different-themed Bratz dolls, and Ms. Morales was working |
| 09:39 | 18 | on -- your best estimate was 100 different Bratz-themed |
| 09:39 | 19 | dolls, they had contracts with Mattel that said they could |
| 09:39 | 20 | not work for competitors, correct? |
| 09:39 | 21 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:39 | 22 | THE WITNESS:  I didn't know that. |
| 09:39 | 23 | THE COURT:  Overruled. |
| 09:39 | 24 | BY MR. ZELLER: |
| 09:39 | 25 | Q.   Well, that was your expectation, true? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

47

| 09:39 | 1 | A.    No. |
|---|---|---|
| 09:39 | 2 | MR. McCONVILLE:  Objection.  Relevance. |
| 09:39 | 3 | THE COURT:  Well, as to expectation, sustained. |
| 09:39 | 4 | BY MR. ZELLER: |
| 09:39 | 5 | Q.   Was that your understanding? |
| 09:39 | 6 | MR. McCONVILLE:  Same objection. |
| 09:39 | 7 | THE COURT:  Overruled. |
| 09:39 | 8 | THE WITNESS:  I didn't know it.  I didn't consider |
| 09:39 | 9 | that. |
| 09:39 | 10 | BY MR. ZELLER: |
| 09:39 | 11 | Q.   Well, your wife left Mattel in March of 2000, right? |
| 09:39 | 12 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 09:39 | 13 | THE COURT:  Overruled. |
| 09:40 | 14 | THE WITNESS:  Yes. |
| 09:40 | 15 | BY MR. ZELLER: |
| 09:40 | 16 | Q.   And the work that we're talking about being done by the |
| 09:40 | 17 | Mattel sample makers while they're Mattel employees started |
| 09:40 | 18 | by October of 2000, after your wife had already left Mattel, |
| 09:40 | 19 | right? |
| 09:40 | 20 | A.    Right. |
| 09:40 | 21 | Q.   And you knew by the time that your wife left Mattel |
| 09:40 | 22 | that she had a contract with Mattel; you knew that? |
| 09:40 | 23 | A.    My wife –– |
| 09:40 | 24 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 09:40 | 25 | THE COURT:  Overruled. |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 48 of 168   Page ID #:305345
CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

48

| | | |
|---|---|---|
| 09:40 | 1 | THE WITNESS:  My wife was a designer.  And so she |
| 09:40 | 2 | may have had a contract.  I don't recall.  But certainly, |
| 09:40 | 3 | you know, the other employees being sample makers, getting |
| 09:40 | 4 | paid hourly, they -- you know, I didn't think that they |
| 09:40 | 5 | would have contracts if -- the thought didn't even cross my |
| 09:40 | 6 | mind. |
| 09:40 | 7 | MR. ZELLER:  Your Honor, I would ask -- |
| 09:40 | 8 | Well, if you can show Mr. Marlow Volume II of his |
| 09:40 | 9 | deposition transcript.  This is page 356. |
| 09:41 | 10 | *(Document provided to the witness.)* |
| 09:41 | 11 | MR. ZELLER:  And I'd ask to publish lines 9 |
| 09:41 | 12 | through 12. |
| 09:41 | 13 | THE COURT:  You may. |
| 09:41 | 14 | MR. ZELLER:  Would you please publish that. |
| 09:41 | 15 | *(Document displayed.)* |
| 09:41 | 16 | MR. ZELLER:  (Reading:) |
| 09:41 | 17 | "QUESTION:  You knew that your wife, as a Mattel |
| 09:41 | 18 | employee for a considerable amount of time, had an |
| 09:41 | 19 | employment agreement with Mattel also, didn't she? |
| 09:41 | 20 | "ANSWER:  Yes." |
| 09:41 | 21 | THE WITNESS:  Uh-huh. |
| 09:41 | 22 | BY MR. ZELLER: |
| 09:41 | 23 | Q.   Direct your attention to Exhibit 13223. |
| 09:41 | 24 | THE COURT:  I'm sorry, sir, also, we can't get |
| 09:41 | 25 | "uh-huh," so was that a "yes" or "no"? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:42 | 1 | THE WITNESS:  Yes. |
| 09:42 | 2 | THE COURT:  Thank you. |
| 09:42 | 3 | *(Document provided to the witness.)* |
| 09:42 | 4 | BY MR. ZELLER: |
| 09:42 | 5 | Q.   And you knew by the time you wrote this e-mail |
| 09:42 | 6 | August 1st, 2005, that you sent to Mr. Larian -- |
| 09:42 | 7 | A.    Uh-huh. |
| 09:42 | 8 | Q.   -- that these sample makers were not the equivalent of |
| 09:42 | 9 | housekeepers being paid on an hourly basis, true? |
| 09:42 | 10 | A.   I knew they were being -- um, I knew they were sample |
| 09:42 | 11 | makers, and I assume that sample makers were being paid on |
| 09:42 | 12 | an hourly basis. |
| 09:42 | 13 | Q.   You knew they worked for Mattel during certain time |
| 09:42 | 14 | periods, right? |
| 09:42 | 15 | A.    Right. |
| 09:42 | 16 | Q.   They were salaried employees and you knew it, correct? |
| 09:42 | 17 | A.   I didn't know that.  I don't think they were.  I think |
| 09:42 | 18 | they were hourly. |
| 09:42 | 19 | Q.   So it would be a surprise to you to learn that Ana |
| 09:43 | 20 | Cabrera was a salaried Mattel employee, who signed an |
| 09:43 | 21 | agreement that said she would not work for a competitor |
| 09:43 | 22 | while a Mattel employee, right? |
| 09:43 | 23 | MR. McCONVILLE:  Relevance. |
| 09:43 | 24 | THE COURT:  Overruled. |
| 09:43 | 25 | THE WITNESS:  Yes, I am surprised. |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

50

| 09:43 | 1 | BY MR. ZELLER: |
|---|---|---|
| 09:43 | 2 | Q.   You would be very surprised? |
| 09:43 | 3 | A.   Yes. |
| 09:43 | 4 | Q.   And you would be very surprised if the same were true |
| 09:43 | 5 | of Beatriz Morales, correct? |
| 09:43 | 6 | A.   Yes. |
| 09:43 | 7 | Q.   And I take it, even as of today, that's something |
| 09:43 | 8 | you've never even investigated or asked about; is that true? |
| 09:43 | 9 | MR. McCONVILLE:  Objection.  Relevance. |
| 09:43 | 10 | THE COURT:  Overruled. |
| 09:43 | 11 | THE WITNESS:  Yes. |
| 09:43 | 12 | BY MR. ZELLER: |
| 09:43 | 13 | Q.   While Ms. Salazar was working on Bratz, while she was a |
| 09:43 | 14 | Mattel employee, did you ever inform Mattel that she was |
| 09:44 | 15 | doing that? |
| 09:44 | 16 | A.   No. |
| 09:44 | 17 | Q.   To your knowledge, did anyone? |
| 09:44 | 18 | A.   No. |
| 09:44 | 19 | Q.   While Ms. Cabrera was working on Bratz, while she was a |
| 09:44 | 20 | Mattel employee, did you tell Mattel that she was doing |
| 09:44 | 21 | that? |
| 09:44 | 22 | A.   No. |
| 09:44 | 23 | Q.   To your knowledge, did anyone? |
| 09:44 | 24 | A.   No. |
| 09:44 | 25 | Q.   While Ms. Morales was working on Bratz, while she was a |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

51

| 09:44 | 1 | Mattel employee, did you inform Mattel that she was doing |
| 09:44 | 2 | that? |
| 09:44 | 3 | A.   No. |
| 09:44 | 4 | Q.   To your knowledge, did anyone? |
| 09:44 | 5 | A.   No. |
| 09:44 | 6 | Q.   You and Veronica Marlow had approximately a seven-year |
| 09:44 | 7 | business relationship with Carter Bryant, correct? |
| 09:44 | 8 | A.   Yes. |
| 09:44 | 9 | Q.   And you and your wife continued to receive payments for |
| 09:44 | 10 | Bratz into approximately 2008, right? |
| 09:44 | 11 | A.   Correct. |
| 09:44 | 12 | Q.   And you were personally involved in the communications |
| 09:44 | 13 | with Carter Bryant and MGA insofar as they pertained to work |
| 09:44 | 14 | that was performed on the Bratz project going back to 2000, |
| 09:44 | 15 | correct? |
| 09:45 | 16 |          MR. McCONVILLE:  Objection.  Vague. |
| 09:45 | 17 |          THE COURT:  Overruled. |
| 09:45 | 18 |          THE WITNESS:  I don't understand the question. |
| 09:45 | 19 |          THE COURT:  Did I hear something?  Good.  That was |
| 09:45 | 20 | a cell phone, I think, going off, but I didn't hear it. |
| 09:45 | 21 |          MR. QUINN:  I didn't either, Your Honor. |
| 09:45 | 22 | BY MR. ZELLER: |
| 09:45 | 23 | Q.   Let me break it down.  From time to time, starting back |
| 09:45 | 24 | in 2000, you had communications with Carter Bryant as they |
| 09:45 | 25 | pertained to Bratz, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 52 of 168   Page ID #:305349
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

52

| | | |
|---|---|---|
| 09:45 | 1 | A.   Yes. |
| 09:45 | 2 | Q.   And you also had communications, going back to 2000, |
| 09:45 | 3 | about Bratz from time to time with MGA, right? |
| 09:45 | 4 | A.   Yes. |
| 09:45 | 5 | Q.   And isn't it true that Carter Bryant and MGA had the |
| 09:45 | 6 | power to approve or disapprove the work that you and |
| 09:45 | 7 | Veronica Marlow did on Bratz? |
| 09:45 | 8 | A.   True. |
| 09:45 | 9 | Q.   If you can please take a look at Exhibit 13223 into |
| 09:46 | 10 | evidence. |
| 09:46 | 11 | (Document displayed.) |
| 09:46 | 12 | BY MR. ZELLER: |
| 09:46 | 13 | Q.   And if we can look at the last page -- or dash 3, |
| 09:46 | 14 | rather. |
| 09:46 | 15 | (Document displayed.) |
| 09:46 | 16 | THE WITNESS:  Uh-huh. |
| 09:46 | 17 | BY MR. ZELLER: |
| 09:46 | 18 | Q.   And we talked about -- you see in this e-mail when you |
| 09:46 | 19 | tell MGA in this e-mail that the sample makers were |
| 09:46 | 20 | employees of a competitor who were moonlighting, right? |
| 09:46 | 21 | A.   Uh, yes. |
| 09:46 | 22 | Q.   And even after that, MGA continued to pay outstanding |
| 09:46 | 23 | invoices that you and Veronica Marlow sent to MGA, correct? |
| 09:46 | 24 | A.   Correct. |
| 09:46 | 25 | Q.   Has anyone, to this day, at MGA ever told you that you |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 53 of 168   Page ID #:305350
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

53

| | | |
|---|---|---|
| 09:46 | 1 | shouldn't have done this:  Use sample makers who were then |
| 09:46 | 2 | Mattel employees, to work on Bratz? |
| 09:46 | 3 | A.   I never told them they were Mattel employees. |
| 09:46 | 4 | Q.   I'm not asking about what you told them.  I'm asking |
| 09:46 | 5 | you has MGA ever told you to this day that it was wrong for |
| 09:47 | 6 | Veronica Marlow to be using Mattel employees as sample |
| 09:47 | 7 | makers to work on Bratz while they're Mattel employees? |
| 09:47 | 8 | A.   I don't recall. |
| 09:47 | 9 | Q.   Has anyone at MGA ever said that doing that violated |
| 09:47 | 10 | any vendor codes or code of conduct that MGA had? |
| 09:47 | 11 | A.   I don't recall. |
| 09:47 | 12 | Q.   In fact, to your knowledge, did MGA ever say, as |
| 09:47 | 13 | someone working for MGA, you have to abide by certain |
| 09:47 | 14 | standards, by a code of conduct? |
| 09:47 | 15 | A.   Um, I don't recall. |
| 09:47 | 16 | Q.   Has MGA ever said to you that you needed to return any |
| 09:47 | 17 | of the million and a half dollars or so that MGA paid to you |
| 09:47 | 18 | and your wife over the years for Bratz? |
| 09:47 | 19 | A.   No. |
| 09:47 | 20 |      I said, "No." |
| 09:47 | 21 | Q.   Now, it's true that you believe that during the 2000 to |
| 09:47 | 22 | 2005 time period Veronica Marlow and these Mattel sample |
| 09:48 | 23 | makers were essentially functioning as a department of MGA, |
| 09:48 | 24 | correct? |
| 09:48 | 25 | A.   No. |

| | | |
|---|---|---|
| 09:48 | 1 | Q.   You believed that without Veronica Marlow and the |
| 09:48 | 2 | Mattel sample makers, MGA would have needed a department |
| 09:48 | 3 | within the company to perform the same functions that they |
| 09:48 | 4 | did, true? |
| 09:48 | 5 | A.   That was my opinion. |
| 09:48 | 6 | Q.   Look at Exhibit 13423. |
| 09:48 | 7 | *(Document provided to the witness.)* |
| 09:48 | 8 | BY MR. ZELLER: |
| 09:48 | 9 | Q.   Do you recognize this? |
| 09:48 | 10 | A.   Yes. |
| 09:48 | 11 | Q.   Please tell us what it is. |
| 09:48 | 12 | A.   It's an e-mail that I sent to Isaac Larian and Paula |
| 09:48 | 13 | Garcia. |
| 09:48 | 14 | MR. ZELLER:  I'd move this into evidence. |
| 09:48 | 15 | THE COURT:  Received. |
| 09:48 | 16 | *(Exhibit No. 13423 received in evidence.)* |
| 09:48 | 17 | *(Document displayed.)* |
| 09:48 | 18 | BY MR. ZELLER: |
| 09:48 | 19 | Q.   Now, this is an e-mail that you sent to Isaac Larian |
| 09:48 | 20 | about the work that Veronica Marlow and the sample makers |
| 09:48 | 21 | were doing on Bratz, correct? |
| 09:49 | 22 | A.   Correct. |
| 09:49 | 23 | Q.   Now, take a look at the fourth paragraph.  Do you see |
| 09:49 | 24 | where it says -- starts, "Because Veronica"? |
| 09:49 | 25 | A.   Yes, yes. |

| 09:49 | 1 | Q.   You see where it starts there.  So it says, "Because |
| 09:49 | 2 | Veronica and her team of three helpers accomplish in three |
| 09:49 | 3 | days what such a team would take ten days to do to get the |
| 09:49 | 4 | same volume of productivity, you would need to employ at |
| 09:49 | 5 | least twelve, plus a manager.  And this is assuming that |
| 09:49 | 6 | they nail every project the first time like Veronica does. |
| 09:49 | 7 | It is likely that this team of employees, now a department, |
| 09:49 | 8 | will not always have a clear vision of the Bratz concept," |
| 09:49 | 9 | end quote.  Do you see that? |
| 09:49 | 10 | A.   Yes. |
| 09:49 | 11 | Q.   And the "helpers," as you use the word, you're |
| 09:49 | 12 | referring to here, included Ana Cabrera and Beatriz Morales, |
| 09:49 | 13 | correct? |
| 09:49 | 14 | A.   I think so, yes. |
| 09:49 | 15 | Q.   And so, here, you're referring to the fact that in your |
| 09:49 | 16 | view Veronica Marlow and these Mattel sample workers |
| 09:49 | 17 | essentially were doing the work that it would have taken a |
| 09:50 | 18 | department to do within MGA, right? |
| 09:50 | 19 | A.   I think this was a little bit of hype too.  I was |
| 09:50 | 20 | trying to promote Veronica's contribution to the company. |
| 09:50 | 21 | It doesn't necessarily reflect anything realistic.  It was |
| 09:50 | 22 | my hyped opinion at the time. |
| 09:50 | 23 | Q.   I'm first asking about the words you wrote. |
| 09:50 | 24 | A.   Yes. |
| 09:50 | 25 | Q.   That's the gist of the words that you wrote, right? |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

56

| | | |
|---|---|---|
| 09:50 | 1 | A.   Well, I was explaining the gist.  The gist is sales |
| 09:50 | 2 | hype, really. |
| 09:50 | 3 | Q.   So this is another instance where you sent an e-mail |
| 09:50 | 4 | that you now say was just incorrect? |
| 09:50 | 5 | A.   Not necessarily incorrect. |
| 09:50 | 6 | MR. McCONVILLE:  Hold on.  Hold on.  Objection. |
| 09:50 | 7 | Argumentative. |
| 09:50 | 8 | THE COURT:  Overruled. |
| 09:50 | 9 | THE WITNESS:  Not necessarily incorrect.  It's |
| 09:50 | 10 | just -- it plays up to a -- a -- a certain, um, opinion of |
| 09:50 | 11 | mine, but not necessarily a -- something realistic. |
| 09:50 | 12 | BY MR. ZELLER: |
| 09:50 | 13 | Q.   These are words you wrote? |
| 09:50 | 14 | A.   Yes. |
| 09:50 | 15 | Q.   You believed them when you wrote them, right? |
| 09:50 | 16 | A.   Yes. |
| 09:50 | 17 | Q.   Please look two more paragraphs down.  Do you see where |
| 09:51 | 18 | it says, quote -- you're referring to the, quote, "many |
| 09:51 | 19 | 100-plus-hour weeks she and her crew put in for Bratz," end |
| 09:51 | 20 | quote.  Do you see that language? |
| 09:51 | 21 | A.   Yes. |
| 09:51 | 22 | Q.   And the crew that's referenced here include at least |
| 09:51 | 23 | two Mattel sample makers, Ms. Cabrera and Ms. Morales, |
| 09:51 | 24 | correct? |
| 09:51 | 25 | A.   Yes.  But, of course, they don't necessarily put in all |

| | | |
|---|---|---|
| 09:51 | 1 | those hundred-hour weeks.  My wife did, but she got some |
| 09:51 | 2 | help, a lesser number of hours, from others. |
| 09:51 | 3 | Q.  Please look at Exhibit-- actually, this is the same |
| 09:51 | 4 | page, I believe, page 3. |
| 09:51 | 5 | (Document provided to the witness.) |
| 09:51 | 6 | MR. ZELLER:  Put up page 3, Ken -- this is -- |
| 09:51 | 7 | let's look at Exhibit 13425. |
| 09:51 | 8 | (Document displayed.) |
| 09:51 | 9 | BY MR. ZELLER: |
| 09:51 | 10 | Q.  Do you recognize this? |
| 09:52 | 11 | A.  Let me look it over. |
| 09:52 | 12 | Yes. |
| 09:52 | 13 | Q.  And please tell us what it is. |
| 09:52 | 14 | A.  It's an e-mail I wrote to, um, to Paula Garcia and |
| 09:52 | 15 | another MGA employee in 2002. |
| 09:52 | 16 | MR. ZELLER:  I'd move it into evidence, |
| 09:52 | 17 | Your Honor. |
| 09:52 | 18 | THE COURT:  Received. |
| 09:52 | 19 | (Exhibit No. 13425 received in evidence.) |
| 09:52 | 20 | (Document displayed.) |
| 09:52 | 21 | BY MR. ZELLER: |
| 09:52 | 22 | Q.  Please take a look at page 3. |
| 09:52 | 23 | (Document displayed.) |
| 09:52 | 24 | BY MR. ZELLER: |
| 09:52 | 25 | Q.  Do you see the sentence where it says, "They put in |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 58 of 168   Page ID #:305355
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

58

| | | |
|---|---|---|
| 09:52 | 1 | many 15-hour days to deliver projects"?  Do you see that? |
| 09:52 | 2 | A.   Yes.  Hold on.  Let me see where is it again.  Okay. |
| 09:52 | 3 | Q.   The "they" that you're referring to was Veronica Marlow |
| 09:52 | 4 | and the sample makers, correct? |
| 09:52 | 5 | A.   Correct. |
| 09:52 | 6 | Q.   And the sample makers at that time included Ana Cabrera |
| 09:52 | 7 | and Beatriz Morales, correct? |
| 09:53 | 8 | A.   Correct. |
| 09:53 | 9 | Q.   Let's please take a look at Exhibit 5723.  This is in |
| 09:53 | 10 | evidence. |
| 09:53 | 11 | *(Document displayed.)* |
| 09:53 | 12 | *(Document provided to the witness.)* |
| 09:53 | 13 | BY MR. ZELLER: |
| 09:53 | 14 | Q.   All right.  Now, we talked a bit about this yesterday. |
| 09:53 | 15 | You recognize that this shows that Ms. Salazar, while she |
| 09:53 | 16 | was a Mattel employee, began working on Bratz no later than |
| 09:53 | 17 | October 13, 2000, right? |
| 09:53 | 18 | A.   Well, I didn't know she was a Mattel employee, but if |
| 09:53 | 19 | you say so. |
| 09:53 | 20 | BY MR. ZELLER: |
| 09:53 | 21 | Q.   Ms. Salazar was a Mattel employee in October of 2000, |
| 09:53 | 22 | correct? |
| 09:53 | 23 | A.   If you say so, I believe you.  I don't recall.  I |
| 09:53 | 24 | didn't -- I don't know. |
| 09:54 | 25 | Q.   Well, we talked yesterday about how those first seven |

DEBBIE GALE, U.S. COURT REPORTER

09:54    1    entries added up to be 42 hours of sample-making services;
09:54    2    you see that?
09:54    3    A.    Correct.
09:54    4    Q.    And this is during that time period October 13, 2000,
09:54    5    to October 19, 2000, right?
09:54    6    A.    Right.
09:54    7    Q.    Now, you know that in order to be working on samples
09:54    8    for fashion dolls from that -- in that time period beginning
09:54    9    on October 13th, that Veronica Marlow and Ms. Salazar had to
09:54   10    have Bratz doll fashion designs to work from, right?
09:54   11              MR. McCONVILLE:  Objection.  Foundation.
09:54   12              THE COURT:  Overruled.
09:54   13              THE WITNESS:  Um, could you explain that again?
09:54   14    BY MR. ZELLER:
09:54   15    Q.    Well, during this time period, during that week we're
09:54   16    talking about, Ms. Salazar was a sample maker?
09:54   17    A.    Right.
09:54   18    Q.    She was -- that meant she was making doll clothing,
09:54   19    right?
09:55   20    A.    Right.
09:55   21    Q.    Um, she worked several hours each day during that week
09:55   22    on Bratz, right?
09:55   23    A.    Uh-huh.
09:55   24    Q.    In fact, it totaled up to be 42 hours during that week,
09:55   25    right?

