UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

```
MATTEL INC., et al.,              )
                                  )
                Plaintiff,        )
                                  )      DAY 24
          vs.                     ) No. CV 04-9049-DOC
                                  )      VOLUME 2
MGA ENTERTAINMENT, INC.,          )
                                  )
                Defendant.        )
_____  )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

FRIDAY, FEBRUARY 25, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6

     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                         BY:  ANNETTE HURST, ESQ.
                          405 HOWARD STREET
8                         SAN FRANCISCO, CALIFORNIA 94105
                          (415)773-5700
9

10

     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                        BY:  THOMAS MCCONVILLE, ESQ.
                          4 PARK PLAZA
12                        SUITE 1600
                          IRVINE, CALIFORNIA 92614
13                         (949)567-6700

14
                           KELLER RACKAUCKAS
15                         BY:  JENNIFER KELLER, ESQ.
                           18500 VON KARMAN AVENUE
16                         SUITE 560
                           IRVINE, CALIFORNIA 92612
17

18

     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                         BY:  MARK OVERLAND, ESQ.
                           100 WILSHIRE BLVD
20                         SUITE 950
                           SANTA MONICA, CA. 90401
21                         (310) 459-2830

22

23

24

25

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 3

```
1                           - AND -

2                 SCHEPER KIM & HARRIS LLP
                  BY:  ALEXANDER COTE, ESQ.
3                 601 WEST 5TH STREET_12TH FLOOR
                  LOS ANGELES, CA. 90071
4                 (213) 613-4660

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2
     PLAINTIFF'S                                           VOIR
 3   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS  DIRE

 4   VALERY AGINSKY                                  21

 5   JEFFREY KINRICH        34      44      76        78
                                    58                83
 6

 7   LAURA OWENS            91

 8                            EXHIBITS

 9
     Party                           FOR          IN
10   EXHIBIT  DESCRIPTION        IDENTIFICATION  EVIDENCE

11    7168-7173                                    122
      7175, 7176, 7178, 7179.                      119
12    7180                                         115
      7181                                         114
13    7183-7188                                    123
      7191                                         143
14    7197, 7204, 7218                             126
      7203, 7207, 7210-7212, 7219, 7220, 7224, 7225  141
15    7222, 7223, 7228                             127
      7226                                         133
16    7230, 7236, 7237                             129
      7232-7234, 7243                              106
17    7239-7242                                    130
      7245-7249                                    136
18    7252-7256                                    111
      7298                                         137
19    23699                                        108
      24033                                        146
20    26939                                        112

21

22

23

24

25
```

1          SANTA ANA, CALIFORNIA; FRIDAY, FEBRUARY 25, 2011

2                              -oOo-

3          **MR. QUINN:**  Okay, Your Honor.  I understand.  I

4     understand.

5          **THE COURT:**  You apparently are such a good attorney that

6     you know all this, but I don't yet as a judge.  And I'm going to

7     get the time to look at it.  So, I don't know if I can accomplish

8     that.  And this happened just before lunch yesterday.  And I came

9     out, of course, and made what I think is an err.  I hope the

10    circuit finds it harmless.  And I received into evidence as an

11    exhibit instead of admitted.  I corrected that immediately upon

12    realizing my mistake in terms of wording.

13          No criticism.  I agree with you.  The rules should apply

14    coequally.  But if I open that up, then this becomes a

15    depositional trial.  And I thought that this applied to experts

16    when I made my ruling concerning Wagner.  I thought I was very

17    specific about you having the same opportunity with their expert

18    and experts.

19          This is the first time I have heard that you or another

20    party may be tactically requesting this rule.  And I need time to

21    look at it.  Because if, in fact, you're correct, I'm going to

22    open it up.

23          **MR. QUINN:**  I understand, Your Honor.  In part it may

24    well be.

25          **THE COURT:**  Enthusiasm of the moment.

1          **MR. QUINN:**  Enthusiasm of the moment or utter failing or

2    blandness on our part.  Either is possible.  We are -- candidly,

3    Your Honor, we have been a little bit unclear on what the

4    landscape or guidelines are.

5          **THE COURT:**  That's because you have chosen to be, in my

6    opinion.  I have been very specific.  I don't agree with that.

7    I'm not going to ever let you or opposing counsel start to

8    establish that kind of record in my court.  The rulings have been

9    without any doubt, in my mind, absolutely clear.  Each party has

10   been aggressive in terms of seizing upon the Court's rulings.

11         **MR. QUINN:**  I'm sure it's our fault completely, Your

12   Honor.

13         **THE COURT:**  No, it's not.  It's probably my lack of

14   wisdom.  So let me take, on the record, that responsibility.  Take

15   that off your shoulders.

16         **MR. QUINN:**  I feel relieved already, Your Honor.

17         **THE COURT:**  And you also feel very relieved that you are

18   not going to be going into this with Mr. Kinrich at the present

19   time.  You can call him back if I'm wrong on that, etcetera, but

20   not at 12:30 with a half hour to go.

21         Now, I'm going to spend the rest of my 30 minutes

22   looking at it, but that doesn't I'm going to be prepared by

23   1:00 o'clock to make that ruling.  Now, I want you to go ahead and

24   complete your record and then I want to hear from Ms. Hurst.  You

25   two can take as much time as you want.

Page 7

1          **MR. QUINN:**  Your Honor, I feel no need to make a record.

2          **THE COURT:**  Ms. Hurst?

3          **MS. HURST:**  Your Honor, I just was handed the excerpts

4   and quickly read them.  They have a number of references to --

5          **THE COURT:**  When did you get these?  This morning?

6          **MS. HURST:**  Yes.

7          **THE COURT:**  What time?

8          **MS. HURST:**  Let's see.  About --

9          **MR. MCCONVILLE:**  About 10:25, Your Honor.

10          **THE COURT:**  In the middle of the examination?

11          **MR. MCCONVILLE:**  Yes.

12          **THE COURT:**  I haven't received notice of this yet, and I

13   got here pretty early this morning.

14          **MS. HURST:**  I have quickly scanned this.  There are a

15   number of references to the Canadian police in here.  This is also

16   hearsay.  We obviously complied with the discovery obligation as a

17   30(B)(6), but a that's whole different kettle of fish.

18          **THE COURT:**  I'm not saying Mr. Quinn is wrong.  I don't

19   know.  And until I have time to look at that, I agree initially

20   that the person may be an adverse party, and you shouldn't be

21   limited by whom you call and vouching for them.  But I thought

22   that the order was rather limiting on my part.

23          But I agree with you.  If in fact, 32.3 applies, why

24   does it apply just to expert?  I need time to look at that, which

25   opens up all sorts of hearsay, which now violates my effort to get

1  just witnesses into court.  And I think each of you, at the end of

2  the trial, will appreciate in varying forms, depending upon who

3  the witness is, the fact that the jury could view their demeanor.

4          A depositional transcript of certain witnesses might not

5  have been as acceptable to one party or the other party at times,

6  or it might be very pleasing to have that person in court.  And

7  that's always been my concern, that this case was going to be

8  tried on the depositions, quite frankly, not through counsel who I

9  admire greatly, but with false information coming to you about who

10  is available or what their availability was, or whether it was

11  convenient.

12          And I think that our system of jurisprudence demands the

13  adversarial system, because we're built on that and it demands

14  witnesses who are testifying in front of a jury.

15          Ms. Keller, you tried to speak.  It's your turn without

16  interruption from Mr. Quinn.

17          **MS. KELLER:**  I'm impressed the Court notice my little

18  lowering of the microphone and correctly deduced what I was going

19  to try to do.

20          I think that there is an additional problem, which is

21  that if the rule were to change now and depositional testimony

22  would be allowed in for all purposes, at all times, we would

23  really be prejudiced, because we have gone through most of the

24  Mattel case now without having been allowed to do that.  And for

25  there to be a wholesale change now beyond what the Court has I

1  think wisely agreed to do, which is to allow it for experts, if

2  it's offered by the adverse party, I think that we would be in a

3  position where there was probably an awful lot of

4  cross-examination we would have liked to have done, or direct

5  examination using those transcripts, we wouldn't be able to do

6  now.

7        **THE COURT:**  The only disagreement I have with you is

8  that not only haven't you been prejudiced, these are primarily

9  witnesses who have been adverse to Mattel's position, starting

10  with Paula Garcia.  And although you may disagree with that, I

11  would have found her, quite frankly, to be an adverse witness.  I

12  would find this last gentleman to be an adverse witness.

13        Having said that, this rule strikes head on with the

14  Court's efforts to make certain that this isn't conducted by

15  snippets of interrogatories, pieces of depositions selectively

16  culled, by each party, which is the way the information that's

17  come to this Court in terms of different representations the

18  parties have made to the Court throughout the last year and all of

19  the discovery disputes and the snippets of information and the 152

20  discovery orders that the Court has written.

21        Let me repeat for the circuit while we're spending the

22  time, that this case started with interrogatories that what was

23  occurring to Judge Larson, who was an able colleague, is that the

24  disputes were referred to a special master.  They were so

25  vociferous and prolonged between Mattel MGA and Mattel, et al,

Page 10

1    that it was literally taking the special master months to make an

2    initial recommendation.  By the time Judge Larson made his

3    determination, then flowed a series of efforts by either party and

4    both parties for the Court to reconsider, which took months.

5             Frankly, this was a case where you had the avalanche and

6    the mushroom-shaped-cloud effect.

7             By the time the rulings got back to the Court, or from

8    the Court to the parties, what they had learned was to simply and

9    bluntly ignore the Court's rulings on many occasions.

10            This Court's first portion was how many pages, counsel?

11   159?  Mr. McConville?

12            **MR. MCCONVILLE:**  I wasn't here, Your Honor.  I heard the

13   stories.  It was large.

14            **THE COURT:**  One of you was or were.

15            Ms. Hurst, how many?

16            **MS. HURST:**  It wasn't my motion, Your Honor.

17            **THE COURT:**  Mr. Zeller?  159?  859 pages?

18            **MR. ZELLER:**  I think it was hundreds.

19            **THE COURT:**  No, no.  Come on now.  I read this stuff,

20   believe it or not.  How many?  850-what?

21            **MR. ZELLER:**  I don't have --

22            **THE COURT:**  Why don't we go get it again.  I'll make the

23   record that it was over 800 pages.  Do you dispute that?

24            **MR. ZELLER:**  Absolutely not.

25            **THE COURT:**  I think that arrived at the Court on, what,

1    a Monday?  Was that a Monday?  Why don't you describe what

2    happened so the Court doesn't have to, to the circuit.

3          MR. ZELLER:  As I -- I know that there was a very large

4    motion.

5          THE COURT:  800-plus pages, Mr. Zeller.

6          MR. ZELLER:  Yes.  I think the Court is absolutely

7    correct on that.  It was over 800 pages including the attachments

8    and calculations.

9          THE COURT:  By the way, I'm not finding fault with

10   Mattel.  The record should reflect it was coequal on MGA's part on

11   different occasions.  So you're not in the dog house.  Let's just

12   take this as one of the many examples that was facing Judge

13   Larson.

14         MR. ZELLER:  It was one of many.  And so I know that the

15   Court had received this very large submission of more than 800

16   pages.  You brought it out to us.

17         THE COURT:  What time?

18         MR. ZELLER:  I think it was the evening.  I mean --

19         THE COURT:  It was.

20         MR. ZELLER:  But days and nights sort of blur together

21   here.

22         THE COURT:  Let's say it was after 11:00 p.m.

23         MR. ZELLER:  I think that's right.

24         THE COURT:  What did the Court do?

25         MR. ZELLER:  The Court gave it to us.

1          **THE COURT:**  No.  I dumped it on the floor.  Let me be

2    more accurate so you don't have to be.  I dumped it on the floor

3    of the court.

4          **MR. ZELLER:**  You did.

5          **THE COURT:**  What did I say to you?

6          **MR. ZELLER:**  And you basically said this nonsense needs

7    to end.

8          **THE COURT:**  And then I walked out.

9          **MR. ZELLER:**  Yes.

10         **THE COURT:**  And I got a call, what, about 12:30?

11         **MR. ZELLER:**  I think that's about right.

12         **THE COURT:**  And you and Ms. Hurst did resolve that.

13         **MR. ZELLER:**  We did.

14         **THE COURT:**  Ms. Hurst, how did you resolve that?

15         **MS. HURST:**  I believe we had a stipulation for filing

16   all future motions in a much more reasonable and limited forum,

17   Your Honor.

18         **THE COURT:**  What was that stipulation?

19         **MS. HURST:**  As I recall, it was 20 pages -- no more than

20   20 pages for brief and no more than up to 50 pages for the

21   attachments.

22         **THE COURT:**  I commend counsel for that, frankly.  Let me

23   be very positive in our discussion.  Shortly thereafter I realized

24   the ridiculousness so that any reviewing court knows that of the

25   interrogatory war that was going on.  Nonresponses that seemed to

1    be particularly frustrating Mattel at the time.  And we turned to

2    depositions.

3              And that's the history of why we turned to depositions.

4    So we had an adversarial process at least, or a semi-adversarial

5    process.  And also now you were getting witnesses in.  And I think

6    Ms. Kuemmerle was one of the first witnesses that I dealt with,

7    who was totally unprepared.  Even though she has made the

8    protestation that she feared being sued by Mattel, she wasn't

9    prepared when she came into court.

10             So from the very beginning, this Court's analysis of the

11   case has been that the parties had been in mortal combat for so

12   long that each party was prepared to, frankly, try to take

13   snippets of depositions, interrogatories, and all the jury would

14   hear would be brief portions through days and days of depositions

15   and volumes of interrogatories.  I think we were up to 155 boxes

16   of just interrogatories by that time.

17             Second, I thought that disabused the adversarial system.

18   I thought that I had grown up in a legal system where the truth is

19   through direct and cross-examination, and the only trial that

20   counts is the one that you are in, unless there is impeachment.  I

21   have heard concerns by Mattel that 32.3 or A1 -- I'm sorry A3, is

22   an unfair treatment in light of Court's ruling concerning Wagner,

23   but I thought that ruling was coequal as to the experts.  Kinrich,

24   though, initially doesn't seem to me to be the appropriate expert,

25   but I may be wrong because I haven't been presented those snippets

Page 14

1   yet.

2          **MS. KELLER:**  He is not an expert, Your Honor.  Our

3   understanding is he is a summary witness.

4          **THE COURT:**  So apparently having this take place between

5   counsel, it must have occurred through some cell phone or some

6   kind of communication, it must have been transferred to you while

7   we were in session at 10:30, the Court is not aware of it.  Mr.

8   Quinn may be absolutely right and the rule should apply coequally.

9   Simple as that.  I thought it had up to this point.

10         **MR. OVERLAND:**  Can I be heard on behalf of Mr. Machado?

11         **THE COURT:**  Absolutely.  Take your time.  I'm not done

12   yet.  I have got lots of time.

13         So I'm a little reluctant through Kinrich to make a snap

14   decision, because I'm hearing this at 12:25, and the jury is

15   coming back at 1:00 o'clock and the jury will be in session at

16   1:00 o'clock.  Mr. Kinrich can certainly come back if I'm wrong.

17   But I don't think initially I'm going to allow you to go there,

18   even if you are right on this issue.

19         Second, I have got to go back and really take another

20   look at 32A3 and see if this directly violates what I think is the

21   fundamental adversarial system and the limitation I thought that

22   was reasonable concerning Wagner.

23         Now, I'm sorry, Mr. Overland, you have my undivided

24   attention.  There will not be interruption from MGA or Mattel?

25         **MR. OVERLAND:**  I'm a little confused at what Mr. Quinn

1   said, but as I understand it, what they're trying to do is present

2   evidence that may or may not have been relied on by Mr. Kinrich

3   and introduce that into evidence.  That's a step removed from the

4   30(B)(6) or 30(b) analysis or 30(a) analysis.

5           **THE COURT:**  32A3.

6           **MR. QUINN:**  That's A step removed from that.  What

7   they're trying to do here is without presenting the actual witness

8   to present a document, that whether it be an expert or somebody

9   who is not an expert, may or may not have relied on and introduce

10  that into evidence.  That's like presenting an expert who may not

11  have relied on a book, or may have relied on a book and introduced

12  the book into evidence.  And that's improper.

13          And I think that's what they're trying to do.  So I

14  think you're a step removed from that 32(b) analysis, because the

15  witness who may be the --

16          **THE COURT:**  30(B)(6)?

17          **MR. OVERLAND:**  Yes.

18          **THE COURT:**  Or 32A3?

19          **MR. OVERLAND:**  I don't know.  I don't know those

20  numbers.  How do I know the numbers?  But anyway, it's the witness

21  who testifies as to the actual events that they want to seek to

22  introduce is not going to be here.  It's a report by -- whether it

23  be an expert or Kinrich, who is not an expert, who is a summary

24  witness, they want to introduce that into evidence without having

25  the actual witness who testifies as to the underlying fact.

1          So you are a step removed from the issue that was dealt

2     with before.  I don't know if I'm making myself clear.  But it

3     seems to me that it's like presenting an expert and trying to

4     introduce the basis for the expert's opinion into evidence which

5     is -- which you can't do.

6          **THE COURT:**  Thank you, Mr. Overland.

7          **MR. OVERLAND:**  Aside from that, again, as we mentioned

8     before, these are not 30(B)(6) witnesses with respect to

9     Mr. Machado.  They may be for MGA or somebody else, but certainly

10    not for Mr. Machado.

11         **THE COURT:**  I would think we would all have the same

12    respect for one another, and that is we would have briefing on

13    this.  This is a huge and fundamental change that potentially

14    would cause prejudice to MGA, although I disagree with that.  And

15    I would think that the Court wouldn't have this what I call a

16    pop-up motion.  Right now I know that Kinrich will not be

17    testifying to 32A3 when he takes the stand.

18         **MR. QUINN:**  I understand that, Your Honor.  When the

19    Court, a few days ago, and the Court said it would visit the issue

20    more, but the Court a few days ago that that it had determined

21    that it was appropriate, that with Wagner --

22         **THE COURT:**  With Wagner, and you are missing a part.

23         **MR. QUINN:**  I hadn't finished.  With Wagner and other

24    witnesses, it was coequal.  The Court was quite clear on that.

25    That pursuant to FRCP 32A3, depositions of an adverse party could

1    be used for the truth of the matter.  There was some discussion

2    about that.  The Court also was clear that it was willing to

3    consider the matter further up.  To that point we hadn't briefed

4    that issue.  Again, I'm not -- I feel no need, Your Honor, to make

5    a record here.  It's something we touched on earlier in the case,

6    and this was a --

7              THE COURT:  Not in this context we didn't.

8              MR. QUINN:  Not in the context of experts.  Absolutely

9    right.

10              THE COURT:  Only in the context of experts.

11              MR. QUINN:  We had not previously discussed it and now

12    recently we have discussed it in the context of experts.

13              THE COURT:  That's correct.

14              MR. QUINN:  Again, I'm sure it's our fault on this side.

15              THE COURT:  No.  Let me take the responsibility.  The

16    Court is supposed to know and anticipate everything.  So it's

17    humbly my responsibility.  The conduct of this trial and the way

18    it goes is my responsibility.  Let me take that off your

19    shoulders.

20              MR. QUINN:  We are struggling to --

21              THE COURT:  15 minutes away from the jury walking

22    through that door.  That's exactly where you are.  And I don't

23    have to go to the bathroom at the age 66, and I don't have to eat.

24              MR. QUINN:  Fine, Your Honor.  Whatever -- I'm done,

25    Your Honor.

1           **THE COURT:**  Are you?  Okay.

2           Now, you bring the briefing to me.  I'll look at it.  If

3    I am wrong and this is the appropriate way to go, we'll get

4    Kinrich back or whomever.  Okay.  You are not being punished and

5    you are not being ruled against.  Do you understand that?  But I

6    need time to look at something as monumental as this, because that

7    is absolutely an appealable issue through one or both parties if

8    there is a verdict.  That is such of a fundamental change from

9    everything that this Court has attempted to do, that whether truly

10   there is prejudice to MGA or not, which I seriously doubt at this

11   point.  Because most of your witnesses have been adverse

12   witnesses.  The record could be made by good appellate counsel.

13          And I'm not too certain I want to give that to either

14   party without reflection.  And number two, this fundamentally

15   strikes at everything the Court has attempted to do to get

16   witnesses into this court.

17          **MR. QUINN:**  That I understood.  That's why I didn't

18   understand why suddenly, with experts, we were going to let

19   testimony be presented for truth pursuant to 32A3.  That's where I

20   got lost, frankly.  And we didn't have any briefing on that when

21   that ruling came down.

22          **THE COURT:**  Yes, we did.  Maybe I'm wrong.  I spent a

23   lot of time with that.  I knew that was coming.  And if you

24   notice, I delayed for some substantial period of time.  I thought

25   I not only had briefing, I thought I had considered that briefing.

1    In fact, I know I had.  I fell asleep with it one night.

2           **MS. HURST:**  We're not asking to open this all up and now

3    have this trial conducted by video deposition.  I want to be

4    absolutely 1000 percent clear about that.  All I have ever asked

5    for was for cross-examination of experts, understanding that that

6    would apply to both sides, cross-examination of adverse experts.

7           **THE COURT:**  We haven't gotten to that point, have we?

8    In other words, 32A3 has not been instituted yet, has it?

9           Let me look at that.  I hear your position; why experts?

10   Why the perceived unfairness, if we're going to apply the rule,

11   etcetera.  I thought it was rather limited in terms of experts,

12   quite frankly, for both sides.  I'm staring at a rule, quite

13   frankly, that was made by a committee, for want of a better word.

14   Why?  It's the devil is in the details.

15          Ms. Hurst might be technically correct, but watch out

16   for the battle you win in case you lose the war.  And I just need

17   time to do the research.

18          I'm not saying you are wrong, Mr. Quinn.  I'm saying

19   this is just a fundamental change.  But if you are concerned over

20   experts, your position is why should it apply to experts and not

21   across the board.  I understand that.  I just can't take that

22   ruling and make a flip decision in five minutes.

23          **MR. QUINN:**  Understood, Your Honor.

24          **THE COURT:**  And hear about this for the first time at

25   12:30.

1          You are both -- let me compliment all counsel -- you are

2    both very good attorneys.  And both sides are extraordinarily

3    aggressive, which this Court appreciates.  I'm sure you have been

4    able to roll over superior court judges on occasion.  Not in

5    federal court.

6          So I'll take my time with it.  You can have briefing to

7    me by what time, on this issue?

8          **MR. QUINN:**  Monday.

9          **THE COURT:**  Sunday.  Excellent.  Sunday is good.  Sunday

10   what time?

11         **MR. QUINN:**  Sunday noon.

12         **THE COURT:**  Sunday noon.  No.  Nine.  In fact,

13   8:00 o'clock.  I'll be here 8:00 o'clock.  I want that briefing

14   delivered to me so I could start reading because we have a whole

15   day with jury instructions, and I don't want to start fragmenting

16   and arguing through a mushroom-shaped cloud.

17         Mr. Corey, 8:00 o'clock, briefing on this.  Sunday.

18   Excellent.  I'll be standing at the door.

19         Ms. Hurst, 8:00 o'clock.  Meet you at the door.

20   Briefing on it.

21         Mr. Zeller, 8:00 o'clock.

22         **MR. ZELLER:**  8:00 a.m.?  As opposed to p.m.

23         THE COURT,:  I think it has to be 8:00 a.m. because

24   you'll be on jury instructions at 9:00.

25         Do you want to go use the bathroom?

Page 21

1          **MR. ZELLER:**  Yes, please.

2          **THE COURT:**  Have a nice recess.

3               (Recess taken, from  12:50 to 1:03.)

4          **THE COURT:**  Back on the record.  Everybody is present.

5     Which means the jury, the alternates, the witness, counsel, the

6     parties.

7               Now we're going to strike the prior comment but I'm

8     going to allow Ms. Hurst to inquire.  She didn't mean to infer he

9     was part of the nuclear or biological program to blow up the

10    United States.  That's not where she is going.  But she can

11    inquire into the background, where was he educated, how was he

12    educated.  You know those kind of things in terms of his

13    educational background.

14              Ms. Hurst, please.

15                          RECROSS-EXAMINATION

16    BY MS. HURST

17    **Q**    You received your MS and your Ph.D in chemistry from the

18    Military Academy of Chemical Defense?

19    **A**    Correct.

20    **Q**    That was an institution involved in chemical warfare;

21    correct?

22    **A**    Yes.  Partially, yes.

23    **Q**    And then you received your training at the Ministry of

24    Internal Affairs; correct?

25    **A**    My training was in analytical chemistry; six years at the

1    Military Academy when I received the master of science degree and

2    another three years when I received the Ph.D.

3    **Q**    But your training in ink analysis was at the Ministry of

4    Internal Affairs; correct?

5    **A**    Yes.  Ink analysis one -- ink is one material, and my

6    training is to use analytical chemistry to analyze any material

7    including ink.

8    **Q**    And you brought that education and training with you here to

9    the United States; correct.

10   **A**    Can you repeat your question please?

11   **Q**    When you came here to the United States, you brought your

12   educational background and your training background with you and

13   you relied on it in connection with your expert assignments; isn't

14   that true?

15   **A**    Yes, of course.

16   **Q**    And you understand the importance of the rule of law;

17   correct?

18   **A**    Yes.

19   **Q**    And you understand the importance of following Court orders,

20   true?

21   **A**    True.

22   **Q**    But you deliberately and knowingly violated the Court order

23   in this case?

24   **A**    I did.

25   **Q**    And you also know it's important to honor agreements;

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1  correct?

2  **A**    I didn't understand the question.

3  **Q**    It's important to honor your agreement; isn't that true?

4  **A**    Yes.

5  **Q**    And the agreement here was that MGA and Mattel were going to

6  observe each other's sampling process, true?

7  **A**    Yes.

8  **Q**    And that agreement was present in order to ensure the

9  integrity of the process; right?

10  **A**    Yes.

11  **Q**    And you took advantage of that agreement yourself when you

12  went to observe Dr. Lyter's sampling, true?

13  **A**    Yes.

14  **Q**    But you deliberately disregarded that agreement when you took

15  the third set of microplugs from Area 8?

16  **A**    Correct.

17  **Q**    Also, when you did your testing in an effort to disprove

18  contamination, you did not follow any accepted protocol; correct?

19  **A**    Correct.  There is no protocol.

20  **Q**    You just made that up; right?

21  **A**    Yes, because there is no protocol that I could use.

22  **Q**    You also agreed with me it's important for an expert witness

23  to do their testing more carefully, true?

24  **A**    Yes.

25  **Q**    But here, you hit the preprinted line when taking one of your

Page 24

1    samples; right?

2    **A**    Correct.

3    **Q**    And the file name in one of your chromatograms doesn't match

4    what you say was the sample reflected in that test; isn't that

5    true?

6    **A**    Not the file name, but the secondary information.

7    **Q**    Let's turn to Exhibit 4598-1.  What is the file name on that

8    chromatogram?

9    **A**    The file name is Paper Blank 1.

10   **Q**    You took two paper blanks; right?

11   **A**    Yes.

12   **Q**    And you called them PB-1 and PB-2?

13   **A**    Yes.

14   **Q**    And that file name says PB-1?

15   **A**    Yes.

16   **Q**    But you tell us that that was actually a test of the samples

17   of both PB-1 and P2; isn't that true?

18   **A**    Yes, I mixed -- I took two plugs from PB1 and one plug from

19   PB2.

20   **Q**    In fact, that file name is inaccurate, isn't it?

21   **A**    It is accurate because it's a paper blank.  But yes, it's a

22   mixture of PB1 and PB2.

23   **Q**    That file name is not an accurate description of the same

24   sample you claim that test reflects; isn't that true?

25   **A**    Yes.

1  **Q**    You also mislabeled the sample name on one of your other

2  chromatograms, true?

3  **A**    The sample name?

4  **Q**    Yes.

5  **A**    Yes.

6  **Q**    You also know that it's important to make an accurate and

7  complete report, true?

8  **A**    Yes.

9  **Q**    You expect that Mattel counsel was going to rely on the

10  report, true?

11  **A**    I relied on my report.  I don't know what anybody else would

12  rely on it.

13  **Q**    You understood that Mattel's lawyers wanted your report for

14  use in the litigation, true?

15  **A**    Yes.

16  **Q**    And you knew it would be disclosed to MGA's lawyers, too?

17  **A**    Yes.

18  **Q**    And even the Court and the jury might rely on what was in

19  your report, true?

20  **A**    Yes.

21  **Q**    But other than that picture, you didn't tell anyone in your

22  report that you had taken the third set of microplugs, true?

23  **A**    That's correct.

24  **Q**    Now, you also know that it's very important to testify as

25  accurately as you can about everything that you saw, or you did,

Page 26

1   or you concluded in connection with your work in this matter;

2   right?

3   **A**   Yes.

4   **Q**   And in order to do that you prepared carefully, true?

5   **A**   Yes.

6   **Q**   You prepared with Mattel's lawyers before your deposition in

7   2008, true?

8   **A**   No.

9   **Q**   No, you didn't meet with them before your deposition?

10   **A**   No.

11   **Q**   Did you meet with them before you testified here?

12   **A**   Yes.

13   **Q**   When you testified in your deposition -- strike that.  Pardon

14   me.

15         You testified yesterday that Area 8 had no extractable

16   ink components, true?

17   **A**   Which area?

18   **Q**   Area 8.

19   **A**   No.  It does have menthol.

20   **Q**   But at first you testified that Area 8 had no extractable ink

21   components; correct?

22   **A**   If I said that, I misspoke.

23   **Q**   Despite that careful preparation with Mattel's lawyers?

24   **A**   Yes.

25         **MR. QUINN:**  I think this is repeating what is --

1          **THE COURT:**  These have been asked and answered, counsel,

2    I believe.

3    BY MS. HURST

4    **Q**   You also testified in your first deposition that you were

5    absolutely certain that phenol derivative was a component of ink

6    rather than paper?

7          **MR. QUINN:**  Asked and answered.

8          **THE COURT:**  Sustained.

9    BY MS. HURST

10   **Q**   You have made at least two testimonial errors in this case;

11   isn't that true?

12         **MR. QUINN:**  Objection.

13         **THE COURT:**  Sustained.  Counsel, strike that.  My

14   apologies.  This was continued redirect by Mr. Quinn and these

15   areas were covered.

16         Please continue.  These were asked or reiterated back on

17   redirect the day before the witness was taken in between

18   Mr. Marlow, and then we were back on redirect; isn't that correct?

19         **MS. HURST:**  Yes.

20         **MR. QUINN:**  This is the concluding examination.

21         **THE COURT:**  Thank you.

22         **MR. QUINN:**  Recross.

23         **THE COURT:**  Recross.  I'm aware of that, but I had

24   forgotten that it was in segments.  And I was thinking it was

25   narrowed to just the discussion over the plugs.  It's not.  It's

Page 28

1    much broader than that.

2    BY MS. HURST

3    **Q**    So you testified in your first deposition that you were

4    absolutely sure that the phenol derivative was a component of ink

5    rather than paper?

6          **MR. QUINN:**  That was asked and answered yesterday.  Ms.

7    Hurst asked this question, Your Honor.

8    BY MS. HURST

9    **Q**    Is that true?

10         **THE COURT:**  On cross-examination?

11         **MR. QUINN:**  Yes.

12         **THE COURT:**  Did you go back into this on redirect?

13         **MR. QUINN:**  No, I didn't.

14         **MS. HURST:**  He did, Your Honor.

15         **THE COURT:**  Just a moment.

16         Ladies and gentlemen, bear with us for just a moment.

17   Mr. Quinn went into the extractable components in Area 8 line 5,

18   the plugs.  The analysis at 8.58.

19         But Ms. Hurst, I don't believe his redirect was as broad

20   as the repeating of what you have already elicited.

21   BY MS. HURST

22   **Q**    You made two testimonial errors, at least, that we know of in

23   this case so far; isn't that true?

24   **A**    I don't know which ones.

25   **Q**    That phenol was a component of ink rather than paper; right?

1    You testified to that?

2             **MR. QUINN:**  Again, this was asked and answered.  This is

3    what we just asked about.

4             **THE COURT:**  It was, Ms. Hurst.

5             **MS. HURST:**  I'm reminding him because he says he doesn't

6    know, Your Honor.  I'm responding to the witness' inquiry.

7             **THE COURT:**  You can ask it.

8    BY MS. HURST

9    **Q**    Right?  You testified that phenol derivative was a component

10   of ink rather than paper and then you took it back; right?

11   **A**    That's correct.

12   **Q**    And you testified that Area 8 had no extractable ink

13   components and then you took it back; right?

14   **A**    Yes.  I misspoke as I said.

15   **Q**    And that's at least two testimonial errors that we know of in

16   this matter; right?

17   **A**    Yes.

18   **Q**    All right.  So after all of this mislabeling, failure to

19   follow the rules, deliberate and flagrant disregard for Court

20   orders and disagreements --

21            **THE COURT:**  Counsel, this is argument, isn't it?

22   BY MS. HURST

23   **Q**    -- and testimonial errors, you expect --

24            **THE COURT:**  I'm sorry.  Isn't this argument, please?

25            **MS. HURST:**  I'm sorry, Your Honor?

1          **THE COURT:**  This is not a hypothetical.  This is a

2     summary argument.  You just ignored my warning to you.

3          **MS. HURST:**  I didn't hear you, Your Honor.

4          **THE COURT:**  I'm warning you.

5          **MS. HURST:**  Understood, Your Honor.

6     BY MS. HURST

7     **Q**    Based on your work in this case as you have described it, you

8     expect this jury to believe your testimony as a scientist that

9     there was menthol in that secret sample from Area 8; isn't that

10    right?

11         **MR. QUINN:**  Objection, Your Honor.

12         **THE COURT:**  Overruled.

13         You can answer that question.

14         **THE WITNESS:**  The sample is not secret.  It's --

15         **THE COURT:**  Sir, answer the question.

16         **THE WITNESS:**  No, it's not right.

17    BY MS. HURST

18    **Q**    So you have conceded now that there is no menthol in that

19    sample?

20    **A**    No, this is not what I said.

21         **THE COURT:**  The problem is you asked a negative and you

22    got the answer that -- do you want me to read back the question?

23         **MS. HURST:**  It's okay, Your Honor.

24         **THE COURT:**  Re-ask it.  Ask it so it doesn't have a

25    negative.

Page 31

1    BY MS. HURST

2    **Q**    You expect this jury to believe that there was menthol in

3    that third undisclosed sample from Area 8?

4             **MR. QUINN:**  Argumentative.

5             **THE COURT:**  Sustained.

6    BY MS. HURST

7    **Q**    On the basis of your work in this matter as you have

8    described it over the last couple of days, it's your testimony as

9    a scientist that there was menthol in the third undisclosed sample

10   from Area 8?

11            **MR. QUINN:**  Same objection, Your Honor, as to

12   "undisclosed."

13            **THE COURT:**  That's properly phrased.

14            You can answer that question.

15            **THE WITNESS:**  It's my testimony that menthol is present

16   in the third, second and the first set of samples that I analyzed

17   by GC-MS.

18   BY MS. HURST

19   **Q**    And you expect us to believe that even though, out of the

20   thousand pens that you have personally collected and tested, you

21   have never personally tested one with black water-based ink with

22   menthol in it?

23            **MR. QUINN:**  Objection.

24            **THE COURT:**  Sustained in its present form.

25   Argumentative.

1   BY MS. HURST

2   **Q**   It's true, sir, that out of the thousand pens that you have

3   personally collected and tested, you have never personally tested

4   one with black water-based ink with menthol in it; isn't that

5   right?

6           **MR. QUINN:**   Asked and answered and beyond the scope.

7           **THE COURT:**   Overruled.

8           You can answer that question.  We have had quite a delay

9   between the days, so you can answer that one more time.

10          **THE WITNESS:**   You mentioned thousands, and I have

11  thousand.  One.  And there are thousands of different

12  formulations.  So I have just a portion of what is available on

13  the market.  In that portion that I have in my collection, I do

14  not have black gel ink scented with menthol, but I have other gel

15  ink scented with menthol.  Not black.

16          **MS. HURST:**   Move to strike that as nonresponsive, Your

17  Honor.

18          **THE COURT:**   Just re-ask it, counsel.

19  BY MS. HURST

20  **Q**   I'm sorry.  Did you just say you have more than a thousand

21  pens?

22  **A**   I'm saying that I have more than a thousand, but not

23  thousands as you said.

24  **Q**   So of the more than 1,000 pens that you have personally

25  tested, it's true that you have never tested one with black

Page 33

1   water-based ink with menthol in it, true?

2   **A**     That's correct.

3   **Q**     Thank you.

4              **THE COURT:**  Doctor, we're going to keep you on call.

5              I'm sorry.  Mr. Overland?

6              **MR. OVERLAND:**  No, Your Honor.

7              **THE COURT:**  We're going to keep you on call.  Go back to

8   your professional responsibility, any planned vacation.  We're

9   going to ask you to remain available until May 7.  The case should

10  conclude -- what month are we in?  March?  The case will conclude

11  in a short period of time.  So if you would be available, though,

12  just in case.  I don't want any additional subpoenas to have to be

13  served.  Thank you very much, sir.

14             Counsel, your next witness, please.

15             **MR. QUINN:**  Jeff Kinrich.

16             **THE COURT:**  Mr. Kinrich, if you would step forward, sir,

17  raise your right hand, sir.

18                JEFFREY KINRICH, PLAINTIFF'S WITNESS, SWORN

19             **THE COURT:**  Come along the side of the jury railing and

20  be kind enough to be seated.  Sir, would you state your full name

21  for the jury.  After you state your full name, spell your last

22  name.

23             **THE WITNESS:**  My name is Jeffrey Kinrich.

24  K-i-n-r-i-c-h.

25             **THE COURT:**  This is direct examination by Mr. Quinn.

Page 34

1                                  DIRECT EXAMINATION

2      BY MR. QUINN

3      **Q**    Mr. Kinrich, what is it that you do for a living?

4      **A**    I'm a certified public accountant and financial analyst, and

5      what I do is analyze things; figure out things like values,

6      calculations that are relevant in litigation.  Things of that

7      sort.

8      **Q**    Can you tell the jury please something about your educational

9      background?

10     **A**    Sure.  I have a bachelor's degree in mathematics from Pomona

11     College in Claremont, California.  I have a master's degree in

12     statistics from Stanford University, and I have a master's of

13     business administration degree -- MBA degree -- in finance and in

14     quantitative methods from the University of Maryland, which I got

15     while I was working in Washington D.C.

16     **Q**    Are you qualified as an accountant?

17     **A**    Yes.  I'm a certified public accountant both in California

18     and in Illinois.

19     **Q**    And did you have to take an exam to become a certified public

20     accountant?

21     **A**    I did.

22     **Q**    I won't you make you brag.  I see on your CV you did pretty

23     well on the CPA test?

24     **A**    My wife told me I only got to take it once.  So I

25     overstudied.

Page 35

1   **Q**     You had the highest score in California and the second

2   highest in the United States that year?

3   **A**     I did.

4   **Q**     You know who got the highest?

5   **A**     I do.  He doesn't remember my name but I remember his.  He

6   was a tax lawyer in Madison, Wisconsin.

7   **Q**     Figures.

8           Were you given an assignment by us in this case?

9   **A**     I was.

10  **Q**     And what was the assignment that you were given?

11  **A**     The assignment was actually quite simple.  The assignment was

12  to consider a set of employees that moved from Mattel to MGA, and

13  divide them in two groups.  Essentially, there are six individuals

14  that are alleged to have downloaded trade secret information, as I

15  understand it, and there's everybody else.  And I was asked to

16  compare those two and look to see what the average change and

17  compensation in salary was when they moved from Mattel to MGA and

18  compare how -- whether the average promotion, average increase for

19  the downloading group was different from the average increase to

20  the remainder of the people who changed jobs.

21  **Q**     And how did you go about determining or learning what the

22  salary changes were from all the employees who moved from Mattel

23  to MGA?

24  **A**     Well, the first thing I did was get a list of employees -- or

25  actually more than employees.  A list of people who had worked at

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 36

1    Mattel and worked at MGA.  Not all of them were employees, so I

2    had to sort that out.

3              I then got records from both Mattel and from MGA; from

4    Mattel records as to what the salaries for those individuals were

5    when they left Mattel, and from MGA when the salaries of those

6    individuals were when they joined MGA.

7    **Q**    Did you perform any calculations with this information?

8    **A**    I did.  I first simply measured the differences so that I

9    could see if a person had a salary of X, and then they moved and

10   got a salary of Y.  You can simply look to compute the percentage

11   increase that they got as a result of that change in employment.

12   **Q**    Did you perform in these calculations for every employee who

13   left Mattel and went to MGA?

14   **A**    I did not.

15   **Q**    Why not?

16   **A**    Well, for two reasons:  First, as I already suggested, there

17   were some people who were not salaried employees.  For example, in

18   the group of people there were some freelancers who only worked

19   occasionally.  And so they don't have a salary to compare.

20             And there were some part-time or temporary people.  So I

21   excluded people like that.  And the second group I excluded were

22   people who had gone from Mattel to MGA, but the gap in employment

23   was more than a year and a half; more than 18 months.  I made a

24   judgment call that if you don't move within 18 months, your salary

25   may not be directly comparable.  And so I excluded anybody who

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 37

1    took more than 18 months to make that transition.

2    **Q**    Let's talk now about what you found out as a part of this

3    analysis.

4            Did you prepare for us some slides to illustrate your

5    findings?

6    **A**    I did.

7    **Q**    And if you could take a look, please, at Exhibit 24113, which

8    I hope is up there.

9    **A**    Just handed to me.  I have that.

10   **Q**    Are these pages here, 24113-4, are these pages the pages that

11   you prepared to illustrate your testimony?

12   **A**    24113-4 through 24113-7 I think is the group that --

13   **Q**    These are slides that you prepared to show the salary changes

14   for these two groups of individuals and to compare them?

15   **A**    Yes.  I prepared it with the help of your office.  I didn't

16   physically draw them myself.

17   **Q**    If we could take a look at Exhibit 24113-4.  With the Court's

18   permission we'll publish that.

19           What does this chart show?

20   **A**    This chart shows a lot of green bars.  What they are, each

21   bar is an employee, and they are in alphabetical order.  The bar

22   on the far left that goes to about, say, 22 percent, is some

23   employee whose last name starts with A.  And the bar on the far

24   right that goes to -- I'd eyeball it at about 30 percent, is some

25   employee whose last name starts with W.  There were no X, Y, or Z.

1          So we just got a sequence of bars across this page.

2   Each bar represents the percentage salary change for someone.  If

3   you look if the upper left-hand corner, it says "joined MGA within

4   six months."

5          So what this group is -- I told you I looked at 18

6   months, and we'll get to all 18 months in a minute.  But this is

7   the first six months, all the people that left MGA and joined

8   Mattel within six months of their departure from Mattel, and these

9   are the percentage of salary increases those people got.

10         So this first person, Mr. or Ms. A got about a

11  22 percent salary increase to make that move.

12         **THE COURT:**  If you could point to that possibly on the

13  screen.  You can see it, but I don't know that the jury.

14         **THE WITNESS:**  Is it a touch screen?

15         **THE COURT:**  It might be, but it doesn't matter.  Point

16  to it so the jury sees.

17         **THE WITNESS:**  This person, person A, the person whose

18  last name was A, got a 22 percent salary increase.  Second one,

19  18 percent salary increase.  And all the way here to the person

20  who is W, got about a 30 percent salary increase.

21         This person here got about 88 percent salary increase

22  when they moved from Mattel to MGA.

23  BY MR. QUINN

24  **Q**    Thank you.  Six individuals who are alleged to have

25  downloaded information included as part of this group?

Page 39

1    **A**    Yes.  Six of these green bars are those people.

2    **Q**    Can you point that out for us?

3    **A**    The easiest way to point that out is go to the next slide.

4    **Q**    That would be 24113-5?

5    **A**    Yes.

6    **Q**    And does 24113-5 show everyone who you calculated salary

7    changes for?

8    **A**    Anyone who moved within six months that I calculated salary

9    changes for.  We're still at the six-month group.

10   **Q**    What does this show us?

11   **A**    This shows us, in red, the employees that are alleged to have

12   downloaded.  And you'll notice here, Ms. Brisbois got about a 42,

13   43 percent salary increase.  Mr. Cooney got 50 percent salary

14   increase.  I'm sorry.  I skipped Mr. Castilla who got just over a

15   20 percent salary increase.  Mr. Machado Gomez got a 61 percent

16   salary increase.  Ms. Trueba got a 30 percent salary increase and

17   Mr. Vargas got, I believe, 88 percent salary increase.

18   **Q**    I notice there are some individuals represented by green bars

19   that are not part of the employees who downloaded information who

20   got more than, say, for example, Mr. Castilla?

21   **A**    That's correct.  For example, here next to Mr. Cooney there

22   is one who got a 30 percent increase that's higher than Mr.

23   Castilla's 20 percent.

24   **Q**    I think you can probably take your seat now.

25           Did you compare -- excluding the six individuals who are

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 40

1   alleged to have downloaded information before leaving Mattel, did

2   you also calculate the average salary change for people who left

3   Mattel and joined MGA within 18 months?

4   **A**   Yes.

5   **Q**   And again, would you explain to us why you chose this 18

6   months as a benchmark?

7   **A**   Well, I chose 18 months because I was looking for a time

8   period that is reasonable -- and I admit that's a judgment call --

9   for comparing people from one job to another.  After 18 months I

10   thought it probably doesn't matter.  It's probably too distinct.

11   But I also said to myself someone might argue with me on 18

12   months.

13         So what I did was look at 18 months, I looked at 12

14   months, I looked at six months just to see if it made any

15   difference and it really didn't.  The answers were the same either

16   way.  So I used 18, but I also looked at 12 and the chart we just

17   looked at was limited to six months.

18   **Q**   So excluding the six individuals who were alleged to have

19   downloaded documents, you calculated the average salary change for

20   people who left Mattel and joined MGA within 18 months?

21   **A**   I did.

22   **Q**   What was it?

23   **A**   It was -- excluding those six people, the rest averaged 12

24   1/2 percent change in salary to go from Mattel to MGA.

25   **Q**   So did you compare this number to the raises received by

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 41

1    individuals in the -- individuals who are alleged to have

2    downloaded information before they went over to MGA?

3    **A**    I did.

4    **Q**    And did you prepare a slide to help you explain what you

5    found in making this comparison?

6    **A**    I did.

7    **Q**    And is that 24113-1?

8    **A**    -1 or-2, either one.

9    **Q**    Let's start with -1.  What does this show us?

10   **A**    May I get up and point to this one?

11            **THE COURT:**  Certainly.  Put your back to me so the jury

12   can see.  I'm not concerned about that.

13            **THE WITNESS:**  Thank you.  Although it's really hard to

14   see here in the shading, here on the left it says average percent

15   change in salary.  And you can barely see it as 12 1/2 percent.

16   That's the average for everybody who left -- who went within the

17   first 18 months.  If you looked at just six months, it's almost

18   the same.

19            Then I indicated the six individuals.  And they're shown

20   here in red.  The 45 percent for Ms. Brisbois, 20.3 Mr. Castilla,

21   etcetera, for the other six.  And the average of all of the red,

22   all of the six people at issue is a salary change of 49.3 percent.

23            So the difference between the 12 1/2 percent average for

24   everybody and the average for the six people who were accused of

25   downloading is 36.8 percent.

Page 42

1    BY MR. QUINN

2    **Q**    Did you do a slide to illustrate that as well?

3    **A**    I did.

4    **Q**    That would be -2?

5    **A**    It would.

6    **Q**    Can you just explain what this shows?

7    **A**    Just what I said in words before, the average salary change

8    is 12 1/2 percent, and the employees at issue had an average

9    salary change of 49.3 percent.

10   **Q**    Thank you.  So would it be fair to say that the employees in

11   the group who allegedly or are alleged to have taken information

12   with them when they left Mattel and went over to MGA, received

13   significantly larger salary increases than the employees, the rest

14   of the employees who went over?

15   **A**    As a group, yes.  Averaged out between the two groups.

16   **Q**    And you also did some other calculations for those who joined

17   MGA within six months?

18   **A**    We showed the six.  I also did 12 and 18.

19   **Q**    So that's the 12 that's slide 6?

20   **A**    It is.

21   **Q**    If we could look just briefly at slide 6 for completeness.

22   Can you tell the jury what this shows?

23   **A**    Let me get up again.

24              Remember, previously we had the green bar and the red

25   bars?  I have now added a blue bar.  The blue bar are these few

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 43

1   extra people -- still alphabetical.  That's why we had gaps

2   before -- these are the people who went before six and 12 months.

3   So you can see if it makes any difference if you look just at six

4   months, or six to 12.  And so you can see that they basically fall

5   in the same range, though there are several -- a few negatives, a

6   few people took a salary cut.

7   **Q**   And you did -- just for completeness, you also did a

8   calculation for those joining -- showing separately also those

9   joining within 12 to 18 months?

10  **A**   Correct.  We'll fill in the last few gaps.

11  **Q**   That would be the slide No. 7; is that correct?

12  **A**   Exactly.

13  **Q**   If you could perhaps just walk us through this.

14  **A**   Here, those are the people in orange.  And it's another half

15  a dozen bars or so.  Generally speaking, the same picture, the

16  same averages.  Some are higher, some are lower.  But again,

17  generally speaking if you look at six months, you look at 12

18  months, you look at 18 months, the picture is the same pretty

19  much.

20  **Q**   And if we could go back to slide -2.  In computing these

21  averages, the average percent on the left-hand side the

22  12.5 percent, you included, I take it, everyone who left and

23  joined MGA within 18 months; is that correct?

24  **A**   That's correct.

25  **Q**   And this shows a comparison from the raises those people got,

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 44

1   that larger group, versus these six individuals; is that correct?

2   **A**   Exactly.

3   **Q**   Thank you very much.

4          **THE COURT:**  Cross-examination please.

5                       CROSS-EXAMINATION

6   BY MS. HURST

7   **Q**   Good afternoon, Mr. Kinrich.

8   **A**   Good afternoon.

9   **Q**   We have met before, but you may not remember.  My name is

10  Annette Hurst.  I represent MGA and Mr. Larian.

11  **A**   Nice to meet you again.

12  **Q**   You served as an expert for Mattel before in other matters;

13  is that true?

14  **A**   Yes, it is.

15  **Q**   And what is the hourly rate at which you bill Mattel for this

16  matter?

17  **A**   My time is billed -- my firm bills at $600 an hour.

18  **Q**   What is the total sum that Mattel has been billed for your

19  firm's work as reflected in this report that you have been

20  testifying about here today?

21  **A**   Before time spent basically waiting to testify here, the bill

22  was little bit over $18,000 in total.

23  **Q**   And there will be more as a result of your waiting and

24  testimony here today?

25  **A**   There will.  Of course, not all of that is my rate.  I had

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    assistants at much cheaper rates, but that's the total for my

2    firm, not me.

3    **Q**    Thank you for that clarification.

4          Now, do you understand why you were asked to calculate

5    these numbers?

6    **A**    I have my own beliefs but no one involved with the case has

7    told me what they intend to do with them.

8    **Q**    And in one of your beliefs is that the hope will be that this

9    disparity in salary change will be viewed as an inducement to the

10   downloading.  Isn't that your understanding?

11   **A**    I don't think I would think of it as an inducement.  I don't

12   know what the lawyers intend to make of it, but I would not think

13   that I would view it as an inducement so much as just a measurable

14   difference.

15   **Q**    In fact, you haven't measured any difference that you could

16   statistically say was a causation of any behavior in connection

17   with your assignment in this matter; isn't that true?

18   **A**    Let me make sure I understand your question.  Is your

19   question about statistics or about causation?

20   **Q**    Sometimes those two things are related; correct?

21   **A**    The correlations are related.  Causation is rarely something

22   you directly get through the statistical results.

23   **Q**    Let's focus on correlations then.

24          You have Mattel made any statistical calculations of a

25   correlation?

1    **A**    Actually, I have since my deposition.  When someone asked me

2    about it, I went back and did it.

3    **Q**    You have not testified to that here today?

4    **A**    That's correct.

5    **Q**    And you have not disclosed that in a report previously?

6    **A**    I did not.  It happened after the deposition when someone

7    asked me about it, and I said this is easy to do, and I did it.

8    **Q**    So you are not here to testify today that there was any

9    inducement by either MGA or Mr. Larian associated with the

10   downloading; is that true?

11   **A**    I'm not here to talk about motivation or psychology.

12   **Q**    Or even facts about what did or didn't happen in this case?

13   **A**    I'm not sure that's true.  These are facts and these things

14   happened.  The things I testified to are facts.

15   **Q**    You didn't testify to any facts about downloading?

16   **A**    No.  Not about downloading.

17   **Q**    You were just asked to assume about that; right?

18   **A**    I was not -- I was asked to identify -- to consider two

19   groups.  Those groups were identified to me in advance.  And I was

20   to measure differences between those two groups.

21   **Q**    You don't have any facts about downloading are not

22   downloading?

23   **A**    About the individuals and their activities, that's correct.

24   **Q**    Now, what you were asked to measure was the change in salary;

25   is that right?

Page 47

1   **A**   Yes.

2   **Q**   Now, in your experience, is salary the entire compensation

3   that people ordinarily receive?

4   **A**   It depends on the company.  Sometimes the answer is yes,

5   sometimes the answer is no.

6   **Q**   With respect to Mattel, the answer is no; correct?

7   **A**   I don't know that that's true for each and every person.

8   Mattel at least at times pays bonuses in addition to salary.  I

9   don't know that every employee is eligible.

10   **Q**   Mattel has bonuses; correct?

11   **A**   At least for some employees.

12   **Q**   Mattel has health insurance; right?

13   **A**   That would be my assumption, though I never checked it out.

14   **Q**   It's a public company; right?

15   **A**   Yes.

16   **Q**   Large public company; right?

17   **A**   Yes.

18   **Q**   You would expect a large public company to offer health

19   insurance, wouldn't you?

20   **A**   As I said, that would be my expectation.

21   **Q**   Maybe even certain number of vacation days; right?

22   **A**   I would expect that as well.

23   **Q**   Perhaps a severance payment?

24   **A**   Again, that's highly likely.  I don't know the facts, but I

25   would expect that's not unreasonable.

Page 48

1   **Q**    Dental insurance?

2   **A**    Possibility.

3   **Q**    Maybe even vision insurance?

4   **A**    Also a possibility.

5   **Q**    There are a variety of ways in which employees are

6   compensated that are not just reflected in their salary; isn't

7   that true?

8   **A**    Yes.

9   **Q**    And you did not look at those other ways in which employees

10   might be compensated at either Mattel or at MGA; is that correct?

11   **A**    It is, but remember, I'm comparing two groups that moved from

12   the same first company to the same second company.  So to the

13   extent that each of them gets a set of benefits, that would be

14   expected to be essentially treated similarly within the group.

15   **Q**    So you are saying everybody from the lowest to the highest

16   would get the same set of benefits?

17   **A**    No.  I'm saying it would be similar within a group.  The

18   lowest at Mattel might not get the same as the highest at Mattel,

19   but you would expect the lowest at one set and the lowest at

20   another set might be more comparable than if they just worked at

21   some undefined company.

22   **Q**    Did you consider any changes in rank that occurred associated

23   with these employees?

24   **A**    I just looked at the salaries.

25   **Q**    So the answer is no, you did not consider any changes in

Page 49

1   rank, am I correct?

2   **A**   Not as a way to separately measure anything, that's correct.

3   **Q**   Did you consider any increases or decreases in the

4   responsibility of the employees?

5   **A**   Again, nothing individually, recognizing that you have two

6   groups.  And to the extent the groups get a promotion on average,

7   similar wage and things like that, that would be encompassed in

8   the result, but I didn't look at them in any way.

9   **Q**   Did you consider prevailing wages and market conditions in

10  any way in connection with your computation of salary changes?

11  **A**   Only implicitly in that the group that didn't download would

12  experience on average similar kinds of environments as the grand

13  total of everybody.

14  **Q**   Well, that's assuming that there is no change; isn't that

15  true?

16  **A**   I don't understand your question.

17  **Q**   Let me try again.

18         You didn't consider whether in the new positions, the

19  prevailing wages were higher; is that true?

20  **A**   Not as a -- I did nothing about the characteristics of the

21  new positions.  I still looked at the overall group to see --

22  given that everybody is getting a new position.  It's a new

23  company.  Even if it's a similar job, they have a new company, a

24  new employer, that the behavior of the group of folks who are

25  identified as alleged downloaders was different than the remainder

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 50

1   of them.

2   **Q**    You have no idea what positions these people left and what

3   positions they came to; isn't that true?

4   **A**    Well, I didn't take it into account.  I did have that

5   information.  So saying I have no idea is probably not true.  But

6   I didn't use it in any way in my analysis that I have described.

7   **Q**    Okay.  And you actually have a master's degree in statistics,

8   true?

9   **A**    I did.

10  **Q**    And you are aware that the U.S. Department of Labor publishes

11  statistics about wages, true?

12  **A**    They do.

13  **Q**    And the state also published statistics about wages, true?

14  **A**    Yes.

15  **Q**    And there is a whole set of classifications about positions

16  and expected market wages, true?

17  **A**    There is a lot of data.  I don't know that there is anything

18  on expected market wage in any kind of a forecast.  They report on

19  historical results more than expectations.

20  **Q**    Must have been really frustrating for you in this assignment

21  to just be taking averages when there is so much more data out

22  there that you could be using to examine these people's salary;

23  isn't that true?

24  **A**    No.  The question being asked is a comparison between two

25  groups.  The question is not, what do you pay a particular kind of

Page 51

1   expertise.  So while those are questions I might answer in a

2   different -- if I'm asked a different question, the question I'm

3   asked is the one that was best answered in this fashion.

4   **Q**   So you were never asked to determine in any way, shape, or

5   form whether these salaries amongst the group who allegedly

6   downloaded were appropriate?

7   **A**   I was not asked to make judgment calls about any of the

8   numbers.  I was merely asked whether they behaved in a different

9   fashion from the group of people who did not -- were not alleged

10  to have downloaded.

11  **Q**   And you were never asked to look at whether any of those six,

12  or all of them, reflected prevailing market rates in their new

13  positions, true?

14  **A**   That's correct.

15  **Q**   And you have no idea whether that's the case?

16  **A**   I have not investigated that, so I don't have an opinion on

17  that.

18  **Q**   You prepared a report in connection with your work?

19  **A**   I did.

20  **Q**   And you had a schedule, Exhibit 5, which showed all of the

21  employees and their changes in salaries, true?

22  **A**   I did have such a schedule.  I believe it was Exhibit 5, but

23  I must admit I don't have my exhibit numbers memorized.

24  **Q**   Do you have your report with you today, sir?

25  **A**   I have it in a briefcase in the back, somewhere but not here.

Page 52

1    **Q**    Do you have your report?

2    **A**    I do have it.

3    **Q**    Of the six employees, three of them were in Mexico; correct?

4    **A**    Three of the six alleged downloaders, yes, they were in

5    Mexico.

6    **Q**    And so their salaries were expressed in Mexican pesos;

7    correct?

8    **A**    They were.

9    **Q**    Now, were any of the alleged six downloaders the most highly

10   compensated employees who moved from Mattel to MGA during the

11   period you studied?

12   **A**    In dollar terms, no.  They were individuals who were more

13   highly compensated.

14   **Q**    Of the individuals -- one of the individuals -- well, pardon

15   me.  The individual who was most highly compensated amongst the

16   group who moved from Mattel to MGA was not an accused downloader;

17   correct?

18   **A**    I think that's necessarily true given my prior answer that

19   they were not the -- none of them were the highest.  Someone else

20   was, yes.

21   **Q**    And the second most high salary who moved from Mattel to MGA

22   was not one of the accused downloaders; correct?

23   **A**    That's correct.

24   **Q**    And there were a number of other people who were more highly

25   compensated than the accused downloaders who were not in that

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    group; correct?

2    **A**    There were -- it looks like of the approximately 50 or 60

3    people, looks like there were about three -- and I might have

4    missed one -- there were about three who were more highly

5    compensated than any of the accused downloaders.

6    **Q**    And if you take all of the accused downloaders and their

7    entire range of salary into account, there were a number -- more

8    employees who were compensated more highly than the accused

9    downloaders; correct?

10   **A**    Well, if I take the lowest of the accused downloaders, there

11   were certainly more than three that were more highly compensated.

12   If I take the highest, I think there were only three of the 50 or

13   60 that were higher.

14   **Q**    If you take the lowest, there were many, many more?

15   **A**    Yes.

16   **Q**    In fact, the lowest of the accused, the lowest compensated of

17   the accused downloaders is Jorge Castilla; is that right?

18   **A**    In dollars, yes.  Probably true once you convert the peso

19   amounts as well.

20   **Q**    And what was his change in salary?

21   **A**    In percentage or dollars?

22   **Q**    Percentage.

23   **A**    20.3 percent.

24   **Q**    20.3 percent?

25   **A**    Yes.

Page 54

1   **Q**    That's the lowest of the accused downloaders?

2   **A**    Yes.

3   **Q**    And in fact, that's close to the average of the whole group,

4   true?

5   **A**    That's -- I'll let others make the judgment call.  The

6   average of the group was 12 1/2.  That was 20.  So it's almost

7   twice as much.  But it's certainly a lot lower than the average of

8   the download group.

9   **Q**    The average of six-month group is 15.4; correct?

10  **A**    Of zero to six months only, correct.  I talked about 12 1/2,

11  which was the whole group.

12  **Q**    And Mr. Castilla was within a six-month group; correct?

13  **A**    He was.

14  **Q**    And his was 20.3?

15  **A**    Yes.

16  **Q**    Now, are you aware that Mattel intends to offer another

17  expert to testify about the amount it says that MGA and Mr. Larian

18  were unjustly enriched as a result of this downloading activity?

19  **A**    No.  I'm not surprised.  I assume they would, but I don't

20  know about it.

21  **Q**    Now, the six, their names are Brisbois; is that correct?

22  **A**    Yes.

23  **Q**    And her change was at 45 percent, true?

24  **A**    Yes.

25  **Q**    And Castilla, and his change is at 20.3 percent, true?

Page 55

1   **A**   Correct.

2   **Q**   And Cooney, his change is at 49.7 percent, true?

3   **A**   Yes.

4   **Q**   And then we have Mr. Machado, and his change is at

5   62.2 percent, true?

6   **A**   Yes.

7   **Q**   And Ms. Trueba, whose change is at 30.8 percent, true?

8   **A**   Yes.

9   **Q**   And Mr. Vargas, whose change is at 88.1 percent, true?

10  **A**   Yes.

11  **Q**   And he was the big spike on your other chart?

12  **A**   He was.

13  **Q**   Now, are you aware that Mattel intends to offer an expert

14  opinion that Mr. Cooney benefited MGA with his downloading in the

15  amount of $2,810?

16  **A**   No.  I'm not aware of any -- of what Mattel is contending

17  about benefits for any of these people.

18  **Q**   So are you aware that Mattel intends to offer an expert

19  opinion that MGA was unjustly enriched by Ms. Brisbois'

20  downloading activity in the amount of $1,281,277?

21          **MR. QUINN:**  Your Honor, this assumes facts.  It's beyond

22  the scope of the expert's opinion.  It's really irrelevant to his

23  testimony.  There is nothing before the Court on this.

24          **THE COURT:**  I agree, counsel.

25          **MS. HURST:**  Me I'm going to ask him to make some

Page 56

1    assumptions along these lines.

2             THE COURT:  That's not what he's being offered for.

3             MS. HURST:  He is being offered to show an implicit

4    correlation.  So I would like to cross-examine about the implicit

5    correlation.

6             THE COURT:  Unjust enrichment.  I don't understand,

7    apparently.  I see that look on your face like I don't understand,

8    so I must not understand.

9             MR. MCCONVILLE:  I get that look all the time.

10            THE COURT:  What am I not understanding here?  Why don't

11   we come to the sidebar for just a moment.

12            Would you excuse us for just a moment.  I don't

13   understand something and counsel will be happy to explain that.

14                 (The following proceedings were held at sidebar.)

15            THE COURT:  I'm confused.  This is unjust enrichment.

16   He is not being presented for unjust enrichment.

17            MS. HURST:  So here's the problem.  He is an expert who

18   has now given implicit endorsement to the notion that there is a

19   correlation between being paid higher amounts and downloading.

20   Okay.  What I'm going to show -- I would like to ask him to make

21   assumptions if he is not aware of this, with a hypothetical, is

22   that there is no correlation because the lowest of the amount of

23   salary change in this group is actually associated with the

24   highest amount of unjust enrichment.

25            And here we have one of the highest numbers associated

1   with a mere $2,000.  It undermines the entire alleged causal that

2   they're trying to show here.  And given that this whole thing is

3   statistically an invalid argument, you know, I think I should be

4   given a little leeway and undermine this by showing that the guy

5   who actually got something that is a minimal salary increase is

6   the one who is alleged to have taken the information of the

7   greatest value.

8        **THE COURT:**  That's outstanding preparation.  Denied.

9   Now, you can call him back if you would like to in your case, but

10  he is not being presented for that purpose.  Thank you very much.

11  Call him back if you would like.

12                    (End sidebar.)

13       **THE COURT:**  Ms. Hurst is more than welcome to call the

14  gentleman back during her case if she would like.  This is outside

15  the scope, and she is precluded at this time.

16            You may be available and you may be summoned back to

17  Court in MGA's case.  That's up to them.

18            Ms. Hurst.

19       **MS. HURST:**  Thank you, Your Honor.  Your Honor, I

20  believe Mr. Cote has some questions for this witness as well, so

21  I'll defer to him at this time.

22       **THE COURT:**  Let me see if Mr. Cote has questions.

23            Mr. Cote?

24       **MR. COTE:**  I do, Your Honor.

25       **THE COURT:**  Mr. Cote on behalf of Mr. Machado.

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 58

1                          CROSS-EXAMINATION

2    BY MR. COTE

3    **Q**    Good afternoon, Mr. Kinrich.

4    **A**    Good afternoon.

5    **Q**    You said earlier what you were testifying to were the facts.

6    Do you remember saying that?

7    **A**    Yes.

8    **Q**    How do you know Mr. Machado's salary?

9    **A**    From records at both Mattel when he worked there and at MGA

10   when he worked there.

11   **Q**    What records did you rely on to get to those facts, as you

12   call them?

13   **A**    I don't have them.  I can't name the specific document

14   without looking at my files which are not here with me, but they

15   were personnel records produced on the one hand by Mattel and on

16   the other hand by MGA as to what the compensation was for each of

17   the individuals.

18   **Q**    Do you still have Exhibit 5 from your report in front of you?

19   **A**    I do.

20   **Q**    You see the rows that have Mr. Machado, Ms. Trueba and

21   Mr. Vargas listed on them?

22   **A**    I do.

23   **Q**    You cite some documents in the far right side of the exhibit?

24   **A**    I do.

25   **Q**    Those are the records?

1    **A**    Those are some of them.  Not the entire set, but these are

2    some of the records, yes.

3    **Q**    You relied on additional records for Mr. Machado that are not

4    listed on that exhibit?

5    **A**    I don't remember specifically because I can't remember that

6    particular line.  These were sufficient to get me to these

7    numbers.  These were not the only places numbers appeared.  But I

8    did not cite every time the same number appeared in multiple

9    locations.

10   **Q**    My question is, where else did you get Mr. Machado's salary

11   from if not the documents that are listed on Exhibit 5?

12   **A**    I think I just said this was sufficient to get numbers, but

13   it wasn't -- I didn't list multiple documents if they might have

14   the same number in them.

15   **Q**    But you don't know if that's the case with respect to

16   Mr. Machado?

17   **A**    It was the case in general.  I cannot say it was for

18   Mr. Machado because that's just over the entire set of 50 or 60

19   people.

20   **Q**    Do you remember what document in particular that you used to

21   get Mr. Machado's salary at Mattel Servicios?

22   **A**    I do not.

23   **Q**    You cite to a Bates number in that section, Exhibit 5.  It's

24   M129024; right?

25   **A**    Through 35.  So it's a range of about 11 or 12 pages.

Page 60

1   **Q**    It is a several-page document.

2         Do you recall if that's the document you relied on to

3   get Mr. Machado's salary at Mattel Servicios?

4   **A**    I assure you I have no recollection of individual documents

5   Bates numbers by number.  So other than the fact it's listed here,

6   which would make me think that's one of the ones I used, I don't

7   have them memorized by number.

8   **Q**    If I offered to show you the document, would that help

9   refresh your recollection?

10  **A**    It would help in that I could match it up, but I don't know

11  that I would remember it.  I would merely agree with you that is a

12  number that's listed.

13           **MR. COTE:**  Your Honor, may I show the witness?

14           **THE COURT:**  Certainly.

15           **MR. COTE:**  Your Honor, for the record, the document I

16  handed up to the witness was previously marked for identification

17  as Exhibit 8870.

18           **THE COURT:**  Thank you.

19  BY MR. COTE

20  **Q**    Is Exhibit 8870 the document you relied on to get

21  Mr. Machado's salary at Mattel Servicios?

22  **A**    It has the right numbers, so I presume that is one of the

23  documents I relied on having.  At this date, I don't remember this

24  specific page or the document itself.

25  **Q**    Let me ask you to turn to page 5.

Page 61

1    **A**     Is that the five in the lower right-hand corner with the TX

2    number?

3    **Q**     That's right.  Do you have that in front of you?

4    **A**     I do.

5    **Q**     Let me ask you a question before we get there.  This was a

6    document originally created in Spanish; right?

7    **A**     I believe so.  I believe this is a translation of it.

8    **Q**     Page 13 has a Certificate of Accuracy of the translation?

9    **A**     It does.

10   **Q**     And pages 14 through 25 are the original in Spanish; right?

11   **A**     Yes.

12   **Q**     What is this document?

13   **A**     It is described as "Final Settlement Payment Special

14   Proceedings," but I do not know what proceedings they were.

15   **Q**     Do I understand that this is a complaint that Mr. Machado

16   filed before the Labor Board in Mexico to get Mattel to pay him

17   the salary they owed him?

18   **A**     I didn't separately understand that.  I didn't review it for

19   that purpose, but I'll certainly except your representation that's

20   what it is.

21   **Q**     Do you have any personal knowledge about what that document

22   is?

23   **A**     Just that it was one of the sources I used, as I read through

24   it, looking for salary information, but not for the other purposes

25   that it might have been used for.

Page 62

1  **Q**    How did you know it was reliable?

2  **A**    How do I know?  I can't know with certainty.  It was put

3  forth to me as a source of salary information by the Mattel

4  attorneys who provided me the information that I requested for

5  salaries.  And this was one of the sources that was available.

6  **Q**    Mattel's lawyers gave you this document and said this is what

7  you should use for Mr. Machado's salary?

8  **A**    They didn't give it to me with those instructions.  They gave

9  it to me saying -- along with a stack of documents a foot high,

10  saying these are documents we have on salaries.  And I sorted

11  through them; I and my associates sorted through them and figured

12  out whose salaries and information came from which documents.

13  **Q**    This Exhibit 8870, this is not a personnel record, is it?

14  **A**    It is not.

15  **Q**    You don't have personnel records for Mr. Machado with respect

16  to his salary at Mattel Servicios?

17  **A**    That's correct, from this document.

18  **Q**    Same thing is true for Mr. Vargas and Ms. Trueba?

19  **A**    Yes.  Same document is cited.

20  **Q**    Did anyone explain to you what this document meant?

21  **A**    I don't believe so.

22  **Q**    Did you ask anyone?

23  **A**    I don't believe so.

24  **Q**    You just put it in your chart without knowing what it was?

25  **A**    I put it in my chart looking for salary information.  And so

1    with that context, yes.  I needed it does to be salary

2    information, I didn't need to know what other purposes the

3    document may have.

4    **Q**    Doesn't the purpose of the documents inform you whether the

5    salary information is accurate?

6    **A**    If it says in here, "this isn't my salary but it's something

7    else," then that would be relevant.

8    **Q**    You just trusted what the document said?

9              **THE COURT:**  Strike the question.  He is going to slow

10   down.

11   BY MR. COTE

12   **Q**    You just trusted what this document said?

13   **A**    Simply for purposes of salary and for no other purposes.

14             **MR. COTE:**  Your Honor, request permission to publish

15   this to the jury?

16             **THE COURT:**  Not at this time, counsel.

17   BY MR. COTE

18   **Q**    This is a document you relied on to prepare your summary of

19   salaries; right?

20   **A**    For that individual, yes, as opposed to all the other lines

21   where I did not rely on this document.

22   **Q**    For Mr. Machado?

23   **A**    Correct.

24   **Q**    And for Mr. Vargas?

25   **A**    Correct.

Page 64

1   **Q**    And for Ms. Trueba?

2   **A**    Correct.

3   **Q**    This one document for all three of those former Mattel

4   Servicios employees; right?

5   **A**    Yes.

6               **MR. COTE:**  Permission to publish?

7               **THE COURT:**  Not at this time.

8   BY MR. COTE

9   **Q**    You understood that Mr. Machado, Ms. Trueba and Mr. Vargas

10   had to file this document before a board in Mexico to get Mattel

11   to pay them the salary that they were owed; right?

12   **A**    I did not understand that previously.  I did not essentially

13   care, once I knew what the salary was, what they were doing with

14   this document.

15               **MR. QUINN:**  Move to strike.  It's irrelevant.

16               **THE COURT:**  I'm prepared to grant that, counsel.  I'm

17   going to let you go a little further with this, but please slow

18   down.

19   BY MR. COTE

20   **Q**    When you were given this document by Mattel's counsel, did

21   you read the entire document?

22   **A**    No.  I skimmed the document looking for salary information

23   and when I found it, I didn't concern myself with the rest of what

24   the document was about.

25   **Q**    You didn't read it at all?

1   **A**    No.  I just said I skimmed it to get it -- to look for the

2   salary information.  So no way did I simply turn to the salary

3   page and say, that's it, because I had to find it.  But I didn't

4   concern myself about what the underlying substance of the document

5   was.

6   **Q**   Other than skimming it, did you read it in any way to try to

7   understand what it was?

8   **A**    No.

9   **Q**   You didn't think that was important?

10  **A**   Not once I had the salary information.

11  **Q**   You didn't want to know the context in which the salary

12  information was presented in this document?

13  **A**    If the salary information was presented as a fact, that was

14  the fact I extracted from the document.  Any other purpose is

15  irrelevant to what I was doing.

16  **Q**    Is it sufficient in your mind, or for your summary, that it's

17  written down?  That's sufficient to be a fact?

18  **A**    No.  I understood this to be an assertion of, in this case,

19  Mr. Machado.  And as an assertion, I assumed very few people are

20  going to understate their salary.  And thus, given the arithmetic

21  I was doing, that was sufficient.

22  **Q**   And you understood to be an assertion in what context?

23  **A**    I did not then have a context.  You have explained it to me

24  in part, but I did not at the time have a context.

25  **Q**   Do you know if Mr. Machado was ever paid the salary he was

Page 66

1   owed?

2   **A**   I do not.

3   **Q**   Do you know if he was paid any of the amounts requested in

4   this document?

5   **A**   I do not.

6          **MR. QUINN:**  Irrelevant, Your Honor.

7          **THE COURT:**  Sustained.  Stricken.

8   BY MR. COTE

9   **Q**   In your analysis -- or excuse me, in your summary, what did

10  you determine Mr. Machado's salary to be at Mattel Servicios?

11  **A**   918,600 pesos per year.

12  **Q**   Where are you reading that from?

13  **A**   My Exhibit 5.

14  **Q**   Does that number appear anywhere in the labor complaint that

15  you have in front of you, Exhibit 8870?

16  **A**   I don't know.  It's, as you pointed out, 20 some-odd pages

17  long and I'd have to go through it.  Plus, I'd also want to look

18  at the other two documents I relied on to see if one of them is

19  the source.

20  **Q**   My question was, is that number anywhere in 8870?

21  **A**   I will start reading if you would like me to do that.  It's a

22  23-page document, but I will look.

23  **Q**   You said before you could just skim it to find it; right?

24  **A**   Skimming still took, when I did it the first time, 10 minutes

25  or more.  And I'm happy to try to do it again if that's what you

Page 67

1    are asking me to do.

2              **MR. COTE:**  Your Honor, should we take a break?

3              **THE COURT:**  It's actually a very short document.  The

4    pages are very short.

5              (Witness reads document.)?

6              **THE WITNESS:**  I found it.  It didn't take 10 minutes.

7    BY MR. COTE

8    **Q**    Did you find the number?

9    **A**    I did.

10   **Q**    Where is the number?

11   **A**    You have to multiply by 12, because the number is shown as a

12   monthly salary.  But if you take the monthly salary in pesos on

13   page 3 and multiply it by 12, you get the number that I had of

14   918,600 pesos.

15   **Q**    You are looking at a chart that has a heading called

16   "salary."

17   **A**    Correct.

18   **Q**    Turn to page 5, you'll see the same chart repeated; right?

19   **A**    Yes.

20   **Q**    Page 5 describes all of the three individuals' compensation,

21   not just salary; right?

22   **A**    Correct.

23   **Q**    You see under paragraph G in that page, that the individuals

24   were entitled to a savings fund of 13 percent of their salary?

25   **A**    I do.

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1   **Q**    One paragraph above that you see that they're also entitled

2   to grocery coupons in the amount of 10 percent of their salary?

3   **A**    I do.

4   **Q**    Did you include the 13 percent?

5   **A**    I did not.

6   **Q**    Include the 10 percent in your analysis?

7   **A**    I did not.

8   **Q**    So the salary compensation number that you have in your

9   report is off by a factor of 23 percent already?

10  **A**    No.

11  **Q**    It's not?

12  **A**    No.

13  **Q**    You didn't include those numbers, though?

14  **A**    That's correct.

15  **Q**    And one paragraph above, paragraph F, talks about a vacation

16  bonus.  Do you see that?

17  **A**    I do.

18  **Q**    What is the vacation bonus?

19  **A**    It says -- parts of it, as you noted, have the word

20  "illegible" there, but a payment of a vacation bonus for

21  100 percent, and then it says "illegible," in an amount equivalent

22  to 12 days per year, essentially, is what it says.

23  **Q**    100 percent of what?

24  **A**    100 percent illegible is what it says.

25  **Q**    Do you know what is written in the illegible?

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 69

1   **A**   I do not.

2   **Q**   This is the document you relied on; right?

3   **A**   Yes.

4         **THE COURT:**  Between answers and questions, each of you

5   take a breath so Maria can get a record because both of you speak

6   quickly.

7         **MR. COTE:**  Thank you, Your Honor.

8   BY MR. COTE

9   **Q**   The 13 percent and the 10 percent, and the vacation bonus,

10  according to this document at least were all part of Mr. Machado's

11  compensation?

12  **A**   Yes.

13  **Q**   And Mr. Vargas' compensation?

14  **A**   Correct.

15  **Q**   And Ms. Trueba's compensation?

16  **A**   Correct.

17  **Q**   You didn't include that in your summary?

18  **A**   That's correct.  I did not.

19  **Q**   Now, did you take into account whether or not people were

20  promoted in your summary?

21  **A**   You mean in a different job, no.  As I described on my

22  earlier testimony, I'm simply comparing salaries at one firm to

23  salaries at another.

24  **Q**   And you didn't compare people who were -- who had more

25  responsibility to people who had less responsibility in their new

Page 70

1   jobs?

2   **A**   Not against each other.  In general many people who change

3   jobs end up getting a promotion and more responsibility.  That's

4   in the base case.  That's essentially in the 12 1/2 percent

5   average salary change.

6   **Q**   Do you know that?

7   **A**   On average across the group of people, yes.  Individually, no

8   some people will not have received a change in position and some

9   will.

10  **Q**   You know on average people are promoted but you don't know

11  which ones or how many?

12  **A**   On average, promotions are included.  I do not have job

13  titles.  I don't even know that you could establish whether there

14  were promotions.  Simply measuring changes in salary.

15  **Q**   You don't know whether you could establish there were

16  promotions, is that what you said?

17  **A**   Yes.  Job titles do not necessarily mean promotion.  If

18  someone is called an artist here and someone is called a senior

19  artist here, that doesn't mean there is a promotion.  It means

20  there are difference in titles at different firms.

21          **THE COURT:**  Stop.  Rest your hands.

22  BY MR. COTE

23  **Q**   You can think of ways to figure out whether someone was

24  promoted or not; right?

25  **A**   I'm not even trying to.

1   **Q**   I understand that you didn't.  My question is you could have

2   done that, though?

3   **A**   Not to answer the question I was asked.

4   **Q**   I'm not asking you about the question Mattel lawyers asked

5   you.  I'm just asking you whether you could have done that.

6   **A**   It is possible, not necessarily doable.  But it's possible

7   that one can look to see if there are promotions involved.  I

8   don't know any of the records that I have that would have enabled

9   me to do that even had it been a question that had been asked of

10   me.

11   **Q**   Well, those records were given to you by Mattel's counsel;

12   right?

13   **A**   Well, all records, because Mattel's counsel asked me to do

14   it.  All records came from them directly.  They weren't the ones

15   who picked them up.  I told them what I wanted.  But they

16   physically assembled them because they had the documents and I did

17   not.

18   **Q**   You told them what you wanted, but you didn't ask them about

19   information regarding promotions; right?

20   **A**   That's correct.

21   **Q**   So you don't know what Mr. Machado's responsibilities were at

22   Mattel Servicios; right?

23   **A**   That's correct.

24   **Q**   And you don't know what his new responsibilities were at MGA

25   de Mexico?

Page 72

1   **A**   That's correct.

2   **Q**   Same thing is true with respect to Ms. Trueba?

3   **A**   Yes.

4   **Q**   Same thing is true with respect to Mr. Vargas?

5   **A**   Yes.

6   **Q**   You just don't know that?

7   **A**   That's correct.

8   **Q**   And you can't rule out his promotion, Mr. Machado's promotion

9   as an explanation for his salary increase; right?

10  **A**   I can't rule it out, but it would not matter to anything that

11  I'm analyzing.  One could always change a title.  That doesn't

12  change the issues that I think that this is designed to address.

13  **Q**   Well, if he had more responsibility, not just title, but more

14  responsibility, let's say he moved from being a director to a vice

15  president, wouldn't that explain an increase in salary?

16  **A**   But then you would have to ask, beyond anything I have done

17  here, whether the change to vice president is related to some of

18  the allegations in the case or not.

19        So the simple fact that you have got a change in

20  responsibility does not address -- would not explain away a change

21  in salary.

22  **Q**   Well, it could explain the salary in its entirety, could it?

23  **A**   But not explain it vis-a-vis the allegations I believe are

24  being made by counsel but that have nothing to do with my

25  analysis.

Page 73

1   **Q**    You understood that Mr. Machado went to work for MGA Mexico;

2   right?

3   **A**    I do.

4   **Q**    Same with Mr. Vargas?

5   **A**    Yes.

6   **Q**    Same with Ms. Trueba?

7   **A**    Yes.

8   **Q**    Do you understand that they were the only three employees at

9   that company at first?

10  **A**    I think I was told that.  I don't have that knowledge with

11  certainty.

12  **Q**    Did you understand that they later reported directly to the

13  vice president for Mexico?

14  **A**    I do not know who they reported to.

15  **Q**    Have you ever heard the term "startup" in connection with a

16  new business venture?

17  **A**    Yes.

18  **Q**    And you understand that startups can be a risky thing?

19  **A**    Yes.

20  **Q**    Sometimes they lose money?

21  **A**    Correct.

22  **Q**    Do you know if MGA Mexico lost money?

23  **A**    I do not.

24  **Q**    Sometimes startups can go out of business?

25  **A**    Yes.

Page 74

1    **Q**    Do you know if MGA Mexico is still in business?

2    **A**    I do not.

3    **Q**    And you understand in your report that of all the employees

4    you looked at, all the employees on Exhibit 5, only three went to

5    MGA Mexico; right?

6    **A**    Yes.

7    **Q**    Only three went to a startup; right?

8    **A**    I can't say that.  But I certainly agree that only three went

9    to MGA Mexico.

10   **Q**    Well, if they were the very first three employees, you don't

11   think that's a startup?

12   **A**    It's a subsidiary of another company.  Usually subsidiaries

13   of existing companies, even of a newly incorporated entity, are

14   not considered startups not in the same fashion as starting a

15   brand new company with no parent, no corporate backing, nothing of

16   that sort.

17   **Q**    That's your opinion even though they share the same risk of

18   losing money or going out of business?

19   **A**    I don't know who the "they" is in your question.

20   **Q**    The subsidiary, the startup?

21   **A**    Well, they may or may not.  Certainly, there are numerous

22   subsidiaries throughout the world that have been started, shut

23   down.  Those employees moved back to the parent company or move to

24   a different subsidiary of the parent, and the employees are not at

25   further risk.  The company may be as a legal matter out of

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 75

1   business.

2           But for employees in principal -- not for these

3   individuals -- but in principle working at a new subsidiary is not

4   the same as working at a brand new startup.

5   **Q**   You don't know if any of those things happened in this case,

6   do you?

7   **A**   I do not.

8   **Q**   I think you told Ms. Hurst that you did look at any market

9   salaries for the toy industry in Mexico?

10  **A**   That's correct.

11  **Q**   You didn't compare Mr. Machado's salary to any other toy

12  executives?

13  **A**   That's correct.

14  **Q**   Either in Mexico or any other country?

15  **A**   That's correct.

16  **Q**   You didn't see where his salary was appropriate for a man of

17  his education and responsibility?

18  **A**   I didn't.  The comparison I testified to on my direct

19  examination simply look at changes in salary over time.

20  **Q**   Assume for me, if you will, that Mr. Machado was promoted and

21  he was moved into the same position that his old boss at Mattel

22  had.  Okay?

23  **A**   Yes.

24  **Q**   What did you have Mr. Machado's salary at MGA pegged at?

25  **A**   At MGA?

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 76

1   **Q**   Yes.

2   **A**   About $1.5 million pesos per year.

3   **Q**   If I were to tell you that Mr. Machado's old boss at Mattel

4   was paid 3,324,839 pesos, would that affect your analysis in any

5   way?

6   **A**   Not at all.

7   **Q**   The fact that his boss is getting more than twice what he was

8   getting doesn't change your analysis?

9        **MR. QUINN:**   Assumes facts not in evidence, Your Honor.

10        **THE COURT:**   He asked a hypothetical.

11   BY MR. COTE

12   **Q**   If his boss was hypothetically getting more than twice his

13   salary, that doesn't change your analysis in any way?

14   **A**   No.

15   **Q**   No further questions.   Thank you.

16        **THE COURT:**   Redirect, Mr. Quinn on behalf of Mattel.

17                    REDIRECT EXAMINATION

18   BY MR. QUINN

19   **Q**   Has the counsel have asked you questions raised anything

20   which in your mind affects or changes the percentage calculations

21   that you described to the jury on direct exam (sic)?

22   **A**   No.

23   **Q**   You didn't look into promotions because you are just looking

24   to see, compare this group, the amount of salary increase they got

25   versus the rest of the former Mattel salaries, the salary increase

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 77

1    they got?

2    **A**    Correct.

3    **Q**    Those who are alleged to have downloaded versus everyone

4    else?

5    **A**    Yes.

6    **Q**    Why didn't you -- you were asked questions by Mr. Cote, why

7    didn't you take into account this 13 percent savings funds, 10

8    percent grocery coupons and the vacation bonus for Mr. Machado and

9    the others?

10   **A**    Two reasons:  First, let me -- maybe three reasons.  First, I

11   was asked to look at salary.  Those are not salary.

12            Second, the reason I was asked to look at salary, or the

13   reason I agreed with your office that salary was the right thing

14   to look at, was the information about fringe benefits and vacation

15   bonuses and things like that was not available on an

16   apples-to-apples basis.  I didn't have that information so would

17   be unable to compare those amounts between the employees.

18            Base salary to base salary, in most cases, is a fair

19   comparison, because if there is a bonus or if there is a

20   percentage add-on or anything else, those typically are

21   proportional to the base salaries.  If you get a 10 percent

22   addition to your salary at Mattel, there is reasons, not

23   individual reasons, but aggregate reasons that those kind of

24   adjustments would also apply to the MGA salary.

25            So when you look at these things apples to apples, you

1    want salary on both sides.  You don't want salary and bonus and

2    vacation allowance on one side and only salary in the other,

3    because then you wouldn't be comparing things fairly.

4    **Q**    So you didn't take into account those nonsalary benefits on

5    either the Mattel side or the MGA side; correct?

6    **A**    So that exactly correct.

7    **Q**    Thank you.

8              **THE COURT:**  And recross-examination, Ms. Hurst.

9                        RECROSS-EXAMINATION

10   BY MS. HURST

11   **Q**    Mattel is a large public company; correct?

12   **A**    Yes.

13   **Q**    MGA is a small privately-held company; correct?

14   **A**    It's not that small, but it is privately held.

15   **Q**    It's been larger or smaller, depending on its fortunes in

16   recent years; correct?

17   **A**    Correct.

18   **Q**    And in fact, some of these percentage changes of salary

19   occurred at different times in those fortunes of the company;

20   isn't that true?

21             **MR. QUINN:**  Vague and ambiguous.

22             **THE COURT:**  Do you understand the question, sir.

23             **THE WITNESS:**  If I look at my own schedule, I might be

24   able to decipher the question.  So let me look.

25             The various salary changes occurred at different dates

1    though within a fairly limited period.  The employees at issue,

2    the six employees basically moved in '04 to '06.  And I would,

3    just eyeballing, say that 90 percent of the other employees, the

4    ones who did not download, also moved in '04 to '06.  A few, there

5    is an '03, a 2000, a couple others, but I would say probably 80 or

6    90 percent are in the same general time period.

7    BY MS. HURST

8    **Q**    You've got your schedule in front of you there?

9    **A**    I do.

10   **Q**    There is the range of employees for the entire 18-month

11   period -- that is, the nonaccused people -- goes from 1999 to

12   2007; correct?

13   **A**    Yes.  I see each of those.

14   **Q**    And 1999, that was before MGA enjoyed its success with Bratz;

15   correct?

16   **A**    I assume that's right.  I actually don't know the Bratz

17   success dates, but I'm sure you do.  I'm sure you know it very

18   well.

19   **Q**    2000, that was before MGA success with Bratz; right?

20   **A**    Again, I don't know the dates, but the dates are well-known

21   to probably everyone in this courtroom but me.

22   **Q**    Bratz didn't come out until the second half of 2001.  You'll

23   accept that?

24   **A**    I will.

25   **Q**    And in 2007, MGA's revenues from the sale of Bratz products

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 80

1    declined significantly.  Do you know that?

2    **A**    I know there was a time in the late 2000's they declined.  If

3    it's 2007, that's fine.

4    **Q**    And do you know that the three years in which the accused

5    downloaders joined MGA which are the years that you identified as

6    having a higher percentage of salary change, were actually the

7    salad days over at MGA with respect to the sales of Bratz?

8    **A**    I'll agree with the second half.  The first half is not what

9    I said.  I didn't say they were the higher salary change.  I said

10   they were the overwhelming majority of the people who moved who

11   were not part of the alleged downloaders.  That is about

12   90 percent of the people who were in the comparison group moved

13   during that three-year period?

14            **THE COURT:**  Did you say salad day?

15            **MS. HURST:**  Yes.  First of all, can I move to strike

16   that answer as nonresponsive?

17            **THE COURT:**  No.  But "salad days," I don't have any

18   concept of that.

19            **MS. HURST:**  That's my upbringing in Ohio coming out

20   there.

21   BY MS. HURST

22   **Q**    Is that a phrase you are familiar with, Mr. Kinrich?

23   **A**    It is.  I knew what you meant.

24   **Q**    What do you understand the "salad days" to mean, sir?

25   **A**    Good profitable periods of time.

Page 81

1   **Q**    You might expect to find a company being more generous with

2   salary increases during a period of time in which it's

3   experiencing high profitability, heavy demand for its products,

4   and a desire, a strong desire to attract new employees to support

5   its operations; isn't that right?

6   **A**    Well, it might be true, but that's why I looked for the years

7   to see that most of them are in the same time periods.

8   **Q**    You didn't look to that until I just asked you that question?

9   **A**    Actually, I did.  And I wouldn't have answered it if I hadn't

10  done that.  I did know and I did care, when I was doing this

11  analysis, that I generally had similar time periods.

12  **Q**    How many of the non-downloading employees did you consider in

13  your 18-month average?

14  **A**    52, although I think one was a missing data point.  I think

15  51 ended up in the total.

16  **Q**    And there were three -- the entire period encompassed by the

17  six accused downloaders is from April 2004 to October 2005; right?

18  **A**    No.  May 2006.

19  **Q**    April 2006?

20  **A**    May.  May 2006.

21  **Q**    April 2004 to May 2006; correct?

22  **A**    Yes.

23  **Q**    Approximately a two-year period?

24  **A**    Yes.

25  **Q**    How many of the persons outside the accused group fall

Page 82

1    outside of that two-year period?

2    **A**    I would have to go item by item.  I look generally at the

3    years, 2004 to 2006.  I didn't cut it off at April and May.  So

4    I'd have to go item by item and separately answer that question.

5    **Q**    You are aware there is a seasonality in the toy business;

6    correct?

7    **A**    In sales, yes.

8    **Q**    And that affects the company's business, true?

9    **A**    In terms of sales, yes.

10   **Q**    There are at least a third of the persons in the nonaccused

11   group who fall outside of that three-year period of the accused

12   downloaders; isn't that true?

13   **A**    You have said three years.  Previously you said two.  Let me

14   make sure I understand you.

15   **Q**    Just going with the way you did it now.

16   **A**    The calendar years?

17   **Q**    The calendar years.  Let's just go with the way you did it.

18   There is at least a third of the group, the nonaccused group, who

19   are outside of those calendar years; isn't that true?

20   **A**    I would have to count them, which may take me a minute.  I'd

21   say just eyeballing it, I will say it's not quite a third, but if

22   you have already counted them, you may already know.

23   **Q**    I have counted them.  Will you accept my representation?

24   **A**    I will.

25   **Q**    You would expect a third to effect an average, wouldn't you?

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 83

1    **A**    Any change in the number affects the average in some fashion

2    even if it's just a minuscule amount.

3    **Q**    In this case, a third is more than a minuscule amount?

4    **A**    Let's be careful.  To say that doesn't mean necessarily they

5    will change the average.  If you take them out, you may get a very

6    similar average.  You may get a different number.

7    **Q**    You don't know?

8    **A**    I do not.

9    **Q**    Thanks.

10            **THE COURT:**  Have you concluded?

11            **MS. HURST:**  Yes.

12            **THE COURT:**  Mr. Cote.

13            **MR. COTE:**  Thank you, Your Honor.

14                          RECROSS-EXAMINATION

15   BY MR. COTE

16   **Q**    I'm going to try to speak much slower this time.

17            Did I hear you say that fringe benefits, as you called

18   them, were unavailable to you?

19   **A**    They were not uniformly available to me across the two

20   companies.

21   **Q**    What did you do to find out the fringe benefits of MGA

22   Mexico?

23   **A**    Once I decided I wasn't doing anything with them, I didn't do

24   anything to attempt to find it out.

25   **Q**    How do you know they were not available?

Page 84

1    **A**    They were not available in the documents I had.

2    **Q**    Did you ask for more documents that might provide that

3    information?

4    **A**    I did not.  Once it become clear that the entire set -- first

5    of all, the amount of time period I had kept me from asking for

6    more documents because there was not time to have MGA actually

7    produce any additional information.  As I understand the legal

8    process, it's a minimum of a 30-day request to your side before

9    information is produced.  And the information was requested from

10   me in less than 30 days.  So there would have been no way to get

11   that information.  Plus, it didn't prove relevant to answering the

12   question I was asked.

13   **Q**    Well, let me break that down a little bit.  You said you

14   didn't have time to ask MGA to give that you information.  Did you

15   ask Mattel's lawyers if they already knew that information?

16   **A**    I asked them if they had the information.  I did not ask

17   about their mental knowledge.  I asked whether there was

18   information about that, and established that in aggregate across

19   the two data sets -- that is, the Mattel side and the MGA side --

20   that there wasn't sufficient information to enable that to be

21   analyzed.

22   **Q**    Did you ask them if they knew about Mr. Machado's, what you

23   called fringe benefits?

24   **A**    I did not ask about Mr. Machado separately, no.

25   **Q**    And these fringe benefits we saw are more than 23 percent

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 85

1    added on to his salary.  You didn't ask about that at all?

2    **A**    I already knew that.  This document at the time, though, I

3    haven't looked at it for six months or something, I had to read it

4    again now, I remember those facts when I looked at it the first

5    time.

6    **Q**    Did you ask Mattel for his employment contract with MGA?

7    **A**    I did not.

8    **Q**    Did you ask them if they even had it?

9    **A**    I did not.

10   **Q**    Think that might be a place to look?

11   **A**    For salary, I had his salary.  I didn't need anymore

12   information.

13   **Q**    I'm talking about the fringe benefits that you said were

14   unavailable.

15   **A**    I did not, because I did not -- it wasn't an issue of one

16   individual that wasn't available.  I did not look for that.  I did

17   not find it relevant to the question I was answering.

18   **Q**    You couldn't get the whole compensation package for some

19   employees so you ignored it for all of them; right?

20   **A**    I didn't ignore it.  It isn't relevant to answering a

21   question about salary.  Everyone in the United States at least --

22   and Mexico is different -- but everyone in the United States

23   typically gets health benefits.  They get vacation.  Gets

24   certainly Social Security payment by the employer.  Everyone gets

25   it.  If you don't add it, you are really treating everybody

1    similarly.  And I did not separately add it.  It doesn't add

2    anything to the analysis of change of average salary.

3    **Q**    Mexico is different you said; right?

4    **A**    Mexico is different.

5    **Q**    Mr. Machado, Mr. Vargas, Ms. Trueba are the only people from

6    MGA on your list?

7    **A**    Yes.

8    **Q**    You compared them to everybody else, 52 people; is that what

9    you said?  52 people total in your population?

10   **A**    Yes.

11   **Q**    You compared them to 52 people who were working in Mexico;

12   right?

13   **A**    That's correct.

14   **Q**    So that assumption you just stated doesn't hold for Mexico;

15   right?

16   **A**    The assumption about there being fringe benefits?  I believe

17   it does hold.  You've already identified fringe benefits.

18   **Q**    They got these additional 23 percent compensation plus

19   vacation bonus at Mattel Mexico and you don't know if they got

20   that at MGA; right?

21   **A**    That's correct.

22   **Q**    Just ignored it completely from your analysis?

23   **A**    That's correct.

24   **Q**    Now, Mattel told you to compare two groups of employees;

25   right?

1   **A**    I'm going to tentatively agree with you because Mattel didn't

2   instruct me which groups to do.  They told me they wanted a

3   comparison of the downloaders and other employees who left.  They

4   didn't identify the groups for me.

5   **Q**    Well, they told you who the accused downloaders were?

6   **A**    Yes, they identified group one.

7   **Q**    And group two was everybody else; right?

8   **A**    Well, ultimately it was.  As I described earlier, I had a

9   much larger set of people.  And I had to move -- I had to, rather,

10  analyze the moves to eliminate people who moved more than a year

11  and a half later to eliminate freelancers, to eliminate temporary

12  employees.  And then when I was done, the 50 some-odd employees it

13  what was left.

14  **Q**    And you compared the six to the 52?

15  **A**    Yes.

16  **Q**    Now, if you had compared the six to people in the industry

17  who had the same titles, you would have a different chart; right?

18  **A**    I'd have an analysis I would consider fairly meaningless, but

19  it would be different.

20  **Q**    You would have a different analysis?

21  **A**    Yes.

22  **Q**    If you compared them, their salaries at MGA to other people

23  who did the same job, you would have a different chart?

24  **A**    Presumably.

25  **Q**    If you compared them to people who had the same types of

Page 88

1   responsibility that they had at MGA, you would have a different

2   chart then too; right?

3   **A**   Again presumably, yes.

4   **Q**   If you compared them to people who were working in the same

5   types of companies they were working in, you would have a

6   different chart then, too; right?

7   **A**   Well, I'll say yes.  I don't know what you mean by "same

8   types of companies."

9   **Q**   Other toy companies.

10  **A**   These are at toy companies.  So that's not necessarily -- a

11  different company than this, if the data is different, obviously a

12  different numerical result will at least at some decimal place

13  will probably happen.

14  **Q**   If you compared their salary to fair market value salaries,

15  you would have a different chart; right?

16  **A**   I don't know that's true.

17  **Q**   You don't know it's not true; right?

18  **A**   I didn't do the analysis so I don't know the result.

19  **Q**   You don't know one way or the other?

20  **A**   Correct.

21  **Q**   And you didn't do any of those analyses because Mattel asked

22  you to just compare the sales between the six and the 52; right?

23  **A**   Mattel asked me a question approximately what you said.  That

24  is, they asked what is the average salary increase for a group of

25  people who left Mattel and went to MGA and how does that compare

Page 89

1    to the average salary increase for the six accused downloaders.

2    **Q**    Because that's what Mattel lawyers told you to do, that's all

3    you did; right?

4    **A**    Well, that's the question they asked me and I answered that

5    question, yes.

6    **Q**    That's what they told you to do and that's all you did;

7    right?

8    **A**    After -- that's all I did.  I did other things, but it's all

9    within the context of answering that question.  I looked at

10   whether 18 months mattered, whether 12 months mattered, whether

11   six months mattered.  I looked at the time periods.  I looked to

12   see whether -- make sure we had a proper definition.  But it's

13   within the context of the question about changes in salary.

14   **Q**    They asked you to compare the two salaries:  One at MGA or

15   MGA Mexico and one at Mattel or Mattel Servicios and that's all

16   you did?

17   **A**    Yes.

18   **Q**    No further questions.

19            **THE COURT:**  Thank you.

20            Let me just talk to you before you take a break.

21            About at the end of the day counsel, during the recess,

22   will put up the time so you'll know exactly where we are.

23            Number two, in most of the cases I have had, about this

24   time I have wanted to write a letter to your employers.  So if you

25   would like a letter to your employer Tuesday, give me your

1   employer's name or a person including his spouse if you want --

2   I'm just kidding you -- so I could send it off to your employers,

3   because it's a nice thing for them to get partway.  They really

4   appreciate that.

5          So I'm more than happy to do that on judicial stationary

6   thanking them for your service.  Bring that to Kathy on Tuesday.

7   Let me know what that company is or the person that might be

8   helpful, just to humbly thank them, from the Court system, for

9   your service.  Would that be okay?

10         Now, you go take a break.  As soon as you come back,

11  we'll call that last witness for the day.  How long would you

12  like?  Two minutes.  I'm just kidding you.  Why don't you go 15

13  minutes at the most and let's get right back into session.

14         Mr. Kinrich, you are to remain on call until May 7.  I

15  doubt that you'll be recalled, but in case you are, I don't want

16  any additional subpoenas.  Go about your professional

17  responsibility, any planned vacation.  If we need you, we'll find

18  you, sir.  Thank you very much.

19             (Recess taken, from  2:41 to 2:58.)

20         **THE COURT:**  Back on the record.  The jury is present,

21  all counsel, the parties.  Counsel were just discussing something

22  for a moment, but as they do, we'll call the next witness forward,

23  whose name is?

24         **MR. ZELLER:**  Laura Owens.

25         **THE COURT:**  Ms. Owens, thank you.  Would you raise your

Page 91

1   right hand.

2              LAURA OWENS, PLAINTIFF'S WITNESS, SWORN

3              **THE COURT:**  If you would come along this railing and

4   there is an entrance right next to the wall.  Now, would you be

5   currently to state your name for the jurors, please?

6              **THE WITNESS:**  Laura Owens, O-w-e-n-s.

7              **THE COURT:**  Counsel, direct examination by Mr. Zeller on

8   behalf of Mattel.

9                          DIRECT EXAMINATION

10  BY MR. ZELLER

11  **Q**    Good afternoon.  Where do you currently work?

12  **A**    Mattel Toys.

13  **Q**    And what is your current title there at Mattel?

14  **A**    I'm the vice president of Capacity and International Demand

15  Planning.

16  **Q**    And I think, just briefly, your educational background is

17  that you have a bachelor's from U.S.C. in business administration?

18  **A**    That's correct.

19  **Q**    And how long have you been working there at Mattel?

20  **A**    It will be 26 years in September.

21  **Q**    And please tell us what it is that you do in your position of

22  vice president of Capacity and International Demand Planning?

23  **A**    I really have two groups.  One that is more operations

24  facing.  And we decide where the toys are going to be made.  And

25  then we also decide the capacity plan to make sure that we have

Page 92

1   enough equipment and people and ramped up to make the toys for the

2   full year.

3            And then other part of my business is the international

4   demand forecasting business.  So what we do is work with all the

5   markets to make sure that their forecasting tools are best; that

6   their inventory is under control; they're demanding enough product

7   in order to make their sales plans.  And also, we work on a lot of

8   special projects to help make sure we are doing things in a

9   unified, as much as we can, way for international.

10  Q    When you say international there at the end, what do you mean

11  by that?

12  A    International is a division of Mattel.  So anything that's

13  sold outside of the United States is considered the international

14  division.  And it has a president that's the head of international

15  division.

16  Q    And can you tell us about how much of Mattel Inc.'s business

17  is the international division as opposed --

18  A    It's about 50 percent right now.

19  Q    Tell us just generally speaking what is forecasting in the

20  toy industry.

21  A    Forecasting is really trying to get enough product to fulfill

22  the customer needs while balancing that with managing your

23  inventory so that you are doing this all in a profitable way.

24  Q    What do you mean by "managing inventory?"

25  A    Well, what you want to do, you don't want too much of any one

Page 93

1    item or too little of any one item.

2    **Q**    Why is it you don't want too much of an item?

3    **A**    If you have too much of an item, what normally happens is you

4    either -- you can't sell it so you have to scrap it, or you are

5    selling it at a loss.  And then the other ramification is that you

6    have to store inventory.  And then you're tying up your money so

7    you can't use your capital in more productive use.

8    **Q**    And then I think you also mentioned you don't want to wind up

9    with too little?

10   **A**    Too little is sort of -- if you have too little, then you are

11   obviously foregoing sales and profit, and you are also making your

12   customer, like a Walmart or a Target, lose profit as well as that

13   shelf space goes empty and you can't sell it to the end consumer.

14        You also wind up with a problem sometimes if you

15   disappoint a customer too much, he is not going to give you the

16   support you need next year for your next line of products.

17   **Q**    What do you mean in the toy industry when you talk about

18   something like customer support?

19   **A**    Well, customer support, I mean that you normally get a

20   certain amount of shelf space for Barbie or Hot Wheels or

21   something like that.  And if you are constantly running out of

22   stock, they may not give you six feet of your shelf space.  They

23   may cut it down because you are not reliable.

24   **Q**    Is forecasting something that's difficult in the toy industry

25   in general?

Page 94

1    **A**    Very difficult.

2    **Q**    Maybe if you could please tell us a little bit about why that

3    is.

4    **A**    There's really four reasons I think that -- why it's

5    difficult.  The one is probably the obvious one, the huge

6    seasonality that we have.  Most of what we sell is sold, probably

7    50 percent of it, in the last couple of months of the year because

8    of Christmas.  And why that is hard is because a lot of times you

9    don't get a good consumer read on it until the very end.  And it's

10   difficult to respond to direct point of sale information.

11          The second reason is in a lot of cases a lot of our

12   records are new product introductions.  So you wind up not having

13   a lot of history about the toy.  So it makes it difficult to

14   predict what you are going to sell that year.  Unlike toothpaste,

15   we sell toothpaste year after year, and there is a lot of

16   statistics about it.  You don't get that when you have new toy

17   introductions all the time.

18   **Q**    Let me stop you there for a second.

19          About how many new products does Mattel introduce every

20   year?

21   **A**    About 60 or 70 percent of our products are new every year.

22   **Q**    Can you, I guess, quantify that in some way in terms of

23   number of items or SKU's?

24   **A**    Normally like consumer SKU, we probably have about 8000

25   SKU's.

Page 95

1    **Q**    Those are the new one?

2    **A**    Yes.

3    **Q**    And you were saying that there were --

4    **A**    There were other reasons.  I guess a third one is there is

5    usually very long lead times in the toy industry.  The products

6    are made quite a far distance from the end market in most cases.

7    And lead times can be three to four months in a lot of cases.  So

8    when you are having to forecast, it's not like you are trying to

9    forecast next week or next month.  You are having to forecast

10   three or four months out.  And it also makes it difficult to

11   resupply when you get closer to Christmas.

12          And the fourth reason is even some of our products don't

13   even last for a year because they might be introduced in a year

14   but they're for the fall season.  So if you only get those things

15   on shelf like in the August and September time frame, you may only

16   have one shot at even trying to place a reorder once you get a

17   good signal from the end consumer.

18   **Q**    At Mattel did you know someone named Jorge Castilla.

19   **A**    Yes, I did.

20   **Q**    Is he someone you worked with?

21   **A**    Yes.  He worked for my director in the one group that I

22   supervise, which is the International Demand Planning group.

23   **Q**    So Mr. Castilla was part of the International Demand Planning

24   group?

25   **A**    Yes, he was.

Page 96

1   **Q**    And do you know what time period?

2   **A**    From 2004 to March of 2006.

3   **Q**    Do you know what Mr. Castilla's educational background was?

4   **A**    Yes.  He had a bachelor's of science degree in international

5   business from Georgetown University.  And I happen to know he was

6   the valedictorian of his high school as well.

7   **Q**    And is he someone who you valued as a member of the team?

8   **A**    Absolutely.  Just a very smart individual.  Very technical

9   savvy.  A good communicator.  Very thorough and well-organized.

10  **Q**    And just if you could please tell us a little bit about what

11  did he do in the group?

12  **A**    In my group or -- yeah, in my group he helped work on our

13  enterprise data warehouse projects.  He helped consolidate a lot

14  of the inventory management reporting in our group.  He was

15  assigned at the very end to our sales planning enhancements

16  projects.  He helped when we had shortages to help allocate which

17  market should get what product.

18          And then any sort of -- part of our group is we're the

19  one voice for international to operations in many instances.  So

20  he may have done a lot of issue resolution when we needed it.

21  **Q**    And so one term mentioned was something called EDW.  What is

22  this?

23  **A**    That's Enterprise Data Warehouse.  And it's what a lot of

24  companies do to pick out the pieces of information -- we have it

25  for Forecasting and Planning -- the pieces of information that

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    they feel valuable that they want to get from a lot of different

2    systems and organize in a certain way.  So it's all of the data

3    and also how do you want to sort it for your company to be able to

4    answer questions very quickly and rapidly for your type of

5    business.

6              **THE COURT:**  Just a moment.  Rest.

7    BY MR. ZELLER

8    **Q**    I think another term that you mentioned in your answer was

9    inventory reporting?

10   **A**    Yes.

11   **Q**    And what does that refer to?

12   **A**    Well, that was what we did periodically with the CFO and the

13   major business units that the company was -- do reporting on what

14   our inventory position is; what the actuals were; what the future

15   was going to look like; the days of supply; how different volumes

16   were coming in at a level of granularity by brand so we would

17   review we were in a good position or we needed to make judgment.

18   **Q**    When he was at Mattel in this 2004 to 2006 time frame period,

19   did Mr. Castilla have access to Mattel computer systems?

20   **A**    Yes, he did.

21   **Q**    And is EDW that you were talking about, is that, in fact, a

22   computer system of some kind?

23   **A**    Yes, it is.

24   **Q**    Was that one of the ones -- one of the systems that Mr.

25   Castilla had access to?

Page 98

1    **A**    Yes, it is.

2    **Q**    And then I think there was another one that was called

3    Sharepoint?

4    **A**    Sharepoint is really a series of servers that we store our

5    work product on -- Excel documents, Word documents, PowerPoint

6    documents.  And normally those are -- or not normally, always they

7    are password protected and only applicable to the groups that are

8    working on those work products.

9    **Q**    And then another system that Mr. Castilla had access to, a

10   Mattel computer system, was something called IDW?

11   **A**    Yes.

12   **Q**    What is that?

13   **A**    That's the International Data Warehouse.  That was the

14   precursor to the Enterprise Data Warehouse because that was

15   developed just for international.

16   **Q**    Is it similar to the EDW?

17   **A**    Yes, it is.

18   **Q**    And then Mr. Castilla also had access to a Mattel computer

19   called ISIS?

20   **A**    Yes, he did.

21   **Q**    And what is ISIS?

22   **A**    ISIS is the system that the international markets use.  They

23   do their sales planning and forecasting.  Their demand planning

24   and order management and their allocation system is all integrated

25   in a system called ISIS.

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    **Q**    And then Mr. Castilla had access to a system called DPAM?

2    **A**    DPAM.  That's like the front end of the operating system.  So

3    as markets put their demand signal in for operation, it goes

4    through DPAM, which basically it knows what source is making the

5    product for what country, and it directs the demand in that

6    direction to the operating systems downstream.

7    **Q**    And Mr. Castilla also had access to a Mattel computer system

8    called Hyperion?

9    **A**    Yes, he did.

10   **Q**    What is that system?

11   **A**    That is the financial consolidation system.  So that's

12   high-level financial information for each market.

13   **Q**    As part of Mr. Castilla's job, was he given access to

14   proprietary and trade secret information of the company?

15   **A**    Yes, he was.

16   **Q**    At some point Mr. Castilla left Mattel?

17   **A**    That's correct.

18   **Q**    Do you know when?

19   **A**    March 13, 2006.

20   **Q**    And then about the time of his departure, were you alerted to

21   the fact he was leaving in some way?

22   **A**    Yeah.  The morning he left, I walked in and he said he was

23   leaving for MGA.  And I said, "oh, congratulations."  And of

24   course if somebody works for MGA, for another competitor, they

25   usually leave the company that day.

Page 100

1   **Q**   Did Mr. Castilla do that?

2   **A**   Yes, he did.

3   **Q**   And at some point before Mr. Castilla left Mattel, did it

4   come to your attention that he had copied certain files from

5   Mattel systems?

6   **A**   Yes, it did.

7   **Q**   And as part of that, when you found out about that, did you

8   look at certain files that Mr. Castilla had downloaded from Mattel

9   prior to the time he departed?

10  **A**   Yes, I did.

11  **Q**   And that was something that you did in conjunction with the

12  Mattel legal department and Mattel security?

13  **A**   That's correct.  They called me down to the office to look at

14  some stuff that was taken.

15  **Q**   And how many documents did you see that Mr. Castilla had

16  downloaded upon his departure from Mattel?

17  **A**   92.

18  **Q**   And do you remember what folder this was called?

19  **A**   Oh, yeah.  I'll never forget that.  It was called the "to

20  take" folder.

21  **Q**   And this was the "to take" folder that was on his network

22  share drive?

23  **A**   I'm not sure.  Yeah, I guess he had put it there.  I think it

24  was erased and then they found it.  But I think he put it on a

25  personal device when he left.

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 101

1    **Q**    And when you reviewed these documents, you looked at these

2    files that Mr. Castilla had downloaded.  Did they look familiar to

3    you?

4    **A**    Yeah.  Most some of them were some personal things but the

5    vast majority of them were Mattel work product.  There were

6    probably a good 70 of them were the related to My World, which was

7    all about enhancements to our Forecasting and Planning systems,

8    our instruction manuals for original sales planning program.

9    Stuff about the EDW and IDW I talked about.

10            So yes, so I was pretty familiar -- I was familiar with

11   the majority of it because they either were done under -- in my

12   group, under my authority, or I was acquainted with them and had

13   some input or approval to most of them.

14   **Q**    And so I think you said about 70 -- or there were 70 of these

15   documents related to forecasting and inventory management?

16   **A**    Correct.

17   **Q**    And this was an area that Mr. Castilla worked in?

18   **A**    Yes, throughout his career.

19   **Q**    And then did you also see some documents in this "to take"

20   folder that Mr. Castilla had created that did not, as far as you

21   know, appear to relate to his job?

22   **A**    Yeah.  I saw one that was the 5-year international strategic

23   plan that he had taken.  And he shouldn't have had access to that.

24   **Q**    Was this something that you would -- that you had actually

25   yourself come across in your work for Mattel?

1  **A**     Well, I had seen it because I get to attend the president's

2  leadership team meeting, which is like his staff meeting.  And

3  they had presented that at that meeting.

4  **Q**    And I take it from what you are saying before, you had pretty

5  high regard for Mr. Castilla prior to the time that you saw this

6  collection of documents that he had taken; right?

7  **A**     Absolutely.  He was a smart, well-organized, seemingly very

8  nice gentleman.

9  **Q**    So what was your reaction when you found out that he had

10 downloaded these documents that you are describing?

11 **A**     Well, I was kind of stunned by the volume of them.  And then

12 I got a little angry because a lot of people had worked on a lot

13 of this product and these documents and he had just walked away

14 with them.  And then my last thought was, that's Jorge.  He was

15 very thorough because he took so many documents in such an

16 organized fashion.

17 **Q**    Focusing then on the 70 documents that related to forecasting

18 and inventory management, were there measures that Mattel took to

19 keep those documents confidential and trade secret?

20 **A**     Yes, they were -- in addition to just the normal protocols --

21 everybody has to have a badge, everybody has to sign an agreement

22 that what they do is confidential at Mattel -- in addition, all of

23 our work product was on servers that were password protected as

24 well.  And it was internal stuff.

25 **Q**    Were these servers limited in their access in any way other

1   than the passwords?

2   **A**   Yes.  Only certain people were allowed on certain servers.

3   **Q**   To have access to the 70 documents?

4   **A**   Yes.

5   **Q**   So was it the case that other people within Mattel, people

6   outside of your group, could not get access to those documents?

7   **A**   That's correct.

8   **Q**   We're still focusing I think on the 70 documents from

9   forecasting and demand planning.  Did they have the word

10  "confidential" written on them?

11  **A**   The 70 documents, no, they didn't, because they were internal

12  documents, and only people in the international planning

13  organizations could view some of them.

14  **Q**   In your view, you believe that Jorge Castilla understood that

15  these were very sensitive confidential documents?

16          **MS. KELLER:**  Objection.  Vague and overbroad.

17          **THE COURT:**  Well, as to Jorge Castilla.

18          **MS. KELLER:**  And as to these "documents," and there are

19  70 of them.

20          **THE COURT:**  Well, no.  You can lump the 70 together

21  generally.  It's just transplanting her thoughts to Mr. Castilla.

22  I assume he is going to be testifying?

23          **MR. ZELLER:**  We hope.  I'm just asking her

24  understanding.

25          **THE COURT:**  Her understanding of what her process is?

Page 104

1           **MR. ZELLER:**  Right.  Let me try it this way.

2    BY MR. ZELLER

3    **Q**   Focusing on those 70 documents that we have been talking

4    about relating to forecasting and demand planning, was there any

5    doubt in your mind as someone who worked with these documents

6    there at Mattel, that these were trade secret documents?

7    **A**    No.  There was no doubt in my mind that this was proprietary

8    trade secret information that I wouldn't want to share with

9    anyone.

10   **Q**    Now, you had mentioned that the 70 documents didn't have

11   "confidential" stamped on them.  Some of these documents are

12   actually on computer systems; right?

13   **A**    Correct.

14   **Q**    Now, the international strategic plan, that five-year plan,

15   did that have the word "confidential" stamped on it?

16   **A**    Yes, it did.

17   **Q**    With respect to these 70 documents that Mr. Castilla

18   downloaded relating to forecasting and demand planning, are those

19   documents that are shared with people outside of Mattel?

20   **A**    No.

21   **Q**    Why is that?

22   **A**    Because it's our internal forecasting process.  There really

23   isn't a need to share it with people outside of Mattel.  The one

24   thing if we did hire consultants, which we did on one of the

25   projects, they may have seen the thing, but they signed

Page 105

1    nondisclosure agreements and confidentiality agreements as well.

2    **Q**    Did any of the materials or documents that Mr. Castilla took

3    relate to Mattel's original sales planning system?

4    **A**    Yes.

5    **Q**    And if you could briefly tell us what that is.

6    **A**    Well, the sales -- the sales planning system is the place

7    where the sales account people can put in the demand that they

8    want for a product by account.  It's where they can put in certain

9    information about accounts, and it's where they can look at that

10   information and compare it to lots of other information that will

11   help them in their forecasting.

12   **Q**    And if you'd please tell us how this was developed?

13   **A**    This was developed internally by our IT group and our

14   business people really at the request of two of our big markets.

15   **Q**    If you could please take a look at some documents here.

16   These are exhibits 7233 -- excuse me, 7232, 7233, 7234, and 7243.

17   And you could let me know, are these documents that you recognize

18   as being among the ones that Mr. Castilla downloaded and had in

19   the "to take" folder?

20   **A**    Yes, I do.

21   **Q**    And can you tell me generally speaking what these documents

22   are?

23   **A**    Yes.  These are the user guides and manuals that tell you

24   step by step how to use the suspects.

25   **Q**    And was it for the sales planning system up to a particular

Page 106

1   time point?

2   **A**   Yes, this was pre-2005.  Because we made some enhancements

3   afterward, but this is the basic core of sales planning system.

4   **Q**   And why is it that this information that's reflected in these

5   exhibits are valuable, in your view, to Mattel?

6   **A**   Well, it just shows, for a toy company, the detailed way that

7   we like to look at it, organize data elements.  How we look at

8   accounts and really how to manage the toy business with all the

9   challenges that we have, to understand how to look at information

10  to make a better forecast.

11          **MR. ZELLER:**  I would offer exhibits 7232, 7233, 7234,

12  and 7243, Your Honor.

13          **THE COURT:**  Received, each of those.

14              (Exhibit 7232-7234, 7243 received in evidence.)

15  BY MR. ZELLER

16  **Q**   Now, did any of the materials that Mr. Castilla took relate

17  to a program that was called Manugistics?

18  **A**   Yes, he did.

19  **Q**   And for the record, that's M-a-n-u-g-i-s-t-i-c-s?

20  **A**   Yes.

21  **Q**   There was something call the Manugistics Pilot Program?

22  **A**   That's correct.

23  **Q**   What was that?

24  **A**   The Manugistics Pilot Program was a pilot test that we tried

25  to -- or that we did conduct in the UK, which we tried to explore

Page 107

1   using statistical forecasting for the toy industry.  And also

2   trying to include that with our customized process to help improve

3   our forecasting.

4   **Q**   And who is it that worked on this Manugistics Pilot Program?

5   **A**   Well, we had, aided by consultants and the actual people from

6   Manugistics, and kind of like our A-Team in the UK and some of the

7   folks from the United States, worked on developing the process and

8   the people and configuring Manugistics to pilot this whole can we

9   use statistical forecasting and can we augment our processes.

10  **Q**   Was Mr. Castilla involved in this program?

11  **A**   Yes, he was.

12  **Q**   And about how long did the project take?

13  **A**   About 18 months.

14  **Q**   Ultimately, did Mattel end up incorporating Manugistics into

15  its forecasting system?

16  **A**   The Manugistics statistical piece, it just wouldn't work for

17  the toy business, but we did learn a lot about how to collect and

18  what additional intelligence and items that we need to collect and

19  put into our process.  So we actually learned quite a bit from it.

20  **Q**   I take it from your answer the system wasn't actually

21  implemented.

22  **A**   No.

23  **Q**   But it formed kind of the basis of knowledge for other

24  improvements?

25  **A**   Correct.

Page 108

1    **Q**    If you could please take a look at Exhibit 23699 in your

2    book.  If you could please tell us what that is?

3    **A**    This was actually the kick-off document for the whole

4    Manugistics project.  So it outlined what the objectives were and

5    it got into some detail about process flows; who would do what;

6    when do they do this; how would we organize to actually implement

7    the pilot, and also kind of reconstruct the way that we do the

8    process.

9    **Q**    And if you'd tell us a little bit about how this document was

10   created?

11   **A**    Well, this was created by that team that was working in the

12   UK and with the help of our consultants and our -- and the

13   Manugistics people.

14            **MR. ZELLER:**  I would offer Exhibit 23699 please?

15            **THE COURT:**  Received.

16            (Exhibit 23699 received in evidence.)

17   BY MR. ZELLER

18   **Q**    Was the information reflected in this document -- let me ask

19   this.

20            This was, as we were talking about, something that Mr.

21   Castilla took with him?

22   **A**    Correct.

23   **Q**    And was this information valuable to Mattel?

24   **A**    Yes, I believe so.

25   **Q**    And please tell us why.

1    **A**    Because it has very detailed process flows about our process,

2    the data that we need; who is going to provide it; the timing of

3    it.  And it's all laid out here in a great amount of detail.

4    **Q**    Please look at Exhibit 26939.  Is this another one of the

5    documents that was in Mr. Castilla's "to take" folder?

6    **A**    Yes, it was.

7    **Q**    And please tell us what it is?

8    **A**    This had the step-by-step revised forecasting process on one

9    side of it, what we needed to do.  And then how the Manugistics

10   program would fit with that; what additional functionality we

11   needed.

12          And it did it from when we initially set up the quota

13   all the way through the cyclical forecasting process that we go

14   through.  So it's very detailed.

15   **Q**    And when was this created?

16   **A**    This was really created at the end of the project.  I mean,

17   the team had really worked hard for 18 months to get this

18   statistical forecast to work.  So they just took a step back and

19   said well, we really like how we have amended some of our process

20   but we have to incorporate what we are doing in the way the toy

21   industry runs.  So that's when they went through to do the

22   evaluation should we go forward with Manugistics or not.

23   **Q**    Please tell us why this was valuable to Mattel.

24   **A**    Because I think this outlines in a very detailed way the way

25   that you -- that we thought made us better and gave us a

1  competitive advantage in the toy of industry of how to conduct

2  forecasting and the whole forecasting correction process.

3  **Q**   And is it the case that Mr. Castilla took other documents

4  relating to the Manugistics program?

5  **A**   Yes, he did.

6  **Q**   If you could please take a look at the following exhibits:

7  7253 through 7256.

8          **THE COURT:**  Through?

9  BY MR. ZELLER

10 **Q**   So, 7252, 7253, 7254, 7255 and 7256.

11         Do you recognize this as more documents that Mr.

12 Castilla took relating to the Manugistics program?

13 **A**   Yes, I do.

14 **Q**   Please take a look at 7258.

15 **A**   Yes.

16 **Q**   Is that another one of the Manugistics documents that Mr.

17 Castilla took?

18 **A**   Yes, it is.

19 **Q**   If you could please then take a look at 23696 and 23697.

20         Do you recognize this as more documents that Mr.

21 Castilla took that related to the Mattel Manugistics program?

22 **A**   Yes, I do.

23         **MR. ZELLER:**  Your Honor, we would offer Exhibit 7253 --

24 or excuse me, 7252 --

25         **THE COURT:**  Counsel, each of those are received.

1              (Exhibit 7252-7256 received in evidence.)

2    BY MR. ZELLER

3    **Q**   And if you could please tell us were these documents that we

4    were just talking about also valuable to Mattel?

5    **A**   Yes.  Because I think they're just a further continuing of

6    the first two I talked about.

7              **MS. KELLER:**  Your Honor, object as vague.  A whole bunch

8    of numbers were just read off.  So the documents we just talked

9    about, could we specify those?

10             **THE COURT:**  On cross-examination you can, counsel.

11   Thank you.  They're received.

12             **THE WITNESS:**  I'm sorry.  Would you repeat the question?

13   BY MR. ZELLER

14   **Q**   Can you tell us why, in your view as you said, these

15   additional documents relating to the Manugistics program were

16   valuable to Mattel?

17   **A**   Well, they're just -- they just give you a more in-depth feel

18   of what we were trying to do.  You have everything in here from

19   the statistics, when we were trying to look at the different

20   statistical forecast versus what we normally do.  You have got the

21   configured training guide for Manugistics.

22             You just have all of the pieces and parts so you get a

23   complete picture of what we spent 18 months learning.

24             **MR. ZELLER:**  Your Honor, if I overlooked it, I would

25   move Exhibit 26939 into evidence.

Page 112

1              **THE WITNESS:**  That was the one we looked at?

2              **MR. ZELLER:**  Yes.  We did.

3              **THE COURT:**  Received.

4                   (Exhibit 26939 received in evidence.)

5    BY MR. ZELLER

6    **Q**    At some point did Mattel enhance its international sales

7    forecasting system and processes?

8    **A**    Yes, it did.

9    **Q**    And when did Mattel do that?

10   **A**    We started it in 2005 and finished it in the early part of

11   2006 and rolled it out in '06 and '07.

12   **Q**    Did any of the materials that Mr. Castilla downloaded, copied

13   into the "to take" folder relate to these sales planning

14   enhancements?

15   **A**    Yes, he did.

16             **THE COURT:**  This is then the international forecasting,

17   counsel?

18             **MR. ZELLER:**  This is the international sales

19   forecasting.

20             **THE COURT:**  Thank you.

21   BY MR. ZELLER

22   **Q**    Was Mr. Castilla himself involved in designing or developing

23   the sales planning enhancements?

24   **A**    No.  I mean, he worked on the Manugistics project which was

25   the genesis of really when we decided to do the enhancements.  But

1    he didn't work on the sales planning enhancements.  He was

2    assigned to the project in late 2005, early 2006.

3            Really, I think all he did was have time to familiarize

4    himself with his documents, but all of the documents were put

5    together by other people.

6    **Q**    And the other people who worked on it within Mattel, this was

7    a large project, these enhancements?

8    **A**    Yes, this was a large project.  This included IT people,

9    people across all of our major markets.  We have several on-site

10   meetings and telephone calls and everything to make sure that we

11   did this appropriately.

12   **Q**    These were all internal Mattel people?

13   **A**    Correct.

14   **Q**    If you could please take a look at Exhibit 7181.

15   **A**    Yes.

16   **Q**    Do you recognize this as one of the documents that Mr.

17   Castilla copied or downloaded into the "to take" folder?

18   **A**    Yes, I do.

19   **Q**    And generally speaking, what is this document?

20   **A**    This is the international forecasting processing framework.

21   So it really has step by step what we do to forecast a project

22   from the initial setup, all the way through the cyclical process.

23   It has who does it, what is done.  And then it very detailed data

24   that we collect in the timing of it.  So it is our process.

25            **MR. ZELLER:**  I would move Exhibit 7181 into evidence,

Page 114

1    Your Honor.

2              **THE COURT:**  Received.

3                    (Exhibit 7181 received in evidence.)

4    BY MR. ZELLER

5    **Q**    Please tell us why is the information in Exhibit 7181, in

6    your view, valuable to Mattel?

7    **A**    Because again, the toy industry is challenging and this is

8    what we think is a good approach for the toy industry with all of

9    its challenges.  It has a lot of detail in it.  And I would think

10   it's the best for us and it gives us a competitive advantage.

11   **Q**    This particular document, 7181, it also has what we'll say

12   are some summary information or some high-level information as

13   well?

14   **A**    On this one, yes.

15   **Q**    And does that make it less valuable as information to the

16   company; that it's something kind of at a higher level for sales

17   forecasting processes?

18   **A**    No.  I mean, I think it's all valuable because you have got

19   high level in this thing; you have very little detail.

20          Like I said before, it's very thorough.  And all the

21   aspects of what we were trying to do over years of hard work to

22   make our forecasting process better.

23   **Q**    If you could please look at Exhibit 7180.  Do you recognize

24   this as another document that Mr. Castilla took?

25   **A**    Yes, I do.

Page 115

1   **Q**    And what is this document?

2   **A**    This is the global sales planning enhancements requirement

3   document.  It's the document that whenever we do an IT project and

4   a business project, it's sort of the blueprint or the Bible of it.

5   And it gives you what we're trying to accomplish and in a very

6   specific detail what you are going to do.  And then it gives you a

7   level of granularity that describes exactly what we're trying to

8   put into our system.

9               **MR. ZELLER:**  I would move Exhibit 7180 into evidence.

10              **THE COURT:**  Received.

11              (Exhibit 7180 received in evidence.) zoo

12  BY MR. ZELLER

13  **Q**    If we could pull -- look at page 2.  This acronym here, GSP

14  Enhancement Project 2005, that's referring to the Global Sales

15  Planning?

16  **A**    Correct.

17  **Q**    And this is one of these documents that Mr. Castilla took

18  among the 70 that related to sales and sales planning and

19  forecasting?

20  **A**    Correct.

21  **Q**    If you could look at the next page.  And we won't go through

22  all this.

23              You'll see here there is a table of contents?

24  **A**    Yes.

25  **Q**    And this is the table of consents for this Global Sales

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    Planning enhancements document that Mr. Castilla took?

2    **A**    Correct.

3    **Q**    And you consider this information reflected in this document

4    to be valuable to Mattel?

5    **A**    Yes, because -- yes.

6    **Q**    Why is that?

7    **A**    Because it really again gets to very detailed specifics of

8    what we were trying to do and how we're going to do it and the

9    connection between the IT and business.

10   **Q**    If you could, please, then turn to Exhibits 7175, 7176, 7178.

11   And 7179.

12            **THE COURT:**  When you say "IT," what is -- again, what is

13   "IT"?

14            **THE WITNESS:**  I'm sorry.  That's -- the IT is our

15   information systems.

16            **THE COURT:**  Thank you.

17            **THE WITNESS:**  Information technology.

18            Yes, I have seen it.

19   BY MR. ZELLER

20   **Q**    You recognize those as additional documents that Mr. Castilla

21   took?

22   **A**    Yes, I do.

23   **Q**    And generally speaking, what are these documents?

24   **A**    These are just more detail around the sales planning

25   enhancements.  If you read through them, it talks about all the

Page 117

1    fields that we're adding and their sales intelligence, market

2    intelligence, promotional intelligence.  And it's the specific

3    pieces that we're adding and some specific functionality that

4    we're adding.

5    **Q**    Was the information shown in these documents valuable to

6    Mattel?

7    **A**    Yes, it was.

8    **Q**    Please tell us how.

9    **A**    Well, again, we're in the toy industry and we spend a lot of

10   time bringing individuals around the world together to figure out

11   what type of information that we should put in our systems that

12   would help them quickly assess a better forecast.

13   **Q**    And I take it that so far all the documents that we have

14   looked at, that Mr. Castilla took -- and talking about these

15   exhibits -- you consider to be trade secrets of Mattel?

16   **A**    Yes, I do.

17   **Q**    If you could please take a look at Exhibits 7174, 7177, 7182,

18   7189, 7193, 7194, 7195.

19   **A**    Yes.

20   **Q**    Do you recognize these as additional documents that Mr.

21   Castilla took?

22   **A**    Yes, I do.

23   **Q**    And generally speaking, what are these documents?

24   **A**    These are just more details around the sales enhancement

25   project.  It has some of the algorithms we were trying to do to

Page 118

1    help with the initial forecast.  It has some IT steps into what

2    they were doing and how they were planning each step of the

3    project.  It's got some high-level overview charts as well.

4    **Q**    And what are you referring to when you are talking about

5    these algorithms?

6    **A**    Well, there is -- it's really a way -- before we used to have

7    a bunch of zeros and people had to come up with a forecast.  And

8    this, we put some algorithms based on product profiles, different

9    kinds of projects with some variables in it that would help you do

10   the initial forecast.

11   **Q**    Was this something that -- this algorithm something that was

12   created internally there at Mattel?

13   **A**    Yes, it was.

14   **Q**    Is it something that's public knowledge?

15   **A**    No.

16   **Q**    Something that Mattel kept trade secret?

17   **A**    Something we kept confidential, yes.

18   **Q**    And with respect to the information including the algorithm

19   that we were talking about in these documents, you believe that

20   that information was valuable to Mattel?

21   **A**    Yes, I do.  I think it's part of the whole collection that

22   gives everything about what we were -- what we implemented.

23            **MR. ZELLER:**  Your Honor, I move those exhibits into

24   evidence.

25            **THE COURT:**  Received.

1              (Exhibit 7175, 7176, 7178, 7179. received in

2    evidence.)

3    BY MR. ZELLER

4    **Q**    Please take a look at Exhibits 7169 -- excuse me, actually

5    different number.  7168, 7169, 7170, 7171, 7172 and 7173.

6    **A**    Yes.

7    **Q**    By the way, I mean, these are all documents you reviewed

8    previously outside the presence of the jury so we could speed the

9    process up?

10   **A**    Absolutely.

11   **Q**    Because there are a number of them obviously?

12   **A**    I know.  I met one with these documents.

13   **Q**    So then I have another group for you to look at.  7183, 7184,

14   7185, 7186, 7187, and 7188.

15   **A**    Yes.

16   **Q**    Then if you could please look at 7197, 7204, and 7218.

17   **A**    Yes, I have it.

18   **Q**    And then last three on this group, 7222, 7223, 7228?

19              **THE COURT:**  Just a moment.  Does that mean from 7183

20   which was the beginning of this group down to 7228?  That's a

21   grouping?

22              **MR. ZELLER:**  Well, I had a different grouping.  7168

23   through 7173.

24              **THE COURT:**  That's one grouping.  That's not what I

25   said.  7183 through 7228, is that your next grouping?

Page 120

1              **MR. ZELLER:**  No.  It ends 7183 through 7188.

2              **THE COURT:**  7197 through 7218, is that another grouping?

3              **MR. ZELLER:**  No.  7204, another individual one, 7218,

4     then 7222, 7223, and finally, 7228.

5     BY MR. ZELLER

6     **Q**    Do you recognize all these exhibits as additional documents

7     that Mr. Castilla took?

8     **A**    Yes, I do.

9     **Q**    Please tell us what these are.

10             **THE COURT:**  I'm assuming when you say "these," that's

11    why I'm asking.  I don't want confusion about what these are and

12    the groupings.  So when you say "these," the ones that haven't

13    been introduced yet are 7168 through 7228 and they're not to be

14    lumped together.  So if you have a grouping in a particular

15    organization and they're different, they're not just all coming in

16    by number.

17             Up to you, counsel.  You have heard me.

18             **MR. ZELLER:**  I understand, Your Honor.

19    BY MR. ZELLER

20    **Q**    With respect to this range of exhibits that I asked you to

21    look at, 7168 through 7173, 7183 through 7188, 7197, 7204, 7218,

22    7222, 7223, and 7228, do you recognize those as additional

23    documents that Mr. Castilla took?

24    **A**    Yes, I do.

25             **MR. ZELLER:**  I would move this into evidence, Your

1    Honor.

2            **THE COURT:**  Not yet.  I want to know what they are.

3    BY MR. ZELLER

4    **Q**    Please tell us what these documents are?

5            **THE COURT:**  Break them down for us so there isn't this

6    mushroom-shaped cloud.

7            **THE WITNESS:**  I may need the numbers to correlate.

8    BY MR. ZELLER

9    **Q**    Let's break it down a little bit.

10           **THE COURT:**  Here is the way it went.  It went 7168

11   through 7173, which sounds liked some kind of grouping.  Then

12   counsel took a breath and started off 7183 down to 7188.  And then

13   he took a breath 7197 to 7204.  Then I can't tell if the other

14   grouping is 7218 through 7228.  Unless we know what they are,

15   they're not coming into evidence.

16           We left off with algorithms valuable to Mattel at 7195.

17   Those have been received.  Beyond that, there is no receipt,

18   counsel.

19           **MR. ZELLER:**  Understood.

20   BY MR. ZELLER

21   **Q**    Focusing on the first group we'll call it, 7168 through 7173.

22   **A**    Okay.  These are all -- yes.  I recognize those.  And they're

23   two things really:  One, they are the overview presentations,

24   update presentations about the project of the sales planning

25   project as we went through time.  They explain at a high level

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 122

1    what was being done, progress, next steps.

2             And then the other part of the last two documents I

3    believe that you talked about, those are as they were going

4    through the system and they had issues and resolution status or

5    what they were going to do about it, so those are listed as well.

6             **THE COURT:**  You're ending at 7173?

7             **THE WITNESS:**  Yes, sir.

8             **MR. ZELLER:**  I would offer those.

9             **THE COURT:**  Received, up to 7173.

10            (Exhibit 7168-7173 received in evidence.)

11   BY MR. ZELLER

12   **Q**   This group that we just talked about, did you consider that

13   to be information that was valuable to Mattel?

14   **A**   Yes, I do.

15   **Q**   And why was that?

16   **A**   Again, as part of the whole collection, it gives you an idea

17   of what we were trying to do and explained it at a high level.

18   And it's something that Mattel spent long and hard time to put

19   together.

20   **Q**   Then focusing on another group here, 7183 through 7188, do

21   you recognize that group?

22   **A**   Yes, I do.

23   **Q**   Are these more documents that Mr. Castilla took?

24   **A**   Yes.

25   **Q**   And please tell us, generally speaking, what these documents

Page 123

1   are?

2   **A**   Okay.  They are everything from the initial concept document

3   when we talked about what our intentions were, and it's where we

4   get to sign off on the go-forward to go through with this project.

5          And then they also contain the planning logs that IT and

6   the business go through when they're planning the project so it

7   tells you what went first, and then some detailed steps of what

8   they were doing as they were developing the program.

9          **MR. ZELLER:**  I would offer 7183 through 7188.

10          **THE COURT:**  I'd like to hear what program that is.

11          **THE WITNESS:**  That's the sales planning enhancements.

12   So it's all the enhancements we made.  What they were doing first

13   and the steps they were doing to go about that.

14          **THE COURT:**  Received.

15          (Exhibit 7183-7188 received in evidence.)

16   BY MR. ZELLER

17   **Q**   In fact, we're still on the subject of these sales planning

18   enhancements; right?

19   **A**   Right.  All of this was on the enhancements that we -- the

20   sales planning enhancements.

21   **Q**   And just to make sure we know where we are, all these

22   documents that we were recently talking about, these last two

23   groups, this is all part and parcel of that sales planning

24   enhancement project that you have been describing?

25   **A**   Correct.

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 124

1   **Q**    And these documents provide more internal information and

2   more detail as well as high-level information about those

3   enhancements?

4   **A**    That's correct.

5   **Q**    Then if you could please take a look at 7197, 7204, and 7218.

6   **A**    Yes.

7   **Q**    Are these more documents pertaining to the sales planning

8   enhancements?

9   **A**    Yes, they are.

10  **Q**    Are these more documents that Mr. Castilla took?

11  **A**    Yes, they are.

12          **MR. ZELLER:**  I would offer 7197, 7204, and 7218.

13          **THE COURT:**  It may be redundant but I want to hear the

14  value to Mattel.

15  BY MR. ZELLER

16  **Q**    If you could please tell us with respect to 7197, 7204 and

17  7218, were those documents in your view and the information in

18  those documents in your view, valuable to Mattel?

19  **A**    Yes, because the majority of them here show the calendar and

20  different departments and the sequence of events that we go

21  through to plan our business in the toy industry.

22          **MR. ZELLER:**  I would offer 7197, 7204 and 7218.

23          **THE COURT:**  Did she consider these trade secrets or not,

24  counsel?

25

Page 125

1   BY MR. ZELLER

2   **Q**    With respect to -- maybe I should back up a little then.

3           With respect to 7168 through 7173, the first grouping we

4   talked about --

5   **A**    Okay.

6   **Q**    -- do you consider the information in those documents to be

7   Mattel trade secrets?

8   **A**    Yes, because they were all part of the details of the sales

9   planning enhancements that we made to our Forecasting and Planning

10  system.

11          **THE COURT:**  Counsel, she had already testified to that.

12          **MR. ZELLER:**  I actually hadn't asked about trade secrets

13  on those, Your Honor.

14          **THE COURT:**  7183 through 7188.  What is your next group?

15  BY MR. ZELLER

16  **Q**    With respect to 7183 through 7188, you consider those to be

17  Mattel trade secrets as well?

18  **A**    Yes, I do.

19  **Q**    And then with respect to this most recent grouping we were

20  talking about of documents 7197, 7204 and 7218, these, as we were

21  talking about, relate to sales planning enhancements?

22  **A**    Yes.  And the calendar by which we do our -- the toy

23  business.

24  **Q**    In your view, is the information contained in those documents

25  Mattel trade secrets?

1    **A**    Yes.  It's not something I would want a competitor to know.

2              **MR. ZELLER:**  I would offer those three exhibits.

3              **THE COURT:**  Received.

4                   (Exhibit 7197, 7204, 7218 received in evidence.)

5    BY MR. ZELLER

6    **Q**    And then the final grouping I had here was 7222, 7223, and

7    7228.  These are more Mattel documents that pertain to the sales

8    planning enhancements?

9    **A**    Can you give me the numbers one more time?  7223 --

10             **THE COURT:**  7222, 7223, 7228.

11             **THE WITNESS:**  Yeah.  These are details about -- again,

12   it has another calendar in here.  It has some high-level flow of

13   information, and then some measurement information that we were

14   considering as part of the sales enhancement project.

15   BY MR. ZELLER

16   **Q**    And are these three documents additional files, documents,

17   that Mr. Castilla took?

18   **A**    Yes.

19   **Q**    Do you consider the information contained in these three

20   documents to be Mattel trade secrets?

21   **A**    Yeah.  They're proprietary and they're something I wouldn't

22   want to share.

23             **MR. ZELLER:**  I would offer 7222, 7223 and 7228.

24             **THE COURT:**  Received.

25                   (Exhibit 7222, 7223, 7228 received in evidence.)

Page 127

1    BY MR. ZELLER

2    **Q**    Changing subjects then.  Mattel, I think as you mentioned

3    earlier, has something called a data warehouse?

4    **A**    Correct.

5    **Q**    Or data warehouses?

6    **A**    Um-hmm.

7    **Q**    And if you please just tell us again briefly what is a data

8    warehouse?

9    **A**    A data warehouse is different data elements around our sales

10   and forecasting process that we want to collect, and we call that

11   those measures.  And then we want to look at it by different

12   dimensions.

13          So we will categorize in different ways by brand, by

14   selling method, by account.  It's a way to mine intelligence,

15   business intelligence very quickly to make rapid decisions.

16   **Q**    What is the purpose of having a data warehouse?  You may have

17   just answered that question.

18   **A**    I'll say it again.  It's just a quick way to get at the

19   information that you need to and slice it and dice it so that you

20   can mine all of this information that you have to make better

21   business decisions.

22   **Q**    And then one of these data warehouses we talked about before

23   was the IDW or the International Data Warehouse?

24   **A**    That's correct.

25   **Q**    When did Mattel introduce that?

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 128

1   **A**    I believe it was around 2001.

2   **Q**    Did Mr. Castilla work on the International Data Warehouse

3   when he was at Mattel?

4   **A**    Yes, he did.  He did when he was located in the Amstelveen in

5   Holland.

6   **Q**    And does he work on something creating called One IDW?

7   **A**    Yeah.  What had happened is people -- the international

8   markets were starting to put data warehouses together, but we

9   wanted to make one to ensure that we had consistency of

10  information; that we were organizing and selecting the information

11  that made the most sense.  And Jorge was part of that effort.

12          **THE COURT:**  Is that Mr. Castilla?

13          **THE WITNESS:**  Yes, I'm sorry.  Mr. Castilla.

14  BY MR. ZELLER

15  **Q**    Please take a look at exhibits 7230, 7236, and 7237.

16  **A**    I have seen them, yes.

17  **Q**    Do you recognize these as additional documents that Mr.

18  Castilla took?

19  **A**    Yes, I do.

20  **Q**    And please tell us generally what are these documents

21  pertaining to?

22  **A**    These are the hands-on training guides for the International

23  Data Warehouse.  So they tell you how to use it, how the data is

24  organized, how to write reports.  And just there is like three

25  huge sections that put it altogether for you.

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

Page 129

1   **Q**    Is the information contained in these documents valuable to

2   Mattel, in your view?

3   **A**    I think so.

4   **Q**    And please tell us why.

5   **A**    It takes a lot of effort to go through and put together a

6   data warehouse, because you first have to start with what kind of

7   questions are you trying to answer and then from that, okay, then

8   what data elements do you need and how do you want to slice it:

9   By time, by product category, by selling type.

10          So it's a way to organize your data and distill it

11  together, and this pretty much shows you how we did it.

12          **MR. ZELLER:**  I would offer 72330, 7236, and 7237?

13          **THE COURT:**  Received.

14          (Exhibit 7230, 7236, 7237 received in evidence.)

15  BY MR. ZELLER

16  **Q**    If you could please look at Exhibits 7239 through 7242?

17          **THE COURT:**  Four documents in that group?

18          **MR. ZELLER:**  Yes, sir.

19          **THE COURT:**  Thank you.

20  BY MR. ZELLER

21  **A**    Yes.

22  **Q**    Do you recognize Exhibits 7239 through 7242 as additional

23  documents that Mr. Castilla took?

24  **A**    Yes, I do.

25  **Q**    And these documents also pertain to the International Data

Page 130

1    Warehouse?

2    **A**    Yes, they do.

3    **Q**    If you could please tell us what these documents are.

4    **A**    These are more of the same, that what I just spoke about.

5    They're the training manuals and information about the

6    International Data Warehouse.

7    **Q**    And you would consider them to be valuable to Mattel for the

8    reasons you just discussed as well?

9    **A**    Correct.

10   **Q**    Do you consider the information contained in these documents

11   to be trade secrets?

12   **A**    Yes.  I believe we put a lot of work into how we organized

13   them.

14            **MR. ZELLER:**  I would offer Exhibit 7239, 7240, 7241, and

15   7242.

16            **THE COURT:**  Received.

17                 (Exhibit 7239-7242 received in evidence.)

18   BY MR. ZELLER

19   **Q**    Now, another kind of data warehouse we talked about was the

20   Enterprise Data Warehouse, sometimes abbreviated EDW?

21   **A**    Correct.

22   **Q**    Did any of the materials that Mr. Castilla took relate to

23   Mattel's Enterprise Data Warehouse?

24   **A**    Yes.

25   **Q**    And I know you have already mentioned that this -- the

Page 131

1    Enterprise Data Warehouse is similar to the International Data

2    Warehouse.  Are there any differences that you can tell us about?

3    **A**    Well, the big difference is we had -- what we wanted to do is

4    take what international had done and make it global.  So we had to

5    work with the U.S. counterparts to make sure we were once again

6    vetting through the data of what we wanted to store; maybe wanted

7    to add additional things; how we wanted to look at.

8            So it was an effort that just made this broader across

9    the company.  First, they started with the financial part of the

10   Enterprise Data Warehouse cube.  And then in 2003 and 2004, we

11   started to do the Enterprise Data Warehouse that was particular to

12   Forecasting and Planning.

13   **Q**    Maybe if we break that down a little bit.

14           When was it that Mattel begin working to design the EDW?

15   **A**    The initial data warehouse was started in 2001.

16   **Q**    And then there was something that was called like a

17   Forecasting and Planning cube module?

18   **A**    Yes.

19   **Q**    And if you could please tell us what that means?

20   **A**    That means that was like the One IDW I was talking about.

21   But it was for not just the international markets but including

22   the U.S. markets.  And that effort started in 2003 and completed

23   in 2004 in terms of the definition of the cube for the Forecasting

24   and Planning process.

25   **Q**    And did this go by a particular name, something like EDW F&P?

1    **A**    Correct.

2    **Q**    Those are the letters F&P?

3    **A**    Yes, Forecasting and Planning.

4    **Q**    If you could please take a look at Exhibit 7226.

5    **A**    Yes, I've looked at it.

6    **Q**    Do you recognize this as another document that Mr. Castilla

7    took?

8    **A**    Yes, I do.

9    **Q**    And this is a document that relates to the Mattel EDW?

10   **A**    Yes, it is.

11   **Q**    And if you could please tell us what this document is?

12   **A**    Well, this is really a list of all of the measures that I

13   talked about that we collectively agreed to would be the best

14   thing to mine our data.  And then you can also see, in addition to

15   those in a lot of detail, then we look at that time by dimension,

16   which is how do you want to look at it:  By month, last month, by

17   prior year, new year.

18             This was a whole page of the way that you would want to

19   slice and dice this.

20             This actually took a lot of work to come up with exactly

21   what this was so that we could look at the data quickly, the way

22   we needed it to make business decisions we felt for the toy

23   industry.

24   **Q**    And do you have estimate as to about how long that took?

25   **A**    For the EDW Forecasting and Planning?

Page 133

1    **Q**    Yes.

2    **A**    I mean, that took a couple of years.

3    **Q**    And can you tell us about how many people worked on that

4    project internally there at Mattel?

5    **A**    Probably a couple of dozen because you had people in the

6    United States, you had people in the IT world, and you had people

7    across the -- in different markets contributing as well.

8    **Q**    In your view, this was a pretty significant internal project

9    at Mattel?

10   **A**    Yes.

11   **Q**    Was the information -- I think you have already said the

12   information in Exhibit 7226 was, in your view, valuable to Mattel?

13   **A**    Yes.

14   **Q**    And did you consider it to be trade secret information of

15   Mattel?

16   **A**    Yes.  Because it's the way we wanted to look at our

17   information after a lot of research.

18         **MR. ZELLER:**  I would offer 7226.

19         **THE COURT:**  Received.

20            (Exhibit 7226 received in evidence.)

21   BY MR. ZELLER

22   **Q**    In terms of the documents and information that Mr. Castilla

23   took, can you tell us kind of where you think this particular

24   document falls in the spectrum of how important the information

25   was or how sensitive it was?

Page 134

1    **A**    Well, I personally think this is pretty important because it

2    on would help us mine data to come to answers pretty quickly, and

3    it was an across-the-company effort.

4              So at this point, this type of information also helps

5    people like in the marketing and the sales group self-serve.  So

6    we become a lot more efficient in the way that we were able to get

7    information out to people to make decisions.

8    **Q**    So in your view this is the kind of information that really

9    would help a toy company in many different functions within the

10   company?

11   **A**    Exactly.

12             **MS. KELLER:**  Objection.  Leading.

13             **THE COURT:**  Overruled.

14   BY MR. ZELLER

15   **Q**    Changing subjects then.  We have also -- there was -- we

16   talked a little bit about something called ISIS?

17   **A**    Yes.

18   **Q**    And then something else called Omni?

19   **A**    Correct.

20   **Q**    What is Omni?

21   **A**    Omni is the U.S. order management system which is the system

22   that the U.S. market uses to process orders from the company, do

23   allocations and just basically manage the products in the

24   warehouse.

25   **Q**    And did Mr. Castilla take information from Mattel that

Page 135

1   related to Omni and to ISIS?

2   **A**    Yes, he did.

3   **Q**    And what is it that he took?

4   **A**    Like I mentioned before, when he was in the Amstelveen

5   office, he was asked to travel to the United States to help a

6   group there compare ISIS, which is a fully integrated order

7   management planning and forecasting system, with the systems that

8   were used in the U.S. which include Omni plus other secret systems

9   they have for sales forecasting allocation and demand planning.

10  **Q**    If you could please look at Exhibits 7245 through 7249.

11  **A**    Yes.

12  **Q**    Do you recognize this as additional documents that Mr.

13  Castilla took?

14  **A**    Yes.

15  **Q**    And what do these documents relate to?

16  **A**    These documents go through in a lot of detail about what

17  would have to be put together if we were to go to the ISIS versus

18  staying with the U.S. system.  So it contrasts the two things;

19  where we have weaknesses, where it's better on one side versus the

20  other.  And then it makes a recommendation for all of the systems:

21  The order management system, the planning system, and the sales

22  and planning system as well.

23  **Q**    So this is a comparative analysis?

24  **A**    Yes, it is.

25  **Q**    Between those two systems, ISIS and Omni?

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    **A**    Yes.

2    **Q**    And maybe you could tell us a little bit more about what this

3    comparative analysis system is.  I know you mentioned it compares

4    and contrast them, maybe if you can give us a better sense of why

5    was it important to compare those two.

6    **A**    It was important to compare them because in the world like

7    this, we wanted to see if we couldn't get the fully integrated

8    system into the U.S. and therefore be more economical for the

9    whole world to be on one platform.

10            And so it goes through in a lot of detail how Omni works

11   and how the ISIS works, and contrasts it and exposes weaknesses in

12   one or the other, or strengths.

13   **Q**    You consider this to be valuable information to Mattel?

14   **A**    Yes, I do.

15   **Q**    Did you consider them to be Mattel trade secrets?

16   **A**    Yes, because both of them were lots of years of experience to

17   bring both of them to fruition.

18            **MR. ZELLER:**  I would offer 7245 through 7249.

19            **MS. KELLER:**  Objection.  Irrelevant.  Not a trade secret

20   of Mattel.

21            **THE COURT:**  I'm not certain if it is.  I'll leave that

22   for cross-examination.  It's represented to be so by the witness.

23   Received.

24            (Exhibit 7245-7249 received in evidence.)

25            **THE COURT:**  That will be argument for counsel also to

1    the jury.

2    BY MR. ZELLER

3    **Q**    If you could please then look at Exhibit 23698.  Is this

4    another document that Mr. Castilla took?

5    **A**    Yes, it is.

6    **Q**    If you could please tell us what it relates to?

7    **A**    The same project.  It's ISIS for U.S. feasibility study.

8    It's a status update of where they were on the project.

9    **Q**    More of the comparative analyses we talked about?

10   **A**    Yes.

11   **Q**    You consider it to be valuable and trade secret information

12   to Mattel as you already discussed for the other documents?

13   **A**    Yes, I do.

14            **MR. ZELLER:**  I would offer 7298.

15            **MS. KELLER:**  Same objection, Your Honor.

16            **THE COURT:**  Received.

17            (Exhibit 7298 received in evidence.)

18            **THE COURT:**  Just a moment, counsel.  One additional

19   question for both categories.  I would like to know if it's of

20   value to a competitor in her opinion.

21   BY MR. ZELLER

22   **Q**    If you could tell us, in fact, is having this information

23   that we were talking about, this comparative analysis between the

24   ISIS system and the Omni system, something that would be valuable

25   to a Mattel competitor?

48051de4-d26c-4dc8-9a41-ddb9cf93c48e

1    **A**     Just in my opinion it shows over years what we have done in

2    the toy industry and the types of functionality that we have.  So

3    I assume it would be interesting to a competitor in the toy

4    industry.

5    **Q**     How is it you think a competitor could use that information,

6    in your view?

7    **A**     Well, I think they could see some of the pieces of

8    information that we pick out; some of the functionality that we

9    have in our systems.

10   **Q**     Is any of that information generally available to the public

11   or to competitors?

12   **A**     No.

13              **THE COURT:**  Received.

14   BY MR. ZELLER

15   **Q**     Did any of the materials that Mr. Castilla took include

16   inventory reports?

17   **A**     Yes.

18   **Q**     And sometimes they're also called inventory update reports?

19   **A**     Correct.

20   **Q**     And what are these reports?

21   **A**     These are reports that we gathered periodically throughout

22   the year to meet with the CFO and some of the other supply chain

23   executives to do an assessment of the kind of demand that we were

24   bringing in, versus what we intended to sell, and what our

25   projected inventory position would be.

1          So it has a lot of sales information, forward-looking

2    sales information, inventory projections, historical information,

3    data supply information.

4    **Q**    Generally speaking, how is that kind of information used in

5    the toy industry?

6    **A**    Well, it really helps us do some corrections.  Sometimes if

7    we look like we're having too much inventory because people are

8    asking for too much demand relative to their sales plan, then the

9    executives will say, hey, you need to get that in line; either

10   commit to more sales, or you need to back up what we're producing.

11   **Q**    You can adjust manufacturing or other kinds of activity in

12   the company to try and compensate?

13   **A**    Correct.

14   **Q**    If you could please take a look at Exhibits 7273, 7207, 7210,

15   7211, 7212, 7219, 7220, 7224, and 7225.

16   **A**    Yes.  I recognize them.

17   **Q**    These are these inventory update reports?

18   **A**    Correct.

19   **Q**    These are documents that Mr. Castilla took?

20   **A**    Correct.

21   **Q**    And they have the kind of information that you just described

22   in them?

23   **A**    Correct.

24   **Q**    And are these kinds of documents valuable to Mattel?

25   **A**    Yes.

Page 140

1   **Q**   And they're valuable for those reasons we were just talking

2   about?

3   **A**   Correct.

4   **Q**   Do you consider them to be Mattel trade secrets?

5   **A**   Yes.  I think we derive economic value from knowing where

6   we're going.

7   **Q**   Is it something that you believe a competitor should have

8   access to?

9   **A**   No.

10  **Q**   And why not?

11  **A**   Just because it has forward-looking sales information.  It

12  shows you at a level that you don't necessarily see in a report,

13  reported to the outside like how our preschool division is doing

14  or how our girls division is doing.

15  **Q**   Maybe we should talk about that a little bit.

16          Mattel is a publicly traded company?

17  **A**   Correct.

18  **Q**   Certain kinds of financial information is actually published

19  to the world?

20  **A**   Correct.

21  **Q**   Is there certain kinds of financial information or specific

22  kinds of financial information that are kept secret and internal

23  there at Mattel?

24  **A**   Sure.

25  **Q**   And it includes this kind of information we're talking about,

Page 141

1    very specific sales and inventory kind of information?

2    **A**   Right.  And the levels that's in this report, plus all the

3    forward-looking information.  You obviously do not publish

4    forward-looking information.

5    **Q**   So this is a different level of specificity than what someone

6    could find out there in the world about Mattel and its sales and

7    inventory?

8              **MS. KELLER:**  Objection.  Leading.

9              **THE COURT:**  Overruled.

10             You can answer that question.

11             **THE WITNESS:**  Yeah.  You don't see that type of

12   information in any kind of report outside because it shows it at

13   lower levels.

14             **MR. ZELLER:**  Your Honor, I would offer 7203, 7207, 7210,

15   7211, 7212, 7219, 7220, 7224 and 7225.

16             **THE COURT:**  Received.

17             (Exhibit 7203, 7207, 7210-7212, 7219, 7220, 7224,

18   7225 received in evidence.)

19   BY MR. ZELLER

20   **Q**   Did some of the information that Mr. Castilla took relate to

21   Mattel's international planning personnel?

22   **A**   Yes.

23   **Q**   If you could please take a look at Exhibit 7191.

24   **A**   I'm looking at it.

25   **Q**   Do you recognize this as a document that Mr. Castilla took?

Page 142

1   **A**     Yes, I do.

2   **Q**     And what is this document?

3   **A**     This is a listing of all of the international planning

4   personnel by market, by title, by location throughout world.  And

5   these are really our subject matter experts on forecasting and

6   helping do the whole demand planning and inventory planning for

7   Mattel throughout the world.

8   **Q**     Is this the kind of information that Mattel shares publicly?

9   **A**     No.

10  **Q**     Do you consider this information to be valuable to Mattel?

11  **A**     Very valuable.  These people are extremely valuable to

12  Mattel.

13  **Q**     I understand the people are valuable to Mattel, but why is it

14  that knowing this information about the structure and the content

15  of Mattel's international planning organization valuable?

16  **A**     Well, if you are in another toy company and you are trying to

17  expand internationally -- and I believe Mattel Toys has a very

18  good international structure -- this is a great list to start

19  calling people if you want them to come work for your company.

20  **Q**     Apart even from the fact it identifies the people, does it

21  tell you something about the structure of the organization that

22  you think is valuable?

23  **A**     It gives you an idea of how many of these types of people we

24  have in different either markets or geographical locations.

25  **Q**     Is this information something that, as it appears in this

Page 143

1    document, something in your view is a Mattel trade secret?

2    **A**    Yes.

3            **MR. ZELLER:**  I would offer 7191.

4            **THE COURT:**  Is this information in 7191 public?  Can I

5    go on the internet and get this?

6            THE WITNESS:  No.

7            **THE COURT:**  Received.

8                    (Exhibit 7191 received in evidence.)

9    BY MR. ZELLER

10   **Q**    Did any of the materials that -- well, actually, strike that.

11   I think we have already talked about this, at least one of the

12   documents that Mr. Castilla took related to Mattel's strategic

13   plans; is that right?

14   **A**    Correct.

15   **Q**    And if you could please take a look at Exhibit 24033.

16   **A**    Yes, I have it.

17   **Q**    Do you recognize this as a document that Mr. Castilla took?

18   **A**    Yes, I do.

19   **Q**    What is this document?

20   **A**    This is the five-year strategic plan that was shared at the

21   strategic planning meetings in '05 by Brian Stockton, who was the

22   president of the international division at the time.

23   **Q**    Can you tell us how this document was created?

24   **A**    This document was created -- each one of the general managers

25   in the different market had to put together an analysis.  It was

Page 144

1    then brought into the international strategic group and

2    synthesized and analyzed and put together as the strategy going

3    forward for Mattel in 2005.

4    **Q**    And when you say -- this is a forward-looking business

5    strategy document?

6    **A**    Yes, it is.

7    **Q**    In your view is it an important document?

8    **A**    Absolutely.

9    **Q**    Was Mr. Castilla supposed to be in possession of this

10   document?

11   **A**    No.

12   **Q**    Was it part of his job?

13   **A**    No.

14   **Q**    Do you know if access to this document was restricted?

15   **A**    Absolutely.

16   **Q**    And if you can please tell us who it was restricted to?

17   **A**    It was really restricted to senior level executives of the

18   company.

19   **Q**    And this is the document that you mentioned does have a label

20   on it that says "confidential"?

21   **A**    Yes.  It says "Mattel confidential proprietary trade secret

22   information restricted access."

23        **MR. ZELLER:**  I would offer Exhibit 243033.

24        **THE COURT:**  Denied.

25        **MR. ZELLER:**  I'm sorry.

1          **THE COURT:**  Denied.  You haven't gone over that

2     document.  That was handed to me just before the recess.  It's not

3     coming into evidence.  It's sitting right over there, counsel.

4          We have a rule, ladies and gentlemen of the jury.  I get

5     to see every document, every objection.  I haven't seen this

6     document, neither has the opposition.  They're now discussing how

7     they're going to work this out because I haven't seen some of the

8     other side's documents, and they're not coming in either until I

9     have seen.  That's how we spend our weekends.  Every document,

10    every objection.

11         And time is now running.  We'll credit this time to both

12    parties from this point forward.  Time is running against both

13    parties.

14         **MR. ZELLER:**  Your Honor, the parties, subject obviously

15    to the Court's approval, have agreed that --

16         **THE COURT:**  It's approved.  They have agreed.

17         Counsel, your next question.  That will work coequally

18    for MGA.

19         **MR. ZELLER:**  It is.  And that's what we have agreed.

20    So, Your Honor, I would offer 24033.

21         **THE COURT:**  That doesn't mean that MGA has conceded this

22    is a trade secret or that it's valuable.  It's only that the

23    Court's rule is stipulated to by both parties that I can at least

24    deem that I have looked at it, which I will tonight.

25         Received, counsel.

1                    (Exhibit 24033 received in evidence.)

2              **THE COURT:**  Counsel, why don't we take a recess here

3    because you are probably almost done.  And MGA is going to start

4    their cross-examination soon and I want time to make sure --

5    they're agreeing to all of your documents in your book; correct?

6              **MR. ZELLER:**  Yes.  Obviously not to --

7              **THE COURT:**  Not that they're --

8              **MR. ZELLER:**  Any good.

9                    (LAUGHTER)

10             **THE COURT:**  No.  But in other words, we'll go over those

11   tonight if we need.

12             I think I'm going to send you tomorrow tonight.  This is

13   a logical breaking point.

14             How much more time do you have?

15             **MR. ZELLER:**  It's less than 10 minutes, but my estimates

16   are so bad, I would hate to have anyone --

17             **THE COURT:**  Let's just send you home.  Let's have you

18   beat the traffic tonight.  That way we can go over their notes.

19             Let me tell you where we're at.  That was as of

20   yesterday.  That's about 71 hours and about 44 hours.  But there

21   is about another six hours.  We're 121 hours into this lawsuit.

22   This can be on the record.  They have each got 120 hours.  We're

23   half done.  We're actually over half done.  I'm going to hold them

24   to it.  It's as simple as that.  You are the American public.

25   Thank you for serving.

1           This is a tremendous detriment.  Counsel are

2     extraordinary, in the Court's opinion.  I want that on the record.

3     They're working very hard.  Believe me.  But, that's it.  When one

4     party reaches that 120 hours, they are sitting.  That's the end of

5     the case.  And we're going to track that to the minute.  They can

6     make decisions.  They have got plenty of time on both sides,

7     although they'll tell me that they don't.

8           Goodnight.  You are not to discuss this matter with

9     anyone or form or express any opinion.  We'll see you Tuesday at

10    8:30.  You have a wonderful weekend.  Stay healthy.

11                        (Jury out.)

12          **THE COURT:**  I want to thank you.  Would you step down.

13    If you would just be seated 8:30 in the morning on Tuesday.  Thank

14    you very much.

15          Mr. Cote and Mr. Overland have been asked to be excused

16    from Sunday's session starting at 8:00 o'clock and ending sometime

17    between three and six.

18          Is that your request, Mr. Cote?

19          **MR. COTE:**  It is, Your Honor.

20          **THE COURT:**  Mr. Overland?

21          **MR. OVERLAND:**  It is yes, Your Honor.

22          **THE COURT:**  The Court is going to discuss copyright on

23    that day and intentional interference with the parties.  I'm also

24    going to probably rule on the Rhee matter.  I'm going to reserve

25    the McFarland matter until I see Mr. McFarland Monday at 4:30, and

Page 148

 1    we're going to resolve 32A3.

 2              **MR. QUINN:**  McFarland or --

 3              **THE COURT:**  Holden.  My apologies.  Holden.  That means

 4    32A3 is going to be discussed also Sunday, Mr. Cote.  Are you

 5    voluntarily excusing yourself?

 6              **MR. COTE:**  Yes, sir.

 7              **THE COURT:**  Mr. Overland, is that acceptable to you?

 8              **MR. OVERLAND:**  Yes, sir.

 9              **THE COURT:**  There could be other matters that come up,

10    but I'm not representing I'm not going to discuss them.  So if you

11    want to be here, there is a lot that can happen.  I trust that's

12    all we're going to do that day.  But there could be other matters,

13    and therefore you're stipulating away argument on whatever pops

14    up, because I never know.

15              **MR. COTE:**  Understood, Your Honor.

16              **THE COURT:**  Mr. Machado will be here on --

17              **MR. OVERLAND:**  I'm not guaranteeing his appearance.  All

18    I can tell you is what I expect.

19              **THE COURT:**  The latest information?

20              **MR. OVERLAND:**  Latest information is that he will be

21    travel here on Tuesday.

22              **THE COURT:**  All the parties are planning different

23    witnesses.  I mean, at some point he is a large part of the

24    lawsuit, so this is why people are starting to scramble now at the

25    back end of the law.

1           MR. OVERLAND:  Just like Mr. Vargas.

2           THE COURT:  I think he is coming.

3           MR. OVERLAND:  Vargas?

4           THE COURT:  Um-hmm.  Mr. Quinn, how is Mr. Vargas doing?

5           MR. QUINN:  Mr. Vargas, I think is getting religion I

6    hear.

7           THE COURT:  Think he'll be here?

8           MR. QUINN:  Yes.  That's what I'm hearing.

9           THE COURT:  I think he'll be here.

10          There is no reason why we can't go off the record and

11   let the court reporter go.

12              (Whereupon the proceedings were adjourned at 4:30.)

13

14                            -oOo-

15

16                        CERTIFICATE

17

18          I hereby certify that pursuant to Section 753, Title 28,

19   United States Code, the foregoing is a true and correct transcript

20   of the stenographically reported proceedings held in the

21   above-entitled matter.

22

23   Date:  FEBRUARY 26, 2011

24

25

1    MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25