1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,                    )
7                                         )
              PLAINTIFFS,                 )
8                                         )
          vs.                             ) CV NO. 04-9049-DOC
9                                         ) STATUS CONFERENCE
MGA ENTERTAINMENT, INC., ET AL.,          )
10                                        )
              DEFENDANTS.                 )
11   _____   )

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                        JURY TRIAL

16                   SANTA ANA, CALIFORNIA

17                MONDAY, FEBRUARY 28, 2011

18                       6:00 P.M.

19

20
              **DEBORAH D. PARKER, CSR 10342**
21              **OFFICIAL COURT REPORTER**
              **UNITED STATES DISTRICT COURT**
22              **411 WEST FOURTH STREET**
                   **SUITE 1-053**
23          **SANTA ANA, CALIFORNIA 92701**
                 **(714) 542-8409**
24            **D.PARKER@IX.NETCOM.COM**

25

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE PLAINTIFF, MATTEL, INC.:

 3                              JOHN QUINN
                               WILLIAM PRICE
 4                             MICHAEL T. ZELLER
                               QUINN EMANUEL URQUHART
 5                             & SULLIVAN, LLP
                               865 S. FIGUEROA STREET
 6                             10TH FLOOR
                               LOS ANGELES, CALIFORNIA 90017
 7                             (213) 443-3000

 8
           FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                               THOMAS S. MC CONVILLE
10                             ORRICK HERRINGTON & SUTCLIFFE, LLP
                               4 PARK PLAZA
11                             SUITE 1600
                               IRVINE, CALIFORNIA 92614
12                             (949) 567-6700

13
                               ANNETTE L. HURST
14                             ORRICK HERRINGTON & SUTCLIFFE, LLP
                               THE ORRICK BUILDING
15                             405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
16                             (415) 773-5700

17
                               JENNIFER L. KELLER
18                             KELLER RACKAUCKAS, LLP
                               18500 VON KARMAN AVENUE
19                             SUITE 560
                               IRVINE, CALIFORNIA 92612
20                             (949) 476-8700

21

22

23

24

25
```

```
1    APPEARANCES OF COUNSEL:

2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

3                              MARK E. OVERLAND
                              LAW OFFICES OF MARK E. OVERLAND
4                              100 WILSHIRE BOULEVARD
                              SUITE 950
5                              SANTA MONICA, CALIFORNIA 90401
                              (310) 459-2830
6

7                              ALEXANDER H. COTE
                              SCHEPER KIM & HARRIS, LLP
8                              601 WEST FIFTH STREET
                              12TH FLOOR
9                              LOS ANGELES, CALIFORNIA 90071
                              (213) 613-4660
10

11
     ALSO PRESENT:
12
                              JEANINE PISONI
13                              MGA ENTERTAINMENT, INC.
                              16360 ROSCOE BOULEVARD
14                              SUITE 105
                              VAN NUYS, CALIFORNIA 91406
15
                              KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
16                              MIKE STOVALL, MGA TECHNICAL OPERATOR

17

18

19

20

21

22

23

24

25
```

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL JOSEPH WAGNER | 7 | 76 | | |
| | 70 | 123 | | |

5

```
 1    SANTA ANA, CALIFORNIA; MONDAY, FEBRUARY 28, 2011; 6:00 P.M.

 2              THE COURT:  We're on the record in the Mattel

 3    matter versus MGA.

 4              Mr. Wagner is present.  Mr. Price is present.

 5    Mr. McConville is present.

 6              And are you, Mr. Wagner?

 7              THE WITNESS:  Yes.

 8              THE COURT:  Thank you, sir.

 9              Would you raise your right hand, please.

10        MICHAEL JOSEPH WAGNER, PLAINTIFFS' WITNESS, SWORN

11              THE WITNESS:  I do.

12              THE COURT:  Thank you very much.

13              If you will, please, take the witness stand which

14    is just to my left.

15              MR. MCCONVILLE:  Your Honor, can I have a second?

16    Ms. Keller is next door.

17              Can I run and go get her?

18              THE COURT:  Mr. Wagner, we'll be right with you.

19    Have a seat.

20              THE WITNESS:  Thank you, your Honor.

21        (Pause.)

22              THE COURT:  We're on the record.

23              Mr. Price, Mr. Zeller, Ms. Hurst, Mr. McConville,

24    Ms. Keller are present.

25              The witness, Mr. Wagner, is on the stand,
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

6

1    previously sworn.

2            And, sir, would you state your full name.

3            THE WITNESS:  Michael Joseph Wagner.

4            THE COURT:  And would you spell your last name,

5    sir.

6            THE WITNESS:  Yes, your Honor.  W-A-G-N-E-R.

7            THE COURT:  Each side has an hour and 15 minutes

8    to use however they would like to.

9            Mr. Price, this is the beginning of your direct

10   examination.

11           MR. PRICE:  Yes, your Honor.

12           I provided the court Exhibit 22643, which is

13   Mr. Wagner's resume; and for purposes of the *Daubert*

14   hearing, rather than going through that for 45 minutes or

15   so, we would just submit that for purposes of this hearing.

16           THE COURT:  That's acceptable, because I don't

17   think that's critical for the *Daubert* hearing.

18           MR. PRICE:  Thank you.

19           And we have some demonstratives.  And as I go

20   through them, if we can mark them, it should be Wagner 1,

21   Wagner 2.

22           THE COURT:  They're marked on the bottom

23   right-hand corner.

24           Let's proceed.

25           MR. PRICE:  Yes.

```
 1                      DIRECT EXAMINATION

 2   BY MR. PRICE:

 3   Q.   Good evening, Mr. Wagner.

 4          I want to go through in kind of a truncated form

 5   what your opinions are and what they are based on, and then

 6   give MGA a chance to examine you.

 7          You have the demonstratives in front of you;

 8   correct?

 9   A.   I do.

10   Q.   And does Demonstrative 1, Wagner 1 summarize your

11   assignments in this case?

12   A.   It does.

13   Q.   And could you, briefly, just tell us what those

14   assignments were?

15   A.   Well, they all relate in some respect to the damages

16   that are being claimed based on the alleged legal violations

17   in the case.  The first one is Mattel lost profits.  The

18   second one is MGA profits that you earned on the Bratz

19   product.  The third is a reasonable royalty to Mattel.

20   Then, I've looked at some non-Bratz trade secrets which have

21   been called the Mexico, Canada and Castilla trade secrets.

22   I've then analyzed the distributions of profits to

23   Mr. Larian from MGA as a result of these of the success of

24   the Bratz products.  And, finally, I had a document in 2008

25   that indicates his net worth which I have reviewed.
```

1    Q.   Let's go to the lost profits, first.  And let me ask

2    you in connection with completing your assignments, did you

3    do an analysis of MGA product sales between 2001 and 2010?

4    A.   I did.

5    Q.   And does Wagner No. 2 show the results of that

6    analysis?

7    A.   Well, it shows one analysis I have done of the 83

8    product lines that MGA has introduced between 2001 and 2010.

9    Q.   And could you describe to us what that shows?

10   A.   What this shows, based on my review of their financial

11   records, that in 2001 MGA had 31 different product lines

12   which they are selling.  And I analyzed how many of those

13   product lines, actually, were sold over the entire 10-year

14   period of 2001 to 2010.  And what this chart shows is the

15   results of that analysis.

16            The blue bar on the left is what the sales of the

17   Bratz products were, and that's approximately $3.4 billion.

18            The next product that was sold through that entire

19   10-year period was a product Hot Hoops, and the total sales

20   in that 10-year period was $17.7 million.

21            THE COURT:  MGA product?

22            THE WITNESS:  Yes, it's a MGA product, your Honor.

23            And then, the only other products that MGA of the

24   83 product lines that -- actually, it's only 31 product

25   lines that existed in 2001 that are still being sold in 2010

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    is a product called Casino, and that had 7 1/2 million worth

2    of sales through this 10-year period.

3    BY MR. PRICE:

4    Q.   So if you exclude Bratz, only 28 of the 30 MGA product

5    lines that were in existence in 2001 were in existence in

6    2010?

7    A.   That's an incorrect question.

8    Q.   Okay.

9    A.   The Bratz, the Hot Hoops and the Casino product lines

10   are the only three of the 31 that have been sold to the

11   entire 10-year period.  The other 28 product lines that

12   existed in 2001, the products did not last a full decade.

13   Q.   And how is this analysis relevant to your analysis on

14   the loss profits to Mattel and profits to MGA?

15   A.   What it shows is the success of MGA at selling other

16   products besides Bratz whether they have the same

17   infrastructure, the same marketing executives, the same

18   distribution systems and the same creative efforts, that

19   this was the only level of success they're able to obtain.

20   Q.   So it's a way of comparing the value of the product

21   itself with the infrastructure and distribution network,

22   et cetera?

23   A.   Well, it's trying to figure out why Bratz was so

24   successful compared to any other product line that MGA sold.

25   Q.   And if you look at Wagner 3, you see this is an

DEBORAH D. PARKER, U.S. COURT REPORTER

1    analysis of MGA's top 10 products by revenue, 2001 to 2010.

2              Is this an analysis you prepared?

3    A.    It is.

4    Q.    And could you tell us what it shows?

5    A.    Well, what this shows is of the top 10 products out of

6    their 83 that had the most amount of sales during this time

7    period and showing how much those contributed to revenues of

8    MGA during this time period.

9    Q.    And so -- for example, so this is revenue, not profit;

10   correct?

11   A.    This is strictly how much they sold.  It is revenues

12   only.

13   Q.    Could you take us through the chart and show us what it

14   shows about MGA's top 10 product by revenue in that same

15   time?

16   A.    Well, it's not showing the actual revenues.  This is

17   calculating the percentage of the total revenues for these

18   10 products during this period of time.  It shows that Bratz

19   was 62 percent of the revenues during this time period.

20              THE COURT:  Does this include 2010?

21              THE WITNESS:  Yes, it does.

22              THE COURT:  I thought that Bratz had kind of a

23   home run product in 2010.

24              THE WITNESS:  Well, they had two products.  I

25   think they may have been talking about Lala --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1              THE COURT:  Lalaloopsy.

2              THE WITNESS:  Your Honor, that only sold

3    $17 million in 2010.

4              THE COURT:  That's all?  What about --

5              THE WITNESS:  Moxsie?

6              THE COURT:  Moxsie, yeah.

7              THE WITNESS:  Moxsie sold 91 million in 2010, your

8    Honor.

9              THE COURT:  Where is Moxsie on my chart?

10             THE WITNESS:  Moxsie is on this chart, your Honor.

11   It's the fourth bar to the right.

12             THE COURT:  I see.  So this isn't by year.

13             THE WITNESS:  No, your Honor.  It's the total time

14   period.  And I will tell you that Moxsie is only in

15   existence for two years versus Bratz being in existence for

16   10 years.  That is clearly a fact.

17             THE COURT:  There's Moxsie (indicating).

18             THE WITNESS:  Yes, your Honor.

19   BY MR. PRICE:

20   Q.   By the way you, said that Lalaloopsy sold how many

21   million?

22   A.   17 million in 2010.

23   Q.   Was it the top selling doll in 2010?

24   A.   Clearly not.

25   Q.   Do you know what was?

1   A.   Well, for MGA, it was Moxsie.  And if you talk about

2   the industry, it was Barbie.

3   Q.   And what's the relative -- do you know the relative

4   sales difference between Lalaloopsy and Barbie?

5   A.   I don't.  I don't have that fact memorized.

6   Q.   So, now, let's go into how you used this.  And the

7   first area on your list which of is Mattel's lost profits

8   from Bratz, and specifically -- so it gets us to No. 4 --

9   let me ask you this:  So, from Mattel's lost profits from

10  Bratz, what you're looking at is that if Mattel had these

11  Bratz trade secrets and, therefore, there was no Bratz

12  product to compete with Mattel because Mattel would not

13  compete with itself, you're looking at the profits Mattel

14  lost as a result of the competition with the Bratz trade

15  secrets; is that right?

16  A.   That is correct.

17  Q.   Now, what's the first step in your analysis for that?

18  A.   Well, the first step is to try to understand causation

19  was the introduction of the Bratz doll and its increased

20  sales, causing sales of Barbie to decline.  And I wanted to

21  see if I could prove that, statistically.  So I analyzed the

22  information that's on this chart.

23  Q.   You say "on this chart."  You're talking with -- we're

24  now at No. 5, I think Wagner 5?

25  A.   Yes, I'm sorry.  I didn't realize you hadn't put it up

1    yet.

2    Q.    Okay.  Could you tell us what the chart itself shows?

3    Is this an analysis or is this just data?

4    A.    This is just data.  This is strictly taken from the

5    data source I had for this industry that shows quarterly

6    sales of both Barbie and Bratz by quarter during this time

7    period from 2000 through 2009.

8    Q.    And you said from the best data you could get.  What

9    data was that?

10   A.    That's NPD data.

11   Q.    And to your knowledge, is there any better data to show

12   the sales and trends in the industry?

13   A.    No.  I did a search of all public record to find -- if

14   I could find any other sources for this information and NPD

15   is the data that the industry uses and the only data I could

16   find that has this type of information.

17   Q.    And so, Wagner 5 here just shows the raw data of Bratz

18   market share versus Barbie market share; correct?

19   A.    Correct.  By quarter.

20   Q.    So what did you do with the data?

21         I mean, if you look at the chart, it looks like

22   there's some relationship.  What did you do from that point?

23   A.    Well, the first thing I did is I developed a

24   statistical model to see if there is a relation between a

25   change in market share for Bratz and a change in market

1    share for Barbie.

2    Q.    And could you explain to us that process?

3    A.    Yes.  It's putting this data into -- into a formula

4    which is basically looking at Bratz as a dependent variable

5    and seeing if when a change in sales of Bratz occurs, which

6    is the independent variable, is there a statistically

7    significant relation.

8    Q.    Between that and --

9    A.    I'm trying to understand if Bratz sales go up, what

10   happens to Barbie sales.  If Barbie sales go up, what

11   happens to Bratz sales.

12   Q.    Now, in this analysis, you're not trying to quantify;

13   is that right?

14   A.    No.  This is only a causation analysis.  I'm not -- I

15   didn't use this analysis that I'm explaining in any way to

16   quantify Mattel's damages in this case.

17   Q.    So, for example, in this analysis, this statistical

18   analysis, did you take into account recalls of Barbie

19   products or things of that nature?

20   A.    No, I do that in another part of my analysis.  But, no,

21   I did not do that.

22   Q.    Okay.  So this is just seeing whether or not Bratz

23   market shares related in some way to Barbie market share?

24   A.    Correct.

25   Q.    And what were your findings?

1   A.   My findings is there is a statistically significant

2   relation between a change in market share of Bratz and a

3   change in market share of Barbie.

4           Now, all my statistics does is prove that there is

5   a relation.   It doesn't tell me which really causes the

6   other.

7   Q.   So what was the next step in arriving at a conclusion

8   that there is a causal link between Bratz market share and

9   Barbie market share?

10  A.   Well, I studied the information available in the market

11  both from Mattel from MGA and from industry observers as to

12  what was happening in this marketplace during this time

13  period.   And I detailed the information that I reviewed in

14  my report, the report dated November 12th, 2000, between

15  pages 25 and 39 information from the industry that explained

16  which was causing which change in market share.

17  Q.   And so you're talking about the third-party statements,

18  MGA statements, Mattel statements?

19  A.   Correct.   They are all explained in my report.   But all

20  of those statements indicate that the introduction of Bratz

21  was causing a decline in market share of Barbie.

22  Q.   So was a -- Bratz wasn't beating Barbie?

23  A.   No.   Bratz was taking market share away from Barbie.   I

24  didn't see anyone who said because Barbie is such a lousy

25  product it was a void, and it was just filled by Bratz,

1    which is the other conclusion you might reach.  No one said

2    that in this time period.

3    Q.   So having done the analysis of whether there's causal

4    relationship, did you then try to determine what sales of

5    Mattel were lost as a result of Bratz, whether there where

6    Barbie sales that were lost as a result of Bratz?

7    A.   The next thing I did was look at whether Bratz expanded

8    the market or not, because I had seen information that there

9    was some information that that might have occurred.  And I

10   wanted to, again, study that statistically.  So I did

11   another equation to determine what -- what the introduction

12   of Bratz did, it actually grew the market for fashion dolls

13   in the United States.

14   Q.   And we've got Wagner 6 here.  So one thing you tried to

15   isolate was what percentage of Bratz sales were the result

16   of simply Bratz bringing more people to the market; correct?

17   A.   Correct.  It would not be appropriate to award those

18   sales to Mattel as lost profits because but for the

19   introduction of Bratz, the market would have been smaller.

20   Q.   So what kind of analysis did you do to see whether or

21   not some of the Bratz sales were a result of them increasing

22   the market?

23        THE WITNESS:  I had information from NPD again for

24   the sale of fashion dolls broken out by different categories

25   which were reflected on this Exhibit 6, and then analyzed

1  each of these different product segments to determine

2  whether the introduction of Bratz actually caused the market

3  to increase.  And I found that for two of the categories, it

4  doesn't seem to indicate that Bratz did impact the market

5  and actually increase the market.  And that's in the not

6  specified product category and also the category that I

7  would expect to see, which is the tween market, which is a

8  market that was originally focused on by MGA and that's the

9  age nine to 11 market.  And I do believe that Bratz expanded

10 the market as a result of their entry.

11 Q.   And when you say "not specified," that's one of the

12 product categories that NPD has?

13 A.   Yes.  Sometimes they collect data, but they did not

14 capture the information of the ultimate age of the ultimate

15 consumer for that product.

16      THE COURT:  I'm sorry.  If I look at this chart, I

17 see age nine to 11.

18      Am I to assume that the opinion you have is that

19 the market expanded, or the Bratz market expansion was

20 89.4 percent in that one age category?

21      THE WITNESS:  Yes, your Honor.

22      THE COURT:  And what does that mean, the Bratz

23 market expansion?

24      THE WITNESS:  What that means is that the

25 customers in that age bracket.

```
 1              THE COURT:  Expanded?

 2              THE WITNESS:  Expanded.  Yes, your Honor.

 3              THE COURT:  Whether they bought Mattel or they

 4   bought MGA product, expanded?

 5              THE WITNESS:  Yes, your Honor.

 6              THE COURT:  89.4 percent.

 7              Well, tell me again what 119.1 percent is?

 8              THE WITNESS:  Well, actually, that shows that for

 9   that particular category, they grew the market over

10   100 percent of what it had been before.

11              THE COURT:  Well, that's what I don't know.  I

12   don't have an age by that.  It says "not specified."  What

13   does that mean?

14              THE WITNESS:  That means, your Honor, is that when

15   NPD collected those sales data, they could not determine the

16   age of the customer.

17              THE COURT:  Okay.

18   BY MR. PRICE:

19   Q.  So in the other age groups we have here other than not

20   specified in age nine to 11, did you find that Bratz

21   expanded the market in the United States?

22   A.  I did not.

23   Q.  And the reason you did this analysis, is because you

24   thought it would be unfair to attribute those sales by Bratz

25   due to market expansion in any way or to take that -- or
```

1    attribute that to Mattel's damages?

2    A.   Well, for Mattel's lost profits it would be

3    inappropriate to include those sales in a lost profits

4    damage calculation.

5              THE COURT:  Just a moment.  If I'm interested in

6    buying a fashion doll, I usually wouldn't think that I would

7    buy a fashion doll for my daughter or me at age zero to 2,

8    would I?

9              THE WITNESS:  Well, you wouldn't, your Honor, but

10   some people do.

11             THE COURT:  Well, I don't think that's my primary

12   market, frankly.  And from age three to five, I don't think

13   a primary market is necessary for three to five, although it

14   might be.

15             Age nine to 11 seems like a large expansion in

16   that age range, if you're correct.  And if that's the

17   primary age range for buying a fashion doll, not a doll, but

18   a fashion doll, isn't that a —— if I ——

19             I mean, I could read that statistically as being

20   20 million units sold.  I have no idea.

21             THE WITNESS:  I'm going to tell you what it is in

22   a minute, your Honor.

23             THE COURT:  Okay.  I'll wait for the next slide;

24   right?

25             THE WITNESS:  Yes, your Honor.

```
1              THE COURT:  I'm waiting for the next slide.
2    BY MR. PRICE:
3    Q.   Well, the next question is whether or not you also
4    looked at whether or not Bratz expanded the market in other
5    countries.
6    A.   I did.  Unfortunately, I don't have information from
7    other countries by age group, like I do for the
8    United States, so I had to do the analysis on the total
9    market.  But in the United States -- pardon me,
10   internationally, I also found expansion in the total market
11   in two countries, and that is the UK and Australia.
12   Q.   Now, you're a little ahead of me here.
13             We're at Wagner 7, and maybe you can -- is this
14   what you wanted to look at to answer the court's question?
15   A.   Yes.  To answer your Honor's question, at least the top
16   of the line is what I ended up concluding, is that in this
17   period of time that in the total market, which is mainly the
18   nine to 11 category that I believe Bratz expanded the market
19   by $904.8 million at retail.
20   Q.   And your conclusion is, then, that Mattel should not
21   collect any damages as a result of that market expansion;
22   correct?
23   A.   That is correct.  And I did not calculate any damages
24   for that market expansion to Mattel.
25   Q.   And then, you have UK expansion of 350.7 million and
```

1    Australia expansion of 183.9 million; is that right?

2    A.    That is correct.

3    Q.    So you calculated a total market expansion of

4    1.4 billion?

5    A.    I do.

6    Q.    And that -- in these calculations you basically gave to

7    MGA.  Mattel has no part of that; correct?

8    A.    For my lost profits calculation, MGA keeps all of that.

9    Q.    Now, after you gave all of that market expansion to

10   MGA, what were your steps in determining what Barbie's lost

11   profits were as a result of Bratz?

12   A.    Well, now, there is a leftover amount of sales that

13   were Bratz sales that didn't expand the market.  Now, if I

14   am to assume that Bratz would not have been on the market,

15   the next step is to figure out how much of that to award to

16   Mattel versus the other industry participants in the fashion

17   doll industry.  So then I use this lower amount of Bratz

18   sales and apportion that to all of the rest industry by

19   their actual market shares year by year.

20   Q.    So when you had total Bratz revenue of --

21           Do you recall what the total Bratz revenue was

22   that you subtracted the 1.4 billion from?

23   A.    Well, I don't have that exactly quantified in my model,

24   because I don't know the markup between retail and

25   wholesale.  But I was using percentages of market share, so

1    I didn't need to do that step.  But I, basically, limit -- I

2    would -- it would be somewhere between $700- and

3    $900,000,000.

4    Q.   So if we look at No. 8, Wagner 8, there is a

5    calculation here of Barbie worldwide lost profits.

6            Can you explain what that shows?

7    A.   Yes.  Based on this analysis, which I just told you

8    about, which when I use only Mattel's actual market shares

9    each year which takes into consideration all of the skills

10   of Mattel, all of the weaknesses of Mattel and also the

11   skills and weaknesses of all the rest of the market

12   participants, it only uses information about people who

13   actually bought fashion dolls in that time period that I

14   have then calculated lost sales to Barbie of, approximately,

15   a billion dollars during this 10-year period.

16   Q.   And that's using a percentage based upon Barbie's

17   actual market share vis-à-vis its competitors?

18   A.   Correct.  And that market share is declining each year

19   and I still recognize that fact in my damage model.

20   Q.   So does that take into account effects of recalls,

21   effects of Mattel's creativity, its ability, et cetera?

22   A.   It takes all of that into consideration.

23   Q.   Can you explain to us how your analysis takes all of

24   that into consideration?

25   A.   Yes.  Because I'm looking at actual data.  How is

1    Mattel actually able to compete against the other providers

2    of fashion dolls to customers in the United States?

3              So I can clearly determine if Mattel was weak,

4    then they wouldn't do as well as compared to their

5    competitors.  If High School Musical was doing well, or

6    Hannah Montana, that's all taken in consideration here.  If

7    Mattel is not executing its strategy well, if it's not

8    advertising properly, they're going to lose market share in

9    that year, and my approach takes that into consideration.

10   Q.   So, for example, Mattel's percentage of market share

11   was zero.  Would you have found any Barbie lost sales?

12   A.   No.  It would be zero.

13   Q.   So your conclusion on the amount of profits that

14   Mattel, Barbie lost as a result of Bratz entering the market

15   was 323.7?

16   A.   Yes.  After I've subtracted what I believe are the

17   incremental costs that they would have incurred to earn that

18   one billion dollars.  And that's approximately 683 million

19   dollars.

20   Q.   How did you calculate that?

21   A.   By analyzing the financial statements of Mattel and the

22   incremental profits they earned on their product lines.

23   They have certain costs that they charge directly to Barbie

24   on their financial statements, things like how much it

25   actually cost to make a Barbie doll, how much it cost to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   actually to distribute it, sometimes what they actually use
 2   in marketing dollars.
 3           So any time that Mattel had direct charges, I
 4   subtracted those.  Then, there is certain common costs very
 5   often called sales general and administrative expenses.  I
 6   used a regression analysis to determine the incremental
 7   change in those costs as sales increase at Mattel and then
 8   subtracted those costs as well.
 9   Q.   So 323.7 million profits is how much Barbie lost,
10   assuming that it was required to compete against its own
11   products, own trade secrets?
12   A.   Yes.
13   Q.   Now, let's go to the second area you were asked to look
14   at, which is Bratz profits.
15           And if we can go to slide 10, could you tell us
16   what slide 10 shows?
17   A.   Well, this is just a three-line income statement of
18   what I concluded that based on my review of MGA's financial
19   records, they sold on a net basis $3.4 billion of Bratz
20   products.  I have calculated what I believe are the
21   incremental costs to generate those sales of $2.6 billion.
22   Then, the residual or the profits is approximately
23   $792 million.
24   Q.   So what profit margin does your analysis reflect?
25   A.   It's a 22 percent profit margin.
```

```
1   Q.   Now, the cost that you calculated, you said you did
2   through a regression analysis?
3   A.   Well, that was part of my approach.  There are other
4   parts to estimating their costs.
5   Q.   Do you have any other indicia that leads you to
6   conclude that your profit margin of 22 percent is in terms
7   of damages calculation a conservative number?
8   A.   Yes.
9   Q.   And what is that?
10  A.   That I reviewed the expert's reports of
11  Mr. Malackowski, the expert retained by MGA to calculate its
12  damages.  And I looked at Schedule 7.3 of his corrected
13  report and calculated what he believes the incremental
14  profitability of the Bratz product line is when he was
15  calculating damages to the Bratz product line.
16  Q.   What did his data show?
17  A.   Well, he concludes that the incremental profitability
18  on Bratz is 30 percent, which is significantly higher than
19  my 22 percent.
20  Q.   So if you used his analysis, this Bratz profit number
21  that you used to calculate damages would actually be higher?
22  A.   It would be significantly higher.  It would be over a
23  billion dollars.
24  Q.   So, now, you've identified the Bratz profits.  What's
25  your next step?
```

1   A.   Well, after I've done that, then I've got to figure out

2   how to apportion that among the intellectual property that

3   you are claiming was Mattel's intellectual property and that

4   Bratz supposedly took based on your liability case.

5   Q.   So let's talk about that.  What sort of analysis did

6   you do to allocate those profits?

7   A.   Well, I did a reasonable royalty analysis of the

8   different buckets of intellectual property to use as a basis

9   to apportion between the different types of intellectual

10  property.

11  Q.   Could you tell us what you mean by a reasonable royalty

12  analysis?

13  A.   Yes.  Well, used what's called the Georgia-Pacific

14  analysis, which is an analysis that was really used

15  primarily in patent cases which is, of course, a different

16  form of intellectual property than trade secrets, or trade

17  names, or copyrights.  But that area of intellectual

18  property law is much better developed than these other

19  areas.  So I, in my experience, had used this same analysis

20  to value other types of intellectual property, as have other

21  experts I know in the field.

22  Q.   For example, what other experts in the field have used

23  this reasonable royalty analysis to allocate profits in

24  these sorts of cases?

25  A.   Well, Mr. Malackowski has done that.

```
 1              MS. KELLER:  I'm going to object.  It's vague as
 2   to "these sorts of cases."  I think we need to be more
 3   specific.
 4   BY MR. PRICE:
 5   Q.   Cases involving either trade secrets or copyright?
 6   A.   Well, I'm currently opposed to Mr. Malackowski in a
 7   case dealing with trade names, trademarks.  And in that
 8   case, he used the Georgia-Pacific analysis to come up with
 9   the reasonable royalty.
10   Q.   For the trade name?
11   A.   Yes.
12   Q.   So using this reasonable royalty analysis, what were
13   the steps that you then took to allocate profits for trade
14   secrets and then for copyright?
15              What's the first step?
16   A.   The first step is I tried to value the entire bucket of
17   intellectual property rights which would be the trade
18   secrets, the copyrights and the trade name -- trade secret.
19   Q.   And how did you do that?
20   A.   Well, I always like to start with some type of baseline
21   or starting point for the hypothetical that the parties
22   could negotiate over.  And I always do that based on the
23   best evidence in a particular case, and the record I have to
24   consider.  And I found that on April 24th, 2007, that MGA
25   entered a license agreement with CBS Consumer Products that
```

1  seemed to license a bundle of rights similar to the bundle
2  of rights that are at issue in this case.
3  Q.   And that's reflected in Demonstrative 12?
4  A.   Yes.
5  Q.   And when you say "a bucket of rights similar," does it
6  reflect logo, names and characters?
7  A.   Correct.  And what they are licensing is the rights to
8  America's Next Top Model, to use in their products.  It was
9  a nonexclusive license.  It was worldwide.  And they were
10  using this intellectual property in their fashion dolls,
11  their doll accessories and other products.
12  Q.   If we go to Demonstrative 13, could you tell us what
13  this shows in using this CBS/MGA agreement as sort of a
14  base?
15  A.   Well, there is a royalty structure in this agreement
16  that range from 9 percent to 11 percent based on volume.
17  And based on the volume of products at issue in this case, I
18  used the royalty rate that reflected that volume which was
19  11 percent.  So I'm going to start my hypothetical
20  negotiation with that as the starting point.
21  Q.   That's because Bratz sold more than a million units?
22  A.   Yes.
23  Q.   So when you did your then summary -- your
24  Georgia-Pacific analysis using this starting point, what did
25  you find?

1    A.   Well, there are 15 Georgia-Pacific factors.  The 15th

2    factor is the hypothetical negotiation.  So the first 14 are

3    what inform your opinion.  So I analyzed each of those 14

4    factors with the facts of this case and concluded that four

5    of those factors would increase the rate from my baseline.

6    Eight of the factors were neutral and two would decrease the

7    royalty rate from my starting point rate.

8    Q.   And that analysis is reflected in your reports?

9    A.   Yes.  It's laid out over about 80 pages in my corrected

10   report, dated November 12, 2010.

11   Q.   And the summary you just talked about is in

12   Demonstrative 14?

13   A.   It is.

14   Q.   And then if we go to Demonstrative 15, does that list

15   the major factors impacting royalty --

16        In Demonstrative 15, does that list what you

17   concluded were the major factors impacting the royalty rate?

18   A.   Yes.

19   Q.   And if you could run us through that.  What were your

20   conclusions?

21   A.   Well, the first is assuming you establish liability

22   that we know that Mattel's intellectual property is both

23   valid and enforceable in this case.  And that's a strong

24   asset, stronger than you normally get in the real world.

25        The second thing is that Mattel is not a willing

```
 1   licensor of its intellectual property for the fashion doll
 2   industry.  In fact, it has never licensed its IP for someone
 3   else to use in the manufacture of a fashion doll.
 4   Q.   So if Mattel had the trade secret of Bratz, of being
 5   able to create Bratz, then it's not the kind of thing that
 6   Mattel would willingly license?
 7   A.   That is correct.
 8   Q.   And what's the third?
 9   A.   The third is that both parties would know that this
10   license agreement would allow MGA to compete directly
11   against Mattel for the sale of fashion dolls.  So Mattel
12   would have to think about all these profits it might lose as
13   a result of allowing MGA to license this intellectual
14   property.
15   Q.   So it's a situation of a competitor licensing to
16   another competitor?
17   A.   Correct.
18   Q.   Now, let me ask you this question:  You've seen where
19   Mr. Bryant got a three percent royalty rate for his work
20   with MGA.
21        Do you remember that?
22   A.   I'm fully aware of that agreement.
23   Q.   So why would you not use that three percent number as a
24   reasonable royalty rate from a hypothetical negotiation
25   between Mattel and MGA?
```

1   A.   Well, a number of reasons.  But the principal reason is

2   that there is no competition between Carter Bryant and MGA.

3   There is no other way that Mr. Bryant could monetize his

4   intellectual property except for licensing it.  He doesn't

5   have another design that this license will make him lose

6   sales underneath that other license.  So it's a very

7   different construct.

8   Q.   And then, what's the fourth bullet point you have here?

9   A.   Well, the fourth one is one of the points that makes

10  the royalty rate go down.  Mattel would have to recognize

11  there would be significant contributions by MGA to actually

12  develop the products, to market them and to have a

13  successful product in the marketplace.

14  Q.   So after doing your Georgia-Pacific analysis, using --

15  I guess it's the baseline --

16            THE COURT:  Just a moment.  Excuse me.

17            Have you read the opinion from the Ninth Circuit?

18            THE WITNESS:  Yes, your Honor.

19            THE COURT:  For want of a better word,

20  Judge Kozinski and the panel speak about the sweat equity or

21  the efforts, if you will, by MGA.

22            Do you believe that this Georgia-Pacific factor

23  accounts for the sweat equity amongst the 14 factors to be

24  considered?

25            THE WITNESS:  I do, your Honor.  And the main

1    reason for that --

2              THE COURT:  Thank you.

3              THE WITNESS:  I'm sorry.

4              THE COURT:  Second, if the court believed that

5    trade secret misappropriation would only go to the jury on

6    the issue of damages on a lost profit analysis and unjust

7    enrichment, and that it would go to --

8              Well, what would your calculation be involving

9    each of those damage theories?

10              THE WITNESS:  Your Honor, I would do the same

11   analysis to apportion between the trade secrets and the

12   copyrights and the trade name, but I would not put forward

13   any calculation of damages based on these figures.

14              THE COURT:  I think I -- I want to say I didn't

15   understand, so help me.

16              Trade secret misappropriation, first bucket.

17              THE WITNESS:  First bucket, if that includes all

18   of what's claimed, there wouldn't be any apportionment.  I

19   wouldn't need to use this analysis for that particular

20   calculation.

21              THE COURT:  "This analysis," meaning

22   Georgia-Pacific?

23              THE WITNESS:  Yes, your Honor.  It would not be

24   necessary.

25              THE COURT:  I want you to forget Georgia-Pacific

1   for just a moment.  I want you to assume trade secret

2   misappropriation and lost profits.

3          What would your analysis be concerning the first

4   bucket of the trade secret misappropriation?

5          THE WITNESS:  If you are going to calculate damage

6   for all the trade secrets which include the copyrights, the

7   trade secrets and the trade name, I wouldn't use this

8   analysis at all.

9          THE COURT:  I understand that.  What would your

10  dollar figure be?

11         THE WITNESS:  For which one -- the lost profits

12  would be the 323 million.

13         THE COURT:  And that would apply to trade secret

14  misappropriation?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  What about unjust enrichment?

17         THE WITNESS:  Unjust enrichment depends on what

18  products are appropriate.  If all Bratz products are

19  included, it would be 792 million.  But, an example, if

20  there's only the first four dolls or the first four dolls

21  plus the other two, or just the fashion dolls with the

22  original sculpt, all those numbers would be lower than that

23  based on that royalty.

24         THE COURT:  Let's make it easy.  Let's take the

25  First Generation dolls of four, plus two.

1          THE WITNESS:  I don't have my chart up here to

2    tell me what that number is.  But it is, your Honor,

3    significantly less than 792 million.  I want to say it's

4    like 30 million.

5          THE COURT:  And sculpts?

6          THE WITNESS:  I think that number is around

7    90 million.

8          THE COURT:  So let me hear those numbers once

9    again.  I didn't write them down.  I'm sorry.

10         First Generation, lost profits for a moment.

11         First Generation dolls plus the two,

12   approximately?

13         THE WITNESS:  Your Honor, what I was just telling

14   you was, what would be the Bratz profits, not Mattel's lost

15   profits.

16         Is that what you're referring to?

17         THE COURT:  I want lost profits.

18         THE WITNESS:  Well, the lost profits is what I

19   would call a more traditional but-for causation, so --

20         THE COURT:  I'm going to stop you.

21         THE WITNESS:  I'm sorry.

22         THE COURT:  Thank you very much.

23         *(Reading):  I want you to forget Georgia-Pacific*

24   *for just a moment.  I want you want to assume trade secret*

25   *misappropriation and the lost profits in the first bucket of*

1    *the trade secret misappropriation.*

2            *Answer:  If you're going to calculate damages for*

3    *all the trade secrets which include copyrights, the trade*

4    *secrets and the trade name, I wouldn't use this analysis at*

5    *all.*

6            *Question:  I understand that.  What would your*

7    *dollar figure be?*

8            *Answer:  For which one?  The lost profits would be*

9    *$323 million.*

10           *That would apply to trade secret misappropriation?*

11           *Yes, your Honor.*

12           *What about unjust enrichment?*

13           *Depends on what profits are appropriate.  If all*

14   *Bratz products are included, it would be $792 million.*

15           *Let me stop you there.  Question:  And sculpts?*

16           *I think the number is $90 million.*

17           Then, I asked you to repeat those numbers, and we

18   went off on some conversation.

19           Is your opinion that in a lost profits analysis

20   that the first four dolls, plus the two that the court is

21   allowing to go to the jury would have lost profits of around

22   $30 million?

23           Yes or no?

24           THE WITNESS:  No.

25           THE COURT:  Okay.  Then, what is your figure

1    without 20 sentences?

2            THE WITNESS:  Well, in lost profits, your Honor --

3            THE COURT:  What is your opinion?

4            THE WITNESS:  -- I did not do any apportionment in

5    lost profits.  I only have one number.

6            THE COURT:  What's your number?

7            THE WITNESS:  And that was the $323 million.

8            THE COURT:  And that $320 million, though, assumes

9    44 dolls going to the market, doesn't it?

10           THE WITNESS:  It includes all of the products

11   going to the market, your Honor.

12           THE COURT:  Let me say that again:  Does that

13   include 44 dolls going to the market?

14           THE WITNESS:  It does include 44 dolls.

15           THE COURT:  And what is 44 minus -- well, you

16   don't have a figure then for the First Generation dolls, the

17   four plus two, do you?

18           THE WITNESS:  Your Honor, I do not on the lost

19   profits calculation.  It is doable, but I have not made that

20   calculation.

21           THE COURT:  All right.  Just a minute.

22       (Pause.)

23           THE COURT:  All right, Counsel.

24   BY MR. PRICE:

25   Q.   So to be clear about the two concepts, the lost profit

1    analysis is loss of profits to Mattel because MGA was able

2    to compete with Mattel using trade secrets; correct?

3    A.    Yes.

4    Q.    And why didn't you limit that the first four dolls or

5    the first six dolls?  I'm talking just about the lost

6    profits analysis.

7    A.    Because that is the way that I normally calculate lost

8    profits.  There is no apportionment in lost profits.  It's

9    either caused or not caused by the alleged legal violation.

10   Q.    And so, for example, if MGA's sweat equity, its skill,

11   its creativity using Mattel's trade secrets resulted in more

12   Bratz sales, how would that impact your Mattel lost profits

13   calculation?

14   A.    Only to the extent that what you just described

15   expanded the market, I would give 100 percent credit to that

16   to MGA.  If it did not expand the market, it's not relevant.

17   Q.    And would that be because doing this really well would

18   nonetheless still decrease Mattel's profits --

19           Is that because if MGA used these trade secrets

20   really well, that is, did a good job doing that, that would

21   still impact Mattel's profits?

22   A.    It would.

23   Q.    Now, the second thing you were talking about was unjust

24   enrichment; right?

25   A.    Yes.

38

1    Q.    That is, what portion of MGA's profits are attributable

2    to violations; correct?

3    A.    Yes.

4    Q.    Okay.  And in connection with that, did you do

5    apportionment?

6    A.    That's where I did the apportionment, yes.

7    Q.    And is that where you used the reasonable royalty rate

8    analysis?

9    A.    Yes.  I tried to analyze each of the buckets

10   independently and then use those results to apportion

11   between the different types of intellectual property.

12   Q.    And we were talking about -- I'm sorry.  Is where this

13   the Georgia-Pacific analysis came in?

14   A.    Yes.

15   Q.    And using that analysis, what you described I think if

16   we go to -- let's start with slide 16.

17          Was this your conclusion with respect to the

18   Georgia-Pacific analysis?

19   A.    Right.  For all of the trade secrets.

20   Q.    And could you explain the conclusion that you reached?

21   I know we have the bottom line here.  But explain what you

22   did.

23   A.    Again, my starting point was 11 percent for product

24   sales, and I raised the rate to 15 percent based on my

25   judgment and the different analysis I did under

1   Georgia-Pacific.  I used 50 percent of licensing revenue,

2   because what is really happening here is MGA, if you are

3   correct, are just licensing your intellectual property to

4   its licensees.  And so, what I've concluded is two-thirds of

5   that profit should go to Mattel, and they should leave one

6   third with MGA.  And based on the high profitability of

7   licensing, that works out to be a 50 percent rate of MGA's

8   licensing revenue.

9   Q.   Now, this isn't a 50 percent licensing rate?

10  A.   No.

11  Q.   It's just 50 percent of whatever licensing rate is

12  obtained?

13  A.   Correct.  So if they're licensing at 15 percent, this

14  is really a 7 1/2 percent royalty rate.

15  Q.   And then, if you look at the 17, looks like you've done

16  a reasonable royalty rate of just the Bratz's name trade

17  secret?

18  A.   I did.

19  Q.   And how did you do that; that is, that bucket?

20  A.   Well, I did the same type of analysis which is

21  Georgia-Pacific.  I used a different baseline for the trade

22  name, trade secret.  I found an agreement between Imperial

23  Toy Company and Little Tikes where Imperial Toy basically

24  licensed the name "Little Tikes" and used that as my

25  starting point which had a rate of 5 to 8 percent, depending

1    on the product.

2    Q.   And so what -- you used the rate 5 percent?

3    A.   Well, it ended up that three of the rates went up and

4    three went down and eight were neutral.  But I ended up

5    concluding that I would use the bottom of that range of

6    5 percent.

7    Q.   And you said three of the -- you were talking about the

8    Georgia-Pacific analysis?

9    A.   I was.

10   Q.   Now, did you take into account the agreement that MGA

11   entered into with Lovins, concerning use of the Bratz trade

12   name?

13   A.   I did.

14   Q.   And how did that impact your analysis?

15   A.   Well, I didn't think it was relevant because of all the

16   differences in that agreement than what I'm trying to

17   calculate.  And the primary differences are -- well, the

18   rate was 3 percent, but the agreement was restricted only to

19   clothing items.  It was not for fashion dolls.  There's also

20   consideration given back by MGA to Lovins to give them a

21   royalty free license from sales of clothing to Costco which

22   was their primary and only customer.  So that took the

23   competitive relationship away from that negotiation.

24        MR. PRICE:  And, your Honor, that assignment

25   agreement from Lovins is Exhibit 31401.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1           THE COURT:  Thank you.
2    BY MR. PRICE:
3    Q.   Now, if we can go to 18, you've got a calculation
4    Reasonable Royalty Rate, Bratz Trade Secrets, Excluding the
5    Bratz name.
6           And how did you arrive at that?
7    A.   Well, this is just substraction.  My understanding is
8    that the trade secrets are made up of the trade name and the
9    non-trade name secrets.  For the total bucket, I estimated
10   the rate to be 15 percent.  For the trade name alone, it was
11   5 percent.  So 15 percent minus 5 percent is 10 percent for
12   the rest of the bucket.
13   Q.   And you also conclude that --
14          You also did a calculation for reasonable royalty
15   rate for copyrights.
16   A.   I did.
17   Q.   And if you'll look at the Demonstrative 19.  Could you
18   explain to us what analysis you did for that, and what your
19   conclusions were?
20   A.   Well, the primary basis I really had in the back of my
21   mind all of this Georgia-Pacific analysis I've already done
22   and considered that information.  But really the driver of
23   the 8 percent is based on the out licenses of Mattel when it
24   licenses its intellectual property out to its licensees.
25   Now, none of these licensee are competitors of Mattel.  They
```

1  are all what I would call partners or promoters of

2  extensions to the lines that Mattel actually sells.  And the

3  average of the lowest rate in those agreements, which

4  indicates to me the floor which with Mattel would not go

5  below, is 8 percent.

6  Q.   And that's a lower royalty rate than you found for the

7  Bratz trade secrets, excluding the Bratz name and for the

8  whole bucket of trade secrets?

9  A.   Right.  It's two percentage lower.

10  Q.   So having done the royalty rate analysis, how did you

11  use that then to apportion MGA's profits according to trade

12  secrets and copyright?

13  A.   Well, first, I looked at what I considered to be a

14  proper benchmark to determine what would be normal profits

15  earned by MGA on the Bratz named, based on their sweat

16  equity, their -- all the qualities that they brought to bear

17  besides the intellectual property.  I used three different

18  benchmarks.  I used what I called the pure toy industry

19  benchmark, which is 17 publicly traded toy companies that

20  gave me information as to their profit margins.  I used the

21  median number of those 17 companies.  And, by the way, if

22  you had put MGA into those 17 companies in 2000, they are

23  much smaller than the median company.  So they are really at

24  the bottom end of this pure toy industry yardstick.

25  Q.   And that's reflected in -- your analysis is reflected

1   in slide 20?

2   A.    Yes.

3   Q.    And so, in the far left, you got the corporate

4   benchmark.  That's the median, is that right, for --

5   A.    Yes, I used the median each year of the damage period

6   to estimate what MGA would have earned on Bratz, if they are

7   able to achieve the profitability of the median of this

8   industry.

9   Q.    And you did the same for a corporate benchmark of

10  Hasbro, Jakks and Mattel; correct?

11  A.    Yes.  I did one of Hasbro and Jakks, which is the

12  second and third most being successful toy companies in the

13  world; and then, I used Mattel, which is the most successful

14  toy company in the world, as a measure of what MGA could

15  have earned from Bratz absent the intellectual property.

16  Q.    Now, why did you think it was reasonable to use these

17  benchmarks in seeing -- in allocating the MGA profitability

18  to Mattel versus MGA?

19  A.    Well, it's really based on the analysis I did on the

20  first two charts we talked about which shows that MGA has

21  not been highly successful in any of their other product

22  lines.  The most successful product line they have been

23  successful in is the profits they have earned from

24  Little Tikes, but they didn't develop that product.  They

25  bought that product for $125 million.  Since then, their

44

1   sales actually have declined.  They haven't been able to

2   generate more value for that product line since they bought

3   it.  But all their other product lines have had not

4   significant success in this area of sales.

5   Q.   So here you are trying to isolate the value of the

6   product versus the value of the sweat equity, the creativity

7   apart from the product; correct?

8   A.   Correct.

9   Q.   And so your conclusions are reflected in chart 20 where

10  you have the division of all trade secrets, except name and

11  the Bratz name.  Is that done using the royalty numbers that

12  you came up with?

13  A.   Right.  Remember, I came up with the 15 percent royalty

14  rate.  I assumed 5 percent for the trade name itself and

15  10 percent for the balance.  So that's where you get the

16  two-thirds, one-third split.

17  Q.   And if we look at page 21, is this the same analysis

18  applied to a copyright?

19  A.   It is.

20  Q.   And if we look at page 22, did you also do the same

21  type of analysis with sub-categories of Bratz products; that

22  is, the core fashion dolls, the core dolls using the Bratz

23  sculpt, all generations of the first four dolls, six dolls,

24  first four dolls and core fashion doll accessories?

25  A.   Yes, I did similar analysis that we just saw in

1    chart 21 for these sub-categories of products.

2    Q.    And those are contained in your reports?

3    A.    Yes.

4    Q.    And this is all in the analysis of apportioning MGA's

5    profits; correct?

6    A.    Correct.

7    Q.    Not Mattel's lost profits?

8    A.    That is correct.

9    Q.    You also were asked to look at the value of the

10   documents in Mexico that were found that in MGA's

11   facilities?

12   A.    Yes.

13   Q.    And does chart 24, Demonstrative 24 reflect that

14   analysis?

15   A.    It does for the Mexico documents.

16   Q.    And could you tell us what sort of analysis that you

17   did?

18   A.    Well, I prepared a framework for Mattel to collect

19   these costs for me.  And I -- having done this before a

20   number of times realized that companies don't have

21   accounting systems to determine exactly how much it costs

22   for them to perform certain internal management functions,

23   particularly, what it really costs them to develop a

24   particular report.

25              So I asked them if at all possible to give me

1   documents to support any numbers they gave me.  And I

2   realized then when it was a labor item that they would have

3   to estimate the amount of time and the level of person who

4   would be doing that work.  But I did know that they would at

5   least have payroll records for those types of people.  So I

6   said, *Give me your best estimate of time and the actual*

7   *amounts paid to these individuals*.

8            And any out-of-pocket expense for -- to a third

9   party, I said, *If you have that information documented, I*

10  *would like to see that.*

11           And that was my basic instruction.  And I told

12  them, if you don't have pure documents to support it, make

13  your best estimate but try to be conservative.

14  Q.   And so where it says "total avoided cost," what you are

15  reflecting here is simply the cost of creating the

16  documents; correct?

17  A.   Correct.

18  Q.   And you've got a third party data line there.  Can you

19  tell us what that is?

20  A.   Yes.  That is a reduction of sales price that Mattel

21  gets from its customers if they will share their point of

22  sale information with Mattel.  And based on the contracts

23  that were shown to me, it appears that it's approximately

24  1 percent discount on their purchases if they will give

25  point of sale information to Mattel.  And I understand that

1    is part of the information that was taken.

2    Q.   Now, did you do this calculation for each document?

3    A.   Yes.  I have a breakdown by document in my detailed

4    schedules.  This is the overall number.

5    Q.   You also have a reasonable royalty rate number.  Is

6    that an alternative number?

7    A.   That would be alternative to the total avoided cost, if

8    the license agreement for these documents would want to

9    share some of this cost savings between the licensor and the

10   licensee.

11   Q.   How did you come up with that?

12   A.   Well, it's really, again, based on my prorations I did

13   in my reasonable royalty calculation that I didn't believe

14   there were any trade names here, so I basically assumed

15   two-thirds of this value would be appropriate as the royalty

16   rate.

17   Q.   And that's for the stolen documents?

18   A.   Correct.

19   Q.   And, finally, you did -- well, not finally.  You did an

20   analysis of Mr. Larian's Bratz's profits distributions?

21   A.   Yes.

22   Q.   And that's reflected on slide 26?

23   A.   Yes.

24   Q.   And how did you calculate that?

25   A.   Well, this came from, again, from the financial records

48

1   of the company for the total distributions to him not as

2   salary but distributions as a shareholder and by year.  And

3   I apportioned this based on the profitability of Bratz

4   compared to the profitability of the total company.

5   Q.    So this would distinguish the total distributions to

6   Mr. Larian from those that could be attributable to Bratz?

7   A.    Correct.

8   Q.    And how did you arrive at that percentage?

9   A.    It was by my estimate of the incremental profitability

10  of the Bratz product line.

11  Q.    And if we go to slide 29 -- I'm sorry, 28, you also did

12  an analysis of Mr. Larian's net worth assets versus

13  liabilities.

14          What did you use here?

15  A.    It was just a document provided by Mr. Larian in the

16  records of this case that indicated his net worth in 2008.

17  I've not received any updated information on his net worth

18  today, so I have not been able to update this calculation.

19          MR. PRICE:  Thank you.

20          THE COURT:  Do you want to take a break?

21          THE COURT REPORTER:  Yes.

22      (Recess taken from 7:01 p.m. to 7:55 p.m.)

23          THE COURT:  I want to ask you a couple of

24  questions.

25          We're back on the record.  Before counsel starts,

1    during the recess, I pulled a case called United States

2    District Court -- well, I'm sorry.

3             *The Application of Mobitv, M-O-B-I-T-V, Inc.*

4    *versus American Society of Composers, Authors, Publishers,*

5    *et cetera.*

6             Let me see if I can inartfully ask you this

7    question:  One, if I just isolated a cause of action, a

8    claim under copyright -- forget trade secret

9    misappropriation for a moment -- copyright, my initial view

10   is that you have two damages areas that seem to be

11   appropriate:  One is lost profits, or you say actual loss

12   and unjust enrichment.  I'm concerned that the

13   Georgia-Pacific factors and the issue of statutory --

14            In copyright, I'm concerned that if there is a

15   royalty, it is limited to statutory damages in the copyright

16   area and that that doesn't go before the jury.  In other

17   words, that that would be the court's determination, not the

18   jurors'.  I want to now move away from copyright for a

19   moment, because I stand to be corrected at any time, and I

20   want to move to trade secret misappropriation.

21            By the way, I'll read to you from the Application

22   of Mobitv, M-O-B-I-T-V, Inc:  *ASCAP has been unable to*

23   *identify any copyright case that has applied the*

24   *Georgia-Pacific factors and this court declines the*

25   *opportunity to be the first to do so.*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1                *Applying the Georgia-Pacific test in the context*

2        *of a rate court proceeding would be inappropriate.  Patent*

3        *law exists to protect an inventor's right to exploit the*

4        *monopoly he is granted in his invention in order to induce*

5        *more creative activity.  By contrast, the rate court's role*

6        *is to protect the market for licenses to play ASCAP music.*

7        *Rate courts must take seriously the fact that they exist as*

8        *a resort of monopolistics exercising disproportionate power*

9        *over the market for music rights, et cetera.*

10               The bigger question to me becomes trade secret

11       misappropriation.  And it's my initial belief that you're

12       entitled to testify to lost profits, unjust enrichment and

13       there is a question about the court instructing the jury and

14       letting them know that there could be a further

15       determination by the court concerning royalty.  But that

16       issue never goes to the jury, and that the Georgia-Pacific

17       factors are something that you and I would discuss at a

18       later time.

19               I want to know why you are being called.  In other

20       words, where I got lost were the application of the

21       Georgia-Pacific factors.  I understand your lost profits

22       analysis fine.

23               Are you also testifying to unjust enrichment?

24               THE WITNESS:  Yes, your Honor.

25               THE COURT:  Okay.  Without running any time off of

```
1   Mattel's clock, I want you to walk me back through the

2   slides, after you talk to Mr. Price and show me again your

3   analysis of unjust enrichment and the amount you come up

4   with in both the copyright area and/or the trade secret

5   misappropriation area, and if they are the same.  And the

6   reason I'm asking, is because there is some limitation in

7   the copyright area that may not exist in the trade secret

8   misappropriation.  It's a much bigger potential bucket.

9           Okay.  Do you understand that?

10          THE WITNESS:  I do, your Honor.

11          THE COURT:  All right.  I want you to step down

12  for a moment.  I want you to talk to Mr. Price before you

13  answer any questions, just as a courtesy.

14          THE WITNESS:  Thank you, your Honor.

15          THE COURT:  Okay.  Step down.

16      (Pause.)

17          THE COURT:  Mr. Cote, that may save you hours.

18          MR. COTE:  Thank you, your Honor.

19          THE COURT:  It may not.

20      (Pause.)

21          THE COURT:  All right.  Thank you.

22          Mr. Price.  I've got the unjust enrichment of 320

23  some -- I mean, lost profits of 320 some million.  327 or

24  323.

25          I didn't understand the unjust enrichment, and I
```

```
 1   didn't understand the interplay yet between trade secret
 2   misappropriation, just potentially your larger bucket, and I
 3   didn't understand the interplay in copyright, okay?
 4            And I'll have to say tentatively I don't know that
 5   the Georgia-Pacific factors are an appropriate analysis
 6   loosely limited to patent and especially, if even in the
 7   trade secret misappropriation, I'm fairly convinced that
 8   that is not to be submitted to the jury.
 9            Mr. Price's questions are?
10   BY MR. PRICE:
11   Q.   Mr. Wagner, I'm going to focus on the unjust
12   enrichment.  And the first thing I would like to turn your
13   attention to is --
14            Well, let me ask you this:  Do you use the royalty
15   rate analysis to come up with in what we presented so far
16   with a royalty rate damage number?
17   A.   No.
18            THE COURT:  I've got that.
19   BY MR. PRICE:
20   Q.   So you're using it only to apportion the damages that
21   you found from unjust enrichment among either trade secrets
22   or copyright?
23   A.   That is correct.
24   Q.   And if you look at --
25            Let's start with slide 20.  So you have calculated
```

1    in the third column from the left a number for profits above

2    benchmark, which you would say are the MGA profits which

3    should go to Mattel under your analysis; correct?

4    A.    Yes.  That is correct.

5    Q.    And arriving at those numbers -- the 597, if you use

6    the pure toy industry; the 457 if you use Hasbro, Jakks; or

7    the 365.2, if you use Mattel -- in arriving at those

8    numbers, have you used any royalty rate analysis?

9    A.    Not to that stage yet, no.

10   Q.    Okay.  So where have you used -- why have you used a

11   royalty rate analysis then in calculating unjust enrichment;

12   that is, the profits that MGA should disgorge?

13   A.    To further apportion those numbers in the middle column

14   between either the trade secrets without the trade name, the

15   trade name by itself and then in the next slide which should

16   be 21, if it was only copyrights that should be awarded.

17   Q.    And so, basically, if you use the pure toy industry

18   benchmark, the unjust enrichment would be 597 million if the

19   jury found that everything was a trade secret?

20   A.    Correct.

21   Q.    But if they found that only the Bratz name was a trade

22   secret, then it would only be 199 million?

23   A.    That is correct.

24   Q.    The royalty rate analysis is used just for apportioning

25   between those buckets?

1    A.    That is what I used a royalty rate analysis for this

2    part of my damage calculation.

3           THE COURT:  I'm sorry.  Are we talking about

4    unjust enrichment?

5           THE WITNESS:  Yes, your Honor.  This is only

6    unjust enrichment, right now, we're talking about.  I did

7    not do a similar analysis for the lost profits number.

8           THE COURT:  Trade secret misappropriation?

9           THE WITNESS:  Yes, your Honor.

10          THE COURT:  Show me unjust enrichment and

11   copyright?

12          THE WITNESS:  That would be slide 21, although the

13   total based on the yardstick and we'll use stick with the

14   pure toy company industry is 597 million.  But if the jury

15   only finds that the copyrights are relevant, then the number

16   is less than that.  It's 318.2 million.

17          THE COURT:  Just a moment.  When you say profits

18   attributable to Mattel's copyrights, does that extend beyond

19   the four original generation dolls and the two other dolls

20   I'm allowing to go to the jury?

21          THE WITNESS:  If that's all you allow to go the

22   jury, this would not be the right slide.  I have other

23   slides that would calculate it for those products only.

24          THE COURT:  And the doll -- fashion doll area,

25   that's all I'm allowing to go to the jury.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE WITNESS:  Again, there is a different chart
 2     than this that would give that number.  This number,
 3     your Honor, is based on the 792.4.
 4              THE COURT:  That's what's causing my confusion,
 5     amongst other things.
 6              What is your figure for the first generation four
 7     dolls and the two additional dolls that I'm allowing to go
 8     to the jury.
 9              THE WITNESS:  Your Honor, I wish had all these
10     numbers in my head.  I have schedules that do that, but I
11     don't have those in these slides here.
12              THE COURT:  What about the sculpts that I'm
13     allowing to go to the jury?
14              THE WITNESS:  I do have a separate number for
15     that, assuming that I've been told what dolls belong in that
16     category and I've made a calculation with those numbers as
17     well.
18              THE COURT:  Your counsel knows.  Your counsel is
19     aware of what dolls I've decided to go to the jury and the
20     sculpts as well.
21              Let me speak frankly.  What I'm concerned about is
22     the potentiality of this going beyond my ruling, and that's
23     not your responsibility.
24              Mr. Price.
25              MR. PRICE:  Your Honor, we do have --
```

DEBORAH D. PARKER, U.S. COURT REPORTER

56

```
 1              THE COURT:  I want you to look at the slide.
 2              MR. PRICE:  Yes.
 3              THE COURT:  That would appear to me to be
 4    contradictory to my ruling.  It would be much more
 5    expansive, at least in copyright because it's listed
 6    "copyright" at the top.
 7              MR. PRICE:  These numbers, your Honor -- and I can
 8    have Mr. Zeller speak to the law of the case, but I can --
 9              THE COURT:  I want to speak to you about the facts
10    of the case and my ruling; right?
11              You're not going around my ruling.  Is that clear?
12    No, I know that.
13              Now, I want to have a blunt discussion, okay?
14    This appears to be in direct violation of the limitations I
15    put on Mattel at least concerning the dolls.
16              Now, you help me with me being wrong, and you
17    correcting me.  I'm open to that.
18              MR. PRICE:  I'm not going to say that you're wrong
19    about your ruling, obviously, because that is your ruling.
20              This number includes the direct copyright
21    infringement damages from those first four plus two dolls.
22              THE COURT:  First four plus two dolls.
23              MR. PRICE:  And we have that broken out.  It's in
24    Mr. Wagner's charts, and we actually -- we just -- we had an
25    hour to present, so we didn't go through that detail.
```

```
 1              THE COURT:  I would like to see it.

 2              MR. PRICE:  Sure.

 3         (Pause.)

 4              THE COURT:  Right now, he will not be testifying

 5    to some substantial portions, so it's up to you now to

 6    explain this to me.

 7              MR. PRICE:  So --

 8              THE COURT:  I'm putting you on warning.

 9              MR. PRICE:  Pardon?

10              THE COURT:  I'm putting you on warning, and on

11    notice.

12              MR. PRICE:  The numbers that he presented in this

13    summary includes both the direct profits -- there is a chart

14    we just saw -- and indirect profits as a result of that

15    infringement.

16              THE COURT:  Uh-huh.

17              MR. PRICE:  Not just the direct profits.  That's

18    why we think that number is justified.  It would be a

19    copyright violation of the first four plus two; and then,

20    the rest would come in under an indirect profits theory, and

21    the sculpt.

22              What I'm going to hand you now, and I'm not sure

23    MGA --

24              THE COURT:  Give it to counsel, first.

25              MR. PRICE:  I don't know if we have extra copies.
```

1          -- is his apportionment, if you are focusing on
2    the Bratz four fashion dolls with the original sculpt and
3    then another calculation which is apportionment of the first
4    four dolls and the two other dolls, not including the
5    sculpt.
6          THE COURT:  Maybe these are the ones I'm most
7    interested in.
8       (Pause.)
9          THE COURT:  I would like that put up on the screen
10   also.
11         Ken, do you have that?
12         MR. KOTARSKI:  Yes, I do.  I'm just waiting to see
13   what he wants to show.
14         Thank you.
15      (Pause.)
16         MR. PRICE:  Can we put up 34?
17   BY MR. PRICE:
18   Q.   Mr. Wagner, could you explain to us what this slide 34
19   shows?
20   A.   Yes.  This only looks at the unjust enrichment for the
21   Bratz core fashion dolls with the original Bratz sculpt.  So
22   instead of the top number before apportionment of being
23   792.4 million in profits, the number is 280.2 million.  I
24   then, again, used benchmarks as to what would be expected
25   that Bratz might earn from its own sweat equity, and that's

1    the second column.  And then, the third column are the

2    profits above the benchmark; and then, finally, using

3    apportionment of just copyright, this would be the number

4    that should be awarded assuming which yardstick you want to

5    use.

6              THE COURT:  Now, the core fashion dolls at the

7    top, look at the top of your diagram for a moment, or a

8    slide.

9              THE WITNESS:  Yes, your Honor.

10             THE COURT:  I don't know what you mean by "core

11   fashion dolls," so I want to be very careful now.  Are those

12   the first four Generation dolls?

13             THE WITNESS:  No, I think it's more expansive than

14   that, your Honor.

15             THE COURT:  I do, too.

16             Let's find out how much more expansive.  Do they

17   include just two other dolls; and if so, which ones do they

18   include?

19             THE WITNESS:  No, your Honor.  It's more expansive

20   than that as well.

21             THE COURT:  I thought so.  How much more

22   expansive?

23             THE WITNESS:  It includes all the dolls that are

24   in that product category that MGA captures.

25             THE COURT:  All 44?

```
 1              THE WITNESS:  You know, I can't -- I don't know if
 2    it's all 44, but it's all of those dolls that I've been told
 3    use the original sculpt.
 4              THE COURT:  And I want you to list for me each
 5    doll you have been told uses the original sculpt.
 6              THE WITNESS:  Your Honor, I would need my detail
 7    model to know --
 8              THE COURT:  Well, get them.  Step off the bench
 9    and get your detail model, and I want you to write them down
10    for me.
11         (Pause.)
12              THE COURT:  Okay.  Copyrights, you're limited to
13    four dolls.  What are the names of the dolls?
14              THE WITNESS:  If you're talking about the original
15    dolls, it's Cloe, Sasha, Jade and Yasmin.
16              THE COURT:  And what two additional dolls did I
17    allow?
18              THE WITNESS:  Funky Dana and La La Cloe.
19              THE COURT:  And what are your calculations for
20    those six dolls?
21              THE WITNESS:  Oh, I'm sorry, your Honor.  That
22    wasn't the question I thought you wanted me to answer.
23              That is in this book, but I thought you wanted to
24    know which ones were in the sculpt.
25              THE COURT:  I'll get to that in just a moment.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Your calculation for those six dolls?

2            And you used, or at least part of the discussion

3    for the Georgia-Pacific factors, whether they are relevant

4    or not, the apportionment discussion so I just come up with

5    a number for a moment.

6            THE WITNESS:  Your Honor, for the Bratz six dolls'

7    profitability -- and this comes Trial Exhibit 24147, tab B1,

8    Schedule 1.0 -- is $31,666,647 before apportionment.

9            THE COURT:  And after apportionment?

10           MR. PRICE:  Mr. Wagner, we can put up slide 26,

11   which is on the monitor.

12           THE COURT:  Is that after apportionment?

13           THE WITNESS:  Yes, your Honor.

14           The third column is after the apportionment, based

15   on the industry benchmark:  Hasbro, Jakks and Mattel.  And

16   so, those numbers are 21 million, 23.4 million and

17   18.2 million before any apportionment to the copyright part

18   of that bundle.

19           THE COURT:  Why on your slide are you listing

20   Hasbro?

21           THE WITNESS:  I'm using Hasbro and Jakks combined

22   as a measure of the normal profitability that Bratz should

23   expect based on its sweat equity; that they would earn the

24   same type of profit margins.

25           THE COURT:  Using the Georgia-Pacific factors

 1    which incorporate this concept of sweat equity from your

 2    position?

 3              THE WITNESS:  No, your Honor.  I do agree with the

 4    GP, fact No. 13, does incorporate the issue of

 5    apportionment, but I don't use Georgia-Pacific at all to get

 6    to these figures so far.

 7              THE COURT:  Okay.  Fair enough.

 8              Now, sculpts.

 9              THE WITNESS:  Your Honor, you want to know what

10    products were in?

11              You know, there is -- you know, thousands and

12    thousands of different SKUs of Bratz fashion dolls, and I do

13    have a schedule here that shows that the subtraction of what

14    SKUs are not included.

15              THE COURT:  I made very specific findings about

16    sculpts, and it's Mattel's job to sort out what sculpts are

17    appropriate or not, and then show me how they reached that

18    decision for presentation to the jury, so everything just

19    doesn't come tumbling into the funnel.

20              This is the time that Mattel defines --

21              Now, if you want time, please.  Don't answer

22    quickly.  Step off the stand for a moment.  I don't care if

23    you take an hour.

24              THE WITNESS:  Well, all I can tell you is what I

25    have done, your Honor.  And under revised tab B3, 2.1, I've

| | |
|---|---|
| 1 | listed all the SKUs that need to be subtracted from the SKUs |
| 2 | that are core fashion dolls that did not use the original |
| 3 | sculpt. |
| 4 | THE COURT:  How does my jury reach a damage |
| 5 | determination in your apportionment analysis in the |
| 6 | copyright area concerning sculpts? |
| 7 | THE WITNESS:  They would use the numbers that I've |
| 8 | calculated that there's approximately $106 million of Bratz |
| 9 | core fashion dolls that do not use the original sculpt, |
| 10 | based on the instructions given to me. |
| 11 | THE COURT:  Minus from what? |
| 12 | THE WITNESS:  Those are sales of core fashion |
| 13 | dolls that did not use the original Bratz sculpt.  And my |
| 14 | understanding, it's based on deposition testimony.  And so, |
| 15 | I subtract those SKUs out of the rest of the core fashion |
| 16 | dolls. |
| 17 | THE COURT:  What are the rest of the core fashion |
| 18 | dolls' numbers? |
| 19 | THE WITNESS:  I would have to read you, you know, |
| 20 | thousands upon thousands of SKUs. |
| 21 | THE COURT:  Okay. |
| 22 | THE WITNESS:  And they do have a schedule, your |
| 23 | Honor.  I mean, I think it's an 800-page schedule that would |
| 24 | list all of them.  But, right now, I thought maybe an easier |
| 25 | way to answer is tell you what's not in it than what's in, |

64

1  because this is only probably 10 pages of SKUs.

2          THE COURT:  So the jury would do what?

3          THE WITNESS:  Well, if the jury -- if my facts are

4  correct, then I have the correct amount of sales for Bratz

5  SKUs.

6          THE COURT:  Which is what amount?

7          THE WITNESS:  That the total amount of profits for

8  these Bratz core fashion dolls that are using the original

9  sculpt is $280.2 million.

10          THE COURT:  Minus?

11          THE WITNESS:  No, that's -- oh, I'm sorry.  You're

12  right.  That's --

13          THE COURT:  106?

14          THE WITNESS:  No, I'm sorry.  The 280 million is

15  after the subtraction of the six dolls, your Honor.  And I

16  could tell you the number before, because that calculation

17  has been done of just all Bratz core fashion dolls, if I

18  could find that here for you.

19          THE COURT:  I don't think I'm interested in that,

20  at least in that area right.  I have four original dolls and

21  plus two and the sculpts that I delineated?

22          THE WITNESS:  Then, it was the chart that we had

23  before this that would be my numbers.

24          THE COURT:  Shore it up again.

25          THE WITNESS:  Those are the numbers that I believe

1    that you are referring to, your Honor.

2              THE COURT:  Well, that include both the four dolls

3    and the sculpts?  Or are those just the six dolls and the

4    sculpts?

5              I thought those were just the dolls.

6              THE WITNESS:  These are just the dolls, your

7    Honor.

8              THE COURT:  So 9.7; is that right?

9              THE WITNESS:  If you use Mattel as your benchmark

10   for what you believe that MGA should have been able to

11   achieve on this product line.

12             THE COURT:  And for the sculpts?

13             THE WITNESS:  It would be the next chart.

14             MR. PRICE:  That's 34.

15             THE WITNESS:  It would be 66 million.

16             THE COURT:  Okay.  Just a moment.

17        (Pause.)

18             THE COURT:  For the sculpts I've delineated;

19   correct?

20             THE WITNESS:  I'm sorry, your Honor.  I'm

21   confused, because I have not seen your order or know what

22   sculpts you delineated.  And I believe that just based on

23   your questioning of me that clearly I have more sculpts in

24   here than you think are appropriate to calculate damage.

25             THE COURT:  Well, I'm not certain.  That's why I'm

1    asking you.  I want you to know --

2           There are some sculpts that have -- Mattel will

3    argue should be included that do not have any semblance

4    potentially to the sculpts that I'm allowing to go to the

5    jury, and --

6           Well, I thank you.

7           THE WITNESS:  You're welcome, your Honor.

8           THE COURT:  Now, I'm going to walk you over to

9    trade secret misappropriation for a moment.  That

10   potentially is a bigger funnel for Mattel.  Potentially, it

11   could be argued that they delineated certain what I'm

12   calling buckets, bucket one and bucket two.

13          Can you walk me through your calculations for

14   trade secret misappropriation?

15          THE WITNESS:  Yes, your Honor.  It's basically the

16   same analysis as you see here on copyrights, but there would

17   be two columns that would split up the amount of benchmark

18   two-thirds and one-third.

19          THE COURT:  And you certainly have a larger

20   number?

21          THE WITNESS:  Yes, your Honor.  It would be

22   larger.

23          THE COURT:  Show me.

24          THE WITNESS:  If I could have, probably, the

25   No. 33 up.

```
 1              That's not the one I want.

 2              MR. PRICE:  Let's try 20.  It's renumbered for

 3    this.

 4              THE WITNESS:  No, go back to 34.  Maybe it's 36,

 5    the one that is the six dolls.  I need this same chart here

 6    (indicating), which I thought should be close proximity to

 7    36 that is doing the same thing for the trade secret.

 8              THE COURT:  Why don't you just step down and show

 9    them.

10         (Pause.)

11              THE WITNESS:  This is it, your Honor.

12              So under this analysis, the profits above the

13    benchmark is exactly the same as under the copyright.  But

14    100 percent of this value is going to be claimed as

15    violation of trade secret.  And two-thirds of it will be all

16    the trade secrets except the trade name.  And one-third of

17    that amount will be the Bratz trade name, trade secret.

18              And these last two columns is where I used the

19    Georgia-Pacific analysis to come up with an apportionment,

20    not a calculation of reasonable royalty damages, but I just

21    used a royalty analysis to split up those two pieces of the

22    trade secrets.

23              THE COURT:  Well, let's just say "dolls."  What's

24    your calculation?

25              THE WITNESS:  Pardon me, your Honor?  You tell me
```

```
 1    what?

 2             THE COURT:  Dolls.  Fashion dolls?

 3             THE WITNESS:  Oh, fashion dolls.  I would do this

 4    same analysis, but instead of starting out with just the

 5    first four dolls -- Ooh La La Cloe, and Funky Fashion

 6    Dana -- I would include all of the SKUs within fashion dolls

 7    and do the same analysis.  It's just a different

 8    calculation, much higher of unjust enrichment.

 9             THE COURT:  Do you have that calculation?

10             THE WITNESS:  Certainly I do, your Honor.

11             THE COURT:  Show me.

12             THE WITNESS:  It's here, your Honor.  Here, the

13    total amount of unjust enrichment for all Bratz core fashion

14    dolls is 293.3 million.  And then, using the pure toy

15    industry -- Hasbro, Jakks, Mattel yardsticks for

16    apportionment -- the middle column in yellow is the total

17    amount of excess profits which then I apportioned two-thirds

18    in the same way I did in the last chart to the trade secrets

19    absent the trade name; and then, the last column is just the

20    trade name, trade secret.

21             THE COURT:  I'm sorry.  I didn't understand.  Say

22    that again.

23             THE WITNESS:  Yes, your Honor.  The middle

24    column -- let's just use pure toy industry, the amount of

25    profits that is left with Bratz that they got from their
```

1    sweat equity -- this particular yardstick is $76.1

2    million -- you subtract that amount from the top number of

3    293.  That leaves an excess profits --

4              THE COURT:  293.  Where do I see that on the

5    chart?

6              THE WITNESS:  I'm sorry, your Honor.  It's the top

7    in the apportionment of 293 Bratz for Bratz Core Fashion

8    Dolls.  It's the second heading on the chart.  The

9    subtraction of the 76.1 million will give you the

10   217.1 million excess profits.

11             THE COURT:  Pure Toy Industry.  What about Mattel?

12             THE WITNESS:  If I use Mattel, then MGA would keep

13   167.3 million.  And we subtract that number from the

14   293 million, the only amount of excess profits is

15   126 million.

16             THE COURT:  Then Mattel should be awarded?

17             THE WITNESS:  Yes.  Mattel should be awarded in

18   this case of unjust enrichment; and then, that has to be

19   divided up, if appropriate, between the non-trade name trade

20   secrets and the trade name trade secrets, which is done in

21   the last two columns.

22             THE COURT:  So what would your figure be in front

23   of the jury?

24             THE WITNESS:  It depends on which ones you allow

25   me to present.  I'm not a liability expert, your Honor.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  I've been told to make these different calculations based on

2  different buckets of potential sales and profits that could

3  be characterized by unjust enrichment.

4           THE COURT:  Now, is this bucket No. 1?

5           THE WITNESS:  I'm not sure.  I would imagine my

6  client thinks that bucket No. 1 is the one that you just

7  excluded, which would have been the $792 million number.  I

8  tried to cascade them down in size, but I don't know how

9  they're ordering them from my testimony and which ones you

10 will permit.

11          THE COURT:  Okay.  Mr. Price, do you have any

12 questions?

13          MR. PRICE:  Yes.

14                    DIRECT EXAMINATION

15 BY MR. PRICE:

16 Q.   In arriving at the SKUs that use the original Bratz

17 sculpt, did you review deposition testimony as to what was

18 identified as the original Bratz sculpt, or was that

19 provided to you?

20 A.   Well, that deposition was provided to my staff and my

21 staff reviewed that information.

22 Q.   So that's -- that's based upon deposition by MGA

23 personnel as to what they said used the original Bratz

24 sculpt?

25 A.   That is correct.

1    Q.   Now, you were just looking at the apportionment of

2    profits trade secrets based upon the core fashion dolls;

3    correct?

4    A.   That's what was displayed, yes.

5    Q.   Now, if you look at what was slide 20 in the original

6    dec I gave you, it says:  *Apportionment of 792.4 MGA Bratz*

7    *profits for trade secrets.*

8         Do you see that?

9    A.   Yes.

10   Q.   So those are your calculations of apportionment of

11   profits to Mattel for trade secrets, if you assume that

12   there has been a finding that all of the Bratz profits are

13   attributable to exploiting Mattel's trade secrets?

14   A.   That is correct.

15   Q.   And that's distinct from the copyright apportionment of

16   profits that you did?

17   A.   Yes.  I did a separate apportionment of copyrights

18   under that same --

19        THE COURT:  And what's your number, again, in

20   copyright?

21        THE WITNESS:  Well, the number in the middle

22   column is the same.  I do not allocate all of that to

23   copyright.  It's actually -- 53.3 percent is what I

24   allocate.

25        THE COURT:  If you are limited to the four dolls

1    and the sculpts, what's your total number between the two in

2    the copyright area?

3              THE WITNESS:  Again, I got a slide.  I don't have

4    that number memorized.

5              MR. PRICE:  36.  I think we were just showing it.

6    It's either 34 or 36.

7              THE WITNESS:  No, that's the six dolls.  I think

8    your Honor asked me about just the first four.

9              MR. PRICE:  36.

10             THE COURT:  No, no.  I want to get a total number

11   in copyright between the six dolls, plus the sculpts.  You

12   can do that math in your head if you want to, but --

13             THE WITNESS:  Well, I think you can't add those

14   two together, because I think the first six dolls are

15   included in the category that includes just the original

16   sculpt.

17             THE COURT:  No -- well, I'll wait.

18             Mr. Price.

19   BY MR. PRICE:

20   Q.   What we have up here --

21             MR. PRICE:  And, your Honor, we're going to have

22   to provide you with supplemental -- what we have been

23   showing you, which is not in the original stack we gave you,

24   because there are some duplication of numbers in the

25   original stack and what we've just showed you, so we'll

1    provide you with the hard copies.

2    BY MR. PRICE:

3    Q.   Looking up here at No. 36, that's the profits of a

4    portion 31.7 million which is the first four dolls and the

5    two additional dolls; correct?

6    A.   Yes.

7    Q.   And that's not including the profits from using the

8    original sculpt in later generation dolls; correct?

9    A.   It is not.  I would assume the original sculpt is used

10   in these dolls as well, but this is only the profits for

11   those six dolls.

12   Q.   And have you also done a calculation for the profits

13   for the first four dolls, plus Ooh La La Cloe and Funky

14   Fashion Dana and profits from subsequent generation dolls

15   that use the, quote, original sculpt?

16   A.   Yes.

17          THE COURT:  And what's that?

18          THE WITNESS:  That's the number that we had up

19   there just before these figures were shown.

20   BY MR. PRICE:

21   Q.   Is that 30?

22   A.   That's this calculation here.

23          THE COURT:  So that is the 123?

24          THE WITNESS:  Yes, your Honor.  That would be 123

25   for all of the trade secrets, and that would be apportioned

```
 1   82.6 million to the trade secrets absent the name and then

 2   $41.3 million to the name alone.

 3              THE COURT:  I want to go back to copyright.

 4              THE WITNESS:  We have a chart like this for

 5   copyright that would have -- instead of the last two

 6   columns, there would be only one column for copyright and

 7   under that, the 123.9 million comes to 66 million for the

 8   copyright.

 9              THE COURT:  I want to just stay with copyrights.

10   I don't want to see a trade secret misappropriation damages

11   claim for just a moment, or analysis.

12              If you are limited in the copyright area to the

13   four original dolls, plus the two, a total of six, and the

14   sculpts that I have delineated for those original four, plus

15   two, plus sculpts used on subsequent generations of dolls,

16   what is your number?

17              THE WITNESS:  The numbers that are on this chart,

18   right now.  That would include all of what you just

19   described, your Honor.

20              THE COURT:  So you would testify to the jury, what

21   number?

22              THE WITNESS:  Well, I would give them a choice of

23   yardstick depending on what they believed should be the

24   appropriate --

25              THE COURT:  No, I'm sorry.  I'm the jury.  Give me
```

1    a number.

2           THE WITNESS:  Well, I was kind of giving them all

3    three numbers that ranges from 66 million to 110 million.

4           THE COURT:  And why the 110 million, again?

5           THE WITNESS:  That if the jury, after I explained

6    all the facts as I understand them, believes that that is

7    the appropriate benchmark to use for the sweat equity of

8    MGA, then they should use that benchmark and that would

9    result in the $110 million number.

10          THE COURT:  I don't understand.  I thought the

11   sweat equity by MGA would reduce the number that Mattel

12   was --

13          THE WITNESS:  It does, your Honor.  The more

14   generous the yardstick, the bigger the subtraction from the

15   280.2 million.  So you understand the pure toy industry

16   benchmark --

17          THE COURT:  I'm sorry.  280 million, is this minus

18   110, minus 86, minus 66?

19          THE WITNESS:  No.

20          THE COURT:  I didn't think so.  I thought that

21   these were actual numbers of damages.

22          THE WITNESS:  They are, your Honor.  The

23   280.2 million is before any apportionment.  If the jury

24   finds no apportionment is appropriate, that's the number to

25   award.  If the jury believes that the appropriate deduction

1   from the 282 point (sic) million is Mattel, as an example,

2   they should subtract 156.3 million from the 280.2 million

3   (sic) and leave that with MGA, which leaves a balance of

4   potential damages of 123.9.

5          And if we are only talking about copyright, then I

6   would tell the jury the damage number they should award is

7   66 million.

8          THE COURT:  I see.  I think I do.

9          Okay.  Mr. Price.

10         MR. PRICE:  If you see, I don't think I have any

11   further questions on that.

12         THE COURT:  Well, I'm not sure I do.

13   Cross-examination.

14     (Pause.)

15         THE COURT:  By the way, I am not certain I do,

16   Mr. Price, so don't take that comment literally, right now.

17         MR. PRICE:  If you want run through it again, I

18   will.

19                    CROSS-EXAMINATION

20   BY MS. KELLER:

21   Q.   Good evening.

22   A.   Good evening, Ms. Keller.

23   Q.   Mr. Wagner, if I may, I would like to ask you about the

24   opinions in your various reports and including the latest

25   report that we got, all right?

1    A.    Thank you.

2    Q.    And let's start first with your analysis of unjust

3    enrichment, okay?

4             Now, in your report, you calculated that the EBIT,

5    the Earnings Before Interest and Taxes, for the Bratz line

6    would have been 792.4 million; right?

7    A.    I did.

8    Q.    And your whole analysis of apportionment that occurs in

9    the unjust enrichment area is based on the Georgia-Pacific

10   factors, isn't it?  At least your apportionment analysis

11   within unjust enrichment.

12   A.    After subtracting for the benchmark return, if I'm

13   going to allocate that amount to the different buckets of

14   intellectual property, it is based on a Georgia-Pacific

15   analysis.

16   Q.    Okay.  That's what I was asking.  Now --

17            Okay.  So we start out, you agree that the

18   standard for calculating profits to be apportioned would be

19   revenues minus the cost incurred to produce, distribute and

20   sell the infringing product; right?

21   A.    I do.

22   Q.    And the reason for this is that otherwise, if the

23   infringer couldn't even permit -- wasn't permitted to deduct

24   the cost incurred in producing and selling the infringing

25   items, the infringer would be unfairly penalized; right?

1   A.   I agree with that.

2   Q.   Okay.  So the amount that you thought should be

3   disgorged then was $792 million; right?

4   A.   That is the amount of profits that Bratz has earned

5   based on my calculations before any apportionment.

6   Q.   And to calculate that amount, you started with a

7   revenue figure of 3.6 billion; right?

8   A.   I think that was gross revenues, yes.

9   Q.   And then, that 3.6 billion was all revenue on all Bratz

10  branded products and all revenue from all Bratz licensing

11  entertainment; right?

12  A.   That is correct.

13  Q.   So Bratz Boys, for example, included?

14  A.   Yes.

15  Q.   Little Bratz?

16  A.   Yes.

17  Q.   Bratz Petz?

18  A.   Yes.

19  Q.   Bratz Babies?

20  A.   Yes.

21  Q.   Itsy Bitsy Bratz?

22  A.   Anything that has "Bratz" in the name, yes.

23  Q.   Even accessories like the FM cruiser and the FM limo?

24         THE COURT:  In the trade secret misappropriation

25  or copyright?

```
 1              What are we talking?
 2              MS. KELLER:  We're talking unjust enrichment, your
 3    Honor.
 4              THE COURT:  I know we are, but in what?
 5              MS. KELLER:  In trade secret.  That's my
 6    understanding.
 7              THE COURT:  Thank you very much.
 8              MS. KELLER:  That's my understanding.
 9              THE COURT:  Unjust enrichment can also occur over
10    copyright.
11              MS. KELLER:  I understand.
12    BY MS. KELLER:
13    Q.   So you included clothing, bicycles, sleeping bags;
14    right?
15    A.   I did.
16    Q.   Every penny of royalty made on licensing?
17    A.   Yes.
18    Q.   And -- but you are not -- you said you weren't hired to
19    assess liability, so you didn't, for example, offer any
20    opinion on whether MGA's use of Carter Bryant's drawings
21    actually caused it to earn any of that revenue; right?
22    A.   That is correct.  I did not deal with the liability
23    issues.
24    Q.   And you calculated the profits associated with the
25    first four dolls -- I have this from your report -- at
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    27.7 million?

2    A.   I think that is correct.  But I think the only numbers

3    we've been talking about were the four, plus the two.

4    Q.   Well, going from your February 7th report, I got the

5    four plus the two dolls at 31 million.

6    A.   That is correct.

7    Q.   Okay.  And that was the entirety of the profit on those

8    six dolls that wasn't apportioned for any value contributed

9    by MGA; right?

10   A.   That is correct at that stage of the calculation.

11   Q.   So without looking at the so-called sweat equity,

12   31 million?

13   A.   Yes.

14   Q.   And you included that figure in the 792.4 million

15   figure used for both trade secrets and copyright; right?

16   A.   That number would be included in that number, yes.

17   Q.   And, in fact, there is quite a bit of duplication in

18   your analysis of copyright and trade secret damages; right?

19   A.   I think there is a lot of similarity, yes, and common

20   features.

21   Q.   And you calculated the profits on all female dolls that

22   used the sculpt that Mattel claims it owns at 289 million;

23   right?

24        I'm going on your February 7th report, page 5,

25   figure 3.

1    A.   I don't have that in front of me, but I thought it was

2    more like 280.  But if you're right, I'll -- and that's in

3    my report and that's the most current report, then I would

4    agree with you.

5    Q.   And, again, no value attributed to anything MGA did;

6    right?

7    A.   At that stage of the calculation you are correct.

8    Q.   So nothing for the themes, or the characters, or the

9    fashions, or the hairstyles, or the face painted, that

10   stage, no apportionment for those things; right?

11   A.   You are correct.

12   Q.   And you didn't make any calculation of profits

13   attributable to use of the "Jade" name.

14           True?

15   A.   Not in isolation.

16   Q.   Now, if you have to disregard your Georgia-Pacific

17   analysis, you haven't made a calculation of what portion of

18   the profits is attributable solely to the use of the Bratz

19   name; right?

20   A.   That would be right.

21   Q.   You would have to use the Georgia-Pacific analysis to

22   do that apportionment; right?

23   A.   Well, you don't have to use it.  That is the method

24   that I used to apportion among the trade secrets, yes.

25   Q.   It's the only method you used?

1    A.    It is.

2    Q.    And so your one-third allocation of profits to the

3    Bratz name depends on your Georgia-Pacific analysis; right?

4    A.    It does.

5    Q.    And where does that one-third come from?

6    A.    It comes from the fact that I calculate a 15 percent

7    royalty rate for all the trade secrets, and I calculated

8    just a 5 percent royalty rate on the trade name from a

9    separate Georgia-Pacific analysis.

10   Q.    But where did you come up with that 15/5 split?

11   A.    Based on the analysis I did in my report; and then,

12   five divided by 15 is a third.

13   Q.    I know you put it in your report, but where does it

14   come from?

15         Did you just pick it out of the air?

16   A.    No, it came from -- again, I explained earlier in my

17   testimony tonight that it came originally from my starting

18   point of the Little Tike's Imperial Toy Company agreement

19   where there is a license to the trade name for a range of

20   five to 8 percent, depending on what product was licensed.

21   And then, I did the Georgia-Pacific analysis.  And at the

22   end of the whole analysis, I concluded the rate should be

23   5 percent.

24   Q.    But where did you come up with the 5 percent?  How did

25   you pick 5 percent?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    A.   Well, that's based on my judgment after looking at all
 2    the facts and the analysis I did in Georgia-Pacific.
 3    Q.   So you just picked it?
 4    A.   Yes.  There is no science to this.  This is based on
 5    the judgment of the valuation expert.
 6    Q.   Now, without your Georgia-Pacific analysis, you don't
 7    have any method of allocating the name --
 8         I'm sorry.  Without your Georgia-Pacific analysis,
 9    you don't have any method of allocating the profits between
10    the name and the rest of the claimed intellectual property;
11    right?
12    A.   Yes, I said that before.  That's still my answer.
13    Q.   And without the Georgia-Pacific analysis, you don't
14    have any method of allocating the profits between the
15    copyrights and the trade secrets; right?
16    A.   That is correct as well.
17    Q.   Now, this benchmark methodology you've been talking
18    about and his Honor asked you about, that benchmark
19    methodology were you pick the total toy industry and then
20    other competitors and what profit margins they tend to have,
21    that hasn't been accepted by any court or peer-reviewed, has
22    it?
23    A.   I believe that it has.  I think it's clearly accepted
24    by the courts.  It's called the analytical approach, and I
25    know there is a number of articles that have discussed it.
```

1   I don't think they are peer-reviewed articles, but it's

2   generally accepted in my industry.

3   Q.   Well, don't you have a little bit of an apples and

4   oranges comparison here, going?

5   A.   I don't know believe so.  I believe that's your

6   position.

7   Q.   Well, you refer to, for example, the 792 million point

8   4 figure that you picked as the Bratz EBIT; right?

9   A.   I did.

10  Q.   For example, if you take a look at Exhibit -- we got

11  these? -- 35339, pages 16 and 17, and it's your supplemental

12  report.

13          You got that in front of you?

14  A.   I do.

15          MS. KELLER:  Your Honor, could we display that?

16          THE COURT:  Certainly.

17      *(The document was published in open court.)*

18  BY MS. KELLER:

19  Q.   We've got -- if we look at these various columns, we've

20  got "MGA Entertainment Total Company."  And we've got "MGA

21  Entertainment Bratz Products; MGA Entertainment Non-Bratz

22  Products; Industry Average, Pure Toy Companies; Industry

23  Median, Pure Toy Companies; Average of Mattel, Hasbro and

24  Jakks; Average Hasbro and Jakks."

25          Do you see all that?

1          And this is a profitability analysis ratio of

2    these companies year by year; right?

3    A.    They are.

4    Q.    Now, the MGA EBIT is shown as 385.6 million; right?

5    A.    Can you tell me where you are reading?

6    Q.    I'm looking at the --

7    A.    Oh, yes, I'm sorry.  That's on page 17.

8          MS. KELLER:  Maybe we could display that.

9          (The document was published in open court.)

10   BY MS. KELLER:

11   Q.    So let's show the MGA EBIT 385.6.  But then, what

12   appears in the total column under "Bratz Products EBIT" is

13   792.4 million; right?

14   A.    That is correct.

15   Q.    So that's the same number you previously said was the

16   Bratz incremental profit; right?

17   A.    Yes.  Based on an EBIT measure.

18   Q.    Well, is it EBIT, though?  Or is it simply a

19   measurement of total sales minus costs?

20   A.    It's clearly sales minus cost.  But as I've defined it

21   my report, it is what I would call incremental EBIT.

22   Q.    Now, this is what -- this document is what you used to

23   calculate this benchmark profitability; right?

24   A.    Yes.

25   Q.    You compared the MGA Bratz products line to industry

1   profitability numbers to determine what you called excess

2   profitability; right?

3   A.   I did.

4   Q.   So you would look at various benchmarks and say

5   anything MGA made over and above that would have been excess

6   profit; right?

7   A.   I do.

8   Q.   And that excess profit you would say belonged to

9   Mattel?

10  A.   Yes.

11  Q.   Now, if we go back to this schedule, I guess it's

12  the -- I'm trying to figure which page it is.  There we go.

13          You've got the various years from 1999 through

14  2010, but you don't have averages at the end; right?

15  Averages for all those years?

16  A.   No.  I did not calculate an average for the entire time

17  period.

18  Q.   And when you compared MGA Bratz products, you picked

19  out MGA Bratz products and you compared them against toy

20  companies', all their products; right?

21  A.   Yes.  I used the average profitability of those toy

22  companies.

23  Q.   Right.  But you didn't take MGA's average profitability

24  versus Mattel's average profitability versus, say, Jakks and

25  Hasbro's average profitability.  You pulled out Bratz as a

1    unit out of all the other MGA products; right?

2    A.    You are correct.

3    Q.    And so the comparison here then instead of comparing,

4    for example, the profit margin for these years on Bratz

5    alone versus Barbie, you compared Bratz to the total toy

6    line that somebody else might have; right?

7    A.    I agree with that statement.

8    Q.    So one of these toy companies, for example, if they are

9    selling Tonka trucks, or toy trains, or tricycles, or

10   whatever, you're comparing those to the Bratz fashion doll?

11   A.    I am.

12   Q.    And you could have just taken apples to apples.  You

13   could have compared the profitability of the Bratz line

14   versus the profitability for that same period of the Barbie

15   line; right?

16   A.    Certainly that's possible.  I don't think that would be

17   reasonable.

18   Q.    Well, fashion doll to fashion doll.  You could have

19   done that; right?

20   A.    Clearly.  But saying that Bratz would have done as well

21   as the icon of the industry, I think, would not be the

22   appropriate measure to use to calculate the excess

23   profitability.

24   Q.    Well, those were the only two big-selling fashion dolls

25   in the world during that period; right?  Bratz and Barbie.

1    True?

2    A.    They were by far the largest two, yes.

3    Q.    So, let's look at your chart -- your chart 8.  You've

4    got Barbie worldwide lost profits from 2001 to 2009.

5            MS. KELLER:  We got that?

6        (The document was published in open court.)

7            MS. KELLER:  I have it right here.  Perhaps we can

8    put this on the ELMO.  We saw this a little earlier.

9    BY MS. KELLER:

10   Q.    And so we can actually do an apples to apples

11   comparison, if we chose.  We can look at, roughly, the

12   profit margin that Mattel made on sales of Barbie during

13   those years from 2001 to 2009; right?

14   A.    We could do that, yes.

15   Q.    And the profit margin there was about 33 percent;

16   right?

17   A.    That's about right, yes.

18   Q.    And if we average the profits for the Bratz dolls

19   during that period, they totaled about 18.78 percent; right?

20   A.    If that's the simple average of those years, you could

21   be right.  I don't know.

22   Q.    Would you like to -- do you need --

23   A.    That's -- again, I would not do it on a simple average

24   basis, because the years where they're making the very large

25   profit margins, there are significantly more sales than, as

1    an example, in 2009 when they have very small profitability.

2    Q.   Well, we're -- I'm using the averages here over all

3    these years that we're talking about, because that's where

4    we're coming up with our lost profits; right?

5              And you've been comparing -- you've been comparing

6    the lost profits for the -- the profitability of the Bratz

7    line against the profitability of companies' entire toy

8    lines whatever toy they may be producing; right?

9    A.   I did do that, yes.

10   Q.   And so, if you used the figure from the direct apples

11   to apples comparison -- Bratz sales versus Barbie sales,

12   18.78 percent versus 33 percent -- then if you use that in

13   your benchmark analysis, the profit that was made by Bratz

14   during all those years would be substantially lower in terms

15   of what would have to be disgorged to Mattel; right?

16   A.   If you thought that was the appropriate analysis, I

17   would agree that would be the conclusion.

18   Q.   In fact, there would be no excess profitability.  None;

19   right?

20   A.   That's clear, if you did that analysis.

21   Q.   So if you compared apples to apples -- Bratz to

22   Barbie -- nothing would have to be disgorged to Mattel;

23   right?

24   A.   If someone thought that was the appropriate

25   methodology, I would agree with you.

90

1   Q.   Well, let's take a look here at oranges to oranges,

2   too, if we can.  Let's take a look if we compare total

3   companies to total companies during this period -- toy

4   companies.

5          We see from 2001 to 2010 that MGA averages about a

6   7.27 profit margin; right?

7   A.   Yes.  Again, if you take a simple average, which I

8   don't think is appropriate but, yes.

9   Q.   If we look at the next line, pure toy companies

10  industry average, we see that there was actually a minus

11  13 percent in the years 2001 to 2010 mostly occasioned by a

12  horrific year in 2008; right?

13  A.   Yes.  It began -- since the sales were down, again,

14  weighting that, you wouldn't have that result.  But if you

15  just take a simple average, you are correct.

16  Q.   So if we go to the next line and we do a pure toy

17  companies industry median, that kind of helps us a little

18  bit with that one anomalous year, we end up with a 6.87

19  average profit; right?

20  A.   You do.

21  Q.   Then, if we go to Mattel, Hasbro and Jakks, the average

22  over that period is 9.23 percent; right?

23  A.   Yes.

24  Q.   And if we go to Hasbro and Jakks, it's 7.21 percent;

25  right?

1    A.    Correct.

2    Q.    And then, if we look at Mattel's average over that

3    period, it's 13.25 percent; right?

4    A.    Again, as a simple average, I would expect that that is

5    a correct calculation.

6    Q.    So we've got -- we would have, if we compared Mattel to

7    MGA over that period, there wouldn't be any excess

8    profitability for Mattel, if we used these numbers; right?

9    A.    Well, there would be --

10   Q.    Mattel is at 13.25 percent and MGA is at 7.27 percent;

11   right?

12   A.    No, there would be excess profitability, I think, under

13   the first two and the Hasbro/Jakks, but there wouldn't be

14   any under Mattel, Hasbro, Jakks and Mattel.

15   Q.    And so, really instead of excess profitability due to

16   the use of this IP, if we look at apples to apples and

17   oranges to oranges, there isn't any excess profitability for

18   MGA during this period; right?

19   A.    No.  I disagree with your characterizations of both

20   apples to apples and oranges to oranges and also on the

21   execution of your methodology.

22   Q.    Now, let me talk about that for a minute, your

23   calculations.  Once you calculated your incremental profit

24   for these various groups of dolls and accessories that

25   you've described, you said you apportioned that amount for

1    the value of the trade secrets or for the copyrights; right?

2    A.    That is correct.

3    Q.    But your apportionment methodology didn't include any

4    kind of incremental cost analysis for these other toy

5    companies; right?

6    A.    That is correct.

7    Q.    So you didn't deduct any of the expenses for those

8    other toy companies that you deducted for the Bratz

9    incremental profits calculation; correct?

10   A.    I deducted expenses in both categories.  I will agree

11   that the Bratz calculation is the increment of the EBIT that

12   Bratz added to that company which is different than the

13   average profitability of my yardsticks.

14   Q.    Apples to oranges?

15   A.    No.  When you understand how generous I am in my

16   yardsticks, I actually believe what I've done is

17   conservative, not as aggressive as you're trying to point

18   out.

19   Q.    Well, let's talk about how conservative you were.  You

20   didn't adjust the industry EBIT for some one-time almost

21   catastrophic event, like when Jakks had a recall of 515,000

22   of their little spa kits in 2009; right?

23   A.    That's completely wrong.  You don't understand my

24   analysis.

25   Q.    Well, I'm just asking you if you accounted for that

93

1    anywhere in your report?

2    A.    Yes.

3    Q.    And your calculations also assume that 100 percent of

4    the Bratz profit over any benchmark returns of other

5    companies would be attributable to the alleged trade secrets

6    and copyrights; right?

7    A.    I did.

8    Q.    So your analysis is premised on your belief that MGA's

9    contribution to Bratz is no greater than what MGA could have

10   earned as an average rate of return; right?

11   A.    That is correct.  In the industry that they are in.

12   Q.    And you assume that 100 percent should be apportioned,

13   quote, unquote, to the intellectual property despite what

14   the Ninth Circuit opinion says; right?

15   A.    That's the conclusions I have reached.  Except for

16   copyrights, it's not 100 percent.

17   Q.    Well, I'm specifically asking, and --

18         Do you have a copy of your deposition in front of

19   you?

20   A.    I had it a minute ago, but it's been taken away from

21   me.

22   Q.    Take a look at page 484.  484, line 14 through 485, 22.

23         MS. KELLER:  And your Honor, I think since there's

24   no jury here, could we just display that?

25         THE COURT:  Yes, please.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

94

1    BY MS. KELLER:

2    Q.    And I'm referring you, especially, to 10 down on

3    page 485.

4            The question was:  *And will you, if you do that,*

5    *be taking into account the Ninth Circuit judgment that MGA*

6    *added value that is not fairly attributable to the*

7    *intellectual property?*

8            ANSWER*:  Well, no.  I think it would not, because*

9            *I would be introducing facts that I believe the*

10           *Ninth Circuit is unaware of that that -- even with*

11           *all these same people and all these same skill*

12           *sets that applied that to other products, they*

13           *were not able to earn any type of return; so,*

14           *therefore, it should be zero.  I don't know*

15           *whether the Ninth Circuit was aware of that fact*

16           *when they made their judgment.*

17           Now, you also said in that same deposition that

18   you disagree with the Ninth Circuit opinion; right?

19   A.    I don't believe I said that.  I think that's taken out

20   of context.

21   Q.    Well, let's look at page 471.

22           MS. KELLER:  And if we could display that.

23           *(The document was published in open court.)*

24   BY MS. KELLER:

25   Q.    Let's start at line 12:

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          QUESTION:  And do you agree that the value added

2          by MGA's hard work and creativity dwarfs the value

3          of the original ideas that Bryant brought with

4          him?

5          ANSWER:  I disagree with that statement.

6          QUESTION:  Why do you disagree?

7          ANSWER:  It's based on the analysis that I have

8          already described to you in a previous answer is

9          that I have looked at the same organization with

10         the same people and the other products they have

11         introduced that are not Bratz and none of them

12         have been successful.

13    BY MS. KELLER:

14    Q.    So, you know, the bottom line is:  You just didn't

15    think the Ninth Circuit really used very thorough reasoning

16    in its opinion; right?

17    A.    First off, I believe that their opinion is different.

18    They're covering different intellectual property than I'm

19    trying to measure.  But all I'm doing is based on my

20    analysis.  And I started my testimony tonight with that

21    analysis of how successful MGA has been in their other

22    products, all their other products.  There are 82 other

23    product lines.  And they do not indicate a level of success

24    of even the average toy company.

25               So that's why I believe that my yardsticks are

1    both appropriate and conservative.

2    Q.   My question, though, is:  You disagreed with the Ninth

3    Circuit.  You decided that you had analyzed it in a way they

4    had not; right?

5    A.   Well, I clearly -- I don't know what information the

6    Ninth Circuit had.

7    Q.   Did you read the opinion?

8    A.   I did.  And they don't tell me what facts they used to

9    base their statement.

10   Q.   Well, what I'm asking you, though, is:  Your

11   methodology is contrary to the Ninth Circuit opinion with

12   which you disagree.

13           True?

14   A.   I don't think -- I don't know whether it's true,

15   because I don't know that we are doing the same type of

16   analyses, covering the same intellectual property.

17   Q.   Do you agree that the value added by MGA's hard work

18   and creativity dwarfs the value of the original ideas Bryant

19   brought with him?  And you said, *I disagree with that*

20   *statement*; right?

21   A.   I did say that at that deposition on that day.

22   Q.   And you understand that that language was taken word

23   for word from the Ninth Circuit opinion.

24           You know that, don't you?

25   A.   I do.

1    Q.    And when you went on to why do you disagree, you

2    basically said -- well, you said specifically:  *I think*

3    *the -- it's based on the analysis that I've already*

4    *described to you in a previous answer is that I have looked*

5    *at the same organization with the same people and the other*

6    *products they have introduced that are not Bratz and none of*

7    *them have been successful.*

8              So, basically, you have decided that you are going

9    to substitute your judgment for that of the Ninth Circuit in

10   this case; right?

11   A.    I don't think the Ninth Circuit was reaching a judgment

12   on the intellectual property that I am calculating.  I

13   thought they were only dealing with two trade names in

14   dealing with an injunction.  I don't think they are

15   calculating damages for all this other intellectual property

16   that I'm calculating damages for.

17   Q.    Well, when the Ninth Circuit opinion said that the

18   value added by MGA's hard work and creativity dwarfed the

19   value of the original idea that Bryant brought with him, you

20   understood what that meant, didn't you?

21   A.    Well, my understanding --

22   Q.    Did you understand what they meant?

23   A.    Maybe I don't.

24   Q.    Did you understand what the meaning of those words

25   were?

1    A.   Well, I'll tell you my meaning.  I can't tell you

2    whether I understood it correctly or not.  My understanding

3    is they are only dealing with two trade names, and that's

4    what they are addressing in their opinion.

5    Q.   Let's talk about your assertion that MGA had never had

6    another successful product other than Bratz, okay?

7         Now, let's look at your Chart No. 3, MGA's Top 10

8    Products by Revenue.

9         MS. KELLER:  I wonder if we ask our learned

10   opposition if they could display that for us so the court

11   can see it a little better.  That would be Chart No. 3.

12   It's already in.  Already shown.

13        MGA's Top 10 Products by Revenue.  We could --

14   there we go.

15        *(The document was published in open court.)*

16   BY MS. KELLER:

17   Q.   Now, you didn't look at the variability of performance

18   within the Bratz products, did you?

19   A.   I don't know what you mean by that, but I think I did.

20   Q.   Some sold better than others, didn't they?

21   A.   Oh, clearly.

22   Q.   Which was the best selling one?

23   A.   Well, the best selling product besides Bratz is

24   Little Tikes.

25   Q.   Here's my question:  You didn't look at the variability

99

1    of performance within Bratz products, not MGA.  Bratz;

2    right?

3    A.   That is correct.  I'm sorry.  I didn't understand your

4    earlier question.

5    Q.   But you knew, though, that the performance of Bratz

6    products varied widely; right?

7    A.   I know that some of the products introduced were not as

8    successful as others.

9    Q.   Well, you knew some were so unsuccessful they were

10   taken off the market pretty quickly; right?

11   A.   Yes.

12   Q.   And you knew others were still on the market; right?

13   A.   Principally, the first four characters are still on the

14   market.

15   Q.   But if you assume all Bratz products succeed because of

16   stolen intellectual property, then all Bratz products should

17   succeed, equally; right?

18   A.   Not necessarily.  That's not my opinion.

19   Q.   Because the difference is the tremendous skill and

20   creativity of MGA; right?

21   A.   Well, you have no facts to prove that except for with

22   Bratz, so I don't know what you're referring to.

23   Q.   Well, let me back up again.  When you say "Bratz," we

24   are talking about a lot of different products here; right?

25   A.   We are.

1  Q.   And you didn't assess them on an item-by-item basis.

2  You lumped them all into one big category called "Bratz";

3  right?

4  A.   I used the average.  You're correct.

5  Q.   And, in fact, when you lumped into Bratz, you didn't

6  just use the first four dolls, or the first six dolls, or

7  just the sculpts.  You used everything that had any remote

8  "Bratz" name on it.

9  A.   Well, I did everything that you described in your

10  question.  I did everything and I did subsets as well.

11  Q.   Like I said, a Bratz lunch pail, a Bratz sleeping bag.

12  It would all be in "Bratz"; right?

13  A.   That's true.

14  Q.   And you didn't differentiate between the licensed

15  products and the products that MGA made itself; right?

16  Correct?

17  A.   You're talking about the licensed -- they had Bratz

18  products?  Or are you talking about their other licenses,

19  like Shrek?

20  Q.   No, I'm talking about Bratz.  Bratz products that were

21  licensed out.  You didn't differentiate among those that

22  were made by other companies under the Bratz license and the

23  products that MGA made.  You just lumped them all under

24  "Bratz" on the graph; right?

25  A.   On this graph, that's correct.

1    Q.   Now, isn't your methodology contrary to the evidence

2    showing that MGA made terrific contributions to the success

3    of Bratz?

4    A.   I don't believe my testimony is inconsistent with that.

5    Q.   You understand, don't you, that even the highest

6    executives within Mattel talked about how Bratz was

7    succeeding because of the skill in the marketplace that

8    Bratz was showing.

9           You know that, don't you?

10   A.   Very early on in this damage period, I believe a Mattel

11   executive said that.

12   Q.   Well, you saw that said more than once, didn't you?

13   A.   I believe there's more than one reference to the

14   success of Bratz and attributing to MGA.

15   Q.   Well, for example, you saw Mr. Kilpin -- I'm sure you

16   saw an e-mail from him saying:  *We walked through a*

17   *True store this morning, in Austin.  Very sobering.  While*

18   *we were represented with our newest product to date, we are*

19   *not surprisingly outdone by Bratz and other competitors in*

20   *price, value and retail presentation.*

21          You read that, didn't you?

22   A.   I did at one time, yes.

23   Q.   And you also, probably, got another e-mail from the

24   same gentleman saying:  *Simply stated, the old way of*

25   *building the Barbie brand just doesn't work anymore.  We*

1    *have been out-thought and out-executed.*

2            You saw that; right?

3    A.   Yes.  Again, if you give me the date, I think that's

4    fairly early on in this process.

5    Q.   April 2nd, 2004; right?

6    A.   Yes.

7    Q.   And then you saw a comprehensive study that Mattel

8    commissioned by an outside consultant that essentially said

9    the same thing; that they were being beaten in the

10   marketplace because MGA was very skillful; right?

11   A.   I remember seeing that document, yes.

12   Q.   But you didn't give that any weight.  You just decided

13   that you were going to use these industry benchmarks of

14   other toy companies that didn't even necessarily make a

15   fashion doll and any profit that MGA made above that

16   benchmark all belonged to Mattel; right?

17           That's essentially what you did on the unjust

18   enrichment analysis; right?

19   A.   It's essentially what I did, but I was aware of all

20   those facts when I made that judgment.

21   Q.   You just didn't give them any weight?

22   A.   No, I gave them some weight, and I think I gave them

23   some very fairly returns for that level of effort.

24   Q.   Well, let's talk about your lost profits analysis,

25   okay?

1              Now, are you aware there has been no testimony at

2    this trial that Mattel has lost any sales due to Bratz?

3              You know that; right?

4    A.   I have not reviewed the transcript.  I don't know what

5    witnesses would testify to that, yet.

6    Q.   Well, you agree that if the sales that Bratz had are

7    not attributed to intellectual property belonging to Mattel,

8    then Mattel wouldn't be able to recover any profits from

9    those sales; right?

10   A.   I agree with that.

11   Q.   And you agree that the calculation of lost profits

12   shouldn't be based on what MGA made, but what Mattel lost;

13   right?

14   A.   I agree with that statement as well.

15   Q.   So the question that you were asking what was the total

16   lost to Mattel as a result of MGA selling Bratz; right?

17   A.   Yes.

18   Q.   And you used a regression analysis to do your

19   calculation, both to figure out the lost Barbie sales and

20   the amount that MGA expanded amount for fashion dolls;

21   right?

22   A.   I did.

23   Q.   Now, let's start with one thing.  Mattel was really

24   kind of -- until Bratz came along, Mattel was essentially a

25   monopoly in the fashion doll industry; right?

1   A.   I don't know -- they had more than 70 percent market

2   share.  If that's a monopoly share, then yes.

3   Q.   By far the biggest fashion doll in the world; right?

4   A.   Yes.

5   Q.   And in the United States, no real competitor; right?

6   A.   I agree with that.

7   Q.   So any market share that Barbie lost was going to be

8   primarily because Barbie was a monopoly.  So if another

9   fashion doll came along, of course, it was going to lose

10  some market share; right?

11  A.   Well, if there is fashion doll that comes along that is

12  successful, they're probably going to take more sales away

13  from Mattel than any other company.

14  Q.   The bottom line is:  If you got a fashion doll that is

15  mere monology anybody who comes --

16           If you have a fashion doll that's a near monopoly,

17  anybody who comes along and takes -- and is successful at

18  all is going to take market share away potentially; right?

19           MR. PRICE:  Your Honor, just for the record, I'm

20  not making form objections, because it's a *Daubert* hearing.

21  I just want to make sure I don't waive those if the same

22  question is asked in front of the jury.

23           THE COURT:  You're not waiving those.

24  BY MS. KELLER:

25  Q.   Now, we talked about your but-for analysis; right?

1  A.   I did.

2          MS. KELLER:  Oh, I'm sorry.  Didn't get an answer

3  to that last one?

4          THE WITNESS:  I think you better have it reread or

5  restated because I've forgotten it now.  I thought we moved

6  on.

7  BY MS. KELLER:

8  Q.   If you've got a fashion doll that has near monopoly and

9  a new fashion doll from a new company comes along and

10 successfully competes against it, of course you're going to

11 lose market share; right?

12 A.   I agree with that statement.

13 Q.   And you talked about your but-for analysis here.  In

14 the but-for world, there is no sale of any doll by MGA,

15 because you're quantifying a total loss to Mattel as a

16 result of MGA selling Bratz; right?

17 A.   Yes.

18 Q.   Or any other toy company in the world; right?

19          I mean, whether it's MGA, or whether it's any

20 other toy company in the world, same basic idea; right?

21 A.   Yes.  To the extent that any other toy company had

22 successful dolls and took sales away from Mattel, I have

23 accounted for that in my damage model and not asked MGA to

24 pay for that.

25 Q.   I mean, in the but-for analysis, you are assuming that

1   MGA would have never made a noninfringing fashion doll;

2   right?

3   A.    That would have anywhere near the success that Bratz

4   had.

5   Q.    You didn't make any assumption about that at all?

6   A.    Correct.

7   Q.    In fact, you assumed for purposes of this but-for

8   analysis that MGA would never make any fashion doll other

9   than the infringing one; right?

10   A.    Well, other than the other dolls that they have made.

11   Q.    Well, again, in terms of losing market share and all

12   that, you assumed that no other toy company in the world was

13   going to be taking market share from Mattel, because no

14   other toy company was going to be making a fashion doll.

15        That's what your but-for analysis assumed; right?

16   A.    No, I don't think that's correct at all.

17   Q.    Well, you certainly didn't include anything in your

18   report containing any assumptions about even the possibility

19   of MGA making a noninfringing doll and competing against

20   Mattel; right?

21   A.    Yes.  Except for just trying to spend more effort on

22   their existing product lines.

23   Q.    I'm asking, did you put that in your report?

24   A.    No.

25   Q.    Now, you didn't determine what Barbie sales would have

1    declined in the event that MGA had made a fashion doll, but

2    just didn't have the "Bratz" name and didn't have any

3    allegedly infringing concept; right?

4              You didn't calculate that?

5    A.   I did not.

6    Q.   And you didn't determine what Barbie sales -- to what

7    degree Barbie sales would have declined in the event that

8    MGA had made and sold the doll that had the Bratz concept

9    but not the name; right?

10   A.   I made no such calculation of that either, yes.

11   Q.   So in your model, your model assumes that MGA was not

12   allowed to sell any doll, even a doll that didn't use what

13   Mattel claims is the IP here; right?

14   A.   I've assumed that they did sell other dolls besides

15   Bratz, and they would continue to sell those products but no

16   other dolls.  They wouldn't come up and invent another

17   concept instead of Bratz.

18   Q.   I'm talking about a hot edgy fashion doll.  You assumed

19   that MGA wouldn't make such a doll, such a noninfringing hot

20   multi-ethnic fashion doll; right?

21   A.   No, I think that description fits Moxie, and I assume

22   that they would have made Moxie.

23   Q.   Did you factor that into your analysis, your lost

24   profit analysis anywhere?

25   A.   Yes.  That would come out of Mattel's market share in

1   the years that Moxie was in the marketplace.

2   Q.   Well, let's look at some of the lost profit analysis

3   that you did, and we've got -- if you look at your summary,

4   tab B4.  You've got a schedule.

5          Oh, by the way, Moxie didn't come out until 2009;

6   right?

7   A.   That's correct.

8   Q.   So what you just said has no application between 2001

9   and 2008; right?

10  A.   I agree with that statement.

11  Q.   Now, if you got that schedule in front of --

12  A.   No, no one has handed it to me.

13  Q.   This is the tab B4.  This is a summary.

14          MS. KELLER:  We got this anywhere?

15      *(Pause.)*

16  BY MS. KELLER:

17  Q.   Now, one of the dolls that you included in your lost

18  profits analysis where you said Barbie lost profits as a

19  result of the Bratz competition, one the dolls you included

20  here was the MyScene doll; right?

21  A.   That's true.

22  Q.   But Mattel only launched MyScene in response to Bratz;

23  right?

24  A.   It did.

25  Q.   Mattel rushed MyScene to market as a competitive

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    response to Bratz; right?

2    A.    That's my understanding.

3    Q.    And actually, you testified that MyScene profits were

4    enhanced because of the expansion of the doll market by

5    Bratz; right?

6    A.    I agree with that.

7    Q.    But your calculation assumes, contrary to your

8    testimony, that Bratz took away sales from MyScene as part

9    of a lost profits calculation; right?

10   A.    Could you repeat that question?

11   Q.    Yet, your calculation assumes, contrary to your

12   testimony, that Bratz took away sales from MyScene as part

13   of this -- your lost profits calculation assumes that;

14   right?

15   A.    To the extent that MyScene was unsuccessful in

16   competing against Bratz or successful, that is taken in

17   consideration in my damage calculation.

18   Q.    So Mattel launches MyScene to compete against Bratz as

19   a competitive response; right?

20   A.    Yes, as mitigation.  That's the way I've treated it in

21   my model.

22   Q.    And MyScene profits were enhanced because of the

23   expansion of the doll market by Bratz; right?

24   A.    Yes.

25   Q.    And you still included on the list of dolls that are

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    part of your lost profits calculation; right?

2    A.   Yes.  But you have to understand the way it's used.  It

3    actually offsets the damages.  It actually uses mitigation.

4    If I didn't include my MyScene, my damage number would be

5    higher.

6    Q.   Well, if you look at page 127 and 128, that's where you

7    actually make your MyScene calculations; right?

8    A.   Yes.

9    Q.   And that's where you calculate that the MyScene sales

10   were negatively impacted by Bratz; right?

11   A.   In certain years, yes.

12   Q.   Now, you also include one of the dolls that you say

13   lost profits because of Bratz was Barbie Fairytopia, Fairies

14   and Mermaids?

15   A.   If that's a Barbie product line then, yes.

16   Q.   Well, I'm just -- take a look at your schedule.

17          This is the same schedule, Barbie Fairytopia,

18   Fairies and Mermaids from 2003 and 2009.  You really think

19   that Bratz competed against Barbie Fairytopia, Fairies and

20   Mermaids?

21   A.   I did not try to discriminate among all the different

22   SKUs at that level of detail.  But, yes, I would say that

23   they did.

24   Q.   Have you looked at any studies of whether little girls

25   going out to buy Bratz were comparing it to Barbie

```
 1    Fairytopia, Fairies and Mermaids?
 2    A.    No, I have no such analysis.
 3    Q.    You also said that Bratz cost profits from the sale of
 4    Total Barbie Princess from 2003 to 2009; is that right?
 5    A.    Yes. I included all the Barbie product lines.
 6    Q.    So anything -- anything that had Barbie on it got
 7    included in your list of lost profits?
 8    A.    Well, you have to show me the schedule, if there is any
 9    lost profits calculated, but I included all Barbie products,
10    yes.
11    Q.    No matter what age group it was targeted to?
12    A.    That is correct.
13    Q.    And you got "Barbie We Three" on here.
14          Do you see that?
15    A.    Yes.
16    Q.    And you knew that that was also a competitive response
17    to a Bratz product; right?
18    A.    Yes.
19    Q.    And so, "We Three" was produced because of a Bratz
20    product and same thing, benefited from a expanded market for
21    the product; right?
22    A.    Yes.
23    Q.    And yet, you got that down for lost profits?
24    A.    It is included in my calculations, yes.
25    Q.    So you never actually did any analysis to find out
```

112

1   about the little girl who bought a Bratz doll would have

2   considered buying instead one of these Barbie dolls.  You

3   never did that; right?

4   A.   No, I didn't do any customer survey.

5   Q.   And you didn't look at any marketing research about

6   that; right?

7   A.   I recall seeing some information about market research,

8   but none to that level of detail.

9   Q.   You didn't include that in your calculations here;

10  right?

11  A.   That wouldn't be a calculation.  It would be something

12  that I would consider in deciding what methodology to use.

13  Q.   Now, you also said you used some NPD data; is that

14  right?

15  A.   I did.

16  Q.   You used that for your regression analysis?

17  A.   A number of them, yes.

18  Q.   And NPD, itself, has strongly suggested that there are

19  limitations for the use of its data because it's not

20  tremendously reliable.

21         True?

22  A.   Well, you've taken a statement I've seen in your

23  motions and, I think, maybe in Mr. Malackowski's report.

24  That makes no sense to me.

25  Q.   Let me ask you about a very specific one.  You know who

 1    Kelly Falco --

 2           You know who Kelly Falco is, the account manager

 3    from NPD's toy division?

 4    A.   I don't know her, but I've seen the document that you

 5    cited to her.

 6    Q.   And that's an Exhibit 31425.

 7           And that's actually an e-mail chain, January 19th,

 8    2005, between Ninette Pembleton of MGA and Kelly Falco of

 9    this NPD; right?

10    A.   Yes.

11    Q.   And Ms. Falco says she *strongly recommends that any*

12    *documents containing NPD data should always be accompanied*

13    *with a disclaimer that NPD data should not under any*

14    *circumstances be used for business analysis*; right?

15    A.   Well, you've read part of what she said, yes.  But she

16    said it should be used and can be used for directional

17    purposes only.  That's the use that I made of the document.

18    Q.   Well, you're actually using it for business analysis

19    here; right?

20           You're using it to calculate lost profits in the

21    hundreds of millions of dollars; right?

22    A.   Yes.  But based on my calculation, I'm using it to

23    offset and reduce my damages.

24    Q.   You are not using it for directional purposes.  You're

25    not a toy company executive who is deciding what direction

1   to go in this year on stocking shelves; right?

2   A.   I'm not a toy company executive.

3   Q.   You using it to come up with calculations on lost

4   profits; right?

5   A.   Oh, I agree with that.

6   Q.   Now, are you aware of that the CEO of Mattel, Bob

7   Eckert, has testified that he would characterize NPD data as

8   inaccurate?

9          Are you aware of that?

10  A.   I've seen your citation to that testimony.

11  Q.   And have you talked to Mr. Eckert about the basis for

12  his belief that this data you relied on for your opinion is

13  inaccurate?

14  A.   No.

15  Q.   Now, your regression analysis also ignores some other

16  variables that affected the sale of Barbie; right?

17  A.   Well, looking at it alone it did, but I did not ignore

18  those variables in my damage calculation.

19  Q.   Well, in the real world, for example, you did not

20  consider -- you didn't consider in your analysis that the

21  marketplace was already over --

22          THE COURT:  We can't get a --

23          Start again.  Slowly.

24  BY MS. KELLER:

25  Q.   You are aware that Mattel executives have testified in

1    this case that they knew that the marketplace was saturated

2    with Barbie dolls?

3              You knew that; right?

4    A.    I did.

5    Q.    And that there were marketing challenges because of

6    that; right?

7    A.    Yes.

8    Q.    You knew that Barbie sales had peaked in 1997; right?

9    A.    I'm aware of that fact.

10   Q.    And had been declining for years.  True?

11   A.    Yes.

12   Q.    And you've seen other Mattel documents talking about

13   the decline in the sales of Barbie before Bratz ever

14   appeared; right?

15   A.    I have.

16   Q.    And you seen Mattel's own research that showed that

17   Barbie was losing relevance with girls; right?

18   A.    I've seen that analysis.

19   Q.    And you knew that girls were maturing at a younger age;

20   right?

21   A.    Yes, I have.

22   Q.    Now, and you knew that that was affecting the marketing

23   as well; right?

24   A.    I did.

25   Q.    And you didn't consider the effect of other Mattel

1    products cannibalizing a significant portion of Barbie's

2    sales; right?

3    A.    That's incorrect.  I did.

4    Q.    Well --

5    A.    You don't understand my methodology.  Because if you

6    understood my methodology, I have taken into consideration

7    everything you've asked me in the last series of questions.

8    Q.    So you considered that Barbie had been losing sales to

9    other competitors' products before Bratz came along; right?

10   A.    I did.

11   Q.    And did you consider the impact of product recalls that

12   Mattel that affected the decline of the Barbie brand?

13   A.    Yes.

14   Q.    But you didn't consider any of these factors important

15   enough in your regression analysis to give any kind of a

16   significant discount; right?

17   A.    It's because it's taken care in another part of the

18   model.  It would not be appropriate to do it there.

19   Q.    Well, your regression analysis doesn't prove that Bratz

20   sales caused the loss of Mattel sales; correct?

21   A.    I agree with you.  It only proves the correlation.

22   Q.    Is that a "yes"?

23   A.    Yes, that is a "yes."

24   Q.    And your regression analysis didn't establish that

25   Bratz was a reason for Barbie's decline in sales; right?

1    A.   That alone does not.

2    Q.   And so, you know, don't you, that Bratz was not the

3    only reason Barbie was having a sales decline?

4    A.   I agree with that, and I've taken that into

5    consideration.

6    Q.   Now, let's talk for a second about this business of

7    what -- I'm going to call it a hypothetical royalty.  I

8    think you called it a reasonable royalty.

9         Do you know of any evidence that Mattel would have

10   exploited the Bratz doll if it had the Bryant drawings?

11   A.   No.

12   Q.   And you don't have any evidence that Mattel would have

13   developed a license to copyright in the Bryant drawings and

14   sculpts; right?

15   A.   That is correct.

16   Q.   In fact you believed that Mattel would not have done

17   so.

18        True?

19   A.   That's my belief.

20   Q.   And you are aware, of course, that Mattel had rejected

21   the name Bratz for its product Diva Starz; right?

22   A.   Yes.

23   Q.   That was because of the negative connotation in the

24   Bratz name.

25        True?

1    A.    That's what I read.

2    Q.    I mean, Brats, B-R-A-T-S.  Not B-R-A-T-Z?

3    A.    I'm aware of that fact.

4    Q.    You know that the president of the girls division said

5    that she didn't like the idea of what the name "Bratz"

6    connoted; right?

7    A.    That is correct.

8    Q.    And you also know that the B-R-A-T-S name couldn't even

9    clear the legal department.

10          True?

11   A.    I've seen some information on that subject, yes.

12   Q.    And you know that Bob Eckert, the CEO, said that he

13   viewed Bratz as having negative social values; right?

14   A.    I'm not recalling that testimony, but it would not

15   surprise me that he said that.

16   Q.    You are aware that he testified in his deposition that

17   he would have vetoed a product inconsistent with Mattel's

18   image?

19   A.    Yes.

20   Q.    So, in short, Mattel would have never exploited or

21   licensed the Bratz intellectual property; right?

22   A.    Based on the information I have seen, I agree with that

23   statement.

24   Q.    Let's talk about your Book of Wisdom analysis.  That

25   comes from a patent case; right?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    A.    It does.
 2    Q.    And it's never been used in a copyright case.
 3          True?
 4    A.    I don't know whether it has or not.
 5    Q.    Your own handbook, the litigation services handbook,
 6    you are one of the four editors of that?
 7    A.    I'm the original editor.  And through the fourth
 8    edition, I was one of four editors, yes.
 9    Q.    And you have written articles for it; right?
10    A.    I've written chapters.
11          THE COURT:  Just a moment.  Deborah, rest your
12    hands.
13       (Pause.)
14          THE COURT:  Okay.  Start again.
15    BY MS. KELLER:
16    Q.    And in the -- in that handbook that we're talking
17    about, the Litigation Services Handbook, the Georgia-Pacific
18    factors are described as useful only if the case involves a
19    technical trade secret or otherwise resembles subject matter
20    similar to that found in patents; right?
21    A.    The author of that chapter had that opinion.
22    Q.    That was in the very book of which you are one of the
23    editors; right?
24    A.    It is, but you need to read the disclaimer in the first
25    part of the book.
```

DEBORAH D. PARKER, U.S. COURT REPORTER

1   Q.   Did you write a correction to that, or a footnote, or

2   any kind of comment that you disagreed with that?

3   A.   No, I did not do that.

4   Q.   And the Book of Wisdom approach is based on the

5   assumption that there's a willing licensor and a willing

6   licensee as of the date of first infringement; right?

7   A.   Which concept did you say?

8   Q.   The so-called Book of Wisdom approach?

9   A.   No.  You're confusing concepts.  It has nothing to do

10  with what you just said.

11  Q.   It allows you to look at what you know later and apply

12  that to a hypothetical negotiation that occurred as of the

13  date of the first infringement; right?

14  A.   That is a correct statement.

15  Q.   And you just told us that in your opinion, Mattel would

16  not have been a willing negotiator in licensing the Bratz

17  concept, even if it had known about it at the time; right?

18  A.   That is correct.

19  Q.   So this was not based on the real world, but based on a

20  hypothetical world that we know Mattel would not have

21  participated in; right?

22  A.   I agree with your statements.

23  Q.   Now, in determining the hypothetical royalty rate to

24  apply, you chose not to start with the Carter Bryant royalty

25  agreement with MGA.

121

1               True?

2    A.    That's true.

3    Q.    And if you wanted to get as close to the real world as

4    you could of 2000, it would have been more appropriate to

5    start with the Bryant agreement; right?

6    A.    I don't agree with that judgment, no.

7    Q.    You calculated a 15 percent royalty for all Bratz trade

8    secrets, including the name with all Bratz products as a

9    base to come up with 594.7 million?

10   A.    I did.

11   Q.    And you decided that the royalty for Bratz trade

12   secrets without the name would be 10 percent or

13   395.6 million?

14   A.    Yes.  If a reasonable royalty damage analysis is

15   appropriate.

16   Q.    And that's just for the name; right?  Without -- the

17   name alone was worth 5 percent?

18   A.    That's correct.

19   Q.    Now, did you review the trial testimony of a person by

20   the name of Steve Linker?

21   A.    No.

22   Q.    Did you know that this gentleman was paid no more than

23   $200 for the B-R-A-T-S name for the Diva Starz project in

24   1999?

25   A.    Yes.  I think you mentioned it in your brief.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

122

1    Q.   So you read both of the briefs, having to do with the

2    *Daubert* motion that we're participating in now?

3    A.   I did.

4    Q.   So you gave that no weight as well, right, in terms of

5    the value of the name?

6         The $200 in the real world, not the hypothetical

7    world, but the real world, that Mattel actually paid for the

8    B-R-A-T-S name, you put that aside and didn't rely on that;

9    correct?

10   A.   That is correct.

11   Q.   The Ninth Circuit opinion that you read, and we talked

12   about earlier, you didn't take it into account in any of the

13   work that you did; is that right?

14   A.   Well, I didn't use it as a fact.

15   Q.   Did you take it into account in any way?

16   A.   Well, it was in the back of my mind, because I read it

17   but I didn't say I used it in my calculations.

18   Q.   Didn't you testify that you did not take the

19   Ninth Circuit's opinion into account in any way in any of

20   the work that you did?

21   A.   You have to tell me what time.  Before my apportionment

22   reports were done, that would clearly be true; after my

23   apportionment reports, that would not be correct.  And if I

24   said that, I misstated the record.

25         MS. KELLER:  I think -- I don't think I have

1  anything further, your Honor.

2  　　　　　　THE COURT:  Okay.

3  　　　　　　MS. KELLER:  I may have one last question.

4  　　(Pause.)

5  BY MS. KELLER:

6  Q.  Without using the Georgia-Pacific factors that we've

7  talked about, you don't have any way to allocate between

8  copyright and trade secret; correct?

9  A.  As I told the judge in his questioning, that's

10  absolutely correct.

11  　　　　　　MS. KELLER:  Nothing further.

12  　　　　　　THE COURT:  Mr. Cote.

13  　　　　　　MR. COTE:  Thank you, your Honor.

14  　　　　　　　　　　　CROSS-EXAMINATION

15  BY MR. COTE:

16  Q.  Good evening, Mr. Wagner.  How are you?

17  A.  I'm fine.  Thank you.

18  　　　　　　MR. COTE:  I would ask to have Exhibit 9891 put in

19  front of you, please.

20  BY MR. COTE:

21  Q.  Do you have 9891 in front of you?

22  A.  I do, yes.

23  Q.  Let me back up just a little bit.

24  　　　　　　Do you know who I represent?

25  A.  I do.  Mr. Machado.

1    Q.   Now, I'm going to ask you questions just about what you

2    called the Mexico documents in your report.

3              Do you understand that?

4    A.   I do.

5    Q.   Okay.  I don't want you to be confused about what

6    questions I'm going to ask you.

7    A.   Thank you.

8    Q.   The very first page of 9891 -- let me back up.

9              9891 is tab B13 to your report; right?

10   A.   It is.

11   Q.   And the very first page is called Schedule 1.1?

12   A.   Yes.

13   Q.   And this is the total calculation of the remedy that

14   Mattel is seeking from Mr. Machado or the two remedies that

15   Mattel is seeking from Mr. Machado; right?

16   A.   It is.

17   Q.   And you calculated them out for unjust enrichment,

18   which is roughly $6 1/2 million?

19   A.   That is correct.

20   Q.   You calculated -- or you, at least, referenced

21   reasonable royalty rate, as you call it; is that right?

22   A.   Yes.

23   Q.   About two-thirds?

24   A.   Correct.

25   Q.   And then you multiply the rate times the unjust

```
 1   enrichment amount, and you get the reasonable royalty in a
 2   dollar figure; right?
 3   A.    That is correct.
 4   Q.    And that's about $4.3 million?
 5   A.    It is.
 6   Q.    Now, when you did the unjust enrichment analysis,
 7   you're measuring the cost of creating the documents that my
 8   client is accused of taking or copying; right?
 9   A.    That is correct.
10   Q.    The cost to who?
11   A.    The cost to Mattel.
12   Q.    And you're using the cost to Mattel as a proxy for
13   what?
14   A.    The cost it would have taken MGA to create the same
15   information.
16   Q.    And that's the only basis you are offering for unjust
17   enrichment; right?
18   A.    It is.
19   Q.    Now, are you going to opine that a voided cost is a
20   proper measure of unjust enrichment?
21   A.    If asked, I would, yes.
22   Q.    Is that your opinion?
23   A.    Absolutely, yes.  That is one measure of unjust
24   enrichment.
25   Q.    Now, you are a lawyer; right?
```

1   A.   I am.

2   Q.   You understand that there is a section or a portion of

3   the case where the jury is instructed; right?

4   A.   I do.

5   Q.   If the judge has a different view on that point, you

6   will defer to the court, I'm sure?

7   A.   Absolutely.

8   Q.   If you could open up on Schedule 2.7, it's page 32 of

9   the document you have in front of you, if that helps you

10  find it.

11  A.   It does.  Thank you.

12       MR. COTE:  And, your Honor, we have these same

13  documents in the binders you reviewed yesterday, if you

14  would like them in paper form.

15  BY MR. COTE:

16  Q.   Do you have Schedule 2.7 in front of you?

17  A.   I do.

18  Q.   This is the total cost of one of the Mexico documents;

19  right?

20  A.   I wouldn't describe it exactly that way, no.

21  Q.   How would you describe it?

22  A.   Well, I think this is the source for the payment for

23  the point of sale data for one year of $1.9 million.

24  Q.   Well, it's got more than just that figure on it; right?

25  A.   Oh, it has other figures, but that's 99.99 percent of

```
 1   the cost.

 2   Q.   Sure.  But Schedule 2.7 is designed to address one

 3   specific Mexico document; right?

 4   A.   That's true.

 5   Q.   And the total cost, as you said, is a little bit more

 6   than $1.9 million?

 7   A.   Yes.  When you also calculate the labor involved, you

 8   add another $383.

 9   Q.   And this document is one of the most expensive ones;

10   right?

11   A.   It is clearly the most expensive.

12   Q.   And this Schedule 2.7 shows an hour of work by finance

13   associate manager at $41 an hour?

14   A.   Yes.

15   Q.   And 16 hours of work by a junior and lists at $21 an

16   hour?

17   A.   That is correct.

18   Q.   And, of course, the big one on this chart like you

19   mentioned is the 1.9 at the bottom; right?

20   A.   Not the very bottom, but, yes.

21   Q.   And then, you have totals and subtotals; right?

22   A.   I do.

23   Q.   In the bottom left-hand corner of Schedule 2.7, there

24   is a footnote.

25             Do you see that?
```

128

 1   A.   I do.

 2   Q.   And that says "source"; right?

 3   A.   It does.

 4   Q.   What's the "source"?

 5   A.   It's that spreadsheet that I explained earlier in my

 6   testimony that I gave to Mattel and then they filled it out

 7   and sent it back to me.

 8   Q.   Okay.  Well, let's put it in front of you.  I'll ask

 9   you to keep what you have there in front of you, which is

10   9891.  I ask you to keep that in front of you, if you would,

11   please.  And also put in front of you Exhibit 35354.

12   A.   *(Witness so complies.)*

13   Q.   I'm actually going to ask you to turn to -- take a look

14   at it for a second if you would, please.

15   A.   *(Witness so complies.)*

16   Q.   Is 35354, the source that's identified at the bottom of

17   Schedule 2.7?

18   A.   I believe that it is.

19   Q.   Could you turn to page 14 of 35354?

20   A.   Yes.

21   Q.   This is the actual page in 35354 that's cited by 2.7;

22   right?

23   A.   It is.

24   Q.   And the footer of 35354 says:  *Cost Analysis Prepared*

25   *by Roberto Isaias*, tab 9; right?

1    A.    It does.

2    Q.    Was 35354 prepared by Mr. Isaias?

3    A.    Yes.

4    Q.    And who is Mr. Isaias?

5    A.    My understanding is that he was a manager in Mexico

6    that was responsible for the area that produced this report.

7    Q.    And he put this 35354 together at your request; right?

8    A.    He did.

9    Q.    Sometime after the litigation began; right?

10   A.    Clearly.

11   Q.    In fact, it was September of last year; right?

12   A.    It was.

13   Q.    By "last year," I mean 2010.

14   A.    I understood your question, and that's what I answered.

15   Q.    Great.  I would ask you to hold both Schedules 2.27 and

16   35354 open in front of you at the same time.

17             Have you done that?

18   A.    I have.

19   Q.    Okay.  In the column marked "costs" on both documents,

20   the numbers are the same; right?

21   A.    They are.

22   Q.    And if you look at the two columns to the right, which

23   just have text in them, the text in both columns on both

24   documents is also the same; right?

25   A.    They are.

1    Q.    In fact, so much so the same that there is a typo on

2    the second line of text on 35354, page 14, where the word

3    "together" is misspelled; right?

4    A.    That is correct.

5    Q.    And the same misspelling carries over to Schedule 2.7;

6    right?

7    A.    Yes.

8    Q.    Now, the text on 35354-14, the very last line of text

9    on the -- sort of more on the right-hand side, there is a

10   cite to a document with a Mattel Bates number.

11            Do you see that?

12   A.    I do.

13   Q.    And that's a document M0031266.

14            Do you see that?

15   A.    I do.

16   Q.    Does M0031266 support the $1.9 million figure?

17   A.    No.  I think that that is referencing the financial

18   document that contains the information that was obtained by

19   paying the $1.9 million.

20   Q.    Does that document support the $1.9 million figure?

21   A.    It does not.

22   Q.    And other than M0031266, does -- is there any other

23   citation to any other document on 35354-14?

24   A.    There is not.

25   Q.    Just one cite and it's wrong; right?

1   A.   Well, it's not citing you the source of the

2   1.9 million.  That is correct.

3   Q.   You still have 2.7 in front of you?

4   A.   I do.

5   Q.   Okay.  2.7, there is a column that says "rate"; right?

6        Do you see that column?

7   A.   I do.

8   Q.   And there is a cite there to tab B13, Schedule 4.1;

9   right?

10  A.   There is.

11  Q.   And we're looking at B13.  That's what 2.7 is part of?

12  A.   We are.

13  Q.   So 4.1 would be in that same document; right?

14  A.   It would.

15  Q.   Is it on page 97?

16  A.   97 and 98.

17  Q.   It's is a two-page document; right?

18  A.   Yes.

19  Q.   Does 4.1 have a source?

20  A.   It does.

21  Q.   What's that source?

22  A.   It's the same spreadsheet that we just talked about

23  earlier.

24  Q.   35354?

25  A.   Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

132

1    Q.    Okay.  So we have to go back to 35354 again; right?

2    A.    We do.

3    Q.    That's Mr. Isaias' spreadsheet?

4    A.    It is.

5    Q.    That he prepared when you asked him to do it?

6    A.    That is correct.

7    Q.    I think the sheet you are looking for in 35354 is

8    page 4; is that right?

9    A.    It is.

10   Q.    Okay.  Now, if you compare the numbers on Schedule 4.1

11   with the numbers on page 4 of Mr.Isaias's spreadsheet, they

12   are the same but for some rounding; right?

13   A.    I would call it truncating, not rounding.  It's just

14   what information is displayed in the column.  The numbers

15   are the same.

16   Q.    Apart from rounding they are the same, or truncated?

17   A.    Yes.

18   Q.    And the text is the same; right?  The right-hand

19   column?

20   A.    It is the same.

21   Q.    Does page four of Mr. Isaias' spreadsheet cite any

22   source at all?

23   A.    It does not.

24   Q.    Okay.  Now, are you going to tell the jury that any of

25   the numbers in Mr. Isaias' spreadsheet are accurate?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   A.   Not these numbers, no.  I don't have the basis to say

2   they are accurate.

3   Q.   What about any of the numbers in that spreadsheet?

4              We looked at page 14, and we looked at page 4.

5   You can just answer with respect to those two.

6   A.   I think I have other information that does support some

7   of the figures, but I don't think -- at least I'm not

8   recalling any other documents for the hourly rate on this

9   Schedule 4.1, but I have seen other information that

10  supports the $1.9 million number.

11  Q.   Well, let's back up a little bit.

12             You testified in your deposition that you're only

13  going to say that these numbers are accurate, if you have

14  backup for them; right?

15  A.   That's true.

16  Q.   And you also said in your deposition that every number

17  you have backup for is cited in your report; right?

18  A.   I said that, yes.

19  Q.   Okay.  And you also said that the only part of the

20  report or the schedule of the report that has anything to do

21  with Mr. Machado is this B13 we've been looking at; right?

22  And that's Exhibit 9891.

23  A.   I believe that is correct.

24  Q.   Okay.  And if you flipped back to Schedule 2.7 of tab

25  B13 --

1              Do you have that in front of you?

2    A.   I do.

3    Q.   We looked at the source cited at the bottom of the

4    page; right?

5    A.   We did.

6    Q.   And we looked at the four point -- the Schedule 4.1

7    that's cited near the top of the page under the rate

8    heading; right?

9    A.   We did.

10   Q.   And we talked about -- we didn't look at it, but we

11   talked about this Bates No. M031266; right?

12   A.   Yes.

13   Q.   Are there any other cites anywhere to be found on

14   page -- rather, on Schedule 2.7?

15   A.   No.

16   Q.   Now, I take it from some of your answers that you want

17   to tell me about some other documents that are not cited in

18   this report; right?

19   A.   Only if you asked me the questions.  I won't volunteer.

20   Q.   All right.  Well, let's back up a little bit and lay a

21   foundation.

22              You remember MGA took your deposition in this case

23   in December of 2010?

24   A.   I do.

25   Q.   I didn't ask you any questions in that deposition;

1    right?

2    A.    You did not.

3    Q.    And that's where we've learned that the cite to

4    M0031266 was the wrong cite?

5    A.    It was not the cite to support the number.  That's

6    correct.

7    Q.    And you -- when I asked you questions a couple days

8    later, you said you remembered that conversation with some

9    pain; right?

10   A.    I probably said that.

11   Q.    Now, at that depo that I asked you questions, that was

12   about two days later; right?

13   A.    It sounds right.

14   Q.    You brought new documents?

15   A.    I did.

16   Q.    Documents that were not cited in your report; right?

17   A.    That is correct.

18   Q.    Documents you did not rely on to reach any of the

19   numbers in your report; right?

20   A.    At that point that would be true.

21   Q.    Well, you haven't changed your report as it relates to

22   Mr. Machado; right?

23   A.    No, but I did get some additional documentary support

24   for the $1.9 million figure.

25   Q.    You got documents after you wrote your report?

136

```
 1    A.    I did.
 2    Q.    Let me show you, please, Exhibit 9897.  It's probably
 3    in the book you already have in front of you.
 4    A.    It's not.  It may be, but it may be mislabeled.
 5    There's a 9898, and the one before that is --
 6    Q.    It should be right before that.
 7    A.    Yeah, it's here.
 8    Q.    You have that; right?
 9    A.    I do.
10    Q.    This is one of the documents you brought to that second
11    day of deposition; right?
12    A.    It is.
13    Q.    And this is an e-mail, isn't it?
14    A.    It is.
15    Q.    And it was e-mail prepared for this litigation; right?
16    A.    It was.
17    Q.    Sent to Mattel's counsel?
18    A.    That is the original e-mail, yes.
19    Q.    That's who Jon Corey is?
20    A.    Jon Corey is one of the counsel for Mattel.
21    Q.    And this purports to show sales for the year 2004 in
22    that second column; right?
23    A.    It does.
24    Q.    And then, it multiplies it by 1 percent?
25    A.    It does.
```

137

1   Q.   And then you get the product of those two numbers.

2   Down at the bottom, you get a number that says a little bit

3   more than $1.9 million; right?

4   A.   Correct.

5   Q.   But this e-mail only talks about 2004; right?

6   A.   I know -- I think it talks about other years in the

7   e-mail as well, but I think this is the only one that

8   schedules out sales numbers.

9   Q.   It only has sales for 2004; right?

10  A.   It does.

11  Q.   There's nothing to multiply the 1 percent by for 2002;

12  right?

13  A.   Not on this document.

14  Q.   Or 2003?

15  A.   That is correct.

16  Q.   And the document that is discussed in Schedule 2.7 is a

17  2003 document, isn't it?

18  A.   I thought the documents were 2004.

19  Q.   I'm talking about Schedule 2.7.

20  A.   Oh, 2.7.  I'm sorry.  I thought you were still on this

21  document.  Yes, you're correct.  That is for 2003.

22  Q.   Okay.  And then, let me show you, please, 9898.

23        Just let me know when you have that in front of

24  you, please.

25  A.   I need help, but I've got it now.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

138

1    Q.   You got it?

2    A.   I do.

3    Q.   This is seven pages of what looked like contracts;

4    right?

5    A.   That is correct.

6    Q.   All these contracts were from 2004; right?

7    A.   I believe one of them is from 2005.

8    Q.   But there's none from 2003.  We can agree on that?

9    A.   We can.

10   Q.   And there's none for '02?

11   A.   That is true as well.

12   Q.   And these are contracts between Mattel, looks like

13   Mattel de Mexico and retailers; right?

14   A.   Retailers in Mexico, yes.

15   Q.   The contract that's for '05, which retailer is that?

16   A.   It's *Tiendas Chedraui,* SA.

17   Q.   *Chedraui*?

18   A.   Yes.

19   Q.   And so, for *Chedraui,* that retailer, you don't have any

20   contract at all for '04; right?

21   A.   No, this is the only contract that I've seen.

22   Q.   I didn't lay this foundation.  Let me do this now.

23          9898 is the other document that you brought with

24   you to the deposition where I asked you questions; right?

25   A.   It is.

139

```
1   Q.   And 9898 is in Spanish; right?

2   A.   It is in Spanish.

3   Q.   How is your Spanish?

4   A.   I have no formal training in Spanish.

5   Q.   In fact, you can't read this document.  You had

6   Mr. Corey translate it for you; right?

7   A.   I did.

8   Q.   Mr. Corey is the Mattel lawyer that we spoke about

9   before; right?

10  A.   He is.

11  Q.   And you'll agree with me that 9897, the e-mail; 9898,

12  the contracts are not cited anywhere in your report; right?

13  A.   That is true.

14  Q.   And you'll agree with me that you did not rely on them

15  in reaching any of the numbers in your report?

16  A.   That is correct.

17           MR. COTE:  Thank you very much.  I don't have any

18  further questions.

19           THE WITNESS:  Thank you.

20           THE COURT:  Redirect?

21      (Pause.)

22           THE COURT:  Deborah, do you need a break?

23           Tell us what time you need to come back.

24      (Pause.)

25           THE COURT:  About 10 or 15 minutes, counsel.
```

140

```
 1          (At 10:41 p.m., proceedings were adjourned.)

 2

 3                          -oOo-

 4

 5                       CERTIFICATE

 6          I hereby certify that pursuant to Section 753,

 7   Title 28, United States Code, the foregoing is a true and

 8   correct transcript of the stenographically reported

 9   proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  March 1, 2011

14

15

16          _____

17                       Deborah D. Parker, Official Reporter

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*