QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc., and Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, and Mattel de Mexico, S.A. de C.V., a Mexico business entity,<br><br>Plaintiff,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S TRIAL BRIEF REGARDING USE OF REASONABLE ROYALTY ANALYSIS AS A METHOD TO APPORTION DEFENDANT'S PROFITS** |

**Preliminary Statement**

At the February 28, 2011 Daubert hearing regarding Mr. Wagner's damages testimony, MGA argued that Mr. Wagner wrongly used the Georgia-Pacific factors to segregate the profits MGA derived from the various trade secrets and works it is alleged to have misappropriated and infringed. Contrary to MGA's arguments, however, the authorities recognize that a reasonable royalty, measured by a Georgia-Pacific analysis, is "one measure of the approximate portion of the defendant's profits attributable to the use" of the trade secret. Restatement (Third) Unfair Competition § 45 cmt. f (1995); Vt. Microsystems, Inc. v. Autodesk, Inc., 138 F.3d 449, 450 (2d Cir. 1998). Accordingly, it is simply not a defect that Mr. Wagner used the Georgia-Pacific factors to segregate the profits MGA received from the various trade secrets it misappropriated. Georgia-Pacific is a time tested method; it is commonly applied to determine a defendant's profits from its infringement or use of a plaintiff's intellectual property; and it was reliably applied by Mr. Wagner to make just such a determination here.

Moreover, even if it was improper for Mr. Wagner to use Georgia-Pacific here (it was not), the result MGA seeks – exclusion of Mr. Wagner's unjust enrichment analysis in its entirety – is unjust. It is MGA's, not Mattel's, burden to apportion profits; Mattel's burden is at most to point to MGA's profits. If it was wrong of Mr. Wagner to use the Georgia-Pacific factors to apportion and segregate MGA's profits (it was not), the most that would follow is that Wagner's *apportionment* analysis suffers a defect. In no circumstance can Mr. Wagner be precluded from presenting to the jury the total, unapportioned profits that MGA earned from its misappropriation and infringement.

**Argument**

**I.   THE *GEORGIA-PACIFIC* FACTORS ARE RECOGNIZED AS A TOOL TO MEASURE PROFITS ATTRIBUTABLE TO WRONGDOING**

Mr. Wagner uses his Georgia-Pacific royalty analysis – a thorough, documented, well-established analysis to which Mr. Wagner dedicates more than 70 pages of his report – to determine the portion of MGA's profits attributable to the various trade secrets and

copyrighted works that MGA is alleged to have misappropriated. See Corrected Expert Report of Michael J. Wagner, dated November 12, 2010, at 57.[1] There is nothing unusual or unwarranted about that; in fact, experts commonly use royalty analyses to determine what portion of a defendant's profits were attributable to the plaintiff's intellectual property, and what portion was not.

Wagner's analysis starts with his royalty opinions. Using the time-tested Georgia-Pacific factors, Mr. Wagner determined that the appropriate reasonable royalty rate for all Mattel's Bratz-related trade secrets is 15%. See November 12, 2010 Report, Section IV. E at 57-100. This conclusion was reached following a standard, albeit thorough, Georgia-Pacific royalty analysis; Mr. Wagner determined a baseline royalty rate for each category of intellectual property and then adjusted the rate upward or downward (or not at all) according the weight of the individual factors. For example, Mr. Wagner determined the baseline royalty rate for all Bratz trade secrets after reviewing licenses produced by MGA and Mattel and determining that the CBS Consumer Products / MGA Merchandise Licensing Agreement is the most relevant license because the agreement covers property comparable to the Mattel intellectual property at issue here and covers licensed products comparable to those in the Bratz royalty base, and because the licensee in that agreement paid a royalty for property to be used in fashion dolls. Id. at 64. Mr. Wagner then dedicated nearly 40 pages of his report to an analysis adjusting the baseline royalty rate in view of the Georgia-Pacific factors. Id. at 64-100. Far from being arbitrary, this royalty analysis is based on a painstaking, highly-detailed analysis of the relevant data. In fact, MGA has not even challenged the reliability of Wagner's Georgia-Pacific royalty analysis.

Then, in an independent analysis that considered the same factors, Wagner determined that the appropriate reasonable royalty rate for Mattel's Bratz name trade secrets is 5%. Id. at 100-119. He reached this conclusion following the same extensive,

---

[1] Pursuant to the Court's request, Mr. Wagner's reports have been lodged with the (footnote continued)

and unchallenged, royalty analysis under Georgia-Pacific.

Arithmetic shows that the difference between the two (15% - 5% = 10%) is the percentage attributable to the non-name trade secrets. See Supplemental Expert Rebuttal Report of Michael J. Wagner, dated December 24, 2010, at 6. Accordingly, Mr. Wagner's royalty analysis leads to the conclusion that the non-name trade secrets (10%) had twice the value to MGA as the name trade secrets (5%). Id. This relationship may sound simple – one is double the other – but it is a function of a thorough Georgia-Pacific analysis applied by Mr. Wagner in a commonplace, accepted manner. Mr. Wagner also determined an appropriate copyright royalty using the Georgia-Pacific analysis.

Having conducted this extensive royalty analysis, which revealed a documented, empirical measure of the value to MGA of the various trade secrets it is alleged to have stolen, Mr. Wagner used this documented relationship to segregate MGA's overall profits as attributable to the different works that it misappropriated. Two-thirds of MGA's unjust enrichment is attributable to the non-name trade secrets, and one-third is attributable to the name trade secret. See Supplemental Expert Rebuttal Report, dated December 24, 2010, at 4-9. These are not random figures; they are the documented result of Wagner's extensive, reliable Georgia-Pacific analysis done to reach legitimate, admissible royalty opinions. Wagner had no obligation to blind himself to the relationships shown by his Georgia-Pacific royalty analyses; it was wholly proper to consider those relationships in assessing to what MGA's overall profits could be attributed, and Mr. Wagner recognized that a reasonable royalty analysis actually reflects the value of the infringement or use to the defendant: "[t]he value of the Mattel Trade Secrets Related to Bratz and Bratz Copyrights are reflected in the royalty rate analysis that I conduct below, in which I have weighed the value of the invention in accordance with the Georgia-Pacific factors." See Correct Expert Report, dated November 12, 2010, at 60.

Indeed, in upholding Mr. Wagner's application of the Georgia-Pacific factors in

---

Court. See Docket No. 10115.

determining an appropriate trade secret royalty rate, the court in <u>Veritas Operating Corp. v. Microsoft Corp.</u>, 2008 WL 7404617 (W.D. Wash. Feb. 26, 2008) noted that "a reasonable 'royalty measure has long been one of a number of calculations available to measure damages for trade secret misappropriation, particularly the value of the benefit received by a defendant who misappropriates trade secrets.'" <u>Id.</u> at *2 (citations omitted). The court in *Veritas* went on observe that Mr. Wagner's royalty analysis in that case was admissible *precisely because* it served as a measure of the defendant's unjust enrichment, holding "[t]he Court deems it appropriate in this case for Veritas to present expert testimony of the value of a reasonable royalty that approximates Microsoft's alleged unjust enrichment from its purported unauthorized use of Veritas' confidential information." <u>Id.</u>

In fact, the authorities converge in recognizing that a royalty analysis, which is traditionally done using the <u>Georgia-Pacific</u> factors,[2] is properly used to determine the portion of a defendant's profits attributable to the intellectual property it misappropriated. The Restatement explains that "*[t]he royalty that the plaintiff and defendant would have agreed to for the use of the trade secret made by the defendant may be one measure of the approximate portion of the defendant's profits attributable to the use*." <u>Restatement (Third) Unfair Competition</u> § 45 cmt. f (1995) (emphasis added); <u>Vt. Microsystems, Inc. v. Autodesk, Inc.</u>, 138 F.3d 449, 450 (2d Cir. 1998) (applying California law, and citing the language from comment f with approval); Douglas G. Smith, <u>Application of Patent Law Damages Analysis To Trade Secret Misappropriation Claims: Apportionment, Alternatives, And Other Common Limitations On Damages</u>, 25 SEATTLE U. L. REV. 821, 854 (2002) ("[A]s the Restatement acknowledges, royalty damages often represent an apportionment of the unjust enrichment received by the defendant through profits derived in part from the misappropriated technology.").

Consistent with the Restatement, courts approve use of the <u>Georgia-Pacific</u> factors to assess the portion of a defendant's profits attributable to the intellectual property at

---

[2] <u>See</u>, e.g., <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 232 F. Supp. 2d 182, 187 (S.D.N.Y. 2002) (footnote continued)

issue. For example, in <u>Coryn Group II, LLC v. O.C. Seacrets, Inc.</u>, 2010 WL 1375301, at *7-8 (D. Md. March 30, 2010), the defense expert addressed the profits attributable to the defendant's use of the plaintiff's "SECRETS" trademark; among other opinions, the report measured those profits by calculating the price defendant would have had to pay the plaintiff for the right to use the SECRETS mark (i.e., an "avoided royalty") based on the <u>Georgia-Pacific</u> factors. <u>Id.</u> at *7. The court rejected the plaintiff's challenge to that opinion, holding the expert's use of the <u>Georgia-Pacific</u> factors to assess unjust enrichment from the infringement was proper, and was not "an unreliable method of calculation." <u>Id.</u> at *8. Other cases are similar. <u>See</u>, <u>e.g.</u>, <u>Goldberg v. Medtronic, Inc.</u>, 686 F.2d 1219, 1224, 1229 (7th Cir. 1982) (affirming award of reasonable royalty of ten percent of defendant's profits, which represented an apportionment of the plaintiff's contribution to the development of the infringing product versus the efforts of the defendant to develop and market the product); <u>Ty Inc. v. Publ'ns Int'l, Ltd.</u>, 2004 WL 5025744, at *1, 6 (N.D. Ill. June 30, 2004) (approving use of a royalty analysis based on prior licenses to apportion profits in a copyright case "between those attributable to the [infringed] photos and those attributable to the [non-infringing] text," rejecting the plaintiff's challenge to the expert's methodology).[3]

The fact is that MGA has identified no defect in Mr. Wagner's <u>Georgia-Pacific</u> analysis that remotely renders it unreliable. It is a reliable method that has been employed for decades, and was reliably applied here to segregate MGA's profits attributable to the various works at issue. It would be error to exclude these opinions even if other courts had not approved the consideration of royalty analyses to segregate profits, which they

---

(discussing application of <u>Georgia-Pacific</u> factors to determine trade secret royalty).

[3] While the expert in <u>Ty</u> did not perform a full <u>Georgia-Pacific</u> analysis, he used relevant licenses as the basis for his apportionment opinion—which is a recognized <u>Georgia-Pacific</u> factor. <u>See</u> <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 232 F. Supp. 2d 182, 187 (S.D.N.Y. 2002) (listing "royalties received by the plaintiff for the licensing of the trade secrets to others, which may prove an established royalty" and "rates paid by the defendant for the use of other trade secrets comparable to the trade secret in suit" as the first two established <u>Georgia-Pacific</u> factors). Thus, the expert's analysis was less sophisticated than the full <u>Georgia-Pacific</u> analysis done by Mr. Wagner here, yet still was
(footnote continued)

have.

Rule 702 provides that expert testimony is admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. These criteria are fully met here. Wagner has conducted a well-established analysis (Georgia-Pacific) in a well-accepted context (royalty). His analysis is sound. That he has taken the conclusions that follow from that analysis and applied them to segregate profits is wholly proper. Indeed, that is far from novel, as shown, and even if it were that would not permit exclusion. See, e.g., Bonner v. ISP Techs., Inc., 259 F.3d 924, 929, 931 (8th Cir. 2001) (affirming admission of expert testimony notwithstanding that expert's opinion "may have been novel" where "nothing in the record [suggested] that it was the result of methodology so unreliable as to render its admission an abuse of discretion") (omitting internal quotations and citations); Hines v. Consol. Rail Corp., 926 F.2d 262, 274 (3d Cir. 1991) (expert's testimony admissible where "opinion could be considered to be 'novel'" but methods used to derive opinion "were not"); Potter ex rel. Potter v. Bowman, 2006 WL 3760267, at *3 (D. Colo. Dec. 18, 2006) (denying motion to exclude expert where "although plaintiffs couch their objections in the language of Daubert and its progeny, their complaint boils down to an argument that Dr. Sandmire's and the other defense experts' opinions should be excluded because they are 'novel.' . . . This standard, commonly known as the Frye test . . . is no longer the sole touchstone of admissibility under Fed. R. Evid. 702. If the reliability and relevance requirements of Rule 702 are otherwise satisfied, the expert's opinion is admissible regardless of its novelty *vel non*.").

## II. MR. WAGNER SHOULD BE ALLOWED TO PRESENT HIS OPINIONS ON MGA'S TOTAL PROFITS REGARDLESS OF THESE ISSUES

It is MGA's, not Mattel's, burden to apportion profits. Mr. Wagner should not be precluded from presenting an unapportioned total profit number for trade secret and admitted.

copyright infringement even if his apportionment opinions were to be excluded. MGA may then present its own apportionment analysis, as it is required under the law to do.

It is established that, under copyright law, Mattel need only present MGA's gross revenue for infringement and then the burden shifts to MGA to prove which portion of its revenue is attributable to factors other than the infringement. See 17 U.S.C. § 504(b) ("In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work"); Three Boys Music Corp. v. Bolton, 212 F.3d 477, 487 (9th Cir. 2000) (copyright owner is required to present proof "only of the infringer's gross revenue, and the infringer is required to prove . . . deductible expenses" and "what percentage of their profits" were not attributable to copying the infringed work).

Likewise, as MGA itself has acknowledged, the burden is on the *defendant* to apportion trade secret profits. See MGA's Opposition to Mattel's Daubert Motion No. 2 at 11-12 ("the burden of apportioning profits falls upon the party accused of trade secret misappropriation."); see also Cartel Asset Mgmt. v. Ocwen Fin. Corp., 249 F. App'x 63, 73, 76-79, 87 (10th Cir. 2007) (in trade secret misappropriation actions, the "plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.") (quoting Restatement (Third) Unfair Competition § 45 cmt. f (1995)); Petters v. Williamson & Assocs., Inc., 151 Wash. App. 154, 164-165 (2009) (noting that the Restatement approach "places on the party in possession of the relevant information-the defendant-the burden of demonstrating which portion, if any, of the revenue obtained through the transfer of a trade secret was not, in fact, attributable to the transfer," and has been "widely adopted in jurisdictions applying the model act").

Mr. Wagner has proffered opinions on MGA's total profits from its wrongdoing. See Corrected Expert Report of Michael J. Wagner, dated November 12, 2010 at 13-23

(calculating MGA's incremental profits relating to the sale, distribution and licensing of Bratz products through December 31, 2010 by calculating revenues and subtracting various costs); Second Supplemental Expert Report of Michael J. Wagner, dated February 7, 2011 at 4-18 (determining Bratz profitability against various industry benchmarks and concluding that amount above these benchmarks constitutes MGA's unjust enrichment, prior to any apportionment to particular trade secrets). He has also proffered opinions that apportion those profits, including apportionment for 1) the first generation Jade, Cloe, Sasha, and Yasmin dolls plus Ooh La La Cloe and Formal Funk Dana,[4] and 2) all Core Fashion Dolls using the Bratz sculpt.[5] Even if his apportionment opinions were to be excluded, his profits opinions are admissible.

## Conclusion

Mr. Wagner's use of the Georgia-Pacific factors is consistent with authority holding that a royalty analysis is a proper method of apportioning a defendant's unjust enrichment. The question whether or not he correctly applied these factors goes to "the weight of his testimony and report, not their admissibility." Seacrets, 2010 WL 1375301, at *8. Mattel is entitled to have the jury hear Mr. Wagner's unjust enrichment opinions, and respectfully requests that Court allow him to present them.

DATED: March 3, 2011

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Michael T. Zeller
Michael T. Zeller
Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

---

[4] Second Supplemental Expert Report, Dated February 7, 2011, at 4.
[5] Second Supplemental Expert Report, Dated February 7, 2011, at 6.