Case 2:04-cv-09049-DOC-RNB  Document 10120  Filed 03/03/11  Page 1 of 151  Page ID #:305815
CV 04-9049 DOC - 3/1/2011 - Day 25, Volume 1 of 3

1

1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5

    MATTEL, INC., et al.,              )
6                                      )
                Plaintiffs,            )
7                                      )
        vs.                            ) No. CV 04-9049 DOC
8                                      )    Day 25
    MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                      )
                                       )
10              Defendants.            )
    _____)
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17            Tuesday, March 1, 2011

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141
24

25  04cv9049 Mattel 2011-03-01 D25V1

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3
               QUINN EMANUEL URQUHART & SULLIVAN
4              BY:  JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6              865 South Figueroa Street
               10th Floor
7              Los Angeles, California 90017
               (213) 443-3000

8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700

20             - AND -

21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 3 of 151   Page ID #:305817
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
          LAW OFFICES OF MARK E. OVERLAND
5         By:  MARK E. OVERLAND
               Attorney at Law
6         100 Wilshire Boulevard
          Suite 950
7         Santa Monica, California 90401
          (310) 459-2830
8
          - AND -
9
          SCHEPER KIM & HARRIS LLP
10        BY:  ALEXANDER H. COTE
               Attorney at Law
11        601 West 5th Street
          12th Floor
12        Los Angeles, California 90071
          (213) 613-4660
13

14   ALSO PRESENT:

15        MGA ENTERTAINMENT, INC.
          BY:  JEANINE PISONI
16             Attorney at Law
          16360 Roscoe Boulevard
17        Suite 105
          Van Nuys, California 91406
18

19        ISAAC LARIAN, MGA CEO

20        KEN KOTARSKI, Mattel Technical Operator

21        MIKE STOVALL, MGA Technical Operator

22        RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 4 of 151   Page ID #:305818
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

4

1                               **I N D E X**

2   **WITNESSES                    DIRECT  CROSS  REDIRECT  RECROSS**

3   OWENS, Laura

4   By Mr. Zeller                    16            98

5   By Ms. Keller                          44              109

6

7   ECKERT, Robert A.

8   By Mr. Quinn                    114

9

10

11                              **EXHIBITS**

12  **EXHIBIT NO.                   IDENTIFICATION    IN EVIDENCE**

13      7192      Trac form for                         64
                  Mr. Castilla
14
        13614     Mattel inventions                     119
15                agreement signed by
                  Mr. Eckert
16
        20474     Document indicating                   29
17                cubes in IDW system

18      24032-1   Picture depicting Barbie              127
                  over 50 years
19
        24032-5   Picture of Barbie in                  128
20                various careers

21      24041     Monster High Draculaura               142

22      24050     Monster High Frankie                  142
                  Stein
23
        24053     Monster High Cleo De                  142
24                Nile

25

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

5

**EXHIBITS** (Continued)

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 24065 | Monster High Clawdeen Wolf | 143 |
| 24068 | Draculaura jewelry box | 145 |
| 24069 | Terrifying Tattoo Roller | 146 |
| 24116 | Fashion Fever Barbie vanity | 129 |
| 24118 | Fashion Fever Girls Allowed Barbie doll | 129 |
| 24119 | Fashion Fever Girls Allowed Barbie doll | 131 |
| 24121 | Fashionista Barbie doll | 131 |
| 24122 | Fashion Fever Barbie doll | 131 |
| 24123 | Barbie Fashion Fever Rockin' Guitar Chair | 132 |

Case 2:04-cv-09049-DOC-RNB  Document 10120  Filed 03/03/11  Page 6 of 151  Page ID #:305820
CV 04-9049 DOC - 3/1/2011 - Day 25, Volume 1 of 3

6

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 1, 2011**            |
|       | 2  | **Day 25, Volume I**                                         |
|       | 3  | (8:31 a.m.)                                                  |
| 08:24 | 4  | *(Outside the presence of the jury.)*                       |
| 08:31 | 5  | THE COURT:  We're on the record.  All counsel are           |
| 08:31 | 6  | present.  The jury is not present.                          |
| 08:31 | 7  | The witness is present.                                      |
| 08:31 | 8  | Concerning the 32(a)3 request by MGA, counsel               |
| 08:31 | 9  | informed the Court informally that they're going to withdraw |
| 08:32 | 10 | that request.                                                |
| 08:32 | 11 | Is that correct, Mr. McConville?                            |
| 08:32 | 12 | MR. McCONVILLE:  Yes, sir.                                   |
| 08:32 | 13 | THE COURT:  All right.  That's withdrawn.                   |
| 08:32 | 14 | I think it's an effort by all counsel, and the              |
| 08:32 | 15 | Court is really complimenting all counsel.                  |
| 08:32 | 16 | This case would have proceeded, quite frankly,              |
| 08:32 | 17 | when this Court got the case in a posture of witnesses not   |
| 08:32 | 18 | appearing, reluctant witnesses not responding for both      |
| 08:32 | 19 | sides.                                                       |
| 08:32 | 20 | A series of depositions would have been presented,          |
| 08:32 | 21 | snippets that each side saw to its advantage, and the jurors |
| 08:32 | 22 | would have been deprived of any ability to see the          |
| 08:32 | 23 | witnesses, or many of the witnesses in this case.           |
| 08:32 | 24 | And therefore, through the efforts of counsel for           |
| 08:32 | 25 | both MGA, Mr. Machado's counsel, and Mattel's counsel, I     |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:32 | 1 | think they've been exemplary in heeding this Court's warning |
| 08:32 | 2 | that it would be minimal, if no depositional testimony |
| 08:33 | 3 | allowed, giving the adversary process a chance to work. |
| 08:33 | 4 | The second continuing debate and discussion is |
| 08:33 | 5 | over the intervention versus the request by MGA to include |
| 08:33 | 6 | the paragraph that Judge Manella originally signed off on. |
| 08:33 | 7 | Mattel is allowed to simply state in a stipulation |
| 08:33 | 8 | permitting MGA to intervene as a party to this action that |
| 08:33 | 9 | MGA Entertainment intervened in the *Mattel v. Bryant* case, |
| 08:33 | 10 | Number 04-9059 on December 8, 2004. |
| 08:33 | 11 | MR. QUINN: And, Your Honor, may we read the |
| 08:34 | 12 | balance of that chronology; when the claims were filed, who |
| 08:34 | 13 | sued who when? |
| 08:34 | 14 | THE COURT: I was waiting for a stipulation. |
| 08:34 | 15 | MR. QUINN: Right. |
| 08:34 | 16 | THE COURT: That's been submitted to the Court. |
| 08:34 | 17 | You've received no response from MGA. Mr. McConville is |
| 08:34 | 18 | looking at that now. |
| 08:34 | 19 | MR. QUINN: All right. |
| 08:34 | 20 | THE COURT: But that's going to go on before |
| 08:34 | 21 | Mr. Larian, and if there's no response, simply get me |
| 08:34 | 22 | another copy. |
| 08:34 | 23 | MR. QUINN: All right. Before Mr. Eckert? |
| 08:34 | 24 | THE COURT: Before Mr. Eckert, I'm sorry. |
| 08:34 | 25 | Third, I want to hear the *Georgia-Pacific* issues |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:34 | 1 | again this evening and have apportionment once again |
| 08:34 | 2 | explained to the Court.  I'm inclined not to give the |
| 08:34 | 3 | *Georgia-Pacific* factors.  The struggle really here is a |
| 08:34 | 4 | struggle between counsel to have the Court validate those |
| 08:34 | 5 | factors, but we'll discuss that again this evening.  I'm |
| 08:34 | 6 | putting everybody on fair notice:  I don't believe the |
| 08:34 | 7 | *Georgia-Pacific* factors apply to this analysis. |
| 08:34 | 8 | But, on the other hand, I think the expert |
| 08:34 | 9 | tentatively has the ability to discuss lost profits.  I |
| 08:35 | 10 | think if apportionment is explained more fully to the Court |
| 08:35 | 11 | and I finally have an understanding of it, he may be able to |
| 08:35 | 12 | talk about certain factors that he relied upon.  But I don't |
| 08:35 | 13 | want the sanctity of the Georgia-Pacific factors coming |
| 08:35 | 14 | before the jury as an accepted standard.  They don't appear |
| 08:35 | 15 | to be in this particular area. |
| 08:35 | 16 | But I think MGA would be the first one that would |
| 08:35 | 17 | appreciate apportionment, especially in trade secret |
| 08:35 | 18 | misappropriation and a reduction, regardless of the |
| 08:35 | 19 | methodology, but I want to hear the methodology once again, |
| 08:35 | 20 | and hear from him again this evening. |
| 08:35 | 21 | Concerning Mr. Holden, I would like to have that |
| 08:35 | 22 | gentleman back this evening, and my apologies for not |
| 08:35 | 23 | getting to him last evening.  The court reporter gave out |
| 08:35 | 24 | about 10:30 in the evening, which means we should have |
| 08:35 | 25 | staffed it with two court reporters last evening. |

9

| | | |
|---|---|---|
| 08:35 | 1 | Next, Monster High.  I view Monster High as |
| 08:36 | 2 | relevant information.  The jury can consider, through |
| 08:36 | 3 | Mr. Eckert's testimony, the following.  And that is, |
| 08:36 | 4 | intellectual property, even if not used as MGA asserts, can |
| 08:36 | 5 | still be relevant; it can still be valuable.  It can be |
| 08:36 | 6 | pulled off the shelf literally at any moment, whether it's |
| 08:36 | 7 | days or years.  I can't imagine a concept like Mickey Mouse |
| 08:36 | 8 | or Donald Duck that would have stood on a shelf at Disney |
| 08:36 | 9 | for years and then not being able to be brought out 5, 10, |
| 08:36 | 10 | 15, literally 20 years later as long as that was kept in a |
| 08:36 | 11 | confidential mode with appropriate security and safeguards. |
| 08:36 | 12 | But informally speaking to Mr. McConville and |
| 08:36 | 13 | Mr. Quinn this morning, it's my understanding that there |
| 08:36 | 14 | will be four dolls displayed.  It gives Mr. Eckert a chance |
| 08:36 | 15 | to explain that his company does have trade secrets that |
| 08:36 | 16 | they jealously guard, whether it's to be used or not.  By |
| 08:37 | 17 | the same token, MGA can come back and assert that this is |
| 08:37 | 18 | nothing more than copying by Monster High and Mattel |
| 08:37 | 19 | responding to the Bratz doll. |
| 08:37 | 20 | Now, Ms. Keller, I saw you grab the microphone. |
| 08:37 | 21 | MS. KELLER:  Your Honor, we are at a horrible |
| 08:37 | 22 | handicap if that's allowed, because Mattel moved and the |
| 08:37 | 23 | Court granted Mattel's motion to preclude us from any |
| 08:37 | 24 | discovery into Monster High. |
| 08:37 | 25 | We don't have any information about how it was |

| | | |
|---|---|---|
| 08:37 | 1 | developed, when it was developed, how long it, quote, sat on |
| 08:37 | 2 | the shelf.  We don't have anything to cross-examine |
| 08:37 | 3 | Mr. Eckert with on that topic.  So he could literally get up |
| 08:37 | 4 | and say anything he wants, and I have no way to effectively |
| 08:37 | 5 | challenge that. |
| 08:37 | 6 | And that was at Mattel's request.  Mattel said |
| 08:37 | 7 | they didn't want to use Monster High; weren't gonna use |
| 08:37 | 8 | Monster High, and we should not be permitted to ask anything |
| 08:38 | 9 | about Monster High.  And we never have been.  And to allow |
| 08:38 | 10 | now after they have effectively barred us from getting into |
| 08:38 | 11 | it by asserting that they would never use it, is really |
| 08:38 | 12 | unfair to us. |
| 08:38 | 13 | THE COURT:  I think we'll rectify that as best we |
| 08:38 | 14 | can.  It is relevant.  It's relevant to the lawsuit.  I |
| 08:38 | 15 | don't know why Mattel resisted that.  But, um, I do know |
| 08:38 | 16 | that we're going to rectify that.  Mr. Eckert will be |
| 08:38 | 17 | spending the weekend with us in all likelihood and some of |
| 08:38 | 18 | the evenings from now on also. |
| 08:38 | 19 | MR. McCONVILLE:  Your Honor, could he be precluded |
| 08:38 | 20 | from going into it until we have adequate discovery on |
| 08:38 | 21 | Monster High and all the documents on Monster High and a |
| 08:38 | 22 | chance to depose him on Monster High? |
| 08:38 | 23 | MR. QUINN:  Your Honor, he was -- maybe it's |
| 08:38 | 24 | because Mrs. Keller hasn't been involved in the case. |
| 08:38 | 25 | Mr. Eckert, I'll represent to the Court, was questioned |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

11

08:38   1   about Monster High.  I read all his depositions.

08:39   2           And then, Your Honor, they introduced it in this

08:39   3   trial.  With Mrs. Martinez on the stand, they put up the

08:39   4   slide -- I think it's Exhibit 40000, which is in evidence,

08:39   5   of the Monster High figures.

08:39   6           THE COURT:  But their claim is it was for a

08:39   7   limited purpose.

08:39   8           MS. KELLER:  We were allowed one --

08:39   9           MR. QUINN:  Yes, but they questioned Mr. Eckert

08:39   10  and other people about Monster High.  We don't propose to do

08:39   11  an extensive exegesis.

08:39   12          THE COURT:  What's an exegesis?

08:39   13          MR. QUINN:  It's like explanation or, you know,

08:39   14  narrative.

08:39   15          THE COURT:  You must have gone to a private

08:39   16  school.

08:39   17          MR. QUINN:  No.  I went to a public school in

08:39   18  Bountiful, Utah, Your Honor.  Viewmont High School.

08:39   19          They did get discovery on Monster High.  I can

08:39   20  show the Court where Mr. Eckert was examined about Monster

08:39   21  High in his deposition.

08:40   22          THE COURT:  Well, it was represented to me in the

08:40   23  documents by Mattel that he had been represented

08:40   24  or -- strike that -- deposed.

08:40   25          MR. QUINN:  It's true.

08:40   1          MS. KELLER:  We were not allowed to get into the

08:40   2   development of Monster High, which is exactly what the

08:40   3   questions are gonna be here.  We were only allowed to get

08:40   4   into it for one very, very limited area.

08:40   5          MR. QUINN:  There was no restriction on the

08:40   6   discovery they could take on Monster High, Your Honor.

08:40   7   Frankly, the examination on that is gonna be very brief.

08:40   8          It's the idea of two Mattel employees -- you know,

08:40   9   it's the beginning of a brand, and we're gonna put some of

08:40  10   the tangibles in evidence.

08:40  11          MS. KELLER:  I would just ask that -- Your Honor,

08:40  12   we'd like to get you the information.  I'd like to pull the

08:40  13   motions, the rulings, and the depo pages and show you

08:40  14   exactly what we were and were not allowed to ask, because I

08:40  15   think this is an important area.  And we've been handcuffed

08:40  16   because we were not allowed to inquire -- to ask about the

08:41  17   development of Monster High.  And that's what they want to

08:41  18   offer it for.

08:41  19          MR. QUINN:  Well, actually, that's not true,

08:41  20   Your Honor.  But...

08:41  21          MS. KELLER:  Well, if it's not true, then I'll be

08:41  22   shown to be wrong, but I'd ask that the Court allow us to

08:41  23   give that information to the Court before any Monster High

08:41  24   material is introduced.

08:41  25          THE COURT:  No.  I'm gonna allow the testimony on

08:41  1   direct examination.  If you feel you're prejudiced, you'll

08:41  2   continue to make the record.  Mr. Eckert's going to be with

08:41  3   us from now on for a substantial period of time.  He's going

08:41  4   to be inconvenienced now.  And he can sit around at night

08:41  5   and go through depositions, et cetera, just like Mr. Larian

08:41  6   was inconvenienced.

08:41  7          So we'll get you that information probably

08:41  8   starting tonight.  And maybe Mr. Eckert will be back, but

08:41  9   you wouldn't be disadvantaged in terms of your examination.

08:41  10          I want to hear the direct and how aggressive

08:41  11  Mattel is, quite frankly, in this area.  It's represented to

08:41  12  me you've got four dolls in this area.

08:41  13          MR. QUINN:  Four dolls, two accessories, and a

08:41  14  commercial.

08:41  15          THE COURT:  And the development is minimal.  The

08:41  16  only point you're trying to show is if it's got intellectual

08:42  17  property, it's of value, et cetera.

08:42  18          MR. QUINN:  Yes.

08:42  19          THE COURT:  Then you can make a more specific

08:42  20  record, Ms. Keller, in this matter.

08:42  21          MS. KELLER:  Your Honor, we filed a brief on this

08:42  22  yesterday.

08:42  23          THE COURT:  That's nice.  I was here yesterday.

08:42  24          MS. KELLER:  Well, the -- we've laid it all out,

08:42  25  Your Honor; it's very short.  It has references to the

| | | |
|---|---|---|
| 08:42 | 1 | docket. |
| 08:42 | 2 | THE COURT:  Just a moment. |
| 08:42 | 3 | I've read that.  I'll show you exactly what I've |
| 08:42 | 4 | read and make a record of it in just a moment. |
| 08:42 | 5 | Okay.  I've read Mattel's opposition to MGA's |
| 08:42 | 6 | Motion in Limine No. 47.  It's got a -- filed on 2/24, five |
| 08:42 | 7 | pages. |
| 08:42 | 8 | I've read Ms. Hurst's filing on February 27th, six |
| 08:42 | 9 | pages. |
| 08:42 | 10 | MGA's reply in support of MGA's motion to -- |
| 08:43 | 11 | in limine No. 47, to exclude Monster High exhibits of |
| 08:43 | 12 | Mattel.  And I read also the February 22nd filing. |
| 08:43 | 13 | Was there another filing? |
| 08:43 | 14 | MS. KELLER:  That's the one, Your Honor. |
| 08:43 | 15 | THE COURT:  Now, have I read everything?  If |
| 08:43 | 16 | not -- |
| 08:43 | 17 | MS. KELLER:  No, I think the Court has read |
| 08:43 | 18 | everything. |
| 08:43 | 19 | THE COURT:  Well, thank you. |
| 08:43 | 20 | So if it was filed yesterday -- what's today? |
| 08:43 | 21 | MR. McCONVILLE:  Actually, two days ago. |
| 08:43 | 22 | MS. KELLER:  Two days ago, sorry. |
| 08:43 | 23 | THE COURT:  I was here yesterday, remember?  And I |
| 08:43 | 24 | was here the day before. |
| 08:43 | 25 | I missed you on Saturday 'cause I gave you all |

| | | |
|---|---|---|
| 08:43 | 1 | grace, which was a mistake. |
| 08:43 | 2 | So if I haven't read something, tell me what I |
| 08:43 | 3 | haven't read. |
| 08:43 | 4 | MS. KELLER:  No, I think you've got it all, |
| 08:43 | 5 | Your Honor. |
| 08:43 | 6 | THE COURT:  Read the whole thing now. |
| 08:43 | 7 | All right.  Get the jury. |
| 08:44 | 8 | *(In the presence of the jury.)* |
| 08:44 | 9 | THE COURT:  Good morning.  How is my favorite jury |
| 08:44 | 10 | doing? |
| 08:44 | 11 | It's good to see all of you.  At my age, it's good |
| 08:44 | 12 | to see anybody. |
| 08:44 | 13 | First of all, I hope you had a wonderful weekend. |
| 08:44 | 14 | And we're very pleased to see all of you back. |
| 08:44 | 15 | All right.  We're back in session.  The jury is |
| 08:44 | 16 | present.  The parties are present.  The witness, Ms. Owens |
| 08:44 | 17 | is present. |
| 08:44 | 18 | THE WITNESS:  Yes. |
| 08:44 | 19 | THE COURT:  And this is continued direct |
| 08:44 | 20 | examination by Mr. Zeller. |
| 08:44 | 21 | MR. ZELLER:  Thank you, Your Honor. |
| 08:44 | 22 | **LAURA OWENS, MATTEL'S WITNESS, PREVIOUSLY SWORN** |
| 08:44 | 23 | **RESUMED THE STAND** |
| | 24 | |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 16 of 151   Page ID #:305830
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

16

| | | |
|---|---|---|
| 08:44 | 1 | **DIRECT EXAMINATION (Resumed)** |
| 08:44 | 2 | BY MR. ZELLER: |
| 08:44 | 3 | Q.   Good morning, Ms. Owens. |
| 08:44 | 4 | A.   Good morning. |
| 08:44 | 5 | Q.   On Friday we were talking about certain documents that |
| 08:44 | 6 | Mr. Jorge Castilla had taken from Mattel upon his departure |
| 08:44 | 7 | to MGA? |
| 08:44 | 8 | A.   Correct. |
| 08:44 | 9 | Q.   And if you could take a look at Exhibit 24172. |
| 08:45 | 10 | *(Document provided to the witness.)* |
| 08:45 | 11 | BY MR. ZELLER: |
| 08:45 | 12 | Q.   Do you recognize what this document is? |
| 08:45 | 13 | A.   Yes. |
| 08:45 | 14 | Q.   And what's this? |
| 08:45 | 15 | A.   This shows the documents taken by Mr. Castilla relating |
| 08:45 | 16 | to the original sales-planning process, and then the |
| 08:45 | 17 | documents relating to the Manugistics pilot project. |
| 08:45 | 18 | MR. ZELLER:  Your Honor, this is the demonstrative |
| 08:45 | 19 | that we discussed, so I would like to display it to the |
| 08:45 | 20 | jury. |
| 08:45 | 21 | THE COURT:  You may display it, but it won't be |
| 08:45 | 22 | received. |
| 08:45 | 23 | MR. ZELLER:  Thank you, Your Honor. |
| 08:45 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| 08:45 | 1 | BY MR. ZELLER: |
|---|---|---|
| 08:45 | 2 | Q.   So is this exhibit -- this demonstrative is a summary |
| 08:45 | 3 | of the references to documents that Mr. Castilla took and |
| 08:45 | 4 | what they relate to, generally speaking, such as the |
| 08:46 | 5 | original sales planning project? |
| 08:46 | 6 | A.   In the Manugistics and all the other documents on the |
| 08:46 | 7 | subsequent pages. |
| 08:46 | 8 | Q.   On the first category we have here on the first page |
| 08:46 | 9 | are the documents relating to the original sales planning |
| 08:46 | 10 | process, and those are the user guides and the manuals |
| 08:46 | 11 | related to the system that we discussed? |
| 08:46 | 12 | A.   Correct. |
| 08:46 | 13 | Q.   And are those user guides something that's proprietary |
| 08:46 | 14 | or trade secret to Mattel? |
| 08:46 | 15 | A.   Yes. |
| 08:46 | 16 | Q.   And if you could please tell us why that is. |
| 08:46 | 17 | A.   Well, these are the data elements that we use in our |
| 08:46 | 18 | sales planning tool.  It's got the screen shots, the |
| 08:46 | 19 | functionality, the overview of how the system works.  And |
| 08:46 | 20 | it's got -- these four documents, they each have like 50 to |
| 08:46 | 21 | a hundred pages each really detailing what's in the system. |
| 08:46 | 22 | Q.   And are these documents, in your view -- they would be |
| 08:47 | 23 | potentially helpful to a competitor of Mattel to have? |
| 08:47 | 24 | A.   It's possible, yes. |
| 08:47 | 25 | Q.   And why is that? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

18

| | | |
|---|---|---|
| 08:47 | 1 | A.   Well, if you're -- um, if you're in the toy industry or |
| 08:47 | 2 | any other industry and you wanted to know what -- how to |
| 08:47 | 3 | look at things to make better decisions about forecasting, |
| 08:47 | 4 | it helps you understand what was important to us.  And we |
| 08:47 | 5 | spent a lot of time figuring that out. |
| 08:47 | 6 | Q.   I guess one way I'm trying to ask this is, is this |
| 08:47 | 7 | something a competitor could actually use in some way to |
| 08:47 | 8 | design or enhance their own systems? |
| 08:47 | 9 | MS. KELLER:  Objection.  Calls for speculation and |
| 08:47 | 10 | assumes facts not in evidence. |
| 08:47 | 11 | THE COURT:  Sustained in its present form, |
| 08:47 | 12 | Counsel. |
| 08:47 | 13 | She said possibly, so it's a little confusing |
| 08:47 | 14 | whether this is really of value or not. |
| 08:47 | 15 | BY MR. ZELLER: |
| 08:47 | 16 | Q.   All right.  That's why I'm trying to clear it up. |
| 08:47 | 17 | So let me try it this way.  In your view, based on what |
| 08:47 | 18 | you know about these documents and the toy industry, do you |
| 08:48 | 19 | believe that this information, these user manuals and the |
| 08:48 | 20 | like, are -- would be helpful to a competitor in designing |
| 08:48 | 21 | or enhancing the competitor's own system? |
| 08:48 | 22 | A.   Yes.  Yes, I think they could be. |
| 08:48 | 23 | Q.   And if you could explain how that is. |
| 08:48 | 24 | A.   Um, well, it's got different data elements.  It's |
| 08:48 | 25 | showing how we're organizing them on the screen to look at |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

19

| | | |
|---|---|---|
| 08:48 | 1 | them.  It's got the way we analyze it.  It shows that you |
| 08:48 | 2 | can look at it by account.  You can look at it by company. |
| 08:48 | 3 | And you can -- and how you can look at it by allocation.  It |
| 08:48 | 4 | has a lot of different details that if I was a competitor |
| 08:48 | 5 | and I had access to that, I would try to learn from it. |
| 08:48 | 6 | Q.   If we can take a look at Exhibit 7243. |
| 08:48 | 7 | *(Document provided to the witness.)* |
| 08:49 | 8 | MR. ZELLER:  And this is in evidence. |
| 08:49 | 9 | *(Document displayed.)* |
| 08:49 | 10 | BY MR. ZELLER: |
| 08:49 | 11 | Q.   And this is something called the "ISIS Sales Planning |
| 08:49 | 12 | User Guide"? |
| 08:49 | 13 | A.   Yes. |
| 08:49 | 14 | Q.   And what is -- what does this document, uh, concern? |
| 08:49 | 15 | A.   This is basically the user guides and the instruction |
| 08:49 | 16 | manuals of how to use our original sales planning |
| 08:49 | 17 | functionality and our ISIS system. |
| 08:49 | 18 | Q.   If we can take a look at dash three of this exhibit. |
| 08:49 | 19 | *(Document displayed.)* |
| 08:49 | 20 | BY MR. ZELLER: |
| 08:49 | 21 | Q.   And what's this show? |
| 08:49 | 22 | A.   This is a pretty high-level overview, and it depicts |
| 08:49 | 23 | the ISIS sales planning, how it works, how things are |
| 08:49 | 24 | integrated together. |
| 08:49 | 25 | Q.   And is this kind of information helpful for a |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:49 | 1 | competitor to have? |
| 08:49 | 2 | A.   I would think so, 'cause it tells you the different |
| 08:50 | 3 | types of things that we're looking at and how they interact |
| 08:50 | 4 | and the inputs and the outputs. |
| 08:50 | 5 | Q.   This looks like it's, I mean, fairly high-level |
| 08:50 | 6 | information.  I mean, this is an overview of the system? |
| 08:50 | 7 | A.   Yeah, this is an overview, but then, you know, |
| 08:50 | 8 | following behind it are specific data elements, screen |
| 08:50 | 9 | shots, just the whole thing of how to use it. |
| 08:50 | 10 | Q.   And then another category of documents that are shown |
| 08:50 | 11 | here, and we talked about -- this is back on Exhibit 24172. |
| 08:50 | 12 | MR. ZELLER:  Pull that up Ken, please. |
| 08:50 | 13 | *(Document displayed.)* |
| 08:50 | 14 | BY MR. ZELLER: |
| 08:50 | 15 | Q.   This next category is about the Manugistics pilot |
| 08:50 | 16 | project? |
| 08:50 | 17 | A.   Correct. |
| 08:50 | 18 | Q.   And we had talked about that on Friday.  If we can take |
| 08:50 | 19 | a look at one of these documents, this is 23699. |
| 08:50 | 20 | *(Document provided to the witness.)* |
| 08:51 | 21 | MR. ZELLER:  And this is in evidence. |
| 08:51 | 22 | *(Document displayed.)* |
| 08:51 | 23 | BY MR. ZELLER: |
| 08:51 | 24 | Q.   And this is the process review kickoff document? |
| 08:51 | 25 | A.   Yes, it is. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

21

| | | |
|---|---|---|
| 08:51 | 1 | Q.   And if we can look at page 30, which is dash 30 of |
| 08:51 | 2 | Exhibit 23699. |
| 08:51 | 3 | *(Document displayed.)* |
| 08:51 | 4 | BY MR. ZELLER: |
| 08:51 | 5 | Q.   This is another kind of flow chart? |
| 08:51 | 6 | A.   Yes, it is. |
| 08:51 | 7 | Q.   And what does this show? |
| 08:51 | 8 | A.   This shows the type of -- this is just one of 30 pages. |
| 08:51 | 9 | But it was showing the process of how we would go about new |
| 08:51 | 10 | item forecasting variables.  So if you read it, it has the |
| 08:51 | 11 | inputs, who provides the inputs, the functional flow by what |
| 08:51 | 12 | department of what things are being done along the |
| 08:51 | 13 | timeframe, and what the outputs are. |
| 08:51 | 14 | Q.   And are there other pages like this in this |
| 08:51 | 15 | presentation? |
| 08:52 | 16 | A.   Yeah.  As I said, there's about 30 pages like this at |
| 08:52 | 17 | this level of granularity. |
| 08:52 | 18 | Q.   And is this the kind of information that you would want |
| 08:52 | 19 | a competitor to have? |
| 08:52 | 20 | A.   No. |
| 08:52 | 21 | Q.   And why is that? |
| 08:52 | 22 | A.   Because it gives them a road map of how to structure |
| 08:52 | 23 | things in a very detailed way.  The inputs, the outputs, the |
| 08:52 | 24 | organizational structure, and just the overall process. |
| 08:52 | 25 | Q.   I think previously we talked a bit about how the |

| | | |
|---|---|---|
| 08:52 | 1 | Manugistics system is a third-party system that Mattel and |
| 08:52 | 2 | others can go and actually buy from a vendor? |
| 08:52 | 3 | A.   Correct. |
| 08:52 | 4 | Q.   And given that, were these documents that we're |
| 08:52 | 5 | discussing concerning the Manugistics pilot project still |
| 08:52 | 6 | something that's proprietary to Mattel? |
| 08:52 | 7 | A.   Yes. |
| 08:52 | 8 | Q.   And how is that? |
| 08:52 | 9 | A.   Well, you can buy the Manugistics software, which is a |
| 08:52 | 10 | piece of software, but you have to develop processes, |
| 08:53 | 11 | internal processes, about how you're gonna use it and how |
| 08:53 | 12 | you're gonna configure it.  And the processes of the people, |
| 08:53 | 13 | the inputs and outputs, along with the software, is -- is |
| 08:53 | 14 | not something you just buy off the shelf. |
| 08:53 | 15 | You have to go develop that. |
| 08:53 | 16 | Q.   Did Mattel do something with that base system that it |
| 08:53 | 17 | obtained or licensed from Manugistics? |
| 08:53 | 18 | A.   I mean, we had a Manugistics pilot, where we tried to |
| 08:53 | 19 | do statistical forecasting many different ways, and then |
| 08:53 | 20 | also worked on our processes.  At the end of the day, we |
| 08:53 | 21 | didn't install Manugistics, but a lot of the learning about |
| 08:53 | 22 | process and other data elements and functionality we used in |
| 08:53 | 23 | our own system. |
| 08:53 | 24 | Q.   Regardless of whether the system was actually |
| 08:53 | 25 | implemented -- |

23

| | | |
|---|---|---|
| 08:53 | 1 | A.   Uh-huh. |
| 08:53 | 2 | Q.   -- in terms of what it is that Mattel actually did with |
| 08:53 | 3 | that base system, did Mattel take steps and otherwise make |
| 08:54 | 4 | efforts to configure that system in a specific way for |
| 08:54 | 5 | Mattel? |
| 08:54 | 6 | A.   Yes. |
| 08:54 | 7 | Q.   And if you could please tell us, generally speaking, |
| 08:54 | 8 | how was that done? |
| 08:54 | 9 | A.   Well, you can use different naming conventions.  You |
| 08:54 | 10 | can -- you can have different work flows in it in a certain |
| 08:54 | 11 | way.  Definitions, various things like that. |
| 08:54 | 12 | Q.   Was the Manugistics system that Mattel configured |
| 08:54 | 13 | something that was publicly available in that form? |
| 08:54 | 14 | A.   Not the configured version.  The off-the-shelf version, |
| 08:54 | 15 | yes. |
| 08:54 | 16 | Q.   Did Mr. Castilla just take information relating to |
| 08:54 | 17 | Manugistics that was the off-the-shelf Manugistics system? |
| 08:54 | 18 | A.   No, he took a variety of other things. |
| 08:54 | 19 | Q.   And that includes all the various specifics and the way |
| 08:54 | 20 | in which Mattel made efforts to configure and customize that |
| 08:55 | 21 | system? |
| 08:55 | 22 | A.   Correct. |
| 08:55 | 23 | Q.   How much, generally speaking, does it cost to get that |
| 08:55 | 24 | Manugistics base system? |
| 08:55 | 25 | A.   Well, you have to purchase the software.  But then we |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

24

| 08:55 | 1 | had to hire consultants outside of Manugistics.  We had to |
| 08:55 | 2 | use the Manugistics people, and then we had our IT |
| 08:55 | 3 | department, our technology department, and then a lot of the |
| 08:55 | 4 | business users.  So it cost -- it cost hundreds of thousands |
| 08:55 | 5 | of dollars to pursue this. |
| 08:55 | 6 | Q.   So there was a value, in your view, to that |
| 08:55 | 7 | information, even apart from whether or not you could get it |
| 08:55 | 8 | from Manugistics? |
| 08:55 | 9 | A.   Yes. |
| 08:55 | 10 | Q.   If we can go to the second page of 24172. |
| 08:56 | 11 | (Document displayed.) |
| 08:56 | 12 | BY MR. ZELLER: |
| 08:56 | 13 | Q.   And another category of documents that we discussed |
| 08:56 | 14 | that Mr. Castilla took -- and they're reflected here -- are |
| 08:56 | 15 | the documents relating to Mattel's sales planning |
| 08:56 | 16 | enhancements? |
| 08:56 | 17 | A.   Correct. |
| 08:56 | 18 | Q.   And I think you've said before that the documents that |
| 08:56 | 19 | we talked about that are listed here were proprietary and |
| 08:56 | 20 | trade secret to Mattel? |
| 08:56 | 21 | MS. KELLER:  Objection.  Legal conclusion of the |
| 08:56 | 22 | witness. |
| 08:56 | 23 | THE COURT:  Sustained. |
| 08:56 | 24 | BY MR. ZELLER: |
| 08:56 | 25 | Q.   I think we talked previously about why it was that |

DEBBIE GALE, U.S. COURT REPORTER

| 08:56 | 1 | you -- in your view, these documents were -- were valuable |
| 08:56 | 2 | and were trade secrets to Mattel? |
| 08:56 | 3 | A.   Yes. |
| 08:56 | 4 | Q.   If we can look at something that's an example of these, |
| 08:56 | 5 | Exhibit 7175. |
| 08:56 | 6 |           *(Document provided to the witness.)* |
| 08:56 | 7 |           *(Document displayed.)* |
| 08:57 | 8 |           THE WITNESS:  Yes. |
| 08:57 | 9 | BY MR. ZELLER: |
| 08:57 | 10 | Q.   And what's this document? |
| 08:57 | 11 | A.   This is one of many pages of specific elements that we |
| 08:57 | 12 | were adding what they were and what screen shots they would |
| 08:57 | 13 | be included in. |
| 08:57 | 14 | Q.   This is one of the documents that Mr. Castilla took? |
| 08:57 | 15 | A.   Yes. |
| 08:57 | 16 | Q.   And if we can look at -- |
| 08:57 | 17 |           MS. KELLER:  Are we on page 3, dash 3? |
| 08:57 | 18 |           *(Document displayed.)* |
| 08:57 | 19 | BY MR. ZELLER: |
| 08:57 | 20 | Q.   What is it that this page shows? |
| 08:57 | 21 | A.   It's -- again, it's the items that are in our database, |
| 08:57 | 22 | what they are, what they show you, the new fields that we're |
| 08:57 | 23 | adding, along with the existing fields.  And it gives you |
| 08:57 | 24 | the details of the things that we picked that we thought |
| 08:57 | 25 | were important for forecasting the toy business. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

26

| | | |
|---|---|---|
| 08:57 | 1 | Q.   And is this information that you're describing, shown |
| 08:57 | 2 | here on this page, something you'd want a competitor to |
| 08:58 | 3 | have? |
| 08:58 | 4 | A.   No. |
| 08:58 | 5 | Q.   And why is that? |
| 08:58 | 6 | A.   Because we spent a lot of time with a lot of people |
| 08:58 | 7 | across many countries deciding what we thought was the most |
| 08:58 | 8 | appropriate to enhance our sales forecasting system for the |
| 08:58 | 9 | toy industry.  And I wouldn't want a competitor to be able |
| 08:58 | 10 | to, without work, you know, just include this stuff in his |
| 08:58 | 11 | system. |
| 08:58 | 12 | Q.   If we can take a look at another example, this is |
| 08:58 | 13 | Exhibit 7177 in evidence. |
| 08:58 | 14 | (Document provided to the witness.) |
| 08:58 | 15 | (Document displayed.) |
| 08:58 | 16 | BY MR. ZELLER: |
| 08:58 | 17 | Q.   And do you recognize what this is? |
| 08:58 | 18 | A.   Yes.  This is a high-level overview of the marketing |
| 08:58 | 19 | process, the data flow. |
| 08:58 | 20 | Q.   And even though it's something that's high level, do |
| 08:59 | 21 | you still consider it to be something that's valuable and |
| 08:59 | 22 | trade secret to Mattel? |
| 08:59 | 23 | A.   Yes, I do.  'Cause this along with all the other |
| 08:59 | 24 | documents tells you different components and how they're |
| 08:59 | 25 | gonna go in and out of the system. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 27 of 151   Page ID #:305841
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

27

| 08:59 | 1 | Q. And is this something that a competitor could use if a |
| 08:59 | 2 | competitor had it? |
| 08:59 | 3 | A. I would imagine they could. They could say, oh, that's |
| 08:59 | 4 | a great idea of how to upload and download data from an |
| 08:59 | 5 | Excel spreadsheet to make it versatile, or a line with quota |
| 08:59 | 6 | market intelligence, that might be something I'd want to |
| 08:59 | 7 | use. So it would definitely give them some ideas. |
| 08:59 | 8 | Q. So if we go back to Exhibit 24172, which is the |
| 08:59 | 9 | demonstrative list. |
| 08:59 | 10 | *(Document displayed.)* |
| 08:59 | 11 | BY MR. ZELLER: |
| 08:59 | 12 | Q. And specifically page dash 3. |
| 08:59 | 13 | *(Document displayed.)* |
| 08:59 | 14 | BY MR. ZELLER: |
| 08:59 | 15 | Q. Another category of documents that Mr. Castilla took |
| 08:59 | 16 | that we talked about were documents relating to EDW and IDW, |
| 09:00 | 17 | which is enterprise data warehouse and international data |
| 09:00 | 18 | warehouse? |
| 09:00 | 19 | A. Correct. |
| 09:00 | 20 | Q. In your view the documents and information in these |
| 09:00 | 21 | documents relating to the data warehouse, both enterprise |
| 09:00 | 22 | and international, were trade secret and valuable to Mattel? |
| 09:00 | 23 | A. Yes. |
| 09:00 | 24 | Q. And if you can please tell us why that is. |
| 09:00 | 25 | A. Well, it's trade secret because we spent many years |

28

| | | |
|---|---|---|
| 09:00 | 1 | figuring out the types of dimensions or data that we wanted |
| 09:00 | 2 | and then how to look at it by talking to people across the |
| 09:00 | 3 | enterprise, at least on the EDW, the way we wanted to name |
| 09:00 | 4 | it, the questions that we wanted to answer, the testing and |
| 09:00 | 5 | the configuring of it, and making sure that it was holistic |
| 09:01 | 6 | in its use, and also that the underlying computer network |
| 09:01 | 7 | that did all of this, that it was robust. |
| 09:01 | 8 | MS. KELLER:  And, Your Honor, is this also limited |
| 09:01 | 9 | to the witness' opinion only? |
| 09:01 | 10 | THE COURT:  This is limited to the witness's |
| 09:01 | 11 | opinion only. |
| 09:01 | 12 | BY MR. ZELLER: |
| 09:01 | 13 | Q.   And is this something that you believe a competitor -- |
| 09:01 | 14 | actually, I should rephrase that.  Is this information that |
| 09:01 | 15 | we're talking about something that a competitor could use in |
| 09:01 | 16 | order to enhance or design its own systems? |
| 09:01 | 17 | A.   Yes. |
| 09:01 | 18 | Q.   If you can please take a look at Exhibit 20474. |
| 09:01 | 19 | *(Document provided to the witness.)* |
| 09:01 | 20 | BY MR. ZELLER: |
| 09:01 | 21 | Q.   And please tell us if you recognize this document. |
| 09:01 | 22 | A.   Yes, I do. |
| 09:01 | 23 | Q.   And what is this? |
| 09:02 | 24 | A.   This is -- um, it has categories of things that are in |
| 09:02 | 25 | the, um, data warehouse, and, um, it's different kinds of |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

29

| | | |
|---|---|---|
| 09:02 | 1 | cubes that were in the system, the IDW system. |
| 09:02 | 2 | Q.   When you say IDW, international data warehouse? |
| 09:02 | 3 | A.   Yes. |
| 09:02 | 4 | Q.   This is a Mattel document that Mr. Castilla took? |
| 09:02 | 5 | A.   Yes, it is. |
| 09:02 | 6 | Q.   Is this information that you believe is valuable and |
| 09:02 | 7 | trade secret to Mattel? |
| 09:02 | 8 | A.   Yes. |
| 09:02 | 9 | Q.   If you can please tell us how. |
| 09:02 | 10 | A.   Well, I think it has -- it has places where we keep |
| 09:02 | 11 | different things, what technology and reporting that we use, |
| 09:02 | 12 | um, and then some of the data elements that we are putting |
| 09:02 | 13 | in specific places and configurations. |
| 09:02 | 14 | Q.   And this is something that wasn't public? |
| 09:02 | 15 | A.   No. |
| 09:03 | 16 | Q.   That's a double negative, I guess. |
| 09:03 | 17 | A.   Yeah.  It's all internal.  It's not to be shared with |
| 09:03 | 18 | the public. |
| 09:03 | 19 | MR. ZELLER:  Your Honor, I'd offer Exhibit 20474. |
| 09:03 | 20 | THE COURT:  Received. |
| 09:03 | 21 | *(Exhibit No. 20474 received in evidence.)* |
| 09:03 | 22 | BY MR. ZELLER: |
| 09:03 | 23 | Q.   I think you'd mentioned something about that this |
| 09:03 | 24 | document reflects a cube? |
| 09:03 | 25 | A.   Uh-huh. |

30

| | | |
|---|---|---|
| 09:03 | 1 | Q.   Please tell us what that is. |
| 09:03 | 2 | A.   Okay.  A cube is -- you get raw data and then you use |
| 09:03 | 3 | something called Cognos tools.  And it helps you organize |
| 09:03 | 4 | that data by specific dimensions.  So it has all of the data |
| 09:03 | 5 | that you want, and then it will help you look at it by |
| 09:03 | 6 | categories, by year, by shipment type.  And it's done to |
| 09:03 | 7 | answer specific questions rapidly about your business.  It's |
| 09:03 | 8 | actually mining your business intelligence. |
| 09:03 | 9 | Q.   So is the cube the output? |
| 09:03 | 10 | A.   Yeah.  Yeah.  So they're called "cubes."  So you tend |
| 09:03 | 11 | to build a cube around a specific -- like we have an F and |
| 09:04 | 12 | P, which is "forecast and planning" cube.  So it's all the |
| 09:04 | 13 | information around that. |
| 09:04 | 14 | Q.   And then you were mentioning something called Cognos, |
| 09:04 | 15 | C-O-G-N-O-S? |
| 09:04 | 16 | A.   Uh-huh. |
| 09:04 | 17 | Q.   And who's that? |
| 09:04 | 18 | A.   It's a company that has a piece of software that |
| 09:04 | 19 | provides the kind of tools that you need to make these |
| 09:04 | 20 | cubes. |
| 09:04 | 21 | Q.   So the tools come from Cognos? |
| 09:04 | 22 | A.   Yes. |
| 09:04 | 23 | Q.   So if the tools come from Cognos, how is the |
| 09:04 | 24 | information in these documents proprietary to Mattel? |
| 09:04 | 25 | A.   It's like an Excel spreadsheet.  You buy an Excel |

| 09:04 | 1 | spreadsheet, which is a Microsoft tool, but all the data you |
| 09:04 | 2 | put in a spreadsheet can be very private, and the way you |
| 09:04 | 3 | organize it and everything else is very internal and private |
| 09:04 | 4 | and proprietary to Mattel. |
| 09:04 | 5 | Q.   So far we've talked about Manugistics pilot program |
| 09:04 | 6 | information, and some of that came from a third-party |
| 09:04 | 7 | vendor? |
| 09:04 | 8 | A.   Uh-huh, yes. |
| 09:05 | 9 | Q.   And then also you mentioned that these tools came from |
| 09:05 | 10 | a third-party vendor called Cognos? |
| 09:05 | 11 | A.   Correct. |
| 09:05 | 12 | Q.   With respect to any of the other documents that |
| 09:05 | 13 | Mr. Castilla took that we've talked about -- |
| 09:05 | 14 | A.   Um-hmm. |
| 09:05 | 15 | Q.   -- did any of that information come from third-party |
| 09:05 | 16 | vendors or have any relationship to third-party vendors, or |
| 09:05 | 17 | was all the rest of it just purely internal to Mattel? |
| 09:05 | 18 | A.   It was purely internal to Mattel.  Most of our other |
| 09:05 | 19 | systems are homegrown. |
| 09:05 | 20 | Q.   If you'd please take a look at Exhibits 7241 and 7242. |
| 09:05 | 21 | *(Documents provided to the witness.)* |
| 09:05 | 22 | BY MR. ZELLER: |
| 09:05 | 23 | Q.   What do these documents relate to? |
| 09:05 | 24 | A.   These are part of the documents, um, talking about |
| 09:05 | 25 | OneIDW and the cubes.  And then the second one is just an |

| | | |
|---|---|---|
| 09:06 | 1 | overview of a training workshop on IDW. |
| 09:06 | 2 | Q.   If -- |
| 09:06 | 3 |         MR. ZELLER:  Maybe we can display some of the |
| 09:06 | 4 | pages from these exhibits. |
| 09:06 | 5 |         MR. McCONVILLE:  Are these already in evidence? |
| 09:06 | 6 |         MR. ZELLER:  Oh, it is.  Let me just double-check. |
| 09:06 | 7 | But, yes, 7241 and 7242 are in evidence. |
| 09:06 | 8 |         *(Documents displayed.)* |
| 09:06 | 9 | BY MR. ZELLER: |
| 09:06 | 10 | Q.   And maybe if you could tell us why you believe that |
| 09:06 | 11 | these pages and these documents contain confidential |
| 09:06 | 12 | information, because some of this looks pretty high level |
| 09:06 | 13 | and general. |
| 09:06 | 14 | A.   I believe when I said these were trade secrets they |
| 09:06 | 15 | were accompanied with the other two large documents that |
| 09:06 | 16 | did -- that had a lot more detail about how to use and what |
| 09:06 | 17 | our IDW cubes are.  So together -- together I think they're |
| 09:06 | 18 | trade secrets. |
| 09:07 | 19 | Q.   And when you say "together," you mean in addition to |
| 09:07 | 20 | the other information that Mr. Castilla took? |
| 09:07 | 21 | A.   Yes. |
| 09:07 | 22 | Q.   So combined? |
| 09:07 | 23 | A.   Combined -- yeah, the combined information. |
| 09:07 | 24 | Q.   If we can go back to be Exhibit 24172-3. |
| 09:07 | 25 |         *(Document displayed.)* |

| | | |
|---|---|---|
| 09:07 | 1 | BY MR. ZELLER: |
| 09:07 | 2 | Q.    And the other category of documents that we discussed |
| 09:07 | 3 | that Mr. Castilla took related to the Omni and ISIS system |
| 09:07 | 4 | analysis? |
| 09:07 | 5 | A.    Yes. |
| 09:07 | 6 | Q.    And that was that comparison between the systems that |
| 09:07 | 7 | we talked about? |
| 09:07 | 8 | A.    Correct. |
| 09:07 | 9 | Q.    And in your view, was the information in those |
| 09:07 | 10 | documents valuable to a competitor to have? |
| 09:07 | 11 | MS. KELLER:  Objection.  No foundation. |
| 09:07 | 12 | THE COURT:  Overruled. |
| 09:07 | 13 | You can state your opinion about that. |
| 09:07 | 14 | THE WITNESS:  Um, yes, I think they could be |
| 09:08 | 15 | valuable to a competitor. |
| 09:08 | 16 | BY MR. ZELLER: |
| 09:08 | 17 | Q.    And why is that? |
| 09:08 | 18 | A.    Well, they had information about comparing the two |
| 09:08 | 19 | systems.  It gave opinion about, hey, why one was better |
| 09:08 | 20 | than the other one and what features there were.  So if you |
| 09:08 | 21 | were trying to make choices, I think it may help enable |
| 09:08 | 22 | that. |
| 09:08 | 23 | Q.    Is it the kind of information a competitor could use to |
| 09:08 | 24 | help either design or enhance its own systems? |
| 09:08 | 25 | A.    Yes, that's what I meant. |

34

| | | |
|---|---|---|
| 09:08 | 1 | Q.   If we can take a look at Exhibit 7246.  And I think we |
| 09:08 | 2 | talked on Friday about this is a document you recognize? |
| 09:08 | 3 | A.   Yes. |
| 09:08 | 4 | MR. ZELLER:  If we can pull that up again. |
| 09:08 | 5 | *(Document displayed.)* |
| 09:08 | 6 | MR. ZELLER:  7246.  If we can go through a couple |
| 09:08 | 7 | pages on that. |
| 09:09 | 8 | *(Document displayed.)* |
| 09:09 | 9 | BY MR. ZELLER: |
| 09:09 | 10 | Q.   This is another document that looks pretty high level? |
| 09:09 | 11 | A.   Yes. |
| 09:09 | 12 | Q.   And why is it, then, even though this is pretty high |
| 09:09 | 13 | level, you consider this information and these flow charts |
| 09:09 | 14 | and the like to be valuable and trade secret to Mattel? |
| 09:09 | 15 | A.   It's similar to the IDW.  It's got -- if you combine |
| 09:09 | 16 | this with the detailed presentations and information that |
| 09:09 | 17 | were in the other documents, I think it paints a good |
| 09:09 | 18 | picture of the total project. |
| 09:09 | 19 | Q.   And if we can take a look at Exhibit 7245. |
| 09:09 | 20 | *(Document provided to the witness.)* |
| 09:09 | 21 | BY MR. ZELLER: |
| 09:09 | 22 | Q.   And this is another one of these documents relating to |
| 09:09 | 23 | the comparison between the Omni and ISIS systems? |
| 09:09 | 24 | A.   Yes, it is. |
| 09:09 | 25 | Q.   And this document -- just focusing on this document by |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 35 of 151   Page ID #:305849
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

35

| 09:09 | 1 | itself, do you believe that the document taken in isolation |
| 09:10 | 2 | is a trade secret? |
| 09:10 | 3 | A.   You know, I'm not -- I'm not quite sure.  I just think |
| 09:10 | 4 | when you take 'em all together, I think they paint a |
| 09:10 | 5 | complete picture. |
| 09:10 | 6 | Q.   And when you say taken with other ones, are you talking |
| 09:10 | 7 | about other documents that we've discussed? |
| 09:10 | 8 | A.   Yes. |
| 09:10 | 9 | Q.   Which ones? |
| 09:10 | 10 | A.   I mean, the other ones with Omni ISIS and then all of |
| 09:10 | 11 | this stuff on sales planning and the original sales planning |
| 09:10 | 12 | around ISIS itself. |
| 09:10 | 13 | Q.   And you're talking about 7245 not being the one that, |
| 09:10 | 14 | really, when taken by itself... |
| 09:10 | 15 | A.   Yeah.  And not in context may be a little difficult. |
| 09:10 | 16 | Q.   If we can go back to Exhibit 24172-4. |
| 09:10 | 17 | (Document displayed.) |
| 09:11 | 18 | BY MR. ZELLER: |
| 09:11 | 19 | Q.   Another category of documents that we discussed that |
| 09:11 | 20 | Mr. Castilla took were these inventory update reports? |
| 09:11 | 21 | A.   Yes. |
| 09:11 | 22 | Q.   And are those documents that you believe were, at the |
| 09:11 | 23 | time, of value to a competitor to have? |
| 09:11 | 24 | A.   Yes. |
| 09:11 | 25 | Q.   Why is that? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

36

09:11 1   A.   They had forward-looking sales information at a level

09:11 2   that we don't -- well, we don't make forward-looking sales

09:11 3   information available.  But it had -- at some detail of

09:11 4   level, it had what we expected to bring, in terms of

09:11 5   availability.  It showed different selling methods.  It

09:11 6   showed a whole host of information about our, you know, past

09:11 7   performance and projections of where we were going to be.

09:11 8   Q.   And then, apart from the specific information in those

09:11 9   inventory reports, was there other kinds of information,

09:12 10  such as their structure or format, that you believe was

09:12 11  valuable?

09:12 12  A.   Well, it showed by, you know -- it showed, you know,

09:12 13  Barbie product or preschool -- it showed a level of detail

09:12 14  that we don't publish to the street.  It could potentially

09:12 15  tell you if we were having trouble in certain areas or

09:12 16  shortages in certain areas.

09:12 17  Q.   Now, with respect to the various documents that we've

09:12 18  talked about and that are reflected here in 24172, that are

09:12 19  listed here --

09:12 20  A.   Uh-huh.

09:12 21  Q.   -- were all these documents on Mattel computer systems?

09:12 22  A.   Yes.

09:12 23  Q.   And were they all on systems that were

09:12 24  password-protected?

09:12 25  A.   Yes, they were.

| | | |
|---|---|---|
| 09:12 | 1 | Q.   Is any of the information that is reflected here and |
| 09:12 | 2 | that we've talked about information that, at the time, you |
| 09:13 | 3 | believe should be in the hands of a competitor such as MGA? |
| 09:13 | 4 | A.   No. |
| 09:13 | 5 | Q.   And if you can tell us, generally speaking, why not, as |
| 09:13 | 6 | to this collection of information that Mr. Castilla took? |
| 09:13 | 7 | A.   We -- well, it's Mattel's learning over years.  It -- |
| 09:13 | 8 | all of the analysis that we've done, mistakes that we've |
| 09:13 | 9 | made, paths we've gone down that did work and didn't work, |
| 09:13 | 10 | you know, hours of people's times, a huge amount of money to |
| 09:13 | 11 | come up with what we thought was bettering our |
| 09:13 | 12 | sales-forecasting process, inventory management process for |
| 09:13 | 13 | the toy industry. |
| 09:13 | 14 |      And I would not want that in the hands of a competitor |
| 09:13 | 15 | because they could take and build upon it. |
| 09:13 | 16 | Q.   When you say "take and build upon it," what do you mean |
| 09:13 | 17 | by that? |
| 09:13 | 18 | A.   Well, I mean, what -- what pieces of information to |
| 09:13 | 19 | look at.  Maybe -- you know, we spent a lot of time on |
| 09:14 | 20 | statistical forecasting, and they could learn what our |
| 09:14 | 21 | issues were so they didn't go down that same path.  Those |
| 09:14 | 22 | are just a couple of examples. |
| 09:14 | 23 | Q.   If a competitor either had at the time or was working |
| 09:14 | 24 | on a different system, different forecasting and planning |
| 09:14 | 25 | system than what Mattel had, would this information still be |

| | | |
|---|---|---|
| 09:14 | 1 | valuable to the competitor? |
| 09:14 | 2 | MS. KELLER:  Objection.  No foundation for this. |
| 09:14 | 3 | THE COURT:  Just a moment. |
| 09:14 | 4 | Overruled. |
| 09:14 | 5 | You can answer that question.  This is your |
| 09:14 | 6 | opinion testimony. |
| 09:14 | 7 | THE WITNESS:  Can you repeat the question again so |
| 09:14 | 8 | I make sure I understood. |
| 09:14 | 9 | THE COURT:  Counsel? |
| 09:14 | 10 | BY MR. ZELLER: |
| 09:14 | 11 | Q.   What I'm wondering is this:  Is that if a competitor |
| 09:14 | 12 | has a -- at the time, a different system or doesn't have a |
| 09:14 | 13 | system at all, would that information still be valuable to |
| 09:15 | 14 | the competitor to have? |
| 09:15 | 15 | A.   In my opinion, yes.  It could either -- if you don't |
| 09:15 | 16 | have anything, it gives you maybe a road map of where to go. |
| 09:15 | 17 | You could adopt some of it or all of it.  Or if you wanted |
| 09:15 | 18 | to make enhancements to your own system, if you looked at |
| 09:15 | 19 | the people-process aspect of this thing, it might give you |
| 09:15 | 20 | ideas on how to run your business differently in -- outside |
| 09:15 | 21 | the system, even. |
| 09:15 | 22 | Q.   Is there information in these documents that a |
| 09:15 | 23 | competitor could look at to decide not what to spend money |
| 09:15 | 24 | on?  In other words -- |
| 09:15 | 25 | A.   Right. |

09:15   1    Q.    -- areas not to go into?

09:15   2    A.    Absolutely.  The big one is statistical forecasting.

09:15   3    We really wanted to do that, and we really tried hard, but

09:15   4    it was very difficult, given some of the challenges in the

09:15   5    toy industry I talked about earlier.

09:15   6    Q.    So it was something that -- this information showed

09:15   7    that it was a blind alley, so to speak?

09:16   8    A.    Correct.

09:16   9    Q.    Have you ever looked into how much Mattel's -- or what

09:16   10   Mattel's cost was to develop the information in these

09:16   11   documents reflected in 24172, the ones we've been talking

09:16   12   about?

09:16   13   A.    Yes, we did.

09:16   14   Q.    And what did you do?

09:16   15   A.    We collected or we got some individuals that were

09:16   16   involved in all of these projects together, and we did some

09:16   17   research on -- we looked at invoices for software we bought,

09:16   18   for consultants we consulted, anytime that we -- we did a

09:16   19   lot of estimating 'cause a lot of us were involved in the

09:16   20   project, the number of people -- 'cause we still remembered

09:16   21   all the individuals -- what percentage of their time was

09:16   22   involved, be so we did all of that.  And then we put -- when

09:17   23   we had actual invoices, we had that cost in it.  We were

09:17   24   estimating individuals' times.  We valued that as well, back

09:17   25   at what they were paid at the time that this was done.

CV 04-9049 DOC – 3/17/2011 – Day 25, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:17 | 1 | Q.   And you did this with other people? |
| 09:17 | 2 | A.   Yes, I did. |
| 09:17 | 3 | Q.   Who else? |
| 09:17 | 4 | A.   I did it with Julie Abrams, who was the IT director for |
| 09:17 | 5 | international in the UK, and she worked on several of the |
| 09:17 | 6 | projects.  Alan Siegel, who is the director of supply chain |
| 09:17 | 7 | optimization projects, who was part of the initial |
| 09:17 | 8 | Manugistics project.  I talked to Michel Bernard, who's the |
| 09:17 | 9 | vice president of IT.  I talked to Jim Ward, who is the vice |
| 09:17 | 10 | president of operations finance, and actually was in Europe |
| 09:17 | 11 | when some of this stuff was done as well.  And myself, of |
| 09:17 | 12 | course. |
| 09:17 | 13 | Q.   When did you do this analysis along with the other team |
| 09:17 | 14 | members? |
| 09:17 | 15 | A.   We did it last fall, the fall of 2010. |
| 09:17 | 16 | Q.   If you could please take a look at 24167. |
| 09:18 | 17 | *(Document provided to the witness.)* |
| 09:18 | 18 | BY MR. ZELLER: |
| 09:18 | 19 | Q.   Do you recognize what this is? |
| 09:18 | 20 | A.   Yes, this is a timeline of the time spent on the |
| 09:18 | 21 | different projects. |
| 09:18 | 22 | Q.   When you say the time spent, you're talking about by |
| 09:18 | 23 | Mattel? |
| 09:18 | 24 | A.   Yes. |
| 09:18 | 25 | MR. ZELLER:  Your Honor, this is another |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

41

| 09:18 | 1 | demonstrative I would like to display. |
|---|---|---|
| 09:18 | 2 | THE COURT:  You may. |
| 09:18 | 3 | MR. ZELLER:  Thank you. |
| 09:18 | 4 | *(Document displayed.)* |
| 09:18 | 5 | BY MR. ZELLER: |
| 09:18 | 6 | Q.   And so if you could please explain a little bit about |
| 09:18 | 7 | what this shows. |
| 09:18 | 8 | A.   Well, what we're trying to show is -- when we were |
| 09:18 | 9 | doing the estimations of these projects, we're trying to |
| 09:18 | 10 | show the timeline of everything that we did that was |
| 09:18 | 11 | involved to create the -- like the sales planning project, |
| 09:18 | 12 | so every -- you know, all the time and resources involved to |
| 09:18 | 13 | go into it, to be able to create the documents that were |
| 09:19 | 14 | taken. |
| 09:19 | 15 | So you can see the original sales planning.  And then |
| 09:19 | 16 | like sales planning -- the Manugistics pilot project.  So |
| 09:19 | 17 | there was 18 months of work by a variety of people, you |
| 09:19 | 18 | know, consultants, software that took place over those two |
| 09:19 | 19 | years.  And then you can see the sales planning |
| 09:19 | 20 | enhancements.  That was another two years of work, where we |
| 09:19 | 21 | tried to enhance our existing systems with a collaborative |
| 09:19 | 22 | effort of many people around the world and our IT partners. |
| 09:19 | 23 | Q.   And this shows the range of dates concerning the |
| 09:19 | 24 | projects that Mr. Castilla took information for? |
| 09:19 | 25 | A.   Yes, it does. |

DEBBIE GALE, U.S. COURT REPORTER

09:19    1    Q.   And it looks like this generally ran the entire 2001
09:19    2    through 2006 time period?
09:19    3    A.   Yes, it did.
09:19    4    Q.   And when you were looking into these various Mattel
09:19    5    costs for the projects, did you reach some sort of
09:19    6    determination as to how much that was?
09:19    7    A.   Yes, we did.
09:19    8    Q.   And what's that number?
09:19    9    A.   It was around -- for the sales and inventory and the
09:20   10    things on this page, it was around $11 million.
09:20   11    Q.   And that was based upon the Mattel time and costs and
09:20   12    the like that you described earlier as what it had actually
09:20   13    cost to develop these?
09:20   14    A.   Yes.
09:20   15    Q.   So it's not even -- this isn't the value of the system
09:20   16    to Mattel; it's just cost?
09:20   17    A.   It's the cost of what it took us to develop it --
09:20   18    develop the different pieces.
09:20   19    Q.   And did you also look into the costs that it took to
09:20   20    develop the international strategic plan that Mr. Castilla
09:20   21    took?
09:20   22    A.   There was -- there was a gentleman, Jim Moore, who did
09:20   23    that with other folks to determine what the cost was to --
09:20   24    for that document.
09:20   25    Q.   And was there a conclusion reached as to the cost for

| | | |
|---|---|---|
| 09:20 | 1 | that? |
| 09:20 | 2 | A.   It was around $600,000. |
| 09:20 | 3 | MS. KELLER:  Objection.  Hearsay. |
| 09:20 | 4 | THE COURT:  Sustained. |
| 09:20 | 5 | MS. KELLER:  Motion to strike. |
| 09:20 | 6 | THE COURT:  Stricken. |
| 09:21 | 7 | BY MR. ZELLER: |
| 09:21 | 8 | Q.   Let me ask a foundational question. |
| 09:21 | 9 | Do you have knowledge of this apart from what it is |
| 09:21 | 10 | that Mr. Ward told you, or is that your only basis? |
| 09:21 | 11 | A.   Um, I mean, I have knowledge of the document.  I have |
| 09:21 | 12 | seen the document, and I knew it was developed by talking to |
| 09:21 | 13 | the different general managers around the world of what |
| 09:21 | 14 | their forecast was, and then it was synthesized together by |
| 09:21 | 15 | the corporate strategy group, so I knew how it came |
| 09:21 | 16 | together. |
| 09:21 | 17 | Q.   I'm trying to find out something a little bit more |
| 09:21 | 18 | specific. |
| 09:21 | 19 | A.   Okay. |
| 09:21 | 20 | Q.   Apart from what Mr. Ward told you, do you have |
| 09:21 | 21 | knowledge as to how much it cost to actually just create the |
| 09:21 | 22 | international strategic plan document, or do you only know |
| 09:21 | 23 | that because Mr. Ward told you? |
| 09:21 | 24 | A.   I only know that because Mr. Ward told me. |
| 09:21 | 25 | Q.   So then as to the other number, the $11 million in |

| | | |
|---|---|---|
| 09:21 | 1 | costs, that's something you personally participated in and |
| 09:21 | 2 | you know? |
| 09:21 | 3 | A.   Yes. |
| 09:21 | 4 |      MR. ZELLER:  I have nothing further right now, |
| 09:21 | 5 | Your Honor. |
| 09:22 | 6 |      THE COURT:  Thank you. |
| 09:22 | 7 |      Cross-examination.  This would be Ms. Keller on |
| 09:22 | 8 | behalf of Mr. Larian and MGA. |
| 09:22 | 9 |      MS. KELLER:  Thank you, Your Honor. |
| 09:22 | 10 | **CROSS-EXAMINATION** |
| 09:22 | 11 | BY MS. KELLER: |
| 09:22 | 12 | Q.   Good morning, Ms. Owens. |
| 09:22 | 13 | A.   Good morning. |
| 09:22 | 14 | Q.   Now, when Mr. Castilla was there, you were vice |
| 09:22 | 15 | president of capacity and international demand planning for |
| 09:22 | 16 | Mattel, Inc.; is that right? |
| 09:22 | 17 | A.   Correct. |
| 09:22 | 18 | Q.   So you were Mr. Castilla's boss? |
| 09:22 | 19 | A.   I was -- yeah, I was his big boss.  He had a person |
| 09:22 | 20 | underneath me. |
| 09:22 | 21 | Q.   So he had somebody else beneath you who he reported to |
| 09:22 | 22 | directly, and then she reported to you, right? |
| 09:22 | 23 | A.   Correct. |
| 09:22 | 24 | Q.   Now, Mr. Castilla resigned on Monday March 13th, right? |
| 09:22 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:22 | 1 | Q.   And the very next day you were in a meeting with Jill |
| 09:23 | 2 | Thomas, who we see here, the director of litigation for |
| 09:23 | 3 | Mattel, and Richard de Anda, of security, right? |
| 09:23 | 4 | A.   Correct. |
| 09:23 | 5 |        THE COURT:  Counsel, I'm sorry.  We know the date |
| 09:23 | 6 | and the year, but the jury doesn't know the year. |
| 09:23 | 7 | March 13th? |
| 09:23 | 8 |        MS. KELLER:  2006. |
| 09:23 | 9 |        THE WITNESS:  It was the next day, right. |
| 09:23 | 10 | BY MS. KELLER: |
| 09:23 | 11 | Q.   So he resigns March 13th.  The very next day you're in |
| 09:23 | 12 | a meeting with security and the law department about the |
| 09:23 | 13 | fact that Mr. Castilla -- that you believe Mr. Castilla had |
| 09:23 | 14 | taken some documents with him, right? |
| 09:23 | 15 | A.   I was called down to their office. |
| 09:23 | 16 | Q.   But by that time you had already reviewed documents |
| 09:23 | 17 | contained in a computer folder entitled "To Take" located on |
| 09:23 | 18 | Mr. Castilla's network-shared drive, right? |
| 09:23 | 19 | A.   I was summoned -- I was asked to come down to the |
| 09:23 | 20 | office. |
| 09:23 | 21 | Q.   Not my question. |
| 09:23 | 22 | A.   Okay.  I'm sorry. |
| 09:23 | 23 | Q.   Before you even came down to the office to have that |
| 09:24 | 24 | meeting, you had already reviewed documents contained in a |
| 09:24 | 25 | computer folder entitled "To Take" that had been located on |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:24 | 1 | Mr. Castilla's network-share drive, right? |
| 09:24 | 2 | A.    That's not true. |
| 09:24 | 3 | Q.    Well, in the meeting -- and there were two meetings, |
| 09:24 | 4 | March 14th and March 15th, right? |
| 09:24 | 5 | A.    I only remember one meeting. |
| 09:24 | 6 | Q.    Can we have you, just to refresh your memory, take a |
| 09:24 | 7 | look at Exhibit 7982. |
| 09:24 | 8 | A.    7982? |
| 09:24 | 9 | Q.    Yes. |
| 09:24 | 10 |        MS. KELLER:  If you don't have it handy, |
| 09:24 | 11 | Your Honor, may I approach? |
| 09:24 | 12 |        THE COURT:  Yes.  Thank you very much.  I |
| 09:24 | 13 | appreciate it. |
| 09:24 | 14 |        *(Document provided to the witness.)* |
| 09:24 | 15 |        THE WITNESS:  Yes, I see it.  It does say two |
| 09:24 | 16 | dates.  I recollect one, but it may have been two days. |
| 09:25 | 17 |        MS. KELLER:  Okay. |
| 09:25 | 18 | BY MS. KELLER: |
| 09:25 | 19 | Q.    Okay.  The bottom line is, right away you were onto the |
| 09:25 | 20 | fact that Mr. Castilla had taken these documents, right? |
| 09:25 | 21 | A.    I was -- yeah, I was summoned down to the office and |
| 09:25 | 22 | told to -- asked to look at these documents. |
| 09:25 | 23 | Q.    But -- okay.  Here's my question again.  Right away |
| 09:25 | 24 | you, Mattel -- |
| 09:25 | 25 | A.    Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:25 | 1 | Q.   I'm sorry.  Right away you were already onto the fact |
| 09:25 | 2 | that Mr. Castilla had downloaded documents, right? |
| 09:25 | 3 | A.   That's correct. |
| 09:25 | 4 | Q.   And you identified 'em quickly, right? |
| 09:25 | 5 | A.   Correct. |
| 09:25 | 6 | Q.   You looked 'em all over, right? |
| 09:25 | 7 | A.   Yes, I did. |
| 09:25 | 8 | Q.   You talked it over with your legal department and your |
| 09:25 | 9 | security people about exactly what they were, what they |
| 09:25 | 10 | represented, right? |
| 09:25 | 11 | A.   Yes. |
| 09:25 | 12 | Q.   They asked for your input into how useful they might be |
| 09:25 | 13 | to someone outside of Mattel, say, oh, MGA, right? |
| 09:25 | 14 | A.   I don't know if we had extensive discussions on that, |
| 09:25 | 15 | but I talked about what they were. |
| 09:25 | 16 | Q.   And you immediately -- you, Mattel, immediately notify |
| 09:26 | 17 | the FBI, right? |
| 09:26 | 18 | A.   I believe so. |
| 09:26 | 19 | Q.   And, in fact, you are Mattel's -- we've talked about |
| 09:26 | 20 | this 30(b)(6), you know -- you're the corporate |
| 09:26 | 21 | representative for Mattel on all these documents you've been |
| 09:26 | 22 | talking about today and last week, right? |
| 09:26 | 23 | A.   That's correct. |
| 09:26 | 24 | Q.   And you were also the big boss of the area where |
| 09:26 | 25 | Mr. Castilla worked, right? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

48

| 09:26 | 1 | A.   Correct. |
| 09:26 | 2 | Q.   And so you didn't want these documents to get over to |
| 09:26 | 3 | MGA, right? |
| 09:26 | 4 | A.   Correct. |
| 09:26 | 5 | Q.   Because you thought they were confidential and |
| 09:26 | 6 | proprietary, right? |
| 09:26 | 7 | A.   That's correct. |
| 09:26 | 8 | Q.   And so that's why you notified the FBI.  You wanted to |
| 09:26 | 9 | make sure that they got seized and intercepted before they |
| 09:26 | 10 | got to MGA, right? |
| 09:26 | 11 | A.   Um, I think we wanted to investigate and make sure what |
| 09:26 | 12 | happened. |
| 09:26 | 13 | Q.   Well, but you also wanted to make sure that these |
| 09:26 | 14 | documents, that you already were satisfied had been taken by |
| 09:26 | 15 | Mr. Castilla, got grabbed before MGA could use 'em, right? |
| 09:27 | 16 | A.   Um, I would assume so. |
| 09:27 | 17 | Q.   Well, you know so, don't you?  I mean, they were |
| 09:27 | 18 | important to you.  You wanted to -- hey, we can't let a |
| 09:27 | 19 | competitor get these documents, right? |
| 09:27 | 20 | A.   Um, I wasn't involved in the security part of it, but, |
| 09:27 | 21 | yes, that would be logical. |
| 09:27 | 22 | Q.   Well, I mean, you're an executive at Mattel.  You were |
| 09:27 | 23 | intimately involved in all this stuff, right? |
| 09:27 | 24 | A.   I was in identifying the documents, yes. |
| 09:27 | 25 | Q.   And in talking to security? |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 49 of 151   Page ID #:305863
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:27 | 1 | A.   Yes. |
| 09:27 | 2 | Q.   And in talking to legal? |
| 09:27 | 3 | A.   Yes, yes. |
| 09:27 | 4 | Q.   And so here's my question:  You didn't want 'em to get |
| 09:27 | 5 | to MGA, right? |
| 09:27 | 6 | A.   No, I wouldn't want them to get to MGA. |
| 09:27 | 7 | Q.   And you took steps to make sure they didn't get to MGA, |
| 09:27 | 8 | right? |
| 09:27 | 9 | A.   Um, I think Mr. Castilla was visited and the stuff was |
| 09:27 | 10 | taken from him. |
| 09:27 | 11 | Q.   That's exactly what I was gonna ask you next.  The FBI, |
| 09:27 | 12 | acting on your information, went over and seized all this |
| 09:27 | 13 | stuff from Mr. Castilla very promptly, right? |
| 09:27 | 14 | A.   Yeah, I believe they got some things from him. |
| 09:27 | 15 | Q.   So all these things that we've been talking about, um, |
| 09:27 | 16 | got intercepted before they got to MGA, true? |
| 09:28 | 17 | A.   I really don't know that. |
| 09:28 | 18 | Q.   Well, you don't have any evidence whatsoever that MGA |
| 09:28 | 19 | ever used one thing Mr. Castilla took from Mattel, true? |
| 09:28 | 20 | A.   True. |
| 09:28 | 21 | Q.   And you do have evidence that the FBI, promptly acting |
| 09:28 | 22 | on your information, went over and seized from Mr. Castilla |
| 09:28 | 23 | some thumb drives that had the documents on 'em.  You know |
| 09:28 | 24 | that, don't you? |
| 09:28 | 25 | A.   Yeah, I believe they did get them back after a couple |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:28 | 1 | of tries. |
| 09:28 | 2 | Q.   So whatever value they may or may not have had never |
| 09:28 | 3 | got used by MGA as far as you know, right? |
| 09:28 | 4 | A.   As far as I know.  I don't know.  I honestly don't know |
| 09:28 | 5 | whether they got used or not. |
| 09:28 | 6 | Q.   Well, you know that there's been a huge amount of |
| 09:28 | 7 | discovery in this litigation, right? |
| 09:28 | 8 | A.   Yes. |
| 09:28 | 9 | Q.   I mean, this has been going on for years, right? |
| 09:28 | 10 | A.   Yeah. |
| 09:28 | 11 | Q.   And you know that your lawyers for Mattel have been |
| 09:29 | 12 | able to look over literally millions of pages of documents, |
| 09:29 | 13 | right? |
| 09:29 | 14 | MR. ZELLER:  Objection, Your Honor.  It's talking |
| 09:29 | 15 | about discovery. |
| 09:29 | 16 | THE COURT:  Well, about the lawyers, et cetera, |
| 09:29 | 17 | that's stricken. |
| 09:29 | 18 | But she's been able to review. |
| 09:29 | 19 | MS. KELLER:  I'll just ask a quick question. |
| 09:29 | 20 | BY MS. KELLER: |
| 09:29 | 21 | Q.   You're a pretty highly placed executive with Mattel, |
| 09:29 | 22 | right? |
| 09:29 | 23 | A.   Yeah.  I -- I did okay. |
| 09:29 | 24 | Q.   Yeah.  Well, it sounds like you did. |
| 09:29 | 25 | And so what I'm asking is just, you know, you don't |

| | | |
|---|---|---|
| 09:29 | 1 | have any information whatsoever -- despite all these years |
| 09:29 | 2 | of litigation, despite all the security work, and despite |
| 09:29 | 3 | the FBI investigation, you don't have any information |
| 09:29 | 4 | whatsoever that MGA ever used one bit of all this |
| 09:29 | 5 | information that was talked about in the last couple days, |
| 09:29 | 6 | right?  Am I right? |
| 09:29 | 7 | A.   Well, I don't have any information that MGA used it, |
| 09:29 | 8 | but... |
| 09:29 | 9 | Q.   That's all I'm asking. |
| 09:30 | 10 | A.   Okay. |
| 09:30 | 11 | Q.   Now, let's just talk very briefly about what some of |
| 09:30 | 12 | this stuff is, if we can. |
| 09:30 | 13 | Now, a number of the documents that you say in your |
| 09:30 | 14 | opinion are trade secrets are actually inventory control |
| 09:30 | 15 | documents, right? |
| 09:30 | 16 | A.   Correct. |
| 09:30 | 17 | Q.   For example, let's look at Exhibit 7203. |
| 09:30 | 18 | *(Document provided to the witness.)* |
| 09:30 | 19 | *(Document displayed.)* |
| 09:30 | 20 | BY MS. KELLER: |
| 09:30 | 21 | Q.   And specifically, let's look at the second page, |
| 09:30 | 22 | inventory update, October 27, 2005. |
| 09:30 | 23 | A.   Yes. |
| 09:30 | 24 | Q.   And this information was created by getting stuff from |
| 09:30 | 25 | various systems and putting it on an Excel spreadsheet? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

52

| | | |
|---|---|---|
| 09:30 | 1 | A.   Correct. |
| 09:30 | 2 | Q.   And the purpose of getting the information together was |
| 09:30 | 3 | to make sure you were on track for your inventory |
| 09:30 | 4 | projections, right? |
| 09:30 | 5 | A.   Yes. |
| 09:30 | 6 | Q.   And Mr. Castilla was actually in charge of periodically |
| 09:31 | 7 | doing this, right? |
| 09:31 | 8 | A.   That's correct. |
| 09:31 | 9 | Q.   So you if he already knew -- I mean, he already had in |
| 09:31 | 10 | his head how one goes about doing that, right?  'Cause he |
| 09:31 | 11 | did it, true? |
| 09:31 | 12 | A.   I think that's accurate. |
| 09:31 | 13 | Q.   And he'd do this about every five to six weeks, maybe |
| 09:31 | 14 | every two months, something like that? |
| 09:31 | 15 | A.   Correct. |
| 09:31 | 16 | Q.   And so you consider inventory information as of a |
| 09:31 | 17 | specific period of time to be a trade secret of Mattel, |
| 09:31 | 18 | true? |
| 09:31 | 19 | A.   Yes, I do. |
| 09:31 | 20 | Q.   But actual inventory numbers change every day, right? |
| 09:31 | 21 | A.   Um, yes, they do. |
| 09:31 | 22 | Q.   And as things are shipped out, inventory goes down, |
| 09:31 | 23 | true? |
| 09:31 | 24 | A.   That's true. |
| 09:31 | 25 | Q.   As things are brought in, inventory goes up, right? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:31 | 1 | A.   That's true. |
| 09:31 | 2 | Q.   Products are shipped out of warehouses every day, |
| 09:31 | 3 | right? |
| 09:31 | 4 | A.   Yes. |
| 09:31 | 5 | Q.   So inventory varies? |
| 09:31 | 6 | A.   Yes, it does. |
| 09:31 | 7 | Q.   Numbers are gonna be different month to month, day to |
| 09:31 | 8 | day, week to week, right? |
| 09:32 | 9 | A.   Correct. |
| 09:32 | 10 | Q.   Very time specific, isn't it? |
| 09:32 | 11 | A.   Uh-huh. |
| 09:32 | 12 | Q.   And so throughout the year, then, you do these |
| 09:32 | 13 | inventory update reports every couple of months, true? |
| 09:32 | 14 | A.   That's correct. |
| 09:32 | 15 | Q.   Now, Exhibit 7203 is dated October 27th, 2005, right? |
| 09:32 | 16 | A.   Yes. |
| 09:32 | 17 | Q.   And Mr. Castilla actually resigned from Mattel on |
| 09:32 | 18 | March 16, 2006? |
| 09:32 | 19 | A.   True. |
| 09:32 | 20 | Q.   So that was about five months after this inventory |
| 09:32 | 21 | update? |
| 09:32 | 22 | A.   I'm sorry, I think it was the 13th he was -- |
| 09:32 | 23 | Q.   I think you're right.  Okay.  Let's subtract that three |
| 09:32 | 24 | days, then. |
| 09:32 | 25 | So this was about five months after this inventory |

CV 04-9049 DOC – 3/17/2011 – Day 25, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:32 | 1 | update that he resigned. |
| 09:32 | 2 | A.   Uh-huh. |
| 09:32 | 3 | Q.   Right? |
| 09:32 | 4 | A.   Yes. |
| 09:32 | 5 | Q.   And so between October of 2005 and when he resigned in |
| 09:32 | 6 | March of '06, the inventory picture would have changed |
| 09:32 | 7 | completely, right? |
| 09:33 | 8 | A.   Um, it may have changed. |
| 09:33 | 9 | Q.   Well, I mean, we know it changes daily -- |
| 09:33 | 10 | A.   Yeah. |
| 09:33 | 11 | Q.   -- weekly, monthly, right? |
| 09:33 | 12 | A.   Yes. |
| 09:33 | 13 | Q.   So we know it would have changed, true? -- in five |
| 09:33 | 14 | months. |
| 09:33 | 15 | A.   Yes. |
| 09:33 | 16 | Q.   And we've already talked about the fact that, |
| 09:33 | 17 | basically, all he did was collect the numbers and put 'em on |
| 09:33 | 18 | a spreadsheet, Excel spreadsheet, right? |
| 09:33 | 19 | A.   Yes. |
| 09:33 | 20 | Q.   And you know Excel spreadsheets are used by people in |
| 09:33 | 21 | all kinds of work, right? |
| 09:33 | 22 | A.   Yes. |
| 09:33 | 23 | Q.   All over the world, different industries? |
| 09:33 | 24 | A.   Uh-huh. |
| 09:33 | 25 | Q.   Nothing especially proprietary or secret about an Excel |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

55

09:33  1  spreadsheet; wouldn't you agree with that?

09:33  2  A.   Yes, I would agree.

09:33  3  Q.   And since he already had in his head how to do this

09:33  4  inventory update with an Excel spreadsheet, nothing trade

09:33  5  secret about that, right?  I mean, he can walk out with

09:33  6  what's in his head and take it anywhere, can't he?

09:33  7           MR. ZELLER:  Objection.  Question's vague.

09:33  8           THE COURT:  Overruled.

09:33  9           THE WITNESS:  I think it depends.  You know, he

09:33  10  can take his experience and everything, but if he takes a

09:34  11  process that's very detailed --

09:34  12  BY MS. KELLER:

09:34  13  Q.   Well, here's what I'm asking.  What he used for this

09:34  14  process was an Excel spreadsheet, right?

09:34  15  A.   Yes, but he --

09:34  16  Q.   And you can go down to Staples or Office Depot, and you

09:34  17  can buy Excel software right off the shelf, true?

09:34  18  A.   True.

09:34  19  Q.   And he had in his head how you do updates.  You call

09:34  20  around, you get the numbers from people, and you stick 'em

09:34  21  in an Excel spreadsheet, right?

09:34  22  A.   Yes.

09:34  23  Q.   And this information that's supposed to be a trade

09:34  24  secret, that's what he -- how he prepared it that way,

09:34  25  right?

DEBBIE GALE, U.S. COURT REPORTER

| 09:34 | 1 | A.   It was that and the information that was contained in |
| 09:34 | 2 | the document. |
| 09:34 | 3 | Q.   But the information contained in the document was five |
| 09:34 | 4 | months old at the time he left, true? |
| 09:34 | 5 | A.   True.  But it had forward-looking sales information in |
| 09:34 | 6 | there, so that may -- that was the right direction that we |
| 09:34 | 7 | were going. |
| 09:34 | 8 | Q.   Well, I understand about the direction.  I'm just |
| 09:34 | 9 | saying the information for the inventory update at the time |
| 09:35 | 10 | he left was five months old, right? |
| 09:35 | 11 | A.   Correct. |
| 09:35 | 12 | Q.   Okay.  Now, let's look at Exhibit 7207. |
| 09:35 | 13 | *(Document provided to the witness.)* |
| 09:35 | 14 | MS. KELLER:  This is already in evidence. |
| 09:35 | 15 | *(Document displayed.)* |
| 09:35 | 16 | BY MS. KELLER: |
| 09:35 | 17 | Q.   And this is another inventory update, right? |
| 09:35 | 18 | A.   Yes, it is. |
| 09:35 | 19 | Q.   August 31, 2005? |
| 09:35 | 20 | A.   Yes. |
| 09:35 | 21 | Q.   This is six and a half months before Mr. Castilla |
| 09:35 | 22 | resigned, right? |
| 09:35 | 23 | A.   Correct. |
| 09:35 | 24 | Q.   So these numbers were even older than the ones we just |
| 09:35 | 25 | saw in 7203, true? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:35 | 1 | A.    True. |
| 09:35 | 2 | Q.    Let's look at Exhibit 7210. |
| 09:35 | 3 | *(Document provided to the witness.)* |
| 09:35 | 4 | *(Document displayed.)* |
| 09:35 | 5 | BY MS. KELLER: |
| 09:35 | 6 | Q.    And that's an inventory update July 6, 2005, right? |
| 09:35 | 7 | A.    Correct. |
| 09:35 | 8 | Q.    So that was eight months before Mr. Castilla resigned |
| 09:35 | 9 | from Mattel, right? |
| 09:35 | 10 | A.    Correct. |
| 09:35 | 11 | Q.    So that's even older than the other two we just talked |
| 09:35 | 12 | about, right? |
| 09:35 | 13 | A.    Yes. |
| 09:35 | 14 | Q.    And let's look at Exhibit 7211. |
| 09:36 | 15 | *(Document displayed.)* |
| 09:36 | 16 | BY MS. KELLER: |
| 09:36 | 17 | Q.    This is an inventory update from May 25, 2005, right? |
| 09:36 | 18 | A.    Yes. |
| 09:36 | 19 | Q.    And that's ten months before Mr. Castilla resigned from |
| 09:36 | 20 | Mattel, isn't it? |
| 09:36 | 21 | A.    Yes. |
| 09:36 | 22 | Q.    So that is even older than the others we've just talked |
| 09:36 | 23 | about, true? |
| 09:36 | 24 | A.    True. |
| 09:36 | 25 | Q.    And let's look at 7219. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:36 | 1 | *(Document displayed.)* |
| 09:36 | 2 | BY MS. KELLER: |
| 09:36 | 3 | Q. That's an inventory update from February 2, 2005, |
| 09:36 | 4 | right? |
| 09:36 | 5 | A. Yes. |
| 09:36 | 6 | Q. So that's 13 and a half months before Mr. Castilla |
| 09:36 | 7 | resigned from Mattel, right? |
| 09:36 | 8 | A. Yes. |
| 09:36 | 9 | Q. And let's look at 7220. |
| 09:36 | 10 | *(Document displayed.)* |
| 09:36 | 11 | BY MS. KELLER: |
| 09:36 | 12 | Q. That's another inventory update from February 2nd, |
| 09:36 | 13 | 2005, right? |
| 09:36 | 14 | A. Yes. |
| 09:36 | 15 | Q. Same thing; 13 and a half months before he actually |
| 09:36 | 16 | left Mattel, right? |
| 09:36 | 17 | A. Correct. |
| 09:36 | 18 | Q. And, um, let's look at 7224. |
| 09:36 | 19 | *(Document displayed.)* |
| 09:36 | 20 | BY MS. KELLER: |
| 09:36 | 21 | Q. That's an inventory update from December 14th, 2004, |
| 09:37 | 22 | right? |
| 09:37 | 23 | A. Correct. |
| 09:37 | 24 | Q. That's a year and three months before Mr. Castilla |
| 09:37 | 25 | resigned from Mattel, correct? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

59

| 09:37 | 1 | A.   Correct. |
|-------|---|---|

09:37   1   A.   Correct.

09:37   2   Q.   7225, that's an inventory update from November 1st,

09:37   3   2004.

09:37   4          (Document displayed.)

09:37   5   BY MS. KELLER:

09:37   6   Q.   Right?

09:37   7   A.   Correct.

09:37   8   Q.   And that's a year and four and a half months before

09:37   9   Mr. Castilla resigned from Mattel, right?

09:37   10   A.   Correct.

09:37   11   Q.   Now, Mr. Castilla had access to more recent data at

09:37   12   Mattel, didn't he, than these reports?

09:37   13   A.   Yeah.  He had access to some of our EDW information.

09:37   14   Q.   But he didn't take the most recent inventory update

09:37   15   reports, right?  Took these old ones, true?

09:37   16   A.   I think he -- yeah, he took the ones that he could get

09:37   17   his hands on.

09:37   18   Q.   Well, he didn't take the most recent one that he

09:37   19   himself had prepared, right?

09:37   20   A.   I don't recollect which was the most recent one, to be

09:37   21   honest.

09:37   22   Q.   Now, let's talk about this EDW, this enterprise data

09:38   23   warehouse.  You said that that's what a lot of companies do

09:38   24   to pick out the pieces of information that they feel

09:38   25   valuable -- that they feel are valuable and that they want

| 09:38 | 1 | to get from a lot of different systems.  You remember that |
| 09:38 | 2 | testimony? |
| 09:38 | 3 | A.   Yes, I do. |
| 09:38 | 4 | Q.   So very common for companies to have electronic data |
| 09:38 | 5 | warehouses, right? |
| 09:38 | 6 | A.   I would imagine so. |
| 09:38 | 7 | Q.   And, by the way, when you say you would imagine so, the |
| 09:38 | 8 | only place you've ever worked is Mattel, right? |
| 09:38 | 9 | A.   No, that's not true. |
| 09:38 | 10 | Q.   Okay.  How long have you been at Mattel? |
| 09:38 | 11 | A.   Almost 26 years. |
| 09:38 | 12 | Q.   I should have phrased it more specifically.  The only |
| 09:38 | 13 | toy company you've ever worked at is Mattel? |
| 09:38 | 14 | A.   No.  I worked at a different toy company before that. |
| 09:38 | 15 | Q.   Okay.  What was the toy company you worked at before |
| 09:38 | 16 | that? |
| 09:38 | 17 | A.   Tomy Toys. |
| 09:38 | 18 | Q.   For how long? |
| 09:38 | 19 | A.   A little over two years. |
| 09:38 | 20 | Q.   And then 26 years at Mattel? |
| 09:38 | 21 | A.   Correct. |
| 09:38 | 22 | Q.   And you would agree with me -- because I'm getting up |
| 09:38 | 23 | there in years myself -- that a lot has changed over that |
| 09:39 | 24 | period of time in terms of how companies do things, right? |
| 09:39 | 25 | A.   Yes, that's true. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

61

| | | |
|---|---|---|
| 09:39 | 1 | Q.   Are you like me?  Can you remember back in the days |
| 09:39 | 2 | when we had little XT computers with the tiny little green |
| 09:39 | 3 | screen and the floppy drive that we put in? |
| 09:39 | 4 | A.   Yes, I can. |
| 09:39 | 5 | Q.   Are you like me and you can remember before we even had |
| 09:39 | 6 | computers? |
| 09:39 | 7 | A.   Maybe in college. |
| 09:39 | 8 | Q.   Okay.  So you're younger than I am. |
| 09:39 | 9 | A.   Just barely. |
| 09:39 | 10 | Q.   We had the IBM Selectric. |
| 09:39 | 11 | But you would agree that the information that you're |
| 09:39 | 12 | telling us about now, electronic data warehouses and the |
| 09:39 | 13 | various processes, forecasting, all of that, that's changed |
| 09:39 | 14 | pretty radically over the 26 years you've been at Mattel, |
| 09:39 | 15 | right? |
| 09:39 | 16 | A.   Yes. |
| 09:39 | 17 | Q.   And the fact that this is all even available on a |
| 09:39 | 18 | computer system, that's something that 26 years ago at your |
| 09:39 | 19 | prior toy company didn't exist, I'll bet, right? |
| 09:39 | 20 | A.   That's correct. |
| 09:40 | 21 | Q.   All right.  Now, let's talk again about this electronic |
| 09:40 | 22 | data warehouse.  So you can access all kinds of information |
| 09:40 | 23 | on that system, right? |
| 09:40 | 24 | A.   That's correct. |
| 09:40 | 25 | Q.   You can access current customer orders, pricing |

| | | |
|---|---|---|
| 09:40 | 1 | information, financial forecasts, sales margins, all that? |
| 09:40 | 2 | A.   Yeah.  And more, yes. |
| 09:40 | 3 | Q.   Let's look at Exhibit 7226, which lists the types of |
| 09:40 | 4 | information. |
| 09:40 | 5 | *(Document provided to the witness.)* |
| 09:40 | 6 | *(Document displayed.)* |
| 09:40 | 7 | BY MS. KELLER: |
| 09:40 | 8 | Q.   And you would say that that information from your |
| 09:40 | 9 | enterprise data warehouse, that's pretty valuable, a lot of |
| 09:40 | 10 | that stuff? |
| 09:40 | 11 | A.   Yes. |
| 09:40 | 12 | Q.   And Mr. Castilla did not take any of that data from |
| 09:40 | 13 | those -- that system when he left, true? |
| 09:40 | 14 | A.   Not that I'm aware of. |
| 09:40 | 15 | Q.   And, um, all of this up-to-the-date stuff about |
| 09:40 | 16 | customer orders, pricing info, financial forecasts, sales |
| 09:41 | 17 | margins, that was all there had he wanted to download it |
| 09:41 | 18 | all, right? |
| 09:41 | 19 | A.   Well, some of it was there, and some of it -- it was |
| 09:41 | 20 | things that we were intending to do. |
| 09:41 | 21 | Q.   So even more valuable he could have downloaded all of |
| 09:41 | 22 | your plans for the immediate future and the farther future, |
| 09:41 | 23 | right? |
| 09:41 | 24 | A.   Well, I was talking about the data elements.  Some of |
| 09:41 | 25 | them weren't included yet, so he couldn't have, obviously, |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

63

| | | |
|---|---|---|
| 09:41 | 1 | downloaded that. |
| 09:41 | 2 | Q.   Okay.  But the bottom line is he didn't download from |
| 09:41 | 3 | that, true? |
| 09:41 | 4 | A.   Not that I'm aware of. |
| 09:41 | 5 | Q.   Now, we've talked a little bit about your opinion about |
| 09:41 | 6 | what constitutes a trade secret.  And am I right that you're |
| 09:41 | 7 | not a lawyer? |
| 09:41 | 8 | A.   That's true. |
| 09:41 | 9 | Q.   And have you been given a copy of any jury instructions |
| 09:41 | 10 | defining what a trade secret is? |
| 09:41 | 11 | A.   No. |
| 09:41 | 12 | Q.   So when you're giving your opinion of a trade secret, |
| 09:41 | 13 | you're kind of using that as -- as a company executive, |
| 09:42 | 14 | right? |
| 09:42 | 15 | A.   Yeah.  It's what I understand per the handbook that |
| 09:42 | 16 | we're given. |
| 09:42 | 17 | Q.   Okay.  Now, Mr. Castilla also took a lot of personal |
| 09:42 | 18 | documents -- lotto numbers, favorite TV shows, that sort of |
| 09:42 | 19 | thing? |
| 09:42 | 20 | A.   Yes. |
| 09:42 | 21 | Q.   And so you've separated those out, right?  You're not |
| 09:42 | 22 | counting those as trade secrets? |
| 09:42 | 23 | A.   No. |
| 09:42 | 24 | Q.   But essentially anything that he took that was |
| 09:42 | 25 | generated by Mattel, in your mind, was a trade secret, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:42 | 1 | right? |
| 09:42 | 2 | A.   Well, when I thought it was proprietary and a |
| 09:42 | 3 | competitor could get some economic benefit from it. |
| 09:42 | 4 | Q.   But is there any document at all on the entire -- in |
| 09:42 | 5 | the entire group that he took that was a Mattel document |
| 09:42 | 6 | that you said was not a trade secret?  In your mind?  In |
| 09:42 | 7 | your opinion? |
| 09:42 | 8 | A.   Most of them were trade secrets.  I remember most of |
| 09:42 | 9 | them being there.  I don't remember one that I said wasn't. |
| 09:42 | 10 | Q.   Okay.  And let's talk about that for a second.  If we |
| 09:43 | 11 | could look at Exhibit 7192. |
| 09:43 | 12 | *(Document provided to the witness.)* |
| 09:43 | 13 | BY MS. KELLER: |
| 09:43 | 14 | Q.   This was a Trac form, T-R-A-C, for Mr. Castilla? |
| 09:43 | 15 | A.   Yes. |
| 09:43 | 16 | Q.   And that's a targeted assessment document that you get |
| 09:43 | 17 | when you get your annual review and your midyear review by |
| 09:43 | 18 | your bosses, right? |
| 09:43 | 19 | A.   Correct. |
| 09:43 | 20 | Q.   So it's part of his employment evaluation? |
| 09:43 | 21 | A.   Correct. |
| 09:43 | 22 | Q.   And? |
| 09:43 | 23 | MS. KELLER:  Your Honor, I'd move to admit 7192. |
| 09:43 | 24 | THE COURT:  Received. |
| 09:43 | 25 | *(Exhibit No. 7192 received in evidence.)* |

| | | |
|---|---|---|
| 09:43 | 1 | *(Document displayed.)* |
| 09:43 | 2 | BY MS. KELLER: |
| 09:43 | 3 | Q.  So this was for Mr. Castilla himself, right? |
| 09:43 | 4 | A.  Uh, yes, and for his personnel record. |
| 09:43 | 5 | Q.  And if -- if we look at 7192-3 -- |
| 09:43 | 6 | *(Document displayed.)* |
| 09:43 | 7 | BY MS. KELLER: |
| 09:43 | 8 | Q.  -- we see boxes at the bottom that aren't filled out, |
| 09:43 | 9 | right? |
| 09:43 | 10 | A.  Correct. |
| 09:43 | 11 | Q.  And those include things like whether his overall |
| 09:44 | 12 | rating is significantly above expectations, or above, or |
| 09:44 | 13 | met, or below, that sort of thing? |
| 09:44 | 14 | A.  Yes. |
| 09:44 | 15 | Q.  And if we look at the next page, 7192-4. |
| 09:44 | 16 | *(Document displayed.)* |
| 09:44 | 17 | BY MS. KELLER: |
| 09:44 | 18 | Q.  That's not filled out either, right? |
| 09:44 | 19 | A.  Correct. |
| 09:44 | 20 | Q.  And on the fifth page -- |
| 09:44 | 21 | *(Document displayed.)* |
| 09:44 | 22 | BY MS. KELLER: |
| 09:44 | 23 | Q.  -- no comments are filled out, right? |
| 09:44 | 24 | A.  Correct. |
| 09:44 | 25 | Q.  But in your mind, even this was a trade secret, right? |

| | | |
|---|---|---|
| 09:44 | 1 | A.   Um, well, I -- |
| 09:44 | 2 | Q.   This -- |
| 09:44 | 3 | A.   I'm sorry? |
| 09:44 | 4 | Q.   This document itself. |
| 09:44 | 5 | A.   I thought the document was, because our HR department |
| 09:44 | 6 | spent significant time and resources over six months to come |
| 09:44 | 7 | up with how we wanted to evaluate employees and what |
| 09:44 | 8 | characteristics were important to Mattel. |
| 09:44 | 9 | Q.   Well, but employers do that in general, don't they?  I |
| 09:44 | 10 | mean, they evaluate employees, right? |
| 09:44 | 11 | A.   I would imagine so. |
| 09:44 | 12 | Q.   And employers have forms for doing that, right? |
| 09:44 | 13 | A.   Yes. |
| 09:44 | 14 | Q.   And employers rate people on things like whether |
| 09:45 | 15 | they've met expectations? |
| 09:45 | 16 | A.   I would imagine so. |
| 09:45 | 17 | Q.   And you don't really know for sure what other employers |
| 09:45 | 18 | use for their forms because you've worked at Mattel for 26 |
| 09:45 | 19 | years, right? |
| 09:45 | 20 | A.   Correct. |
| 09:45 | 21 | Q.   So you don't know, for example, whether MGA has an |
| 09:45 | 22 | employment form that is much more detailed than this, less |
| 09:45 | 23 | detailed; you really don't know, right? |
| 09:45 | 24 | A.   I do not know. |
| 09:45 | 25 | Q.   So you really don't know what value this could be to |

| 09:45 | 1 | MGA because you don't know what MGA already has, true? |
| 09:45 | 2 | A. I do not know what MGA has. |
| 09:45 | 3 | Q. So you don't really know what value this could be to |
| 09:45 | 4 | MGA 'cause you don't know what they've got now, true? |
| 09:45 | 5 | A. Yeah, I don't know what they have now. |
| 09:45 | 6 | Q. Now, nobody at Mattel ever specifically tells employees |
| 09:45 | 7 | that they're not allowed to share their evaluations with |
| 09:45 | 8 | prospective future employers, right? |
| 09:45 | 9 | A. Not that I'm aware of. |
| 09:45 | 10 | Q. And so, you know, an employee would be free to go to a |
| 09:46 | 11 | future employer and say, "Hey, I always had fantastic |
| 09:46 | 12 | reviews, and here are my evaluations." That would be okay, |
| 09:46 | 13 | right? |
| 09:46 | 14 | A. I don't know if I'd like 'em sharing the form, but I |
| 09:46 | 15 | think it's fine to tell 'em that they had fantastic reviews. |
| 09:46 | 16 | Q. Well, whether you would like them to share the form or |
| 09:46 | 17 | not, they weren't prohibited from doing it, right? |
| 09:46 | 18 | A. Well, they weren't supposed to share proprietary |
| 09:46 | 19 | information that was developed by Mattel, and this, I think, |
| 09:46 | 20 | is developed by Mattel. |
| 09:46 | 21 | Q. Did anybody ever specifically tell the employees that |
| 09:46 | 22 | they're not to share their evaluations with perspective |
| 09:46 | 23 | future employers? |
| 09:46 | 24 | A. Not that I'm aware of. |
| 09:46 | 25 | Q. Okay. So the answer is no one ever told 'em that, that |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

68

| | | |
|---|---|---|
| 09:46 | 1 | you're aware of, right? |
| 09:46 | 2 | A.   Correct. |
| 09:46 | 3 | Q.   And this document -- if you can ignore the stuff on it |
| 09:46 | 4 | that says "Confidential Attorney's Eyes Only," 'cause that |
| 09:46 | 5 | was stamped on it for this litigation -- it doesn't have |
| 09:46 | 6 | "confidential" stamped on it anywhere, does it? |
| 09:47 | 7 | A.   No. |
| 09:47 | 8 | Q.   Now, let's look at Exhibit 7118. |
| 09:47 | 9 | (Document provided to the witness.) |
| 09:47 | 10 | MS. KELLER:  That's already in evidence. |
| 09:47 | 11 | (Document displayed.) |
| 09:47 | 12 | BY MS. KELLER: |
| 09:47 | 13 | Q.   And it's kind of hard to read this because it's -- |
| 09:47 | 14 | unfortunately, it's a little blurry.  But this is a one-page |
| 09:47 | 15 | calendar of events for international planning, right? |
| 09:47 | 16 | A.   Yes, it is. |
| 09:47 | 17 | Q.   And this is something else that in your opinion was a |
| 09:47 | 18 | trade secret of Mattel's, correct? |
| 09:47 | 19 | A.   Correct. |
| 09:47 | 20 | Q.   And let's look at line 6 under seasonal deadlines.  The |
| 09:47 | 21 | first column for January shows when the Hong Kong toy fair |
| 09:47 | 22 | was held, right? |
| 09:47 | 23 | A.   Correct. |
| 09:47 | 24 | Q.   That certainly is not a trade secret, is it? |
| 09:47 | 25 | A.   No. |

| 09:47 | 1 | Q.   And the second column for February shows when the |
| 09:47 | 2 | Nuremberg toy fair and New York toy fair were held, right? |
| 09:48 | 3 | A.   Correct. |
| 09:48 | 4 | Q.   That's not confidential information, right? |
| 09:48 | 5 | A.   No. |
| 09:48 | 6 | Q.   Not a trade secret. |
| 09:48 | 7 |      And let me ask you about -- several times you've used |
| 09:48 | 8 | this term "high level."  This document is high level. |
| 09:48 | 9 | Right?  And it's -- for those of us who are not in the |
| 09:48 | 10 | business world every day, when you say that something is |
| 09:48 | 11 | high level, you actually kind of mean the opposite, right? |
| 09:48 | 12 | You mean it's real basic, right? |
| 09:48 | 13 | A.   No.  I think it gives you an overview -- an overview of |
| 09:48 | 14 | something. |
| 09:48 | 15 | Q.   Well, so, for example, you might have a document that |
| 09:48 | 16 | says "goals" on one side, and on the other side it might |
| 09:48 | 17 | say, um, "planning to achieve goals."  And that would be a |
| 09:48 | 18 | high-level document, right? |
| 09:48 | 19 | A.   Yeah. |
| 09:48 | 20 | Q.   Well, let's say, you know, behind it you had a couple |
| 09:48 | 21 | pages of much more detailed information about how to achieve |
| 09:49 | 22 | those things, you would call page 1 with the two boxes, |
| 09:49 | 23 | goals and how to achieve those goals, that would be the |
| 09:49 | 24 | high-level document, right? |
| 09:49 | 25 | A.   I don't know if I would characterize it like that.  If |

| | | |
|---|---|---|
| 09:49 | 1 | you'd asked me, I would have said, you know, the whole |
| 09:49 | 2 | document would be a trade secret.  The heading on the first |
| 09:49 | 3 | page -- |
| 09:49 | 4 | Q.   Not my question. |
| 09:49 | 5 | A.   Okay.  I'm sorry. |
| 09:49 | 6 | Q.   Not my question. |
| 09:49 | 7 | You've used another term that I hear a lot from people |
| 09:49 | 8 | in the business world.  You talk about granularity, okay? |
| 09:49 | 9 | Where something is granular.  That means detailed, right? |
| 09:49 | 10 | A.   Correct. |
| 09:49 | 11 | Q.   When something has a lot of granularity, it has a lot |
| 09:49 | 12 | of detail, right? |
| 09:49 | 13 | A.   Yes. |
| 09:49 | 14 | Q.   And when you say something is high level, you mean it's |
| 09:49 | 15 | just an overview, right? |
| 09:49 | 16 | A.   Correct. |
| 09:49 | 17 | Q.   So you might have the overview, the high-level |
| 09:49 | 18 | document, and then behind it you have a lot of granularity, |
| 09:49 | 19 | right? |
| 09:49 | 20 | A.   Yes. |
| 09:49 | 21 | Q.   Okay.  I just wanted to make sure we were on the same |
| 09:49 | 22 | wavelength on that. |
| 09:49 | 23 | A.   Okay. |
| 09:50 | 24 | Q.   Now, let's look at Exhibit 7191. |
| 09:50 | 25 | *(Document provided to the witness.)* |

| 09:50 | 1  | *(Document displayed.)* |
| 09:50 | 2  | BY MS. KELLER: |
| 09:50 | 3  | Q.   This was a document that -- |
| 09:50 | 4  | MS. KELLER:  And this is already in evidence. |
| 09:50 | 5  | BY MS. KELLER: |
| 09:50 | 6  | Q.   This is a document I think you said you believed was a |
| 09:50 | 7  | trade secret in your opinion, right? |
| 09:50 | 8  | A.   Yes. |
| 09:50 | 9  | Q.   And this contains names and phone numbers of people who |
| 09:50 | 10 | work for Mattel, right? |
| 09:50 | 11 | A.   Yes, it does. |
| 09:50 | 12 | Q.   Now, let's look, for example, at the top part, where it |
| 09:50 | 13 | says "International El Segundo," and we see your name there, |
| 09:50 | 14 | Laura Owens, vice president, right? |
| 09:50 | 15 | A.   Correct. |
| 09:50 | 16 | Q.   And then we see Mr. Castilla's name was there too. |
| 09:50 | 17 | MS. KELLER:  Can we blow that up? |
| 09:50 | 18 | *(Technician complies.)* |
| 09:50 | 19 | BY MS. KELLER: |
| 09:50 | 20 | Q.   And over on the right is the phone number, right? |
| 09:50 | 21 | A.   Correct. |
| 09:50 | 22 | Q.   So you think this document that lists the various |
| 09:50 | 23 | people and their titles, this is a trade secret, true? |
| 09:51 | 24 | A.   Yeah.  Along with where they worked.  And it gives you |
| 09:51 | 25 | an idea maybe how big the organizations are in those |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 72 of 151   Page ID #:305886
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

72

| | | |
|---|---|---|
| 09:51 | 1 | particular countries because of the number of folks that |
| 09:51 | 2 | work there. |
| 09:51 | 3 | Q.   Now, this phone list, this list of people and what they |
| 09:51 | 4 | do -- and I see on one of them, for example, under France, |
| 09:51 | 5 | it lists a Melanie Broussaud as being on maternity leave? |
| 09:51 | 6 | A.   Yes. |
| 09:51 | 7 | Q.   Is that also a trade secret? |
| 09:51 | 8 | A.   That she's on maternity leave? |
| 09:51 | 9 | Q.   Yes. |
| 09:51 | 10 | A.   Probably not. |
| 09:51 | 11 | Q.   Have you tried, just out of curiosity, Googling and |
| 09:51 | 12 | seeing -- |
| 09:51 | 13 | A.   I actually did after someone asked me the other day.  I |
| 09:51 | 14 | couldn't find it. |
| 09:51 | 15 | Q.   Oh, really?  You couldn't find any of this? |
| 09:51 | 16 | A.   I couldn't find this document on the Internet. |
| 09:51 | 17 | Q.   I'm not talking about this document but the information |
| 09:51 | 18 | in it.  'cause I Googled it and found a lot of this |
| 09:51 | 19 | information; phone numbers, titles.  You can do that, can't |
| 09:51 | 20 | you? |
| 09:51 | 21 | A.   Yeah.  On specific individuals, yes. |
| 09:52 | 22 | Q.   Well, you could even Google Mattel and some titles and |
| 09:52 | 23 | some locations and up pops titles and phone numbers, right? |
| 09:52 | 24 |          THE COURT:  Counsel, can we strike that portion |
| 09:52 | 25 | about you Googling the Internet. |

| 09:52 | 1 | MS. KELLER:  Oh, okay. |
| 09:52 | 2 | THE COURT:  We're going to strike that portion |
| 09:52 | 3 | because we -- that's kind of hearsay and not appropriate. |
| 09:52 | 4 | So whether you Google or not.  We'll strike that. |
| 09:52 | 5 | BY MS. KELLER: |
| 09:52 | 6 | Q.   You can Google, for example, Mattel international |
| 09:52 | 7 | planning, France, and you come up with titles and phone |
| 09:52 | 8 | numbers, right? |
| 09:52 | 9 | A.   I have -- didn't do that specifically. |
| 09:52 | 10 | Q.   So you don't know really how secret it is, this |
| 09:52 | 11 | information that's contained here, right? |
| 09:52 | 12 | A.   In this format, with everybody listed, I couldn't find |
| 09:52 | 13 | that anywhere on the Internet. |
| 09:52 | 14 | Q.   Well, not talking about this particular form, okay? |
| 09:52 | 15 | I'm not talking about whether you could find this exact |
| 09:52 | 16 | form, but the information contained on the form, I mean, you |
| 09:52 | 17 | know that by Googling it you can get most or all of it, |
| 09:53 | 18 | right?  The information and the phone numbers and the names? |
| 09:53 | 19 | A.   I think you can probably get a few people's names and |
| 09:53 | 20 | numbers.  I don't know about everyone. |
| 09:53 | 21 | Q.   Might not be able to get maternity leave, true? |
| 09:53 | 22 | A.   Probably not. |
| 09:53 | 23 | Q.   Okay.  Now, you don't -- you don't have any knowledge |
| 09:53 | 24 | that MGA contacted any of the people on this list and tried |
| 09:53 | 25 | to hire them? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

74

| | | |
|---|---|---|
| 09:53 | 1 | A.   I have no knowledge one way or the other. |
| 09:53 | 2 | Q.   So even if MGA had gotten this document before it was |
| 09:53 | 3 | intercepted by the FBI, you don't have any way of knowing |
| 09:53 | 4 | whether it was ever used at all, true? |
| 09:53 | 5 | A.   True. |
| 09:53 | 6 | Q.   Now, let's look at the bottom of 7191. |
| 09:53 | 7 | *(Document displayed.)* |
| 09:53 | 8 | THE WITNESS:  Oh, sorry.  It's the same page. |
| 09:53 | 9 | BY MS. KELLER: |
| 09:53 | 10 | Q.   Same one? |
| 09:53 | 11 | A.   Okay. |
| 09:53 | 12 | Q.   And again, except for this confidential "Attorney's |
| 09:53 | 13 | Eyes Only," which was stamped on it in this litigation, you |
| 09:54 | 14 | don't see any confidential stamp on this anywhere, do you? |
| 09:54 | 15 | A.   No. |
| 09:54 | 16 | Q.   And let's look at Exhibit 7185. |
| 09:54 | 17 | *(Document provided to the witness.)* |
| 09:54 | 18 | *(Document displayed.)* |
| 09:54 | 19 | BY MS. KELLER: |
| 09:54 | 20 | Q.   This is a one-page task list with days remaining to |
| 09:54 | 21 | complete.  All right? |
| 09:54 | 22 | A.   Correct. |
| 09:54 | 23 | Q.   And I think you said that you think this is also |
| 09:54 | 24 | proprietary and, in your opinion, a trade secret of |
| 09:54 | 25 | Mattel's, right? |

| | | |
|---|---|---|
| 09:54 | 1 | A.    Correct. |
| 09:54 | 2 | Q.    This contains tasks that are specific to Mattel's |
| 09:54 | 3 | upgrade of its system, true? |
| 09:54 | 4 | A.    True. |
| 09:54 | 5 | Q.    But it doesn't say how any of those tasks are going to |
| 09:54 | 6 | be accomplished, right? |
| 09:54 | 7 | A.    No.  It's a listing of what they're about to do. |
| 09:54 | 8 | Q.    So it says things like "develop interface"? |
| 09:54 | 9 | A.    Correct. |
| 09:54 | 10 | Q.    Develop Excel templates.  Build SI download wizard, |
| 09:55 | 11 | right? |
| 09:55 | 12 | A.    Uh-huh. |
| 09:55 | 13 | Q.    So in addition to not saying how it's to be done, it |
| 09:55 | 14 | doesn't say whether it ever was done, right? |
| 09:55 | 15 | A.    It doesn't -- on this one it didn't say if it's |
| 09:55 | 16 | completed. |
| 09:55 | 17 | Q.    Doesn't say whether Mattel met a schedule, right? |
| 09:55 | 18 | A.    Correct. |
| 09:55 | 19 | Q.    Doesn't say whether any task was ever done, true? |
| 09:55 | 20 | A.    Well, I think this one is in midweek, so I think it's |
| 09:55 | 21 | showing that things were being worked on. |
| 09:55 | 22 | Q.    But it didn't say if they were ever completed? |
| 09:55 | 23 | A.    No. |
| 09:55 | 24 | Q.    And, in fact, it doesn't even say on this document if |
| 09:55 | 25 | the whole project was abandoned, right? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

76

| | | |
|---|---|---|
| 09:55 | 1 | A.   Not on this particular document. |
| 09:55 | 2 | Q.   Now, you don't know if there's anything in this |
| 09:55 | 3 | document that's unique to Mattel, true? |
| 09:55 | 4 | A.   I don't know what other companies do, so I wouldn't |
| 09:55 | 5 | know. |
| 09:55 | 6 | Q.   Okay.  And you don't know if the items listed here |
| 09:55 | 7 | would be found in most large company's forecasting systems, |
| 09:55 | 8 | right? |
| 09:56 | 9 | A.   I don't know. |
| 09:56 | 10 | Q.   So would I be correct in that statement:  That you |
| 09:56 | 11 | don't know if the items listed here would be found in most |
| 09:56 | 12 | large company's forecasting systems? |
| 09:56 | 13 | A.   Yeah, I don't know what's in other company's |
| 09:56 | 14 | forecasting systems. |
| 09:56 | 15 | Q.   Now, let's talk for a minute about documents that |
| 09:56 | 16 | focused on international planning, okay? |
| 09:56 | 17 | A.   Uh-huh. |
| 09:56 | 18 | Q.   And we talked about the fact that in 2006 you were |
| 09:56 | 19 | responsible for the international planning group that |
| 09:56 | 20 | Mr. Castilla was in, right? |
| 09:56 | 21 | A.   Correct. |
| 09:56 | 22 | Q.   And you work on what's called "international |
| 09:56 | 23 | forecasting and demand"? |
| 09:56 | 24 | A.   Yes. |
| 09:56 | 25 | Q.   And I'll bet you that's actually just what it sounds |

09:56   1   like, right?  You're trying to figure out what the demand is
09:56   2   gonna be so that Mattel can meet it?
09:56   3   A.   Correct.
09:56   4   Q.   And with respect to sales planning, your
09:56   5   responsibilities are for the international portion?
09:56   6   A.   Correct.
09:56   7   Q.   And so since 2005, you haven't had any responsibility
09:56   8   for sales planning in the United States, you personally in
09:57   9   your unit?
09:57   10   A.   No.
09:57   11   Q.   Would that be correct?
09:57   12   A.   Yes.
09:57   13   Q.   And you don't really have any in-depth knowledge of the
09:57   14   U.S. processes at the forecasting level, true?
09:57   15   A.   I -- not in depth.
09:57   16   Q.   And you can't really say whether there are differences
09:57   17   between the international forecasting process and domestic
09:57   18   forecasting process at Mattel, true?
09:57   19   A.   Well, I know that my counterpart has looked at our
09:57   20   forecasting framework and said a lot of it was similar.
09:57   21   Q.   But you personally, you can't say?
09:57   22   A.   Me personally, I don't go through the detail on that
09:57   23   side.
09:57   24   Q.   Now, you said that Mattel has this customized
09:57   25   forecasting system that it developed over years called

| | | |
|---|---|---|
| 09:57 | 1 | "ISIS"? |
| 09:57 | 2 | A.    Yes. |
| 09:57 | 3 | Q.    And a customized system means that it was developed and |
| 09:57 | 4 | the code was written in-house? |
| 09:57 | 5 | A.    Correct. |
| 09:57 | 6 | Q.    And it was customized for Mattel to do forecasting for |
| 09:57 | 7 | Mattel? |
| 09:58 | 8 | A.    Correct. |
| 09:58 | 9 | Q.    To meet Mattel's specific needs? |
| 09:58 | 10 | A.    Correct. |
| 09:58 | 11 | Q.    Right? |
| 09:58 | 12 | A.    Correct. |
| 09:58 | 13 | Q.    And you know that Mattel doesn't even use ISIS for |
| 09:58 | 14 | domestic forecasting, correct? |
| 09:58 | 15 | A.    Correct. |
| 09:58 | 16 | Q.    There's a different set of needs for domestic versus |
| 09:58 | 17 | international, right? |
| 09:58 | 18 | A.    Like I said before, I'm not that familiar with the U.S. |
| 09:58 | 19 | side of it, so I wouldn't -- |
| 09:58 | 20 | Q.    Well -- |
| 09:58 | 21 | A.    I wouldn't want to testify because I don't have |
| 09:58 | 22 | in-depth knowledge. |
| 09:58 | 23 | Q.    I'm not gonna ask you anything in depth. |
| 09:58 | 24 | A.    Okay. |
| 09:58 | 25 | Q.    I promise. |

| | | |
|---|---|---|
| 09:58 | 1 | A.   Okay. |
| 09:58 | 2 | Q.   But you know that Mattel in the U.S. relatively |
| 09:58 | 3 | recently started to use a product called "Demantra" for |
| 09:58 | 4 | domestic sales planning?  You know that, right? |
| 09:58 | 5 | A.   Yes. |
| 09:58 | 6 | Q.   And you yourself were not involved in that project to |
| 09:58 | 7 | implement that, right? |
| 09:58 | 8 | A.   Correct. |
| 09:58 | 9 | Q.   So we've got ISIS for international; Demantra for |
| 09:58 | 10 | domestic. |
| 09:58 | 11 |      And before Demantra, in 2005 and 2006 the domestic |
| 09:59 | 12 | sales planning system that Mattel used was something called |
| 09:59 | 13 | "SAF"? |
| 09:59 | 14 | A.   Yeah.  For the West Coast, yes. |
| 09:59 | 15 | Q.   And that was a 20-year-old system, true? |
| 09:59 | 16 | A.   I don't know the exact age of it, but I know it had |
| 09:59 | 17 | been around for a while. |
| 09:59 | 18 | Q.   Now, Demantra and SAF are both third-party vendors who |
| 09:59 | 19 | sell business forecasting software, right? |
| 09:59 | 20 | A.   I'm not sure about SAF, but Demantra, yes. |
| 09:59 | 21 | Q.   Well, you know that these two companies and many others |
| 09:59 | 22 | supply suites of software to help in the supply-chain |
| 09:59 | 23 | process? |
| 09:59 | 24 | A.   Correct. |
| 09:59 | 25 | Q.   And lots of other companies offer different tools to |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 80 of 151   Page ID #:305894
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

80

| | | |
|---|---|---|
| 09:59 | 1 | help with forecasting, right? |
| 09:59 | 2 | A.   That's correct. |
| 09:59 | 3 | Q.   Now, any company can go in and buy the Demantra |
| 09:59 | 4 | software off the shelf, right? |
| 09:59 | 5 | A.   I would imagine so. |
| 09:59 | 6 | Q.   And so if Mattel used SAF in 2005 and 2006, then |
| 09:59 | 7 | obviously Mattel scrapped that for Demantra in 2007, right? |
| 10:00 | 8 | A.   Can you repeat that?  I want to make sure I understood. |
| 10:00 | 9 | Q.   If Mattel used SAF in 2005 and 2006, obviously, it |
| 10:00 | 10 | scrapped it to use Demantra in 2007? |
| 10:00 | 11 | A.   That's right. |
| 10:00 | 12 | MR. ZELLER:  Assumes facts. |
| 10:00 | 13 | THE COURT:  Overruled. |
| 10:00 | 14 | THE WITNESS:  That's my understanding. |
| 10:00 | 15 | BY MS. KELLER: |
| 10:00 | 16 | Q.   And that was after Mr. Castilla left Mattel? |
| 10:00 | 17 | A.   I think -- I don't know the exact timeline, but I think |
| 10:00 | 18 | it was around that time. |
| 10:00 | 19 | Q.   Well, we know he left in March -- |
| 10:00 | 20 | A.   But when they started Demantra -- sorry. |
| 10:00 | 21 | Q.   When Mr. Castilla was at Mattel, Mattel used SAF for |
| 10:00 | 22 | domestic sales planning, true? |
| 10:00 | 23 | A.   That's my recollection. |
| 10:00 | 24 | Q.   You yourself have never used SAF, right? |
| 10:00 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 10:00 | 1 | Q.   And you don't know how -- really how the system works |
| 10:00 | 2 | in terms of what you would call functionalities? |
| 10:00 | 3 | A.   Not in any detail. |
| 10:00 | 4 | Q.   And Mr. Castilla was in international planning when he |
| 10:01 | 5 | was at Mattel, right? |
| 10:01 | 6 | A.   Correct. |
| 10:01 | 7 | Q.   And the documents that you've talked about relate to |
| 10:01 | 8 | international planning? |
| 10:01 | 9 | A.   Correct. |
| 10:01 | 10 | Q.   And he didn't have any involvement in upgrading the |
| 10:01 | 11 | U.S. system, correct? |
| 10:01 | 12 | A.   To Demantra, no. |
| 10:01 | 13 | Q.   And -- |
| 10:01 | 14 | A.   To my knowledge, he didn't. |
| 10:01 | 15 | Q.   And he didn't take any documents with him concerning |
| 10:01 | 16 | Demantra, the system that is currently in use in the U.S. by |
| 10:01 | 17 | Mattel, right? |
| 10:01 | 18 | A.   Not that I'm aware of. |
| 10:01 | 19 | Q.   And the system that was in use, in fact, at the time |
| 10:01 | 20 | that he left, right? |
| 10:01 | 21 | A.   I don't -- I don't recall if it was actually in -- |
| 10:01 | 22 | Demantra was in use when he left.  Was that the question? |
| 10:01 | 23 | Q.   Well, let's -- let's just look at another exhibit here. |
| 10:01 | 24 | Let's look at 7183, which is already admitted. |
| 10:01 | 25 | *(Document provided to the witness.)* |

| | | |
|---|---|---|
| 10:01 | 1 | (Document displayed.) |
| 10:01 | 2 | BY MS. KELLER: |
| 10:01 | 3 | Q.   And the front page of this says, "initial concept sales |
| 10:02 | 4 | planning." |
| 10:02 | 5 | Let's look at the second page. |
| 10:02 | 6 | (Document displayed.) |
| 10:02 | 7 | BY MS. KELLER: |
| 10:02 | 8 | Q.   It says that this concerns the ISIS sales planning, |
| 10:02 | 9 | right? |
| 10:02 | 10 | A.   Correct. |
| 10:02 | 11 | Q.   And this document is dated February 15th, 2005.  If we |
| 10:02 | 12 | look at that page that begins "initial concept"? |
| 10:02 | 13 | A.   Correct. |
| 10:02 | 14 | Q.   And under "current situation," the document says, "The |
| 10:02 | 15 | ISIS sales planning module has not been fully adopted by all |
| 10:02 | 16 | subsidiaries primarily because of limited functionability |
| 10:02 | 17 | and limited flexibility." |
| 10:02 | 18 | And that was an accurate statement at the time, wasn't |
| 10:02 | 19 | it? |
| 10:02 | 20 | A.   Yes, it was. |
| 10:02 | 21 | Q.   So Mattel's different international subsidiaries hadn't |
| 10:03 | 22 | fully developed ISIS, true? -- I mean -- I'm sorry -- fully |
| 10:03 | 23 | adopted ISIS? |
| 10:03 | 24 | A.   The ISIS sales planning, no, not everyone had adopted |
| 10:03 | 25 | it. |

| | | |
|---|---|---|
| 10:03 | 1 | Q.   And different subsidiaries, even of Mattel -- different |
| 10:03 | 2 | subsidiaries around the world, they all evolved different |
| 10:03 | 3 | processes for using something like this, right? |
| 10:03 | 4 | A.   Yes, they did. |
| 10:03 | 5 | Q.   Or using whatever they use, right? |
| 10:03 | 6 | A.   Yeah, they all use ISIS.  But it's just a sales |
| 10:03 | 7 | planning module that didn't have full adoption. |
| 10:03 | 8 | Q.   And so they might customize it; they might use parts of |
| 10:03 | 9 | it, not use parts of it, right? |
| 10:03 | 10 | A.   Correct. |
| 10:03 | 11 | Q.   And, um, you were actually trying to get your different |
| 10:03 | 12 | subsidiaries aligned using the tools you had made and the |
| 10:03 | 13 | processes you thought were best for Mattel, right? |
| 10:03 | 14 | A.   Correct. |
| 10:03 | 15 | Q.   But even within Mattel, you couldn't necessarily get |
| 10:03 | 16 | the different subsidiaries to buy into it, right? |
| 10:03 | 17 | A.   On the sale -- on the enhancements that we made? |
| 10:04 | 18 | Q.   Yes. |
| 10:04 | 19 | A.   No.  The subsidiaries, we rolled it out to the |
| 10:04 | 20 | subsidiaries, and they're using the backbone process in -- |
| 10:04 | 21 | in this -- in the enhancements. |
| 10:04 | 22 | Q.   But what we're talking about here, though, is that the |
| 10:04 | 23 | different subsidiaries around the world would all evolve |
| 10:04 | 24 | their own different processes, right? |
| 10:04 | 25 | A.   They did initially. |

| | | |
|---|---|---|
| 10:04 | 1 | Q.   And each within Mattel, then, there were differences |
| 10:04 | 2 | among the subsidiaries and how they did things, right? |
| 10:04 | 3 | A.   Correct. |
| 10:04 | 4 | Q.   And that's because they had their own needs, true? |
| 10:04 | 5 | A.   Um, or they just didn't talk to each other. |
| 10:04 | 6 | Q.   Or they had different needs in different countries, |
| 10:04 | 7 | true? |
| 10:04 | 8 | A.   Um, could be. |
| 10:04 | 9 | Q.   So, um, you would agree with me, wouldn't you, that |
| 10:04 | 10 | different companies have different needs?  I mean, just as a |
| 10:04 | 11 | general proposition? |
| 10:04 | 12 | A.   Yes. |
| 10:04 | 13 | Q.   And ISIS was customized, we talked about, for Mattel, |
| 10:05 | 14 | to do Mattel's international forecasting, to meet Mattel's |
| 10:05 | 15 | specific needs and requirements, right? |
| 10:05 | 16 | A.   Yeah. |
| 10:05 | 17 | Q.   And so as of 2005, even different Mattel international |
| 10:05 | 18 | subsidiaries hadn't adopted it? |
| 10:05 | 19 | A.   Wholesale, no. |
| 10:05 | 20 | Q.   Now -- |
| 10:05 | 21 | A.   Okay. |
| 10:05 | 22 | Q.   It's not necessarily true, is it, that something that |
| 10:05 | 23 | works for Mattel is gonna work for any other company, right? |
| 10:05 | 24 | A.   It could be true. |
| 10:05 | 25 | Q.   Well, that's why you customize things for Mattel's |

| | | |
|---|---|---|
| 10:05 | 1 | specific needs, right? |
| 10:05 | 2 | A.   Yeah.  For the needs of the toy industry. |
| 10:05 | 3 | Q.   Well -- and for Mattel's specific product lines, for |
| 10:05 | 4 | example, right? |
| 10:05 | 5 | A.   We don't customize it based on product line. |
| 10:05 | 6 | Q.   Well, Mattel does things its own way; would you agree |
| 10:05 | 7 | with me on that? |
| 10:05 | 8 | A.   I would think we would do things our own way, yes. |
| 10:05 | 9 | Q.   And Mattel is a very large company, the biggest toy |
| 10:05 | 10 | company in the world, true? |
| 10:05 | 11 | A.   True. |
| 10:05 | 12 | Q.   And has the most employees of any toy company in the |
| 10:06 | 13 | world, right? |
| 10:06 | 14 | A.   I believe so. |
| 10:06 | 15 | Q.   It's -- and it's publicly traded, so it's on a stock |
| 10:06 | 16 | exchange, right? |
| 10:06 | 17 | A.   Yes. |
| 10:06 | 18 | Q.   MGA is a much smaller company, isn't it? |
| 10:06 | 19 | A.   I believe so. |
| 10:06 | 20 | Q.   You know so, don't you? |
| 10:06 | 21 | A.   Yeah.  I couldn't tell you their sales, but I know |
| 10:06 | 22 | they're smaller than Mattel. |
| 10:06 | 23 | Q.   And it's a privately held company, right?  It's not |
| 10:06 | 24 | publicly traded? |
| 10:06 | 25 | A.   I believe so. |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 86 of 151   Page ID #:305900
CV 04-9049 DOC – 3/17/2011 – Day 25, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:06 | 1 | Q.    And MGA has far fewer international subsidiaries than |
| 10:06 | 2 | Mattel, true? |
| 10:06 | 3 | A.    That's my understanding. |
| 10:06 | 4 | Q.    And you don't even know yourself whether Mr. Castilla |
| 10:06 | 5 | was doing international forecasting at MGA in 2006 or 2007, |
| 10:06 | 6 | right? |
| 10:06 | 7 | A.    No, I don't know what he wound up doing. |
| 10:06 | 8 | Q.    Now, you were talking about the enhancements to |
| 10:06 | 9 | forecasting.  We talked about -- you mentioned that a minute |
| 10:06 | 10 | ago. |
| 10:06 | 11 | Let's go back for Exhibit 7183. |
| 10:06 | 12 | (Document provided to the witness.) |
| 10:06 | 13 | (Document displayed.) |
| 10:06 | 14 | BY MS. KELLER: |
| 10:06 | 15 | Q.    And -- |
| 10:07 | 16 | MS. KELLER:  You got 7183?  Yes.  Let's look at |
| 10:07 | 17 | the third page. |
| 10:07 | 18 | (Document displayed.) |
| 10:07 | 19 | BY MS. KELLER: |
| 10:07 | 20 | Q.    And at the bottom it says, "approach/major |
| 10:07 | 21 | steps/timing." |
| 10:07 | 22 | Okay.  This is -- this is this ISIS sales planning |
| 10:07 | 23 | development document? |
| 10:07 | 24 | A.    Correct. |
| 10:07 | 25 | Q.    And so if we look at the bottom box on page 3, we see |

| | | |
|---|---|---|
| 10:07 | 1 | approach/major steps/timing."  You see that? |
| 10:07 | 2 | A.   Yes, I do. |
| 10:07 | 3 | Q.   And first point is "requirements, gathering, March |
| 10:07 | 4 | '05"? |
| 10:07 | 5 | A.   Yes. |
| 10:07 | 6 | Q.   And then a little lower down, "steps for Phase I, 1.1 |
| 10:07 | 7 | deliver business specifications, analyze and provide |
| 10:07 | 8 | detailed systems specification," right? |
| 10:07 | 9 | A.   Correct. |
| 10:07 | 10 | Q.   That step took place in 2005, didn't it? |
| 10:08 | 11 | A.   Yes, it did. |
| 10:08 | 12 | Q.   And then you go a little further down, Step 2 is |
| 10:08 | 13 | "Program and test system changes, enabling optional use per |
| 10:08 | 14 | subsidiary." |
| 10:08 | 15 | That phase started in the last half of 2005.  Lasted a |
| 10:08 | 16 | few months, right? |
| 10:08 | 17 | A.   Correct. |
| 10:08 | 18 | Q.   So the ISIS planning enhancements that you talked about |
| 10:08 | 19 | started in 2005? |
| 10:08 | 20 | A.   Yes, they did. |
| 10:08 | 21 | Q.   And then you did a pilot program in the middle or later |
| 10:08 | 22 | half of 2006 to try to test those? |
| 10:08 | 23 | A.   Yes. |
| 10:08 | 24 | Q.   So these enhancements weren't even tested as of the |
| 10:08 | 25 | time Mr. Castilla left Mattel, true? |

| 10:08 | 1 | A.   Well, they were being tested in -- you know, some of |
| 10:08 | 2 | the functionality, in the early part of '06, but they hadn't |
| 10:08 | 3 | been rolled out completely to a subsidiary yet. |
| 10:08 | 4 | Q.   Well, you hadn't even finished the testing when he |
| 10:08 | 5 | left, true? |
| 10:08 | 6 | A.   True. |
| 10:08 | 7 | Q.   And let alone implemented them, right? |
| 10:08 | 8 | A.   Correct. |
| 10:08 | 9 | Q.   So he was not even around at the time testing was |
| 10:09 | 10 | completed and these things were implemented, right? |
| 10:09 | 11 | A.   Correct. |
| 10:09 | 12 | THE COURT:  Is this a good time for a break, |
| 10:09 | 13 | Counsel? |
| 10:09 | 14 | MS. KELLER:  It would be fine, Your Honor. |
| 10:09 | 15 | THE COURT:  Okay.  Then, ladies and gentlemen, |
| 10:09 | 16 | you're admonished not to discuss this matter amongst |
| 10:09 | 17 | yourselves, nor form or express any opinion concerning the |
| 10:09 | 18 | case. |
| 10:09 | 19 | We'll come and get you at 10:30.  Have a nice |
| 10:09 | 20 | recess. |
| 10:09 | 21 | If you will step down, please, and we'll have you |
| 10:09 | 22 | be seated at 10:30. |
| 10:09 | 23 | *(Recess held at 10:09 A.M.)* |
| 10:09 | 24 | THE COURT:  Counsel, we'll see you at 10:30. |
| 10:09 | 25 | *(Outside the presence of the jury.)* |

| 10:09 | 1 | THE COURT: I'm sorry. One more thing on the |
| 10:09 | 2 | record. Just informally for a moment. About how much |
| 10:09 | 3 | longer do you think you'll be, about? |
| 10:09 | 4 | MS. KELLER: About 20 to 30 minutes at most. |
| 10:09 | 5 | THE COURT: Hour, hour and a half? |
| 10:09 | 6 | MS. KELLER: No. |
| 10:09 | 7 | THE COURT: Have you looked at the requested time |
| 10:10 | 8 | frame yet from the submission by Mattel? |
| 10:10 | 9 | MR. McCONVILLE: Yes, I marked it up while I was |
| 10:10 | 10 | sitting here. |
| 10:10 | 11 | THE COURT: Okay. Go talk to him. We'll take a |
| 10:10 | 12 | break. |
| 10:10 | 13 | By the way, on the record. My memory, Ms. Keller, |
| 10:10 | 14 | is this: Of the 160-some orders that the Court turned out |
| 10:10 | 15 | in discovery, there's much more history, I think, to this |
| 10:10 | 16 | Monster High, if my memory's correct. And one of the |
| 10:10 | 17 | reasons is that your claim, in fairness, is a unique |
| 10:10 | 18 | position that both MGA and Mattel was put in. You have to |
| 10:10 | 19 | remember that when Monster High was -- when MGA was seeking |
| 10:10 | 20 | discovery of Monster High, there was a problem presented to |
| 10:10 | 21 | this Court, and Mattel's resistance was, in part, due -- |
| 10:10 | 22 | because Mr. Larian had been involved in the discovery |
| 10:10 | 23 | process. And I forget as a 30(b)6 witness or whatever. |
| 10:11 | 24 | And when this motion was coming to the Court, I |
| 10:11 | 25 | had the unique problem of, literally, information that would |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 90 of 151   Page ID #:305904
CV 04-9049 DOC – 3/17/2011 – Day 25, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:11 | 1 | now be disclosed where a client in a competitive situation |
| 10:11 | 2 | would be viewing now Monster High and the development. |
| 10:11 | 3 | And regardless of that, there was depositional |
| 10:11 | 4 | testimony taken about Monster High. |
| 10:11 | 5 | Second, the parties literally couldn't work out a |
| 10:11 | 6 | solution at that time. I mean, they have never been able to |
| 10:11 | 7 | work out any solution before you joined the case. I'm just |
| 10:11 | 8 | kidding you. |
| 10:11 | 9 | But the end result was, it's hard to imagine the |
| 10:11 | 10 | record that, quote-quote, this is unfair. I'll wait until |
| 10:11 | 11 | the end of direct examination, and we'll have Mr. Eckert |
| 10:11 | 12 | over there being deposed tonight. If there's any problems |
| 10:11 | 13 | at all, you'll have that opportunity. Trust me. |
| 10:11 | 14 | He's not leaving, and I know he'll like to join |
| 10:11 | 15 | our Court family now. |
| 10:11 | 16 | So you're not going to be biased or prejudiced by |
| 10:11 | 17 | that. By the same token, we've got to work out this concern |
| 10:11 | 18 | by Mattel, because their concern at the time was: Here's |
| 10:12 | 19 | Mr. Larian looking at the development stage, et cetera, of |
| 10:12 | 20 | Monster High and the continued exasperation -- I'm sorry -- |
| 10:12 | 21 | exacerbation and ongoing lawsuits. The next lawsuit you |
| 10:12 | 22 | could picture was Mattel suing Mr. Larian because he had |
| 10:12 | 23 | gotten access to Monster High. Mr. Larian now being accused |
| 10:12 | 24 | through no fault of his own. By the same token, Mattel had |
| 10:12 | 25 | a legitimate concern of giving this directly to a |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 91 of 151   Page ID #:305905
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

91

| | | |
|---|---|---|
| 10:12 | 1 | competitor. |
| 10:12 | 2 | Now, that's my memory.  I'll go back and look at |
| 10:12 | 3 | the transcripts, but I'm not finding any fault with either |
| 10:12 | 4 | party.  This isn't the insidiousness of Mattel trying to |
| 10:12 | 5 | hide the development of Monster High, and in fact, I recall |
| 10:12 | 6 | that some deposition took place concerning Monster High.  I |
| 10:12 | 7 | read all the documents.  I saw the depositional testimony. |
| 10:12 | 8 | But you have to remember, I talked to the Special Master, |
| 10:12 | 9 | Mr. O'Brien, almost every evening between 11:00 and about |
| 10:12 | 10 | 11:45.  I may have missed a few weeks or a few evenings, but |
| 10:12 | 11 | I didn't know what was happening at the deposition.  I just |
| 10:13 | 12 | knew about the problems occurring and kind of a |
| 10:13 | 13 | generalization of what was happening across the street. |
| 10:13 | 14 | You make your record after we're done with the |
| 10:13 | 15 | direct examination of Mr. Eckert.  I think it's going to be |
| 10:13 | 16 | brief, nonharmful, but if it turns out to be harmful, let's |
| 10:13 | 17 | get him deposed tonight.  And I'll reserve Robert O'Brien. |
| 10:13 | 18 | He'll be down here in just a few moments, standing by. |
| 10:13 | 19 | MS. KELLER:  I appreciate that, Your Honor.  We |
| 10:13 | 20 | would like to depose him tonight on the development of |
| 10:13 | 21 | Monster High.  And also, if we could have production of the |
| 10:13 | 22 | documents related to that. |
| 10:13 | 23 | THE COURT:  Now we've got to work out, really, |
| 10:13 | 24 | Attorney's Eyes Only or something.  Some agreement that we |
| 10:13 | 25 | could never reach before, because you could just picture the |

| | | |
|---|---|---|
| 10:13 | 1 | next lawsuit.  As Mr. Larian has sued, you know, Mattel. |
| 10:13 | 2 | Now Mattel is going to re-sue on Monster High.  It goes on |
| 10:13 | 3 | and on.  Can we work out something that we could never work |
| 10:13 | 4 | out before, where it's Attorney's Eyes Only, basically? |
| 10:13 | 5 | MS. KELLER:  Well, Your Honor, it's been in the |
| 10:13 | 6 | market for a while now.  For 20 years. |
| 10:13 | 7 | THE COURT:  By the way, you're right, because when |
| 10:13 | 8 | this first came on my radar screen, this was a long time |
| 10:13 | 9 | ago.  It was still in that kind of exacerbating stage, where |
| 10:14 | 10 | I was concerned about -- |
| 10:14 | 11 | MS. KELLER:  It's been on the market for two years |
| 10:14 | 12 | at this point. |
| 10:14 | 13 | THE COURT:  How is it doing? |
| 10:14 | 14 | MR. QUINN:  No.  It came on market in the summer |
| 10:14 | 15 | of 2010. |
| 10:14 | 16 | THE COURT:  Well, we'll talk about it tonight. |
| 10:14 | 17 | The main thing is I reserved Robert O'Brien.  Mr. Eckert's |
| 10:14 | 18 | coming down today anyway. |
| 10:14 | 19 | MR. QUINN:  He's here. |
| 10:14 | 20 | THE COURT:  And we can get the information turned |
| 10:14 | 21 | over or not, but eventually, I'll know through Mr. O'Brien |
| 10:14 | 22 | sometime how that's proceeding tonight. |
| 10:14 | 23 | And also, I think that this might be a lot of |
| 10:14 | 24 | to-do about nothing.  Let's hear that direct examination and |
| 10:14 | 25 | really see where you want to go.  It may not cause the |

| 10:14 | 1 | wholesale disclosure.  I think that that is a little extreme |
| 10:14 | 2 | right now.  Let's get the person on direct examination. |
| 10:14 | 3 | Okay? |
| 10:14 | 4 | MS. KELLER:  Thank you, Your Honor. |
| 10:14 | 5 | Now, go take a recess for 15 minutes. |
| 10:14 | 6 | *(Recess held at 10:14 a.m.)* |
| 10:31 | 7 | *(Proceedings resumed at 10:31 a.m.)* |
| 10:31 | 8 | *(In the presence of the jury.)* |
| 10:31 | 9 | THE COURT:  All right.  We're back in session. |
| 10:31 | 10 | The jury's present.  The witness is present, all counsel. |
| 10:32 | 11 | Thank you for your courtesy.  If you would be seated. |
| 10:32 | 12 | Ms. Keller, if you would continue, please, with |
| 10:32 | 13 | your cross-examine of Ms. Owens. |
| 10:32 | 14 | MS. KELLER:  Thank you, Your Honor. |
| 10:32 | 15 | **CROSS-EXAMINATION (Resumed)** |
| 10:32 | 16 | BY MS. KELLER: |
| 10:32 | 17 | Q.   Ms. Owens, you were talking a little bit about the |
| 10:32 | 18 | forecasting enhancements that you were trying to get put |
| 10:32 | 19 | into place for the ISIS system. |
| 10:32 | 20 | Do you remember that? |
| 10:32 | 21 | A.   Yes. |
| 10:32 | 22 | Q.   And the whole forecasting enhancement system was aimed |
| 10:32 | 23 | at trying to get this old-fashioned green-screen system, |
| 10:32 | 24 | ISIS -- you know, we talked about the little green screens |
| 10:32 | 25 | we used to have back in the day? -- this ISIS was an old |

94

| | | |
|---|---|---|
| 10:32 | 1 | green-screen system, and the enhancements were aimed at |
| 10:32 | 2 | trying to get it to talk to Excel, right? |
| 10:32 | 3 | A.   One of the enhancements was, yes. |
| 10:32 | 4 | Q.   Well, for example, let's look at 7177-A. |
| 10:33 | 5 | *(Document provided to the witness.)* |
| 10:33 | 6 | *(Document displayed.)* |
| 10:33 | 7 | BY MS. KELLER: |
| 10:33 | 8 | Q.   And it says at the top "Marketing process data flow". |
| 10:33 | 9 | And that's -- that's really what this addresses, right? |
| 10:33 | 10 | This chart addresses trying to get this old green-screen |
| 10:33 | 11 | system talking to Excel, right? |
| 10:33 | 12 | A.   Um, yeah.  It's so that people could input stuff and |
| 10:33 | 13 | then upload it.  'Cause they had to travel with it. |
| 10:33 | 14 | Q.   And you wouldn't need to do that if you bought an |
| 10:33 | 15 | up-to-date system that already had all these functions |
| 10:33 | 16 | integrated into it, true? |
| 10:33 | 17 | A.   I'm not sure that's true. |
| 10:33 | 18 | Q.   Well, do you know what kind of system MGA uses? |
| 10:33 | 19 | A.   No, I don't. |
| 10:33 | 20 | Q.   You don't know whether MGA used an up-to-date system |
| 10:33 | 21 | where you wouldn't have to put all these enhancements into |
| 10:33 | 22 | place, right? |
| 10:33 | 23 | A.   I have no idea what they're using. |
| 10:33 | 24 | Q.   So, for example, if MGA was using an up-to-date system, |
| 10:34 | 25 | as opposed to trying to take one of these old-fashioned |

| | | |
|---|---|---|
| 10:34 | 1 | systems and integrate it with Excel, this wouldn't be of any |
| 10:34 | 2 | use to MGA, true? |
| 10:34 | 3 | A.   I don't know if that's true.  Because if you don't have |
| 10:34 | 4 | a connection to the Internet, you maybe want to be able to |
| 10:34 | 5 | download stuff so that you could use it offline. |
| 10:34 | 6 | Q.   But you don't know what -- |
| 10:34 | 7 | A.   No, I -- I don't know. |
| 10:34 | 8 | Q.   So that's my point, that knowing about this is really |
| 10:34 | 9 | pretty useless to MGA, if MGA had an up-to-date system, |
| 10:34 | 10 | right? |
| 10:34 | 11 | A.   I don't know if it -- I honestly don't know. |
| 10:34 | 12 | Q.   Okay.  Let's talk a little bit about the Manugistics |
| 10:34 | 13 | project that you discussed earlier.  Remember that? |
| 10:34 | 14 | A.   Yes. |
| 10:34 | 15 | Q.   And you said Mr. Castilla took various documents |
| 10:34 | 16 | relating to that, true? |
| 10:34 | 17 | A.   True. |
| 10:34 | 18 | Q.   Now, Manugistics is a company that provides software to |
| 10:34 | 19 | various companies to use in forecasting, right? |
| 10:34 | 20 | A.   Yes, it was. |
| 10:34 | 21 | Q.   And MGA could contact Manugistics, itself, and just buy |
| 10:34 | 22 | a system from Manugistics if it wanted to, true? |
| 10:35 | 23 | A.   True. |
| 10:35 | 24 | Q.   And Mattel didn't end up using Manugistics, right? |
| 10:35 | 25 | A.   Correct. |

| 10:35 | 1 | Q.   It just didn't work in the toy industry, right? |
| 10:35 | 2 | A.   The statistical forecasting piece. |
| 10:35 | 3 | We actually, used that software in some other place, |
| 10:35 | 4 | but not for forecasting. |
| 10:35 | 5 | Q.   Not for the purposes that we're talking about in this |
| 10:35 | 6 | trial with respect to what Mr. Castilla took, right? |
| 10:35 | 7 | A.   Correct. |
| 10:35 | 8 | Q.   And the documents that Mr. Castilla took included |
| 10:35 | 9 | manuals that Mattel and Manugistics put together and would |
| 10:35 | 10 | have used if Mattel ended up using Manugistics, right? |
| 10:35 | 11 | A.   Correct. |
| 10:35 | 12 | MS. KELLER:  And let's take a look at 7255. |
| 10:35 | 13 | *(Document provided to the witness.)* |
| 10:35 | 14 | *(Document displayed.)* |
| 08:49 | 15 | BY MS. KELLER: |
| 10:35 | 16 | Q.   This is a manual on how to use Manugistics for people |
| 10:35 | 17 | who actually use Manugistics, right? |
| 10:35 | 18 | A.   Correct. |
| 10:35 | 19 | Q.   And Mattel doesn't, not for the purposes that we've |
| 10:36 | 20 | talked about, right? |
| 10:36 | 21 | A.   Yeah.  It didn't in the long run, no. |
| 10:36 | 22 | Q.   And to your knowledge MGA doesn't either, true? |
| 10:36 | 23 | A.   I don't know what they use. |
| 10:36 | 24 | Q.   So Mr. Castilla took a manual for a system that Mattel |
| 10:36 | 25 | doesn't even use, right? |

| | | |
|---|---|---|
| 10:36 | 1 | A.    Correct. |
| 10:36 | 2 | Q.    That he could have gotten had he -- at any company that |
| 10:36 | 3 | actually used Manugistics -- bought the system from |
| 10:36 | 4 | Manugistics, right? |
| 10:36 | 5 | A.    Well, I believe, if you look through the manual, some |
| 10:36 | 6 | of it is -- refers specifically to Mattel.  So I think |
| 10:36 | 7 | it's -- they're basing that it's been configured for |
| 10:36 | 8 | Mattel -- |
| 10:36 | 9 | Q.    But the bottom -- |
| 10:36 | 10 | A.    -- to train -- to train people. |
| 10:36 | 11 | Q.    But the bottom line is Mattel decided that it wasn't |
| 10:36 | 12 | useful for forecasting and didn't use it, true? |
| 10:36 | 13 | A.    We couldn't get statistical forecasting to work. |
| 10:36 | 14 | Q.    And didn't use it? |
| 10:36 | 15 | A.    And didn't use it. |
| 10:36 | 16 | Q.    And then this information, too, and all of the |
| 10:37 | 17 | information that we've discussed today and last week, all of |
| 10:37 | 18 | it is part of the information that you know to have been |
| 10:37 | 19 | intercepted by the FBI, correct? |
| 10:37 | 20 | A.    I believe so. |
| 10:37 | 21 | MS. KELLER:  Thank you. |
| 10:37 | 22 | Nothing further. |
| 10:37 | 23 | THE COURT:  All right.  Thank you. |
| 10:37 | 24 | Counsel, redirect. |
| 10:37 | 25 | This is Mr. Zeller on behalf of Mattel. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

98

| | | |
|---|---|---|
| 10:37 | 1 | **REDIRECT EXAMINATION** |
| | 2 | BY MR. ZELLER: |
| 10:37 | 3 | Q.   You testified that Mattel contacted the FBI about |
| 10:37 | 4 | Mr. Castilla's taking of this Mattel information that we've |
| 10:37 | 5 | been discussing? |
| 10:37 | 6 | A.   Yes. |
| 10:37 | 7 | Q.   Do you know what happened with copies of these |
| 10:37 | 8 | electronic files that Mr. Castilla took between the time |
| 10:37 | 9 | that he took them, while he was still at Mattel, and then |
| 10:37 | 10 | the time that the FBI went in and talked to him about it? |
| 10:38 | 11 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:38 | 12 | evidence, that there were copies made. |
| 10:38 | 13 | THE COURT:  Overruled. |
| 10:38 | 14 | THE WITNESS:  No, I don't know. |
| 10:38 | 15 | BY MR. ZELLER: |
| 10:38 | 16 | Q.   Do you know what happened to those files in between the |
| 10:38 | 17 | time -- |
| 10:38 | 18 | THE COURT:  You're still referring to the thumb |
| 10:38 | 19 | drive? |
| 10:38 | 20 | MR. ZELLER:  Well, that actually needs to be |
| 10:38 | 21 | cleared up.  It's something different. |
| 10:38 | 22 | BY MR. ZELLER: |
| 10:38 | 23 | Q.   In fact, you're aware that, generally speaking, based |
| 10:38 | 24 | on the information you received in connection with this |
| 10:38 | 25 | case, that what Mr. Castilla did was is he downloaded the |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:38 | 1 | folder or the files in the "To Take" folder to a PDA, not a |
| 10:38 | 2 | thumb drive? |
| 10:38 | 3 | A.   Yeah, that's my understanding. |
| 10:38 | 4 | Q.   And do you know what happened or have any information |
| 10:38 | 5 | as to what happened to that PDA between the time that |
| 10:38 | 6 | Mr. Castilla downloaded the files onto the PDA and the time |
| 10:38 | 7 | that the FBI obtained it from Mr. Castilla at his house? |
| 10:38 | 8 | A.   No.  I have no idea what was done with it. |
| 10:38 | 9 | Q.   Were you aware that Mr. Castilla actually first told |
| 10:39 | 10 | the FBI he couldn't find that PDA? |
| 10:39 | 11 | A.   Or he couldn't find the chip that goes into the PDA |
| 10:39 | 12 | that has the information on it. |
| 10:39 | 13 | Q.   So you're aware that that's what he first told the FBI? |
| 10:39 | 14 | A.   Yeah. |
| 10:39 | 15 | Q.   Did you become aware what it is that Mr. Castilla told |
| 10:39 | 16 | the FBI had happened to that chip in the PDA when he |
| 10:39 | 17 | eventually gave it to them? |
| 10:39 | 18 | MS. KELLER:  Objection.  Double hearsay. |
| 10:39 | 19 | THE COURT:  It is hearsay, isn't it, Counsel? |
| 10:39 | 20 | MR. ZELLER:  They've gone into this understanding. |
| 10:39 | 21 | THE COURT:  Well, they have.  It's not for the |
| 10:39 | 22 | truth of the matter asserted.  It's to show what actions she |
| 10:39 | 23 | took as a representative of Mattel when they apparently |
| 10:39 | 24 | contacted the FBI. |
| 10:39 | 25 | Okay.  Counsel. |

| | | |
|---|---|---|
| 10:39 | 1 | THE WITNESS:  So do I get to answer that? |
| 10:39 | 2 | THE COURT:  Yes. |
| 10:39 | 3 | THE WITNESS:  Can you ask it one more time? |
| 10:39 | 4 | MR. ZELLER:  Sure. |
| 02:59 | 5 | BY MR. ZELLER: |
| 10:39 | 6 | Q.   Do you know where Mr. Castilla said he eventually found |
| 10:39 | 7 | the chip from the PDA that had those files after he'd first |
| 10:39 | 8 | told FBI he couldn't find it. |
| 10:39 | 9 | MS. KELLER:  Same objection, Your Honor. |
| 10:40 | 10 | THE COURT:  Yeah.  Mr. Castilla is available, |
| 10:40 | 11 | isn't he?  Didn't we have his deposition on Saturday? |
| 10:40 | 12 | MR. McCONVILLE:  Yes, sir. |
| 10:40 | 13 | THE COURT:  I don't know.  I mean, Robert O'Brien |
| 10:40 | 14 | was -- I'd ordered him in on Saturday.  I talked to him |
| 10:40 | 15 | across the street by phone.  Is he around? |
| 10:40 | 16 | MR. ZELLER:  He was, Your Honor. |
| 10:40 | 17 | THE COURT:  I'm gonna sustain the objection. |
| 10:40 | 18 | Let's get him in here.  Okay? |
| 10:40 | 19 | MR. ZELLER:  This goes to what steps she took, |
| 10:40 | 20 | what she understood. |
| 10:40 | 21 | They put that at issue as -- |
| 10:40 | 22 | THE COURT:  Well, yeah.  But this is specific |
| 10:40 | 23 | information. |
| 10:40 | 24 | It's literally -- the jury has heard that he took |
| 10:40 | 25 | the files, whether or not they're intercepted or not -- but |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 101 of 151   Page ID #:305915
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

101

| | | |
|---|---|---|
| 10:40 | 1 | certainly, I'm allowing you to get in the fact that nobody |
| 10:40 | 2 | knows what happened to the PDA.  That's not hearsay. |
| 10:40 | 3 | And also, I think she's a 30(b)(6) of some type. |
| 10:40 | 4 | THE WITNESS:  Yes. |
| 10:40 | 5 | THE COURT:  Since everybody in the case seems to |
| 10:40 | 6 | be a 30(b)(6).  Just kidding you. |
| 10:40 | 7 | THE WITNESS:  I didn't know what that was a month |
| 10:40 | 8 | ago. |
| 10:40 | 9 | THE COURT:  But as far as the specific |
| 10:40 | 10 | information, it can only have one import:  That's for the |
| 10:41 | 11 | truth of the matter asserted.  And if I've got Robert |
| 10:41 | 12 | O'Brien working Saturdays, I need to have him work Sundays |
| 10:41 | 13 | also, apparently.  So let's get him in here if you want. |
| 10:41 | 14 | He'll be here tonight, also, by the way.  I just |
| 10:41 | 15 | contacted him, Counsel, for our night session. |
| 10:41 | 16 | MR. ZELLER:  Thank you. |
| 10:41 | 17 | THE COURT:  (To the jury:)  By the way, if you |
| 10:41 | 18 | hear that name, he's just a special master that I also use, |
| 10:41 | 19 | which is of no consequence to you, for the jury. |
| 10:41 | 20 | So, counsel. |
| 10:41 | 21 | BY MR. ZELLER: |
| 10:41 | 22 | Q.   And I take it, in your view, one of the steps that |
| 10:41 | 23 | Mattel took to protect its trade secret information, or |
| 10:41 | 24 | information that in your view was trade secret, was |
| 10:41 | 25 | contacting the FBI? |

CV 04-9049 DOC – 3/17/2011 – Day 25, Volume 1 of 3

102

| 10:41 | 1 | A.   Yes. |
| 10:41 | 2 | Q.   Do you know what communications Mr. Castilla had with |
| 10:41 | 3 | MGA prior to the time that he left Mattel? |
| 10:41 | 4 | A.   I don't have specific knowledge, no. |
| 10:41 | 5 | Q.   Do you know what communications Mr. Castilla had with |
| 10:41 | 6 | MGA from the time that he copied those folder -- those files |
| 10:41 | 7 | from the "To Take" folder until the FBI got the chip from |
| 10:42 | 8 | the PDA? |
| 10:42 | 9 | A.   No, I don't. |
| 10:42 | 10 | Q.   Do you know what communications Mr. Larian and |
| 10:42 | 11 | Mr. Castilla had during that time period? |
| 10:42 | 12 | A.   No, I don't. |
| 10:42 | 13 | Q.   You were asked some questions about the inventory |
| 10:42 | 14 | update reports. |
| 10:42 | 15 | MR. ZELLER:  And if we could pull up the |
| 10:42 | 16 | demonstrative again.  That's 24172.  I think this is the |
| 10:42 | 17 | last page. |
| 10:42 | 18 | *(Document displayed.)* |
| 11:59 | 19 | BY MR. ZELLER: |
| 10:42 | 20 | Q.   And you'll see that these are the exhibit numbers of |
| 10:42 | 21 | the inventory reports that Mr. Castilla took. |
| 10:42 | 22 | A.   Yes. |
| 10:42 | 23 | Q.   And, generally speaking, are these reports quarter to |
| 10:42 | 24 | quarter? |
| 10:42 | 25 | A.   Yeah.  They're every -- every couple of months.  And |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 103 of 151   Page ID #:305917
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

103

| | | |
|---|---|---|
| 10:42 | 1 | they represent quarter-to-quarter information. |
| 10:42 | 2 | Q.   And do they show both the forecasting as well as the |
| 10:42 | 3 | actuals over that time period? |
| 10:43 | 4 | A.   Yes, it does. |
| 10:43 | 5 | Q.   And so this was information that would show the trends |
| 10:43 | 6 | within the business? |
| 10:43 | 7 | A.   Yeah.  It would say what we were planning, what |
| 10:43 | 8 | actually happened, how accurate we were, um -- it just kind |
| 10:43 | 9 | of showed trends as what was going on, if you took all of |
| 10:43 | 10 | 'em. |
| 10:43 | 11 | Q.   And when you say "how accurate" the information -- "how |
| 10:43 | 12 | we were," what were you referring to? |
| 10:43 | 13 | A.   Well, if you projected you were gonna have so much |
| 10:43 | 14 | inventory, is that indeed what happened. |
| 10:43 | 15 | Q.   Well, is it something that shows how accurate Mattel's |
| 10:43 | 16 | forecasting systems were at that time? |
| 10:43 | 17 | A.   Yeah.  At a high level, yes. |
| 10:43 | 18 | Q.   Was any of the information -- or let me ask it this |
| 10:43 | 19 | way: |
| 10:43 | 20 | With respect to these various documents that we've been |
| 10:43 | 21 | talking about, as the inventory update reports that |
| 10:43 | 22 | Mr. Castilla took, was this public information? |
| 10:43 | 23 | A.   No. |
| 10:43 | 24 | Q.   You are aware, as you've said, I think, that |
| 10:43 | 25 | Mr. Castilla obtained and took some Mattel documents because |

| | | |
|---|---|---|
| 10:44 | 1 | he had put them in the "To Take" folder and then downloaded |
| 10:44 | 2 | to that to a PDA? |
| 10:44 | 3 | A.   Yes. |
| 10:44 | 4 | Q.   Do you know if Mr. Castilla took more information than |
| 10:44 | 5 | that, such as hard copy document? |
| 10:44 | 6 | A.   He might have, but I don't have specific knowledge of |
| 10:44 | 7 | that. |
| 10:44 | 8 | Q.   So what other inventory update reports he took in hard |
| 10:44 | 9 | copy or any other documents, you don't know? |
| 10:44 | 10 | A.   No.  I have no idea. |
| 10:44 | 11 | Q.   We have talked about 30(b)(6) witnesses.  And you were |
| 10:44 | 12 | a 30(b)(6) witness in -- on some topics in this case? |
| 10:44 | 13 | A.   Yes. |
| 10:44 | 14 | Q.   Were you ever the 30(b)(6) witness on what evidence of |
| 10:44 | 15 | use there was of the trade secrets? |
| 10:44 | 16 | A.   No. |
| 10:44 | 17 | Q.   That wasn't something that you were designated to |
| 10:44 | 18 | testify about? |
| 10:44 | 19 | A.   That was my understanding. |
| 10:44 | 20 | Q.   So that's not -- so you're not the person to talk to |
| 10:44 | 21 | about whether or not MGA used the information that |
| 10:45 | 22 | Mr. Castilla took? |
| 10:45 | 23 | A.   Correct. |
| 10:45 | 24 | Q.   And, by the way, you said a few times that -- in |
| 10:45 | 25 | response to counsel's questions, that you don't know what |

| | | |
|---|---|---|
| 10:45 | 1 | planning or forecasting systems MGA uses, right? |
| 10:45 | 2 | A.   Correct. |
| 10:45 | 3 | Q.   Does MGA publicly disclose what forecasting and |
| 10:45 | 4 | planning systems it uses? |
| 10:45 | 5 | A.   Not to my knowledge. |
| 10:45 | 6 | Q.   Is that something you would expect a competitor in the |
| 10:45 | 7 | toy industry to make publicly known? |
| 10:45 | 8 | A.   No. |
| 10:45 | 9 | Q.   In fact, is it the opposite:  You would be surprised if |
| 10:45 | 10 | a competitor in the toy industry was publicly publishing |
| 10:45 | 11 | details, information about the structure, um, and |
| 10:45 | 12 | organization of its planning and forecasting systems? |
| 10:45 | 13 | A.   I'd be really surprised. |
| 10:45 | 14 | Q.   Let's please take a look at Exhibit 7191. |
| 10:45 | 15 | *(Document provided to the witness.)* |
| 10:46 | 16 | *(Document displayed.* |
| 10:46 | 17 | BY MR. ZELLER: |
| 10:46 | 18 | Q.   This is the international planning organization |
| 10:46 | 19 | document we were talking about. |
| 10:46 | 20 | A.   Yes, it is. |
| 10:46 | 21 | Q.   Is this collection of information that's reflected on |
| 10:46 | 22 | this page in this document something that was publicly |
| 10:46 | 23 | available back in 2005 or 2006? |
| 10:46 | 24 | A.   Not to my knowledge. |
| 10:46 | 25 | Q.   And I think you were starting to say, in response to |

| | | |
|---|---|---|
| 10:46 | 1 | some questions, that you, yourself, had actually gone on and |
| 10:46 | 2 | tried to search to see if you could find this information? |
| 10:46 | 3 | A.   Yes. |
| 10:46 | 4 | Q.   Please tell us what you did? |
| 10:46 | 5 | A.   I just went onto the network and put "international |
| 10:46 | 6 | planning organization, Mattel."  I couldn't really call up |
| 10:46 | 7 | anything that had this comprehensive document like it is.  I |
| 10:46 | 8 | didn't look at Linked-In or anything like that. |
| 10:46 | 9 | Q.   Well, did you find this entire collection of names and |
| 10:47 | 10 | the markets they worked in? |
| 10:47 | 11 | A.   No. |
| 10:47 | 12 | Q.   So you didn't find it in any form, all together? |
| 10:47 | 13 | A.   Right.  No, I didn't find it -- I was looking for it |
| 10:47 | 14 | all together. |
| 10:47 | 15 | Q.   In your view, are specific words, specific lines in |
| 10:47 | 16 | this document, such as somebody being on maternity leave, |
| 10:47 | 17 | the trade secret here? |
| 10:47 | 18 | A.   No. |
| 10:47 | 19 | Q.   Please explain for us, then, what's the trade secret |
| 10:47 | 20 | information that you believe exists in this document? |
| 10:47 | 21 | A.   Well, I think it's the individuals, and then it's got |
| 10:47 | 22 | the structure of the countries.  You can probably glean from |
| 10:47 | 23 | this, depending on how many people you have in each country, |
| 10:47 | 24 | what subsidiaries you have. |
| 10:47 | 25 | If you don't have a big international presence, but |

| 10:47 | 1 | you're maybe planning to have one later on, this kind of |
|---|---|---|
| 10:47 | 2 | tells you -- gives you some indication of where you have to |
| 10:47 | 3 | meet Mattel head-to-head -- I mean, as an example. |
| 10:48 | 4 | MR. ZELLER:  If we can go back to Exhibit 24172, |
| 10:48 | 5 | which is the listing. |
| 10:48 | 6 | *(Document displayed.)* |
| 10:48 | 7 | MR. ZELLER:  If we just go through those pages, |
| 10:48 | 8 | Ken. |
| 10:48 | 9 | *(Technician complies.)* |
| 10:48 | 10 | BY MR. ZELLER: |
| 10:48 | 11 | Q.   Now, among these documents that Mr. Castilla took -- |
| 10:48 | 12 | and, by the way, there were a total of 96 documents that |
| 10:48 | 13 | were in the "To Take" folder? |
| 10:48 | 14 | A.   That's correct. |
| 10:48 | 15 | Q.   'Cause I think -- |
| 10:48 | 16 | A.   I said "92" before, because I wasn't thinking about his |
| 10:48 | 17 | lottery numbers and other things.  'Cause he had a couple -- |
| 10:48 | 18 | he had some personal items in there. |
| 10:48 | 19 | Q.   So then the listing we have here is just of the Mattel |
| 10:48 | 20 | documents that you believe and understand Mattel is claiming |
| 10:48 | 21 | as trade secret? |
| 10:48 | 22 | A.   Correct. |
| 10:48 | 23 | Q.   Now, with respect to these various documents that |
| 10:48 | 24 | Mr. Castilla put in the "To Take" folder, then downloaded to |
| 10:48 | 25 | his PDA, were any of these documents about off-the-shelf, |

| 10:49 | 1 | third-party software systems? |
| 10:49 | 2 | A.    I mean -- documentation about that? |
| 10:49 | 3 | Q.    Right. |
| 10:49 | 4 | A.    No. |
| 10:49 | 5 | Q.    These were about customized and specialized systems? |
| 10:49 | 6 | A.    Yeah.  They're -- they take a lot of work to configure, |
| 10:49 | 7 | and usually need consultants and a process to enable them in |
| 10:49 | 8 | any organization. |
| 10:49 | 9 | Q.    And is it the case that knowing what doesn't work -- |
| 10:49 | 10 | well, actually, let me step back for a moment. |
| 10:49 | 11 | You were asked some questions about -- about ISIS and |
| 10:49 | 12 | particular weaknesses of ISIS, as well as the fact that the |
| 10:49 | 13 | Manugistics system wasn't used, and similar questions? |
| 10:49 | 14 | A.    Yes. |
| 10:49 | 15 | Q.    And if you can tell us, as somebody in this area, is it |
| 10:49 | 16 | the case that knowing what doesn't work something that can |
| 10:49 | 17 | be valuable to a competitor? |
| 10:49 | 18 | A.    Absolutely.  You don't have to spend the money to |
| 10:49 | 19 | investigate it, or you can go about it a different way. |
| 10:50 | 20 | Q.    And is it also the case that information that does work |
| 10:50 | 21 | about forecasting and planning is something that can be used |
| 10:50 | 22 | by a competitor to design or improve their own systems? |
| 10:50 | 23 | A.    I believe so. |
| 10:50 | 24 |         MR. ZELLER:  I have nothing further. |
| 10:50 | 25 |         THE COURT:  Recross by Ms. Keller on behalf of |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:50 | 1 | Mr. Larian and MGA. |
| 10:50 | 2 | **RECROSS-EXAMINATION** |
| 10:50 | 3 | BY MS. KELLER: |
| 10:50 | 4 | Q.   Ms. Owens, you know what Linked-In is, don't you. |
| 10:50 | 5 | A.   Yes. |
| 10:50 | 6 | Q.   Linked-In is an online directory where people can post |
| 10:50 | 7 | all sorts of information about themselves and link |
| 10:50 | 8 | themselves to colleagues? |
| 10:50 | 9 | A.   Correct. |
| 10:50 | 10 | Q.   And Linked-In has over ten thousand employees listed on |
| 10:50 | 11 | it, doesn't it? |
| 10:50 | 12 | A.   I don't know the exact number. |
| 10:50 | 13 | Q.   I mean, if you put "Mattel" in Linked-In, you really |
| 10:51 | 14 | find just about every single person at any kind of a high |
| 10:51 | 15 | level who works for Mattel, don't you? |
| 10:51 | 16 | MR. ZELLER:  Question's vague as to time period. |
| 10:51 | 17 | Irrelevant for that reason. |
| 10:51 | 18 | THE COURT:  Well, what time period, Counsel? |
| 10:51 | 19 | MS. KELLER:  Last five years, last six years. |
| 10:51 | 20 | THE COURT:  Thank you. |
| 10:51 | 21 | THE WITNESS:  Can you repeat the question? |
| 10:51 | 22 | BY MS. KELLER: |
| 10:51 | 23 | Q.   If you put in -- if you go to Linked-In and you just |
| 10:51 | 24 | put in the word "Mattel," are you aware that you get over |
| 10:51 | 25 | ten thousand names of employees? |

| | | |
|---|---|---|
| 10:51 | 1 | MR. ZELLER:  Same objection. |
| 10:51 | 2 | THE COURT:  Overruled. |
| 10:51 | 3 | THE WITNESS:  I haven't tried that.  Wouldn't |
| 10:51 | 4 | surprise me. |
| 08:46 | 5 | BY MS. KELLER: |
| 10:51 | 6 | Q.  And, in fact, executives almost all tend to post their |
| 10:51 | 7 | information on Linked-In, right? |
| 10:51 | 8 | A.  I don't know that for a fact. |
| 10:51 | 9 | Q.  You didn't check, though, to see if a person could |
| 10:51 | 10 | simply go to Linked-In, punch in "Mattel," and find all the |
| 10:51 | 11 | names that you talked about on Exhibit 7191, along with |
| 10:51 | 12 | their job description, right? |
| 10:51 | 13 | A.  I didn't go to Linked-In.  I was looking for the |
| 10:52 | 14 | specific document. |
| 10:52 | 15 | Q.  Okay.  Now, the -- we talked about the fact that the |
| 10:52 | 16 | day after Mr. Castilla resigned, these meetings began with |
| 10:52 | 17 | you and security and legal, right? |
| 10:52 | 18 | A.  Correct. |
| 10:52 | 19 | Q.  Very concerned about the documents that he took, right? |
| 10:52 | 20 | A.  Yes. |
| 10:52 | 21 | Q.  Um, did you call MGA, call Mr. Larian, and say, "Hey, |
| 10:52 | 22 | this guy you just hired, he took some documents"? |
| 10:52 | 23 | A.  No, I didn't. |
| 10:52 | 24 | Q.  Did you direct anyone to do that? |
| 10:52 | 25 | A.  No, I didn't. |

| | | |
|---|---|---|
| 10:52 | 1 | Q.   Uh, and, to your knowledge, no letter was even sent to |
| 10:52 | 2 | MGA saying, "Hey, this employee that you just hired took our |
| 10:52 | 3 | stuff," correct? |
| 10:52 | 4 | A.   Yeah, I have no awareness of that. |
| 10:52 | 5 | Q.   Well, this is your subject area, though, right? |
| 10:52 | 6 | A.   Yeah. |
| 10:52 | 7 | Q.   This international planning, that's your thing.  You're |
| 10:52 | 8 | the head of it, true? |
| 10:52 | 9 | A.   True. |
| 10:52 | 10 | Q.   And as far as you know, not one person ever |
| 10:52 | 11 | contacted -- not one person ever contacted MGA -- not one |
| 10:53 | 12 | person from Mattel -- not legal, not security, not you -- |
| 10:53 | 13 | and said, "Hey, you know, we don't want -- we want to make |
| 10:53 | 14 | sure you're aware of this, and we don't want this stuff |
| 10:53 | 15 | used"? |
| 10:53 | 16 | A.   No.  I'm not aware that anybody did that. |
| 10:53 | 17 | Q.   And you were never copied, for example, on a so-called |
| 10:53 | 18 | cease-and-desist letter or anything like that, right? |
| 10:53 | 19 | A.   No. |
| 10:53 | 20 | Q.   And, in fact, this was kind of a sting operation, |
| 10:53 | 21 | wasn't it? |
| 10:53 | 22 | MR. ZELLER:  Objection.  Argumentative. |
| 10:53 | 23 | THE WITNESS:  I -- |
| 10:53 | 24 | THE COURT:  Well, I'm not sure if the witness |
| 10:53 | 25 | knows what a sting operation is. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

112

| | | |
|---|---|---|
| 10:10 | 1 | BY MS. KELLER: |
| 10:53 | 2 | Q.   Well, Mattel was aware that Mr. Castilla was |
| 10:53 | 3 | downloading this information at the time he was downloading |
| 10:53 | 4 | it, right? |
| 10:53 | 5 | A.   I honestly don't know if they knew it at the time or |
| 10:53 | 6 | they looked after he left. |
| 10:53 | 7 | Q.   Well, if they looked after he left, it would have been |
| 10:53 | 8 | immediately after he left, right? |
| 10:53 | 9 | A.   Correct. |
| 10:53 | 10 | Q.   Because, by the next day, there was a meeting being |
| 10:53 | 11 | held, and you had already reviewed the documents, right? |
| 10:54 | 12 | A.   I reviewed the document at the meeting that I was |
| 10:54 | 13 | called down to.  I had no knowledge of it before then. |
| 10:54 | 14 | Q.   And as I mentioned earlier, the FBI was contacted |
| 10:54 | 15 | immediately, right? |
| 10:54 | 16 | A.   Yes. |
| 10:54 | 17 | MS. KELLER:  Thank you. |
| 10:54 | 18 | Nothing further. |
| 10:54 | 19 | THE COURT:  I'm placing all of the witnesses on |
| 10:54 | 20 | call until May 7th.  But the case will conclude, believe me, |
| 10:54 | 21 | much earlier than that.  In fact, in about -- well, couple |
| 10:54 | 22 | hours. |
| 10:54 | 23 | So go about your professional responsibilities. |
| 10:54 | 24 | Take any personal engagements you have planned.  If we need |
| 10:54 | 25 | you, trust me we'll find you. |

| | | |
|---|---|---|
| 10:54 | 1 | THE WITNESS:  Okay.  Thank you, Your Honor. |
| 10:54 | 2 | THE COURT:  Okay.  Step down, please. |
| 10:54 | 3 | *(Witness steps down subject to recall.)* |
| 10:54 | 4 | THE COURT:  Counsel, your next witness, please. |
| 10:54 | 5 | MR. QUINN:  Your Honor, our next witness will be |
| 10:54 | 6 | Robert Eckert. |
| 10:54 | 7 | THE COURT:  Thank you. |
| 10:54 | 8 | MR. QUINN:  Can we have about five minutes to move |
| 10:54 | 9 | some boxes, bring in boxes? |
| 10:54 | 10 | THE COURT:  All right. |
| 10:54 | 11 | (To the jury:)  There are some boxes that have to |
| 10:54 | 12 | be moved, just like when Mr. Larian testified.  So let's |
| 10:54 | 13 | take five minutes or so.  Let counsel bring in all the boxes |
| 10:54 | 14 | that they're going to be referring to on both sides. |
| 10:55 | 15 | Please don't discuss this matter amongst |
| 10:55 | 16 | yourselves nor form or express any opinion. |
| 10:55 | 17 | We'll come and get you very quickly. |
| 10:55 | 18 | Counsel, if both sides can start the |
| 10:55 | 19 | transportation process. |
| 10:55 | 20 | MR. QUINN:  Thank you, Your Honor. |
| 10:55 | 21 | *(Jury recesses.)* |
| 10:55 | 22 | *(Pause in the proceedings at 10:55 a.m.)* |
| 11:05 | 23 | *(Proceedings resumed at 11:05 a.m.)* |
| 11:05 | 24 | *(In the presence of the jury.)* |
| 11:05 | 25 | THE COURT:  Okay.  We're back on the record. |

| | | |
|---|---|---|
| 11:05 | 1 | Counsel are present.  The jury's present, the alternates. |
| 11:06 | 2 | And Counsel on behalf of Mattel, would you call |
| 11:06 | 3 | your next witness, please. |
| 11:06 | 4 | MR. QUINN:  Your Honor, Mattel calls Robert |
| 11:06 | 5 | Eckert. |
| 11:06 | 6 | THE COURT:  Thank you, sir.  If you'd step |
| 11:06 | 7 | forward, please, between the double doors. |
| 11:06 | 8 | Now, sir, would you stop, and raise your right |
| 11:06 | 9 | hand. |
| 11:06 | 10 | **ROBERT ECKERT, MATTEL'S WITNESS, SWORN** |
| 11:06 | 11 | THE WITNESS:  I do. |
| 11:06 | 12 | THE COURT:  Thank you, sir.  If you would come |
| 11:06 | 13 | along the jury railing, please.  If you would be seated in |
| 11:06 | 14 | the chair and state your full name, please. |
| 11:06 | 15 | THE WITNESS:  My name is Robert Allen Eckert. |
| 11:06 | 16 | THE COURT:  Would you spell your last name, |
| 11:06 | 17 | please. |
| 11:06 | 18 | THE WITNESS:  E-C-K-E-R-T. |
| 11:06 | 19 | THE COURT:  This is Mr. Quinn on behalf of |
| 11:06 | 20 | Mattel -- |
| 11:06 | 21 | MR. QUINN:  Thank you, Your Honor. |
| 11:06 | 22 | THE COURT:  -- direct examination. |
| 11:06 | 23 | **DIRECT EXAMINATION** |
| 11:06 | 24 | BY MR. QUINN: |
| 11:06 | 25 | Q.   Mr. Eckert, by whom are you employed? |

| 11:06 | 1 | A.   I'm employed by Mattel Incorporated. |
| 11:06 | 2 | Q.   What position do you have there? |
| 11:06 | 3 | A.   I am the chairman of the board and the chief executive |
| 11:07 | 4 | officer. |
| 11:07 | 5 | Q.   And for how long have you been the chairman and CEO of |
| 11:07 | 6 | Mattel? |
| 11:07 | 7 | A.   Since May of 2000. |
| 11:07 | 8 | Q.   And prior to joining Mattel in May of 2000, what was |
| 11:07 | 9 | your employment? |
| 11:07 | 10 | A.   I was employed by Kraft Foods for 23 years. |
| 11:07 | 11 | Q.   And what was your position, your last position at |
| 11:07 | 12 | Kraft? |
| 11:07 | 13 | A.   I was the president and chief executive officer of |
| 11:07 | 14 | Kraft Foods, Incorporated. |
| 11:07 | 15 | Q.   Prior to Kraft, what was your employment? |
| 11:07 | 16 | A.   I worked many jobs during college and high school. |
| 11:07 | 17 | Q.   All right.  So we're back to your education, then? |
| 11:07 | 18 | A.   Okay. |
| 11:07 | 19 | Q.   Could you tell the jury what your educational -- what |
| 11:07 | 20 | degrees you have. |
| 11:07 | 21 | A.   I have a Bachelor of Science degree from the University |
| 11:07 | 22 | of Arizona, and I have a master of management degree from |
| 11:07 | 23 | Northwestern University. |
| 11:07 | 24 | Q.   After you got your masters in management from |
| 11:07 | 25 | Northwestern, did you join Kraft? |

| | | |
|---|---|---|
| 11:07 | 1 | A.   Yes, about two weeks later. |
| 11:08 | 2 | Q.   Other than your position as CEO of chairman -- CEO and |
| 11:08 | 3 | chairman of Mattel, do you have any other business |
| 11:08 | 4 | affiliations or obligations that -- you know, in your |
| 11:08 | 5 | business life now that you have? |
| 11:08 | 6 | A.   Well, I'm on the board of directors of two companies: |
| 11:08 | 7 | McDonald's Corporation and Levi Strauss & Co. |
| 11:08 | 8 | Q.   And how about in terms of any academic institutions, do |
| 11:08 | 9 | you have any ongoing obligation? |
| 11:08 | 10 | A.   I do.  I'm affiliated with -- or a member of the Board |
| 11:08 | 11 | of Visitors at the UCLA Anderson School of Management.  And |
| 11:08 | 12 | I am a member of the advisory board of the Kellogg School of |
| 11:08 | 13 | Management at Northern Western University. |
| 11:08 | 14 | Q.   And are you involved in any institutions relating to |
| 11:08 | 15 | public affairs or in the public sphere? |
| 11:08 | 16 | A.   I am.  I'm a director of the World Affairs Council in |
| 11:08 | 17 | Southern California, and I'm a director of the Pacific |
| 11:08 | 18 | Council on International Policy in Southern California. |
| 11:09 | 19 | Q.   What is the World Affairs Council? |
| 11:09 | 20 | A.   It's an organization that provides a place for people, |
| 11:09 | 21 | particularly leaders from outside of the United States, to |
| 11:09 | 22 | come and address the community of Los Angeles or Southern |
| 11:09 | 23 | California. |
| 11:09 | 24 | Q.   You have noticed -- and I'm sure others have noticed -- |
| 11:09 | 25 | that you have not been in the courtroom during this trial up |

| | | |
|---|---|---|
| 11:09 | 1 | to this point? |
| 11:09 | 2 | A.   Other than for opening arguments, that's true. |
| 11:09 | 3 | Q.   Is there a reason for that? |
| 11:09 | 4 | A.   I've been excluded pursuant to a Court order, I think. |
| 11:09 | 5 | Q.   Did you understand there's a Court order that people |
| 11:09 | 6 | who are going to be witnesses are not supposed to be in the |
| 11:09 | 7 | audience and attend the Court until after they testify? |
| 11:09 | 8 | A.   That's correct. |
| 11:09 | 9 | Q.   And, by the way, before we get into your background at |
| 11:09 | 10 | Mattel, let's just ask, do you have a Linked-In account |
| 11:09 | 11 | yourself? |
| 11:09 | 12 | A.   No, I do not. |
| 11:09 | 13 | Q.   How did you come to join Mattel from Kraft? |
| 11:09 | 14 | A.   I was recruited by a recruit -- executive recruiting |
| 11:09 | 15 | firm named Korn/Ferry. |
| 11:10 | 16 | Q.   They contacted you? |
| 11:10 | 17 | A.   They did. |
| 11:10 | 18 | Q.   All right.  And what was the -- they kind of indicated |
| 11:10 | 19 | that there was an opening at Mattel, that Mattel was looking |
| 11:10 | 20 | for a CEO? |
| 11:10 | 21 | A.   It was public knowledge at the time, but, yes, they did |
| 11:10 | 22 | indicate that to me. |
| 11:10 | 23 | Q.   And what was the next step after they contacted you? |
| 11:10 | 24 | A.   I spoke on the phone with representatives from |
| 11:10 | 25 | Korn/Ferry, and then I met with Richard Ferry of Korn/Ferry |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

118

| | | |
|---|---|---|
| 11:10 | 1 | in a conference room at O'Hare Airport in Chicago, where I |
| 11:10 | 2 | worked. |
| 11:10 | 3 | Q.   And did there reach -- come a point where you started |
| 11:10 | 4 | to talk to people on the Board at Mattel? |
| 11:10 | 5 | A.   Yes.  I did talk to four directors on the Board |
| 11:10 | 6 | sometime over probably the next four or six weeks. |
| 11:10 | 7 | Q.   And did -- there came a point where you actually |
| 11:10 | 8 | received an offer for the position of being CEO at Mattel? |
| 11:10 | 9 | A.   Yes, that's correct. |
| 11:10 | 10 | Q.   And once you received Mattel's offer, did you accept it |
| 11:10 | 11 | as soon as you received it? |
| 11:10 | 12 | A.   No, I did not. |
| 11:10 | 13 | Q.   What was the sequence of events? |
| 11:11 | 14 | A.   I understood the offer.  Some of it had been negotiated |
| 11:11 | 15 | by representatives of mine, including legal counsel.  So |
| 11:11 | 16 | I -- I had the offer in hand.  And then I resigned from my |
| 11:11 | 17 | employer and then I accepted the offer. |
| 11:11 | 18 | Q.   I mean, there's a -- a statement that's been made in |
| 11:11 | 19 | this trial that you signed a contract with Mattel while you |
| 11:11 | 20 | were still employed by Kraft. |
| 11:11 | 21 | Is that a true statement? |
| 11:11 | 22 | A.   No, it is not. |
| 11:11 | 23 | Q.   What was the actual sequence? |
| 11:11 | 24 | A.   I resigned from my position, and then I signed the |
| 11:11 | 25 | employment agreement, which at that time was a term sheet, |

| | | |
|---|---|---|
| 11:11 | 1 | if you will. |
| 11:11 | 2 | Q.   And how much time transpired between the time that you |
| 11:11 | 3 | were first contacted about this opportunity and the time |
| 11:11 | 4 | that you resigned, roughly? |
| 11:11 | 5 | A.   Probably in the six-to-eight-week range. |
| 11:12 | 6 | Q.   So at no point were you working for two companies at |
| 11:12 | 7 | once? |
| 11:12 | 8 | A.   That's correct. |
| 11:12 | 9 | Q.   On your first day of employment at Mattel, did you sign |
| 11:12 | 10 | an inventions agreement? |
| 11:12 | 11 | A.   I did.  It may have been my second day.  Certainly -- |
| 11:12 | 12 | my first day in the office, my first full day at Mattel. |
| 11:12 | 13 | Q.   If we could place before you, Mr. Eckert, |
| 11:12 | 14 | Exhibit 13614. |
| 11:12 | 15 | (Document provided to the witness.) |
| 11:12 | 16 | BY MR. QUINN: |
| 11:12 | 17 | Q.   And I will ask you if you can identify that as the |
| 11:12 | 18 | Mattel inventions agreement, which you signed on your first |
| 11:12 | 19 | day in the office at Mattel? |
| 11:12 | 20 | A.   Yes, I can identify this. |
| 11:12 | 21 | MR. QUINN:  We'd offer Exhibit 13614, Your Honor. |
| 11:12 | 22 | THE COURT:  Received. |
| 11:12 | 23 | (Exhibit No. 13614 received in evidence.) |
| 11:12 | 24 | MR. QUINN:  If we could publish that for the jury. |
| 11:12 | 25 | (Document displayed.) |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

120

| | | |
|---|---|---|
| 11:12 | 1 | BY MR. QUINN: |
| 11:12 | 2 | Q.   Have you had a chance -- have you taken time to review |
| 11:12 | 3 | this inventions agreement? |
| 11:12 | 4 | A.   Yes, I have. |
| 11:12 | 5 | Q.   Have you had an opportunity to compare it with Carter |
| 11:12 | 6 | Bryant's inventions agreement? |
| 11:13 | 7 | A.   Yes, I have. |
| 11:13 | 8 | Q.   And can you tell the jury whether or not this is |
| 11:13 | 9 | word-for-word the same agreement that Carter Bryant signed? |
| 11:13 | 10 | A.   Based on my reading, they are identical. |
| 11:13 | 11 | Q.   And what was your understanding about how this |
| 11:13 | 12 | inventions agreement worked in terms of inventions developed |
| 11:13 | 13 | by an employee or ideas that an employee comes up with |
| 11:13 | 14 | during their appointment at Mattel, whether it's you, or |
| 11:13 | 15 | Carter Bryant, or anyone else -- what was your understanding |
| 11:13 | 16 | of how that worked? |
| 11:13 | 17 | A.   My understanding was that things we devise or create at |
| 11:13 | 18 | Mattel belong to Mattel, and that we would respect the |
| 11:13 | 19 | confidentiality of Mattel's property. |
| 11:13 | 20 | Q.   Did it include -- I mean, was some distinction made in |
| 11:13 | 21 | your own mind, or so far as you've heard, relating to other |
| 11:13 | 22 | employees -- any distinction made by things that -- ideas |
| 11:13 | 23 | that people come up with, or inventions that people have, |
| 11:13 | 24 | while -- between 9:00 to 5:00, while they're on the company |
| 11:13 | 25 | premises, versus nights and weekends? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:14 | 1 | A.   No.  I've never -- never had that distinction or heard |
| 11:14 | 2 | of that distinction in practice. |
| 11:14 | 3 | Q.   There are agreements like this, in your experience -- |
| 11:14 | 4 | or, in your understanding, are understandings like this |
| 11:14 | 5 | common in the business world? |
| 11:14 | 6 | A.   Yes.  I think they're certainly common in the toy |
| 11:14 | 7 | industry. |
| 11:14 | 8 | Q.   And even at Kraft, I mean, did you have some kind of |
| 11:14 | 9 | understanding that things that you came up with whether it |
| 11:14 | 10 | was during the workday or on nights and weekends, if it |
| 11:14 | 11 | related to Kraft's business, the food business, that's |
| 11:14 | 12 | something that really the company owned? |
| 11:14 | 13 | MS. KELLER:  Objection.  Irrelevant. |
| 11:14 | 14 | THE COURT:  Overruled. |
| 11:14 | 15 | THE WITNESS:  Yes, certainly. |
| 11:14 | 16 | BY MR. QUINN: |
| 11:14 | 17 | Q.   Can you think of a specific example of maybe something |
| 11:14 | 18 | where you came up with an idea while you were working at |
| 11:14 | 19 | Kraft, outside the ordinary business hours, and you |
| 11:14 | 20 | recognized that it was something that was owned by the |
| 11:14 | 21 | company or needed to be offered to the company? |
| 11:14 | 22 | A.   I can. |
| 11:14 | 23 | Q.   And what would that be? |
| 11:14 | 24 | A.   I created or invented a product.  At the time it was |
| 11:15 | 25 | conceived, it was baked potato toppings.  I was working in |

CV 04-9049 DOC – 3/17/2011 – Day 25, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:15 | 1 | the salad dressing business at Kraft, and had an idea of |
| 11:15 | 2 | toppings for potatoes.  Ultimately, introduced -- I think |
| 11:15 | 3 | there's still a dressing by Kraft for potato salad.  And I |
| 11:15 | 4 | remember thinking of that idea and writing a memo about that |
| 11:15 | 5 | idea on a weekend, sitting by a swimming pool, and it may |
| 11:15 | 6 | have been in Southern California. |
| 11:15 | 7 | Q.   All right.  And did you end up writing that idea up? |
| 11:15 | 8 | A.   I did. |
| 11:15 | 9 | Q.   And submitted it to the company? |
| 11:15 | 10 | A.   I did. |
| 11:15 | 11 | Q.   And did it cross your mind for a moment that this was |
| 11:15 | 12 | something that, you know, you could go out and exploit on |
| 11:15 | 13 | your own? |
| 11:15 | 14 | A.   No, not at all. |
| 11:15 | 15 | Q.   Let's talk about -- now talk about Mattel. |
| 11:15 | 16 | What is the business of Mattel? |
| 11:15 | 17 | A.   Primarily in the toy business, but we make products |
| 11:15 | 18 | outside of toys, as well. |
| 11:16 | 19 | Q.   What would be examples of products outside of toys? |
| 11:16 | 20 | A.   We make a line, we call it "Fisher-Price Babygear," so |
| 11:16 | 21 | it might be baby swings or bouncers or a monitor -- those |
| 11:16 | 22 | things under the Fisher-Price label.  We're involved in the |
| 11:16 | 23 | entertainment with the production or distribution of DVD's |
| 11:16 | 24 | or films, and books through American Girl, or even retail |
| 11:16 | 25 | stores in American Girl.  It's still centered in the toy |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 123 of 151   Page ID #:305937
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

123

11:16   1    business.

11:16   2    Q.   And how about in terms of educational products, as

11:16   3    well?

11:16   4    A.   We do make educational products.  We're certainly

11:16   5    online with products as well -- or, you know, ways for

11:16   6    consumers to interact with our brands online.

11:16   7    Q.   When you joined Mattel back in 2000, did you undertake

11:16   8    some effort to find out something about the history of the

11:16   9    company?

11:16   10   A.   I did.

11:16   11   Q.   And what was it that you did?

11:16   12   A.   Before I joined the company, I read as much as I could.

11:16   13   I -- I studied analyst's reports, read books about the toy

11:17   14   industry and the like.

11:17   15        When I joined the company, I met with employees every

11:17   16   day.  And I remember Labor Day weekend of that first year,

11:17   17   spending it with Ruth and Elliot Handler, the founders of

11:17   18   the company.

11:17   19   Q.   Tell us about Ruth and Elliot Handler and the founding

11:17   20   of Mattel.

11:17   21             MS. KELLER:  Objection.  Irrelevant.

11:17   22             THE COURT:  Relevancy?

11:17   23             MR. QUINN:  It's background history of the

11:17   24   company, Your Honor, the origins of the company.

11:17   25             It's a nice story, Your Honor.

| | | |
|---|---|---|
| 11:17 | 1 | THE COURT:  Well, can we spend about 30 seconds on |
| 11:17 | 2 | it? |
| 11:17 | 3 | MR. QUINN:  Yeah.  30 seconds. |
| 11:17 | 4 | THE COURT:  All right.  About 30 seconds. |
| 11:17 | 5 | BY MR. QUINN: |
| 11:17 | 6 | Q.   What did you learn about the origins of the -- |
| 11:17 | 7 | A.   I learned that the Handlers founded the company in 1945 |
| 11:17 | 8 | in a garage in their apartment building.  Elliott was a |
| 11:17 | 9 | designer.  He was making picture frames.  He used scraps |
| 11:17 | 10 | from the picture frames to make doll house furniture. |
| 11:17 | 11 | That's how he got started in the toy business. |
| 11:17 | 12 | They borrowed money, went to Sears, bought some tools, |
| 11:17 | 13 | and started making doll house furniture.  And that was the |
| 11:17 | 14 | beginning of Mattel with another partner named Harold |
| 11:18 | 15 | Mattson. |
| 11:18 | 16 | Q.   So Ruth and Elliot Handler and Harold Mattson -- |
| 11:18 | 17 | A.   Yes. |
| 11:18 | 18 | Q.   -- were the founders? |
| 11:18 | 19 | And did -- over the years, did you then -- did you |
| 11:18 | 20 | spend time with the Handlers? |
| 11:18 | 21 | They were still alive when you -- |
| 11:18 | 22 | A.   I did. |
| 11:18 | 23 | Q.   -- came out in 2000? |
| 11:18 | 24 | A.   Elliot Handler is still alive today.  I see him every |
| 11:18 | 25 | year.  Ruth passed away four or five years ago. |

| | | |
|---|---|---|
| 11:18 | 1 | Q.   In terms of the name "Mattel," do you know what the |
| 11:18 | 2 | history of that is, where that came from? |
| 11:18 | 3 | A.   I do. |
| 11:18 | 4 | Q.   And what is that? |
| 11:18 | 5 | A.   It's Matt for Mat- -- Mattson, and El for Elliot |
| 11:18 | 6 | Handler.  I'm not sure why Ruth's name wasn't involved. |
| 11:18 | 7 | Q.   Um-hm. |
| 11:18 | 8 | A.   Ruth's story is, uh, that she was a woman, and back in |
| 11:18 | 9 | 1945 that wasn't acceptable. |
| 11:18 | 10 | Q.   The entrepreneur? |
| 11:18 | 11 | A.   An entrepreneur. |
| 11:18 | 12 | Q.   Did -- in the early years, did Mattel have some |
| 11:18 | 13 | innovative involvement in advertising and promoting toys? |
| 11:18 | 14 | A.   We did.  The story that Elliot tells is investing |
| 11:19 | 15 | everything they had to be the first sponsor of the Mickey |
| 11:19 | 16 | Mouse Club television show.  I think it was a $500,000 |
| 11:19 | 17 | commitment to sponsor the show for a year. |
| 11:19 | 18 | Q.   When was Barbie launched? |
| 11:19 | 19 | A.   In 1959. |
| 11:19 | 20 | Q.   And what was -- where did the name come from?  Did you |
| 11:19 | 21 | learn that? |
| 11:19 | 22 | A.   I did. |
| 11:19 | 23 | Q.   What was that? |
| 11:19 | 24 | A.   Barbie is Ruth and Elliot's daughter. |
| 11:19 | 25 | Q.   And was Barbie different in some way from dolls that |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

126

| 11:19 | 1 | had been on the market before it was introduced? |
| 11:19 | 2 | A.   It was.  Uh, as -- |
| 11:19 | 3 | Q.   How so? |
| 11:19 | 4 | A.   As the Handlers tell me the story, dolls in those days |
| 11:19 | 5 | were primarily baby dolls, infants.  And Barbie was a |
| 11:19 | 6 | grown-up doll that consumer -- girls used to play with |
| 11:19 | 7 | fashions and hair and aspire to be something older, instead |
| 11:19 | 8 | of nurturing something younger. |
| 11:19 | 9 | Q.   How did Barbie do, initially, when it was first |
| 11:20 | 10 | introduced? |
| 11:20 | 11 | A.   It wasn't well-received by Elliot, the designer at |
| 11:20 | 12 | Mattel.  It wasn't well-received by some of our retail |
| 11:20 | 13 | customers.  But when it did make it to store shelves, it did |
| 11:20 | 14 | quite well. |
| 11:20 | 15 | Q.   And can you tell us how Barbie ranks in terms of the |
| 11:20 | 16 | recent history of toys in the world in terms of number of |
| 11:20 | 17 | sales versus other toys? |
| 11:20 | 18 | A.   Barbie's probably the best-selling toy in the world -- |
| 11:20 | 19 | probably the best-selling toy in the world today, and I |
| 11:20 | 20 | suspect Barbie's the best-selling toy in the history of the |
| 11:20 | 21 | world. |
| 11:20 | 22 |          MR. QUINN:  If we could look at Exhibit 24032. |
| 11:20 | 23 |            *(Document provided to the witness.)* |
| 11:00 | 24 | BY MR. QUINN: |
| 11:20 | 25 | Q.   24032.  I ask you if you can identify that document. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:20 | 1 | A.   I can.  This is from a presentation I've made. |
| 11:20 | 2 | Q.   And what does it depict? |
| 11:21 | 3 | A.   It depicts Barbie at various times over the last 50 |
| 11:21 | 4 | years and how she's been portrayed in fashion. |
| 11:21 | 5 | MR. QUINN:  We'd offer dash 1, Your Honor. |
| 11:21 | 6 | THE COURT:  Received. |
| 11:21 | 7 | *(Exhibit No. 24032-1 received in evidence.)* |
| 11:21 | 8 | MR. QUINN:  If we could display that? |
| 11:21 | 9 | THE COURT:  You may. |
| 11:21 | 10 | (Document displayed.) |
| 11:59 | 11 | BY MR. QUINN: |
| 11:21 | 12 | Q.   So this depicts various iterations of Barbie in the |
| 11:21 | 13 | decades since the 50's? |
| 11:21 | 14 | A.   It does. |
| 11:21 | 15 | Q.   Barbie, not too long ago, have a birthday? |
| 11:21 | 16 | A.   She did. |
| 11:21 | 17 | Q.   And what was that birthday? |
| 11:21 | 18 | A.   It was her 50th birthday. |
| 11:21 | 19 | Q.   What year was that? |
| 11:21 | 20 | A.   In 2008 -- uh, 2009. |
| 11:21 | 21 | Q.   Can we look -- can you take a look at dash 5 in that |
| 11:21 | 22 | exhibit.  Gonna ask if you can identify that page. |
| 11:21 | 23 | A.   I can.  This is a picture of Barbie in various careers, |
| 11:22 | 24 | from astronaut to pediatrician to ballerina or soccer player |
| 11:22 | 25 | or nurse. |

| | | |
|---|---|---|
| 11:22 | 1 | MR. QUINN:  We'd offer exhibit dash 5, Your Honor, |
| 11:22 | 2 | 24032-5. |
| 11:22 | 3 | THE COURT:  Received. |
| 11:22 | 4 | *(Exhibit No. 24032-5 received in evidence.)* |
| 11:22 | 5 | MR. QUINN:  If we could display that for the jury. |
| 11:22 | 6 | (Document displayed.) |
| 11:22 | 7 | BY MR. QUINN: |
| 11:22 | 8 | Q.   Is that something that has been -- something over the |
| 11:22 | 9 | years Mattel has emphasized portraying Barbie in different |
| 11:22 | 10 | types of occupations and different types of roles? |
| 11:22 | 11 | A.   Yes, it has been. |
| 11:22 | 12 | Q.   And has Barbie, over the years, continued to evolve, to |
| 11:22 | 13 | try to stay current, and to appeal to today's girls? |
| 11:22 | 14 | A.   Yes. |
| 11:22 | 15 | Q.   I'd like to show you some examples of Barbie dolls.  If |
| 11:22 | 16 | we can get some help from Ms. Juarez. |
| 11:22 | 17 | And first, I'll show you Exhibit 24116. |
| 11:22 | 18 | *(Exhibit provided to the witness.)* |
| 11:22 | 19 | BY MR. QUINN: |
| 11:23 | 20 | Q.   Is that 24116? |
| 11:23 | 21 | A.   Yes, it is. |
| 11:23 | 22 | Q.   And that actually isn't the one I was expecting to see. |
| 11:23 | 23 | But what is that? |
| 11:23 | 24 | A.   It's a vanity or a dressing table in the Barbie brand |
| 11:23 | 25 | for Fashion Fever. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

129

| | | |
|---|---|---|
| 11:23 | 1 | Q.   All right.  So that's a -- that would be an example of |
| 11:23 | 2 | like an accessory or something you'd sell, if you -- along |
| 11:23 | 3 | with a doll, or somebody could buy that if they had the |
| 11:23 | 4 | doll? |
| 11:23 | 5 | A.   That's correct. |
| 11:23 | 6 | MR. QUINN:  We'd offer 24116, Your Honor. |
| 11:23 | 7 | THE COURT:  Received. |
| 11:23 | 8 | *(Exhibit No. 24116 received in evidence.)* |
| 11:23 | 9 | *(Document displayed.)* |
| 11:23 | 10 | MR. QUINN:  And then 24118. |
| 11:23 | 11 | *(Exhibit provided to the witness.)* |
| 11:23 | 12 | BY MR. QUINN: |
| 11:23 | 13 | Q.   What is 24118? |
| 11:23 | 14 | A.   This is a doll in the Barbie collection for Fashion |
| 11:23 | 15 | Fever. |
| 11:23 | 16 | Q.   If you could perhaps turn that so the jury can see what |
| 11:23 | 17 | you're looking at there. |
| 11:23 | 18 | A.   *(Witness complies.)* |
| 11:23 | 19 | Q.   And that portrays a Barbie in what type of role?  Or |
| 11:23 | 20 | how would you describe that? |
| 11:24 | 21 | A.   Well, it's part of a theme about, um, girls, young |
| 11:24 | 22 | women, and being in a group. |
| 11:24 | 23 | MR. QUINN:  We'd off 24118. |
| 11:24 | 24 | THE COURT:  Received. |
| 11:24 | 25 | *(Exhibit No. 24118 received in evidence.)* |

DEBBIE GALE, U.S. COURT REPORTER

| 11:24 | 1 | *(Document displayed.)* |
| 08:59 | 2 | BY MR. QUINN: |
| 11:24 | 3 | Q.   If we could take a look at 24119. |
| 11:24 | 4 | *(Exhibit handed to the witness.)* |
| 11:24 | 5 | BY MR. QUINN: |
| 11:24 | 6 | Q.   This is another Barbie doll? |
| 11:24 | 7 | A.   This is a Barbie doll. |
| 11:24 | 8 | Q.   And this is a Barbie Fashion Fever Girls Allowed? |
| 11:24 | 9 | A.   That's what the last one was.  This is just a Barbie |
| 11:24 | 10 | Fashion Fever. |
| 11:24 | 11 | Q.   And is there a year on that?  I should've asked you |
| 11:24 | 12 | about the other one.  Can you tell from looking at that what |
| 11:24 | 13 | year that came out? |
| 11:24 | 14 | A.   2005 is the copyright date on the package. |
| 11:24 | 15 | MR. QUINN:  And then, if we could look at 24121. |
| 11:24 | 16 | *(Exhibit provided to the witness.)* |
| 11:24 | 17 | BY MR. QUINN: |
| 11:24 | 18 | Q.   And what version of a Barbie doll is that? |
| 11:24 | 19 | A.   This is in the Fashionista subline within Barbie.  It's |
| 11:24 | 20 | Barbie doll. |
| 11:25 | 21 | Q.   What is the Fashionista subline?  What do you mean by |
| 11:25 | 22 | that? |
| 11:25 | 23 | A.   We've historically had a subline or a group of dolls |
| 11:25 | 24 | within the Barbie franchise designed to appeal to a little |
| 11:25 | 25 | older girl than princess play or to make believe play, if |

| | | |
|---|---|---|
| 11:25 | 1 | you will. |
| 11:25 | 2 | MR. QUINN: Ken, perhaps, if we can put the image |
| 11:25 | 3 | of that up on the screen, 24121. |
| 11:25 | 4 | We'd offer that, Your Honor. |
| 11:25 | 5 | THE COURT: Received. |
| 11:25 | 6 | *(Exhibit No. 24121 received in evidence.)* |
| 11:25 | 7 | *(Document displayed.)* |
| 11:25 | 8 | MR. QUINN: And I didn't offer in 24119, the |
| 11:25 | 9 | Fashion Fever Girls Allowed. I'd offer that. |
| 11:25 | 10 | THE COURT: It's received. Received also. |
| 11:25 | 11 | MR. QUINN: Thank you. |
| 11:25 | 12 | *(Exhibit No. 24119 received in evidence.)* |
| 11:25 | 13 | *(Document displayed.)* |
| 11:25 | 14 | MR. QUINN: If we could look at 24122. |
| 11:25 | 15 | *(Exhibit provided to the witness.)* |
| 11:59 | 16 | BY MR. QUINN: |
| 11:25 | 17 | Q. What Barbie doll is that? |
| 11:25 | 18 | A. This is also a Fashion Fever doll. |
| 11:25 | 19 | MR. QUINN: We'd offer that as well, Your Honor. |
| 11:25 | 20 | THE COURT: Received. |
| 11:25 | 21 | *(Exhibit No. 24122 received in evidence.)* |
| | 22 | BY MR. QUINN: |
| 11:25 | 23 | Q. And what theme -- or how would you describe -- is this |
| 11:25 | 24 | part of that same subline that you were talking about? |
| 11:25 | 25 | A. Yes. This is -- predates Fashionistas, but it's in |

| | | |
|---|---|---|
| 11:26 | 1 | that same realm of having dolls that appeal to older girls. |
| 11:26 | 2 | Q.   So, I mean, what is the logic of -- I mean, you've got |
| 11:26 | 3 | this brand of Barbie dolls, fashion dolls.  What's the logic |
| 11:26 | 4 | of having these different sublines, as you've described it? |
| 11:26 | 5 | A.   Well, girls play with Barbie's starting at a fairly |
| 11:26 | 6 | young age, sometimes three or four years old, and all the |
| 11:26 | 7 | way up to, in some cases, eight or ten years old.  Sometimes |
| 11:26 | 8 | they're playing with Barbie online, and not even playing |
| 11:26 | 9 | with the doll anymore.  So we have different products |
| 11:26 | 10 | designed to appeal to girls at a different age. |
| 11:26 | 11 | Q.   Okay.  And you identify them as different lines or |
| 11:26 | 12 | sublines within the brand? |
| 11:26 | 13 | A.   We do.  Or different themes within the brand. |
| 11:26 | 14 |          MR. QUINN:  If we could look at 24123, please. |
| 11:26 | 15 |            (Exhibit provided to the witness.) |
| 11:59 | 16 | BY MR. QUINN: |
| 11:26 | 17 | Q.   Is this a Barbie Fashion Fever Rockin' Guitar Chair? |
| 11:26 | 18 | A.   It is. |
| 11:26 | 19 |          MR. QUINN:  We'd offer that in evidence, |
| 11:26 | 20 | Your Honor. |
| 11:26 | 21 |          THE COURT:  Received. |
| 11:26 | 22 |          (Exhibit No. 24123 received in evidence.) |
| 11:26 | 23 |            (Document displayed.) |
| | 24 | BY MR. QUINN: |
| 11:26 | 25 | Q.   And that's an example of another accessory that's part |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:26 | 1 | of the Barbie line? |
| 11:27 | 2 | A.   That's correct. |
| 11:27 | 3 | Q.   And do you have any idea how many of these different |
| 11:27 | 4 | types of accessories, in addition to dolls, that Mattel |
| 11:27 | 5 | sells? |
| 11:27 | 6 | A.   Over the years, we've sold millions of them.  They |
| 11:27 | 7 | accompany the Barbie doll and allow the girl to play out a |
| 11:27 | 8 | theme or an experience. |
| 11:27 | 9 | Q.   But in terms of -- do you have any idea today how many |
| 11:27 | 10 | different of these accessory -- would we talking -- be |
| 11:27 | 11 | talking about in the numbers of dozens or scores? |
| 11:27 | 12 | A.   Yes.  Certainly more than dozens. |
| 11:27 | 13 | Q.   There's another product we've heard of, or brand, |
| 11:27 | 14 | called Hot Wheels.  What is Hot Wheels? |
| 11:27 | 15 | A.   Hot Wheels is a die-cast, as we call it, car, a |
| 11:27 | 16 | miniature car, on a small scale. |
| 11:27 | 17 | Q.   When was Hot Wheels introduced? |
| 11:27 | 18 | MS. KELLER:  Objection.  Irrelevant. |
| 11:27 | 19 | THE COURT:  Relevancy, Counsel? |
| 11:27 | 20 | MR. QUINN:  Just the brand.  We're just gonna be |
| 11:27 | 21 | talking about brands. |
| 11:27 | 22 | THE COURT:  Just generally branding.  Overruled. |
| 11:27 | 23 | THE WITNESS:  It was introduced in 1968. |
| 11:59 | 24 | BY MR. QUINN: |
| 11:27 | 25 | Q.   And who invented Hot Wheels? |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 134 of 151   Page ID #:305948
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

134

11:28   1   A.   Elliott Handler and one of the Mattel designers at the
11:28   2   time.
11:28   3   Q.   In addition to developing toys and brands internally,
11:28   4   has Mattel also grown by acquiring other toy companies?
11:28   5   A.   We have.
11:28   6   Q.   And what would be some of the other toy companies that
11:28   7   folks might have heard of that Mattel has acquired?
11:28   8   A.   Fisher-Price, American Girl, Matchbox, Tyco R/C, which
11:28   9   would include, in those days, things like Sesame Street
11:28   10  brands.
11:28   11  Q.   And how many employees does Mattel have today?
11:28   12  A.   Between 30- and 35,000.
11:28   13  Q.   And how many different countries does Mattel have
11:28   14  offices?
11:28   15  A.   Forty-three.
11:28   16  Q.   And how many different countries does Mattel sell its
11:28   17  products?
11:28   18  A.   About 150.
11:28   19  Q.   Can you give us an estimate of about how many different
11:28   20  toys Mattel sells each year, or offers to -- you know, in
11:28   21  its line?  How many different toys there are?
11:29   22  A.   Various by, you know, the definition of an individual
11:29   23  toy.  But it's probably in the range of 8- to 10- or 11,000.
11:29   24  Q.   And each year how many of those are new that year?
11:29   25  A.   About 80 percent.

11:29   1   Q.    80 percent of the 8- or 10,000?

11:29   2   A.    Yes.

11:29   3   Q.    And how do you -- how is it possible to come up with

11:29   4   that many new toys every year?

11:29   5   A.    It's a big deal, so, you know, a Barbie doll is not the

11:29   6   same as another Barbie doll, even though they're both within

11:29   7   the Barbie brand.  And when someone purchases a toy, it's

11:29   8   very rare that they purchase the same toy twice.  So whether

11:29   9   it's a Hot Wheels car or a Barbie doll, we have to make

11:29   10  multiple versions of these new ideas to appeal to people to

11:29   11  keep buying them.

11:29   12  Q.    And is having innovation and creative people at the

11:29   13  company important for being able to develop these thousands

11:29   14  of new toys every year?

11:29   15  A.    Yes, it absolutely is.

11:30   16  Q.    Other than Hot Wheels and Barbie, what are some of the

11:30   17  other brands -- toy brands that are part of Mattel?

11:30   18  A.    Well, we've talked about Fisher-Price or Matchbox or --

11:30   19  we make toys for Nickelodeon -- Dora the Explorer is an

11:30   20  example -- or we make toys for Disney-Pixar movies like

11:30   21  *Toy Story 3* or *Cars 2*.  We make toys like Thomas the Train.

11:30   22  We make toys for WWE wrestling.  There's quite a number of

11:30   23  brands inside of Mattel.

11:30   24  Q.    Let's talk for a moment about the concept of a brand.

11:30   25        I mean, what -- to your mind, what is a brand?  What

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

136

| | | |
|---|---|---|
| 11:30 | 1 | does that mean? |
| 11:30 | 2 | A.  Well, a brand starts with a product or a thing.  We'll |
| 11:30 | 3 | say a product.  And then it's how that product is identified |
| 11:31 | 4 | for consumers.  It could include a name, the packaging, the |
| 11:31 | 5 | advertising to distinguish that product from another product |
| 11:31 | 6 | within the same category. |
| 11:31 | 7 | Q.  What, in your experience, are the requirements for a |
| 11:31 | 8 | successful brand? |
| 11:31 | 9 | A.  Well, certainly have to have a good product.  That's |
| 11:31 | 10 | particularly true in the toy business.  Having that product |
| 11:31 | 11 | named correctly and advertised and promoted -- those are all |
| 11:31 | 12 | important aspects of developing a brand. |
| 11:31 | 13 | Q.  In terms of once you have a good core product, are |
| 11:31 | 14 | there things that that permits you to do with the brand? |
| 11:31 | 15 | A.  Certainly.  Particularly in the toy business where the |
| 11:31 | 16 | product is, as we just discussed, very important. |
| 11:31 | 17 | Q.  So we've heard this term "brand extensions."  Can you |
| 11:31 | 18 | explain how that works? |
| 11:31 | 19 | A.  Well, as an example, Barbie is more than just the doll |
| 11:32 | 20 | today.  Barbie is in accessories.  Barbie is in DVD's.  You |
| 11:32 | 21 | can see a Barbie movie.  You can go to Barbie.com online. |
| 11:32 | 22 | But all of those are centered in the Barbie doll. |
| 11:32 | 23 | Q.  Is the concept of a brand in the toy industry, is it |
| 11:32 | 24 | different in the toy industry than other industries, say, |
| 11:32 | 25 | for example, the food industry?  You were previously at |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 137 of 151   Page ID #:305951
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

137

| | | |
|---|---|---|
| 11:32 | 1 | Kraft. |
| 11:32 | 2 | A.   It is. |
| 11:32 | 3 | Q.   Okay.  Can you explain that and how you learned that? |
| 11:32 | 4 | A.   Well, I remember having lunch with a woman at Mattel. |
| 11:32 | 5 | It was either my first day on the job or certainly my first |
| 11:32 | 6 | week on the job.  She had worked at Kraft at some point in |
| 11:32 | 7 | her career, and was working -- or had worked at Mattel, and |
| 11:32 | 8 | she asked to have lunch with me so she could tell me a |
| 11:32 | 9 | little bit about the difference between marketing toys and |
| 11:32 | 10 | marketing cheese. |
| 11:32 | 11 | And the point she made was that, in the business I was |
| 11:32 | 12 | from, the food business, cheese is fairly similar.  Cheddar |
| 11:32 | 13 | cheese is the same as the next cheddar cheese, by |
| 11:33 | 14 | definition, the standard of identity of what is a cheddar |
| 11:33 | 15 | cheese.  So the name and the packaging and the advertising, |
| 11:33 | 16 | the pricing are all relatively more important, compared to |
| 11:33 | 17 | toys where the product is the king.  So if you have a great |
| 11:33 | 18 | product, it sells. |
| 11:33 | 19 | You do need advertising and packaging and -- the right |
| 11:33 | 20 | display and pricing.  But if you don't have a good product, |
| 11:33 | 21 | those things are not sufficient to differentiate and create |
| 11:33 | 22 | demand for the product, so -- so in the toy business, the |
| 11:33 | 23 | product is more important than it is in the food business in |
| 11:33 | 24 | developing a brand. |
| 11:33 | 25 | Q.   I mean, have there been some examples, while you've |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 138 of 151   Page ID #:305952
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

138

| 11:33 | 1 | been at Mattel, where there was a toy, an effort -- |
| 11:33 | 2 | introduced -- an effort to build a new brand that, frankly, |
| 11:33 | 3 | the kids just didn't like the toy; that, core, it wasn't a |
| 11:33 | 4 | great product? |
| 11:33 | 5 | A.   We, unfortunately, have several of those every year. |
| 11:33 | 6 | But I can think of -- I can certainly think of a brand where |
| 11:34 | 7 | we put a lot of effort into it and created something that |
| 11:34 | 8 | consumers didn't -- at the end of day, didn't appeal to |
| 11:34 | 9 | consumers. |
| 11:34 | 10 | Q.   And is there like a doll example that you could -- you |
| 11:34 | 11 | could share with us? |
| 11:34 | 12 | A.   Flavas would be a good example of that, a product we |
| 11:34 | 13 | introduced in 2003, that we launched with great fanfare and |
| 11:34 | 14 | not a lot of success. |
| 11:34 | 15 | Q.   You -- did you promote it and advertise it and do all |
| 11:34 | 16 | those good things to try to raise people's awareness of it? |
| 11:34 | 17 | A.   We did. |
| 11:34 | 18 | Q.   But it didn't sell? |
| 11:34 | 19 | A.   It sold at a very small amount. |
| 11:34 | 20 | Q.   Right.  It's not enough to keep doing it? |
| 11:34 | 21 | A.   That's correct. |
| 11:34 | 22 | Q.   Does the importance -- the relative importance of the |
| 11:34 | 23 | product, as you've described it, in the toy industry mean |
| 11:34 | 24 | that these other things -- the presentation, the packaging, |
| 11:34 | 25 | the advertising -- these other kinds of things that surround |

| | | |
|---|---|---|
| 11:34 | 1 | the product -- does that mean that they don't matter at all? |
| 11:34 | 2 | A.   No.  Um, as an example, we still need to promote and |
| 11:35 | 3 | present the product and name it and the like. |
| 11:35 | 4 | Q.   And Mattel does that, obviously, with its products? |
| 11:35 | 5 | A.   We do.  We spend hundreds of millions of dollars every |
| 11:35 | 6 | year advertising and promoting our products. |
| 11:35 | 7 | Q.   And does this advertising and promotion -- does it help |
| 11:35 | 8 | build these -- help build the brands? |
| 11:35 | 9 | A.   Yes, it does. |
| 11:35 | 10 | Q.   Can you give us a recent example of a new brand that |
| 11:35 | 11 | Mattel has come up with and introduced successfully in the |
| 11:35 | 12 | marketplace? |
| 11:35 | 13 | A.   Uh, we had two very successful introductions last year |
| 11:35 | 14 | of new brands.  Monster High is one within the doll |
| 11:35 | 15 | category -- the fashion doll category. |
| 11:35 | 16 | Q.   And you're thinking of -- |
| 11:35 | 17 | A.   I'm thinking of another one -- sorry. |
| 11:35 | 18 |     I'm thinking of a second brand, Sing-a-ma-jigs!, which |
| 11:35 | 19 | was launched within the Fisher-Price division. |
| 11:36 | 20 | Q.   We've already heard about Monster High in this trial. |
| 11:36 | 21 | We have in evidence Exhibit 40000. |
| 11:36 | 22 |          MR. QUINN:  If we could put that up on the screen. |
| 11:36 | 23 |       *(Document displayed.)* |
| 11:36 | 24 | BY MR. QUINN: |
| 11:36 | 25 | Q.   And these are images of the Monster High dolls? |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

140

| | | |
|---|---|---|
| 11:36 | 1 | A.   They are. |
| 11:36 | 2 | Q.   When was Monster High launched? |
| 11:36 | 3 | A.   In the second half of 2010. |
| 11:36 | 4 | Q.   So this is a relatively new brand? |
| 11:36 | 5 | A.   It's brand new. |
| 11:36 | 6 | Q.   All right.  A brand new brand? |
| 11:36 | 7 | A.   Yes. |
| 11:36 | 8 | Q.   And, by the way, who was the designer for these dolls? |
| 11:36 | 9 | A.   The designer -- it was a team effort.  There were |
| 11:36 | 10 | several people, but Lily Martinez was one of the lead |
| 11:36 | 11 | designers on the doll. |
| 11:36 | 12 | Q.   And we have some exemplars of the Monster High dolls |
| 11:36 | 13 | here.  If we could show you Exhibit 24041. |
| 11:37 | 14 | *(Exhibit provided to the witness.)* |
| 11:37 | 15 | MR. QUINN:  And if we could put that up on the -- |
| 11:37 | 16 | the picture up on the screen, Ken. |
| 11:37 | 17 | *(Document displayed.)* |
| 11:37 | 18 | BY MR. QUINN: |
| 11:37 | 19 | Q.   Is this a Draculaura from Monster High? |
| 11:37 | 20 | A.   It is.  The daughter of Dracula. |
| 11:37 | 21 | Q.   What is the concept of these Monster High dolls? |
| 11:37 | 22 | MS. KELLER:  Objection.  Irrelevant. |
| 11:37 | 23 | THE COURT:  Overruled. |
| 11:37 | 24 | THE WITNESS:  The idea, which was created by two |
| 11:37 | 25 | package designers inside of Mattel -- twin brothers, I |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 141 of 151   Page ID #:305955
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:37 | 1 | believe -- was offspring of famous monsters -- |
| 11:37 | 2 | Frankenstein's daughter, Dracula's daughter -- who have that |
| 11:37 | 3 | in common:  That they are monsters, and they're going to |
| 11:37 | 4 | high school together.  So that's the story.  Sort of the |
| 11:37 | 5 | trials and tribulations of high school through the eyes of |
| 11:37 | 6 | these unique characters. |
| 11:37 | 7 | BY MR. QUINN: |
| 11:37 | 8 | Q.   And was this concept something that a Mattel employee, |
| 11:37 | 9 | did you say, came up with? |
| 11:37 | 10 | A.   Yes. |
| 11:37 | 11 | Q.   Do you recall the person's name? |
| 11:37 | 12 | A.   I believe there were two twins involved in this: |
| 11:37 | 13 | Garrett and Darren Sander. |
| 11:38 | 14 | Q.   And they worked in the packaging area, you say? |
| 11:38 | 15 | A.   They did.  But I associate them with the ones who |
| 11:38 | 16 | conceived the idea and thought of the story line. |
| 11:38 | 17 | Q.   So did this new brand actually start with a back story, |
| 11:38 | 18 | this idea that famous monsters would have offspring who were |
| 11:38 | 19 | going to high school together? |
| 11:38 | 20 | A.   It did. |
| 11:38 | 21 | Q.   And then at some point somebody started creating a |
| 11:38 | 22 | two-dim- -- a drawing of that, presumably? |
| 11:38 | 23 | A.   I believe that was Lily who did that. |
| 11:38 | 24 | MR. QUINN:  So I'd offer Exhibit 24041, |
| 11:38 | 25 | Your Honor, the Draculaura. |

CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

142

| 11:38 | 1 | *(Exhibit No. 24041 received in evidence.)* |
| 11:38 | 2 | *(Document displayed.)* |
| 11:38 | 3 | MR. QUINN:  And then, if we could look at |
| 11:38 | 4 | Exhibit 24050. |
| 11:38 | 5 | *(Exhibit provided to the witness.)* |
| 11:38 | 6 | BY MR. QUINN: |
| 11:38 | 7 | Q.   Is this Frankie Stein from Monster High? |
| 11:38 | 8 | A.   It is. |
| 11:38 | 9 | MR. QUINN:  We'd offer that, Your Honor. |
| 11:38 | 10 | THE COURT:  Received. |
| 11:38 | 11 | *(Exhibit No. 24050 received in evidence.)* |
| 11:38 | 12 | *(Document displayed.)* |
| 11:38 | 13 | MR. QUINN:  And then 24053. |
| 11:38 | 14 | *(Exhibit provided to the witness.)* |
| 11:38 | 15 | BY MR. QUINN: |
| 11:39 | 16 | Q.   Cleo De Nile from Monster High? |
| 11:39 | 17 | A.   It is. |
| 11:39 | 18 | MR. QUINN:  Offer that, Your Honor. |
| 11:39 | 19 | THE COURT:  Received. |
| 11:39 | 20 | *(Exhibit No. 24053 received in evidence.)* |
| 11:39 | 21 | *(Document displayed.)* |
| 11:39 | 22 | MR. QUINN:  24065, Clawdeen Wolf from Monster |
| 11:39 | 23 | High. |
| 11:39 | 24 | *(Exhibit provided to the witness.)* |
| 11:39 | 25 | MR. QUINN:  We'd offer that, Your Honor. |

| | | |
|---|---|---|
| 11:39 | 1 | THE COURT:  Received. |
| 11:39 | 2 | *(Exhibit No. 24065 received in evidence.)* |
| 11:39 | 3 | *(Document displayed.)* |
| 11:59 | 4 | BY MR. QUINN: |
| 11:39 | 5 | Q.   And were these -- can you tell us whether or not this |
| 11:39 | 6 | new brand was successful? |
| 11:39 | 7 | A.   It's been very successful. |
| 11:39 | 8 | Q.   Can you -- is there some way you can quantify that for |
| 11:39 | 9 | us? |
| 11:39 | 10 | A.   We can't make enough of them.  So, you know, there -- |
| 11:39 | 11 | there is a range of toys:  Some successful, some not |
| 11:39 | 12 | successful.  This always falls into part of the distribution |
| 11:39 | 13 | curve of very successful toys. |
| 11:39 | 14 | Q.   When you say, "We can't make enough of 'em," do you |
| 11:39 | 15 | mean that literally? -- that you actually don't have the |
| 11:39 | 16 | manufacturing capacity to meet the demand? |
| 11:39 | 17 | A.   Literally, we're increasing capacity in the |
| 11:39 | 18 | manufacturing plant that makes these dolls in Indonesia to |
| 11:39 | 19 | satisfy demand and allow us to expand it to other markets |
| 11:39 | 20 | beyond the United States. |
| 11:40 | 21 | Q.   And in addition to, you know, having a good -- by the |
| 11:40 | 22 | way, how did this do compared to other new dolls or fashion |
| 11:40 | 23 | dolls last year?  Do you know how this ranked, stacked up |
| 11:40 | 24 | against the competition? |
| 11:40 | 25 | A.   I do. |

Case 2:04-cv-09049-DOC-RNB  Document 10120  Filed 03/03/11  Page 144 of 151  Page ID #:305958
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

144

| | | |
|---|---|---|
| 11:40 | 1 | Q.   And how did it do? |
| 11:40 | 2 | A.   It was the best-selling new fashion doll, according to |
| 11:40 | 3 | NPD. |
| 11:40 | 4 | Q.   In 2010? |
| 11:40 | 5 | A.   In 2010. |
| 11:40 | 6 | Q.   And did -- were you -- you started out, you thought, |
| 11:40 | 7 | with a great core product -- a product -- first a story, |
| 11:40 | 8 | then a drawing, then a great core toy product? |
| 11:40 | 9 | A.   We did. |
| 11:40 | 10 | Q.   And then did you promote that in the way you've |
| 11:40 | 11 | described with advertisements and advertising and things |
| 11:40 | 12 | like that? |
| 11:40 | 13 | A.   Yes.  We launched the brand on YouTube, on Friday |
| 11:40 | 14 | August 13th, "Friday the 13th," of 2010.  We did television |
| 11:40 | 15 | advertising.  We spent a lot of time, effort, energy, and |
| 11:40 | 16 | probably money on the Internet with what we call webisodes |
| 11:40 | 17 | or stories in the Internet, as opposed to on television. |
| 11:41 | 18 | MR. QUINN:  We have one of those commercials, |
| 11:41 | 19 | Your Honor.  It's Exhibit 24064.  And we'd request |
| 11:41 | 20 | permission to publish this, Your Honor. |
| 11:41 | 21 | THE COURT:  You may. |
| 11:41 | 22 | *(Video played.)* |
| | 23 | BY MR. QUINN: |
| 11:41 | 24 | Q.   In addition to the actual dolls, were you able to -- |
| 11:41 | 25 | have you been able to extend this brand to accessories and |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 145 of 151   Page ID #:305959
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

145

| | | |
|---|---|---|
| 11:41 | 1 | other types of products? |
| 11:41 | 2 | A.   We have. |
| 11:41 | 3 | Q.   If I could show you Exhibit 24068. |
| 11:42 | 4 | (Exhibit provided to the witness.) |
| 11:42 | 5 | BY MR. QUINN: |
| 11:42 | 6 | Q.   Can you tell us what this is? |
| 11:42 | 7 | A.   This is Draculaura's jewelry box that's in a coffin. |
| 11:42 | 8 | Q.   Kids like that? |
| 11:42 | 9 | A.   Kids do like this? |
| 11:42 | 10 | MR. QUINN:  We'd offer that in evidence, |
| 11:42 | 11 | Your Honor. |
| 11:42 | 12 | THE COURT:  Received. |
| 11:42 | 13 | (Exhibit No. 24068 received in evidence.) |
| 11:42 | 14 | (Document displayed.) |
| 11:42 | 15 | MR. QUINN:  And then Exhibit 24069. |
| 11:42 | 16 | (Exhibit provided to the witness.) |
| 11:42 | 17 | BY MR. QUINN: |
| 11:42 | 18 | Q.   Can you tell us -- |
| 11:42 | 19 | A.   This is called a Terrifying Tattoo Roller.  It makes |
| 11:42 | 20 | temporary tattoos that girls can wear. |
| 11:42 | 21 | Q.   And washes off? |
| 11:42 | 22 | A.   Yes. |
| 11:42 | 23 | Q.   Have you also been able to license out to other |
| 11:42 | 24 | companies the right to use the Monster High name and brand |
| 11:42 | 25 | for different kinds of things? |

Case 2:04-cv-09049-DOC-RNB   Document 10120   Filed 03/03/11   Page 146 of 151   Page ID #:305960
CV 04-9049 DOC - 3/17/2011 - Day 25, Volume 1 of 3

146

| 11:42 | 1 | A.   We have.  Monster High is in that category that appeals |
| 11:42 | 2 | to a little older girl, than sort of your typical Barbie |
| 11:42 | 3 | doll, so it's an area of interest to people outside of the |
| 11:42 | 4 | toy business. |
| 11:42 | 5 | Q.   And what would be some examples of other types of |
| 11:42 | 6 | products that you've been able to license other companies or |
| 11:43 | 7 | people to make with the Monster High brand? |
| 11:43 | 8 | A.   Well, for Halloween, while Monster High was launching, |
| 11:43 | 9 | Party City had Monster High Halloween costumes.  Claire's |
| 11:43 | 10 | has accessories for girls.  Macy's is marketing a T-shirt. |
| 11:43 | 11 | Justice 2 stores, again targeting that -- between a younger |
| 11:43 | 12 | girl and teen girl.  Justice stores had a line of clothing |
| 11:43 | 13 | with Monster High that they promoted during the |
| 11:43 | 14 | back-to-school season this fall -- last fall. |
| 11:43 | 15 | Q.   You've told us that this started with a -- |
| 11:43 | 16 | MR. QUINN:  I'm sorry.  We need to move to admit |
| 11:43 | 17 | Exhibit 24069, which is the Terrifying Tattoo Roller, |
| 11:43 | 18 | Your Honor. |
| 11:43 | 19 | THE COURT:  Received. |
| 11:43 | 20 | *(Exhibit No. 24069 received in evidence.)* |
| 11:43 | 21 | BY MR. QUINN: |
| 11:43 | 22 | Q.   You've told us that Monster High began inside Mattel |
| 11:43 | 23 | with employees who had a story, and then it, then, was |
| 11:43 | 24 | created into a drawing. |
| 11:43 | 25 | Did it occur -- so far as you know, did it occur to |

| 11:44 | 1 | anyone to just license out the idea for the Monster High |
| 11:44 | 2 | doll to some other toy company?  So far as you know? |
| 11:44 | 3 | A.   No, not that I've heard of. |
| 11:44 | 4 | Q.   I mean, is that something that, so far as you know, |
| 11:44 | 5 | Mattel has ever done:  To license a competitor to make a |
| 11:44 | 6 | competing fashion doll? |
| 11:44 | 7 | A.   No.  We've never done that that I'm aware of. |
| 11:44 | 8 | Q.   Can you tell us whether or not that's something that |
| 11:44 | 9 | Mattel would be unlikely to do, or would be inclined to do? |
| 11:44 | 10 | A.   Well, I can't imagine a case in which we would do that. |
| 11:44 | 11 | Q.   Why is that? |
| 11:44 | 12 | A.   We're setting up some other company in the toy |
| 11:44 | 13 | business, in the doll business, to compete with our |
| 11:44 | 14 | products?  If we're gonna have that kind of competition, |
| 11:44 | 15 | we'd rather do it ourselves, than set up another company to |
| 11:44 | 16 | succeed. |
| 11:44 | 17 | Q.   In your own mind, is it different licensing people to |
| 11:44 | 18 | make, say, Monday High books or Halloween costumes or things |
| 11:45 | 19 | like that? |
| 11:45 | 20 | A.   Yes. |
| 11:45 | 21 | Q.   Why is that different? |
| 11:45 | 22 | A.   We don't make those products.  We make the toys.  And |
| 11:45 | 23 | those products complement the toys and build the brand |
| 11:45 | 24 | across more than just the toy category. |
| 11:45 | 25 | We only make toys.  So we don't want to -- if there is |

| | | |
|---|---|---|
| 11:45 | 1 | some day gonna be a Monster High bicycle, as there is a |
| 11:45 | 2 | Barbie bicycle today, we don't want to be in the |
| 11:45 | 3 | bicycle-making business. |
| 11:45 | 4 | Q.   So that's an instance where you might license somebody |
| 11:45 | 5 | that makes bicycles to do that? |
| 11:45 | 6 | A.   We would. |
| 11:45 | 7 | Q.   But licensing a competitor to actually bring to market |
| 11:45 | 8 | a fashion-doll design is something that you think is -- |
| 11:45 | 9 | would be quite a bit different and -- and harder to justify |
| 11:45 | 10 | from a business standpoint? |
| 11:45 | 11 | A.   Yes, I do. |
| 11:45 | 12 | Q.   I mean, suppose Mattel were to do that, take one of |
| 11:45 | 13 | these -- a concept for a fashion doll, and to license a |
| 11:45 | 14 | competitor to actually make that doll and bring it to market |
| 11:46 | 15 | to compete with Mattel.  Can you tell us, you know, what |
| 11:46 | 16 | types -- what the economics -- in order to make that |
| 11:46 | 17 | attractive to Mattel, what would be some of the economic |
| 11:46 | 18 | considerations that you would think about? |
| 11:46 | 19 | A.   Well, we would need to be compensated for, um, the fact |
| 11:46 | 20 | that this other product would succeed in the marketplace, |
| 11:46 | 21 | and it was our idea, so we'd want compensation for that. |
| 11:46 | 22 | And we would also need to be compensated for the lost sales |
| 11:46 | 23 | of the existing products that we had that were already in |
| 11:46 | 24 | the marketplace before we licensed out this idea to another |
| 11:46 | 25 | company. |

| | | |
|---|---|---|
| 11:46 | 1 | Q.   And, in your mind, how would that translate in terms of |
| 11:46 | 2 | the types of economic terms that you would be comfortable |
| 11:46 | 3 | with to do that? |
| 11:46 | 4 | A.   I'm having a hard time getting comfortable with the |
| 11:46 | 5 | notion.  So it would have to be a quite impressive set of |
| 11:47 | 6 | economics to motivate us to do that. |
| 11:47 | 7 | MS. KELLER:  Your Honor, I think somebody may need |
| 11:47 | 8 | a break here. |
| 11:47 | 9 | THE COURT:  Oh. |
| 11:47 | 10 | (To the jury:)  Break? |
| 11:47 | 11 | All right.  You're admonished -- why don't we just |
| 11:47 | 12 | go to lunch.  Okay? |
| 11:47 | 13 | You're admonished not to discuss this matter |
| 11:47 | 14 | amongst yourselves nor form or express any opinion |
| 11:47 | 15 | concerning the case. |
| 11:47 | 16 | We'll see you at 1:00 o'clock.  Okay? |
| 11:47 | 17 | Mr. Eckert, if you would step down.  Thank you, |
| 11:47 | 18 | sir. |
| 11:47 | 19 | *(Witness steps down.)* |
| 11:48 | 20 | MR. QUINN:  Your Honor, I think we're basically |
| 11:48 | 21 | okay on the stipulation.  I think Mr. McConville had one -- |
| 11:48 | 22 | just one issue that we don't have an agreement on. |
| 11:48 | 23 | THE COURT:  I'll come back down and visit with you |
| 11:48 | 24 | for a moment. |
| 11:48 | 25 | Do you want me to do that informally? |

11:48    1            MR. QUINN:  If you wouldn't mind.

11:48    2            THE COURT:  All right.  We're off the record.

11:48    3            *(Lunch recess held at 11:48 a.m.)*

11:48    4            *(Further proceedings reported by Jane Sutton*

11:48    5        *Rule in Volume II.)*

11:48    6                            -oOo-

11:48    7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

11:48   1                          -oOo-

11:48   2

11:48   3                       CERTIFICATE

11:48   4

11:48   5        I hereby certify that pursuant to Section 753,

11:48   6   Title 28, United States Code, the foregoing is a true and

11:48   7   correct transcript of the stenographically reported

11:48   8   proceedings held in the above-entitled matter and that the

11:48   9   transcript page format is in conformance with the

11:48   10  regulations of the Judicial Conference of the United States.

11:48   11

11:48   12  Date:  March 1, 2011

11:48   13

11:48   14
11:48
11:48   15  _____
11:48
11:48   16      DEBBIE GALE, U.S. COURT REPORTER
            CSR NO. 9472, RPR

11:48   17

11:48   18

        19

        20

        21

        22

        23

        24

        25