Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 1 of 158   Page ID #:305966
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

1

1                    **UNITED STATES DISTRICT COURT**

2                    **CENTRAL DISTRICT OF CALIFORNIA**

3               **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                          - - - - - - -

5

6     MATTEL, INC., ET AL.,              )
                                         )
7                 Plaintiffs,            )
                                         )
8          vs.                           ) No. CV 04-9049-DOC
                                         )    Day 25
9     MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                         )
10                Defendants.            )
      _____)

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                          Jury Trial

17                      Santa Ana, California

18                     Tuesday, March 1, 2011

19

20

21

22    Jane C.S. Rule, CSR 9316
      Federal Official Court Reporter
23    United States District Court
      411 West 4th Street, Room 1-053
24    Santa Ana, California 92701
      (714) 558-7755
25
      11-03-01 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             KEN KOTARSKI, Mattel Technical Operator

17             MIKE STOVALL, MGA Technical Operator

18             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

22

23

24

25
```

4

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ECKERT, ROBERT | | | | |
| By Mr. Quinn | 5 | | | |
| By Ms. Keller | | 56 | | |

EXHIBITS

| Exhibit | Identification | Evidence |
|---|---|---|
| Plaintiffs' No. 1193 | | 39 |
| Plaintiffs' No. 1807 | | 34 |
| Plaintiffs' No. 9216 | | 30 |

1          SANTA ANA, CALIFORNIA, TUESDAY, MARCH 1, 2011

2                  DAY 25, VOLUME 2 OF 3

3                      (1:02 p.m.)

4              (The following proceedings is taken in the

5          presence of the jury.)

6              THE COURT:  We are back in session.  The jury is

7      present, all counsel, the parties are present, the witness,

8      Mr. Eckert.

9              Counsel, thank you for your courtesy.  If you'd be

10     seated, please.

11             Now, this is addressed to the alternate juror.

12             We have not been able to fix your seat, but it

13     will be fixed tonight, so if that seat rises, we'll get you

14     down with a ladder.

15             (Laughter.)

16             THE COURT:  And we'll have you sit down here, but

17     we think it's okay for today, okay?

18             All right.  Counsel, if you'd like to continue,

19     please.

20             MR. QUINN:  Thank you, your Honor.

21         ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED

22                 DIRECT EXAMINATION (Continued)

23     BY MR. QUINN:

24     Q   Mr. Eckert, before we broke, we were talking about this

25     concept of whether Mattel would license a concept for a doll

1    to a competitor; do you recall we were speaking about that?

2    A    Yes, I do.

3    Q    And you told us why that was highly unlikely to happen,

4    and I think I was asking you, you know, in terms of if you

5    were -- if you were to do that, what types of -- what the

6    economics would have to look like in order to make that

7    attractive to Mattel, to license a competitor with a doll

8    concept?

9            MS. KELLER:  Objection.  Irrelevant.

10            THE COURT:  Overruled.

11            You can answer the question.

12            THE WITNESS:  Well, we would have to be

13    compensated for setting up a competitor or having whatever

14    it is the competitor sold of that category, as well as the

15    lost sales we would have from the products we already make

16    in that category.

17    BY MR. QUINN:

18    Q    So would the terms, then, have to be extremely

19    attractive for you even to consider doing something like

20    that?

21    A    Yes.  I'm having a hard time imagining a set of terms

22    that would encourage us to do that, but they would have to

23    be attractive.

24    Q    All right.  Let's change gears now, and I'd like to ask

25    you what you found, what the situation was at Mattel when

1    you arrived, I think you said –– was it May of 2000?

2    A    It was in May of 2000.

3    Q    So at –– you know, what was the situation that you

4    found in the company when you first joined it in May of

5    2000?

6    A    The company was in financial trouble.  It had been

7    without a CEO for four or five months.  The company was

8    losing money, losing cash every day.  We had made an

9    acquisition that did not work out well ––

10   Q    What was that acquisition?

11   A    It was of a company called "The Learning Company," they

12   made educational software for children, like Read a Rabbit

13   or Carmen San Diego, trying to keep up where kids were

14   moving online to play and entertain.  That acquisition

15   didn't work out well.  It was the very peak of the dot com

16   bubble of the year 1999 or thereabouts.

17   Q    And when you say it didn't work out well, I mean, what

18   do you mean by that?

19   A    The financial projections that Mattel had made for the

20   company were way too aggressive, the assumptions that Mattel

21   had made.  The business –– the company –– that company, The

22   Learning Company, wasn't doing well, and it was doing so

23   poorly that it was impacting the results of all of Mattel.

24   Q    How much had Mattel paid for The Learning Company?

25   A    It was in the range of $3.5 billion.

1   Q    And what -- were you involved in doing something about

2   that acquisition?

3   A    We divested, we got rid of The Learning Company under

4   my watch in October -- late September or early October of

5   2000, so in my early days at Mattel, we essentially sold

6   that company.

7   Q    And you said that the purchase price had been about

8   3.5 billion.  How much were you able to -- how much could

9   you get it for, what was the sales price when you sold it?

10  A    Well, I think at the time we sold it, I'm not sure we

11  got anything.  Over the course of time, we probably made 50

12  or $100 million, that sort of range, on the sale.

13  Q    And you said the company had been without a CEO for

14  some number of months before you arrived?

15  A    Mattel had been, yes.

16  Q    Had this poor acquisition and the fact that there

17  wasn't a CEO, had these events impacted morale at the

18  company?

19  A    Yes, I think people were quite concerned about the

20  future of the company and their future in employment with

21  the company.

22  Q    The toy business itself, was it successful at the same

23  time when you first joined?

24  A    Yes.  Mattel was still the number one toy manufacturer

25  and marketer in the world.

1    Q    So what did you do when you first arrived to try to

2    deal with these issues that you found when you got to the

3    company?

4    A    In a word, we tried to refocus the company, tried to

5    focus back again on the core business that had made it

6    successful, the toy business, and divest or unwind, if you

7    will, The Learning Company acquisition so that the company

8    would be back to its original core toy business that had

9    been quite successful.

10   Q    When you first arrived, did you do something to kind of

11   address the troops and introduce yourself?

12   A    I did on my first day of my job, I was down at the

13   company cafeteria after I went through the probably hour or

14   two long --

15   Q    HR Process?

16   A    -- HR process and security process in the company.  We

17   had a meeting with all the employees in the cafeteria that

18   was video cast to other locations around the world so I

19   could be introduced to the employees and I spoke for a few

20   minutes and answered their questions.

21   Q    Did you set some initial goals for the employees in

22   that initial meeting?

23   A    I did.

24   Q    What were those?

25   A    I talked about simultaneously three things, build

1   brands, cut costs and develop people, and I've used those

2   themes for more than the past 10 years.

3   Q    So other than get rid of The Learning Company, what

4   other things did you do to address the financial situation

5   that you found?

6   A    We significantly reduced the dividend.  I believe we

7   had been paying a dividend of about 36 cents per share to

8   the owners of the company, the stockholders of the company,

9   we reduced --

10  Q    Mattel is a public company, obviously, traded on public

11  stock exchanges?

12  A    It is.  So we reduced significantly the dividend.  We

13  did reduce headcount at the company.  It was, if you will,

14  hunker-down mode to try to get through the storm.

15  Q    And you said you looked in to refocussing.  What did

16  you mean by "refocussing"?

17  A    I meant returning to Mattel's core, as I had read and

18  understood the then roughly 50-year history of the company,

19  when it focused on its core business, particularly in the

20  toy business, it did well.

21       There had been other times in the company's past where

22  it had made acquisitions outside of its core business.  We

23  owned a circus at one time in our history.  I think we owned

24  a movie production studio.  Those sorts of moves, for

25  whatever reason, Mattel isn't that good at those things, and

Case 2:04-cv-09049-DOC-RNB  Document 10121  Filed 03/03/11  Page 11 of 158  Page ID #:305976
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

11

1    it doesn't advance the company.

2    Q    So did you do anything to try to re -- did you see a

3    need to reorganize the groups within the company when you

4    arrived?

5    A    I did.  There were some jobs that were open at the

6    senior management level, people who had either quit or been

7    fired, at very high levels, and I saw an opportunity to

8    consolidate groups, which we've continued to work on over

9    time.

10   Q    And in terms of groups working together in the various

11   operations teams, did you -- did you see any need to address

12   the way they were working together?

13   A    I did, particularly in what we consider our operations

14   groups.  I noted that we had, for example, manufacturing

15   reporting up in one, I called it "silo" at the time.

16        We had the distribution of products reporting yet to

17   another different group of people, the warehousing of

18   property reporting to yet another group of people, and they

19   might have different agendas, different goals, different

20   objectives, and my view has always been that that supply

21   chain, if you will, taking the products from engineering

22   through delivery to the customer should be one seamless

23   operation with one set of goals, so that was one of the

24   first things on which we worked.

25   Q    So when you say silos, do you think there was a silo

1    within -- there was a design center there, right, you came

2    to learn?

3    A    Yes.

4    Q    And were there silos within the design center?

5    A    No, I don't remember ever having that conclusion.

6    Q    So the silos you're referring to are these different

7    operating groups?

8    A    Primarily the operations group itself, that is the

9    manufacturing and distribution, and probably to a little

10   lesser degree within the operating divisions, if you will,

11   the -- the marketing units of the company.

12   Q    So how did you change things to try to address this

13   issue of groups not -- in operations not working together in

14   the best possible way?

15   A    Over time, we've been consolidating groups,

16   consolidating divisions, consolidating functions which

17   reduces the management oversight in those areas and fosters

18   a more collaborative approach to managing whatever area it

19   is.

20   Q    And what would be examples of those types of changes

21   that you made?

22   A    Well, very quickly in my career at Mattel, we named an

23   executive vice president of worldwide operations who has

24   responsibility, still to this day, for all toys, whether we

25   manufacture them in Mattel factories or whether we procure

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 13 of 158   Page ID
#:305978
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

13

1   them from contract factories through distribution, through

2   warehousing, through delivery to customers.

3        So even in our very first year, we brought together all

4   of the operations groups, if you will, and over time we've

5   consolidated the business divisions by putting together the

6   girls' toy group with the boys' toy group, the girls' and

7   boys' toy group with the Fisher Price or infant and

8   preschool toy group, and most recently, all of that along

9   with the international or outside of U.S. business.

10  Q    All right.  Let's turn now to what the condition was of

11  the fashion doll business at Mattel, and particularly

12  Barbie, in 2000 when you arrived.  Can you tell us what kind

13  of shape that part of the business was in?

14  A    Barbie sales had peaked in about 1997, so in 2000,

15  Barbie was still the number one fashion doll in the world,

16  probably the No. 1 toy in the world, but Barbie sales had

17  declined, what -- had been declining when I joined the

18  company.

19  Q    The 1997 peak?

20  A    Yes.

21  Q    Do you recall the numbers, what the Barbie sales were

22  in 1997 versus 2000 when you joined?

23  A    Around $1.9 billion of revenues, that is sales of

24  Barbie in 2 -- in 1997 and around $1.6 billion of sales in

25  2000 or 2001.

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 14 of 158   Page ID #:305979
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

14

1   Q     So before you arrived after 1997, Barbie sales had gone

2   from, what did you say, 1.9 billion to about 1.5 or 1.6?

3   A     Yes.

4   Q     Now, is -- who had been the CEO before you at Mattel?

5   A     A woman named Jill Barad.

6   Q     And had Miss Barad been responsible in a positive way

7   to the growth of Barbie in the Barbie business?

8   A     Oh, certainly in the course of the 1980s and '90s,

9   really under her leadership, Barbie probably went from 2- or

10  3- or $400 million in sales up to that almost $2 billion in

11  sales.

12  Q     So you referred earlier to Ruth Handler back in the

13  1950s not being a partner, but there was a CEO who was a

14  woman who -- the immediate predecessor who presided over

15  this growth of Barbie?

16  A     Yes, quite a change.

17  Q     Times change?

18  A     Yes, and for the good.

19  Q     Now, during the -- do you know whether or not there had

20  been other fashion dolls that had appeared in the

21  marketplace, you know, prior to 2000, you know, during this

22  period of Barbie's growth, had there been other fashion

23  dolls that had been introduced in the marketplace?

24  A     Yes.  I don't know for how long, but I'm sure over many

25  years, there have always been more than one fashion doll in

1    the marketplace.

2    Q    Can you think of any of the names of any of them?

3    A    I can.  The Cindy doll, the Gem doll, various retailers

4    introduce smaller lines of dolls under different brand names

5    or what we refer to as private label, store brands, over

6    time.  There was a Britney Spears doll.

7    Q    So what were the records of these other fashion dolls

8    during the time when Barbie had this growth, you know, other

9    fashion dolls would be introduced in the market, and how did

10   they do?

11   A    They might do reasonably well for a fairly short period

12   of time, but Barbie still, in the year 2000, had a

13   90 percent share of the fashion doll subcategory, if you

14   will, something like that.

15   Q    Is this a situation where other fashion dolls would be

16   introduced and, you know, they would be a success for a year

17   or two but then fade?

18   A    I think that's typical.

19   Q    So wasn't another fashion doll that had the staying

20   power of Barbie; is that fair to say?

21   A    That's correct.

22   Q    All right.  So you told us that Barbie sales had peaked

23   in 1997 and had declined leading up to 2000 when you

24   arrived.

25        Did you try to acquire some understanding as to what

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 16 of 158   Page ID #:305981
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

16

1   was happening with Barbie, why -- why it was in decline?

2   A    Yes, I think there were several conclusions that I

3   arrived at.

4   Q    What were those?

5   A    One is the phenomenon that I talked about, not just in

6   Barbie but broadly across toys, but I think was pronounced

7   in Barbie, the phenomenon of kids getting older younger.

8   Q    What do you mean by that, "getting older younger"?

9   A    That is graduating from toy play at an earlier age, so

10  in our parents' generation, perhaps children played with

11  toys until they were 12, 13 or 14 years old, and in our

12  children's generation, maybe they play with toys until they

13  are 8 or 9 or 10 years old.

14       There are other things for kids to do that takes away

15  from sales in the toy category, and I think that was true in

16  Barbie, the girls graduated to things non-Barbie at an

17  earlier age over time.

18  Q    That was one factor that you thought was affecting

19  Barbie sales?

20  A    Yes.

21  Q    Were there some other factors that you identified?

22  A    I think at the time the average girl in the United

23  States owned some number like 10 or 15 Barbie dolls.

24  Q    Uh-huh.

25  A    So it's always difficult to sell the 11th or 16th

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 17 of 158   Page ID #:305982
CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

17

1   Barbie doll to someone who already has 10 or 15, so it's

2   just harder to grow when you've reached that level of

3   maturity.

4   Q    And then was there any other factors that you found

5   were affecting the -- adversely the Barbie sales?  We talked

6   about girls getting older younger, and the fact that so many

7   Barbies had been sold, kids had so many, anything else?

8   A    I would mention retailer support as well.  As retailers

9   saw Barbie sales declining, from their perspective, they

10  were probably reducing support of the brand.

11  Q    So is this a phenomena that can feed on itself, in

12  effect?

13  A    I think it can over the short term.  Over the long

14  term, you know, retailers are reacting to what they see

15  consumers buying, but there are certainly times within

16  brands when retailer support either is strong or weak,

17  depending on what their view of the performance of the

18  product line is.

19  Q    And how about retailer inventories and that situation,

20  whether retailers were in a position to buy more Barbies?

21  A    That would have been high in the late 1990s, so like

22  having a -- a child with 15 Barbies, how many more does the

23  child need, a retailer had plenty of Barbies in the late

24  '90s here in the states, and how many more did they need,

25  which would impact our sales.  We record sales when we're

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 18 of 158   Page ID #:305983
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

18

1    moving products into the retailers.

2    Q    Did Mattel do anything, you know, in 2000, in the early

3    years when you were at Mattel to try to address this problem

4    in the -- this issue especially in the fashion doll market

5    that girls were getting older younger?

6    A    Oh, sure.  We introduced -- we extended the Barbie

7    brand into things like DVDs and entertainment.  Barbie was

8    one of the very first websites for girls back around the

9    year 2000.  We introduced sublines, as I mentioned earlier,

10   within Barbie to appeal to older girls who might have been

11   tired or -- of the brand.

12   Q    Can you think of the names of any of those sub-brands

13   that were specifically targeted to older girls?

14   A    There was a Mystery Squad, a Generation Girl,

15   ultimately a MyScene Doll, all designed to appeal to an

16   older girl in the -- the core Barbie play at the time.

17   Q    When did you first become aware of the Bratz doll as --

18   as being a competitor?

19   A    In somewhere, probably the middle or second half of the

20   year 2001.

21   Q    And -- and did it appear in some part of the world

22   first?

23   A    It did.  I first became aware of it when it launched in

24   Spain.

25   Q    And what's your best recollection as to when that was?

```
 1    A    It may have been between June and September of 2001.

 2    Q    And then do you recall when you became aware of it as

 3    being introduced in the market in the U.S.?

 4    A    It was -- in my mind's eye, it was later that fall, the

 5    Christmas holiday season of 2001.

 6    Q    And was it perceived at the time to be a direct

 7    competitor to Mattel's fashion dolls, including Barbie?

 8    A    Yes, I think it was.

 9    Q    All right.  And what do you mean by that, when we talk

10    about a direct competitor, how does that manifest itself to

11    you?

12    A    Well, it's what consumers do, they play with a brand of

13    doll or another brand of doll, so those are competitors.

14    It's how a retailer looks at what it sells, I can sell brand

15    A or brand B or brand C or all three brands within a

16    category.  It's how the market share reporting services,

17    like NPD, categorize products.

18    Q    If it was Barbie and Bratz in the same category?

19    A    I am not sure in 2001, I think they were, but I could

20    be wrong.

21    Q    You referred to NPD, can you tell the jury what NPD is?

22    A    NPD is a service that supplies manufacturers or

23    marketers in a category like toys with the sales to

24    consumers of its products as well as competitor's products.

25    Q    And is that like a subscription service that you
```

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 20 of 158   Page ID #:305985
CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

20

1    subscribe to?

2    A    We pay for it.  I don't know if I'd use the term

3    "subscription," but we and our competitors and other people

4    in other categories pay money to get this information which

5    monitors sales to consumers of all the brands in a category.

6    Q    Do you regard NPD data as being accurate and reliable?

7    A    It's not perfect.  My experience with it is at -- at a

8    higher level, the longer the time frame and the higher the

9    level that you're looking at of a product category, the more

10   accurate it is.  As you get down to, for example, monthly

11   sales of a particular product in the marketplace, it's not

12   as accurate.

13   Q    And what would be an example of data that might -- you

14   think is, in your experience, more accurate, what type of --

15   kind of slices of the market?

16   A    Well, we talk about a brand like the Barbie brand over

17   the course of a year.  Certainly by the time we get into the

18   holiday season when there are more toys sold, as we get into

19   that third and fourth quarter, the second half of a year,

20   there's enough data that I think that the sample size works

21   and it's fairly accurate.  If we are looking at a Barbie

22   doll sales in January or February, I don't think NPD is that

23   reliable.

24   Q    So we were talking about how you perceived Bratz when

25   it came on the market as being a direct competitor to Barbie

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 21 of 158   Page ID #:305986
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

21

1    and other Mattel fashion dolls.  I mean, why isn't it the

2    case that, you know, a child or a parent, you know, might

3    just buy -- well, in the past I've bought one new Barbie

4    every year, now I'll continue to buy one Barbie but I'll

5    just also add a Bratz?

6    A    To some degree, just the natural budgeting process

7    within a family.  Some people have so much money to spend on

8    toys or so much money to spend on toys for their daughters

9    or toys at the holiday season, or whatever it is, I don't

10   think there is a -- there's not an unlimited budget that

11   households have to buy toys, and I think the same is true of

12   retailers.

13   Q    And what do you mean the same being true of retailers?

14   A    Walmart can't just buy toys and carry toys,

15   unfortunately.  You know, they carry other categories, and

16   they need to invest their resources, including the cash that

17   they have, to buy products and pet food and clothing and

18   food, toys and sporting goods, so it's not -- it's not an

19   unlimited opportunity.

20   Q    So did you -- during the years after you joined Mattel,

21   did you monitor as best you could what was happening to

22   Barbie and Mattel's other fashion dolls market shares

23   vis-a-vis Bratz and the other fashion dolls that were out

24   there in the market?

25   A    Yes, we did.

1   Q    And, you know, this NPD data which, as you said, over

2   the longer term tends to be reliable or at least more

3   reliable than it is over the short term, is there any better

4   sales data that was out there for long-term trends?

5   A    No, certainly not when looking at a broader set of

6   products than just the company's own products.

7   Q    And based on your monitoring of what was happening with

8   market share, did you, you know, come to some understanding

9   or what was your perception about, say, between the period

10  of 2001 and 2007 as to what was happening to Barbie's market

11  share as compared to what was happening with Bratz's market

12  share?

13  A    Well, in the early years of the 2000s, 2000 or 2001,

14  Barbie had approximately a 90 percent share of the fashion

15  doll category.  By the mid to late 2000s, that share had

16  dropped to around 55 percent.

17       On the other hand, Bratz, which probably had no share

18  in the year 2000, may have gone up to 35 percent or some

19  number like that by 2006 or '7.

20  Q    Was it -- was it your view or was it apparent to you

21  that Barbie was, in fact, losing market share in sales to

22  Bratz?

23  A    Yes.

24  Q    And Mattel's other fashion dolls, was it apparent to

25  you that they were also losing --

 1              MS. KELLER:  Objection.  Compound as to both

 2     market share and sales.

 3              THE COURT:  Do you want to break that down?

 4              MR. QUINN:  Sure.

 5     BY MR. QUINN:

 6     Q    With respect to Mattel's other fashion dolls, was it

 7     your perception that their market share was also affected in

 8     a negative way by the growth of Bratz's market share?

 9              MS. KELLER:  Objection.  Vague.

10              THE COURT:  Overruled.

11              THE WITNESS:  Yes.

12     BY MR. QUINN:

13     Q    And sales as well?

14     A    Yes, that's correct.

15     Q    Now, is there something to the idea that Bratz was a

16     new entry to the market, and that, in fact, it grew the

17     market, in other words, there was a market for, you know,

18     there are more people out there, kids, parents, who wanted

19     to buy fashion dolls as a result of Bratz being introduced?

20     A    Yes, I think that's reasonable.

21     Q    All right.  And is that something that you -- did you

22     see that?  I mean, did you conclude that, that actually the

23     introduction of Bratz had broadened the market for fashion

24     dolls generally?

25     A    Yes, I remember that particularly for those older-age

1   girls who might have otherwise left the fashion doll

2   business.

3   Q    But how did that affect, in terms of the market share

4   for -- for Barbie and Mattel's other fashion dolls, did that

5   change the fact that there was a loss in market share to

6   Bratz?

7   A    No, our market share declined from roughly 90 percent

8   to whatever the number was in 2006 or '7, 55 percent or

9   thereabouts, it's a sizeable market share decline.

10  Q    Now, was this something that went unnoticed by people

11  within Mattel?

12  A    No.

13  Q    Was it something that people within Mattel took

14  seriously and tried to understand and tried to respond to?

15  A    Yes, it was.

16  Q    And, you know, how did people respond to that?  What

17  was -- what was happening, if you can describe to us what it

18  was like within Mattel when they see the loss of market

19  share and how people reacted to that?

20  A    It's a big deal.  There's a lot of self-reflection,

21  self-examination, what happened --

22  Q    What are we doing wrong?

23  A    What are we doing wrong?  What do we need to do better?

24  Why didn't we do that?  This is -- even though Barbie was

25  still the number one fashion doll and perhaps toy in the

1   world, Barbie sales and share had declined.

2       Bratz had been quite successful, the first time that

3   anybody can remember a fashion doll doing that well in that

4   space for -- for that long a period of time, and so people

5   were highly concerned and anxious about it at Mattel.

6   Q    Had MGA ever come to market with a fashion doll before?

7   A    (No audible response.)

8   Q    Before Bratz?

9   A    Not that I know of.

10  Q    All right.  At the -- did this self-reflection,

11  self-criticism, this loss of market share, did this actually

12  have -- affect people, I mean, in a personal way at Mattel?

13          MS. KELLER:  Objection.  Irrelevant.

14          THE COURT:  Sustained.

15  BY MR. QUINN:

16  Q    In terms of their careers and their compensation, was

17  this having an impact on people at Mattel?

18          MS. KELLER:  Same objection.

19          THE COURT:  Are we driving at layoffs or --

20          MR. QUINN:  That, loss of bonuses and people

21  losing their jobs.

22          THE COURT:  Relevancy?

23          MR. QUINN:  Well, I think it explains some of the

24  things that have been introduced and will be introduced in

25  terms of things people said at Mattel and the way people

1    reacted to this.

2            THE COURT:  Overruled.

3            THE WITNESS:  Certainly people lost their jobs,

4    people had their paychecks smaller, their bonuses went away,

5    the value of the company was -- was less, so it -- it

6    affected people personally.  It affected their job, if they

7    still had a job, how much they got paid for their job and

8    what future they had with the company, they took it very

9    seriously.

10   BY MR. QUINN:

11   Q    All right.  So prior to, say, late 2003, when people

12   were engaging in the self-criticism and self-reflection and

13   trying to understand this phenomenon that you described, did

14   people know, so far as you are aware, that actually one of

15   Mattel designers had designed Bratz while he was still

16   employed by Mattel and taken it to MGA?

17           MS. KELLER:  Objection.  Assumes facts not in

18   evidence that are for the jury to decide.

19           THE COURT:  That will eventually be one of the

20   many decisions you'll make.  It's somewhat conclusionary,

21   but to ask the question, I'll allow the question, but I want

22   you as the jury to understand, you are not to assume that

23   fact, that is something that will be proven and submitted to

24   you by both parties or disproven.

25           Counsel?

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 27 of 158   Page ID #:305992
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

27

1          MR. QUINN:  Thank you.

2          THE WITNESS:  So can I hear the question again,

3     I'm sorry?

4     BY MR. QUINN:

5     Q    In the process of the people at Mattel engaging in

6     self-criticism and self-reflection that you've described and

7     trying to understand what's happened to us in the

8     marketplace, do you recall -- prior to the end of 2003, do

9     you recall anyone saying or, you know, referring to the fact

10    that, you know, gee, this design, this Bratz design was

11    designed by Carter Bryant, one of our own designers in the

12    Mattel design center while he was employed by Mattel, and he

13    took it to MGA, is that something that, you know, you ever

14    heard somebody say prior to the end of 2003?

15    A    Certainly not inside Mattel, I don't think Mattel

16    people thought that.

17    Q    Now, do Mattel's own internal documents and market

18    studies and market plans from the time period 2001, 2002,

19    2003, 2004 reflect this loss of market share and concern

20    about the market share that you've described?

21    A    Yes, they did.

22    Q    And -- and the self-criticism and self-reflection that

23    you've described?

24    A    Yes.

25    Q    I will ask you to please take a look at Exhibit 9216.

1   Can you identify this document?

2   A    This is a document called "The Bratz Brief" dated

3   November 14, 2003, and it's an internal-to-Mattel document.

4   Q    And is this a document that you were shown in your

5   deposition in this case?

6   A    I was.

7   Q    And also MGA has provided some binders of documents

8   that they might want to question you about, you've had a

9   chance to look at those?

10  A    I have seen some of those, but I've seen this

11  document --

12  Q    Right.

13  A    -- in my deposition or in other places.

14  Q    And do you recall -- I mean, this document is dated

15  November 14th, 2003, the Bratz brief, do you recall that you

16  saw this at the time, the date that it bears?

17  A    I don't -- I don't know when I saw it.  I do --

18          MS. KELLER:  Objection.  Nonresponsive.

19          THE COURT:  Overruled.  I think he's going to

20  state a general time frame, Counsel, just a moment.

21          Continue with your answer.

22          THE WITNESS:  I don't know when I saw the

23  document.  I do have a memory of seeing the document in some

24  form or another, perhaps a draft, prior to my deposition,

25  but I can't give you the specific date, whether or not it

1   was November 14th or thereabouts.

2           MR. QUINN:  Your Honor, we would offer in evidence

3   the Bratz brief, Exhibit 9216, dated November 14, 2003.

4           THE COURT:  I'm still unclear about when he

5   believes he saw it.  I -- I don't have the date of the

6   deposition, so I don't know how --

7           MR. QUINN:  Right.

8           THE COURT:  Well, I do, but I don't think the jury

9   understands any time frame, so I'm going to sustain your

10  objection, Counsel.

11          Just reask the question.

12          MR. QUINN:  Sure.

13  BY MR. QUINN:

14  Q    Do you recall prior to your deposition that at some

15  point, you saw the Bratz brief?

16  A    Yes, I do.

17  Q    Are you able to narrow that down in terms of time

18  period?

19  A    I'm sure it was in 2003.  I can't be or -- I can't be

20  more specific than that.  I believe I saw a draft or some

21  version of this at the time it was being developed.

22          MR. QUINN:  So we would offer the Bratz brief,

23  your Honor.

24          THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 30 of 158   Page ID #:305995
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

30

 1            (Plaintiffs' Exhibit No. 9216 is received in

 2       evidence.)

 3   BY MR. QUINN:

 4   Q    And if we could display the first page, here.

 5       Can you tell us just sort of in big term -- big

 6   picture, in general terms, what this appears to you to be?

 7   A    I would use the term "a white paper."  It's a -- it's a

 8   document that is the self-examination, the -- what -- what

 9   happened with Bratz and what happened to Mattel and how do

10   we, if you will, create the knowledge from this experience

11   so that in a document 5 or 10 or 20 or 30 years from now,

12   somebody can go back and look at the case study, if you

13   will, of what happened.

14   Q    Sort of like what did we do right, what did we do

15   wrong, what can we learn from this?

16   A    Yes.

17   Q    If you could turn, please, to page dash five.

18            MR. QUINN:  And Ken, if we can enlarge sort of the

19   top three paragraphs, there, or just look at some of this

20   language.

21   BY MR. QUINN:

22   Q    In the top paragraph, the second sentence says, "The

23   positioning, packaging and advertising were remarkably

24   focused on luring the older girls away from Barbie"; do you

25   see that?

1   A    Yes, I do.

2   Q    And that refers to Barbies' positioning, packaging and

3   advertising, right?

4   A    Yes, I believe it does.

5   Q    And is that consistent with attitudes that you saw

6   within Mattel, that people recognize that, you know, Bratz

7   was being successful in an older girl segment which had

8   perhaps been underserved or less of a focus --

9             MS. KELLER:  Objection.

10  BY MR. QUINN:

11  Q    -- for Barbie in the past?

12            MS. KELLER:  Objection.  Leading the witness.

13            THE COURT:  I'll sustain the objection.  It is

14  leading, Counsel.

15  BY MR. QUINN:

16  Q    I'll just ask you, then, Mr. Eckert, what does this

17  mean to you?

18  A    In the 2003 time frame, Bratz had been quite successful

19  in marketing to older girls, girls in the, call it

20  8-to-10-year age, and over time, they appealed more to a

21  younger girl, but in this time period, it was targeted, if

22  you will, positioned or marketed to older girls.

23  Q    If you'd look, then, at the third paragraph there on

24  page dash five, the last sentence which says, and I quote,

25  "Consumer research suggested that Bratz was successfully

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 32 of 158   Page ID #:305997
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

32

1    exploiting Barbie's vulnerabilities among older girls;

2    potential cannibalization existed among the older girl

3    portfolio."

4         Cannibalization, that doesn't sound like a good thing

5    even if you're a doll.  Does that word have a meaning to

6    you, in the marketing world?

7    A    It is in the marketing world.  It's the trade-off of

8    sales from one product to another.

9    Q    So if you say one doll is cannibalizing another doll,

10   that means they are taking sales away from that other doll?

11   A    Yes.

12   Q    So what does this sentence that we just looked at about

13   consumer research, what does that mean to you?

14   A    As it says, Barbie is vulnerable to the girls who are

15   older, who are tiring of Barbie as they age, and we have

16   other products, things like Diva Starz or Generation Girl or

17   What's Her Face or, in 2003, MyScene, some within, some

18   outside of the Barbie arena, that Bratz is likely to take

19   sales from.

20   Q    All right.  Is that -- so is that -- is this reflective

21   of the kinds of attitudes that were prevalent that you saw

22   among your colleagues at Mattel in reaction to this loss of

23   market share, on the one hand, for Mattel fashion dolls, and

24   the growth of market share, on the other hand, for the Bratz

25   fashion dolls?

1    A    Yes, I think it is.

2    Q    I'd ask you to please turn now to Exhibit 1807.  And is

3    this also a document -- this "house on fire," is this also a

4    document that you were shown in your deposition?

5    A    I believe it is, yes.

6    Q    And is that also a document that was in the binders

7    that MGA has provided among the documents that they have

8    indicated they may want to ask you questions about?

9              MS. KELLER:  Objection.  Improper question.

10             THE COURT:  Sustained.

11   BY MR. QUINN:

12   Q    Well, have you reviewed this document within the last

13   24 hours?

14   A    I have.

15   Q    In preparing to testify?

16   A    Yes, I have.

17   Q    And -- and does this document similarly reflect

18   attitudes, concerns, reactions of people at Mattel to this

19   phenomenon of the growth market share in Bratz and the loss

20   of market share for the Mattel fashion dolls?

21             MS. KELLER:  Objection.  Leading.

22             THE COURT:  Overruled.

23             You can answer that question.

24             THE WITNESS:  I think in parts, it is similar, and

25   in parts, it is quite different.

```
 1              MR. QUINN:  We'd offer 2005 Barbie spring line
 2    review, the "house on fire" document, Exhibit 1807, your
 3    Honor.
 4              THE COURT:  Received.
 5              (Plaintiffs' Exhibit No. 1807 is received in
 6         evidence.)
 7              MR. QUINN:  And if we could put the first page up
 8    there on the screen.
 9    BY MR. QUINN:
10    Q    If we could look at page dash three.  It says there at
11    the top, "The house is on fire."  And then at the bottom,
12    "Bratz is gaining share with core five to eight-year-olds.
13    Since November, Bratz' penetration has grown from 66 to
14    80 percent with five to six-year-olds, and 80 to 84 percent
15    with seven to eight-year-olds"; do you see that, sir?
16    A    I do.
17    Q    And is this -- is this the kind of thing that you saw
18    people talking about and reporting on and studying and
19    trying to understand?
20              MS. KELLER:  Objection.  Leading.
21              THE COURT:  Overruled.
22              The answer has already been received previously,
23    so it doesn't suggest it, Counsel.
24              You can answer the question, sir.
25              THE WITNESS:  Yes, and it is consistent with what
```

 1    I said earlier about, over time, Bratz was appealing to a

 2    younger audience.

 3    BY MR. QUINN:

 4    Q    And let's turn to page dash five, which is headed

 5    "Fight Fire with Fire."  By the way, I think you said prior

 6    to this litigation, you don't recall ever seeing this

 7    document; is that correct?

 8    A    That is correct.

 9    Q    And this says, "No other brand in history is as

10    emotionally meaningful to girls and women as Barbie.  In

11    spite of this, a rival-led Barbie genocide rapidly grows.

12    All the talent, power and history behind the Barbie brand

13    should be focused to fight back.  Product, packaging,

14    marketing and sales must be launched that is brilliant,

15    tactical, aggressive, revolutionary and ruthless.  This is

16    war and sides must be taken.  Barbie stands for good, all

17    others stand for evil."

18         Is that something you would agree -- do those reflect

19    statements that you would agree with?

20    A    No, there's virtually nothing on this page that is

21    indicative of the kind of language I would use to describe a

22    situation like this.

23    Q    And do you recall seeing this slide at the time?

24    A    I've seen this slide in court and in depositions.  I

25    don't recall -- I do not recall seeing this slide in 2005 or

1    '4 -- in 2004.

2    Q    I mean, do you -- do you agree that -- well, let me ask

3    it this way:  Was there a -- was there an effort -- do you

4    recall whether there was an effort made at Mattel in this

5    time frame when this loss of market share is happening, an

6    effort made to try to convey to employees a sense of

7    urgency?

8    A    Sure, I can -- I can understand why someone would write

9    this.  These are not the kinds of words I would use to

10   describe a situation in business.

11   Q    In a -- in a situation, though, where there's a need to

12   respond to something in the marketplace, a significant

13   change, is there sometimes a need to kind of get people's

14   attention?

15            MS. KELLER:  Objection.  Leading.

16            THE COURT:  Sustained.

17   BY MR. QUINN:

18   Q    I mean, do you -- have you ever been in a situation

19   where you needed to get people's attention to address a new

20   phenomena in it the marketplace?

21   A    Yes, rallying the troops, if you will, to make sure

22   people understand the gravity of the situation, the task at

23   hand and motivating them to do what it takes to succeed.

24   Q    All right.  You said a moment ago that, although you

25   don't agree with how this is expressed, you -- you can

1  understand why someone, whoever the author was, might have

2  said these things, you said that?

3  A    Yes, I do.

4  Q    And why?  Can you share with us what it is that you

5  know why somebody would have tried to express things like

6  this?

7  A    I think, again, it's someone trying to communicate that

8  this is very serious, a big challenge, we have to make

9  significant changes, you know, and the analogy here is to

10 good and evil and war and those sorts of terms, again, not

11 the kinds of terms I would use much in business, but that

12 strikes the emotional cord of what the task is at hand.

13 Q    If you'd turn to the preceding page, dash four, the

14 author of this says, "We must do some things differently

15 around here."

16     I mean, did you agree with that, that in the fashion

17 doll business, there -- there was a need to do some things

18 differently?

19 A    Yes, I would agree with that.

20 Q    And could you explain that, please?

21 A    Well, we are losing market share.  Our business is

22 declining.  We need to make changes, and we need to do

23 things, you know, the things we were doing years ago weren't

24 successful today in building a business, so we needed to

25 change.

```
 1   Q    Was Bratz the only challenge that the Mattel -- Mattel
 2   fashion doll business, including Barbie, faced in the, you
 3   know, 2002, 2003, 2004, 2005 time period?
 4   A    Well, no.  As I mentioned, the brand had faced other
 5   challenges, but there was certainly nothing like when Bratz
 6   hit it.
 7   Q    So when you say "other challenges," what -- what other
 8   challenges had the brand faced or was facing that time
 9   period?
10   A    We talked about kids getting older younger or -- or
11   children having a lot of Barbie dolls or there were other
12   competitors in the marketplace, but there was nothing, to my
13   knowledge, in the history of the Barbie brand, that impacted
14   the brand like Bratz did.
15   Q    All right.  So what do you mean by that, nothing like
16   Bratz?
17   A    Nothing that was able over a sustained period of time
18   to take -- to garner that much market share from the Barbie
19   brand.
20   Q    And in a short period of time?
21   A    In a short period of time, but then it was sustained
22   for some period of time.
23   Q    All right.  Let me change gears, now, and I'd like to
24   ask you about what you knew when about Carter Bryant, okay?
25   That will be the next subject.
```

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 39 of 158   Page ID #:306004
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

39

1    A    Okay.

2    Q    And I'll ask you first to take a look at Exhibit 1193.

3            MR. QUINN:  I frankly don't know if this is in

4    evidence yet or not.

5            Does anybody know?

6            MR. STOVALL:  Is not.

7            MR. QUINN:  Is not.

8    BY MR. QUINN:

9    Q    And can you identify Exhibit 1193?

10   A    I can.

11   Q    What is it?

12   A    It is a Xerox or it's a photocopy of a letter addressed

13   to the CEO of Mattel in -- it doesn't have a date.  It was

14   received in August of 2002.

15   Q    And there is a stamp there that says "Robert A. Eckert,

16   received"?

17   A    It does.

18           MR. QUINN:  We'd offer Exhibit 1193, your Honor.

19           THE COURT:  Received.

20           (Plaintiffs' Exhibit No. 1193 is received in

21       evidence.)

22   BY MR. QUINN:

23   Q    Now, this is -- this has your stamp on it.  Did you

24   have a practice that when you received things, you stamp

25   indicating receipt with your name on it?

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 40 of 158   Page ID #:306005
CV 04-9049-DOC – 03/02/2011 - Day 25, Vol. 2 of 3

40

1   A    My administrative assistant at the time stamped mail as

2   it came in.

3   Q    And there does not appear to be, you know, any type of

4   signer or any indication on this document as to who wrote

5   it?

6   A    That's correct.

7   Q    Do you recall receiving this now, in 2011?

8   A    Well, I've clearly seen this.

9   Q    Right.

10  A    And -- and I didn't recall receiving it until I was

11  deposed on it, so now I know I've seen it.

12  Q    But you don't recall the actual incident when it

13  arrived in your in box?

14  A    No.

15  Q    And -- and how do you know -- looking at this, how do

16  you know that you must have seen this, that you did see it?

17  A    That's my handwriting at the -- at the top of the page.

18  That's how I address things, with the arrow to the person,

19  and that's my -- that's how I sign my initials at the bottom

20  of it.  That's my writing.

21  Q    Right.  So this letter addressed to CEO Mattel, Inc.,

22  it says, "Dear CEO," that's you, "I have information that I

23  think Mattel should investigate.  In 2000, a Mattel employee

24  by the name of Carter Bryant was working with Mattel to

25  design dolls.  One of the dolls that he was working on

1    creating was the Bratz dolls.  MGA Entertainment found out

2    about his creation and approached him to plan a way that he

3    could sell the dolls to MGA and never tell Mattel.  While he

4    was working with Mattel" and working from --

5    A    I'm sorry.

6    Q    -- to create these dolls, he worked out a deal with MGA

7    that let him collect a large sum of money each year from MGA

8    in exchange for his secrecy about the dolls and the fact

9    that they are rightly Mattel dolls.

10        Carter left Mattel to live off the money that MGA has

11   been paying him since then.  MGA tells everyone in the

12   business that, and I can't read -- Bratz was created by MGA,

13   which is not true.  MGA knew that Carter was an employee

14   with Mattel and that it was wrong to pay him to steal this

15   product from Mattel.

16             MS. KELLER:  And, your Honor, may we have --

17             THE COURT:  Yes.

18             MS. KELLER:  -- an instruction that this is not

19   offered for the truth and only goes to the statute of

20   limitations issue?

21             THE COURT:  Yeah.  This is not offered for the

22   truth.  Obviously whoever this person is is not in court.

23   There is no ability to cross-examine this person.  We don't

24   know anything about this, other than it's being offered on

25   the statute of limitations issue and also to show whatever

1    subsequent conduct Mattel took in relation to receiving this

2    letter, but what we cannot do is we cannot accept it for the

3    truth of the content of this letter.  Is that understood by

4    everybody?

5              *(No audible response.)*

6              THE COURT:  Okay.  Thank you.

7              Counsel?

8    BY MR. QUINN:

9    Q    So have you, till this day, Mr. Eckert, gotten any

10   information about who the author of this letter was?

11   A    No.  It's still an anonymous letter.

12   Q    Do you -- as a CEO of Mattel, do you receive anonymous

13   letters?

14   A    I do.

15   Q    Roughly, how many anonymous letters do you receive?

16   A    I probably receive in the neighborhood of a half a

17   dozen to a dozen every year.

18   Q    Do you have a standard way of dealing with these

19   anonymous letters?

20   A    I usually read through them quite quickly.  I don't

21   have, you know, I don't place a lot of credibility on

22   anonymous letters.

23   Q    Why is that?

24   A    Because they tend to be complaints about someone from

25   someone, and it's someone not willing to step up and talk to

1    me about it.  It's just here, Bob, deal with this, and so I

2    tend to deal with it quite quickly, pick the person I think

3    might be most relevant and send it to them.

4    Q    And do you expect that person when you -- when you pass

5    on to someone an anonymous letter, do you expect them

6    necessarily to report back to you or, you know, tell you

7    what they learned or whether they've been able to chase that

8    to ground?

9    A    No, I don't.

10   Q    Why not?

11   A    I assume they may treat anonymous letters like I do,

12   and, you know, maybe it moves around and it strikes a cord

13   with somebody, but again, I don't -- I don't place a great

14   deal of importance on anonymous letters.

15   Q    Now, in this -- is that -- the practice that you've

16   described, is that the practice that -- can you tell from

17   this, even though you don't recall the occasion when you

18   received this anonymous letter, can you tell from this that

19   that's actually the practice that you followed in this case?

20   A    It certainly appears to be, yes.

21   Q    And can you explain how you can tell that?

22   A    It's likely that I read this letter.  I decided that it

23   has something to do with the human resources, it's a

24   employee complaint, I sent it to Alan Kaye.

25   Q    Who is Alan Kaye?

CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

44

```
 1    A    Alan Kaye is head of our executive vice president of
 2    human resources.  He's our chief people person at Mattel.
 3    Q    And what did you say there?  Can you read your
 4    handwriting for us?
 5    A    I have no problem reading.  It says, "Alan Kaye, dash,
 6    worth having Richard explore, question mark."
 7    Q    And down below, there are some additional notes, that
 8    looks like it's different handwriting?
 9    A    It does.
10    Q    And was that handwriting that was not on this when you
11    passed this off to Alan Kaye?
12    A    I'm sure it wasn't.
13    Q    Did you -- I mean, as CEO, as someone who receives, I
14    think you said, 6 to 12 anonymous letters a year, would it
15    ever occur to you to go out and file a lawsuit just based on
16    having received an anonymous letter?
17    A    No, not at all.
18    Q    Would you regard that as a responsible use of our
19    justice system?
20             MS. KELLER:  Objection.  Leading.
21             THE COURT:  Sustained.
22    BY MR. QUINN:
23    Q    Well, as far as you are concerned, is the fact of an
24    anonymous letter, can you tell us whether or not that is, in
25    itself, any proof that any of the allegations there are
```

1    true?

2    A    No, and in fact, as I mentioned, I view letters like

3    this that are sent anonymously with a little jaundiced,

4    skeptic eye.

5    Q    So why wouldn't you sue, bring a lawsuit against Carter

6    Bryant, for example, just having -- based on having

7    receiving this anonymous letter?

8    A    Well, lawsuits cost a lot of time, money and effort on

9    our behalf, on the court system, on jurors, and we just

10   don't go around filing suits based on anonymous complaints

11   generally from -- about one employee to the other.

12   Q    Does --

13   A    Excuse me, I don't recall ever considering a lawsuit

14   based on something like this.

15   Q    All right.  This anonymous letter is dated August 5,

16   2002.  Let's go forward in time, now, to an article, which

17   is in evidence, a Wall Street article.  This is Exhibit 1C,

18   which is -- has been heavily redacted, and this is in

19   evidence, so we can put it up on the screen, an article

20   entitled "To Lure Older Girls, Mattel Brings in Hip-Hop

21   Crowd"; do you see that?

22   A    I do.

23   Q    And the article, if we go to the second page, the tiny

24   bit that's left after all of the redactions, says, "MGA says

25   the Bratz were designed by Carter Bryant, a former member of

1    the Barbie team.  Isaac Larian, chief executive of MGA, says

2    he had never heard of a project similar to the Bratz at

3    Mattel.  He says he chose Mr. Bryant's idea for the Bratz

4    over several others after holding a sort of fashion doll

5    design contest in late 1999"; do you see that?

6    A    I do.

7    Q    Now, do you recall reading this Wall Street Journal

8    article at the time?

9            MS. KELLER:  And I'm going to object vague as to

10   time unless we have the date.

11           MR. QUINN:  Good point.

12   BY MR. QUINN:

13   Q    The date on this article is July 18th, 2003, right?  I

14   think you can see that on the first page.

15   A    I do.

16   Q    So do you recall that you read this article when it was

17   published?

18   A    I have read the article, and I'm sure I read the

19   article on the day it was published.

20   Q    And did you learn at some point that Mr. Bryant had

21   actually been a Mattel employee in 1999?

22   A    I did.

23   Q    And can you tell when it was that -- when it was you

24   learned that?

25   A    In the fall of the year 2003, sometime around

1    Thanksgiving.

2    Q    All right.  Did there come a time that you learned that

3    Mr. Bryant had entered into a contract with MGA during the

4    time he was still employed by Mattel?

5    A    Yes, I did learn that.

6    Q    And when was it that you learned that?

7    A    It was in the fall of 2003.  I associate the

8    Thanksgiving time period, but I don't remember the specific

9    date.

10   Q    And what was it -- how did that come to your attention?

11   What was it that you saw that caused you to understand that

12   he had entered into a contract with MGA while he was still

13   employed by Mattel?

14   A    We had seen evidence from a lawsuit in Hong Kong, I

15   believe it was, between MGA and someone else.  That evidence

16   included Mr. Bryant's contract with MGA.  I also saw the

17   contract Mr. Bryant had with Mattel, and I saw Bratz

18   drawings at that meeting.

19           MR. QUINN:  So if we could put on the screen

20   exhibit 15, Mr. Bryant's contract with MGA.

21   BY MR. QUINN:

22   Q    Does this appear to you to be the contract that you say

23   you saw with some drawings as a result of some litigation in

24   Hong Kong?

25   A    I need to read it for a minute to familiarize myself

1    with it.

2    Q     Okay.

3    A     Yes, I believe it is.

4    Q     Now, as a result of seeing this contract in connection

5    with this Hong Kong litigation that MGA was involved in in

6    late 2003, did you reach any conclusions regarding Carter

7    Bryant?

8    A     Yes, I did.

9    Q     What conclusion did you reach?

10   A     By signing this contract, he violated his employment

11   agreement with Mattel.

12          MS. KELLER:  Objection.  It's a legal conclusion

13   and a question for the jury, your Honor.  I would ask

14   that -- I would ask that this be limited to his own opinion.

15          THE COURT:  Well, remember, this is his opinion.

16   It shows -- well, you can consider it.  It certainly will

17   show why Mr. Eckert formed this opinion and the subsequent

18   actions he took in relation to it, but remember, this is his

19   opinion, okay?

20          Counsel.

21   BY MR. QUINN:

22   Q     You indicate that you -- is it true that you looked at

23   both Mr. Bryant's contract with MGA and the dates of that

24   contract as well as his contract with Mattel and his

25   employment records to see when he was still working at

 1   Mattel; did you do that?

 2           MS. KELLER:  I'm going to object again.  Leading.

 3           THE COURT:  No, overruled.

 4           You can answer that question.

 5           THE WITNESS:  Yes, I did look at both contracts,

 6   and I looked at a depiction, as I recall it, of a time line

 7   of Mr. Bryant's employment with Mattel.

 8   BY MR. QUINN:

 9   Q    Did you reach any -- can you tell us whether or not you

10   reached any conclusion as to whether or not Mr. Bryant had

11   been a loyal employee based on that?

12           THE COURT:  No.  Let me caution the jury, once

13   again, that this is his opinion.  This is something you'll

14   determine that will show any subsequent conduct, so it's

15   limited in terms of his opinion.

16           THE WITNESS:  My opinion is that Mr. Bryant was

17   disloyal to Mattel and violated the terms of his agreement

18   with Mattel.

19   BY MR. QUINN:

20   Q    And after that, did Mattel file a lawsuit against

21   Mr. Bryant?

22   A    We did.

23           MR. QUINN:  Your Honor, at this point, I'd like to

24   read the stipulation that's been agreed to with Defendants

25   concerning certain facts and events in the chronology of

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 50 of 158   Page ID #:306015
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

50

1    this litigation.

2           THE COURT:  You may read the stipulation, Counsel.

3           MR. QUINN:  "On April 27th, 2004, Mattel filed a

4    complaint against Carter Bryant in the Superior Court of Los

5    Angeles County, case number BC314398."  After Mr. -- "after

6    Bryant removed the action to the United States District

7    Court for the Central District of California, case number

8    4-9059, Carter Bryant's deposition was taken for the first

9    time on November 4th, 2004.  MGA Entertainment, Inc.,

10   intervened in the Mattel versus Bryant action, case number

11   4-9059, on December 8th, 2004.

12          "On April 13th, 2005, MGA Entertainment, Inc.,

13   filed a complaint against Mattel, Inc., in the Central

14   District of California, case number 5-02727.

15          "On May 20th, 2005, the Court issued an order

16   staying the action pending a interlocutory appeal.

17          "On April 16th, 2006, the Court issued an order

18   vacating the stay.

19          "On November 20th, 2006, Mattel's first amended

20   complaint was lodged with the Court, bringing claims against

21   MGA Entertainment, Inc., Isaac Larian, Carter Bryant, MGA

22   Entertainment, HK Limited, MGAE de Mexico, SRL de CV and

23   Gustavo Machado."

24          That is the stipulation.

25          THE COURT:  Stipulated to by Mattel?

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 51 of 158   Page ID #:306016
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

51

```
1          MR. QUINN:  Yes, your Honor.

2          THE COURT:  And Mr. --

3          MS. KELLER:  So stipulated.

4          THE COURT:  Stipulated to by MGA and Mr. Larian.

5          Now, that's binding upon us.  In other words, what

6   they've set forth --

7          MS. KELLER:  I'm sorry, your Honor.  Miss Hurst

8   tells me --

9          THE COURT:  Well, just a moment.

10         Stop the clock running, Jane.

11         MS. KELLER:  We -- Miss Hurst would like to defer

12  the entry of the stipulation because apparently part of it

13  is not correct.

14         MR. QUINN:  Your Honor, we cleared this with The

15  court and Mr. McConville --

16         THE COURT:  Excuse me, this will be binding upon

17  us.  This is the stipulation, it is so entered.  Both

18  parties have agreed to this, the record will reflect.  Thank

19  you.

20         It was done outside of your presence, and the

21  Court was informed of this informally.  If there's a mistake

22  in this and both parties agree to this, we'll clear that up

23  later, but for the present time, this is binding upon both

24  parties, now.

25         Counsel?
```

1    BY MR. QUINN:

2    Q    You were here in court, I think you've said, during the

3    opening statements at the beginning of this case?

4    A    I was.

5    Q    And you heard Miss Keller say in her opening statement

6    that, and I quote, "Mattel, if somebody comes in in the same

7    situation as Carter Bryant, takes the person's word for it,

8    as long as they sign this document, they don't even have

9    lawyers involved"; do you recall Miss Keller saying --

10            THE COURT:  I'm going to stop that right now.

11   We're not going to go back to opening statements and what

12   was said by either counsel.  That's not evidence.  We're not

13   going to do that.

14            MR. QUINN:  Okay.

15            THE COURT:  Understood by both parties?

16            MR. QUINN:  Understood, your Honor.

17            THE COURT:  You are not going to get each lawyer

18   involved and attack any lawyer.  Understood by both parties?

19            MR. QUINN:  Yes.

20            MS. KELLER:  Yes.

21            THE COURT:  Do I have that?

22            MR. QUINN:  Yes.

23            THE COURT:  Excellent.  Now, let's move on.

24   BY MR. QUINN:

25   Q    Are you aware of any circumstance or occasion when

```
1    Mattel has entertained or considered an idea or design for a

2    toy that was brought to Mattel by a current employee of a

3    competitor in the toy industry?

4    A    No, I'm not.

5    Q    Are you aware of any circumstance where Mattel has

6    entertained or considered an idea or design for a toy that

7    was brought to Mattel by somebody who had just recently left

8    a competitor?

9    A    No, I specifically asked that question of people who

10   were in charge of that, and the answer is no, no one who is

11   in --

12           MS. KELLER:  Objection.  Objection.  This is all

13   hearsay.

14           THE COURT:  Just a moment.

15           Well, the answer is no.

16   BY MR. QUINN:

17   Q    All right.  Do you have -- do you have an understanding

18   about why Mattel does not and would not consider concepts or

19   ideas brought to Mattel in that fashion?

20   A    Yes, I do.

21   Q    And what is your understanding?

22   A    My understanding is that Mattel would not entertain a

23   meeting, a discussion or allow someone to come in and

24   present a new idea if he or she were employed by another toy

25   company presently or in the immediate past.
```

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 54 of 158   Page ID #:306019
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

54

1    Q     Why?  Why wouldn't Mattel do that?

2    A     Because it's too risky.

3    Q     Why, why is it risky?

4    A     For the same reason we are sitting here today.

5    Q     Well, how about if somebody had left, they had left and

6    they come in up with an idea, why wouldn't Mattel consider

7    that, why would that be too risky?

8    A     It depends on the time frame, but it takes time for

9    someone to develop an independent idea, to put it in a

10   presentation form so it could be described to somebody at

11   Mattel or one of our competitors.  I -- I don't think it's

12   reasonable to conclude that somebody does that overnight.

13   Q     And what is the risk that you are referring to, what is

14   the risk that you have in mind?

15   A     The risk is the person doesn't own the idea that he or

16   she is selling.

17                (Attorney discussion held off the record.)

18                MR. QUINN:  Nothing further, thank you.

19                THE COURT:  Now, before you start

20   cross-examination, would you like the Court to take a break?

21                MS. KELLER:  If we could, your Honor.

22                THE COURT:  That way you can get set up with the

23   binders, et cetera.

24                All right.  You are admonished not to discuss this

25   matter amongst yourselves, nor form or express any opinion

 1   concerning this case.  We'll come in and get you in about 20

 2   minutes.  Go out and have a nice recess.

 3            *(The following proceedings is taken outside*

 4        *the presence of the jury.)*

 5            THE COURT:  You may step down, Mr. Eckert.

 6            Now, let's go back on the record.

 7            What is incorrect about this stipulation that I

 8   was informed was a stipulation except for one section that I

 9   had indicated and told counsel was appropriate to include,

10   there were some added words by Mr. McConville that the Court

11   rejected?  So what -- is there a date incorrect?  What's the

12   issue here?

13            MS. HURST:  Your Honor, in the seventh paragraph

14   of the draft stipulation, it talks about the lodging of the

15   first amended complaint.  That document was never filed with

16   the court as a first amended complaint, so it's misleading.

17   That document never existed and was filed on the docket in

18   that form.

19            THE COURT:  All right, now --

20            MS. HURST:  That was my concern.

21            THE COURT:  We'll clear that up this evening, and

22   if we need to, we will reread the stipulation, but let's go

23   take a break for now.  I don't think the jury knows the

24   difference between a lodged or unlodged at the present time,

25   but if it's inappropriate, we can clean that up, but other

1    than that, I thought we had a stipulation --

2             MS. HURST:  No other issue.

3             THE COURT:  All right.  That can be done easily.

4             All right.  Counsel, have a nice recess.

5             *(Recess.)*

6             *(The following proceedings is taken in the*

7        *presence of the jury.)*

8             THE COURT:  All right.  The jury is present, all

9    counsel are present, the parties are present, the witness.

10            This is cross-examination by Ms. Keller on behalf

11   of Mr. Larian and MGA.

12             **ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED**

13                      **CROSS-EXAMINATION**

14   BY MS. KELLER:

15   Q    Good afternoon, Mr. Eckert.

16   A    Good afternoon.

17   Q    Mr. Eckert, one of the questions that you were asked

18   was -- had to do with your not being here with us these last

19   many weeks?

20   A    I do.

21   Q    And you said that it was because witnesses are excluded

22   and you're a witness?

23   A    Yes, that's my understanding.

24   Q    Now, the corporate representative designated for Mattel

25   is Lily Martinez sitting at the counsel table, right?

1    A     That's correct.

2    Q     And you know she also was a witness in this case,

3    right?

4    A     No, I don't know that.

5    Q     Well, will you accept my representation that she was a

6    witness in this case?

7    A     Yes.

8    Q     And yet, here she is as a corporate representative.

9    Now, you knew full well that if you designated yourself as a

10   corporate representative, you could be here witness or no,

11   right?

12          MR. QUINN:  Objection.  Irrelevant, your Honor,

13   knowing who the corporate representative is.

14          THE COURT:  No, overruled.

15          THE WITNESS:  No, I didn't know that.

16   BY MS. KELLER:

17   Q     You know that when Mr. Larian is sitting here every

18   single day and you are not, it looks bad to the jury, right?

19          MR. QUINN:  Objection.  Argumentative.

20   Irrelevant.

21          THE COURT:  Well --

22          MS. KELLER:  It goes to bias, your Honor.

23          MR. QUINN:  Mr. Larian is a party, your Honor,

24   he's personally a party.

25          THE COURT:  Okay.  Understood.

```
 1              I'll let you two go on for a while.

 2              (Laughter.)

 3              MR. QUINN:  Done, your Honor.

 4              THE COURT:  No.  I want you two to converse in

 5    front of the jury.  You go ahead and have a conversation.

 6              MS. KELLER:  I have eyes only for you, your Honor.

 7              (Laughter.)

 8              THE COURT:  Yeah, right.

 9              MR. QUINN:  Yours, too.

10              THE COURT:  Well, let's not put that on the record

11    so my wife knows I'm coming home.

12              (Laughter.)

13              THE COURT:  It doesn't matter.  Let me just say

14    that.  Mr. Larian is here as a Defendant, but the Court,

15    you'll find, may excuse him on different occasions, and

16    that's entirely appropriate.  He's also got a business to

17    run.

18              Mr. Eckert can designate himself as a corporate

19    representative, but he doesn't have to.  Lily Martinez, this

20    is entirely appropriate and proper.  It should have no

21    bearing on this lawsuit, okay?

22              Mr. Machado has not been here on occasion, in

23    fact, ever, and he'll be here tomorrow.  And his absence is

24    not to be construed by you in any either favorably or

25    unfavorably, in other words, the parties are going to come
```

```
 1   and go at different times in this case, okay, so it's
 2   neutral.
 3            Thank you.
 4   BY MS. KELLER:
 5   Q    Mr. Eckert, with all that in mind, nevertheless, you
 6   felt it necessary to explain that the reason you weren't
 7   here is because you are a witness, right?
 8            MR. QUINN:  Argumentative, your Honor, feel
 9   anything.
10            MS. KELLER:  I'll rephrase.
11   BY MS. KELLER:
12   Q    Nevertheless, with all that in mind, you explained that
13   the reason you had not been here every day was that you were
14   a witness, right?
15   A    Yeah, I certainly tried to answer the question that
16   way.
17   Q    Well, you understand that as the corporate
18   representative, you can get off the witness stand and take
19   Miss Martinez's place, don't you?
20   A    No, sorry, I really don't.
21            MS. KELLER:  Your Honor, I would ask that the
22   Court --
23            THE COURT:  No, the Court isn't going to be drawn
24   into this.  We'll talk about this at 5:00 or 8:00 tonight,
25   okay?
```

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 60 of 158   Page ID #:306025
CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

60

1          MS. KELLER:  Okay.

2    BY MS. KELLER:

3    Q    Now, in preparation for testifying today, of course you

4    have read documents, right?

5    A    Yes, I have.

6    Q    And you've looked at binders, right?

7    A    Yes, I have.

8    Q    And you've reviewed your deposition, true?

9    A    Yes, I have.

10   Q    And have you also prepared with any other personnel,

11   say, from your corporate communications department?

12   A    No, I don't remember meeting at all with anybody from

13   the corporate communications department.

14   Q    Or from any public relations type of firm to assist you

15   in your presentation?

16   A    No, I haven't done that.

17   Q    You remember testifying before congress about product

18   recalls, right?

19   A    I did, yes.

20   Q    And you had a public relations firm prepare you for

21   that testimony?

22   A    Well, I had several people involved.  There were public

23   relations firms involved, yes.

24   Q    And for example, your testimony was videotaped while

25   you rehearsed it, right?

```
 1                MR. QUINN:  Object, your Honor.  This is
 2     irrelevant.  Testimony before congress?
 3                THE COURT:  Well, Counsel, I think you're driving
 4     at whether he's been pre-prepared or what is his preparation
 5     is in terms of being a witness.
 6                MS. KELLER:  Yes.
 7                THE COURT:  No, overruled.  You can answer the
 8     question.  Eventually we may be getting into that area,
 9     so...
10                THE WITNESS:  Could I hear the question again.
11     BY MS. KELLER:
12     Q    Yes.  You were prepared by public relations people,
13     who, for example, videotaped you rehearsing testimony before
14     you testified before congress, right?
15     A    I -- I don't know that I was videotaped.
16     Q    And you know your corporate representative, Lily
17     Martinez, has testified here that she was prepared by a
18     public relations firm before she testified in this matter,
19     right?
20                MR. QUINN:  I object, your Honor.  There was no
21     such testimony.
22                THE COURT:  Sustained.
23     BY MS. KELLER:
24     Q    Have you worked with any acting coaches to prepare for
25     your testimony here?
```

1   A      No.

2   Q      Now, before you worked at Mattel, you said you worked

3   at Kraft Foods?

4   A      That's correct.

5   Q      And you were the general manager of the Kraft cheese

6   division at one point?

7   A      I was.

8   Q      And you oversaw things like Oscar Mayer Lunchables

9   Lunch Combinations?

10  A      Yes, I did.

11  Q      So you weren't, for lack of a better term, a toy guy

12  before you came to Mattel?

13  A      That's correct.

14  Q      You didn't have any background in toys at all?

15  A      That's correct.

16  Q      And you said that when you got to Mattel that you set

17  goals, you had three goals, you said, build brands, cut

18  costs and develop people, right?

19  A      Yes, I did.

20  Q      And part of cutting cost was cutting people, right?

21  A      We certainly did job eliminations, yes.

22  Q      Well, yeah.  When you said you reduced the headcount,

23  that meant you laid off more than 500 employees the first

24  year, right?

25  A      I believe that's the case, yes.

1    Q    And that's before there was a Bratz on the market,
2    right, Mr. Eckert?
3    A    Yes, that's correct.
4    Q    And you laid off another 980 the next year, 2001,
5    right?
6    A    I don't know that to be the case.
7    Q    You closed your plant in Kentucky?
8    A    We did close the plant in Kentucky.  I don't know what
9    year it was.
10   Q    And that involved 980 jobs, all gone, right?
11   A    Gone from Kentucky, yes.
12   Q    Well, gone from the American labor scene, your 980 jobs
13   that year at Mattel were eliminated, right?
14   A    If -- if that's the number, yes.
15   Q    Well, and that was before Bratz even was a hit, right?
16   A    In 2001?
17   Q    Yes.  Didn't even hit the market until the toy season
18   that year, late in the year, right?
19   A    Well, I don't know when the plant closing occurred that
20   year.
21   Q    Anytime that year, Bratz had not become a big hit in
22   2001 either, had it?
23   A    No, I think it was gaining traction in the marketplace
24   in 2001.
25   Q    So you think that the fact that Bratz was released in

```
1    2001 for the Christmas season, that was the reason you laid

2    off 980 people in 2001?

3              MR. QUINN:  Assumes facts.

4              THE COURT:  Well, you added the Christmas season,

5    Counsel.  Just reask the question.

6    BY MS. KELLER:

7    Q    Bratz started selling in the Christmas season 2001,

8    right?

9    A    It was selling in the second half of 2001, yes.

10   Q    And that's -- well, second half, Christmas is the big

11   time of the year in the toy business, isn't it?

12   A    Yes.

13   Q    That's when, sometimes, 90 percent of sales can occur?

14   A    No, I wouldn't say that.

15   Q    And so what I -- what I'm driving at is those 980

16   people you laid off that year, that didn't have anything to

17   do with Bratz, right?

18   A    Assumes facts as to the year.

19             THE COURT:  No, overruled.

20             You can answer that question, but Counsel, you

21   might make certain it's the correct year.

22   BY MS. KELLER:

23   Q    Well, Mr. Eckert, you are the CEO of your company,

24   right?

25   A    Yes, I am.
```

1  Q    You are the head guy, true?

2  A    Yes.

3  Q    The buck stops with you?

4  A    Yes, it does.

5  Q    All major decisions involving your company have to be

6  approved by you?

7  A    No, I wouldn't agree with that.

8  Q    You would agree that before you close down a plant,

9  that would have to be approved by you?

10  A    Yes, under normal circumstances.

11  Q    And before 980 people got the ax, that would have to be

12  approved by you?

13  A    If -- if it were a plant closing of that size, yes,

14  they would.

15  Q    And you don't even remember that you closed that plant

16  the year after you got there, 2001?

17  A    I don't remember what year the plant closed.

18  Q    And you laid off another 240 people in 2002, right?

19  A    I don't know the specific number of layoffs that may

20  have occurred in 2002.

21  Q    Another 250 layoffs in 2004?

22  A    I don't know that number.

23  Q    Another 200 in 2006, over 200?

24  A    I don't know that number.

25  Q    Over a thousand in 2008, surely you remember that?

1    A    I do remember a headcount reduction program in 2008.

2    Q    Well, headcount reduction means people are getting

3    fired, right?

4    A    Not necessarily, no.  Some people are -- the job is

5    eliminated or they take a retirement program or there is

6    some sort of arrangement that there is a reduction in

7    employment.

8    Q    Over a thousand layoffs in 2008, layoffs, not

9    retirements, right, you remember that, don't you, as the

10   head person in your company?

11   A    I remember a thousand reduction in force.  I can't

12   testify that over a thousand of them were layoffs.

13   Q    Well, the way you have made your company profitable is

14   cutting people's jobs, right?

15   A    Um.

16   Q    Or reducing the headcount, as you like to say?

17   A    No, I wouldn't say that's the way Mattel is profitable.

18   Q    And you also said that another -- another way that

19   you -- another goal that you had for the company was

20   consolidation.  And consolidation, that meant cutting a

21   bunch of plants, too, and cutting facilities, right?

22   A    There were some facilities that were consolidated into

23   larger units, yes.

24   Q    And people lost their jobs in the consolidations, too,

25   right?

1    A    Yes, they probably did.

2    Q    Well, you know they did, don't you?  Not probably, you

3    know it, hundreds, right?

4    A    Well, I don't know that hundreds did.  I do know people

5    would have lost their jobs as business offices were closed.

6    Q    Now, meanwhile, during that same period where all these

7    people were losing their jobs, the period of 2000 to 2009,

8    your total compensation was over $200 million, wasn't it?

9    A    No, I don't have any reason to believe that.

10   Q    Among other things, you got 4.5 million stock options

11   during that period?

12   A    From the period of 2000 to 2009?

13   Q    That's right.

14   A    I may have.

15   Q    Well, the very first year you were hired, you got 3 --

16   3 million stock options, right?

17   A    That's correct.

18   Q    And the next four years, you got 375,000 stock options

19   each year, right?

20   A    I don't think that is true.

21   Q    Well, if you take a look at the proxy statement for

22   your company that you have to file, your compensation is

23   listed there, right?

24   A    It is.

25   Q    And you try to make sure that those statements are true

1    and accurate, don't you?

2    A    I do.

3    Q    Do you have any reason to dispute those 375,000

4    per-year stock options granted at the money to you for 2002,

5    2003, 2004 and 2005?

6    A    That wasn't the question I had heard.

7    Q    Well, I'm just talking about those four years right

8    now.

9    A    Okay, I'm sorry.  I'm sorry, that wasn't the question I

10   heard.

11   Q    Well --

12   A    The years of 2002?  2002?

13   Q    Well, let's start again just to be clear.  Let's start

14   again with 2000.

15        You got an option to purchase 3 million shares, right?

16   A    That's correct.

17   Q    And then 2001, 2002, 2003, 2004, 375,000 stock options

18   each year granted at the money?

19   A    I don't believe that's the case.

20   Q    Have you ever -- 2005, 375,000 stock options granted at

21   the money?

22   A    In 2005?

23   Q    Uh-huh.  As well as those other years?

24   A    No, not the other years.

25   Q    Well, have you taken a look at your company's proxy

CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

69

1    statements as it pertains to your compensation?

2    A    I hae at the time -- I would have at the time, yes.

3    Q    And we'll see if we can provide a copy of that to you

4    at the break.

5         At the money, when you get a stock option at the money,

6    that means you are not paying anything for it, right?

7    A    Paying for a stock option?

8    Q    When you are granted a stock option by your company,

9    quote, "at the money," you aren't paying anything for it,

10   right?

11   A    That's correct, and you are getting no value.

12   Q    Yeah, you are given it, right?

13   A    You are given a right, yes.

14   Q    And you're given a right to exercise it, meaning later

15   on, you can cash it in at some later point, right?

16   A    That's correct.

17   Q    And as of yesterday, Mattel's stock was trading for

18   about $25 a share?

19   A    Okay.

20   Q    Is that right?

21   A    I believe it is.

22   Q    You pay pretty close attention to the stock price,

23   don't you?

24   A    I do watch it, yes.

25   Q    I mean, you work for the shareholders of your company,

1   don't you?

2   A    I do.

3   Q    So what I'm asking is, over those years, did you get

4   altogether in addition to $81 million, did you get 4 and a

5   half million stock options?

6   A    I can't -- I don't know where the $81 million came

7   from, so I guess I can't -- I can't agree with what you are

8   asking.

9   Q    Well, I just added up from your proxy statements,

10  salary, bonus, other, stock grants, and then I also looked

11  at the stock options --

12          MR. QUINN:  Your Honor, this is testimony by

13  Miss Keller.  I don't hear a question here.

14          THE COURT:  Sustained.

15          MR. QUINN:  And I move to strike the statement by

16  counsel.

17          THE COURT:  Stricken.

18          Just reask the question, Counsel.

19  BY MS. KELLER:

20  Q    How many stock options do you hold today that you

21  haven't exercised?

22  A    I don't know the exact number, but it's probably around

23  2 million shares.

24  Q    Two million times $25, let's see, that would be about

25  $50 million worth of shares that you hold today?

1    A    No, that's not how I value stock options.

2    Q    Well, you have stockholdings in addition to stock

3    options, you have stockholdings in your company too, don't

4    you?

5    A    That's correct.

6    Q    About how many shares of Mattel stock do you own, not

7    counting options?

8    A    I would think it's in the range, I would say, probably

9    of 800- or 900,000 shares.

10   Q    And you were given those shares as part of your total

11   compensation by the company?

12   A    Yes.

13   Q    So depending on how this case goes, you have a very

14   direct financial interest in the outcome, yourself as an

15   individual, don't you?

16   A    I could, yes.

17   Q    Well, either way you do, don't you?  I mean, if your

18   company wins big and you get a big judgment against MGA,

19   that's likely to have a positive effect on the company's

20   shares in the market, true?

21   A    I think so, yes.

22   Q    And so the value of your shares would go up, right?

23   A    Yes, they would.

24   Q    Value of your options would go up, right?

25   A    Yes, they would.

1    Q    So this could be a swing of many millions of dollars or

2    even tens of millions, right?

3    A    I don't -- I don't know how to put a number to the

4    value of that.

5    Q    Well, and that's because you don't know exactly how

6    high the shares might go as a result of a favorable outcome

7    here, true?

8    A    Yes.

9    Q    I mean, they could go up 5 bucks, 10 bucks, 20 bucks a

10   share, who knows how much they could go up, right?

11   A    Yes.

12   Q    And so those 2 million options plus 8- or 900,000

13   shares, you start multiplying that out by even 5 or $10,

14   that could be a whole lot of money in your pocket if this

15   case goes well for your company, right?

16   A    Yes, it would.

17   Q    And same -- the reverse is true, too, if MGA gets a big

18   judgment against your company, you personally are going to

19   take a hit in the pocketbook if the shares go down, right?

20   A    Yes, I would.

21   Q    And shares are very sensitive, shares in the market,

22   the stock market is very sensitive to things like whether a

23   company has just gotten hit with a big judgment, true?

24   A    I'm sure there are -- at times, it's true.

25   Q    Well, it's generally true, isn't it?

1    A    No, I don't think I would agree with that.

2    Q    You know sitting here today, that depending on the

3    outcome of this case, you personally stand to gain or lose

4    potentially tens of millions of dollars, true?

5    A    Oh, I think that's true, it's possible.

6    Q    Now, you are not an expert in doll design, are you?

7    A    No, I'm not.

8    Q    Your expertise is in managing a company, true?

9    A    Yes.

10   Q    And specifically a giant public corporation, right?

11   A    No, I've managed companies and entities that were not

12   public.

13   Q    Well, Mattel, like Kraft, is a public company with

14   boards of directors and thousands of shareholders, right?

15   A    Kraft was not a public company when I was the president

16   of Kraft.

17   Q    It is today?

18   A    It is today.

19   Q    So back to what I was saying, Mattel, like Kraft today,

20   we'll say, is a public company with boards of directors and

21   thousands and thousands of shareholders, true?

22   A    Yes.

23   Q    And in contrast to Mattel, you know that MGA is a

24   privately-held company, true?

25   A    Yes.

1    Q    And it's -- it's what's kind of commonly called a

2    closely-held corporation in which a very small group of

3    shareholders control the operation and management of the

4    company, right?

5    A    That may be true.

6    Q    And closed corporations generally don't have access to

7    the kind of working capital that corporations with large

8    numbers of shareholders have, right?

9    A    No, I wouldn't agree with that.

10   Q    Do you know that more than 90 percent of all the

11   businesses in the U.S. are closely-held corporations, not

12   big public ones like yours?

13   A    That wouldn't surprise me.

14   Q    And do you know that most closely-held corporations are

15   actually family businesses?

16   A    That wouldn't surprise me either.

17   Q    Now, there's a risk element in privately-held

18   companies, isn't there?

19   A    There's a risk element in all companies.

20   Q    Well, in your own case, you didn't start Mattel, right?

21   A    That's correct.

22   Q    You didn't build it from the ground up, right?

23   A    That's correct.

24   Q    And when it hit the hard times that you talked about,

25   you didn't have to take any money out of your pocket to put

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 75 of 158   Page ID #:306040
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

75

 1     into it to keep it going, did you?

 2     A     I certainly made trade-offs to come to Mattel.

 3     Q     That's not what I'm talking about.

 4           When Mattel hit the rocky times in the year 2000, you

 5     didn't dig into your pocket and mortgage your home to keep

 6     the company going, did you?

 7                 MR. QUINN:  Your Honor, this is irrelevant,

 8     whether he mortgaged his home.

 9                 THE COURT:  I'm going to sustain that, Counsel.

10     BY MS. KELLER:

11     Q     You've never had to use your own money to pay for

12     advertising for Mattel, have you?

13                 MR. QUINN:  Same objection.  Irrelevant.

14                 THE COURT:  I'll hear you later, Counsel, but I'm

15     going to sustain the objection.

16     BY MS. KELLER:

17     Q     Now, on your watch, there were products that --

18     products that Mattel developed like MyScene Barbie, What's

19     Her Face, Flavas, right?

20     A     Yes.

21     Q     And whether they made money or lost money, the Mattel

22     shareholders were the ones that were ultimately going to

23     hold the bag for that, right?

24     A     (No audible response.)

25     Q     Yes?

1   A    The shareholders and other constituencies are impacted

2   by the performance of products, yes.

3   Q    Mattel is required by the Securities and Exchange

4   Commission to periodically file things called 10-Ks; is that

5   right?

6   A    Yes, it is.

7          MS. KELLER:  If we can see Exhibit 18395.

8   BY MS. KELLER:

9   Q    Is that the Mattel form 10-K for the period that ended

10  December 31st, 2007?

11         MS. PHILLIPS:  We need to use 7508.

12         MS. KELLER:  I'm sorry, it's 18395, also known as

13  7508, okay?

14  BY MS. KELLER:

15  Q    Is that the Mattel 10-K for the period ending

16  December 31st, 2007?

17  A    Yes, it is.

18  Q    And would you go to page 135 of that exhibit?  And that

19  lists the subsidiaries of Mattel?  135?

20  A    I'm looking.

21       No, I'm sorry.  Is that 135?

22  Q    Well, I'll tell you what, while we are looking for

23  that, I'll ask you, there is a Mattel Asia Pacific Sourcing

24  Limited, right?

25  A    Yes -- yes, there is.

1    Q    And that's in Hong Kong?

2    A    Partly in Hong Kong.

3    Q    There is a Mattel Europe Holdings in the Netherlands?

4    A    Yes, I think there is.

5    Q    There is a Mattel Foreign Holdings Limited in Bermuda?

6    A    There may be.

7    Q    Mattel International Holdings in the Netherlands?

8    A    There may be.

9    Q    You don't even know?

10   A    I don't.

11   Q    Mattel Marketing Holdings Limited in Singapore?

12   A    There may be.

13   Q    Mattel Overseas Operations Limited in Bermuda?

14   A    I believe there is.

15   Q    And Bermuda is a place where it's very favorable to

16   have holding companies, true, in terms of the financial

17   structure, tax structure, all that?

18   A    I believe it is.

19   Q    And that's why you have two different holding companies

20   in Bermuda, it's not because Bermuda is a huge toy market

21   for Mattel, right?

22   A    I really don't know why we have two entities in

23   Bermuda.

24   Q    And is that because you leave that to the other people,

25   the accountants, the financial guys, the lawyers to decide

1   how to set all these things up?

2   A    Yes.

3   Q    And you got 10 other wholly owned subsidiaries around

4   the world, right?

5   A    We may.

6   Q    And money comes in and out of these various companies

7   and holding companies, but you leave that up to the

8   accountants and the lawyers and the other people to manage

9   that?

10  A    That's right.

11  Q    So there's nothing particularly odd or unusual, as far

12  as you are concerned, about that structure, it's just the

13  structure that's been set up by the money people and the

14  lawyers, right?

15  A    Yes, I think that's correct.

16  Q    Now, as the CEO of a $9 billion company, you have a lot

17  of responsibilities, don't you?

18  A    Yes, I do.

19  Q    And one of the most important is simply being the

20  leader of the company, right?

21  A    Yes.

22  Q    You've written articles about the importance of

23  leadership?

24  A    I have.

25  Q    One of them in the Harvard Business Review where

1   leadership starts, true?

2   A    Yes.

3   Q    And if you look at Exhibit 2305, that was your first

4   quarter 2004 earnings call.

5        Can you tell us what an earnings call is?

6   A    An earnings call is something we and most public

7   companies do once a quarter to announce publicly the

8   financial results for the preceding quarter --

9   Q    And who do you announce them to?

10  A    We announce them publicly.

11  Q    To anyone who wants to listen in on the earnings call?

12  A    Yes, I think it's replayable, but it's generally the

13  investment community, the media.

14  Q    And your message for that year was simply lead, right?

15  A    For the year 2004?

16  Q    Yeah, if you take a look at 2305, page 2.

17            THE COURT:  Did you say lead or lean?

18            MS. KELLER:  Lead.

19            THE COURT:  Lead, thank you.

20            THE WITNESS:  2305.  2305?

21  BY MS. KELLER:

22  Q    2305, page 2.

23  A    All right.

24  Q    You see at the top of the page, you report that you had

25  recently penned your annual letter to shareholders which

1    centers on a one word or theme for the year?

2    A    Yes.

3    Q    And your theme was lead?

4    A    That's correct.

5    Q    You said, "There are leaders and followers, leaders

6    inspire, they overcome challenges, they are visionary.

7    Leaders redefine boundaries, they take risks and set the

8    pace."

9         Were those your words?

10   A    Yes, they were.

11   Q    And they also take responsibility, don't they?

12   A    Yes, they do.

13   Q    Leaders are supposed to be accountable for their

14   organization and their actions, right?

15   A    Yes, they are.

16   Q    And you're responsible for what goes on at Mattel,

17   aren't you?

18   A    Ultimately, yes.

19   Q    And you're responsible for knowing what goes on at your

20   corporation, true?

21   A    I wouldn't say I'm responsible for knowing everything,

22   but I'm responsible for knowing what's going on in the

23   business, yes.

24   Q    And accepting that no CEO can possibly know everything

25   that thousands of employees or even hundreds of employees or

1  maybe even dozens are doing, nevertheless, ultimately, as I

2  said before, the buck stops with you, doesn't it?

3  A    Yes, I think it does.

4  Q    Now, you've been -- I want to talk to you for a second

5  about intellectual property and what you do to protect it

6  when hiring, okay?

7       You've been involved in transactions in which Mattel

8  has licensed intellectual property from third parties, true?

9  A    Yes, I have.

10 Q    And in your role as CEO, you've approved some of those

11 transactions?

12 A    Yes, I have.

13 Q    For example, you've approved transactions associated

14 with Mattel's acquiring rights to intellectual property held

15 by companies making movies and television shows, books,

16 other forms of entertainment; is that right?

17 A    I'm having a hard time of thinking of other forms of

18 entertainment, but yes.

19 Q    And you would expect that Mattel would assure itself

20 that the licensor granting Mattel the rights has the rights

21 to convey to Mattel in those transactions, right?

22 A    Yes.

23 Q    And a way that companies assures themselves that

24 they're acquiring rights is by obtaining something called

25 representations and warranties, true?

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 82 of 158   Page ID #:306047
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

82

1    A    Yes.

2    Q    And another way companies assures themselves if they

3    are acquiring rights to something is by conducting what's

4    known as due diligence, yes?

5    A    Yes.

6    Q    So to prevent employees from bringing confidential

7    information to Mattel from their previous employers, Mattel

8    has them go through a program where they actually sign

9    documents about that topic, true?

10   A    I believe that's covered in the -- in the incoming

11   documents that people sign.

12   Q    Right.  You give them documents explaining to them that

13   they shouldn't bring intellectual property from previous

14   employers to Mattel, right?

15   A    I believe that's correct.

16   Q    Well, do you know it's correct?

17   A    Well, I think it is covered in the code of conduct.

18   Q    And -- well, those are two different things, aren't

19   they?  You have a code of conduct at Mattel, right?

20   A    We do have a code of conduct at Mattel.

21   Q    And people are actually expected to sign off that they

22   understand that code of conduct, right?

23   A    That's correct.

24   Q    And in addition, when new employees come to Mattel, you

25   have them sign documents that explain to them that they

1   should not bring confidential information with them from

2   their previous employers, right?

3   A    I don't know if we have that.

4   Q    Okay.  If you'd take a look at your deposition,

5   December 17th, 2009, page 511, and we're going to get that

6   for you.  It's materializing to your left.

7        And if you can look at page 10 -- page 511, lines 10

8   through 14, and 511, lines 15 through 20.

9   A    I'm sorry, page 511, pages 15 through 20, I have that.

10  Q    And 10 through 14.

11  A    And 10 through 14, I have that.

12  Q    Okay.  Especially take a look at 16 through 20 -- or 15

13  through 20.

14  A    Yes, I believe that.

15  Q    Does that refresh your memory?

16  A    Yes, it's consistent with my view of the code of

17  conduct.

18  Q    I'm not talking about the code of conduct.

19        MS. KELLER:  Your Honor, may I read lines 15

20  through 20?  Actually 10, it should go 10 through 20.

21        MR. QUINN:  Could we ask that it go to page 512,

22  line 2, carry over to the next --

23        MS. KELLER:  Well, I think we already discussed

24  that, your Honor.  This is just going to, right now, the

25  signing of documents.

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 84 of 158   Page ID #:306049
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

84

1          THE COURT:  You may read, Counsel, from 10 to 20.

2          MS. KELLER:  Question:  "Does Mattel have any

3    practices that is uses to prevent employees that it hires

4    from bringing confidential information with them from their

5    prior employers?"

6          Answer:  "Yes, I believe we do."

7          Question:  "What does Mattel do in that regard?"

8          Answer:  "I believe when someone joins Mattel, he

9    or she goes through a program that includes signing

10   documents that explain to them that they shouldn't do that,

11   that it is not right, and they understand that that's not

12   right."

13   BY MS. KELLER:

14   Q    Okay.  And then you told us that in addition to that,

15   there is the code of conduct, true?

16   A    I did talk about the code of conduct in that same --

17   Q    Yes, and I'm not saying you didn't.  I am not saying

18   you didn't.

19        We have certain procedures that we have to follow here

20   in the court, and I'll be asking you about statements that

21   you've made that are inconsistent with anything you say on

22   the stand, but if it's the same, I won't be asking you about

23   that, okay?  All right with you?

24   A    Okay.

25   Q    And if someone worked for a competitor and then joined

1    another firm and there was any concern over the relationship

2    between the firms, it would be important for someone like

3    the supervisor of that employee to be mindful of it and keep

4    an eye out for things that may not appear to be consistent

5    with this agreement that you just talked about having them

6    sign, right?

7    A    (No audible response.)

8    Q    Do you want me to break that down for you?

9    A    Yes, please.

10   Q    Let's say somebody comes to you from another employer,

11   I mean, people come to Mattel to work, from MGA, right?

12   A    They may, yes.

13   Q    Well, you know that they do, don't you?

14   A    Not recently.

15   Q    Have --

16   A    But they have.

17   Q    Have you looked to see how many MGA employees you have

18   at Mattel?

19   A    No, I have not.

20   Q    So you don't know if it's 10, 100 or a thousand, you

21   just don't know, true?

22   A    I don't know, but it's hard for me to imagine that it's

23   some number like a hundred or a thousand.

24   Q    Well, we're not asking to imagine.  I'm asking if you

25   know.

1    A    Okay.  I don't know.

2    Q    And so if someone, say, comes to work for you from MGA,

3    they might start work one day after they leave MGA, right?

4    A    (No audible response.)

5            MR. QUINN:  Calls for speculation.

6            THE COURT:  No.  Overruled.

7            You can answer it.

8            THE WITNESS:  That's conceivable.

9    BY MS. KELLER:

10   Q    And of course, when they come from MGA, they have

11   things in their heads already, right, ideas?

12   A    When they come from -- when people come to work, they

13   have ideas, yes.

14   Q    Yes.  So it would be important for someone like that

15   person's supervisor to keep an eye on that person just in

16   case suddenly they start coming up with something, say, that

17   rings a bell as having come from MGA; would you -- would

18   that be fair to say?

19           MR. QUINN:  Vague and ambiguous.  It's overly

20   general, your Honor.

21           THE COURT:  Overruled.

22           You can answer the question.

23           THE WITNESS:  I think it would be.

24   BY MS. KELLER:

25   Q    And you've seen, at times, that companies actually

```
 1   write letters to each other, either between the human
 2   resources people or the general counsel of the companies to
 3   remind companies of their obligations in that regard?
 4   A    Yes, I have.
 5   Q    Just to make sure that people at a high level are aware
 6   of the potential issues that could come up, right?
 7   A    Yes.
 8   Q    And you know that's occurred at Mattel?
 9   A    Yes, I do.
10   Q    You've seen situations where Mattel has sent letters to
11   its former employees and their new employers reminding them
12   of their obligations to Mattel?
13   A    Yes, I have.
14   Q    You've seen it come the other way, too; you've gotten
15   letters from other toy companies reminding you of your new
16   employee's obligations to the former employer, right?
17   A    I don't know that I've received that sort of letter.
18   Q    Well, if you were to hire somebody away from another
19   company, you can surely imagine a case where the company
20   would write formally to Mattel and make sure that
21   confidential information from that company wasn't used at
22   Mattel, right?
23   A    Yes, I can.
24   Q    But focusing on the company that hired the new
25   employee, unless there is some really specific circumstances
```

```
 1    that warranted concern, you can't think of anything else one
 2    should do to ensure that the employee has lived by his or
 3    her agreement not to bring confidential information from the
 4    prior employer other than, you know, you get reps and
 5    warranties, right?
 6    A    No, I don't think I said that.
 7    Q    Well, are you aware that Mattel has acquired
 8    intellectual properties from third parties in order to
 9    launch products?
10    A    Yes.
11    Q    For example, if you produced toys related to a movie
12    that you didn't produce, right?
13    A    Yes.
14    Q    So say if there is a Batman movie, and Warner Brothers
15    owns the rights to Batman, you've acquired, through
16    licensing agreements, the rights to produce toys supporting
17    the Batman movie or using Batman characters, right?
18    A    That's correct.
19    Q    Now, you are aware, aren't you, that Mattel relied on
20    outside inventors for 25 percent of its revenue in, let's
21    see, 2004; are you aware of that?
22    A    I don't know that specific figure.
23    Q    Well, I'll tell you what, if I could just approach you
24    with Exhibit 25157 and ask you to take a look at it, and I'm
25    talking about outside inventors, and Mattel relying on
```

1    outside inventors for 25 percent of its revenue that year,

2    25157.

3              *(Attorney discussion held off the record.)*

4              MS. KELLER:  We're looking at 25157, page 4.

5              THE WITNESS:  May I just look at what this is?

6    BY MS. KELLER:

7    Q    Yeah.  I'm focusing your attention on Page 4.

8    A    I know.

9    Q    We've got 45 pages here, and I'm not asking you about

10   anything but page 4 right now.

11   A    Okay.

12             MR. QUINN:  Your Honor, I'm not -- it's not in the

13   binders.  It hasn't been shown to the Court.  We have a rule

14   on that, I thought.

15             MS. KELLER:  I'm asking if it refreshes his

16   memory, your Honor.

17             THE COURT:  It's not coming into evidence,

18   Counsel, so she can refer to it, but it won't be coming into

19   evidence at this time, and it won't be shown up on the

20   screen.

21             THE WITNESS:  Yes, I think that's a good estimate.

22   BY MS. KELLER:

23   Q    So about a quarter of the total revenue, then, comes

24   from -- from products that are created by outside inventors,

25   right?

1    A    No, I don't read this statement that way.  It might be

2    based on inventor input.  I don't know if products are

3    created by outside inventors.

4    Q    Well, you've got internal responsible for 75 percent,

5    right?

6    A    Yes.

7    Q    And then inventor, 25 percent?

8         MR. QUINN:  Your Honor, this was just to refresh

9    recollection, and I think we are beyond that now.

10        THE COURT:  No.  You can ask the question,

11   Counsel.

12   BY MS. KELLER:

13   Q    Internal revenue -- revenue sources worldwide internal

14   responsible for about 75 percent, inventor about 25 percent;

15   is that right?

16   A    Excluding American Girl, that's what it says.

17   Q    And in fact, if you look at page 10 of this document,

18   your business actually grew faster when you relied on

19   outside inventors, right?

20   A    It says segments that rely on input from inventors have

21   grown faster.  It says that.

22   Q    And outside inventors work on a royalty basis, right?

23   A    Generally, I think that's true.

24   Q    Inventor houses are vendors or suppliers of Mattel?

25   A    Yes.

1   Q    They are not toy manufactures like Mattel?

2   A    No, none that -- not that I'm aware of.

3   Q    And they are both individual inventors, and there are

4   what are called "inventor houses," right?

5   A    I don't use the term "houses."  I would use

6   "companies."

7   Q    Okay.  They are individual inventors, and they're

8   companies of inventors, right?

9   A    Yes.

10  Q    And somebody named Steve Linker, for example, is he

11  one?

12  A    I don't know.

13  Q    And the inventions that you get from outside inventors

14  or inventor houses, all Mattel does to assure itself that

15  the individual inventors have the right to a product is get

16  what are called representations and warranties from those

17  inventors, true?

18  A    No, that's not my understanding.

19          MS. KELLER:  Your Honor, I -- I don't know if --

20  we may need a break right now.

21          Does somebody need a break?

22          THE COURT:  Does somebody need a break?

23          MS. KELLER:  I thought I saw that.

24          THE COURT:  Okay.  You are admonished not to

25  discuss this matter amongst yourselves, nor form or express

1    any opinion concerning this case.  Have a nice recess.

2    We'll come and get you in about 10 or 15 minutes, okay?

3              Counsel, will you remain for just a moment

4    concerning 25157.

5              Mr. Eckert, thank you, sir.  You may step down.

6              As soon as the jury is gone, I want to stay on the

7    record.

8              *(The following proceedings is taken outside*

9         *the presence of the jury.)*

10             THE COURT:  First, let me speak to both counsel

11   outside the presence of the jury.

12             The question is asked concerning Mr. Eckert

13   designating himself as the representative in court cause the

14   following concerns for the Court:

15             First, the impression is that Mr. Eckert has no

16   stake or doesn't care in the lawsuit, although that's now

17   been dissipated because of the stockholdings, because he's

18   not present.  Certainly, Mr. Eckert could designate himself,

19   but the impression is that because Mr. Larian is here, that

20   somehow this is disadvantageous because you had asked the

21   question, Ms. Keller, about the cumulative effect of

22   Mr. Larian being here all day every day and the jury looking

23   at him.  The impression is that it's imbalanced, and that

24   Mr. Larian is in a disadvantageous position.  Mr. Larian, it

25   can also be argued, is in an advantageous position because

1    he is sitting here every day looking at the jury.

2              MS. KELLER:  May I respond, your Honor?

3              THE COURT:  Not yet.

4              In a civil case, Mr. Larian is not required to be

5    here.

6              MS. KELLER:  I didn't say he was.  If I could

7    respond?

8              THE COURT:  Okay, please.

9              MS. KELLER:  Your Honor, this was brought up by

10   Mr. Quinn in his direct examination of Mr. Eckert.  I was

11   not planning to ask it, but what he said was, you know,

12   you -- "you know Mr. Larian is here.  You are not.  Why is

13   that?"  And he said that he was not here because he was

14   barred by a witness exclusion rule from attending the trial.

15   So the impression created there --

16             THE COURT:  Excuse me.  Excuse me.  My apologies.

17   You are absolutely right.  I've forgotten that.  You are

18   absolutely right.

19             So how did we get here?  From your position, it's

20   the opening direct examination of Mr. Eckert by Mr. Quinn

21   trying to disassociate an imbalance of Mr. Eckert not being

22   here every day.

23             MS. KELLER:  Yes.

24             THE COURT:  Therefore, creating the opposite

25   position that Mr. Eckert is to be excused because he is

1    banned in some way.

2              MS. KELLER:  Well, actually it's a real

3    misstatement for the jury that he's been somehow barred from

4    the courtroom as a CEO of Mattel because all he had to do

5    was choose to be the corporate representative and be here

6    every day.  Counsel knows that, and he says he doesn't know,

7    but counsel knows that, and so we have now had the jury

8    basically told that Mr. Larian gets to be sitting here every

9    day, and poor Mr. Eckert is barred, and that's the only

10   reason he's not here, and it's just absolutely not true.

11             They are asking for a billion dollars, your

12   Honor --

13             THE COURT:  How -- how did we get here?  I mean,

14   how did we get into this minutia that has nothing do with

15   this lawsuit, and how am I going to cure that in front of

16   the jury?

17             MR. QUINN:  Your Honor, I don't think you need to

18   say anything more.

19             THE COURT:  I do.  I'm disturbed by this.

20             MR. QUINN:  Can -- can I respond to counsel's

21   comments.

22             THE COURT:  Oh, absolutely.  You two can go back

23   and forth if you want to.

24             MR. QUINN:  Well, the Court is not interested in

25   hearing my response.

 1          THE COURT:  I am.  I am always interested.

 2          MR. QUINN:  Well, I'm concerned that the jury

 3   would think he doesn't care because he hasn't been here.  I

 4   wanted to dissipate, do battle with any impression that he

 5   doesn't regard this as an important matter because he hasn't

 6   been here.

 7          That doesn't mean that the jury then needs to get

 8   into the niceties and technicalities of who can be appointed

 9   as a table representative or not.  And the fact of the

10   matter is a corporation -- sure, Mattel could have decided

11   that Mr. Eckert would be the table representative, but a

12   corporation is entitled to appoint anyone to be a

13   representative.  We picked, we thought, a logical person

14   who, frankly, has more to do with the facts of this case

15   than Mr. Eckert does.

16          So, I mean, this doesn't -- I mean, she -- yeah,

17   and you may recall, your Honor -- I'm just reminded that the

18   examination of the first witness, Ivy Ross, Ms. Keller

19   pointed out that Mr. Eckert wasn't here, "Where is

20   Mr. Eckert?"  So my concern started with her examination of

21   the very first witness that, "Unfortunately Mr. Larian, he

22   has to be here.  Where is Mr. Eckert?"  She -- she started

23   that.

24          THE COURT:  Well, I -- I appreciate both of your

25   arguments.  I don't want either side to be advantaged or

1    disadvantaged because of a client not being here or being

2    here.  There's got to be some neutrality to that.

3            MS. KELLER:  I would just ask, though, the Court

4    right now, unfortunately the jury has been left with a

5    completely false impression that this Court has barred

6    Mr. Eckert from this courtroom when he can come and go as he

7    pleases if he chose to.  That's my problem with it.  And --

8    and this is a billion dollars that they want from us.  I

9    think it does undermine the legitimacy of a claim if he

10   chooses not to be here at all, that the CEO of this company

11   seeking a billion dollar judgment does not even show up

12   except to testify.

13           THE COURT:  Why don't we just substitute

14   Mr. Eckert for Miss -- I mean, Mr. Eckert for Lily Martinez?

15           MS. KELLER:  You certainly could do that.

16           THE COURT:  I think in resolves it.

17           MR. QUINN:  Your Honor, we are entitled to appoint

18   whoever we want as our corporate representative.

19           THE COURT:  You are until you open the door and

20   start getting into a leading question, quite frankly, to

21   dissipate what you perceive is advance sympathy.

22           Ms. Martinez, it's been a pleasure having you in

23   my court.

24           MR. QUINN:  Your Honor, she brought it up with

25   Ivy Ross.

```
 1          THE COURT:  She did, but now we are going to get
 2    coequal balance between the sides, and I think that would be
 3    very positive development for Mattel because you'll
 4    demonstrate that your CEO is more than willing to be here in
 5    a positive note, and we'll put the two protagonists who's
 6    been at war for a significant period of time in the same
 7    courtroom at the same time, and that's my order.
 8          Ask Mr. Eckert to step in.
 9          MR. QUINN:  Yes.
10          Get Mr. Eckert.
11          Your Honor has said in a civil case, a party
12    doesn't need to attend.  Is the Court now ordering that the
13    parties must always be here?
14          THE COURT:  I'm ordering Mr. Eckert to be here.
15    That will take all of the taint and prejudice away from both
16    sides, and I hope that you will willingly exceed to this in
17    front of the jury.
18          MR. QUINN:  How should I manifest that?
19          THE COURT:  I don't know.  I would do that in a
20    very positive and exuberant way if I was you, so it looked
21    like this was a wonderful idea on your part.
22          MR. QUINN:  Okay.  If we're going to do that, your
23    Honor, can we do that when he's through with his examination
24    so it looks like a natural thing --
25          THE COURT:  Absolutely.
```

98

1          MR. QUINN:  -- and not make a big song and dance

2     out of it.  He's just here.

3          THE COURT:  Well, I wouldn't make a big song and

4     dance --

5          MR. QUINN:  You are?

6          THE COURT:  No.  I said I would not make a big

7     song and dance, but the drama goes on.

8          It's always good to have both you gentlemen here.

9          MR. QUINN:  You know, I have come to admire,

10    appreciate and understand this Court's commitment to coequal

11    treatment, but, your Honor --

12          THE COURT:  I know --

13          MR. QUINN:  You are talking about a man who leads

14    a company of 30,000 employees.

15          THE COURT:  Yes, I am, and who is just as

16    responsible as Mr. Larian.

17          So I would suggest that you go take a break for

18    five minutes, and then we deal with this.  But you've got an

19    inclination and an idea what I'm going to do, and I'll leave

20    that to your choice how you want to handle it.

21          MR. QUINN:  I'm sorry, your Honor, a choice of --

22    I didn't get the choice.

23          THE COURT:  You have no choice.

24          MR. QUINN:  Yeah, I thought it was Hobson's --

25    Hobson's choice.

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 99 of 158   Page ID #:306064
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

99

```
 1            THE COURT:  No, no, because I'm always interested
 2    in what you have to say.
 3            MR. QUINN:  Well, I have some questions, but I
 4    don't know whether now is the time that you want to address
 5    them.
 6            THE COURT:  No, only that, Mr. Eckert, you will be
 7    now be the designated representative of Mattel, and you'll
 8    be required to be in my courtroom.
 9            MR. QUINN:  So we'd like Mr. Machado to stay also,
10    your Honor.
11            THE COURT:  Oh, he'll be here tomorrow, and if the
12    Mexican court will let him stay, he will, but if not, he
13    will be going back.
14            So Ms. Martinez, thank you very much.  How we
15    handle that in the presence of the jury -- why don't you
16    remain the rest of the day, okay?
17            MR. QUINN:  Your Honor, I thought --
18            THE COURT:  No.
19            MR. QUINN:  I thought we were going to make the
20    transition when Mr. Eckert leaves the stand.
21            THE COURT:  What did I just say?
22            MR. QUINN:  You said goodbye to Ms. Martinez.
23            THE COURT:  No.  What did I say after that?
24            MR. QUINN:  Something about the end of the day.
25            THE COURT:  What did I say?
```

1          MR. QUINN:  Something about a transition at the

2     end of the day, but I don't think Mr. Eckert's going to be

3     done at the end of the day.

4          THE COURT:  See, you didn't listen because what I

5     quickly said was, "Ms. Martinez, why don't you stay," okay?

6          MR. QUINN:  Oh.

7          THE COURT:  But you were so concerned that you

8     didn't listen, so --

9          Just to make that transition smoother, okay, stay

10    until the end of the day, and somehow we'll work this out so

11    there's not a prejudice to Mattel or MGA.

12          But since you two have been at war, basically, for

13    the last couple of years, I think that that will dissipate

14    any concern about Mr. Eckert's commitment, any concern about

15    Mr. Larian's commitment, and I think that will dissipate any

16    potential prejudice to any of the parties and set aside this

17    quibbling about who is the most committed or not in the

18    case.

19          Well, thank goodness, though, that we only have 19

20    days to go, so --

21          Now, I'm going to get the jury in a couple of

22    minutes.

23          *(Recess.)*

24          *(The following proceedings is taken in the*

25      *presence of the jury.)*

         1            THE COURT:  All right.  Then the jury is present.

         2    All counsel are present.  The parties are present.

         3            If you'd please be seated.  The witness is

         4    present.

         5            And Counsel, your continued cross-examination of

         6    Mr. Eckert.

         7        **ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED**

         8            **CROSS-EXAMINATION** (Continued)

         9    BY MS. KELLER:

        10    Q    Mr. Eckert, when we broke -- when we were broke -- when

        11    we broke, we were talking about what Mattel does to assure

        12    itself that an individual inventor has the right to a

        13    product that it is assigning to Mattel; do you remember

        14    that?

        15    A    Yes, I do.

        16    Q    And my question is, isn't it true that Mattel only gets

        17    reps and warranties and does basic due diligence to assure

        18    itself that the inventor has the right to make that

        19    assignment?

        20    A    I think the difference is we know the inventors.

        21    Q    Well, whether you do or not, whether you know them or

        22    not, okay?

        23    A    I --

        24    Q    You'd get reps and warranties, right; representations

        25    and warranties, true?

1    A    That's correct.

2    Q    And you do some additional due diligence, right?

3    A    I'm not aware of a case where we take submissions of

4    ideas from people we don't know.

5    Q    Well, as of your deposition in -- as of your deposition

6    January 8th, 2008 --

7              (Attorney discussion held off the record.)

8    BY MS. KELLER:

9    Q    Okay.  As of your deposition dated December 18th, 2009,

10   you didn't know what Mattel did?

11             MR. QUINN:  That's an improper use of prior

12   testimony, your Honor.  I object to the form.

13             MS. KELLER:  Okay.  I'll rephrase it.

14             THE COURT:  I'm going to sustain the objection.

15   BY MS. KELLER:

16   Q    In 2009, you didn't know what Mattel did in terms of

17   acquiring intellectual property to assure itself that the

18   inventor had the right to make the assignment to Mattel,

19   true?

20   A    I don't remember what I knew then.  I know what I know

21   now.

22   Q    Well, you've read up on it now, haven't you?

23   A    No, but I've spoken to people about it.

24   Q    Well, you've been prepared for your testimony here,

25   right?

1    A    I have been prepared for my testimony.

2    Q    And you've been prepared on that point, right?

3    A    I have certainly spoken to people about that point,

4    yes.

5    Q    Well -- but I'm talking about -- let's talk about what

6    you knew in 2009.  You didn't even know what Mattel

7    customarily did in terms of its diligence or its

8    acquisitions of other companies' intellectual property

9    rights, true?

10   A    I don't know.

11   Q    Take a look at your deposition, December 18th, 2009,

12   Volume 4, and let's look at page 712, lines 11 through 19.

13   A    Yes, as I read the question beyond reps and warranties,

14   that's correct.

15           MS. KELLER:  Well, your Honor, I'd ask to read

16   lines 11 through 19.

17           THE COURT:  Just a moment.

18           On line 17, Counsel, I don't see the disparity.

19           Overruled.

20           MS. KELLER:  So may I read it, your Honor?

21           THE COURT:  No.  It's consistent.

22   BY MS. KELLER:

23   Q    So as of 2009, you really didn't know what Mattel

24   customarily did in terms of its diligence or its

25   acquisitions of other companies' intellectual property

1    rights; isn't that true?

2    A    (No audible response.)

3    Q    Are you reading your testimony now?

4    A    I am.  I'm trying to read the sentence you are talking

5    about.

6    Q    That would be 17 to 19.

7    A    Well, that was my answer at that time.

8    Q    Well, I'm not asking you whether it's your answer.  Is

9    it true that in 2009 -- and you were the CEO of the company

10   in 2009, right?

11   A    I was.

12   Q    Is it true that in 2009, you didn't know what Mattel

13   customarily did in terms of its diligence or its

14   acquisitions of other companies' intellectual property

15   rights; is that a true statement?

16   A    That's an accurate reading.

17   Q    I'm not asking if this is an accurate reading.  Here is

18   what I'm asking:  Is it true, is it a true statement, that

19   as of 2009, you did not know what Mattel customarily did in

20   terms of its diligence or its acquisitions of other

21   companies' intellectual property rights; is that a true

22   statement?

23   A    No, I really don't think it is.

24            MS. KELLER:  Your Honor, may I read lines 11

25   through 19?

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 105 of 158   Page ID #:306070
CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

105

```
 1              THE COURT:  Now you may.
 2              MS. KELLER:  Question:  "Is there anything apart
 3    from obtaining written representations and warranties in
 4    conducting due diligence with respect to those
 5    representations and warranties of such ownership in such
 6    licenses that Mattel customarily does in order to ensure a
 7    valid transfer of rights?"
 8              Answer:  "I don't know what Mattel customarily
 9    does in terms of its diligence or its acquisitions of other
10    companies' intellectual property rights."
11    BY MS. KELLER:
12    Q    Now, in 2009, you actually weren't familiar with
13    industry standards and licensing agreements either, were
14    you?
15    A    That's true.
16    Q    And let's talk about this particular case, then, not
17    just in general.
18         Is it true that you are not aware that there's an
19    e-mail written by an outside lawyer engaged by MGA,
20    reporting to MGA, that Mr. Bryant's attorney told him that
21    Mr. Bryant did his Bratz drawings in 1998?
22    A    No, I'm not aware of that.
23    Q    And even -- even as you sit here today, nobody has
24    shown you that e-mail, right?
25    A    Unless it was in your opening argument and I'm not
```

1    remembering it, I don't believe I've seen that e-mail.

2    Q    So you don't remember seeing any e-mail correspondence

3    from a David Rosenbaum?

4    A    No, I'm not remembering that.

5    Q    And likewise, I guess, nobody has shown you a back and

6    forth between MGA and its lawyer about this period in

7    September 2000, when MGA and Carter Bryant were negotiating,

8    you haven't been shown that either?

9    A    I'm sorry, could you ask that again?

10   Q    The e-mail I'm talking about, okay, was written in

11   September of 2000, when MGA and Carter Bryant were

12   negotiating; will you accept that representation for a

13   second?

14   A    Okay.

15   Q    Has anybody shown you the back and forth of

16   correspondence like that in September of 2000 between MGA

17   and Carter Bryant and an outside lawyer?

18   A    No, I don't remember seeing that at all.

19   Q    Now, at least as of December 17th, 2009 -- well,

20   December 17th, 2009, was years after you had sued Carter

21   Bryant and MGA, true?

22   A    Yes, it is.

23   Q    And you still hadn't seen -- as of December 17th, 2009,

24   you still hadn't seen the written agreement between

25   Mr. Bryant and MGA conveying the intellectual property in

1    his Bratz drawings, right?

2    A    Again, unless I saw it in -- at trial, no.

3    Q    I'm talking about as of December 17th, 2009, you still

4    hadn't seen the written agreement between Mr. Bryant and MGA

5    conveying Mr. Bryant's intellectual property rights in his

6    drawings to MGA, true?

7    A    I can't say for certain because of a previous trial,

8    but it's likely.  It's possible.

9    Q    Well, let's take a look at your deposition,

10   December 17th, 2009, at page 501, pages (sic) 6 through 9.

11        Have you had a chance to look at that?

12   A    I have.

13   Q    So am I correct that as of December 17th, 2009, you

14   still hadn't seen the written agreement between Mr. Bryant

15   and MGA conveying the intellectual property in his Bratz

16   drawings?

17   A    Like I said at the time, I don't believe I have.  I

18   can't say that with the certainty you'd like me to say, but

19   it's my best recollection.

20   Q    So your answer remains "I don't believe I have"; is

21   that right?

22   A    No.  I may have seen it in the opening arguments here.

23   Q    I'm asking whether you have today seen the written

24   agreement between Mr. Bryant and MGA conveying the

25   intellectual property in his Bratz drawings; have you seen

```
 1    it, yes or no?

 2    A    I've seen the contract between Mr. Bryant and MGA.

 3    Q    And as of December 17th, 2009, had you seen it?

 4    A    Had I seen the contract --

 5    Q    That's right.

 6    A    -- between Carter Bryant and MGA?

 7    Q    The written agreement between Mr. Bryant and MGA

 8    conveying the intellectual property in his Bratz drawings,

 9    have you seen it as of December 17th, 2009?

10            MR. QUINN:  It assumes facts not in evidence, your

11    Honor, the question as phrased.

12            THE COURT:  Just a moment.

13            MR. QUINN:  About the effect of the agreement.

14            THE COURT:  Just a moment.  Let me read for one

15    moment.

16            Well, it's the conveying of the intellectual

17    property you're concerned about; is that correct?

18            MS. KELLER:  Yes, your Honor.

19            MR. QUINN:  It's a jury question, your Honor.

20            MS. KELLER:  I'll rephrase it slightly.

21            THE COURT:  Yeah, I'm going to sustain the

22    objection.

23    BY MS. KELLER:

24    Q    As of December 17th, 2009, had you seen the written

25    agreement between Mr. Bryant and MGA that purported to
```

1    convey Mr. Bryant's intellectual property in his Bratz

2    drawings to MGA; yes or no?

3    A    I have seen an agreement or parts of an agreement

4    between Mr. Bryant and MGA.  I don't know if it covered the

5    Bratz drawings.

6    Q    Let me ask you again, as of December 17th, 2009, are

7    you with me on the date?

8    A    I am.

9    Q    Had you seen the written agreement between Mr. Bryant

10   and MGA; do you know what I'm taking about?

11   A    I have seen the --

12   Q    No.  The written agreement between Mr. Bryant and MGA

13   that purported to convey Mr. Bryant's intellectual property

14   rights in his Bratz drawings to MGA?

15            MR. QUINN:  That's argumentative, your Honor.

16   There are multiple agreements, so -- I mean, it assumes

17   facts not in evidence.

18            THE COURT:  No.  Overruled.

19            You can answer that question.

20            THE WITNESS:  I don't know.

21            MS. KELLER:  Your Honor, I'd ask to read page 501,

22   lines 6 through 9.

23            THE COURT:  Page 501?

24            MS. KELLER:  Yes, your Honor, lines 6 through 9.

25            THE COURT:  You may.

```
 1              MS. KELLER:  Question:  "Have you ever seen the

 2    written agreement between Mr. Bryant and MGA conveying the

 3    intellectual property in his Bratz drawings?"

 4              Answer:  "I don't believe I have."

 5    BY MS. KELLER:

 6    Q    Now, you are aware, of course, that your company is

 7    asking for roughly a billion dollars in damages in this case

 8    from MGA and Mr. Larian?

 9              MR. QUINN:  It assumes facts not in evidence, your

10    Honor.

11              THE COURT:  Overruled.

12              THE WITNESS:  I haven't been through the

13    calculations, but I'll use your term, roughly, yes.

14    BY MS. KELLER:

15    Q    Well, you said you were here for opening statements,

16    right?

17    A    Yes, I was.

18    Q    And you certainly heard --

19              MR. QUINN:  Your Honor, I thought we weren't going

20    to do that, who said what in opening.

21              THE COURT:  We are not attacking each other's

22    opening statement, but you can ask if he's aware of it.

23              MS. KELLER:  I will.

24    BY MS. KELLER:

25    Q    Let's go back again to --
```

1          THE COURT:  Excuse me.

2          The import of this question between the two of you

3    is what's the amount that's eventually going to be asked by

4    Mattel of Mr. Larian and/or MGA, is that correct, and if

5    he's aware of that amount?

6          MS. KELLER:  No.  That's not my question, your

7    Honor.

8          THE COURT:  Okay.  Then what's your question?

9    BY MS. KELLER:

10   Q    My question is:  Are you aware of the fact that your

11   company has been seeking damages of roughly a billion

12   dollars against MGA and Mr. Larian in this case?

13         THE COURT:  You can answer the question.

14         THE WITNESS:  Yes, I believe that's the case.

15   BY MS. KELLER:

16   Q    Well, do you believe it or are you aware of it?  I'm

17   asking a yes or no; are you aware of that?

18   A    Yes, I am.

19   Q    And so you are telling us, then, that you've been

20   seeking, roughly, a billion dollars in damages against MGA

21   and Mr. Larian without seeing the agreement between

22   Mr. Bryant and MGA, okay?

23         THE COURT:  Is that a question?

24         THE WITNESS:  Well, I have seen an agreement

25   between Mr. Bryant and MGA.

1    BY MS. KELLER:

2    Q    At the time -- at the time you sued Mr. Bryant, let's

3    just start with that.  We've already established that at the

4    time you sued Mr. Bryant, you hadn't even seen the written

5    agreement between Mr. Bryant and MGA --

6              MR. QUINN:  That -- that misstates the evidence.

7    It assumes facts not in evidence, your Honor.  I think the

8    evidence is to the contrary.

9              THE COURT:  Well, ask the question, Counsel.

10   BY MS. KELLER:

11   Q    We've just established that as of December 17th, 2009,

12   you had not seen the written agreement between Mr. Bryant

13   and MGA conveying the intellectual property in his Bratz

14   drawings; do you recall that just a minute ago?

15   A    I do recall that.

16   Q    And you sued Mr. Bryant before that, right?

17   A    I have seen an agreement between Mr. Bryant and MGA.

18   Q    No, no, no.  You sued him before that date.

19   A    Before which date?

20   Q    Before December of 2009, years earlier, you had sued

21   Carter Bryant, yes?

22   A    That's correct.

23   Q    So you sued him before you even saw the written

24   agreement between Mr. Bryant and MGA conveying the

25   intellectual property rights in Mr. Bryant's Bratz drawings

1   to MGA; yes, you did that, didn't you?

2   A    I'm not sure that's the case.

3   Q    Let's go back again.

4        As of December of 2009, you had never seen that written

5   agreement, correct?

6   A    I have seen a written agreement.

7   Q    As of December 20009, you hadn't seen it, and that's

8   what you testified to under oath, correct?

9   A    I had seen -- at the very least, I remember being at a

10  presentation where I had seen at least excerpts of the

11  document that I saw earlier today and last night.

12  Q    When you testified in December of 2009 that you did not

13  believe you had seen that agreement on that date, are you

14  telling us you were wrong?

15            MR. QUINN:  Your Honor, that's argumentative.

16  It's ambiguous as to what "that agreement" is.

17            THE COURT:  No.  Overruled.

18            You can answer the question, sir.

19            THE WITNESS:  No, I -- I don't see the

20  inconsistency you do.

21            MS. KELLER:  May I read it again, your Honor?

22            THE COURT:  Well, you've already read it once.  I

23  don't think you need to read it again.  He has it in front

24  of him, and you can ask him questions about it.

25

1    BY MS. KELLER:

2    Q    Okay.  I want to ask you some questions about this

3    statement.  Have you ever seen the written agreement between

4    Mr. Bryant and MGA conveying the intellectual property in

5    his Bratz drawings, okay?  You remember that question,

6    right?

7    A    I do.

8    Q    And you said, "I don't believe I have," and that was

9    December 17th, 2009, right?

10   A    That's correct.

11   Q    You had sued Mr. Bryant before that date, correct?

12   A    That's correct.

13   Q    And so additionally before that date, you had not seen

14   the e-mails from MGA's lawyer reporting to MGA that

15   Mr. Bryant had made the drawings in 1998 when not employed

16   at Mattel, right?

17   A    I'm not sure of that.

18   Q    Well, you told us that as of today you haven't seen any

19   e-mails from David Rosenbaum on that subject matter, right?

20   A    I -- I believe I said, or at least I meant to convey

21   that I may have seen those in your opening arguments --

22   Q    Well, just a minute ago --

23   A    -- or in another trial.

24   Q    Just a minute ago I understood you to say that as of

25   today, you have never seen, at all, any e-mails from David

```
 1   Rosenbaum on the subject of the due diligence he was doing

 2   for MGA about the Carter Bryant drawings in ownership.  This

 3   is just like minutes ago.

 4              MR. QUINN:  Wait.  It assumes facts not in

 5   evidence.  It's argumentative.  It misstates the testimony,

 6   your Honor.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  I just don't know if I've seen those

 9   e-mails.

10   BY MS. KELLER:

11   Q    Well, a few minutes ago you said that you didn't

12   believe you had.

13   A    That's correct.

14   Q    Is it still true that you don't believe you had?

15   A    I -- I -- I don't believe I have, but --

16   Q    But even today?

17   A    Even today, I don't believe I have, but I may have.

18   Q    Well, "I don't believe I have but I may have," now that

19   wasn't the answer that you gave in December of 2009, right?

20   A    That's correct.

21   Q    And "I don't believe I have" is kind of a hedge answer,

22   isn't it?

23   A    It's my best recollection.

24   Q    Well, it's kind of leaving yourself an opening, isn't

25   it?
```

1    A    Well, I'm trying to, as I am today, convey as best I

2    can what I remember and what I don't.

3    Q    But you know it goes to the very heart of the case,

4    right?

5              MR. QUINN:  Argumentative, your Honor.

6              THE COURT:  Well, sustained in its present form,

7    and it's also ambiguous.

8    BY MS. KELLER:

9    Q    Don't you know that the written agreement between

10   Mr. Bryant and MGA goes to the very heart of what's at issue

11   here in this case?

12             MR. QUINN:  Same objection.

13             THE COURT:  Overruled.

14             THE WITNESS:  And I have seen a written agreement

15   between those two.

16   BY MS. KELLER:

17   Q    Well, let's back up again, okay?

18        You know, don't you, yes or no, that that written

19   agreement between Mr. Bryant and MGA goes to the heart of

20   this case; you know that, don't you?

21   A    Which agreement are you talking about?

22   Q    I'm talking about the written agreement between Carter

23   Bryant and MGA that purports to convey Mr. Bryant's

24   intellectual property rights in the Bratz drawings to MGA,

25   surely you know that that goes to the very heart of this

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 117 of 158   Page ID #:306082
CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

117

1    case, don't you?

2    A    Yes.

3    Q    Okay.  And so you've had the same law firm, now,

4    representing Mattel from the very beginning of this case; is

5    that correct?

6    A    That's correct.

7    Q    And you know that there has been an immense amount of

8    discovery done in this case, right?

9    A    Yes, I do.

10   Q    And you know that there's been -- this is the second

11   trial, right?

12   A    That's correct.

13   Q    You know there had been many, many depositions, true?

14   A    Yes.

15   Q    You are certainly familiar, as the CEO and the guy

16   where the buck stops, with what this case is all about,

17   aren't you?

18   A    Yes, I am.

19   Q    And you know that there are certain documents in this

20   case that are important, don't you?

21   A    Yes.

22   Q    And you know that it's a critical issue whether MGA did

23   due diligence to figure out at the time if Carter Bryant had

24   the right to convey this intellectual property to MGA; you

25   know that, don't you?

1    A    Yes, I do.

2    Q    And you understand that the status of, for example,

3    actions that were undertaken by MGA's attorney and

4    representations by MGA's attorney to MGA has a lot of

5    importance in this case; you know that, don't you?

6              MR. QUINN:  It assumes facts not in evidence.

7              THE COURT:  It's ambiguous, Counsel.  Just reask

8    it.

9    BY MS. KELLER:

10   Q    Well, you know what "due diligence" is because you

11   talked about it earlier, right?

12   A    I do.

13   Q    Due diligence is taking the steps that a reasonably

14   diligent person in the industry would take to confirm the

15   ownership of the property, right?

16   A    Yes.

17   Q    And you know that due diligence undertaken by a company

18   in this context is getting reps and warranties and whatever

19   further it thinks it needs to do in terms of confirming

20   ownership, such as having an outside attorney investigate

21   it; you know that, don't you?

22   A    Reps and warranties from an employee of another

23   company?

24   Q    Reps and warranties from an inventor, you know that's

25   important here, don't you?

1    A    I do know that reps and warranties are important.

2    Q    And you know that due diligence is important, right?

3    A    Yes.

4    Q    And you certainly know that it's an industry standard

5    to get reps and warranties from an inventor, true?

6    A    Yes.

7    Q    In fact, that's what Mattel does, Mattel gets reps and

8    warranties from inventors, doesn't it?

9    A    Yes, it does.

10   Q    And for example, if an inventor comes to Mattel and

11   says, "Hey, I've got this great design I want to sell you,"

12   and gives you reps and warranties, you don't send a private

13   eye out to conduct an independent investigation as to

14   whether that person really is who he says he is, do you?

15   A    We certainly may, if we didn't know the person?

16   Q    Can you give me an example of a time that you have had,

17   Mattel, when an inventor has come to you and made reps and

18   warranties, I want you to give me an example of a time that

19   Mattel has hired a private investigator to go out and

20   investigate whether that inventor was really the person he

21   said he was.

22   A    I don't know if we've ever done that.

23   Q    You know you haven't.

24   A    No, I don't know that.

25   Q    So you are just guessing?

1    A    No.

2    Q    You know that the issue of due diligence and reps and

3    warranties is really important in this case, don't you?

4    A    Yes, it is.

5    Q    So surely you've made a thorough survey of what Mattel

6    does in these circumstances, right?

7    A    We don't have the circumstances of an employee of a

8    competitor company pitching an idea at Mattel.  We don't

9    have these circumstances.

10   Q    Have you --

11   A    We never have.

12   Q    Have you ever hired a private investigator to go check

13   into any inventor who came to you with an invention, ever?

14   A    I don't know.

15   Q    Have you ever done a forensic analysis before signing a

16   contract?  In other words, an ink analysis?

17   A    I don't know.

18   Q    Have you ever done a paper-aging analysis?

19   A    Not that I'm aware of.

20   Q    Well, you know that you haven't, don't you?

21   A    No, I don't.

22   Q    And who exactly is it in your company that you've

23   talked to to make the survey that enables you to say what

24   has or hasn't been done?

25   A    I've talked to three people within the last couple of

1    weeks.

2    Q    Within the last couple of weeks?

3    A    Yes.

4    Q    Did you -- did you talk to those people before you

5    filed the lawsuit against Carter Bryant?

6    A    No.

7    Q    Did you talk to those people before the first trial?

8    A    No.

9    Q    Did you talk to them before your deposition was taken?

10   A    No.

11   Q    Did you talk to them before seeking hundreds of

12   millions of dollars in damages from MGA and Mr. Larian?

13   A    No.

14   Q    So within the last couple of weeks, you've talked to

15   some people, and that's just to find out what kind of due

16   diligence Mattel does when dealing with inventors?

17   A    No.

18   Q    Now, are you aware that Mr. Rosenbaum, the outside

19   lawyer retained by MGA, reported back to MGA that the work

20   that Mr. Bryant did was outside the scope of his employment

21   with Mattel; did you know that?

22           MR. QUINN:  Misstates the evidence, your Honor.

23           THE COURT:  Just a moment.

24           Overruled.

25           You may answer the question, sir.

```
 1              THE WITNESS:  No.
 2   BY MS. KELLER:
 3   Q    Have you asked to see those documents?
 4              MR. QUINN:  Vague and ambiguous as to what
 5   documents.
 6              MS. KELLER:  Okay.  I'll rephrase.
 7   BY MS. KELLER:
 8   Q    Have you asked to see all the documents relating to
 9   MGA's outside counsel, David Rosenbaum's efforts to confirm
10   that Mr. Bryant actually owned the intellectual property he
11   was conveying to MGA?
12              MR. QUINN:  Assumes facts not in evidence.
13              THE COURT:  Overruled.
14              THE WITNESS:  No, I have not.
15   BY MS. KELLER:
16   Q    You know they exist, though, don't you?
17   A    No, I don't.
18   Q    Are you telling me that the first time you ever heard
19   that these documents exist is from me standing here at the
20   podium?
21              THE COURT:  Hold on.  Just a minute.
22              That's going to get an objection right away,
23   correct?
24              MR. QUINN:  Right.
25              THE COURT:  "Are you telling me."  Sustained.
```

1   Reask it.

2   BY MS. KELLER:

3   Q    Is it true that until you heard me ask the question

4   just now that you never knew of the existence of an e-mail

5   chain between MGA's outside lawyer and MGA about his efforts

6   to confirm Carter Bryant owned the intellectual property he

7   was conveying to MGA?

8   A    No, I believe I had heard that previously.

9   Q    And having heard that, you've never even asked to see

10  those documents?

11  A    That's correct.

12  Q    You know it's only a handful of documents, don't you?

13  A    No, I don't.

14  Q    But the buck stops with you --

15  A    Yes, it does.

16  Q    -- right?

17       So despite having not seen the contract -- the written

18  agreement between Mr. Bryant and MGA conveying whatever

19  intellectual property rights in the Bratz drawings he had,

20  and despite having not asked to see the e-mail chain from

21  MGA's outside counsel to MGA, you, nevertheless, decided to

22  sue Mr. Bryant?

23  A    That's correct.

24  Q    And you believe that Mr. Bryant took the brand name or

25  trademark "Bratz" from Mattel?

1    A    I do.

2    Q    And to your knowledge, Mattel wasn't using "Bratz" as a

3    trademark at the time Mr. Bryant left the company, right?

4    A    That's correct.

5    Q    And are you aware that your own legal department

6    informed Ivy Ross that the name "Brats," B-r-a-t-s, was not

7    available back in 1999 or 2000?

8    A    No, I'm not.

9    Q    No one -- no one has informed you of that either?

10            MR. QUINN:  Move to strike, your Honor.  That

11   assumes facts.

12            THE COURT:  Overruled.

13            THE WITNESS:  No.

14   BY MS. KELLER:

15   Q    So are you hearing it for the first time now?

16   A    Yes, I am.

17   Q    And was Mattel using Bratz with a "z" as a brand name

18   at the time Mr. Bryant left Mattel?

19   A    No, it was not.

20   Q    Well, as of December 17th, 2009, you didn't even know

21   the answer to that, did you?

22   A    Whether or not Mattel was using the Bratz name in 2009?

23   Q    As of your deposition, December 17th, 2009, you didn't

24   even know whether Mattel was using Bratz as a brand name at

25   the time Mr. Bryant left Mattel, correct?

1  A    That's -- that could be, yes.  I could believe that,

2  yes.

3  Q    Well, take a look at page 503, lines 14 through 16.

4           MR. QUINN:  What volume or date?

5           MS. KELLER:  And that is December 17th, 2009.

6           MR. QUINN:  Page and line?

7           MS. KELLER:  Page 503, lines 14 through 16.

8  BY MS. KELLER:

9  Q    Do you see that?

10  A    I do.

11           MR. QUINN:  I think that's what he said, your

12  Honor.

13           THE COURT:  Just a moment.

14  BY MS. KELLER:

15  Q    Is it true --

16           THE COURT:  Just a moment, Counsel.

17           The question, Counsel?

18  BY MS. KELLER:

19  Q    The question is:  Is it true that as of December 17,

20  2009, you didn't know whether Mattel was using Bratz as a

21  brand name at the time Mr. Bryant departed Mattel?

22  A    That was my answer.

23  Q    Was that true, that you didn't even know?

24  A    I -- I might phrase it longer.  I don't believe so, but

25  I don't know for sure.

1           MS. KELLER:  Your Honor, may I read lines 14

2      through 16?

3           THE COURT:  You may.

4           MS. KELLER:  Question:  "Was Mattel using Bratz as

5      a brand name at the time Mr. Bryant departed Mattel?"

6           Answer:  "I don't know."

7      BY MS. KELLER:

8      Q    So you believed that Mr. Bryant took the brand name or

9      trademark "Bratz" from Mattel, right?

10     A    Yes.

11     Q    But you don't even know if Mattel was using Bratz as a

12     brand name at the time that Mr. Bryant left, true?

13     A    Yes, we may --

14     Q    And how --

15          (Interruption in the proceedings.)

16          THE COURT:  No.  Just a moment.

17          MS. KELLER:  I'm going to ask --

18          THE COURT:  Wait.

19          It's up to counsel to control the questions, and

20     it's up to you to wait to answer, and I can't get a clear

21     record from my court reporter who has a frown on her face

22     right now.

23          THE WITNESS:  I apologize.

24          THE COURT:  No, and so does Ms. Keller.

25          So as each of you apologize to each other, your

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 127 of 158   Page ID #:306092
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

127

1    question, Counsel, is?

2    BY MS. KELLER:

3    Q    And how exactly did Mr. Bryant steel the trademark or

4    brand name that Mattel was not using?

5              THE COURT:  And your answer question is?

6              THE WITNESS:  I don't know.

7              THE COURT:  And your question is?

8    BY MS. KELLER:

9    Q    How did Mr. Bryant steel a brand name or trademark that

10   Mattel was not, to your knowledge, using?

11             THE COURT:  And your answer is?

12             MR. QUINN:  He just answered.  Asked and answered.

13             THE COURT:  Overruled.

14             THE WITNESS:  I don't know.

15             THE COURT:  Okay.  Now, you have the rhythm.

16             (Laughter.)

17             THE COURT:  All right.  Next question.

18   BY MS. KELLER:

19   Q    Now, you know that Carter Bryant never did any Bratz

20   drawings in response to any Mattel assignment, right?

21   A    I don't know that.

22   Q    Well, again, you are the CEO of Mattel, true?

23   A    That is true.

24   Q    So surely when this whole controversy surfaced, you

25   went to the design center to see if there had been a Bratz

1    project that Mr. Bryant was working on, that he was assigned

2    to, right?

3    A    No, I did not.

4    Q    And you still haven't till this very day, right?

5    A    Gone to the design center in 2000?

6    Q    Well, what I -- what I just asked you -- let's back up

7    again.

8    A    Okay.

9    Q    You know that Mr. Bryant never created any Bratz

10   drawings at Mattel in response to any assignment by Mattel,

11   right?

12   A    No, I don't know that.

13   Q    Who was Mr. Bryant's boss at the design center?

14   A    I don't know his direct supervisor.  It would have been

15   Ivy Ross.

16   Q    Well, what have you done to find out whether Mr. Bryant

17   was assigned a Bratz project at Mattel?

18            MR. QUINN:  Your Honor, it's irrelevant.

19            THE COURT:  Overruled.

20            THE WITNESS:  Nothing.

21   BY MS. KELLER:

22   Q    You've never even checked, one way or the other?

23   A    I certainly had no reason to suspect he was working on

24   a Bratz project at Mattel.

25   Q    Well, then let me ask you again, did Carter Bryant

1    create Bratz drawings in response to an assignment from

2    someone at Mattel; yes or no?

3    A    I don't know.

4    Q    So you are leaving the door opened that maybe this was

5    actually an assignment by somebody at Mattel and you just

6    haven't heard about it?

7              MR. QUINN:  Your Honor, this is argument.

8              THE COURT:  It's argumentative.

9              Reask the question, Counsel.

10   BY MS. KELLER:

11   Q    That would be pretty darn important to you, wouldn't

12   it?  I mean, if Mr. Bryant was given a direct assignment to

13   create a Bratz-type project at Mattel, you'd sure want to

14   know that, wouldn't you?

15   A    I -- I would today, yes.

16   Q    I mean, given the tens of millions of dollars that you

17   personally have at stake, up or down depending on the

18   outcome of this case, you would want that kind of important

19   piece of information, wouldn't you?

20   A    I would want to know that today.

21   Q    But you haven't bothered to find out?

22   A    You're asserting it today.  I haven't heard this idea

23   until today.

24   Q    You were not aware up until today that the idea of when

25   and where Carter Bryant created the Bratz drawings was in

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 130 of 158   Page ID #:306095
CV 04-9049-DOC – 03/02/2011 – Day 25, Vol. 2 of 3

130

1    issue in this case?

2    A    No, I -- I never answered that.

3    Q    You know that Mr. Bryant was in Barbie collectibles

4    from January 1999 to October 2000, right?

5    A    Yes.

6    Q    I mean, did you check to find out where he was actually

7    working, true?

8    A    Yes.

9    Q    And you know that he was hired as a project designer in

10   the Barbie collector department, right?

11   A    I don't know that that's what his title was.

12   Q    Have you bothered to find out what his title was at the

13   time he was working in Barbie collectibles?

14              MR. QUINN:  Object to "bothered," your Honor.

15              THE COURT:  We'll strike the word "bothered."

16              Reask the question.

17   BY MS. KELLER:

18   Q    Have you investigated what Mr. Bryant's title was when

19   he was in Barbie collectibles?

20   A    No, I have not.

21   Q    You know that he designed hairstyles and outfits and

22   makeup and accessories for Barbies, though, don't you?

23   A    I believe he did, yes.

24   Q    Why -- is that a "yes"?

25   A    Yes.

```
 1    Q    I mean, as CEO of Mattel, you have some understanding
 2    of what goes on in Barbie collectibles, don't you?
 3    A    Yes.
 4    Q    And these were collectible dolls for an adult market,
 5    not toys for children, true?
 6    A    I wouldn't always draw that distinction, no.
 7    Q    So you don't know that Barbie collectibles are sold
 8    primarily to adult women?
 9    A    That -- I don't believe that was the question I
10    answered.
11    Q    Aren't Barbie collectibles sold primarily to adult
12    women?
13    A    Yes, they are.
14    Q    Then they are not toys for children, correct?
15    A    Primarily, that's correct.
16    Q    So what -- what projects did Mr. Bryant work on in his
17    second stint at Mattel?  Can you tell us the specific
18    projects he worked on?
19    A    No, I can't.
20    Q    Any?
21    A    No.
22    Q    Even one?
23    A    No.
24    Q    Does Hollywood Movie Star collection ring a bell?
25    A    No.
```

1   Q     How about Mann's Chinese Theater Barbie?

2   A     No.

3   Q     The Classical Goddess collection?

4   A     No.

5   Q     The Royal Jewels collection?

6   A     No.

7   Q     The Fairy of the Garden project?

8   A     No.

9   Q     Swan Barbie?

10  A     No.

11  Q     Grand Entrance Barbie?

12  A     No.

13  Q     Do you even know what those dolls are?

14  A     No, certainly not all of them.

15  Q     Are you even aware that Mattel has a series of dolls

16  based on Greek mythology?

17  A     I have seen dolls that may have been, but I may be

18  wrong.

19  Q     So you really don't even know what Barbie collectibles

20  is all about, right?

21  A     No, I wouldn't say that, but I certainly don't know all

22  of the products over the years, no.

23  Q     Well, you are aware, aren't you, that Mr. Bryant was

24  never asked to design an entirely new doll with an entirely

25  new sculpt?

```
 1              MR. QUINN:  Assumes facts, your Honor.

 2              MS. KELLER:  We've got ample testimony on it.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  No, I'm not aware of that.

 5  BY MS. KELLER:

 6  Q    Do you have any idea what Mr. Bryant did at Barbie

 7  collectibles, whatsoever?

 8  A    I assume he worked on fashions and designs for Barbie

 9  collectibles, but I don't know his day-to-day

10  responsibilities.

11  Q    You say you assume?

12  A    That's correct.

13  Q    You haven't checked?

14  A    That's correct.

15  Q    So are you telling us that you don't know that he never

16  designed an entirely new doll with a new sculpt?

17  A    Well, I believe he did design a new doll with a new

18  sculpt.

19  Q    And what was the new sculpt that he worked on?

20  A    I think he worked with others in what became the Bratz

21  sculpt.

22  Q    No, no.  I'm talking about at Mattel in Barbie

23  collectibles, okay?  I know what the legal theory is.  I'm

24  talking about --

25              MR. QUINN:  I object to the -- move to strike the
```

1   statement, your Honor.

2           THE COURT:  Sustained.  Stricken.

3   BY MS. KELLER:

4   Q    I'm talking about the facts of what he did at Mattel in

5   Barbie collectibles.

6           MR. QUINN:  Your Honor, again, move to strike the

7   preamble, "I'm talking about the facts."

8           THE COURT:  Sustained.

9           Just reask the question.

10  BY MS. KELLER:

11  Q    At Barbie Collectibles, did Carter Bryant ever work on

12  a new doll with an entirely new sculpt?

13  A    I don't know.

14  Q    At Barbie collectibles, Mr. Bryant was never asked to

15  work on an edgy, hip, urban, multi-ethnic doll, correct?

16  A    I don't know.

17  Q    And Mr. Bryant was never asked to create any drawings

18  of an edgy, hip, urban doll, multi-ethnic, while he was on

19  Mattel property, correct?

20  A    I don't know that.

21  Q    Mr. Bryant never submitted any drawings of an edgy,

22  hip, urban doll to his superiors at Mattel, correct?

23  A    I don't know.

24  Q    Mr. Bryant's superiors at Mattel never asked him to

25  produce any such designs, right?

```
1    A    I don't know.
2    Q    And Mr. Bryant never created any of the Bratz drawings
3    within the scope of his employment at Mattel, correct?
4    A    No, that's incorrect.
5    Q    That, you know?
6    A    Yes.
7    Q    You know what your legal theory is in this case, right?
8    A    I know what our inventions agreement says, yes.
9    Q    You know what you don't know anything that Mr. Bryant
10   did or didn't do while he was in Barbie collectibles, right?
11   A    No, I don't know what he did.
12   Q    Now, let's talk about the inventions agreement for a
13   second.
14        I think earlier today you told us that you, yourself,
15   signed an inventions agreement with Mattel, right?
16   A    Yes.
17   Q    And you knew when you signed it generally what it
18   meant, right?
19   A    I would have read it, yes.
20   Q    Well, you said earlier that you did and you knew what
21   it meant, right?
22   A    I'm not disputing that.
23   Q    Am I correct?
24   A    I don't -- I don't remember what I said, so I'll --
25   Q    Just today?
```

1    A    That's correct, I don't remember everything I've said

2    in the last hour, let alone, you know, eight hours.

3    Q    As of --

4    A    I'm not disputing whether or not I read it or

5    understood it.

6    Q    As of January 8th, 2008, you didn't even know whether

7    you had ever signed a document called an inventions

8    agreement at Mattel, right?

9    A    I believe that's right.

10   Q    And you didn't remember as of January 8th, 2008, you

11   didn't even remember the first time you reviewed an

12   inventions agreement, right?

13   A    That's possible.

14   Q    Take a look at your deposition of that date,

15   January 8th, 2008, page 157, lines 5 through 7.

16   A    Page 157.

17   Q    I'm looking.  I think that's right.  I might be wrong.

18   Let me see, here.

19   A    Okay.

20   Q    It's pages 152 and 153, and specifically 153, lines 8

21   through 12, or 8 through 16.

22   A    Yes.

23   Q    Okay.  As of January 8th, 2008, you didn't even know

24   whether you had signed a document called an inventions

25   agreement, true?

1   A    That was called an inventions agreement, yes.

2   Q    And you didn't know whether -- you didn't know when the

3   first time was that you had reviewed anything called an

4   inventions agreement?

5   A    That's correct.

6   Q    Now, it didn't stick in your mind because -- as of

7   January 2008, it hadn't stuck in your mind that you had ever

8   signed such a thing because it just didn't seem that

9   significant to you, right?

10  A    No.  As I'm remembering this testimony, I think it had

11  to do with the title "Inventions Agreement," just as -- just

12  as we're talking about what documents I saw with Mr. Bryant,

13  you know, the title of the document to you is very

14  important, so I'm trying to be clear.

15  Q    Well, you were asked about two specific agreements.

16  One was a confidentiality agreement, right?

17  A    Yes.

18  Q    And you said you remembered signing that, right?

19  A    Yes.

20  Q    And you were asked about the inventions agreement?

21  A    Yes.

22  Q    And you said you did not recall signing such a thing,

23  right?

24  A    No.  I said I didn't know if I had signed such a thing

25  called an inventions agreement.

```
 1              MS. KELLER:  Your Honor, I'd ask to read from
 2    page 153, lines 8 through 16.
 3              MR. QUINN:  Your Honor, here she really does --
 4    I'd request she'd read --
 5              THE COURT:  No.  I'm not going to allow the
 6    reading, Counsel.  I think it's a consistent answer, "I
 7    don't know," and I remember that.
 8    BY MS. KELLER:
 9    Q    And do you recall that in 2004, four years after you
10    joined Mattel, you were asked to sign a new agreement, a new
11    inventions agreement at Mattel; do you remember that?
12    A    No, I don't remember that.
13    Q    And that's because, again, it just wasn't that
14    significant to you, right?
15    A    No.  I don't know that I did sign a new inventions
16    agreement in 2004.
17    Q    Did you even read the agreements you were given to
18    sign?
19              MR. QUINN:  Vague and ambiguous as to time.
20    BY MS. KELLER:
21    Q    Either time?
22              MR. QUINN:  It assumes facts.
23              THE COURT:  Do you understand the question?
24              THE WITNESS:  I do.
25              THE COURT:  You can answer the question.
```

1    Overruled.

2              THE WITNESS:  If I signed an inventions agreement,

3    I read it before I signed it.

4    BY MS. KELLER:

5    Q    Well, earlier today you said you signed an inventions

6    agreement, and, in fact, you told us what it was about.

7    A    That's correct.

8    Q    When you were being asked by Mr. Quinn, you said that

9    you definitely signed an inventions agreement, and you told

10   us your understanding of what was in it, right?

11   A    That's correct.

12   Q    Now you're telling us that you don't if you ever even

13   signed an inventions agreement, right?

14   A    No, that's not what I'm telling you.

15   Q    And back in, at the time of your deposition in 2008,

16   you said you didn't remember whether you had signed an

17   agreement, to begin with, or whether you signed a new one in

18   2004, right?

19   A    A document entitled "Inventions Agreement," that's

20   correct.

21   Q    Well, have you been shown your inventions agreement

22   before testifying today?

23   A    Yes, I have.

24   Q    And when was that?

25   A    I've seen it on several occasions.

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 140 of 158   Page ID #:306105
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

140

1   Q    But just a second ago, you told us that you didn't even

2   know if you had ever signed a document entitled "Inventions

3   Agreement," right?

4   A    No, I don't believe I said that.

5   Q    I mean, I'm talking about two sentences ago.

6   A    I thought you were reading from 2008, if you are

7   referring to that.  Not contemporaneously.  I have signed an

8   agreement, and I've read it, and I'm sure I read it before I

9   signed it.

10  Q    And you know that as of today, right?

11  A    That's correct.

12  Q    But as of 2008, you didn't know that?

13  A    I --

14          MR. QUINN:  It's argumentative, your Honor.  It's

15  improper use of prior testimony.  Object to the form of the

16  question.

17          THE COURT:  You can just restate it.

18          MR. QUINN:  She should just read it if she wants

19  to read it.

20          THE COURT:  Well, Mr. Quinn, thank you.

21          MR. QUINN:  Sorry, your Honor.

22          THE COURT:  Anything else?

23          MR. QUINN:  That's all, your Honor.

24          THE COURT:  Okay.  Thank you very much.

25  Overruled.

1          Now, just restate it, though.  It sounds like a

2    accusation.  We might like a question, okay?

3    BY MS. KELLER:

4    Q    Earlier today you testified that you not only had read

5    your inventions agreement before you signed it and signed

6    it, but you also understood it, right?

7    A    Yes.

8    Q    As of 2008, you didn't even remember whether you had

9    signed an inventions agreement, either in the year 2000 or

10   in the year 2004, right?

11   A    A document called "Inventions Agreement," that's

12   correct.

13   Q    But as of today, the reason that you know all about it

14   is because you know it's an important issue in this case,

15   right?

16   A    Oh, certainly.

17   Q    And you know that you were going to be asked about your

18   interpretation of your inventions agreement, right?

19   A    No.

20   Q    So now you have paid attention to it and you have read

21   it and you have discussed it, and now you say you understand

22   it, right?

23   A    Again, if I signed it in 2000 or 2004, I read it and

24   understood it.

25   Q    Well, yeah, but what I'm getting at is as of 2008, you

1    didn't even know there was such a thing that you had signed,

2    correct?

3    A    That's correct.

4    Q    And that's because at the time you signed it as opposed

5    to now, when you know all about the subject of this lawsuit,

6    at the time you signed it, both times, you didn't know that

7    it was that significant, right?

8    A    No, that's not true.

9    Q    And today you were telling us about your understanding

10   of employees signing this agreement, right?

11   A    Yes.

12   Q    But as of 2008, you didn't even know that employees

13   were being asked to sign inventions agreements, right?

14   A    A document called "Inventions Agreement," that's

15   correct.

16   Q    Well, or anything containing an inventions agreement?

17   A    No, I don't believe that is correct.

18   Q    It wasn't until you met with lawyers to prepare for

19   your deposition in 2008 that you learned all about

20   inventions agreements, true?

21   A    No.

22   Q    Is it true that as of 2008, that before you were

23   preparing with your lawyers for your deposition, you didn't

24   even know that employees were being asked to sign a document

25   called an inventions agreement?

1    A    That may be true, yes.

2    Q    Is it true or is it something that may be true?

3    A    Well, it would be helpful if I looked at the document

4    that you're reading from.

5    Q    Okay.  Take a look at page 157 of your deposition,

6    January 28th, 2008, lines 17 through 21.

7    A    I think I was consistent at the time that I didn't know

8    that there was a thing called an inventions agreement.

9    Q    Isn't it true that before you met with your lawyers to

10   prepare for your deposition, you didn't even know that

11   employees were being asked to sign a document entitled

12   "Inventions Agreement"; is that true, yes or no?

13   A    Yes, it is.

14         MS. KELLER:  Your Honor, would this be a good time

15   for a break?

16         THE COURT:  Apparently, it would.

17         (Laughter.)

18         THE COURT:  Now, just a moment.

19         How are all of you doing; okay?

20         (No audible response.)

21         THE COURT:  Now, just a minute.  Let me talk to

22   you.

23         Do you see this chart over here?  It's how much

24   time we have left, and I need you to stay healthy, okay?  I

25   need you to get good sleep.  We're nearing the backside, the

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 144 of 158   Page ID #:306109
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

144

 1    downside of the case, okay?  And I want to compliment you,

 2    counsel had gotten a little heated today, but they are

 3    absolutely doing a superb job, so my compliments to all

 4    counsel.  They are extraordinary, and they are enjoying

 5    their weekends here.  They are getting it to you as quickly

 6    as they can.

 7           This case is probably going conclude in the last

 8    part of March, but we are going from about 6 hours a day

 9    down to about 5 hours and 45 minutes a day.  Remember, if we

10    could average 6 hours a day, that's the magic number, right?

11    Almost.  So if you can be in session on Saturday and

12    Sunday -- I'm just kidding you.

13           (Laughter.)

14           THE COURT:  This case is going to go to you early

15    in April, and I asked you to bring in any employer that

16    you'd like me to write to.  If you forgot that, I'll start

17    collecting those tomorrow afternoon.  I'll write a personal

18    letter from the Court to your employer thanking them for

19    your service.  I mean, they deserve that.  I just don't know

20    what's happening, and I don't want any issues or problems.

21    To your spouses, just tell them you're tied up.  I won't

22    write the letter, okay?

23           Now, I'll see you tomorrow at 8:30.  Has anybody

24    talked to anybody about the case so I can start this all

25    over again?

Case 2:04-cv-09049-DOC-RNB  Document 10121  Filed 03/03/11  Page 145 of 158  Page ID #:306110
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

145

1           Don't do it.  Don't do it.

2           The case has gotten a lot of notoriety, and we'll

3    get increased notoriety.  If you recognize it, turn the

4    page, set it down, okay?

5           You are admonished not to discuss this matter

6    amongst yourselves, nor form or express any opinion

7    concerning the case.  Goodnight.

8           And sir, we'll get your chair fixed for you

9    tomorrow.

10          *(Laughter.)*

11          THE COURT:  Now, counsel, if you'd have a seat for

12   a moment.

13          *(The following proceedings is taken outside*

14       *the presence of the jury.)*

15          THE COURT:  Thank you, Mr. Eckert.  Why don't you

16   step down and join us for a moment.  I want you present

17   during this conversation.

18          Now, last evening, counsel, I think we were in

19   session until, what, 10:30, 10:45?

20          MS. KELLER:  10:45, your Honor.

21          THE COURT:  Okay.  Now, tonight I've ordered air,

22   so you'll have it much cooler.  It got a little hot last

23   night.

24          And Jane, I may need a backup court reporter.

25          *(The Court and reporter discussion held off*

1          *the record.)*

2                  THE COURT:  We have a lot to do.  We have to work

3     out exactly where we found ourselves a year ago on Monster

4     High.

5                  And therefore, Mr. Larian, I need your input.

6                  And Mr. Eckert, I need your input.  It's your

7     companies, along with your lawyers.

8                  It's my understanding a year ago that the

9     difficulty we got into was really Mattel's resistance, in

10    good faith from your perspective, not to cause discovery of

11    Monster High because my memory, with the 150 discovery

12    motions that we've handed down, was that you were obviously

13    concerned that you were turning over your information to a

14    competitor.

15                 And Mr. Larian, if I remember, Mr. Zeller had

16    really said that -- you were concerned at that time, I think

17    it was one of our initial motions that you were concerned

18    that Mr. Larian was going to obtain confidential information

19    again from Mattel; is that memory correct?

20                 MR. ZELLER:  Largely with the -- with I think

21    this -- a little bit more specific --

22                 THE COURT:  Mr. O'Brien, would you come up and

23    join us for just a moment?  I'm going to need your help.

24    Just have a seat in that chair I've prepared for you, sir.

25                 *(Laughter.)*

1      MR. ZELLER:  Initially, when MGA asked information

2  about Monster High, it was still an unreleased product.

3      THE COURT:  Did you hear me say that?

4      MR. ZELLER:  I understand that, Judge, but there

5  is a little more to it than that.

6      MGA itself was the one who started this point

7  about unreleased product information should not be turned

8  over, so it was goose and gander.  Then at that point, the

9  Court said no, they don't get discovery on it, and that was

10  coequal.

11      THE COURT:  Well, that's -- just a moment.  We're

12  together.  That's what I recall also.  I'll go back and pull

13  the order if I need to, but I was very concerned in a

14  competitive marketplace whether it has been released or not,

15  on behalf of Mattel, that you shouldn't be turning over

16  competitive secrets to your competitor, right, Mr. Eckert?

17  Makes sense from a business standpoint.

18      I think Mr. Quinn and Mr. Price and Mr. Zeller

19  made your position known, and it was -- I agreed with you.

20      MR. ZELLER:  And then in changed.

21      THE COURT:  And now -- and then it changed.

22      MR. ZELLER:  And the Court ordered that discovery.

23  It was released.  MGA came back and said that impediment

24  about it being an unreleased product is no longer true, "We

25  want discovery," and the Court said, "Yes, you get discovery

 1    on it," and they asked Mr. Eckert, they asked -- I mean,

 2    they got discovery on it.

 3          THE COURT:  It was examination from the deposition

 4    because Mr. O'Brien is kind enough to call me usually at

 5    11:00 at night, okay, and inform me -- not blow by blow

 6    what's been occurring, but he's been an able master and has

 7    really kept the Court apprised far beyond any other special

 8    master I've worked with, and I pay Mr. O'Brien that

 9    compliment on the record.

10          Now, though, Monster High has come into play,

11    because I understand the need for Mattel to show that their

12    intellectual property, even if not released on the

13    marketplace immediately, may have future value.

14          And I think, Mr. Quinn, you've argued that ably to

15    the Court on a number of occasions.

16          But with that position, then MGA has an equitable

17    position also, and that is you ought to have discovery about

18    the development.  The problem is we are right back to where

19    we were a year ago, and that is how do we get that

20    discovery, and should it be attorneys' eyes only, which I

21    thought we would reach a resolution on in the last occasion,

22    but we never have.  Now, that's the first issue.

23          The second issue is the peculiarity, Mr. Eckert,

24    Mr. Larian, we find ourselves in with each of counsel ably

25    arguing your matter but putting the other side in somewhat

1   of a disadvantage.

2           And Mr. Quinn, I saw your blood pressure raise,

3   which was good for you at your age.

4           MR. QUINN:  How old do you think I am, your Honor.

5           THE COURT:  I think you're about 25, Mr, Quinn.

6           MR. QUINN:  Thank you.

7           THE COURT:  But you'll be like me when you get out

8   of here, you'll be 66.

9           *(Laughter.)*

10          THE COURT:  So what occurred was that Mr. Quinn, a

11  very able lawyer, decided to take a very aggressive tactic

12  and explain why his client hadn't been present.  And if you

13  need, I'll go back and read to you this evening.

14          I understand your motivation.  I don't understand

15  why that occurred.  I'm not critical of it, but it put then

16  counsel in the position from MGA of responding, "Yes, you

17  could have been present.  You could have designated yourself

18  as a witness."

19          Now, that plays on both sides of the ledger.

20          On one hand, it could be perceived that

21  Mr. Larian, as Ms. Keller is trying to impart to the jury,

22  is here and is disadvantaged, and he's the poor defendant,

23  but we know that Mr. Larian is free to leave any time.  He

24  doesn't have to attend these proceedings.  That's by choice.

25  Is there any disagreement about that?  Has the Court said

```
1    anything different, Ms. Keller?

2              MS. KELLER:  No.

3              THE COURT:  Okay, fine.

4              Now, by the same token, Mr. Eckert has a little

5    bit of an issue about not being here when, in fact, quite

6    frankly, he could have designated himself as the

7    representative, as Mr. Keller states, and here we are in a

8    position of each side feeling that it's been imbalanced.

9              In a few moments, Mr. Quinn, I will listen to you.

10             MR. QUINN:  Thank you.

11             THE COURT:  Just before you start, let me remind

12   you of something.  You represent a very able client with 30-

13   to 35,000 employees, right?

14             MR. QUINN:  I do.

15             THE COURT:  And I'm sure that Mattel is a very

16   important client, and they should be; you're excellent

17   counsel.

18             I represent the American public.  Let me repeat

19   that to you.  I represent people who come into court -- you

20   know where I'm going with this, don't you?

21             MR. QUINN:  I do, your Honor.

22             THE COURT:  People who are middle class, lower

23   middle class, literally getting criticism from employers

24   that I'm having to fend off, a little gal trying to go to

25   school up there who can't attend, and I don't see absolutely
```

Case 2:04-cv-09049-DOC-RNB   Document 10121   Filed 03/03/11   Page 151 of 158   Page ID #:306116
CV 04-9049-DOC - 03/02/2011 - Day 25, Vol. 2 of 3

151

1    no reason why you think Mr. Eckert would be inconvenienced

2    by not being the designated representative.

3             Now, I'm going to order him to be present in a few

4    moments, tentatively, but I'm going to listen to you first,

5    and I'm going to encourage the two of you to work this out

6    before I take this issue on between you and opposing

7    counsel, so we don't get into that box; understood?

8             MR. QUINN:  Understood, your Honor.

9             THE COURT:  All right.  I'm going to take a recess

10   for about a half an hour to 45 minutes.  This may be the

11   first agreement counsel met.  Because if, in fact --

12   Mr. Eckert is here.

13            Mr. Larian you've been here every day by choice,

14   so you don't have the Court's sympathy.  The two days next

15   week, forget it; you are here all the time.  But if you are

16   here from now on, Mr. Eckert will be here from now on.

17            MR. LARIAN:  I'll be here.

18            THE COURT:  It's going to be absolutely coequal

19   from this point.  Nobody has what I call that 30 percent

20   advantage that the record never captures; understood?

21            MR. QUINN:  Your Honor said that --

22            THE COURT:  Do you want to argue now, or do you

23   two want to talk to each other for a few moments?

24            MR. QUINN:  Well, the Court said that at some

25   point --

```
 1              THE COURT:  Your turn.

 2              MR. QUINN:  Thank you, your Honor.

 3              In the Court's recitation, there's one thing that

 4   somehow I don't think has gotten picked up or focused on

 5   sufficiently, and that is that Mr. Keller started this with

 6   the first witness, "Where is Mr. Eckert?"  She put that in

 7   play.

 8              Now, maybe that was a good thing, maybe that was a

 9   bad thing.  We can all have our own opinions on that

10   questioning, but it's undisputed, and we'll show the Court

11   in the record, that Ms. Keller brought that up with the

12   first witness.

13              My judgment, as a trial lawyer, was I needed to

14   make some response to that, and I did what I did.  I will

15   also say it goes without saying, your Honor, that if this

16   Court orders Mr. Eckert to be here, he will be here,

17   obviously, and that goes without saying, but --

18              THE COURT:  With this record, I understand that.

19              MR. QUINN:  But, you know, there is something here

20   that's been said, and there's a between-the-lines tenor to

21   this that, with all due respect, I think is kind of

22   insulting or offensive to Ms. Martinez who, you know, we

23   heard her say -- Ms. Keller make some comment like, you

24   know, in a question, "And here she is, is Ms. Martinez," and

25   I fear the Court, to some degree, maybe a little bit, is
```

1    embracing that idea that she isn't somebody of sufficient

2    stature, experience, involvement in the underlying facts,

3    that she's not appropriate to be a corporate representative.

4           THE COURT:  Why would you think that?  I think you

5    are the genesis of Monster High.  You also have some

6    resemblance to the first four dolls.

7           MR. QUINN:  Well, your Honor, some people would

8    say she's the genesis of Bratz, Toon Teenz.

9           THE COURT:  That's right, and I'm sure that that's

10   not the reason she's at the table because of her competency,

11   but that also helps.

12          MR. QUINN:  I think this is a fair consideration,

13   your Honor, and -- and I do believe there is something to

14   the idea, and again I repeat, obviously if this Court

15   instructs Mr. Eckert to be here, he's going to be here; no

16   doubt about it.

17          THE COURT:  I understand that.

18          MR. QUINN:  But in terms who is eligible or who is

19   proper to be the corporate representative, I don't think we

20   should send the message that Ms. Martinez somehow doesn't

21   have the appropriate credentials or experience or

22   involvement to do that role.

23          THE COURT:  We will never do this.

24          Ms. Martinez, we would not only never insult you,

25   but it's been a pleasure having you here.  If there's a

1    transition made, it will be very gracious.  In fact, it's

2    going to look like Mattel is embracing this before the jury,

3    okay?  So you won't be insulted.

4            MR. QUINN:  So two separate questions, your Honor.

5    Should Mr. Eckert be here?  He can be here and not be the

6    corporate representative.  I mean, if -- if -- I appreciate

7    the Court understands what I'm saying.  We would like -- if

8    the Court orders Mr. Eckert to be here, so be it, but we'd

9    like Ms. Martinez to continue to be Mattel's corporate

10   representative.  We do think, your Honor, that we're

11   entitled to choose who that's going to be, and we don't

12   think this is some illogical or arbitrary choice.

13           THE COURT:  Okay.

14           Counsel?

15           MS. KELLER:  First of all, your Honor, I would

16   like to correct the record.  I never asked Ivy Ross one word

17   about where is Mr. Eckert, nor did I ask Ivy Ross one word

18   about the corporate representative issue, and it would make

19   no sense.  She wasn't even at Mattel anymore.  So I'm not

20   sure where Mr. Quinn is getting that.

21           MR. QUINN:  That was Ms. Martinez.

22           *(Interruption in the proceedings.)*

23           MR. QUINN:  I misspoke.  It was Ms. Martinez that

24   she asked, not -- the second witness, not the first.

25           MS. KELLER:  Well, Ms. Martinez was asked about

 1    being the corporate representative because she was the

 2    corporate representative.

 3            The point is that this jury has been left with a

 4    completely false apprehension, which is that Mr. Eckert

 5    could not be here, indeed was barred by the Court's order

 6    from being here, and the reason that he's only shown up as a

 7    witness today for the first time in front of this jury,

 8    other than opening statements, is because the Court did, in

 9    fact, bar him, and that simply isn't the truth.  The truth

10    is he could have chosen to be here any time as the corporate

11    representative, and I don't think the jury should be left

12    with that falsehood hanging out there; I just don't.

13            And it's true that Mr. Larian could choose to

14    leave if he wanted to and would not have to be here, other

15    than on those occasions when the Court has ordered him to be

16    here, but that really isn't the point.  I didn't bring this

17    up with Mr. Eckert, counsel did, and he was permitted to

18    give an answer that counsel knew to be wrong.

19            MR. QUINN:  Well --

20            MS. KELLER:  And made it seem as if this Court was

21    participating in the barring of him from being present.

22            MR. QUINN:  So January 19th, with Ms. Martinez on

23    the stand, question by Ms. Keller, "Not Mr. Eckert, the CEO,

24    not any of the senior people are the corporate

25    representative."

1           "(No audible response.)"

2           "None of the corporate executives of Mattel are

3     sitting here as corporate representatives like you, right?"

4           "Objection sustained."

5           She brought it up.

6           THE COURT:  Excuse me.  Objection -- what was the

7     ruling?

8           MR. QUINN:  The Court, "I'll sustain the

9     objection, Counsel.  They've been excluded by joint request

10    of both counsel, so" --

11          THE COURT:  Brilliant ruling.

12          (Laughter.)

13          MR. QUINN:  So they can't be here.  And so it was

14    absolutely right; if he wasn't the corporate representative,

15    he can't be here.  That's what -- and with specific

16    reference to Mr. Eckert, that's what the Court told the

17    jury.

18          THE COURT:  All right.

19          Now, just a moment.  We can go back and forth all

20    evening, and do you two want to talk to each other, or is

21    there anything left to say?  If there is nothing left to

22    say, then I'll make a ruling, and that will be the end of it

23    tonight.

24          MS. KELLER:  It sounds to me like --

25          THE COURT:  No, Counsel, just -- as Ms. Keller

1    gets up out of her seat and approaches Mr. Quinn, as they

2    discuss this quietly at the back of the room.

3              MR. QUINN:  Yes?

4              *(Laughter.)*

5              THE COURT:  Don't play to me.  Talk to each other

6    quietly.

7              This may be the first accommodation made in this

8    case between the sides for the last two years.

9              *(Attorney discussion held off the record.)*

10             MS. HURST:  At some point can we address Monster

11   High issue as well, your Honor?

12             THE COURT:  Not now, counsel.

13             *(Interruption in the proceedings.)*

14             Okay.  Counsel, Jane needs a break for just a

15   moment whatever you are doing, okay?  We'll be back in about

16   10 minutes.

17             *(Recess.)*

18                              -oOo-

19

20

21

22

23

24

25

1                          –oOo–

2                       **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 2, 2011

12

13

14   _____

15   JANE C.S. RULE, U.S. COURT REPORTER
     CSR NO. 9316

16

17

18

19

20

21

22

23

24

25