1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,                    )
7                                         )
              PLAINTIFFS,                 )
8                                         )
          vs.                             ) CV NO. 04-9049-DOC
9                                         ) DAY 25
MGA ENTERTAINMENT, INC., ET AL.,         ) VOLUME 3 of 3
10                                        )
              DEFENDANTS.                 )
11   _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      JURY TRIAL

16                  SANTA ANA, CALIFORNIA

17                 TUESDAY, MARCH 1, 2011

18                      5:52 P.M.

19

20
                **DEBORAH D. PARKER, CSR 10342**
21               **OFFICIAL COURT REPORTER**
                **UNITED STATES DISTRICT COURT**
22                **411 WEST FOURTH STREET**
                        **SUITE 1-053**
23             **SANTA ANA, CALIFORNIA 92701**
                      **(714) 542-8409**
24                **D.PARKER@IX.NETCOM.COM**

25

1    APPEARANCES OF COUNSEL:

2        FOR THE PLAINTIFF, MATTEL, INC.:

3                            JOHN QUINN
                            WILLIAM PRICE
4                            MICHAEL T. ZELLER
                            QUINN EMANUEL URQUHART
5                            & SULLIVAN, LLP
                            865 S. FIGUEROA STREET
6                            10TH FLOOR
                            LOS ANGELES, CALIFORNIA 90017
7                            (213) 443-3000

8
         FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
9
                            THOMAS S. MC CONVILLE
10                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                            4 PARK PLAZA
11                            SUITE 1600
                            IRVINE, CALIFORNIA 92614
12                            (949) 567-6700

13
                            ANNETTE L. HURST
14                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                            THE ORRICK BUILDING
15                            405 HOWARD STREET
                            SAN FRANCISCO, CALIFORNIA 94105
16                            (415) 773-5700

17
                            JENNIFER L. KELLER
18                            KELLER RACKAUCKAS, LLP
                            18500 VON KARMAN AVENUE
19                            SUITE 560
                            IRVINE, CALIFORNIA 92612
20                            (949) 476-8700

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                              MARK E. OVERLAND
                               LAW OFFICES OF MARK E. OVERLAND
 4                              100 WILSHIRE BOULEVARD
                               SUITE 950
 5                              SANTA MONICA, CALIFORNIA 90401
                               (310) 459-2830
 6

 7                              ALEXANDER H. COTE
                               SCHEPER KIM & HARRIS, LLP
 8                              601 WEST FIFTH STREET
                               12TH FLOOR
 9                              LOS ANGELES, CALIFORNIA 90071
                               (213) 613-4660
10

11
      ALSO PRESENT:
12
                               JEANINE PISONI
13                              MGA ENTERTAINMENT, INC.
                               16360 ROSCOE BOULEVARD
14                              SUITE 105
                               VAN NUYS, CALIFORNIA 91406
15

16                              ROBERT ECKERT, MATTEL CEO
                               ISAAC LARIAN, MGA CEO
17                              KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                               MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                          I N D E X

 2

 3    PLAINTIFFS' WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 4     MICHAEL JOSEPH WAGNER                       8        47

 5                                                          56

 6

 7                          E X H I B I T S

 8    DEFENDANTS' EXHIBITS:              IDENTIFICATION  EVIDENCE

 9     9891, 9897, 9898 and 35354 Expert                    83
          Report of Michael Wagner;
10        E-mail; Mattel Mexico
          Commercial Agreements and
11        Cost Analysis Prepared by
          Roberto Isaias
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SANTA ANA, CALIFORNIA; TUESDAY, MARCH 1, 2011; 5:52 P.M.
 2           (The following proceedings were had outside the
 3           presence of the jury:)
 4                 THE COURT:  We're on the record.
 5                 All counsel are present.  Mr. Eckert is present.
 6     Mr. Larian is present.
 7                 I know counsel has worked hard this evening,
 8     trying to reach an agreement.  They have not been able to do
 9     so.
10                 I've had an informal conversation with Mr. Quinn
11     and Ms. Hurst -- well, with all counsel, and it's apparent
12     an agreement cannot be reached.
13                 Mr. Eckert, I'm just prepared to designate you
14     over your counsel's objection as the corporate
15     representative.  Counsel feels there might be some harm.  I
16     think it would be sufficient, sir, if I just ordered you to
17     be present.  And Ms. Martinez would remain at the table, but
18     you would be prominently displayed.  And I don't think
19     anything further needs to be said.
20                 Now, is that acceptable to you, Mr. Eckert?
21                 MR. ECKERT:  Yes, it is.
22                 THE COURT:  And Mr. Larian.
23                 That way I think we have that balance between both
24     sides.  We'll stop the quibbling now about who's present and
25     who's not, and there is no advantage to either side.
```

1          So we only have 19 days to 20 days to go with the

2   trial, one day of argument.  So in a sense, you've been here

3   on all occasions.

4          As the defendant, Mr. Larian, you've been prompt

5   in all occasions.  Mr. Eckert will have the equal dignity

6   for the court.  You'll be prompt as well.  And I think,

7   Mr. Eckert, you have had 20 days.  We'll make it, okay?

8          All right.  Now, second, we need to conduct three

9   things this evening before I spend about 45 minutes in

10  chambers.  First, I would like to continue on with

11  Mr. Wagner, but I also need the beginning of Mr. Eckert's

12  testimony, or deposition tonight.  And I'm assuming that

13  that's our next problem that what we haven't been able to

14  do, is work out attorneys' eyes only agreement, and we're

15  right back to where we were a year ago.

16         Is that my assumption, since we haven't done one

17  agreement in the case, so far --

18         MS. HURST:  We don't have any problem with them

19  designating an attorney eyes only.  They've refused to give

20  us anything.  I asked this morning for a series of eight

21  categories of documents, and they haven't agreed to give us

22  a single one.

23         MR. QUINN:  Well, these are very broad, like

24  Rule 34 document requests, categories, all the following

25  documents, all this, you know, as this court has come to

1    know and love in the middle of trial, your Honor.

2            I mean, Mr. Larian got on the stand and testified

3    about 10 or 15 dolls we got no, discovery on.  Never had any

4    discovery on it.

5            THE COURT:  Right.  Let me ask you this.  Thank

6    goodness I have Robert O'Brien present.  I think that he

7    could sit down with you, listen to both sides and come up

8    with some equitable recommendation to the court, rather than

9    me keeping you on the record.  And I can, hopefully, go on

10   with Mr. Wagner this evening at some point.  If we don't

11   reach an accommodation, then I can certainly rule quickly on

12   the matters.

13           But the one thing I am going to insist upon

14   eventually -- and it's simply to form -- and that is, at

15   least the development of Monster High be turned over.  I

16   don't think the interworkings of the particular doll, the

17   joints, et cetera, are relevant but certainly the time

18   frames.  And that you're going to be entitled to.

19           Now, how quickly we get that, how that's drafted

20   becomes, you know, art.  But I'm going to ask Mr. Larian to

21   stay tonight, which is ordering you to.

22           I'm going to ask Mr. Eckert to stay the night,

23   which is a polite way of ordering you to.  And you can watch

24   what your attorneys are going through each night.

25           You can go to dinner, if you would like to.  I

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   need 45 minutes in chambers.  If you would rejoin me at

 2   6:45, I would like to see you at that time.

 3              Thank you.

 4              MS. KELLER:  Your Honor, may we inquire about one

 5   thing?

 6              We were, as we mulled over Mr. Wagner's testimony,

 7   thinking that rather than have him testify again, first, and

 8   then argue, if we could have brief argument, first, about

 9   the targeted areas.

10              THE COURT:  No.  I want to hear him again.  I

11   don't mean to be impolite by just "no."  I said I wanted to

12   hear him again.  I want to hear him again, briefly.

13              All right.  6:45.

14         (Recess taken from 5:57 p.m. to 8:42 p.m.)

15              THE COURT:  We're on the record.

16              Counsel is present.

17              Mr. Wagner, do you recall the oath that was

18   administered last week?

19              THE WITNESS:  I do, your Honor.

20              THE COURT:  Good evening to you.

21              Counsel, if you would like to proceed.

22              Mr. Price.

23                     REDIRECT EXAMINATION

24   BY MR. PRICE:

25   Q.   Mr. Wagner, I want to focus just on the unjust
```

1    enrichment calculations you did, which -- the portion of

2    MGA's profits between sweat equity and profits from the

3    intellectual property, okay?

4    A.    That's fine.

5    Q.    Now, let me start out with what was the method, the

6    approach you used to calculate --

7              THE COURT:  Put them up as you go.

8              MR. PRICE:  Let me call out the numbers.

9              THE COURT:  I can see them easier here than I can

10   from the point of a packet.

11   BY MR. PRICE:

12   Q.    So what was the method of calculating what portion of

13   MGA's profits was attributable to their sweat equity versus

14   the intellectual property, the trade secrets, or the

15   copyrights?

16   A.    It was using three different benchmarks:  One was what

17   I call the pure toy company index and the profits that that

18   group of companies earned on an earnings before interest and

19   taxes basis each year during the damage period and comparing

20   that to the incremental earnings before interest and taxes

21   that I calculated for Bratz.  That was the first yardstick

22   that I used, and I would assume that the average toy company

23   is a fair return to MGA for their sweat equity in Bratz.

24   Q.    So at this point when you're just apportioning sweat

25   equity to intellectual property, at this point you're not

1    using a royalty analysis at all; correct?

2    A.    That is correct.

3          MR. PRICE:  If we could put up slide 19 to sort of

4    illustrate the methodology.

5    BY MR. PRICE:

6    Q.    We see on the left side here, there is a bar that says

7    "Profit MGA."  And this goes up to $100.

8          This is, kind of, a hypothetical 100-dollar profit

9    finding; right?

10   A.    Correct.

11   Q.    And could you explain to us what you do to apportion

12   the profits for unjust enrichment between the sweat equity

13   and the value of intellectual property?

14   A.    Well, this is a hypothetical for just $100 worth of

15   profit, but it's actually using the actual result of using

16   Mattel as that industry yardstick.  And the entire bar which

17   is dark green on the bottom and a lighter green on top is

18   split up between profit that would be generated by the

19   normal sweat equity and the contribution of the company to

20   its product's success, using Mattel's average profit margin

21   of its products each year as that metric.

22          I then move over the blue bar, or that part of

23   that which is profit above that benchmark, and that's what

24   this reflects.  That would leave for $100 of profit $54 with

25   MGA and $46 with -- would go to Mattel for their

1  intellectual property.

2  Q.   So in this situation, using Mattel as a benchmark, you

3  would have more than half of the profits remain in MGA, even

4  if they obtained those profits by threat of Mattel's trade

5  secrets?

6  A.   Well, yes.  Because still they generated some of these

7  profits by their own efforts, and that has to be recognized.

8  Q.   And so --

9        THE COURT:  Just a moment.

10        Okay.  Here's my fear.  I don't believe

11  tentatively that the Georgia-Pacific factors apply, nor am I

12  going to tentatively instruct on Georgia-Pacific factors in

13  unjust enrichment, on trade secret misappropriation and

14  copyright, but I'm still listening.

15        And my concern is even if I don't instruct that

16  the questioning will go this way:

17        *By the way, you got benchmark.*

18        *Well, how many times have you used this*

19  *methodology?*

20        *Hundreds and hundreds of times.*

21        *And why, or where did this methodology come from?*

22        *From a case called Georgia-Pacific.*

23        And so even though I'm not instructing on

24  Georgia-Pacific that the fallback position in front of the

25  jury will be, *Oh, there's something called Georgia-Pacific.*

1    And as far as some of the factors in Georgia-Pacific, those

2    may be some factors that you choose to rely on.  But as soon

3    as Georgia-Pacific gets not only mentioned but then segued

4    over into a case that I don't think is applicable, the

5    unjust enrichment for both trade secret misappropriation and

6    copyright, that's my concern.

7              I don't know if I can restrain Mr. Zeller.  I'm

8    just kidding you, or Mr. Price.  You've also got other ways

9    of measuring this.  So I'm going to tell you, tentatively,

10   lost profits, I'm satisfied.  It's this area that may -- may

11   be shutting down, and I'm giving --

12             Now, do you have any comments on that?  Can you

13   help me with this?

14             THE WITNESS:  Well, yes, your Honor.

15             First off, to get to this stage of my unjust

16   enrichment, I'm not using Georgia-Pacific.

17             THE COURT:  I know that.  I'm afraid of where

18   we're going from here.  So far, benchmark.

19             MR. PRICE:  We plan to illustrate that in the next

20   few slides, your Honor, why the royalties impact this at

21   all.

22             THE COURT:  I know you're going to.  So go on,

23   Counsel.

24             MR. PRICE:  Okay.

25   ////

```
 1   BY MR. PRICE:

 2   Q.   So just we're clear, at this point -- if you look at

 3   that left bar where it says "Profits From Trade Secrets From

 4   Unjust Enrichment," if it's our burden just to show the

 5   profits, the analysis could stop there; correct?

 6   A.   If that's your burden, you could stop there.

 7   Q.   But you went further and tried to apportion between the

 8   sweat equity and the IP value; right?

 9           THE COURT:  Which, by the way, MGA might like if

10   it's a reduced number.

11           THE WITNESS:  I believe they would like a reduced

12   number.

13           THE COURT:  And I indicated that this morning

14   before, I think, I had Ms. Hurst here, and I talked to

15   Mr. McConville about that.  Now, regardless, they're going

16   to disagree with whatever methodology you come up with.  I

17   understand that.

18           THE WITNESS:  And so do I.

19           THE COURT:  And vice versa for the expert for MGA.

20           So, Counsel.

21   BY MR. PRICE:

22   Q.   So let's see this in action.  Let's use an example

23   where you used the profits from all the Bratz products for

24   trade secret; that is, if the jury finds that there would

25   have been no MGA Bratz products but for the theft.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. PRICE:  And if we can go to slide 20.

 2   BY MR. PRICE:

 3   Q.    So on the left-hand side, you got three corporate

 4   benchmarks; correct?

 5   A.    I do.

 6   Q.    And then next to that, you have that MGA profit number,

 7   which you talked about last night for all Bratz products,

 8   which is 792.4 million; correct?

 9   A.    That is my calculation.

10   Q.    Now, on that third, you've got "Benchmark Corporation

11   Profits MGA."

12              So could you tell us what that is?

13   A.    That is the portion of the 792.4 million that I would

14   leave with MGA or reduce this profit number, based on these

15   different yardsticks.

16              THE COURT:  And the yardsticks are?

17              THE WITNESS:  Either the 17 pure toy companies,

18   the Hasbro and Jakks which are the second and third largest

19   toy companies in the industry, or just looking at Mattel,

20   which is the largest.

21              THE COURT:  In simple terms, no Georgia-Pacific

22   factors.

23              THE WITNESS:  Nothing.

24              THE COURT:  Hold on.

25              THE WITNESS:  No, nothing yet.
```

```
 1              THE COURT:  I'm with you.  Keep going.
 2   BY MR. PRICE:
 3   Q.   And so then you would subtract this yardstick, which is
 4   just a normal industry return and that leaves a portion that
 5   is left over.
 6              So if you look at the bottom here, for example,
 7   you had mentioned before that if you looked at the Mattel
 8   benchmark, it would be 24 percent to MGA and 46 percent to
 9   Mattel; correct?
10   A.   Correct.
11   Q.   And that's what this reflects in slide 20, if you look
12   at the Mattel as a benchmark; right?
13   A.   It does.
14   Q.   So 427 million stays with MGA, and then the benchmark
15   of Mattel of --
16              THE COURT:  No, I'm sorry.  Slow down.
17              MR. PRICE:  Let me slow down.
18              THE COURT:  Slow down.
19   BY MR. PRICE:
20   Q.   So 54 percent of 792.4 million of MGA Bratz profits,
21   you subtract to arrive at the number that is MGA's profits
22   that should be awarded to Mattel for theft of trade secrets;
23   right?
24   A.   Yes.  This analysis of all of the Bratz sales.
25   Q.   Now, the next question is:  Well, what if on this trade
```

1   secrets part --

2          THE COURT:  Now, just a moment.  You're going to

3   get attacked on "all of the Bratz sales," so the question

4   will be:  What are all of the Bratz sales that you are

5   referring to?

6          THE WITNESS:  Your Honor, it's --

7          THE COURT:  Hold.  All accessories.

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  All sculpts, whether they are from the

10  sculpts designated, all 44 dolls, but you are doing this on

11  the trade secret misappropriation?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  That has to be clear.  You're not

14  going to do this on the copyright where I've already made --

15         THE WITNESS:  I heard you last night, your Honor.

16         THE COURT:  Okay.  Okay.  Keep going.

17  BY MR. PRICE:

18  Q.   So, at this point, you now have three different numbers

19  which would be profits as a result of Mattel's trade

20  secrets.

21         Next question is:  What if the jurors decide the

22  name "Bratz" was not Mattel's trade secret?  Did you do a

23  calculation to further reduce these numbers, if the jury

24  makes that decision?

25  A.   I did.

 1            THE COURT:  Show me that.

 2   BY MR. PRICE:

 3   Q.   In that analysis, did you use royalties?

 4            THE WITNESS:  This is where I used an analysis of

 5   reasonable royalties within the framework of Georgia-Pacific

 6   which you have your questions about, your Honor.  But I used

 7   it in this context to figure out a relative portion of value

 8   between the different types of trade secrets.

 9            THE COURT:  So as to Bratz?

10            THE WITNESS:  As to Bratz.

11            THE COURT:  Bratz being what, once again?  The

12   name?

13            THE WITNESS:  Well, I only put in two buckets.  I

14   understand there's a number of different trade secrets, a

15   number of concepts, number of drawings, a sculpt, hero shot

16   and then the name.  I only gave a separate number for the

17   name.

18            THE COURT:  The name.  Okay.

19   BY MR. PRICE:

20   Q.   And it was an allocating between the name and the other

21   trade secrets that you then used a Georgia-Pacific analysis?

22   A.   Right.  I did a Georgia-Pacific analysis to figure out

23   what I think if this property would be licensed what a

24   reasonable royalty rate would be, which is 15 percent.  I

25   did a separate Georgia-Pacific analysis.  Only the trade

name was to be licensed to put a value on that.  And then,

the difference between those two numbers would be the value

of the rest of the trade secrets.

Q.   So if we could see this in action then, if you could

look at slide 21, now, the first four columns are the same

columns you had before where you arrived at numbers

representing what portion of MGA's profits are attributable

to Mattel's trade secrets; correct?

A.   Correct.

Q.   Now, tell us what the two columns on the right are,

then?

A.   This is just splitting up that value between the trade

name and all the rest of the trade secrets.

Q.   So let's look --

            THE COURT:  So I'm going to walk through, then,

just so I understand it, and I'll take --

            Is this the application of the 24 percent and

46 percent?

            THE WITNESS:  Well, that would be the bottom

number, the Mattel numbers.

            THE COURT:  That's where I'm driving at.

            THE WITNESS:  Yes, your Honor.

            THE COURT:  Okay.  And let me focus just on

Mattel.  And, therefore, you used the Georgia-Pacific

factors to factor out the Bratz name from the rest of the

1    trade secrets; is that correct?

2            THE WITNESS:  Yes, your Honor.  And I needed to do

3    that in two steps.

4            THE COURT:  Okay.

5            THE WITNESS:  And the first step, of course, if I

6    want to allocate it out, I have to know what the whole

7    bundle was worth, so I did an analysis for the whole bundle.

8    And then, I had to do a separate analysis just isolating the

9    value of the trade name; and then, I could determine the

10   difference.

11           THE COURT:  I'm going to stop, right there.

12           Some of the reasons within Georgia-Pacific could

13   be argued are very common sense things that people would

14   look like, if the Georgia-Pacific case had never occurred.

15           THE WITNESS:  You're correct, your Honor.

16           THE COURT:  And the concern I'm expressing is that

17   the line of questioning will start in good faith about

18   common sense factors that might be reasonable for you to

19   look at, but it will segue very quickly into:  How many

20   times did you use this methodology?

21           Hundreds.

22           I don't know that this is the appropriate

23   methodology.  That's my concern.  In fact, I've got some

24   tremendous doubts that this is the valid methodology for

25   this analysis.  But the factors, themselves, if you and I

1   were just sitting down and having a cup of coffee, might be

2   factors, or a couple of those factors that we took into

3   account, just common sense.  The problem is that the next

4   questions will be:  Your methodology, what did you rely

5   upon?

6           Georgia-Pacific.

7           I'm not instructing the jury on Georgia-Pacific.

8   They think there's something called "Georgia-Pacific" out

9   there that you've hundreds of times when I'm concerned about

10  the methodology as it carries over into these areas.  And

11  then, we go through a fact, or analysis, and there's five

12  factors, or two factors against and seven factors, let's

13  say, neutral.  I may be one or two off.

14          THE WITNESS:  You're close, your Honor.

15          THE COURT:  The end result is, if I don't believe

16  that this is the appropriate methodology, but I don't want

17  to confine, you know, from that common sense application of

18  looking at those factors, I've got such aggressive counsel

19  on both sides, quite frankly -- who I really am enjoying and

20  doing an outstanding job -- that I'm inclined to not let you

21  do it.

22          Hear me?

23          THE WITNESS:  I hear you, your Honor.

24          THE COURT:  The easy way to control it is:  You're

25  not testifying, other than the lost profits.  So, right now,

1  they're thinking.  They're hearing my words and their minds

2  are spinning with possibilities.

3          I'm going to let Mr. Price continue.

4          MR. PRICE:  And, your Honor, obviously, I would

5  like to be heard on your thoughts, but let's find out --

6  I'll show you what he was going to do.  And we've kind of

7  shown how the royalties come in, and that's to allocate

8  between the Bratz name trade secret and all trade secrets

9  after you have already identified the profits.

10         THE COURT:  Well, walk me through Hasbro, Jakks

11  for just a moment.  Let's just get that on the record, and

12  then we'll follow up to the pure toy industry again, just so

13  I make certain I understand.

14  BY MR. PRICE:

15  Q.   Okay.  So, Mr. Wagner, you got the corporate benchmark

16  Hasbro, Jakks, the first column; and the second column is

17  the MGA Bratz profits, six of all Bratz-related products

18  that you've calculated at 792.4 million; correct?

19  A.   Yes.

20  Q.   So walk us through the columns as to what you did next.

21  A.   Next, I looked at year by year the profitability of

22  Hasbro Jakks; and then, compared it year by year with the

23  profitability of the Bratz products.  And if the Bratz's

24  profits exceeded the Hasbro, Jakks average profitability

25  that year, I would put it into that yellow column; if it did

not, the portion that was the same would go into the column

that is white.  And that's how I allocated year buy year

between Hasbro Jakks and the Bratz product line.

THE COURT:  So every year I have a different

Hasbro Jakks.

THE WITNESS:  Yes.  I want to see how they compete

year by year in a particular year.

THE COURT:  And what would this ratio be?

THE WITNESS:  I don't have my calculator with me,

but it looks to me like it would be about 40 percent to MGA

and about 60 percent to Mattel.

THE COURT:  And, once again, that's based upon

this particular year Hasbro Jakks --

THE WITNESS:  It's a weighted average.  So it's

depending on how successful the Bratz products are in a

particular year versus Hasbro Jakks, but it's really done on

a year by year calculation.

THE COURT:  Take me up to the pure toy industry

again.

THE WITNESS:  There I just use -- there are 17

companies, which I calculated all of their profit margins,

and I used the median each year which is the middle company,

the company that was right in the middle of this industry.

THE COURT:  That's what I didn't understand.  I

didn't --

 1          I heard last evening, but I didn't, for some

 2   reason, focus on what was the mean average of the 17

 3   companies.

 4          THE WITNESS:  Your Honor, it's not the average,

 5   you know, which is you add all of profit margins and divide

 6   by the number of companies.  That would give you the

 7   average.  I'm using just the median, which means there's 17

 8   companies, so there's eight companies above the middle

 9   company and there's eight companies below it.  So I would

10   select just that middle company each year.

11          THE COURT:  What would the average be?

12          THE WITNESS:  I have a schedule that shows you

13   that, but that would be distorted by some of these large

14   recalls and stuff and aberrational events.  And I didn't

15   want to use that type of yardstick.

16          THE COURT:  Counsel.

17          MR. PRICE:  And so to continue walking through

18   then, stay with the -- shall we stay with Mattel, your

19   Honor, or --

20          THE COURT:  No, I think that -- so you've used the

21   mean?

22          THE WITNESS:  Median, your Honor.

23          THE COURT:  The median.

24          THE WITNESS:  Which means the middle point.

25          THE COURT:  Okay.  Counsel.

1    BY MR. PRICE:

2    Q.    And --

3            THE COURT:  For this particular year.  Now, how do

4    I know what year this is?

5            THE WITNESS:  No, your Honor.  This is, in fact,

6    putting all of the years together and giving you one number.

7    I do it for each year of the damage period.

8            THE COURT:  Let me stop.  So this chart I'm

9    looking at are all of the years?

10           THE WITNESS:  Yes, your Honor.  It's 2000 -- I'm

11   sorry.

12           THE COURT:  Those years are from 2000 --

13           THE WITNESS:  -1.

14           THE COURT:  To 2000 --

15           THE WITNESS:  10.

16           THE COURT:  10.

17           What happens if you didn't have 2009 and 2010?

18   How would that change these figures?

19           THE WITNESS:  Well, I would just eliminate those

20   two years, and it would reduce these numbers slightly.

21   Because by 2009 and 2010, the profits that MGA's earning

22   from Bratz is not very much.

23           THE COURT:  Counsel.

24   BY MR. PRICE:

25   Q.    So I think you've walked up to the second -- I'm sorry,

1    the third and fourth columns up to the yellow; is that

2    right?

3    A.   I did.

4    Q.   So after you've arrived at the yellow, then, where you

5    have the Mattel portion of MGA's profits attributable to

6    MGA's trade secrets, then walk us through the final two

7    columns using Hasbro Jakks?

8            Use Hasbro, Jakks.

9    A.   Well, again, based on my analysis of what I believe the

10   royalty would be for both the total bucket of trade secrets

11   and just the trade name secrets, I came to conclusion that

12   the trade name would be 5 percent and the total bucket would

13   be 15 percent.  So the trade name is one-third of the total

14   bucket, five divided by 15.  And all the other trade secrets

15   would be 10 divided by 15, or two-thirds.  And that's how I

16   allocate the $457.7 million, under the Hasbro, Jakks

17   yardstick.

18   Q.   So a third of that going to the Bratz name would be

19   152.6 million; right?

20   A.   Correct.

21   Q.   And the two-thirds would be 305.1 million under Hasbro,

22   Jakks?

23   A.   Yes.

24   Q.   And this allocation reduces the damages?

25   A.   Well, it doesn't reduce the damages, really.  The

1   number is still 457.7; but if the jury finds you didn't

2   prove liability on one of these buckets, they could subtract

3   that and award a correct number.

4   Q.   And you have done like similar calculations if you

5   use -- even for trade secrets, if instead of looking at all

6   the Bratz profits, for example, you look at just the profits

7   on the core fashion dolls and the dolls with the original

8   sculpt; right?

9   A.   I did.

10          MR. PRICE:   And, your Honor, just for your

11   reference, the same methodology, those are slides 22 and 23.

12          We can show it real quick.  22, that's the --

13          THE COURT:   Just a moment.  Just a minute.

14      (Pause.)

15          THE COURT:   All right now.  This is trade secrets

16   again.

17          MR. PRICE:   We don't think we need to go this far

18   on trade secrets, but we understand on copyright.

19          THE COURT:   This is your fashion dolls with

20   original Bratz sculpt.

21          Okay.  Next.

22          MR. PRICE:   And then, 22 is doing the same

23   analysis and allocating between the Bratz name and all trade

24   secrets just as with the $792 million profit figure.

25          Your Honor, yesterday, you were asking about what

27

```
 1    was included in the original Bratz sculpts and that

 2    schedule.  We can go through that, if you would like, or we

 3    can continue on to copyright.

 4              THE COURT:  No, I would like to see that.

 5    BY MR. PRICE:

 6    Q.   So if you would look at Exhibit 24181, which you have

 7    in front of you, I think.

 8              Do you?

 9    A.   I don't.

10    Q.   You don't, okay.  How do I have it, and you don't?

11              MR. PRICE:  And, your Honor, that's one of the

12    exhibits I gave you tonight.

13        (Pause.)

14              THE WITNESS:  I have it now.

15    BY MR. PRICE:

16    Q.   Can you tell us what 24181 is?

17    A.   Yes.  This is a schedule I had prepared last night that

18    lists by SKU all of the SKUs that include Bratz core fashion

19    dolls, using the original Bratz sculpt.  And it's a 23-page

20    schedule.  There are a total of 2,427 SKUs that are in this

21    bucket of core fashion dolls that use the original Bratz

22    sculpt.

23              The back part of the schedule starting on page --

24    Bates Stamp No. -- last two digits -- 43 lists the Bratz

25    core fashion dolls that do not use the original sculpt.  And
```

1    there are, I believe, 253 SKUs that do not use the original

2    sculpt.  And the basis for those exclusions are described in

3    Footnotes A through L on the last two pages of the schedule,

4    which was a deposition of Ms. Garcia and trial testimony of

5    Mr. Larian.

6    Q.    So let me start.  You said this is a revised schedule.

7    Revised last night?

8    A.    Yes.  Because as I think explained yesterday, the

9    original way I did it was just use the total number of core

10   fashion doll revenues by year, and then only really did the

11   last half of the schedule, which was subtract out the SKUs

12   that did not use the original sculpt.

13   Q.    And yesterday the court asked if you could show a list

14   of the ones with the original sculpt, the core fashion dolls

15   with the original sculpt?

16   A.    Yes.

17   Q.    And so that's what this Exhibit 24181 shows in detail

18   from Bates -1 to Bates -43?

19   A.    Correct.

20   Q.    Now, if you look at pages 48 and 49, you refer to

21   sources to help you identify what of these teenage fashion

22   dolls where the original sculpt and what were not; correct?

23   A.    That is correct.

24   Q.    And one of the things you cite to, if you look at

25   Exhibit 24179, which is the deposition of Paula Garcia,

 1   November 18, 2010 --

 2           Do you see that?

 3   A.   I don't have it in front of me, but I know that's the

 4   deposition.

 5   Q.   Let me give you a copy of that.

 6           THE COURT:  Just a moment, Counsel.

 7           MR. PRICE:  Your Honor, that's another one of the

 8   documents we provided to the court.

 9           THE COURT:  What page?

10           THE WITNESS:  Your Honor, in the Footnote A, it's

11   page 60, lines 1 through 19; and page 62, lines 2 through 9.

12       *(Pause.)*

13           THE COURT:  Okay.  Thank you.

14           Counsel.

15           MR. PRICE:  And if you look at page 62, kind of

16   the summary question of Ms. Garcia --

17           Can we put that up, Kenneth, or do we have that?

18           MR. KOTARSKI:  We don't have that.  Sorry.  I do

19   have her deposition.

20           MR. PRICE:  I'll just read it:

21       QUESTION*:  So with respect to the female Bratz*

22       *line of dolls, other than the fairies line; the*

23       *mother/daughter pack; the big sister/little sister*

24       *pack; the Bratz, the movie doll line; the Bratz*

25       *walking doll line, did the remainder of the female*

1        *Bratz line of dolls use the same head, torso, arms*

2        *and legs?*

3        ANSWER*:  Correct, with the exclusion of 2010.*

4    BY MR. PRICE:

5    Q.   Do you see that?

6    A.   I do.

7    Q.   Do you use that to help distinguish between the core

8    fashion dolls that used the original sculpt and those that

9    did not?

10   A.   Yes.

11   Q.   Did you modify that as a result of the testimony of

12   Mr. Larian in this trial?

13   A.   Yes, I did.

14        MR. PRICE:  And, your Honor, if I could bring up

15   Exhibit 24180.  It's excerpts from Mr. Larian's testimony

16   here at the trial.

17        *(Pause.)*

18   BY MR. PRICE:

19   Q.   And so, at trial, Mr. Larian identified some more

20   products which were not -- which were -- I'm sorry.

21        At trial, Mr. Larian identified some Bratz core

22   fashion dolls that did not have the original Bratz sculpt.

23   A.   Correct.  That were in addition to what Ms. Garcia

24   testified to in her deposition.

25   Q.   And did you rely on that on revising in your figures

1    after his testimony?

2    A.   Yes.  We tried to exclude all of the dolls that he

3    described in his testimony.

4             THE COURT:  Further reduction?

5             THE WITNESS:  Yes, your Honor.

6    BY MR. PRICE:

7    Q.   So what we end up with is what we have here in

8    Exhibit 24181?

9    A.   Correct.

10   Q.   So we talked about unjust enrichment trade secrets.

11            Let's talk now about the unjust enrichment

12   copyright.

13            MR. PRICE:  And, your Honor, I will -- just for

14   the court's reference, if you want to see the detailed

15   royalty analysis for trade secrets, that is at slides 27

16   through 39 for the total packet of trade secrets.

17            THE COURT:  Okay.  And for the copyright?

18            MR. PRICE:  The copyright analysis, which we have

19   not got to yet on the royalty analysis, your Honor, is going

20   to be slide 64.  That's a different analysis, which we'll

21   explain.  It's 64 and 65.

22            THE COURT:  I don't understand the royalty

23   analysis.

24            MR. PRICE:  Let's walk through the copyright so I

25   can -- so we can show your Honor.

```
 1              But if you wanted to see the detailed analysis
 2    that he was going to talk about with respect to
 3    Georgia-Pacific analysis on the trade secrets, then that
 4    would be the slides I talked to you about.
 5              It shows item by item.  For example, you can look
 6    after slide 31.  This is trade secrets.  You got the wrong
 7    slide up there.  This is one of the factors.  And Mr. Wagner
 8    will explain how this factor would increase or decrease from
 9    his baseline of 11 percent.
10        (Pause.)
11              THE WITNESS:  Was that a question, or a statement?
12              MR. PRICE:  We can go through these, your Honor,
13    but I think this just shows the detailed analysis that he
14    did.
15              THE COURT:  Well, flip them through quickly.  32.
16    BY MR. PRICE:
17    Q.   Okay.  It starts at -- that analysis starts at 27;
18    correct?
19    A.   It does.
20    Q.   And this is where you look at a license agreement that
21    kind of gives you a base number?
22    A.   A starting point for a negotiation.
23    Q.   And why did you use this agreement?
24    A.   I based on all the agreements that I reviewed, it
25    seemed to be closest in nature to the package of trade
```

33

1    secrets that I was trying to value.

2    Q.   Why?

3    A.   Because it was, basically, dealing with names and

4    characters and a logo for America's Next Top Model.  And one

5    of the parties to this agreement was a party to this

6    litigation, which is MGA; and the other party, the licensor

7    was CBS.

8    Q.   So, then, if you look at slide 28, this shows what that

9    agreement had for royalty rates; correct?

10   A.   Correct.

11          THE COURT:  28?

12   BY MR. PRICE:

13   Q.   Slide 28.  And you used the royalty rate for

14   11 percent.  Why?

15   A.   Because of the volume that's at issue in this case.

16   There are millions of units at issue, so I used the top rate

17   of 11 percent.

18   Q.   And then, if we look at 29, slide 29, you see it has

19   the Georgia-Pacific factors.  And you see you talk about how

20   analyzing them will either increase or decrease the relative

21   starting point?

22   A.   That was the purpose of this slide.

23   Q.   Slide 30, that shows the 15 factors that you

24   considered?

25   A.   Yes.

1    Q.   And then, if we look at 31, rates MGA pays for the use

2    of other comparable IP, you analyzed that and conclude that

3    would decrease the starting point?

4    A.   I did.  I looked at all the other license agreements

5    that were made available to me, and a number of them have

6    lower rates than my starting point rate.  So that would

7    cause me to want to lower the rate from the starting point

8    rate.

9         THE COURT:  I don't understand why we're doing

10   this.

11        MR. PRICE:  Oh, your Honor, if you wanted to go

12   through this detail, when we go, for example, back to

13   slide 21, those two right columns where Mr. Wagner allocates

14   the value of the Bratz name versus all trade secrets, you

15   recall he goes through a royalty analysis to compare the

16   royalty for all trade secrets to the royalty for Bratz.

17        THE COURT:  What's going to occur if I do not

18   allow the Georgia-Pacific analysis?

19        MR. PRICE:  If you don't allow even the discussion

20   of Mr. Wagner's methodology, that is, whether called

21   Georgia-Pacific, or what, just an analysis --

22        THE COURT:  Well, I might be willing to.  I don't

23   know yet.  But if I don't allow reference to

24   Georgia-Pacific --

25        MR. PRICE:  If you don't allow reference to

1    Georgia-Pacific, then I think we would go through his

2    analysis and just not attach the name "Georgia-Pacific";

3    that he started with a base royalty and then he made

4    adjustments based on various factors.

5            Of course, the reason we would --

6            THE COURT:  And the testimony wouldn't be,

7    although I know you would like it to be, that this was a

8    time-honored methodology that he was applying.

9            You see, there's my concern.  I mean, I can't be

10   any more direct about that.

11           THE WITNESS:  Your Honor, what you stated very

12   well before is that this, really, is a collection of factors

13   that are just commonly used and make sense.  And I could

14   just do my testimony, just talking about the facts and not

15   talk about Georgia-Pacific.  Talk about the number of

16   factors.  Just explain to the jury the facts I considered.

17           THE COURT:  So you would have some reasoning

18   behind the process.

19           THE WITNESS:  Right.  Right.

20           THE COURT:  All right.

21           MR. PRICE:  So, your Honor, we'll skip the

22   analysis because you kind of get a feel for what that

23   analysis is.

24           And the question is:  What it's labeled?

25   Obviously, I want to be heard on that.

 1              Now, let's look at that analysis for unjust

 2     enrichment for copyright.  And, your Honor, you said that

 3     you're not going to allow the theory of direct and indirect

 4     profits for the overall profits for copyright.  As an offer

 5     of proof -- and we won't go through it -- we've got

 6     slides 57 and 58, which show the analysis that would be done

 7     on copyright, if you used both the direct and indirect

 8     profits for all of MGA profits.  But I understand your

 9     ruling, so --

10              THE COURT:  Do you want to tear those up now,

11     or --

12              I'm just joking with you.  Keep them up.  They

13     look great.

14              MR. PRICE:  We want to keep them on the record,

15     obviously, so we have the offer of proof.

16              Let's give an example of the apportionment for

17     copyright by taking a category of the first four dolls --

18     I'll get to that.

19              THE COURT:  I've given you four plus two.  You got

20     six.

21              MR. PRICE:  We do have that.  We can do the Bratz

22     core fashion dolls with a sculpt as well.  Both of those.

23     Let's start at slide 59.

24              59, Ken.

25              Now, this shows your analysis on a portion of

```
 1   profits for copyright infringement, based upon MGA profits

 2   for the core fashion dolls with the original Bratz sculpts.

 3            THE COURT:  Let me make sure from the expert.  Are

 4   these four dolls?  Or are these the four, plus two that I'm

 5   letting --

 6            THE WITNESS:  No, your Honor.  That's on pages 61

 7   and 62.

 8            THE COURT:  Are these four dolls?

 9            THE WITNESS:  No, your Honor.  All of these dolls

10   that are in this exhibit that are the Bratz core fashion

11   dolls that used the original Bratz sculpt.  That's what this

12   figure 59 is calculating.

13            THE COURT:  Another way for me to think about this

14   are sculpts.

15            THE WITNESS:  Yes, your Honor.  Exactly.

16            THE COURT:  It's confusing me.  At the top is the

17   label Bratz core fashion dolls with original Bratz sculpt.

18            Let me repeat back to you:  I should be just

19   thinking sculpts?

20            THE WITNESS:  You should, your Honor.

21   BY MR. PRICE:

22   Q.   By Bratz core fashion dolls, you mean the teenage

23   fashion dolls; correct?

24   A.   Correct.

25   Q.   So you did an analysis of the profits that MGA had as a
```

 1    result of the sale of the dolls with the original sculpts;

 2    correct?

 3    A.    Correct.

 4    Q.    And your conclusion of MGA's profits was 280.3 million?

 5    A.    It was.

 6    Q.    And that is the second column here after the corporate

 7    benchmark?

 8    A.    It is.

 9    Q.    Now, again, did you --

10          THE COURT:  Is this, 46/54 split?

11          THE WITNESS:  You know, I haven't calculated this

12    one, your Honor.  It's close, because as I said before --

13          THE COURT:  For Mattel.

14          THE WITNESS:  I can't -- it's probably pretty

15    close.  But, your Honor, each year is independent, and it

16    depends --

17          THE COURT:  But I'm never sure what slide I'm

18    looking at.  I'm not sure if I'm looking for a compilation

19    of years, or if I'm looking for one year.

20          THE WITNESS:  I'm only presenting the compilation

21    of the damage period in these summary charts.

22          THE COURT:  This is a compilation, 2000 --

23          THE WITNESS:  2001 through 2010.  All of them

24    cover that time period, your Honor.

25          THE COURT:  Counsel.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   BY MR. PRICE:
 2   Q.   So you've calculated MGA's profits from the sculpts at
 3   208.3 million; correct?
 4   A.   Correct.
 5   Q.   And then you have, again, the benchmark corporate
 6   profits which gives some of that to MGA and some of Mattel;
 7   correct?
 8   A.   Right.  And using the Mattel yardstick, the majority or
 9   more than 50 percent would go to MGA and less than
10   50 percent would go to Mattel.
11   Q.   And that's the same method you talked about before?
12   A.    It's the exact same methodology.  Again, the facts are
13   different, because the amount of sales of these products
14   aren't identical by year to the sales that I used in the
15   unjust enrichment calculation we went over, so the
16   apportionment between the two companies may be slightly
17   different.
18   Q.   Because you are using different years?
19   A.   Correct.
20   Q.   And then, what we have in the fourth column in yellow
21   is the amount that is apportioned to the Mattel -- Mattel's
22   right to its copyrights?
23   A.   That is correct.
24   Q.   So at this point did you, again, try to do an analysis
25   to see, well, if the jury --
```

| | |
|---|---|
| 1 | Well, what did you do next? |
| 2 | A.   Well, what I did next was trying, again, to value the |
| 3 | copyright portion of this.  I looked at the 10 largest |
| 4 | customers -- I should say, licensees of Mattel of its |
| 5 | copyrights.  And I think we have a chart on that, which is |
| 6 | chart 64.  And these license agreements have a range of |
| 7 | royalty rates.  They go from a minimum to a maximum, based |
| 8 | on certain circumstances. |
| 9 | And I looked at the average of the low rates in |
| 10 | these agreements, the lowest rates and that was 8 percent. |
| 11 | And I assumed that that would be in effect the lowest rate |
| 12 | that Mattel would be willing to accept for its copyrights. |
| 13 | Particularly, because all of these yardsticks are not with |
| 14 | competitors but are with partners who are helping extend |
| 15 | their Barbie product line and helping them in their efforts, |
| 16 | so I thought this was a conservative and reasonable |
| 17 | yardstick to determine the percentage of this intellectual |
| 18 | property that is related to copyright. |
| 19 | Q.   Let's go back to 59 where you have allocated or |
| 20 | apportioned the profits between MGA and Mattel using the |
| 21 | benchmark; right? |
| 22 | A.   Yes. |
| 23 | Q.   And let's go to slide 60.  There you have that |
| 24 | additional column in yellow, which is profits attributable |
| 25 | to Mattel's copyrights. |

1          Could you tell us how you calculated that?

2     A.   Yes.  Remember earlier I said that the total bundle of

3     rights which include all the copyrights and trade secrets I

4     valued at 15 percent.  Then, as I just told you, I valued

5     the copyrights at 8 percent.  So I'm really at 8/15ths or

6     approximately 23 percent of this total profit above the

7     benchmark to the copyrights, and that's the last column.

8          MR. PRICE:  Your Honor, Mr. Wagner did, again, the

9     same methodology for the first four dolls and Ooh La La Cloe

10    and Funky Fashion.  Same analysis.  That's slides 59 and 60.

11         THE COURT:  No, it's not 59 and 60.

12         THE WITNESS:  61 and 62.

13    BY MR. PRICE:

14    Q.   61 and 62.  Thank you.

15         This is -- one of the changes, here, is that if

16    you look at MGA's profits for the first four dolls and then

17    Ooh La La Cloe and Funky Fashion Dana, MGA's profits are

18    31.7 million.  That's that second column; right?

19    A.   It is.  That's the profits from just those six dolls.

20    Q.   And then.  You do the same analysis where you apportion

21    according to the benchmark?

22    A.   I do.

23    Q.   And that's the third and fourth columns?

24    A.   It is.

25    Q.   And then, slide 62, then you apply the royalty rate to

1    come up with profits attributable to the copyrights?

2    A.   Right.  I apportioned approximately 53 percent of this

3    total excess profits to the copyrights by themselves.

4              MR. PRICE:  Your Honor, Mr. Wagner is also

5    prepared to testify to a different damages methodology which

6    is just a royalty rate methodology; that is, you don't look

7    at apportionment of these profits.  You just calculate a

8    royalty rate on the sales.

9              MS. KELLER:  Your Honor, we would object to this

10   eleventh hour changing of methodologies.  We've already seen

11   a change in the rate schedules as of today, but this is a

12   complete change in methodology.  It's literally being sprung

13   on us.

14             THE COURT:  Let me hear what this methodology is.

15             MR. PRICE:  It's in his reports.  It's been a

16   methodology we presented --

17             THE COURT:  I thought it was, too.

18             MR. PRICE:  And I know the court has expressed

19   concern about this methodology, but I wanted to distinguish

20   this methodology from the use of the reasonable royalty

21   rates to allocate among the trade secrets.

22   BY MR. PRICE:

23   Q.   And if we could look at -- I think it's slide 52, which

24   shows your calculation of a pure royalty analysis what

25   royalties would be due for use of Mattel's Bratz name trade

1    secret.

2    A.    That it would be, the bottom right-hand number of

3    198.2 million which is made up of two parts.  It would be a

4    5 percent royalty on their product sales and a 17 percent

5    royalty on their licensing and other revenue.

6    Q.    And that's the analysis that you showed us last night

7    when you calculated the 5 percent on trade secret and

8    17 percent on licensing?

9    A.    Yes.

10   Q.    So the bottom line here would be there would be

11   $198.2 million in royalties due for use of the Bratz trade

12   name secret?

13   A.    Yes.

14   Q.    And then, if we go to 53, could you tell us what this

15   is?

16   A.    Yes.  This is just the difference between the royalty

17   of 15 percent for all of the intellectual property, and the

18   5 percent for the copyrights -- pardon me, 5 percent for the

19   trade name.  So 10 percent is the rate I would come up with

20   for all the rest of the trade secrets absent the trade name.

21   Q.    And then, 33 percent of the licensing?

22   A.    Yes.  That's two-thirds of the 50 percent that I had

23   for the full bundle of rights.  So, again, this is a

24   percentage of the more profitable licensing revenue stream.

25   Q.    And if you look at slide 54, does that reflect your

1   calculation of royalties due for Mattel's trade secrets,

2   excluding the Bratz name?

3   A.   Yes.

4   Q.   And this is just a pure royalty analysis not a portion

5   of MGA's profits or lost profits?

6   A.   That is correct.

7   Q.   And the bottom line on royalties due for Mattel's trade

8   secrets, excluding the Bratz name, would be 396.5 million?

9   A.   That is correct.

10  Q.   And if you look at slide 55, could you tell us what

11  that is?

12  A.   This is really doing the exact same royalty

13  calculations but for seven different buckets of possible

14  sales.

15  Q.   And that includes -- for trade secrets, you start with

16  all Bratz, but then you break out for the core fashion dolls

17  accessories, et cetera; correct?

18  A.   Correct.

19  Q.   Now, for copyrights, did you also calculate a damages

20  number, based just on royalties that would be due?

21  A.   I did.

22  Q.   And if you look at page 66 -- let's start with 65.  And

23  I believe you testified, again, last night about these

24  figures.

25            These were the figures that you arrived at as a

1   reasonable royalty rate for copyright?

2   A.    I did.

3   Q.    And you explained that 8 percent tonight.

4   A.    I did, again.

5   Q.    If you look at 66, could you tell us what that is?

6   A.    Again, this is my calculation of a royalty for all the

7   sales of Bratz products related to copyright.  And it would

8   be 8 percent to product sales and 27 percent to licensing

9   revenue for a total of 317.2 million.

10  Q.    But you broke that out; correct?

11        On slide 67, you broke that number out so that we

12  have a royalty summary on specific buckets; correct?

13  A.    It's the same seven buckets that I did for the trade

14  secrets.

15  Q.    So --

16        THE COURT:  I'm sorry.  I'm confused about

17  something.

18        You see all Bratz 317.2 at the top?

19        THE WITNESS:  Yes, your Honor.

20        THE COURT:  Is that --

21        THE WITNESS:  Yes, it is, your Honor.

22        THE COURT:  That's a compilation.  In other words,

23  that's my total at the top?

24        THE WITNESS:  Right.  And you said yesterday that

25  you're not going to let this in.  They asked me to tell you

1    the number.

2            THE COURT:  I wanted to hear it one more time.

3    But the 317 is simply the addition of 105.3 --

4            Look at the top number.  I'm really confused by

5    something.  17.2 million.

6            THE WITNESS:  Your Honor, it's the calculation we

7    just did on tab 66, which is a 8 percent royalty on,

8    approximately, $3 billion worth of sales and a 27 percent

9    royalty on, approximately, 250 million.  So that's the

10   royalty on the full $3.4 billion worth of Bratz sales.

11           MR. PRICE:  We understand that for copyright you

12   are not going to permit that large bucket, so we're doing

13   this really as an offer of proof for the record.

14   BY MR. PRICE:

15   Q.   I think the category that we talked about is if you go

16   four down, you've got Bratz core fashion dolls with the

17   Bratz sculpts.  And you calculated what the royalty would be

18   due on a royalty rate of 8 percent for that; correct?

19   A.   Correct.

20           MR. PRICE:  So, your Honor, those -- so those last

21   lines, 52, 53, 54, 55, 65, 66, 67 are on just a pure royalty

22   theory.

23           THE COURT:  Just a moment.  So 64 through 67?

24           MR. PRICE:  Let me read those again, your Honor.

25           It would actually be 51, 52, 53, 54, 55, 65, 66,

1    and 67.

2              THE COURT:  All pure royalty.

3              MR. PRICE:  That's a pure royalty methodology.

4              The purpose of this was to explain Mr. Wagner's

5    methodology.

6              And I'll leave it to you and MGA.

7              THE COURT:  Thank you very much, Mr. Price.  I

8    appreciate that.

9         *(Pause.)*

10             THE COURT:  Mr. Cote, would you like to go first

11   tonight?

12             MR. COTE:  Sure, I can do that.  I'm going to be

13   very brief, your Honor.  Thank you.

14                        RECROSS-EXAMINATION

15   BY MR. COTE:

16   Q.   Good evening again, Mr. Wagner.

17   A.   Good morning, Mr. Cote.

18   Q.   How are you doing?

19   A.   Fine.  Thank you.

20   Q.   I want talk to you about reasonable royalty tonight.

21   Again, I'm just going to talk to you about the Mexico

22   documents.

23             But before I get there, let me just make sure I

24   understand how you did a reasonable royalty for the other

25   parts of the case.  Your process starts with a baseline

1  royalty rate; right?

2  A.   That is correct.

3  Q.   And we saw a slide today where you used a rate of

4  11 percent, something like that; right?

5  A.   I did.

6  Q.   Now, when you calculated the reasonable royalty for

7  Mr. Machado for the Mexico documents, you didn't start with

8  a baseline rate from some contract like you did for all your

9  other analyses; right?

10  A.   I did not.

11  Q.   The second step, once you had the baseline rate, is to

12  use what we have been referring to as the Georgia-Pacific

13  factors; right?

14  A.   I did.

15  Q.   And whether you call them the Georgia-Pacific factors

16  or whether you call them common sense inklings, you applied

17  them in all the cases where you're dealing with the Bratz

18  IP; right?

19  A.   I did.

20  Q.   There were different types of IP involved, excluding

21  the Mexico documents.

22       You did some copyright work; right?

23  A.   I did.

24  Q.   You did some trade secrets work?

25  A.   Yes.

1    Q.   And you did some trade secrets associated with just

2    some names of products, Bratz and I think Moxie was the

3    other one.

4              Am I right?

5    A.   Well, I did that originally in my reports, but I'm not

6    offering that opinion at trial.

7    Q.   I just want to understand your process.  Is that -- did

8    I say it right?

9    A.   You were correct.

10   Q.   Okay.  And you went through each of the factors for

11   each of those different types of intellectual property;

12   right?

13   A.   I did.

14   Q.   And you would agree with me that your analysis of the

15   factors was different for the different types of property;

16   right?

17   A.   Yes.

18   Q.   I don't need to show you the two charts you did to have

19   you agree with me on that point; right?

20   A.   You did.

21   Q.   You would expect intellectual property to have

22   different Georgia-Pacific type analysis, depending on the

23   type of property and the unique circumstances of it?

24   A.   Yes, it's factually based.

25   Q.   Now, you didn't go through the Georgia-Pacific factors

1   explicitly when you were talking about the Mexico documents;

2   right?

3   A.   That's a fair statement.

4   Q.   And in the section of your report that discusses the

5   Mexico documents, you didn't mention the factors at all?

6   A.   I did not.

7   Q.   Last step in the process you have, you start with your

8   base rate.  You use your factors to raise the base rate up

9   or down; and then, you multiply the final rate by something;

10  right?

11  A.   Yes.

12  Q.   And in excluding the Mexico documents, the something

13  you multiply your final rate by was sales; right?

14  A.   Well, not revenues.  Different types of revenue.

15  Q.   Fair enough.  Revenues.  And the reason you did that is

16  because the idea is that the -- having the intellectual

17  property caused, or was the basis for having the sales;

18  right?

19  A.   Well, at least contributed to the sales.

20  Q.   Okay.

21          THE COURT:  What do calculations look like, if I

22  didn't allow the Georgia-Pacific factors and limited you to

23  lost profits, finding that there was no unjust enrichment

24  concerning Machado?

25          What would that look like?

```
 1              THE WITNESS:  Well, all I would have is my avoided
 2    cost remedy.  I would not be offering also a royalty
 3    opinion.
 4              THE COURT:  Can you show me what that would look
 5    like?
 6              THE WITNESS:  Yes, your Honor.
 7              THE COURT:  Would you, please, and ask Mr. Price
 8    to help with that for just a moment.
 9              Counsel, I just want to look for a moment.
10              MR. PRICE:  Do you want the entire analysis, or
11    just the bottom line?
12              THE COURT:  Just the bottom line.
13              MR. PRICE:  If you could turn to --
14              MR. COTE:  69.
15         (Pause.)
16              THE WITNESS:  Your Honor, the bottom line --
17              MR. PRICE:  I'm sorry, your Honor.  I may have
18    been confused by your question.
19              Were you asking for lost profits on -- against
20    MGA?
21              THE COURT:  Just a moment.
22         (Pause.)
23              THE COURT:  I don't know what total avoided costs
24    are.  It's just a word to me.
25              I want to come back and ask:  If you were
```

```
 1    precluded from a Georgia-Pacific analysis -- I want you to

 2    take me through a lost profits analysis on your part not

 3    using the Georgia-Pacific factors.  How would you go about

 4    that?

 5               THE WITNESS:  Your Honor, it would stop at the

 6    $6.5 million number.  If you avoid a cost, that is profits

 7    because profits are a difference between revenue and costs.

 8               MR. PRICE:  So you're asking just with respect to

 9    the Mexico documents?

10               I want to make sure you didn't want to go back to

11    lost profits and MGA.

12    BY MR. COTE:

13    Q.   Let me follow up on that a little bit.  I want to be

14    clear with what we're talking about with lost profits.

15               You are not opining that MGA sold a single doll

16    because of documents from Mexico; right?

17    A.   I am not.

18    Q.   Not a single marginal sale; right?

19    A.   I have seen no evidence of that.

20               THE COURT:  Excuse me.  So you're going to call

21    these avoided costs?

22               THE WITNESS:  Yes, your Honor.

23               THE COURT:  Not lost profits.

24               THE WITNESS:  I'm not going to use that term,

25    although you could use it, but I wasn't planning on using
```

1   that term.

2           THE COURT:  So when I see "avoided costs" in my

3   mind, I should be thinking about lost profits or lost

4   profits avoided costs.

5           THE WITNESS:  They're the same thing actually,

6   your Honor.

7           THE COURT:  Counsel.

8   BY MR. COTE:

9   Q.   We talked about this analysis that's up on the screen

10  yesterday.  We called it unjust enrichment; right?

11  A.   You could also call it that as well.

12  Q.   That's what you called it?

13  A.   Yes.

14  Q.   Because you don't have any evidence that MGA got even a

15  single sale from having these Mexico documents; right?

16  A.   You are correct.  I've not seen that evidence.

17          THE COURT:  So "unjust enrichment" would be a more

18  appropriate term?

19          THE WITNESS:  Well, that's another term as well.

20  Yes, your Honor.

21  BY MR. COTE:

22  Q.   And just to complete the scenario, you don't have any

23  evidence that Mattel lost a single sale because Mr. Machado

24  purportedly copied the Mexico documents; right?

25  A.   I have seen no evidence on that subject either.

54

```
 1    Q.   So none of your analysis has anything to do with sales,
 2    whether lost by Mattel or whether gained by MGA as a result
 3    of the Mexico documents; right?
 4    A.   That is correct.
 5    Q.   So your unjust enrichment theory is really just a
 6    theory of disgorgement; right?
 7    A.   Yes.
 8    Q.   Now, backing up a little bit, we were talking about the
 9    first step is you find an initial rate.
10         What was the term we used?
11    A.   You used "baseline."
12    Q.   Thank you.  That's the term you used, too; right?
13    A.   I think I said it was a starting point.
14    Q.   Okay.  So you use a starting point or a baseline rate.
15    That's step one; right?
16    A.   Yes.
17    Q.   Step two is you apply the factors to make it go up or
18    down; right?
19    A.   Yes.
20    Q.   Step three is you multiply that rate by something;
21    right?
22    A.   You do.
23    Q.   And as we just agreed, MGA didn't get any sales from
24    having them, Mexico documents, as far as you know?
25    A.   I've said it a number of times yesterday and today, I
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   haven't seen any of that evidence.

2   Q.   So you couldn't multiply it by the sales; because if

3   you did, you would be multiplying a percent times zero, and

4   you would get what?

5   A.   Any number multiplied by zero is zero.

6   Q.   So if you tried to apply your royalty analysis to sales

7   with respect to the Mexico documents, you would have

8   nothing; right?

9   A.   Well, I have no evidence of it.  It's not saying it

10  didn't happen, but I have no evidence to apply it.

11  Q.   With everything that you know if you were to do that

12  analysis, your result would be a royalty of zero; right?

13  A.   Based on the information I have today.

14  Q.   And that's why you didn't use sales; right?

15  A.   Clearly.  If I have no evidence, I'm not going to use

16  sales.

17  Q.   That's why you used this cost number instead?

18  A.   Yes.  It's an alternative measure.

19  Q.   And you only did that for the Mexico documents; right?

20  A.   No, I did it for other documents as well besides the

21  Mexico documents.  I did it for the Canada documents, the

22  Castilla documents and others.

23  Q.   You didn't do it for any of the Bratz IP; right?

24  A.   That is true.

25          MR. COTE:  Thank you.

56

| | |
|---|---|
| 1 | THE WITNESS:  Thank you. |
| 2 | THE COURT:  All right. |
| 3 | MS. KELLER:  I just have a few, your Honor. |
| 4 | RECROSS-EXAMINATION |
| 5 | BY MS. KELLER: |
| 6 | Q.   Mr. Wagner, you're aware that the court has allowed |
| 7 | only six of the Bratz dolls for the copyright infringement |
| 8 | claim; correct? |
| 9 | A.   I am. |
| 10 | Q.   And you are aware, also, that the court allowed the |
| 11 | copyright infringement claim with respect to the sculpts; |
| 12 | right? |
| 13 | A.   I understand that as well. |
| 14 | Q.   And you calculated profits from all Bratz dolls using |
| 15 | the sculpts at 280 million on your slide 34; correct? |
| 16 | A.   That 280 million is for all of the core fashion dolls |
| 17 | that include the sculpt. |
| 18 | THE COURT:  Just a moment.  Put up slide 34, |
| 19 | please. |
| 20 | MS. KELLER:  Is it 39 now? |
| 21 | THE COURT:  39.  That's fine.  Take your time.  I |
| 22 | want to see it. |
| 23 | *(Pause.)* |
| 24 | MS. HURST:  22. |
| 25 | THE COURT:  Now, 22.  It's moving. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              MR. PRICE:  That's for profits.  Do you mean
2    copyright?
3              Copyright, I think, is 59.
4              MS. KELLER:  Yes, it is.
5         (The document was published in open court.)
6    BY MS. KELLER:
7    Q.   So you calculated the profits from all Bratz dolls that
8    used the sculpts, okay, at 280 million?
9    A.   Correct.
10   Q.   But the court excluded the later Generation dolls from
11   the copyright claim based on the sculpts; right?
12   A.   I don't understand that, no.
13   Q.   Well, let me read you Footnote 9 from the summary
14   judgment order, quote:  This does not constitute a finding
15   that subsequent Generation dolls infringe.  The grant of
16   summary judgment on that issue is absolute, okay?
17   A.   I'm not dealing with liability.  If I have the wrong
18   base, I would not present the calculation.
19   Q.   And the base would be the first Generation Bratz dolls,
20   plus Ooh La La Cloe and Formal Funk Dana; right?
21   A.   If you ask me to assume you have a correct
22   interpretation, that would be the calculation.
23   Q.   But the 280 million includes all the subsequent
24   generations; right?
25   A.   They include all dolls that infringe, I understand, the
```

```
 1   original sculpt, but, yes.  To answer your question, yes.
 2   Q.   It includes all subsequent Generations?
 3   A.   It does.
 4   Q.   If we assume that Footnote 9 actually means what it
 5   says, then the subsequent Generation dolls shouldn't have
 6   been included in this figure; right?
 7   A.   If you're asking me to assume this is the wrong base,
 8   I'll agree with you.  I don't deal with the liability
 9   issues.
10   Q.   I'm just asking you to assume that the court's order
11   says what it is, okay, and that's that the grant of summary
12   judgment on that issue is absolute.
13           MR. PRICE:  Your Honor, I'm going to object.  You
14   know what you said, and there's an alternative -- another
15   calculation.  I just don't think we're getting anywhere.
16   BY MS. KELLER:
17   Q.   Well, this 280 million that includes the subsequent
18   Generation dolls, that includes profits on all the dolls,
19   including all fashions, the hairstyles, the face paint, the
20   packaging, all those things; right?
21   A.   It would include the entire product, yes.
22   Q.   So not just the sculpt, of course.
23   A.   No, you don't sell a sculpt.  This is the products that
24   use the sculpts.
25   Q.   So no, matter what later changes were made in terms of
```

```
 1   fashion and hair and face paint and everything, you included
 2   it anyway?
 3   A.   I did.
 4   Q.   And the number, for example, includes profits on Bratz
 5   Wild Wild West Fianna; correct?
 6   A.   I don't have all it memorized, but I believe that would
 7   be in there.
 8   Q.   Okay.  And let's talk about your lost profits analysis.
 9            At least as of yesterday, your calculation for
10   Mattel's lost profits was around 323 million; right?
11   A.   It was.
12   Q.   That number included Mattel's supposed lost profits on
13   every single Bratz product ever made; right?
14   A.   I don't think so.  No, I think I explained yesterday
15   that I excluded all the market expansion sales from my
16   analysis of lost profits.
17   Q.   No, I'm talking about you calculated profits looking at
18   everything single Bratz product of any kind ever made;
19   right?
20   A.   Oh, I started that way, yes.  I agree with that.  I'm
21   sorry.
22   Q.   Without respect to then what you did with the numbers,
23   you were calculating your numbers based on every Bratz
24   product ever made; right?
25   A.   I included all of their sales of Bratz products, yes,
```

1    in my analysis.

2    Q.    So it was considerably more than just the first four

3    dolls:  Ooh La La Cloe and Formal Funk Dana; right?

4    A.    That is correct.

5    Q.    And it was also even more than what you called the

6    Bratz core fashion dolls; right?

7    A.    It is.

8    Q.    And so, if we look at B12 of your February 7th, 2010

9    report, Schedule 1 is your calculation of Mattel's lost

10   profits allocated among the various MGA categories; right?

11   A.    Yes.  Yes, I'm sorry.

12   Q.    So, for example, you're saying that Mattel has lost

13   profits of 45 million attributable to Bratz accessories for

14   core fashion dolls; right?

15   A.    That is correct.

16   Q.    And 10 million for Big Babyz and Kidz; right?

17   A.    Yes.

18   Q.    And 6.9 million for sporting goods.  That's all part of

19   Mattel's lost profits, according to your analysis; right?

20   A.    It is.

21   Q.    Electronics, 15 or 16 million; right?

22   A.    I think, it's 15 million.

23   Q.    And you claim that part of Mattel's lost profit is

24   72 million for licensing?

25   A.    Yes.

1  Q.   And if we look at Schedule 1.1 of that same tab, that

2  shows how you assigned a portion of the 323 million that you

3  say are Mattel's lost profits to each Bratz product SKU;

4  right?

5  A.   That is the attempt of the schedule, yes.

6  Q.   So using this schedule, we could figure out what you

7  think Mattel's lost profits are for the first four dolls,

8  plus would Ooh La La Cloe and Formal Funk Dana?

9  A.   You could do that.

10  Q.   And you could also figure out what you think Mattel's

11  lost profits are for the core fashion dolls using the

12  sculpt; right?

13  A.   You could do that.

14  Q.   And the lost profits from the first four days plus

15  Ooh La La Cloe and Formal Funk Dana would come to

16  7.5 million?

17  A.   I haven't done the calculation.  I'm assuming that

18  you've done it correctly.

19  Q.   Okay.  That sounds about right, doesn't it?

20  A.   I think that would be about right, yes.

21  Q.   7 1/2 million.

22       And the lost profits from what you call the core

23  fashion dolls, and the core fashion dolls being any doll

24  that used the same sculpt that was found in the first four;

25  right?

1    A.    Yes.

2    Q.    And that would be lost profits from core fashion dolls,

3    using the sculpt would be 103.5 million; right?

4    A.    Correct.

5              THE COURT:  Just a moment, Counsel.  Just a

6    moment.

7         *(Pause.)*

8              THE COURT:  Counsel, do you have a printout of

9    this?

10             MS. KELLER:  Of this outline?  We can make you

11   one.

12        *(Pause.)*

13   BY MS. KELLER:

14   Q.    Now, you testified yesterday --

15             THE COURT:  Just give me one moment.  I'll be

16   right with you.

17        *(Pause.)*

18   BY MS. KELLER:

19   Q.    And if we look again at Exhibit 24181, today's

20   brand-new schedule revised as of today, March 1st, if you

21   look at page 21 of the many dolls you have listed about

22   seventh down is Bratz Wild Wild West Fianna?

23   A.    I see that.

24   Q.    And that was actually one of the dolls that the

25   Ninth Circuit opinion specifically found should not have

```
 1   been included; right?
 2   A.    I don't recall that.
 3   Q.    And if you look at page 8 -- actually page 4 that
 4   exhibit, if you go down about eight, you see Bratz
 5   Funk 'N' Glow Jade?
 6   A.    I see that.
 7   Q.    That was another one that was specifically named in the
 8   Ninth Circuit opinion as one that shouldn't have been
 9   included; right?
10         MR. PRICE:  I'm going to object.  It's irrelevant
11   for the lost profits damage analysis.  Calling for a legal
12   conclusion.
13         MS. KELLER:  It's just calling for a reading of
14   the opinion.
15         THE COURT:  How would this come out in front of a
16   jury?
17         MS. KELLER:  Well, that's a really good question,
18   but --
19         THE COURT:  I'm going to let you ask.  There is no
20   harm.
21         But how does this come out in front of a jury?
22         MS. KELLER:  Your Honor, I don't think it should.
23   And the reason I don't think it should is that none of this
24   stuff should go to the jury.  I mean, this is law of the
25   case.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1          And Mr. Wagner did say yesterday -- I think it was

 2     yesterday.  I'm losing track of time -- that he considered

 3     the Ninth Circuit opinion.  He read it.

 4          THE COURT:  This should be part of the reduction

 5     analysis.

 6          MS. KELLER:  I think it should be part of the

 7     court's analysis for why these calculations are both

 8     unreliable and prohibited by the law of the case.

 9     BY MS. KELLER:

10     Q.   Let's talk for a second about the Larian distribution.

11          You testified that Isaac Larian's Bratz profits

12     distributions, you calculated from 2002 through 2008 was

13     384 million; right?

14     A.   That sounds right.

15     Q.   And that was -- at least yesterday, it was Mattel's

16     slide 26.  I'm not sure what it is now.

17          MR. PRICE:  It's 73 of this --

18          MS. KELLER:  Okay.  Can we put that up?

19          *(The document was published in open court.)*

20     BY MS. KELLER:

21     Q.   Now, there is duplication in the numbers for the total

22     unjust enrichment in the Larian distributions; right?

23     A.    If you are saying -- if I think I understand your

24     question is that if MGA is required to pay the unjust

25     enrichment, this amount would be duplicative of that amount.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    I agree with you.

2    Q.   Okay.  So you didn't determine what portion of that

3    384 million is attributable to what Mattel is claiming are

4    the Bratz trade secrets and what portion is attributable to

5    the copyright; correct?

6    A.   Correct.  I did not do that analysis here.

7    Q.   And in your November 12th, 2010 corrected report, at

8    page 40 --

9    A.   Actually, can I stand corrected?

10           If you look at Exhibit 76, I have done that now,

11   but it was not in my original report.

12   Q.   When you say, "I have done that now," when was the

13   "now"?

14   A.   Within the last couple days.

15   Q.   When you look at Isaac Larian's benefit from sales of

16   Bratz products, your November 12th corrected report, you

17   said:  *Isaac Larian's benefit from sales of Bratz product is*

18   *determined to be MGA's distributions to Mr. Larian*

19   *attributable to Bratz associated with his proportional*

20   *ownership interest in MGA's income*; right?

21           And you did not determine what portion of that

22   384 million is attributable to the first four dolls, plus

23   Formal Funk Dana and Ooh La La Cloe; right?

24   A.   That is correct.

25   Q.   And you also did not determine what portion is

1   attributable to the core fashion dolls using the sculpt;

2   correct?

3   A.   That is correct as well.

4   Q.   And you did not determine what portion of the 384

5   million is attributable to the Bryant drawings; right?

6   A.   I did not isolate it to the drawings.

7   Q.   Or to the sculpt?

8   A.   That is correct.

9   Q.   Or to the name Bratz?

10          So the 384 million is a total number that is

11  attributable to Mr. Larian's distributions for all of Bratz

12  product, all Bratz licensing, all Bratz accessories; right?

13  A.   That is correct.

14  Q.   Bratz Boyz?

15  A.   That is included.

16  Q.   Bratz Petz, Little Bratz, Bratz Babyz, Bratz Kidz, the

17  Bratz FM Cruiser, Bratz Inflatable Lounge, all that.

18          Is that right?  Everything Bratz?

19  A.   That is correct.

20          MS. KELLER:  Nothing further.

21          THE COURT:  All right.  Anything further by either

22  party?

23          MR. PRICE:  No, your Honor.

24          THE COURT:  Ms. Keller?

25          MS. KELLER:  No more questions.

```
 1              THE COURT:  Mr. Cote.

 2              MR. COTE:  No, thank you, your Honor.

 3              THE COURT:  Sir, thank you very much.

 4              Do you want to see if we can pay the courtesy to

 5    Mr. Holden tonight?

 6              MS. HURST:  Your Honor, we would like to have

 7    argument on this, because the witness is going to go on the

 8    stand soon.

 9              THE COURT:  Certainly.  Who would like to start?

10              MS. HURST:  It's our motion, your Honor, we would

11    like to start.

12              THE COURT:  Please.

13              MS. HURST:  Your Honor, the unjust enrichment

14    calculation is inadmissible for two independent reasons.  At

15    least two independent reasons.  The unjust enrichment

16    calculation, even with the apportionment.  Actually --

17    pardon me, putting aside the apportionment just focusing on

18    the benchmark analysis, the benchmark analysis is a false

19    comparison.  It is a comparison between MGA's Bratz only

20    incremental products, profits and the remaining toy

21    companies earnings before interest and taxes.  Which means

22    that for all of the remaining companies, Mr. Wagner has

23    taken both their entire product lines, and he has washed out

24    all of the fixed expenses associated with all of those

25    product lines.  Whereas for MGA Bratz only, he has not
```

1    washed out all of the fixed expenses.

2           And we know this is a false comparison, because if

3    you take MGA's total company EBIT, it's less than half of

4    the 792 million figure.

5           And this is the transcript from last night, your

6    Honor, at pages 85 to 87.  So at page 85, Mr. Wagner agrees

7    the MGA EBIT would be 385.6 million.  But the incremental

8    Bratz profits that he used in making his benchmark is 792.4.

9    It's off by 100 percent.

10          If you compare it, apples to apples instead of

11   apples to oranges, that's not just a quibble about which

12   expenses should be included.  That's not just an argument,

13   *Oh, he failed to include some and not others.*

14          THE COURT:  Stop just a moment.

15      *(Pause.)*

16          THE COURT:  What do you mean by incremental

17   products -- profits?

18          MS. HURST:  Right.  So Mr. Wagner in doing his

19   benchmark comparison used what he called the Bratz

20   incremental profit number to calculate the profitability

21   percentage.  He used the 792.4 number.  And then he made his

22   benchmark comparison of MGA's profitability percentage using

23   the 792.4 number.  He calculated his percentages only on

24   Bratz incremental profits.  But then when he compared that

25   792.4 calculated percentage of profitability to all the

1    other toy companies, he didn't just limit it to the

2    incremental profitability of a single product line.

3    Instead, he took the entire company's toy lines, and he

4    washed out all of the fixed expenses, too.  So he

5    dramatically lowered their profitability with respect to the

6    comparator company.  He dramatically lowered their

7    profitability by taking out all fixed expenses, which he did

8    not do using the incremental profit and 792.4 figure for

9    Bratz.

10           And he says it right in pages 86 and 87 from last

11   night's transcript.  At 86, line 18:

12       QUESTION: *And when you compared MGA Bratz*

13       *products, you picked out MGA Bratz products and*

14       *you compared them against toy companies all their*

15       *products; right?*

16       *ANSWER:  Yes.  I used the average profitability of*

17       *those toy companies.*

18       *QUESTION:  Right.  But you didn't take MGA's*

19       *average profitability versus Mattel's average*

20       *profitability versus, say, Jakks' and Hasbro's*

21       *average profitability.  You pulled out Bratz as a*

22       *unit out of all the other MGA products; right?*

23       *ANSWER:  You are correct.*

24           MS. HURST:  And then you go on and he continues to

25   answer that he did not compare product line to product line

1    or total company to total company.   Instead, he compared
2    product line to total company.
3           Now, he admits that if he had taken the total
4    company profitability for MGA against the total company
5    profitability for the others, then the total company number
6    he would have had to start with for MGA is 385.6, not 792.4.
7    He admits that right on page 85:   *The MGA EBIT is*
8    *385.6 million.*
9           That is an error rate in the benchmark comparison
10   of more than 100 percent.   That doesn't go -- that's not
11   just weight.   That is admissibility.   It is a false
12   comparison.   When you admit you're not comparing apples to
13   apples as he did in this courtroom and in his deposition,
14   and when you have an error rate, a comparison -- a
15   comparator rate that is off by 100 percent.   He's comparing
16   to apples to oranges.   He admits he's comparing apples to
17   oranges.   And as the court saw last night -- and we're not
18   even to the Georgia-Pacific issue yet.   We're just looking
19   at this benchmark comparison now.   As the court saw last
20   night, if you just took the average profitability either on
21   a Mattel Barbie brand to MGA Bratz brand, average basis; or
22   on a MGA total company Bratz basis, to comparator total
23   company basis, if you just did that, then this entire excess
24   profitability would go away.   Because there would be zero
25   excess profits if you compared on either an apples to apples

1    basis, or an oranges to oranges basis.

2            That demonstrates absolutely that this method is

3    unreliable.  This is not just a quarrel in judgment.  It is

4    a false comparison.  It's a false comparison, your Honor.

5    And we haven't even gotten to the Georgia-Pacific problem,

6    yet.

7            Then, independently of this false comparison in

8    the unjust enrichment apportionment -- and now this doesn't

9    matter if you're talking about trade secret or copyright.

10   It doesn't matter.  He used that same benchmark comparison

11   analysis for both types of claims.  And he uses the false

12   comparison in both types of analysis.

13           Then, we get to allocating amongst the types of

14   intellectual property.  Now, here we have the

15   Georgia-Pacific problem, which is an independent reason to

16   exclude these calculations.  Georgia-Pacific is not an

17   admissible methodology for what he has done here.

18   Georgia-Pacific reasonable royalty should not be before the

19   jury in this case.

20           Mr. Eckert testified clearly and unequivocally

21   today that Mattel never would have licensed MGA.  That means

22   there is no actual harm in the form of lost royalty damages

23   under Section 504 of the Copyright Act.  It is absolutely

24   indisputable based on that testimony that a hypothetical

25   royalty analysis is not consistent with Section 504 damages.

1          The reasonable royalty analysis can't go before

2     the jury on the copyright claim.  It also can't go before

3     the jury on the trade secret claim, because it's a matter

4     for the court.  Now, to let them backdoor it by having him

5     say, *Oh, well, these are just common sense factors* or

6     whatever, that's not correct.  Many of these factors are not

7     common sense factors.  They are factors that have been

8     uniquely derived from the patent law.

9          There are assumptions in here about the validity

10    of the intellectual property, convoyed sales, contribution

11    to the base, and a number of other factors that have no

12    place in this case.  And what's going to happen here if he

13    is permitted to testify that these are just common sense

14    factors, is that they are going to be getting a reasonable

15    royalty analysis in front of the jury which the jury could

16    fashion upon as a basis for calculating damages when it's

17    legally impermissible for it to do so.

18          So what you have here -- and this, again, goes to

19    admissibility.  What you have here is them saying, *Well, we*

20    *won't call it a polygraph test.  We'll just say we're going*

21    *to use a common sense measure of respiration -- but we won't*

22    *call it a polygraph test, so it's okay, your Honor.  We can*

23    *still go ahead and put it in front of the jury*, even though

24    the polygraph test is inadmissible.  That's what they're now

25    suggesting.

1          Now, could they have chosen other methodologies?

2    They could have chosen other methodologies.

3          THE COURT:  Mr. Wagner, would you remain outside,

4    please.

5          Thank you.

6      (Pause.)

7          MS. HURST:  They could have chosen other

8    methodologies.

9          Whether they agree or disagree, Mr. Malackowski

10   had six different choices in his report that had nothing to

11   do with Georgia-Pacific.  There were other choices that

12   Mr. Wagner could have made.  He could have tried to measure

13   inventor contribution versus all other contribution.  He

14   could used comparable fashion dolls.  He could have looked

15   at Mattel, the way Mattel values the respective

16   contributions of its own employees to the development of

17   their products by looking at relative pay skills at Mattel,

18   relative expenses at Mattel.  They could have done a survey

19   to measure what the consumer motivation was.

20         There are a million different ways they could have

21   done this that didn't need to rely on the Georgia-Pacific

22   analysis.  They chose this deliberately because they wanted

23   to get that in front of the jury.  It was a risk that they

24   took with the advice of more than able counsel at Mattel.

25   They took that risk knowingly, and now the court should not

1    save them from that by fashioning something that pretends

2    that we're not doing a Georgia-Pacific analysis but,

3    nonetheless, puts the analysis in front of the jury when

4    it's inadmissible.  They had other choices.  They didn't

5    like the other choices, because it didn't get them 5- or

6    $600 million.  And the court should not save them from that

7    knowing and deliberate choice to rely on an inadmissible

8    methodology.  There is no admissible opinion here regarding

9    unjust enrichment.

10          Furthermore, your Honor, the trade secret, the

11   trade secret allocation suffers from another faulty problem,

12   which is that Mr. Wagner has not allocated the trade secret

13   profits amongst the buckets of trade secrets as Mattel has

14   defined them in its ever-changing trade secret designation.

15   As the court well knows, because of our discussion on the

16   jury instructions, their latest -- or not quite latest shot

17   at this, docket 9829, has eight different buckets.  Eight

18   buckets:  Two separate defined Bratz concepts, a Bratz name,

19   a Jade name, two different sculpts, the Bratz Hero Shot; and

20   then, finally the drawings.  You've seen nothing, and there

21   is nothing in Mr. Wagner's reports indicating -- and he

22   allocated in a fashion consistent with Mattel's trade secret

23   identification.  He has not done so.

24          And, your Honor, in the briefing, we cited cases

25   on that point in particular where when the expert fails to

1   allocate and doesn't give the jury a choice to knock out

2   some of the trade secrets to believe that some of the trade

3   secrets may not be trade secrets, the analysis is defective.

4   And, clearly, Mr. Wagner has not done that, probably because

5   he wasn't even aware of what Mattel's trade secret

6   designations were when he did all his calculations.  Which,

7   by the way, is another reason that they are ridiculous and

8   completely unreliable.  He had not even been given any trade

9   secret identification, but he was perfectly happy to

10  calculate hundreds of millions of dollars without even

11  knowing what he was calculating.

12          The unjust enrichment calculation is defective for

13  copyright because it relies on numerous profits that have

14  been excluded by the court.  The 792.4, obviously, includes

15  everything and they are trying to backdoor through indirect

16  profits what the court has already excluded.  But now the

17  sculpt number, they are doing it again.  In the court's

18  summary judgment order, the court said, *Okay, fine.  The*

19  *sculpts will go on the jury on, but that is not a way for*

20  *you to get back into the subsequent Generations.*

21          The court said it right there in Footnote 9.  And,

22  yet, here we are with Mr. Wagner calculating all the profits

23  on all subsequent generation dolls at $280 million.  They

24  are putting up that number and asking for it despite the

25  court's prior order.  It's inconsistent with the court's

1   order.  And it's inconsistent with the Ninth Circuit

2   opinion.  He just confirmed he has included dolls that the

3   Ninth Circuit ruled out as infringing.

4           Now, they want to say, *Well, we're entitled to*

5   *every penny on an indirect profits theory because of some*

6   *but-for analysis.*

7           Now, you've heard this witness say repeatedly he's

8   not testifying to causation.  They want to say, *Well,*

9   *everybody agrees that without the drawings, you wouldn't*

10  *have a doll and without the first Generation dolls, you*

11  *never could have done anything else.*

12          Nonsense.  There has been no, witness who has

13  testified and never will that simply having those drawings

14  would have been sufficient to earn all of those profits.

15  And the Ninth Circuit -- and this is where we're dealing

16  with an equitable remedy in the Ninth Circuit --

17  constructive trust -- an equitable remedy here in this

18  court -- unjust enrichment -- and maybe a monetary

19  calculation, but the principles are the same.  You can't do

20  that.  The Ninth Circuit has said so.

21          And for them to try to backdoor it all back in

22  through indirect profits and this but-for analysis is not

23  consistent with the apportionment required.  That's just on

24  copyright trade secret.  All of the unjust enrichment

25  analysis is, it's defective because it's inconsistent with

```
 1    the law of the case and it's unreliable.  The benchmark
 2    comparison is unreliable.  And because it's premised upon an
 3    inadmissible analysis, which is Georgia-Pacific, the whole
 4    unjust enrichment analysis has to go.
 5              And then, that brings us to lost profits.  Lost
 6    profits suffers from a number of the same defects.  On the
 7    copyright side, it has not been limited.  It has not been
 8    limited to the dolls that the court has found infringing.
 9              On the trade secret side, it has not been
10    allocated amongst the eight buckets defined as the trade
11    secret.  So there is no way for the jury to choose, if it
12    wishes to do so.  Again, the case law provides that that is
13    a defect that warrants exclusion, that warrants exclusion
14    when they don't divide it amongst the various trade secrets
15    and give the jury a means of choosing.
16              So the lost profits analysis is defective on the
17    copyright front, because it's not causally attributable to
18    the infringement.  It's not a result of the infringement.
19    And it's defective on the trade secret front.  And this is
20    not even going into that regression analysis, your Honor.
21    It's not even going into the problems with the regression
22    analysis.  It's just the fundamental failure to follow the
23    rules in search of the big numbers.  Fundamental failure to
24    follow the rules in search of the big numbers.
25              What they have here that's admissible is disgorged
```

1   profits on the six dolls, and that's it.  That's all they

2   got.

3           I'll let Mr. Cote argue about Mexico.  But that's

4   all they got that's admissible here on the Bratz IP, the six

5   dolls.  That's it.  This is 31.7 million.  That's what

6   they've got.

7           The court has discretion here.  It's supposed to

8   exercise it under *Daubert* and *Kumho Tire*.  And we have made

9   a substantial showing regarding lack of reliability and

10  failure to meet the requisite legal standards.  And they

11  should be excluded.  Because they came in here and they

12  chose to do these analyses, hoping that they were going to

13  slide it past this court and put up the big numbers.  They

14  chose amongst many methodologies they could have chosen,

15  because they wanted to put up the big numbers.  And they

16  blew it.  And the court should call them on it, because it

17  doesn't meet the legal standards under 702 and the law of

18  this case and the law generally governing the claims of

19  these type.

20          I won't say a lot more regarding reasonable

21  royalty.  I think the court has already indicated its

22  inclination to exclude that, but it must be excluded.  They

23  cannot put a hypothetical royalty analysis in front of this

24  year on the copyright claim.  It is not actual damages.  And

25  there's nothing in the Copyright Act that allows either a

1    floor of a reasonable royalty calculation the way the Patent

2    Act does expressly, or an alternative of a reasonable

3    royalty calculation the way the Uniform Trade Secret Act

4    does.  It's just not there in the Copyright Act, so there is

5    no way to do a hypothetical royalty under the Copyright Act

6    in this case.  We don't have to argue about whether there

7    may be some theoretical case where it come in the future,

8    but this is not it.  And there has never been a case

9    applying a Georgia-Pacific hypothetical royalty to copyright

10   damages.  It doesn't exist.

11          In all of the case law and the form instruction

12   talking about lost royalties are talking about established

13   royalties.  The *McRoberts* case out of the Seventh Circuit

14   and the *Wall Data* case in the Ninth Circuit, software cases

15   with established license schedules.  Somebody copies a

16   software, they don't pay for it, you know exactly how much

17   that is.

18          On *Davis versus The Gap*, the guy had previously

19   licensed the photograph.  *Polar Bear*, they had negotiations

20   for what they would pay.  All of these cases where the

21   courts have referred to a lost royalty as actual harm,

22   actual damages, it's because there was an actual royalty.

23   And as you heard Mr. Eckert testify today unequivocally,

24   there would never have been an actual royalty in this case.

25          If Mattel could have proven that it would have

```
 1   exploited Bratz, it could have gone for the big number on
 2   the lost opportunity side, but they can't.  So their problem
 3   is one of their own making.  They would not have chosen to
 4   exploit it themselves.  They would not have chosen to
 5   license it.  They would not have chosen to exploit it
 6   themselves.  They would not have chosen to license it.
 7          So what they do is come here and say, We're
 8   fighting for the right to kill it.  We're fighting for the
 9   right to kill it and we want MGA to pay one billion dollars
10   for that.  And it is fundamentally unfair.  When MGA's huge
11   efforts on all these products, consumer welfare benefited
12   from this, it is fundamentally unfair for them to come in
13   here and say, I want $1.1 billion for something I never
14   would have exploited and never would have licensed, because
15   I want the right to kill it and to kill the consumer welfare
16   that went along with that and the jobs that went along with
17   it and the investment and the media and the advertising and
18   the trademarks.
19          When you have somebody like Steven Linker who came
20   here and testified in the early days of this trial that the
21   actual price for the name Bratz was $200, the actual price
22   for the name Bratz, the idea for the name Bratz in the same
23   year was $200.  That's why we don't see an avoided cost
24   analysis right there.  An avoided cost analysis for the name
25   Bratz would be $200.  Could they have calculated it that way
```

1    without regard to Georgia-Pacific?

2            You bet.  You bet.  But they don't like $200

3    versus 500 million, or 190 million, whatever their number

4    is.

5            The Georgia-Pacific analysis is inadmissible

6    before the jury on trade secret.  It's inadmissible, period,

7    on copyright as a measure of damages.  It is the basis for

8    all of the apportionment calculations and can't get in

9    through the back door in a way that is -- the jury could

10   then seize upon to make an impermissible damages

11   calculation.  The unjust enrichment numbers are faulty for

12   that reason; but more significantly as well, they are also

13   unreliable because of the benchmark comparison.

14           And, finally, your Honor, I'll stop, because I'm

15   repeating myself now.  On lost profits, they have not

16   limited themselves.  They have not limited themselves to the

17   infringing dolls.  And on the trade secret side, they

18   haven't allocated to the buckets.  So all they've got as an

19   admissible opinion here is the disgorgement of profits on

20   the six dolls and, maybe, using that last slide we showed a

21   lost profit figure that's limited also to the six dolls.

22           But, by the way, those are duplicative, too.  Just

23   to be clear, those are then duplicative.  Because what they

24   are doing, what they are doing with that 7.5 million and the

25   31.7 million, is they're taking one sale of a Bratz doll and

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    they're looking to, on this side of the equation, disgorge

2    MGA's profits for that sale and on this side of the equation

3    claim a loss, Mattel incremental profit, on exactly the same

4    sale.  So those are duplicative on top of everything else,

5    not to mention the Larian distributions.

6            The Larian distributions aren't even in the

7    ballpark.  Completely duplicative of the other numbers,

8    aren't limited on the infringement on the copyright side.

9    On the trade secret side, there's no allocation.  Again,

10   unreliable and don't comport with the law of the case.

11           I'll stop there.

12           MR. PRICE:  Could I ask the court a question, off

13   the record?

14           THE COURT:  Okay.

15       *(Off the record.)*

16       *(Pause.)*

17       *(Recess taken from 10:38 p.m. To 11:22 p.m.)*

18           THE COURT:  Mr. Cote.

19           MR. COTE:  Thank you, your Honor.

20           Before I start my argument, I neglected yesterday

21   to move into evidence the four exhibits that I showed the

22   witness.  I would like to do that now for the limited

23   purposes of this hearing.

24           THE COURT:  How would you like them marked?  How

25   would you like them marked?

```
1              MR. COTE:  They were numbered with trial exhibit
2    numbers.
3              Can I read those numbers off?
4              THE COURT:  You can.
5              MR. COTE:  It was 9891, 9897, 9898 and 35354.
6              Thank you, your Honor.
7              THE COURT:  Received.
8          (Defendants' Exhibits 9891, 9897, 9898 and 35354
9          received in evidence.)
10             MR. COTE:  Not a single sale.  That's what
11   Mr. Wagner said today on the stand.
12             He did not find evidence of MGA, or MGA Mexico
13   having a single sale as a result of the documents that
14   Mr. Machado is accused of copying.  He did not find any
15   evidence that Mattel or Mattel Mexico lost a single sale
16   because of the documents Mr. Machado was accused of taking.
17             So there is no lost profits analysis offered with
18   respect to the Mexico documents.  What happened instead was
19   Mr. Wagner sent a blank spreadsheet to some folks in Mexico,
20   Mr. Isaias and others, and he asked them to fill it in.
21   They did.  And they sent it back to him.  This happened in
22   September of 2010.  Then, he copied those numbers into a new
23   chart.  He added them up.  He made them pretty.  He did some
24   formatting and he presents the new chart, which is just a
25   copy and paste of Mr. Isaias' chart, as if it was an expert
```

1    opinion.  And that is the basis for his expert opinion for

2    both unjust enrichment and reasonable royalty.

3           But it's nothing of the sort.  He's just repeating

4    information given to him by Mr. Isaias.  He is just

5    repeating inadmissible evidence.  He did no analysis.  He

6    just copied.  And then, he took the numbers and he added

7    them up, which is something the jury can do.

8           Now, we know he merely copied because we saw in

9    the examination that he didn't check any of the cites where

10   there were any.  We saw in one of his schedules that he

11   cited to a Mattel document that had a Bates number.  And he

12   cited to it in his report, because Mr. Isaias cited to it in

13   his spreadsheet.  But we learned in his deposition -- and he

14   admitted yesterday evening -- that that document that was

15   cited doesn't offer any support for the number that it's

16   supposed to offer support for.

17          And that number is $1.9 million which maybe isn't

18   a lot of money when we're talking about billions of dollars

19   or hundreds of millions of dollars, but it's a lot of money

20   to Mr. Machado, and that level of sloppiness is not

21   acceptable.

22          We saw that Mr. Wagner didn't even check the

23   spelling when he copied Mr. Isaias' spreadsheet.  I pointed

24   out one typo that was misspelled.  It was the word

25   "together" in his schedule.  I only had time, your Honor, to

go through one of his -- one of Mr. Wagner's spreadsheets, but I'll represent to the court -- and you can see this in the exhibit -- he repeated that same copying and pasting error 23 times in the report. He just copied what Mr. Isaias wrote, put it in his own report and called it his expert opinion.

Now, he admitted that he had no support for that $1.9 million figure, which appears three times in the report. It totals $5.7 million. It's the bulk of the money that he thinks Mr. Machado should pay Mattel. He admits that he doesn't have any support for that -- at least, he didn't at the time he wrote his report. But he did come up with some documents later. After MGA took his deposition. He scrambled and found some documents that supposedly helped him out.

Here's the thing about the new documents, and these are the exhibits that we just talked about: 9897 and 9898. There were never produced before in this case until the second day of his deposition. That's the first time anybody saw them. And if you look at the documents, you'll see they don't have a Mattel Bates number. They have a MW Bates number, which is Michael Wagner's Bates number.

But, anyways, he didn't have them when he wrote his report, so he had to admit that he didn't rely on them. But even if he had had them, and even if he had relied on

1    them, they don't support his conclusion that documents talk

2    about 2004, and a little bit about 2005.  But his report is

3    about 2002 and 2003.  He doesn't have any numbers for the

4    $1.9 million for '02 and '03.  He couldn't even find that

5    after he was deposed.

6            And, finally, the new documents are in Spanish.

7    And Mr. Wagner admits he doesn't read Spanish.  He had to

8    have Mattel's counsel translate parts of the documents for

9    him.  That's not being a responsible expert.

10           Now, an expert cannot make up a number and then go

11   looking for support when he gets caught.  But that's what

12   Mr. Wagner did here.  And the support that he found after

13   the fact is inadequate.  At a minimum, these new documents

14   should not be shown to the jury and not admitted in this

15   case and not discussed, because it's a clear violation of

16   Rule 26, which requires him to disclose every source that

17   he's going to rely on in his report.  It's Rule 26(a)(2)(B).

18   He didn't disclose it, because he didn't have it.  And it

19   can't be a basis of his opinion now that he has been caught.

20           So the problems with Mr. Wagner's report are

21   threefold:  First, it's not a reliable analysis.  An expert

22   cannot just ask his client what he thinks the number should

23   be and then pass it off as his expert opinion.  But that's

24   all he did here.  Mr. Isaias' chart was prepared

25   specifically for this litigation, a couple of months ago, at

1   Mr. Wagner's request.

2           Mr. Wagner doesn't even know where the numbers

3   came from.  He didn't ask.  But more troubling, Mr. Wagner,

4   obviously, is just a backdoor way to get in this

5   inadmissible evidence.  Now, I know we're going to hear that

6   the Rules of Evidence 702, in particular, permit reliance on

7   hearsay.  That's not the objection we're making.  We'll

8   concede that point.  The objection here is that the basis

9   for Mr. Wagner's opinion and the opinion itself are one and

10  the same.  This is no light between them.

11          The input for his opinion are Mr. Isaias' number

12  and the output of his opinion are Mr. Isaias' numbers down

13  to the misspellings and down to the missed cites.  The

14  advisory notes give an example of why we let experts use

15  inadmissible evidence.  And the example they give is a

16  doctor who may rely on a variety of information to diagnose

17  the patient.  The patient comes into the doctor and says, *My*

18  *arm hurts.*  And the doctor maybe does some tests, or maybe

19  ask some questions and consults a treatise and concludes:

20  *You have tendonitis.*  That's the sort of inadmissible

21  evidence that could be considered to support an expert

22  opinion.

23          Mr. Wagner doesn't do any of that kind of

24  analysis.  Mr. Wagner is like a doctor who would come in and

25  sit on the stand and say, *It's my expert opinion that his*

*arm hurts.*

He is just repeating what he was told.  He didn't do anything for himself.

Mr. Wagner admitted yesterday on the stand that he cannot tell the jury that any of the numbers that he copied for Mr. Isaias are accurate.  He admits that all he can say to the jury is that someone at Mattel told them what they were.  He said, *I will only tell the jury if the numbers are accurate, if I have backup for it.*  But as we saw in the examples we went through yesterday, he doesn't have the backup.

He said, *Any of the backup would be cited in my schedules.*  That's what he said.  And the schedule in this case is Exhibit 9891 to his report.  And that's why I went through every single cite on that one page in that report for that most expensive document.  And we saw that every single cite on that page for the most expensive document dead ended at Mr. Isaias' spreadsheet.

"Isaias" is I-S-A-I-A-S.

All Mr. Wagner is doing is repeating what he was told.  He didn't do any analysis, and that's not the point of expert testimony.

Now, at a minimum, an expert's testimony -- an expert's opinion must help the jury.  But Mr. Wagner's opinion doesn't help the jury, because all he does is take

things that he was told and add them up.  The jury can hear from the original source whatever the evidence is.  And the jury can add up the numbers, or it can be done in closing argument.

Mr. Wagner, to the extent he did any analysis at all, was nothing more than a calculator.  And that's not something the jury needs help with.  We're not talking about huge and complicated numbers when it comes to the Mexico documents.  What Mattel should have done is bring in Mr. Isaias and have him explain why he thinks those numbers are right, and let us cross-examine him.  By having Mr. Wagner repeat Mr. Isaias's numbers, it deprives us of any chance to cross-examine him.  And it lends them an aura of accuracy, or reliability that they simply do not have.

Now, just to address a point that came up with Mr. Kinrich.  With respect to the Mexico City documents, at least, and I suspect it's probably true for his entire opinion, Mr. Wagner cannot be a summary witness either.  Summary witnesses are limited to summarizing admissible evidence.  Mr. Wagner doesn't summarize anything.  He just copies it down to the spelling errors, down to the mistaken cites.  But what he copies is not itself admissible.  What he's copying is a spreadsheet or a chart prepared by the client at his request after the litigation began, and it's full of numbers that have no, support.  That's not

1   admissible, and he cannot just summarize it as a summary

2   witness.

3        Now, I suspect that my friends on the other side

4   are going to say, *Well, this can be handled with a*

5   *corrective instruction.*  An instruction can say:  *You, the*

6   *members of the jury, are not to take Mr. Wagner's numbers as*

7   *a given.  His opinion is not evidence of the underlying*

8   *costs.*  Some instruction like that.

9        But the advisory notes to the 2000 amendments to

10  Rule 703 say you have to take into account whether such an

11  instruction would be effective in the given case.  And it

12  wouldn't be effective in this case for three reasons:

13  First, an instruction that advises the jury to disregard

14  Mr. Wagner's basis for his opinion or not accepted as

15  evidence for his opinion, but accept his conclusion would be

16  nonsense because the basis for his opinion is the

17  conclusion.  He didn't do any work.  They are one and the

18  same.  There's no way to distinguish them.

19        Secondly, the instruction would make the opinion

20  meaningless.  Mr. Wagner adds up somebody else's numbers,

21  but the jury can do that.  There is no reason for Mr. Wagner

22  to come up and head up a few numbers.  The instruction will

23  not be effective, because Mr. Wagner is the only witness who

24  is going to even talk about the costs of these Mexico

25  documents.  There is not another witness on Mattel's list,

1    as we just heard this evening, that they could call that

2    will testify to that.  He's the only source.

3           Having that evidence come through Mr. Wagner and

4    then telling the jury to disregard it will be ineffective.

5    They will have no basis for analyzing or understanding his

6    opinion, which is just math.  Just an addition.  If they

7    don't understand the underlying numbers, so they can't be

8    instructed to disregard one and not the other, because they

9    are inseparable.

10          Finally, I just want to make a couple of points

11   about reasonable royalty.  Mr. Wagner's reasonable royalty

12   analysis is flawed for a number of reasons.  First, the

13   court knows my view on reasonable royalty being a question

14   for the court, not for the jury, so I don't think I need to

15   belabor that.  Ms. Hurst made the same point, and I don't

16   think I need to repeat that here.

17          But Mr. Wagner's royalty analysis is based on the

18   same faulty spreadsheets that he copied for unjust

19   enrichment.  His reasonable royalty is just two-thirds of

20   the unjust enrichment number.  If the unjust enrichment

21   number is no good, then the reasonable royalty number is

22   also no good.

23          Now, Mr. Wagner admitted on the stand this evening

24   that the way to do a reasonable royalty analysis is to start

25   with some number from the defendant's contracts, a similar

1    type of contract.  He didn't do that with respect to the

2    Mexico documents.  He started with 100 percent.  That's the

3    percentage he started with.  For the Bratz -- some of the

4    other intellectual property in the case, for example, on

5    page 67 of his papers, he has got a royalty rate of

6    8 percent, but he starts with 100 for Mr. Machado.

7         Once you have the rate, you're supposed to use the

8    factors to figure out whether it goes up or down.

9    Mr. Wagner didn't use any factors to figure out whether the

10   rate should go up or down in connection with the Mexico

11   documents.  He admitted that on the stand.  He used the

12   Georgia-Pacific factors which, whether they are called part

13   of case law or part of common sense or good reasoning, at

14   least give you some basis for understanding why he reached

15   the conclusion he did.  He didn't do that in connection with

16   the Mexico documents.  He didn't do it at all.  There is

17   nothing in his report explaining why he reached the royalty

18   rate he reached.  He started with 100 percent and lowered it

19   to two-thirds, or 67 percent.  And we have no idea why,

20   because he didn't tell us.  Because he didn't do the

21   Georgia-Pacific analysis, or any other analysis.

22         Finally, his third step is to apply the percentage

23   from the royalty to the sales that resulted from having the

24   intellectual property that's at issue.  That's how he did it

25   for all of the Bratz IP.  But as I started off by saying,

1    there were no sales resulting from the Mexico documents.

2    There were also no sales lost by Mattel from the Mexico

3    documents.  So he couldn't use sales.  Because if he had

4    taken a royalty on the sales, the number would be zero.  So

5    he had to come up with a different number.  So he used the

6    cost number.

7            Here's what we know.  If Mr. Wagner had done the

8    reasonable royalty analysis for the Mexico documents the

9    same way he did it for all the other intellectual property

10   that's at issue in this case, his number would be zero.  And

11   that's the only reason he has a different methodology.

12           Now, I won't suggest that these problems with

13   Mr. Wagner's report are the result of excessive risk taking

14   as maybe the case for some of the other intellectual

15   property at issue in this case.  It's the result of this

16   Mexico part of the case being an afterthought in

17   Mr. Wagner's mind, and maybe in counsels' mind.

18           The $6 1/2 million they're asking for is not a lot

19   of money compared to the hundreds of millions of dollars

20   that we saw in some of the other slides today.  I'll agree

21   with that.  It's a lot of money to my client.  And he should

22   not be forced to pay it.  He should not even be forced to

23   defend against it in front of a jury on such a baseless

24   report.

25           Thank you.

1          THE COURT:  Now, Mr. Zeller, are you disadvantaged

2     at all without Mr. Price here, because my only concern is,

3     if Mr. Wagner is taking the stand tomorrow, that your case

4     isn't being held up.

5          And, Mr. Quinn, the same question to you.  I want

6     you to be full strength when you argue this matter.

7          Now, if he's not going on tomorrow, then maybe

8     it's better that you have Mr. Price here so you can talk to

9     him, if he's making the presentation.  I want to afford you

10    that courtesy.  By the same token, if he is going on

11    tomorrow, then I want to push through this evening and get

12    it resolved for you.  I don't want you held up in any way,

13    if he's going on.

14         MR. ZELLER:  We're, obviously, at the court's

15    convenience.  We'll argue whatever is good for you.

16         THE COURT:  I'm at your convenience, Michael -- I

17    mean, Mr. Zeller.

18         MR. ZELLER:  But I do want to say, it doesn't

19    sound like it's very likely Mr. Wagner is going to go on

20    tomorrow.

21         THE COURT:  If he's not, then -- well, that's up

22    to you.  But if Mr. Price is presenting this evidence, it

23    would seem appropriate that he listens to your argument.

24    He's the very one to be here.

25         Now, if he is going on, what I don't want to do is

1    have you in a position of looking like you're floundering,

2    because you've got all your witnesses here.  But if

3    Mr. Machado is not here tomorrow -- I'm not going to hold

4    that against you, frankly.  He was promised to be here.

5    It's been presented to me --

6                MR. COTE:  He'll be here, your Honor.

7                THE COURT:  -- he'll be here.

8                So I'm really at your discretion.  I could push

9    through evening very easily, or I can wait for Mr. Price.  I

10   can reconvene early tomorrow morning.  I can reconvene at

11   7:00 o'clock, if you want.

12               Well, I can't get ahold of Debbie this time of

13   night.  I apologize.

14               So you and Mr. Quinn talk, because I don't want

15   one side disadvantaged, okay?  So just spend a moment.

16       (Pause.)

17               MR. ZELLER:  The consensus, in fact, the unanimous

18   vote by Mr. Quinn and I, is to pick this up tomorrow,

19   tomorrow evening after the jury is discharged.

20               THE COURT:  Is that acceptable?

21               MS. HURST:  Absolutely.  That's acceptable, your

22   Honor.

23               THE COURT:  I think that would be fair.  It's too

24   critical an issue.

25               Would you remain for just one moment?  I want to

1    speak to both of you about one more thing.

2              Deborah, just stay there.  I'll be right back.

3          *(Pause.)*

4              THE COURT:  Okay.  That's fine.

5              MR. ZELLER:  Your Honor, we do have a few more

6    Machado documents.  Where did they go?

7              Here they are.

8              MR. MCCONVILLE:  We have a few more Eckert ones,

9    as well.

10             THE COURT:  Why don't I keep Michael and you.

11         *(At 11:47 p.m., proceedings were adjourned.)*

12

13                          -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

97

```
 1                              CERTIFICATE

 2              I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  March 2, 2011

10

11

12                        _____

13                        Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*