1

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                     )
                Plaintiffs,           )
7                                     )
          vs.                         ) No. CV 04-9049 DOC
8                                     )    Day 26
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 4
9                                     )
                                      )
10              Defendants.           )
   _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Jury Trial

16                 Santa Ana, California

17               Wednesday, March 2, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-02 D26V1

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

2

**APPEARANCES OF COUNSEL:**

1

2

FOR PLAINTIFF MATTEL, INC., ET AL.:

3

4             QUINN EMANUEL URQUHART & SULLIVAN
              BY:  JOHN QUINN
5                  WILLIAM PRICE
                   MICHAEL T. ZELLER
                   Attorneys at Law
6             865 South Figueroa Street
              10th Floor
7             Los Angeles, California 90017
              (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
              BY:  THOMAS S. McCONVILLE
13                 Attorney at Law
              4 Park Plaza
14            Suite 1600
              Irvine, California 92614
15            (949) 567-6700

16            - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
              BY:  ANNETTE L. HURST
18                 Attorney at Law
              405 Howard Street
19            San Francisco, California 94105
              (415)773-5700

20            - AND -

21            KELLER RACKAUCKAS
22            BY:  JENNIFER KELLER
                   Attorney at Law
23            18500 Von Karman Avenue
              Suite 560
24            Irvine, California 92612
              (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB Document 10125 Filed 03/04/11 Page 3 of 142 Page ID #:306234
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
              LAW OFFICES OF MARK E. OVERLAND
5             By:  MARK E. OVERLAND
                   Attorney at Law
6             100 Wilshire Boulevard
              Suite 950
7             Santa Monica, California 90401
              (310) 459-2830
8
              - AND -
9
              SCHEPER KIM & HARRIS LLP
10            BY:  ALEXANDER H. COTE
                   Attorney at Law
11            601 West 5th Street
              12th Floor
12            Los Angeles, California 90071
              (213) 613-4660
13

14   ALSO PRESENT:

15            MGA ENTERTAINMENT, INC.
              BY:  JEANINE PISONI
16                 Attorney at Law
              16360 Roscoe Boulevard
17            Suite 105
              Van Nuys, California 91406
18

19            ISAAC LARIAN, MGA CEO

20            KEN KOTARSKI, Mattel Technical Operator

21            MIKE STOVALL, MGA Technical Operator

22            RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 4 of 142   Page ID #:306235
CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

4

1                         **I N D E X**

2   **WITNESSES                    DIRECT  CROSS  REDIRECT  RECROSS**

3   ECKERT, Robert A.

4
    By Ms. Keller                          7
5

6

7

8                         **EXHIBITS**

9   **EXHIBIT NO.                   IDENTIFICATION    IN EVIDENCE**

10    1277    Mattel consumer research              82
              memo dated 1/9/2002
11
      1804-0001  Marketing Plan cover              117
12            page

13    1804    Marketing Plan                       117

14    1805    The Bratz Brief                      124

15    7502    Mattel 10-K                          87

16    7503, Page 1  Mattel 2002 10-K               101

17    7504-27 Mattel 2003 10-K                     121

18    7504-00028  Page 28 of                       122
              Exhibit 7504
19
      8676    E-mail chain from                    88
20            Mr. Eckert to
              Mr. Kilpin, Ms. Luther
21            and Mr. Bossick dated
              6/18/2004
22
      8968-77 Girls Business Unit,                 98
23            2002 Goals and
              Objectives
24

25

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 5 of 142   Page ID #:306236
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

5

1

2                        **EXHIBITS (Continued)**

3        EXHIBIT NO.                  IDENTIFICATION     IN EVIDENCE

4

5        8969-00021  Minutes of May 22,                    102
                     2002 Mattel Board of
6                    Directors meeting

7        9634        Memo from Mr. Eckert to                80
                     Mattel Board of
8                    Directors, Re: Strategic
                     Plan Offsite, dated
9                    9/1/2005

10       13873       Certifiation of                         8
                     Registration from U.S.
11                   Copyright Office - Doll
                     No. 1
12
         13874       Certificate of                         12
13                   Registration from U.S.
                     Copyright Office - Doll
14                   No. 2

15       13880       Certificate of                         14
                     Registration from U.S.
16                   Copyright Office

17       15815       Employee Confidentiality               62
                     and Inventions Agreement
18
         16196-9 Barbie final                              104
19                   recommendations,
                     appendices, August 5th,
20                   2002, revised August 6,
                     2002
21
         16196-10  Page 10 of                              106
22                   Exhibit 16196

23       16196-24  Page 24 of                              107
                     Ehxibit 16196
24
         16196-27  Page 27 of                              108
25                   Exhibit 16196

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

6

1                      **EXHIBITS** (Continued)

2    **EXHIBIT NO.**              **IDENTIFICATION**    **IN EVIDENCE**

3

4      16196-63  Page 63 of                              108
                 Exhibit 16196
5
       31286-00024  Minutes from                         115
6                 8/16/2003 Mattel Board
                  of Directors meeting
7
       35943    Mattel What's Her Face                    99
8               doll

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

7

|   |    |                                                                   |
|---|----|-------------------------------------------------------------------|
|   | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 2, 2011**                |
|   | 2  | **Day 26, Volume 1 of 4**                                         |
|   | 3  | (8:40 a.m.)                                                        |
| 08:40 | 4  | *(In the presence of the jury.)*                              |
| 08:40 | 5  | THE COURT:  All right.  We're on the record.  All             |
| 08:40 | 6  | counsel are present.  The parties are present.  The witness,  |
| 08:40 | 7  | Mr. Eckert, is present.  The jury and alternates.             |
| 08:40 | 8  | Ms. Keller, if you would like to continue your               |
| 08:41 | 9  | cross-examination.                                           |
| 08:41 | 10 | MS. KELLER:  Thank you, Your Honor.  If you could            |
| 08:41 | 11 | give me just one second here.                                |
| 08:43 | 12 | THE COURT:  All right.  Ms. Keller.                          |
| 10:21 | 13 | **ROBERT A. ECKERT, MATTEL'S WITNESS, PREVIOUSLY SWORN**     |
| 10:21 | 14 | **RESUMED THE STAND**                                        |
| 08:43 | 15 | **CROSS-EXAMINATION (Continued)**                           |
| 08:43 | 16 | BY MS. KELLER:                                                |
| 08:43 | 17 | Q.   I want to talk to you for a moment, Mr. Eckert, about a |
| 08:43 | 18 | concept called "work for hire."  You're familiar with that, |
| 08:43 | 19 | of course, aren't you?                                       |
| 08:43 | 20 | A.   I read the term yesterday.  Other than that, I'm not    |
| 08:43 | 21 | sure I had heard the term.                                    |
| 08:43 | 22 | Q.   And you have a master's in management, do you?          |
| 08:43 | 23 | A.   I do.                                                    |
| 08:43 | 24 | Q.   And you -- you were -- you've been CEO of Mattel for    |
| 08:43 | 25 | 11 years.                                                     |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

8

| | | |
|---|---|---|
| 08:43 | 1 | A.   Not quite 11 years. |
| 08:43 | 2 | Q.   Before that, you were with Kraft for 23 years? |
| 08:43 | 3 | A.   That's correct. |
| 08:43 | 4 | Q.   Now, you had your in-house intellectual property lawyer |
| 08:44 | 5 | at Mattel, Michael Moore, copyright Carter Bryant's drawings |
| 08:44 | 6 | in late October of 2006, correct? |
| 08:44 | 7 | A.   I know the drawings were copyrighted.  I don't know by |
| 08:44 | 8 | whom. |
| 08:44 | 9 | Q.   Let's look at Exhibit 13873.  You surely know they were |
| 08:44 | 10 | copyrighted by your company, don't you? |
| 08:44 | 11 | A.   I do. |
| 08:44 | 12 | Q.   Now, this is the certificate of registration of the |
| 08:44 | 13 | copyright that Mattel obtained and the U.S. Copyright Office |
| 08:44 | 14 | issued, correct? |
| 08:44 | 15 | A.   It appears to be so, yes. |
| 08:44 | 16 | MS. KELLER:  Your Honor, I'd move 13873 into |
| 08:44 | 17 | evidence. |
| 08:44 | 18 | THE COURT:  Received. |
| 08:44 | 19 | (Exhibit No. 13873 received in evidence.) |
| 08:44 | 20 | (Document displayed.) |
| 08:44 | 21 | BY MS. KELLER: |
| 08:44 | 22 | Q.   Now, on the first page it says, "This is to certify |
| 08:44 | 23 | that the attached additional certificate is a claim of |
| 08:44 | 24 | copyright for drawing of Doll No. 1." |
| 08:44 | 25 | Do you see that? |

CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

9

| | | |
|---|---|---|
| 08:44 | 1 | A.   I do. |
| 08:44 | 2 | Q.   Let's look at the last page, page 5.  This is actually |
| 08:45 | 3 | a drawing, right? |
| 08:45 | 4 | A.   It is. |
| 08:45 | 5 | Q.   And who's that a drawing of? |
| 08:45 | 6 | A.   A doll. |
| 08:45 | 7 | Q.   But I mean, who?  Which one? |
| 08:45 | 8 | A.   Uh, I don't know.  A Bratz doll. |
| 08:45 | 9 | Q.   And let's go to the second page, page 2, under title of |
| 08:45 | 10 | this work it says, "Drawing of Doll No. 1."  And then we go |
| 08:45 | 11 | to the very bottom of the page, "Copyright Claimant" says, |
| 08:45 | 12 | "Mattel, Inc." |
| 08:45 | 13 |      That's your company, right? |
| 08:45 | 14 | A.   It is. |
| 08:45 | 15 | Q.   And the application was received on October 30th, 2006. |
| 08:45 | 16 |      Now, let's go back up to Section 2.  It says, "name of |
| 08:45 | 17 | author, Carter Bryant," right? |
| 08:45 | 18 | A.   Yes. |
| 08:45 | 19 | Q.   On the very right-hand side, it shows him as being born |
| 08:45 | 20 | in 1968, correct? |
| 08:45 | 21 | A.   That's correct. |
| 08:45 | 22 | Q.   And right under this, still on the right-hand side, in |
| 08:45 | 23 | Section 2, there's a section "Was this author's contribution |
| 08:45 | 24 | to the work," and then there's some boxes, right? |
| 08:46 | 25 | A.   That's correct. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:46 | 1 | Q.   There are boxes, "anonymous, pseudonymous."  Both "no" |
| 08:46 | 2 | boxes have little ticks in them, right? |
| 08:46 | 3 | A.   That's correct. |
| 08:46 | 4 | Q.   And if you go immediately to the left of this, you see |
| 08:46 | 5 | "Author's nationality or domicile."  It says, "citizen of |
| 08:46 | 6 | U.S.A."? |
| 08:46 | 7 | A.   Yes. |
| 08:46 | 8 | Q.   To the left of this, at the far left-hand side, it |
| 08:46 | 9 | says, "Was this contribution to the work a," quote, "'work |
| 08:46 | 10 | made for hire,'" unquote.  And there are two boxes |
| 08:46 | 11 | underneath this, a "yes" and a "no" box.  You see the little |
| 08:46 | 12 | tick in the "no" box? |
| 08:46 | 13 | A.   I'll take your representation that it is. |
| 08:46 | 14 | Q.   Well, you can look on the screen, if you'd like. |
| 08:46 | 15 | A.   That's helpful.  Yes. |
| 08:46 | 16 | Q.   And you understand that a work made for hire is a, |
| 08:46 | 17 | quote, "work prepared by an employee within the scope of his |
| 08:46 | 18 | or her employment," correct? |
| 08:46 | 19 | MR. QUINN:  Your Honor, I object.  I mean, he is |
| 08:46 | 20 | the CEO, but he's not a lawyer.  That's a legal conclusion. |
| 08:47 | 21 | THE COURT:  Overruled. |
| 08:47 | 22 | THE WITNESS:  I'm sorry.  The question again? |
| 08:47 | 23 | BY MS. KELLER: |
| 08:47 | 24 | Q.   You understand that under the U.S. Code, a work made |
| 08:47 | 25 | for hire is, quote, "a work prepared by an employee within |

| 08:47 | 1  | the scope of his or her employment," correct? |
| 08:47 | 2  | MR. QUINN:  Same objection, Your Honor. |
| 08:47 | 3  | THE COURT:  Overruled. |
| 08:47 | 4  | MR. QUINN:  Legal conclusion or opinion. |
| 08:47 | 5  | THE WITNESS:  I'm not a lawyer, but I believe |
| 08:47 | 6  | that's accurate. |
| 08:47 | 7  | BY MS. KELLER: |
| 08:47 | 8  | Q.   And so your company prepared this copyright claim in |
| 08:47 | 9  | which you said that the drawing was not created within the |
| 08:47 | 10 | scope of Mr. Bryant's employment, correct? |
| 08:47 | 11 | MR. QUINN:  Same objection, Your Honor. |
| 08:47 | 12 | THE COURT:  Same ruling. |
| 08:47 | 13 | THE WITNESS:  Yes, because I understand he had |
| 08:47 | 14 | assigned those rights. |
| 08:47 | 15 | BY MS. KELLER: |
| 08:47 | 16 | Q.   Is that -- is that a yes? |
| 08:47 | 17 | A.   Yes. |
| 08:47 | 18 | Q.   Let's see if this is an accident or some sort of |
| 08:47 | 19 | smudge.  Let's look again at Exhibit 13874.  Okay? |
| 08:47 | 20 | A.   I have it. |
| 08:47 | 21 | Q.   You got that in front of you? |
| 08:47 | 22 | A.   I do. |
| 08:47 | 23 | Q.   And you recognize that as another copyright? |
| 08:48 | 24 | A.   I do. |
| 08:48 | 25 | Q.   And this is for Doll No. 2, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 12 of 142   Page ID #:306243
CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

12

08:48    1    A.    Yes, it is.

08:48    2    Q.    Let's look at the page -- page 5 of that.

08:48    3              MS. KELLER:  Your Honor, I'd move that that be

08:48    4    admitted into evidence.

08:48    5              THE COURT:  13874.  Is that your request?

08:48    6              MS. KELLER:  Yes, Your Honor.

08:48    7              THE COURT:  What about 13873?

08:48    8              MS. KELLER:  Same, Your Honor.

08:48    9              THE COURT:  Both are received.

08:48   10              (Exhibit No. 13873 previously received in

08:48   11    evidence.)

08:48   12              *(Exhibit No. 13874 received in evidence.)*

08:48   13               *(Document displayed.)*

08:48   14    BY MS. KELLER:

08:48   15    Q.    See the doll on page 5?

08:48   16    A.    I do.

08:48   17    Q.    Recognize that doll?

08:48   18    A.    Yes.

08:48   19    Q.    Know who that is?

08:48   20    A.    Might be Hallidae, but I'm not well versed in the names

08:48   21    of the dolls.

08:48   22    Q.    And this is also -- if we go to the second page of

08:48   23    13874.

08:48   24    A.    Yes.

08:48   25    Q.    This is also where we see, "Was this contribution of

| | | |
|---|---|---|
| 08:48 | 1 | work made for hire?"  We see a small tick in the "no" box, |
| 08:48 | 2 | right? |
| 08:48 | 3 | A.    That's correct. |
| 08:48 | 4 | Q.    And so you know that this also -- when this application |
| 08:49 | 5 | was made by Mattel, Mattel said it was not made within the |
| 08:49 | 6 | scope of Carter Bryant's employment with Mattel, correct? |
| 08:49 | 7 | That's what this is saying, true? |
| 08:49 | 8 | MR. QUINN:  Again, lacks foundation.  Legal |
| 08:49 | 9 | conclusion, Your Honor. |
| 08:49 | 10 | THE COURT:  Overruled.  This is his understanding. |
| 08:49 | 11 | BY MS. KELLER: |
| 08:49 | 12 | Q.    You understand that this is Mattel saying that when |
| 08:49 | 13 | Carter Bryant created this drawing, he was not creating it |
| 08:49 | 14 | within the scope of his employment at Mattel, correct? |
| 08:49 | 15 | A.    Um, yes, because we had other rights. |
| 08:49 | 16 | Q.    No, I don't want to hear your legal theory. |
| 08:49 | 17 | MR. QUINN:  Your Honor, I object.  He should be |
| 08:49 | 18 | permitted to give an answer, a full answer. |
| 08:49 | 19 | THE COURT:  Please don't cut the gentleman off. |
| 08:49 | 20 | Finish your answer, sir. |
| 08:49 | 21 | THE WITNESS:  Yes.  Because, again, I believe |
| 08:49 | 22 | Mattel had other rights to this work. |
| 08:49 | 23 | BY MS. KELLER: |
| 08:49 | 24 | Q.    Whether the rights to Mattel were assigned or not, the |
| 08:49 | 25 | question remains:  Did he create them within the scope of |

| | | |
|---|---|---|
| 08:49 | 1 | his employment at Mattel?  True? |
| 08:49 | 2 | A.   I believe he did. |
| 08:49 | 3 | Q.   That's not the question.  The question is -- this is an |
| 08:49 | 4 | issue for this jury, isn't it?  You know that -- that the |
| 08:50 | 5 | issue for this jury is did Mr. Bryant create these within |
| 08:50 | 6 | the scope of his employment at Mattel, right? |
| 08:50 | 7 | A.   I believe he did, yes. |
| 08:50 | 8 | Q.   And this -- and this question on the copyright form |
| 08:50 | 9 | doesn't say anything about assignment of rights, does it? |
| 08:50 | 10 | Take another look at it if you need to. |
| 08:50 | 11 | I'm looking at this one box, where you're being asked |
| 08:50 | 12 | was this contribution to the work a, quote, "work made for |
| 08:50 | 13 | hire."  Doesn't say anything about assignment there, does |
| 08:50 | 14 | it? |
| 08:50 | 15 | A.   No, it does not. |
| 08:50 | 16 | Q.   Now, let's look at Exhibit 13880.  This is another |
| 08:50 | 17 | copyright by Mattel of one of the dolls, correct? |
| 08:50 | 18 | A.   Yes, it is. |
| 08:50 | 19 | MS. KELLER:  Your Honor, I'd move 13880 into |
| 08:50 | 20 | evidence. |
| 08:50 | 21 | THE COURT:  Received. |
| 08:50 | 22 | (Exhibit No. 13880 received in evidence.) |
| 08:50 | 23 | BY MS. KELLER: |
| 08:50 | 24 | Q.   Let's look at the last page. |
| 08:51 | 25 | (Document displayed.) |

| | | |
|---|---|---|
| 08:51 | 1 | BY MS. KELLER: |
| 08:51 | 2 | Q.   Is that another one of the dolls? |
| 08:51 | 3 | A.   Yes, it is. |
| 08:51 | 4 | Q.   Which one -- which drawing is this? |
| 08:51 | 5 | A.   I don't know. |
| 08:51 | 6 | Q.   Let's look at the second page.  And again, the box is |
| 08:51 | 7 | ticked off "no" under "Was this a contribution" -- "Was this |
| 08:51 | 8 | contribution to the work," quote, "'a work made for hire,'" |
| 08:51 | 9 | unquote. |
| 08:51 | 10 | Do you see that? |
| 08:51 | 11 | A.   I do. |
| 08:51 | 12 | Q.   Now, under copyright -- let's go back to Section 4. |
| 08:51 | 13 | Under "copyright claimant transfer," it says, "If the |
| 08:51 | 14 | claimant is different from the author in Section 2, give a |
| 08:51 | 15 | brief statement of how the claimant obtained ownership of |
| 08:51 | 16 | the copyright." |
| 08:51 | 17 | You see that? |
| 08:51 | 18 | A.   I'm looking at it.  I have it.  It's on the same page. |
| 08:51 | 19 | I have it. |
| 08:51 | 20 | Q.   And it says "assignment," right? |
| 08:52 | 21 | A.   It does.  Can I just take a moment to read the |
| 08:52 | 22 | sentence? |
| 08:52 | 23 | Q.   Sure. |
| 08:52 | 24 | A.   Thank you. |
| 08:52 | 25 | A.   All right. |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 16 of 142   Page ID #:306247
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

16

| | | |
|---|---|---|
| 08:52 | 1 | Q.   So you're saying that Mr. Bryant's inventions agreement |
| 08:52 | 2 | gave you the right to the drawings, right? |
| 08:52 | 3 | A.   Yes, I believe that's the case. |
| 08:52 | 4 | Q.   Even though he didn't do the drawings in the scope of |
| 08:52 | 5 | his employment, right? |
| 08:52 | 6 | MR. QUINN:  Your Honor, it's argumentative.  It's |
| 08:52 | 7 | a misstatement of the law. |
| 08:52 | 8 | MS. KELLER:  Your Honor, I'm asking about this |
| 08:52 | 9 | copyright registration and what it says on behalf of Mattel. |
| 08:52 | 10 | THE COURT:  Overruled. |
| 08:52 | 11 | THE WITNESS:  I believe it was created in the |
| 08:52 | 12 | scope of his employment. |
| 08:52 | 13 | BY MS. KELLER: |
| 08:52 | 14 | Q.   I'm asking what this says that you filed with the |
| 08:52 | 15 | United States.  Okay?  You're saying Mr. Bryant's inventions |
| 08:52 | 16 | agreement gave you the right to the drawings even though he |
| 08:52 | 17 | didn't do the drawings in the scope of his employment, true? |
| 08:52 | 18 | MR. QUINN:  It's just wrong as a matter of law, |
| 08:52 | 19 | Your Honor. |
| 08:52 | 20 | MS. KELLER:  It's not wrong as a matter of law, |
| 08:52 | 21 | Your Honor. |
| 08:52 | 22 | MR. QUINN:  Your Honor, may we have a rare |
| 08:52 | 23 | conversation on this. |
| 08:52 | 24 | THE COURT:  No.  Neither one of you can, and quit |
| 08:53 | 25 | bickering amongst yourselves. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

17

| | | |
|---|---|---|
| 08:53 | 1 | It's overruled. |
| 08:53 | 2 | Answer the question, please. |
| 08:53 | 3 | THE WITNESS:  The way I read the document -- and |
| 08:53 | 4 | again, I'm not a lawyer -- I do see the assignment here, and |
| 08:53 | 5 | I do see the checked box "work for hire, no." |
| 08:53 | 6 | BY MS. KELLER: |
| 08:53 | 7 | Q.   Now, and you just admitted, I believe, a minute ago |
| 08:53 | 8 | before we had our colloquy, that you understand that a work |
| 08:53 | 9 | for hire is a work done within the scope of someone's |
| 08:53 | 10 | employment, correct? |
| 08:53 | 11 | A.   Yes. |
| 08:53 | 12 | Q.   And so this is an admission on Mattel's part that |
| 08:53 | 13 | Mr. Bryant did not do the drawings within the scope of his |
| 08:53 | 14 | employment, true? |
| 08:53 | 15 | A.   No, I don't -- I don't draw that conclusion. |
| 08:53 | 16 | Q.   All right.  Let's go back again.  When you check "no," |
| 08:53 | 17 | you're saying -- you're checking "no," this -- |
| 08:53 | 18 | THE COURT:  Well, just a moment.  He didn't check |
| 08:53 | 19 | "no." |
| 08:53 | 20 | BY MS. KELLER: |
| 08:53 | 21 | Q.   When Mattel's agent checked "no," you're saying this |
| 08:54 | 22 | contribution to the work was not a work made for hire, |
| 08:54 | 23 | right? |
| 08:54 | 24 | MR. QUINN:  Legal conclusion, Your Honor. |
| 08:54 | 25 | THE COURT:  Overruled. |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

18

| | | |
|---|---|---|
| 08:54 | 1 | THE WITNESS:  Mattel's agent is checking that |
| 08:54 | 2 | box -- |
| 08:54 | 3 | BY MS. KELLER: |
| 08:54 | 4 | Q.   And -- |
| 08:54 | 5 | A.   -- that's correct. |
| 08:54 | 6 | Q.   And you knew this was an extremely important document |
| 08:54 | 7 | because this document was Mattel's attempt to establish, |
| 08:54 | 8 | however late in the game, that Mattel actually owned the |
| 08:54 | 9 | Bratz dolls, right? |
| 08:54 | 10 | MR. QUINN:  It's argumentative.  Compound. |
| 08:54 | 11 | THE COURT:  Overruled. |
| 08:54 | 12 | THE WITNESS:  It's a copyright for the drawings. |
| 08:54 | 13 | BY MS. KELLER: |
| 08:54 | 14 | Q.   You knew that this was your company's attempt to |
| 08:54 | 15 | establish that you owned the drawings, right? |
| 08:54 | 16 | A.   Yes. |
| 08:54 | 17 | Q.   So you knew it was extremely important, right? |
| 08:54 | 18 | A.   Yes. |
| 08:54 | 19 | Q.   Because you knew that you were gonna claim that if you |
| 08:54 | 20 | owned the drawings, you owned everything that came from |
| 08:54 | 21 | those drawings, right? |
| 08:54 | 22 | A.   Yes.  I think generally that's true. |
| 08:54 | 23 | Q.   And so you knew this was a very, very important |
| 08:54 | 24 | document, right? |
| 08:54 | 25 | A.   I didn't, but I assume that the person who filled it |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:55 | 1 | out did. |
| 08:55 | 2 | Q.   And you're the head guy at Mattel, right? |
| 08:55 | 3 | A.   I am. |
| 08:55 | 4 | Q.   Buck stops with you, true? |
| 08:55 | 5 | A.   That's correct. |
| 08:55 | 6 | Q.   You're the person who runs the railroad.  You're the |
| 08:55 | 7 | engineer, right? |
| 08:55 | 8 |            THE COURT:  Well, Counsel, we'll stop with the |
| 08:55 | 9 | railroads. |
| 08:55 | 10 |            THE WITNESS:  No, I don't. |
| 08:55 | 11 |            THE COURT:  Well, you don't have to answer the |
| 08:55 | 12 | question. |
| 08:55 | 13 |            THE WITNESS:  I wanted to answer that question. |
| 08:55 | 14 |            THE COURT:  You're not a railroad person, so you |
| 08:55 | 15 | don't have to worry about it. |
| 08:55 | 16 |            Ask another question. |
| 08:55 | 17 | BY MS. KELLER: |
| 08:55 | 18 | Q.   And a minute ago you agreed that your understanding of |
| 08:55 | 19 | a work made for hire is a work prepared by an employee |
| 08:55 | 20 | within the scope of his or her employment, right? |
| 08:55 | 21 |            MR. QUINN:  Asked and answered twice. |
| 08:55 | 22 |            THE COURT:  Overruled. |
| 08:55 | 23 |            THE WITNESS:  Uh, yes. |
| 08:55 | 24 | BY MS. KELLER: |
| 08:55 | 25 | Q.   So when you're checking this box "no," you're saying |

| 08:55 | 1 | that your employee did not make this work within the scope |
| 08:55 | 2 | of his employment, correct? |
| 08:55 | 3 | A.   I didn't check the box.  When one checks the box -- |
| 08:55 | 4 | Q.   When -- |
| 08:55 | 5 | A.   -- I believe one may be deferring to the assignment on |
| 08:55 | 6 | the document. |
| 08:55 | 7 | Q.   That's not what I'm asking you.  Let me see if you |
| 08:56 | 8 | understand my question again. |
| 08:56 | 9 |      Okay?  Very simple. |
| 08:56 | 10 |      The box, "Was this a contribution to the work, 'a work |
| 08:56 | 11 | made for hire'" is checked "no."  And just minutes ago you |
| 08:56 | 12 | said you understand that a work made for hire is a work |
| 08:56 | 13 | prepared by an employee within the scope of his or her |
| 08:56 | 14 | employment, correct? |
| 08:56 | 15 | A.   That's correct. |
| 08:56 | 16 | Q.   Now, you know that Carter Bryant has always said he did |
| 08:56 | 17 | these drawings in 1998, right? |
| 08:56 | 18 | A.   No, I don't know that. |
| 08:56 | 19 | Q.   You know he's never once wavered from that, right? |
| 08:56 | 20 | A.   No, I don't know that. |
| 08:56 | 21 | Q.   And you know that's a central issue in this case, don't |
| 08:56 | 22 | you? |
| 08:56 | 23 | A.   I do believe the creation of the drawings is a central |
| 08:56 | 24 | issue, yes. |
| 08:56 | 25 | Q.   So it would be really important for you to know as the |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 21 of 142   Page ID #:306252
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

21

| | | |
|---|---|---|
| 08:56 | 1 | head guy at Mattel what Carter Bryant himself has said about |
| 08:56 | 2 | that, wouldn't it? |
| 08:57 | 3 | A.   Um, I have not been here for Carter Bryant's testimony. |
| 08:57 | 4 | Q.   Not my question. |
| 08:57 | 5 | A.   I have no way of knowing. |
| 08:57 | 6 | Q.   Not my question. |
| 08:57 | 7 | A.   I'm sorry. |
| 08:57 | 8 | Q.   You have no way of knowing.  You have able counsel, |
| 08:57 | 9 | don't you? |
| 08:57 | 10 | MR. QUINN:  Your Honor -- |
| 08:57 | 11 | THE WITNESS:  I don't think I'm allowed to discuss |
| 08:57 | 12 | someone's testimony in court with my attorneys. |
| 08:57 | 13 | BY MS. KELLER: |
| 08:57 | 14 | Q.   You have able counsel, don't you? |
| 08:57 | 15 | A.   I do. |
| 08:57 | 16 | Q.   And you had able counsel for years and years on this |
| 08:57 | 17 | matter, right? |
| 08:57 | 18 | A.   That's correct. |
| 08:57 | 19 | Q.   The same able counsel for years and years, right? |
| 08:57 | 20 | A.   That's correct. |
| 08:57 | 21 | Q.   And you said -- for example, you even were here for |
| 08:57 | 22 | opening statements, right? |
| 08:57 | 23 | A.   I was. |
| 08:57 | 24 | Q.   And, of course, you were familiar with the testimony of |
| 08:57 | 25 | the various witnesses, right? |

| | | |
|---|---|---|
| 08:57 | 1 | A.   No, I'm not. |
| 08:57 | 2 | Q.   Are you telling me that in all these years, you've |
| 08:57 | 3 | never inquired of anybody what Carter Bryant actually said |
| 08:57 | 4 | about his ownership of the drawings? |
| 08:57 | 5 | A.   Um, I may have asked someone, but I've -- I've not -- |
| 08:57 | 6 | I'm not -- I've not seen his testimony. |
| 08:58 | 7 | Q.   I'm not asking what you may have done.  I'm asking what |
| 08:58 | 8 | you did.  Are you telling me that in all these years you |
| 08:58 | 9 | have never inquired, "What did Carter Bryant actually say |
| 08:58 | 10 | about his ownership of these drawings?" |
| 08:58 | 11 | MR. QUINN:  It's argumentative.  "Are you telling |
| 08:58 | 12 | me." |
| 08:58 | 13 | THE COURT:  Sustained.  Restate the question. |
| 08:58 | 14 | BY MS. KELLER: |
| 08:58 | 15 | Q.   Is it true, Mr. Eckert, knowing that this is a central |
| 08:58 | 16 | issue in this case, that in all these many years, you have |
| 08:58 | 17 | never once inquired, "What did Carter Bryant say about his |
| 08:58 | 18 | ownership of these drawings?" |
| 08:58 | 19 | A.   I'm not sure that I have. |
| 08:58 | 20 | Q.   And in all these years, you've never inquired, "What |
| 08:58 | 21 | did Carter Bryant say about when he made these drawings?" |
| 08:58 | 22 | A.   No, I have had discussions about that. |
| 08:58 | 23 | Q.   Well, you've had discussions about that.  So you know, |
| 08:58 | 24 | then, that Carter Bryant has always said unwaveringly to |
| 08:58 | 25 | everyone who asked him, in and out of court, that he made |

| | | |
|---|---|---|
| 08:59 | 1 | these drawings in 1998.  You know that, don't you? |
| 08:59 | 2 | A.   No, I don't know that. |
| 08:59 | 3 | Q.   Because you didn't ask? |
| 08:59 | 4 | A.   No.  Uh -- |
| 08:59 | 5 | Q.   Wasn't important to you? |
| 08:59 | 6 | A.   No, that's not true.  I don't know that. |
| 08:59 | 7 | Q.   Certainly it was something you wanted to know before |
| 08:59 | 8 | you sued him, wasn't it? |
| 08:59 | 9 | MR. QUINN:  The "it."  It's vague and ambiguous. |
| 08:59 | 10 | THE COURT:  Do you understand the question, sir? |
| 08:59 | 11 | If you don't, she can reask it. |
| 08:59 | 12 | MS. KELLER:  I'll reask it, Your Honor. |
| 08:59 | 13 | THE WITNESS:  All right. |
| 08:59 | 14 | BY MS. KELLER: |
| 08:59 | 15 | Q.   Mr. Eckert, surely before you sued Carter Bryant, |
| 08:59 | 16 | surely you wanted a thorough investigation done and report |
| 08:59 | 17 | to you about what he said was the date of the creation of |
| 08:59 | 18 | these drawings, right? |
| 08:59 | 19 | A.   No, that wasn't even relevant to the suit we filed |
| 08:59 | 20 | against Carter Bryant. |
| 08:59 | 21 | Q.   Ah, because even if he had created them before he came |
| 08:59 | 22 | to work at Mattel, you still intended to sue him, right? |
| 08:59 | 23 | A.   Even if he -- I'm sorry, if could you reask that |
| 08:59 | 24 | question. |
| 08:59 | 25 | Q.   Because even if he created them before he came to work |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 24 of 142   Page ID #:306255
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

24

| | | |
|---|---|---|
| 09:00 | 1 | at Mattel, you were still gonna sue him, right? |
| 09:00 | 2 | A.   Yes. |
| 09:00 | 3 | Q.   No matter what, right? |
| 09:00 | 4 | A.   No. |
| 09:00 | 5 | Q.   If he created them in 1995, you were gonna sue him, |
| 09:00 | 6 | right? |
| 09:00 | 7 | A.   Again -- |
| 09:00 | 8 | Q.   A "yes"? |
| 09:00 | 9 |       MR. QUINN:  Excuse me, Your Honor.  May the |
| 09:00 | 10 | witness -- |
| 09:00 | 11 |       THE COURT:  I don't think the witness can answer |
| 09:00 | 12 | the question. |
| 09:00 | 13 |       So slow down.  Ask the question.  Okay? |
| 09:00 | 14 |       And then you'll respond. |
| 09:00 | 15 | BY MS. KELLER: |
| 09:00 | 16 | Q.   I'm gonna ask you a question that calls for a "yes" or |
| 09:00 | 17 | "no" answer.  Even if you had thought he created them in |
| 09:00 | 18 | 1997, you were still gonna sue him, right? |
| 09:00 | 19 |       MR. QUINN:  Your Honor, it can't be fairly |
| 09:00 | 20 | answered yes or no. |
| 09:00 | 21 |       THE COURT:  Do you understand the question? |
| 09:00 | 22 |       THE WITNESS:  I do. |
| 09:00 | 23 |       THE COURT:  Okay.  You can respond. |
| 09:00 | 24 |       THE WITNESS:  We were going to sue Carter Bryant |
| 09:00 | 25 | for his disloyalty to Mattel by accepting employment and |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 25 of 142   Page ID #:306256
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

25

| 09:00 | 1 | working exclusively for a competitor while he was an |
| 09:00 | 2 | employee of Mattel, regardless of what date the drawings |
| 09:00 | 3 | were made. |
| 09:00 | 4 | BY MS. KELLER: |
| 09:00 | 5 | Q.   So even if they had been made in 1997, you were gonna |
| 09:00 | 6 | sue him, yes? |
| 09:00 | 7 | A.   Yes, I believe that's the case. |
| 09:01 | 8 | Q.   Even if he made 'em in 1996, you were gonna sue him, |
| 09:01 | 9 | right? |
| 09:01 | 10 | A.   Yes, I believe that's the case. |
| 09:01 | 11 | Q.   Even if he made 'em in 1995, you were gonna sue him, |
| 09:01 | 12 | right? |
| 09:01 | 13 | A.   Yes, I believe that's the case. |
| 09:01 | 14 | Q.   Even if he made 'em in 1994, you were gonna sue him, |
| 09:01 | 15 | right? |
| 09:01 | 16 | A.   Yes. |
| 09:01 | 17 | Q.   Even if he made 'em in 1985, you were gonna sue him, |
| 09:01 | 18 | right? |
| 09:01 | 19 | A.   I have to see when he was born. |
| 09:01 | 20 | *(Laughter in the courtroom.)* |
| 09:01 | 21 | MS. KELLER:   Trust me that he's older than 25, 26. |
| 09:01 | 22 | BY MS. KELLER: |
| 09:01 | 23 | Q.   You were gonna sue him no matter when he made these |
| 09:01 | 24 | drawings, right? |
| 09:01 | 25 | A.   Again, the initial lawsuit was not related to the date |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 26 of 142   Page ID #:306257
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

26

| | | |
|---|---|---|
| 09:01 | 1 | of the drawings.  It was related to his violation of his |
| 09:01 | 2 | employment agreement with Mattel by working exclusively for |
| 09:01 | 3 | a competitor while he was under contract to work for Mattel. |
| 09:01 | 4 | Q.    His disloyalty to Mattel? |
| 09:01 | 5 | A.    Yeah. |
| 09:01 | 6 | Q.    That's what he was being sued for, his disloyalty? |
| 09:02 | 7 | A.    Breach of contract. |
| 09:02 | 8 | Q.    And is that the only thing you're pursuing here in |
| 09:02 | 9 | court?  Is that -- |
| 09:02 | 10 | A.    No.  We've learned a lot more since that initial |
| 09:02 | 11 | lawsuit. |
| 09:02 | 12 | Q.    And you think that, even if he created those drawings |
| 09:02 | 13 | in 1998 when he was not working for Mattel, you think that |
| 09:02 | 14 | you're entitled to a hundred percent of everything that was |
| 09:02 | 15 | created using those drawings as a starting point, right? |
| 09:02 | 16 | A.    No.  If -- if he created those drawings in 1998 when he |
| 09:02 | 17 | was not a Mattel employee, and he had disclosed those to |
| 09:02 | 18 | Mattel -- |
| 09:02 | 19 | Q.    No, no.  No. |
| 09:02 | 20 | A.    I'm sorry. |
| 09:02 | 21 |         MR. QUINN:  Cut off the answer, Your Honor. |
| 09:02 | 22 |         THE COURT:  I'm gonna have you finish the answer, |
| 09:02 | 23 | sir. |
| 09:02 | 24 |         THE WITNESS:  If he created the drawings when he |
| 09:02 | 25 | was not an employee of Mattel, and had he informed Mattel of |

| | | |
|---|---|---|
| 09:02 | 1 | those drawings when he joined the company, as he was |
| 09:03 | 2 | required to do, and he pursued those drawings after he left |
| 09:03 | 3 | the company and never did anything with those drawings or |
| 09:03 | 4 | anything related to those drawings while he was at Mattel, I |
| 09:03 | 5 | don't think we'd have a claim for everything that came |
| 09:03 | 6 | subsequent to those drawings. |
| 09:03 | 7 | BY MS. KELLER: |
| 09:03 | 8 | Q.   Let's break it down, because there are a number of |
| 09:03 | 9 | issues that are gonna have to be decided in this lawsuit. |
| 09:03 | 10 | Okay?  Let's break it down. |
| 09:03 | 11 | Let's say he had created those drawings in 1998 when he |
| 09:03 | 12 | was not working for Mattel.  And that's all you had.  Okay? |
| 09:03 | 13 | Forget about whether he disclosed them.  That's all you have |
| 09:03 | 14 | to go on. |
| 09:03 | 15 | He created the drawings in 1998 when he was not working |
| 09:03 | 16 | for Mattel. |
| 09:03 | 17 | Would you still be in here asking for 100 percent of |
| 09:03 | 18 | everything that was created that says "Bratz" on it? |
| 09:03 | 19 | A.   He still violated his -- he still -- I'm sorry, if you |
| 09:03 | 20 | want me to answer the question, I'd like to do that. |
| 09:03 | 21 | Q.   I'm asking you a question, and you're answering a |
| 09:04 | 22 | different one. |
| 09:04 | 23 | THE COURT:  Just a moment.  Finish your answer, |
| 09:04 | 24 | and then we'll continue to reask the question back and forth |
| 09:04 | 25 | for a while.  It's fine. |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 28 of 142   Page ID #:306259
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

28

| | | |
|---|---|---|
| 09:04 | 1 | THE WITNESS:  Okay. |
| 09:04 | 2 | THE COURT:  So finish your answer. |
| 09:04 | 3 | THE WITNESS:  He still violated his agreement with |
| 09:04 | 4 | Mattel, if he did not disclose those drawings to Mattel. |
| 09:04 | 5 | BY MS. KELLER: |
| 09:04 | 6 | Q.   I'm asking you a different question. |
| 09:04 | 7 | A.   Okay. |
| 09:04 | 8 | Q.   I want you to tell me if you understand the question |
| 09:04 | 9 | before you answer it.  Okay? |
| 09:04 | 10 | A.   Okay. |
| 09:04 | 11 | Q.   I'm asking you only one thing, not legal theories, not |
| 09:04 | 12 | other things you know, not other things you want to throw |
| 09:04 | 13 | in.  Okay? |
| 09:04 | 14 | MR. QUINN:  Your Honor, I object -- |
| 09:04 | 15 | MS. KELLER:  One question. |
| 09:04 | 16 | MR. QUINN:  I object to the preamble. |
| 09:04 | 17 | THE COURT:  We'll strike the last portion. |
| 09:04 | 18 | Ladies and gentlemen, remember something.  The |
| 09:04 | 19 | Court has a certain amount of discretion.  I gave Mr. Price |
| 09:04 | 20 | a wide amount of discretion in some cases.  On some |
| 09:04 | 21 | occasions, the questions were redundant, there was a weekend |
| 09:04 | 22 | in between when Mr. Larian was on the stand.  I'm going to |
| 09:04 | 23 | give counsel the same opportunity for MGA.  Some of the |
| 09:04 | 24 | questions may be redundant.  Bear with both counsel from |
| 09:04 | 25 | both sides, both of these gentlemen are the CEOs of their |

| 09:04 | 1 | corporations. |
| 09:04 | 2 | Counsel. |
| 09:04 | 3 | BY MS. KELLER: |
| 09:05 | 4 | Q.   Gonna ask it a different way, Mr. Eckert.  This is a |
| 09:05 | 5 | "yes" or "no" answer.  If an employee has an idea before he |
| 09:05 | 6 | or she comes to work for Mattel, does Mattel own that idea? |
| 09:05 | 7 | A.   Generally, not. |
| 09:05 | 8 | Q.   Now, when employees agree to work at Mattel and sign a |
| 09:05 | 9 | confidentiality agreement with Mattel, you don't believe |
| 09:05 | 10 | they transfer all the ideas and dreams they had before they |
| 09:05 | 11 | began to work at Mattel, true? |
| 09:05 | 12 | A.   Um, that's correct.  They, I'm sure, have many ideas |
| 09:05 | 13 | and dreams totally unrelated to Mattel's business. |
| 09:05 | 14 | Q.   When employees agree to work at Mattel and sign a |
| 09:05 | 15 | confidentiality agreement with Mattel, you don't believe |
| 09:05 | 16 | they transfer all the ideas and dreams they had before they |
| 09:05 | 17 | began to work at Mattel, yes or no? |
| 09:05 | 18 | A.   I think I just answered that. |
| 09:05 | 19 | Q.   Is that a yes?  Do you agree with that statement? |
| 09:06 | 20 | A.   Yes, I agree that employees may have all sorts of |
| 09:06 | 21 | dreams and ideas totally unrelated to Mattel or Mattel's |
| 09:06 | 22 | business. |
| 09:06 | 23 | Q.   That's not what I'm asking you.  Let me ask it again. |
| 09:06 | 24 | A.   Okay. |
| 09:06 | 25 | Q.   When employees agree to work at Mattel and sign a |

| | | |
|---|---|---|
| 09:06 | 1 | confidentiality agreement with Mattel, you don't believe |
| 09:06 | 2 | they transfer all the ideas and dreams they had before they |
| 09:06 | 3 | began work at Mattel, true or false? |
| 09:06 | 4 | A.   For the third time, I believe that their dreams and |
| 09:06 | 5 | ideas and things they have in life totally unrelated to |
| 09:06 | 6 | Mattel's business, we have no claim for. |
| 09:06 | 7 | Q.   And so if they have a dream or an idea before they work |
| 09:06 | 8 | at Mattel that's related to Mattel's business, you believe |
| 09:06 | 9 | they do transfer that to Mattel? |
| 09:06 | 10 | A.   I believe they need to disclose that. |
| 09:06 | 11 | Q.   That's not my question.  Is that idea transferred to |
| 09:06 | 12 | Mattel? |
| 09:06 | 13 | A.   If they haven't told us about it, there's certainly |
| 09:06 | 14 | gonna be the potential for a dispute. |
| 09:06 | 15 | Q.   Different question.  Do they transfer it to Mattel? |
| 09:07 | 16 | A.   Um, they may very well. |
| 09:07 | 17 | Q.   Do they transfer it to Mattel? |
| 09:07 | 18 | A.   They may very well. |
| 09:07 | 19 | Q.   Do they transfer it to Mattel? |
| 09:07 | 20 | A.   They may very well. |
| 09:07 | 21 | Q.   Do they or don't they? |
| 09:07 | 22 | A.   They may very well. |
| 09:07 | 23 | THE COURT:  I think that's the answer that's going |
| 09:07 | 24 | to be forthcoming:  They may very well. |
| 09:07 | 25 | MS. KELLER:  Your Honor, I'd ask the witness to |

| | | |
|---|---|---|
| 09:07 | 1 | take a look at his deposition transcript of July -- I'm |
| 09:07 | 2 | sorry -- trial transcript of July 1st, 2008. |
| 09:07 | 3 | *(Document provided to the witness.)* |
| 09:07 | 4 | MS. KELLER:  Page 3879, lines 14 through 18. |
| 09:07 | 5 | THE COURT:  You may read. |
| 09:08 | 6 | MS. KELLER:  (Reading:) |
| 09:08 | 7 | "QUESTION:  When an employee agrees to go to work |
| 09:08 | 8 | at Mattel and signs a confidentiality agreement with Mattel, |
| 09:08 | 9 | is it your view that they transfer all of the ideas and |
| 09:08 | 10 | dreams that they had before they began to work at Mattel? |
| 09:08 | 11 | "ANSWER:  No." |
| 09:08 | 12 | BY MS. KELLER: |
| 09:08 | 13 | Q.   Now -- so a moment ago I believe you were saying that |
| 09:08 | 14 | an employee who comes with an idea -- comes up with an idea |
| 09:08 | 15 | before coming to work at Mattel might transfer that to |
| 09:08 | 16 | Mattel.  They may very well have transferred it to Mattel -- |
| 09:08 | 17 | was that what you said? -- if it related to Mattel's |
| 09:08 | 18 | business, right? |
| 09:08 | 19 | A.   Uh, yes. |
| 09:08 | 20 | Q.   And where in the Mattel inventions agreement does it |
| 09:08 | 21 | say that? |
| 09:08 | 22 | A.   May I have a copy of the agreement? |
| 09:08 | 23 | Q.   Have you studied it before today? |
| 09:09 | 24 | A.   I've certainly looked at it. |
| 09:09 | 25 | Q.   Take a look at Trial Exhibit 25.  The same as your |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 32 of 142   Page ID #:306263
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

32

| | | |
|---|---|---|
| 09:09 | 1 | agreement, I might add. |
| 09:09 | 2 | THE COURT: They'll hand you a copy in just a |
| 09:09 | 3 | moment. |
| 09:09 | 4 | MS. KELLER: This is actually Carter Bryant's |
| 09:09 | 5 | agreement we're gonna hand you. |
| 09:09 | 6 | THE WITNESS: And does it have the attached |
| 09:09 | 7 | conflict-of-interest statement? |
| 09:09 | 8 | BY MS. KELLER: |
| 09:09 | 9 | Q.   I'm asking you where in the inventions agreement it is. |
| 09:09 | 10 | Okay?  I'm not asking you about the conflict-of-interest |
| 09:09 | 11 | form, and I'm sure your counsel can go into that with you. |
| 09:09 | 12 | MGA ASSISTANT PHILLIPS: I do have 13614, which is |
| 09:09 | 13 | his agreement.  I will actually approach, if I may.  And we |
| 09:09 | 14 | can give you both your agreement and the identical Carter |
| 09:09 | 15 | Bryant agreement. |
| 09:10 | 16 | THE WITNESS: I think they're the same. |
| 09:10 | 17 | *(Documents provided to the witness.)* |
| 09:11 | 18 | MS. KELLER: And could we have Section 2 blown up, |
| 09:11 | 19 | please, specifically 2-A. |
| 09:11 | 20 | *(Document displayed.)* |
| 09:11 | 21 | THE WITNESS: Okay.  I believe the answer is in |
| 09:11 | 22 | the third section. |
| 09:11 | 23 | BY MS. KELLER: |
| 09:11 | 24 | Q.   Conflicts with other activities? |
| 09:11 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 09:11 | 1 | Q.   Let's read it. |
| 09:11 | 2 | "My employment with the company requires my undivided |
| 09:11 | 3 | attention and effort; therefore, during my employment with |
| 09:11 | 4 | the company, I will fully comply with the company's |
| 09:11 | 5 | conflict-of-interest policy as it may be amended from time |
| 09:11 | 6 | to time.  I shall not, without the company's express written |
| 09:11 | 7 | consent, engage in any employment or business other than for |
| 09:11 | 8 | the company or invest in or assist in any manner in any |
| 09:12 | 9 | business competitive with the business or future business |
| 09:12 | 10 | plans of the company." |
| 09:12 | 11 | Where in that portion does it say the word "transfer"? |
| 09:12 | 12 | A.   I don't believe it says the word "transfer." |
| 09:12 | 13 | Q.   Where in that portion does it say the word |
| 09:12 | 14 | "inventions"? |
| 09:12 | 15 | A.   I don't believe it says the word "inventions." |
| 09:12 | 16 | Q.   Where in that portion does it say the word |
| 09:12 | 17 | "assignment"? |
| 09:12 | 18 | A.   I don't believe it says the word "assignment." |
| 09:12 | 19 | Q.   Now, let's look under "ownership of inventions," 2-A. |
| 09:12 | 20 | "I agree to communicate to the company as promptly and |
| 09:12 | 21 | fully as practicable all inventions as defined below |
| 09:12 | 22 | conceived or reduced to practice by me alone or jointly by |
| 09:12 | 23 | others at any time during my employment by the company.  I |
| 09:12 | 24 | hereby assign to the company and/or its nominees all my |
| 09:12 | 25 | right, title, and interest in such inventions and all my |

DEBBIE GALE, U.S. COURT REPORTER

34

09:13 1    right, title, and interest in any patents, copyrights,

09:13 2    patent applications, or copyright applications based

09:13 3    thereon.  I will assist the company and/or its nominees

09:13 4    without charge, but at no expense to me at any time, in any

09:13 5    proper way to obtain for its and/or their own benefit

09:13 6    patents and copyrights for all such inventions anywhere in

09:13 7    the world and to enforce its and/or their rights and legal

09:13 8    proceedings."

09:13 9            MS. KELLER:  Let's go back to that first sentence

09:13 10   again.  Let's see if we can highlight "conceived or reduced

09:13 11   to practice by me alone or jointly by others at any time

09:13 12   during my employment by the company."

09:13 13            *(Document displayed.)*

09:13 14   BY MS. KELLER:

09:13 15   Q.   Now, do you know what the word "during" means?

09:13 16   A.   Yes.

09:13 17   Q.   And you know what the period of my -- okay.  "During,"

09:13 18   you know what that means.  You know what "my employment"

09:13 19   means, right?

09:14 20   A.   Yes.

09:14 21   Q.   You know what "by the company" means, right?

09:14 22   A.   That's correct.

09:14 23   Q.   During my employment by the company means during my

09:14 24   work at Mattel, right?

09:14 25   A.   No.  It means while I'm employed by the company.

| 09:14 | 1 | Q.   And the conflict-of-interest questionnaire you talked |
| 09:14 | 2 | about doesn't say anything about inventions or ideas, does |
| 09:14 | 3 | it? |
| 09:14 | 4 | A.   Um, I'd like to see that. |
| 09:14 | 5 | Q.   Let's take a look at Trial Exhibit 26. |
| 09:14 | 6 | *(Document displayed.)* |
| 09:14 | 7 | *(Document provided to the witness.)* |
| 09:14 | 8 | MS. KELLER:  It's in evidence. |
| 09:15 | 9 | BY MS. KELLER: |
| 09:15 | 10 | Q.   Do you see the word "inventions" anywhere? |
| 09:16 | 11 | A.   No, I do not. |
| 09:16 | 12 | Q.   Do you see the word "assignment" anywhere in there? |
| 09:16 | 13 | You know it's not there, right? |
| 09:16 | 14 | A.   I'll take your word for it. |
| 09:16 | 15 | Q.   Let's look at the bottom where it says, "I certify." |
| 09:16 | 16 | "I certify that I have read Mattel's policies |
| 09:16 | 17 | concerning conflict of interest and the answers to the above |
| 09:16 | 18 | questions are true.  I understand that failure to answer |
| 09:16 | 19 | this questionnaire fully and truthfully constitutes grounds |
| 09:16 | 20 | for immediate termination of my employment." |
| 09:16 | 21 | That means firing, right? |
| 09:16 | 22 | A.   Yes, it does. |
| 09:16 | 23 | Q.   So somebody who doesn't answer this truthfully, the |
| 09:16 | 24 | consequence is firing, true? |
| 09:16 | 25 | A.   I believe it says it may be. |

| | | |
|---|---|---|
| 09:16 | 1 | Q.   "I agree" -- well, let's look at that.  Let's just talk |
| 09:16 | 2 | about that for a minute. |
| 09:16 | 3 | "I certify that I have read Mattel's policies |
| 09:16 | 4 | concerning conflict of interest and the answers to the above |
| 09:16 | 5 | questions are true.  I understand that failure to answer |
| 09:16 | 6 | this questionnaire fully and truthfully constitutes grounds |
| 09:17 | 7 | for immediate termination of my employment." |
| 09:17 | 8 | Where does it say "may be" in there? |
| 09:17 | 9 | A.   That's how I interpret the sentence you just read. |
| 09:17 | 10 | Q.   Where does it say "may be"? |
| 09:17 | 11 | A.   I interpret "constitutes grounds" as that could be an |
| 09:17 | 12 | outcome. |
| 09:17 | 13 | Q.   Where does it say "may be"? |
| 09:17 | 14 | A.   That's how I interpret it, despite the fact that it |
| 09:17 | 15 | doesn't say the word "may be." |
| 09:17 | 16 | Q.   Okay.  So the words "may be" are not there? |
| 09:17 | 17 | A.   That's correct. |
| 09:17 | 18 | Q.   And it says, "I also agree to notify my superior |
| 09:17 | 19 | immediately of any changes in my situation that would cause |
| 09:17 | 20 | me to answer any of the above questions differently.  I |
| 09:17 | 21 | further certify that to the best of my knowledge, neither I |
| 09:17 | 22 | nor any member of my immediate family is or has been engaged |
| 09:17 | 23 | in any capacity which creates a conflict of interest." |
| 09:17 | 24 | So this conflict-of-interest questionnaire asks the |
| 09:17 | 25 | employee to divulge any conflicts, right? |

| | | |
|---|---|---|
| 09:18 | 1 | A.   Yes. |
| 09:18 | 2 | Q.   And says that if they don't, they can be fired, true? |
| 09:18 | 3 | A.   Yes. |
| 09:18 | 4 | Q.   It doesn't say that they are hereby assigning anything |
| 09:18 | 5 | they've created to Mattel anywhere on this form, right? |
| 09:18 | 6 | A.   This form does not talk about assignment, that's |
| 09:18 | 7 | correct. |
| 09:18 | 8 | Q.   And, in fact, it says the purpose -- at the top, it |
| 09:18 | 9 | says, "The purpose of this questionnaire is to confirm the |
| 09:18 | 10 | propriety of relations between our key employees and our |
| 09:18 | 11 | suppliers and competitors."  It doesn't say the purpose of |
| 09:18 | 12 | this conflict-of-interest questionnaire is to transfer to |
| 09:18 | 13 | Mattel any intellectual property not disclosed on this form, |
| 09:18 | 14 | right? |
| 09:18 | 15 | A.   No.  The purpose of the inventions agreement is to |
| 09:18 | 16 | transfer intellectual property. |
| 09:18 | 17 | Q.   Yes, exactly what I was asking you about before.  And |
| 09:18 | 18 | so what I'm asking you is -- let's ask again.  Under your |
| 09:18 | 19 | inventions agreement, is it your testimony that even if |
| 09:19 | 20 | Carter Bryant devised the drawings, drew them in 1998, they |
| 09:19 | 21 | still belong to Mattel? |
| 09:19 | 22 | A.   They may. |
| 09:19 | 23 | Q.   Yes or no; do they or don't they? |
| 09:19 | 24 | A.   It depends on the circumstances. |
| 09:19 | 25 | Q.   Well, you haven't even asked about the circumstances -- |

| | | |
|---|---|---|
| 09:19 | 1 | A.   No, I've just -- you haven't asked about them either. |
| 09:19 | 2 | Q.   You're telling us -- believe me, we've asked about |
| 09:19 | 3 | them.  Specifically, when Carter Bryant created these |
| 09:19 | 4 | drawings -- |
| 09:19 | 5 | MR. QUINN:  Move to strike, Your Honor. |
| 09:19 | 6 | THE COURT:  Strike the comment. |
| 09:19 | 7 | Counsel, ask a question now. |
| 09:19 | 8 | BY MS. KELLER: |
| 09:19 | 9 | Q.   You don't even know, you told us, what Carter Bryant |
| 09:19 | 10 | has said about whether he created these drawings in 1998, |
| 09:19 | 11 | right? |
| 09:19 | 12 | A.   That's correct. |
| 09:19 | 13 | Q.   And as far as you're concerned -- you told us a little |
| 09:19 | 14 | while ago, no matter what these agreements say, as far as |
| 09:19 | 15 | you're concerned, if he drew them in 1998 and then he came |
| 09:19 | 16 | to work at Mattel, Mattel still owns them, right? |
| 09:19 | 17 | A.   No.  I think I said they may own them.  We may have |
| 09:20 | 18 | rights to those drawings. |
| 09:20 | 19 | Q.   Well, you're asking for a billion dollars or more. |
| 09:20 | 20 | Okay?  Do you or don't you think you own them even if they |
| 09:20 | 21 | were created in 1998? |
| 09:20 | 22 | A.   It depends on the circumstances. |
| 09:20 | 23 | Q.   Knowing the circumstances in this case, do you or don't |
| 09:20 | 24 | you? |
| 09:20 | 25 | A.   Knowing the circumstances in this case, yes, I believe |

| | | |
|---|---|---|
| 09:20 | 1 | we do. |
| 09:20 | 2 | Q.   And that's even if he created them in Missouri on his |
| 09:20 | 3 | on time when he wasn't working for Mattel in 1998, right? |
| 09:20 | 4 | A.   Of course, you know that's not all he did, so I believe |
| 09:20 | 5 | the circumstances are not -- |
| 09:20 | 6 | Q.   Do you understand my question? |
| 09:20 | 7 | A.   -- not exhaustive. |
| 09:20 | 8 | Yes, I do. |
| 09:20 | 9 | Q.   Let me ask it again.  So it's your testimony, then, |
| 09:20 | 10 | that no matter what these agreements say, even if he created |
| 09:20 | 11 | the drawings in 1998 in Missouri when he was not working for |
| 09:20 | 12 | Mattel, Mattel owns them? |
| 09:20 | 13 | A.   Under the circumstances, as I understand them, the |
| 09:20 | 14 | answer is yes. |
| 09:20 | 15 | Q.   And based on your understanding, you're asking for a |
| 09:21 | 16 | billion dollars in damages, true? |
| 09:21 | 17 | A.   No, I don't believe that's the case.  But I'm sure |
| 09:21 | 18 | we're asking for substantial damages. |
| 09:21 | 19 | Q.   You don't even know how much you're asking for? |
| 09:21 | 20 | A.   Well, I know there is a debate through and including |
| 09:21 | 21 | last night on what the damages' requests are. |
| 09:21 | 22 | Q.   You know there's a debate as to what the Court is gonna |
| 09:21 | 23 | rule, right? |
| 09:21 | 24 | A.   Yes, I do. |
| 09:21 | 25 | Q.   You know that you've been asking from the beginning |

| | | |
|---|---|---|
| 09:21 | 1 | here for a billion dollars, right? |
| 09:21 | 2 | A.   I don't know that to be the case. |
| 09:21 | 3 | Q.   Well, you said -- you've told us that you sat through |
| 09:21 | 4 | both opening statements, right? |
| 09:21 | 5 | A.   I did. |
| 09:21 | 6 | Q.   So you know that figure your company is asking for is a |
| 09:21 | 7 | billion dollars or more, right? |
| 09:21 | 8 | A.   No, I don't know that. |
| 09:21 | 9 | Q.   Have you forgotten? |
| 09:21 | 10 | MR. QUINN:  Your Honor, it's -- |
| 09:21 | 11 | THE WITNESS:  No. |
| 09:21 | 12 | MR. QUINN:  -- argumentative. |
| 09:21 | 13 | THE COURT:  Yeah.  Sustained. |
| 09:21 | 14 | You can ask, Counsel. |
| 09:21 | 15 | MS. KELLER:  Is -- |
| 09:21 | 16 | THE COURT:  -- about the opening statement and |
| 09:21 | 17 | what he heard, et cetera, but it's a little argumentative. |
| 09:21 | 18 | BY MS. KELLER: |
| 09:21 | 19 | Q.   You remember Mr. Quinn saying that this jury was gonna |
| 09:22 | 20 | be asked for damages of about a billion dollars, right? |
| 09:22 | 21 | MR. QUINN:  Your Honor, I thought we weren't |
| 09:22 | 22 | getting into opening statements. |
| 09:22 | 23 | THE COURT:  Well, remember, opening statements are |
| 09:22 | 24 | not evidence.  They're simply an effort by both counsel to |
| 09:22 | 25 | tell you where they hope that they're going with the case. |

| | | |
|---|---|---|
| 09:22 | 1 | Things substantially change for both sides. |
| 09:22 | 2 | But all we're interested in here is just the state |
| 09:22 | 3 | of mind that you have, not what your counsel's asking for. |
| 09:22 | 4 | Um, whatever the evidence is that changes, including |
| 09:22 | 5 | increasing or decreasing that amount. |
| 09:22 | 6 | So you can ask him what his state of mind is, |
| 09:22 | 7 | Counsel, what his expectations were, which is what I thought |
| 09:22 | 8 | you were asking.  So just reask it. |
| 09:22 | 9 | BY MS. KELLER: |
| 09:22 | 10 | Q.   Mr. Eckert, you know that from the beginning of this |
| 09:22 | 11 | litigation, it's been Mattel's position that you're entitled |
| 09:22 | 12 | to damages of a billion dollars or more, true? |
| 09:22 | 13 | A.   No, I don't believe that's the case. |
| 09:22 | 14 | Q.   Okay.  What's the number that you've been asking for |
| 09:22 | 15 | all along since the start? |
| 09:23 | 16 | A.   Um, the number has changed. |
| 09:23 | 17 | MR. QUINN:  Your Honor, yeah, assumes facts -- |
| 09:23 | 18 | assumes that there is one number. |
| 09:23 | 19 | THE COURT:  Yeah. |
| 09:23 | 20 | Some of this will depend upon some of the rulings, |
| 09:23 | 21 | quite frankly, that the Court makes about what evidence is |
| 09:23 | 22 | presented to you. |
| 09:23 | 23 | So both sides are right, and both sides are wrong |
| 09:23 | 24 | a little bit.  And I'm gonna give counsel discretion to ask |
| 09:23 | 25 | what's in Mr. Eckert's mind.  But that doesn't mean that |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

42

| 09:23 | 1 | he's in a fair position to answer that right now.  It may be |
| 09:23 | 2 | a situation where he has one belief, and it's either |
| 09:23 | 3 | increased, literally, or decreased.  So we were spending |
| 09:23 | 4 | some of our nights discussing that, and some of our |
| 09:23 | 5 | weekends, amongst many issues. |
| 09:23 | 6 |          As best you can, Counsel, and best you can, |
| 09:23 | 7 | Mr. Eckert. |
| 09:23 | 8 | BY MS. KELLER: |
| 09:23 | 9 | Q.   Mr. Eckert, let me try to make it very clear.  Okay? |
| 09:23 | 10 | I'm not asking you what your understanding is of any ruling |
| 09:24 | 11 | the Court may make about the maximum amount Mattel might be |
| 09:24 | 12 | allowed to ask the jury for.  Okay?  Do you understand that? |
| 09:24 | 13 | A.   I do. |
| 09:24 | 14 | Q.   I'm asking you, isn't it true that Mattel has asked in |
| 09:24 | 15 | this litigation, before this trial started and at the start |
| 09:24 | 16 | of this trial, for damages of a billion dollars or more? |
| 09:24 | 17 | True or false? |
| 09:24 | 18 | A.   I think that's true. |
| 09:24 | 19 | Q.   Let's go back to -- let's go back to that inventions |
| 09:24 | 20 | agreement of Mattel.  Is it your understanding that under |
| 09:24 | 21 | the inventions agreement that we've been looking at, that if |
| 09:24 | 22 | an employee creates drawings ten years before that employee |
| 09:24 | 23 | comes to work at Mattel and then comes to work at Mattel in |
| 09:25 | 24 | a related design capacity, designer capacity, that those |
| 09:25 | 25 | drawings belong to Mattel? |

| | | |
|---|---|---|
| 09:25 | 1 | A.    Again, it depends on the circumstances. |
| 09:25 | 2 | Q.    Well, this is -- this is a hypothetical question.  Jane |
| 09:25 | 3 | Jones makes some drawings of a doll, say, an American Girl |
| 09:25 | 4 | doll, and Jane Jones makes those drawings in the year 2001. |
| 09:25 | 5 | Jane Jones comes to work at Mattel in 2011, and she begins |
| 09:25 | 6 | work on similar dolls. |
| 09:25 | 7 | Does Mattel own her drawings based just on that? |
| 09:25 | 8 | A.    She has violated her conflict-of-interest |
| 09:25 | 9 | questionnaire. |
| 09:25 | 10 | Q.    That's not what I'm asking. |
| 09:25 | 11 | A.    So -- |
| 09:25 | 12 | Q.    I'm asking about ownership.  Not whether you could fire |
| 09:26 | 13 | her under the conflict-of-interest questionnaire. |
| 09:26 | 14 | Ownership.  Jane Jones created the drawings in 2001.  Now |
| 09:26 | 15 | she's come to work at Mattel in 2011.  Does Mattel own her |
| 09:26 | 16 | drawings that she made ten years earlier? |
| 09:26 | 17 | A.    I think in the hypothetical, if someone has an idea |
| 09:26 | 18 | prior to employment and does absolutely nothing with that |
| 09:26 | 19 | idea while they're employed by Mattel, I don't think Mattel |
| 09:26 | 20 | has rights to that idea. |
| 09:26 | 21 | Q.    So if she comes to work at Mattel in 2011 and she |
| 09:26 | 22 | created the drawings in 2001, Mattel doesn't own her |
| 09:26 | 23 | drawings? |
| 09:26 | 24 | A.    Mattel may. |
| 09:26 | 25 | Q.    Mattel doesn't own her drawings when she walks in the |

DEBBIE GALE, U.S. COURT REPORTER

| 09:26 | 1 | door of Mattel in 2011 and back in her drawer at home are |
|---|---|---|

09:26   1   door of Mattel in 2011 and back in her drawer at home are

09:26   2   her drawings that she made in 2001.  She walks over the

09:26   3   threshold into Mattel.  She's now working at the design

09:26   4   center.  Does Mattel own her drawings just based on that

09:27   5   information I've given you?  "Yes" or "no," just based on

09:27   6   that information.

09:27   7   A.   Depending on what she does --

09:27   8   Q.   I'm just basing it on --

09:27   9   A.   I'm just trying to answer your question.

09:27   10   Q.   Just based on that information alone.

09:27   11   A.   And I'm just trying to answer question.

09:27   12   Q.   Just all you know now -- here's the whole universe of

09:27   13   facts that you know.  She created 'em in 2001.  They're

09:27   14   sitting in her drawer at home.  She now works for Mattel.

09:27   15   Here's the threshold.  She crosses the threshold.  She's now

09:27   16   in your design center.  Those are the only facts you have.

09:27   17   That's it.  That's the universe.  Do you own her drawings?

09:27   18   A.   If she does nothing -- I'm sorry to disappoint you

09:27   19   here.

09:27   20   Q.   No, I'm not -- I'm asking you -- that's the universe of

09:27   21   facts.  We're trying to break this down.  I know what you

09:27   22   want to tell me, but what I'm asking you is very limited.

09:27   23             MR. QUINN:  Your Honor, I object.

09:27   24             MS. KELLER:  It's limited to --

09:27   25             MR. QUINN:  I object to the preamble.

09:27    1              THE COURT:  We'll strike the preamble.

09:27    2    BY MS. KELLER:

09:27    3    Q.   I'm limiting this to -- very, very simple, just based

09:28    4    on those facts alone, no additional facts from me or from

09:28    5    you.  Just those facts.  She's got her drawings in her desk

09:28    6    drawer at home from ten years earlier.  She's now walked

09:28    7    into Mattel's design center, and she begins her first day of

09:28    8    employment.  Do you own the drawings based just on those

09:28    9    facts and nothing else?

09:28    10   A.   My belief is, certainly if she has disclosed it, not at

09:28    11   that time.

09:28    12   Q.   Well, let's say --

09:28    13              THE COURT:  Just a moment.  Let me caution the

09:28    14   jury.

09:28    15              This is not idle gossip when Mr. Larian's on the

09:28    16   stand or idle questions or idle gossip or idle questions

09:28    17   when Mr. Eckert's on the stand.

09:28    18              You'll find that one of the issues that I later

09:28    19   submit to you is this whole concept of ideas and ownership.

09:29    20   And I'm going to be giving that to the jury.

09:29    21              So among statute of limitations issues, et cetera,

09:29    22   you're going to be deciding these issues.  So I just want to

09:29    23   caution you that these issues are, in fact, coming to you

09:29    24   from both Mr. Larian's standpoint and Mr. Eckert's

09:29    25   standpoint, amongst many, many issues in this case that

| | | |
|---|---|---|
| 09:29 | 1 | you'll be deciding. |
| 09:29 | 2 | All right.  Counsel. |
| 09:29 | 3 | BY MS. KELLER: |
| 09:29 | 4 | Q.   Okay.  Let's go back again, because we haven't talked |
| 09:29 | 5 | about conflict-of-interest questionnaire yet.  That's not a |
| 09:29 | 6 | fact yet.  This is a hypothetical.  It's only got these |
| 09:29 | 7 | facts in it in this box right now.  The facts are:  She |
| 09:29 | 8 | walks into the Mattel design center and begins her first day |
| 09:29 | 9 | at work.  Those are the only facts right now.  Does Mattel |
| 09:29 | 10 | own those drawings of hers from ten years earlier? |
| 09:29 | 11 | A.   Under your hypothetical, when she walked in the door, |
| 09:29 | 12 | did she sign our agreements? |
| 09:29 | 13 | Q.   Did she sign your inventions agreement?  We're just |
| 09:29 | 14 | doing the inventions agreement.  I'll get to conflict of |
| 09:29 | 15 | interest in a second. |
| 09:29 | 16 | I'm asking you step by step, under your inventions |
| 09:30 | 17 | agreement, when she crosses the threshold and she walks into |
| 09:30 | 18 | Mattel, do you automatically own those drawings she made ten |
| 09:30 | 19 | years earlier? |
| 09:30 | 20 | A.   If she walks into Mattel and she has had ideas from ten |
| 09:30 | 21 | years earlier and she does nothing with those ideas, we |
| 09:30 | 22 | don't have rights to those ideas. |
| 09:30 | 23 | Q.   Now, let's add in a second fact. |
| 09:30 | 24 | Now, she crosses the threshold of Mattel, and she walks |
| 09:30 | 25 | into the design center, and she has signed both your |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 47 of 142   Page ID #:306278
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

47

| | | |
|---|---|---|
| 09:30 | 1 | inventions agreement and the employee conflict-of-interest |
| 09:30 | 2 | questionnaire, and she hasn't listed those drawings back in |
| 09:30 | 3 | her desk drawer.  We both agree that you have the right, if |
| 09:30 | 4 | you want to, to fire her for not listing them; is that |
| 09:31 | 5 | right? |
| 09:31 | 6 | A.   Uh, yes, I believe that's correct. |
| 09:31 | 7 | Q.   Well, now, under the -- but under the agreement -- |
| 09:31 | 8 | under the agreement, it actually talks about whether the |
| 09:31 | 9 | employee has received anything of value, in cash or in kind, |
| 09:31 | 10 | over $60 on any one occasion or over $300 total during the |
| 09:31 | 11 | past 12 months, and then it says if you're answer is yes to |
| 09:31 | 12 | any of these, you have to please explain.  You see that? |
| 09:31 | 13 | A.   Um, I'm sorry, but I don't know from where you're |
| 09:31 | 14 | reading. |
| 09:31 | 15 | *(Document displayed.)* |
| 09:31 | 16 | BY MS. KELLER: |
| 09:31 | 17 | Q.   Okay.  Let's look at the list of all the things that |
| 09:31 | 18 | the employee has to answer yes or no to. |
| 09:31 | 19 | A.   Okay. |
| 09:31 | 20 | Q.   And it says, "receipt of any commission, et cetera, |
| 09:31 | 21 | means receipt of anything of value, in cash or in kind, over |
| 09:32 | 22 | $60 on any one occasion or over $300 total during the past |
| 09:32 | 23 | twelve months." |
| 09:32 | 24 | And then it lists a number of different categories. |
| 09:32 | 25 | Okay?  Including, "Have you owned directly or indirectly any |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

48

09:32    1    interest in a Mattel supplier?"  And then it goes down to --

09:32    2    A.    "Are you aware of any activity of any employee which

09:32    3    you believe could be construed as a potential conflict of

09:32    4    interest with Mattel?"

09:32    5    Q.    Right.  Are you aware of any activity of any employee?

09:32    6    And let's look above that at No. 5.

09:32    7    A.    At No. 5?

09:32    8    Q.    Yeah.  It asks if -- this is where we see a check mark,

09:32    9    "yes," by Mr. Bryant.  "Have you or any relative of yours,

09:32   10    by blood or marriage, been a director, officer, consultant,

09:32   11    agent, employee, or representative or acted for any Mattel

09:32   12    competitor in any capacity?"  Has "Yes."

09:33   13         And then right above that, "Have you been the recipient

09:33   14    of any commission, fee, loan, trip, gift, benefit, or

09:33   15    anything else of value that is derived in any way from a

09:33   16    Mattel competitor?"  And that's checked "yes" too, right?

09:33   17    A.    Yes.

09:33   18    Q.    So what the employee is being asked to explain, then,

09:33   19    if we look down below where it says, "If your answer to any

09:33   20    of the above is "yes," please explain," the employee is

09:33   21    being asked whether in the past twelve months they've

09:33   22    received anything of value from a Mattel competitor, right?

09:33   23    A.    Um, no, I'm sorry.  I'm not following you on that.

09:33   24    Q.    Let's look at No. 4.

09:33   25    A.    Okay.

| 09:33 | 1 | Q.   Okay.  Where they're basically asked if they've been |
| 09:33 | 2 | given anything of value in the last twelve months by a |
| 09:33 | 3 | Mattel competitor.  And let's look back up to recipient of |
| 09:33 | 4 | any commission, et cetera, what that means, there at the |
| 09:33 | 5 | top. |
| 09:33 | 6 | MS. KELLER:  Can we put that in red? |
| 09:33 | 7 | *(Technician complies.)* |
| 09:33 | 8 | BY MS. KELLER: |
| 09:33 | 9 | Q.   Means anything of value, in cash or in kind, over $60 |
| 09:34 | 10 | on any one occasion or over $300 total during the past |
| 09:34 | 11 | twelve months.  Right? |
| 09:34 | 12 | A.   Um, yes, but I also -- |
| 09:34 | 13 | Q.   Is that -- |
| 09:34 | 14 | A.   But above that, I read, to receive compensation -- |
| 09:34 | 15 | "deliver materials to receive compensation of any kind from |
| 09:34 | 16 | any supplier or competitor." |
| 09:34 | 17 | Q.   Right.  But what they're asked to disclose here -- with |
| 09:34 | 18 | those boxes, they're asked to disclose essentially, among |
| 09:34 | 19 | other things, have they been paid anything by a competitor |
| 09:34 | 20 | in the last twelve months, right? |
| 09:34 | 21 | A.   Yes.  That's true. |
| 09:34 | 22 | Q.   And that's what he goes on to explain, when Carter |
| 09:34 | 23 | Bryant explains.  He talks about being paid for his artwork |
| 09:34 | 24 | by Ashton Drake Galleries in the past twelve months, right? |
| 09:34 | 25 | A.   I don't know what Carter Bryant -- |

| | | |
|---|---|---|
| 09:34 | 1 | Q.   Well -- |
| 09:34 | 2 | A.   -- was intending to -- |
| 09:35 | 3 | Q.   I'm not asking what his intent was or for you to decide |
| 09:35 | 4 | his intent, just what these words say. |
| 09:35 | 5 | A.   I'm sorry.  I heard your question to be what was Carter |
| 09:35 | 6 | Bryant's intent. |
| 09:35 | 7 | Q.   No. |
| 09:35 | 8 | A.   So I don't know the answer to that. |
| 09:35 | 9 | Q.   Well, I'm not asking that. |
| 09:35 | 10 | A.   Okay. |
| 09:35 | 11 | Q.   I'm asking, what do these words say? |
| 09:35 | 12 | A.   The words say, "four," comma, "five," comma, "freelance |
| 09:35 | 13 | design and," ampersand, "artwork in 1998 from approx period |
| 09:35 | 14 | 5/98 through 11/98 for the Ashton Drake Galleries." |
| 09:35 | 15 | Q.   Now, I'd like you to take a look at this document, this |
| 09:35 | 16 | conflict-of-interest questionnaire and tell me where it |
| 09:35 | 17 | covers at all portfolio drawings or drawings in a desk |
| 09:35 | 18 | drawer without compensation. |
| 09:35 | 19 |       In other words, I would like you to tell me where on |
| 09:36 | 20 | this form the person even has to disclose that they've |
| 09:36 | 21 | created drawings for which they have not yet received |
| 09:36 | 22 | compensation in the past twelve months? |
| 09:36 | 23 | A.   Uh, I think in No. 9 alone, "any activity which you |
| 09:36 | 24 | believe could be construed as a potential conflict of |
| 09:36 | 25 | interest with Mattel."  Creating doll designs and coming to |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 51 of 142   Page ID #:306282
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

51

| | | |
|---|---|---|
| 09:36 | 1 | work for Mattel in my mind's eye is something worthy of note |
| 09:36 | 2 | to Mattel. |
| 09:36 | 3 | Q.   "Are you aware of any activity of any employee which |
| 09:36 | 4 | you believe could be construed as a potential conflict of |
| 09:36 | 5 | interest with Mattel?"  So you're saying that under that, |
| 09:36 | 6 | this person, who ten years before she ever even signed on |
| 09:36 | 7 | with Mattel created some drawings and put them in her desk |
| 09:36 | 8 | drawer, created a conflict of interest with Mattel, right? |
| 09:36 | 9 | A.   So I'm sorry, I'm a little confused.  Now we're moving |
| 09:36 | 10 | back from Carter Bryant back to the hypothetical? |
| 09:36 | 11 | Q.   Here's what I'm asking you. |
| 09:37 | 12 | A.   Okay. |
| 09:37 | 13 |       THE COURT:  No, that's correct.  That's the way I |
| 09:37 | 14 | took that question also. |
| 09:37 | 15 |       THE WITNESS:  I'm sorry.  I'm confused. |
| 09:37 | 16 |       THE COURT:  Now, we're moving back to the girl |
| 09:37 | 17 | hypothetical, or are we moving to Carter Bryant? |
| 09:37 | 18 | BY MS. KELLER: |
| 09:37 | 19 | Q.   Let's just talk about the conflict-of-interest |
| 09:37 | 20 | questionnaire. |
| 09:37 | 21 |       THE COURT:  In relation to the girl or Carter |
| 09:37 | 22 | Bryant? |
| 09:37 | 23 |       MS. KELLER:  Right. |
| 09:37 | 24 | BY MS. KELLER: |
| 09:37 | 25 | Q.   So does No. 9 say -- let's say we're back to Jane, who |

| | | |
|---|---|---|
| 09:37 | 1 | has walked into the Mattel design center, and she created |
| 09:37 | 2 | portfolio drawings 10 years earlier -- |
| 09:37 | 3 | THE COURT:  Let's be clear.  We're back to the |
| 09:37 | 4 | hypothetical. |
| 09:37 | 5 | BY MS. KELLER: |
| 09:37 | 6 | Q.   So you're telling me that No. 9 should alert her that |
| 09:37 | 7 | the drawings actually now belong to Mattel? |
| 09:37 | 8 | A.   That's not what I'm telling you. |
| 09:37 | 9 | Q.   "Are you aware of any activity of any employee which |
| 09:37 | 10 | you believe could be construed as a potential conflict of |
| 09:37 | 11 | interest with Mattel?" |
| 09:37 | 12 | Isn't that actually asking the person:  Do you know of |
| 09:37 | 13 | some other employee who's done something that could be a |
| 09:37 | 14 | conflict of interest with Mattel?  I mean, isn't that what |
| 09:37 | 15 | its asking? |
| 09:38 | 16 | A.   It's asking what it says it's asking. |
| 09:38 | 17 | Q.   Well, it doesn't say:  Have you ever created anything |
| 09:38 | 18 | which could conceivably someday be used maybe by a |
| 09:38 | 19 | competitor to compete against Mattel?  It doesn't say that, |
| 09:38 | 20 | does it? |
| 09:38 | 21 | A.   Uh, I certainly interpret it as meaning that, even |
| 09:38 | 22 | though the words don't say that. |
| 09:38 | 23 | Q.   Well, it says, "Are you aware?" |
| 09:38 | 24 | Okay.  Let's break it down.  "Are you aware" means "do |
| 09:38 | 25 | you know," doesn't it? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:38 | 1 | A.   Um, yes. |
| 09:38 | 2 | Q.   And do you -- are you aware -- do you know or do you |
| 09:38 | 3 | have some idea of -- right?  Are you aware?  Like a |
| 09:38 | 4 | conscious being is aware, true? |
| 09:38 | 5 | A.   Yes. |
| 09:38 | 6 | Q.   And then "of any activity."  And activity would be |
| 09:38 | 7 | something someone has done, right?  An activity is something |
| 09:38 | 8 | somebody engages in, right? |
| 09:38 | 9 | A.   Yes. |
| 09:38 | 10 | Q.   And "of any employee," that means somebody who's |
| 09:38 | 11 | working at Mattel, right? |
| 09:38 | 12 | A.   Including your hypothetical person who walked in the |
| 09:39 | 13 | door, yes. |
| 09:39 | 14 | Q.   "Of any employee which you believe could be construed |
| 09:39 | 15 | as a potential conflict of interest with Mattel." |
| 09:39 | 16 |      So -- and you know what a conflict of interest is, |
| 09:39 | 17 | right? |
| 09:39 | 18 | A.   Yes. |
| 09:39 | 19 | Q.   So what this is asking them is are you aware of |
| 09:39 | 20 | anything that a Mattel employee has done that could be |
| 09:39 | 21 | construed as a potential conflict of interest, right? |
| 09:39 | 22 | A.   And in your hypothetical example, I think the answer to |
| 09:39 | 23 | that is yes, Jane needs to check that box "yes." |
| 09:39 | 24 | Q.   Well, why don't you just say to your employees if -- |
| 09:39 | 25 | you're telling us that you think an employee can read No. 9 |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 54 of 142   Page ID #:306285
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

54

| | | |
|---|---|---|
| 09:39 | 1 | and would know from reading No. 9 that that means that the |
| 09:39 | 2 | employee needs to tell Mattel everything that employee has |
| 09:39 | 3 | ever created, whether for compensation or otherwise, right? |
| 09:39 | 4 | A.   No.  I think if an employee reads these documents, the |
| 09:39 | 5 | employee understands, in your hypothetical example, that if |
| 09:40 | 6 | she has created doll designs prior to joining Mattel, she |
| 09:40 | 7 | needs to disclose that. |
| 09:40 | 8 | Q.   Well, but this is signed before the employee ever even |
| 09:40 | 9 | becomes a Mattel employee, right? |
| 09:40 | 10 | A.   Um -- |
| 09:40 | 11 | Q.   I mean, you know that, don't you?  They can't be |
| 09:40 | 12 | employed at Mattel until after they sign this? |
| 09:40 | 13 | MR. QUINN:  We've got three questions now, |
| 09:40 | 14 | Your Honor. |
| 09:40 | 15 | THE COURT:  Reask it. |
| 09:40 | 16 | BY MS. KELLER: |
| 09:40 | 17 | Q.   You know that the employee can't become an employee |
| 09:40 | 18 | until after they sign these documents, right? |
| 09:40 | 19 | A.   Um, so now we're, I think, at a technical line.  I |
| 09:40 | 20 | believe in one's first day of employment, we sign these |
| 09:40 | 21 | documents -- at least, I did. |
| 09:40 | 22 | Q.   Here's my question.  You have to sign these before you |
| 09:40 | 23 | become an employee, right? |
| 09:40 | 24 | A.   I just -- you know, that -- that to me is on a -- a |
| 09:40 | 25 | fine line of a human resource issue.  I really don't know |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

55

| | | |
|--|--|--|
| 09:41 | 1 | whether you're technically an employee the day you walk in |
| 09:41 | 2 | for that first hour before you sign this.  I just don't |
| 09:41 | 3 | know. |
| 09:41 | 4 | Q.   Not my question. |
| 09:41 | 5 | A.   Oh, I'm sorry. |
| 09:41 | 6 | Q.   You can't even be a Mattel employee unless you sign |
| 09:41 | 7 | these, true or false? |
| 09:41 | 8 | MR. QUINN:  I think it was just asked and |
| 09:41 | 9 | answered, Your Honor. |
| 09:41 | 10 | THE COURT:  Well, the answer was, "I'm sorry." |
| 09:41 | 11 | BY MS. KELLER: |
| 09:41 | 12 | Q.   If I refused to sign the confidentiality information |
| 09:41 | 13 | and inventions agreement, I can't come to work at Mattel, |
| 09:41 | 14 | right? |
| 09:41 | 15 | A.   That's correct. |
| 09:41 | 16 | Q.   If I refuse to sign the conflict-of-interest |
| 09:41 | 17 | questionnaire, I can't come to work at Mattel, right? |
| 09:41 | 18 | A.   That's correct. |
| 09:41 | 19 | Q.   So I can't be an employee at Mattel until I sign these |
| 09:41 | 20 | agreements, right? |
| 09:41 | 21 | A.   Again, now, we're gonna -- I don't want to quibble over |
| 09:41 | 22 | the word "until," but you're drawing a distinction for me |
| 09:41 | 23 | that, frankly, I don't think is that important.  But you're |
| 09:41 | 24 | making it sound important. |
| 09:41 | 25 | Q.   And I want to ask you the question again.  And I'm not |

| | | |
|---|---|---|
| 09:41 | 1 | asking you whether I'm trying to make something sound |
| 09:42 | 2 | important.  Here's my question. |
| 09:42 | 3 | My question is:  You can't come to work at Mattel and |
| 09:42 | 4 | be a Mattel employee until you sign those agreements, yes or |
| 09:42 | 5 | no? |
| 09:42 | 6 | A.   I don't -- I don't know that's the case. |
| 09:42 | 7 | Q.   So if I refuse to sign these agreements, I can come be |
| 09:42 | 8 | an employee at Mattel? |
| 09:42 | 9 | A.   Um -- |
| 09:42 | 10 | Q.   In the design center? |
| 09:42 | 11 | A.   It's hard for me to imagine that you could retain your |
| 09:42 | 12 | employment with Mattel without signing these documents. |
| 09:42 | 13 | Q.   So are you telling us, then, that I would be a Mattel |
| 09:42 | 14 | employee for that nanosecond before I signed these, but |
| 09:42 | 15 | after I've walked into the building? |
| 09:42 | 16 | A.   That's what I really don't know. |
| 09:42 | 17 | Q.   Okay.  And during that nanosecond before -- when you |
| 09:42 | 18 | considered me an employee, but I hadn't signed these yet, |
| 09:42 | 19 | would my drawings belong to you? |
| 09:42 | 20 | A.   During that nanosecond, if you were really not yet a |
| 09:43 | 21 | Mattel employee, you hadn't read and understood these |
| 09:43 | 22 | documents, and you didn't want to sign up at Mattel after |
| 09:43 | 23 | you had thought about that, I think the answer is no.  I |
| 09:43 | 24 | think if you were in that nanosecond, you had these |
| 09:43 | 25 | documents, you were reading these documents, and you, in |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 57 of 142   Page ID #:306288
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

57

| | | |
|---|---|---|
| 09:43 | 1 | your hypothetical example, realize that, you know, I may |
| 09:43 | 2 | have to disclose something I worked on ten years ago and I |
| 09:43 | 3 | don't want do that and I don't want to be a Mattel employee, |
| 09:43 | 4 | I think a reasonable person would conclude you were never a |
| 09:43 | 5 | Mattel employee. |
| 09:43 | 6 | Q.   Let's -- now, you have human resources people who were |
| 09:43 | 7 | in charge of signing people up, right? |
| 09:43 | 8 | A.   That's correct. |
| 09:43 | 9 | Q.   And has any human resources employee at Mattel ever |
| 09:43 | 10 | said that No. 9, "Are you aware of any activity of any |
| 09:43 | 11 | employee which you believe could be construed as a potential |
| 09:43 | 12 | conflict of interest with Mattel" -- has there ever been |
| 09:43 | 13 | anybody in your human resources department who has said that |
| 09:44 | 14 | an answer to that question, whether positive or negative, |
| 09:44 | 15 | transfers intellectual property of an employee to Mattel? |
| 09:44 | 16 | A.   I don't know. |
| 09:44 | 17 | Q.   Have you talked to your human resources people to find |
| 09:44 | 18 | out what they tell people when they sign these documents? |
| 09:44 | 19 | A.   No, I have not. |
| 09:44 | 20 | Q.   Have you investigated at all -- are you aware of the |
| 09:44 | 21 | fact, by the way, that your human resources department takes |
| 09:44 | 22 | the position that its policy is not to explain these forms |
| 09:44 | 23 | to employees? |
| 09:44 | 24 |        MR. QUINN:  Assumes facts not in evidence, |
| 09:44 | 25 | Your Honor, as phrased. |

| | | |
|---|---|---|
| 09:44 | 1 | THE COURT:  Overruled. |
| 09:44 | 2 | THE WITNESS:  No, I don't know that. |
| 09:44 | 3 | BY MS. KELLER: |
| 09:44 | 4 | Q.   Have you asked them? |
| 09:44 | 5 | A.   No, I have not. |
| 09:44 | 6 | THE COURT:  Now, we're going to strike "the fact." |
| 09:44 | 7 | The question said "the fact."  The question is asking you to |
| 09:44 | 8 | assume that that's what the human resources department does. |
| 09:45 | 9 | You're not to take that for the truth at all.  Okay? |
| 09:45 | 10 | BY MS. KELLER: |
| 09:45 | 11 | Q.   As the CEO of Mattel, have you read the testimony of |
| 09:45 | 12 | your human resources people in connection with this case to |
| 09:45 | 13 | see what they said about that topic? |
| 09:45 | 14 | A.   No.  I haven't read any person's testimony in this case |
| 09:45 | 15 | other than my own. |
| 09:45 | 16 | Q.   In your capacity as CEO of Mattel, have you talked to |
| 09:45 | 17 | your human resources people to find out what their policies |
| 09:45 | 18 | are about explaining these to potential employees? |
| 09:45 | 19 | A.   No, I have not. |
| 09:45 | 20 | Q.   In your capacity as CEO of Mattel, have you suggested |
| 09:45 | 21 | to people that they should put a clause in the |
| 09:45 | 22 | conflict-of-interest questionnaire which says, "if you fail |
| 09:45 | 23 | to disclose anything you have ever designed that could |
| 09:45 | 24 | conceivably be the subject of something Mattel produces, you |
| 09:45 | 25 | are automatically transferring that intellectual property to |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

59

| | | |
|---|---|---|
| 09:45 | 1 | Mattel"?  Have you thought about that? |
| 09:46 | 2 | MR. QUINN:  Your Honor, he's never said that's his |
| 09:46 | 3 | position.  Assumes facts.  It's argumentative. |
| 09:46 | 4 | THE WITNESS:  I heard two questions. |
| 09:46 | 5 | Have I asked about it, and then have I thought |
| 09:46 | 6 | about it.  The answer to both questions is no. |
| 09:46 | 7 | THE COURT:  Overruled. |
| 09:46 | 8 | THE WITNESS:  Sorry, Your Honor. |
| 09:46 | 9 | THE COURT:  That's fine.  I was going to overrule |
| 09:46 | 10 | the objection. |
| 09:46 | 11 | THE WITNESS:  I didn't hear the word "objection." |
| 09:46 | 12 | I just thought he was helping you. |
| 09:46 | 13 | BY MS. KELLER: |
| 09:46 | 14 | Q.  I want to turn to a different topic. |
| 09:46 | 15 | You know, what Project Platypus was, right? |
| 09:46 | 16 | A.  I -- I do have some understanding of it, yes. |
| 09:46 | 17 | Q.  And Project Platypus was a think tank created by |
| 09:46 | 18 | somebody named Ivy Ross at Mattel, right? |
| 09:46 | 19 | A.  Uh, yes. |
| 09:46 | 20 | Q.  And that was at the end of 2001, true? |
| 09:46 | 21 | A.  Um, I don't know the date, but it certainly could have |
| 09:47 | 22 | been. |
| 09:47 | 23 | Q.  And Project Platypus actually resulted in some products |
| 09:47 | 24 | that were released to market, right? |
| 09:47 | 25 | A.  Yes, I think it did. |

Case 2:04-cv-09049-DOC-RNB Document 10125 Filed 03/04/11 Page 60 of 142 Page ID #:306291
CV 04-9049 DOC – 3/27/2011 – Day 26, Volume 1 of 4

60

| | | |
|---|---|---|
| 09:47 | 1 | Q.   For example, Ello was a so-called, quote, "creation |
| 09:47 | 2 | system" for five- to ten-year-old girls.  You know about |
| 09:47 | 3 | that, don't you? |
| 09:47 | 4 | A.   I do. |
| 09:47 | 5 | Q.   And, in fact, Ivy Ross made a commitment to you to |
| 09:47 | 6 | create brands in three months that would generate 50 million |
| 09:47 | 7 | or more in sales, right? |
| 09:47 | 8 | A.   I don't remember that, a commitment like that. |
| 09:47 | 9 | Q.   Well, the project was pretty important to Mattel, |
| 09:47 | 10 | wasn't it?  Project Platypus? |
| 09:47 | 11 | A.   I think it was important. |
| 09:47 | 12 | Q.   And it actually was a toy development process unique to |
| 09:47 | 13 | Mattel? |
| 09:47 | 14 | A.   I think it was. |
| 09:47 | 15 | Q.   Gave Mattel a step up on the competition? |
| 09:47 | 16 | A.   I don't know if that's the conclusion I'd draw, but I |
| 09:48 | 17 | think it was a unique process to Mattel. |
| 09:48 | 18 | Q.   You're aware that Ms. Ross participated in a number of |
| 09:48 | 19 | case studies where she revealed all the details about |
| 09:48 | 20 | Project Platypus? |
| 09:48 | 21 | A.   No. |
| 09:48 | 22 | Q.   Haven't read about that in all the trade publications |
| 09:48 | 23 | and general publications, *BusinessWeek*, for example? |
| 09:48 | 24 | A.   Um, no, I don't remember reading articles where she |
| 09:48 | 25 | disclosed the details of Project Platypus.  I just -- sorry, |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 61 of 142   Page ID #:306292
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

61

| | | |
|---|---|---|
| 09:48 | 1 | I don't remember reading that. |
| 09:48 | 2 | Q.   And her assistant on the project, after working on it, |
| 09:48 | 3 | took it to Proctor & Gamble, right? |
| 09:48 | 4 | A.   I don't know. |
| 09:48 | 5 | Q.   You talk to Ivy Ross about any of that? |
| 09:48 | 6 | A.   No, I have not. |
| 09:48 | 7 | Q.   And you know she was the first witness in this case? |
| 09:48 | 8 | A.   I do know that. |
| 09:48 | 9 | Q.   Now, Mattel owned the process that Ivy Ross created |
| 09:48 | 10 | with Project Platypus, right? |
| 09:48 | 11 | A.   Uh, yes. |
| 09:48 | 12 | Q.   It related to Mattel's business, true? |
| 09:48 | 13 | A.   Yes, it did. |
| 09:49 | 14 | Q.   And so have you sued Procter & Gamble? |
| 09:49 | 15 | A.   No, not that I'm aware of. |
| 09:49 | 16 | Q.   Let's look at Exhibit 15815. |
| 09:49 | 17 | *(Document provided to the witness.)* |
| 09:49 | 18 | MS. KELLER:  This is the new 2004 confidentiality |
| 09:49 | 19 | agreement. |
| 09:49 | 20 | BY MS. KELLER: |
| 09:49 | 21 | Q.   Now, you know there was a meeting in 2004 to discuss |
| 09:49 | 22 | having all the employees sign a new confidentiality |
| 09:49 | 23 | agreement, right? |
| 09:49 | 24 | A.   Um, I know there was a meeting in 2004, and I believe |
| 09:49 | 25 | it had to do with this subject. |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

62

| 09:49 | 1 | Q.   And, in fact, you said that you yourself signed a new |
| 09:49 | 2 | agreement in 2004, correct? |
| 09:49 | 3 | A.   I don't know that I did. |
| 09:49 | 4 | Q.   Do you remember testifying yesterday that you signed |
| 09:49 | 5 | two agreements, one in 2000 and one in 2004? |
| 09:50 | 6 | A.   No, I don't remember that. |
| 09:50 | 7 | Q.   Let's look at this agreement.  Now, this is for a |
| 09:50 | 8 | person named Harvey Scott, right?  Take a look at page 3 of |
| 09:50 | 9 | 15815. |
| 09:50 | 10 | A.   Yes, it is. |
| 09:50 | 11 | Q.   And do you know who Harvey Scott is? |
| 09:50 | 12 | A.   No, I do not. |
| 09:50 | 13 | Q.   Take a look at the front page.  It says, "Employee |
| 09:50 | 14 | Confidentiality and Inventions Agreement," right? |
| 09:50 | 15 | A.   Yes. |
| 09:50 | 16 | Q.   See the little Mattel stamp on the left? |
| 09:50 | 17 | A.   I would say that's the Mattel logo on the left. |
| 09:50 | 18 | Q.   And see the little "M" at the bottom that shows it was |
| 09:50 | 19 | produced by Mattel in this litigation? |
| 09:50 | 20 | A.   I do see the "M" at the bottom. |
| 09:50 | 21 | MS. KELLER:  Your Honor, I move to admit 15815. |
| 09:50 | 22 | THE COURT:  Received. |
| 09:50 | 23 | *(Exhibit No. 15815 received in evidence.)* |
| 09:50 | 24 | *(Document displayed.)* |
|  | 25 | |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

63

| | | |
|--|--|--|
| 09:50 | 1 | MS. KELLER:  Now, let's look at page 1 where it |
| 09:50 | 2 | says, "Mattel's exclusive ownership of my work product, my |
| 09:51 | 3 | Mattel inventions, and Mattel's proprietary rights". |
| 09:51 | 4 | It says, "I acknowledge that all work that is made by |
| 09:51 | 5 | me solely or jointly with others that is within the scope of |
| 09:51 | 6 | my employment with Mattel and is protectable by copyright is |
| 09:51 | 7 | work made for hire, as that term is defined by the |
| 09:51 | 8 | United States Copyright Act, with the result that Mattel |
| 09:51 | 9 | will be the sole owner of the (sic) work." |
| 09:51 | 10 | BY MS. KELLER: |
| 09:51 | 11 | Q.   So you understand that to mean what it says, that -- |
| 09:51 | 12 | A.   I apologize, but I was spending most of my time trying |
| 09:51 | 13 | to find out where you were on the page. |
| 09:51 | 14 | Q.   Sure. |
| 09:51 | 15 | A.   If you would give me a minute to read that. |
| 09:51 | 16 | Q.   Absolutely.  Go ahead. |
| 09:51 | 17 | A.   That would be helpful.  Okay. |
| 09:52 | 18 | Q.   So in this new employee confidentiality and inventions |
| 09:52 | 19 | agreement, it says, under 2-A, "I acknowledge that all work |
| 09:52 | 20 | that is made by me solely or jointly with others that is |
| 09:52 | 21 | within the scope of my employment with Mattel and is |
| 09:52 | 22 | protectable by copyright is work made for hire, as that term |
| 09:52 | 23 | is defined by the United States Copyright Act, with the |
| 09:52 | 24 | result that Mattel will be the sole owner of such work.  And |
| 09:52 | 25 | within the scope made by me solely or jointly with others, |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 64 of 142   Page ID #:306295
CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

64

| | | |
|---|---|---|
| 09:52 | 1 | that is within the scope of my employment with Mattel." |
| 09:52 | 2 | Right?  You see that? |
| 09:53 | 3 | A.   I do see that. |
| 09:53 | 4 | Q.   And "within the scope of my employment with Mattel" |
| 09:53 | 5 | means... |
| 09:53 | 6 | A.   A question? |
| 09:53 | 7 | Q.   While a person is working at Mattel, right? |
| 09:53 | 8 | A.   I think it's certainly related to the time one's |
| 09:53 | 9 | working at Mattel. |
| 09:53 | 10 | Q.   Related to?  Or is? |
| 09:53 | 11 | A.   (No response.) |
| 09:53 | 12 | Q.   "Within the scope of my employment with Mattel." |
| 09:53 | 13 | Employment with Mattel means you're paying them for work for |
| 09:53 | 14 | you? |
| 09:53 | 15 | A.   Um, I read it as work related to Mattel's work.  So let |
| 09:53 | 16 | me read it again. |
| 09:53 | 17 | Q.   Hold on a second.  Well, say -- |
| 09:53 | 18 | THE COURT:  No, let him read it.  Let him read it. |
| 09:54 | 19 | THE WITNESS:  Yeah, I don't believe it's confined |
| 09:54 | 20 | to the employment period the way I read the sentence. |
| 09:54 | 21 | BY MS. KELLER: |
| 09:54 | 22 | Q.   So you believe, then, that this should read:  I |
| 09:54 | 23 | acknowledge that all work that is made by me solely or |
| 09:54 | 24 | jointly with others that is within the scope of my |
| 09:54 | 25 | employment with Mattel or was made at any time before I came |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

65

09:54  1    to work for Mattel -- you think that's really what it should

09:54  2    read, don't you?

09:54  3    A.   No.  I don't think the words need to change to affect

09:54  4    my interpretation of what it says.

09:54  5    Q.   So according to you, any employee reading this should

09:54  6    know that a drawing made ten years earlier belongs to

09:54  7    Mattel, right?

09:54  8    A.   No.  Again, I don't necessarily think that a drawing

09:54  9    made ten years prior belongs to Mattel.

09:54  10   Q.   Well, but an employee reading this should certainly

09:54  11   know that drawings made ten years earlier might very well

09:55  12   belong to Mattel?

09:55  13   A.   I -- I certainly think that if an employee has created

09:55  14   designs and drawings related to Mattel's business ten years

09:55  15   ago and is coming to work at Mattel, I think, if nothing

09:55  16   else, just to me, someone should disclose that, should want

09:55  17   to disclose that to make sure there's no issue, to protect

09:55  18   him or herself from the kind of issue we're facing here.

09:55  19   Q.   Not the question.

09:55  20   A.   I'm sorry.

09:55  21   Q.   Do you own it?

09:55  22   A.   Again --

09:55  23   Q.   Do you own it?

09:55  24   A.   We may.

09:55  25   Q.   And --

DEBBIE GALE, U.S. COURT REPORTER

09:55   1    A.    We may very well.

09:55   2    Q.    And what about if it's created 20 years earlier?  Same

09:55   3    thing?

09:55   4    A.    I don't think that the date is that important.

09:55   5    Q.    So 20 years earlier could still belong to Mattel?

09:55   6    A.    It could still belong to Mattel.

09:55   7    Q.    And so if I'm 18 years old and I create a drawing, and

09:55   8    now, 40 years later, at 58, I go to work for Mattel, Mattel

09:56   9    may own those drawings I made when I was 18, right?

09:56   10   A.    Yes, I believe it may.

09:56   11   Q.    And an employee reading this should understand that to

09:56   12   be the case, right?

09:56   13   A.    Again, I think an employee reading these documents

09:56   14   should understand --

09:56   15   Q.    No, not my question.

09:56   16              MR. QUINN:  Your Honor.

09:56   17              THE COURT:  Just a moment.  Excuse me.

09:56   18              Finish your answer.

09:56   19              THE WITNESS:  Pardon?

09:56   20              THE COURT:  Finish your answer.

09:56   21              THE WITNESS:  I think an employee or a prospective

09:56   22   employee reading these documents should understand that if

09:56   23   they have created ideas, designs, inventions related to the

09:56   24   toy business before they came to Mattel, they could have

09:56   25   issues.  They could -- particularly if they worked on those

| | | |
|---|---|---|
| 09:56 | 1 | products at Mattel, it seems to me, we would have a right to |
| 09:56 | 2 | go all the way back to the invention itself. |
| 09:57 | 3 | BY MS. KELLER: |
| 09:57 | 4 | Q.   Not my question. |
| 09:57 | 5 | A.   Okay. |
| 09:57 | 6 | Q.   Let me try again.  Okay? |
| 09:57 | 7 | 'Cause I know you want to answer a different question. |
| 09:57 | 8 | MR. QUINN:  Your Honor. |
| 09:57 | 9 | THE COURT:  Excuse me.  I'm sorry.  We're going to |
| 09:57 | 10 | strike, "try again." |
| 09:57 | 11 | And we're going to strike, "I know you want to |
| 09:57 | 12 | answer a different question." |
| 09:57 | 13 | Okay?  Disregard it. |
| 09:57 | 14 | BY MS. KELLER: |
| 09:57 | 15 | Q.   My question is a simple one.  Doesn't need any other |
| 09:57 | 16 | facts added to it.  Here's my question: |
| 09:57 | 17 | If I create some drawings at 18, stick 'em in my desk |
| 09:57 | 18 | drawer, and they relate to dolls, now, I come to work as a |
| 09:57 | 19 | doll designer at Mattel 40 years later -- I'm now 58 years |
| 09:57 | 20 | old -- should I know from reading 2-A, work made for hire, |
| 09:57 | 21 | that those drawings may very well belong to Mattel?  Should |
| 09:57 | 22 | I know that as an employee signing on? |
| 09:57 | 23 | And that's a yes or no. |
| 09:57 | 24 | A.   No.  My answer is trying to be equally as simple.  If |
| 09:57 | 25 | an employee or a prospective employee has created things |

| | | |
|---|---|---|
| 09:58 | 1 | related to the toy business, regardless of when it was done, |
| 09:58 | 2 | and comes to work at Mattel, I think that person should know |
| 09:58 | 3 | that if he or she is gonna work at those ideas at Mattel, |
| 09:58 | 4 | Mattel does have a right all the way back to those ideas.  I |
| 09:58 | 5 | think -- I don't have any problem with an employee believing |
| 09:58 | 6 | that. |
| 09:58 | 7 | Q.   I'm not asking whether you have a problem with |
| 09:58 | 8 | anything.  I'm asking about one section here, and I'm not |
| 09:58 | 9 | asking about your general understanding or your legal |
| 09:58 | 10 | theories.  One section, "work made for hire," the section |
| 09:58 | 11 | that's being displayed right now and is right in front of |
| 09:58 | 12 | you. |
| 09:58 | 13 | *(Document displayed.)* |
| 09:58 | 14 | BY MS. KELLER: |
| 09:58 | 15 | Q.   And my question is:  Should an employee know from |
| 09:58 | 16 | reading that section that drawings they made 40 years ago |
| 09:58 | 17 | may belong to Mattel?  40 years ago when they hadn't even |
| 09:58 | 18 | heard of Mattel? |
| 09:59 | 19 | MR. QUINN:  Your Honor. |
| 09:59 | 20 | MS. KELLER:  Never worked for Mattel.  Were not |
| 09:59 | 21 | employed by Mattel.  Should an employee from looking at this |
| 09:59 | 22 | section know that? |
| 09:59 | 23 | MR. QUINN:  I object, Your Honor, this is not the |
| 09:59 | 24 | agreement Carter Bryant signed, and it's not relevant. |
| 09:59 | 25 | THE COURT:  Whose agreement do we have up on the |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 69 of 142   Page ID #:306300
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

69

| | | |
|---|---|---|
| 09:59 | 1 | board right now? |
| 09:59 | 2 | MS. KELLER:  This was the 2004 employee |
| 09:59 | 3 | confidentiality and inventions agreement that Mr. Eckert |
| 09:59 | 4 | himself signed, as well as other employees, in 2004. |
| 09:59 | 5 | THE COURT:  Overruled. |
| 09:59 | 6 | THE WITNESS:  Again, an employee -- |
| 09:59 | 7 | BY MS. KELLER: |
| 09:59 | 8 | Q.   Just this section.  Take a look. |
| 09:59 | 9 | A.   An employee reading this section, to me, might think |
| 09:59 | 10 | about -- might well think about, might be expected to think |
| 09:59 | 11 | about, as they're reading this document, things they created |
| 09:59 | 12 | years ago. |
| 09:59 | 13 | Q.   Now, I'm not asking you whether an employee might be |
| 09:59 | 14 | expected to think about or could think about or might think |
| 10:00 | 15 | about.  Does this section make it clear in black and white |
| 10:00 | 16 | to anyone reading it that an invention an employee created |
| 10:00 | 17 | decades ago may belong to Mattel?  That's a yes or no. |
| 10:00 | 18 | A.   (No response.) |
| 10:00 | 19 | Q.   Not what they might think or what they could think or |
| 10:00 | 20 | what you might think.  Does it say that? |
| 10:00 | 21 | A.   It does say in these words, as I interpret them and as |
| 10:00 | 22 | I read them, that something that someone worked on years ago |
| 10:00 | 23 | may be owned by Mattel or Mattel may assert rights to that. |
| 10:00 | 24 | Q.   "I acknowledge that all work that is made by me solely |
| 10:00 | 25 | or jointly with others that is within the scope of my |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 70 of 142   Page ID #:306301
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

70

| | | |
|---|---|---|
| 10:00 | 1 | employment with Mattel and is protectable by copyright is |
| 10:00 | 2 | work made for hire, as that term is defined by the |
| 10:00 | 3 | United States Copyright Act, with the result that Mattel |
| 10:00 | 4 | will be the sole owner of such work." |
| 10:01 | 5 | So that section should tell anyone reading it that |
| 10:01 | 6 | Mattel might own their ideas from 40 years earlier? |
| 10:01 | 7 | A.   Yeah.  Again, I read the entire documents.  But I |
| 10:01 | 8 | certainly would read this as -- um, as something that should |
| 10:01 | 9 | trigger a red flag in the prospective employee's mind. |
| 10:01 | 10 | Q.   Not my question. |
| 10:01 | 11 | A.   That -- |
| 10:01 | 12 | Q.   Wasn't asking about a red flag, what they might think |
| 10:01 | 13 | or should think or could think.  It's asking about what it |
| 10:01 | 14 | said in writing, black and white. |
| 10:01 | 15 | A.   And, again -- |
| 10:01 | 16 | Q.   But let's move on. |
| 10:01 | 17 | A.   Okay. |
| 10:01 | 18 | Q.   Let's move on, shall we? |
| 10:01 | 19 | THE COURT:  Then we'll strike the comment. |
| 10:01 | 20 | Counsel, we're moving on now. |
| 10:01 | 21 | BY MS. KELLER: |
| 10:01 | 22 | Q.   Let's move on to -- actually, it's Section B, |
| 10:01 | 23 | disclosure of inventions. |
| 10:01 | 24 | THE COURT:  Counsel, I just received a sign from |
| 10:01 | 25 | Kathy that the jury needs a break.  This would be a good |

| | | |
|---|---|---|
| 10:01 | 1 | junction, I think.  This would be a good time. |
| 10:02 | 2 | You're admonished not to discuss this matter |
| 10:02 | 3 | amongst yourselves, nor form or express any opinion |
| 10:02 | 4 | concerning the case.  We'll come and get you about |
| 10:02 | 5 | 20 minutes. |
| 10:02 | 6 | All right.  Mr. Eckert, take a step down.  Thank |
| 10:02 | 7 | you very much, sir. |
| 10:02 | 8 | *(Witness steps down.)* |
| 10:02 | 9 | THE COURT:  Counsel, we'll see you at 20 after. |
| 10:02 | 10 | I'll open the doors. |
| 10:02 | 11 | *(Recess held at 10:02 a.m.)* |
| 10:18 | 12 | *(Proceedings resumed at 10:21 a.m.)* |
| 10:18 | 13 | *(Outside the presence of the jury.)* |
| 10:21 | 14 | THE COURT:  All right.  We're on the record |
| 10:21 | 15 | outside the presence of the jury. |
| 10:21 | 16 | Mr. Zeller and Ms. Hurst are here. |
| 10:21 | 17 | Here's what I need from you:  I need a copy, |
| 10:21 | 18 | Mr. Zeller, of Mr. Wagner's most recent affirmative report, |
| 10:21 | 19 | as well as his most recent rebuttal report.  And I also want |
| 10:21 | 20 | red lines of those reports compared to his earlier reports, |
| 10:21 | 21 | because it's ranging over a hundred pages. |
| 10:21 | 22 | And I want them in hard copy form, and I also want |
| 10:21 | 23 | them in hard drives.  And I want those by 2:00 p.m. today |
| 10:21 | 24 | so, hopefully, I don't have to keep you until midnight |
| 10:21 | 25 | again.  Because when you left last evening, my day just |

| | | |
|---|---|---|
| 10:22 | 1 | started.  So, as you were all getting your sleep, the Court |
| 10:22 | 2 | was still considering these matters -- hours that you don't |
| 10:22 | 3 | even want to know, because you wouldn't believe.  So I want |
| 10:22 | 4 | those by 2:00 o'clock. |
| 10:22 | 5 | Now, get the jury. |
| 10:22 | 6 | *(In the presence of the jury.)* |
| 10:22 | 7 | THE COURT:  All right.  We're back on the record. |
| 10:22 | 8 | All counsel are present. |
| 10:22 | 9 | Sir, if you would have a seat. |
| 10:22 | 10 | The parties -- and, Counsel, Ms. Keller's |
| 10:22 | 11 | continuing on with her cross-examination of Mr. Eckert. |
| 10:22 | 12 | **CROSS-EXAMINATION (Continued)** |
| 10:22 | 13 | BY MS. KELLER: |
| 10:23 | 14 | Q.   Mr. Eckert, I want to ask you some more questions about |
| 10:23 | 15 | your -- the -- Mattel's new 2004 employee confidentiality |
| 10:23 | 16 | and inventions agreement.  All right? |
| 10:23 | 17 | A.   Okay. |
| 10:23 | 18 | Q.   Let's look at -- |
| 10:23 | 19 | MR. PRICE:  Your Honor, could I have a standing |
| 10:23 | 20 | objection to these lines of questions that it's irrelevant? |
| 10:23 | 21 | THE COURT:  Certainly. |
| 10:23 | 22 | Overruled. |
| 10:23 | 23 | BY MS. KELLER: |
| 10:23 | 24 | Q.   If we look under subdivision 2(b)(i) disclosure of all |
| 10:23 | 25 | inventions, it says, "I will promptly disclose in confidence |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

73

| | | |
|---|---|---|
| 10:23 | 1 | to Mattel all inventions, discoveries, improvements, |
| 10:23 | 2 | developments, designs, works, original works of authorship, |
| 10:23 | 3 | ideas, know-how, formulas, processes, methods, software |
| 10:23 | 4 | programs, databases, mask works, and trade secrets, whether |
| 10:23 | 5 | or not patentable, copyrightable, or protectable as trade |
| 10:23 | 6 | secrets," paren, "collectively," quote, "inventions," |
| 10:23 | 7 | unquote, closed parens, "that I, alone or jointly with |
| 10:24 | 8 | others, conceive, create, develop or reduce to practice |
| 10:24 | 9 | during my period of employment with Mattel, whether or not |
| 10:24 | 10 | in the course of my employment with Mattel." |
| 10:24 | 11 | You see that? |
| 10:24 | 12 | A.   I do. |
| 10:24 | 13 | Q.   Now, between the time Carter Bryant signed his |
| 10:24 | 14 | agreement that we've just looked at from 2000, 9924, and |
| 10:24 | 15 | this 2004 agreement, 15815, you completely changed the |
| 10:24 | 16 | wording of the invention's agreement, right? |
| 10:24 | 17 | A.   It certainly is changed, yes. |
| 10:24 | 18 | Q.   Well, I mean you added in the "work for hire" provision |
| 10:24 | 19 | that did not exist before, right? |
| 10:24 | 20 | A.   Yes. |
| 10:24 | 21 | Q.   You defined "inventions" to include "ideas," which |
| 10:24 | 22 | didn't exist in the 2000 version, right? |
| 10:24 | 23 | A.   That word didn't exist in the 2000 version, correct. |
| 10:25 | 24 | Q.   You changed the phrase "during my employment" to |
| 10:25 | 25 | "during my period of employment," right? |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 74 of 142   Page ID #:306305
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

74

| | | |
|---|---|---|
| 10:25 | 1 | A.   Yes. |
| 10:25 | 2 | Q.   You changed "conceived or reduced to practice" in the |
| 10:25 | 3 | past tense to "conceive, create, develop or reduce to |
| 10:25 | 4 | practice" in the present tense, right? |
| 10:25 | 5 | A.   Yes. |
| 10:25 | 6 | Q.   You added in the phrase "whether or not in the course |
| 10:25 | 7 | of my employment with Mattel," right? |
| 10:25 | 8 | A.   Yes. |
| 10:25 | 9 | Q.   And none of that was in Carter Bryant's agreement, |
| 10:25 | 10 | true? |
| 10:25 | 11 | A.   The specific words were not, correct. |
| 10:25 | 12 | Q.   And you know this, of course, because you signed the |
| 10:25 | 13 | same two agreements that Carter Bryant signed -- exact same |
| 10:25 | 14 | form, right? |
| 10:25 | 15 | A.   Uh, yes. |
| 10:25 | 16 | Q.   And the changes to the agreements were made because |
| 10:25 | 17 | words mean something, don't they? |
| 10:26 | 18 | A.   Uh, I would agree with that.  I'm not sure that those |
| 10:26 | 19 | are connected, but words do mean something, and there were |
| 10:26 | 20 | changes to the agreement, yes. |
| 10:26 | 21 | Q.   And you understand that words in contracts are very |
| 10:26 | 22 | important? |
| 10:26 | 23 | A.   Yes, I do. |
| 10:26 | 24 | Q.   You understand that the exact words in contracts are |
| 10:26 | 25 | very important? |

| | | |
|---|---|---|
| 10:26 | 1 | A.   Yes, I do. |
| 10:26 | 2 | Q.   And you understand that whether somebody can easily |
| 10:26 | 3 | understand words in a contract is very important, right? |
| 10:26 | 4 | A.   Yes. |
| 10:26 | 5 | Q.   Now, I'd like to move on to a new area:  Whether Mattel |
| 10:26 | 6 | would have manufactured or marketed Bratz. |
| 10:26 | 7 | Now, at the time Mr. Bryant was at Mattel, Mattel would |
| 10:26 | 8 | not have manufactured or marketed Bratz if Mr. Bryant had |
| 10:26 | 9 | presented his drawings; isn't that true? |
| 10:26 | 10 | A.   I don't know that. |
| 10:26 | 11 | Q.   Have you investigated it? |
| 10:26 | 12 | A.   No, I have not. |
| 10:26 | 13 | Q.   Have you talked to the people who would have been the |
| 10:26 | 14 | relevant decision makers at the time to see if you would |
| 10:26 | 15 | have manufactured or marketed Bratz? |
| 10:27 | 16 | A.   Um, at the time, we didn't have opportunity, so, no, I |
| 10:27 | 17 | have not. |
| 10:27 | 18 | Q.   Well, had you had it, though -- I mean, you were the |
| 10:27 | 19 | ultimate decision maker at Mattel in the year 2000 and 2001, |
| 10:27 | 20 | right? |
| 10:27 | 21 | A.   That's correct. |
| 10:27 | 22 | Q.   Now, I think yesterday you testified that you didn't |
| 10:27 | 23 | know that the name "Brats," B-R-A-T-S, was unable to be |
| 10:27 | 24 | cleared by your legal department when Mattel tried to clear |
| 10:27 | 25 | it. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:27 | 1 | Do you remember that? |
| 10:27 | 2 | A.   I do. |
| 10:27 | 3 | Q.   Have you checked into that since yesterday? |
| 10:27 | 4 | A.   No, I have not. |
| 10:27 | 5 | Q.   And are you aware that a gentleman by the name of Steve |
| 10:27 | 6 | Linker testified here at trial that he was paid only $200 -- |
| 10:27 | 7 | MR. QUINN:  Your Honor, object to the form of the |
| 10:27 | 8 | question. |
| 10:27 | 9 | THE COURT:  You can ask a hypothetical. |
| 10:27 | 10 | MR. QUINN:  It's testimony versus testimony. |
| 10:27 | 11 | THE COURT:  You can inform the witness, though, in |
| 10:27 | 12 | a hypothetical:  If Mr. Linker testified to the following. |
| 10:27 | 13 | BY MS. KELLER: |
| 10:27 | 14 | Q.   If Mr. Linker testified that he was paid no more than |
| 10:27 | 15 | $200 by Mattel for the B-R-A-T-S name for the Diva Starz |
| 10:28 | 16 | project in 1999, does that sound like about the right dollar |
| 10:28 | 17 | amount to you? |
| 10:28 | 18 | A.   I don't know. |
| 10:28 | 19 | Q.   One way or the other? |
| 10:28 | 20 | A.   I don't know one way or the other. |
| 10:28 | 21 | Q.   Now, you understand, don't you, that Adrienne |
| 10:28 | 22 | Fontanella, who was the president of Mattel's Girls Division |
| 10:28 | 23 | at the time Bratz was marketed, thought the name "Bratz," |
| 10:28 | 24 | B-R-A-T-Z, had negative connotations? |
| 10:28 | 25 | MR. QUINN:  Your Honor, I object.  Assumes facts. |

| | | |
|---|---|---|
| 10:28 | 1 | MS. KELLER:  Your Honor, I will make an offer of |
| 10:28 | 2 | proof. |
| 10:28 | 3 | MR. PRICE:  Your Honor, this should be discussed |
| 10:28 | 4 | tonight. |
| 10:28 | 5 | THE COURT:  Well, you can ask him, Counsel. |
| 10:28 | 6 | You're stating a fact, and the jury -- is there an |
| 10:28 | 7 | e-mail to that effect that's already come into evidence, |
| 10:28 | 8 | Counsel? |
| 10:28 | 9 | MR. QUINN:  No. |
| 10:28 | 10 | THE COURT:  Okay. |
| 10:29 | 11 | MS. KELLER:  I'm sorry, Your Honor? |
| 10:29 | 12 | THE COURT:  Is there an e-mail already in |
| 10:29 | 13 | evidence? |
| 10:29 | 14 | MS. KELLER:  It is not an e-mail, Your Honor.  It |
| 10:29 | 15 | is her testimony. |
| 10:29 | 16 | THE COURT:  But in front of this jury? |
| 10:29 | 17 | MS. KELLER:  Not yet. |
| 10:29 | 18 | THE COURT:  Is it going to be? |
| 10:29 | 19 | MS. KELLER:  We plan to, yes. |
| 10:29 | 20 | THE COURT:  Gonna call Adrienne Fontanella? |
| 10:29 | 21 | MS. KELLER:  Yes. |
| 10:29 | 22 | MS. HURST:  Yes. |
| 10:29 | 23 | THE COURT:  It's subject to a motion to strike. |
| 10:29 | 24 | But ask "if the testimony is." |
| 10:29 | 25 | (To the jury:) Now, to save maybe people coming |

| | | |
|---|---|---|
| 10:29 | 1 | back, I'm gonna allow and accept counsel's representation |
| 10:29 | 2 | that Adrienne Fontanella is going to be called.  But we |
| 10:29 | 3 | don't know what that person's going to say. |
| 10:29 | 4 | So, counsel can ask a hypothetical, "If the |
| 10:29 | 5 | testimony were as follows," and then ask Mr. Eckert what his |
| 10:29 | 6 | response would be. |
| 10:29 | 7 | All right.  Counsel. |
| 10:29 | 8 | BY MS. KELLER: |
| 10:29 | 9 | Q.   Adrienne Fontanella was president of Mattel's Girls |
| 10:29 | 10 | Division in 2001? |
| 10:29 | 11 | A.   Yes. |
| 10:29 | 12 | Q.   You know Ms. Fontanella pretty well, don't you? |
| 10:30 | 13 | A.   I do.  I do know her, yes. |
| 10:30 | 14 | Q.   And she reported to you, didn't she? |
| 10:30 | 15 | A.   She did. |
| 10:30 | 16 | Q.   You had pretty frequent contact with her, right? |
| 10:30 | 17 | A.   Yes, I did. |
| 10:30 | 18 | Q.   And I want you to assume that Adrienne Fontanella will |
| 10:30 | 19 | testify that, at the time she first heard of it, she thought |
| 10:30 | 20 | the name "Brats," B-R-A-T-S, had negative connotations. |
| 10:30 | 21 | Okay? |
| 10:30 | 22 | Do you agree with that? |
| 10:30 | 23 | A.   Um, do I agree that the word "brats" has negative |
| 10:30 | 24 | connotations? |
| 10:30 | 25 | Q.   Yeah. |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

79

| | | |
|---|---|---|
| 10:30 | 1 | A.    Yes. |
| 10:30 | 2 | Q.    And assume that Ms. Fontanella has testified, and will |
| 10:30 | 3 | testify, that she had a very strong obligation and loyalty |
| 10:30 | 4 | to girls to present things that were in good taste and |
| 10:30 | 5 | didn't suggest anything negative or not appropriate. |
| 10:30 | 6 | Did you feel the same way at the time? |
| 10:30 | 7 | A.    I -- I'm sorry.  I just didn't track it. |
| 10:31 | 8 | Could you ask me the same thing again? |
| 10:31 | 9 | Q.    Yes.  That she had a very strong obligation and loyalty |
| 10:31 | 10 | to girls to present things that were in good taste and |
| 10:31 | 11 | didn't suggest anything negative and not appropriate. |
| 10:31 | 12 | At the time, did you agree with that statement? |
| 10:31 | 13 | A.    I think so, yes. |
| 10:31 | 14 | Q.    And, in fact, you would have vetoed any decision to |
| 10:31 | 15 | launch a new brand or sub-brand that was counter to your |
| 10:31 | 16 | view of the company and how it is perceived, right? |
| 10:31 | 17 | A.    Um, no.  I wouldn't necessarily do that. |
| 10:31 | 18 | Q.    Could we have you take a look at your deposition of |
| 10:31 | 19 | April 27, 2010, page 1147, lines 14 through 19. |
| 10:31 | 20 | *(Document provided to the witness.)* |
| 10:32 | 21 | THE COURT:  14 through 19? |
| 10:32 | 22 | I don't see that as contradictory, Counsel. |
| 10:32 | 23 | MS. KELLER:  I'll move on, Your Honor. |
| 10:32 | 24 | BY MS. KELLER: |
| 10:32 | 25 | Q.    You viewed Bratz as having negative social values, |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

80

| | | |
|---|---|---|
| 10:32 | 1 | didn't you -- the doll, the doll Bratz? |
| 10:32 | 2 | A.   I think parents viewed that.  I -- I would agree with |
| 10:32 | 3 | that. |
| 10:32 | 4 | Q.   And, in fact, you called Bratz the anti-Barbie, right? |
| 10:32 | 5 | A.   I may have. |
| 10:32 | 6 | Q.   Did you? |
| 10:32 | 7 | A.   I don't know, but I may have. |
| 10:32 | 8 | Q.   That was your opinion, wasn't it. |
| 10:32 | 9 | A.   Yes. |
| 10:32 | 10 | Q.   Now, if we can look at Exhibit 9634, this is a |
| 10:32 | 11 | September 1st, 2005 memo from you to the Mattel Board of |
| 10:32 | 12 | Directors, "Re: Strategic Plan Offsite," correct? |
| 10:33 | 13 | A.   Yes. |
| 10:33 | 14 | MS. KELLER:  Your Honor, I would move Exhibit 9634 |
| 10:33 | 15 | into evidence. |
| 10:33 | 16 | THE COURT:  Received. |
| 10:33 | 17 | (Exhibit No. 9634 received in evidence.) |
| 10:33 | 18 | (Document displayed.) |
| 10:33 | 19 | BY MS. KELLER: |
| 10:33 | 20 | Q.   And if we look at page 3, the first paragraph says, |
| 10:33 | 21 | "What happened to Barbie?" |
| 10:33 | 22 | Right? |
| 10:33 | 23 | A.   Yes. |
| 10:33 | 24 | Q.   And you wrote at least part of this paragraph, didn't |
| 10:33 | 25 | you? |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

81

| | | |
|---|---|---|
| 10:33 | 1 | A.   Yes. |
| 10:33 | 2 | Q.   You wrote the last sentence of the first paragraph |
| 10:33 | 3 | under, "What happened to Barbie?"  Right? |
| 10:33 | 4 | A.   I'm pretty sure I did, yes. |
| 10:33 | 5 | Q.   And it says, "Bratz became the anti-Barbie, just as |
| 10:33 | 6 | American Girl had successfully done, albeit with positive |
| 10:33 | 7 | social values a decade earlier." |
| 10:34 | 8 |      And one of the things that you implied when you wrote |
| 10:34 | 9 | that sentence was that Bratz had negative social values, |
| 10:34 | 10 | right? |
| 10:34 | 11 | A.   Yes. |
| 10:34 | 12 | Q.   In addition to the negative social connotations of |
| 10:34 | 13 | Bratz, at all costs, you also wanted to avoid what you |
| 10:34 | 14 | called "cannibalizing Barbie," right? |
| 10:34 | 15 | A.   No. |
| 10:34 | 16 |           MS. KELLER:  If we could look at Exhibit 1277. |
| 10:34 | 17 | BY MS. KELLER: |
| 10:34 | 18 | Q.   Do you have that in front of you? |
| 10:34 | 19 | A.   Yes, I do. |
| 10:34 | 20 | Q.   And this is a Mattel consumer research memo, dated |
| 10:34 | 21 | January 9, 2002, correct? |
| 10:34 | 22 | A.   Yes, it is. |
| 10:34 | 23 |           MS. KELLER:  Your Honor, I'd move 1277 into |
| 10:34 | 24 | evidence. |
| 10:34 | 25 |           MR. QUINN:  Your Honor, we -- I haven't been able |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 82 of 142   Page ID #:306313
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

82

| | | |
|---|---|---|
| 10:34 | 1 | to pull that yet.  Could I have just a second? |
| 10:34 | 2 | THE COURT:  Certainly. |
| 10:35 | 3 | MR. QUINN:  Thank you, Your Honor. |
| 10:35 | 4 | THE COURT:  Okay. |
| 10:35 | 5 | MS. KELLER:  And, Your Honor -- |
| 10:35 | 6 | THE COURT:  Received. |
| 10:35 | 7 | *(Exhibit No. 1277 received in evidence.)* |
| 10:35 | 8 | *(Document displayed.)* |
| 10:35 | 9 | MS. KELLER:  Thank you. |
| 10:35 | 10 | BY MS. KELLER: |
| 10:35 | 11 | Q.   Now, the subject of this January 9, 2002 report was |
| 10:35 | 12 | "MyScene Cannibalization Study," right? |
| 10:35 | 13 | A.   Yes. |
| 10:35 | 14 | Q.   And if we look at the second page, 1277-2, at the top, |
| 10:35 | 15 | "Key Findings." |
| 10:35 | 16 | *(Document displayed.)* |
| 10:35 | 17 | BY MS. KELLER: |
| 10:35 | 18 | Q.   It says -- what was MyScene? |
| 10:35 | 19 | A.   MyScene was a subline of dolls offered by Mattel -- |
| 10:35 | 20 | marketed by Mattel. |
| 10:36 | 21 | Q.   And a subline intended to do what? |
| 10:36 | 22 | A.   Uh, intended to appeal to a slightly older girl than |
| 10:36 | 23 | core Barbie did. |
| 10:36 | 24 | Q.   So to try to appeal to the same segment that Bratz was |
| 10:36 | 25 | appealing, too? |

CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

83

| | | |
|---|---|---|
| 10:36 | 1 | A.    Um, yes. |
| 10:36 | 2 | Q.    So at the top, "Key Findings," it says, "Encouragingly, |
| 10:36 | 3 | introducing MyScene appears to have had -- to have little to |
| 10:36 | 4 | no negative impact on the share of the mainline Barbie brand |
| 10:36 | 5 | as a whole." |
| 10:36 | 6 | You see that? |
| 10:36 | 7 | A.    Yes, I do. |
| 10:36 | 8 | Q.    Now, look down at No. 2.  It says, "By contrast, Bratz |
| 10:36 | 9 | clearly lost share once MyScene was available.  This finding |
| 10:36 | 10 | is particularly encouraging, given that prior research |
| 10:36 | 11 | demonstrated that when Bratz was introduced into a |
| 10:36 | 12 | competitive environment before the launch of MyScene, Bratz |
| 10:36 | 13 | cannibalized Barbie brand share." |
| 10:37 | 14 | So you were very sensitive, then, about introducing |
| 10:37 | 15 | brands you thought would take market share from mainline |
| 10:37 | 16 | Barbie, right? |
| 10:37 | 17 | A.    I don't know that I'm personally that sensitive to the |
| 10:37 | 18 | issue, but someone was.  Whoever wrote this was. |
| 10:37 | 19 | Q.    Mattel didn't want to introduce brands that you thought |
| 10:37 | 20 | would take market share away from mainline Barbie because |
| 10:37 | 21 | then you were just taking market share from yourself, right? |
| 10:37 | 22 | A.    Um, no.  That's -- that's not my belief -- if I'm |
| 10:37 | 23 | speaking for Mattel. |
| 10:37 | 24 | Q.    Well, you didn't want to introduce any doll that |
| 10:37 | 25 | threatened to cannibalize Barbie, correct? |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

84

| | | |
|---|---|---|
| 10:37 | 1 | A.   No. |
| 10:37 | 2 | Q.   You're own testing showed that Bratz cannibalized |
| 10:37 | 3 | Barbie, right? |
| 10:37 | 4 | A.   That's what this report says, yes. |
| 10:37 | 5 | Q.   Now, do you recall when it was that you first started |
| 10:37 | 6 | to study the performance of Barbie shortly after coming |
| 10:37 | 7 | onboard at Mattel? |
| 10:38 | 8 | A.   I'm sure I would have studied the performance of all of |
| 10:38 | 9 | the major brands early in my employment, so it would -- it |
| 10:38 | 10 | would have been immediately. |
| 10:38 | 11 | Q.   As of 2008, you said you didn't remember when it was |
| 10:38 | 12 | that you started to study the performance of Barbie, right? |
| 10:38 | 13 | A.   I still don't know exactly when I did.  But it would |
| 10:38 | 14 | have been early in my tenure. |
| 10:38 | 15 | Q.   If you can take a look at your deposition from |
| 10:38 | 16 | January 28, 2008. |
| 10:38 | 17 | *(Document provided to the witness.)* |
| 10:38 | 18 | MS. KELLER:  Page 14? |
| 10:38 | 19 | THE COURT:  Lines? |
| 10:39 | 20 | MS. KELLER:  14 -- I'm sorry.  This is page 19, |
| 10:39 | 21 | lines 14 through 17. |
| 10:39 | 22 | THE COURT:  Page 19?  Okay. |
| 10:39 | 23 | MS. KELLER:  I'm sorry.  I'm sorry.  I'm on the |
| 10:39 | 24 | wrong page.  Lines (sic) 14, lines 1 through 4. |
| 10:39 | 25 | THE COURT:  Now, just a moment. |

| | | |
|---|---|---|
| 10:39 | 1 | What page: 14 or 19? |
| 10:39 | 2 | MS. KELLER: 14, lines 1 through 4. |
| 10:39 | 3 | THE COURT: Okay. Thank you. |
| 10:39 | 4 | MR. QUINN: It's not impeaching, Your Honor. |
| 10:39 | 5 | THE COURT: Just a moment. |
| 10:39 | 6 | It's consistent. It's not impeaching, Counsel. |
| 10:39 | 7 | BY MS. KELLER: |
| 10:39 | 8 | Q. When you started to study the performance of Barbie, do |
| 10:39 | 9 | you know whether the sales were trending up or trending |
| 10:39 | 10 | down? |
| 10:39 | 11 | A. No. I -- I don't remember at that time whether the |
| 10:39 | 12 | sales were trending up or down in 2000, globally. |
| 10:40 | 13 | Q. Now, yesterday Mr. Quinn asked you how Barbie was |
| 10:40 | 14 | performing when you joined the company. |
| 10:40 | 15 | Do you remember that? |
| 10:40 | 16 | A. I do. |
| 10:40 | 17 | Q. And you said Barbie's revenues began to decline in |
| 10:40 | 18 | 1997, right? |
| 10:40 | 19 | A. Yes, I -- yes. |
| 10:40 | 20 | Q. And in 2008, you no longer remembered that, correct? |
| 10:40 | 21 | A. Um, no. The way I remember this deposition going was: |
| 10:40 | 22 | Did I recall my conclusion at the time I started the |
| 10:40 | 23 | analysis? |
| 10:40 | 24 | I -- I certainly know the trends on Barbie from 2000 to |
| 10:40 | 25 | the present. |

| | | |
|---|---|---|
| 10:40 | 1 | Q.   Well, you know that Barbie peaked in 1997, right? |
| 10:40 | 2 | A.   I do know that. |
| 10:40 | 3 | Q.   And had been in decline before you even arrived at |
| 10:40 | 4 | Mattel, right? |
| 10:40 | 5 | A.   Yes. |
| 10:40 | 6 | Q.   And you know Barbie sales were declining in the |
| 10:40 | 7 | United States in 2000 and 2001, right? |
| 10:41 | 8 | A.   Yes. |
| 10:41 | 9 | Q.   And that was before Bratz ever came onto the scene, |
| 10:41 | 10 | right? |
| 10:41 | 11 | A.   Yes. |
| 10:41 | 12 | Q.   And -- |
| 10:41 | 13 | A.   Well, 2000 was. |
| 10:41 | 14 | Q.   And, in fact, Bratz didn't come onto the scene in 2001 |
| 10:41 | 15 | until late in the season, right? -- in the United States. |
| 10:41 | 16 | A.   The second half of the year, correct. |
| 10:41 | 17 | Q.   And the big time of the year, as we've talked about, is |
| 10:41 | 18 | Christmas for toy companies, true? |
| 10:41 | 19 | A.   Yes. |
| 10:41 | 20 | Q.   Now, let's look at Exhibit 7502. |
| 10:41 | 21 | *(Document provided to the witness.)* |
| 10:41 | 22 | BY MS. KELLER: |
| 10:41 | 23 | Q.   And this is the 2001 Mattel 10-K.  Could you tell the |
| 10:41 | 24 | jury what a 10-K is? |
| 10:41 | 25 | A.   A 10-K is the annual financial report of the company |

| | | |
|---|---|---|
| 10:41 | 1 | that is filed with the Securities and Exchange Commission. |
| 10:41 | 2 | Q.   And if you look at page 1 of 7502, that's the cover. |
| 10:42 | 3 | MS. KELLER:  Your Honor, we'd move 7502 into |
| 10:42 | 4 | evidence. |
| 10:42 | 5 | THE COURT:  Received. |
| 10:42 | 6 | *(Exhibit No. 7502 received in evidence.)* |
| 10:42 | 7 | *(Document displayed.)* |
| 10:42 | 8 | BY MS. KELLER: |
| 10:42 | 9 | Q.   7502-1, "Optimize," you selected that word? |
| 10:42 | 10 | A.   I did. |
| 10:42 | 11 | Q.   And you do that every year, right?  You pick one word |
| 10:42 | 12 | that you -- or one phrase that you want to key on? |
| 10:42 | 13 | A.   Yes. |
| 10:42 | 14 | MS. KELLER:  And let's look at 7502, page 9. |
| 10:42 | 15 | *(Document displayed.)* |
| 10:42 | 16 | MS. KELLER:  And let's look at the first page of |
| 10:42 | 17 | your 10-K. |
| 10:42 | 18 | *(Document displayed.)* |
| 10:42 | 19 | MS. KELLER:  Let's look at page 27 now, the third |
| 10:43 | 20 | paragraph, in the middle. |
| 10:43 | 21 | *(Document displayed.)* |
| 10:43 | 22 | BY MS. KELLER: |
| 10:43 | 23 | Q.   "Barbie sales in the U.S. declined 12 percent in 2001." |
| 10:43 | 24 | Do you see that? |
| 10:43 | 25 | A.   Not yet. |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 88 of 142   Page ID #:306319
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

88

| | | |
|---|---|---|
| 10:43 | 1 | Q.    Middle of the third paragraph. |
| 10:43 | 2 | A.    I'm sorry.  I'm looking. |
| 10:43 | 3 | Q.    Five lines down. |
| 10:43 | 4 | A.    I have it.  "Barbie sales in the U.S. declined |
| 10:43 | 5 | 12 percent"? |
| 10:43 | 6 | Q.    Yes.  And was that a true statement? |
| 10:43 | 7 | A.    Uh, I'm sure it was. |
| 10:43 | 8 | Q.    And the reason why Barbie's revenues were declining is |
| 10:43 | 9 | because, beginning in the 1990's, Barbie was increasingly |
| 10:43 | 10 | scene as babyish by older girls, right? |
| 10:43 | 11 | A.    I think that was certainly a contributing factor. |
| 10:43 | 12 | Q.    Well, you, yourself, observed this, didn't you? |
| 10:43 | 13 | A.    I believed it.  I don't know if I observed it. |
| 10:43 | 14 | MS. KELLER:  Let's look at Exhibit 8676. |
| 10:44 | 15 | (Document provided to the witness.) |
| 10:44 | 16 | BY MS. KELLER: |
| 10:44 | 17 | Q.    8676, is this an e-mail chain dated June 18, 2004, from |
| 10:44 | 18 | you to Tim Kilpin, Sujata Luther and Jerome Bossick? |
| 10:44 | 19 | A.    Yes, it is. |
| 10:44 | 20 | MS. KELLER:  Move that into evidence, Your Honor. |
| 10:44 | 21 | THE COURT:  Received. |
| 10:44 | 22 | (Exhibit No. 8676 received in evidence.) |
| 10:44 | 23 | (Document displayed.) |
| 10:44 | 24 | BY MS. KELLER: |
| 10:44 | 25 | Q.    And in this e-mail now who was Tim Kilpin? |

| | | |
|---|---|---|
| 10:44 | 1 | A.   Tim Kilpin at the time was a general manager of our |
| 10:44 | 2 | Girls Division. |
| 10:44 | 3 | Q.   And who was Sujata Luther? |
| 10:44 | 4 | A.   Sujata Luther was likely the person in charge of |
| 10:44 | 5 | research for at least the Girls Division -- marketing |
| 10:44 | 6 | research. |
| 10:44 | 7 | Q.   And who was Jerome Bossick? |
| 10:44 | 8 | A.   Jerry Bossick at the time may have been the manager for |
| 10:45 | 9 | the girls business that is not Barbie, or he may have been |
| 10:45 | 10 | in the finance group. |
| 10:45 | 11 | Q.   Now, in this e-mail, you say, "As part of the |
| 10:45 | 12 | development of the strategic plan, I've started to develop a |
| 10:45 | 13 | line of thinking about," quote, "What happened to Barbie?" |
| 10:45 | 14 | unquote, "particularly related to older girls.  I'd |
| 10:45 | 15 | appreciate your reaction to the logic flow shown below.  I'm |
| 10:45 | 16 | not looking for proof of facts, just your concurrence or |
| 10:45 | 17 | suggestions for improvement to the line of thinking. |
| 10:45 | 18 |      "What happened to Barbie?" |
| 10:45 | 19 |      Now, look at Number 2.  It says, "Barbie increasingly |
| 10:45 | 20 | seen as babyish by older girls beginning in 199X." |
| 10:45 | 21 |      Did you write 199X 'cause you weren't sure exactly what |
| 10:45 | 22 | year it was that Barbie began to be seen as babyish by older |
| 10:46 | 23 | girls? |
| 10:46 | 24 | A.   Um, I probably didn't have that specificity in mind |
| 10:46 | 25 | but, generally speaking, yes. |

| | | |
|---|---|---|
| 10:46 | 1 | Q.   I'm just asking, the reason for the "X" is because you |
| 10:46 | 2 | weren't sure of exactly what year. |
| 10:46 | 3 | A.   It's probably because the reason -- the particular year |
| 10:46 | 4 | wasn't that important to what I was trying to communicate. |
| 10:46 | 5 | Q.   Well, is this a typo? |
| 10:46 | 6 | A.   No, it's not a typo. |
| 10:46 | 7 | Q.   And after this, you, yourself, point out that Barbie |
| 10:46 | 8 | was pushed even younger by your own products; is that right? |
| 10:46 | 9 | A.   *(No response.)* |
| 10:46 | 10 | Q.   Take a look at Number 4. |
| 10:46 | 11 | A.   Thank you.  Thank you.  I'm looking for that.  Uh, yes. |
| 10:46 | 12 | Q.   You had an entertainment segment, Nutcracker, Rapunzel, |
| 10:46 | 13 | et al., which is referenced here, right? |
| 10:47 | 14 | A.   Yes. |
| 10:47 | 15 | Q.   And you said it pushed Barbie even younger, true? |
| 10:47 | 16 | A.   That was my belief, yes. |
| 10:47 | 17 | Q.   Now, all the doll lines you launched -- that Mattel |
| 10:47 | 18 | launched, rather -- around the end of the 1990's and |
| 10:47 | 19 | beginning of the 2000's eventually failed, right? |
| 10:47 | 20 | A.   No. |
| 10:47 | 21 | Q.   Well, you point out here that Generation Girl, launched |
| 10:47 | 22 | in 1999 and proved unsustainable beyond 2000? |
| 10:47 | 23 | That's Number 3. |
| 10:47 | 24 | A.   Yes. |
| 10:47 | 25 | Q.   "Unsustainable" means it failed, right? |

| | | |
|---|---|---|
| 10:47 | 1 | A.   No. |
| 10:47 | 2 | Q.   It means it wasn't selling, right? |
| 10:47 | 3 | A.   At some point, correct. |
| 10:47 | 4 | Q.   So Generation Girl, launched in 1999, and proved |
| 10:47 | 5 | unsustainable beyond 2000, you withdraw it after 2000, |
| 10:47 | 6 | right? |
| 10:47 | 7 | A.   That may be the case, yes. |
| 10:47 | 8 | Q.   Is it the case? |
| 10:47 | 9 | A.   I think so. |
| 10:47 | 10 | Q.   And then it says, "Diva Starz.  New Mattel brand |
| 10:47 | 11 | launched successfully in 2000, but proved unsustainable |
| 10:48 | 12 | beyond 2001." |
| 10:48 | 13 | And that -- so that one failed too, right? |
| 10:48 | 14 | A.   No. |
| 10:48 | 15 | Q.   You withdraw it after 2001 -- |
| 10:48 | 16 | A.   Right. |
| 10:48 | 17 | Q.   -- from the market, right? |
| 10:48 | 18 | A.   We did discontinue it.  But I wouldn't describe it as |
| 10:48 | 19 | being unsuccessful. |
| 10:48 | 20 | Q.   Well, when you have a successful product, you don't |
| 10:48 | 21 | discontinue it 'cause it actually sells toys, right? |
| 10:48 | 22 | THE COURT:  Are you saying "product" or "brand"? |
| 10:48 | 23 | MS. KELLER:  Product. |
| 10:48 | 24 | THE COURT:  Okay. |
| 10:48 | 25 | THE WITNESS:  Well, we do discontinue products and |

| | | |
|---|---|---|
| 10:48 | 1 | brands and rotate new products all the time. |
| 10:48 | 2 | BY MS. KELLER: |
| 10:48 | 3 | Q.   Yeah.  But if a product is a big ol' success and it's |
| 10:48 | 4 | making you money, you don't discontinue it? |
| 10:48 | 5 | A.   That's right.  If it's sustainable, we certainly don't |
| 10:48 | 6 | discontinue it. |
| 10:48 | 7 | Q.   That's what I mean by "sustainable."  I mean, if it's |
| 10:48 | 8 | successful and it's making Mattel money, you don't just junk |
| 10:48 | 9 | it, right? |
| 10:48 | 10 | A.   I apologize.  I heard a difference between success and |
| 10:48 | 11 | sustainable. |
| 10:48 | 12 | We don't just junk a product that is sustainably |
| 10:49 | 13 | performing well in the marketplace. |
| 10:49 | 14 | Q.   And if a product is flopping, you withdraw it, right? |
| 10:49 | 15 | A.   If we can't rectify the situation, yes. |
| 10:49 | 16 | Q.   If you can't fix the flopping part, you withdraw it, |
| 10:49 | 17 | right? |
| 10:49 | 18 | A.   Over time, yes. |
| 10:49 | 19 | Q.   You withdraw it if it's flopping, right? |
| 10:49 | 20 | A.   That's right, at some point we do, yes. |
| 10:49 | 21 | Q.   And you point out in this memo that "Barbie brand |
| 10:49 | 22 | P&L" -- |
| 10:49 | 23 | Okay.  That stands for profits and losses, right? |
| 10:49 | 24 | A.   Correct. |
| 10:49 | 25 | Q.   -- "propped up by entertainment segment, early ship, |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 93 of 142   Page ID #:306324
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

93

| | | |
|---|---|---|
| 10:49 | 1 | international growth, high-margin licensing revenue, |
| 10:49 | 2 | companywide cost-reduction program" -- that's number 6. |
| 10:49 | 3 | So what you're saying here is that the Barbie brand's |
| 10:49 | 4 | profits and losses were being propped up by things other |
| 10:49 | 5 | than sales of the dolls themselves, right? |
| 10:50 | 6 | A.   Um, no.  This includes sales of the dolls.  But it |
| 10:50 | 7 | certainly goes beyond sales of the dolls. |
| 10:50 | 8 | Q.   Well, "Barbie brand P&L propped up by entertainment |
| 10:50 | 9 | segment," that would be, say, TV shows, movies, that sort of |
| 10:50 | 10 | thing? |
| 10:50 | 11 | A.   Um, it could be.  But I also associate it as the dolls |
| 10:50 | 12 | associated with those things. |
| 10:50 | 13 | Q.   So "entertainment segment," to you means the dolls |
| 10:50 | 14 | themselves? |
| 10:50 | 15 | A.   When I use the term "segment," within Barbie, I think |
| 10:50 | 16 | it does, yes.  It probably did at the time. |
| 10:50 | 17 | Q.   "Barbie brand" -- |
| 10:50 | 18 | A.   Probably does today. |
| 10:50 | 19 | Q.   "Barbie brand P&L propped up by entertainment segment," |
| 10:50 | 20 | to you means propped up by the doll itself? |
| 10:50 | 21 | A.   No.  It -- it might, I said, include the doll.  It's |
| 10:50 | 22 | the things around the entertainment portion of the business, |
| 10:50 | 23 | which does include DVDs and movies and other things. |
| 10:50 | 24 | Q.   Does "early ship" include the doll itself? |
| 10:50 | 25 | A.   It is early ship of products, so it does include dolls. |

| | | |
|---|---|---|
| 10:51 | 1 | Q.   Yeah.  But the "early ship," "propping up the profits |
| 10:51 | 2 | and loss" -- that means the early ship was helping with |
| 10:51 | 3 | profits, right? |
| 10:51 | 4 | A.   Yes.  That means the earlier shipment of products |
| 10:51 | 5 | helped with profits, yes. |
| 10:51 | 6 | Q.   And the "high-margin licensing revenue," that means |
| 10:51 | 7 | that was helping with profits, right? |
| 10:51 | 8 | A.   Yes. |
| 10:51 | 9 | Q.   And the companywide cost-reduction program, that |
| 10:51 | 10 | included firing a lot of people, right? |
| 10:51 | 11 | A.   The companywide cost-reduction program in 2004 was a |
| 10:51 | 12 | lot of -- a lot of activities, but I'm sure it included job |
| 10:51 | 13 | eliminations. |
| 10:51 | 14 | Q.   Well, by "job eliminations," when I said "firing |
| 10:51 | 15 | people" that's what I meant.  You know, hundreds of layoffs, |
| 10:51 | 16 | right? |
| 10:51 | 17 | A.   It may have. |
| 10:51 | 18 | Q.   Did it? |
| 10:51 | 19 | A.   I don't know.  That, you know, was a component of the |
| 10:51 | 20 | companywide cost-reduction program. |
| 10:51 | 21 | Q.   And you note that, in Number 7, "Bratz.  MGA launched |
| 10:51 | 22 | Passion for Fashion dolls directly at tweens in 2000/2002. |
| 10:52 | 23 | Added benefit:  High piece count. |
| 10:52 | 24 |     What do you mean by "high piece count"? |
| 10:52 | 25 | A.   It means a lot of individual pieces within the package. |

| 10:52 | 1  | Q.   And then it says, "Added benefit:  Relatively high |
| 10:52 | 2  | retail margins." |
| 10:52 | 3  |      What does that mean? |
| 10:52 | 4  | A.   That means that retailers -- that is, the retail |
| 10:52 | 5  | customers who ultimately sell products to consumers are |
| 10:52 | 6  | making a higher profit on that product relative to its |
| 10:52 | 7  | competition. |
| 10:52 | 8  | Q.   And in this e-mail, you're soliciting opinions from |
| 10:52 | 9  | Ms. (sic) Kilpin, Ms. Luther and Mr. Bossick, right? |
| 10:52 | 10 | A.   Um, I would just change it to "Mr." Kilpin, but, yes. |
| 10:52 | 11 | Q.   I'm sorry.  You're absolutely right.  Mr. Kilpin, |
| 10:52 | 12 | Ms. Luther, and Mr. Bossick. |
| 10:52 | 13 |      And, of course, you found out what Mr. Kilpin thought |
| 10:52 | 14 | about your logic flow in the top e-mail, correct? |
| 10:52 | 15 | A.   Yes. |
| 10:52 | 16 | Q.   And this is from Mr. Kilpin to Matt Bousquette, and it |
| 10:53 | 17 | says, "Matt, sending this on to you before sending to Bob." |
| 10:53 | 18 |      You were Bob? |
| 10:53 | 19 | A.   Uh -- |
| 10:53 | 20 | Q.   You assume? |
| 10:53 | 21 | A.   I'm sure I was. |
| 10:53 | 22 | Q.   "Wasn't sure if there were other things he might be |
| 10:53 | 23 | looking for in his attached message.  Looks good.  A few |
| 10:53 | 24 | additional thoughts as we've learned from the recent |
| 10:53 | 25 | research. |

| | | |
|---|---|---|
| 10:53 | 1 | "Around 2000, we moved to counter Barbie's image as |
| 10:53 | 2 | aloof, perfect, cold.  We stressed younger themes -- |
| 10:53 | 3 | nurturing, fantasy.  At the same time, we didn't continue to |
| 10:53 | 4 | deliver the best possible," quote, "older," slash, "cool," |
| 10:53 | 5 | unquote, "trend-right ideas.  This led to the lost |
| 10:53 | 6 | generation Russell speaks of in her presentation.  Girls 5 |
| 10:53 | 7 | to 9 years old today haven't seen a cool, trendy Barbie |
| 10:53 | 8 | consistently. |
| 10:53 | 9 | "In addition to Bratz's positioning, piece count, and |
| 10:54 | 10 | margin profile, it delivered a striking visual alternative |
| 10:54 | 11 | to Barbie:  Hip," quote, "attitude," unquote, "cartoonish. |
| 10:54 | 12 | They effectively, quote, "counterprogrammed," unquote, |
| 10:54 | 13 | versus Barbie. |
| 10:54 | 14 | "As we launch new segments specifically targeted to |
| 10:54 | 15 | older girls in Fall '04/Spring '05, we're now directly |
| 10:54 | 16 | addressing key attributes:  Fashionable, but still |
| 10:54 | 17 | beautiful; the right mix of accessories, piece count, a |
| 10:54 | 18 | better retail margin." |
| 10:54 | 19 | So from reading this e-mail from Mr. Kilpin, and yours |
| 10:54 | 20 | below it, Barbie was seen as babyish by older girls even |
| 10:54 | 21 | before Bratz ever entered the market in late 2001, right? |
| 10:54 | 22 | A.   That was certainly my opinion. |
| 10:54 | 23 | Q.   And Mr. Kilpin's opinion, right? |
| 10:54 | 24 | A.   Yes. |
| 10:54 | 25 | Q.   And, in fact, the opinion of the executives at Mattel, |

| | | |
|---|---|---|
| 10:54 | 1 | in general, who were studying this issue, true? |
| 10:54 | 2 | A.   I think it goes to this self-examination and |
| 10:55 | 3 | reflection. |
| 10:55 | 4 | Q.   Not the question. |
| 10:55 | 5 | A.   I'm sorry? |
| 10:55 | 6 | Q.   The question is, that was generally the opinion of the |
| 10:55 | 7 | executives at Mattel looking at the issue, right? |
| 10:55 | 8 | A.   I don't know if I can speak for everybody, but I think |
| 10:55 | 9 | so. |
| 10:55 | 10 | Q.   Well, you were the CEO, so you were soliciting opinions |
| 10:55 | 11 | of other executives, right? |
| 10:55 | 12 | A.   That's correct. |
| 10:55 | 13 | Q.   It was important to you to find out the answers, right? |
| 10:55 | 14 | A.   Yes. |
| 10:55 | 15 | MS. KELLER:  Now, let's look at Exhibit 8968. |
| 10:55 | 16 | *(Document provided to the witness.)* |
| 10:55 | 17 | BY MS. KELLER: |
| 10:55 | 18 | Q.   This is a March 6, 2002, Mattel Board of Directors |
| 10:55 | 19 | meeting minutes, right? |
| 10:55 | 20 | A.   It is an agenda -- yes, the minutes are here.  Yes. |
| 10:55 | 21 | Q.   And I'm turning your attention specifically to 8968-77, |
| 10:55 | 22 | entitled, "Girls Business Unit, 2002 Goals and Objectives." |
| 10:55 | 23 | Do you see that? |
| 10:56 | 24 | A.   I do. |
| 10:56 | 25 | MS. KELLER:  And, Your Honor, we'd move 8968-77 |

| | | |
|---|---|---|
| 10:56 | 1 | into evidence. |
| 10:56 | 2 | THE COURT:  Received. |
| 10:56 | 3 | *(Exhibit No. 8968-77 received in evidence.)* |
| 10:56 | 4 | *(Document displayed.)* |
| 10:56 | 5 | BY MS. KELLER: |
| 10:56 | 6 | Q.   Now, one portion of this says: |
| 10:56 | 7 | "Maintain doll market share in US. |
| 10:56 | 8 | "Drive modest healthy growth in Barbie. |
| 10:56 | 9 | "Capitalize on growth opportunities with Polly Pocket |
| 10:56 | 10 | and What's Her Face. |
| 10:56 | 11 | "Leverage Diva Starz and Mystery Squad to mitigate |
| 10:56 | 12 | competitive pressure from Bratz." |
| 10:56 | 13 | Okay.  Now, tell me what -- what was What's Her Face? |
| 10:56 | 14 | A.   What's Her Face was a line of dolls introduced in |
| 10:56 | 15 | perhaps 2001. |
| 10:56 | 16 | Q.   And What's Her Face literally had no face, right? |
| 10:56 | 17 | A.   Uh, yes. |
| 10:57 | 18 | MS. KELLER:  If we look at trial Exhibit 35943. |
| 10:57 | 19 | *(Exhibit provided to the witness.)* |
| 10:57 | 20 | BY MS. KELLER: |
| 10:57 | 21 | Q.   Is that What's Her Face? |
| 10:57 | 22 | A.   Yes, it is. |
| 10:57 | 23 | Q.   And would you show that to the members of the jury, |
| 10:57 | 24 | please. |
| 10:57 | 25 | A.   *(Witness complies.)* |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

99

| | | |
|---|---|---|
| 10:57 | 1 | MS. KELLER:  Do we have a photo of that, as well. |
| 10:57 | 2 | And, Your Honor, we would move in Exhibit 35943. |
| 10:57 | 3 | THE COURT:  Received. |
| 10:57 | 4 | *(Exhibit No. 35943 received in evidence.)* |
| 10:57 | 5 | *(Document displayed.)* |
| 10:57 | 6 | BY MS. KELLER: |
| 10:57 | 7 | Q.   And that's a picture on the screen that we see of |
| 10:57 | 8 | What's Her Face's lack of a face, right? |
| 10:57 | 9 | A.   Um, yeah.  You don't see the components of the face |
| 10:57 | 10 | that are next to it.  That's correct. |
| 10:57 | 11 | Q.   So there are components of a face that come with the |
| 10:57 | 12 | doll, but the doll, itself, doesn't have a face. |
| 10:57 | 13 | A.   Yeah.  The doll -- the girl designs the face. |
| 10:57 | 14 | Q.   Now, we saw in exhibit -- let's go back to |
| 10:57 | 15 | Exhibit 8968, page 77. |
| 10:58 | 16 | We saw in Exhibit 8676 that you characterize Diva Starz |
| 10:58 | 17 | as unsustainable beyond 2001, right? |
| 10:58 | 18 | A.   Yes, I believe so. |
| 10:58 | 19 | Q.   And so that's another way of saying that it failed |
| 10:58 | 20 | after 2001, right? |
| 10:58 | 21 | A.   At some point, it did.  I would say it was |
| 10:58 | 22 | unsuccessful -- unsustainable. |
| 10:58 | 23 | Q.   Is that another way of saying it failed after 2001? |
| 10:58 | 24 | A.   Yes, I think so. |
| 10:58 | 25 | Q.   And if we go back to Exhibit 8968, page 77. |

| | | |
|---|---|---|
| 10:58 | 1 | A.   Okay. |
| 10:58 | 2 | Q.   This "maintain doll market share in U.S." portion that |
| 10:58 | 3 | we're seeing -- so -- "2002 goals and objectives" -- so |
| 10:58 | 4 | Mystery Squad is mentioned here. |
| 10:59 | 5 | And Mystery Squad also failed, right? |
| 10:59 | 6 | A.   At some point it wasn't sustainable, so, again, I argue |
| 10:59 | 7 | it's successful for a time and then it cycles through, yes. |
| 10:59 | 8 | Q.   Less than a year? |
| 10:59 | 9 | A.   I don't remember on Mystery Squad whether it was -- how |
| 10:59 | 10 | long it was. |
| 10:59 | 11 | Q.   These all got pulled off the market after one year, |
| 10:59 | 12 | right? -- one season? |
| 10:59 | 13 | A.   No, I don't think that's the case. |
| 10:59 | 14 | Q.   And Barbie revenues continued to decline in |
| 10:59 | 15 | 2002, right? |
| 10:59 | 16 | A.   They did. |
| 10:59 | 17 | Q.   Let's look at Exhibit 7503. |
| 10:59 | 18 | (Document displayed.) |
| 10:59 | 19 | BY MS. KELLER: |
| 10:59 | 20 | Q.   And that's your 2002 10-K that you sent to the |
| 10:59 | 21 | Securities and Exchange Commission, right? |
| 10:59 | 22 | A.   It is. |
| 10:59 | 23 | Q.   And the -- if we look at the first page of that, the |
| 11:00 | 24 | cover, 7503, it says "Innovate," right? |
| 11:00 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:00 | 1 | MS. KELLER:  Your Honor, we'd move 7503, page 1 |
| 11:00 | 2 | in. |
| 11:00 | 3 | THE COURT:  Received. |
| 11:00 | 4 | *(Exhibit No. 7503, page 1 received in* |
| 11:00 | 5 | *evidence.)* |
| 11:00 | 6 | *(Document displayed.)* |
| 11:59 | 7 | BY MS. KELLER: |
| 11:00 | 8 | Q.   And "innovate" was your word for that year, true? |
| 11:00 | 9 | A.   That's correct. |
| 11:00 | 10 | Q.   Let's look at -- let's look at 7503, page 27, the |
| 11:00 | 11 | second paragraph. |
| 11:00 | 12 | *(Document displayed.)* |
| 11:00 | 13 | BY MS. KELLER: |
| 11:00 | 14 | Q.   And it says, "Barbie sales were up 6 percent in 2002, |
| 11:00 | 15 | reflecting an increase of 16 percent in international sales |
| 11:00 | 16 | and a decline of 2 percent in domestic sales." |
| 11:00 | 17 | Do you see that? |
| 11:00 | 18 | A.   I do. |
| 11:01 | 19 | Q.   So Barbie sales in the United States were down |
| 11:01 | 20 | 2 percent in 2002, true? |
| 11:01 | 21 | A.   Yes. |
| 11:01 | 22 | Q.   Now, Kmart and other bankruptcies affected your sales |
| 11:01 | 23 | around this time, right?  In 2002? |
| 11:01 | 24 | A.   I don't remember specifically when Kmart declared |
| 11:01 | 25 | bankruptcy.  But it may have been 2002. |

| | | |
|---|---|---|
| 11:01 | 1 | Q.  Let's take a look at Exhibit 8969, minutes from the |
| 11:01 | 2 | May 22, 2002 Mattel Board of Directors meeting. |
| 11:01 | 3 | *(Document provided to the witness.)* |
| | 4 | BY MS. KELLER: |
| 11:01 | 5 | Q.  You attended that meeting? |
| 11:01 | 6 | A.  Yes, I did. |
| 11:01 | 7 | Q.  Let's turn to page 21.  You recognize that as part of |
| 11:01 | 8 | the minutes? |
| 11:01 | 9 | A.  Just give me one second to confirm that. |
| 11:02 | 10 | THE COURT:  What was that exhibit number again? |
| 11:02 | 11 | MS. KELLER:  It's 8969, Your Honor.  And we're |
| 11:02 | 12 | referring to specifically to 8969-00021. |
| 11:02 | 13 | THE COURT:  Thank you. |
| 11:02 | 14 | THE WITNESS:  Yes. |
| 11:02 | 15 | MS. KELLER:  We'd move that in, Your Honor. |
| 11:02 | 16 | THE COURT:  Received. |
| 11:02 | 17 | *(Exhibit No. 8969-00021 received in* |
| 11:02 | 18 | *evidence.)* |
| 11:02 | 19 | THE WITNESS:  What page are we on? |
| 11:02 | 20 | MS. KELLER:  8969-00021. |
| 11:02 | 21 | THE COURT:  And that's received. |
| 11:02 | 22 | *(Document displayed.)* |
| 02:59 | 23 | BY MS. KELLER: |
| 11:02 | 24 | Q.  If we look at the fourth bullet point down, it says, |
| 11:02 | 25 | "Domestic sales were impacted by" -- |

| | | |
|---|---|---|
| 11:02 | 1 | A.   I don't want to interrupt you.  I'm sorry.  I'm just |
| 11:02 | 2 | not on that page yet.  I thought we were on a different |
| 11:02 | 3 | section. |
| 11:02 | 4 | Q.   We're on 8969-00021. |
| 11:02 | 5 |      And it says, "Domestic sales were impacted by a |
| 11:03 | 6 | 45 percent decline in sales to Kmart due to its bankruptcy |
| 11:03 | 7 | filing." |
| 11:03 | 8 |      Does that refresh your memory about Kmart's bankruptcy |
| 11:03 | 9 | filing? |
| 11:03 | 10 | A.   Yes. |
| 11:03 | 11 | Q.   And store closings associated with the Kmart bankruptcy |
| 11:03 | 12 | affected Mattel sales of its products, right? |
| 11:03 | 13 | A.   Certainly in the short-term, yes. |
| 11:03 | 14 | Q.   And there have been significant bankruptcies of retail |
| 11:03 | 15 | customers that have impacted Mattel's financial performance, |
| 11:03 | 16 | right? |
| 11:03 | 17 | A.   Uh, yes.  Certainly in a short-term, yes. |
| 11:03 | 18 | Q.   Well, Kmart, KB Toys, Woolworths in the United Kingdom, |
| 11:03 | 19 | some bankruptcies in Latin America all affected Mattel's |
| 11:03 | 20 | bottom line, right? |
| 11:03 | 21 | A.   For a period of time, yes. |
| 11:03 | 22 | Q.   Now, your own research showed that the Barbie brand had |
| 11:03 | 23 | big problems as of 2002 that had nothing to do with Bratz, |
| 11:04 | 24 | right? |
| 11:04 | 25 | A.   I don't know. |

CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

104

| | | |
|---|---|---|
| 11:04 | 1 | Q.   You don't remember that? |
| 11:04 | 2 | A.   I don't remember our own research in 2002. |
| 11:04 | 3 | Q.   Well, you're certainly not blaming all of the problems |
| 11:04 | 4 | that you had with Barbie sales on Bratz, are you? |
| 11:04 | 5 | A.   No. |
| 11:04 | 6 | Q.   Let's take a look at Exhibit 16196, "Barbie final |
| 11:04 | 7 | recommendations, appendices, August 5th, 2002, revised |
| 11:04 | 8 | August 6, 2002." |
| 11:04 | 9 | You recognize that as an internal Mattel document, |
| 11:04 | 10 | right? |
| 11:04 | 11 | A.   Give me just one minute to see this. |
| 11:05 | 12 | Q.   And I'm gonna be starting to ask you to look |
| 11:05 | 13 | specifically at page 9. |
| 11:05 | 14 | A.   I don't know if it was created by Mattel, but it |
| 11:05 | 15 | certainly is about Mattel. |
| 11:05 | 16 | Q.   And it's a Mattel document, right? |
| 11:05 | 17 | A.   Again, I don't know if it -- I don't know if it was |
| 11:05 | 18 | created by anybody at Mattel, but it is about Mattel. |
| 11:05 | 19 | MS. KELLER:  Your Honor, I'd move 16196-9 into |
| 11:05 | 20 | evidence. |
| 11:05 | 21 | THE COURT:  Received. |
| 11:05 | 22 | *(Exhibit No. 16196-9 received in evidence.)* |
| 11:05 | 23 | MR. QUINN:  Your Honor, at this point, there still |
| 11:05 | 24 | isn't foundation. |
| 11:05 | 25 | THE COURT:  Received. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

105

| | | |
|---|---|---|
| 11:05 | 1 | *(Document displayed.)* |
| 11:05 | 2 | BY MS. KELLER: |
| 11:05 | 3 | Q.   Take a look at the -- by the way, if you look at any |
| 11:05 | 4 | page here, if you look at the bottom right, you see a little |
| 11:05 | 5 | "M" for Mattel, a production stamp? |
| 11:05 | 6 | A.   Yes. |
| 11:05 | 7 | Q.   So that indicates to you that this document came from |
| 11:06 | 8 | Mattel, right? |
| 11:06 | 9 | A.   It indicates that it was produced by Mattel, yes. |
| 11:06 | 10 | Q.   Well, are you saying that this document is not a Mattel |
| 11:06 | 11 | document that Mattel used in analyzing Barbie sales? |
| 11:06 | 12 | A.   I'm not that familiar with the document.  But I'm |
| 11:06 | 13 | looking at the page you put me on called "Management |
| 11:06 | 14 | Interviews," so it just doesn't yet ring true to me that |
| 11:06 | 15 | this is a document about Barbie sales created by Mattel. |
| 11:06 | 16 | MS. KELLER:  Let's put 16196-9 on the screen. |
| 11:06 | 17 | *(Document displayed.)* |
| 11:59 | 18 | BY MS. KELLER: |
| 11:06 | 19 | Q.   And it says, "22 Management Interviews were conducted." |
| 11:06 | 20 | You recognize the names of those people, don't you? |
| 11:06 | 21 | A.   I do. |
| 11:06 | 22 | Q.   "Senior Management Girls: |
| 11:07 | 23 | "Adrienne Fontanella, President. |
| 11:07 | 24 | "Jerry Bossick, SVP Strategic Planning/Finance. |
| 11:07 | 25 | "Richard Dickson, SVP consumer product and retail. |

| | | |
|---|---|---|
| 11:07 | 1 | "Ivy Ross, SVP Product and Visual Design." |
| 11:07 | 2 | And then you've got the marketing and PR people, the |
| 11:07 | 3 | consumer products licensing people, products and visual |
| 11:07 | 4 | design development people.  You've got, really, a large |
| 11:07 | 5 | segment of Mattel management involved in Barbie being |
| 11:07 | 6 | interviewed here, right? |
| 11:07 | 7 | A.   Yes. |
| 11:07 | 8 | Q.   And let's look at page 10 to see what the management |
| 11:07 | 9 | interview findings were. |
| 11:07 | 10 | MS. KELLER:  And, Your Honor, we'd move page 10 |
| 11:07 | 11 | into evidence. |
| 11:07 | 12 | THE WITNESS:  Yes. |
| 11:07 | 13 | THE COURT:  Received. |
| 11:07 | 14 | *(Exhibit No. 16196-10 received in evidence.)* |
| 11:07 | 15 | *(Document displayed.)* |
| 11:07 | 16 | BY MS. KELLER: |
| 11:07 | 17 | Q.   Let's look at the third point down. |
| 11:07 | 18 | "Internally, people do not agree on what Barbie stands |
| 11:07 | 19 | for today. |
| 11:07 | 20 | "There is no consistent view of Barbie consumers. |
| 11:08 | 21 | "There are differing opinions as to whether/how the |
| 11:08 | 22 | Barbie brand can appeal to older girls. |
| 11:08 | 23 | "The Barbie brand lacks personality depth because she |
| 11:08 | 24 | is all things to all people. |
| 11:08 | 25 | "There is confusion around who has ownership of the |

| | | |
|---|---|---|
| 11:08 | 1 | Barbie brand. |
| 11:08 | 2 | "There is blurred definition and overlap in job roles. |
| 11:08 | 3 | "The organization is in a risk-averse/defensive mode." |
| 11:08 | 4 | Now, none of those management interview findings that |
| 11:08 | 5 | we've just looked at has anything to do with Bratz, correct? |
| 11:08 | 6 | A.   That's correct. |
| 11:08 | 7 | Q.   Let's look at page 24 of this document.  And that one |
| 11:08 | 8 | is headlined, "Barbie continues to suffer from saturation." |
| 11:09 | 9 | MS. KELLER:  And, Your Honor, we'd move page 24 |
| 11:09 | 10 | into evidence. |
| 11:09 | 11 | THE COURT:  Received. |
| 11:09 | 12 | *(Exhibit No. 16196-24 received in evidence.)* |
| 11:09 | 13 | *(Document displayed.)* |
| 11:09 | 14 | BY MS. KELLER: |
| 11:09 | 15 | Q.   And this, "Barbie continues to suffer from saturation, |
| 11:09 | 16 | "says, "The penetration of Barbie and introduction of other |
| 11:09 | 17 | dolls is contributing to girls losing interest in Barbie at |
| 11:09 | 18 | a young age." |
| 11:09 | 19 | "Saturation," what does that mean? |
| 11:09 | 20 | A.   A point -- a large amount. |
| 11:09 | 21 | Q.   So many Barbies out there that -- that a saturation |
| 11:09 | 22 | point is being reached, right? |
| 11:09 | 23 | A.   Yes.  That's someone's conclusion here, yes. |
| 11:09 | 24 | MS. KELLER:  And let's look at 16196-27. |
| 11:10 | 25 | And, Your Honor, we'd move that into evidence. |

CV 04-9049 DOC – 3/27/2011 – Day 26, Volume 1 of 4

108

| | | |
|---|---|---|
| 11:10 | 1 | THE COURT:  Received. |
| 11:10 | 2 | *(Exhibit No. 16196-27 received in evidence.)* |
| 11:10 | 3 | *(Document displayed.)* |
| 11:10 | 4 | MS. KELLER:  And that is entitled, "Barbie's |
| 11:10 | 5 | open-endedness attracts younger girls and alienates older |
| 11:10 | 6 | girls." |
| 11:10 | 7 | And let's now look at 16196-63. |
| 11:10 | 8 | And, Your Honor, we'll move that page into |
| 11:10 | 9 | evidence? |
| 11:10 | 10 | THE COURT:  Received. |
| 11:10 | 11 | *(Exhibit No. 16196-63 received in evidence.)* |
| 11:10 | 12 | *(Document displayed.)* |
| 11:10 | 13 | MS. KELLER:  And that says, "Peer pressure is |
| 11:10 | 14 | accelerating reality girls to," quote, "graduate," unquote, |
| 11:10 | 15 | "from Barbie." |
| 11:10 | 16 | BY MS. KELLER: |
| 11:10 | 17 | Q.   What did "reality girls" refer to? |
| 11:10 | 18 | A.   I don't know. |
| 11:10 | 19 | Q.   Now, whatever that meant -- whatever these other |
| 11:10 | 20 | problems were that we've just discussed, these problems |
| 11:10 | 21 | existed totally independent of MGA and Bratz, right? |
| 11:11 | 22 | A.   No.  I don't know that these did.  I saw in one of the |
| 11:11 | 23 | pages the introduction of other girls driving Barbie |
| 11:11 | 24 | younger.  But, as I thought I said yesterday, I think there |
| 11:11 | 25 | are certain -- certainly things beyond Bratz that |

DEBBIE GALE, U.S. COURT REPORTER

| 11:11 | 1 | contributed to Barbie sales decline. |
| 11:11 | 2 | Q.   There were a lot of problems with Barbie sales that had |
| 11:11 | 3 | nothing to do with Bratz, right? -- starting in 1997 when |
| 11:11 | 4 | there was no Bratz. |
| 11:11 | 5 | A.   Yeah, there certainly were problems with Barbie sales |
| 11:11 | 6 | unrelated to Bratz. |
| 11:11 | 7 | Q.   Now, I think we've talked about Adrienne Fontanella. |
| 11:11 | 8 | And she was president of the Girls Division in the year |
| 11:11 | 9 | 2000, right? |
| 11:11 | 10 | A.   Yes. |
| 11:11 | 11 | Q.   And if we look at exhibit -- well, I guess we don't |
| 11:11 | 12 | need to do that. |
| 11:11 | 13 | Around February 2003, you asked Ms. Fontanella to |
| 11:11 | 14 | resign? |
| 11:11 | 15 | A.   Yes. |
| 11:11 | 16 | Q.   And you were disappointed in her performance as the |
| 11:12 | 17 | person in charge of the Girls Division at the time you asked |
| 11:12 | 18 | for her resignation, right? |
| 11:12 | 19 | A.   Um, I thought there was a different management |
| 11:12 | 20 | structure that would improve performance. |
| 11:12 | 21 | Q.   Well -- |
| 11:12 | 22 | A.   I don't know -- it's certainly -- certainly reasonable |
| 11:12 | 23 | that I was disappointed with her performance. |
| 11:12 | 24 | Q.   Well, when you asked her to resign, that means you |
| 11:12 | 25 | fired her, right? |

| | | |
|---|---|---|
| 11:12 | 1 | A.    Um, yes. |
| 11:12 | 2 | Q.    And you fired her because you were disappointed in her |
| 11:12 | 3 | performance as a person in charge of the Girls Division, |
| 11:12 | 4 | right? |
| 11:12 | 5 | A.    No, not really. |
| 11:12 | 6 | Q.    So if you were enthusiastic about her performance, you |
| 11:12 | 7 | weren't gonna fire her, true? |
| 11:12 | 8 | A.    Um, yes. |
| 11:12 | 9 | Q.    And at the time you asked Ms. Fontanella to resign, the |
| 11:12 | 10 | Barbie line was not doing very well, was it? |
| 11:12 | 11 | A.    That's correct. |
| 11:12 | 12 | Q.    Now, when you were asked that in January of 2008, you |
| 11:12 | 13 | didn't remember how the Barbie line was performing, right? |
| 11:12 | 14 | A.    In 2002? |
| 11:13 | 15 | Q.    2008 -- |
| 11:13 | 16 | A.    It's possible -- |
| 11:13 | 17 | Q.    When you were asked in 2008 that very same question |
| 11:13 | 18 | about asking Ms. Fontanella to resign because the Barbie |
| 11:13 | 19 | line wasn't doing well, you didn't recall, right? |
| 11:13 | 20 | A.    Well, I remember talking about consolidating divisions |
| 11:13 | 21 | probably at that time. |
| 11:13 | 22 | Q.    Is it true that you didn't recall firing Ms. Fontanella |
| 11:13 | 23 | because the Barbie line wasn't doing well, when you were |
| 11:13 | 24 | asked in 2008? |
| 11:13 | 25 | A.    I -- I don't know. |

| | | |
|---|---|---|
| 11:13 | 1 | Q.   Now, you combined the Boys and Girls Divisions and |
| 11:13 | 2 | created Mattel brands and made Matt Bousquette president |
| 11:13 | 3 | after you fired Adrienne Fontanella, right? |
| 11:13 | 4 | A.   That's correct. |
| 11:13 | 5 | Q.   And in July 2003, you introduced a concept -- a product |
| 11:13 | 6 | called "Flavas," right? |
| 11:13 | 7 | A.   Yes. |
| 11:13 | 8 | Q.   And Flavas was designed to compete directly with Bratz, |
| 11:13 | 9 | true? |
| 11:13 | 10 | A.   Yes. |
| 11:13 | 11 | Q.   It was edgy, hip-hop, urban dolls for girls, right? |
| 11:13 | 12 | A.   Yes. |
| 11:13 | 13 | Q.   And you wanted to use the creativity that you had at |
| 11:13 | 14 | Mattel and all the innovation and all the designers and all |
| 11:13 | 15 | your marketing and branding and everything to really try to |
| 11:14 | 16 | create a powerful Flavas product, right? |
| 11:14 | 17 | A.   Yes. |
| 11:14 | 18 | Q.   And you had seen Bratz advertising and merchandising |
| 11:14 | 19 | for Bratz, right?  You had seen MGA's merchandising and |
| 11:14 | 20 | advertising for Bratz at that point, true? |
| 11:14 | 21 | A.   Yes. |
| 11:14 | 22 | Q.   So, basically, MGA's playbook was out there for the |
| 11:14 | 23 | world to see as far as what it was doing to advertise and |
| 11:14 | 24 | merchandise Bratz, right? |
| 11:14 | 25 | A.   It's advertising and merchandising was certainly out |

| | | |
|---|---|---|
| 11:14 | 1 | there.  I don't know that I would say its playbook was out |
| 11:14 | 2 | there. |
| 11:14 | 3 | Q.   And Flavas was a failure, wasn't it? |
| 11:14 | 4 | A.   Uh, yes. |
| 11:14 | 5 | Q.   And, um -- |
| 11:14 | 6 | MS. KELLER:  Do we have -- what exhibit is that? |
| 11:14 | 7 | Your Honor, we have Exhibit 34457, the Flavas |
| 11:14 | 8 | commercial that has previously been introduced.  And we |
| 11:14 | 9 | would ask to play it at this point. |
| 11:14 | 10 | THE COURT:  Certainly. |
| 11:15 | 11 | We're going to commercial. |
| 11:15 | 12 | MS. KELLER:  And this is for -- your competitor |
| 11:15 | 13 | product to Bratz, right?  I'm sorry.  Wrong product. |
| 11:15 | 14 | THE COURT:  That's not Flavas. |
| 11:15 | 15 | MR. QUINN:  Your Honor, this I think has been |
| 11:15 | 16 | played once already. |
| 11:15 | 17 | THE COURT:  It has.  And I'm going to let you play |
| 11:15 | 18 | one of yours again, just so it's co-equal. |
| 11:15 | 19 | Which one would you like? |
| 11:15 | 20 | MR. QUINN:  We only have one, Your Honor. |
| 11:15 | 21 | THE COURT:  You want to play it back-to-back?  You |
| 11:15 | 22 | can play it again if you want to. |
| 11:15 | 23 | MR. QUINN:  We can pick anything to play? |
| 11:15 | 24 | THE COURT:  No. |
| | 25 | |

| | | |
|---|---|---|
| 12:59 | 1 | BY MS. KELLER: |
| 11:15 | 2 | Q.   Okay.  Flavas was gonna be your competitors to Bratz, |
| 11:15 | 3 | right? |
| 11:15 | 4 | A.   Among other products, yes. |
| 11:15 | 5 | MS. KELLER:  Okay.  Let's see it if we can. |
| 11:15 | 6 | *(Video played.)* |
| 11:59 | 7 | BY MS. KELLER: |
| 11:16 | 8 | Q.   And Flavas was such a failure that it was withdrawn |
| 11:16 | 9 | almost immediately, right? |
| 11:16 | 10 | A.   Yes. |
| 11:16 | 11 | Q.   And both Flavas and MyScene were launched after Bratz? |
| 11:16 | 12 | A.   Uh, certainly Flavas. |
| 11:16 | 13 | Yes, I believe MyScene, as well. |
| 11:16 | 14 | Q.   MyScene was another attempt to compete directly with |
| 11:16 | 15 | the Bratz concept? |
| 11:16 | 16 | A.   Well, certainly competing with older -- for older girls |
| 11:16 | 17 | so that -- yes, it would compete with Bratz, yes. |
| 11:16 | 18 | Q.   But, I mean, it was the same basic concept:  You wanted |
| 11:16 | 19 | something that was hip and urban and edgy, right? |
| 11:16 | 20 | A.   No. |
| 11:17 | 21 | Q.   Well, MyScene wasn't even -- MyScene was also a |
| 11:17 | 22 | failure, right? |
| 11:17 | 23 | A.   No. |
| 11:17 | 24 | Q.   MyScene isn't offered domestically at retail anymore, |
| 11:17 | 25 | is it? |

| | | |
|---|---|---|
| 11:17 | 1 | A.   In 2001?  No, it was not. |
| 11:17 | 2 | Q.   Wasn't offered in 2008 either, was it? |
| 11:17 | 3 | A.   I think it may have been. |
| 11:17 | 4 | Q.   Well, if we could take a look at your trial testimony, |
| 11:17 | 5 | page 3864, July 1st, 2008. |
| 11:17 | 6 | THE COURT:  Could the jury also be reminded of the |
| 11:17 | 7 | launch date of MyScene so we have some parameters on this. |
| 11:17 | 8 | BY MS. KELLER: |
| 11:17 | 9 | Q.   When was MyScene launched, Mr. Eckert? |
| 11:17 | 10 | A.   2002, I believe. |
| 11:17 | 11 | Q.   Take a look at 3864, lines 8 through 16. |
| 11:17 | 12 | *(Document provided to the witness.)* |
| 11:18 | 13 | THE WITNESS:  Yes. |
| | 14 | BY MS. KELLER: |
| 11:18 | 15 | Q.   So as of 2008, Mattel did not offer MyScene |
| 11:18 | 16 | domestically at retail; in other words, you weren't selling |
| 11:18 | 17 | it in stores, right? |
| 11:18 | 18 | A.   Yeah.  As I said -- well, it is for sale at retailers, |
| 11:18 | 19 | but I don't believe Mattel currently offers it for sale. |
| 11:18 | 20 | Q.   And that was as of 2008, right? |
| 11:18 | 21 | A.   Yes. |
| 11:18 | 22 | Q.   So meanwhile, Barbie kept floundering in 2003, right? |
| 11:18 | 23 | A.   I wouldn't use the term "floundering."  We certainly |
| 11:18 | 24 | had sales issues in Barbie over the years. |
| 11:18 | 25 | Q.   Well, the sales issues were really negative issues, |

| | | |
|---|---|---|
| 11:18 | 1 | right? -- in 2003?  I mean, Barbie sales were declining |
| 11:18 | 2 | severely, weren't they? |
| 11:18 | 3 | A.   I believe -- my recollection is Barbie sales were down. |
| 11:18 | 4 | I don't remember the specific number. |
| 11:18 | 5 | Q.   Down a lot, right? |
| 11:18 | 6 | A.   I don't remember the number. |
| 11:18 | 7 | MS. KELLER:  Let's look at Exhibit 31286. |
| 11:18 | 8 | BY MS. KELLER: |
| 11:19 | 9 | Q.   This is the minutes of an August 16, 2003 Mattel Board |
| 11:19 | 10 | of Directors meeting? |
| 11:19 | 11 | A.   It is. |
| 11:19 | 12 | Q.   And if you take a look at page 24, the first -- you |
| 11:19 | 13 | recognize that as part of this same exhibit?  24. |
| 11:19 | 14 | 31286-00024. |
| 11:19 | 15 | A.   I do. |
| 11:19 | 16 | MS. KELLER:  Move that page into evidence, |
| 11:19 | 17 | Your Honor. |
| 11:19 | 18 | THE COURT:  Received. |
| 11:19 | 19 | (Exhibit No. 31286-0024 received in |
| 11:19 | 20 | evidence.) |
| 11:19 | 21 | (Document displayed.) |
| 11:19 | 22 | BY MS. KELLER: |
| 11:19 | 23 | Q.   If we look at the first paragraph, last line, "Domestic |
| 11:19 | 24 | Barbie sales were down 29 percent, reflecting declines in |
| 11:19 | 25 | the core doll segment and continued declines in the |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 116 of 142   Page ID #:306347
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

116

| 11:20 | 1 | collector and accessories segments." |
| 11:20 | 2 | And this is dated August 7, 2003, correct? |
| 11:20 | 3 | A.   Yes.  It appears to be speaking for the second quarter |
| 11:20 | 4 | of 2003. |
| 11:20 | 5 | Q.   Twenty-nine percent decline in domestic sales is not a |
| 11:20 | 6 | good thing, is it? |
| 11:20 | 7 | A.   No, it is not. |
| 11:20 | 8 | Q.   And you actually told your marketing department -- or, |
| 11:20 | 9 | rather, you were told by your marketing department in |
| 11:20 | 10 | October of 2003 that the marketing department believed |
| 11:20 | 11 | Mattel didn't react quickly and decisively to market |
| 11:20 | 12 | successes and failures within the Barbie line, right? |
| 11:20 | 13 | A.   I don't remember being told that. |
| 11:20 | 14 | Q.   Do you recall ever being told in October of 2003 that |
| 11:20 | 15 | the response to Bratz by Mattel had been minor? |
| 11:20 | 16 | A.   I don't remember being told that. |
| 11:20 | 17 | Q.   Did anybody tell you in October of 2003 that retailers |
| 11:21 | 18 | were, quote, "off Barbie," unquote? |
| 11:21 | 19 | A.   No, I don't -- I don't remember being told that. |
| 11:21 | 20 | Q.   Do you remember being told by Marketing in October 2003 |
| 11:21 | 21 | that retailers had lost confidence in Barbie? |
| 11:21 | 22 | A.   No.  I don't remember being told that. |
| 11:21 | 23 | MS. KELLER:  Let's look at Exhibit 1804.  This is |
| 11:21 | 24 | the Barbie 2004 marketing plan, dated October 28th, 2003. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 117 of 142   Page ID #:306348
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

117

| 11:21 | 1 | BY MS. KELLER: |
| 11:21 | 2 | Q.   Do you have that before you? |
| 11:21 | 3 | A.   I do. |
| 11:21 | 4 | MS. KELLER:  Your Honor -- We'll just go to |
| 11:21 | 5 | page 2. |
| 11:21 | 6 | Can we first admit, Your Honor, page 1, 18- -- |
| 11:22 | 7 | 01804-0001? |
| 11:22 | 8 | THE COURT:  Is this the marketing plan? |
| 11:22 | 9 | MS. KELLER:  Yes. |
| 11:22 | 10 | THE COURT:  Received. |
| 11:22 | 11 | MS. KELLER:  Cover page. |
| 11:22 | 12 | *(Exhibit No. 1804-0001 received in evidence.)* |
| 11:22 | 13 | *(Document displayed.)* |
| 10:00 | 14 | BY MS. KELLER: |
| 11:22 | 15 | Q.   Now, you know that this was written by Tim Kilpin, the |
| 11:22 | 16 | Senior VP Girls Marketing and Design, right? |
| 11:22 | 17 | A.   No, I don't know that. |
| 11:22 | 18 | MS. KELLER:  Let's look at page 2, "Barbie 2003 |
| 11:22 | 19 | Status Summary." |
| 11:22 | 20 | Your Honor, I think we'll, just to make things a |
| 11:22 | 21 | little easier, move the entire Exhibit 1804 into evidence at |
| 11:22 | 22 | this time. |
| 11:22 | 23 | THE COURT:  Received. |
| 11:22 | 24 | *(Exhibit No. 1804 received in evidence.)* |
| 11:22 | 25 | MS. KELLER:  Let's look at page 2. |

| | | |
|---|---|---|
| 11:23 | 1 | (Document displayed.) |
| 11:23 | 2 | BY MS. KELLER: |
| 11:23 | 3 | Q.   "Barbie 2003 Status Summary:  A brand in crisis." |
| 11:23 | 4 |      See that? |
| 11:23 | 5 | A.   I do. |
| 11:23 | 6 | Q.   And it says, "Brand losing significant market share to |
| 11:23 | 7 | Bratz, Disney Princesses." |
| 11:23 | 8 |      Do you see that? |
| 11:23 | 9 | A.   I do. |
| 11:23 | 10 | Q.   "Brand viewed by trade licensees and consumers as |
| 11:23 | 11 | having lost trendy edge for younger girls." |
| 11:23 | 12 |      MS. KELLER:  Now, let's look at page 9, "Barbie |
| 11:23 | 13 | 2003, Key Learnings." |
| 11:23 | 14 |      (Document displayed.) |
| 11:23 | 15 | BY MS. KELLER: |
| 11:23 | 16 | Q.   And one thing we see is, "Didn't reinvent the product |
| 11:23 | 17 | and packaging fast enough." |
| 11:24 | 18 |      "Barbie looked tired on shelf and lacked newness." |
| 11:24 | 19 |      MS. KELLER:  And let's look at page 11 of Barbie |
| 11:24 | 20 | Key Learnings. |
| 11:24 | 21 |      (Document displayed.) |
| 11:24 | 22 |      MS. KELLER:  "Competition." |
| 11:24 | 23 |      "Didn't react quickly and decisively to market |
| 11:24 | 24 | successes," slash, "failures." |
| 11:24 | 25 |      "Minor response to Bratz in product and |

| | | |
|---|---|---|
| 11:24 | 1 | marketing." |
| 11:24 | 2 | "Lost 6 months of market responsiveness due to BDO |
| 11:24 | 3 | timing so far advanced." |
| 11:24 | 4 | BY MS. KELLER: |
| 11:24 | 5 | Q.   What's "BDO"? |
| 11:24 | 6 | A.   BDO are initials for Brand Development -- don't know |
| 11:24 | 7 | the last word.  Overview?  Outline?  Objective? |
| 11:24 | 8 | Q.   And the next thing says, "Competitors' properties |
| 11:24 | 9 | successfully managed retail presence of multiple licensee," |
| 11:25 | 10 | paren, "Disney princess." |
| 11:25 | 11 | A.   Okay. |
| 11:25 | 12 | MS. KELLER:  Let's look at page 13, entitled, "Key |
| 11:25 | 13 | Challenges Facing barbie." |
| 11:25 | 14 | *(Document displayed.)* |
| 11:25 | 15 | BY MS. KELLER: |
| 11:25 | 16 | Q.   And we see, "Retailers are off Barbie." |
| 11:25 | 17 | What does that mean? |
| 11:25 | 18 | A.   I'm not sure whoever -- what it means to whomever wrote |
| 11:25 | 19 | it, but I can interpret it. |
| 11:25 | 20 | Q.   Well, under "Retailers are off Barbie," it says, |
| 11:25 | 21 | "Confidence." |
| 11:25 | 22 | "Space." |
| 11:25 | 23 | "Support." |
| 11:25 | 24 | So whoever wrote this was concluding that retailers |
| 11:25 | 25 | were losing confidence in Barbie? |

| | | |
|---|---|---|
| 11:25 | 1 | A.    Yes. |
| 11:25 | 2 | Q.    Giving less space to Barbie products, right? |
| 11:25 | 3 | A.    I believe so, yes. |
| 11:25 | 4 | Q.    And providing less support for Barbie, right? |
| 11:25 | 5 | A.    Yes. |
| 11:25 | 6 | Q.    And under that, it says, "Competitors will copy," |
| 11:25 | 7 | slash, "expand on our entertainment strategy adding to |
| 11:26 | 8 | dilution and clutter." |
| 11:26 | 9 |         And, right under that, "Bratz continues to gain |
| 11:26 | 10 | strength." |
| 11:26 | 11 |         "Direct hit on worlds themes." |
| 11:26 | 12 |         "High piece count." |
| 11:26 | 13 |         "Price value." |
| 11:26 | 14 |         "Upcoming entertainment." |
| 11:26 | 15 |         MS. KELLER:  And then, let's look at page 15 where |
| 11:26 | 16 | it says, "Business Mission:  Regain share, Regain |
| 11:26 | 17 | Confidence, Regain connectivity with consumers." |
| 11:26 | 18 |         *(Document displayed.)* |
| 11:26 | 19 | BY MS. KELLER: |
| 11:26 | 20 | Q.    Now, did anybody tell you, as the CEO, in October of |
| 11:26 | 21 | 2003, that one of the business metrics of the Barbie line |
| 11:26 | 22 | was to try to recapture three to five points from Bratz? |
| 11:27 | 23 | A.    No.  I don't remember that from 2003. |
| 11:27 | 24 |         MS. KELLER:  Let's look at Exhibit 1804-17, "Key |
| 11:27 | 25 | Business Metrics, U.S. Market Share:  Recapture three to |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

121

| | | |
|---|---|---|
| 11:27 | 1 | five points from Bratz across all relevant categories." |
| 11:27 | 2 | (Document displayed.) |
| 11:27 | 3 | BY MS. KELLER: |
| 11:27 | 4 | Q.   Now, despite this -- if we could go back to page 1 -- |
| 11:27 | 5 | despite this Barbie 2004 marketing plan, domestic Barbie |
| 11:27 | 6 | sales continued to decline in 2003, right? |
| 11:27 | 7 | A.   I believe they did. |
| 11:27 | 8 | Q.   And, for example, if we look at Exhibit 7504, your 2003 |
| 11:27 | 9 | 10-K.  I think that one you entitled "Lead." |
| 11:28 | 10 | A.   Yes. |
| 11:28 | 11 | Q.   Look at page 27. |
| 11:28 | 12 | MS. KELLER:  And, Your Honor, we would move |
| 11:28 | 13 | 7504-27 into evidence. |
| 11:28 | 14 | THE COURT:  Received. |
| 11:28 | 15 | (Exhibit No. 7504-27 received in evidence.) |
| 11:28 | 16 | (Document displayed.) |
| 11:28 | 17 | BY MS. KELLER: |
| 11:28 | 18 | Q.   If you look at the second paragraph. |
| 11:28 | 19 | A.   On page? |
| 11:28 | 20 | Q.   Page 27.  7503-00027. |
| 11:28 | 21 | A.   Yes, I'm sorry. |
| 11:28 | 22 | Q.   I'm sorry.  7504.  I'm sorry. |
| 11:28 | 23 | A.   I'm on 7054-00027. |
| 11:28 | 24 | Q.   You see that there's a 15 percent decline in domestic |
| 11:28 | 25 | gross sales? |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

122

| | | |
|---|---|---|
| 11:29 | 1 | A.   I don't see that.  I'm reading the second paragraph. |
| 11:29 | 2 | It says, "Overall" -- does it start with "Overall in 2003"? |
| 11:29 | 3 | Q.   7504-27. |
| 11:29 | 4 | A.   Yes? |
| 11:29 | 5 | Q.   I think that may be on page 28, rather than 27.  I'm |
| 11:29 | 6 | sorry about that. |
| 11:29 | 7 | A.   Okay. |
| 11:29 | 8 | Q.   Take a look at page 28. |
| 11:29 | 9 | A.   Yes. |
| 11:29 | 10 | Q.   Second paragraph. |
| 11:29 | 11 | A.   Yes. |
| 11:30 | 12 | Q.   "Domestic gross sales decreased 10 percent for Mattel |
| 11:30 | 13 | brands."  But then let's look at what happened with Barbie. |
| 11:30 | 14 |      And you had a 15 percent decline in domestic Barbie |
| 11:30 | 15 | gross sales, correct? |
| 11:30 | 16 | A.   Yes. |
| 11:30 | 17 |      MS. KELLER:  Your Honor, we'd move page 7504-00028 |
| 11:30 | 18 | into evidence. |
| 11:30 | 19 |           THE COURT:  Received. |
| 11:30 | 20 |      (Exhibit No. 7504-00028 received in |
| 11:30 | 21 |      evidence.) |
| 11:30 | 22 |           (Document displayed.) |
| 11:30 | 23 | BY MS. KELLER: |
| 11:30 | 24 | Q.   Now, there were also declines in sales of Diva Starz -- |
| 11:30 | 25 |      We'll, okay, go back to the top of the second |

DEBBIE GALE, U.S. COURT REPORTER

| 11:30 | 1 | paragraph.  I'll show you where we were looking -- that |
| 11:30 | 2 | there was a 15 percent decline in domestic Barbie gross |
| 11:30 | 3 | sales. |
| 11:31 | 4 | There were also declines in the sales of Diva Starz and |
| 11:31 | 5 | What's Her Face, right? |
| 11:31 | 6 | A.   Let me read a little further. |
| 11:31 | 7 | Yes. |
| 11:31 | 8 | Q.   And these were only partially offset by the |
| 11:31 | 9 | introduction of Flavas in 2003, right? |
| 11:31 | 10 | A.   Yes. |
| 11:31 | 11 | Q.   But then the Flavas product line did not meet |
| 11:31 | 12 | expectations in 2003 and was discontinued in 2004, right? |
| 11:31 | 13 | A.   Yes. |
| 11:31 | 14 | MS. KELLER:  Have we got one of the Diva Starz |
| 11:31 | 15 | tangibles up there?  And could we have the exhibit number? |
| 11:32 | 16 | *(Exhibit provided to the witness.)* |
| 11:31 | 17 | MGA ASSISTANT PHILLIPS:  17384. |
| 11:31 | 18 | MS. KELLER:  17384. |
| 11:31 | 19 | MGA ASSISTANT PHILLIPS:  It's already in. |
| 11:31 | 20 | MS. KELLER:  Already in evidence. |
| 11:31 | 21 | *(Document displayed.)* |
| 11:32 | 22 | BY MS. KELLER: |
| 11:32 | 23 | Q.   This is one of your Diva Starz dolls? |
| 11:32 | 24 | A.   Yes. |
| 11:32 | 25 | Q.   So those were declining, as well as What's Her Face |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

124

| | | |
|---|---|---|
| 11:32 | 1 | declining, as well as Flavas declining, right? |
| 11:32 | 2 | A.   I would say Flavas was unsuccessful in 2003.   It |
| 11:32 | 3 | wouldn't have been a decline because it didn't have a base |
| 11:32 | 4 | in 2002.  But it was unsuccessful. |
| 11:32 | 5 | Q.   And you withdrew it? |
| 11:32 | 6 | A.   Yes. |
| 11:32 | 7 | Q.   I want to turn your attention to something else now, |
| 11:32 | 8 | something that's already been referred to in your direct |
| 11:32 | 9 | examination by Mr. Quinn. |
| 11:32 | 10 | Let's look at Exhibit 1805. |
| 11:32 | 11 | *(Document provided to the witness.)* |
| 11:32 | 12 | BY MS. KELLER: |
| 11:32 | 13 | Q.   Do you recognize that as something entitled "The Bratz |
| 11:32 | 14 | Brief"? |
| 11:32 | 15 | A.   I do. |
| 11:32 | 16 | MS. KELLER:  And, Your Honor, I would move 1805 |
| 11:33 | 17 | in. |
| 11:33 | 18 | MR. QUINN:  I think it's in evidence, Your Honor. |
| 11:33 | 19 | THE COURT:  It's already in, but I'll re-receive |
| 11:33 | 20 | it. |
| 11:33 | 21 | MS. KELLER:  Your Honor, I think it's in as |
| 11:33 | 22 | Exhibit 9216. |
| 11:33 | 23 | THE COURT:  Well, we'll receive it as 1805 also. |
| 11:33 | 24 | *(Exhibit No. 1805 received in evidence.)* |
| 11:33 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

125

| | | |
|---|---|---|
| 11:33 | 1 | BY MS. KELLER: |
| 11:33 | 2 | Q.   Now, this is dated November 14, 2003? |
| 11:33 | 3 | A.   It is. |
| 11:33 | 4 | Q.   And you were shown this Bratz Brief yesterday, right? |
| 11:33 | 5 | A.   I don't believe I was shown this document yesterday. |
| 11:33 | 6 | Q.   Well, you were shown The Bratz Brief yesterday, |
| 11:33 | 7 | correct? |
| 11:33 | 8 | A.   I was shown a version of The Bratz Brief yesterday, |
| 11:33 | 9 | correct. |
| 11:33 | 10 | Q.   This is a different version? |
| 11:33 | 11 | A.   I think it may be. |
| 11:33 | 12 | Q.   What is different about it? |
| 11:33 | 13 | A.   I don't know.  But I'm not sure it's the same version I |
| 11:33 | 14 | saw yesterday. |
| 11:33 | 15 | Q.   Well, I'm just asking you, do you have some reason to |
| 11:33 | 16 | believe that it's different, other than I offered a |
| 11:33 | 17 | different exhibit number? |
| 11:33 | 18 | A.   If I could look at it for a few minutes, I would be |
| 11:33 | 19 | happy to answer that. |
| 11:33 | 20 | Q.   Well, I'll just withdraw the question. |
| 11:33 | 21 |     Now, you actually commissioned The Bratz Brief |
| 11:34 | 22 | yourself, right? |
| 11:34 | 23 | A.   No.  Um, I don't -- I don't know who commissioned it. |
| 11:34 | 24 | Q.   Well, you told Jerome Bossick to prepare an analysis of |
| 11:34 | 25 | Bratz and Barbie, right? |

CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

126

| | | |
|---|---|---|
| 11:34 | 1 | A.    I certainly may have. |
| 11:34 | 2 | Q.    And are you aware -- you know, what -- you know who |
| 11:34 | 3 | Keith Storie is, right? |
| 11:34 | 4 | A.    I do. |
| 11:34 | 5 | Q.    And are you aware that Keith Storie was Mattel's |
| 11:34 | 6 | 30(b)(6) witness on this subject? |
| 11:34 | 7 | A.    I know he was a 30(b)(6) witness.  I don't know the |
| 11:34 | 8 | topics that he covered. |
| 11:34 | 9 | Q.    Are you aware that he said you commissioned this? |
| 11:34 | 10 | MR. QUINN:  Your Honor, I object to the form of |
| 11:34 | 11 | the question. |
| 11:34 | 12 | THE COURT:  In its present form, sustained. |
| 11:34 | 13 | BY MS. KELLER: |
| 11:34 | 14 | Q.    Assuming that Mr. Storie said that you commissioned |
| 11:34 | 15 | this, do you have any reason to disagree with that |
| 11:34 | 16 | statement? |
| 11:34 | 17 | MR. QUINN:  Your Honor, again, object to the form |
| 11:34 | 18 | of the question. |
| 11:34 | 19 | Are we gonna start confronting witnesses with |
| 11:35 | 20 | assumptions about other witness's testimony?  We haven't |
| 11:35 | 21 | done that up to today. |
| 11:35 | 22 | MS. KELLER:  It's a 30(b)(6) witness, Your Honor, |
| 11:35 | 23 | binding the company. |
| 11:35 | 24 | THE COURT:  Is he a 30(b)(6)? |
| 11:35 | 25 | MS. KELLER:  No.  Mr. Storie. |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

127

| | | |
|---|---|---|
| 11:35 | 1 | THE COURT:  Well, then he can come in, can't he? |
| 11:35 | 2 | In other words, he's not the 30(b)(6). |
| 11:35 | 3 | Sustained. |
| 11:59 | 4 | BY MS. KELLER: |
| 11:35 | 5 | Q.   Do you have any reason to dispute whether you |
| 11:35 | 6 | commissioned this Bratz Brief? |
| 11:35 | 7 | A.   Yes.  I just don't know who commissioned it. |
| 11:35 | 8 | Q.   But do you have any reason to dispute that it was you? |
| 11:35 | 9 | A.   I don't know that I'd use the term "dispute."  It |
| 11:35 | 10 | certainly may have been me.  I just don't remember who did. |
| 11:35 | 11 | Q.   And do you know somebody named Sujata Luther? |
| 11:35 | 12 | A.   I do. |
| 11:35 | 13 | Q.   And in this document -- at the end of this document, |
| 11:35 | 14 | did you actually edit some of Sujata Luther's comments? |
| 11:35 | 15 | A.   I apologize, but I've moved, so what's the -- what |
| 11:35 | 16 | exhibit is it? |
| 11:35 | 17 | MS. KELLER:  Well, let's look at Exhibit 1805-6. |
| 11:36 | 18 | *(Document displayed.)* |
| 11:36 | 19 | THE WITNESS:  I have it.  1805. |
| 11:36 | 20 | BY MS. KELLER: |
| 11:36 | 21 | Q.   Dash 6. |
| 11:36 | 22 | A.   Dash 6. |
| 11:36 | 23 | Q.   And you see where it says, "Lessons Learnt"? |
| 11:36 | 24 | A.   Yes, I do. |
| 11:36 | 25 | Q.   L-E-A-R-N-T? |

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

128

| 11:36 | 1 | A. That's correct. |
|---|---|---|

11:36   1   A.   That's correct.

11:36   2   Q.   And where's Sujata Luther from?

11:36   3   A.   I don't know.

11:36   4   Q.   Is Sujata Luther from India?

11:36   5   A.   I don't know.  She may be.

11:36   6   Q.   Does Sujata Luther speak British-accented English?

11:36   7   A.   Yes, I would say so.

11:36   8   Q.   And you actually criticized the use of "learnt," which

11:36   9   resulted in a corrected version that we see in 9216-6.

11:36   10   Let's take a look at that, if we could.

11:37   11   A.   Yes.

11:37   12   Q.   And this was changed to "Lessons Learned," right?

11:37   13   A.   That's correct.

11:37   14   Q.   And that was because of your editorial suggestion,

11:37   15   true?

11:37   16   A.   That's quite possible.

11:37   17   Q.   Is it the case?

11:37   18   A.   I don't remember specifically, but I suspect it is.

11:37   19        MS. KELLER:  Now, let's look at 1805-2.  It says,

11:37   20   "State of Barbie."

11:37   21        *(Document displayed.)*

11:37   22        THE WITNESS:  Okay.  Yes.

11:37   23        MS. KELLER:  It says, "Entering 2010" *(sic)* "the

11:37   24   Barbie brand was in a critical stage of it's life cycle.

11:37   25   The impact of media, TV, music, and other external factors

| | | |
|---|---|---|
| 11:37 | 1 | was pushing girls to mature faster than ever. Barbie sales |
| 11:37 | 2 | were skewing younger. Older girls, eight to ten, after |
| 11:37 | 3 | playing with Barbie since they were three years, were |
| 11:38 | 4 | seeking a variety of alternative play opportunities. They |
| 11:38 | 5 | were aspiring to become teenagers and be associated with |
| 11:38 | 6 | things that represented that stage in a girl's life. |
| 11:38 | 7 | "As a brand, Barbie did not appear to have evolved with |
| 11:38 | 8 | the times or the consumer. The three- to ten-year-old |
| 11:38 | 9 | consumer was uniquely segmented in terms of play patterns, |
| 11:38 | 10 | interests, development, and social maturity stages. Yet the |
| 11:38 | 11 | Barbie product offerings were primarily one dimensional -- |
| 11:38 | 12 | targeted to younger girls and less relevant to the already |
| 11:38 | 13 | dissatisfied older girl. Associations of Barbie being |
| 11:38 | 14 | babyish were surfacing among the older girl segment." |
| 11:38 | 15 | BY MS. KELLER: |
| 11:38 | 16 | Q. Now, this was something that we've already discussed, |
| 11:38 | 17 | that you were already aware of even before this brief was |
| 11:38 | 18 | prepared, right? |
| 11:38 | 19 | A. Yes. |
| 11:38 | 20 | Q. And then it says, "In 1999 and 2000, 30 to 35 percent |
| 11:38 | 21 | of the Barbie's sales volume was derived from dolls targeted |
| 11:39 | 22 | to older girls. On the other hand, in 2001 and 2002, only |
| 11:39 | 23 | 15 to 20 percent of the volume came from older girl relevant |
| 11:39 | 24 | product." |
| 11:39 | 25 | So, even in one year, you were losing a big chunk of |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 130 of 142   Page ID #:306361
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

130

| 11:39 | 1 | the older girl market, right? |
| 11:39 | 2 | A.   I would view that over four years.  But we were |
| 11:39 | 3 | certainly losing a chunk of the older girl market, yes. |
| 11:39 | 4 | Q.   Okay.  And "Girls and moms were continuously expressing |
| 11:39 | 5 | concern that their toy chests were overflowing with Barbie |
| 11:39 | 6 | dolls -- a perceived sense of saturation and fatigue was |
| 11:39 | 7 | setting in." |
| 11:39 | 8 | And you were already aware of that before this brief |
| 11:39 | 9 | was written, as we discussed saturation briefly, right? |
| 11:40 | 10 | A.   Um -- |
| 11:40 | 11 | Q.   In your own e-mail, you discuss -- |
| 11:40 | 12 | A.   Well -- |
| 11:40 | 13 | Q.   -- saturation, right? |
| 11:40 | 14 | A.   -- I think my e-mail -- I don't remember the date of my |
| 11:40 | 15 | e-mail.  It may have been subsequent to this. |
| 11:40 | 16 | Q.   Well -- |
| 11:40 | 17 | A.   But regard- -- go ahead.  I'm sorry. |
| 11:40 | 18 | Q.   But you were aware of the problem, right? |
| 11:40 | 19 | A.   Yes. |
| 11:40 | 20 | Q.   "Despite this consumer phenomenon, the Barbie brand |
| 11:40 | 21 | continued to pursue the 'heritage' strategy of fragmented |
| 11:40 | 22 | segments with individual, feature-driven dolls and |
| 11:40 | 23 | accessories.  Note that this strategy was enormously |
| 11:40 | 24 | successful in the growth phase of Barbie life cycle.  By |
| 11:40 | 25 | contrast, the success of Generation Girl in year one, |

| | | |
|---|---|---|
| 11:40 | 1 | Nutcracker Barbie, Rapunzel Barbie were signs that the |
| 11:40 | 2 | content-driven/storyline based segments were now providing a |
| 11:40 | 3 | unique, selling proposition for the Barbie franchise, giving |
| 11:40 | 4 | girls a reason beyond the feature of the doll to want |
| 11:40 | 5 | another Barbie.  They connected emotionally with the |
| 11:41 | 6 | character in the story itself, which drove depth of |
| 11:41 | 7 | purchase." |
| 11:41 | 8 | So -- and then, right under that, we see, |
| 11:41 | 9 | "Noteworthy is the fact that, due to the increased |
| 11:41 | 10 | saturation of Barbie, girls were more discriminating about |
| 11:41 | 11 | the product and demanded more uniqueness and greater product |
| 11:41 | 12 | differentiation.  Products that seemed to pique girl's |
| 11:41 | 13 | interests possessed the ideal combination of content and |
| 11:41 | 14 | features." |
| 11:41 | 15 | So this was all an analysis of what was wrong and |
| 11:41 | 16 | needed to be fixed with Barbie, right? |
| 11:41 | 17 | A.   Again, as I said yesterday, I do think this was |
| 11:41 | 18 | consistent with that self-reflection:  What was wrong with |
| 11:41 | 19 | Barbie?  What could we do better?  Yes. |
| 11:41 | 20 | Q.   This was all an examination of the problems you were |
| 11:41 | 21 | having with Barbie and what to do to try to fix them, right? |
| 11:41 | 22 | A.   In part, I could agree with that. |
| 11:42 | 23 | Q.   Now, if you look at "Business Perspective," right |
| 11:42 | 24 | underneath this portion we've just been looking at, and you |
| 11:42 | 25 | look at the second paragraph down: |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 132 of 142   Page ID #:306363
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

132

| | | |
|---|---|---|
| 11:42 | 1 | "Barbie was the primary contributor to Mattel's 1997 |
| 11:42 | 2 | financial performance, with Barbie sales accounting for |
| 11:42 | 3 | 36 percent of Mattel's revenue and 48 percent of its income. |
| 11:42 | 4 | Mattel's dependence on Barbie's performance was obvious and |
| 11:42 | 5 | significant." |
| 11:42 | 6 | Right? |
| 11:42 | 7 | A.   *(No response.)* |
| 11:42 | 8 | Q.   And that was still true in 2003, that Barbie was a |
| 11:42 | 9 | tremendously important part of Mattel's financial |
| 11:42 | 10 | performance, right? |
| 11:42 | 11 | A.   I don't think it contributed 36 percent of revenue or |
| 11:42 | 12 | 48 percent of income.  It was -- it was certainly |
| 11:43 | 13 | important -- |
| 11:43 | 14 | Q.   Mattel -- |
| 11:43 | 15 | A.   -- still is important. |
| 11:43 | 16 | Q.   Mattel's dependence on Barbie's performance is still |
| 11:43 | 17 | obvious and significant to this day, right? |
| 11:43 | 18 | A.   Yes. |
| 11:43 | 19 | Q.   And then, right under this, we see, |
| 11:43 | 20 | "A critical element of Barbie's above-average |
| 11:43 | 21 | contributions to Mattel was its below-average margin to the |
| 11:43 | 22 | retailer.  Typical Barbie doll margins were 20 percent |
| 11:43 | 23 | versus the more normal margins averaging 35 percent. |
| 11:43 | 24 | Retailers expressed dissatisfaction with the low margins." |
| 11:43 | 25 | That means they weren't making as much money on it, |

Case 2:04-cv-09049-DOC-RNB    Document 10125    Filed 03/04/11    Page 133 of 142    Page ID #:306364
CV 04-9049 DOC - 3/27/2011 - Day 26, Volume 1 of 4

133

| | | |
|---|---|---|
| 11:43 | 1 | right? |
| 11:43 | 2 | A.   That's correct. |
| 11:43 | 3 | Q.   "However, as long as sales velocity remained high and |
| 11:43 | 4 | there was no strong competition, they had no option." |
| 11:43 | 5 | So what that means is, even if retailers were unhappy |
| 11:43 | 6 | with the low profit margins, as long as there was no |
| 11:43 | 7 | competition, they were stuck with it.  They had no option, |
| 11:43 | 8 | right? |
| 11:43 | 9 | A.   I don't agree with that. |
| 11:43 | 10 | Q.   But that's what this says, right? |
| 11:44 | 11 | A.   That is what it says. |
| 11:44 | 12 | Q.   And then, if we look right under that, we go to the |
| 11:44 | 13 | next page, Part 3, we see the discussion of the |
| 11:44 | 14 | 2001/2002 Bratz launch, right? |
| 11:44 | 15 | A.   Yes. |
| 11:44 | 16 | Q.   And it starts out, "Bratz" -- |
| 11:44 | 17 | MS. KELLER:  Go to the third paragraph down. |
| 11:44 | 18 | *(Technician complies.)* |
| 11:44 | 19 | BY MS. KELLER: |
| 11:44 | 20 | Q.   "Bratz was unique.  Aesthetically, Bratz had a |
| 11:44 | 21 | completely different animated look.  In comparison, Barbie |
| 11:44 | 22 | always had a more realistic and unique look that was core to |
| 11:44 | 23 | the brand.  In terms of the positioning, Bratz had a unique |
| 11:44 | 24 | tone and matter -- manner as bratty teenagers with," quote, |
| 11:44 | 25 | "a Passion for Fashion," unquote.  "Older girls perceived |

CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

134

| | | |
|---|---|---|
| 11:44 | 1 | them as the snotty popular girls and saw them as the |
| 11:44 | 2 | anti-Barbie.  In this case, the competitive threat was based |
| 11:45 | 3 | on a unique brand positioning and product execution that was |
| 11:45 | 4 | relevant and resonated with older girls." |
| 11:45 | 5 | So Bratz' brand positioning and product execution were |
| 11:45 | 6 | working really well, right? |
| 11:45 | 7 | A.   That's certainly what the author said in this. |
| 11:45 | 8 | Q.   And then it says, "Bratz' advertising also appeared to |
| 11:45 | 9 | be on target with attitude, a Passion for Fashion, and |
| 11:45 | 10 | intrusive techniques.  The positioning, packaging, and |
| 11:45 | 11 | advertising were remarkably focused on luring the older |
| 11:45 | 12 | girls away from Barbie." |
| 11:45 | 13 | Have you ever seen the original Bratz commercial, |
| 11:45 | 14 | Mr. Eckert? -- the TV commercial where the dolls are driving |
| 11:45 | 15 | in a little convertible? |
| 11:45 | 16 | A.   I may have. |
| 11:45 | 17 | Q.   And have you ever compared that to your Flavas |
| 11:45 | 18 | commercial? |
| 11:45 | 19 | A.   No. |
| 11:46 | 20 | Q.   Even though they were -- even though Flavas was |
| 11:46 | 21 | supposed to directly compete with Bratz? |
| 11:46 | 22 | A.   I don't compare television commercials over time. |
| 11:46 | 23 | Q.   Now, if we go down a little more, we see, "Further, |
| 11:46 | 24 | girls were enamored by the piece count and stuff that |
| 11:46 | 25 | accompanied the dolls." |

11:46  1      "Enamored" means the girls really loved it, right?

11:46  2   A.   I'm sure that's what the author intended to convey.

11:46  3   Q.   "Despite the high price points, moms perceived a

11:46  4   definite value for money and were willing to justify their

11:46  5   purchase.  Moms also endorsed the brand due to its whimsical

11:46  6   humor that compensated for their irreverent attitude."

11:46  7      You understand what the author is saying there, right?

11:46  8   A.   I do.  Not the kind of words I'd use, but I think I

11:46  9   understand what somebody's saying.

11:46  10  Q.   And -- and under that, it says,

11:47  11     "Based upon the success of Bratz in Spain and some buzz

11:47  12  in the U.S., a series of research studies were initiated

11:47  13  beginning in the Fall of 2001, shortly after the launch in

11:47  14  the U.S.  Focus groups were conducted in the U.S. and Spain

11:47  15  in the fall, and were followed by additional focus groups in

11:47  16  this Spring -- in the Spring, along with quantitative

11:47  17  research which included a cannibalization study."

11:47  18     So you wanted to see whether Bratz was cannibalizing

11:47  19  Barbie, right?

11:47  20  A.   I don't know that I did.  But I'm sure somebody did.

11:47  21  Q.   And just, if we can -- I've got this image of dolls

11:47  22  eating each other.  But, basically, when you talk about the

11:47  23  cannibalization, you mean Bratz taking away market share

11:47  24  from Barbie?

11:47  25  A.   Yes.  Substituting one for the other --

136

| | | |
|---|---|---|
| 11:47 | 1 | Q.   Yeah. |
| 11:47 | 2 | A.   -- in a market share sense.  Buying one instead of the |
| 11:47 | 3 | other. |
| 11:47 | 4 | Q.   Okay. |
| 11:47 | 5 |      "Consumer research suggested that Bratz was |
| 11:48 | 6 | successfully exploiting Barbie's vulnerabilities among older |
| 11:48 | 7 | girls.  Potential cannibalization existed among the older |
| 11:48 | 8 | girl portfolio." |
| 11:48 | 9 |      Do you see that? |
| 11:48 | 10 | A.   I do. |
| 11:48 | 11 | Q.   And would it be fair to say also that the introduction |
| 11:48 | 12 | of Bratz, you know, actually expanded the market for older |
| 11:48 | 13 | girls buying fashion dolls, correct? |
| 11:48 | 14 | A.   Yes. |
| 11:48 | 15 | Q.   Now, beneath this it says, |
| 11:48 | 16 |      "Bratz continues to pick up momentum at retail. |
| 11:48 | 17 | Subsequent research highlighted insights which explained |
| 11:48 | 18 | older girls' interest in Bratz.  Most important was the |
| 11:48 | 19 | observation from older girls who had grown tired of Barbie. |
| 11:48 | 20 | They saw Bratz as the teenage aspirational dolls that |
| 11:48 | 21 | allowed them to act the irreverent storylines, a welcome |
| 11:48 | 22 | diversion from a brand that they loved, but was now failing |
| 11:48 | 23 | to sustain their interest." |
| 11:48 | 24 |      Now, you took this study fairly seriously, didn't you? |
| 11:49 | 25 | A.   I certainly read a version of The Bratz Brief.  I may |

| 11:49 | 1 | have read more than one version of it. |
| 11:49 | 2 | I think it was an important document. |
| 11:49 | 3 | MS. KELLER:  And let's look at the next page under |
| 11:49 | 4 | Roman Numeral V, "Lessons Learnt." |
| 11:49 | 5 | *(Document displayed.)* |
| 11:49 | 6 | MS. KELLER:  "Maintain a continuous monitor on the |
| 11:49 | 7 | pulse of the consumer.  Understand the gaps in their needs |
| 11:49 | 8 | and play patterns.  Segment needs/gaps by the age of the |
| 11:49 | 9 | consumer. |
| 11:49 | 10 | "Know your competition.  Threat can arise from |
| 11:49 | 11 | large and small competitors on a worldwide basis. |
| 11:49 | 12 | "Fiercely protect the brand.  If a potential |
| 11:49 | 13 | significant threat appears on the radar screen, all efforts |
| 11:49 | 14 | should be mounted immediately, ranging from product |
| 11:49 | 15 | development, availability, pricing, packaging, promotions |
| 11:49 | 16 | and advertising.  Develop relevant strong flanker brands |
| 11:50 | 17 | that enhance rather than cannibalize, and manage the |
| 11:50 | 18 | portfolio with that in mind." |
| 11:50 | 19 | "Be willing to take risks.  Push the envelope |
| 11:50 | 20 | beyond the existing comfort zone.  Be sensitive to moms, but |
| 11:50 | 21 | do not overreact to their issues, especially as it pertains |
| 11:50 | 22 | to positioning or humor." |
| 11:50 | 23 | BY MS. KELLER: |
| 11:50 | 24 | Q.   All these things are related to helping you compete |
| 11:50 | 25 | better with the Barbie brand than you had been doing, right? |

| | | |
|---|---|---|
| 11:50 | 1 | A.   Certainly someone's trying to communicate the "Lessons |
| 11:50 | 2 | Learnt" from the Bratz introduction. |
| 11:50 | 3 | Q.   Well, in -- up until Bratz came along, Barbie had |
| 11:50 | 4 | almost a monopoly on the fashion doll market.  I think you |
| 11:50 | 5 | said 90 percent yesterday? |
| 11:50 | 6 | A.   I did say there have been points and times when Barbie |
| 11:50 | 7 | had a 90 percent share of the subcategory fashion dolls, |
| 11:51 | 8 | yes. |
| 11:51 | 9 | Q.   And this document, when it talks earlier about how |
| 11:51 | 10 | retailers didn't have any option, even if they were unhappy |
| 11:51 | 11 | with Barbie, that's 'cause Barbie had a near monopoly until |
| 11:51 | 12 | Bratz came along, right? |
| 11:51 | 13 | A.   No.  I don't agree with that at all. |
| 11:51 | 14 | Q.   Let's -- |
| 11:51 | 15 | A.   They -- they had plenty of options. |
| 11:51 | 16 | Q.   Let's look at the next thing that The Bratz Brief says. |
| 11:51 | 17 |        Under "Be willing to take risks," we've got:  "Develop |
| 11:51 | 18 | unique content-driven marketing and product develop |
| 11:51 | 19 | strategies." |
| 11:51 | 20 |        Do you see that? |
| 11:51 | 21 | A.   I do. |
| 11:51 | 22 | Q.   And that indicates that those needed to still be done. |
| 11:51 | 23 | In other words, that they weren't being done, right? |
| 11:51 | 24 | A.   No, that's not -- um, I don't read that at all in that |
| 11:51 | 25 | sentence. |

| | | |
|---|---|---|
| 11:51 | 1 | Q.   Underneath that, it says, "Mature brands must explore |
| 11:51 | 2 | non-heritage strategies to reinvigorate the consumer," |
| 11:51 | 3 | meaning, we gotta change what we been doing, right? |
| 11:51 | 4 | A.   No.  I read -- I read the sentence as what it says: |
| 11:51 | 5 | Mature brands need to explore different strategies. |
| 11:51 | 6 | Q.   And then you've got, "Product extensions of successful |
| 11:52 | 7 | new brands should be faithful to the original strategy, yet |
| 11:52 | 8 | must continue to be unique, innovative, and have the ability |
| 11:52 | 9 | to generate repeat and trial purchase." |
| 11:52 | 10 | Under that, "Be willing to pursue fads and trends if |
| 11:52 | 11 | they resonate with the consumer and touch on a hot button |
| 11:52 | 12 | with them." |
| 11:52 | 13 | And that's because you weren't doing that up until that |
| 11:52 | 14 | point, right? |
| 11:52 | 15 | A.   No. |
| 11:52 | 16 | Q.   "Understand the value proposition for the consumer. |
| 11:52 | 17 | Value for money is a critical component of the purchase |
| 11:52 | 18 | decision proposition.  If they love it, they will buy it." |
| 11:52 | 19 | So the author is saying we've gotta deliver more value |
| 11:52 | 20 | for the money, right? |
| 11:52 | 21 | A.   Um, I read -- the author says, "If they love it, |
| 11:52 | 22 | they'll buy it."  I'm not convinced that's the case. |
| 11:52 | 23 | Q.   "Value for" -- you're not convinced that, if consumers |
| 11:52 | 24 | love a product and think they're getting value for the |
| 11:53 | 25 | money, they'll buy it? |

Case 2:04-cv-09049-DOC-RNB   Document 10125   Filed 03/04/11   Page 140 of 142   Page ID #:306371
CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

140

| | | |
|---|---|---|
| 11:53 | 1 | A.   I'm not.  I mean, I think there are plenty of products |
| 11:53 | 2 | that are out of reach for consumers from a pricing |
| 11:53 | 3 | standpoint. |
| 11:53 | 4 | Q.   So this whole line really kind of meant nothing to you |
| 11:53 | 5 | in terms of Barbie marketing? |
| 11:53 | 6 | A.   No.  I just -- I'm not adopting what you're telling me |
| 11:53 | 7 | it means. |
| 11:53 | 8 | Q.   Let's go to the next one. |
| 11:53 | 9 | "Emphasize innovation in toy development.  The customer |
| 11:53 | 10 | (sic) has set an extremely high bar and Mattel must exceed |
| 11:53 | 11 | their expectations." |
| 11:53 | 12 | And finally, "Advertising and positioning must be |
| 11:53 | 13 | persuasive and intrusive.  Target the right audience." |
| 11:53 | 14 | Now, these areas we've discussed, these were all areas |
| 11:53 | 15 | where you, at Mattel, and the Barbie brand were failing and |
| 11:53 | 16 | needed to improve, right? |
| 11:53 | 17 | A.   No.  I wouldn't say that. |
| 11:53 | 18 | Q.   And this was all completely independent of anything MGA |
| 11:53 | 19 | was doing, true? |
| 11:53 | 20 | A.   No.  I wouldn't say that. |
| 11:54 | 21 | MS. KELLER:  Your Honor, is this a good time for a |
| 11:54 | 22 | break? |
| 11:54 | 23 | THE COURT:  Apparently it is. |
| 11:54 | 24 | All right.  Could I see that schedule, Kathy? |
| 11:54 | 25 | What time can you come back?  I've forgotten. |

CV 04-9049 DOC – 3/2/2011 – Day 26, Volume 1 of 4

141

| 11:54 | 1 | Have we set our 40 minutes for lunch today?  45? |
|-------|---|---|

11:54   1   Have we set our 40 minutes for lunch today?  45?

11:54   2           I'll see you, then, at twenty till the hour.

11:54   3   Would that be okay?  We'll get right back to work, and then

11:54   4   we'll let you out at 3:30 today.

11:54   5           All right.  You're admonished not to discuss this

11:54   6   matter among yourselves nor to form or express any opinion

11:54   7   concerning the case.

11:54   8           We'll see you at twenty minutes to the hour.

11:54   9           *(Lunch recess held at 11:54 a.m.)*

11:54   10          *(Further proceedings reported by Jane Sutton*

11:54   11     *Rule in Volume II.)*

11:54   12                          –oOo–

11:54   13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/2/2011 - Day 26, Volume 1 of 4

142

| 11:54 | 1 | -oOo- |
|---|---|---|
| 11:54 | 2 | |
| 11:54 | 3 | CERTIFICATE |
| 11:54 | 4 | |
| 11:54 | 5 | I hereby certify that pursuant to Section 753, |
| 11:54 | 6 | Title 28, United States Code, the foregoing is a true and |
| 11:54 | 7 | correct transcript of the stenographically reported |
| 11:54 | 8 | proceedings held in the above-entitled matter and that the |
| 11:54 | 9 | transcript page format is in conformance with the |
| 11:54 | 10 | regulations of the Judicial Conference of the United States. |
| 11:54 | 11 | |
| 11:54 | 12 | Date:  March 2, 2011 |
| 11:54 | 13 | |
| 11:54 | 14 | |
| 11:54 | 15 | _____ |
| 11:54 | 16 | DEBBIE GALE, U.S. COURT REPORTER<br>CSR NO. 9472, RPR |
| 11:54 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |