1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

MATTEL, INC., ET AL.,              )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           ) No. CV 04-9049-DOC
                                   )     Day 26
MGA ENTERTAINMENT, INC., ET AL.,   )     Volume 2 of 4
                                   )
          Defendants.              )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Wednesday, March 2, 2011

Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-03-02 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
5                  MICHAEL T. ZELLER
                   WILLIAM PRICE
6                  Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20             KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 3 of 96   Page ID #:306376
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

3

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             KEN KOTARSKI, Mattel Technical Operator

17             MIKE STOVALL, MGA Technical Operator

18             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 4 of 96   Page ID #:306377
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

4

```
1                           I N D E X

2

3

4                        EXAMINATION

5

6  Witness Name          Direct     Cross      Redirect     Recross

7  ECKERT, ROBERT
      By Ms. Keller                   5

8

9

10                        EXHIBITS

11

12  Exhibit                        Identification     Evidence

13  Defendants' No. 1806                                 14

14  Defendants' No. 1807                                 18

15  Defendants' No. 2302                                 66

16  Defendants' No. 2305                                 47

17  Defendants' No. 8973                                  9

18  Defendants' No. 8980                                  7

19  Defendants' No. 8987                                 88

20  Defendants' No. 16255                                35

21  Defendants' No. 25882                                85

22  Defendants' No. 25907                                87

23  Defendants' No. 35819                                75

24  Defendants' No. 35820                                88

25
```

 1                SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 2, 2011

 2                        DAY 26, VOLUME 2 OF 4

 3                          (12:46 p.m.)

 4              *(The following proceedings is taken in the*

 5          *presence of the jury.)*

 6              THE COURT:  All right.  Then we are back in

 7    session, and the jury is present, all alternates, all

 8    counsel.  Thank you for your courtesy.  The witness,

 9    Mr. Eckert.

10              And Counsel, if you'd be seated.

11              And this is the continued cross-examination by

12    Ms. Keller on behalf of Mr. Larian and MGA.

13              MS. KELLER:  Thank you, your Honor.

14          **ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED**

15                  **CROSS-EXAMINATION (continued)**

16    BY MS. KELLER:

17    Q    Mr. Eckert, this document we were talking about before

18    we broke for lunch, the Bratz brief, that was prepared

19    November 14th, 2003, correct?

20    A    I believe that was the date on the document, yes.

21    Q    And your board of directors' meeting was November 21st,

22    2003, correct?

23    A    I don't know.

24    Q    Can you take a look at trial Exhibit 31287.  These are

25    the minutes of the November 21st, 2003 board meeting, board

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 6 of 96   Page ID #:306379
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

6

1   of directors.

2   A     Yes, there was a board meeting on November 21, 2003.

3   Q     So this Bratz brief dated November 14, 2003 was just

4   one week before the board meeting, right?

5   A     Yes.

6   Q     And in fact, there was a presentation made to the board

7   of directors based on the Bratz brief, right?

8   A     Not that I remember, not based on the agenda of the

9   board meeting.

10  Q     Well, isn't it true that just a week after the Bratz

11  brief, there was a meeting of the board of directors at

12  which the dismal picture that this Bratz brief painted of

13  Barbie sales was presented?

14  A     I don't know what was presented to the board at this

15  particular meeting.

16  Q     You were there, weren't you?

17  A     I was.  It's not on the agenda, as I see it.

18  Q     Well --

19  A     But nevertheless, I wouldn't agree with your portrayal

20  of dismal performance.

21  Q     And you wouldn't agree with the Bratz brief's portrayal

22  of the dismal performance of Barbie either, right?

23  A     There were some things in the Bratz brief I did agree

24  with, and I'm sure there were some things that I didn't

25  agree with.

1    Q    You don't have any particular reason to dispute that

2    there was a presentation made to the board of directors

3    based on the Bratz brief, do you?

4    A    No.

5    Q    Now, if we could turn to a different topic, you have

6    seen Exhibit 8980 in the past, have you not?

7    A    I don't know.

8    Q    Let's take a look at it.  And this is entitled "Mattel,

9    Inc., 2004 TRACS," T-R-A-C-S?

10   A    Correct.

11   Q    Do you recognize that document?

12   A    I do.

13          MS. KELLER:  Your Honor, I'd ask that 8980 be

14   admitted.

15          THE COURT:  Received.

16          (Defendants' Exhibit No. 8980 is received in

17      evidence.)

18   BY MS. KELLER:

19   Q    And this document goes into your goals for 2004,

20   doesn't it?

21   A    It's a draft of the company's goals for 2004, yes.

22   Q    And they were your goals too, weren't they?

23   A    Yes, they would be.

24   Q    Now, if we look at the first page, we've got a portion

25   that says, "Deliver the numbers," a portion that says,

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

8

1   "Channel strategy," and then we come to "fix dolls."  And

2   "fix dolls" means fix what was broken, right?

3   A    Well, it certainly means improve performance.

4   Q    Fix, repair, right?

5   A    Yes.

6   Q    Now, under "fix dolls," it says, "Full execution of

7   worlds of Barbie, strengthen MyScene, transition out of

8   Flavas, get us back in the" -- the very end of it says, "get

9   us back in the offense," right?

10  A    I'm sorry, I don't see that.

11  Q    Very end of "fix dolls"?

12  A    Oh, okay.  Yes.

13  Q    And at the bottom of this document, it says,

14  "Aggressive intellectual property plan protection external

15  Simba, others as appropriate"; do you see that?

16  A    I do.

17  Q    Now, let's look at Exhibit 8973.

18       MR. QUINN:  Excuse me, your Honor.  On that

19  exhibit, there was supposed to be a redaction that the Court

20  ordered.  If we are not going to go back to it, that's

21  perhaps something we can address later.

22       THE COURT:  Later, okay.  Take it up during the

23  recess.  Thank you.  My apologies, I didn't pick that up.

24  BY MS. KELLER:

25  Q    Exhibit 8973?

1    A    Yes.

2    Q    This is -- the first e-mail here is from Diane Douglas

3    to you and others dated January 19th, 2004, right?

4    A    (No audible response.)

5    Q    At the bottom?

6    A    I'm looking.

7         Yes.

8              MS. KELLER:  Your Honor, we'd move in

9    Exhibit 8973.

10             THE COURT:  Received.

11             *(Defendants' Exhibit No. 8973 is received in*

12        *evidence.)*

13   BY MS. KELLER:

14   Q    And this says, The attached is an excerpt from

15   Barron's -- the Barron's round table story that ran this

16   weekend.  Meryl Witmer's comments regarding the Mattel lay

17   out very clearly the negative perceptions we're battling on

18   the Barbie front and for the company in general.

19        So this is January 19, 2004, you've been on board for

20   four years or so?

21   A    A little less, three and a half years.

22   Q    And under Barbie issues, this says, "Barbie has become

23   irrelevant.  Girls are embarrassed to be seen playing with

24   Barbie.  Licensees are dropping Barbie right and left."

25   Flavas, a Barbie knockoff -- I'm sorry, Flavas, a Bratz

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

10

1    knockoff, can now be found in discount bins nationwide.

2    Barbie is losing shelf space, Bratz brand says its space

3    increasing four to eight times.  Now Bratz is moving to

4    Europe.

5         So –– and who was Diane Douglas?

6    A    Diane Douglas is the senior vice president for investor

7    relations at Mattel.

8    Q    And this was sent to you and copied to various people,

9    Matt Bousquette, and who was he?

10   A    Matt Bousquette was the president of Mattel brands.

11   Q    Tim Kilpin, who was he?

12   A    Tim Kilpin would have been in charge, the general

13   manager of the girls' division, I believe at the time.

14   Q    And who was Russell Arons?

15   A    Russell Arons was a vice president of marketing on the

16   Barbie brand, I believe she was at the time.

17   Q    And what is Barron's round table?

18   A    Barron's is a weekly newspaper.  I believe a round

19   table is a discussion Barron's holds and records with

20   various people talking about various topics.

21   Q    And Barron's is a very, very influential business

22   publication, is it not?

23        MR. QUINN:  Your Honor, based on that testimony, I

24   move to strike that this is hearsay, a summary of an

25   article.

```
 1              THE COURT:  Overruled.  This goes to state of mind
 2    concerning Mr. Eckert.
 3              THE WITNESS:  Barron's is an influential
 4    publication, yes.
 5    BY MS. KELLER:
 6    Q    So seeing this -- having -- knowing that this had been
 7    published in Barron's wasn't good news to you, was it?
 8    A    No, correct.
 9    Q    And in fact, it had the potential to really negatively
10    affect your stock price, right?
11    A    Well, I suppose it had the potential to do that.
12    Q    Well, Barron's is widely read by business industry
13    analysts including in the toy industry, right?
14    A    I think that's true.
15    Q    And under general issues, it says, "Mattel has lost its
16    innovative spirit.  Mattel is knocking off other companies'
17    toys."  Knocking off means copying, right?
18    A    Yes, it does.
19    Q    "Industry rumor has it Toys R Us was left with a lot of
20    Mattel product after Christmas."
21              MR. QUINN:  Objection, your Honor.  This is
22    hearsay.
23              THE COURT:  Overruled.
24    BY MS. KELLER:
25    Q    Mattel's second largest --
```

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

12

```
 1              THE COURT:  Just a moment.
 2              This is obviously e-mails going back and forth.
 3    This is for Mr. Eckert's state of mind and the conduct or
 4    actions he takes.
 5    BY MS. KELLER:
 6    Q    "Mattel's second largest creditor of FAO Schwarz
 7    selling on credit when most other companies had COD terms."
 8    What does that mean?
 9    A    I believe it means this person believed we were FAO
10    Schwarz company's second largest creditor, selling to that
11    company on credit when other companies were selling to them
12    essentially on a cash basis.
13    Q    And so Mattel was owed a lot of money by FAO Schwarz,
14    right?
15    A    I don't know that.  Meryl Witmer apparently believed
16    that.
17    Q    Well, FAO Schwarz later went bankrupt, right?
18    A    It did.
19    Q    And it was in a lot of financial trouble at the time,
20    right?
21    A    It was in financial trouble, yes.
22    Q    So all of the --
23    A    I don't know that it owed Mattel any money.  It may
24    have.
25    Q    Only according to this, right?
```

1    A    According to this e-mail and this person, yes.

2    Q    Well, was there any follow-up e-mail from you saying,

3    Barron's is all wrong about this, we need to correct that,

4    we are not the largest creditor of FAO Schwarz?

5    A    No, I don't tend to react in that way to these sorts of

6    things.

7    Q    Was there any kind of e-mail that you know of from

8    anyone claiming that that statement was wrong?

9    A    No.

10   Q    And that includes your communications division of

11   Mattel, right?

12   A    Yes.

13   Q    And that's because it wasn't wrong, as far as you know,

14   right?

15   A    No, that's -- as I just said, I wouldn't react to

16   something like this for most any reason.

17   Q    Well, essentially what happened, then, that you came to

18   learn about was that there was this business publication

19   that had a very, very negative article about Mattel losing

20   its innovative spirit, copying other companies' toys, having

21   problems with the Barbie brand, girls embarrassed to be seen

22   playing with Barbie.  I mean, this was really a very, very,

23   very worrisome development for you, that the business world

24   was being told all those things about you and your brand,

25   wasn't it?

1    A    No, I wouldn't conclude that from one person's comment

2    among what is usually several in this round-table discussion

3    of different companies.  I wouldn't draw that conclusion.

4    Q    Well, nobody in this e-mail chain within Mattel was

5    telling you, we have to correct this because all these

6    statements are erroneous, right?

7    A    I don't -- I certainly don't remember anybody taking

8    any action as a result of this.

9    Q    Well, let's turn to Exhibit 1806, and if we look at the

10   first page, we see, "Confidential, 20 copies only, Barbie

11   2004 marketing plan update 3/16/04."  You recognize that,

12   don't you?

13   A    I do.

14          MS. KELLER:  And your Honor, I'd ask to publish --

15   I'd ask to have 1806 admitted.

16          THE COURT:  It's received, and you may publish it.

17          *(Defendants' Exhibit No. 1806 is received in*

18       *evidence.)*

19   BY MS. KELLER:

20   Q    Let's look at the first page.  And where it says "20

21   copies only"; do you see that?

22   A    I do.

23   Q    And "confidential," that was a pretty large stamp on

24   the page, right?

25   A    It is.

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

15

```
1    Q    Let's look at -- and this is March 16th, 2004, right?

2    A    It is.

3    Q    So this is just a couple months after that e-mail we

4    were just discussing about Barron's round table, right?

5    A    I'll take your word for that.

6    Q    Let's turn to the second page.  It says "Agenda."  This

7    is 1806-3 -- no, 1806-2, I'm sorry.  "The house is on fire."

8    Let's look at the next page.  It says, "The house is on

9    fire."  And we see up in the right, a little drawing of some

10   type, right?

11   A    We do.

12   Q    "Every score card measurement is down.  Market share of

13   doll category down 7 percent."  Total -- top four POS down

14   13 percent.  POS stands for point of sale?

15   A    It does.

16   Q    "The count and space support down 85 percent at

17   Walmart, 22 percent at TRU," and that stands for Toys R Us?

18   A    It does.

19   Q    "Bratz is gaining share with core 5 to 8-year-olds.

20   Since November, Bratz penetration has grown from 66 percent

21   to 80 percent with 5 to 6-year-olds, 80 to 84 percent with 7

22   to 8-year-olds.  Worst attribute ratings in 45 years of

23   Barbie.  Down 8 percent for most fun to play with.  Down

24   8 percent for prettiest doll.  Down 6 percent for both

25   fashion and accessories."
```

 1        And you understood that the house that was on fire here

 2   was Mattel's house, right?

 3   A    When you say "understood," I don't recall reading this

 4   document before I testified in a prior case.  I certainly do

 5   today.

 6   Q    The house on fire was Mattel's house, right?

 7   A    I'm sure that's what was meant to be portrayed.

 8   Q    And if we turn to the next page, 1806-4, we see at the

 9   top left, "Barbie score card 3303," and that lays out some

10   pretty negative numbers, doesn't it?

11   A    It does.

12   Q    And if we go to the next page, and the page after that,

13   more negative numbers, right?

14   A    (No audible response.)

15   Q    These are brand measurements, aren't they?

16   A    They appear to be.

17   Q    And it says, "Bratz has surpassed Barbie in appearance,

18   aspiration and play value."  And a lot of different

19   categories are listed here, aren't they?

20   A    Yes.

21   Q    And then we go to page -- page 7, more negative

22   numbers, right?

23   A    I see positive arrows, but there may be negative

24   numbers.  I mean, none of these numbers look negative.  They

25   may have been declines, they may have been changes, but I

1   usually -- when I describe a negative number, there's either

2   a minus sign or a bracket around it.

3   Q    Let's go to the next page, and it says, "The house is

4   on fire.  Bratz marketing and media is getting more

5   aggressive.  Estimated 30 percent GRP increase over last

6   year."  What's GRP?

7   A    Here, it would mean gross rating point.

8   Q    2002, 2700; 2003, 7808; 2004, 9018 projected?

9   A    I don't know.  They could be some quantity of rating

10  points.

11  Q    And it says, "Pre-fall GRP's increased by 38 percent

12  based on higher support for Sunkist Summer, Pets, and Wild

13  Life Safari, right?

14  A    It does.

15  Q    Now, under "Bratz marketing and media is getting more

16  aggressive," Kim -- Tim Kilpin had general overall

17  managerial responsibility for the Barbie line in April 2004,

18  didn't he?

19  A    I believe he did.

20  Q    And he is actually the person who wrote Exhibit 1806,

21  correct?

22  A    I don't know.

23  Q    Let's look at Exhibit 1807; do you recognize this as

24  the 2005 Barbie spring line review?

25  A    I do.

1    Q    And this is dated April 15th, 2004?

2    A    It is.

3              MS. KELLER:  Your Honor, I'd ask that that exhibit

4    be admitted.

5              THE COURT:  Received.

6              *(Defendants' Exhibit No. 1807 is received in*

7         *evidence.)*

8    BY MS. KELLER:

9    Q    And we see that same little image on the front that we

10   saw on the other document, right?

11   A    I do.

12   Q    And this is a -- showing a house on fire, right?

13   A    That wasn't my first reaction when I first saw it, but

14   I believe it is.

15   Q    In fact, previously in 2008, you testified that this

16   looked more like an oak tree leaf, right?

17   A    I may have.  I wasn't -- when I first saw this, which

18   may have been 2008, I wasn't sure what it was, but I think

19   in this context, it is a depiction of the house on fire.

20   Q    Well, in the context in which you saw it on all these

21   pages, you knew it wasn't any oak tree leaf, right?

22   A    Once I had seen it in context, that's correct.

23   Q    Well, you saw the 2005 Barbie spring line review at the

24   time, back in 2004, right?

25   A    No, I -- I don't believe I did.

1    Q    You don't think that houses on fire have oak leaves

2    coming out of them, right?

3    A    That's true.

4    Q    And if we look at the very next page of that document,

5    that document also says, "The house is on fire," and there's

6    the house right next to it appearing to be on fire, right?

7    A    Correct.

8    Q    Now, in April of 2004, the performance of the Barbie

9    lined domestically was important to you as the chairman and

10   CEO of Mattel, wasn't it?

11   A    Yes.

12   Q    And you do remember that was the month you sued Carter

13   Bryant, right?

14   A    Yes, it was.

15   Q    And in 2008, you didn't remember, did you, that when

16   you reviewed financial preparations -- financial information

17   in preparation for earnings calls in April of 2004, you

18   didn't remember that the Barbie line domestically wasn't

19   preparing well -- wasn't performing well, right?

20        No sleep, I'm mixing up all my words.  I'll rephrase

21   that.

22   A    I understood it.

23          (Laughter.)

24   BY MS. KELLER:

25   Q    Okay.  When you reviewed the financial information in

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

20

```
 1   preparation for an earnings call in April of 2004, do you
 2   remember seeing that domestic -- seeing that, domestically,
 3   the Barbie line wasn't performing well?
 4   A    Yes, this is not the kind of document I would use to
 5   prepare for earnings calls.
 6   Q    That's not what I'm asking.
 7   A    Okay, I'm sorry.
 8   Q    What I'm asking is, when you reviewed financial
 9   information in preparation for an earnings call in April of
10   2004, do you remember seeing in that financial information
11   that, domestically, the Barbie line wasn't doing well?
12   A    I would have seen in April 2004 what it was doing.  I
13   can't today tell you what it said, but I would have seen the
14   information on sales performance of the Barbie line before
15   the earnings call.
16   Q    But as of 2008, you didn't remember that, right?
17   A    I didn't remember what the number was.  I still don't
18   remember what the number is.  But I would have reviewed the
19   Barbie sales number before the earnings call.
20   Q    I want you to take a look at your deposition of
21   January 28th, 2008, page 91, lines 10 through 16.
22   A    Page?
23   Q    Ninety-one, 10 through 15.
24        Have you had a chance to look at that?
25   A    I have.
```

 1   Q     So when you reviewed the financial information in

 2   preparation for the earnings call that was conducted in

 3   April of 2004, do you remember seeing that, domestically,

 4   the Barbie line wasn't performing well?

 5              MR. QUINN:  Consistent, your Honor, it's not

 6   impeaching.

 7              MS. KELLER:  It's not, your Honor.

 8              THE COURT:  That's right, but you can ask.

 9              THE WITNESS:  You can ask?

10              THE COURT:  You can answer the question.

11              THE WITNESS:  What was the question?

12              THE COURT:  It's not an impeaching document, so

13   she's not going to read it, she's just asking you a

14   question.

15              THE WITNESS:  And the question was, I'm sorry?

16   BY MS. KELLER:

17   Q     In preparation -- when you reviewed the financial

18   information in preparation for the earnings call that was

19   conducted in April of 2004, do you remember seeing that,

20   domestically, the Barbie line wasn't performing well?

21   A     No, and I would have reviewed that information, but I

22   don't remember what it said.

23   Q     Do you remember that it wasn't performing well?

24   A     It's certainly possible.

25   Q     Do you remember that it wasn't performing well?

```
 1    A    No, I don't.

 2    Q    And in April of -- in 2008, you also didn't remember

 3    that the Barbie line had not been performing well in 2004,

 4    right?

 5              MR. QUINN:  Object to the form of the question,

 6    your Honor.

 7              THE COURT:  No, you can answer that question, sir.

 8              THE WITNESS:  If I heard the question correctly,

 9    in 2008, I also didn't remember what the number was.

10    BY MS. KELLER:

11    Q    Not what the number was, that the Barbie --

12    A    No.

13    Q    -- line domestically was not performing well?

14    A    Well, I can't draw that conclusion without knowing what

15    the number is that I saw at the time.

16              MS. KELLER:  Your Honor, I'd ask permission to

17    read that portion of page 91, 10 through 15.

18              MR. QUINN:  It's not impeaching.

19              THE COURT:  No, I think it's consistent, Counsel.

20    BY MS. KELLER:

21    Q    Well, let me ask you one last time, forget about

22    specific numbers.

23              MR. QUINN:  Object to the preamble, your Honor.

24              THE COURT:  Yeah.

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 23 of 96   Page ID #:306396
CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

23

1    BY MS. KELLER:

2    Q    I'm not asking you specific numbers.  What I'm asking

3    you is this:  When you reviewed the financial information in

4    preparation for the earnings call that was conducted in

5    April of 2004, do you remember seeing that, domestically,

6    the Barbie line was not performing well?

7    A    No, I don't remember that.

8    Q    But you do remember that that was the month you sued

9    Carter Bryant?

10   A    I do.

11   Q    Now, if you could take a look at Exhibit 1807, second

12   page again.  We see at the top, "Sales at retail are

13   terrible," meaning?

14   A    I'm sure whoever wrote this meant they were very bad.

15   Q    "Market share has dropped at a chilling rate from

16   58.6 percent in January to 50.3 percent in April."

17        That's -- when this says "market share has dropped at a

18   chilling rate," you understood that to mean that this was a

19   real crisis, right?

20   A    Again, I -- I can't say I understood at the time

21   because I don't believe I read this at the time.  I think it

22   was a very dramatic, very dramatic decline in market share.

23   Q    And you don't remember reading the Bratz brief a week

24   before the board of director's meeting either, right?

25   A    No, I do remember reading the Bratz brief before I saw

1    that in my deposition.  I don't remember what day it was.

2    Q    And do you remember reading the Bratz brief a week

3    before the board of director's meeting?

4    A    I don't remember when I read it.

5    Q    This goes on to say, "Worlds are working but nothing

6    else is," right?

7    A    Yes, it does.

8    Q    And what does worlds mean?

9    A    I think in this context, worlds is the way at the time

10   we were marketing line -- sublines of Barbie products to go

11   around different themes that we internally referred to as

12   worlds of.

13   Q    And let's go to the next page, 1807-03.  "Barbie is

14   losing key attribute ratings with girls, cool, fun to play

15   with, I want to be her, aspiration, pretty, fashionable."

16   Not good; would you agree with me?

17   A    I would.

18   Q    "Bratz is gaining share with core 5 to 8-year-olds.

19   Since November, Bratz' penetration has grown from 66 percent

20   to 80 percent with 5 to 6-year-olds, 80 to 84 percent with 7

21   to 8-year-olds"; again, very dramatic for Mattel, right?

22   A    I think they were dramatic numbers for Bratz.

23   Q    And bad news for Mattel?

24   A    Not necessarily, but certainly we were losing business

25   to Bratz at the time, yes.

1    Q    But not that big of a deal, right?

2    A    No, I didn't say that.

3    Q    Let's go to the next page, 1807-004.  "Fight fire with

4    fire.  We must," all caps, "do some things differently

5    around here."

6         Let's go to the next page.

7         "Fight fire with fire.  No other brand in history is as

8    emotionally meaningful to girls and women as Barbie.  In

9    spite of this, a rival-led Barbie genocide rapidly grows.

10   All the talent, power, and history behind the Barbie brand

11   should be focused to fight back.  Product, packaging,

12   marketing and sales must be launched that is brilliant,

13   tactical, aggressive, revolutionary and ruthless.  This is

14   war and sides must be taken.  Barbie stands for good.  All

15   others stand for evil."

16        Now, you've tried to really distance yourself from this

17   document, haven't you?

18   A    I would certainly distance myself from this language.

19   Q    Well, you're telling us that you never even saw this

20   before this litigation, right?

21   A    That's correct.

22   Q    And you are the CEO of the company?

23   A    That's correct.

24   Q    And this is the best seller that your company has, the

25   Barbie line, right?

1    A    That's correct.

2    Q    And your Barbie line is getting killed by Bratz, right?

3    A    The Barbie line is certainly losing business and share

4    to Bratz.

5    Q    And it was just two weeks after this presentation that

6    you sued Carter Bryant, right?

7    A    It was some weeks -- a week or two after the date of

8    this presentation, yes.

9    Q    And this presentation about the spring line review,

10   very important to Mattel, the spring line review, right?

11   Every year?

12   A    A line review is important at Mattel.

13   Q    But this is the line review, this is the Barbie line,

14   this is the most important product that Mattel has, right?

15   A    Well, I think line reviews across our brands are

16   important.  Barbie is an important brand, yes.

17   Q    And it was a huge concern of yours as CEO that Barbie

18   sales had been plummeting, right?

19   A    Well, I was certainly concerned that Barbie sales had

20   declined over the years.

21   Q    And you were really concerned that they were now

22   dropping like a hot rock and Bratz was gaining ground,

23   right?

24   A    No, I wouldn't use that language.

25   Q    Well, whether you would use the language or not, Barbie

1    sales were declining even faster now that Bratz had appeared

2    on the scene, true?

3    A    Absolutely, yes.

4    Q    And so let's take a look at the next page of this

5    document, 1807-0006.  "Keep doing the same thing."  And what

6    we see here is that if Mattel keeps doing the same thing you

7    have been doing, the numbers are going to keep dropping,

8    right?  Your sales are going to continue to fall, that's

9    what this is projecting, isn't it?

10   A    I believe so, yes.

11   Q    And so you as the CEO, can you tell us why this

12   information would have been kept from you?

13   A    I didn't participate in line reviews, still don't

14   participate in line reviews, so I don't see these kinds of

15   presentations.

16   Q    And so no executive at Mattel came to you and said, you

17   got to see this, I mean, this is really dramatic, this

18   really lays it out what's happening to the Barbie brand,

19   nobody came to you and said that, right?

20   A    That's correct.

21   Q    And let's look at 1807-7, "Doing what it takes.

22   Better, higher value product.  Packaging innovation,

23   content, improved retailer margin."  That's telling --

24   that's telling you that you've got to change the way you are

25   doing things in order to improve your numbers, right?

1   A    I think that's the conclusion the author is drawing,

2   yes.

3   Q    And same with the very next page, page 8, right?

4   A    I'm really not sure what this is.  Maybe it's my copy.

5   Q    "Doing what it takes, more in product, packaging

6   innovation, content."

7        Let's go to the last page.  "Fight fire with fire.  The

8   mission, regain market share, regain relevance with girls,"

9   retain -- "regain retailer confidence"; do you see that?

10  A    I do.

11  Q    And the little guy's up there with a flamethrower or --

12  A    I see there is a fire extinguisher.

13  Q    Yeah, you're right, it's a fire extinguisher putting

14  out the fire.

15       So that's -- well, "fight fire with fire" --

16  A    The words and pictures don't --

17           (Interruption in the proceedings.)

18           THE WITNESS:  I'm sorry.

19  BY MS. KELLER:

20  Q    Whatever it is, next to it, it says, "fight fire with

21  fire," right?

22  A    Yes.

23  Q    And the person holding it is wearing some sort of

24  protective suit, right?

25  A    Yes.

1   Q    So are you telling us you don't know who created this

2   document, the 2005 Barbie spring line review?

3            MR. QUINN:  It's argumentative as phrased.

4            THE COURT:  Yeah, strike "are you telling,"

5   Counsel.

6   BY MS. KELLER:

7   Q    Is it your testimony that you don't know who created

8   this document?

9   A    I -- I don't -- I don't remember whose document this

10  is.  I don't know.

11  Q    But you do know as the CEO of Mattel, that the spring

12  line review's responsibility was Tim Kilpin's, right?

13  A    No.  Tim Kilpin was the general manager of the division

14  at the time.  I wouldn't say that he was responsible for the

15  spring line review, no, I wouldn't say that.

16  Q    Didn't you attend the spring line review presented by

17  Tim Kilpin?

18  A    It's certainly possible that I did, but routinely I

19  don't.  Certainly possible I did.

20  Q    And Tim Kilpin presented the line reviews, did he not?

21  A    No, in -- again, I generally don't attend line reviews,

22  but I associate line reviews as generally being led by the

23  head of marketing or the head of design for a group.

24  Q    Do you have any reason to believe that Mr. Kilpin did

25  not present the spring line review?

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

30

```
 1   A    No, I don't.

 2   Q    Where was Mr. Kilpin's office in relation to your own?

 3   A    In 2004?

 4   Q    Yes.

 5   A    I believe it was in the same building.

 6   Q    You talked to Mr. Kilpin at least weekly, didn't you?

 7   A    No, I doubt that.

 8   Q    So this document, then, your testimony is you never saw

 9   it until this litigation, right?

10   A    I don't remember seeing it.  It's possible I did, but

11   it -- it doesn't -- it doesn't strike a cord with me that I

12   saw this at the time.

13   Q    And you weren't aware of the contents of this document

14   at the time either, right?

15   A    Well, if I had seen it, I was.  If I hadn't seen it, I

16   wasn't.

17   Q    Do you know who Russell Arons is?

18   A    I do.

19   Q    And Russell Arons was vice president of Barbie

20   marketing at the time this 2005 spring line review was

21   written?

22   A    She may have been.

23   Q    And what was Tim Kilpin's title?

24   A    Tim Kilpin was probably the general manager of girls'

25   toys in the girls' division.
```

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

31

1    Q    And Russell Arons actually wrote this document when she

2    was vice president of Barbie marketing, right?

3    A    I thought you had said before that Tim Kilpin had

4    written it.

5    Q    And Tim Kilpin presented it, true?

6    A    I don't know who wrote it and who presented it.

7    Q    Have you checked around to find out?

8    A    No.

9    Q    You know it's kind of a major document in this case,

10   don't you?

11            MR. QUINN:  Assumes facts not in evidence, and

12   it's argumentative.

13            THE COURT:  Sustained.

14   BY MS. KELLER:

15   Q    Do you know that this document is an important document

16   in this litigation?

17            MR. QUINN:  Same objection, your Honor.  That's

18   for the jury to decide.

19            THE COURT:  Well, I don't know how you separate

20   one document from another, but it infers that this is a

21   critical document.

22   BY MS. KELLER:

23   Q    Well, you understand that this language "a rival-led

24   Barbie genocide rapidly grows," you would agree with me that

25   that's kind of inflammatory language, right?

1    A    Yes, I would.

2    Q    And the discussion of how the response had to be

3    brilliant, tactical, aggressive, revolutionary and ruthless,

4    you would agree that that's kind of inflammatory, too,

5    right?

6    A    Quite a bit less inflammatory, but right on that line.

7    Q    And saying that any brand other than Barbie stood for

8    evil, you'd agree that that's kind of inflammatory, right?

9    A    Yes, I would agree that that's inflammatory.

10   Q    And so you're telling us, then, that you've never taken

11   any steps to investigate either who wrote this --

12             MR. QUINN:  Object again.  "You're telling us."

13             THE COURT:  Just in its present form.  Just reask

14   the question.

15   BY MS. KELLER:

16   Q    And so you never took any steps to investigate who

17   wrote this, right?

18   A    That's correct.

19   Q    And you never took any steps to investigate who

20   presented it, right?

21   A    That's correct.

22   Q    And yet this document is not the kind of document that

23   you would like to see Mattel produce, true?

24             MR. QUINN:  Object to "and yet," your Honor.  It's

25   argumentative.

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

33

```
 1              MS. KELLER:  I'll subtract the "yet."
 2    BY MS. KELLER:
 3    Q    This is not the kind of document you like to see Mattel
 4    putting out, true?
 5    A    Sure.
 6    Q    So of course, you would want to make sure that the
 7    person who was responsible for producing this document was
 8    no longer with Mattel, wouldn't you?
 9    A    No.
10    Q    Wouldn't you be a little curious as to who would
11    produce a document like this?
12    A    I am now.
13    Q    Are you telling us this is the first you ever heard of
14    it?
15    A    No.
16    Q    You've heard of this document for years now, right?
17    A    Yes, I have.
18    Q    And you were asked about it in your deposition, right?
19    A    I may have been.
20    Q    You don't want to know who wrote it, do you?
21    A    No.
22    Q    You don't want to know who presented it, do you?
23    A    No.
24    Q    You'd rather not --
25              MR. QUINN:  Your Honor, I think we have a double
```

1    negative.

2              THE WITNESS:  We have a lot of negatives going on.

3              THE COURT:  It's a double negative so we don't

4    know what he's answering "no" to.

5    BY MS. KELLER:

6    Q    Is it true that you would rather be able to say that

7    you are in the dark about it?

8    A    No, that's not true.

9    Q    Now, around the time of April 15th, 2004, when this

10   document was produced, Mr. Kilpin was reporting to you and

11   to others about what he was seeing in the marketplace,

12   right?

13   A    In April of 2004?  I'm sure he was.

14   Q    In fact, Mr. Kilpin was writing that Mattel was being

15   outthought and outexecuted by MGA, right?

16   A    He may have been.

17   Q    Well, you know he was, don't you?

18   A    Right now, I don't know what he was writing in 2004,

19   but he certainly may have.

20   Q    Let's look at Exhibit 16255.

21             THE COURT:  Is that April 7th, Counsel?

22             MS. KELLER:  This is an e-mail, on the top it's

23   April 7th, 2004, and on the bottom, March 31st, 2004.

24   BY MS. KELLER:

25   Q    Do you recognize Tim Kilpin as the author of the e-mail

 1   in the bottom e-mail in the chain?

 2   A    I do.

 3            MS. KELLER:  Your Honor, I would move 16255 into

 4   evidence.

 5            THE COURT:  Received.

 6            *(Defendants' Exhibit No. 16255 is received in*

 7       *evidence.)*

 8   BY MS. KELLER:

 9   Q    And one of the things -- if we look at the bottom

10   e-mail there, Mr. Kilpin says, "We walked into a TRU store

11   this a.m. in Austin," and that refers to a Toys R Us store,

12   right?

13   A    I'm sure it does.

14   Q    "Very sobering.  While we were represented with our

15   newest product to date, we are not surprisingly" --

16            MR. QUINN:  Your Honor, I object.  Mr. Eckert's

17   name is nowhere on this document.  There's no foundation to

18   question him about it.

19            MS. KELLER:  Your Honor.

20            THE COURT:  All right.  Stop.  Ms. Keller.

21            MS. KELLER:  Your Honor, consistent with the

22   Court's previous rulings about the CEO of the company being

23   allowed to be presented with material from top executives.

24            THE COURT:  And this is not for the truth of the

25   matter asserted.  I'll let the witness look at it, see if he

```
 1    knows about it, and if he knows about it, he can testify

 2    about it.  There may have been conversation, there may not

 3    have been between Mr. Kilpin and Mr. Eckert.  And counsel

 4    can certainly ask him, even if he doesn't know about it,

 5    what his reaction to this is.

 6              THE WITNESS:  So may I read it?

 7              THE COURT:  Yes, please.  Take your time and read

 8    it for just a moment.

 9              And remember, this is not for the truth of the

10    matter asserted.  We don't have Mr. Kilpin here.  None of

11    these people are on the e-mail chain.

12              MS. KELLER:  And we will be calling him, your

13    Honor.

14              THE COURT:  All of them?

15              MS. KELLER:  No, we will be calling Mr. Kilpin.

16              THE COURT:  Okay, well, that --

17              MS. KELLER:  And others.

18              THE COURT:  That may resolve the problem, so...

19              Now, I'll receive that subject to a motion to

20    strike, then.

21              MS. KELLER:  Thank you, your Honor.

22              THE COURT:  And that way you can question the

23    witness if he knows this document, and if he doesn't --

24              MS. KELLER:  Well, your Honor, in addition, I was

25    going to question him about the timing in relation to the
```

```
 1    other document.

 2              THE COURT:  You can.

 3    BY MS. KELLER:

 4    Q    Mr. Eckert, you see where Mr. Kilpin writes --

 5    A    I don't want to interrupt you, but I know you're going

 6    to do a sentence, and I'm close to the end.

 7              THE COURT:  He's still reading.

 8              THE WITNESS:  Okay.

 9    BY MS. KELLER:

10    Q    Mr. Kilpin writes --

11              MR. QUINN:  Your Honor, shouldn't there first be a

12    foundational question about whether he's ever seen this

13    document before.

14              THE COURT:  Well, Counsel, your question.

15    BY MS. KELLER:

16    Q    Mr. Kilpin writes, "We walked a TRU store this a.m. in

17    Austin.  Very sobering.  While we were represented with our

18    newest product to date, we are not surprisingly outdone by

19    Bratz and other competitors in price, value and retail

20    presentation."

21         Now, this was just two weeks before the document I just

22    showed you, the 2005 Barbie spring line review, correct?

23    A    Yes, that's correct.

24    Q    And this reflects many of the same sentiments that we

25    see in this 2005 spring line review, correct?
```

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

38

```
1    A    No, I -- I read it differently.  I read it as a more
2    motivating, let's make things happen sort of e-mail.
3              THE COURT:  Well, Counsel, let's find out if he's
4    aware of this document, if he's had a conversation with
5    Mr. Kilpin, if he's even seen this document before.  It's
6    unclear.
7              MS. KELLER:  Your Honor, I don't want to make a
8    speaking offer of proof --
9              THE COURT:  You don't want to make a scene?
10   That's fine.  Just ask him if he's seen this document
11   before, just so I know.
12   BY MS. KELLER:
13   Q    Have you seen this document before, Mr. Eckert?
14   A    I may have seen it the night before -- I may have seen
15   it yesterday morning.  I -- I remember something, but I'm
16   not sure I've seen this document.
17   Q    And this is in preparation for testimony, true?
18   A    In the binders -- I believe this was in a binder I've
19   seen.
20   Q    And this correctly reflects what Mr. Kilpin was telling
21   you, the CEO, right around the same time period, right?
22   A    I don't know that.
23   Q    Mr. Kilpin was telling you that your spring sales were
24   continuing to drop, wasn't he?
25   A    I don't know what Mr. Kilpin was telling me then.
```

1    Q    Well, the 2005 Barbie spring line review was certainly

2    saying that, wasn't it?

3    A    Yes, that presentation said that.

4    Q    And both this e-mail and the presentation emphasized

5    that you were being outdone by Bratz, right?

6    A    Yes, it does.

7    Q    And something had to be done, right?

8    A    I don't see those words in here, but I think that was

9    the sentiment.

10   Q    Because if something wasn't done, your sales were going

11   to keep on dropping, right?

12   A    I certainly saw that in the previous document.

13   Q    And Mr. Kilpin thought that you needed to accelerate

14   your package redesign both in the graphics and structural

15   breakthroughs, right?

16   A    Yes.

17   Q    He wanted to start adding a doll to every accessory,

18   right?

19   A    No, I read him asking a question about that.  I don't

20   know what his -- what he wanted to do.

21   Q    He was coming up with a whole assortment of ideas to

22   try to do anything to inject some life into the Barbie

23   brand, right?

24   A    No, I think he was trying to stimulate the team.

25   Q    And around the same time, Matt Bousquette was going

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

40

```
 1    with his team from city to city trying to figure out how to

 2    stop the drop in sales, right?

 3    A    I'm sorry, I just don't know where and when he

 4    traveled.

 5    Q    Well, I'm talking about in April of 2004, shortly

 6    before the spring line review document, the Barbie business

 7    was in serious decline, wasn't it?

 8    A    Yes.

 9    Q    And the old way of building the Barbie brand just

10    wasn't working anymore, was it?

11    A    I think that's the conclusion the author drew.

12    Q    And if you take a look at Exhibit 1808, that's an

13    April 2nd, 2004 e-mail from Mr. Kilpin?

14    A    It is.

15    Q    And to a number of people at Mattel, a number of

16    executives, right?

17    A    It is.

18         MS. KELLER:  Your Honor, I would offer 1808 into

19    evidence.

20         THE COURT:  Well, do we have the same problem, is

21    Mr. Eckert on this chain?

22         MS. KELLER:  He is not on the chain --

23         THE COURT:  All right.  Here is what I'm going to

24    let you do.  I'm going to let you question him about this

25    document to see if there's a consistency between his
```

1    thoughts and allegedly what's contained in this e-mail.

2          But ladies and gentlemen, I'm not going to receive

3    1808 or 16255 at the present time, but I have counsel's

4    representation that Mr. Kilpin is going to testify.

5          So I'll take it subject to motion to strike.

6    Counsel, you can display it.

7          MS. KELLER:  Thank you, your Honor.

8    BY MS. KELLER:

9    Q    And let's look at the -- what's labeled "Original

10   message, Tim Kilpin, April 2nd, 2004, subject, confidential,

11   the Barbie call to action, road trip results."

12         Now, Mr. Kilpin writes, "As you know, I've asked the

13   team to accelerate development of our brand campaign, our

14   package redesign and our spring '05 new worlds."

15         And those were all addressed in this -- in this

16   document that we've been talking about, 1807, right, the

17   spring line review?

18   A    I'm sorry, can you say that again?  I'm trying to

19   familiarize myself with the document.  I apologize for not

20   focusing on the question.  Can I take a moment to

21   familiarize myself with the document?

22   Q    Well, let me just ask you one question first, and then

23   you can get back to it.

24         The part that I just read, "I've asked the team to

25   accelerate development of our brand campaign, our package

1    redesign and our spring '05 new worlds," those, among other

2    things, were discussed in this document we were just talking

3    about, 1807 --

4    A    And I'm sorry --

5    Q    -- the Barbie spring line review, right?

6    A    Where are you reading on the document I have in front

7    of me?  I'm just not following you.  I apologize.

8    Q    The last -- the last -- bottom of the first page.

9    A    Okay.  I just don't see that, I'm sorry.  If you'd just

10   help me with the sentence that I'm supposed to be reading.

11   Q    Let's look at "as you know," second from the bottom.

12   A    Okay.

13        Yes.

14   Q    If I get my reading glasses, I can help you more.

15   A    I've got that sentence.

16   Q    "As you know, I've asked the team to accelerate

17   development of our brand campaign, our package redesign and

18   our spring '05 new worlds"; do you see that?

19   A    I do.

20   Q    The Barbie design, marketing, packaging and consumer

21   product --

22        MR. QUINN:  Excuse me, your Honor, the witness

23   asked for a chance to read the document and Ms. Keller

24   promised him that chance.  He's never seen it before.

25        THE COURT:  Just take a look at that line that

1    she's referring to.

2              THE WITNESS:  Okay.  I found that line.

3              THE COURT:  Okay, Counsel.

4    BY MS. KELLER:

5    Q    "The Barbie design, marketing, packaging and consumer

6    product teams, along with help from our research and

7    engineering teams, are moving together quickly to address

8    these issues."  Was all that true, to your knowledge?

9    A    I have no reason to dispute it.

10   Q    And where it says, "Simply stated, the old way of

11   building the Barbie brand just doesn't work anymore.  We

12   have been outthought and outexecuted, and it stops now."

13   That was true, wasn't it?

14   A    That these words appear on this paper?

15   Q    No, I mean, the concept.  It was true that the old way

16   of building the Barbie brand wasn't working for you anymore,

17   right?

18   A    I -- I would certainly say it wasn't working as well.

19   Q    And it's true that you had been outthought and

20   outexecuted, right?

21   A    No, I don't -- I don't think I've ever drawn that

22   conclusion.

23   Q    And actually this -- this road trip that's referred to

24   in here to talk to retailers, included, say, talking to

25   Walmart, right?

1   A   I don't know.  Again, if you'd point me to a part, I'd

2   read that part of this.

3   Q   Let's look right under where it says "Original

4   message."

5   A   Okay.

6   Q   It says, "As you all know, Matt and his team spent the

7   week zipping from city to city, planogram room to planogram

8   room, to review and discuss the state of our business."

9       And then you go couple of lines from that, you see, "At

10  Walmart, Barbie is down 39 percent YTD," that's year to

11  date, right?

12  A   Yes.

13  Q   "Their overall girls' business, however, is plus

14  22 percent."  And right under that, "Bratz at Walmart is up

15  180 percent.  On a productivity basis across the chain, they

16  claim Bratz is now outselling Barbie at our largest account.

17  At Kmart, Barbie's fall planogram space is 32 and a half

18  feet.  Bratz', both fashion and small dolls, is 42 feet."

19      Now, you went to some of these meetings with the

20  retailers in June of 2004, didn't you?

21  A   I may have.

22  Q   Well, you personally as the CEO, you had to go around

23  and try to assure these retailers that you were going to do

24  something about this, right?

25  A   Well, I've certainly called on customers, retailers

1    over the years, yes.

2    Q    I'm not talking about over the years.  I'm talking

3    about June of 2004, okay?

4        In June of 2004, you went to meetings with retailers to

5    try to reassure them that you were going to step up to the

6    plate and do better, right?

7    A    I just don't know if I did call on -- visit retailers

8    in June 2004.  I certainly may have.

9    Q    Well, the company was in crisis mode, wasn't it?

10   A    No.

11   Q    Things were declining more rapidly even than they had

12   in the past in terms of the Barbie brand, right?

13   A    Yes.

14   Q    And we saw that in the numbers for the spring line

15   review, right?

16   A    Yes.

17   Q    And we're seeing that reflected in Mr. Kilpin's

18   e-mails, right?

19   A    Yes.

20   Q    I mean, 39 percent Barbie was down in just one year at

21   your biggest customer, Walmart, right?

22   A    I don't read that as a year.  I read that as a 90-day

23   period.

24   Q    Okay.

25   A    Or in the case of Walmart, it's probably actually two

1    months, probably a 60-day period.

2    Q    Nevertheless, it was consistent with your falling

3    numbers that you had had for some time, only now it was

4    accelerating, as we saw in the Exhibit 1807, the spring line

5    review, the drop was accelerating, right?

6    A    Well, I don't know if I'd draw that conclusion

7    comparing some longer period of time with some two-month

8    period of time.  I don't know that I'd draw the conclusion

9    that things had changed.

10   Q    Well, the executives you had in charge of the Barbie

11   brand were drawing that conclusion, weren't they?

12   A    They may have been.

13   Q    You know they were from reading all these documents,

14   right?

15   A    From reading the portions of the documents I've read,

16   yes.

17   Q    Well, from reading them overall, you know your brand

18   was in crisis, right?

19   A    No, again, that's not the conclusion I've drawn.

20   Q    Let's look at the same e-mail, let's look at the last

21   paragraph on page 1808-001.  It says, "As we build up to our

22   global line previews in one month, and our pre-toy fair

23   presentations in June, we will need to blow up a lot of

24   preconceived notions about Barbie.  Expect the team to throw

25   a lot of, quote, 'hand grenades," unquote, new approaches to

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

47

```
 1   packaging, pricing, design and marketing.  I expect a lot of
 2   debate and disagreement, which is fine.  Complacency will
 3   kill us."
 4        And then if we look at the next page, he ends by
 5   saying, "Remember the mission for Barbie, regain relevance,
 6   regain confidence, regain share."
 7        Now, regain means to get something back you've lost,
 8   right?
 9   A    That's correct.
10   Q    And so at least according to Mr. Kilpin, you had lost
11   relevance, lost confidence and lost share, right?
12   A    It was lower, yes.  That's how I would assume -- that's
13   what he meant to communicate, yes.
14   Q    And I'd like you to take a look at Exhibit 2305.  And
15   this was your April 20th, 2004 earnings call.  Do you
16   recognize that document?
17   A    I do.
18             MS. KELLER:  Your Honor, I move 2305 into
19   evidence.
20             THE COURT:  Received.
21             (Defendants' Exhibit No. 2305 is received in
22        evidence.)
23   BY MS. KELLER:
24   Q    And you were a participant on this earning call,
25   weren't you?
```

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

48

1    A    I was.

2    Q    If you look at the bottom of 2305-1, you're quoted as

3    saying, "Thank you, Diane, and good morning everyone.  The

4    first quarter of the year was not a good quarter."  Is that

5    a true statement?

6    A    Yes.

7    Q    And you go on to say, "And while I'm not pleased with

8    our performance, I'm not surprised."  Was that a true

9    statement, too?

10    A    I'm sure it was.

11    Q    And you assured people on the earnings call that you

12    were going to try to turn around the fashion doll business,

13    right?

14    A    May I take a minute to read this?

15    Q    Sure.  Just look at the first line of the second

16    paragraph on page 2.  This is a long document, and I'm not

17    asking you --

18    A    First line on the second paragraph of page 2?

19    Q    Yes.

20    A    Yes.

21    Q    And so you assured the people on the earnings call that

22    you were going to try to turn around Mattel's fashion doll

23    business, right?

24    A    Yes.

25    Q    And if you look at page 3, the first paragraph, third

1    line, there had been a 15 percent decline in Barbie sales in

2    the United States when compared to the first quarter of

3    2003, correct?

4    A    Yes.

5    Q    And again, you assured people on the earnings call that

6    you were going to try to turn that around, right?

7    A    Yes.

8    Q    Now, if we go back to Exhibit 1807, the Barbie spring

9    line review.  Again, that was dated April 15th, 2004, right?

10   A    It is.

11   Q    And you sued Carter Bryant April 27th, 2004, right?

12   A    That sounds right.  It could have been --

13        MS. KELLER:  We had a stipulation to that affect,

14   your Honor.

15        THE COURT:  Yeah.

16        THE WITNESS:  Okay.

17        MS. KELLER:  To the date the lawsuit against

18   Carter Bryant was filed.

19        THE COURT:  I believe that was already read

20   yesterday by Mr. Quinn.

21        MS. KELLER:  It was.

22   BY MS. KELLER:

23   Q    And in late 2003 or early 2004, you had attended a

24   meeting with attorneys from a firm called Wachtell Lipton in

25   New York where the substance of the discussion included

 1    potential litigation against Mr. Bryant, right?

 2    A    Yes.

 3    Q    And that was after at least one meeting with your --

 4              MR. QUINN:  Your Honor, this is irrelevant and

 5    contrary to the Court's order.

 6              MS. KELLER:  30(b)(6), your Honor.

 7              MR. QUINN:  He's not a 30(b)(6).

 8              THE COURT:  Was he designated as a 30(b)(6) in

 9    this area?

10              MR. QUINN:  No.

11              MS. KELLER:  This is from the 30(b)(6) deposition

12    October 4, 2010.

13              THE COURT:  Can I see a copy of that, Counsel?

14              Was he designated as such in this area?

15              MS. KELLER:  May I have a moment?

16              MR. QUINN:  Mr. Eckert was not, but the objection

17    is different, your Honor.  It's an order the Court made.

18              THE COURT:  Well --

19              MS. KELLER:  Ms. Hurst informs me that he was not

20    designated on that specific subject, your Honor.

21              THE COURT:  All right.  Thank you.  Move on, then.

22    BY MS. KELLER:

23    Q    Well, in any event, as sales of Barbie dropped, you

24    began considering a lawsuit against --

25              MR. QUINN:  Your Honor, I object.  Clear violation

1    of the court order.

2         THE COURT:  Well, I'm not certain where we are at

3    with this.  Something tells me I need to talk to counsel for

4    just a moment, both of them, and so why don't you take a

5    brief recess, why don't you give us 15 minutes.  This will

6    be our last recess and then we'll resume.

7         You're admonished not to discuss this matter

8    amongst yourselves, nor form or express any opinion

9    concerning the case.

10         And Mr. Eckert, please step down.

11         And Counsel, if you'd remain for just a moment.

12         *(The following proceedings is taken outside*

13     *the presence of the jury.)*

14         THE COURT:  Now, we are out of the presence of the

15    jury.  What's the concern about?

16         MR. QUINN:  Your Honor, there's been a specific

17    violation of this Court's order, for example, Exhibit 8980,

18    they were ordered to redact out "aggressive IP litigation."

19    They were ordered to do that.  We specifically raised it.

20    This was in the context of the discussion that they can't go

21    into litigation as a business strategy.

22         They not only didn't redact it, they put it up

23    there on the screen, and they called the witness' and the

24    jury's attention to that phrase.  And what they are trying

25    to orchestrate now, the story they are trying to weave is

1    that this litigation was filed as part of a business

2    strategy, and the Court ordered them not to do that.

3            So it's clear violation on the redaction of

4    Exhibit 8980, and it's consistent with the violation of this

5    Court's orders about staying away from litigation as a

6    business strategy.  The Court granted our Motion in Limine

7    Number 2 that the motives for filing suit are irrelevant.

8            MS. KELLER:  May I be heard?

9            MR. QUINN:  And now, I think, your Honor, we

10   should be permitted to go into all of the Hong Kong

11   litigation and compare the dolls that they sued on.  I think

12   that door has been opened wide, now.

13           THE COURT:  I don't.

14           Now, Counsel?

15           MS. KELLER:  Your Honor, not only did I not go

16   into lawsuits as part of a business strategy, I asked

17   actually a much less -- I asked one question about one line,

18   when Mr. Larian was asked repeatedly by Quinn Emanuel about

19   the fact that he aggressively moved to protect their

20   intellectual property, and the argument in favor of that was

21   that they weren't going into any specific litigation that

22   may have been filed, but that it was perfectly proper to ask

23   him about aggressive protection of their intellectual

24   property, that that was -- there was nothing inflammatory or

25   prejudicial about that.

1        This was one line.  That's all.  I didn't go into

2    anything more than that, and I asked actually a much less

3    aggressive version than Mr. Quinn asked previously when he

4    was waving around actual complaints from actual lawsuits.

5        MR. QUINN:  Your Honor, that was after Mr. Larian

6    volunteered, his first day on the stand, that Mattel sues

7    everybody, that we're -- that we sue everybody in the

8    business.  The Court will remember that statement.

9        But I don't hear Ms. Keller denying that they

10   violated this Court's order by failing to redact out of 8980

11   "aggressive IP protection."  And they called it to the

12   jury's attention.

13       And what they are doing now, clearly trying to

14   indicate you're meeting with lawyers, you know, you sued on

15   this day, this is all put in the context of business

16   problems.  And let's not kid ourselves, they are

17   communicating to the jury exactly what this Court said they

18   couldn't, that is, that this case is part motivated by a

19   certain business strategy.

20       MS. KELLER:  We were told by the Court that we

21   couldn't get into other litigation of Mattel.  We were told,

22   for example, that we couldn't use litigate to death against

23   other companies.  We were told that we couldn't use the fact

24   that it was part of a general litigation strategy that

25   Mattel had to try to crush other competitors.

1          This is this case, and this is timing in this case

2     of filing this lawsuit, and that is not going into other

3     litigation at all.  It's this litigation.

4          THE COURT:  Are you ready for a ruling or --

5          (Laughter.)

6          MR. ZELLER:  One quick point.

7          THE COURT:  Mr. Zeller.

8          MR. ZELLER:  Just to remind your Honor, that

9     section that they're showing about aggressive IP litigation,

10    we specifically discussed it when we went through the Eckert

11    binders, the Court ordered them to redact it.  One reason

12    why is because it refers to Simba, a third-party lawsuit,

13    nothing to do with this case, and so that's why I just

14    wanted to respond to Ms. Keller's point, that allegedly this

15    is not about third parties or other litigation, that section

16    is.  It's about Simba.  It was displayed on the screen and

17    it was specifically called to the jury's attention.

18         THE COURT:  Let's go back and forth until you're

19    ready to have me make a ruling, so I want to make sure

20    you...

21         MR. QUINN:  Well, this is smoke and mirror,

22    sleight of hand are phrases that comes to mind.  We are

23    pretending, now, Ms. Keller is pretending that we didn't

24    specifically discuss with this Court this week in going over

25    the Eckert binders, whether they can discuss this case as a

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 55 of 96   Page ID #:306428
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

55

 1    business strategy, and we did discuss that.

 2            She's trying to change the subject now and say,

 3    I'm staying away from third-party other litigation.  I

 4    understood that this business strategy -- this case as a

 5    business strategy was fair game.  She's protect -- that

 6    wasn't the discussion, your Honor.

 7            MS. KELLER:  If anybody on our side would like to

 8    join Mr. Zeller in responding, that would be fine, but as

 9    far as I'm concerned, your Honor, I've had what -- I've said

10    what I had to say.  We certainly didn't go anywhere near

11    litigating to death, using lawsuits to crush people in other

12    litigation.

13            MR. QUINN:  She wasn't there when the Eckert

14    binders were reviewed, your Honor.  This wasn't about

15    litigation to death, they can't do that because then we get

16    insurance, the Court has said.  What this Court said was

17    that they could not talk about using this case, that this

18    case was part of their business strategy.

19            MS. KELLER:  It also --

20            MR. QUINN:  She wasn't there.

21            MS. KELLER:  It also goes to statute of

22    limitations issues, when they knew, when they were

23    considering.  The Court is going to come up with a new

24    relation back date.  Previously the relation back date was

25    the very filing of the Carter Bryant suit.  Now that is a

 1   moving target.  All those things should be considered, your

 2   Honor.

 3          MR. QUINN:  This is a very creative lawyer, but

 4   Mr. McConville was there, and I bet Mr. McConville will

 5   confirm that was the Court's ruling.

 6          THE COURT:  Do you want to have Mr. McConville

 7   come to the lectern?

 8          MR. QUINN:  I -- I -- I'm fine with it, your

 9   Honor.

10          MS. KELLER:  Your Honor, repeatedly we have heard

11   our opponents --

12          MR. QUINN:  He's in an awkward spot.

13          MS. KELLER:  -- go into subject matter that the

14   Court had indicated in informal discussions might not be

15   permitted, and repeatedly we have heard as long as the

16   foundation is laid, if the basis is there for it, you know,

17   I haven't made a ruling until I've heard the evidence, and

18   you can go ahead and see if you can lay the foundation.

19          And we've heard that over and over.  I can't even

20   count the number of times the Court has informally indicated

21   it probably wasn't going to allow something and then we saw

22   Mattel essentially go straight ahead with the information.

23   My understanding is that the Court hadn't made a ruling

24   until the Court made a ruling.

25          THE COURT:  Sure.  Well, as I've said, and I'll

 1    say for the record again, the blessings of you submitting

 2    your 81 motions in limine is that while this Court would not

 3    normally decide motions in limine because they are taken by

 4    the parties as binding, it really forced the Court to become

 5    current with all the future problems that were going to

 6    occur during this trial, so I take that as a -- actually a

 7    very good thing that occurred to the Court.

 8            I'll remind both counsel, I usually don't decide

 9    motions in limine before trial, but here, I think it was a

10    blessing.  It was a good thing that occurred, because what

11    it did was give a preview to the Court of every single

12    issue, but I also warned all parties that those were subject

13    to constant review because of litigation.

14            In the motion, I stated Mattel's motion is granted

15    in part and denied in part.  MGA is not limited to arguing

16    about Mattel's litigation motives and conduct, though it may

17    not rely upon independent evidence of such motives and/or

18    conduct.  I said, finally, the Court will revisit this

19    ruling if Mattel attempts to use outside evidence to rebut

20    MGA's argument that Mattel had nefarious motives in filing

21    this lawsuit.  In such circumstances, the Court may permit

22    MGA to introduce its own rebuttal evidence.

23            Now, I thought that the meaning of this was

24    relatively clear, but -- first, there was a conversation on

25    Saturday or Sunday, I forget when.

```
 1                MR. ZELLER:  It was Sunday.

 2                THE COURT:  With Mr. McConville present and

 3    Mr. Zeller.  Most of you went home and went to sleep.  I'm

 4    just kidding you.

 5                You were here, Mr. Zeller.

 6                MR. ZELLER:  Yes, sir.

 7                THE COURT:  Who was with you?

 8                MR. ZELLER:  Mr. McConville was here as well.

 9                THE COURT:  And --

10                MR. ZELLER:  I think by that time --

11                THE COURT:  Was it an evening session?

12                MR. ZELLER:  It was.

13                THE COURT:  About what time?

14                MR. ZELLER:  I want to say by that time, it was

15    probably about 7:00.  It was into the evening, and Mr. Price

16    has been released.

17                THE COURT:  And was Mr. Quinn here?

18                MR. ZELLER:  That was a day when Mr. Price, with

19    your permission, was here instead of Mr. Quinn.

20                THE COURT:  Okay.  Was Ms. Hurst here?

21                MR. ZELLER:  I don't believe so, your Honor.

22                THE COURT:  Mr. McConville was here.

23                My memory is clearly that this last portion was

24    going to be redacted, it was third-party litigation.

25                MR. ZELLER:  Correct.
```

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 59 of 96   Page ID #:306432
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

59

 1          THE COURT:  So there's just a disconnect.  It's

 2    been put up on the board, we can simply redact it.  You'd

 3    call that to my attention.  And this was part of the

 4    third-party litigation that I was concerned about in the

 5    litigation to death strategy, but you've never been

 6    precluded from inquiring into this area about the

 7    motivations for filing the lawsuit as long as this wasn't

 8    litigation to death strategy, which I'm precluding you from.

 9          So the timing of this is entirely inappropriate

10    and it does not open the door to the Hong Kong litigation.

11    So you can inquire about 2004, these e-mails surrounding the

12    filing of the lawsuit, the earning statements -- I'm sorry,

13    the earnings call, the e-mails, et cetera, leading to your

14    belief that this was filed because Barbie wasn't doing well

15    in the marketplace.  You cannot go beyond that.

16          MS. KELLER:  I understand.

17          THE COURT:  And I think Mr. Zeller accurately

18    reflects, and Mr. McConville was here, the fact that we were

19    going to get away from this third-party litigation, okay?

20          Now, there's the disconnect again.  It's happened

21    with Mattel on occasion, so equally fair, it's happened with

22    MGA, right?

23          MR. MC CONVILLE:  Yes, sir.

24          THE COURT:  How should I cure that?  You see, you

25    are the only counsel who have never, let me repeat this for

1    the record, ever, ever been allowed to go home.

2           Let me say that again.  Mr. Overland is here, but

3    in the Aryan Brotherhood, I don't think counsel ever left

4    before -- during those nine months of litigation before 9:00

5    or 10:00 at night.  I can never remember a time that they

6    ever went home as early as 8:00.  And I think the Court has

7    been extraordinarily gracious in having one lead counsel

8    here, Mr. McConville.

9           MR. MC CONVILLE:  Yes, sir.

10           THE COURT:  Or Mr. Quinn, who you've spent

11    numerous hours with me, it's been a pleasure having you both

12    here.  We are trading off.  That's happened to Mattel on

13    occasion, and now it's happening to MGA, and the disconnect

14    now, Ms. Keller, is that apparently this wasn't communicated

15    by Mr. McConville to you, so get this off my screen and

16    redact the last portion.  Is that clear?

17           MS. KELLER:  Yes, sir.

18           THE COURT:  What did I just say?

19           MS. KELLER:  Redact the last portion and get it

20    off your screen.

21           THE COURT:  Excellent.  So far it's harmless, it's

22    been flashed up.  We'll get away with it.  The jury will

23    never find out what Simba is, it's meaningless.

24           Number 2, Mr. Quinn, this is not and will not open

25    the door to the Hong Kong litigation.

```
 1              Number 3, don't you dare go into litigation to
 2    death.
 3              What did I just say?
 4              MS. KELLER:  Don't I dare go into litigation to
 5    death.  Don't intend to, your Honor.
 6              THE COURT:  Now, this is an appropriate area of
 7    inquiry.  It's always been an appropriate area of inquiry.
 8              Now, you have about five minutes.
 9              MR. ZELLER:  Your Honor, quickly, the Court also
10    said to Mr. McConville that if they showed that portion of
11    that document, that Hong Kong was open.  The Court said, you
12    know, basically did the point about repeat back to me what I
13    said, and Mr. McConville repeated it back that if they went
14    into this, that we, Mattel, were entitled to go into the
15    Hong Kong litigation.  That was a specific warning by the
16    Court.
17              THE COURT:  I'm going to strike that portion.
18    That's not going to open the door, Counsel.
19              MR. QUINN:  Your Honor, the reasons for bringing a
20    lawsuit as a business strategy, this is really changing the
21    landscape here.  It's simply -- if someone thinks they have
22    a meritorious claim, they are entitled to bring the claim.
23    Whether it's what's going on in business, whether it's part
24    of a business strategy, that's not relevant to anything as
25    to whether we can prove the elements of our claim.  It's not
```

 1   an affirmative defense that it's good for a business

 2   strategy or it's bad for a business strategy.  If we can

 3   prove the elements of our claim, the fact that it might help

 4   us in business, too, doesn't defeat our proof on any of

 5   those elements.

 6          It injects into this case something that's

 7   completely irrelevant, and it's very inflammatory.  They

 8   don't need that to defend these claims.  And we're now near

 9   the close of our case, changing the landscape, the basis on

10   which this case has been tried.

11          THE COURT:  I'm going to read into the record so

12   the Circuit has the courtesy of the Court's in limine

13   ruling, and I'll remind any reviewing court that this --

14   some of these in limine rulings have changed, both for

15   Mattel and MGA.

16          This was in Mattel's Motion in Limine Number 2 to

17   exclude evidence or argument concerning Mattel's motivation

18   for filing suit.  This way a law clerk and the judge and the

19   circuit or the panel doesn't have to look up this particular

20   ruling.

21          "Mattel seeks to exclude evidence that it intended

22   to litigate MGA to death.  MGA claims that such evidence is

23   relevant to its unfair competition claim and its unclean

24   hands defense.  However, MGA's complaint does not identify

25   Mattel's litigation motive as a predicate to its unfair

Case 2:04-cv-09049-DOC-RNB  Document 10126  Filed 03/04/11  Page 63 of 96  Page ID #:306436
CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

63

1    competition claim.  Any such allegation would probably be

2    barred by the Noerr-Pennington doctrine anyway.

3         "Moreover, MGA's unclean hands defense cannot

4    arise out of Mattel's litigation motives or conduct,

5    because, quote, the misconduct that brings the unclean hands

6    doctrine in to play must relate directly to the transaction

7    concerning which the complaint is made.

8         "Mattel's motivation and conduct may nevertheless

9    be relevant to MGA's statute of limitations defense and

10   Mattel's fraudulent concealment theory.  For instance,

11   Mattel argues that MGA's concealment of Bryant's involvement

12   in Bratz prevented Mattel from earlier discovering the

13   factual basis for its claims against Bryant and MGA.  This

14   argument may be undermined by evidence that Mattel waited to

15   sue until after Bratz achieved commercial success.

16        "Such an inference may be reasonably drawn from

17   the evidence relevant to the pending claims and defenses.

18   For example, the anonymous letter to Eckert, the Anders

19   (phonetic) letter to Kaye and MGA's annual profits between

20   2000 and 2003 and the date this lawsuit was filed.

21        "Thus, MGA is not meaningfully disadvantaged from

22   the exclusion of evidence and testimony that is only

23   probative of Mattel's intent in filing this lawsuit.  For

24   example, MGA has at various times cited the testimony of

25   former Mattel executive Ron Brawer that Mattel intended to

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 64 of 96   Page ID #:306437
CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

64

1   litigate MGA to death.  The relevance of this evidence is

2   limited to Mattel's intent in filing this lawsuit, which is

3   itself of limited relevance to MGA's statute of limitations

4   defense.  Its prejudicial affect to Mattel far outweighs the

5   probative value since it forces Mattel to defend its

6   strategy and damaging allegation that Mattel prefers to

7   compete through litigation.

8           "Given MGA's ability to draw reasonable inferences

9   from the time line of this litigation and the facts already

10  relevant to other claims, the prejudicial affect of Brawer's

11  testimony and other evidence of Mattel's intent far

12  outweighs its probative value.  Mattel's motion is granted

13  in part and denied in part.

14          "MGA is not limited to arguing about Mattel's

15  litigation motives and conduct, though it may not rely upon

16  independent evidence of such motives and/or conduct.  I'll

17  revisit or the Court will revisit this ruling if Mattel

18  attempts to use outside evidence to rebut MGA's argument

19  that Mattel had nefarious motives in filing this lawsuit.

20  In such circumstances, the Court may permit MGA to introduce

21  its own rebuttal evidence that Brawer's testimony is of

22  Mattel's litigation motives and conduct."

23          MS. KELLER:  Your Honor, I must go to the bathroom

24  before the jury comes back.

25          THE COURT:  We'll take a recess.  We'll come back.

1          Now, let's do this.  You have other issues.  Can

2    we take this up and go to a different issue when counsel

3    comes back, save this for this evening?

4          MR. QUINN:  Yes.

5          THE COURT:  That way there is no harm, and we can

6    go over this again.  Make certain that I feel comfortable

7    with that ruling, okay?

8          MR. QUINN:  Thank you.

9          THE COURT:  Why don't we take five minutes so all

10   of you can use the restroom and then we'll get the jury back

11   in session.

12          *(Recess.)*

13          *(The following proceedings is taken in the*

14      *presence of the jury.)*

15          THE COURT:  All right.  The jury is present, all

16   counsel, the parties, the witness, Mr. Eckert.

17          Counsel, thank you for your courtesy.  If you'd

18   please be seated.

19          And Ms. Keller, if you'd like to continue on with

20   your cross-examination, please.

21          Mr. Zeller, if you can see, along with Ms. Hurst,

22   Cathy for a moment.

23          MR. ZELLER:  Sure.

24          MS. KELLER:  Should I proceed, your Honor?

25          THE COURT:  Please.

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 66 of 96   Page ID #:306439
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

66

**ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED**

**CROSS-EXAMINATION (Continued)**

BY MS. KELLER:

Q    Mr. Eckert, have you ever used a code name for MGA?

A    No, I don't believe I have, but I've certainly heard

one.

Q    Let's look at Exhibit 2302.

     This is an e-mail from you to you, correct?

A    Yes.

Q    So this is something you sent to yourself, true?

A    Correct.

          MS. KELLER:  And your Honor, I'd ask that 2302 be

admitted.

          THE COURT:  It's received.

          *(Defendants' Exhibit No. 2302 is received in*

     *evidence.)*

BY MS. KELLER:

Q    This is dated April 28th, 2004, right?

A    It is.

Q    And it contains an article from the Wall Street Journal

entitled "Mattel files breach of contract suit," right?

A    Yes.

Q    So this is --

          MR. QUINN:  Your Honor, I object.  This was

supposed to be redacted also.  Another violation of a court

```
 1   order.

 2             THE COURT:  Just a moment.

 3             We'll just take it down.

 4             So Counsel, you can question now.  We'll just

 5   leave it off the screen until it's redacted.

 6             I just don't want hearsay coming in from a

 7   newspaper article and what a reporter is writing involving

 8   either Mattel or MGA, so it's not the end of the world.

 9   We'll get that cleaned up tonight.

10             MS. KELLER:  And your Honor, I'm not going to go

11   into any of the text.

12             THE COURT:  Well, just ask him questions, and

13   we'll keep it off the screen to make sure.

14   BY MS. KELLER:

15   Q    This is from you to you, right?

16   A    That's correct.

17   Q    And it was -- what you were sending to yourself was a

18   Wall Street Journal article entitled "Mattel files breach of

19   contract suit," right?

20   A    That's correct.

21   Q    And the date of the article was April 27th, 2004,

22   right?

23   A    Correct.

24   Q    And at the top left it says "NHB time line," right?

25   A    Yes.
```

1    Q    N is one letter after the letter M, right?

2    A    Yes.

3    Q    H is one letter after the letter G, right?

4    A    Yes.

5    Q    And B is one letter after the letter A, right?

6    A    It is.

7    Q    So you had decided to use a code word whenever you

8    referred to MGA, right?

9    A    No, and I certainly wouldn't use that if that's the

10   code.

11   Q    Well, you didn't want to be associated with

12   decision-making about the lawsuit, right?

13   A    No, I don't agree with that at all.

14   Q    You wanted other people within your company to be the

15   ones that you could say had all the knowledge and made all

16   of the decisions, right?

17   A    No, that's not true.

18   Q    And in fact, in the past, you've denied even knowing

19   what "NHB time line" means, correct?

20   A    I still do.

21   Q    And so somehow this NHB time line got on your e-mail

22   from you to you, right?

23   A    That's correct.

24   Q    But you don't know how?

25   A    That's correct.

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

69

```
 1    Q    And you know that in your office, you maintain a file

 2    known or referred to as NHB, right?

 3    A    No, I don't.  I don't have such a file.

 4    Q    You are aware that NHB has been used as a reference to

 5    MGA within Mattel's law department, right?

 6    A    I have now seen these initials.  I don't know if they

 7    are used in the law department.  They may be.

 8    Q    That's another one of those things that you'd probably

 9    want to investigate, right; how the heck did this get on

10    your e-mail from you to you?  So did you investigate?

11    A    No, I did not, and it's not one of those things I'd

12    want to investigate.

13    Q    Let's turn to a different topic area.

14         You would agree, won't you, that just having an idea

15    doesn't automatically translate into having a brand?

16    A    Yes, I would agree with that.

17    Q    Building a brand is a lot more than just having an

18    initial design, right?

19    A    It is certainly more, yes.

20    Q    It's a lot more, isn't it?

21    A    Well, I think it starts with a design, but it's

22    certainly more than a design.

23    Q    That was my question.  It's a lot more than a design,

24    isn't it?

25    A    Yes, I'd agree with that.
```

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

```
1    Q    And in fact, not every design ever gets turned into a
2    brand, right?
3    A    That's correct.
4    Q    And you have many, many, many designs at Mattel, even
5    by talented designers that don't get turned into brands,
6    true?
7    A    I'm sure that's true.
8    Q    Now, while you were at Mattel, Mattel sought to build
9    and manage stronger brands, right?
10   A    Yes.
11   Q    In September of 2002, for example, Mattel implemented a
12   process specifically designed to build and manage stronger
13   brands, right?
14   A    (No audible response.)
15   Q    I'm talking about the 360 Task Force?
16   A    That -- that I implemented the 360 -- I'm sorry, I
17   didn't understand the question.
18   Q    While you were at Mattel --
19   A    Yes.
20   Q    -- Mattel sought in September of 2002 to implement a
21   process designed to build and manage stronger brands, right?
22   A    It may have.
23   Q    You are the CEO.  Did it?
24   A    I don't know.
25   Q    You heard of the 360 Task Force, haven't you?
```

1    A    I've heard of the 360 -- I've seen the 360 in a

2    document.  It may have been a task force.

3    Q    Well, that was one of the things that you did in

4    response to the fact that your sales were in decline, right;

5    you, Mattel?

6    A    Mattel, if I'm remembering the document correctly, had

7    a 360-degree project.  I would agree with that.

8    Q    And the project was designed to build and manage

9    stronger brands, right?

10   A    If I'm remembering, I thought it was about the Barbie

11   brand or the American Girl brand, but those are brands.

12   Q    You are just -- are you just referring to a document,

13   or do you actually know what your company was doing at that

14   point with respect to building brands?

15   A    I'm referring to a document when you talk about 360.

16   Q    Okay.  Let's just talk about what you know in your head

17   without referencing any specific document.

18        In September of 2002, did Mattel implement a process

19   designed specifically to build and manage stronger brands?

20   A    I don't know.

21   Q    Now, Adrienne Fontanella was president of the girl's

22   division at the time; you do remember that, right?

23   A    And this time is?

24   Q    September 2002.

25   A    Yes.

1   Q    Let's look at Exhibit 16074, I think --

2          MS. KELLER:  And this is already in evidence, your

3   Honor.

4   BY MS. KELLER:

5   Q    And this is the 360 Task Force e-mail from Adrienne

6   Fontanella to a whole host of people within Mattel, right?

7   A    Yes, it is.

8   Q    And on the very first page it says that the purpose is

9   to build and manage brands through holistic thinking, right?

10  A    (No audible response.)

11  Q    Well, let's just read the first line.

12  A    I'm sorry, I just haven't seen it yet.

13  Q    It's all right.  Let's just read the first line.

14  A    All right.

15  Q    "I wanted to take this opportunity to welcome you to a

16  very exciting new initiative, the 360 Task Force, a process

17  to build and manage stronger brands.  Attached is a document

18  outlining the details and team assignments, but in a

19  nutshell, my hope is that this process will engender a true

20  sense of teamwork that transcends departmental lines and

21  allows each group to take ownership and focus, really focus

22  on their brand and all it encompasses; a complete 360 brand

23  mentality," okay?

24         So the purpose of this task force was to build and

25  manage brands through the interplay of the various

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

73

1   departments in groups, true?

2   A    That's what it appears to be.

3   Q    And marketing was in charge, right?

4   A    I see that.

5   Q    And so if we look at the chart on the second page, if

6   you look in the middle, it says "360 brand building," and

7   this gives you all of the things that go into building a

8   brand, right?

9   A    Oh, I'm sorry.  I'm on a different page.  I'm on 02?

10  Q    We're looking at 03.

11  A    Sorry.

12  Q    I should have made that clear.

13  A    So I apologize.  I missed your question.

14  Q    Well, this gives us all of the elements that are

15  important in building a brand, right?

16  A    No, I wouldn't agree with that.

17  Q    Well, we see in the middle, "marketing," right?

18  A    I see at the top "marketing," yes.

19  Q    And "marketing" is actually standing above the other

20  items, isn't it?

21  A    I do see that.

22  Q    And then to the right we see "design, research,

23  website, PR," and that means public relations, right?

24  A    I'm sure it does.

25  Q    "Account planning, international, media planning,

1    creative, product planning, packaging, strat planning," what

2    is "strat planning"?

3    A    I assume it means strategic planning.

4    Q    "Ad agency, promotions, merchandising, entertainment,

5    licensing."

6         And if we look to the left under "What is it," we see

7    "360 Task Forces will engage in open dialogue centered on

8    building and managing complete brands sponsored by the girls

9    leadership team," and it goes into what the five guiding

10   principles will be, right?

11   A    Yes.

12   Q    So if you look at this -- back to this diagram, this

13   360 brand-building diagram, "design was just one element of

14   many," Ms. Fontanella writes, right?

15   A    I'd read these as likely to be groups of people,

16   departments.

17   Q    Okay.  Let's say they are groups of people and

18   departments.

19   A    Okay.

20   Q    And in the middle it says "360 brand building," right?

21   A    Yes.

22   Q    And you actually commissioned a pretty expensive study

23   about brand building that doesn't even mention design,

24   right?

25   A    I don't know.

1    Q    And on this wheel about the brand building, there's

2    actually nothing even here about the product being the most

3    important thing.  In fact, I'm looking for the product on

4    here.

5    A    Well, I agree.  There is not a group called "the

6    product."  It's not a function.  I'm reading these as

7    functions, which I thought you agreed with.

8    Q    And all these things go into building a brand, right?

9    A    These are different functions that work on building a

10   brand, yes.

11   Q    And you need all of them, right?

12   A    Yes -- well, I don't know that you need all of them.

13   You need multiple things, yes.

14   Q    Let's look at Exhibit 35819.

15        Is this an April 29th, 2004 e-mail from you to unknown

16   recipients entitled "Focusing on my track goals

17   organizational changes"?

18   A    Yes.

19            MS. KELLER:  Your Honor, I would move 35819 into

20   evidence.

21            THE COURT:  Received.

22            (Defendants' Exhibit No. 35819 is received in

23        evidence.)

24   BY MS. KELLER:

25   Q    Now, if we look at the fifth paragraph down, it says,

1    "Developing a strategic plan," and this is something you

2    wrote, right?

3    A    Yes, or it certainly went out under the "What's on my

4    mind, Robert Eckert" letterhead.

5    Q    And it says, "To bring more focus and additional

6    resources to the strategic planning process.  Mandana

7    Sadigm, who most recently served as SVP finance and

8    strategic planning for International, will be responsible

9    for the company's strategic planning process as SVP

10    strategic planning, reporting to Kevin Farr.

11         "As part of the realignment" --

12              (Interruption in the proceedings.)

13              THE COURT:  We -- we need to redo that.

14              MS. KELLER:  "As part of the realignment, Claus,"

15    C-l-a-u-s, "Bjerre," B-j-e-r-r-e, "has been promoted to VP

16    strategic planning.  Mike Salop will focus his attentions on

17    analyzing and evaluating mergers and acquisition

18    opportunities as SVP strategic opportunities, reporting to

19    Kevin Farr."

20              Let's look at Exhibit 9218.  This is a chain of

21    e-mails between Mike Salop, Matt Bousquette, Tim Kilpin and

22    Russell Arons of Mattel, including an e-mail from Mike Salop

23    to Matt Bousquette on June 3rd, 2004, correct?

24    A    Yes.

25    Q    And Mr. Salop says --

```
 1              MR. QUINN:  Your Honor, I object.  I think it's

 2    in evidence.  There is no foundation.  He isn't on these

 3    e-mails, hasn't been asked if he's ever seen any of them

 4    before.

 5              MS. KELLER:  And your Honor, we are going to be

 6    calling Mr. Kilpin, so I'd ask that it be admitted

 7    provisionally.

 8              THE COURT:  Conditionally, it will be, Counsel.

 9    You can refer to it.

10    BY MS. KELLER:

11    Q    At 9218-2 --

12    A    Do you want me to take a minute to see what this is?

13    Q    Yes, and I'd like to direct you to the June 3rd, 2004

14    e-mail from Mike Salop to Matt Bousquette.

15    A    Okay.

16    Q    The one that's entitled "Bratz Competitive Review."

17              THE COURT:  Now, just a moment, Counsel.

18              Would you go back up to the top?  I want to see

19    who is on this chain.

20              There is Kilpin.  All right, thank you.

21              THE WITNESS:  Okay.  I've read the June 3rd e-mail

22    from Mike Salop to Matt Bousquette.

23    BY MS. KELLER:

24    Q    And it starts, "As I think you're aware, I've been

25    asked to put together a team to analyze MGA in depth.  The
```

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 78 of 96   Page ID #:306451
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

78

1   goal is to deduct where they may be going from here and

2   derive information that could help guide our competitive

3   strategy.  The emphasis will be on Bratz, but we will also

4   try to gain a deeper understanding of MGA as a company.

5        "I'm planning to split the review into four main areas:

6   'Overview of MGA,' organization, business model, et cetera;

7   'Performance Breakdown,' segment, age group, price point,

8   geography, et cetera; 'Strategies and Operating Tactics,'

9   marketing, sales, D&D, et cetera; 'Conclusions and

10  Recommendations,' SWOT review, outlook, Mattel competitive

11  response opportunities."

12            THE COURT:  Now, let me remind the jury, we don't

13  have these persons in front of us, Mr. Kilpin, at the

14  present time, who is on the e-mail string, nor Mike Salop.

15  Technically, this is hearsay.  No cross-examination can take

16  place.  But it's been represented to me that Mr. Kilpin will

17  be called to testify, so subject to a motion to strike, the

18  only evidence to this evidence is concerning state of mind

19  of the present witness, Mr. Eckert, if any.

20            Counsel?

21        MS. KELLER:  Thank you.

22  BY MS. KELLER:

23  Q    And the next paragraph says on the second -- looking at

24  the second sentence, "We may also engage Bain for a limited

25  time to help us with some of the external analysis, customer

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

79

```
 1    relationships, terms, vendor arrangement, et cetera."
 2         So this says June of 2004, right?
 3    A    That's correct.
 4    Q    You've already sued Carter Bryant at this point, right?
 5    A    That's correct.
 6    Q    And you had people at Mattel involved in undertaking an
 7    in-depth analysis of MGA, right?
 8    A    Well, people at Mattel are apparently going to do that,
 9    yes.
10    Q    Now, obviously, if the success of Bratz is only due to
11    Mr. Bryant's designs, you didn't need to analyze MGA in
12    depth, true?
13    A    I don't think we -- I -- I thought we sued, in 2004,
14    Mr. Bryant for violating his contract and other provisions.
15    I'm not sure at that time where Bratz fit into this.
16    Q    What I'm asking you is if the success of Bratz is only
17    because of Mr. Bryant's designs, you didn't need to analyze
18    MGA in depth, true?
19    A    Oh, no.  I -- I think the company -- Mattel would still
20    be interested in analyzing competitors.  We do that all the
21    time.
22    Q    Well, this wasn't just any competitor, this was a
23    competitor that was killing you in the marketplace, right?
24    A    Well, we've analyzed virtually all competitors in the
25    marketplace.  This is certainly one of them.
```

1    Q    This particular competitor wasn't just one of them, it

2    was the one that was killing you in the marketplace, right?

3    A    This -- this is the one that was taking share from

4    Barbie.

5    Q    This is the one that was beating you at the fashion

6    doll business, right?

7    A    This is the one that was taking share from Barbie.

8    Q    And you directed Mike Salop to do this analysis, right?

9    A    I don't know that I did.

10   Q    And you also were the person who asked for the Bain

11   analysis mentioned in this e-mail, right?

12   A    I don't believe I am.  It's certainly possible, but I

13   don't think I was.

14   Q    And you know that the Bain analysis is another very bad

15   document from Mattel in this case, right?

16   A    No.

17              MR. QUINN:  Argumentative.

18              THE COURT:  In its present form, sustained.

19   BY MS. KELLER:

20   Q    You know that the Bain analysis has a number of things

21   in it that are harmful to MGA's position in this case,

22   right?

23              MR. QUINN:  Your Honor, the document speaks for

24   itself, whatever it says.

25              THE COURT:  Overruled.  It goes to state of mind.

1            You can answer the question.

2            THE WITNESS:  No, I don't.

3            *(Interruption in the proceedings.)*

4            THE COURT:  What we should do is strike everything

5    and start over, okay?  Because Jane couldn't get it with all

6    the takeovers.

7            So your object, Counsel?

8            MS. KELLER:  I'll restate it, your Honor.

9            THE COURT:  Okay.

10   BY MS. KELLER:

11   Q    You know what the Bain analysis is, don't you?

12   A    I do.

13   Q    You've read it in connection with your preparations,

14   right?

15   A    I've certainly seen it.

16   Q    When?

17   A    Well, I saw it at a -- on at least one and maybe two

18   different occasions during different depositions, and I saw

19   it in one of the binders two nights ago, or yesterday

20   morning.

21   Q    And you saw it -- and you saw it after being -- and

22   presented it to MGA at the time -- I'm sorry, to Mattel at

23   the time.

24       Really, the lack of sleep is really starting to take a

25   toll.

1           THE COURT:  You're fine, Counsel.

2           MR. QUINN:  Lacks foundation.  Assumes facts.

3           THE COURT:  Overruled.

4           THE WITNESS:  I –- I didn't recall seeing it.  I

5    certainly think it's possible I have seen it.  I think it's

6    possible I saw it before my deposition.

7    BY MS. KELLER:

8    Q    The Bain analysis was commissioned by Mattel --

9           THE COURT:  Excuse me just a moment.

10          I've already cautioned all the witnesses, and if

11   you don't know, fine.  If you do, fine.  But words like "I

12   could have, might have, possible," it has no meaning --

13          THE WITNESS:  All right.

14          THE COURT:  -- okay?

15          If you can answer the question directly, answer

16   the question.

17          THE WITNESS:  Then can I --

18          THE COURT:  So you know, "I possibly could have

19   seen it," the jury has no idea if you did or not, all right?

20          THE WITNESS:  Yes.

21          THE COURT:  So if you don't believe you have,

22   fine.  If you did, fine.  If you don't know, fine.

23          THE WITNESS:  All right.  Can I revise my answer,

24   then?

25          THE COURT:  Certainly.

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 83 of 96   Page ID #:306456
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

83

```
 1              THE WITNESS:  I don't know if I've seen it before

 2    in my deposition.

 3    BY MS. KELLER:

 4    Q    The Bain Consulting Group was commissioned to study why

 5    it was and how it was that MGA was beating Mattel at the

 6    fashion doll game, right?

 7    A    No, I don't know that that was the scope of the

 8    assignment given to Bain.

 9    Q    You've read it, haven't you?

10    A    I -- I have certainly perused it, yes.

11              THE COURT:  Referring to the Bain report?

12              MS. KELLER:  Yes.

13    BY MS. KELLER:

14    Q    You've heard of the Bain report, right?

15    A    I have.

16    Q    And you are trying to distance yourself from that

17    report, aren't you?

18    A    No.

19    Q    It has some things in it that are contrary to Mattel's

20    position in this lawsuit, right?

21              MR. QUINN:  Objection.  The document speaks for

22    itself.

23              THE COURT:  Overruled.

24              THE WITNESS:  I don't know.

25
```

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

84

```
1    BY MS. KELLER:

2    Q    The purpose of getting the Bain report was to help you

3    figure out how to get back in the lead in the fashion doll

4    business against MGA, wasn't it?

5    A    Not from what I'm reading here, no.

6    Q    Let's look at Exhibit 9218-1.

7    A    That's what I have, isn't it?  Isn't that what this is?

8              MS. PHILLIPS:  Yes.

9              THE WITNESS:  Okay.

10   BY MS. KELLER:

11   Q    Who did Mr. Salop report to?

12   A    (No audible response.)

13   Q    You don't have to look at the document.  It's just a

14   question of who Mr. Salop reported to.

15   A    He reported to different people during his career, so

16   I'm trying to think in June of 2004, most likely he reported

17   to Kevin Farr or maybe -- I -- I don't know.

18   Q    So when this says in this e-mail dated June 9, 2004,

19   "We are forming an internal team to work with Bain on

20   gaining a deeper understanding of MGA's potential strategies

21   and operating tactics," does that mean what it says?

22   A    It does to me.

23   Q    Let's look at Exhibit 25882, and this is a Mattel

24   document entitled "Project Doll kick-off meeting June 28th,

25   2004," and at the bottom, you see a production that says,
```

1    "Bain/Mattel," right?

2    A    I do.

3    Q    Now, let's look at the second page of this document.

4            MS. KELLER:  Well, your Honor, I would move 25882

5    into evidence.

6            THE COURT:  It's received.

7            *(Defendants' Exhibit No. 25882 is received in*

8        *evidence.)*

9    BY MS. KELLER:

10   Q    Let's look at the second page, "Review goals for

11   project doll.  Provide brief overview for MGA.  Discuss

12   approach and high-level time line.  Agree on team structure

13   and next steps," right?

14   A    Yes.

15   Q    And this is dated June 28th, 2004?

16   A    Correct.

17   Q    And if you look at the next page, page 3, it says, "The

18   project goals:  Develop a full understanding of MGA's

19   current operating tactics and future direction to aid

20   Mattel's competitive strategy.  Synthesize existing internal

21   Mattel findings with additional insights to develop cohesive

22   point of view and specific action plan recommendations."

23       So the whole goal of this project was to help you

24   compete against MGA, right?

25   A    I think the words speak for themselves, but I think

CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

86

1    that's a summary of that.

2    Q    Let's look at the next page, "MGA overview," and it

3    shows MGA's estimated worldwide revenue growing, right?

4    A    It does.

5    Q    Let's look at the next page after that, "MGA has

6    experienced strong growth in the U.S. due to the success of

7    Bratz," right?

8    A    Yes.

9    Q    And under "Bratz" description, under "advertising," it

10   says, "Bratz advertising is focused on an efficiency

11   strategy compared to Barbie," right?

12   A    I see that.

13   Q    The bottom, it says, "Creative approach has been

14   consistent since the beginning, girls with a passion for

15   fashion," right?

16   A    Yes.

17   Q    And let's look at page 11, and if you look at the

18   bottom left under "Organization," it says, "MGA's CEO, Isaac

19   Larian, appears to be the driving force behind the company's

20   product development and market success"; do you see that?

21   A    I do.

22   Q    Let's look at Exhibit 25907.

23   A    I have it.

24   Q    This is the June 28th, 2004, consulting agreement

25   between Mattel and Bain & Company; is that right?

1    A    Yes, it is.

2    Q    Bain & Company is a consultancy, right?

3    A    Yes, it is.

4    Q    Among other people, Mitt Romney was with Bain &

5    Company, right?

6    A    He was.

7    Q    And if we look at page 25907-7, we see it was signed by

8    Mike Salop from Mattel on July 21st, 2004, right?

9    A    Yes.

10   Q    And Russ Hagey for Bain & Company on August 5th, 2004?

11   A    That's correct.

12        MS. KELLER:  Your Honor, I'd ask to admit 25907.

13        THE COURT:  Received.

14        (Defendants' Exhibit No. 25907 is received in

15    evidence.)

16   BY MS. KELLER:

17   Q    And this is an agreement of some seven pages; is that

18   right?

19   A    That's correct.

20   Q    Now, let's look at Exhibit 35280 -- I mean, I'm sorry,

21   35820.

22        Do you recognize this as a Bain & Company invoice sent

23   to Mattel July 26th, 2004?

24   A    I do.

25        MS. KELLER:  I move 35820 into evidence, your

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 88 of 96   Page ID #:306461
CV 04-9049-DOC - 03/02/2011 - Day 26, Vol. 2 of 4

88

1    Honor.

2             THE COURT:  Received.

3             *(Defendants' Exhibit No. 35820 is received in*

4        *evidence.)*

5    BY MS. KELLER:

6    Q    And this invoice was for $422,951?

7    A    Yes, I believe it is.

8    Q    Let's look at Exhibit 8987.

9        Do you recognize that as the Bain & Company project

10   doll project update dated August 2nd, 2004?

11   A    I do.

12            MS. KELLER:  Your Honor, I would move 8987 into

13   evidence.

14            THE COURT:  Received.

15            *(Defendants' Exhibit No. 8987 is received in*

16       *evidence.)*

17   BY MS. KELLER:

18   Q    Now, this was the report that your company actually

19   paid for to do the analysis of MGA in why it was so

20   successful with Bratz, correct?

21   A    I read this as a draft of a report, or an update.

22   Q    There were actually multiple reports, weren't there?

23   A    There may have been.

24            THE COURT:  Just one moment, Counsel.

25            *(Discussion held off the record.)*

CV 04-9049-DOC — 03/02/2011 — Day 26, Vol. 2 of 4

89

BY MS. KELLER:

Q    So Bain & Company did a number of reports for you

trying to analyze for you why MGA was so successful with

Bratz compared to Mattel with Barbie, right?

A    They certainly did a number of reports, and Bratz was

certainly the topic of at least this report.

Q    Let's look at page 12 of this report, if we can, on the

right-hand side --

A    Excuse me.  This is an internal page 12?

Q    This is page 8987-00012.  It also happens to be 12 on

the report itself.

     Now, under "Advertising and Promotion" --

A    Thank you.

     I'm sorry?

Q    Under "Advertising and Promotion," it says, "In

absolute terms, MGA spends 50 percent more on media for

Bratz than Mattel does for MyScene.  However, on a per-doll

basis, MGA spends," and is that a little less-than sign?

A    (No audible response.)

Q    An approximate sign?

A    I would say it's an approximate sign.

Q    Approximate sign, "approximately 20 percent less, given

its larger sales volume."  And then underneath that, it

says, "Retailers report that MGA is much more flexible in

its terms; i.e., more willing to take back inventory,

```
 1    offering individual SKUs instead of predetermined

 2    assortments, shipping domestic at DI rates, et cetera."

 3    What is "DI" rate?

 4    A     Direct import.

 5    Q     And retailers like it when companies are more flexible

 6    in their terms, don't they?

 7    A     I think yes, they do.

 8    Q     I mean, retailers don't want companies to be rigid in

 9    their terms, right?

10    A     Right.

11    Q     And under "Logistics," it says, "Assumes Bratz doll is

12    shipped DI, shipping DI estimated to reduce shipping cost by

13    15 to 20 percent due to better shipping rates of retailers."

14          Now, that is something that MGA did that Mattel didn't

15    do, right?

16    A     No.  Mattel also sells products on DI, or direct

17    import.

18    Q     Let's go back to under "Advertising and Promotion"

19    where it says, "Retailers report that MGA is much more

20    flexible in its terms."  It says, "much more flexible in its

21    terms," it meant much more flexible than Mattel, right?

22    A     Let me just read the context, because it doesn't say

23    that, so let me see what this page is saying.

24          I think that's a reasonable conclusion, yes.

25    Q     And in fact, what this is do specifically is it's
```

1    comparing Mattel's MyScene brand to the Bratz brand, right?

2    A    Yes, it is.

3    Q    And it's telling you why it is that Bratz is more

4    successful, true?

5    A    No.  It's stating a bunch of numbers and findings, so

6    it's saying what the findings of whatever this page of the

7    study is about.

8    Q    Well, the purpose of the study was to help you

9    understand why you were being beaten at the stores by MGA

10   with the Bratz brand versus your MyScene brand, that's what

11   this is about, right?

12            MR. QUINN:  Lacks foundation, your Honor.

13            THE COURT:  Overruled.

14            THE WITNESS:  That's not how I just read the

15   document that outlined the purpose of the study.  No, I

16   wouldn't agree with that.

17   BY MS. KELLER:

18   Q    Let's look at what's called "Ex-factory."  "Bratz

19   spends more on packaging and soft goods as well as adds one

20   or two more accessories per box.  That's a good thing to

21   buyers, isn't it?

22   A    I don't know about packaging, but adding accessories

23   per box could be a good thing, yes.

24   Q    And in fact, you ended up copying that tactic, didn't

25   you?

1    A    No.

2    Q    And under "D&D," that stands for design and

3    development, doesn't it?

4    A    Yes.

5    Q    It says, "Estimated based on the percentage of D&D

6    outsourced to Hong Kong and the prevailing labor rates

7    versus U.S. based design"; what does that mean?

8    A    I believe it means that someone calculated the cost of

9    labor in Hong Kong compared to the cost of labor in the

10   United States for the design and development function.

11   Q    Let's look at 8987-15.

12        Here is another comparison chart comparing Mattel

13   MyScene to MGA Bratz, right?

14   A    Yes.

15   Q    And on the right, it says under "Findings," "Large

16   retailers prefer to buy product DI versus domestic," right?

17   A    Yes.

18   Q    And that's because they can save on shipping costs,

19   right?

20   A    It might be a function of economics, or it might be a

21   function of other things.

22   Q    Well, let's look immediately to the right under

23   "Prospectus," where it says --

24              MR. QUINN:  Your Honor, this is hearsay within

25   hearsay.

 1              THE COURT:  Overruled.

 2    BY MS. KELLER:

 3    Q    Where it says, "Lately, there has been a shift towards

 4    offering product on a DI basis to larger retailers like

 5    Walmart, Target and Toys R Us because they get better

 6    shipping terms.  Those retailers save on shipping cost, and

 7    thus, boost their margins by shipping product themselves."

 8         Now, you knew that MGA was shipping its -- allowing

 9    retailers to buy its product DI so they can save money on

10    shipping, right?

11    A    That's what this says, yes.

12    Q    And you knew that that was a competitive advantage MGA

13    had over you, right?

14    A    No.  As I also said, Mattel also sells products on DI.

15    Q    Well, but you were not selling the vast majority of

16    your products on DI, true?

17    A    (No audible response.)

18    Q    If you know.

19    A    True.

20    Q    Now, if you go to the next finding, it says, "MGA ships

21    the majority of its product FOB Hong Kong; i.e., DI."  And

22    then on the right, we see girls toy buyer from Costco quoted

23    as saying, "Buying FOB Hong Kong is preferable because it's

24    cheaper for us to ship than for a smaller company like MGA,

25    and plus, it gives us more flexibility to ship to different

 1    U.S. locations.  We buy most of our MGA product FOB; with

 2    Mattel, it's a mixed bag."

 3            THE COURT:  Now, remember, once again, let me

 4    continually caution you that this is not for the truth.  We

 5    don't have these people here.  It's for state of mind.

 6    Mr. Eckert can testify.

 7    BY MS. KELLER:

 8    Q    So Bain is telling you that there is yet another

 9    competitive advantage that MGA has in the analysis you paid

10    Bain to do, right; the FOB issue, true?

11    A    No, I don't -- I don't necessarily conclude it's

12    competitive advantage.  I see what the words say, which is

13    they -- MGA ships all of its products FOB, with Mattel, it's

14    not all of its product.  I agree with that.

15    Q    And if we go to the next finding, it says, "MGA is

16    willing to price DI for domestic sales to please some

17    retailers," and to the right, a lead toy buyer from Target

18    is quoted as saying, "This year, MGA offered us domestic

19    product at the same price as DI.  This is yet another

20    example of MGA being more flexible with us than other

21    manufacturers," right?

22    A    Yes.

23    Q    So that was another competitive advantage Bain was

24    telling you in the study you paid for that MGA had over

25    Mattel, right?

CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

95

1    A    Yes.

2    Q    And if you look at the graph on the left where it

3    compares MGA Bratz to Mattel MyScene, you see under

4    "Estimated percent of product shipped DI," 80 percent for

5    Bratz and 30 percent for MyScene, right?

6    A    Yes.

7    Q    Now, let's look at this same document, 8987-16.

8         Oh, and before we leave that, to your knowledge, Carter

9    Bryant wasn't involved in MGA's shipping, right?

10   A    I don't know.

11   Q    Do you have any information that he was?

12   A    No, I do not.

13   Q    And your information was that he was a designer, right?

14   A    That's correct.

15   Q    So going to page 16, this is a comparison of Bratz and

16   MyScene as they appear in stores on store shelves, right?

17   A    Yes.

18            *(Live reporter switch with Maria Dellaneve.)*

19                          –oOo–

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10126   Filed 03/04/11   Page 96 of 96   Page ID #:306469
CV 04-9049-DOC – 03/02/2011 – Day 26, Vol. 2 of 4

96

1                              –oOo–

2                           **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  March 3, 2011

12

13

14                     _____

                       JANE C.S. RULE, U.S. COURT REPORTER
15                     CSR NO. 9316

16

17

18

19

20

21

22

23

24

25