Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

| | | |
|---|---|---|
| MATTEL INC., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DAY 26 |
| vs. | ) | No. CV 04-9049-DOC |
| | ) | 3 OF 4 |
| MGA ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

WEDNESDAY, MARCH 2 , 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

 1    **APPEARANCES OF COUNSEL:**

 2    **FOR THE PLAINTIFF:**   QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                              BY:  MICHAEL ZELLER, ESQ.
 3                            and  JOHN QUINN, ESQ.
                              865 S. FIGUEROA
 4                            10TH FLOOR
                              LOS ANGELES, CALIFORNIA 90017
 5                            (213)443-3000

 6
      FOR THE DEFENDANTS:   ORRICK, HERRINGTON & SUTCLIFFE
 7                            BY:  ANNETTE HURST, ESQ.
                              405 HOWARD STREET
 8                            SAN FRANCISCO, CALIFORNIA 94105
                              (415)773-5700
 9

10
      FOR THE DEFENDANTS:   ORRICK HERRINGTON & SUTCLIFFE
11                            BY:  THOMAS MCCONVILLE, ESQ.
                              4 PARK PLAZA
12                            SUITE 1600
                              IRVINE, CALIFORNIA 92614
13                             (949)567-6700

14
                              KELLER RACKAUCKAS
15                            BY:  JENNIFER KELLER, ESQ.
                              18500 VON KARMAN AVENUE
16                            SUITE 560
                              IRVINE, CALIFORNIA 92612
17

18
      FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                            BY:  MARK OVERLAND, ESQ.
                              100 WILSHIRE BLVD
20                            SUITE 950
                              SANTA MONICA, CA. 90401
21                            (310) 459-2830

22

23

24

25

```
 1                          - AND -

 2                 SCHEPER KIM & HARRIS LLP
                   BY:  ALEXANDER COTE, ESQ.
 3                 601 WEST 5TH STREET_12TH FLOOR
                   LOS ANGELES, CA. 90071
 4                 (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6b8f7240-07c5-450d-a0a2-82dda8e477a8

1                          I N D E X

2
    PLAINTIFF'S                                                    VOIR
3   WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS   DIRE

4   ROBERT ECKERT                       5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6b8f7240-07c5-450d-a0a2-82dda8e477a8

1          SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 2, 2011

2                CROSS-EXAMINATION (CONTINUED)

3   BY MS. KELLER

4   **Q**   And the Bain study that you paid for says, "Bratz has a clear

5   brand identity in stores.  Bratz dolls have distinct look.  Wall

6   of purple."

7          And under "My Scene" it says, "Difficult to distinguish

8   My Scene from Barbie."

9          So that's yet another analysis that Bain is doing to

10  tell you why Bratz appears to be selling better than My Scene;

11  right?

12  **A**   I don't draw that conclusion, but the words say, here is the

13  look of Bratz and here is the look of My Scene.  I see that.

14  **Q**   You agree that having a clear brand identity is a good thing;

15  right?

16  **A**   Yes.

17  **Q**   And you agree that adding a product like My Scene that's

18  difficult to distinguish from Barbie was a bad thing; right?

19  **A**   No, I don't agree with that.

20  **Q**   When you are directly trying to compete with Bratz, true?

21  **A**   I don't agree with that.

22  **Q**   Okay.  Let's look at page 23.  Now, this entire page is

23  devoted to how much time MGA is able to save in getting a product

24  to market; right?

25  **A**   Yes.

1   **Q**     And the conclusion here was that MGA was pretty darn

2   efficient in getting its products designed and to market; right?

3   **A**     Yes.

4   **Q**     And in fact, if you look at the comparison of the two bars on

5   the left, how long it takes Mattel to do that versus how long it

6   takes MGA to do that, you see that Mattel takes around 11 months;

7   right?

8   **A**     I do.

9   **Q**     And MGA only seven?

10  **A**     I do.

11  **Q**     Now, in the toy business being able to design a product and

12  get it to market quickly gives a person a competitive advantage;

13  right?

14  **A**     It can.  Speed is a benefit.

15  **Q**     And one reason it's a benefit is because children's taste can

16  change quickly?

17  **A**     That's correct.

18  **Q**     A trend or a fad can catch on and grow like wild fire; true?

19  **A**     Yes.

20  **Q**     If the toy company can respond to that quickly, that's

21  advantageous; isn't it?

22  **A**     Yes.

23  **Q**     And so, if you look at this page, under "MGA Method U.S.

24  design," it says, "Approval of concepts is undertaken by small

25  team based on limited testing.  Time saving:  Two to four weeks."

Page 7

1          And then under "Perspectives," it says, "MGA approval

2    process involves a maximum of five people."

3          Underneath that it says, "MGA are huge on testing.  They

4    test" -- I'm sorry.  "Mattel are huge on testing.  They test more

5    than anyone else."

6          Now, let's look back to the MGA Method column, Hong Kong

7    design.  MGA usually hands over a drawing to HK.  Mattel often

8    creates a 3D model in U.S. and HK.

9          Look at the time saving.  Three to four weeks; right?

10   **A**    Yes.

11   **Q**    So, MGA is able to do the design three to four weeks faster

12   than Mattel, true?

13   **A**    Yes.

14   **Q**    And let's look down underneath that on the left.  It says,

15   "Design team with decision-making power.  A company's designs to

16   HK and work with manufacturer directly for cost and samples."

17         That's under MGA Method; right?

18   **A**    That's correct.

19   **Q**    And that saves two weeks over Mattel's Method, true?

20   **A**    Correct.

21   **Q**    And on the right, a freelance girl's toy designer is quoted

22   as saying the big disadvantage that Mattel has is that they are

23   more bureaucratic.  So, obviously, if a company is nimble and

24   quick, that's an advantage over a company that's bureaucratic;

25   right?

Page 8

1    **A**    Yes.

2    **Q**    Under "Executive Approval," MGA Method happens once sample's

3    returned to U.S.  Usually only take a few days.  And the time

4    saving over Mattel was four weeks; right?

5    **A**    Yes.

6    **Q**    And on the right it says "senior decision-making is the

7    number one hold up with large companies like Mattel."  And under

8    that, "The big variable between Mattel and MGA is the approval

9    process."

10           And that's another competitive advantage, if executive

11   approval can be gained quickly rather than held up; right?  Gives

12   the company a competitive advantage?

13   **A**    It's an advantage, yes.  Yes.

14   **Q**    And under "Engineering," it actually takes MGA a little

15   longer than Mattel -- two weeks -- because it says, "Some

16   iteration between U.S. and HK."  If we look over on the right, "it

17   actually takes a little longer to do the manufacturing side of

18   development in Asia because coordination from here U.S. is more

19   difficult."

20           So Mattel had an advantage over MGA there; right?

21   **A**    That's how I would read this, yes.

22   **Q**    And under "Packaging" it says, "Ready at production start."

23   And then if you look at the time saving of MGA over Mattel, four

24   weeks, true?

25   **A**    Yes.

1    **Q**    And if you look at the source on the left-hand side at the

2    bottom, the source for all these comments, it says, "Toy industry

3    interviews Mattel employee interviews."

4            So Bain had access to your employees to interview to

5    come up with its conclusions; right?

6    **A**    That appears to be the case, yes.

7    **Q**    Let's look at page 32, 08987-00032.

8    **A**    Okay.

9    **Q**    And this gives you the Bain consultancy's conclusions about

10   all the advantages that MGA has over Mattel; right?

11   **A**    I don't know yet.  May I take a minute to read it?

12   **Q**    Absolutely.

13   **A**    (Witness reads document.)

14           There is no real heading on this at all.

15   **Q**    These are really more recommendations for -- these are

16   recommendations for Mattel to catch up to MGA; right?

17   **A**    I don't know.  So may I take a minute to read it?

18   **Q**    Sure.

19   **A**    (Witness reads document.)

20           No.  So that's not how I read this.  I don't read that

21   at all.

22   **Q**    Let's move on to the page I actually had in mind, which was

23   page 35.

24   **A**    Okay.

25   **Q**    08987.  And this gives you summary findings comparing MGA's

Page 10

1    Bratz versus Mattel's My Scene; right?

2    **A**    Yes.

3    **Q**    And I take it that the little circles that are all filled in,

4    in black, on the left are better to have than the little circles

5    that are only partially filled in on the right.  If we look, for

6    example, on the bottom where it says "Flexibility with retailers.

7    MGA invests in making retailers happy doing things such as

8    creating special in-store supplies, selling individual SKU's

9    instead of assortments, paying the difference between DI and

10   domestic shipping themselves."

11           And you can see that the little circle is all filled in

12   on the left for Bratz and only a quarter filled in for My Scene?

13   **A**    Yes.

14   **Q**    And that tells you that in the Bain consultant's opinion the

15   Bratz brand wins out there; right?

16   **A**    Yes.

17   **Q**    And if you look at Bratz, the brand, right above that, "Bratz

18   has rapidly extended its brand offering products in a broad range

19   of categories."  Underneath that it says, "My Scene brands

20   extensions remain quite limited."

21           So it looks like Bratz beats My Scene in that one, too;

22   right?

23   **A**    Yes.

24   **Q**    And if you look above that, "Presentation in aisle.  Bratz

25   often appears as a single unified brand within a store with dolls

1   and lifestyle products alongside one another."

2          Underneath that it says, "My Scene tends to be

3   interspersed among other Barbie products and doesn't appear as a

4   cohesive brand."

5          So Bain gives Bratz better marks to that category, too;

6   right?

7   **A**    Yes, it does.

8   **Q**    Under "Retail Margins.  Bratz offers more attractive margins

9   to its retail partners making it more lucrative for them to sell a

10  Bratz doll versus a My Scene doll."

11         Bratz wins that one, too; right?

12  **A**    Yes.

13  **Q**    And then on top, "Advertising support.  In countries where My

14  Scene has advertised more heavily than Bratz, Bratz has not done

15  as well.  MGA has ramped up Bratz U.S. advertising while My Scene

16  is on the decline."

17         So Bain gives Bratz the better marks on that one, too;

18  right?

19  **A**    Yes, it does.

20  **Q**    Now, nowhere on this page is there any mention of Carter

21  Bryant; right?

22  **A**    That's correct.

23  **Q**    And nowhere on this page is there any mention of Carter

24  Bryant's drawings; right?

25  **A**    That's correct.

1   **Q**    Now, let's look at -- basically if you go through this Bain

2   report, Mr. Eckert, you can see that in category after category,

3   the Bain consultants you hired tell you that MGA was just

4   outperforming Mattel; right?

5   **A**    No.  The pages we just talked about to me were a comparison

6   of Bratz and My Scene.

7   **Q**    Yes.  And over and over again Bratz was beating My Scene;

8   right?

9   **A**    Yes.  In the MGA -- in the -- now I'm doing it.  In the Bain

10  conclusion I agree that's what it said.

11  **Q**    But a lot of these observations that the Bain consultancy

12  made weren't limited just to the My Scene brand.  Things like

13  flexibility, making retailers happy, advertising.  Those were

14  things across the board where MGA was beating Mattel; right?

15  **A**    No, I don't agree with that at all.

16  **Q**    Do you see anywhere in the Bain analysis the statement,

17  "MGA's success is because of the original drawings?"

18  **A**    It's going to take me a minute to read through this.  I

19  certainly see on page 10 that -- where it says, "believe to have

20  been on the verge of bankruptcy in 2001 prior to the takeoff of

21  Bratz," and I see the entry in the girls doll Bratz in 2001 --

22          **MS. KELLER:**  Your Honor, move to strike the answer as

23  nonresponsive.

24          **MR. QUINN:**  He hadn't finished the answer, Your Honor.

25          **THE COURT:**  Overruled.

1    **THE WITNESS:**  It seems to me that's directly related to

2  Carter Bryant's designs, the Bratz dolls are.

3    **MS. KELLER:**  I would move to strike the answer as

4  nonresponsive.

5    **THE COURT:**  Overruled.  Re-ask the question.

6  BY MS. KELLER

7  **Q**    Let's take a look at page 10 and you tell me where it says

8  the words "Carter Bryant."

9  **A**    It doesn't.

10  **Q**    Let's take a look at page 10 and see where it says the words

11  "drawings."

12  **A**    It doesn't.

13  **Q**    Let's take a look at page 10 and tell me where it says

14  anything about original designs responsible for success of Bratz,

15  anywhere where those words appear?

16  **A**    The words don't appear.

17  **Q**    Thank you.  Now, I'm going to turn to a different concept.

18  You know the concept of something called "statute of limitations?"

19  **A**    I do.

20  **Q**    And a statute of limitations, your understanding is, means

21  that you have a limited amount of time in which to file a lawsuit

22  or the time limit will bar the filing of a lawsuit, true?

23  **A**    I don't know that it bars the filing of a lawsuit.  That

24  wouldn't be my understanding, no.

25    **MS. KELLER:**  Your Honor, my helpful colleague has just

Page 14

1   pointed out that it has reached 3:15.

2        **THE COURT:**  I think we're leaving at 3:30, but if you

3   want to -- at 3"30 she was going to leave.  If this is a

4   convenient time to break before you get into this area, we can do

5   so.

6        **MS. KELLER:**  That's fine, Your Honor.

7        **THE COURT:**  Why don't we just do that.  You're

8   admonished not to discuss this matter amongst yourselves or form

9   or express any opinion concerning the case.  We'll see you

10  8:30 tomorrow.  Please drive safe.

11                         (Jury out.)

12       **THE COURT:**  The jury is no longer present.  Counsel, if

13  you would just have a seat for just a moment.  Let's clear up the

14  record concerning your concern about 1808, please.  Would you put

15  that up on the --

16       **MR. QUINN:**  I think it's 8098 -- I'm sorry, Your Honor.

17  Were you going to -- the last one?

18       **THE COURT:**  And I thought it was 1808, but I could

19  certainly stand corrected.  And I thought you were concerned about

20  the last paragraph.  Let me look back at my notes, and perhaps I'm

21  wrong on that.

22       **MR. MCCONVILLE:**  2302, Your Honor.

23       **MR. QUINN:**  2302 was the one that had the newspaper

24  article.  It was to have been redacted.

25       **THE COURT:**  It's the concern that Mr. Zeller had over

1    the last paragraph involving a third-person lawsuit.

2              **MR. QUINN:**  That was 80980.  That's up on the screen

3    now.

4              **THE COURT:**  Could you blow up the bottom portion.  8980,

5    beginning with "Aggressive intellectual property plan protection

6    external Simba.  Others as appropriate will be stricken."

7              And I'm happy to do that in front of the jury, counsel,

8    but I can strike it out of their presence and have it excised.

9              **MR. QUINN:**  Out of their presence, Your Honor.  The

10   testimony about it as well.

11             **THE COURT:**  And the testimony will be stricken also.  In

12   case of a read-back, it won't go in front of the jury.

13             Now, let me explain to whatever reviewing court what is

14   occurring, because there are a number of mistakes, and they're

15   occurring because of this Court's courtesy towards counsel.

16             The lawsuit began with a request by counsel to be able

17   to display some segment of the 40000-plus exhibits by the

18   respective parties during the lawsuit.  That also included,

19   historically, a request by both parties to put on a PowerPoint

20   presentation.  At one time the Court believed that there was an

21   accord between the parties that that was going to take place.  And

22   my impression, although not a finding, was that Mattel had agreed

23   that and former counsel for MGA had agreed to that.  But with new

24   counsel coming in to the case, the new counsel did not consent.

25   That's not a finding, but that was the Court's impression.

1          Also, the Court was going to historically use its own

2    screens, but counsel had requested a 60-foot screen.  And under

3    the circumstances I thought that that was an appropriate request

4    because of the number of documents and the ease.  And I do

5    compliment counsel on the presentation.

6          In addition, it was apparent to this Court if I

7    undertook this task, that there would be some error along the way

8    in affording counsel this courtesy with the number of documents

9    the Court and counsel have undertaken to -- in attempt to review

10   in a cursory fashion each exhibit for each witness sometime prior

11   to their testifying.  But that review is rather cursory.  It's a

12   review that familiarizes the Court with different exhibits and

13   gives the Court some inclinations of what is about to occur, but

14   it's certainly not a thorough reading of each e-mail string, or

15   each report, or each exhibit, which would be almost impossible for

16   lead counsel and the Court to undertake.  But it gives the Court

17   fair warning of what the primary areas of objection are going to

18   be.

19         Now, because counsel are on a running clock and we have

20   literally jurors who are sacrificing a good part of their

21   well-being to the case, the Court decided that taking the time and

22   mistrusting counsel in terms of their presentation would eat up a

23   good portion of this time.  So historically and traditionally

24   there would be a request by one counsel to have the Court receive

25   an exhibit while a witness was testifying.  But if I took what I

1   called the traditional approach, I would simply have not received

2   the evidentiary item at the time that the party either examining

3   or cross-examining the witness wished to do so.  And therefore, I

4   thought that with the representation of counsel, that they truly

5   needed this for their representative cases; that this was a wise

6   thing for the Court to do.

7         What that does, though, for the Court when it extends

8   that courtesy, it inherently causes a certain amount of error,

9   because the Court cannot listen to the evidence, take notes, nor

10  dig through the volumes of exhibits at the same time.  And if I

11  examine each exhibit -- which I'm more than willing to do --

12  before its receipt in detail, literally counsel's time would be

13  eaten away.  120 hours is extraordinary for both sides and it's

14  ample time, in this Court's opinion.  In fact, if the case was

15  retried, I would probably cut it down 10 to 20 hours.

16        Second, the reviewing Court should know that this Court

17  has tried to segment out lead counsel at different times.  The

18  reason for that is I think that if I have all counsel in here on

19  all occasions -- Mr. McConville, Ms. Hurst, Ms. Keller on the MGA

20  side; Mr. Cote, Mr. Overland, representing Machado; and Mr.

21  Zeller, Mr. Price, and Mr. Quinn on the Mattel side -- that

22  literally counsel would be exhausted in a short period of time.

23        So therefore, the Court has allowed one lead counsel to

24  be present with support counsel, and on most occasions has tried

25  to let lead counsel go home, in particular Mr. Price, because of

Page 18

1   some needs; and Ms. Keller because, frankly, she was trying to

2   catch up with the case.  And I think Mr. McConville has been here

3   most of the time.  Mr. Quinn, Mr. Zeller and Ms. Hurst all the

4   time.

5          What that that's caused on occasion is a disconnect, and

6   the Court is not finding any fault with this.  I don't think any

7   counsel has intentionally put a document up on the screen.  On

8   most occasions the Court has not ruled because I didn't want to

9   bring in court reporters.  I didn't want to give an indication of

10  the Court's ruling, although there have been some occasions where

11  an in limine motion was apparent and one of these was the last

12  occasion with Mr. Zeller and Mr. McConville.

13         That's also happened, though, on the reverse side with

14  Mattel on occasion, putting up a document.  So I don't see how

15  this has caused prejudice to either side.  I don't see how this

16  has opened the door to Hong Kong.  It's irrelevant.  And the

17  error, if there is, is absolutely harmless.  This document was put

18  up.  Frankly, you couldn't read it on the screen because you

19  didn't blow it up.  I couldn't read it when it was put up.  And

20  therefore, it's going to be stricken and nobody has any idea what

21  Simba is.  So, that's not the opening to drive the truck through

22  the building.

23         So, it's really an explanation of what is occurring

24  here.  Because if the Court takes a different task, your 120 hours

25  would probably be 85 to 90 hours of actual working time.  But it's

1   really an explanation why this can never be the perfect case if

2   the Court's going to attempt to accommodate counsel in the

3   presentation so they're able to put up a slide in relation to the

4   witness' testimony on direct or cross-examination.  And I

5   recognize that inherent problem right from the beginning.  That's

6   why I initially hesitated to have you put up any slides.

7           I thought, though, with all the years I spent in trial,

8   that it was much better that the Court take that chance.

9           And I'll remind you, counsel, I can't get to 26

10  notebooks when Mr. Larian is on direct, or 23 notebooks when he is

11  on cross, or when Mr. Eckert is on the stand, 12 notebooks on one

12  side and eight on the other, or Machado, etcetera.  So therefore,

13  I have had to depend upon counsel.

14          I find this error to be harmless, but it's just an

15  explanation of why the disconnects are occasionally occurring.  I

16  do not deem that they're intentional.  And I think, quite frankly,

17  it's somewhat balanced out.  There have been a few slips by Mattel

18  and a few slips by MGA, and the Court is not affronted by it.

19          I'm going to choose to continue in this way because I

20  think that for whatever inherent problems the Court will have,

21  that the presentation by both of you is enhanced by the ability to

22  show a document to Mr. Larian, Mr. Price, or to Mr. Eckert, Mr.

23  Quinn, or Ms. Keller to Mr. Larian, or Mr. McConville to whomever.

24          But I do want the circuit to recognize that courts take

25  a tremendous risk in doing that because there will be an increased

1   amount of error because the Court can't get to the document

2   quickly enough without 40,000 exhibits or I end up breaking

3   counsel's back.  Because Mr. Price, you would be here all the

4   time.  Mr. Quinn would be here all the time.  Mr. Zeller would be

5   here all the time.  And what would happen is you would never get

6   any rest.  I don't have to rest, but I like somebody on Mattel's

7   side to be fresh.  And the same courtesy on the MGA side.

8           Ms. Keller, you would have never caught up with this

9   case, frankly, if you would have kept my normal hours.

10          Now, I'm not going to grandstand, but I am going to

11  say -- and I'll repeat this.  And it's not an affront to any of

12  you.  You really are the fortunate attorneys coming in here

13  regardless of your volume.  The Aryan Brotherhood had well over

14  300,000 documents.  This was an eight-month trial with Mr.

15  Overland.  And all you have to do is get Mr. Overland on the

16  record to tell you about six consecutive weekends on the record

17  that we spent with the Mexican Mafia, or Mr. Stewart was six

18  consecutive weekends.

19          So, I actually think you are very fortunate in this

20  regard and that is, in a criminal matter we had to bring in court

21  reporters on those weekends, and at night we had to go literally

22  to the point of exhaustion.  I try to guard you because I want

23  your best performance.  I don't have to perform.  I'm not in the

24  mosh pit of litigation anymore.  But I have been there enough

25  times to know that I can't get you to the breaking point and have

1   your best performance.  I will make the record, though, you are

2   not close yet, although some of you are getting a little tired.

3           So having made that record, we're simply going to strike

4   that bottom portion.  The jury couldn't read it, has no

5   understanding what Simba is.  There is no follow-up direction, and

6   it's harmless error.  But I just caution everybody.

7           When we see something obvious, Mr. Zeller, like you saw

8   and called it to our attention, it should be noted.

9           Here is what I'd like to do this evening:  I'd like to

10  get Mr. Wagner in almost immediately.  And I'm going to take about

11  a five-minute break, let you use the rest rooms, etcetera, and

12  then let's get right back to Mr. Wagner with all counsel present

13  for a moment.  After you conclude your argument, I want a couple

14  minutes to read a couple things I have prepared for both parties,

15  depending upon your argument, Mr. Zeller.  And then I want to give

16  very brief rebuttal.

17          But I'm not going to limit you again.  If you want to

18  keep going, that's fine.  But I just encourage you to make it

19  concise.  Right after that, I'd like to pay you the courtesy of

20  getting to the young man who has been three consecutive nights, or

21  two consecutive nights, counsel, and try to get some idea of what

22  his testimony is this evening.

23          Now, finally, I want to take this impression because of

24  Mr. Larian and Mr. Eckert.

25          You have asked me, Mr. Quinn, not to make a comment to

Page 22

1   the jury, and in some ways I agree.  But here is the detriment and

2   benefit to both sides.

3          Mr. Larian, you don't have to be here.  You have chosen

4   to be here and I think that's a wise position, quite frankly.  I

5   mean, the jury sees you are involved.  This involves your company,

6   for goodness sakes.  And I know it's a tremendous hardship to you.

7   And so you are encouraged to be here, but you haven't been ordered

8   by the Court.  In a civil matter, you can come and go, and you

9   know that.  That's a choice.

10          Mr. Machado is in the unique position of the Court

11   having to write letters to the judge in Mexico getting

12   Mr. Machado's presence here.  And I think I have got Mr. Machado's

13   presence for two weeks.  He'll probably go back and probably be

14   back again, and I'll talk to Mr. Overland about that.

15          Not finding any fault with either party, but Mr. Larian,

16   you are right, Mr. Quinn, is not the representative by

17   designation, but I do have the power to make that choice.  I

18   choose not to.  Lily Martinez?  Lily Martinez.  But I'm going to

19   take away from both of you this advantage or disadvantage, because

20   20 to 30 percent of trial work are literally impressions made that

21   you never capture on the record just in terms of fairness and

22   balance.

23          Now, how I'm going to handle that, I'm not certain yet.

24   I don't know yet if I'm going to instruct the jury or tell the

25   jury, frankly, Mr. Larian, that you have been welcome to be here

1    the whole time; you haven't been required to.  That's not going to

2    have any benefit or detriment to you.  That's a choice.  I may

3    choose, and I'm not certain yet, to tell the jury at the same time

4    that Mr. Eckert was, in fact, excluded as a witness; appropriate

5    representative was appointed but, in fact, that Mattel had the

6    choice of designating Mr. Eckert to be here.

7           But I'd like to take the high road in that unless you

8    force me into a box with both counsel, because if you leave me to

9    my own devices without the usually bickering, I am now going to

10   require Mr. Eckert to be here and I am going to require Mr. Larian

11   to be here.

12          Now, if you two gentlemen reach an accord that Mr.

13   Eckert has an important meeting on behalf of Mattel -- he is a

14   public company -- he can attend that meeting.

15          And if you need to be some place next week like you

16   indicated, Mr. Larian, and you and Mr. Eckert reach that accord --

17          **MR. LARIAN:**  We are going out to dinner tonight.

18          **THE COURT:**  You can go out to dinner, both of you,

19   tonight. I'd like to get a photograph of that.  But that's between

20   you two gentlemen.  In other words, no harm.  But what I won't

21   hear is the argument that somehow one person represents a public

22   company and therefore is more needed than another person who has a

23   private company who is just as needed.

24          And I will be adamant that while I respect each of you

25   gentlemen greatly, I'm more concerned about my jury and calling

1    folks who are middle class to lower middle class coming in and

2    serving in this capacity to try to resolve this lawsuit.  And it's

3    been a tremendous detriment to this jury and obviously their

4    employers of which I'm going to attempt to write letters to

5    tonight and thank them.  I'm going to work that out in the next

6    day or two.  I don't want to do that in the middle of Mr. Eckert's

7    testimony and I want to think about how to handle that.

8              But I'm certainly open to informal input from both of

9    you later on.  But I probably will say something to the jury to

10   make sure this is balanced out.  And I may simply take the high

11   road that both of you gentlemen have agreed that you want to be

12   here rather than being ordered to be here.  But we're going to

13   balance this impression out very, very quickly because I know you

14   are each rightfully concerned.

15             Now, I need about a 10-minute recess just to give you a

16   break for a moment.  And is Mr. Wagner here?  Why don't we meet at

17   about 10 minutes, okay.

18             And let's get your argument, Mr. Zeller, at that time.

19   Take your time.  You are under no time constraints.  Ms. Hurst was

20   not under a time constraint last evening.  Okay, thank you.

21             (Recess taken, from  3:41 to 4:03.)

22             **THE COURT:**  Mr. Wagner is still sitting here, Mr.

23   Eckert.  I don't think they're needed for the night session,

24   counsel.

25             **MR. LARIAN:**  I'd like to be here.

1            **THE COURT:**  You are more than welcome to.  You are to

2     not required to.

3            Mr. Eckert, you are more than welcome to, you're not

4     required to.

5            Mr. Wagner, do you recall the oath that was still

6     administered?

7            **THE WITNESS:**  I do, Your Honor.

8            **THE COURT:**  Two days ago?

9            **THE WITNESS:**  It was, Your Honor.

10           **THE COURT:**  Excellent.  This is Mr. Zeller and Mr.

11    Zeller's examination.

12           **MS. HURST:**  Your Honor, they concluded their exam last

13    night.

14           **THE COURT:**  No.  Mr. Zeller never, ever -- I'm sorry.

15    Not examination.  The argument.  Thank you.

16           **MS. HURST:**  Can we excuse the witness for argument, Your

17    Honor?  He was excused last night.

18           **THE COURT:**  But I'm going to have more questions of you,

19    trust me.  Wait outside for a moment.  Let Mr. Zeller argue.  My

20    apologies to you.  I already had you up on the stand because I had

21    a number of questions for you.  Let me wait until Mr. Zeller is

22    done and maybe I don't have any questions.  Thank you.  I

23    appreciate your courtesy, sir.

24           Mr. Zeller.

25           **MR. ZELLER:**  Thank you, Your Honor.  I'd like to start

Page 26

1   off with just some general principles, because I think they get us

2   fairly far in this context as to where we are exactly in this

3   process.  As the Court is aware, the basic standard for copyright

4   as well as trade secret damages is that it is the plaintiff's

5   burden to put on evidence of revenue; revenue that has connection

6   to the claimed infringement or misappropriation.  And that is

7   pretty much the extent of the plaintiff's burden.  At that point

8   it becomes the defendant's burden to deduct costs, make arguments

9   as to why costs ought to be deducted and to make arguments about

10  apportionment.

11          This is reflected very clearly in the Ninth Circuit

12  copyright instructions.  And this is 17.24 copyright damages

13  defendant's profits which, of course, is unjust enrichment as

14  sometimes we're calling it, other times called disgorgement.

15          THE COURT:  So in other words, if we hadn't gone any

16  further into misappropriation, from your perspective the burden

17  shifts back to MGA?

18          MR. ZELLER:  Correct.

19          THE COURT:  Were you planning to go any further into

20  this apportionment on your direct examination?

21          MR. ZELLER:  Well, we would like to.  But part of the

22  where I'm headed with this is that theoretically we could put Mr.

23  Wagner up.  He could talk about what those revenues are, and we

24  can say we met our burden.

25          I don't think that the debate or issue should be whether

1    or not he is excluded from talking about MGA's profits.  I mean,

2    to some degree, because our burden on this is simply in the first

3    instance to come forward and say, here is the profits, that that

4    can't really be, I think, excluded you based on these

5    controversies that MGA is raising about apportionment or other

6    issues.

7              My point is fundamentally that at a bear minimum I think

8    Mr. Wagner is entitled to testify on that issue as to MGA's

9    profits.  And I think the Court has commented this.  There is

10   something -- I don't know if the word is an irony, but there is

11   some aspect here where what Mr. Wagner is attempting to do is

12   apportion MGA's challenging that, but this reduces the amount that

13   Mattel is asking for.

14             Again, in theory, we could simply put Mr. Wagner up --

15   and I think we're entitled to do at least this -- have him say

16   this is the amount of profits.  Maybe you could talk about costs

17   that ought to be deducted, and just leave apportionment for MGA to

18   try and argue to the jury.

19             But we don't think that Mr. Wagner should stop there.

20   We think, in fairness, he ought to be able to talk about

21   apportionment.  And for the record, I was just going to mention --

22             **THE COURT:**  Question is, why.  Spend some time with me

23   now.  One thought I had was my concern about the apportionment

24   theory.  Obviously, Georgia Pacific factors, which I do not think

25   are applicable.  But I wanted to hear the experts back-to-back.  I

Page 28

1  wanted to hear them on the same day.  And let me accept the

2  responsibility for apparently becoming confused about what counsel

3  wants so I take that off of counsel's shoulders.  But I really

4  wanted to hear them two weeks ago.  I heard about a cruise,

5  etcetera, and unfortunately got kind and should have made

6  some additional demands upon counsel, but I didn't want to be too

7  presumptive.

8           I could limit this to the simple profits with the expert

9  saved for rebuttal.  I could have then MGA go forward and decide

10  if they're going to present what I'm going to call an

11  apportionment effort in terms of "sweat equity."  I also am going

12  to have the Kumho/Daubert hearing with that expert and decide if

13  that expert has a methodology that's acceptable.

14          And the question I keep asking myself in this brave new

15  world is, what is a methodology?  What is acceptable?  Somewhat of

16  a unique situation.

17          So, I'm pretty much determined that your expert and

18  probably the opposing expert will be qualified on lost profits.

19  It's the unjust enrichment that's causing the difficulty.  And if

20  your position is that you'd initially present him on

21  revenue/profits, lost profits, and that's the end of the

22  discussion waiting for unjust enrichment, we're probably done with

23  the discussion this evening.

24          If your position is you are going to go further or

25  attempt to further while he is on the stand instead of waiting for

1    rebuttal or seeing what MGA's decision is in that regard, and with

2    me not having the Kumho/Daubert hearing with their expert, then I

3    need to know that because then I might have to make some rulings

4    this evening that might be favorable or unfavorable.  And I don't

5    want to be bound by an unfavorable ruling if I find his

6    methodology isn't appropriate.

7         So, that's kind of a tactical decision with you and

8    Mr. Price and Mr. Quinn.

9         **MR. ZELLER:**  Sure.  If I can put up one data point for

10   the Court, because I don't think that this has been mentioned yet,

11   because I do recognize, obviously, the Court is focused on the

12   issue of the Georgia Pacific factors, and in particular should we

13   call them the Georgia Pacific factors as sort of a subset of that

14   issue.

15        MGA's own expert, actually in his own expert report --

16   and this is dated November 5, 2010, and this begins at page 69 --

17   himself says and abdicates application of the Georgia Pacific

18   factors to determination of a reasonable royalty measure of

19   damages for trade secret misappropriation.

20        And he starts off his section by saying, "a reasonable

21   royalty has been accepted as a methodology for determining damages

22   under the Lanham Act, claims of misappropriation of trade secrets

23   and claims of unjust enrichment."

24        And he then discusses the fact that it's the

25   hypothetical negotiation construct and specifically framed up by

Page 30

1     the Georgia Pacific factors.

2              THE COURT:  But, just a moment.

3         (Brief pause in proceedings)

4              THE COURT:  Please continue.

5              MR. ZELLER:  Continuing to page 70 -- and I think we

6     actually have this.

7              And then what he says -- and this is starting on page

8     70, "In order to determine the reasonable royalty that would have

9     resulted from a hypothetical negotiation in this matter, I have

10    relied upon the following generally accepted method which is

11    typically referred to by my peers.  I have used this approach more

12    than 100 times in patent infringement and trade secret

13    misappropriation matters to determine a reasonable royalty."

14             So, I mean --

15             THE COURT:  You see what is happening, though?  They're

16    becoming conflated.  And I have got an awful lot of case law out

17    there that says it's not appropriate to apply the Georgia Pacific

18    factors.  So what can't happen is there can't be inconsistency on

19    my part.

20             MR. ZELLER:  The unusual dimension of this, of course,

21    is that MGA's own expert is saying this is an accepted

22    methodology, the very point that MGA has been pressing on and

23    saying it's not an accepted methodology.

24             To some degree what we're -- I don't want to say

25    conflating, but perhaps -- or at least we're somewhat bundling

1    together is the issue of is this a remedy that's available as a

2    matter of law versus is it an accepted methodology?

3           And I think in some respects the issue of, is it an

4    accepted methodology in the context of unjust enrichment, context

5    of trade secret misappropriation, MGA's own expert says it is.  I

6    mean, that's at least his representation, that it is.

7           I do think -- and this somewhat gets us into the

8    copyright royalty measure, or reasonable royalty measure of

9    damages, but I also am somewhat concerned that at some point --

10   and this has been certainly MGA's argument -- is that as a matter

11   of law, as a complete matter of law under copyright, reasonable

12   royalty measure of damages based upon a hypothetical lost license

13   fee is not available.

14          And that is actually completely flatly contrary to Ninth

15   Circuit law.  The standard jury instruction for copyright, 17.23

16   for copyright damages says that -- and it specifically authorizes

17   this method and it says, "That amount also could be represented by

18   the lost license fees the plaintiff would have received for the

19   defendant's own authorized use of a plaintiff's work."

20          And certainly, I heard MGA's argument last night that

21   this is somehow constrained only to situations where you can prove

22   you have actually -- the plaintiff can prove that it has actually

23   licensed the work and therefore has actually lost revenue.

24          But the Ninth Circuit in Polar Bear says exactly the

25   opposite.  And here is what it says in Polar Bear, and this is at

1    page 708 to 709.  "It is not improper for a jury -- it says a

2    jury -- to consider either a hypothetical lost license fee or the

3    value of the infringing use to the infringer to determine actual

4    damage provided the amount is not based on undue speculation."

5         **THE COURT:**  But here is the difference:  The difference

6    is when Georgia Pacific gets cited, it brings into construct 15 --

7    I forget, 15 or 16 factors.  I think it's 15, might be 16.  I

8    think it's 15.  Most of those factors are inapplicable to

9    copyright.  So the expert gets up on the stand and conflates the

10   two and basically says, "This is a proven methodology that I have

11   used hundreds and hundreds of times," and it's not.  It's a

12   methodology that he or she has used in the patent context where

13   Georgia Pacific is absolutely appropriate.

14        That's what I was driving at inartfully the other day.

15   There may be some of the Georgia Pacific factors in and of

16   themselves they're just common sense factors that having a cup of

17   coffee would sit down and agree that an expert should look at.

18   But as soon as Georgia Pacific gets mentioned with sanctity, there

19   is the problem.  And I don't think it's appropriate for this Court

20   to instruct on Georgia Pacific.  In fact, we may all get together

21   in two or three years again for another meeting, but hopefully we

22   don't do it because of that.

23        So, your turn.

24        **MR. ZELLER:**  That's all very well taken.  And I just

25   want to clear up first and foremost the point, because MGA has

1   certainly conflated this, which is the issue of is a hypothetical

2   license available as a remedy as a matter of law, which they have

3   urged it is not.  That's one issue.  And I think that they're just

4   wrong on that.  So I wanted to address that first and foremost.

5          And I think where we are with the Court is how do we

6   deal, or how do we grapple with the issue of the construct that in

7   the real world here, trial, an expert is going to give to this

8   construct of hypothetical license.

9          **THE COURT:**  And that's my question for you, and it's

10  something that MGA needs to take into account.  You are absolutely

11  right.  You and Mr. Quinn could put up -- who is doing the

12  examination, Mr. Price or Mr. Quinn?

13         **MR. QUINN:**  Mr. Price.

14         **THE COURT:**  You and Mr. Price could put up Mr. Wagner,

15  potentially, and discuss revenue, profits, lost profits, and sit

16  down.  If you are right and the burden then shifts to MGA

17  concerning apportionment and you do nothing with that, now MGA has

18  to make the tactical choice what are we going to do.

19         If they make the tactical choice of saying to Mr.

20  Wagner, "Well, did you consider sweat equity?"  Here it comes.

21  "Yes, I did."

22         If they make the tactical choice of not presenting

23  anything concerning apportionment or sweat equity, then my

24  question becomes both to you in this tactical gamesmanship, what

25  choices will MGA make?

1          Now, MGA is taking the pristine position that if you go

2    further at this time with apportionment, that you don't have a

3    methodology; that Georgia Pacific is inapplicable, and you are not

4    counting apples to apples and oranges to oranges.  And that you've

5    doubled, basically -- that's the argument I'm hearing -- doubled

6    the potential amount and the Court shouldn't allow the 792 million

7    to be thrown up on the wall.

8          I don't think exclusion is the remedy here of an expert.

9    But what the expert does testify to, I am the gatekeeper and I

10   want to make certain too large a figure isn't put up on the wall

11   that's unsubstantiated.

12         So, your turn again.

13         **MR. ZELLER:**  And I think that putting out -- and again,

14   this is not our preferred course of action, but just to talk about

15   kind of where we are at the moment, under the law the expert can

16   go up and talk about, here are the revenues that were earned.  And

17   that's not just throwing a number up against the wall.  That would

18   be satisfying our burden under, really, what is quite clear case

19   law as well as the jury instructions.

20         We would obviously -- I think, then, what would not be

21   terribly controversial would be the next step for Mr. Wagner to

22   deduct costs.  Cost of goods, other standard kinds of deductions.

23   Obviously, I recognize MGA is going to quarrel with his method of

24   doing that, and they're going to say more cost should be deducted

25   and the like.  But at least I think we're on the same page, right

Page 35

1  up to point we're an accepted methodology.

2          So that leaves the reservoir of Bratz profits.  And that

3  is, potentially anyway under this construct we're talking about,

4  the number that Mr. Wagner would put forth in front of the jury

5  and I think could properly do so.

6          THE COURT:  Because the Kumho/Daubert testimony didn't

7  take place at the same time.  And because your expert is the first

8  expert out of the box.  Why shouldn't the Court limit both parties

9  to that simple methodology on their opening with their experts,

10  and then allow in rebuttal, if any, the methodology that might

11  pertain to sweat equity, if any?

12          And that way I would have had the benefit of the

13  Kumho/Daubert hearing with the other expert also so I have a sense

14  of balance, and I can question him whether he relied on the

15  Georgia Pacific factors.

16          I hear your representation.  It's probably in the

17  report, which I don't have in front of me.  But I don't see the

18  tactical disadvantage to either one of you as long as you have the

19  ability and rebuttal to bring forth your expert.

20          MR. ZELLER:  If I may just have a moment to confer.

21          THE COURT:  That doesn't mean the other side is going to

22  agree because, of course, they want to knock you out of the box in

23  a proper methodology.  But if you go that far, I'm wondering why

24  we're spending night and weekends.

25          MR. ZELLER:  I also just don't think MGA has any way

6b8f7240-07c5-450d-a0a2-82dda8e477a8

1   of -- I mean, that they have asserted any basis that would stop us

2   from --

3           **THE COURT:**  You are the one asking to go further,

4   though, with your expert in the opening.  That's what MGA is

5   concerned about right now.

6           **MR. ZELLER:**  Understood.

7           **THE COURT:**  And my concern is I haven't heard MGA's

8   expert, so I don't want to be overly harsh with your expert right

9   now, especially if their expert comes flying in the door and has

10  Georgia Pacific conflated as well in terms of a methodology.

11  Where is the fairness in that?

12          So, hold on.  I see Ms. Hurst is agitated.  I'm just

13  kidding you.  Shaking her head.  But that makes no difference to

14  the Court.  You take your time.  This is your time now.

15              (Brief pause in proceedings.)

16          **THE COURT:**  Depending upon what you initially say, I

17  want a couple minutes in chambers.  I want to read to you some

18  concerns that I have even if you take that tact.  That's what Ms.

19  Hurst has referred to, the apples and apples and oranges to

20  oranges and the way this got computed.  Because there is a certain

21  responsibility by the Court, not just throw up a number,

22  especially a large number, and then leave it for simple

23  cross-examination if I have some concern.

24          And I have got a little bit of concern about

25  Mr. Wagner's calculation, and I want to talk to you about that in

Page 37

1  a moment.

2          Now, by the way, that doesn't discredit you asking for a

3  billion dollars, because even if that was cut in half in a sense,

4  you still have potentially punitives.  You haven't misled the jury

5  in any way.  That could be double number.  So if the jury hit with

6  390 million -- okay.  That might be doubled by a jury.

7          **MR. PRICE:**  Your Honor, to try and clarify what the

8  Court is suggesting to make sure I understand.  For Mattel's lost

9  profits, obviously there is no Georgia Pacific analysis in that.

10 So we would go through that.

11         **THE COURT:**  Right.

12         **MR. PRICE:**  For the copyright, for MGA's profits, what

13 the Court is suggesting --

14         **THE COURT:**  No, no.  I'm not suggesting.  We're just

15 having a discussion.  I'm not pushing that position at all.  I'm

16 happy to decide the apportionment issue tonight.

17         **MR. PRICE:**  One option is because of the burden of

18 proof, that we simply put up MGA's profits from sales of the six

19 dolls and sculpts, or sales of the six dolls, and say it's not our

20 burden to then apportion that to sweat equity.

21         My only fear in that is I wouldn't want Mr. Wagner to

22 come across as trying to pull one over on the jury; that he didn't

23 try to subtract sweat equity.  I'm afraid MGA will say this

24 doesn't include sweat equity and you haven't presented that.

25         So, there would have to be some, I think, instruction by

6b8f7240-07c5-450d-a0a2-82dda8e477a8

1    the Court in that scenario that he is limited right now to doing

2    that, and that the cross-examination would be on the profits

3    number, and that the sweat equity would come later if MGA

4    introduced evidence of that.

5              **THE COURT:**  Let me repeat back to you.  The tactical

6    disadvantage that you can't be placed in is that Mr. Wagner looks

7    like he never considered this issue, and that he is then -- that

8    there is an inference on cross-examination.  I would have to see

9    what MGA's position is on that in just a moment.  In fact, I can

10   actually preclude MGA from going any further with their expert and

11   leave all of this for rebuttal.

12              I have also been in a position before where I have

13   demanded the experts be put on back-to-back in front of the jury.

14   I think I have that discretion.  And what's caused me concern is

15   my inability -- and I accept that responsibility -- to get both

16   experts in here at the same day and same time and hear their

17   positions respectively, on the record, about whether there is a

18   conflation and how the other expert is going to deal with what I

19   call this brave new world of how does an expert account for sweat

20   equity.

21              And I'm not too certain that some of the Georgia Pacific

22   factors may not be relevant.  What I am concerned about is I'm not

23   going to instruct on Georgia Pacific.  It's not applicable.  And

24   number two, I don't think that Georgia Pacific should be

25   mentioned, and I don't think that experts on either side should be

1    able to take the position that this is a methodology that they

2    relied upon hundreds and hundreds of times.  Not in the copyright

3    area.

4            But I want to make sure that's coequal.  And I hadn't

5    had the privilege of having Mr. Malackowski here regardless of his

6    report.  Number two, I need your latest report.  It's kind of

7    been -- well, I have got your latest report.  I needed it today.

8    That's why I'm getting off the bench in a few moments after we

9    discuss this.  But I want you to continue with apportionment.  I

10   want to take your time if you really pursue it.  But remember, you

11   were the ones pursuing it to the begin with.

12           **MR. ZELLER:**  With respect to the briefs, I thought they

13   were delivered.

14           **THE COURT:**  They have been delivered.  I just haven't

15   had time to look at them.

16           **MR. ZELLER:**  I just to make sure it was our failing,

17   Your Honor.

18           **THE COURT:**  No failure.  I need to go back and look at

19   them.  That's going to take anywhere from five minutes to five

20   hours tonight.  But what I'm not going to do is not give you an

21   answer so that you are prepared for Mr. Wagner.  He may have to

22   just his charts.  It's not fair to make a ruling just before he

23   gets on the stand.

24           So if you want to continue on as to the apportionment

25   argument, I'm welcome being you to.  In fact, it would be a

Page 40

1   pleasure.

2          MR. ZELLER:  And I do think it certainly makes some

3   sense, while we're going through this process, to discuss this.  I

4   do think that there is no disagreement on our part that there is

5   no need to instruct on the Georgia Pacific factors.  I mean, that,

6   in our view, is not something that's controversial.

7          THE COURT:  You don't have to worry about those factors

8   submitted to me by you.

9          MR. ZELLER:  I think where we get -- there is a little

10  bit more of a difficulty is -- and certainly, saying that the

11  expert will not refer to the validity or sanctity of the Georgia

12  Pacific factors, or identify them as such, is in some ways pretty

13  easy to do.  The difficulty, however, arises when the methodology

14  gets attacked.  And that's certainly going to be true both for us

15  and for MGA's expert in particularly applying the Georgia Pacific

16  factors to copyright and to trade secret.

17         THE COURT:  Why am I allowing any apportionment argument

18  at all?  In other words, for either expert, why do I allow either

19  party to go and take that position?  In other words, it could

20  simply be lost profits and revenue.

21         MR. ZELLER:  I do think that there are -- and I'll

22  actually agree with MGA's position, that there are literally a

23  million different ways that one could properly apportion.  So, I

24  don't think the abstract principle that apportionment should be

25  permitted is -- should be that much of an issue.  I actually find

Page 41

1    it a little remarkable, however, that MGA's position apparently is

2    that there are a million proper ways of doing it, but the one way

3    that appears to be improper is not only something that their own

4    expert is applying, but happens to be the Georgia Pacific factors,

5    which that certainly is not in this situation, obviously, but

6    nevertheless is an accepted methodology.  It's something that has

7    some history to it and has been accepted by courts in other

8    contexts.

9            So, it's not a methodology that is completely unproven.

10   I think we all agree that the issue here has more to do with

11   applying it in a particular context of copyright or trade secret.

12           I will go back to one question the Court has posed, and

13   I think rightfully so, to MGA which is, if you're not going to

14   apply the Georgia Pacific factors regardless of what we call it,

15   how do you do this?  How would you go about engaging in a rigorous

16   methodology that looks at what would the licensing fee be under

17   the context of a hypothetical negotiation.

18           And I don't think that the Court's point that some of

19   the Georgia Pacific factors would not apply.  I don't think that

20   should be treated as dispositive for one reason, which is that's

21   true in patent cases as well.

22           It's not uncommon for experts in a number of patent

23   cases to look at the Georgia Pacific factors and agree that seven.

24   Eight, nine of them don't apply in the particular context of the

25   case.

Page 42

1          So I think Georgia Pacific itself is flexible enough

2     where it contemplates that many of these factors are simply not

3     going to be relevant.  And that's the framework.

4          So I do think that this is at least something.  If we

5     start with the premise that at least -- I'll just focus on

6     copyright for a moment because I think the Ninth Circuit has been

7     very clear about this, that a jury could consider a hypothetical

8     license negotiation construct for purposes of determining a

9     reasonable royalty.  So, I mean, given that's the law that there

10    has to be some construct that allows parties to get there and

11    something -- some methodology where one could determine what that

12    should be, the time honored one, again, in a different context of

13    patent, is at least the Georgia Pacific factors.

14         I do think that the real difficulty here really comes

15    down not to the instruction, because I think we agree with that;

16    there would be no need for, or would want an instruction on

17    Georgia Pacific, or even that the experts call it Georgia Pacific.

18    They're going to say, "I applied the following six or seven

19    factors," and without giving it a label.  I think the real

20    difficulty is to what degree can they say this is a methodology

21    that I have applied in other contexts.

22         And I also kind of go back to -- and I think it's always

23    been a good expression of the Court, which is the truth walks

24    around.  It's not rather like a lie that walks around.  The fact

25    is they can cross-examine him.  Their witness, we could

1    cross-examine their witness and simply say, yes, you have applied

2    this methodology but not in this situation.

3            I mean, that would be a legitimate tact of

4    cross-examination.  It doesn't make the methodology that's applied

5    to be something that would be the level of junk science or

6    otherwise so unacceptable that it should not at least be presented

7    to the jury to make a determination.  That's something that the

8    jury, I think, can determine.

9            **THE COURT:**  Why are you harmed on direct examination if

10   you don't go through an apportionment analysis by waiting to see

11   what questions are asked on cross-examination?  Or second, if MGA

12   does not touch upon this, or if it does, why you don't have

13   rebuttal?

14           **MR. ZELLER:**  I would say under those circumstances we

15   would not be harmed as long as --

16           **THE COURT:**  What happens, though, if I don't agree with

17   your eventual methodology?  What you are going to feel is that you

18   are trapped by that; that you felt the Court gave you a

19   representation that somehow if you waited.  And so, therefore, I

20   don't want to be accused later on, if I don't find your

21   methodology to be appropriate, of precluding you.

22           So if you want to go forward with this, I'm listening to

23   this and, in fact, welcoming that.

24           **MR. ZELLER:**  And I can certainly say that we would not

25   say that to the Court.  We recognize that under -- whether it's

Page 44

1    now, whether it's a month from now, or whatever the case may be,

2    that the Court may very well say, "I'm not going to allow

3    Mr. Wagner to make these apportionment opinions."

4            Ultimately, however, I mean, the fact is, as I was

5    mentioning earlier, Mr. Wagner, even if he is precluded on that, I

6    think there is a strong likelihood we would put him up in any

7    event and have him say these are the profits, these are the costs;

8    it's the defendant's burden to prove apportionment, and then let

9    them attempt to do so and attack their apportionment methods.

10           I mean, that is one way we could proceed.  We don't want

11   to.  And we certainly want to protect our expert in the way that

12   Mr. Price was mentioning, but I think that could be accomplished.

13           **THE COURT:**  I'm not encouraging.  I just want know what

14   you want to do.  If you want to go forward with that, I want to

15   hear your argument in response to Ms. Hurst's argument about the

16   apportionment and your methodology.

17           I think that there are different burdens under the trade

18   secret misappropriation and the Copyright Act.  I think you are

19   right on the Copyright Act.  I think by statute you have got a

20   different standard to deal with, and I want you to look at that in

21   a moment.  That's statutory.  Okay.  And that's where you are

22   going to run into problems.  So don't get lulled into the

23   copyright thinking that it applies to trade secret

24   misappropriation.  Take the time to look at it.

25           **MR. ZELLER:**  We were, in fact, discussing that very

6b8f7240-07c5-450d-a0a2-82dda8e477a8

1    point.

2          **THE COURT:**  Therefore, I don't want you to be trapped in

3    the situation of who has the burden on this thing.  Of course,

4    California legislature couldn't be anymore clear.

5          John, if you want to go do something for 20 minutes, let

6    me take Mr. Haigh and counsel on their matter.

7    (Whereupon there was a change in reporters and DEBORAH PARKER

8    reported the 6:00 session.)

9                         -oOo-

10                      CERTIFICATE

11

12         I hereby certify that pursuant to Section 753, Title 28,

13   United States Code, the foregoing is a true and correct transcript

14   of the stenographically reported proceedings held in the

15   above-entitled matter.

16

17   Date:  MARCH 3, 2011

18

19

20   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

21

22

23

24

25