1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,                    )
7                                         )
                PLAINTIFFS,               )
8                                         )
            vs.                           ) CV NO. 04-9049-DOC
9                                         ) DAY 26
MGA ENTERTAINMENT, INC., ET AL.,         ) VOLUME 4 of 4
10                                        )
                DEFENDANTS.               )
11   _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       JURY TRIAL

16                  SANTA ANA, CALIFORNIA

17               WEDNESDAY, MARCH 2, 2011

18                       6:16 P.M.

19

20
              **DEBORAH D. PARKER, CSR 10342**
21            **OFFICIAL COURT REPORTER**
              **UNITED STATES DISTRICT COURT**
22            **411 WEST FOURTH STREET**
                  **SUITE 1-053**
23            **SANTA ANA, CALIFORNIA 92701**
                  **(714) 542-8409**
24            **D.PARKER@IX.NETCOM.COM**

25

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                          JOHN QUINN
                           WILLIAM PRICE
 4                          MICHAEL T. ZELLER
                           QUINN EMANUEL URQUHART
 5                          & SULLIVAN, LLP
                           865 S. FIGUEROA STREET
 6                          10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
 7                          (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                           THOMAS S. MC CONVILLE
10                          ORRICK HERRINGTON & SUTCLIFFE, LLP
                           4 PARK PLAZA
11                          SUITE 1600
                           IRVINE, CALIFORNIA 92614
12                          (949) 567-6700

13
                           ANNETTE L. HURST
14                          ORRICK HERRINGTON & SUTCLIFFE, LLP
                           THE ORRICK BUILDING
15                          405 HOWARD STREET
                           SAN FRANCISCO, CALIFORNIA 94105
16                          (415) 773-5700

17
                           JENNIFER L. KELLER
18                          KELLER RACKAUCKAS, LLP
                           18500 VON KARMAN AVENUE
19                          SUITE 560
                           IRVINE, CALIFORNIA 92612
20                          (949) 476-8700

21

22

23

24

25
```

```
1    APPEARANCES OF COUNSEL:

2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

3                              MARK E. OVERLAND
                              LAW OFFICES OF MARK E. OVERLAND
4                              100 WILSHIRE BOULEVARD
                              SUITE 950
5                              SANTA MONICA, CALIFORNIA 90401
                              (310) 459-2830
6

7                              ALEXANDER H. COTE
                              SCHEPER KIM & HARRIS, LLP
8                              601 WEST FIFTH STREET
                              12TH FLOOR
9                              LOS ANGELES, CALIFORNIA 90071
                              (213) 613-4660
10

11
     ALSO PRESENT:
12
                              JEANINE PISONI
13                              MGA ENTERTAINMENT, INC.
                              16360 ROSCOE BOULEVARD
14                              SUITE 105
                              VAN NUYS, CALIFORNIA 91406
15

16                              ROBERT ECKERT, MATTEL CEO
                              ISAAC LARIAN, MGA CEO
17                              KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                              MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1                        I N D E X

 2

 3   PLAINTIFFS' WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    MICHAEL JOSEPH WARNER       22

 5

 6                     E X H I B I T S

 7   PLAINTIFFS' EXHIBITS:            IDENTIFICATION  EVIDENCE

 8    2     WAGNER, MARCH 1, 2011,                       23
           DAUBERT SLIDES
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 2, 2011; 6:16 P.M.

2         *(The following proceedings were had outside the*

3         *presence of the jury:)*

4              THE COURT:  All right.  Let's go on the record and

5    get started.

6              We're on the record and all counsel are present.

7              In the interim, Mr. Zeller, I'm becoming convinced

8    that although MGA bears the burden of apportionment under

9    the Copyright Act, I think Mattel, tentatively, bears the

10   burden of apportionment under the Uniform Trade Secrets Act.

11   I think the difference is between the language in Section

12   504 of the Copyright and Section 3426.3, the California

13   Civil Code of Procedure.  The Copyright Act expressly states

14   that *the plaintiff only needs to prove the defendant's total*

15   *revenues and shift the burden to the defendant to prove the*

16   *amount of its revenues unrelated to infringement.*

17             On the other hand, the Trade Secrets Act does not

18   articulate this burden shifting framework.  The differences

19   reflected in the model instructions for the two claims, the

20   Ninth Circuit Model Instruction on copyright damages 1724,

21   as you stated, quote:  *The defendant has the burden of*

22   *proving the portion of the profit, if any, attributable to*

23   *factors other than infringing the copyrighted work.*  On the

24   other hand, the California Trade Secret Act, Model

25   Instruction CACI 4401 states that *a trade secret plaintiff*

6

*must prove unjust enrichment.  Unjust enrichment does not*
*include amounts unrelated to the trade secret*
*misappropriation.*

CACI 4410, which is the unjust enrichment
instruction, states that *unjust enrichment is calculated by*
*subtracting out reasonable expenses*, and the use notes
specify that *not all benefits that flow from the*
*misappropriations are unjust.*

Citing the Restatement of Restitution, Section 1,
Comment A:  Of course, the Ninth Circuit in this case cited
with approval the Dan B. Dobbs Treatise for the proposition
that unjust enrichment does not include the fruits of a
misappropriater's own labors or legitimate efforts.

So it, tentatively, seems that if you bear the
burden of proving unjust enrichment and second unjust
enrichment does not include sweat equity and business
expenses, then you bear the burden of apportioning out those
amounts.

That's just a tentative conclusion, but I want to
hear your thoughts and your opportunity.  Hopefully, all
understand, we couldn't make it more confusing for the jury,
if we tried to.

MR. ZELLER:  One place I would start is, is this
is a Washington court of appeals decision called Petters,
P-E-T-T-E-R-S, and Washington adopted the

1    Uniform Trade Secrets Act.  Obviously, its version.  And in

2    this decision what the court does is, it starts with the

3    Restatement of Unfair Competition, which has been a

4    longstanding statement of trade secret law.  And the

5    Restatement of Unfair Competition in Section 45,

6    Comment F -- this is, actually, a very widely cited comment

7    with respect to trade secret claims, historically, and it

8    says:  *The plaintiff has the burden of establishing the*

9    *defendant's sales.  The defendant has the burden of*

10   *establishing any portion of the sales not attributable to*

11   *the trade secret and any expenses to be deducted in*

12   *determining net profits.*

13           So I think at least, historically, under this

14   approach the burden has been -- that burden shifting has

15   been comparable to the Copyright Act.  And then *Petters* goes

16   on and says:  *This is a logical and unremarkable formulation*

17   *of the rule.  It places on the party in possession of the*

18   *relevant information, the defendant, the burden of*

19   *demonstrating which portion, if any, of the revenue obtained*

20   *through the transfer of a trade secret was not, in fact,*

21   *attributable to the transfer.  That is, it requires the*

22   *defendant to explain why a particular portion of the money*

23   *that it received as a result of the misappropriating*

24   *transaction should not be considered, an actual loss*

25   *suffered by the plaintiff under RCW* -- and then it goes on

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    to cite the relevant statute there in Washington.

2              And then it says in the next sentence:   *The rule*

3    *has been widely adopted in jurisdictions applying the model*

4    *act.*

5              So, at least, this court was recognizing that

6    the -- at least, the authority, as I understood it, in other

7    jurisdictions applying the Uniform Trade Secret Act had

8    similarly adopted this kind of burden shifting.  And for the

9    record, this can be -- this decision can be found at

10   210 Pacific 3d, 1048.  And the portion that I'm referring to

11   appears to be pages 1 -- actually, page 1054.

12             Also, MGA, itself, previously in briefing to the

13   court recognized that the burden was on the defendant to

14   apportion.  And the court will recall, of course, MGA has

15   its own claims -- trade secret misappropriation -- it's

16   taken its own positions on this.  And in opposing Mattel's

17   *Daubert* motion as to MGA's expert, MGA's opposition to

18   Mattel*'s Daubert* motion, number two, at pages 10 to 11, MGA

19   says, quote:   *The burden of apportioning profits falls upon*

20   *the party accused of trade secret misappropriation.*

21             And so, I do recognize that there is, as the court

22   is saying, at least -- there may be some differences in the

23   language of the statute in the sense that the statute

24   doesn't explicitly allocate, at least doesn't go on, like

25   the Copyright Act does in Section 504 and say, *Here's the*

*burden-shifting regime,* historically, under a Restatement approach, as well as recognized by, at least, some of these authorities I'm referencing, adopting Uniform Trade Secret Acts, nevertheless continue with that same burden-shifting regime.

So I do think that there is at least authority and MGA has certainly seemed to concede, previously, that that was the proper regime.

THE COURT:  Do you want to get to the merits of your argument concerning apportionment?

MR. ZELLER:  Yes, sir.

I think, just starting with the, sort of, a legal proposition which is, is that -- and I would cite the court to the *Vairtos Operating Corporation versus Microsoft* case. And this, I know, has been cited in papers.  It's 2008 Westlaw 7404617, and this is a Western District of Washington case.  In there in fact, specifically, the issue was, Mr. Wagner applying in a trade secret misappropriation case the Georgia-Pacific factors.  And in the first part of this decision -- and this can be found at page 2 -- Microsoft specifically challenged Mr. Wagner's opinion, based upon a reasonable royalty measure of damages in a trade secret case and said, *It's not an appropriate measure.*

And, in fact, it says -- Microsoft asserts that this remedy typically applied in patent cases and based on a

1    hypothetical negotiation between the parties is not

2    authorized under WUTSA -- again, the Washington state

3    equivalent of CUTSA.

4            And the court goes on to say:  *The Court finds*

5    *Varitos' position persuasive.  Although Washington adopted*

6    *wholesale the Uniform Trade Secrets Act in 1981, before the*

7    *1985 amendments of the UTSA to specifically provide for a*

8    *reasonable royalty measure of past damages, it is not at all*

9    *clear that an actual loss or unjust enrichment analysis as*

10   *provided for by WUTSA may not include a reasonable royalty*

11   *measure.  As Veritas argues and the court agrees, a*

12   *reasonable royalty measure has long been one of a number of*

13   *calculations available to measure damages for trade secret*

14   *misappropriation, particularly the value of the benefit*

15   *received by a defendant who misappropriates trade secrets*;

16   and then, citations for that proposition follows.

17           The court goes on to say that *the court deems it*

18   *appropriate in this case for Veritas to present expert*

19   *testimony of the value of the reasonable royalty that*

20   *approximates Microsoft's alleged unjust enrichment from its*

21   *purported unauthorized use of Varitos' confidential*

22   *information.*

23           And so that's part one of the court's conclusion

24   there.  And then, part two is that Microsoft -- similar to

25   here -- challenged the use of the Georgia-Pacific factors as

1    being the appropriate measure, the appropriate methodology

2    for purposes of determining reasonable royalty.  And the

3    court finds that, in fact, the Georgia-Pacific factors in

4    the trade secret misappropriation context is an appropriate

5    methodology.  And specifically this is found on page 4 of

6    the decision.  And it begins: *Microsoft argues that*

7    *Mr. Wagner's methodologies in calculating Varitos' patent*

8    *and trade secret damages are flawed, because they failed to*

9    *use the correct royalty base and because they conducted an*

10   *insufficient quantitative analysis.*

11           Then, the court goes on to talk about how it

12   actually had dismissed the patent claims, or found for --

13   yeah, actually -- I'm sorry -- was a dismissal of the patent

14   claims; and then, goes on to say this:  *However, the court*

15   *is not persuaded that Mr. Wagner performed an insufficient*

16   *analysis regarding a reasonable royalty as to trade secret*

17   *damages.*

18           And then, it goes on to say specifically about how

19   *the Court finds that Mr. Wagner adequately applies the*

20   *Georgia-Pacific factors in determining an appropriate*

21   *royalty rate.  As Veritas describes, Mr. Wagner determined a*

22   *starting point royalty rate for the trade secret claims*

23   *based on an analysis of agreements in which Veritas had*

24   *licensed its volume manager source code to third parties,*

25   *including Hitachi, and then goes on to describe further the*

1    *application of the Georgia-Pacific factors there.*

2            So in this case, this particular construct was

3    actually adopted.  The other case that I would direct the

4    court's attention to -- and I think this also supports the

5    idea that applying, you know, the reasonable royalty measure

6    in a particular -- a construct such as Georgia-Pacific is

7    specifically apposite and specifically proper as a

8    methodology here is the *Auto Desk* decision.

9            The *Auto Desk* decision actually starts off by

10   talking about how reasonable royalty is a common form of

11   award in both trade secret and patent cases.  It thus is

12   well established in the law.  And then I think the most

13   salient part of what -- and I think this, really, speaks to

14   the use of the reasonable royalty methodology for the

15   apportionment of profits resulting from trade secret

16   misappropriation is this passage.  And it says --

17           And, by the way, MGA has cited this part of the

18   passage with approval and relied upon it, but it goes on to

19   say something that I think is very, very pertinent here:  *If*

20   *the trade secret accounts for only a portion of the profits*

21   *earned on the defendant's sales* -- so we're talking about

22   apportionment -- *such as when the trade secret relates to a*

23   *single component of a product marketable without the secret,*

24   *an award to the plaintiff of defendant's entire profit may*

25   *be unjust.*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    And that's the portion that in fact MGA cites and

2    relies upon.  It goes on to say:  *However, the royalty that*

3    *the plaintiff and defendant would have agreed to for the use*

4    *of the trade secret made by the defendant may be one measure*

5    *of the approximate portion of the defendant's profits*

6    *attributable to the use.*

7    So we believe that this language specifically

8    recognizes that reasonable royalty measures are an

9    appropriate way of determining and apportioning profits,

10   which is really, I think, part one of the problem or the

11   issue that the court has been raising, which is:  Is a

12   hypothetical licensed negotiation construct, regardless of

13   what we call it, an appropriate way of apportioning.  We

14   think under these authorities that it is.

15   Then, the second part -- and this is further

16   addressed by *Auto Desk* is, is it specifically recognizes

17   that the methodology that we're talking about for reasonable

18   royalty in the trade secret misappropriation context is,

19   in fact, a hypothetical negotiation construct which is, of

20   course, what Georgia-Pacific contemplates.  And it is, of

21   course, the second part of what MGA has basically been

22   attacking and saying that hypothetical negotiation construct

23   should not be allowed or not permitted or not recognized.

24   But page 451 of the Auto Desk decision

25   specifically talks about how this is:  *A reasonable royalty*

1    *award attempts to measure a hypothetically agreed value of*

2    *what the defendant wrongfully obtained from the plaintiff.*

3    *By means of a suppositious meeting between the parties, the*

4    *court calculates what the parties would have agreed to as a*

5    *fair licensing price at the time that the misappropriation*

6    *occurred.*

7              So, it's again authorizing and approving this kind

8    of construct.

9              The other point that I would make is, is that MGA

10   has made the argument that taking Georgia-Pacific, which, I

11   think we all agree is a recognized methodology that's

12   applied certainly in the patent context where it's most

13   known.  There is also as we were indicating earlier, there

14   is authority as well as statements by MGA's own expert, by

15   Mr. Wagner, that the Georgia-Pacific construct has been

16   applied in trade secret cases as well.  But even if that

17   were not the case, even if there wasn't that record, courts

18   have noted that the novelty of applying an appropriate or

19   time-honored methodology to a new situation so-called being

20   novel in that sense does not make it improper under *Daubert*.

21   That for years was kind of a buzz word under the Frye test

22   that people are well familiar with, but *Daubert* looks at

23   reliability and fit.  And the fact is, is that simply

24   because Georgia-Pacific has not been treated as time-honored

25   as being applied for purposes of trade secret

1    misappropriation, as is in patent, is not in our view

2    sufficient to make it a proper basis for exclusion under

3    *Daubert*.

4          So the next point that I would raise is, is that

5    the record, as I was mentioning, both by MGA's expert who

6    said that he's applied it -- and he doesn't differentiate

7    granted between patent and trade secret cases, but he says

8    he has done it more than 100 times where he has applied this

9    very methodology.

10         I've cited the Veritas case where Mr. Wagner with

11   the court approval applied the Georgia-Pacific factors in a

12   trade secret case.

13         And you, of course --

14         THE COURT:  Did the court read Georgia-Pacific

15   factors to the jury?

16         MR. ZELLER:  I could check with Mr. Wagner.  I

17   doubt it.

18         But the reality is, your Honor, for purposes of

19   our decision, I think we all agree that there would be no

20   reason for the court to read the Georgia-Pacific factors to

21   the jury.  So from our perspective that should be a nonissue

22   now because we do not dispute that there is -- that there's

23   no reason to tell the jury what the Georgia-Pacific factors

24   are, or to instruct on them.  Because when I think,

25   ultimately, really where we are is, is what happens when and

1    if there's an attack on Mr. Wagner; or, perhaps, even MGA's

2    own expert or applying a reasonable royalty kind of

3    construct in the course of talking about unjust enrichment,

4    or -- unjust enrichment for purposes of trade secret

5    damages.  Certainly, in all candor, your Honor, we think

6    that Mr. Wagner ought to be able to say, *Look, I have*

7    *applied this methodology in other cases.*  He can say, *I've*

8    *applied it in some trade secret cases.  I've applied it in*

9    *some patent cases.*

10         You know, the jury can determine whether or not

11   that's appropriate.  But at the end of the day, we think

12   this is something that really goes to its weight, as opposed

13   to being an issue of admissibility.  And, by the way, MGA's

14   own expert has basically recognized this by adopting this

15   very same kind of methodology and construct in the context

16   of MGA's own trade secret claims.  I just don't see him in a

17   position to now say that this is something that is so

18   completely off base, something that is so unrecognized that

19   Mattel should not be allowed to present to a jury a

20   methodology that does have at least some history behind it,

21   and let the jury determine whether or not that's a fair

22   apportionment.

23         The court, also, I'm sure recognizes and has seen,

24   probably, enough at least of MGA's own expert, they're going

25   to posit a number of alternatives as to apportionment.

```
1   There may be arguments that no apportionment should be
2   warranted.  I think it's an open question, by the way, under
3   the law, as to whether or not once a trade secret
4   misappropriation claim is established, whether or not there
5   is that kind of apportionment.  There's certainly the issue
6   of what costs and the like -- what kind of causation exists
7   for purposes of trade secret misappropriation.  But unlike
8   copyright where it's very clear that there has to be some
9   sort of apportionment, historically that has not been true
10  for trade secret claims.  So it seems ultimately to us that
11  applying this methodology which has again some currency, not
12  as much as -- obviously, it's not as well recognized in the
13  trade secret context as it is the patent case.
14  Nevertheless, it does have some history and some currency in
15  the trade secret misappropriation case.  And we also think
16  that given the language of Auto Desk that I read where it
17  specifically recognizes that this may be a proper method of
18  apportioning the unjust profits of a trade secret
19  misappropriation defendant.
20          THE COURT:  If the court felt that the methodology
21  was insufficient, would the remedy be exclusion, as
22  Ms. Hurst argues, or would you simply be in the position of
23  not being able to apportion out the -- well, portions
24  attributable to sweat equity for want of a better word, or
25  non-trade secret amounts from your unjust enrichment
```

1    calculation under 4410.

2          I guess what I'm trying to say is:  Ms. Hurst is

3    going to argue that that's exclusion, but I'm not certain

4    that precludes the expert from coming on the stand,

5    initially.  What it does, is leave the witness vulnerable

6    for attack, and I think your argument back to the court

7    would be, *Judge, even if you ruled that way, that's subject*

8    *then to the cross-examination and our witness is not*

9    *defenseless.  That become MGA's choice to bring up the lack*

10   *of supporting methodology.*

11         All right.  Anything further before I turn to

12   Mr. Price?

13         MR. ZELLER:  Well, I do -- with respect to the

14   court's last question, I think the answer is very clear on

15   copyright.  That would not result in exclusion.  It just

16   wouldn't.

17         THE COURT:  I understand that.  I'm over on

18   trademark.  I'm over on the dichotomy, almost this inherent

19   quagmire between the two sections and the utter confusion

20   that the jury is going to face in the instructions between

21   copyright and trade secret misappropriation.  If isn't

22   confusing enough already, that's going to be extraordinarily

23   confusing to a jury.

24         MR. ZELLER:  And with respect, then, to the trade

25   secret claim, we also think it's the same answer, although

1    that's dependent, of course, on the court's view as to the

2    law of burden shifting.

3             THE COURT:  Assume and focus on trade secret

4    misappropriation for a moment; that there is burden --

5    strike that, that there is --

6             Under the California Trade Secret Act that there

7    is not burden shifting and that under trade Secret

8    misappropriation that you have the responsibility under 4410

9    in the area of unjust enrichment to calculate by subtracting

10   out reasonable expenses.  And if the court follows the use

11   notes specifying non-benefits that flow from the

12   misappropriation, how would you do that?

13            MR. ZELLER:  Well, I do think that under those

14   circumstances Mr. Wagner would still be able to testify.

15   And the reason why is, is that Mr. Wagner doesn't use the

16   Georgia-Pacific factors, or the licensing construct for the

17   sweat equity, or for the cost.  He could certainly --

18            THE COURT:  Just a moment.  I would like to hear

19   in concrete terms how he would do that.

20            MR. ZELLER:  The first step is, of course, he

21   would -- he would take and he would get the revenues.

22            THE COURT:  Could I see that?  Could I hear that

23   from Mr. Wagner for a moment?

24            MR. ZELLER:  Sure.  Absolutely.

25            THE COURT:  In other words, instead of words, let

1    me listen and see how he would potentially do that.

2            MR. PRICE:  Your Honor, do you still have the

3    slide that we provided to the court?

4            THE COURT:  I do, but I want it up on the screen.

5        *(Pause.)*

6            THE COURT:  Mr. Wagner, you're still under oath.

7            The question that the court had was, as follows.

8    And outside of your presence, we've had a discussion.

9            I'm going to retrace some official thoughts; and

10   that is, that there is a difference between the language

11   potentially in Section 504 of the Copyright Act and the

12   California Civil Code Section 3426.3.  And this is language

13   that can potentially cause great confusion to a jury.

14           The Copyright Act expressly states that the

15   plaintiff only needs to prove the defendant's total revenues

16   and shift the burden to the defendant to prove the amount of

17   its revenues unrelated to infringement.  So it's a shifting

18   analysis.  A burden shifting.  And, therefore, all Mattel

19   would have to do in a sense is to prove the defendant's

20   total revenues and it would be up to MGA with that shifting

21   burden to prove the amount of revenues unrelated to

22   infringement.

23           The difference is that the Ninth Circuit Model

24   Instructions on copyright damages, in 1724, as Mr. Zeller

25   points out, states that *the defendant has the burden of*

1   *proving the portion of the profit, if any, attributable to*

2   *factors other than the infringing the copyright work.*

3          But on the other hand my concern is that the

4   California Trade Secret Act is state law matter.  The Model

5   Instruction CACI 4401 states that *a trade secret plaintiff*

6   *must prove unjust enrichment and that unjust enrichment does*

7   *not include amounts unrelated to the trade secret*

8   *misappropriation.*

9          4410, which is the unjust enrichment instruction,

10  states that *unjust enrichment is calculated by subtracting*

11  *out reasonable expenses* and the Use Note specified that *not*

12  *all benefits that flow from misappropriation are unjust.*

13         Now, the Ninth Circuit has cited in our case, with

14  approval, the Dan B. Dobbs Treatise for the proposition that

15  *unjust enrichment does not include the fruits of a*

16  *misappropriater's own labors or legitimate efforts.*

17         So I've stated to both parties outside of your

18  presence that it tentatively seems that Mattel would bear

19  the burden of proving unjust enrichment and unjust

20  enrichment does not include sweat equity and business

21  expenses, and Mattel would bear the burden of apportioning

22  out those amounts.  So I'm back to the apportioning problem.

23         If I found that your methodology using the

24  Georgia-Pacific factors, regardless of the Washington case

25  that your counsel has cited, lacked the methodology to allow

1     that testimony, how else would you go about resolving this

2     issue concerning damages?

3             MR. PRICE:  Your Honor, could I give Mr. Wagner

4     the slides so he can use that?

5             THE COURT:  Please.  You can lead an expert,

6     in fact.  And I would appreciate you putting that slide up

7     on the board.

8             MR. PRICE:  I will.

9             THE COURT:  In other words, I want you to walk me

10    through it in just a moment.  And I'm going to let Mr. Price

11    ask you questions.

12                        DIRECT EXAMINATION

13    BY MR. PRICE:

14    Q.   Mr. Wagner, you heard the court's question which was,

15    in the apportionment of profits under the trade secrets

16    unjust enrichment claim --

17            First, let me ask you, do you use the

18    Georgia-Pacific analysis to apportion between revenue costs

19    and sweat equity?

20    A.   No.

21    Q.   And if you could look at slide 20 --

22            MR. PRICE:  And, your Honor, I don't think we

23    marked this from last night.  If we can -- we'll mark this

24    the Wagner March 1, '11 *Daubert* slides.

25            THE COURT:  So marked and received.

1          *(Plaintiffs' Exhibit 2 received in evidence.)*

2     BY MR. PRICE:

3     Q.    Using slide 20, could you explain to the court how you

4     apportioned trade secret profits under unjust enrichment?

5     A.    After calculating the total profits that I believe MGA

6     earned as a result of the sale of the Bratz products, I then

7     apportioned some of that out not using Georgia-Pacific but

8     using the benchmarks of the industry average profitability,

9     the profitability of the second and third most successful

10    toy companies in the world, and then the largest toy company

11    in the world.  And looking at the difference between my

12    calculation of those profits and these profits of the arctic

13    is how I apportioned to unjust enrichment.  And that is

14    before doing any Georgia-Pacific analysis.

15          THE COURT:  You've heard the criticism that you

16    are 100 percent too high in your calculations by Ms. Hurst.

17          THE WITNESS:  I don't know if it's 100 percent,

18    but they clearly think my numbers are too high.

19          THE COURT:  I know that.  Did you follow what her

20    questions were that regard?

21          THE WITNESS:  Well, I think I followed her

22    questions.  I think they believe that it's an apples and

23    oranges that I have an incremental earnings before interest

24    and taxes for Bratz and a, what I would call, fully absorbed

25    accounting earnings for interest --

1          THE COURT:  We didn't get that.  Say that again
2     slowly.
3          THE WITNESS:  Yes.  That I used an incremental
4     EBIT -- Earnings Before Interest and Taxes -- to measure the
5     unjust enrichment or the total profits from Bratz sales.  I
6     subtract from that a fully allocated cost earnings before
7     interest and taxes for my yardsticks.  That wasn't a
8     mistake.  That was intentional, because there's reasons for
9     this, your Honor.  There is no perfect yardstick and there
10    are many factors in my yardsticks that tend to overstate
11    what I believe, actually, Bratz would earn but for the
12    alleged taking of the intellectual property.
13         These yardsticks, all of them include
14    substantially intellectual property that is contributing to
15    those earnings.
16         THE COURT:  Why don't you specifically respond to
17    her concerns.
18         THE WITNESS:  Well, her concern is that I need to
19    have the same measure of EBIT in both Bratz and the
20    yardstick.  I don't believe that's a requirement.
21         THE COURT:  Why?
22         THE WITNESS:  Because the yardstick isn't perfect.
23    As I would like to tell you, your Honor, is that -- as an
24    example, Mattel, they have the Barbie brand.  That is the
25    best brand in the toy industry.  They also have

1    Fisher-Price.  They also have Matchbox.  They have a number

2    of very successful brands.  That's contributing to this

3    average profitability, and that's overstating this

4    yardstick.  So I'm actually giving them more that I believe

5    they actually would have earned but for their -- this

6    intellectual property.

7          There would be no intellectual property in the

8    Bratz product.  Yes, this would be sweat equity.  Yes,

9    they're going to contribute certain things to it.  But I've

10   got a yardstick that is, I think, actually hurting my client

11   in awarding too much for the sweat equity.  Because, again,

12   if you remember, the first charts that I used shows you that

13   they had 82 other product lines that have other intellectual

14   property, other trademarks, other sweat equity.

15         THE COURT:  Let me repeat back to you:  If you

16   focused on Barbie, what you're saying is you would actually

17   have a more beneficial or greater benefit to Mattel.

18         THE WITNESS:  Well, clearly.  And I think it was

19   suggested in the questions that that is the appropriate

20   apples to apples comparison is to use Barbie as to what

21   Bratz would have earned, but for the alleged taking of the

22   intellectual property.

23         I don't agree with that.  That's saying that they

24   would be the best in the world without what they took.  And

25   if they had other product lines that they'd shown that type

1    of success, I might agree with them.  But they've never done

2    this, your Honor, in 25 years of corporate history with any

3    other product except for this one.  There is something

4    different about Bratz.  And that's what I'm trying to

5    measure.  And I think I've done very conservative --

6              THE COURT:  I heard you.  Thank you.

7              THE WITNESS:  I'm sorry, your Honor.

8              THE COURT:  All right.  Now, would you step down

9    just a moment.  I may provide more questions, but I want to

10   go back in the back for just a moment.

11             THE WITNESS:  Yes, your Honor.

12             THE COURT:  Mr. Price, do you have any questions,

13   briefly?

14             MR. PRICE:  No, your Honor. unless there is an

15   area --

16             THE COURT:  I may have some more.  I want a little

17   bit of time.

18             Sir, if you will just remain in the courtroom,

19   please.

20             THE WITNESS:  I'm sorry.  Should I leave, your

21   Honor?

22             THE COURT:  No, you may sit down.

23        *(Recess taken from 6:53 p.m. to 7:57 p.m.)*

24             THE COURT:  All right.  We're on the record.

25             My conclusion is, as follows:  I'm going to give

1    you a chance to supplement anything I say, but this time

2    it's brief for both of you.  And I only want you to identify

3    issues that you think I've ignored concerning the lost

4    profits.

5            Mr. Wagner calculates lost profits for Mattel by

6    excluding market expansion, which he calculates as revenues

7    beyond the industry baseline prior to Bratz.  All other

8    Bratz sales must have come at the expense of others in the

9    industry, and predominantly Barbie.  There are two potential

10   flaws here:

11           First, Mr. Wagner, you may assume that the

12   preexisting market would not have receded absent Bratz, but

13   this flaw may undermine your conclusions by first causing

14   you to diminish the extent of any market expansion; and

15   second, causing you to diminish the amount that Mattel

16   benefited from any market expansion.

17           Second, you may assume that Barbie's share of the

18   preexisting market would have stayed constant absent Bratz,

19   which may ignore the dynamic described by Mr. Eckert today

20   and yesterday.  In particular, Mr. Eckert testified that

21   Barbie sales declined because of oversaturation, which would

22   suggest that Barbie sales would have declined exponentially

23   over the years.

24           On the other hand, the correlation between an

25   uptick in Barbie sales and a downtick in Bratz sales over

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    the last few years may show that the Barbie sales were not

2    suffering merely for market oversaturation.  Some consumers

3    are probably returning to Barbie as Bratz withdraws from the

4    market.

5              So my conclusion is that these are issues that go

6    to the weight, not admissibility and can be addressed during

7    cross-examination on your lost profits analysis.

8              Concerning reasonable royalty, you know, I'll hear

9    from you briefly, but I'm pretty far down the line on this.

10   You've concluded, Mr. Wagner, a reasonable royalty analysis

11   under the Georgia-Pacific rubric and your report, though, is

12   unclear about whether your conclusions apply only to the

13   trademark claim or the copyright claim as well.  That may

14   have been partially cleared up by your slides.

15             There is one flaw that I think is fatal.  First, I

16   agree with Mattel that license fee or a reasonable royalty

17   is recoverable as actual damages under 504 of the

18   Copyright Act.  I find that *On Davis v. The Gap, Inc.*, 246

19   F.3d 152 (2001) set out the Second Circuit -- set out by the

20   Second Circuit -- is convincing to this court.  Contrary to

21   MGA's argument, the issue of whether the plaintiff was

22   actually licensing its works prior to the infringement

23   appears to be immaterial.

24             The Second Circuit, instead, expressed a concern

25   about free riding in the absence of actual lost profits.  It

1    analogized copyright infringement to, quote:  *A subway rider*

2    *who jumps the turnstile and avoids paying the normal fare.*

3              However, that's -- I think that encompasses the

4    problem.  The license or reasonable royalty measure in a

5    copyright infringement case is the fair market value of the

6    license.  In the Second Circuit's words, the question is not

7    what the owner would have charged but rather what is the

8    fair market value.  In other words, the reasonable royalty

9    in a copyright infringement case is *ex ante* and the

10   objective determination.

11             Georgia-Pacific, by contrast, involves an ex-post

12   and subjective analysis.  It doesn't calculate what the fair

13   market value was, but rather what the particularly situated

14   plaintiff and defendant would have agreed to in a

15   hypothetical negotiation.  It also uses the Book of Wisdom

16   to look backwards at everything we've learned since the

17   infringement.  I think you've conceded as much in looking

18   back at your report in paragraph 155.  And all this analysis

19   is improper under copyright law.

20             Now, I recognize that a reasonable royalty

21   calculated using the Georgia-Pacific factors may be a viable

22   remedy for trade secret misappropriation.  However,

23   reasonable royalty is a fallback remedy and in any event

24   should be calculated by the court and not the jury.

25             I think given the disparity between the law that

1  applies under copyright law and trade secret law, there's no

2  reason to confuse the jury with this issue.  This is

3  especially so because unjust enrichment in this case seems

4  to be provable, though the precise amount is obviously

5  subject to great debate.  I, therefore, doubt we'll even get

6  to a reasonable royalty on the trade secret claim.

7          I'm concluding that your Georgia-Pacific is

8  improper under copyright law and should be excluded as a

9  result.

10         The last part is the most troublesome to me, and

11 I'm going to ask both of you for comment; and then, of

12 course, I'll listen to your other comments as long as you

13 would like tonight.

14         I want to propound to both MGA and Mattel --

15 because this is a coequal problem for both of you.  Isn't

16 the proper expert for measuring sweat equity somebody who is

17 involved in management or human resources, like Mr. Eckert,

18 or Mr. Larian, or -- but not an expert in accounting, like

19 Mr. Wagner?

20         I simply don't understand what that sweat equity

21 concept of how an accountant is able to calculate that the

22 real world marketplace.  So I'm going to invite some

23 argument from you from both sides on that.  If you want to

24 make comments, I've got three other questions, and maybe I

25 can propound them to you now, just in case we get past this

1    initial hurdle.

2         Mr. Wagner, you calculate apportionment two ways:

3    The benchmark model and the royalty measure.

4         In the benchmark model, you've compared the Bratz

5    net profits with an industry-wide Earning Before Interest

6    and Taxes measure and a company-by-company Earning Before

7    Interest and Taxes measure.  Earning Before Interest and

8    Taxes is revenue and nonoperating income minus expenses, and

9    you've also calculated the EBIT margin, which is EBIT

10   divided into total revenue.  So I have got these three

11   additional questions, if we can get past the first I asked.

12        Do you calculate out fixed costs?  Write this

13   down?

14        Do you calculate out fixed cost, like labor and

15   physical resources, like facilities and electricity, in

16   determining the amount of Bratz profits?

17        Next question I might have for you is:  Why do you

18   compare the EBIT, or what I've actually refer to as profit,

19   against Bratz profits when you could compare the EBIT margin

20   against the Bratz EBIT margin.  I guess, in other words, I'm

21   saying, I think that the margin may be a better point of

22   comparison in the total EBIT, but I'm not sure where that

23   leaves me in terms of calculation back to the jury.

24        Finally, if you isolate out Bratz profits and

25   compare that number to the EBIT for another company's entire

```
 1    product line, aren't you first assuming that the second

 2    company would have produced an equal volume of product, as

 3    MGA; and second, under the -- and second, underappreciating

 4    the fact that MGA's marginal cost on a single product like

 5    Bratz would be much lower than a company who produces a

 6    smaller volume of a number of products.

 7              So, in simplified terms, the more I'm thinking

 8    about this, the -- well, let me wait.

 9              Let me just address the first question to

10    Mr. Zeller, and Ms. Hurst:  Why are either of your experts

11    the proper person for measuring sweat equity when I've got

12    management here?  And why isn't that the person to be

13    helping the jury with this issue?

14              Mr. Zeller?

15              MR. ZELLER:  I don't think that that's mutually

16    exclusive.  And I understand the court's point that,

17    perhaps, guidance could be given by an executive.  I don't

18    know that, frankly, Mr. Eckert is the person on the Mattel

19    side.  Might be someone who's more, we'll say, closer to the

20    creative side of the business.  But I certainly don't

21    disagree that someone in that position can help the jury

22    understand what sweat equity is, its significance and also

23    then the significance of the intellectual property and how

24    that helps as well and how, you know --

25              And, I think, people have been talking about this
```

```
 1    when they talk about building a brand.  So I think to some
 2    degree, that is already out there, you know.  And the court
 3    has already heard testimony, too, about -- and there's been
 4    some back and forth about this, as to how much of that is
 5    what we're calling sweat equity.  Other people have just
 6    simply called, you know, work and investment and everything
 7    else, and we have heard that from some witnesses.
 8            So I don't disagree that it's a proper subject for
 9    the witnesses, the business people and the creative people
10    to address.  However, what I think an expert brings to this,
11    like Mr. Wagner is, is that it's a way of quantifying it.
12    You know, these benchmarks -- I mean, obviously MGA is going
13    to attack the benchmark.  We wouldn't expect anything less.
14    They're going to attack the numbers.  But that doesn't mean
15    that it's not helpful to the jury, and, you know, the jury
16    can choose to accept or reject.  That is being a benchmark.
17            But I do think it's -- I don't want to say it's
18    beyond the kin of an executive to help the jury understand
19    the difference between sweat equity and IP --
20            THE COURT:  Don't focus on the executive.  Focus
21    on my point.
22            MR. ZELLER:  Right.  Well, I think you were saying
23    is, is:  Why do we even need an expert for this at all?
24            I don't think that those other types of
25    individuals, the nonexperts, can quantify it, or at least
```

```
 1    give some measure of quantification to it.

 2              THE COURT:  How can an accountant?

 3              MR. ZELLER:  Well, in the way that Mr. Wagner did

 4    it.  He looked at a way of trying to determine and separate

 5    out -- and that is what accountants do, too.

 6              THE COURT:  Let me hear from Ms. Zeller -- I mean,

 7    Ms. Hurst.  I'm starting to associate the two of you

 8    together.

 9              MS. HURST:  Your Honor, Mr. Malackowski in fact

10    used one method of apportionment that does exactly as the

11    court suggests.  He made a time contribution evaluation by

12    apportioning the relative time contribution of Mr. Bryant

13    versus others, which I believe is exactly the type of

14    calculation that the court is suggesting; and that is, one

15    of six methods that Mr. Malackowski employed.

16              I don't think a human resources professional is

17    required to make that calculation.  I think the damages

18    expert is the appropriate person to do it.  What the court

19    is really noting is a flaw in methodology.

20              THE COURT:  But you understand that I don't -- I

21    have the same lack of confidence in Mr. Malackowski for this

22    reason:  He throws out six methods and then chooses which

23    one is -- It happens to be the flavor of the day.  So I

24    don't have a lot of confidence in your damages expert

25    either, although he may have calculated one out of the six,
```

1  or maybe others, but Georgia-Pacific, you know, comments --

2  MS. HURST:  He did not use Georgia-Pacific factors

3  for apportionment.  I need to make that extremely clear for

4  the record.  That is a misstatement.

5  Mr. Malackowski did not use Georgia-Pacific

6  factors, a Georgia-Pacific hypothetical analysis for

7  apportionment.  Moreover, your Honor, Mattel did not move to

8  exclude Mr. Malackowski's apportionment analysis in any way.

9  Their *Daubert* motion does not attack Mr. Malackowski's

10  apportionment analysis.

11  THE COURT:  Okay.  Thank you very much.

12  Now, Mr. Cote, I don't want to leave you out, but

13  this is brief now.

14  MR. COTE:  Your Honor, I'm not sure what to say.

15  You haven't talked about the Mexico documents.  Mr. Zeller

16  also didn't talk about the Mexico documents.

17  My comments about Mr. Wagner's work on the Mexico

18  documents part of the case is -- remains unaddressed, or

19  unchallenged by anyone on Mattel.  It's, apparently,

20  undisputed that all he did was copy a spreadsheet prepared

21  by Mattel employees; did no independent work on his own.  He

22  merely added up the numbers.

23  And for all the reasons we said last night --

24  THE COURT:  Now, Mr. Wagner, come up here just a

25  moment.  I want you to answer those questions for me briefly

1    and I mean very briefly now.

2         (Pause.)

3              THE COURT:  Are you calculating out fix costs like

4    labor and physical resources in determining the amount of

5    Bratz profits?

6              THE WITNESS:  Yes, your Honor.  Those numbers --

7              THE COURT:  Yes or no?

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  That's how brief it's going to be now.

10   You may get paid by the word.  I'm just kidding you, but

11   that's it.

12             Why do you compare the EBIT against Bratz profits

13   when you could compare the EBIT margin against the Bratz

14   EBIT margin?

15             THE WITNESS:  I'm sorry, your Honor.  I thought

16   that's what I'm doing.  I'm not sure if I understand your

17   question.

18             THE COURT:  You believe that that's what you're

19   doing?

20             THE WITNESS:  Well, my yardstick is an EBIT

21   measure, and I'm measuring its Bratz EBIT.

22             THE COURT:  Do you think the margin would be a

23   better point of comparison?

24             THE WITNESS:  "Margin" means many different

25   things.  There is a gross margin.

1          THE COURT:  I notice that.

2          THE WITNESS:  There's contribution margin.

3          THE COURT:  I notice that.

4          THE WITNESS:  There's profit for tax.

5          THE COURT:  Do you know how unclear that is?

6          THE WITNESS:  Yes, your Honor.

7          THE COURT:  Do you have any concept to what the

8    jury is listening to?

9          We're not going to mystify them.  If you isolate

10   out the Bratz profits and you compare that number to the

11   EBIT for another company's entire product line, first,

12   aren't you assuming that the second company would have

13   produced an equal volume of product as MGA?

14         THE WITNESS:  Not necessarily.  But you could make

15   that assumption, yes, your Honor.

16         THE COURT:  And I'm also concerned that you're

17   underappreciating the fact that MGA's marginal costs on a

18   single product like Bratz will be much lower than a company

19   who produces a smaller volume of a larger number of

20   products.

21         THE WITNESS:  I agree with that, your Honor.

22   You're thinking about it correctly.

23         THE COURT:  Okay.  Sir, step down.  Thank you.

24         THE WITNESS:  You're welcome, your Honor.

25         THE COURT:  All right.  Now, I'm going to invite

1    any comments.  That will be the end of the discussion, and

2    I'll make my ruling as soon as I go back into chambers.

3            You can start anyplace you like to.  You can go

4    anyplace you like to.  This is it.  So I don't care who

5    starts, but that will be the end of it.

6            So, I think I'm going to end with Mr. Zeller.  I'm

7    going to start with Ms. Hurst.  Go to Mr. Cote, but this is

8    brief now.  And then back to Mr. Zeller.

9            MS. HURST:  The statement that Mattel can simply

10   put up any revenue that has a connection and then argue

11   damages from that is a misstatement of the law.

12           They cannot put that 792 number in front of the

13   jury.  It's not consistent with the Ninth Circuit opinion.

14   And it's not consistent with the law.  They are seeking

15   every penny of profit made on thousands and thousands of

16   noninfringing products.  Under *Polar Bear*, under the

17   Copyright Act, the standard for that kind of indirect profit

18   causation is exceedingly high.  The court says it's

19   extrinsic causation standard for indirect profits.

20           It is clear from the Ninth Circuit opinion that

21   that standard cannot be met in this case.  They cannot put

22   that 792 number up there under the Copyright Act, and they

23   can't do it under the Trade Secrets Act either, because as

24   the court has correctly noted, the burden under the

25   Trade Secrets Act in California requires them to separate it

1   out.  They have offered no reliable method of separating it

2   out.

3           With respect to the benchmark issue, Mr. Wagner

4   conceded that he compared incremental profits which only

5   takes a very limited portion, it only allocates a very

6   limited portion of fixed expenses.  He compared incremental

7   profits to EBIT, which washes out all the fixed expenses.

8   Incremental profits to EBIT.  He could have compared

9   incremental profits to incremental profits.  If he had done

10  so, there would have been no excess profitability.  He could

11  have compared EBIT to EBIT.  If he had done so, there would

12  have been no excess profitability.  So only by making,

13  choosing to make the false comparison does he come up with

14  an excess profitability.  That is clearly unreliable.

15  That's not just a matter of judgment.  That's deliberately

16  choosing the only combination which is a false comparison

17  which could come up with a number other than zero.  It's

18  apples to oranges.

19          THE COURT:  All right.  Now, you're starting to

20  repeat.

21          MS. HURST:  Okay, I'll stop.  I'm sorry.

22          THE COURT:  If you have a new concept, that's

23  fine.  Last evening, we went around 10 times.  I was

24  appreciative of it.  I allowed it.  Tonight, no.

25          MS. KELLER:  Veritas.  Washington state does not

 1    have 3426.3(b).

 2              THE COURT:  I understand that.  That was

 3    Judge Cougenhour's case.  Separate issue.

 4              MS. HURST:  Can't do it.  Can't do it when the

 5    statute specifically says reasonable royalties only the

 6    alternative.

 7              Okay.  The reason I said last night that

 8    31 million is the only admissible number that they've got on

 9    unjust enrichment, is because that's their initial burden

10    under 504 on the six dolls.

11              THE COURT:  Now, I'm going to stop you right

12    there.

13              I saw that statement that you put up in

14    Footnote 9, and this is my concern after I saw that.  I'm

15    going to issue this tomorrow in written form.  I'm going to

16    read this to you, because you're wrong.  And if you are

17    relying upon that, you're being misled.  I'm going to

18    correct that immediately.

19              Footnote 9 to the January 5th, 2011 Amended

20    Order -- now, remember the Amended Order is only an

21    expansion from the first 115, or 16 pages.  There's 168

22    pages.  That's why I'm referring to it as the Amended Order.

23              And the motion for summary judgment does not,

24    quote, unquote, *does not constitute a finding that*

25    *subsequent Generation dolls infringe.  The grant of summary*

1    *judgment on that issue is absolute,* end of quote.

2            *The term "this" in the first sentence of*

3    *Footnote 9 refers to the court's conclusion in the text that*

4    *a reasonable fact-finder could conclude that the Bratz*

5    *production sculpt TX 17733 infringed Bryant's concept sculpt*

6    *TX 1136 in which Mattel registered a copyright.  That's*

7    *Docket No. 16:11 through 13.  The term "that issue" in the*

8    *second sentence of Footnote 9 refers to the court's*

9    *conclusion in the text that no reasonable fact-finder could*

10   *find substantial similarity between the protectable*

11   *expression in Bryant's concept sketches in all but*

12   *subsequent Generation Bratz dolls* -- you'll find that at 28,

13   lines 8 through 13 -- *finding general issues of material*

14   *fact as to whether Formal Funk Dana and Ooh La La Cloe*

15   *infringed Bryant's concept sketches.*

16            *This court, as the law requires, performed an*

17   *extrinsic analysis comparing articulable similarities*

18   *between the production sculpt TX 1773 and concept sculpt*

19   *TX 1136.  The court found sufficient similarities between*

20   *the precise angles of the two sculpts' skulls and facial*

21   *features, abdomens and arm sway to create a genuine issue of*

22   *material fact as to substantial similarity of protectable*

23   *expression and virtual identity overall.*  You'll find that

24   at 15:16 and 16 through 10.

25            *Footnote 9 stated that the court's finding on the*

1    *sculpt did not implicate its later determination that all*

2    *but that two subsequent Generation Bratz dolls -- which*

3    *unlike the sculpts express the idea of a complete young, hip*

4    *female fashion doll with exaggerated features -- did not*

5    *infringe Bryant's sketches.*

6              *Footnote 9 does not, however, preclude a jury*

7    *finding that the production sculpt TX 17733 infringes the*

8    *concept TX 1136.  To infer this kind of preclusive effect*

9    *from Footnote 9 would render absolutely nugatory the Court's*

10   *extrinsic analysis as to the sculpts,* for which I spent

11   considerable time.  *Mattel is entitled to argue that the two*

12   *sculpts are virtually identical overall and correspondingly*

13   *seek the recovery of all available remedies, like the*

14   *damages enumerated in the Copyright Act as 17 U.S.C.*

15   *Section 504.*

16             *It is likewise unreasonable to read Footnote 9 to*

17   *preclude the recovery of any profits by subsequent*

18   *Generation Bratz dolls sales, even excluding sales of*

19   *Ooh La La Cloe and Formal Funk Dana.  It may be the case*

20   *that none of the subsequent Generation Bratz dolls*

21   *incorporated the Bratz production sculpt TX 17733.  But that*

22   *was not the issue on which either party moved for summary*

23   *judgment and, indeed, MGA acknowledged that many thousands*

24   *of variations of the Bratz dolls used the production sculpts*

25   *as a foundation.  And I'll refer you back to MGA's motion*

1    for summary judgment at 33, lines 19 through 20.

2              *Even if MGA sold sculpts that infringed the*

3    *copyrighted Bryant sculpt, it may be the case that the vast*

4    *majority, if not all of MGA's profits, flowed from factors*

5    *unrelated to the protectable expression in the sculpt, like*

6    *doll fashions, hairstyles, eye color and product packaging.*

7    *However, neither party moved for summary judgment on the*

8    *extent to which profits resulted from any sculpt*

9    *infringement.  This issue, therefore, remains unresolved as*

10   *well.*

11             *In my January 5th, 2011 Amended Order, I found a*

12   *genuine issue of material fact as to whether TX 17733 and*

13   *TX 1136 were virtually identical overall.  That*

14   *determination did not affect the court's entry of summary*

15   *judgment on the issue of whether all but two subsequent*

16   *Generation Bratz dolls infringed Bryant's concept sketches.*

17   *The summary judgment order does not include Mattel -- or*

18   *preclude Mattel from arguing that, first, the Bratz*

19   *production sculpt infringes the Bryant sculpt and second,*

20   *many dolls incorporate the Bratz production sculpt; and*

21   *third, some portion of the profit generated from sales of*

22   *those dolls is attributable to the sculpt infringement.*

23             Now, I'll put that out tomorrow again.  But when I

24   heard that last evening, I don't want you to be misled from

25   either party about what my findings were.  If I need to

1    clear up Footnote 9, I'm glad to do so, but I thought it was

2    very clear from my analysis in relation to Footnote 9.

3            All right.  Now, please continue.

4            MS. HURST:  And an inadmissible methodology does

5    not become admissible on rebuttal because the witness has

6    been attacked for failing to apportion.  Let me give an

7    analogy.

8            If the police officer is on the stand saying that

9    the suspect lied and on cross-examination the defense

10   counsel says, *You've no evidence that my client lied,* the

11   polygraph test does not become admissible on redirect.  It

12   still is inadmissible.

13           THE COURT:  And not only that, I not only tend to

14   agree with that upon reflection.  The difference is you keep

15   getting a sliding evaluation from an expert; in other words,

16   you never complete the moving target, which is unfair.  I

17   mean, at some point it freezes.  The parties have had a

18   chance and a choice, and that's it.

19           MS. HURST:  I just want to emphasize the final

20   issue is that on this -- the allocation amongst the buckets

21   on the 792.  Mattel moved to exclude Mr. Malackowski's

22   opinion on MGA's affirmative trade secret claim, citing 02

23   and other cases, and saying the failure to allocate amongst

24   the trade secrets is fatal.  And that's the same argument

25   we're making about the 792 on the trade secret claim.

1              And the problem is, it's everything and nothing.

2    Every single trade secret when you don't allocate, you're

3    not committed; and then, that leaves in the wiggle room, the

4    moving target, and every single trade secret is both

5    everything, and it's nothing.

6              THE COURT:  When I'm calling for the briefing as

7    late as today -- I gained the last report 10 days ago --

8    that ends the discussion.

9              MS. HURST:  So, your Honor, I've heard the court's

10   comments with regard to the summary judgment order.  I'll

11   just address that briefly.

12             THE COURT:  What I'm going to do, because I'll

13   have to, I'll amend Footnote 9.  I thought it was relatively

14   clear.  Seeing that on the board was inhibiting that

15   argument last night.  It made me realize it wasn't clear.

16             MS. HURST:  Well -- and the reason, just so the

17   court understands why we understood the other way, is

18   because if you compare a blank sculpt and a finished doll,

19   they don't look anything alike.  They're not substantially

20   similar.

21             THE COURT:  I understand.

22             MS. HURST:  So when you said the subsequent

23   generations didn't infringe, we thought it meant what it

24   said.

25             THE COURT:  I'm not finding fault.  After that

1   analysis, I thought it was self-evident, but it's not.  So

2   I'll amend it.  That's fine.

3           MS. HURST:  And I guess --

4           THE COURT:  It gives you time to adjust, okay?

5           MS. HURST:  And what I would say on that, though,

6   is that we did move for summary judgment on the proposition

7   that the subsequent generations don't infringe the sculpt.

8   We absolutely did.  And if the court may even recall that we

9   moved under Rule 37, because they hadn't in the *Lee Loetz*

10  opinion any protectable elements from which to make that

11  comparison.  We certainly did move, and I renew that --

12          THE COURT:  When I heard last evening because of

13  the burden shifting, you're getting this out tonight, okay?

14          MS. HURST:  Understood.

15          THE COURT:  Otherwise, you would have been caught,

16  quite frankly, flat footed on that.

17          MS. HURST:  So in closing, we have not on

18  affirmative claim, either on our affirmative claims, or on

19  our apportionment with respect to Mattel's affirmative

20  claim, we are not offering a reasonable royalty analysis as

21  anything other than a reasonable royalty that would be

22  considered by the court if and only if, okay?

23          And we agree -- and this applies to our

24  affirmative claims and their affirmative claims -- that the

25  burden is on the plaintiff in the trade secret claims to

```
 1    separate out just from unjust.  Just like the court say that
 2    California law.  That's right there in the use notes.  The
 3    instructions contemplate that structure.
 4              THE COURT:  If it wasn't Washington, it might be
 5    different.
 6              MS. HURST:  All right.  No further comments.
 7              THE COURT:  Counsel.
 8              MR. COTE:  Thank you, your Honor.
 9              I'll be brief.  We haven't talked about the Mexico
10    documents tonight.  But what Mr. Zeller started --
11              THE COURT:  Do you want me to turn to Mr. Zeller
12    and you have the last word?
13              MR. COTE:  Sure.
14              THE COURT:  Mr. Zeller, why don't you incorporate
15    both, but in particular MGA.  That's where the big struggle
16    is.
17              MR. ZELLER:  First, it's simply not correct, as
18    the court knows, that Mr. Wagner's analysis asked for,
19    quote, every penny of profit, end quote.  That's just
20    demonstrably incorrect.  So the premise of MGA's argument
21    are incorrect.
22              Number two, in the attempt to distinguish *Veritas*,
23    Ms. Hurst I assume correctly points out there is a variation
24    in the Washington statute.  But that's immaterial here.
25    What matters is, is that the district court found that
```

1    reasonable royalty was an appropriate measure; and number

2    two, that Georgia-Pacific was an appropriate measure of

3    reasonable royalty.  That's the construct that we've been

4    struggling with here all together as to whether or not this

5    recognized concept of Georgia-Pacific recognized in the

6    patent area can apply to trade secret, and whether it's

7    transportable in that way.  And there are certainly

8    decisions.  And MGA's own expert says so, that that

9    Georgia-Pacific factor can be considered as an appropriate

10   construct for reasonable royalty in trade secret claims.

11            I quoted Mr. Malackowski's report.  I don't see

12   how he could have possibly misstated it.  I quoted it.  That

13   is what he said.  He said he has done it in hundreds of

14   cases.  Again, he doesn't differentiate between patent and

15   trade secret misappropriation.  But he says, collectively,

16   in those cases, he has done it over 100 times.

17            So I don't think that the charge here that somehow

18   we have misstated what this expert's opinion is, is

19   well-founded.

20            The other point I would make is -- and this was a

21   new argument here by MGA, which is a resort to the 02 case.

22   The court will recall that it is certainly true we made that

23   point about Mr. Malackowski's report and opinion about trade

24   secret.

25            The court on summary judgment said that that was

1    premature.  We don't know what the jury is going to

2    determine the trade secrets are.  And that certainly cannot

3    be a basis for excluding on *Daubert*.  It's not a basis for

4    its exclusion.  The punishment, of course, would be is, we

5    would lose in front of the jury.  The jury would determine

6    that doesn't make any sense.  It doesn't work for the trade

7    secrets that we have found.  Mattel owns.  But that's not

8    *Daubert*.  That's not summary judgment.  That's simply an

9    issue for the jury, and I think that was the point the court

10   made on summary judgment.  So I don't think the 02 point

11   goes anywhere.

12            Obviously, I've made the pitch as to why it is we

13   think reasonable royalty by way of Georgia-Pacific does work

14   in a trade secret misappropriation case, so I won't belabor

15   that.  But I do think, still, given everything that has been

16   discussed, even with the burden shifting and even accepting

17   what the court's tentative construct was, which it is

18   Mattel's burden to put forth revenues, costs on unjust

19   enrichment, that Mr. Wagner still can do that without

20   controversy, without controversy with respect to the

21   Georgia-Pacific factors, the area that the Court finds --

22   there's one that the court is struggling with.  Again, we

23   aren't waiving our position here.  We urge the court, and I

24   think the court is well aware of this, that we do think it's

25   a proper construct for him to apply to take that next step

1    and apply the factors however they are called to make that

2    determination.

3           But even if the Court finds that an expert

4    shouldn't be allowed to do that, pursuant to *Daubert*, that

5    does not exclude his entire opinion.  And I think he would

6    still be able to testify as to those other elements of

7    unjust enrichment.  So I do think the court should give that

8    consideration as well.

9           The final point I would make in response to

10   Mr. Cote's arguments about the Mexican documents is, is that

11   what Mr. Cote hasn't pointed out -- hasn't addressed is, is

12   that the methodology that was applied here was constructed

13   by Mr. Wagner.  This wasn't him just simply saying, getting

14   fed a bunch of numbers.  He came up with a methodology.  He

15   gave instructions to the people who have that information as

16   to how it is to calculate those costs.  And, of course,

17   these are the percipient people.  These are the people with

18   that information.  They provided him the information

19   according to the methodology that he asked for, and he got

20   those numbers back.  So the idea that somehow he's just

21   taking numbers that other people came up with and passing

22   them off as his own is just simply not correct.  He had a

23   methodology.  He is applying it.  If Mr. Cote and

24   Mr. Overland wish to attack it, that's certainly what I

25   would expect that they would do in cross-examination.  But I

1    also would say is the alternative for somehow to prove

2    simply the cost.  And all we're talking about here is what

3    the term that Mr. Wagner used was "avoided costs," but what

4    we're really talking about is how much did it take to make

5    these big documents and this information that was taken.

6    The idea that we're supposed to parade, you know, 20, 30

7    people in theory to say, *Here's what I did,* and here's the

8    cost number that I got, it does not seem reasonable, and it

9    seems like it's a perfectly acceptable subject of testimony

10   by an expert who created this methodology, has put these

11   numbers together and properly can testify about them.

12              THE COURT:  Thank you.

13              MR. ZELLER:  I'm sorry, one more thing.

14              Mr. Price had reminded me.  One other thing, too,

15   is about -- Mr. Wagner, I'm sure the court already knows --

16   is isn't just simply an accountant.  He's an MBA.

17              THE COURT:  He's a lawyer.

18              MR. ZELLER:  He's a lawyer.  But, also, he's an

19   expert in IP valuation.  So I just wanted to remind the

20   court of that as well.

21              THE COURT:  His resume is quite impressive.

22              MR. ZELLER:  And he also does include the fixed

23   costs that the court asked about, and that's on slide 17.

24   It gives the breakout of the costs that he included.

25              THE COURT:  Mr. Cote.

```
 1              MR. COTE:  Thank you, your Honor.

 2              I'll be brief, as the court suggested.  The first

 3    point:  Mr. Zeller started off his argument at the beginning

 4    of the evening by saying it's up to the plaintiff to prove

 5    revenues.  If the court decides that Mr. Wagner can put on a

 6    lost profits analysis, he has nothing to say about Mexico,

 7    because there are no profits.  He did not find a single sale

 8    caused by or a single sale lost by any of the Mexico

 9    documents, so he cannot opine on anything if he is limited

10    to a lost profit with respect to Mexico.

11              Second point.  What Mr. Zeller describes as a

12    methodology is picking up the phone, calling the client and

13    asking them how much they think he should put in his report;

14    and then, they send him a number and then he copies it and

15    pastes it in his report, with the typos and with the bad

16    cites and says, *Here is my expert opinion.  You have to

17    believe it, because as Mr. Zeller pointed out, I have a MBA,

18    I have a JD.  I have a very impressive resume.*

19              THE COURT:  Just a moment.

20              Do you have that -- the 5 million-dollar figure in

21    that analysis?

22              Can you put that up on the screen for me?

23              I forget it's -- I don't know if it's 18, or -- I

24    forget.

25              Can you put that up for a moment?
```

```
 1              MR. COTE:  You're talking about slide 69, I think.
 2              THE COURT:  Slide 5,815, I don't know.  Just put
 3    that up on the board for me.
 4         (Pause.)
 5              THE COURT:  Okay.  Now, just a moment.
 6              Some of this is chump change.  The third-party
 7    data $5,987,000.  How is that derived?
 8              MR. COTE:  Are you asking me?
 9              This is a number I went through with Mr. Wagner in
10    my examination.  Most of that number consists of three
11    chunks of $1.9 million each.  The $1.9 million is supported
12    by a cite to a document that Mr. Wagner admitted didn't
13    support it.
14              THE COURT:  Now, just a moment.
15              Mr. Zeller, help me, or Mr. Price.  The
16    5.9 million, what document -- who's the witness?  How is it
17    supported?
18              In other words, when you talk about a parade of
19    horribles, 20 witnesses coming in, I just want to spend a
20    moment with Mr. Wagner.  I, quite frankly, am wondering why
21    that isn't a relatively easy thing to prove, but it may not
22    be.
23              MR. PRICE:  Your Honor, can Mr. Wagner answer that
24    question?
25              THE COURT:  Sure.  Absolutely.  Mr. Wagner, you
```

1    don't have to take the stand.  Just come on up to the

2    lectern.  You're still under oath.

3              Tell me where you derive that 5.9 million from.

4              THE WITNESS:  Your Honor, that's from a number of

5    contracts that were provided to me.  And Mr. Cote was

6    correct.  Originally, I did not have that information, but

7    was investigated in my deposition.  Then, I asked for more

8    support, and I was given six contracts.  I think it was

9    discussed, briefly.

10             But what it says is --

11             THE COURT:  Just a moment.  Those six contracts,

12   what are they?

13             MR. ZELLER:  It's probably best if Mr. Wagner

14   addresses those.

15             THE COURT:  Those six contracts, what are they?

16             THE WITNESS:  Your Honor, it's a contract with a

17   major retailer in Mexico, or six of them.

18             THE COURT:  Just a moment.  So instead of the

19   parade of horribles of 20 witnesses that you whined about,

20   why aren't those just coming into evidence?

21             In other words, the complaint is, *Look, he just*

22   *copied the product down to the missed typo.*  If you got six

23   contracts out there, what are those six contracts?  Let me

24   look at them and see what the real problem is here.

25             MR. ZELLER:  We can certainly look into that.  I

 1    was talking also more generally --

 2            THE COURT:  No, no, no.  We're done now.

 3            This is 6.5 compared to $5.9 million.  If you want

 4    to call Mattel IT costs, et cetera, or on the labor costs

 5    prepared data, or whatever, it's not burdensome, and it's

 6    quick.  I just -- I'm not hearing that there is a real

 7    problem getting this in, in a sense and it somewhat negates

 8    the accusation that you probably just copied it with typos.

 9            So what's your response if they come up with

10    admissible evidence, totaling six contracts with

11    5.9 million?  Now what do you do?

12            Just looking ahead for a moment.

13            MR. COTE:  Two responses to that.  I said in my

14    argument yesterday is what they should have done is bring up

15    the percipient witnesses.

16            THE COURT:  Now, let's -- just a moment.  Let's

17    just assume that they are a business record, or -- just very

18    easy to get in.  I don't know.  But assume the worst for

19    you, right now, that it's an easy document to get in and,

20    again, before Wagner comes up.  What's your response to

21    that?

22            In other words, plan for the worst or hope for the

23    best.  Pray.  I'm just kidding you.

24            No, no, no.  They may be inadmissible.  They may

25    be --

1          MR. COTE:  We have objections with the actual

2     contracts themselves, but you want to put those aside.

3          THE COURT:  I want to put those aside

4     hypothetically?

5          MR. COTE:  If --

6          THE COURT:  By the way, they don't even know what

7     they are, right now.  They are searching for them.

8          MR. COTE:  I understand.  I have copies.

9          If they can be admitted, then all Mr. Wagner is

10    doing is adding up numbers, which the jury can do.  There is

11    no need to have someone with his impressive pedigree and

12    resume to give the ump, the validation, to those documents

13    that they wouldn't otherwise be entitled to.  That's really

14    the problem.  And then, it's really a -- it's a lack of

15    helpfulness to the jury, which is a key part of the test for

16    expert --

17         THE COURT:  Okay.  Good night.  Oh, I'm sorry.

18    Mr. Price.

19         MR. PRICE:  Your Honor, with respect to --

20         THE COURT:  This is the last go-round.  This is

21    very brief.

22         Mr. Price, I'm going it pay you that courtesy.

23    That means I'm going to back to Ms. Zeller (sic) again,

24    Mr. Cote and that's it tonight.

25         MR. PRICE:  I just wanted to address the

1    third-party data issue.  Mr. Wagner can probably address it

2    in more detail.  But what that is, is, your Honor, it

3    concerns the point of sales documents which they took.  And

4    Mattel paid for that.  This isn't avoided the costs to

5    Mattel methodology.  Mattel pays for that in these contracts

6    by giving a discount of 1 percent to its customers, so it

7    is --

8             THE COURT:  Let me repeat that back, because I

9    don't have those in front of me, and I don't understand.

10            Is this the total cost paid for these three

11   contracts?

12            MR. PRICE:  It's the total cost we pay under those

13   six contracts for the point of sales information from those

14   customers.  That is, we give them a discount if they will

15   give it to us.  So, therefore, we are foregoing, we are

16   paying for that information.  And that's the information

17   they stole.

18            THE COURT:  No, I'm sorry.  Let's do this again.

19   I'm not sure I understand that.  In other words, you are not

20   paying a company for some kind of data.  This is a discount.

21            MR. PRICE:  Which is the same thing.  Instead of

22   charging you $10 for my product, if you give me the point of

23   sales information about my product, I will only charge you

24   9.  So I'm in effect paying a dollar for that information.

25   Now, that's not the percentage.  It's 1 percent, not 10.

1          And that's one of the documents that was taken

2     from us which we paid 1 percent of the sales to those six

3     companies.

4          THE COURT:  And how much is 1 percent of the sales

5     to those six companies?

6          MR. PRICE:  That's the $5,987,527.

7          THE COURT:  Okay.  Now, that --

8          Whether I agree or not, that finally makes sense.

9     I didn't know what 5.9 million was when it went up on the

10    slide.

11         MR. PRICE:  There is a little bit of labor costs

12    in there, but what I told you is 99.9 percent of that

13    number.

14         THE COURT:  It doesn't matter.  I finally

15    understand.  To me, it was a slide, third party.  I wasn't

16    certain what it meant.  Everybody seems to be in a rush.

17         Now, I understand what it is.  Okay.

18         All right.  How do you prove that?

19         MR. PRICE:  Well, you have an expert look at the

20    transaction and say, *This was the amount of sales between*

21    *Mattel and its customer.  In return, they got this POS*

22    *information and the sales that were reduced because of*

23    *these.*

24         THE COURT:  And you have these actual documents?

25         MR. PRICE:  Yes, we have the documents.  That's

1   what Mr. Wagner was asked about on cross-examination.

2           THE COURT:  But they haven't come into evidence?

3           MR. PRICE:  No, they haven't come into evidence,

4   but obviously an expert can rely on evidence that's not

5   admitted.

6           THE COURT:  Even if it's just copied evidence?  In

7   other words it makes no difference, from your perspective?

8           MR. PRICE:  It's the contract.

9           THE COURT:  Call down.  He got it.  It doesn't

10  matter because the underlying basis is a contract.  It

11  doesn't matter if he just took the document and just pasted

12  it in from your perspective, right?

13          One more time, Mr. Cote.

14          MR. COTE:  I think I need to talk about the

15  contracts a little bit now.  The $5.9 million on the slide

16  in front of the court consists mostly of $5.7 million, which

17  is three years of this data, $1.9 million per year.

18          So far all Mr. Wagner has done is tell the jury

19  that 1.9 times 3 is 5.7.  We don't need an MBA for that.

20  Secondly --

21          THE COURT:  Just a moment.  Let's assume we didn't

22  have Mr. Wagner.

23          MR. COTE:  Right.

24          THE COURT:  They would have to get those documents

25  into evidence.

```
 1              MR. COTE:  They would.

 2              THE COURT:  And they would have to have somebody

 3   come up from?

 4              MR. COTE:  Mexico.

 5              THE COURT:  Or Mr. Machado?

 6              MR. COTE:  If Mr. Machado has seen them before and

 7   can identify them, sure.  He wasn't in sales.  He didn't

 8   deal with retailers, so I don't think that's very likely.

 9   But maybe he can.  The problem with the contracts is they're

10   all dated after he left, and they are only for one year.

11              THE COURT:  Assuming you didn't have the expert,

12   how would those come in?

13              MR. ZELLER:  Well --

14              THE COURT:  Not making you jump through hoops,

15   just curiosity, because I'm finally understanding what these

16   third-party data are.  Before that, it was just a number.

17              MR. ZELLER:  We would have to bring somebody up

18   from Mexico who actually dealt with the contracts, right.

19   Someone from Mattel is what I'm saying.

20              Here's where I suspect the next attack would be,

21   is:  He's not an expert.  He wouldn't be allowed to add up

22   numbers.

23              THE COURT:  Okay.

24              MR. ZELLER:  I mean, but I don't know that it's

25   just one person from Mexico.  I don't know that it wouldn't
```

 1    take six.  But, presumably, we could find one or two people

 2    who could then authenticate the contracts?

 3                THE COURT:  If I could see the contracts, I would

 4    know what the real problem was.  Do you have them?

 5                MR. ZELLER:  I don't know that we have them here,

 6    but we can absolutely get them.

 7                THE COURT:  Why don't you get them.  Just turn

 8    around, and he's going to hand them to you.  I want to see

 9    them.

10                MR. ZELLER:  Good news.  We do have them.

11                THE COURT:  Of course, he does.  You're well

12    prepared.

13                Now, let me see it the contracts.

14                Mr. Cote, have you seen these documents?

15                MR. COTE:  I have, your Honor.  They are in

16    Spanish, actually.

17                THE COURT:  Okay.  And who are the contracts with?

18    Because there's only three; correct?  Three?

19                MR. COTE:  No.

20                THE COURT:  How many?

21                MR. COTE:  Six or seven.  I'm getting that number

22    right now, your Honor.

23                MR. ZELLER:  The first one I have is Volume I of

24    the Wagner documents.  This is exhibit --

25                THE COURT:  Just a minute.

```
 1            MR. COTE:  There are seven, your Honor.
 2        (Pause.)
 3            THE COURT:  Volume I, what's the first exhibit?
 4            MR. ZELLER:  This is Exhibit 9891.  I'm sorry.
 5   9898-1.
 6            THE COURT:  All right.  Now, I have that in
 7   Volume No. 6.
 8            MR. ZELLER:  The version I have is Volume I, my
 9   apologies.
10            THE COURT:  Mr. McConville, come up here.
11            This is off the record.
12        (Off the record.)
13        (At 8:51 p.m., proceedings were adjourned.)
14
15                            -oOo-
16
17
18
19
20
21
22
23
24
25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1                        CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  March 3, 2011

10

11

12                       _____

13                       Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```