1               **UNITED STATES DISTRICT COURT**

2               **CENTRAL DISTRICT OF CALIFORNIA**

3            **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

   MATTEL, INC., et al.,            )
6                                    )
            Plaintiffs,              )
7                                    )
        vs.                          ) No. CV 04-9049 DOC
8                                    )    Day 27
   MGA ENTERTAINMENT, INC., et al.,  )    Volume 1 of 4
9                                    )
                                     )
10          Defendants.              )
   _____)
11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Jury Trial

16                 Santa Ana, California

17               Thursday, March 3, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-03 D27V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
              QUINN EMANUEL URQUHART & SULLIVAN
4             BY:  JOHN QUINN
                   WILLIAM PRICE
5                  MICHAEL T. ZELLER
                   Attorneys at Law
6             865 South Figueroa Street
              10th Floor
7             Los Angeles, California 90017
              (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
              BY:  THOMAS S. McCONVILLE
13                 Attorney at Law
              4 Park Plaza
14            Suite 1600
              Irvine, California 92614
15            (949) 567-6700

16            - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
              BY:  ANNETTE L. HURST
18                 Attorney at Law
              405 Howard Street
19            San Francisco, California 94105
              (415)773-5700
20
              - AND -
21
              KELLER RACKAUCKAS
22            BY:  JENNIFER KELLER
                   Attorney at Law
23            18500 Von Karman Avenue
              Suite 560
24            Irvine, California 92612
              (949) 476-8700
25

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 3 of 160   Page ID #:306674
CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
            LAW OFFICES OF MARK E. OVERLAND
5           By:  MARK E. OVERLAND
                  Attorney at Law
6           100 Wilshire Boulevard
            Suite 950
7           Santa Monica, California 90401
            (310) 459-2830
8
            - AND -
9
            SCHEPER KIM & HARRIS LLP
10          BY:  ALEXANDER H. COTE
                  Attorney at Law
11          601 West 5th Street
            12th Floor
12          Los Angeles, California 90071
            (213) 613-4660
13

14   ALSO PRESENT:

15          MGA ENTERTAINMENT, INC.
            BY:  JEANINE PISONI
16                Attorney at Law
            16360 Roscoe Boulevard
17          Suite 105
            Van Nuys, California 91406
18

19          ISAAC LARIAN, MGA CEO

20          KEN KOTARSKI, Mattel Technical Operator

21          MIKE STOVALL, MGA Technical Operator

22          RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

23          GUSTAVO MACHADO, Defendant

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 4 of 160   Page ID #:306675
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

4

1                          **I N D E X**

2   **WITNESSES**                **DIRECT  CROSS  REDIRECT  RECROSS**

3   ECKERT, Robert A.

4   By Ms. Keller                10

5   By Mr. Overland                       132

6

7

8                          **EXHIBITS**

9   **EXHIBIT NO.**                  **IDENTIFICATION    IN EVIDENCE**

10    1194     Document from Mr. DeAnda                   120
             to Mr. Kaye, Subject:
11           MGA Bratz

12    1195-RS Investigation report                         96

13    1195-RS-10  Page 10 of                               99
               Investigation report
14
      1195-RS-11  Page 11 of                              100
15             Investigation report

16    1195-RS-12  Page 12 of                              100
               Investigation report
17
      1195-RS-4  Page 4 of                                101
18             Investigation report

19    1195-RS-5  Page 5 of                                101
               Investigation report
20
      1195-RS-8  Page 8 of                                103
21             Investigation report

22    1195-RS-9  Page 9 of                                103
               Investigation report
23
      1195-RS-21  Page 21 of                              103
24             Investigation report

25

<pre>
 1                      EXHIBITS (Continued)

 2   EXHIBIT NO.                   IDENTIFICATION    IN EVIDENCE

 3
        1195-RS-24  Page 24 of                          103
 4           Investigation report

 5
        1195-RS-35  Page 35 of                          103
 6           Investigation report

 7      1195-RS-36  Page 36 of                          103
             Investigation report
 8
        1195-RS-37  Page 37 of                          103
 9           Investigation report

10      1195-RS-38  Page 38 of                          104
             Investigation report
11
        1195-RS-60  Page 60 of                          105
12           Investigation report

13      1195-RS-66  Page 66 of                          106
             Investigation report
14
        1195-RS-68  Page 68 of                          110
15           Investigation report

16      1195-RS-69  Page 69 of                          110
             Investigation report
17
        1195-RS-70  Page 70 of                          111
18           Investigation report

19      1195-RS-71  Page 71 of                          111
             Investigation report
20
        1195-RS-72  Page 72 of                          111
21           Investigation report

22      1195-RS-73  Page 73 of                          113
             Investigation report
23
        1195-RS-74  Page 74 of                          113
24           Investigation report

25      1195-RS-75  Page 75 of                          113
             Investigation report
</pre>

1

2                        **EXHIBITS** (Continued)

3      EXHIBIT NO.                    IDENTIFICATION      IN EVIDENCE

4
       1195-RS-76  Page 76 of                              113
5              Investigation report

6      1195-RS-86  Page 86 of                              116
               Investigation report
7
       1195-RS-87  Page 87 of                              118
8              Investigation report

9      6678-2  Page 2 of Incident                          127
               report
10
       6678-3  Page 3 of Incident                          128
11             report

12     7507-36 Mattel 2006 10-K report                      39

13     7508    Mattel 2007 10-K report                      40

14     7508-39 Mattel 2007 10-K report                      41

15     7508-28 Mattel 2007 10-K report                      43

16     7509-32 Mattel 2008 10-k report                      73

17     7523    Memo from Mr. Eckert to                     135
               Mattel Board of
18             Directors dated11/1/2005

19     8677    2004 corporate strategic                     24
               plan
20
       9225    Bain & Company reporte                       78
21             dated 9/7/2004

22     16216   Barbie 2005 Action Plan                      26
               dated 4/13/2005
23
       35438   "What's on My Mind"                          22
24             e-mail from Mr. Eckert
               dated 4/1/2004
25

CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

7

1                        **EXHIBITS (Continued)**

2    **EXHIBIT NO.**                    **IDENTIFICATION    IN EVIDENCE**

3

4    35517    "What's on My Mind"                         31
             e-mail from Mr. Eckert
5            dated 10/10/2005

6    35526    Email from Mr. Eckert to                    37
             Mr. Friedman dated
7            12/23/2005

8    35844    Mattel Memo re Tween                        81
             panel
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, THURSDAY, MARCH 3, 2011**          |
|       | 2  | **Day 27, Volume 1 of 4**                                   |
|       | 3  | (8:44 a.m.)                                                  |
| 08:43 | 4  | *(In the presence of the jury.)*                            |
| 08:44 | 5  | THE COURT:  All right.  We're on the record.                |
| 08:44 | 6  | And I think the best way to resolve a couple                |
| 08:44 | 7  | things that have occurred that have nothing to do with the  |
| 08:44 | 8  | case but have something to do with impressions that are     |
| 08:44 | 9  | getting made.  Remember, I've always said that there's      |
| 08:44 | 10 | 20 percent of a case that takes place that has -- that's    |
| 08:44 | 11 | never captured on the record, but there are impressions and |
| 08:44 | 12 | senses about what happens in a courtroom.  It's the subtlety|
| 08:45 | 13 | that you never see on a record, but it just bears a little  |
| 08:45 | 14 | bit on fairness.                                            |
| 08:45 | 15 | Mr. Machado is present with Mr. Overland and                |
| 08:45 | 16 | Mr. Cote, and he has not been able to be present in the     |
| 08:45 | 17 | past.  And his presence or absence is not to be construed by|
| 08:45 | 18 | you in any way as disinterest in the case.                  |
| 08:45 | 19 | Sometimes a party will believe if they're here or           |
| 08:45 | 20 | not here that that has a subtle sway on the jury.  And you  |
| 08:45 | 21 | heard something occur the other day that was in good faith  |
| 08:45 | 22 | by both counsel's part.                                     |
| 08:45 | 23 | Mr. Larian is here as a defendant.  He has the              |
| 08:45 | 24 | choice of being here, but he also has the choice of not     |
| 08:45 | 25 | being here.  In a civil case, a defendant doesn't need to be |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 9 of 160   Page ID #:306680
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

9

08:45  1   here, and he's chosen to be here, and that's all well and
08:45  2   good, but whether he's here or not is his choice.
08:45  3        Mr. Eckert's on the stand.  He's an equal CEO of
08:45  4   another company.  They're both chief executive officers,
08:45  5   both a hardship to their respective companies, obviously,
08:46  6   both privately held and publicly held.
08:46  7        Mr. Eckert was a witness and, as such, he could
08:46  8   not be here.  Our witnesses, in a sense, are basically told
08:46  9   to wait out in the hallway and not be present in the
08:46  10  courtroom listening to other witnesses.  But a corporation
08:46  11  can designate a person to represent them.  In this case,
08:46  12  it's been Lily Martinez, who's been present the entire time.
08:46  13  And Mattel can properly designate Lily Martinez or another
08:46  14  person as a corporate representative.
08:46  15       But also, Mr. Eckert and Mattel could have
08:46  16  designated Mr. Eckert as the corporate representative, and
08:46  17  he could have been here.  What I'm driving at is, you
08:46  18  shouldn't be in the position of judging who's here, who's
08:46  19  not here; therefore, the subtlety is this person's more
08:46  20  interested or not than the other person.  It has nothing to
08:46  21  do with the lawsuit.
08:46  22       Now, we've reached an accommodation, though.
08:46  23  Mr. Larian is going to be here at all times.  Mr. Eckert
08:46  24  will be here at all times.  Mr. Machado will be here, we
08:46  25  think, at all times, except there is some reason that he

| | | |
|---|---|---|
| 08:47 | 1 | might being excused for a very brief period of time.  If |
| 08:47 | 2 | anytime Mr. Eckert and Mr. Larian aren't here, it's because |
| 08:47 | 3 | they've jointly agreed not to be here because of something |
| 08:47 | 4 | that the other is accommodating the other person for. |
| 08:47 | 5 | Otherwise, it just takes away the subtlety, |
| 08:47 | 6 | because you saw each side trying to explain subtlety, why |
| 08:47 | 7 | their client was here or wasn't here.  Let me just say it to |
| 08:47 | 8 | you once again.  It has nothing to do with the case.  So if |
| 08:47 | 9 | somebody has been here more or less often, it's not a matter |
| 08:47 | 10 | of whether liability attaches or not. |
| 08:47 | 11 | I think we've resolved that, because both have |
| 08:47 | 12 | taken the position that they'll be here. |
| 08:47 | 13 | All right.  Counsel, if you would like to continue |
| 08:47 | 14 | with your examination. |
| 08:47 | 15 | **ROBERT ECKERT, MATTEL'S WITNESS, PREVIOUSLY SWORN** |
| 08:47 | 16 | **RESUMED THE STAND** |
| 08:47 | 17 | **CROSS-EXAMINATION (Resumed)** |
| 08:47 | 18 | BY MS. KELLER: |
| 08:47 | 19 | Q.   Good morning, Mr. Eckert. |
| 08:47 | 20 | A.   Good morning. |
| 08:47 | 21 | Q.   I'd like to talk to you a little bit about an issue |
| 08:47 | 22 | that exists in this case about Mattel's claimed lost profits |
| 08:48 | 23 | from the activity of MGA and Bratz.  Okay? |
| 08:48 | 24 | A.   All right. |
| 08:48 | 25 | Q.   Now, on Tuesday Mr. Quinn was questioning you about a |

| 08:48 | 1 | woman named Jill Barad, who was your predecessor at Mattel, |
| 08:48 | 2 | right? |
| 08:48 | 3 | A.   Yes. |
| 08:48 | 4 | Q.   And you said that she left Mattel after the issues |
| 08:48 | 5 | regarding The Learning Company arose and also the decline in |
| 08:48 | 6 | Barbie sales, true? |
| 08:48 | 7 | A.   Yes.  I think primarily related to The Learning |
| 08:48 | 8 | Company, but true. |
| 08:48 | 9 | Q.   And The Learning Company was just an absolutely |
| 08:48 | 10 | disastrous acquisition for Mattel, wasn't it? |
| 08:48 | 11 | A.   Yes, it was. |
| 08:48 | 12 | Q.   It was a $3.8 billion acquisition for Mattel at the end |
| 08:48 | 13 | of 1998, right? |
| 08:48 | 14 | A.   That number seems a little high, but it was at least |
| 08:48 | 15 | $3 1/2 billion in 1998, yes. |
| 08:49 | 16 | Q.   And it was just a losing proposition for Mattel, right? |
| 08:49 | 17 | A.   Yes, it was. |
| 08:49 | 18 | Q.   And Ms. Barad was fired in February of 2000, and you |
| 08:49 | 19 | replaced her after that, right? |
| 08:49 | 20 | A.   Um, she either fired or -- was fired or resigned in |
| 08:49 | 21 | February, I believe is correct.  And I joined in May. |
| 08:49 | 22 | Q.   Well, the Board of Directors didn't really give her |
| 08:49 | 23 | much choice in the matter, correct? |
| 08:49 | 24 | A.   I think that's the case. |
| 08:49 | 25 | Q.   And when she left, she was given a $50 million good-bye |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 12 of 160   Page ID #:306683
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

12

| | | |
|---|---|---|
| 08:49 | 1 | gift by Mattel? |
| 08:49 | 2 | MR. QUINN:  Objection.  It's irrelevant, |
| 08:49 | 3 | Your Honor. |
| 08:49 | 4 | MS. KELLER:  Goes to lost profits. |
| 08:49 | 5 | MR. QUINN:  It's irrelevant. |
| 08:49 | 6 | MS. KELLER:  Goes to lost profits. |
| 08:49 | 7 | THE COURT:  Just a moment. |
| 08:49 | 8 | MR. PRICE:  It's not the time frame. |
| 08:49 | 9 | THE COURT:  That's what I'm worried about.  It's |
| 08:49 | 10 | the time frame. |
| 08:49 | 11 | MS. KELLER:  I was going to ask the next question, |
| 08:49 | 12 | Your Honor. |
| 08:49 | 13 | THE COURT:  Well, ask the next question first, and |
| 08:49 | 14 | we'll see if it goes to the time frame. |
| 08:49 | 15 | BY MS. KELLER: |
| 08:49 | 16 | Q.   She was given a $50 million golden parachute that was |
| 08:49 | 17 | spread over five years, correct? |
| 08:49 | 18 | MR. QUINN:  It's irrelevant, Your Honor. |
| 08:49 | 19 | THE COURT:  Overruled. |
| 08:49 | 20 | You can answer the question. |
| 08:49 | 21 | THE WITNESS:  I don't know.  I do know she was |
| 08:49 | 22 | given a severance package, but I don't know the terms of it. |
| 08:50 | 23 | BY MS. KELLER: |
| 08:50 | 24 | Q.   Well, at your very first Board of Directors meeting, |
| 08:50 | 25 | you were actually shouted down twice by members of the board |

13

| | | |
|---|---|---|
| 08:50 | 1 | who were angry about this deal with Ms. Brad, right? |
| 08:50 | 2 | A.    No. |
| 08:50 | 3 | MR. QUINN:  Objection.  This is irrelevant, Your |
| 08:50 | 4 | Honor. |
| 08:50 | 5 | THE COURT:  Well, the deal -- overruled, first, |
| 08:50 | 6 | Counsel.  But the deal. |
| 08:50 | 7 | THE WITNESS:  No, that's not true. |
| 08:50 | 8 | BY MS. KELLER: |
| 08:50 | 9 | Q.   She was given five years of salary and bonuses totaling |
| 08:50 | 10 | 2 -- 26.4 million, right? |
| 08:50 | 11 | A.   I don't know. |
| 08:50 | 12 | Q.   She was given a pension of $709,000 per year for the |
| 08:50 | 13 | rest of her life, right? |
| 08:50 | 14 | A.   I don't know. |
| 08:50 | 15 | Q.   She was 48 at the time that she left Mattel? |
| 08:50 | 16 | A.   She may have been. |
| 08:50 | 17 | Q.   Well, you know that even today you're still paying her |
| 08:50 | 18 | 709,000 a year, right?  You know that? |
| 08:50 | 19 | A.   No, I don't know that. |
| 08:50 | 20 | Q.   She was given a $3 million -- she was forgiven a |
| 08:50 | 21 | $3 million home loan, right? |
| 08:50 | 22 | A.   She may have been. |
| 08:50 | 23 | Q.   She was forgiven -- in other words, Mattel paid for a |
| 08:51 | 24 | $4.2 million loan that had been granted her back in 1997, |
| 08:51 | 25 | right? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

14

| | | |
|---|---|---|
| 08:51 | 1 | A.   That may be the case. |
| 08:51 | 2 | Q.   Mattel paid $3 million of her taxes; federal, state, |
| 08:51 | 3 | and Medicare, right? |
| 08:51 | 4 | A.   That I don't know. |
| 08:51 | 5 | Q.   She was given a paid life insurance policy of |
| 08:51 | 6 | $5 million for the remainder of her time on this earth, |
| 08:51 | 7 | right? |
| 08:51 | 8 | A.   That I don't know. |
| 08:51 | 9 | Q.   She was given private -- uh, paid health insurance, |
| 08:51 | 10 | private country club memberships, right? |
| 08:51 | 11 | A.   That I don't know. |
| 08:51 | 12 | Q.   For $2 she was allowed to purchase all her office |
| 08:51 | 13 | furniture and her leased corporate car, right? |
| 08:51 | 14 | A.   That I don't know. |
| 08:51 | 15 | Q.   She was handed $6.4 million worth of stock options that |
| 08:51 | 16 | were worth in the millions of dollars, right? |
| 08:51 | 17 | A.   That I don't know. |
| 08:51 | 18 | Q.   And in return for all this, she was required to give 40 |
| 08:51 | 19 | hours per month of consulting services just for the |
| 08:51 | 20 | remainder of 2000, right? |
| 08:51 | 21 | A.   That I don't know. |
| 08:51 | 22 | Q.   Well, you know that in your filings with the SEC, |
| 08:51 | 23 | you're still listing the moneys that are being paid to |
| 08:52 | 24 | Ms. Barad, right? |
| 08:52 | 25 | A.   No, I don't know that. |

DEBBIE GALE, U.S. COURT REPORTER

15

| | | |
|---|---|---|
| 08:52 | 1 | Q.   Now, you also talked last Tuesday about selling The |
| 08:52 | 2 | Learning Company, right? |
| 08:52 | 3 | A.   Yes. |
| 08:52 | 4 | Q.   And you put that on the block in the spring of 2000 |
| 08:52 | 5 | shortly after you became CEO? |
| 08:52 | 6 | A.   Uh, yes, it may have been even before that, but |
| 08:52 | 7 | certainly during the year 2000. |
| 08:52 | 8 | Q.   And this was really a huge albatross for Mattel, right? |
| 08:52 | 9 | You wanted to sell it? |
| 08:52 | 10 | A.   Yes, that's correct. |
| 08:52 | 11 | Q.   And you wanted to sell it at just about any cost, |
| 08:52 | 12 | right? |
| 08:52 | 13 | A.   No.  We spent many months trying to sell The Learning |
| 08:52 | 14 | Company. |
| 08:52 | 15 | Q.   Well, a corporate turnaround firm named Gores |
| 08:52 | 16 | Technology Group purchased the company for no cash, right? |
| 08:52 | 17 | A.   That's correct. |
| 08:52 | 18 | Q.   And in addition, Mattel agreed to pay off half a |
| 08:52 | 19 | billion dollars of The Learning Company's debt, right? |
| 08:53 | 20 | 500 million? |
| 08:53 | 21 | A.   No, I don't remember that.  And I remember that there |
| 08:53 | 22 | was no cash trading hands on the day of the sale. |
| 08:53 | 23 | Q.   They -- |
| 08:53 | 24 | A.   There was future cash. |
| 08:53 | 25 | Q.   They didn't pay you anything, but you paid off a half a |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:53 | 1 | billion dollars' worth of debt that The Learning Company |
| 08:53 | 2 | had, right? |
| 08:53 | 3 | A.   Um, I don't believe that's the case. |
| 08:53 | 4 | Q.   You don't know? |
| 08:53 | 5 | A.   I don't know.  I don't know that to be true. |
| 08:53 | 6 | Q.   And in the year 2000, Mattel's net loss amounted to |
| 08:53 | 7 | more than 430 million, right? |
| 08:53 | 8 | A.   It may have. |
| 08:53 | 9 | Q.   Well, it did, didn't it? |
| 08:53 | 10 | A.   I don't know off the top of my head. |
| 08:53 | 11 | Q.   And there have been many, many other corporate |
| 08:53 | 12 | executives at Mattel who were also given very significant |
| 08:53 | 13 | good-bye gifts on your watch, right? |
| 08:53 | 14 | MR. QUINN:  Objection.  Relevance. |
| 08:53 | 15 | MS. KELLER:  Goes to lost profits. |
| 08:53 | 16 | MR. QUINN:  It has nothing to do with lost |
| 08:53 | 17 | profits. |
| 08:53 | 18 | THE COURT:  It has a lot to do with revenue, |
| 08:54 | 19 | doesn't it? |
| 08:54 | 20 | MS. KELLER:  And expenses. |
| 08:54 | 21 | THE COURT:  Yeah.  Overruled. |
| 08:54 | 22 | THE WITNESS:  We generally have severance packages |
| 08:54 | 23 | for every employee who is let go at Mattel. |
| 08:54 | 24 | BY MS. KELLER: |
| 08:54 | 25 | Q.   Well, for example, Adrienne Fontanella, who had been |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 17 of 160   Page ID #:306688
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

17

| | | |
|---|---|---|
| 08:54 | 1 | the president of Girls Barbie, right?  You listed her |
| 08:54 | 2 | severance in your 2003 first quarter 10Q that you filed, |
| 08:54 | 3 | right? |
| 08:54 | 4 | A.   I believe that's the case. |
| 08:54 | 5 | Q.   And she got a going-away gift of $6,504,000, right? |
| 08:54 | 6 | MR. QUINN:  This is argumentative, Your Honor, |
| 08:54 | 7 | "going-away gift." |
| 08:54 | 8 | THE COURT:  Sustained. |
| 08:54 | 9 | MS. KELLER:  Okay. |
| 08:54 | 10 | BY MS. KELLER: |
| 08:54 | 11 | Q.   She was given a lump-sum payment of $6,504,500, right? |
| 08:54 | 12 | A.   Yes, that was her severance. |
| 08:54 | 13 | Q.   And she was also given a $641,000 bonus for that year, |
| 08:54 | 14 | right? |
| 08:54 | 15 | A.   She may have been. |
| 08:54 | 16 | Q.   And that was a bonus for a year in which her sales of |
| 08:55 | 17 | Barbie were tanking, right? |
| 08:55 | 18 | A.   Uh, Barbie may have declined, but the company may have |
| 08:55 | 19 | done well. |
| 08:55 | 20 | Q.   And she was given $4,850,000, which represented three |
| 08:55 | 21 | times her annual salary and bonus, right? |
| 08:55 | 22 | A.   That would have been included in her severance package, |
| 08:55 | 23 | yes. |
| 08:55 | 24 | Q.   And with respect to this being a severance package, |
| 08:55 | 25 | does every Mattel employee get severance? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

18

| | | |
|---|---|---|
| 08:55 | 1 | A.   If a Mattel employee is let go, certainly in a |
| 08:55 | 2 | professional job or in a managerial job, yes, they would |
| 08:55 | 3 | qualify for severance. |
| 08:55 | 4 | Q.   Do you know a lady by the name of Maria Elena Salazar? |
| 08:55 | 5 | A.   I may have heard the name, but I don't know her. |
| 08:55 | 6 | Q.   How much severance was she given -- |
| 08:55 | 7 | A.   I don't know. |
| 08:55 | 8 | Q.   -- when you fired her? |
| 08:55 | 9 | A.   I don't know. |
| 08:55 | 10 | Q.   How about zero? |
| 08:56 | 11 | MR. QUINN:  Your Honor, object.  Irrelevant.  Move |
| 08:56 | 12 | to strike. |
| 08:56 | 13 | THE COURT:  Just a moment.  It's argumentative. |
| 08:56 | 14 | You'll strike the "how about zero."  Stricken. |
| 08:56 | 15 | Disregard it. |
| 08:56 | 16 | BY MS. KELLER: |
| 08:56 | 17 | Q.   Was she given zero severance? |
| 08:56 | 18 | A.   If this is the person I think it is; that is, she was |
| 08:56 | 19 | working for MGA while she was working at Mattel, I'm sure |
| 08:56 | 20 | she was not given severance. |
| 08:56 | 21 | Q.   None of the seamstresses at Mattel, if they're let go |
| 08:56 | 22 | for any reason, are given severance, are they? |
| 08:56 | 23 | A.   Certainly none of the model makers, the sample makers |
| 08:56 | 24 | that worked for Mattel and, simultaneously, without our |
| 08:56 | 25 | knowledge, worked for MGA, I'm sure they wouldn't have been |

| 08:56 | 1 | given severance. |
| 08:56 | 2 | Q.   Not my question. |
| 08:56 | 3 | THE COURT:  Just a moment.  We're going to strike |
| 08:56 | 4 | the comment "not my question." |
| 08:56 | 5 | Ask the next question. |
| 08:56 | 6 | BY MS. KELLER: |
| 08:56 | 7 | Q.   Here is my question:  If a seamstress is simply laid |
| 08:56 | 8 | off because you just decide to lay off, say, a hundred |
| 08:56 | 9 | people, you don't give 'em any severance, do you? |
| 08:56 | 10 | A.   If a model maker is laid off, I believe they do qualify |
| 08:57 | 11 | for severance. |
| 08:57 | 12 | Q.   How much? |
| 08:57 | 13 | A.   I don't know.  It depends on how long they have worked |
| 08:57 | 14 | at the company and what their salary was when they departed. |
| 08:57 | 15 | Q.   I'm talking about the seamstresses. |
| 08:57 | 16 | A.   If you're talking about the people that worked for |
| 08:57 | 17 | MGA -- |
| 08:57 | 18 | Q.   No. |
| 08:57 | 19 | A.   -- while they were on Mattel's payroll, I'm sure the |
| 08:57 | 20 | answer is zero. |
| 08:57 | 21 | Q.   Let's say today you decide to lay off a hundred sample |
| 08:57 | 22 | makers; how much severance do they get? |
| 08:57 | 23 | MR. QUINN:  Objection.  To relevance, Your Honor. |
| 08:57 | 24 | THE COURT:  Well, just a moment. |
| 08:57 | 25 | The question's going back and forth. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

20

| | | |
|---|---|---|
| 08:57 | 1 | Make it clear if you're referring to the |
| 08:57 | 2 | seamstresses, because the answer has been, if they were |
| 08:57 | 3 | working for MGA, they're not given severance. |
| 08:57 | 4 | But if it's a general question about somebody |
| 08:57 | 5 | who's just getting terminated in a work-reduction problem, |
| 08:57 | 6 | then the answer may be that they are getting severance. |
| 08:57 | 7 | And I don't know that that question's clear going |
| 08:57 | 8 | back and forth, because it's switching back and forth. |
| 08:57 | 9 | MS. KELLER:  I'm gonna make it clear, Your Honor. |
| 08:58 | 10 | THE COURT:  Make it clear. |
| 08:58 | 11 | BY MS. KELLER: |
| 08:58 | 12 | Q.   Forget about MGA. |
| 08:58 | 13 | Seamstresses today, if you decide to lay off a hundred |
| 08:58 | 14 | seamstresses because you just don't want them anymore; |
| 08:58 | 15 | you're doing a headcount reduction. |
| 08:58 | 16 | MR. QUINN:  Objection.  Argumentative. |
| 08:58 | 17 | THE COURT:  And they're not working for MGA? |
| 08:58 | 18 | MS. KELLER:  That's right. |
| 08:58 | 19 | THE COURT:  They're not, okay. |
| 08:58 | 20 | MR. QUINN:  Object to the "you don't want them |
| 08:58 | 21 | anymore," Your Honor.  It's argumentative. |
| 08:58 | 22 | THE COURT:  Just a moment.  I can see counsel from |
| 08:58 | 23 | both sides got too much sleep last night. |
| 08:58 | 24 | *(Laughter in the courtroom.)* |
| 08:58 | 25 | THE COURT:  All right. |

| | | |
|---|---|---|
| 08:58 | 1 | (Reading realtime:) "Seamstresses today, if you |
| 08:58 | 2 | decide to lay off a hundred seamstresses because you just |
| 08:58 | 3 | don't want them anymore" -- we'll strike that portion, |
| 08:58 | 4 | Counsel. |
| 08:58 | 5 | BY MS. KELLER: |
| 08:58 | 6 | Q.   Let's say you do what you referred to the other day as |
| 08:58 | 7 | a headcount reduction, or a force reduction, meaning you |
| 08:58 | 8 | decide to let a hundred people go -- has nothing to do with |
| 08:58 | 9 | MGA -- how much severance do they get? |
| 08:59 | 10 | A.   If they are salaried employees, I -- they will get |
| 08:59 | 11 | severance related to how long they have been an employee and |
| 08:59 | 12 | what their position is when their job is eliminated. |
| 08:59 | 13 | Q.   So if they're making, say, $30,000 a year, they get how |
| 08:59 | 14 | much severance? |
| 08:59 | 15 | A.   It depends on how long they have been with the company. |
| 08:59 | 16 | Q.   Let's say -- |
| 08:59 | 17 | A.   I think the number tends to be up to -- it could be 18 |
| 08:59 | 18 | months, but there's some relationship to salary and time. |
| 08:59 | 19 | Q.   If they've been there 25 years, it could be up to 18 |
| 08:59 | 20 | months? |
| 08:59 | 21 | A.   I think that's the case. |
| 08:59 | 22 | Q.   Let's talk some more about revenues at Mattel.  You |
| 08:59 | 23 | remember the house-on-fire marketing plans that we talked |
| 09:00 | 24 | about yesterday, right? |
| 09:00 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:00 | 1 | Q.    And you said you disagreed with the language, right? |
| 09:00 | 2 | A.    That's correct. |
| 09:00 | 3 | Q.    But you certainly thought that the situation described |
| 09:00 | 4 | was very serious, true? |
| 09:00 | 5 | A.    Yes. |
| 09:00 | 6 | Q.    Let's look at Exhibit 35438. |
| 09:00 | 7 | (Document provided to the witness.) |
| 09:00 | 8 | BY MS. KELLER: |
| 09:00 | 9 | Q.    And this is one of your e-mails dated April 1st, 2004. |
| 09:00 | 10 | You see that? |
| 09:00 | 11 | A.    Yes.  This is a "what's on my mind" e-mail that goes |
| 09:00 | 12 | out to a large number of employees. |
| 09:00 | 13 | Q.    And you start by saying, "We are at a crossroads," |
| 09:00 | 14 | right? |
| 09:00 | 15 | MR. QUINN:  Not sure -- is this in evidence? |
| 09:00 | 16 | MS. KELLER:  Your Honor, I'm gonna move it in, |
| 09:00 | 17 | 35438, if it's not. |
| 09:00 | 18 | THE COURT:  Received. |
| 09:00 | 19 | (Exhibit No. 35438 received in evidence.) |
| 09:00 | 20 | (Document displayed.) |
| 09:01 | 21 | BY MS. KELLER: |
| 09:01 | 22 | Q.    And you start out by saying, "We are at a crossroads," |
| 09:01 | 23 | right? |
| 09:01 | 24 | A.    Yes. |
| 09:01 | 25 | Q.    And it continues in the first sentence of your second |

| | | |
|---|---|---|
| 09:01 | 1 | paragraph, "The reality" -- and moving on, "is that our |
| 09:01 | 2 | business hasn't grown since 2000," right? |
| 09:01 | 3 | A.   That's correct. |
| 09:01 | 4 | Q.   And then you refer to the previous day's reduction in |
| 09:01 | 5 | force, right? |
| 09:01 | 6 | A.   I do. |
| 09:01 | 7 | Q.   Reduction in force means firing people, right? |
| 09:01 | 8 | A.   Yes.  It means job eliminations, yes. |
| 09:01 | 9 | Q.   And in the third paragraph, you say, "Every time you've |
| 09:01 | 10 | personally let someone go, it turned out to be a blessing in |
| 09:01 | 11 | disguise" -- right?  "He or she invariably found a new job, |
| 09:01 | 12 | which turned out to be a better long-term opportunity." |
| 09:02 | 13 |      No names are listed here, are they? |
| 09:02 | 14 | A.   No. |
| 09:02 | 15 | Q.   And in the last paragraph you say, "There is only one |
| 09:02 | 16 | path to avoid downsizings, the path of growth," and you list |
| 09:02 | 17 | your 2004 priorities, right? |
| 09:02 | 18 | A.   Yes. |
| 09:02 | 19 | Q.   And the very first one is "fix dolls."  Do you see |
| 09:02 | 20 | that? |
| 09:02 | 21 | A.   That's correct. |
| 09:02 | 22 | Q.   And that's because your dolls just weren't selling very |
| 09:02 | 23 | well, right? |
| 09:02 | 24 | A.   No.  We continued in 2004 to have the largest share of |
| 09:02 | 25 | market in the doll business around the world. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

24

| 09:02 | 1 | Q.   Well, don't you usually fix something that's broken, |
| 09:02 | 2 | Mr. Eckert? |
| 09:02 | 3 | A.   Well, it certainly needed repair.  It needed to do |
| 09:02 | 4 | better, but that wasn't the question I'd heard.  I'm sorry. |
| 09:02 | 5 | Q.   And let's look at -- |
| 09:02 | 6 | MS. KELLER:  If we could take a look at |
| 09:02 | 7 | Exhibit 8677. |
| 09:03 | 8 | *(Document provided to the witness.)* |
| 09:03 | 9 | BY MS. KELLER: |
| 09:03 | 10 | Q.   This is the 2004 corporate strategic plan? |
| 09:03 | 11 | A.   Yes, it is. |
| 09:03 | 12 | MS. KELLER:  Your Honor, I'd move 8677 into |
| 09:03 | 13 | evidence. |
| 09:03 | 14 | THE COURT:  Received. |
| 09:03 | 15 | *(Exhibit No. 8677 received in evidence.)* |
| 09:03 | 16 | *(Document displayed.)* |
| 09:03 | 17 | BY MS. KELLER: |
| 09:03 | 18 | Q.   And if we look at page 32 of that document -- and I'm |
| 09:03 | 19 | referring not to the Bates stamp on it, but 32 on the actual |
| 09:03 | 20 | document itself. |
| 09:03 | 21 | A.   Uh, that starts with "girls" -- "older girls"? |
| 09:03 | 22 | Q.   Yes. |
| 09:03 | 23 | A.   I have that. |
| 09:03 | 24 | Q.   And at the top it says, "Girls:  MGA has captured |
| 09:03 | 25 | today's older girls' fashion-driven aspirations, creating |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

25

| | | |
|---|---|---|
| 09:03 | 1 | renewed demands for fashion dolls within this" -- |
| 09:04 | 2 | A.   I'm sorry.  I'm on a different page.  I'm on the |
| 09:04 | 3 | TX32 page. |
| 09:04 | 4 | THE COURT:  Counsel, is going to help you.  She'll |
| 09:04 | 5 | have that page open for you now. |
| 09:04 | 6 | THE WITNESS:  Got it. |
| 09:04 | 7 | THE COURT:  You don't have to hunt anymore. |
| 09:04 | 8 | She'll have that ready for you. |
| 09:04 | 9 | BY MS. KELLER: |
| 09:04 | 10 | Q.   This says, "MGA has captured today's older girls' |
| 09:04 | 11 | fashion-driven aspirations, creating renewed demand for |
| 09:04 | 12 | fashion dolls within this segment." |
| 09:04 | 13 | And that was a true statement, wasn't it? |
| 09:04 | 14 | A.   Uh, yes. |
| 09:04 | 15 | Q.   MGA had actually expanded the pie in that segment, |
| 09:04 | 16 | right? |
| 09:04 | 17 | A.   That's correct. |
| 09:04 | 18 | Q.   And one of the things that you wanted to do in your |
| 09:04 | 19 | corporate strategic plan was to take advantage of that |
| 09:04 | 20 | opportunity that MGA had created for you, right? |
| 09:04 | 21 | A.   Well, we certainly wanted to continue appealing to |
| 09:04 | 22 | older girls, yes. |
| 09:04 | 23 | Q.   You wanted to take advantage of the fact that MGA had |
| 09:04 | 24 | increased the pie for older girls, right? |
| 09:04 | 25 | A.   Um, yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

26

09:04    1    Q.    Now, let's look at Exhibit 16216.

09:05    2            *(Document provided to the witness.)*

09:05    3    BY MS. KELLER:

09:05    4    Q.    And you recognize this as the Barbie 2005 Action Plan,

09:05    5    dated 4/13/05, correct?

09:05    6    A.    That's the title of it.  I'm looking to see what it is.

09:05    7    That's certainly the title of it, yes.

09:05    8    Q.    And you see the production stamp on the bottom right

09:05    9    begins with an "M," showing Mattel produced it?

09:05   10    A.    Yes.

09:05   11            MS. KELLER:  Your Honor, I'd move 16216 into

09:05   12    evidence.

09:05   13            THE COURT:  Received.

09:05   14            *(Exhibit No. 16216 received in evidence.)*

09:05   15            *(Document displayed.)*

09:05   16    BY MS. KELLER:

09:05   17    Q.    Now, if you look at the second page of this document,

09:05   18    it starts out with "Q1:  What happened."

09:06   19        Q1 means quarter one?

09:06   20    A.    I'm sure it does.

09:06   21    Q.    And it says underneath what happened, "Didn't

09:06   22    anniversary younger girl business.  Left it exposed.  What

09:06   23    does didn't anniversary that business mean?

09:06   24    A.    I speculate that whatever this is and whoever wrote it

09:06   25    is talking about products in the prior year that weren't

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

27

| | | |
|---|---|---|
| 09:06 | 1 | repeated in the current year.  So that's the anniversary |
| 09:06 | 2 | connotation. |
| 09:06 | 3 | Q.   And underneath that it says, "Missing basic forever |
| 09:06 | 4 | play pattern/business." |
| 09:06 | 5 | What does that mean? |
| 09:06 | 6 | A.   I really don't know. |
| 09:06 | 7 | Q.   Under that it says, "Product's better, but not enough |
| 09:06 | 8 | to drive excitement or overcome saturation/higher NFB, nag |
| 09:07 | 9 | factor bar." |
| 09:07 | 10 | And we know by now what NFB stands for, don't we? |
| 09:07 | 11 | A.   I've never heard of that one before.  No, I don't. |
| 09:07 | 12 | Q.   NFB.  Let's see, "N" is one letter after "M" -- |
| 09:07 | 13 | A.   No. |
| 09:07 | 14 | THE COURT:  No. |
| 09:07 | 15 | MS. KELLER:  No?  Okay.  I'm wrong.  Not the first |
| 09:07 | 16 | time. |
| 09:07 | 17 | BY MS. KELLER: |
| 09:07 | 18 | Q.   Underneath that, it says, "competition stronger, Bratz |
| 09:07 | 19 | and Disney."  And Bratz, of course, refers to MGA's doll, |
| 09:07 | 20 | right? |
| 09:07 | 21 | A.   Uh, yes. |
| 09:07 | 22 | Q.   A couple lines down it says, "key world's not growing." |
| 09:07 | 23 | What were key worlds? |
| 09:07 | 24 | A.   In 2005 I suspect the author is referring to these |
| 09:07 | 25 | sublines within the Barbie brand that I talked about |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:07 | 1 | yesterday that had a different theme and different products |
| 09:07 | 2 | surrounding a different theme. |
| 09:07 | 3 | Q.   And after that it says, "Callie declining.  MyScene," |
| 09:07 | 4 | quote, 'holding,'" unquote. |
| 09:08 | 5 | And "holding" means staying the same, right?  Not |
| 09:08 | 6 | growing. |
| 09:08 | 7 | A.   That would be -- I don't know if it was growing or not, |
| 09:08 | 8 | but I think that's a reasonable interpretation. |
| 09:08 | 9 | Q.   And it says under that "product media launches not |
| 09:08 | 10 | maximized, creative message muddled, not driving Barbie the |
| 09:08 | 11 | brand."  Right? |
| 09:08 | 12 | A.   I see that, yes. |
| 09:08 | 13 | Q.   Under that it says, "no accessories worked, weak |
| 09:08 | 14 | listings, price/value not great."  And underneath that it |
| 09:08 | 15 | says, "retailers drawing down inventory." |
| 09:08 | 16 | What does it mean when it says, "retailers drawing down |
| 09:08 | 17 | inventory"? |
| 09:08 | 18 | A.   I'm sure the author here is referring to retailers |
| 09:08 | 19 | using the stock that they have on hand or in their |
| 09:08 | 20 | warehouses instead of buying additional products from the |
| 09:08 | 21 | manufacturer, which in this case would be Mattel. |
| 09:08 | 22 | Q.   And under that it says, "critical sales strategies |
| 09:08 | 23 | didn't work," and it lists a couple. |
| 09:08 | 24 | Now, I'd like you to go to page 4. |
| 09:09 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 09:09 | 1 | BY MS. KELLER: |
| 09:09 | 2 | Q.   Do you have that? |
| 09:09 | 3 | A.   I do. |
| 09:09 | 4 | Q.   It says, "House on Fire." |
| 09:09 | 5 | "Exact same situation one year ago." |
| 09:09 | 6 | "4/10." |
| 09:09 | 7 | "POS down 17 percent."  That means point of sale? |
| 09:09 | 8 | A.   It does. |
| 09:09 | 9 | Q.   "Shipping down 21 percent."  Why is that significant? |
| 09:09 | 10 | A.   Shipping is the basis for our revenues, that is, what |
| 09:09 | 11 | we ship or sell to the retail customers. |
| 09:09 | 12 | Q.   And then it says, "Some world's okay.  Basics down |
| 09:09 | 13 | 45 percent."  And then beneath that it says, "Bratz gaining |
| 09:09 | 14 | share younger." |
| 09:09 | 15 | Now, let's turn to the next page, page 5. |
| 09:09 | 16 | *(Document displayed.)* |
| 09:09 | 17 | BY MS. KELLER: |
| 09:10 | 18 | Q.   And the question is why?  It says, "Only Fairytopia was |
| 09:10 | 19 | truly breakthrough.  We stopped delivering the basic |
| 09:10 | 20 | business." |
| 09:10 | 21 | "MyScene, running in place." |
| 09:10 | 22 | Again, that just means in a holding pattern, right? |
| 09:10 | 23 | A.   I think that's a reasonable interpretation. |
| 09:10 | 24 | Q.   "The competition is better, stronger." |
| 09:10 | 25 | Now, let's go to page 9. |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 30 of 160   Page ID #:306701
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

30

| | | |
|---|---|---|
| 09:10 | 1 | *(Document displayed.)* |
| 09:10 | 2 | BY MS. KELLER: |
| 09:10 | 3 | Q.   And here we see the same mission that was listed in |
| 09:10 | 4 | 2004, right? |
| 09:10 | 5 | "Regain relevance." |
| 09:10 | 6 | "Regain confidence." |
| 09:10 | 7 | Those were listed in the document we read for last |
| 09:10 | 8 | year, true? |
| 09:10 | 9 | A.   I know we read those yesterday.  It may have been |
| 09:10 | 10 | last -- for the prior year. |
| 09:10 | 11 | Q.   "Reconnect. |
| 09:11 | 12 | "Retake the pink. |
| 09:11 | 13 | "Regain share." |
| 09:11 | 14 | So in 2005 you were still in the same position that you |
| 09:11 | 15 | had been in 2004 with respect to being outperformed by MGA |
| 09:11 | 16 | and losing sales, right? |
| 09:11 | 17 | A.   We were certainly losing sales and market share to |
| 09:11 | 18 | Bratz, yes. |
| 09:11 | 19 | Q.   Now, let's look at Exhibit 35517. |
| 09:11 | 20 | *(Document produced to the witness.)* |
| 09:11 | 21 | BY MS. KELLER: |
| 09:11 | 22 | Q.   This is another one of your "what's on my mind" |
| 09:11 | 23 | e-mails.  This one is dated October 10th, 2005.  And the |
| 09:11 | 24 | subject is "New Organizational Structure." |
| 09:11 | 25 | Do you see that? |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 31 of 160   Page ID #:306702
CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

31

| | | |
|---|---|---|
| 09:11 | 1 | A.   I do. |
| 09:11 | 2 | MS. KELLER:  And, Your Honor, I would move |
| 09:11 | 3 | Exhibit 35517 into evidence. |
| 09:11 | 4 | THE COURT:  Received. |
| 09:11 | 5 | *(Exhibit No. 35517 received in evidence.)* |
| 09:11 | 6 | *(Document displayed.)* |
| 09:11 | 7 | BY MS. KELLER: |
| 09:11 | 8 | Q.   And you start by saying you will be "publicly |
| 09:12 | 9 | announcing later that day a new organizational structure |
| 09:12 | 10 | which combines Mattel brands and Fisher-Price brands into |
| 09:12 | 11 | one division called Brands led by Neil Friedman."  Right? |
| 09:12 | 12 | A.   That's correct. |
| 09:12 | 13 | Q.   And the second paragraph from the bottom says, "Matthew |
| 09:12 | 14 | Bousquette, the former president of Mattel brands, has |
| 09:12 | 15 | decided to pursue other business ventures after 17 |
| 09:12 | 16 | successful years at Mattel." |
| 09:12 | 17 | Mr. Bousquette was let go, right? |
| 09:12 | 18 | A.   He was.  He resigned, technically, but he was let go. |
| 09:12 | 19 | Q.   And among other things, he had presided over the |
| 09:12 | 20 | disastrous introduction of the Flavas dolls that were |
| 09:12 | 21 | supposed to compete with Bratz, right? |
| 09:12 | 22 | A.   Uh, yes. |
| 09:12 | 23 | Q.   And we saw the Flavas commercial yesterday, true? |
| 09:12 | 24 | A.   We did. |
| 09:12 | 25 | Q.   And not only did Flavas not succeed commercially, but |

| | | |
|---|---|---|
| 09:12 | 1 | it caused Mattel to be subjected to a tremendous amount of |
| 09:13 | 2 | criticism in the press, right? |
| 09:13 | 3 | A.   I'm not sure I'd agree with that. |
| 09:13 | 4 | Q.   Mattel was accused of stereotyping African Americans, |
| 09:13 | 5 | right? |
| 09:13 | 6 | A.   No, I don't remember ever seeing that. |
| 09:13 | 7 | Q.   And Mattel was accused of generating a toy that was |
| 09:13 | 8 | conveying negative messages to kids, right? |
| 09:13 | 9 | A.   No, I don't -- I don't recall seeing that. |
| 09:13 | 10 | Q.   The Flavas dolls came with their own graffiti wall, |
| 09:13 | 11 | right?   Remember that toy? |
| 09:13 | 12 | A.   I remember the packaging that had graffiti. |
| 09:13 | 13 | Q.   And so children were being encouraged to think of |
| 09:13 | 14 | graffiti on walls as a fashion accessory in the Flavas line, |
| 09:13 | 15 | right? |
| 09:13 | 16 | A.   No.  I -- I wouldn't agree with that. |
| 09:13 | 17 | Q.   And there was a joke made by Mr. Larian about it that |
| 09:13 | 18 | was published in -- |
| 09:13 | 19 | MR. QUINN:  I object, Your Honor.  This is gonna |
| 09:14 | 20 | be hearsay. |
| 09:14 | 21 | THE COURT:  For some reason, I don't know -- |
| 09:14 | 22 | MR. QUINN:  I'd like to hear the joke, but not |
| 09:14 | 23 | right now. |
| 09:14 | 24 | THE COURT:  I'm a little leary of this one, |
| 09:14 | 25 | counsel, I don't know what's about to occur.  So why don't |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

33

| | | |
|---|---|---|
| 09:14 | 1 | we discuss that at the recess.  All right? |
| 09:14 | 2 | MS. KELLER:  Well -- |
| 09:14 | 3 | THE COURT:  Whatever Mr. Larian's joke is, let's |
| 09:14 | 4 | take that at the recess. |
| 09:14 | 5 | MS. KELLER:  I'll leave it at Mr. Larian -- |
| 09:14 | 6 | MR. QUINN:  Excuse me.  I don't want to hear -- I |
| 09:14 | 7 | don't think we have to hear Mr. Larian's -- |
| 09:14 | 8 | MS. KELLER:  Wasn't gonna give the quote.  Thank |
| 09:14 | 9 | you. |
| 09:14 | 10 | THE COURT:  Not gonna give the quote? |
| 09:14 | 11 | MS. KELLER:  No. |
| 09:14 | 12 | THE COURT:  Just if he knows about it? |
| 09:14 | 13 | MS. KELLER:  Yeah. |
| 09:14 | 14 | THE COURT:  Whatever this was? |
| 09:14 | 15 | MS. KELLER:  Right. |
| 09:14 | 16 | THE COURT:  All right. |
| 09:14 | 17 | BY MS. KELLER: |
| 09:14 | 18 | Q.   Mr. Larian was quoted in some trade publications having |
| 09:14 | 19 | a pithy comment about the Flavas dolls, right? |
| 09:14 | 20 | A.   I'm sure he was. |
| 09:14 | 21 | Q.   And CNBC had a segment on the disastrous Flavas dolls, |
| 09:14 | 22 | right? |
| 09:14 | 23 | A.   Uh... I just don't know. |
| 09:14 | 24 | Q.   *Wall Street Journal* criticized Flavas, right? |
| 09:14 | 25 | A.   I'm sure there was an article about Mattel or Barbie |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

34

09:14  1    that may have included things on Flavas.  I don't know if
09:14  2    there was an article criticizing Flavas.
09:15  3    Q.    And --
09:15  4    A.    There may have been.
09:15  5    Q.    Well, there was just an outpouring of such articles,
09:15  6    wasn't there?
09:15  7    A.    No.
09:15  8    Q.    And you were personally embarrassed because Flavas was
09:15  9    really at odds with the image that Mattel had tried to
09:15  10   project in the past of wholesomeness, right?
09:15  11   A.    No.
09:15  12   Q.    And one of the reasons Flavas was withdrawn, along with
09:15  13   the fact that it just wasn't selling, was all the criticism
09:15  14   that Mattel was getting, true?
09:15  15   A.    Um, no.  It wasn't selling.
09:15  16   Q.    And anyway, it was after this that Mr. Bousquette was
09:15  17   let go, true?
09:15  18   A.    Some two years after that, yes.
09:15  19   Q.    Well, it's 2005 that you're sending out this e-mail,
09:15  20   what's on my mind, right?
09:15  21   A.    That's correct.
09:15  22   Q.    And Mattel had still, as we've seen, seen revenues from
09:16  23   Barbie declining, true?
09:16  24   A.    Yes.
09:16  25   Q.    And Barbie still was the most important toy Mattel had,

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

35

09:16  1    right?

09:16  2    A.   Along with Fisher-Price, yes.

09:16  3    Q.   Well, Barbie was the biggest revenue source for Mattel,

09:16  4    right?

09:16  5    A.   No.  I believe Fisher-Price was.

09:16  6    Q.   And so Mr. Bousquette, after being let go, was given

09:16  7    $5.4 million in severance and a big bonus, right?

09:16  8    A.   I'm sure he -- I know he was given severance.

09:16  9    Q.   Well, I'm talking about 5.4 million and a big bonus for

09:16  10   the year, right?

09:16  11   A.   I know he was given severance.  I don't know what his

09:16  12   bonus was for that year.

09:16  13   Q.   Well, it wasn't like, say, the 18 months' worth of

09:16  14   service that one of the seamstresses would get that was

09:16  15   making 30 grand, right?

09:16  16         MR. QUINN:  This is irrelevant, Your Honor.  It's

09:17  17   argumentative.

09:17  18         THE COURT:  Sustained.

09:17  19   BY MS. KELLER:

09:17  20   Q.   In addition to his 5.4 million and his bonus, the day

09:17  21   Mr. Bousquette was fired, Mattel also gave him a consulting

09:17  22   deal for 1.5 million for two years, right?

09:17  23   A.   I recall that.  I think that's correct.

09:17  24   Q.   And yet by Christmas 2005, gross sales for Barbie

09:17  25   worldwide had slumped to as much as 15 percent, true?

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/7/2011 – Day 27, Volume 1 of 4

36

| | | |
|---|---|---|
| 09:17 | 1 | A.   They had declined.  They may have declined by |
| 09:17 | 2 | 15 percent domestically. |
| 09:17 | 3 | Q.   I'm talking about worldwide now.  They were down by as |
| 09:17 | 4 | much as 15 percent, right? |
| 09:17 | 5 | A.   I don't know that figure off the top of my head. |
| 09:17 | 6 | Q.   Well, you thought the situation was serious, didn't |
| 09:17 | 7 | you, a CEO, head guy? |
| 09:17 | 8 | A.   Yes, I did think the Barbie situation was serious. |
| 09:17 | 9 | Q.   And things were performing disastrously from the |
| 09:17 | 10 | perspective of those declining sales, right? |
| 09:17 | 11 | A.   Certainly the Barbie business was declining.  Other |
| 09:18 | 12 | businesses were growing.  Other businesses that |
| 09:18 | 13 | Mr. Bousquette worked on for the previous 17 years were |
| 09:18 | 14 | growing. |
| 09:18 | 15 | Q.   But -- |
| 09:18 | 16 | A.   But the Barbie business was declining. |
| 09:18 | 17 | Q.   And Mr. Bousquette was fired, right? |
| 09:18 | 18 | A.   In one of these consolidations where we had fewer |
| 09:18 | 19 | general managers, he was not the one chosen to lead the new |
| 09:18 | 20 | division; Neil Friedman was. |
| 09:18 | 21 | Q.   He was fired, right? |
| 09:18 | 22 | A.   He was. |
| 09:18 | 23 | Q.   Now let's look at Exhibit 35526. |
| 09:18 | 24 | A.   In fact -- I'm sorry to interrupt you -- his job was |
| 09:18 | 25 | eliminated. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

37

| | | |
|---|---|---|
| 09:18 | 1 | Q.   Yeah. |
| 09:18 | 2 | *(Document provided to the witness.)* |
| 09:19 | 3 | BY MS. KELLER: |
| 09:19 | 4 | Q.   So 35526, this is an e-mail from you to Neil Friedman, |
| 09:19 | 5 | dated December 23, 2005, right? |
| 09:19 | 6 | A.   Yes, it is. |
| 09:19 | 7 | MS. KELLER:  Your Honor, I'd move 35526 into |
| 09:19 | 8 | evidence. |
| 09:19 | 9 | THE COURT:  Received. |
| 09:19 | 10 | *(Exhibit No. 35526 received in evidence.)* |
| 09:19 | 11 | *(Document displayed.)* |
| 09:19 | 12 | BY MS. KELLER: |
| 09:19 | 13 | Q.   Who was Neil Friedman at that point?  What was his job? |
| 09:19 | 14 | A.   Neil Friedman was the president of Mattel brands, which |
| 09:19 | 15 | at this time included girls, boys, and Fisher-Price, or |
| 09:19 | 16 | infant and preschool divisions. |
| 09:19 | 17 | Q.   And this says, "The NPD numbers are terrible.  In the |
| 09:19 | 18 | month of November, I realize that one shouldn't calculate |
| 09:19 | 19 | monthly shares.  Mattel lost a full share point, going from |
| 09:19 | 20 | 20.2 percent share last year to 19.2 percent share this |
| 09:19 | 21 | year.  Viewed another equally inappropriate, I'm sure, way, |
| 09:19 | 22 | Mattel contributed 88 percent of the entire toy categories' |
| 09:20 | 23 | small decline for the month.  In girls toys, MGA had a huge |
| 09:20 | 24 | month.  Bratz came very close to matching Barbie's sales in |
| 09:20 | 25 | NPD's fashion dolls/clothes/accessories segment.  Last year, |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 38 of 160   Page ID #:306709
CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

38

| | | |
|---|---|---|
| 09:20 | 1 | in the month of November, Barbie outsold Bratz by over 2 to |
| 09:20 | 2 | 1.  Let's hope December looks better." |
| 09:20 | 3 | So here, you're telling Mr. Friedman that while the |
| 09:20 | 4 | previous year Barbie had outsold Bratz by over 2 to 1, now |
| 09:20 | 5 | Bratz had almost matched Barbie's sales, right? |
| 09:20 | 6 | A.   Yes, with the caveat that one shouldn't calculate |
| 09:20 | 7 | shares that way. |
| 09:20 | 8 | Q.   Well, I understand that. |
| 09:20 | 9 | But it wasn't looking good, right? |
| 09:20 | 10 | A.   Yes, I agree with that. |
| 09:20 | 11 | Q.   And, in fact, you sent this letter to Mr. Friedman |
| 09:20 | 12 | because you were very concerned about what was happening, |
| 09:20 | 13 | right? |
| 09:20 | 14 | A.   Yes, I was. |
| 09:20 | 15 | Q.   Now, let's look at Exhibit 7507, the 2006 annual |
| 09:21 | 16 | report, the 10-K that you filed for Mattel. |
| 09:21 | 17 | *(Document provided to the witness.)* |
| 09:21 | 18 | BY MS. KELLER: |
| 09:21 | 19 | Q.   Do you recognize that document as being the 10-K you |
| 09:21 | 20 | filed? |
| 09:21 | 21 | A.   I do. |
| 09:21 | 22 | MS. KELLER:  Your Honor, I would move, um -- well, |
| 09:21 | 23 | let's look at 7507 page 36. |
| 09:21 | 24 | BY MS. KELLER: |
| 09:21 | 25 | Q.   Now -- |

CV 04-9049 DOC – 3/7/2011 – Day 27, Volume 1 of 4

39

| | | |
|---|---|---|
| 09:21 | 1 | MS. KELLER:  And, Your Honor, I'd move 7507, |
| 09:21 | 2 | page 36, into evidence. |
| 09:21 | 3 | THE COURT:  Received. |
| 09:21 | 4 | *(Exhibit No. 7507-36 received in evidence.)* |
| 09:21 | 5 | *(Document displayed.)* |
| 09:21 | 6 | BY MS. KELLER: |
| 09:21 | 7 | Q.   Now, this year, in 2006, Barbie sales were actually up |
| 09:21 | 8 | 3 percent in the U.S., correct? |
| 09:21 | 9 | A.   Uh, I haven't found that yet. |
| 09:21 | 10 | Q.   Very bottom paragraph. |
| 09:21 | 11 | A.   Okay.  I'm sorry. |
| 09:22 | 12 | Q.   Third line from the bottom. |
| 09:22 | 13 | A.   Yes, that's correct. |
| 09:22 | 14 | Q.   So domestic gross sales of Barbie increased 3 percent |
| 09:22 | 15 | that year, right? |
| 09:22 | 16 | A.   That's correct. |
| 09:22 | 17 | Q.   But international gross sales of Barbie decreased |
| 09:22 | 18 | 2 percent, true? |
| 09:22 | 19 | A.   That's correct. |
| 09:22 | 20 | Q.   Now, let's look at the next year, Exhibit 7508.  This |
| 09:22 | 21 | is the 2007 annual report, the 10-K that you filed with the |
| 09:22 | 22 | Securities and Exchange Commission. |
| 09:22 | 23 | *(Document provided to the witness.)* |
| 09:22 | 24 | BY MS. KELLER: |
| 09:22 | 25 | Q.   You recognize that as that document? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:22 | 1 | A.   I do. |
| 09:22 | 2 | MS. KELLER:  Your Honor, I'd move to admit 7508. |
| 09:22 | 3 | THE COURT:  Received. |
| 09:22 | 4 | *(Exhibit No. 7508 received in evidence.)* |
| 09:22 | 5 | *(Document displayed.)* |
| 09:22 | 6 | BY MS. KELLER: |
| 09:22 | 7 | Q.   Let's look at page 41. |
| 09:23 | 8 | *(Document displayed.)* |
| 09:23 | 9 | BY MS. KELLER: |
| 09:23 | 10 | Q.   Now, in 2007, if you look at the second paragraph, |
| 09:23 | 11 | domestic sales of Barbie actually decreased by 15 percent, |
| 09:23 | 12 | right? |
| 09:23 | 13 | A.   I haven't found that yet. |
| 09:23 | 14 | Q.   Second -- |
| 09:23 | 15 | A.   I'm in the second paragraph. |
| 09:23 | 16 | Q.   Second paragraph, five lines? |
| 09:23 | 17 | A.   I'm sure I'll get to it. |
| 09:23 | 18 | THE COURT:  They may have highlighted that for you |
| 09:23 | 19 | up on the screen. |
| 09:23 | 20 | THE WITNESS:  I'm sorry.  Yes, it does say that. |
| 09:23 | 21 | MS. KELLER:  And can we take that off the screen |
| 09:23 | 22 | for a minute? |
| 09:23 | 23 | THE COURT:  Now they haven't highlighted it for |
| 09:23 | 24 | you. |
| 09:23 | 25 | MS. KELLER:  Well, I only wanted to refer to that |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

41

| 09:23 | 1 | one line, Your Honor, and there was some other things that I |
|---|---|---|
| 09:23 | 2 | know the Court had wanted not gone into.  That's why I took |
| 09:23 | 3 | it down. |
| 09:23 | 4 | THE COURT:  I appreciate that. |
| 09:23 | 5 | BY MS. KELLER: |
| 09:23 | 6 | Q.   So domestic gross sales of Barbie actually decreased by |
| 09:23 | 7 | 15 percent, right? |
| 09:23 | 8 | A.   Yes, that's correct. |
| 09:23 | 9 | Q.   So you had some very, very serious issues with recalls |
| 09:23 | 10 | from 2005 to 2008, especially in the summer of 2007, true? |
| 09:24 | 11 | A.   We certainly did in the summer of 2007, yes. |
| 09:24 | 12 | Q.   And if we look at page 39 of that same document, |
| 09:24 | 13 | 7508-0039, that discusses these product recalls, right? |
| 09:24 | 14 | A.   That's correct. |
| 09:24 | 15 | MS. KELLER:  Your Honor, I'd move page 39 into |
| 09:24 | 16 | evidence. |
| 09:24 | 17 | THE COURT:  Received. |
| 09:24 | 18 | *(Exhibit No. 7508-39 received in evidence.)* |
| 09:24 | 19 | *(Document displayed.)* |
| 09:24 | 20 | BY MS. KELLER: |
| 09:24 | 21 | Q.   And this says, "During the third quarter of 2007, |
| 09:24 | 22 | Mattel recalled products with high-powered magnets that may |
| 09:24 | 23 | become dislodged."  And when you say "dislodged," children |
| 09:24 | 24 | were swallowing those magnets, weren't they? |
| 09:24 | 25 | A.   Usually not.  What I meant by dislodged is that the |

| | | |
|---|---|---|
| 09:25 | 1 | glue that was holding the magnet to the toy failed. |
| 09:25 | 2 | Q.   And some children were swallowing those magnets, right? |
| 09:25 | 3 | A.   Uh, yes. |
| 09:25 | 4 | Q.   "And other products, some of which were produced using |
| 09:25 | 5 | nonapproved --" I'm trying to see what that word is.  It's a |
| 09:25 | 6 | little small for me. |
| 09:25 | 7 | A.   Which paragraph are you on? |
| 09:25 | 8 | Q.   I'm on the third paragraph, where it begins, "During |
| 09:25 | 9 | the third quarter of 2007."  That should have said |
| 09:25 | 10 | "nonapproved paint," but I'm having trouble reading it. |
| 09:25 | 11 | "Some of which were produced using nonapproved paint |
| 09:25 | 12 | containing lead in excess of applicable regulatory and |
| 09:25 | 13 | Mattel standards, collectively third quarter of 2007 |
| 09:25 | 14 | recalls." |
| 09:25 | 15 | If goes on to say, "Additional products were recalled, |
| 09:25 | 16 | withdrawn from retail stores, or replaced at the request of |
| 09:26 | 17 | consumers in the fourth quarter of 2007 as a result of small |
| 09:26 | 18 | parts separating from a product, some instances of paint |
| 09:26 | 19 | containing lead in excess of applicable regulatory standards |
| 09:26 | 20 | in another product, and the presence of lead in the |
| 09:26 | 21 | substrate in excess of an Illinois regulatory standard in |
| 09:26 | 22 | other products." |
| 09:26 | 23 | And if you look at page 28. |
| 09:26 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

43

| | | |
|---|---|---|
| 09:26 | 1 | BY MS. KELLER: |
| 09:26 | 2 | Q.   You warned your shareholders that the recalls could |
| 09:26 | 3 | have a material adverse effect on Mattel's financial |
| 09:26 | 4 | condition, correct?  I'm looking at -- |
| 09:26 | 5 | A.   Yes. |
| 09:26 | 6 | MS. KELLER:  And, Your Honor, I'd move page 28 of |
| 09:26 | 7 | 7508 into evidence. |
| 09:26 | 8 | THE COURT:  Received. |
| 09:27 | 9 | (Exhibit No. 7508-28 received in evidence.) |
| 09:27 | 10 | ^(Document displayed.) |
| 09:27 | 11 | BY MS. KELLER: |
| 09:27 | 12 | Q.   And by material adverse effect on Mattel's financial |
| 09:27 | 13 | condition, you were signaling to the shareholders, not just |
| 09:27 | 14 | that it could hurt Mattel's profits, but also that it could |
| 09:27 | 15 | hurt the value of the shareholders shares, right? |
| 09:27 | 16 | A.   Those two things are related, yes. |
| 09:27 | 17 | Q.   And Barbie products were included in the recalls from |
| 09:27 | 18 | 2005 to 2008, right? |
| 09:27 | 19 | A.   Uh, yes, there were Barbie accessories, yes. |
| 09:27 | 20 | Q.   And in November of 2006, there was a recall of a toy |
| 09:27 | 21 | called Polly Pockets, right? |
| 09:27 | 22 | A.   Yes. |
| 09:27 | 23 | Q.   And that was a magnet problem, right? |
| 09:27 | 24 | A.   That's correct. |
| 09:27 | 25 | Q.   And that problem was a result of a faulty design by |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

44

| | | |
|---|---|---|
| 09:27 | 1 | Mattel designers here in the United States, right? |
| 09:28 | 2 | A.   That's not how I would describe the situation of what |
| 09:28 | 3 | happened with small magnets.  I'd be happy to explain it. |
| 09:28 | 4 | Q.   Well, this -- this whole situation, all these recalls, |
| 09:28 | 5 | this created an enormous public relations firestorm for |
| 09:28 | 6 | Mattel, didn't it? |
| 09:28 | 7 | A.   Yes, it did.  It was certainly a very challenging time |
| 09:28 | 8 | for the company. |
| 09:28 | 9 | Q.   And you had to actually testify before Congress about |
| 09:28 | 10 | the safety of your toys and why all these toys were unsafe |
| 09:28 | 11 | and had been recalled, right? |
| 09:28 | 12 | A.   Yes, and what we had done about it. |
| 09:28 | 13 | Q.   Now, if I could show you Exhibit 7519. |
| 09:28 | 14 | *(Document provided to the witness.)* |
| 09:28 | 15 | BY MS. KELLER: |
| 09:28 | 16 | Q.   That's a copy of your Congressional testimony on |
| 09:29 | 17 | September 19, 2007, right? |
| 09:29 | 18 | A.   This is the written testimony, which I contrast to the |
| 09:29 | 19 | oral testimony -- but it is. |
| 09:29 | 20 | Q.   This is a written statement that you submitted to |
| 09:29 | 21 | Congress, right? |
| 09:29 | 22 | A.   That's correct. |
| 09:29 | 23 | Q.   And then in addition, you were asked a number of |
| 09:29 | 24 | questions by members of Congress as well, true? |
| 09:29 | 25 | A.   Well, in addition, I made an oral statement and then |

09:29    1    participated in questions and answers, yes.

09:29    2    Q.    And what you told Congress, uh -- you were trying to

09:29    3    tell the truth, right?

09:29    4    A.    That's correct.

09:29    5    Q.    Now, on June 8th, 2007, Auchan, a French direct

09:29    6    importer had retained an independent lab called Intertek to

09:29    7    test for lead and paint on some of Mattel's preshipment toys

09:29    8    destined for stores in France, right?

09:29    9    A.    What was the date you mentioned?

09:29    10   Q.    June 8th, 2007?

09:30    11   A.    Yes, I think that's correct.

09:30    12   Q.    And the toys had actually been manufactured for

09:30    13   Mattel --

09:30    14            MR. QUINN:  Your Honor, I object as to relevance

09:30    15   now.

09:30    16            THE COURT:  I'm going to sustain that, Counsel.  I

09:30    17   don't know where we're going with this.

09:30    18            MS. KELLER:  Goes to --

09:30    19            THE COURT:  I certainly will allow it concerning

09:30    20   lost profits and the different factors that go into the

09:30    21   damages calculation if the jury decides liability here, but

09:30    22   the specifics of that testimony seem to be irrelevant.  It's

09:30    23   the fact that it occurred and what the effect is on the

09:30    24   10-Ks.

09:30    25            MR. QUINN:  There's a specific issue here that

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 46 of 160   Page ID #:306717
CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

46

| | | |
|---|---|---|
| 09:30 | 1 | this Court has ruled is out, should not be gone into, and I |
| 09:30 | 2 | sense it coming. |
| 09:30 | 3 | THE COURT:  Well, I'm just not sure why we're |
| 09:30 | 4 | getting into this area right now.  Maybe we can discuss this |
| 09:30 | 5 | at the recess.  I'm not precluding you.  I just don't know |
| 09:30 | 6 | where we're going with this. |
| 09:30 | 7 | MS. KELLER:  Perhaps we can discuss it generally, |
| 09:30 | 8 | Your Honor, without going into all the detail about what |
| 09:30 | 9 | happened and why. |
| 09:30 | 10 | THE COURT:  Let's see what the question is. |
| 09:31 | 11 | BY MS. KELLER: |
| 09:31 | 12 | Q.   Well, in addition to -- there was more than one recall |
| 09:31 | 13 | that Mattel had to do, right? |
| 09:31 | 14 | A.   In 2007? |
| 09:31 | 15 | Q.   Yes. |
| 09:31 | 16 | A.   Yes, that's correct. |
| 09:31 | 17 | Q.   There was a recall on August 2nd, 2007, right? |
| 09:31 | 18 | A.   That's correct. |
| 09:31 | 19 | Q.   And August 14th, 2007? |
| 09:31 | 20 | A.   That's correct. |
| 09:31 | 21 | Q.   And Mattel had actually had to report itself to the |
| 09:31 | 22 | Consumer Products Safety Commission when -- through |
| 09:31 | 23 | various -- |
| 09:31 | 24 | MR. QUINN:  Your Honor, I object. |
| 09:31 | 25 | THE COURT:  Yeah. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

47

| | | |
|---|---|---|
| 09:31 | 1 | MR. QUINN: It's irrelevant. |
| 09:31 | 2 | THE COURT: I'm going to sustain it. |
| 09:31 | 3 | BY MS. KELLER: |
| 09:31 | 4 | Q. There was a lot of bad press about Mattel around this |
| 09:31 | 5 | time, wasn't there? |
| 09:31 | 6 | A. There was certainly a lot of press about Mattel; some |
| 09:31 | 7 | good, some bad. |
| 09:31 | 8 | Q. And there was a lot of bad press about the safety of |
| 09:31 | 9 | Mattel's toys, right? |
| 09:31 | 10 | A. Certainly there was bad press about defects, yes. I |
| 09:31 | 11 | would agree with that. |
| 09:31 | 12 | Q. Well, I mean, the nature of the press was that these |
| 09:32 | 13 | toys weren't safe for kids, right? |
| 09:32 | 14 | A. That's correct. |
| 09:32 | 15 | Q. And they weren't safe for kids because they had many, |
| 09:32 | 16 | many times the amount of lead in the paint that was |
| 09:32 | 17 | permissible, true? |
| 09:32 | 18 | A. Yes. |
| 09:32 | 19 | Q. And they weren't safe for kids because in some of Polly |
| 09:32 | 20 | Pockets toys the magnets were getting dislodged and some |
| 09:32 | 21 | kids were swallowing them, right? |
| 09:32 | 22 | A. That's correct. |
| 09:32 | 23 | Q. And there was also -- in addition to the recall on |
| 09:32 | 24 | August 2nd, there was another one August 14th, 2007? |
| 09:32 | 25 | A. That's correct. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

48

09:32  1   Q.    The first recall was for the high levels of lead in the

09:32  2   paint, right?

09:32  3   A.    The first one being August 2nd?

09:32  4   Q.    Yes.

09:32  5   A.    That's correct.

09:32  6   Q.    And that was almost two months after the initial

09:32  7   discovery --

09:32  8           MR. QUINN:  Objection, Your Honor.  This is

09:32  9   irrelevant.

09:32  10          THE COURT:  Just a moment.

09:32  11          MR. QUINN:  And --

09:32  12          THE COURT:  Just a minute.  What's the question?

09:33  13          MR. QUINN:  Your Honor, this is an issue the Court

09:33  14   addressed and has made a ruling on that.  It shouldn't be --

09:33  15          THE COURT:  I accept that representation.  I just

09:33  16   don't quite know where we're at with this.

09:33  17          MS. KELLER:  A lot --

09:33  18          MR. QUINN:  Excuse me.  I don't think this --

09:33  19          MS. KELLER:  I was --

09:33  20          MR. QUINN:  -- in front of the jury --

09:33  21          THE COURT:  Excuse me.

09:33  22          (To the jury:)  Could I borrow both counsel for

09:33  23   one moment?  Would you mind?  Why don't you visit amongst

09:33  24   yourselves.  Let me talk to them at sidebar.  I can see that

09:33  25   they both want to talk to me.

| | | |
|---|---|---|
| 09:33 | 1 | *(Sidebar proceedings reported as follows:)* |
| 09:33 | 2 | THE COURT:  All right.  We're on the record at |
| 09:34 | 3 | sidebar. |
| 09:34 | 4 | I thought I allowed the recall, the page which you |
| 09:34 | 5 | can get into, and all the subsequent recalls to show |
| 09:34 | 6 | concerning lost profits and all of the other factors that |
| 09:34 | 7 | have gone into the lost profits of Mattel.  It's entirely |
| 09:34 | 8 | appropriate so far. |
| 09:34 | 9 | What's the concern, and where are we going? |
| 09:34 | 10 | MS. KELLER:  Your Honor –– |
| 09:34 | 11 | MR. QUINN:  I'll tell you my concern. |
| 09:34 | 12 | THE COURT:  Okay. |
| 09:34 | 13 | MR. QUINN:  What she wants to do is to bring up an |
| 09:34 | 14 | issue about whether there was a delay in reporting this. |
| 09:34 | 15 | And this has been discussed with the Court.  And the delay |
| 09:34 | 16 | whether or not Mattel timely reported after discovery of |
| 09:34 | 17 | these problems. |
| 09:34 | 18 | THE COURT:  It's irrelevant. |
| 09:34 | 19 | MR. QUINN:  It's irrelevant.  And Mattel has a |
| 09:34 | 20 | position on that we can –– |
| 09:34 | 21 | THE COURT:  Just a minute.  Let me hear from –– |
| 09:34 | 22 | MR. QUINN:  Mattel has a position on that.  We can |
| 09:34 | 23 | debate that it's a trial within the trial. |
| 09:34 | 24 | THE COURT:  Before the accusation, let's find out |
| 09:34 | 25 | if that's where we're going, because the only relevant part |

| | | |
|---|---|---|
| 09:34 | 1 | is the effect that this is having. |
| 09:34 | 2 | In the general market, there's conversation about |
| 09:34 | 3 | the nonsafety of Mattel toys.  There have been numerous |
| 09:35 | 4 | recalls you're absolutely allowed to get into.  I mean, |
| 09:35 | 5 | after all, lost profits, et cetera, is part of that. |
| 09:35 | 6 | The specifics, though, about the French |
| 09:35 | 7 | manufacturer. |
| 09:35 | 8 | MS. KELLER:  Well, I abandoned that already. |
| 09:35 | 9 | THE COURT:  Yes, you did. |
| 09:35 | 10 | MS. KELLER:  I abandoned that already, but I have |
| 09:35 | 11 | looked in vain for any ruling of the Court saying that we |
| 09:35 | 12 | couldn't get into the firestorm of criticism.  And what I |
| 09:35 | 13 | was going to ask is part of this firestorm of criticism that |
| 09:35 | 14 | was leveled at Mattel -- |
| 09:35 | 15 | THE COURT:  Yeah. |
| 09:35 | 16 | MS. KELLER:  -- was for Mattel's delays in |
| 09:35 | 17 | reporting the high levels of lead paint to the government. |
| 09:35 | 18 | And there was a two-month delay.  And there were -- every |
| 09:35 | 19 | publication on either -- was criticizing 'em, parents |
| 09:35 | 20 | weren't buying their toys, people were calling in and |
| 09:35 | 21 | complaining.  I mean, it was a real firestorm:  Not just |
| 09:35 | 22 | because the toys had lead paint in 'em.  Because of Mattel's |
| 09:35 | 23 | delay in reporting them.  And I haven't seen any ruling by |
| 09:35 | 24 | the Court saying we can't get into that. |
| 09:35 | 25 | MR. QUINN:  Your Honor, we have a failure of |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 51 of 160   Page ID #:306722
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

51

09:36  1   communication on MGA's side.  We go over these things

09:36  2   through the binders when Ms. Keller is not present, and then

09:36  3   she can come here and feign -- or maybe it isn't passed on

09:36  4   to her what the Court's rulings are, just like what happened

09:36  5   yesterday.

09:36  6           THE COURT:  It's been co-equal on both sides.  For

09:36  7   the record, the Court has no criticism of any counsel.

09:36  8           Once again, whoever the reviewing Court is, I hope

09:36  9   that they understand that counsel are literally working as

09:36  10  hard as they can.  And the Court's taken a position, and

09:36  11  I've been personally willing to accept an increased amount

09:36  12  of error, hopefully small on my part, by allowing these

09:36  13  exhibits to come in, in close proximity to the time that

09:36  14  both sides believe that they need an exhibit literally

09:36  15  received into evidence and put up on a screen, for two

09:36  16  reasons:

09:36  17          First, it increases the presentation of counsel

09:37  18  and the efforts that they're trying to make through

09:37  19  testimony regarding that particular witness.  I think

09:37  20  without that accommodation by the Court, this case would

09:37  21  absolutely be nonunderstandible and detrimental to both

09:37  22  Mattel and MGA.

09:37  23          Therefore, the Court has to accept a certain

09:37  24  amount of its rulings are having to be made quickly.  That's

09:37  25  why all counsel are reviewing all of these exhibits with the

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

52

| | | |
|---|---|---|
| 09:37 | 1 | Court prior to the time that the witness ever takes the |
| 09:37 | 2 | witness stand, probably 40,000 by the time we're done. |
| 09:37 | 3 | But because the Court can't read every one of |
| 09:37 | 4 | those documents, some of which are hundreds of pages, all |
| 09:37 | 5 | the Court can get is a sense of what that document is, |
| 09:37 | 6 | generally speaking, so I know that -- the problems that are |
| 09:37 | 7 | going to occur. |
| 09:37 | 8 | My ruling's this:  You can get into the recalls, |
| 09:38 | 9 | the lead paint, all of the different problems that have |
| 09:38 | 10 | occurred to Mattel, including the Congressional testimony, |
| 09:38 | 11 | because that's part of the notoriety that the public |
| 09:38 | 12 | absorbed in terms of the many other factors that led to |
| 09:38 | 13 | these diminution of revenues besides Bratz. |
| 09:38 | 14 | What you can't get into is the specifics about |
| 09:38 | 15 | what happened with the French manufacturer.  You can't get |
| 09:38 | 16 | into specifics where the prejudicial effect outweighs the |
| 09:39 | 17 | probative value. |
| 09:39 | 18 | Okay.  So far it's Congress.  Fine.  Shows the |
| 09:39 | 19 | notoriety. |
| 09:39 | 20 | CNBC, fine. |
| 09:39 | 21 | Wall Street, fine. |
| 09:39 | 22 | Lead, fine. |
| 09:39 | 23 | Paint, fine. |
| 09:39 | 24 | But the delay in reporting seems to me to be |
| 09:39 | 25 | *de minimis*, from my perspective. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

53

| 09:39 | 1 | MS. KELLER: It wasn't, though, Your Honor. |
| 09:39 | 2 | It was -- it was actually a big component of what |
| 09:39 | 3 | he was grilled about before Congress, and it was a big |
| 09:39 | 4 | component of the criticism in the press because what |
| 09:39 | 5 | happened was Mattel was not only criticized for the lead in |
| 09:39 | 6 | the toys, but for not promptly, within 24 hours as required, |
| 09:39 | 7 | notify the Consumer Products Safety Commission about it. |
| 09:39 | 8 | Now, I already had abandoned that, even. I had |
| 09:39 | 9 | abandoned the details. But one of the -- one of the sources |
| 09:40 | 10 | of criticism in the media that contributed to their decline |
| 09:40 | 11 | in sales was the perception that Mattel was not only not |
| 09:40 | 12 | producing safe toys, but was not promptly disclosing to |
| 09:40 | 13 | people. |
| 09:40 | 14 | THE COURT: Is that what generated the |
| 09:40 | 15 | Congressional investigation? |
| 09:40 | 16 | MS. HURST: That they weren't trustworthy. |
| 09:40 | 17 | THE COURT: I'm sorry. One attorney at a time. |
| 09:40 | 18 | MS. HURST: Sorry. |
| 09:40 | 19 | THE COURT: Or two of you are leaving my presence, |
| 09:40 | 20 | and I will get down to one attorney for both sides. |
| 09:40 | 21 | You two are speaking: Mr. Quinn and Ms. Keller. |
| 09:40 | 22 | MS. KELLER: I can address that. |
| 09:40 | 23 | THE COURT: Now, let me reask again before I was |
| 09:40 | 24 | distracted. |
| 09:40 | 25 | Did Congress institute these hearings not only |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 54 of 160   Page ID #:306725
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

54

| | | |
|---|---|---|
| 09:40 | 1 | because of the lead in paint, but also because of the delay? |
| 09:40 | 2 | MS. KELLER:  Yes.  And furthermore, Congresswoman |
| 09:41 | 3 | Pelosi even called for the sacking of the head of the |
| 09:41 | 4 | Consumer Products Safety Division -- Consumer Products |
| 09:41 | 5 | Safety -- |
| 09:41 | 6 | MS. HURST:  -- Commission. |
| 09:41 | 7 | MS. KELLER:  -- Commission, who was a George W. |
| 09:41 | 8 | Bush appointee and was seen as too cozy with industry and |
| 09:41 | 9 | had let Mattel off the hook for not reporting. |
| 09:41 | 10 | I wasn't going to go into that. |
| 09:41 | 11 | But there was a firestorm. |
| 09:41 | 12 | THE COURT:  You're not -- by the way, you were not |
| 09:41 | 13 | going to go into that. |
| 09:41 | 14 | MS. KELLER:  No, of course not. |
| 09:41 | 15 | But there was a firestorm of criticism from |
| 09:41 | 16 | Congress as well as the media about the delay.  And he was |
| 09:41 | 17 | grilled about that before Congress:  The delay in reporting. |
| 09:41 | 18 | THE COURT:  Let me ask again. |
| 09:41 | 19 | Did Congress institute these Congressional |
| 09:41 | 20 | hearings because of the failure to report this in a timely |
| 09:41 | 21 | manner? |
| 09:42 | 22 | MS. KELLER:  I think it was both things. |
| 09:42 | 23 | THE COURT:  I understand that -- |
| 09:42 | 24 | MS. KELLER:  I think it was. |
| 09:42 | 25 | THE COURT:  I understand that lead and paint may |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

55

09:42  1    have already caused a Congressional inquiry.  Did they

09:42  2    institute these hearings because they perceived Mattel had

09:42  3    unnecessarily delayed reporting?

09:42  4            MS. KELLER:  The only thing I know is what the

09:42  5    content of the hearings was.  I can't go into the

09:42  6    Congressmen's heads.  But the content of the hearings was

09:42  7    both.

09:42  8            THE COURT:  For the present time, you're

09:42  9    precluded.  We're going to spend our recess, our lunch hour.

09:42  10   I want you to show me those provisions.  Because remember,

09:42  11   on the weekends, I'm generally looking at groups of a

09:42  12   hundred pages in a binder and passing through those just to

09:42  13   give me an antenna-like look.  What are my problems for the

09:42  14   coming week.

09:42  15           I knew there was a Congressional investigation.  I

09:42  16   knew there was lead in paint.  I basically acquiesced to

09:42  17   that on a weekend and said, "Fine."

09:42  18           MS. KELLER:  Okay.

09:42  19           THE COURT:  But I was also alerted that the

09:42  20   specifics of that were going to cause Mattel tremendous

09:42  21   problems; that they wanted to be heard about that.  And I'd

09:43  22   initially said, you know, I don't think it's relevant, but

09:43  23   I'd never gotten into the depth of it.  And, you know, I'm

09:43  24   willing to get into the depth of it, but I've got to have

09:43  25   time to do that, and I've got to have time for you to show

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 56 of 160   Page ID #:306727
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

56

| | | |
|---|---|---|
| 09:43 | 1 | me. |
| 09:43 | 2 | MS. KELLER:  I'll go on. |
| 09:43 | 3 | THE COURT:  It's not a wing and a prayer. |
| 09:43 | 4 | MS. KELLER:  I'll go on to other matters. |
| 09:43 | 5 | MR. QUINN:  There's another larger issue, |
| 09:43 | 6 | Your Honor.  Counsel says she's looked in vain for an order, |
| 09:43 | 7 | and the Court has said a lot of things at these sessions |
| 09:43 | 8 | where we don't have a transcript. |
| 09:43 | 9 | THE COURT:  Just a moment.  We can always get a |
| 09:43 | 10 | transcript with counsel once I call the court reporter in. |
| 09:43 | 11 | I'm willing to do that at any time. |
| 09:43 | 12 | So far both counsel have been in a position that |
| 09:43 | 13 | they wanted the Court to handle this informally, because if |
| 09:43 | 14 | I call the reporter in, they won't be sleeping, there won't |
| 09:43 | 15 | be enough time in the days, 'cause I'm not calling any more |
| 09:43 | 16 | Saturday and Sunday sessions with a court reporter, who |
| 09:43 | 17 | needlessly comes in for an hour program.  Your choice. |
| 09:44 | 18 | MR. QUINN:  Your Honor, we're comfortable. |
| 09:44 | 19 | THE COURT:  So these were informal discussions |
| 09:44 | 20 | that were meaningless, 99 percent of our discussions have |
| 09:44 | 21 | not been rulings by the Court.  They've been simply |
| 09:44 | 22 | indications of where counsel should go or the ability for |
| 09:44 | 23 | counsel to raise an objection and alert the Court that this |
| 09:44 | 24 | is a particular area of concern. |
| 09:44 | 25 | There's been absolutely nothing binding on a |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 57 of 160   Page ID #:306728
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

57

| 09:44 | 1 | weekend with the exception of a couple issues concerning |
|---|---|---|

09:44    1    weekend with the exception of a couple issues concerning

09:44    2    third parties, where I specifically said, for instance, to

09:44    3    Mr. McConville, "Please excise this portion."

09:44    4    That's been unintentional.  The volume here is

09:44    5    overwhelming.  Let me once again say for the record counsel

09:44    6    on both sides have done a magnificent job.

09:44    7    MS. KELLER:  And, Your Honor, before we go back,

09:44    8    there was a motion in limine made by Mattel on this, and it

09:44    9    was denied.

09:44    10    THE COURT:  I recall that.  But it was denial to

09:44    11    this extent:  You could get into lead.  You could get into

09:44    12    paint.  You could get into Congressional inquiry.  That was

09:44    13    the motion that I recall denying.

09:45    14    What I didn't know was the reduction.  That did

09:45    15    not come.

09:45    16    MS. KELLER:  The delay?

09:45    17    THE COURT:  The delay.  Nobody raised that with

09:45    18    me --

09:45    19    MS. KELLER:  Okay.

09:45    20    THE COURT:  -- until a weekend, and I was going

09:45    21    through with Mr. McConville and Mr. Zeller.

09:45    22    Okay.  It's been a pleasure visiting with

09:45    23    everybody this morning.

09:45    24    *(End of sidebar proceedings.)*

09:45    25    *(In the presence of the jury.)*

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 58 of 160   Page ID #:306729
CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

58

| | | |
|---|---|---|
| 09:45 | 1 | THE COURT:  (To the jury:)  Once again, let me |
| 09:45 | 2 | just remind you that we've been able to resolve that, |
| 09:45 | 3 | because I get worried about impressions, once again, about |
| 09:46 | 4 | who's here or not here.  So let me go back to that for just |
| 09:46 | 5 | a moment. |
| 09:46 | 6 | That's why I think counsel on both sides have been |
| 09:46 | 7 | helpful in resolving this.  You don't want the impression |
| 09:46 | 8 | that one party's less or more interested, so everybody's in |
| 09:46 | 9 | general agreement everybody will just be here.  Takes away |
| 09:46 | 10 | any insinuation, any concern about the subtlety of who's |
| 09:46 | 11 | here or not. |
| 09:46 | 12 | All right.  Counsel, if you would like to |
| 09:46 | 13 | continue, please. |
| 09:46 | 14 | MR. QUINN:  Your Honor, may I request that the |
| 09:46 | 15 | question be stricken? |
| 09:46 | 16 | THE COURT:  Oh, the question is stricken. |
| 09:46 | 17 | BY MS. KELLER: |
| 09:46 | 18 | Q.   These August recalls, Mr. Eckert, millions of toys were |
| 09:46 | 19 | recalled, right? |
| 09:46 | 20 | A.   Yes, that's correct. |
| 09:46 | 21 | Q.   And they were recalled for fear that if the toys were |
| 09:46 | 22 | not recalled, they could seriously injure or kill children, |
| 09:47 | 23 | right? |
| 09:47 | 24 | A.   Well, they were recalled because they didn't meet our |
| 09:47 | 25 | standards, and they were -- there is a problem, yes. |

| | | |
|---|---|---|
| 09:47 | 1 | Q.   They didn't meet your standards, or they didn't meet |
| 09:47 | 2 | federal standards? |
| 09:47 | 3 | A.   Both. |
| 09:47 | 4 | Q.   And they were recalled because they could seriously |
| 09:47 | 5 | injure or kill a child, right? -- if they were not recalled? |
| 09:47 | 6 | A.   I think that could certainly be the case in the |
| 09:47 | 7 | magnets, yes. |
| 09:47 | 8 | Q.   And the lead amounts were off the charts, weren't they? |
| 09:47 | 9 | MR. QUINN:  Vague and ambiguous. |
| 09:47 | 10 | THE COURT:  Well, you might say "high," Counsel. |
| 09:47 | 11 | See if they're high. |
| 09:47 | 12 | MS. KELLER:  See if I can find the precise amount. |
| 09:47 | 13 | BY MS. KELLER: |
| 09:47 | 14 | Q.   Were they over 100 times the amount of lead that was |
| 09:47 | 15 | permitted by federal standards? |
| 09:47 | 16 | A.   I don't know the number.  And I'm sure it varied by |
| 09:47 | 17 | product and the very component on the product that was out |
| 09:48 | 18 | of the standard. |
| 09:48 | 19 | Q.   It was a huge variation, right? |
| 09:48 | 20 | A.   It was -- certainly whatever the component was on the |
| 09:48 | 21 | toy that was affected was out of compliance.  The range |
| 09:48 | 22 | varied by product from, I'm sure, a little bit out of |
| 09:48 | 23 | compliance to a lot out of compliance. |
| 09:48 | 24 | Q.   Some of these toys had so much lead in 'em that if the |
| 09:48 | 25 | child chewed on the toy, the child could go into |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 60 of 160   Page ID #:306731
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

60

| | | |
|---|---|---|
| 09:48 | 1 | convulsions, right? |
| 09:48 | 2 | A.   No.  In fact, we had professional toxicologists examine |
| 09:48 | 3 | just that fact.  Because again, it was small components on a |
| 09:48 | 4 | toy that were affected -- still too much, but there was no |
| 09:48 | 5 | evidence that any child ever was injured due to the lead |
| 09:48 | 6 | paint.  Still unacceptable. |
| 09:48 | 7 | Q.   That's the position you took, I understand that. |
| 09:49 | 8 | But let me ask you -- |
| 09:49 | 9 | MR. QUINN:  Move to strike.  Excuse me.  Move to |
| 09:49 | 10 | strike the comment. |
| 09:49 | 11 | THE COURT:  Sustained. |
| 09:49 | 12 | Stricken. |
| 09:49 | 13 | Reask, Counsel. |
| 09:49 | 14 | BY MS. KELLER: |
| 09:49 | 15 | Q.   I'm not asking you about your position.  I want to ask |
| 09:49 | 16 | you about limits. |
| 09:49 | 17 | MR. QUINN:  Again move to strike, Your Honor. |
| 09:49 | 18 | THE COURT:  Overruled. |
| 09:49 | 19 | You can ask the question. |
| 09:49 | 20 | BY MS. KELLER: |
| 09:49 | 21 | Q.   The legal limit for lead in paint is 0.06 percent, |
| 09:49 | 22 | right? |
| 09:49 | 23 | A.   Yes. |
| 09:49 | 24 | Q.   And the Mattel toys recalled in 2007 had as much as |
| 09:49 | 25 | 11 percent, right? |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

61

| | | |
|---|---|---|
| 09:49 | 1 | A.   In the component that was affected, yes. |
| 09:49 | 2 | Q.   So -- |
| 09:49 | 3 | A.   Certainly could have been. |
| 09:49 | 4 | Q.   So I was a little low.  It was really more like 10,000 |
| 09:49 | 5 | times the amount of lead that was permitted, right? |
| 09:49 | 6 | A.   Certainly in the component.  For example, the yellow |
| 09:49 | 7 | headlight on a train car, the yellow headlight, which was |
| 09:49 | 8 | out of compliance, was well out of compliance.  I don't |
| 09:49 | 9 | think there's any question about that. |
| 09:49 | 10 | Q.   It -- this affected millions and millions of toys, |
| 09:50 | 11 | right? |
| 09:50 | 12 | A.   It did. |
| 09:50 | 13 | Q.   And before the end of 2007, Mattel and its subsidiary, |
| 09:50 | 14 | Fisher-Price, had a total of five recalls, right? |
| 09:50 | 15 | A.   Yes. |
| 09:50 | 16 | Q.   There were 20 million toxic and dangerous toys |
| 09:50 | 17 | manufactured in -- mostly in China that were recalled, |
| 09:50 | 18 | right?  20 million? |
| 09:50 | 19 | A.   The magnet toys that went back for, I think, a decade, |
| 09:50 | 20 | that I know was in the millions.  I don't know if that's |
| 09:50 | 21 | true of the toys that had issues with lead paint that were |
| 09:50 | 22 | out of compliance with lead paint. |
| 09:50 | 23 | Q.   The five recalls in 2007 involved 20 million toxic and |
| 09:50 | 24 | dangerous toys, right? |
| 09:50 | 25 | A.   Yes.  And would you like me to explain that? |

| | | |
|---|---|---|
| 09:51 | 1 | Q.   And there were 675,000 Barbie accessories in which lead |
| 09:51 | 2 | paint was discovered, true? |
| 09:51 | 3 | A.   Uh, lead paint on a small component of the Barbie |
| 09:51 | 4 | accessory, that is true. |
| 09:51 | 5 | Q.   They were recalled? |
| 09:51 | 6 | A.   They were. |
| 09:51 | 7 | Q.   And the lead paint was caused by the manufacturing |
| 09:51 | 8 | process of Mattel's vendors in China? |
| 09:51 | 9 | A.   It was caused almost exclusively by subcontractors of |
| 09:51 | 10 | Mattel's vendors overseas. |
| 09:51 | 11 | Q.   And the recalled magnetic toys that caused injuries to |
| 09:51 | 12 | children, such as the Polly Pockets brand, those resulted |
| 09:51 | 13 | from poor design by Mattel here in the U.S., correct? |
| 09:51 | 14 | A.   I think there was an issue with magnet toys that dates |
| 09:51 | 15 | back a long time.  And I will tell you, Mattel was the only |
| 09:51 | 16 | company and still to this day is the only company that |
| 09:52 | 17 | retroactively recalled all of our small magnet toys once we |
| 09:52 | 18 | found a better way to embed the magnet into the toy. |
| 09:52 | 19 | Q.   Not my question. |
| 09:52 | 20 | Here's my question:  Those designs, those were the |
| 09:52 | 21 | result of flaws in the design here in the U.S. by Mattel? |
| 09:52 | 22 | Yes? |
| 09:52 | 23 | A.   Certainly the design was improved.  The previous design |
| 09:52 | 24 | was insufficient, that's correct. |
| 09:52 | 25 | Q.   Insufficient?  There were children who actually died |

DEBBIE GALE, U.S. COURT REPORTER

| 09:52 | 1 | from swallowing these magnets, right? |

09:52   1   from swallowing these magnets, right?

09:52   2   A.   No.

09:52   3   Q.   And there was a fourth recall in October --

09:52   4        MR. QUINN:  Your Honor, there's no good faith

09:52   5   basis for that question.  I request that the question and

09:52   6   the answer be stricken.

09:52   7        MS. KELLER:  Children died.

09:52   8        THE COURT:  The question remains.  The answer's

09:52   9   "No."

09:52   10  BY MS. KELLER:

09:52   11  Q.   You know better, don't you, Mr. Eckert?

09:52   12  A.   No.  In fact, I know no child died as a result of

09:52   13  swallowing a magnet in a Mattel toy.

09:52   14       MS. KELLER:  Your Honor, I would ask to recess to

09:52   15  inquire of the Court as to whether I may ask the next

09:52   16  question about a possibly prohibited area.

09:53   17       THE COURT:  Well, it depends.

09:53   18       Why don't we move on and get to the recess so we

09:53   19  don't take another sidebar.

09:53   20       MS. KELLER:  Thank you, Your Honor.

09:53   21  BY MS. KELLER:

09:53   22  Q.   Mr. Eckert, there was a fourth recall in October for

09:53   23  Go-Go Diego products containing high levels of lead in the

09:53   24  paint, right.

09:53   25  A.   Yes.  There was a component in that product, correct.

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

64

| 09:53 | 1 | Q.   And then there was another recall in September for |
| 09:53 | 2 | Laugh and Learning Kitchen Toys manufactured in China, |
| 09:53 | 3 | right? |
| 09:53 | 4 | A.   In the month of September? |
| 09:53 | 5 | Q.   Yes. |
| 09:53 | 6 | A.   It may have been. |
| 09:53 | 7 | Q.   And meanwhile, you had closed the only remaining Mattel |
| 09:53 | 8 | plant in the United States, so all your manufacturing was |
| 09:53 | 9 | being done in Asia, true? |
| 09:53 | 10 | A.   No.  The plant that was closed in the United States |
| 09:53 | 11 | didn't make any of these toys.  It made Power Wheels.  And |
| 09:54 | 12 | that production did not go to China.  That's correct.  So |
| 09:54 | 13 | the answer is no. |
| 09:54 | 14 | Q.   On your watch, you closed the last remaining Mattel |
| 09:54 | 15 | manufacturing plant in the United States, right? |
| 09:54 | 16 | A.   Yes. |
| 09:54 | 17 | Q.   Now, this -- uh, we talked about the headlines your |
| 09:54 | 18 | company had to face.  You didn't think they were that bad? |
| 09:54 | 19 | A.   No, I said there were bad headlines.  We were also |
| 09:54 | 20 | acknowledged for doing some of the things that we did during |
| 09:54 | 21 | the recalls. |
| 09:54 | 22 | Q.   *Forbes* ran a headline "Chinese Toy Terror," right? |
| 09:54 | 23 | A.   I don't know. |
| 09:54 | 24 | Q.   *USA Today* ran a headline "Mattel's Stellar Reputation |
| 09:54 | 25 | Tainted," right? |

| | | |
|---|---|---|
| 09:54 | 1 | A.   I don't know. |
| 09:54 | 2 | Q.   There was a panic among parents, wasn't there, who had |
| 09:54 | 3 | bought toys for their kids that turned out to be among the |
| 09:55 | 4 | recalled toys? |
| 09:55 | 5 | A.   Parents were appropriately concerned.  No question |
| 09:55 | 6 | about that.  As I was as -- as I said to Congress, as a |
| 09:55 | 7 | father of four.  I understand the importance of the issue. |
| 09:55 | 8 | Q.   You had a mother actually show up at Mattel |
| 09:55 | 9 | headquarters with a car loaded with your company's toys and |
| 09:55 | 10 | demand that someone in authority go through them to see |
| 09:55 | 11 | which ones were dangerous and which ones were safe, right? |
| 09:55 | 12 | A.   I don't know that. |
| 09:55 | 13 | Q.   And that got some real publicity, didn't it? |
| 09:55 | 14 | A.   Not that I -- I don't believe so. |
| 09:55 | 15 | Q.   After the first two recalls, your company went into |
| 09:55 | 16 | crisis mode, didn't it? |
| 09:55 | 17 | A.   We shut down the entire supply chain of Mattel. |
| 09:55 | 18 | Q.   Well -- |
| 09:55 | 19 | A.   I would call that crisis mode, yes. |
| 09:55 | 20 | Q.   Well, but you also went into public relations crisis |
| 09:55 | 21 | mode, right? |
| 09:55 | 22 | A.   Well, the whole company, we shut down. |
| 09:55 | 23 | Q.   Is that a yes? |
| 09:55 | 24 | A.   We shut down -- I'm trying to answer your question. |
| 09:55 | 25 | Q.   My question is about public relations.  Okay?  You went |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

66

| | | |
|---|---|---|
| 09:55 | 1 | into full-bore public relations crisis mode, right? |
| 09:56 | 2 | A.   We went into crisis mode in the company, and public |
| 09:56 | 3 | relations is one of the functions that's involved with that, |
| 09:56 | 4 | correct. |
| 09:56 | 5 | Q.   You ran a full-page ad with the second recall on the |
| 09:56 | 6 | *Wall Street Journal*, right? |
| 09:56 | 7 | A.   We ran a full-page ad with a letter from me to parents |
| 09:56 | 8 | in a number of newspapers on August 14th, correct. |
| 09:56 | 9 | Q.   You ran a full-page ad trying to reassure people in the |
| 09:56 | 10 | *New York Times*, right? |
| 09:56 | 11 | A.   Yes. |
| 09:56 | 12 | Q.   You ran a full page ad trying to reassure people in *USA* |
| 09:56 | 13 | *Today*, right? |
| 09:56 | 14 | A.   Yes.  Yes, we did. |
| 09:56 | 15 | Q.   And the fact that you were seen as blaming China for |
| 09:56 | 16 | the recalls actually caused a tremendous amount of trade |
| 09:56 | 17 | tension between the United States and China, didn't it? |
| 09:56 | 18 | A.   No, we never blamed China for the recalls. |
| 09:56 | 19 | Q.   That was actually covered in the *New York Times*, too, |
| 09:56 | 20 | wasn't it? |
| 09:56 | 21 | A.   That we blamed China for the recalls? |
| 09:56 | 22 | Q.   That your blaming China for the recalls had increased |
| 09:56 | 23 | trade tensions between the two countries. |
| 09:57 | 24 | MR. QUINN:  It assumes facts. |
| 09:57 | 25 | THE COURT:  Overruled. |

| | | |
|---|---|---|
| 09:57 | 1 | THE WITNESS:  I don't believe we ever blamed China |
| 09:57 | 2 | for the recall under any circumstances.  The recalls |
| 09:57 | 3 | happened because vendors or subcontractors did not comply |
| 09:57 | 4 | with Mattel's rules.  It had nothing to do with the country |
| 09:57 | 5 | in which they were produced. |
| 09:57 | 6 | BY MS. KELLER: |
| 09:57 | 7 | Q.   You actually sent your executive vice president of |
| 09:57 | 8 | worldwide operations, Tom Debrowski, to Beijing to apologize |
| 09:57 | 9 | to the Chinese for blaming the Chinese manufacturers, true? |
| 09:57 | 10 | A.   Just as we sent -- |
| 09:57 | 11 | Q.   Sir, is that true? |
| 09:57 | 12 | A.   I'm trying to answer -- |
| 09:57 | 13 | Q.   Is it true? |
| 09:57 | 14 | MR. QUINN:  Your Honor. |
| 09:57 | 15 | THE WITNESS:  I'm trying to answer your question. |
| 09:57 | 16 | THE COURT:  If you want a yes or no, just ask yes |
| 09:57 | 17 | or no.  If you want an open-ended question, give an |
| 09:57 | 18 | open-ended.  So reask the question. |
| 09:57 | 19 | BY MS. KELLER: |
| 09:57 | 20 | Q.   I will ask you a "yes" or "no" question. |
| 09:57 | 21 | Did you send Tom Debrowski, your executive vice |
| 09:57 | 22 | president of worldwide operations, to Beijing to apologize |
| 09:57 | 23 | to the Chinese for blaming the Chinese manufacturers; yes or |
| 09:57 | 24 | no? |
| 09:57 | 25 | A.   Mr. *Debrowski* -- |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 68 of 160   Page ID #:306739
CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

68

| | | |
|---|---|---|
| 09:58 | 1 | MS. KELLER:  Objection.  Nonresponsive. |
| 09:58 | 2 | THE COURT:  Please answer. |
| 09:58 | 3 | THE WITNESS:  Mr. Debrowski went to China just as |
| 09:58 | 4 | Mr. Stockton went to Europe -- |
| 09:58 | 5 | MS. KELLER:  Objection.  Nonresponsive. |
| 09:58 | 6 | THE WITNESS:  -- to apologize to everyone |
| 09:58 | 7 | involved, most importantly, parents, whether they lived in |
| 09:58 | 8 | this country or any other country. |
| 09:58 | 9 | China, France, Spain; the recalls were an issue |
| 09:58 | 10 | worldwide, and we did apologize to everybody involved. |
| 09:58 | 11 | BY MS. KELLER: |
| 09:58 | 12 | Q.   You actually sent Tom Debrowski, your executive vice |
| 09:58 | 13 | president of worldwide operations, to Beijing to apologize |
| 09:58 | 14 | to the Chinese government for blaming the Chinese |
| 09:58 | 15 | manufacturers, true? |
| 09:58 | 16 | A.   In the way -- |
| 09:58 | 17 | MS. KELLER:  Objection.  Nonresponsive. |
| 09:58 | 18 | THE COURT:  All right.  I am going to counsel the |
| 09:58 | 19 | jury once again, just as I did previously during other |
| 09:58 | 20 | witnesses. |
| 09:58 | 21 | Listen to the question.  Listen to the answer. |
| 09:58 | 22 | Credibility is at stake for all witnesses in this matter. |
| 09:58 | 23 | Okay.  And volunteering is one of those positions |
| 09:59 | 24 | that you may consider in relation to a question:  If the |
| 09:59 | 25 | question's not clear by counsel, so be it.  But volunteering |

| | | |
|---|---|---|
| 09:59 | 1 | can also be an issue concerning credibility. |
| 09:59 | 2 | All right.  Counsel, reask your question. |
| 09:59 | 3 | BY MS. KELLER: |
| 09:59 | 4 | Q.   You actually sent Tom Debrowski, your executive vice |
| 09:59 | 5 | president of worldwide operations, to Beijing to apologize |
| 09:59 | 6 | to the Chinese government for blaming the Chinese |
| 09:59 | 7 | manufacturers, true? |
| 09:59 | 8 | A.   Tom Debrowski went to China to apologize, and the way |
| 09:59 | 9 | one does things in China is through the government, yes. |
| 09:59 | 10 | Q.   So that was a yes? |
| 09:59 | 11 | A.   Tom Debrowski went to China to apologize to the people |
| 09:59 | 12 | of China through the government. |
| 09:59 | 13 | Q.   And, in fact, Li Changjiang, the country's quality |
| 10:00 | 14 | watchdog chief, claimed that 85 percent of the Mattel toy |
| 10:00 | 15 | recalls were due to Mattel design faults, right? |
| 10:00 | 16 | A.   He may have claimed that.  I don't know. |
| 10:00 | 17 | Q.   And this sparked another public relations crisis for |
| 10:00 | 18 | Mattel, right? |
| 10:00 | 19 | A.   No, not that -- no, I don't believe so. |
| 10:00 | 20 | Q.   This was a bad year for Mattel for reasons that had |
| 10:00 | 21 | nothing whatsoever to do with MGA, right? |
| 10:00 | 22 | A.   Actually, our sales grew 6 percent that year.  But it |
| 10:00 | 23 | was a tough year for Mattel, no question about it. |
| 10:00 | 24 | Q.   Well, the first two quarters of 2008, Mattel reported a |
| 10:00 | 25 | net loss of 46.6 million in the first quarter alone, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:00 | 1 | A.   That's not unusual. |
| 10:00 | 2 | Q.   Is that a yes? |
| 10:00 | 3 | A.   It may be. |
| 10:00 | 4 | Q.   Is it a yes? |
| 10:00 | 5 | A.   May be -- I don't know. |
| 10:00 | 6 | Q.   You know you lost money that first quarter? |
| 10:00 | 7 | A.   I'm not surprised.  We would lose money in any first |
| 10:00 | 8 | quarter, so we may have. |
| 10:00 | 9 | Q.   As the CEO, surely you know that the first quarter |
| 10:01 | 10 | after this enormous worldwide public relations disaster you |
| 10:01 | 11 | lost money? |
| 10:01 | 12 | A.   In many first quarters, we lose money.  It may have |
| 10:01 | 13 | included the first quarter following, uh, the product |
| 10:01 | 14 | recalls. |
| 10:01 | 15 | Q.   And you know that a year earlier in the first quarter, |
| 10:01 | 16 | before the recalls, you had a net income of 12 million, a |
| 10:01 | 17 | net gain, right? |
| 10:01 | 18 | A.   We may have. |
| 10:01 | 19 | Q.   In the second quarter of 2008, Barbie sales continued |
| 10:01 | 20 | to fall, right? |
| 10:01 | 21 | A.   They may have. |
| 10:01 | 22 | Q.   Your company experienced a 48 percent decrease in |
| 10:01 | 23 | profits, right? |
| 10:01 | 24 | A.   It may have. |
| 10:01 | 25 | Q.   And the third quarter of 2008 wasn't too good either, |

| | | |
|---|---|---|
| 10:01 | 1 | was it? |
| 10:01 | 2 | A.   No.  By that time, we had stopped the supply chain.  We |
| 10:01 | 3 | weren't shipping for much of the third quarter.  We shipped |
| 10:01 | 4 | no toys to retailers. |
| 10:02 | 5 | Q.   And, of course, there was a worldwide recession in 2008 |
| 10:02 | 6 | too, right? |
| 10:02 | 7 | A.   Certainly by the fall of 2008, that's correct. |
| 10:02 | 8 | Q.   And toys are pretty sensitive to that because they're |
| 10:02 | 9 | discretionary purchases, right?  They're sensitive to |
| 10:02 | 10 | recessionary times, true? |
| 10:02 | 11 | A.   I apologize.  I think you were on 2008, and at some |
| 10:02 | 12 | point I was still talking about 2007.  So, yes, there was a |
| 10:02 | 13 | worldwide recession in 2008. |
| 10:02 | 14 | Q.   So between the horrible press and the scared parents |
| 10:02 | 15 | and the worldwide recession in 2008, your company |
| 10:02 | 16 | experienced a 48 percent decrease in profits, right? |
| 10:02 | 17 | A.   In -- in what time period are we now talking about? |
| 10:02 | 18 | Q.   Second quarter of 2008. |
| 10:02 | 19 | A.   In the second quarter of 2008 -- um, I associate the |
| 10:02 | 20 | very tough economic times as really starting in the fall of |
| 10:02 | 21 | 2008. |
| 10:03 | 22 | Q.   In the -- |
| 10:03 | 23 | A.   But it's possible we had a profit decline in the second |
| 10:03 | 24 | quarter of 2008. |
| 10:03 | 25 | Q.   I'm talking about a 48 percent decrease in profits in |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

72

| | | |
|---|---|---|
| 10:03 | 1 | the second quarter of 2008? |
| 10:03 | 2 | A.   Yeah.  I'm sure you appreciate the numbers in the early |
| 10:03 | 3 | quarters of Mattel varied quite a bit. |
| 10:03 | 4 | Q.   The third quarter was pretty bad too in 2008, right? |
| 10:03 | 5 | A.   Uh -- |
| 10:03 | 6 | Q.   Is that a yes? |
| 10:03 | 7 | A.   I don't know the specific numbers. |
| 10:03 | 8 | Q.   And, in fact, in early November your response to the |
| 10:03 | 9 | economic woes at Mattel was cut another thousand jobs, |
| 10:03 | 10 | right? |
| 10:03 | 11 | A.   We did reduce employment in the fall of 2008. |
| 10:03 | 12 | Q.   Thousand jobs, right? |
| 10:03 | 13 | A.   I believe that's correct. |
| 10:03 | 14 | Q.   And in your 2008 annual report, 10-K, Barbie sales were |
| 10:03 | 15 | down 7 percent, true? |
| 10:04 | 16 | A.   It may be. |
| 10:04 | 17 | Q.   That sound about, right? |
| 10:04 | 18 | A.   I don't know.  I'd have to look at the page. |
| 10:04 | 19 | MS. KELLER:  Could we see Exhibit 7509, page 32. |
| 10:04 | 20 | *(Document provided to the witness.)* |
| 10:04 | 21 | BY MS. KELLER: |
| 10:04 | 22 | Q.   And if you look at the second paragraph under the |
| 10:04 | 23 | italicized word "sales" -- I'm sorry.  This is the Mattel |
| 10:04 | 24 | 2008 annual report, 10-K, filed with the Securities and |
| 10:04 | 25 | Exchange Commission. |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 73 of 160   Page ID #:306744
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

73

| | | |
|---|---|---|
| 10:04 | 1 | Are you on page 32, sir? |
| 10:04 | 2 | A.   I am. |
| 10:04 | 3 | Q.   7509-00032? |
| 10:05 | 4 | A.   I am. |
| 10:05 | 5 | Q.   If you look under the italicized "sales," second |
| 10:05 | 6 | paragraph down, fifth line, domestic gross sales of Barbie |
| 10:05 | 7 | decreased 7 percent? |
| 10:05 | 8 | A.   Yes. |
| 10:05 | 9 | MS. KELLER:  Your Honor, I would move that page, |
| 10:05 | 10 | 7509-32, into evidence. |
| 10:05 | 11 | THE COURT:  Received. |
| 10:05 | 12 | *(Exhibit No. 7509-32 received in evidence.)* |
| 10:05 | 13 | *(Document displayed.)* |
| 10:05 | 14 | MS. KELLER:  And, Your Honor, would this be a good |
| 10:05 | 15 | time to take a very brief break? |
| 10:05 | 16 | THE COURT:  It would be a good time to take a |
| 10:05 | 17 | break. |
| 10:05 | 18 | You're admonished not to discuss this matter |
| 10:05 | 19 | amongst yourselves, nor form or express any opinion |
| 10:05 | 20 | concerning the case.  We'll come and get you in 25 minutes. |
| 10:05 | 21 | Well, can we make it 20? |
| 10:05 | 22 | Thanks a lot.  20 minutes. |
| 10:05 | 23 | 25 after the hour, Counsel. |
| 10:05 | 24 | All right.  Counsel, have a nice recess. |
| 10:05 | 25 | *(Jury recess held at 10:05 a.m.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 74 of 160   Page ID #:306745
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

74

| | | |
|---|---|---|
| 10:05 | 1 | THE COURT:  Oh, one more thing. |
| 10:06 | 2 | Debbie, stay for a moment. |
| 10:06 | 3 | *(Outside the presence of the jury.)* |
| 10:06 | 4 | THE COURT:  All right.  Out of the presence of the |
| 10:06 | 5 | jury.  There's been an objection by Mr. Quinn concerning the |
| 10:06 | 6 | issue involving alleged criticism by Congress concerning |
| 10:06 | 7 | delay. |
| 10:06 | 8 | Ms. Keller -- Ms. Keller, the reason that the |
| 10:06 | 9 | Court is allowing this are those headline issues like lead |
| 10:06 | 10 | paint -- I'm sorry -- lead paint, magnets, or those issues |
| 10:06 | 11 | that the public would normally see that might decrease the |
| 10:06 | 12 | price of stock or affect lost profits. |
| 10:06 | 13 | Gather the headlines.  Show me where delay itself |
| 10:06 | 14 | was front and center rather than just questioning by |
| 10:06 | 15 | Congress.  If it's simply -- I don't mean simply -- if it's |
| 10:06 | 16 | a Congressional representative questioning Mr. Eckert under |
| 10:07 | 17 | the gun, in a sense, that may not be the kind of notoriety |
| 10:07 | 18 | that would affect the profits of Mattel like lead paint or |
| 10:07 | 19 | magnets. |
| 10:07 | 20 | But if, in fact, that's making a headline in a |
| 10:07 | 21 | sense, and Mattel further has its reputation tarnished by |
| 10:07 | 22 | being accused of delay, then that may be relevant.  And then |
| 10:07 | 23 | I'll discuss that over the lunch hour with both counsel. |
| 10:07 | 24 | So the duty of MGA right now, and Mattel, gather |
| 10:07 | 25 | those articles for me.  Let me see if this is top billing, |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

75

| | | |
|---|---|---|
| 10:07 | 1 | in a sense, in *USA Today*.  And I don't mean the Fremont, |
| 10:07 | 2 | California press where I grew up.  I'm just kidding you, |
| 10:07 | 3 | 'cause I picked on Fremont so I didn't single out a city. |
| 10:07 | 4 | But you show me how that delay hits the headlines |
| 10:07 | 5 | that further diminishes, if you will, and has equal stature |
| 10:07 | 6 | of the drama paint and magnets, and then I'll reconsider |
| 10:08 | 7 | that and talk to both counsel about that. |
| 10:08 | 8 | But if we get into that area, it will be very |
| 10:08 | 9 | brief.  It will simply be a question about did delay cause |
| 10:08 | 10 | criticism and make the following headlines, which further |
| 10:08 | 11 | could have affected the revenue of Mattel as one of the |
| 10:08 | 12 | issues concerning lost profits.  Because Mattel is asking |
| 10:08 | 13 | for a billion dollars, you have a right to get into all the |
| 10:08 | 14 | factors that potentially reduced it. |
| 10:08 | 15 | Second, my ruling has been, also, you're not |
| 10:08 | 16 | getting into specifics like France and a manufacturer or |
| 10:08 | 17 | somebody in France doing a specific thing, because that's |
| 10:08 | 18 | character, quite frankly.  It has nothing to do with what |
| 10:08 | 19 | the public's receiving that might diminish the revenue of |
| 10:08 | 20 | Mattel. |
| 10:08 | 21 | Now, Counsel, you've got 15 more minutes. |
| 10:08 | 22 | Mr. Eckert, sir, thank you.  Step down. |
| 10:08 | 23 | *(Witness steps down.)* |
| 10:08 | 24 | *(Recess held at 10:08 a.m.)* |
| 10:18 | 25 | *(Proceedings resumed at 10:26 a.m.)* |

76

| 10:26 | 1 | *(In the presence of the jury.)* |
|---|---|---|
| 10:26 | 2 | THE COURT:  All right.  We're back in session. |
| 10:26 | 3 | All counsel are present.  The parties are present. |
| 10:26 | 4 | The witness is present. |
| 10:26 | 5 | Ms. Keller, if you'd like to continue on with your |
| 10:26 | 6 | examination, please. |
| 10:26 | 7 | **CROSS-EXAMINATION (Continued)** |
| 10:27 | 8 | BY MS. KELLER: |
| 10:27 | 9 | Q.   Mr. Eckert, you talked about some dolls that Mattel |
| 10:27 | 10 | produced in 2010 the other day. |
| 10:27 | 11 | Do you recall talking about Monster High? |
| 10:27 | 12 | A.   I do. |
| 10:27 | 13 | Q.   And we've discussed previously that, when Mattel had |
| 10:27 | 14 | tried to produce a hip, edgy, multi-ethnic urban fashion |
| 10:27 | 15 | doll to compete with Bratz for the older girl market, the |
| 10:27 | 16 | result had been Flavas, which had been a flop, right? |
| 10:27 | 17 | A.   We had several dolls that competed in the older girl |
| 10:27 | 18 | market.  Flavas was a flop, yes. |
| 10:27 | 19 | Q.   And it took you ten years to develop Monster High, |
| 10:27 | 20 | didn't it? |
| 10:27 | 21 | A.   No. |
| 10:27 | 22 | Q.   It was only after seeing MGA's products in the |
| 10:27 | 23 | marketplace for all those years that you finally came up |
| 10:28 | 24 | with a successful fashion doll other than Barbie, right? |
| 10:28 | 25 | A.   No. |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 77 of 160   Page ID #:306748
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

77

| | | |
|---|---|---|
| 10:28 | 1 | Q.   And you did it at the same time as the current sort of |
| 10:28 | 2 | vampire and werewolf *"Twilight"* craze, right? |
| 10:28 | 3 | A.   Monster High was introduced during the interest in the |
| 10:28 | 4 | vampires and monsters and those things, yes. |
| 10:28 | 5 | MS. KELLER:  Let's look at Exhibit 9225. |
| 10:28 | 6 | *(Document provided to the witness.)* |
| 10:28 | 7 | BY MS. KELLER: |
| 10:28 | 8 | Q.   And this a Bain & Company report entitled, "Project: |
| 10:28 | 9 | Doll.  Final handover materials," dated September 7th, 2004, |
| 10:28 | 10 | correct? |
| 10:28 | 11 | A.   Yes, it is. |
| 10:28 | 12 | Q.   And it bears a Bain-Mattel production stamp on it? |
| 10:28 | 13 | A.   Yes.  I think that's what it is, yes. |
| 10:28 | 14 | MS. KELLER:  Your Honor, I would move 9225 into |
| 10:29 | 15 | evidence. |
| 10:29 | 16 | MR. QUINN:  Your Honor, not for the truth.  It's |
| 10:29 | 17 | hearsay. |
| 10:29 | 18 | THE COURT:  Would one of you bring me that |
| 10:29 | 19 | document quickly. |
| 10:29 | 20 | Well, this is a Bain Company report, once again? |
| 10:29 | 21 | MR. McCONVILLE:  It's a different version, yes. |
| 10:29 | 22 | THE COURT:  Commissioned by Mattel? |
| 10:29 | 23 | MR. McCONVILLE:  Yes. |
| 10:29 | 24 | THE COURT:  Overruled.  It's received. |
| 10:29 | 25 | MS. KELLER:  Thank you. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

78

| 10:29 | 1 | (Exhibit No. 9225 received in evidence.) |
| 10:29 | 2 | (Document displayed.) |
| 08:46 | 3 | BY MS. KELLER: |
| 10:29 | 4 | Q.   And these were the final handover materials from the |
| 10:29 | 5 | Bain & Company for "Project:  Dolls," right? |
| 10:29 | 6 | A.   Yes. |
| 10:29 | 7 | Q.   Now let's look at page 7, the Executive Summary. |
| 10:29 | 8 | (Document displayed.) |
| 10:29 | 9 | THE WITNESS:  So this is an internal page 7? |
| 10:29 | 10 | MS. KELLER:  Yes. |
| 10:29 | 11 | THE WITNESS:  I don't see a -- I've got the right |
| 10:30 | 12 | page. |
| 10:30 | 13 | MS. KELLER:  And under "Executive Summary," on the |
| 10:30 | 14 | left, "Economics," it says, "MGA's current strategy and |
| 10:30 | 15 | tactics, economics."  Look at the second line down. |
| 10:30 | 16 | "Retailers make more money with Bratz. |
| 10:30 | 17 | "Retailers capture higher margins by selling Bratz |
| 10:30 | 18 | dolls than MyScene, approximately 25 percent versus |
| 10:30 | 19 | approximately 20 percent. |
| 10:30 | 20 | "Bratz/MGA more profitable." |
| 10:30 | 21 | Underneath that, we see: |
| 10:30 | 22 | "Heavy use of DI. |
| 10:30 | 23 | "Outsourcing many non-doll Bratz products." |
| 10:30 | 24 | And then, under "International," slash, |
| 10:30 | 25 | "Products," we see: |

| 10:30 | 1 | "International distributors relatively autonomous. |
| 10:31 | 2 | "Fast to market:  MGA is able to get product from |
| 10:31 | 3 | concept to market in approximately 7 months." |
| 10:31 | 4 | And then underneath that, "MGA is aggressively |
| 10:31 | 5 | seeking to license-in concepts for toys; Sony only major |
| 10:31 | 6 | studio that considers them a strong partner." |
| 10:31 | 7 | Let's look at page 31. |
| 10:31 | 8 | *(Document displayed.)* |
| 10:31 | 9 | BY MS. KELLER: |
| 10:31 | 10 | Q.   And page 31 -- page 31 discusses, among other things, |
| 10:31 | 11 | that "MGA saves design and develop time through a faster |
| 10:31 | 12 | approval process." |
| 10:31 | 13 | And we talked a little about that yesterday, didn't we? |
| 10:31 | 14 | A.   Yes, we did. |
| 10:31 | 15 | Q.   And this is the same chart we saw in the -- |
| 10:32 | 16 | MR. QUINN:  Your Honor, there's an issue here |
| 10:32 | 17 | relating to a ruling the Court has previously made.  I'm |
| 10:32 | 18 | afraid we're gonna see a similar phenomenon. |
| 10:32 | 19 | THE COURT:  Well, Mr. McConville is now getting to |
| 10:32 | 20 | his feet to approach the lectern, and Mr. Quinn is now |
| 10:32 | 21 | getting up out of his seat and approaching the lectern.  It |
| 10:32 | 22 | will be discussed by all counsel. |
| 10:32 | 23 | MS. KELLER:  It's much ado about nothing, as is so |
| 10:32 | 24 | often is case with lawyers. |
| | 25 | |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

80

| 10:32 | 1 | BY MS. KELLER: |
|---|---|---|
| 10:32 | 2 | Q.  So this is the same chart we saw in the draft Bain |
| 10:32 | 3 | report yesterday that shows that MGA is 13 to 16 weeks |
| 10:32 | 4 | faster to market than Mattel, right? |
| 10:32 | 5 | A.  I don't know if it is the same chart we looked at |
| 10:32 | 6 | yesterday, if they're two different drafts.  But we looked |
| 10:32 | 7 | at a similar chart yesterday, if not the same chart. |
| 10:32 | 8 | Q.  And you agreed yesterday that it was a major advantage |
| 10:32 | 9 | to get a product to market faster, right? |
| 10:32 | 10 | A.  I agreed it was an advantage.  It certainly depends on |
| 10:33 | 11 | the product, but it's an advantage. |
| 10:33 | 12 | Q.  Now, from the time that Monster High was -- I guess the |
| 10:33 | 13 | phrase used in the toy industry is "concepted" -- to the |
| 10:33 | 14 | time it got to market, it took three years, didn't it? |
| 10:33 | 15 | A.  No. |
| 10:33 | 16 |      MS. KELLER:  Let's look at Exhibit 35844. |
| 10:33 | 17 |      *(Document provided to the witness.)* |
| 11:59 | 18 | BY MS. KELLER: |
| 10:33 | 19 | Q.  You recognize this as an August 3rd, 2007 memo? |
| 10:33 | 20 | A.  Uh, yes. |
| 10:33 | 21 | Q.  Internal memo from Mattel, and the subject is "Tween |
| 10:33 | 22 | Panel:  6- to 9-year-old new concept focus groups report." |
| 10:33 | 23 | You see that? |
| 10:33 | 24 | A.  Yes, I do. |
| 10:33 | 25 | Q.  This is dated August 3rd, 2007? |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

81

| | | |
|---|---|---|
| 10:33 | 1 | A.   It is. |
| 10:33 | 2 | MS. KELLER:  Your Honor, I would move 35844 into |
| 10:33 | 3 | evidence. |
| 10:33 | 4 | THE COURT:  Received. |
| 10:33 | 5 | *(Exhibit No. 35844 received in evidence.)* |
| 10:33 | 6 | *(Document displayed.)* |
| 10:33 | 7 | BY MS. KELLER: |
| 10:33 | 8 | Q.   Now, this was a focus group for five different |
| 10:34 | 9 | concepts, among which was Monster High, right? |
| 10:34 | 10 | MR. QUINN:  That lacks foundation, Your Honor. |
| 10:34 | 11 | MS. KELLER:  Okay.  This -- I'll back up. |
| 10:34 | 12 | BY MS. KELLER: |
| 10:34 | 13 | Q.   Let's look at "Background and Objectives." |
| 10:34 | 14 | A.   Okay. |
| 10:34 | 15 | Q.   It says, "Marketing and Design have developed several |
| 10:34 | 16 | new concept ideas that include illustrations and short |
| 10:34 | 17 | concept descriptions.  There is a desire to understand the |
| 10:34 | 18 | strengths and weaknesses of each concept, as well as |
| 10:34 | 19 | suggested enhancements.  After this phase of research, there |
| 10:34 | 20 | are plans to translate one or more of these concepts to 3-D |
| 10:34 | 21 | for further testing. |
| 10:34 | 22 | "Working names for the five concepts are City Sisters, |
| 10:34 | 23 | Sisters Squad, Skie, Posh Princesses, Monster High." |
| 10:34 | 24 | Q.   Now, you actually began testing the concept for Monster |
| 10:34 | 25 | High in August of 2007, right? |

| 10:35 | 1 | A.   Yes. |
| 10:35 | 2 | Q.   And, in fact, if you look toward the bottom of that |
| 10:35 | 3 | first page, you see a discussion about Monster High. |
| 10:35 | 4 | A.   I do. |
| 10:35 | 5 | Q.   And the key conclusion above it was, "Overall, while |
| 10:35 | 6 | girls appreciated some aspects of all five concepts |
| 10:35 | 7 | presented, only Monster High stood out as representing a new |
| 10:35 | 8 | and different look and positioning versus fashion dolls that |
| 10:35 | 9 | are currently available." |
| 10:35 | 10 | But you didn't actually get the Monster High dolls to |
| 10:35 | 11 | market for three years, right? |
| 10:35 | 12 | A.   Well, it looks like we didn't get the Monster High |
| 10:35 | 13 | dolls shown here in any year.  But Monster High did come out |
| 10:36 | 14 | in 2010. |
| 10:36 | 15 | Q.   Well, there were a lot of big changes that happened |
| 10:36 | 16 | between initial drawings and the ultimate doll, right? |
| 10:36 | 17 | A.   There can be. |
| 10:36 | 18 | Q.   And there generally are, aren't there? |
| 10:36 | 19 | A.   I wouldn't say there generally are.  I would say there |
| 10:36 | 20 | can be. |
| 10:36 | 21 | Q.   Well -- |
| 10:36 | 22 | A.   And there apparently was in the case of Monster High. |
| 10:36 | 23 | Q.   You didn't even have a 3-D concept in 2007, just some |
| 10:36 | 24 | drawings, according to this, right? |
| 10:36 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 10:36 | 1 | Q.   So the bottom line is, before you produced a line of |
| 10:36 | 2 | dolls known as "Monster High," it took you three years? |
| 10:36 | 3 | A.   Yes. |
| 10:36 | 4 | Q.   Now, I'd like to ask you a little bit about Mattel in |
| 10:36 | 5 | Mexico. |
| 10:36 | 6 | You're aware that Mattel actually prosecuted Gustavo |
| 10:36 | 7 | Machado, Mariana Trueba and Pablo Vargas in Mexico, right? |
| 10:37 | 8 | A.   Yes, I am. |
| 10:37 | 9 | Q.   And, in Mexico, you know that an individual who claims |
| 10:37 | 10 | to be a victim can actually initiate a prosecution |
| 10:37 | 11 | criminally, right? |
| 10:37 | 12 | A.   I believe that's the -- I believe that's correct, yes. |
| 10:37 | 13 | Q.   And you hired many lawyers and investigators in order |
| 10:37 | 14 | to prosecute these three people, correct? |
| 10:37 | 15 | A.   That, I don't know. |
| 10:37 | 16 | Q.   All three of these MGA de Mexico employees had criminal |
| 10:37 | 17 | complaints filed against them in Mexico by Mattel, right? |
| 10:37 | 18 | A.   Uh, yes, I believe that to be the case. |
| 10:37 | 19 | Q.   But you made a deal with Pablo Vargas, didn't you? |
| 10:37 | 20 | A.   Yes.  We have an agreement with Mr. Vargas, yes. |
| 10:37 | 21 | Q.   And the deal you made was that you would give him a |
| 10:37 | 22 | complete pardon in return for his giving you the testimony |
| 10:37 | 23 | you wanted, right? |
| 10:37 | 24 | A.   The truth -- |
| 10:37 | 25 | MR. QUINN:  Vague and ambiguous. |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 84 of 160   Page ID #:306755
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

84

| | | |
|---|---|---|
| 10:37 | 1 | THE WITNESS:  The truth, yes. |
| 10:37 | 2 | THE COURT:  Overruled. |
| 10:38 | 3 | THE WITNESS:  Yes. |
| 10:05 | 4 | BY MS. KELLER: |
| 10:38 | 5 | Q.   In return for his giving you the testimony you wanted? |
| 10:38 | 6 | A.   No.  In return for his agreeing to testify to the |
| 10:38 | 7 | truth, including in this Court. |
| 10:38 | 8 | Q.   And the truth was contained in a declaration your |
| 10:38 | 9 | lawyers drafted and had him sign, true? |
| 10:38 | 10 | A.   It may be. |
| 10:38 | 11 | Q.   It was, wasn't it? |
| 10:38 | 12 | A.   I don't know that. |
| 10:38 | 13 | Q.   And if his testimony varied from that declaration that |
| 10:38 | 14 | your lawyers drafted and had him sign, he wouldn't get the |
| 10:38 | 15 | pardon, right? |
| 10:38 | 16 | A.   Uh, that may be the case. |
| 10:38 | 17 | Q.   You know that to be the case, don't you? |
| 10:38 | 18 | A.   No, I don't. |
| 10:38 | 19 | Q.   And Mr. Vargas actually gave you two different |
| 10:38 | 20 | declarations, and you rejected them because they didn't say |
| 10:38 | 21 | what you wanted, right? |
| 10:38 | 22 | MR. QUINN:  Lacks any foundation, Your Honor. |
| 10:38 | 23 | THE COURT:  Overruled. |
| 10:38 | 24 | THE WITNESS:  No, I don't know that. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:38 | 1 | BY MS. KELLER: |
| 10:38 | 2 | Q.   The declaration -- |
| 10:38 | 3 | THE COURT:  Instead of "personally," you might |
| 10:38 | 4 | say, does he know?  Because I don't know if he was |
| 10:38 | 5 | personally involved at this point in those discussions, and |
| 10:38 | 6 | if they took place, who it was with. |
| 10:39 | 7 | So reask -- |
| 10:39 | 8 | BY MS. KELLER: |
| 10:39 | 9 | Q.   As -- |
| 10:39 | 10 | THE COURT:  -- the question. |
| 11:59 | 11 | BY MS. KELLER: |
| 10:39 | 12 | Q.   As CEO of Mattel, I think you've told us that the buck |
| 10:39 | 13 | stops with you, right? |
| 10:39 | 14 | A.   That's correct. |
| 10:39 | 15 | Q.   And if Mattel is going to go so far as to criminally |
| 10:39 | 16 | prosecute somebody, that's a decision that stops with you, |
| 10:39 | 17 | too, isn't it? |
| 10:39 | 18 | A.   Uh, no.  But I was certainly aware of it. |
| 10:39 | 19 | Q.   And you knew that Mr. Vargas had given Mattel two |
| 10:39 | 20 | different declarations that Mattel had rejected because they |
| 10:39 | 21 | didn't say what Mattel wanted, true? |
| 10:39 | 22 | A.   No. |
| 10:39 | 23 | Q.   The declaration, in order for Mr. Vargas to get his |
| 10:39 | 24 | pardon, had to match Mattel's version of the truth, right? |
| 10:39 | 25 | MR. QUINN:  Your Honor, this is argument.  Lacks |

| | | |
|---|---|---|
| 10:39 | 1 | any foundation. |
| 10:39 | 2 | THE COURT:  Overruled. |
| 10:39 | 3 | You can answer the question. |
| 10:39 | 4 | THE WITNESS:  No.  He had to agree to testify to |
| 10:39 | 5 | the truth to what happened. |
| 11:59 | 6 | BY MS. KELLER: |
| 10:39 | 7 | Q.   As you saw it? |
| 10:39 | 8 | A.   No. |
| 10:39 | 9 | Q.   And so, for example, when Mr. Vargas said in one of his |
| 10:39 | 10 | initial declarations that he didn't use any Mattel |
| 10:39 | 11 | information, you rejected it? |
| 10:40 | 12 | MR. QUINN:  Lacks any foundation, Your Honor. |
| 10:40 | 13 | It's just argument at this point. |
| 10:40 | 14 | THE COURT:  If he doesn't know about the document, |
| 10:40 | 15 | itself, it's argument, Counsel. |
| 10:40 | 16 | Sustained. |
| 10:40 | 17 | BY MS. KELLER: |
| 10:40 | 18 | Q.   Was there also a clause in Mattel's agreement with |
| 10:40 | 19 | Mr. Vargas that he would be paid a late fee if the pardon |
| 10:40 | 20 | was not entered by a certain date? |
| 10:40 | 21 | A.   I don't know that. |
| 10:40 | 22 | Q.   And the payment was going to be at a rate of 3,000 a |
| 10:40 | 23 | day, up to 100,000, depending on how late Mattel gave the |
| 10:40 | 24 | pardon; is that true? |
| 10:40 | 25 | A.   I don't know that. |

Case 2:04-cv-09049-DOC-RNB  Document 10138  Filed 03/07/11  Page 87 of 160  Page ID #:306758
CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

87

| | | |
|---|---|---|
| 10:40 | 1 | Q.   Well, you know he was paid, don't you? |
| 10:40 | 2 | A.   No, I don't. |
| 10:40 | 3 | Q.   And it was completely within Mattel's control to pardon |
| 10:40 | 4 | him, right? |
| 10:40 | 5 | A.   Um, I'm not familiar with Mexican law.  But I -- I have |
| 10:40 | 6 | no reason to believe that's not the case. |
| 10:40 | 7 | THE COURT:  Just a moment. |
| 10:40 | 8 | Counsel, you said a rate of 3,000 a day to a |
| 10:40 | 9 | hundred thousand. |
| 10:40 | 10 | Dollars or pesos? |
| 10:40 | 11 | MS. KELLER:  Dollars. |
| 10:40 | 12 | THE COURT:  Dollars. |
| 10:40 | 13 | BY MS. KELLER: |
| 10:41 | 14 | Q.   I want to move on to a different topic. |
| 10:41 | 15 | You testified on Tuesday that you couldn't sue Carter |
| 10:41 | 16 | Bryant until you had seen his consulting agreement with MGA; |
| 10:41 | 17 | is that right? |
| 10:41 | 18 | A.   I testified that we didn't sue Carter Bryant until I |
| 10:41 | 19 | had seen some agreement or at least some part of some |
| 10:41 | 20 | agreement that Mr. Bryant had with MGA; that's correct. |
| 10:41 | 21 | Q.   Well, you said you couldn't until you saw it -- in this |
| 10:41 | 22 | Court, right? |
| 10:41 | 23 | A.   I don't -- I don't know what word I used on Tuesday. |
| 10:41 | 24 | If I did, I meant to say we "didn't." |
| 10:41 | 25 | Q.   And you also testified in 2009 that you, yourself, had |

| | | |
|---|---|---|
| 10:41 | 1 | never seen that agreement, true? |
| 10:41 | 2 | A.   I may have testified in 2009 that I hadn't seen some |
| 10:42 | 3 | specific agreement.  I know I had seen an agreement.  I'm |
| 10:42 | 4 | not sure that in 2009 I had seen the agreement on whatever |
| 10:42 | 5 | question was asked. |
| 10:42 | 6 | Q.   You testified in this Court just the other day that, as |
| 10:42 | 7 | of 2009, you haven't seen the agreement, correct? |
| 10:42 | 8 | A.   I had seen an agreement. |
| 10:42 | 9 | Q.   No.  Here's what I'm asking:  Did you testify in this |
| 10:42 | 10 | court that -- in this courtroom -- that, as of 2009, you, |
| 10:42 | 11 | yourself, had not seen the agreement? |
| 10:42 | 12 | MR. QUINN:  Vague and ambiguous as to "the |
| 10:42 | 13 | agreement." |
| 10:42 | 14 | MS. KELLER:  The Carter Bryant consulting |
| 10:42 | 15 | agreement with MGA. |
| 10:42 | 16 | THE WITNESS:  I had seen. |
| 10:42 | 17 | MS. KELLER:  Not my question. |
| 10:42 | 18 | BY MS. KELLER: |
| 10:42 | 19 | Q.   Did you testify the other day in this Court that, as of |
| 10:42 | 20 | 2009, you, yourself, hadn't seen it? |
| 10:42 | 21 | A.   What I believe I testified was that I had seen an |
| 10:42 | 22 | agreement between Carter Bryant, a Mattel employee, and MGA. |
| 10:43 | 23 | I -- I don't know the name of that agreement. |
| 10:43 | 24 | Q.   And did you testify the other day in this Court that, |
| 10:43 | 25 | as of 2009, you hadn't seen it?  Yes or no? |

| | | |
|---|---|---|
| 10:43 | 1 | A.   I -- I believe I testified that I hadn't seen some |
| 10:43 | 2 | specific document, or didn't know the name of a specific |
| 10:43 | 3 | document that you asked me about.  I have seen an agreement, |
| 10:43 | 4 | or at least I remember a very specific presentation that had |
| 10:43 | 5 | excerpts of that agreement on a screen. |
| 10:43 | 6 | Q.   You hadn't seen it as of 2009, right? |
| 10:43 | 7 | A.   I hadn't seen what as of 2009? |
| 10:43 | 8 | Q.   The very document that we're talking about:  The |
| 10:43 | 9 | consulting agreement between Carter Bryant and MGA. |
| 10:43 | 10 | As of 2009, you hadn't seen it, right? |
| 10:43 | 11 | A.   I'll have to look at that document to tell you whether |
| 10:43 | 12 | that's the document I saw. |
| 10:43 | 13 | Q.   And here's my next question:  Did you testify just the |
| 10:43 | 14 | other day in this courtroom that, as of 2009, you hadn't |
| 10:44 | 15 | seen it? |
| 10:44 | 16 | A.   I had seen an agreement.  I don't know exactly which |
| 10:44 | 17 | agreement you're talking about, then or now. |
| 10:44 | 18 | Q.   Well, let's talk about one that you do know about.  You |
| 10:44 | 19 | remember the anonymous letter you said you received in |
| 10:44 | 20 | August 2002? |
| 10:44 | 21 | A.   Yes. |
| 10:44 | 22 | Q.   And you said you thought very little of it, handed it |
| 10:44 | 23 | off to Alan Kaye, right? |
| 10:44 | 24 | A.   That's correct. |
| 10:44 | 25 | Q.   And that was Exhibit 1193, right? |

| | | |
|---|---|---|
| 10:44 | 1 | A.    That, I don't know. |
| 10:44 | 2 | MS. KELLER:  It's in evidence. |
| 10:44 | 3 | *(Document provided to the witness.)* |
| 10:44 | 4 | *(Document displayed.)* |
| 10:44 | 5 | BY MS. KELLER: |
| 10:44 | 6 | Q.    And this was August 5th, 2002, date-stamped "Robert A. |
| 10:44 | 7 | Eckert," right? |
| 10:44 | 8 | A.    That's correct. |
| 10:44 | 9 | Q.    Now, this was the anonymous letter in which the letter |
| 10:44 | 10 | writer alleged that Carter Bryant had worked on Bratz dolls |
| 10:44 | 11 | while at Mattel, and that Carter Bryant and MGA had some |
| 10:45 | 12 | sort of deal.  And it even said that MGA had paid Mr. Bryant |
| 10:45 | 13 | to, quote, "steal this product from Mattel," unquote, right? |
| 10:45 | 14 | A.    It does. |
| 10:45 | 15 | Q.    And it also contained your handwritten note to Alan |
| 10:45 | 16 | Kaye asking if the letter should be forwarded to Richard. |
| 10:45 | 17 | And that means Richard DeAnda of your investigation |
| 10:45 | 18 | department, right? |
| 10:45 | 19 | A.    Yes. |
| 10:45 | 20 | Q.    And you said Tuesday you didn't think much of this |
| 10:45 | 21 | anonymous letter because you thought this was one employee |
| 10:45 | 22 | gossiping about another, right? |
| 10:45 | 23 | A.    Um, that's the way I think most of these letters are. |
| 10:45 | 24 | Q.    How do you know this came from an employee? |
| 10:45 | 25 | A.    I don't know.  I don't know where it came from. |

| | | |
|---|---|---|
| 10:45 | 1 | Q.   And you certainly knew it wasn't about a current |
| 10:45 | 2 | employee of Mattel's because it says on the face of it that |
| 10:45 | 3 | Mr. Bryant had left Mattel, right? |
| 10:45 | 4 | A.   Correct. |
| 10:45 | 5 | Q.   Now, this was the very time that Barbie sales were |
| 10:45 | 6 | declining and Bratz was taking off that you got this letter, |
| 10:46 | 7 | right? |
| 10:46 | 8 | A.   That's correct. |
| 10:46 | 9 | Q.   And you understood that months earlier Mattel had |
| 10:46 | 10 | actually opened an investigation into MGA and Carter Bryant, |
| 10:46 | 11 | right? |
| 10:46 | 12 | A.   No, I hadn't understood that. |
| 10:46 | 13 | Q.   In fact, you knew it was common knowledge by early 2002 |
| 10:46 | 14 | that Carter Bryant was a designer of Bratz, right? |
| 10:46 | 15 | A.   No. |
| 10:46 | 16 |      MS. KELLER:  Let's look at Exhibit 17252, which is |
| 10:46 | 17 | in evidence. |
| 10:46 | 18 |         (Document provided to the witness.) |
| 10:46 | 19 |         (Document displayed.) |
| 10:46 | 20 | BY MS. KELLER: |
| 10:46 | 21 | Q.   This is a February 7th, 2002 letter from your law firm, |
| 10:46 | 22 | Quinn Emanuel, advising Mr. Larian that all references to |
| 10:46 | 23 | Mattel's Barbie and Diva Starz must be removed from the |
| 10:46 | 24 | Bratz Yahoo discussion group websites. |
| 10:46 | 25 |      Do you see that? |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 92 of 160   Page ID #:306763
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

92

| | | |
|---|---|---|
| 10:46 | 1 | A.   Not yet. |
| 10:46 | 2 | Yes, I do. |
| 10:47 | 3 | Q.   And if you turn to -- let's look at Exhibit -- oh, |
| 10:47 | 4 | Mattel monitored websites that discussed your products, |
| 10:47 | 5 | right? |
| 10:47 | 6 | A.   Uh, I don't know. |
| 10:47 | 7 | Q.   Well, you know that Mattel today monitors websites |
| 10:47 | 8 | discussing your products, right? |
| 10:47 | 9 | A.   Yes, it does. |
| 10:47 | 10 | Q.   And you knew that that's what this letter, dated |
| 10:47 | 11 | February 7th, 2002, was about, right? |
| 10:47 | 12 | A.   I've never seen this before, so if you'd like to give |
| 10:47 | 13 | me a minute to read it, I'll answer that. |
| 10:47 | 14 | So I didn't know at the time what this letter was about |
| 10:47 | 15 | 'cause I hadn't seen the letter, but it seems to be |
| 10:47 | 16 | addressing that subject, yes. |
| 10:47 | 17 | Q.   And this is -- this letter is written on behalf of |
| 10:47 | 18 | Mattel, right? |
| 10:47 | 19 | A.   Yes, it is. |
| 10:47 | 20 | Q.   It says that right on the first line:  "We are counsel |
| 10:47 | 21 | to Mattel, Inc."  Right? |
| 10:48 | 22 | A.   Yes, it does. |
| 10:48 | 23 | Q.   And then it goes on to discuss the Yahoo discussion |
| 10:48 | 24 | groups, true? |
| 10:48 | 25 | A.   Yes. |

CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

93

| | | |
|---|---|---|
| 10:48 | 1 | MS. KELLER:  Now, let's look at Exhibit-- |
| 10:48 | 2 | *(Loud noise in courtroom.)* |
| 10:48 | 3 | THE COURT:  Are you okay? |
| 10:48 | 4 | MS. KELLER:  Everybody okay? |
| 10:48 | 5 | THE CLERK:  Was that you? |
| 10:48 | 6 | A JUROR:  It went down. |
| 10:48 | 7 | THE COURT:  It went down?  Wow! |
| 10:48 | 8 | You know something?  We're gonna get you out of |
| 10:48 | 9 | there.  I'm worried about your well-being.  Just a moment. |
| 10:48 | 10 | Let's get you out of there.  We're going to seat |
| 10:48 | 11 | you right here in the aisle. |
| 10:48 | 12 | *(Alternate juror changes chairs.)* |
| 10:49 | 13 | THE COURT:  Okay. |
| 10:49 | 14 | Counsel, please continue. |
| 10:49 | 15 | MS. KELLER:  Now, let's look at Exhibit 4507, |
| 10:49 | 16 | which is in evidence. |
| 10:49 | 17 | *(Document provided to the witness.)* |
| 10:49 | 18 | *(Document displayed.)* |
| 11:59 | 19 | BY MS. KELLER: |
| 10:49 | 20 | Q.   And at the bottom of this page -- I'll wait until you |
| 10:50 | 21 | get that. |
| 10:50 | 22 | A.   Yes, I have this. |
| 10:50 | 23 | MR. QUINN:  Your Honor, there's no -- this is an |
| 10:50 | 24 | internal MGA e-mail.  There's no foundation he's ever seen |
| 10:50 | 25 | it. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

94

| | | |
|---|---|---|
| 10:50 | 1 | THE COURT:  I'm sorry.  What number is it? |
| 10:50 | 2 | 17252 was the letter. |
| 10:50 | 3 | MS. KELLER:  This is -- |
| 10:50 | 4 | MR. QUINN:  4507. |
| 10:50 | 5 | THE COURT:  4507.  Just a moment. |
| 10:50 | 6 | MR. QUINN:  Also wasn't in the binder. |
| 10:50 | 7 | THE COURT:  Take that down for just a minute now. |
| 10:50 | 8 | (Document removed from display.) |
| 10:50 | 9 | THE COURT:  Have we gone over this exhibit? |
| 10:50 | 10 | MR. McCONVILLE:  Yes. |
| 10:51 | 11 | THE COURT:  And it's an internal document -- |
| 10:51 | 12 | Could one of you bring that document to me, |
| 10:51 | 13 | please. |
| 10:51 | 14 | Debbie, stop the time clock running. |
| 10:51 | 15 | MS. KELLER:  And, Your Honor, it's forwarding a |
| 10:51 | 16 | post on a Yahoo website. |
| 10:51 | 17 | THE COURT:  Great.  Well, you can ask him about |
| 10:51 | 18 | it.  What's the reason for putting it up? |
| 10:51 | 19 | It's not -- it's something, I'm assuming, he might |
| 10:51 | 20 | know about, generally speaking; but he doesn't know about |
| 10:51 | 21 | this document, if it's an internal document. |
| 10:51 | 22 | MS. KELLER:  Not the initial e-mail, Your Honor, |
| 10:51 | 23 | but what is contained in it. |
| 10:51 | 24 | THE COURT:  Just ask him without putting it up on |
| 10:51 | 25 | the screen.  You can ask him if he knew about the Yahoo |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:51 | 1 | website and who David Dees is, et cetera. |
| 10:51 | 2 | MS. KELLER:  And, Your Honor, this document's |
| 10:51 | 3 | already in evidence. |
| 10:51 | 4 | THE COURT:  I know that.  But that doesn't mean he |
| 10:51 | 5 | has any foundation for knowing what it is. |
| 10:52 | 6 | You can certainly ask him about the area.  Does he |
| 10:52 | 7 | know about David Dees?  Does he know about the Yahoo |
| 10:52 | 8 | website? |
| 10:52 | 9 | All relevant. |
| 10:52 | 10 | BY MS. KELLER: |
| 10:52 | 11 | Q.   Well, this document contains, does it not, the forward |
| 10:52 | 12 | of a website communication from a guy named David Dees, |
| 10:52 | 13 | right? |
| 10:52 | 14 | MR. QUINN:  Your Honor, lacks any foundation.  All |
| 10:52 | 15 | he can do is read it. |
| 10:52 | 16 | THE COURT:  Yeah, I'm going to sustain the |
| 10:52 | 17 | objection, Counsel. |
| 10:52 | 18 | You can ask about the area.  But using this to |
| 10:52 | 19 | have Mr. Eckert testify about the internal document from |
| 10:52 | 20 | MGA?  The objection's sustained. |
| 10:52 | 21 | BY MS. KELLER: |
| 10:52 | 22 | Q.   Then turn your attention to 1195-RS. |
| 10:52 | 23 | *(Document provided to the witness.)* |
| 10:52 | 24 | BY MS. KELLER: |
| 10:53 | 25 | Q.   And you recognize this as an internal investigation |

| | | |
|---|---|---|
| 10:53 | 1 | report generated within Mattel, correct? |
| 10:53 | 2 | A.   I don't yet. |
| 10:53 | 3 | Q.   Take a look at the production stamp on the front. |
| 10:53 | 4 | THE COURT:  Well, Counsel, this is the document I |
| 10:53 | 5 | went over.  It's received. |
| 10:53 | 6 | *(Exhibit No. 1195-RS received in evidence.)* |
| 10:53 | 7 | MS. KELLER:  Thank you. |
| 10:53 | 8 | THE WITNESS:  Yes, it's a Mattel document. |
| 10:53 | 9 | MS. KELLER:  And let's look at -- this is |
| 10:53 | 10 | voluminous, Your Honor.  I'm gonna be referring to a couple |
| 10:53 | 11 | pages.  1195-RS-0004. |
| 10:53 | 12 | *(Document displayed.)* |
| 10:53 | 13 | BY MS. KELLER: |
| 10:53 | 14 | Q.   It's entitled, "Incident Report." |
| 10:53 | 15 | A.   Yes. |
| 10:53 | 16 | Q.   And it says, "Occurrence -- |
| 10:53 | 17 | "Category:  Theft. |
| 10:53 | 18 | "Subcategory:  Propriety information. |
| 10:53 | 19 | "Occurrence date:  3/15/02. |
| 10:54 | 20 | "Reported date:  3/20/02. |
| 10:54 | 21 | "Building site:  El Segundo design center." |
| 10:54 | 22 | And under "Incident Narrative," it says, "Information |
| 10:54 | 23 | received from design center staff Evelyn Viohl and Ivy Ross |
| 10:54 | 24 | that MGA Entertainment, headed by a person known as Isaac |
| 10:54 | 25 | Larian, has recently hired a number of former Mattel |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 97 of 160   Page ID #:306768
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

97

| 10:54 | 1 | employees, and is manufacturing products that appear to be |
| 10:54 | 2 | Mattel designs." |
| 10:54 | 3 | And under that, it says, "Invest opened."  And you |
| 10:54 | 4 | know that to be short for "investigation," right? |
| 10:54 | 5 | A.   I would assume that. |
| 10:54 | 6 | Q.   And it listed Evelyn Viohl and Ivy Ross as the |
| 10:54 | 7 | informants, right?  True? |
| 10:54 | 8 | A.   Uh, yes, I believe so. |
| 10:54 | 9 | Q.   And you know who those people are and were at the time, |
| 10:54 | 10 | right? |
| 10:54 | 11 | A.   Yes. |
| 10:54 | 12 | Q.   And you know, don't you, that this investigation was |
| 10:54 | 13 | specifically looking into Carter Bryant and his role at MGA, |
| 10:55 | 14 | right? |
| 10:55 | 15 | A.   No, I don't know that. |
| 10:55 | 16 | MS. KELLER:  Let's look at page 8 of this |
| 10:55 | 17 | investigation. |
| 10:55 | 18 | *(Document displayed.)* |
|  | 19 | BY MS. KELLER: |
| 10:55 | 20 | Q.   Look at the second -- third -- well, the whole page. |
| 10:55 | 21 | Look at the listings here.  All those listings are searches |
| 10:55 | 22 | for addresses, phone numbers and dates of birth for anyone |
| 10:55 | 23 | named "Carter H. Bryant," right? |
| 10:55 | 24 | A.   I don't know that. |
| 10:55 | 25 | Q.   Well, is that what it says? |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

| | | |
|---|---|---|
| 10:55 | 1 | A.   I -- no.  It has names, addresses, phone numbers, |
| 10:55 | 2 | licenses reported. |
| 10:55 | 3 | Q.   And this is generated by Mattel's internal |
| 10:55 | 4 | investigation department, right? |
| 10:55 | 5 | A.   I don't know that. |
| 10:55 | 6 | Q.   Look at the front page where there's a stamp.  You see |
| 10:56 | 7 | the "M" for Mattel? |
| 10:56 | 8 | A.   I do. |
| 10:56 | 9 | Q.   And you see "DeAnda" above Exhibit number? |
| 10:56 | 10 | A.   I do. |
| 10:56 | 11 | Q.   Richard DeAnda was the head of your investigations at |
| 10:56 | 12 | Mattel, correct? |
| 10:56 | 13 | A.   He was in charge of security, yes. |
| 10:56 | 14 | Q.   Okay.  And so this appears to be an internal document |
| 10:56 | 15 | generated by your own security department, right? |
| 10:56 | 16 | A.   Looks to be a file generated by the security |
| 10:56 | 17 | department, yes. |
| 10:56 | 18 | Q.   And as of March 15th, 2002, security is looking into |
| 10:56 | 19 | Carter Bryant, right? |
| 10:56 | 20 | A.   His name certainly appears on this page. |
| 10:56 | 21 | Q.   And you see that one of the listings here is showing |
| 10:56 | 22 | him living at 1A Sycamore Drive in Kimberline City, |
| 10:56 | 23 | Missouri.  This is -- that's on page 10.  Take a look at |
| 10:56 | 24 | that. |
| 10:56 | 25 | *(Document displayed.)* |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

99

| 10:57 | 1 | MS. KELLER:  Your Honor, I'd ask that page 10 be |
| 10:57 | 2 | admitted. |
| 10:57 | 3 | THE COURT:  Received. |
| 10:57 | 4 | *(Exhibit No. 1195-RS-10 received in evidence.)* |
| 10:57 | 5 | THE WITNESS:  Yes. |
|  | 6 | BY MS. KELLER: |
| 10:57 | 7 | Q.  And you're aware that this was Mr. Bryant's address in |
| 10:57 | 8 | 1998, right? |
| 10:57 | 9 | A.  Uh, no, I'm not. |
| 10:57 | 10 | MS. KELLER:  We just had a delay, Your Honor.  We |
| 10:57 | 11 | redacted the Social Security number. |
| 10:57 | 12 | THE COURT:  You can do that later.  I don't think |
| 10:57 | 13 | the jury can memorize it.  You can redact that later.  That |
| 10:57 | 14 | will save you some time. |
| 10:57 | 15 | MS. KELLER:  And let's look at page 11. |
| 10:57 | 16 | *(Document displayed.)* |
|  | 17 | BY MS. KELLER: |
| 10:57 | 18 | Q.  This is basically a summary of Mr. Bryant's employment |
| 10:57 | 19 | at Mattel, isn't it? |
| 10:58 | 20 | A.  Uh, yes.  That's what it appears to be. |
| 10:58 | 21 | Q.  And you see him listed as being in Barbie |
| 10:58 | 22 | Collector/Preliminary Design? |
| 10:58 | 23 | A.  Yes, I do. |
| 10:58 | 24 | MS. KELLER:  I'd ask to have page 11 admitted, |
| 10:58 | 25 | Your Honor. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:58 | 1 | THE COURT:  Received. |
| 10:58 | 2 | *(Exhibit No. 1195-RS-11 received in evidence.)* |
| 10:58 | 3 | BY MS. KELLER: |
| 10:58 | 4 | Q.   And then, if you'd turn to page 12. |
| 10:58 | 5 | *(Document displayed.)* |
| | 6 | BY MS. KELLER: |
| 10:58 | 7 | Q.   This lists Mr. Bryant as living at 1319 West |
| 10:58 | 8 | 160th Street in Gardena, California, right? |
| 10:58 | 9 | A.   That's correct. |
| 10:58 | 10 | Q.   And you're aware, aren't you, that this was |
| 10:58 | 11 | Mr. Bryant's address when he was working at Mattel in 1999 |
| 10:58 | 12 | and 2000? |
| 10:58 | 13 | A.   No, I'm not. |
| 10:58 | 14 | MS. KELLER:  Move page 12 into evidence, |
| 10:58 | 15 | Your Honor. |
| 10:59 | 16 | THE COURT:  Received. |
| 10:59 | 17 | *(Exhibit No. 1195-RS-12 received in evidence.)* |
| | 18 | BY MS. KELLER: |
| 10:59 | 19 | Q.   So Mattel had opened an official investigation in |
| 10:59 | 20 | March 2002 into Carter Bryant and MGA in the context of |
| 10:59 | 21 | complaints MGA had taken Mattel designs, right? |
| 10:59 | 22 | A.   Let me look at that first page again to see what this |
| 10:59 | 23 | file is about. |
| 10:59 | 24 | Q.   If you take a look at page 4, where it says -- |
| 10:59 | 25 | A.   No.  It says, "hired a number of former employees and |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:59 | 1 | is manufacturing products that appear to be Mattel designs." |
| 10:59 | 2 | MS. KELLER:  Your Honor, if we could admit -- I'm |
| 10:59 | 3 | not sure whether I moved page 4 into evidence; but if not, I |
| 10:59 | 4 | would move it into evidence now. |
| 10:59 | 5 | THE COURT:  It's received. |
| 10:59 | 6 | *(Exhibit No. 1195-RS-4 received in evidence.)* |
| 11:00 | 7 | *(Document displayed.)* |
| | 8 | BY MS. KELLER: |
| 11:00 | 9 | Q.   "Manufacturing products that appear to be Mattel |
| 11:00 | 10 | designs," that would be Bratz, wouldn't it? |
| 11:00 | 11 | A.   I don't know. |
| 11:00 | 12 | Q.   Well, that's what you were concerned about, wasn't it? |
| 11:00 | 13 | A.   I didn't have any concern about this file. |
| 11:00 | 14 | MS. KELLER:  And let's move page 5 into evidence, |
| 11:00 | 15 | if we could, Your Honor. |
| 11:00 | 16 | THE COURT:  Received. |
| 11:00 | 17 | *(Exhibit No. 1195-RS-5 received in evidence.)* |
| 11:00 | 18 | *(Document displayed.)* |
| | 19 | BY MS. KELLER: |
| 11:00 | 20 | Q.   And this is the one that shows Ivy Ross and Evelyn |
| 11:00 | 21 | Viohl as the informants. |
| 11:00 | 22 | And then started at pages 8 -- a lot of these are |
| 11:00 | 23 | redacted, but at least pages 8 through 18 are about Carter |
| 11:01 | 24 | Bryant, right? |
| 11:01 | 25 | MR. QUINN:  Your Honor, several of those pages are |

| | | |
|---|---|---|
| 11:01 | 1 | redacted in full, Your Honor. |
| 11:01 | 2 | MS. KELLER:  I'm not referring to the completely |
| 11:01 | 3 | blank pages. |
| 11:01 | 4 | THE WITNESS:  Well, page -- |
| 11:01 | 5 | MR. QUINN:  She said "through 18," Your Honor. |
| 11:01 | 6 | Every page after -- |
| 11:01 | 7 | MS. KELLER:  Okay.  I'll delete the references to |
| 11:01 | 8 | the blank pages, then. |
| 11:01 | 9 | MR. QUINN:  The redacted. |
| 11:01 | 10 | MS. KELLER:  Redacted. |
| 11:01 | 11 | *(Documents displayed.)* |
| | 12 | BY MS. KELLER: |
| 11:01 | 13 | Q.   So up until page 12, Carter Bryant, right? |
| 11:01 | 14 | A.   That's correct. |
| 11:01 | 15 | Q.   And if we go to page 21, we see, second and third down, |
| 11:02 | 16 | "ABC International Traders" and "Micro Games of America," |
| 11:02 | 17 | right? |
| 11:02 | 18 | A.   We do. |
| 11:02 | 19 | Q.   And then, if you turn to page 24, second name down, you |
| 11:02 | 20 | see the name "Isaac Larian"? |
| 11:02 | 21 | A.   I do. |
| 11:02 | 22 | Q.   And then, if you go to the next -- the next page after |
| 11:02 | 23 | that. |
| 11:02 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|--|--|--|
| 11:02 | 1 | BY MS. KELLER: |
| 11:02 | 2 | Q.   More searching on Isaac Larian, correct? |
| 11:03 | 3 | A.   Yes, it appears to be the case. |
| 11:03 | 4 | Q.   So as of March 20th, 2002, your internal investigations |
| 11:03 | 5 | department, in response to a complaint by Ivy Ross and |
| 11:03 | 6 | another woman, were investigating Carter Bryant and Isaac |
| 11:03 | 7 | Larian, right? |
| 11:03 | 8 | A.   It appears to be the case. |
| 11:03 | 9 | MS. KELLER:  Your Honor, just to make sure that I |
| 11:03 | 10 | have the right pages in evidence, I would be moving pages 4, |
| 11:03 | 11 | 5, 8, 9, 10, 11, 12 -- |
| 11:04 | 12 | THE COURT:  21, 24? |
| 11:04 | 13 | MS. KELLER:  Yes. |
| 11:04 | 14 | And continuing on:  36, 35, 37, 38. |
| 11:04 | 15 | I'd move all those in, Your Honor. |
| 11:04 | 16 | THE COURT:  Each are received. |
| 11:04 | 17 | *(Exhibit No. 1195-RS-4, 1195-RS-5, 1195-RS-10,* |
| 11:04 | 18 | *1195-RS-11 and 1195-RS-12 previously received in evidence.)* |
| 11:04 | 19 | *(Exhibit No. 1195-RS-8 received in evidence.)* |
| 11:04 | 20 | *(Exhibit No. 1195-RS-9 received in evidence.)* |
| 11:04 | 21 | *(Exhibit No. 1195-RS-21 received in evidence.)* |
| 11:04 | 22 | *(Exhibit No. 1195-RS-24 received in evidence.)* |
| 11:04 | 23 | *(Exhibit No. 1195-RS-35 received in evidence.)* |
| 11:04 | 24 | *(Exhibit No. 1195-RS-36 received in evidence.)* |
| 11:04 | 25 | *(Exhibit No. 1195-RS-37 received in evidence.)* |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

104

| | | |
|---|---|---|
| 11:04 | 1 | (Exhibit No. 1195-RS-38 received in evidence.) |
| 11:04 | 2 | BY MS. KELLER: |
| 11:04 | 3 | Q.   And if you look at page 39, you see an investigation of |
| 11:04 | 4 | Farhad Larian, right? |
| 11:04 | 5 | A.   I see his name, yes. |
| 11:05 | 6 | Q.   Well, and again, these are documents generated by your |
| 11:05 | 7 | Mattel internal security division, right? |
| 11:05 | 8 | A.   I don't know that.  I know they were in a file, as we |
| 11:05 | 9 | discussed; but I don't know what or where these documents |
| 11:05 | 10 | came from. |
| 11:05 | 11 | Q.   Other than they came from Mattel? |
| 11:05 | 12 | A.   Other than that they were in a file produced by Mattel. |
| 11:05 | 13 | Q.   And other than they bear the name on the front |
| 11:05 | 14 | "DeAnda," who's the head of your security? |
| 11:05 | 15 | A.   That's correct. |
| 11:05 | 16 | Q.   And other than they appear to be responding to an |
| 11:05 | 17 | investigation? |
| 11:05 | 18 | A.   I don't know that I draw the link through all of this |
| 11:05 | 19 | yet. |
| 11:05 | 20 | Q.   And if you go back to pages 57, 58, you see more |
| 11:05 | 21 | searches on ABC International Traders, Inc., right? |
| 11:06 | 22 | A.   Yes. |
| 11:06 | 23 | Q.   You go to page 60, you see searches of "MGA" under |
| 11:06 | 24 | corporation names?  California corporate searches? |
| 11:06 | 25 | A.   I see things like "MGA Biomedical Testing." |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

105

| | | |
|---|---|---|
| 11:06 | 1 | Q.   Well, you see -- |
| 11:06 | 2 | A.   I do see that.  I do see -- I'm sorry.  I see the |
| 11:06 | 3 | letters "MGA," yes. |
| 11:06 | 4 | Q.   You see the search for anything with "MGA" in it, |
| 11:06 | 5 | right? |
| 11:06 | 6 | A.   No.  I don't know that's what this is. |
| 11:06 | 7 |          MS. KELLER:  Your Honor, I would move page 60 into |
| 11:06 | 8 | evidence. |
| 11:06 | 9 |          THE COURT:  Received. |
| 11:06 | 10 |          *(Exhibit No. 1195-RS-60 received in evidence.)* |
| 11:06 | 11 |            *(Document displayed.)* |
| | 12 | BY MS. KELLER: |
| 11:06 | 13 | Q.   This appears to be a search for anything with "MGA" in |
| 11:06 | 14 | the name, right? |
| 11:06 | 15 | A.   I don't know what it is. |
| 11:06 | 16 | Q.   Well, let's look at "corporation name" in the very |
| 11:06 | 17 | first box that we see.  It says, "Allied General |
| 11:06 | 18 | Agency, Inc.," which will do business in California as "MGA |
| 11:06 | 19 | Allied General Insurance Agency," right? |
| 11:07 | 20 | A.   Yes. |
| 11:07 | 21 | Q.   Right under that, "Baby MGA, Inc."? |
| 11:07 | 22 | A.   Yes. |
| 11:07 | 23 | Q.   Right under that, "MGA Biomedical Testing." |
| 11:07 | 24 |      Right under that "MGA Computer Corporation." |
| 11:07 | 25 |      You would agree with me that this looks like somebody |

| | | |
|---|---|---|
| 11:07 | 1 | was doing a search for anything with "MGA" in the name, |
| 11:07 | 2 | right? |
| 11:07 | 3 | A.   Yes, I would. |
| 11:07 | 4 | Q.   And the next page, same thing, 61. |
| 11:07 | 5 | A.   Uh, yes. |
| 11:07 | 6 | Q.   And if we look at page 60, and you take a look at |
| 11:07 | 7 | what's highlighted on the screen. |
| 11:07 | 8 | *(Document displayed.)* |
| | 9 | BY MS. KELLER: |
| 11:07 | 10 | Q.   What does it say? |
| 11:07 | 11 | A.   It says, "Rules of search for," quote, "MGA," end |
| 11:07 | 12 | quote. |
| 11:07 | 13 | Q.   And, in fact, this whole document is really about |
| 11:08 | 14 | searching for anything to do with Carter Bryant, MGA, and |
| 11:08 | 15 | Isaac Larian, right? |
| 11:08 | 16 | A.   No.  I don't know that. |
| 11:08 | 17 | Q.   You know ABC International Traders was the predecessor |
| 11:08 | 18 | company of MGA? |
| 11:08 | 19 | A.   It may have been. |
| 11:08 | 20 | MS. KELLER:  And let's look at page 66. |
| 11:08 | 21 | I would move that page into evidence, as well, |
| 11:08 | 22 | Your Honor. |
| 11:08 | 23 | THE COURT:  Received. |
| 11:08 | 24 | *(Exhibit No. 1195-RS-66 received in evidence.)* |
| 11:08 | 25 | *(Document displayed.)* |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

107

BY MS. KELLER:

11:08   Q.   And at the top, it says, "3/15/02."  It looks like
11:08   "Received case.  Opened investigation."
11:08        And under that you see, "Met with Ivy Ross on this case
11:08   and discussed IP protection program."
11:08        That would be intellectual property, right?
11:09   A.   Uh.
11:09   Q.   It's a reasonable --
11:09   A.   Uh, yes, I'm sure it is.
11:09   Q.   And then it -- under that, on 3/28, "Met with Cassidy
11:09   Park to get more info on MGA issue.  She suspected Carter
11:09   Bryant as illustrator/former employee who may have
11:09   plagiarized design of Lily Martinez and created Bratz dolls
11:09   for MGA."
11:09        You see that?
11:09   A.   I do.
11:09   Q.   And so that tells you, doesn't it, that, as of that
11:09   date -- as of March 2002, your investigation division was
11:09   looking at whether Carter Bryant had taken something from
11:09   Mattel to MGA to create Bratz dolls?  That's what this whole
11:09   thing's about, isn't it?
11:09        MR. QUINN:  That's compound, Your Honor.
11:09        THE COURT:  Overruled.
11:09        THE WITNESS:  Uh, no.  I don't have any reason to
11:09   believe that.

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | BY MS. KELLER:                                              |
| 11:10 | 2  | Q.   You understand that the statute of limitations is a    |
| 11:10 | 3  | very important issue in this case, don't you?               |
| 11:10 | 4  | A.   I do.                                                   |
| 11:10 | 5  | Q.   And you know that when you first suspected Carter       |
| 11:10 | 6  | Bryant and MGA might be working on something, that you would |
| 11:10 | 7  | claim as your intellectual property is an issue the jury is  |
| 11:10 | 8  | gonna have to decide, right?                                 |
| 11:10 | 9  |            MR. QUINN:  Misstates the legal standard,         |
| 11:10 | 10 | Your Honor.                                                 |
| 11:10 | 11 |            THE COURT:  Well, it partially does.             |
| 11:10 | 12 |            But I think the question's a fair question.       |
| 11:10 | 13 |            You can answer the question.                      |
| 11:10 | 14 |            THE WITNESS:  I don't know the legal standard, but |
| 11:10 | 15 | I -- I do know one of the issues in the case is the statute  |
| 11:10 | 16 | of limitations.                                             |
| 11:10 | 17 | BY MS. KELLER:                                              |
| 11:10 | 18 | Q.   And you know that the earlier the date is that Mattel   |
| 11:10 | 19 | found out, the worse it is for Mattel in this lawsuit,       |
| 11:10 | 20 | right?                                                       |
| 11:10 | 21 | A.   No, not necessarily.                                    |
| 11:10 | 22 | Q.   Well, you know that, Mr. Eckert, don't you?             |
| 11:10 | 23 | A.   No.                                                     |
| 11:10 | 24 | Q.   Let's look at the next line on this page, under the     |
| 11:10 | 25 | line we looked at, where it says, "1500."                    |

| | | |
|---|---|---|
| 11:11 | 1 | "Checked with HR for Bryant's file.  Term date |
| 11:11 | 2 | 10/20/00.  File is in offsite storage.  Requested it be |
| 11:11 | 3 | retrieved."  Right? |
| 11:11 | 4 | A.   Uh, yes. |
| 11:11 | 5 | Q.   And then you see various notations under here, |
| 11:11 | 6 | including, "7/22/03, Researched Bryant's current address for |
| 11:11 | 7 | legal, Jill Thomas." |
| 11:11 | 8 |     And that, next to it, says, "DeAnda," right? |
| 11:11 | 9 | A.   I believe so, yes. |
| 11:11 | 10 | Q.   And Jill Thomas is the director of litigation for |
| 11:11 | 11 | Mattel, who's sitting in this courtroom, right? |
| 11:11 | 12 | A.   That's correct. |
| 11:11 | 13 | Q.   And DeAnda is the person we just talked about:  Richard |
| 11:11 | 14 | DeAnda, the head of security? |
| 11:11 | 15 | A.   I think that's a reasonable assumption. |
| 11:11 | 16 | Q.   And then, if we look -- |
| 11:11 | 17 |     MS. KELLER:  And, Your Honor, I would move that |
| 11:12 | 18 | page 66 into evidence. |
| 11:12 | 19 |     THE COURT:  Received. |
| 11:12 | 20 |   (Exhibit No. 1195-RS-66 previously received in evidence.) |
| 11:59 | 21 | BY MS. KELLER: |
| 11:12 | 22 | Q.   And then, if we look at page 68 -- |
| 11:12 | 23 |     MS. KELLER:  Which I would also move into |
| 11:12 | 24 | evidence, Your Honor. |
| 11:12 | 25 |     THE COURT:  Received. |

| | | |
|---|---|---|
| 11:12 | 1 | *(Exhibit No. 1195-RS-68 received in evidence.)* |
| 11:12 | 2 | *(Document displayed.)* |
| 11:12 | 3 | BY MS. KELLER: |
| 11:12 | 4 | Q.   That's a description of Isaac Larian? |
| 11:12 | 5 | A.   It has to do with Isaac Larian, yes. |
| 11:12 | 6 | Q.   Has to do with his background? |
| 11:12 | 7 | A.   Yes. |
| 11:12 | 8 | Q.   And the same is true of page 70? |
| 11:12 | 9 | A.   No.  It's a different person. |
| 11:12 | 10 | Q.   I'm sorry.  Page 69.  68 and 69? |
| 11:12 | 11 | A.   Uh, yes. |
| 11:12 | 12 | MS. KELLER:  And, Your Honor, I'd move 68 and 69 |
| 11:12 | 13 | into evidence. |
| 11:12 | 14 | THE COURT:  Received. |
| 11:12 | 15 | *(Exhibit No. 1195-RS-68 previously received in evidence.)* |
| 11:12 | 16 | *(Exhibit No. 1195-RS-69 received in evidence.)* |
| 11:12 | 17 | *(Document displayed.)* |
| 11:12 | 18 | BY MS. KELLER: |
| 11:13 | 19 | Q.   And you were researching Mr. Larian also because you |
| 11:13 | 20 | were concerned that perhaps Mr. Bryant had taken some |
| 11:13 | 21 | intellectual property to MGA, right? |
| 11:13 | 22 | A.   I don't know that. |
| 11:13 | 23 | Q.   Well, you know Mr. Larian was the CEO of MGA, true? |
| 11:13 | 24 | A.   He's the -- yes, I believe that's the case. |
| 11:13 | 25 | MS. KELLER:  Move 68 and 69 into evidence, |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

111

| | | |
|---|---|---|
| 11:13 | 1 | Your Honor. |
| 11:13 | 2 | THE COURT:  Received. |
| 11:12 | 3 | *(Exhibit No. 1195-RS-68 and 1195-RS-69* |
| 11:12 | 4 | *previously received in evidence.)* |
| 11:13 | 5 | Q.   And then on page 70, your investigation department is |
| 11:13 | 6 | researching Thomas Park, the chief operating officer of MGA? |
| 11:13 | 7 | A.   I see his name is in this file. |
| 11:13 | 8 | Q.   And same with page 71? |
| 11:13 | 9 | A.   Correct. |
| 11:13 | 10 | MS. KELLER:  Your Honor, move 70 and 71 into |
| 11:13 | 11 | evidence. |
| 11:13 | 12 | THE COURT:  Received. |
| 11:13 | 13 | *(Exhibit No. 1195-RS-70 received in evidence.)* |
| 11:13 | 14 | *(Exhibit No. 1195-RS-71 received in evidence.)* |
| 11:13 | 15 | *(Document displayed.)* |
| 11:13 | 16 | BY MS. KELLER: |
| 11:13 | 17 | Q.   And then 72 is, "Anatomy of a Hit:  Celebrating a |
| 11:14 | 18 | Passion for Bratz," right? |
| 11:14 | 19 | A.   Yes, it is. |
| 11:14 | 20 | Q.   And this appears to be from the *Hollywood Reporter*? |
| 11:14 | 21 | A.   I think that's a reasonable assumption. |
| 11:14 | 22 | MS. KELLER:  Move 72 into evidence, Your Honor. |
| 11:14 | 23 | THE COURT:  Received. |
| 11:14 | 24 | *(Exhibit No. 1195-RS-72 received in evidence.)* |
| 11:14 | 25 | *(Document displayed.)* |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

112

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | BY MS. KELLER:                                                      |
| 11:14 | 2  | Q.   73 and 74 represents an article from *The Entrepreneur*       |
| 11:14 | 3  | about Isaac Larian?                                                 |
| 11:14 | 4  | A.   It appears to be something entitled "*The Entrepreneur*."     |
| 11:14 | 5  | I don't know if that's a -- a thing.                                |
| 11:14 | 6  |           MS. KELLER:  Your Honor, I'd move 73 and 74 into          |
| 11:14 | 7  | evidence.                                                           |
| 11:14 | 8  |           MR. QUINN:  Your Honor, 73 --                             |
| 11:14 | 9  |           THE COURT:  That could be --                             |
| 11:14 | 10 |           MR. QUINN:  -- would not be for truth.                   |
| 11:14 | 11 |           THE COURT:  Yeah.  It could be hearsay, so it's          |
| 11:14 | 12 | not for the truth of the matter asserted.                          |
| 11:14 | 13 |           MS. KELLER:  No.                                          |
| 11:14 | 14 |           THE COURT:  Let me instruct the jury.                    |
| 11:15 | 15 |           (To the jury:) Frankly, I'm trying to keep               |
| 11:15 | 16 | newspaper articles out from different news agencies and             |
| 11:15 | 17 | reporters, so that you're the jury that views the facts.            |
| 11:15 | 18 | And I don't want you to be influenced by what the press is          |
| 11:15 | 19 | writing, from the *Wall Street Journal* to television clips.       |
| 11:15 | 20 |           So in allowing this in, its only for the purpose          |
| 11:15 | 21 | of showing the investigative actions or what type of                |
| 11:15 | 22 | investigation was taking place, or how thorough, or what            |
| 11:15 | 23 | information was being gathered, and whether it's relevant or        |
| 11:15 | 24 | not.  So I'll let this come in, but the content is hearsay.         |
| 11:15 | 25 | Okay?                                                               |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

113

| | | |
|---|---|---|
| 11:15 | 1 | Whoever's writing this, in a favorable or |
| 11:15 | 2 | unfavorable light or whatever they're saying, is not to be |
| 11:15 | 3 | taken for the truth of the matter asserted. |
| 11:15 | 4 | Counsel. |
| 11:15 | 5 | MS. KELLER:  Move 73 and 74 into evidence, |
| 11:15 | 6 | Your Honor. |
| 11:15 | 7 | THE COURT:  Received. |
| 11:15 | 8 | *(Exhibit No. 1195-RS-73 received in evidence.)* |
| 11:15 | 9 | *(Exhibit No. 1195-RS-74 received in evidence.)* |
| 11:15 | 10 | *(Document displayed.)* |
| | 11 | BY MS. KELLER: |
| 11:15 | 12 | Q.   So that's an article about Mr. Larian, right? |
| 11:15 | 13 | A.   Yes. |
| 11:15 | 14 | Q.   75 and 76 are labeled "Confidential Information."  And |
| 11:16 | 15 | those are also about Mr. Larian, right? |
| 11:16 | 16 | A.   Yes, they are. |
| 11:16 | 17 | MS. KELLER:  Move 75 and 76 into evidence, |
| 11:16 | 18 | Your Honor. |
| 11:16 | 19 | THE COURT:  Received. |
| 11:16 | 20 | *(Exhibit No. 1195-RS-75 received in evidence.)* |
| 11:16 | 21 | *(Exhibit No. 1195-RS-76 received in evidence.)* |
| 11:16 | 22 | *(Document displayed.)* |
| | 23 | BY MS. KELLER: |
| 11:16 | 24 | Q.   And this starts off with personal information about |
| 11:16 | 25 | Mr. Larian, including that he was born in Iran in 1954, and |

| | | |
|---|---|---|
| 11:16 | 1 | became a citizen of the United States in the early 1970's, |
| 11:16 | 2 | right? |
| 11:16 | 3 | A.   Yes. |
| 11:16 | 4 | Q.   Now, some of this appears to be sort of resumé |
| 11:16 | 5 | information, right? |
| 11:16 | 6 | A.   Yes. |
| 11:16 | 7 | Q.   But then, if you see the fourth bullet point down, it |
| 11:16 | 8 | says, "Wife totally devoted to him and their children's |
| 11:16 | 9 | development." |
| 11:16 | 10 | You see that? |
| 11:16 | 11 | A.   I do. |
| 11:16 | 12 | Q.   Where'd that come from? |
| 11:16 | 13 | A.   I have no idea. |
| 11:16 | 14 | Q.   There's a -- his personal residence address, right? |
| 11:17 | 15 | A.   Yes. |
| 11:17 | 16 | Q.   Says under that, "Supporters and donors to |
| 11:17 | 17 | Beverly Hills High School and Board of Education." |
| 11:17 | 18 | Do you know where that came from? |
| 11:17 | 19 | A.   No. |
| 11:17 | 20 | Q.   "September 2003, Larian family welcomed to Stephen S. |
| 11:17 | 21 | Wise Temple, Los Angeles, California." |
| 11:17 | 22 | Do you know where that came from? |
| 11:17 | 23 | A.   No. |
| 11:17 | 24 | Q.   "Hobbies include philanthropy works, biking, writing |
| 11:17 | 25 | poetry, volleyball, and camping with family," right? |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

| | | |
|---|---|---|
| 11:17 | 1 | A.   That's what it says, yes. |
| 11:17 | 2 | Q.   And then the next page even has something labeled, |
| 11:17 | 3 | "personal characteristics." |
| 11:17 | 4 | It says, Mr. Larian has a "large ego," right? |
| 11:18 | 5 | Do you see that? |
| 11:18 | 6 | A.   I don't yet. |
| 11:18 | 7 | Q.   Page 76, the very first -- |
| 11:18 | 8 | A.   Oh, I'm sorry.  It's blacked out on mine. |
| 11:18 | 9 | Yes, it does. |
| 11:18 | 10 | Q.   And that's an unusual characteristic for a CEO, isn't |
| 11:18 | 11 | it? |
| 11:18 | 12 | THE COURT:  You don't have to answer that. |
| 11:18 | 13 | *(Laughter in the courtroom.)* |
| | 14 | BY MS. KELLER: |
| 11:18 | 15 | Q.   And it has some negative things, you know? |
| 11:18 | 16 | A.   Yes.  It's very unusual. |
| 11:18 | 17 | Q.   "Hot tempered, short fuse, easy to ignite," right? |
| 11:18 | 18 | A.   Uh, yes. |
| 11:18 | 19 | Q.   And then, at the bottom -- third from the bottom, it |
| 11:18 | 20 | says, "Persistent and will not give up to a fault." |
| 11:18 | 21 | Do you see that? |
| 11:18 | 22 | A.   I do. |
| 11:18 | 23 | Q.   Do you know where your investigation staff came up with |
| 11:18 | 24 | all this information about Mr. Larian and his family and his |
| 11:18 | 25 | wife and his temple and his kids and all that? |

| | | |
|---|---|---|
| 11:18 | 1 | A.   No.  I don't know who came up with this or how. |
| 11:18 | 2 | Q.   But you know why, don't you? |
| 11:18 | 3 | A.   No, I don't. |
| 11:18 | 4 | Q.   And would it be fair to say that, really, this whole |
| 11:19 | 5 | document -- this whole document is an investigation of |
| 11:19 | 6 | either Carter Bryant, Mr. Larian, or the people around them? |
| 11:19 | 7 | A.   No, I don't know that. |
| 11:19 | 8 | MS. KELLER:  Well, let's look at page 86. |
| 11:19 | 9 | (Document displayed.) |
| 11:19 | 10 | BY MS. KELLER: |
| 11:19 | 11 | Q.   That's an investigation of Angela Larian, Mr. Larian's |
| 11:19 | 12 | wife, isn't it? |
| 11:19 | 13 | A.   I see on -- oh, I'm sorry.  86.  I was on -- June |
| 11:19 | 14 | Lockhart. |
| 11:19 | 15 | Q.   No.  Page 86. |
| 11:19 | 16 | A.   I have it. |
| 11:19 | 17 | Q.   "Angela L. Larian." |
| 11:19 | 18 | MS. KELLER:  Your Honor, I'd ask that 86 be |
| 11:19 | 19 | admitted. |
| 11:19 | 20 | THE COURT:  Received. |
| 11:19 | 21 | (Exhibit No. 1195-RS-86 received in evidence.) |
| 11:19 | 22 | (Document displayed.) |
| 11:19 | 23 | THE WITNESS:  Yes, I see that. |
| | 24 | BY MS. KELLER: |
| 11:19 | 25 | Q.   Any reason why MGA would be investigating Mr. Larian's |

CV 04-9049 DOC – 3/3/2011 – Day 27, Volume 1 of 4

117

| | | |
|---|---|---|
| 11:19 | 1 | wife that you know of? |
| 11:19 | 2 | A.   I think you meant "Mattel." |
| 11:19 | 3 | Q.   I'm sorry.  Yes, I did. |
| 11:20 | 4 |     Any reason that you know why Mattel would be |
| 11:20 | 5 | investigating Mr. Larian's wife? |
| 11:20 | 6 | A.   No. |
| 11:20 | 7 | Q.   "Any good reason," I should say. |
| 11:20 | 8 |        MR. QUINN:  Move to strike. |
| 11:20 | 9 |        THE COURT:  Was that a question or an answer? |
| 11:20 | 10 |        Stricken. |
| | 11 | BY MS. KELLER: |
| 11:20 | 12 | Q.   Let's look at page 87. |
| 11:20 | 13 |       *(Document displayed.)* |
| 11:20 | 14 | BY MS. KELLER: |
| 11:20 | 15 | Q.   Somebody has handwritten here "El Rodeo School" |
| 11:20 | 16 | underneath, "Founders wall donors." |
| 11:20 | 17 |     Do you see that? |
| 11:20 | 18 | A.   Yes. |
| 11:20 | 19 | Q.   And it has a whole list of people who appear to have |
| 11:20 | 20 | donated to a founder's wall at El Rodeo School? |
| 11:20 | 21 | A.   I don't have that on my version. |
| 11:20 | 22 | Q.   Well, if you look at 87, 88 -- |
| 11:20 | 23 | A.   Oh. |
| 11:20 | 24 | Q.   -- 89 and 90. |
| 11:20 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:21 | 1 | Q.   And if you look back to the first page, where it says, |
| 11:21 | 2 | "Special thanks to all of our families who support our |
| 11:21 | 3 | school." |
| 11:21 | 4 | A.   Page 87? |
| 11:21 | 5 | MS. KELLER:  And, Your Honor -- |
| 11:21 | 6 | THE WITNESS:  Yes. |
| 11:21 | 7 | MS. KELLER:  Your Honor, I'm only gonna ask that |
| 11:21 | 8 | page 87 be admitted.  There are an awful lot of other names |
| 11:21 | 9 | on here. |
| 11:21 | 10 | THE COURT:  All right.  87's received. |
| 11:21 | 11 | (Exhibit No. 1195-RS-87 received in evidence.) |
| 11:21 | 12 | (Document displayed.) |
| | 13 | BY MS. KELLER: |
| 11:21 | 14 | Q.   Do you have any reason why your investigation |
| 11:21 | 15 | department would be looking at the donations that the Larian |
| 11:21 | 16 | family, including the Larian children, have made to El Rodeo |
| 11:21 | 17 | School? |
| 11:21 | 18 | A.   No. |
| 11:21 | 19 | Q.   Any particular reason at all to investigate the Larian |
| 11:21 | 20 | children? |
| 11:21 | 21 | A.   Um, I don't know who created these pages or why. |
| 11:22 | 22 | Q.   These pages that were produced from Mattel? |
| 11:22 | 23 | A.   That's correct. |
| 11:22 | 24 | Q.   From Mattel's security chief? |
| 11:22 | 25 | A.   Uh, I don't know -- oh, if that's what this stamp |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 119 of 160   Page ID #:306790
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

119

| | | |
|---|---|---|
| 11:22 | 1 | means, yes. |
| 11:22 | 2 | Q.   DeAnda? |
| 11:22 | 3 | A.   Yes. |
| 11:22 | 4 | MS. KELLER:  Let's look at Exhibit 1193, again. |
| 11:22 | 5 | Oh, I'm sorry.  I've got one follow-up question |
| 11:22 | 6 | for you. |
| | 7 | BY MS. KELLER: |
| 11:22 | 8 | Q.   This investigation that appears to have been opened in |
| 11:22 | 9 | March of 2002, into Carter Bryant and MGA and Mr. Larian, |
| 11:22 | 10 | that was five months before you received the anonymous |
| 11:23 | 11 | letter that was stamped August 5th, 2002, right? |
| 11:23 | 12 | A.   Yes. |
| 11:23 | 13 | Q.   And if we go back to the anonymous letter, |
| 11:23 | 14 | Exhibit 1193. |
| 11:23 | 15 | *(Document displayed.)* |
| | 16 | BY MS. KELLER: |
| 11:23 | 17 | Q.   This is the only letter you ever received where someone |
| 11:23 | 18 | alleged an employee had taken Mattel designs and offered |
| 11:23 | 19 | them to a competitor, right? |
| 11:23 | 20 | A.   I think that's true.  It certainly may be true. |
| 11:23 | 21 | Q.   Well, do you know whether it is or not.  "May be" is a |
| 11:23 | 22 | little different than "is." |
| 11:23 | 23 | A.   Well, I certainly don't remember another anonymous |
| 11:23 | 24 | letter about this topic. |
| 11:23 | 25 | Q.   Now, let's look at Exhibit 1194. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

120

| | | |
|---|---|---|
| 11:24 | 1 | A.    I have it. |
| 11:24 | 2 | Q.    And this also has a Mattel Bates stamp on it, right? |
| 11:24 | 3 | A.    It does. |
| 11:24 | 4 | Q.    Showing it was produced by Mattel, right? |
| 11:24 | 5 | A.    That's correct. |
| 11:24 | 6 | Q.    And this is from Richard DeAnda, the head of your |
| 11:24 | 7 | investigation, to Alan Kaye, correct? |
| 11:24 | 8 | A.    I would call Richard DeAnda head of security, but, |
| 11:24 | 9 | correct. |
| 11:24 | 10 | Q.    Head of security. |
| 11:24 | 11 | "Subject:  MGA Bratz," right? |
| 11:24 | 12 | A.    That's correct. |
| 11:24 | 13 | MS. KELLER:  Your Honor, I would move 1194 in |
| 11:24 | 14 | evidence. |
| 11:24 | 15 | THE COURT:  Received. |
| 11:24 | 16 | *(Exhibit No. 1194 received in evidence.)* |
| 11:24 | 17 | *(Document displayed.)* |
| | 18 | BY MS. KELLER: |
| 11:24 | 19 | Q.    And this says, "Alan, I've received your anonymous |
| 11:24 | 20 | letter originally sent to Bob Eckert regarding Carter Bryant |
| 11:24 | 21 | and Bratz." |
| 11:24 | 22 | And, by the way, Mr. Eckert, this doesn't have a date |
| 11:24 | 23 | on it, does it? |
| 11:24 | 24 | A.    It does not. |
| 11:24 | 25 | Q.    And do you know how it was that Mattel came to produce |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

121

| 11:24 | 1 | this e-mail with no date on it? |
|---|---|---|
| 11:25 | 2 | A.   No, I don't. |
| 11:25 | 3 | Q.   Have you investigated how it was that this e-mail was |
| 11:25 | 4 | produced without any date whatsoever? |
| 11:25 | 5 | A.   No, I haven't. |
| 11:25 | 6 | Q.   Have you directed anyone else to investigate that? |
| 11:25 | 7 | A.   No, I haven't. |
| 11:25 | 8 | Q.   Have you inquired about it? |
| 11:25 | 9 | A.   No, I haven't. |
| 11:25 | 10 | Q.   And this says, "Alan, I've received your anonymous |
| 11:25 | 11 | letter originally sent to Bob Eckert regarding Carter Bryant |
| 11:25 | 12 | and Bratz.  I'm aware of this situation and have been |
| 11:25 | 13 | working on it for several months.  My frustration in this |
| 11:25 | 14 | matter was the genesis of" -- and it looked like there was |
| 11:25 | 15 | something redacted -- something else redacted -- "and that |
| 11:25 | 16 | is now in the hands of Robert Normile. |
| 11:25 | 17 |      Robert Normile is who? |
| 11:25 | 18 | A.   Robert Normile is the general counsel of Mattel. |
| 11:25 | 19 | Q.   And then it says, "The truth of the matter is that |
| 11:25 | 20 | Carter Bryant did work for Mattel, however." |
| 11:25 | 21 |      And then there's some more information redacted, right? |
| 11:26 | 22 | A.   That's right. |
| 11:26 | 23 | Q.   "Redacted" means taken out, true? |
| 11:26 | 24 | A.   That's correct. |
| 11:26 | 25 | Q.   The next thing we see is "According to outside |

DEBBIE GALE, U.S. COURT REPORTER

| 11:26 | 1 | attorneys, McShane" -- |
| 11:26 | 2 | MR. QUINN:  Your Honor, could the Court explain to |
| 11:26 | 3 | the jury what "redacted" -- I mean, both sides -- |
| 11:26 | 4 | THE COURT:  You two can talk about that later on, |
| 11:26 | 5 | so I have a fair and balanced discussion with the jury about |
| 11:26 | 6 | that, but not now. |
| 11:26 | 7 | MS. KELLER:  I hate the phrase "fair and |
| 11:26 | 8 | balanced," Your Honor. |
| 11:26 | 9 | MR. QUINN:  She said "taken out," Your Honor. |
| 11:26 | 10 | THE COURT:  "Equitable," then. |
| 11:26 | 11 | But ask the question. |
|  | 12 | BY MS. KELLER: |
| 11:26 | 13 | Q.   Who's McShane? |
| 11:26 | 14 | A.   It may have been an attorney who worked at Mattel. |
| 11:26 | 15 | Q.   "May have been" or was? |
| 11:26 | 16 | A.   I don't know. |
| 11:26 | 17 | Q.   Says, "McShane has been" -- and then it looks like |
| 11:26 | 18 | there was some more things taken out -- "we only found out |
| 11:26 | 19 | during our last trip to Mexico that Mattel has a |
| 11:26 | 20 | relationship with MGA.  We have MGA's product in our Mexico |
| 11:26 | 21 | warehouse.  Evidently, Mattel Latin America has an agreement |
| 11:26 | 22 | with MGA to sell their product.  This is a good example that |
| 11:27 | 23 | the right hand doesn't know what the left is doing. |
| 11:27 | 24 | Let me know if and how you would like me to respond to |
| 11:27 | 25 | Mr. Bob." |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:27 | 1 | Signed, "Rich." |
| 11:27 | 2 | Is "Mr. Bob," Bob Eckert? |
| 11:27 | 3 | A.   I think that's a reasonable conclusion. |
| 11:27 | 4 | Q.   And -- |
| 11:27 | 5 | A.   Or it could be Bob Normile. |
| 11:27 | 6 | Q.   Okay. |
| 11:27 | 7 | A.   I really don't know to whom he's referring. |
| 11:27 | 8 | Q.   But the first line of this says, "Alan, I've received |
| 11:27 | 9 | your anonymous letter originally sent to Bob Eckert |
| 11:27 | 10 | regarding Carter Bryant and Bratz," right? |
| 11:27 | 11 | A.   It does. |
| 11:27 | 12 | Q.   And then under that couple lines, there's a reference |
| 11:27 | 13 | to Robert Normile, right? |
| 11:27 | 14 | A.   That's correct. |
| 11:27 | 15 | Q.   Now, since it was such an important matter, surely you |
| 11:27 | 16 | were informed and updated on the investigation into Carter |
| 11:27 | 17 | Bryant and Bratz that was taking place over these several |
| 11:27 | 18 | months, right? |
| 11:27 | 19 | MR. QUINN:  Your Honor, I object to the preamble. |
| 11:27 | 20 | Assumes facts.  Move to strike. |
| 11:28 | 21 | THE COURT:  Overruled. |
| 11:28 | 22 | You can answer the question. |
| 11:28 | 23 | THE WITNESS:  No, I was not. |
| | 24 | BY MS. KELLER: |
| 11:28 | 25 | Q.   And the investigation was actually instigated by a |

| | | |
|---|---|---|
| 11:28 | 1 | letter you received, right? |
| 11:28 | 2 | A.   Uh, I don't know that. |
| 11:28 | 3 | Q.   And July 18th, 2003, there was a *Wall Street Journal* |
| 11:28 | 4 | article referencing Carter Bryant, right? |
| 11:28 | 5 | A.   There was. |
| 11:28 | 6 | Q.   And you read it at the time, didn't you? |
| 11:28 | 7 | A.   I did. |
| 11:28 | 8 | MS. KELLER:  Let's take a look at Exhibit 6678. |
| 11:28 | 9 | *(Document provided to witness.)* |
| | 10 | BY MS. KELLER: |
| 11:28 | 11 | Q.   Oh, by the way, that *Wall Street Journal* article was |
| 11:28 | 12 | July 17, 2003? |
| 11:28 | 13 | A.   Uh, the article, I thought, was in 2004.  Might have |
| 11:28 | 14 | been July -- uh, no.  July of -- |
| 11:28 | 15 | Q.   I think it's -- |
| 11:28 | 16 | A.   2003.  I think that's correct. |
| 11:28 | 17 | What exhibit is it? |
| 11:29 | 18 | Q.   The one we have we can't show right now because it |
| 11:29 | 19 | hasn't been redacted. |
| 11:29 | 20 | MR. QUINN:  We have it.  We can put it up. |
| 11:29 | 21 | THE COURT:  Ms. Keller, they have the redacted |
| 11:29 | 22 | version.  Do you want to have them put it up? |
| 11:29 | 23 | MS. KELLER:  Just for the date. |
| 11:29 | 24 | THE COURT:  All right.  For the date. |
| 11:29 | 25 | MS. KELLER:  If we could just see the heading. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

125

| | | |
|---|---|---|
| 11:29 | 1 | THE COURT:  You can put it up, if you want to, |
| 11:29 | 2 | just the heading. |
| 11:29 | 3 | *(Document displayed.)* |
| 11:29 | 4 | THE WITNESS:  Yes.  2003. |
| | 5 | BY MS. KELLER: |
| 11:29 | 6 | Q.   So you knew by July of 2003 that Carter Bryant had |
| 11:29 | 7 | designed Bratz because it was mentioned in the article, |
| 11:29 | 8 | right? |
| 11:29 | 9 | A.   Uh, there was certainly mention of Carter Bryant in the |
| 11:29 | 10 | article. |
| 11:29 | 11 | Q.   Well, the article mentioned Carter Bryant as the |
| 11:29 | 12 | designer of Bratz, didn't it? |
| 11:29 | 13 | A.   I know it associated Carter Bryant with Bratz.  It may |
| 11:29 | 14 | have been -- it may have included the phrase "designer." |
| 11:30 | 15 | Q.   Let's -- if we've got a copy of it up there, perhaps we |
| 11:30 | 16 | can show it to you to refresh your recollection, even though |
| 11:30 | 17 | we can't display it. |
| 11:30 | 18 | MS. KELLER:  Don't have it? |
| 11:30 | 19 | MR. QUINN:  We have a redacted version.  It's 1-C, |
| 11:30 | 20 | and we can put it up. |
| 11:30 | 21 | MS. KELLER:  It doesn't help us, Your Honor, with |
| 11:30 | 22 | the content. |
| 11:30 | 23 | MR. QUINN:  There's an agreed content. |
| 11:30 | 24 | THE COURT:  We're wasting time. |
| 11:30 | 25 | I think we just need that exhibit.  And show it to |

| | | |
|---|---|---|
| 11:30 | 1 | the witness in the unredacted form. |
| 11:30 | 2 | As six attorneys now get up out of their seats to |
| 11:30 | 3 | find it. |
| 11:30 | 4 | MS. KELLER:  We're gonna look for it.  And I'm |
| 11:30 | 5 | gonna move on -- |
| 11:30 | 6 | THE COURT:  All right. |
| 11:30 | 7 | MS. KELLER:  -- right now. |
| 11:30 | 8 | Okay.  Let's look at Exhibit 6678. |
| 11:31 | 9 | Ah, we have it. |
| 11:31 | 10 | THE WITNESS:  That's good, because you also have |
| 11:31 | 11 | her.  *(Indicating.)* |
| 11:31 | 12 | *(Document provided to the witness.)* |
| 11:31 | 13 | THE WITNESS:  Okay.  I have the -- a version of |
| 11:31 | 14 | the July 2003 *Wall Street Journal* article. |
| | 15 | BY MS. KELLER: |
| 11:31 | 16 | Q.   And specifically July 18th, 2003? |
| 11:31 | 17 | A.   That's correct. |
| 11:31 | 18 | Q.   And you read the article at the time, correct? |
| 11:31 | 19 | A.   Yes. |
| 11:31 | 20 | Q.   And it mentions that Carter Bryant had designed Bratz, |
| 11:31 | 21 | right? |
| 11:31 | 22 | A.   Yes. |
| 11:31 | 23 | MS. KELLER:  Now, let's look at Exhibit 6678. |
| 11:31 | 24 | *(Document provided to the witness.)* |
| 11:31 | 25 | THE WITNESS:  I have that. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:31 | 1 | BY MS. KELLER: |
| 11:32 | 2 | Q.   And this is another incident report produced by Mattel, |
| 11:32 | 3 | right? |
| 11:32 | 4 | A.   Um, it appears to be. |
| 11:32 | 5 | Q.   And under -- |
| 11:32 | 6 |        MS. KELLER:  Your Honor, I would move 6678-2 into |
| 11:32 | 7 | evidence. |
| 11:32 | 8 |             THE COURT:  Received. |
| 11:32 | 9 |             *(Exhibit No. 6678-2 received in evidence.)* |
| 11:32 | 10 |              *(Document displayed.)* |
| | 11 | BY MS. KELLER: |
| 11:32 | 12 | Q.   Under "Category," it says, "Suspicious activity. |
| 11:32 | 13 |      "Subcategory:  Unauthenticated release of info. |
| 11:32 | 14 |      "Occurrence date:  9/5/02. |
| 11:32 | 15 |      "Reported date:  9/9/03. |
| 11:32 | 16 |      "Building suite:  El Segundo Tower. |
| 11:33 | 17 |      "Report taken by:  Richard DeAnda, Vice President of |
| 11:33 | 18 | Security." |
| 11:33 | 19 |      And there's an incident narrative here that says, |
| 11:33 | 20 |      "On August 5th, 2002, a letter addressed to CEO was |
| 11:33 | 21 | received in Bob Eckert's office.  The letter, sent by an |
| 11:33 | 22 | anonymous sender, stated that former Mattel employee, Carter |
| 11:33 | 23 | Bryant, sold Bratz concept to MGA." |
| 11:33 | 24 |        MS. KELLER:  And let's look at 6678, page 3, which |
| 11:33 | 25 | I would also move into evidence, Your Honor. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

128

| | | |
|---|---|---|
| 11:33 | 1 | THE COURT:  Received. |
| 11:33 | 2 | *(Exhibit No. 6678-3 received in evidence.)* |
| 11:33 | 3 | *(Document displayed.)* |
| | 4 | BY MS. KELLER: |
| 11:33 | 5 | Q.   Okay.  You received the letter August 5th, 2002, right? |
| 11:33 | 6 | A.   Yes. |
| 11:33 | 7 | Q.   But the occurrence date listed here is September 5th, |
| 11:33 | 8 | 2002, right? |
| 11:33 | 9 | A.   Yes. |
| 11:33 | 10 | Q.   And the reported date that we have is listed as |
| 11:33 | 11 | September 9th, 2003? |
| 11:34 | 12 | A.   That's correct. |
| 11:34 | 13 | Q.   And the letter is referenced in an e-mail from Alan |
| 11:34 | 14 | Kaye -- from Richard DeAnda, the head of security, to Alan |
| 11:34 | 15 | Kaye.  It's completely missing any date whatsoever.  And |
| 11:34 | 16 | that's Exhibit 1194, right? |
| 11:34 | 17 | A.   I'm sorry.  I didn't follow the last part of your |
| 11:34 | 18 | question. |
| 11:34 | 19 | Q.   Well -- and it's referenced in the e-mail, 1194, from |
| 11:34 | 20 | Mr. DeAnda to Alan Kaye, that's completely missing any date |
| 11:34 | 21 | at all, right? |
| 11:34 | 22 | *(Document provided to the witness.)* |
| 11:34 | 23 | THE WITNESS:  I just -- I don't know where this |
| 11:34 | 24 | reference is that you're referring to. |
| 11:34 | 25 | THE COURT:  It's being shown on the screen. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:34 | 1 | THE WITNESS:  Okay.  I'm sorry. |
| 11:34 | 2 | THE COURT:  On the screen, they actually blocked |
| 11:34 | 3 | around the questioned date. |
| 11:34 | 4 | THE WITNESS:  So the incident report, 6678 -- |
| 11:34 | 5 | MS. KELLER:  So this -- |
| 11:35 | 6 | THE WITNESS:  -- references what? |
| 11:35 | 7 | BY MS. KELLER: |
| 11:35 | 8 | Q.   So this 6678 says there is an occurrence date of |
| 11:35 | 9 | September 5th, '02, and a reported date of 9/9/03.  But it's |
| 11:35 | 10 | talking about the anonymous letter that you received |
| 11:35 | 11 | August 5th, 2002, right? |
| 11:35 | 12 | A.   That's what's in the incident narrative, yes. |
| 11:35 | 13 | Q.   And then Mr. DeAnda, the head of security, is talking |
| 11:35 | 14 | about having received that letter; he's talking about that |
| 11:35 | 15 | in an e-mail, Exhibit 1194, that is somehow missing any date |
| 11:35 | 16 | whatsoever, correct? |
| 11:35 | 17 | A.   That, I don't know.  I don't know that these are |
| 11:35 | 18 | connected. |
| 11:35 | 19 | Q.   Well, let's look again at 1194. |
| 11:36 | 20 | A.   Okay. |
| 11:36 | 21 | Q.   "Alan, I've received your anonymous letter originally |
| 11:36 | 22 | sent to Bob Eckert regarding Carter Bryant and Bratz." |
| 11:36 | 23 | Did you get more than one anonymous letter about Carter |
| 11:36 | 24 | Bryant and Bratz? |
| 11:36 | 25 | A.   I don't believe so. |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

130

| | | |
|---|---|---|
| 11:36 | 1 | Q.   So you're the CEO of Mattel, you're suing MGA and |
| 11:36 | 2 | Mr. Larian, and you're asking for a billion dollars.  Can |
| 11:36 | 3 | you explain all these different dates and the missing date? |
| 11:36 | 4 | MR. QUINN:  It's argumentative, Your Honor. |
| 11:36 | 5 | Preamble is argumentative. |
| 11:36 | 6 | THE COURT:  Yeah.  Sustained. |
| | 7 | BY MS. KELLER: |
| 11:36 | 8 | Q.   Can you explain all these different dates and the |
| 11:36 | 9 | missing date? |
| 11:36 | 10 | MR. QUINN:  It's compound and vague and ambiguous. |
| 11:36 | 11 | THE COURT:  Overruled. |
| 11:36 | 12 | THE WITNESS:  Uh, there are different dates on |
| 11:36 | 13 | different documents.  And I can't explain the source of the |
| 11:36 | 14 | documents or the dates. |
| | 15 | BY MS. KELLER: |
| 11:37 | 16 | Q.   Now, lastly, I think you -- you said the other day that |
| 11:37 | 17 | you sued Carter Bryant because Mr. Bryant was disloyal to |
| 11:37 | 18 | Mattel, right? |
| 11:37 | 19 | A.   That's correct. |
| 11:37 | 20 | Q.   And you think he stole some intellectual property from |
| 11:37 | 21 | you, right? |
| 11:37 | 22 | A.   At the time we sued Carter Bryant, whatever he was |
| 11:37 | 23 | working on while he was a Mattel employee, if that was |
| 11:37 | 24 | intellectual property, yes. |
| 11:37 | 25 | Q.   And you felt very, very strongly about whatever it was |

| | | |
|---|---|---|
| 11:37 | 1 | that you thought Mr. Bryant had, or might have, or might be |
| 11:37 | 2 | discovered to have done, right?  Very strongly about it that |
| 11:37 | 3 | he was disloyal, true? |
| 11:37 | 4 | A.   Well, we certainly did when we discovered what he had |
| 11:37 | 5 | done, yes. |
| 11:37 | 6 | Q.   And you felt so strongly about it that you settled |
| 11:37 | 7 | Mr. Bryant's case with him essentially for nothing? |
| 11:38 | 8 | MR. QUINN:  This is argument, Your Honor. |
| 11:38 | 9 | THE COURT:  Overruled. |
| 11:38 | 10 | THE WITNESS:  We did settle our case with |
| 11:38 | 11 | Mr. Bryant. |
| | 12 | BY MS. KELLER: |
| 11:38 | 13 | Q.   And you felt so strongly about your case with |
| 11:38 | 14 | Mr. Bryant that you didn't even, as a condition of settling |
| 11:38 | 15 | it, get an admission of wrongdoing, did you? |
| 11:38 | 16 | MR. QUINN:  Again, Your Honor, it's argument.  The |
| 11:38 | 17 | preamble is argument. |
| 11:38 | 18 | THE COURT:  It's the preamble.  It's the "You felt |
| 11:38 | 19 | so strongly." |
| 11:38 | 20 | But you can ask the question.  It's a proper |
| 11:38 | 21 | question. |
| | 22 | BY MS. KELLER: |
| 11:38 | 23 | Q.   As a condition of settling the case with Mr. Bryant, |
| 11:38 | 24 | you did not even ask for an admission of wrongdoing from |
| 11:38 | 25 | him, correct? |

| | | |
|---|---|---|
| 11:38 | 1 | A.    I don't know what we asked for. |
| 11:38 | 2 | Q.    You didn't get one, correct? |
| 11:38 | 3 | A.    Correct. |
| 11:38 | 4 |         MS. KELLER:  Nothing further. |
| 11:38 | 5 |         MR. QUINN:  We'll need a minute to set up and move |
| 11:38 | 6 | boxes, Your Honor. |
| 11:38 | 7 |         MR. OVERLAND:  I have some questions. |
| 11:38 | 8 |         MR. QUINN:  Oh. |
| 11:38 | 9 |         MS. KELLER:  Your Honor, we are reserving that one |
| 11:38 | 10 | issue that we had discussed. |
| 11:38 | 11 |         THE COURT:  Certainly.  And there will be |
| 11:38 | 12 | recross-examination. |
| 11:38 | 13 |         Mr. Overland, on behalf of Mr. Machado. |
| 11:39 | 14 | **CROSS-EXAMINATION** |
| 11:39 | 15 | BY MR. OVERLAND: |
| 11:39 | 16 | Q.    Mr. Eckert, part of your job as CEO of Mattel is to |
| 11:39 | 17 | become aware of important or key events; is that right? |
| 11:39 | 18 | A.    Yes. |
| 11:39 | 19 | Q.    Key events that happen at Mattel worldwide, correct? |
| 11:39 | 20 | A.    Yes. |
| 11:39 | 21 | Q.    And part of your job is also to report on a regular |
| 11:39 | 22 | basis to the Board of Directors of Mattel about these |
| 11:39 | 23 | events, correct? |
| 11:39 | 24 | A.    That's correct. |
| 11:39 | 25 | Q.    And you do -- you do report to them about these events? |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

133

| | | |
|---|---|---|
| 11:39 | 1 | A.   I report to the Board of Directors events that I |
| 11:39 | 2 | consider worthy of their knowledge, yes. |
| 11:39 | 3 | Q.   Important events in the life of Mattel, right? |
| 11:40 | 4 | A.   No.  I -- I screen -- I screen information that is then |
| 11:40 | 5 | provided to the Board of Directors. |
| 11:40 | 6 | Q.   So you don't report everything that happens; you just |
| 11:40 | 7 | report events that you consider to be important and that the |
| 11:40 | 8 | Board should know about, right? |
| 11:40 | 9 | A.   That's correct. |
| 11:40 | 10 | Q.   And sometimes you report in writing to the Board about |
| 11:40 | 11 | these events, right? |
| 11:40 | 12 | A.   Yes. |
| 11:40 | 13 | Q.   Now, when you report to the Board about these events, |
| 11:40 | 14 | do you make sure that you know as much as possible about the |
| 11:40 | 15 | events that you're reporting to the Board? |
| 11:40 | 16 | A.   No.  I don't think I know as much as possible about a |
| 11:40 | 17 | lot of events at Mattel. |
| 11:40 | 18 | Q.   So when you report and they ask questions about some of |
| 11:40 | 19 | the events that you're reporting about, do you just tell 'em |
| 11:40 | 20 | you don't know? |
| 11:40 | 21 | A.   No.  If they ask questions, I go try and find the |
| 11:40 | 22 | answer. |
| 11:40 | 23 | Q.   But you want to make sure that when you're reporting, |
| 11:40 | 24 | that you're giving 'em enough information so that they're |
| 11:41 | 25 | aware of what these key or important events are? |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

134

| | | |
|---|---|---|
| 11:41 | 1 | A.   I'm providing them my perspective on what I consider to |
| 11:41 | 2 | be important events worthy of their knowledge. |
| 11:41 | 3 | Q.   And sufficient information to them so that they become |
| 11:41 | 4 | aware of what you're aware of, correct? |
| 11:41 | 5 | A.   No.  I don't provide them all of the information I'm |
| 11:41 | 6 | aware of. |
| 11:41 | 7 | Q.   And is there a reason for that? |
| 11:41 | 8 | A.   Uh, yes.  I work at Mattel every day, all day.  And I |
| 11:41 | 9 | am aware of many things that the Board of Directors, who -- |
| 11:41 | 10 | most of whom have other outside full jobs -- um, they |
| 11:41 | 11 | don't -- they don't have the access -- they don't have the |
| 11:41 | 12 | time or the responsibility to know all of the information |
| 11:41 | 13 | that I know. |
| 11:41 | 14 |         MR. OVERLAND:  I want you to take a look, sir, at |
| 11:42 | 15 | Exhibit 7523. |
| 11:42 | 16 |         (Document provided to the witness.) |
| 11:42 | 17 | BY MR. OVERLAND: |
| 11:42 | 18 | Q.   Have you taken a look at that? |
| 11:42 | 19 | A.   Oh, I'm sorry.  I haven't. |
| 11:42 | 20 | Q.   Okay.  Take a look at it.  See if you recognize that. |
| 11:42 | 21 | A.   I do. |
| 11:42 | 22 | Q.   And is that the November 1st, 2005 memo that you sent |
| 11:42 | 23 | to the members of the Board of Directors of Mattel |
| 11:42 | 24 | concerning key or important events? |
| 11:42 | 25 | A.   It's a summary of key activities at Mattel, yes. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

135

| 11:42 | 1 | Q.   Is that a memo of incidents or happenings at Mattel |
| 11:42 | 2 | that you consider to be important and that you thought that |
| 11:42 | 3 | the Board of Directors of Mattel should beware of? |
| 11:42 | 4 | A.   Yes. |
| 11:42 | 5 | MR. OVERLAND:  Your Honor, may Exhibit 7523 be |
| 11:42 | 6 | admitted? |
| 11:43 | 7 | THE COURT:  Received. |
| 11:43 | 8 | (Exhibit No. 7523 received in evidence.) |
| 11:43 | 9 | (Document displayed.) |
| 11:59 | 10 | BY MR. OVERLAND: |
| 11:43 | 11 | Q.   Taking a look at Exhibit 7523, sir, if you look at "MGA |
| 11:43 | 12 | Mexico" -- do you see that? |
| 11:43 | 13 | A.   I do. |
| 11:43 | 14 | MR. OVERLAND:  Can we blow that up? |
| 11:43 | 15 | (Technician complies.) |
| | 16 | BY MR. OVERLAND: |
| 11:43 | 17 | Q.   Now, that's a report that you're making to the Board of |
| 11:43 | 18 | Directors of Mattel concerning an event at MGA in Mexico, |
| 11:43 | 19 | correct? |
| 11:43 | 20 | A.   That's correct. |
| 11:43 | 21 | Q.   And you said there that, "Late last week, approximately |
| 11:43 | 22 | 30 federal police raided the Mexican offices of MGA, makers |
| 11:44 | 23 | of Bratz." |
| 11:44 | 24 | You see that? |
| 11:44 | 25 | A.   I do. |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

136

| | | |
|---|---|---|
| 11:44 | 1 | Q.   Now, when you give this information to the Board of |
| 11:44 | 2 | Directors, do you make sure that you're giving accurate |
| 11:44 | 3 | information? |
| 11:44 | 4 | A.   Well, I certainly try to. |
| 11:44 | 5 | Q.   And you certainly wouldn't want to give the Board |
| 11:44 | 6 | information that's inaccurate, correct? |
| 11:44 | 7 | A.   That's correct. |
| 11:44 | 8 | Q.   The Board expects you to give them accurate |
| 11:44 | 9 | information, right? |
| 11:44 | 10 | A.   Yes, it does. |
| 11:44 | 11 | Q.   And do you know more about this raid by 30 federal |
| 11:44 | 12 | police officers than you relayed to the Board of Directors? |
| 11:44 | 13 | A.   I know more about the topic, yes. |
| 11:44 | 14 | Q.   That's not my question. |
| 11:44 | 15 | A.   I'm sorry. |
| 11:44 | 16 | Q.   My question is, do you know more about the raid by the |
| 11:44 | 17 | 30 federal police officers than you related to the Board of |
| 11:44 | 18 | Directors? |
| 11:45 | 19 | A.   No, I don't -- I don't remember other details about the |
| 11:45 | 20 | raid. |
| 11:45 | 21 | Q.   Do you remember whether the 30 federal police officers |
| 11:45 | 22 | were armed? |
| 11:45 | 23 | A.   No, I don't. |
| 11:45 | 24 | Q.   Do you remember who sent the officers to the offices of |
| 11:45 | 25 | MGA? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

137

| | | |
|---|---|---|
| 11:45 | 1 | A.   No, I don't. |
| 11:45 | 2 | Q.   Was it Mattel? |
| 11:45 | 3 | A.   I don't know. |
| 11:45 | 4 | Q.   And then you say that, "This action was in response to |
| 11:45 | 5 | a 300-page criminal complaint filed by Mattel." |
| 11:45 | 6 | You see that? |
| 11:45 | 7 | A.   I do. |
| 11:45 | 8 | Q.   Now, do you know more about that sentence than I just |
| 11:45 | 9 | read than you relayed to the Board of Directors of Mattel? |
| 11:45 | 10 | A.   Yes. |
| 11:45 | 11 | Q.   You know -- do you know that Mattel hired lawyers in |
| 11:45 | 12 | Mexico to prepare that criminal complaint? |
| 11:45 | 13 | A.   Yes.  I believe that's the case. |
| 11:45 | 14 | Q.   And that would be the firm of Basham -- Basham and |
| 11:46 | 15 | Correa? |
| 11:46 | 16 | A.   No.  I don't know the name of the firm. |
| 11:46 | 17 | Q.   But you know that Mattel hired a law firm, right? |
| 11:46 | 18 | A.   Yes, I do. |
| 11:46 | 19 | Q.   And do you know whether this is a large law firm in |
| 11:46 | 20 | Mexico City? |
| 11:46 | 21 | A.   No, I don't. |
| 11:46 | 22 | Q.   Did you ever try to find out who these lawyers were |
| 11:46 | 23 | that Mattel hired to prepare this 300-page complaint? |
| 11:46 | 24 | A.   No, I do not. |
| 11:46 | 25 | Q.   Do you know how much you have paid these lawyers in |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

138

| | | |
|---|---|---|
| 11:46 | 1 | Mexico to prosecute this criminal case? |
| 11:46 | 2 | MR. QUINN:  This is irrelevant.  And the Court's |
| 11:46 | 3 | made rulings on this, Your Honor. |
| 11:46 | 4 | THE COURT:  Overruled. |
| 11:46 | 5 | THE WITNESS:  No, I don't. |
| | 6 | BY MR. OVERLAND: |
| 11:46 | 7 | Q.   Do you know whether it was more than a million dollars? |
| 11:46 | 8 | A.   I don't know how much it was. |
| 11:47 | 9 | MR. OVERLAND:  Your Honor, may Exhibit 6677 be |
| 11:47 | 10 | placed before the witness? |
| 11:47 | 11 | *(Document provided to the witness.)* |
| 11:47 | 12 | THE COURT:  It has been placed before the witness, |
| 11:47 | 13 | Counsel. |
| | 14 | BY MR. OVERLAND: |
| 11:47 | 15 | Q.   When I asked you before, sir, about the firm of Basham |
| 11:47 | 16 | and Correa, have you ever heard of the firm of Basham, |
| 11:47 | 17 | Ringe, R-I-N-G-E, and Correa? |
| 11:47 | 18 | A.   No, I have not. |
| 11:47 | 19 | Q.   Does anything, in terms of the numbers -- |
| 11:47 | 20 | MR. QUINN:  Your Honor, there's -- a ruling's been |
| 11:47 | 21 | made on this. |
| 11:47 | 22 | MR. OVERLAND:  I'm not asking it be admitted. |
| 11:47 | 23 | MR. QUINN:  Still -- |
| 11:47 | 24 | THE COURT:  Well, you can inquire, Counsel. |
| 11:47 | 25 | Just a moment. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:48 | 1 | He's going to ask you a question.  Okay? |
| | 2 | BY MR. OVERLAND: |
| 11:48 | 3 | Q.   Does anything in terms of the numbers or the entries in |
| 11:48 | 4 | that exhibit call anything to mind that you may not remember |
| 11:48 | 5 | about any amounts paid or any -- anybody that you hired in |
| 11:48 | 6 | Mexico to prosecute this criminal case? |
| 11:48 | 7 | A.   No.  I have no idea what this is. |
| 11:48 | 8 | Q.   Okay.  You can put it aside, sir. |
| 11:48 | 9 | MR. OVERLAND:  Let's get back to Exhibit 7523, |
| 11:48 | 10 | please. |
| 11:48 | 11 | THE WITNESS:  I have it. |
| 11:48 | 12 | (Document displayed.) |
| | 13 | BY MR. OVERLAND: |
| 11:49 | 14 | Q.   Now, in this report that you made to the Board, you |
| 11:49 | 15 | said to them that the criminal complaint -- the 300-page |
| 11:49 | 16 | criminal complaint, which was filed by Mattel, accuses |
| 11:49 | 17 | several MGA managers who previously worked for Mattel Mexico |
| 11:49 | 18 | of misappropriating trade secrets; is that right? |
| 11:49 | 19 | A.   Uh, I would use the word "alleging," but that's |
| 11:49 | 20 | correct. |
| 11:49 | 21 | Q.   I'm sorry?  What did you say? |
| 11:49 | 22 | A.   You said "accusing," and I just changed it to |
| 11:49 | 23 | "alleging." |
| 11:49 | 24 | Q.   I'm sorry? |
| 11:49 | 25 | A.   I think it's the same meaning. |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

140

| | | |
|---|---|---|
| 11:49 | 1 | Q. I'm sorry. |
| 11:49 | 2 | A. I'm sorry. |
| 11:49 | 3 | Q. Well, we're both sorry, then. |
| 11:49 | 4 | A. Okay. |
| 11:49 | 5 | *(Laughter in the courtroom.)* |
| 11:49 | 6 | Q. Do you know whether any Mattel employees in Mexico |
| 11:49 | 7 | assisted in the appropriation of this 300-page criminal |
| 11:50 | 8 | complaint? |
| 11:50 | 9 | A. No, I don't. |
| 11:50 | 10 | Q. Do you know who had communications with the attorneys |
| 11:50 | 11 | in Mexico who prepared the criminal complaint? |
| 11:50 | 12 | A. No, I don't. |
| 11:50 | 13 | Q. Now, Mattel filed its criminal complaint, Mr. Eckert, |
| 11:50 | 14 | because it -- Mattel thought it was important to prosecute |
| 11:50 | 15 | these three individuals, correct? |
| 11:50 | 16 | A. Uh, yes. |
| 11:51 | 17 | Q. And it was important to prosecute them because, among |
| 11:51 | 18 | other things, you wanted to send a message to other Mattel |
| 11:51 | 19 | employees that, if, in fact, they had done what they did, |
| 11:51 | 20 | they couldn't get away with it, correct? |
| 11:51 | 21 | A. Um, yes. |
| 11:51 | 22 | Q. And that they would be prosecuted, not just civilly, |
| 11:51 | 23 | but criminally in Mexico for doing it, correct? |
| 11:51 | 24 | A. No. I don't know if we were making -- if I was making |
| 11:51 | 25 | a specific communication to employees in Mexico. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

141

| | | |
|---|---|---|
| 11:51 | 1 | But certainly, if an employee steals from Mattel |
| 11:51 | 2 | important property, which is what this case is about, we are |
| 11:51 | 3 | gonna do everything we can within our rights to prosecute |
| 11:51 | 4 | that. |
| 11:51 | 5 | Q.   Including a criminal prosecution? |
| 11:51 | 6 | A.   Absolutely. |
| 11:51 | 7 | Q.   Correct? |
| 11:51 | 8 | A.   Yeah, that's correct. |
| 11:51 | 9 | Q.   And it's very important for Mattel to do that to send |
| 11:51 | 10 | that message, right? |
| 11:51 | 11 | A.   It's very important for Mattel to do everything we can |
| 11:51 | 12 | to prevent people stealing our property. |
| 11:52 | 13 | Q.   Right. |
| 11:52 | 14 | A.   Yes. |
| 11:52 | 15 | Q.   And part of that is filing a criminal prosecution so |
| 11:52 | 16 | that employees know that this is very important to Mattel, |
| 11:52 | 17 | correct? |
| 11:52 | 18 | A.   Theft is a big deal. |
| 11:52 | 19 | Q.   Now, one of three employees that were accused of |
| 11:52 | 20 | copying or taking documents from Mattel in Mexico was Pablo |
| 11:52 | 21 | Vargas, right? |
| 11:52 | 22 | A.   That's correct. |
| 11:52 | 23 | Q.   And you've been asked a couple of questions about |
| 11:52 | 24 | Mr. Vargas. |
| 11:52 | 25 | Now, Mr. Vargas is no longer being prosecuted in |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 142 of 160   Page ID #:306813
CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

142

| | | |
|---|---|---|
| 11:52 | 1 | Mexico, correct? |
| 11:52 | 2 | A.   Correct. |
| 11:52 | 3 | Q.   And that's because Mattel entered into an agreement |
| 11:52 | 4 | with Mr. Vargas on May 28th, 2010, by which Mattel agreed to |
| 11:52 | 5 | give him a pardon, correct? |
| 11:53 | 6 | A.   Yes. |
| 11:53 | 7 | Q.   Now, that was almost five years after Mattel initiated |
| 11:53 | 8 | the prosecution in Mexico, correct? |
| 11:53 | 9 | A.   Yes. |
| 11:53 | 10 | Q.   Now, do you know how many different statements |
| 11:53 | 11 | Mr. Vargas had given between 2005, when Mattel initiated the |
| 11:53 | 12 | prosecution, and 2010, when he finally gave a statement to |
| 11:53 | 13 | Mattel that was acceptable to Mattel? |
| 11:53 | 14 | A.   No, I don't. |
| 11:53 | 15 | Q.   More than ten? |
| 11:53 | 16 | A.   I don't know. |
| 11:53 | 17 | Q.   And under Mexican law, you're aware, sir, that the |
| 11:53 | 18 | giving of a pardon is a dismissal of the case, correct? |
| 11:53 | 19 | A.   I'm not a lawyer.  I'm not a Mexican lawyer.  But |
| 11:54 | 20 | that's consistent with my understanding of the law. |
| 11:54 | 21 | Q.   I'm just asking for what your understanding is. |
| 11:54 | 22 | A.   That would be -- that's consistent with my |
| 11:54 | 23 | understanding. |
| 11:54 | 24 | Q.   So a pardon is a same effect as a dismissal of all |
| 11:54 | 25 | charges:  You can walk out. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

143

| 11:54 | 1 | A.   Uh. |
|---|---|---|

11:54   1   A.   Uh.

11:54   2   Q.   No harm, no foul, right?

11:54   3   A.   I don't know if I would conclude that.  But I associate

11:54   4   it with a dismissal of charges that we would talk about in

11:54   5   the United States.

11:54   6   Q.   And were you trying to send another message to the

11:54   7   employees that they could get a pardon and a dismissal of

11:54   8   charges, even though you filed a criminal case?

11:54   9   A.   Well, I -- I'm sure there are many criminal cases filed

11:54   10   that don't ultimately result in a trial or a conviction.

11:54   11   Q.   I'm sure there are.  But my question is, what message

11:54   12   were you trying to send when you agreed to give Mr. Vargas a

11:54   13   pardon in his criminal case?

11:55   14   A.   I don't think we were -- I don't think I was trying to

11:55   15   send any message.

11:55   16   Q.   So the message was only in terms of the filing of

11:55   17   charges; is that right?

11:55   18   A.   No.

11:55   19   Q.   Well, was there any kind of message that you wanted to

11:55   20   send to employees in granting a pardon to Mr. Vargas?

11:55   21   A.   No.

11:56   22   Q.   Now, Mr. Eckert, does Mattel investigate all of its

11:56   23   employees who leave and go to work for another firm --

11:56   24   A.   No, I don't --

11:56   25   Q.   -- for another company?  I'm sorry.

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

144

| 11:56 | 1 | A.    No, I don't believe so. |
|---|---|---|
| 11:56 | 2 | Q.    Does Mattel investigate all of its employees who leave |
| 11:56 | 3 | and go to work for a competitor? |
| 11:56 | 4 | A.    I don't know.  Certainly, with a time lapse, I'm sure |
| 11:56 | 5 | the answer is no. |
| 11:56 | 6 | Q.    I don't know what you mean by that. |
| 11:56 | 7 | A.    Well, somebody could work for Mattel, and ten years |
| 11:56 | 8 | later go to work at Hasbro, and I'm sure we probably don't |
| 11:56 | 9 | even know about it. |
| 11:56 | 10 | Q.    Okay.  Well, let's say somebody leaves Mattel in Mexico |
| 11:56 | 11 | and within days goes to work for MGA.  Does that cause you |
| 11:56 | 12 | to investigate that individual? |
| 11:56 | 13 | A.    It would cause me to, yes. |
| 11:57 | 14 | Q.    And does Mattel investigate all of its employees that |
| 11:57 | 15 | it knows are going to work for a competitor after leaving |
| 11:57 | 16 | Mattel? |
| 11:57 | 17 | A.    No.  I don't believe -- I don't think it does. |
| 11:57 | 18 | Q.    So that you only select, if you do investigate -- do |
| 11:57 | 19 | you do investigations of individuals who leave Mattel and go |
| 11:57 | 20 | to work for a competitor? |
| 11:57 | 21 | A.    I know at times we do. |
| 11:57 | 22 | Q.    And when you do this, who does the investigations? |
| 11:57 | 23 | A.    I don't know who -- the specific person who does that. |
| 11:57 | 24 | MR. OVERLAND:  Okay.  Your Honor, would this be a |
| 11:57 | 25 | good time to break? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:57 | 1 | THE COURT:  Apparently this would be a good time. |
| 11:57 | 2 | MR. OVERLAND:  Thank you. |
| 11:57 | 3 | THE COURT:  (To the jury:) You're admonished not |
| 11:57 | 4 | to discuss this matter amongst yourselves nor form or |
| 11:57 | 5 | express any opinion concerning the case.  Have a nice lunch. |
| 11:57 | 6 | We'll see you at 1:00 o'clock. |
| 11:57 | 7 | Counsel, if you would remain in session. |
| 11:58 | 8 | *(Jury recesses for lunch at 11:58 a.m.)* |
| 11:58 | 9 | THE COURT:  Sir, if you would step down, please. |
| 11:58 | 10 | *(Outside the presence of the jury.)* |
| 11:58 | 11 | THE COURT:  Counsel, we'll remain in session. |
| 11:58 | 12 | The jury's no longer present. |
| 11:58 | 13 | I'd like to see those articles that I asked MGA to |
| 11:58 | 14 | gather. |
| 11:58 | 15 | *(Documents provided to the Court.)* |
| 11:58 | 16 | THE COURT:  I've been handed a telephone book. |
| 11:58 | 17 | MS. KELLER:  That's the Congressional hearings, |
| 11:58 | 18 | Your Honor. |
| 11:58 | 19 | THE COURT:  Thank you.  I'm interested in the news |
| 11:58 | 20 | generated in the *Wall Street Journal*, MSNBC or CNN. |
| 11:58 | 21 | MS. HURST:  Yes.  I handed the Court an article |
| 11:58 | 22 | from the *Wall street Journal* dated September 4, 2007. |
| 11:58 | 23 | THE COURT:  All right.  Just a moment. |
| 11:58 | 24 | In the fourth paragraph -- or fifth paragraph, I'm |
| 11:58 | 25 | sorry -- it reads -- well, let's just read the first |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

146

| | | |
|---|---|---|
| 11:59 | 1 | portion.  I'm going down to the third paragraph so that the |
| 11:59 | 2 | reviewing Court has the courtesy of knowing what this |
| 11:59 | 3 | Court's referring to.  It's an exhibit marked 7513. |
| 11:59 | 4 | "Mattel, in at least three major cases since late |
| 11:59 | 5 | 1990's, including last month's recall of nearly 8 million |
| 11:59 | 6 | play sets studded with potentially dangerous magnets, took |
| 12:00 | 7 | months to gather information in two of the cases.  It |
| 12:00 | 8 | collected scores of complaints for months before disclosing |
| 12:00 | 9 | them to the agency." |
| 12:00 | 10 | This apparently was the Consumer Products Safety |
| 12:00 | 11 | Commission. |
| 12:00 | 12 | "At times Mattel officials have considered |
| 12:00 | 13 | possible remedies for defects before making an initial |
| 12:00 | 14 | report to the agency disclosing safety concerns.  Mattel |
| 12:00 | 15 | Chairman and Chief Executive Robert Eckert said in an |
| 12:00 | 16 | interview that the company discloses problems on its own |
| 12:00 | 17 | timetable because it believes both the law and the |
| 12:00 | 18 | Commissions enforcement practices are unreasonable.  Mattel |
| 12:00 | 19 | said it should be able to evaluate hazards internally before |
| 12:00 | 20 | alerting any outsiders regardless of what the law says. |
| 12:00 | 21 | "'By mandating that companies immediately report |
| 12:00 | 22 | any incident that could conceivably expose a hazard, the |
| 12:00 | 23 | Commission's standard might apply to almost anything,' |
| 12:00 | 24 | Mr. Eckert said.  'It's very easy for anyone to apply the |
| 12:01 | 25 | word 'could' backward, he added." |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:01 | 1 | "The CPSC doesn't agree. 'It's a statute. It's |
| 12:01 | 2 | clear,' said Julie Vallese, the Commission's spokeswoman, |
| 12:01 | 3 | referring to the 24-hour rule. Yet enforcing such rules |
| 12:01 | 4 | poses a challenge for the small agency, which has limited |
| 12:01 | 5 | resources and is only authorized to impose fines of less |
| 12:01 | 6 | than $2 million against companies that Ms. Vallese says," |
| 12:01 | 7 | quote, "'Think they can get away with delaying reporting." |
| 12:02 | 8 | "Since 2001, the agency has twice fined the |
| 12:02 | 9 | world's largest toymaker for knowingly withholding |
| 12:02 | 10 | information regarding problems that created an unreasonable |
| 12:02 | 11 | risk of serious injury or death. Mattel settled the cases, |
| 12:02 | 12 | denying any wrongdoing or that the recalled toys had a |
| 12:02 | 13 | defect. |
| 12:02 | 14 | "Now, the Commission is investigating the |
| 12:02 | 15 | timeliness of the company's disclosures before its most |
| 12:02 | 16 | recent recall. At the same time, internal CPSC documents |
| 12:02 | 17 | raise questions about whether Mattel has passed along |
| 12:02 | 18 | information to regulators about possible recurring |
| 12:02 | 19 | electrical problems with a recall the toy company has |
| 12:02 | 20 | declared fixed. |
| 12:02 | 21 | "The clash raises questions about federal safety |
| 12:02 | 22 | standards and enforcement power of the nation's consumer |
| 12:02 | 23 | safety agency. With one of its three commission seats |
| 12:02 | 24 | vacant since late last year due to standoff between Congress |
| 12:02 | 25 | and the White House, the CPSC has been hobbled in ordering |

| | | |
|---|---|---|
| 12:03 | 1 | recalls, levying fines, and updating safety rules.  In |
| 12:03 | 2 | addition to toymakers, it has come under fire in recent |
| 12:03 | 3 | months for being too timid in dealing with other industries |
| 12:03 | 4 | that make roughly 15,000 products under its purview. |
| 12:03 | 5 | "Senate Majority Whip Dick Durbin, the Illinois |
| 12:03 | 6 | Democrat who heads the subcommittee that oversees the |
| 12:03 | 7 | agency's funding, calls the CPSC a toothless tiger with an |
| 12:03 | 8 | inability to find offenders and change conduct." |
| 12:03 | 9 | Did the Congressional investigation and the |
| 12:03 | 10 | Congressional hearings that Mr. Eckert testified at occur |
| 12:03 | 11 | after September 4th, 2007, which is this *Wall Street Journal* |
| 12:03 | 12 | article? |
| 12:03 | 13 | MS. HURST:  Yes, sir, Your Honor. |
| 12:03 | 14 | THE COURT:  All right. |
| 12:03 | 15 | Now, how long after were the Congressional |
| 12:03 | 16 | hearings in which Mr. Eckert was placed before Congress? |
| 12:03 | 17 | MS. HURST:  Your Honor, Mr. Eckert testified on |
| 12:04 | 18 | September 12th, and eight days later.  And on page 132 of |
| 12:04 | 19 | the transcript that I handed up to the Court, he was |
| 12:04 | 20 | specifically asked by Senator Durbin what he believed his |
| 12:04 | 21 | reporting obligation was. |
| 12:04 | 22 | THE COURT:  (Reading:) |
| 12:04 | 23 | "SENATOR DURBIN:  Following up on that, |
| 12:04 | 24 | Mr. Eckert, one of the questions that was raised is your |
| 12:04 | 25 | requirement as a toy manufacturer to report defective |

| | | |
|---|---|---|
| 12:04 | 1 | products or dangerous products.  And so what do you |
| 12:04 | 2 | understand your corporate obligation to be, under the law or |
| 12:04 | 3 | otherwise, to notify either the Consumer Product Safety |
| 12:04 | 4 | Commission about the dangers that you found of a product |
| 12:04 | 5 | that you're selling, or to take other action?" |
| 12:04 | 6 | And then Mr. Eckert goes on with the answer that's |
| 12:04 | 7 | apparently reported or summarized in the *Wall Street* |
| 12:04 | 8 | *Journal*. |
| 12:04 | 9 | Now, let me ask these following questions: |
| 12:04 | 10 | I've allowed, so far, before this jury, the lead |
| 12:05 | 11 | issues pertaining to Mattel, the hazardous paint issues |
| 12:05 | 12 | pertaining to Mattel, the Congressional and Senatorial |
| 12:05 | 13 | investigation pertaining to Mattel.  All of those, |
| 12:05 | 14 | apparently, received notoriety and, in fact, nationwide |
| 12:05 | 15 | notoriety from CNN to -- MSNBC?  *Wall Street Journal*? |
| 12:05 | 16 | MS. KELLER:  I don't know if it was MSNBC, but it |
| 12:05 | 17 | was CNBC, I know. |
| 12:05 | 18 | THE COURT:  CN -- |
| 12:05 | 19 | MS. KELLER:  Both, apparently. |
| 12:05 | 20 | THE COURT:  Sounds like every major news agency in |
| 12:05 | 21 | the country, at least by default, covered this. |
| 12:05 | 22 | My question's this:  I tentatively am holding to |
| 12:05 | 23 | my ruling that the specifics that you started to get into |
| 12:05 | 24 | concerning some French manufacturer are irrelevant.  It's |
| 12:05 | 25 | the -- it's the generation of the notoriety to the public |

| | | |
|---|---|---|
| 12:06 | 1 | that is appropriate. |
| 12:06 | 2 | And what I don't want to see, though, is a line of |
| 12:06 | 3 | questioning that goes this way -- no surprises on your part: |
| 12:06 | 4 | "Mr. Eckert was accused in a headline or accused |
| 12:06 | 5 | of delaying information to Congress?" |
| 12:06 | 6 | First of all, I don't see that in this article. |
| 12:06 | 7 | So I'm having trouble if that kind of question is asked.  It |
| 12:06 | 8 | might be that Mattel -- or there's, you know, a delay in |
| 12:06 | 9 | reporting that's reported, but it has to have some -- some |
| 12:06 | 10 | gravamen, some notoriety to it. |
| 12:06 | 11 | MS. KELLER:  Your Honor, it wasn't a question of a |
| 12:06 | 12 | delay in reporting to Congress. |
| 12:07 | 13 | THE COURT:  No, to the agency, to CPSC. |
| 12:07 | 14 | MS. KELLER:  And -- and -- |
| 12:07 | 15 | THE COURT:  And, by the way, this is the famous |
| 12:07 | 16 | incident when Congresswoman Pelosi apparently made the |
| 12:07 | 17 | accusation against President Bush's administration at the |
| 12:07 | 18 | time of being too cozy, for want of a better word, with the |
| 12:07 | 19 | American manufacturing industry.  And there was widespread |
| 12:07 | 20 | criticism throughout the country by, then, the Democratic |
| 12:07 | 21 | Congress in power, if I recall correctly, criticizing the |
| 12:07 | 22 | Republican administration and their lack of agency |
| 12:07 | 23 | safeguards. |
| 12:07 | 24 | MS. KELLER:  They were specifically criticizing |
| 12:07 | 25 | President Bush's appointee, the head of the CPSC, and I |

CV 04-9049 DOC - 3/7/2011 - Day 27, Volume 1 of 4

151

| 12:07 | 1 | wasn't gonna ask any of that. |
| 12:07 | 2 | THE COURT:  Okay.  So we can take that off the |
| 12:07 | 3 | table. |
| 12:07 | 4 | I want to hear the question you're gonna ask or |
| 12:08 | 5 | possibly ask. |
| 12:08 | 6 | MS. KELLER:  The question I had attempted to |
| 12:08 | 7 | ask -- |
| 12:08 | 8 | THE COURT:  Why don't you write that down so we |
| 12:08 | 9 | don't have any problems. |
| 12:08 | 10 | MS. KELLER:  -- was, "And isn't it true, |
| 12:08 | 11 | Mr. Eckert, that there was a tremendous amount of bad |
| 12:08 | 12 | publicity, not just over the recalls themselves, but over |
| 12:08 | 13 | Mattel's delay in reporting the problems with these toys to |
| 12:08 | 14 | the Consumer Products Safety Commission?" |
| 12:08 | 15 | THE COURT:  Now, then it's not a personal attack |
| 12:08 | 16 | on Mr. Eckert. |
| 12:08 | 17 | MS. KELLER:  No. |
| 12:08 | 18 | THE COURT:  What I don't want is the question, |
| 12:08 | 19 | "When did you last stop beating your wife? -- or "your |
| 12:08 | 20 | husband?"  So we're gender neutral. |
| 12:08 | 21 | MS. KELLER:  I could care less about Mr. Eckert. |
| 12:08 | 22 | I care about Mattel's earnings and what drove their earnings |
| 12:08 | 23 | down. |
| 12:08 | 24 | THE COURT:  So you've got paint.  You've got the |
| 12:08 | 25 | Congressional investigations.  You've got the lead. |

| | | |
|---|---|---|
| 12:08 | 1 | Okay.  Let me hear from Mr. Quinn. |
| 12:08 | 2 | MR. QUINN:  Your Honor, let's first take a step |
| 12:08 | 3 | back. |
| 12:08 | 4 | We're in 2007.  Let's remind ourselves the reason |
| 12:08 | 5 | we're talking about lead paint and magnets and things -- |
| 12:08 | 6 | because the claim is that it would adversely affect Mattel's |
| 12:09 | 7 | sales, and therefore its damages.  The Court knows, from |
| 12:09 | 8 | having spent a lot of time with Mr. Wagner, that, by 2007, |
| 12:09 | 9 | the lost profits numbers are really tapering down.  Bratz is |
| 12:09 | 10 | not the factor that it was in the marketplace. |
| 12:09 | 11 | So in terms of the delta that we're talking about, |
| 12:09 | 12 | this is pretty late in the game.  Mattel -- Bratz, our view |
| 12:09 | 13 | of the world, has already caused almost all the damage that |
| 12:09 | 14 | we're claiming. |
| 12:09 | 15 | They've been able to get into lead paint.  That's |
| 12:09 | 16 | all out there.  They've been able to get into magnets. |
| 12:09 | 17 | That's all out there, even though this is 2007. |
| 12:09 | 18 | Now, to get in, in addition to this additional |
| 12:09 | 19 | issue about whether Mattel delayed improperly, I really |
| 12:09 | 20 | think opens the door -- we're then having the -- this is the |
| 12:09 | 21 | tail that wags the dog. |
| 12:09 | 22 | They've given us one article.  I mean, this is |
| 12:09 | 23 | all -- supposedly, it affects public perception, and then it |
| 12:10 | 24 | affects our sales.  They've got one article. |
| 12:10 | 25 | Your Honor, if we go down this road -- i Mean, the |

| | | |
|---|---|---|
| 12:10 | 1 | Consumer Products Safety Commission looked into this.  No |
| 12:10 | 2 | fine.  No charges.  No allegations on late reporting. |
| 12:10 | 3 | If you get into this, it's a highly technical area |
| 12:10 | 4 | as to at what time you're obligated to report. |
| 12:10 | 5 | THE COURT:  Will we have senators in here and |
| 12:10 | 6 | Congressmen, Counsel -- |
| 12:10 | 7 | MR. QUINN:  Yeah -- |
| 12:10 | 8 | THE COURT:  -- and all that drama? |
| 12:10 | 9 | MR. QUINN:  -- well, in some ways that might -- |
| 12:10 | 10 | that might be fun.  But I think at this point -- |
| 12:10 | 11 | THE COURT:  I'm joking with you. |
| 12:10 | 12 | MR. QUINN:  I mean, at this point, Your Honor, |
| 12:10 | 13 | they've got a lot of, you know, negative publicity that's |
| 12:10 | 14 | been displayed for the jury. |
| 12:10 | 15 | To also let this in, which is based on one |
| 12:10 | 16 | article -- it's a whole new issue, which, then, frankly, we |
| 12:10 | 17 | have to do battle with.  The idea that we were callus and, |
| 12:10 | 18 | you know, delayed in complying with our legal obligations, |
| 12:10 | 19 | when, by the way, you know, the regulatory agency |
| 12:11 | 20 | responsible for this didn't reach any such conclusion at |
| 12:11 | 21 | all, is not something that we could simply ignore. |
| 12:11 | 22 | We then have to chase that in this courtroom.  And |
| 12:11 | 23 | I think the probative value is completely outweighed by the |
| 12:11 | 24 | prejudicial effect. |
| 12:11 | 25 | THE COURT:  All right.  First of all, we shouldn't |

154

| | | |
|---|---|---|
| 12:11 | 1 | be getting into the merits of whether this is true or not. |
| 12:11 | 2 | It's only the notoriety that's generated that's relevant to |
| 12:11 | 3 | Mattel's revenue, their stock, this lost profits issue, |
| 12:11 | 4 | because you're requesting a billion dollars.  They've got |
| 12:11 | 5 | the right to offset that, in some sense. |
| 12:11 | 6 | I'd like to see any more articles you've got, |
| 12:11 | 7 | though. |
| 12:11 | 8 | MS. KELLER:  We'll try to dig some up over the |
| 12:11 | 9 | noon hour, Your Honor.  But this was the front page of the |
| 12:11 | 10 | *Wall Street Journal.* |
| 12:11 | 11 | THE COURT:  Is that a big paper? |
| 12:11 | 12 | MS. KELLER:  It was repeated -- |
| 12:11 | 13 | THE COURT:  All right. |
| 12:11 | 14 | MS. KELLER:  -- in many, many publications.  And |
| 12:11 | 15 | just on my little BlackBerry, I think I got a couple dozen. |
| 12:11 | 16 | THE COURT:  Great. |
| 12:11 | 17 | MS. KELLER:  This was picked up -- this was big |
| 12:11 | 18 | news. |
| 12:11 | 19 | THE COURT:  I'd just like to see a little bit more |
| 12:12 | 20 | generation. |
| 12:12 | 21 | I know that the case and the recall got massive |
| 12:12 | 22 | publicity.  I know that Congress convened, literally.  I |
| 12:12 | 23 | know that 20,000, you know, products were recalled. |
| 12:12 | 24 | The testimony has been relevant concerning the |
| 12:12 | 25 | difficulty between China and the United States and the |

| | | |
|---|---|---|
| 12:12 | 1 | accusations that flew back and forth at that time.  That did |
| 12:12 | 2 | cause a lot of headlines and did cause some tremendous |
| 12:12 | 3 | difficulty between the State Department, our Executive |
| 12:12 | 4 | Branch, and the Chinese government at that time. |
| 12:12 | 5 | But it's the impact of that, the notoriety of that |
| 12:12 | 6 | that's relevant. |
| 12:12 | 7 | MS. KELLER:  Yes. |
| 12:12 | 8 | THE COURT:  It's not, you know, one paragraph and, |
| 12:12 | 9 | quote/unquote, not even a headline. |
| 12:12 | 10 | If I see a headline that says "delay," or I have a |
| 12:12 | 11 | compilation of papers that then rises to the notoriety, |
| 12:12 | 12 | minimally, I'll probably let you ask a rather innocuous |
| 12:13 | 13 | question about delay being another factor.  But I want to |
| 12:13 | 14 | see more press on this. |
| 12:13 | 15 | MS. KELLER:  Your Honor -- |
| 12:13 | 16 | MR. QUINN:  Your Honor -- |
| 12:13 | 17 | THE COURT:  No, no.  Did you notice I'm just |
| 12:13 | 18 | speaking to one person? |
| 12:13 | 19 | I'll come back to you, Mr. Quinn, I promise you. |
| 12:13 | 20 | We've got all lunch hour. |
| 12:13 | 21 | Gather those for me.  I don't think it's |
| 12:13 | 22 | sufficient yet.  Okay? |
| 12:13 | 23 | MS. KELLER:  Okay. |
| 12:13 | 24 | THE COURT:  Okay.  And then we'll have another |
| 12:13 | 25 | round of discussion.  But it's premature right now, and |

| | | |
|---|---|---|
| 12:13 | 1 | right now you're precluded from it.  Right now I'm not |
| 12:13 | 2 | satisfied with the *Wall Street Journal* and the fifth |
| 12:13 | 3 | paragraph. |
| 12:13 | 4 | MS. KELLER:  Well, no.  The whole story is about |
| 12:13 | 5 | it, Your Honor. |
| 12:13 | 6 | THE COURT:  No.  No, it's not. |
| 12:13 | 7 | It's about delay, but it's really about the |
| 12:13 | 8 | functioning, quite frankly, and the inability of the CPSC to |
| 12:13 | 9 | regulate.  And really it's a fight between the |
| 12:13 | 10 | Administration, which is Republican, and a Democratic |
| 12:13 | 11 | Congress. |
| 12:13 | 12 | I mean, this story is generated, and Mattel is the |
| 12:13 | 13 | middle of this dispute.  And certainly, they're the |
| 12:14 | 14 | headliner in this dispute but it goes much beyond that. |
| 12:14 | 15 | Well, it was also the CPSC saying, "This is a |
| 12:14 | 16 | statute.  They've gotta report within 24 hours," and |
| 12:14 | 17 | Mr. Eckert saying, "No, we don't." |
| 12:14 | 18 | I'll never let you get into that, Counsel. |
| 12:14 | 19 | MS. KELLER:  Okay. |
| 12:14 | 20 | THE COURT:  The best you're going to hope for from |
| 12:14 | 21 | this Court is going to be that, "Mr. Eckert, were you also |
| 12:14 | 22 | criticized, or was Mattel also criticized for delay in |
| 12:14 | 23 | reporting?" |
| 12:14 | 24 | But I have to see enough generation to believe |
| 12:14 | 25 | that this affected the stock.  That this was widely enough |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 157 of 160   Page ID #:306828
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

157

| | | |
|---|---|---|
| 12:14 | 1 | known.  Certainly, the paint recall was.  Certainly the lead |
| 12:14 | 2 | product was.  Certainly the Congressional investigations |
| 12:14 | 3 | were.  But I haven't seen that yet. |
| 12:14 | 4 | So, right now you're precluded. |
| 12:14 | 5 | MS. KELLER:  We'll look for some more, Your Honor. |
| 12:14 | 6 | THE COURT:  Okay. |
| 12:14 | 7 | MS. KELLER:  And just so our position -- |
| 12:14 | 8 | THE COURT:  Well, if you've got a BlackBerry and |
| 12:14 | 9 | you pulled up six, pull up twenty. |
| 12:14 | 10 | MS. KELLER:  We can print some out for you. |
| 12:14 | 11 | THE COURT:  Thank you. |
| 12:14 | 12 | Now, Mr. Quinn, I know you want to speak. |
| 12:14 | 13 | Now, they're not speaking.  Mr. Quinn is speaking. |
| 12:14 | 14 | MR. QUINN:  I just wanted to say one other thing, |
| 12:14 | 15 | Your Honor. |
| 12:14 | 16 | Mr. Eckert -- just to give the Court a clue of the |
| 12:14 | 17 | road we would be going down, Mr. Eckert is quoted in this |
| 12:14 | 18 | article.  He disputes that he said the things that he's |
| 12:15 | 19 | quoted as saying.  And he then wrote an op-ed piece in |
| 12:15 | 20 | either the *New York Times* or the *Wall Street Journal* |
| 12:15 | 21 | responding to this and -- |
| 12:15 | 22 | THE COURT:  Yeah. |
| 12:15 | 23 | MR. QUINN:  So there's two sides here about -- in |
| 12:15 | 24 | terms of what was said in an interview. |
| 12:15 | 25 | THE COURT:  I kind of feel like I'm the caretaker |

Case 2:04-cv-09049-DOC-RNB   Document 10138   Filed 03/07/11   Page 158 of 160   Page ID #:306829
CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

158

| | | |
|---|---|---|
| 12:15 | 1 | of the cemetery, and nobody's listening. |
| 12:15 | 2 | So the end result is, Mr. Quinn, right now, you're |
| 12:15 | 3 | prevailing on this.  But you're going to go out and you're |
| 12:15 | 4 | going to also help generate and see what these articles are. |
| 12:15 | 5 | Because it's not just the notoriety, it's what's being said. |
| 12:15 | 6 | Right now, I'm not finding a sufficient foundation |
| 12:15 | 7 | that the public was affected on the one *Wall Street* article |
| 12:15 | 8 | that was presented to the Court.  Now, later on it may be. |
| 12:15 | 9 | But I'm never going to allow either party to get |
| 12:15 | 10 | into the machinations between a Democratic house and a |
| 12:15 | 11 | Republican president.  We're not going to have Senators and |
| 12:15 | 12 | Congresspeople coming in here.  And I'm not going to get |
| 12:16 | 13 | into Eckert's specific quotes. |
| 12:16 | 14 | MS. KELLER:  Your Honor -- |
| 12:16 | 15 | THE COURT:  Now, hold on. |
| 12:16 | 16 | MS. KELLER:  -- you may have noticed, I didn't ask |
| 12:16 | 17 | him -- |
| 12:16 | 18 | THE COURT:  I know.  But Mr. Quinn is rising to |
| 12:16 | 19 | the occasion of trying to stop you by presenting a parade of |
| 12:16 | 20 | horribles. |
| 12:16 | 21 | MS. KELLER:  That wasn't where I was going. |
| 12:16 | 22 | THE COURT:  Now, we should all finally walk over |
| 12:16 | 23 | and touch Mr. Machado. |
| 12:16 | 24 | Mr. Machado, welcome.  You're here with us in |
| 12:16 | 25 | spirit and in presence.  It a pleasure to have you here, |

CV 04-9049 DOC - 3/3/2011 - Day 27, Volume 1 of 4

159

| Time | Line | |
|---|---|---|
| 12:16 | 1 | sir. |
| 12:16 | 2 | MR. MACHADO:  Thank you, Your Honor. |
| 12:16 | 3 | THE COURT:  All right. |
| 12:16 | 4 | Now, Counsel, you have 44 minutes. |
| 12:16 | 5 | MS. KELLER:  Thank you. |
| 12:16 | 6 | *(Lunch recess held at 12:16 a.m.)* |
| 12:16 | 7 | *(Further proceedings reported by Jane Sutton* |
| 12:16 | 8 | *Rule in Volume II.)* |
| 12:16 | 9 | -oOo- |
| 12:16 | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 12:16 | 1 | -oOo- |
| 12:16 | 2 | |
| 12:16 | 3 | CERTIFICATE |
| 12:16 | 4 | |
| 12:16 | 5 | I hereby certify that pursuant to Section 753, |
| 12:16 | 6 | Title 28, United States Code, the foregoing is a true and |
| 12:16 | 7 | correct transcript of the stenographically reported |
| 12:16 | 8 | proceedings held in the above-entitled matter and that the |
| 12:16 | 9 | transcript page format is in conformance with the |
| 12:16 | 10 | regulations of the Judicial Conference of the United States. |
| 12:16 | 11 | |
| 12:16 | 12 | Date:  March 3, 2011 |
| 12:16 | 13 | |
| 12:16 | 14 | |
| 12:16 | 15 | _____ |
| 12:16 | 16 | DEBBIE GALE, U.S. COURT REPORTER<br>CSR NO. 9472, RPR |
| 12:16 | 17 | |
| 10:08 | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |