Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 1 of 93   Page ID #:306834
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                    - - - - - - -

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )    Day 27
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 2 of 4
                                      )
10             Defendants.            )
     _____)

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                 Santa Ana, California

18               Thursday, March 3, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-03 MattelV2

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     WILLIAM PRICE
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 3 of 93   Page ID #:306836
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ISAAC LARIAN, MGA CEO

16            KEN KOTARSKI, Mattel Technical Operator

17            MIKE STOVALL, MGA Technical Operator

18            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 4 of 93   Page ID #:306837
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

4

1                          **I N D E X**

2

3

4                         **EXAMINATION**

5

6   **Witness Name**        **Direct**     **Cross**      **Redirect**      **Recross**

7   ECKERT, ROBERT
        By Mr. Overland                      5
8       By Mr. Quinn                                        18

9

10

11                          EXHIBITS

12

13  **Exhibit**                         **Identification**      **Evidence**

14  Plaintiffs' No. 13757                                       71

15  Plaintiffs' No. 23846                                       91

16  Plaintiffs' No. 24176                                       92

17  Defendants' No. 35952                                        9

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 5 of 93   Page ID #:306838
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

5

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | **SANTA ANA, CALIFORNIA, THURSDAY, MARCH 3, 2011** |
| 2  | **DAY 27, VOLUME 2 OF 4** |
| 3  | **(1:01 p.m.)** |
| 4  | *(The following proceedings is taken in the* |
| 5  | *presence of the jury.)* |
| 6  | THE COURT:  All right.  We are back in session. |
| 7  | The jury is present, the alternates.  Mr. Eckert is present, |
| 8  | counsel, the parties. |
| 9  | And Counsel, Mr. Overland, continue your |
| 10 | cross-examination, please. |
| 11 | MR. OVERLAND:  Thank you. |
| 12 | **ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED** |
| 13 | **CROSS-EXAMINATION (Continued)** |
| 14 | BY MR. OVERLAND: |
| 15 | Q    Mr. Eckert, before we broke for lunch, we were talking |
| 16 | about investigations conducted by Mattel of Mattel employees |
| 17 | who went to work for competitors; do you remember that? |
| 18 | A    I do. |
| 19 | Q    And I think you told us that it wasn't all employees |
| 20 | who left Mattel to work for competitors that were |
| 21 | investigated, correct? |
| 22 | A    I believe that's the case, yes. |
| 23 | Q    Only some, right? |
| 24 | A    Yes. |
| 25 | Q    And they're only investigated if they are suspected of |

1    some wrongdoing, correct?

2    A    No, I don't know that that's necessarily the case.

3    Q    Well, are they investigated because they are going to

4    work for a competitor?

5    A    I can imagine a case where that is the case, yes.

6    Q    But are employees who go to work for a competitor of

7    Mattel investigated solely because they are going to work

8    for an employer -- for a competitor?

9    A    They may be, but I don't know.

10    Q    Do you know in this case if individuals were

11    investigated just because they were going to work for a

12    competitor?

13    A    There certainly may have been times where we definitely

14    wanted to know about individuals going to a specific

15    competitor.

16    Q    Maybe my question wasn't clear.  Do you know whether in

17    this case, case involving Mr. Machado, Ms. Trueba and

18    Mr. Vargas, they were being investigated just because they

19    were going to work for MGA in Mexico?

20    A    No.

21    Q    In other words, they were being investigated for

22    something else, correct?

23    A    I believe the investigation started, that is this

24    project started, if you will, in Mexico when they resigned

25    from Mattel.

1    Q    And when -- when you say "this project started," what
2    do you mean?
3    A    I mean, the head of Mattel Mexico, Gabriel Zalzman, was
4    very concerned about the anxiety these employees had on
5    their exit at Mattel.  They wanted to leave very quickly,
6    which, as I understand, the custom in that office was that
7    people didn't quit and immediately pack up and leave.  And I
8    know that raised a concern with the head of the office,
9    Mr. Zalzman.
10   Q    So -- but you don't know this personally, correct?
11   A    I do know that personally -- I mean --
12   Q    You were there when they resigned?
13   A    No, I wasn't.
14   Q    So you don't have any personal knowledge of anything
15   you just said, correct?
16   A    I have personal knowledge -- that's correct.
17   Q    Let me show you, sir, Exhibit 35952.
18            *(Attorney discussion held off the record.)*
19   BY MR. OVERLAND:
20   Q    Exhibit 35952, sir, is a Mattel incident report; do you
21   see that?  At least -- it's the first four pages of an
22   800-page investigation conducted by Mattel.  Have you ever
23   seen that before?
24   A    No, I have not.
25   Q    Okay.  But that is a Mattel investigation report, and

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 8 of 93   Page ID #:306841
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

8

1   it was prepared by an individual by the name of Jaime Elias?

2   A    It may have been.

3   Q    Well, do you see his name on there, "report taken by"?

4   A    Yes, I do.

5   Q    All right.  And that's an investigation that's done by

6   Mattel in the ordinary course of its business, correct?

7   A    I don't know.  It's called an incident report.

8   Q    Well, does Mattel conduct investigations as part of its

9   regular course of business?

10   A    I'm sure it does.

11   Q    And Mr. Elias is a -- the investigator for worldwide

12   security for Mattel, Inc., correct?

13   A    That's correct.

14   Q    And he works at Mattel, Inc., in El Segundo,

15   California, correct?

16   A    Yes.

17   Q    And he reports directly to Mr. DeAnda that we talked

18   about -- that you talked about before, correct?

19   A    He did at this time.

20   Q    And when you say "at this time," you mean back in 2004?

21   A    Correct.

22   Q    All right.

23          MR. OVERLAND:  Your Honor, I ask that the exhibit

24   be moved into evidence.

25          THE COURT:  Received.

```
 1              (Defendants' Exhibit No. 35952 is received in
 2        evidence.)
 3   BY MR. OVERLAND:
 4   Q    Now, if you look at --
 5              MR. OVERLAND:  Do you have another copy?
 6   BY MR. OVERLAND:
 7   Q    Okay.  If you look at the first page, and again, this
 8   is only four pages of an 800-page report, but I just want
 9   you to look at this exhibit, if you look at the date of the
10   occurrence right there at the top?
11   A    Yes.
12   Q    It says 4/19/04?
13   A    It does.
14   Q    4/19/2004?
15   A    That's correct.
16   Q    That's the date that Mr. Vargas, Ms. Trueba and
17   Mr. Machado, to your knowledge, resigned from Mattel
18   Servicios, correct?
19   A    It may have been.
20   Q    You don't know?
21   A    I know it was in April of 2004.  I don't know the
22   specific -- I don't remember the specific date.
23   Q    Okay.  If you look at the -- right at the very top
24   where it says "Subcategory," and it says "Employee
25   Investigation"; do you see that?
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 10 of 93   Page ID #:306843
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

10

1    A    Yes, I do.

2    Q    So this is an investigation of certain employees,

3    correct?

4    A    It appears to be, yes.

5    Q    Does it appear to be anything else?

6    A    Pages 3 and 4, which are also -- one is listed as

7    page 1, and another -- the second two pages on this

8    attachment don't appear to me to be related to the first two

9    pages.

10   Q    Okay.  But you don't know that?

11   A    That's correct.

12   Q    My question was, where it says, "Subcategory, Employee

13   Investigation," that is all that's reflected that this

14   document pertains to, correct?

15   A    No.  It says right below it, it pertains to proprietary

16   information.

17   Q    We are going to get to that.

18   A    Oh, I'm sorry.  So I guess the answer is no.

19   Q    The answer is no, right?

20   A    The answer to your question is no.

21   Q    Okay.  So it is an employee investigation with respect

22   to proprietary information, correct?

23   A    That seems to be the case, yes.

24   Q    And that -- and this was an investigation conducted by

25   Mr. Elias with respect to suspected taking of proprietary

1    information, correct?

2    A     Yes, that's what it appears to be.

3    Q     And this investigation was reported, do you see there

4    the reported date?

5    A     I do.

6    Q     April 19th, 2004, 1706, which would be 5:06 in the

7    afternoon, correct?

8    A     Yes.

9    Q     And the investigation was with respect to the taking of

10   information by certain individuals, correct?

11   A     It appears to be.

12   Q     Well, does it appear to be anything else in that?

13   A     Not the first two pages, no.

14   Q     Now, if you turn around -- if you turn the pages, now,

15   and you look at the following page, page 2 of the exhibit,

16   and there are certain names on that page, correct?

17   A     There are.

18   Q     And if you look at the first one, incident person

19   details four of five -- four of six; do you see that?

20   A     I do.

21   Q     And the individual referred to there is Pablo Vargas,

22   correct?

23   A     Yes.

24   Q     And Pablo Vargas, if you follow down right after the

25   name, it says, "Person type," and it says "Suspect"; do you

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 12 of 93   Page ID #:306845
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

12

1  see that?

2  A    Yes.

3  Q    And that indicates that Mr. Vargas, as of the date this

4  investigation was commenced, was considered a suspect in the

5  taking of proprietary information, correct?

6  A    I don't know if I would connect this line with that

7  date.  I don't know that.

8  Q    Well, this is the second page of the report, correct?

9  A    This is the second page you've handed me, that's

10 correct.

11 Q    Well, you see the Bates stamp on it?

12 A    I do.

13 Q    Okay.  And "M" stands for Mattel?

14 A    It does.

15 Q    And do you see the Bates stamp ending in 866?

16 A    I do.

17 Q    And then the next Bates stamp ends in 867; do you see

18 that?

19 A    Yes, I do.

20 Q    So that would indicate that these are consecutive pages

21 to that report, correct?

22 A    Yes, it would.

23 Q    At least that's what Mattel represented when it handed

24 over these -- this document, correct?

25 A    I would assume that.

1    Q    Would you assume anything else other than that?

2    A    No.

3    Q    And therefore, as of the date that this was reported in

4    the time April 19th, 2004, 1706 hours, Mr. Vargas was

5    considered a suspect in the taking of proprietary

6    information, correct?

7    A    No, I can't draw that conclusion, particularly if you

8    are saying an 800-page report was generated here, that it

9    all goes back to hour 1706 of one day.  I can't connect

10   these different pages.

11   Q    Well, do you see on page 1 of the report, sir?

12   A    I do.

13   Q    It says, as we read, "Type, proprietary information"?

14   A    Yes.

15   Q    That's the type of investigation that was being

16   conducted, right?

17   A    Yes, it appears to be.

18   Q    And the type of investigation that was being conducted

19   was the taking of proprietary information, correct?

20   A    I believe so.

21   Q    And Mr. Vargas was a suspect in that, correct?

22   A    I -- I don't know if he was at 1706, but he was, yes.

23   Q    If you look at the bottom of the page, sir.

24   A    Which page?

25   Q    The first page.

1   A    Yes.

2   Q    And the second page, do you see a date in the footer?

3   A    I do.

4   Q    What –– what is that date?

5   A    4/20/2004.

6   Q    That would be April 20th, 2004?

7   A    It would.

8   Q    What does that indicate to you?

9   A    That indicates to me that these both came from the same

10  date, April 20th, most likely.

11  Q    And does that indicate when the –– when the document

12  was created?

13  A    It certainly appears to.

14  Q    Does it appear to be anything else?

15  A    No.

16  Q    Now, going back to page 2, right after Mr. Vargas, do

17  you see "incident person details"?

18  A    Yes.

19  Q    And that is –– what name appears under that?

20  A    The first one is Vargas, comma, Pablo.

21  Q    Okay.  The one right after that.  We went through that

22  already.

23  A    I'm sorry.

24  Q    The one after that?

25  A    Machado, comma, Gustavo.

1   Q    And do you see also it says "Person type"?

2   A    Yes, I do.

3   Q    And what does that say?

4   A    "Suspect."

5   Q    And that indicates Mr. Machado also was a suspect in

6   the taking of proprietary information, correct?

7   A    I suspect it does.

8   Q    With respect to this particular investigation by

9   Mr. Elias, correct?

10  A    Again, I haven't seen this report, so I don't want to

11  draw some conclusion that is inappropriate, but that's

12  certainly what it appears to me.

13  Q    Is there any other conclusion you can draw from that,

14  sir?

15  A    No.

16  Q    All right.

17  A    No.

18  Q    Now, take a look at right below Mr. Machado, there is

19  another individual's name there?

20  A    Yes.

21  Q    Do you see that?

22  A    I do.

23  Q    What's that person's name?

24  A    Trueba, comma, Mariana.

25  Q    Okay.  And again, under "Person type," what does it

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 16 of 93   Page ID #:306849
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

16

1    say?

2    A    "Suspect."

3    Q    And that again indicates that she was a suspect with

4    respect to this investigation in the taking of proprietary

5    information from Mattel in Mexico, correct?

6    A    It would appear to me to be that case, yes.

7    Q    Okay.  Now, turn the page, please.  There is another

8    name there?

9    A    There is.

10   Q    And that's an Omar Cavassuto?

11   A    That's correct.

12   Q    Is there any indication there that he's considered a

13   suspect?

14   A    No.

15   Q    Take a look -- go to the first page, now.  See where it

16   says "O'Connor, Brian"?

17   A    Yes.

18   Q    Any indication there that he's considered a suspect?

19   A    No.

20   Q    And below that, there is an individual by the name of

21   Robert Normile; do you see that?

22   A    I do.

23   Q    And it says "Person type," and it says "Witness,"

24   right?

25   A    It does.

1    Q    Any indication that he's considered a suspect?

2    A    No.

3    Q    So the only three suspects in terms of this

4    investigation were Mr. Vargas, Mr. Machado and Mr. -- and

5    Ms. Trueba, correct?

6    A    Based on the two pages you've shown me, or three pages

7    you've shown me, that is correct.

8    Q    Well, do you want to look at all the 800 pages?

9    A    Well, if -- if you want me to answer that question, I

10   would almost have to.  I could answer it more narrowly, but

11   I'm trying to answer your question.  Based on these pages,

12   that's correct.

13   Q    Well, why don't you go and read the 800 pages, not

14   today, and then you can come back and I'll ask you more

15   questions about it; deal?

16   A    If you would like me to answer questions about the 800

17   pages, I'm happy to do that.

18   Q    Well, I haven't asked you any questions about the 800

19   pages.

20           THE COURT:  He'll be right here anyway, Counsel.

21           MR. OVERLAND:  Okay.

22           THE COURT:  He'll be right here.

23   BY MR. OVERLAND:

24   Q    And the three individuals that were suspects in the

25   taking of proprietary information -- strike that.

```
 1        In the three individuals that were the suspects in the

 2   investigation that was being conducted by Mattel in the

 3   taking of proprietary investigation (sic) were suspects in

 4   an investigation that commenced on April the 19th, 2004, at

 5   17:06 hours, correct?

 6   A    That would appear, to me, to be the case.

 7   Q    Okay.  Does anything else appear to be the case other

 8   than what I just said?

 9   A    No.

10        MR. OVERLAND:  That's all.

11        THE COURT:  Redirect by Mr. Quinn on behalf of

12   Mattel.

13        MR. QUINN:  Thank you, your Honor.

14                  REDIRECT EXAMINATION

15   BY MR. QUINN:

16   Q    Mr. Eckert, if we could look at Exhibit 1195RS, and

17   let's first look at the first page, -1, you were asked about

18   this this morning by Ms. Keller; do you recall that?

19        MR. QUINN:  If we can put that on the screen.

20   BY MR. QUINN:

21   Q    And on page 2, this is the incident report with an

22   occurrence date of March 15, 2002?

23   A    Mr. Quinn, we don't have this yet.

24   Q    Okay.  If I could ask you to turn to page -4?

25   A    Of?
```

1    Q    1195RS-4?

2    A    I have page 5 and 3.

3    Q    And you don't have 4?

4    A    Correct.

5         MR. QUINN:  If I may approach, your Honor.

6         THE WITNESS:  All right.  I have it.

7    BY MR. QUINN:

8    Q    And if you'll see there on page -4, this is the

9    incident report, and it indicates the occurrence date of

10   March 15, 2002; do you see that?

11   A    I do.

12   Q    And the incident narrative, it says, "Information

13   received from design center staff Evelyn Viohl and Ivy Ross

14   at MGA Entertainment, headed by a person known as Isaac

15   Larian, has recently hired a number of former Mattel

16   employees and is manufacturing products that appear to be

17   Mattel designs."

18        Do you recall being asked about that this morning?

19   A    I do.

20   Q    And if I could ask you to turn to page -66.  Does this

21   appear to be a chronological record of what was referred to

22   as -- of this investigation?

23   A    Yes.

24   Q    And do you see next to March 28th, there is a reference

25   to -- I think it says, "Meet with Cassidy Park to gather

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

20

1    great" -- or can you read that?

2        "Meet with Cassidy Park to get more information on MGA

3    issue.  She suggested Carter Bryant as" -- "as

4    illustrator/former employee who may have plagiarized design

5    of Lily Martinez and created Bratz dolls for MGA"; do you

6    see that?

7    A    I do.

8    Q    Now, what -- what does the word "plagiarize" mean to

9    you?

10   A    To copy, essentially, verbatim.

11   Q    And have you seen a project doll named Toon Teenz?

12   A    I have -- I have seen designs of a doll named Toon

13   Teenz.

14   Q    And are you -- do you know whether or not Lily Martinez

15   had any involvement with that project, the Toon Teenz

16   project?

17   A    I do.

18   Q    And did you believe that those Toon Teenz designs or

19   dolls -- did you feel like the Bratz dolls were copies of

20   the Toon Teenz designs or dolls?

21   A    I don't -- I wouldn't use the word "copy," no.

22   Q    Did you ever hear from any source that Cassidy Park and

23   others in Mattel had raised the issue that they thought

24   Carter Bryant had seen the Toon Teenz dolls, and that they

25   thought the Toon Teenz dolls had been copied by him in

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 21 of 93   Page ID #:306854
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

21

```
 1   making Bratz?

 2   A    Have I seen that?  No, I don't believe I have.

 3   Q    Did you ever hear from any source that that allegation

 4   or that concern had been made or expressed?

 5   A    I think there was some reference to Toon Teenz in the

 6   Wall Street Journal article of 2003.  I -- I think that's

 7   the case.

 8   Q    There was -- there was a reference there that people at

 9   Mattel thought the Bratz dolls had been copied after a

10   project that had been shelved at Mattel; is that what you

11   are thinking of?

12   A    Yeah, I don't remember the specific words.

13   Q    Maybe we can take a look at that.

14        Are you familiar with the test -- you know Ivy Ross?

15   A    I do.

16   Q    And you know that Ivy Ross was the first witness in

17   this case?

18   A    I do.

19   Q    Are you aware of Ivy Ross's testimony that Cassidy Park

20   came to her and expressed a concern that --

21            MS. KELLER:  Objection.  Hearsay.

22   BY MR. QUINN:

23   Q    -- Carter Bryant had copied Lily Martinez's Toon Teenz

24   dolls?

25            THE COURT:  Sustained.
```

```
1              MR. QUINN:  Well --

2              THE COURT:  He doesn't have to answer.

3              MR. QUINN:  I'm sorry, your Honor?

4              THE COURT:  He does not have to answer it.  The

5    objection was hearsay.  It's sustained.

6    BY MR. QUINN:

7    Q    As of the time -- if we can go back, as of the time of

8    March 15, 2002, the date of this incident report, Mr. Bryant

9    had been gone from Mattel for about a year and a half?

10   A    That's correct.

11   Q    Do you see anything here in this summary or report,

12   anything to indicate that Mr. Bryant had been working with

13   or for MGA at the same time he was employed by Mattel?

14   A    No, I don't.

15   Q    Do you see anything here that indicates that -- or any

16   mention that he developed Bratz while he was employed by

17   Mattel?

18   A    No.

19   Q    Now, so far as you are aware, has Mattel ever brought a

20   claim that the -- that Bratz is a knockoff of Toon Teenz?

21   A    No, I'm -- I'm not aware of any such claim.

22   Q    Well, do you know whether or not Mattel's security

23   department ever looked into a claim that it was a knockoff?

24   A    No, I don't know.

25   Q    And by the way, before we leave this Exhibit 1195RS,
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 23 of 93   Page ID #:306856
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

23

```
 1    this file, you were asked some questions about whether

 2    Mattel would have any good reason to investigate

 3    Mr. Larian's children.

 4         Do you see evidence in here of some investigation of

 5    Mr. Larian's children when you turn the pages, when you look

 6    through that?

 7    A    May I take a minute to do that?

 8    Q    Sure.

 9    A    I don't believe I do.

10    Q    If you could take a look at page 75?

11    A    I'm on it.

12    Q    All right.  Is there a reference there to their names

13    and ages?

14    A    Yes.

15    Q    Beyond that, do you see any other reference to them?

16    A    No.

17    Q    Are you aware of any lawsuit or claim that Mattel has

18    ever made against MGA based on the allegation that Bratz was

19    a plagiarized version of Toon Teenz?

20    A    No, I'm not aware of any claim of that.

21    Q    And if we can go back to page 1195RS-4, and look at

22    the -- at the beginning, the incident narrative there, where

23    it says that Isaac Larian has recently hired a number of

24    former Mattel employees and is manufacturing products that

25    appear to be Mattel designs.  You don't know whether or not
```

1  that reference to Mattel designs is a reference to Lily

2  Martinez's Toon Teenz; is that true?

3  A    That's correct.

4  Q    And after -- this is -- this incident report is dated

5  March of 2002, and then in August of 2002, you received the

6  anonymous letter?  I think that's Exhibit 1193, if we could

7  take a look at that, 1193.

8  A    I have that.

9  Q    So -- and you've got your received stamp there.  Is it

10 true that you received this anonymous letter some five

11 months after that incident report file, Exhibit 1195RS, that

12 we just looked at?

13 A    Yes.

14 Q    I may have miss -- I may have misheard, but I thought

15 Ms. Keller asked you the question whether the incident file,

16 1195RS, was caused by or occasioned by this August letter;

17 would that have been possible?

18 A    Not based on the dates, no.

19 Q    Does it appear to you that that other investigation,

20 whatever it was, 1195RS, that that was already -- that file

21 had been opened, and that was ongoing at the time you

22 received this anonymous letter?

23 A    I know that it was open based on the date.

24 Q    And if you -- actually if we can go back to 1195RS-66,

25 that chronological record.  Can you tell from looking at

1    that, that that investigation was already open and ongoing

2    as of the time you received the anonymous letter,

3    Exhibit 1193?

4    A    Based on the dates in the left-hand column, that would

5    appear to be the case.

6    Q    And then you told us that you then forwarded the

7    anonymous letter to Mr. Kaye?

8    A    I did.

9    Q    And you've been shown Exhibit 6678?

10          MR. QUINN:  If we could put that up on the screen.

11   BY MR. QUINN:

12   Q    And does it appear to you -- if we can look -- this is

13   dated, at the top, for occurrence date it says, May 5, 2002;

14   do you see that?

15   A    Are you on page 002?

16   Q    I'm on page 002, 0002.

17   A    Yes.

18   Q    And it says at the top -- I'm sorry, I'm not reading it

19   right.

20   A    Yes.

21   Q    Does it say September 5, 2002?

22   A    It does.

23   Q    But if you look at the narrative, incident narrative

24   down below --

25          MR. QUINN:  If we could blow that up.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 26 of 93   Page ID #:306859
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

26

```
 1   BY MR. QUINN:

 2   Q    It's got the date August 5, 2002, "A letter addressed

 3   to CEO was received in Bob Eckert's office"; do you see

 4   that?

 5   A    I do.

 6   Q    So does it appear to you that somebody just made a

 7   mistake in putting the date there?

 8            MS. KELLER:  Objection.  Calls for speculation.

 9            THE COURT:  Sustained.

10   BY MR. QUINN:

11   Q    Well, the August 5, 2002, that was -- was that the

12   correct date for the date that you received that anonymous

13   letter?  And we can --

14   A    Let's look at it again.

15   Q    Let's go back and take a look at that.

16   A    Yes, it is.

17   Q    All right.  So you forwarded that.

18        Did you ever hear back from Mr. Kaye or anybody in

19   security as a result of your forwarding this anonymous

20   letter?

21   A    No, I did not.

22   Q    If they had come up with some credible information that

23   Mr. Bryant had, in fact, created Bratz while he was working

24   for Mattel and received money from MGA while he was working

25   for Mattel, as the anonymous letter stated, would you have
```

1    expected that they would report back to you on that?

2    A    Yes, I would.

3    Q    And as of the date of this -- of the receipt of this

4    anonymous letter, August 5, 2002, did you have any

5    information that Mr. Bryant at any time had worked for

6    Mattel and MGA at the same time?

7    A    No, I did not.

8    Q    Or that he began developing a prototype of a doll while

9    he was still at Mattel, did you have any information about

10   that at the time you received the anonymous letter?

11   A    No, I did not.

12   Q    Or that he did any work in the development of Bratz

13   while he was employed by Mattel?

14   A    No, I did not.

15   Q    When did you first receive credible information,

16   information that you regarded as credible, indicating that

17   Mr. Bryant had simultaneously been working for Mattel and

18   for MGA?

19            MS. KELLER:  Objection.  Assumes facts not in

20   evidence.

21            THE COURT:  Overruled.

22            You can answer the question.

23            THE WITNESS:  It was in the fall of 2003.  I don't

24   remember the specific date, but around Thanksgiving time of

25   2003.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 28 of 93   Page ID #:306861
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

28

1   BY MR. QUINN:

2   Q    And that was -- what was the connection in which you

3   learned that?

4   A    That was in a meeting in which I was shown the

5   documents from Hong Kong that included excerpts at least of

6   an agreement that Mr. Bryant had to work exclusively with

7   MGA and shown a copy of his agreement with Mattel that he

8   was an employee of Mattel.

9   Q    At the time of the agreement with MGA?

10  A    That's correct.

11  Q    And maybe we could look at Exhibit 15.

12         MR. QUINN:  And if we can blow up the dates up at

13  the top.

14  BY MR. QUINN:

15  Q    Is that the -- that date, September 18th, 2000, the

16  date of his -- of an agreement between him and MGA, was

17  that -- is that something that you saw or was called to your

18  attention for the first time as a result of these documents

19  that were received from Hong Kong?

20  A    Yes, that -- I recall seeing at least this part of the

21  letter, or this -- whatever this is.  I would -- I would

22  describe this as a letter right here dated September 18th,

23  and the signature page --

24  Q    And --

25  A    -- and perhaps excerpts, but I do remember seeing the

1   date September 2000.

2   Q    And can you tell us whether or not at that time you

3   made -- you learned or made a determination that as of the

4   time he enters into that -- that agreement, he was a Mattel

5   employee?

6   A    That was the conclusion of the meeting.

7   Q    And to be fair, the actual signature date, if we can

8   look at the bottom.

9           MR. QUINN:  And if we can blow that up at the

10  bottom.

11  BY MR. QUINN:

12  Q    The actual signature date there where it appears the

13  document was signed up, that's October 4, correct?

14  A    Yes.

15  Q    But the document is dated as of September 18th?

16  A    That's correct.

17  Q    And did you notice whether or not the document provides

18  that Mr. Bryant, as of September 18th, was to work on a

19  exclusive basis for MGA?

20  A    That's my understanding of the document that I saw at

21  the time.

22  Q    And as of both those dates, September 18, 2000 and

23  October 4th, 2000, did you determine whether or not

24  Mr. Bryant was then a Mattel employee?

25  A    Yes.  The documents I was shown at that meeting

1    concluded that Mr. Bryant was still an employee of Mattel.

2    Q    Okay.  So let's talk, now -- like to talk -- ask you

3    more questions about this agreement and some of the

4    questions Ms. Keller asked you about it.

5         During her cross-examination, she asked you about

6    whether you had seen, this was yesterday, the written

7    agreement between Mr. Bryant and MGA, and I think I wrote

8    this down right, "conveying the intellectual property in his

9    Bratz drawings as of the time of your December 2009

10   deposition"; do you recall her asking you that question?

11   A    I do.

12   Q    Now, as of the time of that deposition, she -- she

13   asked you whether you had seen the agreement conveying the

14   Bratz drawings.  As of the time of your deposition, had you

15   seen an agreement between MGA and -- and Mr. Bryant?

16   A    I had seen an agreement between MGA and Mr. Bryant, and

17   I believe this document number 15 is what I saw.

18   Q    And as of the time of that deposition, did you

19   understand that Mr. Bryant had, pursuant to that agreement,

20   purported to assign rights to MGA?

21   A    I don't remember specifically.  I may not have

22   remembered at that time specifically what rights Mr. Bryant

23   conveyed to MGA.

24   Q    All right.  So what was your -- when you -- when you

25   first saw this agreement, you said sometime around

1   Thanksgiving, or excerpts from the agreement, fall of 2003,

2   what was your focus on, what --

3   A    I'm sorry.

4   Q    Go ahead.

5   A    When you are finished.

6   Q    Yes.

7   A    My focus was on the employment dates a Mattel employee

8   under contract to work exclusively for a competitor of

9   Mattel.

10   Q    And as a result of that, did you reach any conclusions?

11   A    My conclusion at the time was Mr. Bryant, while he was

12   a Mattel employee, also agreed to work exclusively for MGA.

13   Q    In fall of 2003, who was it who called this agreement

14   to your attention and these dates?

15   A    You were at the meeting.  Mr. Normile, Mattel's general

16   counsel was at the meeting.  Mr. Zeller, I believe, one of

17   your colleagues, was at the meeting.  And there may have

18   been other Mattel in-house attorneys.

19   Q    And as a result of your learning that a Mattel employee

20   had entered into a exclusive contract with a competitor at

21   the time he was a Mattel employee, did you decide to take

22   some action?

23   A    We began pursuing what was involved here, yes.

24   Q    And what was the action that was ultimately taken?

25   A    Ultimately in April of 2004, we filed the lawsuit

CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

32

1   against Carter Bryant.

2   Q    And -- and what were -- what were the gist of the

3   claims in that lawsuit?

4   A    The gist of the claims was that he was -- he was

5   disloyal to Mattel, he violated his agreement to work with

6   Mattel, and whatever he was creating while he was at Mattel

7   belonged to Mattel.

8   Q    Now, you said in response to Ms. Keller's questions

9   yesterday on cross-examination, that Mattel would have sued

10  Carter Bryant no matter when the Bratz drawings were made,

11  whether he made them 5 years before, whether he had made

12  them in 1998, 10 years before; do you recall those

13  questions?

14  A    I do.

15  Q    Why is it that Mattel would have sued Mr. Bryant at

16  that time no matter when he made the Bratz drawings?

17  A    That wasn't the issue of my focus at the time.  The

18  issue of my focus at the time was a Mattel employee working

19  exclusively for a competitor of Mattel, that's a problem

20  regardless when he drew drawings.

21  Q    After that, after the lawsuit started, did discovery

22  begin where parties began to exchange documents and

23  depositions were taken including Mr. Bryant's deposition?

24  A    Yes.

25  Q    And -- and did you learn more about what had happened?

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 33 of 93   Page ID #:306866
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

33

1    A    Yes.

2    Q    And after, at some point, did you learn more about

3    MGA -- whether or not MGA had been involved?

4    A    Yes.

5    Q    And at that point, did you learn what MGA knew at the

6    time Mr. Bryant approached him -- approached MGA?

7    A    Yes, I did.

8    Q    And did you learn that MGA knew at the time he

9    approached them that he was a Mattel employee?

10   A    I was told that, yes.

11   Q    Let's talk -- I'd like to ask you some questions now

12   about the inventions agreement.

13        During your cross-examination, Ms. Keller asked you

14   whether in your deposition in 2008, you testified that you

15   did not know whether you had ever signed a Mattel inventions

16   agreement; do you recall being asked about that testimony

17   yesterday?

18   A    I do.

19   Q    And she read to you a question and answer you were

20   asked on January 28th, 2008, page 153, lines 8 to 12, "Have

21   you ever signed a document that's referred to or nominated

22   as an inventions agreement," and your answer was, "I don't

23   know"; do you recall that?

24        MS. KELLER:  Your Honor, I'm going to object to

25   this.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 34 of 93   Page ID #:306867
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

34

1          THE COURT:  Sustained.  Sustained.  Just put that

2    down.

3    BY MR. QUINN:

4    Q    Why is it that you responded that way to that question

5    in your deposition?

6    A    Because the name inventions agreement did not strike a

7    cord with me at that time.

8    Q    Did -- at the time you were being questioned, did you

9    actually have the inventions agreement in front of you?

10   A    No.

11   Q    Did you remember what the title of the agreement was?

12   A    No.

13   Q    Did you testify just one page earlier in the

14   deposition, that you had -- that you do recall that you

15   signed an inventions agreement which included an assignment

16   of inventions?

17        Sorry.

18             (Attorney discussion held off the record.)

19             MR. QUINN:  All right.

20   BY MR. QUINN:

21   Q    Did you testify, just one page earlier in the same

22   deposition, that you had signed a confidentiality agreement

23   which may have included an assignment of inventions?

24             MS. KELLER:  Objection.  Improper question, your

25   Honor.

 1            THE COURT:  No.  It's -- I just need the page

 2   number.

 3            MS. KELLER:  I was going to say, may we have the

 4   page?

 5            MR. QUINN:  Page 152.

 6            THE WITNESS:  What date?

 7            MR. QUINN:  January 28th, 2000 --

 8            THE COURT:  And as I see that page arriving.

 9            MR. QUINN:  Yes, January 28th.

10            THE COURT:  Okay.  Thank you.  No more questions

11   until I see it.

12            MR. QUINN:  It's January 28th, page 152.

13            MS. KELLER:  May we have the lines?

14            MR. QUINN:  Line 10, to 153, line 1.

15            Actually, just to line 16 on page 152.

16            MS. KELLER:  It's a different topic, your Honor.

17            THE COURT:  Just a minute.

18            No, Counsel, you may read.

19            MR. QUINN:  Question:  "When you came to work with

20   Mattel, did you sign a confidentiality agreement?"

21            Answer:  "I have signed it.  I don't know

22   specifically -- I don't know whether you're referring to the

23   date I joined Mattel.  I don't know."

24            Question:  "Is that also an inventions agreement?"

25            Answer:  "I don't know."

CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

36

```
 1    BY MR. QUINN:

 2    Q    And in fact, isn't the title of what we referred as the

 3    "Inventions Agreement," a "Confidentiality and Inventions

 4    Agreement"?

 5              MR. QUINN:  If we could look at Exhibit 13614.

 6              And if we could enlarge the title at the top.

 7    BY MR. QUINN:

 8    Q    The title of that document was the "Employee

 9    Confidential," and holes are punched here, but it appears to

10    be "Inventions Agreement"?

11    A    Yes.

12    Q    And that passage of the deposition that I read -- I

13    just read, was just the page before the page that Ms. Keller

14    questioned you about yesterday, correct?

15    A    It appears to be so.

16    Q    But whatever the title of the document, was there any

17    doubt in your mind when you started at Mattel that any

18    inventions you came up with, ideas that you came up with in

19    the toy business would belong to Mattel?

20    A    No.

21    Q    You also testified during Ms. Keller's questioning that

22    if an employee has drawings that he made before working at

23    Mattel, and the employee does not work on those drawings at

24    Mattel, Mattel would not own those drawings; do you recall

25    that testimony?
```

1    A    Yes.

2    Q    And you also testified during cross-examination that

3    Mattel might own designs and drawings that an employee made

4    years before coming to work at Mattel; do you recall that?

5    A    I do.

6    Q    I think there were questions about if they had been

7    made 10 years ago, 30 years ago, when they're 18 years old

8    and they just put them in a drawer; do you recall those

9    questions?

10   A    I do.

11   Q    Why did you answer it that way, that Mattel might own

12   those drawings?

13   A    Well, if the employee did something with that work,

14   pursued that project while working at Mattel, we would have

15   rights to that work.

16   Q    And what do you mean by that?  What would be an example

17   of that?

18   A    Worked on those drawings, did something with those

19   drawings to make it a product or a project or somehow

20   pursued those drawings as a part of working at Mattel.

21   That, to me, is the distinguishing factor.

22   Q    Is there any language in the confidentiality and

23   inventions agreement that makes that distinction?

24   A    There is in my mind's eye.

25   Q    If we can take a look at Exhibit 13614, which I believe

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 38 of 93   Page ID #:306871
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

38

 1    is your inventions agreement?

 2    A    Yes.

 3    Q    And in particular, ownership of inventions?

 4         MR. QUINN:  If we can enlarge those first two

 5    paragraphs.

 6    BY MR. QUINN:

 7    Q    In the first paragraph, in the first line of

 8    paragraph 2A, where it cites -- where it states, "I agree to

 9    communicate to the company as promptly and fully as

10    practicable all inventions as defined below conceived or

11    reduced to practice by me"; do you see that?

12    A    I do.

13    Q    What in your mind is the distinction between conceived

14    and reduced to practice?

15    A    Conceived is a thought or idea or creation in the mind.

16    Reduced to practice means making -- taking it to some

17    further step, more -- making something concrete of it.

18    Q    So how would this apply to someone who had done some

19    designs before they came to Mattel, and then came to Mattel

20    and did some work on it?

21         MS. KELLER:  I assume this is for his opinion

22    only, your Honor, as a layperson, not a lawyer.

23         THE COURT:  This is Mr. Eckert's opinion, okay?

24         Counsel?

25         THE WITNESS:  My opinion is if the person worked

1   on those designs or made something of those designs at

2   Mattel, that would be reducing to practice.

3   BY MR. QUINN:

4   Q    So are you referring to -- assuming you are talking

5   about designs relating to the company's business?

6   A    Correct.

7   Q    So suppose an employee had drawings of a doll before

8   coming to work at Mattel, but then used doll parts and

9   solicited the help of coworkers and advanced the development

10  of a doll and came up with a prototype; are you with me so

11  far?

12          MS. KELLER:  I'm going to object, your Honor.

13  This is an improper hypothetical based on -- obviously on

14  the facts as Mr. Quinn sees them of this case.

15          MR. QUINN:  Your Honor, she asked about

16  hypotheticals about stepping over the --

17          THE COURT:  Overruled.

18          Remember, this is confined to what Mr. Eckert's

19  opinion is.  Eventually you'll be deciding many of these

20  issues.

21  BY MR. QUINN:

22  Q    And we're talking about this concept of reduced to

23  practice, and suppose an employee joins Mattel, they've

24  already created drawings, but then -- they start at Mattel,

25  and they start to develop those doll -- a doll design into a

```
1   prototype, use parts, solicit the help of coworkers, in your

2   mind, would that be reducing to practice?

3   A    Yes, it would.

4           MS. KELLER:  Your Honor, I'm going to object

5   again.  That's based on the facts of this case as Mr. Quinn

6   sees them.  It's an improper hypothetical.

7           THE COURT:  Overruled.

8           You can cast your opinion.

9           THE WITNESS:  Yes, it is.

10  BY MR. QUINN:

11  Q    And can you tell us whether or not you believe Mattel

12  would have a claim to an ownership of what the employee

13  developed even though they had come up with the designs even

14  before they started at Mattel?

15          THE COURT:  Remember, let me remind the jury, this

16  is his opinion.  You'll be the eventual decider of these

17  issues.

18          THE WITNESS:  My opinion is we would have such a

19  claim.

20  BY MR. QUINN:

21  Q    Are you aware of Carter Bryant's testimony that he did

22  create Bratz drawings while he was employed at Mattel?

23          MS. KELLER:  Objection.

24          THE COURT:  Now we are walking, now, back to

25  specific facts.  I'm going to sustain the objection.  In
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 41 of 93   Page ID #:306874
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

41

1   other words, we've gotten a flavor from the contract and

2   what he believes in terms of his opinion, but now we are not

3   going to go back where each side goes through the respective

4   facts that you see.

5   BY MR. QUINN:

6   Q    Now, suppose that the employee doesn't arrive with

7   drawings but actually creates doll designs while employed by

8   Mattel, in your understanding of how this contract works,

9   either conceived or reduced to practice, would Mattel have

10  an ownership claim in those drawings?

11  A    Yes, it would.

12  Q    If we could look at Exhibit 719 in evidence.

13       If this drawing -- if an employee admitted that they

14  created this drawing while they were employed at Mattel and

15  they were under an inventions agreement like yours --

16            MS. KELLER:  Objection.  Improper, your Honor.

17            THE COURT:  If we are going to start comparing to

18  the first generation, this is a comparison.

19            MR. QUINN:  This is just the drawing, your Honor.

20            MS. KELLER:  It's an improper hypothetical, your

21  Honor.

22            THE COURT:  I haven't heard it yet.  So ask the

23  question.

24  BY MR. QUINN:

25  Q    If an employee created this drawing, Exhibit 719, while

```
 1    they were employed at Mattel, in your view, would Mattel

 2    have an ownership claim to it?

 3              MS. KELLER:  Objection.  Completely improper

 4    hypothetical.

 5              THE COURT:  I'll sustain the objection, Counsel.

 6    BY MR. QUINN:

 7    Q    You were asked some questions yesterday about, did you

 8    go down to the design center and find out, you know, ask

 9    people about what Mr. Bryant had been working on or did you

10    learn whether or not he had been instructed to create Bratz

11    drawings or drawings like Bratz; do you recall those

12    questions?

13    A    I do.

14    Q    And as I recall, your answer was, you didn't do those

15    things?

16    A    That's correct.

17    Q    Would it matter to you whether or not Mr. Bryant, while

18    he was employed in the design center, had received

19    instructions from his supervisor to create Bratz drawings?

20    A    No, it wouldn't.

21    Q    Why not?

22    A    I really don't care what his supervisor told him to do.

23    My concern at the time we filed the lawsuit against

24    Mr. Bryant was that he, a Mattel employee, went to work for

25    a competitor on an exclusive basis.  What his job was at the
```

1    time at Mattel, I wouldn't go investigate that.

2    Q    Under your understanding of the contract, if an

3    employee while employed by Mattel creates doll designs, does

4    it matter whether or not their supervisor has instructed

5    them to create those designs while they are -- if they are

6    employed by Mattel, in terms of Mattel's ownership interest

7    in those designs?

8    A    No, it doesn't matter.

9    Q    You indicated who came up with the Monster Hall -- the

10   Monster High doll design?

11   A    The Sander twins.

12   Q    Right.  And what were their jobs?

13   A    They are package designers.

14   Q    They weren't doll designers?

15   A    That's correct.

16   Q    Was there -- even though they were package designers

17   and not doll designers, was there any question ever raised

18   about whether or not the idea for the Monster High dolls was

19   owned by Mattel rather than them personally?

20          MS. KELLER:  Objection.  Irrelevant whether there

21   was a question raised.

22          THE COURT:  Just a moment.

23          That portion is stricken, Counsel.  Reask it.

24   BY MR. QUINN:

25   Q    In your understanding, did Mattel from the beginning

1   own the idea for the Monster High dolls which originated

2   with package designers and not doll designers?

3   A    Yes.

4   Q    During cross-examination yesterday, you -- Ms. Keller

5   also asked you if you had been ever asked to review a

6   Rosenbaum e-mail chain, an e-mail chain involving an

7   attorney by the name of Rosenbaum before Mattel decided to

8   sue Carter Bryant; do you remember those questions?

9   A    I remember the name Rosenbaum.

10  Q    And do you recall being asked about an e-mail chain

11  relating to Mr. Rosenbaum, an attorney, who was involved

12  representing MGA in its dealings with Mr. Bryant?

13  A    I do.

14  Q    And you recall Miss Bryant -- Ms. Keller asked you why

15  it was, I mean, why -- how could you sue Mr. Bryant without

16  asking to review these Rosenbaum e-mails; do you recall

17  that?

18  A    I do.

19  Q    Were you aware that MGA did not produce any version of

20  the Rosenbaum e-mail until 2007, more than three years after

21  Mattel sued Carter Bryant?

22            MS. KELLER:  Objection.  Improper question.

23            THE COURT:  Sustained.

24  BY MR. QUINN:

25  Q    Well, do you know when MGA provided the Rosenbaum

1    e-mail chain to Mattel?

2             MS. KELLER:  Same objection.

3             THE COURT:  I'm going to sustain it.  You can ask

4    him when he first saw it, Counsel.

5    BY MR. QUINN:

6    Q    Do you -- do you know when the Rosenbaum e-mail chain

7    that Ms. Keller --

8             THE COURT:  Just a moment.  Let me see both of

9    you.  That may be an incorrect ruling on my part.  Can I see

10   you sidebar.  I want to talk to both of you for just a

11   moment.

12            Excuse us, I want to ask counsel a couple of

13   questions that I may have forgotten.

14               *(Discussion at sidebar held off the record.)*

15               *(Recess.)*

16               *(The following proceedings is taken in the*

17        *presence of the jury.)*

18            THE COURT:  All right.  The jury is present, the

19   alternates, all parties.  Counsel, thank you for your

20   courtesy, and the witness.

21            Mr. Quinn, if you'd like to continue with your

22   redirect examination.

23            MR. QUINN:  Thank you, your Honor.

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 46 of 93   Page ID #:306879
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

46

| | |
|---|---|
| 1 | **ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED** |
| 2 | **REDIRECT EXAMINATION (Continued)** |
| 3 | BY MR. QUINN: |
| 4 | Q    Mr. Eckert, do you recall you were asked by Ms. Keller |
| 5 | on cross-examination about this Rosenbaum e-mail chain; do |
| 6 | you recall being asked about that? |
| 7 | A    Yes, I do. |
| 8 | Q    And specifically asked whether it's true that you |
| 9 | authorized the filing of a lawsuit against Carter Bryant |
| 10 | despite the fact that you didn't see or ask to see the |
| 11 | e-mail chain between Attorney Rosenbaum and MGA and |
| 12 | Mr. Bryant's counsel; do you recall that question? |
| 13 | A    I don't recall that specific question.  I recall the |
| 14 | subject. |
| 15 | Q    But the general subject that -- do you recall being |
| 16 | asked, gee, you didn't even ask to see this e-mail chain |
| 17 | before filing the lawsuit against Carter Bryant; do you |
| 18 | recall that? |
| 19 | A    I do. |
| 20 | Q    Is there any way you could have gotten that e-mail |
| 21 | chain before the lawsuit was filed? |
| 22 | A    It appears not. |
| 23 | Q    Did you even know it existed? |
| 24 | A    No. |
| 25 | Q    Did you ask for it? |

1    A    No, I did not.

2    Q    You were also asked some questions about Mattel's

3    dealings with inventors; do you recall that?

4    A    I do.

5    Q    And in response to one of Ms. Keller's questions, you

6    said something about, you know, during the last couple of

7    weeks, you've done some investigation or spoken to people

8    inside Mattel to educate yourself about Mattel's policies

9    and involvement with investors -- or inventors; do you

10   recall that?

11   A    I do.

12   Q    Why is it that you made the decision to learn about

13   what Mattel's policies are with respect to dealing with

14   inventors?

15   A    It's a subject that's been raised in this case, an

16   important topic.  I'm trying to be mindful of people's time.

17   I think the Court expects me to be able to talk about things

18   like that.

19   Q    And as a result, did you talk to the people within

20   Mattel who have the most knowledge about dealings with

21   investors (sic)?

22   A    Yes, I did.

23   Q    I'm sorry, "inventors."

24        You talked to people about -- that are most

25   knowledgeable about inventors?

```
 1   A     Yes, I did.

 2   Q     All right.  Of all the -- based on what you learned, of

 3   all the outside inventor -- inventors that Mattel uses or

 4   has dealings with, how many of them are employed or have

 5   been employed by competing toy companies?

 6              MS. KELLER:  Objection.  Calls for hearsay.  It

 7   could only be the result of hearsay.

 8              THE COURT:  Um --

 9              MR. QUINN:  She asked these questions, your Honor.

10              THE COURT:  Just a minute.

11              No, you are the chief executive officer.  At least

12   you have, I believe, some idea in your capacity, and just as

13   Paula Garcia was allowed, Counsel, by the Court to be used

14   for a certain portion concerning her ability for MGA, I

15   think Mr. Larian (sic) is in a good position to answer that

16   question.  That's overruled.

17              MR. QUINN:  Mr. Eckert.

18              THE COURT:  Well, now I'm getting them together.

19              All right.  I mean Mr. Eckert.  My apologies.

20              You can answer the question, sir.

21   BY MR. QUINN:

22   Q     Let me just frame the question again.

23   A     Thank you.

24   Q     Of all the outside inventors that Mattel uses, how many

25   are inventors who work for competing toy companies?
```

1   A    None that I, nor others, are aware of at Mattel.

2   Q    Or just recently left a competing toy company?

3   A    None.

4   Q    Who are the inventors that you referred to that Mattel

5   does work with when inventors have ideas and they submit

6   them to Mattel?

7   A    We work with a variety of inventors.  I see a group of

8   inventors on occasion.  They range from small firms, almost

9   an independent person, to companies with dozens of

10  employees.

11  Q    At one point you said in response to one of

12  Ms. Keller's questions, that we work with people, the

13  inventors we know; do you recall that?

14  A    I do.

15  Q    And what did you mean by that?

16  A    I meant that we have a group of inventors with whom we

17  work primarily.  I'm sure there's rare occasions where

18  there's some new one into the group, but there's a fairly

19  core, stable group of inventors with whom we work, as I

20  understand it.

21  Q    Can you tell us whether or not that includes

22  representatives of inventors?

23  A    It does.  It may include agents of inventors.

24  Q    Does it -- can you tell us whether or not Mattel has a

25  policy of dealing only with inventors or -- or except in

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 50 of 93   Page ID #:306883
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

50

1    rare cases, only with inventors who it knows and has worked

2    with in the past?

3    A    Well, that's certainly our practice.

4    Q    Why does Mattel have that practice?

5    A    It's important to know with whom we're doing business.

6    Q    Do you think that there are some risks with

7    entertaining idea submissions or inventions that are

8    submitted by people you don't know?

9                MS. KELLER:  Objection.  Irrelevant.

10               THE COURT:  Just a moment.

11               Overruled.

12               THE WITNESS:  We have a tremendous screening

13   process for an individual to get through to submit an idea.

14   An individual coming into Mattel isn't likely going to be

15   heard for the reason of risk.

16   BY MR. QUINN:

17   Q    And what is the risk that you are concerned about?

18   A    The risk is that someone may come in with an idea that

19   we've already had and not know that and have a dispute with

20   us.  The risk is we don't know the person or what -- where

21   they came up with what they came up with.

22   Q    Would it sound like due diligence to you if a toy

23   company relied on a lawyer who was not asked to provide an

24   opinion about ownership issues?

25               MS. KELLER:  Objection.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 51 of 93   Page ID #:306884
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

51

```
 1              THE COURT:  Sustained.
 2    BY MR. QUINN:
 3    Q    Well, would you -- I mean, if you retained a lawyer to
 4    look into ownership issues, would you expect them to
 5    actually do an investigation?
 6    A    Yes.
 7              MS. KELLER:  Same objection, your Honor.
 8              THE COURT:  I'll sustain the objection, Counsel.
 9              MS. KELLER:  And move to strike.
10              THE COURT:  Strike the question and strike the
11    answer.
12    BY MR. QUINN:
13    Q    Let's look at the Bratz brief, Exhibit 9216.
14              MR. QUINN:  If we can put that up on the screen.
15    BY MR. QUINN:
16    Q    And you told us, when I was asking you questions and
17    when Ms. Keller was asking you questions, that since you
18    arrived at Mattel starting in May of 2000, I mean, you are
19    aware of various challenges that Barbie faced, correct?
20    A    Yes.
21    Q    And -- and just -- can you describe what some of those
22    challenges are that it faced?
23    A    It faced the phenomenon, if you will, of kids getting
24    older younger and moving away from traditional toys or dolls
25    specifically at an earlier age in life.
```

```
 1        It faced issues with some consumers in some markets,

 2   like the United States, already having a lot of Barbie dolls

 3   in their possession and the challenge of -- of motivating

 4   someone to buy another one, and I believe I also talked

 5   about some issues with retailers and managing down

 6   inventories.

 7   Q    And there were some issues about how the Barbie doll

 8   was received as being too babyish and not having evolved

 9   sufficiently and things of that nature?

10   A    I certainly had those opinions at some point.

11   Q    And is that something that's discussed in the Bratz

12   brief and these other documents that we've seen in this

13   trial?

14   A    It's certainly been discussed in documents.

15   Q    And you were asked some questions if various Mattel

16   doll lines aimed at older girls were failures; do you recall

17   those questions?

18   A    I do.

19   Q    And in the Bratz brief here, if you look at -3.

20            MR. QUINN:  If we could blow up the bottom there.

21   BY MR. QUINN:

22   Q    One of those is a reference to Generation Girl; do you

23   see that?

24   A    I do.

25   Q    And then if you -- and Diva Starz as well?  If you'd
```

1    flip over to the next page.

2    A    Yes.

3    Q    Do you -- do you see there Diva Starz, it says, "This

4    line reached worldwide revenue of approximately $80 million

5    in 2001"; do you see that?

6    A    I do.

7    Q    I mean, did you regard Diva Starz as being a failure?

8    A    No, not in any way.

9    Q    Why not?

10   A    It was a very innovative doll.  It was one of the first

11   interactive toys, and sales of $80 million in one year is

12   quite important, even to a company as large as Mattel.

13   Q    You looked at it during cross-examination, it was taken

14   out and shown to you, and it's kind of got that odd shape

15   and very large head.  Can you explain why it has that very

16   large head and shape?

17   A    It does have a lot of electronics.  The doll can

18   recognize what it's wearing and interact with the child --

19   Q    Meaning, what do you mean it recognizes what it's

20   wearing?

21   A    Meaning if you give the doll the green purse, the Diva

22   Starz doll reacts, "Thank you for the green purse.  Do you

23   also have another accessory?"  The dolls actually could, in

24   some generation, I don't remember if it was the first

25   generation, they could interact with each other.  They could

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

54

 1    essentially compare what they were wearing.  It was quite

 2    innovative for 2000 and -- 2000 or 2001, or 2000.

 3    Q    And from a financial standpoint, was it a failure?

 4    A    No.

 5    Q    And how about Generation Girl, it says here on the

 6    second paragraph, really on the third, I guess, on this

 7    page -4, that Generation Girl generated sales of over

 8    $35 million in its first year, 1999; however, by 2001, sales

 9    had eroded to $7 million.

10         Can you tell us whether or not you regarded Generation

11    Girl as being a failure?

12    A    I do not regard it as a failure.  $35 million in sales

13    for a subline is a good number.

14    Q    Is it common or uncommon for successful toys that are

15    introduced by Mattel to only be offered by Mattel for a year

16    or two?

17    A    Well, I think, as I mentioned, about 80 percent of our

18    toys are new every year, so most of our toys, by definition,

19    aren't available for an extended period of time.  That's the

20    nature of the toy business.

21    Q    And can you tell us approximately how many new toys

22    Mattel introduces every year?

23    A    We introduce in the neighborhood of 6- to 8,000, 6- to

24    9,000, perhaps, new toys every year.

25    Q    And the reference -- you were also asked about MyScene

1    and whether MyScene was a failure.  Do you -- do you happen

2    to know approximately what the total sales were for MyScene?

3    A    Yes, I do.

4    Q    What were they?

5    A    I think it was in the neighborhood of 700 and -- about

6    $750 million.

7    Q    And that would cover roughly what period?

8    A    2002 to perhaps 2007.  I might be wrong on the last

9    date.

10   Q    If we turn -- go back to -4 on the Bratz brief, and

11   there, after discussing the challenges Barbie faced and the

12   other fashion dolls directed to older girls that Mattel

13   offered, there is a discussion -- begins a discussion of

14   Bratz; do you see that?

15   A    I do.

16   Q    Can you compare for us the significance of the

17   challenge that Bratz posed for Barbie and Mattel's other

18   fashion dolls as compared to the other things you've

19   described?

20   A    Well, Bratz took significant market share from Barbie

21   and from Mattel, and it's still on the market today.

22   Q    And -- and what was -- if you could estimate for us

23   what the -- what the market share lost was or what the trend

24   was in market share between 2000 and 2007, between Barbie on

25   the one hand and Bratz on the other hand?

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 56 of 93   Page ID #:306889
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

56

1  A    Barbie's share in 2000 or 2001 was around 90 percent of

2  the fashion doll category, and by 2007, I believe it was in

3  the mid 50s as a share of the fashion doll category.

4  Q    And how about Bratz, how did Bratz's market share

5  change during that time?

6  A    Bratz would have had no share in 2000, and I believe

7  Bratz got to about a 35 percent share of market or

8  thereabouts.

9          MR. QUINN:  Thanks, Ken.  You can take that down.

10  BY MR. QUINN:

11  Q    Ms. Keller went through a lot of documents going

12  through various quarters and years where concern is

13  expressed about Barbie sales, and there is reference to the

14  fact that Barbie sales are going down.

15      Where did most of those sales, where did they go, that

16  Barbie lost?

17          MS. KELLER:  Objection.  Assumes facts not in

18  evidence.  No foundation.  And calls for speculation that

19  they -- that they were their sales to begin with and went

20  somewhere.

21          THE COURT:  The question is unclear to me,

22  Counsel.  Reask it.

23          MR. QUINN:  I'll reframe it, your Honor.

24  BY MR. QUINN:

25  Q    You made reference to various market data that you have

CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

57

```
 1   available to you concerning what's going on in the fashion

 2   doll market.

 3             THE COURT:  Are you asking him what's attributable

 4   to the decline in Barbie?

 5             MR. QUINN:  I'm asking a little bit different

 6   question, your Honor.

 7             THE COURT:  Okay.

 8   BY MR. QUINN:

 9   Q    Did you have various data available to you about sales

10   in the marketplace, Barbie versus Bratz --

11   A    Yes.

12   Q    -- and other fashion dolls?

13   A    I'm sorry.  Yes.

14   Q    And -- and obviously you've indicated that you saw the

15   decline in -- during different periods in Barbie sales?

16   A    That's correct.

17   Q    Can you tell us whether, in the same period, you saw

18   increases in Bratz' sales?

19   A    We certainly saw increases in Bratz share and in their

20   sale to consumers.

21   Q    Is there anything in that Bratz brief or the house on

22   fire document or, you know, any other documents that we

23   looked at that says something like, you know, what we really

24   need to do is sue MGA?

25             MS. KELLER:  Are we opening the door, your Honor?
```

 1          THE COURT:  Well, ask Mr. Quinn.  Would you like

 2   to have a brief discussion?

 3          MR. QUINN:  The answer is no.

 4          THE COURT:  Okay.  Mr. Quinn is thinking about

 5   that for a moment.

 6   BY MR. QUINN:

 7   Q    You know, she gave -- Miss Keller showed you a lot of

 8   documents, and in all the documents that she showed you, did

 9   you see anything that said, sue MGA, you know, these various

10   marketing documents, house on fire, did you see that?

11   A    No, I did not.  Not that I remember.

12          THE COURT:  You are referring to as a strategy.

13          MR. QUINN:  I'm sorry?

14          THE COURT:  I'm sorry.

15   BY MR. QUINN:

16   Q    When -- when was it that Mattel ultimately did sue MGA?

17   A    I know MGA joined the lawsuit we had against Carter

18   Bryant.  I believe that was in late 2004, it may have been

19   December.

20   Q    And when was it that -- that's when they joined, but

21   when was it that Mattel ultimately sued MGA?

22   A    I don't -- I don't remember the specific date.  It may

23   have been 2006.

24   Q    Do you recall there was a stipulation that was read

25   about a chronology while you were on the stand and I was

1    asking you questions before?

2    A    I do.  There were stays --

3    Q    And these -- these various documents that we've seen

4    that talk about criticisms of Barbie, what you refer to as

5    the saturation that's being babyish and we're getting killed

6    by Bratz and, you know, genocide and all those other things,

7    that very strong language that we've seen in some of those

8    documents; do you recall that?

9    A    I do.

10   Q    During this entire period, from, you know, 2000 to

11   2007, 2008, were Barbies still being sold?

12   A    Yes.

13   Q    Were new themes for Barbies being introduced every

14   year?

15   A    Yes.

16   Q    Were they still being sold in countries -- were Barbies

17   still being sold in countries all around the world?

18   A    Yes.

19   Q    And how did Barbie stack up during this time period,

20   2000 to 2007, 2008, against other fashion dolls?

21          MS. KELLER:  Objection.  Vague, and vague as to

22   time, vague as to dolls, vague as to places in the world.

23          THE COURT:  I took that question to mean Barbie

24   against other dolls in 2008 and 2009.

25          MR. QUINN:  No.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 60 of 93   Page ID #:306893
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

60

1   BY MR. QUINN:

2   Q    I meant during this entire time period, from 2000 to

3   2008, how did Barbie, in terms of its sales and market

4   share, compare to other fashion dolls?

5          MS. KELLER:  Objection.  Vague as to time.

6          THE COURT:  Overruled.

7          THE WITNESS:  Barbie in that period would have

8   been the best-selling fashion doll in the world.

9   BY MR. QUINN:

10  Q    During this entire time period, did Barbie outsell

11  Bratz fashion dolls?

12         THE COURT:  Now, is this --

13         MR. QUINN:  Yeah, 2000 to 2008.

14         THE COURT:  That whole period or year by year?

15         MR. QUINN:  That whole period.

16         THE WITNESS:  Yes.

17  BY MR. QUINN:

18  Q    But were the people at Mattel satisfied with Barbie's

19  performance?

20  A    No, absolutely not.

21  Q    Why not?

22  A    Barbie was not performing well.

23  Q    What do you mean by that?

24  A    Barbie's sales in general were declining.  It's an

25  important business to Mattel.  People were very concerned

1    and upset about what had happened, and there is no way

2    anybody at Mattel was satisfied with Barbie's performance.

3    Q    And when you say people were concerned and upset about

4    what had happened, what are you referring to?

5    A    I mean that -- that Barbie's share had declined, Barbie

6    sales had declined, and even though Barbie was still the

7    best-selling doll, her performance was disappointing.

8    Q    Prior to the -- prior to the initiation of the

9    litigation and getting the discovery that you've described

10   in learning what you referred to, did you, or so far as you

11   are aware, know -- so far as you are aware, anyone at Mattel

12   know that the design for Bratz had come from a designer in

13   the Mattel design center?

14   A    No.

15   Q    During cross-examination, Ms. Keller asked you some

16   questions about whether Mattel would have ever made Bratz

17   itself; do you recall those questions?

18   A    I believe I do.

19   Q    She -- she asked you questions suggesting that Adrienne

20   Fontanella would testify or has testified that she didn't

21   like the connotation of the name Bratz; do you recall that?

22   A    Yes.

23   Q    Now, Ms. Fontanella, she was a manager at Mattel?

24   A    Yes.

25   Q    Was she the one --

1          MS. KELLER:  Objection.  Misstates the evidence.

2    President at Mattel?

3    BY MR. QUINN:

4    Q    I mean, what was her position at Mattel?

5    A    She was the head of the girl's division.

6    Q    And when did she -- did she leave Mattel?

7    A    She did.

8    Q    And when was it that she left Mattel?

9    A    In 2002.

10   Q    Was she the only one whose opinion on things like this

11   mattered at Mattel?

12   A    No.

13   Q    And you said she left in 2002?

14   A    She did.

15   Q    If market research had shown that Bratz would sell a

16   lot of dolls but would take sales away from Barbie, if -- if

17   Carter Bryant had brought the Bratz design to Mattel and

18   given Mattel an opportunity to make Bratz dolls, and market

19   research had shown that Bratz would sell a lot of dolls but

20   would take some of the sales from Barbie, is that -- does

21   that mean that Mattel would not consider bringing Bratz to

22   market?

23          MS. KELLER:  Objection.  Assumes facts not in

24   evidence.

25          THE COURT:  Overruled.

```
 1                You may answer that question.

 2                MS. KELLER:  Your Honor, it assumes that Mattel

 3     could have made Bratz and would have made Bratz.

 4                THE COURT:  No, I understand that, Counsel.  That

 5     is a question you can ask in recross-examination.

 6                You can ask the question.

 7                So ladies and gentlemen, it's just for his state

 8     of mind.

 9     BY MR. QUINN:

10     Q    So if Mr. Bryant had brought the Bratz designs to

11     Mattel and given Mattel an opportunity and Mattel had

12     developed it but done some market research that indicated

13     that if it brought Bratz to market, it would take sales away

14     from Barbie, does that mean that Mattel would not have

15     considered bringing Bratz to market?

16     A    I know speaking for me at Mattel, my views on that

17     issue of cannibalization have been very clear for years.

18     Q    And what do you mean by that?  What are your views?

19     A    My views have consistently been for decades that if a

20     brand is going to be introduced to take business away from

21     another brand, it ought to come -- it's even best coming

22     from the company that makes the first brand.

23          In this case, if there is going to be a Barbie killer,

24     it ought to come from Mattel, that kind of internal

25     trade-off is good --
```

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

64

1    Q    What --

2    A    -- or can be good.

3    Q    What do you mean?  What do you mean by that?

4    A    I mean, my view of this is, these things -- these

5    things happen.  New products are introduced.

6    Q    Right.

7    A    Somebody is going to introduce the better mouse trap.

8    The company who makes the mouse trap ought to be the one

9    introducing the better mouse trap.

10   Q    And is that a view that you've expressed before today?

11   A    I've had that view for decades, consistently.

12   Q    Now, we've talked about this New York Times article, or

13   it was a Wall Street Journal article that you saw in July of

14   '03; do you recall that?

15   A    I do.

16   Q    And did it identify Carter Bryant as being a designer,

17   a former employee in the Mattel design center?

18   A    I believe it did.

19   Q    But did it indicate that he had designed Bratz while he

20   was employed in the design center?

21            MS. KELLER:  Objection.  Assumes facts not in

22   evidence, your Honor.

23            THE COURT:  Just a moment.

24            MS. KELLER:  That's a jury question.

25            THE COURT:  Just a moment.

```
 1             Now, this is not introduced for the truth of the
 2   matter asserted, once again.  This is hearsay, but it can be
 3   introduced to show what his state of mind is and what action
 4   he took based upon this Wall Street Journal article, but you
 5   are not to assume that that Wall Street article has correct
 6   facts or that there are any facts attached to it.
 7             Now, Counsel, you can ask that question.
 8             MR. QUINN:  Okay.
 9             THE WITNESS:  Can you ask it again?
10   BY MR. QUINN:
11   Q    Yes.  As of July of 2003 when you read this Wall Street
12   Journal article, I mean, did you learn from that that
13   Mr. Bryant had designed Bratz while he was working for
14   Mattel in the Mattel design center?
15   A    No, I did not.
16   Q    When did you learn that?
17   A    I learned that in the fall of 2003, sometime around
18   Thanksgiving.  I don't -- I don't mean to adopt or agree
19   with everything you just said.  I learned about the fact
20   that Mr. Bryant was working at both Mattel and a competitor
21   in the fall of 2003.
22   Q    Are you saying that you knew in the fall of 2003, that
23   Mr. Bryant had designed Bratz in the Mattel design center?
24   A    No, I didn't know that.
25   Q    All right.  Is that something that you later learned?
```

1   A     Yes.

2          MS. KELLER:  Objection.  Assumes facts not in

3   evidence, your Honor, that he designed Bratz in the Mattel

4   design center?

5          THE COURT:  Well, that's assuming a fact, so

6   sustained, Counsel.  And the answer is stricken.

7          MR. QUINN:  Okay.

8   BY MR. QUINN:

9   Q     Can you tell us whether or not you learned later that

10  Mr. Bryant had done the drawings that were the basis of --

11  became the basis of the Bratz dolls while employed by

12  Mattel?

13         MS. KELLER:  Objection.  Assumes --

14         THE COURT:  Sustained.  Sustained.

15         What it does is it assumes facts not in evidence.

16         MR. QUINN:  Right.

17         THE COURT:  In other words, if that came to be his

18  belief, so be it.  You can ask the question, but the

19  statement sounds like a fact.

20         MR. QUINN:  Right.

21  BY MR. QUINN:

22  Q     Let me try asking it this way:  Based upon the later

23  discovery that was obtained, did you come to the belief that

24  Mr. Bryant had done those drawings while he was a Mattel

25  employee?

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

67

 1    A     Yes, I did.

 2    Q     Would you agree -- if Paula Garcia testified that it

 3    would be --

 4              THE COURT:  Counsel, no.

 5              MR. QUINN:  No?

 6              THE COURT:  No.

 7              MR. QUINN:  Okay.

 8              THE COURT:  We can't remember who different

 9    witnesses are anymore.

10              I'm just joking with you.

11              They'll have a chance to argue this in about -- a

12    very short period of time, actually, so they can argue these

13    facts to you from both sides.

14              MR. QUINN:  Different subject, your Honor.

15    BY MR. QUINN:

16    Q     During cross-examination, Ms. Keller asked you some

17    questions about a copyright registration form; do you recall

18    that?  I think it's Exhibit 13873.

19              MR. QUINN:  If we can put that up on the screen.

20              And if we can go to the next page, Ken.

21    BY MR. QUINN:

22    Q     And she called your attention to a box about work for

23    hire, it's about there in the middle, and asks you about --

24    was this contribution to the work, a work made for hire, and

25    pointed out that the box was checked "no"; do you recall

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 68 of 93   Page ID #:306901
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

68

1    those questions?

2    A    I do.

3    Q    Now, do you know -- you know, did you learn when you

4    were in law school that -- that was a joke.

5            (Laughter.)

6    BY MR. QUINN:

7    Q    You haven't ever been to law school?

8    A    I've had time since this case began, and I've seen the

9    movie, I think it was called "Convicted" very recently.

10           (Laughter.)

11   BY MR. QUINN:

12   Q    Do you know whether or not work made for hire, whether

13   that's a specialized technical term of art in copyright law?

14   A    I believe it's a legal term.  I don't know if it's a --

15   a copyright law legal term, but I believe it's a legal term.

16   Q    Do you know whether or not the copyright office -- when

17   one submits one of these applications for registration, do

18   you know whether or not the copyright office requires that

19   the applicant, the person submitting the application, must

20   pick one basis for ownership, that is to say whether you

21   must make a choice between an assignment like under an

22   inventions agreement or work for hire; do you know whether

23   that choice is required?

24   A    I've come to understand that, but I didn't know that.

25   Q    Do you know -- do you know why one would be chosen

1    rather than another?

2    A    No.

3    Q    But putting that aside, is it -- can you tell from

4    looking at this that Mattel is claiming ownership of this

5    drawing, copyright --

6              MS. KELLER:  Objection.  Calls for conclusion.

7              THE COURT:  No, overruled.

8              You can answer that question.

9              THE WITNESS:  May I see the whole document?

10             MR. QUINN:  If we could maybe enlarge Section 4

11   down there at the bottom.

12             THE COURT:  Now, remember, this is his personal

13   opinion.  Each side can introduce an expert on this area if

14   they choose.

15   BY MR. QUINN:

16   Q    Do you see there, the copyright?

17             MS. PHILLIPS:  We need a copy up here.

18             MR. QUINN:  Pardon?

19             MS. PHILLIPS:  We need a copy.

20             MR. QUINN:  This is Exhibit 13873.

21             THE COURT:  This was already received, so you can

22   put it up on the board.

23             MR. QUINN:  It's actually already up there, your

24   Honor.

25

1    BY MR. QUINN:

2    Q    Mr. Eckert, just very simply, who is the copyright

3    claimant, who claims ownership up here in this copyright

4    application?

5    A    It says Mattel, Incorporated, Mattel, Inc.

6         MR. QUINN:  And I ask if Exhibit 13757 could be

7    placed before the witness, 13757.

8         Yeah, if we could go back, Ken, and find where it

9    says -- that last exhibit that says assignment.

10   BY MR. QUINN:

11   Q    And under Mattel, there is a reference there to

12   assignment; do you see that?

13   A    I do.

14   Q    And then if we can look at Exhibit 13757.

15   A    I have that.

16   Q    You understood from that last registration, that Mattel

17   was claiming ownership by way of assignment, correct?

18   A    Yes.

19   Q    And if we look at Exhibit 13757, can you identify this

20   as a registration document attaching a notice of copyright

21   assignment filed on behalf of Mattel for --

22   A    Yes, yes.

23   Q    -- in this case, it says on the first page, a Jade

24   drawing?

25   A    Yes.

CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

71

```
1              MR. QUINN:  We'd offer that, your Honor.

2              THE COURT:  Received.

3              (Plaintiffs' Exhibit No. 13757 is received in

4       evidence.)

5              MR. QUINN:  And if we can just enlarge that.

6   BY MR. QUINN:

7   Q    There is the certificate and the ribbon and the gold

8   seal.

9              MR. QUINN:  If we can go to the next page.

10  BY MR. QUINN:

11  Q    And it says, "Certificate of Recordation."

12             MR. QUINN:  And then the next page.

13  BY MR. QUINN:

14  Q    And that refers there, it's a registration relating to

15  a Jade drawing; do you see that in 5?

16  A    I do.

17  Q    And then down at the bottom, it's a reference to when

18  recordation will be mailed to a Michael Moore, senior

19  counsel at Mattel; do you see that?

20  A    I do.

21  Q    And then attached to it is a notice of copyright

22  assignment, the next page?

23  A    Yes, I see that.

24  Q    I think it's the --

25  A    In my packet, it's two pages.  You just have the two
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 72 of 93   Page ID #:306905
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

72

1    pages reversed in my packet.

2    Q    All right.  If we can skip forward -- do you have the

3    notice --

4    A    I have the page that says "Notice of Copyright

5    Assignment."

6    Q    There it is.

7         And this says, "Mattel, Inc., hereby provides notice

8    that in that certain employee confidential information and

9    inventions agreement executed by Mattel, Inc., on the one

10   hand, and Carter H. Bryant, on the other hand, on January 4,

11   2000, 1999, a copy of which is attached hereto and

12   separately recorded, Carter H. Bryant assigned to Mattel,

13   Inc., as and from the time of creation, exclusively and

14   throughout the universe, all right, title and interest in

15   and to the following works," and then there is a list of

16   works entitled "Jade Drawing, Sasha Drawing, Bratz Group

17   Drawing, Cloe Drawing, Yasmin Drawing"; do you see that?

18   A    I do.

19   Q    And then also, recorded with this with the copyright

20   office is Mr. Bryant's employee confidential information and

21   inventions agreement; that's attached as well.  Do you see

22   that?

23   A    I do.

24   Q    So from this, does it appear to you that Mattel

25   actually filed with the copyright office the notice of

1    assignment from Mr. Bryant as being the basis for its claim

2    of ownership to these drawings?

3    A    That's what it appears to me.

4    Q    You were asked whether you thought that flames behind a

5    house were a oak leaf; do you recall that?

6    A    I do.

7    Q    And if we can look at Exhibit 1807.  Ms. Keller asked

8    you if the first time you saw this picture, you said it

9    looked like an oak leaf, right?

10   A    I'm not sure that's what she specifically asked.  I

11   remember when I first saw this picture.

12   Q    All right.  And when was that?

13   A    That was in my very first deposition in this case,

14   which may have been in January of 2008.

15   Q    And at that time, did you see this document for the

16   first time?

17   A    That's correct.

18   Q    And you said at the time that you thought behind the --

19   behind the house was something that looked like a leaf?

20   A    At the time not having seen the document, it looked

21   like an oak leaf to me.

22   Q    And if we look at the next page of this.

23        The next page has got "house on fire" on the top,

24   right?

25   A    Yes.  Yes, it does.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 74 of 93   Page ID #:306907
CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

74

1  Q    "House on fire" does not appear on that first page,

2  right?

3  A    That's correct.

4  Q    All right.  So when you saw the second page, did you

5  understand this was not a leaf?

6  A    I'm starting to get the picture.

7  Q    All right.  And then you were asked some questions

8  about Project Platypus, and a Business Week article

9  concerning Project Platypus, and whether this was –– whether

10 Ivy Ross had disclosed some Mattel trade secret in

11 cooperating with this Business Week article; do you recall

12 that?

13 A    I do.

14 Q    Did you know about the article in advance?

15 A    I did.

16 Q    Were you consulted about it?

17 A    I don't know if I'd use the word "consulted."  I would

18 use the word probably "apprised."

19 Q    And did you voice any objection to Ms. Ross talking

20 about this Project platypus with BusinessWeek?

21 A    None at all.

22 Q    Why not?

23 A    I thought it was a good thing.  The –– I thought the

24 project was a good project.  I thought the recognition of

25 Mattel pursuing something like this, working on innovation,

1    working on new ideas was good for Mattel.

2    Q    Could we turn, now, to Exhibit 2302.

3         And Ms. Keller called your attention at the top to some

4    letters NHB; do you see that?

5    A    I do.

6    Q    NHB time line.

7         And she asked you why was NHB -- I don't remember the

8    exact question, but why was NHB part of this e-mail, or why

9    did you type in "NHB"; do you recall that?

10   A    No.  I recall being asked about this, but I don't

11   recall anything about being asked about typing in.

12            MR. QUINN:  Well, if we can enlarge that upper

13   left-hand corner.

14   BY MR. QUINN:

15   Q    Does it appear to you that NHB time line, there, is in

16   a different typeface than the rest of the e-mail?

17   A    I don't know.

18   Q    You can't tell?

19   A    I can't.

20   Q    Did you put that there, up at the top?

21   A    I doubt it.  The answer is no, I didn't.

22   Q    How do you know that?

23   A    I don't -- I don't have any NHB code name or -- when

24   I -- when I print something out that I print out to myself,

25   I print it out.  I wouldn't add something to it, certainly

 1   not some initials that I don't know or use.

 2   Q    I mean, does your e-mail system that you use there at

 3   Mattel -- actually, when you create an e-mail, does it

 4   permit entering data up there, above the address, if you are

 5   doing it when you're creating the e-mail?

 6   A    I have no idea.  I -- I don't know how to.  It might,

 7   but I don't know how to do that.

 8              MS. KELLER:  I'm going to move to strike, your

 9   Honor, as speculation.

10              THE COURT:  No.  Overruled.

11   BY MR. QUINN:

12   Q    So now, I'd like to turn to some questions you were

13   asked this morning.  Right at the beginning of the

14   cross-examination this morning, you were asked some

15   questions about your predecessor, Jill Barad, which I think

16   was suggested to be a very extravagant severance package

17   that she received when she left; do you recall those

18   questions?

19   A    I do.

20   Q    Were you even with Mattel when Ms. Barad left the

21   company?

22   A    No, I wasn't.

23   Q    Did you have any involvement at all in making the deal

24   that was made with her at the time of her departure?

25   A    No.

1    Q    Do you know whether or not she had an employment

2    contract with Mattel?

3    A    Yes, she did have an employment contract.

4    Q    And at the time she left, that contract still had some

5    time to run on it?

6    A    Yes.

7    Q    So if she were to leave, that would have to be dealt

8    with in some fashion?

9    A    Correct.

10   Q    Similarly, you were asked about Adrienne Fontanella and

11   Matt Bousquette.  Did they also have employment contracts

12   with Mattel?

13   A    Yes, they did.

14   Q    Were you involved at all in the negotiation of their

15   employment contracts?

16   A    No, I was not.

17   Q    Can you tell us whether or not their employment

18   contracts were in place already at the time that you

19   arrived?

20   A    Yes, they were in place.

21   Q    And when we're talking about employment contracts,

22   what -- what are we talking about here?

23   A    We are talking about the terms of employments.  It can

24   have to do with the position.  In this case, we're

25   specifically talking about the severance terms.

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

78

```
1    Q    I mean, do most employees have employment contracts

2    like that?

3    A    No.

4    Q    That's -- what employees had employment contracts?

5    A    At Mattel?

6    Q    Yes.

7    A    I may be the only employee with an employment contract.

8    Q    And at the time you arrived, were there a number of

9    employees?

10   A    There were.

11   Q    Let's turn to the 2007 product recalls.  The product

12   recalls related primarily to what products?

13   A    More than any other line, it would have been a

14   Fisher-Price brand of products.

15   Q    Were any Barbie products affected by the lead paint

16   recalls?

17   A    Yes.

18   Q    And can you just tell us what those products were, the

19   Barbie products that were affected by the paint recalls?

20   A    They were not Barbie dolls.  They were Barbie

21   accessories, and there was an -- an impermissible level of

22   lead within these components within these of play sets.

23   Q    Can you give an example of an accessory?

24   A    I can't.  Like a kitchen set.

25   Q    And the lead paint problem would be associated with
```

1   what in the kitchen set?

2   A     In this specific case, I believe in a kitchen set, or

3   something like a kitchen set, there were impermissible

4   levels of lead on a plate that I believe had potato chips,

5   and I think it was the plate of the potato chips that was

6   the problem.

7   Q     Were there any Barbie dolls that were affected by the

8   lead paint?

9   A     No.

10   Q     And how about the magnets, were there any Barbie

11   products that were affected by the magnet recalls?

12   A     Yes, there was.

13   Q     And can you tell us what those were, or how many?

14   A     I believe it was -- I believe there was one Barbie

15   doll, one Barbie product that was affected by the magnet

16   recall.

17   Q     You indicated that you shut down the supply chain.

18   What did you mean by that?

19   A     Around August 1st of 2000, we stopped shipping Mattel

20   products from Asia --

21   Q     2000?

22   A     I'm sorry, 2007.  I apologize.  Around August 1st,

23   2007, we stopped shipment of Mattel products out of Asia

24   until we had confirmed results that they did not violate the

25   lead paint standards.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 80 of 93   Page ID #:306913
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

80

1    Q    And what did -- what impact did that have on Mattel's

2    business to shut down the supply chain?

3            MS. KELLER:   Your Honor, are we permitted to go

4    into details now on recross?

5            MR. QUINN:   I'm just asking to follow-up on the

6    question she asked about supply chain.

7            MS. KELLER:   Since we are getting into details,

8    are we allowed to do that?

9            THE COURT:   I don't know yet.   Let me hear the

10   question and the answer.   I know you'd like to, but let's

11   hear the question and the answer.

12   BY MR. QUINN:

13   Q    Did shutting down the supply chain have an impact on

14   Mattel's business?

15   A    Certainly in the short term.

16   Q    Did the recalls cause a downturn in Mattel sales, in

17   general?

18   A    Certainly during the time of the -- during the recalls,

19   it may have, yes.

20   Q    Can you tell us how Mattel's total sales that year, the

21   year 2007, compared to the year before, 2006?

22   A    I believe they increased 6 percent.

23   Q    And then if we go forward to 2008, you were asked some

24   questions about individual quarters in 2008, and I think

25   particularly the first quarter in 2008, it -- is there -- do

1    you have certain expectations in the toy business relating

2    to the first quarter?  Do they tend to be higher or lower

3    than other quarters?

4    A    The first quarter is the slowest time, generally, for

5    the toy business.  So there are many first quarters, as I

6    mentioned, where Mattel generates no profits at all.

7    Q    And do you -- can you tell us whether you tend to

8    remember results on a quarter-by-quarter basis or annual

9    basis?

10   A    Sometimes within the course of a year, I'll focus on

11   the quarters because it's a progress report, but we are very

12   clear with investors at Mattel that we don't run the company

13   on a quarterly basis, and they should invest in the company

14   on a quarterly basis, so I focus minimally on annual

15   results.

16   Q    Does the -- in terms of the volume, is there a

17   significant variation in first quarters versus other

18   quarters in the toy business?

19   A    Yes.  Generally, the first two quarters are much slower

20   times for the toy business than the last two quarters.

21   Q    And as a result of that, does that affect the amount of

22   variation, quarter to quarter?

23   A    Are you talking about --

24   Q    In terms of sales?

25   A    Yes, it's a smaller base.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 82 of 93   Page ID #:306915
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

82

1   Q    By -- you've talked about -- we've talked a lot about

2   the affect of Bratz sales and growing market share on Mattel

3   fashion doll sales and Barbie market share.  You know, by

4   the time of the -- we're talking about now, at the time of

5   the recalls in 2007, was Bratz as big a factor in terms of

6   its -- its -- as a competitor in diverting sales from Barbie

7   and Mattel's other fashion dolls?

8   A    No, I don't think it was.

9           MR. QUINN:  Your Honor, would now be a good time

10  for a break?

11          THE COURT:  We haven't even gone an hour, have we?

12          MR. QUINN:  I haven't been watching the clock.  We

13  can keep going, your Honor.

14          THE COURT:  Yeah, why don't we finish your

15  examination and then take a break between your examination

16  and the redirect.

17          MR. QUINN:  All right.

18  BY MR. QUINN:

19  Q    You were asked a number of questions yesterday about

20  Mattel's foreign subsidiaries; do you recall that?

21  A    Yes.

22  Q    You were asked whether there is anything odd or unusual

23  about having foreign subsidiaries or affiliated

24  corporations; do you recall that?

25  A    I don't remember that question.

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

```
1    Q    All right.  Well, do you have an understanding about

2    observance of corporate formalities, you know, for the

3    corporate entity?

4              MS. KELLER:  Objection.  Irrelevant, unless he's

5    testifying as an expert, your Honor.

6              THE COURT:  Yeah.

7              MR. QUINN:  I asked about this yesterday, your

8    Honor.

9              THE COURT:  Yeah, I understand that, and let me

10   let you do this again.  I don't know where you're going,

11   though.  Is this a privately held company, publicly held

12   company, pertaining to his own board?

13             MR. QUINN:  Pertaining to Mattel, his experience

14   in the business world, what he understands about the

15   necessity of observing corporate formalities.

16             THE COURT:  Overruled.

17             But if it relates back to MGA, the answer is no.

18   In relation to Mattel, the answer is yes, conducting his own

19   business, his own board, but he's not going to be an expert

20   in terms of a privately held company.

21             (Attorney discussion held off the record.)

22             THE COURT:  Although he may have knowledge about a

23   privately held company, that's not the -- he's not going to

24   start asserting documents or casting opinions about whether

25   it's a properly held board or meetings, et cetera.
```

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 84 of 93   Page ID #:306917
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

84

1    BY MR. QUINN:

2    Q    Do you have some understanding about the need to

3    observe corporate formalities?

4    A    Yes.  I believe there are some requirements in

5    countries in which companies do business to have certain

6    entities, legal entities.

7                THE COURT:  Now, this pertains to Mattel?

8                MR. QUINN:  To Mattel.

9                THE WITNESS:  To Mattel.

10   BY MR. QUINN:

11   Q    And at Mattel, is that something that Mattel pays a lot

12   of attention to, making sure that corporate formalities are

13   observed?

14   A    I'm sure we do.

15   Q    At Mattel, have you ever sent your CFO an e-mail saying

16   "Do 30 million, please"?

17               MS. KELLER:  Okay --

18               THE COURT:  Sustained.  Stricken.  Disregard,

19   ladies and gentlemen.

20               MS. KELLER:  And your Honor --

21               THE COURT:  That's fine.  Sustained.  Stricken.

22   Disregard the question.

23               MR. QUINN:  I'm moving on, your Honor.

24               THE COURT:  Yes, you're moving on.

25

CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

85

1    BY MR. QUINN:

2    Q    You were asked some questions about your compensation.

3    What was your salary when you started at Mattel?

4    A    $1,250,000 a year.

5    Q    And what is your salary today?

6    A    $1,250,000 per year.

7    Q    It hasn't changed?

8    A    That's correct.

9    Q    Is there a reason for that?

10   A    Yes.

11   Q    What is that?

12   A    I believe CEOs, in general, me in particular, are well

13   compensated and don't need raises.

14   Q    Have you been offered raises?

15   A    I have.

16   Q    Are there other components to your compensation other

17   than your salary?

18   A    Yes.

19   Q    What are those other components?

20   A    I receive bonuses based on the performance of the

21   company.  I receive stock awards that may increase in value

22   if the value of the company increases.

23   Q    Do you also receive stock options, or is that what

24   you --

25   A    I do.  I would put that in the stock awards.

```
 1    Q    Have you ever -- has your compensation been anything
 2    approaching $200 million in total since you joined Mattel?
 3    Or you've been hiding that from your wife?
 4    A    My wife, she wanted to know that, but --
 5            (Laughter.)
 6    BY MR. QUINN:
 7    Q    Has it been anything approaching that?
 8    A    No.
 9    Q    Could you tell us -- you said the bonuses are based on
10    the performance of the company.  What do you -- what do you
11    mean by that?
12    A    That's correct.  It's primarily based on improved
13    profitability of the company.  There are specific measures,
14    but in general, if the company's profits increase, our bonus
15    is paid.
16    Q    Are there specific metrics that, I guess, the board of
17    directors have set for -- or goals that if you meet, you are
18    going to get a certain bonus?
19    A    That's correct.  The metrics are set in advance, so
20    that we -- we know what the goal is, and if we achieve those
21    goals, we earn a bonus.
22    Q    And -- and the stock options, how does that work?  I
23    mean, when you get a stock option, the day you get it, is
24    that something that that day has value?
25    A    The stock option is the opportunity to buy a share of
```

1    stock at a certain price.  The day you receive a stock

2    option, it is at that price.  So technically, the day you

3    receive a stock option, you can't sell that option and make

4    any money.  You would -- let's say you had a stock option at

5    $25.  You would pay $25 for the share and sell it for $25,

6    so you would not profit.  But if -- if over time the value

7    of the company increased and the stock price increased, you

8    would make money on the difference between the higher price

9    over time and the price at which you were awarded the stock

10   option.

11   Q    And do you actually have to pay something or give some

12   consideration if you exercise the option to get the stock?

13   A    Yes.  In my example, you have to pay the $25.  You have

14   to pay the whatever price the grant -- the grant price is.

15   Q    Can you tell us what percentage of your total

16   compensation is tied to the success or the performance of

17   the company, between bonuses and stock grants and stock

18   options?

19   A    Probably between two-thirds of my compensation and

20   maybe 80 or 85 percent of my compensation.

21   Q    I mean, if you are -- can you tell us what the total

22   revenue was at Mattel when you first joined the company,

23   annual revenue?

24   A    I believe in the year 2000, it would have been a little

25   over four-and-a-half billion dollars.

1  Q    And do you know what the total revenue was this last

2  year?

3  A    It was $5.9 billion.

4  Q    If the company does not do well, I mean, if it -- if it

5  does very, very poorly, under your arrangement with the

6  board of directors, are you eligible to get bonuses?

7  A    There have been years that I've received zero bonus,

8  and other senior managers have received zero bonus.

9            MR. QUINN:  And, your Honor, I'd like to offer --

10 BY MR. QUINN:

11 Q    You made reference in response -- Ms. Keller asked you

12 about, you know, in connection with these 2007 recalls that,

13 you know, Mattel engaged in communications and public

14 relations campagne; do you recall those questions?

15 A    I do.

16 Q    And you said that actually Mattel took out ads in major

17 newspapers?

18 A    That's correct.

19            MR. QUINN:  And your Honor, we'd like to mark and

20 offer in evidence a Wall Street Journal ad dated

21 August 14th, 2007, trial Exhibit 24244; from U.S.A. Today,

22 trial Exhibit 24243; and from the New York Times, trial

23 Exhibit 24245-1.

24            THE COURT:  All right.

25            MS. KELLER:  Your Honor, we would object unless we

1   can put in the articles that we'd like to introduce.

2            THE COURT:  Yeah, we are not going to receive

3   those, Counsel.  It's enough that you put out articles, and

4   there's testimony concerning that.

5            MR. QUINN:  Your Honor, I think I just have a

6   couple of exhibits I would like to offer --

7            THE COURT:  Okay.

8            MR. QUINN:  -- and for that purpose, I'd like to

9   reopen because these don't really relate to the last

10  examination, but it's just two exhibits, and I'm just going

11  to offer the two exhibits, if that's permitted.

12  BY MR. QUINN:

13  Q    If you'd look at Exhibit 23846.

14  A    Yes.

15           MR. QUINN:  23846.

16           MS. KELLER:  Can we just have a moment, Counsel?

17           MR. QUINN:  Sure.

18           *(Attorney discussion held off the record.)*

19           THE COURT:  What volume was that in?

20           MR. QUINN:  Pardon me?

21           THE COURT:  Do you recall what volume that was in?

22           MR. QUINN:  This was a --

23           THE COURT:  It would be a supplemental volume?

24           MR. QUINN:  This was a supplement, your Honor.

25           THE COURT:  Yeah, I got it.

Case 2:04-cv-09049-DOC-RNB   Document 10140   Filed 03/07/11   Page 90 of 93   Page ID #:306923
CV 04-9049-DOC - 03/03/2011 - Day 27, Vol. 2 of 4

90

 1            MR. QUINN:  Volume -- Volume 1, actually, your

 2    Honor.

 3            THE COURT:  Yeah.

 4            MR. QUINN:  Volume 1.

 5            THE COURT:  This 23846 is volume 16, Counsel, if

 6    you are looking for it.

 7            MR. QUINN:  I'm sorry?

 8            THE COURT:  I'm just notifying counsel where they

 9    can find it.  They'll find it at Volume 16, and then we went

10    back to Volume 1.  That's where it is.

11            Mr. McConville, it was Volume 16 and then --

12            MR. MC CONVILLE:  Yes.

13    BY MR. QUINN:

14    Q    Can you identify that as a contract between Mattel

15    Mexico and Mattel Servicios with a certified translation

16    attached?

17    A    I can understand the translation that that is a

18    contract.

19        Yes, and it's a certified translation, yes.

20            MR. QUINN:  We'd offer that, your Honor.

21            THE COURT:  Is that one of those exhibits we went

22    over last night?

23            MR. QUINN:  No, your Honor.  It's not one of

24    these.

25            THE COURT:  Can I see it?

```
 1              (Complied.)

 2              THE COURT:  It's received.

 3              MR. QUINN:  Thank you, your Honor.

 4              (Plaintiffs' Exhibit No. 23846 is received in

 5       evidence.)

 6              MR. QUINN:  And then if we can put before the

 7    witness Exhibit 24176.  It's a tangible, a Barbie family.

 8              MS. KELLER:  May we inquire as to the relevance,

 9    your Honor?

10              MR. QUINN:  It's an affected product.

11              THE COURT:  Okay.

12    BY MR. QUINN:

13    Q    Can you identify Exhibit 24176?

14    A    This is a line of dolls from Barbie.

15              MR. QUINN:  We'd offer that, your Honor.

16              THE COURT:  I know we looked at that the other

17    evening.  Can you give us the name on it?

18              THE WITNESS:  It's Barbie.

19              On the back it says "Barbie Dolls."

20              MR. QUINN:  "Barbie Dolls," your Honor.

21              (Laughter.)

22              THE COURT:  Okay.  Counsel, I'm not sure why we

23    are doing this, but it's received.

24              MR. QUINN:  Thank you, your Honor.

25
```

1          *(Plaintiffs' Exhibit No. 24176 is received in*

2          *evidence.)*

3     BY MR. QUINN:

4     Q    All right.  And Mr. Eckert, earlier I had asked you

5     about whether during the entire period, from 2000 and 2007,

6     Barbie outsold Bratz during that entire period, and you

7     answered "yes."  You understood I was talking about

8     cumulatively, in total; is that correct?

9     A    Yes, I was.  At least I was.

10          *(Attorney discussion held off the record.)*

11          MR. QUINN:  Nothing further.  Thank you, your

12    Honor.

13          THE COURT:  Now, this appears to be a good time

14    for a recess.  I'm going to get you in about 15 minutes

15    again, and then get right back in for another hour, and then

16    let you go.

17          You are admonished not to discuss this matter

18    amongst yourselves, nor form or express any opinion

19    concerning this case.  Have a nice recess.

20          *(Recess.)*

21                              -oOo-

22

23

24

25

CV 04-9049-DOC – 03/03/2011 – Day 27, Vol. 2 of 4

93

1                         –oOo–

2                      **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 4, 2011

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25