Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,              )
                                  )
                 Plaintiff,       )
                                  )     DAY 27
          vs.                     ) No. CV 04-9049-DOC
                                  )     VOLUME 3 OF 4
MGA ENTERTAINMENT, INC.,          )
                                  )
                 Defendant.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

THURSDAY, MARCH 3 , 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**   QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                              BY:  MICHAEL ZELLER, ESQ.
3                             and  JOHN QUINN, ESQ.
                              865 S. FIGUEROA
4                             10TH FLOOR
                              LOS ANGELES, CALIFORNIA 90017
5                             (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                         BY:  ANNETTE HURST, ESQ.
                          405 HOWARD STREET
8                         SAN FRANCISCO, CALIFORNIA 94105
                          (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                        BY:  THOMAS MCCONVILLE, ESQ.
                          4 PARK PLAZA
12                        SUITE 1600
                          IRVINE, CALIFORNIA 92614
13                         (949)567-6700

14
                          KELLER RACKAUCKAS
15                        BY:  JENNIFER KELLER, ESQ.
                          18500 VON KARMAN AVENUE
16                        SUITE 560
                          IRVINE, CALIFORNIA 92612
17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                        BY:  MARK OVERLAND, ESQ.
                          100 WILSHIRE BLVD
20                        SUITE 950
                          SANTA MONICA, CA. 90401
21                        (310) 459-2830

22

23

24

25

1                              - AND -

2                              SCHEPER KIM & HARRIS LLP
                               BY:   ALEXANDER COTE, ESQ.
3                              601 WEST 5TH STREET_12TH FLOOR
                               LOS ANGELES, CA. 90071
4                              (213) 613-4660

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

a370b210-62c5-49b3-b3d2-b082459220eb

```
 1                         I N D E X

 2
     PLAINTIFF'S                                        VOIR
 3   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS  DIRE

 4   ROBERT ECKERT                                   5

 5

 6

 7

 8                         EXHIBITS

 9
     DEFENDANT'S                        FOR          IN
10   EXHIBIT  DESCRIPTION          IDENTIFICATION  EVIDENCE

11      15770                                       11
        18355                                       52
12      26554                                       12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

 1              SANTA ANA, CALIFORNIA; THURSDAY, MARCH 3, 2011

 2

 3              **THE COURT:**  Back in session.  Counsel are present, the

 4     jury is present.  Ms. Keller beginning with her

 5     recross-examination.

 6                           RECROSS-EXAMINATION

 7     BY MS. KELLER

 8     **Q**    Mr. Eckert, if we can just finish up on one issue.  In

 9     addition to all the other negative publicity that Mattel suffered

10     in 2007 from the lead paint recalls and the magnet recalls, all

11     the safety issues, you were subject to a lot of negative publicity

12     as well at Mattel for delaying in reporting these issues to the

13     federal authorities, especially the --

14              **MR. QUINN:**  Objection, Your Honor.  That was not the

15     question.  Move to strike.

16              **THE COURT:**  Yes, it was.

17              **MR. QUINN:**  No, it was not, Your Honor.

18              **MR. PRICE:**  Assumes a fact.

19              **THE COURT:**  I'm sorry.  It's "Mr. Eckert, you," that's

20     the problem.

21              **MS. KELLER:**  If you keep reading, Your Honor, I did not

22     say, "Mr. Eckert."  I'll rephrase it, Your Honor.

23              **THE COURT:**  I'll sustain the objection.  Restate the

24     question.

25              **MR. QUINN:**  Your Honor, we request that she use the

Page 6

1    exact question.

2              THE COURT,:  I don't have the exact question.

3         **MR. QUINN:**  She does.

4         **THE COURT:**  Then you can read the question.

5    BY MS. KELLER

6    **Q**    In addition to all the other negative publicity about the

7    recalls themselves, and I'm talking about the recalls of your toys

8    for lead paint problems and the recalls of your toys for the

9    magnet safety problems, were you also subject to a tremendous

10   amount of negative publicity regarding Mattel's delay in reporting

11   these problems to the proper federal authorities?

12             **MR. QUINN:**  I object, Your Honor.  That is not --

13             **THE COURT:**  Overruled.

14             **MR. QUINN:**  It was allegations.

15             **THE COURT:**  Overruled.

16             You can answer the question, sir.

17             **THE WITNESS:**  There were some media reports that alleged

18   that.

19   BY MS. KELLER

20   **Q**    Well, I'm not just talking about some media reports.  A

21   tremendous number of them; right?

22   **A**    No.

23   **Q**    Was there one on the front page of the Wall Street Journal?

24             **MR. QUINN:**  Your Honor --

25             **THE COURT:**  You can follow-up, counsel.  I think I'm

1  going to open the door for both of you.  I'll leave that to each

2  of you, but you can point out the specific papers if you would

3  like to, counsel.

4  BY MS. KELLER

5  **Q**    You read the Wall Street Journal?

6  **A**    I do.

7  **Q**    Pretty significant publication in the business world; right?

8  **A**    Yes.

9        **THE COURT:**  Just a moment.

10        Ladies and gentlemen, this has the opportunity of being

11  a mini-trial within a mini-trial within a mini-trial with another

12  mini-trial.  I'm just kidding you.  The only import of this is if

13  there was publicity that might affect damages, if you get to

14  damages in this case -- in other words, if you ever found

15  liability here, or if you found liability, this might have an

16  effect concerning what the revenue was and how the revenue was

17  affected and whether Bratz was the primary or sole, you know,

18  reason for Barbie's decline, or whether there were other factors

19  as well.  And one of those is obviously, and you are hearing from

20  both counsel, a discussion about recalls and congressional

21  hearings, etcetera.

22        I think the import isn't the specific allegations,

23  etcetera, because they're not really important.  It's the affect

24  of those.  It's the notoriety and publicity and how investors

25  would feel about that, or how that affects revenues or shareholder

Page 8

1    interest, or investors on what happened to the stock.

2            So we're trying to confine it to that, but in a moment

3    apparently we're going to use the rest of the time on this event,

4    which we hope we don't.

5            **MS. KELLER:**  I have one question about that, Your Honor,

6    if it's answered.

7            **THE COURT:**  One question.

8    BY MS. KELLER

9    **Q**    And the question is:  And was that the subject of an article

10   on the front page of the Wall Street Journal?

11   **A**    Yes, it was.  I believe it may have been the front page.

12   **Q**    Now, you were asked some questions about an investigation as

13   to whether Carter Bryant allegedly plagiarized Lily Martinez' Toon

14   Teens project; right?

15   **A**    Yes.

16   **Q**    Now, Mattel rejected that product; correct?  Mattel didn't

17   introduce the Toon Teens.  Didn't pursue it?

18   **A**    That's correct.

19   **Q**    And that's because when you subjected it to a focus group,

20   girls didn't like it; right?

21   **A**    I don't know why the decision was made.

22   **Q**    Would you take a look at Exhibit 286, which is in evidence, I

23   think.  It's in evidence.  And this is a Worldwide Consumer

24   Research Confidential Mattel product; right?

25   **A**    That's correct.

1    **Q**    And this was dated November 17, 1999; correct?

2    **A**    Yes.

3    **Q**    And if you see under "Toon Teens" on the first page, "girls

4    had mixed reactions to the look of the dolls."  And on the right,

5    "Do not pursue development of the dolls."

6              That was the represented action; right?

7    **A**    That's correct.

8    **Q**    And Mattel followed that recommended action; right?

9    **A**    I know Mattel didn't introduce the dolls.  I don't know if

10   this was the cause of that.  But Mattel did not introduce the

11   dolls.

12   **Q**    Let's turn to page 4.  And you see where it says Toon Teens?

13   **A**    I do.

14   **Q**    And under "Girls had mixed reactions to the look of the Toon

15   Teens dolls," it said, "On the one hand many girls did not seem to

16   care for the doll's proportions, particularly the large size of

17   the head, legs and feet compared to the body."

18             And as you said, Mattel just did not end up introducing

19   that product; right?

20   **A**    That's correct.

21   **Q**    Now, you made some comments about the subject of so-called

22   cannibalization.  Cannibalization being when one of your products

23   or somebody else's product starts cutting into your market share

24   and existing product; right?

25   **A**    Yes.

1   **Q**    And you said that you personally have always thought that if

2   a product is going to be cannibalized, you want the company that

3   produces it to be the one that produces the cannibalizing new

4   product, because if you can build a better mouse trap, you ought

5   to be the one to do it; right?

6   **A**    Yes.

7   **Q**    Well, you have seen many documents in this litigation that

8   were cannibalization studies of Barbie; right?

9   **A**    I have certainly seen some.

10  **Q**    You have seen a lot of them in the course of being CEO of

11  Mattel, too?

12  **A**    No.

13  **Q**    You have never seen new brand cannibalization studies from

14  your company?

15  **A**    I have seen what you showed me yesterday or today.

16  **Q**    Now, you said in your deposition I believe -- well, let me

17  back up.

18          Isn't it true that the first time that -- before you

19  filed this lawsuit, are you aware of a single document Mattel ever

20  produced that said cannibalization of Barbie was a good thing?

21  **A**    No, I don't recall seeing a document either good or bad about

22  cannibalization.  It's possible.

23  **Q**    After this lawsuit was filed, you have seen some documents

24  about it from Mattel, and they have all been documents that cast

25  cannibalization of Barbie as a very negative thing; right?

Page 11

1   **A**   I would say certainly in a negative connotation.

2   **Q**   And there hasn't been a single document that you have seen

3   that says it's a good thing?

4   **A**   That's correct.

5   **Q**   And except for your statement at your deposition, are you

6   aware of any printed words, any paper anywhere emanating from

7   Mattel saying that cannibalization of Barbie can be a positive

8   thing?

9   **A**   No, I'm not.

10  **Q**   And actually, Mattel, over the years, has devoted a lot of

11  time and attention to trying to figure out ways to keep Barbie

12  from being cannibalized by other Mattel products; right?

13  **A**   It may have.

14  **Q**   You've seen those, haven't you, as CEO?

15  **A**   No, I haven't.

16  **Q**   Let's take a look at Exhibit 15770.  This is a Mattel

17  Worldwide Consumer Research document dated January 9 of 2002;

18  right?

19  **A**   Yes.

20          **MS. KELLER:**  Your Honor, I would move 15770 into

21  evidence.

22          **THE COURT:**  Received.

23              (Exhibit 15770 received in evidence.)

24  BY MS. KELLER

25  **Q**   And the subject of this is "My Scene Cannibalization Study

Page 12

1   Report."  And if we look at page 1, we see, "Research was recently

2   conducted with girls ages 6 to 10, to understand the interaction

3   between the My Scene segment and other toy brands.  The main

4   objective was to understand which brands My Scene potentially

5   cannibalizes, i.e. when My Scene is launched and purchased to

6   determine which brands are not purchased."

7           Now, let's go to page 4.  And we see a chart percentage

8   change in My Scene's share after this brand was introduced.  And

9   it shows Bratz minus 2 percent, no impact.  Mary-Kate and Ashley,

10  minus two, no impact.  Barbie 0 percent, no impact, etcetera.

11          All these dolls that are listed we see no impact.

12          And then under "Recommendation" it says "Continue to

13  pursue the My Scene brand as currently positioned."  Right?

14  **A**    Yes.

15  **Q**    Now, let's look at Exhibit 26554.  Do you have that in front

16  of you?

17  **A**    I do.

18  **Q**    That's another Worldwide Consumer Research Mattel internal

19  document dated January 14, 2002, and this is another new brand

20  cannibalization study; right?

21  **A**    Yes.

22          **MS. KELLER:**  Your Honor, I would offer 26554.

23          **THE COURT:**  Received.

24          (Exhibit 26554 received in evidence.)

25

1   BY MS. KELLER

2   **Q**    And if we look on the front page here, this says, "To gain

3   insight into the impact of various brands, (Bratz, Fashion Divas,

4   What's Her Face, Fashion Polly, Purrfect Family) on each other,

5   Barbie, and non-doll purchases, a new methodology was designed to

6   explore cannibalization dynamics."

7          Let's look down under "Summary of Findings."

8          It said, "Among 6 to 7 year olds, the presence of

9   Fashion Polly results in the greatest loss of share for the

10  mainline Barbie segment, (i.e. Salon Surprise) relative to other

11  test brands.  Among young and older girls (6 to 10 years old),

12  Fashion Polly also disproportionately impacts the share of What's

13  Her Face."

14         Now, immediately under that it says "Bratz has no

15  observable impact on Barbie among 6 to 7 year olds.  However,

16  among older 8 to 10 year olds, Bratz does appear to cannibalize

17  Barbie, Fashion Polly, and the Fashion Divas."

18         And then underneath that it says, "Among 6 to 7 year

19  olds, the introduction of Fashion Divas results in some minor loss

20  of share for Barbie.  Among 8 to 10 year olds, the cannibalization

21  of Barbie is more pronounced."

22         And then the last bullet point says, "Finally, the

23  introduction of What's Her Face does not appear to be accountable

24  for significant loss of share among new or existing doll brands,

25  although What's Her Face does have moderate impact on non-doll

Page 14

1    purchases."

2              Now, the date of this, January 14, 2002, was just after

3    the introduction of the first generation of the Bratz dolls;

4    right?

5    **A**    Yes.

6    **Q**    Now, let's look at the next page, page 2.  And we see "Loss-

7    of-Share Summary."  Let's look at the top where it says -- and we

8    look in the various age groups.  On the far right it says it

9    represented no threat to; and in the 6 to 7year old age group,

10   Barbie.  And in the 8 to -- well, Barbie is the relevant one I'm

11   focusing on.  It shows Bratz representing no threat to Barbie

12   market share in the 6 to 7 year old group; right?

13   **A**    That's correct.

14   **Q**    And then if we go to page 6 where it said "Older girls, ages

15   8 to 10 years:  Percentage change in share of chips by brand," we

16   see that now when we're dealing with girls 8 to 10 years old,

17   impacted brand.  Barbie minus 19 percent; Bratz impacts the Barbie

18   brand total minus 19 percent; right?

19   **A**    I believe that's what it's communicating.

20   **Q**    So Mattel's internal cannibalization studies showed that the

21   Bratz market share impact was likely to be greatest among girls 8

22   to 10, and very little impact on younger girls, true?

23   **A**    When it was first launched, yes.

24   **Q**    And that turned out to be accurate research, didn't it?

25   **A**    Yes.

1  **Q**    Now, I think you were telling us that you first saw Carter

2  Bryant's agreement with MGA, Exhibit 15, in fall of 2003.  You

3  thought around November; right?

4  **A**    Yes.  I at least saw excerpts of it, or the document.

5  **Q**    And you were asked who called it to your attention.  Do you

6  remember that?

7  **A**    I think I was asked who was in the meeting.

8  **Q**    Well, actually who called it to your attention; right?

9  **A**    I don't remember that.

10  **Q**    Well, someone brought it to your attention as opposed to you

11  bringing it to the attention of the others; correct?

12  **A**    That's correct.

13  **Q**    And you said in the meeting was Mr. Quinn, Mr. Zeller here at

14  the end of the table, and Bob Normile (phonetic)?

15  **A**    That's correct.

16  **Q**    And where was this meeting held?

17  **A**    In a conference room across from my office at Mattel.

18  **Q**    And who was it who gave you the copy of the contract?

19  **A**    I remember it being displayed in a presentation.

20  **Q**    By whom?

21  **A**    I don't remember which individual was going through the

22  documents.

23  **Q**    Well, it was one of the Quinn Emanuel lawyers; right?

24  **A**    No.  It was either one of the Quinn Emanuel lawyers or one of

25  the Mattel lawyers.

1   **Q**   And you had actually brought the Quinn Emanuel lawyers on

2   board on June 20, 2002, for the purpose of getting their advice

3   about suing MGA; right?

4   **A**   I think we have been associated with Quinn Emanuel for many

5   years.

6           **MR. QUINN:**   Irrelevant, Your Honor, and there is a

7   privilege issue.

8           **MS. KELLER:**   Your Honor, I think that was waived by the

9   asking of the question.

10          MR. QUINN:   No.

11          **THE COURT:**   No, I don't believe it is, counsel.   You can

12  inquire who was present.   You can inquire about the presentation

13  and who made it, I believe.   But if there is advice being given in

14  the room, the attorney-client privilege would seem to be

15  applicable.

16  BY MS. KELLER

17  **Q**   You were considering --

18          **THE COURT:**   If not we can consider that tonight.

19  BY MS. KELLER

20  **Q**   You were considering suing MGA from the time the Bratz doll

21  began to be successful; right?

22  **A**   No.   I was not.

23  **Q**   And you were considering suing MGA from June 20, 2002?

24  **A**   No.

25  **Q**   And you were looking for a reason, looking for something to

1   hang your hat on; right?

2   **A**    No.

3   **Q**    When you were shown this agreement -- and I think you

4   referred to this as the agreement where Mr. Bryant became an

5   employee of MGA?

6   **A**    I don't know if it was employee.  I recall it being working

7   exclusively for MGA.

8   **Q**    As a consultant; right?

9   **A**    It may have been.

10  **Q**    And well, do you know today?

11  **A**    I don't think it was as an employee at that time.

12  **Q**    When you saw this contract, did you ever pick up the phone

13  and call Isaac Larian and say, "Hey, what gives?  Do you know

14  there was a two-week overlap between our firms with this employee

15  of ours and this consultant of yours?"

16  **A**    No.

17  **Q**    Did you attempt to write a letter or an e-mail to Mr. Larian

18  to say, "Hey, what gives?  We have got a two-week overlap here?"

19  **A**    No.

20  **Q**    And by this time you had Mr. Larian's home address and home

21  phone number?

22  **A**    I did not.

23  **Q**    Well, Mattel did; right?

24  **A**    Yes, it did.

25  **Q**    And so it would have been a pretty simple matter to just pick

1    up the phone and say, "Hey, we may have a real problem here and

2    let's find out what you knew about this."  Right?

3    **A**    No.  I think by this time, this six- or eight-week window

4    that we're talking about with overlapping employment, Mr. Larian

5    had a clear relationship with Mattel that was very contentious.

6    **Q**    Well, I'm talking about before initiating a billion-dollar

7    litigation against MGA, I mean, didn't you want to call him up and

8    at least see what he had to say?

9    **A**    No, I did not.

10          **MR. QUINN:**  Misstates, Your Honor.  The question

11   misstates the context.  She asked about -- before suing MGA, she

12   had been asking about Mr. Bryant.

13          **MS. KELLER:**  I'll rephrase.

14   BY MS. KELLER

15   **Q**    Before suing anybody for a billion dollars, why not just pick

16   up the phone and call?

17          **MR. QUINN:**  Assumes there was a suit against Mr. Bryant

18   for a billion dollars.

19          **THE COURT:**  Counsel, sustained.

20   BY MS. KELLER

21   **Q**    Before suing anybody for anything, whether it was hundred

22   dollars of millions or a billion, why not pick up the phone and

23   say, "What gives with all this?"

24   **A**    I can't imagine any circumstances at that time that I would

25   pick up the phone and talk to Mr. Larian.

Page 19

1   **Q**     You wanted to put MGA out of business, didn't you?

2   **A**     No.

3   **Q**     You wanted the Bratz line for yourself, didn't you?

4   **A**     Not in April of 2004.

5   **Q**     You wanted to use whatever information you could get to try

6   to take all of the profits from Bratz for yourself and Mattel?

7   **A**     No.  Not until we learned what we learned as a result of

8   filing that lawsuit.

9   **Q**     Now, you had had people pursuing this for a while.  This

10  wasn't just out of the blue that in fall of 2003 this presentation

11  was made to you?

12            **MR. QUINN:**  This is vague and ambiguous, Your Honor.

13            **THE COURT:**  Overruled.  I'm going to reverse that.  It

14  is vague.  Reask the question.

15  BY MS. KELLER

16  **Q**     This wasn't just out of the blue that people turned up in

17  your office projecting copies of this contract; right?

18  **A**     No.  I'm sure they set up a meeting to do this.

19  **Q**     Wasn't out of the blue that they set up a meeting to do it if

20  you had hired people to look into this for you, to see if there

21  was any grounds to sue these folks; right?

22            **MR. QUINN:**  Vague and ambiguous.  What folks?

23  BY MS. KELLER

24  **Q**     Carter Bryant and MGA.

25            **THE COURT:**  Overruled.

Page 20

1      **THE WITNESS:**  I know -- I believe there was -- I believe

2   there were people looking at Carter Bryant's employment at Mattel

3   at the time, yes.

4   BY MS. KELLER

5   **Q**    You were looking for a way to sue Carter Bryant and MGA and

6   take all the profits they were making from Bratz; right?

7   **A**    We didn't do that.  No, we did not sue MGA in 2004.

8   **Q**    Yes, I know.  You sued Carter Bryant.  And you knew that if

9   you sued Carter Bryant alone you could kind of pick him off;

10  right?

11  **A**    No.

12  **Q**    That was a legal strategy, to sue Carter Bryant first; right?

13  **A**    No.

14  **Q**    And then force MGA into a position where MGA would have to

15  intervene to protect its intellectual property rights?

16      **MR. QUINN:**  This is argument, Your Honor.

17      **THE COURT:**  Sustained.

18  BY MS. KELLER

19  **Q**    Until Bratz became a big success, you didn't do anything

20  about Carter Bryant's supposed breach of his duty of loyalty to

21  Mattel; right?

22  **A**    We didn't -- I didn't know about Carter Bryant's breach of

23  loyalty to Mattel until the fall of 2003.

24  **Q**    The reason you went after him was because Bratz became a huge

25  success?

Page 21

1    **A**     No.

2    **Q**     The reason you went after MGA was because Bratz became a huge

3    success?

4    **A**     No.

5    **Q**     The reason we have seen all these memos about the house on

6    fire, the Bratz brief, the Bain study, was because Bratz had

7    become a huge success; right?

8              **MR. QUINN:**  Overbroad, Your Honor.  Compound.

9              **THE COURT:**  Well, it should be a question also.

10             **MS. KELLER:**  I'll go on, Your Honor.

11   BY MS. KELLER

12   **Q**     Now, yesterday you told us that, in your opinion, if somebody

13   had come up with some drawings of a toy 40 years ago even, and

14   then had come to work at Mattel and had not disclosed that on the

15   conflict of interest form, in your opinion those drawings would

16   belong to Mattel.

17             You remember testifying to that yesterday; right?

18   **A**     I don't believe so.

19             **MR. QUINN:**  Misstates the testimony.

20             **THE WITNESS:**  I don't believe that's what I said.

21   BY MS. KELLER

22   **Q**     After your testimony, you prepared with your attorneys;

23   right?

24   **A**     No.  I went home.

25   **Q**     You prepared with your attorneys today; right?

1    **A**    I met with Mr. Quinn this morning.

2    **Q**    You have talked with your attorneys in the interim between

3    your testimony yesterday and now?

4    **A**    Yes, I have.

5    **Q**    And you understand now that that testimony yesterday about

6    how Mattel would own --

7             **MR. QUINN:**  This is argument and assumes facts.

8             **THE COURT:**  Sustained.

9    BY MS. KELLER

10   **Q**    You understand --

11            **MR. QUINN:**  Request it be stricken.

12            **THE COURT:**  It is stricken.

13   BY MS. KELLER

14   **Q**    You understand today that the testimony yesterday about

15   Mattel's ability to own something created 40 years ago and put in

16   a drawer by virtue of the reasoning you gave yesterday, you

17   understand as you sit here today that that sounded ridiculous;

18   right?

19            **MR. QUINN:**  Argumentative.

20            **THE COURT:**  Sustained.

21            **MR. QUINN:**  Assume facts.  Move to strike, Your Honor.

22            **THE COURT:**  Stricken.

23   BY MS. KELLER

24   **Q**    Today, now, you are telling us that --

25            **MR. QUINN:**  Objection.  Argumentative, Your Honor.  "You

Page 23

1    are telling us."

2              THE COURT:  Just ask him a question, counsel.

3    BY MS. KELLER

4    Q    Today your testimony is that only if somebody had created

5    something before coming to work at Mattel and then came to Mattel

6    and worked on that same toy concept would it belong Mattel; right?

7              MR. QUINN:  That's what he said yesterday, Your Honor.

8    I object.

9              THE WITNESS:  I see no inconsistency between what I said

10   yesterday and what I said today.

11   BY MS. KELLER

12   Q    I'm not asking what you see.  I'm asking you a question about

13   what you said.  Okay?

14   A    Okay.

15   Q    Yesterday you testified that if I created something 40 years

16   ago and put it in a desk drawer then came to work at Mattel, that

17   by virtue of not disclosing it on the conflict of interest form,

18   that item would belong Mattel?

19   A    I don't believe I said that.

20   Q    As long as it related to toys?

21   A    I don't believe I said that.

22   Q    Today you are telling us, as I understand it, you are

23   testifying today that --

24             MR. QUINN:  Your Honor, again, the way it's phrased,

25   argumentative.

Page 24

1          **THE COURT:**  Rephrase it, counsel.

2     BY MS. KELLER

3     **Q**    Today you have testified that only if you brought something

4     with you to Mattel and worked on the project at Mattel would it

5     belong to Mattel; right?

6     **A**    Yes.  And I would be happy to try and explain my view which

7     is consistent both days.

8     **Q**    Sir, that's for the jury to decide.

9     **A**    Okay.

10          **MR. QUINN:**  Object to that.  Move to strike, Your Honor.

11          **THE COURT:**  Strike the comment.

12    BY MS. KELLER

13    **Q**    You do understand you are here in a capacity as a witness;

14    right, Mr. Eckert?

15    **A**    I do.

16    **Q**    And you are here to answer questions that are asked of you?

17    **A**    Yes.

18    **Q**    You understand you are not the trier of fact, true?

19          **MR. QUINN:**  Your Honor, this is argument.

20          **THE COURT:**  Sustained.

21    BY MS. KELLER

22    **Q**    When you sued Carter Bryant, you believed Mattel had been

23    harmed; right?

24    **A**    Yes.

25    **Q**    You sued him for breach of contract; right?

Page 25

1    **A**    Yes.

2    **Q**    And the breach that Mattel asserted was not that Carter

3    Bryant had taken Bratz to MGA rather than giving it to Mattel,

4    true?

5    **A**    I believe his breach was that he was working for a competitor

6    while he was working for Mattel.

7    **Q**    Well, previously, though, haven't you said that the breach

8    that Mattel asserted was that Carter Bryant had taken Bratz to MGA

9    rather than giving it to Mattel.  True?

10   **A**    I don't know.

11   **Q**    Please turn to your deposition page 90, October 4, 2010.

12   **A**    Yes, I have it.

13   **Q**    Take a look at, if you would, at lines 18 page 90 lines 18

14   through 23.  Had a chance to read that?

15   **A**    I have.

16   **Q**    And so the breach of contract that Mattel asserted was that

17   Mr. Bryant had taken Bratz to MGA rather than giving it to Mattel;

18   isn't that right?

19   **A**    I said I believe that's the case.

20   **Q**    That's what I'm asking.

21   **A**    That's what I said.

22   **Q**    And one of the forms of harm you believed had been suffered

23   by Mattel was it has lost sales of Mattel products to Bratz

24   products, true?

25   **A**    I believe ultimately that was the conclusion, yes.

Page 26

1   **Q**    So you didn't just sue Carter Bryant for working at two

2   places at the same time; right?

3   **A**    We did sue him for working at two places at the same time.

4   **Q**    The harm you claim accrued to Mattel was because he didn't

5   give Bratz to Mattel?

6   **A**    Ultimately, yes.

7   **Q**    Now, I want to also ask you about your testimony about --

8          **MR. QUINN:**  That's not offered for truth what the

9   complaint says, presumably.  It's what is intended.  We would

10  offer the complaint itself in evidence, Your Honor.

11         **THE COURT:**  We're not going to do that for either one of

12  you.

13         The complaints aren't being received into evidence.

14  Different complaints, depending upon which party's suing the other

15  party, has all sorts of allegations in it.  We'll leave the proof

16  of those allegations here.  I have made the determination that you

17  are not to see all of those 300 pages on each side.  I'm just

18  kidding you.  But I'm not kidding you.

19         The claims here are very well set forth by both parties,

20  and you'll get those for your consideration.  And I'm a little

21  concerned about a complaint that rolls in where each party starts

22  returning to a paragraph, because the parties could go back and

23  forth for significant period of time.  And one of you might accept

24  that as being the truth.  We'll hear that in the adversarial

25  process here, what the claims that are before you here.

Page 27

1          So we're not going to offer it and we're not going to

2     refer to it.

3     BY MS. KELLER

4     **Q**    I'm asking about your belief, Mr. Eckert.  Your belief was

5     that the breach of contract by Mr. Bryant was that he had taken

6     Bratz to MGA rather than giving it to Mattel; right?

7     **A**    Ultimately that became my belief, yes.

8     **Q**    Not ultimately.  At the time you filed the lawsuit?

9     **A**    At the time we filed -- at the time we filed the Carter

10    Bryant lawsuit?

11    **Q**    Yes.

12    **A**    My recollection is I didn't know at that time what dates

13    Carter Bryant drew the Bratz drawings.

14    **Q**    Not my question.  My question is when you filed suit against

15    Carter Bryant, you believed that when Carter Bryant took Bratz to

16    MGA instead of giving it to Mattel, that resulted in harm to

17    Mattel, true?

18    **A**    No, I don't think I believe that at that time.  I certainly

19    have come to believe that over time.

20            **MS. KELLER:**  Your Honor, I would like the witness to

21    take a look at his deposition, page 90, line 25 through 91, line

22    5.

23            **MR. QUINN:**  To 16, Your Honor.  We would request to 16

24    because I don't get another examination, Your Honor.

25            **THE COURT:**  I was given page 91; is that correct?  And

Page 28

1    on page 91, counsel, you would like me to refer to?

2              MS. KELLER:   90, Your Honor, line 25, through 91, line

3    5.

4              THE COURT:   Thank you.   Just a moment, counsel.   You may

5    read down to line 16.   I think that encompasses the entire answer

6    and his answer to this entire question.   So you both are -- I'm

7    sorry.   You may read from page 90 line 25, to 91 concluding at

8    line 16.

9    BY MS. KELLER

10   "QUESTION:   All right.   And when you filed suit against Carter

11   Bryant, you believed that when Carter Bryant took Bratz to MGA,

12   that that had resulted in harm to Mattel; isn't that true?

13   "ANSWER:   Yes, it is.

14   "QUESTION:   And one of the forms of harm that you believed it

15   caused when you filed suit against Carter Bryant in April 2004 was

16   that Mattel had lost sales of its products that instead went to

17   sales of Bratz products; isn't that true?

18   "ANSWER:   It's hard for me to opine on what that suit said when I

19   haven't read that document in months or years.   It's quite

20   possible."

21              Now, you also have told us about your belief in what

22   industry standards are in terms of licensing agreements with

23   inventors and others; correct?

24              MR. QUINN:   Misstates the testimony.

25              THE COURT:   Overruled.

1        **THE WITNESS:**  I have discussed relationships with

2    inventors.

3    BY MS. KELLER

4    **Q**    And as of December 18, 2009, you were not familiar with

5    industry standards in licensing agreements, true?

6    **A**    No, I wouldn't agree with that.

7    **Q**    Would you take a look at your deposition page 712, lines 8

8    through 9.  This is December 18, 2009.

9    **A**    We're on page?

10   **Q**    712, lines 8 and 9.

11       **THE COURT:**  You may read, counsel.

12   BY MS. KELLER

13   **Q**    "THE WITNESS:  I'm not really family with industry standards

14   in licensing agreements."

15       **MR. QUINN:**  Could he also read the question?

16       **THE COURT:**  Let's go back to the question, counsel.

17   BY MS. KELLER

18   **Q**    "QUESTION:  Apart from obtaining written representations and

19   warranties in such licenses and conducting due diligence with

20   respect to those representations and warranties and ownership and

21   such licenses, is there anything else in your view that is

22   standard in the industry to perform in connection with such

23   transactions in order to ensure a valid transfer of rights?

24   "ANSWER:  I'm not really familiar with industry standards in

25   licensing agreements."

1          Now Mr. Eckert, in addition, you don't really know what

2     Mattel customarily does in terms of doing diligence on acquisition

3     of other company's intellectual property rights, do you?

4     **A**     No, that's incorrect.

5     **Q**     And take a look at that same page, line 11 through 19.

6     **A**     Are we talking about then or are we talking about now?

7     **Q**     I'm talking about taking a look at your deposition transcript

8     lines 11 through 19.

9     **A**     Page?

10    **Q**     Page 712.

11    **A**     Okay.

12          **MR. QUINN:**  Your Honor, this is beyond the scope of my

13    examination.

14          **MS. KELLER:**  It's actually not, Your Honor.

15          **MR. QUINN:**  It goes to acquisition of the -- it's a

16    different issue.

17          **MS. KELLER:**  Of other companies' intellectual property

18    rights.

19          **THE COURT:**  You two carry on a conversation for a while.

20    I'll be right with you.

21               (Brief pause in proceedings.)

22          **THE COURT:**  Overruled.  You may question about this,

23    counsel.

24    BY MS. KELLER

25    **Q**     "QUESTION:  Is there anything apart from obtaining written

Page 31

1  representations and warranties and conducting due diligence with

2  respect to those representations and warranties and ownership in

3  such licenses that Mattel customarily does in order to ensure a

4  valid transfer of rights?

5  "ANSWER:  I don't know what Mattel customarily does in terms of

6  its diligence or its acquisitions of other companies' intellectual

7  property rights."

8         So, Mr. Eckert, just a little more than a year ago, a

9  year and a couple months ago, you weren't able to answer any

10  questions about what Mattel usually does in terms of due diligence

11  when acquiring intellectual property rights from others; right?

12  **A**    That is one of those areas I followed up with to be prepared

13  to discuss today.

14  **Q**    But you didn't follow up on it to be prepared to discuss it

15  for your deposition, true?

16  **A**    That's true.

17  **Q**    Is that also a tactic not know at the deposition --

18         **MR. QUINN:**  This is argument.  Move to strike.

19         **THE COURT:**  Stricken.

20  BY MS. KELLER

21  **Q**    Let's talk about the testimony that we heard a little earlier

22  about the success of Generation Girl and Diva Starz.  I'd like to

23  turn your attention to Exhibit 8676.  And this is an e-mail from

24  you to Tim Kilpin, Sujata Luther and Jerome Bossick, dated

25  June 18, 2004.

Page 32

1   **A**    Yes.

2   **Q**    This says, "Generation Girl" -- looking at numeral 3.

3   "Generation Girl Barbie successfully launched in 1999 but proved

4   unsustainable beyond 2000."

5           That means it only lasted for a year and got pulled;

6   right?

7   **A**    It may have lasted for a year or two before it was

8   discontinued.

9   **Q**    We're back to what successful versus what is unsustainable.

10  And something that is unsustainable you can't keep going it

11  profitably; right?

12          **MR. QUINN:**  This is argumentative.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  Many of our toys last one holiday season,

15  period.

16  BY MS. KELLER

17  **Q**    Here is my question:  A toy that proves unsustainable is a

18  toy that you can't continue to find profitability in; right?

19  **A**    Yes.

20  **Q**    And look at number five.  "Diva Stars, new Mattel brand,

21  launched successfully in 2000, but proved unsustainable beyond

22  2001."

23          Same thing.  It couldn't continue to be profitable for

24  Mattel for more than about a year; right?

25  **A**    I believe it lasted two or three years, but the point I made

Page 33

1    here was probably two or three years.

2    **Q**    Well, "unsustainable beyond 2001," means beyond 2001 not

3    profitable; right?

4    **A**    No.  I don't believe that's the case.  I don't think that's

5    the point I was trying to make.

6    **Q**    Without respect to the point you were trying to make, I'm

7    asking about your statement that it proved unsustainable.  When

8    something proves unsustainable, I think you have just agreed with

9    me it means it's not continuing to be profitable; right?

10   **A**    That's correct.

11   **Q**    You talked about Mattel's outside inventors and I think you

12   said you have educated yourself.  And all of them were only for

13   Mattel; is that right?

14   **A**    I'm sorry, I didn't hear the question.

15   **Q**    These outside inventors that Mattel uses, I believe you

16   testified Mr. Quinn just asked you that all of them work only for

17   Mattel?

18   **A**    No.

19   **Q**    So some of these outside inventors do work for other

20   companies too; right?

21   **A**    Yes, they do.

22   **Q**    In fact, most of these inventor houses work for any number of

23   companies; right?

24   **A**    I believe that's the case.

25   **Q**    They don't sign an exclusive agreement with Mattel that

Page 34

1   they'll only work for Mattel; right?

2   **A**   I don't know if they do.

3   **Q**   If they work for other companies, they don't, true?

4   **A**   Yes.

5   **Q**   And as far as the policy of dealing only with inventors you

6   already know, are you telling us that you never, ever hire a new

7   inventor?

8   **A**   No.

9   **Q**   So when you hire a new inventor, that's somebody you haven't

10   worked with before; right?

11   **A**   Yes, it is.

12   **Q**   And some of these inventor houses have many, many corporate

13   clients; right?

14   **A**   I don't know if that's the case, but it's possible.

15   **Q**   Well, some of these inventor houses will provide toys to

16   Mattel and Hasbro right?

17   **A**   That's correct.

18   **Q**   And Jax; right?

19   **A**   They may.

20   **Q**   And maybe MGA for all you know; right?

21   **A**   They may.

22   **Q**   So this working for outside inventors who work only for

23   Mattel, that's just not your policy, is it?

24            **MR. QUINN:**   There was no such testimony, Your Honor.

25            **THE COURT:**   Overruled.  You can ask the question.

1          **THE WITNESS:**  I don't believe I said that.

2     BY MS. KELLER

3     **Q**    You hire inventors who work for your competitors sometimes;

4     right?

5     **A**    I believe that may be the case.

6     **Q**    Hasbro is a competitor of yours?

7     **A**    Hasbro is.

8     **Q**    Jax is a competitor of yours?

9     **A**    Jax is.

10    **Q**    MGA is?

11    **A**    Yes.

12    **Q**    And any of them could be accused at any time of -- any of

13    these inventors could be accused at any time of funneling an idea

14    from another toy company to Mattel; right?

15    **A**    I'm sure they could be accused of many things.

16    **Q**    But you have representations and warranties that you get from

17    them to assure yourself that the ideas that they're selling you

18    are their own; right?

19    **A**    I'm sure we do.

20    **Q**    And likewise, you assume if they sell an idea to a

21    competitor, they provide the competitor with representations and

22    warranties to assure the competitor that the idea is their own?

23    **A**    I'm sure they do.

24    **Q**    And when you get these ideas from outside inventors and you

25    get representations and his warranties from them, that's really

Page 36

1   all need to satisfy yourself that the intellectual property you

2   are getting will belong to Mattel, can be legitimately assigned to

3   Mattel, true?

4   **A**    When we know that inventor and have a relationship with that

5   person, yes.  When we know he is an independent inventor,

6   absolutely.

7   **Q**    Or if it's a new inventor.  You said sometimes you hire a new

8   inventor.

9   **A**    If it's a new inventor, we know that person and do due

10  diligence on that inventor before we accept any ideas.

11  **Q**    Do you hire a private investigator?

12  **A**    I don't know.

13  **Q**    Do you fingerprint them?

14  **A**    I don't know.

15  **Q**    Do you put them on a lie detector box?

16  **A**    I don't know.

17  **Q**    Do you just make sure that your lawyer contacts their lawyer

18  to ensure that the representations and warranties are accurate?

19  **A**    No, I don't believe that's the case.

20  **Q**    Even as you sit here today, knowing the subject matter of

21  this lawsuit, you still don't even know what Mattel does other

22  than getting representations and warranties to assure itself that

23  the ideas from outside inventors that you get are theirs to give

24  you?

25  **A**    No.  We, as I tried to indicate, have a substantial process

1   for somebody coming off the street and trying to present a new

2   idea to Mattel.

3   **Q**   But you don't even know what that substantial process is;

4   right?

5   **A**   I know who runs that process.

6   **Q**   You don't know what the process --

7   **A**   I don't know what they do.

8   **Q**   You don't have any idea.  For all you know all they do is

9   just get the standard reps and warranties that everybody else in

10  the business gets; right?

11  **A**   No, that's not what they told me.

12  **Q**   Have you brought any documentation with you of what they

13  actually do?

14  **A**   No, I brought no documentation.

15  **Q**   And these outside inventors, tell me the biggest one that you

16  worked with.

17  **A**   There is a sizable inventor in Chicago which is one of the

18  largest ones I remember.

19  **Q**   What is the name of it?

20  **A**   It's a set of three initials.  It might be BMO.  It's

21  individuals' names.

22  **Q**   Do you know every inventor who works for them?

23  **A**   No, I don't.

24  **Q**   Do you know any of them, a single name?

25  **A**   I have met the principals.

Page 38

1   **Q**    Do you know a single name of an inventor who works for them?

2   **A**    No, I don't.

3   **Q**    So you don't really know what Mattel does with these people

4   and you don't really know the inventors who work for them; right?

5   **A**    I know what Mattel does with inventors, but I don't know the

6   inventors who work for inventor companies.

7   **Q**    You don't even know for sure what the name of that company

8   is; right?

9   **A**    That's correct.

10  **Q**    Nor do you know what agreements they have with their

11  inventors; right?

12  **A**    That's correct.

13  **Q**    Nor do you know what agreements Mattel gets from that company

14  whatever their initials may be; right?

15  **A**    I don't know what our agreements are with them.

16  **Q**    Now, you were asked about your compensation by Mr. Quinn, and

17  you said that you get an annual salary of $1,250,000; right?

18  **A**    That's correct.

19  **Q**    Now, that really understates your total compensation by quite

20  a large number, doesn't it?

21  **A**    Well, I certainly get more compensation than my salary, yes.

22  **Q**    Your salary is often dwarfed by the initial compensation;

23  right?

24  **A**    Yes.  It's a smaller component of my compensation than the

25  performance-based elements, yes.

1   **Q**     Well, but when you talk about performance-based, your first

2   year, before you had any performance to evaluate, according to

3   your proxy statement, you made $12,727,375 plus options to

4   purchase 3 million shares of stock; is that right?

5             **MR. QUINN:**  That assume facts and move to strike the

6   preamble.

7             **THE COURT:**  Overruled.

8             **THE WITNESS:**  I don't remember my compensation in the

9   year 2000.

10  BY MS. KELLER

11  **Q**     This is the year you were hired before --

12            **THE COURT:**  You said hired?

13            **MS. KELLER:**  Yes.

14  BY MS. KELLER

15  **Q**     Hired by Mattel.  So there wasn't any performance to measure

16  at the time you were hired; right?  Not with Mattel anyway?

17  **A**     But Mattel certainly compensated for programs I had with my

18  previous employer, yes.

19  **Q**     Well, if we go through these proxy statements, perhaps we can

20  figure out your total compensation over the years.

21            Does the amount of $12,727,375 sound about right for

22  2000, plus options to purchase 3 million shares?

23  **A**     Are we going to go look at the proxy?

24  **Q**     Yes, if you would like to look at the proxy.  And I would

25  turn to --

1       **THE COURT:**  You want to give the exhibit number so

2  she'll have it?

3       **MS. KELLER:**  I don't have an exhibit number on here,

4  Your Honor.  These are all SEC -- I have a stack of SEC proxies,

5  and I know they have been produced.  If I could just have a

6  moment.  40,006 would be the next exhibit in order.

7       **THE COURT:**  Have we looked at these before?

8       **MS. KELLER:**  I'm sorry.  Your Honor, I went through it

9  only in summary fashion, but after the testimony that he receives

10  1,250,000 a year --

11       **MR. QUINN:**  That wasn't the testimony, Your Honor.

12       **THE COURT:**  Just a moment.  I'm not foreclosing you from

13  going into that.  I want to make sure there is no objection.  I

14  want to make sure I have seen the documents.  And if there is no

15  complaint from Mattel, we'll continue on tonight.

16       **MS. KELLER:**  Your Honor, this is offered right now just

17  to refresh the witness' recollection.  I think that's the quickest

18  way to do it.

19       **THE COURT:**  There is no problem with it coming into

20  evidence.  I just want to make sure that one side isn't

21  complaining that the rules are any different.

22       **MR. QUINN:**  What I would really like are copies, Your

23  Honor.

24       **MS. KELLER:**  These are Mattel's SEC --

25       **MR. QUINN:**  We don't have them.  We have a lot of paper

Page 41

1   but...

2          **THE COURT:**  You don't have that much paper.  We could do

3   that eat at Joe's routine with the cardboard box on the front and

4   walk around and show it to counsel.

5          Counsel, why don't you come up and look over the

6   shoulder; speed this along.  He can look so we can keep up.  Maybe

7   that will satisfy everybody.  If not, we can go on.  I want to

8   finish this witness tonight, hopefully.

9          Counsel.

10         If you are dissatisfied with anything, Mr. Quinn, we'll

11  stop.

12         Ms. Keller.

13         This isn't a counseling session.  You can look, that's

14  all.

15         Ms. Keller.

16         **MS. KELLER:**  Your Honor, if I could just have a moment.

17             (Counsel confer)

18  BY MS. KELLER

19  **Q**   Before we start with the proxy, I'd like to ask you a few

20  questions about your employment contract with Mattel.  Okay?

21  **A**   Okay.

22  **Q**   Your initial employment contract was for a three-year term

23  from May 16, 2000 to June 30, 2003; right?

24  **A**   My employment agreement has an evergreen clause that renews

25  automatically.  So it would have been the first three years from

Page 42

1    whatever date.  May 16 sounds right.

2    **Q**    That's why I used the phrase "initial contract."

3    **A**    I think it's all one contract.

4    **Q**    Okay.  And you started an annual base salary of a million

5    point 25, 1.25 million?

6    **A**    Yes, $1,250,000.

7    **Q**    And you have a management incentive plan that gives you a

8    target bonus of 1.25 million guaranteed minimum for the year 2000,

9    with a maximum of 2.5 million; right?

10   **A**    That's correct.

11   **Q**    And a long-term incentive plan threshold annual bonus of

12   2 million with a target bonus of 4 million and a maximum of

13   8 million; right?

14   **A**    That may be.

15   **Q**    And stock options to purchase 3 million shares at an exercise

16   price the day you started employment; right?

17   **A**    On that first day, yes.

18   **Q**    You were granted 685,468 shares of Mattel stock outright to

19   compensate for a restricted grant you lost by leaving Kraft;

20   right?

21   **A**    Yes.  And I think that vested over a seven over 10-year

22   period of time, yes.

23   **Q**    Vesting June 2000, January 2001, January 2002 and June 2008;

24   right?

25   **A**    Yes.  I believe that's correct.

Page 43

1    **Q**    So that all vested already?

2    **A**    That's correct.

3    **Q**    And the share price on that day was $11.25, meaning the grant

4    is now worth about $7,711,515.  Does that sound about right?

5    **A**    It could.

6    **Q**    A signing bonus of 2.8 million to compensate you for leaving

7    Kraft; right?

8    **A**    That's correct.  The bonus I left behind at Kraft.

9    **Q**    And 5.5 million in a loan?

10   **A**    That's correct.

11   **Q**    Which was later forgiven; right?

12   **A**    That's correct.

13   **Q**    And you were also grossed up so you could get the tax benefit

14   from forgiveness for the loan, true?

15   **A**    Yes.

16   **Q**    So saying that you made 1,250,000 was little low?

17           **MR. QUINN:**  That misstates the testimony.  He said it

18   was his salary, Your Honor.

19           **THE COURT:**  Regardless, I'll let counsel inquire.  I

20   believe he said salary to begin with, but I don't want there to be

21   any misimpression.  I believe it was 1.25 in salary.  But counsel

22   can inquire.  If he has other compensation, it may be different

23   than salary.

24           So, counsel.

25

Page 44

1   BY MS. KELLER

2   **Q**   So the total that first year was 12,720,375 with options to

3   purchase 3 million shares; right?

4           **THE COURT:**  You might refer to that as income.

5   BY MS. KELLER

6   **Q**   Total compensation.

7   **A**   If I'm adding up mentally what you just went through with

8   some of that being realized in subsequent years up to or through

9   2007 or 2008, I believe that's correct.

10  **Q**   Then now let's go to 2001.  And your salary and total

11  compensation was listed in the 2002 proxy; right?

12  **A**   It would have been.

13  **Q**   Let's look at page 24.

14          **MR. QUINN:**  Your Honor, may I sit down?  I feel silly.

15          **THE COURT:**  Sure.  You wanted for stand there, now you

16  can sit down.  Just want to make sure you don't feel disadvantaged

17  if you haven't seen these proxy statements.

18  BY MS. KELLER

19  **Q**   That year your total compensation I think is reflected at

20  $2,182,802; is that right?

21  **A**   I see on the pages salary of $1,250,000, a bonus of $802,500.

22  **Q**   Now, let's look at 2002.  Looking at page 27 of the proxy

23  statement.

24  **A**   On page 22?

25  **Q**   27.

Page 45

1   **A**     In the upper right-hand corner, 27.

2   **Q**     Under "Summary Compensation Table."

3   **A**     Yes.  I have the Summary Compensation Table.

4   **Q**     If we add all that up, that comes to 11,877,494 total

5   compensation plus 375,000 stock options; right?

6   **A**     I haven't done the arithmetic but it might.  It looks like it

7   would.

8   **Q**     Let's look at 2003 that proxy statement.  It would be at page

9   35.  Have you got that at page 35?

10  **A**     I do.

11  **Q**     And that total compensation ends up being about $12,875,640

12  plus 375,000 stock options granted at the money; right?

13  **A**     No.  I just see $1,250,000 for salary, and the bonus may be

14  $633,998.

15  **Q**     And then under "Other Compensation," we have loan and

16  interest forgiveness of $10,961,642.  That's under all other --

17  **A**     In the year 2003, no.

18  **Q**     You are right.  That's under the year 2000.  So I was a

19  little low.  Are you looking at the -- you should be looking at

20  the 2003.

21  **A**     2003 Summary Compensation Table on page 35.

22  **Q**     And there is also 2002 Summary Compensation Table on that

23  same page.

24  **A**     And 2001.

25  **Q**     And 2001.

Page 46

1   **A**    There is always three years; when the employee has been with

2   the company three years.

3   **Q**    So your 2002 compensation includes other compensation of

4   $10,961,642; correct?

5   **A**    Yes, it does.

6   **Q**    And again, the stock option granted at the money.

7          Now, rather than continue going through every year,

8   would you agree with me that your total compensation was

9   considerably more than the salary that you listed?

10          **MR. QUINN:**  Your Honor, I object.  He already said that

11   it was -- 85 percent of his compensation was performance-based and

12   the salary was a small part of that.  He already said that.

13          **THE COURT:**  I understand.

14          You can answer the question, sir.

15          **THE WITNESS:**  Yes.  I believe the majority of my

16   compensation is not in the form of a base salary.

17   BY MS. KELLER

18   **Q**    You said it's performance-based?

19   **A**    Yes.

20   **Q**    2007, that was a really bad year as we discussed for Mattel;

21   right?

22   **A**    It was a year in which our sales and profits increased, but

23   it was a very challenging year for Mattel, yes.

24   **Q**    Well, your Barbie sales plummeted and you had the toy recalls

25   and you had horrible publicity.  Your total sales were down?

Page 47

1    **A**    No.  Our total sales were up in 2007.

2    **Q**    2007 you got total compensation of $11,350,527?

3    **A**    Which page are you on now?

4    **Q**    I am looking at the Schedule 14A, proxy statement for 2008.

5    Looking at page 47?

6    **A**    Yes.  Here I'm sure you know you are now mixing values for

7    stock options that may or may not ever be received.

8    **Q**    I'm looking at the amount that you reported as total

9    compensation, the amount you reported to the Securities and

10   Exchange Commission as your total compensation for that year of

11   $11,350,527.

12   **A**    Yes.

13   **Q**    And 2008 included a benefit that hadn't been listed in some

14   prior years, the use of the company's private jet for your

15   personal use; right?

16   **A**    That's correct.

17   **Q**    And you got $691,988 in addition to the other amounts for use

18   of the jet, country club, car, etcetera; right?  And that would --

19   **A**    401K, deferred contribution, life insurance premiums, yes.

20   **Q**    2009 proxy, looking at page 48.

21   **A**    I'm sorry.  Yes.

22   **Q**    So total compensation of $6,999,051?

23   **A**    That's correct.

24   **Q**    2009, did it come to about 11.5 million then, do you

25   remember?

Page 48

1    **A**    In 2009?

2    **Q**    Yes.

3    **A**    It may have.

4    **Q**    Does that sound about right?

5    **A**    I would normally think of a number around $8 million.  No.

6    Performance was very strong and profitable in 2009.  Yes, it does

7    sound about right.

8    **Q**    And that also included another half million dollars in

9    various benefits like use of the private jet, deferred

10   compensation, that sort of thing?

11   **A**    No.  I think it had a very small amount on use of the

12   company's leased airplane.

13   **Q**    Let's take a look at the 2010 proxy statement.  And look at

14   page 60.

15   **A**    I have it.

16          **MR. QUINN:**  Your Honor, 2010, we're now outside the

17   period.

18   BY MS. KELLER

19   **Q**    No.  We're looking at 2009 compensation.

20   **A**    She is right.

21   **Q**    So under "Other," we see $502,893; right?

22   **A**    Yes.

23   **Q**    And that's broken down to include the use of the private jet,

24   for your personal use, deferred comp, 401K, etcetera, true?

25   **A**    Yes.

1   **Q**    And so, if we add up all the stock grants, the salary, the

2   benefits, the total compensation, the stock options, we're talking

3   about over a hundred million dollars over the last decade?

4   **A**    Well, my wife will be pleased she didn't lose $100 million

5   last night.  I would say it's probably been in the neighborhood of

6   8- to $11 million a year.  So 10 years times that number, we're in

7   a range somewhere before taxes.

8   **Q**    Plus stock grants and stock options?

9   **A**    No.  Most of those numbers include the value of the stock

10  grant.

11  **Q**    And I think you told us that you -- I think you told us that

12  you have potentially tens of millions on the line in either

13  direction depending on the outcome of this trial; right?

14  **A**    Well, potentially the stock price changes every day.  So I'm

15  sure this could influence the stock price one way or the other.

16  **Q**    Up or down?

17  **A**    It could, I think, unless expectations are already built into

18  it somehow.  But it could.

19  **Q**    Nothing further.

20         **MR. QUINN:**  Your Honor, Ms. Keller made representations

21  to the jury about Mr. Eckert --

22         **THE COURT:**  We'll discuss that outside the presence of

23  the jury.  Or would you like to have a sidebar for just a moment

24  without the speaking objection?

25         **MR. QUINN:**  I would.

Page 50

1        **THE COURT:**  Give us one minute.  The witness may have

2   concluded his testimony.  But like Mr. Larian, he is subject to

3   being called back and he'll be here regardless.

4        So, counsel.

5            (The following proceedings were held at sidebar.)

6        **MR. QUINN:**  Ms. Keller represented to the jury that Mr.

7   Eckert testified today contrary to his testimony yesterday.  She

8   said that although he testified today on my examination, that if

9   somebody brought designs to Mattel and they worked at them, worked

10  on those designs while they were at Mattel, that therefore Mattel

11  would have a claim on them.  And she told the jury, "That's not

12  what you said yesterday.  You knew it would look ridiculous."

13       I have his testimony from yesterday.  Page 67, line 15,

14  through 68, line 6.  And I don't know if we need to read this into

15  the record again, it's already there.  But he said that yesterday.

16  That if a person should know that if he is going to work on those

17  ideas at Mattel, Mattel does have a right all the way back to

18  those ideas.

19       I don't have -- he said this yesterday.  So she made a

20  misrepresentation to the jury as to what his testimony was.  I'd

21  like to make a very limited examination to the jury just to point

22  that out.

23       **MS. KELLER:**  Then I would like to read the many, many,

24  many pages of shifting testimony and refusing to answer the

25  questions that it took to get there.  Here is a sample.

1        **THE COURT:**  May I suggest to both of you something?

2        **MS. KELLER:**  That we calm down?

3        **THE COURT:**  No.  I think it's invigorating to watch you

4    two.  I think he resolved that in the answer that he gave to Ms.

5    Keller's question which turned out to be consistent with the day

6    before.  Mr. Larian is going to be back up on the stand again as

7    Mr. Eckert is going to be back up on the stand.  You are both

8    going to have another opportunity.  And I think that if you put

9    him back on the stand for any purpose, I'm going to open back up

10   to both of you.

11       So you two need to talk about that.  I'm going to step

12   out of the room for just a moment.  But I'm not going to foreclose

13   you.

14       I'm not going to foreclose you either.  And we can go

15   back and forth with this.  So I'll see you in just a moment

16   hopefully when some common sense returns.  I'll be right outside

17   the door.

18                    (Brief pause in proceedings.)

19                    (End side-bar.)

20       **THE COURT:**  Back in the presence of the jury after a

21   thorough and thoughtful discussion between the parties.

22       **MS. KELLER:**  I just had one last document I forgot to

23   move in from trial Exhibit 18335 listing the subsidiaries of

24   Mattel.

25       **THE COURT:**  Received.

Page 52

1              (Exhibit 18355 received in evidence.)

2         THE COURT:  Anything further?

3         MS. KELLER:  Nothing further?

4         MR. QUINN:  Nothing.

5         THE COURT:  Thank you very much, sir.  You may step

6  down.

7              Now, ladies and gentlemen, we will see you tomorrow at

8  8:30.  Please drive safely.  It's a little late tonight.  Don't

9  discuss this matter, form or express any opinion.  Good night.

10                       (Jury out.)

11         THE COURT:  Counsel, why don't we excuse Mr. Eckert and

12  Mr. Larian this evening.  Why don't you have a seat for just a

13  moment.  And Mr. Machado also.  I'm sorry.  Before we excuse the

14  gentleman, we have something out of the presence of the jury.

15              Mr. Overland wanted to put something on the record.  He

16  approached the Court before Mr. Machado testified, who I believe

17  is the next witness.

18              Mr. Overland?

19         MR. OVERLAND:  Yes, Your Honor.  Two things:  One is I

20  want the record to be clear that Mr. Machado is still testifying

21  under compulsion of the Court's order that it issued sometime back

22  overruling his Fifth Amendment privilege.

23         THE COURT:  I'm sorry.  He is still?

24         MR. OVERLAND:  Testifying under compulsion of the

25  Court's order that it issued sometime previously overruling his

 1   Fifth Amendment privilege.

 2           **THE COURT:**  That's correct.  The same ruling I made

 3   concerning his Fifth Amendment privilege at the time of the

 4   deposition almost a year ago is incorporated in your request that

 5   he not testify.

 6           **MR. OVERLAND:**  Yes, Your Honor.

 7           **THE COURT:**  This is under compulsion of the Court order.

 8           I think also, Mr. Machado, if you have an opportunity,

 9   I'll certainly write the judge in Mexico expressing my personal

10   appreciation for allowing you to be here.

11           **MR. OVERLAND:**  And the other thing is we have tried to

12   work out a stipulation with respect to the confidential attorneys'

13   eyes only documents, which I'm sure are going to be shown to

14   Mr. Machado during his examination.  Apparently we have been

15   unable to reach a stipulation for some reason.

16           **THE COURT:**  Why would I be surprised?  I'm not

17   surprised.

18           **MR. OVERLAND:**  So we do -- there was a proposed

19   stipulation, from my understanding, that was sent by Mr. Zeller

20   that was acceptable and then apparently it became unacceptable to

21   Mr. Zeller.  But we do have a copy of it.  And I would ask that

22   before any of these documents are shown to Mr. Machado, to avoid

23   confusion that the Court give this instruction or some similar

24   instruction just to avoid any type of confusion that these

25   documents were originally marked "confidential."

Page 54

1          **THE COURT:**  Could I see that instruction?

2          **MR. OVERLAND:**  Yes.

3          **THE COURT:**  Thank you.  Mr. Cote, thank you, sir.  Why

4      don't I read this requested instruction in the record.

5          And Mr. Zeller, let me hear from you.

6          The proposed instruction by Mr. Machado's counsels are,

7      "You have seen documents in this case and they have the words

8      'confidential attorneys' eyes only' imprinted on the documents.

9      Attorneys for various parties and non-parties added these words to

10     copies of the documents after this case started."

11         I'm going to stop right there.  I don't think that

12     that's appropriate.  You have to sort out, both sides, what

13     documents are stamped "confidential" and what documents are

14     confidential attorneys' eyes only.  And this has to be done with

15     clarity.  Because certain documents will be stamped

16     "confidential," other documents that I'm not certain I have seen

17     all of from the CD tape may have attorneys' eyes only.  I just

18     don't know.  So I am little remiss at making a broad sweeping

19     allegation.

20         But I do recognize, Mr. Overland, this is well-taken.

21     In other words, the concept here is just a matter of some hard

22     work by Court and counsel tonight.

23         **MR. OVERLAND:**  It's my understanding there are no

24     documents that are going to be shown to Mr. Machado that were

25     originally stamped "confidential."

1          **THE COURT:**  That may be the case.  But it's

2    extraordinarily confusing to the jury.  And what I'm concerned

3    about is not only Mr. Machado, but MGA and Mattel.  And I'm not

4    certain how we're going to sort that out.  Because later on

5    "attorneys' eyes only" were stamped on so many of these documents

6    that the jury could become easily confused.  So it's not just

7    Mr. Machado's problem.  It is all counsel's problem.

8          **MS. HURST:**  We agree with the requested instruction.  We

9    want to make it clear that has nothing to do with assessing

10   reasonable efforts for trade secret purposes.

11         **THE COURT:**  "Attorneys for various parties and

12   non-parties added these words to copies of the documents after

13   this case started as part of the discovery process and in

14   accordance with the Court's procedure.  The original documents did

15   not have the words on them.  The words 'confidential attorneys'

16   eyes only' are not evidence and you are instructed to disregard

17   them."

18         Now, I think that's part of this, but that's not the

19   complete instruction that's needed.  There has to be a balance to

20   this instruction so there is no confusion that states other

21   documents are marked "confidential" and those should not be

22   confused with "attorneys' eyes only" stamped documents.

23         And therefore, I'm declining to do that at the present

24   time, and each one of you can question document by document if you

25   choose.  That's going to take a lot of time.  So while I agree in

Page 56

1    principle, I don't want the confusion later on where Mattel is

2    claiming that this is a confidential document and one of the

3    jurors starts to assume, incorrectly, oh, there is confusion.   Is

4    this confidential document attorneys' eyes only?  I'm not sure.

5            So, I don't quite know what to do with that except

6    possibly to see all the documents that would be presented

7    tomorrow, and let's take a look at those tonight one by one, and

8    just require you to state tomorrow, instead of sweeping the board,

9    that each document that you are referring to has a stamp that was

10   later added.  There can't be that many documents so we can at

11   least resolve Mr. Machado's problem immediately.

12           Mr. Overland, I think you have the smaller number.  It's

13   eventually the prejudice that carries over to the parties and the

14   confusion with MGA and Mattel.  And we have never worked that out.

15   You've called that to my attention, I have called that to your

16   attention but we have never resolved that.

17           **MR. OVERLAND:**  Is it possible to just have them redact

18   just that "confidential attorneys' eyes only" from the documents

19   and that way there won't be any problem and no instruction

20   necessary?

21           **MR. ZELLER:**  We're not agreeable to that.  It's just

22   going to create all sorts of mischief in terms of these are

23   documents that were produced in litigation.  Those are the control

24   numbers, that's how they were stamped, that's how they were

25   produced.

1        **THE COURT:**  More importantly, we should be consistent.

2   I was going to get back to my damages expert before midnight

3   tonight, but we can resolve that later on.  My question is going

4   to become, how many documents?  Because we might be able to go

5   through those quickly.  It might be a small number.  Instead of

6   talking about it, why don't we get to work.

7        **MR. MCCONVILLE:**  Agreed.

8        **THE COURT:**  Let's see the documents.

9        Mr. Larian, thank you.  You are excused this evening.

10  Mr. Eckert is excused.

11       **MS. KELLER:**  Before that occurs, Mr. Larian tells me he

12  took the Court up on its offer yesterday, that if he and Mr.

13  Eckert spoke and agreed on any days that they might not be

14  present.  And my understanding is that he has spoken to Mr. Eckert

15  and they have agreed Mr. Larian can leave for those two days next

16  week and return for which Mr. Eckert can pick any two days.

17       **THE COURT:**  Excellent.  Excellent.  Good.  I want to

18  thank both of you.  If Mr. Eckert was here, I'd thank him also.

19  (Whereupon there was a change in reporters and DEBORAH PARKER

20  reported the 5:00  session.)

21                              -oOo-

22

23                           CERTIFICATE

24

25       I hereby certify that pursuant to Section 753, Title 28,

1    United States Code, the foregoing is a true and correct transcript

2    of the stenographically reported proceedings held in the

3    above-entitled matter.

4

5    Date:  MARCH 3, 2011

6

7

8    MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25