1

1

2

3

4               UNITED STATES DISTRICT COURT

5             CENTRAL DISTRICT OF CALIFORNIA

6                   SOUTHERN DIVISION

7                       - - -

8       THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

10       MATTEL, INC., et al.,
                        Plaintiffs,
11           vs.
                                    CV-04-9049-DOC
12       MGA ENTERTAINMENT, INC.,   TRIAL DAY 28
         et al.,                    Volume 2 of 4
13                      Defendants.

14       --------------------------

15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                 Santa Ana, California

19                Friday, March 4, 2011

20

21                    SHARON A. SEFFENS, RPR
22                    United States Courthouse
                      411 West 4th Street, Suite 1-1053
23                    Santa Ana, CA  92701
                      (714) 543-0870
24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
5    865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
6    (213) 443-3000

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
9    4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14
     KELLER RACKAUCKAS LLP
15   JENNIFER L. KELLER
     18500 Von Karman Avenue, Suite 560
16   Irvine, CA
     (949) 476-8700
17

18   FOR CARLOS GUSTAVO MACHADO GOMEZ:

19   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
20   Santa Monica, CA  90401
     (310) 459-2830
21

22   ALEXANDER COTE
     SCHEPER KIM AND HARRIS LLP
23   601 West Fifth Street, 12th Floor
     Los Angeles, CA  90071-2025
24   (213) 613-4655

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

3

```
1    ALSO PRESENT:

2    MGA ENTERTAINMENT, INC.
     JEANINE PISONI
3    16360 Roscoe Boulevard, Suite 105
     Van Nuys, CA  91406
4

5    ALSO PRESENT:

6    ISAAC LARIAN, MGA CEO

7    KEN KOTARSKI, Mattel Technical Operator

8    MIKE STOVALL, MGA Technical Operator

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1
 2                              INDEX
 3                                              PAGE
 4   PLAINTIFF'S
     WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS
 5
     CARLOS GUSTAVO MACHADO GOMEZ
 6      (Continued)                5(Z)  56(O)
 7   PLAINTIFF'S
     EXHIBITS:                    MARKED         RECEIVED
 8
     Exhibit 23840                                   9
 9   Exhibit 7142                                    11
     Exhibit 8859                                    20
10   Exhibit 6746                                    26
     Exhibit 8855-A                                  29
11   Exhibit 7111                                    30
     Exhibit 8466                                    35
12   Exhibit 8866                                    45
     Exhibit 7105                                    47
13   Exhibit 7132                                    48
14   DEFENSE
     WITNESSES:       DIRECT   CROSS   REDIRECT   RECROSS
15
16   (None)
17   DEFENSE
     EXHIBITS:                   MARKED         RECEIVED
18
19   Exhibit 6401                                   63
20
21
22
23
24
25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   SANTA ANA, CALIFORNIA; FRIDAY, MARCH 4, 2011; 10:30 A.M.
 2              (Jury not present.)
 3              THE COURT:  We are on the record outside the
 4   presence of the jury.
 5              Counsel for Mr. Machado would like to join in the
 6   last objection?
 7              MR. OVERLAND:  Yes.
 8              THE COURT:  Thank you.
 9              (Jury present.)
10              THE COURT:  The jury is present, the alternates,
11   all counsel.  The parties are present, the witness.  Thank
12   you for your courtesy.
13              If you'd please be seated.  Mr. Zeller's continued
14   direct examination of Mr. Machado.
15      CARLOS GUSTAVO MACHADO GOMEZ, PLAINTIFF'S WITNESS,
16      PREVIOUSLY SWORN
17                    DIRECT EXAMINATION (Continued)
18   BY MR. ZELLER:
19   Q    Mr. Machado, we've discussed you took information from
20   Mattel; right?
21   A    Yes.
22   Q    You coordinated with others -- Ms. Trueba, Mr. Vargas
23   -- to take information from Mattel; right?
24   A    Right.
25   Q    The three of you did this together in order to take
```

```
 1   information that you knew included confidential Mattel
 2   information over to MGA; right?
 3   A    Right.
 4   Q    And you knew that this information didn't belong to you
 5   or to Ms. Trueba or Mr. Vargas?
 6   A    Correct.
 7   Q    And despite all that, as you sit here today, you don't
 8   believe you did anything wrong; right?
 9   A    Did I say that?
10   Q    Did you do anything wrong?
11   A    Wrong in what sense?  Morally or --
12   Q    I mean in any sense.
13           MR. MCCONVILLE:  Compound.
14           THE COURT:  Overruled.
15           THE WITNESS:  I am not sure.
16   BY MR. ZELLER:
17   Q    Would you please look at your deposition transcript.
18   This is volume 4, April 22nd, 2010, at page 461,
19   specifically lines 1 through 18.
20   A    Ready.
21           THE COURT:  You may read.
22           MR. ZELLER:  "Question:  As you sit here today, do
23   you think that taking these documents from Mattel that could
24   be useful at MGA was wrong?
25           "Answer:  What do you mean, wrong?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              "Question:  In any sense.

 2              "Answer:  In some way perhaps.

 3              "Question:  In what manner?

 4              "Answer:  That I could avoid the fact of having to

 5      come here.

 6              "Question:  Any other way?

 7              "Answer:  No."

 8      BY MR. ZELLER:

 9      Q    Now, when you answered the questions this way when you

10      were being deposed during your deposition in this case, when

11      you say "that I could avoid the fact of having to come

12      here," you meant having to be deposed; right?

13      A    Yes, and the fact of all these legal --

14      Q    So apart from the fact that --

15              MR. MCCONVILLE:  Objection, Your Honor.  The

16      witness wasn't done answering his question.

17              MR. ZELLER:  I apologize if you have more.

18              THE WITNESS:  Well, yes.  I was referring to that

19      day and to the fact that I was in the middle of a lawsuit,

20      yes.

21      BY MR. ZELLER:

22      Q    So other than the fact that there has been

23      inconvenience and trouble for you having to sit for a

24      deposition because of what you did, there is nothing else

25      that you saw or even see now as being wrong with what you
```

```
 1    did; right?

 2              MR. MCCONVILLE:  Objection.  Argumentative.

 3    Misstates the facts.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  Right.

 6    BY MR. ZELLER:

 7    Q    And you didn't think there was anything wrong by

 8    downloading this Mattel information and taking it to a

 9    competitor; correct?

10    A    Correct.

11    Q    And you certainly never told anyone that what you did,

12    you thought was wrong; right?

13    A    No.

14    Q    That is correct?

15    A    That is correct.

16    Q    Now, you certainly never told Mr. Larian here that what

17    you did downloading this information, taking it from Mattel,

18    was wrong; correct?

19    A    No, I didn't tell him.

20    Q    It's a true statement you never told him that; right?

21    A    Yes.

22    Q    And you never spoke with Mr. Larian about the search

23    that the Mexican police did of MGA's Mexico City offices in

24    2005; right?

25    A    Right.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

9

```
1    Q    And he has never asked to speak with you about that;
2    true?
3    A    True.
4    Q    Prior to the time that you left Mattel Mexico, you and
5    Mr. Vargas went to a Mattel offsite strategy meeting; right?
6    A    Correct.
7    Q    And this was after the time when you knew for sure that
8    you were leaving Mattel and going to MGA; correct?
9    A    No.
10   Q    That's not correct?
11   A    No, that's not correct.
12   Q    Well, the purpose of this meeting that you and Mr.
13   Vargas went to, this offsite Mattel meeting, was to generate
14   future business strategy ideas for selling and marketing
15   Mattel products in Mexico; correct?
16   A    Correct.
17   Q    Please look at Exhibit 23840.
18   A    (Witness complies.)
19   Q    Do you recognize this as the agenda for this offsite
20   Mattel strategy meeting we are discussing?
21   A    Yes.
22        MR. ZELLER:  I would move Exhibit 23840 into
23   evidence.
24        THE COURT:  Received.
25        (Exhibit 23840 received in evidence)
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    BY MR. ZELLER:

2    Q    And the topics that were discussed at this meeting,

3    this Mattel strategy meeting for future business plans of

4    Mattel there in Mexico, included competitive strategy,

5    portfolio analysis, new markets?

6    A    Yes.

7    Q    And this was forward-looking business strategy of

8    Mattel in Mexico that you and Mr. Vargas learned and became

9    exposed to there at this meeting; right?

10   A    Right.

11   Q    And you, in fact, took notes from this meeting, this

12   offsite strategy meeting; right?

13   A    Right.

14   Q    Please take a look at Exhibit 7142.

15   A    (Witness complies.)

16   Q    And specifically -- well, first of all, do you

17   recognize this document?

18   A    Yes.

19   Q    They are your notes?

20   A    No.

21   Q    Well, take a look at 7142-26.

22   A    Right.

23   Q    Now, these are your notes from the -- well, I

24   apologize.  Do you recognize these as notes from the Mattel

25   Mexico offsite strategy meeting?

11

1    A     Yes.

2              MR. ZELLER:  I would move Exhibit 7142 into

3    evidence.

4              THE COURT:  Received.

5              *(Exhibit 7142 received in evidence)*

6    BY MR. ZELLER:

7    Q     And specifically on page 7142-26 as we were talking

8    about, this is information, notes from the strategy meeting;

9    right?

10   A     Right.

11   Q     And by the way, when you were having this strategy

12   meeting there with your colleagues at Mattel --

13             THE COURT:  Just a moment.  Is Machado taking them

14   or other people and this is synthesized?  That's very

15   unclear.

16   BY MR. ZELLER:

17   Q     Please tell us who prepared these.

18   A     It was prepared by me and my group of collaborators,

19   yes.

20   Q     At this strategy meeting you were having while you were

21   still a Mattel employee, did you tell your colleagues there

22   at Mattel that while you were being part of this meeting to

23   talk about future Mattel business strategy in Mexico, that

24   you had been in contact with MGA and already either had

25   decided you were going to leave or certainly knew it was a

```
 1    distinct possibility?  Did you tell them anything?
 2              MR. MCCONVILLE:  Objection.  Compound.  Vague.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  No.
 5    BY MR. ZELLER:
 6    Q    So they had no idea that you were halfway out the door
 7    to a competitor; right?
 8              MR. MCCONVILLE:  Objection.  Calls for
 9    speculation.
10              THE COURT:  Sustained in its present form.
11    BY MR. ZELLER:
12    Q    As far as you know, your colleagues had no idea that
13    you were halfway out the door to a competitor?
14              THE COURT:  Sustained in its present form.  Let's
15    take out "halfway out the door."
16    BY MR. ZELLER:
17    Q    As far as you knew, your colleagues there at Mattel at
18    this strategy meeting talking about future business plans
19    for Mattel didn't know, had no idea that you were going to
20    go to MGA; right?
21              MR. MCCONVILLE:  Objection.  Assumes facts.
22              THE COURT:  Overruled.
23              THE WITNESS:  No, they didn't.
24    BY MR. ZELLER:
25    Q    Turning back, then, to 7142-26, these notes that we
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    have been talking about in connection with the offsite
 2    strategy meeting of Mattel, this was among the materials
 3    that you took when you left Mattel and went to MGA; right?
 4    A    Yes.
 5    Q    In fact, what you did is at some point you took the
 6    Mattel information or at least some of the Mattel
 7    information that you had downloaded onto that Sony Vaio
 8    laptop that we talked about from Mattel.  You took some of
 9    those files and you burned them onto a CD; right?
10    A    Right.
11    Q    And this was a green Sony CD; right?
12    A    Yes.
13    Q    And this page that we're talking about, 7142-26, was
14    among the files that you copied, the Mattel files that you
15    copied from your Sony laptop onto that CD; right?
16    A    I am not sure.
17    Q    Now, you resigned on April 19, 2004?
18    A    Correct.
19    Q    And you went in and you told Mr. Ibara, your
20    supervisor, that you were leaving; right?
21    A    Yes.
22    Q    And it's true that you and Ms. Trueba and Mr. Vargas
23    stuck around there at Mattel knowing you were going to go to
24    MGA and work there so that the three of you could obtain and
25    take Mattel information; right?
```

14

```
 1   A     I didn't understand the term stuck around.

 2   Q     Well, you resigned on April 19, 2004?

 3   A     Yes.

 4   Q     The reason why you did not leave Mattel earlier, just

 5   simply walk out of Mattel earlier even though you knew you

 6   were going to a competitor, was so that you could download

 7   and take Mattel information; right?

 8   A     No.

 9   Q     You did stick around there at Mattel for a period of

10   time even once you knew you were going to leave Mattel and

11   go to MGA; right?

12             MR. MCCONVILLE:  Objection.  Vague.

13             THE COURT:  Overruled.

14             THE WITNESS:  Yes.

15   BY MR. ZELLER:

16   Q     In fact, you have even agreed that by March 30, 2004,

17   you knew you were leaving; right?

18             MR. MCCONVILLE:  Objection.  Misstates the

19   evidence.

20             THE COURT:  Overruled.

21             THE WITNESS:  Around that date, yes.

22   BY MR. ZELLER:

23   Q     But you didn't leave until April 19, 2004; right?

24   A     Right.

25   Q     And during this time period at least, you were
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    downloading Mattel information; right?

 2    A    Right.

 3    Q    So it's true that the reason why you stayed at Mattel

 4    from at least March 30, 2004, until you gave your

 5    resignation on April 19, 2004, was because you wanted to

 6    have access to Mattel information in order to take it to

 7    MGA?

 8    A    No.

 9    Q    Isn't it true that you told Mr. Larian that you were

10    staying at Mattel Mexico in order to take information from

11    Mattel that you could use in setting up MGA's Mexico

12    operations?

13    A    No.

14    Q    You certainly talked with Mr. Larian about taking the

15    Mattel information; right?

16    A    No.

17    Q    Never?

18    A    Never.

19    Q    Well, let's take a look at Exhibit 6437.  This is

20    already in evidence as Exhibit 3618.  This is an e-mail that

21    you sent to Mr. Larian on April 21, 2004?

22    A    Yes.

23    Q    And this is right after you resigned from Mattel and

24    went to MGA; right?

25    A    Yes.
```

```
 1   Q    And by the way, you're sending this e-mail from an
 2   e-mail account called plot 04; right?
 3   A    Right.
 4   Q    In this e-mail that you sent to Mr. Larian, you say,
 5   "Rome is on fire"?
 6   A    Yes.
 7   Q    You are talking about Mattel?
 8   A    I believe so, yes.
 9   Q    That is who you were referring to is Mattel?
10   A    Yes.
11   Q    And the reason you wrote that was to let Mr. Larian
12   know just how much damage you and the others caused to
13   Mattel on your way out; right?
14            MR. MCCONVILLE:  Objection.  Vague.
15            THE COURT:  Overruled.
16            THE WITNESS:  Yes.
17   BY MR. ZELLER:
18   Q    You were gloating about it; right?
19   A    I was just informing.
20   Q    You were reporting that to Mr. Larian?
21   A    Yes.
22   Q    Because you knew that that was something he wanted to
23   hear about, is how much damage you and the others had caused
24   Mattel; correct?
25   A    I am not sure if he wanted to hear that.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    Q    What was Mr. Larian's response when you told him how

 2    much damage you had caused to Mattel?

 3              MR. MCCONVILLE:  Objection, Your Honor.  Assumes

 4    facts.  He never told him how much damage he caused.

 5              THE COURT:  Well, when he used the phrase "Rome is

 6    on fire," the jury will determine what that means.

 7              MR. ZELLER:  He has already told us that that's

 8    what it meant.

 9              THE COURT:  Counsel.

10    BY MR. ZELLER:

11    Q    After you reported to Mr. Larian that "Rome is on

12    fire," which you said earlier was reporting to him how much

13    damage you and the others had caused to Mattel, what was Mr.

14    Larian's response?

15    A    I am not sure.

16    Q    You see it in the e-mail; right?

17    A    That is my cell phone number.

18    Q    You, in fact, had told Mr. Larian that you were the

19    right man for the job there in Mexico; right?

20    A    I am not sure if I told him that way.

21    Q    That was the gist of what you told him?

22    A    Yes.

23    Q    And you told Mr. Larian that you could help MGA set up

24    its operations there in Mexico; right?

25    A    Yes.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    Q    And you knew that you could do that so long as, along

 2    with your experience, you had the right information to do

 3    it; right?

 4    A    No.

 5    Q    Well, when you started working there at MGA after you

 6    resigned from Mattel and during this time period when you

 7    sent the e-mail to Mr. Larian about "Rome is on fire," all

 8    this damage that you had caused to Mattel that you were

 9    telling him about --

10            MR. MCCONVILLE:  Objection.  Compound before he's

11    even gotten to the question.

12            THE COURT:  Do you understand the question, sir?

13            THE WITNESS:  No.

14            THE COURT:  Reask the question.

15            MR. ZELLER:  Sure.

16    BY MR. ZELLER:

17    Q    Focusing on this time period then after you gave your

18    resignation from Mattel -- and by the way, when you gave

19    that resignation, you refused to tell your supervisor where

20    you were going; right?

21    A    Right.

22    Q    So after you resigned, isn't it true that MGA didn't

23    provide you any information about the Mexican market in

24    order to set up operations?

25    A    In which period?  Sorry.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    Q    This is right after you had resigned from Mattel and
 2    you are now working there at MGA.
 3    A    Not for the first weeks, no.
 4    Q    There was no information that MGA had to give you about
 5    the Mexican market or how to go about setting up operations
 6    there in Mexico; right?
 7              MR. MCCONVILLE:  Objection.  Calls for
 8    speculation.
 9              THE COURT:  Overruled.
10              THE WITNESS:  Right.
11    BY MR. ZELLER:
12    Q    And during this time period you were giving regular
13    reports to Mr. Larian; right?
14    A    Right.
15    Q    And your responsibilities there at MGA Mexico when you
16    were setting it up were the same kinds of responsibilities
17    you had while you were at Mattel Mexico; right?
18    A    Some of them, yes.
19    Q    Also, MGA Mexico, this new operation you were setting
20    up, had the same customers as Mattel Mexico; right?
21    A    Right.
22    Q    Part of what you did early on, because MGA didn't
23    provide you with information about how to set up in Mexico
24    these new MGA operations, is that you and the other two
25    started putting together a business plan for what MGA should
```

1    do there in Mexico; right?

2    A    We did start to build a business plan later on, yeah.

3    Q    Well, you started immediately working on a new strategy

4    for selling MGA products in Mexico; right?

5    A    Yes.

6    Q    And even before you ever visited MGA in Los Angeles

7    after you had started working there for MGA, and before MGA

8    provided you any information about the Mexican market, you

9    and Mr. Vargas prepared a business plan; right?

10   A    No.

11   Q    Please take a look at Exhibit 8859.  This is already, I

12   think, partially admitted.

13            MR. ZELLER:  By that I mean, Your Honor, I think

14   there were certain parties who had objected.

15   BY MR. ZELLER:

16   Q    Do you recognize Exhibit 8859?

17   A    Yes.

18   Q    You prepared it?

19   A    Partially.

20            MR. ZELLER:  I would move this into evidence for

21   all purposes, Your Honor.

22            THE COURT:  Received.

23            (Exhibit 8859 received in evidence)

24   BY MR. ZELLER:

25   Q    Now, this is a business plan that you sent to Mr.

```
 1   Larian using the plot 04 e-mail address; right?

 2   A    I don't see how this can be a business plan.

 3   Q    Well, how would you describe it?

 4   A    It's a checklist of the issues we should be talking

 5   about the first week of our job.

 6   Q    Whether you call it a business plan or something else,

 7   this was what you and Mr. Vargas created as the business

 8   strategy for MGA in Mexico; correct?

 9           MR. MCCONVILLE:  Objection.  Misstates his

10   testimony as to it's a checklist.

11           THE COURT:  Overruled.

12           THE WITNESS:  I don't see a delineated strategy

13   here.  It's a checklist of issues that we needed to talk

14   about.

15   BY MR. ZELLER:

16   Q    Why did you send it to Mr. Larian?

17   A    Because I was supposed to be there with him the

18   following week.

19   Q    So he is the CEO?

20   A    Yes.

21   Q    And you thought it was important to send him a

22   checklist?

23   A    Yes.

24   Q    Is it your testimony that you had no business strategy

25   in mind during this time period right after you left Mattel
```

```
 1    Mexico and started working for MGA?

 2    A    A completed one, no.

 3    Q    I didn't ask about a completed one.  You had a business

 4    strategy; correct?

 5    A    No.

 6    Q    Isn't it true, focusing on this list as you call it, or

 7    the checklist, in fact you did most of the points contained

 8    in this, actually executed them; right?

 9    A    Some of them.

10    Q    So this was a plan at least in part that you ended up

11    executing at least in part; right?

12              MR. MCCONVILLE:  Objection.  Misstates his

13    testimony.

14              THE COURT:  Overruled.

15              THE WITNESS:  These were ideas that I needed to

16    discuss, and some of them came to life and some they don't.

17    BY MR. ZELLER:

18    Q    And when is it you prepared this checklist as you are

19    calling it that you sent to Mr. Larian?

20    A    On the week of April 19th, 2004.

21    Q    So it was right after you left Mattel?

22    A    That's correct.

23    Q    Right after you resigned?

24    A    Yes.

25    Q    And this is before MGA provided you with any kind of
```

1    information about the Mexican market; right?

2    A    Yes.

3    Q    Now, isn't it true that once the MGA Mexico operation

4    got started and began operating, that MGA took market share

5    from Mattel?

6    A    Can you say that again, please.

7    Q    Sure.  At some point MGA Mexico operations actually

8    started to get up and running; right?

9    A    Correct.

10   Q    You started to sell products, Bratz products in

11   particular, to retailers in Mexico; right?

12   A    Correct.

13   Q    And previously, by the way, the way that MGA sold Bratz

14   products in Mexico was through a distributor; right?

15   A    That's correct.

16   Q    But what changed was that you and the others set up an

17   entirely new business for the first time in there for MGA to

18   market and sell MGA products; right?

19   A    Right.

20   Q    So it was new?

21   A    Yes.

22   Q    And after that operation started to grow, after you

23   actually started selling products to retailers, MGA Mexico

24   began taking market share from Mattel?

25   A    Yes.

```
 1   Q    And it's true that when you met with Mr. Larian for
 2   that very first time, that MGA's market share in Mexico had
 3   been about three percent?
 4              MR. MCCONVILLE:  Objection.  Foundation.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Bratz market share, yes.
 7   BY MR. ZELLER:
 8   Q    And you told Mr. Larian that?
 9   A    I am not sure if I told him that.
10   Q    You discussed it?
11   A    I am not sure.
12   Q    But it's a true fact that when you first met with him,
13   the Bratz market share of fashion dolls there in Mexico was
14   three percent?
15   A    Yes.
16              MR. MCCONVILLE:  Objection.  Foundation.
17              THE COURT:  Overruled.
18   BY MR. ZELLER:
19   Q    Sorry?
20   A    Yes.
21   Q    And then after you and Ms. Trueba and Mr. Vargas took
22   all this information from Mattel and you resigned from
23   Mattel and you began setting up the Mexico operations during
24   the 2003 to 2004 time period, MGA sales tripled?
25   A    From when to when?
```

1    Q     From 2003 to 2004.

2    A     What month in 2004?

3    Q     As compared to the earlier time period, before the

4    Mexico operation.

5    A     I can't be sure, but they did increase.

6    Q     It's your best recollection that those sales from 2003

7    to 2004 at least tripled; right?

8    A     Yes.

9    Q     And MGA sales also went up about 70 percent from 2004

10   to 2005; right?

11   A     Yes.

12   Q     And in July of 2005 you told Mr. Larian that Bratz had

13   a 17-percent market share in Mexico?

14   A     I am not sure.

15   Q     Well, focusing on the July of 2005 time period, what

16   was the market share of Bratz in Mexico by that time?

17   A     Some figure between 12 and 15 maybe.

18   Q     So the market share increased from about three percent

19   prior to the time that you and the others opened up MGA

20   Mexico's operations and grew by July of 2005 to 12 to 15

21   percent of the market; right?

22   A     Yes.

23   Q     You also told Mr. Larian that the brand that was most

24   affected by this growth there in Mexico was Barbie; right?

25                MR. MCCONVILLE:  Object to the form of the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   question as also told.

 2             THE COURT:  Overruled.

 3             THE WITNESS:  I am not sure.  I am not sure if I

 4   told him.

 5   BY MR. ZELLER:

 6   Q    Do you remember telling him that the Barbie brand was

 7   suffering as a result of what you had done?

 8   A    No, I don't.

 9             MR. MCCONVILLE:  Just a minute.  Never mind.

10   BY MR. ZELLER:

11   Q    Please take a look at Exhibit 6746.  Do you recognize

12   Exhibit 6746 as an e-mail that you sent to Mr. Larian?

13   A    Yes.

14             MR. ZELLER:  I would move this into evidence, Your

15   Honor.

16             THE COURT:  It's received.

17             (Exhibit 6746 received in evidence)

18   BY MR. ZELLER:

19   Q    If you can take a look at the second page.

20   A    Second page?

21   Q    Yes.  It's about the third bullet point down.

22   A    Yes.

23   Q    Here you tell Mr. Larian that Barbie is Mattel most

24   affected brand?

25   A    Yes.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    Q    What you were saying here is that MGA's increased sales

2    of Bratz in Mexico was causing Mattel sales of Barbie dolls

3    to decrease; right?

4    A    Right.

5    Q    Because you knew that Bratz and Barbie were competing

6    dolls; right?

7    A    Right.

8    Q    And when the Bratz market share increased, Barbie

9    market share decreased?

10             MR. MCCONVILLE:  Objection.  Calls for

11   speculation.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yes.

14   BY MR. ZELLER:

15   Q    Now, we talked a little bit about the CD that you

16   created.  So what you did is you took those Mattel files and

17   some other files that you had on your Sony laptop computer

18   and made a copy of them to a CD, this green Sony CD we were

19   talking about; right?

20   A    Right.

21   Q    Then you took that CD to MGA Mexico's offices; right?

22   A    Right.

23   Q    And where did you have it?

24   A    In my office.

25   Q    Did you burn that CD sometime in late 2004 or early

```
1   2005?

2   A    Yes.

3   Q    And some months later the Mexican police conducted a

4   search of MGA's offices; right?

5   A    Right.

6   Q    And they found your green CD; right?

7           MR. MCCONVILLE:  Objection.  Calls for

8   speculation.

9           THE COURT:  Overruled.

10          MR. MCCONVILLE:  No foundation.  No personal

11  knowledge.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes.

14  BY MR. ZELLER:

15  Q    In fact, you told Susana Kuemmerle at that time when

16  she told you that the search was being executed that you had

17  the CD that contained Mattel documents on it in your office;

18  right?

19  A    Right.

20          MR. ZELLER:  At this time, Your Honor, I would

21  offer Exhibit 8855-A into evidence for all purposes.  This

22  is the CD.

23          THE COURT:  Have you had an opportunity to look at

24  this CD?  Have you viewed this CD and the contents on it,

25  Mr. Machado?
```

```
 1              THE WITNESS:  No.

 2              THE COURT:  Has anybody shown you this CD before

 3     to look at?

 4              THE WITNESS:  No.

 5              THE COURT:  All right.  I am going to receive it

 6     at this time, counsel.  For all purposes I'm going to

 7     receive this CD at this time.

 8              MR. ZELLER:  Thank you.

 9              MR. MCCONVILLE:  We'd object on foundation

10     grounds, Your Honor.

11              MR. OVERLAND:  Join.

12              (Exhibit 8855-A received in evidence)

13     BY MR. ZELLER:

14     Q    Let's compare a couple of files here.  If you can

15     please take a look at Exhibit 7111.

16     A    (Witness complies.)

17     Q    This is something that's a file called boys-Brazil.ppt?

18     A    Yes.

19     Q    This is one of the files that you copied from your

20     laptop to the green CD we have been talking about?

21     A    Yes.

22     Q    Also this is a file that originally came from the

23     Mattel systems; right?

24     A    Correct.

25     Q    One of the ones that one of the three of you copied
```

1    from Mattel's system onto the USB device and then onto your

2    laptop?

3    A    Yes.

4    Q    And the CD that we're talking about is the one that was

5    in your office that the Mexican police found; right?

6    A    Right.

7    Q    This particular file -- if we can --

8         MR. ZELLER:  I would move Exhibit 7111 into

9    evidence, Your Honor.

10        THE COURT:  It's received.

11        *(Exhibit 7111 received in evidence)*

12   BY MR. ZELLER:

13   Q    This is one of those documents that was on the CD that

14   the police found?

15   A    Yes.

16        MR. ZELLER:  And then, Ken, if we can pull up the

17   boys-Brazil.ppt file from the CD.

18   BY MR. ZELLER:

19   Q    You will see that these are the same documents?

20   A    Yes.

21   Q    It's the same file?

22        MR. MCCONVILLE:  Objection, Your Honor.  The

23   witness doesn't have a CD in front of him.  The record is

24   going to be unclear as to what is going on.

25        MR. ZELLER:  We're displaying --

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              THE COURT:  Just a moment.  This is 8855, and this
 2   is supposed to be 7111 on the CD.
 3              MR. ZELLER:  He has in front of him the hard copy,
 4   7111, and --
 5              THE COURT:  Which comes from Exhibit 8855?
 6              MR. ZELLER:  Correct.
 7              THE COURT:  I think I just said that.
 8              MR. ZELLER:  I apologize.  I wasn't tracking.
 9              THE COURT:  Okay.
10   BY MR. ZELLER:
11   Q    Let's please look at Exhibit 7106.
12   A    I have it.
13   Q    Do you recognize this as another document that was on
14   your CD?
15   A    Something like it, yes.
16   Q    And specifically this is a file that's named
17   A&P04-media1.xls?
18   A    Yes.
19   Q    And while we won't go through all the documents there
20   on the CD you created, there were a number of Mattel
21   documents on it; right?
22   A    Correct.
23   Q    And these are documents that originally came from
24   Mattel's computer systems that you put on the USB drive,
25   then onto your laptop; then you burned them onto the CD, and
```

1    you took the CD to MGA's offices?

2            MR. MCCONVILLE:  Objection.  Compound.

3            THE COURT:  Overruled.

4            THE WITNESS:  Yes.

5    BY MR. ZELLER:

6    Q    And this is the CD that the police found in your office

7    when they were doing the search?

8            MR. MCCONVILLE:  Objection.  Foundation.

9            THE COURT:  There is going to be some contention

10   between the parties about what was actually found on this

11   CD, which is why the Court has asked the witness if he

12   reviewed the CD.

13           I will let the other side develop what their

14   version is, whether information was added or whether this is

15   the same CD.  But at least this Court is going to receive it

16   at this time, and then the parties can disagree about the

17   actual document if they choose to.

18           MR. OVERLAND:  Join in the objection.

19           THE COURT:  Thank you.  Overruled.  Now because I

20   made that long-winded explanation to the jury, he has

21   forgotten the question.

22           MR. ZELLER:  I am happy to restate, Your Honor.

23   BY MR. ZELLER:

24   Q    The CD we have been talking about is the green CD that

25   was in your office there at MGA in Mexico that the police

```
 1   found?

 2            MR. MCCONVILLE:  Same objection.

 3            THE COURT:  That the police found.  That's the

 4   constant objection for the record.  It's overruled.

 5   BY MR. ZELLER:

 6   Q    Let me try it this way.  You created the green CD and

 7   you did that at the end of 2004 or early 2005, and you took

 8   it to MGA's offices; right?

 9   A    Right.

10   Q    And it was there in your office for a number of months?

11   A    Right.

12   Q    And then the police search occurred?

13   A    Yes.

14   Q    By the way, you weren't there when the search occurred;

15   right?

16   A    No, I wasn't.

17   Q    You were at Susana Kuemmerle's house in New Jersey?

18   A    Originally I was in New York.

19   Q    You were on a business trip?

20   A    That's correct.

21   Q    And Ms. Kuemmerle first told you that this search had

22   occurred?

23   A    Yes.

24   Q    Then when you went back to your office there at MGA in

25   Mexico City after the police were there, your CD wasn't
```

1     there anymore; right?

2     A     Right.

3     Q     And there is only one green CD that you created that

4     had these Mattel documents on them that you took to MGA's

5     offices; right?

6     A     That's correct.

7     Q     When you were working at Mattel Mexico, there were

8     sales reports that were called FRP reports?

9     A     Yes.

10    Q     And these were among the documents that you took from

11    Mattel; right?

12    A     Yes.

13    Q     In fact, if you could please take a look at Exhibit

14    8466, which is in evidence at least as to some parties.  Do

15    you have that?

16              THE COURT:  I think he's looking at a single page,

17    and that's all.  We went over it on Saturday or Sunday a

18    couple weeks ago.  If you look at it, it's just -- would you

19    hold that up for counsel.  It just says spreadsheet and it's

20    just one page.  So he doesn't have the content.

21              MR. ZELLER:  This is already in evidence

22    partially, Your Honor.  Maybe Mr. Machado can look at the

23    screen.

24    BY MR. ZELLER:

25    Q     If you can please take a look at the screen.  That may

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    be the easiest way.  This is Exhibit 8466.  Do you recognize

 2    this as a Mattel point-of-sale report?

 3    A    Yes.

 4    Q    This is one of these point-of-sale reports that we were

 5    calling FRP reports; right?

 6    A    Correct.

 7              MR. ZELLER:  I would move this into evidence for

 8    all purposes.

 9              THE COURT:  Received.

10              (Exhibit 8466 received in evidence)

11    BY MR. ZELLER:

12    Q    And these FRP reports that we are talking about are

13    reports prepared by Mattel Mexico personnel; right?

14    A    Yes.

15    Q    In fact, Pablo Vargas and people working with Pablo

16    Vargas had responsibility for creating these FRP reports;

17    right?

18    A    Right.

19    Q    And some of the information in this document that we

20    have in front of us, Exhibit 8466, comes from a retailer

21    called Walmex; right?

22    A    Yes.

23    Q    And that's Wal*Mart in Mexico; right?

24    A    That's correct.

25    Q    And some of the information then that's in this
```

```
 1   document, not all of it, but some of it comes from Walmex;
 2   right?
 3   A     Yes.
 4   Q     And Mattel pays for this information to get it from
 5   Walmex by giving a discount to retailers such as Walmex in
 6   exchange for that information?
 7              MR. MCCONVILLE:  Objection.  Calls for
 8   speculation.  No foundation.
 9              THE COURT:  Overruled.
10              THE WITNESS:  I am not sure about that.
11   BY MR. ZELLER:
12   Q     Well, you are aware that Mattel gets point-of-sale
13   information from retailers in Mexico by giving them a
14   discount -- in other words, paying for it?
15              MR. MCCONVILLE:  Objection.  Vague.
16              THE COURT:  Overruled.
17              THE WITNESS:  I can't be sure about that.
18   BY MR. ZELLER:
19   Q     That's your understanding; right?
20   A     No, because I don't know about the discounts.  I didn't
21   know about the discount.
22   Q     Well, these FRP reports contain information that's not
23   available to MGA normally; right?
24   A     Right.
25   Q     It's internal confidential Mattel information about the
```

```
 1   details of the sales of its products at a particular
 2   retailer; right?
 3   A    Correct.
 4           MR. MCCONVILLE:  Compound.
 5           THE COURT:  Overruled.
 6   BY MR. ZELLER:
 7   Q    When you -- let me ask it this way.  You certainly
 8   didn't believe that the information that the retailers
 9   provided back to Mattel was free; right?
10           MR. MCCONVILLE:  Objection.  Vague.
11           THE COURT:  Do you understand the question?
12           THE WITNESS:  Yes, I do.
13           THE COURT:  You may answer it, sir.
14           THE WITNESS:  I understood they gave information
15   because the business relationship they have.
16   BY MR. ZELLER:
17   Q    My question is a little different.  Did you think that
18   Walmex and the other retailers were providing detailed sales
19   information back to Mattel about the sale of Mattel products
20   for free?
21   A    Yes.
22   Q    Certainly you recognize that this information in these
23   FRP reports was information that was valuable for a
24   competitor of Mattel to have; right?
25           MR. MCCONVILLE:  Objection.  Foundation.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

38

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  Not always.

 3    BY MR. ZELLER:

 4    Q    It was generally the case you understood that these FRP

 5    reports contained information about Mattel sales that would

 6    be valuable for a competitor of Mattel to have; right?

 7                MR. MCCONVILLE:  Same objection.

 8                THE COURT:  Overruled.

 9                THE WITNESS:  At the same time that they occurred,

10    yes.

11    BY MR. ZELLER:

12    Q    Well, at the same time?  Isn't it true that you and the

13    others took more than 10 versions of these FRP reports?

14    A    I am not sure.

15    Q    You took several of them; right?

16    A    I didn't copy them, so --

17    Q    Well, you -- well, Mr. Vargas coordinating with you

18    copied a number of these FRP reports; right?

19    A    Yes.

20    Q    And the reason why you did that was so that you would

21    have a comprehensive picture about the details of Mattel

22    sales so that you could use that same information to try and

23    create projections for sales into the future; right?

24                MR. MCCONVILLE:  Objection.  Compound and vague.

25                THE COURT:  Overruled.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              THE WITNESS:  No.
 2    BY MR. ZELLER:
 3    Q    So you and Mr. Vargas got together.  You spent at least
 4    two weeks there going around Mattel searching for
 5    information to take that would be useful for your jobs at
 6    MGA, and you took several of these FRP reports, but they had
 7    no value; right?
 8              MR. MCCONVILLE:  Objection.  Compound.
 9              THE COURT:  Overruled.
10              THE WITNESS:  I didn't say that.
11    BY MR. ZELLER:
12    Q    You agree with me that the reason why you and Mr.
13    Vargas in combination took these FRP reports was because you
14    knew that they would be valuable to you in your future job
15    going forward there at MGA; right?
16              MR. MCCONVILLE:  Objection.  Compound.
17              THE COURT:  Overruled.
18              THE WITNESS:  That they could be.  That they could
19    be helpful.
20    BY MR. ZELLER:
21    Q    It was your expectation that they would be valuable for
22    that reason; right?
23    A    Right.
24              MR. MCCONVILLE:  Objection.  Vague as to that
25    reason.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  Correct.

3    BY MR. ZELLER:

4    Q    Certainly when you and the other two were copying

5    documents from Mattel's systems, it wasn't your plan to take

6    documents that had no value; right?

7    A    Right.

8    Q    And when you were working at MGA after you left Mattel,

9    you did access and use some of these documents that you and

10   the others took from Mattel Mexico; right?

11         MR. MCCONVILLE:  Objection.  Vague as to which

12   documents.

13         THE COURT:  Overruled.

14         THE WITNESS:  Yes.

15   BY MR. ZELLER:

16   Q    Among those documents that you actually accessed and

17   used that you and the other two had taken from Mattel Mexico

18   included these FRP files; right?

19   A    Correct.

20   Q    And what you did specifically was you used that

21   information to compare MGA's Bratz against Mattel's Barbie;

22   right?

23   A    Yes.

24   Q    And Mattel's MyScene; right?

25   A    Yes.

```
1    Q    And you did a point-of-sale analysis for MGA; right?

2    A    Yes.

3    Q    And you used that point-of-sale analysis as part of

4    your reports to Mr. Larian on a weekly basis; right?

5    A    Correct.

6    Q    And up until the summer of 2004, MGA Mexico did not

7    have a Nielsen account; right?

8    A    Can you repeat the dates.

9    Q    Sure.  The summer of 2004 is the time period I am

10   focused on.  Is it true that MGA Mexico did not have a

11   Nielsen account prior to the summer of 2004?

12   A    That is correct.

13   Q    And when MGA Mexico did for the first time in the

14   summer of 2004 get a Nielsen account, MGA had to pay for

15   that information; right?

16   A    Right.

17   Q    But prior to that time, what you and the others did is

18   that you used the Nielsen information that Mattel had paid

19   for to assist MGA; correct?

20   A    No.

21   Q    Was the Nielsen information you took more worthless

22   information?

23            MR. MCCONVILLE:  Objection.  Argumentative.

24            THE COURT:  Sustained.

25   BY MR. ZELLER:
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

42

```
 1   Q    What did you do with the ACNielsen information that
 2   Mattel had paid for?
 3   A    Nothing.
 4   Q    You used it in the presentation that you made to Mr.
 5   Larian; right?
 6   A    In March, yes.
 7   Q    But you used the ACNielsen information in a
 8   presentation to Mr. Larian while you were a Mattel employee;
 9   right?
10   A    Yes.
11   Q    You then take, along with the other two, Nielsen
12   information when you are leaving Mattel to go to MGA; right?
13   A    Right.
14   Q    And you selected documents to take from Mattel because
15   you thought they would be useful there at MGA; right?
16   A    Right.
17   Q    So if I understand what you're saying, you used that
18   information, this Mattel information or information that
19   Mattel had paid for in order to get your job; right?
20   A    Yes.
21   Q    But you never used it again?
22   A    No.
23   Q    That's correct?  That's what you're saying?
24   A    Yes.
25   Q    Now, please take a look at Exhibit 8866.  This is a
```

```
 1  sales forecast document.
 2  A    I'm sorry.  There is no page here.
 3            THE COURT:  It's another single page, I believe.
 4            MR. ZELLER:  If we can display, Ken, 8866.
 5            MR. MCCONVILLE:  It's not in evidence, Your Honor.
 6            MR. ZELLER:  It's a voluminous electronic
 7  document.
 8            THE COURT:  It will be received, counsel.
 9            MR. ZELLER:  Thank you.  If we can please pull up
10  Exhibit 8866.
11            MR. MCCONVILLE:  We object on foundation grounds.
12            THE COURT:  Overruled.
13  BY MR. ZELLER:
14  Q    You recognize this as a sales forecast document?
15  A    Yes.
16  Q    This was something that you worked on while you were at
17  MGA?
18  A    No.
19  Q    Did others at MGA work on it?
20  A    This document?
21  Q    Yes.
22  A    No.
23  Q    This is a Mattel document you have seen before, though?
24  A    Yes.
25            MR. MCCONVILLE:  Foundation.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              THE COURT:  The foundation objection may be
 2    appropriate on the first page.  Is there a signature or a
 3    Bates number?  Mr. McConville, if you would rise from your
 4    seat --
 5              MR. MCCONVILLE:  No, there's not, Your Honor.
 6              THE COURT:  What?
 7              MR. MCCONVILLE:  There's no signature.  This is
 8    not a document --
 9              THE COURT:  No signature, and it doesn't follow
10    the Bates number?
11              MR. ZELLER:  It's from the CD, Your Honor.
12              THE COURT:  Well, let's get the foundation, then,
13    to be sure.
14              MR. ZELLER:  Okay.  If we can pull up the Bates
15    stamp again.
16    BY MR. ZELLER:
17    Q    You will see that this document is stamped.  It's
18    3815506, and it has a dot.  And then it goes, has some zeros
19    and 43.  What I will tell you is that this is a number that
20    lawyers have added in this case.  This reflects that --
21              THE COURT:  For my purposes, counsel, I am just
22    going to receive it, now that I see that up on the screen.
23    I've just got the single page.
24              MR. ZELLER:  Understood, Your Honor.
25              THE COURT:  It's received.
```

```
 1              (Exhibit 8866 received in evidence)
 2    BY MR. ZELLER:
 3    Q    Let me just step back.  This document that we have here
 4    up on the screen, Exhibit 8866 from the CD, is -- you
 5    recognize it as a sales forecast document?
 6    A    Yes.
 7    Q    It's a sales forecast document that came originally
 8    from Mattel?
 9    A    Yes.
10    Q    And you worked on documents like this when you were
11    working there at Mattel Mexico?
12    A    Yes.
13    Q    This document is one of the documents that you and the
14    others downloaded from Mattel and that you then copied onto
15    the green CD; right?
16    A    Yes.
17    Q    This document, this sales forecast document, contains
18    Mattel confidential information in it; right?
19    A    Yes.
20    Q    And that includes projected sales information?
21    A    Yes.
22    Q    It includes confidential Mattel information such as
23    profit margin?
24    A    Yes.
25    Q    It includes Mattel confidential information such as the
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   identification of new products that are not yet in the

2   market?

3   A    Yes.

4   Q    And it contains this information on a level of detail

5   that's by product, by product; right?

6   A    Correct.

7   Q    You used this document and other sales forecast

8   documents when you were at MGA as part of your job; right?

9   A    No.

10  Q    No?

11  A    No.

12  Q    What did you do with it?

13  A    Nothing.

14  Q    This is a document you copied from Mattel systems;

15  right?

16  A    Right.

17  Q    You and the others spent time searching for documents

18  that you believed would be useful at your new job; right?

19  A    Right.

20  Q    You downloaded it onto the USB device and then onto a

21  laptop computer; right?

22  A    Right.

23  Q    Then you copied this file from your computer onto a CD

24  that you took to MGA; right?

25  A    (No response).

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   Q     So you went to all that trouble for it but you never
 2   used it?
 3   A     That is correct.
 4   Q     You never even looked at it when you were there at MGA?
 5   A     No.
 6   Q     Please take a look at Exhibit 7105.
 7              MR. ZELLER:  Your Honor, this is also from the CD.
 8              THE COURT:  It has at least the same Bates number
 9   on it.
10              We have the CD.  If you need to see that in your
11   deliberations, I will supply it to you and you can look at
12   the CD.
13              Counsel, your next question.
14              MR. ZELLER:  If we can please pull up 7105.  It's
15   part of the CD.  It's in evidence.
16              THE COURT:  It's received.
17              (Exhibit 7105 received in evidence)
18   BY MR. ZELLER:
19   Q     Generally you recognize that this is a marketing budget
20   and forecast document for Mattel; right?
21   A     Budget, yeah.
22   Q     And this is a document that you took from Mattel
23   systems and ultimately copied onto the CD that was there in
24   your MGA office; right?
25   A     Yes.
```

```
 1   Q    And these marketing forecast documents like the one we
 2   have here contain confidential Mattel information; right?
 3             MR. MCCONVILLE:  Objection.  Misstates the
 4   witness's testimony concerning what the document is.
 5             THE COURT:  Do you know?
 6             THE WITNESS:  Yes.  It's a marketing budget.
 7   BY MR. ZELLER:
 8   Q    You call this a marketing forecast or marketing budget;
 9   right?
10             THE COURT:  Why don't you ask him if it's
11   confidential.
12   BY MR. ZELLER:
13   Q    Focusing your attention on Exhibit 7105, this document
14   contains confidential Mattel information; right?
15   A    Yes.
16   Q    And you took this document because you thought it would
17   be useful to you at MGA Mexico; correct?
18   A    Correct.
19   Q    Please look at Exhibit 7132.
20             MR. ZELLER:  This is from the CD as well, Your
21   Honor.
22             THE COURT:  Received.
23             (Exhibit 7132 received in evidence)
24   BY MR. ZELLER:
25   Q    There is a Mattel document that you and the others
```

1    took; right?

2    A    Correct.

3    Q    And you ultimately copied it onto your CD and took it

4    to MGA's offices there in Mexico City; right?

5    A    Right.

6    Q    And you worked on this plan with the help of your

7    supervisor, Mr. Ibara; correct?

8    A    I am not sure.

9    Q    Please take a look at your April 24, 2010, deposition.

10   This is volume 6 at page 1148.  If you could just read to

11   yourself lines 4 through 15.

12             THE COURT:  You may read.

13             MR. ZELLER:  I was just going to refresh him on

14   it.

15   BY MR. ZELLER:

16   Q    Does looking at this refresh your recollection that you

17   worked on this document with Mr. Ibara?

18   A    Yes.

19   Q    And you will agree with me that overall marketing

20   strategies reflected here in Exhibit 7132 is something that

21   should not be shared with competitors?

22   A    Yes.

23   Q    And you took this document because you believed having

24   it would be useful for your job at MGA in the future; right?

25   A    Right.

1   Q     Now, at the time when you reached an agreement with MGA

2   and decided to go to MGA, you signed an agreement?

3   A     Yes.

4   Q     You had an employment contract?

5   A     Yes.

6   Q     And did the employment contract say anything about not

7   taking information from Mattel or competitors?

8   A     I am not sure.

9   Q     But you read your agreement?

10  A     Yes, I did.

11  Q     And was it your understanding that MGA in this contract

12  was saying you can't bring any Mattel confidential

13  information over here?

14  A     I don't remember if I understood that at that time.

15  Q     So you don't recall --

16  A     Yes.

17  Q     -- any instance in which MGA, such as in a written

18  contract or a letter or some other form, said to you, "Don't

19  bring any Mattel information"?

20  A     Yes.  I remember.

21  Q     You do remember that?

22  A     Yes.

23  Q     So you had an agreement of some kind, whether it was a

24  contract or in some other way, but you understood you had an

25  agreement with MGA that you were not to bring Mattel

1   information over to MGA; right?

2   A    Yes.

3   Q    And this was an agreement you violated?

4   A    Yes.

5   Q    Because you, in fact, did take Mattel information,

6   along with Ms. Trueba and Mr. Vargas, and take it to MGA;

7   right?

8   A    Right.

9   Q    And, in fact, it's enough information that you can't

10  even tell us exactly how much you took; right?

11          MR. MCCONVILLE:  Objection.  Argumentative.

12          THE COURT:  In its present form it's

13  argumentative, counsel.

14  BY MR. ZELLER:

15  Q    Isn't it true that one reason you can't tell us how

16  much information you yourself took and the others took was

17  because it was of a pretty large volume?

18  A    Yes.

19  Q    After the search occurred there of MGA's Mexico City

20  offices by the police, Ms. Kuemmerle told you that you

21  should get attorneys; right?

22  A    Yes.

23  Q    And by the way, by that time was Ms. Kuemmerle your

24  boss, your supervisor?

25  A    She was.

1   Q     And Ms. Kuemmerle was someone who helped you look for

2   attorneys; right?

3   A     Yes.

4   Q     By the way, as we talked about, your attorney fees are

5   being paid by MGA?

6   A     Yes.

7   Q     They have been since the time of the search all the way

8   up until today; right?

9   A     That's right.

10  Q     And Mr. Overland and Mr. Cote are among the lawyers who

11  have represented you here in this case; right?

12  A     Right.

13  Q     And you know that they are coordinating your legal

14  strategy with MGA; right?

15          MR. MCCONVILLE:  Objection, Your Honor.

16          THE COURT:  Sustained.  Stricken.  The jury will

17  disregard the question.

18  BY MR. ZELLER:

19  Q     Well, you have seen your lawyers talking --

20          THE COURT:  No, counsel.

21  BY MR. ZELLER:

22  Q     Now, at any time did MGA fire you for taking the Mattel

23  information?

24  A     No.

25  Q     Did MGA ever cut your pay for taking the Mattel

1    information?

2    A    No.

3    Q    Did MGA put you on leave or suspend you in any way for

4    taking the Mattel information?

5    A    No.

6    Q    In fact, after the search by the police where Mattel

7    information was found in your office, Mr. Larian and the

8    others at MGA gave you a promotion; right?

9    A    Right.

10   Q    And you were promoted to a position at MGA's

11   headquarters --

12   A    Yes.

13   Q    -- here in Southern California?

14   A    Correct.

15   Q    And you were promoted to vice president of marketing;

16   right?

17   A    Right.

18   Q    You got paid more money?

19   A    Yes.

20   Q    You got benefits?

21   A    The same ones.

22   Q    MGA paid for housing?

23   A    Not exactly.

24   Q    Some of it at least?

25   A    Yes.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   Q      You had a housing allowance?

2   A      Correct.

3   Q      When you came to the parent company, part of your

4   responsibilities were international marketing; right?

5   A      Yes.

6   Q      And as we talked about, you actually got a pay raise;

7   right?

8   A      Yes.

9   Q      And when you and Mr. Larian discussed this promotion

10  that you were going to get, did he say anything or did you

11  and he discuss the fact that you had taken this information

12  from Mattel?

13  A      No.

14  Q      We talked earlier about the fact that you had violated

15  an agreement with MGA by bringing this information from

16  Mattel -- taking this information from Mattel.  But while

17  there were those words there, did MGA ever take any action

18  against you of any kind for taking Mattel's information from

19  Mattel, taking it to MGA's offices, and using it?

20  A      No.

21  Q      There was absolutely no adverse action of any kind that

22  MGA took against you because of that; is that true?

23  A      That is true.

24  Q      So while there were words about don't take information,

25  that was never backed up by any action; right?

```
 1              MR. MCCONVILLE:  Objection.  Argumentative.

 2              THE COURT:  Sustained in its present form.

 3   BY MR. ZELLER:

 4   Q    You understood that MGA asked you to sign an agreement

 5   that MGA never intended to enforce; right?

 6              MR. MCCONVILLE:  Objection.  Speculation.

 7              MR. OVERLAND:  Join.

 8              THE COURT:  You may state your state of mind.

 9   Overruled.  This is as to his state of mind.

10              THE WITNESS:  Can you say it again, please?

11   BY MR. ZELLER:

12   Q    Isn't it true that when you signed that agreement where

13   those words were present saying don't take Mattel

14   information, you understood that MGA never intended to

15   enforce it?

16              MR. MCCONVILLE:  Objection.  Calls for

17   speculation.

18              THE COURT:  This only goes to what his thought is.

19              THE WITNESS:  I am not sure if I understood that

20   back then.

21              THE COURT:  He'll ask again.  Well, your answer

22   is, "I am not sure I understood that back then"?  Is that

23   your answer?

24              THE WITNESS:  Yes.

25              THE COURT:  All right.  Counsel.
```

```
 1   BY MR. ZELLER:
 2   Q     But you understand that now?
 3            MR. MCCONVILLE:  Objection.  That's argumentative.
 4            THE COURT:  Sustained.
 5   BY MR. ZELLER:
 6   Q     Well, let me ask this.  Has MGA done anything to
 7   enforce that agreement that you and MGA say that you had
 8   that you would not take Mattel information?
 9   A     No.
10            MR. ZELLER:  I have nothing further, Your Honor.
11            THE COURT:  Cross-examination, please, by Mr.
12   Overland on behalf of Mr. Machado.
13            Do you need time to change out any binders, Mr.
14   Cote and Mr. Overland?  I think he has only got nine
15   binders.
16            MR. OVERLAND:  We do, but I can start.
17            THE COURT:  All right.  Over the lunch hour you
18   can change them.
19                        CROSS-EXAMINATION
20   BY MR. OVERLAND:
21   Q     Mr. Machado, you were asked about you not paying for
22   your attorneys.  Do you remember those questions?
23   A     Yes.
24   Q     Now, in April of 2005 Mattel filed criminal charges
25   against you in Mexico; correct?
```

57

```
 1    A    Correct.

 2    Q    And those charges were for what?

 3    A    Misappropriation of confidential information.

 4    Q    And taking of information from Mattel?

 5    A    Yes.

 6    Q    Basically the same facts that are involved in this case

 7    formed the basis for those charges; correct?

 8    A    That is correct.

 9    Q    Now, are you aware that Mattel hired one of the largest

10    firms in Mexico City to prosecute that case?

11    A    Yes.

12    Q    What's the name of that firm?

13    A    Basham, Ringe, and Correa.

14    Q    Is that R-i-n-g-e?

15    A    R-i-n-g-e-e.

16    Q    And Correa, C-o-r-r-e-a?

17    A    Yes.

18    Q    How many lawyers does that firm have?

19    A    Around a hundred.

20    Q    When you went to -- when you became aware that Mattel

21    had hired this firm, this large firm in Mexico City to

22    prosecute you, did you go and ask for help in obtaining a

23    lawyer to represent you?

24    A    Yes.

25         MR. ZELLER:  Objection to the preamble.
```

1              THE COURT:  Overruled.

2    BY MR. OVERLAND:

3    Q    Why did you do that?

4    A    Because I didn't have the resources to pay it.

5    Q    When you say resources, what do you mean?

6    A    Money.

7    Q    So you didn't have the money to pay for a lawyer and

8    you needed help; right?

9    A    Yes.

10   Q    And the other side that was prosecuting you was

11   spending money on a firm that had over a hundred lawyers;

12   correct?

13             MR. ZELLER:  Objection, Your Honor.  If I am not

14   allowed to get into the lawyers, I don't see why he is.

15             THE COURT:  Let's not get into the conversation or

16   the coordination, counsel.  Overruled.

17             No speaking objections, counsel.

18             MR. OVERLAND:  Do you want me to repeat the

19   question?

20             THE WITNESS:  Please.

21   BY MR. OVERLAND:

22   Q    Since Mattel had hired a hundred-person firm in Mexico

23   City to prosecute you, did you think you needed help in

24   defending yourself?

25   A    Yes.

```
1    Q    And did you go to somebody for help?

2    A    Yes.

3    Q    Who did you go to?

4    A    Susana Kuemmerle.

5    Q    Did Susana Kuemmerle say right away, okay, we will

6    provide you a lawyer?

7    A    No.

8    Q    What did she say?

9    A    That she was going to check with corporate, with Mr.

10   Larian and the counsel team there.

11   Q    And at some time later did you learn that you were

12   going to get that help?

13   A    Yes.

14   Q    That's because you couldn't afford to have a lawyer

15   come up against a hundred-man firm; correct?

16   A    That is correct.

17   Q    So then they hired -- how did it come about that you

18   hired a lawyer in Mexico to defend yourself?

19   A    We searched.  We interviewed with some firms, with some

20   law firms.

21   Q    When you say we, do you mean yourself, Ms. Trueba, Mr.

22   Vargas --

23   A    And Ms. Kuemmerle.

24   Q    -- and Ms. Kuemmerle?

25   A    Yes.
```

```
 1   Q     Now, did Ms. Kuemmerle ever say you have to take this
 2   particular lawyer?
 3   A     No, she didn't.
 4   Q     Did she ever tell you what lawyer you had to take?
 5   A     No.
 6   Q     Who selected the lawyer in Mexico City to represent
 7   you?
 8   A     Between Mr. Vargas, Ms. Trueba, and myself.
 9   Q     How many lawyers did you interview before you finally
10   selected a lawyer?
11   A     Three.
12   Q     And that prosecution that started in April of 2005, is
13   that still going on to this very day?
14   A     Yes.
15   Q     We're talking about the criminal prosecution in Mexico;
16   right?
17   A     Right.
18   Q     Is Mr. Vargas still a defendant in that criminal
19   prosecution?
20   A     No.
21   Q     What happened?
22   A     He got a pardon.
23   Q     From?
24   A     From Mattel Servicios.
25   Q     And that happened in May of 2010?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   A     Yes.

2   Q     Now, before you were employed by Mattel Servicios, who

3   did you work for?

4   A     Ensueno-Tyco.

5   Q     Ensueno-Tyco.  That's E-n-s-u-e-n-o --

6            THE COURT:  You can get the spelling at lunch

7   time.

8            MR. OVERLAND:  Okay.

9   BY MR. OVERLAND:

10  Q     Was that a division of Tyco Toys?

11  A     Yes, it was.

12  Q     Does Tyco Toys still exist?

13  A     No.

14  Q     What happened?

15  A     Mattel bought Tyco.

16  Q     So it's no more; correct?

17  A     No.  No more.

18  Q     Now, you were shown certain exhibits by counsel for

19  Mattel, 6402 and 6403, the conflict-of-interest

20  questionnaire.  Do you remember that?

21  A     Yes, I do.

22  Q     Now, did you ever receive anything from Mattel in terms

23  of any kind of money or anything of value for you to put

24  your signature on that conflict-of-interest questionnaire?

25  A     No.

1   Q    You were just told to sign it; right?

2   A    Yes, I was.

3   Q    Did they ask for anything in return for you to sign it?

4   A    No.

5   Q    Now, several questions were asked about who your

6   employer was in Mexico.  Do you remember that?

7   A    Yes.

8         MR. OVERLAND:  I am going to need an exhibit at

9   this time, Your Honor, Exhibit 6401.

10        THE COURT:  He has it, counsel.

11  BY MR. OVERLAND:

12  Q    Do you recognize Exhibit 6401?

13  A    Yes, I do.

14  Q    What is that?

15  A    It's my employment contract between Mattel Servicios

16  and myself.

17  Q    Is that employment contract say you work for Mattel de

18  Mexico?

19  A    No.

20  Q    Does it say you work for Mattel, Inc.?

21  A    No.

22  Q    Who does it say you work for in Mexico?

23  A    Mattel Servicios SA de CV.

24  Q    Mattel Servicios is a separate company from Mattel de

25  Mexico and Mattel, Inc.; correct?

```
 1    A     Correct.

 2              MR. OVERLAND:  I'm sorry, Your Honor.  Do we have

 3    Exhibit 20441?

 4              THE COURT:  20441?

 5              MR. OVERLAND:  Yes.

 6              THE COURT:  Is that before the witness?  Just a

 7    moment.

 8    BY MR. OVERLAND:

 9    Q     While we're looking for that, let's go back to Exhibit

10    6401.  Is that the contract you signed the first day that

11    you worked for Mattel Servicios?

12    A     Yes.

13    Q     Did you ever sign any contract after that of employment

14    with any other company within Mattel other than Servicios?

15    A     No.

16    Q     If you look at the last page, which would be page 18 of

17    the translation of Exhibit 6401, what's the date when you

18    signed that?

19    A     May 16, 1994.

20              MR. OVERLAND:  Your Honor, may this Exhibit 6401

21    be introduced into evidence?

22              THE COURT:  Received.

23              (Exhibit 6401 received in evidence)

24              MR. OVERLAND:  Can we display it, please.

25              THE COURT:  It's now on the screen, counsel.
```

```
 1              MR. OVERLAND:  Thank you.

 2    BY MR. OVERLAND:

 3    Q    If you look at --

 4              MR. OVERLAND:  Sorry, Your Honor.  Can you bear

 5    with me just a second?

 6              THE COURT:  You want to take a recess also at this

 7    time?

 8              MR. OVERLAND:  Yes.  Could we, please?

 9              THE COURT:  That way the exhibits will be in

10    proper order over the lunch time.

11              You are admonished not to discuss this matter

12    amongst yourselves nor form or express any opinions in this

13    case.

14              Let's go off the record.

15              (Discussion off the record.)

16              (Recess.)

17                              -oOo-

18

19

20

21

22

23

24

25
```

```
 1
 2
 3
 4
 5                          CERTIFICATE
 6
 7          I hereby certify that pursuant to Section 753,
 8   Title 28, United States Code, the foregoing is a true and
 9   correct transcript of the stenographically reported
10   proceedings held in the above-entitled matter and that the
11   transcript page format is in conformance with the
12   regulations of the Judicial Conference of the United States.
13
14   Date:  March 5, 2011
15
16                          Sharon A. Seffens 3/5/11
17                          _____
18                          SHARON A. SEFFENS, U.S. COURT REPORTER
19
20
21
22
23
24
25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER