Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 1 of 75   Page ID #:307144
CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

1

1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                      - - - - - - -

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )    Day 28
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 3 of 4
                                      )
10            Defendants.             )
     _____ )

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                 Santa Ana, California

18                Friday, March 4, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-04 MattelV3

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20             KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 3 of 75   Page ID #:307146
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

3

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
5                 Attorney at Law
             601 West Fifth Street
6            12th Floor
             Los Angeles, California 90071
7            (213) 613-4660

8            – AND –

9            LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO

16           KEN KOTARSKI, Mattel Technical Operator

17           MIKE STOVALL, MGA Technical Operator

18           RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20           WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21           MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

22           FRANK RORIE, Orrick Herrington & Sutcliffe

23           KARMELE LANDARIBAR-ARZAGA, Spanish Interpreter

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 4 of 75   Page ID #:307147
CV 04–9049–DOC – 03/04/2011 – Day 28, Vol. 3 of 4

4

```
 1                         I N D E X

 2

 3

 4                        EXAMINATION

 5

 6    Witness Name          Direct    Cross     Redirect     Recross

 7    MACHADO GOMEZ, CARLOS
           By Mr. Overland             6

 8

 9

10

11                         EXHIBITS

12

13    Exhibit                     Identification    Evidence

14    Defendants' No. 8853                            54

15    Defendants' No. 8870                            58

16    Defendants' No. 24060                           25

17    Defendants' No. 35378                           35

18

19

20

21

22

23

24

25
```

```
 1              SANTA ANA, CALIFORNIA, FRIDAY, MARCH 4, 2011

 2                       DAY 28, VOLUME 3 OF 4

 3                           (1:02 p.m.)

 4              (The following proceedings is taken in the

 5         presence of the jury.)

 6              THE COURT:  All right.  We are back on the record.

 7              Mr. Machado is present, counsel are present.

 8              If you'd please be seated.  Mr. Overland will be

 9    here in just a moment.

10              And counsel, on the way in, the jury informed the

11    Court that they would like to reconvene next Tuesday.

12    They've been extraordinarily gracious, and they'd like to

13    start at 1:00 and just come in a block of time.  They'd like

14    to go 12 straight hours, until 6:00 a.m. the next day.

15              (Laughter.)

16              THE COURT:  What they said is they'd like to go

17    until 6:00 that evening, try to hold to that schedule.  So

18    if we'd be prepared from 1:00 to 6:00.

19              Thank you.  Normally, I wouldn't take a break for

20    anything, but that's something that we had scheduled, and I

21    don't want to break that particular commitment.

22              All right.  Then I'm going to step down for just a

23    moment and look like I'm late, okay?

24              I'll be right back.

25              (Interruption in the proceedings.)
```

```
 1              THE COURT:  Okay.  We're back in session.
 2              And Counsel, Mr. Overland, if you'd like to
 3    continue with your examination, please.
 4              MR. OVERLAND:  Thank you.
 5     CARLOS GUSTAVO MACHADO GOMEZ, PLAINTIFFS' WITNESS, RESUMED
 6                 CROSS-EXAMINATION (Continued)
 7    BY MR. OVERLAND:
 8    Q    Mr. Machado, before the lunch, we were talking about
 9    the contract that you had signed with Servicios; do you
10    understand that?
11    A    Yes.
12    Q    And that would be --
13              THE COURT:  6401?
14              MR. OVERLAND:  Yes, thank you.
15              Your Honor, may the first page of that be
16    displayed to the jury?
17              THE COURT:  You may display it.
18              MR. OVERLAND:  Is it --
19              THE COURT:  It's on the screen now.
20              MR. OVERLAND:  Okay.
21    BY MR. OVERLAND:
22    Q    If you'd look at the first paragraph on top, there,
23    before the "Declarations," in capitals, you see it says that
24    the company there is your employer, right?
25    A    Right.
```

1    Q    And the company is who?

2    A    Mattel Servicios SA de CV.

3    Q    Anybody else in any part of this contract called your

4    employer?

5    A    No.

6    Q    So regardless of what cards you had or what you put in

7    your resume, this is the contract that defines who your

8    employer was, correct?

9    A    Correct.

10    Q    We also talked before the lunch about the fact that you

11    couldn't afford to hire attorneys to defend the criminal

12    case that was brought by Mattel against you in Mexico; do

13    you remember that?

14    A    Yes.

15    Q    Now, Mattel also in -- at a later date, filed this

16    lawsuit against you personally, right?

17    A    Right.

18    Q    And you had the money to represent yourself in that

19    case?

20    A    No.

21    Q    I'm sorry, in this case?

22    A    No.

23    Q    And you knew that Mattel was represented by Quinn

24    Emanuel?

25    A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 8 of 75   Page ID #:307151
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

8

1   Q     And Quinn Emanuel is a large firm in Los Angeles and

2   other places?

3             MR. ZELLER:  Objection, your Honor.

4             THE COURT:  Sustained.

5             We are not going to go into size and power, or

6   lack thereof.

7   BY MR. OVERLAND:

8   Q     Did you think you had the money to represent yourself

9   against a firm like Quinn Emanuel?

10            MR. ZELLER:  Objection.

11            THE COURT:  Sustained in its present form.

12            Just "Quinn Emanuel," not like –– just "Quinn

13  Emanuel," against the law firm Quinn Emanuel.

14            MR. OVERLAND:  I think the point is made.

15            THE COURT:  That's why I sustained the objection,

16  okay?

17            (Laughter.)

18            MR. OVERLAND:  Okay.  We are on the same page.

19            THE COURT:  All right.

20  BY MR. OVERLAND:

21  Q     So what did you do to get help in representing you

22  against Quinn Emanuel?

23            MR. ZELLER:  Objection as to "Quinn Emanuel."

24            THE COURT:  Well, they can name a law firm.  It's

25  good advertising.  I'm just joking with you, but it's a law

1    firm.

2            There's lots of law firms.  There's Quinn Emanuel

3    and 50,000 million other law firms, so there we go.

4    BY MR. OVERLAND:

5    Q    What did you do to get help?

6    A    I asked MGA to help me pay the fees.

7    Q    And MGA agreed to pay for your lawyer, right?

8    A    Yes.

9    Q    And that would be me, in part, and Mr. Cote's firm,

10   right?

11   A    Yes.

12   Q    Now, when you -- let's go back to Exhibit 6401.  This

13   contract that you signed was an employment contract,

14   correct?

15   A    Correct.

16   Q    And you agreed to do certain things in -- in exchange

17   for something by Servicios, correct?

18   A    Correct.

19   Q    And what you agreed to do was to work for Servicios,

20   right?

21   A    Right.

22   Q    And did you get anything in exchange for that?

23   A    My salary.

24   Q    So you weren't working for free, right?

25   A    Right.

1    Q    And you didn't put your signature at the end of

2    Exhibit 6401 without getting anything in return, right?

3    A    That's correct.

4    Q    And that would be the salary that you got from

5    Servicios, right?

6    A    Right.

7    Q    Were you paid by Mattel, Inc.?

8    A    No.

9    Q    Were you paid by Mattel de Mexico?

10   A    No.

11   Q    Who paid your salary?

12   A    Mattel Servicios.

13   Q    And was that always the case as long as you were

14   employed by Mattel Servicios?

15   A    Yes.

16   Q    When you got Exhibits 6402, that would be the

17   questionnaire, and 6403, was that given to you by someone

18   employed by Mattel Servicios?

19   A    Yes.

20   Q    And did you get any additional salary or anything else

21   in order to sign that questionnaire?

22   A    No.

23   Q    You just signed it, right?

24   A    Yes.

25   Q    You got nothing in return?

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 11 of 75   Page ID #:307154
CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

11

1    A    Yes.

2    Q    Now, let's talk a little bit about the meeting that you

3    had at the New York toy fair; do you remember being asked

4    questions about that?

5    A    Yes.

6    Q    How many days was that meeting?

7    A    Three.

8    Q    And at that meeting, what did you do?

9    A    We went -- well, people at Mattel went to see what

10   business opportunities there were available.

11             THE COURT:  Could you speak up?  Just move the

12   microphone a little closer.  That chair doesn't move,

13   unfortunately.

14             THE WITNESS:  Okay.

15             THE COURT:  Thank you, sir.

16             I'm sorry, would you repeat your answer?

17             THE WITNESS:  We went --

18             THE COURT:  Here is what you said:

19             "We went -- well, people at Mattel went to see

20   what business opportunities there were available."

21             THE WITNESS:  There were available as a toy -- the

22   third-party distributors that were showcasing their products

23   in New York.

24   BY MR. OVERLAND:

25   Q    So the toy fair, what it is is distributors displaying

1   their products, right?

2   A    Yes.

3   Q    And you'd go there and you look at the products, right?

4   A    Yes.

5   Q    And you'd talk with the distributors, right?

6   A    Yes.

7   Q    To familiarize yourself with the upcoming products in

8   the toy industry, right?

9   A    Right.

10   Q    And you did that for a period of three days?

11   A    Yes.

12   Q    You and Ms. Trueba?

13   A    Yes.

14   Q    How long was the meeting with Mr. Larian?

15   A    Fifteen to twenty minutes.

16   Q    And did you go there for the purpose of meeting

17   Mr. Larian?

18   A    To New York?

19   Q    Yeah.

20   A    No.

21   Q    Why did you go there?

22   A    Because I was required to by Mattel.

23   Q    And it was there that Ms. -- you met Ms. Kuemmerle?

24   A    Yes.

25   Q    And Ms. Kuemmerle said, "Here is the chance" -- what

1    did Ms. Kuemmerle say in terms of meeting Mr. Larian?

2    A    That there might be a chance to meet him.

3    Q    So did you know beforehand, before you went to the toy

4    fair in New York, that you were going to meet Mr. Larian?

5    A    No, I didn't.

6    Q    Now, after you met Mr. Larian for those 15 minutes out

7    of the 3 days you were in New York, did you find out that

8    Mr. Larian was going to be interviewing individuals in

9    Mexico?

10   A    Yes.

11   Q    How did you find that out?

12   A    He told me.

13   Q    When did he tell you that?

14   A    During the interview.

15   Q    What interview?

16   A    The interview -- well, the meeting with him, sorry.

17   The meeting I had with him, the 15-minute meeting I had with

18   him.

19   Q    In New York?

20   A    Yes, in New York.

21   Q    What did he tell you at that 15-minute meeting?

22   A    He met me, we shook hands, and that he was interested

23   in setting up MGA Mexico, and he asked me if I was

24   interested in the possibility.  I said "yes," and that's

25   pretty much about it.

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 14 of 75   Page ID #:307157
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

14

1   Q     Did he offer you a job, then?

2   A     No.

3   Q     Did Ms. Kuemmerle offer you a job?

4   A     No.

5   Q     When was this toy fair?

6   A     It was mid-February.

7   Q     Of 2004?

8   A     Of 2004.

9   Q     And did Ms. Kuemmerle, after that meeting in

10  mid-February of 2004, tell you that Mr. Larian was coming

11  down to Mexico to interview some candidates to open up an

12  MGA office?

13  A     Yes.

14          MR. ZELLER:  Objection.  Leading.

15          THE COURT:  Overruled.

16          THE WITNESS:  Yes.

17  BY MR. OVERLAND:

18  Q     When were you told that?

19  A     The -- the same day of the meeting with Mr. Larian.

20  Q     After you had finished the meeting or at the same time?

21  A     At the same time.

22  Q     And what did you say about that?

23  A     That -- that she would let me know about it, the exact

24  dates.

25  Q     No.  What did you say?

1    A    That -- that I told Susana that if it was in March, I

2    will be interested in interviewing with Mr. Larian.

3    Q    Were you told at that time to bring anything to that

4    interview with Mr. Larian?

5    A    No.

6    Q    Now, did you, in fact, go to meet Mr. Larian sometime

7    after mid-February 2004?

8    A    Besides the interview at The W Hotel?

9    Q    Well, did you meet him at any time besides the

10   interview at The W Hotel in Mexico City?

11   A    No.

12   Q    So the first time you saw him again was the meeting at

13   The W, right?

14   A    Yes.

15   Q    Were you -- had you been told to make any kind of

16   presentation at that meeting?

17   A    No.

18           THE COURT:  Are you referring at the meeting in

19   New York?

20           MR. OVERLAND:  No, I'm sorry.  At The W.

21           THE COURT:  At The W, okay.

22           THE WITNESS:  No, I wasn't.

23   BY MR. OVERLAND:

24   Q    Had you been told to bring any documents with you at

25   the meeting at The W?

```
 1    A    No.

 2    Q    And I want to say "had you been told," I'm talking

 3    about either by Mr. Larian or Ms. Kuemmerle.

 4    A    No.  Just the resume.

 5    Q    So you were told to bring something, right?

 6    A    Yes.

 7    Q    Bring what?

 8    A    The resume.

 9    Q    Were you told to bring anything else other than your

10    resume?

11    A    No.

12    Q    And you then met in early March at The W Hotel,

13    correct?

14    A    Correct.

15    Q    And it was you, Mr. Vargas and Ms. Trueba, right?

16    A    Yes.

17    Q    And you brought along a presentation, right?

18    A    Yes.

19    Q    Now, you were shown Exhibit 6754, and Exhibit 6754 is a

20    hard copy of what was identified at the presentation, right?

21    A    Right.

22    Q    Is that the form in which you took -- you made the

23    presentation?

24    A    Yes, it is.

25    Q    Did you have a hard copy of the presentation at that
```

1    time?

2    A    No.

3    Q    All right.  So when I say is that the form, I mean was

4    it in hard copy?

5    A    Oh, I understood the -- no, it wasn't a hard copy.

6    Q    How was the presentation made?

7    A    In my personal laptop.

8    Q    And your personal laptop had a screen?

9    A    Yes.

10   Q    And --

11   A    We displayed the presentation from the screen.

12   Q    When you say "we," it's you, Ms. Vargas -- Mr. Vargas

13   and Ms. Trueba?

14   A    Ms. Trueba.

15   Q    And how did everybody watch the presentation?

16   A    We were sitting around the laptop.

17   Q    And when you say "we," you mean the three of you?

18   A    Plus --

19   Q    Plus?

20   A    Mr. Larian, Mr. Park and Ms. Kuemmerle.

21   Q    And so you were all looking at this screen which shows

22   what has been printed out in Exhibit 6754, right?

23   A    That's correct.

24   Q    All right.  Now, I can't tell whether this exhibit has

25   the confidential, attorneys'-eyes-only stamp on it.

```
 1            THE COURT:  If the presenter would move that up at
 2    the bottom, I can tell.
 3            (Complied.)
 4            MR. RORIE:  It does.
 5            THE COURT:  It does.
 6            MR. OVERLAND:  Okay.  Thank you.
 7    BY MR. OVERLAND:
 8    Q    Do you see that stamp at the bottom that says
 9    "Confidential, attorney's eyes only"?
10    A    Yes.
11    Q    All right.  With respect to this exhibit and any other
12    exhibit that is in the CD, or any other document in this
13    case, were those words stamped on there at the time, in
14    2004, at the time you copied any of those documents?
15            MR. ZELLER:  Question is overbroad.
16            THE COURT:  Overruled.
17            THE WITNESS:  No.
18    BY MR. OVERLAND:
19    Q    Are you aware that this stamp, "Confidential,
20    attorneys' eyes only," was put on there by the attorneys in
21    this case long after 2004?
22    A    Yes.
23    Q    Now, let's look at 6754, you were shown page 3 of that
24    exhibit by counsel for Mattel.  Let's -- let's look at that
25    again.
```

1           What is that?

2    A     This is a map of Mexico.

3    Q     Is that confidential Mattel information?

4    A     No.

5    Q     Is there anything on that page that's confidential

6    Mattel information?

7    A     No.

8    Q     You are also shown page 14 of 6754; take a look at

9    that.

10          THE COURT:  And Counsel, that's now displayed on

11   the board.

12          MR. OVERLAND:  Oh, I'm sorry.

13   BY MR. OVERLAND:

14   Q     What is that?

15   A     It is a pie chart showing the self-service market share

16   in 2004.

17   Q     And it talks -- you see there "Soriana, 13 percent."

18   What is Soriana?

19   A     A Mexican retailer.

20   Q     And what is "Gigante"?

21   A     Also a Mexican retailer.

22   Q     Is the information that's shown on page 14 confidential

23   Mattel information?

24   A     No.

25   Q     I'm sorry, page 4.

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 20 of 75   Page ID #:307163
CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

20

```
 1              MR. MC CONVILLE:  No, you're on --

 2              MR. OVERLAND:  What page am I on?

 3          (Laughter.)

 4              THE COURT:  Page 3 is the map of Mexico.  Page 14

 5     is the self-service market share.

 6              MR. OVERLAND:  I'm sorry.  Okay.  I see.

 7     BY MR. OVERLAND:

 8     Q    All right.  Take a look at page 4.  That also was shown

 9     to you.

10     A    Which page, sorry?

11     Q    Page 4.

12     A    Ready.

13     Q    What is that?

14     A    It's a chart introducing a name.

15     Q    It's a chart?

16     A    The word "economics."

17     Q    The word "economics" on a yellow background?

18     A    Yes.

19     Q    In a long rectangle?

20     A    Yes.

21     Q    Is that confidential Mattel information?

22     A    No.

23     Q    Is there anything in Exhibit 6754 or the presentation

24     that you made at The W that was confidential Mattel

25     information?
```

CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

21

```
 1   A     No.

 2   Q     Where did you get that information?

 3   A     Third-party suppliers.

 4   Q     When you say "third-party suppliers," what do you mean?

 5   A     Companies that sells this kind of information.

 6   Q     Companies?  What companies?

 7   A     Nielsen and Mindshare, Infobasic.

 8   Q     And these are companies you can go to and get any of

 9   the information that is in Exhibit 6754, right?

10   A     That's correct.

11   Q     So there's nothing in the Exhibit 6754 that belongs to

12   Mattel or Mattel, Inc., or Mattel de Mexico or Mattel

13   Servicios, right?

14   A     Right.

15   Q     Nor is there anything in Exhibit 6754 that is

16   confidential information from any of those three entities,

17   correct?

18   A     Correct.

19   Q     It's information that anybody can get from these

20   companies if you pay for it, right?

21   A     Right.

22   Q     Now, let's take a look at Exhibit 8859 that was shown

23   to you.

24         What would you call that?

25   A     A checklist.
```

CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

22

```
 1   Q    What kind of checklist?

 2   A    Checklist of topics to be discussed the following week.

 3   Q    To be discussed with whom?

 4   A    With Mr. Larian --

 5   Q    How long -- I'm sorry.

 6   A    -- and Mr. Park, Mr. Tom Park.

 7   Q    I'm sorry, Mr. who?

 8   A    Park.

 9   Q    And how long did it take you to prepare this checklist?

10   A    Half an hour.

11   Q    Did you do this by yourself?

12   A    No.

13   Q    Who helped you do it?

14   A    Pablo Vargas.

15   Q    Anybody else?

16   A    No.

17   Q    So the two of you talked about it and then came up with

18   this checklist, right?

19   A    Right.

20   Q    Now, if you look at the checklist -- take a look at the

21   first bullet point.

22   A    Yes.

23   Q    It says, "Lines selection based on key leanings in the

24   U.S."

25   A    Yes.
```

1   Q    Do you see that?

2   A    Yes, I see it.

3   Q    What does that mean?

4   A    It's a typo.  It's "learnings."

5   Q    So that should be "key learnings"?

6   A    "Key learnings."

7   Q    So what did that bullet point intend to show?

8   A    That we wanted to talk about the basic key learnings in

9   the U.S. market and international markets.

10  Q    Okay.  If you look down to Bullet Point Number 4,

11  "Media plan," "This will be a tough one"; do you see that?

12  A    Yes.

13  Q    Have you selected any kind of media plan --

14  A    No.

15  Q    -- at the time that you prepared this?

16  A    No, I haven't.

17  Q    Okay.  Then if you go down in the bullet points, and

18  you see that it says "Monday, March the 3rd as date you will

19  be starting at the office"?

20  A    Yes.

21  Q    That would be the last bullet point?

22  A    Correct.

23  Q    "We should be starting at the office Monday, March the

24  3rd."  Is that when you started at the offices of MGA?

25  A    No.

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 24 of 75   Page ID #:307167
CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

24

1    Q    So why -- why does this say Monday, March 3rd?

2    A    We were meaning to say Monday, May 3rd.

3    Q    And do you know if March the 3rd was a Monday?

4    A    No, it wasn't.

5         MR. OVERLAND:  Your Honor, may the Court take

6    judicial notice that March the 3rd, 2004, was a Wednesday?

7         (Laughter.)

8         MR. OVERLAND:  We gave you a calendar.

9         THE COURT:  Well, we'll come back to that, okay?

10   Not right now.

11        MR. OVERLAND:  Okay.

12        THE COURT:  I don't have that calendar readily at

13   my disposal, but I'm sure you did.

14        MR. OVERLAND:  Okay.

15        THE COURT:  Counsel, we'll all stipulate to that

16   eventually, but let's go on.

17        MR. OVERLAND:  Okay.

18   BY MR. OVERLAND:

19   Q    Was May the 3rd a Monday?

20   A    Yes, it was.

21   Q    2004?

22   A    Yes.

23   Q    Now, when you accessed your computer at Mattel

24   Servicios, you had a password, right?

25   A    Yes.

CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

```
 1   Q    And that was a password that you had personally?

 2   A    Yes.

 3   Q    And after you logged on and entered your password, did

 4   you need any other passwords to access any type of

 5   information in that -- strike that.

 6        After you entered your password and logged onto the

 7   computer, did you need any additional passwords to log onto

 8   any specific files or folders?

 9   A    No.

10   Q    Okay.

11             MR. OVERLAND:  Your Honor, may the witness be

12   shown Exhibit 24060?

13             THE COURT:  24060.

14             MR. OVERLAND:  Can I ask that that be admitted?

15             THE COURT:  That's been placed before the witness,

16   Counsel.

17             MR. OVERLAND:  I ask that that be admitted into

18   evidence, your Honor.

19             THE COURT:  Received.

20             (Defendants' Exhibit No. 24060 is received in

21        evidence.)

22   BY MR. OVERLAND:

23   Q    See -- do you see Exhibit 24060 states, "You are

24   logging into a Mattel system.  This system provides access

25   to Mattel's confidential and propriety information," and
```

1    then it goes on.

2         When you logged onto the Mattel Servicios computer

3    after entering your password, did this prompt come up?

4    A    No.

5    Q    Did anything like this come up?

6    A    No.

7    Q    Did anything -- was there any prompt that came up that

8    told you that you were accessing confidential information?

9    A    No.

10             THE COURT:  Just a moment, Counsel.  You said

11   "Mattel Servicios' computer," and it says "You are logging

12   onto a Mattel system."

13             MR. OVERLAND:  Right.

14             THE COURT:  It doesn't say "Mattel Servicios'

15   computer."

16             MR. OVERLAND:  And Mr. Machado said that nothing

17   like this ever came up.

18             THE COURT:  Okay.

19             Please continue.

20   BY MR. OVERLAND:

21   Q    The files that you had access to in the Mattel

22   Servicios' computers were located where?  Was it a hard

23   drive, a shared directory?  What was it?

24   A    It was my hard drive and a shared directory.

25   Q    And what was the shared directory?

1   A    It was a shared directory for marketing and sales

2   within Mattel Servicios Mexico.

3   Q    Did you ever access any information on the Mattel

4   Servicios computer system that was not either on your hard

5   drive or on the Mattel Servicios Mexico shared directory?

6   A    No.

7   Q    Now, when you went to work for MGA, you've told us that

8   MGA had distributed Bratz in Mexico through Hasbro, right?

9   A    Correct.

10  Q    And what's Hasbro?

11  A    A toy company.

12  Q    It's a competitor of Mattel Servicios, Mattel de

13  Mexico, correct?

14  A    Hasbro, yes.

15  Q    And when you were determining how to market the Bratz

16  dolls in Mexico, did you do a study of how Hasbro was

17  distributing the Bratz dolls in Mexico?

18  A    Yes.

19  Q    And what did you find?

20  A    That the price -- the retail price were too high, that

21  they were not carrying too many SKUs -- or enough SKUs.

22  Q    I'm sorry, I didn't understand that.

23  A    They weren't carrying too many items from the line.

24  They didn't pick up too many items.

25  Q    And when you say "too many items," what do you mean?

1    A    They have 8 to 10 selected items to distribute in

2    Mexico from very much bigger products.

3    Q    So like the doll products?

4    A    Yes.

5    Q    So they had 8 to 10 doll products that they were

6    distributing in Mexico, right?

7    A    Yes.

8    Q    Anything else?

9    A    That -- that they were using -- they weren't applying

10   media -- or they weren't buying enough media to support

11   Bratz.

12   Q    Do you know what the advertising budget for Hasbro was

13   when it was distributing Bratz dolls in Mexico?

14   A    No.

15   Q    So what, if anything, did you do in terms of your

16   marketing plan at MGA Mexico to try to remedy anything that

17   Hasbro had done?

18   A    We selected more dolls, we selected around 25 to 30.

19   Q    Okay.  When you say "we," who is "we"?

20   A    Mariana Trueba, Susana Kuemmerle, and Pablo Vargas and

21   myself.

22   Q    Okay.  So you increased the products or dolls from the

23   8 to 10 that Hasbro was distributing to around 25?

24   A    Yes.

25   Q    Okay.  Did you do anything else?

1   A     Yes.

2   Q     What did you do?

3   A     We decreased the price.

4   Q     By how much?

5   A     Around 30 percent.

6   Q     When Hasbro was distributing the Bratz dolls in Mexico,

7   did you do a comparison of the cheapest Bratz doll and the

8   most expensive Barbie?

9   A     Yes.

10  Q     And what did you find out?

11  A     There were more or less the same retail price.

12  Q     So the most expensive Barbie when Hasbro was

13  distributing Bratz in Mexico was about the same price as the

14  cheapest Bratz doll, right?

15  A     Yes.

16  Q     And is that a reason why you reduced all the prices

17  25 percent?

18  A     Yes.

19  Q     Did you do anything else?

20  A     Yes.

21  Q     What?

22  A     We -- we -- Pablo Vargas, Mariana Trueba and Susana

23  Kuemmerle and myself designed media campagne that was strong

24  enough to support the line, and it was bigger than Hasbro's

25  media investment.

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 30 of 75   Page ID #:307173
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

30

1   Q    Does that mean you increased the advertising from what

2   Hasbro had done?

3   A    Yes.

4   Q    And do you remember what that increase was?

5   A    Yes, it was 8 to 10 times more.

6   Q    When you went to work for MGA de -- MGA de Mexico, was

7   one of the things that you did was request an increase in

8   the marketing or advertising budget?

9   A    Yes.

10   Q    Now, what did you request as an increase?

11   A    I'm not sure, but I -- I -- I'm not sure of the

12   increase, but the number was about $6 million.

13   Q    That's what you requested?

14   A    Yes.

15   Q    And you requested that from whom?

16   A    From Mr. Larian and Mr. Park.

17   Q    And did you get that increase?

18   A    No.

19   Q    What did you actually get to be the advertising or

20   marketing budget when you went to work for MGA Mexico?

21   A    Something between 3 and 4 million pesos -- 3 or

22   $4 million, sorry.

23   Q    Three or four million?

24   A    Yes.

25   Q    And when you were working for Mattel Servicios, what

1    was the marketing budget that you had there?

2    A    It was between 18 to $25 million.

3    Q    And you only had three to four when you went to work at

4    MGA, correct?

5    A    Yes.

6    Q    Now, let's go back now to that meeting that you were

7    asked about that showed the spring line before you resigned

8    from Mattel; do you remember those questions?

9    A    The (inaudible) meeting.

10            (Interruption in the proceedings.)

11   BY MR. OVERLAND:

12   Q    The meeting that you went to at the end of March?

13   A    Yes.

14   Q    At that time when you went to the meeting, had you

15   decided that you were going to leave Mattel Mexico and go

16   to -- Mattel Servicios and go to work for MGA Mexico?

17   A    No.

18   Q    When did you actually decide that you were going to

19   leave -- and when I say "you," I mean you personally, when

20   did you actually decide that you were going to leave Mattel

21   Servicios and go to work for Mattel Mexico?

22   A    On the day I got a proposal from MGA that I had found

23   reasonable to accept.

24   Q    And when you say "a proposal," what do you mean?

25   A    A job proposal.

1   Q    With salary?

2   A    Yes.

3   Q    Have you been negotiating your salary before getting

4   that proposal?

5   A    Yes.

6   Q    And who were you negotiating the salary with?

7   A    Mr. Park and Mr. Larian.

8   Q    And was that done -- how was that done; in person, by

9   mail, by phone?

10  A    We -- we gave them --

11       How --

12            (Witness and interpreter discussion held off

13       the record.)

14            THE INTERPRETER:  "We prepared a letter where we

15  had our salary -- where we requested a specific salary."

16  BY MR. OVERLAND:

17  Q    And how much did you request?

18  A    150,000 pesos monthly.

19  Q    And at the exchange rate in 2004, how much is that in

20  dollars?

21  A    Around $14,000.

22  Q    Per month?

23  A    Per month.

24  Q    Okay.  And at Mattel de Mexico, how much were you

25  making?

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 33 of 75   Page ID #:307176
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

33

1    A     75,000 pesos.

2    Q     So you were making half of what you requested, right?

3    A     Yes.

4    Q     And why did you ask for double of your salary?

5    A     Because it was a higher position.  It was a new

6    position.  I was --

7    Q     I'm sorry, it was a what position first?

8    A     A higher position.  I was going from group manager to

9    marketing director, and because of the risk of changing --

10   changing -- or switching jobs from the biggest toy company

11   to a small company.

12   Q     What kind of risk?

13   A     Well, Mattel was very well-established in the market,

14   and we were about to -- to try to establish or to set up a

15   new toy company, and all new projects have -- have its risk

16   of failing.

17   Q     And in fact, in June of 2009, Mattel (sic) de Mexico

18   closed its offices, right?

19   A     MGA de Mexico closed.

20   Q     I'm sorry, MGA de Mexico, right.  They closed their

21   offices?

22   A     They closed six months after.

23   Q     So you were out of a job?

24   A     Yes.

25   Q     The figure of 150,000 pesos, did you get advice from

1    somebody to ask for that?

2    A    Yes.

3    Q    Who was that?

4    A    Maria del Carmen Mendez.

5    Q    And who was that?

6    A    She was a friend that had worked at Mattel before, at

7    Mattel Servicios before.

8    Q    And what position did she have there?

9    A    She was the human resources director.

10   Q    And at the time that you consulted her, was she still

11   working at Mattel Servicios?

12   A    No, she wasn't.

13   Q    What was her business then?

14   A    She was an HR consultor.

15   Q    And what did she say about the 150,000 that you were

16   asking for?

17   A    It was -- it was just -- just right in the market,

18   standard salary for a marketing director.

19   Q    Would you take a look, sir, please, at Exhibit 35378.

20        Do you recognize that as being a copy of employment

21   records at Mattel de Mexico relating to Ricardo Ibarra?

22   A    Yes.

23        MR. OVERLAND:  Your Honor, I ask that that exhibit

24   be introduced.

25        THE COURT:  These are employment records for whom?

```
 1              MR. OVERLAND:  Mr. Ibarra, his boss.

 2              THE COURT:  Oh, received.

 3              (Defendants' Exhibit No. 35378 is received in

 4         evidence.)

 5    BY MR. OVERLAND:

 6    Q    And if you look at the last page and -- before you do

 7    that, now Mr. Ibarra was -- what was his title at Mattel de

 8    Mexico?

 9    A    He was a marketing director.

10    Q    And that's the same title that you were going to get at

11    MGA, right?

12    A    Yes.

13    Q    And what was Mr. -- if you look at the last page, it

14    shows what Mr. Ibarra's salary was at MGA (sic) for that

15    position?

16              MR. MC CONVILLE:  Mattel, not MGA.

17              THE COURT:  Mattel, Counsel?

18              MR. OVERLAND:  What did I say?

19              THE COURT:  MGA.

20              MR. OVERLAND:  Oh, I'm sorry.

21    BY MR. OVERLAND:

22    Q    At Mattel was for that position?

23    A    Yes.

24    Q    What was it?

25    A    $3,324,636.
```

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 36 of 75   Page ID #:307179
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

36

1   Q    And does it say what it was on a monthly basis?

2   A    No.

3   Q    Did that come out to about 240,000 pesos per month,

4   around there?

5   A    (No audible response.)

6   Q    That's okay.  We can do the math.

7   A    Okay.

8   Q    By the way, that 3 million figure is not U.S. dollars,

9   that's in pesos, right?

10  A    Yes.

11  Q    Mexican pesos, right?

12  A    Yes.

13  Q    Now, the -- was the request that you made for 150,000

14  pesos per month accepted by MGA de Mexico?

15  A    No.

16  Q    There were counteroffers back and forth, right?

17  A    Yes.

18  Q    Now, what did you finally agree to as your salary at

19  MGA de Mexico?

20  A    120,000 pesos.

21  Q    And that is less than half than what Mr. Ibarra was

22  making at the same position at Mattel, correct?

23  A    Yes.

24  Q    And did you also negotiate a bonus plan with MGA

25  Mexico?

1    A    Yes.

2          MR. OVERLAND:  Your Honor, may the witness be

3    shown Exhibit 20441?

4          THE COURT:  20441.

5    BY MR. OVERLAND:

6    Q    Do you recognize that, sir?

7    A    It isn't here yet.

8    Q    Oh, then you don't recognize it.

9          THE COURT:  It's now before the witness, Counsel.

10   BY MR. OVERLAND:

11   Q    Take a look at it, sir, and see if you recognize that.

12   A    Yes.

13   Q    What is it?

14   A    It's my offer letter to -- to Mattel, Mattel Servicios.

15   Q    Is it your offer letter or their offer letter to you?

16   A    Their offer letter to me, to Mattel Servicios.

17   Q    And did you have a -- a bonus plan there also?

18   A    Yes.

19   Q    Now, the bonus that you negotiated with MGA as part of

20   your compensation when you went to work for them, what kind

21   of bonus -- what was the bonus based on?

22   A    On sales target.

23   Q    What do you mean by that?

24   A    That we need to achieve a certain level of sales to

25   obtain the bonus, and there were different levels of sales

```
 1   and different bonus according to which level of sales.
 2   Q    So if you reached a certain amount of sales, according
 3   to the contract that you signed, you would be entitled to a
 4   bonus, correct?
 5   A    That's correct.
 6   Q    And did you ever receive a bonus above and beyond to
 7   which you were entitled to under the contract for reaching a
 8   certain amount of sales at MGA de Mexico?
 9   A    No.
10   Q    All right.  Let's -- let's talk a little about what
11   happened after the presentation at The W.
12        Did you, by yourself, without Mr. Vargas or Ms. Trueba,
13   have an interview with Mr. Larian and Mr. Park?
14   A    (No audible response.)
15   Q    Not The W, after you made the presentation.
16   A    Yes.
17   Q    And tell us what happened at that interview?
18   A    Well, they -- they -- Mr. Larian, Mr. -- Mr. Park and
19   Ms. Kuemmerle read my resume, asked me some questions about
20   my experience and how many years I have, and also handed the
21   letter when -- when my -- with my salary and benefits
22   intention.
23   Q    That's the one where you asked for 150,000 pesos?
24   A    That's correct.
25   Q    Okay.
```

1    A     And that was it.

2    Q     Did either Mr. Larian or Mr. Park at any time, or for

3    that matter, Ms. Kuemmerle, tell you that if you went to

4    work for MGA Mexico, you should bring documents that you had

5    at Mattel Servicios?

6    A     No.

7    Q     Did any of them ever suggest that you should do that?

8    A     No.

9    Q     Did any of them hint that you should do that?

10   A     No.

11   Q     Do you remember Mr. Larian making any kind of comments

12   about what he wanted you to bring with you to MGA Mexico?

13   A     Yes.

14   Q     What did he say?

15   A     "I want your brain."

16   Q     Did he say he wanted anything else other than your

17   brain?

18   A     No.

19   Q     What did you understand that to mean?

20   A     That he wanted my experience and my knowledge.

21   Q     And at that time, how much experience did you have in

22   the toy industry?

23   A     Ten years.

24   Q     When you went to work for Mattel -- for MGA de Mexico,

25   did you rely on that experience in doing your job?

```
 1    A    Yes.

 2    Q    Did you try to erase everything that you learned from

 3    your head in going to -- in those 10 years in the toy

 4    industry in going --

 5    A    No.

 6    Q    -- to work with MGA de Mexico?

 7    A    No.

 8    Q    In fact, you relied on that experience, right?

 9    A    Yes.

10    Q    In fact, that's one of the reasons you got the job was

11    your experience?

12    A    Yes.

13    Q    Now, when did you actually decide that you were going

14    to work at Mattel Mexico -- I'm sorry, at MGA Mexico?

15    A    The day I received the offer that I accepted was -- I

16    believe it was beginning of April.

17    Q    Okay.  Let me show you --

18         MR. OVERLAND:  Or your Honor, may the witness be

19    shown Exhibit 6489?

20         THE COURT:  6489.

21         MR. OVERLAND:  I'm sorry, it's 6484, I'm told.

22         THE COURT:  6484.

23         It's now been placed before the witness, Counsel.

24    BY MR. OVERLAND:

25    Q    Will you take a look at that exhibit and see if you
```

CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

41

```
 1   recognize that.

 2   A    Yes.

 3   Q    Is that the offer that you were referring to in your

 4   testimony?

 5   A    This one is offer letter when I -- when I came to work

 6   here in Southern California.

 7   Q    That's a different one, right?

 8   A    Yes.

 9   Q    Okay.  Do you remember when exactly you received the

10   offer letter to initially go to work to -- at MGA Mexico?

11   A    I think it was April 1st.

12   Q    And did you receive that through e-mail or by letter?

13   A    E-mail.

14   Q    And when did you decide to accept that offer, after

15   receiving it on April 1st?

16   A    That very day.

17   Q    Did you talk it over with anybody?

18   A    Yes.

19   Q    With whom?

20   A    Pablo Vargas and Mariana Trueba.

21   Q    And April 1st was after that meeting that you were

22   asked about in Exhibit 23840 that you went to at Queretaro,

23   right?

24   A    Was the day that meeting finished, yes.

25   Q    So it was after that meeting finished, right?
```

1   A    Yes.

2   Q    Okay.  Let's talk a little bit about that meeting in

3   Queretaro.

4        Was that meeting a general meeting, or was it divided

5   into groups?

6   A    It was divided into groups.

7   Q    And what groups was it divided into?

8   A    Well, it was boys, girls and infant and preschool.

9   Q    Now, when you were employed by Mattel Servicios, your

10  responsibility was what, boys or girls?

11  A    Boys.

12  Q    Boys only?

13  A    Yes.

14  Q    And did you go, at that meeting, to any of the groups,

15  and when I say "that meeting," let's refer to it as the

16  Queretaro meeting; do you know what I'm talking about?

17  A    Yes.

18  Q    Did you go to any of the groups that was divided into

19  girls?

20  A    No.

21  Q    When I say "divided into girls," does that mean that

22  boys went to one meeting and girls went to the other

23  meeting?

24  A    No.

25  Q    What does it mean?

1   A     No.  The boys group is for the people that were related

2   to boys toys, and girls to girls toys.

3   Q     So the only meetings that you went to were with the

4   groups that were -- had anything to do with boys toys,

5   right?

6   A     Right.

7   Q     Did MGA Mexico have anything to do with boys toys when

8   you went to work for them?

9   A     No.

10  Q     All the time that you were at MGA Mexico, did they have

11  anything to do with boys toys?

12  A     Some years after.

13  Q     When -- when was the first time that MGA Mexico had

14  anything to do with boys toys?

15  A     2006.

16  Q     And in terms of the notes that you took at that

17  meeting, which are -- which were shown to you in

18  Exhibit 7142, did you ever use any of the information that

19  you learned in 2004 at MGA?

20  A     No.

21  Q     Why not?

22  A     Because it wasn't relevant anymore.

23  Q     When you say "not relevant," was it too old?

24  A     Too old.

25  Q     And what kind of boys toys did MGA Mexico deal with in

1    2006?

2    A    RC line called Island Racers.

3             (Interruption in the proceedings.)

4             THE WITNESS:  RC, radio controlled.

5    BY MR. OVERLAND:

6    Q    Radio controlled racers?

7    A    Radio controlled cars called Island Racers.

8    Q    And was there anything that you learned at that meeting

9    in 2004 that was useful in any way with respect to those

10   radio controlled cars that MGA Mexico introduced in 2006?

11   A    No.

12   Q    Now, at the time that you left the -- that meeting on

13   April 1st of 2004, did you have a signed contract of

14   employment with MGA de Mexico?

15   A    No.

16   Q    When you did you sign the contract to go to work for

17   MGA Mexico?

18   A    April 16th, 2004.

19   Q    And do you remember what day of the week that was?

20   A    It was a Friday.

21   Q    Did you work at Mattel Servicios on the following

22   Saturday, the 17th, or the following Sunday, the 18th?

23   A    No.

24   Q    What was your first day of work at Mattel Servicios

25   after you signed that contract on the 16th?

1    A    April 19th, 2004.

2    Q    That was a Monday?

3    A    Yes.

4    Q    And what's the first thing that you did when you went

5    to work on that Monday, April the 19th?

6    A    I talked to Ricardo Ibarra and tell him my resignation.

7    Q    And Ibarra, again, was your boss, right?

8    A    Yes.

9    Q    And what time was it that you spoke to him?

10   A    Between 8:00 and 8:30 o'clock in the morning.

11   Q    And what did you tell him?

12   A    That -- that I was going to -- to work for toy

13   competitor, and that because of that fact, I needed to -- to

14   stop working at Mattel that very day.

15   Q    And what did he say?

16   A    I was -- he asked me if I could stay more, and he -- if

17   I -- if my decision wasn't already made and --

18   Q    What did you say?

19   A    I said no, that I was going to work for a competitor,

20   and I -- I needed to --

21   Q    Did he ask you who that competitor was?

22   A    Yes.

23   Q    Did you tell him?

24   A    No.

25   Q    Why?

```
 1   A    Because I didn't -- I didn't want -- I didn't want him
 2   to find out about it, about MGA, because if he knew, he
 3   would have -- have more time to prepare a welcome plan for
 4   MGA de Mexico.
 5   Q    A what plan?
 6   A    A welcome plan.
 7   Q    A welcome plan?
 8   A    A counter-attack plan.
 9   Q    A plan that would -- as to how to compete with MGA?
10   A    As how to compete with MGA, yeah.
11   Q    Okay.  And at the time you resigned, there wasn't even
12   an MGA in existence, correct?
13   A    That's correct.
14   Q    What else happened after you told Mr. Ibarra you were
15   going to work for a competitor?
16   A    I spoke with the head of HR and the head of Mattel
17   Mexico, Gabriel Zalzman.
18   Q    Did you ask him for anything?
19   A    No -- oh, I asked him for my severance, or "finiquito,"
20   we call it in Spanish.
21   Q    And when you say "finiquito," that's your --
22   A    Yes.
23   Q    -- final paycheck?
24   A    Final paycheck.
25   Q    And did you understand that under Mexican law, Mattel
```

1    Servicios had an obligation to pay you -- to give you your

2    last paycheck when you left?

3    A    Yes.

4    Q    Now, when you talked to Mr. Zalzman, did you tell him

5    also you were going to work for a competitor?

6    A    Yes.

7    Q    And when you told Mr. Ibarra you were going to work for

8    a competitor, did he wish you luck?

9    A    Yes.

10   Q    And when you told Mr. Zalzman you were going to work

11   for a competitor, what did he say?

12   A    That if I was going to the competition, he didn't

13   wish -- he didn't wish me luck at all.

14   Q    Did you get your final paycheck that day?

15   A    No.

16   Q    How long did you wait to get your final paycheck?

17   A    Until the following Friday.

18   Q    How long was it before you left that day, the offices

19   at Mattel Servicios, without getting your paycheck?

20   A    Can you say it again, please?

21   Q    Sure.  When were you told by anybody at Servicios that

22   you weren't getting your final paycheck that day?

23   A    I don't remember if it was Ibarra or Simon Watt.

24   Q    But when was it?  Was it in the morning, the

25   afternoon --

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 48 of 75   Page ID #:307191
CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

48

1    A    It was noon, around noon.

2    Q    Around noon?

3    A    Yes.

4    Q    And did he say why you weren't getting it?

5    A    Because they didn't -- it wasn't ready.

6    Q    And did you leave, then, without getting it?

7    A    Yes.

8    Q    When did you next hear from anybody at Mattel Servicios

9    about getting your paycheck?

10    A    Sometime during the week.

11    Q    And who did you hear it from?

12    A    Simon Watt.

13    Q    And he was the head of HR?

14    A    Yes.

15    Q    HR, human relations?

16    A    Human resources, yes.

17    Q    Okay.  Human resources.

18         Did you hear it from anybody else?

19    A    No.

20    Q    What did Mr. Watt tell you about getting your final

21    paycheck?

22    A    He told me that he wanted Ms. Trueba, Mr. Vargas and me

23    to meet him at conference room at the hotel the following

24    Friday in order to get that -- that check.

25    Q    And did he tell you what hotel?

1    A    Yes.

2    Q    What hotel?

3    A    The Radisson Hotel.

4    Q    And did you go that Friday to meet Mr. Watt to get your

5    final paycheck?

6    A    Yes.

7    Q    Ms. Trueba with you?

8    A    Yes.

9    Q    Mr. Vargas with you?

10   A    Yes.

11   Q    Now, when Mr. Watt told you to meet you there, did he

12   tell you you should also bring a lawyer with you?

13   A    No.

14   Q    And when you got there, who was -- when you got to that

15   meeting room at the Radisson, who was there?

16   A    It was Simon Watt, Mr. Cavassuto.

17   Q    Who is Mr. Cavassuto?

18   A    He was the head of finance for Mattel Servicios.

19   Q    Okay.  Anybody else?

20   A    Yes.

21   Q    Who?

22   A    Two attorneys from Basham, Ringe & Correa.

23   Q    Basham, Ringe & Correa is that the same law firm that

24   filed the criminal complaint against you, correct?

25   A    Correct.

1    Q    And what was the name of these two lawyers?

2    A    Oscar de la Vega and Monica Shaffino.

3    Q    And were you told anything?

4    A    Yes.

5    Q    Who said what?

6    A    Mr. De la Vega.

7    Q    What did Mr. De la Vega say?

8    A    He -- he gave us some kind of contract with the

9    calculation of our amount of the paycheck that we must sign.

10   It was a condition that we must sign in order to get that

11   check.

12            MR. OVERLAND:  Your Honor, would this be a good

13   time to stop or --

14            THE COURT:  This would be a good time.

15            Now, ladies and gentlemen, you are admonished not

16   to discuss this matter amongst yourselves, nor form or

17   express any opinion concerning this case.  We'll come get

18   you in about 15 minutes.

19            And sir, you may step down.

20            (Recess.)

21            (The following proceedings is taken in the

22       presence of the jury.)

23            THE COURT:  We are back in session.  The jury and

24   alternates are present, the parties, counsel, the witness.

25            And Mr. Overland, if you'd like to continue with

1    your examination, please.

2      **CARLOS GUSTAVO MACHADO GOMEZ, PLAINTIFFS' WITNESS, RESUMED**

3                    **CROSS-EXAMINATION** (Continued)

4    BY MR. OVERLAND:

5    Q    Mr. Machado, before the break, we were talking about

6    the meeting that you went to when Mr. Watt asked you to meet

7    him at the Radisson Hotel conference room to get your

8    paycheck; do you remember that?

9    A    Yes.

10   Q    And when you got there, the -- one of the lawyers

11   that's from the Basham firm asked you to sign something,

12   correct?

13   A    Correct.

14   Q    And he asked you to sign it before you got your final

15   paycheck, right?

16   A    Yes.

17   Q    And what was it that he asked you to sign?

18   A    It was some -- some kind of an agreement.

19   Q    And what was in that agreement?

20   A    There was a clause that would prevent me or ban me from

21   working in the toy industry.

22   Q    Do you remember anything else that was in that -- in

23   that agreement that you were asked to sign?

24   A    No.

25   Q    Do you recall if there was something in the agreement

1    where you acknowledged that Mattel Servicios had told you

2    what documents were confidential while you were working at

3    Mattel Servicios?

4    A    Yes.

5    Q    And was that true?

6    A    No.

7    Q    Has Mattel or anyone at Mattel Servicios ever told you

8    which documents were confidential?

9    A    No.

10          MR. OVERLAND:  Your Honor, may Exhibit 8853 be

11   placed before the witness?

12          THE COURT:  8853.

13          MR. OVERLAND:  I'm sorry, be placed before the

14   witness.

15          THE COURT:  That is now placed before the witness,

16   Counsel.

17   BY MR. OVERLAND:

18   Q    Can you take a look at that exhibit, sir?

19   A    Yes.

20   Q    All right.  It's in English, and that's a translation

21   of the Spanish, which is at the last page of 8853, correct?

22   A    Correct.

23   Q    Did you get it in English or Spanish?

24   A    Spanish.

25   Q    And if you look at the paragraph, which is the third

1    from the bottom --

2    A    Yes.

3    Q    You see the paragraph there that says, "I equally

4    recognize that the company told me about the confidential

5    character of such information and documentation provided to

6    me to do my work"; do you see that?

7    A    Yes.

8    Q    Is that -- had anybody ever told you that?

9    A    No.

10   Q    And if you look at the following paragraph, is that the

11   paragraph that you referred to as preventing you from

12   working in the toy industry?

13   A    The second from the bottom --

14   Q    Yes.

15   A    -- yes.

16   Q    The one after the one I just read.

17   A    Yes.

18   Q    And why do you say it was preventing you from working

19   in the toy industry?

20   A    Because it is -- it has listed the activities that I

21   would not -- that I would not be able to perform after

22   signing it.

23         MR. OVERLAND:  Your Honor, may Exhibit 8853 be

24   introduced?

25         THE COURT:  It's received, and you may display it,

1    if you'd like.

2         MR. OVERLAND:  Please.

3         *(Defendants' Exhibit No. 8853 is received in*

4    *evidence.)*

5    BY MR. OVERLAND:

6    Q    And again, sir, the third paragraph from the bottom, if

7    we could highlight the part that you say never happened, the

8    fact about Mattel Servicios telling you what documentation

9    was confidential.

10        MR. OVERLAND:  Could we highlight it for the jury,

11   please.

12        THE COURT:  The part that's been highlighted,

13   Counsel, begins, "I declare that during the performance of

14   my functions," and then it goes on.

15   BY MR. OVERLAND:

16   Q    And the second sentence, "I equally recognize that the

17   company told me about the confidential character of such

18   information," you are not disputing that you did receive

19   confidential information, correct?

20   A    Correct.

21   Q    So you did receive it, but nobody at Mattel Servicios

22   ever told you that any particular document was confidential,

23   right?

24   A    Right.

25   Q    How do you know you received confidential -- some

CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

55

```
 1    information that was confidential?
 2    A    Because of -- because I could classify if it was
 3    confidential or not according to my previous experience.
 4    Q    You could tell if it was something that shouldn't be
 5    given to a competitor, right?
 6    A    Yes.
 7    Q    But -- but there was -- was there ever any stamp in any
 8    of the documents that you saw that said "confidential"?
 9    A    Very few times.
10    Q    And do you remember what documents those were?
11    A    No.
12    Q    And we'll get to this later, but did any of the
13    documents that you copied onto the USB have a "confidential"
14    stamp on it --
15    A    No.
16    Q    -- at the time that you copied them?
17    A    No.
18    Q    They may now, but that's something that was added later
19    by the lawyers, right?
20    A    Right.
21    Q    In this case?
22    A    Yes.
23    Q    Okay.  Now, if we can take a look at the following
24    paragraph, which starts with "The confidential information
25    will include."
```

```
 1              MR. OVERLAND:  If we could highlight that.
 2    BY MR. OVERLAND:
 3    Q    And it says, "Without limitation, all information
 4    acquired or of which I became aware in any manner during my
 5    work-related, concerning or arising from the activities of
 6    the company related to services or products existing for
 7    computer service" -- "for computer equipment," and then it
 8    goes on.
 9              Did you understand that paragraph to mean that you
10    could not rely on your -- on anything that you learned in
11    any manner orally or in writing at Mattel Servicios if you
12    signed this contract?
13    A    Yes.
14    Q    And if you were to look for another job, could you tell
15    a prospective employer that you had experience at Mattel
16    Servicios and what that experience was if you signed this?
17    A    Again, please?
18    Q    Yeah.  If you had signed Exhibit 8853, did you
19    understand whether you could tell a prospective employer
20    about any experience that you had gained at Mattel
21    Servicios?
22    A    No, I wouldn't be able to.
23    Q    Because of this clause in the contract, right?
24    A    Right.
25    Q    And the last paragraph says, "If you violate these
```

 1   obligations, that could lead to legal liabilities,

 2   including, without limitation, criminal punishments," and

 3   then it sites certain articles applicable to industrial

 4   property, correct?

 5   A     Correct.

 6   Q     Did you, in fact, sign this agreement?

 7   A     No.

 8   Q     Did you ask that the paragraphs that we just read be

 9   deleted before you signed the agreement?

10   A     Yes.

11   Q     Whom did you ask?

12   A     Oscar de la Vega.

13   Q     What did he say?

14   A     No.

15   Q     And did he say anything about your paycheck if you

16   didn't sign it?

17   A     Yes, that we would not get it if we did not sign it.

18   Q     So what did you do?

19   A     We -- we left, we left with a copy of this document,

20   and we didn't sign, and we didn't get a paycheck that day.

21   Q     Did you have to file a complaint with the Secretary of

22   Labor in Mexico to get your paycheck?

23   A     Yes.

24   Q     When did you do that?

25   A     June or July of 2004.

1    Q    And did you hire a lawyer for that?

2    A    Yes.

3    Q    Take a look at Exhibit 8870, please.

4         Do you recognize that?

5    A    Yes.

6    Q    Is that the complaint that you filed with the Secretary

7    of Labor in Mexico to get your final paycheck from Mattel

8    Servicios?

9    A    Yes.

10        MR. OVERLAND:  Your Honor, may Exhibit 8870 be

11   introduced?

12        THE COURT:  Received.

13        MR. OVERLAND:  All right.

14        (Defendants' Exhibit No. 8870 is received in

15        evidence.)

16   BY MR. OVERLAND:

17   Q    Did you have some kind of proceedings in Mexico as a

18   result of your filing of this complaint?

19   A    Yes.

20   Q    And what were the results of those proceedings?

21   A    We finally got the paycheck.

22   Q    Did -- was there an order to Mattel Servicios to pay

23   your final paycheck?

24   A    Yes.

25   Q    Not just yours, also Ms. Trueba's, right?

1    A    Right.

2    Q    And also Mr. Vargas'?

3    A    That's correct.

4    Q    And did the order that was given by the labor board say

5    that you had to sign any kind of paper or document in order

6    to get your paycheck?

7    A    No.

8    Q    Did you sign a receipt that you got the money?

9    A    Yes.

10   Q    Anything other than a receipt that you got the money?

11   A    No.

12   Q    Now, you talked a little bit in answers to the

13   questions by Mattel's attorney about when you were leaving

14   Servicios about you and Ms. Trueba and Mr. Vargas copying

15   documents from Mattel Servicios' files to take with you to

16   MGA, right?

17   A    Right.

18   Q    Did you do this on orders from anybody at MGA Mexico?

19   A    No.

20   Q    In fact, you had signed an agreement on April the 16th

21   with MGA that said that you weren't supposed to take

22   anything, right?

23   A    Correct.

24   Q    But you did?

25   A    Yes.

1    Q    Why did you do that?

2    A    Because I thought some documents could be useful.

3    Q    For what purpose?

4    A    For copying formats.

5    Q    For copying the formats?

6    A    The formats, yes.

7    Q    Any other reason?

8    A    For comparison reasons.

9    Q    What kind of comparison?

10   A    The historic sales of certain products to my new

11   products.

12   Q    What does that mean?

13   A    That I would compare -- I would be able to compare my

14   actual sales of retail against historic sales from years

15   before.

16   Q    So what was the intent, there, in terms of the

17   comparison?  What were you trying to do?

18   A    Just compare to see how good I was doing.

19   Q    So you would compare what sales Bratz were at MGA with

20   past sales of Mattel?

21   A    Yes.

22   Q    And that was your intention in taking that?

23   A    Yes.

24   Q    Or in downloading those documents, right?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10146   Filed 03/07/11   Page 61 of 75   Page ID #:307204
CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

61

1   Q    And when you copied them to the USB drive, at that time

2   in 2004, do you know what capacity that USB drive had?

3   A    Yes.

4   Q    What was it?

5   A    256 megabytes.

6   Q    I don't know how much about that, but how many

7   documents are you talking about?

8   A    Well, depending on the size, but it could be just one

9   document or it could be 5 to 10 documents.

10  Q    And some of the documents that you copied had many,

11  many pages, right?

12  A    Correct.

13  Q    The documents that you copied, was there confidential

14  information on each and every page?

15  A    No.

16  Q    So were there some documents that had no confidential

17  information of Mattel Servicios in it?

18  A    Yes.

19  Q    Or Mattel de Mexico?

20  A    Yes.

21  Q    Or Mattel, Inc.?

22  A    Yes.

23  Q    And why did you -- why did you copy those documents?

24  A    For the same reasons I already told you.  I had three

25  basic reasons; that one, the comparison reasons --

1    Q    You told us two.

2    A    And there were some documents that I was proud of, or

3    that I feel attached to, because they were my brands, and I

4    feel attached them to.

5    Q    Can you give an example of that?

6    A    Yes.

7    Q    What was it?

8    A    Presentation of boys, how -- or how my sales have grown

9    since I -- since I was in charge of them.  Trends, industry

10   trends in the boys -- within the boys categories.

11   Q    Anything else?

12   A    No.  That's all I remember now.

13   Q    Were you intending to just copy what Mattel did, Mattel

14   Servicios did in its marketing and just transfer that over

15   into what MGA Mexico was going to do in its marketing?

16   A    No.

17   Q    Why not?

18   A    Because there were -- they were very different kind of

19   companies.

20   Q    Tell me what the differences were.

21   A    Well, Mattel is the largest toy manufacturer in the

22   world.  Mexico is their biggest -- or was at the time their

23   biggest market share -- the largest markets in terms of

24   market share.  They had been there for -- for -- for 15

25   years or more.  They have very well-established brands with

1    great consumer awareness, and they had a lot of money to

2    spend at marketing.  And on the other side, I was going to

3    introduce almost completely new -- new brand to the market

4    that came from a smaller toy company, and I needed to -- to

5    administrate my resources very well in order to succeed.

6    Q    And did you -- and so you had a different marketing

7    strategy at MGA than you did at Mattel, right?

8    A    Yes.

9    Q    And let's talk, for example, about the marketing

10   budget.  And you told us that it was the ultimate marketing

11   budget that you had at MGA was around $3 million?

12   A    Yes.

13   Q    And the marketing budget that you had at Mattel

14   Servicios was over 20 million, right?

15   A    Yes.

16   Q    So did you have to, then, adjust the strategies in

17   terms of marketing because of financial constraints?

18   A    Yes.

19   Q    And how did you do that?

20   A    Well, first of all, I allocated within my resources.  I

21   allocated more money proportionally to consumer research

22   because I wanted -- I wanted to find out what the Mexican

23   consumer thought about Bratz in order to design a

24   communication strategy that would trigger consumer sales.

25   Q    And is this something that you had done at Mattel

1    Servicios?

2    A    No.

3    Q    So this was something totally different, right?

4    A    Yes.

5    Q    And did you have to look at any Mattel documents to

6    figure out that you had to do consumer research at MGA?

7    A    No.

8    Q    Did you, in fact, look at any Mattel documents to do

9    this strategy of establishing a consumer research as part of

10   your budget?

11   A    No.

12   Q    What did you rely on in order to do this strategy for

13   marketing at Mattel de Mexico -- I'm sorry, at MGA de

14   Mexico?

15   A    I relied on my experience and Mariana Trueba's

16   experience.

17   Q    What did you do in terms of changing the marketing

18   strategies you had at Mattel Servicios in creating new

19   strategies at MGA de Mexico?

20   A    Well, that was the basic one, the most important one,

21   but the second most important one was to administrate --

22        Is that correct to say, "administrate"?

23           THE INTERPRETER:  Administer.

24           THE WITNESS:  -- administer my resources as well

25   because I didn't have enough money to spend on other things,

CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

65

1    so I have to keep a very good eye on my -- my marketing

2    budget.

3    BY MR. OVERLAND:

4    Q    Now, while you were at Mattel Servicios, you introduced

5    new brands into the Mexican market, correct?

6    A    Yes.

7    Q    And you were responsible for that, right?

8    A    Yes.

9    Q    And one of them was Max Steel?

10   A    Correct.

11   Q    What was Max Steel?

12   A    Twelve action figures for boys.

13   Q    And the other one was Power Rangers?

14   A    Yes.

15   Q    Power Rangers was what?

16   A    Also action figures based on a popular television show.

17   Q    And Spiderman?

18   A    Yes.

19   Q    Okay.  I think everybody knows who Spiderman is.

20   A    I think so.

21   Q    And was this all boys products that you introduced

22   at -- that you personally introduced into the market at

23   Mattel Servicios?

24   A    Yes.

25   Q    Did you ever introduce any girls products into the

1    market at Mattel Servicios?

2    A    Yes.

3    Q    When was that?

4    A    It was 1999 or 2000.

5    Q    And what kind of girls products?

6    A    It was -- again, it was duel gender boys -- toys,

7    games, because I manage games and puzzles, so we introduced

8    Pictionary.

9    Q    So games and puzzles for both boys and girls, correct?

10   A    That's correct.

11   Q    And other than that, any -- any products that you

12   introduced at Mattel Servicios that were geared for girls?

13   A    No.

14   Q    And did MGA Mexico ever have any products of games and

15   puzzles in the Mexican market?

16   A    No.

17   Q    Now, when you introduced Max Steel and Power Rangers

18   and Spiderman at Mattel Servicios, did you ever do any

19   market research in launching these new products?

20   A    No.

21   Q    Why not?

22   A    Because it was something that for -- first reason was

23   we didn't believe it was needed, and second reason was it

24   was something that wasn't done at MGA Servicios before.

25   Q    Is there a difference -- was there a difference in your

```
 1   mind in introducing something that had the Mattel brand on

 2   it and something that had the MGA de Mexico brand on it?

 3   A    I didn't get the question quite well.

 4   Q    Okay.

 5   A    Can you repeat it, please?

 6   Q    Yeah.  In your mind, was there a difference between

 7   introducing into the Mexican market that had the Mattel

 8   brand and introducing in 2004 or 2005 something that had the

 9   MGA brand?

10   A    Yes.

11   Q    What's the difference?

12   A    Well, as I told you, the Mattel -- Mattel -- Mattel

13   brand and Mattel -- and most of Mattel brands are -- are

14   brands that have -- that have a lot of brand awareness

15   within the consumer at Mexico, so it's very well-recognized

16   by -- by kids and moms, so it's easier -- it's easier to

17   launch them because -- and other brands don't have that

18   recognition.

19   Q    And in 2004, when you started at MGA Mexico, along with

20   others, did MGA have the same brand recognition that Mattel

21   had?

22   A    No.

23   Q    When you introduced Max Steel Power Rangers and

24   Spiderman into the Mexican market, was there -- was the

25   target audience for which they were introduced the same as
```

```
 1    the girls target audience for -- at MGA Mexico?

 2    A    No.

 3    Q    Now, do you recall what the response was of Mattel de

 4    Mexico to the introduction of the line of dolls that Bratz

 5    introduced in 2004?

 6    A    Yes.

 7    Q    What was it?

 8    A    The -- the introduction of a new -- new lines to

 9    compete with Bratz, like Flavas, or Flavas, Flavas.

10    Q    Okay.  What else?

11    A    More MyScene products, there were price decreases, and

12    there were a lot of media investment.

13    Q    Did you also learn that some retailers were told about

14    extra discounts if they didn't buy Bratz products?

15    A    Yes.

16    Q    Let me go back to -- we'll do that later.

17         Now, let's talk about when you were at Mattel

18    Servicios, and let's go back again in time when you were

19    copying these documents, all right?

20         As I understand it, you copied some documents, correct?

21    A    Yes.

22    Q    And Ms. Trueba copied some documents, right?

23    A    Right.

24    Q    And Mr. Vargas copied some documents, right?

25    A    That is correct.
```

```
1    Q    And you know why you copied them, right?

2    A    Yes.

3    Q    And after they were copied, they were copied to this

4    USB drive that had limited capacity, right?

5    A    Yes.

6    Q    And when you copied it -- after you copied it, then you

7    downloaded it onto your laptop, right?

8    A    Right.

9    Q    And that was a laptop that you kept at home?

10   A    Yes.

11   Q    And did you also then receive that USB from Ms. Trueba

12   and Mr. Vargas and copy into your laptop or download into

13   your laptop whatever they had copied?

14   A    Yes.

15   Q    Okay.  Did you look at each and every document that

16   they had copied?

17   A    No.

18   Q    Did you -- what did you do when you -- when you got the

19   USB drive, let's say, from Mr. Vargas, what did you do?

20   A    I would just download the documents he copied.

21   Q    Into the laptop?

22   A    Yes.

23   Q    And then the same with Ms. Trueba?

24   A    Yes.

25   Q    And then there was a directory of all the documents
```

1    that had been downloaded?

2    A    Yes.

3    Q    Did you create a special directory for the documents

4    that were downloaded by Mr. Vargas?

5    A    Yes.

6    Q    Did you call it something?

7    A    Yes.

8    Q    What did you call it?

9    A    PV, his initials.

10   Q    How about for Ms. Trueba, did you create a special

11   directory for her?

12   A    No.

13   Q    Why not?

14   A    Because I want -- we -- I wanted to differentiate

15   because Pablo was sales and we were marketing, so all the

16   documents in the PV folder would be sales.

17   Q    So any documents relating to sales were not copied by

18   you; is that accurate?

19   A    Yes.

20   Q    Now, let's take a look at what's been marked as

21   Exhibit 6408, which is your resume.

22        When -- when did you create that resume, Mr. Machado,

23   if you know?

24   A    Sometime before April '04.

25   Q    Do you see at the top where it says "March 1999 to

1    date"?

2    A    Yes.

3    Q    Do you remember what that date was?

4    A    No.

5    Q    If you look at the "group brand manager," which that

6    refers to, do you know whether -- whether this resume went

7    all the way up to the year 2000, 2001, 2002?

8    A    I didn't understand your question.

9    Q    See there where it says "group brand manager" at the

10   top?

11   A    Yes.

12   Q    And your responsibilities?

13   A    Uh-huh.

14   Q    Do you know up to what date those responsibilities

15   related?

16   A    Until I left Mattel Servicios.

17   Q    And before you left Mattel Servicios, were you -- did

18   you update your resume?

19   A    No.

20   Q    Did you copy this resume to -- was this one of the

21   things you copied onto your laptop, or did you create it on

22   your laptop?

23   A    Yes.

24   Q    And then you copied it onto the CD, correct?

25   A    Yes, and the last day I have an updated disk version

1   must have been for the meeting at The W with Mr. Larian and

2   Mr. Park.

3   Q    And why do you say that?

4   A    Because if I left in April, I must have saved the most

5   updated version to that date.

6   Q    And this CD that you created, which there was a CD

7   shown to you, do you remember when you created that CD?

8   A    Yes.

9   Q    When was that?

10  A    It was beginning of 2005.

11  Q    Do you remember the month?

12  A    January.

13  Q    And after you created the CD, what did you do with it?

14  A    I left it at home.

15  Q    Did you eventually take it to the offices at MGA

16  Mexico?

17  A    Yes.

18  Q    When did you do that?

19  A    Sometime in the summer of 2005.

20  Q    So how long was it -- was that CD at home before you

21  took it to the MGA Mexico offices?

22  A    Around -- at least six months.

23  Q    Did you look at that CD at any time while you were at

24  the MGA offices -- let me rephrase that.

25       Did you look at the information in that CD at any time

1    while you were at the MGA offices?

2    A    Yes.

3    Q    What did you look at?

4    A    My resume.

5    Q    Anything else?

6    A    No.

7    Q    Why did you look at your resume?

8    A    Because I wanted to update it.

9    Q    And is exhibit -- and did you update it?

10   A    Yes.

11   Q    Did you update it on your laptop?

12   A    Yes.

13   Q    Why did you take it to the MGA offices to update your

14   resume?

15   A    Because I had replaced my -- my previous -- with an

16   Apple, and this is in Word, and I didn't have the -- the

17   software to open it in my -- in my personal computer, so I

18   took it to the office where I can find software that was

19   compatible to open up a Word document.

20   Q    And did you actually update your resume?

21   A    Yes.

22   Q    And is Exhibit 6408 a version of the updated resume?

23   A    No, it isn't.

24   Q    What is it?  What is it?

25   A    This one is the -- the -- the version up to

CV 04-9049-DOC – 03/04/2011 – Day 28, Vol. 3 of 4

74

1    March/April 2004.

2    Q    So after you updated it, you didn't change the version

3    in the CD, correct?

4    A    Correct.

5    Q    You just kept it in your laptop, correct?

6    A    Yes.

7                *(Live reporter switch with Denise Paddock.)*

8                              -oOo-

Case 2:04-cv-09049-DOC-RNB  Document 10146  Filed 03/07/11  Page 75 of 75  Page ID #:307218
CV 04-9049-DOC - 03/04/2011 - Day 28, Vol. 3 of 4

75

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  March 5, 2011

12

13

14          _____

            JANE C.S. RULE, U.S. COURT REPORTER
15          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25