UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

| | |
|---|---|
| MATTEL, INC., et al.,                 ) | |
|                                       ) | |
|                 Plaintiffs,           ) | |
|                                       ) | |
|         vs.                           ) | No. CV 04-9049-DOC (RNBx) |
|                                       ) | Day 28 |
| MGA ENTERTAINMENT, INC., et al.,      ) | Volume 4 of 4 |
|                                       ) | |
|                 Defendants.           ) | |
| _____) | |

REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
FRIDAY, MARCH 4, 2011

Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
030411 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 28 V4
03/04/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

UNITED STATES DISTRICT COURT

1   **APPEARANCES OF COUNSEL (Continued):**

2

3

4    FOR CARLOS GUSTAVO MACHADO GOMEZ:

5            LAW OFFICES OF MARK E OVERLAND
             BY: Mark E Overland
6                Attorney at Law
             100 Wilshire Boulevard, Suite 950
7            Santa Monica, CA 90401
             310-459-2830
8
             -AND-
9
             SCHEPER KIM AND HARRIS LLP
10           BY: ALEXANDER H COTE
                 Attorney at Law
11           601 West Fifth Street, 12th Floor
             Los Angeles, CA 90071-2025
12           213-613-4655

13           ALSO PRESENT:

14           MGA ENTERTAINMENT, INC.
             BY: JEANINE PISONI
15               Attorney at Law
             16360 Roscoe Boulevard, Suite 105
16           Van Nuys, California 91406

17

18   ALSO PRESENT:

19           KEN KOTARSKI, Mattel Technical Operator

20           MIKE STOVALL, MGA Technical Operator

21           KARMELE LANDARIBAR-ARZAGA, Spanish Interpreter

22           (Spanish interpreter to assist with translation

23           when necessary.)

24

25

## CHRONOLOGICAL INDEX

030411 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 28 V4
CV 04-9049 DOC

<u>WITNESS:</u>                                                          <u>PAGE:</u>

<u>CARLOS GUSTAVO MACHADO GOMEZ</u>
CROSS-EXAMINATION RESUMED
BY MR. OVERLAND..........................................     5
CROSS-EXAMINATION
BY MR. McCONVILLE........................................    24
REDIRECT EXAMINATION
BY MR. ZELLER............................................    45


## <u>EXHIBIT(S) RECEIVED INTO EVIDENCE:</u>

5486      .............................................    35

6414      .............................................    24

6426      .............................................    84

6486      .............................................    33

8858      .............................................    22

          .............................................    85

23902     .............................................    40

|  |  |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; FRIDAY, MARCH 4, 2011 |
| 2 | Day 28, Volume 4 of 4 |
| 3 | P.M. SESSION |
| 4 | (Open court - jury present.) |
| 14:26 5 | **CARLOS GUSTAVO MACHADO GOMEZ,** |
| 6 | witness, called by Plaintiff(s), previously sworn. |
| 7 | **CROSS-EXAMINATION RESUMED** |
| 8 | BY MR. OVERLAND: |
| 9 | Q.   Now, you were shown -- |
| 14:54 10 | May the witness be shown Exhibit 8166? |
| 11 | THE COURT:  8166. |
| 12 | Just a moment, Counsel. |
| 13 | You initially referred to 6478, so our |
| 14 | recordkeeping's correct, and then did you mention 6408? |
| 14:55 15 | In other words, were those two different resumes or |
| 16 | the same you're referring to? |
| 17 | MR. OVERLAND:  The resumé is 6408. |
| 18 | If I said 6478, then I didn't mean to refer to the |
| 19 | resumé as that. |
| 14:55 20 | THE COURT:  Right. |
| 21 | Q.   BY MR. OVERLAND:  Now, you were asked during your |
| 22 | examination by Mattel's counsel about Exhibit 8166? |
| 23 | Do you remember that? |
| 24 | A.   I don't have the exhibit here, so -- |
| 14:56 25 | Q.   I'm sorry.  8466. |

Case 2:04-cv-09049-DOC-RNB   Document 10147   Filed 03/07/11   Page 6 of 87   Page ID #:307224
CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

6

```
 1    A.   I'll look on the screen.

 2    Q.   Is that a sales document?

 3    A.   Yes.

 4    Q.   Is that one of the documents that you personally did not

 5    copy to the USB?

 6    A.   Yes.

 7    Q.   Is that one of the documents that Mr. Vargas copied?

 8    A.   Yes.

 9    Q.   Did you ever look at the sales document, any sales

10    document, like Exhibit 8466 at MGA for any purpose?

11    A.   Yes.

12    Q.   Which ones?

13    A.   It was some -- some file like this.

14    Q.   When you say "like this" you mean like Exhibit 8466?

15    A.   That's correct.

16    Q.   Do you remember whether it was this particular exhibit?

17    A.   No.

18    Q.   Okay.  And why did you look at it?

19    A.   To compare.  To compare my historic Bratz' sales.

20    Q.   And do you remember when you looked at sales numbers to

21    do the comparison?

22    A.   Yes.

23    Q.   When?

24    A.   At early December 2004.

25    Q.   And why did you do it in early December of 2004?
```

1    A.    Because Bratz sales were starting to increase, and I was

2    curious to compare the numbers of sales in the first week of

3    December of Bratz dolls against the number of sales of Barbie

4    and My Scene dolls the previous -- the previous year for the

14:57  5  same week.

6    Q.    So the documents that you looked at that were like

7    Exhibit 8466 contained information about Mattel's sales for a

8    certain period of time; right?

9    A.    Yes, retail sales.

14:58 10  Q.    Retail sales, that is, sales to the ultimate consumer?

11   A.    That's correct.

12   Q.    And those -- the numbers that you looked at, were they

13   throughout the document or in one particular part of the

14   document?

14:58 15  A.    They were in one particular part.

16   Q.    And do you know, the documents that you looked at, how

17   many pages they had?

18   A.    Not exactly.

19   Q.    Was it more than a hundred?

14:58 20  A.    Yes.

21   Q.    More than 200?

22   A.    Between 1- and 200.

23   Q.    And of those 1- or 200 pages, the numbers that you

24   looked at were contained in how many pages?

14:58 25  A.    One or two pages.

UNITED STATES DISTRICT COURT

```
 1   Q.   Did you look at any other part of those documents other

 2   than those one or two pages?

 3   A.   No.

 4   Q.   And after you looked at the past numbers of sales by

14:59  5   Mattel, did you take any action?

 6   A.   No.

 7   Q.   What did -- what did you look at them for?

 8   A.   Just to do some benchmarking.  I was curious to see if I

 9   was -- if I was performing according to expectations.

14:59 10   Q.   And did you -- what -- what did you decide or determine

11   after looking at the numbers of past sales?

12   A.   That -- that Bratz was doing okay, but not -- not --

13   not -- not as okay as if I could have wanted.

14   Q.   Not as good as you would have wanted?

15:00 15   A.   Yes.

16   Q.   Okay.  Did you -- what was it that you wanted in terms

17   of Bratz sales?

18   A.   I don't remember the exact figure, but I wanted them --

19   I was hoping they would be higher.

15:00 20   Q.   And did you hoping -- were you hoping that --

21   A.   They would be higher.

22   Q.   -- were you hoping that they would be equal to the sales

23   that Mattel had in the past?

24   A.   No.

15:00 25   Q.   Why not?
```

1    A.    Because that would be impossible because we didn't -- we

2    didn't place the same quantity of dolls that Mattel placed in

3    the market, so, you know, it wouldn't be a possible thing to

4    happen.

15:00  5    Q.    So had you arrived at a specific percentage of what the

6    Bratz dolls should sell as compared to Mattel?

7    A.    Yes.

8    Q.    And how did you arrive at that percentage?

9    A.    Sorry?

15:00 10    Q.    How did you arrive at that percentage?

11    A.    I don't remember exactly, but I thought I wanted it to

12    be like between 15 and 20 percent.

13    Q.    And when you looked at documents like Exhibit 8466 to

14    compare, how were you doing?

15:01 15    A.    It was around -- not even 10 percent, like 8 to

16    9 percent.

17    Q.    And what, if anything, did you change in order to

18    achieve the figure that you wanted as a result of looking at

19    these past Mattel sales?

15:01 20    A.    I -- sorry?

21    Q.    Did you change anything --

22    A.    No.

23    Q.    -- in order to achieve that percentage that you thought

24    you should have after you looked at the documents, like

15:01 25    Exhibit 8466?

1    A.    No.

2    Q.    Did you change anything, in terms of marketing, when you

3    realized that, gee, we weren't achieving the percentage that

4    I thought we could achieve?

15:02  5    A.    No.

6    Q.    You continued as you did before?  You did everything the

7    same?

8    A.    I'm not understanding.

9    Q.    Do you remember hiring an ad agency?

15:02  10   A.    Yes.

11   Q.    When did you do that?

12   A.    In the summer of 2004.

13   Q.    Was that before you determined you weren't doing as well

14   as you thought you were going to be doing?

15:02  15   A.    Yes.

16   Q.    And what did you -- what did that ad agency do?

17   A.    They would plan and buy media time for MGA Mexico.

18   Q.    And that was part of your original intent -- or was that

19   part of your original intent when you went to MGA Mexico

15:03  20   to -- to do that?

21   A.    Yes.

22   Q.    And you did that based on your experience; right?

23   A.    Yes.

24        MR. OVERLAND:  Can I have just a moment,

15:03  25   Your Honor?

CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

```
 1              THE COURT:  Certainly.
 2              (Pause in the proceedings.)
 3    Q.   BY MR. OVERLAND:  Now, sometime after you were at
 4    MGA Mexico you became aware of a search by the Mexican
15:04  5    federal police of MGA offices; right?
 6    A.   Yes.
 7    Q.   And, as you said, you weren't there at the time of the
 8    search; right?
 9    A.   Right.
15:04 10    Q.   Everything you know about the search you heard from
11    other people?
12    A.   Yes.
13    Q.   Do you remember the conversation that you had with
14    Ms. Kuemmerle that you were asked about after the search?
15:04 15    A.   Yes.
16    Q.   And was that the day of the search or a later date?
17    A.   The telephone conversation, you mean?
18    Q.   Any conversation.
19    A.   Yes.
15:04 20    Q.   "Yes" what?  Was it the day of the search or the day
21    after?
22    A.   The day of the search.
23    Q.   And did you also have a conversation with Mr. Larian
24    about it?
15:04 25    A.   No.
```

```
 1    Q.   On the phone or in person?

 2    A.   No.

 3    Q.   And when you had the conversation with Ms. Kuemmerle,

 4    what did she say?

15:05  5    A.   She said that the Mexican authorities were conducting a

 6    search in the MGA Mexico office.

 7    Q.   And then you told her about the CD that you had in the

 8    offices that contained the Mattel information; right?

 9    A.   Yes.

15:05 10    Q.   And in terms of the search, did you talk about, also, in

11    that conversation, about what you thought the reason for the

12    search was?

13    A.   Yes.

14    Q.   What did you say?

15:05 15         MR. ZELLER:  I think this is hearsay.

16         THE COURT:  Sustained.

17    Q.   BY MR. OVERLAND:  Was it -- what did you understand --

18    what was your understanding as to why the search was

19    conducted at that time?

15:06 20         MR. ZELLER:  It's irrelevant.

21         THE COURT:  Sustained.

22         MR. OVERLAND:  Your Honor, it's offered as state of

23    mind for subsequent actions.

24         THE COURT:  Why don't we discuss that at the next

15:06 25    break.
```

1          MR. OVERLAND:  Okay.  Can we stop here?  Is this a

2     good time, then?

3               (Laughter.)

4          THE COURT:  I guess I have no choice, yes.

15:06  5          MR. OVERLAND:  No, you do.

6          THE COURT:  Ladies and Gentlemen, I need to take a

7     break, obviously.

8               So you are admonished not to discuss this matter

9     amongst yourselves nor to form or express any opinion about

15:06  10    the case.

11               I'm going to come get you, then, in 10 or

12    15 minutes.

13               (Open court - jury not present.)

14          THE COURT:  Counsel, would you have a seat.

15:06  15               We're still in session, and I'll be right with you

16    in just a moment.

17               Mr. Overland, I hope I'm not going to hear the

18    following, that the search is taking place because Mattel is

19    hoping to drive, basically, MGA out of business.

15:07  20               Why don't we ask the question -- and I know I'm not

21    going to hear that -- but why don't we ask the question

22    outside the presence of the jury just to make sure we're not

23    going to hear that.

24               Why is the search taking place, in your opinion?

15:07  25          THE WITNESS:  Because they looking -- in the first

1    place, they looking for evidence.

2              THE COURT:  Okay.  We know that.

3              THE WITNESS:  And, in the second --

4              THE COURT:  What did you expect to say in relation

15:07 5   to that question of Mr. Overland's?

6              THE WITNESS:  Well, that -- that Mr. Zalzman, who

7    was the head of Mattel Mexico at the time, made a meeting

8    with the office employees soon after we left Mattel, and told

9    him that -- he told them that that wasn't a fact, that he was

15:08 10  not going to forgive, and that he would pursue these act

11   until its final consequences and see us -- see us in jail.

12             THE COURT:  So, basically, Mr. Zalzman, once again,

13   is --

14             THE WITNESS:  Mattel de Mexico head.

15:08 15        THE COURT:  And were you present at that meeting?

16             THE WITNESS:  No, I wasn't.

17             THE COURT:  Is he alive, Mr. Zalzman?

18             THE WITNESS:  Yes, he is.

19             THE COURT:  Do you know where he is?

15:08 20        THE WITNESS:  No, I don't.

21             THE COURT:  Where is Mr. Zalzman?

22             MR. ZELLER:  He's with Mattel in Mexico.

23             And this is actually double hearsay that he's

24   relying on.

15:08 25        This is a conversation that Mr. Machado had with

| | |
|---|---|
| 1 | somebody else about what Mr. Zalzman -- |
| 2 | THE COURT:  And also about Mattel's motivations. |
| 3 | It's going to be sustained, Counsel, but you can |
| 4 | certainly bring Mr. Zalzman up. |
| 15:09 5 | MR. OVERLAND:  Can I be heard since it's sustained? |
| 6 | THE COURT:  Certainly. |
| 7 | MR. OVERLAND:  Your Honor, I think that the -- that |
| 8 | Mattel has brought out evidence concerning what actions were |
| 9 | taken after the search and this is relevant not -- not for |
| 15:09 10 | the truth but in terms of his state of mind as circumstantial |
| 11 | evidence and Ms. Kuemmerle's state of mind as circumstantial |
| 12 | evidence with respect to the actions that were taken after |
| 13 | the search. |
| 14 | So it's not offered for the truth, it's not |
| 15:09 15 | hearsay, it's circumstantial evidence with respect to the |
| 16 | actions that were taken afterwards, that they thought that |
| 17 | this -- part of this was for -- that Mr. Zalzman had made |
| 18 | that statement -- and they can bring Mr. Zalzman to refute it |
| 19 | if they want -- but the statement was that he was not going |
| 15:10 20 | to stop until he sees these guys behind bars. |
| 21 | THE COURT:  But the implication is that Mattel is |
| 22 | persuing MGA for all of these nefarious reasons. |
| 23 | In other words, I don't see the tie-in yet between |
| 24 | Mr. Zalzman saying that he'll see them behind bars and |
| 15:10 25 | anything to do with the search. |

```
 1              In other words, are you saying that this is --

 2              MR. OVERLAND:  Oh, no.

 3              THE COURT:  -- is this statement made before the

 4   search?

15:10 5         MR. OVERLAND:  It's made after the search.

 6              THE COURT:  That's what I thought.

 7              MR. OVERLAND:  Oh, no, it doesn't have anything to

 8   do in terms of explaining motivation for the search.

 9              THE COURT:  Here comes Mr. Cote.  Wait just a

15:10 10  moment.

 11             Mr. Cote is approaching Mr. Overland.  They're

 12  going to have a conversation.

 13             (Discussion held off the record.)

 14             MR. OVERLAND:  This is a threat made by

15:10 15  Mr. Zalzman.  At least it was their understanding, before the

 16  search.

 17             THE COURT:  Before the search?

 18             MR. OVERLAND:  Oh, yeah.

 19             THE COURT:  I thought it was after the search.

15:11 20             Now it's before the search.

 21             MR. OVERLAND:  Made before the search --

 22             THE COURT:  Now, did he know about this?

 23             MR. OVERLAND:  -- after he resigned.

 24             THE COURT:  Wait just a moment.

15:11 25             Did he know about this at the time?
```

```
 1                  MR. OVERLAND:  Who "he"?

 2                  THE COURT:  "He" he, the witness.

 3                  (Laughter.)

 4                  MR. OVERLAND:  He did.  That's what he and

15:11  5   Ms. Kuemmerle talked about.  What he's going to say is, oh, I

 6   guess Salzman is making good on his threat.

 7                  MR. QUINN:  Your Honor, should the witness be

 8   excused during this colloquy?

 9                  THE COURT:  Good idea.

15:11 10                  Sir, why don't you step down for just a moment.

11                  Thank you.  You can wait out in the hallway.

12                  So let me hear this one more time.

13                  (Witness exited courtroom.)

14                  THE COURT:  All right.  Let me understand this.

15:11 15                  Mr. Machado will testify that he had a conversation

16   with Ms. Kuemmerle who tells him that Mr. Zalzman has said

17   that she'll pursue this -- or he'll pursue this until he's in

18   jail?

19                  MR. OVERLAND:  No.

15:12 20                  THE COURT:  Okay.  Let's try again.

21                  MR. OVERLAND:  This is a conversation with

22   Kuemmerle on the day of --

23                  THE COURT:  On the day of the search.

24                  MR. OVERLAND:  -- on the day of the search --

15:12 25                  THE COURT:  A phone call from New York.
```

         1            MR. OVERLAND:  -- where they're talking about, hey,

         2    there was a raid, there was a search, and Mr. Machado says to

         3    her, well, I guess Zalzman is making good on his promise to

         4    see us in jail.  And he had said that -- I think it was his

15:12    5    state of mind, which he communicates to Ms. Kuemmerle, that

         6    Mr. Zalzman had said to people in the office that they're not

         7    going to get away with this, I'm going to pursue them until

         8    they're in jail.

         9            It's not offered for the truth.

15:12   10            THE COURT:  What's the relevance?

        11            MR. OVERLAND:  The relevance is that Mattel has

        12    brought in, now, evidence concerning the lack of concern, the

        13    lack of action taken after this search to show indifference,

        14    and this is an explanation as to his state of mind, which was

15:13   15    communicated to Ms. Kuemmerle that affects that evidence in

        16    terms of the action taken.

        17            THE COURT:  Zalzman to Kuemmerle, Kuemmerle to

        18    Machado?

        19            MR. OVERLAND:  No, just Machado to Kuemmerle.

15:13   20            That's all there is, Machado to Kuemmerle about

        21    Zalzman's threat, and it helps to explain -- it's

        22    circumstantial evidence that helps to explain the evidence

        23    that they put in saying that, you know, it was a search and

        24    they found all these documents and they just didn't really

15:13   25    care, they didn't take any -- any steps, and this helps to

1    explain it, that this -- what they felt was that this was

2    part of the motivation by Zalzman to try to put them in --

3    put them in jail.

4              THE COURT:  Thank you very much.

15:13  5              Sustained.

6              That won't be coming in.

7              Now both of you can get Mr. Zalzman on the train

8    and bring him up to testify as to Mr. Zalzman.

9              That's sustained.

15:19 10              (Recess taken.)

11              (Open court - jury present.)

12              THE COURT:  We are back in session, the jury's

13    present, all counsel are present, the parties are present and

14    the witness is present.

15:20 15              Mr. Overland, the witness is now on the stand, sir.

16              If you'd like to continue your questions, please.

17              MR. OVERLAND:  Thank you.

18    Q.   Mr. Machado, in that conversation that you had with

19    Ms. Kuemmerle on the day of the search, did you tell her that

15:20 20    the CD that you had in the office was an old CD?

21    A.   Yes.

22    Q.   I'm sorry?

23    A.   Yes.

24    Q.   I want to go back to some documents.

15:21 25              Your Honor, may the witness be shown Exhibit 6426?

```
 1                THE COURT:  6426.

 2                And, Counsel, I'll tell you when that's been placed

 3       before the witness.

 4                MR. OVERLAND:  Thank you.

15:21  5                THE COURT:  It's coming to him right now.

 6                (Pause in the proceedings.)

 7                MR. OVERLAND:  I'm sorry.  Is it before the

 8       witness?

 9                THE COURT:  No, it's not before him yet.

15:22 10                It's moving towards him right now.

11                MR. OVERLAND:  Okay.  Thank you.

12                THE COURT:  Now he has it, Counsel.

13                MR. OVERLAND:  Thank you.

14       Q.   Mr. Machado, take a look at Exhibit 6426, please.

15:22 15       A.   Okay.

16       Q.   Do you recognize that?

17       A.   Yes.

18                MR. ZELLER:  Your Honor, we don't have this in our

19       binders.

15:22 20                THE COURT:  Come up and look over his shoulder.

21                Next question, Counsel.

22                MR. ZELLER:  I'm just saying that this may not --

23                THE COURT:  Next question, Counsel.

24                Let's move along.

15:22 25       Q.   BY MR. OVERLAND:  Is that an e-mail from you on the
```

```
 1    plot04 e-mail account to Mr. Larian on April the 1st, 2004,

 2    accepting the offer of employment at MGA Mexico?

 3    A.   Yes.

 4              MR. OVERLAND:  Your Honor, may Exhibit 6426 be

15:23 5    received?

 6              THE COURT:  Did we discuss that?

 7              Is that your concern?

 8              MR. ZELLER:  That is my concern, Your Honor.  We

 9    did not, as far as I know.

15:23 10             THE COURT:  We'll save that until after court

11    Counsel to make sure the court will receive it.

12              But he can testify about it and then we'll talk

13    about if I can receive it.

14              MR. OVERLAND:  And can we place Exhibit 8858 before

15:23 15    the witness?

16              THE COURT:  You may.

17    Q.   BY MR. OVERLAND:  And is Exhibit 8858 the offer that was

18    sent to you by MGA, the offer of employment, on March 30th,

19    2004?

15:23 20    A.   Yes, I think it is.

21    Q.   All right.

22              And, again, Your Honor, I'll ask that that be

23    received subject to whatever discussion?

24              THE COURT:  8858's received, Counsel.

15:24 25             MR. OVERLAND:  Thank you.
```

UNITED STATES DISTRICT COURT

```
 1                    (Exhibit(s) 8858, received.)

 2                    THE COURT:  And I assume 6426 will be also.

 3                    I just want to see it.

 4                    MR. OVERLAND:  Sure.

15:24 5     Q.    Now let's talk about that plot04 address on the e-mail.

 6                 Who created that?

 7     A.    Mr. Vargas.

 8     Q.    And do you see the name -- strike that.

 9                 Do you know why he created the plot04 e-mail

15:24 10    address?

 11    A.    Yes.

 12    Q.    Why?

 13    A.    He created an address that we -- Pablo and Mariana and

 14    me could use to be in touch with the MGA people.

15:24 15    Q.    And do you know why he chose that name "plot04"?

 16    A.    Yes.

 17    Q.    Why?

 18    A.    Because he felt that he was in the middle of a story

 19    line.

15:24 20    Q.    A story line, novel?

 21    A.    A novel.

 22    Q.    A novel?

 23    A.    A novel, a book, or a movie.

 24    Q.    And do you know what name Mr. Vargas used to sign up for

15:25 25    that e-mail address?
```

1    A.    Yes.

2    Q.    What name?

3    A.    Carlos Fuentes.

4    Q.    And who is or was Carlos Fuentes?

15:25  5    A.    Carlos Fuentes is popular Mexican writer, writer.

6    Q.    And what does he write about?

7    A.    He writes about Mexican society and Mexican history.

8    Q.    Does he talk about any time -- does he write about any

9    type of crime novels?

15:25  10    A.    No.

11    Q.    Does he write about any kind of sinister plots?

12    A.    No.

13    Q.    Can you take a look at Exhibit 6414, please.

14         THE COURT:  He has 6414 before him.

15:26  15         MR. OVERLAND:  Thank you.

16    Q.    And would you take a look, sir, about the middle of the

17    first page --

18         No, strike that.

19         Do you know what Exhibit 6414 is?

15:26  20    A.    Yes.

21    Q.    What is it?

22    A.    It's an e-mail from the plot04 account to Susana, to

23    Susana and Isaac and Mr. Larian.

24         MR. OVERLAND:  Your Honor, may Exhibit 6414 be

15:26  25    introduced?

```
 1              THE COURT:  Received.

 2              MR. OVERLAND:  It may already be in.

 3              (Exhibit(s) 6414, received.)

 4    Q.   BY MR. OVERLAND:  Can you take a look, sir, please at --

15:26 5   in the middle of the first page, do you see an e-mail on the

 6    account from an individual?

 7    A.   Yes.

 8    Q.   What's the name?

 9    A.   Carlos Fuentes.

15:26 10  Q.   That's all.

11              THE COURT:  I think this will be Mr. McConville on

12    behalf of Mr. Larian and MGA on cross-examination.

13                          CROSS-EXAMINATION

14    BY MR. McCONVILLE:

15:27 15  Q.   Mr. Machado, I'm going to pick up at the toy fair

16    meeting in February of 2004.

17              Do you have that thought in your -- in your mind

18    now?

19    A.   Yes.

15:27 20  Q.   And as I understand it, you flew to New York to

21    participate in the New York toy fair on behalf of Mattel in

22    the February 2004 time frame?

23    A.   Yes.

24    Q.   And the toy fair lasted three days, thereabouts; right?

15:27 25  A.   Yes.
```

1    Q.    And while you were in New York you learned from

2    Susana Kuemmerle that she could arrange for a meeting with --

3    between you and Isaac Larian; is that right?

4    A.    Yes.

15:28  5    Q.    And then you agreed with Ms. Kuemmerle to -- to attend a

6    meeting with Isaac Larian; is that right?

7    A.    Yes.

8    Q.    And that meeting lasted about 15 minutes; is that right?

9    A.    That's right.

15:28 10   Q.    And prior to this 15-minute meeting, did you believe

11   that you had to terminate your employment with -- with

12   Mattel?

13   A.    No.

14   Q.    Did you believe that the contracts with Mattel required

15:28 15   you to terminate your employment before you could consider

16   another job offer?

17   A.    No.

18   Q.    Did you believe that -- that you would be disloyal to

19   Mattel if you participated in an interview while you were

15:28 20   still employed at Mattel to go work somewhere else?

21             MR. ZELLER:  I object to the leading.

22             THE COURT:  Overruled.

23             THE WITNESS:  No.

24   Q.    BY MR. McCONVILLE:  Do you understand that it is

15:28 25   Mattel's position that someone who interviews for a position

 1    is being disloyal if they don't quit before they go interview

 2    for another job?

 3              MR. ZELLER:  Misstates Mattel's position.

 4              THE COURT:  Sustained; sustained.

15:29 5         You can save that for argument, Counsel.

 6              MR. McCONVILLE:  Okay.

 7    Q.   And do you understand you were shown your

 8    confidentiality -- I'm sorry your conflict of interest

 9    questionnaire?

15:29 10        Do you remember that?

 11   A.   Yes.

 12   Q.   And that related to your employment at Mattel Servicios;

 13   correct?

 14   A.   Yes.

15:29 15  Q.   And did you understand by signing -- did anyone from

 16   Mattel explain to you that by signing that agreement that

 17   Mattel may own all ideas in your head for any time that you

 18   had come up with an idea prior to working at Mattel?

 19              MR. ZELLER:  Argumentative.

15:29 20           THE COURT:  Overruled.

 21              THE WITNESS:  No.

 22   Q.   BY MR. McCONVILLE:  That wasn't something that was

 23   explained during the course of your on-boarding at Mattel?

 24   A.   No.

15:29 25  Q.   And you signed two of those agreements; right?

1    A.    Yes.

2    Q.    And did anyone explain at the time you signed the second

3    agreement that Mattel could own all thoughts in your head

4    that preexisted your employment at Mattel?

15:30  5              MR. ZELLER:  This is argumentative.

6              THE COURT:  Overruled.

7              THE WITNESS:  No.

8              MR. McCONVILLE:  Okay.

9    Q.    So you had -- let's go back to the meeting at -- with

15:30 10   Mr. Larian.

11             How long did that meeting last?

12   A.    Between 15 and 20 minutes.

13   Q.    And who participated in the meeting?

14   A.    Mr. Larian, Ms. Kuemmerle and myself.

15:30 15   Q.    And did Mr. Larian ask you questions during the meeting?

16   A.    Yes.

17   Q.    Well, why don't you describe in general what happened at

18   the meeting?

19   A.    Well, it was very informal meeting.  He asked me if I

15:30 20   would be interested in -- in the possibility of setting up

21   MGA Mexico, and he asked me where I have worked before or up

22   to that date.

23   Q.    Okay.

24   A.    And that we would be in touch in the following weeks or

15:31 25   days -- weeks -- and -- and that our visit to Mexico City

          1   would follow up some weeks after.

          2   Q.   Okay.  And during the course of that meeting Mr. Larian

          3   asked you about your experience; right?

          4   A.   Yes.

15:31     5   Q.   Did he ask you which Mattel documents you could get

          6   access to on the Mattel servers?

          7   A.   No.

          8   Q.   Did he ask you whether or not you could access point of

          9   sale documents from 2004?

15:31    10   A.   No.

         11   Q.   Did he ask you what sort of information you could get

         12   your hands on prior to leaving Mattel?

         13   A.   No.

         14   Q.   Okay.  In fact, did the discussion of -- of what you

15:31    15   could bring -- what you -- what you could bring from Mattel

         16   to MGA, did it come up at that meeting?

         17   A.   Can you repeat the question, please.

         18   Q.   Let me ask a better question.

         19        At the meeting did Mr. Larian ask you to bring

15:31    20   anything with you, assuming you've had employment at MGA?

         21   A.   No.

         22   Q.   Okay.  And after your meeting with -- with Mr. Larian, I

         23   think you said that the next time you -- you met with him was

         24   at the W Hotel; is that right?

15:32    25   A.   Yes.

1    Q.    And that meeting was a few weeks -- was in March

2    sometime in Mexico City; is that right?

3    A.    That is right.

4    Q.    And at that meeting -- so as I understand it, you were

15:32  5    there, and one of the things that you did at the meeting was

6    you -- you had a presentation that you prepared?

7    A.    Yes.

8    Q.    I shouldn't say -- when I say "you" it was Ms. Truebas

9    and Mr. Vargas and yourself; correct?

15:32 10    A.    Just Mr. Vargas and myself.

11    Q.    I'm sorry; just you and Mr. Vargas.

12          And that you sat around a laptop and reviewed the

13    presentation?

14          Is that right?

15:32 15    A.    Yes.

16    Q.    And how long did the looking over the shoulder at the

17    laptop, how long did that -- in your estimate, how long did

18    that take?

19    A.    Between 20 to 30 minutes.

15:33 20    Q.    Twenty to 30 minutes; okay.

21          And did Mr. Larian ask you, prior to the meeting at

22    the W, to bring anything with you?

23    A.    No.

24    Q.    Did Mr. Larian ask you to bring a presentation to the

15:33 25    meeting at the W?

UNITED STATES DISTRICT COURT

1    A.    No.

2    Q.    Did Mr. Larian know -- well, let me -- let me not ask

3    that question, because that would be objectionable.

4              (Laughter.)

15:33  5              THE COURT:   Objection sustained.

6              (Laughter.)

7              MR. QUINN:   Move to strike.

8              (Laughter.)

9    Q.    BY MR. McCONVILLE:   Did -- so when you -- when you --

15:33  10    after the presentation, did you then have an interview with

11    Mr. Larian?

12    A.    Yes.

13    Q.    And how long did the interview last?

14    A.    Around 20 minutes.

15:34  15    Q.    And did Mr. Larian have a separate interview, then, with

16    Mr. Vargas and Ms. Truebas?

17    A.    That is correct.

18    Q.    And during the course of -- of your meetings with

19    Mr. Larian, whether during the PowerPoint or whether during

15:34  20    your interview, did Mr. Larian ask you to bring anything with

21    you to MGA?

22    A.    No.

23    Q.    Did he, in fact, tell you what you should bring with you

24    to MGA?

15:34  25    A.    Yes.

CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

```
 1    Q.   What did he tell you to bring?

 2    A.   I want just your brain.

 3    Q.   Just your brain?

 4    A.   Yes.

15:34  5    Q.   Okay.  And going back to the presentation, which is

 6    Exhibit 6754 --

 7              Could we put that in front of the witness, please.

 8              -- and could you just --

 9              How many pages are in that exhibit?

15:35 10    A.   Eighty-two.

11    Q.   Eighty-two pages and you covered about that in about

12    20 minutes?

13              Is that right?

14    A.   Yes.

15:35 15    Q.   So -- and if you look through there, is there a Mattel

16    logo anywhere in that?

17              I'm sure you've looked at this exhibit before.

18              Is there a Mattel logo anywhere in there?

19              THE COURT:  Let's find out if he has.

15:35 20    Q.   BY MR. McCONVILLE:  Okay.  And did you -- have you

21    looked at the exhibit prior to testifying today?

22    A.   Yes.

23    Q.   Is there a Mattel logo inside that exhibit?

24    A.   I have seen the Mattel logo.

15:35 25    Q.   And you looked at this presentation.  This presentation,
```

1   I believe you said it was on the screen.

2          Did you leave behind a hardcopy of that exhibit?

3   A.   No, I didn't, sir.

4   Q.   Did anyone leave behind a hardcopy of that exhibit?

15:35 5   A.   No.

6   Q.   Did Mr. Larian ask you for a copy of it?

7   A.   No, he didn't.

8   Q.   At the meeting did Mr. Larian ask you to describe the

9   types of information you could access at Mattel Servicios?

15:35 10  A.   No.

11  Q.   And at the conclusion of your meeting at the W did you

12  conclude at that point that you -- that you would be

13  resigning from Servicios?

14  A.   No.

15:36 15  Q.   In fact, after that meeting, did you -- did you get a

16  job offer from MGA?

17  A.   Some weeks later.

18  Q.   Some weeks later.

19          And I -- as I think we've seen the contract that

15:36 20  you've signed -- maybe we haven't -- actually, why don't we

21  put that in front of you.

22          Why don't we look at Exhibit 6486.

23          Do you recognize that document?

24  A.   Yes.

15:36 25  Q.   What is it?

1    A.    It's the -- it's the contract of employment between

2    MGA Mexico and myself.

3              MR. McCONVILLE:  Can I move that into evidence,

4    please?

15:37 5              THE COURT:  Received.

6              (Exhibit(s) 6486, received.)

7              MR. McCONVILLE:  I'd like you to turn to --

8              THE COURT:  That's 6754, I assume, it was

9    previously received also.

15:37 10             If not, do you want that received for both parties?

11   That's the presentation, the 82 pages.

12             MR. McCONVILLE:  Yeah, that was already in

13   evidence.

14             THE COURT:  Already in evidence.

15:37 15   Q.    BY MR. McCONVILLE:  All right.  The -- if you could turn

16   to the last page of that document, please.

17             Well, actually, this document has both an English

18   and Spanish version; is that right?

19   A.    Yes.

15:37 20   Q.    Okay.  If you could just turn to the last page of the

21   document, which is --

22   A.    The English?

23   Q.    -- the English page, yes, the second to the last page --

24   I'm sorry -- which is 6486-20.

15:37 25             And do you see it says "signed April 16, 2004"?

```
 1              It should be highlighted on the screen, if you need
 2     it.
 3     A.   Yes, I see it.
 4     Q.   So between -- whenever -- the March meeting at the W,
 5     you didn't conclude your meetings with MGA until April 16,
 6     2004; is that right?
 7     A.   That is right.
 8     Q.   And during -- between the interview at the W and the
 9     execution of this agreement, how many conversations would you
10     say you had with representatives from MGA?
11     A.   Talking conversations?
12     Q.   Yes.
13     A.   Maybe seven, eight.
14     Q.   And -- and -- and approximately how many e-mails did you
15     have back and forth negotiating this deal?
16     A.   Around 20/25.
17     Q.   And so, suffice it to say, that -- that until you had an
18     agreement, that -- that you could live with, you weren't
19     going to give notice to -- to depart Mattel; is that right?
20     A.   That is right.
21     Q.   I'd like to actually show you one of the documents --
22     let's look at Exhibit 5480, please.
23              Let me know when you have that in front of you.
24              It was the one that I handed you separately, Frank.
25              (Pause in the proceedings.)
```

15:38 5
15:38 10
15:38 15
15:39 20
15:39 25

1    Q.   BY MR. McCONVILLE:  Do you have it in front of you?

2    A.   Yes.

3    Q.   Do you recognize this document?

4    A.   Yes.

15:40 5    Q.   It's an e-mail -- it's an e-mail change involving you;

6    correct?

7    A.   Yes.

8              MR. McCONVILLE:  Your Honor, move it into evidence.

9              THE COURT:  Received.

15:40 10             MR. McCONVILLE:  I'm sorry.  Pages 1 and 2.

11             THE COURT:  Received.

12             (Exhibit(s) 5486, received.)

13   Q.   BY MR. McCONVILLE:  Now, you were asked questions by

14   counsel for Mattel regard an offsight visit you took while

15:40 15   still employed by Mattel, but while interviewing with MGA.

16             Do you remember that?

17   A.   Yes.

18   Q.   And then he asked you about notes that you took.

19             Do you remember those questions?

15:40 20   A.   Yes.

21   Q.   Now, let's take a look at this e-mail which is the first

22   e-mail in the chain which is April 14, 2004.

23             Do you see that?

24   A.   Yes.

15:40 25   Q.   And "plot04," that is you?

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | A.   Yes.                                                    |
| 2     | Q.   And it's to Isaac Larian.                               |
| 3     |      Do you see that?                                        |
| 4     | A.   Yes.                                                    |
| 15:40 5 | Q.   I'd like you to look at -- let's start with the text of |
| 6     | the second sentence there.                                   |
| 7     |      It says "we are worried because we MUST" -- all         |
| 8     | capitals -- "resign on Wednesday due to that afternoon the   |
| 9     | directors and ourselves would have to fly to Buffalo, and    |
| 15:41 10 | then to LA to see the spring '05 line (returning May 3rd) and |
| 11    | that would delay the process even more."                     |
| 12    |      Did I read that correctly?                              |
| 13    | A.   Yes.                                                    |
| 14    | Q.   And the event that you're talking about that you would  |
| 15:41 15 | have to -- that you were going to go see from Buffalo to LA, |
| 16    | that's the review of Mattel's spring line; is that right?    |
| 17    | A.   That is right.                                          |
| 18    | Q.   And so what you were trying to communicate here was you |
| 19    | needed to get this deal done with MGA so that you would not  |
| 15:41 20 | go see Mattel's spring line; is that right?                  |
| 21    | A.   Yes.                                                    |
| 22    | Q.   Because you were concerned you didn't want to have      |
| 23    | exposure to Mattel's upcoming line; right?                   |
| 24    | A.   Yes.                                                    |
| 15:42 25 | Q.   But ultimately you did sign your agreement with MGA and |

    1    I wanted to -- we just looked at that exhibit, 6486, and I'd

    2    like you to turn to, in the English version, Page 12 of 6486.

    3           And while we're getting that up for you, do you

    4    recall you were asked questions --

15:42 5           THE COURT:  It's in front of him now.

    6    Q.   BY MR. McCONVILLE:  Thank you, if we could look at -- on

    7    Page 12, paragraph I.

    8    A.   Yes.

    9    Q.   Do you see that?

15:42 10   A.   Yes.

    11   Q.   The second sentence in that paragraph says "the

    12   employee" -- that's you -- "undertakes not to use for the

    13   performance of the work to be developed in the company" --

    14   that would be MGA -- "any privileged information that he

15:42 15   knows by virtue of the work, job or position, exercise of

    16   profession or business relationship of which he may have

    17   knowledge from another moral or physical person and that is

    18   considered to be an industrial secret pursuant to the law, by

    19   virtue of a contract, convention or agreement that he may

15:43 20   have signed."

    21          Did I read that correctly?

    22   A.   Yes.

    23   Q.   And what did you understand that to mean?

    24   A.   That I shouldn't use any information -- any -- any

15:43 25   information from my previous jobs.

1    Q.    From your previous jobs to go work at MGA; right?

2    A.    Yes.

3    Q.    In essence, this is saying "bring your brain"; right?

4    A.    Yes.

15:43 5    Q.    And this is what you promised to MGA to do; right?

6    A.    Yes.

7    Q.    And, in fact, you -- you -- you were asked questions

8    about whether or not -- whether or not you received

9    permission from Mattel to take Mattel information to MGA?

15:43 10           Do you remember those questions?

11   A.    Yes.

12   Q.    Did you receive -- did you receive permission from MGA

13   to bring that information to MGA?

14   A.    No.

15:44 15   Q.    In fact, you promised MGA that you would not bring that

16   information; correct?

17   A.    Correct.

18   Q.    And you were asked questions about whether or not you

19   agreed to keep it secret from Mattel that you were copying

15:44 20   this information?

21           Do you remember those questions?

22   A.    Yes.

23   Q.    And, in fact, when you went to MGA, you likewise didn't

24   tell anyone at MGA that you had that information; correct?

15:44 25   A.    Correct.

1    Q.   And after you left, there was a rumor that some legal

2    action was going to be taken against you in Mexico.

3              Is that right?

4              MR. ZELLER:  Objection; irrelevant.  Hearsay.

15:44 5        THE COURT:  No, this doesn't go to state of mind.

6              You can testify.  I don't especially want to know

7    the rumor, but there was some rumor about legal action

8    apparently.

9              Is that correct, Counsel?

15:44 10       MR. McCONVILLE:  Yes, sir.

11             THE COURT:  You can ask the question.

12             MR. McCONVILLE:  I'd like to put in front of you

13   Exhibit 23902.

14             I think it's in Mattel's exhibit binder, 23902.

15:45 15  Q.   Do you have that in front of you?

16   A.   Yes, I do.

17             (Discussion held off the record.)

18   Q.   BY MR. McCONVILLE:  Do you recognize it?

19   A.   Yes.

15:45 20  Q.   What is it?

21   A.   It's an e-mail from me to Ms. Gronich.

22   Q.   What's the date on it?

23             THE COURT:  It should be May 15th, Counsel.

24             MR. McCONVILLE:  Yes.

15:45 25       THE WITNESS:  May 15th, 2004.

| | |
|---|---|
| 1 | MR. McCONVILLE:  Your Honor, I move its admission. |
| 2 | MR. ZELLER:  This is hearsay and it's irrelevant. |
| 3 | MR. McCONVILLE:  Then it can be hearsay, but it |
| 4 | should come into evidence. |
| 15:46 5 | THE COURT:  Overruled. |
| 6 | MR. McCONVILLE:  Can you publish, please. |
| 7 | THE COURT:  Once again, Ladies and Gentlemen, this |
| 8 | is not for the truth of the matter asserted in this document, |
| 9 | but it is -- no, my apologies.  Just a moment. |
| 15:46 10 | Just a moment. |
| 11 | Overruled; it is received. |
| 12 | (Exhibit(s) 23902, received.) |
| 13 | Q.   BY MR. McCONVILLE:  And so this e-mail was from you to |
| 14 | Daphne Gronich, and I believe you said Daphne Gronich was one |
| 15:46 15 | of MGA's in-house counsel?  Is that right? |
| 16 | A.   General counsel, as I remember. |
| 17 | Q.   And the text of the e-mail from you -- |
| 18 | THE COURT:  Counsel, let's take this down just a |
| 19 | moment. |
| 15:46 20 | Is this going to cause issues concerning |
| 21 | attorney-client privilege with Daphne Gronich? |
| 22 | MR. ZELLER:  It is. |
| 23 | MR. McCONVILLE:  It's already been produced. |
| 24 | THE COURT:  I understand that. |
| 15:46 25 | MR. McCONVILLE:  Right. |

|  |  |
|---|---|
| 1 | THE COURT:  I just want to make sure the playing |
| 2 | field is clear. |
| 3 | MR. ZELLER:  I'm going to say that's a waiver. |
| 4 | THE COURT:  I understand that. |
| 15:47  5 | Believe it or not, I knew that. |
| 6 | How did I know that? |
| 7 | (Laughter.) |
| 8 | THE COURT:  Now, why don't you go and talk to this |
| 9 | team over here.  Over there. |
| 15:47 10 | Now we'll take that off the board for a moment -- |
| 11 | They're having a discussion on both sides -- and have your |
| 12 | having discussions on both sides. |
| 13 | This is probably the turning point of the lawsuit |
| 14 | for both parties. |
| 15:47 15 | I'm just joking with you. |
| 16 | So let's see how important this is to each side. |
| 17 | (Discussion held off the record.) |
| 18 | THE COURT:  Might I suggest -- |
| 19 | MR. McCONVILLE:  Forget it. |
| 15:47 20 | THE COURT:  Okay. |
| 21 | That's been taken down. |
| 22 | That will not be a waiver of the privilege. |
| 23 | It went up and it went down. |
| 24 | That's it. |
| 15:47 25 | MR. ZELLER:  Thank you. |

Case 2:04-cv-09049-DOC-RNB   Document 10147   Filed 03/07/11   Page 42 of 87   Page ID
#:307260
CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

42

```
 1              THE COURT:  Nobody saw it.
 2    Q.   BY MR. McCONVILLE:  At some point --
 3              MR. ZELLER:  I would move to strike.
 4              THE COURT:  Stricken.
15:47 5         You will disregard the question.
 6              Your next question.
 7    Q.   BY MR. McCONVILLE:  At some point, after you were
 8    employed at MGA but prior to the raid in October of 2005, did
 9    you assure MGA that you had taken -- taken no information
15:48 10   from Mattel?
11    A.   I'm not sure.
12    Q.   Okay.  But, in any event, you do know that you told
13    Suzanne Kuemmerle in October 2005 on the day of the raid at
14    MGA Mexico that you had taken Mattel information; correct?
15:48 15   A.   Correct.
16    Q.   And that was the first time that she had learned about
17    that; correct?
18    A.   Correct.
19    Q.   And you had a conversation with her about what
15:48 20   information might be present at MGA Mexico; right?
21    A.   Yes.
22    Q.   And I believe you said that that disc that was present
23    in your office was there for purposes of you to edit your
24    resumé; right?
15:49 25   A.   Right.
```

```
 1    Q.    And -- and you needed to bring it to work because --

 2    because the software you had at home wasn't compatible for

 3    the program to edit your resumé; right?

 4    A.    Right.

15:49  5    Q.    Okay.  And -- and prior to the day of the raid, that was

 6    the first time that anyone from MGA learned that -- that you

 7    and Ms. Truebas and Mr. Vargas had taken information from

 8    Mattel; correct?

 9             MR. ZELLER:  Foundation as phrased.

15:49 10             THE COURT:  Overruled.

11             THE WITNESS:  Correct.

12             THE COURT:  Well, just a moment, my apologies.

13             My apologies.  I'm going to reverse that ruling.

14             It's sustained.

15:49 15             It's referring back to MGA and what MGA's knowledge

16    was.  He can talk about his knowledge.

17             MR. ZELLER:  Okay.  I ask that it be stricken.

18             THE COURT:  Stricken.

19    Q.    BY MR. McCONVILLE:  Did you tell anyone prior to that

15:50 20    raid in October of 2005 that you had brought to MGA Mattel

21    information?

22    A.    No.

23    Q.    And to the best of your knowledge had Truebas and Vargas

24    told anyone either?

15:50 25    A.    No.
```

1    Q.    And I believe you discussed that the information on the

2    CD was not information that you used while at MGA; correct?

3    A.    Correct.

4    Q.    You were asked some questions --

15:50  5            One moment, please.

6            (Discussion held off the record.)

7    Q.    BY MR. McCONVILLE:  Ultimately, did you tell

8    Isaac Larian what had happened?

9    A.    No.

15:51 10   Q.    Did -- you were asked -- asked some questions

11   concerning -- concerning your promotion.  Do you remember

12   that?

13   A.    Yes.

14   Q.    Do you recall when it was that you -- that you were

15:51 15   being considered for the promotion from MGA Mexico to MGA US?

16   A.    Around June 2005.

17   Q.    June 2005?

18   A.    Yes.

19   Q.    So that would be approximately five months before the

15:51 20   raid?

21   A.    Yes.

22   Q.    So the process of you getting this promotion was in

23   place prior to the raid occurring at -- at -- at -- at -- at

24   MGA Mexico; correct?

15:52 25   A.    Yes.

```
 1              MR. McCONVILLE:  No further questions.

 2              THE COURT:  Redirect examination by Mr. Zeller on

 3       behalf of Mattel.

 4                       REDIRECT EXAMINATION

 5       BY MR. ZELLER:

 6       Q.   If you'd please take a look at Exhibit 6437.

 7              And this is in evidence.

 8              And direct your attention to the e-mail, which is

 9       from you to Mr. Larian --

10              MR. McCONVILLE:  I'm sorry, I'm sorry, this is not

11       in evidence, from what I'm told.

12              MR. ZELLER:  6437, it's the "Rome on fire" e-mail.

13              MR. McCONVILLE:  It's a duplicate of another

14       exhibit.

15              MR. ZELLER:  It's in.

16              THE COURT:  It may be cross-marked with different

17       identifying numbers, which may be the confusion.  It's the

18       same exhibit.

19              MR. ZELLER:  It's the same document.

20       Q.   Direct your attention to the part of the e-mail that you

21       wrote to Mr. Larian which is the one dated April 21st,

22       2004 --

23              And this is right after you resigned from Mattel?

24       A.   Correct.

25       Q.   -- and you say here in the first line "hello new boss"
```

 1    and then you go on to say "as you might have heard we

 2    resigned yesterday and let me tell you 'Rome is on fire.'"

 3              Do you see that?

 4    A.    Yes.

15:53  5    Q.    And we talked earlier and you said that this "Rome on

 6    fire" part is a reference to Mattel; right?

 7    A.    Right.

 8    Q.    And then you continue on in the next sentence, as it

 9    sends "we are driving them crazy!!!" -- and it has three

15:54 10    exclamation points.

 11              Do you see that?

 12    A.    Yes.

 13    Q.    And again you are referring to Mattel?

 14    A.    Yes.

15:54 15    Q.    And Mr. Larian responds to this report, as you said, and

 16    it says "I am in NY."

 17              New York; right?

 18    A.    Yes.

 19    Q.    "What is your cell?"

15:54 20              Do you see that?

 21    A.    Yes.

 22    Q.    And you understood that Mr. Larian did not want you to

 23    put into writing how you would set "Rome on fire"; correct?

 24              MR. McCONVILLE:  Objection; calls for speculation.

15:54 25              MR. OVERLAND:  Objection.

```
 1            Opinion as to Mr. Larian's state of mind.

 2            THE COURT:  Sustained.

 3            MR. ZELLER:  I'm asking for his state of mind.

 4            THE COURT:  You will be able to ask Mr. Larian

15:54  5  directly; sustained.

 6  Q.  BY MR. ZELLER:  Well, you understood --

 7            MR. McCONVILLE:  Same objection.

 8            MR. ZELLER:  In response -- I'm asking about him.

 9  Q.  You understood, when you got this e-mail -- I'm talking

15:55 10  about you -- this e-mail in response from Mr. Larian -- that

11  you were not to put in writing how you would set "Rome on

12  fire"?

13            THE COURT:  Let me caution the jury.

14            I'll let it in for state of mind as it applies to

15:55 15  him, what is he thinking?, but it's -- how do I once again

16  continually caution you about this -- it only goes to his

17  state of mind in any subsequent conduct or action and whether

18  he placed a phone call or didn't place a phone call or if

19  there was a conversation.  It's not to be taken concerning

15:55 20  Mr. Larian's state of mind or what he's thinking.

21            He's been on the stand.

22            Mr. Machado, you can answer the question.

23            THE WITNESS:  No.

24  Q.  BY MR. ZELLER:  Take a look at the bottom of the e-mail

15:55 25  that you wrote -- do you see where you say -- and this is in
```

```
 1    your -- your original e-mail to Mr. Larian -- "I will be on

 2    my cell phone if you need further information."

 3            Do you see that?

 4    A.   Yes.

 5    Q.   And you're referring to whether he needs more

 6    information about how you set "Rome on fire"; correct?

 7    A.   No.

 8    Q.   Well, you certainly understood, when you received this

 9    e-mail from Mr. Larian, he didn't want a written response

10    from you; correct?

11            MR. McCONVILLE:  Objection, Your Honor.

12            MR. OVERLAND:  Same objection as to Mr. Larian's

13    state of mind.

14            THE COURT:  Sustained.

15    Q.   BY MR. ZELLER:  You didn't give a written response to

16    this; correct?

17    A.   I'm not sure.

18    Q.   You don't see one with this e-mail; right?

19    A.   No, but there might be one.

20    Q.   You don't see one with this e-mail; correct?

21    A.   No, I don't.

22    Q.   Did you call Mr. Larian on the cell?

23    A.   Yes.

24            (Unknown voice over the audio system:  "Wait, wait,

25    wait, wait.")
```

```
 1    Q.    BY MR. ZELLER:  You've said in your testimony that --

 2              THE COURT:  What was that?

 3              (Laughter.)

 4              MR. McCONVILLE:  Someone near a microphone?

 5              MR. OVERLAND:  What?  What did I say?

 6              THE COURT:  I'm not sure, but apparently it's

 7    unrelated.

 8              Counsel, please continue.

 9              MR. OVERLAND:  Sorry.

10              THE COURT:  It must be Friday afternoon.

11              (Laughter.)

12              MR. OVERLAND:  I hope so.

13              THE COURT:  Ask your question.

14    Q.    BY MR. ZELLER:  You said in your testimony that MGA told

15    you and you had agreed not to use information from your

16    previous jobs and only bring your brain; right?

17    A.    Yes.

18    Q.    And also you said that you didn't tell anyone at MGA

19    that you had taken this information from Mattel; right?

20    A.    Right.

21    Q.    And the truth is is that you didn't tell them because

22    they already knew that you had taken this information; right?

23              MR. OVERLAND:  Objection; calls for speculation

24    that somebody else knew.

25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT

```
 1    Q.   BY MR. ZELLER:  You believed and understood that others

 2    at MGA already knew that you had taken this information from

 3    Mattel; right?

 4              MR. McCONVILLE:  Your Honor, this is the flip side

15:57 5    of the objection that was sustained on me.

 6              THE COURT:  Once again he can testify about his

 7    state of mind.

 8              MR. McCONVILLE:  Okay.

 9              THE WITNESS:  No.

15:57 10   Q.   BY MR. ZELLER:  Well, you knew you had taken information

 11   from Mattel while you were at MGA; right?

 12   A.   Yes.

 13   Q.   And, in fact, you were a top-level manager there at MGA

 14   in Mexico; right?

15:58 15   A.   Yes.

 16   Q.   And Mr. Vargas --

 17              (Discussion held off the record.)

 18              MR. ZELLER:  I'm sorry; MGA Mexico, a top level

 19   executive there.

15:58 20              (Discussion held off the record.)

 21              MR. ZELLER:  Oh, did I say Mattel?

 22              MR. QUINN:  Yes.

 23              MR. ZELLER:  I apologize, so I'll start that

 24   question over.

15:58 25   Q.   You were a top-level executive at MGA Mexico; correct?
```

```
 1   A.   Correct.
 2   Q.   Okay.  And we just talked about that you knew that you
 3   and Mr. Vargas and Ms. Truebas had taken information from
 4   Mattel?
15:58  5   A.   Correct.
 6   Q.   Ms. Truebas knew that the three of you had taken
 7   information from Mattel; right?
 8   A.   Right.
 9   Q.   And she was a manager at MGA Mexico; right?
15:58 10   A.   Right.
11   Q.   Mr. Vargas, another MGA manager, knew that the three of
12   you had taken information from Mattel; right?
13   A.   Correct.
14   Q.   And you certainly didn't need to go around telling each
15:58 15   other you had already taken the information from Mattel
16   because you did it together; correct?
17   A.   Yes.
18   Q.   If you could please take a look at Exhibit 6402.
19        And this, you'll recognize, is one of the conflict
15:59 20   of interest forms that you signed for Mattel, Inc.?
21   A.   Yes.
22   Q.   And if you could take a look at the first sentence of
23   this, it says -- well, actually, let's go down a little bit
24   further about -- the sentence that says "please be advised
15:59 25   that we require 100 percent completion in this project."
```

 1              Do you see that?

 2    A.    Yes.

 3    Q.    And you understood, when you received this conflict of

 4    interest form, that you had to fill it out and sign it;

15:59  5    right?

 6    A.    Yes.

 7    Q.    You understood it was a requirement of your job;

 8    correct?

 9    A.    I'm not sure if I think that.

16:00 10    Q.    You certainly knew that if you did not sign the conflict

11    of interest questionnaires that were presented to you while

12    you were a Mattel employee that you would not be permitted to

13    continue -- to continue to work at Mattel; right?

14    A.    I'm not sure if I understood that.

16:00 15    Q.    You're just not sure one way or another?

16    A.    Yes.

17    Q.    So going, then, to the Page 6402-3 -- and you see here

18    it says, "I understand that failure to answer this

19    questionnaire fully and truthfully constitutes grounds for

16:00 20    immediate termination of my employment."

21              Do you see that?

22    A.    Yes.

23    Q.    And you understood that if you did not complete this

24    form fully and truthfully that it constituted grounds for

16:00 25    termination?

1   A.   I understand it now.

2   Q.   And -- and -- and you don't have any reason to think you

3   did not understand it back then when you signed it; correct?

4   A.   Correct.

16:01 5   Q.   The next sentence says "I agree not to divulge any

6   company information to unauthorized recipients."

7        You saw that language when you signed this; right?

8   A.   I'm not sure if I saw it.

9   Q.   Well, it -- certainly it's right above your signature;

16:01 10  correct?

11  A.   Right.

12  Q.   And the next sentence says "I also agree to notify my

13  superior immediately of any changes in my situation that

14  would cause me to answer any of the above questions

16:01 15  differently."

16       And do you see that?

17  A.   Yes.

18  Q.   And that was something else that you understood was an

19  obligation that you had to Mattel when you were employed by

16:01 20  Mattel; correct?

21  A.   I understand it now, but I'm not sure if I understood it

22  then.

23  Q.   Well, do you have any reason to doubt that you

24  understood it at the time when you signed this agreement?

16:02 25  A.   No.

CV 04-9049 DOC - 03/04/2011  Volume 4 of 4

16:02

16:02

16:02

16:03

16:03

 1   Q.   And -- and -- and you knew, during the time when you

 2   were a Mattel employee and prior to the time that you left

 3   Mattel that you had an obligation not to take internal,

 4   confidential information from any Mattel company regardless

 5   of what the name of that Mattel company was; true?

 6   A.   Can you repeat that again.

 7   Q.   Sure.  During times at the company you talked about

 8   Mattel Servicios and other entities; correct?

 9   A.   Yes.

10   Q.   And my question is of all the Mattel companies you

11   understood while you were a Mattel employee that you had an

12   obligation not to take or misuse the internal confidential

13   Mattel information of any Mattel company, right, regardless

14   of what the name of it was?

15   A.   Right.

16   Q.   You knew that?

17   A.   I'm not sure if I knew that.  I know that now.

18   Q.   Well, you -- you knew that at the time you were a Mattel

19   employee; right?

20   A.   Yes.

21   Q.   And you didn't think to yourself, when you were

22   downloading all this information, I'm technically an employee

23   of Mattel Servicios, not an employee of Mattel de Mexico or

24   Mattel, Inc., and therefore I am free to take the

25   information?

```
 1    A.    Right.

 2    Q.    That's not what you argued to yourself?

 3              MR. OVERLAND:  Objection to the word technically.

 4              THE COURT:  Strike the word technically.

16:03  5          Reask the question.

 6    Q.    BY MR. ZELLER:  Let me ask you this, do you believe you

 7    had a right to take information from Mattel, Inc., the parent

 8    company, and Mattel de Mexico, there in Mexico City, because

 9    you were an employee of Mattel Servicios?

16:03 10   A.    No.

11    Q.    And in fact, you believed, even after you left Mattel

12    there in Mexico, that Mattel de Mexico was your employer;

13    correct?

14    A.    After I left?

16:04 15   Q.    Yes.

16    A.    I'm not sure if I thought that.

17    Q.    Well, we saw your resumé earlier and it said you were

18    employed by Mattel de Mexico; right?

19    A.    Right.

16:04 20   Q.    And you told us your business cards had on it Mattel

21    de Mexico; right?

22    A.    Right.

23    Q.    And we saw testimony from you earlier where you said you

24    were employed by Mattel Mexico, not Servicios; right?

16:04 25   A.    Right.
```

CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

```
 1    Q.   And when you sued for your paycheck, as you talked

 2    about, one of the companies that you sued for your paycheck

 3    was Mattel de Mexico; correct?

 4    A.   I don't know.

16:04 5    Q.   Well, please take a look at Exhibit 8870.

 6              And if you'd take a look about halfway down the

 7    page you'll see the parties that were named in that claim

 8    that you made.

 9              Do you see that?

16:05 10   A.   Yes.

 11   Q.   And -- and having reviewed this document, does this

 12   refresh your recollection?

 13   A.   Yes.

 14   Q.   So it's true that one of the companies that you sued for

16:05 15   your final paycheck, as you talked about, was Mattel

 16   de Mexico?

 17   A.   Yes.

 18   Q.   And isn't it true that other than in your testimony here

 19   and in this case you -- you didn't go around calling yourself

16:05 20   an employee of Mattel Servicios; correct?

 21   A.   Can you rephrase the question.

 22   Q.   Right.

 23              Other than in your testimony in this case,

 24   including at your deposition, did you call yourself an

16:06 25   employee of Mattel Servicios?  Is that how you generally
```

| | |
|---|---|
| 1 | called yourself? |
| 2 | A.   When I worked there? |
| 3 | Q.   Right. |
| 4 | A.   No. |
| 16:06 5 | Q.   And -- and -- and you understood that just because you |
| 6 | had obligations to Mattel Servicios you also had obligations |
| 7 | to Mattel, Inc., of the kind that we saw in the conflict of |
| 8 | interest questionnaire, and to Mattel Mexico; correct? |
| 9 | A.   I don't know.  I'm not sure if I felt that. |
| 16:06 10 | Q.   Well, you certainly understood you had obligations to |
| 11 | more than just Mattel Servicios; right? |
| 12 | MR. OVERLAND:  Objection; vague. |
| 13 | THE COURT:  Do you understand the question, sir? |
| 14 | THE WITNESS:  Yes. |
| 16:06 15 | THE COURT:  Please answer it. |
| 16 | THE WITNESS:  Yes. |
| 17 | Q.   BY MR. ZELLER:  Previously you had testified that you |
| 18 | went and met with Mr. Larian at MGA's toy fair showroom in |
| 19 | New York; right? |
| 16:07 20 | A.   Yes. |
| 21 | Q.   And this was MGA's private showroom where they show |
| 22 | products? |
| 23 | A.   Yes. |
| 24 | Q.   And so you went in there and you met with Mr. Larian |
| 16:07 25 | there? |

Case 2:04-cv-09049-DOC-RNB   Document 10147   Filed 03/07/11   Page 58 of 87   Page ID #:307276
CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

58

1    A.    Yes.

2    Q.    And did MGA have you sign any kind of agreement or

3    contract or anything like that prior to the time that you had

4    this meeting with Mr. Larian in the showroom?

16:07 5              MR. McCONVILLE:  Objection; relevance.  It goes to

6    our case.

7              MR. ZELLER:  It's to establish he didn't have any

8    agreement of any kind with MGA as of that time.

9              MR. McCONVILLE:  The same objection, Your Honor.

16:07 10             THE COURT:  Just a minute.

11             (Pause in the proceedings.)

12             THE COURT:  This simply is confined to the meeting

13   that they are having?

14             MR. ZELLER:  Yes.

16:07 15             I'm -- I'm trying to find out the timing of what he

16   signed with MGA and when.

17             THE COURT:  Overruled.

18             THE WITNESS:  No.

19   Q.    BY MR. ZELLER:  And so when you -- as of the time when

16:08 20  you went into the showroom to meet with Mr. Larian, you had

21   no agreement or understanding with MGA as of that time?

22             Is that true?

23             MR. McCONVILLE:  Same objection.

24             THE COURT:  Overruled.

16:08 25             THE WITNESS:  Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10147   Filed 03/07/11   Page 59 of 87   Page ID #:307277
CV 04-9049 DOC - 03/04/2011   Volume 4 of 4

59

1    Q.    BY MR. ZELLER:  Did Mr. Larian tell you during this

2    meeting that he had already planned to set up MGA Mexico?

3    A.    No.

4    Q.    What was it that you and he discussed on that subject

16:08  5    during this meeting that you had in the private showroom of

6    MGA Hong Kong -- excuse me -- at the New York toy fair?

7    A.    That he had the intention to set up MGA Mexico, and he

8    asked me if I was interested in the possibility of helping to

9    do so.

16:08 10    Q.    And when you went to this meeting with Mr. Larian at the

11    private showroom of MGA at the New York toy fair, you weren't

12    going as a Mattel representative, even though you were a

13    Mattel employee at the time; right?

14    A.    Right.

16:09 15    Q.    You testified about this Basham law firm in Mexico;

16    correct?

17    A.    Yes.

18    Q.    And you know it's not Basham, the law firm, that's

19    prosecuting you; right?

16:09 20    A.    As far as I know, yes.

21    Q.    There is a prosecutor handling your -- a prosecutor of

22    the federal Mexican government handling your prosecution

23    there in Mexico; correct?

24    A.    I -- I -- I don't know.

16:09 25    Q.    Do you know how large the law firms are

1    that represent MGA?

2              THE COURT:  Well, counsel --

3              MR. McCONVILLE:  Objection.

4              THE COURT:  I sustain the objection between law

16:10 5    firms and size and power and lack thereof.

6              I cut MGA from that also.

7              MR. ZELLER:  Well, Mr. Machado started talking

8    about it, but --

9              MR. McCONVILLE:  We object, Your Honor.

16:10 10              MR. ZELLER:  -- Mr. Machado's counsel.

11    Q.   You talked also about your fee agreement with MGA, in

12    other words, that MGA would reimburse you for your legal

13    fees.

14              Do you recall is that that?

16:10 15              MR. OVERLAND:  I object, Your Honor, this was

16    improper rebuttal.  That was never raised.

17              MR. McCONVILLE:  That was raised on Mr. Zeller's

18    first examination with this witness.

19              THE COURT:  We've already counseled you, Counsel.

16:10 20              MR. ZELLER:  Mr. Machado's counsel asked about the

21    MGA agreement to repay.

22              THE COURT:  I'll let you ask one more time.

23    Q.   BY MR. ZELLER:  You recall, generally speaking, that

24    subject?

16:11 25    A.   Yes.

```
 1    Q.    But you said MGA agreed to pay for your attorneys' fees.

 2          Do you remember that?

 3    A.    Yes.

 4    Q.    But, in fact, MGA agreed to pay your -- your attorneys'

 5    fees for only so long as you make them happy; right?

 6                MR. OVERLAND:  Objection; argumentative.

 7                THE COURT:  Sustained.

 8    Q.  BY MR. ZELLER:  Well, isn't it true that MGA has agreed

 9    to pay your attorneys' fees for only so long as MGA wants to?

10                MR. OVERLAND:  Objection; calls for --

11                THE COURT:  It's also been asked and answered.

12                We covered this, Counsel.

13                MR. ZELLER:  I'm just trying to lay a foundation to

14    ask the further questions, if I could.

15                THE COURT:  We've covered this now.

16    Q.  BY MR. ZELLER:  Well, isn't it true that MGA has an

17    incentive to pay your attorneys' fees?

18                MR. OVERLAND:  Objection; calls for speculation.

19                THE COURT:  Sustained.

20    Q.  BY MR. ZELLER:  You believe that MGA has an incentive to

21    pay your attorneys' fees; correct?

22                MR. OVERLAND:  Objection; vague.

23                MR. McCONVILLE:  Relevance.

24                THE COURT:  Sustained.

25    Q.  BY MR. ZELLER:  During your testimony you referred to
```

16:11 5
16:11 10
16:11 15
16:11 20
16:12 25

```
 1    the W Hotel meeting as an interview several times.
 2            Do you recall that?
 3    A.   Yes.
 4    Q.   Please tell us who was -- who was there, again.
16:12 5  A.   Mr. Larian, Mr. Parker, Ms. Kuemmerle, Ms. Truebas,
 6    Mr. Vargas and myself.
 7    Q.   So that was seven people?
 8    A.   Yes.
 9    Q.   Have you ever had a job interview before this where
16:12 10  seven were in attendance?
11            MR. OVERLAND:  Objection; relevance.
12            THE COURT:  Overruled.
13            THE WITNESS:  No.
14    Q.   BY MR. ZELLER:  Did you ever have a job interview prior
16:12 15  to this one where you gave a PowerPoint presentation?
16    A.   No.
17    Q.   And -- and -- and you'd never had a job interview
18    previously where you gave a PowerPoint presentation that ran
19    more than 80 pages; right?
16:13 20  A.   No.
21    Q.   That's correct?
22    A.   That's correct.
23    Q.   Now, you were asked questions about whether or not the
24    information from Nielsen and MindShare was confidential.
16:13 25            Do you recall that?
```

|   |   |
|---|---|
| 1 | A.    I recall. |
| 2 | Q.    And you said it wasn't confidential; right? |
| 3 | A.    Right. |
| 4 | Q.    Well, you certainly know that -- that Nielsen and |
| 16:13 5 | MindShare consider it to be confidential when they give it to |
| 6 | their clients; right? |
| 7 |               MR. OVERLAND:  Objection; calls for speculation. |
| 8 |               THE COURT:  No.  You can cast an opinion about |
| 9 | that. |
| 16:13 10 |               You're in the field. |
| 11 |               THE WITNESS:  I'm not sure. |
| 12 | Q.    BY MR. ZELLER:  Well, you certainly know that Nielsen |
| 13 | and MindShare get paid for that information; right? |
| 14 | A.    Yes. |
| 16:13 15 | Q.    In order to provide it to their clients and customers; |
| 16 | right? |
| 17 | A.    Right. |
| 18 | Q.    So isn't it true that when you were providing this |
| 19 | information to Mr. Larian and others at MGA, while you were a |
| 16:13 20 | Mattel employee -- and this is third-party information paid |
| 21 | for by Mattel -- you were giving a benefit to MGA? |
| 22 |               MR. McCONVILLE:  Objection; calls for speculation. |
| 23 |               MR. OVERLAND:  Also vague. |
| 24 |               THE COURT:  It's also an argument. |
| 16:14 25 |               Put it in the form of a question. |

UNITED STATES DISTRICT COURT

1          Ask him if that's what he believes.

2     Q.   BY MR. ZELLER:  You understood that you were giving

3     information to MGA that Mattel had to pay for; right?

4     A.   Right.

16:14  5     Q.   You understood that MGA -- that meant MGA didn't have to

6     pay for that information itself; right?

7     A.   Right.

8     Q.   And so while you were a Mattel employee you were

9     benefitting MGA; right?

16:14 10     A.   I'm not sure.

11     Q.   You talked earlier about how Hasbro was the distributor

12     of Bratz prior to the time that you and Mr. Vargas and

13     Ms. Truebas set up MGA Mexico.

14          Do you recall that?

16:15 15     A.   Yes.

16     Q.   And I think you said something along the lines of that

17     Hasbro really wasn't able to make a success out of the Bratz

18     doll there in Mexico; right?

19     A.   Correct.

16:15 20     Q.   So Hasbro -- Hasbro's the second largest toy company in

21     the world; right?

22     A.   Right.

23     Q.   So Hasbro couldn't make Bratz a success in Mexico, it

24     took the Mattel information that the three of you took in

16:15 25     order to make Bratz a success in Mexico; correct?

1     A.    No.

2     Q.    Well, you had mentioned how you had only three to four

3     million dollars in advertising.

4           Do you recall that?

16:15 5     A.    Marketing, yes.

6     Q.    And so that means that the product, these Bratz dolls,

7     must have been really important in selling; correct?

8           MR. OVERLAND:  Objection; vague.

9           THE COURT:  Overruled.

16:15 10          THE WITNESS:  I -- I -- I didn't understand.

11    Q.    BY MR. ZELLER:  I'm sorry?

12    A.    I didn't understand the question.

13    Q.    Well, you -- you didn't have a very large marketing

14    budget; right?

16:16 15    A.    Right.

16    Q.    Now, you didn't have a very large advertising budget;

17    right?

18    A.    Right.

19    Q.    So -- but you were successful in selling the Bratz dolls

16:16 20    there in Mexico; right?

21    A.    Right.

22    Q.    And -- and -- and one of the reasons was is because the

23    product itself, the Bratz dolls, were important as part of

24    that selling point?

16:16 25    A.    "Important" as appealing to the consumer?  Is that what

1    you are saying?

2    Q.    Yes.

3    A.    Yes.

4    Q.    You also had mentioned during questioning by your

16:16 5    counsel a couple of times that MGA was a small company, they

6    were taking a -- a risk by going off with MGA Mexico.

7              Do you recall that?

8    A.    Yes.

9    Q.    Isn't it true that in 2004 MGA's revenues were $672

16:16 10   million?

11   A.    Can you repeat the quantity.

12   Q.    672 million.

13   A.    I'm not sure.  I cannot be sure.

14   Q.    Well, what did you think MGA's revenues were as of the

16:17 15   time that you went there in 2004?

16   A.    Something -- something more than half a billion, but I'm

17   not sure about the exact figure.

18   Q.    And -- and most of that revenue, you understood, was

19   from Bratz dolls; right?

16:17 20   A.    Correct.

21   Q.    And -- and -- and you were saying there was a risk of

22   failure, but the reality was that you were setting up a

23   subsidiary of a company that in 2004 alone earned over half a

24   billion dollars; right?

16:17 25   A.    Right.

 1   Q.   And you certainly knew that you had -- you weren't --

 2   this wasn't a startup company, this was an extension of an

 3   established company here in the United States into Mexico;

 4   right?

16:18 5   A.   Right.

 6   Q.   As a matter of fact, you certainly knew that if

 7   MGA Mexico, for whatever reason, floundered, you would have

 8   opportunities at MGA, the parent; right?

 9   A.   I couldn't -- I couldn't be sure of that.

16:18 10   Q.   You certainly hoped so?

 11   A.   I -- I could be hopeful, yes.

 12   Q.   And -- and -- and you certainly thought that that was a

 13   possibility; right?

 14   A.   I don't -- I don't -- I'm not sure if I -- if I thought

16:18 15   that.

 16   Q.   Well, it eventually did happen that you moved from

 17   MGA Mexico to MGA in the United States; correct?

 18   A.   Yes.

 19   Q.   You were asked questions about the fact that you didn't

16:18 20   get a sales bonus when you were there at MGA Mexico.

 21           Do you recall that?

 22           MR. OVERLAND:  Objection; misstates the evidence.

 23           THE COURT:  Overruled.

 24           THE WITNESS:  I did receive it.

16:18 25   Q.   BY MR. ZELLER:  I'm sorry.  You did?

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/04/2011   Volume 4 of 4

```
 1   A.   Yes.
 2   Q.   Oh, I apologize.  Maybe I misheard.
 3             So just so there is a clear point on this, you did
 4   receive your bonuses from MGA; is that correct?
16:19  5   A.   That is correct.
 6   Q.   And you never had your bonus withheld or cut because of
 7   the fact that you had taken information from Mattel; correct?
 8   A.   Correct.
 9   Q.   Your counsel asked you questions about how Mr. Larian
16:19 10   and MGA didn't know what you were doing.
11             Do you recall that, about taking the Mattel
12   information?
13   A.   Yes.
14   Q.   You certainly know that what you did, taking of Mattel
16:19 15   information, was a breach of what MGA and Mr. Larian agrees
16   were agreements that you had with them; right?
17   A.   Right.
18   Q.   So you -- you understand that saying that Mr. Larian and
19   MGA didn't know is bad for you but good for MGA in this case?
16:19 20             MR. OVERLAND:  Objection; argumentative.
21             THE COURT:  Overruled.
22             THE WITNESS:  That's the way it happened.
23   Q.   BY MR. ZELLER:  Well, your lawyer, your own lawyer, was
24   asking you a question about -- asking you to admit that you
16:20 25   had violated an agreement with MGA.
```

UNITED STATES DISTRICT COURT

```
 1              MR. OVERLAND:  Objection; argumentative.

 2    Q.   BY MR. ZELLER:  Do you recall that?

 3              THE COURT:  Just a moment.

 4              (Pause in the proceedings.)

16:20  5         THE COURT:  Overruled.

 6              THE WITNESS:  Yes.

 7    Q.   BY MR. ZELLER:  Didn't you think that was strange?

 8              MR. OVERLAND:  Objection; irrelevant.

 9              THE COURT:  Overruled.

16:20 10        THE WITNESS:  No.

11    Q.   BY MR. ZELLER:  You -- you -- you talked about how

12    you -- you had to go --

13              THE COURT:  My apologies, Counsel, that objection

14    is sustained about what his lawyer's thinking.

16:20 15             My apologies.

16              That's sustained.

17    Q.   BY MR. ZELLER:  You had mentioned that --

18              MR. OVERLAND:  Will that be stricken, Your Honor?

19              THE COURT:  It is stricken.

16:21 20  Q.   BY MR. ZELLER:  You had mentioned that -- you had

21    mentioned that you had made these demands for severance when

22    you -- when you left Mattel.

23              Do you recall that?

24    A.   Yes.

16:21 25  Q.   And what you did was that you were
```

```
 1    demanding from Mattel --
 2              MR. OVERLAND:  Objection; objection.  That
 3    misstates the evidence, demand for a final paycheck.
 4              MR. ZELLER:  Well, I think we -- I think the
 5    witness used the word "severance."
 6              THE COURT:  Yes, overruled.
 7    Q.   BY MR. ZELLER:  So "severance" and final paycheck is the
 8    same thing in your --
 9              THE COURT:  He didn't say "severance."  He said he
10    had to go to the board to get the final paycheck.
11              MR. ZELLER:  They used both terms.
12              That's all I'm saying.
13    Q.   So let me just -- when you were using the word
14    "severance" and "final paycheck" in your testimony, it was
15    the same thing; right?
16    A.   Correct.
17    Q.   You wanted a final payment from Mattel for your work at
18    Mattel; right?
19    A.   Yes.
20    Q.   And you -- what you were demanding was more money from
21    Mattel, payment from Mattel, after you had taken all this
22    information you've talked about, you downloaded, along with
23    Mr. Truebas -- or Ms. Truebas and Mr. Vargas; correct?
24    A.   Correct.
25    Q.   And you also had, by that time, as we had talked about
```

```
 1   earlier, provided that paid information from Nielsen and

 2   MindShare, to a competitor of Mattel, MGA; right?

 3   A.   No.

 4   Q.   You had already given the presentation at the W Hotel

16:22  5   that had that information in there to MGA; correct?

 6   A.   I showed it, yeah.

 7   Q.   And you -- you did this after you had put "Rome on

 8   fire"; right?

 9   A.   Yes.

16:22 10   Q.   And Mr. Zalzman and the others who you discussed, they

11   didn't know what you'd done; correct?

12        MR. OVERLAND:  Objection; calls for speculation.

13        THE COURT:  Overruled.

14   Q.   BY MR. ZELLER:  But you didn't tell them?

16:23 15   A.   No.

16   Q.   You talked about how some documents that you took had

17   confidentiality stamps on them and some didn't; right?

18   A.   Right.

19   Q.   But you didn't need a confidentiality stamp to know that

16:23 20   what you were taking when you were downloading documents from

21   Mattel's system were confidential documents; right?

22        MR. OVERLAND:  Objection; vague as to which

23   documents.

24        THE COURT:  Overruled.

16:23 25        You can answer that question.
```

UNITED STATES DISTRICT COURT

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | THE WITNESS:  Can you say it again, please.                         |
|       | 2  | MR. ZELLER:  Right.                                                 |
|       | 3  | Q.   You didn't need to have a stamp on the document saying         |
|       | 4  | it was confidential for you to know that it was confidential;       |
| 16:23 | 5  | right?                                                              |
|       | 6  | A.   Right; most of the times.                                      |
|       | 7  | (Pause in the proceedings.)                                         |
|       | 8  | MR. ZELLER:  If you could please take a look at                     |
|       | 9  | Exhibit 22408.                                                      |
| 16:24 | 10 | (Pause in the proceedings.)                                         |
|       | 11 | Q.   BY MR. ZELLER:  Do you recognize this?                         |
|       | 12 | A.   No.                                                            |
|       | 13 | Q.   Well, you certainly knew that prior to the time --             |
|       | 14 | Well, we should take that down.                                     |
| 16:25 | 15 | Oh, it's already into evidence.                                     |
|       | 16 | Oh, I apologize.  It's already in evidence, so if                   |
|       | 17 | you can pull that up?                                               |
|       | 18 | MR. McCONVILLE:  Objection, Your Honor; no                          |
|       | 19 | foundation.                                                         |
| 16:25 | 20 | MR. ZELLER:  Well, I just want to ask him about a                   |
|       | 21 | line.                                                               |
|       | 22 | This is already in evidence.                                        |
|       | 23 | MR. McCONVILLE:  That hasn't been the rule we've                    |
|       | 24 | applied in the past in this case, Your Honor.                       |
| 16:25 | 25 | THE COURT:  Just a minute.                                          |

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/04/2011  Volume 4 of 4

```
 1              (Pause in the proceedings.)

 2              MR. McCONVILLE:  Can we take it down while the

 3      judge considers a ruling?

 4              THE COURT:  Certainly.

16:25  5        MR. McCONVILLE:  Thank you.

 6              THE COURT:  And it would be nice if one of you

 7      handed me the documents and stop the clock running for a

 8      moment on Mattel.

 9              (Pause in the proceedings.)

16:26 10        THE COURT:  For the record it's 22408.

11              (Pause in the proceedings.)

12              THE COURT:  Have you seen this document before?

13              THE WITNESS:  No.

14              THE COURT:  What?

16:26 15        THE WITNESS:  No, I haven't.

16              THE COURT:  Objection sustained.

17              All right.  Start the clock running again.

18      Q.  BY MR. ZELLER:  You said that no one at MGA asked you to

19      bring a presentation to the W Hotel meeting.

16:26 20        Do you recall that?

21      A.  Yes.

22      Q.  But you, in fact, did discuss that with Ms. Kuemmerle

23      beforehand; correct?

24      A.  I'm not sure.

16:26 25  Q.  You told her that you were going to make a presentation
```

Case 2:04-cv-09049-DOC-RNB   Document 10147   Filed 03/07/11   Page 74 of 87   Page ID #:307292
CV 04-9049 DOC - 03/04/2011   Volume 4 of 4

74

 1    at that meeting to Mr. Larian and the others; correct?

 2    A.    I'm not sure.

 3    Q.    Well, isn't it true that when you showed this

 4    presentation to the people at MGA they didn't tell you to

16:27 5    take it down or stop showing it to them; correct?

 6    A.    Correct.

 7    Q.    If you could please take a look at 7104.

 8          And for the record, Judge, this is from the CD.

 9          THE COURT:  All right.  Thank you.

16:27 10          MR. ZELLER:  So it's already in evidence.

 11          THE COURT:  All right.  Thank you.

 12    Q.    BY MR. ZELLER:  Mr. Machado, do you recognize that this

 13    is something that is called the Barbie 2005 preliminary line

 14    list?

16:28 15    A.    Yes.

 16    Q.    You recognize this as one of the documents that the

 17    three of you downloaded from Mattel, put on to your laptop

 18    and then you put on to your CD and then you took to MGA;

 19    right?

16:28 20    A.    I can't be sure.

 21    Q.    Well, you generally recognize what a line list is;

 22    right?

 23    A.    Yes.

 24    Q.    And what this is is that this is something that shows,

16:28 25    essentially, the playbook for what Mattel was going to be

1   doing for the 2005 product line; right?

2   A.   Right.

3   Q.   And you and the others took a copy of this document,

4   7104, in early 2004, before you left Mattel and went to MGA;

16:28  5   correct?

6   A.   I didn't copy it, so I'm not sure.

7   Q.   Well, is this among these documents that you and the

8   others took that you say sat around for six months at your

9   house?

16:29 10         MR. OVERLAND:  Objection, Your Honor;

11   mischaracterizes the evidence and argumentative.

12         THE COURT:  Overruled.

13         You can answer the question, sir.

14         THE WITNESS:  It might be, but --

16:29 15   Q.   BY MR. ZELLER:  Well, let me make sure I understand.

16         The three of you took, in early 2004, the playbook

17   for Mattel's product line for 2005, and it sat in your house

18   collecting dust for six months?

19         MR. McCONVILLE:  Objection.

16:29 20         MR. OVERLAND:  Objection; argumentative.

21         MR. McCONVILLE:  And "vague" as to what a

22   "playbook" is.

23         THE COURT:  Overruled.

24         Answer the question.

16:29 25         THE WITNESS:  If this document was, in fact,

1        in the CD.

2                THE COURT:  What he said was if this document was

3        in the house the answer's "yes."

4                Why don't you just repeat your answer to the

16:30  5        question.

6                THE WITNESS:  If this document was, in fact, in the

7        CD, then, yes it collected dust for six months.

8        Q.   BY MR. ZELLER:  Okay.  So during the six-month time

9        period where Mr. Vargas and Mr. Truebas were saying to you,

16:30 10        where are all these documents, we took this trouble to find

11        and collect and download?

12        A.   No.

13        Q.   And you're also saying that you -- these -- these

14        documents were at your house for six months and the only

16:30 15        reason why you took the CD that contained this document and

16        other Mattel documents on it was because you wanted to have a

17        copy of your resumé, just one document, on the CD at work at

18        MGA?

19        A.   Yes.

16:30 20        Q.   So it's -- it's -- it's just a coincidence that the CD

21        was found by the police, the CD that you took into MGA's

22        offices had all these Mattel documents on them?

23                MR. McCONVILLE:  Objection; argumentative.

24                THE WITNESS:  Can you repeat it, please.

16:31 25                MR. ZELLER:  Sure.

```
 1    Q.   So are you saying it's just a coincidence that the CD

 2    that the police found had all these Mattel documents on

 3    them --

 4            MR. McCONVILLE:  Objection.

16:31 5   Q.   BY MR. ZELLER:  -- and that they were in MGA's offices?

 6            THE COURT:  We've got an objection, Counsel.

 7            You can certainly ask him how that occurred, but

 8    just rephrase the question.

 9    Q.   BY MR. ZELLER:  Well, so you're saying that the fact

16:31 10   that this CD had all this Mattel confidential information on

 11   it, all these Mattel files on it, had nothing to do with the

 12   reason why you took it to MGA's office?

 13           MR. OVERLAND:  I object to the form of the

 14   question.

16:31 15          THE COURT:  Overruled.

 16           Please answer the question.

 17           MR. OVERLAND:  Assumes facts that it had all this

 18   confidential information on it.

 19           THE COURT:  Overruled.

16:31 20          Please answer the question, sir.

 21           THE WITNESS:  Can you repeat it, please.

 22           Sorry.

 23   Q.   BY MR. ZELLER:  You're saying that there is no

 24   connection between the fact that you took the CD to your

16:32 25   offices at MGA and the fact that that CD has many
```

UNITED STATES DISTRICT COURT

 1    confidential Mattel files on it?

 2    A.    Yes.

 3    Q.    But there were also hardcopies of Mattel documents found

 4    in your office during the search by the police; correct?

16:32  5              MR. McCONVILLE:  Objection; assumes facts not in

 6    evidence as to where they were found.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  Yes.

 9    Q.   BY MR. ZELLER:  And there are also hardcopy documents of

16:32 10    Mattel documents found at the offices of Ms. Truebas and

11    Mr. Vargas; correct?

12    A.    Correct.

13              MR. McCONVILLE:  Objection; foundation.

14              THE COURT:  Overruled.

16:32 15              Your answer was --

16              THE WITNESS:  Correct.

17    Q.   BY MR. ZELLER:  So -- so is it -- is it a coincidence

18    that there were hardcopy Mattel documents found in those

19    offices, the MGA offices?

16:33 20              MR. OVERLAND:  Same objection; argumentative.

21              THE COURT:  Overruled.

22              MR. McCONVILLE:  Same objection; foundation.

23              THE COURT:  Overruled.

24              THE WITNESS:  I can't say that.

16:33 25    Q.   BY MR. ZELLER:  Did you take those documents to the MGA

| | |
|---|---|
| 1 | offices in order to update your resumé? |
| 2 | MR. OVERLAND:  Objection; assumes facts. |
| 3 | THE COURT:  Overruled. |
| 4 | THE WITNESS:  No. |
| 16:33  5 | MR. ZELLER:  Okay. |
| 6 | Nothing further, Your Honor. |
| 7 | THE COURT:  Recross? |
| 8 | MR. OVERLAND:  Absolutely; yes. |
| 9 | Do you want me to start? |
| 16:33 10 | THE COURT:  Well, how long will you be? |
| 11 | MR. OVERLAND:  A half hour, at least. |
| 12 | THE COURT:  A half hour. |
| 13 | Do you want to start, then, on Tuesday with this? |
| 14 | MR. OVERLAND:  If the jury wants to go home, I'll |
| 16:33 15 | start Tuesday. |
| 16 | THE COURT:  If you want to go home, we'll bring you |
| 17 | back on Tuesday, and then that way we'll beat the Friday |
| 18 | traffic; all right. |
| 19 | (Laughter.) |
| 16:33 20 | THE COURT:  Well, once again, thank you for another |
| 21 | week. |
| 22 | All right.  Please drive safely. |
| 23 | Has anybody talked to anybody about the case so I |
| 24 | can start all over again? |
| 16:33 25 | (Laughter.) |

```
 1              THE COURT:  Don't do it.

 2              Do not discuss this matter, nor form or express an

 3     opinion about this case.

 4              Go about your business.

16:34 5         We'll see you Tuesday at 1:00.

 6              What time?

 7              THE JURY AS A WHOLE:  1:00.

 8              THE COURT:  Thank you very much.

 9              (Open court - jury not present.)

16:34 10        THE COURT:  Mr. Machado, you may step down, sir.

11              And let me talk to counsel for just a moment a

12     moment on the record, and then I'll talk to you informally.

13              The continuing difficulty you're going to have in

14     this matter between the two of you is the continuing

16:34 15   objection, which I will understand that there is a lack of

16     foundation and that this potentially is confidential

17     information.

18              I want the reviewing court to hopefully understand

19     that apparently neither party's decided to show this tape to

16:34 20   the witness, Mr. Machado, and this court finds that there's

21     sufficient foundation through the testimony concerning the

22     confidentiality of numerous documents, I believe, through

23     Ms. Owens?

24              MR. McCONVILLE:  That was Castilla, Your Honor.

16:35 25   That was --
```

```
 1              THE COURT:  Counsel, thank you very much.

 2              Did you notice I was speaking to --

 3              Sit down.

 4              MR. ZELLER:  Those are different documents,

16:35 5    Your Honor.

 6              THE COURT:  No; but there are a series of documents

 7    concerning the tape or the CD itself, and there are a series

 8    of other documents.

 9              Why don't we just spend some time now and go back.

16:35 10              MR. OVERLAND:  Your Honor --

11              THE COURT:  Just a moment, Counsel.

12              I'll be right with you.

13              If I'm wrong, I'll certainly get corrected and

14    we'll rectify that Tuesday.

16:35 15              (Pause in the proceedings.)

16              THE COURT:  Counsel, you're absolutely correct.

17              Laura Owens and the Castilla documents, none of

18    those touched on the CD; is that correct.

19              MR. McCONVILLE:  Right; not on the CD.

16:36 20              There was another storage device testified about,

21    though, which might be what you're thinking about.

22              THE COURT:  Well, I can't be certain.

23              MR. McCONVILLE:  It was a different storage device.

24              THE COURT:  We went through a series of documents.

16:36 25              Now, let me just ask you, why hasn't Machado been
```

         1    shown this disc by either party?

         2          This can get cleared up very quickly.  We've wasted

         3    probably an hour to two hours on this, which is your time

         4    running.

16:36    5          And if you choose not to, you don't have to

         6    respond, but --

         7          MR. ZELLER:  We did --

         8          THE COURT:  -- I've certainly been sitting here all

         9    weekend and --

16:36   10          MR. ZELLER:  We have showed it to him.  We showed

        11    it to him during his deposition, and --

        12          THE COURT:  Well, I don't know that and the jury

        13    doesn't know that.

        14          Well, we're going to leave the record just the way

16:36   15    it is.

        16          MR. QUINN:  Your Honor, we have asked MGA for the

        17    copy that's the subject of the chain of title stipulation --

        18          THE COURT:  Uh-huh.

        19          MR. QUINN:  -- the last word -- we asked for it

16:36   20    over a week ago I think, they said it's with ILS, they said

        21    they would try to get it for us.  We have asked several

        22    times, we still don't have it.

        23          THE COURT:  It's been received.

        24          That document's now in and the record will stand as

16:37   25    it is.

1           You've gotten that document into evidence, Counsel,

2   and I'll stand on that record.

3           The second thing, before we go off the record

4   tonight, is the exhibit -- there was 6426.

16:37 5           I couldn't remember if we had looked at it over the

6   weekend or not, but why don't each of you look at that now.

7           So, Mr. Overland if you choose to go into it, we

8   can go into that right now so that we can receive it, or see

9   if there's any objection by either party.

16:37 10          There's no reason to hold you tonight for that.

11          (Discussion held off the record.)

12          MR. OVERLAND:  While we're looking for that, Judge,

13  there are also two exhibits that you wanted to look at.

14          Is that part of it?

16:37 15          THE COURT:  That's one of them, the one that wasn't

16  shown, and there were two other exhibits that I wanted to

17  receive before receiving them.

18          MR. OVERLAND:  I think the other one was 8858,

19  which is the attachment.

16:38 20          MR. McCONVILLE:  No objection from MGA, Your Honor.

21          THE COURT:  Well, the objection came, I think, from

22  Mattel.

23          No, 8858's received.  It was 6426, plot04,

24  April 1st, 2004, this is accepting an offer of employment,

16:38 25  which is being shown to counsel.

 1    And while we're doing that, the reason you're not

 2  going to get into the discussion on MGA's behalf about

 3  Kuemmerle talking to Machado about a search taking place and

 4  what Machado said is because, once again, that's that

16:38 5  litigation to death issue, and I'm precluding that, and

 6  that's exactly where that answer was leading from Machado.

 7    And then is there an objection to 6426?

 8    MR. McCONVILLE:  No.

 9    THE COURT:  And then it's received.

16:38 10    (Exhibit(s) 6426, received.)

 11    THE COURT:  And, Mr. Overland, when you go back on

 12  redirect, just make that known.

 13    And there was one other document; and if you would

 14  show that to me, then we'll go off the record so we can get

16:39 15  some of you on your way.

 16    Mr. Larian, Mr. Eckert, there's no reason to remain

 17  tonight unless you choose to.  We'll see you next Tuesday.

 18    Thank you.

 19    MR. OVERLAND:  The other one is 8858, which is the

16:39 20  attachment to 6426.

 21    THE COURT:  I believe I had already received that,

 22  and I may be mistaken.  Am I mistaken about that?

 23    MR. OVERLAND:  I think you received it.  It's not

 24  in evidence, as far as I know, because they objected to it.

16:39 25    THE COURT:  Yeah, it was an offer sent by MGA on

         1    March 30th, 2004, signed by Carlos Fuentes, a popular Mexican

         2    writer.

         3              MR. OVERLAND:  Yes, very good.

         4              THE COURT:  With the plot04 on it.

16:39    5              I would think that 8858 would come in.

         6              I don't know why there was an objection.

         7              MR. ZELLER:  The only reason there was an objection

         8    is because we didn't have it.

         9              It wasn't in the binders and we hadn't gone over it

16:40   10    and I just --

        11              THE COURT:  Do you want to look at it now and see

        12    if there's any objection.

        13              MR. ZELLER:  I have looked at it now with

        14    Mr. Overland and there is no objection.

16:40   15              MR. OVERLAND:  No objection.

        16              MR. McCONVILLE:  No objection from MGA.

        17              THE COURT:  Then it is received.

        18              (Exhibit(s) 8858, received.)

        19              THE COURT:  Can we go off the record for a moment?

16:40   20              We'll stay on the record.

        21              MR. ZELLER:  It is just because it pertains to --

        22    the parties, if you'll recall, reached a stipulation about

        23    the CD, but it has never been read to the jury.

        24              THE COURT:  Sure.

16:40   25              MR. ZELLER:  But we would like to read it to the

```
 1    jury and just admit into evidence just a file listing of

 2    what's on the CD of what they have.

 3             MR. QUINN:  And all the documents.

 4             MR. ZELLER:  And all the printout of everything on

 5    the CD.

 6             THE COURT:  You're more than welcome to.

 7             MR. ZELLER:  Thank you.

 8             THE COURT:  And once it's been received, then the

 9    hardcopies can be printed out, matched up against it and that

10    way the jury has it in hardcopy form.

11             The struggle was whether it was going to be

12    received; I've received it.

13             Now, I would suggest, though, to Mattel that you

14    get the rest of that stipulation because it shows the law

15    firms that passed through, and there is a gap right now.

16             So MGA may disagree with how this information got

17    on the CD, but I made that ruling.

18             All right.  Now, is there anything else on the

19    record?  And then I want to talk to you just briefly about

20    the weekend and what the hours are going to be and get your

21    wisdom.

22             MS. HURST:  We have one issue regarding a witness,

23    Your Honor.

24             THE COURT:  Certainly.

25             MS. HURST:  Ms. Sujata Luther is -- has elderly
```

CV 04-9049 DOC - 03/04/2011 - Volume 4 of 4

```
 1    ailing parents in the country --
 2             THE COURT:  Well, that's what I'm going to talk to
 3    you about in just a moment.
 4             The whole lineup of witnesses next week, and if we
 5    need to call her out of order.
 6             MS. HURST:  We do.
 7             THE COURT:  And what we're going to do.
 8             I'm going to talk to you about that.
 9             If you want that on the record I'm glad to do that,
10    so we'll stay on the record until you tell me we don't have
11    to.
12             MS. HURST:  We can be off the record.
13             That's fine.
14             THE COURT:  All right.  Off the record.
15             (Adjournment at 16:41 to resume on Sunday, March 6,
16    2011, at 8:00 a.m.  Next session reported by Deborah Parker.)
17
18
19
20
21
22
23
24
25
```