1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3          **SOUTHERN DIVISION AT SANTA ANA**

4       HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,              )
7                                  )
             PLAINTIFFS,           )
8                                  )
         vs.                       ) CV NO. 04-9049-DOC
9                                  ) STATUS CONFERENCE
MGA ENTERTAINMENT, INC., ET AL.,   ) VOLUME 1 of 4
10                                 )
             DEFENDANTS.           )
11  _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      JURY TRIAL

16                 SANTA ANA, CALIFORNIA

17                SUNDAY, MARCH 6, 2011

18                     8:20 A.M.

19

20
            **DEBORAH D. PARKER, CSR 10342**
21          **OFFICIAL COURT REPORTER**
            **UNITED STATES DISTRICT COURT**
22          **411 WEST FOURTH STREET**
            **SUITE 1-053**
23          **SANTA ANA, CALIFORNIA 92701**
            **(714) 542-8409**
24          **D.PARKER@IX.NETCOM.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                            JOHN QUINN
                             WILLIAM PRICE
 4                           MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                           & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                           (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                           (949) 567-6700

13
                             ANNETTE L. HURST
14                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                           (415) 773-5700

17
                             JENNIFER L. KELLER
18                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                           SUITE 560
                             IRVINE, CALIFORNIA 92612
20                           (949) 476-8700

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                             ALEXANDER H. COTE
                              SCHEPER KIM & HARRIS, LLP
 4                             601 WEST FIFTH STREET
                              12TH FLOOR
 5                             LOS ANGELES, CALIFORNIA 90071
                              (213) 613-4660
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; SUNDAY, MARCH 6, 2011; 8:20 A.M.

2       *(The following proceedings were had outside the*

3       *presence of the jury:)*

4           THE COURT:  We're on the record.

5           Now, Ms. Hurst.

6           MS. HURST:  Your Honor, Ms. Sujata Luther,

7    S-U-J-A-T-A L-U-T-H-E-R, was formally the senior vice

8    president of strategic planning and the head of Mattel's

9    consumer research for nearly 20 years.

10          She is a resident of Chicago, Illinois and is

11   represented by counsel who has asserted that she will be

12   unavailable beginning on Saturday of this week, because she

13   will be taking a trip out of the country to the country of

14   India, where her elderly parents reside.  One of whom –– at

15   least, one of whom is having surgery scheduled for next

16   week; and therefore, she cannot further postpone her plans.

17          She is not subject to the jurisdiction of the

18   court for trial subpoena, as she is a resident of Chicago,

19   Illinois.  Her attorney accepted a subpoena from us but has

20   never acknowledged that her attendance can be compelled, or

21   that it was valid; and she has been willing to cooperate and

22   to appear.  She was willing to appear on Wednesday of this

23   week, on Thursday of this week.  And pursuant to the court's

24   request over this weekend, her lawyer informed us yesterday

25   that she would change her plans and make herself available

1    on Friday of this week.

2           After Mattel learned of Ms. Luther's

3    unavailability, they identified between six and eight

4    additional witnesses, after saying repeatedly that first

5    that they would rest their case last week and later that

6    they would rest their case this week.  In our view, Mattel

7    has taken deliberate steps to procure the unavailability of

8    this witness, in addition to the fact that she is not

9    subject to a trial subpoena.

10          We, therefore, ask that the court either take the

11   witness out of order on Friday, or that her videotaped

12   deposition be played.  It is not -- I understand that in an

13   off-the-record sessions, the court has suggested that MGA

14   could simply waive cross-examination on all of Mattel's

15   witnesses this week to try to get to Ms. Luther.  Number

16   one, there's no guarantee that would work; but number two,

17   the prejudice to that would be enormous.  In addition, a

18   number of witnesses that Mattel suddenly designated after

19   learning of Ms. Luther's unavailability coming this weekend

20   for six weeks in India -- which would make it impossible for

21   us to bring her at any time in our case -- our statute of

22   limitations witnesses, Mr. de Anda, for example, statute of

23   limitations, this is a defense on which we bear the burden

24   of proof.  They could bring these witnesses in rebuttal.

25          So, your Honor, we're prejudiced by Ms. Luther's

1   unavailability.  She is an extremely important witness,

2   extremely important witness and Mattel has taken steps to

3   procure her unavailability.  She's not subject to trial

4   subpoena.  Again, then, we reiterate our request that she

5   either be taken out of order, or on either Wednesday,

6   Thursday, or Friday –– so it doesn't have to be the last

7   witness in their case –– if they are going to go on with

8   these tentative witnesses, we could take her out of order

9   and do her on Wednesday.  It wouldn't disrupt their

10  presentation and make them finish on a low note.  They've

11  identified another 10 witnesses.  So if we take her on

12  Wednesday, that's not a problem.

13          So, again, we would request that she either be

14  taken out of order or that the court agree that her

15  videotaped deposition can be played because she's clearly

16  unavailable under the rule.

17          THE COURT:  All right.  Counsel.  Mattel.

18          MR. ZELLER:  Thank you, your Honor.

19          Obviously we've discussed these issues off the

20  record, so I'm not going to belabor really any of our

21  points.

22          THE COURT:  Well, belabor them so the circuit

23  understands what is happening.

24          MR. ZELLER:  I will start off with the point that,

25  first, while Ms. Luther is a former Mattel executive, the

```
 1   fact is, is that -- and this is shown by Sujata Luther's
 2   deposition transcript, because it was actually done at the
 3   deposition -- MGA and Ms. Hurst, in particular, interfered
 4   with our relationship with her.  That was the intended
 5   consequence of Ms. Hurst's antics at the deposition, and it
 6   had its intended effect.
 7            In particular, she suggested to the witness that
 8   we were -- that we had a conflict; that the witness should
 9   be invoking the Fifth Amendment.  These were completely
10   improper suggestions.  It understandably caused the witness
11   concern.  It terminated -- she terminated our relationship,
12   because of it.  We were representing her.
13            I will also note that, in fact -- I'm sure not
14   coincidentally, Sujata Luther is related to an Orrick
15   attorney.  So I think any implication that we have somehow
16   are the ones who have interfered with this or made her
17   unavailable is simply factually false.  And I think that's
18   quite clear from the deposition transcript.
19            We do agree with MGA that there's no jurisdiction.
20   The court doesn't have jurisdiction over her.  She is a
21   resident of Chicago.  She doesn't have any connection to
22   this forum that we're aware of.  And moreover, as I
23   understand the representations of counsel, she's moving out
24   of the country, is I guess her intended plan.  We have not
25   been in contact with the witness; apparently, MGA has.
```

8

```
 1           As the court has noted, previously, MGA has
 2    refused to take any of our witnesses out of order.  When we
 3    asked for that accommodation, we were given a flat "no" by
 4    MGA.  So these are, in fact, the ground rules.  As we've
 5    also noted, it would be particularly prejudicial to
 6    interrupt our case at this stage near the end.  It's no
 7    consolation whether it's the last witness or near the last
 8    witness.  While MGA's counsel has repeatedly asserted that
 9    we've added 10 witnesses, that's not even remotely the case.
10    We have added some additional short witnesses.  These are
11    because of MGA's and Mr. Machado's obstruction.
12           For example, we're calling Mr. Cavassuto, because
13    Mr. Machado and MGA refused to stipulate to the authenticity
14    of some simple commercial contracts.  So now he has to be
15    called.  Many of these issues, in fact, are directly -- many
16    of these witnesses are directly the result of recent
17    developments in the case interjected by MGA or Mr. Machado's
18    counsel.
19           One other point I would make on that, in fact, is
20    that MGA can obviate the need for any number of these
21    additional witnesses by simply stipulating to the
22    admissibility documents.  That is why we're calling a number
23    of these witnesses, is to simply get our documents in.  But
24    MGA can, obviously, stipulate to that and make it more
25    likely that Ms. Sujata Luther would be able to testify
```

1    before the week is out.

2         The other thing that MGA could certainly do is

3    simply shorten their crosses of these witnesses.  That would

4    be another way in which MGA, itself, can control the timing

5    of when Ms. Luther testifies and ensure that she testifies

6    this week.  It is not correct that MGA is being put in a

7    position of, quote, waiving, end quote, its

8    cross-examination.  It could either shorten it, or as the

9    court has also suggested, it can simply re-call these

10   witnesses in their case-in-chief and cross-examine them

11   then.

12        So it's not a waiver, and no one has ever

13   suggested it would be a waiver to their right to

14   cross-examine.  They could simply choose to defer it, if it

15   is true, as MGA has said, if it's so important for Sujata

16   Luther to testify in its case.

17        Finally, I'll note that the witnesses that we have

18   added -- I think is just an elaboration on the point that I

19   was making earlier -- are not there for statute of

20   limitations purpose.  They are not to respond -- they are

21   not here to respond to a -- prospective statute of

22   limitations defense.

23        Mr. Cavassuto, as I mentioned, is being called to

24   get into evidence these contracts that Mr. Machado was

25   attempting to obstruct our ability to get introduced into

1    evidence.  Mr. de Anda is not being called in order to talk

2    about statute of limitations.  As his purpose, the reason

3    why we're calling Mr. de Anda, is because MGA during the

4    examination of Mr. Eckert suggested that somehow documents

5    have been altered.  So we feel like we have to respond and

6    we have to respond sooner rather than later to that

7    accusation, so that was the reason why we moved up

8    Mr. de Anda and why we are now calling him is, in order to

9    respond to those.  Undoubtedly, MGA wants to cross him on a

10   whole variety of issues, but that's their perogative, or

11   they can choose to call him later on in their case-in-chief

12   and examine him then.

13        MS. HURST:  Your Honor, I would like to respond to

14   the accusation that has been repeatedly made that I somehow

15   interfered with the relationship between Mr. Mattel and

16   Ms. Luther.

17        At the deposition, after a day and a half of

18   testimony from Ms. Luther that absolutely eviscerated

19   Mattel's case, Mr. Gordon examined the witness purportedly

20   as her attorney.  Not just Mattel's attorney but her

21   personal attorney.  He began cross-examining her about her

22   personal relationship with an attorney at my law firm, an

23   attorney, by the way, who has never worked on this matter,

24   has never billed a minute to this matter and is walled off

25   from this matter.

1           Mr. Gordon plainly used information that had been

2    shared with him in confidence by the witness to begin

3    cross-examining her.  I, frankly, was shocked and appalled

4    by this turn of events.  When it was apparent that the

5    attorney who was supposed to be there personally

6    representing this witness in her personal capacity began

7    cross-examining her regarding information that she had

8    shared with him in confidence, believing that she had an

9    attorney-client relationship with him, it was an atrocious

10   display.

11           THE COURT:  What is the date of the deposition?

12           MS. HURST:  One moment.

13       *(Pause.)*

14           MR. ZELLER:  I'm happy to -- I'm sorry.

15           THE COURT:  The date of the deposition.

16       *(Pause.)*

17           MS. HURST:  The date -- there were two dates of

18   the deposition, your Honor:  The first day was July 8th,

19   2010; the second day was September 24th, 2010.

20           THE COURT:  Was this brought to the court's

21   attention?

22           MS. HURST:  No, it was not.

23           THE COURT:  Why?

24           MS. HURST:  By either party.

25           THE COURT:  Why?

```
 1          MS. HURST:  I thought the cross-examination was

 2    improper.  But I figured if they tried to do it again at

 3    trial, we would just make a motion in limine.  I didn't

 4    think that there was any further event required.

 5          THE COURT:  Okay.

 6          MR. MCCONVILLE:  Let me be clear.

 7          We have never had any direct contact with

 8    Ms. Luther.  And the assertion that we somehow interfered

 9    with their relationship with his is based entirely on the

10    fact that her supposed personal lawyer turned on her, and

11    then it became clear after she had testified at some length

12    about the use of false pretenses to gain access to showrooms

13    and that she knew about it and that she had been aware of

14    what was going on, that Quinn Emanuel also did not tell her

15    that there was a then pending federal criminal investigation

16    of these matters.  Numerous other witnesses were told about

17    this and some of them elected to take the Fifth, including

18    Mr. Villasenor.

19          So Mr. Gordon turned on the witness on cross,

20    after two days of that testimony against Mattel, and the

21    whole spectacle was ridiculous.  So she terminated -- I'm

22    sure -- I mean, I haven't talked her.  But I'm sure she

23    terminated the relationship because her lawyer violated his

24    duty of loyalty and failed to apprise her of material facts

25    concerning the representation, not because I somehow
```

```
1     interfered in the relationship.

2              So I just really feel that that accusation is

3     entirely inappropriate and that if the record is examined,

4     it will be apparent that Quinn Emanuel violated its

5     obligation to the witness, and that's why they were

6     terminated.

7              THE COURT:  Mr. Cote, I saw you waving your hand.

8              MR. COTE:  Thank you.

9              I just wanted to respond to the comments made by

10    Mr. Machado's counsel.

11             Mr. Wagner is Mattel's expert in this case, their

12    damages expert.  He seeks $6 1/2 million from my client

13    who's an individual, not a big corporation.  5.7 million of

14    the 6.5 are monies that Mattel supposedly paid, pursuant to

15    contracts, the contracts that were mentioned.  That appears

16    to be the sole basis for the $5.7 million.

17             Mr. Wagner has admitted in deposition and admitted

18    in the *Daubert* hearing in this court that he had never seen

19    the contracts prior to issuing his report.  He saw the first

20    page of some of them for the first time after he was

21    deposed.  He saw them only in Spanish.  Mattel's counsel

22    supposedly translated them for him.  They are not the basis

23    of his report.

24             The full text of the contracts were supposedly

25    given to the court for our informal reviews on Saturday.
```

1         THE COURT:  That was yesterday, wasn't it?

2         MR. COTE:  Yes, that was yesterday, your Honor.

3    Today is the 6th.  Sunday, at 8:00 o'clock, this morning was

4    the first time that anybody, including Mr. Wagner, has ever

5    seen these contracts in English.  Mr. Wagner doesn't read or

6    speak Spanish.  So the very first time he learned what the

7    contracts say, upon which he bases almost his entire report,

8    was this morning.

9         I don't think it's improper that I ask to receive

10   English copies of the document so that I can understand what

11   they say.  So I can understand the basis of Mr. Wagner's

12   opinion because obviously he doesn't understand the basis of

13   his opinion, because he didn't see the documents before.

14        The suggestion that Mr. Cavassuto is just going to

15   introduce these documents is false.  The binder prepared for

16   the court's review yesterday has 10 exhibits in it, one of

17   which is the contracts.  He's not just an authenticity

18   witness.  He's a substantive witness that they're using to

19   run out the clock.

20        Thank you.

21        THE COURT:  Counsel.

22        MR. ZELLER:  I've never accused Mr. Cote of doing

23   anything improper.

24        THE COURT:  By the way, Mr. Wagner, would you

25   remain outside.  They may be insulting you in just a moment.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1        (Laughter.)

2            THE COURT:  I'm just joking with you, sir.

3            MR. ZELLER:  I'll try to avoid that.

4            I have never accused Mr. Machado's counsel of

5    doing anything other than what he has every right to do,

6    which is to challenge our ability to put on evidence, and

7    that's what we are responding to.  So we are calling a

8    percipient witness to put in the contracts.  And I have

9    never said that the only thing that any of these people are

10   ever going to talk about is somehow authenticity.  The other

11   issues have been raised.

12           Mr. Machado's examination raised certain issues

13   that we're going to respond to through Mr. Cavassuto.  So

14   MGA and Mr. Machado are really kind of fundamentally missing

15   the point.  They are raising issues.  We're responding.  We

16   have every right to respond, and we need to put in our

17   evidence.

18           The second point I would make is, is that I

19   suppose I shouldn't be too shocked by the rather extravagant

20   rhetoric by Ms. Hurst at this point, given the discussions

21   previously about liquidating KGB agents.

22           But I have to say that Ms. Hurst --

23           THE COURT:  Is that in reference to the witness

24   who was from Russia --

25           MR. ZELLER:  Correct.

1      THE COURT:  -- who is educated and in his year at

2  the chemical school of engineering, and the effort to tie

3  in, first, the fact that the person had attended school

4  there, to allege fraud and a murder when he wasn't even on

5  the grounds in 1984?

6      Is that correct?

7      MR. ZELLER:  That's right.  That's exactly what

8  I'm referring to.

9      THE COURT:  Well, I'm going to set a pretty

10  complete record for both of you.  Then, you might want to

11  have it sealed when I'm done today.

12      MR. ZELLER:  Well, I think the rhetoric this

13  morning came pretty close to that.

14      First of all, what -- if it is -- well, let me

15  start with this point.

16      MGA, during this deposition, interjects before

17  there was any questioning by Mattel's counsel, the notion

18  of -- that there was an investigation.

19      And what she says is:

20      *Ms. Luther* -- this is, by the way, at page 298,

21  starting at line 17 of Ms. Luther's deposition, Volume 2.

22      This says -- this is by Ms. Hurst:  Mr. Luther --

23      *Ms. Luther, in purporting to represent you in*

24  *connection with this deposition, did Mr. Gordon* -- this is

25  Mattel's lawyer -- *ever advise you that Mr. Villasenor's*

1    *conduct had become the subject of a potential criminal*

2    *investigation and that may implicate your rights and*

3    *responsibilities vis-à-vis the testimony that you were*

4    *giving in connection with this lawsuit?*

5              Now, I will interrupt myself for a moment to point

6    out, as the court knows, this criminal investigation was

7    importuned by MGA because it publicized attorneys' eyes only

8    information in the press, which then the U.S. Attorney's

9    office decided, apparently, to look at.  There is no basis

10   for this, but that's what MGA did.

11             In any event, it now comes full circle.  Ms. Hurst

12   uses MGA's own misconduct to suggest to Sujata Luther that,

13   *Gee, is your lawyer here?  Being really loyal to you, has he*

14   *told you to basically lawyer and invoke the Fifth Amendment,*

15   *like, by the way, a lot of MGA witnesses have done?*

16             And then, Mr. Gordon says, *Well, of course*

17   *instruct you not to reveal the attorney-client.*

18             And here's what Ms. Hurst says.  This starts at

19   line 3, on page 299:

20             By Ms. Hurst:  *Are you going to follow that*

21   *instruction?*

22             Answer:  *My attorney is recommending it.*

23             Question:  *It's your choice whether to waive with*

24   *respect to those communications or not.*

25             And then, basically, she suggests that she should

 1    talk with the attorney.

 2             And so then, she says:

 3             Question:  Let me ask you one more question, and

 4    let him instruct before you go talk to him:  *Did Mr. Gordon*

 5    *ever advise you of the potential right that you had or your*

 6    *interest in potentially asserting a Fifth Amendment right*

 7    *against self-incrimination in connection with this*

 8    *deposition and the potential criminal investigation of*

 9    *Mr. Villasenor's conduct by the U.S. Attorney's office in*

10    *Los Angeles?*

11             And then, of course, the witness is -- after being

12    instructed not to reveal any attorney-client communications

13    says:  *May we talk?*

14             So the idea that somehow MGA --

15             THE COURT:  Excuse me, for just a moment.

16        *(Pause.)*

17             MR. ZELLER:  Obviously, Ms. Hurst has not properly

18    related the circumstances of this deposition to the court.

19    She then talks later on about a question that Mr. Gordon

20    well after this, or after this passed.

21             The relationship was already interfered with by

22    that point, as Ms. Hurst intended.  And, of course, she was

23    attempting to intimidate the witness, was attempting to get

24    her to invoke the Fifth Amendment, which is totally

25    improper.

1    MGA must now live with the circumstances and the

2    consequences of its own actions.  I'm happy to submit any

3    amount of this deposition transcript to the court that it

4    will be quite evident what Ms. Hurst's tactics were with

5    respect to Ms. Luther.

6         So the idea that, somehow, Ms. Luther terminated

7    us because of a violation of the attorney-client privilege

8    is A, false; B, unsupported; C, contrary to the deposition

9    record and D, somewhat remarkable for MGA to assert

10   concerning that Ms. Luther has never asserted it.  The

11   person who has asserted is only MGA and that, obviously, was

12   never a party to that relationship is the one that

13   interfered with it.

14        MS. HURST:  I would just like to say for the

15   record that everything that Mr. Zeller said was predicated

16   on the notion that the questions that he read from pages 298

17   and 299 of the transcript were before Mr. Gordon ever asked

18   a question.  That is false.

19        Mr. Gordon's examination began at page 293, line

20   2, which is before any of the questions that Mr. Zeller just

21   read, so --

22        THE COURT:  Call Ms. Keller.  Tell her to get in

23   here.  Call Mr. Quinn and tell him to get in here.  I'm not

24   going to ever be out-resourced.  If we're going to get down

25   to this level today, we're spending the day together.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1      One hour driving time.  Go get them on the phone.

2      *(Pause.)*

3      THE COURT:  Now, Mr. Zeller, please continue.

4      Ms. Hurst.

5      MS. HURST:  Page 292, line 25:

6      *Ms. Hurst:  All right.  I have no further*

7  *questions.*

8      Page 293, line 2:  *Mr. Gordon:  I have a few.*

9      Mr. Gordon proceeds to ask Ms. Luther about her

10  personal relationship with Orrick attorneys:  *Do you know*

11  *anyone who works at the Orrick law firm, other than the*

12  *Orrick attorneys who are with us here today*?

13      *Yes, I do.*

14      *Who do you know?*

15      *My niece's husband.*

16      The examination about the witness' familial

17  relationship considers -- continues for several pages.  At

18  one point, Mr. Gordon asks her does her nephew work with

19  Ms. Hurst on other matters.

20      We have been advised by Ms. Luther's counsel that

21  Ms. Luther provided this current counsel, that Ms. Luther

22  provided this information in confidence to Mr. Gordon upon

23  the initiation of the attorney-client relationship and the

24  fact that he turned on her in the deposition using

25  information provided to him in confidence was the reason for

1    the termination of the attorney-client relationship.  And

2    it's plain from the transcript.

3              THE COURT:  Okay.  Mr. Zeller.

4              MR. ZELLER:  One final --

5              THE COURT:  I'm sorry, Mr. Cote.

6              MR. COTE:  No, thank you, your Honor.

7              THE COURT:  This isn't final.  This is

8    entertainment.  All day long?  Eventually, we'll get down to

9    why we're here today.  Take your time, both of you.  Get

10   your feelings out on the record.  Apparently, we'll just sit

11   here today and listen to this nonsense.

12             But go on.

13             MR. ZELLER:  I agree it's nonsense.

14             We certainly haven't raised this.  I'm just

15   responding because I think we have to with Ms. Hurst raising

16   this.  The point is -- and Ms. Hurst continues to miss the

17   point.  Nothing in that questioning, that supposed violation

18   of the attorney-client privilege -- which, obviously,

19   Ms. Hurst has no standing, right, or ability to assess,

20   since she had nothing to do with it -- is completely

21   irrelevant to the questioning she did to intimidate the

22   witness to invoke the Fifth Amendment.  It has nothing to do

23   with it.

24             THE COURT:  Now, when will Mr. -- or when will

25   Ms. Keller be here?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. MCCONVILLE:  I left her a message, your Honor.

2     I wasn't able to reach her.

3          MR. PRICE:  I'm trying --

4          THE COURT:  Now, we can -- we'll see when

5     Mr. Price, because you have been able -- Mr. Price.

6          What's occurring is the continued difficulties

7     between counsel, that, apparently, go back for many, many

8     years concerning their feeling about how each side has

9     conducted discovery.  And Ms. Hurst and Mr. Zeller have been

10    the primary people who have been responsible for the

11    continued discovery efforts by each of their parties.

12         Let me pay each of you a compliment.  I know that

13    your feelings run very high, but you've been put in the

14    position by your respective parties of being the one

15    continuing -- or the two continuing attorneys that had this

16    ongoing relationship overall with the depositional testimony

17    which has been quite, quite heated.

18         Let me try to remain complimentary about counsel

19    on the record, but try to inform the reviewing court, maybe,

20    each week about what each the parties have been engaged in.

21         From the very beginning of this case, I'll repeat

22    that this case brought by Mattel -- and, by the way, have --

23         This is off the record for a moment.

24         *(Discussion held off the record.)*

25         THE COURT:  Back on the record.

```
 1              Because of the heated and continuing adversary
 2    process that I think Ms. Hurst and Mr. Zeller have been
 3    trusted into on behalf of the parties, the court has been
 4    insisting on lead trial counsel to eventually make the
 5    decisions about the conduct of the case at trial.  After
 6    all, it's really those two counsel:  Mr. Quinn, Mr. Price,
 7    Ms. Keller and Mr. McConville -- and course, Mr. Cote and
 8    Mr. Overland -- who have to decide eventually about what
 9    they want this case to look like in front of the jury.  So
10    this is just another continuing round of the difficulties
11    counsel have had behind the scenes.
12              Now, let me wait for just a few moments until
13    Mr. McConville and Mr. Price come back in; and then, let's
14    just go over this past week of just some of the things that
15    have occurred.
16              I'll step down for just a moment.  Counsel ordered
17    to remain.  Let's get both lead counsel down here, so I have
18    all counsel making decisions today.  And then, we'll go over
19    this schedule and see if this is, once again, the problem
20    because this is only the 50th problem that's arisen.  All of
21    which have seemed to dissipate very quickly once we had lead
22    counsel here.
23              Now, let the record also note that Ms. Hurst was
24    not here yesterday so did not enter into many of
25    discussions.  The representations, quite frankly, are
```

1   overblown.  If she would have been here, she would have

2   realized that 10 witnesses weren't added.  And we'll go

3   through each one of those and show you how, quite frankly,

4   MGA could very easily get this witness on the stand, if they

5   chose to.

6          And I'll be right back with you.

7          *(Recess taken from 8:50 a.m. to 9:22 a.m.)*

8          THE COURT:  Okay.  We're on the record.

9          We are missing Mr. McConville, so we're off the

10  record.

11         I'm going to go and take another recess, then.

12         *(Pause.)*

13         THE COURT:  We're on the record.

14         The court is going to try to summarize for any

15  reviewing court some of the interesting events of this week.

16         First, the witnesses that were presented to the

17  court yesterday, because we were in session Saturday, at

18  8:00 o'clock in the morning, but by agreement of all counsel

19  without a court reporter.  Today is Sunday and each day

20  we're starting at 8:00 o'clock.  Today we're on the record

21  with a court reporter.

22         Yesterday, it was represented to me by Mr. Quinn

23  that Wagner was going to be on the stand for an hour and a

24  half, and Mr. Zeller joined in that time estimate also.

25         Is that still your time estimate?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. PRICE:  That's certainly our goal, yes.

2          THE COURT:  No, no.  That's why I need lead

3     counsel here.

4          MR. PRICE:  I'm putting --

5          THE COURT:  Yes or no?

6          An hour and half, was that a correct

7     representation?

8          Because the record should reflect that Mr. Price

9     was not here yesterday.  Ms. Hurst was not here yesterday

10    and Mr. Quinn and Mr. Zeller, who's always here.

11    Mr. McConville, who's always here, was present.  But that

12    was the representation yesterday, an hour and a half.

13         MR. PRICE:  That's an accurate representation.

14         THE COURT:  Okay.  An hour and a half.

15         Now, Ms. Hurst is concerned, of course, about

16    Sujata Luther, and we don't want a primary witness excluded,

17    if it's possible.  But I'll make my record concerning that,

18    if it's necessary.

19         How long is your cross?

20         MS. HURST:  I can't commit to less than two hours.

21         THE COURT:  And you can't estimate your redirect,

22    nor your recross; is that correct?

23         MR. PRICE:  That's true.  Two hours is going to be

24    lengthy, I'm sure.

25         THE COURT:  Yes.  Now, second it was represented

 1    to me that Mr. Cavassuto would be a short witness.

 2              I want the circuit to understand or reviewing

 3    court the discourtesy that each side is displaying towards

 4    one another.

 5              Let me begin with the fact that Mattel had only

 6    sent one page of the contracts to Mr. Cote, and those were

 7    in Spanish; correct, Mr. Cote?

 8              MR. COTE:  That's right, your Honor.

 9              THE COURT:  And that you wanted to see the entire

10    transcripts, and they were in Spanish?

11              MR. COTE:  That's right, your Honor.

12              THE COURT:  And you do not speak Spanish?

13              MR. COTE:  That's right, your Honor.

14              THE COURT:  Those transcripts were requested by

15    the court, Mr. Corey, on Friday, or Saturday?  I forget.

16              Mr. Corey?

17              MR. COREY:  Saturday, I believe.

18              THE COURT:  Saturday.

19              And Mr. Corey supplied all transcripts in Spanish

20    to Mr. Cote; is that correct?

21              MR. COTE:  I believe I have translations of all

22    the contracts.

23              THE COURT:  I'm not talking about translations,

24    yet.  We're going to walk through to show the discourtesy

25    that each party has paid to each other.

1              Did you receive them on Saturday?

2              MR. COTE:  In translation, or in written Spanish?

3              THE COURT:  In Spanish.

4              MR. COTE:  Yes.

5              THE COURT:  Had you received the contracts, the

6    entire contracts before Saturday in written Spanish?  That's

7    a "yes" or a "no"?

8              MR. COTE:  It was either Friday or Saturday.  I'm

9    not sure which day.

10             THE COURT:  Mr. Corey, when were they given to him

11   in Spanish?

12             MR. COREY:  Friday, your Honor.

13             THE COURT:  So on Friday, Mr. Cote has all of the

14   agreements in Spanish; but prior to that, you had the first

15   page and that was all of many of the agreements?

16             MR. COTE:  I believe there is a total of 21

17   contracts, and I think I had the first page of seven, if I

18   remember correctly.  They are laid out on the bench in

19   front --

20             THE COURT:  They are laid out on the bench.  Did

21   you have the remaining 14 in Spanish?

22             MR. COTE:  I did not.

23             THE COURT:  So you had the first page of seven and

24   none of the remaining 14?

25             MR. COTE:  That's right, your Honor.

1              THE COURT:  Mr. Corey's conversation with the

2    court disclosed that from his perspective yesterday, only

3    the first page had significance.

4              And the remaining of these contracts were given to

5    you yesterday, Mr. Cote, the 14?

6              MR. COTE:  The 14 were given on Friday, I think,

7    Mr. Corey represented.

8              THE COURT:  And the remaining portion of the

9    seven, with only the first page you had received?

10             MR. COTE:  At the same time.

11             THE COURT:  When?

12             MR. COTE:  Friday.

13             THE COURT:  So you've had at least all of the

14   contracts in Spanish since Friday?  That's 21?

15             MR. COTE:  Friday or Saturday, yes.

16             THE COURT:  Mr. Corey?

17             MR. COREY:  Friday.

18             THE COURT:  Mr. Cote?

19             MR. COTE:  I trust Mr. Corey's representation.

20   Friday.

21             THE COURT:  Okay.  Friday.

22             In the meantime, not to segue too far, Mr. Machado

23   took the stand.  So the circuit has a flavor of the courtesy

24   extended to both parties, this is a timed trial.  And the

25   court's approach by Mr. Cote and Mr. Zeller and asked if --

 1   by Mr. Zeller, if Mattel could have a simultaneous

 2   translation because they worried about the time.  Mr. Cote

 3   has taken the position that this should be sequential with

 4   questions and answers in English and Spanish, which is much

 5   more consumptive of time.

 6          The court then, I believe, took all of the parties

 7   down to see the court executive officer, who informed the

 8   court that we had the resources, of course, for simultaneous

 9   translation, and over Mr. Cote's objection, we had

10   simultaneous translation.

11          This court believed that Mr. Machado was primarily

12   Spanish-speaking and informed the parties to have their

13   interpreter present when Mr. Machado took the stand.  It

14   turns out that Mr. Machado, he doesn't speak perfect

15   English, is so close to speaking perfect English to cause

16   some concern on this court's part why we would ever had a

17   Spanish interpreter present.

18          During the direct examination, Mr. Zeller asked

19   Mr. Machado, if he not only spoke English but if he

20   communicated in his e-mails by English and the inference was

21   made to the jury that Mr. Machado was unduly consuming

22   Mattel's time and doing that purposefully.

23          I understand that many of the courts may be

24   willing to simply disregard an almost perfectly speaking

25   English witness, but this court engaged Mr. Machado in a

```
 1    quick conversation and his English is impeccable.

 2            Therefore, this court had made the decision that

 3    by inserting a translator, the ability for the jury to judge

 4    demeanor and the insulation that was taking place was not

 5    appropriate and asked Mr. Machado to speak in English since

 6    he could communicate so well but kept the interpreter at his

 7    side in case he needed clarification; on one occasion, he

 8    did.

 9            To further set a record about the interesting week

10    we've had, we'll go to Mr. Eckert.  The court was privileged

11    to be able to read the Daily Journal article that,

12    apparently, came out.  I think it was submitted by the

13    parties and, frankly, they got it wrong.  The reason that

14    this got opened was Ms. Keller striking back at Mr. Quinn's

15    gratuitous attempt to explain to the jury, which was

16    completely irrelevant, why Mr. Eckert had not been here.

17            Mr. Zeller and Ms. Martinez or Mr. Quinn had

18    requested and designated Lily Martinez as the corporate

19    representative, which they're entitled to do.  But the

20    obvious reason besides her hard-earned efforts is that she

21    looks like the characters in the first four of Bratz

22    drawings, but she is also an able representative.  So the

23    visual which the circuit can't capture is one of an

24    immaculately dressed and, by the way, very competent

25    representative for Mattel, but who also has a duality
```

purpose of sitting at the table so that the jury can see the
visual.

Now, Mr. Quinn's questions basically opened with: *well, you haven't been able to be here, because you're a witness.* And that inference that was being portrayed was a completely irrelevant line of questioning.

Ms. Keller then rose to the occasion and debate by attempting to explain that it looked bad having Mr. Larian here every day sitting as a defendant in the chair, and that Mr. Eckert could have been designated the corporate representative and could have been here.

All of that is true. All of that is irrelevant. All of it is prejudicial to both sides.

First, Mr. Larian chooses to be here. So the opposite side of the coin is MGA's duality, and it can be argued that Mr. Larian has a deep-seeded interest, and he should be here, and it's also that he, quote, unquote, has to be here. And it looks bad quote, unquote.

This court is requiring both parties to be present, because the 20 percent of the trial that's occurred can't be captured on the record, and that's the impression of one party, Mr. Eckert, who has been barred from the courtroom because he's a witness; and the other party, Mr. Larian. Who's being forced to be here. And none of that is true.

1          There's an agreement between Mr. Eckert and

2     Mr. Larian, apparently, which may be the first time that

3     they've spoken in this multi-million-dollar lawsuit that

4     Mr. Larian is going to be gone, apparently, two days,

5     Mr. McConville?

6               MR. MCCONVILLE:  Yes, sir.

7               THE COURT:  And he's spoken to Mr. Eckert and he's

8     consented.  And Mr. Eckert can choose two days when he's

9     absent, and Mr. Larian will not be here on those days also,

10    which is a first courtesy that the court has seen extended

11    between the parties.

12          So I don't know how this is being played by each

13    of your press consultants, but it's an order that they be

14    present so that there is no misunderstanding on all

15    occasions unless they have reached an agreement, and this

16    court is to be informed two days in advance when they won't

17    be present.

18          Third, this witness problem occurring between

19    Sujata Luther has quite a history.  Mattel, actually, in

20    some ways, is being disadvantaged and advantaged in this

21    process as MGA is.  When the court was presented with this

22    case, after the transfer from Judge Larson, it became

23    apparent that each party wanted to try the case in snippets,

24    portions of a deposition, portions of an interrogatory,

25    multiple interrogatories.  Not only was the court presented

1    with the first motion by the parties of, I think, 159 pages

2    but the interrogatory backlog that Judge Larson hadn't been

3    able to respond to because of the resources devoted by each

4    of the parties to the case had put the former district court

5    in the position of receiving an objection to an

6    interrogatory that then went to the Special Master who in

7    good faith was overwhelmed.

8              Apparently, Judge Infante had been driven off the

9    case as a private mediator.  And after the month or two it

10   took the Special Master and his two or three associates to

11   examine the objections and make a recommendation to the

12   trial court, then Judge Larson needed time -- a month or

13   more, or two -- with limited resources with the law clerk.

14   By the time the decisions were handed down, this court was

15   presented a backlog of what turned out to be tens and tens

16   an tens of issues that had not been decided.  In fact, the

17   numbers didn't even match up.  Counsel didn't even have the

18   ability to coordinate docket numbers when this case first

19   came to the court.  One of the reasons was the mass filing

20   under seal and inability of the parties to even keep track

21   of the docketing.

22             By the time Judge Larson decided the issue, and in

23   good faith he believed with finality, then each party,

24   depending upon the decision, brought motions for

25   reconsideration.  And after, literally, anywhere from three

1    to five months had passed on the interlocutory disputes

2    taking place between the parties, hopefully, there had been

3    a resolution.  And in this court's opinion, each party,

4    respectively, simply ignored it.  In other words, the

5    decisions came so late and the avalanche that each party had

6    the resources to bombard the federal court with just cause

7    of each party to ignore many of Judge Larson's rulings.

8          Now, this court took the position from early on

9    that there would be two lead counsel.  Initially, it was

10   represented for all purposes it would be Mr. Zeller and for

11   all purposes Ms. Hurst.  Mr. McConville joined us, I think,

12   short time into the process, and Mr. Quinn.  And it was

13   pledged that these would be the two lead counsel.

14         Now, Mr. Price, I hadn't met you at that time.  I

15   didn't know that you would become involved.

16         Mr. Cote, I knew Mr. Overland was, but I didn't

17   know you at that time and you weren't involved in any of the

18   things I'm trying to perpetuate as a record.

19         Because of the RICO allegations and wanting to

20   make certain that each party had had a full and complete

21   opportunity to develop the RICO, which was in phase two, or

22   2A, or 2C, or 3, because the trial was phased out by

23   Judge Larson, I granted 25 depositions to Mattel over the

24   objection of MGA who, basically, I think, wanted five or

25   less.  And I can't remember the number.  Maybe zero.

1          One of the reasons the court did that was to

2    believe that the adversarial system would be best served;

3    that the interrogatories were leading to nothing but a paper

4    war.  And we turned our efforts to depositions.  The circuit

5    can go over the number of 30(b)(6) witnesses who were

6    absolutely unprepared for both sides.  They'll have a

7    complete looking camera of some of the privilege logs, and

8    the use of the privilege logs.  And I've stated to both

9    counsel -- and I'll make the record again -- that,

10   eventually, graduating sanctions could have led to terminal

11   sanctions, if this court would have had the case from the

12   beginning by one or both parties.

13          Because the case was so far along, the court was

14   put in the perspective of:  Who do I sanction first?  And

15   decided that I would not start imposing sanctions, because

16   the first person out of the box, although there was one

17   occasion wherein formal sanctions was handed down, and it

18   was resolved quickly.

19          Subsequently, there were about 25 depositions

20   conducted.  I think we handed down over 150 orders.  Lead

21   trial counsel became completely responsive of all of the

22   decisions in this court, which is why we find ourselves in

23   the position of summoning Mr. Quinn and Ms. Keller, although

24   they thought they had the day off today.

25          I think lead counsel are entirely responsible for

1    the decisions made.  And Ms. Hurst and Mr. Zeller are so

2    hard fought and so far so diligent in their efforts that

3    there is no accommodation that can ever be reached between

4    them.

5            Some of the interesting discourtesies to each side

6    have been, regardless of the protestations of MGA,

7    Mr. Zeller's request to have Mr. Vargas testify at some

8    point in the middle of MGA's case because allegedly

9    Mr. Vargas couldn't be here, the court's belief is, he could

10   have been here.  He's available.  Could have been put on the

11   plane.  But regardless of my belief, Mattel will dispute

12   that, and I'm not making a finding concerning that.  But I

13   know that that simple courtesy was turned down for one

14   reason:  MGA does not want Mattel to put on a favorable

15   witness to Mattel's position in little MGA's case.

16           Same problem is occurring with Sujata Luther.

17   Sujata Luther is a witness who has testimony favorable to

18   MGA and Mattel objects to this court requiring Mattel to

19   take a witness out of order when they are winding up their

20   case, hopefully, on the strongest note.  And I agree.

21           Yesterday, this court believed in good faith that

22   there were a number of witnesses left; and that if, counsel

23   would have informed the court on Thursday or Friday, I would

24   have asked the jury to be in session on Monday and move my

25   entire criminal and civil calendar for you.  Nobody -- other

1    than saying they were running into problems with Sujata

2    Luther -- gave the court the information about either her

3    appearance, illness in terms of the time schedule, that she

4    was needed.  Only that Mattel had consistently represented

5    that they would rest last week, or even early this week, and

6    that there was a shama-lam, that there was conniving on

7    Mattel's part to string out the ability of MGA to present

8    Sujata Luther.

9            This court is deeply concerned that it would now

10   change its position of requiring witnesses to appear in

11   court so that their credibility can be tested.  I'm going to

12   begin with what this case could have lacked but for that

13   court's -- this court's effort.

14           First, Carter Bryant was not coming to testify.

15   Literally, this would have been snippets of a critical

16   witness where demeanor could not have been viewed.  Demeanor

17   is not appropriate in terms of a, quote, unquote, video

18   deposition.  Depositions, all adversarial, are not truly

19   adversarial.  There is not a judge there.  A jury isn't

20   sitting.  So they are adversarial in terms of counsel being

21   present.  I don't view them as truly adversarial

22   proceedings.

23           I think that regardless of what's happened behind

24   the scenes from the court's perspective, both parties have

25   been inconsistent, because different witnesses were

1    available and, apparently, decided to keep their own time

2    schedule when the American jurors are sitting, lower middle

3    class people and some upper middle class people, who have

4    devoted their nights and weekends, literally -- and I'm just

5    joking with you -- but their lives to the case for three to

6    four months, by the time they get done with deliberation.

7    And yet, the entitlement that each counsel, apparently,

8    brings to this court, has carried over to the witnesses,

9    because they haven't taken a strong hand; and if they have,

10   it's been one of bickering, in this court's opinion, on many

11   occasions.  Literally, 99 percent of all the problems have

12   been quickly resolved by the court either placing a phone

13   call, which I usually wouldn't do but only with counsel's

14   permission to literally Carter Bryant's attorney and other

15   witnesses to make them appear.  And, therefore, each side

16   has received a substantial benefit by the activity of this

17   court.

18          And, now, to suddenly take the position that

19   Sujata Luther is a critical witness and is going to go by

20   way of depositional testimony is declined by this court.  It

21   would cause substantial prejudice.  She can be here, and she

22   should be here.  I recognize I don't have jurisdiction; if I

23   did and she wasn't here, this court would issue a warrant

24   for her arrest and was prepared to do so with Carter Bryant

25   and was prepared to do so with the other gentleman, Mr. --

1          MR. ZELLER:  Mr. Marlow?

2          THE COURT:  Mr. Marlow.

3          I think that the record will reflect that the

4    court placed a phone call to Mr. Marlow and told him to get

5    back in his car and get down here immediately.  And it was

6    that blunt, after he wrote what I call a negotiation letter

7    to counsel, which was really a negotiation with the court.

8          Now, the court is very pleased that I haven't had

9    to issue a warrant yet, but I'm quite prepared to do so.

10          Continuing on with the discourtesy of each counsel

11   toward the other counsel, it's really been a tit for tat.

12   There is no reason in this court's opinion why Mr. Cavassuto

13   now cannot have a stipulation entered into concerning at

14   least how the documents got here.  Number two, once that

15   stipulation was entered into, I'm not certain why Mr. Wagner

16   would be testifying about those documents because the

17   documents are self-explanatory.  They set out the amount in

18   question.  And I don't believe that at least as far as

19   Mr. Machado is concerned that Mr. Wagner is an appropriate

20   witness with his 17 slides.

21          But, quite frankly, after watching what occurred

22   with Mr. Machado and the English/Spanish issue, I become

23   very, very concerned that each party is trying to

24   consciously run out the clock on the other, and I'm not

25   budging from the 120 minutes (sic).  If Mr. Price chooses to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    take Mr. Larian on for seven days, I have no quarrel with

2    that.  He's a primary witnesses.  That's a tactical

3    decision.  But Mattel will not be heard to complain by this

4    court with any credibility that you don't have enough time.

5           And MGA I think is in just as difficult position,

6    too, on your case.  Even though you are at 60 hours, I think

7    you're going to be scrambling in the last 80 hours.  So when

8    the gong hits 120, you're done, and you're sitting.

9           And I'm putting you on notice of that on the

10   record, right now.  Mattel is at 82 hours and 34 minutes.

11   This court has repeatedly warned Mattel and told Mattel, 120

12   hours.  End of discussion.  Make your record.  I know you're

13   going to try to.  It won't be acceptable.

14          MGA in this court's opinion will eventually try to

15   do the same thing, although they think that they have

16   sufficient time.  My guess is that they'll be begging for

17   time and probably even come to the court with a joint

18   stipulation, eventually.  I will not be doing that.  You're

19   on notice.  120 hours means exactly what it means.

20          Now, the next thing concerning the discourtesy has

21   been, if the circuit goes back and forth, there has been

22   such discourtesy between counsel, in the simplest issues

23   from stipulating to copyright, to chains of evidence that

24   were so easily resolved where each party was having a decent

25   position.  I understand that each party believes that the

 1   other party hasn't supplied complete information; and if so,

 2   until the last moment.

 3          Second, I view de Anda now as a potential

 4   necessary witness.  He was on the list.  There is no way

 5   that the court is going to preclude you from calling

 6   Mr. de Anda.  The question is how long.

 7          So let's see after Mr. Wagner and the hour and a

 8   half and the two hours and the redirect and recross, I would

 9   assume that takes Tuesday from 1:00 to 6:00.

10          On Cavassuto, how long do you estimate?

11          MR. ZELLER:  Our estimate for the direct of that

12   witness is one half hour.

13          THE COURT:  How long for cross?

14          MR. COTE:  Ten minutes.

15          THE COURT:  How long, MGA?

16          MR. MCCONVILLE:  Five minutes.

17          THE COURT:  Okay.  45 minutes.

18          Mr. Wagner, you're ordered to have as your next

19   witness -- strike that.

20          Mr. Cavassuto.  My apologies.  We discussed that

21   Saturday.  He will be the next witness after the present

22   witness is excused.  Mr. Wagner will follow.

23          Therefore, Ms. Hurst, you have been asking for the

24   order of witnesses.  That will be the order of witnesses.

25          Mr. de Anda, how long will he be on the witness

```
 1    stand, counsel?

 2            MR. ZELLER:  One hour for direct.

 3            THE COURT:  How long on cross-examination?

 4            MR. MCCONVILLE:  45 minutes.

 5            THE COURT:  45 minutes.

 6            MR. COTE:  I'll need 10 or 15.

 7            THE COURT:  So about two hours for de Anda.  Then

 8    redirect or recross, I'm going to limit you to 10 minutes

 9    each.

10            Mr. Wagner, I'm going to put down some

11    limitations, and I'm going to limit you on your

12    cross-examination in just a moment.

13            Who is your fourth witness?

14            MR. ZELLER:  We also have Jill Nordquist.

15            THE COURT:  Jill Nordquist.

16            Now, was she subpoenaed?  Was she on your witness

17    list?

18            MR. ZELLER:  Yes, she was.

19            THE COURT:  Counsel, do you agree?

20            MS. HURST:  I'll have to check.  Yes, we agree.

21            THE COURT:  And what will she testify to?

22            MR. ZELLER:  She is going to discuss some of the

23    trade secret documents.

24            THE COURT:  How long?

25            MR. ZELLER:  25 minutes.
```

```
 1              THE COURT:  How long?

 2              MR. ZELLER:  20 to 25 minutes.

 3              THE COURT:  30 minutes.

 4              How long on cross?

 5              MS. HURST:  She is relevant to the statute of

 6   limitations, so --

 7              THE COURT:  30 minutes.

 8              MS. HURST:  30 minutes.

 9              MR. COTE:  15 for me, please.

10              THE COURT:  All right.  Your next witness?

11              MR. ZELLER:  Allison Willensky.

12              THE COURT:  Was she on the witness list?

13              MR. ZELLER:  Yes, she was.

14              THE COURT:  What is she going to testify to?

15              MR. ZELLER:  This is also to get some of the

16   additional trade secret documents.

17              THE COURT:  Why can't those be stipulated?

18              MR. ZELLER:  That was our view, is that they

19   should be.

20              THE COURT:  Explain your position on the record.

21              MR. ZELLER:  This is true of a number of these

22   witnesses is, is that they are going to come and testify and

23   lay a foundation for the introduction of our claimed trade

24   secret information, the documents.

25              The court will recall, in fact, one witness --
```

44

```
1          THE COURT:  Too many words.  How long?
2          MR. ZELLER:  Well, for her, 20 minutes.
3          THE COURT:  20 minutes for Willensky.
4          Cross-examination, 20 minutes.
5          MS. HURST:  Your Honor, she's got a lot of other
6  issues that she's relevant to.
7          THE COURT:  She may have, and you can call her
8  back.  But you have requested Sujata Luther on the stand.
9  We don't want to miss a critical witness.  You've been
10  asking for a witness list.  This is it.
11          So what I won't hear is too many words.  What I
12  won't hear is that you're prejudiced because as I said,
13  informally, you could delay, if you chose to, the
14  cross-examination of Mr. Wagner.
15          By the way, the time limits that apply to Wagner
16  will also apply to your expert.  So whatever I decide in
17  terms of an hour and a half for Mattel will be coequal in
18  terms of MGA.  That will be the end of the discussion.  And
19  the cross-examination will be coequal with both sides.  But
20  there will be a limitation.
21          Now, after Willensky?
22          MR. COTE:  Your Honor, can I have some time for
23  Willensky?
24          THE COURT:  Just a moment.  Oh, I'm sorry,
25  Mr. Cote.
```

1           Mr. Cote, how long do you want?

2           MR. COTE:  Ten minutes.  15 minutes.

3           THE COURT:  That means you've just increased on 20

4    minutes.  I view the party as a party.  You got 30 minutes

5    from Willensky, then, instead of 20 minutes.

6           They've got 20 and 10, because Mr. Cote is going

7    to use that time, apparently.

8           So 20 minutes for MGA.  10 minutes for Willensky

9    per party, per side.

10          All right.  Who is your next witness?

11          MR. ZELLER:  Jim Ward.

12          THE COURT:  Jim Ward.

13          Is Mr. Ward on the witness list?  Was Mr. Ward on

14   the witness list?  Was Mr. Ward on the witness list?

15          MR. ZELLER:  I'm not sure.

16          THE COURT:  No, no.  Just a moment.  That's a

17   simple question.

18          Is Mr. Ward on the witness list?

19          MR. ZELLER:  He is, your Honor.

20          THE COURT:  Okay.  Agreed by MGA?

21          MS. HURST:  One of the amended witness lists, your

22   Honor.

23          THE COURT:  Amended witness list.

24          You've got notice.  How long will Mr. Ward be on

25   the stand?

```
 1              MR. ZELLER:  15 minutes, maximum.

 2              THE COURT:  15 minutes on cross-examination.

 3              Mr. Cote, do you want to use some time also?

 4              MR. COTE:  No, thank you.

 5              THE COURT:  Make it relevant.  Because it's

 6   prejudicial to MGA.

 7              Sujata Luther will be testifying in person or she

 8   will not be testifying?

 9              MR. COTE:  That's why I said, "No, thank you."

10              THE COURT:  Understood.  Because many of these

11   people maybe can be called back, quite frankly.

12              These are tactical decisions by counsel.

13              The next witness.

14              MR. ZELLER:  Kim Gohata.

15              THE COURT:  How long?

16              MR. ZELLER:  20 minutes.

17              THE COURT:  Counsel?

18              MS. HURST:  She was never on any witness list.

19              THE COURT:  What witness list does she appear on,

20   counsel?

21              MR. ZELLER:  I don't believe she was.

22              THE COURT:  She will not be testifying.

23              MR. ZELLER:  May I be heard?

24              THE COURT:  You may.

25              MR. ZELLER:  Ms. Gohata is going to be testifying
```

```
 1    simply -- she's going to be a custodian of records witness
 2    who we have disclosed and we had identified as being someone
 3    we would call.  She is simply going to testify as to the
 4    authenticity and admissibility of Mattel business records
 5    that we have asked the other side to stipulate to.  We have
 6    always had a custodian of records.
 7              THE COURT:  Have those been shown to the other
 8    side?
 9              MR. ZELLER:  I believe that they have.
10              THE COURT:  Have they?  Yes or no?
11              MR. ZELLER:  I didn't participate, so I can't
12    answer that directly.
13              THE COURT:  Just a moment.  Who did?
14              MR. ZELLER:  I believe that --
15              THE COURT:  Who?
16              MR. ZELLER:  I think that Scott Watson sent
17    e-mails, and we proposed stipulations asking for the
18    introduction, the stipulation to a whole variety of
19    documents.
20              THE COURT:  Let's see if they will stipulate, at
21    least as to the chain, not -- or the authenticity.
22              MR. ZELLER:  Right.
23              THE COURT:  Which is it:  Chain or authenticity?
24              MR. ZELLER:  It's the authenticity and
25    admissibility.
```

1          THE COURT:  And what are the documents?

2          MR. ZELLER:  The documents are personnel records.

3          THE COURT:  Of whom?

4          MR. ZELLER:  Mr. Tumaliuan.

5          THE COURT:  In other words, I know there's a

6   disagreement on whether he's an intern or whether he's a

7   paid intern.  But these documents are in the possession of

8   Mattel?

9          MR. ZELLER:  Right.  These are Mattel business.

10          THE COURT:  Now, why isn't that stipulation

11   forthcoming when you claim that you have problems with

12   Sujata Luther?

13          All right.  We'll set a better record.  I want

14   those documents in court today.

15          MR. ZELLER:  We reviewed the documents --

16          THE COURT:  I want those documents in court.  I

17   want a record concerning them.  I'm not going to show them

18   to the other side in my presence, and I want to get the

19   other side's position.

20          MR. ZELLER:  We reviewed them yesterday, your

21   Honor.

22          THE COURT:  Is there a stipulation?

23          MR. MCCONVILLE:  The short answer is, we have a

24   couple of documents we would like to get in through their

25   custodian as well, personnel files.  As long as it's --

```
 1              THE COURT:  By the way, for the circuit, this is
 2    typically what has happened in the past.  This may be the
 3    first moment of clarity between counsel and common sense.
 4    But this continuing bickering back and forth has been
 5    absolutely ridiculous.
 6              Now, what are the documents you want to get in,
 7    since you are negotiating here?
 8              MR. MCCONVILLE:  The personnel file of Carter
 9    Bryant and the personnel file of Margaret Leahy.
10              THE COURT:  Are you objecting?
11              MR. ZELLER:  And the reality is --
12              THE COURT:  Too many words.
13              Get them in here.  I want to see them physically
14    on your desks, okay?
15              I want to see what the problem is.  I want to make
16    a record about what's happening with each counsel.  I can
17    further limit this, if I want to.
18              Your next witness.
19              MR. ZELLER:  Then we have Anna Rhee.
20              THE COURT:  At the present rate, I'm not sure
21    she's testifying.  Put a big question mark by her.
22              MR. ZELLER:  And Heather McComb.
23              THE COURT:  McComb was always known to the court.
24              MR. ZELLER:  Right.
25              THE COURT:  How long?
```

```
 1            MR. ZELLER:  45 minutes.

 2            THE COURT:  How long, counsel?

 3            MS. HURST:  Same.

 4            THE COURT:  Mr. Cote?

 5            MR. COTE:  No, thank you.

 6            THE COURT:  All right.  Who else?

 7            MR. ZELLER:  MGA custodian of records.

 8            THE COURT:  Concerning what?

 9            MR. ZELLER:  Concerning the additional documents

10   that we need to get in, such as the MGA personnel files, MGA

11   product --

12            THE COURT:  Just a moment.

13            MGA personnel files, there shouldn't be any

14   difficulty with that, but is there?

15            MR. ZELLER:  MGA --

16            THE COURT:  Ms. Hurst, is there?

17            MS. HURST:  As a principle, there shouldn't be.

18            THE COURT:  Okay.  I want those documents on your

19   desk today.  Go physically get them.  Get your crew busy and

20   get them over here.

21            MS. HURST:  Your Honor, we'll agree to take our

22   custodian of records out of order.

23            THE COURT:  I don't know what that means.

24            MS. HURST:  We'll take it out of order during our

25   case, if necessary.  We'll agree to that.  If we can't reach
```

1   a stipulation --

2           THE COURT:  We'll see them today.  Get all these

3   records over here.  I'm going to have a record.  Everybody

4   wanted a record.  We'll have a record from now on.

5           MR. ZELLER:  We have been asking MGA to stipulate

6   to these documents for weeks.

7           THE COURT:  Too many words.

8           Not interested.  We'll find out.  I want the

9   documents over here.  I want to make a record about what

10  you're stipulating to and what you're not.  Because Sujata

11  Luther will either be testifying in person or she won't be

12  testifying.  These are all decisions that could have easily

13  been made months ago.

14          All right.  Next witness?

15          MR. ZELLER:  There is a question as to whether

16  Annette Pembleton is the person from MGA who should be the

17  custodian of records.  She was previously.  And we may need

18  to call her separately, depending on how the MGA custodian

19  issue gets resolved.

20          THE COURT:  So we don't know.  We're waiting,

21  right, for the records?

22          MR. ZELLER:  On that, we're waiting.

23          THE COURT:  And who else?

24          MR. ZELLER:  So the court is aware, that's the

25  entirety of our list.

52

```
 1                THE COURT:  And then you are resting?

 2                MR. ZELLER:  Yes.

 3                THE COURT:  Mark this down.  An hour and a half on

 4     direct examination for Wagner.

 5                And one and a half limited on cross-examination

 6     for Wagner.

 7                Ten minutes' redirect.  Ten minutes' recross.

 8     Limitations apply to MGA and their expert in the same hours.

 9                MS. HURST:  Your Honor, may I address that issue?

10                THE COURT:  Just a moment.

11                MS. HURST:  Your Honor --

12                THE COURT:  Ms. Hurst, do not cut me off until

13     you're invited to.  I'll come back on this issue in just a

14     moment.  You have a habit of doing that.

15                De Anda is a relatively -- Cavassuto, there should

16     be no disagreement after today concerning stipulations.  If

17     there is, you got 20 minutes, and you have 10 and 10.

18                Mr. Cote, you want a time.  You got 10 minutes.

19     Ms. Hurst, you have 10 minutes.

20                De Anda, you have an hour and 30 minutes on

21     direct.

22                Do you want time, Mr. Cote?

23                MR. COTE:  Yes, please.

24                THE COURT:  How much time?

25                MR. COTE:  I ask for 15.
```

53

1          THE COURT:  15.  An hour and 15 minutes for MGA.

2    15 minutes for Mr. Cote.

3          Jill Nordquist, 30 minutes for each party.  You

4    can divide them any way you want to.

5          Allison Willensky, 30 minutes for each party.  You

6    can divide them any way you want to.

7          Let Heather McComb, 45 and 45; and then, we'll

8    talk about all of these MGA custodian of records and Annette

9    Pembleton.

10          How long will it take you to get the records over

11    here?

12          I'm going to take a recess.  I've got 350 other

13    cases I'm going to work on right now.

14          MR. ZELLER:  If it includes the products?

15          THE COURT:  Everything.

16          MR. ZELLER:  It's going to take hours.

17          THE COURT:  Now, are these the product in terms of

18    indirect damages?

19          MR. ZELLER:  No, these are products that include

20    the sculpt, which of course the court is aware there are

21    hundreds of those products.  And so, I mean it's a large

22    universe.

23          THE COURT:  And who is testifying to that?

24          MR. ZELLER:  Well, that would be the custodian of

25    records if MGA --

```
 1                 THE COURT:  Who is the -- just a moment.

 2                 Now, that doesn't mean that they are consenting to

 3       their admissibility.  But as far as their chain, foundation?

 4                 MR. ZELLER:  They're self-authenticating.  There

 5       should be none.  The only issue is admissibility.  So we've

 6       asked MGA to stipulate to the admissibility of the products?

 7                 THE COURT:  Not the admissibility.  They are not

 8       going to stipulate to the admissibility of the product.

 9                 MR. ZELLER:  Then we're going to have to call

10       their custodian, and that custodian is going to have to go

11       over the products.

12                 MS. HURST:  Your Honor, we're willing to stipulate

13       to the product but not that the list be read to the jury.

14       We want them to see the product.  That's our concern.

15                 I got the list last night.  I immediately

16       responded and said, *We will agree, if you agree to set up*

17       *the joint facility so that the jury can view the product.*

18                 That's all we care about is visual examination.

19       We are more than willing to agree that our own products come

20       into the record.

21                 THE COURT:  Well, we'll see.  I'm going to recess

22       and I want you to add up the times I've given to you, and

23       see where that leaves you with Sujata Luther.  Seems to me

24       that there is no reason she can't be on the stand on Friday.

25                 MS. HURST:  Your Honor, may I --
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1          THE COURT:  No, not yet.

 2          Number three, or four, or five for the circuit, I

 3  want the circuit to know that this court is willing to

 4  reconvene on Saturday.  I was willing to reconvene tomorrow.

 5  Nobody really called this to the attention.  Just gave the

 6  problem to the court, and then claimed that they would be

 7  biased, which is nonsensical.  This is typical conduct that

 8  is occurring over and over again, repetitively.

 9          The court is not certain that the jury can

10  reconvene on Saturday.  We haven't asked them yet.  But if

11  needed and they will, the court is certainly willing to be

12  in session with the jury, because it's normally in session

13  with counsel on Saturday.

14          Now, I'm going to come back in 15 minutes.  You

15  two talk for a moment.  You get your time frame set out.

16  Let's see if we get close to Sujata Luther on Friday, okay?

17          15 minutes.

18      (Recess taken from 10:09 a.m. to 10:21 a.m.)

19          THE COURT:  We can go on the record.

20          We're on the record.

21          Counsel, I want you to go over each witness.  And,

22  by the way, the time frames for each expert now applies to

23  the other side, so your expert.

24          Now, counsel is limited to an hour and a half,

25  just as Mattel's is.  An hour and a half on

1    cross-examination by --

2           MS. HURST:  Your Honor, Mr. Price and I discussed

3    that off the record.

4           I wanted to point out to the court when

5    Mr. Willensky, he's going to be testifying to defend against

6    Mattel's claims.  He's also going to be testifying to

7    present his opinions on MGA's affirmative claims.

8           THE COURT:  I'm more worried about Sujata Luther.

9    You put the court in this very difficult position of being

10   able to claim prejudice, and I've offered you the

11   opportunity of examining during your time.  You've declined

12   that.  I respect that.  Now, respect the fact that the court

13   is trying to get Sujata Luther on the stand so that you have

14   a co-equal effort.

15          But all the problems you are presenting have been

16   easily resolved.  You do it.

17          MS. HURST:  Your Honor, Mr. Price and I agree that

18   Mr. Wagner could go two hours, two hours, twenty, twenty,

19   and we'll still get to Ms. Sujata Luther by Friday, after

20   adding up all the times that the court ordered.

21          THE COURT:  I'll go over each witness with you,

22   because that depends upon stipulations also you're going to

23   reach also concerning your custodians.  Because I don't know

24   what you're doing in regard to this change yet, so this

25   could change, very quickly.  And I want to know now.

1        Now, maybe Mr. Quinn can continue his bike ride

2   this morning while everybody is in session.  Maybe

3   Ms. Keller could go about whatever she's doing.  We don't

4   have to get them in, maybe; right?

5        MR. PRICE:  That would be good.

6        THE COURT:  That would be good.

7        But right now, they're here.  So you tell me the

8   time.

9        We're going to start going over it very slowly,

10  and I want to hear witness by witness what your agreements

11  are.

12        Mr. Wagner --

13        I'm sorry, Mr. Cavassuto.  All right.  30 minutes

14  on.

15        MR. MCCONVILLE:  Mr. Machado, actually, would be

16  the continuing examination, will be the first thing that

17  would take place on Tuesday.

18        THE COURT:  How long will you be with Mr. Machado?

19        MR. MCCONVILLE:  30 minutes.

20        THE COURT:  And we were in the middle of the --

21        MR. COTE:  Recross.  We were about to start

22  recross.

23        MS. HURST:  Mr. Overland has 30 minutes.

24        THE COURT:  Okay.  Redirect, how long?

25        MR. MCCONVILLE:  He has already done redirect.

| | |
|---|---|
| 1 | THE COURT:  That's right.  We're on recross. |
| 2 | Because it's -- recross. |
| 3 | Thank you very much. |
| 4 | Okay.  30 minutes. |
| 5 | Cavassuto. |
| 6 | MR. MCCONVILLE:  The total time, it would be 20 |
| 7 | minutes for Mattel, and 20 minutes on MGA and Mr. Machado. |
| 8 | THE COURT:  Well, that leaves out now -- 20 |
| 9 | minutes total between Machado divided any way that you would |
| 10 | like to. |
| 11 | MR. COTE:  We'll work it out, your Honor. |
| 12 | MR. MCCONVILLE:  I'm sorry, your Honor. |
| 13 | Can I correct what I just said?  I know we're |
| 14 | trying to get the most accurate record we can. |
| 15 | THE COURT:  This will be what you'll do. |
| 16 | MR. MCCONVILLE:  I was reading what the court had |
| 17 | stated before. |
| 18 | THE COURT:  I said 30 minutes before. |
| 19 | MR. MCCONVILLE:  Right.  So Mattel would have 30 |
| 20 | minutes with Mr. Cavassuto. |
| 21 | THE COURT:  And that includes direct and redirect. |
| 22 | And your 30 minutes divided however you want to is going to |
| 23 | include cross and recross. |
| 24 | MR. MCCONVILLE:  Yes, sir. |
| 25 | THE COURT:  Agreed to by both parties? |

```
 1                 MR. ZELLER:  No.

 2                 THE COURT:  No?  All right.

 3                 MR. ZELLER:  What I said and what we agreed --

 4     what we were talking about was half an hour for the direct.

 5     That is what it's going to take.  I don't know what the

 6     redirect is going to be.  But in any event, I didn't say it

 7     was going to be in total, and I don't know why it's now

 8     being --

 9                 THE COURT:  My apologies.  You're absolutely right

10     that we'd only gotten to direct and cross.  So how much

11     time?

12                 MR. ZELLER:  Well, what's the amount of time for

13     the cross, then?

14                 MR. COREY:  30 minutes.

15                 MR. ZELLER:  15.

16                 THE COURT:  Then 15 minutes on the other side.  Is

17     that acceptable?

18                 MR. COTE:  Sure.

19                 MR. MCCONVILLE:  Yes.

20                 THE COURT:  So let's add that into our equation,

21     so that's an hour and a half, isn't it?

22                 So we are at -- between Machado and Cavassuto; is

23     that correct, so far?

24                 MR. COTE:  That's right.

25                 THE COURT:  Next witness, Wagner.  What's the
```

1    private agreement you've reached, other than the court's

2    agreement of one hour and a half?

3              MR. PRICE:  Two hours.  Two hours.  20 minutes.

4              THE COURT:  Two hours on direct?

5              MR. PRICE:  Yes.

6              THE COURT:  Two hours' cross.  How long on

7    redirect?

8              MR. PRICE:  20 minutes.

9              THE COURT:  And then, 20 minutes.

10             Now, why am I going to accept Wagner as an expert

11   on a civil -- in other words, the contracts presented are

12   simply added up.

13             He's not an expert concerning that?

14             MR. PRICE:  It aids the jury.  It's not just the

15   contracts.  Those contracts apply to sales, to come up with

16   the cost that Mattel pays for that point of sale

17   information.  So you got a contract that's, you know,

18   2 percent or 1 percent of whatever it is.  And then, he does

19   the math for the sales associated with that, which gives you

20   then the Mattel's cost.

21             THE COURT:  Remember, neither one of you may be

22   precluded from re-calling your expert.  We've talked about

23   that, and see where your time is.  It's only an effort to

24   get the case to the jury, but Wagner may be called back.

25   Maybe Malackowski is called back.  But that's a negotiation

```
 1   between all of us.  So --

 2           Well, I'll discuss that with you later today,

 3   regardless, just for our time frames, two hours.  And even

 4   if he is presenting summary or expert witness concerning

 5   Machado, two hours, two hours, 20 minutes, 20 hours.

 6           Is that acceptable to you, Mr. Cote?

 7           MR. COTE:  That's fine, your Honor.

 8           THE COURT:  Ms. Hurst?

 9           MS. HURST:  Great.

10           THE COURT:  Mr. McConville?

11           MR. MCCONVILLE:  Yes.

12           THE COURT:  Mr. Price?

13           MR. PRICE:  Yes.

14           THE COURT:  Mr. Zeller?

15           MR. ZELLER:  Yes.

16           THE COURT:  Well, let's add up our time, then.

17           That's two hours and 40 minutes; is that correct?

18           MS. HURST:  No, 44.

19           THE COURT:  Four-forty.  Thank you, Ms. Hurst.

20           Now, if we're in session from 1:00 o'clock to 6:00

21   but with, you know, numerous breaks in there, we're really

22   going to get about halfway through Wagner realistically on

23   Tuesday, aren't we?

24           We've got the juror who has class at 3:30; and I

25   can cut down the lunch hour by five or 10 minutes, but
```

```
 1   that's about all, from an hour to maybe 15 minutes, but I'm
 2   not going to promise that.
 3           Let's take Wagner, two hours.  You're minimally
 4   going to be through direct examination, Mr. Price, on
 5   Tuesday; if I can stretch it, if the jury will stay with us
 6   a little while, maybe we can get partway into the
 7   cross-examination.
 8           De Anda is the next witness.
 9           MR. ZELLER:  Yes.
10           THE COURT:  How long?
11           MR. ZELLER:  That was one and a half hours'
12   direct.  45 minutes' cross.  Ten minutes' redirect.  Ten
13   minutes' recross.
14           THE COURT:  Just a moment.  So 45 minutes -- 45
15   minutes' direct.
16           Is that your agreement?  That sounds imbalanced to
17   me.
18           MS. HURST:  I think it was 90 each.
19           MR. COTE:  I thought it was 90 each for de Anda.
20           MR. MCCONVILLE:  Your Honor, I think the confusion
21   is we went through the numbers, each side an estimate; and
22   then, you came back and said -- what I perceived -- here's
23   what I'm going to allow.
24           THE COURT:  Okay.  You tell me.
25           MR. MCCONVILLE:  Okay.
```

63

```
 1              THE COURT:  45 direct?

 2              MR. MCCONVILLE:  They said --

 3              THE COURT:  45 minutes' cross then?

 4              MR. COREY:  It's a half hour.

 5              THE COURT:  An hour and a half.  What about

 6   redirect?

 7              MR. MCCONVILLE:  An hour and a half on direct.

 8              THE COURT:  No, no.  Just a moment.  An hour and a

 9   half on direct?

10              MR. MCCONVILLE:  Yes.

11              THE COURT:  Okay.  Thank you.  And on cross?

12              MR. MCCONVILLE:  Okay.  So hour total between

13   Mr. Machado and MGA.

14              THE COURT:  On cross?

15              MR. MCCONVILLE:  Yes.

16              THE COURT:  Redirect?

17              MR. ZELLER:  25 minutes.

18              THE COURT:  Is that your agreement?

19              All right.  And recross?

20              MR. MCCONVILLE:  20 minutes total.

21              THE COURT:  Let's add up the total time for that,

22   gentlemen.

23              Two and a half, it looks like, on direct and cross

24   and about one hour and 45, so -- three hours and 15 minutes?

25   Is that approximately?
```

1          MR. COTE:  That's right.

2          THE COURT:  Now, my guess is with the carryover of

3    Wagner and de Anda, that's going to just about conclude your

4    Wednesday session.

5          Jill Nordquist is your next witness?

6          MR. MCCONVILLE:  Right.

7          MR. ZELLER:  We estimated the direct at 30

8    minutes; and then, the court said 30 minutes total each

9    side.

10          THE COURT:  Now, what do you want to do?  What

11    gets Sujata Luther, hopefully, on the stand on a reasonable

12    period of time?

13          MS. HURST:  30 is total.  We will allocate it

14    between cross and recross for us.  If we have to call her

15    back later, we will.

16          THE COURT:  All right.  Because these witnesses

17    will be available, and they'll all be subject to re-call.

18    So 30 minutes -- once again, repeat Jill Nordquist, 30

19    minutes on direct.

20          MR. ZELLER:  Yes, we would like 30 minutes on

21    direct.

22          THE COURT:  You have it.  On cross?

23          MR. MCCONVILLE:  We will apportion 30 minutes

24    total for cross and recross.

25          THE COURT:  No, I just want -- okay.  Between the

1    two, total of 30.

2              MR. MCCONVILLE:  Yes.

3              MS. HURST:  Right.

4              THE COURT:  This is going to get unbalanced.  How

5    much would you want on redirect?

6              MR. ZELLER:  15 or less.

7              THE COURT:  15.  So let's say 45 minutes total

8    then, 30 and 15; and on cross and recross, a total of 30;

9    however, is apportioned between Mr. Cote and Ms. Hurst.

10             So that should add up to an hour and 15 minutes,

11   shouldn't it?

12             MR. MCCONVILLE:  Yes.

13             MS. HURST:  Yes.

14             THE COURT:  Willensky.

15             MR. ZELLER:  20 minutes' direct.

16             THE COURT:  Okay.  Cross?

17             MR. MCCONVILLE:  We will apportion 30 minutes for

18   both cross and recross.

19             THE COURT:  Redirect?

20             MR. ZELLER:  15.

21             THE COURT:  So 45 minutes; is that correct?

22             MR. ZELLER:  Yes.

23             MR. MCCONVILLE:  No.

24             MS. HURST:  No.

25             THE COURT:  You're absolutely right.  20 and 30 is

```
 1    50.
 2              MS. HURST:  65.
 3              THE COURT:  And with another 15, so what is it?
 4    An hour and five minutes?
 5              MR. ZELLER:  Yes.  65 minutes.
 6              THE COURT:  Okay.  Jim Ward.
 7              MR. ZELLER:  15 minutes' direct.
 8              THE COURT:  Cross?
 9              MR. MCCONVILLE:  15 minutes total for cross and
10    recross.
11              THE COURT:  Redirect?
12              MR. ZELLER:  Ten.
13              THE COURT:  So 25 and 15 is, what?  40 minutes?
14              MS. HURST:  Yes.
15              THE COURT:  Yes.  40 minutes.
16              Anna Rhee, I still got a question mark.  If she's
17    on the stand, she'll be on the stand for less than five
18    minutes.
19              Heather McComb?
20              MR. ZELLER:  Well, we skipped over the custodian,
21    the Mattel custodian.
22              THE COURT:  That's Kim --
23              MR. PRICE:  Gohata.
24              THE COURT:  Gohata.  And that -- who's Kim Gohata?
25              MR. ZELLER:  She is an attorney in the Mattel law
```

1    department.

2              THE COURT:  Time?

3              MR. ZELLER:  20 minutes' direct.

4              THE COURT:  I said she wasn't going to testify.

5    Let me hear your direct.

6              20 minutes?

7              MR. ZELLER:  Yes.

8              THE COURT:  Okay.  Who else?

9              MR. ZELLER:  If I can talk about that, because --

10             THE COURT:  Just a moment.

11             Cross, if she's testifying?

12             MR. MCCONVILLE:  We just want to get in to

13   personnel file through her, if she's coming in as custodian.

14             THE COURT:  Time?

15             MR. MCCONVILLE:  Time?

16             MS. HURST:  10 minutes, assuming she cooperates.

17             THE COURT:  Cross.  Redirect?

18             MR. ZELLER:  Ten.

19             THE COURT:  Recross.

20             MS. HURST:  I can't -- this is just a custodian.

21             Why do we need redirect and recross?

22             MR. ZELLER:  She's just the custodian.

23             I don't see why stipulations aren't reached --

24             MS. HURST:  We will stipulate to waive any

25   redirect and recross, if they will.

```
 1              MR. MCCONVILLE:  Your Honor, we don't have a
 2    problem with stipulating that this witness would get into
 3    evidence of the personnel files.  We just want to have that
 4    witness get in the personnel files from Mattel that we want
 5    to get in as well.
 6              THE COURT:  Well, just a moment.
 7              We just need to get those personnel files over and
 8    have each of you verify what they are; right?
 9              It's a shame that Mr. Quinn's bike riding over
10    this, and Ms. Keller, whatever she is doing; but that's what
11    I'll do.
12              MR. PRICE:  He got a flat and he's hitchhiking
13    now.
14              THE COURT:  Good.
15              MR. MCCONVILLE:  Ms. Keller is hitchhiking.
16    That's how she started her day, is hitchhiking.
17              THE COURT:  All right.  I'll take a recess for
18    just a moment, and you go over those, if you will.
19          (At 10:37 a.m., proceedings were recessed.)
20
21                              -oOo-
22
23
24
25
```

```
 1                            CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  March 6, 2011

10

11

12                         _____

13                         Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```