Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING


MATTEL INC., et al.,            )
                                )
                Plaintiff,      )
                                )        STATUS CONFERENCE
        vs.                     ) No. CV 04-9049-DOC
                                )        VOLUME 2 OF 4
MGA ENTERTAINMENT, INC.,        )
                                )
                Defendant.      )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

SUNDAY, MARCH 6 , 2011




Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

df692778-4a00-4f96-b0c6-0544125347a0

 1    **APPEARANCES OF COUNSEL:**

 2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
 3                           and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
 4                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 5                           (213)443-3000

 6
      FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
 7                           BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
 8                           SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
 9

10
      FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                           BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                            (949)567-6700

14
                             KELLER RACKAUCKAS
15                           BY:  JENNIFER KELLER, ESQ.
                             18500 VON KARMAN AVENUE
16                           SUITE 560
                             IRVINE, CALIFORNIA 92612
17

18

19                           - AND -

20                           SCHEPER KIM & HARRIS LLP
                             BY:  ALEXANDER COTE, ESQ.
21                           601 WEST 5TH STREET_12TH FLOOR
                             LOS ANGELES, CA. 90071
22                           (213) 613-4660

23

24

25

1          SANTA ANA, CALIFORNIA; SUNDAY, MARCH 6, 2011

2                              -oOo-

3          **THE COURT:**  We're on the record.

4          And the parties have reached stipulations on?

5          **MR. PRICE:**  On authenticity of documents and personnel

6    files as well as whether or not those records -- those particular

7    pages identified by the party are business records; not on

8    relevance.  Ms. Gohata would not be testifying about relevance,

9    just on authenticity.

10          **THE COURT:**  And the objection is?

11          **MS. HURST:**  You want to read off the pages, the ones we

12   have agreed to?

13          **MR. PRICE:**  Do we want to resolve this first?

14          **MS. HURST:**  Sure, whatever.

15          **MR. PRICE:**  We're down to one document that MGA is

16   objecting is not a business record.  That's Mr. Tumaliuan's file.

17   His application we're agreeing is being admitted for a limited

18   purpose, which is what Mattel --

19          **MS. HURST:**  Our objection to the Choice Point

20   investigation report is that it's a report of a third party; that

21   that is not a record of regularly conducted business by Mattel.

22   And that it contains hearsay.  And it also purports to report on

23   communications with MGA in connection with that hearsay.

24          And so, we just we have agreed to everything else.  That

25   is the only document we object to.

df692778-4a00-4f96-b0c6-0544125347a0

Page 4

1             THE COURT:  So it's page 29?

2             MS. HURST:  29, 30, 31.

3             THE COURT:  Where is Mr. Quinn?

4             MR. PRICE:  On his way in his second outfit.

5             THE COURT:  How long will it take him to get here?

6             MR. PRICE:  My guess is an hour.  It will obviously help

7     getting in through security.

8             THE COURT:  Now, I'm going to go right back to our

9     schedule.  Machado, 30 minutes.

10            Mr. Cote, is that correct?

11            MR. COTE:  That's correct.

12             THE COURT:  I'm going to keep repeating.  I'm going to

13    do it again when Mr. Quinn get his.  Cavassuto 30 minutes by

14    Mattel; is that correct?

15            MR. ZELLER:  Yes.

16            THE COURT:  On your direct.

17            MR. ZELLER:  Yes.

18            THE COURT:  30 minutes for MGA on cross?

19            MS. HURST:  MGA and Machado combined.  Yes.

20            THE COURT:  I had 15 and 15.  You had an hour and a

21    half.  What you gave me were 30 minutes on direct for Mattel, 30

22    minutes on cross for MGA, 15 minutes on redirect, 15 minutes on

23    recross.  Total, an hour and a half.  Is that agreed?

24            MR. ZELLER:  It is.

25            THE COURT:  Wagner, two hours on direct by Mattel.  Is

Page 5

1    that agreed?

2              **MR. ZELLER:**  Yes.

3              **THE COURT:**  Two hours on cross.  Is that agreed?

4              **MS. HURST:**  Yes.

5              **THE COURT:**  20 minutes on redirect.  Is that disagreed?

6              **MR. ZELLER:**  Yes.

7               **THE COURT:**  20 minutes on recross.  Is that agreed?

8              **MS. HURST:**  Yes.

9              **THE COURT:**  Four hours and 40 minutes, is that correct?

10             **MS. HURST:**  Correct.

11             **THE COURT:**  DeAnda, one and a half hours on direct; in

12   other words, an hour and 30 minutes; one hour on cross.

13             Is that agreed by Mattel?

14             **MR. ZELLER:**  Yes.

15             **THE COURT:**  MGA?

16             **MS. HURST:**  Yes.

17             **THE COURT:**  25 minutes on redirect; is that correct,

18   Mattel?

19             **MR. ZELLER:**  Yes.

20             **THE COURT:**  And 20 minutes on recross.

21             **MS. HURST:**  Agreed.

22             **THE COURT:**  Three hours and 15 minutes; is that correct?

23             **MS. HURST:**  Yes.

24             **THE COURT:**  Jill Norgood (sic), 30 minutes on direct; is

25   that correct?

1          **MR. ZELLER:**  Yes.

2          **THE COURT:**  30 minutes on cross, is that correct, MGA?

3          **MS. HURST:**  Combined for cross and recross.

4          **THE COURT:**  15 minutes on Jill Norgood on recross; is

5    that correct on behalf the -- strike that.  Redirect.  Is that

6    correct on behalf of Mattel?

7          **MR. ZELLER:**  Yes.

8          **THE COURT:**  Allison Willensky 20 minutes on direct by

9    Mattel.

10          **MR. ZELLER:**  Yes.

11          **THE COURT:**  30 minutes on cross by MGA.

12          **MS. HURST:**  Yes, cross and recross.

13          **THE COURT:**  Is that satisfactory because you can have

14   co-equal time.  15 minutes on redirect by Mattel; is that correct?

15          **MR. ZELLER:**  Yes.

16          **THE COURT:**  Total time, an hour and five minutes; is

17   that correct?

18          **MS. HURST:**  Correct.

19          **THE COURT:**  Jim Ward 15 minutes on direct, 15 minutes on

20   cross with 10 minutes on Dr. redirect.

21          **MR. ZELLER:**  Yes.

22          **THE COURT:**  And the 15 minutes is the cross and recross

23   involving gym Ward.

24          **MS. HURST:**  Agreed.

25          **MR. ZELLER:**  It is.

1          **THE COURT:**  Now, I'm going to go over this again when

2    Mr. Quinn gets here.

3          Jim Gohata, 20 minutes on direct, 20 minutes on cross.

4          **MS. HURST:**  Gohata we've just cut down to the dispute

5    regarding that one document.

6          **THE COURT:**  To one document.

7          **MS. HURST:**  And I don't think any testimony from Gohata

8    is going to solve that problem, if we can get a ruling by the

9    Court, then it will be resolved.

10          **MR. ZELLER:**  That's not correct.  He will testify that

11    it was a business record.

12          **THE COURT:**  I'm sorry?

13          **MR. ZELLER:**  There is a -- we will proffer that

14    Ms. Gohata will testify that the pages in dispute that the Court

15    has are, in fact, business records of Mattel; namely, that they're

16    created in the ordinary course of business and so on, as part of

17    the employment application process.

18          **THE COURT:**  And the disagreement is?

19          **MR. ZELLER:**  Whether or not it's a business record.

20          **THE COURT:**  Are we referring to the one document?

21          **MR. ZELLER:**  Yes, sir.

22          **THE COURT:**  I'll resolve that for you concerning all of

23    the other documents.

24          **MS. HURST:**  It's agreed.

25          **MR. PRICE:**  Agreed their authentic and business records,

Page 8

1   not that they're relevant.

2           THE COURT:  You two write this down.  I'm tired of it

3   already, back and forth.  Write down the exact language right now.

4           And the record should reflect my apologies to the court

5   reporters for getting you here at 8:00 o'clock.  I want that on

6   the record.  Your time has been wasted this morning because of the

7   parties' inability to compromise on the simplest issues.  And

8   while the Court doesn't mind expending its own energy listening to

9   the bickering, when the staff is involved and inconvenienced,

10  that's a tremendous discourtesy.

11          MS. HURST:  Your Honor, we have agreed they're authentic

12  and business records and with respect to one document.

13          THE COURT:  So therefore, it's no time for Gohata; is

14  that correct?

15          MS. HURST:  Correct.

16          THE COURT:  We're going to skip Anne Rhee for the time

17  being.  If she is testifying, she'll be on the stand for no more

18  than 10 minutes at the most.

19          Heather McComb, counsel, how long on behalf of Mattel?

20          MR. ZELLER:  45 minutes direct.

21          THE COURT:  On behalf of MGA?

22          MS. HURST:  45.

23          THE COURT:  On recross or -- strike that.  Redirect?

24          MR. ZELLER:  30.

25          THE COURT:  On recross?

Page 9

1              MS. HURST:  Ten.

2              THE COURT:  You sure you don't want more?  You can have

3    co-equal time.

4              MS. HURST:  Ten is fine.

5              THE COURT:  All right.  Two hours and 10 minutes,

6    counsel?

7              MS. HURST:  Correct.

8              THE COURT:  Correct?  Okay.  Now, MGA custodian of

9    records, MGA personnel, etcetera.  We have gotten that far and I

10   wasn't sure what you were bickering about this morning.

11             MR. ZELLER:  The issue is that there are products and

12   documents from MGA's files that we have asked for a stipulation or

13   in the alternative that they produce a custodian of records to

14   move them into evidence.

15             THE COURT:  Okay.  And I ordered you to bring those over

16   on behalf of MGA and Mattel.  Where are they?

17             MR. ZELLER:  There are 1300 products.  That's in process

18   of having those brought over.  And the same is still true of the

19   documents.  We provided a list.  I mean, the parties have the

20   documents on their own, but we're assembling a stack to bring over

21   here.

22             THE COURT:  How do you propose we resolve that?

23             MS. HURST:  Your Honor, with respect to the records, we

24   propose that we would stipulate to them as long as they're

25   available for visual inspection by the jury; not just that we read

1    a list of products.  I propose that the joint facility across the

2    street be set up mutually by the parties; we lay them all on the

3    on the tables; we bring the jury over to look at them or whenever

4    the Court determines is the appropriate time.  And then that's

5    done.  That's our proposal.

6          **THE COURT:**  I don't have the ability to put these

7    products back in the hallway.  So that's why we had the informal

8    walk-through yesterday.  The record should reflect that counsel

9    was with the Court on Saturday morning.  The last thing we did

10   yesterday was walk through the hallway.

11         There is not enough room for 1300 products.  How are we

12   going to resolve that?

13         **MR. ZELLER:**  There are I think two options.  The first

14   one is setting up a separate facility where then the jury goes and

15   looks at them.

16         Another way is -- and these aren't necessarily mutually

17   exclusive, but another one is to have binders of the --

18   photographs of the products.

19         **THE COURT:**  Why not binders of the photographs of the

20   products.

21         **MR. ZELLER:**  I'm sorry?

22         **THE COURT:**  Why don't we have binders of the photographs

23   of the products, and when the jury calls for what I call a

24   tangible, bring it over?

25         **MR. ZELLER:**  That's what I thought was -- would make

1   some sense.

2          THE COURT:  Now, in the first trial, phase one,

3   apparently there was a room set aside, but my belief is that that

4   room was totally inaccurate and, in fact, it made no difference

5   where the location was set up.

6          MS. HURST:  Your Honor, we're willing to have pictures,

7   but we would like to have a visual inspection as well.  We just

8   think it's not the same viewing it flat on the page.  It doesn't

9   convey the same information.  And we're willing to bear the cost

10  of setting up the joint facility.

11          The parties already have the joint facility.  It's right

12  across the street.  We can put the products out on tables.  The

13  jury can view it for a short period of time once.  It can come off

14  of our time.  And after that, they can have the pictures in

15  binders.  And then if they want to see anything further, it can be

16  brought to them.

17          THE COURT:  Give me an idea of the 1300 products, how

18  much room does it take and how is this to be laid out?

19          MS. HURST:  We would just lay it out on tables, Your

20  Honor.

21          THE COURT:  1300 products?

22          MS. HURST:  We just got the stipulation yesterday so to

23  be honest with you, I didn't count.  But I know there is a lot of

24  over there.  And we looked at trying to do this before and we felt

25  if we laid up banquet tables around the edges of the room like in

1   a U-shape and put all the product on that, that it would be

2   available for visual inspection.  We looked at doing that.  We

3   took in measurements.

4           **THE COURT:**  If you give me an idea, once again, of the

5   space, I have an extra jury room down the hallway.  I can set up

6   all this product in this extra jury room and keep the jury inside

7   the confines of the courthouse.  No different than a storage room

8   in the first trial.

9           Once again I'm going to ask, how much product.

10          **MS. HURST:**  It's certainly acceptable to us to do it in

11  the other jury room.

12          **THE COURT:**  You can take them right down the hall and

13  they can see the product.  And also they have access to it that

14  way if they need to look.  It's only a couple steps from the jury

15  room.

16          How much product?  I'll continue asking that until

17  midnight if I have to.

18          **MS. HURST:**  I think Mattel may be in a better position

19  to know that at this point because they selected what they wanted

20  on the list.

21          **THE COURT:**  How much product?

22          **MR. ZELLER:**  I can't make a representation as to that

23  right now, Your Honor.  We'll have to go and look.

24          **THE COURT:**  Is it all laid out across the street?

25          **MS. HURST:**  It's not right now, Your Honor.

1        **MR. PRICE:**  To give you an idea, in the prior trial we

2   had a courtroom about this size with a big table with the products

3   laid out and products against all the wall.

4        **THE COURT:**  I'm not going to tie up a courtroom.

5        **MR. PRICE:**  That's kind of how much --

6        **THE COURT:**  Wait until Mr. Quinn gets here.  I'll take

7   all of you down the hallway and you'll make the determination if

8   this other jury room is big enough.  But it will be confined to a

9   jury room.  I'm not going to take the jury outside the confines of

10  the building.  If we can't reach a satisfactory agreement, it will

11  simply by photograph.  But I'd like to avoid that if we can.  But

12  I don't want to give Mattel the chance to load up and take that

13  away from MGA.

14        Ninette Pembleton is the next witness.

15        Let's go back to the time.  How long for the custodian

16  of records?  Regardless of what agreement we reach or don't reach,

17  how long for the custodian of records?

18        **MR. ZELLER:**  I don't have an estimate.

19        **MS. HURST:**  You mean the MGA custodian or the Mattel --

20  the MGA?

21        **THE COURT:**  That was the next one on my list.

22        **MR. ZELLER:**  We're discussing the MGA custodian, and we

23  don't have an estimate as to the amount of time it's going to

24  take.  It just depends on the mechanics of the amount of products,

25  how difficult it is with that witness.

1        **THE COURT:**  How I do get that answer then?  Back to

2   8:00 o'clock this morning.  How I do get the answer in terms of

3   Sujata Luther and getting MGA's case on this week?  How do we

4   resolve that?

5        **MS. HURST:**  We're willing to do that in our case.  We

6   would waive any requirement and we would bring the custodian of

7   records in our case.

8        **THE COURT:**  No time then.

9        **MS. HURST:**  This week, sure.

10       **THE COURT:**  No time in Mattel's case?

11       **MS. HURST:**  Still count against them when it comes back

12   later, but it will give us a little more time to work out a

13   stipulation now.

14       **MR. ZELLER:**  That's not acceptable to us.

15       **THE COURT:**  You want it in your case?

16       **MR. ZELLER:**  We do.

17       **THE COURT:**  Get the products rolling then.  On the way

18   down the highway?

19       **MR. ZELLER:**  Yes, they are.

20       **THE COURT:**  We're here until it gets done.

21       **MS. HURST:**  To be clear, we don't have any problem with

22   the products, as I have indicated.

23       **THE COURT:**  I just need to know time because you are the

24   one pressing for Sujata Luther.  I think that's a vital witness.

25   She will not be presented by deposition.  I just want to know how

1  this is going to be resolved.  Five minutes or five hours?  It

2  makes a difference.

3         **MR. ZELLER:**  One thing, Your Honor, if I can point this

4  out.

5         **THE COURT:**  I don't think so.  I think we're done.

6         Ninette Pembleton, what's happening with Ms. Pembleton?

7         **MR. ZELLER:**  As I said, we don't know if we have to call

8  her in until the custodian issues are resolved.  She is someone

9  who is able to authenticate certain documents and products from

10  the first trial.

11        **THE COURT:**  Well, knowing the parameters of the first

12  trial, what is the problem in terms of authenticity if you need

13  her?  In other words, plan for the worse and why wouldn't there be

14  a stipulation?  What's the concern.

15        **MR. ZELLER:**  There should be a stipulation.

16        **MS. HURST:**  It's the documents that are at issue.  They

17  proposed a stipulation that includes stuff like Brisbois thumb

18  drives up in Canada.  And that's the issue.  It's not the product.

19  We don't have any problem with the product at all.  It's the other

20  documents that they want to get in through a custodian, some of

21  which are not in our custody.

22        **THE COURT:**  How does the Court know how to rule on that

23  in the present situation?

24        **MS. HURST:**  Well --

25        **THE COURT:**  We're right back to 8:00 o'clock this

Page 16

1   morning.

2          **MS. HURST:**  Which is why we propose that they can bring

3   it in our case.  We would waive and let them bring that in our

4   case.

5          **MR. ZELLER:**  The Court will recall weeks ago when we

6   went through the process of trying to stipulate as to which of

7   Carter Bryant's documents were authentic and would come into

8   evidence.  Do you understand that MGA has never even responded to

9   that stipulation?  We are literally weeks out from a variety of

10  stipulations that we have proposed.  So, now for MGA to suggest

11  that we just kick this can further down the road until some point

12  in their case on the premise that perhaps some day they might

13  respond to our stipulations, is really I think --

14         **THE COURT:**  No.  We'll resolve it.

15         **MR. ZELLER:**  And the idea that somehow, too, that we're

16  now hearing for the first time --

17         **THE COURT:**  Thank you very much.  We're done now.

18         **MR. ZELLER:**  Thank you.

19         **THE COURT:**  Your argument just ended.

20         All right, then, let's start on the copyright argument.

21  You have an hour and a half, no longer.  And that includes your

22  presentation as well as your rebuttal.  You can divide it any way

23  you choose to.

24         Mr. Cote, if you want extra time, do you want additional

25  time?

1        **MR. COTE:**  Copyright doesn't concern us, Your Honor.

2        **THE COURT:**  My apologies.  Thank you.  But the

3   intentional interference?

4        **MR. COTE:**  Same.  Don't need any time.

5        **THE COURT:**  How are you doing with your translations?

6        **MR. COTE:**  I have the translations, Your Honor.

7        **THE COURT:**  Maybe we can resolve your matter then.

8        **MR. COTE:**  Certainly.

9        **THE COURT:**  Where do we stand concerning the

10  translations?

11        **MR. COTE:**  I have the translations.  I don't have any

12  issues.

13        **THE COURT:**  No issues?

14        **MR. COTE:**  Not with the translations.

15        **THE COURT:**  Then why are you here?

16        **MR. COTE:**  I'm not sure.

17        **THE COURT:**  Why don't you go home.

18        Satisfactory, Mr. Corey?

19        **MR. COREY:**  Yes, Your Honor.

20        **MR. MCCONVILLE:**  We would like him to stay, Your Honor.

21  Just fun to have around.

22        **THE COURT:**  Mr. Cote, then.  But I want you -- do you

23  have any concerns during product or anything else?

24        **MR. COTE:**  No, Your Honor.  No product issue.

25        **THE COURT:**  Go home and rest.

Page 18

1           MR. COTE:  Thank you.

2           THE COURT:  All right.  Who would like to lead off in

3    terms of copyright?

4           MS. HURST:  Usually they go first when it's their claim.

5           THE COURT:  It doesn't matter.  The time clock just

6    started to run on both of you now.

7           MR. COREY:  Mr. Wagner is there.

8           THE COURT:  Why don't we excuse the gentleman, but I

9    want him back or at least available, or whoever is presenting Mr.

10   Wagner tomorrow.  I'm going to probably hand down some rulings.  I

11   really don't understand why Mr. Wagner's testifying now as an

12   expert to a number of documents that quite simply are a matter of

13   adding up the addition.  And I don't see why the stipulation can't

14   be reached concerning what the amounts are if the jury finds.

15          I don't see why we're taking time with that, or 17

16   slides when he should be focused on MGA.

17          MR. PRICE:  We can try a new stipulation.

18          THE COURT:  What is the stipulation you need?

19          MR. PRICE:  Well, it would be to the numbers on this

20   chart.  For example, Mattel gave discounts in this amount for

21   point of service information, would be, for example --

22          THE COURT:  Which they're not going to stipulate to,

23   apparently.

24          MR. PRICE:  Probably not.

25          THE COURT:  Mr. Cote?

1          **MR. COTE:**  No, I don't believe we would stipulate to

2     that.

3          **MR. PRICE:**  If they're not going to stipulate to that,

4     it seems like we need to have a witness say that.

5          **THE COURT:**  Okay.  All right.  Then thank you very much.

6          **MR. COTE:**  Thank you.

7          **THE COURT:**  All right, counsel, we're about three

8     minutes into the argument so far.  Now, you have an hour and 57

9     minutes for each of you.

10         **MR. ZELLER:**  Thank you, Your Honor.  Obviously this is a

11    preliminary matter, as the Court is aware.  You have already made

12    a number of rulings on copyright which define, really, the

13    parameters of where we are.  We're obviously working on the

14    premise of those prior rulings.  And as the Court is aware,

15    obviously we have a different view and different position on some

16    of those matters that the Court has ruled upon.  So we're just

17    starting from the premise of what the Court has ruled and arguing

18    the instructions from there.

19         I'll start I think with MGA's instructions, because

20    certainly as the Court also knows, there are standard Ninth

21    Circuit jury instructions for copyright.  I think in many

22    instances they're on point and appropriate.  The Court has

23    certainly indicated those are the instructions it intends to use.

24         **THE COURT:**  By the way, they're set out along the

25    counsel table to the right.  I'm not going to stray very far in

 1   the Ninth Circuit instructions.

 2              **MR. ZELLER:**  Right.  We understood that was the Court's

 3   view.

 4              **THE COURT:**  No, you didn't, but that's fine.

 5              **MR. ZELLER:**  I do now.  Thank you.

 6              Just walking through MGA's instructions, one aspect I

 7   would say about them is, is that they are argumentative in

 8   describe be the works that are at issue.  In particular, they

 9   refer to matters such as Carter Bryant's sketches, or the

10   preliminary Bratz doll sculpt.

11              I mean, there are these characterizations of the works

12   at issue that we don't agree with, and they're replete throughout

13   the MGA version of the instructions.

14              **THE COURT:**  If I was you, I would go down instruction by

15   instruction eventually, because those are the ones I'm going to

16   give, and see what you disagree with.  I'd get down to specifics.

17              **MR. ZELLER:**  I thought I was being specific.  The

18   preliminary instruction, for example, that MGA proposes

19   specifically refers to the Carter Bryant sketches and the

20   "preliminary Bratz doll sculpt."

21              **THE COURT:**  Why don't you walk over and see what I'm

22   going to give.

23              Ms. Hurst, why don't you save yourself a lot of time and

24   walk over and see what I'm going to give.  Starts over on this

25   end.  Right here.

1          **MS. KELLER:**  Your Honor, while counsel is doing that,

2     may I make a brief call to one of the other lawyers?

3          **THE COURT:**  Absolutely.  Get all the resources that you

4     can.

5          **MS. KELLER:**  I just want to convey some of this.

6          **THE COURT:**  There are a few in question side-by-side.

7     Simple, basic, Ninth Circuit copyright instructions.

8        (Brief pause in proceedings)

9          **THE COURT:**  Back on the record, counsel.

10         Mr. Zeller, please.

11         **MR. ZELLER:**  We don't believe that it's appropriate to

12    give instruction 17.25 and 17.26 which relate to statute damages.

13         **MS. HURST:**  We agree.

14         **THE COURT:**  Okay.  So do we, by the way, but I set them

15    out.  Okay.  Excellent.  We're all on the same wave length.  Next?

16         **MR. ZELLER:**  I don't know what the Court's intention is

17    with respect to 17.5, in particular, whether or not the Court

18    intends to give some sort of instruction on the certificate.  It's

19    behind one of the other instructions, but it's not marked up.  So

20    I can't tell.

21         **THE COURT:**  Mr. Zeller?

22         **MR. ZELLER:**  So first, we don't believe that 17.5 as it

23    is framed is applicable here because validity is not at issue.

24    We, however, also have proposed an instruction that does, and this

25    is a special instruction that addresses the issue of the meaning

Page 22

1   of a Certificate of Registration.

2          The Court will recall that in the context of our efforts

3   to call Ralph Owen as an expert, the Court said that it would

4   instruct the jury on the meaning of the Certificate of

5   Registration.  The Court will also recall that during the

6   examination of Mr. Eckert, MGA asserted, through its questioning,

7   that by checking "no" for work made for hire, that was conclusive,

8   dispositive, an admission.  That it was not a work made for hire.

9          So we have proposed an instruction that basically says

10  what the Court said on its prior rulings, which is, that the Court

11  has determined that Mattel is permitted to avail itself of the

12  work made for hire avenue for potential ownership.  And we think

13  that that instruction, 17.9, also should be given which is the

14  standard instruction for work made for hire.

15         We also believe that it's appropriate for the Court to

16  give the standard copyright instructions for derivative liability;

17  namely, vicarious infringement and contributory infringement.  And

18  those are 17.20 and 17.21, for the -- of the standard Ninth

19  Circuit jury instructions.

20         **MS. HURST:**  We agree with that.

21         **THE COURT:**  Just a moment.  The numbers, again, are

22  going to be?  I have got them over on the table, but 17.20, 17.21?

23         **MR. ZELLER:**  Yes.

24         **THE COURT:**  Agreed?

25         **MR. ZELLER:**  It is.

1          **MS. HURST:**  We also agree that validity is uncontested

2     and, therefore, 17.5 is unnecessary.  I'll reserve my comments on

3     the remainder of the work made for hire issue.

4          **THE COURT:**  Agreed then, Mr. Zeller, 17.5 not to be

5     given?

6          **MR. ZELLER:**  It is.

7          **THE COURT:**  Stipulated by both parties, 17.5 will not be

8     given.

9          By the way, while you are thinking up your instruction,

10    I'll talk to Mr. McConville and Mr. Price.

11         It seems to me then we should just have books in the

12    hallway.  We can cut down the number of tangibles, etcetera, in

13    that hallway.  We're going to have a separate storage room.  But

14    we'll set that up and see what that looks like with both parties.

15    That will be done by next weekend.

16         **MR. ZELLER:**  Then the other thing I noticed, Your Honor,

17    is that the Court is giving 17.10, which talks about assignees of

18    copyright interest, but I didn't see 17.9 which is the parallel to

19    that explaining ownership by way of work made for hire, which we

20    think should be given.

21         **THE COURT:**  So 17.9 in conjunction with 17.10?

22         **MR. ZELLER:**  Correct.  And I don't know to what degree

23    the Court thinks that it's necessary to address MGA's proposed

24    instructions given that obviously the Court is using the standard

25    Ninth Circuit jury instructions which is along the lines of what

Page 24

1    we discussed.

2              THE COURT:  Why don't I wait to see what MGA is

3    proposing and counter with it.  You have got plenty of time.  What

4    other comments do you have?

5              MR. ZELLER:  I think that's it for now.

6              THE COURT:  Copyright then back to MGA.

7              MS. HURST:  Thank you, Your Honor.

8              Your Honor, in 17.2 we believe that the works that are

9    in the underlying works with respect to which infringement is

10   being claimed should be specifically identified by trial exhibit

11   number.  So those two sculpts and the pitch book and --

12             THE COURT:  So give me those exhibit numbers.

13             MS. HURST:  I believe that's 302 for the pitch book, and

14   the preliminary sculpt is 1136.  The second sculpt is 1141.  What

15   was that other -- we think it's 5-51 for the drawing on Ooh La La

16   Cloe, but we're not 1000 percent certain, so we need to double

17   check that.  It was in the Court's summary judgment motion.  We'll

18   check it.

19             THE COURT:  Thank you.

20             MS. HURST:  Additionally, Your Honor, in addition to the

21   underlying works, we also request that the accused works that are

22   eligible to be considered be identified; namely, the four first

23   generation dolls and the two additional dolls, the Formal Funk

24   Dana and Ooh La La Cloe.

25             THE COURT:  Give me those by exhibit number.  Do you

Page 25

1   want those identified by exhibit number?

2          **MS. HURST:**  Yes.  I believe the way Court has set these

3   out, the place to do that would be and the sentence that the Court

4   has written in on 17.13, "Mattel argues that (insert dolls) are

5   derivative works of Carter Bryant's drawings."  That would be the

6   place I think, Your Honor, where we're suggesting that those six

7   dolls with exhibit numbers would be identified.

8          **THE COURT:**  That Court had already started that.

9          **MS. HURST:**  It appears to me that the Court had already

10  started that.

11         The exhibit numbers for the accused dolls, Your Honor,

12  are First Generation Cloe, 12286.  First Generation Yasmin,

13  17.561.

14         **THE COURT:**  Just a moment.  Thank you.

15         **MS. HURST:**  First Generation Sasha, 17.558.  First

16  Generation Jade, 17.551.

17         **THE COURT:**  Okay.

18         **MS. HURST:**  Ooh La La Cloe is 17.546.  Formal Funk Dana

19  is 17.529.  There have been multiple versions of these marks.

20  We'll just need to go back and confirm these are the numbers they

21  came in under because I had drafted these numbers up before.

22         **THE COURT:**  You give those to me today, because we'll be

23  drafting these instructions today and tonight.

24         **MS. HURST:**  The Bratz production sculpt, which would be

25  the other accused work.

Page 26

1          **THE COURT:**  That would be 1136?

2          **MS. HURST:**  That's the preliminary sculpt.

3          **THE COURT:**  1141?

4          **MS. HURST:**  Yeah.  1136 and 1141 are the sculpts which

5     they claim ownership.  And 17.733 is the final production sculpt

6     which they use accuse on the basis of 1136 and 1141.

7               Your Honor, we disagree that any instruction should be

8     given on work made for hire because that theory of ownership was

9     not disclosed until shortly before the close of discovery in

10    September of 2010.  We disagree that it should be permitted based

11    on estoppel grounds, and further, on the ground that there is no

12    basis in the record for instructing on that theory, under work

13    made for hire, because there has been absolutely no evidence at

14    all that creating Bratz was part of the course and scope of

15    employment for Carter Bryant.

16              And additionally, in our view it would be inconsistent

17    with the mandate since the Court limited the theory of ownership

18    in the Ninth Circuit to the express assignment and consideration

19    of that upon remand.  Having said all that, if the Court is going

20    to instruct on the work made for hire doctrine, then the form

21    instruction 17.9 is, in our view, appropriate and we otherwise

22    have no objection to it.

23              We do not agree that any special instruction is

24    necessary or appropriate saying that Mattel has not admitted that

25    it's not a work made for hire.  If the Court instructs on work

df692778-4a00-4f96-b0c6-0544125347a0

1   made for hire, then the jury will consider the evidence and accord

2   it the weight that it's entitled.

3           Your Honor, apart from the foregoing, the only

4   additional comment we would make are that under damages, under 504

5   we have, I'm sure, beat record to death on this, at this point,

6   and the Court has already ruled on reasonable royalty, so I don't

7   have to go back there.  I'm not sure that at this point there is

8   any fair market value theory under 17.23, especially the last

9   sentence, "lost license fee the plaintiff would have received but

10  for the defendant's unauthorized use of the plaintiff's work." Mr.

11  Eckert clearly testified they never would have licensed it.

12          And so, Your Honor, in our view the last sentence of

13  17.23 cannot be given consistent with the record.

14          Your Honor, in 17.24, the bracketed language regarding

15  indirect profits should be included since that is the theory for

16  the damages claimed on all dolls using the core sculpt as well as

17  all the other products that are not claimed to be infringing.

18          I think that probably -- and then statute of limitations

19  we have addressed separately.  I think I said this before, but

20  I'll just say it quickly here.  We think that under TRW there is

21  no discovery rule anymore in federal statutes; that when the Ninth

22  Circuit addressed -- unless there is some specific reason why in

23  the statutory structure or legislative history that such a rule

24  would apply.

25          In Polar Bear, the Ninth Circuit did adopt the discovery

1  rule, but it did so without any discussion of TRW whatsoever or

2  the required elements of TRW.  There was no finding in that

3  regard.  So we'll object for the record and preserve our position

4  that it's not a discovery rule.

5       And that would bring us to the test for copyright

6  infringement, which there is no form.  They gave up.  They threw

7  up their hands.  It used to be 17.17 and then they fell over, and

8  for good reason, and it's reflected in this case.

9       I don't know if the Court -- how the Court wants to

10  hear -- whether it wants to hear from Mattel first on the

11  equivalent of 17.17 from us --

12       **THE COURT:**  It doesn't matter.  Why don't you just

13  continue on with 17.17 and then we'll go back to Mattel and then

14  back to you.

15       **MS. HURST:**  Thank you.  I should say also, Your Honor,

16  that on damages, Mattel has proposed a number of special

17  instructions.  Those aren't laid out on the table at the moment,

18  but we don't agree that the Ninth Circuit has approved of the

19  disallowance of expenses in a case involving alleged willful

20  infringement.  The Ninth Circuit has not adopted that rule and

21  that instruction should not be given.

22       In the absence of that instruction, willful infringement

23  is irrelevant and the willful infringement instruction should not

24  be given.

25       Mattel has a special instruction on apportionment that

Page 29

1   we object to which shouldn't be submitted, and consistent with the

2   special instruction on indirect profits with 504, the same with

3   their special instruction number 41.  So we object to those.

4           Their special instruction number 41 and 42 --

5           **THE COURT:**  Mr. Quinn has just arrived, for the record.

6           **MR. QUINN:**  Good afternoon, Your Honor.

7           **THE COURT:**  Good afternoon Mr. Quinn.

8           **MS. HURST:**  We object to the other special instructions

9   proffered by Mattel.  I'm not going to belabor the record with any

10  further comment on those at this point.  If Mr. Zeller addresses

11  them, I'll reserve.

12          That brings us to 17.17.  We proposed our test for

13  copyright infringement.  And in our view this instruction needs to

14  do three things:  It needs to identify the comparisons that the

15  jury is to make.  It needs to identify the standards pursuant to

16  which they're to make them.  And it needs to identify which

17  elements can't be considered and which elements should be

18  considered.  And that's the structure of the instruction that we

19  have proposed.

20          Your Honor, frankly, we don't think it does the jury or

21  anyone else a whole lot of good to call some tests extrinsic and

22  some intrinsic, and this and that and the other thing.  We thought

23  set out the standard and let them apply it.  That doesn't really

24  add a lot to call something extrinsic versus intrinsic.  If all of

25  us lawyers want to know what that is, fine.

1           So we have drafted our proposed 17.17 to not go through

2     all that rigmarole because it doesn't really add anything for the

3     finder of fact.

4           Your Honor, obviously the key -- the heart of this is

5     the protectable versus the unprotectable element.  And we have

6     proposed 19 unprotectable elements as warranted, we believe, by

7     arguments that have been made, testimony given, arguments made,

8     and the Ninth Circuit opinion and the other pertinent law.  Many

9     of these come right out of the Ninth Circuit opinion.

10           Fashion dolls with a bratty look or attitude.  A young,

11     female fashion doll with exaggerated proportions.  Dolls sporting

12     trendy clothing.  Exaggerated features, including an oversized or

13     larger head and feet.  Larger eyes, thick lips, high cheekbones,

14     slim arms, long legs, and slim torsos.

15           In other words, the idea of a particular human form is

16     not protected, only the specific particularized expression on that

17     form can be protected.  Lips that curve.  I'm just reading from

18     our instruction now.  Paragraph 7, the look of a girl who is

19     wearing heavy make up.

20           Number eight, oversized almond-shaped eyes.  Number

21     nine, angular eyebrows.  Number 10, the doll's resemblance to

22     humans.  In other words, a fashion doll must be representational

23     of a human and therefore that must be excluded.

24           11, the presence of hair, head, two eyes and other human

25     features.  12, human clothes, shoes, and accessories.  Again, the

1  idea of that is that's part and parcel of it being a fashion doll

2  and is not protectable.

3          13, features necessary to depict a certain age, race or

4  ethnicity.  14, an "urban" or "rural" appearance.  15, standard

5  features relative to others like a thin body or small waist.

6          16, postures and poses that mimic the human form or are

7  standard for the effective display of fashionable clothing.

8          I'm going to stop on this one for a moment.  This one is

9  particularly necessitated both by Mr. Quinn's opening statement

10  and by the examination of Lily Martinez and other suggestions that

11  there was something somehow special by the pose of those figures

12  and the Toon Teens drawings, that that's somehow protectable.

13  There was a direct comparison repeatedly made with Carter Bryant's

14  drawings, and argument was made those were unique elements in

15  those Toon Teens drawings.

16          That absolutely misstated the law.  And it makes the

17  pose and posture instruction which is clearly correct under

18  Aliotti, Goldberger and all the other cases necessary, because the

19  law has been misstated during the course of this trial so far with

20  respect to poses and postures being unique elements.

21          17, Your Honor, elements necessary to make a fashion

22  doll capable of mass production on an efficient economic scale.

23  That expresses functionality or a merger doctrine.  And there has

24  been and will be testimony also when Ms. Leahy takes the stand

25  about changes that were necessary to the sculpt in order to make

Page 32

1   it capable of mass production.

2           Paragraph -- pardon me, element 18, elements necessary

3   to satisfy the basic intended play pattern of a fashion doll.

4   Here we put, i.e. and that should be -- actually, i.e. is correct.

5   Taking off and putting on clothes and accessories.  So in other

6   words, relative proportions and size and other things that make

7   it -- that are necessary so that you can actually take off the

8   clothes and put them on again.  That's the basic idea of a fashion

9   doll.  It's not protected.

10          And finally, Your Honor, standard cosmetic technique and

11  placement.  That is, blush on cheeks or eye shadow on eyes.

12  Again, this is an idea.  These are standard things.  It's a scènes

13  à faire.  Blush goes on cheeks, eye shadow goes on eyes.  The only

14  thing that's protected is the specific expression.  So we want to

15  filter out those ideas and then have the specific expression.

16          And there, Your Honor, we had submitted that the jury

17  should be instructed based on the Ninth Circuit opinion that the

18  following elements are protectable:  The particular expression of

19  face paint, hair color and style, clothing and accessories.  And

20  here with respect to the sculpt, the minute sculptural variation.

21  And that just comes right out of the Ninth Circuit opinion.

22          We also included the instruction that the jury can

23  determine that other elements are unprotectable based on the

24  notion that they're not original; they're standard features.

25  That's the scènes à faire doctrine.  Or stock features are

1    utilitarian in purpose or merge into the expression of the idea.

2    We have offered the instruction on merger.  Merger occurs when you

3    determine that the range of available choices for expression of a

4    particular idea is so limited that it would be unfair to allow any

5    one copyright holder to have a monopoly on such feature.

6            And, of course, that comes from -- directly Rosenthal

7    and other cases in the Ninth Circuit.

8            So, I think that's probably where all of the action is

9    in terms of the instructions on the copyright claims.  All of

10   those ideas should be excluded, both for purposes of the jury's

11   consideration of the sculpts and of the dolls themselves.  And

12   with that, I'll just leave it at that.

13           **THE COURT:**  Turn it back over to Mattel.

14           **MR. ZELLER:**  Taking these points that MGA has made in

15   order.  First, identifying the underlying works in the

16   instructions is not workable.  MGA is not correct that Mattel's

17   claims of ownership and, therefore, of copyright infringement is

18   only two.  I think she identified one set of drawings and two

19   sculpts.  Maybe it was a little bit more.  That's not at all

20   correct.

21           In fact -- and the Court is undoubtedly seen the jury

22   verdict from phase one where we asked for the jury to determine

23   which drawings Mattel owned and it found, Mattel, in fact, owned

24   all of them.  In fact, some 90 different drawings.  And moreover,

25   the sculpts that we also claim rights to were not limited to 1136

1    and 1141.  It also includes what is depicted at 5-88, 5-89, and

2    Exhibit 537-3.  So the idea of reading them all off doesn't seem

3    to be workable and certainly is contrary to the Court's notion and

4    direction of simplifying these matters.

5          As to the second point that MGA made is that Mattel

6    somehow is being -- characterization I should say, that MGA is

7    making is that we say that the dolls are the derivative works, and

8    that's obviously not the full extent of it.  There are drawings

9    too that are derivative works.

10          So again, this idea that all this should be identified

11   in the instructions is just unwieldy and, frankly, unnecessarily.

12   The Court's instructions on this point are pretty clear, I think.

13          The next point MGA made was about work made for hire.

14   These complaints had been aired on many occasions in front of the

15   Court.  The Court has rejected them.  The Court made very clear on

16   summary judgment as well and in other orders we're entitled to

17   proceed on a work made for hire theory.  And frankly, the idea

18   that MGA has been prejudiced where it has endlessly explored for

19   years, in discovery, the scope of Carter Bryant's duties and the

20   like, that somehow it was surprised on the close of discovery by

21   this theory I think is contrary to the record.

22          The further point that MGA has made about damages under

23   504, I, of course, recognize that the Court has already ruled that

24   it will not send to a jury reasonable royalty or indirect profits

25   as copyright measure of damages.

1          The one thing I would say in response to MGA's point,

2    and I am certain that this is not encompassed by the Court's prior

3    rulings, is that Mattel's theory for damages based on the core

4    sculpt derives from indirect profits.  I mean, that certainly

5    could be a theory, which Mattel could have obtained damages if the

6    Court were to allow jury instructions on that basis.  But that's

7    not why we're asserting -- even notwithstanding the Court's

8    indirect profits ruling that that's not a theory that will be

9    asserted by Mattel to the jury, the fact is, is that MGA's use of

10   the core sculpt is itself infringement.  So it's not an indirect

11   profits analysis.  And the indirect profits rulings that the Court

12   has made do not preclude Mattel from seeking direct infringement

13   damages for that core sculpt.

14          With respect to the statute of limitations argument that

15   MGA makes here, I believe that we have talked about this on prior

16   occasions.  The bottom line is that the Ninth Circuit, in Polar

17   Bear, has stated the law.  Obviously, it was aware of a Supreme

18   Court case in TRW.  I could spend some time if the Court wanted

19   discussing TRW and why it doesn't have anything to do with the

20   Copyright Act, and in particular because the statute that was at

21   issue in TRW, in fact, was phrased quite differently than the

22   Copyright Act.

23          But the bottom line is that the Ninth Circuit has set

24   forth the law in Polar Bear.  And the Southern District of New

25   York judge's interpretation of TRW really can't obviously change

Page 36

1    the law here in the Ninth Circuit.  And the Ninth Circuit decision

2    in Polar Bear is clear that the discovery rule does apply to the

3    Copyright Act and Copyright Act claims.

4            MGA is not correct that willful infringement would be

5    irrelevant if the Court were to decide that the jury should not be

6    instructed to disallow costs or certain costs if it finds willful

7    infringement.  There is also -- a willfulness infringement also

8    gives the Court authority to enhance damages.

9            With respect then to, I think, the last issue that MGA

10   raised here, which really goes to the instruction on substantial

11   similarity, MGA, of course, advocates its version of the

12   instruction, but there are multiple issues with this proposed

13   instruction.

14           One is, as MGA acknowledges in the argument, MGA's

15   instruction ignores the extrinsic, intrinsic test which is the law

16   in the Ninth Circuit.  And in doing so it not only ignores it, but

17   it actually ends up making misstatements of law because it does

18   not parse between the intrinsic test and the extrinsic test.

19           For example, MGA's proposed instruction says, "You may

20   not consider unprotectable elements when you make the comparison."

21   Which is not a correct statement of the law.  The Court has made

22   very clear -- the Ninth Circuit, that is -- has made very clear

23   that during certain aspects of the extrinsic and intrinsic test,

24   that non-protectable elements may very well be considered as part

25   of the analysis.  Obviously, there are times when it cannot be

df692778-4a00-4f96-b0c6-0544125347a0

Page 37

1    considered and there are times when it can be considered.  So the

2    statement by MGA as to, you may never consider it," to the jury is

3    simply incorrect and overbroad.

4            And I would cite to the Court such matters as Three Boys

5    Music Corporation case, that's the Bolton case, where the Court

6    says even unprotectable elements are considered in deciding

7    whether the total concept and feel of the works are substantially

8    similar under the intrinsic test.  And in fact, that's really, I

9    think, the principal problem that MGA's instruction creates by not

10   distinguishing between extrinsic and intrinsic examination.

11           MGA's instruction also misapplies, we think, the

12   standards of similarity that apply here.  And, of course, as we

13   all know from the Ninth Circuit decision, the standard for the

14   infringement of the sculpt is not simply virtual identity of

15   protected elements, which is how MGA is attempting to spin it.

16           What the Ninth Circuit said is that the virtual identity

17   standard of similarity applies if it's to the works overall.  It

18   also said that substantial similarity of protected elements is

19   another way in which the sculpt could be infringed.  In MGA's

20   instruction it does not take that into account, does not address

21   that point, and therefore is erroneous.

22           As MGA's counsel pointed out, MGA's instruction also

23   gives a rather lengthy list of elements that MGA claims are

24   unprotectable.  The list itself is confusing, the way that it's

25   phrased.  It includes all manner of points in it that actually

df692778-4a00-4f96-b0c6-0544125347a0

Page 38

1  appear to be inconsistent with the points that it then goes on to

2  say can be considered as protected elements and doesn't really

3  draw much of a distinction.  It many respects, even worse what

4  this instruction does is it gives a list of 19 things can that it

5  wants the Court to instruct the jury to disregard for all purposes

6  without really much guidance at all, but then goes on to invite

7  the jurors to basically decide that they can ignore any number of

8  elements.

9         The reality is that either protectability is an issue of

10 fact that should go to the jury and have the jury determine it, or

11 it's an issue of law in which it should simply be set forth and

12 the Court instruct on it and the jury be told about that.

13        MGA is trying to have it both ways on this.  And I'm

14 specifically referring to the portion of the instruction where it

15 says, "I'm instructing you that you can't consider unprotectable

16 elements.  All the following 19 elements have to be disregarded,"

17 and then it goes on to say, "but you can go ahead and decide if

18 there's more."

19        And so the argument, or the instruction is confusing,

20 it's argumentative, and we don't think that it properly sets forth

21 the law.

22        **THE COURT:**  In your opinion should I instruct on the

23 protectable elements?

24        **MR. ZELLER:**  No, Your Honor.  We think that the Court

25 ought to give the jury guidance and say that ideas are not

1   protectable.  This is what can be protected, and the things can

2   and cannot; Scènes à faire and the like.  But to start parsing it

3   this way in words starts to get very confusing.  And in some

4   respects, too, they really seem to be saying at one point you

5   can't even take into account it's a doll.  That's going to be

6   terribly confusing to the jury.  It literally seems to be

7   suggesting to them ignore the works at issue.

8            So, I mean, I think, frankly, the easier way and the

9   better way, and the way that we would suggest is to simply say,

10  for example -- and I think this is consistent with the Ninth

11  Circuit jury instructions -- is that ideas are not protectable,

12  but MGA not only says that, and says it several times, it then

13  goes on to guild the lily and talk about the merger doctrine and

14  the like.  So it's this undo emphasis, too, on point.

15           The other aspect of this instruction -- and even if the

16  Court were to instruct on what is protectable and what is not

17  protectable, MGA's instruction is not consistent with the Court's

18  summary judgment ruling, and because the Court provided an

19  illustrative list of protected elements that it considered on

20  summary judgment, including a whole array of elements that are

21  mentioned nowhere in MGA's instructions.

22           And just to name a couple that the Court will recall are

23  matters such as the precise, shape, size and placement of the

24  facial elements.  The overall face shape.  The precise angles,

25  measurements and shapes of the sculpt's midsections.

1          So I mean, the Court identified a variety of aspects

2     that it believed were potentially protectable that are not

3     included in this instruction.  So if we do go down that road, I

4     think obviously in fairness all of it needs to be mentioned rather

5     than sort of a long litany of, "all these things are

6     unprotectable, I'm going to invite you to find a bunch more things

7     potentially unprotectable, and here is a short list of things that

8     can be protected," and that's how MGA's instruction is currently

9     set out.

10          And I think as a final point on this, it's not correct

11    that Mattel has been arguing such matters to the jury that the

12    poses and the drawings are somehow the protectable aspect.  As the

13    Court knows, we're not even arguing copyright infringement of Toon

14    Teens.  That's not even one of the work that's at issue.  We're

15    simply pointing out that the jury should take into account the

16    Toon Teens drawings for purposes of timing; that they were an

17    inspiration, were an influence on Carter Bryant's drawings, and

18    therefore a date can be established as to when they were created.

19          But we have never argued to the jury, and I didn't hear

20    testimony cited or questions cited that somehow suggested to the

21    jury that the law was that poses or postures were protectable

22    elements.  That's certainly not what we are arguing to this jury.

23          **THE COURT:**  Ms. Hurst?

24          **MS. HURST:**  One moment, Your Honor.  Thank you.

25          **THE COURT:**  Mr. Quinn, Mr. McConville, while you are

1    sitting here, I'm going to want to see the following in writing

2    from each of you:  I have already made my record this morning,

3    this Court was deeply concerned about the waste of time, and each

4    of you as lead counsel owe a specifically apology to the two court

5    reporters that were brought in and, I hope, you are kind enough

6    and courteous enough for the wasted four hours that the Court

7    spent this morning quibbling and listening to quibbling by counsel

8    over the inability to reach some segment and dates, and the

9    discourtesy that's been displayed by each of the parties towards

10   one another.  And I have a specific record and that will remain

11   unsealed.

12            Now, that's Maria, and Deborah will be up here.  And I

13   hope, Mr. Quinn, you are gentleman enough to apologize to each of

14   my court reporters for the wasted weekend that they have spent.

15            And Ms. Keller, I hope that you are also.  You'll do

16   that out of my presence, I hope.

17            You will draft for me the agreement that we have reached

18   this morning.

19            Mr. Quinn, you will sign your name to it.

20            Mr. Price, you will sign your name to it.  Understood?

21            **MR. PRICE:**  Yes.

22            **THE COURT:**  Mr. McConville, Ms. Keller, you will sign

23   your name.  You will go down not only the agreement that we have

24   reached in terms of time, but you will set that forward by day.

25            So, Tuesday reconvening at 1:00 o'clock we will be in

Page 42

1    session.

2             And Mr. Quinn, I'm going to go down this, and if you

3    have a disagreement, you'll make this known to me.  This is the

4    way we spent our morning.

5             Mr. Machado, it's agreed by Mr. Cote and Mr. Overland

6    will take 30 minutes.  Mr. Cavassuto, 30 minutes for Mattel on

7    direct, 30 minutes on cross-examination by MGA, 15 minutes on

8    redirect and 15 minutes on recross.

9             Is that agreed to, Mr. Quinn?

10            **MR. QUINN:**  Yes, Your Honor.

11            **THE COURT:**  Ms. Keller?

12            **MS. KELLER:**  Yes, Your Honor.

13            **THE COURT:**  Mr. Wagner, two hours on direct, two hours

14   on cross, 20 minutes on redirect, 20 minutes on recross.  Total of

15   four hours and 40 minutes.

16            Is that agreed to, Mr. Quinn?

17            **MR. QUINN:**  Yes, Your Honor.

18            **THE COURT:**  Ms. Keller?

19            **MS. KELLER:**  Yes, Your Honor.

20            **THE COURT:**  Mr. de Anda, one and a half hours on direct,

21   one hour on cross, 25 minutes on redirect, and I believe 20

22   minutes on recross.  Total hours of three hours and 15 minutes.

23            Agreed to, Mr. Quinn?

24            **MR. QUINN:**  Your Honor, actually I think that de Anda

25   can be done in one hour.

Page 43

1          **THE COURT:**  I'm going to give you hour and a half.  That

2     was the agreement.  You have that time.  It's not transferable to

3     another witness.  Is that acceptable to you?

4          **MR. QUINN:**  Yes, Your Honor.

5          **THE COURT:**  Ms. Keller?

6          **MS. KELLER:**  Yes, Your Honor.

7          **THE COURT:**  Three hours and 15 minutes.

8          Jill Norgood, 30 minutes on direct, 30 minutes on cross,

9     15 minutes on redirect.  Total of one hour and 15 minutes.

10         Acceptable, Mr. Quinn.

11         **MR. QUINN:**  Yes, Your Honor.

12         **THE COURT:**  Ms. Keller?

13         **MS. KELLER:**  Yes, Your Honor.

14         **THE COURT:**  Have each of you, by the way, had time to

15    talk to your co-counsel, Mr. Price, about this, Mr. Quinn, so you

16    are not being pushed into this time frame?

17         **MR. QUINN:**  I actually have not, Your Honor.

18         **THE COURT:**  I'll recess, you talk to him.  And I'll be

19    back in just a moment with Ms. Hurst with your concluding remarks.

20         **MS. HURST:**  Thank you.

21         (Recess taken, from 1:37 to 1:55.)

22         **THE COURT:**  Back on the record.  All parties are

23    present.

24         Machado, 30 minutes.  Cavassuto, 30 minutes for Mattel

25    on direct, 30 minutes for MGA on cross, 15 minutes redirect, 15

Page 44

1    minutes recross.  Total, an hour 30 minutes.

2              Is that acceptable to you, Mr. Quinn?

3         MR. QUINN:  Yes, Your Honor.

4         THE COURT:  Mr. Price?

5         MR. PRICE:  Yes.

6         THE COURT:  Mr. McConville?

7         MR. MCCONVILLE:  Yes.

8         THE COURT:  Mr. Zeller?

9         MR. ZELLER:  Yes.

10         THE COURT:  I mean, Ms. Keller.

11         MS. KELLER:  I'm deeply hurt.  Yes, that's fine.

12         THE COURT:  Wagner, 20 minutes on -- or strike that.

13    Two hours on direct, two hours on cross, 20 minutes on redirect,

14    20 minutes on recross.  By the way, that will be the limitation

15    placed on MGA's expert also.  So whatever you are agreeing to now

16    is coequal.  So be careful with this because it will be absolutely

17    dead equal in terms of time.

18              Mr. Quinn?

19         MR. QUINN:  Yes, Your Honor.

20         THE COURT:  Mr. Price?

21         MR. PRICE:  Yes, Your Honor, can I ask for one question?

22    If I end the direct, say, an hour 50, may I -- is that the total

23    time I can have and allocate as I need?

24         THE COURT:  Do you mean can you switch the 10 minutes?

25    Certainly, I don't care as long as it's a total of two hours and

Page 45

1    20 minutes.  In other words, if you reach a logical breaking

2    point, an hour and 40 minutes, as long as you take a total of two

3    hours and 20 minutes, you can allocate back and forth.  But if you

4    finish -- strike that.

5            Now, is that acceptable?  You can also allocate your

6    time back and forth.

7            **MS. KELLER:**  Your Honor, the only thing that concerns me

8    is the Court's statement about our expert.  Our expert has to

9    rebut their claims and do our claims and then they'll be entitled

10   to --

11           **THE COURT:**  I don't think they're calling the expert

12   back anymore.  That's it.  You two can talk about that, but I'm

13   done with the experts after the two cases in chief.

14           **MR. PRICE:**  Your Honor, we will talk about this.

15           **THE COURT:**  No.  We'll do it now.  This is going to be

16   worked out.  I'm going to find out exactly where we stand with

17   this case, this week.  So you two renegotiate then.

18           Agreeable, two hours and 20 minutes?  20 minutes

19   redirect, 20 minutes recross, or a variation of the two hours and

20   20 minutes shifting time?

21           Mr. Quinn?

22           **MR. QUINN:**  Yes, Your Honor.

23           **THE COURT:**  Mr. Price?

24           **MR. PRICE:**  Yes.

25           **THE COURT:**  Ms. Keller?

Page 46

1          MS. KELLER:  I hope we're more distinct than that.

2          THE COURT:  I'm just used to Mr. Zeller being here so

3    often that I just transferred his name over to the other side, and

4    I apologize.

5          MS. KELLER:  Yes, Your Honor.  That's acceptable.

6          THE COURT:  And Mr. McConville?

7          MR. MCCONVILLE:  Yes, sir.

8          THE COURT:  All right.  De Anda, an hour and a half on

9    direct, an hour on cross, 25 minutes on redirect and 20 minutes on

10   cross.  Total, three hours and 15 minutes.

11          Is that acceptable, Mr. Quinn.

12          MR. QUINN:  Yes, it is.  We don't need the hour and a

13   half, I don't think.

14          THE COURT:  I'm going to give you the hour and a half.

15   That was the agreement this morning.

16          Is that acceptable, Mr. Price?

17          MR. PRICE:  Yes.

18          THE COURT:  Ms. Keller?

19          MS. KELLER:  Yes, Your Honor.

20          THE COURT:  Mr. McConville?

21          MR. MCCONVILLE:  Yes.

22          THE COURT:  Jill Norgood, 30 minutes on direct, 30

23   minutes on cross and recross combined, and 15 minutes on redirect,

24   total of an hour and 15 minutes.

25          Mr. Quinn, what that means is your side has 45 minutes,

Page 47

1    basically; the other side has 30 minutes.

2               Is this acceptable to you, sir?

3          **MR. QUINN:**  Yes.

4          **THE COURT:**  Mr. Price?

5          **MR. PRICE:**  Yes.

6          **THE COURT:**  Ms. Keller?

7          **MS. KELLER:**  Yes, Your Honor.

8          **THE COURT:**  Mr. McConville?

9          **MR. MCCONVILLE:**  Yes.

10         **THE COURT:**  Allen Willensky, 20 minutes on direct, 15

11   minutes on redirect, 30 minutes total on cross and recross for a

12   total of 100 -- strike that, 65 minutes.

13              Is that acceptable to you, Mr. Quinn?

14         **MR. QUINN:**  Yes.

15         **THE COURT:**  Mr. Price?

16         **MR. PRICE:**  Yes.

17         **THE COURT:**  Ms. Keller?  You can have more, remember.  I

18   mean, it can be coequal.  You can have an extra five minutes if

19   you want.

20         **MS. KELLER:**  That's fine, Your Honor.

21         **THE COURT:**  You want 30 minutes?

22         **MS. KELLER:**  Yes, Your Honor.

23         **THE COURT:**  All right.  Jim Ward, 15 minutes on direct,

24   15 minutes on cross and recross, redirect 10 minutes.  Total of 40

25   minutes.  What it really states is 25 minutes for Mattel and 15

Page 48

1   minutes for MGA.

2           Is this acceptable to you, Mr. Quinn?

3           **MR. QUINN:**  Yes.

4           **THE COURT:**  Mr. Price?

5           **MR. PRICE:**  Yes.

6           **THE COURT:**  Ms. Keller?

7           **MS. KELLER:**  Yes, Your Honor.

8           **THE COURT:**  Mr. McConville?

9           **MR. MCCONVILLE:**  Yes, sir.

10          **THE COURT:**  Heather McComb, 45 minutes on direct, 30

11   minutes on redirect, 45 minutes on cross and 10 minutes on recross

12   came out to basically 75 minutes for Mattel and 65 minutes --

13   strike that.  Yes, 55 minutes for MGA.

14          Do you want more time for MGA?

15          MR. MCCONVILLE:  No.

16          **MS. KELLER:**  No.  Thank you.

17          **THE COURT:**  Acceptable to you, Mr. Quinn?

18          **MR. QUINN:**  I'm responsible for McComb.  And I actually

19   would like an hour and 15 minutes on direct.  That would be an

20   additional half hour.

21          **THE COURT:**  Okay.  And what about redirect?

22          **MR. QUINN:**  30 minutes is fine on redirect, Your Honor.

23          **THE COURT:**  45 minutes on -- I'm going to start

24   computing time again because right there I don't know where we

25   stand and we still have two other issues to decide in terms of two

Page 49

1   others.

2           **MS. KELLER:**  We'll stick with our time, Your Honor.

3           **THE COURT:**  All of these people are subject to recall if

4   you need them also.  They'll all be in here.

5           So that would be a total 55 minutes then for MGA.

6           Is that acceptable, Ms. Keller?

7           **MS. KELLER:**  It is.

8           **THE COURT:**  Mr. McConville?

9           **MR. MCCONVILLE:**  Yes.

10          **THE COURT:**  And an hour 15 minutes.  So that would be 75

11  minutes on direct, 30 minutes on redirect, that's about an hour

12  and 45 minutes; is that correct, Mr. Quinn?

13          **MR. QUINN:**  Yes, Your Honor.

14          **THE COURT:**  Now, I'm going to stop there.  And you are

15  going to draft that day by day for me.  You have six hours on --

16  see where we stand getting some of your case on today.

17          What that would look like would be this:  On Tuesday,

18  Mr. Machado at 1:00 p.m. for half an hour until 1:30.

19  Mr. Cavassuto from 1:30 to 3:00 o'clock; is that correct?

20          **MS. KELLER:**  Yes.

21          **MR. MCCONVILLE:**  Yes.

22          **THE COURT:**  Okay.  That would finish that gentleman as a

23  witness.  3:15 to 5:15 on direct for Mr. Wagner.

24          Can you go that long?  Who is presenting Mr. Wagner?

25          **MR. PRICE:**  I am.  With this stuff, it would be nice to

Page 50

1   have a break.

2          THE COURT:  We don't have to take a break right at 5:15.

3   If you want to take an earlier break, take it.  We're just going

4   to take one 15-minute break.  Would that be acceptable?

5          MR. PRICE:  Yes.

6          THE COURT:  So we'll start at 3:15.  Why don't you call

7   the break for 15 minutes, wherever that is convenient.  And

8   basically until 5:15 or earlier, 15-minute break.  And instead of

9   going from 5:30 to 6:00, I'd recommend an earlier break like at

10  whatever time.  Okay.

11         MS. HURST:  We figured all the breaks were sort of

12  optional in terms of when, Your Honor, but just to build the time

13  into the schedule.  It wasn't meant to be minute by minute.

14         THE COURT:  8:30 Wagner until 10, 10:00 o'clock.  Mr.

15  Cross -- I'm sorry.  10:00 o'clock cross-examination.  I'm sorry.

16  8:30 Wagner until 10:00 o'clock.  What does the "cross" mean?

17         MS. HURST:  Cross-examination.  He is on cross.

18         THE COURT:  Oh, on cross-examination.  I see.  You just

19  listed that below.  15 minutes then from 10:15 to 10:30.  Instead

20  of me just reading this into the record, let me go down it for a

21  moment.

22               (Brief pause in proceedings.)

23         THE COURT:  On McComb you start at 1:00 o'clock and then

24  you have got until 3:40?

25         MS. HURST:  That's with the new longer estimate.

 1           **THE COURT:**  And then in theory we end at 3:40 for that

 2    day?

 3           MR. MCCONVILLE:  No.

 4           **MS. HURST:**  That's as far as we got.

 5           **THE COURT:**  What is "COB"?

 6           **MS. HURST:**  Close of business.  Sorry.

 7           **THE COURT:**  Well, a large part of that depends on

 8    Gohata, which I'll resolve after our arguments today on the

 9    instructions for you, which will negate that person as a.  Witness

10    but then we have all the issues rising out of the need for Mattel,

11    of course, to have some idea of the stipulations or

12    non-stipulations in the form of those stipulations.

13           How are we going to resolve that?

14           **MR. MCCONVILLE:**  I think with regard to the product, it

15    is resolved; that whatever MGA product that they want to

16    introduce, we'll agree can be introduced; the physical product

17    that can be reviewed by the jury.

18           **THE COURT:**  And obviously no agreement as to the

19    evidentiary value of that?

20           **MR. MCCONVILLE:**  Correct.

21           **THE COURT:**  And instead of forcing you into that in

22    front of the jury, which looks like a concession, that can simply

23    be received.  In other words -- otherwise, it sounds like you are

24    consenting to the admission of the product and it has viability.

25           So I would simply receive that with the agreement out of

Page 52

1    the presence of the jury that you are not placed in the tactical

2    position of saying "we agree."

3            MS. HURST:  I'm not sure that matters.  We can just say

4    both parties are offering the product for the jury's review and

5    we'll put it in the other jury room as the Court has suggested.

6            THE COURT:  When should I start transporting that to the

7    other jury room?  I have got access to it as early as tomorrow.

8    And I just don't want to start calling in resources again on the

9    weekend.

10           MR. ZELLER:  Can I check, Your Honor?

11           THE COURT:  Yes.  Make it convenient for you and for

12   Mattel, but tomorrow is my best day.

13           MR. ZELLER:  We can start that process tomorrow.  It's

14   such volume of product, it may take more than a day.

15           THE COURT:  It will, but what I'll do is this:  Let me

16   meet one of you here with Milli from each side just logistically

17   in the morning.  Because what I need to do is open up a jury room

18   on this floor, and I need to check with Milli to make certain

19   that's acceptable.  I don't know if we have a visiting judge.  I

20   don't know if another Court needs that jury room, because what I

21   want to do is move the product in there even three weeks before

22   the deliberations.  All right.

23           Now, what other issues do we have concerning your time

24   issues?

25           MR. QUINN:  Your Honor, there is -- we have given notice

Page 53

1   that there is a --

2           THE COURT:  Anne Rhee, I know about Anne Rhee.

3           MR. QUINN:  And Maryman, the forensic electronic data

4   examiner.  We have this order that the Court indicated it would

5   sign related to the USB drive that's in custody pursuant to

6   stipulation --

7           THE COURT:  Why don't you give it that to me now and

8   I'll sign it right now.  Show it to the other party.

9           MR. QUINN:  Our hope is if we can get this on Tuesday,

10  we can get it to Mr. Maryman on Tuesday and he can be in a

11  position to analyze it.

12          MR. MCCONVILLE:  We take no position but just wonder

13  aloud, there is a court proceeding in Canada that was pending to

14  which this thumb drive applied.  So I mean, we take no position as

15  to this order.  It's fine.  Whatever they get, we would like a

16  copy of.

17          THE COURT:  Why don't I do this:  Why don't I sign this

18  order, see if KMPG will comply.  If they don't, take that issue

19  from there.  Because if we don't have the thumb drive, I don't

20  know what the next recommendation would be.  So is today the 6th?

21          Now, what I'm going to do is I've got court reporters in

22  today but I don't have a way of reaching Kathy today.  Want to

23  send this out tomorrow morning?

24          MR. QUINN:  Yes, we'll e-mail it to them tomorrow

25  morning.

Page 54

1        **THE COURT:**  She is usually in at 7:30.  What I did is I

2    signed all three copies with the original signatures so she has

3    three copies.

4            Next, before we go back to your argument, you want to

5    switch tables, MGA, so that when you begin the presentation of

6    your case, because you have claims, that you sit at the table

7    presently is occupied by Mattel?  Remember, 20 percent of fairness

8    is what never appears on the record, and I'll make that statement

9    over and over again.  So we'll simply switch tables.

10           The other thing is if you choose not to, I'll tell the

11   jury, quite frankly, the Court has given the option of parties

12   switching tables.  If you decide not to, that would be a coequal

13   statement.  Both parties have decided to remain where they are

14   situated, but this is the presentation of MGA's case.

15           If you are more comfortable there, you can stay right

16   where you are and I would make that brief statement to the jury,

17   that both parties have agreed, not just MGA, but both parties have

18   acceded to Mattel remaining at Mattel's table.

19       **MS. KELLER:**  May we make this decision after a couple

20   days after we have talked to Mr. Larian?

21       **THE COURT:**  Certainly.  Certainly.  By tomorrow.  He is

22   around.  Why don't you call him now?

23       **MS. KELLER:**  I will go call him right now.

24       **MR. QUINN:**  I guess the only remaining potential witness

25   issue we know of is MGA's document custodian as to certain

1   documents.  We have dealt now by stipulation with the MGA product.

2   There also have been discussions about whether we need to get an

3   MGA custodian to lay a foundation for certainly.

4          **THE COURT:**  And these are the 1300 products.

5          **MR. QUINN:**  No.  This is something other than the

6   proceeds.  These relate to some documents.

7          **THE COURT:**  Is this Ninette Pembleton?

8          **MR. QUINN:**  I believe so, yes.

9          **MR. ZELLER:**  It potentially would be depending on who

10  they select.

11         **MR. QUINN:**  We're looking to them to select somebody to

12  just testify as a custodian.

13         **THE COURT:**  And those documents, the complaint was this

14  morning, I believe, that some of those documents involved the

15  thumb drive from Brisbois, was that the complaint?

16         **MR. ZELLER:**  I was hearing that for the first time in

17  court here, Your Honor.  It has not been made before we received

18  no response.  We have provided now MGA with a binder of the

19  documents.  We previously gave them a list.  They have access to

20  all their own documents.

21         **THE COURT:**  We'll resolve that today.  You have got the

22  binder.  We'll go through it and see what your objections are.  Is

23  that the binder?

24         **MS. HURST:**  It is.

25         **THE COURT:**  When did you get it?

1          **MS. HURST:**  Few minutes ago.

2          **THE COURT:**  Few minutes ago?

3          **MS. HURST:**  I think we got the list the first time on

4     Thursday, was it?

5          **THE COURT:**  That's not fair.  Tomorrow.  Tomorrow

6     sometime.  You need to take your time to look at that.  There is

7     no reason for me to push that hard if you are just getting it.

8          **MR. MCCONVILLE:**  One thing I could say, Your Honor, is

9     just a quick review of it, I think we maybe could have stipulated

10    at some level to authentication, but there is no way we're going

11    to stipulate to admissibility.  This stuff has -- they need to put

12    a witness in if they want to make it relevant.

13         **THE COURT:**  Let me turn back because I haven't gone

14    through that binder, obviously.  That leaves me on a wing and a

15    prayer and I don't want to do that.

16         Mr. Zeller?

17         **MR. ZELLER:**  General for me to respond to.  These are

18    MGA documents.  To what degree they're going to dispute matters

19    such as if they're business records or otherwise, why they're

20    admissible, whether there is going to be hearsay objections, I

21    don't know.

22         **THE COURT:**  Okay.  Now just one minute.  Let me go get

23    one more thing.

24              (Brief pause in proceedings.)

25         **THE COURT:**  Back on the record.

1          Ms. Hurst?

2          **MS. HURST:**  Thank you, Your Honor.  I wanted to -- I

3   didn't go into detail on all of Mattel's special instructions.

4   I'm not sure whether I need to do that to preserve record or not.

5   Let me just go through and I'll make one or two comments on each

6   of them and I'll save my last words on our instructions.

7          Mattel has special instruction number 17, the inverse

8   ratio rule.  The inverse ratio rule is only applicable to factual

9   copying, not legal copying; that is, to the extent it is legally

10  viable at all.  It only relates to the issue of how much

11  similarity do you have to prove it to show access.

12         Access is not disputed in this case.  So it's not

13  proper -- it improperly lessens the burden of proof on legal

14  copying.  It's clearly not proper to give.  So we would object to

15  that.

16         **THE COURT:**  Okay.

17         **MS. HURST:**  Similarly, special instruction number 18 --

18         **THE COURT:**  What was the inverse ratio rule?

19         **MS. HURST:**  That was 17.

20         18, evidence of copying names or title.  Again, this is

21  for -- they're trying to lard up all these instructions that are

22  only relevant to factual copying when access isn't disputed.  And

23  also the form instructions cover it.

24          **THE COURT:**  Okay.

25         **MS. HURST:**  19, three dimensional works can infringe two

1   dimensional works.  We have never said otherwise.  Again, it's a

2   non-issue and it puts improper emphasis on their argument.

3          20, differences are not a defense to copyright

4   infringement.  I don't know what that means.  This is again,

5   improperly trying to mess up the test for infringement.  It's not

6   lessening the quantum of proof.  Pointing out differences.  It's

7   so jury can make the evaluation under the substantial similarity

8   comparison.

9          21, alteration of color is not a defense to copyright

10  infringement.  This is completely irrelevant.  Again, it's trying

11  to lessen their burden.  But what I think they're really trying to

12  do here is say that if all Carter Bryant did was color in his

13  drawings while he was still employed by Mattel, that that would be

14  a protectable work, which is just plainly not correct.  So that's

15  confusing and improper.

16         Special instruction number 22, intent to infringe.  Not

17  necessary for liability.  The form instructions make clear what

18  the elements are.  This is again, it's not necessary.

19         So that's all those special instructions they offered.

20         **THE COURT:**  Okay.

21         **MS. HURST:**  Let me go back to the last round of points

22  and be done.

23         Our understanding is that the Court has -- is sending

24  the theory of indirect profit to the jury on all the core female

25  sculpts.  And the assertion that the mere use of the core sculpt

1   is itself an infringement, this is an incorrect proposition of

2   law, so we really need to get this sorted out.

3           It may be that the core sculpt infringes one or more of

4   the preliminary sculpts or the drawing that Mr. Zeller referenced,

5   5-88, 5-89.  But that's the core sculpt just qua core sculpt.

6   When we're talking about the dolls, they have to be considered in

7   their entirety, and the comparison has to be made in its entirety.

8   And the comparison has to be to those sculpts.

9           The step that Mr. Zeller is skipping is basically he is

10  trying to say, well, because we own -- we might own the

11  preliminary sculpt or those proportion diagrams, then that also

12  means we own the final production sculpt and we can make a

13  comparison of the final production sculpt to the completed dolls.

14  That's incorrect.

15          They don't gain ownership over the final production

16  sculpt by virtue of it possibly being an infringing work.  The

17  comparison has to be between what they own and what they accuse.

18  And when they own a preliminary sculpt and they're accusing a

19  subsequent generation doll, then that's what the comparison has to

20  be between.  That's infringement.

21          Now, if they're trying to say that if the final

22  production sculpt infringes and it's incorporated in the

23  subsequent generation dolls, then they should get indirect profits

24  on those dolls, which I believe is really what the Court said in

25  its minute order explaining footnote 9 the other day.  That's the

1    way I read the minute order amending and explaining footnote 9,

2    then that's the way it should be charged.  There has been no

3    determination whatsoever that those subsequent generation dolls

4    are infringing on either of those two sculpts.  And they don't.

5    It's clear.

6            I mean, it's clear from the comparison that they don't.

7    If you hold up that gray sculpt to pick one subsequent generation

8    doll, Wild West Fianna -- and this is what the Ninth Circuit

9    determined.  It doesn't infringe.  You look at those two things

10   and evaluate them.  You don't pretend that the fashion and

11   accessories and the face paint and hair and all that other stuff

12   isn't there.  That's the product they're accusing.

13           So there is no substantial similarity between the gray

14   sculpt and the subsequent generation work.  And I presume this is

15   why the Court's order explaining further footnote 9 the other day

16   said they are not barred from arguing they're entitled to profits

17   on all of those dolls, but that is an indirect profits theory.  It

18   is not an infringing work theory.

19           The notion that we don't have to identify what is

20   necessary for the comparison, of course you do.  The forms

21   contemplate that you do.  Maybe I didn't give a long enough list,

22   but we have to say, on the one hand, you have to determine what

23   Mattel owns and once you have determined that, that's what you

24   have to compare.

25           And the reason we have to do this also is because it may

1  be that Mattel owns a derivative work if they prevail on some

2  theory of ownership, it may be they only own a derivative work, in

3  which case they would only own the quantum of additional original

4  expression that was added in that work, and then the jury would

5  have to compare that on a derivative work basis comparing only the

6  quantum of additional original expression to the accused works.

7          So we have got to have this -- a structure around this.

8  And you can't just be waving your arms around and saying, hey,

9  there is a bunch of drawings and that's our claim.  And that's

10  exactly what they tried to do with trade secret, too.

11          And it's not just good enough to put a list on the

12  verdict form.  Again, for the same reason that we said in the

13  trade secret context, it now assumes it has been passed and the

14  question has been answered.

15          So we have got to put a structure around this where it's

16  made clear to the jury first you have to look at ownership, and

17  once you decide if Mattel owns something, then that's what you

18  compare.  And by the way, if you decide they only own a derivative

19  work, so let's say they think Carter Bryant did the drawings in

20  1998.  Maybe they think they only did the coloring, so he did the

21  coloring in the year 2000.  Then our view would be that's not

22  enough to own anything.  But at most, all they would own is the

23  coloring.  And then that would have to be all that they own and

24  can be compared.

25          So it's complicated.  It's confusing.  And the jury has

Page 62

1    to be given a road map to how to do this properly if they want all

2    those millions of drawings and all that other stuff in there.  Our

3    view is this whole thing could be just boiled down to do they own

4    the pitch book?  Do they own the two sculpts?  And that would be a

5    fair way of putting in to the jury.  But if they want all that

6    other crap in there, the jury is going to have to be given a road

7    map to this.  Pardon me.  That's too colloquial a term.  I

8    apologize.

9            I don't know where -- I mean, I don't know what I'm

10   missing, but I don't know of any basis for the assertion that

11   willful infringement gives the Court the authority to enhance

12   damages.  That's not true under the Copyright Act.  There are no

13   punitive damages under the Copyright Act.  So that's just not

14   correct.

15           So if the Court is not going to give the instruction on

16   disallowing expenses, which it shouldn't do because that's the law

17   in the Ninth Circuit, then willful infringement instruction is not

18   given.  Sure, there is enhancement on the trade secret claim.

19   That's the willful misappropriation instruction.  But willful

20   infringement is only relevant to statutory damages, which we have

21   stipulated in the first round are not relevant here.

22           That brings us to the test for infringement.  I'm going

23   to just say I think total concept and field cannot be rationalized

24   with section 102(b), and I'll leave that point at that.

25           If we're going to give the two-part test, say, past

df692778-4a00-4f96-b0c6-0544125347a0

1   through extrinsic and then go to intrinsic, I think it's going to

2   be really hard to understand.  But if that's what we're going to

3   do, then either way, even if we're not going to call it intrinsic

4   and extrinsic, if we're just going to give them two tests, however

5   we're going to do it, there is no doubt that the ideas that cannot

6   be considered must be identified.  That is just black letter Ninth

7   Circuit law.

8           In fact, that was the error the district court was found

9   to have made in the Ninth Circuit opinion.  The district court

10  erred in failing to filter out all the unprotectable elements of

11  Bryant's sketches.  I'm reading from the amended opinion.  And

12  then it goes on to list unprotected elements that the district

13  court used which it had found to be an inadequate number of

14  unprotected elements.  So, absolutely those have to be filtered.

15  That is just black letter Ninth Circuit law.  And you have to tell

16  the jury what they are.  That's the whole point of the extrinsic

17  test.

18          Mr. Zeller's view, I guess, is that we don't tell them

19  what the protected elements are.  Personally, given that the Ninth

20  Circuit has determined what protected elements are, I think it's

21  crazy not to tell them that.  If the Court has found additional

22  protected elements, I'm not objecting to them being instructed on

23  all of what has been determined to be protected elements so that

24  they have as much information as possible to enable them to make

25  the comparison.

Page 64

1          Harbor House I think is the case, Your Honor, that

2   squarely holds that they have to be told what the unprotectable

3   elements are.  There are other cases that say that too, but Harbor

4   House is --

5          So I think that that implicates -- and then the final

6   thing was that I said that we needed to have poses and postures in

7   some of these other elements, because Mattel has been arguing that

8   these things are unique elements.  And Mr. Zeller responded and

9   said that they have not argued that about Toon Teens.

10          Let me just read to the Court from the opening statement

11   of Mr. Quinn at pages 66 and 67.  He is talking about Toon Teens,

12   and he says -- and this is 66/22, "We're saying there are unique

13   elements here.  He was influenced by Ms. Martinez' work in 1999.

14   And you can see it's 1999.  And that helps us place in time when

15   it was he created these Bratz drawings in 1999.  Toon Teens did

16   not exist in 1998.  That's our point.  And there is another

17   interesting thing you might notice.  The Toon Teen drawings didn't

18   have noses," and he goes on to talk about noses.

19          There is absolutely no doubt that they did in opening

20   and they intend to close, to argue that there were unique elements

21   of the Toon Teens drawings that were copied by Mr. Bryant and that

22   that places in time his creation.

23          Now, this is the fallacy and the sham, frankly, that

24   they have perpetuated in this case from the beginning.  They want

25   to say that there are unique elements and that that shows that Mr.

Page 65

1    Bryant copied.  Now, if they were making a copyright infringement
2    claim on Toon Teens, okay, then all of the instructions would have
3    to apply.  And by the way, they don't have any proof of access on
4    this one.
5            So given all those unprotected elements -- to the
6    drawings that is -- yeah, they had proof of access to the dolls
7    but never to the drawings.  So you might even have to say that to
8    show factual copying in a situation like this, they would have to
9    show striking similarity because there is not a lot of protected
10   expression there.  But they avoid all of those requirements, okay,
11   by just saying, "well, we're not really claiming infringement."
12           They avoid all the requirements by calling it a timing
13   argument when it's really a disguised infringement argument where
14   they're trying to avoid the requirements.  Because they're saying,
15   oh, there's these unique elements.  Look at that pose of that
16   thing standing on those roller skates, unbalanced.  It's so unique
17   that he must have copied it, and that's how we know he did it in
18   1999.
19           And they're putting one over on everybody by doing that
20   to avoid the requirements of what would really believe a unique
21   and original element.  And they're doing it because of the statute
22   of limitations.  They don't want to make that claim because it
23   would absolutely be barred under the statute of limitations.  So
24   to use Mr. McConville's term, they're running the shamolam here on
25   the Toon Teens.  We're not making that claim.  But the reality is

df692778-4a00-4f96-b0c6-0544125347a0

1   they are making a disguised copyright claim.  Because the only way

2   it could establish timing was if it met the requirements of the

3   Copyright Act.  That is, there was copying of something that

4   really is original.

5         All dolls stand around with their arms like this.

6   That's how they pose and show their clothes.  We showed it with

7   that Blythe thing.  We showed it Diva Starz.  All these other

8   things that come into the record, they're not original elements,

9   and the poses and postures element needs to be included in this

10  instruction as a prophylactic against their disguised Toon Teens

11  infringement claim which has been improper the whole time anyway.

12  They did argue it and they will argue it.

13        **THE COURT:**  All right now, just a moment.  We have had

14  two rounds but we haven't quite -- I want to make sure.  Ms.

15  Hurst, do you have more?

16        **MS. HURST:**  No, thank you.

17        **THE COURT:**  Regardless of the two rounds, Mr. Price,

18  anything else you would like to add?

19        **MR. PRICE:**  I'll let Mr. Zeller add.

20        **THE COURT:**  Mr. Quinn?

21        **MR. QUINN:**  I will also defer to Mr. Zeller, Your Honor.

22        **THE COURT:**  Mr. Zeller, briefly.

23        **MR. ZELLER:**  Just briefly, Your Honor.  As the Court

24  knows, and we have said to the jury, said to the Court time and

25  time again, our copyright infringement claim is not of Toon Teens.

1    That's just -- MGA can engage in any amount of rhetoric about it

2    being a supposed sham and a disguise and that's really our claim,

3    it is not.  It is to show timing.  The Court is aware that MGA

4    itself makes very similar arguments.  It's put in front of the

5    jury, Steve Madden adds saying that was the inspiration and this

6    is to help show timing.

7          No one is arguing that Carter Bryant copied Toon Teens

8    in the copyright sense or copied Steven Madden in the copyright

9    sense.  It is to show that there is a certain timing to the

10   influences that he had in creating his drawings.  And that is why

11   it is relevant evidence.  It would be confusing in the extreme for

12   the Court to start instructing on what the jury should not find

13   protectable about the Toon Teens illustrations.

14         The jury knows and has been told, and the Court can tell

15   them again, that this claim of infringement is not of Toon Teens.

16   It doesn't require conflating a series of arguments about what is

17   protectable and what wouldn't be hypothetically if Mattel asserted

18   such a claim about poses.  The fact is, is that -- and Ms. Hurst

19   also elides not only the concept of what the copyrighted work is

20   that's being asserted as being infringed, but also eliding the

21   concepts of even calling something unusual or unique doesn't make

22   it protectable and no one said it does.

23         Ms. Hurst alluded to the concept of striking similarity.

24   Under the law, the fact is that something can be completely

25   unprotectable, but yet it can be used if it's considered to be a

df692778-4a00-4f96-b0c6-0544125347a0

1    striking similarity, as proof of access and copying.  It's

2    completely divorced of the notion of whether it's actually

3    protectable or not.

4            And any number of examples have been given in the case

5    law, but one would be in the days past when people used to put

6    together catalogs, they would seed information in there.  If

7    people -- and that's s-e-e-d -- and they would put in basically

8    some error, some misinformation and see if someone else copied it

9    to see if they're copying our catalog.  They do the same thing

10   with maps and the like.  This is obviously some time ago.  But

11   courts never got confused about somehow the concept that that kind

12   of similarity, that kind of striking similarity meant that someone

13   was asserting, or the plaintiff was asserting that it made it

14   substantially similar.  It just simply proved access.  It proved

15   factual copying.  So, really there is no basis for interweaving

16   these concepts into the substantial similarity instruction based

17   on MGA's arguments about Toon Teens, which are, in our view,

18   misdirected.

19           The only other point I would make in response to this is

20   that the Court's ruling on the difference between the dolls and

21   the sculpt I think has been clear since summary judgment.  The

22   Court has obviously elaborated on its sense for the benefit of

23   MGA.  It appears that MGA is still trying to make some sort of

24   argument that doesn't really still draw the proper distinction

25   that the Court has been making.

1            The sculpt, when it is used, if the jury finds it to be

2    virtually identical, under the articulated Ninth Circuit

3    substantial similarity test, will be infringing.  It doesn't

4    matter whether they -- whatever they adorn it with, the sculpt

5    itself will still be infringing.  The jury will have to make a

6    determination as to what the remedy should be for that.  But it's

7    not as -- it's not that the "dolls" became infringing.  The fact

8    is, is that these are works, the sculpts themselves, that are

9    capable of protection independently.  And the jury is simply going

10   to have to make that determination as to what damages should be

11   awarded should they find that MGA's reproduction of the sculpt is

12   infringing.

13           And somehow it's, again, still being conflated because

14   MGA was just arguing that the dolls had to be considered in their

15   entirety.  The Court's already made very clear what the jury is

16   going to be comparing when it talks about the dolls in their

17   entirety.  And that is on the six dolls that the other Court has

18   identified.

19           So I just think that ultimately, again, this distinction

20   that MGA is now trying to draw having been mistaken previously on

21   the difference between the dolls and the sculpts still perpetuates

22   something that's not consistent with the Court's ruling.

23           **THE COURT:**  Mr. McConville, do you agree with Ms.

24   Hurst's argument so far?  Anything you would like to add?

25           **MR. MCCONVILLE:**  Nothing to add, Your Honor, and I do

1   agree.

2           **THE COURT:**  Ms. Keller?

3           **MS. KELLER:**  Same, Your Honor.

4           **THE COURT:**  Ms. Hurst, last opportunity.

5           **MS. HURST:**  Your Honor, the only thing that I would add

6   is based on this last round of comments, it appears that Mr.

7   Zeller said, if I heard him correctly, he agrees the dolls did not

8   become infringing by virtue of sculpt infringement and really it's

9   a question of remedy, in which case I think we are on the same

10  page, that that's an indirect profits claim.  I would urge the

11  Court maybe to go back again and take another look at this whole

12  issue of what does it mean that the sculpt might infringe with

13  respect to the subsequent generation dolls.

14          **THE COURT:**  Okay.  Thank you.  We've closed the door now

15  on copyright.  If I need any additional information, I'll call

16  you.  Otherwise, I'm not accepting any further briefing on this

17  unless asked for.  You have adequately briefed it.  Keep your

18  associates' business to themselves from now on unless I inquire.

19  Understood?

20          **MR. QUINN:**  Yes, Your Honor.

21          **THE COURT:**  No more avalanche now.  We're done with it.

22  If I have questions, I'll come back and ask you.

23          **MS. HURST:**  Your Honor, I apologize.  I forgot.  There

24  is one thing I wanted to add.  We filed a breach of contract other

25  day asking for reconsideration on the 205(d) defense.  And I

Page 71

1    wanted to ask that the Court instruct the jury on the 205(d)

2    defense.

3            THE COURT:  We have that.  Thank you.

4            How long do you need for intentional interference?

5            MR. ZELLER:  15 minutes or less.

6            MS. HURST:  Are we doing contract interpretation as part

7    of that?

8            THE COURT:  Contract interpretation as part of that.  In

9    other words, I'm closing the door today on intentional

10   interference.

11           MS. HURST:  Including all issues of contract

12   interpretation?

13           THE COURT:  Including all issues of contract

14   interpretation.

15           MS. HURST:  Are we also addressing all other theories of

16   ownership?

17           THE COURT:  All theories of ownership.  I'm closing the

18   door after today.

19           MS. HURST:  I'm going to need an hour probably.

20           THE COURT:  Mr. Zeller, an hour also?  Take coequal

21   time.  If you need less, so be it.  Or more.

22           MR. ZELLER:  Until I know what she is going to say, but

23   honestly I don't think, frankly --

24           THE COURT:  Why don't I have MGA start this time even

25   though it's your claim, and I can go three rounds again.

df692778-4a00-4f96-b0c6-0544125347a0

Page 72

1          **MR. ZELLER:**  Okay.

2          **THE COURT:**  Okay.

3   (Whereupon there was a change in reporters and DEBORAH PARKER

4   reported the 3:00 session.)

5                              -oOo-

6                            CERTIFICATE

7

8          I hereby certify that pursuant to Section 753, Title 28,

9   United States Code, the foregoing is a true and correct transcript

10  of the stenographically reported proceedings held in the

11  above-entitled matter.

12

13  Date:  MARCH 6, 2011

14

15

16  MARIA DELLANEVE, U.S. COURT REPORTER
    CSR NO. 9132
17

18

19

20

21

22

23

24

25