Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

```
MATTEL INC., et al.,            )
                                )
              Plaintiff,        )
                                )      STATUS CONFERENCE
         vs.                    ) No. CV 04-9049-DOC
                                )      VOLUME 4 OF 4
MGA ENTERTAINMENT, INC.,        )
                                )
              Defendant.        )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

SUNDAY, MARCH 6 , 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

0a64f2f0-d296-4a3a-955f-cc2991eb47c2

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:   QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                           BY:  MICHAEL ZELLER, ESQ.
 3                         and  JOHN QUINN, ESQ.
                           865 S. FIGUEROA
 4                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
 5                         (213)443-3000

 6
      FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
 7                         BY:  ANNETTE HURST, ESQ.
                           405 HOWARD STREET
 8                         SAN FRANCISCO, CALIFORNIA 94105
                           (415)773-5700
 9

10
      FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                         BY:  THOMAS MCCONVILLE, ESQ.
                           4 PARK PLAZA
12                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
13                          (949)567-6700

14
                           KELLER RACKAUCKAS
15                         BY:  JENNIFER KELLER, ESQ.
                           18500 VON KARMAN AVENUE
16                         SUITE 560
                           IRVINE, CALIFORNIA 92612
17

18

19

20

21

22

23

24

25
```

```
 1              SANTA ANA, CALIFORNIA; SUNDAY, MARCH 6, 2011
 2                               -oOo-
 3          THE COURT:  Back on the record.
 4          Mr. Zeller?
 5          MR. ZELLER:  I fear I may have been somewhat inartful in
 6  how I have been attempting to describe the problem we're wrestling
 7  with in calling the terms "reasonable."  And part of it goes back
 8  to, in some respects, the functional equivalent to saying the
 9  contract is ambiguous.  Because the punch line, if the Court is
10  going to give the equivalent of 3.-- or excuse me, 3.20,
11  interpretation construction against the drafter --
12          THE COURT:  Just a moment.  I don't know that I'm going
13  to give that.  Usually it was the case the Court should be
14  reluctant to give that unless it's a deadlocked jury.  So I'm not
15  certain I'm giving that at all.
16          MR. ZELLER:  And we don't want that read.  We think it
17  should be only to a deadlocked jury.  But just under one scenario,
18  if that instruction is read, when you sort of bookend these things
19  where the Court first says both interpretations are reasonable,
20  then if the Court were able to read 3.20 where it basically says,
21  but if you can't decide, or if these interpretations basically are
22  doing equal battle, you do it against -- you construe it against
23  the drafter, I mean, again, it gets us back to this point of where
24  we were concerned about using the term "ambiguity."
25          And "reasonable" is the same thing as "ambiguous" in a
```

Page 4

1  sense too.  It's just the flip side of it some ways of how we get
2  to "ambiguity."  We all as lawyers and Your Honor, of course,
3  knows that "ambiguous" is a legal term.  It carries a certain
4  consequence.
5         **THE COURT:**  You're playing with fire.  There is a good
6  reason for giving "ambiguity."  You should be searching for
7  something as an alternative.  And, unless you give me that, I'm
8  warning you, you are walking on very fine line with this
9  instruction.  And once I make the decision, I'm not going to back
10 away.
11        **MR. ZELLER:**  I thought we had, Your Honor.  And our
12 proposal, our suggestion, proposed instruction is to say, either
13 what the court has said in terms of, "this is for you to decide,"
14 or, "the contract is open to interpretation in this respect."  And
15 we think that gets it across rather than --
16        **THE COURT:**  Just a moment.
17     (Brief pause in proceedings)
18        **THE COURT:**  Please continue.
19        **MR. ZELLER:**  We do think that those alternative phrases,
20 including, "the contract is open to interpretation in this
21 respect," gets across to the jury what its job is.  "Reasonable"
22 is just like "ambiguous."  It's value laden.
23        And, moreover, we do think it's a proper determination
24 for this jury to decide in the context of what it is going to do,
25 that one-size interpretation is not reasonable.

1          I mean, the real problem here is -- and the Court hit
2    this previously, which is the terms "ambiguous" and "reasonable"
3    are legal terms that don't necessarily by definition mean that
4    it's proper to use them with the jury.  And that is because -- I
5    mean, the term "ambiguous" simply means it's up to the jury to
6    decide it.  But that doesn't mean that the jury has to be told
7    it's ambiguous.  That's just the conclusion that leads to the
8    further conclusion that this is proper for the jury to determine.
9          And so that's really our difficulty with the term
10   "reasonable."  And the Ninth Circuit did not limit what the jury
11   could decide on these issues.  I mean, that's the open playing
12   field and those are our concerns.
13        **THE COURT:**  Okay.  Ms. Hurst?
14        **MS. HURST:**  "Both proffered interpretations are
15   reasonable," is the correct way to solve this problem.  It gives
16   equal dignity to both sides.  It does not solve the problem to
17   say, "This is an issue for you to decide."
18        They want to preclude our interpretation as a reasonable
19   one.  And that is a misstatement of the law of this case when that
20   statement gets made, as it will, as it has already been in opening
21   statement.
22        It's not putting too big a thumb on the scale to give
23   that with 3.20.  Now, we have not said it's ambiguous.  We have
24   just said both sides are being reasonable.  Good Lord, that's
25   reasonable.  But 3.20 has got to be given along with the rest.

1         Let me just back up a minute because Mr. Zeller made a
2    few other comments earlier that I didn't respond to.
3         We agree 3.15 should be given.  CACI 3.15.  We agree
4    CACI 3.16 should be given.  We agree CACI 3.17 should be given.
5    We agree CACI 3.18 should be given.  In addition, and as an
6    adjunct to CACI 3.15 and 3.16, we ask for our special instruction
7    "conception and reduction of practice" providing what the special
8    meanings are that the jury can choose if they wish to do so.
9         And I understand we may not want to argue that
10   instruction now.  I just wanted to put that down since we were
11   talking about 3.15 and 3.16 so we can come back to it later.
12        **THE COURT:**  We're going to come back to it tomorrow no
13   matter what.  So you're both going to have a good opportunity.
14   Now, I'm not going to set this down done until I have a
15   semi-complete set of instructions.  I'm tired of looking at all
16   the minutia and paperwork now.  So it's inefficient for me to come
17   back to it and back to it.  A lot of final decisions are getting
18   made by me now.
19        **MS. HURST:**  On 3.20, there is no cite whatsoever for
20   that use note about giving it only when the jury is deadlocked,
21   and that is not consistent with civil code 1654.  1654 says, "In
22   cases of uncertainty not removed by the preceding rules."
23        **THE COURT:**  How can you have cases of uncertainty if
24   both interpretations are reasonable?
25        **MS. HURST:**  No.  "In cases of uncertainty not removed by

1 the preceding rules." That is the preceding rules of
2 interpretation. In other words, we have now given them 3.15,
3 3.16, 3.17, 3.18. Maybe some others as well depending on where we
4 go with conception and reduction to practice, anything else that
5 may be proposed.
6 So what you get with 3.20 is try to work it out with all
7 these other rules. But then if you can't, if you can't come to an
8 agreement after that, if you can't come to a conclusion about what
9 it means, if it's still uncertain, then construe against the
10 drafter. And this is why we need -- this is why we do need the
11 instruction "both interpretations are reasonable." Because,
12 otherwise, they want to argue there is no uncertainty, period, and
13 there is uncertainty. It's the law of the case that there is
14 uncertainty.
15 They're entitled to the benefit of all the other
16 instructions as are we about how to remove the uncertainty. But
17 they're not entitled to preclude us from the fact of the
18 uncertainty, which is what they're trying to do.
19 **THE COURT:** Okay.
20 **MS. HURST:** And it's not a deadlocked situation in City
21 of Hope. It was not a deadlocked situation when the instruction
22 was given. Civil Code 1654 is a substantive rule of
23 interpretation. It's a rule of last resort, but that doesn't mean
24 you only give it when the jury is deadlocked. You just tell the
25 jury, and they follow the instruction, this is your rule of last

Page 8

1  resort.  So open to interpretation --

2  **THE COURT:**  How can it be a rule of last resort?  In
3  other words, how did we get in that position in a trial of that
4  type if it's not -- in other words, if you are giving it, it
5  doesn't become a rule of last resort.

6  **MS. HURST:**  It is, if you tell them it is.  You have to
7  -- to conclude otherwise presumes that the jury doesn't do its
8  job.

9  **THE COURT:**  What it means is that the Court never gave
10 that instruction to begin with.

11 **MS. HURST:**  They did in City of Hope, which went to the
12 California Supreme Court.  They gave the instruction.

13 **THE COURT:**  They gave that the first time to the jury?
14 I don't think so.  I think that they gave it in the City of Hope
15 later as the jury became deadlocked.  Now, I may be wrong so we'll
16 both go back and do some reading tonight.  I think in the City of
17 Hope that instruction was not initially given.  I may stand
18 corrected so I need to go back in chambers.

19 **MS. HURST:**  The Court may be correct.  I'll read the
20 language I was looking at.

21 **THE COURT:**  Just find that fact situation for me if it's
22 there.  It may not be in the case.

23 **MS. HURST:**  It says the trial court gave the jury a
24 series of instruction on the rules governing interpretation.

25 **THE COURT:**  Just a moment.  I will guarantee you when I

1  go back in and read that case the Court gave the jury a series of

2  instructions only because they either sent out a note or had

3  gotten hung up.

4          **MS. HURST:** I'm just looking.  Hold on one second.

5          **THE COURT:** Frankly, it wouldn't have been an issue

6  otherwise.

7          **MS. HURST:** Not true.  Because --

8          **THE COURT:** You just find that out for me, both of you.

9          **MS. HURST:** Genentec asserts that, "The Court erred by

10 instructing the jury that if after applying other rules of

11 interpretation there remains an uncertainty, that language must be

12 interpreted against the party who caused the uncertainty to

13 exist."

14         I mean, basically Genentec attacked the very form

15 instruction that we're talking about.  So that's how the issue

16 arose.  That's what I'm reading here, Your Honor.

17         **THE COURT:** All right.  Anything further?  I'll go back

18 and look at it tonight.

19         **MS. HURST:** I wanted to add on this point.  This is an

20 adhesion contract.  And they have conceded this was a condition of

21 employment.  All their witnesses have testified it was a condition

22 of employment that you had to sign this contract.  Mr. Eckert

23 testified he had to sign this contract to have a job.  And the

24 rule in the case of an adhesion contract is they construe against

25 the drafter applies with even more force.

1           That rule cannot be honored if the instruction is not
2   given, say, for deadlock.  So it has to be given.  It's given, and
3   it is stated that it's a rule of last resort.  But it is not given
4   only in the case of deadlock, especially in a case like this where
5   it's an adhesion contract and the rule applies with more force.
6           I have nothing for add on disputed term.
7           **THE COURT:**  Why don't I simply cease the argument
8   tonight.  I think I have heard you.  I want some time now in
9   chambers to do some work.
10          Unless Mr. Zeller, one quick comment.
11          **MR. ZELLER:**  Thank you.
12          **THE COURT:**  And then Ms. Hurst one quick comment.
13  That's it.
14          **MR. ZELLER:**  3.20 doesn't say if there is still
15  uncertainty, you resort to construing agreement against the
16  drafter.  It says if you still cannot agree on the meaning of the
17  term, which is why we're concerned.  If the first part of the
18  instructions say both sides have reasonable interpretations and
19  then you get to the last instruction, it says, and if you can't
20  agree on the meaning of this after being told that both sides are
21  perfectly reasonable in how they're approaching this, I mean, that
22  takes essentially off the table the jury's task.
23          And we do think it's totally within the jury's
24  discretion to decide, based on the language of the agreement, the
25  extrinsic evidence and anything else that they have in front of

Page 11

1  them, that there is not uncertainty and/or one side's
2  interpretation is unreasonable.
3           The other point I would make is that MGA actually
4  disclaimed, and the Court noted this in its order on the motions
5  in limine, that MGA disclaimed any adhesion contract argument.  I
6  mean, that's off the table by MGA's own concessions.  And the
7  record is that, in fact, people do negotiate these terms.  An
8  "agreement for inventions" certainly is a term or precondition for
9  employment at Mattel but that does not make it an adhesion
10 contract.
11          Parties or people going to Mattel have and do and
12 certainly have the ability to negotiate the terms of that
13 agreement.  So it is not an adhesion contract, and MGA by our
14 understanding and certainly as reflected in the Court's motion in
15 limine order, actually abandoned that view.
16          **THE COURT:**  Mr. Price, do you have anything to argue?
17          MR. PRICE:  No.
18          **THE COURT:**  Mr. Quinn?
19          **MR. QUINN:**  No, Your Honor.
20          **THE COURT:**  Which one of you gentlemen will be arguing
21 this to the jury?  Still deciding?  If you are, that's fine.
22          **MR. QUINN:**  We're still deciding.
23          **THE COURT:**  That's fine.
24          Ms. Hurst, briefly.
25          **MS. HURST:**  3.20 says, first, consider all of the other

1  instructions. So it does make it a rule of last resort. If that
2  weren't clear, then we should just use the language of civil Code
3  1654 and drop it wholesale into an instruction, in case of
4  uncertainty not removed by the preceding rules, interpret against
5  the drafter.
6       We abandoned our unconscionability defense. That's not
7  the same thing as our contention that the contract is one of
8  adhesion. And it plainly is. All the testimony has been to that
9  effect. Everybody said you have to sign one of these to come to
10 work at Mattel. And so it is an adhesion contract.
11      Anyway, we didn't abandon our contention that it was an
12 adhesion contract. Quite frankly, after Mr. Eckert's testimony
13 unconscionability is back on the table but let's not go there
14 tonight.
15 **THE COURT:** We're going to save intentional infliction
16 for tomorrow, and we have some more discussion on contractual
17 issues.
18 **MS. HURST:** I have a deposition tomorrow afternoon
19 2:30 to 7:30.
20 **THE COURT:** You'll be there. I'm going to order you
21 back 10:00 a.m. tomorrow. We might even try for 9:30. I can be
22 done with this calendar at 9:30. All counsel ordered back at that
23 time. Good night.
24      We're back on the record.
25      The consumer report of Mr. Tumaliuan was not prepared by

1  Mattel's custodian of records.  TX 20572 through -28 reveals that

2  the report was prepared by Choice Point, the consumer reporting

3  agency.

4         Therefore, Mattel's custodian of records is not a person

5  with knowledge of the contents of the report.

6         Therefore, this report was offered by Mattel, and it

7  does not fall in the business record exception.

8         It will not be admitted.

9         Now, we're off the record.

10        (Whereupon the proceedings were adjourned at 5:45

11  p.m.)

12

13                              -oOo-

14

15                           CERTIFICATE

16

17       I hereby certify that pursuant to Section 753, Title 28,

18  United States Code, the foregoing is a true and correct transcript

19  of the stenographically reported proceedings held in the

20  above-entitled matter.

21

22  Date:  MARCH 6, 2011

23

24  _____

25  MARIA DELLANEVE, U.S. COURT REPORTER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25