1

2

3

4          UNITED STATES DISTRICT COURT

5          CENTRAL DISTRICT OF CALIFORNIA

6               SOUTHERN DIVISION

7                  - - -

8     THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

10    MATTEL, INC., et al.,
                Plaintiffs,
11        vs.

12                                    CV-04-9049-DOC
      MGA ENTERTAINMENT, INC.,
13    et al.,                         Volume 1 of 1
                Defendants.

14    --------------------------

15

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18               Santa Ana, California

19              Monday, March 7, 2011

20

21                  SHARON A. SEFFENS, RPR
22                  United States Courthouse
                    411 West 4th Street, Suite 1-1053
23                  Santa Ana, CA  92701
                    (714) 543-0870
24

25

```
 1    APPEARANCES OF COUNSEL:

 2    For Plaintiff MATTEL, INC., ET AL.:

 3    JOHN B. QUINN
      MICHAEL T. ZELLER
 4    WILLIAM PRICE
      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5    865 South Figueroa Street, 10th Floor
      Los Angeles, CA  90017
 6    (213) 443-3000

 7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8    THOMAS MCCONVILLE
      ORRICK HERRINGTON & SUTCLIFFE LLP
 9    4 Park Plaza, Suite 1600
      Irvine, CA  92614
10    (949) 567-6700

11    ANNETTE HURST
      ORRICK, HERRINGTON & SUTCLIFFE LLP
12    The Orrick Building
      405 Howard Street
13    San Francisco, CA  94105
      (415) 773-4585
14
      KELLER RACKAUCKAS LLP
15    JENNIFER L. KELLER
      18500 Von Karman Avenue, Suite 560
16    Irvine, CA
      (949) 476-8700
17

18    FOR CARLOS GUSTAVO MACHADO GOMEZ:

19    MARK E. OVERLAND
      100 Wilshire Boulevard, Suite 950
20    Santa Monica, CA  90401
      (310) 459-2830
21

22    ALEXANDER COTE
      SCHEPER KIM AND HARRIS LLP
23    601 West Fifth Street, 12th Floor
      Los Angeles, CA  90071-2025
24    (213) 613-4655

25
```

1    **ALSO PRESENT:**

2    **MGA ENTERTAINMENT, INC.**
     **JEANINE PISONI**
3    **16360 Roscoe Boulevard, Suite 105**
     **Van Nuys, CA  91406**

4

5    **ALSO PRESENT:**

6    **ISAAC LARIAN, MGA CEO**

7    **KEN KOTARSKI, Mattel Technical Operator**

8    **MIKE STOVALL, MGA Technical Operator**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

2                                                              **PAGE**

3    **STATUS CONFERENCE**                                        **4**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      SANTA ANA, CALIFORNIA; MONDAY, MARCH 7, 2011; 6:15 P.M.

2              (Jury not present.)

3              THE COURT:  First, I have reviewed the summary

4      judgment order, and I want to go over that on the record.

5          First, Trade Secret Misappropriation:  These are the

6      people who remain:  Brawer, Bryant, Castilla, Cooney,

7      Machado, Vargas, Trueba, Brisbois.  Contreras is no longer

8      part of this claim.

9          Aiding and Abetting Breach of Fiduciary Duty:  This

10     claim has been dismissed in its entirety.

11         Aiding and Abetting Breach of Duty of Loyalty:  Bryant,

12     Cabrera, Morales, Salazar, and Tumaliuan are still subject

13     to this claim.  Everyone else is out, including Brawer,

14     Castilla, Cooney, Machado, Vargas, Trueba, and Brisbois.

15         If you would like me to repeat any part of that for

16     counsel, I would be happy to.  Mr. Zeller, are you okay?

17             MR. ZELLER:  I'm fine.

18             THE COURT:  Ms. Keller?

19             MS. KELLER:  I'm fine.

20             THE COURT:  Mr. McConville?

21             MR. MCCONVILLE:  I'm fine.

22             THE COURT:  Mr. Quinn?

23             MR. QUINN:  I'm fine.

24             THE COURT:  Mr. Price?

25             MR. PRICE:  I'm fine.

1          THE COURT:  Intentional Interference with

2     Contractual Relations:  There may be some confusion on this

3     issue because the summary judgment order started by

4     discussing how the claim was superseded, but I then

5     addressed Mattel's arguments about the validity of its

6     contracts with Cooney, Castilla, and Brawer.

7          The first reason for that was the issue of whether

8     the provision of 1(d) in the Inventions Agreement that

9     requires a departing employee to return valuable materials

10    to the employer is distinct from the trade secret

11    misappropriation allegations.  I noted elsewhere in the

12    order that "there is no allegation, nor any evidence in the

13    record, that these employees engaged in wrongdoing unrelated

14    to the misappropriation of Mattel's information."  But I did

15    not explicitly make that finding in the section of the order

16    discussing intentional interference, even though it has

17    equal force to both claims.

18          The second reason is that I made rulings on issues

19    that I could have avoided because I felt that you are all

20    entitled to a developed record so that you can file appeals

21    and cross-appeals to the fullest extent possible.  I think

22    that's a fair position for both parties to be in.

23          In short, even though the intentional interference

24    claim is superseded as to Brawer, Castilla, and Cooney, I

25    wanted to make rulings on Mattel's contracts with those

 1  employees so that the record would be fully developed.  You

 2  may obviously argue on appeal that my rulings were dicta,

 3  but that's a matter for the Ninth Circuit to resolve.

 4          Most of this can be cleaned up at a Rule 54.  But

 5  since Mattel may be inclined to dismiss this claim as to Mr.

 6  Brawer, I think that the jury will be instructed that this

 7  claim is limited to Bryant, Tumaliuan, Cabrera, Morales, and

 8  Salazar's obligations under paragraph three, but I will let

 9  you make that choice and take your time and decide, Mr.

10  Zeller, what you want to do in that regard.  There is no

11  rush to it.

12          Here are some of my basic thoughts regarding MGA2

13  3121569, which is a draft e-mail from Isaac Larian to Paula

14  Garcia that states --

15          Mr. Holden, would you be kind enough to wait

16  outside for just a moment.  I am going to get to you in just

17  a minute.

18          It's a draft e-mail from Isaac Larian to Paul

19  Garcia:  "Make sure Paula is prepped and doesn't know about

20  the Mattel seamstresses."  Mattel's arguments on this e-mail

21  are fully reflected on its submission at Docket 10040.

22          First, Mattel argues to this Court that the

23  communication is not privileged because Larian intended for

24  its contents to be shared with Paula Garcia.  In other

25  words, the argument is the communication was not "made in

```
 1    confidence" because Mr. Larian was instructing his counsel
 2    to prepare Ms. Garcia to testify that she does not know a
 3    fact" and necessarily commanding Holden to share the
 4    contents of the e-mail with Ms. Garcia, thereby waiving the
 5    privilege.  This initial argument is unconvincing on the law
 6    and the facts.
 7         First, the law is clear that a communication
 8    between a corporate client and its attorney may be made in
 9    confidence, even if it is shared with other employees of the
10    corporation.  Upjohn Co. versus United States.
11         Second, the draft communication does not direct
12    Holden to command Ms. Garcia to lie about her knowledge.
13    The e-mail actually contains an instruction to shield Ms.
14    Garcia from certain facts while preparing her for a
15    deposition, but I am going to be open to reconsideration of
16    this initial statement after hearing Mr. Holden.
17         I think the proper question is whether
18    Mr. Larian's instruction that Holden not disclose certain
19    facts to Garcia is privileged.  That question is governed by
20    the Ninth Circuit's test in United States versus Margolis at
21    557 F.2d 209 at 211 (Ninth Circuit 1977), which provides:
22         First, where legal advice of any kind is sought
23    from a professional legal advisor in his capacity as such,
24    the communications relating to that purpose, made in
25    confidence by the client, are at his instance permanently
```

1   protected from disclosure by himself or by the legal

2   advisor, unless the protection is waived.

3          The prong at issue is the third prong.  Does an

4   e-mail about deposition preparation "relate to the purpose"

5   for which Mr. Holden was retained, representing MGA in

6   connection with its litigation against Mattel?  I am going

7   to assume for purposes of this argument that the law of

8   privilege attaches to a direction to an attorney in

9   connection with pending litigation.

10          This is a difficult issue because, first, on the

11   one hand, you have the Second Circuit cases cited by

12   Mattel's brief; but, second, on the other hand, you have the

13   fact that hundreds of e-mails from each party's clients to

14   their lawyers have been withheld as privileged in this case,

15   even though those e-mails don't have questions and contain

16   simple direction.

17          So this potentially gets us to the crime-fraud

18   standard.  I find that under the first prong of United

19   States versus Zolin at 491 U.S. 554 (1989) an in-camera

20   hearing examination of both Mr. Larian and Mr. Holden may

21   yield evidence to establish the applicability of the

22   crime-fraud exception to the attorney/client privilege,

23   assuming of course that the privilege applies.  That

24   in-camera examination may reveal that Mr. Larian intended

25   for his e-mail communication to further a crime or a fraud.

 1           Now, I want to discuss Anna Rhee this evening

 2    also.

 3           Do you want to have Ms. Hurst present for both of

 4    these motions?

 5           MR. MCCONVILLE:  That's not necessary, Your Honor.

 6           THE COURT:  Okay.  Mattel is seeking to call Anna

 7    Rhee to testify about a December 2010 conversation she had

 8    with Mr. Pootipong Phoosopha, an MGA employee.

 9           Ms. Rhee testified out of the presence of the jury

10    that Mr. Pootipong Phoosopha called her in December 2010 and

11    told her that he had been directed by Mr. Larian to tell her

12    that (1) Mr. Larian knew but was willing to forgive the fact

13    that Rhee lied at the first trial; (2) Mr. Larian had heard

14    that Mattel intended to file a lawsuit against Ms. Rhee; and

15    (3) MGA was willing to provide Ms. Rhee with an attorney in

16    connection with either that hypothetical lawsuit by Mattel

17    or this trial.  That testimony can be found at Docket 9734,

18    pages 39 through 41.

19           Mr. Phoosopha, who had been shielded from Mr.

20    Larian and MGA's general counsel after the Court learned of

21    this factual issue, also testified outside the presence of

22    the jury.  He testified that he had been called into Paula

23    Garcia's office and that Ms. Garcia told him that Mr. Larian

24    wanted to meet with him.  Mr. Phoosopha testified that Mr.

25    Larian directed him to call Ms. Rhee and share with Ms. Rhee

1  that Mr. Larian had heard "she might be sued, something like

2  that," and that if Ms. Rhee did get sued, she could reach

3  out to Mr. Larian for an attorney.

4        Mr. Phoosopha denied that Mr. Larian said anything

5  about Ms. Rhee's truthfulness at the first trial.  On

6  cross-examination, Mr. Phoosopha, who is not a native

7  English speaker, expressed confusion about the difference

8  between being sued and being part of a legal proceeding,

9  like being served with a trial subpoena.  He also testified

10  that Ms. Rhee responded that she hoped somebody "is not

11  suing again."  His testimony can be found at Docket No.

12  9734, pages 29 through 37.

13        Mr. Larian was asked about this episode during his

14  testimony in this trial.  He testified that he spoke with

15  Mr. Phoosopha in a cubicle in the southeast/north corner of

16  MGA's design center prior to this trial.  He testified that

17  he directed Mr. Phoosopha to "Call Anna Rhee.  Ask her if

18  she wants a lawyer in this trial.  If she does, we can --

19  MGA can provide one."

20        Thus, the inconsistency the Court initially finds

21  between Mr. Larian and Mr. Phoosopha's testimony concerns

22  the issue of whether Mr. Larian said Ms. Rhee would be

23  "sued" by Mattel or called as a witness by Mattel.

24  Mr. Phoosopha expressed some confusion about that

25  distinction and attempted to clear it up on redirect

examination.  Then there was the inconsistency between Ms.
Rhee's testimony about Mr. Phoosopha's testimony because Ms.
Rhee claims that she was accused of lying at the first trial
and that Mr. Phoosopha disagrees with Ms. Rhee's account.

Mattel identifies two reasons why Ms. Rhee's
testimony about her conversation with Mr. Phoosopha is
relevant:

The first is consciousness of guilt.  Mattel has
argued that Mr. Larian offered to help Ms. Rhee in order to
purchase her favorable testimony in this lawsuit and/or in
order to prejudice her against Mattel.  That shows his
concern that Ms. Rhee's testimony would be unfavorable to
MGA's position.  The argument is that only guilty people try
to cover up bad facts, which is itself an argument that is
hotly contested by the parties.

Setting that aside, the problem is that Ms. Rhee's
testimony is hearsay, though it is not double hearsay, since
Mr. Larian's statements are not being offered for their
truth if it comes in under consciousness of guilt.  The
issue is Mr. Phoosopha's statements to Ms. Rhee about what
Mr. Larian said to him are being offered for their truth.
That's a critical distinction.

It is Mr. Larian's statements to Mr. Phoosopha
that supposedly evidence Mr. Larian's consciousness of
guilt.  Mr. Phoosopha is not a party opponent, and his

```
 1   consciousness of guilt is irrelevant, especially given these
 2   fact circumstances in which he did not really act of his own
 3   volition.
 4           Thus, initially subject to counsels' arguments
 5   this evening, I am going to tentatively conclude that
 6   Mr. Phoosopha is the proper witness on the issue of
 7   Mr. Larian's consciousness of guilt.  Mattel is free to ask
 8   him about what Mr. Larian directed him to do.
 9           Concerning Ms. Rhee's state of mind, Mattel argues
10   that the phone call with Ms. Rhee may have influenced her
11   testimony, and also rebuts any bias Ms. Rhee may have had in
12   Mattel's favor even though her lawyer is being paid for by
13   Mattel.  I find this argument less convincing.  The cases
14   cited by Mattel involve actual threats of physical or
15   economic harm, so the conduct here is distinct from the
16   conduct discussed in Mattel's cases.
17           I'm otherwise unclear on how this episode goes to
18   Ms. Rhee's state of mind and bias.  Even if it did, a
19   limiting instruction to the jury that it not consider
20   Mr. Phoosopha's statements for their truth is unlikely to be
21   very effective since Mr. Larian is sitting right here in
22   court and has been asked about this issue.
23           I am going to open this up briefly to conversation
24   with the Court on this second area concerning Ms. Rhee's
25   testimony.  Let me caution Mr. Zeller, Mr. Price, Mr. Quinn,
```

 1   here is the difficulty I am having.  Consciousness of guilt

 2   is a concept that involves a person speaking to another

 3   person.  Here the difficulty is that there is an

 4   intermediary, Pootipong, who Mr. Larian is speaking to.  So

 5   if this came in under consciousness of guilt, the jury would

 6   have to be instructed that it's not for the truth of the

 7   matter asserted when in fact that's the very relevant

 8   portion of it.

 9            Concerning Ms. Rhee's state of mind, I am still

10   open to argument on that.  The difficulty I am having,

11   though, is that I think your argument is that subject to

12   this kind of influence she still in a sense hung tough with

13   her testimony in light of this approach, but I think the

14   Court would have to read a limiting instruction that it's

15   not offered for the truth of the matter asserted only as to

16   her state of mind when I think your real effort is to get

17   this in front of the jury for the truth of the statements he

18   made.  So for the life of me, I don't understand the

19   resistance to calling Mr. Phoosopha.

20            Which one of you wants to address the Court?

21            MR. QUINN:  I will, Your Honor.  Your Honor, I

22   will start with the state of mind issue.  I would like to

23   recall to the Court's attention the questions that MGA's

24   counsel asked Ms. Rhee in front of the jury after we had had

25   this session outside the presence of the jury where Ms. Rhee

 1   testified about the telephone call.

 2           In that examination and before the jury, Ms.

 3   Keller suggested on cross-examination that Ms. Rhee was

 4   scared and that she was testifying under a fear that Mattel

 5   might sue her.  The questions put to her and the answers

 6   were:

 7           "Q.  You were scared initially, right?

 8           "A.  Right.

 9           "Q.  You were scared that maybe you might be sued,

10   right?

11           "A.  Right.

12           "Q.  And if you were sued, you didn't know whether

13   you would even have the resources to fight back, right?

14           "A.  Right.

15           "Q.  And the reason you called MGA so many times

16   trying to see if MGA would provide you a lawyer is you were

17   afraid Mattel was going to sue you?

18           "A.  No, not back then.  I just didn't know what

19   to do."

20           "Not back then," she was talking about her efforts

21   back initially when her deposition was to be taken.  After

22   she testified outside the presence of the jury to having

23   gotten this call where according to her and also according

24   to Mr. Pootipong he said Mattel was going to sue you, MGA's

25   counsel remarkably capitalized on that and went with it in

1   front of the jury and elicited the response, no, I wasn't

2   afraid back then.

3           The clear suggestion left with the jury was that

4   this witness was potentially testifying the way she was

5   because she was afraid she was going to be sued by Mattel.

6   What the jury hasn't heard and what we all heard outside the

7   presence of the jury was that she never was threatened at

8   any time with any suit by Mattel.

9           I mean, clearly the issue was put in issue by

10  MGA's counsel's own actions by eliciting this testimony,

11  whether she was afraid she would be sued by Mattel.  In

12  fact, her testimony and the testimony of Mr. Pootipong was

13  that he told her that you are going to be sued by a Mattel.

14  That is what Mr. Larian told him, and that is the carrot

15  that he gave him to communicate to Ms. Rhee.

16          Now, he isn't a native speaker, and they brought

17  out on cross-examination of Mr. Pootipong that there is

18  indeed some issue about what was intended there.  That's

19  something if they want to they can pursue and straighten out

20  and call their employee, Mr. Pootipong.

21          We clearly have an issue as to Ms. Rhee's mental

22  state about whether she was on the stand and testifying

23  under a fear that she might be sued by Mattel.  We know that

24  that is the message she got, although in fact she said she

25  wasn't afraid of that.  She had never gotten a threat.

1  Clearly I think her mental state is in issue at a minimum.

2           THE COURT:  Let's stop right there.  If it comes

3  in for mental state, there is an instruction that goes with

4  that that it's not for the matter asserted.

5           MR. QUINN:  Understood, and I now want to go on

6  beyond that.  The testimony is clear that Mr. Pootipong was

7  acting as the agent of of Mr. Larian.  He was take into by

8  Ms. Garcia into Mr. Larian's office and given some

9  instructions.  He was given a commission.  Do the following.

10 Make this phone call.  He testified that Mr. Larian told him

11 you should communicate you are going to be sued by Mattel.

12          The only difference in the accounts of

13 Mr. Pootipong and Ms. Rhee is whether Mr. Larian said, "I

14 know that you lied last time."  Other than that --

15          THE COURT:  Actually from your perspective, it's

16 much graver.  There is a second problem.  There is a second

17 issue of credibility.

18          What date did we have that evening hearing?  Was

19 it February 17, Pootipong?

20          MR. ZELLER:  His testimony was January 27.

21          THE COURT:  I want to find that portion in

22 Mr. Larian's testimony now.

23          What date did Mr. Larian testify on?

24          MR. QUINN:  On that subject?

25          THE COURT:  Yes.

1          MR. QUINN:  Do we have that?  Part of the problem

2     of doing the word search is how to spell Pootapong.

3          THE COURT:  I can find it in my notes.

4          MR. ZELLER:  It's day 17.  I am just trying to

5     find the date.

6          (Pause in proceedings.)

7          MR. ZELLER:  It was February 11.

8          THE COURT:  I want to go back and check the

9     record, but I think there is some concern in my mind if

10    there was consistency or inconsistency about the statement

11    that he allegedly made to Mr. Pootipong Phoosopha that he

12    knew that she had lied before.  I will check that in just a

13    moment after your arguments.

14         MR. QUINN:  Your Honor, this is not hearsay at

15    all.  Mr. Larian has already told us that he gave an

16    instruction to Mr. Pootipong, instructed him to deliver a

17    message, so he was acting as an agent of MGA and Mr. Larian

18    in giving that message.  It's a party admission.  The fact

19    that he was not acting on his own volition is precisely the

20    point.  It's undisputed that he made that call because

21    Mr. Larian asked him to.  He was directed to deliver a

22    message.  The message he delivered is a party admission.

23         Now, both Mr. Pootipong and Ms. Rhee testified

24    that he told her that she was going to be sued by Mattel.

25    Even Ms. Keller's exam ultimately -- the last question and

1    answer on that -- on page 36, she asked him:

2            "Q.  And now you thought there was maybe more

3    suing that was going to happen, right?

4            "A.  I don't know because this is what Isaac asked

5    me.  He said he heard she might get sued.  That's why he

6    asked me to call Anna Rhee."

7            Then I on redirect asked him directly -- I'm just

8    pulling this up:

9            "Q.  Did Mr. Larian say that he had -- he thought

10   that Anna Rhee would be sued or that she would be a witness?

11           "A.  I think he said -- he mean by she might get

12   sued.

13           "Q.  By Mattel?

14           "A.  Yes."

15           There is consistency here on that.  In any event,

16   what we know from Mr. Larian's testimony is he did ask

17   Mr. Pootipong to make that call, and he was acting as an

18   agent.

19           THE COURT:  Ms. Keller, or, Mr. McConville?

20           MS. KELLER:  I think Mr. McConville is going to

21   address it.

22           MR. MCCONVILLE:  Your Honor, as I understand the

23   assertion by Mattel, it's if you inflect in the reading of a

24   transcript, "No, not back then," that that somehow brings

25   greater gravity to the statement.  We saw the woman testify.

1    She didn't say, "Not back then."  She said, "No, not back

2    then," which is consistent with the evidence.  There is

3    nothing to impeach here.  "No, not back then" means she

4    wasn't afraid she was going to be sued back then.  That's

5    what that means.  It has no bearing on what she thinks now

6    because what she thinks now is irrelevant.

7          This whole line of examination was addressed by

8    Ms. Keller because they were trying to soften the blow of

9    the fact that they were providing the woman with counsel.

10   We were responding to their examination.  This wasn't

11   something that we introduced.  This was us asking questions

12   to follow up about why it was she was in the situation she

13   was in.  There is "not back then."  I recall the testimony,

14   "No, not back then."

15         How that rises to a level now that we have to get

16   into a matter that has nothing to do with any claim or

17   defense in this case is beyond me.  I haven't heard them

18   argue that it is related to any claim or defense in this

19   case.  This is a collateral matter, and we have seen

20   evidence of how they are going to use this.  They are going

21   to use it to make Isaac Larian to look bad.  That is the

22   entire reason for doing it.

23         We have already seen -- you know, I'm going to ask

24   Fred Larian questions about documents, and then we get into

25   a fraud complaint.  I'm not going to ask Mr. Eckert

1    questions about whether or not -- whether these questions

2    concerning corporate structure have anything to do with MGA.

3    I am only going to ask questions that relate to Mattel's

4    corporate structure.  The Court says okay.  The next

5    question is have you ever asked anybody to take $30 million

6    out of the account?  Objection sustained.

7            Their whole goal is not to try and follow the

8    rules, and their goal is not to try and win the case on the

9    facts.  Their goal is to try and dirty up Isaac Larian.

10   They have been tenacious at getting to this one point

11   because the point that they are going to make is that Isaac

12   Larian instructed someone to contact Anna Rhee.

13           Who cares?  It has nothing do with anything other

14   than to dirty up Isaac Larian.  If the point of it is this

15   goes to her state of mind, her testimony about her state of

16   mind was I'm not afraid.  So where do we get?  What do we

17   get by calling Pootipong, a nonwitness, who has nothing to

18   do with the claims or the defenses in this case?  We get him

19   to come in and say -- we all saw the witnesses testify.  We

20   have got a native Farsi speaker speaking to I believe a

21   native -- I believe he said he was a Thai speaker speaking

22   to another person.  I don't recall the language Ms. Rhee

23   spoke, but it's versions removed from what this case is

24   about.

25           They want to make the case about the piggy bank.

1    This goes to alter ego, piggy bank.  This is just more

2    efforts by them to try to dirty up Isaac Larian.  If the

3    issue is her state of mind, she testified to her state of

4    mind, which I was not afraid.  If that's the issue, it's

5    done.  It is hearsay.  I understand the Court's position

6    it's double hearsay.

7         So now we are going down a road that has no basis

8    for any claim in this case in order to have a trial about

9    whether or not in various languages something got

10   communicated in a broken manner to a witness who said she

11   wasn't afraid.  That is 403 by definition.  She said why

12   would I be afraid they are going to sue me?  I am working

13   for them now.  She laughed.  If it goes to her state of

14   mind, she didn't think much of it.

15        THE COURT:  Mr. Quinn.

16        MR. QUINN:  The question that I think we ask is is

17   it perfectly okay for a party to send messengers out to

18   communicate messages like this to witnesses?  Is that

19   perfectly okay?  Is that something that's not of note --

20   worthy of this Court's notice?

21        I submit that calling somebody and telling them to

22   contact a witness and say you are going to be sued by Mattel

23   is something that does go to issues that are important in

24   this case.  That's not purely collateral under Rule 608(b).

25   It's collateral only if it relates solely for the purpose of

```
 1   attacking the credibility of the witness.  That's not what
 2   this would be offered for.  It would be offered for
 3   knowledge, motive, intent, the way comments and actioning
 4   directed towards affecting witness's testimony is always
 5   offered and comes into evidence.
 6            I mean, it's not -- the argument I hear is suppose
 7   it's all true it doesn't relate to any claim or defense in
 8   the case, so an effort to communicate something like that to
 9   a witness is entirely irrelevant.  I don't think that's the
10   law.
11            However you inflect it, "not back then" -- whether
12   it's "not back then" with emphasis or without emphasis she
13   is saying she wasn't afraid back then when her deposition
14   was taken, the inference is that she was then.  Both
15   Pootipong and Rhee say the words were uttered, "Mattel is
16   going to sue you."  If they think it's just a language or
17   translation issue, that's -- I mean, summary judgment
18   shouldn't be granted on that.  That's something for them to
19   address.
20            Mr. Larian has already given us agency.  He has
21   agreed that he sent Pootipong as a messenger.  Rhee's
22   testimony is what it is.  Pootipong's testimony is what is
23   it.  If they want to put in some other account and say he
24   got it wrong, that's fine.  They can address that, but it
25   shouldn't be foreclosed.
```

1            MR. MCCONVILLE:  Again, you just heard what they

2    are going to do with this information.  Isaac Larian didn't

3    say go call her up and tell her, "Mattel is going to sue

4    you."  Isaac Larian said, "There is going to be a trial, and

5    I will offer you a lawyer."  Then the next step is Pootipong

6    on his examination --

7            THE COURT:  He said something else.  He said, "I

8    know that you lied at the first trial."

9            MR. MCCONVILLE:  That is not Isaac Larian's

10   testimony.  That is not Pootipong's testimony.  That is Anna

11   Rhee's testimony.  Mr. Larian never said that.  Pootipong

12   never said that.  That was Anna Rhee after laughing.

13   Mr. Pootipong said she laughed about it.  The person who

14   said about lying at the first trial was Anna Rhee.

15           THE COURT:  She said that Pootipong conveyed that

16   to her.

17           MR. MCCONVILLE:  I understand that.  We were

18   talking about the testimony of Isaac Larian and Pootipong.

19           THE COURT:  I think that the disturbing part to me

20   is the timing of this statement on the eve of trial, the

21   inconsistency about Mattel suing, and restatement that

22   Larian had told Pootipong who had allegedly told her that he

23   knew she was lying at the first trial.  Those are the three

24   things that are disturbing to me, so take your time with

25   this.

1          MR. MCCONVILLE:  As to the first issue, there was

2     testimony from Ms. Rhee at the first trial that she couldn't

3     get a lawyer, so she called MGA 30 times.  Isaac Larian

4     wanted to relay to her that if she needed a lawyer MGA would

5     provide her a with a lawyer at this time.  I mean, that was

6     the reason for the contact.

7          With regard to the timing, the timing was trial

8     was approaching, and if she needed a lawyer, MGA was

9     prepared to provide her with a lawyer for trial.

10          THE COURT:  If I believe that it is suitable for

11    the jury to hear -- the inconsistency coupled with that is,

12    "I know she is lying."

13          MR. MCCONVILLE:  Mr. Larian said he didn't relay

14    that to Pootipong.  Pootipong said he didn't relay that to

15    Anna Rhee, and Anna Rhee said she heard it and laughed.  So

16    no one -- so if Anna Rhee is going to talk about what Isaac

17    Larian said through Pootipong, that is double hearsay.  It

18    is not --

19          THE COURT:  I think I have already covered the

20    hearsay issue with you.  If it comes in at all under state

21    of mind, there has to be a cautionary instruction that it's

22    not for the truth.  If it comes in under consciousness of

23    guilt, then it doesn't.  I am concerned about the double

24    hearsay problem, and I am not certain it's coming in yet.

25    That's why I am throwing it out there one more time.  You

```
 1   know I am concerned about the timing of this.  I don't like

 2   the intonation of this kind of approach after -- whatever

 3   you want to call it after a significant period of time, and

 4   all of a sudden on the eve of trial it's either reaching out

 5   inappropriately -- well, I am concerned.

 6          MR. MCCONVILLE:  I appreciate the Court's concern.

 7   I think Mr. Larian was aware that at the first trial there

 8   was testimony that Anna Rhee didn't have a lawyer and called

 9   MGA 30 times.

10          THE COURT:  He could have offered her a lawyer a

11   lot earlier.

12          MR. MCCONVILLE:  There was no reason to because

13   there was nothing that took place after the trial.  I mean,

14   I think -- the fact of the matter is -- the notion of a

15   curative instruction -- we have all heard the term "You

16   can't unring a bell."  That's what this is.  This isn't a

17   matter of Mr. Quinn said this is summary judgment.  This is

18   an evidentiary ruling, Your Honor.  This is a matter -- you

19   have seen all the evidence that has been trotted out about

20   let's just paint Isaac Larian as a bad guy.  This is just

21   another step --

22          THE COURT:  This doesn't help.  That's the

23   problem.

24          MS. KELLER:  May I add one thing?  Here is the

25   bigger problem.  The Court had a chance to see and hear the
```

1    witness in person, Pootipong.  It's not just that there is a

2    language barrier, but he actively got something wrong that

3    we could all see, which is he couldn't differentiate between

4    the trial and suing.  He said that when he was talking to

5    Anna Rhee that she had said to him, oh, I was hoping the

6    suing was over, but now there was going to be more suing.

7    There was going to be this other round of suing.  It was

8    very clear to all of us in that room -- I don't have the

9    transcript in front of me, but it was very clear to all of

10   us that he wasn't differentiating between a retrial and

11   another round of suing.

12          So here you have somebody who you have already

13   seen is confused about his nomenclature, and you're supposed

14   to rely on his -- Anna Rhee's version of what he said to

15   her, and what he said to her based on what Mr. Larian said

16   to him that he didn't perfectly understand.  It's like a

17   telephone game only with people speaking different

18   languages.

19          If he misunderstood that much, there is no telling

20   how much more he misunderstood.  He never said -- in fact,

21   he denied -- and came across very credible I thought -- he

22   denied flatly saying anything to her about her having lied

23   at the first trial, zero.  So in order to believe that this

24   is a statement of Mr. Larian adopted by his agent, you have

25   to believe that statement is made, but the person who is

1    relaying it doesn't say that it was made.

2            The only agency he has --

3            THE COURT:  But the receiver does.

4            MS. KELLER:  Only if it's actually made, and he

5    denies making it.  So the only agency that we have here that

6    is a clean agency is Mr. Larian tells him to tell her that

7    he will provide a lawyer, and he thinks Mattel is suing her.

8    Well, what he thinks is there is another round of suing

9    about to happen.  It's easy to see how the confusion arose,

10   but you don't have a clean relay.  You don't have a clean

11   handoff of the baton in terms of what is said and then what

12   is relayed.

13           You have Mr. Larian having been asked whether he

14   offered to provide her a lawyer, and he agreed he did.

15   That's the agency that counsel is talking about.  The rest

16   of it Anna Rhee is the only source of it, and Anna Rhee is

17   two steps removed from the maker of the statement.

18           We all agree that Mr. Larian should not have

19   reached out to anybody about anything.  He shouldn't be

20   having anybody convey anything to anyone.  We all agree on

21   that -- certainly his counsel do -- but ascribing it the

22   degree of nefariousness that it has now is wrong.  I think

23   it's legally wrong, and it's wrong in terms of the amount of

24   prejudice it's going to generate.

25           He knew that this woman was angry because the

```
 1   first time around everybody on earth in this case was

 2   lawyered up with one side or the other, and she knows that.

 3   She calls MGA over and over again, and MGA doesn't even call

 4   her back, and she is scared that she is going to get sued

 5   way back when.  They are all scared, so she turns to Mattel,

 6   and Mattel provides her a lawyer.

 7           What happens?  She gets asked about that on direct

 8   by Mattel.  She gets asked about it so that she won't look

 9   like a sponsored witness, so she won't look like Mattel is

10   sponsoring her.  So we bring out the fact that when she

11   asked MGA for a lawyer MGA didn't respond.  Now that is

12   supposed to add relevancy to this new argument?  It doesn't.

13           Then the becomes, okay, if you strip that away,

14   what is the relevance?  I can see the Court's concern.  What

15   if what it means is that Mr. Larian is really trying to

16   influence her somehow?  What if that's what it means?  But

17   the problem like I said is you don't have a clean handoff of

18   the baton to prove that.

19           The state of mind part of it is out because what

20   is her state of mind?  She laughed it off.  She said to

21   Pootipong "Don't be ridiculous.  Mattel wouldn't be suing

22   me.  I'm doing work for them right now."  She laughed about

23   it on the stand and said it didn't phase here in the

24   slightest, and you could see by her testimony that it truly

25   did not because she wasn't softening any testimony that she
```

1    had that was harmful to MGA.

2         THE COURT:  Why isn't the jury making that

3    determination?

4         MS. KELLER:  Because it's prejudicial.  You don't

5    have a clean evidentiary record on which to make that

6    judgment that this statement was actually made by

7    Mr. Larian, the statement about you lied last time or

8    anything beyond I am willing to provide you a lawyer.

9         THE COURT:  But the receiver of the information is

10   very clear about what she received.  So supplant Pootipong's

11   confusion with the receiver saying I wasn't influenced by

12   this, but this is what was said to me.

13        MS. KELLER:  Except the person who is supposed to

14   be relaying -- ordinarily the party who makes the statement

15   is responsible for the statement.  It's admissible.  It's a

16   party admission.  Here to find that the party made the

17   statement you have to find that Pootipong relayed the

18   statement.  You have to find that the statement was actually

19   made to her.

20        THE COURT:  I'm not finding that this was a party

21   admission necessarily.  That's their argument.

22        MS. KELLER:  I understand, but if that were the

23   argument, then you would have to first find that the

24   statement was truly made by the party.

25        THE COURT:  On a party admission, you're right.

1   I'm not talking about a party admission.  I never came out

2   and addressed a party admission.  I don't know where the two

3   of you are going with this.  I know Mr. Quinn raised it.

4   Fine.

5            MS. KELLER:  Then ignoring the party admission

6   aspect of it, for it to be admissible in any sense, you

7   would first have to show that the person here, Mr. Larian,

8   who is supposed to have made the statement to Pootipong for

9   Pootipong to relay, actually made it.  Yet the relayer said

10  it wasn't made.  He denies it, and he flatly denies it.  He

11  just says he told her Mattel might be suing her, and if that

12  happened, MGA would provide a lawyer.  That's what Pootipong

13  says.

14           THE COURT:  Here is what I don't understand

15  between the two of you.  I don't understand why I find that

16  either Pootipong is mistaken or not when I have the receiver

17  of the information with clarity saying this is what was

18  conveyed to me.  This is what was said to me by

19  Mr. Pootipong on behalf of Mr. Larian.  I don't know why

20  Pootipong has this unequal balance in this evidentiary

21  equation.

22           MS. KELLER:  The only thing that I think is clear

23  from his testimony is that he -- there's no question he did

24  not understand the difference between a trial and suing.

25           THE COURT:  Why isn't the jury determining that?

1          MS. KELLER:  Because unless the Court has

2    assurance that this is a reliable statement reliably

3    relayed --

4          THE COURT:  What happens if I feel it's a reliable

5    statement from Ms. Rhee's perspective, that she has got

6    clarity on that issue, that there is no equivocation?  What

7    do I do with that?

8          MS. KELLER:  Because it shouldn't depend on what

9    the hearer thinks she heard.  If should depend on what was

10   actually said.  Otherwise, if you are depending on what the

11   hearer actually heard and not what was actually said, then

12   you are getting back to state of mind, but then it's

13   irrelevant because she said it didn't affect her state of

14   mind at all.

15         THE COURT:  Well, the argument is that she held up

16   under it.  The opposite argument is even hearing that I am

17   coming in and telling the truth.

18         MS. KELLER:  Well, except that if you are offering

19   it for her state of mind, it would be to show that her state

20   of mind was impacted by it in a way adverse to Mattel.  Yet

21   she laughs off and says that's ridiculous.  I'm working for

22   Mattel.

23         THE COURT:  Are you sure about that, or is state

24   of mind also your ability to receive that information and

25   continue to testify?

```
 1            MS. KELLER:  I don't think so.  I think here it

 2    would be offered to show that she was affected by it in some

 3    fashion.  That's the whole purpose.  Otherwise, you are just

 4    opening the floodgates, and anything the person hears can

 5    come in.  So you are balancing that interest in clarifying

 6    the impact on her state of mind if it's a state of mind

 7    argument against the prejudice.  There is no relevance

 8    because her state of mind wasn't affected.

 9            So you are back to then do we offer it just to

10    show that the original speaker of what is purportedly

11    related is a bad guy?  He is doing something bad.  He is

12    trying to influence a witness.  That could be anybody.  It

13    wouldn't have to necessarily be a party.  It could be

14    anybody, but --

15            THE COURT:  I'm not going to make a finding

16    concerning that, but of course I am concerned.  Let me

17    repeat that.

18            MS. KELLER:  I understand.  Anytime you think

19    somebody is trying to affect the testimony of a witness it's

20    got to be of concern, but then you're back to, okay, given

21    the devastating impact of any kind of witness-tampering

22    allegation -- it's the sort of thing that -- the reason

23    Mattel wants it so badly is because they know that it's

24    incredibly damaging.

25            Now you are back to, well, how reasonable is this?
```

```
 1    Did this guy really try to affect the witness's testimony
 2    and not just offer her a lawyer?  If he really tried to
 3    affect her testimony, I want to make sure that I am
 4    satisfied that it's reliable that he did that.  Where is the
 5    reliability here where your relay person for the statement
 6    is so confused that he doesn't know the difference between
 7    suing and a trial?
 8              THE COURT:  Because I hold credibility with Ms.
 9    Rhee who received that statement and states with clarity
10    this is what she heard.
11              MS. KELLER:  It really does matter what the relay
12    person heard and how he interpreted it and how he relayed
13    it.  It is really like the telephone game only that is a
14    Thai speaker.
15              THE COURT:  Here is my concern, and then I am
16    going to take a rest from this and think about it once
17    again.  Mattel would like to take -- Mr. Quinn would like to
18    take the jump avoiding Pootipong right to the statement
19    concerning Ms. Rhee.  If that occurs, it can only come in
20    under state of mind regardless of the agency argument, or at
21    least I tentatively think that before I give it some more
22    thought this evening.
23              If it's coming in for consciousness of guilt if
24    the Court allows it, then there is a hearsay problem.  I am
25    deeply concerned that there is an intermediary named
```

```
 1   Pootipong, and I accept your argument partially.  How can

 2   you allow this for consciousness of guilt because there is

 3   an intermediary, which is either credible or noncredible and

 4   a receiver?  You have got hearsay.

 5           So that's why I started the discussion this

 6   evening that if it's coming in it's either coming in for the

 7   truth of the matter asserted concerning consciousness of

 8   guilt and Pootipong has to take the stand, or it's coming in

 9   for state of mind and Pootipong doesn't have to take the

10   stand.

11           Obviously, Mr. Quinn, you want to make that jump

12   to state of mind, and I have heard your argument concerning

13   a party admission.

14           Ms. Keller, are you finished?  I will hear you one

15   more time, and then we are finished with this for this

16   evening.

17           MS. KELLER:  The only thing I am thinking is in

18   addition -- I won't rehash my argument that I made, that her

19   state of mind is unaffected, but if it were coming in for

20   her state of mind, I think that gets you past one level of

21   hearsay, but I don't think it gets you past two.  In other

22   words, if she were to say they put on two witnesses, and the

23   first witness says, yeah, I relayed this to her that she was

24   lying and we would help her with a lawyer this time around

25   and then they put her on, at least they have now gotten past
```

1    one level of hearsay, but as you said, they want to jump

2    straight to Anna Rhee and use the state of mind exception to

3    the hearsay rule to get past two levels, and I don't think

4    they can do that.

5            THE COURT:  Well, the problem is also it's going

6    to come up in argument, and it is going to sound like it's a

7    truthful statement.  I am going to stop counsel and inform

8    the jury it's not for the truth of the matter asserted.  So

9    back and forth we go.  This will get mixed up in front of

10   the jury as you said, and it will come out for the truth

11   regardless of the Court's instruction.  Now, jurors are

12   presumed to understand all of this, but obviously I am also

13   concerned about the confusion.

14           In a perfect world, this is what would happen.  I

15   can't force Mattel to do this.  Pootipong would take the

16   stand, and then Rhee would take the stand.  Mattel doesn't

17   want to go there.

18           MS. KELLER:  Well, they don't want to go there

19   because Pootipong does clear it up.  That's the problem.

20   That's the reason they want to jump that step.

21           THE COURT:  I disagree with you.  In front of the

22   jury, regardless of what Mr. Pootipong says, the jury is

23   going to be free to view this in either direction, that

24   there is confusion from language as you argue or jury

25   tampering quite frankly from Mattel's perspective.  The

1    problem is that jump.

2          MS. KELLER:  Without Pootipong, there is only one

3    conclusion that they draw.  With Pootipong, they have to

4    make a judgment call.  Was this a garbled transmission where

5    the guy maybe shouldn't have transmitted it at all, but it

6    was a garbled transmission?  It wasn't that sinister?  If

7    they only hear Anna Rhee, their only conclusion is, wow,

8    this is bad.

9          THE COURT:  Look at it from Mattel's position

10   also.  You have got an employee inside -- I mean, just in

11   the real world, you have got an employee working for

12   Mr. Larian who gets approached by Mr. Larian.  I don't know

13   if he had ever talked to Mr. Larian before this.  I mean, on

14   the eve of trial finding out that he is a friend with Anna

15   Rhee to place a phone call and a conversation -- on the one

16   hand, MGA argues that this is just a confusing problem for

17   Mr. Pootipong.  On the other hand, Ms. Rhee is very definite

18   about what is being said to her.

19          The logical step in a perfect world that would

20   clear this up for the Circuit is Pootipong and then Ms.

21   Rhee, but it's apparent, Mr. Quinn, you are going to

22   continue to try to take a gigantic leap --

23          MR. QUINN:  I wouldn't rule out the possibility

24   depending upon what the Court's ruling is.

25          THE COURT:  I am about ready to rule that you're

```
 1   going to be required to put on Pootipong and clear up this
 2   whole mess and then Ms. Rhee and not preclude Ms. Rhee.
 3   That will clear up my hearsay problem, and it will also give
 4   you the benefit if they believe your position that this is
 5   for the truth of the matter asserted, period, end of
 6   discussion.
 7            I think that if the jury hears the same thing I
 8   heard there is a very, very good argument for both of you.
 9   One is confusion, and the other is jury tampering.  If you
10   continue to take the jump, I don't know what I'm going to
11   do.  I'm going to sleep on it tonight.
12            MR. QUINN:  I understand.  I don't rule out the
13   possibility that we will request permission to call both.
14            THE COURT:  No, no, no.  When I come out tomorrow,
15   that will be a final ruling.  You make your decision
16   tonight, but that's going to be it -- oh, I see what you are
17   saying.  My apologies.  If I say state of mind -- if I rule
18   against you, then back you come.
19            MR. QUINN:  We will call them both.  We will do
20   what the Court suggests.
21            THE COURT:  Well, then I think I know what my
22   ruling is already -- I'm just joking with you.  I would like
23   to see them both up on the stand frankly.  That clears it
24   up.
25            MR. QUINN:  If I could just respond to a couple of
```

```
 1    things that Ms. Keller said.  She said emphatically that Ms.
 2    Rhee's state of mind is not an issue because she laughed it
 3    off.  She didn't take it seriously.  That wasn't in front of
 4    the jury.  The jury has never heard that.  All the jury
 5    heard was Ms. Keller's question.
 6           THE COURT:  It doesn't matter to me.  You don't
 7    have to worry about that from either person's perspective.
 8    To me that laugh is just the same as I withstood the
 9    onslaught.
10           MR. QUINN:  I soldiered on.
11           THE COURT:  Exactly.  It doesn't matter.  The
12    point is the approach was made.  In fact, it's a very good
13    reason for her being a very credible witness to stand up to
14    that.  Now, I don't know where this takes us, if this takes
15    us into the mini-trial that Mr. McConville fears, but quite
16    frankly, this is Mr. Larian's own doing.
17           If you feel that there is prejudice here, I
18    understand that, but for goodness sakes, sometimes you get
19    as fair a trial as you want to give yourself.  I mean, it's
20    so silly.  An attorney could have gone to her.  There are so
21    many other ways, but Mr. Larian takes it upon himself to put
22    this horrendous issue in front of the Court and in front of
23    the jury.  Quite frankly, it doesn't smell right.  That's
24    what is concerning me.  It doesn't feel right.  People don't
25    reach out that way on the eve of trial.  That's what has got
```

```
 1    me deeply concerned.  Now, I know you hear that.  You just
 2    don't believe it yet.  I'm deeply concerned about it.
 3              MR. QUINN:  Your Honor, Ms. Keller's leading
 4    questions were, "There's a lot of suing going on" --
 5              THE COURT:  That's what I call patchwork.  That's
 6    what the two of you are doing consistently.  I made my
 7    record Sunday.  You weren't here.  You two got in a
 8    firefight because frankly -- I understand both positions,
 9    but I'm not complimentary of them.
10              You wanted to explain in a totally unrelated area
11    why Mr. Eckert is not here.  You didn't have to go there,
12    but once you opened the door, it's like the person who
13    pushes first at the basketball game.  The other side is
14    going come back and explain why he is here.  That was a
15    leadoff by Mattel.
16              MR. QUINN:  With all due respect, she pushed on
17    that door first and that the first witness pointed out Mr.
18    Eckert isn't here.  I mean, that's history, Your Honor, and
19    that's behind us.
20              At the end after all these questions about a lot
21    of suing going on, she asked him ultimately when he could
22    express the thought in his own words -- I have the
23    transcript here.  I read it to the Court.  He said that
24    that's what Mr. Larian said, is he heard she might get sued.
25    That's why he asked me to call.
```

```
 1              THE COURT:  There are two thoughts that I have,
 2     and, that is, I don't know if I am inclined to not permit
 3     the testimony.  I'm very concerned that I allow this
 4     testimony with the Court's thoughts up to this time and
 5     allow it for a state of mind exception.  I think the
 6     appropriate way if this is going to be presented is
 7     Pootipong and then Ms. Rhee.  I think that way the truth is
 8     out.  Everybody can judge whether this is a matter of
 9     demeanor, but I can't force you into that position.
10              No. 2, I am worried about the use of time.  It's
11     not fair to you to put you in a position where you are
12     putting up two witness when you could put up one if you
13     believe you have got a good evidentiary fact basis for this.
14     Time is getting short, so I'll sleep on it.  We have had our
15     discussion tonight.  Let's just ended it.
16              Now, I want to talk to Mr. Holden.
17              MR. QUINN:  Yes, sir.
18              THE COURT:  This has to be an in-camera proceeding
19     obviously with the first prong finding that I have made.
20     Therefore, I'm going to excuse Mattel at this time, and I
21     would like Mr. Holden.
22              (The following proceedings were
23              in-camera under seal:)
24              (End of in-camera under seal proceedings.)
25              THE COURT:  I was just communicating with the
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   special master.  They're just closing up the depo.
 2   Apparently Ms. Hurst was involved.  She apparently is pretty
 3   exhausted, so we will go over the exhibits tonight and get
 4   you on your way.
 5            These three exhibits concerning Mr. Wagner --
 6            MR. QUINN:  Your Honor, I had also mentioned going
 7   over --
 8            THE COURT:  Just a moment.
 9            MR. MCCONVILLE:  Can we see them?
10            THE COURT:  The second one is a complete
11   distortion in my opinion.  The first one -- well, on the
12   third one, you have the same graft.  It's just a different
13   form.  He can come in at 7:30 tomorrow if he wants to
14   explain it to me.
15            MR. PRICE:  I can argue that tonight.
16            THE COURT:  Okay.
17            MR. PRICE:  Your Honor, you have handed us four
18   pages of the demonstratives, which your inclination is not
19   to allow us to use with Mr. Wagner.  Let me talk about Nos.
20   3 and 4 first.  The reason they are relevant, Your Honor, is
21   Mr. Wagner uses those benchmarks if you recall for comparing
22   MGA with the entire toy industry or Hasbro, Jakks, for
23   Mattel in saying that you can use those benchmarks to
24   apportion sweat equity compared to the impact of the IP.
25            Now, these support his opinion because he says,
```

1    look, if MGA's sweat equity was special, then you would

2    expect different results from this, but this says -- and he

3    will explain it -- simply if you look at the products MGA

4    had in 2001, which ones lasted the entire ten years?  This

5    shows that there were only three that lasted the entire ten

6    years.  That's the only purpose of this chart, which is to

7    say if you look at the toys they had in 2000, how many

8    lasted the entire ten years?  Only Bratz.  He will say that

9    shows you that Bratz is special.

10            The second one shows you again this 2001 to 2010

11   time frame.  What were MGA's top ten products by revenue?

12   Here you have Bratz, which Mattel contends is its

13   intellectual property.  MGA has said that it was very

14   creative, that it had lots of products, and that its

15   creativity should be shown in the sales of its other

16   products.  So if you look at the other top ten products, you

17   see two were acquisitions, which is not MGA's intellectual

18   property.  They bought that.  Three are licensed products,

19   which again that's not MGA's intellectual property.  Here

20   you have in blue here four which are of MGA origin.  These

21   are the ones where you can see how well those sold using

22   MGA's creativity.

23            What it shows here is that the top ten -- you can

24   see that the ones using MGA's creativity are very small.

25   This is between 2001 and 2010.

```
 1               THE COURT:  What are these?

 2               MR. PRICE:  I don't know when each of these came

 3     out, but that doesn't matter because the question is in

 4     2001 --

 5               THE COURT:  This does matter.  I don't know the

 6     years.  In other words, there is no designation.

 7               MR. PRICE:  I will have him testify about the

 8     years.

 9               THE COURT:  No, he won't unless he tells me

10     beforehand what that is.

11               MR. PRICE:  We will be glad to bring him in.  This

12     is fairly critical to his analyses.

13               THE COURT:  Until I understand it, it's not coming

14     in.  Have him come in here and explain it to me.

15               MR. PRICE:  All right.  This is the first part of

16     his analysis.  He has to first decide for the Mattel

17     products.  He has got to determine whether or not an

18     increase in Bratz sells means a decrease in Mattel sells.

19     He has to see is there a relationship of some sort to see

20     whether or not the Bratz sales would affect Mattel's

21     profits?  So this is kind of the cornerstone of that

22     analysis/

23               MS. KELLER:  This goes to 2009?

24               MR. PRICE:  Yes.

25               MR. MCCONVILLE:  2008?
```

```
 1            THE COURT:  Aren't we into the same problem again?
 2   I was very definite about that.  I don't know why I'm not
 3   communicating.  I gave you a choice.  I thought you were
 4   ending at 2008 because it was so diminimus, and now --
 5            MR. PRICE:  Remember they said they didn't want us
 6   to end then.  They requested that we not end --
 7            THE COURT:  Both sides have said two things to me.
 8   On one side, you said 2008, and they chipped in and didn't
 9   want to end.  You said 2010, and then there was a complaint
10   by the other side that you were going to 2010.
11            MR. PRICE:  I don't remember that last part.  We
12   were here ready to change these, and they said they didn't
13   want us to because it eliminates -- now the night before to
14   say --
15            MR. MCCONVILLE:  We got schedules from Wagner last
16   night at 2:00 a.m.  We some more this morning.  We got some
17   more schedules up until 4:00 this afternoon.
18            MR. PRICE:  The reason they got these schedules is
19   they gave us these 2010 numbers.  He was going on estimates,
20   so we decided to actually use the actual numbers they gave
21   us about a week ago.  That's a lot --
22            THE COURT:  The problem is if we are going into
23   2009 and 2010 -- now, that's apparently the decision by MGA
24   now to get into an area that I have precluded -- then they
25   have got the opening the door argument now on their side as
```

```
 1    you have been arguing that they have been opening the door,

 2    so --

 3            MR. ZELLER:  I thought you had ruled that that

 4    would not open the door because MGA was making the choice.

 5    We offered as the Court knows to stop at '08 in order to

 6    take that issue off the table.  They said they didn't want

 7    to.  The Court at that point made very clear to them that

 8    they still could not go into the injunction.

 9            THE COURT:  What's your position on --

10            MS. KELLER:  It skews -- I can only speak very

11    generally at this point on it, but it skews the damage

12    calculation because of the way Wagner computes the damages

13    in terms of his benchmarks for Mattel, his benchmarks for

14    the group of companies.  It suddenly creates a much larger

15    gap that makes it look like Mattel should recover more.  At

16    least, that's what Ms. Hurst's objection was.

17            THE COURT:  I think it becomes MGA's problem now

18    in a sense.  First, you were going end at 2008.  I think you

19    volunteered that.  The damages were diminimus in 2009 and

20    2010.  Now my memory is coming back that Ms. Hurst then

21    complained that if you ended early she wasn't going to be

22    able to cross-examine on the skewing.  Therefore, that's not

23    going to open the door in terms of the injunction.

24            MR. PRICE:  The final one, Your Honor, again is a

25    calculation that reduces the damages.  What Mr. Wagner does
```

```
 1   is he says was there market expansion created by Bratz?
 2   That's one of the arguments.  So he did a regression
 3   analysis and found that, yes, there was in fact market
 4   expansion created by Bratz, and we are attributing none of
 5   that to Mattel.  If you put that aside, that is MGA's.  They
 6   get to keep all of that.
 7            MS. KELLER:  I am not up to speed enough to speak
 8   on that.  I think Ms. Hurst is going to have to address
 9   that.
10            THE COURT:  Is there any other matter?  I will
11   give you until tomorrow evening at 6:00 to get those
12   e-mails.  I am not going to wait on that any further.  If
13   you can produce those, you have got the Court's attention.
14   If you have those e-mails, I have an open mind on it.
15            MR. PRICE:  Mr. Wagner is supposed to testify
16   tomorrow.  I mean, the calculations to do this stuff is
17   enormous.  It takes an a lot of time.  If we have to redo
18   it, he can't testify tomorrow.  He would have to crunch a
19   lot of numbers.  It took him days and days just to input the
20   2010 figures.
21            This one is critical because it shows the
22   relationship.  He has to make a causation determination in
23   order for them to do the analysis of how much does MGA sales
24   affect Mattel's sales?  This shows you visually exactly it
25   relates to.  This is something we are going to use in
```

```
 1    redirect if there is a complaint about --
 2              THE COURT:  Which one is he using in direct?
 3              MR. PRICE:  No. 7.
 4              THE COURT:  Okay, thank you for the explanation.
 5              Now we have motion for a mistrial brought by
 6    Mattel.  Mr. Quinn.
 7              MR. QUINN:  Your Honor, we have had a series of
 8    statements as the Court knows that Mr. Larian has made and
 9    now most recently that MGA's counsel has made that we think
10    really call into fair question whether or not Mattel can get
11    a fair trial here.  These are statements that are so
12    potentially impactful that I don't think we can just
13    disregard the possibility that some jurors may be influenced
14    by them.
15              We have the statement that Mr. Larian -- his
16    statement that Mattel killed his father.  MGA doesn't
17    dispute in the briefing that that was an improper comment,
18    that it was highly prejudicial.  There was no instruction to
19    the jury that the specific statement was simply false and
20    improper.
21              We have the statement that Mattel caused
22    Mr. Bryant to have a stroke.  MGA in the briefing also does
23    not dispute that this statement was highly prejudicial.  The
24    jury hasn't been given a specific admonition.  Instead, the
25    Court indicated, well, it's possible that Mr. Bryant might
```

1    be recalled later in the case at which point the jury could

2    then presumably observe and assess his health for

3    themselves.

4           We submit that Mr. Bryant's health is not a

5    relevant issue in this case.  We understand now the

6    information that the Court has is that Mr. Bryant was not

7    diagnosed with a stroke at all.  The false claim to the jury

8    still has not been corrected.  The Court's statement to the

9    jury was that the -- the Court told the jury, quote, "The

10   Court doesn't know that Mr. Bryant had a stroke or not."

11   That's where the record stands on that issue.

12          Mr. Larian claimed that Mattel's counsel made a

13   racist comment.  Counsel was subjected to allegations of

14   racism in front of the jury.  That was a subject of

15   cross-examination, and frankly of all of these, that's the

16   one at this point I am least concerned about, but still it's

17   extraordinary that counsel would be confronted in front of

18   the jury with such a charge.

19          Mr. Larian then made a statement that Mattel --

20   volunteered that Mattel is stifling competition.  MGA argued

21   that Mr. Larian's statement that Mattel stifles competition

22   was directly responsive to counsel's questions, but the

23   Court specifically ruled to the contrary finding that his

24   statement, quote, "was a gratutious comment by Mr. Larian in

25   a string of gratutious comments about Mattel's motive in

 1   filing this lawsuit, as well as Mattel's anticompetitive

 2   tendency."  The jury hasn't been specifically instructed on

 3   that.

 4         Mr. Larian made a comment that Mattel owes

 5   royalties on trapezoidal packaging.  MGA claims that this

 6   statement was solicited by Mattel, but the quotation in

 7   MGA's own opposition shows that Mattel asked a yes or no

 8   question concerning Mr. Larian's understanding of his

 9   application for a patent.  After answering "Yes," Mr. Larian

10   then volunteered a nonresponsive assertion that Mattel has

11   used his patent and failed to pay royalties.  That hasn't

12   been corrected.

13         Then he made a false acquisition that Mattel fixes

14   retailer pricing.  MGA contends in its brief that by

15   questioning Larian about his understanding of stolen Mattel

16   documents found in MGA Mexico's possession Mattel elicited

17   Mr. Larian's gratuituous testimony that Mattel is illegally

18   fixing retail prices.  But the question that was asked of

19   Mr. Larian was whether he knows what the retail margin is,

20   not whether Mattel was setting the margin, not whether he

21   was setting the margin, and certainly not whether Mattel was

22   doing so.

23         Most of these improper comments and attacks have

24   not been addressed in front of the jury at all, and none

25   have been corrected with a specific curative instruction.

1     The Court's instruction to the jury has been up to this

2     point that nonresponsiveness and gratuitous statements may

3     be considered in evaluating credibility, but that statement

4     does not reference Mr. Larian nor address any of his

5     specific comments.  I mean, if anything, it can be read to

6     mean that the jurors should consider such statements in

7     evaluating credibility and has encouraged the jurors to

8     consider Mr. Larian's irrelevant and highly prejudicial

9     statements.

10          Then last week while Mr. Eckert was on the stand

11    and Ms. Keller was cross-examining him, we had a highly

12    inflammatory and we submit improper gratuitous reference to

13    Mattel magnets killing children.  It was completely

14    irrelevant to anything that was being discussed.  The

15    testimony there was -- Ms. Keller asked the question:

16          "Q.  Here's my question.  Those designs -- those

17    were the result of flaws in the design here in the U.S. by

18    Mattel?  Yes?

19          "A.  Certainly the design was improved.  The

20    previous design was insufficient.  That's correct.

21          "Q.  Insufficient?  There were children who

22    actually died from swallowing these magnets, right?

23          "A.  No.

24          "Q.  And there was a fourth recall in October?

25          "MR. QUINN:  There is no good-faith basis for that

 1   question.  I request that the question and answer be

 2   stricken.

 3           "MS. KELLER:  Children died.

 4           "THE COURT:  The question remains.  The answer is

 5   "No."

 6           "BY MS. KELLER:

 7           "Q.  You know better don't you, Mr. Eckert?

 8           "A.  No.  In fact, I know no child died as a

 9   result of swallowing a magnet in a Mattel toy.

10           "MS. KELLER:  Your Honor, I would ask to recess to

11   inquire of the Court as to whether I may ask the next

12   question about a possibly prohibited area.

13           "THE COURT:  Well, it all depends."

14           Of course, then in the recess, Ms. Keller never

15   brought that up again, but she has gratuitously brought

16   up -- remember the whole context in which the basis for

17   discussing recalls was the publicity and how that might

18   affect Mattel's lost profits claim.  There simply is no

19   basis to have brought up the question about whether Mattel

20   had toys that had magnets that had killed children.  I mean,

21   it's completely irrelevant to any issue in this case.

22           It should not have been injected, and then it was

23   left with the impression -- Ms. Keller said:  "I would like

24   to recess to inquire of the Court as to whether I may ask

25   the next question about a possibly prohibited area," thus

1    communicating to the jury that she had some evidence that

2    Mattel has had these incidents where children have actually

3    died.  I will represent to the Court that there are no such

4    incidents so far as Mattel knows.  Their simply aren't any.

5           It was completely improper to bring that up.  This

6    comes on the heels of -- after Mr. Larian testified.

7    Another thing he volunteered is that its magnets and lead

8    paint injure children I think he said was -- kill children.

9    Mr. Zeller remembers kill children.  So the jury had already

10   heard that, and then Ms. Keller brings this up.

11          Your Honor, we shouldn't have to try this case

12   with the words ringing in the jury's ears that children died

13   because of magnets on Mattel toys.  The jury is left with

14   the impression that Mattel killed kids, but that the Court

15   won't let her -- Ms. Keller -- present any evidence about

16   it.  That was clearly what was communicated by her.  I want

17   to talk to the Court about whether I go into this possibly

18   prohibited area.

19          So the message to the jury is, yes, there are kids

20   that have died, and the only reason I can't present evidence

21   of it is that the Court won't let me.  That is completely

22   improper, Your Honor.  We shouldn't have to contend with the

23   issue in this case about whether Mattel has put toys out

24   there that have killed children.  We should not have to

25   defend that.  It has got nothing to do with anything in this

1    case.  That's my argument.

2         THE COURT:  Ms. Keller.

3         MS. KELLER:  Well, the Court will remember that

4    the context of this was in the context of Mattel's lost

5    profits and the bad publicity that Mattel had had.

6    Mr. Eckert tried to downplay that bad publicity, but the

7    fact is that the year 2007 just looked at alone involved a

8    firestorm -- an absolute firestorm of criticism.  For

9    example, a story in the "New York Times" on August 14, 2007,

10   "Mattel issues new recall of toys made in China" that talks

11   about the design flaw here in the United States in the toys,

12   and Mr. Eckert would not give me a direct answer to that

13   question no matter how many times I asked.  He would not

14   answer it.  I would say that was a design flaw here in the

15   U.S. wasn't it?  Well, the design was insufficient, and it

16   was corrected.

17        The "New York Times," for example, on August 14

18   talks about that.  It says -- and this was on the front page

19   of the Business Section of the "New York Times" -- "The

20   separate action today involving a design flaw in

21   18.2 million magnetic toys, about half of them sold in the

22   United States, expanded a recall initiated last year after

23   reports of deaths and injuries to children who ingested

24   magnets that had come loose.  Mattel says the recall covered

25   63 varieties of toys made since 2002 and sold before January

1    of this year, including 44 poly pocket toys," et cetera, and

2    the headine is "Mattel Issues New Recall of Toys Made in

3    China."

4            I didn't have time today to do a thorough Lexus

5    nexus search, but just a quick Google search pulled up a

6    treasurer trove of these articles.  It really -- it was all

7    over the place.  In addition, there were a lot of articles

8    about the lead recalls.  The lead actually was -- the

9    problems with the lead ingested by children were actually

10   more serious according to the news articles, and it was all

11   over TV, too.

12           There were ABC TV pieces that I couldn't download

13   and bring in, but there were television stories about how

14   the ingestion of lead was cumulative, and these toys had

15   extraordinarily high amounts of lead.  When children ingest

16   the lead from these toys, many times the parents don't know

17   it immediately.  The children start having more and more

18   problems.  They can end up with seizures, convulsions,

19   neurological disorders.  They can end up losing IQ points.

20   All sorts of disastrous things happen.  This was in the news

21   in 2007.

22           Mr. Eckert did not want to admit to any of that.

23   He wanted to downplay it all to talk about how they had a

24   profitable year.  Life was good and not admit to any

25   problems, but the fact is it was being plastered all over

1   the place that children could die from ingesting the

2   magnets.  Children were having perforated intestines.

3          It's also in a number of places, including in books

4   that have been written.  One in particular is by Jerry

5   Oppenheimer called "Toy Monster."  He is a "New York Times:

6   best selling author and former investigative reporter where

7   they talk about Mattel's response, which was to dispatch

8   lawyers to immediately do a confidential prefiling

9   settlement with these parents so that they could not have

10  the information about just how terrible this stuff was

11  hitting the public.  So this was all over the press at the

12  time.  To say there is no good-faith basis for it is just

13  plain wrong.  There most simply was a good-faith basis for

14  it.

15         I would have like to have asked Mr. Eckert about

16  Mattel's pattern of going out and trying to do these

17  prefiling settlements with parents so that it could be

18  confidential and no one could ever get into the details of

19  what happened to these kids, but it was pretty clear to me

20  that I wasn't going to be allowed to do that.  It

21  absolutely -- to say there is no good-faith basis for it

22  kind of defies the reality of what I saw just in a quick

23  Google search.

24         The things about Mr. Larian's comments, Your

25  Honor, I think we have already thoroughly briefed.  I

```
 1   haven't had a chance today to respond to this latest
 2   supplemental brief that we got this morning because we have
 3   been otherwise occupied all day.  The Court I think, though,
 4   with respect to Mr. Larian -- the Court certainly responded
 5   at the time as to anything Mr. Larian said.
 6              I will tell you on balance far from prejudicing
 7   Mattel I think Mr. Larian hurt his own case with some of
 8   these outbursts.  I think the racist outburst, for example,
 9   especially coupled with the passages that were cited to,
10   made Mr. Larian look ridiculous, and it made him look not
11   credible when he said that.
12              Some of the other outbursts about Mattel killed
13   his father -- the Court instructed the jury that that wasn't
14   the case, and no one on the jury took that seriously.
15   Carter Bryant having had a stroke, I don't remember exactly
16   what the Court said, but the Court definitely instructed the
17   jury something to the effect that that hadn't happened.  I
18   don't recall exactly what the Court said, and I don't have
19   it in front of me.
20              As far as trapezoidal packaging, any comment about
21   that is absolutely diminimus because the jury hasn't heard
22   anything about even what trapezoidal packaging really is or
23   anything about any so-called infringement, so that at worst
24   is diminimus.
25              I think the sum total of Mr. Larian's outburst
```

1   were definitely detrimental to MGA rather than Mattel, and

2   the Court observed that itself.  When somebody is

3   continually not responding to questions and engaging in

4   outbursts, the jury draws a conclusion, but it's not a

5   conclusion favorable to the person giving the outbursts.  We

6   on our side of the courtroom were sitting here dismayed as

7   we heard the various things that were said, and we were

8   dismayed because we knew that the impact on the jury was a

9   negative one for us.

10          Unless the Court has any specific questions, I

11   would submit it.

12          MR. QUINN:  Your Honor, counsel has not said that

13   any Mattel magnets -- she has any evidence whatsoever that

14   any Mattel magnets from any Mattel toy ever killed a child.

15   They have no evidence of that.  It hasn't happened.  She

16   falsely suggested to the jury that Mattel has put toys out

17   there with magnets on them that have killed children.

18          She didn't even claim that there had been

19   publicity about deaths of children caused by Mattel magnets.

20   That would have been the hook for relevance.  We haven't

21   heard anything about that.  She didn't say that there were

22   any reports that children died in her questioning from

23   magnets from Mattel toys.  She said, "Children died."  She

24   made the assertion.

25          You would think prefiling settlements of cases --

```
 1    let's suppose it happened.  Settlements aren't probative of
 2    anything, but you would think that prefiling settlements
 3    would mean there would be no publicity.  Again, that's the
 4    only basis for this discussion.  So this has been left with
 5    statements by counsel injecting an issue into this case.
 6    What could be more prejudicial than a major toymaker that's
 7    put toys out there that have killed?  There is no evidence
 8    of it.
 9            In everything she read, there was nothing about
10    Mattel toys having magnets that killed kids.  It hasn't
11    happened.  She communicated to the jury:
12            "Q.  You know better, don't you, Mr. Eckert?
13            "A.  No, I know no child died as a result of
14    swallowing a magnet in a Mattel toy," something you would
15    think Mr. Eckert would know.
16            "MS. KELLER:  Your Honor, I would ask to recess to
17    inquire of the Court as to whether I may ask the next
18    question about a possibly prohibited area," thus
19    communicating she has got evidence of it, but the Court
20    won't let her present of it.  Of course she never brought it
21    up because there is no evidence of it.
22            We think this is a basis for a mistrial on top of
23    everything else, but at a minimum, the jury needs to be told
24    no Mattel magnet from a Mattel toy has ever killed a child.
25    That's irrelevant, and they should disregard that whole
```

1   colloquy.

2        MS. KELLER:  The question is not whether we have

3   proof that a Mattel magnet killed a child.  The question is

4   was there a good-faith basis for the question?  I'm looking

5   at three articles that I was able to pull up quickly.  One

6   is entitled -- it's AP dated August 14, 2007 -- "Mattel

7   Issues New Massive China Toy Recall," and in the middle of

8   the article -- it's all about Mattel, not about other

9   manufacturers.  In the middle of the article, "Several

10  injuries have been reported in an earlier poly pocket recall

11  last November.  At least one U.S. child has died and 19

12  others needed surgery since 2003 after swallowing magnets

13  used in toys the government said."  The entire article was

14  about Mattel.

15       The same with the "New York Times" article, August

16  14, 2007, entitled "Mattel Issues New Recall Of Toys Made In

17  China."  The entire article is about Mattel toys.  There is

18  not one other toy manufacturer mentioned in the article.

19  Mr. Eckert is quoted.  The Consumer Products Safety

20  Commission is quoted.  This is the one I read earlier.  "The

21  separate action today involving a design flaw in

22  18.2 million magnetic toys, about half of them sold in the

23  United States, expanded a recall initiated last year after

24  reports of deaths and injuries to children who ingested

25  magnets that had come loose."

1          I don't think that in order to ask that question

2     and have a good-faith basis for it I have to be able to say

3     chapter and versus the specific toy that the "New York

4     Times" or the AP was talking about.  It's a good-faith

5     belief that we are talking about to ask the question.  There

6     is certainly ample information in the press to form a

7     good-faith belief to ask that question.

8          MR. QUINN:  It's not their manufacturers.  It's

9     Mattel.  There is no evidence that any Mattel toy magnet has

10    ever killed a child.  For her to go and say, you know, I'm

11    being prohibited from going into this, and I need to talk to

12    the Court about this after Mr. Eckert emphatically denies

13    that it's ever happened sends the wrong message to the jury.

14         I mean, the questions weren't even framed in terms

15    of publicity about this.  If they have got some evidence

16    that there is some publicity about a Mattel toy magnet

17    killing a child, let's hear it.  I'm not hearing it.  We are

18    not saying that no magnet in any toy ever made by anybody

19    didn't ever kill a child.  The question is Mattel toys and

20    publicity about Mattel toys.

21         MS. KELLER:  When you are talking about entire

22    articles in major publications in the leading newspaper in

23    the nation and the leading wire service that are all about

24    Mattel toy recalls and then specifically talk about children

25    becoming ill and dying, when you have multiple reports in

```
 1    the press about children with perforated intestines almost

 2    dying, it seems to me ridiculous to say that there is no

 3    good-faith belief for that question.

 4            It was all in the context of publicity.  The

 5    problem is you can't separate the two.  To hear Mr. Eckert

 6    tell it, there has never been a problem except a minor

 7    public relations issue that was papered over, and they went

 8    on to be profitable.

 9            Your Honor, I will submit it.

10            MR. QUINN:  The questions weren't about publicity,

11    Your Honor.

12            "Q.  There were children who actually died from

13    swallowing those magnets, right?"

14            Children died.  Your Honor, I would ask to recess

15    to inquire of the Court.  They have no evidence that a

16    Mattel magnet ever killed a child.  At a minimum, the jury

17    has got to be told that that's not an issue in this case,

18    and they should ignore it.  They should be told it's simply

19    not true.

20            MS. KELLER:  I don't know that there is any

21    evidence that it's not true, because what happens is every

22    time it looks like there is about to be a lawsuit, Mattel

23    dispatches a lawyer to settle up with these people in a

24    confidential sealed settlement, so we never find out.

25            That's one of the things that I was referring to
```

63

```
 1    in the book "Toy Monster."  I never cited the book by name,
 2    but that's what it is about.  It's about the campaign by
 3    Mattel to tap all this down and not let it see the light of
 4    day.  Nevertheless, the "New York times" and the AP and
 5    other publications all around the world, even in Belfast,
 6    Ireland, in one case, were publishing articles about this at
 7    the time.
 8              MR. QUINN:  Submit.
 9              MS. KELLER:  Submit it, Your Honor.
10              THE COURT:  Well, let me reflect on it.  I just
11    received the brief today, and I read it sometime this
12    afternoon.  I am going to peruse it again.  It's under
13    submission.
14              What are we going to do next?
15              MR. ZELLER:  We have the binders for --
16              THE COURT:  Do you want to go over those?
17              THE COURT:  Why don't I get rid of one counsel for
18    each side and work with one counsel for both sides.
19              MR. PRICE:  Can I say just one thing on the record
20    with respect to Mr. Wagner?  He is coming in tomorrow
21    morning.  I think he arrives around 8:00 a.m. at John Wayne
22    because he is not going to testify until 1:00.  At least,
23    that's the latest information I have.
24              THE COURT:  I'm tied up after 9:00.
25              MR. PRICE:  As soon as he gets here, we can over.
```

64

1              THE COURT:  I'm not available.

2              MR. PRICE:  I mean, if he gets here at 8:00.

3              THE COURT:  Oh, I will be here, but I need to know

4    he is here.  I'm not going to get all counsel in here over

5    that.

6              MR. PRICE:  That's his schedule.

7              THE COURT:  Well, we have half an hour.  We have

8    another witness, and I can look at those again tonight.  If

9    I have a concern, I can take a recess and ask him quickly

10   what they mean.  There's only four that I am concerned about

11   that I don't understand.

12                              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7                        CERTIFICATE
 8
 9          I hereby certify that pursuant to Section 753,
10    Title 28, United States Code, the foregoing is a true and
11    correct transcript of the stenographically reported
12    proceedings held in the above-entitled matter and that the
13    transcript page format is in conformance with the
14    regulations of the Judicial Conference of the United States.
15
16    Date:  March 8, 2011
17
18
19                        Sharon A. Seffens 3/8/11
                          _____
20                        SHARON A. SEFFENS, U.S. COURT REPORTER
21
22
23
24
25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER