CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

1

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4    – – – – – – –

5

6    MATTEL, INC., ET AL.,                    )
                                              )
7            Plaintiffs,                      )
                                              )
8        vs.                                  ) No. CV 04-9049-DOC
                                              )    Day 29
9    MGA ENTERTAINMENT, INC., ET AL.,         )    Volume 1 of 2
                                              )
10           Defendants.                      )
     _____)

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        Jury Trial

17                    Santa Ana, California

18                  Tuesday, March 8, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-08 MattelV1

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
              By:  JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   WILLIAM PRICE
 6                 Attorneys at Law
              865 South Figueroa Street
 7            10th Floor
              Los Angeles, California 90017-2543
 8            (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                 Attorney at Law
              4 Park Plaza
13            Suite 1600
              Irvine, California 92614
14            (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                 Attorney at Law
              405 Howard Street
18            San Francisco, California 94105
              (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21            BY:  JENNIFER L. KELLER
                   Attorney at Law
22            18500 Von Karman Avenue
              Suite 560
23            Irvine, California 92612
              (949) 476-8700

24

25
```

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                  Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              – AND –

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                 Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             KEN KOTARSKI, Mattel Technical Operator

17             MIKE STOVALL, MGA Technical Operator

18             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

22             FRANK RORIE, Orrick Herrington & Sutcliffe

23             KARMELE LANDARIBAR-ARZAGA, Spanish Interpreter

24

25

4

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MACHADO GOMEZ, CARLOS | | | | |
|   By Mr. Overland | | | | 6 |
|   By Mr. McConville | | | | 26 |
| | | | | |
| CAVASSUTO, ERNESTO OMAR | | | | |
|   By Mr. Zeller | 28 | | 69 | |
|   By Mr. Cote | | 58 | | 72 |
|   By Mr. McConville | | 62 | | 74 |
| | | | | |
| WAGNER, MICHAEL | | | | |
|   By Mr. Price | 79 | | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Defendants' No. 6426 | | 6 |
| Plaintiffs' No. 6734 | | 43 |
| Plaintiffs' No. 6738 | | 45 |
| Defendants' No. 7144 | | 17 |
| Plaintiffs' No. 9898 | | 31 |
| Plaintiffs' No. 24262 | | 33 |
| Plaintiffs' Nos. 24264, 24264T | | 34 |
| Plaintiffs' No. 24269 | | 35 |

CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

5

1          **I N D E X** (Continued)

2

3

4              **EXHIBITS**

5

6   <u>**Exhibit**</u>                    <u>**Identification**</u>      <u>**Evidence**</u>

7   Plaintiffs' No. 24270                                   56

8   Defendants' No. 34909-33                                64

9   Defendants' No. 34909-35                                65

10  Defendants' No. 34908-88                                66

11  Defendants' No. 34908-90                                69

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           SANTA ANA, CALIFORNIA, TUESDAY, MARCH 8, 2011

2                    DAY 29, VOLUME 1 OF 2

3                         (1:02 p.m.)

4              *(The following proceedings is taken in the*

5          *presence of the jury.)*

6              THE COURT:  Okay.  We are back in session.  The

7      jury is present, the witness, all parties, counsel.

8              And Mr. Overland, if you'd like to continue with

9      your cross-examination.

10             MR. OVERLAND:  Thank you, your Honor.

11             Before I ask questions, your Honor, I'd like to

12     move into evidence Exhibit 6426, that's the April 1st, 2004

13     e-mail that we talked about after the jury was sent home.

14             THE COURT:  Received.

15             *(Defendants' Exhibit No. 6426 is received in*

16         *evidence.)*

17     **CARLOS GUSTAVO MACHADO GOMEZ, PLAINTIFFS' WITNESS, RESUMED**

18                 **RECROSS-EXAMINATION (Continued)**

19     BY MR. OVERLAND:

20     Q    Mr. Machado, do you remember talking on Friday about

21     the meeting of Mr. Larian for the first time at the New York

22     toy fair?

23     A    Yes.

24     Q    And when you met him at the toy fair, did you stay in

25     the showrooms of MGA or did you go someplace else?

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

7

```
 1              MR. ZELLER:  This gets into MGA's affirmative

 2     claims.

 3              MR. OVERLAND:  This was raised by counsel in

 4     cross-examination on Friday.

 5              THE COURT:  No, I -- I think that this is

 6     reserved, and you can bring the gentleman back.  This gets

 7     right on the borderline of the agreement between the

 8     parties.

 9              Your case will be starting on Friday.

10     BY MR. OVERLAND:

11     Q    Can you take a look, sir, at Exhibit 6401, that is the

12     employment contract with Mattel Servicios?

13     A    Yes, I have it in front of me.

14     Q    And that's the contract that you signed with Mattel

15     Servicios beginning work there in 1994?

16     A    Yes.

17     Q    And if you look at paragraph 10 of that contract, sir,

18     it says that "the employee," and that would be you, right,

19     Mr. Machado?

20     A    Yes.

21     Q    "Acknowledges that all documents and information he may

22     be given due to the employment relationship are the

23     exclusive property of the employer."  And that's part of the

24     contract that you signed back then, right?

25     A    Right.
```

CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

8

1   Q    Did you sign any other contract ever that changed that

2   particular provision?

3   A    No.

4   Q    And the employer that's referred to again would be

5   whom?

6   A    Mattel Servicios de Mexico.

7   Q    And if you look at the first part of Exhibit 6401,

8   right at the beginning, if you look at the first five lines

9   there?

10  A    Yes.

11  Q    That, in fact, says that Mattel Servicios is the

12  employer, correct?

13  A    That's correct.

14  Q    Not Mattel, Inc., right?

15  A    Right.

16  Q    And not Mattel de Mexico, right?

17  A    Right.

18  Q    Did you ever sign any employment contract with Mattel,

19  Inc.?

20  A    No.

21  Q    Did you ever sign any employment contract with Mattel

22  de Mexico?

23  A    No.

24  Q    Now, let's look now, sir, at Exhibit 6437, that's the

25  so-called "Rome on fire" e-mail; do you see that?

CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

9

1   A      Yes.

2   Q      And that was sent by you on April the 21st of 2004,

3   correct?

4   A      Correct.

5   Q      And does this e-mail have anything at all to do with

6   your copying of documents to the USB drive and later to the

7   CD?

8                MR. ZELLER:  Leading.

9                THE COURT:  Overruled.

10               THE WITNESS:  No.

11  BY MR. OVERLAND:

12  Q      What does this have to do with?

13  A      It has to do with -- with the exit of Ms. Trueba,

14  Ms. Vargas -- Mr. Vargas and myself at Mattel.

15  Q      And in terms of the position that the three of you

16  occupied at Mattel Servicios, were you low-level

17  employees --

18  A      No.

19  Q      -- or something higher?

20  A      We were something higher.  We were like top managers,

21  not directors, but yes, top managers.

22  Q      And if you look, sir, at paragraph 2 of that same -- or

23  strike that.

24         If you look at the first paragraph right after "Rome is

25  on fire."

1    A    Yes.

2    Q    You said, "We left the office at 1:30 p.m. yesterday,

3    and since then, they have already made 10 changes in the

4    staff.  We are driving them crazy."

5         What does that refer to?

6    A    That they were trying to fill the holes we left when --

7    when -- they were trying to fill the holes that we left that

8    day.

9    Q    The holes in?

10   A    The holes of our positions with other people, other

11   staff, and they were moving stuff around to -- to cover the

12   positions.

13   Q    Does that first paragraph of that e-mail have anything

14   at all to do with the copying of documents?

15   A    No.

16   Q    Take a look at the second paragraph.  "Based on what we

17   know from our contacts, Jerry's and Gabriel's," and then in

18   parentheses, "Mattel's Mexico G.M."

19        Who is Gabriel?

20   A    Mr. Zalzman.

21   Q    Okay.  And who is Jerry?

22   A    Mr. Cleary.

23   Q    Who was Mr. Cleary, or who is Mr. Cleary?

24   A    He, at the time, was the head of Latin America.

25   Q    And then it says, quote is -- quote, "We are 60 percent

1    sure" -- I'm sorry, "80 percent sure they went to MGA,"

2    closed quote.  "They are even thinking of calling Hasbro to

3    ask and prevent our actions."

4         What does that refer to?

5    A    Well, they were -- they were pretty --

6              MR. ZELLER:  This is hearsay, your Honor.

7              THE COURT:  This is his interpretation.  Remember,

8    we don't have the other party that's communicating here in

9    court subject to cross examination, but he can state what

10   his thought and feeling was about what this paragraph meant.

11   BY MR. OVERLAND:

12   Q    Okay.  Well, let's break it down.  The quote --

13             THE COURT:  Well, that was a favorable ruling,

14   Counsel.  You don't have to break it down, he can answer it.

15             MR. OVERLAND:  Well, that was partially favorable.

16             (Laughter.)

17             MR. OVERLAND:  I want to make clear that -- but

18   thank you for --

19             THE COURT:  It's a split decision for you and

20   Mattel.

21             MR. OVERLAND:  It was, so I want to make it more

22   than that.

23   BY MR. OVERLAND:

24   Q    Take a look at the -- let's take a look at that

25   paragraph again.  The part that's in quotes, that's

1    referring to something that somebody else said, right?

2    A    Right.

3    Q    And then the sentence following that, that's something

4    that you said, right?

5    A    That's correct.

6    Q    Okay.  Tell -- tell me what you meant when you said

7    "They are even thinking of calling Hasbro to ask and prevent

8    our actions."

9    A    We thought that they might be calling Hasbro to let

10   them know that three employees of Mattel Mexico have

11   resigned, and they thought that they were going to set up

12   MGA Mexico, and since Hasbro was a distributor, we felt that

13   they might call them and let them know.

14   Q    And does that paragraph have anything at all to do with

15   copying documents?

16   A    No.

17   Q    Let's look now at the next paragraph.  "We will take

18   your pictures tomorrow, and we will send them along with a

19   list of topics of what we want to plan for MGA Mexico";

20   what's that about?

21   A    As I remember, it was some pictures that he wanted to

22   take from retail stores, that us -- Mr. Larian asked us to

23   take from retail stores, and the topics is the checklist

24   that we wanted for MGA Mexico.

25   Q    Does that paragraph have anything at all to do with

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 13 of 131   Page ID #:307772
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

13

1    copying documents?

2    A    No.

3    Q    Have you ever told anyone at Mattel Servicios or anyone

4    anywhere else that you have copied documents onto your USB

5    drive and then later onto the CD?

6    A    No.

7    Q    Let's take a look at Exhibit 7104, please.  Do you

8    remember being asked about this on Friday?

9    A    Yes.

10   Q    All right.  Now, this exhibit, does it deal with boys'

11   toys at all?

12   A    No.

13   Q    And when you were at Servicios, your responsibility was

14   what?

15   A    Boys' toys.

16   Q    What does this exhibit deal with?

17   A    Girls' toys.

18   Q    And specifically which?

19   A    Barbie.

20   Q    Anything else?

21   A    MyScene.

22   Q    Anything else?

23   A    No.

24   Q    And who else at Mattel Servicios was the person that

25   dealt with or was responsible for girls' toys?

1    A    Ms. Trueba.

2    Q    And Mariana Trueba, what was her title at Servicios?

3    A    Group marketing manager for girls' toys.

4    Q    So you had boys and she had girls?

5    A    That's correct.

6    Q    Have you ever seen -- did you ever see this document,

7    Exhibit 7104, before you left Mattel Servicios?

8    A    No.

9    Q    Did you ever see it at MGA?

10   A    No.

11   Q    Did you copy this Exhibit 7104 onto the CD?

12   A    No.

13   Q    Did you copy it to the USB drive?

14   A    Yes.

15   Q    Was that given to you by Ms. Trueba to copy?

16   A    Yes.

17   Q    Now, let's take a look at Exhibit 7153.

18        Have you taken a look at that, sir?

19   A    Yes.

20   Q    Now, Exhibit 7153 is a hard copy of the document that

21   Mattel claims was found at the MGA offices after the search.

22   Did you have this document in your office at MGA?

23   A    Yes, I believe I had it.

24   Q    Okay.  And if you look at the first page, there, there

25   is an M there, number 3, and then a circle around it, and an

1   M after that.  Do you know what that M stands for?

2   A    I believe it's for my last name, Machado.

3   Q    How did you get this Exhibit 7153?

4   A    I got it through -- through a sales employee at MGA

5   that got it from a retailer.

6   Q    When you say "got it from a retailer," what do you

7   mean?

8   A    From a buyer of -- of a certain retailer.

9   Q    And when you say a retailer, you mean someone like

10  Walmart or Walmex, somebody that sells products to the

11  ultimate consumer in Mexico?

12  A    Correct.

13  Q    And do you know why MGA sales would have a document

14  like this from a retailer?

15          MR. ZELLER:  Calls for speculation.

16          THE COURT:  No, overruled.

17          You can answer the question.

18          THE WITNESS:  Sometimes the retailers -- well,

19  many times the retailers give -- give price lists to

20  competitors to show them that certain company's giving some

21  discounts or some special prices or comparative prices, so

22  the company that it's giving it to can react to it or do

23  something about it.

24  BY MR. OVERLAND:

25  Q    And react to it in what way?

1   A    For example, look, this is Hasbro Action Man that is

2   for 200 pesos and your comparative Max Steel is 220 pesos,

3   so I think you should decrease the price.

4   Q    So it's a bargaining tool for the -- for the retailer

5   to whom you're selling?

6   A    Yes.

7   Q    Do you know when this price list was created?

8   A    I'm not sure, but sometime in 2005.

9   Q    And that was after you left Servicios, correct?

10  A    Yes.

11  Q    Now, take a look at Exhibit 7144, please.

12  A    Yes.

13  Q    Do you recognize what that is?

14  A    Yes.

15  Q    What is it?

16  A    It's a presentation that the marketing people at Mattel

17  back then recreated to show comparative product to the sales

18  force.

19  Q    To show a comparative product --

20  A    Comparative product and prices and trends that will be

21  in the market in 2004 to our sales force.

22  Q    And that was created by -- at Mattel Servicios?

23  A    Yes.

24  Q    Did you have any part in creating this document?

25  A    Yes.

1    Q     What part?

2    A     The part of boys.

3              MR. OVERLAND:  Your Honor, I move Exhibit 7144

4    into evidence.

5              THE COURT:  Received.

6              (Defendants' Exhibit No. 7144 is received in

7        evidence.)

8    BY MR. OVERLAND:

9    Q    Now, if you look, sir, at the pages ending in that

10   exhibit at 066 through 081, and can you take a look at

11   those?

12   A     Zero what, sorry?

13   Q     066 through 081.

14   A     Yes.

15   Q     Can you tell us briefly what those pages contain?

16   A     It's a comparative analysis for -- for fashion dolls

17   that were going to be in the market in 2004, MyScene, Bratz,

18   Britney and Barbie.

19   Q    Is there -- is there also a comparison between Max

20   Steel and Action Man?

21   A     No.

22              MR. OVERLAND:  May I have just a moment?

23              (Attorney discussion held off the record.)

24   BY MR. OVERLAND:

25   Q    Mr. Machado, is Exhibit 7144 a Mattel, Hasbro 2004

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 18 of 131   Page ID #:307777
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

18

1    spring and fall comparison?

2    A    Yes.

3    Q    And is there anything in that exhibit relating to a

4    comparison, take your time, between Max Steel and Action

5    Man?

6    A    Yes.

7    Q    Where is that?

8    A    Page 034.

9    Q    Okay.

10   A    Oh, 249.

11   Q    034 to 249?

12   A    Yes.

13   Q    And did you create those comparisons?

14   A    Yes.

15   Q    And Max Steel was a product of whom?

16   A    Mattel, Mattel Servicios.

17   Q    And Action Man was a product of whom?

18   A    Hasbro.

19   Q    And Hasbro was a competitor of Mattel at the time that

20   you created that, correct?

21   A    Correct.

22   Q    And where did you get the information for Hasbro to

23   make the comparison?

24            MR. ZELLER:  Your Honor, this is irrelevant, and

25   it gets into MGA's claims apparently.

```
 1              THE COURT:  Overruled.

 2              You can answer the question.

 3              THE WITNESS:  I got it through a key account

 4   executive from the sales force who got it from a retailer.

 5   BY MR. OVERLAND:

 6   Q    For the same reason that the MGA obtained it with

 7   respect to the previous exhibit, correct?

 8   A    Correct.

 9   Q    Now, sir, let's take a look at Exhibit 7148, please.

10        Before we do that, go back to the previous exhibit,

11   7144, with respect to the information that was obtained from

12   Hasbro, that sales information, did you ever look at that in

13   the company of any Mattel employees?

14   A    Yes.

15   Q    And who are they?

16   A    They were my marketing coworkers and also Mr. Zalzman

17   and Mr. Ibarra.

18   Q    And who was Mr. Ibarra?

19   A    My boss, the marketing director.

20   Q    And who was Mr. Zalzman?

21   A    Gabriel Zalzman was the head of Mattel Mexico at the

22   time.

23   Q    And when they looked at it, did they ever tell you,

24   hey, you know, Mr. Machado, you shouldn't be looking at this

25   because this is competitor's information?
```

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 20 of 131   Page ID #:307779
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

20

1    A    No.

2    Q    Take a look at Exhibit 7148, please.

3    A    Ready.

4    Q    And this is another hard copy document that Mattel

5    claims was found in the offices of MGA after the raid?

6              MR. ZELLER:  Object to Mattel claims.

7              THE COURT:  Sustained.  Stricken.

8              Reask the question.

9    BY MR. OVERLAND:

10   Q    This is a hard copy document that was allegedly found

11   in the Mattel offices after the raid.  Did you have this

12   document in your office?

13   A    No.

14   Q    All right.  If you look at the first page, do you see a

15   number 2 and the letter P?

16   A    Yes.

17   Q    Do you know who the letter P stands for?

18   A    I believe it's Pablo Vargas.

19   Q    That's the same person who got the pardon from Mattel?

20   A    Yes, he is.

21   Q    And take a look at Exhibit Number 7156.

22   A    Ready.

23   Q    Exhibit 7156 is another document that was allegedly

24   found at the MGA offices after the raid, another hard copy,

25   not something on the CD, did you have that document in your

1    office at MGA Mexico?

2    A     No.

3    Q     Again, the first page, look at the number 2, the letter

4    P, do you know what the letter P stands for?

5    A     Pablo Vargas.

6    Q     Take a look at Exhibit Number 7160.  7160 is another

7    hard copy document allegedly found after the raid at the MGA

8    offices.  Did you have this document in your office?

9    A     No.

10   Q     Take a look at the first page, do you see a letter P?

11   A     Yes.

12   Q     Who does that stand for?

13   A     Pablo Vargas.

14   Q     Take a look at Exhibit Number 7155.  That's another

15   hard copy document allegedly found in the offices of MGA.

16   There's a first page -- take a look at the first page, the

17   number 1 with the circle around it, and can you make out

18   what the letters after that say?

19   A     Pablo V.

20   Q     And who does that stand for?

21   A     Pablo Vargas.

22   Q     And finally, take a look at Exhibit Number 6462.  And

23   that's another hard copy document allegedly found in the MGA

24   offices after the raid in October of 2005.  Did you have

25   this hard copy document in your office?

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

1   A     No.

2   Q     Take a look again at the first page.

3   A     Yes.

4   Q     And can you read what those letters say after the

5   number?

6   A     P, Pablo, V.

7   Q     And do you know who that stands for?

8   A     Pablo Vargas.

9   Q     Now, you were asked on Friday, Mr. Machado, about some

10  obligations you may have had to Mattel, Inc., and Mattel de

11  Mexico; do you remember those?

12  A     Yes.

13  Q     Do you think you had any employer, employee obligations

14  to Mattel, Inc., or Mattel de Mexico?

15  A     No.

16  Q     Why not?

17  A     Because any of -- any of those two were my employers.

18  Q     When you say "any of those two were my employers," do

19  you mean what?

20  A     Mattel, Inc., and Mattel de Mexico.

21  Q     Were or were not?

22  A     Were not.

23  Q     Now, you were also asked on Friday by counsel for

24  Mattel about the risk that you took in doing your salary

25  negotiations with Mr. Larian; do you remember those

 1    questions?

 2    A    Yes.

 3    Q    Now, when Mattel offices closed in 2009 -- I'm sorry,

 4    when MGA offices closed in Mexico in 2009, did you ever get

 5    another job with MGA anywhere?

 6    A    No, no.

 7    Q    Did Pablo Vargas get another job with MGA anywhere

 8    after the offices closed, to your knowledge?

 9    A    No.

10    Q    And did Mariana Trueba get any job with MGA after the

11    offices closed in 2009, to your knowledge?

12    A    No.

13    Q    You live in Mexico City, right?

14    A    Yes.

15    Q    And you came here from Mexico City to be here?

16    A    Yes.

17    Q    What kind of work are you doing in Mexico City?

18    A    I'm a freelance consultant for the toy industry.

19    Q    And finally, Mr. Machado, you were asked on Friday by

20    counsel for MGA about Exhibit 5480, and that was the e-mail

21    that you sent on April 14th of 2004 to Mr. Larian; do you

22    remember that?

23    A    Yes.

24         MR. OVERLAND:  Your Honor, may this exhibit be

25    moved into evidence?  I don't think it was.

```
 1              THE COURT:  There was some disagreement about that
 2    this weekend, wasn't there, Counsel?
 3              MR. ZELLER:  As to privilege, yes.
 4              MR. MC CONVILLE:  No, this is a different
 5    document, your Honor.
 6              THE COURT:  Oh, my apologies.
 7              MR. MC CONVILLE:  This document was already
 8    received.
 9              MR. OVERLAND:  If it was, then forget it.
10              THE COURT:  Yes, it's received.  This is not the
11    document from Mexico.
12              MR. OVERLAND:  Okay.
13    BY MR. OVERLAND:
14    Q    And this is a document, sir, if you look at where you
15    say "guys," who are you referring to as "guys"?
16    A    Mr. Larian and Mr. Park.
17    Q    And it says, if you look at it, the second sentence
18    says, "We are worried because we," in capitals, "must resign
19    on Wednesday."  And then I think there is a typo, but it
20    says, "Due to that afternoon, the directors and ourselves
21    would have to fly to Buffalo and then to L.A. to see the
22    spring '05 line, returning May 3rd"; do you see that?
23    A    Yes.
24    Q    And when you are talking about the spring '05 line,
25    what are you referring to in that e-mail?
```

1    A    To the review that was about to be made in -- in

2    Buffalo and California about the new lines and new products

3    that Mattel would be launching in the following year.

4    Q    And if you had gone to that meeting, what would you

5    have learned?

6    A    I would have learned new lines --

7    Q    When you say "new lines," what do you mean?

8    A    New brand launches, new products to be introduced to

9    the market by Mattel.

10   Q    Okay.  What else would you have learned from the line?

11   A    Prices, TV plans, marketing strategies.

12   Q    All for those new products?

13   A    Yes, and the continuing ones as well.

14   Q    And that -- would that have been information that would

15   have been known to the public?

16   A    No.

17   Q    And did you delay your resignation from Mattel

18   Servicios in order to go to that spring 2005 fashion line by

19   Mattel in order to learn this information?

20   A    No.

21   Q    Instead, when did you resign?

22   A    April 19th, 2004.

23   Q    And since you had resigned, you no longer went to that

24   spring fashion line meeting, correct?

25   A    Correct.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 26 of 131   Page ID #:307785
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

26

1   Q    Did Mr. Larian ever write, e-mail or tell you to go to

2   that spring fashion line meeting so that you could learn

3   about all these Mattel new products and get that

4   information?

5   A    No.

6             MR. OVERLAND:  I have nothing further.

7             THE COURT:  Now, sir, you may step down.

8             Strike that.

9             MR. MC CONVILLE:  One or two questions, your

10   Honor.

11             THE COURT:  All right.

12             This will be Mr. --

13             Counsel?

14                        **RECROSS-EXAMINATION**

15   BY MR. MC CONVILLE:

16   Q    Mr. Machado, you were asked questions concerning your

17   meeting during the New York toy fair with Isaac Larian in

18   February of 2004; do you remember those questions?

19   A    Yes.

20   Q    Where physically did that meeting occur?

21   A    In a conference room downstairs.

22   Q    All right.

23             MR. MC CONVILLE:  No further questions.

24             THE COURT:  All right.  Thank you.

25             Sir, you may step down.  Thank you.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 27 of 131   Page ID #:307786
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

27

 1              Counsel on behalf of Mattel, your next witness,

 2     please.

 3              MR. ZELLER:  Mattel calls Omar Cavassuto.

 4              THE COURT:  Thank you very much.

 5              Sir, if you'd step forward, please.

 6              Sir, if you'd step forward, please.  Thank you.

 7              And if you'd stop at that location and please

 8     raise your right hand.

 9        **ERNESTO OMAR CAVASSUTO, PLAINTIFFS' WITNESS, SWORN**

10              THE WITNESS:  Yes, I do.

11              THE COURT:  Thank you, sir.

12              If you'd be kind enough to come along the jury

13     railing, please.

14              Be seated.  Thank you, sir.  Would you state your

15     full name for the jury, please.

16              THE WITNESS:  Ernesto Omar Cavassuto.

17              THE COURT:  And would you spell your last name,

18     please.

19              THE WITNESS:  C as in Charlie, A, V as in Victor,

20     a-s-s-u, T as in Tom, O.

21              THE COURT:  Thank you, sir.

22              Counsel, direct examination by Mr. Zeller on

23     behalf of Mattel.

24

25

**DIRECT EXAMINATION**

1

BY MR. ZELLER:

2

3   Q    Good afternoon.  Please tell us where you work.

4   A    I work for Mattel, Inc., in El Segundo.

5   Q    So currently you work for the parent company?

6   A    Yes.

7   Q    Here in Southern California?

8   A    Yes.

9   Q    And what's your job title currently?

10  A    I'm director of international finance.

11  Q    And generally speaking, what are your responsibilities

12  as the director of international finance?

13  A    Basically it's coordinating the financial reporting

14  activities of all the entities outside of the U.S.,

15  reviewing their numbers, their account receivable, their

16  inventories, coordinating their forecasts or plans and

17  reporting to corporate.

18  Q    You previously worked for Mattel de Mexico?

19  A    Yes.

20  Q    And what years did you work for Mattel de Mexico?

21  A    From February 2001 to March 2010.

22  Q    And what was your job title there?

23  A    I was the director of finance for Mattel de Mexico.

24  Q    And what were your responsibilities as the director of

25  finance?

1    A     Those were similar to the U.S., to the job that I'm

2    doing now, but include also accounts payable, credit and

3    collections, taxes, all the general ledgers, all the

4    reporting activities and planning and financial activities.

5    Q     Are you familiar with a company or entity called Mattel

6    Servicios?

7    A     Yes.

8    Q     And is there a relationship between Mattel Mexico and

9    Mattel Servicios?

10   A     Yes, it is.

11   Q     Please tell us what that relationship is.

12   A     Well, the purpose of Mattel Servicios is to provide

13   services to Mattel de Mexico.

14   Q     And during the time period you were working in Mexico

15   City?

16   A     Yes.

17   Q     I take it that's where you were working for Mattel de

18   Mexico?

19   A     Yes, Mexico City.

20   Q     Did you also keep books and records for Mattel

21   Servicios?

22   A     Yes.

23   Q     Was part of your responsibility when you were working

24   for Mattel de Mexico to prepare contracts between Mattel de

25   Mexico and retailers?

1   A    Yes.

2   Q    If you could please take a look at Exhibit 9898A.

3        Do you recognize this?

4   A    Yes.

5   Q    What is this?

6   A    This is a commercial agreement between Mattel de Mexico

7   and a customer.

8             MR. ZELLER:  I would move to admit Exhibit 9898A.

9             MR. COTE:  Objection, your Honor.  Rule 26 and the

10  document is incomplete.

11            THE COURT:  We'll take that up at the recess with

12  counsel this evening.  These documents don't need to be

13  displayed at this time regardless.

14  BY MR. ZELLER:

15  Q    Do you recognize the handwriting on these pages?

16  A    Yes.

17  Q    Whose handwriting is on here?

18  A    Well, I recognize the trade and collection initial --

19  the trade and collection manager initial, my initial on the

20  left-hand side and the signature of Roberto Isaias,

21  I-s-a-i-a-s.

22            THE COURT:  All right.  Just a moment.  Are these

23  the original seven that we initially discussed, Mr. Zeller?

24  Mr. Cote?

25            In other words, I don't have any issues with the

```
 1    original seven, Counsel.  I have 9898 as the initial one

 2    with that one page and then the complete copies were

 3    available.

 4              Received.

 5              MR. ZELLER:  Thank you.  And we'll also put in the

 6    evidence as well, your Honor, the complete versions.

 7              THE COURT:  Okay.  Counsel, with that

 8    representation, they are received.  You'll get the complete

 9    version.  You got that on Sunday, didn't you?

10              MR. COTE:  Yes, your Honor.

11              THE COURT:  All right.  It's received.

12              MR. ZELLER:  Thank you.

13              (Plaintiffs' Exhibit No. 9898 is received in

14         evidence.)

15    BY MR. ZELLER:

16    Q    Are you familiar with a concept called point of sale

17    data?

18    A    Yes.

19    Q    Please tell us what that is.

20    A    Well, the point of sale data is basically the

21    information that the customer provides on how the products

22    are selling through in their stores, what the consumers are

23    buying.

24    Q    Is this information that Mattel de Mexico during the

25    time period you were there has received from retailers?
```

1    A    Yes.

2    Q    And does Mattel de Mexico pay retailers for providing

3    that point of sale information?

4    A    Yes.

5    Q    And how do they do that?

6    A    Mattel de Mexico pays via discount, it's a credit note

7    that is issued on a quarterly basis, but it's a discount.

8    Q    A discount against what?

9    A    Against the sales price.

10   Q    And what is the amount of that discount?

11   A    It ranges between 1 to 1.5 percent.

12   Q    And is the discount that Mattel gives -- Mattel de

13   Mexico gives in exchange for receiving that information from

14   the retailers, referenced in agreements?

15   A    Yes.

16   Q    If you could please take a look at Exhibit 24262.

17   A    Yes.

18   Q    Do you recognize this exhibit?

19   A    Yes, it's a gross sales by customer scale.

20          MR. ZELLER:  I move this into evidence, your

21   Honor.

22          MR. COTE:  Rule 26 objection, your Honor.

23          THE COURT:  Did you receive this complete

24   document, Counsel?

25          MR. COTE:  Yes.

```
 1              THE COURT:  Overruled.  It's received.

 2              (Plaintiffs' Exhibit No. 24262 is received in

 3         evidence.)

 4    BY MR. ZELLER:

 5    Q    If we can take a quick look at this.  This shows Mattel

 6    de Mexico sales by retailer for a certain time period?

 7    A    Yes.

 8    Q    What time period does it cover?

 9    A    2002 and 2004.

10    Q    Maybe if you just tell us what -- what this chart

11    shows.

12    A    Well, this is in Mexican pesos.  It shows on the

13    left-hand side -- the left-hand side the name of the

14    retailer and then the sales to that retailer in the year

15    2002, 2003, 2004, and in the bottom, the total company.

16    Q    And then it gives the totals there for each year, 2002,

17    2003 and 2004, separately?

18    A    Yes.

19    Q    And you were saying all these numbers are in Mexican

20    pesos?

21    A    Yes.

22    Q    If you can please take a look at Exhibit 24262.

23         Oh, I'm sorry.  Actually if you can look at 24264 and

24    24264T.

25    A    Okay, yes.
```

1    Q    Do you recognize these documents?

2    A    Yes.  It's same.  It's customer agreements.

3    Q    And when you say "customer agreements," you are talking

4    about retailer agreements?

5    A    Yes, it's an agreement between Mattel de Mexico and a

6    customer, a commercial agreement.

7    Q    And 24264T is a translation of those agreements?

8    A    Yes.

9    Q    An English translation?

10   A    Yes.

11          MR. ZELLER:  I would move 24264 and 24264T into

12   evidence, your Honor.

13          THE COURT:  Received.

14          (Plaintiffs' Exhibit Nos. 24264 and 24264T

15      are received in evidence.)

16          MR. ZELLER:  And maybe if we can display the first

17   page of 24264T.

18   BY MR. ZELLER:

19   Q    And this is -- this is an example of one of the various

20   agreements between the retailers and Mattel de Mexico?

21   A    Yes.

22   Q    And are these the agreements that provide for that

23   discount --

24   A    Yes.

25   Q    -- that you referenced earlier where the retailers are

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

35

```
 1   providing information to Mattel de Mexico in exchange for a
 2   certain amount of discount?
 3   A    Yes.
 4   Q    And if you could at least tell us, that discount that
 5   the retailers get, that's against those gross sales that we
 6   saw in the prior exhibit?
 7   A    Yes.
 8   Q    24262?
 9   A    Yes.
10   Q    If you could please take a look at 24269.
11   A    Yes.
12   Q    Do you recognize this?
13   A    Yes, it's similar.  It's an agreement signed between
14   Mattel de Mexico and a customer in Mexico.
15   Q    Which customer?
16   A    Walmart, this is Walmart.
17        MR. ZELLER:  I would move into evidence 24269.
18        THE COURT:  Received.
19        (Plaintiffs' Exhibit No. 24269 is received in
20        evidence.)
21   BY MR. ZELLER:
22   Q    And what time period does this one cover?
23   A    It says 2003, March 14, 2003.
24   Q    And does this also then provide the discount
25   information or the discount terms between Mattel de Mexico
```

1    and Walmart for that year?

2    A    Yes.

3    Q    And that discount is, again, in exchange for Walmart

4    providing information to Mattel de Mexico?

5    A    Yes, correct.

6    Q    What does Mattel do with the point of sales data that

7    it receives?

8    A    Well, Mattel de Mexico receives the information from

9    several customers, and that is basic information to

10   understand how the products are performing in the

11   marketplace, how the products are selling through.  If there

12   is an issue with the product that is sitting there and not

13   moving through, if there is a problem that it's really

14   moving through really well, it's the understanding of how

15   the market is reacting to the products.

16   Q    And if you can tell us, in what ways does Mattel de

17   Mexico actually use the point of sale data in order to

18   adjust its business strategies or otherwise actually carry

19   out its business?

20   A    Okay, yeah.  When you receive that information, what

21   you're going to do is, and I need to use an example, if a

22   product is moving a little bit slower than other products in

23   the same category, what you are going to do is analyze if

24   you need to provide more advertising support, more material

25   in the marketplace, you need to sit down with the customer,

 1   analyze other promotional activities to foster that product

 2   so you can change your strategy with that information.

 3   Q    If you can please take a look at Exhibit 8466, which is

 4   already in evidence.

 5        And by the way, you reviewed these more voluminous

 6   documents that we are talking about here in advance so we

 7   wouldn't spend time with the jury while you are reviewing

 8   them?

 9   A    Yeah, I know this document.

10   Q    Right, but what I was asking is a more general

11   question.  There are some voluminous documents that we are

12   going to talk about here today.  In order to save time in

13   front of the jury, you've already looked at these prior to

14   your testimony to prepare?

15   A    Yes, yes.

16   Q    And this is one of the documents you looked at?

17   A    Yes.

18   Q    And you recognize this?

19   A    Yes.

20   Q    What is it?

21   A    This is a report that shows basically the information

22   that we've been talking about, this -- how the products --

23   the different products from Mattel are moving through in the

24   marketplace.

25   Q    All right.  And is this -- does this document contain

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 38 of 131   Page ID #:307797
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

38

1   Mattel trade secret information?

2           MR. MC CONVILLE:  Your Honor, I'm going to object.

3   This goes beyond the scope what this witness was designated

4   for.

5           THE COURT:  Overruled.

6           MR. COTE:  Also calls for a legal conclusion.

7           THE COURT:  Overruled.

8           You can answer that question.  In your opinion.

9           This is his opinion.

10          MR. MC CONVILLE:  Lacks foundation, too, your

11  Honor.

12          THE COURT:  Thank you.  Overruled.

13          THE WITNESS:  Yes, basically it has because it

14  shows the amount that you want to sell to the customer, how

15  much you have sold to the customer, and the different SKUs,

16  you are going to see how that product is moving in the

17  marketplace, if it is selling through well, if not, then

18  this can, you know, drive different alternatives or

19  strategies from the company, so this is, yes, internal

20  information.

21  BY MR. ZELLER:

22  Q    All right.  And is this information valuable for a

23  competitor of Mattel to have?

24  A    Yes.

25          MR. MC CONVILLE:  Same objection, your Honor.

1          THE COURT:  Overruled.

2    BY MR. ZELLER:

3    Q    And why is that?

4    A    Because you would know which product or which category

5    are performing well, and also if you are a competitor, you

6    can adjust your own strategies to try to counteract that.

7    You can also see a product is not doing well, if a product

8    is not performing as the rest of the category in that store,

9    there are things you can do or increase your presence in

10   that store.

11   Q    Can a competitor get the information that's reflected

12   here in this exhibit?

13   A    No.

14   Q    Are you familiar with something called AC Nielsen?

15   A    Yes.

16   Q    And are you also familiar with something called NPD?

17   A    Yes.

18   Q    And do any of those outside, third-party services of

19   that kind provide this level of detail information about

20   Mattel sales?

21   A     No, it's different because AC Nielsen provides a read

22   of the marketplace by category, so it's not as detail as

23   this one, and on the other hand, AC Nielsen does not read

24   all of the stores.  It reads hyper market, supermarkets, so

25   the information is different.

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

40

1   Q    So I take it you can't buy this kind of information if

2   you're a competitor of Mattel from some other source?

3   A    The POS information that's here, no.

4   Q    And POS is point of sale?

5   A    Yes, point of sale.

6   Q    If you can please take a look at the following

7   additional documents.  These are 7096, 7087, 7081, 7082,

8   7083, 7084, 7085 and 7086.

9           MR. ZELLER:  These are all in evidence, your

10  Honor.

11          THE COURT:  Thank you.

12          THE WITNESS:  Yeah, this is a POS report too,

13  point of sales report too.

14  BY MR. ZELLER:

15  Q    And if I ask you the same questions about these

16  exhibits that I just asked you about 8466, which was the

17  Walmart point of sale analysis, you would give me the same

18  answers?

19          MR. COTE:  Objection.  Compound.

20          MR. MC CONVILLE:  Same objection, your Honor, to

21  foundation for this witness, and improper disclosure.

22          THE COURT:  Overruled.

23          You can answer the question.

24          THE WITNESS:  Yes, it's basically the same because

25  it includes the sell in, the sales that Mattel, it's really

1    performing and how the product is moving in the different

2    SKUs, so yes, it's basically the same.  Format a little bit

3    different, but it's basically the same.

4    BY MR. ZELLER:

5    Q    All right.  If you would please take a look at

6    Exhibit 7138, which is already in evidence.

7    A    Yes.

8    Q    And is -- what do you recognize this document as?

9    A    It's -- it's similar.  It's what is called the regional

10   report.  It's the -- I would say this consolidates the top

11   customers, the customers that make around 70 percent of the

12   sales are consolidated here.

13   Q    So this is a consolidation of the point of sale

14   information?

15   A    Yes.

16            MR. MC CONVILLE:  Your Honor, I continue to object

17   to this testimony by this witness --

18            MR. COTE:  As I do.

19            MR. MC CONVILLE:  -- as being not disclosed.

20            THE COURT:  All right.  Thank you.

21            Overruled.

22   BY MR. ZELLER:

23   Q    And if I ask you the same questions about whether this

24   information is trade secret and whether it would be valuable

25   to a competitor and those other questions I asked you about

1    the prior point of sale data documents, you'd give me the

2    same answers?

3    A    Yes.

4              MR. COTE:  Objection.  Compound.

5              THE COURT:  Overruled.

6    BY MR. ZELLER:

7    Q    If you can please look at 7090, which is in evidence.

8    A    Yes.

9    Q    And do you recognize what this is?

10   A    Yeah, this is a report that my team -- part of this

11   report, my X-team in Mexico put together on the

12   macroeconomic information.  It's basically a macroeconomic

13   report on how the different customers were performing if

14   they were opening new stores, basically the outlook and the

15   retail inventory, yeah.

16   Q    All right.  And is this information that you consider

17   to be a trade secret of Mattel de Mexico?

18             MR. MC CONVILLE:  Objection.  Foundation.

19             THE WITNESS:  Yes, it has some information too.

20             THE COURT:  Overruled.

21   BY MR. ZELLER:

22   Q    And is it information that would be valuable for a

23   competitor of Mattel de Mexico to have?

24             MR. COTE:  Same objection.

25             MR. MC CONVILLE:  Same objection.

 1              THE COURT:  Overruled.

 2              THE WITNESS:  Yes.

 3    BY MR. ZELLER:

 4    Q    And why is that?

 5    A    Because it's similar to the other report, you would

 6    know your strategy on the different brands and how they are

 7    performing, how much are you selling in, how much are you

 8    selling to the customers.

 9    Q    If you can please take a look at Exhibit 6734.

10    A    Yes.

11    Q    Do you recognize what this is?

12    A    Yeah, this is the -- what is called the FRP report and

13    it shows the POS information again.

14              MR. ZELLER:  I move Exhibit 6734 into evidence.

15              THE COURT:  Received.

16              MR. MC CONVILLE:  Same objection, your Honor.

17              (Plaintiffs' Exhibit No. 6734 is received in

18         evidence.)

19    BY MR. ZELLER:

20    Q    You referred to this as a FRP report, please tell us a

21    little bit about what that means.

22    A    Well, this is basically the detail of the different

23    SKUs and how they are selling through, again, in -- in the

24    different retailers and as a total in Mattel.  That is

25    basically the POS information, how are we -- how Mattel de

```
 1    Mexico was selling in and how the product was moving in the

 2    marketplace.

 3    Q    And do you consider FRP reports, the information in

 4    these reports, to be trade secret?

 5    A    Yes.

 6              MR. COTE:  Objection.  Lack of foundation.

 7              THE COURT:  Overruled.

 8    BY MR. ZELLER:

 9    Q    Please tell us why.

10    A    Because you would know how a product is performing in

11    the marketplace.  You would know if Mattel product is really

12    moving fast, if it's slow, if there are certain SKUs in a

13    specific category that you are not there and you want to

14    contract that by entering that category, that is basically

15    to know how the products of Mattel were doing.

16    Q    If you -- and do you consider it to be information that

17    would be valuable for a competitor to have?

18    A    Yes.

19    Q    And why is that?

20              MR. MC CONVILLE:  Objection.  No foundation.

21              THE COURT:  Overruled.

22              THE WITNESS:  Because they would know how Mattel

23    was performing in the different SKU levels and the different

24    categories.

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 45 of 131   Page ID #:307804
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

45

1    BY MR. ZELLER:

2    Q    And when you say "SKU levels," what are you referring

3    to?

4    A    It would be the specific toy number, the specific unit

5    number.

6    Q    So it's product by product information?

7    A    Product by product, yeah.

8    Q    And is that kind of information publicly available at

9    this level of detail, that you know?

10   A    No.

11   Q    Please take a look at Exhibit 6738.

12   A    Yes.

13   Q    Do you recognize what this is?

14   A    Yes, this is a similar report, you see the month,

15   February, March, April, but basically how much Mattel was

16   selling and how much Mattel was selling through.

17            MR. ZELLER:  I would move Exhibit 6738 into

18   evidence.

19            MR. MC CONVILLE:  Objection.  Foundation.  Lack of

20   disclosure of this witness.

21            THE COURT:  Overruled.

22            (Plaintiffs' Exhibit No. 6738 is received in

23        evidence.)

24   BY MR. ZELLER:

25   Q    And is the information in this document something that

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 46 of 131   Page ID #:307805
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

46

1    you consider to be trade secret?

2    A    Yes.

3    Q    And why is that?

4    A    Because it's -- this is internal information, and it's

5    the information that Mattel uses to understand how the

6    products are performing and to adjust strategies if

7    necessary.  This is not public.  It's -- really you would

8    know how your products are performing.

9    Q    And I take it if I ask you the same questions I asked

10   earlier about the point of sale data and its value to

11   competitors and the like, you'd give me the same answers?

12           MR. MC CONVILLE:  Objection.  Foundation.

13           THE COURT:  Overruled.

14           THE WITNESS:  Yes.

15   BY MR. ZELLER:

16   Q    Please look at Exhibit 7112, this is in evidence.

17   A    Okay, yes.

18   Q    And in particular, if you can look at pages 8 through

19   13, that's -8 through -13.

20   A    Yes.

21   Q    And is this information that comes from the Mattel

22   point of sale data that we've been talking about?

23   A    It should, because it says sell in and sell through and

24   the variances, so those numbers should come from the point

25   of sales reports.

1    Q    And if I ask you the same questions about whether this

2    is trade secret information and why, as I did for 8466,

3    you'd tell me the same thing?

4    A    Yes.  It's basically the same information.

5    Q    Are you familiar with a acronym or a term called BID,

6    B-I-D?

7    A    Yes.

8    Q    And what's that refer to?

9    A    The acronym was the -- it's like saying integrated

10   database and it shows the top seven or eight customers in

11   Mattel and the information related to the point of sales.

12   Q    This is referring, then, to an internal Mattel system?

13   A    Internal, yes, internal.

14   Q    And can you tell me about how much of the Mexico market

15   those retailers comprised?

16   A    The seven and eight should comprise around 70 percent

17   of the -- of the sales.

18   Q    Of the total sales of Mattel de Mexico?

19   A    Of Mattel de Mexico, yes.

20   Q    If you could please look at Exhibit 7078.  This is in

21   evidence.

22            MR. MC CONVILLE:  What number?

23   BY MR. ZELLER:

24   Q    Do you recognize this?

25   A    No, there's a place --

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 48 of 131   Page ID #:307807
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

48

1    Q    Oh, I'm sorry, you need to look at the screen.

2    A    Oh, I'm sorry.

3    Q    This is a voluminous document.

4         So do you recognize 7078?

5    A    Can you make it a little bigger?

6    Q    Yeah, there's a screen actually -- oh, it doesn't.

7         You can also turn around.  There is a large screen

8    right behind you.

9    A    Oh, okay.  Maybe you can move it to the right.

10        Yeah, it's the POS information, point of sales

11   information.

12   Q    And is this something sometimes called a BID report?

13   A    Yes.

14   Q    And is -- does this -- do these BID reports contain

15   Mattel trade secret information?

16   A    Yes.

17   Q    What information in these documents do you consider to

18   be trade secret?

19             MR. MC CONVILLE:  Objection.  Foundation.

20             THE COURT:  Overruled.

21             THE WITNESS:  Similar to the other reports, we

22   talk about this, how the different products are performing

23   in the marketplace and the different customers.

24   BY MR. ZELLER:

25   Q    All right.  And is this information that you believe

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

49

```
 1    would be valuable to a competitor to have?

 2               MR. MC CONVILLE:  Objection.  Foundation.

 3               THE COURT:  Overruled.

 4               THE WITNESS:  Yes.

 5    BY MR. ZELLER:

 6    Q    And tell us why that is.

 7    A    Because our competitor can adjust its strategies

 8    understanding how Mattel is doing in the marketplace.

 9    Q    And is this kind of information something that a

10    competitor can get from other sources?

11    A    No.

12    Q    If you can please take a look at 7079, 7080 and 7119,

13    which are all in evidence.

14               MR. ZELLER:  If you can scroll through those, Ken.

15               THE WITNESS:  Okay.

16    BY MR. ZELLER:

17    Q    Do you recognize these as more BID reports?

18    A    If you can make it a little bit bigger at the top where

19    the title is.

20         If you can show the top of the report.

21         There.

22         Yes, that is in units, and yes, it's the same.

23    Q    And so if I ask you the same questions about these BID

24    reports that I asked you about the first one, you'd give me

25    the same answers?
```

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 50 of 131   Page ID #:307809
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

50

1    A    Yes.

2    Q    Please take a look at Exhibit 7148.

3         MR. ZELLER:  7148, it's not in evidence yet?  Can

4    you please take --

5         MR. STOVALL:  It is in evidence.

6         MR. ZELLER:  Oh, it is evidence?

7         Can you put that up?

8         THE WITNESS:  That's basically the same report.

9    The point of sale information on a weekly basis.

10   BY MR. ZELLER:

11   Q    And do these kinds of reports have a particular kind of

12   name, or do you refer to them in some way?

13   A    Now we scope US reports, they were called FRPs at one

14   point in time, they were called BID reports.

15   Q    And so this is another form of the point of sale

16   information or POS information that you consider to be trade

17   secret information?

18   A    Yes.

19   Q    For the reasons that you've already discussed?

20   A    Yes, yes, basically contain the same information that

21   we talked about.

22   Q    If you can please look at Exhibit 8866.  This is in

23   evidence.

24   A    Yes.

25   Q    And what is -- what is this document?

1   A    This is basically a sales plan.  It tells you what

2   happened in one year and how are you planning the following

3   year.  It's basically a sales plan by customer.

4   Q    And this particular document was for what time period?

5   A    This one has information for 2004, 2003.

6   Q    And does this document contain Mattel trade secret

7   information?

8            MR. MC CONVILLE:  Objection.  Foundation.

9            THE COURT:  Overruled.

10           THE WITNESS:  Yes, it has in -- looking through

11   page 18 on the right-hand side, you can see 2004 demands,

12   that is what Mattel was going to import.  It has a financial

13   planning on page 22, and then in the back, it has the full P

14   and L detail by the different products.

15   BY MR. ZELLER:

16   Q    Does this include forward-looking information or

17   forecasts?

18   A    Yes, these are projections, yes, first semester, second

19   semester.

20   Q    So this is the business plan of Mattel Mexico for going

21   forward in 2004?

22   A    Yeah, it would be -- this is the base for preparing the

23   business plan.

24   Q    And is this information, information that would be

25   valuable to a competitor?

 1              MR. MC CONVILLE:  Objection.  Foundation.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes, you have the different prices

 4     on the different products.  You have the margins on the

 5     different products.  You know if a product is going to have

 6     advertising or not, if a product is going to pay royalties

 7     or not.  It's -- this is the full P and L for the different

 8     products.

 9              THE COURT:  All right.  Counsel, you're at a half

10     an hour now, if you want to use the 45 minutes, you can

11     proceed.

12              MR. ZELLER:  Thank you.

13              THE COURT:  But there will not be any redirect.

14              MR. ZELLER:  Okay.

15     BY MR. ZELLER:

16     Q    If you can please take a look at Exhibit 7077.  Do you

17     recognize what this is?

18     A    Yeah, that is the summary -- summary of the external

19     plan.  This is the plan that Mattel was preparing to analyze

20     the sales for the different customers.

21     Q    And this particular one was for Walmart?

22     A    Yes, yes.

23     Q    And does this document contain what was at the time

24     Mattel trade secret information?

25              MR. MC CONVILLE:  Objection.  Foundation.

1           THE COURT:  Overruled.

2           THE WITNESS:  Yes, because it has, at least what I

3    see on the screen is the -- the price, the suggested retail

4    price, and I think that -- if you can move to the right a

5    little bit, you have the client margin, that is what the

6    customer is going to make with the different products.

7    BY MR. ZELLER:

8    Q    And is this the kind of information that was valuable

9    for a competitor to have at the time?

10          MR. MC CONVILLE:  Objection.  Foundation.

11          THE COURT:  Overruled.

12          THE WITNESS:  Yes.

13   BY MR. ZELLER:

14   Q    How is that?

15   A    You know the structure of the pricing at Mattel, the

16   margins, the volumes, everything.

17   Q    And is that something, then, a competitor can use to

18   fashion in its own strategy or sales?

19   A    Yes.

20   Q    And tell us how they would do that.

21   A    For example -- again, if a customer -- if a competitor

22   has this information and sees that Mattel is providing to

23   customer X a margin of 20 percent for a specific category,

24   he can go to that customer and offer at 22 percent to get

25   their products in or get more space or get additional

1    exhibitions.

2    Q    If you could please take a look at Exhibits 7120, 7124,

3    7130 and 7118.  And do you recognize these as more sales

4    documents of Mattel?

5    A    Yes, those are more sales documents, yes.

6    Q    And I take it if I ask you the same questions about

7    whether they are trade secret and why, you would give me the

8    same answers?

9    A    Yes.

10            MR. MC CONVILLE:  Objection.  Foundation.

11            MR. COTE:  Compound.

12            THE COURT:  Overruled.

13            THE WITNESS:  Yes, it's the same.

14   BY MR. ZELLER:

15   Q    Please take a look at Exhibit 8471.

16   A    Yes.

17   Q    Do you recognize this?

18   A    Yes, it's a sales plan by the different quarters, by

19   the different customers.

20   Q    So this also has the same kind of information in it

21   we've been discussing.

22   A    Yes, sales for each of the different customers in the

23   different periods.

24            MR. MC CONVILLE:  Objection.  Vague.

25            THE COURT:  Overruled.

1   BY MR. ZELLER:

2   Q    And you consider this to be trade secret and valuable

3   to a competitor for the same reasons we were discussing?

4   A    Yes.

5             MR. MC CONVILLE:  Objection.  Foundation and

6   leading.

7             THE COURT:  Overruled.

8             And your answer, sir, was?  Was your answer yes?

9             THE WITNESS:  Yes.

10  BY MR. ZELLER:

11  Q    Please take a look at Exhibit 7140.

12       This is in evidence.

13       And is this a document -- actually let me rephrase it.

14       Does this document have information in it that you

15  consider to be trade secret back in the 2004 time period?

16            MR. MC CONVILLE:  Objection.  Foundation and

17  leading.

18            THE COURT:  Overruled.

19            THE WITNESS:  Yes, it has.

20  BY MR. ZELLER:

21  Q    And why is that?

22  A    Because it has the different -- this was a proposal.

23  It has the different payment terms for the different

24  customers, so it shows your payment and financing strategy

25  with the different customers.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 56 of 131   Page ID #:307815
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

56

1    Q    And is this information that you consider to be

2    valuable to a competitor?

3    A    Yes.

4              MR. MC CONVILLE:  Objection.  Foundation.

5              THE COURT:  Overruled.

6    BY MR. ZELLER:

7    Q    Please look at Exhibit 24270.

8    A    Yes.

9    Q    Do you recognize what this is?

10   A    Yes.  It's the confidentiality agreement that pops up

11   in your screen when you log in the Mattel system.

12             MR. ZELLER:  I would move Exhibit 24270.

13             THE COURT:  Received.

14             (Plaintiffs' Exhibit No. 24270 is received in

15        evidence.)

16             MR. ZELLER:  If we can please display that.

17   BY MR. ZELLER:

18   Q    And what is it that -- so you are saying this is a

19   pop-up that came on when you logged on to the Mattel de

20   Mexico system, is that --

21             MR. MC CONVILLE:  Objection.  Vague as to time.

22   Vague as to time, your Honor.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes, before logging in, you're going

25   to see this window popping up.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 57 of 131   Page ID #:307816
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

57

```
 1              THE COURT:  Well let's find out, Counsel, just to
 2   be sure.  2004, 2005, today?  What's the time frame?
 3   BY MR. ZELLER:
 4   Q    Is this the way it appeared in 2004?
 5   A    Yes.
 6   Q    And what does it say?
 7   A    It says that -- it says at the top -- it's in Spanish,
 8   but on the top it says confidentiality declaration, warning,
 9   this is Mattel confidential and trade secret property for
10   Mattel.  Do not use or share information without previous
11   consent in writing by Mattel.  The you -- the not authorized
12   use of this will imply violating the law.  If you are not
13   authorized to see this information, please refrain from
14   entering the system and contact the legal department at
15   Mattel.
16   Q    All right.  And is this a pop-up screen that every
17   employee, as you understood it, there at Mattel in Mexico
18   City saw back in the 2004 time period when he or she logged
19   on to the system?
20   A    Yeah, everybody should see this in their computers.
21   Q    It was a standard pop-up that came up every time?
22   A    Yes.
23              MR. ZELLER:  Nothing further.
24              THE COURT:  Counsel, cross-examination.  This is
25   by Mr. Cote on behalf of Mr. Machado.
```

Case 2:04-cv-09049-DOC-RNB  Document 10175  Filed 03/10/11  Page 58 of 131  Page ID #:307817
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

58

|     |                                                                                  |
| --- | -------------------------------------------------------------------------------- |
| 1   | **CROSS-EXAMINATION**                                                             |
| 2   | BY MR. COTE:                                                                      |
| 3   | Q    Good afternoon, Mr. Cavassuto.                                               |
| 4   | A    Good afternoon.                                                              |
| 5   | Q    We looked at Exhibit 24269, which is a letter agreement                      |
| 6   | with Walmart; do you remember that exhibit?                                       |
| 7   | A    Yes.  Let me -- 2469 --                                                      |
| 8   | Q    While we are looking for that, do you remember looking                       |
| 9   | at a letter agreement with Walmart?                                               |
| 10  | A    Yes.                                                                         |
| 11  | Q    And that was a letter agreement where Mattel was asking                      |
| 12  | Walmart to give it -- let's start over.                                           |
| 13  | Mattel was asking Walmart to give Walmart's information                           |
| 14  | to Mattel de Mexico, right?                                                       |
| 15  | A    To share Walmart's information with Mattel de Mexico,                        |
| 16  | yes.                                                                              |
| 17  | Q    To share the information, right?                                             |
| 18  | A    Yes.                                                                         |
| 19  | Q    Walmart could keep a copy for itself, right?                                 |
| 20  | A    Can you ask the question again?                                              |
| 21  | Q    Walmart was just sharing it, meaning they kept a copy                        |
| 22  | for themselves, right?                                                            |
| 23  | A    I'm not sure about that.                                                     |
| 24  | Q    The reason why Mattel was asking Walmart for the                             |
| 25  | information is because Walmart didn't have it -- let me                           |

1   start over.

2       The reason why Mattel de Mexico was asking Walmart for

3   the information was because Mattel de Mexico didn't have it

4   without getting it from Walmart first, right?

5   A    Yes.

6   Q    And this data we are talking about was just sales data

7   for Walmart Mexico, right?

8   A    Yes.

9   Q    I think you have that letter agreement in front of you

10  now.

11  A    Yes.

12  Q    Is there anything in that letter agreement that says

13  Walmart can't give that information to someone else?

14  A    No.

15  Q    Walmart can sell that information or give it to anybody

16  it wants to, can't it?

17  A    They can.

18  Q    So Walmart can use the information for itself, right?

19  A    Yes.

20  Q    Can use it to make its own business decisions?

21  A    Yes.

22  Q    It can decide that a particular Barbie doll isn't

23  selling very well and decide to carry less of it, right?

24  A    Yes.

25  Q    And it does those things to try to make money off of

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 60 of 131   Page ID #:307819
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

60

1    the information it collects, correct?

2    A    Yes.

3    Q    Now, the -- the exhibit with Walmart that we were just

4    talking about, is that 24269 that's in front of you?

5    A    Yes, 24269.

6    Q    We also looked at 24264 -- or T, which are the

7    contracts of a variety of other retailers, right?

8    A    Yes.

9    Q    And like Walmart, in all of these contracts -- let me

10   start over.

11       Like the Walmart contract, all these contracts are

12   Mattel asking for the retailer's information, right?

13   A    Yes.

14   Q    And those retailers can do whatever they want to with

15   it, right?

16   A    Yes.

17   Q    Just like Walmart, right?

18   A    Yes.

19   Q    None of the retailers in Mexico need Mattel's

20   permission to sell that information to somebody else, right?

21   A    No.

22   Q    And none of them need Mattel's information to use it

23   themselves, right?

24   A    Can you ask the question again.

25   Q    Sure.

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

61

```
 1        None of those retailers in Mexico need to get Mattel de

 2   Mexico's permission before they use the information

 3   themselves, right?

 4   A    Themselves, no.

 5   Q    At the end of your examination, you were shown a window

 6   screen -- what did you call it, a warning of

 7   confidentiality?

 8   A    Yes.

 9   Q    And that pops up when you log into Mattel de Mexico's

10   computer system?

11   A    Before logging in.

12   Q    Before logging in?

13   A    Yes.

14   Q    And does it pop up when you open up a particular

15   document?

16   A    No, it's before you log into the system.

17   Q    Does it pop up when you open a particular e-mail?

18   A    No.

19   Q    Only when you log in?

20   A    When you log in, before logging in.

21   Q    So it doesn't tell you on a document-by-document basis

22   what's confidential and what's not, right?

23   A    Right.

24   Q    Now, when you were asked questions about the value of

25   these documents, you said that they were valuable because
```

1    the competitor can use them to adjust their strategies; is

2    that right?

3    A     Yes.

4    Q     So the value of the document or the value of the

5    information comes from how it's used, right?

6    A     Yeah, the value of the information or the document,

7    yes.

8    Q     Comes from how it's used?

9    A     Yes.  Can I elaborate?

10   Q     No.  I'll let your counsel do it.

11        Thank you.

12   A     Okay.

13             MR. COTE:  No further questions.

14             THE COURT:  Okay.  Mr. McConville on behalf of MGA

15   and Mr. Larian.

16                    **CROSS-EXAMINATION**

17   BY MR. MC CONVILLE:

18   Q     Mr. Cavassuto, you were asked questions that related to

19   point of sale information; do you remember those questions?

20   A     Yes.

21   Q     And I believe your testimony was that, in general, all

22   of the documents you looked at contain the same information,

23   right?

24   A     Basically, yes.

25   Q     Basically the same point of sale information, right?

1    A    Yes.

2    Q    Now, you said this point of sale information is

3    valuable to Mattel at a minimum, right?

4    A    Yes, absolutely.

5    Q    And so that point of sale information, how often is it

6    provided to Mattel?

7    A    On a weekly basis.

8    Q    Okay.  So the documents we looked at for point of sale

9    information, it's fair to say that it would be out of date a

10   week later; is that fair to say?

11   A    Yes.

12   Q    And the value that you ascribed to these documents as

13   point of sale information, you are not saying it's valuable

14   for all times, are you?

15   A    No.

16   Q    So the value of the point of sale information at some

17   point is no longer valuable, right?

18   A    Right.

19   Q    The -- and that applied in general to all of the

20   documents you talked about, right?

21   A    Yes.

22   Q    I want you to look at Exhibit 34909, and in particular,

23   I'd like you to turn to page -- well, do you recognize the

24   document?

25   A    Yes.

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

64

1   Q    Could you turn -- this is a Mattel financial document,

2   correct?

3   A    Yes.

4   Q    It's the fourth quarter, 2004, actual results for

5   Mattel?

6   A    Yes.

7        MR. MC CONVILLE:  Your Honor, I'd like to display

8   page 33 of the exhibit.

9        THE COURT:  You may.

10       MR. MC CONVILLE:  And move that into evidence.

11       THE COURT:  Received.

12       *(Defendants' Exhibit No. 34909-33 is received*

13       *in evidence.)*

14  BY MR. MC CONVILLE:

15  Q    Can you look at page 33, please.

16       And do you recognize this page as a report of Mattel's

17  international gross sales by country using -- I'm sorry, I

18  forgot, you don't have the screen.

19  A    Yeah.

20  Q    Gross sales by country using actual exchange rates,

21  correct?

22  A    Yes, correct.

23  Q    And if you go down to the bottom -- third of the way

24  from the bottom, there is a line for Mexico; do you see

25  that?

1    A    Yes.

2    Q    And this reflects that the sales for 2003 were

3    $276.8 million; do you see that?

4    A    $276.8 million, yes.

5    Q    And that's for 2003, correct?

6    A    Yes.

7    Q    And then if you go to 2004, which is a few columns

8    over, the sales for Mexico actually went up from 2003 to

9    2004 to $309.9 million; do you see that?

10   A    Yes.

11   Q    So that was a change of 12 percent, correct?

12   A    Correct.

13   Q    And in 2004, you recall that was the year that

14   Mr. Machado, Mr. Vargas and Ms. Trueba left, right?

15   A    Yes.

16   Q    And then let's go to the next page of that exhibit,

17   which is page 35.

18          MR. MC CONVILLE:  And I move page 35 into

19   evidence, your Honor.

20          THE COURT:  Received.

21          *(Defendants' Exhibit No. 34909-35 is received*

22      *in evidence.)*

23   BY MR. MC CONVILLE:

24   Q    And this page are the actual profits by country; do you

25   see that?

1    A    Yes.

2    Q    And if you go down to the line for Mexico, it reflects

3    that in 2003, you had profits of 43.7 percent (sic) in

4    Mexico; is that right?

5    A    43.7 millions.

6    Q    Yeah, I'm sorry, 43.7 million in profits in Mexico,

7    correct?

8    A    Yes.

9    Q    And then in 2004, those profits went up to

10   47.3 million, correct?

11   A    Yes.

12   Q    And then if we go to the next year, which would be

13   Exhibit 34908; do you have that in front of you?

14   A    Yes.

15   Q    And what is that?

16   A    It's the 2005, fourth quarter actuals.

17   Q    And I'd like to show you page 88 of that exhibit,

18   please, and I'd like to publish it.

19            THE COURT:  You may.  Do you want it received,

20   Counsel?

21            MR. MC CONVILLE:  Yes, please.  That page.  Thank

22   you.

23            THE COURT:  Received.

24            *(Defendants' Exhibit No. 34908-88 is received*

25       *in evidence.)*

1    BY MR. MC CONVILLE:

2    Q    And this is -- this is Mattel international gross sales

3    by country, 2005 actual exchange rates, correct?

4    A    Correct.

5    Q    And if we see -- if we go to the line for 2004 -- for

6    2004, the column, and there is a line there for Mexico; do

7    you see that?

8    A    Yes.

9    Q    And it lists the actual -- or the gross sales at

10   309.9 million, right, for 2004?

11   A    Yes.

12   Q    And for 2005, the sales are 364.1 million, correct?

13   A    Correct.

14   Q    And so that's an increase in sales of 17 percent,

15   right?

16   A    Yes.

17   Q    And this is the year after Messieurs Vargas and Machado

18   and Ms. Trueba left, correct?

19   A    Yes.

20   Q    Sales went up, correct?

21   A    Yes.

22   Q    Let's take a peak at profits.

23        If you could look at page 90 of that exhibit.

24   A    Yes.

25   Q    And this is profits by country?

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 68 of 131   Page ID #:307827
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

68

1    A    Yes.

2    Q    Correct?

3    A    Correct.

4    Q    And again, we go down to the Mexico line, and for 2004,

5    it shows that the profits were $47.3 million, right?

6    A    Right.

7    Q    And that the following year, 2005, profits went up to

8    $57.6 million, right?

9    A    Yes.

10   Q    And that's an increase of 22 percent in your profits

11   the year after these individuals left Mattel Mexico,

12   correct?

13   A    Yes.

14   Q    You were asked about whether these documents would have

15   value to a competitor; do you remember that?

16   A    Yes.

17   Q    If someone doesn't even know that these documents

18   exist, they would have no value to that person, correct?

19            MR. ZELLER:  Improper hypothetical.

20            THE COURT:  Overruled.

21            THE WITNESS:  Correct.

22            MR. MC CONVILLE:  No further questions.

23            What?

24            (Attorney discussion held off the record.)

25            MR. MC CONVILLE:  Oh, yes, I'm sorry, your Honor.

1    May I move in page 90 of that last exhibit?

2            THE COURT:  Yes.  Received.

3            *(Defendants' No. 34908-90 is received in*

4       *evidence.)*

5            MR. MC CONVILLE:  I'm sorry.  I'm reminded I

6    should ask another question.

7    BY MR. MC CONVILLE:

8    Q    When these three left, they didn't take the only copy

9    of the information from Mattel, did they?

10   A    I cannot answer that, I don't know.

11   Q    You don't know if you had copies remaining of documents

12   in your system?

13   A    There should have been in the system.

14   Q    Okay.

15           MR. MC CONVILLE:  No further questions.

16           THE COURT:  Counsel, recross.  You have five

17   minutes.  Correct that, I'm sorry, redirect, my apologies,

18   you have five minutes.

19                    **REDIRECT EXAMINATION**

20   BY MR. ZELLER:

21   Q    You were asked some questions about whether or not

22   detailed sales information or sales information of the kind

23   that we are talking about in these documents would become

24   stale or no longer have value at a certain point; do you

25   recall that?

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 70 of 131   Page ID #:307829
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

70

1   A     Yes.

2   Q     Now, having a -- a history of detailed sales

3   information, even though it's no longer exactly current,

4   would still have value?

5   A     Yes.

6   Q     And -- and please tell us why would having that

7   historical data have value?

8   A     Because you would know how the different products in

9   the different categories performed in the different channels

10  and customers.

11  Q     And would that tell you something about projecting

12  future sales and strategy?

13  A     Yes, it would tell me to project.

14  Q     And how would that historical information do that?

15  A     Because that is what really happened in the

16  marketplace, is what we call the actual results, so that

17  would be the base for me to project and consider the future

18  growth, and you need to take into account what happened in

19  the past.

20  Q     So it helps, at least in one respect, shows past

21  trends, and that would -- that would give you some

22  suggestions for what might happen in the future?

23  A     Yes.

24              MR. MC CONVILLE:  Objection.  Leading.

25              THE COURT:  Overruled.

1    BY MR. ZELLER:

2    Q    And as we discussed, some of the information in these

3    documents that I showed you also had forward-looking

4    information in it?

5    A    Yes, projections, yes.

6    Q    And so that wasn't -- that wasn't information that when

7    it was -- it was taken in April 2004 was -- was stale at

8    that time, right?

9    A    No, that was projected in second semester of the

10   following year.

11   Q    During the time period when you were working there for

12   Mattel de Mexico in performing work for Mattel Servicios,

13   did you ever sign something called a conflict of interest

14   form?

15   A    Yes, I did.

16   Q    And --

17          MR. MC CONVILLE:  Beyond the scope.

18          THE COURT:  Counsel, is it beyond the scope?  It's

19   not the reason he was produced.  Sustained.

20   BY MR. ZELLER:

21   Q    Now, if we can go to Exhibit 5480 -- oh, wait a minute.

22   I must have that down wrong.

23          MR. ZELLER:  If you can take that down for a

24   second.

25          (Attorney discussion held off the record.)

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 72 of 131   Page ID #:307831
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

72

1    BY MR. ZELLER:

2    Q    You remember you were asked some questions about

3    whether the information that the retailers provided was

4    valuable?

5    A    Yeah.

6    Q    And you were also asked some questions about whether or

7    not the retailers could use it in any way that they wanted;

8    do you recall that?

9    A    Yes, yes.

10   Q    But -- but Mattel pays money for that information,

11   right?

12   A    Yes.

13   Q    And it pays information by providing those discounts

14   that we talked about into the contracts with the retailers?

15   A    Yes.

16   Q    So at a minimum, it costs money to get that

17   information?

18   A    Yes.

19          MR. ZELLER:  Nothing further.

20          THE COURT:  Counsel, re -- recross by Mr. Cote.

21                    **RECROSS-EXAMINATION**

22   BY MR. COTE:

23   Q    Mr. Cavassuto, the value of the historical information

24   is that it can be used to plan future sales; is that right?

25   A    One of the piece is to project future sales.

1    Q    So again, that's an actual use of the historical data,

2    right?

3    A    Yeah, part of it.

4    Q    Now, are projections of future sales always accurate?

5    A    No.

6    Q    Is it more of an art than a science?

7    A    I think it's both.

8    Q    And is -- projecting future sales with up-to-date,

9    current information is a very difficult thing to do, isn't

10   it?

11   A    Can you ask the question again, please?

12   Q    Projecting future sales with up-to-date and current

13   information is a difficult thing to do?

14   A    It's complex.

15   Q    Complex.  And is it made more complex or less complex

16   if the data is years old?

17   A    No, I don't think it is more or less complex.  I think

18   it is complex because, again, it's not the only variable

19   that you take into account, but it's one of the pieces that

20   you need to know.

21   Q    Is it easier to make projections of sales in 2005 if

22   you have 2004 data or 2002 data?

23   A    Both could help.  2004 probably more.

24   Q    Thank you.

25             MR. COTE:  No further questions.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 74 of 131   Page ID #:307833
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

74

```
 1              THE COURT:  Recross by Mr. McConville on behalf of
 2   MGA and Mr. Larian.
 3                     RECROSS-EXAMINATION
 4   BY MR. MC CONVILLE:
 5   Q    You were asked questions about -- about whether the --
 6   you agree that the point of sale data at some point becomes
 7   stale, right?
 8   A    Yeah.
 9   Q    And it's so stale that Mattel actually gets the
10   information on a weekly basis, right?
11   A    Well, that is -- the process you use is on a weekly
12   basis because you need updated information.
13   Q    Right.  You need weekly updated information, correct?
14   A    Correct.
15   Q    Because the prior week's information that Mattel is
16   paying for becomes stale a week later, right?
17   A    Yeah.
18   Q    Okay.  And the -- so at a minimum, from Mattel's
19   perspective, the information is stale after a week because
20   you're paying for it on a weekly basis, right?
21   A    No, you don't pay on a weekly basis.
22   Q    I'm sorry.  You're paying money in order to get it on a
23   weekly basis, right?
24   A    Yes.
25   Q    And so from Mattel's perspective, anyhow, the value of
```

1    the information declines on a weekly basis, right?

2    A    I wouldn't say that.

3    Q    Well, you get updated weekly information, correct?

4    A    Yes.

5    Q    Okay.  Now, you were talking about whether or not the

6    information, historical data could be used as a baseline,

7    but -- but you are also aware, aren't you, that you can --

8    one can get historical data on sales from Nielsen and NPD,

9    correct?

10   A    Yes, but it's a different type of information.

11   Q    Right.  One can get sales information, historical sales

12   data, purchase it from a vendor called NPD and Nielsen,

13   correct?

14   A    Yes.

15           MR. ZELLER:  Asked and answered.

16           THE COURT:  Overruled.

17   BY MR. MC CONVILLE:

18   Q    I'd like to put in front of you Exhibit 35975.

19        Do you recognize it?

20   A    Yes.

21   Q    This an e-mail exchange that you are on between

22   Mr. Zalzman and Ibarra dated May 30, 2007?

23   A    Yes.

24           MR. MC CONVILLE:  Your Honor, I would ask to admit

25   Exhibit 35975.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 76 of 131   Page ID #:307835
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

76

```
 1              MR. ZELLER:  Object on relevance, 403.

 2              THE COURT:  Received.

 3              MR. ZELLER:  And this is also outside the scope,

 4   your Honor.

 5              THE COURT:  Received.

 6   BY MR. MC CONVILLE:

 7   Q    Sir, this is an e-mail on which you're copied.  I think

 8   you told us that Gabriel Zalzman is the general manager of

 9   Mexico; is that correct?

10   A    Was at that time.

11   Q    Was at that time?

12   A    Yes.

13   Q    Which was May 30, 2007?

14   A    Yes.

15   Q    And Ricardo Ibarra, I believe you said, was the head of

16   marketing; is that right?

17   A    He was the head of marketing at that time.

18   Q    At that time.

19        And you'll see from this e-mail under background, it

20   says, and this is to Mr. Ibarra, "Your ex-assistant Miriam

21   committed fraud during her tenure at Mattel that reached

22   approximately 300,000 in personal purchases.  This conduct

23   goes as far as 2003 until her dismissal in March of 2006";

24   do you see that?

25   A    Yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 77 of 131   Page ID #:307836
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

77

1   Q    And so this relates to a fraud committed by --

2           THE COURT:  Just a moment.  I'm going to sustain

3   the objection, Counsel.

4           MR. ZELLER:  And I would ask for this to be

5   stricken.

6           THE COURT:  It is to be stricken.

7           Ladies and gentlemen, you are to disregard this

8   e-mail.

9           Next question.

10          MR. MC CONVILLE:  No further questions.

11          THE COURT:  All right.  Thank you, sir, you may

12  step down.

13          Your next witness, please.

14          MR. PRICE:  Michael Wagner.

15          I need a second to set up.  Would this be a good

16  time?

17          THE COURT:  Everybody agreed, 3:00.

18          Now, if you want to break that agreement, Counsel,

19  and take the recess now?

20          MS. HURST:  Yes, your Honor.  That's fine.

21          THE COURT:  Fifteen minutes, then.

22          You are admonished not to discuss this matter

23  amongst yourselves, nor form or express any opinion

24  concerning this case.

25          Counsel, you have 15 minutes.

```
 1              (Recess.)

 2              (The following proceedings is taken in the

 3         presence of the jury.)

 4              THE COURT:  All right.  The jury is present.  All

 5    counsel are present.  The parties are present.

 6              And Counsel, your next witness, please.

 7              MR. PRICE:  Michael Wagner.

 8              THE COURT:  Mr. Wagner.

 9              And Counsel, will you remain at the lectern while

10    Mr. Wagner is stepping forward and having a seat, and will

11    you state your agreement?

12              MR. PRICE:  Your Honor, Mattel and MGA have agreed

13    that when an expert is testifying, the other side's experts

14    can be in the courtroom and observe.

15              THE COURT:  Counsel?

16              MS. KELLER:  So stipulated.

17              THE COURT:  So when your expert testifies, same

18    courtesy will be extended.

19              MS. KELLER:  Yes.

20              THE COURT:  All right.

21              Thank you very much, sir.  Will you state your

22    full name, please.

23              THE WITNESS:  Michael Joseph Wagner.

24              THE COURT:  Will you swear Mr. Eckert -- or strike

25    that.
```

```
 1              Will you swear Mr. Wagner.

 2         MICHAEL JOSEPH WAGNER, PLAINTIFFS' WITNESS, SWORN

 3              THE WITNESS:  I do.

 4              THE COURT:  Thank you, sir.  If you'd please be

 5    seated.

 6              THE WITNESS:  Thank you, your Honor.

 7              THE COURT:  Counsel, this is direct examination on

 8    behalf of Mattel.

 9              MR. PRICE:  Thank you.

10                       DIRECT EXAMINATION

11    BY MR. PRICE:

12    Q    Mr. Wagner, where do you work?

13    A    I work in Mountain View, California, for a firm called

14    LitiNomics, Incorporated.

15    Q    Can you tell us what LitiNomics, Incorporated, is?

16    A    It's a management consulting firm that focuses on

17    valuing intellectual property.

18    Q    And you are testifying in this case as an expert,

19    correct?

20    A    I am.

21    Q    And you've been retained by Mattel to look into certain

22    areas and give expert opinions, right?

23    A    That is correct.

24    Q    And, generally, what areas were you asked to look into?

25    A    I'm asked to look into the damages issue in the case,
```

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 80 of 131   Page ID #:307839
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

80

 1    assuming that you prove your case on liability, what are the

 2    damages suffered by Mattel.

 3    Q    So you are not here to tell the jury whether Mattel's

 4    right or wrong, correct?

 5    A    That is correct.

 6    Q    You are here to say what the damages would be if the

 7    jury finds that Mattel is correct, right?

 8    A    That is my assignment.

 9    Q    Let's talk a little bit about your background, and

10    the -- do you have a copy of your -- your CV in front of

11    you?

12    A    I do.

13    Q    It's Exhibit 22643.

14         So you graduated from the University of Santa Clara

15    with a BS in engineering in 1969; is that correct?

16    A    That is correct.

17    Q    And so originally, did you plan to be a technical

18    engineer, or what was the reason for the BS in engineering?

19    A    It was because I wanted a career in management, but I

20    wanted to have a career in high technology management.  I'm

21    from the Silicon Valley area.

22    Q    And then you got an MBA at the University of California

23    at Los Angeles in 1970 -- '71; is that right?

24    A    That is correct.

25    Q    Masters of Business Administration?

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

81

1   A    Some people call it an MBA.

2   Q    An MBA.

3        And then you graduated in 1975 from Loyola University

4   School of Law in Los Angeles with a JD?

5   A    I did.

6   Q    And why did you do that?

7   A    Again, I thought it would be useful in the management

8   career instead of getting a Ph.D in some business expertise.

9   Again, a law degree would be more useful.

10  Q    Have you ever actually practiced law?

11  A    No, except for one of my areas of expertise does

12  require a legal background, but besides that, no.

13  Q    Well, let's talk about your work experience, then.

14  After you graduated with a JD in 1975, what's the first job

15  that you had?

16  A    First job was with a corporation down in this area

17  called the Fluor Corporation.  I went to work in their

18  management training program to be a project manager.

19  Q    You were there for about a year?

20  A    Fifteen months.

21  Q    And then in 1981, you joined Dickenson O'Brien &

22  Associates?

23  A    No.  You are not reading my CV correctly.

24  Q    Okay.

25  A    My next job was with Price Waterhouse, at that time one

```
 1    of the big accounting firms, and I worked in the management
 2    consulting department.
 3    Q    I think I'm reading it correctly, but okay.
 4              (Laughter.)
 5    BY MR. PRICE:
 6    Q    Oh, I see.
 7         So tell us what you did as a consultant with Price
 8    Waterhouse.
 9    A    Well, that was back in 1976, and that's my starter of
10    the career that I'm still in today, and that is analyzing
11    commercial issues in matters that are in dispute, typically
12    either a business valuation, an intellectual property
13    valuation or commercial damages.
14    Q    And then you became a manager in 1979?
15    A    I did.
16    Q    And what does that mean at Price Waterhouse?
17    A    It's just a position.  It's the position beneath a
18    partner in the firm.
19    Q    Well, you then became a senior manager?
20    A    Well, between those two stints, I was at Dickenson,
21    O'Brien & Associates.
22    Q    There we go.
23    A    My problem is that I joined a number of firms more than
24    once, which means I left them and then returned to that firm
25    in the future.
```

```
1   Q    And what was Dickenson, O'Brien & Associates?

2   A    It was a management consulting firm in San Francisco

3   that did the same type of work that Price Waterhouse did,

4   but a very small firm.

5   Q    And so then you turned to Price Waterhouse in '83?

6   A    Yes, as a senior manager, and then became a partner in

7   1985.

8   Q    How long were you a partner at Price Waterhouse?

9   A    Seven and a half years.

10  Q    And I guess Price Waterhouse is?

11  A    It's a big accounting firm.  Most people know them

12  because they do the Academy Awards.  That's where most

13  people recognize the firm's name.

14  Q    And when you say you were at partner at Price

15  Waterhouse, what does that mean?

16  A    That means I was an owner of the firm and one of the

17  senior members of that company.

18  Q    So in 1992 or '93, you left Price Waterhouse?

19  A    I did.

20  Q    What was the next job that you had?

21  A    I joined a very large management consulting firm based

22  out of Boston for the Harvard business professors to do

23  their management consulting work.  The name of the firm was

24  Putnam, Hayes & Bartlett, and I was a managing director in

25  that firm.
```

1    Q    And did you get another position at Putnam, Hayes &

2    Bartlett, or what happened next?

3    A    Well, that firm was acquired by a very large publicly

4    owned management consulting firm based out of England, and I

5    became a senior vice president of that firm.

6    Q    And when you say "consulting," you are again doing the

7    same sort of things that --

8    A    The type of work I do has not changed, it's just who my

9    employer was.

10   Q    And then in 1999, you went to -- you were a management

11   director at InteCap?

12   A    Yes.

13   Q    That's also a management consulting firm?

14   A    Yes.  That was the largest privately owned consulting

15   firm in the United States that focuses on intellectual

16   property valuation.

17   Q    And then in 2004, you went to CRA International, which

18   was the successor of InteCap?

19   A    Yeah.  I didn't go to them --

20   Q    They came to you?

21   A    Yes.  They bought our firm.  That was a publicly traded

22   management consulting firm, and they acquired InteCap, and I

23   became a managing director of that firm.

24   Q    And then starting in 2007, you were a managing director

25   of LitiNomics; is that correct?

1    A    Correct, and that's where I am today.

2    Q    Could you tell us what your -- in your career, what

3    your professional affiliations have been?

4    A    Well, if you mean by "affiliations" what organizations

5    I've been a member of, I've been a member of California

6    Society of CPAs, because I'm also a certified public

7    accountant.  I'm a member of the State Bar of California

8    because I have an active license to practice law, and I'm a

9    member of the American Institute of Certified Public

10   Accountants because that's the organization that governs the

11   rules for accountants in our country.

12   Q    Have you had any leadership roles in the American

13   Institute of Certified Public Accountants?

14   A    Yes.

15   Q    What kind of roles have you had?

16   A    I've had a number.  Currently, I'm serving on the

17   committee that has promulgated a new certificate for CPAs.

18   It's called a "Certificate in Financial Forensics," so it's

19   a certificate for people who are CPAs that do the type of

20   work that I do, and I'm on that committee.

21        Formally, I was the coeditor of the "CPA Expert," which

22   is the publication of the American Institute of Certified

23   Public Accountants that gives guidance to CPAs who either do

24   business valuations or do work in litigated matters.  I

25   served on the Litigation Service Committee for a number of

1    years for the AICPA.  I was also on the Practice Standards

2    Committee when they set the standards for CPAs who were

3    consultants, and I had a number of other assignments as

4    well.

5    Q    Are you certified in national forensics?

6    A    I have Certificate Number 26, and there are now over

7    4,000 CPAs who have that certification.

8    Q    How long has that certification been available?

9    A    It was promulgated last year.

10   Q    In addition to -- to your affiliation with the State

11   Bar of California and the American Institute of Certified

12   Public Accountants, have you had any other professional

13   affiliations in the past?

14   A    Yes.  The California Society of CPAs.  I was also

15   formally a certified management consultant.  I was also a

16   member of the Academy of Experts, which is a British-based

17   organization that licenses professional consultants around

18   the world.

19   Q    Have you had any publications?

20   A    I have 30 professional publications.

21   Q    And what kind of topics do they cover?

22   A    Generally, the calculation of commercial damages or the

23   conduct of doing work in the litigated environment are the

24   two types of things I normally write about.

25   Q    And what types of publications are you talking about?

1    A    Well, I am the founding editor and a coauthor of a

2    number of chapters in the Litigation Services Handbook,

3    which is now in its fourth edition, which is a book about

4    guidance to financial professionals who do work in the

5    litigation environment.  I'm also contributed to a number of

6    other books with chapters, and then published and

7    professional journals.

8    Q    Have you published specifically in the area of valuing

9    intangible assets?

10   A    Yes.  So I have one chapter in a valuation book where

11   there is a chapter on the valuation of intellectual

12   property, and I coauthored a chapter on that subject.

13   Q    And recently have you become affiliated with a -- it's

14   an online or a web-based publication?

15   A    Yes.  There is a publication called Dunn, that's

16   D-u-n-n, on damages.  He's a very well-known lawyer who has

17   probably written more about the calculation of damages than

18   any other lawyer in the country, and he's come out now with

19   a web-based service with a quarterly publication, and he

20   asked me to be on his board of editors.

21   Q    And are you about to have something published in

22   connection with that?

23   A    It will be published this week, yes.

24   Q    Have you also given presentations, speeches?

25   A    I've given many speeches to professional bodies, mainly

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 88 of 131   Page ID #:307847
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

88

```
 1    to professionals like myself or to attorneys about the
 2    proper way to calculate damages.
 3    Q    You have testified as an expert before?
 4    A    I've testified in 118 trials before today.
 5    Q    And in how many trials have you been qualified by the
 6    Court to testify as an expert witness?
 7    A    Well, every court that I've been designated in and
 8    testifying on, I was qualified as expert in the area that I
 9    was testifying in.
10    Q    And were those areas, for the most part, the same areas
11    that you are testifying about today?
12    A    Yes.
13    Q    The professional publications that you -- that you have
14    published in, most of those publications are for
15    practitioners; is that right?
16    A    Yes.  I only write for people who are actually doing
17    work in this area.
18    Q    Now, when you testified as an expert, have you
19    testified for -- for plaintiffs, defendants, both?
20    A    Both, and it's fairly equal that I am retained by the
21    plaintiff, who is trying to prove a legal violation and
22    calculate their damages, and an equal number of times
23    about -- I would say about equal.  I worked for the
24    defendant in commenting upon the problems, if any, I found
25    in the plaintiff's damage expert's report.
```

CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

89

1    Q    Well, I take it that when you consult, you aren't

2    consulting for free?

3    A    No.

4    Q    You have an hourly rate?

5    A    I do.

6    Q    What is your hourly rate in connection with this case?

7    A    For this case, it's $695 an hour.

8    Q    Now, is that the rate that you charge clients now?

9    A    No.

10   Q    What do you charge now?

11   A    Since I started on this case a number of years ago, I

12   never increased my rate for a current client.  My current

13   rate, since the beginning of 2010, a little over a year ago,

14   is $795 an hour.

15   Q    So let's talk about your assignment in this case.

16             MR. PRICE:  And your Honor, if we -- actually, we

17   don't need to put that up.

18   BY MR. PRICE:

19   Q    One assignment you had was to calculate Mattel's lost

20   profits, assuming there was liability?

21   A    Yes.

22   Q    Another assignment was to calculate MGA's -- MGA's

23   profits and how that should be allocated to Mattel, assuming

24   liability, correct?

25   A    I did that assignment as well.

1    Q    Let's focus on those assignments right now, and let's

2    start with Mattel's lost profits.

3         Do you have an understanding as to why that is relevant

4    to damages here?

5    A    I do.

6    Q    And what's that understanding?

7    A    That the entry of the Bratz product in the marketplace

8    caused Mattel to lose market share for its Barbie product.

9    Q    So in other words, Bratz was competing with -- with

10   Barbie, and there was some affect on Mattel?

11   A    Correct.

12   Q    And you've been asked to assume that there is

13   liability, and that let's assume there was no Bratz

14   competition, right?

15   A    That is correct.

16   Q    It's a -- it's a world without Bratz because the ideas

17   and concepts belong to, and designs, belong to Mattel,

18   right?

19   A    That's my understanding of your theory.

20   Q    And you are not -- you are not telling the jury whether

21   that's right one way or the other, right?

22   A    I am not.

23   Q    So let's talk about, then, your -- your analysis of --

24   of this area of how much Mattel lost in profits in a world

25   where there was a competitor with Bratz, okay?

1        Did you check MGA's figures to determine whether MGA

2   would have had some sort of comparable product, if there had

3   not been Bratz, something comparable to Bratz?

4   A    I did.  I tried to look for yardsticks within MGA to

5   figure out what other type of products they could offer

6   instead of Bratz, and what the success of those products

7   have been.

8   Q    And what did you do to do that?

9   A    I collected information at the product line level from

10  MGA for the 10 years, from 2001 and 2010.  They had 84

11  separate product lines during that time period, and I

12  analyzed the sales history of all those different products.

13            THE COURT:  Counsel, just a moment.

14            (Interruption in the proceedings.)

15            THE COURT:  Counsel, please continue.

16            MR. PRICE:  Your Honor, at this time we were going

17  to proceed to Slide 3.

18            THE COURT:  Thank you.

19            MS. HURST:  Your Honor, I believe the Court had

20  indicated this one would not be displayed.

21            THE COURT:  Well, Slide 3 is just Mattel's lost

22  profits for Bratz; is that correct?

23            MS. HURST:  No.

24            MR. PRICE:  Your Honor, let me take some stuff

25  out.

```
 1              THE COURT:  It's been changed a number of times,
 2    and I'm not quite certain which --
 3              MR. PRICE:  Your Honor, may I approach?
 4              THE COURT:  Yes.  I'll show you my last one,
 5    Counsel.  Is this new?
 6              MR. PRICE:  It's got some figures that are updated
 7    because of new information.
 8              THE COURT:  Well, okay.  Just a moment.  It's your
 9    time, Counsel.  Just a moment.
10              Yeah, I don't know what this is in relation to.
11    You are going to pass through this slide.  Next slide.
12    BY MR. PRICE:
13    Q    Well, let's talk about what you did in looking at -- at
14    the Bratz product to see whether or not you could reach a
15    conclusion as to whether MGA, absent Bratz, would have come
16    up with another product that would have impacted Mattel's
17    profits; are you with me?
18    A    Yes.
19    Q    Okay.  And is one of the things you did to look at how
20    many of MGA's products which were around in 2001 were still
21    around in 2010?
22    A    I did that.
23    Q    That is whether they had products that would have --
24    that -- that historically, and they were using their talent
25    and creativity, have lasted over that period of time, right?
```

1    A    Right.  In 2001, they had 31 different product lines,

2    and I wanted to see how many other products, besides Bratz,

3    still were being sold 10 years later by MGA.

4    Q    Now --

5              THE COURT:  The next slide, I am going to allow.

6    This one, I will not.

7    BY MR. PRICE:

8    Q    So there had been products between 2001 and 2010 that

9    lasted a number of years, correct?

10   A    Yes.

11   Q    But you looked at whether there were any products that

12   lasted, the time frame that Bratz did, that MGA was

13   responsible for?

14   A    I did.

15   Q    And what did you find in terms of -- between 2001 and

16   2010 whether MGA had other products that lasted that span of

17   years?

18   A    Out of those 31 product lines that exist in 2001, only

19   two of those product lines have lasted 10 years.

20   Q    And did you do an estimate as to what the -- the

21   profits were on -- on those product lines that lasted that

22   entire time frame?

23   A    I didn't do a profit analysis.  I did a revenue

24   analysis.  How many sales during this 10 year time period

25   did these other two product lines achieve in relationship to

1    how many sales were made by Bratz.

2    Q    And what did you find?

3    A    That the number two product over a 10-year time period

4    only had approximately $18 million worth of sales.

5              THE COURT:  Is that Hot Hoops?

6              THE WITNESS:  Yes, your Honor.

7              THE COURT:  Now, these are MGA products?

8              THE WITNESS:  That is an MGA created product, your

9    Honor.

10             THE COURT:  Is Casino also a product of MGA?

11             THE WITNESS:  Yes, your Honor.

12             THE COURT:  Counsel, you can show the slide.

13             MR. PRICE:  You can show Slide 3.

14   BY MR. PRICE:

15   Q    Does Slide 3 of Exhibit 24294 reflect your analysis?

16   A    It does.

17   Q    And can you explain to the jury what you found?

18   A    Yes.  I looked at the sales each year for all of the 84

19   product lines, but the 31 in particular that were in

20   existence in 2001, I wanted to see how successful any other

21   product was, and the only two products that lasted the 10

22   years were the two that are displayed on this chart.  Hot

23   Hoops achieved approximately $18 million worth of sales over

24   10 years, and Casino earned over the 10-year period

25   approximately $7 and a half million, and you compare that to

1    the $3.4 billions of sales of Bratz.

2    Q    And what is this -- does this analysis tell you with

3    respect to the damages calculations; how does it help?

4    A    Well, I wanted to know, using the same types of people,

5    the same resources, the same sweat equity, what was MGA able

6    to achieve with other product lines in comparison to Bratz,

7    and this was the information that I learned by analyzing

8    their sale history.

9    Q    And that's because later on you calculate MGA's profits

10   and split it between the value of the intellectual property

11   and the value of the sweat equity, the work?

12   A    Yes.  And in the lost profits, I want to understand

13   what, if any, competitive response there would have been by

14   MGA if they had not offered the Bratz product.

15   Q    So if in 2000 they had not learned about seeing the

16   Bratz product, you were trying to figure out whether or not

17   they would have done anything like that?

18          MS. HURST:  Objection.  Lacks foundation.  Calls

19   for speculation.  This is just accounting, your Honor.

20          THE COURT:  Counsel, I don't need a speaking

21   objection, now.

22          Sustained.

23   BY MR. PRICE:

24   Q    You were analyzing historically what MGA's creativity,

25   marketing, distribution, et cetera, have achieved in the

1    marketplace other than Bratz between 2001 and 2010, correct?

2    A    I did do that, yes.

3    Q    Now, in addition to just looking at the sales of the

4    products that were there the entire 10 years, did you also

5    look at the sales of MGA's top 10 products for that time

6    frame, between 2001 and 2010?

7    A    I did.

8    Q    And does the Chart Number 4, 24294-4, reflect that

9    analysis?

10   A    It does.

11   Q    Could you explain to the jury what this was.

12   A    Yes.  Using, again, the sales records of MGA, I wanted

13   to understand what were the top 10 products of this company

14   during this decade of the damage period, and the vertical

15   axis is just the percentage of sales of the top 10 products

16   during that time period.  So the first column on the left

17   shows you the Bratz sales.  They compose 62 percent of the

18   sales of MGA of their top 10 products.

19        Then going from the first bar on the left over towards

20   the right, the next biggest amount of sales that MGA has

21   earned on a product is Little Tikes.  Now, Little Tikes is

22   not a product line that was created by MGA.  They purchased

23   this company, which was an existing company with an existing

24   IP, intellectual property, existing brand recognition for

25   $125 million at the end of 2006.

1   Q    Mr. Wagner, since 2006, since MGA has owned Little
2   Tikes, has it brought -- has its profit gone up or down?
3   A    Well, the sales of Little Tikes has actually declined
4   over time, so with the sweat equity of MGA applying to that
5   existing brand with good name recognition, they have not
6   been able to increase the sales.
7   Q    So let's go -- further on the slide, we've got --
8        MR. PRICE:  Duck, Rachel.
9   BY MR. PRICE:
10  Q    -- we've got the third column, here, Zapf.  Can you
11  tell us what that is?
12  A    Yes.  That was actually another company that was
13  acquired by MGA again in 2006, and they had existing
14  products principally in Europe, but they have dolls in that
15  product line, and they have achieved the next best amount of
16  sales in that product in this 10-year time period.
17  Q    By "next best," do you mean the 3 percent is the second
18  highest of these top 10 or --
19  A    Well, it's the third highest of the top 10, but --
20  Q    Okay.  Sorry.
21       And so you just dealt with the two red bars, which are
22  acquisitions.  Could you tell us what the black bars are
23  here?
24  A    Yeah.  The three black bars are three other product
25  lines, again, that have -- are products not created by MGA

1    but were MGA licenses characters from other companies.  So

2    for example, Marvel, or Marvel, is the comics, and it's

3    principally Spiderman products they're selling.  MGA did not

4    create Spiderman, but they have a license to use those

5    characters, and they have been relatively successful for

6    MGA, and that makes up 2 percent of their sales.

7        Rescue Pets is another product line that is licensed by

8    MGA, and then Shrek is 1 percent of the sales.  It had a

9    very good year its first year, and then basically it's

10   disappeared, but it did have approximately $32 million worth

11   of sales in one year.  And those are all, again, products

12   not created by MGA, but actually using someone else's IP

13   through a license.

14   Q    And then we have -- and is that blue or purple?  I

15   can't tell.  You've got the MGA origin?

16   A    First of all, I think it's blue, but the last four

17   product lines, the bottom four of the top 10, are products

18   that MGA has created using their own talents, their own

19   ideas.  And the largest one is Moxie, which is a product

20   they introduced just two years ago, and they've been

21   relatively successful with that product in 2009 and 2010,

22   but not nearly as successful in the first two years as Bratz

23   was.

24   Q    Well, let me ask you about Moxie.  You said that was

25   introduced when?

Case 2:04-cv-09049-DOC-RNB  Document 10175  Filed 03/10/11  Page 99 of 131  Page ID #:307858
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

99

1   A    It's introduced in 2009.

2   Q    And what you are using are sales figures for 2009 and

3   2010?

4   A    Correct, those are the two years I have data for.

5   Q    And given what you've reviewed in the case, was MGA

6   structurally, functionally the same type of company in 2009

7   as it was in 2000?

8         MS. HURST:  Objection.  Beyond the scope.  It

9   calls for an opinion.

10        THE COURT:  Just a moment.

11        Sustained.

12  BY MR. PRICE:

13  Q    Well, let me ask you this:  Are you aware of MGA's

14  distribution?

15  A    I am.

16  Q    Are you, from reviewing the material, aware of their

17  percentage of shelf space at retailers?

18  A    I see that they increased significantly the amount of

19  shelf space that they had at major retailers for toys

20  between 2001 and 2009.

21  Q    Are you aware of the difference in size of MGA in terms

22  of sales and products between 2000 and 2009?

23  A    Well, they peaked around 2007 around a billion dollars

24  worth of sales, but they are significantly larger today than

25  they were in 2000.

```
 1              THE COURT:  Sorry.  This isn't going to be
 2    specific enough.
 3              Let me inform the jury, each side has two hours
 4    and 20 minutes with this expert.  At the conclusion of that
 5    time, this expert will be stepping down.  That same courtesy
 6    will be extended towards MGA when they have their expert,
 7    and their expert will be stepping down.
 8              So Counsel, you can use your time accordingly, but
 9    he doesn't have the foundation for where you're going right
10    now.  He doesn't have the specific figures for the Court.
11    He can just tell me larger or smaller, so if you want to
12    spend your time there, you're forewarned, okay?
13              MR. PRICE:  Okay.
14    BY MR. PRICE:
15    Q    So you did say that Moxie did not perform as well in
16    2009 and 2010 as Bratz did when it first came out.  Could
17    you tell us what you mean by that?
18              MS. HURST:  Your Honor, objection.  Timing issue,
19    about 2009, 2010.
20              THE COURT:  No, I'll leave that for
21    cross-examination.  Overruled.
22              THE WITNESS:  Yes.  In 2001, Bratz's first year
23    sales is about $24 million, in 2001.  In 2009, Moxie did
24    better than that, actually doubled that, about $55 million,
25    but it's a much more established company with established
```

1    shelf space at the Walmarts and the Targets and the Toys R

2    Us.  So Ms. Hurst is right, you really can't compare the

3    two.  55 million with a size company as MGA is not as good

4    as 21 million back in 2001 when they didn't have the

5    distribution chain.

6               But what's more important is the second year.  In

7    the second year, Bratz did $190 million worth of sales.  In

8    2010, Moxie is less than half of that, it's only $90 million

9    in sales, and also at a significantly smaller profit margin.

10   So it's not going to have the staying power that Bratz did.

11   BY MR. PRICE:

12   Q    So did you determine whether or not between 2001 and

13   2009, MGA, using its own creativity and sweat equity, had

14   created a successful fashion doll in the market other than

15   Bratz?

16   A    They had not.

17   Q    And -- and how does this analysis reflected in Slide 6

18   affect your opinions; what does it tell you?

19               MS. HURST:  Objection.  Calls for --

20               THE COURT:  It's Slide 4, Counsel, not 6.

21               MR. PRICE:  I'm sorry, your Honor.  I apologize.

22   Slide 4.

23               MS. HURST:  Objection.  Lacks foundation.  Calls

24   for speculation.

25               THE COURT:  Overruled.

1          THE WITNESS:  Based on my judgment that but for

2     the introduction of the Bratz product, MGA would not have

3     had the sale success that they've had during this time

4     period, and they would not have introduced a product that

5     would have competed successfully against Barbie.

6     BY MR. PRICE:

7     Q    So let's, then, go to specifics about your findings on

8     how -- how introduction of Bratz, the world of Bratz

9     affected Mattel's profits, okay?

10         What did you -- did you reach an over all conclusion as

11    to what Mattel's lost profits were as a result of -- of

12    there being a world where MGA had Bratz?

13    A    Yes.

14    Q    Okay.  What was your conclusion?

15    A    That Mattel has lost $323.7 million of sales of Barbie

16    products between 2001 and 2009.

17    Q    So in determining that, the first -- was the first step

18    you had to take to see if there was a relationship between

19    Bratz market share and -- and Barbie's market share?

20    A    I did.

21    Q    What did you do to look at that?

22    A    Well, I collected data on the industry in the United

23    States, and I had information from a company called NPD,

24    which is the world's largest provider of retail and consumer

25    information.  I had quarterly sales information for the

1    fashion doll industry, and I compared the sales history of

2    Bratz -- excuse me -- with Mattel.

3    Q    And does Chart 7, there, reflect one of the first steps

4    of your analysis?

5    A    It does.  This is the data that I used and analyzed to

6    prove that there was a relationship between --

7              MS. HURST:  Your Honor, this one had been excluded

8    as well.

9              THE COURT:  No, it wasn't excluded, Counsel.  I

10   was concerned about this.  I'll inform counsel from the

11   prior set, I was concerned about 3, 8, 4 and 7, but 7, upon

12   analysis, I'm going to allow; 4 I'm not going to allow, not

13   necessarily into evidence, and we'll discuss that; 3, I

14   finally have an explanation for, and I am still going to

15   wait on 8.

16             MR. PRICE:  Your Honor, I'm going to wait to offer

17   these into evidence later.

18             THE COURT:  And I'm not receiving them.

19             MR. PRICE:  That's why I'm waiting.

20   BY MR. PRICE:

21   Q    Could you tell us what Slide 7 shows?

22   A    What it shows is the market share of Barbie versus

23   Bratz in the United States between 2000 and 2009.  The blue

24   line are Barbie's market share, and the red line is Bratz's

25   market share.

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 104 of 131   Page ID #:307863
CV 04-9049-DOC – 03/08/2011 – Day 29, Vol. 1 of 2

104

1   Q    And so looking at this relationship, what were your

2   conclusions at this -- at this step?

3   A    Before analyzing it scientifically, I concluded there

4   appears to be an inverse relationship.  As Bratz sales go

5   up, Barbie sales go down, and as Mattel Barbie sales go up,

6   Bratz sales go down.

7   Q    You mentioned that this was using something called NPD

8   data?

9   A    Yes.

10   Q    Could you tell us what NPD data is.

11   A    Well, they track information from retail

12   establishments, and then they publish that information and

13   companies buy this information so they can track their

14   success versus their competitors' success.

15   Q    When you say companies buy this information, what types

16   of companies?

17   A    Well, both the parties to this litigation buys the

18   exact data I used in this case to track what's happening in

19   the fashion doll industry, so it's companies like Mattel and

20   MGA.

21   Q    Is this -- the NPD data, is this information that is

22   relied upon by people in the toy industry?

23   A    Yes.

24   Q    Now, we've heard the phrase SKUs or S-K-Us; do you know

25   what those are?

1   A    Yes, that's a stock-keeping unit, and that's a product

2   all the way down to the detailed level, like it may be a

3   doll with a particular style or a group of dolls, if it's a

4   particular product that is sold.

5   Q    And would this sort of data, the NPD data, be

6   appropriate if you went down to that sort of level?  You

7   know, we've seen these reports with hundreds and hundreds of

8   pages of SKUs.

9   A    No.  I think when you get down to the actual SKU level,

10  there is some problems with the accuracy of the data.

11  Q    And so at what level were you looking at the data to

12  determine there was a relationship between Bratz sales and

13  Bratz market share and Barbie's market share?

14  A    It's total sales.  It's all stock-keeping units.  It's

15  not at the stock-keeping-unit level.

16  Q    And in connection with your analysis, did you look at

17  the NPD web page to see how they were describing themselves?

18  A    Yes.

19  Q    If you'd look at Exhibit 24234 and tell me whether or

20  not that's a screen shot.

21         THE COURT:  Well, while he's getting that, ladies

22  and gentlemen, both the expert for Mattel and the expert for

23  MGA, I am not certain you'll be seeing any of these again.

24  These may be demonstratives.  I may later reduce and receive

25  these into evidence.  I'm not certain yet.

```
 1            So it's up to counsel on both sides, when they

 2   present their damages experts, to explain this clearly to

 3   you, and you can have the testimony read back.  These may

 4   come into evidence, but if they do, do not accept that the

 5   Court's necessarily accepting this from either Mattel's

 6   expert or MGA's expert.  I may find that it's just

 7   appropriate to help you understand what each expert is

 8   saying, but I'm not certain of that yet.  I may reserve that

 9   judgment until MGA's expert testifies later in the trial.

10   BY MR. PRICE:

11   Q    Is Exhibit 24234 a copy of the screen shot you saw on

12   NPD's website as to how this represents its services?

13   A    Yes.  It's actually a screen shot that I copied from

14   the internet on September 3rd, 2010.

15            MR. PRICE:  Your Honor, I move Exhibit 24234 into

16   evidence.

17            MS. HURST:  Can I see a copy, please?

18            MR. PRICE:  Sure.

19            THE COURT:  It's denied.

20            Counsel, your next question, please.

21   BY MR. PRICE:

22   Q    So after taking the first step, analyzing the data to

23   see if there appeared to be a relationship, did you take

24   another -- I'll step back.

25            Did you take another step with these numbers to
```

 1  determine whether or not there was a relationship between

 2  Bratz market share and Mattel's?

 3  A    Yes.  I wanted to analyze the information statistically

 4  to see if I could develop a valid relationship that I can

 5  prove scientifically of this data.

 6  Q    And what did you -- what did you do and what did you

 7  find?

 8  A    Well, I developed a statistical relation using this

 9  data, trying to see if there is a relationship between a

10  change in market share of Bratz and a change in market share

11  of Mattel, and I found that there is a statistically

12  significant inverse relationship for these two market

13  shares.

14  Q    Now, by the way, your -- your findings and your

15  calculations, they take up some space?

16  A    I have thousands of pages of schedules to -- to inform

17  my opinion.

18  Q    And you understand that MGA also has an expert in this

19  case?

20  A    They do.

21  Q    And you've done expert reports with schedules, right?

22  A    I have.

23  Q    And their expert has done expert reports with

24  schedules?

25  A    He has as well.

1   Q    And you've looked at each other's reports and

2   schedules?

3   A    We have.

4   Q    And the analysis that you did here, the statistical

5   analysis, is something which you -- it's been shared with

6   the other expert, right?

7   A    I didn't share it with him, but you had provided them

8   to the other side, and I know they've reviewed them.

9   Q    Because you've seen their reports?

10  A    I have.

11  Q    So the analysis -- you did something called the

12  regression analysis?

13  A    It's a statistical regression analysis.

14  Q    Which means?

15  A    It means basically drawing the best straight line

16  through these data points to figure out if there is a

17  relationship.

18  Q    And is there some sort of a -- something called like a

19  confidence level so you can determine whether or not there

20  would be a statistically significant relationship?

21  A    There is, and based on my results, I am 99.998 percent

22  confident that I can reject the null hypothesis, which means

23  there is no relation.  So I am very confident that I've

24  proven scientifically that there is a relation between Bratz

25  market share and Barbie market share.

1              THE COURT:  Now, Counsel, you can put Slide 7 up.

2     I am not precluding that during the demonstration.  I'm just

3     not representing that this is coming in.

4     BY MR. PRICE:

5     Q    And did you use that figure or that analysis to

6     calculate the amount of market share that Mattel lost or

7     profits Mattel lost as a result of -- of Bratz being in the

8     real world, I guess?

9     A    No, because there is a lot of other things I have to

10    take into consideration to do a proper damage calculation.

11    This was just to prove to myself that there was causation,

12    that the increase in market share of the Bratz did cause a

13    decrease in Mattel's market share.

14    Q    But you didn't use -- you did not use the same

15    regression analysis to determine the amount, right?

16    A    I did not.

17    Q    Now, in this step where you're just trying to see if

18    there is a relationship between Bratz and Barbie market

19    share, did you do anything else other than look at the

20    numbers?

21    A    Yes.  All statistics does for me is prove its relation.

22    It doesn't prove which of the variables causes the change in

23    the other.  But I reviewed 59 different published facts

24    during this time period that were published either by

25    industry observers, by MGA itself and by Mattel itself that

1   said which one was causing the change in the other, and all

2   59 of those observations said that Bratz's entry in the

3   market place was causing a decline in Barbie sales.

4       So when you combine that information with my scientific

5   information, I believe it's the entry of Bratz in the

6   marketplace that caused a decline in Barbie sales.

7   Q    And for example -- well, in your report, you list those

8   documents?

9   A    I have 15 pages of my November 12th, 2010 report that

10  lists all of these observations.

11  Q    And if we look, for example, at Exhibit 630 --

12          MR. PRICE:  Which is already in evidence, your

13  Honor.

14  BY MR. PRICE:

15  Q    And this is in evidence.  It's one of those interviews

16  with Mr. Larian where there are questions, and then

17  Mr. Larian wrote answers, and if you'd look at the second

18  page, the first full question right there says, question,

19  "I'd like to know more about Isaac's insight into the" --

20  I'm sorry, there is a "how."  "How has the Bratz phenomenon

21  affected your company, and how would it impact the company's

22  toy business long term?"  He says, "MGA was growing 30 to

23  40 percent per year prior to Bratz.  This growth is fueled

24  by product innovation.  With Bratz, the growth has been more

25  than 200 to 300 percent.  The toy business, as a whole, does

1    not grow more than 2 percent per year, so our growth is

2    coming at the expense of other toy companies like Mattel."

3         These are the types of documents you were looking at to

4    determine if Bratz were having an impact on Barbie's market

5    share?

6    A    Yes, this is one of the 59 observations that I

7    reviewed.

8    Q    I've got limited time, so let's go to your next step.

9         After concluding there is a relationship, what did you

10   do, then, to measure how that relationship affected Mattel's

11   products?

12   A    Well, first, there is observations that I saw in the

13   record that the entry of Bratz actually increased the market

14   for fashion dolls, and I wanted to test to see if that was

15   true or not.  And if that is true, if Bratz actually grew

16   the market, then those are the not sales that are lost by

17   Barbie, and so I had to adjust for that fact.

18   Q    So if you found that Bratz actually created a bigger

19   market, you weren't willing to include that as part of

20   Mattel's damages figure, correct?

21   A    That is correct.

22   Q    So what did you do to see if the introduction of Bratz

23   in the marketplace had actually increased the market?

24   A    I, again, analyzed the NPD data in the United States

25   and Nielsen data in a number of other countries outside of

1    the United States, and some data from a company called GFK

2    in Australia to see if I could prove whether the entry of

3    Bratz caused the market to increase.  And using that data, I

4    observed that in some age brackets in the United States, and

5    in total markets in some of these other countries, I believe

6    Bratz did increase the market.

7    Q    And is Slide 8, does it help you explain what you

8    found?

9    A    Yes.  This is the results --

10           THE COURT:  Just a moment.  What's "not specified"

11   mean on Slide 8?

12   BY MR. PRICE:

13   Q    Okay.  On Slide 8, Mr. Wagner, where it says "not

14   specified," what does that mean?

15           THE COURT:  In the left-hand column.

16           THE WITNESS:  Yes.  This is information collected

17   by NPD from retailers and consumers through surveys, and

18   they ask the person what is the age of the person who is

19   going to receive this doll?  And so the information is

20   broken out by age categories.  But sometimes either the

21   question is not asked, but there is no response to the

22   question, so there is a category called "not specified," and

23   I do not know the age group of the person who received that

24   doll.

25

1    BY MR. PRICE:

2    Q    So that's an NPD-created category, not a category you

3    created?

4              THE COURT:  All right.  You may proceed.

5              MR. PRICE:  If we can show Slide 8.

6              THE COURT:  That's 7, Counsel.

7              MR. PRICE:  I know.

8              I'm asking for 8, Ken.

9    BY MR. PRICE:

10   Q    Can you tell the jury what Slide 8 reflects?

11   A    Yes.  I analyzed this information statistically for

12   these different age brackets, and before I did this, I

13   believe I should find an increase, if anyplace, in the age

14   9-to-11 age bracket, because that is the tween market.  This

15   was the type of age of woman who was not playing with dolls

16   anymore.  This girl thought she was more of an adult, and

17   the entry of Bratz kind of rekindled the interest for dolls

18   in that age bracket.  And I wanted to find out if more of

19   them bought dolls, and it obviously was true, I found that

20   it was true, that 89.4 percent of the sales in that age

21   category actually was an increase of sales of that category

22   than there had been before.

23   Q    So if -- if before this there had been a hundred

24   dollars of sales in that category, then as a result of

25   market expansion, what would the sales have been?

```
 1   A    Well, $89.40 of sales are market expansion, and I'm not
 2   going to give Mattel any of those sales.
 3   Q    By the way, did you do an analysis to see whether or
 4   not this SKU-ing to the 9-to-11-year-olds of Bratz stayed
 5   the same over this period of time between 2001 to 2010?
 6   A    Actually it didn't.  It was initially the focus on MGA
 7   and where they're having their success, but actually over
 8   the whole 10-year time period, you know, 6-to-8-year-old
 9   girls want to emulate the 9-to-11-year-old girls.  And
10   actually overall, there are far more Bratz dolls sold in the
11   6-to-8 age category.  And actually after 2006, believe it or
12   not, there were many sales to 3-to-5-year-olds of Bratz
13   dolls as there are to 9-to-11-year-olds, so it did not stay
14   static.
15   Q    In any event, for this analysis, did you make a
16   determination as to whether or not Bratz expanded the
17   market?
18   A    I did, and I believe that in these two categories, not
19   specified in 9 to 11, in the United States, that Bratz did
20   increase the size of the market.
21   Q    And could you tell us, did you try to -- to come up
22   with a figure, that is to find out how much it increased the
23   market?
24   A    Oh, yes.  I calculated how much they increased the
25   market, and it was approximately $904 million of sales
```

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 115 of 131   Page ID #:307874
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

115

1   during this damage period.

2   Q    And if you can look at -- well, let me ask you this:

3   How did you do that?  How did you determine how much the

4   introduction of Bratz increased the market itself?

5   A    Well, I used these percentages and subtracted those

6   from Bratz's actual sales in those categories and eliminated

7   those from my calculation of any potential lost profits.

8   Q    If you could look at Slide 9, could you tell us what

9   this reflects?

10  A    Yes.  This reflects the results I just explained in the

11  United States, and also in the five foreign countries that I

12  had information to analyze, I only found a statistically

13  significant relationship in two of them that Bratz sales

14  increased the market.  I found that in the United Kingdom

15  and Australia.  And doing the same calculations, I came up

16  with another $350 million of market expansion in the United

17  Kingdom and $184 million of expansion in Australia, for a

18  total expansion of $104.5 billion.

19  Q    And that expansion, $1.4 billion, none of that was

20  allocated to Mattel in the world where there would be no

21  Bratz?

22  A    That is correct.

23  Q    So having done this statistical analysis, what was the

24  next step, and perhaps you can use Slide 10 to explain to

25  the jury what you did?

1    A    Yes.  The top line says "Bratz sales," that's what I

2    started with.  But now I subtract that Bratz market

3    expansion, and what's left over is the Bratz sales that can

4    allocate to someone else that's in the fashion doll market.

5    It may be Mattel.  It may be another competitor who lost

6    sales as a result of Bratz's entry.  So once I have that --

7    once I have that amount, I'm going to then try to figure out

8    how much of these remaining sales were lost to Barbie versus

9    others.

10   Q    So once you've got the Bratz sales to allocate to the

11   rest of the market, that is MGA and Bratz aren't in the

12   market, and the sales would have gone, then, to what's

13   remaining of the competitors, how do you figure out what

14   Mattel would get versus Hasbro or Jacks or somebody else?

15   A    Well, either those companies or Mattel itself with its

16   other product lines, it has other dolls, like High School

17   Musical and Hannah Montana and Monster High, that also could

18   be losing sales.  Now, those are competitors to Barbie.

19        Whatever Mattel's competitive position was in each year

20   of the damage period, I take that into consideration.  So if

21   in 2005, Mattel has 50 percent of the market compared to

22   everybody else, I'm going to give Mattel 50 percent of the

23   market.  Another year they have 40 percent of the remaining

24   market, I'll give them 40 percent, because that's how they

25   are able to compete against the rest of the market if Bratz

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 117 of 131   Page ID #:307876
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

117

1    was not there.

2    Q    And so what you do for each year is multiply Barbie's

3    percent of the market compared to its other competitors with

4    the Bratz sales that were in the market from that year?

5    A    The Bratz sales that were not market expansion sales.

6    Q    And then you come up, then, with a total of Barbie's

7    lost sales?

8    A    I do.

9    Q    Does Slide 11 show the results of your analysis?

10   A    Yes.  The blue bars are Barbie's actual sales each year

11   during this damage period, and the red part of the bar on

12   top is my calculation of their lost sales.

13   Q    So in your analysis, do you assume that Barbie's

14   percentage of the market is static throughout this time

15   frame?

16   A    No, I don't.  If -- if -- I don't leave them with their

17   pre-Bratz introduction market share.  I look at their actual

18   market share each year, and their shares were decreasing,

19   and that's still reflected in my damages analysis.  They are

20   still losing share to either other Mattel products or other

21   competitors, and I take that into consideration.

22   Q    So for example, we've heard testimony about "House on

23   Fire," about recalls, about -- about business issues that

24   Barbie or Mattel was having, is that taken into account in

25   your analysis, whatever those issues are?

1    A    Whatever those issues are are taken into consideration

2    100 percent in my analysis.

3    Q    So for example, in 2007, the blue bar reflects what

4    Barbie's actual sales were in 2007?

5    A    Yes.

6    Q    All right.  And this is Barbie, not Mattel, correct?

7    A    This is strictly Barbie.  That is the only product line

8    of Mattel that I've calculated damages for.

9    Q    All right.  And it shows that in 2006, they had more

10   sales, correct?

11   A    Their sales are higher in 2006 in the actuals than they

12   were in 2007.

13   Q    So your analysis takes into account whatever was

14   happening in the market in determining Barbie's market share

15   compared to its competitors, right?

16   A    That is correct.

17   Q    So having taken that into account, how did you arrive,

18   then, at, you know, the red area on these graphs, which

19   are -- you describe as "Total Barbie loss net sales"?

20   A    As I already explained in that concept chart, I took

21   that market that is beneath the market expansion for Bratz

22   sales, and then I allocate each year to Barbie's actual

23   market share in that year of the fashion doll industry,

24   without considering Bratz in the marketplace, and gave

25   Barbie that market share of those remaining sales.

1    Q    So if you had 50 percent of the market share, and the

2    additional sales were a dollar, you'd give 50 cents?

3    A    That's right.

4    Q    And 20 percent to the market share because its

5    competitors had 80 percent, you would get 20 percent, so 20

6    cents?

7    A    In your hypothetical, that's correct.

8    Q    You didn't find that, but that's how the methodology

9    works?

10   A    Yes.

11   Q    So how did you, then, do the calculation -- well, let

12   me ask you this:  Did you do an analysis to see overall,

13   given your calculations, what percentage increase you've

14   given in -- in sales to Barbie by eliminating Bratz in the

15   market?

16   A    Yes.  I've increased Barbie sales in this damage period

17   by 9.7 percent.  I'm not giving them a hundred percent more

18   sales.  All I'm saying is based on my judgment and analysis,

19   their sales would have been less than 10 percent higher.

20   Q    If you go to Slide 13, can you explain to us how you

21   did the calculation itself?

22   A    Well, all I've done so far is calculate their lost

23   revenues, which is about a billion dollars.  But then I had

24   to subtract the incremental costs that Mattel would incur to

25   make those sales.  So again, based on my analysis of the

1    financial statements of Mattel, and my own judgments and my

2    own scientific analysis of the variability of some of these

3    costs, I've determined they would have incurred an

4    additional $682.5 million of costs in order to generate that

5    $1.6 billion worth of lost revenue.

6    Q    So how did you calculate the cost?

7    A    Well, I used the financial records of Mattel.  They

8    have product line financials that gives me the cost of goods

9    sold, the actual cost to make the dolls.  They also have

10   sometimes direct charges for things like tooling to actually

11   make the molds for the dolls to be built, for things like

12   advertising and marketing.  Sometimes these are costs that

13   are directly charged to the Barbie product line.  And then

14   there's more general costs that are not directly tied to a

15   particular product line, and I analyzed, again using

16   regression analysis, that approximately for every dollar

17   increase in sales, there's between 20 and 25 cents of

18   additional, what we call, sales, general and administrative

19   expenses.  And so I then included those costs as well.

20   Q    Does incremental costs come into play here?

21   A    Yes, these are incremental costs.

22   Q    So basically you're saying that Mattel already had a

23   certain number of costs associated with its operations,

24   right?

25   A    Right.  There are things that are called fixed costs --

1    Q    And --

2    A    -- and I did not include those in my calculation.

3    Q    What you were doing was try to find out what were the

4    increase in cost be by the increased number of sales you

5    were attributing here?

6    A    Right.  Barbie had $10.5 billion worth of sales during

7    this time period, and I want to know how many costs would

8    they have to increase to get $11 billion worth of sales.

9    Q    Now, we've heard testimony about the prior CEO of

10   Mattel, for example, getting a buyout, a -- those sorts of

11   costs, that sort of cost, that particular cost, would that

12   have any affect on your calculation of the Barbie's lost

13   profits in this time frame?

14   A    Well, that particular cost that you just explained

15   would not, because that cost was charged a hundred percent

16   in the 2000 financial statements, and I'm only analyzing the

17   period from 2001 to 2009.

18   Q    And you are analyzing what extra costs it would -- it

19   would take to sell and to make more sales?

20   A    More sales of Barbie.

21   Q    And so when you finally do the calculation, you come to

22   a conclusion that as a result of Bratz, Barbie's loss

23   profits was about 323.7 million; is that correct?

24   A    That is correct.

25   Q    Now, in addition to doing that analysis, what Mattel's

1   lost profits were, did you also do an analysis to see what

2   MGA's profits were as a result of selling Bratz?

3   A    I did.

4   Q    And why did you do that?

5   A    Well, I believe that it's your belief that this

6   calculation is relevant to some of your liability theories.

7   Q    So let's talk about the steps.  And this is an entirely

8   different analysis than the sales that Mattel lost, right?

9   A    Yes.  This is strictly looking at how many sales Bratz

10  made and what I believe are the costs you should subtract

11  from that to reach the profits that were earned by Bratz.

12  Q    And then having calculated the profits that MGA earned,

13  do you take another step to try to allocate between the

14  profits due to MGA's efforts and the profits due to the

15  intellectual property of Bratz?

16  A    Yes.

17  Q    So let's talk -- what -- what kind of methodology did

18  you use to do that?

19  A    To do what?  You asked me two things.

20  Q    Okay.  Well, let's talk about apportioning profits;

21  that is, you calculate the products of MGA, and then you are

22  going to apportion them between MGA's work and the value of

23  intellectual property.  What kind of methodology did you

24  use?

25  A    The methodology is called a yardstick methodology.  I

1    try to look at, in the record, what are the best yardsticks

2    that I think would properly reflect the profits that MGA

3    might be able to make on its products if they didn't have

4    the Mattel intellectual property in their products.

5    Q    So let's go to Slide 19.  Can you use Slide 19 to

6    explain to the jury what your methodology was, at least with

7    respect, for example, to apportioning profits for trade

8    secrets versus MGA's efforts?

9    A    Yes.  The first column where you see -- it's a dark

10   green on the bottom and a lighter green at the top, the

11   total bar would be a hypothetical of a hundred dollars of

12   profits to MGA.  I'm going to find some benchmark, and this

13   benchmark actually is -- I'll use Mattel's average profits

14   they make on their business, what did they earn when they

15   sell toys, and say that profit is attributable to sweat

16   equity or the contribution of MGA.  I'll subtract that from

17   this first green bar, and that will be the profit that MGA

18   has earned above the benchmark.

19   Q    And so what does the profit above the benchmark then

20   represent?

21   A    It represents the other contributions of MGA to the

22   success of Bratz beyond the intellectual property of Mattel.

23   Q    And could you explain to us why you used this

24   methodology?

25   A    Well, it's a methodology that's accepted.  It's

1    actually something that I wrote about 13 years ago or 15

2    years ago in that book I published on the subject, is that

3    there is something called an analytical approach where you

4    look at the average profitability in an industry, and

5    anything it's earned above that, you normally attribute to

6    some type of intellectual property.

7    Q    So in this example, for example, if you were using a

8    hundred dollars, and we were looking at -- at Mattel's

9    benchmark profits to do the calculation, MGA made a hundred

10   dollars throughout the time frame.  Your benchmark is --

11   what does this show here in the benchmark?

12   A    What it shows is that -- that Mattel earned as

13   yardstick about $54 in every hundred dollars of profit.  So

14   you subtract the $54 from the hundred, and you'd leave $46

15   that's left as profit that MGA earned as a result of

16   something beyond the normal return that Mattel receives.

17   Q    And -- and what would that -- that part, which I guess

18   is the blue part here, what would that represent; the amount

19   that MGA earned above what the benchmark earned?

20   A    Correct, which would be a measure of the value of the

21   intellectual property or the trade secret.

22   Q    So you are dividing between the value of the efforts,

23   creativity of the company, correct?

24   A    Correct.

25   Q    And then the part of the profits that are attributable

1    to the intellectual property, the uniqueness of Bratz or the

2    trade secrets, correct?

3    A    That is correct.

4    Q    So for this methodology, I guess the first thing you'd

5    have to do is figure out what MGA's profits were?

6    A    I do.

7    Q    And let's turn to your calculation for trade secrets

8    first, okay?

9         And if we could go to Slide 42, for purposes of

10   allocation among MGA's profits on the trade secret's

11   analysis, what did you find that MGA's profits were over

12   this time frame?

13   A    That between 2001 and 2010, that based on $3.4 billion

14   worth of sales, that Bratz earned incremental profits of

15   $734.9 million.

16   Q    And again, when you say "incremental profits," what do

17   you -- what do you say?

18   A    That these are profits earned above what the company

19   would have earned but for the selling of the Bratz product.

20   They had an existing business.  They had, again, fixed costs

21   to run an existing business with 30 products.  Those costs

22   are not going to vary, but the incremental costs by adding

23   this product is what I'm trying to measure.

24   Q    Now, in doing that profit calculation, did you take

25   into account MGA's legal fees that are not associated with

1    this case?

2    A    For this calculation, I did.

3    Q    Did you do other calculations where that wasn't taken

4    into account?

5    A    I have.

6    Q    Why did you do it when it wasn't -- where you didn't

7    take it into account?

8    A    Well, when I analyzed the legal expense as a percentage

9    of sales statistically, I found no valid relationship

10   between an increase in sales, increase in legal fees, so

11   that was not an incremental expense.

12   Q    This calculation, though, you did take that into

13   account, right?

14   A    I did.

15   Q    And did it reduce the profit figure?

16   A    By about $54 million.

17   Q    So if you take the expenses not related to this case

18   into account, then MGA's Bratz products are about

19   735 million, right?

20   A    Yes.

21   Q    Did you take into account the expenses related to this

22   case?

23   A    No.

24   Q    And why not?

25   A    That -- if I did that, I would, in effect, be awarding

 1   MGA's legal fees when they would lose this case.  My

 2   calculations are only relevant if the jury finds that MGA is

 3   liable for the legal violations you are alleging.

 4   Q    So your narrow area is to assume liability and then

 5   calculate damages based upon that assumption?

 6   A    Yes.

 7   Q    So after calculating MGA's Bratz profits, you had to --

 8   well, you told us how you did that.  If you could look at

 9   Slide 44, is that --

10         THE COURT:  Counsel, you are a little over one

11   hour, just so you know.

12         MR. PRICE:  Thank you.

13   BY MR. PRICE:

14   Q    Does Slide 44 reflect how you calculated the costs that

15   you subtracted from net sales?

16   A    I wouldn't say it's how I calculated.  It's really my

17   conclusions.

18   Q    Okay.  So if we looked, then, at 43, the one before you

19   got the net sales less the cost, right?

20   A    Yes.

21   Q    And then 44, this is your conclusions as to the cost,

22   right?

23   A    Yes.  It's just a little bit more detail than on 43.

24   Q    And at the bottom of this, it gives the -- it says

25   Exhibit 24285 tab B1, and it has all these schedules; do you

Case 2:04-cv-09049-DOC-RNB   Document 10175   Filed 03/10/11   Page 128 of 131   Page ID #:307887
CV 04-9049-DOC - 03/08/2011 - Day 29, Vol. 1 of 2

128

1    see that?

2    A    I do.

3    Q    And that refers to what?

4    A    Those refer to schedules in what I call my damage

5    model.  I use Excel spreadsheets with a bunch of tabs in

6    them to actually make my calculations, and this refers to a

7    number of those schedules.

8    Q    By the way, have you been updating these figures as

9    you've gotten additional information from MGA?

10   A    Yes.  Up until two weeks ago, we only had estimates for

11   2010, but two weeks ago, we actually finally got actual

12   financial information through December 31st, and as a

13   result, I redid my model, and it did lower the numbers

14   slightly.

15   Q    So having been arrived at -- we now have the conclusion

16   as to the MGA profits, $734.9 million, right?

17   A    Correct.

18   Q    So the next step is how you allocate those profits

19   between MGA's activity, marketing, advertising, et cetera,

20   and the value of the intellectual property, right?

21   A    That is correct.

22   Q    So let's focus on the trade secrets, okay?

23        And could you tell us -- can I step us through how you

24   did the analysis to do that allocation of the profits, and

25   perhaps we can start at Slide 45.

1   A    Yes.  I looked at a number of possible benchmarks or

2   yardsticks.  The first one I considered was when I started

3   my testimony with, what has MGA done with their other

4   product lines?  And I realized that except for Bratz, they

5   had never had a product line that had sold more than -- as

6   much as $30 million a year in sales until 2007.  So from

7   2000 to 2006, with their approximately 70 product lines,

8   none of them were terribly successful.

9        Also, based on my statistical analysis of Bratz, if you

10  saw the detail of my schedule in 2010, where they have

11  $32 million worth of sales, I actually believe on an

12  incremental basis that they're losing money on Bratz.  They

13  are losing almost a million dollars.  So you have to have

14  about $30 million or more in sales for a company the size of

15  MGA turn any profits, and none of their other product lines

16  were achieving that level of sales until they bought Little

17  Tikes and Zapf, and Moxie has had that level of sales for

18  the last two years.  But of the 83 other product lines, none

19  of them were generating any profits, even though they had

20  all of the same distribution channels, the same management,

21  the same sweat, the same creativity from this organization

22  that Bratz has.  So if I use that yardstick, there is no

23  value of the trade to the sweat equity of this company, but

24  I thought it would be reasonable to --

25  Q    So if you used as the benchmark of what MGA has

1   accomplished, except for Bratz, then you would have

2   allocated all of MGA's profits to Mattel?

3   A     I would.

4   Q     Okay.  You didn't do that in these schedules?

5   A     I did not.

6   Q     Okay.  So what did you use -- what other method -- what

7   else did you use, what other data did you use to try to do

8   an allocation?

9   A     Well, another thing I looked at is I collected

10  information on the 17 publicly traded pure toy companies

11  that have information during this time period and looked at

12  what type of profits that they earned in each year, and I

13  used the median number for each year.  The "median" means

14  the middle, so I didn't use an average, which you take all

15  of their profit margins and divide by 17 companies.  I look

16  at the middle company, which is kind of just the heart of

17  the toy industry, and said, "What type of earnings did those

18  companies make on an earnings before interest and taxes

19  basis?"  And that was this first yardstick that I've used.

20              *(Live reporter switch with Sharon Seffens.)*

21                            -oOo-

22

23

24

25

-oOo-

**CERTIFICATE**

         I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 9, 2011

                    _____
                    JANE C.S. RULE, U.S. COURT REPORTER
                    CSR NO. 9316