UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
              Plaintiffs,
   vs.

                              CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,      DAY 29
et al.,                       Volume 2 of 2
              Defendants.

-------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Tuesday, March 8, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

2

```
 1   APPEARANCES OF COUNSEL:

 2   For Plaintiff MATTEL, INC., ET AL.:

 3   JOHN B. QUINN
     MICHAEL T. ZELLER
 4   WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
 6   (213) 443-3000

 7   For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8   THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
 9   4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14
     KELLER RACKAUCKAS LLP
15   JENNIFER L. KELLER
     18500 Von Karman Avenue, Suite 560
16   Irvine, CA
     (949) 476-8700
17

18   FOR CARLOS GUSTAVO MACHADO GOMEZ:

19   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
20   Santa Monica, CA  90401
     (310) 459-2830
21

22   ALEXANDER COTE
     SCHEPER KIM AND HARRIS LLP
23   601 West Fifth Street, 12th Floor
     Los Angeles, CA  90071-2025
24   (213) 613-4655

25
```

1    ALSO PRESENT:

2    MGA ENTERTAINMENT, INC.
     JEANINE PISONI
3    16360 Roscoe Boulevard, Suite 105
     Van Nuys, CA  91406

4

5    ALSO PRESENT:

6    KEN KOTARSKI, Mattel Technical Operator

7    MIKE STOVALL, MGA Technical Operator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1

 2

 3                          INDEX

 4                                                PAGE

 5   PLAINTIFF'S
     WITNESSES:          DIRECT   CROSS   REDIRECT   RECROSS
 6
     MICHAEL WAGNER
 7     (Continued)         5(P)    22(H)

 8
     PLAINTIFF'S
 9   EXHIBITS:                    MARKED          RECEIVED

10   Exhibit 513                                    84

11

12   DEFENSE
     WITNESSES:          DIRECT   CROSS   REDIRECT   RECROSS
13
14    (None)

15   DEFENSE
     EXHIBITS:                    MARKED          RECEIVED
16
17    (None)

18

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    **SANTA ANA, CALIFORNIA; TUESDAY, MARCH 8, 2011; 4:00 P.M.**

2                     (Jury present.)

3          MICHAEL WAGNER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

4                    DIRECT EXAMINATION (Continued)

5    BY MR. PRICE:

6    Q    When you say a median -- so, for example, if you have

7    ten, nine, four, and two, what's the median?

8    A    Eight.

9    Q    So that's the middle point.  So what you are looking at

10   is the middle point.

11        For example, if there were particular companies that

12   had difficulty that year -- Hasbro or Jakks had recalls or

13   particular financial trouble -- how would that affect the

14   benchmark?

15   A    How that would affect the benchmark is -- remember

16   there are 17 companies here, so I am taking in effect the

17   ninth company.  If eight companies are less profitable and

18   one of them have a terrible year, that's not going to affect

19   the median.  As an example, if there is a product recall for

20   one of these companies that really causes them to lose a lot

21   of money, it will not change that middle company's profit

22   margin.  That's one reason why I use the median.  It takes

23   out the wild swings of either success or failure of any of

24   the particular companies.

25   Q    You calculated the corporate benchmark.  Did you do it

```
 1    year by year?  Did you put all the numbers together over the
 2    ten years?  How did you do that?
 3    A    It's year by year, so it's weighted by the success of
 4    Bratz in that particular year.  If say in 2006 Bratz has the
 5    most sales, then the 2006 year is going to have the most
 6    impact on my analysis.  So I'll use the median of 2006 for
 7    everyone else in that year.  We are competing in the same
 8    economy that would be affected by the same either recession
 9    or strength in the economy, or possibly people aren't buying
10    fashion dolls or other toys because they can't afford them.
11    It's all taken into consideration.
12    Q    So show us then what you did.  We have got the first
13    number, which is the $734.9 million in profits.  Then we
14    have the second column here, "Benchmark Corporation
15    Profits – MGA Portion."  Explain to the jury what that
16    represents.
17    A    What that represents is if I would give to MGA this
18    median profit margin of the 17 public toy companies in that
19    year, based on the sales of Bratz in each of the years, that
20    Bratz should have made $190.1 million during this time
21    period.
22    Q    So your conclusion is that the $190.1 million
23    represents the creativity, efforts, advertising, marketing,
24    et cetera, of what MGA would have been expected to earn?
25    A    Right, with the assumption that they would do as well
```

```
 1   as the median company in the toy industry of very large

 2   public companies.

 3   Q    Let's go to the next slide then.  So in your

 4   methodology after looking at the MGA profits and

 5   apportioning to MGA the same profits that in this case the

 6   toy industry median would be, what's the next step?

 7   A    Well, you subtract the $190 million from the

 8   $735 million, and you would get excess profits of

 9   $544.8 million.

10   Q    And that would represent the amount of MGA's profits

11   that would be allocable to Mattel under the assumption that

12   there is a finding of a trade secrets violation and some

13   blocking of trade secrets so that MGA couldn't sell Bratz?

14   A    Correct.

15   Q    Now, that's one benchmark.  Did you also look at other

16   benchmarks?

17   A    I considered two other benchmarks.

18   Q    What other benchmarks did you consider?

19   A    The next one is I looked at the No. 2 and No. 3 toy

20   companies in the world, Hasbro and Jakks.  These are very

21   successful companies.  Hasbro is a billion dollar a year in

22   sales toy company, too.  In their returns -- you have to

23   understand there is intellectual property.  They have some

24   of the best brand names in the toy business.  You have all

25   heard of Monopoly, Scrabble, Transformers, GI Joes, Trivial
```

1    Pursuit.  These are really well-known toy names.  That type

2    of intellectual property helps Hasbro earn the profits it

3    earns each year, which I included in this yardstick.

4        Also, Jakks has names like Smirf, Sponge Bob Square

5    Pants, Star Wars, and Ultimate Fighting Championship.  So,

6    again, they have very well-known brands that are helping

7    them earn the profits they earn, which I leave in these

8    yardsticks and would award to MGA if you believe that was

9    the appropriate yardstick to use to figure out what profits

10   MGA would earn on Bratz if they didn't have the Mattel

11   intellectual property.

12   Q    So if you look at Hasbro/Jakks, you have got the MGA

13   Bratz profits of $734.9 million, correct?

14   A    Correct.

15   Q    And you leave with MGA the number $324.2 million?

16   A    Right.  With that yardstick, I would leave a

17   substantially larger portion of the profits from Bratz with

18   MGA.

19   Q    So how was that number arrived at, the $324.2 million?

20   A    The same way with the pure toy industry.  I took the

21   average here of Hasbro/Jakks profitability and then compared

22   it to the Bratz profitability each year to come up with this

23   measure.

24   Q    Did you say the average?

25   A    Yes.  I think -- you can't get a median -- the median

1    of two companies and the average are the same number.

2    Q    Okay.  And did you use another benchmark -- so the

3    result is $410.7 million would be the profits applicable to

4    Mattel as the value of the intellectual property?

5    A    Yes, using Hasbro/Jakks as your yardstick.

6    Q    You said you also used a Mattel yardstick.

7    A    I did.

8    Q    Could you turn to Slide 50?  Could you tell us what you

9    did with respect to the Mattel yardstick?

10   A    Yes.  Here I said if you believe that despite the 82

11   other times where MGA has tried to same develop a product

12   and has not been very successful but this is the only one

13   that would, and it would be as valuable as the average

14   product put out by the top toy company in the world when

15   averaged during this decade, then that is the yardstick you

16   should use.  You should subtract $420.5 million of the total

17   Bratz profits and leave that with MGA, and the difference

18   would be $314.4 million, which is due to the Mattel

19   intellectual property in Bratz.

20   Q    Do you think it is appropriate to use Mattel as a

21   yardstick?

22   A    I personally think in my judgment that MGA would not

23   have done that well with this 84 product line, but if you

24   really wants to be fair to MGA, you could use this

25   yardstick.

1    Q    Now, why did you -- did you have kind of a check to see

2    whether this analysis appeared to be appropriate?

3    A    Yes.

4    Q    What was that?

5    A    Again, it's comparing it generally to what MGA's data

6    would achieve in their other product lines.  They have never

7    had another product line that had billions of dollars in

8    sales, except for Little Tykes, but, again, that was an

9    acquired company, and they haven't based on the history of

10   ownership generated any additional value in that product

11   line.  Of the products that they actually created

12   themselves -- they're not licensing in ideas from other

13   people -- there are very little sales and I believe losses

14   in those product lines.

15   Q    When you talk about that analysis, you are referring to

16   what we had up as Slide 4, which shows the top ten products

17   by revenue and then breaks it out finally to products that

18   are of MGA origin?

19   A    My analysis is actually broader than that.  This only

20   looks at the four most successful products that they have

21   created.  I looked at all the other products they created,

22   which number about 60 or 70 more products where they haven't

23   even had this level of success.

24   Q    Now, if you go back to Slide 50, that's the chart that

25   shows the three benchmarks and the analysis and the three

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    profits above the benchmark.

 2        With Mattel when you were calculating its corporate

 3    profits, were you looking just at Barbie, or were you

 4    looking at all of Mattel?

 5    A    This is all of Mattel, so Barbie would be in these

 6    numbers, but it would reflect Fischer Price toys, all the

 7    other product lines that Mattel has.  They have other great

 8    brands too like American Girl and as I just said Fischer

 9    Price, and they have Matchbox Cars.  They have many other

10    very successful products, High School Princess Dolls, Hanna

11    Montana.  They have a lot of other really good products.

12    It's just combining all of their products both successful

13    and unsuccessful in giving you the middle point of that

14    number.

15    Q    Why would it not be appropriate to compare Bratz

16    profits to just Barbie profits?

17    A    Well, I think it's unrealistic to think that MGA would

18    have come up with the most successful doll in over 50 years

19    in the world but for the intellectual property at issue in

20    this case.  They clearly haven't done it in any other

21    product line that they have produced or sold, so I think

22    that would be an inappropriate yardstick to use.

23    Q    In your analysis, you are assuming liability, that is,

24    that there were trade secrets that belonged to Mattel?

25    A    I am.
```

1  Q    Now, we talked about trade secrets at this point.  I

2  want to switch to another area that's copyright.

3       You were asked also to apportion profits assuming the

4  jury finds copyright infringement of specific Bratz

5  products, correct?

6  A    Correct.  Not all of the Bratz products sold are

7  accused of copyright infringement.  Only a subset of them

8  are.

9  Q    So when we go to copyright infringement, we are going

10 to a narrower subset of Bratz sales?

11 A    We are.

12 Q    On the trade secrets, you are including Bratz pets and

13 Bratz boys and Bratz ponies and anything that resulted or

14 might have resulted from the brand growing as a result of

15 trade secret?

16 A    Correct.  I used all Bratz products in that

17 calculation.

18 Q    So let's focus now on copyright when we're focusing on

19 specific products.

20      Did you do an apportionment of profits analysis for

21 Bratz MGA profits for the four fashion dolls, that is, the

22 female teenage Bratz doll that included the original sculpt

23 that was used with the first four Bratz dolls?

24 A    I did.

25 Q    Is that reflected on Slide 57?

1    A    Yes.

2    Q    And your conclusion as to the profits on those fashion

3    dolls, young teenage Bratz dolls that used the original

4    sculpt, what did you include with respect to the profits?

5    A    Well, the profits on those sales using the same

6    methodology I used in the overall calculation of Bratz would

7    lead to total profits earned by those dolls of $261.1

8    million.

9    Q    Did you do the same methodology you used before to

10   compare that to the corporate benchmark and then arrive at

11   profits above the benchmark?

12   A    The analysis is exactly the same.  It's just starting

13   from a different starting point, fewer products and a

14   different calculation of profits.

15   Q    Would the benchmark proportion be the same as it was in

16   the trade secret calculation?

17   A    No, not exactly because it depends on the timing of the

18   sales.  MGA is not -- they don't have the same profit margin

19   each year in this damage period.  It depends on when these

20   products are sold.  If products are sold in a very

21   profitable year, then it would be different than if the

22   products were sold in a less profitable year.  So my

23   benchmark numbers are not going to be identical, but the

24   approach is exactly the same.

25   Q    If you look at Chart 57, you found the Mattel portion

1    using the pure toy industry benchmark as being $190 million?

2    A    That would be the amount of profits earned above the

3    benchmark by using the median company in the toy industry.

4    Q    That would reflect in your opinion the amount earned

5    because of the intellectual property?

6    A    Yes.

7    Q    And then for Hasbro/Jakks, the amount earned above the

8    benchmark would be $149 million?

9    A    That's correct.

10   Q    And if you used Mattel as a benchmark, the amount would

11   be $109 million?

12   A    Yes.

13   Q    Did you also do the same type of analysis looking just

14   at the first four dolls and two other dolls, Ooh-La-La Cloe

15   and Formal Funk Dana?

16   A    Yes.

17   Q    If you look at Slide 58, did you calculate what Bratz

18   profits were on those four dolls plus the other two dolls,

19   Ooh-La-La Cloe and Formal Funk Dana?

20   A    Yes, I used the same exact method to calculate profits

21   on the sales.  I calculated $30.3 million worth of profits.

22   Q    Having calculated the profits, do you then go through

23   the same analysis to allocate it?

24   A    I do.

25   Q    If you would look at Slide 54, is this a result of your

```
 1   analysis of the apportionment of profits from the first four
 2   dolls and Ooh-La-La Cloe and Formal Funk Dana?
 3   A    It is.
 4   Q    So you are using a different profit figure?  This time
 5   you are using $30.3 million?
 6   A    I am.
 7   Q    And you apportion it using the benchmark?
 8   A    Correct.
 9   Q    And your conclusion is if it's the pure toy industry
10   benchmark it's $19.9 million?
11   A    Yes.
12   Q    If you use Hasbro/Jakks it's $22.1 million?
13   A    Yes, and I would like to point something out.  It's
14   based again on the timing of these sales.  Actually for
15   these periods of time, Hasbro/Jakks was not as profitable as
16   the median toy company.  They are doing worse.  So actually
17   using this as a yardstick, Hasbro/Jakks would give less
18   money remaining with MGA than if they used a pure toy
19   company.  That proves that the yardsticks are static.  It
20   depends on what is happening each year in my damage period.
21   Q    You do it on a year-by-year basis?
22   A    I do.
23   Q    And then we have Mattel at $17.1 million?
24   A    That's correct.
25   Q    Another assignment you had was to look at Mr. Larian's
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    profit distributions and allocate those distributions to

2    Bratz or something else, correct?

3    A    I did.

4    Q    Could you tell us what the methodology was for that?

5    A    Well, from the corporate records of MGA, we learned of

6    all the distributions to Mr. Larian above his salary that he

7    received from MGA year by year.  I then allocated that based

8    on the profits that I believe were earned as a result of

9    Bratz versus the profits earned by other product lines to

10   allocate the total amount to Bratz.

11   Q    If you would look at Slide 73, is that your conclusion

12   the number $383.8 million as to the Bratz profits that were

13   distributed to Mr. Larian?

14   A    Yes, through 2009.

15   Q    If you would look at Slide 74, can you tell us what

16   Slide 74 shows?  The title is "Isaac Larian's Bratz Profit

17   Distributions."

18   A    This is just the same information broken out by year to

19   show which years he received the money and what amounts.

20   Q    So in the peak year of 2006, there was a distribution

21   of about $117 million?

22   A    Correct.

23   Q    Now, when you say these are distributions to

24   Mr. Larian, is he the only one getting the distributions of

25   profits?

1    A    No.  He owns approximately 82 percent.  He and his

2    family trusts own about 82 percent of MGA, so the balance of

3    the distributions are going to others.

4    Q    So having calculated the profits that were distributed

5    to Mr. Larian, did you then go through the next step as you

6    did before and try to allocate that between creativity,

7    sweat equity, and intellectual property?

8    A    I did the same exact analysis as I have been describing

9    in my testimony.

10             MS. HURST:  Objection.  Previously undisclosed

11   slides.

12             THE COURT:  Overruled.

13   BY MR. PRICE:

14   Q    This is in connection with the trade secrets analysis?

15   A    Yes.

16   Q    If you would go to Slide 87 --

17             THE COURT:  Just a moment.  Take that off the

18   screen for just a moment.  Retrieve the slides and show me

19   where the slide is located, please.

20             (Pause in proceedings.)

21             THE COURT:  Overruled.  Please proceed.

22   BY MR. PRICE:

23   Q    Let's go back to Slide 74.  After determining what the

24   distributions were that were allocated to Mr. Larian, the

25   percentage ownership, did you then do the kind of analysis

1  you talked about to allocate it between trade secret,

2  intellectual property, creativity, sweat equity, et cetera?

3  A    I did.

4  Q    If you would look at Slide 87.

5       MS. HURST:  Your Honor, it's this one that I have

6  the objection to, 87.  We didn't get that before this

7  morning, Your Honor.

8       THE COURT:  I will take that subject to a motion

9  to strike.  Continue on.  The methodology is the same?

10      MR. PRICE:  Yes.

11 BY THE COURT:

12 Q    Could you tell us what Slide 87 represents?

13 A    Yes.  It's doing the same type of analysis I did before

14 but apportioning this time distribution between a normal

15 industry benchmark being measured by the pure toy industry,

16 by Hasbro/Jakks, or by Mattel and then giving Mr. Larian the

17 normal return of those yardsticks and the balance being

18 apportionate to the Mattel intellectual property in the

19 Bratz product.

20 Q    So for the pure toy industry, the Mattel portion would

21 be $284.6 million?

22 A    Correct.

23 Q    Hasbro/Jakks has a benchmark of $214.5 million?

24 A    Yes.

25 Q    And Mattel has a benchmark of $154.2 million?

1    A    That's correct as well.

2          MR. PRICE:  Your Honor, we have went a little over

3    an hour and a half.

4          THE COURT:  Ladies and gentlemen, why don't we

5    take a 15-minute recess.

6          You are not to discuss this matter nor to form or

7    express any opinions concerning this matter.

8          (Recess.)

9          (Jury present.)

10         THE COURT:  We are back in session.  The jury is

11   present.  Counsel are present, and the parties are present.

12         Counsel, you may continue with your examination,

13   please.

14   BY MR. PRICE:

15   Q    Mr. Wagner, if we look at what you did then, because of

16   trade secret violations, MGA was not able to sell Bratz, or

17   only Mattel could have.

18         Your calculation is that Barbie's lost profits as a

19   result of MGA selling Bratz was $323.7 million?

20   A    Yes, for the Barbie product line only.

21   Q    Then the other numbers that you have given us are what

22   portion of MGA's profits are attributable to intellectual

23   property as opposed to creativity, marketing, what you call

24   sweat equity?

25   A    Correct, after the apportionments by the industry

1   yardsticks that I used.

2   Q    Did you find any products certainly prior to 2009 that

3   MGA created that as a result of MGA's creativity, sweat,

4   advertising, et cetera, made profits?

5   A    I don't believe any of those products would have made

6   profits.  I think the largest annual sales for any of their

7   creative products were around $14 million a year.

8   Q    So what's your conclusion then as to your base

9   conclusion as to what portion of MGA's profits of Bratz was

10  attributable to the intellectual property on trade secret?

11  A    If that was the yardstick I used, which is using the

12  same company with different product lines, it would

13  basically be 100 percent would be due to the intellectual

14  property.

15  Q    In addition, did you also try to calculate the value of

16  a particular document, a point of sale document, which you

17  were told was found in MGA's Mexico office?

18  A    Yes.

19  Q    And could you tell us how you calculated the value of

20  the point of sales information?

21  A    Yes.  I was given contracts for three years for the

22  seven largest retailers in Mexico where Mattel agreed to

23  give them a discount on their purchases of products if they

24  would give their point of sale information to Mattel.  That

25  discount averages about one percent.  I then received gross

```
 1   sales information for those companies for the period 2002 to
 2   2004 in pesos, so I converted the pesos to dollars on an
 3   annual basis using an average of the daily exchange rates
 4   between the Mexican peso and the American dollar to come up
 5   with an average conversion rate for each year.
 6        The number that I got from Mattel was gross sales.
 7   This one percent discount was to be applied to net sales, so
 8   based on other contract terms, I made the correct
 9   calculation of that discount and converted it to U.S.
10   dollars.
11   Q    In these contracts, if, for example, Mattel was selling
12   -- had a $1,000 worth of product it is selling to a
13   retailer, what would the retailer actually pay to Mattel in
14   addition to giving them the point of sales commission?
15   A    $990.
16   Q    So basically it was costing Mattel $10 per $1,000?
17   A    Correct.
18   Q    Did you calculate then the cost to Mattel of getting
19   that point of sales information from the retailers?
20   A    I did.
21   Q    Was that the measure of your damages on that document
22   as to how much Mattel had to pay for it?
23   A    Yes.
24   Q    Taking into account pesos and exchange rates, what was
25   your conclusion on that?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MR. COTE:  Objection.  Improper opinion.  No
 2   timely disclosure.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  It was approximately $5.1 million.
 5              MR. PRICE:  No further questions at this time,
 6   Your Honor.
 7              THE COURT:  By agreement, does that mean reserving
 8   the time that you haven't used?  Is that my understanding?
 9              MR. PRICE:  Yes.
10              THE COURT:  Thank you, Counsel.
11              This will be cross-examination by Ms. Hurst.
12              THE COURT:  Counsel, I won't count this time.
13                        CROSS-EXAMINATION
14   BY MS. HURST:
15   Q    Good afternoon, Mr. Wagner.
16   A    Good afternoon, Ms. Hurst.
17   Q    You mentioned that you're billing rate for this matter
18   is $695 an hour?
19   A    I did.
20   Q    And you have had more than 20 people working on this
21   engagement?
22   A    That's correct.
23   Q    You have written numerous reports on Mattel's damages
24   claims, true?
25   A    These a fair characterization.
```

1    Q    And your reports have schedules that fill boxes and
2    boxes of documents, true?
3    A    That's true.
4    Q    Occasionally, you have made mistakes in that process
5    true?
6    A    Certainly.
7    Q    And you have corrected them in your view?
8    A    I have.
9    Q    And that's just part of the business of being a damages
10   expert?  Mistakes get made from time to time, true?
11   A    I agree with that statement.
12   Q    All right.  Now, how much in total have you in all the
13   firms that you have worked with billed Mattel for your work
14   on this case to date?
15            MR. PRICE:  Objection.  Ambiguous as to this case.
16            MS. HURST:  The entire case.
17            THE COURT:  Well, in other words, this case --
18   BY MS. HURST:
19   Q    From the time of your engagement to the present.
20   A    I don't have the information for the firm that I
21   started this case with originally in either late 2007 or
22   2008, but my current firm since 2009 -- I believe they have
23   billed approximately $2.4 million.
24   Q    So in total, it is something more than $2.4 million you
25   have billed in connection with this case?

```
1    A    That would be correct.

2    Q    It's your full-time occupation to serve as a damages

3    expert in litigation, true?

4    A    Not full-time.  I also do just pure business valuation

5    and also alter ego work, but I would say 80 percent of my

6    work is damages work.

7    Q    And you testified at trial as you mentioned well more

8    than 100 times, true?

9    A    I have.

10   Q    And you have testified at deposition many multiples of

11   that?

12   A    292 times.

13   Q    All right.  You know the drill.

14   A    I do.

15   Q    Now, one of the things that you did in this case is

16   make assumptions about what is the intellectual property

17   that is at issue; is that right?

18   A    That's correct.

19   Q    There are some trade secrets that you understand to be

20   at issue?  Is that true?

21   A    Yes.

22   Q    And there are some copyrights that you understand to be

23   at issue, right?

24   A    Yes.

25   Q    And you are assuming that Mattel can prove misuse of
```

1    those trade secrets, true?

2    A    I believe that's correct.

3    Q    And you are not here to tell the jury whether Mattel

4    has proven misuse of a trade secret, right?

5    A    I have no opinion on that subject.  I'm not here to

6    tell the jury anything about that subject.

7    Q    You are assuming that Mattel can prove that it owns a

8    copyright and that that copyright has been infringed is that

9    true?

10   A    I believe that's correct.

11   Q    And you are not here to tell the jury whether Mattel

12   owns a copyright?

13   A    I'm not.

14   Q    And you are not here to tell the jury whether MGA has

15   infringed any copyright that Mattel might own?

16   A    I'm not here to do that.

17   Q    You have assumed all of that?

18   A    For the purpose of my work, I have.

19   Q    But you need to know something about the intellectual

20   property in order to make your calculations?

21   A    I agree with that.

22   Q    So let's just make sure we are all on the same page and

23   have the same general understanding of what is the

24   intellectual property that is the basis for your

25   calculations.  Is that okay with you?

1  A     Yes.

2  Q     All right.  I would like to show the witness Exhibit

3  302 which is in evidence, please.

4        Have you seen this before, Mr. Wagner?

5  A     I have.

6  Q     You understand that this is what has been called Carter

7  Bryant's pitch book to MGA?

8  A     Yes.

9  Q     These are the basic drawings that form the foundation

10 of Mattel's copyright claim as you understand it, correct?

11            MR. PRICE:  Objection.  Misstates the theory and

12 assumes facts not in evidence.

13            THE COURT:  Overruled.

14            THE WITNESS:  I don't know what they have

15 asserted.  I haven't been here to hear the testimony, so I

16 don't know what this is, what you claim in your question.  I

17 believe this is part of the intellectual property, yes.

18 BY MS. HURST:

19 Q     But you are not sure one way or another the

20 significance of this pitch book in terms of Mattel claim?

21 A     That is correct.

22 Q     Could we also show the witness Exhibit 1136, the

23 sculpt?  That head falls out readily, so -- have you seen

24 that before, Mr. Wagner?

25 A     I haven't seen it in three dimensions.  I have seen

1    pictures of it before.

2    Q    This is the first time you have ever seen it in the

3    flesh, so to speak?

4    A    Yes, it is.

5    Q    You understand that that object, that Exhibit 1136, is

6    also part of the basis for Mattel's claims for copyright

7    infringement?

8    A    Yes, I believe it's one of the two sculpts that they

9    are claiming.

10   Q    You have mentioned one of the two.  Let's show the

11   witness Exhibit 1141-A as well.

12        Is this the first time you have seen that one in the

13   flesh?

14   A    It is.

15   Q    You understand that sculpt is also part of the basis

16   for Mattel's copyright claim?

17   A    I do.

18   Q    You also had to have a sort of a basic understanding of

19   what the trade secrets would be?

20   A    Correct.

21   Q    It's true, isn't it, that the trade secrets also

22   concern work that Carter Bryant did?

23   A    That is my understanding.

24   Q    It's your understanding that basically both the trade

25   secret claims and the copyright claims all concern work that

 1   Carter Bryant did while he was still employed at Mattel or

 2   at least so Mattel claims?

 3   A    Yes.

 4   Q    Basically it's all the same stuff, right?

 5              MR. PRICE:  Objection.  That's ambiguous.

 6              THE COURT:  That's a little ambiguous, Counsel.

 7   Sustained.

 8   BY MS. HURST:

 9   Q    You have seen a document where Mattel defines what its

10   claiming as its trade secrets, right?

11   A    I have.

12   Q    I will ask that the witness be shown Exhibit 35945.  Do

13   you have that before you, Mr. Wagner?

14   A    I do.

15   Q    Do you recognize that as a document that Mattel filed

16   with the Court defining what its trade secrets are?

17   A    I do.

18   Q    And you actually considered that in making your various

19   calculations, true?

20   A    To be honest, this isn't the document that I used, but

21   I used a document similar to this.

22   Q    You see there that on the first page of Exhibit 35945

23   there are various -- Exhibit A, pardon me -- there are

24   various definitions of trade secrets?

25   A    There are.

```
 1   Q     And there is Bratz Concept No. 1?

 2   A     Yes.

 3   Q     Bratz Concept No. 2?

 4   A     That is correct.

 5   Q     Would you place before the witness Exhibit 35993?

 6         Do you see, Mr. Wagner, that Exhibit 35993 is a

 7   document we have made up that recites those trade secrets

 8   that are on the front of Exhibit 35945?  Does that look

 9   correct to you?

10   A     It does look correct.

11         MS. HURST:  I would ask permission to publish

12   35993.

13         MR. PRICE:  35993 we just got last night.  We

14   never got any of these demonstratives.

15         THE COURT:  You haven't gotten any demonstratives

16   from the other side?

17         MS. HURST:  We sent them in the same time frame.

18         THE COURT:  Overruled.  You may publish it.

19   BY MS. HURST:

20   Q     Mattel has defined eight different buckets of trade

21   secrets, right?

22   A     That's fair.

23   Q     Bratz Concept 1, Bratz Concept 2, the Bratz name --

24         MR. PRICE:  I will object.  This is not the

25   version that is currently going to be presented to the jury.
```

1          THE COURT:  It may not be.  I haven't had time to

2     see this either, so --

3          MS. HURST:  Your Honor, it's a filing they made

4     with the Court.

5          THE COURT:  I just haven't seen this to examine it

6     in detail.  I am going to accept your representation.  It

7     looks to be similar, but I haven't read the total document.

8     BY MS. HURST:

9     Q    The Bratz name is one of the trade secrets Mattel has

10    identified?

11    A    It is.

12    Q    The Jade name is one of the trade secrets Mattel has

13    identified?

14    A    It has.

15    Q    Let me just pause there for a minute.  You have never

16    calculated in any of your reports any value specific to the

17    Jade name; is that correct?

18    A    That's correct.

19    Q    So none of the numbers that you have given us here

20    today attribute value to the Jade name, or do they include

21    value for the Jade name?

22    A    The answer to your compound question is, no, I have

23    never given you a specific number for Jade, but it would

24    include it, yes.

25    Q    So the numbers you have given today for unjust

```
 1   enrichment include all of these trade secrets lumped in
 2   together?
 3   A    Correct.
 4   Q    And you have not assigned value separately to each of
 5   the eight trade secrets, correct?
 6   A    That is correct.
 7   Q    Continuing after the Jade name is the Bratz sculpt,
 8   Exhibit 1136-A?
 9   A    Correct.
10   Q    That's the gray sculpt that we just looked at a moment
11   ago in connection with the copyright claim?
12   A    Yes.
13   Q    In Bucket 6 is Bratz sculpt 1141.  That's the lighter
14   colored, Caucasion flesh-colored sculpt?
15   A    It is.
16   Q    That's also the one we looked at in connection with the
17   copyright claim?
18   A    It is the same.
19   Q    Now, the Bratz Hero Shot, do you have an understanding
20   what that is?
21   A    I do.
22   Q    What's that?
23   A    That is a picture of the four original dolls similar to
24   the picture that you showed earlier in my examination.
25   Q    It's the front page of Exhibit 302; is that right?
```

1   A      I believe so.

2   Q      It's the front page of Carter Bryant's pitch book?

3   A      Yes.

4   Q      Then the Bratz drawings, that's a whole list of Carter

5   Bryant's drawings?

6   A      I believe there are 64 of them, yes.

7   Q      I want to focus you now on Bratz Concept No. 1 for a

8   few moments.

9          THE COURT:  Counsel, there might be some

10  disagreement over the actual wording.  I can go back in the

11  back real quick and get that, the wording that was

12  submitted.  You can just show it to me as well if there is

13  any disagreement.  These are the eight or nine buckets that

14  I have basically seen.

15         MS. HURST:  This is Docket 9829.

16         MR. ZELLER:  This is not the correct current

17  version of our "trade secret" definition.

18         THE COURT:  Is this the one that was submitted to

19  me earlier?

20         MR. ZELLER:  It was an earlier version.

21         THE COURT:  Thank you.  You may proceed.

22         MS. HURST:  Thank you, Your Honor.

23  BY MS. HURST:

24  Q    Let's make sure we understand what the trade secret is

25  here in Bratz Concept No. 1.  "A multi-ethnic group," right?

1   A     That's how it starts.

2   Q     "Of hip, urban, edgy, trendy, teenage girls fashion

3   dolls and accessories," right?

4   A     Correct.

5         MS. HURST:  Let's make this easier.  I have got

6   something big that we can bring in that is going to make

7   this easier.  Can you get that board?  We will continue

8   while they're getting the board.

9   BY MS. HURST:

10   Q     "Collectively known as Bratz," so Bratz Concept No. 1

11   includes the name?

12   A     It does.

13   Q     And, in fact, the difference between Bratz Concept 1

14   and 2 is that 1 has the name and 2 doesn't, right?

15   A     That's my understanding, yes.

16   Q     "Including designs for large oversized heads and feet,"

17   right?

18   A     Yes.

19   Q     "Large eyes," do you see that?

20   A     I do.

21         MR. PRICE:  Objection.  We haven't seen any

22   version of these demonstratives before.

23         THE COURT:  I have seen down through eight or nine

24   buckets.

25         MS. HURST:  This is just Bratz Concept No. 1

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

34

```
 1    broken out into a list.  I could write it out on a pad.

 2              THE COURT:  Overruled.

 3    BY MS. HURST:

 4    Q    "Almost nonexistent noses"?

 5    A    You should include small before that, but, yes.

 6    Q    My apologies.

 7              THE COURT:  Does this come as any surprise to you?

 8              THE WITNESS:  No, Your Honor.

 9              THE COURT:  Overruled.

10    BY MS. HURST:

11    Q    "Small bodies," that's next?

12    A    It is.

13    Q    "The dolls are four high school multi-ethnic friends

14    with attitude."  That is next.

15    Q    They have distinctive names?  That's one of the

16    elements?

17    A    Yes.

18    Q    Nicknames, right?

19    A    This is the next element.

20    Q    Fashions?

21    A    Correct.

22    Q    Personalities?

23    A    Yes.

24    Q    Back stories?

25    A    Yes.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    Q    "And icons descriptive of the dolls personal mascot."

2    A    That completes the sentence.

3    Q    Now, Bratz concept -- concept, that's basically the

4    idea for the Bratz dolls, right?

5    A    I believe that is meaning the same thing.  It does to

6    me.

7    Q    This is all of the key elements of the Bratz idea that

8    Mattel has defined as its trade secret Bratz idea No. 1,

9    right?

10           MR. PRICE:  Object.  That's incorrect.  It's not

11   the version that we presented.

12           THE COURT:  Is there another version that I

13   haven't seen?

14           MR. PRICE:  No.

15           MR. ZELLER:  No.  We filed that version.  The

16   Court has it.

17           MS. HURST:  If they want to argue that they

18   changed it to try to fix a problem, they can, but I am

19   allowed to cross-examine on what they filed.

20           MR. PRICE:  That's just wrong.

21           THE COURT:  I'm going to strike counsel's comment.

22   The jury is to disregard it.

23           Look at that exhibit for just a moment.  What

24   exhibit are you familiar with?  What exhibit have you seen

25   before that's been filed with this Court and refer that

```
 1   exhibit to counsel for both parties.
 2            THE WITNESS:  I don't have my work papers with me,
 3   but I believe it was Mattel's second corrected Notice of
 4   Compliance re the Court's February 1, 2011, order, but I
 5   would need my memory refreshed to confirm that my
 6   recollection is correct.
 7            MS. HURST:  I will represent to the Court that the
 8   description in the second corrected notice is the one we are
 9   showing.
10            THE COURT:  Okay.  I will accept that
11   representation.  Thank you very much.  I want to make sure
12   you are not caught unaware.
13            By the way, have you been shown any other version
14   besides that by either of the parties, either Mattel or MGA?
15            THE WITNESS:  Not before right now.
16            THE COURT:  Please proceed.
17   BY MS. HURST:
18   Q    Could we show the witness Exhibit 35311?  Do you have
19   that before you, Mr. Wagner?
20   A    I do.
21   Q    And that is -- it says "Mattel 2000" on the front of
22   it, correct?
23   A    It does.
24   Q    And do you see there is a little Bates number down
25   there with an "M" in front of indicating it came from
```

1   Mattel's files?

2   A    Yes.

3   Q    Does this appear to you to be a Mattel catalog for the

4   year 2000?

5   A    It appears to be part of a catalog, yes.

6   Q    Do you see there on pages -- internal pages 88 and 89,

7   which are pages 90 and 91 of the exhibit, that there are

8   some catalog entries for the Diva Starz product?

9   A    Yes.

10       MS. HURST:  Your Honor, I request permission to

11  admit and publish pages 90 and 91 regarding the Diva Starz

12  product from the Mattel catalog.

13       MR. PRICE:  Objection --

14       THE COURT:  Denied.

15  BY MS. HURST:

16  Q    Is a Mattel catalog ordinarily published in the

17  industry as a means of Mattel selling its products?

18       MR. PRICE:  Objection.  It's irrelevant to his

19  opinion on damages.

20       THE COURT:  If you have seen the catalog before, I

21  may let this in if you relied upon it, but this isn't going

22  to be a way for either party through any of the experts to

23  get into evidence that is not before this jury.

24       MS. HURST:  Your Honor, this is a Mattel catalog.

25       THE COURT:  Counsel, I don't care.

```
 1            MS. HURST:  Would you take it subject to a motion
 2   to strike?  Clearly we will able to admit this document.
 3            THE COURT:  During your case?
 4            MS. HURST:  Absolutely.
 5            THE COURT:  Subject to a motion to strike.
 6            MR. PRICE:  My objection is this does not go to
 7   damages.  It's irrelevant because she is trying to do
 8   liability here.
 9            THE COURT:  Overruled.
10   BY MS. HURST:
11   Q    Do you have the two pages in front of you?
12            THE COURT:  Is this going to lost profits, or are
13   you starting to argue your case through the comparison?
14            MS. HURST:  It goes to unjust enrichment.
15            THE COURT:  By comparing the dolls?
16            MS. HURST:  I am not going to compare the dolls.
17            THE COURT:  What are you going to do?
18            MS. HURST:  I am going to demonstrate the
19   disclosure of the concept.  It's relevant to the calculation
20   of damages and the methodology for damages.
21            THE COURT:  Proceed.
22   BY MS. HURST:
23   Q    Now, you see there the two pages of the Diva Starz in
24   the Mattel 2000 catalog, right, Mr. Wagner?
25   A    I do.
```

1   Q    All right.  Would you agree with me that that's a

2   multi-ethnic group of dolls?

3   A    It appears to be.

4   Q    Now, Diva Starz came out in the fall of 2000; is that

5   right?

6   A    I believe that's correct.

7   Q    So at that point this multi-ethnic group of fashion

8   dolls was disclosed to the public?

9            MR. PRICE:  Objection --

10            THE COURT:  Please take that off the screen.

11            MS. HURST:  I am going to go through some more of

12   this.

13            THE COURT:  Not unless it goes to damages.

14            MS. HURST:  It does go to constituting lead time

15   versus other methodologies based on prior disclosure that

16   was an available methodology that was not chosen.

17            MR. PRICE:  She is trying to do liability.

18            THE COURT:  That's my concern, Counsel.  If this

19   is to a liability determination for comparison of this

20   witness, I am not going to allow it.  In fact, if this is a

21   methodology that could have been pursued, I will allow you

22   to do that, but I think we are going to keep these photos

23   off the screen until we establish those questions.

24            MS. HURST:  The Diva Starz dolls are already in

25   evidence.

40

```
 1              THE COURT:  I understand that.  Please proceed.

 2   BY MS. HURST:

 3   Q    On the catalog pages there before you, Mr. Wagner, do

 4   you see that these dolls are described as having fashion

 5   play?

 6              MR. PRICE:  Object.  It's irrelevant to damages.

 7              THE COURT:  Overruled.  I will give counsel a

 8   little bit of leeway.

 9              THE WITNESS:  There is a bullet that says "Fashion

10   Play."

11   BY MS. HURST:

12   Q    And there is a bullet point for "Hair Play"?

13   A    There is.

14   Q    There is a bullet point for "Accessory Play" as well?

15   A    Yes.

16   Q    Fashion play and hair play, that's kind of the basic

17   definition of the play pattern for a fashion doll; is that

18   right?

19              MR. PRICE:  Objection.  Lack of foundation.

20              THE COURT:  Overruled.

21              THE WITNESS:  Well, they would be included as the

22   type of things you would sell a fashion doll with.

23   BY MS. HURST:

24   Q    Diva Starz is a fashion doll?

25   A    It was.
```

1   Q     And it came with accessories?

2   A     Yes.

3   Q     And Mattel described this doll as "cool talking teens"?

4   A     Can you tell me where on the page it says that?

5   Q     Sure, the first sentence.

6   A     Yes, "cool talkin' teens."

7   Q     Continuing in that first paragraph, it describes them

8   as "ultra trendy"?

9             MR. PRICE:  Objection.  This is liability.

10            THE COURT:  Overruled.

11            THE WITNESS:  Yes.  They use the term "ultra

12   trendy."

13   BY MS. HURST:

14   Q     If you read down several bullet points where it says

15   Tia, do you see she is described as an urban girl?

16   A     I see that.

17   Q     Now, you would agree with me wouldn't you that this was

18   a cool trendy teenage fashion doll with accessories, right?

19            MR. PRICE:  Objection, goes to liability.

20            THE COURT:  Counsel, I am starting to become

21   concerned with this testimony.  This is allegedly a damages

22   expert.  The jury can accept or reject his --

23            MS. HURST:  Do you want to have a sidebar?  I

24   don't want to make a speaking objection, but --

25            THE COURT:  I am going to foreclose this early.

1   We can do that in the morning.

2   BY MS. HURST:

3   Q    Under one of your unjust enrichment calculations, you

4   have ascribed all of the value of all Bratz products, all of

5   the profits of all products ever sold with the Bratz name;

6   is that true?

7   A    That's accurate.

8   Q    And you have not broken it down between the eight

9   different trade secrets, true?

10  A    I already answered that, and the answer is the same.  I

11  did not.

12  Q    So one way to understand your opinion is that you have

13  ascribed all of the value of everything that ever bore the

14  Bratz name to Bratz Concept No. 1 listed right here on this

15  board; isn't that true?

16  A    No, you just asked if I ascribed it to any particular

17  trade secret.  I did not do that.

18  Q    By not doing that, you have made either all of the

19  value or none of the value a possibility for every single

20  one of the eight buckets?

21  A    That's correct.

22  Q    So it could be that at the end of the day you would be

23  asking for all of the value associated with Bratz for the

24  idea expressed in Bratz Concept No. 1?

25  A    If that was the jury's conclusion as to liability, yes,

1    and they believe that was a blocking IP.

2    Q    If that idea had been disclosed to the public before

3    MGA ever used it, then that would be an improper damages

4    calculation wouldn't it?

5              MR. PRICE:  Objection.  Goes to liability.

6              THE COURT:  Overruled.

7              THE WITNESS:  If there is no liability, my damage

8    calculations are irrelevant.  I would agree with that.

9    BY MS. HURST:

10   Q    If the idea were disclosed to the public only a short

11   time after MGA used it, then one of the proper damages

12   methods in looking at that would be what advantage did MGA

13   get from just being a short time ahead, right?

14   A    If you isolated all of the IP issue in your assumption,

15   your hypothetical, I would agree with that statement.

16   Q    That would be what's called lead time damages?

17   A    Normally we call it a head start.

18   Q    Okay.  Did you look at whether there was a head start

19   methodology that was appropriate in this case?

20   A    I did on another part of this case responding to your

21   damage claims, but I did not do it for Mattel's damages.

22   Q    For Mattel's damages, you never looked at whether Diva

23   Starz entirely disclosed Bratz Concept No. 1, and,

24   therefore, the head start methodology might have been more

25   appropriate?

1          MR. PRICE:  Objection.  Assumes facts not in

2     evidence.

3          THE COURT:  Overruled.

4          THE WITNESS:  I would agree with that statement.

5          MS. HURST:  May I continue with the Diva Starz

6     analysis?

7          THE COURT:  Not in a comparative sense.  That's

8     inappropriate.  You can talk about the methodology, but what

9     I am not going to do is allow argument through the expert

10    going down similarities and dissimilarities of the dolls.

11    BY MS. HURST:

12    Q    Do you think that large oversized heads and feet were

13    unknown to the toy industry in the fall of 2000?

14         MR. PRICE:  Objection.  That's liability.

15         MS. HURST:  It goes to credibility of the

16    calculation.

17         THE COURT:  Overruled.  You can answer that

18    question.

19         THE WITNESS:  That element by itself -- there had

20    been other dolls earlier in time that had that one feature.

21    BY MS. HURST:

22    Q    Do you think large oversized eyes was unknown to the

23    toy industry in the fall of 2000?

24         MR. PRICE:  Same objection.

25         THE COURT:  Counsel, he is placed in a position of

```
 1    making a valuation of each of these elements.  That's what
 2    the jurors are going to obviously decide.  It's enough that
 3    he did not take it into account and not evaluated the head
 4    start method.  Going down each of these elements is
 5    argument.  You can certainly do that in your closing
 6    argument.  You can pull up Diva Starz, but it's not for the
 7    expert.
 8    BY MS. HURST:
 9    Q    Is there any single one of these elements in Bratz
10    Concept No. 1 that you know was not disclosed to the public
11    by the fall of 2000?
12              MR. PRICE:  Same objection.
13              THE COURT:  I will let you generally answer that
14    question.
15              THE WITNESS:  I haven't done enough investigation
16    of those issues to give you an informed answer, so, no.
17    BY MS. HURST:
18    Q    Is it true that if every one of these elements were
19    disclosed to the public by the time Carter Bryant came to
20    MGA with his pitch book, then this trade secret would be of
21    no value as far as you are concerned?
22    A    If you are asking me if all of these descriptions
23    combined into one product existed, I think my answer would
24    be, yes, I don't think it would be liability.
25    Q    You have calculated what you called unjust enrichment
```

1    both for the trade secrets and for the copyright?

2    A    I did.

3    Q    And the sculpt and the pitch -- the drawings -- are

4    included as underlying intellectual property for both of

5    those calculations?

6    A    I believe they are.

7    Q    You agree that that means there is overlap between the

8    two, right?

9    A    There is.

10   Q    And you agree it would not be proper to award a number

11   for trade secrets and a number for copyrights, true?

12   A    I agree with that.  That would be double-counting.

13   Q    Now, in all of your examination of MGA's books and

14   records, did you ever find a skew for selling the Carter

15   Bryant drawings?

16   A    No.

17   Q    So the money you are asking for was not for selling

18   copies of the Carter Bryant drawings?

19   A    I don't think they were for sale.

20   Q    What MGA sold was products?

21   A    That I agree with.

22   Q    And your calculation for unjust enrichment for trade

23   secret includes all of the products that MGA ever sold,

24   right?

25   A    No, that had the Bratz name.  No, there is plenty of

1    products MGA sold.  I am not asking for unjust enrichment.

2    Q    Every product that had the Bratz name on?

3    A    Correct.

4    Q    And not only the products but all the licensing

5    royalties that MGA received as well, right?

6    A    That's true.

7    Q    So all of those licensees who manufactured product and

8    paid royalties to MGA -- you are asking to discorge all

9    those royalties based on the efforts of all those licensees?

10   A    Royalties less the costs involved in the licensing

11   program, yes.

12   Q    The costs of licensing are generally pretty low?

13   A    Yes.  The profit margins in licensing are normally very

14   high.

15   Q    That's a big number?

16   A    As a percentage of sales, yes.

17   Q    That's based on products manufactured by the licensee,

18   right?

19   A    That's true.  It's not the profit the licensees earn,

20   though.  It's only the royalty stream coming back to MGA for

21   the use of the Bratz licenses, names, logos, et cetera.

22   Q    Now, your $3.4 billion includes all of the sales of

23   Bratz Boys, right?

24   A    It does.

25   Q    Can you find Bratz Boys in Exhibit 302, the Carter

1   Bryant pitch book, for me?

2   A    I don't believe it's in there.

3   Q    Your $3.4 billion in revenues, that includes all of the

4   revenues of Little Bratz?

5   A    Yes.

6   Q    And that's not in the pitch book either, right?

7   A    I am not recalling that in the pitch book, no.

8   Q    And your calculation of unjust enrichment includes all

9   the profits on Bratz Pets, right?

10  A    It does.

11  Q    And Bratz Pets, that's not in the pitch book, right?

12  A    I would have to go back and look but probably not.

13  Clearly not all of them are in there.  That's true.

14  Q    In fact, there is no pets in the pitch book?

15  A    I would have to have my memory refreshed.

16  Q    Could we give the witness Exhibit 302, please?

17  A    Does this contain all 64 of the drawings.

18  Q    No.

19  A    Then I couldn't answer your question.

20  Q    Do you think that Carter Bryant drew Bratz pets?

21  A    I have some recollection of seeing some drawings with a

22  pet, but that's just my best recollection.

23  Q    Does your unjust enrichment number for trade secrets

24  include all of the Bratz accessories?

25  A    They do.

```
 1   Q    For example, it includes the FM Cruiser and the FM
 2   Limo?
 3   A    They do.
 4   Q    Do you find the FM Limo anywhere in Exhibit 302?
 5   A    I don't think so.
 6   Q    Your unjust enrichment for the trade secret is includes
 7   all of the non-doll products, housewares, bicycles, sleeping
 8   bags, DVDs, movies, all of it?
 9   A    As I told you before, I included all products with the
10   Bratz name.
11   Q    And all of the profits from those products you have
12   included in your calculation of unjust enrichment?
13   A    Before apportionment, yes.
14   Q    So you are attributing all of the value before
15   apportionment -- all of value of those products before
16   apportionment to the trade secrets, right?
17   A    Correct.
18   Q    But there is no value in Carter Bryant's drawings if he
19   just sticks them in a drawer?
20   A    I agree with that.
21   Q    Those drawings are only valuable if they are
22   commercially exploited?
23   A    That's true.
24   Q    Now, you do agree that MGA was able to accomplish a lot
25   without Carter Bryant, right?
```

```
1              MR. PRICE:  Objection, ambiguous.
2              THE COURT:  Overruled.
3              THE WITNESS:  Do you mean in connection with Bratz
4    or with their other product lines?
5    BY MS. HURST:
6    Q     In connection with Bratz.
7    A     I think they did add some value to Bratz, yes.
8    Q     MGA developed different themes for Bratz dolls, right?
9    A     They did.
10   Q     MGA developed new characters for Bratz dolls?
11   A     That's true as well.
12   Q     New fashions?
13   A     Yes.
14   Q     Hair styles?
15   A     They did.
16   Q     In fact, many of the Bratz branded products that you
17   have included in your trade secret unjust enrichment
18   analysis were developed without any input from Carter Bryant
19   whatsoever?
20   A     I agree with that statement.
21   Q     Now, you have seen a number of Mattel documents in this
22   case where Mattel agrees that MGA put value in Bratz, right?
23   A     I have.
24   Q     You have seen Mattel documents talking about the
25   successful brand positioning of Bratz?
```

```
 1   A    I have seen such a document.

 2   Q    You have seen Mattel documents talking about great

 3   marketing and advertising strategies by MGA?

 4   A    At some points in time, yes.

 5   Q    In fact, the Bratz brief is such a document?

 6   A    In fact, that Bratz brief extols in Mattel's view the

 7   virtues of MGA in selling its products?

 8   A    Well, as to the author of that document.  I can't tell

 9   you whether that is Mattel's view, but clearly the author

10   who was a Mattel employee believed that when they wrote the

11   document.

12   Q    If you knew that that document was commissioned by CEO

13   Bob Eckert, you wouldn't quarrel with it would you?

14   A    That's a better question for Mr. Eckert, but I don't

15   believe he reviews everything that's shown to him in

16   writing.

17   Q    You didn't put very much reliance on the Bratz brief in

18   coming to your opinions did you?

19   A    I would say I did.

20   Q    You took into account the part where it discussed MGA's

21   successful marketing and advertising?

22   A    Yes.

23   Q    And you did all of that through your benchmark

24   yardstick methodology?

25   A    I did.
```

```
1    Q    But not in any other way, true?

2    A    That's where I captured that information, yes.

3    Q    Only in the benchmark, right?

4    A    Right.

5    Q    You have seen Mattel documents describing how MGA's

6    packaging is particularly good?

7    A    I have.

8    Q    You have seen Mattel documents saying that it's

9    particularly appealing to older girls, right?

10   A    I think early in this damage period I saw documents

11   that reflected that, yes.

12   Q    You have seen Mr. Eckert's what happened to Barbie

13   e-mail talking about Bratz offering high piece counts and

14   high retail margins.  Those are both successful strategies

15   for MGA as well?

16   A    Well, clearly high retail margins is the result of the

17   success of the product, and that is attributable to all the

18   factors.  For example, you can have a great sales force and

19   do great marketing, but if they have a lousy product, they

20   don't make a lot of sales.  If you have good product, it

21   doesn't take a genius to do great marketing, but, yes, I

22   have seen that.

23   Q    Clearly it's possible to fail when trying to make an

24   edgy, hip, fashion doll targeted to the older girl market?

25   A    I agree with that.
```

1  Q    It's possible for the greatest toy company in the world

2  to fail at doing that?

3  A    It is.

4  Q    Now, we have been talking about your trade secret

5  unjust enrichment profits number, which includes every Bratz

6  branded item ever sold by anybody, right?

7  A    We have talked about that, yes.

8  Q    Now let's talk about the copyright revenues for a

9  moment.  Do you have that in mind?

10  A    I do.

11  Q    Now, in that calculation, you have included what you

12  call the core fashion dolls with the original Bratz sculpt,

13  right?

14  A    That's what I tried to capture, yes.

15  Q    Can you tell us what that sculpt is exactly?

16  A    It's one of these two sculpts that you showed me on the

17  stand.

18  Q    Neither of those sculpts was ever in a product was it?

19  A    I don't know that level of detail.

20  Q    So you actually don't know what the Bratz sculpt is

21  that's in all those core fashion dolls?

22  A    I don't.  I think that's a liability question.

23  Q    You just assume that to be true?

24  A    Well, based on the testimony of Ms. Garcia and

25  Mr. Larian as to which dolls in the core fashion area do not

```
 1    include the original sculpt, and that's the basis for my
 2    numbers.
 3    Q    Isn't it true there are two original sculpts?
 4    A    I know that there are two sculpts that are being
 5    alleged as trade secrets, and I believe they are the ones
 6    that you showed me.
 7    Q    I am talking about the final production sculpts that
 8    were actually used in the first generation and subsequent
 9    core fashion dolls.  Isn't it true that there were two of
10    those?
11    A    You are giving me facts that I am not aware of.
12    Q    Isn't it true there was a difference between the two
13    original production sculpts?
14    A    I wouldn't know.
15    Q    And you don't have any idea what the difference between
16    those two sculpts is?
17    A    I do not.
18    Q    But all of the female fashion dolls using those
19    original sculpts have been included in your profit
20    calculation, true?
21    A    Correct.
22    Q    Now, MGA never sold the black production sculpts to the
23    public?
24    A    They're not for sale.  I agree.
25    Q    Remind me what your profits calculation was.
```

```
1    A    $261 million.

2    Q    This was not $261 million worth of do-it-yourself

3    fashion dolls?

4    A    Clearly not.

5    Q    So your calculation of profits on the core female

6    fashion dolls includes everything that was in the box,

7    right?

8    A    Correct.

9    Q    It includes -- well, let me back up a second.  Also,

10   that's not just the first generation of dolls, right?

11   A    That calculation includes more than the first

12   generation.

13   Q    And in the profits on the first generation, that was

14   about $23 million did you say?

15   A    I think it's about $30 million.

16   Q    I think the $30 million is the first generation plus

17   two?

18   A    You are correct.  I'm sorry.  I think it was $27

19   million.

20   Q    $27 million for the first generation of dolls?

21   A    The first four dolls.

22   Q    The ones closest in time to Carter Bryant's drawings?

23   A    Correct.

24   Q    But you have included all of the dolls for nine years,

25   right?
```

```
1    A    Yes.  I think it goes for nine years.  I don't think

2    there is any 2010, but I do believe there are sales for nine

3    years for some of the SKUs.

4    Q    Before applying your benchmark methodology, you have

5    not deducted any value for the face paint on the black

6    sculpt?

7    A    That's true.

8    Q    You have not deducted for hair color and style?

9    A    Before apportionment, that's correct.

10   Q    You have not deducted for doll names?

11   A    That's true.

12   Q    You haven't deducted for the fashions?

13   A    That's correct.  I have not apportioned for that before

14   the apportionment analysis.

15   Q    You haven't deducted for the accessories sold in the

16   package?

17   A    That's correct.

18   Q    Not for the purses, shoes, jewelry, and all the little

19   chaskies (phonetic) in there?

20   A    Is that different than accessories?  No, I haven't done

21   that either.

22   Q    You have not deducted for the themes?

23   A    That's true.

24   Q    You haven't deducted for the value of the packaging?

25   A    That's true at that stage in my calculation.
```

1   Q     At that stage in the calculation, you haven't deducted

2   for the value of having the Bratz brand on there to act as a

3   guarantor of the quality of the product, true?

4   A     That's true.

5   Q     Let me ask you to look at one of these dolls.  Do we

6   have be Exhibit 17369, Tokyo-A-Go-Go Fiana?

7             THE COURT:  You are going into copyright?

8             MS. HURST:  Yes, Your Honor.

9             THE COURT:  Not trade secret misappropriation.

10  BY MS. HURST:

11  Q     This is one of the dolls that you have included in your

12  core female doll profit calculation?

13  A     That's true.

14  Q     Just take a look at that, and I want you to look at

15  Exhibit 1136, that gray sculpt.  It's also still there on

16  the desk in front of you.

17            MR. PRICE:  Objection.  It goes to liability.

18            THE COURT:  If it's in the copyright area -- if

19  the expert is testifying that he is going beyond the first

20  six dolls --

21  BY MS. HURST:

22  Q     Have you gone beyond the first six dolls in calculating

23  your profits for copyright?

24  A     For all the dolls using the original sculpt, yes.

25  Q     Have you gone beyond those first four plus two,

```
 1   Ooh-La-La Cloe and Formal Funk Dana in calculating?

 2   A     Yes, for all the dolls that used the original sculpt.

 3   Q     And the original sculpt -- you said you are not sure

 4   exactly what that is?

 5   A     Correct.

 6   Q     But it's definitely not that gray thing?

 7   A     I see similarities between –

 8           MR. PRICE:  Objection.  We are getting into

 9   liability.

10           THE COURT:  Overruled.

11   BY MS. HURST:

12   Q     Let me make sure I understand.  You have never seen

13   that gray thing before today?

14   A     I have just seen the picture of it.  I have seen a

15   two-dimensional depiction of this sculpt before today.

16   Q     Do you see any face paint on that gray sculpt?

17   A     No.

18   Q     There is no hair on it?

19   A     There is no hair.

20   Q     There is no fashions on it?

21   A     Clearly not.

22   Q     No shoes, no purses?

23   A     No.

24   Q     True?

25   A     That's true.
```

```
1   Q    There is no theme on that gray thing?
2   A    I don't think there is a theme on the gray thing.
3   Q    Certainly nothing like Tokyo-A-Go-Go?
4   A    That's true.
5   Q    What about the other one, 1141?  None of those elements
6   are present on 1141?
7   A    My answers would be all the same.
8   Q    But in your copyright profits calculation, you have
9   included all of those elements of value, true?
10  A    That's true before apportionment.
11  Q    And you think your apportionment methodology takes into
12  account all of the value that MGA created in going from the
13  gray thing to Tokyo-A-Go-Go Fiana?
14  A    That and more in my opinion, yes.
15  Q    Those sculpts are also part of the trade secret claim?
16  A    They are.
17  Q    On the trade secret claim, as you have indicated on
18  your Slide 25, you think the damages award should be to
19  Mattel -- that MGA should pay to Mattel somewhere between
20  $365 million and almost $597 million, right?
21  A    Correct.
22  Q    You also -- let me take a step back.  For the benchmark
23  companies, you used a measure of profitability called
24  earnings before interest and taxes, right?
25  A    I did.
```

1   Q    And you took all of the product lines of those

2   companies, not just one, right?

3   A    That is correct.

4   Q    And you took all of the expenses of those companies

5   before interest and taxes, right?

6   A    I did.

7   Q    And that's how you came up with the profit number that

8   you used for the benchmark comparison, true?

9   A    I did.

10  Q    Now, you have also calculated MGA's earnings before

11  interest and taxes, right?

12  A    I did on an incremental basis.

13  Q    Well, I am talking about the total company's earnings

14  before interest and taxes.

15  A    Yes.  MGA, yes.

16  Q    All of MGA?

17  A    Yes.

18  Q    And you found that number to be $385.6 million, true?

19  A    There are a lot of numbers in my head.  That's not one

20  I memorized, but it sounds right.

21  Q    It sounds about right to you?

22  A    Yes.

23  Q    Can we see Slide 25?

24       MR. PRICE:  Objection, we have never seen any

25  version of this slide before today.

```
 1              MS. HURST:  It's their slide.
 2              MR. PRICE:  They are adding to it I believe.
 3              THE COURT:  Well, I don't know counsel.  I will
 4    take your representation for it.
 5              MS. HURST:  Thank you.
 6              THE COURT:  Counsel, this is her time now.
 7    BY MS. HURST:
 8    Q    You see that's your Slide 25 with a white box added on
 9    the side?
10    A    Correct.
11    Q    Other than that white box, it's all the same as your
12    slide was?
13    A    Yes.
14    Q    All I have done is add a white box with a number that
15    you just gave me that you calculated?
16    A    Correct.
17    Q    Now, you actually think it would be way too generous to
18    MGA to leave it with $423.7 million under the Mattel
19    calculation, right?
20    A    I do.
21    Q    So what you are asking the jury to do is to award to
22    Mattel an amount of profits that is actually more than MGA's
23    total earnings before interest and taxes for the entire
24    period, correct?
25    A    That's absolutely correct.
```

```
 1   Q    But when you are feeling generous, you will leave us
 2   $20 million, right?
 3              MR. PRICE:  Objection.  Argumentative.
 4              THE COURT:  Sustained in its present form.
 5   BY MS. HURST:
 6   Q    If you were to provide what you consider to be the most
 7   favorable calculation to MGA, that would leave MGA with
 8   $20 million for ten years of work at the end of the day?
 9              MR. PRICE:  Same objection.
10              THE COURT:  Overruled.
11              THE WITNESS:  That is correct.
12   BY MS. HURST:
13   Q    Now, when you made this comparison, you did not compare
14   that MGA total company even number to the total company even
15   numbers of the other companies?
16   A    I did not.
17   Q    You compared what you called the Bratz product line
18   incremental profits to those total company numbers?
19   A    That's exactly what I did.
20   Q    In the Bratz incremental profit calculation, you
21   allocated only some of the company's expenses to the Bratz
22   product line, correct?
23   A    That's a fair estimate.
24   Q    But for the benchmark companies, you included all of
25   their expenses in those same categories, true?
```

1    A    Intentionally so, yes.

2    Q    So, for example, in the case of Mattel as a benchmark,

3    you deducted its out-of-pocket legal expenses related to

4    this lawsuit?

5    A    That would be true.

6    Q    You deducted its out-of-pocket legal expenses related

7    to losses for product recalls on lead paint?

8    A    That would be true.

9    Q    You deducted its expenses for lawsuits related to

10   product recalls for magnets, true?

11   A    Those would be included in my figures.

12   Q    You deducted its out-of-pocket expenses for its

13   shareholder lawsuits for delays in reporting to the Consumer

14   Product Safety Commission?

15           MR. PRICE:  Objection.

16           THE COURT:  Overruled.

17           THE WITNESS:  I believe those expenses are

18   included in my analysis.

19   BY MS. HURST:

20   Q    But you did not include MGA's out-of-pocket expenses

21   for this lawsuit?

22   A    That's true.

23   Q    Now, if you had wanted to, you could have compared

24   Barbie incremental profit to Bratz incremental profit?

25   A    I certainly have that capability.

```
 1              THE COURT:  Just a moment.  I want to remind the
 2   jury some of these factors given by either counsel on direct
 3   and cross may be hearsay.  In other words, an expert can
 4   actually rely upon hearsay, things they have read and heard,
 5   in forming their opinion, but they are not being given for
 6   the truth of the matter asserted.
 7   BY MS. HURST:
 8   Q    If you wanted to compare just the Bratz incremental
 9   profit with the Barbie incredible profit, you could have
10   done that?
11   A    I could, yes.
12   Q    And if you wanted to compare total MGA company earnings
13   before interest and taxes to total earnings before interest
14   and taxes of the other comparison companies, you could have
15   done that as well?
16   A    Certainly I had the capability of doing that.
17   Q    Now, by comparing the single product line Bratz
18   incremental profits to the total companies, you did not take
19   into account that MGA had relatively lower marginal costs
20   for its products, true?
21   A    I don't understand the question.
22   Q    If MGA was more efficient on a single product line
23   basis with respect to Bratz, by using the total company
24   expenses for the comparative expenses companies, you didn't
25   give it the benefit of that efficiency?
```

1    A    That's true.

2    Q    Lower marginal costs for MGA would mean MGA was

3    especially efficient, right?

4    A    Generally you could equate those two concepts, yes.

5    Q    Being especially efficient would lead MGA to have

6    enhanced profitability, right?

7    A    Everything else being equal, that is the normal result.

8    Q    You didn't think there was any evidence that MGA was

9    especially efficient did you?

10   A    I don't remember saying that.  I was aware of certain

11   things that they seemed to be efficient in.  As to others,

12   they were less efficient, but I analyzed their actual

13   incremental profitability, so whatever it is, I took it into

14   consideration.

15   Q    Show the witness Exhibit 36021, please.

16          MR. PRICE:  Objection.  This is a demonstrative

17   that we haven't seen in any form ever.

18          THE COURT:  The hasn't seen it either.  I don't

19   know what that is, Counsel.  I haven't seen it.

20          MS. HURST:  Those were numbers that we used at the

21   hearing the other evening, Your Honor.  They have seen this

22   all before.

23          THE COURT:  Is that what you just put up?  I don't

24   even know what it is, Counsel.  I have to be shown the

25   document before the jury considers it.

```
 1              MS. HURST:  Can I ask the witness if he recognizes
 2    it?
 3              THE COURT:  No, not until I see it.  That's the
 4    standing rule.
 5              This came in the other evening?  This is my memory
 6    as well.
 7              MS. HURST:  Yes.
 8    BY MS. HURST:
 9    Q    Do you have Exhibit 36021 before you?
10    A    I do.
11    Q    Do you recognize the first nine columns, not the final
12    column but the first nine columns, as numbers coming from
13    your various schedules that you prepared in this matter?
14    A    Yes.
15    Q    Those are the various profitability percentages that
16    you calculated by year for both Bratz, Barbie, and then for
17    the total companies, correct?
18    A    Correct.
19    Q    And then I just added a column on the end there
20    "Averaging," right?
21    A    Yeah, but can you tell me whether it's a simple average
22    or a weighted average?
23    Q    It's just a simple average because I didn't think you
24    brought your calculator with you today.
25    A    I came prepared.  I couldn't do that calculation with
```

1   this calculator.

2   Q    I will just ask you to assume the simple average for

3   the purposes of my questioning.

4   A    That's fine.

5   Q    We were talking about -- let's talk about the bottom

6   row there, the Barbie incremental profit average to the

7   Bratz incremental profit average.  Let's just look at that.

8        The Bratz incremental profit average over the entire

9   period of time, 2001 to 2009, just a straight line average

10  across the period with these numbers, is 23.7 percent?  Does

11  that look right to you?

12  A    I think it probably is right.  I can tell you what the

13  weight average number is because that's the right number to

14  use.  That's 22 percent.  It's possible 23.7 is the simple

15  average.

16  Q    22 percent is the weighted average?

17  A    Yes, that's what I calculated for Bratz?

18  Q    Have you calculated the weighted average for Barbie as

19  well?

20  A    I have.

21  Q    And what's that?

22  A    32 percent.

23  Q    You actually think the weighted average is the better

24  number?

25  A    It's clearly the right number to use.

1    Q     Did I get that right, 22 and 32?

2    A     You did.

3    Q     All right.  Now, if you had compared these

4    profitability percentages between Bratz and Barbie, you

5    would have found no excess profitability for Bratz?

6    A     That's true.

7    Q     And then there would be no damages number for Mattel?

8          MR. PRICE:  Objection.  Vague as to which

9    calculation.

10         THE COURT:  Overruled.

11   BY MS. HURST:

12   Q     If you had used that as your benchmark, then there

13   would be no damages award for Mattel, true?

14   A     Under unjust enrichment, that's correct.

15   Q     Now, your benchmark methodology assumes that there is

16   some condition causing Bratz to be excessively

17   profitability, right?

18   A     Correct.

19   Q     Basically you assumed that it was the intellectual

20   property in this case?

21   A     That's my assumption.

22   Q     It's up to the jury to decide whether that's right or

23   not?

24   A     I believe that is their prerogative.

25   Q     You did not look for another explanation for this

1   so-called excess profitability did you?

2   A    That's incorrect.

3   Q    You think you looked for other explanations?

4   A    Yes.

5   Q    Is it true that your data shows that at the beginning

6   of this period of time Mattel had more than 90 percent of

7   the fashion doll market?

8   A    I believe that's accurate.

9   Q    You agree with me that Mattel had a monopoly in the

10  fashion doll market at the beginning of the period?

11          MR. PRICE:  Objection.  Calls for a legal

12  conclusion.

13          MS. HURST:  Overruled.

14          THE WITNESS:  I believe they had a legal monopoly

15  at that point in time, yes.

16  BY MS. HURST:

17  Q    It's usually true that monopolists can set their prices

18  higher because of the absence of competition?

19  A    Depending on how you define the market, that may be

20  true.  It may not.

21  Q    When a monopolist can set higher prices because of an

22  absence of competition, it gets extra profits, right?

23  A    That's generally the result, yes.

24  Q    And when a second company comes tip-toeing into the

25  market and sets its price at the same place, it gets a share

1  of the excess profits, right, Mr. Wagner?

2  A    Those aren't the facts of this case, but I could see

3  that situation happening, yes.

4  Q    That would be basic economy theory wouldn't it?

5  A    Yes.

6  Q    Now, you didn't do an economic analysis of the

7  structure of the fashion doll market in your opinions did

8  you?

9  A    I did parts of my calculation as to that, so I disagree

10  with that statement.

11  Q    Did you calculate supercompetitive profits for Barbie

12  monopolists?

13  A    No, I didn't go to that level of analysis to compare

14  the Barbie profitability with the rest of their products.  I

15  do know that they are generally higher, but during this

16  period of time with competition from Bratz, they were lower.

17  Q    Isn't it true that if you assume this was a monopoly

18  market and MGA came along and set its prices at about the

19  same level that that would explain the excess profitability,

20  Mr. Wagner?

21  A    But those aren't the facts of this case.  The facts are

22  that actually MGA charged higher prices than Barbie, which

23  is unheard of.  You are taking market share away from the

24  market leader with higher prices?  That's unprecedented, so,

25  no, I don't agree with the characterization in your

1    question.

2    Q    You understood I am asking you a hypothetical question?

3    A    I do, but I am trying to get hypotheticals that are

4    tied to the facts of this case.

5    Q    Let me try this again.  If you assume that Mattel was a

6    monopolist at the beginning of the period -- do you have

7    that assumption in mind?

8    A    I do.

9    Q    And it was earning excess profits because it was a

10   monopolist -- do you have that assumption in mind?

11   A    I do.

12   Q    MGA came along and set its prices at about the same

13   rate, and it was able to share in those profits as well.  Do

14   you have that assumption in mind?

15   A    I do.

16   Q    Then that would explain the excess profitability?

17   Isn't that true, Mr. Wagner?

18   A    That's part of the explanation.  Yes, I agree with

19   that.

20   Q    Now, when you compare to -- the one thing that Barbie

21   and Bratz both have in common that we know that we can all

22   agree on is that they are both fashion dolls?

23   A    I think everyone would agree to that, yes.

24   Q    And they were both sold in that fashion doll market?

25   A    Yes.

```
 1   Q    And Jakks wasn't selling fashion dolls in the fashion
 2   market?
 3   A    No.
 4   Q    Hasbro wasn't selling popular fashion dolls in the
 5   fashion market?
 6   A    No, not what I would call fashion dolls.
 7   Q    None of those 17 companies that you used for your
 8   benchmark had popular fashion dolls in the fashion doll
 9   market?
10   A    I don't think I would agree with that statement.
11   Q    You don't know?
12   A    There are other sellers of fashion dolls besides Mattel
13   and MGA, and those would be included in the 17 other
14   companies.
15   Q    Did you look at whether those particular product lines
16   also had what you would call excess profits?
17   A    I didn't isolate out their fashion dolls from their
18   other products.
19   Q    Now, you calculated a number for Mr. Larian of about
20   $384 million; is that right?
21   A    That's correct.
22   Q    And that money comes out of the pot of MGA profits,
23   true?
24   A    Yes.
25   Q    So there is duplication?  There is overlap there?
```

```
 1    A    Clearly.  Again, that was duplicate numbers.  The jury
 2    should not award both.
 3    Q    Now, MGA is a Subchapter S corporation?
 4    A    That's true.
 5    Q    A Subchapter S corporation does not pay income taxes?
 6    A    It does not.
 7    Q    The shareholders have to pay the taxes for the company,
 8    right?
 9    A    No.  The shareholders would have to pay the taxes but
10    not for the company.  They are given K-1s, and they are
11    responsible for the taxes for the profits of the company.
12    Q    So together the shareholders in the company have an
13    obligation to pay taxes?
14    A    I think it's just the shareholders.
15    Q    In this case, Mr. Larian had an obligation to pay taxes
16    on the distributions, true?
17    A    That's true.
18    Q    And you have actually found that the total amount
19    distributed to shareholders to meet tax liabilities is about
20    $130 million through 2005?
21    A    That sounds right.
22    Q    You did not lower the distribution for Mr. Larian to
23    take that into account?
24    A    That's absolutely correct.
25    Q    Now, you don't actually have those profits in hand when
```

1    you send them off to the IRS to pay for tax liabilities?

2    A    If it's a check for the distribution, it's straight to

3    the IRS.  You do not get the cash in your bank account.

4    That's correct.

5    Q    The number -- that $384 million number that you came up

6    with for Mr. Larian, you have not allocated that between

7    trade secrets and copyrights, true?

8    A    Just to trade secrets.

9    Q    You haven't provided any way to break that down among

10   the different trade secrets?

11   A    That's true.

12   Q    You haven't provided any way to break that down amongst

13   the various products, true?

14   A    I have not.

15          MS. HURST:  Your Honor, would this be a convenient

16   breaking point?

17          THE COURT:  This is a good time.

18          Ladies and gentlemen, you are admonished not to

19   discuss this matter amongst yourselves nor to form or

20   express anything concerning the case.  Have a nice evening.

21   We will see you promptly tomorrow at 8:30.

22          Mr. Wagner, you may step down, sir.

23          (Jury not present.)

24          THE COURT:  I just want to start with the time and

25   where we are at and put the calculation on the board

 1    concerning the time used by both parties, and then I want to

 2    get a calculation of the accuracy of about how much time is

 3    left.

 4              (Recess.)

 5              THE COURT:  We are back on the record.

 6              It seems to have caught Mattel by surprise, Mr.

 7    Zeller, that counsel was referring to 9801-1, which was

 8    filed literally in mid February with the Court.

 9              What additional document are you referring to?

10              MR. ZELLER:  I will get the docket number.  We

11    have it here.  It's the one that Mr. Quinn referenced when

12    he said that we always thought it was quite clear that what

13    we were talking about was the Carter Bryant concept.  We

14    then provided the Court a corrected version, and it says

15    that.  It says it very clearly, and they omitted that

16    language.

17              THE COURT:  Go get it for me.

18              MR. ZELLER:  Yes.  It's Docket No. 10034.  I have

19    a copy for the Court.

20              THE COURT:  Just a moment.  Now, what gave you the

21    right to amend?  I would like to see the number because this

22    is a constantly moving target.  Allowing you even a filing

23    in mid February, I think is very gracious by the Court.  Our

24    last chart filed that we have been operating on was

25    February 5, 2011.  I don't recall ever granting --

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MR. ZELLER:  Your Honor, this was discussed with

 2   Mr. Quinn and the Court previously.  It was after MGA began

 3   to misuse and misstate what our position was, so we stated

 4   we provided this additional document to state unambiguously.

 5   It doesn't prejudice MGA.  It couldn't possibly do so.  It

 6   was always the premise on which we proceeded.  It's only now

 7   we are trying to make express what was known all along.

 8              THE COURT:  Did I grant this?  I don't recall ever

 9   granting this.

10              I remember discussions with you, Mr. Quinn, so

11   let's make the record clear between us.

12              MR. QUINN:  The discussion proceeded as if that

13   was our then current statement of that bucket, and then the

14   Court later distributed draft jury instructions which

15   includes that language.  It's just preparatory language

16   about the particular doll line that Carter Bryant brought

17   comprising --

18              THE COURT:  This was an initial distribution, and

19   this was based on Docket No. 9801, so read it.

20              MR. QUINN:  Your Honor, it's correct.  That

21   preparatory language that I referred to is not in this

22   document.

23              THE COURT:  And it was never intended to be.

24   That's what I distributed.  That's what I wanted indicated.

25   I have never signed any amendment regarding anything else
```

 1    other than 9801.

 2            I don't really understand, Mr. Zeller, you jumping

 3    to the lectern and then inferring that there is another

 4    document signed by this Court.  That document has been on my

 5    table since I drafted it and distributed it to counsel.

 6    This did not come as a surprise.

 7            MR. ZELLER:  I didn't jump to the lectern nor I

 8    did I suggest that the Court signed an order.

 9            THE COURT:  Let's pass through that.  This is the

10    document that you are working off of.

11            Ms. Hurst, what did I just say?

12            MS. HURST:  9801 is the document that the Court

13    will be working off of.

14            MS. HURST:  Any modification I made to the

15    distributed tentative jury instruction I showed you.  I

16    don't think that there is any modification except for maybe

17    a few words.

18            MS. HURST:  I agree.

19            THE COURT:  Mr. Quinn, what did I just say?

20            MR. QUINN:  That the document you are holding

21    there -- I can't remember the number -- is the one that we

22    are going to be working off.

23            THE COURT:  Now, the second thing is where do you

24    stand in terms of time that is left to you, Mr. Price,

25    because I am going to get you and Ms. Hurst out of here this

78

1    evening because you are on the firing line tomorrow, and I
2    want to give you both some rest?
3            MR. PRICE:  I have about been told I used an hour
4    and 38.
5            THE COURT:  Well, if there is a disagreement, I
6    can have the court reporter check it out.  I am going to
7    accept that.
8            MS. HURST:  That sounds about right.
9            THE COURT:  How much time have you used?
10           MS. HURST:  I have got an hour and 15.
11           THE COURT:  That you used?
12           MS. HURST:  Yes.
13           THE COURT:  So you each have two hours and 20
14   minutes.  You can divide that proportionally.
15           THE COURT:  Last night I ordered some e-mails.
16           MR. MCCONVILLE:  There were none.
17           THE COURT:  Okay.
18           Where do we stand in terms of total time?  Let's
19   go over this again.  Are we about on schedule?
20           MS. HURST:  Yes.  We are slightly ahead of
21   schedule I believe.
22           MR. ZELLER:  No, we are not.
23           THE COURT:  I didn't think so.
24           MR. ZELLER:  Let me say this, the Court has just
25   ordered that we will rest on Thursday.  It has now created a

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

 1   condition which will ensure that we do not get our documents

 2   in.  As you know, MGA is refusing to stipulate to the most

 3   basic fundamental documents in this case, which means we

 4   will have to call an MGA custodian of records.  That's going

 5   to be time-consuming.  That's going to be wasting time.

 6   That's something that is entirely within MGA's hands.

 7   Apparently since the Court is now saying we are not going

 8   beyond Thursday, it means we are going to be cut off on our

 9   case.

10            THE COURT:  MGA.

11            MR. MCCONVILLE:  We think we are on schedule.  We

12   actually think we will come in a little under budget.

13            THE COURT:  What about this problem that keeps

14   occurring that Mr. Zeller concerned about?  I want to hear

15   the difficulty once again on the record because I have heard

16   it informally.  The request made by Mattel MGA perceives is

17   overly broad.  It has put them in a box.  It was represented

18   to me informally -- and I don't know if we have a good

19   record -- that you want to stipulate to the foundation.

20            MR. MCCONVILLE:  Correct.

21            THE COURT:  I want to get this on the record so

22   the Circuit understands what is happening.  Although I don't

23   wish to harm your case, these people can be called back also

24   during MGA's case.  The point is, Mr. Quinn, and, Mr. Price,

25   I don't want you to finish ending on a low note.  By the

1    same token, I want you to end on a high note.

2              In other words, if it doesn't harm Mattel, then

3    it's ridiculous that Sonja Luther can't testify with the

4    agreement we have made getting her in here on Friday.  So

5    then I don't mind Mattel being disturbed over some

6    foundational issues.  In fact, I am not going to punish

7    Mattel for a foundational issue when MGA can use their time

8    getting people in here, so you end on high note.

9              Do you understand that, Mr. Zeller?

10             MR. ZELLER:  I do.

11             THE COURT:  Quibbling over the foundation and

12   using time for that so that Sonja Luther can't testify is

13   where I draw a tremendous difference.

14             MR. ZELLER:  The quibbling is by MGA.

15             THE COURT:  Let's get a full record of this now.

16   Let's begin with, Mr. Zeller, and what you are willing to

17   stipulate to.  I think you are both right.  This is the one

18   loose end that wasn't tied up.

19             MR. ZELLER:  Well, there is more than that.  The

20   Carter Bryant drawings, which MGA said months ago it would

21   stipulate to the admissibility of, it still has not done so.

22             THE COURT:  We will take them one by one.  Where

23   do you want to start?  I am getting copies of the documents.

24             MS. HURST:  Carter Bryant's drawings were already

25   admitted.

1        THE COURT:  That was my understanding also.  Let's

2   get this all sorted out.

3        MS. HURST:  He took the binder home.  He looked at

4   it.  He came back and testified the following day that they

5   were all his documents, and they were admitted.

6        THE COURT:  Let's just start one by one with

7   Carter Bryant's drawings and what hasn't been received and

8   what can't be stipulated to.

9        MR. ZELLER:  Exhibit 513, it is a copyright

10  registration by MGA Entertainment dated December 22, 2003.

11        Exhibit 565 --

12        THE COURT:  Ms. Hurst.

13        MS. HURST:  I am going to go and leave this to

14  Mr. McConville, but I can assure the Court that we are not

15  objecting to the authenticity of a copyright registration.

16        MR. MCCONVILLE:  We are not.  We don't know what

17  the relevance of it is, but --

18        MR. ZELLER:  They are stipulating to the

19  authenticity.  They want to fight about relevance.  They

20  also don't agree that any of this is admissible.  All they

21  are agreeing to is authenticity, which by the way, these

22  were produced by MGA.  Authenticity is established by that.

23  That gives us nothing.

24        THE COURT:  If I receive these, what's the issue?

25        MR. ZELLER:  If it's now in evidence, nothing.

```
 1                THE COURT:  Mr. McConville.  You can argue

 2     that they are --

 3                MR. MCCONVILLE:  Right.  There are a number of

 4     steps that are happening here, which I'm sure we will get to

 5     the parade of horribles of whatever it is we have done to

 6     them, but in essence, we said, yes, it's a copyright

 7     application.  I just don't know that it's relevant.

 8                THE COURT:  I still don't understand the dispute.

 9                MR. ZELLER:  Because MGA initially said -- Mr.

10     McConville said to me that they would agree to the

11     admissibility of the documents except for relevance and that

12     that would be argued to the Court.  Then we got an e-mail

13     that said, oh, no, we are not going to even agree to that.

14     All we agree is that they are authenticate, and that's it,

15     which means in order to get them admitted, we still have to

16     have a witness come in and establish that they are, for

17     example, business records or somehow otherwise admissible.

18                THE COURT:  They are stipulating outside the

19     presence of the jury that basically the foundation has been

20     laid for admissibility, and they are leaving it to each of

21     you to argue the relevancy of it.

22                MR. MCCONVILLE:  There are some documents -- for

23     the vast majority of these documents --

24                THE COURT:  We are going one by one.  What's the

25     problem, Mr. Zeller?
```

83

```
1            MR. ZELLER:  I would move it into evidence.

2            THE COURT:  Received.

3            What's your next one?

4            MS. HURST:  Could we have an offer of proof of the

5   relevance of it before it's received?

6            THE COURT:  Okay, we will back up and then receive

7   it.

8            What's the relevance?  What are we doing here?  It

9   may be highly relevant.  I just don't know.

10           MR. ZELLER:  It is the MGA registration of the

11  Bratz doll scuplture that is at issue in the case.  It has

12  misstatements of dates on it.  It has dates that were later

13  corrected.

14           THE COURT:  Is this the Carter Bryant submission?

15  I thought that was already received, the one that shows

16  Carter Bryant is basically for want of better word perjuring

17  himself?

18           MR. ZELLER:  No, it's a different document.

19           THE COURT:  That's already in evidence isn't it?

20           MR. ZELLER:  I was talking about Exhibit 565.

21  Shall I go back to the first one that's already been

22  received?

23           THE COURT:  Yes.

24           MR. ZELLER:  Exhibit 513 is a Bratz group drawing

25  done where it says.  The name of the author is Carter Bryant
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   registered December 2003.  It has misstated dates on it,

2   dates that were later corrected supposedly.  Again, more

3   conflicting assertions by MGA as to the dates on which

4   certain activities were done with the drawings and the other

5   works at issue in the case.

6               THE COURT:  Okay.

7               MR. MCCONVILLE:  Okay, I understand the relevance.

8   Stipulate to its admissibility.

9               THE COURT:  That's one out of 1,000.

10              (Exhibit 513 received in evidence.)

11              MR. ZELLER:  Exhibit 565, copyright registration

12  by MGA, Bratz doll scup!ture.  Again, it gives conflicting

13  dates and particularly when admitted with other so-called

14  correction forms by MGA.  I would move it into evidence.

15              MS. KELLER:  Here is the problem that I am seeing.

16  In order to avoid using time to put a witness up and discuss

17  these, they want us to stipulate to them.  Some of them have

18  minor errors or even major errors that need to be explained.

19  That puts us in a position if we stipulate to these they are

20  going to stand up and just argue like crazy what these are

21  and a nefarious meaning.

22              That puts us in a position where in return for

23  stipulating that these come in we now have to call a witness

24  to explain them away and burn our time.  If it were just

25  stipulating to something as a housekeeping matter that was

1    something that was not going to really be a serious issue of

2    argument, we would do it.  I am looking at these, and I am

3    seeing where this is going.  This is shifting their time

4    burden onto us and putting -- now we have the burden of

5    explaining these documents to the jury.

6            THE COURT:  Here is the difficulty.  I am very

7    accepting in terms of you getting in a number of documents

8    where Carter Bryant had perjured himself.  I am very

9    reluctant with the, quote, "avalanche" of a significant

10   number of documents unless I have something definable.  What

11   I don't want the jury to do or have to go through is just a

12   whole series of what you believe are miscalculated dates

13   that have no relevance.  That's the problem.

14           The problem isn't their admissibility.  The

15   problem is what are we doing with them?  Is it just a huge

16   stack of papers that counsel then get up and argue that

17   because Carter Bryant perjured himself on this document that

18   MGA has a continuing pattern of lots of other copyrights

19   that are unconnected to Carter Bryant?

20           What is the relevance?

21           MR. ZELLER:  The relevance is -- and you will see

22   these in the other copyright registrations as well -- they

23   make misstatements about the dates.  They then correct them,

24   plus they say, for example, that one work is a derivative of

25   another.  In other words, it came from something else.

1          THE COURT:  I am going to leave this to trial

2     counsel now.  I want to talk to Mr. Quinn.  I don't want

3     your case harmed.  I want you to end on a high note.  Sonja

4     Luther will be testifying whether you have rested your case

5     or not because she is not available, and we are down to the

6     last couple hours.  She will be testifying on Friday.

7          Now, it doesn't have to be Friday morning.  You

8     don't have to rest on Thursday, but she will be on the stand

9     on Friday.  Then if I have to interrupt your case, I will,

10    but I would like not to.  So you don't have to end.

11         Mr. Zeller, if you want to call additional

12    people -- but I think then we are down to -- we will work it

13    out.

14         So, Counsel, you can expect that Sonja Luther

15    whether Mattel rests or not will be on the stand on

16    Thursday -- or Friday, and then I have to interrupt their

17    case, I am prepared to do so.  I hopefully don't get in that

18    position, but that's the record I am making.

19         When, though, on Friday -- there is the question.

20    How long is she going to take to testify?

21         MS. KELLER:  I haven't finished looking at

22    everything, Your Honor.  I think a couple of hours for --

23         THE COURT:  What do you think, Mr. Quinn, and, Mr.

24    Price?

25         MR. PRICE:  I am not sure what they are doing with

1  her.  I know I would like equal time.

2        THE COURT:  You have got equal time.

3        MR. PRICE:  It depends on how much time they take.

4        THE COURT:  If you think we are going to go over

5  to Saturday, I would like to ask the jury if they can.

6        MS. HURST:  If we start at 8:30 with her, there is

7  no reason to work on Saturday and inconvenience the jury.

8        THE COURT:  Well, then I am back in that trap that

9  Mr. Zeller is concerned about, and that is ordering you to

10  finish on Thursday.  I'm not going to do that the more I

11  think about it, but I will probably interrupt your case at

12  that point because I think the essential witnesses quite

13  frankly have been on the stand.

14        MS. HURST:  Your Honor, may I be excused?

15        THE COURT:  Only if you take Mr. Price with you.

16        I'm thinking what we have to cover this evening.

17  I want to talk to counsel.  One, I want to ask once again I

18  want to be absolutely certain that you have had every

19  opportunity over at MGA.  I ordered certain documents

20  pursuant to the in-camera hearing last evening to be

21  produced in light of the testimony.

22        Have you made a thorough search?  Are you

23  satisfied that you have no e-mails the Court requested?

24        MR. MCCONVILLE:  Yes.

25        THE COURT:  Okay.  Is there anything further you

1    would like to say on that issue?  There are two ways to do

2    it.

3                MR. MCCONVILLE:  Right.

4                THE COURT:  And I informed you about it.

5                MR. MCCONVILLE:  Understood.

6                THE COURT:  Mattel hasn't been privy to that, but

7    I know what I said.

8                MR. MCCONVILLE:  Can I have a second?

9                THE COURT:  Yes.

10               (Defense counsel conferring.)

11               THE COURT:  The record should reflect also the

12   Court is taking quite a bit of time -- counsel who testified

13   last evening was extremely courteous.  The Court has made

14   some demands upon MGA in terms of production.  I gave them

15   24 hours.  The Court is only making an additional inquiry to

16   make certain that they had enough time to do a thorough

17   search for what the Court demanded yesterday.

18               MR. MCCONVILLE:  If you have any more questions

19   about the underlying facts, we would like to do that

20   in-camera.

21               THE COURT:  I'm not inviting any additional

22   summary of the facts.  I'm not going to construe the e-mail

23   the way the Court was invited to construe it yesterday.  I

24   think the wording is plain.  I'm prepared to make the

25   ruling.

```
 1              All right, concerning the Paula Garcia e-mail, I
 2    do not view this as advice of counsel.  It is not
 3    privileged.  I invited e-mails -- in fact demanded e-mails
 4    pursuant to some testimony last evening.  The interpretation
 5    the Court was asked to infer or make is not appropriate.
 6    The plain wording is, "Make sure Paula is prepped and
 7    doesn't know that Veronica was using Mattel seamstresses."
 8    In addition to that, after hearing the testimony, if I
 9    construed it the way I was asked to last evening, I would
10    have expected e-mails or communications between counsel
11    involved and the different entities who were to being
12    contacted.
13              I think that that record will simply remain
14    sealed.  You have got this e-mail at your disposal now.
15              MR. QUINN:  As the Court knows, we have been
16    trying to use that since before opening statement.  This has
17    been a subject of long consideration by the Court multiple
18    times.  Before we close, we would now like to recall
19    Mr. Larian and have a chance to question him about that.
20              THE COURT:  You may.  You may do that for about
21    five minutes.  In other words, it will be limited to that
22    area.  It won't be an undue consumption of time.
23              MR. QUINN:  Understood.  Your Honor, I understand
24    there is a separate e-mail that he sent to Mr. Holden.  May
25    we ask that that be produced to us?  We only have the one
```

1    that he sent to himself.

2            THE COURT:  There is a --

3            MR. MCCONVILLE:  Judge, I think the one they are

4    talking about is -- remember it was originally produced in

5    an overwritten format, so they only have where it says I

6    believe to Isaac Larian, and there is no additional

7    information on it.  I believe what they are saying is they

8    want the original --

9            THE COURT:  Well, I have both in front of me.

10   There was a lot of confusion about the time.  The first

11   e-mail that was submitted to me is dated January 19, 2008,

12   at 1:46 p.m.  The second unredacted e-mail that the Court

13   ordered has the e-mail sent from Isaac Larian to Greg

14   Holden, and the time on that e-mail is I believe 13:45,

15   Counsel.

16           MR. MCCONVILLE:  Yeah.

17           THE COURT:  So let's just take a look at both of

18   these for a moment.  On the one I am going to call the

19   redacted e-mail, I have the date Saturday, January 19, 2008,

20   at 1:46 p.m.  You have that document don't you?

21           MR. MCCONVILLE:  That's the one I have, yes.

22           THE COURT:  On the unredacted, I have from Isaac

23   Larian to Greg Holden on January 19, 2008, at 13:45:40.

24           MR. MCCONVILLE:  Your Honor, I don't have that one

25   in front of me.

```
 1              THE COURT:  I am going to hand it to you.  I have
 2    Mr. Holden's response.  This is the original.  I have his
 3    response at 1:54 p.m. on the same date, January 19, 2008.
 4    Correct?
 5              MR. MCCONVILLE:  Yes.
 6              THE COURT:  You are ordered to turn this over to
 7    Mattel.
 8              Now, the second issue is Pootipong.  I am
 9    concerned under 403 that if this Court allows Mattel on such
10    a critical issue to jump to state of mind and bypass
11    Pootipong that the Court has the problem of hearsay.
12              Second, I have a 403 issue concerning the chain of
13    statements made to Mr. Larian to Pootipong to Ms. Rhee.  To
14    avoid the 403 issue of confusion, Mr. Quinn, I am going to
15    allow this testimony concerning Ms. Rhee, but I am only
16    going to allow it if Pootipong is called as well in the same
17    timeframe that Mr. Larian is.
18              I may feel that this also goes to state of mind,
19    but that is a very, very close call by the Court.  Here the
20    confusion that Ms. Keller has been complaining of can be
21    avoided.  There is a very clear record of what was said
22    before.  I think that that presents this to the jury in a
23    fashion so that they can make the determination.  Quite
24    frankly, for the point that Mattel is trying to make, I
25    don't think it really matters, but you may.
```

```
 1            That's my ruling.  Without Pootipong, you are
 2    precluded.  If you're calling Pootipong, you may present the
 3    evidence.  If you're going to do so, my suggestion is you do
 4    it at the same time that Mr. Larian is up on the stand.  I
 5    have always expressed my deep concern.
 6            One of the reasons that the Court delayed was to
 7    see if this was -- I'm not making this finding, but there's
 8    been a somewhat developing pattern as I started to look at
 9    the personalities involved in this case.  Although these
10    decisions aren't tied to one another, obviously I have
11    expressed some concern in the past.
12            So you can reopen in that regard, but it's very
13    limited, and I want to work out the time with you this
14    evening.  This is not going to be, Mr. Price -- I am going
15    to let you ask the questions, but if Mr. Larian doesn't
16    answer them, it's not going to go on.  If he avoids them or
17    makes a statement, there is only so many times you can ask
18    it.  I will give you a little bit of leeway as I did in the
19    first proceeding when he was up on the stand.
20            MR. PRICE:  Your Honor, as to the Paula e-mail,
21    you said about five minutes.  I would request about 15
22    because there are then subsequent documents which will
23    impeach his knowledge, which is one of the reasons we wanted
24    to use that.
25            THE COURT:  I would have to see those documents.
```

```
 1    Right now the answer is no.  I need that fully developed.

 2    It's absolutely limited to this document.  Every time I get

 3    involved in it, I get a new surprise from both sides.

 4              MR. PRICE:  I apologize.  It's testimony

 5    subsequent to that.  I would be happy to tell the Court that

 6    in-camera so you can make a decison as to whether I can have

 7    15 minutes.

 8              THE COURT:  Are there e-mails?

 9              MR. PRICE:  I misspoke.  It was actually testimony

10    that he gave subsequent to sending out that e-mail.

11              THE COURT:  I would have to see that.  I just

12    don't know what you are talking about.  My answer right is

13    no.  Show that to me.  Do it quickly.  Right now you have a

14    limitation on questions concerning any statements he made to

15    Ms. Rhee and the e-mail concerning Mr. Holden of five to ten

16    minutes.

17              MR. PRICE:  I have already asked him about Ms.

18    Rhee.  I think that was pretty fully explored.

19              THE COURT:  If you are going back into that in

20    light of my ruling, I need to know that.  I think the record

21    is fairly well closed, and I don't know what else there is

22    to ask other than allowing you to call Pootipong and Rhee,

23    but --

24              MR. PRICE:  I think you are right.

25              THE COURT:  But that's up to you.
```

94

```
 1              What else do we need to do tonight?
 2              MR. QUINN:  Both sides I think have some additions
 3    to the exhibit binders.
 4              THE COURT:  Okay.
 5              MR. MCCONVILLE:  And we have exhibits for Ms.
 6    Luther here.
 7              THE COURT:  That's fine.  How long will the
 8    binders take?  If they are short, I will just do them now.
 9    If they are long, I want to come back about 8:30 or 9:00.
10              MR. MCCONVILLE:  I just looked at them, and my
11    guess is it will take us 15 minutes.  They are the types of
12    documents we have seen before.
13              THE COURT:  What is your time estimate,
14    Mr. Zeller?
15              MR. ZELLER:  We just have a few simple documents
16    to add.
17              THE COURT:  I will do it right now then.
18              (Recess.)
19              THE COURT:  We are back on record.  My apologies
20    for excusing Ms. Hurst this evening because I want equality
21    between Mr. Zeller and Ms. Hurst because a lot of this is
22    falling to both of you.  I want to talk to you about the
23    relation-back ruling on the trade secret claim for a moment
24    because Mattel just filed a brief.
25              MR. ZELLER:  Yes.
```

```
 1              THE COURT:  That was filed yesterday, and it

 2    responded to the Court's February 16, 2011, order vacating

 3    the relation back ruling on the trade secret claim.  I am

 4    going to more fully and comprehensively address the relation

 5    back issue during the trial or after the jury reaches a

 6    verdict, but it's important I think for this record that the

 7    February 16 order that I sent out to the parties stated that

 8    the Court would set a briefing schedule.  So I don't find

 9    any concern in your filing, but that order did not as the

10    introduction to your brief states, quote, "solicit further

11    briefing."

12              There was a reason why I did not solicit further

13    briefing, Mr. Zeller, at that time.  I think there are four

14    or five very thorny legal questions at the center of this

15    dispute, and I may need your help and MGA's help with only

16    one or two of them.  For instance, your brief discusses the

17    pleading standards under Rule 8 and general rules of

18    relation back, and while I appreciate your research, I

19    really do regret that you expended any of your time and

20    energy thus far on it without the Court's direction.

21              Both parties agree that Judge Larson made a

22    mistake on the relation back issue.  I certainly not about

23    to reverse Judge Larson at Mattel's expense, but at the same

24    time, I'm not going to perpetuate his ruling beyond its

25    original scope.  Thus, the only real factual dispute is over
```

1    the scope of Judge Larson's ruling:  Did he think that the

2    trade secret misappropriation claim included Bratz?

3            This is not the first time that I have encountered

4    a single claim that subdivides into several predicate acts.

5    I am going to refer all of you to an order I issued in a

6    case called Doe versus LDS Church and Boys Scouts of

7    America, Case No. 09-351, while I was sitting by designation

8    in the District of Idaho.  That case is still pending before

9    this Court by designation.  That case went up to the Circuit

10   on an interlocutory appeal, and a panel included Judge

11   Reinhardt and Betty Binns Fletcher, and they rejected the

12   petition.

13           The case involved the question of whether a single

14   claim for abuse can be subject to the laws of two states, as

15   well as two statutes of limitations, when the alleged abuse

16   occurred in both Idaho and Oregon.  That case may support

17   one of the arguments in Mattel's brief concerning the

18   reading of the statute of limitations, Mr. Zeller, but it

19   can also undercut my ruling that Mexican law does not apply

20   to MGA and Larian with respect to the Mexico acts.

21           My ruling in that case certainly isn't binding

22   precedent.  I recognize its novelty, and I am reluctant at

23   the present time to apply it to this case, but I think it

24   gives you some insight into the questions I am working

25   through in terms of your motions on behalf of Mattel and

1    eventually MGA.

2           I will leave it at that, and no further argument

3    is necessary.  I don't need further briefing on this at the

4    present time.  MGA is certainly free to file a brief in

5    response to Mattel's.  In fact, you may want to.  Mattel can

6    file a reply if it wants to, but I will say to you that it's

7    premature, and I'm sorry you did all that work.  I don't

8    know that it was necessarily helpful.

9           I recognize that the Rule 54 motions are coming

10   up.  As before, please file those motions on thumb drives,

11   although you don't have to hyperlink the briefs.  I just

12   want to reduce the clutter in chambers, and I don't want

13   hard copies of those briefs and exhibits.  I don't need

14   them.  In fact, I found it very helpful on weekends to carry

15   that thumb drive with me.

16          You should also start planning to jointly lodge a

17   master copy of thumb drives that contain the final versions

18   of each of the briefs and other submissions that were

19   previously filed.  These will be copies that should be

20   stored by the Clerk's Office, and they will go directly to

21   the Ninth Circuit.  There is no urgency, but I want you to

22   somewhat start that planning now.  I think it will cut down

23   the volume.

24          I have reserved the thumb drives you have already

25   lodge with me, but they were sometimes not labeled and

1    sometimes amended, and I don't think the Circuit will be
2    able to sort through all of them.
3         Next, you are free to address the substance of the
4    issues however you want, but I will provide you with a
5    little bit of guidance that's making my life easier so that
6    I don't have to continually call supplemental briefing.
7         On behalf of MGA, if you intend to move for
8    judgment on the duty of loyalty claim, you should address
9    whether a non-fiduciary employee even owes any common law --
10   by way of example noncontractual duties -- under California
11   law.
12        If you intend to move for judgment on the trade
13   secret misappropriation claim with respect to the non-Bratz
14   information, I think you should probably address the issue
15   of whether Mattel employees who went to other companies were
16   investigated for trade secret misappropriation.
17        I asked this question at the summary judgment
18   hearing, and both Mr. Molinski and Mr. Zeller said they
19   didn't know the answer.  It's an important question as far
20   as I am concerned.  If no other Mattel employee ever took
21   information before leaving the company, then it really adds
22   weight to Mattel's contention that MGA induced the conduct.
23   On the other hand, if dozens of Mattel employees were
24   engaged in such conduct, then maybe the problem was at
25   Mattel and not MGA.  If you don't want to have that

```
 1    discovery, then I can get it as soon as possible, but I am

 2    going to want an answer to that question from both parties

 3    at the Rule 54 hearing.

 4            If you intend to move for judgment on the

 5    copyright preemption issue, a serial recitation won't help

 6    me much.  The Trade Secrets Act reads like a choose your own

 7    adventure book because it incorporates contract law,

 8    fiduciary law, tort law, criminal law, and property law.

 9    There is a very good article by a Stanford law professor on

10    that subject.  Some theories of liability under the Trade

11    Secrets Act may be preempted but others may not.  It's one

12    reason why the special verdict may be critical on this

13    issue.  After all, regardless, we don't know what the

14    Circuit is going to eventually do.

15            On behalf of Mattel, Mr. Zeller, MGA hasn't put on

16    its case yet, so I expect you will not be filing a motion at

17    this time.  You have got plenty of time.

18            MR. ZELLER:  We actually talked to MGA about that,

19    and it's our expectation that we would file our motions at

20    the end of MGA's case.

21            THE COURT:  Okay.  Now, is there anything else we

22    need to do on the record?

23            MR. MCCONVILLE:  No, I don't think so.

24            THE COURT:  Okay.

25                        -oOo-
```

1

2

3

4                               CERTIFICATE

5

6              I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  March 9, 2011

14

15

                              Sharon A. Seffens 3/9/11
16                           _____

                              SHARON A. SEFFENS, U.S. COURT REPORTER
17

18

19

20

21

22

23

24

25