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 60 of 168   Page ID #:305357
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

60

| | | |
|---|---|---|
| 09:55 | 1 | A.   Right. |
| 09:55 | 2 | Q.   And she had to have fashion designs in order to make |
| 09:55 | 3 | the samples that she was working on during that week, right? |
| 09:55 | 4 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:55 | 5 | THE COURT:  Overruled. |
| 09:55 | 6 | THE WITNESS:  I don't know.  My wife could have |
| 09:55 | 7 | been making the designs concurrently. |
| 09:55 | 8 | BY MR. ZELLER: |
| 09:55 | 9 | Q.   Well, you can't have samples made unless you know what |
| 09:55 | 10 | the fashions are that are gonna be made, right? |
| 09:55 | 11 | A.   It can be done on the spot as -- as kind of like, um, a |
| 09:55 | 12 | designer, you know, working and -- on one thing and a sample |
| 09:55 | 13 | maker working on something else trying things out, um, and |
| 09:55 | 14 | the designer will evaluate what the sample maker just did, |
| 09:55 | 15 | and it changes the design.  I mean, this can happen at the |
| 09:55 | 16 | same time.  Design and sample making can happen |
| 09:56 | 17 | concurrently. |
| 09:56 | 18 | Q.   You have to have a design to make the sample to, even |
| 09:56 | 19 | if you're doing it at the same time, right? |
| 09:56 | 20 | A.   Right. |
| 09:56 | 21 | Q.   And by the way, so during this time period that we're |
| 09:56 | 22 | talking about, that highlighted week from October -- |
| 09:56 | 23 | starting in October, up through October 19th -- |
| 09:56 | 24 | A.   Right. |
| 09:56 | 25 | Q.   -- Ms. Salazar was making creative contributions to the |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 61 of 168   Page ID
#:305358
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

61

| 09:56 | 1 | samples, right? |
| 09:56 | 2 | MR. McCONVILLE:  Objection. |
| 09:56 | 3 | THE WITNESS:  No. |
| 09:56 | 4 | MR. McCONVILLE:  Foundation. |
| 09:56 | 5 | THE COURT:  Overruled. |
| 09:56 | 6 | THE WITNESS:  My wife and Carter Bryant were the |
| 09:56 | 7 | creative contributors to the dolls. |
| 09:56 | 8 | BY MR. ZELLER: |
| 09:56 | 9 | Q.   Well, and as a matter of fact, you know that what Maria |
| 09:56 | 10 | Salazar was doing during that week, October 13, 2000, until |
| 09:56 | 11 | October 19, 2000, was working with Carter Bryant to come up |
| 09:56 | 12 | with the creative elements of these samples, the fashion |
| 09:56 | 13 | doll samples, true? |
| 09:56 | 14 | A.   I don't think she ever met Carter Bryant, at least not |
| 09:56 | 15 | during that period. |
| 09:57 | 16 | Q.   Whether or not she ever met -- well, actually, we can |
| 09:57 | 17 | step back from that for a moment. |
| 09:57 | 18 | You do know that Ms. Salazar worked with Carter Bryant |
| 09:57 | 19 | at Mattel, true? |
| 09:57 | 20 | A.   I don't know that. |
| 09:57 | 21 | Q.   You do know that Ana Cabrera worked with Carter Bryant |
| 09:57 | 22 | at Mattel, correct? |
| 09:57 | 23 | A.   I don't know that.  I was never there.  I never saw any |
| 09:57 | 24 | of those people working together at Mattel. |
| 09:57 | 25 | Q.   So you do not know whether or not Ms. Salazar, during |

| | | |
|---|---|---|
| 09:57 | 1 | this week in October of 2000 that we're talking about, met |
| 09:57 | 2 | with Carter Bryant or not, do you? |
| 09:57 | 3 | A.   I know that she didn't, because I know where she |
| 09:57 | 4 | worked, and it was in her garage, and, um, my wife was there |
| 09:57 | 5 | and that was it.  There wasn't, um -- Carter Bryant wasn't |
| 09:57 | 6 | around there. |
| 09:57 | 7 | Q.   Where was Ana -- excuse me -- where was Ms. Salazar on |
| 09:57 | 8 | that Wednesday when she worked ten and a half hours on Bratz |
| 09:58 | 9 | while a Mattel employee?  Where did she physically do that? |
| 09:58 | 10 | A.   In her garage. |
| 09:58 | 11 | Q.   Did she meet with Carter Bryant in the Mattel design |
| 09:58 | 12 | center on that day? |
| 09:58 | 13 | A.   I would have no knowledge of that. |
| 09:58 | 14 | Q.   You didn't -- you don't know where Ms. Salazar was |
| 09:58 | 15 | during that week at all times, do you? |
| 09:58 | 16 | A.   No. |
| 09:58 | 17 | Q.   You don't know whether or not she met with Carter |
| 09:58 | 18 | Bryant about Bratz, correct? |
| 09:58 | 19 | A.   Correct. |
| 09:58 | 20 | Q.   And it's true that during this time period that we're |
| 09:58 | 21 | talking about, October 13, 2000, through October 19, 2000 -- |
| 09:58 | 22 | A.   Uh-huh. |
| 09:58 | 23 | Q.   -- Ms. Salazar was working on samples that Carter |
| 09:58 | 24 | Bryant had created contributions to, whether or not |
| 09:58 | 25 | Ms. Cabrera and Carter Bryant actually met to do that, true? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:58 | 1 | A.    Could you repeat that question?  I think there was some |
| 09:58 | 2 | confusion. |
| 09:58 | 3 | Q.    I'm not asking about whether they met somewhere.  So |
| 09:59 | 4 | I'm trying to set that aside. |
| 09:59 | 5 | A.    Well, you said Ms. Cabrera. |
| 09:59 | 6 | Q.    I apologize if I misspoke, then.  Let me try it this |
| 09:59 | 7 | way. |
| 09:59 | 8 | Setting aside any meetings that occurred -- I'm not |
| 09:59 | 9 | asking about meetings.  I'm asking about the work that was |
| 09:59 | 10 | done during that week.  Isn't it true that what Ms. Salazar |
| 09:59 | 11 | was doing during that week in October of 2000 was creating |
| 09:59 | 12 | Bratz doll samples that had their origins in the creative |
| 09:59 | 13 | contributions that Carter Bryant made? |
| 09:59 | 14 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:59 | 15 | THE COURT:  Overruled. |
| 09:59 | 16 | THE WITNESS:  I guess you could trace it back to |
| 09:59 | 17 | Carter Bryant's drawings.  Because my wife worked from his |
| 09:59 | 18 | drawings, and then my wife took those drawings and added her |
| 09:59 | 19 | contributions to it and then sat down with Ms. Salazar in |
| 09:59 | 20 | her garage, and with her husband, the three of them there |
| 09:59 | 21 | working on these fashions.  And that 10.5 hours could be her |
| 09:59 | 22 | husband helping and just adding up the two hours that |
| 09:59 | 23 | happened consec -- at the same time, but adding them up |
| 09:59 | 24 | together could make it look like it was consecutive. |
| 10:00 | 25 | MR. ZELLER:  Move to strike. |

| | | |
|---|---|---|
| 10:00 | 1 | THE COURT:  I'll let the jury be the determiner, |
| 10:00 | 2 | Counsel. |
| 10:00 | 3 | MR. ZELLER:  Thank you. |
| 10:00 | 4 | BY MR. ZELLER: |
| 10:00 | 5 | Q.   Carter Bryant was a Mattel employee during the |
| 10:00 | 6 | October 13, 2000, through October 19, 2000, time period that |
| 10:00 | 7 | we're talking about, correct? |
| 10:00 | 8 | MR. McCONVILLE:  Objection.  Foundation. |
| 10:00 | 9 | THE COURT:  Overruled. |
| 10:00 | 10 | THE WITNESS:  I don't know. |
| 10:00 | 11 | BY MR. ZELLER: |
| 10:00 | 12 | Q.   Well, you knew Carter Bryant was a Mattel employee at |
| 10:00 | 13 | some point, right? |
| 10:00 | 14 | A.   Yes. |
| 10:00 | 15 | Q.   Please tell us your understanding of when he worked |
| 10:00 | 16 | there. |
| 10:00 | 17 | A.   I don't know.  I don't recall the exact dates. |
| 10:00 | 18 | Q.   I'm not asking about exact dates.  Tell me what you |
| 10:00 | 19 | know. |
| 10:00 | 20 | A.   Uh, what I've been told by other people.  I never saw |
| 10:00 | 21 | him working there.  I don't know about his work history |
| 10:00 | 22 | there.  It's -- um, I mean, what I've seen in the newspaper |
| 10:00 | 23 | is basically all I know about that. |
| 10:00 | 24 | Q.   Tell us what you know. |
| 10:00 | 25 | A.   He worked there, um, in -- I don't know.  It's -- '97 |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:00 | 1 | maybe.  And I know he worked there in, uh, 2000.  Maybe part |
| 10:01 | 2 | of '99. |
| 10:01 | 3 | Q.   Carter Bryant has given you and your wife about |
| 10:01 | 4 | three-and-a-half million dollars over the years? |
| 10:01 | 5 | A.   I don't think it's been that much. |
| 10:01 | 6 | Q.   More than three? |
| 10:01 | 7 | A.   Maybe less. |
| 10:01 | 8 | Q.   How much? |
| 10:01 | 9 | A.   I don't know, but I'm guessing around three. |
| 10:01 | 10 | Q.   And did you ever see him socially? |
| 10:01 | 11 | A.   Yes. |
| 10:01 | 12 | Q.   Your wife saw him socially? |
| 10:01 | 13 | A.   Yes. |
| 10:01 | 14 | Q.   But you have no idea whether he worked for Mattel in |
| 10:01 | 15 | 2000? |
| 10:01 | 16 | A.   I know he worked for Mattel in 2000.  I just don't know |
| 10:01 | 17 | the exact dates.  It's not something I -- I kept a record |
| 10:01 | 18 | of. |
| 10:01 | 19 | Q.   So you wouldn't be surprised to learn that he worked at |
| 10:01 | 20 | Mattel up through October 19, 2000, right? |
| 10:01 | 21 | A.   That to -- that could be very likely.  I don't know. |
| 10:01 | 22 | Q.   Now, you know and your records show that work was done |
| 10:01 | 23 | on Bratz prior to October 19, 2000, correct? |
| 10:01 | 24 | A.   Yes. |
| 10:02 | 25 | Q.   Please take a look at Exhibit 13647. |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

66

| | | |
|---|---|---|
| 10:02 | 1 | *(Document provided to the witness.)* |
| 10:02 | 2 | BY MR. ZELLER: |
| 10:02 | 3 | Q.   Do you recognize this? |
| 10:02 | 4 | A.   Yes. |
| 10:02 | 5 | Q.   Please tell us what it is. |
| 10:02 | 6 | A.   It is a record of, uh, projects and the time worked |
| 10:02 | 7 | that my wife did. |
| 10:02 | 8 | MR. ZELLER:  I'd move this into evidence, |
| 10:02 | 9 | Your Honor. |
| 10:02 | 10 | THE COURT:  Received. |
| 10:02 | 11 | *(Exhibit No. 13647 received in evidence.)* |
| 10:02 | 12 | *(Document displayed.)* |
| 10:02 | 13 | BY MR. ZELLER: |
| 10:02 | 14 | Q.   So now, as we've been talking about, work that was done |
| 10:02 | 15 | on Bratz prior to October 19, 2000, included the |
| 10:02 | 16 | sample-making work that we've talked about, right? |
| 10:02 | 17 | A.   Correct. |
| 10:02 | 18 | Q.   Uh, and it also included work on the sculpting of the |
| 10:02 | 19 | Bratz doll, true? |
| 10:02 | 20 | A.   Correct. |
| 10:02 | 21 | Q.   And if we take a look at the second page here of this |
| 10:03 | 22 | document. |
| 10:03 | 23 | *(Document displayed.)* |
| 10:03 | 24 | BY MR. ZELLER: |
| 10:03 | 25 | Q.   This is something that you created that shows certain |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 67 of 168   Page ID #:305364
CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

67

| | | |
|---|---|---|
| 10:03 | 1 | activities -- |
| 10:03 | 2 | A.    Correct. |
| 10:03 | 3 | Q.    -- on Bratz, as well as other projects we'll talk about |
| 10:03 | 4 | here in a second? |
| 10:03 | 5 | A.    Okay. |
| 10:03 | 6 | Q.    That included the October -- actually, the September |
| 10:03 | 7 | and October 2000 time period, right? |
| 10:03 | 8 | A.    Right. |
| 10:03 | 9 | Q.    Now, by the way, at the top, you'll see that there's a |
| 10:03 | 10 | reference to something called "angel."  Do you see that up |
| 10:03 | 11 | there? |
| 10:03 | 12 | A.    Yes. |
| 10:03 | 13 | Q.    Now, you don't know if this angel reference here is the |
| 10:03 | 14 | Prayer Angel project, correct? |
| 10:03 | 15 | A.    I do know.  I remember that. |
| 10:03 | 16 | Q.    Please take a look at your testimony of May 2nd, 2008. |
| 10:03 | 17 | And this is pages 160 through 161. |
| 10:03 | 18 | *(Document provided to the witness.)* |
| 10:04 | 19 | MR. ZELLER:  And, Your Honor, specifically this is |
| 10:04 | 20 | page 160, line 19, through 161, line 12. |
| 10:04 | 21 | THE COURT:  You may publish. |
| 10:04 | 22 | MR. ZELLER:  Thank you. |
| 10:04 | 23 | *(Document displayed.)* |
| 10:04 | 24 | MR. ZELLER:  (Reading:) |
| 10:04 | 25 | "QUESTION:  Where did you get your understanding |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

68

| | | |
|---|---|---|
| 10:04 | 1 | that Prayer Angels and angels are the same thing? |
| 10:04 | 2 | "THE DEPONENT:" -- this is you -- "Yeah. I don't |
| 10:04 | 3 | really have a good -- a clear understanding of that because |
| 10:04 | 4 | I didn't have much experience with it. My wife worked on |
| 10:04 | 5 | these things; I didn't. I just sent invoices and quotes |
| 10:05 | 6 | when necessary. I didn't really get too involved in it. I |
| 10:05 | 7 | had a full-time job. |
| 10:05 | 8 | "QUESTION: Just so we're clear on this, you don't |
| 10:05 | 9 | have any fact that you can state to support a belief that |
| 10:05 | 10 | Prayer Angels and angels were the same thing; is that right? |
| 10:05 | 11 | "ANSWER: I can't say either way. I have nothing |
| 10:05 | 12 | to really base any answer on. I don't have a recollection |
| 10:05 | 13 | of that," end quote. |
| 10:05 | 14 | THE WITNESS: Uh-huh. |
| 10:05 | 15 | BY MR. ZELLER: |
| 10:05 | 16 | Q. So let's please go back to Exhibit 13647. |
| 10:05 | 17 | (Document displayed.) |
| 10:05 | 18 | THE WITNESS: Okay. |
| 10:05 | 19 | BY MR. ZELLER: |
| 10:05 | 20 | Q. On page 2, you'll see that this record reflects that |
| 10:05 | 21 | Bratz doll sculpting work was done on Bratz on September 29, |
| 10:05 | 22 | 2000, right? |
| 10:05 | 23 | A. Right. |
| 10:05 | 24 | Q. That was a time when Carter Bryant was a Mattel |
| 10:05 | 25 | employee, correct? |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

69

| | | |
|---|---|---|
| 10:05 | 1 | A.   Right. |
| 10:05 | 2 | MR. McCONVILLE:  Objection.  Foundation. |
| 10:05 | 3 | THE COURT:  Overruled. |
| 10:05 | 4 | THE WITNESS:  I'm sorry? |
| 10:06 | 5 | BY MR. ZELLER: |
| 10:06 | 6 | Q.   That was a time when Carter Bryant was a Mattel |
| 10:06 | 7 | employee, correct? |
| 10:06 | 8 | MR. McCONVILLE:  Same objection. |
| 10:06 | 9 | THE COURT:  Overruled. |
| 10:06 | 10 | THE WITNESS:  Yes. |
| 10:06 | 11 | BY MR. ZELLER: |
| 10:06 | 12 | Q.   You'll see it also reflects that there was Bratz doll |
| 10:06 | 13 | sculpting work done on October 6th, 2000, correct? |
| 10:06 | 14 | A.   Correct. |
| 10:06 | 15 | Q.   That was a time when Carter Bryant was a Mattel |
| 10:06 | 16 | employee, correct? |
| 10:06 | 17 | MR. McCONVILLE:  Foundation. |
| 10:06 | 18 | THE COURT:  Overruled. |
| 10:06 | 19 | THE WITNESS:  Correct. |
| 10:06 | 20 | BY MR. ZELLER: |
| 10:06 | 21 | Q.   And this record also shows that the Bratz doll sculpt |
| 10:06 | 22 | was delivered by October 11th, 2000, right? |
| 10:06 | 23 | A.   Um, I don't see that. |
| 10:06 | 24 | Q.   Do you see this entry where it says -- it says, |
| 10:06 | 25 | "11 October, pick up and deliver doll body, brainstorm"?  Do |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:06 | 1 | you see that? |
| 10:06 | 2 | A.   Yes. |
| 10:06 | 3 | Q.   And that's referencing the fact that the Bratz doll |
| 10:06 | 4 | sculpt was picked up and delivered on that day, correct? |
| 10:06 | 5 | A.   Assuming it was that same sculpt.  I don't know.  It |
| 10:07 | 6 | could have been an unfinished sculpt just for evaluation.  I |
| 10:07 | 7 | don't know what it was. |
| 10:07 | 8 | Q.   I'm not asking which sculpt it is.  Isn't it true that |
| 10:07 | 9 | that entry reflects that a Bratz doll sculpt was completed |
| 10:07 | 10 | and delivered by October 11th, 2000? |
| 10:07 | 11 | A.   Not at all.  It shows that a doll body was delivered. |
| 10:07 | 12 | It doesn't say it was a completed sculpt.  It doesn't even |
| 10:07 | 13 | say it refers to that same sculpt.  I don't know what |
| 10:07 | 14 | that -- it could have been another variation of the sculpt. |
| 10:07 | 15 | Q.   This is for the Bratz project, right? |
| 10:07 | 16 | A.   It is, but it didn't say it's a finished sculpt. |
| 10:07 | 17 | Q.   I didn't use the word "finished," sir. |
| 10:07 | 18 | A.   Yes, you did. |
| 10:07 | 19 | Q.   I asked, "a Bratz sculpt." |
| 10:07 | 20 | A.   You said "a finished sculpt." |
| 10:07 | 21 | Q.   Let's make sure we're on the same page. |
| 10:07 | 22 | A.   Okay. |
| 10:07 | 23 | Q.   Isn't it true that your records reflect that no later |
| 10:08 | 24 | than October 11th, 2000, a Bratz sculpt was completed and |
| 10:08 | 25 | delivered? |

| | | |
|---|---|---|
| 10:08 | 1 | A.   Now you're using the word "completed."  I can't agree |
| 10:08 | 2 | with that.  I mean, it doesn't say anything there about |
| 10:08 | 3 | anything being completed. |
| 10:08 | 4 | Q.   Do you think a sculpt has to be completed before it can |
| 10:08 | 5 | be delivered? |
| 10:08 | 6 | MR. McCONVILLE:  Objection.  Argumentative. |
| 10:08 | 7 | THE COURT:  Overruled. |
| 10:08 | 8 | THE WITNESS:  Not at all.  It can be half done. |
| 10:08 | 9 | It can be evaluated and changed. |
| 10:08 | 10 | BY MR. ZELLER: |
| 10:08 | 11 | Q.   And, by the way, you know it would be bad for MGA if |
| 10:08 | 12 | you were to testify that there was a completed Bratz sculpt |
| 10:08 | 13 | actually done by October 11, 2000, while Carter Bryant was a |
| 10:08 | 14 | Mattel employee, true? |
| 10:08 | 15 | MR. McCONVILLE:  Objection.  Argumentative. |
| 10:08 | 16 | THE COURT:  Overruled. |
| 10:08 | 17 | THE WITNESS:  I have no idea. |
| 10:08 | 18 | BY MR. ZELLER: |
| 10:08 | 19 | Q.   Well, Veronica Marlow, your wife, didn't do any of the |
| 10:08 | 20 | sculpting, did she? |
| 10:08 | 21 | A.   She gave some guidance. |
| 10:08 | 22 | Q.   My question is, did she do the sculpting? |
| 10:08 | 23 | A.   She contributed to it. |
| 10:09 | 24 | Q.   Did she do the sculpting? |
| 10:09 | 25 | A.   As a contributor. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:09 | 1 | Q.   Did she do the sculpting? |
| 10:09 | 2 | MR. McCONVILLE:  Asked and answered. |
| 10:09 | 3 | THE COURT:  Overruled. |
| 10:09 | 4 | THE WITNESS:  Partly. |
| 10:09 | 5 | BY MR. ZELLER: |
| 10:09 | 6 | Q.   She actually put -- took tools and sculpted some |
| 10:09 | 7 | aspects of Bratz; is that your testimony? |
| 10:09 | 8 | A.   Well, she was -- she helped direct the sculpting, as |
| 10:09 | 9 | far as I recall. |
| 10:09 | 10 | Q.   Now, it says on here that she picked up the sculpt, |
| 10:09 | 11 | right? |
| 10:09 | 12 | A.   No.  It says she picked up and delivered a doll body. |
| 10:09 | 13 | Q.   What's the doll body? |
| 10:09 | 14 | A.   I don't know.  I don't recall that detail on that day |
| 10:09 | 15 | exactly what the body was.  It could have been part of a |
| 10:09 | 16 | sculpt.  It could have been, um -- another prototype. |
| 10:09 | 17 | Doesn't say. |
| 10:09 | 18 | Q.   Well, it was a Bratz doll body, right? |
| 10:09 | 19 | A.   It was Bratz-related, yes. |
| 10:09 | 20 | Q.   Now, the truth of the matter is, Mr. Marlow, you don't |
| 10:10 | 21 | know whether your wife, Veronica Marlow, was making creative |
| 10:10 | 22 | contributions to Bratz in 2000, correct? |
| 10:10 | 23 | A.   I do know that she was making creative contributions to |
| 10:10 | 24 | Bratz in 2000.  She worked very hard doing that. |
| 10:10 | 25 | Q.   Please take a look at your deposition transcript of |

| | | |
|---|---|---|
| 10:10 | 1 | May 2nd, 2008, page 172. |
| 10:10 | 2 | *(Document provided to the witness.)* |
| 10:10 | 3 | THE WITNESS:  Okay. |
| 10:10 | 4 | BY MR. ZELLER: |
| 10:10 | 5 | Q.   Specifically, take a look at lines 2 through 9. |
| 10:10 | 6 | A.   Uh-huh. |
| 10:10 | 7 | MR. ZELLER:  I'd ask to publish these, Your Honor. |
| 10:10 | 8 | THE COURT:  You may. |
| 10:10 | 9 | *(Document displayed.)* |
| 10:10 | 10 | MR. ZELLER:  (Reading:) |
| 10:11 | 11 | "QUESTION:  In late 2000, your wife was making |
| 10:11 | 12 | creative contributions to the Bratz project, correct? |
| 10:11 | 13 | "THE DEPONENT: -- which is you -- "I believe she |
| 10:11 | 14 | was, but I don't know." |
| 10:11 | 15 | THE WITNESS:  There was an -- intervening lines |
| 10:11 | 16 | there that caused a distraction to me, and I may have been |
| 10:11 | 17 | confused when I gave that answer.  But I clearly remember |
| 10:11 | 18 | that she made many creative contributions to Bratz in that |
| 10:11 | 19 | time. |
| 10:11 | 20 | MR. ZELLER:  Your Honor, I'd ask that I be allowed |
| 10:11 | 21 | to publish the remainder he's referring to. |
| 10:11 | 22 | THE COURT:  You may. |
| 10:11 | 23 | *(Document displayed.)* |
| 10:11 | 24 | BY MR. ZELLER: |
| 10:11 | 25 | Q.   So now the part where you're claiming you got |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

74

| | | |
|---|---|---|
| 10:11 | 1 | distracted and gave a wrong answer, I think you're saying |
| 10:11 | 2 | now? |
| 10:11 | 3 | A.   Yes. |
| 10:11 | 4 | Q.   Were objections being made by Mr. McFarland, your |
| 10:12 | 5 | attorney, and MGA's attorney, right? |
| 10:12 | 6 | A.   Right. |
| 10:12 | 7 | MR. McCONVILLE:  Objection.  Misstates the |
| 10:12 | 8 | evidence. |
| 10:12 | 9 | THE COURT:  Overruled. |
| 10:12 | 10 | BY MR. ZELLER: |
| 10:12 | 11 | Q.   And by Mr. Trinidad, right? |
| 10:12 | 12 | A.   Right. |
| 10:12 | 13 | Q.   Who was he? |
| 10:12 | 14 | A.   I don't know. |
| 10:12 | 15 | Q.   He was another attorney on your side, wasn't he? |
| 10:12 | 16 | A.   No. |
| 10:12 | 17 | Q.   He wasn't a Mattel attorney, was he? |
| 10:12 | 18 | A.   I don't know who that was. |
| 10:12 | 19 | Q.   You know he was Carter Bryant's lawyer, right? |
| 10:12 | 20 | A.   I didn't know that. |
| 10:12 | 21 | Q.   Do you have a reason to doubt it? |
| 10:12 | 22 | A.   No. |
| 10:12 | 23 | Q.   So your own attorneys and Carter Bryant's attorneys |
| 10:12 | 24 | confused you; is that true? |
| 10:12 | 25 | A.   There was -- there was a question asked.  There was |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

75

| 10:12 | 1 | some conversation, and I gave an answer and -- and I am -- I |
|---|---|---|
| 10:12 | 2 | am -- I'm absolutely a hundred percent sure that my wife did |
| 10:13 | 3 | a lot of creative work on the Bratz dolls in the year 2000. |
| 10:13 | 4 | Q.   That's not what you said at your deposition, true? |
| 10:13 | 5 | A.   My deposition answer is inaccurate. |
| 10:13 | 6 | Q.   That's not what you have said at your deposition, true? |
| 10:13 | 7 | A.   True. |
| 10:13 | 8 | Q.   Now, you know, by the way, a doll body is a doll |
| 10:13 | 9 | sculpt, right? |
| 10:13 | 10 | A.   Right. |
| 10:13 | 11 | Q.   It's part of a doll sculpt, right? |
| 10:13 | 12 | A.   Right. |
| 10:13 | 13 | Q.   So what you knew was being delivered by that date of |
| 10:13 | 14 | October 11, 2000, was, in fact, a Bratz sculpt doll body, |
| 10:13 | 15 | true? |
| 10:13 | 16 | A.   Yes. |
| 10:13 | 17 | MR. ZELLER:  I have nothing further right now, |
| 10:13 | 18 | Your Honor. |
| 10:13 | 19 | THE COURT:  Do you want to start cross or take a |
| 10:13 | 20 | recess? |
| 10:13 | 21 | MR. McCONVILLE:  We can take a break. |
| 10:13 | 22 | THE COURT:  Why don't we take a 15-minute recess. |
| 10:13 | 23 | You're admonished not to discuss this matter amongst |
| 10:13 | 24 | yourselves, nor to form or express any opinion concerning |
| 10:14 | 25 | the case. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

76

| | | |
|---|---|---|
| 10:14 | 1 | If it's okay with you, I'll come and get you right |
| 10:14 | 2 | at 10:30.  Okay? |
| 10:14 | 3 | All right.  Counsel, 10:30.  Thank you. |
| 10:14 | 4 | *(Recess held at 10:14 a.m.)* |
| 10:28 | 5 | *(Proceedings resumed at 10:28 a.m.)* |
| 10:28 | 6 | *(In the presence of the jury.)* |
| 10:29 | 7 | THE COURT:  All right.  We're back in session. |
| 10:29 | 8 | The jury's present, all counsel, the parties. |
| 10:29 | 9 | If you would be seated.  This is Mr. McConville on |
| 10:29 | 10 | behalf of MGA and Mr. Larian. |
| 10:29 | 11 | **CROSS-EXAMINATION** |
| 10:29 | 12 | BY MR. McCONVILLE: |
| 10:29 | 13 | Q.   Good morning, Mr. Marlow. |
| 10:29 | 14 | A.   Good morning. |
| 10:29 | 15 | Q.   You were asked questions about whether you ever told |
| 10:29 | 16 | Mattel that Salazar, Cabrera and Morales were working for |
| 10:29 | 17 | you on the Bratz project. |
| 10:29 | 18 | Do you remember those questions? |
| 10:29 | 19 | A.   Yes. |
| 10:29 | 20 | Q.   Did you ever tell MGA the identity of the sample makers |
| 10:30 | 21 | who were working for you on the Bratz project? |
| 10:30 | 22 | A.   No. |
| 10:30 | 23 | Q.   And, in fact, your position, as it relates to MGA, is |
| 10:30 | 24 | you were an independent contractor, correct? |
| 10:30 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:30 | 1 | Q.   The Marlows, whether you or your wife, were not MGA |
| 10:30 | 2 | employees, correct? |
| 10:30 | 3 | A.   Correct. |
| 10:30 | 4 | Q.   And as a result of your relationship with MGA you |
| 10:30 | 5 | retained the -- Ms. Salazar, Ms. Cabrera and Ms. Morales to |
| 10:30 | 6 | work for you, right? |
| 10:30 | 7 | A.   Right. |
| 10:30 | 8 | Q.   And as a result of that relationship, they were |
| 10:30 | 9 | contractors to you, correct? |
| 10:30 | 10 | A.   Correct. |
| 10:30 | 11 | Q.   They never worked -- let me restate. |
| 10:30 | 12 | You never told MGA that Salazar, Cabrera, or Morales |
| 10:30 | 13 | were the helpers for you and your wife on the Bratz project, |
| 10:30 | 14 | right? |
| 10:30 | 15 | A.   Correct. |
| 10:30 | 16 | Q.   And, in fact, you didn't do it orally, right? |
| 10:31 | 17 | A.   Right. |
| 10:31 | 18 | Q.   You didn't do it in e-mails, right? |
| 10:31 | 19 | A.   Right. |
| 10:31 | 20 | Q.   And you didn't do it in invoices, correct? |
| 10:31 | 21 | A.   Correct. |
| 10:31 | 22 | Q.   In fact, it was in your best interest as a contractor |
| 10:31 | 23 | to conceal that information from MGA, right? |
| 10:31 | 24 | A.   Right. |
| 10:31 | 25 | Q.   Because if you told MGA the identity of these |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 78 of 168   Page ID #:305375
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

78

| | | |
|---|---|---|
| 10:31 | 1 | seamstresses, MGA might try to hire them, right? |
| 10:31 | 2 | A.   Right. |
| 10:31 | 3 | Q.   And if MGA hired the seamstresses, your company |
| 10:31 | 4 | wouldn't have them to work for you, right? |
| 10:31 | 5 | A.   Right. |
| 10:31 | 6 | Q.   So it was in your best interest to not tell MGA the |
| 10:31 | 7 | identities of your seamstresses, right? |
| 10:31 | 8 | A.   Correct. |
| 10:31 | 9 | Q.   You were shown some testimony yesterday from your |
| 10:32 | 10 | deposition which was dated May 2nd, 2008.  I'd like to show |
| 10:32 | 11 | you a few more lines than you were shown yesterday. |
| 10:32 | 12 | A.   All right. |
| 10:32 | 13 | Q.   It's page 102, lines 15 through 25, continuing on to |
| 10:32 | 14 | page 103, to line 7. |
| 10:32 | 15 | *(Document provided to the witness.)* |
| 10:32 | 16 | MR. McCONVILLE:  Your Honor, I'd ask to publish |
| 10:32 | 17 | that as a rule of completeness. |
| 10:32 | 18 | THE COURT:  You may. |
| 10:32 | 19 | *(Document displayed.)* |
| 10:32 | 20 | MR. McCONVILLE:  *(Reading:)* |
| 10:32 | 21 | "QUESTION:  How did you do that? |
| 10:32 | 22 | "ANSWER:  I didn't do that.  My wife did. |
| 10:32 | 23 | "QUESTION:  How was that achieved? |
| 10:32 | 24 | "ANSWER:  She helped a friend get a job there. |
| 10:32 | 25 | "QUESTION:  Who was that? |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

79

| 10:32 | 1 | "ANSWER:  Maria Elena Salazar. |
| 10:32 | 2 | "QUESTION:  Where did she" -- I'm sorry -- "where |
| 10:33 | 3 | did she -- where did Maria Salazar get a job at? |
| 10:33 | 4 | "ANSWER:  At MGA. |
| 10:33 | 5 | "QUESTION:  And is Maria Salazar somebody who |
| 10:33 | 6 | worked on Bratz dolls for you and Ms. Marlow? |
| 10:33 | 7 | "ANSWER:  Yes. |
| 10:33 | 8 | "QUESTION:  Did you -- to your knowledge, was MGA |
| 10:33 | 9 | ever informed of the fact that Ms. Salazar was working on |
| 10:33 | 10 | Bratz for you and Ms. Marlow? |
| 10:33 | 11 | "ANSWER:  After the fact, I think, you know.  In |
| 10:33 | 12 | order for her to get a job there, she -- I'm speculating.  I |
| 10:33 | 13 | really don't know the details.  I shouldn't go on." |
|  | 14 | BY MR. McCONVILLE: |
| 10:33 | 15 | Q.   So, sir, when you provided the testimony about whether |
| 10:33 | 16 | MGA knew, you quickly corrected it and said, "I'm |
| 10:33 | 17 | speculating about where MGA knew anything about who was |
| 10:33 | 18 | working on the Bratz project," correct? |
| 10:33 | 19 | A.   Correct. |
| 10:34 | 20 | Q.   You were shown some records that you maintained on |
| 10:34 | 21 | behalf of -- how should we refer to it?  The Marlow company? |
| 10:34 | 22 | The Marlow contractor?  What's a shorthand way that you |
| 10:34 | 23 | would be comfortable with? |
| 10:34 | 24 | A.   My wife's company. |
| 10:34 | 25 | Q.   Okay.  So you were shown some records that you |

| | | |
|---|---|---|
| 10:34 | 1 | maintained for your wife's company, right? |
| 10:34 | 2 | A.   Right. |
| 10:34 | 3 | Q.   Let's -- for example, you were shown Exhibit 5723. |
| 10:34 | 4 | MR. McCONVILLE:  If we could have that up, please. |
| 10:34 | 5 | It's already in evidence so we can put it on the screen. |
| 10:34 | 6 | (Document displayed.) |
| 10:34 | 7 | MR. McCONVILLE:  Can you zoom in on that. |
| 10:34 | 8 | BY MR. McCONVILLE: |
| 10:34 | 9 | Q.   So this handwritten record here, this was a record you |
| 10:34 | 10 | maintained for your wife's company, right? |
| 10:34 | 11 | A.   Yes. |
| 10:34 | 12 | Q.   This is not a record you ever gave to MGA, correct? |
| 10:34 | 13 | A.   Correct. |
| 10:34 | 14 | Q.   In fact, you were shown a number of records. |
| 10:34 | 15 | MR. McCONVILLE:  If we could look at |
| 10:34 | 16 | Exhibit 11980, please.  It's already in evidence.  You can |
| 10:35 | 17 | put it up there. |
| 10:35 | 18 | (Document displayed.) |
| 10:35 | 19 | BY MR. McCONVILLE: |
| 10:35 | 20 | Q.   Okay.  Here's Exhibit 11980.  Do you see that? |
| 10:35 | 21 | A.   Yes. |
| 10:35 | 22 | Q.   This was a record you maintained for your wife's |
| 10:35 | 23 | company, right? |
| 10:35 | 24 | A.   Right. |
| 10:35 | 25 | Q.   This was not a record you provided to MGA, correct? |

| | | |
|---|---|---|
| 10:35 | 1 | A.   Correct. |
| 10:35 | 2 | Q.   And, in fact, if we looked at this record, who's that |
| 10:35 | 3 | for? -- the name up at the top there. |
| 10:35 | 4 | A.   Pedro Salazar. |
| 10:35 | 5 | Q.   And to your knowledge was Pedro Salazar ever a Mattel |
| 10:35 | 6 | employee? |
| 10:35 | 7 | A.   He was not. |
| 10:35 | 8 | Q.   In fact, Pedro Salazar -- let me -- he was not a Mattel |
| 10:35 | 9 | employee, right? |
| 10:35 | 10 | A.   Correct. |
| 10:35 | 11 | Q.   So do you have any concept as to why Mattel would be |
| 10:35 | 12 | making claims about Pedro Salazar? |
| 10:35 | 13 | A.   No. |
| 10:35 | 14 | Q.   Okay.  Um, and, in fact, if we look at the dates |
| 10:35 | 15 | there -- September 2001 for Pedro Salazar's work, do you see |
| 10:35 | 16 | that? |
| 10:35 | 17 | A.   Yes. |
| 10:35 | 18 | Q.   I think counsel for Mattel told you today that Maria |
| 10:36 | 19 | Salazar left Mattel in March of 2001, right?  Do you |
| 10:36 | 20 | remember that -- when he told you that today? |
| 10:36 | 21 | A.   Yes. |
| 10:36 | 22 | Q.   And you accepted that that representation was true: |
| 10:36 | 23 | That she left in March of 2001, right? |
| 10:36 | 24 | A.   Yes. |
| 10:36 | 25 | Q.   So, can you conceive of any reason why Mattel would try |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

82

| | | |
|---|---|---|
| 10:36 | 1 | to show you a document for a person who wasn't a Mattel |
| 10:36 | 2 | employee for a time that doesn't even relate to when the |
| 10:36 | 3 | person might have been working at Mattel?  Do you have any |
| 10:36 | 4 | concept as to how that could have happened? |
| 10:36 | 5 | A.    No. |
| 10:36 | 6 | Q.    It's pretty confusing, wasn't it? |
| 10:36 | 7 | A.    Yes. |
| 10:36 | 8 | Q.    So, in any and all events, this record that has nothing |
| 10:36 | 9 | to do with the Mattel employee, that has nothing to do with |
| 10:36 | 10 | the timeframe wherein a Mattel employee might have been |
| 10:36 | 11 | working there, this is a record you maintained for the |
| 10:36 | 12 | Marlow company, correct? |
| 10:36 | 13 | A.    Correct. |
| 10:36 | 14 | Q.    And it's not a record you ever gave to MGA, right? |
| 10:36 | 15 | A.    Correct. |
| 10:37 | 16 | Q.    One of the records that you did give to MGA -- let's |
| 10:37 | 17 | look at that one. |
| 10:37 | 18 | MR. McCONVILLE:  Exhibit 606, which is already in |
| 10:37 | 19 | evidence.  If we could turn to page -- I think it's page 2. |
| 10:37 | 20 | (Document displayed.) |
| 10:37 | 21 | (Document provided to the witness.) |
| 09:01 | 22 | BY MR. McCONVILLE: |
| 10:37 | 23 | Q.    Do you see page 2 there? |
| 10:37 | 24 | A.    Yes. |
| 10:37 | 25 | Q.    This is an invoice from Veronica Marlow's company, |

| | | |
|---|---|---|
| 10:37 | 1 | submitted to MGA, correct? |
| 10:37 | 2 | A.   Yes. |
| 10:37 | 3 | Q.   And, in fact, this invoice relates to work that -- that |
| 10:37 | 4 | your wife Veronica performed, correct? |
| 10:37 | 5 | A.   Correct. |
| 10:37 | 6 | Q.   So this invoice, on page 2, has nothing to do with any |
| 10:37 | 7 | work that seamstresses did; is that correct? |
| 10:37 | 8 | A.   Correct. |
| 10:38 | 9 |          MR. McCONVILLE:  And let's look at page 5 of |
| 10:38 | 10 | Exhibit 606. |
| 10:38 | 11 |             (Document displayed.) |
| 10:38 | 12 |          MR. McCONVILLE:  If we could zoom in there. |
| 10:38 | 13 | BY MR. McCONVILLE: |
| 10:38 | 14 | Q.   Again, this is the type of invoice that was submitted |
| 10:38 | 15 | to MGA, correct? |
| 10:38 | 16 | A.   Yes. |
| 10:38 | 17 | Q.   On behalf of Veronica Marlow's company? |
| 10:38 | 18 | A.   Yes. |
| 10:38 | 19 | Q.   And how is it that you describe the work that's done by |
| 10:38 | 20 | the people who were sewing? |
| 10:38 | 21 | A.   Uh, they sewed together the -- |
| 10:38 | 22 | Q.   I'm sorry.  Let me ask -- that was a bad question. |
| 10:38 | 23 | A.   Okay. |
| 10:38 | 24 | Q.   In the invoice, how do you describe the work? |
| 10:38 | 25 | A.   Third-party sewing and pattern-making support. |

84

| | | |
|---|---|---|
| 10:38 | 1 | Q.    So this invoice doesn't say, "Third-party sewing and |
| 10:38 | 2 | pattern-making support provided by moonlighters from |
| 10:38 | 3 | Mattel," does it? |
| 10:38 | 4 | A.    No. |
| 10:38 | 5 | Q.    Do you recall ever submitting an invoice to MGA that |
| 10:38 | 6 | says, "Third-party sewing and pattern-making support |
| 10:39 | 7 | provided by people moonlighting from Mattel"? |
| 10:39 | 8 | A.    No. |
| 10:39 | 9 | Q.    And one of the reasons -- and this level of detail |
| 10:39 | 10 | that's provided in this invoice that describes the sewing, |
| 10:39 | 11 | this is the same level of detail that you provided to MGA, |
| 10:39 | 12 | correct? |
| 10:39 | 13 | A.    Correct. |
| 10:39 | 14 | Q.    And one of the reasons that you -- that you didn't |
| 10:39 | 15 | provide greater detail we've discussed is that it wouldn't |
| 10:39 | 16 | be in the Veronica Marlow company's best interest to let MGA |
| 10:39 | 17 | know the identity of the -- of the seamstresses, correct? |
| 10:39 | 18 | A.    Correct. |
| 10:39 | 19 | Q.    And you also said that it would not -- that the |
| 10:39 | 20 | seamstresses, themselves, requested that their information |
| 10:39 | 21 | be kept away from MGA, correct? |
| 10:39 | 22 | A.    Correct. |
| 10:39 | 23 | Q.    And the work that these -- that these seamstresses |
| 10:39 | 24 | performed, could you describe where that happened, |
| 10:40 | 25 | please" -- where they actually did the work. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:40 | 1 | A.   They did the work in their garages -- respective |
| 10:40 | 2 | garages.  Maria Elena Salazar and her husband, Pedro, were |
| 10:40 | 3 | sewing contractors for many years before their work with us |
| 10:40 | 4 | on Bratz.  They did work with us on other projects that we |
| 10:40 | 5 | did prior to any projects we even did for MGA, and even |
| 10:40 | 6 | prior to Veronica Marlow's employment at Mattel. |
| 10:40 | 7 | Q.   Okay.  So let me just stop you there.  Sorry. |
| 10:40 | 8 | Describe how many machines are in this garage -- I'm |
| 10:40 | 9 | sorry -- sewing machines are in this garage? |
| 10:40 | 10 | A.   There were about 15 machines in there. |
| 10:40 | 11 | Q.   So they were running their own seamstress shop from |
| 10:40 | 12 | their garage? |
| 10:40 | 13 | A.   Yes. |
| 10:40 | 14 | Q.   Was this garage located in the Mattel design center? |
| 10:40 | 15 | A.   No. |
| 10:40 | 16 | Q.   Okay.  So you didn't go to the Mattel design center to |
| 10:40 | 17 | see the work that was being performed in the garage, right? |
| 10:40 | 18 | A.   Right. |
| 10:40 | 19 | Q.   And it was your understanding that Pedro Salazar |
| 10:40 | 20 | actually was working with Maria Salazar on their own company |
| 10:40 | 21 | that did sewing work, right? |
| 10:41 | 22 | A.   Right. |
| 10:41 | 23 | Q.   Okay.  So let's put the Salazars aside. |
| 10:41 | 24 | And now tell for me -- describe for me the work that |
| 10:41 | 25 | Ms. Cabrera did and whether she worked together with |

| | | |
|---|---|---|
| 10:41 | 1 | Ms. Morales. |
| 10:41 | 2 | A.   Ms. Cabrera and Ms. Morales worked together in the |
| 10:41 | 3 | garage of Ms. Cabrera.  They had about four or so sewing |
| 10:41 | 4 | machines there, and many tables.  And they were equipped to |
| 10:41 | 5 | do professional sewing contracting. |
| 10:41 | 6 | Q.   And again, that garage wasn't in the Mattel design |
| 10:41 | 7 | center? |
| 10:41 | 8 | A.   No. |
| 10:41 | 9 | Q.   And do you know whether these -- whether Ms. Cabrera |
| 10:41 | 10 | and Ms. Morales -- whether they did sewing work for persons |
| 10:41 | 11 | other than the Marlow company? |
| 10:41 | 12 | A.   Yes, they did. |
| 10:41 | 13 | Q.   They did do that? |
| 10:41 | 14 | A.   Yes. |
| 10:41 | 15 | Q.   And as far as, um -- well, you're aware of the hours |
| 10:42 | 16 | your wife kept while she was working on the -- on the Bratz |
| 10:42 | 17 | project for her company, right? |
| 10:42 | 18 | A.   Yes. |
| 10:42 | 19 | Q.   And she, on occasion, would go visit the seamstresses |
| 10:42 | 20 | in their garage? |
| 10:42 | 21 | A.   While they were -- while the seamstresses were working, |
| 10:42 | 22 | my wife would be there almost all the time. |
| 10:42 | 23 | Q.   And what time of day did your wife go to visit the |
| 10:42 | 24 | seamstresses? |
| 10:42 | 25 | A.   At night. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:42 | 1 | Q.   So it would have been -- assume a normal working day of |
| 10:42 | 2 | 9:00 to 5:00.  It would have been after 5:00? |
| 10:42 | 3 | A.   Usually about 6:00 to 11:00 they worked. |
| 10:42 | 4 | Q.   And what about on the weekends?  Did your wife go visit |
| 10:42 | 5 | the seamstresses on the weekends? |
| 10:42 | 6 | A.   They put in ten- to twelve-hour days on Saturdays and |
| 10:42 | 7 | sometimes worked on Sundays. |
| 10:42 | 8 | Q.   Okay.  You were asked whether you knew for a fact these |
| 10:42 | 9 | people worked at Mattel.  Do you remember those questions? |
| 10:42 | 10 | A.   Yes. |
| 10:43 | 11 | Q.   Let me ask you this:  Do you know how much they were |
| 10:43 | 12 | making on an hourly basis at Mattel? |
| 10:43 | 13 | A.   No. |
| 10:43 | 14 | Q.   Do you know whether you paid them more money on an |
| 10:43 | 15 | hourly basis than Mattel? |
| 10:43 | 16 | MR. ZELLER:  Assumes facts as to "hourly basis." |
| 10:43 | 17 | THE COURT:  Overruled. |
| 08:55 | 18 | BY MR. McCONVILLE: |
| 10:43 | 19 | Q.   So you don't know whether you were paying them more per |
| 10:43 | 20 | hour than Mattel was paying them per hour? |
| 10:43 | 21 | A.   No. |
| 10:43 | 22 | Q.   And you said, I believe, that these three women we've |
| 10:43 | 23 | been discussing were friends of the Marlow family? |
| 10:43 | 24 | A.   Yes. |
| 10:43 | 25 | Q.   And did you have an understanding as to why these women |

| | | |
|---|---|---|
| 10:43 | 1 | and their families were working after hours and on the |
| 10:43 | 2 | weekends? |
| 10:43 | 3 | A.   Yes. |
| 10:43 | 4 | Q.   And what's your understanding of what they were doing? |
| 10:43 | 5 | A.   Um, they were trying to make ends meet.  They were just |
| 10:43 | 6 | hard-working families.  And Ms. Cabrera, for example, her |
| 10:43 | 7 | mother was dying of cancer in Mexico, and she was sending |
| 10:43 | 8 | her money for medical care. |
| 10:43 | 9 | Q.   Okay.  So you didn't understand that these -- that |
| 10:43 | 10 | these women who operated these sewing machines were doing |
| 10:44 | 11 | something to be disloyal to Mattel, did you? |
| 10:44 | 12 | A.   No.  We didn't need anything from Mattel. |
| 10:44 | 13 | Q.   Okay.  And at some point you worked for -- the Marlow |
| 10:44 | 14 | company worked for MGA as an independent contractor from |
| 10:44 | 15 | 2000 to 2005; is that right? |
| 10:44 | 16 | A.   Right. |
| 10:44 | 17 | Q.   And in 2005, do you recall a meeting with MGA personnel |
| 10:44 | 18 | to discuss the work that the Marlow company was doing for |
| 10:44 | 19 | MGA? |
| 10:44 | 20 | A.   Yes. |
| 10:44 | 21 | Q.   That -- do you recall when that meeting occurred? |
| 10:45 | 22 | A.   Um, in the Spring of 2005. |
| 10:45 | 23 | Q.   Okay.  And you -- you went to MGA for the meeting? |
| 10:45 | 24 | A.   Yes, I was there. |
| 10:45 | 25 | Q.   And as -- who else was present at the meeting as you |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

89

| | | |
|---|---|---|
| 10:45 | 1 | recall? |
| 10:45 | 2 | A.   Paula Garcia, Mel Woods and, uh, vice president of |
| 10:45 | 3 | taxation at MGA.  I don't remember his name. |
| 10:45 | 4 | Q.   Do you remember who -- the position Mel Woods had? |
| 10:45 | 5 | A.   He was president of MGA. |
| 10:45 | 6 | Q.   Okay.  And at this meeting, do you recall that MGA was |
| 10:45 | 7 | concerned -- expressed to you a concern about how much money |
| 10:45 | 8 | was being paid to the Marlow company? |
| 10:45 | 9 | A.   Yes. |
| 10:45 | 10 | Q.   And do you recall at this meeting MGA asked for the |
| 10:45 | 11 | first time the identities of the people who were sewing for |
| 10:45 | 12 | you? |
| 10:45 | 13 | A.   I think I recall that. |
| 10:45 | 14 | Q.   And do you recall at this meeting, Spring of 2005, |
| 10:45 | 15 | whether you provided the names of the people who were |
| 10:46 | 16 | working for the Marlow company? |
| 10:46 | 17 | A.   We walked out of that meeting.  We didn't provide 'em |
| 10:46 | 18 | any names. |
| 10:46 | 19 | Q.   Why didn't you provide 'em with the names? |
| 10:46 | 20 | A.   We wanted to protect our business. |
| 10:46 | 21 | Q.   And, um, so you were asked their names, right? |
| 10:46 | 22 | A.   Yes. |
| 10:46 | 23 | Q.   And you didn't provide their name, right? |
| 10:46 | 24 | A.   Right. |
| 10:46 | 25 | Q.   You walked out of the meeting, correct? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

90

| | | |
|---|---|---|
| 10:46 | 1 | A.   And lost the business. |
| 10:46 | 2 | Q.   And at the end of that meeting, you did no more work |
| 10:46 | 3 | for MGA; isn't that true? |
| 10:46 | 4 | A.   That's right. |
| 10:46 | 5 | Q.   And subsequent to that meeting, you wrote an e-mail, |
| 10:46 | 6 | correct? |
| 10:46 | 7 | A.   Yes. |
| 10:46 | 8 | Q.   Which we've seen, which is Exhibit 13223. |
| 10:46 | 9 | *(Document provided to the witness.)* |
| 10:46 | 10 | THE WITNESS:  Yes. |
| 10:46 | 11 | *(Document displayed.)* |
| | 12 | BY MR. McCONVILLE: |
| 10:46 | 13 | Q.   And this e-mail is the e-mail that you send to Paula |
| 10:47 | 14 | Garcia; it's dated June 20, 2005? |
| 10:47 | 15 | A.   Yes. |
| 10:47 | 16 | Q.   So this is roughly in the timeframe of the meeting you |
| 10:47 | 17 | just described at MGA? |
| 10:47 | 18 | A.   Yes. |
| 10:47 | 19 | Q.   And if you -- what was the point of this e-mail? |
| 10:47 | 20 | A.   I was desperately trying to recover the business with |
| 10:47 | 21 | MGA. |
| 10:47 | 22 | Q.   So as of middle of 2005, you understood that MGA wasn't |
| 10:47 | 23 | gonna be doing business with the Marlow company anymore? |
| 10:47 | 24 | A.   It appeared that way. |
| 10:47 | 25 | Q.   And the point of this e-mail was to -- a sales pitch, |

| | | |
|---|---|---|
| 10:47 | 1 | essentially? |
| 10:47 | 2 | A.   Yes. |
| 10:47 | 3 | Q.   To try and get back the opportunity to work with MGA? |
| 10:47 | 4 | A.   Yes. |
| 10:47 | 5 | Q.   And if we look at the -- page 3 of the e-mail -- |
| 10:48 | 6 | actually, let me back up. |
| 10:48 | 7 | Let's go to page 2 of the e-mail. |
| 10:48 | 8 | (Document displayed.) |
| 10:48 | 9 | BY MR. McCONVILLE: |
| 10:48 | 10 | Q.   You were shown -- or you were asked questions about the |
| 10:48 | 11 | number of dolls that the Marlow company works on. |
| 10:48 | 12 | Do you remember those questions? |
| 10:48 | 13 | A.   Yes. |
| 10:48 | 14 | Q.   And you were asked whether that represented all the |
| 10:48 | 15 | dolls that MGA ever designed. |
| 10:48 | 16 | Do you remember those questions? |
| 10:48 | 17 | A.   Yes. |
| 10:48 | 18 | MR. ZELLER:   Objection.   It mischaracterizes the |
| 10:48 | 19 | questions. |
| 10:48 | 20 | THE COURT:   Well, is it the "ever designed"? |
| 10:48 | 21 | No.   Overruled. |
| 10:48 | 22 | You can ask the question. |
| 09:30 | 23 | BY MR. McCONVILLE: |
| 10:48 | 24 | Q.   Okay.   You recall the questions you were asked? |
| 10:48 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:48 | 1 | Q.   You don't have any understanding or –– you don't have a |
| 10:48 | 2 | good understanding of how many dolls MGA designed, do you? |
| 10:48 | 3 | A.   No. |
| 10:48 | 4 | Q.   You don't really have a good understanding of how many |
| 10:48 | 5 | fashions MGA's designed, do you? |
| 10:48 | 6 | A.   No. |
| 10:48 | 7 | Q.   In fact, the best place for that information to come |
| 10:48 | 8 | from would be MGA, right? |
| 10:48 | 9 | A.   Right. |
| 10:48 | 10 | MR. McCONVILLE:  So let's go to the third page of |
| 10:48 | 11 | this e-mail. |
| 10:48 | 12 | *(Document displayed.)* |
| 09:16 | 13 | BY MR. McCONVILLE: |
| 10:49 | 14 | Q.   The fourth full paragraph, beginning with "These |
| 10:49 | 15 | women." |
| 10:49 | 16 | A.   Okay. |
| 10:49 | 17 | Q.   It says, in part, "These women have fun together.  They |
| 10:49 | 18 | eat and sit around a big TV, watching Spanish soap operas |
| 10:49 | 19 | while they work." |
| 10:49 | 20 | Let me ask you this:  But as of this time, as of 2005, |
| 10:49 | 21 | this would not include Ms. Salazar, right? |
| 10:49 | 22 | A.   That's correct. |
| 10:49 | 23 | Q.   "As Veronica leaves for work in the evening, I |
| 10:49 | 24 | sometimes ask her if she can't stay home that night.  She'll |
| 10:49 | 25 | usually tell me she needs to go.  She doesn't need to go so |

| | | |
|---|---|---|
| 10:49 | 1 | she can supervise or crack a whip.  She needs to go because |
| 10:50 | 2 | they want her there.  They need her there." |
| 10:50 | 3 | Q.   So this e-mail is -- are you describing in this e-mail |
| 10:50 | 4 | that these women work at Mattel? |
| 10:50 | 5 | A.   No. |
| 10:50 | 6 | Q.   Okay.  And if we look, actually, at the entire text of |
| 10:50 | 7 | this e-mail in 2005.  Right? |
| 10:50 | 8 | A.   Uh-huh. |
| 10:50 | 9 | Q.   When you were told you were gonna lose the business if |
| 10:50 | 10 | you didn't identify who these women were, all right? -- did |
| 10:50 | 11 | you identify -- I want you to take whatever time you need to |
| 10:50 | 12 | look in this e-mail. |
| 10:50 | 13 |      Did you ever identify who the seamstresses were even at |
| 10:50 | 14 | threat of losing the business? |
| 10:50 | 15 | A.   No. |
| 10:50 | 16 | Q.   And so you didn't tell MGA, right? |
| 10:50 | 17 | A.   (No response.) |
| 10:50 | 18 | Q.   You have to audibly -- |
| 10:50 | 19 | A.   No, I didn't. |
| 10:50 | 20 | Q.   And you didn't tell Paula Garcia? |
| 10:50 | 21 | A.   No. |
| 10:50 | 22 | Q.   You didn't tell Isaac Larian, right? |
| 10:50 | 23 | A.   No. |
| 10:50 | 24 | Q.   And in response to this e-mail, did you get work back |
| 10:50 | 25 | from MGA? |

Case 2:04-cv-09049-DOC-RNB Document 10104 Filed 03/01/11 Page 94 of 168 Page ID #:305391
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

94

| | | |
|---|---|---|
| 10:50 | 1 | A.    No. |
| 10:51 | 2 | Q.    MGA stopped doing work with you at that time, right? |
| 10:51 | 3 | A.    Yes. |
| 10:51 | 4 | Q.    Did you -- one of the reasons you were concerned -- I |
| 10:51 | 5 | believe you were asked about whether you knew these people |
| 10:51 | 6 | would be fired from Mattel -- these seamstresses, whether |
| 10:51 | 7 | they'd be fired from Mattel; do you recall that? |
| 10:51 | 8 | A.    Yes. |
| 10:51 | 9 | Q.    What, in fact, happened to these women after Mattel |
| 10:51 | 10 | found out that they were working for the Marlow company? |
| 10:51 | 11 | MR. ZELLER:  Foundation. |
| 10:51 | 12 | THE COURT:  Overruled. |
| 10:51 | 13 | THE WITNESS:  Well, they -- you know, we told them |
| 10:51 | 14 | to quit when we revealed their names.  We were compelled to |
| 10:51 | 15 | reveal their names. |
| 10:51 | 16 | BY MR. McCONVILLE: |
| 10:51 | 17 | Q.    Let's back up.  So you say you were compelled to reveal |
| 10:51 | 18 | their names.  In what context were you compelled to reveal |
| 10:51 | 19 | their names? |
| 10:51 | 20 | A.    In our depositions and the discovery of the materials |
| 10:52 | 21 | by Mattel's lawyers. |
| 10:52 | 22 | Q.    Okay.  So during this litigation -- we've seen your |
| 10:52 | 23 | deposition testimony -- you were compelled to identify who |
| 10:52 | 24 | these women were, correct? |
| 10:52 | 25 | A.    And we did. |

| | | |
|---|---|---|
| 10:52 | 1 | Q.   Okay.  And you did. |
| 10:52 | 2 | And then what happened? |
| 10:52 | 3 | A.   And then we told 'em that they should quit their jobs |
| 10:52 | 4 | because it would be hard on them to stay there after their |
| 10:52 | 5 | identities were revealed to Mattel's lawyers.  And they |
| 10:52 | 6 | didn't quit.  They felt like they didn't do anything wrong, |
| 10:52 | 7 | and they weren't gonna quit their jobs.  And they stayed |
| 10:52 | 8 | there until, one day they showed up at their jobs to work, |
| 10:52 | 9 | and they were immediately -- |
| 10:52 | 10 | MR. ZELLER:  I'm gonna object on foundation as to |
| 10:52 | 11 | "what they felt," and move to strike. |
| 10:52 | 12 | THE COURT:  It was asked by Mattel initially, or a |
| 10:52 | 13 | portion of it was, so there's a lack of foundation. |
| 10:52 | 14 | Apparently, Mr. Marlow's testimony is that he's |
| 10:52 | 15 | hearing this from some other source -- unless we have a |
| 10:53 | 16 | foundation he was there.  Was he there? |
| 10:53 | 17 | MR. McCONVILLE:  He was not there.  But if I can |
| 10:53 | 18 | make an offer of proof.  He was asked -- |
| 10:53 | 19 | THE COURT:  Thank you very much, Counsel.  Now, |
| 10:53 | 20 | that's just speaking. |
| 10:53 | 21 | MR. McCONVILLE:  Okay. |
| 10:53 | 22 | THE COURT:  All right.  Not this time.  Mr. Marlow |
| 10:53 | 23 | will be back probably later today.  I'll look back through |
| 10:53 | 24 | the record. |
| 10:53 | 25 | Not now, Counsel.  Okay. |

| | | |
|---|---|---|
| 10:53 | 1 | Thank you. |
| 10:53 | 2 | MR. McCONVILLE:  Okay. |
| 09:14 | 3 | BY MR. McCONVILLE: |
| 10:53 | 4 | Q.   You're aware -- |
| 10:53 | 5 | THE COURT:  Over the lunch hour, I'll go back and |
| 10:53 | 6 | see if that was opened up by Mattel.  I'm not going to |
| 10:53 | 7 | scurry back through it right now. |
| 10:53 | 8 | MR. McCONVILLE:  Okay. |
| | 9 | BY MR. McCONVILLE: |
| 10:53 | 10 | Q.   You were aware that they were fired? |
| 10:53 | 11 | A.   Yes. |
| 10:53 | 12 | Q.   Okay. |
| 10:53 | 13 | THE COURT:  And, Counsel, you can add "by Mattel." |
| 10:53 | 14 | MR. McCONVILLE:  Okay. |
| 11:59 | 15 | BY MR. McCONVILLE: |
| 10:53 | 16 | Q.   By Mattel? |
| 10:53 | 17 | A.   Yes. |
| 10:53 | 18 | Q.   All right.  Thank you. |
| 10:53 | 19 | After you disclosed their names? |
| 10:53 | 20 | A.   Yes. |
| 10:53 | 21 | THE COURT:  Now, if he's physically there, |
| 10:53 | 22 | Counsel, and you want a blow-by-blow description, that's |
| 10:53 | 23 | something else.  Okay?  But I don't believe he was there. |
| 10:54 | 24 | MR. McCONVILLE:  He was not, Your Honor. |
| 10:54 | 25 | THE COURT:  Well, then we're not getting into a |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

97

| | | |
|---|---|---|
| 10:54 | 1 | blow-by-blow description with the drama. |
| 10:54 | 2 | MR. McCONVILLE:  I was just going "state of mind." |
| 10:54 | 3 | He was asked questions. |
| 10:54 | 4 | THE COURT:  Thank you very much. |
| 10:54 | 5 | All right. |
| 10:54 | 6 | BY MR. McCONVILLE: |
| 10:54 | 7 | Q.   Mr. Marlow, you were asked some questions concerning |
| 10:54 | 8 | the recordkeeping that you maintained for the various people |
| 10:54 | 9 | who worked for the Marlow company. |
| 10:54 | 10 | Do you recall those questions? |
| 10:54 | 11 | A.   Yes. |
| 10:54 | 12 | Q.   And you were asked whether a Gonzalo worked -- or did |
| 10:54 | 13 | sample-making.  Do you recall that? |
| 10:54 | 14 | A.   Yes. |
| 10:54 | 15 | Q.   Did you ever tell MGA how you maintained the Marlow's |
| 10:54 | 16 | records? |
| 10:54 | 17 | A.   No. |
| 10:54 | 18 | Q.   Did you ever disclose those records to -- |
| 10:54 | 19 | A.   No. |
| 10:54 | 20 | Q.   Hold on.  Did you ever disclose those records to MGA? |
| 10:54 | 21 | A.   No. |
| 10:54 | 22 | Q.   And after MGA stopped doing business with the Marlows, |
| 10:54 | 23 | with the Marlow company, you understood that MGA continued |
| 10:54 | 24 | to make Bratz dolls, right? |
| 10:55 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

98

| | | |
|---|---|---|
| 10:55 | 1 | Q.   And that was after 2005 they made dolls? |
| 10:55 | 2 | A.   Yes. |
| 10:55 | 3 | Q.   They made 'em in 2006 and 2007 and on and on? |
| 10:55 | 4 | A.   Yes. |
| 10:55 | 5 | Q.   And, in fact, after the relationship terminated between |
| 10:55 | 6 | you and MGA, MGA actually had its highest years of sales of |
| 10:55 | 7 | Bratz sales.  Do you know that? |
| 10:55 | 8 | A.   No. |
| 10:55 | 9 | MR. ZELLER:  Assumes facts. |
| 10:55 | 10 | THE COURT:  Well, is there an objection or not? |
| 10:55 | 11 | MR. McCONVILLE:  He said, "assumes facts." |
| 10:55 | 12 | THE COURT:  I heard the witness answer "no," so |
| 10:55 | 13 | I'm not sure where we're at. |
| 10:55 | 14 | MR. McCONVILLE:  Right. |
| 10:55 | 15 | BY MR. McCONVILLE: |
| 10:55 | 16 | Q.   So you don't know whether Bratz sales had their highest |
| 10:55 | 17 | sales after the relationship terminated with the Marlows? |
| 10:55 | 18 | A.   No. |
| 10:55 | 19 | Q.   But you do know that Bratz products continued to be |
| 10:55 | 20 | sold after the relationship ended, correct? |
| 10:55 | 21 | A.   Correct. |
| 10:55 | 22 | Q.   And those dolls continued to be sold despite the fact |
| 10:55 | 23 | that the -- that the Marlows were no longer using sample |
| 10:55 | 24 | makers -- that were employed at Mattel, right? |
| 10:55 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

99

| | | |
|---|---|---|
| 10:55 | 1 | MR. McCONVILLE:  No further questions, Your Honor. |
| 10:56 | 2 | THE COURT:  Redirect. |
| 10:56 | 3 | **REDIRECT EXAMINATION** |
| 09:19 | 4 | BY MR. ZELLER: |
| 10:56 | 5 | Q.   In response to counsel's questions, you were now |
| 10:56 | 6 | calling the Mattel employees "seamstresses" and "sewers," |
| 10:56 | 7 | right? |
| 10:56 | 8 | A.   Right. |
| 10:56 | 9 | Q.   Their actual title was sample maker, right? |
| 10:56 | 10 | A.   Right. |
| 10:56 | 11 | Q.   It's what they actually did? |
| 10:56 | 12 | A.   Yeah. |
| 10:56 | 13 | Q.   It's different than just sewing; it's an actual |
| 10:56 | 14 | valuable specialized skill, correct? |
| 10:56 | 15 | A.   In my mind it's the same thing. |
| 10:56 | 16 | Q.   You don't know that "seamstress" is something different |
| 10:56 | 17 | from a "sample maker"?  Is that your testimony? |
| 10:56 | 18 | A.   It -- they did sewing work. |
| 10:56 | 19 | Q.   And, by the way, when your wife began working at Mattel |
| 10:56 | 20 | and she had what you knew was a contract with Mattel, she |
| 10:57 | 21 | started off as a sample maker, true? |
| 10:57 | 22 | A.   Um, I didn't know about her contract at that time. |
| 10:57 | 23 | Q.   Well, at some point you became aware that she had a |
| 10:57 | 24 | contract while she was at Mattel, correct? |
| 10:57 | 25 | A.   I suppose so.  I -- recalling from my testimony that |

| | | |
|---|---|---|
| 10:57 | 1 | you pointed out to me this morning.  But I don't have a |
| 10:57 | 2 | clear recollection of that now. |
| 10:57 | 3 | Q.   Well, do you have a clear recollection that when she |
| 10:57 | 4 | started at Mattel, her first position was as a senior sample |
| 10:57 | 5 | maker? |
| 10:57 | 6 | A.   Yes. |
| 10:57 | 7 |      Yes, I said. |
| 10:57 | 8 | Q.   Now, MGA paid over a million and a half dollars to you |
| 10:57 | 9 | and your wife for these services, but MGA by -- according to |
| 10:57 | 10 | you, had no idea who was actually working on these dolls; is |
| 10:57 | 11 | that true? |
| 10:58 | 12 | A.   True. |
| 10:58 | 13 | Q.   And it's also your testimony that, between Ms. Cabrera |
| 10:58 | 14 | and Ms. Morales, that they worked on some 250 Bratz dolls, |
| 10:58 | 15 | according to you.  MGA still had no idea who was working on |
| 10:58 | 16 | those dolls; is that your testimony? |
| 10:58 | 17 | A.   Well, I didn't say that they worked on 250.  I said one |
| 10:58 | 18 | worked on a hundred, another one worked on 150.  And there |
| 10:58 | 19 | could have been some overlap.  I'm sure they worked on dolls |
| 10:58 | 20 | together. |
| 10:58 | 21 | Q.   Between them? |
| 10:58 | 22 | A.   But I never told MGA -- |
| 10:58 | 23 | Q.   I'm not asking whether you told MGA.  I'm asking for |
| 10:58 | 24 | your belief. |
| 10:58 | 25 |      Isn't it true that your testimony here is that, even |

| 10:58 | 1  | though one of the Mattel sample makers worked on a hundred |
| 10:58 | 2  | different theme Bratz dolls and another Mattel sample maker |
| 10:58 | 3  | worked on another 150 Bratz theme dolls, even if there was |
| 10:58 | 4  | some overlap, the entire universe, MGA still had no idea who |
| 10:59 | 5  | was actually providing those services; is that your |
| 10:59 | 6  | testimony? |
| 10:59 | 7  | A.   Correct. |
| 10:59 | 8  | Q.   And, by the way, if I understand what you're saying |
| 10:59 | 9  | correctly, is, is that, not only does MGA have no idea, but |
| 10:59 | 10 | you and Veronica Marlow hid the fact that these were Mattel |
| 10:59 | 11 | sample makers providing work on all these dolls -- all these |
| 10:59 | 12 | Bratz dolls from your friend Paula Garcia who was at MGA, |
| 10:59 | 13 | correct? |
| 10:59 | 14 | A.   Correct. |
| 10:59 | 15 | Q.   And so how is it that Paula Garcia eventually found |
| 10:59 | 16 | out? |
| 10:59 | 17 | A.   From our discovery, uh, from the depositions.  I don't |
| 10:59 | 18 | know. |
| 10:59 | 19 | Q.   You have no explanation? |
| 10:59 | 20 | A.   I don't know. |
| 10:59 | 21 | Q.   You haven't discussed with Paula Garcia, your friend to |
| 10:59 | 22 | this day, that these were Mattel sample makers who provided |
| 10:59 | 23 | services on hundred -- over hundred and fifty or 250 Bratz |
| 11:00 | 24 | dolls, whatever that number is? |
| 11:00 | 25 | A.   I didn't see Paula Garcia after our relationship with |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

102

| 11:00 | 1 | MGA ended. |
| 11:00 | 2 | Q.   And you have no explanation as to how it is that she |
| 11:00 | 3 | did say, and has testified, that she found out? |
| 11:00 | 4 | A.   No. |
| 11:00 | 5 | Q.   That's a surprise to you? |
| 11:00 | 6 | A.   Yes. |
| 11:00 | 7 | Q.   Now, the truth is that you don't really know what it is |
| 11:00 | 8 | that Paula Garcia knew, correct? |
| 11:00 | 9 | A.   Correct. |
| 11:00 | 10 | Q.   You don't really know what it is that Mr. Larian knew |
| 11:00 | 11 | about the sample makers, true? |
| 11:00 | 12 | A.   True. |
| 11:00 | 13 | Q.   You don't know what it is that MGA actually knew and |
| 11:00 | 14 | when it knew it about the fact that there were these Mattel |
| 11:00 | 15 | sample makers working on Bratz dolls, true? |
| 11:00 | 16 | A.   True. |
| 11:00 | 17 | Q.   And you also don't really know what it is that Carter |
| 11:00 | 18 | Bryant knew about that, correct? |
| 11:00 | 19 | A.   Correct. |
| 11:00 | 20 | Q.   And -- 'cause you've already told me that you weren't |
| 11:01 | 21 | aware that Carter Bryant actually worked with Ms. Salazar |
| 11:01 | 22 | when they were both there at Mattel, right? |
| 11:01 | 23 | A.   Right. |
| 11:01 | 24 |        MR. ZELLER:  In fact, let's take a look at |
| 11:01 | 25 | Exhibit 5620 in evidence. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:01 | 1 | (Document provided to the witness.) |
| 11:01 | 2 | (Document displayed.) |
| 11:01 | 3 | BY MR. ZELLER: |
| 11:01 | 4 | Q.   Well, I'll represent that -- I assume you haven't seen |
| 11:01 | 5 | this before, right? |
| 11:01 | 6 | A.   I saw it like a week ago, when you mailed me this |
| 11:01 | 7 | notebook. |
| 11:01 | 8 | MR. McCONVILLE:  Objection.  Foundation. |
| 11:01 | 9 | THE COURT:  What? |
| 11:01 | 10 | MR. McCONVILLE:  He's never seen the thing before. |
| 11:01 | 11 | THE COURT:  He said he got this notebook a week |
| 11:01 | 12 | ago. |
| 11:01 | 13 | MR. McCONVILLE:  Last week. |
| 11:01 | 14 | THE COURT:  And that's when he saw it for the |
| 11:01 | 15 | first time? |
| 11:01 | 16 | MR. McCONVILLE:  Right. |
| 11:01 | 17 | THE COURT:  Well, thank you very much. |
| 11:01 | 18 | All right.  Question, Counsel. |
| 09:22 | 19 | BY MR. ZELLER: |
| 11:02 | 20 | Q.   Do you recognize this as being a signed photograph -- |
| 11:02 | 21 | sometimes people call 'em glamor shots -- of Carter Bryant, |
| 11:02 | 22 | signed to one of the sample makers during the time that they |
| 11:02 | 23 | were both there at Mattel? |
| 11:02 | 24 | MR. McCONVILLE:  Objection.  Foundation as to |
| 11:02 | 25 | date. |

| | | |
|---|---|---|
| 11:02 | 1 | THE COURT:  Yeah.  I don't know where we're going |
| 11:02 | 2 | with this, Counsel. |
| 11:02 | 3 | BY MR. ZELLER: |
| 11:02 | 4 | Q.  Well, let me -- |
| 11:02 | 5 | THE COURT:  If this is going to go back through |
| 11:02 | 6 | Carter Bryant and Paula Garcia's testimony through this |
| 11:02 | 7 | witness, it's going to be sustained. |
| 11:02 | 8 | BY MR. ZELLER: |
| 11:02 | 9 | Q.  Well, let me just ask this, then:  You have no idea |
| 11:02 | 10 | what the relationship was between Carter Bryant and the |
| 11:02 | 11 | sample makers, right? |
| 11:02 | 12 | THE COURT:  Let's take the photograph down, |
| 11:02 | 13 | please. |
| 11:02 | 14 | *(Displayed document removed.)* |
| 11:02 | 15 | THE COURT:  Thank you. |
| | 16 | BY MR. ZELLER: |
| 11:02 | 17 | Q.  Did you know that Carter Bryant was a reference to MGA |
| 11:02 | 18 | for Ms. Salazar when she applied to work there at MGA? |
| 11:02 | 19 | A.  No. |
| 11:03 | 20 | Q.  Did you know that, at various times prior to 2005, MGA |
| 11:03 | 21 | considered hiring the Mattel sample makers directly? |
| 11:03 | 22 | A.  No. |
| 11:03 | 23 | Q.  But it is true that from time to time over the years |
| 11:03 | 24 | MGA raised questions about your bills and Veronica Marlow's |
| 11:03 | 25 | bills, correct? |

105

| | | |
|---|---|---|
| 11:03 | 1 | A.   Yes. |
| 11:03 | 2 | Q.   And, particularly, they wanted to know why there were |
| 11:03 | 3 | all these charges, correct? |
| 11:03 | 4 | A.   Yes. |
| 11:03 | 5 | Q.   And they were raising questions, at least as early as |
| 11:03 | 6 | April 2002, and other times, about this work that was being |
| 11:03 | 7 | provided, right? |
| 11:03 | 8 | A.   Right. |
| 11:03 | 9 | Q.   And the truth is, is that you didn't tell MGA |
| 11:03 | 10 | directly –– you didn't say, "These were Mattel sample |
| 11:03 | 11 | makers," because you thought, by no later than 2003, when |
| 11:04 | 12 | Maria Salazar began working at MGA, that MGA knew that these |
| 11:04 | 13 | sample makers were Mattel employees, true? |
| 11:04 | 14 | A.   No. |
| 11:04 | 15 |      I said, "No." |
| 11:04 | 16 | Q.   Well, you certainly thought that, based on the fact |
| 11:04 | 17 | that Veronica Marlow helped Ms. Salazar get a job at MGA, |
| 11:04 | 18 | that MGA did know that the sample makers were Mattel |
| 11:04 | 19 | employees, true? |
| 11:04 | 20 |           MR. McCONVILLE:  Objection.  Vague. |
| 11:04 | 21 |           THE COURT:  Sustained. |
| | 22 | BY MR. ZELLER: |
| 11:04 | 23 | Q.   Well, you believed by the time that Maria Salazar |
| 11:04 | 24 | became an MGA employee, back in 2003, that MGA knew the |
| 11:04 | 25 | sample makers working on Bratz were Mattel employees, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:04 | 1 | correct? |
| 11:04 | 2 | A.   You know, there was a period that Maria Elena Salazar |
| 11:04 | 3 | worked for us full time that I believe she wasn't a Mattel |
| 11:05 | 4 | employee, maybe around 2002 or 2003.  I don't remember |
| 11:05 | 5 | exactly.  But I know that -- that she worked for us full |
| 11:05 | 6 | time after she finished working at Mattel. |
| 11:05 | 7 |            MR. ZELLER:  Move to strike as nonresponsive. |
| 11:05 | 8 |            THE COURT:  Just a moment. |
| 11:05 | 9 |            He confined it to 2003.  Sustained. |
| 11:05 | 10 |            Stricken.  It's nonresponsive. |
| 09:30 | 11 | BY MR. ZELLER: |
| 11:05 | 12 | Q.   I'm asking about something very specific:  What you |
| 11:05 | 13 | believed. |
| 11:05 | 14 |      Some point you became aware, because Maria Salazar told |
| 11:05 | 15 | you, that she got a job at MGA, right? |
| 11:05 | 16 | A.   Right. |
| 11:05 | 17 | Q.   She, of course, knew, as you understood it, that she |
| 11:05 | 18 | had worked on Bratz while she was a Mattel employee, right? |
| 11:05 | 19 | A.   Right. |
| 11:05 | 20 | Q.   And because of those -- those two things, you believed, |
| 11:05 | 21 | in your own mind, that MGA was aware that sample making |
| 11:06 | 22 | services that had been provided on Bratz had been provided |
| 11:06 | 23 | by then Mattel employees, correct? |
| 11:06 | 24 |            MR. McCONVILLE:  Objection.  Vague. |
| 11:06 | 25 |            THE WITNESS:  No. |

| | | |
|---|---|---|
| 11:06 | 1 | I don't know why you would think that. |
| 11:06 | 2 | THE COURT: Overruled. |
| 11:06 | 3 | BY MR. ZELLER: |
| 11:06 | 4 | Q. Let's please take a look at your May 2nd, 2008 |
| 11:06 | 5 | deposition. This is page 102, lines 11 through 23. |
| 11:06 | 6 | MR. ZELLER: And this has already been published, |
| 11:06 | 7 | Your Honor. |
| 11:06 | 8 | MR. McCONVILLE: So, then, it's duplicative, |
| 11:06 | 9 | Your Honor, and cumulative. |
| 11:06 | 10 | *(Document displayed.)* |
| 11:06 | 11 | THE COURT: All right. Counsel. |
| 11:06 | 12 | Overruled. |
| 11:06 | 13 | MR. McCONVILLE: So, Your Honor, I'd ask that it |
| 11:07 | 14 | go through the entire thing I just showed, if we're going to |
| 11:07 | 15 | show the snippet. |
| 11:07 | 16 | THE COURT: At this time, you can. |
| 11:07 | 17 | For completeness? |
| 11:07 | 18 | MR. McCONVILLE: For completeness. |
| 11:07 | 19 | THE COURT: Absolutely. |
| 11:07 | 20 | MR. McCONVILLE: Which would be through 103. |
| 11:07 | 21 | THE COURT: I think it's also unduly consumptive |
| 11:07 | 22 | of time between both of you. This has already been |
| 11:07 | 23 | published, now. |
| 11:07 | 24 | MR. ZELLER: I'll move on, Your Honor. |
| 11:07 | 25 | THE COURT: If you want a rule of completeness, |

| | | |
|---|---|---|
| 11:07 | 1 | that's fine, but we'll go through the whole thing. |
| 11:07 | 2 | MR. ZELLER:  That's fine.  I'll re- -- I'll change |
| 11:07 | 3 | this. |
| | 4 | BY MR. ZELLER: |
| 11:07 | 5 | Q.   It's true that you did testify, whether or not you call |
| 11:07 | 6 | it speculation, whether you call it your understanding, call |
| 11:07 | 7 | it your belief -- you, at a particular point in time, |
| 11:07 | 8 | because of the fact that Maria Salazar went to MGA and |
| 11:07 | 9 | worked, you had a belief in your mind, correct or not, that |
| 11:07 | 10 | MGA already knew that the sample makers working on Bratz |
| 11:07 | 11 | included Mattel employees, correct? |
| 11:07 | 12 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 11:07 | 13 | THE COURT:  Counsel, this -- |
| 11:07 | 14 | THE WITNESS:  It didn't. |
| 11:08 | 15 | THE COURT:  This has been asked and answered, |
| 11:08 | 16 | hasn't it? |
| 11:08 | 17 | MR. ZELLER:  It's a preface to another question. |
| 11:08 | 18 | THE COURT:  One more time. |
| 11:08 | 19 | Your answer, sir, was? |
| 11:08 | 20 | THE WITNESS:  I didn't. |
| 09:32 | 21 | BY MR. ZELLER: |
| 11:08 | 22 | Q.   So it's your testimony that it never crossed your mind |
| 11:08 | 23 | that MGA was aware? |
| 11:08 | 24 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 11:08 | 25 | THE COURT:  Counsel? |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

109

| | | |
|---|---|---|
| 11:08 | 1 | BY MR. ZELLER: |
| 11:08 | 2 | Q.   You had mentioned that you did become aware at some |
| 11:08 | 3 | point the sample makers -- the Mattel sample makers were |
| 11:08 | 4 | fired by Mattel, right? |
| 11:08 | 5 | A.   Right. |
| 11:08 | 6 | Q.   And that wasn't a surprise to you when that happened, |
| 11:08 | 7 | was it? |
| 11:08 | 8 | A.   That's right. |
| 11:08 | 9 | Q.   You, in fact, knew that was gonna happen and expected |
| 11:08 | 10 | it, if it was found out, right? |
| 11:08 | 11 | A.   Yes. |
| 11:08 | 12 | Q.   And, in fact, you and Veronica Marlow, along with MGA, |
| 11:08 | 13 | were the ones who created that risk, correct? |
| 11:09 | 14 | MR. McCONVILLE:  Objection.  Argumentative. |
| 11:09 | 15 | THE COURT:  Sustained. |
| 11:09 | 16 | The question is stricken, ladies and gentlemen. |
| 11:09 | 17 | BY MR. ZELLER: |
| 11:09 | 18 | Q.   You testified previously that the reason why the sample |
| 11:09 | 19 | makers -- the Mattel sample makers were working on Bratz |
| 11:09 | 20 | while Mattel employees, was -- I think your phrase was "to |
| 11:09 | 21 | make ends meet." |
| 11:09 | 22 | Do you recall that? |
| 11:09 | 23 | A.   Yes. |
| 11:09 | 24 | Q.   Please take a look at Exhibit 13223. |
| 11:09 | 25 | *(Document provided to the witness.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:09 | 1 | *(Document displayed.)* |
| | 2 | BY MR. ZELLER: |
| 11:09 | 3 | Q.   And focusing your attention on the third page of your |
| 11:09 | 4 | 2005 e-mail, this is the first full paragraph, do you see |
| 11:09 | 5 | where you say, |
| 11:09 | 6 | "We pay them very generously because they are risking |
| 11:09 | 7 | their day jobs, even a nice retirement, to work for us.  If |
| 11:10 | 8 | they were ever discovered, they'd certainly be painfully |
| 11:10 | 9 | humiliated and fired.  Yet they have told Veronica several |
| 11:10 | 10 | times that they don't work for her for the money," end |
| 11:10 | 11 | quote. |
| 11:10 | 12 | Do you see that? |
| 11:10 | 13 | A.   Yes. |
| 11:10 | 14 | Q.   That's what you wrote, correct? |
| 11:10 | 15 | A.   Right. |
| 11:10 | 16 | Q.   Now -- and in the same e-mail, you were asked |
| 11:10 | 17 | questions, you recall, about -- you don't know how many |
| 11:10 | 18 | dolls MGA made, right? |
| 11:10 | 19 | A.   Right. |
| 11:10 | 20 | Q.   Right.  But you were being asked about this same |
| 11:10 | 21 | e-mail, which is Exhibit 13223, and in particular Note 3 on |
| 11:10 | 22 | the second page. |
| 11:10 | 23 | Do you recall that? |
| 11:10 | 24 | A.   Yes. |
| 11:10 | 25 | Q.   Now, these numbers here, however, under the heading of |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

111

| | | |
|---|---|---|
| 11:10 | 1 | "Dolls" -- the number of dolls that Veronica Marlow and the |
| 11:10 | 2 | sample makers worked on -- |
| 11:11 | 3 | A.   Yes. |
| 11:11 | 4 | Q.   -- those weren't the -- you're referring to the number |
| 11:11 | 5 | of dolls that Veronica Marlow and the sample makers worked |
| 11:11 | 6 | on, right? |
| 11:11 | 7 | A.   Yes. |
| 11:11 | 8 | Q.   These are numbers that you compiled from your own |
| 11:11 | 9 | records, correct? |
| 11:11 | 10 | A.   Yes. |
| 11:11 | 11 | Q.   So when you put down here that in 2002 Veronica Marlow |
| 11:11 | 12 | and the Mattel sample makers worked on 100 dolls for MGA -- |
| 11:11 | 13 | A.   Uh-huh. |
| 11:11 | 14 | Q.   -- you are weren't speculating about the number of |
| 11:11 | 15 | dolls MGA was making; you were telling MGA the number of |
| 11:11 | 16 | dolls that Veronica Marlow and the sample makers worked on, |
| 11:11 | 17 | true? |
| 11:11 | 18 | A.   True. |
| 11:11 | 19 | Q.   That's correct? |
| 11:11 | 20 | A.   Yes. |
| 11:11 | 21 | Q.   And the same is true for the next line, which reflects |
| 11:11 | 22 | 159 dolls for the year 2003 -- |
| 11:11 | 23 | A.   Right. |
| 11:11 | 24 | Q.   -- worked on by Veronica Marlow and the Mattel sample |
| 11:11 | 25 | makers, correct? |

| | | |
|---|---|---|
| 11:11 | 1 | A.   Correct. |
| 11:11 | 2 | Q.   And the same is true of the next line, where it shows |
| 11:12 | 3 | 77 -- |
| 11:12 | 4 | A.   Right. |
| 11:12 | 5 | Q.   -- dolls were worked on by Veronica Marlow and the |
| 11:12 | 6 | sample makers for the year 2004? |
| 11:12 | 7 | A.   Now, these are not all necessarily made by Mattel |
| 11:12 | 8 | sample makers.  We had sample makers that were not Mattel |
| 11:12 | 9 | employees, and my wife was also a sample maker. |
| 11:12 | 10 | Q.   And the 101 doll number for 2005 -- |
| 11:12 | 11 | A.   Uh-huh. |
| 11:12 | 12 | Q.   -- it's reflected there? |
| 11:12 | 13 | A.   Yes. |
| 11:12 | 14 | Q.   That was the number that -- of -- that Veronica and |
| 11:12 | 15 | these sample makers actually worked on -- |
| 11:12 | 16 | A.   Right. |
| 11:12 | 17 | Q.   -- right? |
| 11:12 | 18 |     And even though Veronica Marlow's sample makers worked |
| 11:12 | 19 | on all these dolls, this total number, which is over 400 for |
| 11:12 | 20 | MGA, it's your testimony MGA had no idea who actually was |
| 11:12 | 21 | providing the sample making services, true? |
| 11:12 | 22 | A.   True. |
| 11:12 | 23 | Q.   Sorry? |
| 11:12 | 24 | A.   Yes, true. |
| 11:13 | 25 | Q.   Now, you were asked questions about the fact that you |

| | | |
|---|---|---|
| 11:13 | 1 | weren't quite following questions about your records that |
| 11:13 | 2 | had Pedro Salazar referenced there; do you recall that? |
| 11:13 | 3 | A.   Right. |
| 11:13 | 4 | Q.   And it's true that the reason why we're talking about |
| 11:13 | 5 | those records is because, as you acknowledge, for other |
| 11:13 | 6 | names, you created records with false names in them, |
| 11:13 | 7 | correct? |
| 11:13 | 8 | A.   I didn't create records with false names.  I may have |
| 11:13 | 9 | been given false names.  I don't know.  They could have been |
| 11:13 | 10 | people that worked with these people.  They could have been |
| 11:13 | 11 | business managers.  I don't know the relationship. |
| 11:13 | 12 | Q.   Well, you know that the records you created showing |
| 11:13 | 13 | that Rosalba Cabrera worked on Bratz weren't correct because |
| 11:14 | 14 | Rosalba Cabrera didn't work on Bratz, right? |
| 11:14 | 15 |       MR. McCONVILLE:  Objection.  Asked and answered. |
| 11:14 | 16 |       THE COURT:  Overruled. |
| 11:14 | 17 |       THE WITNESS:  I don't know if she did any work at |
| 11:14 | 18 | all or not. |
| 11:14 | 19 | BY MR. ZELLER: |
| 11:14 | 20 | Q.   So let me just ask this directly, then:  Is it your |
| 11:14 | 21 | testimony now that the names reflected in your records are |
| 11:14 | 22 | truthful? |
| 11:14 | 23 | A.   I don't know.  I could have been given misleading |
| 11:14 | 24 | information. |
| 11:14 | 25 | Q.   You know that they are not true, correct? |

| | | |
|---|---|---|
| 11:14 | 1 | A.   I don't know.  As I just stated, I could have been |
| 11:14 | 2 | given misleading information by these seamstresses. |
| 11:14 | 3 | Q.   So you were misled by a combination of Ana Cabrera, |
| 11:14 | 4 | Beatriz Morales and Ms. Salazar. |
| 11:14 | 5 | A.   The possibility exists.  I'm not saying that it was. |
| 11:14 | 6 | I'm just saying that's one possibility. |
| 11:14 | 7 | Q.   Well, I'm asking you, did they mislead you? |
| 11:14 | 8 | A.   I don't know. |
| 11:14 | 9 | Q.   Did any of them? |
| 11:15 | 10 | A.   I don't know. |
| 11:15 | 11 | Q.   So do you have any explanation, then, as to why your |
| 11:15 | 12 | records reflect that Rosalba Cabrera worked on Bratz even |
| 11:15 | 13 | though she didn't? |
| 11:15 | 14 | A.   'Cause I was told that. |
| 11:15 | 15 | Q.   By whom? |
| 11:15 | 16 | A.   By my wife. |
| 11:15 | 17 | Q.   So your wife misled you? |
| 11:15 | 18 | A.   I don't think so.  That's what she was told by Isabel |
| 11:15 | 19 | Cabrera. |
| 11:15 | 20 | Q.   Can you tell us who misled you? |
| 11:15 | 21 | A.   I don't know if I was even misled at all.  Could be |
| 11:15 | 22 | true; it could be false.  I don't know. |
| 11:15 | 23 | Q.   Well, you did see your testimony earlier from 2008 |
| 11:15 | 24 | where you admitted that Rosalba Cabrera, for example, did no |
| 11:15 | 25 | work on Bratz, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:15 | 1 | A.   That was an assumption I made at that time.  I don't |
| 11:15 | 2 | know if that was accurate. |
| 11:15 | 3 | Q.   That's how you testified, true? |
| 11:15 | 4 | A.   That's how I testified. |
| 11:15 | 5 | Q.   Do you have any explanation -- I want you to assume for |
| 11:15 | 6 | a moment that that testimony was correct, that Rosalba |
| 11:16 | 7 | Cabrera did no work on Bratz.  Do you have any explanation |
| 11:16 | 8 | for us as to how it is that Rosalba Cabrera is shown in your |
| 11:16 | 9 | records as working on Bratz? |
| 11:16 | 10 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 11:16 | 11 | THE COURT:  Overruled. |
| 11:16 | 12 | THE WITNESS:  I don't know. |
| 11:16 | 13 | MR. ZELLER:  I don't have anything further. |
| 11:16 | 14 | THE COURT:  This is recross by Mr. McConville on |
| 11:16 | 15 | behalf of MGA and Mr. Larian. |
| 11:16 | 16 | Mr. Overland, let me make certain.  I know that |
| 11:16 | 17 | you and Mr. Cote said you would speak up when you wished to |
| 11:16 | 18 | examine.  Any questions? |
| 11:16 | 19 | MR. COTE:  No questions. |
| 11:16 | 20 | THE COURT:  Just checking in. |
| 11:16 | 21 | MR. COTE:  Thank you. |
| 11:16 | 22 | THE COURT:  Okay.  Thank you. |
| 11:16 | 23 | MR. OVERLAND:  We'll speak up. |
| | 24 | |
| | 25 | |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 11:16 | 1  | **RECROSS-EXAMINATION**                                      |
| 11:16 | 2  | MR. McCONVILLE:  Can we put up Exhibit 13223,                |
| 11:16 | 3  | please.                                                      |
| 11:16 | 4  | *(Document displayed.)*                                      |
|       | 5  | BY MR. McCONVILLE:                                           |
| 11:16 | 6  | Q.   This is the e-mail dated June 2005 that you wrote        |
| 11:17 | 7  | following the meeting with MGA where you refused to provide  |
| 11:17 | 8  | the names of the seamstresses, correct?                      |
| 11:17 | 9  | A.   Correct.                                                |
| 11:17 | 10 | Q.   And I believe you were just asked questions about       |
| 11:17 | 11 | whether or not you believed that MGA must have known that    |
| 11:17 | 12 | the seamstresses were Mattel employees.                      |
| 11:17 | 13 | Do you remember that?                                        |
| 11:17 | 14 | A.   Yes.                                                    |
| 11:17 | 15 | Q.   And I believe the premise was because one of these      |
| 11:17 | 16 | seamstresses, Ms. Salazar, who was fired by Mattel in 2001,  |
| 11:17 | 17 | got a job at MGA in 2003.                                    |
| 11:17 | 18 | Do you remember that?                                        |
| 11:17 | 19 | MR. ZELLER:  Assumes facts.                                  |
| 11:17 | 20 | THE WITNESS:  Yes.                                           |
| 11:17 | 21 | THE COURT:  Overruled.                                       |
|       | 22 | BY MR. McCONVILLE:                                           |
| 11:17 | 23 | Q.   Do you remember that?                                   |
| 11:17 | 24 | A.   Yes.                                                    |
| 11:17 | 25 | Q.   So let's go with the premise that, in 2003, you must    |

| | | |
|---|---|---|
| 11:17 | 1 | have known that MGA was aware that these were Mattel |
| 11:17 | 2 | employees.  Okay?  Let's go with that as a premise.  Okay? |
| 11:18 | 3 | A.   All right. |
| 11:18 | 4 | Q.   So why in 2005 didn't you just say, "Hey, these are |
| 11:18 | 5 | Mattel employees," in this e-mail? |
| 11:18 | 6 | MR. ZELLER:  This was asked and answered. |
| 11:18 | 7 | THE WITNESS:  Because I really didn't -- |
| 11:18 | 8 | THE COURT:  Well, this all goes around the area |
| 11:18 | 9 | that you two have entered into concerning confusion, |
| 11:18 | 10 | et cetera. |
| 11:18 | 11 | Overruled. |
| 11:18 | 12 | BY MR. McCONVILLE: |
| 11:18 | 13 | Q.   So let's go with the premise that in 2003 you believed |
| 11:18 | 14 | that MGA must have known that you were hiring Mattel sample |
| 11:18 | 15 | makers.  Let's go with that as a premise. |
| 11:18 | 16 | Why would you write an e-mail in 2005 that doesn't |
| 11:18 | 17 | reference Mattel. |
| 11:18 | 18 | A.   Because I still wanted to protect their identities? |
| 11:18 | 19 | Q.   Because MGA didn't know, right? |
| 11:18 | 20 | A.   Right. |
| 11:18 | 21 | Q.   In 2005, you never -- by 2005, you had never told |
| 11:18 | 22 | anyone at MGA the identities of the people who were your |
| 11:19 | 23 | seamstresses, right? |
| 11:19 | 24 | A.   Right. |
| 11:19 | 25 | Q.   And let's -- let's look at some language here which was |

| | | |
|---|---|---|
| 11:19 | 1 | highlighted for you. |
| 11:19 | 2 | THE COURT:  Counsel, I've allowed this, but I |
| 11:19 | 3 | thought that the disagreement was the confusing portion |
| 11:19 | 4 | concerning Salazar and Cabrera. |
| 11:19 | 5 | MR. McCONVILLE:  Right. |
| 11:19 | 6 | THE COURT:  Is this -- |
| 11:19 | 7 | Please continue. |
| 11:19 | 8 | MR. McCONVILLE:  I'm not being clear? |
| 11:19 | 9 | THE COURT:  No. |
| 11:19 | 10 | Counsel, please continue. |
| 11:19 | 11 | BY MR. McCONVILLE: |
| 11:19 | 12 | Q.   Okay.  So let's go back to this one provision of this |
| 11:19 | 13 | e-mail that says -- you were shown that the -- on page 3 the |
| 11:19 | 14 | last line of the first full paragraph -- that they don't |
| 11:19 | 15 | work for her for the money. |
| 11:19 | 16 | A.   Right. |
| 11:19 | 17 | Q.   Yeah.  Do you really think they were doing it for fun? |
| 11:19 | 18 | A.   No. |
| 11:19 | 19 | Q.   What were they doing it for? |
| 11:20 | 20 | A.   They were doing it for the money. |
| 11:20 | 21 | Q.   This is an e-mail that you wrote trying to get MGA to |
| 11:20 | 22 | invite you back in to do work for them, correct? |
| 11:20 | 23 | A.   Yes. |
| 11:20 | 24 | Q.   And if, in fact, MGA knew by 2005 the identities of |
| 11:20 | 25 | these seamstresses, why would you go on for three pages and |

119

| | | |
|--|--|--|
|11:20|1|not describe them or not say where they worked?|
|11:20|2|A.   'Cause I didn't think they knew.|
|11:20|3|Q.   Okay.|
|11:20|4|        MR. McCONVILLE:  No further questions.|
|11:20|5|        THE COURT:  I'm going to ask you to remain|
|11:20|6|available, as we have all of the witnesses, until May 7th.|
|11:20|7|The reason for that I don't want any further subpoenas or|
|11:20|8|inconvenience flying across the country or all over the|
|11:20|9|world.  But we expect you to be available.|
|11:20|10|        Thank you very much, sir.  You may step down.|
|11:20|11|         (Witness steps down subject to recall.)|
|11:20|12|        THE COURT:  Counsel, your next witness, please.|
|11:20|13|        MR. QUINN:  Your Honor, Dr. Aginsky will finish|
|11:21|14|up.|
|11:21|15|        THE COURT:  Thank you.|
|11:21|16|        THE WITNESS:  Your Honor, may I leave the|
|11:21|17|premises?|
|11:21|18|        THE COURT:  Thank you, sir.|
|11:21|19|        I believe we were on redirect.  And this is|
|11:21|20|Mr. Quinn.|
|11:21|21|        Doctor, if you would please return to the stand.|
|11:21|22|This is running time.  So if you'll move quickly.|
|10:21|23|**VALERY AGINSKY, MATTEL'S WITNESS, PREVIOUSLY SWORN**|
|10:21|24|**RESUMED THE STAND**|
|11:21|25|        THE COURT:  Thank you, sir.|

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 120 of 168   Page ID #:305417
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

120

| 11:21 | 1 | And this is redirect examination by Mr. Quinn. |
| | 2 | MR. QUINN:  Thank you, Your Honor. |
| 11:21 | 3 | **REDIRECT EXAMINATION (Resumed)** |
| 11:21 | 4 | MR. QUINN:  If we could put up on the screen |
| 11:21 | 5 | Exhibit 23962-11.  And if we could enlarge that middle part |
| 11:22 | 6 | up at the top, Ken. |
| 11:22 | 7 | *(Document displayed.)* |
| | 8 | BY MR. QUINN: |
| 11:22 | 9 | Q.   Just to kind of reorient ourselves, Dr. Aginsky, what |
| 11:22 | 10 | were the total number of microplugs that you took out of the |
| 11:22 | 11 | Area 8? |
| 11:22 | 12 | A.   Fourteen. |
| 11:22 | 13 | Q.   And you took ten plugs initially, and then you told us |
| 11:22 | 14 | about taking an additional four that you took without an MGA |
| 11:22 | 15 | observer present, correct? |
| 11:22 | 16 | A.   Correct. |
| 11:22 | 17 | Q.   And what tests did you run on those total 14 plugs?  If |
| 11:22 | 18 | you could break that down for us:  How you used those plugs |
| 11:22 | 19 | in your testing. |
| 11:22 | 20 | A.   I used the four plugs for the TLC analysis, then three |
| 11:22 | 21 | plugs for the first GC-MS analysis, and another three plugs |
| 11:23 | 22 | for the second GC-MS analysis.  And the additional four |
| 11:23 | 23 | plugs that I took later, it was Test No. 3, which I called |
| 11:23 | 24 | the confirmatory test. |
| 11:23 | 25 | Q.   Did you review any documents last night to determine |

| | | |
|---|---|---|
| 11:23 | 1 | when you disclosed to MGA any document reflecting that you |
| 11:23 | 2 | had taken a total of 14 plugs out of Area 8? |
| 11:23 | 3 | A.   Yes. |
| 11:23 | 4 | Q.   And what was it that you reviewed? |
| 11:23 | 5 | A.   I reviewed my first report dated February 8, 2008, and |
| 11:23 | 6 | my deposition taken at -- on March 24, 2008. |
| 11:23 | 7 | Q.   And after reviewing those two documents, do you know |
| 11:23 | 8 | when you first disclosed to MGA any document reflecting that |
| 11:23 | 9 | you had taken the total of 14 plugs, including the four |
| 11:24 | 10 | additional plugs, out of Area 8? |
| 11:24 | 11 | A.   Yes. |
| 11:24 | 12 | Q.   When did you first disclose any such document to MGA? |
| 11:24 | 13 | A.   In my first report. |
| 11:24 | 14 | Q.   And that was the report dated? |
| 11:24 | 15 | A.   That was February 8, 2008 report. |
| 11:24 | 16 | Q.   And which document did you disclose in the |
| 11:24 | 17 | February 2008 report that reflected you had taken a total of |
| 11:24 | 18 | 14 microplugs from Area 8? |
| 11:24 | 19 | A.   That was the Attachment No. 1 to my report.  It was a |
| 11:24 | 20 | reduced copy of page 11, showing the -- the areas from which |
| 11:24 | 21 | I took circles, and the microplugs that I -- that I took. |
| 11:24 | 22 | Q.   All right.  So this was a photograph? |
| 11:24 | 23 | A.   Yes. |
| 11:24 | 24 | Q.   And you told us you had taken photographs when you took |
| 11:25 | 25 | the plugs? |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

122

| | | |
|---|---|---|
| 11:25 | 1 | A.   Yes. |
| 11:25 | 2 | Q.   And did this photograph show that a total of 14 |
| 11:25 | 3 | microplugs had been taken? |
| 11:25 | 4 | A.   Yes.  I could easily see them and count them looking at |
| 11:25 | 5 | the photograph, yes. |
| 11:25 | 6 | Q.   And this was an attachment to a report that you |
| 11:25 | 7 | provided to MGA in February of 2008? |
| 11:25 | 8 | A.   Yes. |
| 11:25 | 9 | Q.   And then after that, did MGA's lawyers take your |
| 11:25 | 10 | deposition? |
| 11:25 | 11 | A.   Yes. |
| 11:25 | 12 | Q.   And they asked you questions about your expert report |
| 11:25 | 13 | at your deposition? |
| 11:25 | 14 | A.   Yes. |
| 11:25 | 15 | Q.   And at your deposition, were you asked by MGA's counsel |
| 11:25 | 16 | how many microplugs you took from Area 8? |
| 11:25 | 17 | A.   Correct. |
| 11:25 | 18 | Q.   And what did you answer? |
| 11:25 | 19 | A.   I answered overall 14 samples. |
| 11:26 | 20 | Q.   Did you ever intend to conceal from MGA the fact that |
| 11:26 | 21 | you -- how many plugs in total you had taken from Area 8? |
| 11:26 | 22 | A.   No. |
| 11:26 | 23 | Q.   Did you ever believe that you had kept secret from MGA |
| 11:26 | 24 | how many plugs you had taken from Area 8? |
| 11:26 | 25 | A.   No. |

| 11:26 | 1 | Q.   Why did you believe that you could not keep secret from |
| 11:26 | 2 | MGA the number of plugs you took from Area 8? |
| 11:26 | 3 | A.   Because it is very easy to see, when looking at the |
| 11:26 | 4 | actual notary book, at page 11, to see how many -- to see |
| 11:26 | 5 | and count how many plugs I took, so -- to count 14 microplug |
| 11:26 | 6 | holes in Area 8. |
| 11:26 | 7 | Q.   All right.  When you took the additional four plugs |
| 11:26 | 8 | that you told us about, did you have any expectation as to |
| 11:27 | 9 | whether or not MGA would be retaining somebody with |
| 11:27 | 10 | expertise in this area to examine the notary book? |
| 11:27 | 11 | A.   Yes.  I assumed that MGA will be using another ink |
| 11:27 | 12 | expert to repeat the analysis that I had conducted. |
| 11:27 | 13 | Q.   And did you think that some other -- if they retained |
| 11:27 | 14 | another ink analyst expert, did you think he would be able |
| 11:27 | 15 | to see how many microplug holes you had taken out of that |
| 11:27 | 16 | Area 8? |
| 11:27 | 17 | A.   Yes. |
| 11:27 | 18 | Q.   And have you looked at the original notary book to see |
| 11:27 | 19 | how many microplug holes there now are in Area 8? |
| 11:27 | 20 | A.   Yes. |
| 11:27 | 21 | Q.   And any -- are there now any microplug holes in Area 8 |
| 11:27 | 22 | of the notary book that you did not create? |
| 11:27 | 23 | A.   Yes. |
| 11:27 | 24 | Q.   If you'd look, please, at Exhibit 60, the page we're |
| 11:28 | 25 | talking about, page 11, the original notary book -- |

| | | |
|---|---|---|
| 11:28 | 1 | MR. QUINN:  If we could put that before you, |
| 11:28 | 2 | please. |
| 11:28 | 3 | *(Exhibit provided to the witness.)* |
| 04:00 | 4 | BY MR. QUINN: |
| 11:28 | 5 | Q.   And before we take a look at this in detail, it was -- |
| 11:28 | 6 | your report that you sent in February, if we could go back |
| 11:28 | 7 | to that report that you provided. |
| 11:28 | 8 | Did you give the original photograph to MGA's attorneys |
| 11:28 | 9 | at that time attached to your report, or was it a copy of |
| 11:28 | 10 | the...? |
| 11:28 | 11 | A.   If I remember, it was a printout from the digital |
| 11:28 | 12 | photo, like a first -- first generation.  It's not a copy, |
| 11:28 | 13 | but a printout -- |
| 11:29 | 14 | Q.   And that -- |
| 11:29 | 15 | A.   -- of a digital photo. |
| 11:29 | 16 | Q.   And that's the attachment that you made to your |
| 11:29 | 17 | February report? |
| 11:29 | 18 | A.   Yes. |
| 11:29 | 19 | Q.   That was provided to MGA's counsel? |
| 11:29 | 20 | A.   I believe so, yes. |
| 11:29 | 21 | Q.   And that you were then questioned about at your |
| 11:29 | 22 | deposition? |
| 11:29 | 23 | A.   Yes. |
| 11:29 | 24 | Q.   All right.  So we are looking at the notary book now. |
| 11:29 | 25 | And I had -- um, how many microplug holes do you see there |

| 11:29 | 1 | now, today, in that Area 8?  If you could count them, |
| 11:29 | 2 | please. |
| 11:29 | 3 | A.    Twenty-six. |
| 11:29 | 4 | Q.    And how many of those microplug holes in Area 8 did you |
| 11:30 | 5 | create? |
| 11:30 | 6 | A.    Fourteen. |
| 11:30 | 7 | Q.    Do you know how the remainder of those microplug holes |
| 11:30 | 8 | got there in Area 8? |
| 11:30 | 9 | A.    Yes. |
| 11:30 | 10 | Q.    How do you know that? |
| 11:30 | 11 | A.    I was present when -- and observed Dr. Lyter, an expert |
| 11:30 | 12 | for MGA, taking -- taking microplugs from this Area 8.  And |
| 11:30 | 13 | I took 12 samples, 12 microplugs. |
| 11:30 | 14 | Q.    And you were present and observing when he did that? |
| 11:30 | 15 | A.    Yes. |
| 11:30 | 16 | Q.    Approximately when was that that he did that? |
| 11:30 | 17 | A.    Approximately at the end of April of 2008. |
| 11:30 | 18 | Q.    So that was after you had taken your microplug holes? |
| 11:30 | 19 | A.    Yes. |
| 11:30 | 20 | Q.    Do you have any way of distinguishing between the holes |
| 11:30 | 21 | made by microplugs that you took versus the holes made by |
| 11:30 | 22 | microplugs that Dr. Lyter took? |
| 11:31 | 23 | A.    Yes. |
| 11:31 | 24 | Q.    How can you tell the difference? |
| 11:31 | 25 | A.    The microplugs holes that I took are slightly bigger in |

| | | |
|---|---|---|
| 11:31 | 1 | diameter than Dr. Lyter's. |
| 11:31 | 2 | Q.   After you had taken the microplugs that you took, was |
| 11:31 | 3 | there enough ink left in Area 8 to allow another expert, |
| 11:31 | 4 | such as Dr. Lyter, to conduct the same number of GC-MS and |
| 11:31 | 5 | TLC tests that you did? |
| 11:31 | 6 | A.   Yes. |
| 11:31 | 7 | Q.   Is there, even now, enough ink, in your opinion, left |
| 11:31 | 8 | in Area 8 still remaining after Dr. Lyter took his |
| 11:31 | 9 | microplugs from Area 8 for someone to take additional plugs |
| 11:31 | 10 | and, yet again, conduct the same number of tests on that |
| 11:31 | 11 | area as you did? |
| 11:31 | 12 | A.   Yes. |
| 11:32 | 13 | Q.   And have you done anything to determine exactly where |
| 11:32 | 14 | you took those additional four microplugs that you took? |
| 11:32 | 15 | Have you done anything to determine exactly where you took |
| 11:32 | 16 | those additional four microplugs in Area 8 from? |
| 11:32 | 17 | A.   Yes. |
| 11:32 | 18 | Q.   What did you do? |
| 11:32 | 19 | A.   I compared digital photo that I took after I had taken |
| 11:32 | 20 | the first ten plugs with a digital photo that I took after I |
| 11:32 | 21 | had taken additional four plugs. |
| 11:32 | 22 | Q.   And have you done anything to make sure that MGA's |
| 11:32 | 23 | counsel has had access to the digital photos you relied on |
| 11:32 | 24 | to determine where you took those four additional |
| 11:32 | 25 | microplugs? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

127

| | | |
|---|---|---|
| 11:32 | 1 | A.   Yes. |
| 11:32 | 2 | Q.   What did you do to make sure that MGA's counsel has |
| 11:32 | 3 | access to that? |
| 11:33 | 4 | A.   I gave these two digital -- two files, digital photos, |
| 11:33 | 5 | to Jennifer English. |
| 11:33 | 6 | Q.   She's sitting up there to your left? |
| 11:33 | 7 | A.   Yes.  And to any -- for Mattel. |
| 11:33 | 8 | And I saw her sending/e-mailing these two digital |
| 11:33 | 9 | photos to MGA's counsel yesterday -- yesterday night. |
| 11:33 | 10 | Q.   And you personally observed that? |
| 11:33 | 11 | A.   Yes. |
| 11:33 | 12 | MR. QUINN:  All right.  Looking at |
| 11:33 | 13 | Exhibit 23496-1. |
| 11:33 | 14 | *(Document provided to the witness.)* |
| 11:33 | 15 | *(Document displayed.)* |
| 11:33 | 16 | BY MR. QUINN: |
| 11:33 | 17 | Q.   Could you please show to the jury where you took those |
| 11:33 | 18 | additional four microplugs from the Area 8. |
| 11:34 | 19 | A.   Yes.  The first plug was -- the first two plugs were |
| 11:34 | 20 | from the letter "M" in the word "from."  And this was, from |
| 11:34 | 21 | the left, this leg, and from the middle line.  *(Indicating.)* |
| 11:34 | 22 | This line, there is 92 grams, because there was more |
| 11:34 | 23 | ink there.  This line was created by two -- two movements, |
| 11:34 | 24 | down and up.  And again, here, down and up.  *(Indicating.)* |
| 11:34 | 25 | So these are two, first. |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

128

| | | |
|---|---|---|
| 11:34 | 1 | Then, it was an additional plug from the first "9" in |
| 11:34 | 2 | the "1999."  And again, it was –– it was two movements, down |
| 11:34 | 3 | and up.  So more ink was here. *(Indicating.)* |
| 11:34 | 4 | And finally, the first plug that I took was from the –– |
| 11:35 | 5 | in the word "Missouri," from the –– from the letter "U," the |
| 11:35 | 6 | right-hand side, upper portion of letter "U," where the |
| 11:35 | 7 | writing instrument dwelled for a while and, therefore, more |
| 11:35 | 8 | ink –– more ink absorbed into paper. |
| 11:35 | 9 | Q.   So I think you told us yesterday that in taking those |
| 11:35 | 10 | four additional plugs, your goal was to confirm results you |
| 11:35 | 11 | had already gotten in your testing, correct? |
| 11:35 | 12 | A.   That's correct. |
| 11:35 | 13 | Q.   And you wanted to try to get places where lines crossed |
| 11:35 | 14 | so you could get more ink; is that right? |
| 11:35 | 15 | A.   Yes, yes. |
| 11:35 | 16 | Q.   And by the way, I think you said "1999."  Did you mean |
| 11:35 | 17 | "1999," the year? |
| 11:35 | 18 | A.   1998, yes.  From the "9" in the 1998 entry. |
| 11:35 | 19 | Q.   All right.  And you're not doing this from a memory you |
| 11:36 | 20 | have from January of 1998; you did this –– you're doing this |
| 11:36 | 21 | because you compared the digital photos that you took after |
| 11:36 | 22 | you took the first ten samples, and then another photo you |
| 11:36 | 23 | took after you took the fourteen; is that right? |
| 11:36 | 24 | A.   That's correct.  Initially, when I took the first four |
| 11:36 | 25 | samples, of course, I knew from where I took these four |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

129

| | | |
|---|---|---|
| 11:36 | 1 | samples, but that was three years ago.  I refreshed my |
| 11:36 | 2 | memory yesterday. |
| 11:36 | 3 | Q.   All right.  Do you -- let me change subjects now. |
| 11:36 | 4 | You, of course, recall the questions you were asked |
| 11:36 | 5 | yesterday about the possibility that small peaks in those |
| 11:36 | 6 | printouts could be either minor ink components or |
| 11:36 | 7 | contaminants. |
| 11:36 | 8 | Do you recall those questions? |
| 11:36 | 9 | A.   Yes. |
| 11:36 | 10 | Q.   Is there any correlation between the size of a peak in |
| 11:36 | 11 | a chromatogram and the chances of that peak being the result |
| 11:36 | 12 | of contamination? |
| 11:36 | 13 | A.   No. |
| 11:36 | 14 | Q.   Is there a possibility that a small peak can also |
| 11:37 | 15 | represent -- or a paper component -- a component of the |
| 11:37 | 16 | paper itself? |
| 11:37 | 17 | A.   Yes. |
| 11:37 | 18 | Q.   And is there any greater chance that a small peak in a |
| 11:37 | 19 | chromatogram will be a contaminant than a larger peak will? |
| 11:37 | 20 | A.   No. |
| 11:37 | 21 | Q.   Did your testing allow you to determine whether the |
| 11:37 | 22 | peaks that you saw at the 8.58 retention time in the |
| 11:37 | 23 | chromatograms for the three tests of the Area 8 samples were |
| 11:37 | 24 | ink or paper components rather than contaminants? |
| 11:37 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 130 of 168   Page ID #:305427
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

130

| | | |
|---|---|---|
| 11:37 | 1 | Q.   And -- and why were you able to reach the conclusion |
| 11:37 | 2 | that these were not contaminants? |
| 11:37 | 3 | A.   There are four reason for this. |
| 11:37 | 4 | Reason number one, is that, as I testified, I conducted |
| 11:37 | 5 | three separate GC-MS tests for the ink in the Area No. 8. |
| 11:38 | 6 | And all of them showed the presence of menthol.  And when I |
| 11:38 | 7 | increased the concentration of the ink for confirmatory |
| 11:38 | 8 | test, the concentration of menthol increased, which shows |
| 11:38 | 9 | that this is not from paper.  It is from the ink. |
| 11:38 | 10 | Reason number two:  I didn't find any presence of |
| 11:38 | 11 | menthol, even at trace level, in any way on pages 11 or 12 |
| 11:38 | 12 | in any of the 16 other areas from which I took ink samples, |
| 11:38 | 13 | or from a paper blank area.  So nowhere there was menthol, |
| 11:38 | 14 | which is -- more striking, is that no menthol was present in |
| 11:38 | 15 | the Area No. 7 that touches Area No. 8. |
| 11:38 | 16 | Reason number three is that I found no evidence of |
| 11:38 | 17 | physical contamination, such as what I testified |
| 11:38 | 18 | yesterday -- like no presence of -- of a drop of water being |
| 11:39 | 19 | on -- on the paper, and that would cause some warping of the |
| 11:39 | 20 | paper, or no stain, no ring, that could remain in paper |
| 11:39 | 21 | after the liquid would evaporate. |
| 11:39 | 22 | And reason number four is -- is I conducted a number of |
| 11:39 | 23 | experiment to test the contamination theory.  And all these |
| 11:39 | 24 | experiments clearly showed that -- that, first of all, when |
| 11:39 | 25 | the contamination was, what I called casual, then, no |

| | | |
|---|---|---|
| 11:39 | 1 | menthol was detected.  When I did a direct contamination, by |
| 11:39 | 2 | using a lot of unusual -- that would be unusual in real |
| 11:39 | 3 | life, a lot of menthol-containing substance, like Vicks |
| 11:40 | 4 | Vapor Rub ointment, and even this test showed that the level |
| 11:40 | 5 | of menthol that was detected was significantly lower than |
| 11:40 | 6 | the level of menthol that I detected in the ink in the |
| 11:40 | 7 | Area 8. |
| 11:40 | 8 | And also, I didn't find, again, any evidence of the tip |
| 11:40 | 9 | of the writing instrument being contaminated with something |
| 11:40 | 10 | like an ointment because there was no pen skipping in the |
| 11:40 | 11 | Area 8 that I observed. |
| 11:40 | 12 | And finally, the analysis that I conducted, the three |
| 11:40 | 13 | analysis for Area 8, didn't -- didn't show the presence of |
| 11:40 | 14 | any additional components that would be present if something |
| 11:40 | 15 | like an ointment or similar menthol-containing material |
| 11:40 | 16 | would be used -- something like a petroleum jelly |
| 11:41 | 17 | components.  They would be present in the GC-MS |
| 11:41 | 18 | chromatogram.  And they were not present. |
| 11:41 | 19 | MR. QUINN:  Your Honor, I'd now like to move into |
| 11:41 | 20 | evidence the exhibits that we discussed last night. |
| 11:41 | 21 | THE COURT:  They're received, Counsel. |
| 11:41 | 22 | And if you want to state them back for the record. |
| 11:41 | 23 | I have them in my book also. |
| 11:41 | 24 | MR. QUINN:  If I may. |
| 11:41 | 25 | THE COURT:  I can probably do it even quicker. |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

132

| 11:41 | 1 | MR. QUINN:  If they may be displayed, as we move |
| 11:41 | 2 | them in, Your Honor? |
| 11:41 | 3 | THE COURT:  You may. |
| 11:41 | 4 | MR. QUINN:  So Exhibit 23962-1. |
| 11:41 | 5 | *(Exhibit No. 23962-1 received in evidence.)* |
| 11:41 | 6 | *(Document displayed.)* |
| 11:41 | 7 | THE COURT:  Then, there'll all just be dashes; |
| 11:41 | 8 | they're all the same exhibit, Debbie, 23962-1. |
| 11:41 | 9 | Then it will be? |
| 11:41 | 10 | MR. QUINN:  Then dash 3. |
| 11:41 | 11 | *(Exhibit No. 23962-3 received in evidence.)* |
| 11:41 | 12 | THE COURT:  That's 1. |
| 11:41 | 13 | So now we need 3. |
| 11:41 | 14 | *(Document displayed.)* |
| 11:41 | 15 | MR. QUINN:  5.  Dash 5. |
| 11:42 | 16 | *(Exhibit No. 23962-5 received in evidence.)* |
| 11:42 | 17 | *(Document displayed.)* |
| 11:42 | 18 | MR. QUINN:  Dash 6. |
| 11:42 | 19 | *(Exhibit No. 23962-6 received in evidence.)* |
| 11:42 | 20 | *(Document displayed.)* |
| 11:42 | 21 | MR. QUINN:  Dash 7. |
| 11:42 | 22 | *(Exhibit No. 23962-7 received in evidence.)* |
| 11:42 | 23 | *(Document displayed.)* |
| 11:42 | 24 | MR. QUINN:  Dash 8. |
| 11:42 | 25 | *(Exhibit No. 23962-8 received in evidence.)* |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

133

| | | |
|---|---|---|
| 11:42 | 1 | *(Document displayed.)* |
| 11:42 | 2 | MR. QUINN:  Dash 9. |
| 11:42 | 3 | *(Exhibit No. 23962-9 received in evidence.)* |
| 11:42 | 4 | *(Document displayed.)* |
| 11:42 | 5 | MR. QUINN:  Dash 10. |
| 11:42 | 6 | *(Exhibit No. 23962-10 received in evidence.)* |
| 11:42 | 7 | *(Document displayed.)* |
| 11:42 | 8 | MR. QUINN:  Dash 11. |
| 11:42 | 9 | *(Exhibit No. 23962-11 received in evidence.)* |
| 11:42 | 10 | *(Document displayed.)* |
| 11:42 | 11 | MR. QUINN:  Dash 12. |
| 11:42 | 12 | *(Exhibit No. 23962-12 received in evidence.)* |
| 11:42 | 13 | *(Document displayed.)* |
| 11:42 | 14 | MR. QUINN:  Dash 13. |
| 11:42 | 15 | *(Exhibit No. 23962-13 received in evidence.)* |
| 11:42 | 16 | *(Document displayed.)* |
| 11:42 | 17 | MR. QUINN:  Dash 14. |
| 11:42 | 18 | *(Exhibit No. 23962-14 received in evidence.)* |
| 11:42 | 19 | *(Document displayed.)* |
| 11:42 | 20 | MR. QUINN:  And dash 19. |
| 11:42 | 21 | *(Exhibit No. 23962-19 received in evidence.)* |
| 11:42 | 22 | *(Document displayed.)* |
| 11:42 | 23 | THE COURT:  Those are received, Counsel. |
| 11:42 | 24 | MR. QUINN:  Thank you, Your Honor. |
| 11:42 | 25 | THE COURT:  Ladies and gentlemen, I'll allow |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 134 of 168   Page ID
#:305431
CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

134

| | | |
|---|---|---|
| 11:42 | 1 | counsel for each side -- they'll have a number of |
| 11:42 | 2 | demonstratives.  You saw other exhibits where conclusions |
| 11:42 | 3 | were reached, and they were put up -- you know, writings. |
| 11:42 | 4 | That technically isn't evidence, but counsel for |
| 11:42 | 5 | both Mattel and MGA, when they argue that, may actually put |
| 11:42 | 6 | up a display, if they want to, during their argument.  But |
| 11:42 | 7 | those are simply summations.  You've got the testimony.  And |
| 11:43 | 8 | I'll allow both parties to do that. |
| 11:43 | 9 | Ms. Hurst, do you have questions on |
| 11:43 | 10 | recross-examination? |
| 11:43 | 11 | MS. HURST:  Thank you, Your Honor. |
| 11:43 | 12 | THE COURT:  Please. |
| 11:43 | 13 | Counsel, this is all running time. |
| 11:43 | 14 | **RECROSS-EXAMINATION** |
| 12:59 | 15 | BY MS. HURST: |
| 11:43 | 16 | Q.   Dr. Aginsky, you said that it would have always been |
| 11:43 | 17 | possible to count the number of holes in the notary book, |
| 11:44 | 18 | right? |
| 11:44 | 19 | A.   Yes. |
| 11:44 | 20 | Q.   And are you now saying that you don't need to document |
| 11:44 | 21 | your work because it's always possible for some other expert |
| 11:44 | 22 | to come along later and figure out how many holes you took? |
| 11:44 | 23 | A.   I'm not saying this. |
| 11:44 | 24 | Q.   That would not be an acceptable practice in any |
| 11:44 | 25 | forensic society of which you're a member, right? -- failing |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

135

| | | |
|---|---|---|
| 11:44 | 1 | to document your work because you can expect somebody else |
| 11:44 | 2 | to come along and figure it out later; isn't that true? |
| 11:44 | 3 | A.   (No response.) |
| 11:44 | 4 | Q.   That would not be acceptable, would it? |
| 11:44 | 5 | A.   I don't agree. |
| 11:44 | 6 | Q.   You think that's okay?  Just not documenting your work |
| 11:44 | 7 | 'cause somebody else can figure it out later? |
| 11:44 | 8 | A.   I think I documented my work. |
| 11:44 | 9 | Q.   With your photographs, right? |
| 11:44 | 10 | A.   Yes. |
| 11:44 | 11 | Q.   Let's talk about those photographs for a moment. |
| 11:44 | 12 | You had Ms. English e-mail them to me last night, |
| 11:44 | 13 | correct? |
| 11:44 | 14 | A.   Yes. |
| 11:45 | 15 | Q.   And you understand it's important to take notes at the |
| 11:45 | 16 | time of your work, don't you? |
| 11:45 | 17 | A.   Yes, some -- some notes are important, yes. |
| 11:45 | 18 | Q.   All right.  And taking notes at the time of your work |
| 11:45 | 19 | is the best way to guarantee their accuracy; isn't that |
| 11:45 | 20 | true? |
| 11:45 | 21 | A.   Generally, yes. |
| 11:45 | 22 | Q.   And you testified that you took the second set of |
| 11:45 | 23 | samples on January 14, 2008; isn't that right? |
| 11:45 | 24 | A.   That's correct. |
| 11:45 | 25 | Q.   But the date of your photograph does not match that |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:45 | 1 | date, does it? |
| 11:45 | 2 | A.   Yes.   The photograph that I took was on the 30th of |
| 11:45 | 3 | January.   That was, I believe, the day when I packed the |
| 11:45 | 4 | journal and sent it back to MGA. |
| 11:45 | 5 | MS. HURST:  Your Honor, that was nonresponsive to |
| 11:46 | 6 | my question. |
| 11:46 | 7 | THE COURT:  Overruled. |
| 11:46 | 8 | BY MS. HURST: |
| 11:46 | 9 | Q.   The date of your photograph does not match the date on |
| 11:46 | 10 | which you now claim to have taken those plugs; isn't that |
| 11:46 | 11 | true? |
| 11:46 | 12 | A.   That's true. |
| 11:46 | 13 | Q.   In fact, it was more than two weeks later that you took |
| 11:46 | 14 | a photo -- second photograph; isn't that right? |
| 11:46 | 15 | A.   That's correct. |
| 11:46 | 16 | Q.   And it was more than two weeks after you claim is the |
| 11:46 | 17 | date on which you took your GC-MS test of that third sample; |
| 11:46 | 18 | isn't that true? |
| 11:46 | 19 | A.   That's true. |
| 11:46 | 20 | Q.   So the date of your photograph of those plugs does not |
| 11:46 | 21 | match and is, in fact, later than the date you claim you |
| 11:46 | 22 | made your third GC-MS test; isn't that right? |
| 11:46 | 23 | A.   That's right. |
| 11:47 | 24 | MS. HURST:  Can we see Exhibit 23962-1, please |
| 11:47 | 25 | Mike. |

| | | |
|---|---|---|
| 11:47 | 1 | *(Document displayed.)* |
| 12:59 | 2 | BY MS. HURST: |
| 11:47 | 3 | Q.   I just want to reorient us since it's been a little |
| 11:47 | 4 | while since we've heard about all the work you did, |
| 11:47 | 5 | Dr. Aginsky. |
| 11:47 | 6 |       First, you visually examine the sample in the notary |
| 11:47 | 7 | book, right? |
| 11:47 | 8 | A.   Yes. |
| 11:47 | 9 | Q.   And you looked at it under a microscope, as well, |
| 11:47 | 10 | correct? |
| 11:47 | 11 | A.   Correct. |
| 11:47 | 12 | Q.   And doing that, you were not able to distinguish |
| 11:47 | 13 | between line 5 and the other portions of the entry, correct? |
| 11:47 | 14 | A.   There was some evidence suggesting that it might be a |
| 11:47 | 15 | different ink under the microscope. |
| 11:48 | 16 | Q.   But you were not able to come to a conclusion that you |
| 11:48 | 17 | could distinguish between, them using a visual examination, |
| 11:48 | 18 | correct? |
| 11:48 | 19 | A.   Correct.  Not definitively, no. |
| 11:48 | 20 | Q.   And then you made a microscopic examination, and you |
| 11:48 | 21 | were unable to conclude that you could distinguish, based on |
| 11:48 | 22 | your microscopic examination, correct. |
| 11:48 | 23 | A.   This is what you just asked me. |
| 11:48 | 24 |       I said that, based on visual and microscopic, there was |
| 11:48 | 25 | some evidence to suggest that this might be a different |

138

| | | |
|---|---|---|
| 11:48 | 1 | writing instrument -- different writing ink.  But I couldn't |
| 11:48 | 2 | say a definitively. |
| 11:48 | 3 | Q.   So the answer is you could not conclude, based on your |
| 11:48 | 4 | microscopic examination, that they were different?  The |
| 11:48 | 5 | answer to that question is "yes" -- |
| 11:48 | 6 | A.   Yes. |
| 11:48 | 7 | Q.   -- right? |
| 11:48 | 8 | A.   Right. |
| 11:48 | 9 | Q.   And then you conducted an infrared examination, right? |
| 11:48 | 10 | A.   Yes. |
| 11:48 | 11 | Q.   And you could not conclude they were different based on |
| 11:48 | 12 | the infrared examination, true? |
| 11:48 | 13 | A.   True. |
| 11:48 | 14 | Q.   And then you conducted the TLC, thin-layer |
| 11:49 | 15 | chromatography test, correct? |
| 11:49 | 16 | A.   Correct. |
| 11:49 | 17 | Q.   And you could not distinguish between the inks based on |
| 11:49 | 18 | that test, correct? |
| 11:49 | 19 | A.   Correct. |
| 11:49 | 20 | Q.   And now that leaves us with the GC-MS test, in which |
| 11:49 | 21 | you claim you found menthol, correct? |
| 11:49 | 22 | A.   I did find it, yes. |
| 11:49 | 23 | Q.   Now, you've testified here this morning and yesterday |
| 11:49 | 24 | that you disclosed the third set of microplugs in your |
| 11:50 | 25 | February 2008 report; is that true? |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

139

| | | |
|---|---|---|
| 11:50 | 1 | A.   That's correct. |
| 11:50 | 2 | Q.   And you say that you disclosed the secret set of third |
| 11:50 | 3 | microplugs because you provided Attachment 1 to your report; |
| 11:50 | 4 | is that right? |
| 11:50 | 5 | MR. QUINN:  Objection. |
| 11:50 | 6 | THE COURT:  Sustained. |
| 11:50 | 7 | Just strike the word "secret." |
| 11:59 | 8 | BY MS. HURST: |
| 11:50 | 9 | Q.   You say that you disclosed the third set of microplugs |
| 11:50 | 10 | in Attachment 1 to your report, right? |
| 11:50 | 11 | A.   Yes. |
| 11:50 | 12 | Q.   It did not say in the text of your report that you had |
| 11:50 | 13 | taken a third secret set of microplugs, true? |
| 11:50 | 14 | A.   That's correct. |
| 11:50 | 15 | Q.   This is what Attachment 1 to your report looked like; |
| 11:50 | 16 | is that true?  *(Indicating.)* |
| 11:50 | 17 | A.   Yes.  The cover -- the cover copy looks true, yes. |
| 11:51 | 18 | Q.   Because it was a reduced copy of page 11, right? |
| 11:51 | 19 | A.   Yes. |
| 11:51 | 20 | *(Document displayed.)* |
| 11:51 | 21 | BY MS. HURST: |
| 11:51 | 22 | Q.   And I'm now displaying on the ELMO, the document camera |
| 11:51 | 23 | in the courtroom, what that reduced copy of page 11 looked |
| 11:51 | 24 | like; is that correct? |
| 11:51 | 25 | A.   No.  That's a -- I don't know what generation copy is |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 140 of 168   Page ID #:305437
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

140

| | | |
|---|---|---|
| 11:51 | 1 | this, but definitely not the one that I attached to my |
| 11:51 | 2 | report. |
| 11:51 | 3 | Q.   But it was this size, 8-and-a-half-by-11, wasn't it? |
| 11:51 | 4 | A.   Yes, the size is similar. |
| 11:51 | 5 | Q.   It was an 8-and-a-half-by-11 size copy of the notary |
| 11:51 | 6 | page, wasn't it? |
| 11:51 | 7 | A.   That's correct. |
| 11:51 | 8 | Q.   And it's your testimony here this morning that that |
| 11:51 | 9 | additional set of tiny holes was visible through your |
| 11:51 | 10 | disclosure of this copy; is that true? |
| 11:51 | 11 | A.   Uh, for myself and Dr. Lyter, yes. |
| 11:52 | 12 | Q.   Assuming Dr. Lyter knew to look for an extra set of |
| 11:52 | 13 | plugs? |
| 11:52 | 14 | A.   What I'm saying, that we are doing this work routinely, |
| 11:52 | 15 | and he knows how to count the microdisks on the copy of a |
| 11:52 | 16 | document from which the microplugs had been taken. |
| 11:52 | 17 | Q.   You think that an 8-and-a-half-by-11-sized printout of |
| 11:52 | 18 | a digital photograph would be sufficient for anyone to |
| 11:52 | 19 | observe with the naked eye, if they didn't know to look for |
| 11:52 | 20 | the set of plugs, the additional set of plugs that you took? |
| 11:52 | 21 | A.   I'm not saying for anyone.  But it was easy to do for |
| 11:52 | 22 | me. |
| 11:52 | 23 | Q.   You knew about it? |
| 11:52 | 24 | THE COURT:  Is that a question? |
| 11:52 | 25 | Counsel, your question. |

| | | |
|---|---|---|
| 11:52 | 1 | BY MS. HURST: |
| 11:52 | 2 | Q.   You knew about it, right?  You knew.  You were the only |
| 11:53 | 3 | one who knew at that time about the third set of microplugs; |
| 11:53 | 4 | isn't that right? |
| 11:53 | 5 | A.   At the time when I prepared an attachment, yes. |
| 11:53 | 6 | Q.   Now, you referred to your notes yesterday during your |
| 11:53 | 7 | testimony; isn't that right? |
| 11:53 | 8 | A.   What notes? |
| 11:53 | 9 | Q.   The notes of your, uh, testing that you looked at a |
| 11:53 | 10 | copy of in Exhibit 4600. |
| 11:53 | 11 | A.   Dash 1.  4600-1. |
| 11:53 | 12 | Q.   Dash 1, yes.  You looked at those notes, right? |
| 11:53 | 13 | A.   Yes. |
| 11:53 | 14 | Q.   Mr. Quinn read them into the record with you yesterday, |
| 11:53 | 15 | correct? |
| 11:53 | 16 | A.   Yes. |
| 11:53 | 17 | Q.   Those notes reflect only one date on which you took |
| 11:54 | 18 | samples; isn't that right? |
| 11:54 | 19 | A.   No.  Well, I should -- shouldn't say no, because the |
| 11:54 | 20 | date when I took samples, it was 4th of January.  Yes, it |
| 11:54 | 21 | was -- that date was there.  But then the other dates relate |
| 11:54 | 22 | to the -- to my analysis, not to when I took samples. |
| 11:54 | 23 | Q.   So your answer now is "yes"; am I correct? |
| 11:54 | 24 | A.   You're correct, yes. |
| 11:54 | 25 | Q.   The notes only reflect one date of sampling; isn't that |

| | | |
|---|---|---|
| 11:54 | 1 | true? |
| 11:54 | 2 | A.    That's true. |
| 11:54 | 3 | Q.    But you want us to accept these notes as a good match |
| 11:54 | 4 | for the order in which you performed your procedures, even |
| 11:54 | 5 | though we know they're inaccurate in at least one way; isn't |
| 11:54 | 6 | that right? |
| 11:54 | 7 |         MR. QUINN:  Argumentative.  Assumes facts. |
| 11:54 | 8 |         THE COURT:  Overruled. |
| 11:54 | 9 |         You can answer the question. |
| 11:54 | 10 |         THE WITNESS:  Um, I think that that exhibit |
| 11:55 | 11 | correctly reflects the analysis that I did, and it shows the |
| 11:55 | 12 | chronological order in which I examined each -- each areas |
| 11:55 | 13 | from which I took samples on pages 11 and 12. |
| 11:55 | 14 | BY MS. HURST: |
| 11:55 | 15 | Q.    It doesn't show all the dates on which you performed |
| 11:55 | 16 | your test, does it? |
| 11:55 | 17 | A.    It shows the first date when started the -- first, I |
| 11:55 | 18 | did TLC examination on the 12th of January.  And then I |
| 11:55 | 19 | proceeded on the same date, started -- did GC-MS |
| 11:55 | 20 | examination.  And they took -- |
| 11:55 | 21 | Q.    All right.  Dr. Aginsky -- |
| 11:55 | 22 | A.    I completed it on the 15th. |
| 11:55 | 23 | Q.    Dr. Aginsky, can you answer my question yes or no? |
| 11:55 | 24 |       The notes do not reflect all of the dates on which you |
| 11:55 | 25 | claim to have performed tests; isn't that true? |

| | | |
|---|---|---|
| 11:55 | 1 | A.   No, it's not. |
| 11:55 | 2 | Q.   Can you answer that question yes or no? |
| 11:55 | 3 | A.   No, it's not true. |
| 11:55 | 4 | Q.   All right.  So let's look at the notes. |
| 11:42 | 5 | *(Document displayed.)* |
| | 6 | BY MS. HURST: |
| 11:56 | 7 | Q.   Up here it says 1/12/08, your TLC test, right? |
| 11:56 | 8 | A.   That's correct. |
| 11:56 | 9 | Q.   Then over here on the left, it says 1/15/08? |
| 11:56 | 10 | A.   Yes. |
| 11:56 | 11 | Q.   There's no date there in between, right? |
| 11:56 | 12 | A.   That's what I -- I did from 1/12 to 1/15. |
| 11:56 | 13 | Q.   You claim to have performed tests on January 13th, |
| 11:56 | 14 | right? |
| 11:56 | 15 | A.   I'm not claiming it.  It's on each printout of GC-MS |
| 11:56 | 16 | chromatogram. |
| 11:56 | 17 | Q.   But January 13th is not on these notes, is it? |
| 11:56 | 18 | A.   It's -- it's between two dates, meaning that it is |
| 11:56 | 19 | exclusive. |
| 11:56 | 20 | Q.   Is "January 13, 2008" written down on these notes |
| 11:56 | 21 | anywhere? |
| 11:56 | 22 | A.   It not written there. |
| 11:56 | 23 | Q.   Okay.  And you claim that you did chromatograms on |
| 11:56 | 24 | January 14, 2008, too, don't you? |
| 11:56 | 25 | A.   I'm not claiming.  I did it. |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

144

| 11:56 | 1 | Q. Okay. But that date's not written down on your notes |
| 11:56 | 2 | either, is it? |
| 11:56 | 3 | A. That's correct. |
| 11:57 | 4 | Q. Let me ask you, you've said you've prepared hundreds of |
| 11:57 | 5 | reports as an expert, correct? |
| 11:57 | 6 | A. Yes. |
| 11:57 | 7 | Q. And you've testified at least 40 times here in the |
| 11:57 | 8 | United States? |
| 11:57 | 9 | A. No. In the United States -- it's overall 40 times. |
| 11:57 | 10 | Q. Okay. How many times have you testified here in the |
| 11:57 | 11 | United States at trial, in a courtroom in front of a jury |
| 11:57 | 12 | like this? |
| 11:57 | 13 | A. At trial, approximately 14 or 15 times. |
| 11:57 | 14 | Q. Okay. How about in the Soviet Union? How many times |
| 11:57 | 15 | did you testify there? |
| 11:57 | 16 | A. In Russia, after the collapse of the former Soviet |
| 11:57 | 17 | Union, approximately 20 times. |
| 11:58 | 18 | Q. And did they have juries there? |
| 11:58 | 19 | A. No. |
| 11:58 | 20 | Q. Would you agree with me that, for any expert witness |
| 11:58 | 21 | upon whom a jury should rely, that the education is |
| 11:58 | 22 | important? |
| 11:58 | 23 | A. I believe so. |
| 11:58 | 24 | Q. That their training is important? |
| 11:58 | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:58 | 1 | Q.    That following protocols and the rules is important? |
| 11:58 | 2 | A.    Yes. |
| 11:58 | 3 | Q.    That it's important to test -- do your tests carefully? |
| 11:58 | 4 | A.    Yes. |
| 11:58 | 5 | Q.    That it's important to make an accurate and complete |
| 11:58 | 6 | report? |
| 11:58 | 7 | A.    Yes. |
| 11:58 | 8 | Q.    And that it's important to prepare carefully for your |
| 11:58 | 9 | testimony so that you can testify as accurately as possible? |
| 11:58 | 10 | A.    Yes. |
| 11:58 | 11 | Q.    Now, you were educated at an institution dedicated to |
| 11:59 | 12 | chemical warfare; isn't that true? |
| 11:59 | 13 | MR. QUINN:  It's irrelevant, Your Honor. |
| 11:59 | 14 | THE COURT:  Sustained. |
| 11:59 | 15 | MS. HURST:  The witness just said education was |
| 11:59 | 16 | important. |
| 11:59 | 17 | THE COURT:  Well, that's true, but he gave a |
| 11:59 | 18 | duality.  His initial training was back in 1980, I believe. |
| 11:59 | 19 | And if I'm not mistaken, he said in 1982 he moved |
| 11:59 | 20 | off to the identification bureau and explosives, I thought, |
| 11:59 | 21 | but -- just a moment. |
| 11:59 | 22 | Ph.D. |
| 11:59 | 23 | 1980, obtained degree. |
| 11:59 | 24 | 1982, senior forensic science center, forensic |
| 11:59 | 25 | sciences, explosives and firearms. |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

146

| 11:59 | 1 | Sustained. |
| 11:59 | 2 | BY MS. HURST: |
| 11:59 | 3 | Q.   Your training in ink analysis you received at the |
| 11:59 | 4 | Ministry of Internal Affairs, correct? |
| 12:00 | 5 | A.   Yes. |
| 12:00 | 6 | Q.   Ministry of Internal Affairs, that's the correct |
| 12:00 | 7 | translation of where you worked, isn't it? |
| 12:00 | 8 | A.   If you're asking me about just ink analysis? |
| 12:00 | 9 | Q.   Yes. |
| 12:00 | 10 | A.   Specifically this particular type of material?  Then, |
| 12:00 | 11 | yes, the first time when I started analyzing inks was when I |
| 12:00 | 12 | joined the Ministry of the Interior Forensic Science Center. |
| 12:00 | 13 | Q.   Also known as the Ministry of Internal Affairs, |
| 12:00 | 14 | correct? |
| 12:00 | 15 | A.   Yes. |
| 12:00 | 16 | Q.   And the Soviet secret police were part of the Ministry |
| 12:00 | 17 | of Internal Affairs, while you were there doing ink |
| 12:00 | 18 | analysis, correct? |
| 12:00 | 19 | MR. QUINN:  Objection. |
| 12:00 | 20 | THE COURT:  Sustained. |
| 12:00 | 21 | Now, why don't we take a lunchtime break for just |
| 12:00 | 22 | a moment. |
| 12:00 | 23 | Okay.  You're admonished not to discuss this |
| 12:00 | 24 | matter amongst yourselves nor form or express any opinion. |
| 12:00 | 25 | Have a nice lunch, and we'll see you at 1:00 o'clock. |

| | | |
|---|---|---|
| 12:00 | 1 | Counsel, if you would remain for a moment. |
| 12:00 | 2 | *(Jury recesses for lunch at 12:00 p.m.)* |
| 12:01 | 3 | *(Outside the presence of the jury.)* |
| 12:01 | 4 | THE COURT:  Have a seat, Doctor. |
| 12:01 | 5 | THE WITNESS:  Thank you. |
| 12:01 | 6 | THE COURT:  Are we going into his workings in the |
| 12:01 | 7 | Soviet Union? |
| 12:01 | 8 | First of all, Doctor, by the way, you won't have a |
| 12:01 | 9 | chance to respond to this, but the Soviet Union, then, after |
| 12:01 | 10 | its collapse in 1992, Russia adopted jury trials in Moscow |
| 12:01 | 11 | for murders. |
| 12:01 | 12 | THE WITNESS:  Yes. |
| 12:01 | 13 | THE COURT:  You probably didn't know that. |
| 12:01 | 14 | Now, have a seat. |
| 12:01 | 15 | Where are we going with this?  Is the prejudicial |
| 12:01 | 16 | effect gonna outweigh the probative value?  Are we getting |
| 12:01 | 17 | into chemical warfare here? |
| 12:01 | 18 | Here are my notes: |
| 12:01 | 19 | 1980, obtained his degree from Moscow -- in |
| 12:01 | 20 | Moscow. |
| 12:01 | 21 | 1982, there was nothing about chemicals.  It was |
| 12:01 | 22 | forensic and fire- -- or explosives and firearms in the |
| 12:01 | 23 | forensic sciences. |
| 12:01 | 24 | 1983, forensic document ink examination.  And then |
| 12:02 | 25 | he said -- you're absolutely right, Counsel -- in 1983, |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 148 of 168   Page ID #:305445
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

148

| | | |
|---|---|---|
| 12:02 | 1 | "Head of chemical group." |
| 12:02 | 2 | My apologies.  Got it right in my notes, and I didn't |
| 12:02 | 3 | have time to refer back to it. |
| 12:02 | 4 | MR. QUINN:  But that's at the Ministry of |
| 12:02 | 5 | Interior. |
| 12:02 | 6 | THE COURT:  Thank you very much.  Did you notice I |
| 12:02 | 7 | was speaking to Ms. Hurst? |
| 12:02 | 8 | Mr. Quinn probably didn't notice that. |
| 12:02 | 9 | MS. HURST:  Your Honor -- |
| 12:02 | 10 | THE COURT:  Now, where are we going? |
| 12:02 | 11 | MS. HURST:  Your Honor, the witness is a Ph.D in |
| 12:02 | 12 | chemistry. |
| 12:02 | 13 | THE COURT:  Right. |
| 12:02 | 14 | MS. HURST:  Ph.D in chemistry -- the foundation |
| 12:02 | 15 | for everything he's done since.  That's -- his education was |
| 12:02 | 16 | at the Military Academy of Chemical Defense. |
| 12:02 | 17 | THE COURT:  Now you can inquire, counsel.  I |
| 12:02 | 18 | didn't have time to go back through my notes.  I didn't |
| 12:02 | 19 | remember "chemical," quite frankly. |
| 12:02 | 20 | But it sounds insidious. |
| 12:02 | 21 | MR. QUINN:  But, Your Honor -- |
| 12:02 | 22 | THE COURT:  Just a minute, Mr. Quinn.  Hold on. |
| 12:02 | 23 | I'll be with you in just a moment. |
| 12:02 | 24 | MR. QUINN:  All right. |
| 12:02 | 25 | THE COURT:  Maybe that was too quick a |

| | | |
|---|---|---|
| 12:02 | 1 | determination. |
| 12:02 | 2 | I'd love to ask the doctor a few questions, but |
| 12:02 | 3 | I'd have you two shuddering -- like if he knows our friends |
| 12:02 | 4 | north of Potomac.  That's north of the Potomac. |
| 12:03 | 5 | MS. HURST:  I thought that was south of the |
| 12:03 | 6 | Potomac. |
| 12:03 | 7 | THE COURT:  No, it's north of the Potomac. |
| 12:03 | 8 | MS. HURST:  Virginia, didn't you mean? |
| 12:03 | 9 | THE COURT:  No.  That's north. |
| 12:03 | 10 | MS. KELLER:  Your Honor, could the witness be |
| 12:03 | 11 | excused? |
| 12:03 | 12 | THE COURT:  Can't find the freeway. |
| 12:03 | 13 | MR. QUINN:  I know the answer to that question, |
| 12:03 | 14 | Your Honor. |
| 12:03 | 15 | THE COURT:  Yeah.  And -- |
| 12:03 | 16 | (To the witness:) But you don't recognize a person |
| 12:03 | 17 | by the name of M-A-R-T-Y-N-O-V, do you?  M-A-R-T-Y-N-O-V? |
| 12:03 | 18 | Just curious. |
| 12:03 | 19 | THE WITNESS:  (No response.) |
| 12:03 | 20 | THE COURT:  Okay.  Thank you. |
| 12:03 | 21 | Well, I might want him for a few more questions, |
| 12:03 | 22 | and you might also.  I just want to know where we're going |
| 12:03 | 23 | with this. |
| 12:03 | 24 | MS. HURST:  Your Honor -- |
| 12:03 | 25 | THE COURT:  Because the prejudicial effect could |

| 12:03 | 1 | outweigh the probative value.  But you can inquire into his |
| 12:03 | 2 | educational background, but it's not going to be insidious |
| 12:03 | 3 | like he's a nuclear explosives expert, okay? -- or a |
| 12:03 | 4 | chemical -- |
| 12:03 | 5 | MS. HURST:  Your Honor -- |
| 12:03 | 6 | THE COURT:  -- or he's going to bomb the United |
| 12:03 | 7 | States back in 1992. |
| 12:03 | 8 | We're not going there. |
| 12:03 | 9 | MS. HURST:  Your Honor, I have a good faith basis |
| 12:03 | 10 | to believe that at the Soviet Ministry of Internal Affairs |
| 12:03 | 11 | in the 1980's, while he was there and head of one of the |
| 12:04 | 12 | units, the entire organization -- |
| 12:04 | 13 | THE COURT:  Sir, just a moment. |
| 12:04 | 14 | Sir, would you be kind enough to step down. |
| 12:04 | 15 | I probably should talk to counsel privately, as |
| 12:04 | 16 | she suggested. |
| 12:04 | 17 | This is gonna be interesting. |
| 12:04 | 18 | *(Witness steps down.)* |
| 12:04 | 19 | THE COURT:  And then, Mr. Quinn, we'll be right |
| 12:04 | 20 | with you.  I know that you and Mr. Gordon are anxious to |
| 12:04 | 21 | speak.  But I want to hear exactly now, with the doctor out |
| 12:04 | 22 | of the room, where we're going. |
| 12:04 | 23 | *(Witness leaves the courtroom.)* |
| 12:04 | 24 | THE COURT:  Because what I don't want is the link |
| 12:04 | 25 | through torture, et cetera, linking it to the Soviet police. |

| | | |
|---|---|---|
| 12:04 | 1 | By the way, do you have time for a story? |
| 12:04 | 2 | MS. HURST:  Always. |
| 12:04 | 3 | MR. ZELLER:  Always. |
| 12:04 | 4 | THE COURT:  In 1999, I was in Russia.  They sent |
| 12:04 | 5 | me to Arkhangelsk, because they'll never send me to Moscow |
| 12:04 | 6 | and a nice place.  And up there, in the freezing cold, where |
| 12:04 | 7 | the river freezes 16 to 19 feet with ice, they hadn't turned |
| 12:04 | 8 | on the "ice" in Arkhangelsk for my 200 Russian judges, from |
| 12:04 | 9 | east of the Yuros, who had driven 38 to 48 hours by car. |
| 12:05 | 10 | Now, the people over in Murmansk had had their |
| 12:05 | 11 | heat turned on -- because, you see, in Russia, they have a |
| 12:05 | 12 | centralized heating system.  Can you imagine how the people |
| 12:05 | 13 | of Arkhangelsk felt about the people of Murmansk who'd had |
| 12:05 | 14 | their heat turned on?  And they hadn't -- they were just |
| 12:05 | 15 | furious. |
| 12:05 | 16 | Isn't that a wonderful story? |
| 12:05 | 17 | Now, where are we going with this? |
| 12:05 | 18 | MS. HURST:  While he was there, the organization |
| 12:05 | 19 | had its worst bribery and corruption scandal in its history, |
| 12:05 | 20 | from top to bottom, which included murdering an agent of the |
| 12:05 | 21 | KGB to cover it up and prevent the discovery of this bribery |
| 12:05 | 22 | and corruption. |
| 12:05 | 23 | THE COURT:  That's where I thought we were going. |
| 12:05 | 24 | Now, I'm not an expert on Russia, but I've been |
| 12:05 | 25 | there enough to understand where I thought you were going. |

| | | |
|---|---|---|
| 12:05 | 1 | The prejudicial effect would seemingly outweigh |
| 12:05 | 2 | the probative value of that. |
| 12:05 | 3 | MS. HURST:  If he was involved in it, I don't |
| 12:05 | 4 | think so. |
| 12:05 | 5 | THE COURT:  Well, do you want to call him back in |
| 12:06 | 6 | and ask him?  I'm curious now.  I doubt if it's coming in, |
| 12:06 | 7 | but it's a great topic.  It will give you a great record. |
| 12:06 | 8 | Let's ask him. |
| 12:06 | 9 | MS. HURST:  Fine with me. |
| 12:06 | 10 | THE COURT:  I don't care.  I doubt if it's coming |
| 12:06 | 11 | in. |
| 12:06 | 12 | MS. HURST:  Look, if it's true that this witness |
| 12:06 | 13 | was suspected of bribery and corruption while a chemical |
| 12:06 | 14 | forensic scientist working in law enforcement, it's hard to |
| 12:06 | 15 | imagine that that probative value wouldn't outweigh the |
| 12:06 | 16 | prejudice on that. |
| 12:06 | 17 | THE COURT:  I wish I had a videotape of all the |
| 12:06 | 18 | gestures you just made. |
| 12:06 | 19 | I was just joking, Counsel. |
| 12:06 | 20 | *(Witness re-enters the courtroom.)* |
| 12:06 | 21 | THE COURT:  Doctor -- first of all, how can his |
| 12:06 | 22 | allegedly being a suspect have any bearing on this case? |
| 12:06 | 23 | Was he indicted?  Prosecuted?  Convicted? |
| 12:06 | 24 | MS. HURST:  I don't think they do that there. |
| 12:06 | 25 | THE COURT:  Oh, yeah, they do. |

| | | |
|---|---|---|
| 12:06 | 1 | MS. HURST:  Not then. |
| 12:06 | 2 | THE COURT:  Yes, they do. |
| 12:06 | 3 | Now, there was some criticism it was telephone |
| 12:06 | 4 | justice, that people phoned in the verdicts. |
| 12:06 | 5 | So, Doctor, this isn't meant to embarrass you. |
| 12:06 | 6 | Have a seat for just a moment. |
| 12:07 | 7 | *(Witness resumes the stand.)* |
| 12:07 | 8 | THE COURT:  Were you ever convicted of any crime |
| 12:07 | 9 | involving bribery or murder? |
| 12:07 | 10 | THE WITNESS:  No. |
| 12:07 | 11 | THE COURT:  Thank you very much, Doctor.  You may |
| 12:07 | 12 | leave the room.  Thank you, sir. |
| 12:07 | 13 | *(Witness steps down.)* |
| 12:07 | 14 | MS. HURST:  Thank you. |
| 12:07 | 15 | THE COURT:  Counsel, have a nice lunch.  Don't go |
| 12:07 | 16 | there. |
| 12:07 | 17 | MR. QUINN:  Your Honor, you said I'd get a chance |
| 12:07 | 18 | to speak. |
| 12:07 | 19 | THE COURT:  Well, Mr. Quinn. |
| 12:07 | 20 | MR. QUINN:  He was head of the -- |
| 12:07 | 21 | THE COURT:  Just a moment. |
| 12:07 | 22 | Doctor, if you would be so kind -- I'm sorry.  You |
| 12:07 | 23 | may be getting your exercise today, sir, so -- in and out. |
| 12:07 | 24 | MR. QUINN:  It wasn't until he went to the -- |
| 12:07 | 25 | THE COURT:  Just a moment.  Let the doctor leave |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 154 of 168   Page ID #:305451
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

154

| | | |
|---|---|---|
| 12:07 | 1 | the room. |
| 12:07 | 2 | (Witness exits the courtroom.) |
| 12:07 | 3 | THE COURT:  By the way, I'd love to have a |
| 12:07 | 4 | conversation with the doctor, but I won't.  It would be |
| 12:07 | 5 | fascinating. |
| 12:07 | 6 | MR. QUINN:  He is. |
| 12:07 | 7 | THE COURT:  Also, when I'm usually in Moscow, I |
| 12:07 | 8 | have all sorts of the former KGB guarding me, which is very |
| 12:07 | 9 | interesting, 'cause you get right through the airport |
| 12:07 | 10 | monitors quickly. |
| 12:07 | 11 | MR. QUINN:  It's still there.  It's just got |
| 12:07 | 12 | different initials. |
| 12:07 | 13 | THE COURT:  Oh, I know.  I've actually got a badge |
| 12:07 | 14 | that they gave me.  And if I keep it under my coat collar |
| 12:07 | 15 | and raise it -- God, can you imagine this record? -- and you |
| 12:08 | 16 | raise it like that, you can get into anyplace you want. |
| 12:08 | 17 | Amazing.  But I don't use it, because I'm a judge of the |
| 12:08 | 18 | United States.  I just keep it in a drawer. |
| 12:08 | 19 | Now, Mr. Quinn, since we've established he is not |
| 12:08 | 20 | a murderer nor was he convicted of fraud; and the import, |
| 12:08 | 21 | seemingly, is that this would like to be tied to the old |
| 12:08 | 22 | KGB, maybe even the Walker case and the 11 operatives that |
| 12:08 | 23 | we had killed because Mr. Walker was a traitor. |
| 12:08 | 24 | MS. HURST:  Not the KGB.  The secret police.  They |
| 12:08 | 25 | killed the KGB. |

CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

155

12:08   1           THE COURT:  Really?  There's some debate about

12:08   2   that.

12:08   3           All right.  Counsel.

12:08   4           MR. QUINN:  Ms. Hurst is conflating two things.

12:08   5           He went -- his education was at this military

12:08   6   academy, which does have chemical something in its name, and

12:08   7   she wants to suggest, and has suggested before the jury,

12:08   8   that somehow he's involved in chemical warfare.  I think

12:09   9   that's inappropriate.

12:09   10          THE COURT:  I do, too.  We're going to strike the

12:09   11  comment.

12:09   12          MR. QUINN:  I would appreciate that.

12:09   13          Then, he leaves that organization.  After he

12:09   14  graduates, he joins the forensic science center at the

12:09   15  Ministry of the Interior.  This is his testimony:  He first

12:09   16  works in explosives, and then he's recruited to go into the

12:09   17  chemistry department, but that's in the Ministry of the

12:09   18  Interior.  It has nothing to do with the academic military

12:09   19  institute where he got his training.

12:09   20          So Ms. Hurst wants to conflate those two and

12:09   21  suggest that somehow his involvement in the chemical

12:09   22  forensic section of the forensic science center of the

12:09   23  Ministry of the Interior had something to do with chemical

12:09   24  warfare.  And it doesn't.

12:09   25          And I heard -- the Court said something like she

| | | |
|---|---|---|
| 12:09 | 1 | can go into that.  I just think that's completely |
| 12:09 | 2 | inappropriate.  It's irrelevant, terribly prejudicial. |
| 12:09 | 3 | THE COURT:  What he testified to is, in 1982, he |
| 12:09 | 4 | became a senior forensic scientist in the forensic section |
| 12:10 | 5 | of explosives and firearms.  In 1983, he became a forensic |
| 12:10 | 6 | document ink document examiner; that he was head of the |
| 12:10 | 7 | chemical group, which, apparently, must -- |
| 12:10 | 8 | MR. QUINN:  That's within the forensic document |
| 12:10 | 9 | examination unit. |
| 12:10 | 10 | THE COURT:  And in 1993, he received an award for |
| 12:10 | 11 | new techniques in dating documents and DNA. |
| 12:10 | 12 | So, you're right, the import of this is he's in |
| 12:10 | 13 | charge of chemical warfare.  And it's inappropriate. |
| 12:10 | 14 | MR. QUINN:  And I would appreciate it if the jury |
| 12:10 | 15 | be instructed to disregard. |
| 12:10 | 16 | THE COURT:  Instructed to disregard. |
| 12:10 | 17 | MS. HURST:  Your Honor -- |
| 12:10 | 18 | THE COURT:  But as far as the background, you can |
| 12:10 | 19 | go into his background. |
| 12:10 | 20 | MS. HURST:  His education and training are not |
| 12:10 | 21 | irrelevant to his service as an expert witness.  He just |
| 12:10 | 22 | said on the stand that they are relevant. |
| 12:10 | 23 | THE COURT:  You can go into his educational |
| 12:10 | 24 | background. |
| 12:10 | 25 | MR. QUINN:  But should she be talking about |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 157 of 168   Page ID #:305454
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

157

| | | |
|---|---|---|
| 12:10 | 1 | chemical warfare?  Your Honor -- |
| 12:10 | 2 | MS. HURST:  It was the Academy of Chemical |
| 12:10 | 3 | Defense. |
| 12:10 | 4 | THE COURT:  That wasn't your question. |
| 12:11 | 5 | MS. HURST:  I asked, "That was devoted to chemical |
| 12:11 | 6 | warfare, right?"  And he said, "Yes." |
| 12:11 | 7 | He was an arm of the prosecution of the Soviet |
| 12:11 | 8 | State during a period of time when the rule of law did not |
| 12:11 | 9 | apply, and he's a witness who deliberately violated a Court |
| 12:11 | 10 | order in this country.  That is relevant to examining his |
| 12:11 | 11 | credibility and his -- he's riddled with errors.  He's |
| 12:11 | 12 | mislabeled things.  His notes don't match.  This thing is a |
| 12:11 | 13 | farce. |
| 12:11 | 14 | MR. QUINN:  She's got all that, Your Honor, if she |
| 12:11 | 15 | wanted to make that argument.  But she shouldn't be getting |
| 12:11 | 16 | into chemical warfare. |
| 12:11 | 17 | THE COURT:  You can go into his background.  I'll |
| 12:11 | 18 | repeat that to you.  You cannot leave the import that he is |
| 12:11 | 19 | solely involved in chemical warfare. |
| 12:11 | 20 | And that was your question.  That's where you left |
| 12:11 | 21 | it, Ms. Hurst, frankly. |
| 12:12 | 22 | MS. HURST:  I wasn't finished. |
| 12:12 | 23 | THE COURT:  Well, I have no guarantee of that |
| 12:12 | 24 | 'cause you could have sat down at that moment.  And the |
| 12:12 | 25 | objection was proper, and it was sustained. |

| | | |
|---|---|---|
| 12:12 | 1 | Now, you're not being foreclosed about his |
| 12:12 | 2 | background.  But if you go into the sinister relationship |
| 12:12 | 3 | and these unfounded accusations, the prejudicial effect |
| 12:12 | 4 | outweighs probative value.  You can go into his background. |
| 12:12 | 5 | What did I just say, Ms. Hurst? |
| 12:12 | 6 | MS. HURST:  I can go into his background. |
| 12:12 | 7 | Don't go into the other stuff.  I got it. |
| 12:12 | 8 | THE COURT:  Write that million-dollar check out on |
| 12:12 | 9 | the table, if you do. |
| 12:12 | 10 | MS. HURST:  I understand.  But the testimony -- |
| 12:12 | 11 | THE COURT:  Make it from your law firm. |
| 12:12 | 12 | MS. HURST:  I understand.  But the testimony so |
| 12:12 | 13 | far should not be stricken. |
| 12:12 | 14 | The testimony so far should not be stricken. |
| 12:12 | 15 | THE COURT:  Testimony so far will be stricken. |
| 12:12 | 16 | You gave a false impression, as far as the Court's |
| 12:12 | 17 | concerned. |
| 12:12 | 18 | You can reask it in the same area. |
| 12:12 | 19 | Now, Mr. Quinn. |
| 12:12 | 20 | MR. QUINN:  I just have two questions, |
| 12:12 | 21 | Your Honor -- one question and one item of information. |
| 12:12 | 22 | The question is:  Is she gonna be permitted to go |
| 12:13 | 23 | into chemical warfare at this military academy? |
| 12:13 | 24 | THE COURT:  No.  She can go back into what's |
| 12:13 | 25 | appropriate:  His training. |

| 12:13 | 1 | MR. QUINN:  All right. |
| 12:13 | 2 | THE COURT:  You can emphasize the fact that he was |
| 12:13 | 3 | trained at an institute that involved chemicals.  What you |
| 12:13 | 4 | cannot do is apparently what you intended to do; and that |
| 12:13 | 5 | is, to get back into some accusation in the 1980's involving |
| 12:13 | 6 | murder -- |
| 12:13 | 7 | MS. HURST:  I'm just -- |
| 12:13 | 8 | THE COURT:  -- or some unfounded accusation. |
| 12:13 | 9 | MS. HURST:  Just on his education, am I permitted |
| 12:13 | 10 | to inquire -- |
| 12:13 | 11 | THE COURT:  Now it's on his education? |
| 12:13 | 12 | MS. HURST:  Right.  No.  That's what I asked about |
| 12:13 | 13 | first.  That's what I'm saying should not being stricken. |
| 12:13 | 14 | THE COURT:  No.  I'm gonna strike it.  I think |
| 12:13 | 15 | it's a misimpression, and you can reask in that area. |
| 12:13 | 16 | MS. HURST:  All right. |
| 12:13 | 17 | THE COURT:  All right.  Thank you. |
| 12:13 | 18 | Have a nice -- |
| 12:13 | 19 | MR. QUINN:  Your Honor, the point of the |
| 12:13 | 20 | information:  The next witness, expert witness, Jeff |
| 12:13 | 21 | Kinrich. |
| 12:13 | 22 | In light of Court's ruling regarding FRCP |
| 12:13 | 23 | Rule 32(a)(3) and use of depositions for all purposes, we |
| 12:14 | 24 | intend to use, with that witness, testimony of the President |
| 12:14 | 25 | of MGA Canada, who was also their 30(b)(6) designee, with |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 160 of 168   Page ID #:305457
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

160

| | | |
|---|---|---|
| 12:14 | 1 | respect to thefts by Janine Brisbois. |
| 12:14 | 2 | We have identified to them the passages, and we |
| 12:14 | 3 | intend to read that into the record for truth and -- |
| 12:14 | 4 | THE COURT:  Counsel, sit -- |
| 12:14 | 5 | MR. QUINN:  -- in connection with this expert. |
| 12:14 | 6 | THE COURT:  -- down.  We're going to be here |
| 12:14 | 7 | awhile. |
| 12:14 | 8 | MR. QUINN:  In other words, Your Honor, we have |
| 12:14 | 9 | seen the wisdom of this Court's approach to Rule 32.  We are |
| 12:14 | 10 | embracing it.  And starting this afternoon, we are gonna |
| 12:14 | 11 | offer such testimony. |
| 12:14 | 12 | THE COURT:  Okay. |
| 12:14 | 13 | Counsel. |
| 12:14 | 14 | MS. HURST:  Our understanding was that the ruling |
| 12:14 | 15 | was all experts could be crossed with such testimony from |
| 12:14 | 16 | the adverse side. |
| 12:14 | 17 | THE COURT:  Yeah.  The ruling is recorded -- |
| 12:14 | 18 | strike that -- 32 -- let's spend some time, and let me find |
| 12:15 | 19 | my notes.  I believe you're correct, Counsel.  It comes from |
| 12:15 | 20 | the adverse party, but let's take sometime with that. |
| 12:15 | 21 | I don't have it memorized, but I had it on my desk |
| 12:15 | 22 | yesterday, Counsel.  And so if you'll bear with me while I |
| 12:15 | 23 | go through these mounds of paperwork, I'll probably find it, |
| 12:15 | 24 | and we'll read it right into the record again. |
| 12:16 | 25 | All right.  Rule 32(a)(3), can you read that along |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

161

| | | |
|---|---|---|
| 12:16 | 1 | with me, Mr. Quinn.  I think it says, "an adverse party," |
| 12:16 | 2 | doesn't it? |
| 12:16 | 3 | MR. QUINN:  And this is an adverse party.  It's |
| 12:16 | 4 | the president of MGA Canada, and also a 30(b)(6) witness. |
| 12:16 | 5 | So I got both of 'em. |
| 12:16 | 6 | THE COURT:  Appears you do. |
| 12:16 | 7 | MR. QUINN:  And I've provided them with the cites. |
| 12:16 | 8 | I just wanted to give everybody a heads-up that, with Expert |
| 12:16 | 9 | Kinrich, we're going into that. |
| 12:16 | 10 | MS. HURST:  Your Honor, Expert Kinrich's report |
| 12:16 | 11 | and testimony does not disclose any reliance on this at all. |
| 12:16 | 12 | He was a summary -- he was allowed only as a |
| 12:16 | 13 | summary witness who was gonna come and calculate a bunch of |
| 12:16 | 14 | percentages of salaries. |
| 12:16 | 15 | MR. QUINN:  But they want, with Wagner, to read to |
| 12:16 | 16 | him testimony he did not rely on. |
| 12:17 | 17 | This is a goose-and-gander situation, Your Honor. |
| 12:17 | 18 | MS. HURST:  Well, no, that's a completely |
| 12:17 | 19 | different issue.  If it's not part of the foundation for his |
| 12:17 | 20 | work at all, then it doesn't come in for numerous other |
| 12:17 | 21 | reasons, including that it wasn't disclosed, including that |
| 12:17 | 22 | it has nothing to do with his actual work. |
| 12:17 | 23 | MR. QUINN:  Then, we'll just read it, Your Honor. |
| 12:17 | 24 | Before he takes the stand, we'd like to read it into the |
| 12:17 | 25 | record. |

| | | |
|---|---|---|
| 12:17 | 1 | MS. HURST:  Well, that was not our understanding |
| 12:17 | 2 | of the Court's ruling but... |
| 12:17 | 3 | THE COURT:  32(a)(3) seems to apply co-equally, |
| 12:17 | 4 | and it says, "adverse party." |
| 12:17 | 5 | Isn't the gentleman an adverse party? |
| 12:17 | 6 | MS. HURST:  Kinrich is adverse to us.  He's not |
| 12:17 | 7 | adverse to them. |
| 12:17 | 8 | MR. QUINN:  Talking about the witness -- we want |
| 12:17 | 9 | to read her testimony.  She's the president of MGA Canada |
| 12:17 | 10 | and a 30(b)(6) witness. |
| 12:17 | 11 | MS. HURST:  Right.  But now they're trying to |
| 12:17 | 12 | substitute for calling the witness.  They're -- now, he's |
| 12:17 | 13 | saying it's not part of the foundation of the expert |
| 12:18 | 14 | opinion. |
| 12:18 | 15 | The Court has always said if the witnesses are |
| 12:18 | 16 | gonna testify, have to come and testify in person.  And we |
| 12:18 | 17 | have delivered those witnesses.  Now, this is -- he's not |
| 12:18 | 18 | being offered as foundation for any expert opinion.  They're |
| 12:18 | 19 | just trying to do it as a substitute for calling the |
| 12:18 | 20 | witness.  That was not what the Court had ruled would be |
| 12:18 | 21 | acceptable.  The Court has never allowed that. |
| 12:18 | 22 | The Court had said we could cross-examine an |
| 12:18 | 23 | expert with it. |
| 12:18 | 24 | MR. QUINN:  32(a)(3) doesn't limit the use of |
| 12:18 | 25 | transcripts to available -- in this circumstance, the |

| | | |
|---|---|---|
| 12:18 | 1 | availability of the witness or to experts.  It says it's |
| 12:18 | 2 | admissible for all purposes. |
| 12:18 | 3 | THE COURT:  I want to look at 30(b)(6) and |
| 12:18 | 4 | 31(a)(4) before I make that ruling.  In other words, I have |
| 12:18 | 5 | 32 with me at the present time. |
| 12:18 | 6 | MS. HURST:  Right.  Well -- |
| 12:18 | 7 | THE COURT:  And I'm not gonna do that on the fly |
| 12:18 | 8 | with a wing and a prayer, Counsel. |
| 12:18 | 9 | MR. QUINN:  Your Honor, we're gonna -- |
| 12:18 | 10 | THE COURT:  So if you'll remain -- thank you very |
| 12:19 | 11 | much, Counsel.  You're ordered to remain:  All of you. |
| 12:19 | 12 | Have a seat. |
| 12:19 | 13 | Now, let me hear once again:  Kinrich is going to |
| 12:19 | 14 | testify as to what? |
| 12:19 | 15 | MR. QUINN:  He's testifying that, um, certain |
| 12:20 | 16 | people received, um, much more of a pay increase when they |
| 12:20 | 17 | went to MGA than other Mattel people.  And he does some |
| 12:20 | 18 | summaries of that delta. |
| 12:20 | 19 | THE COURT:  Now, after I'd allowed that, I haven't |
| 12:20 | 20 | received those passages that you're relying upon.  In other |
| 12:20 | 21 | words, I don't know, with specifics, what you're trying to |
| 12:20 | 22 | read in and how it's related to this witness. |
| 12:20 | 23 | MR. QUINN:  Well, this witness identifies five |
| 12:20 | 24 | people -- |
| 12:20 | 25 | THE COURT:  All right. |

CV 04-9049 DOC – 2/25/2011 – Day 24, Volume 1 of 2

164

| | | |
|---|---|---|
| 12:20 | 1 | MR. QUINN:  -- I believe is the number. |
| 12:20 | 2 | THE COURT:  Name them. |
| 12:20 | 3 | I think it's Brawer, isn't it?  Cooney? |
| 12:20 | 4 | MR. QUINN:  Brisbois, Castilla -- |
| 12:20 | 5 | THE COURT:  Just a minute. |
| 12:20 | 6 | Counsel.  Nice and slow now.  We have plenty of |
| 12:20 | 7 | time. |
| 12:20 | 8 | Castilla. |
| 12:20 | 9 | Brisbois. |
| 12:20 | 10 | MR. QUINN:  Cooney. |
| 12:20 | 11 | THE COURT:  Cooney. |
| 12:20 | 12 | MR. QUINN:  Machado. |
| 12:20 | 13 | THE COURT:  Machado. |
| 12:20 | 14 | MR. QUINN:  Trueba. |
| 12:20 | 15 | THE COURT:  Trueba. |
| 12:20 | 16 | There should be seven, Counsel? |
| 12:21 | 17 | MR. QUINN:  And Vargas. |
| 12:21 | 18 | THE COURT:  Vargas. |
| 12:21 | 19 | I think we're missing one, aren't we?  There's a |
| 12:21 | 20 | seventh. |
| 12:21 | 21 | MR. QUINN:  Well, what I'm looking at says six. |
| 12:21 | 22 | THE COURT:  Okay. |
| 12:21 | 23 | Now, what's he going to say concerning Brisbois? |
| 12:21 | 24 | MR. QUINN:  He's going to say that she received a |
| 12:21 | 25 | 45 percent raise when she joined MGA. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:21 | 1 | THE COURT:  And what do you want to read in under |
| 12:21 | 2 | 32? |
| 12:21 | 3 | MR. QUINN:  The jury has yet to hear anything |
| 12:21 | 4 | about Brisbois.  The jury has heard these other -- |
| 12:21 | 5 | THE COURT:  I'm sorry. |
| 12:21 | 6 | What do you want to read in? |
| 12:21 | 7 | MR. QUINN:  Do you want the cites? |
| 12:21 | 8 | THE COURT:  No, no, no.  See all this comes to me |
| 12:21 | 9 | as a surprise.  We want to be co-equal, like you said. |
| 12:21 | 10 | MR. QUINN:  Right. |
| 12:21 | 11 | THE COURT:  But we don't want to be surprised, do |
| 12:21 | 12 | we? |
| 12:21 | 13 | MR. QUINN:  Of course, not. |
| 12:21 | 14 | THE COURT:  No.  We don't want to do that. |
| 12:21 | 15 | MR. QUINN:  Would you like me to summarize the |
| 12:21 | 16 | testimony? |
| 12:21 | 17 | THE COURT:  Yes. |
| 12:21 | 18 | MR. QUINN:  This person, the witness's name is |
| 12:21 | 19 | Diane Govia-Gordon, is the president of MGA Canada, and was |
| 12:21 | 20 | the 30(b)(6) designated witness relating to some downloading |
| 12:22 | 21 | activity. |
| 12:22 | 22 | THE COURT:  In Canada? |
| 12:22 | 23 | MR. QUINN:  In Canada by Janine Brisbois. |
| 12:22 | 24 | MS. HURST:  It's -- Your Honor, may I -- |
| 12:22 | 25 | THE COURT:  No, you may not. |

Case 2:04-cv-09049-DOC-RNB   Document 10104   Filed 03/01/11   Page 166 of 168   Page ID #:305463
CV 04-9049 DOC - 2/25/2011 - Day 24, Volume 1 of 2

166

| | |
|--|--|
|12:22|1|
|12:22|2|

    12:22   1         MR. QUINN:  And, in summary, this witness
    12:22   2   testifies what they -- what she learns from Ms. Brisbois
    12:22   3   about this downloading activity that had taken place, what
    12:22   4   Ms. Brisbois said to her.
    12:22   5         And our reason for wanting to read this now is
    12:22   6   that the jury has heard about these other people, who
    12:22   7   Mr. Kinrich is going to present these calculations for, but
    12:22   8   they haven't heard this name at all.
    12:22   9         THE COURT:  Now, just a moment.
    12:22  10         Why should I be in a position of not being able to
    12:22  11   thoughtfully consider this?  And this is not something I
    12:22  12   want to undertake in 35 minutes.
    12:23  13         MR. QUINN:  There has been -- I mean, the Court
    12:23  14   will recall, in the first week of this trial, we had a
    12:23  15   discussion about the application of Rule 32.  It says the
    12:23  16   deposition of adverse person can be used for any purpose.
    12:23  17   And at that time, the way the Court saw it, it -- the Court
    12:23  18   didn't think that we should be able to use that kind of
    12:23  19   testimony at that time.
    12:23  20         Just this week, a different view has --
    12:23  21         THE COURT:  No.  It's been a rather consistent
    12:23  22   view, and that is:  No depositions.
    12:23  23         The only exception to that appears -- that I've
    12:23  24   allowed, have been experts.  And it's been co-equal on both
    12:23  25   sides.  So my perception is that this is something that's

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:23 | 1 | coming to me as a first impression. I haven't had time to |
| 12:23 | 2 | look at it; and until I do -- |
| 12:23 | 3 | I think it's rather consistent. So what I'm not |
| 12:24 | 4 | going to do is let you set the record that suddenly the |
| 12:24 | 5 | rules have changed. That's not correct for my record at |
| 12:24 | 6 | all. |
| 12:24 | 7 | MR. QUINN: Okay, Your Honor. I understand. |
| 12:24 | 8 | *(Live reporter switch at 12:24 p.m.)* |
| 12:24 | 9 | *(Further proceedings reported by Maria* |
| 12:24 | 10 | *Dellaneve in Volume II.)* |
| 12:24 | 11 | -oOo- |
| 12:24 | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 12:24 | 1 | -oOo- |
| 12:24 | 2 | |
| 12:24 | 3 | CERTIFICATE |
| 12:24 | 4 | |
| 12:24 | 5 | I hereby certify that pursuant to Section 753, |
| 12:24 | 6 | Title 28, United States Code, the foregoing is a true and |
| 12:24 | 7 | correct transcript of the stenographically reported |
| 12:24 | 8 | proceedings held in the above-entitled matter and that the |
| 12:24 | 9 | transcript page format is in conformance with the |
| 12:24 | 10 | regulations of the Judicial Conference of the United States. |
| 12:24 | 11 | |
| 12:24 | 12 | Date:  February 26, 2011 |
| 12:24 | 13 | |
| 12:24 | 14 | |
| 12:24 | 15 | _____ |
| 12:24 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR |
| 12:24 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |