Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 1 of 151   Page ID #:308034
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

MATTEL, INC., et al.,                )
                                     )
            Plaintiffs,              )
                                     )
     vs.                             ) No. CV 04-9049 DOC
                                     )    Day 30
MGA ENTERTAINMENT, INC., et al.,     )    Volume 1 of 2
                                     )
                                     )
            Defendants.              )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Wednesday, March 9, 2011


Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

04cv9049 Mattel 2011-03-09 D30V1

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 2 of 151   Page ID #:308035
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3

                QUINN EMANUEL URQUHART & SULLIVAN
4               BY:  JOHN QUINN
                     WILLIAM PRICE
5                    MICHAEL T. ZELLER
                     Attorneys at Law
6               865 South Figueroa Street
                10th Floor
7               Los Angeles, California 90017
                (213) 443-3000

8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12              ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                BY:  THOMAS S. McCONVILLE
13                   Attorney at Law
                4 Park Plaza
14              Suite 1600
                Irvine, California 92614
15              (949) 567-6700

16              - AND -

17              ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                BY:  ANNETTE L. HURST
18                   Attorney at Law
                405 Howard Street
19              San Francisco, California 94105
                (415)773-5700

20              - AND -

21              KELLER RACKAUCKAS
22              BY:  JENNIFER KELLER
                     Attorney at Law
23              18500 Von Karman Avenue
                Suite 560
24              Irvine, California 92612
                (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB Document 10181 Filed 03/11/11 Page 3 of 151 Page ID #:308036
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5           LAW OFFICES OF MARK E. OVERLAND
            By:  MARK E. OVERLAND
                 Attorney at Law
6           100 Wilshire Boulevard
            Suite 950
7           Santa Monica, California 90401
            (310) 459-2830

8           - AND -

9
            SCHEPER KIM & HARRIS LLP
10          BY:  ALEXANDER H. COTE
                 Attorney at Law
11          601 West 5th Street
            12th Floor
12          Los Angeles, California 90071
            (213) 613-4660

13

14   ALSO PRESENT:

15          MGA ENTERTAINMENT, INC.
            BY:  JEANINE PISONI
16               Attorney at Law
            16360 Roscoe Boulevard
17          Suite 105
            Van Nuys, California 91406

18

19          ROBERT A. ECKERT, Mattel CEO

20          ISAAC LARIAN, MGA CEO (not present)

21          KEN KOTARSKI, Mattel Technical Operator

22          MIKE STOVALL, MGA Technical Operator

23          RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24          CARLOS GUSTAVO MACHADO GOMEZ

25

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 4 of 151   Page ID #:308037
CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

4

 1                        I N D E X

 2   WITNESSES                 DIRECT  CROSS  REDIRECT  RECROSS

 3   WAGNER, Michael

 4   By Ms. Hurst                        6                77

 5   By Mr. Cote                        24

 6   By Mr. Price                              34

 7

 8   de ANDA, Richard

 9   By Mr. Quinn              95

10

11

12                        E X H I B I T S

13   EXHIBIT NO.                  IDENTIFICATION    IN EVIDENCE

14     6658-T-1 Cover page of Global                   134
                Investigations File
15              04-0287

16     6658-T-69 Exhibits 6658-T-69                    135
                through 6658-T-86 –
17              computer printout

18     6658-T-90 Document re files                     138
                copied to USB
19

       6658-T-147 Exhibit 6658-T-147                   138
20                through 6658-T-154 re
                  documents copied from
21                Mr. Vargas computer

22     6658-T-157 Exhibit 6658-T-157                   139
                  through 6658-T-168 –
23                printout of documents
                  copied by Mr. Machado,
24                Ms. Trueba and Mr.
                  Vargas

25

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 5 of 151   Page ID #:308038
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

5

```
 1                        EXHIBITS (Continued)

 2    EXHIBIT NO.                    IDENTIFICATION      IN EVIDENCE

 3

 4    6658-T-767 Exhibits 6658-T-767                         141
                 through 6658-T-785, IT
 5               policies signed by
                 Mr. Machado, Ms. Trueba
 6               and Mr. Vargas

 7    6678-1  Photocopy of file number                       128
              on manila folder
 8
      6678-4  Undated e-mail from                            131
 9            Mr. de Anda to Mr. Kaye

10    6678-5  Anonymous letter                               131

11    6678-6  Copy of envelope                               132
              containing anonymous
12            letter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 6 of 151   Page ID #:308039
CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

6

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 9, 2011**          |
|       | 2  | **Day 30, Volume 1 of 2**                                    |
|       | 3  | (8:35 a.m.)                                                   |
| 08:35 | 4  | *(In the presence of the jury.)*                             |
| 08:36 | 5  | THE COURT:  All right.  Good morning.  The jury's            |
| 08:36 | 6  | present, the alternates, the witness, all counsel.           |
| 08:36 | 7  | Counsel, thank you for your courtesy.  If you                |
| 08:36 | 8  | would be seated, please.                                     |
| 08:36 | 9  | Ms. Hurst, would you like to continue your                   |
| 08:36 | 10 | cross-examination.                                           |
| 08:36 | 11 | MS. HURST:  Thank you, Your Honor.                           |
| 10:21 | 12 | **MICHAEL WAGNER, MATTEL'S WITNESS, PREVIOUSLY SWORN**      |
| 10:21 | 13 | **RESUMED THE STAND**                                        |
| 08:36 | 14 | **CROSS-EXAMINATION   (Continued)**                         |
| 08:36 | 15 | BY MS. HURST:                                                 |
| 08:36 | 16 | Q.   Good morning, Mr. Wagner.                               |
| 08:36 | 17 | A.   Good morning, Ms. Hurst.                                |
| 08:36 | 18 | Q.   Yesterday we were looking at Exhibit 17369, an example  |
| 08:36 | 19 | of one of the Bratz female dolls, correct?                   |
| 08:36 | 20 | A.   We did.                                                 |
| 08:36 | 21 | Q.   And this is the Tokyo-A-Go-Go doll, right?              |
| 08:36 | 22 | A.   It is.                                                  |
| 08:36 | 23 | Q.   I want to just take a step back here for a moment and   |
| 08:37 | 24 | talk about the nature of all of these calculations that      |
| 08:37 | 25 | you've done, imagining Tokyo-A-Go-Go is the basis for our    |

7

| | | |
|---|---|---|
| 08:37 | 1 | discussion.  Okay? |
| 08:37 | 2 | A.   I can do that. |
| 08:37 | 3 | Q.   All right.  I'm a lousy artist, but I'm gonna draw -- |
| 08:37 | 4 | this is gonna be my pathetic attempt to represent |
| 08:37 | 5 | Tokyo-A-Go-Go.  Okay? |
| 08:37 | 6 | A.   I accept that. |
| 08:37 | 7 | *(Document displayed.)* |
| 08:37 | 8 | BY MS. HURST: |
| 08:37 | 9 | Q.   All right.  Thank you. |
| 08:37 | 10 | Now, on the one side you have unjust enrichment -- what |
| 08:37 | 11 | you called "unjust enrichment," correct? |
| 08:37 | 12 | A.   We called it at trial "Bratz profits," but I think it's |
| 08:37 | 13 | the same thing. |
| 08:37 | 14 | Q.   All right.  That's very helpful.  That's Bratz profits. |
| 08:37 | 15 | Right? |
| 08:37 | 16 | A.   Correct. |
| 08:37 | 17 | Q.   And that's the money that MGA earned on the sale of |
| 08:37 | 18 | Tokyo-A-Go-Go, right? |
| 08:37 | 19 | A.   Correct. |
| 08:37 | 20 | Q.   And then you also had a number for Larian profits, |
| 08:38 | 21 | right? |
| 08:38 | 22 | A.   I did. |
| 08:38 | 23 | Q.   And that was also Mr. Larian's share of the money on |
| 08:38 | 24 | Tokyo-A-Go-Go, right? |
| 08:38 | 25 | A.   That is correct. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

8

| | | |
|---|---|---|
| 08:38 | 1 | Q.   And that's a subset of Bratz profits, right? |
| 08:38 | 2 | A.   Yes. |
| 08:38 | 3 | Q.   Okay.  And you would not award -- those would be |
| 08:38 | 4 | duplicative.  It wouldn't be fair to give both of those, |
| 08:38 | 5 | right?  You would agree with that? |
| 08:38 | 6 | A.   It would not be fair to award Mattel both of those |
| 08:38 | 7 | numbers, I agree with that. |
| 08:38 | 8 | Q.   All right.  Now, you also calculated what you call |
| 08:38 | 9 | "lost profits," right? |
| 08:38 | 10 | A.   I did. |
| 08:38 | 11 | Q.   And that's Mattel profits, right? |
| 08:38 | 12 | A.   That is correct. |
| 08:38 | 13 | Q.   And what you did was you imagined that Bratz wasn't |
| 08:38 | 14 | there, right? |
| 08:38 | 15 | A.   Correct. |
| 08:38 | 16 | Q.   And then you assumed that Barbie got that sale instead, |
| 08:39 | 17 | right? |
| 08:39 | 18 | A.   Well, for the portion of those sales that I believe |
| 08:39 | 19 | Mattel would have received, yes. |
| 08:39 | 20 | Q.   All right.  So again, there's duplication between the |
| 08:39 | 21 | MGA profits and the Mattel profits, true? |
| 08:39 | 22 | A.   I believe there is as well, yes. |
| 08:39 | 23 | Q.   'Cause it's still just that one doll sale that we're |
| 08:39 | 24 | talking about, right? |
| 08:39 | 25 | A.   Correct.  For that one particular doll, if you awarded |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

9

| | | |
|---|---|---|
| 08:39 | 1 | both lost profits and unjust enrichment, that would be a |
| 08:39 | 2 | double recovery. |
| 08:39 | 3 | Q.   And that wouldn't be fair, you agree? |
| 08:39 | 4 | A.   I agree with that. |
| 08:39 | 5 | Q.   Now, before we move to lost profits, I just want to go |
| 08:39 | 6 | back to where we were yesterday for a moment.  On the Bratz |
| 08:39 | 7 | profit piece of it, on the unjust enrichment piece, you |
| 08:39 | 8 | agree that if you had compared the average profitability of |
| 08:40 | 9 | Bratz to Barbie, then the unjust enrichment part, the Bratz |
| 08:40 | 10 | profits -- excess profits would be zero, correct? |
| 08:40 | 11 | A.   I think that's what the calculation would be. |
| 08:40 | 12 | Q.   All right.  And you also agree -- you also agree that |
| 08:40 | 13 | using your benchmark methodology, you're suggesting a |
| 08:40 | 14 | damages calculation that is more than the total company |
| 08:40 | 15 | profits for MGA for the entire period, true? |
| 08:40 | 16 | A.   For two of the measures, yes.  But I did try to |
| 08:40 | 17 | duplicate your number last night, and I have to tell you I |
| 08:40 | 18 | did not get 385.6 million for MGA's EBIT.  I got |
| 08:40 | 19 | 416 million, so I think you're off by about 30 million. |
| 08:40 | 20 | Q.   Okay.  If you testified in your deposition that it was |
| 08:40 | 21 | 385.6 million, did you make a mistake? |
| 08:40 | 22 | A.   If I did, I'd like to see what I said and what I was |
| 08:40 | 23 | referring to.  But, yes, it would be a mistake. |
| 08:41 | 24 | Q.   Today you say it was a mistake, then, in your |
| 08:41 | 25 | deposition, right? |

| | | |
|---|---|---|
| 08:41 | 1 | MR. PRICE:  Objection.  Assumes facts, Your Honor. |
| 08:41 | 2 | THE WITNESS:  Well, I don't know if I had that -- |
| 08:41 | 3 | THE COURT:  Excuse me. |
| 08:41 | 4 | THE WITNESS:  -- read my deposition, if I did that |
| 08:41 | 5 | but -- |
| 08:41 | 6 | THE COURT:  Sir, sir. |
| 08:41 | 7 | THE WITNESS:  I'm sorry, Your Honor. |
| 08:41 | 8 | THE COURT:  Sustained. |
| 08:41 | 9 | MS. HURST:  We're gonna find that and continue and |
| 08:41 | 10 | come back to it while we're finding it. |
| 08:41 | 11 | BY MS. HURST: |
| 08:41 | 12 | Q.   Now, focusing on the lost profits piece, the -- imagine |
| 08:41 | 13 | that Bratz wasn't there and Barbie got the sale piece. |
| 08:41 | 14 | Okay.  Do you have that in mind? |
| 08:41 | 15 | A.   I do. |
| 08:41 | 16 | Q.   Now, the way that you calculated that was to start with |
| 08:42 | 17 | a regression analysis, right? |
| 08:42 | 18 | A.   I did. |
| 08:42 | 19 | Q.   And you used NPD data for that regression analysis, |
| 08:42 | 20 | true? |
| 08:42 | 21 | A.   That's true. |
| 08:42 | 22 | Q.   Now, NPD has had its problems as a data service |
| 08:42 | 23 | provider, true? |
| 08:42 | 24 | A.   I agree with that. |
| 08:42 | 25 | Q.   Walmart dropped out of NPD and it no longer had Walmart |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:42 | 1 | sales data, true? |
| 08:42 | 2 | A.    True.  I don't think that was the reason why Walmart |
| 08:42 | 3 | dropped them, but Walmart did drop that service. |
| 08:42 | 4 | Q.    And Walmart is the largest retailer in the world, true? |
| 08:42 | 5 | A.    That is true. |
| 08:42 | 6 | Q.    Target also dropped its data out of NPD, right? |
| 08:42 | 7 | A.    They did. |
| 08:42 | 8 | Q.    And at some point NPD gave up on using actual sales |
| 08:42 | 9 | data and just used surveys, correct? |
| 08:42 | 10 | A.    That is correct. |
| 08:42 | 11 | Q.    And surveys also have a margin of error, don't they? |
| 08:42 | 12 | A.    They do. |
| 08:43 | 13 | Q.    So NPD market share data is just an estimate using |
| 08:43 | 14 | surveys, true? |
| 08:43 | 15 | A.    That is true. |
| 08:43 | 16 | Q.    Now, you considered a lot of deposition testimony in |
| 08:43 | 17 | this case, right? |
| 08:43 | 18 | A.    Yes, I did. |
| 08:43 | 19 | Q.    And one of the depositions that you considered was the |
| 08:43 | 20 | deposition of Mr. Eckert, the CEO of Mattel, true? |
| 08:43 | 21 | A.    That's true. |
| 08:43 | 22 | Q.    And you know that in his deposition, Mr. Eckert |
| 08:43 | 23 | testified that, generally speaking, he would characterize |
| 08:43 | 24 | NPD data as inaccurate, true? |
| 08:43 | 25 | A.    I believe that's what he said in his deposition. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 12 of 151   Page ID #:308045
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

12

| | | |
|---|---|---|
| 08:43 | 1 | Q.   Okay.  But even though Mr. Eckert called the NPD data |
| 08:43 | 2 | inaccurate, Walmart and Target dropped out, and it's based |
| 08:43 | 3 | on surveys, you still felt it was appropriate in your |
| 08:43 | 4 | judgment to use NPD data to calculate nearly $400 million of |
| 08:43 | 5 | lost profits against MGA, correct? |
| 08:44 | 6 | A.   Well, the reason I used it -- |
| 08:44 | 7 | Q.   Can you answer that? |
| 08:44 | 8 | A.   In answer to your question, yes, in my judgment, it's |
| 08:44 | 9 | appropriate.  It's the best information available to do what |
| 08:44 | 10 | I need to do. |
| 08:44 | 11 | Q.   And that was using your judgment as an expert, right? |
| 08:44 | 12 | A.   That's correct. |
| 08:44 | 13 | Q.   And that's the judgment for which you've billed Mattel |
| 08:44 | 14 | nearly $2 1/2 million in this matter, true? |
| 08:44 | 15 | A.   They pay for a lot more than just my judgment.  That's |
| 08:44 | 16 | all the billings of my firm on the case.  But, yes, |
| 08:44 | 17 | ultimately, it's my judgment. |
| 08:44 | 18 | Q.   Now, the regression analysis by itself, just by itself, |
| 08:44 | 19 | doesn't tell you that Bratz took market share away from |
| 08:44 | 20 | Barbie, true? |
| 08:44 | 21 | A.   That is correct.  It just proves correlation. |
| 08:44 | 22 | Q.   In other words, there's some relationship between the |
| 08:44 | 23 | two, but you don't know yet what it is, right? |
| 08:44 | 24 | A.   You don't know which one is causing the change in the |
| 08:44 | 25 | other. |

| | | |
|---|---|---|
| 08:44 | 1 | Q.   All right.  So it could be consistent with your data, |
| 08:44 | 2 | your regression analysis, that Barbie failed due to problems |
| 08:45 | 3 | with her own performance, and her sales would continue |
| 08:45 | 4 | declining irrespective of Bratz, true? |
| 08:45 | 5 | A.   Well, anything is possible.  But I don't think, based |
| 08:45 | 6 | on the facts I've investigated that's a reasonable |
| 08:45 | 7 | conclusion. |
| 08:45 | 8 | Q.   I understand you don't think it's a reasonable |
| 08:45 | 9 | conclusion.  But just taking the regression analysis alone, |
| 08:45 | 10 | Barbie failing on her own and continuing to lose her sales |
| 08:45 | 11 | is consistent with that, right? |
| 08:45 | 12 | A.   Consistent with what? |
| 08:45 | 13 | Q.   With the regression analysis. |
| 08:45 | 14 | A.   The regression analysis proves there's an inverse |
| 08:45 | 15 | relationship between Bratz market share and Barbie market |
| 08:45 | 16 | share.  It does not prove which one causes the other to |
| 08:45 | 17 | change. |
| 08:45 | 18 | Q.   So it can be consistent with the regression analysis |
| 08:45 | 19 | that Barbie's decline caused the opportunity for Bratz, |
| 08:45 | 20 | right? |
| 08:45 | 21 | A.   I already answered that.  Anything is possible.  I |
| 08:45 | 22 | don't believe that's reasonable in this case, but certainly |
| 08:45 | 23 | it's possible. |
| 08:45 | 24 | Q.   The reason you don't believe it's reasonable is based |
| 08:45 | 25 | on what you called your 59 observed incidents, true? |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 14 of 151   Page ID #:308047
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

14

| | | |
|---|---|---|
| 08:46 | 1 | A.    Correct. |
| 08:46 | 2 | Q.    And a lot of those observed incidents were Mr. Larian |
| 08:46 | 3 | bragging about taking market share away from Mattel, right? |
| 08:46 | 4 | A.    A good number of them were, yes, what Mr. Larian was |
| 08:46 | 5 | telling the public.  I assume he was telling them the truth |
| 08:46 | 6 | of what was happening in the marketplace. |
| 08:46 | 7 | Q.    Well, certainly he was telling them the truth that |
| 08:46 | 8 | Bratz was gaining market share, right? |
| 08:46 | 9 | A.    At the expense of Barbie. |
| 08:46 | 10 | Q.    Now, I want you to imagine that this market share |
| 08:46 | 11 | competition between Mattel, Barbie, and Bratz is like a |
| 08:46 | 12 | footrace.  Do you have that in mind? |
| 08:46 | 13 | A.    I do. |
| 08:46 | 14 | Q.    Okay.  And Barbie and Bratz are the runners in this |
| 08:46 | 15 | race, okay? |
| 08:46 | 16 | A.    I understand that. |
| 08:46 | 17 | Q.    All right.  Now, Barbie has been running for a while, |
| 08:46 | 18 | right?  Her career started before Bratz, right? |
| 08:46 | 19 | A.    Yeah, more than 50 years before. |
| 08:46 | 20 | Q.    Okay.  And Bratz comes along and they're at the |
| 08:46 | 21 | starting blocks, and the announcer fires the gun, and they |
| 08:47 | 22 | start the race, and then Barbie pulls up her Achilles tendon |
| 08:47 | 23 | and falls down.  Do you have that in mind? |
| 08:47 | 24 | A.    I do. |
| 08:47 | 25 | Q.    All right.  Now, Bratz keeps on running to the finish |

| | | |
|---|---|---|
| 08:47 | 1 | line, right? |
| 08:47 | 2 | A.   I would assume, unless Bratz is a nice person and wants |
| 08:47 | 3 | to help Barbie. |
| 08:47 | 4 | Q.   But this is a competition, right, Mr. Wagner? |
| 08:47 | 5 | A.   I'm a competitor, and I like to help my competition, |
| 08:47 | 6 | just like I'm trying to help you right now. |
| 08:47 | 7 | Q.   Bratz wants to win the race, so she runs to the finish |
| 08:47 | 8 | line.  You got that in mind? |
| 08:47 | 9 | A.   I got that.  I'm sorry.  Yes. |
| 08:47 | 10 | Q.   Now, in that scenario, Barbie's failure of performance |
| 08:47 | 11 | caused the loss by Barbie of that race, true? |
| 08:47 | 12 | A.   If I accept your hypothetical, I would not say that |
| 08:47 | 13 | Bratz's success was a result of Barbie's failure. |
| 08:47 | 14 | Q.   Right.  Instead it would be Bratz coming along and |
| 08:47 | 15 | being in the right place at the right time, true? |
| 08:47 | 16 | A.   Under your hypothetical, that would be true. |
| 08:47 | 17 | Q.   Like Woody Allen said, 90 percent of success in life is |
| 08:48 | 18 | showing up, right, Mr. Wagner? |
| 08:48 | 19 | A.   He did say that. |
| 08:48 | 20 | Q.   Now, there is evidence in this case that Barbie was |
| 08:48 | 21 | failing on her own, isn't there? |
| 08:48 | 22 | A.   I wouldn't say she was failing by any means.  This doll |
| 08:48 | 23 | was still the number one fashion doll every year of this |
| 08:48 | 24 | damage period.  It was not doing as well as it had |
| 08:48 | 25 | previously.  I wouldn't call that failure when you're still |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

16

| | | |
|---|---|---|
| 08:48 | 1 | number one. |
| 08:48 | 2 | Q.   The Barbie sales were declining for several years |
| 08:48 | 3 | before Bratz entered the market; isn't that true? |
| 08:48 | 4 | A.   That's true. |
| 08:48 | 5 | Q.   And document after document in Mattel's files indicated |
| 08:48 | 6 | a problem with saturation of the market; isn't that true? |
| 08:48 | 7 | A.   I believe that's true. |
| 08:48 | 8 | Q.   In other words, girls were sick of playing with Barbie, |
| 08:48 | 9 | right, Mr. Wagner? |
| 08:48 | 10 | A.   I think the saturation means they already had a whole |
| 08:48 | 11 | bunch of dolls; they didn't need another one. |
| 08:48 | 12 | Q.   Right. |
| 08:48 | 13 | A.   I don't know whether they were sick of Barbie, no. |
| 08:48 | 14 | Q.   They already had a bunch of dolls and they didn't need |
| 08:49 | 15 | another one, right? |
| 08:49 | 16 | A.   That's true. |
| 08:49 | 17 | Q.   But in calculating lost profits of about 384 million, |
| 08:49 | 18 | you assumed that all of the girls who bought a Bratz doll |
| 08:49 | 19 | would have bought a Barbie doll, true? |
| 08:49 | 20 | A.   For the sales that I think Mattel would have made, yes. |
| 08:49 | 21 | Q.   You didn't -- you didn't assume any of 'em would have |
| 08:49 | 22 | bought video games, right? |
| 08:49 | 23 | A.   No.  That would be a counterfactual assumption.  These |
| 08:49 | 24 | girls bought fashion dolls. |
| 08:49 | 25 | Q.   You didn't allow for them to decide to buy video games |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

17

08:49   1    instead of another Barbie, true?

08:49   2    A.    No.  I assume -- that is true.  I assume they will

08:49   3    either buy a Barbie or another fashion doll, because they

08:49   4    bought a doll.

08:49   5    Q.    You didn't assume that they would have gone to the

08:49   6    movies instead of buying their 20th Barbie, true?

08:49   7    A.    I did not assume that; that's correct.

08:49   8    Q.    And you didn't assume that they would buy a T-shirt or

08:49   9    a pair of earrings instead of buying their 20th Barbie,

08:49   10   true?

08:49   11   A.    Well, first off, you're asking me to assume that

08:50   12   everyone who bought a Bratz already had 19 Barbie dolls.  I

08:50   13   don't think that's probably true.

08:50   14   Q.    Bottom line is you assumed that the Barbie -- the Bratz

08:50   15   purchasers would have bought Barbies instead of video games,

08:50   16   earrings, going to the movies, and all the other options,

08:50   17   true?

08:50   18   A.    That is correct.

08:50   19          MS. HURST:  Ms. Kieckhefer, would you show the

08:50   20   witness Exhibit 36002 and 36019.

08:51   21          (Documents provided to the witness.)

08:51   22   BY MS. HURST:

08:51   23   Q.    Do you have those two in front of you, Mr. Wagner?

08:51   24   A.    I do.

08:51   25   Q.    Did you have a chance to look at those last night?

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 18 of 151   Page ID #:308051
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

18

| | | |
|---|---|---|
| 08:51 | 1 | A.    I looked at them yesterday, yes. |
| 08:51 | 2 | Q.    And you confirm those exhibits, 36002 and 36019, are |
| 08:51 | 3 | generally accurate in their portrayal of annual Barbie doll |
| 08:51 | 4 | sales? |
| 08:51 | 5 | A.    No.  I assumed that you're recording information |
| 08:51 | 6 | accurately. |
| 08:51 | 7 | Q.    Okay. |
| 08:51 | 8 |            MS. HURST:  Your Honor, may I display 36002 and |
| 08:51 | 9 | 36019? |
| 08:52 | 10 |            THE COURT:  You may. |
| 08:52 | 11 |            (Document displayed.) |
| 08:52 | 12 | BY MS. HURST: |
| 08:52 | 13 | Q.    Now, Mr. Wagner, 36002, that's a graph showing the U.S. |
| 08:52 | 14 | Barbie doll sales from 1982 to 2006, correct? |
| 08:52 | 15 | A.    It does, based on NPD data. |
| 08:52 | 16 | Q.    Again, based on that NPD data, and you think that's -- |
| 08:52 | 17 | that data is sufficient for this purpose, right? |
| 08:52 | 18 | A.    For sales at retail, I believe it is. |
| 08:52 | 19 | Q.    All right.  And it shows a steep rise in Barbie sales |
| 08:52 | 20 | in the late 1990s, true? |
| 08:52 | 21 | A.    It does. |
| 08:52 | 22 | Q.    And then -- I've got a bar graph version of this that |
| 08:52 | 23 | we'll show, that's a little easier to see.  Do you have |
| 08:52 | 24 | that?  That's Exhibit 36019. |
| 08:52 | 25 |            (Document displayed.) |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

19

08:52    1                THE WITNESS:  I do.

08:52    2    BY MS. HURST:

08:52    3    Q.    And here, we have extended it through 2009, using

08:52    4    Mattel 10-K's.  You consider 10-K's to be a reliable source

08:53    5    of financial data, correct?

08:53    6    A.    I do.

08:53    7    Q.    All right.  So what this curve shows us is that there

08:53    8    was a steep rise of Barbie sales in the late 1990s, peaking

08:53    9    about 1997 or so, correct?

08:53   10    A.    That was my understanding.  It was a peak in 1997.

08:53   11    Q.    And that's consistent with what you believed when

08:53   12    you've done your opinions here in the case, right?

08:53   13    A.    It is.

08:53   14    Q.    And then Barbie sales declined in '98, '99, and 2000,

08:53   15    before Bratz entered the market, true?

08:53   16    A.    That's true.

08:53   17    Q.    Now, during that peak period in the late 1990s, it

08:53   18    looks like Barbie was getting more sales for fashion dolls

08:53   19    relative to other toy products, true?

08:53   20    A.    What other toy products are you talking about?

08:53   21    Q.    Well, video games, um, you know, choose anything, other

08:53   22    forms of child entertainment.

08:53   23    A.    Yeah, I don't think the video games were that big at

08:54   24    that point, but, yes, clearly as video games entered the

08:54   25    marketplace, that had an impact on fashion dolls.

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 20 of 151   Page ID #:308053
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

20

| | | |
|---|---|---|
| 08:54 | 1 | Q.   And clearly there was a spike for Barbie in the late |
| 08:54 | 2 | '90s, right? |
| 08:54 | 3 | A.   That would be correct. |
| 08:54 | 4 | Q.   And it looks like after the late '90s, if you just look |
| 08:54 | 5 | at this curve, that Barbie sales returned to historical |
| 08:54 | 6 | levels, right? |
| 08:54 | 7 | A.   Well, it is a bell-shaped curve, so it did return to |
| 08:54 | 8 | sale level at earlier years, yes. |
| 08:54 | 9 | Q.   Okay.  And if Barbie sales returned to historical |
| 08:54 | 10 | levels for reasons unrelated to Bratz, then there would be a |
| 08:54 | 11 | zero lost-profits award in this case, true? |
| 08:54 | 12 | A.   If you assume that Bratz had no impact on Barbie sales, |
| 08:54 | 13 | there would be no damages. |
| 08:54 | 14 | Q.   So if Barbie sales returned to their historical levels |
| 08:54 | 15 | for reasons unrelated to Bratz, then there would be zero |
| 08:55 | 16 | lost profits, true? |
| 08:55 | 17 | A.   No, that's an incomplete hypothetical.  I'd need more |
| 08:55 | 18 | facts to know. |
| 08:55 | 19 | Q.   You did not study the reasons for Barbie's sales |
| 08:55 | 20 | decline, did you? |
| 08:55 | 21 | A.   Oh, I did, yes.  And I took all of that into |
| 08:55 | 22 | consideration in my approach. |
| 08:55 | 23 | Q.   By looking at market share starting in 2000, true? |
| 08:55 | 24 | A.   Correct.  I -- if your answer -- pardon me, if your |
| 08:55 | 25 | question was about the 1990s, I did not study that period. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

21

08:55  1    Q.   You didn't look at the 1990s at all, right?

08:55  2    A.   I did not.

08:55  3    Q.   And you didn't look at whether the 1990s were an

08:55  4    aberration in Barbie's performance, true?

08:55  5    A.   No.

08:55  6    Q.   And when you started in 2000, you didn't know whether

08:55  7    that starting point was an aberration in Barbie's

08:55  8    performance, true?

08:55  9    A.   I don't think it's an aberration.  It's just based on

08:55  10   all the market factors and all the competition, that's what

08:55  11   they achieved.  It's not an aberration.

08:55  12   Q.   But you didn't study the performance in 2000 relative

08:55  13   to the prior years, did you?

08:55  14   A.   That is correct.

08:56  15   Q.   So let me just try this one more time.

08:56  16        If you assume that Barbie sales returned to their

08:56  17   historical levels for reasons unrelated to Bratz, then there

08:56  18   would be a zero-dollar lost-profits award in this case,

08:56  19   true?

08:56  20             MR. PRICE:  Objection.  Incomplete hypothetical.

08:56  21             THE WITNESS:  My answer is the same.  That's an

08:56  22   incomplete hypothetical.  The market is very different in

08:56  23   the 2000s than it was in the 1990s.  So just the fact they

08:56  24   had the same level of sales, there's a whole bunch of other

08:56  25   things that you must consider to determine, in answer to

CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

22

| | | |
|---|---|---|
| 08:56 | 1 | your question. |
| 08:56 | 2 | BY MS. HURST: |
| 08:56 | 3 | Q.   And what you considered was market share, right? |
| 08:56 | 4 | A.   Yes.  And that takes into consideration all the |
| 08:56 | 5 | problems that Mattel had selling Barbie, all the strengths |
| 08:56 | 6 | of the competitors that were also selling fashion dolls, and |
| 08:56 | 7 | what's happening in the general economy and other competing |
| 08:57 | 8 | products like video games.  It takes all of that into |
| 08:57 | 9 | consideration. |
| 08:57 | 10 | Q.   Except that you assumed that all the Bratz purchasers |
| 08:57 | 11 | would have purchased Barbie dolls, true? |
| 08:57 | 12 | A.   Absolutely not. |
| 08:57 | 13 | Q.   Okay.  Let me just -- |
| 08:57 | 14 | A.   A fraction of the sales I give to Mattel. |
| 08:57 | 15 | MR. PRICE:  He gets to complete his answer. |
| 08:57 | 16 | THE COURT:  Well, I think that what's occurring is |
| 08:57 | 17 | the two of you are talking over the top of each other. |
| 08:57 | 18 | MS. HURST:  I apologize. |
| 08:57 | 19 | THE COURT:  Answer the question, sir.  Answer the |
| 08:57 | 20 | question. |
| 08:57 | 21 | BY MS. HURST: |
| 08:57 | 22 | Q.   Let me try again.  After you factored out what you |
| 08:57 | 23 | called "Bratz expansion," you assumed in your Mattel |
| 08:57 | 24 | lost-profits calculation that every Bratz purchaser would |
| 08:57 | 25 | have purchased a Barbie doll, true? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 23 of 151   Page ID #:308056
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

23

| | | |
|---|---|---|
| 08:57 | 1 | A.    Wrong.  100 percent wrong. |
| 08:57 | 2 | Q.    Okay.  Do you have -- |
| 08:58 | 3 |       MS. HURST:  Ms. Kieckhefer, could we give the |
| 08:58 | 4 | witness his testimony from February 28th, 2011 -- |
| 08:58 | 5 | February 28th, the *Daubert* hearing. |
| 08:59 | 6 |       *(Document provided to the witness.)* |
| 08:59 | 7 | BY MS. HURST: |
| 08:59 | 8 | Q.    Do you see that testimony at pages 84 and 85, |
| 08:59 | 9 | Mr. Wagner? |
| 08:59 | 10 | A.    What lines? |
| 08:59 | 11 | Q.    Starting at 84, line 10, through 85, line 7. |
| 09:00 | 12 | A.    I see that. |
| 09:00 | 13 | Q.    And you confirmed in that prior testimony that your |
| 09:00 | 14 | supplemental report had an MGA earnings before interest and |
| 09:00 | 15 | taxes of 385.6 million, true? |
| 09:00 | 16 | A.    True.  But I don't know what years that is covering.  I |
| 09:00 | 17 | just redid the calculation last night, based on my |
| 09:00 | 18 | December 24th report, and for the period 2001 through 2009, |
| 09:00 | 19 | which is what I should be comparing on my chart, the number |
| 09:00 | 20 | is 416 million. |
| 09:00 | 21 |    I need to know what period I was calculating that |
| 09:00 | 22 | number for. |
| 09:00 | 23 | Q.    Okay.  At your prior testimony, you confirmed that |
| 09:00 | 24 | MGA's earnings before interest and taxes was 385.6 million, |
| 09:00 | 25 | true? |

| Time | Line | |
|---|---|---|
| 09:00 | 1 | A.    True, based on the page that's being shown.  And I |
| 09:00 | 2 | don't know what period that covered for that calculation. |
| 09:00 | 3 | Q.    Mr. Wagner, with respect to your lost-profits |
| 09:01 | 4 | calculation, you assumed that all purchasers of Bratz dolls |
| 09:01 | 5 | would be fashion doll purchasers, correct? |
| 09:01 | 6 | A.    That is correct. |
| 09:01 | 7 | Q.    And then you allocated a big chunk of that to Mattel, |
| 09:01 | 8 | true? |
| 09:01 | 9 | A.    Well, Mattel did have a fairly large market share. |
| 09:01 | 10 | THE COURT:  Sir, I'm sorry.  Answer the question. |
| 09:01 | 11 | THE WITNESS:  Yes. |
| 09:01 | 12 | THE COURT:  Thank you. |
| 09:01 | 13 | BY MS. HURST: |
| 09:01 | 14 | Q.    So if they would have purchased other toy products or |
| 09:01 | 15 | other entertainment products, then your lost-profits |
| 09:01 | 16 | calculation would be wrong, true? |
| 09:01 | 17 | A.    It could be, yes. |
| 09:01 | 18 | MS. HURST:  Thank you.  I'm going to pass to |
| 09:01 | 19 | Mr. Cote, Your Honor. |
| 09:01 | 20 | THE COURT:  All right.  Mr. Cote. |
| 09:01 | 21 | **CROSS-EXAMINATION** |
| 09:01 | 22 | BY MR. COTE: |
| 09:01 | 23 | Q.    Good morning, Mr. Wagner. |
| 09:01 | 24 | A.    Good morning, Mr. Cote. |
| | 25 | |

| | | |
|---|---|---|
| 09:01 | 1 | Q.   When you were figuring out the damages for the Mexico |
| 09:02 | 2 | part of this case, did you find that Mattel lost any sales |
| 09:02 | 3 | at all? |
| 09:02 | 4 | A.   I could find no evidence on that subject so, no. |
| 09:02 | 5 | Q.   Did you find that MGA gained any sales at all? |
| 09:02 | 6 | A.   No.  I saw no evidence from your client that I could |
| 09:02 | 7 | establish whether they did or did not. |
| 09:02 | 8 | Q.   You -- from my client?  Who's my client? |
| 09:02 | 9 | A.   Okay.  Well, I'm sorry, the -- your client's employer, |
| 09:02 | 10 | MGA.  That's who I thought we were talking about. |
| 09:02 | 11 | Q.   When I asked you those questions, I asked you about |
| 09:02 | 12 | Mattel and MGA.  Would the same answers be true if I asked |
| 09:02 | 13 | you about Mattel de Mexico and MGA de Mexico? |
| 09:02 | 14 | A.   It would. |
| 09:02 | 15 | Q.   So no lost sales in the part of any Mattel entity, |
| 09:02 | 16 | right? |
| 09:02 | 17 | A.   Well, I don't know whether there are none.  I didn't |
| 09:02 | 18 | see any evidence that I could establish, beyond what I would |
| 09:02 | 19 | consider speculation, a reasonable number. |
| 09:03 | 20 | Q.   You couldn't find any; is that fair? |
| 09:03 | 21 | A.   That's fair. |
| 09:03 | 22 | Q.   And no sales gained by either MGA or MGA de Mexico, |
| 09:03 | 23 | right? |
| 09:03 | 24 | A.   Again, same answer.  I couldn't find any, and so I |
| 09:03 | 25 | could not establish whether it was any gain by MGA. |

09:03   1   Q.   So because you couldn't find sales lost on the Mattel

09:03   2   side or sales gained on the MGA side, you had to use a

09:03   3   different measure, a different methodology to find a damages

09:03   4   number for Mexico, right?

09:03   5   A.   That is correct.

09:03   6   Q.   Okay.  What did you use?

09:03   7   A.   I used the third most -- the third established method

09:03   8   to establish value, and that's a cost approach.

09:03   9   Q.   Okay.  And explain to me what you mean by that.

09:03   10   A.   That what it cost to create the documents that were

09:03   11   stolen.

09:03   12   Q.   And how was that a measure of damages?

09:03   13   A.   That that's one of the three methods of valuing

09:03   14   property, either cost, market, or income.  So it's an

09:03   15   established approach, and one that normally gives you the

09:03   16   lowest value.

09:04   17   Q.   Let me make sure I understand.  The theory is that MGA

09:04   18   de Mexico saved money because, according to Mattel, they got

09:04   19   these trade secret documents for free?

09:04   20   A.   That's fair.

09:04   21   Q.   So you called that unjust enrichment or avoided costs.

09:04   22   It all boils down to they saved some money?

09:04   23   A.   Correct.

09:04   24   Q.   And they saved money because your theory is they

09:04   25   otherwise would have had to pay for the trade secret

| | | |
|---|---|---|
| 09:04 | 1 | information; is that right? |
| 09:04 | 2 | A.   That's correct. |
| 09:04 | 3 | Q.   And you figured out how much Mattel de Mexico actually |
| 09:04 | 4 | paid for the trade secret information, right? |
| 09:04 | 5 | A.   That's accurate. |
| 09:04 | 6 | Q.   You took -- you -- well, you found an average 1 percent |
| 09:04 | 7 | discount on gross sales; is that right? |
| 09:04 | 8 | A.   No. |
| 09:04 | 9 | Q.   Okay.  What did you do? |
| 09:04 | 10 | A.   Originally, that's a calculation that I saw that Mattel |
| 09:04 | 11 | did, but when I reviewed the contracts, I realized it should |
| 09:05 | 12 | have been calculated on net sales.  So the number I |
| 09:05 | 13 | presented at trial was 1 percent based on net sales. |
| 09:05 | 14 | Q.   One percent of net sales? |
| 09:05 | 15 | A.   Yes. |
| 09:05 | 16 | Q.   And that's a discount, right? |
| 09:05 | 17 | A.   That is a discount. |
| 09:05 | 18 | Q.   Who got the discount? |
| 09:05 | 19 | A.   The retailers who supplied their point of sale |
| 09:05 | 20 | information to Mattel. |
| 09:05 | 21 | Q.   Retailers in Mexico? |
| 09:05 | 22 | A.   Correct. |
| 09:05 | 23 | Q.   And what did Mattel de Mexico get in exchange? |
| 09:05 | 24 | A.   They got the information so they can analyze how their |
| 09:05 | 25 | products were doing in those retailers' locations. |

| | | |
|---|---|---|
| 09:05 | 1 | Q.   So the retailers gave Mattel the retailer's |
| 09:05 | 2 | information, right? |
| 09:05 | 3 | A.   Correct. |
| 09:05 | 4 | Q.   And you said it was 1 percent of net sales, and net |
| 09:05 | 5 | sales were what? |
| 09:05 | 6 | A.   Net sales were what? |
| 09:05 | 7 | Q.   What was the total net sales? |
| 09:05 | 8 | A.   Oh, I can't remember the number.  I want to say it was |
| 09:05 | 9 | 5 billion. |
| 09:05 | 10 | Q.   And you took 1 percent of that? |
| 09:05 | 11 | A.   Correct. |
| 09:05 | 12 | Q.   What was that number? |
| 09:05 | 13 | A.   About $5 million. |
| 09:05 | 14 | Q.   And that's the damages for Mexico, right? |
| 09:06 | 15 | A.   Well, that and some other costs, but that's the primary |
| 09:06 | 16 | cost, yes. |
| 09:06 | 17 | Q.   That's what you testified about on direct, right? |
| 09:06 | 18 | A.   Yes. |
| 09:06 | 19 | Q.   So the idea is that Mattel de Mexico paid $5.1 million |
| 09:06 | 20 | for this so-called trade secret information, right? |
| 09:06 | 21 | A.   Correct. |
| 09:06 | 22 | Q.   Now, if this sales information was not a trade secret, |
| 09:06 | 23 | your damages number would be zero, right? |
| 09:06 | 24 | A.   I agree if this is not trade secret information, there |
| 09:06 | 25 | should be no damages. |

29

| 09:06 | 1 | Q.   Now, based on your experience and education, you know |
| 09:06 | 2 | that companies like MGA and Mattel have employees, right? |
| 09:06 | 3 | A.   I do. |
| 09:06 | 4 | Q.   And you know also -- also know that those companies |
| 09:06 | 5 | have expenses, right? |
| 09:06 | 6 | A.   They do, as well. |
| 09:06 | 7 | Q.   Let me give you a "for instance."  These companies pay |
| 09:06 | 8 | rent? |
| 09:06 | 9 | A.   Normally. |
| 09:06 | 10 | Q.   Do individual employees pay the rent? |
| 09:06 | 11 | A.   Not typically. |
| 09:06 | 12 | Q.   Not ever? |
| 09:07 | 13 | A.   No, I couldn't say not -- never, but it would be |
| 09:07 | 14 | unusual. |
| 09:07 | 15 | Q.   And if the company gets a month of free rent, the |
| 09:07 | 16 | company gets a benefit, right? |
| 09:07 | 17 | A.   That would be a benefit. |
| 09:07 | 18 | Q.   The company saves the money of that month's rent, |
| 09:07 | 19 | right? |
| 09:07 | 20 | A.   Yes. |
| 09:07 | 21 | Q.   And that's what you would call "avoiding a cost." |
| 09:07 | 22 | A.   That hypothetical, I would agree with that. |
| 09:07 | 23 | Q.   Does the individual employee save any money if the |
| 09:07 | 24 | company gets free rent? |
| 09:07 | 25 | A.   If their compensation's based on profits, they would. |

| 09:07 | 1 | Q. If their compensation is based on profits they would, |
|-------|---|---|
| 09:07 | 2 | right? |
| 09:07 | 3 | A. Yes. Because if you have less costs, then your profits |
| 09:07 | 4 | are higher, and if you are under incentive compensation, you |
| 09:07 | 5 | would be paid more. |
| 09:07 | 6 | Q. Let's put aside the possibility of bonuses. Let's just |
| 09:07 | 7 | talk about straight salary for now. We'll come back to |
| 09:07 | 8 | bonuses in a minute. Okay? |
| 09:07 | 9 | Apart from the possibility of bonuses, does the |
| 09:08 | 10 | employee save any money if the company gets a month of free |
| 09:08 | 11 | rent? |
| 09:08 | 12 | A. I don't think so. |
| 09:08 | 13 | Q. Now, the -- the information that the retailers gave to |
| 09:08 | 14 | Mattel in exchange for this discount, who paid that discount |
| 09:08 | 15 | or who -- who incurred the cost of that discount? |
| 09:08 | 16 | A. Mattel. |
| 09:08 | 17 | Q. Not Mattel's employees, right? |
| 09:08 | 18 | A. Correct. |
| 09:08 | 19 | Q. And did MGA de Mexico -- it would be MGA de Mexico that |
| 09:08 | 20 | would incur that discount if you were to enter into the same |
| 09:08 | 21 | type of arrangement with the retailers, right? |
| 09:08 | 22 | A. They would. |
| 09:08 | 23 | Q. They would give the discount? |
| 09:08 | 24 | A. That's how it would work. |
| 09:08 | 25 | Q. Not the employees? |

| 09:08 | 1 | A. Generally, that would not be the case that an employee |
| 09:08 | 2 | would do that. |
| 09:08 | 3 | Q. Not Mr. Machado? |
| 09:08 | 4 | A. No. |
| 09:08 | 5 | Q. So if MGA de Mexico got this sales information for |
| 09:08 | 6 | free, it would be MGA that would get the benefit, right? |
| 09:09 | 7 | A. That would be true. |
| 09:09 | 8 | Q. Not Mr. Machado? |
| 09:09 | 9 | A. Again, he may benefit from that based on promotions and |
| 09:09 | 10 | higher salary, but he wouldn't have the direct benefit. |
| 09:09 | 11 | Q. Let's talk about that. Did you look at whether |
| 09:09 | 12 | Mr. Machado got bonuses? |
| 09:09 | 13 | A. No. I think another expert testified as to his |
| 09:09 | 14 | compensation. I did not look at that issue. |
| 09:09 | 15 | Q. Well, my question is: Did you look at whether |
| 09:09 | 16 | Mr. Machado got bonuses? |
| 09:09 | 17 | A. No. |
| 09:09 | 18 | Q. So you don't know when he got them, if he got them, how |
| 09:09 | 19 | much they were, right? |
| 09:09 | 20 | A. Well, I think I did read a report of the other expert |
| 09:09 | 21 | where he got a signing bonus, but that's all I know he got. |
| 09:09 | 22 | Q. So your opinion is based on a signing bonus? |
| 09:09 | 23 | A. That is a benefit to him, yes. |
| 09:09 | 24 | Q. Do you know he got a signing bonus? |
| 09:09 | 25 | A. No. I -- that wasn't my area of responsibility in this |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

32

| | | |
|---|---|---|
| 09:09 | 1 | case, so I don't know. |
| 09:09 | 2 | Q.   You don't know one way or the other whether he got a |
| 09:09 | 3 | bonus? |
| 09:09 | 4 | A.   I believe he did, but you'd have to show me |
| 09:09 | 5 | Mr. Kinrich's report. |
| 09:09 | 6 | Q.   Do you know one way or the other yourself whether he |
| 09:09 | 7 | got a bonus? |
| 09:09 | 8 | A.   Beyond looking at that report, no. |
| 09:10 | 9 | Q.   And you didn't testify about that on direct exam, |
| 09:10 | 10 | right? |
| 09:10 | 11 | A.   I did not. |
| 09:10 | 12 | Q.   Now, I want you to assume, Mr. Wagner, that Mr. Machado |
| 09:10 | 13 | looked at one or two pages of one of these point-of-sale |
| 09:10 | 14 | reports that's thousands of pages long.  Okay?  Are you with |
| 09:10 | 15 | me so far? |
| 09:10 | 16 | A.   I am. |
| 09:10 | 17 | Q.   And I also want you to assume that after he looked at |
| 09:10 | 18 | it, he didn't change anything that MGA was doing.  Okay? |
| 09:10 | 19 | Still with me? |
| 09:10 | 20 | A.   I am. |
| 09:10 | 21 | Q.   All right.  Great.  In your expert opinion, do you |
| 09:10 | 22 | think that Mr. Machado should pay Mattel $5 million for |
| 09:10 | 23 | doing that? |
| 09:10 | 24 |         MR. PRICE:  Object.  That calls for legal |
| 09:10 | 25 | conclusion.  The question is damages. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:10 | 1 | THE COURT:  Well, in its present form, sustained. |
| 09:10 | 2 | BY MR. COTE: |
| 09:10 | 3 | Q.   Would your damages calculation still be that |
| 09:10 | 4 | Mr. Machado should pay $5 million if that's all he did? |
| 09:10 | 5 | MR. PRICE:  Same objection.  His opinion's about |
| 09:11 | 6 | damages, not about parties. |
| 09:11 | 7 | THE COURT:  Just a minute.  I think, Counsel, you |
| 09:11 | 8 | can ask him what the damages would be in that hypothetical. |
| 09:11 | 9 | I'll allow that question. |
| 09:11 | 10 | BY MR. COTE: |
| 09:11 | 11 | Q.   Let me back up just a little bit.  Your number for |
| 09:11 | 12 | damages for Mexico was $5 million or $5.1 million, right? |
| 09:11 | 13 | A.   For the point-of-sale information.  There's other |
| 09:11 | 14 | damages, as well. |
| 09:11 | 15 | Q.   That you didn't testify to? |
| 09:11 | 16 | A.   I did not testify to. |
| 09:11 | 17 | Q.   If Mr. Machado looked at just one or two pages of a |
| 09:11 | 18 | document that's thousands of pages long and then didn't |
| 09:11 | 19 | change anything that MGA was doing afterwards, what would |
| 09:11 | 20 | your damages number be? |
| 09:11 | 21 | A.   The number would be the same. |
| 09:12 | 22 | MR. COTE:  No further questions. |
| 09:12 | 23 | THE COURT:  Counsel, redirect, please. |
| 09:12 | 24 | This is Mr. Price on behalf of Mattel. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 34 of 151   Page ID #:308067
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

34

| | | |
|---|---|---|
| 09:12 | 1 | **REDIRECT EXAMINATION** |
| 09:12 | 2 | BY MR. PRICE: |
| 09:12 | 3 | Q.   Mr. Wagner, first, I'd like to talk to you about lost |
| 09:12 | 4 | profits versus what, uh, Ms. Hurst was talking about, unjust |
| 09:12 | 5 | enrichment.   Okay?   Now, in your direct examination, we |
| 09:12 | 6 | didn't use the word "unjust enrichment," right? |
| 09:12 | 7 | A.   We did not. |
| 09:12 | 8 | Q.   So that's the same thing, though, as -- as MGA's |
| 09:12 | 9 | profits; that is, what -- how they've been enriched and how |
| 09:12 | 10 | much should they have to give back, right? |
| 09:13 | 11 | A.   Correct, related to the Bratz product. |
| 09:13 | 12 | Q.   And the lost profits of Mattel were an entirely |
| 09:13 | 13 | different figure with an entirely different analysis, |
| 09:13 | 14 | correct? |
| 09:13 | 15 | A.   That is correct. |
| 09:13 | 16 | Q.   And you understand that, uh, at the end of this case, |
| 09:13 | 17 | there may be a verdict form which asks for different |
| 09:13 | 18 | numbers? |
| 09:13 | 19 | A.   That's generally what I understand happens. |
| 09:13 | 20 | Q.   It says, "If you say 'yes' here, go to here; if you say |
| 09:13 | 21 | 'no'" -- you've seen those kind of verdicts, right? |
| 09:13 | 22 | A.   I have. |
| 09:13 | 23 | Q.   So let me talk to you about the lost profits that you |
| 09:13 | 24 | testified about. |
| 09:13 | 25 |                   MR. PRICE:  And if we could go to Slide 7. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 35 of 151   Page ID #:308068
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

35

| | | |
|---|---|---|
| 09:13 | 1 | *(Document displayed.)* |
| 09:13 | 2 | BY MR. PRICE: |
| 09:13 | 3 | Q.   Ms. Keller *(sic)* was asking you about your regression |
| 09:13 | 4 | analysis.  How many regression analyses did you do for this |
| 09:13 | 5 | Mattel lost profit -- not just the slide, but for your |
| 09:13 | 6 | Mattel lost-profit analysis? |
| 09:13 | 7 | A.   Probably a dozen or more. |
| 09:14 | 8 | Q.   And in connection with just finding out whether there |
| 09:14 | 9 | was a relationship between Bratz sales and Barbie sales and |
| 09:14 | 10 | just looking at that relationship, you used one |
| 09:14 | 11 | regression -- you used a regression analysis? |
| 09:14 | 12 | A.   I did just one. |
| 09:14 | 13 | Q.   And you heard Ms. Keller *(sic)* said -- ask whether or |
| 09:14 | 14 | not -- |
| 09:14 | 15 | MS. HURST:  I have a lot of respect for |
| 09:14 | 16 | Ms. Keller, Your Honor, but. |
| 09:14 | 17 | THE COURT:  Counsel. |
| 09:14 | 18 | MR. PRICE:  Okay.  I apologize.  I flattered |
| 09:14 | 19 | Ms. Hurst. |
| 09:14 | 20 | MS. HURST:  Indeed.  Thank you, Mr. Price. |
| 09:14 | 21 | MR. PRICE:  Either one I would have. |
| 09:14 | 22 | BY MR. PRICE: |
| 09:14 | 23 | Q.   Okay.  Let me ask you about Ms. Hurst.  She was asking |
| 09:15 | 24 | if this line here; that is, these are Barbie's reduced |
| 09:15 | 25 | market share.  Do you see that? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

36

| | | |
|---|---|---|
| 09:15 | 1 | A.   I do. |
| 09:15 | 2 | Q.   She said if that was totally unrelated to MGA's sales |
| 09:15 | 3 | of Bratz, then Mattel's lost profits would be zero.  Do you |
| 09:15 | 4 | remember her asking that question? |
| 09:15 | 5 | A.   I do. |
| 09:15 | 6 | Q.   In your opinion is there any way that a portion of |
| 09:15 | 7 | Mattel's lost sales, you know, at least were not related to |
| 09:15 | 8 | Bratz increased sales? |
| 09:15 | 9 | A.   I think there is a portion that's not related to their |
| 09:15 | 10 | increased sales, and I've taken that into consideration in |
| 09:15 | 11 | my model. |
| 09:15 | 12 | Q.   And explain to the jury, how did you take it into |
| 09:15 | 13 | consideration; that is, that -- that some of Barbie's lost |
| 09:15 | 14 | sales had nothing to do with Bratz? |
| 09:15 | 15 | A.   That Barbie is losing sales to other Mattel products |
| 09:15 | 16 | themselves that are fashion dolls, to other competitors that |
| 09:15 | 17 | offer fashion dolls, and that's reflected in their market |
| 09:15 | 18 | share versus Mattel's market share of their other dolls and |
| 09:16 | 19 | the market share of the other competitors.  And the extent |
| 09:16 | 20 | that those other competitors are doing better than Barbie |
| 09:16 | 21 | and taking share away from them, I've considered that in my |
| 09:16 | 22 | allocation. |
| 09:16 | 23 | Q.   So, for example, if we go to Slide 11, this is the |
| 09:16 | 24 | slide where you show Barbie's actual and lost sales for 2001 |
| 09:16 | 25 | to 2009. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

37

| | | |
|---|---|---|
| 09:16 | 1 | (Document displayed.) |
| 09:16 | 2 | BY MR. PRICE: |
| 09:16 | 3 | Q.   If we look just at the blue bars, those are Barbie's |
| 09:16 | 4 | actual sales, correct? |
| 09:16 | 5 | A.   Correct. |
| 09:16 | 6 | Q.   And you show them as declining? |
| 09:16 | 7 | A.   That's true.  And this is in the United States. |
| 09:16 | 8 | Q.   Okay.  So how -- could you explain to the jury what |
| 09:16 | 9 | you're taking into account when, in your analysis, you take |
| 09:16 | 10 | into account the fact that Barbie's sales were declining? |
| 09:16 | 11 | A.   The -- I still think in this world without Bratz their |
| 09:16 | 12 | sales still would be declining.  What that trend would be is |
| 09:16 | 13 | the top of these bars.  It's still a downward trend.  And |
| 09:17 | 14 | that's because either the market's getting smaller because |
| 09:17 | 15 | of things like girls playing video games instead of playing |
| 09:17 | 16 | with dolls, or it's because other people are coming out with |
| 09:17 | 17 | popular fashion dolls, like High School Musical or Disney |
| 09:17 | 18 | Princess or Monster High.  Other products are taking sales |
| 09:17 | 19 | away from Barbie.  And that's all considered in my analysis. |
| 09:17 | 20 | Q.   So this analysis takes into account the effect on the |
| 09:17 | 21 | market as a whole of video game sales or -- or people going |
| 09:17 | 22 | to movies instead of buying fashion dolls and things of that |
| 09:17 | 23 | nature, right? |
| 09:17 | 24 | A.   I believe that it does. |
| 09:17 | 25 | Q.   So having taken -- you took that into account. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:17 | 1 | Did you also take into account whether or not there are |
| 09:17 | 2 | other Bratz sales that should not be attributed to the rest |
| 09:17 | 3 | of the market? |
| 09:17 | 4 | A.   I did.  And as I explained to you, that to the extent I |
| 09:17 | 5 | could prove that Bratz expanded the market, I'm not awarding |
| 09:17 | 6 | any lost profits on those sales to either Mattel or any |
| 09:18 | 7 | other competitor. |
| 09:18 | 8 | MR. PRICE:  And that's Slide 9, I believe, if we |
| 09:18 | 9 | can show that. |
| 09:18 | 10 | *(Document displayed.)* |
| 09:18 | 11 | BY MR. PRICE: |
| 09:18 | 12 | Q.   So this is the calculation you did where you took off |
| 09:18 | 13 | from the top of Bratz sales a figure that would not be |
| 09:18 | 14 | allocated to anybody else in the market; is that right? |
| 09:18 | 15 | A.   That is correct. |
| 09:18 | 16 | Q.   And so that figure was $1.4 billion, which you just |
| 09:18 | 17 | took off the table? |
| 09:18 | 18 | A.   Yes. |
| 09:18 | 19 | Q.   Now, your analysis was the impact of -- of Bratz on |
| 09:18 | 20 | Barbie sales, correct? |
| 09:18 | 21 | A.   That's what I did. |
| 09:18 | 22 | Q.   Okay.  Did you do an analysis of the impact of Bratz on |
| 09:18 | 23 | other Mattel sales? |
| 09:18 | 24 | A.   I did not.  I didn't calculate any damages for any |
| 09:18 | 25 | other Mattel fashion doll product. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

39

| | | |
|---|---|---|
| 09:18 | 1 | Q.   And did you think that was something that was -- that |
| 09:18 | 2 | was appropriate for your analysis? |
| 09:19 | 3 | A.   I thought it was conservative.  I saw evidence in the |
| 09:19 | 4 | record that Bratz did cause loss of sales of other products |
| 09:19 | 5 | sold by Mattel, including Fashion Divas and Polly Pocket, |
| 09:19 | 6 | and yet, I have not calculated any damages for those |
| 09:19 | 7 | products. |
| 09:19 | 8 | Q.   So, for example, if you'd look at Exhibit 22054. |
| 09:19 | 9 |           *(Document provided to the witness.)* |
| 09:19 | 10 | BY MR. PRICE: |
| 09:19 | 11 | Q.   Is 22054 one of documents that you reviewed in your |
| 09:19 | 12 | analysis? |
| 09:19 | 13 | A.   It is. |
| 09:19 | 14 | Q.   And that's appears to be an e-mail from Mr. Larian to |
| 09:19 | 15 | Walmart with an MGA production number on it? |
| 09:19 | 16 | A.   It is. |
| 09:20 | 17 |           MR. PRICE:  Your Honor, I'd move Exhibit 22504 |
| 09:20 | 18 | into evidence. |
| 09:20 | 19 |           MS. HURST:  Objection.  Hearsay. |
| 09:20 | 20 |           THE COURT:  I'm going to sustain the objection. |
| 09:20 | 21 | BY MR. PRICE: |
| 09:20 | 22 | Q.   On the face of it, does this have an MGA production |
| 09:20 | 23 | number? |
| 09:20 | 24 | A.   It does. |
| 09:20 | 25 | Q.   Is it from Isaac Larian? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

40

| 09:20 | 1 | A.   He is the author of this e-mail. |
| 09:20 | 2 | Q.   And it's to Walmart? |
| 09:20 | 3 | THE COURT:  I won't be receiving any evidence |
| 09:20 | 4 | through experts testifying.  Co-equal for both sides.  He |
| 09:20 | 5 | can refer to it.  He's an expert.  He can refer to hearsay, |
| 09:20 | 6 | but it's hearsay. |
| 09:20 | 7 | BY MR. PRICE: |
| 09:20 | 8 | Q.   Okay.  Is this one of documents that you're referring |
| 09:20 | 9 | to that you said suggested that Bratz sales had impacts on |
| 09:20 | 10 | other Mattel products? |
| 09:20 | 11 | A.   Yes.  It talks about impacts on Barbie and Polly |
| 09:20 | 12 | Pocket. |
| 09:20 | 13 | Q.   And did this support your view that you could have |
| 09:20 | 14 | broadened your damages calculation to include Bratz sales |
| 09:20 | 15 | being at the expense of Polly Pocket as well as Barbie? |
| 09:20 | 16 | A.   Yes. |
| 09:20 | 17 | Q.   So you chose just to look at one portion of Mattel's |
| 09:20 | 18 | line, the Barbie line, correct? |
| 09:21 | 19 | A.   Right.  The major line that was impacted. |
| 09:21 | 20 | Q.   Now, Ms. Hurst asked you about the 1990s.  Is there any |
| 09:21 | 21 | reason you -- could you tell us why you didn't study the |
| 09:21 | 22 | 1990s in connection with your analysis? |
| 09:21 | 23 | A.   It's a totally different market with different market |
| 09:21 | 24 | factors, different economy.  It's before the damage period. |
| 09:21 | 25 | I don't think that has much meaningful information for me to |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

41

| 09:21 | 1 | analyze.  I analyzed the period where damages were being |
| 09:21 | 2 | claimed. |
| 09:21 | 3 | Q.   Now, in this analysis, you said you used this NPD data? |
| 09:21 | 4 | A.   I did. |
| 09:21 | 5 | Q.   And Ms. Hurst asked you whether or not there were |
| 09:21 | 6 | problems with the data.  Do you recall that? |
| 09:21 | 7 | A.   There's problems with all data. |
| 09:21 | 8 | Q.   So -- |
| 09:21 | 9 | A.   So, yes, I'm aware of problems with NPD data. |
| 09:21 | 10 | Q.   Do companies including MGA and Mattel still spend quite |
| 09:21 | 11 | a bit of money to get that data? |
| 09:21 | 12 | A.   They still do, as far as I understand. |
| 09:22 | 13 | Q.   And is it your understanding that people in the |
| 09:22 | 14 | industry still rely on it? |
| 09:22 | 15 | A.   They do rely upon it. |
| 09:22 | 16 | Q.   And did you see evidence, for example, that MGA itself |
| 09:22 | 17 | relies on NPD data? |
| 09:22 | 18 | A.   They do. |
| 09:22 | 19 | Q.   If you'd look at 23481. |
| 09:22 | 20 | *(Document provided to the witness.)* |
| 09:22 | 21 | THE WITNESS:  I've got it. |
| 09:22 | 22 | BY MR. PRICE: |
| 09:22 | 23 | Q.   Is this one of documents which were listed in your |
| 09:22 | 24 | report as a document that you were relying on for the |
| 09:22 | 25 | reliability of NPD data? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:22 | 1 | A.   (No response.) |
| 09:23 | 2 | Q.   Let me strike the question. |
| 09:23 | 3 | Is this a document you reviewed in connection with |
| 09:23 | 4 | preparing your report? |
| 09:23 | 5 | A.   Yes, this is a document that supports my view that |
| 09:23 | 6 | Bratz took market share away from Barbie. |
| 09:23 | 7 | Q.   Uh, and in connection with -- this appears to be an |
| 09:23 | 8 | e-mail from Mr. Larian to Walmart? |
| 09:23 | 9 | A.   It is. |
| 09:23 | 10 | Q.   And it's a document where -- |
| 09:23 | 11 | MS. HURST:  Your Honor, I object to the |
| 09:23 | 12 | publication of the hearsay through this witness. |
| 09:23 | 13 | THE COURT:  Sustained.  You can refer to it.  You |
| 09:23 | 14 | can talk about it. |
| 09:23 | 15 | BY MR. PRICE: |
| 09:23 | 16 | Q.   Is this a document where Mr. Larian is talking about |
| 09:23 | 17 | the sales of Bratz compared to Barbie? |
| 09:23 | 18 | THE COURT:  Well, just a moment.  The most |
| 09:23 | 19 | important thing is:  Is this a document you read before and |
| 09:23 | 20 | relied upon in your analysis? |
| 09:23 | 21 | THE WITNESS:  Yes, Your Honor.  It's in my report. |
| 09:23 | 22 | THE COURT:  Thank you. |
| 09:23 | 23 | Counsel, please continue. |
| 09:23 | 24 | BY MR. PRICE: |
| 09:23 | 25 | Q.   Did you obtain any information from this as to whether |

| | | |
|---|---|---|
| 09:23 | 1 | or not MGA Mexico relied on NPD data? |
| 09:23 | 2 | A.   I did. |
| 09:23 | 3 | Q.   And what did you conclude? |
| 09:23 | 4 | A.   That MGA uses NPD data in its efforts to promote its |
| 09:24 | 5 | products to its customers. |
| 09:24 | 6 | Q.   Customers such as -- such as Walmart? |
| 09:24 | 7 | A.   Yes. |
| 09:24 | 8 | Q.   Now, Ms. Hurst also asked you a number of questions |
| 09:24 | 9 | about allocation of profits and EBIT and allocation between |
| 09:24 | 10 | benchmarks whether benchmarks were appropriate.  Do you |
| 09:24 | 11 | recall those questions? |
| 09:24 | 12 | A.   I do. |
| 09:24 | 13 | Q.   Okay.  Now, does that benchmark issue, you know, |
| 09:24 | 14 | comparing to benchmarks, uh, have anything to do with your |
| 09:24 | 15 | calculation of lost sales to Mattel as a result of increased |
| 09:24 | 16 | sales of Bratz? |
| 09:24 | 17 | A.   No. |
| 09:24 | 18 | Q.   And if we could look at Exhibit 10 -- I'm sorry, it's |
| 09:24 | 19 | Slide 10 of Exhibit 24294. |
| 09:25 | 20 | *(Document displayed.)* |
| 09:25 | 21 | BY MR. PRICE: |
| 09:25 | 22 | Q.   Now, does Slide 10 here show the methodology that you |
| 09:25 | 23 | used in calculating the lost profits to Mattel as a result |
| 09:25 | 24 | of Bratz sales? |
| 09:25 | 25 | A.   Well, it goes to the part of where I calculate the lost |

| 09:25 | 1 | sales only.  It doesn't explain how I get to profits. |
| 09:25 | 2 | Q.   This doesn't yet subtract the costs? |
| 09:25 | 3 | A.   It does not. |
| 09:25 | 4 | Q.   So what we have here in Slide 10 is your methodology of |
| 09:25 | 5 | how you did the lost sales before deducting the costs? |
| 09:25 | 6 | A.   Yes. |
| 09:25 | 7 | Q.   And so you took Bratz sales, right? |
| 09:25 | 8 | A.   I did. |
| 09:25 | 9 | Q.   You took that -- was it 1.9 billion?  You took that |
| 09:25 | 10 | market expansion right off the table, correct? |
| 09:25 | 11 | A.   I did.  But remember, that number's at retail. |
| 09:25 | 12 | Q.   Uh-huh. |
| 09:25 | 13 | A.   But I did, yes. |
| 09:25 | 14 | Q.   And then that was in the sales to allocate to the rest |
| 09:25 | 15 | of the market, correct? |
| 09:25 | 16 | A.   Correct. |
| 09:25 | 17 | Q.   And it's that number that wasn't as a result of market |
| 09:25 | 18 | expansion, that you then "proportioned" according to how |
| 09:26 | 19 | Barbie was actually performing in the market with respect to |
| 09:26 | 20 | its competitors, right? |
| 09:26 | 21 | A.   That's exactly right. |
| 09:26 | 22 | Q.   And that's when you saw that curve of Barbie sales |
| 09:26 | 23 | going down that you took that into account year by year, |
| 09:26 | 24 | correct? |
| 09:26 | 25 | A.   I did. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 45 of 151   Page ID #:308078
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

45

| | | |
|---|---|---|
| 09:26 | 1 | Q.   Now, you've seen documents where Mattel was very |
| 09:26 | 2 | extremely disappointed with the sales of Barbie, correct? |
| 09:26 | 3 | A.   I've seen such documents. |
| 09:26 | 4 | Q.   And you told the jury, though, that you didn't conclude |
| 09:26 | 5 | that Barbie was a failure, right? |
| 09:26 | 6 | A.   Clearly that's not my view. |
| 09:26 | 7 | Q.   Okay.  So why did you say that?  I mean -- I mean, the |
| 09:26 | 8 | Mattel folks were really concerned about -- about the sales |
| 09:26 | 9 | going down. |
| 09:26 | 10 | A.   Well, two reasons.  First, that in spite of everything |
| 09:26 | 11 | that happened in this actual world, Barbie's still every |
| 09:26 | 12 | single year the number one fashion doll in the world. |
| 09:26 | 13 | And if you compare the total sales of Bratz to Barbie, |
| 09:27 | 14 | Barbie had $10.5 billion worth of sales during this time |
| 09:27 | 15 | period.  Bratz had approximately 3.4 billion.  So even |
| 09:27 | 16 | though they're doing, in their own minds, poorly, there's |
| 09:27 | 17 | still three times the sale of the next biggest competitor. |
| 09:27 | 18 | I think that's a pretty successful company. |
| 09:27 | 19 | Q.   Did you look at what's called the "market cap" of |
| 09:27 | 20 | Mattel during that timeframe? |
| 09:27 | 21 | A.   I did. |
| 09:27 | 22 | Q.   Okay.  And could you explain to the jury what -- what |
| 09:27 | 23 | market cap means? |
| 09:27 | 24 | MS. HURST:  Objection.  Beyond the scope and |
| 09:27 | 25 | irrelevant. |

| | | |
|---|---|---|
| 09:27 | 1 | THE COURT:  Overruled. |
| 09:27 | 2 | You can answer the question. |
| 09:27 | 3 | THE WITNESS:  Market cap is the total market value |
| 09:27 | 4 | of Mattel's stock.  What people are willing to pay for in |
| 09:27 | 5 | the market to own a share of stock of Mattel. |
| 09:27 | 6 | BY MR. PRICE: |
| 09:27 | 7 | Q.   Now, during this time period, the time period that |
| 09:27 | 8 | Ms. Hurst says Barbie was failing, during the time period of |
| 09:28 | 9 | 2001 till -- till the present, did Mattel's market cap |
| 09:28 | 10 | increase?  Decrease?  Stay the same? |
| 09:28 | 11 | A.   It just about doubled.  So it increased significantly |
| 09:28 | 12 | during this time period.  So the company became, basically, |
| 09:28 | 13 | twice as valuable during the 2000 time period, the 2000 |
| 09:28 | 14 | decade. |
| 09:28 | 15 | Q.   Now, does that have any influence on when we go to |
| 09:28 | 16 | unjust enrichment, that is -- and you use those |
| 09:28 | 17 | benchmarks -- does that have any influence on your |
| 09:28 | 18 | conclusion as to what are appropriate benchmarks? |
| 09:28 | 19 | A.   Yes.  That tells me again, Mattel, as a benchmark, |
| 09:28 | 20 | is -- extremely generous benchmark to use because, again, |
| 09:28 | 21 | it's the most successful toy company in the world.  It |
| 09:28 | 22 | doubled its value during this period of time -- that I use |
| 09:28 | 23 | it as a yardstick. |
| 09:29 | 24 | Q.   Ms. Hurst also asked you about Mr. Larian's |
| 09:29 | 25 | distributions associated with Bratz of about 384 million, |

09:29   1   and she was talking to you about money going to the IRS.  Do

09:29   2   you recall that?

09:29   3   A.   I do.

09:29   4   Q.   Could you tell us, uh, why you don't take that into

09:29   5   account in your calculations?

09:29   6   A.   A number of reasons.

09:29   7       First off is that, as was explained in my

09:29   8   cross-examination, MGA pays no taxes, but its shareholders

09:29   9   do.

09:29   10      Now, in -- starting in 2007, 2008, and 2009, MGA lost

09:29   11  over $300 million in its business.  That means that

09:29   12  Mr. Larian can file amended tax returns, where, in the

09:29   13  earlier years, he actually wrote checks.

09:29   14          MS. HURST:  Your Honor, objection.  This is --

09:29   15          THE COURT:  Well, I think we need to have a

09:29   16  sidebar, I think, at this time.

09:29   17          Ladies and gentlemen, would you excuse us for one

09:30   18  moment.  Just take this as a recess.  You're admonished not

09:30   19  to discuss this matter amongst yourselves, nor form or

09:30   20  express any opinion concerning the case.

09:30   21          We'll come back and get you shortly.

09:30   22          *(Jury recesses at 9:30 a.m.)*

09:30   23          *(Outside the presence of the jury.)*

09:30   24          THE COURT:  Mr. Wagner, if you will remain outside

09:30   25  for just one moment.

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

48

| | | |
|---|---|---|
| 09:30 | 1 | THE WITNESS:  Yes, Your Honor. |
| 09:30 | 2 | *(Witness exits the proceedings.)* |
| 09:30 | 3 | THE COURT:  Counsel be seated. |
| 09:30 | 4 | I want a very clear record on this. |
| 09:30 | 5 | The injunctive relief handed down by Judge Larson, |
| 09:30 | 6 | once again, was on what date? |
| 09:30 | 7 | MS. HURST:  December 3rd, 2008. |
| 09:30 | 8 | THE COURT:  Okay. |
| 09:31 | 9 | Obviously, that had a significant effect upon MGA, |
| 09:31 | 10 | and I want the record clear about the banter that's gone |
| 09:31 | 11 | back and forth and make sure that we have a record of this, |
| 09:31 | 12 | so any informal discussion is capsulized.  I think the |
| 09:31 | 13 | formal discussions have been capsulized for the Circuit. |
| 09:31 | 14 | But the Court initially counseled Mattel that they |
| 09:31 | 15 | might be wise to limit their damages analysis to 2008 |
| 09:31 | 16 | because the injunctive relief had a significant bearing upon |
| 09:31 | 17 | MGA.  And I'd already granted an *in limine* motion that MGA |
| 09:31 | 18 | was not going to be allowed to go into the alleged harm of |
| 09:31 | 19 | the injunctive relief that Judge Larson granted.  That, of |
| 09:31 | 20 | course, had a severe impact on MGA. |
| 09:31 | 21 | This Court has numerous lawsuits against different |
| 09:32 | 22 | retailers pending after this case between MGA and their |
| 09:32 | 23 | retailers for retailers canceling of orders.  And, |
| 09:32 | 24 | obviously, part of the loss of MGA is due to this injunctive |
| 09:32 | 25 | relief in this time period. |

| | | |
|---|---|---|
| 09:32 | 1 | Then Ms. Hurst, though, objected and felt that the |
| 09:32 | 2 | 2009/2010 time period would be relevant.  The reason for |
| 09:32 | 3 | that is she hoped to be able to vigorously cross-examine the |
| 09:32 | 4 | expert and show that his records -- I'm sorry -- that his |
| 09:32 | 5 | numbers were incorrect. |
| 09:32 | 6 | The Court stated if that occurred, I was not going |
| 09:32 | 7 | to allow MGA to use this as a door to open into injunctive |
| 09:32 | 8 | relief or the injunctive relief granted by Judge Larson. |
| 09:32 | 9 | Now, I want to make certain that's an accurate and |
| 09:32 | 10 | basic recapsulation of the record. |
| 09:32 | 11 | Mr. Price? |
| 09:32 | 12 | MR. PRICE:  That's correct. |
| 09:32 | 13 | THE COURT:  All right.  Ms. Hurst? |
| 09:33 | 14 | MS. HURST:  Agreed. |
| 09:33 | 15 | THE COURT:  All right.  Now, where are we going |
| 09:33 | 16 | with this?  No surprises.  In other words, when the expert |
| 09:33 | 17 | comes back on the stand in 12 minutes, I don't want any |
| 09:33 | 18 | surprises. |
| 09:33 | 19 | MR. PRICE:  Your Honor, what the expert's going to |
| 09:33 | 20 | testify to is that he could not do a deduction for taxes |
| 09:33 | 21 | from that 384 million number because he knows Mr. Larian |
| 09:33 | 22 | can -- has losses that he can -- he can adjust against the |
| 09:33 | 23 | income.  He also knows that you can -- you can take a credit |
| 09:33 | 24 | going forward for any payment in this case. |
| 09:33 | 25 | THE COURT:  Why are we talking about MGA's -- just |

| | | |
|---|---|---|
| 09:33 | 1 | a moment. |
| 09:33 | 2 | *(Reading from realtime:)* |
| 09:33 | 3 | "QUESTION:  Can you tell us why -- why |
| 09:34 | 4 | you -- well, you don't take that into account in your |
| 09:34 | 5 | deliberations? |
| 09:34 | 6 | "ANSWER:  A number of reasons. |
| 09:34 | 7 | "First off is that, as was explained in my |
| 09:34 | 8 | cross-examination, MGA pays no taxes, but its shareholders |
| 09:34 | 9 | do.  Now, starting in 2007, 2008, 2009, MGA lost over |
| 09:34 | 10 | 300 million in its business.  That means that Mr. Larian can |
| 09:34 | 11 | file the amended tax returns, where, in the earlier years, |
| 09:34 | 12 | he actually wrote checks." |
| 09:34 | 13 | What's your next question? |
| 09:34 | 14 | MR. PRICE:  He said that's one factor.  I'd say, |
| 09:34 | 15 | "How does that affect your inability or ability to adjust |
| 09:34 | 16 | for the payment of taxes?" |
| 09:34 | 17 | THE COURT:  What's your cross-examination in this |
| 09:34 | 18 | area? |
| 09:34 | 19 | MS. HURST:  I'm concerned that it's pure |
| 09:34 | 20 | speculation what the tax effect -- future tax effect might |
| 09:34 | 21 | be.  But I'm also extremely concerned, because I have to say |
| 09:34 | 22 | that at the time we had this whole discussion about opening |
| 09:35 | 23 | the door to the injunction, I had no idea this witness was |
| 09:35 | 24 | gonna get up here and testify that the continuing period |
| 09:35 | 25 | from 2008 through 2010 and MGA's inability to successfully |

09:35   1   commercialize other products during that period of time was
09:35   2   gonna be used as evidence as to why MGA lacks creativity
09:35   3   and, therefore, it must have stolen the IP.  And that's what
09:35   4   this witness said.  It's one thing to say we have to use his
09:35   5   benchmark calculation through 2009/2010 to be fair about
09:35   6   what MGA's actual profits were.  It's a whole other thing
09:35   7   for him to get up there and talk about Monster High and 2010
09:35   8   and how Mattel's the best --
09:35   9           THE COURT:  Now, Ms. Hurst, you just furnished.
09:35   10  Thank you.
09:35   11          That's my concern.
09:35   12          Just a moment.
09:35   13          I think -- and this is a vernacular -- you're
09:35   14  dealing with chump change in 2009/2010 in terms of the
09:35   15  damages you're requesting.  And I think you're taking an
09:35   16  extraordinary risk.  I'll leave that to your wisdom.
09:35   17  Because now it's segued from what I thought, just slightly,
09:36   18  but's it's segued over into the area that, if you do obtain
09:36   19  a verdict, I think this would be one of the first things
09:36   20  that the Circuit would look at; and that is, the inability
09:36   21  of the expert to go back and see what the injunctive relief
09:36   22  is and the effect of that injunctive relief in 2009, 2010,
09:36   23  and parts of 2008.  And you're running an extraordinary risk
09:36   24  on appeal again.
09:36   25          MR. PRICE:  I want --

| | | |
|---|---|---|
| 09:36 | 1 | THE COURT: No. I'm done. I'm not going to make a |
| 09:36 | 2 | ruling on it. You make your decision. |
| 09:36 | 3 | MR. PRICE: You -- can I make my record, though? |
| 09:36 | 4 | THE COURT: Make your record. |
| 09:36 | 5 | MR. PRICE: Which is that it was Ms. Hurst who |
| 09:36 | 6 | challenged him for not deducting taxes from the profit |
| 09:36 | 7 | distributions to Mr. Larian, so my expert has to be able to |
| 09:36 | 8 | say the reason you can't do that -- he can't do that is he |
| 09:36 | 9 | doesn't have that information, and he knows that because |
| 09:36 | 10 | MGA's a Subchapter S corporation, that Mr. Larian would have |
| 09:36 | 11 | credits for any losses. |
| 09:36 | 12 | THE COURT: But you can do that without getting |
| 09:36 | 13 | into the 2009/2010 time period, can't you? |
| 09:36 | 14 | MR. PRICE: You can't because those -- you can do |
| 09:36 | 15 | those -- get those credits over a period of time of years. |
| 09:37 | 16 | THE COURT: How much money are we dealing with? |
| 09:37 | 17 | MR. PRICE: Well, the point is -- |
| 09:37 | 18 | THE COURT: No, no. How much money are we dealing |
| 09:37 | 19 | with? |
| 09:37 | 20 | MR. PRICE: We don't know how much his tax |
| 09:37 | 21 | deductions would be. |
| 09:37 | 22 | THE COURT: Fairly small. Do you want to run that |
| 09:37 | 23 | risk with the Circuit again? I mean, I like getting |
| 09:37 | 24 | together with you every two years, but... |
| 09:37 | 25 | MR. PRICE: Well, I will -- |

| | | |
|---|---|---|
| 09:37 | 1 | THE COURT:  I'll leave that to your wisdom. |
| 09:37 | 2 | MR. PRICE:  Given his answer, I'll ask him to talk |
| 09:37 | 3 | in terms of generalities rather than specifics. |
| 09:37 | 4 | THE COURT:  I think that might be very wise; |
| 09:37 | 5 | otherwise, we might be visiting again in two years. |
| 09:37 | 6 | Now, this does not open the door yet.  Okay?  But |
| 09:37 | 7 | I'm going to listen very closely to the questions from |
| 09:37 | 8 | Mattel, and if we need to have another conference at |
| 09:37 | 9 | sidebar, we will. |
| 09:37 | 10 | Okay.  Counsel, we've got five minutes. |
| 09:37 | 11 | *(Recess held at 9:37 a.m.)* |
| 09:44 | 12 | *(Proceedings resumed at 9:44 a.m.)* |
| 09:44 | 13 | *(In the presence of the jury.)* |
| | 14 | THE COURT:  The jury is present, the alternates, |
| | 15 | the witness, and all counsel. |
| | 16 | Counsel, you may continue your examination. |
| 09:45 | 17 | **REDIRECT EXAMINATION (Continued)** |
| 01:59 | 18 | BY MR. PRICE: |
| 09:45 | 19 | Q.   Mr. Wagner, we were talking about why, in your |
| 09:45 | 20 | calculation of the Bratz-related distributions, that |
| 09:45 | 21 | Mr. Larian received -- you know, why you didn't do a |
| 09:45 | 22 | calculation for taxes. |
| 09:45 | 23 | And based on the answer you last gave, can you tell us, |
| 09:45 | 24 | then, you know, why -- how that impacted whether or not you |
| 09:45 | 25 | thought it was appropriate to reduce for taxes? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

54

09:45  1  A.  Commercial damages are normally tax deductible by the
09:45  2  person paying them.
09:45  3       And the taxpayer can refile previous returns for two
09:45  4  years, and then they also can use that as a deduction for
09:45  5  20 years going into the future to not pay taxes in the
09:45  6  future.
09:45  7  Q.  So would there be any way for -- in any event, for you
09:45  8  to do a calculation of taxes without tax report information?
09:45  9  A.  I would need Mr. Larian's tax returns to really
09:45  10  understand his tax situation.
09:46  11  Q.  Now, let me go to the unjust enrichment; that is, the
09:46  12  portion of Bratz profits that you then allocated to --
09:46  13  between sweat equity and the value of the intellectual
09:46  14  property.  Okay?
09:46  15       And first let me ask you:  Do you remember Ms. Hurst
09:46  16  showed you a description of the trade secrets that are
09:46  17  involved in this case?  Do you recall that?
09:46  18  A.  I do.
09:46  19  Q.  Now, when you read those descriptions, were you aware
09:46  20  of what the lawsuit was about?
09:46  21  A.  Yes.
09:46  22  Q.  I mean, did you have an understanding as to whether
09:46  23  those trade secrets related to a particular design or
09:46  24  concept?
09:46  25  A.  I did.

Case 2:04-cv-09049-DOC-RNB    Document 10181    Filed 03/11/11    Page 55 of 151    Page ID #:308088
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

55

09:46  1   Q.   And what was your understanding as to what those trade

09:46  2   secrets related to?

09:46  3   A.   It was those group of ideas and concepts that were

09:46  4   brought all together by Carter Bryant while he was at

09:46  5   Mattel.

09:46  6   Q.   Now, and again, you're not here to tell the jury

09:46  7   whether or not that was done while at Mattel or some other

09:47  8   time, correct?

09:47  9   A.   That's right.  I'm not proving that issue.

09:47  10  Q.   And you haven't, you know, compared dolls or designs to

09:47  11  see whether or not there is, in fact, copyright infringement

09:47  12  or whether or not trade secrets were stolen, correct?

09:47  13  A.   I have not.

09:47  14  Q.   And that's not your expertise?

09:47  15  A.   It is not.

09:47  16  Q.   So in response to one of Ms. Hurst's questions, though,

09:47  17  she asked you whether or not you had allocated among trade

09:47  18  secrets, and you said -- you said "no," correct?

09:47  19  A.   I did say that.

09:47  20  Q.   And you said that wouldn't affect your damages

09:47  21  calculation if a trade secret was blocking.

09:47  22       Could you tell us what you meant by a trade secret

09:47  23  being "blocking"?

09:47  24            MS. HURST:  Objection.  Calls for a legal

09:47  25  conclusion.

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

56

| | | |
|---|---|---|
| 09:47 | 1 | THE COURT: Sustained. |
| 09:47 | 2 | BY MR. PRICE: |
| 09:47 | 3 | Q. Well, no. In response to her question -- she asked you |
| 09:47 | 4 | whether or not your damages figure would apply if only some |
| 09:47 | 5 | of the trade secrets were found by the jury. Do you recall |
| 09:48 | 6 | that? |
| 09:48 | 7 | A. I do. |
| 09:48 | 8 | Q. And what was your response? |
| 09:48 | 9 | MS. HURST: Same objection. He's trying to elicit |
| 09:48 | 10 | a legal conclusion. |
| 09:48 | 11 | MR. PRICE: It's what she asked him. |
| 09:48 | 12 | THE COURT: You raised the issue, didn't you, |
| 09:48 | 13 | Ms. Hurst? |
| 09:48 | 14 | MS. HURST: I only asked about whether he |
| 09:48 | 15 | allocated, that's all. |
| 09:48 | 16 | THE COURT: You can answer the question, sir. You |
| 09:48 | 17 | can answer the question. |
| 09:48 | 18 | THE WITNESS: My answer to her questions was: It |
| 09:48 | 19 | depends. I'd need more facts to know. If one of the trade |
| 09:48 | 20 | secrets was enough to preclude Bratz from being in the |
| 09:48 | 21 | marketplace, it would have all the value. |
| 09:48 | 22 | BY MR. PRICE: |
| 09:48 | 23 | Q. And that, of course, isn't something that you as an |
| 09:48 | 24 | expert are here to decide; that is, whether or not one of |
| 09:48 | 25 | the trade secrets would preclude MGA from creating the Bratz |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:48 | 1 | line, right? |
| 09:48 | 2 | A.   I have not made that determination. |
| 09:48 | 3 | Q.   Now, Ms. Hurst also showed you Exhibit 302, which was |
| 09:48 | 4 | Mr. Bryant's -- uh, what we've seen as Mr. Bryant's pitch |
| 09:48 | 5 | book; do you recall that? |
| 09:48 | 6 | A.   She showed me the first page. |
| 09:48 | 7 | Q.   Uh, did, uh -- is it your understanding that's the |
| 09:49 | 8 | only -- those are the only Carter Bryant designs which are |
| 09:49 | 9 | the subject of this case? |
| 09:49 | 10 | A.   Well, actually, I -- I stand corrected.  She did have |
| 09:49 | 11 | some -- more than one page, but she did admit it wasn't all |
| 09:49 | 12 | of the pages.  So, no, I understand there's more than is in |
| 09:49 | 13 | that pitch book. |
| 09:49 | 14 | Q.   And in connection with the MGA profits, do you recall |
| 09:49 | 15 | Ms. Hurst asked you a line of questions as to whether or |
| 09:49 | 16 | not, you know, you were including for the trade secret every |
| 09:49 | 17 | product that was related to Bratz?  Do you recall that? |
| 09:49 | 18 | A.   A number of times, I recall it. |
| 09:49 | 19 | Q.   And in your analysis, have you done analysis that goes |
| 09:49 | 20 | to the issue of whether or not there would have been a Bratz |
| 09:49 | 21 | brand in the market if there had been no Bratz dolls? |
| 09:49 | 22 | MS. HURST:  Objection.  Beyond the scope. |
| 09:49 | 23 | Undisclosed opinions. |
| 09:50 | 24 | THE COURT:  You're asking -- wait a minute.  I |
| 09:50 | 25 | want to be sure of this question. |

| | | |
|---|---|---|
| 09:50 | 1 | You're asking him if Bratz would have existed? |
| 09:50 | 2 | MR. PRICE:  Whether the Bratz brand would have |
| 09:50 | 3 | existed but for the Bratz dolls. |
| 09:50 | 4 | THE COURT:  No.  Sustained. |
| 11:59 | 5 | BY MR. PRICE: |
| 09:50 | 6 | Q.  Ms. Hurst, you recall, she questioned you about Flavas? |
| 09:50 | 7 | A.  She did. |
| 09:50 | 8 | Q.  And I think she asked you whether it was correct |
| 09:50 | 9 | isn't -- it's possible for a -- oh -- it's possible for a |
| 09:50 | 10 | doll to fail depending upon the product, right? |
| 09:50 | 11 | A.  She did. |
| 09:50 | 12 | Q.  So, basically, your observation -- |
| 09:50 | 13 | MS. HURST:  Your Honor, I object and move to |
| 09:50 | 14 | strike to the characterization of my questions. |
| 09:50 | 15 | MR. PRICE:  I'll reask it, Your Honor. |
| 11:59 | 16 | BY MR. PRICE: |
| 09:50 | 17 | Q.  Uh, did you answer -- by answering a leading question, |
| 09:50 | 18 | did you say that it's possible to fail depending upon the |
| 09:51 | 19 | product? |
| 09:51 | 20 | A.  I did. |
| 09:51 | 21 | Q.  And Flavas was an example of a product that didn't do |
| 09:51 | 22 | as well as expected because of the product? |
| 09:51 | 23 | A.  That's correct. |
| 09:51 | 24 | Q.  So you can have the best advertising or merchandising |
| 09:51 | 25 | or marketing, and if the product's not good, it's not going |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 59 of 151   Page ID #:308092
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

59

| | | |
|---|---|---|
| 09:51 | 1 | to sell, correct? |
| 09:51 | 2 | A.   I said that, and that's my opinion. |
| 09:51 | 3 | Q.   Now, in your analysis of MGA's profits and what's |
| 09:51 | 4 | attributable to the intellectual property of |
| 09:51 | 5 | Bratz -- okay -- in that analysis, did you do an analysis to |
| 09:51 | 6 | see whether or not MGA, using creativity, marketing, |
| 09:51 | 7 | et cetera, had created value for its other products? |
| 09:51 | 8 | MS. HURST:  Your Honor, this is the issue we were |
| 09:51 | 9 | discussing at the recess. |
| 09:51 | 10 | MR. PRICE:  No.  It's what he -- it's based upon |
| 09:51 | 11 | what's in evidence. |
| 09:51 | 12 | THE COURT:  Just a moment. |
| 09:51 | 13 | MS. HURST:  I'm gonna say it opens the door. |
| 09:52 | 14 | THE COURT:  Counsel. |
| 09:52 | 15 | What time period, Counsel? |
| 09:52 | 16 | MR. PRICE:  This is 2001.  It's referring, |
| 09:52 | 17 | Your Honor, to Chart 4. |
| 09:52 | 18 | THE COURT:  Counsel, what time period? |
| 09:52 | 19 | MR. PRICE:  The Chart 4 is 2001 to 2010. |
| 09:52 | 20 | THE COURT:  I'll leave that to you, Counsel. |
| 09:52 | 21 | You're forewarned. |
| 09:52 | 22 | BY MR. PRICE: |
| 09:52 | 23 | Q.   If you can look at Chart 4. |
| 09:52 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 09:31 | 1 | BY MR. PRICE: |
| 09:52 | 2 | Q.   We saw this yesterday, correct? |
| 09:52 | 3 | A.   We did. |
| 09:52 | 4 |        THE COURT:  All right.  I let that in for that |
| 09:52 | 5 | purpose yesterday, Counsel. |
| 09:52 | 6 |        MR. PRICE:  Okay. |
| 09:52 | 7 |        THE COURT:  This may not open the door but... |
| 09:52 | 8 | BY MR. PRICE: |
| 09:52 | 9 | Q.   So what is your conclusion from this analysis as to |
| 09:52 | 10 | whether or not the value of Bratz is as a result of MGA's |
| 09:52 | 11 | sweat equity, creativity, marketing, as opposed to being the |
| 09:53 | 12 | result of the intellectual property, the uniqueness of the |
| 09:53 | 13 | product? |
| 09:53 | 14 | A.   My conclusion is that the sweat equity that MGA's able |
| 09:53 | 15 | to put into its products have not generated other |
| 09:53 | 16 | significant profitability in all of the 83 other product |
| 09:53 | 17 | lines.  There has to be another explanation for the |
| 09:53 | 18 | phenomenal success of Bratz.  And my judgment, that would be |
| 09:53 | 19 | related to its intellectual property. |
| 09:53 | 20 |        MS. HURST:  Your Honor, object and move to strike. |
| 09:53 | 21 | It opens the door. |
| 09:53 | 22 |        THE COURT:  It doesn't, Counsel. |
| 09:53 | 23 |        Overruled. |
| 09:53 | 24 | BY MR. PRICE: |
| 09:53 | 25 | Q.   And you recall that Ms. Hurst put up on the board a |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 61 of 151   Page ID #:308094
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

61

| | | |
|---|---|---|
| 09:53 | 1 | Slide 25; it was MGA's Slide 25. |
| 09:53 | 2 | MR. PRICE:  Do we have that, Ken?  I'll put it on |
| 09:53 | 3 | the ELMO. |
| 09:53 | 4 | *(Document displayed.)* |
| 09:53 | 5 | BY MR. PRICE: |
| 09:54 | 6 | Q.  First let me ask you, with the slide that MGA used, for |
| 09:54 | 7 | one thing, is this the Bratz profit number that you're |
| 09:54 | 8 | using? |
| 09:54 | 9 | MS. HURST:  Objection.  Vague. |
| 09:54 | 10 | THE COURT:  Overruled. |
| 09:54 | 11 | THE WITNESS:  No. |
| 09:54 | 12 | BY MR. PRICE: |
| 09:54 | 13 | Q.  I mean, this is one of the calculations that you did in |
| 09:54 | 14 | your reports, correct? |
| 09:54 | 15 | A.  It is. |
| 09:54 | 16 | Q.  And this is the calculation, if you don't deduct for |
| 09:54 | 17 | MGA's legal expenses unrelated to this case, right? |
| 09:54 | 18 | A.  That is correct. |
| 09:54 | 19 | Q.  Okay.  So what was the number that you actually used in |
| 09:54 | 20 | your calculations?  Was it a higher or lower number than is |
| 09:55 | 21 | on MGA's Slide 25? |
| 09:55 | 22 | A.  It was lower by about $54 million. |
| 09:55 | 23 | Q.  And that's because, in your testimony yesterday, you |
| 09:55 | 24 | subtracted that cost, giving MGA lower profits and, |
| 09:55 | 25 | therefore, less profits to distribute to the market, |

| | | |
|---|---|---|
| 09:55 | 1 | correct? |
| 09:55 | 2 | A.   That is correct. |
| 09:55 | 3 | Q.   Now, what she asked you about was this EBIT number, |
| 09:55 | 4 | either 385.6 million, or -- what was the number you say that |
| 09:55 | 5 | you calculated with the most recent data? |
| 09:55 | 6 | A.   I think it's 416 million. |
| 09:55 | 7 | Q.   And she said, well, your allocation to Mattel from |
| 09:55 | 8 | MGA's profits is, uh, bigger than MGA's profits, overall |
| 09:55 | 9 | profits, before interest and taxes.  Do you recall that? |
| 09:55 | 10 | A.   I do. |
| 09:55 | 11 | Q.   Now, that sounds kind of unusual.  Could you tell us |
| 09:55 | 12 | why that's -- that's what you would expect the conclusion to |
| 09:55 | 13 | be in this case? |
| 09:55 | 14 | A.   Yes.  It's not unusual, unfortunately, for a lot of |
| 09:56 | 15 | companies to lose money.  If you look at the two years prior |
| 09:56 | 16 | to the introduction of Bratz for MGA, when their sales were |
| 09:56 | 17 | at the $77 million or lower, they actually lost money in |
| 09:56 | 18 | those years before introduction of Bratz.  They weren't |
| 09:56 | 19 | making any money. |
| 09:56 | 20 | And then you look at, actually, during this damage |
| 09:56 | 21 | period, the year 2007, which was their best year ever, it's |
| 09:56 | 22 | the only year that MGA sold over a billion dollars of |
| 09:56 | 23 | products that year.  They sold a billion-20 million dollars |
| 09:56 | 24 | worth of products that year. |
| 09:56 | 25 | And you know what their EBIT margin was?  Negative. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 63 of 151   Page ID #:308096
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

63

| | | |
|---|---|---|
| 09:56 | 1 | They actually lost $37 million.  Even though they're |
| 09:56 | 2 | increasing their sales dramatically, they're selling a lot |
| 09:56 | 3 | of products, they still didn't make any money. |
| 09:56 | 4 | So my conclusion is that they would have lost money but |
| 09:56 | 5 | for Bratz. |
| 09:56 | 6 | Q.   So how would that -- now, you talk about what was |
| 09:56 | 7 | happening before, uh, 2000, 2001.  Do you have any |
| 09:57 | 8 | additional information on what MGA's financial situation was |
| 09:57 | 9 | like, say, in -- in the timeframe of '97 to 2001 before |
| 09:57 | 10 | Bratz really became popular? |
| 09:57 | 11 | A.   It's my understanding they actually filed for |
| 09:57 | 12 | bankruptcy in 1997, and also that they were -- at least |
| 09:57 | 13 | observers were saying they were close to bankruptcy prior to |
| 09:57 | 14 | the introduction of Bratz. |
| 09:57 | 15 | Q.   Now, one of the documents Ms. Hurst talked to you |
| 09:57 | 16 | about -- |
| 09:57 | 17 | MS. HURST:  Your Honor, I object and move to |
| 09:57 | 18 | strike.  That is hearsay and publication of hearsay and |
| 09:57 | 19 | inappropriate foundation, 403. |
| 09:57 | 20 | THE COURT:  Once again it's not for the truth of |
| 09:57 | 21 | matter asserted.  And I don't know -- Counsel, I agree I'm |
| 09:57 | 22 | going to strike the last statement. |
| 09:57 | 23 | (To the jury:) You're going to completely |
| 09:57 | 24 | disregard the question and the answer. |
| 09:57 | 25 | Counsel. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

64

| 09:57 | 1 | BY MR. PRICE: |
| 09:57 | 2 | Q.   Let me ask it this way:  Ms. Hurst asked you questions |
| 09:57 | 3 | in your examination about the Bain report and whether or not |
| 09:57 | 4 | you had read it and relied upon it.  Do you recall that? |
| 09:58 | 5 | A.   I do. |
| 09:58 | 6 | Q.   And if you look at Exhibit 20568. |
| 09:58 | 7 | *(Document provided to the witness.)* |
| 09:58 | 8 | MR. PRICE:  I'm sorry.  Wrong number. |
| 09:58 | 9 | THE COURT:  Counsel, you're not going to go back |
| 09:58 | 10 | into the same area through the Bain report.  If that's where |
| 09:58 | 11 | you're going, you're precluded. |
| 09:58 | 12 | MR. PRICE:  I'm just following up on her |
| 09:58 | 13 | questions. |
| 09:58 | 14 | THE COURT:  Counsel, did you hear my ruling?  I |
| 09:58 | 15 | hope you'll obey it. |
| 09:58 | 16 | MR. PRICE:  That's what I'm going to do. |
| 09:58 | 17 | THE COURT:  More than once you've heard it. |
| 09:58 | 18 | MR. PRICE:  Yep.  Uh -- so, uh, when you say you |
| 09:58 | 19 | looked at the overall company and it was losing money in |
| 09:58 | 20 | these years, then how come -- why do we have, then, in your |
| 09:58 | 21 | calculations, an apportionment of MGA Bratz profits? |
| 09:58 | 22 | THE WITNESS:  Because I'm saying that it's |
| 09:58 | 23 | possible for this one product, that they did actually |
| 09:58 | 24 | contribute to the -- its success, and even though I don't |
| 09:59 | 25 | believe there would have been $3.1 billion worth of sales -- |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 65 of 151   Page ID #:308098
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

65

| | | |
|---|---|---|
| 09:59 | 1 | it would have been a lot less -- they may have earned a |
| 09:59 | 2 | profit as measured by the three benchmarks that I used. |
| 09:59 | 3 | BY MR. PRICE: |
| 09:59 | 4 | Q.   So if you're looking at MGA and ignoring the rest of |
| 09:59 | 5 | its products and looking just at Bratz, are you able to |
| 09:59 | 6 | calculate whether or not they made a profit on that product? |
| 09:59 | 7 | A.   I'm confused by your question.  Are you asking me did |
| 09:59 | 8 | they make a profit on all their other products besides |
| 09:59 | 9 | Bratz? |
| 09:59 | 10 | Q.   Let me ask it -- I mean, you talked about how overall |
| 09:59 | 11 | they were not making a profit.  Were you able to isolate |
| 09:59 | 12 | whether or not MGA was making a profit on Bratz? |
| 09:59 | 13 | A.   Oh, yes.  Based on my analysis, they were making a |
| 09:59 | 14 | profit on Bratz every year until 2010. |
| 09:59 | 15 | Q.   So if they're making a profit on Bratz and you found |
| 09:59 | 16 | they're not making a profit on other things -- okay? -- why |
| 10:00 | 17 | did you use MGA Bratz profits in your unjust enrichment |
| 10:00 | 18 | calculation?  Can you explain why you used Bratz profits |
| 10:00 | 19 | instead of overall MGA profits? |
| 10:00 | 20 | A.   Because the only thing that you are alleging that MGA |
| 10:00 | 21 | did inappropriately is to sell the Bratz product.  Nothing |
| 10:00 | 22 | else they did is related to this lawsuit. |
| 10:00 | 23 | Q.   Ms. Hurst also asked you about your fee. |
| 10:00 | 24 | A.   She did. |
| 10:00 | 25 | Q.   And how long have you been working -- you or your firm |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 66 of 151   Page ID #:308099
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

66

| | | |
|---|---|---|
| 10:00 | 1 | been working on the case? |
| 10:00 | 2 | A.   I think since 2007. |
| 10:00 | 3 | Q.   And did you testify at another proceeding in 2008? |
| 10:00 | 4 | A.   I did, twice. |
| 10:00 | 5 | Q.   And it's your understanding that based upon reports |
| 10:00 | 6 | you've received, that MGA also has experts on its side? |
| 10:00 | 7 | A.   They did in the first matter, and they do in this |
| 10:00 | 8 | matter. |
| 10:00 | 9 | Q.   And in the first matter, it's your understanding that |
| 10:01 | 10 | MGA had experts that -- that billed for their work? |
| 10:01 | 11 | A.   They did. |
| 10:01 | 12 | Q.   And that's a different expert than they have in this |
| 10:01 | 13 | matter who is billing for work, correct? |
| 10:01 | 14 | MS. HURST:  Objection, Your Honor.  There was |
| 10:01 | 15 | prior ruling on commenting. |
| 10:01 | 16 | THE COURT:  Sustained. |
| | 17 | BY MR. PRICE: |
| 10:01 | 18 | Q.   Well, if we're going to compare your billings on MGA |
| 10:01 | 19 | damages to MGA's experts' billings on MGA damages for the |
| 10:01 | 20 | same period of time, which is -- when did you start? |
| 10:01 | 21 | A.   2007. |
| 10:01 | 22 | Q.   To the present, correct? |
| 10:01 | 23 | A.   Correct. |
| 10:01 | 24 | Q.   So if you're gonna compare, you would compare those |
| 10:01 | 25 | billings to the experts MGA used during that same period of |

| | | |
|---|---|---|
| 10:01 | 1 | time, correct? |
| 10:01 | 2 | A.   That might be a fair comparison. |
| 10:01 | 3 | THE COURT:  Counsel, he'll be on the stand, so you |
| 10:01 | 4 | can ask him. |
| 10:01 | 5 | MR. PRICE:  Well, that will be part of the |
| 10:01 | 6 | equation. |
| 10:01 | 7 | THE COURT:  All right. |
| 10:01 | 8 | BY MR. PRICE: |
| 10:02 | 9 | Q.   Now, with respect to the analysis on -- on the |
| 10:02 | 10 | sculpts -- this is again for the unjust enrichment portion |
| 10:02 | 11 | of your analysis -- there was some questions about whether |
| 10:02 | 12 | or not you were aware that there were different sculpts in |
| 10:02 | 13 | the first generation.  Do you recall those questions? |
| 10:02 | 14 | A.   I do. |
| 10:02 | 15 | Q.   And did you rely on your analysis on the testimony, the |
| 10:02 | 16 | sworn testimony, of Ms. Paula Garcia? |
| 10:02 | 17 | A.   I did. |
| 10:02 | 18 | Q.   Did you have an understanding as to what Ms. Garcia's |
| 10:02 | 19 | position was in the company when she testified? |
| 10:02 | 20 | Let me be clearer.  Did you understand what |
| 10:02 | 21 | Ms. Garcia's relationship was to the Bratz product at the |
| 10:02 | 22 | time she testified? |
| 10:02 | 23 | A.   I believe so. |
| 10:02 | 24 | Q.   What was your understanding? |
| 10:02 | 25 | A.   That she was basically the product manager. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:02 | 1 | Q.   So your understanding is she was in charge of the |
| 10:02 | 2 | entire Bratz line, correct? |
| 10:02 | 3 | A.   That's my understanding. |
| 10:02 | 4 | Q.   And if you'd look at Exhibit 24179. |
| 10:03 | 5 | *(Document provided to the witness.)* |
| 10:03 | 6 | THE COURT:  Is this an e-mail of some type, |
| 10:03 | 7 | Counsel? |
| 10:03 | 8 | MR. PRICE:  Your Honor, no.  This is the excerpt |
| 10:03 | 9 | of testimony that he relied on for the sculpts as to how to |
| 10:03 | 10 | identify what products used what sculpts. |
| 10:03 | 11 | BY MR. PRICE: |
| 10:03 | 12 | Q.   And is this deposition testimony that you relied on in |
| 10:03 | 13 | identifying what particular SKU's used the original sculpt? |
| 10:03 | 14 | A.   Not exactly. |
| 10:03 | 15 | Q.   Can you tell us what you mean? |
| 10:03 | 16 | A.   This is testimony as to what SKU's did not use the |
| 10:03 | 17 | original sculpt. |
| 10:03 | 18 | Q.   So it was the flip side? |
| 10:03 | 19 | A.   Yes. |
| 10:03 | 20 | Q.   Okay.  And if you'd look at page 62, lines 2 through 9. |
| 10:04 | 21 | Is that sort of the bottom line as to what you relied |
| 10:04 | 22 | on from the product developer, the person in charge of |
| 10:04 | 23 | Bratz, as to what did not use the original sculpts? |
| 10:04 | 24 | A.   Yes. |
| 10:04 | 25 | Q.   So what was your understanding, based upon Ms. Garcia's |

| | | |
|---|---|---|
| 10:04 | 1 | testimony, as to what products used the original sculpts and |
| 10:04 | 2 | what did not? |
| 10:04 | 3 | A.   Well, all the products except the Fairies line, the |
| 10:04 | 4 | mother/daughter pack, the big sister/little sister pack, the |
| 10:04 | 5 | Bratz The Movie doll line, the Bratz walking doll line, all |
| 10:04 | 6 | other fashion dolls used the original sculpts.  However, |
| 10:04 | 7 | there is additional testimony in this trial from Mr. Larian |
| 10:04 | 8 | that adds a couple of other SKU's besides this. |
| 10:05 | 9 | Q.   And did you also subtract those from the products that |
| 10:05 | 10 | used the original sculpts? |
| 10:05 | 11 | A.   Yes. |
| 10:05 | 12 | Q.   And in the testimony when Ms. Garcia's talking about |
| 10:05 | 13 | the sculpts, what words were actually used for sculpt?  It |
| 10:05 | 14 | was a sculpt or -- or other words used? |
| 10:05 | 15 | MS. HURST:  Objection.  Hearsay. |
| 10:05 | 16 | THE COURT:  Sustained. |
| 10:05 | 17 | BY MR. PRICE: |
| 10:05 | 18 | Q.   When you looked at this testimony to rely on it, you |
| 10:05 | 19 | know, about which dolls used the original sculpt and which |
| 10:05 | 20 | didn't -- okay? -- and you used this testimony to rely on |
| 10:05 | 21 | it, what was the definition of sculpt that was used? |
| 10:05 | 22 | A.   I believe it's the same head. |
| 10:05 | 23 | MS. HURST:  Same objection, Your Honor. |
| 10:05 | 24 | THE COURT:  Sustained. |
| 10:05 | 25 | MR. PRICE:  I'm asking what his definition was in |

| | | |
|---|---|---|
| 10:05 | 1 | his analysis. |
| 10:05 | 2 | THE COURT:  Thank you. |
| 10:05 | 3 | Sustained. |
| 10:05 | 4 | Now, this is where we ended up yesterday also with |
| 10:05 | 5 | Ms. Hurst and the chart, et cetera. |
| 10:06 | 6 | This is a damages expert.  And what's really |
| 10:06 | 7 | occurring is testimony back in front of the jury through |
| 10:06 | 8 | Garcia, just as Ms. Hurst produced the chart yesterday. |
| 10:06 | 9 | Both are improper. |
| 10:06 | 10 | Let's move along now. |
| 10:06 | 11 | BY MR. PRICE: |
| 10:06 | 12 | Q.  With respect to the NPD data, you were asked whether or |
| 10:06 | 13 | not Walmart and Target dropped out of NPD.  Do you recall |
| 10:06 | 14 | that? |
| 10:06 | 15 | A.  I do. |
| 10:06 | 16 | Q.  Now, is -- is Walmart and Target information used in |
| 10:06 | 17 | the NPD analysis as it's done now? |
| 10:06 | 18 | A.  No, not for this -- categories that I'm using it, |
| 10:06 | 19 | except for people who were surveyed that bought at those |
| 10:06 | 20 | stores. |
| 10:06 | 21 | Q.  I mean, that's what I'm asking.  The methodology which |
| 10:06 | 22 | is used is survey information? |
| 10:06 | 23 | A.  It is. |
| 10:06 | 24 | Q.  And does that survey information exclude Walmart and |
| 10:06 | 25 | Target? |

| | | |
|---|---|---|
| 10:06 | 1 | A.    No. |
| 10:06 | 2 | Q.    So in connection with your unjust enrichment |
| 10:06 | 3 | calculations, okay -- those calculations, have you taken |
| 10:07 | 4 | into account the portion of Bratz profits that would be |
| 10:07 | 5 | attributable to MGA's efforts? |
| 10:07 | 6 | A.    Yes. |
| 10:07 | 7 | Q.    And so the numbers that you presented represent the |
| 10:07 | 8 | portion of the Bratz profit that would be attributable to |
| 10:07 | 9 | something unique about -- about the Bratz product, right? |
| 10:07 | 10 | A.    Above the sweat equity of MGA. |
| 10:07 | 11 | Q.    And when you look at -- at the impact on Mattel; that |
| 10:07 | 12 | is Mattel's lost profits, in that calculation, do you take |
| 10:07 | 13 | into account the market expansion that Bratz caused? |
| 10:07 | 14 | A.    I did. |
| 10:07 | 15 | Q.    Do you take into account that Mattel's sales were |
| 10:07 | 16 | declining, even though it was still the number one fashion |
| 10:07 | 17 | doll in the world and outselling Bratz 3 to 1? |
| 10:07 | 18 | A.    I did. |
| 10:07 | 19 | Q.    Do you take into account other market forces such as |
| 10:08 | 20 | whether people are switching to video games or computers, |
| 10:08 | 21 | uh, or, uh, Segways or something? |
| 10:08 | 22 | A.    Yes. |
| 10:08 | 23 | Q.    And could you tell us how is all that taken into |
| 10:08 | 24 | account in your analysis? |
| 10:08 | 25 | A.    Because I use actual market share information.  The |

| | | |
|---|---|---|
| 10:08 | 1 | actual fashion doll market each year is getting smaller |
| 10:08 | 2 | because of these other choices that girls have to play with. |
| 10:08 | 3 | That's all taken into consideration in my approach. |
| 10:08 | 4 | Q.   And that is what's reflected in Slide 24294-11; is that |
| 10:08 | 5 | right? |
| 10:08 | 6 | A.   Yes. |
| 10:09 | 7 | THE COURT:  It's the blue one with the small red |
| 10:09 | 8 | at the top. |
| 10:09 | 9 | MR. PRICE:  Thank you. |
| 10:09 | 10 | (Document displayed.) |
| 11:59 | 11 | BY MR. PRICE: |
| 10:09 | 12 | Q.   Now, again, Ms. Hurst asked you about whether or not |
| 10:09 | 13 | for this -- your analysis it was, you know, fair to think |
| 10:09 | 14 | that, uh, MGA -- that its own efforts, you know, didn't have |
| 10:09 | 15 | more of an impact on the Bratz sales.  You remember that |
| 10:09 | 16 | line of questions? |
| 10:09 | 17 | A.   I do. |
| 10:09 | 18 | Q.   And did you do an analysis of sales of -- which |
| 10:09 | 19 | compared, uh, the total Barbie sales with the total Bratz |
| 10:09 | 20 | sales and then the sales you thought that -- that Barbie |
| 10:09 | 21 | would have had but for Bratz and then compared that to the |
| 10:09 | 22 | sales of MGA's other products? |
| 10:09 | 23 | A.   I did. |
| 10:09 | 24 | Q.   And is that, uh, 24294, Slide 12? |
| 10:10 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:10 | 1 | MR. PRICE:  Okay.  If we could display that, |
| 10:10 | 2 | Your Honor. |
| 10:10 | 3 | *(Document displayed.)* |
| 10:10 | 4 | BY MR. PRICE: |
| 10:10 | 5 | Q.   So show us what we're seeing here.  What is the green |
| 10:10 | 6 | line? |
| 10:10 | 7 | A.   Those are the actual sales in dollars of Barbie for |
| 10:10 | 8 | each of the years 2001 through 2009. |
| 10:10 | 9 | Q.   So let's focus now on the green.  And what is the red? |
| 10:10 | 10 | A.   The red are the actual sales of Bratz in dollars |
| 10:10 | 11 | between 2001 and 2009. |
| 10:10 | 12 | Q.   And your analysis showed that there was -- there was a |
| 10:10 | 13 | relationship between those numbers, right? |
| 10:10 | 14 | A.   I did. |
| 10:10 | 15 | Q.   Now, what's now this blue line that you have on top of |
| 10:10 | 16 | the green line? |
| 10:10 | 17 | A.   Those are the additional sales that I believe Barbie |
| 10:10 | 18 | would have achieved if Bratz was not in the marketplace. |
| 10:10 | 19 | Q.   And that's the calculation you did, taking out the |
| 10:11 | 20 | expansion and then giving some of those sales to the |
| 10:11 | 21 | competitors -- other competitors based upon market share? |
| 10:11 | 22 | A.   Correct. |
| 10:11 | 23 | Q.   And what is the difference in terms of percentage?  How |
| 10:11 | 24 | much have you increased Barbie's sales if you assume that -- |
| 10:11 | 25 | that MGA, you know, could not have come to market with |

74

| | | |
|---|---|---|
| 10:11 | 1 | Bratz? |
| 10:11 | 2 | A.   A little less than 10 percent. |
| 10:11 | 3 | Q.   Now, let's talk about the bottom line, almost literally |
| 10:11 | 4 | here.  You see there's a black line on the bottom here, |
| 10:11 | 5 | which goes from 2001 to 2009 it looks like.  Can you tell us |
| 10:11 | 6 | what that black line shows? |
| 10:11 | 7 | A.   Of all of the other product lines that MGA carried |
| 10:11 | 8 | during this actual period, I looked at the product that had |
| 10:11 | 9 | the highest sales each year that was an MGA-created product |
| 10:12 | 10 | to see how successful that product was in each of the years. |
| 10:12 | 11 |      And that's what the black line is. |
| 10:12 | 12 | Q.   So the black line is all products other than Bratz, the |
| 10:12 | 13 | high sales number? |
| 10:12 | 14 | A.   No, it does not include products where they've |
| 10:12 | 15 | acquired, like Little Tykes, or they've licensed in, like |
| 10:12 | 16 | Spiderman. |
| 10:12 | 17 |      It's products that they actually used their own |
| 10:12 | 18 | creativity to bring to market. |
| 10:12 | 19 | Q.   So what does this analysis tell you with respect to |
| 10:12 | 20 | your damages methodology? |
| 10:12 | 21 | A.   That MGA's not been successful with any other product |
| 10:12 | 22 | when it used their own creativity until fairly recently.  I |
| 10:12 | 23 | think there's some success with Moxie in 2009 and 2010, and |
| 10:12 | 24 | that's why you actually finally see the black line go up |
| 10:12 | 25 | above zero. |

| | | |
|---|---|---|
| 10:12 | 1 | Q.   And so what does that tell you as to -- with respect to |
| 10:12 | 2 | the Bratz profits, how much is due to MGA's marketing |
| 10:13 | 3 | creativity versus the value of the product? |
| 10:13 | 4 | A.   It's a lot less than the yardsticks or benchmarks that |
| 10:13 | 5 | I have given them credit for. |
| 10:13 | 6 | MR. PRICE:  Nothing further, Your Honor. |
| 10:13 | 7 | THE COURT:  Cross-examination. |
| 10:13 | 8 | MS. HURST:  Your Honor, could we have a restroom |
| 10:13 | 9 | break before we start. |
| 10:13 | 10 | THE COURT:  All right.  Ladies and gentlemen, |
| 10:13 | 11 | we'll come back and get you in about ten minutes.  You're |
| 10:13 | 12 | admonished not to discuss this matter amongst yourselves, |
| 10:13 | 13 | nor form or express any opinion concerning this case. |
| 10:13 | 14 | *(Jury recesses at 10:13 a.m.)* |
| 10:13 | 15 | *(Outside the presence of the jury.)* |
| 10:14 | 16 | THE COURT:  All right.  Counsel, if you would be |
| 10:14 | 17 | seated, perhaps.  The Court went over slides last night, |
| 10:14 | 18 | Mr. McConville, with you in this next presentation.  Have |
| 10:14 | 19 | those been corrected? |
| 10:14 | 20 | MR. McCONVILLE:  Yes, they have. |
| 10:14 | 21 | THE COURT:  Have those slides been deleted that I |
| 10:14 | 22 | told you to delete? |
| 10:14 | 23 | MR. McCONVILLE:  Yes. |
| 10:14 | 24 | THE COURT:  Could I see a copy of that |
| 10:14 | 25 | presentation? |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 76 of 151   Page ID #:308109
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

76

| | | |
|---|---|---|
| 10:14 | 1 | MR. McCONVILLE:  We didn't amend them.  We just |
| 10:14 | 2 | deleted them. |
| 10:14 | 3 | THE COURT:  No apples to oranges? |
| 10:14 | 4 | MR. McCONVILLE:  Correct. |
| 10:14 | 5 | THE COURT:  All right. |
| 10:14 | 6 | All right.  Counsel, we'll see you in ten minutes, |
| 10:14 | 7 | then. |
| 10:14 | 8 | MR. PRICE:  Your Honor, can I make a record on the |
| 10:14 | 9 | Bain report?  'Cause I think there was a misunderstanding. |
| 10:14 | 10 | THE COURT:  I can make a record also.  And then |
| 10:14 | 11 | you can make your record. |
| 10:14 | 12 | This idea of close to bankruptcy is unduly |
| 10:14 | 13 | prejudicial.  This expert can talk about numbers, but to |
| 10:14 | 14 | attempt to get that in through an e-mail and then through |
| 10:14 | 15 | the Bain report is not appropriate.  It's too inflammatory. |
| 10:14 | 16 | Your record now. |
| 10:14 | 17 | MR. PRICE:  I didn't realize you were making a 403 |
| 10:15 | 18 | grounds, Your Honor.  The reason I was introducing it was |
| 10:15 | 19 | Ms. Hurst asked a lot of questions about the Bain report's |
| 10:15 | 20 | analysis. |
| 10:15 | 21 | THE COURT:  Well, we didn't get into the |
| 10:15 | 22 | bankruptcy.  If he actually declared bankruptcy and went |
| 10:15 | 23 | through a bankruptcy process, that would be different.  This |
| 10:15 | 24 | is inflammatory, and under 403, it's precluded. |
| 10:15 | 25 | MR. PRICE:  And our record, Your Honor, is, |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 77 of 151   Page ID
#:308110
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

77

| | | |
|---|---|---|
| 10:15 | 1 | obviously, they did file bankruptcy in '97, and it's |
| 10:15 | 2 | relevant to Mr. Wagner's analysis.  I'm gonna do that one |
| 10:15 | 3 | "side," because his analysis is that the intellectual |
| 10:15 | 4 | property's what made the company. |
| 10:15 | 5 | THE COURT:  I'm going to respectfully disagree.  I |
| 10:15 | 6 | think it's a backdoor way, quite frankly, of getting into |
| 10:15 | 7 | the bankruptcy.  Thank you very much. |
| 10:15 | 8 | Now, you've got eight minutes if want to use the |
| 10:15 | 9 | restroom.  Okay. |
| 10:15 | 10 | *(Recess held at 10:15 a.m.)* |
| 10:22 | 11 | *(Proceedings resumed at 10:22 a.m.)* |
| 10:22 | 12 | *(In the presence of the jury.)* |
| 10:22 | 13 | THE COURT:  We're back in session.  The jury's |
| 10:22 | 14 | present, the alternates, all counsel, the parties, and the |
| 10:22 | 15 | witness. |
| 10:22 | 16 | This is cross-examination by Ms. Hurst on behalf |
| 10:22 | 17 | of Mr. Larian and MGA. |
| 10:22 | 18 | **RECROSS-EXAMINATION** |
| 11:59 | 19 | BY MS. HURST: |
| 10:22 | 20 | Q.   You see that's your Slide 4 up there, Mr. Wagner? |
| 10:22 | 21 | *(Document displayed.)* |
| 10:22 | 22 | THE WITNESS:  You've written the word "Spiderman"; |
| 10:22 | 23 | but, yes, besides that, it's my chart. |
| 10:22 | 24 | MS. HURST:  Sorry.  Made a note on there for |
| 10:23 | 25 | myself. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

78

| | | |
|---|---|---|
| 10:23 | 1 | BY MS. HURST: |
| 10:23 | 2 | Q.   And that chart is titled, "MGA's Top Ten Products by |
| 10:23 | 3 | Revenue," true? |
| 10:23 | 4 | A.   It is. |
| 10:23 | 5 | Q.   Now, that 62 percent number for all of MGA's decade of |
| 10:23 | 6 | 2000, that's not just a single product, right? |
| 10:23 | 7 | A.   No.  That's, again, all their products. |
| 10:23 | 8 | Q.   And the Bratz products -- that's all Bratz products, |
| 10:23 | 9 | correct? |
| 10:23 | 10 | A.   Yes. |
| 10:23 | 11 | Q.   That's not a single Bratz product, right? |
| 10:23 | 12 | A.   It is not. |
| 10:23 | 13 | Q.   That's the Bratz brand, true? |
| 10:23 | 14 | A.   True. |
| 10:23 | 15 | Q.   Now, there were thousands of different products that |
| 10:23 | 16 | were sold under the Bratz brand, true? |
| 10:23 | 17 | A.   That's true. |
| 10:23 | 18 | Q.   And the performance of those different products varied, |
| 10:23 | 19 | true? |
| 10:23 | 20 | A.   They did. |
| 10:24 | 21 | Q.   In particular, there were many female fashion dolls, |
| 10:24 | 22 | correct? |
| 10:24 | 23 | A.   There were. |
| 10:24 | 24 | Q.   And many of them even used that original sculpt that |
| 10:24 | 25 | you included in your calculation, true? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:24 | 1 | A.   I think there were about 2,427 SKU's that did. |
| 10:24 | 2 | Q.   All right.  And of those 2,427 SKU's using the female |
| 10:24 | 3 | sculpt, there was quite a range of performance, true? |
| 10:24 | 4 | A.   I agree with that. |
| 10:24 | 5 | Q.   And you did not study the variability of performance of |
| 10:24 | 6 | those products as part of your analysis, did you? |
| 10:24 | 7 | A.   I did not. |
| 10:24 | 8 | Q.   So even though they used the same sculpt, some of those |
| 10:24 | 9 | products sold well and some of them sold poorly, true? |
| 10:24 | 10 | A.   I agree with that. |
| 10:24 | 11 | Q.   Even though they had the same IP, some of them sold |
| 10:24 | 12 | well and some of them sold poorly, true? |
| 10:25 | 13 | A.   That is true. |
| 10:25 | 14 | Q.   Which means there was something else in the equation, |
| 10:25 | 15 | right? |
| 10:25 | 16 | A.   I agree with that. |
| 10:25 | 17 | *(Document displayed.)* |
| 10:25 | 18 | MR. PRICE:  Your Honor, I would object based upon |
| 10:25 | 19 | your ruling about using other testimony. |
| 10:25 | 20 | THE COURT:  Counsel? |
| 10:25 | 21 | MR. PRICE:  Move to -- |
| 10:25 | 22 | MS. HURST:  This is Mr. Eckert's trial testimony, |
| 10:25 | 23 | Your Honor, not deposition testimony. |
| 10:25 | 24 | THE COURT:  Just a moment. |
| 10:25 | 25 | MR. COTE:  If we can take it down until you rule? |

| | | |
|---|---|---|
| 10:25 | 1 | THE COURT: Yeah. Let's take that down, Counsel. |
| 10:25 | 2 | Let's ask some questions first about it. |
| 10:25 | 3 | *(Document display removed.)* |
| | 4 | BY MS. HURST: |
| 10:25 | 5 | Q. You had a Slide 3; is that right? |
| 10:25 | 6 | A. I'm certain I did. |
| 10:25 | 7 | *(Document displayed.)* |
| 10:25 | 8 | BY MS. HURST: |
| 10:26 | 9 | Q. Your Slide 3 says, "Of 31 products that MGA sold in |
| 10:26 | 10 | 2001, only Bratz and two others had sales through 2010," |
| 10:26 | 11 | correct? |
| 10:26 | 12 | A. Correct. |
| 10:26 | 13 | Q. And the point of this slide is to show that MGA's |
| 10:26 | 14 | really just not very successful outside of Bratz, right? |
| 10:26 | 15 | A. Of products that they created, yes. |
| 10:26 | 16 | THE COURT: Counsel, I allowed, I believe, |
| 10:26 | 17 | Mr. Price, you, to finally show this slide yesterday, didn't |
| 10:26 | 18 | I? |
| 10:26 | 19 | MR. PRICE: This slide, yes. But they've added a |
| 10:26 | 20 | quote from a witness, which was the reason I was objecting. |
| 10:26 | 21 | THE COURT: Oh, well, let me see -- let me see a |
| 10:26 | 22 | collection of the slides. That's why I was asking for |
| 10:26 | 23 | copies of these. |
| 10:26 | 24 | I'd like a complete set of these slides, |
| 10:26 | 25 | Mr. McConville, as I ordered last evening. No surprises. |

| | | |
|---|---|---|
| 10:26 | 1 | *(Documents provided to the Court.)* |
| 10:26 | 2 | THE COURT:  Yeah.  Sustained.  You can talk about |
| 10:26 | 3 | it, but you can take the quote off, Counsel. |
| 10:27 | 4 | MS. HURST:  Understood. |
| 10:27 | 5 | THE COURT:  Okay. |
| 10:27 | 6 | BY MS. HURST: |
| 10:27 | 7 | Q.  Isn't it true, uh, Mr. Wagner, that in this very trial, |
| 10:27 | 8 | Mr. Eckert testified that Mattel turns over 80 percent of |
| 10:27 | 9 | its product each year? |
| 10:27 | 10 | A.  I believe there's testimony -- that effect, yes, but |
| 10:27 | 11 | that's not what's being characterized on this chart. |
| 10:27 | 12 | Q.   Mattel turns over -- Mattel and other toy companies |
| 10:27 | 13 | turn over their product each year because the toy industry |
| 10:27 | 14 | is one that demands a high rate of innovation; isn't that |
| 10:27 | 15 | true? |
| 10:27 | 16 | A.  I agree with that. |
| 10:27 | 17 | MR. PRICE:  Object.  It's ambiguous as to product. |
| 10:27 | 18 | They're talking past each other. |
| 10:27 | 19 | THE COURT:  Overruled. |
| 10:27 | 20 | What's your answer, sir? |
| 10:27 | 21 | THE WITNESS:  I agree with that statement. |
| 10:27 | 22 | BY MS. HURST: |
| 10:27 | 23 | Q.   And, for example, Mattel introduced Barbie in 1959, |
| 10:27 | 24 | true? |
| 10:27 | 25 | A.   Actually, it's her birthday.  52 years ago today, it |

| | | |
|---|---|---|
| 10:27 | 1 | was introduced at the New York International Toy Fair on |
| 10:27 | 2 | March 9, 1959. |
| 10:28 | 3 | Q.   To celebrate, I have a reproduction of the original |
| 10:28 | 4 | Barbie doll here.  *(Indicating.)* |
| 10:28 | 5 | Do you recognize that as an facsimile of the original |
| 10:28 | 6 | Barbie? |
| 10:28 | 7 | A.   I don't know. |
| 10:28 | 8 | Q.   You don't know?  You've never -- you've actually never |
| 10:28 | 9 | bought a doll in your life, true? |
| 10:28 | 10 | A.   That's correct. |
| 10:28 | 11 | Q.   And you're not a toy -- a fashion doll expert, correct? |
| 10:28 | 12 | A.   I am not. |
| 10:28 | 13 | THE COURT:  (To the jury:)  Now, let me caution |
| 10:28 | 14 | you again. |
| 10:28 | 15 | Remember what I said about gratuitous comments, |
| 10:28 | 16 | ingratiating comments -- okay? -- by any of the parties. |
| 10:28 | 17 | Okay?  They're improper. |
| 10:28 | 18 | All right.  Counsel. |
| 10:28 | 19 | BY MS. HURST: |
| 10:28 | 20 | Q.   Do you think, Mr. Wagner, that all of the success that |
| 10:28 | 21 | Mattel has enjoyed in selling Barbie products for the last |
| 10:28 | 22 | 52 years is attributable to this single doll? |
| 10:28 | 23 | A.   I would say probably not. |
| 10:28 | 24 | Q.   But your damages calculations in this case assume that |
| 10:29 | 25 | all of MGA's success is attributable to that first |

| | | |
|---|---|---|
| 10:29 | 1 | generation of its dolls, true? |
| 10:29 | 2 | A.   I wouldn't say that's true, no. |
| 10:29 | 3 | Q.   You've assumed that but for those dolls, MGA would not |
| 10:29 | 4 | have enjoyed its subsequent success, true? |
| 10:29 | 5 | A.   I do agree with that statement, yes. |
| 10:29 | 6 | Q.   Now, you had to identify particular Mattel products |
| 10:29 | 7 | that you think lost sales as a result of Bratz sales in |
| 10:29 | 8 | making your lost profits calculation, true? |
| 10:29 | 9 | A.   I didn't have to do that, no. |
| 10:29 | 10 | Q.   But you did, correct? |
| 10:29 | 11 | A.   I was asked by counsel just to allocate my lost profits |
| 10:30 | 12 | to all of the SKU's, and I did that calculation.  I didn't |
| 10:30 | 13 | have to do that for my damage calculation. |
| 10:30 | 14 | Q.   One of the profits *(sic)* to which you allocated part of |
| 10:30 | 15 | Mattel's lost profits claims was Barbie Princess, true? |
| 10:30 | 16 | A.   If you change the word "profit" to "product," yes. |
| 10:30 | 17 | Q.   I misspoke.  Pardon me. |
| 10:30 | 18 | One of the products to which you allocated Mattel's |
| 10:30 | 19 | lost profits claims was Barbie Princess, true? |
| 10:30 | 20 | A.   That's true. |
| 10:30 | 21 | Q.   And isn't it true that Barbie Princess was generally |
| 10:30 | 22 | targeted toward the younger age range of the fashion doll |
| 10:30 | 23 | market? |
| 10:30 | 24 | A.   I agree with that. |
| 10:30 | 25 | Q.   And you understood that Bratz was generally targeted to |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

84

| | | |
|---|---|---|
| 10:30 | 1 | the older age range of the fashion doll market, don't you? |
| 10:30 | 2 | A.   Only in the beginning.  I think I testified in my |
| 10:30 | 3 | examination that, actually starting in 2006, there's many |
| 10:30 | 4 | sales of Bratz to the three- to five-year-old segment as |
| 10:30 | 5 | there was to the nine to eleven.  So it ended up not being |
| 10:31 | 6 | true. |
| 10:31 | 7 | Q.   Let me try this again. |
| 10:31 | 8 |      When Bratz was introduced, it was targeted to the older |
| 10:31 | 9 | age range of girls, true? |
| 10:31 | 10 |           MR. PRICE:  I object to the preface.  It's a |
| 10:31 | 11 | different question.  So saying, "Let's try again" -- |
| 10:31 | 12 |           THE COURT:  Reask it, Counsel. |
| 10:31 | 13 | BY MS. HURST: |
| 10:31 | 14 | Q.   It's true that MGA targeted the Bratz fashion dolls to |
| 10:31 | 15 | the older age range of girls, true? |
| 10:31 | 16 | A.   Initially they did, yes. |
| 10:31 | 17 | Q.   Later they introduced a whole bunch of additional |
| 10:31 | 18 | products, true? |
| 10:31 | 19 | A.   That's true. |
| 10:31 | 20 | Q.   Including Bratz Little Sisters, and Bratz Little |
| 10:31 | 21 | Babies, and all sorts of things that might appeal to younger |
| 10:31 | 22 | girls, right? |
| 10:31 | 23 | A.   I agree with that. |
| 10:31 | 24 | Q.   But the original product was targeted toward an older |
| 10:31 | 25 | age range, correct? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

85

| | | |
|---|---|---|
| 10:31 | 1 | A.    I agree with that statement, as well. |
| 10:31 | 2 | Q.    And, in fact, Mattel found that it had -- that the |
| 10:31 | 3 | original Bratz products, the Bratz core female dolls, had |
| 10:31 | 4 | renewed demand in that other -- older range of girls, true? |
| 10:32 | 5 | A.    They did find that. |
| 10:32 | 6 | Q.    Now, Mattel was not one to sit on its heels and watch |
| 10:32 | 7 | Bratz enjoying that success in the older age range, was it? |
| 10:32 | 8 | MR. PRICE:  Objection.  Argumentative.  Ambiguous. |
| 10:32 | 9 | THE COURT:  Sustained. |
| | 10 | BY MS. HURST: |
| 10:32 | 11 | Q.    You're familiar with the MyScene product, Mr. Wagner? |
| 10:32 | 12 | A.    I am. |
| 10:32 | 13 | Q.    And that was a fashion doll targeted towards the older |
| 10:32 | 14 | age range of girls? |
| 10:32 | 15 | A.    It was. |
| 10:32 | 16 | Q.    And that was a fashion doll product that Mattel |
| 10:32 | 17 | introduced in response to Bratz, right? |
| 10:32 | 18 | A.    They did that. |
| 10:32 | 19 | Q.    Okay.  And you also included allocated lost profits -- |
| 10:32 | 20 | Mattel lost profits -- to the MyScene products, true? |
| 10:32 | 21 | A.    I did. |
| 10:33 | 22 | Q.    You mentioned Monster High earlier? |
| 10:33 | 23 | A.    I did. |
| 10:33 | 24 | Q.    That's a recent Mattel product? |
| 10:33 | 25 | A.    It is. |

| 10:33 | 1 | Q. Are you also familiar with Lalaloopsy, a recent MGA |
| 10:33 | 2 | product? *(Indicating.)* |
| 10:33 | 3 | A. I am. |
| 10:33 | 4 | Q. And you know that according to that NPD data that |
| 10:33 | 5 | Lalaloopsy was the best-selling new fashion doll in the |
| 10:33 | 6 | fourth quarter of 2010, true? |
| 10:33 | 7 | A. If you talk about "new fashion doll," of the ones that |
| 10:33 | 8 | were introduced in 2010, that may be true. It's not close |
| 10:33 | 9 | to being as successful as a lot of other fashion dolls. |
| 10:33 | 10 | Q. Right. But for new dolls introduced in 2010, |
| 10:33 | 11 | Lalaloopsy enjoyed the best fourth quarter of any of them, |
| 10:33 | 12 | true? |
| 10:33 | 13 | A. I don't know if that's true or not. I haven't seen |
| 10:33 | 14 | that data, but that is possible. |
| 10:33 | 15 | Q. And without knowing whether Lalaloopsy was enjoying |
| 10:34 | 16 | that level of success, you were comfortable testifying that |
| 10:34 | 17 | MGA didn't have a creative bone in its body, true? |
| 10:34 | 18 | MR. PRICE: Objection. Argumentative. |
| 10:34 | 19 | THE COURT: Overruled. |
| 10:34 | 20 | THE WITNESS: I don't think that's what I said. |
| 10:34 | 21 | That wasn't my opinion. |
| 10:34 | 22 | BY MS. HURST: |
| 10:34 | 23 | Q. In your unjust enrichment calculation -- in your unjust |
| 10:35 | 24 | enrichment calculation, you compared Bratz to the toy |
| 10:35 | 25 | industry, correct? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

87

| | | |
|---|---|---|
| 10:35 | 1 | A.   I did. |
| 10:35 | 2 | *(Document displayed.)* |
| | 3 | BY MS. HURST: |
| 10:35 | 4 | Q.   In your lost profits calculation, you compared Bratz to |
| 10:35 | 5 | Barbie, true? |
| 10:35 | 6 | A.   I don't think I compared them, no. |
| 10:35 | 7 | Q.   You compared their market share, true? |
| 10:35 | 8 | A.   I wasn't -- oh, yes, for causation.  But I wouldn't say |
| 10:35 | 9 | I was comparing them in the same way I did in an unjust |
| 10:35 | 10 | enrichment. |
| 10:35 | 11 | Q.   It's true that in your lost profits calculation you |
| 10:35 | 12 | compared Bratz and Barbie market shares, true? |
| 10:35 | 13 | A.   Yes.  To determine if there was a relationship between |
| 10:35 | 14 | the two, I did do that. |
| 10:35 | 15 | Q.   Now, in your Mexico calculation, you used avoided |
| 10:36 | 16 | costs, true? |
| 10:36 | 17 | A.   I did. |
| 10:36 | 18 | Q.   Now, if you had compared Bratz and Barbie incremental |
| 10:36 | 19 | profitability for your unjust enrichment calculation, the |
| 10:36 | 20 | number would have been zero, right? |
| 10:36 | 21 | A.   You asked me that yesterday.  The answer is still the |
| 10:36 | 22 | same:  It would be zero. |
| 10:36 | 23 | Q.   You did not look at using an avoided-cost methodology |
| 10:36 | 24 | for the Bratz trade secrets in this case, true? |
| 10:36 | 25 | A.   That's true. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 88 of 151   Page ID #:308121
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

88

| | | |
|---|---|---|
| 10:36 | 1 | Q. One of the Bratz trade secrets in this case is the |
| 10:36 | 2 | Bratz name, true? |
| 10:36 | 3 | A. It is. |
| 10:36 | 4 | Q. Now, are you aware that Mr. Steven Linker testified in |
| 10:36 | 5 | this trial that he was paid by Mattel $200 for the idea for |
| 10:36 | 6 | the name "Brats"? |
| 10:36 | 7 | A. I haven't seen the testimony, but that has been |
| 10:36 | 8 | represented to me. |
| 10:37 | 9 | Q. And that meant Mattel had a cost of $200 for the idea |
| 10:37 | 10 | for the name "Brats," and that was actually in the year |
| 10:37 | 11 | 2000, correct? |
| 10:37 | 12 | A. If you -- if your facts are correct, that's true. |
| 10:37 | 13 | Q. And that was an idea for a name for a fashion doll, |
| 10:37 | 14 | right? |
| 10:37 | 15 | A. I would assume that's true. |
| 10:37 | 16 | Q. So one way of valuing the avoided cost of the "Brats" |
| 10:37 | 17 | name, would be to look at Mr. Linker's testimony that it was |
| 10:37 | 18 | worth $200; isn't that true? |
| 10:37 | 19 | A. That is a methodology one could choose, yes. |
| 10:37 | 20 | Q. And if you chose that methodology to value the "Brats" |
| 10:37 | 21 | name, the testimony in this trial would give you a $200 |
| 10:37 | 22 | number, correct? |
| 10:37 | 23 | A. If it was -- yes, if you just use that calculation, |
| 10:37 | 24 | that would be the number. |
| 10:37 | 25 | I don't think it's appropriate. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

89

| 10:37 | 1 | THE REPORTER:  Your Honor, I need to find out if |
| 10:37 | 2 | "Brats" is spelled with an S, when they're referring to -- |
| 10:37 | 3 | THE COURT:  Or a Z?  Yeah. |
| 10:37 | 4 | MS. HURST:  With respect to the testimony of |
| 10:38 | 5 | Mr. Linker, that would be referring to Brats with an "S." |
| 10:38 | 6 | THE REPORTER:  Thank you. |
| 10:38 | 7 | MS. HURST:  Thank you. |
| 10:38 | 8 | BY MS. HURST: |
| 10:38 | 9 | Q.   You understood that was referring to "Brats" with an |
| 10:38 | 10 | "S," Mr. Wagner? |
| 10:38 | 11 | A.   I did. |
| 10:38 | 12 | Q.   Now, you don't think that the difference between $200 |
| 10:38 | 13 | and 596.7 million is accounted for by the change from an "S" |
| 10:38 | 14 | to a "Z," do you? |
| 10:38 | 15 | A.   I don't, no. |
| 10:39 | 16 | Q.   You said you thought it would be generous to use Mattel |
| 10:39 | 17 | as the comparison because it's the most successful toy |
| 10:39 | 18 | company in the world, right? |
| 10:39 | 19 | A.   I did say that. |
| 10:39 | 20 | Q.   And you referred to Mattel's market capitalization, the |
| 10:39 | 21 | total value of its stock, as one measure of its success, |
| 10:39 | 22 | correct? |
| 10:39 | 23 | A.   Yes. |
| 10:39 | 24 | Q.   What was the range of that total value of Mattel during |
| 10:39 | 25 | the decade 2000 to 2010? |

DEBBIE GALE, U.S. COURT REPORTER

| 10:39 | 1 | A.    It's started around 5 billion, and it ended up around |
| 10:39 | 2 | close to 9 billion. |
| 10:39 | 3 | Q.    So it was a $9 billion company? |
| 10:39 | 4 | A.    Correct. |
| 10:39 | 5 | Q.    Now, Mattel improved its profitability throughout that |
| 10:39 | 6 | period, correct? |
| 10:39 | 7 | A.    They did. |
| 10:39 | 8 | Q.    And that was a big factor in the increase in market |
| 10:40 | 9 | cap, true? |
| 10:40 | 10 | A.    I would agree with that statement. |
| 10:40 | 11 | Q.    One of the ways that Mattel improved its profitability |
| 10:40 | 12 | through that period was by cutting costs, true? |
| 10:40 | 13 | A.    That's true. |
| 10:40 | 14 | Q.    In fact, Mr. Eckert was known as a cost-cutter when he |
| 10:40 | 15 | came in as CEO in 2000, true? |
| 10:40 | 16 | A.    I don't know whether that's true or not. |
| 10:40 | 17 | Q.    You don't know whether the industry publications |
| 10:40 | 18 | described him as a cost-cutter coming in to "right the ship" |
| 10:40 | 19 | for Mattel in 2000? |
| 10:40 | 20 | A.    No. |
| 10:40 | 21 | Q.    Isn't it true that Mattel, year after year after year, |
| 10:40 | 22 | engaged in layoffs to cut costs to improve its |
| 10:40 | 23 | profitability? |
| 10:40 | 24 |         MR. PRICE:  Objection.  Argumentative as phrased. |
| 10:40 | 25 | Ambiguous. |

| 10:40 | 1 | THE COURT:  Well, it is argumentative, Counsel. |
| 10:40 | 2 | You can ask him what he relied upon. |
| 01:59 | 3 | BY MS. HURST: |
| 10:40 | 4 | Q.   You looked at Mattel's 10-K's in connection with your |
| 10:40 | 5 | opinions in this matter, true? |
| 10:40 | 6 | A.   I did. |
| 10:40 | 7 | Q.   And you saw there were reports of many layoffs, series |
| 10:41 | 8 | of reductions in head counts between the period 2000 and |
| 10:41 | 9 | 2001, true? |
| 10:41 | 10 | MR. PRICE:  Same objection as to ambiguity. |
| 10:41 | 11 | THE COURT:  Overruled. |
| 10:41 | 12 | THE WITNESS:  They had a number of layoffs during |
| 10:41 | 13 | that time period. |
| 10:41 | 14 | BY MS. HURST: |
| 10:41 | 15 | Q.   And that's one way that companies cut costs in order to |
| 10:41 | 16 | improve profitability, right? |
| 10:41 | 17 | A.   They do. |
| 10:41 | 18 | Q.   And you're giving Mattel the benefit of that -- |
| 10:41 | 19 | cost-cutting measures and saying they're the most profitable |
| 10:41 | 20 | company in the world and, therefore, not a good comparison |
| 10:41 | 21 | for MGA, true? |
| 10:41 | 22 | A.   Well, I'm saying that they are a successful company. |
| 10:41 | 23 | They are successful by both introducing innovative products |
| 10:41 | 24 | that sell for a profit, and they are efficient and cut costs |
| 10:41 | 25 | that aren't necessary.  And that is one of the reasons that |

| | | |
|---|---|---|
| 10:41 | 1 | they are the most successful toy company. |
| 10:41 | 2 | And those are not necessarily the same characteristics |
| 10:41 | 3 | that were -- that I saw at MGA. |
| 10:41 | 4 | Q.   Is it true -- how much does Mattel rely on outside |
| 10:41 | 5 | inventors for its new product? |
| 10:41 | 6 | A.   I think fairly extensively. |
| 10:41 | 7 | Q.   Mattel, with all its innovation, still needs to rely on |
| 10:42 | 8 | others to come up with its new products, true? |
| 10:42 | 9 | A.   Not all of them, but they do use outside inventors as |
| 10:42 | 10 | well as their internal design people. |
| 10:42 | 11 | Q.   In calculating unjust enrichment and comparing Bratz |
| 10:42 | 12 | versus the toy industry, you've come up with a range from |
| 10:42 | 13 | 365 to 596 million, true? |
| 10:42 | 14 | A.   I'd have to refer back to my numbers.  Are you still |
| 10:42 | 15 | using the old numbers, or the ones that I showed the jury? |
| 10:42 | 16 | Q.   I thought you showed Slide 25 to the jury.  Was I -- |
| 10:43 | 17 | A.   No, you're -- I am looking at it now.  Those are the |
| 10:43 | 18 | numbers, yes. |
| 10:43 | 19 | Q.   And if you had compared Bratz to Barbie, that number |
| 10:43 | 20 | would have been zero, true? |
| 10:43 | 21 | A.   That's true. |
| 10:43 | 22 | Q.   In your lost profits number, you compared Bratz to |
| 10:43 | 23 | Barbie, and you came up with -- what is it?  384 million? |
| 10:43 | 24 | A.   No.  I think that's the old number. |
| 10:43 | 25 | Q.   323.  Sorry. |

| | | |
|---|---|---|
| 10:43 | 1 | A.    324.  Let's round it. |
| 10:43 | 2 | Q.    324 million, right? |
| 10:43 | 3 | A.    Correct. |
| 10:43 | 4 | Q.    And you did that by assuming that all of the Bratz |
| 10:43 | 5 | fashion doll purchasers would have been fashion doll |
| 10:43 | 6 | purchasers, right? |
| 10:43 | 7 | A.    That weren't -- the portion that expanded the market, |
| 10:43 | 8 | yes. |
| 10:43 | 9 | Q.    So, in other words, you didn't allocate any of those |
| 10:43 | 10 | Bratz fashion doll purchasers to the rest of the toy |
| 10:43 | 11 | industry, right? |
| 10:43 | 12 | A.    You mean toy industry participants that were not making |
| 10:44 | 13 | fashion dolls?  That is correct. |
| 10:44 | 14 | Q.    And then, for Mexico, you used the avoided-cost method |
| 10:44 | 15 | to come up with $5.1 million, right? |
| 10:44 | 16 | A.    For the point of sale information, in the reports that |
| 10:44 | 17 | were taken. |
| 10:44 | 18 | Q.    And if you had used that avoided-cost method to come up |
| 10:44 | 19 | with a, you know, value for, say, the Bratz name, the |
| 10:44 | 20 | testimony in this case would have supported $200, true? |
| 10:44 | 21 | A.    Well, for someone who could not otherwise exploit that |
| 10:44 | 22 | name, yes, that would be one measure. |
| 10:44 | 23 | Q.    In each instance, Mr. Wagner, you've chosen a method |
| 10:44 | 24 | which gives us a significant number; isn't that true? |
| 10:44 | 25 | A.    I would say that all my numbers are significant, yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 94 of 151   Page ID #:308127
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

94

| | | |
|---|---|---|
| 10:45 | 1 | MS. HURST:  No further questions. |
| 10:45 | 2 | MR. COTE:  No questions, Your Honor.  Thank you. |
| 10:45 | 3 | THE COURT:  All right.  Thank you. |
| 10:45 | 4 | Mr. Wagner, you may step down. |
| 10:45 | 5 | THE WITNESS:  Thank you, Your Honor. |
| 10:45 | 6 | *(Witness steps down subject to recall.)* |
| 10:45 | 7 | THE COURT:  Counsel, your next witness, please. |
| 10:45 | 8 | MR. QUINN:  Your Honor, Mattel calls Richard |
| 10:45 | 9 | de Anda. |
| 10:45 | 10 | THE COURT:  Thank you. |
| 10:46 | 11 | Raise your right hand. |
| 10:46 | 12 | **RICHARD DE ANDA, MATTEL'S WITNESS, SWORN** |
| 10:46 | 13 | THE WITNESS:  I do. |
| 10:46 | 14 | THE COURT:  Thank you, sir.  Come along the jury |
| 10:46 | 15 | railing, please. |
| 10:46 | 16 | Now, sir, would you state your full name for the |
| 10:46 | 17 | jury. |
| 10:46 | 18 | THE WITNESS:  Yes.  Richard de Anda. |
| 10:46 | 19 | THE COURT:  Spell your last name, sir. |
| 10:46 | 20 | THE WITNESS:  Yes.  Small D-E, capital A-N-D-A. |
| 10:46 | 21 | THE COURT:  Direct examination by Mr. Quinn on |
| 10:46 | 22 | behalf of Mattel. |
| 10:46 | 23 | MR. QUINN:  Thank you, Your Honor. |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 10:46 | 1 | **DIRECT EXAMINATION** |
| 10:46 | 2 | BY MR. QUINN: |
| 10:46 | 3 | Q.   Mr. de Anda, what is your current job? |
| 10:46 | 4 | A.   I'm a consultant with Mattel. |
| 10:46 | 5 | Q.   And how long have you been a consultant with Mattel? |
| 10:46 | 6 | A.   Since December of 2008. |
| 10:46 | 7 | Q.   You were previously employed by Mattel? |
| 10:46 | 8 | A.   Yes. |
| 10:46 | 9 | Q.   And you retired -- |
| 10:46 | 10 | A.   Yes. |
| 10:46 | 11 | Q.   -- not too long ago? |
| 10:46 | 12 | A.   Yes, that's correct. |
| 10:46 | 13 | Q.   Was that in December 2008? |
| 10:47 | 14 | A.   That was. |
| 10:47 | 15 | Q.   And during your retirement, you're continuing to do |
| 10:47 | 16 | some consulting with Mattel; is that correct? |
| 10:47 | 17 | A.   That's correct. |
| 10:47 | 18 | Q.   What was your position at Mattel? |
| 10:47 | 19 | A.   Initially, in -- when I was hired, I was hired as the |
| 10:47 | 20 | Director of Global Security and Investigations, and that was |
| 10:47 | 21 | in November of 1997. |
| 10:47 | 22 | Q.   So did -- you started at Mattel as supervisor for |
| 10:47 | 23 | Global Security in 1997? |
| 10:47 | 24 | A.   Yes. |
| 10:47 | 25 | Q.   And did you later assume some other position? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

96

| | | |
|---|---|---|
| 10:47 | 1 | A.  I did.  Within six months, I was promoted to a vice |
| 10:47 | 2 | president, and expanded the unit to cover global |
| 10:47 | 3 | investigations. |
| 10:47 | 4 | Q.  And did you continue to have that position in your |
| 10:47 | 5 | retirement in December of 2008? |
| 10:47 | 6 | A.  I did. |
| 10:48 | 7 | Q.  And what were your responsibilities, generally, while |
| 10:48 | 8 | working at Mattel? |
| 10:48 | 9 | A.  Well, basically, I would view it as minimizing business |
| 10:48 | 10 | interruption, which covers everything from A through Z, both |
| 10:48 | 11 | internal and external, be it theft, be it protection of |
| 10:48 | 12 | Mattel assets, investigating both civil/criminal issues, |
| 10:48 | 13 | internal issues. |
| 10:48 | 14 | Q.  So, basically, security-type issues as a general |
| 10:48 | 15 | matter? |
| 10:48 | 16 | A.  As a general matter. |
| 10:48 | 17 | Q.  Are you a licensed private investigator in the State of |
| 10:48 | 18 | California? |
| 10:48 | 19 | A.  I am. |
| 10:48 | 20 | Q.  For how long have you been a licensed private |
| 10:48 | 21 | investigator? |
| 10:48 | 22 | A.  Numerous decades.  Probably since the 70's. |
| 10:48 | 23 | Q.  And do you provide, you know, private investigative |
| 10:48 | 24 | services yourself? |
| 10:48 | 25 | A.  I do. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 97 of 151   Page ID #:308130
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

97

| | | |
|---|---|---|
| 10:48 | 1 | Q.   And do you do business under a certain name in that |
| 10:48 | 2 | capacity? |
| 10:48 | 3 | A.   Yes. |
| 10:48 | 4 | Q.   And what is the name of that business? |
| 10:49 | 5 | A.   Richard N. de Anda & Associates, Incorporated. |
| 10:49 | 6 | Q.   And for how long have you been doing business also |
| 10:49 | 7 | under that name providing private investigative services? |
| 10:49 | 8 | A.   Since the 70's. |
| 10:49 | 9 | Q.   And what kind of work have you done in that capacity, |
| 10:49 | 10 | in Richard de Anda and -- I think you said, "& Associates"? |
| 10:49 | 11 | A.   Mainly, corporate investigations for corporate clients. |
| 10:49 | 12 | Global investigations dealing with financial institutions |
| 10:49 | 13 | around the world.  I have provided services for attorneys, |
| 10:49 | 14 | law firms, expert witness and security advice. |
| 10:49 | 15 | Q.   And did your -- did you do this work during the time |
| 10:49 | 16 | that you were also employed by Mattel? |
| 10:49 | 17 | A.   A very small portion of it, yes. |
| 10:49 | 18 | Q.   And did you -- did the folks at Mattel know that?  Did |
| 10:49 | 19 | you disclose to them that you also had this private business |
| 10:49 | 20 | and get their sign-off on it? |
| 10:49 | 21 | A.   Yes. |
| 10:50 | 22 | Q.   Did you -- other than this private business that you've |
| 10:50 | 23 | had -- uh, detective business -- could you please give the |
| 10:50 | 24 | jury a rundown on what your employment experience was before |
| 10:50 | 25 | joining Mattel? |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 98 of 151   Page ID #:308131
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

98

| | | |
|---|---|---|
| 10:50 | 1 | A.   Uh, yes.  I'll start from Mattel and go backwards, |
| 10:50 | 2 | then. |
| 10:50 | 3 | Prior to Mattel, I worked for a finance -- two |
| 10:50 | 4 | individuals by the name of Michael and Lowell Milkin.  I ran |
| 10:50 | 5 | a -- I would say a personal business for them involving |
| 10:50 | 6 | their personal needs and security for two years. |
| 10:50 | 7 | Prior to that, I worked for the Hagan Company, which |
| 10:50 | 8 | was a REIT, which owned real estate in several western |
| 10:50 | 9 | states, dealing with major malls.  I ran the security |
| 10:50 | 10 | department for them. |
| 10:50 | 11 | Prior to that, I was on my own for about three years, |
| 10:50 | 12 | running my own security business.  And then, just prior to |
| 10:51 | 13 | that, I worked for Colombia Savings as a vice president, |
| 10:51 | 14 | running their security and investigative operations. |
| 10:51 | 15 | And then the Los Angeles Police Department, prior to |
| 10:51 | 16 | that, for 20 years.  The majority of my time was spent in |
| 10:51 | 17 | homicide.  I worked homicide for about five years, and then |
| 10:51 | 18 | ran the homicide unit, dealing with homicide and |
| 10:51 | 19 | kidnappings, for the most part.  And prior to that, I was an |
| 10:51 | 20 | undercover in the police department, working a vice unit and |
| 10:51 | 21 | then a patrol unit for a while. |
| 10:51 | 22 | And before coming on to Los Angeles Police |
| 10:51 | 23 | Department -- if you'd like me to go on? |
| 10:51 | 24 | Q.   Yeah.  What did you do before that? |
| 10:51 | 25 | A.   I was in the United States Marine Corps.  I served from |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 99 of 151   Page ID #:308132
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

99

| | | |
|---|---|---|
| 10:51 | 1 | 19- -- from January of 1966 to January of 1968. |
| 10:51 | 2 | Q.    And did you serve in Vietnam, sir? |
| 10:51 | 3 | A.    I did. |
| 10:51 | 4 | Q.    What unit were you attached to? |
| 10:51 | 5 | A.    I was with the 2nd Battalion, 1st Marines -- 1st Marine |
| 10:52 | 6 | Division in the upper part of Vietnam. |
| 10:52 | 7 | Q.    And where were you stationed? |
| 10:52 | 8 | A.    Just south of Da Nang, initially.  And then, shortly |
| 10:52 | 9 | thereafter, I was with a rifle company.  We were sent on an |
| 10:52 | 10 | outpost in, basically, the middle of nowhere for several |
| 10:52 | 11 | months. |
| 10:52 | 12 | Q.    And were you decorated -- |
| 10:52 | 13 | A.    Yes. |
| 10:52 | 14 | Q.    -- and honorably discharged? |
| 10:52 | 15 | A.    Yes. |
| 10:52 | 16 | Q.    What decorations did you -- |
| 10:52 | 17 | A.    I have a purple heart, was recommended for a bronze |
| 10:52 | 18 | star.  I have, I think, six Presidential unit citations, one |
| 10:52 | 19 | meritorious unit citation, I think a combat ribbon, and |
| 10:52 | 20 | other ribbons and metals. |
| 10:52 | 21 | Q.    Let's turn now to your employment at Mattel and your |
| 10:52 | 22 | first hearing about MGA. |
| 10:52 | 23 | And could you tell us, please, when you first heard |
| 10:52 | 24 | about that company? |
| 10:52 | 25 | A.    I -- I believe it was in -- in early 19- -- excuse |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 100 of 151   Page ID #:308133
CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

100

| | | |
|---|---|---|
| 10:53 | 1 | me –– 2002, in conjunction with information received from an |
| 10:53 | 2 | individual employee by the name of Ivy Ross and/or Cassidy |
| 10:53 | 3 | Parks.  With regards to similarities from the Bratz doll to |
| 10:53 | 4 | a product that an employee at Mattel, Lily Martinez, had |
| 10:53 | 5 | designed or had drawings of. |
| 10:53 | 6 | Q.   All right.  So you were contacted by some Mattel |
| 10:53 | 7 | employees? |
| 10:53 | 8 | A.   Yes. |
| 10:53 | 9 | Q.   And those are those two individuals you just named: |
| 10:53 | 10 | Ivy Ross and Cassidy Parks? |
| 10:53 | 11 | A.   "Park," yes. |
| 10:53 | 12 | Q.   Park.  I'm sorry.  And what was it that they brought to |
| 10:53 | 13 | your attention? |
| 10:53 | 14 | A.   They had brought to my attention that –– that they were |
| 10:53 | 15 | under the impression that the Bratz doll that was produced |
| 10:53 | 16 | by MGA was a copy of a –– renderings that Lily Martinez had |
| 10:53 | 17 | drawn. |
| 10:53 | 18 | Q.   Did they say anything to you about Mr. Bryant having |
| 10:54 | 19 | done this work on Bratz while he was employed by Mattel? |
| 10:54 | 20 | A.   No. |
| 10:54 | 21 | Q.   At the time that they brought this information to your |
| 10:54 | 22 | attention, was Mr. Bryant a Mattel employee at that time? |
| 10:54 | 23 | A.   No, he was not. |
| 10:54 | 24 | Q.   And so, as best you can recall, when was it that those |
| 10:54 | 25 | ladies contacted you on this issue? |

| | | |
|---|---|---|
| 10:54 | 1 | A.    It was early in 2002, I believe March, around March. |
| 10:54 | 2 | Q.    And what did you do with the information after you |
| 10:54 | 3 | received this report? |
| 10:54 | 4 | A.    I had contacted the legal department. |
| 10:54 | 5 | Q.    And is there a particular person there who you |
| 10:54 | 6 | contacted? |
| 10:54 | 7 | A.    Yes, Michele McShane. |
| 10:54 | 8 | Q.    And did you discuss it with anybody else? |
| 10:54 | 9 | A.    Later on, yes.  I discussed it with -- we conducted |
| 10:54 | 10 | meetings shortly thereafter with Ivy Ross, Cassidy Park, |
| 10:54 | 11 | Michele McShane, myself, Bob Simoneau, and there were other |
| 10:54 | 12 | people in the meeting, but I just cannot remember who they |
| 10:55 | 13 | were. |
| 10:55 | 14 | Q.    Who is Bob Simoneau? |
| 10:55 | 15 | A.    Simoneau. |
| 10:55 | 16 | Q.    Who is he? |
| 10:55 | 17 | A.    He was an investigator in my department. |
| 10:55 | 18 | Q.    He worked for you?  Did he work for you? |
| 10:55 | 19 | A.    Yes. |
| 10:55 | 20 | Q.    Spell Mr. Simoneau's name. |
| 10:55 | 21 | A.    It's -- remember how to spell it.  It doesn't sound |
| 10:55 | 22 | like it's spelled. |
| 10:55 | 23 | THE COURT:  S-I-M-O-N-E-U? |
| 10:55 | 24 | THE WITNESS:  Yes. |
| 10:55 | 25 | MS. HURST:  E-A-U. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:55 | 1 | MR. QUINN:  N-E-A-U. |
| 10:55 | 2 | So S-I-M-O-N-E-A-U, I believe. |
| 10:55 | 3 | BY MR. QUINN: |
| 10:55 | 4 | Q.   Does that sound right? |
| 10:55 | 5 | A.   That sounds right.  I know it's not phonetically the |
| 10:55 | 6 | way it sounds.  But that does sound correct, yes. |
| 10:55 | 7 | Q.   So you told us you had this meeting? |
| 10:55 | 8 | A.   Yes. |
| 10:55 | 9 | Q.   And what was the purpose of the meeting? |
| 10:55 | 10 | A.   Is to understand their beliefs, and to see who would |
| 10:55 | 11 | then handle the next steps, either my department or the |
| 10:55 | 12 | legal department. |
| 10:55 | 13 | Q.   And what was -- was there a decision made as to who |
| 10:56 | 14 | would handle this going forward? |
| 10:56 | 15 | A.   Yes. |
| 10:56 | 16 | Q.   And what was the decision that was made? |
| 10:56 | 17 | A.   It was that the legal department would, Michele McShane |
| 10:56 | 18 | would take responsibility for determining if, in fact, there |
| 10:56 | 19 | was infringement or not. |
| 10:56 | 20 | Q.   And at that point, had you received any information |
| 10:56 | 21 | that led you to believe that Mr. Bryant had worked on the |
| 10:56 | 22 | Bratz doll while he was employed by Mattel? |
| 10:56 | 23 | A.   No. |
| 10:56 | 24 | Q.   Did anyone at Mattel suggest to you before that |
| 10:56 | 25 | Mr. Bryant had worked on the Bratz doll while he was a |

| | | |
|---|---|---|
| 10:56 | 1 | Mattel employee? |
| 10:56 | 2 | A.   No. |
| 10:56 | 3 | Q.   So the issue related to whether the Bratz doll was just |
| 10:56 | 4 | too similar to this Toon Teens design that Ms. Martinez had |
| 10:56 | 5 | done? |
| 10:56 | 6 | A.   Yes. |
| 10:56 | 7 | Q.   All right.  So the upshot was the legal department said |
| 10:56 | 8 | that they were gonna look into this? |
| 10:56 | 9 | A.   Yes. |
| 10:56 | 10 | Q.   And was there some explanation given about why this was |
| 10:56 | 11 | thought to be a legal issue, rather than something that |
| 10:57 | 12 | would be in your responsibility? |
| 10:57 | 13 | MS. HURST:  Objection.  Hearsay. |
| 10:57 | 14 | THE COURT:  Overruled. |
| 10:57 | 15 | MS. KELLER:  Your Honor, this privilege has been |
| 10:57 | 16 | asserted on this issue by Mattel previously. |
| 10:57 | 17 | MR. QUINN:  It's just the subject matter, |
| 10:57 | 18 | Your Honor. |
| 10:57 | 19 | THE COURT:  Just a moment. |
| 10:57 | 20 | I got a note at the same time.  Just a minute, |
| 10:57 | 21 | Counsel.  I'm sorry.  Counsel, just a moment. |
| 10:57 | 22 | Okay.  Counsel, this was asserted to be |
| 10:57 | 23 | privileged.  And are you waiving this privilege? |
| 10:57 | 24 | MR. QUINN:  Your Honor, he has testified as to the |
| 10:57 | 25 | limited -- |

DEBBIE GALE, U.S. COURT REPORTER

| 10:57 | 1 | THE COURT: Are you waiving the privilege? |
| 10:57 | 2 | MR. QUINN: We are not waiving any privilege. |
| 10:58 | 3 | THE COURT: All right. Your next question, then. |
| 10:58 | 4 | BY MR. QUINN: |
| 10:58 | 5 | Q. So what was your understanding as to why the legal |
| 10:58 | 6 | department was gonna look into this as opposed to the |
| 10:58 | 7 | security department? |
| 10:58 | 8 | MS. KELLER: Same objection, Your Honor. |
| 10:58 | 9 | THE COURT: Sustained. |
| 10:58 | 10 | BY MR. QUINN: |
| 10:58 | 11 | Q. Did you understand that there was an issue of copyright |
| 10:58 | 12 | that was gonna be evaluated? |
| 10:58 | 13 | MS. KELLER: Objection. Same objection, |
| 10:58 | 14 | Your Honor. |
| 10:58 | 15 | MR. QUINN: It's just the subject matter, |
| 10:58 | 16 | Your Honor. |
| 10:58 | 17 | MR. McCONVILLE: Your Honor -- |
| 10:58 | 18 | MR. QUINN: He's testified to this multiple times. |
| 10:58 | 19 | MR. McCONVILLE: Your Honor, the privilege was |
| 10:58 | 20 | asserted as recently as last night in the McShane matter. |
| 10:58 | 21 | THE COURT: Sustained. |
|  | 22 | BY MR. QUINN: |
| 10:58 | 23 | Q. Could we take a look -- well, before we do that. |
| 10:58 | 24 | After that meeting, did you check in with Ms. McShane |
| 10:58 | 25 | periodically to find out where she was in doing what she was |

| | | |
|---|---|---|
| 10:58 | 1 | doing? |
| 10:58 | 2 | A.   Yes. |
| 10:58 | 3 | Q.   And how often did you do that? |
| 10:58 | 4 | A.   Quite often. |
| 10:58 | 5 | Q.   Can you give us a ballpark -- |
| 10:59 | 6 | A.   Um -- |
| 10:59 | 7 | Q.   -- estimate of how often you did that? |
| 10:59 | 8 | A.   I would say once a week or so, somewhere around once a |
| 10:59 | 9 | week or so. |
| 10:59 | 10 | Q.   And was there ever -- from your standpoint, was there |
| 10:59 | 11 | ever any sort of conclusive response about where her work |
| 10:59 | 12 | stood on this issue looking into this? |
| 10:59 | 13 | A.   Months later. |
| 10:59 | 14 | Q.   Um, if you could take a look, please, at |
| 10:59 | 15 | Exhibit 1195-RD. |
| 10:59 | 16 |         MR. QUINN:  If we could put that before |
| 10:59 | 17 | Mr. de Anda. |
| 10:59 | 18 |           *(Document provided to the witness.)* |
| 10:59 | 19 |         MR. QUINN:  And this is in evidence, Your Honor -- |
| 10:59 | 20 | or pages of it are.  The first page is in evidence, if we |
| 10:59 | 21 | could put that up on the screen. |
| 10:59 | 22 |         MS. KELLER:  Is that "RS" instead of "RD"? |
| 10:59 | 23 |         MR. QUINN:  I'm sorry? |
| 10:59 | 24 |         MS. KELLER:  Is that "RS" instead of "RD"? |
| 10:59 | 25 |         MR. QUINN:  "RD."  If we could put the first page |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

106

| | | |
|---|---|---|
| 11:00 | 1 | up on the... |
| 11:00 | 2 | Okay.  Your Honor, I'm told that "RD" is redacted |
| 11:00 | 3 | to eliminate Social Security numbers and that that's the |
| 11:00 | 4 | only difference between the two. |
| 11:00 | 5 | THE COURT:  That's fine. |
| 11:00 | 6 | MR. QUINN:  So if we could put 1195-RD-1 up on the |
| 11:00 | 7 | screen. |
| 11:00 | 8 | *(Document displayed.)* |
| | 9 | BY MR. QUINN: |
| 11:00 | 10 | Q.   And my question to you, Mr. de Anda, is do you |
| 11:00 | 11 | recognize this document? |
| 11:00 | 12 | A.   It appears to be a file folder. |
| 11:00 | 13 | Q.   And if you could take a look maybe at the pages behind |
| 11:00 | 14 | it to satisfy yourself what it is, my question to you is |
| 11:00 | 15 | what is this exhibit that you're looking at? |
| 11:00 | 16 | A.   It's a file folder for an internal incident report. |
| 11:00 | 17 | Q.   And what does this -- is this something that was |
| 11:00 | 18 | created within your security department at Mattel? |
| 11:01 | 19 | A.   Yes. |
| 11:01 | 20 | Q.   And, just general, what is the subject matter of this |
| 11:01 | 21 | particular file? |
| 11:01 | 22 | A.   The subject matter of this file is -- let me see what's |
| 11:01 | 23 | reported here. |
| 11:01 | 24 | It's -- is a report in regards to the manufacturing of |
| 11:01 | 25 | a product that appears to be similar to Mattel's products. |

| 11:01 | 1 | Q.  All right.  Is this the file that was opened relating |
| 11:01 | 2 | to this matter that was brought to your attention by |
| 11:01 | 3 | Ms. Park and Ms. Ross concerning Toon Teens and whether |
| 11:01 | 4 | Bratz is too similar to Toon Teens? |
| 11:01 | 5 | A.  That's correct. |
| 11:01 | 6 |      MR. QUINN:  And if we could put up on the screen |
| 11:01 | 7 | dash 4. |
| 11:01 | 8 |      This is in evidence, Your Honor. |
| 11:01 | 9 |      *(Document displayed.)* |
| 11:01 | 10 | BY MR. QUINN: |
| 11:01 | 11 | Q.  Who prepared this page that we're looking at here? |
| 11:02 | 12 | A.  It was prepared by Bob Simoneau. |
| 11:02 | 13 | Q.  And if you could turn to page dash 66, back in the |
| 11:02 | 14 | report. |
| 11:02 | 15 |      MR. QUINN:  I believe this is in evidence, |
| 11:02 | 16 | Your Honor.  Says at the top "Chronological Record." |
| 11:02 | 17 |      *(Document displayed.)* |
| 11:02 | 18 | BY MR. QUINN: |
| 11:02 | 19 | Q.  Can you tell us what we're looking at here? |
| 11:02 | 20 | A.  This is a chronological record of activities that would |
| 11:02 | 21 | have been done by anyone participating in this matter. |
| 11:02 | 22 | Q.  And who prepared this particular page that we're |
| 11:02 | 23 | looking at now, the chronological record? |
| 11:02 | 24 | A.  Well, I recognize the handwriting through -- from |
| 11:02 | 25 | March 15th, '02, through July 3rd, '02, to be Simoneau's, |

| | | |
|---|---|---|
| 11:02 | 1 | and then the last two entries in '03 and '04 to be my |
| 11:03 | 2 | handwriting. |
| 11:03 | 3 | Q.   If you turn, please, to page -- so -- after -- if we |
| 11:03 | 4 | could turn to the pages after 66.  If we could turn the |
| 11:03 | 5 | page -- |
| 11:03 | 6 | MR. QUINN:  And I believe this is in evidence, |
| 11:03 | 7 | Your Honor, 66 through 71. |
| 11:03 | 8 | *(Document displayed.)* |
| 11:03 | 9 | BY MR. QUINN: |
| 11:03 | 10 | Q.   Who prepared these pages? |
| 11:03 | 11 | A.   I don't know who actually prepared the pages.  I think |
| 11:03 | 12 | that I'm the one who inserted them, but I don't remember |
| 11:03 | 13 | from where. |
| 11:03 | 14 | Q.   All right.  Well, we'll come back to that. |
| 11:03 | 15 | Going back to that chronological record, on dash 66, |
| 11:03 | 16 | can you tell us basically what the purpose of this is? |
| 11:03 | 17 | A.   The purpose of these two entrees? |
| 11:03 | 18 | Q.   Of that chronological record. |
| 11:03 | 19 | A.   Oh, of the chronological record.  It's just to list |
| 11:03 | 20 | activities that are being conducted at that time. |
| 11:03 | 21 | Q.   And the last entry there is -- is that dated June of |
| 11:04 | 22 | 2004? |
| 11:04 | 23 | A.   Uh, yes.  June -- it appears to be 21st of 2004, I |
| 11:04 | 24 | think.  I can't really read it that well. |
| 11:04 | 25 | Q.   Is that in your handwriting? |

| | | |
|---|---|---|
| 11:04 | 1 | A.   Yes, it is. |
| 11:04 | 2 | Q.   And it states that there's -- it states, "Update: |
| 11:04 | 3 | Isaac Larian background." |
| 11:04 | 4 | Is that -- did I read that correctly? |
| 11:04 | 5 | A.   You did. |
| 11:04 | 6 | Q.   And how does that relate to the materials that -- that |
| 11:04 | 7 | follow in the file, following this page? |
| 11:04 | 8 | A.   It's information that was obtained on Mr. Larian. |
| 11:04 | 9 | Q.   And are you the one that actually collected that |
| 11:04 | 10 | information -- |
| 11:04 | 11 | A.   I believe I did. |
| 11:04 | 12 | Q.   -- in June of 2004? |
| 11:04 | 13 | A.   Yes. |
| 11:04 | 14 | Q.   And why did you update the file to include this |
| 11:04 | 15 | information that we're looking at here? |
| 11:04 | 16 | A.   The best of my recollection now is that, at the time, |
| 11:04 | 17 | that MGA and Mr. Larian were a party of interest. |
| 11:05 | 18 | Q.   And what was it that was going on in June of 2004 |
| 11:05 | 19 | that -- that you recall that caused them to be a party of |
| 11:05 | 20 | interest at that time? |
| 11:05 | 21 | A.   Well, by then, I had received information that |
| 11:05 | 22 | Mr. Larian had in his possession a rendering or drawing of |
| 11:05 | 23 | Flavas, which was Mattel's proprietary information.  By |
| 11:05 | 24 | then, we had learned that three of our managers had left our |
| 11:05 | 25 | Mattel -- our Mexico Mattel subsidiary and opened an MGA |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 110 of 151   Page ID #:308143
CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

110

| | | |
|---|---|---|
| 11:05 | 1 | office, and had taken an extensive amount of proprietary |
| 11:05 | 2 | information. |
| 11:05 | 3 | Let's see.  What else?  There were a few other issues |
| 11:05 | 4 | that involved proprietary information.  I can't recall them |
| 11:06 | 5 | right now off the top of my head. |
| 11:06 | 6 | So, obviously, MGA and Mr. Larian became a party of |
| 11:06 | 7 | interest. |
| 11:06 | 8 | Q.   And is that why, the best of your recollection, you |
| 11:06 | 9 | collected this information at that time and put this in the |
| 11:06 | 10 | file? |
| 11:06 | 11 | A.   Yes.  It was just gathering research and information at |
| 11:06 | 12 | the time. |
| 11:06 | 13 | Q.   Let's take a look at those 2004 additions to the file. |
| 11:06 | 14 | MR. QUINN:  If we could turn to -- first to |
| 11:06 | 15 | page 2-67. |
| 11:06 | 16 | (Document displayed.) |
| 11:06 | 17 | THE WITNESS:  Yes. |
| 11:06 | 18 | MR. QUINN:  It says, "Executive biographies." |
| 11:06 | 19 | And then turn to the next page dash 68. |
| 11:06 | 20 | THE WITNESS:  Yes. |
| 11:06 | 21 | (Document displayed.) |
| 11:06 | 22 | BY MR. QUINN: |
| 11:06 | 23 | Q.   You see there's some information there concerning |
| 11:06 | 24 | Mr. Larian? |
| 11:06 | 25 | A.   Yes, I do. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:06 | 1 | MR. QUINN:  And then if we turn to the page 69. |
| 11:06 | 2 | Some additional information. |
| 11:06 | 3 | *(Document displayed.)* |
| 11:06 | 4 | BY MR. QUINN: |
| 11:06 | 5 | Q.   Says he was born in 1954 in Iran and is a U.S. citizen. |
| 11:06 | 6 | Do you see that? |
| 11:06 | 7 | A.   Yes, I do. |
| 11:06 | 8 | Q.   And then there's some additional information on the |
| 11:06 | 9 | next page dash 70, about Thomas F. Park, who's identified as |
| 11:07 | 10 | chief operating officer. |
| 11:07 | 11 | *(Document displayed.)* |
| 11:07 | 12 | THE WITNESS:  Yes. |
| 11:07 | 13 | BY MR. QUINN: |
| 11:07 | 14 | Q.   And on the bottom of these pages, in the lower |
| 11:07 | 15 | right-hand corner, there is an MGA logo. |
| 11:07 | 16 | Do you see that? |
| 11:07 | 17 | A.   Yes. |
| 11:07 | 18 | Q.   Did you get this information from MGA? |
| 11:07 | 19 | A.   No.  I -- I think I could have received it online.  It |
| 11:07 | 20 | could have been published online.  I don't know -- I don't |
| 11:07 | 21 | remember where I actually received this. |
| 11:07 | 22 | Q.   Why would Mattel, you know, want to have this |
| 11:07 | 23 | information concerning Mr. Larian and Mr. Park and about |
| 11:07 | 24 | MGA, generally? |
| 11:07 | 25 | A.   I would think at the time -- |

| | | |
|---|---|---|
| 11:07 | 1 | MS. KELLER:  Objection.  Speculation of the |
| 11:07 | 2 | witness. |
| 11:07 | 3 | THE COURT:  Just a moment. |
| 11:07 | 4 | Sustained. |
| 11:07 | 5 | BY MR. QUINN: |
| 11:07 | 6 | Q.   What's your best recollection as to why you would -- |
| 11:07 | 7 | would have collected this information at the time? |
| 11:07 | 8 | A.   Well, Mr. Larian and MGA, as I said before, was a party |
| 11:08 | 9 | of interest because of the issues we were experiencing with |
| 11:08 | 10 | regards to our loss and theft of intellectual property. |
| 11:08 | 11 | Q.   If you'd turn, please, to pages dash 72 and 73. |
| 11:08 | 12 | A.   Yes. |
| 11:08 | 13 | MR. QUINN:  If we could put these on the screen? |
| 11:08 | 14 | I believe these pages are in evidence, as well. |
| 11:08 | 15 | *(Document displayed.)* |
| 11:08 | 16 | BY MR. QUINN: |
| 11:08 | 17 | Q.   What are we looking at here, dash 72? |
| 11:08 | 18 | A.   Dash 72 is just simply a -- the *Hollywood Reporter,* |
| 11:08 | 19 | the -- I think it's the cover page. |
| 11:08 | 20 | Q.   And there's a -- the article referenced on the cover |
| 11:08 | 21 | page concerns Bratz? |
| 11:08 | 22 | A.   Yes. |
| 11:08 | 23 | Q.   And then, if you'd turn the page. |
| 11:08 | 24 | *(Document displayed.)* |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 113 of 151   Page ID #:308146
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

113

| | | |
|---|---|---|
| 11:59 | 1 | BY MR. QUINN: |
| 11:08 | 2 | Q.   Dash 73, what is that? |
| 11:08 | 3 | A.   I believe that's the article that was contained within |
| 11:08 | 4 | that magazine. |
| 11:09 | 5 | Q.   And then, if you'd look at pages dash 77 through dash |
| 11:09 | 6 | 86 in the file.  Can you tell us what these pages are? |
| 11:09 | 7 | A.   One moment, please. |
| 11:09 | 8 |      Yes, this is an online search engine called |
| 11:09 | 9 | "LocateFast," that Mattel subscribes to through my |
| 11:09 | 10 | department.  And basically LocateFast is a search engine |
| 11:09 | 11 | that helps you search for public records. |
| 11:09 | 12 | Q.   And if you subscribe to it, this engine will return |
| 11:09 | 13 | results from public sources about people -- |
| 11:09 | 14 | A.   Yes. |
| 11:09 | 15 | Q.   -- basically? |
| 11:09 | 16 | A.   Yes. |
| 11:09 | 17 |      MR. QUINN:  Your Honor, I'm not sure if dash 77 |
| 11:09 | 18 | through dash 86 are in evidence, but I would offer them. |
| 11:10 | 19 |      THE COURT:  I'm going to go through them again |
| 11:10 | 20 | this evening.  We'll read each of those articles.  But I |
| 11:10 | 21 | want to make certain there's no objection concerning |
| 11:10 | 22 | hearsay.  And I don't think I've read all those. |
| 11:10 | 23 |      I think, Mr. Zeller and Mr. McConville, I looked |
| 11:10 | 24 | at those two nights ago? |
| 11:10 | 25 |      MR. McCONVILLE:  Yes, sir. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

114

| | | |
|---|---|---|
| 11:10 | 1 | MR. ZELLER:  Yes, sir. |
| 11:10 | 2 | THE COURT:  So you can expect that they'll be |
| 11:10 | 3 | coming in, but it may just be the face page, Counsel. |
| 11:10 | 4 | MR. QUINN:  Okay.  I think the article, actually, |
| 11:10 | 5 | Your Honor, is in evidence already that we looked at. |
| 11:10 | 6 | THE COURT:  Maybe.  I'm not gonna guess. |
| 11:10 | 7 | MR. QUINN:  All right.  72, 73. |
| 11:59 | 8 | BY MR. QUINN: |
| 11:10 | 9 | Q.   But, in any event, 77 through 86, this is search |
| 11:10 | 10 | results relating to what type of search?  Can you tell what |
| 11:10 | 11 | you were -- what you entered in the search box that returned |
| 11:10 | 12 | this information? |
| 11:10 | 13 | A.   Just a moment, please.  It's hard to read this copy. |
| 11:10 | 14 | "Larian" I see.  And "Angelina" I think. |
| 11:10 | 15 | Q.   Does it look like "Angela"? |
| 11:10 | 16 | A.   "Angela," it could be, yes. |
| 11:10 | 17 | Q.   Why would you be running searches on the name Angela |
| 11:11 | 18 | Larian? |
| 11:11 | 19 | A.   What I believe -- |
| 11:11 | 20 | MS. KELLER:  Objection.  Calls for speculation. |
| 11:11 | 21 | THE COURT:  Overruled.  You can answer the |
| 11:11 | 22 | question. |
| 11:11 | 23 | THE WITNESS:  Thank you, Your Honor. |
| 11:11 | 24 | What -- I believe I ran "Angela" to get a better |
| 11:11 | 25 | hit, I would say -- |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 115 of 151   Page ID #:308148
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

115

| | | |
|---|---|---|
| 11:11 | 1 | THE COURT:  Just a moment. |
| 11:11 | 2 | "I believe --" |
| 11:11 | 3 | THE WITNESS:  I'm sorry. |
| 11:11 | 4 | THE COURT:  -- doesn't mean anything to the jury. |
| 11:11 | 5 | I know police officers are used to talking that way.  Not in |
| 11:11 | 6 | my Court. |
| 11:11 | 7 | "Best of my opinion." |
| 11:11 | 8 | "Best of my recollection." |
| 11:11 | 9 | "I believe" -- No. |
| 11:11 | 10 | THE WITNESS:  All right. |
| 11:11 | 11 | THE COURT:  What did you do? |
| 11:11 | 12 | THE WITNESS:  I ran her name to identify Isaac |
| 11:11 | 13 | Larian.  Because I had ran "Isaac Larian" initially, and I |
| 11:11 | 14 | think I came up with several different individuals, so I |
| 11:11 | 15 | wanted to identify the right person -- |
| 11:11 | 16 | BY MR. QUINN: |
| 11:11 | 17 | Q.   So -- |
| 11:11 | 18 | A.   -- with the cross reference. |
| 11:11 | 19 | Q.   Okay.  If we look at pages 75 to 76 -- |
| 11:11 | 20 | MR. QUINN:  These are in evidence, Your Honor. |
| 11:11 | 21 | If we could put 75 up on the screen, please, Ken. |
| 11:12 | 22 | *(Document displayed.)* |
| 11:12 | 23 | BY MR. QUINN: |
| 11:12 | 24 | Q.   Where did this information come from that we're looking |
| 11:12 | 25 | at here:  This information concerning Mr. Larian? |

| 11:12 | 1 | A.   I created it off the information I received through the |
| 11:12 | 2 | Google searches, Internet searches, and LocateFast searches. |
| 11:12 | 3 | The personal and the career and business. |
| 11:12 | 4 | (Document displayed.) |
| 11:12 | 5 | THE WITNESS:  And then on the -- 76, I created |
| 11:12 | 6 | that from individuals that knew of, or knew people that knew |
| 11:12 | 7 | of Ms. -- Mr. Larian just to understand who he was. |
| 11:59 | 8 | BY MR. QUINN: |
| 11:12 | 9 | Q.   So this is information -- you put this together, sort |
| 11:12 | 10 | of, collecting some data about Larian? |
| 11:12 | 11 | A.   Yes. |
| 11:12 | 12 | Q.   And if I understand what you're telling us correctly, |
| 11:12 | 13 | the reason you ran the name "Angela Larian" was to narrow |
| 11:12 | 14 | the number of search hits, basically? |
| 11:12 | 15 | A.   That's correct. |
| 11:12 | 16 | Q.   To make sure you had the right individual, Isaac |
| 11:13 | 17 | Larian? |
| 11:13 | 18 | A.   That is correct. |
| 11:13 | 19 | Q.   What sources of information did you use to prepare the |
| 11:13 | 20 | personal and the career and business sections there on pages |
| 11:13 | 21 | dash 75 and dash 76? |
| 11:13 | 22 | If we go -- where did you get that information there? |
| 11:13 | 23 | It says, "born in Iran" and he became a U.S. Citizen. |
| 11:13 | 24 | Do you know where you got that information? |
| 11:13 | 25 | A.   I think part of it was Google searches and the |

| | | |
|---|---|---|
| 11:13 | 1 | LocateFast information.  It's a compilation of all of that. |
| 11:13 | 2 | Q.   And if you look back at the slides we looked at |
| 11:13 | 3 | earlier, back on pages dash 68 and dash 69. |
| 11:13 | 4 | *(Document displayed.)* |
| 11:13 | 5 | BY MR. QUINN: |
| 11:13 | 6 | Q.   This information that has the -- these pages that have |
| 11:13 | 7 | the MGA logo in the right-hand corner, does it appear to you |
| 11:13 | 8 | that some of that information that you have on dash 75 and |
| 11:14 | 9 | 76 came straight out of dash 68 and dash 69? |
| 11:14 | 10 | A.   Yes, that's correct. |
| 11:14 | 11 | Q.   So if you -- for example, if you compare the |
| 11:14 | 12 | information, the statements about Mr. Larian's birth date |
| 11:14 | 13 | and being from Iran, and having a degree in civil |
| 11:14 | 14 | engineering, the length of marriage, names and ages of his |
| 11:14 | 15 | kids -- that all appears in these slides which are at -- |
| 11:14 | 16 | dash, for example, dash 69, if we could look at that -- |
| 11:14 | 17 | these MGA slides? |
| 11:14 | 18 | MS. KELLER:  Objection.  Leading. |
| 11:14 | 19 | THE COURT:  Overruled. |
| 11:14 | 20 | *(Document displayed.)* |
| 11:14 | 21 | THE WITNESS:  One moment, please.  I'm sorry. |
| 11:14 | 22 | Yes. |
| 11:14 | 23 | BY MR. QUINN: |
| 11:14 | 24 | Q.   And where did you get Mr. Larian's home address? |
| 11:14 | 25 | A.   Through LocateFast. |

| | | |
|---|---|---|
| 11:14 | 1 | Q.   That's the search that you did? |
| 11:14 | 2 | A.   Yes. |
| 11:14 | 3 | Q.   And then the career and business information on dash 75 |
| 11:14 | 4 | and dash -- on page dash 75, the bottom half of that. |
| 11:15 | 5 | *(Document displayed.)* |
| 11:59 | 6 | BY MR. QUINN: |
| 11:15 | 7 | Q.   Can you tell us whether or not that also came from |
| 11:15 | 8 | those MGA slides? |
| 11:15 | 9 | A.   It did. |
| 11:15 | 10 | Q.   And then, if we could look at dash 87 to dash 90. |
| 11:15 | 11 | MR. QUINN:  And this is in evidence.  If we could |
| 11:15 | 12 | put dash 87 up on the screen. |
| 11:15 | 13 | *(Document displayed.)* |
| | 14 | BY MR. QUINN: |
| 11:15 | 15 | Q.   Some information about "Founders Wall Donors" |
| 11:15 | 16 | apparently at a -- at a school? |
| 11:15 | 17 | A.   Uh, yes, it is. |
| 11:15 | 18 | Q.   And where did you get this information? |
| 11:15 | 19 | A.   It was just a Google search, online search.  It was |
| 11:15 | 20 | just running the name, and the name came up with this hit. |
| 11:15 | 21 | Q.   And you did ultimately -- did you ultimately hear back |
| 11:15 | 22 | from Ms.-- which name was it that you ran, do you recall, |
| 11:16 | 23 | that came up with this hit that you're indicating here? |
| 11:16 | 24 | A.   Oh, um, I believe -- well, it was "Larian."  And I |
| 11:16 | 25 | don't remember if I ran "Isaac" or "Angela."  Probably |

| 11:16 | 1 | "Isaac." |

11:16   1   "Isaac."

11:16   2   Q.   All right.  So this is the file that you -- this file

11:16   3   was opened up in connection with this report about Toon

11:16   4   Teens?

11:16   5   A.   That is correct.

11:16   6   Q.   That's how it started?

11:16   7   A.   That's how it started.

11:16   8   Q.   And then later on you added some additional

11:16   9   information?

11:16   10   A.   Years later.

11:16   11   Q.   And at some point did you hear back from Ms. McShane --

11:16   12   you said the legal department was looking into this issue

11:16   13   about whether Toon Teens was too close to Bratz, or whether

11:17   14   Bratz was too close to Toon Teens.  At some point did you

11:17   15   hear back from the legal department on that issue?

11:17   16   A.   I did.

11:17   17   Q.   And what did you hear in that --

11:17   18          MS. KELLER:  Objection.  Same objection as before

11:17   19   Your Honor:  What he heard back from the legal department.

11:17   20   And hearsay.

11:17   21          THE COURT:  The meeting's always been in question.

11:17   22   But I'm not sure if McShane --

11:17   23          What position did McShane hold at that time,

11:17   24   Counsel?

11:17   25          MR. QUINN:  She was an in-house lawyer at Mattel.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

120

11:17   1          I'll withdraw the question, and ask a different

11:17   2   question, Your Honor.

11:17   3   BY MR. QUINN:

11:17   4   Q.   So far as you know, did Mattel ever bring a copyright

11:17   5   infringement suit against MGA asserting that Bratz was a

11:17   6   copyright infringement of Toon Teens?  Did Mattel ever bring

11:18   7   such a claim?

11:18   8   A.   No.

11:18   9   Q.   Okay.  I'd like you, please if you would, to turn to

11:18  10   Exhibit 1193.  And I'll ask you what this document is.

11:18  11          *(Document provided to the witness.)*

11:18  12          THE WITNESS:  Thank you.

11:18  13          *(Document displayed.)*

11:18  14   BY MR. QUINN:

11:18  15   Q.   And what is Exhibit 1193?

11:18  16   A.   It is a document that was given to me by Alan Kaye.

11:18  17   Q.   And what is your understanding about what it is?

11:18  18   A.   It's an anonymous letter that was sent to the CEO of

11:18  19   Mattel, Bob Eckert.

11:18  20   Q.   And you indicated that Mr. Kaye forwarded it to you?

11:19  21   A.   Yes, that's correct.

11:19  22   Q.   And remind us who Mr. Kaye is?

11:19  23   A.   Mr. Alan Kaye was the, at the time, the senior vice

11:19  24   president of Human Resources for Mattel and my direct

11:19  25   report.  I would report directly in to Mr. Kaye.

| | | |
|---|---|---|
| 11:19 | 1 | Q.   And there's some handwriting up there at the top, and |
| 11:19 | 2 | then at the bottom.  Can you read that for us? |
| 11:19 | 3 | A.   Yes.  It says, "Alan," and then the letter "K" -- |
| 11:19 | 4 | "worth having Richard explore."  And there's initials. |
| 11:19 | 5 | Q.   There's a question mark there after "explore"? |
| 11:19 | 6 | A.   Yes, there's a question mark.  Thank you. |
| 11:19 | 7 | Q.   All right. |
| 11:19 | 8 | A.   And then there is what appears to be "RA" circled under |
| 11:19 | 9 | that handwriting, with an arrow pointing down to another |
| 11:19 | 10 | handwritten note. |
| 11:19 | 11 | Q.   And do you know whose initials those are? |
| 11:19 | 12 | A.   The "RA," Robert Eckert. |
| 11:19 | 13 | Q.   So doesn't use an "E"? |
| 11:20 | 14 | A.   I'm sorry.  Is that an "E"?  It looks like an "A." |
| 11:20 | 15 | It's an "E."  Sorry, Bob. |
| 11:20 | 16 | Q.   Maybe it's his middle initial? |
| 11:20 | 17 | A.   Could be. |
| 11:20 | 18 | Q.   And then down below there's another note? |
| 11:20 | 19 | A.   Yes, there is. |
| 11:20 | 20 | Q.   Could you read that for us. |
| 11:20 | 21 | A.   Yes.  It says, "Richard" -- oh -- "I would start with |
| 11:20 | 22 | Ivy to see if this makes any sense."  And I recognize the |
| 11:20 | 23 | initials here as Alan Kaye's. |
| 11:20 | 24 | Q.   So when it was forwarded to you, it had both those |
| 11:20 | 25 | notes on it; is that right? |

| 11:20 | 1 | A.    Yes. |
|---|---|---|
| 11:20 | 2 | Q.    And what is the date on this, by the way?  There's a |
| 11:20 | 3 | received stamp in the upper right. |
| 11:20 | 4 | A.    Yes.  There's a received date stamp of August 5, 2002. |
| 11:20 | 5 | Q.    Do you actually recall receiving this anonymous letter |
| 11:20 | 6 | when -- and it's being forwarded to you by Mr. Kaye -- do |
| 11:20 | 7 | you recall that? |
| 11:20 | 8 | A.    Yes. |
| 11:20 | 9 | Q.    And what was your reaction at the time when you |
| 11:20 | 10 | received the anonymous letter? |
| 11:20 | 11 | A.    Well, it was mildly interesting because it's from -- |
| 11:21 | 12 | anonymous person.  And I recall this was relating to the |
| 11:21 | 13 | same issue that we were already involved in with regards to |
| 11:21 | 14 | the Toon Teens and Bratz matter. |
| 11:21 | 15 | Q.    And why did you think that?  That it somehow related to |
| 11:21 | 16 | that -- this is like -- the date of this is how many months |
| 11:21 | 17 | after you've opened that earlier file because you received |
| 11:21 | 18 | the report from Ms. Ross and Ms. Park? |
| 11:21 | 19 | A.    It's about five months, four to five months. |
| 11:21 | 20 | Q.    And why was it that you thought that this related to |
| 11:21 | 21 | that same issue that had already been brought to your |
| 11:21 | 22 | attention? |
| 11:21 | 23 | A.    Well, it refers to Bratz in the letter.  It refers to |
| 11:21 | 24 | Bratz being created with other dolls; that this is one of |
| 11:21 | 25 | many dolls that were created at Mattel.  And I didn't have |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 123 of 151   Page ID #:308156
CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

123

| | | |
|---|---|---|
| 11:21 | 1 | the ability to interview the author of this letter, so my |
| 11:22 | 2 | assumption was that it was just simply the ongoing issue |
| 11:22 | 3 | that we were currently in the midst of trying to determine |
| 11:22 | 4 | if, in fact, this was a copy of Lily's -- Martinez's Toon |
| 11:22 | 5 | Teens or not, um, at that time. |
| 11:22 | 6 | Q.   And does it also refer to Carter Bryant? |
| 11:22 | 7 | A.   Yes, it does. |
| 11:22 | 8 | Q.   It says -- the first sentence says, "I have information |
| 11:22 | 9 | that I think Mattel should investigate." |
| 11:22 | 10 | And then it goes on:  "In 2000, a Mattel employee by |
| 11:22 | 11 | the name of Carter Bryant was working with Mattel to design |
| 11:22 | 12 | dolls.  One of the dolls that he was working on creating was |
| 11:22 | 13 | the Bratz dolls." |
| 11:22 | 14 | Do you see that? |
| 11:22 | 15 | A.   Yes, I do. |
| 11:22 | 16 | Q.   And do you recall your reaction to what when you were |
| 11:22 | 17 | reading that? |
| 11:22 | 18 | A.   Well, I -- yes, I do, actually.  I recall it as |
| 11:22 | 19 | being -- that it was inaccurate because, my understanding at |
| 11:22 | 20 | the time, that Mattel was not creating a Bratz doll. |
| 11:23 | 21 | Q.   And your understanding at the time, based upon your |
| 11:23 | 22 | earlier discussion with Ms. Ross and Ms. Park was what, in |
| 11:23 | 23 | terms of when Mr. Bryant created Bratz? |
| 11:23 | 24 | A.   I have -- at the time -- I have no idea when he created |
| 11:23 | 25 | Bratz, but it was not at Mattel, as far as I knew at the |

124

| | | |
|---|---|---|
| 11:23 | 1 | time. |
| 11:23 | 2 | Q.   What did you do after you received this anonymous |
| 11:23 | 3 | letter from Mr. Kaye? |
| 11:23 | 4 | A.   My recollection is I contacted Michele McShane and |
| 11:23 | 5 | shared the information with her and asked her where she was, |
| 11:23 | 6 | with the determining... |
| 11:23 | 7 | Q.   Okay.  And we won't go further into the conversation |
| 11:23 | 8 | with the lawyer.  But, basically, you called -- did you call |
| 11:23 | 9 | her attention to this letter? |
| 11:23 | 10 | A.   I did. |
| 11:23 | 11 | Q.   And was your purpose in calling her to find out where |
| 11:23 | 12 | she was just in terms of what she was looking into? |
| 11:23 | 13 | A.   Yes. |
| 11:24 | 14 | Q.   Did you ultimately respond to Mr. Kaye? |
| 11:24 | 15 | A.   I did. |
| 11:24 | 16 | MR. QUINN:  And if we could look at Exhibit 1194. |
| 11:24 | 17 | *(Document provided to the witness.)* |
| 11:24 | 18 | MR. QUINN:  Before we do that -- |
| 11:24 | 19 | BY MR. QUINN: |
| 11:24 | 20 | Q.   When you called Ms. McShane and called her attention to |
| 11:24 | 21 | this anonymous letter, can you tell us, yes or no, whether |
| 11:24 | 22 | she had an answer for you on what she was looking into? |
| 11:24 | 23 | A.   She did not have an answer. |
| 11:24 | 24 | Q.   And did you then -- did you at some point, then, |
| 11:24 | 25 | respond to Mr. Kaye? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

125

11:24    1    A.    Shortly thereafter.

11:24    2    Q.    Shortly after receiving the anonymous letter and making

11:24    3    this call?

11:24    4    A.    Yes.

11:24    5           MR. QUINN:  If we could look at Exhibit 1194.

11:24    6    This is in evidence.

11:24    7           (Document displayed.)

11:24    8    BY MR. QUINN:

11:24    9    Q.    What is this that we're looking at here?

11:24   10    A.    This is an e-mail that I authored and sent to Alan

11:25   11    Kaye.

11:25   12    Q.    When did you send it?

11:25   13    A.    A day or two after my conversation, or the same day,

11:25   14    with McShane.

11:25   15    Q.    You say, "Alan, I've received your anonymous letter

11:25   16    originally sent to Bob Eckert regarding Carter Bryant and

11:25   17    Bratz.  I'm aware of this situation and have been working on

11:25   18    it for several months."

11:25   19           Now, what is it that you're referring to there?

11:25   20    A.    I'm referring to waiting on the information from

11:25   21    Michele McShane.

11:25   22    Q.    And relating again to the issue about whether Toon

11:25   23    Teens is too much like Bratz?

11:25   24    A.    Yes.

11:25   25    Q.    "My frustration in this matter was the genesis of" --

| | | |
|---|---|---|
| 11:25 | 1 | and then some information has been redacted -- "and that is |
| 11:25 | 2 | now in the hands Robert Normile." |
| 11:25 | 3 | Who is Robert Normile? |
| 11:25 | 4 | A.   He is the chief legal counsel for Mattel. |
| 11:25 | 5 | Q.   "The truth of matter is that Carter Bryant did work for |
| 11:25 | 6 | Mattel, however" -- and then it's redacted again.  And it |
| 11:25 | 7 | says, "According to outside attorneys" -- redacted -- |
| 11:25 | 8 | "McShane has been" -- redacted.  And then it goes on to -- |
| 11:26 | 9 | you refer to the fact that Mattel had some relationship with |
| 11:26 | 10 | MGA in Latin America, right? |
| 11:26 | 11 | A.   That's correct. |
| 11:26 | 12 | Q.   Now, the information -- do you recall whether or not, |
| 11:26 | 13 | when you responded to Mr. Kaye, you included some of the |
| 11:26 | 14 | confidential legal communications that Ms. McShane had given |
| 11:26 | 15 | you? |
| 11:26 | 16 | A.   That's correct. |
| 11:26 | 17 | Q.   Uh, in the e-mail? |
| 11:26 | 18 | A.   Yes. |
| 11:26 | 19 | Q.   And is that what is -- has been redacted here, because |
| 11:26 | 20 | that's attorney-client privilege information? |
| 11:26 | 21 | A.   That's correct. |
| 11:26 | 22 | Q.   This e-mail, it has been pointed out, does not have a |
| 11:26 | 23 | date on it.  Do you have an explanation for that? |
| 11:26 | 24 | A.   I do. |
| 11:26 | 25 | Q.   And what is that? |

| | | |
|---|---|---|
| 11:26 | 1 | A.   I pushed the "Copy" before I sent it, so it didn't date |
| 11:26 | 2 | stamp it, or didn't send it so, therefore, it didn't put a |
| 11:26 | 3 | date on it until I sent it. |
| 11:27 | 4 | Q.   Why would you make a copy before you sent it? |
| 11:27 | 5 | A.   Because it was just for my file.  And I would -- had to |
| 11:27 | 6 | have sent it and pull it back up and make a copy of it.  And |
| 11:27 | 7 | that's just what happened. |
| 11:27 | 8 | Q.   All right.  But can you tell us whether or not you're |
| 11:27 | 9 | confident that you did, in fact, send this -- pressed "send" |
| 11:27 | 10 | and sent this e-mail to Mr. Kaye? |
| 11:27 | 11 | A.   Absolutely. |
| 11:27 | 12 | Q.   And how soon after talking to Ms. McShane did you do |
| 11:27 | 13 | that? |
| 11:27 | 14 | A.   Within a day or two, if not right after. |
| 11:27 | 15 | Q.   If you could turn, please, to Exhibit 6678. |
| 11:27 | 16 | *(Document provided to the witness.)* |
| 11:28 | 17 | MR. QUINN:  This is in evidence, Your Honor, just |
| 11:28 | 18 | pages 2 and 3. |
| 11:28 | 19 | BY MR. QUINN: |
| 11:28 | 20 | Q.   If you could first look at the document and satisfy -- |
| 11:28 | 21 | tell us if you can tell us what this is? |
| 11:28 | 22 | A.   Yes.  It's an incident report. |
| 11:28 | 23 | Q.   And, generally, this relates to what subject? |
| 11:28 | 24 | A.   This relates to the subject that we were just |
| 11:28 | 25 | discussing:  The anonymous letter and the e-mail sent to |

| | | |
|---|---|---|
| 11:28 | 1 | Alan Kaye by me. |
| 11:28 | 2 | Q.   And dash 1, is that the cover page for this? |
| 11:28 | 3 | A.   Actually, what this is -- no, it's not the cover page. |
| 11:28 | 4 | It's actually a photocopy of the file number in a manila |
| 11:28 | 5 | file. |
| 11:28 | 6 | MR. QUINN:  I'd offer exhibit dash 1, Your Honor. |
| 11:28 | 7 | THE COURT:  Received. |
| 11:28 | 8 | *(Exhibit No. 6678-1 received in evidence.)* |
| 11:28 | 9 | MR. QUINN:  If we could put that up on the screen. |
| 11:28 | 10 | *(Document displayed.)* |
| 11:28 | 11 | BY MR. QUINN: |
| 11:28 | 12 | Q.   So the upper right-hand corner, there's a number there. |
| 11:28 | 13 | What is that? |
| 11:28 | 14 | A.   That's the file number by year and by sequential order. |
| 11:28 | 15 | So that year, that was the 1680th case for that year. |
| 11:29 | 16 | Q.   So if we could turn to the next page, which is in |
| 11:29 | 17 | evidence, dash 2. |
| 11:29 | 18 | *(Document displayed.)* |
| 11:29 | 19 | BY MR. QUINN: |
| 11:29 | 20 | Q.   And in the upper left-hand corner -- |
| 11:29 | 21 | MR. QUINN:  If we could enlarge that, Ken? |
| 11:29 | 22 | (Technician complies.) |
| 11:29 | 23 | BY MR. QUINN: |
| 11:29 | 24 | Q.   -- it indicates an occurrence date of September 5, |
| 11:29 | 25 | 2002.  Do you see that? |

| | | |
|---|---|---|
| 11:29 | 1 | A.    Yes. |
| 11:29 | 2 | Q.    And what is that? |
| 11:29 | 3 | A.    That is a -- the date of occurrence.  And that is a |
| 11:29 | 4 | typo with the month, which should have been "8" instead of a |
| 11:29 | 5 | "9." |
| 11:29 | 6 | Q.    But that refers to the date of what? |
| 11:29 | 7 | A.    Oh.  The date of the -- the date of the occurrence. |
| 11:29 | 8 | The date when I received the anonymous letter. |
| 11:29 | 9 | Q.    And did you get it right down below in the body, the |
| 11:29 | 10 | incident narrative? |
| 11:29 | 11 | A.    I did. |
| 11:29 | 12 | Q.    There, it says, "On August 5, 2002, a letter addressed |
| 11:29 | 13 | to CEO was received in Bob Eckert's office," et cetera? |
| 11:30 | 14 | A.    Yes. |
| 11:30 | 15 | Q.    All right.  So that is the correct date of -- |
| 11:30 | 16 | A.    Yes. |
| 11:30 | 17 | Q.    Should have been the correct date of the occurrence? |
| 11:30 | 18 | A.    That is correct. |
| 11:30 | 19 | Q.    And then how about the reported date up above?  It |
| 11:30 | 20 | says -- there's a reported date of September 9, 2003, which |
| 11:30 | 21 | is about a year later. |
| 11:30 | 22 | A.    That's when I finally got around to memorializing this |
| 11:30 | 23 | in a case folder. |
| 11:30 | 24 | Q.    So what do you mean by that? |
| 11:30 | 25 | A.    Well, this sat on my desk for quite some time on a |

| | | |
|---|---|---|
| 11:30 | 1 | paper clip, just the anonymous letter, the envelope that the |
| 11:30 | 2 | letter came in, and the e-mail I sent to Alan Kaye.  And |
| 11:30 | 3 | back in September of '03 is when I finally memorialized it |
| 11:30 | 4 | in an actual incident report. |
| 11:30 | 5 | MR. QUINN:  And then, in -- if we go into the rest |
| 11:30 | 6 | of the file, dash 3. |
| 11:30 | 7 | *(Document displayed.)* |
| 11:30 | 8 | BY MR. QUINN: |
| 11:30 | 9 | Q.   What's that? |
| 11:30 | 10 | A.   I'm sorry. |
| 11:31 | 11 | Q.   Just turn the page -- |
| 11:31 | 12 | A.   I see. |
| 11:31 | 13 | Q.   -- to dash 3. |
| 11:31 | 14 | A.   I see. |
| 11:31 | 15 | Q.   What are we looking at there? |
| 11:31 | 16 | A.   This I don't recognize. |
| 11:31 | 17 | Q.   It says, "Incident report, page 2, The letter was |
| 11:31 | 18 | forwarded to Rich de Anda for investigation." |
| 11:31 | 19 | A.   Right. |
| 11:31 | 20 | Q.   Do you have any memory what that is? |
| 11:31 | 21 | A.   I guess it's just the second page of the incident |
| 11:31 | 22 | report. |
| 11:31 | 23 | MR. QUINN:  And then dash 4. |
| 11:31 | 24 | *(Document displayed.)* |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 131 of 151   Page ID #:308164
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

131

| | | |
|---|---|---|
| 11:31 | 1 | BY MR. QUINN: |
| 11:31 | 2 | Q.   That's a copy of your printout -- |
| 11:31 | 3 | A.   E-mail, yes. |
| 11:31 | 4 | Q.   -- undated printout? |
| 11:31 | 5 | MR. QUINN:  If we could -- |
| 11:31 | 6 | Your Honor, we offer dash 4, which is another copy |
| 11:31 | 7 | of the e-mail to -- undated e-mail to Mr. Kaye. |
| 11:31 | 8 | THE COURT:  Received. |
| 11:31 | 9 | *(Exhibit No. 6678-4 received in evidence.)* |
| 11:31 | 10 | MR. QUINN:  If we could turn to that. |
| 11:31 | 11 | THE WITNESS:  Yes. |
| 11:31 | 12 | *(Document displayed.)* |
| 11:31 | 13 | BY MR. QUINN: |
| 11:31 | 14 | Q.   So does it look like you printed out a copy of this |
| 11:31 | 15 | e-mail before pressing "send" and put that hard copy in the |
| 11:32 | 16 | file? |
| 11:32 | 17 | A.   That's exactly what I did. |
| 11:32 | 18 | MR. QUINN:  Then, if we could turn to dash 5. |
| 11:32 | 19 | We'd offer this, Your Honor.  This is another copy |
| 11:32 | 20 | of the anonymous letter. |
| 11:32 | 21 | THE COURT:  Received. |
| 11:32 | 22 | *(Exhibit No. 6678-5 received in evidence.)* |
| 11:32 | 23 | *(Document displayed.)* |
| 11:32 | 24 | BY MR. QUINN: |
| 11:32 | 25 | Q.   And you obviously put a copy of the anonymous -- |

| | | |
|---|---|---|
| 11:32 | 1 | A.   I did. |
| 11:32 | 2 | Q.   -- letter in this file? |
| 11:32 | 3 | A.   Yes. |
| 11:32 | 4 | Q.   And then dash 6, what is that? |
| 11:32 | 5 | A.   This is the envelope that the anonymous letter came in. |
| 11:32 | 6 | MR. QUINN:  We'd offer dash 6, Your Honor. |
| 11:32 | 7 | THE COURT:  Received. |
| 11:32 | 8 | *(Exhibit No. 6678-6 received in evidence.)* |
| 11:32 | 9 | *(Document displayed.)* |
| 11:32 | 10 | BY MR. QUINN: |
| 11:32 | 11 | Q.   And that's the full extent of the file on the anonymous |
| 11:32 | 12 | letter? |
| 11:32 | 13 | A.   That's correct. |
| 11:32 | 14 | Q.   So, I mean, did you have any -- did you, in fact, do |
| 11:32 | 15 | any further investigation on the anonymous letter? |
| 11:32 | 16 | A.   No.  I never did any investigation.  I was, once again, |
| 11:32 | 17 | waiting on information from our legal department to |
| 11:32 | 18 | determine what would be the course of action. |
| 11:32 | 19 | Q.   Okay.  If we could -- I'd like to change subjects now, |
| 11:32 | 20 | and ask you whether there came a point that you learned that |
| 11:33 | 21 | some Mattel de Mexico employees had resigned on the same day |
| 11:33 | 22 | and gone to work for MGA? |
| 11:33 | 23 | A.   I did. |
| 11:33 | 24 | Q.   And when was it that that came to your attention? |
| 11:33 | 25 | A.   It was in '04, the Spring of '04. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

133

| | | |
|---|---|---|
| 11:33 | 1 | Q.   And was your department, the security department, |
| 11:33 | 2 | involved at all in following up on that and looking into |
| 11:33 | 3 | those events? |
| 11:33 | 4 | A.   Yes. |
| 11:33 | 5 | Q.   How did this security department first hear that, uh, |
| 11:33 | 6 | these three employees had resigned together on the same day |
| 11:33 | 7 | and that there were some issues? |
| 11:33 | 8 | A.   We had received information from Brian O'Connor, who is |
| 11:33 | 9 | a Mattel's international in-house counsel. |
| 11:33 | 10 | Q.   And did -- was your department then involved in doing |
| 11:33 | 11 | some investigation on that subject? |
| 11:33 | 12 | A.   Yes. |
| 11:33 | 13 | Q.   And what was your role in investigating those events |
| 11:33 | 14 | down in Mexico? |
| 11:33 | 15 | A.   I assigned the case to Jaime Elias, who was an internal |
| 11:34 | 16 | investigator for Mattel.  And I would help give direction |
| 11:34 | 17 | and guidance. |
| 11:34 | 18 | Q.   Is Mr. Elias somebody who worked for you? |
| 11:34 | 19 | A.   Yes, he is. |
| 11:34 | 20 | Q.   And did he work on this investigation under your |
| 11:34 | 21 | supervision? |
| 11:34 | 22 | A.   Yes, he did. |
| 11:34 | 23 | Q.   And keep you up to date about what he was doing and get |
| 11:34 | 24 | direction from you? |
| 11:34 | 25 | A.   Yes. |

CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

134

| | | |
|---|---|---|
| 11:34 | 1 | Q.   If you could turn, please, to Exhibit 6658-T. |
| 11:34 | 2 | *(Document provided to the witness.)* |
| 11:34 | 3 | THE WITNESS:  Yes. |
| 11:34 | 4 | BY MR. QUINN: |
| 11:34 | 5 | Q.   Ask you if you can identify this document, the |
| 11:34 | 6 | documents behind the tab 6658-T. |
| 11:34 | 7 | A.   The first page is the Mattel Global Security |
| 11:34 | 8 | Investigations with a file number of 04-0287, Mexico City, |
| 11:34 | 9 | Mexico, dated April 19, 2004. |
| 11:35 | 10 | This is just the cover sheet to the incident report. |
| 11:35 | 11 | Q.   And this relates to those three employees who left to |
| 11:35 | 12 | go to work for MGA in Mexico? |
| 11:35 | 13 | A.   That's correct. |
| 11:35 | 14 | MR. QUINN:  Your Honor, we'd offer dash 1, the |
| 11:35 | 15 | cover page of the report. |
| 11:35 | 16 | THE COURT:  It's received. |
| 11:35 | 17 | *(Exhibit No. 6658-T-1 received in evidence.)* |
| 11:35 | 18 | *(Document displayed.)* |
| 11:35 | 19 | MR. QUINN:  If we could put that up on the screen. |
| 11:35 | 20 | *(Document displayed.)* |
| 11:35 | 21 | BY MR. QUINN: |
| 11:35 | 22 | Q.   This report that we have behind this cover page, who |
| 11:35 | 23 | actually prepared the report? |
| 11:35 | 24 | A.   Jaime Elias did. |
| 11:35 | 25 | Q.   He did this under your supervision? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 135 of 151   Page ID #:308168
CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

135

| | | |
|---|---|---|
| 11:35 | 1 | A.   That, he did. |
| 11:35 | 2 | Q.   If you could look at pages dash 69 through dash 86. |
| 11:35 | 3 | Dash 69 through dash 86. |
| 11:35 | 4 | And my question to you will be if you can identify |
| 11:35 | 5 | these pages. |
| 11:36 | 6 | A.   Uh, yes. |
| 11:36 | 7 | Q.   What are they? |
| 11:36 | 8 | A.   This is a snapshot of -- e-mail from Gustavo Machado's |
| 11:36 | 9 | Mattel computer.  Lists his plot04. |
| 11:36 | 10 | Q.   What is plot04? |
| 11:36 | 11 | A.   Plot04 is a file with e-mails that was contained within |
| 11:36 | 12 | Machado's Mattel computer. |
| 11:36 | 13 | MR. QUINN:  Your Honor, we would offer exhibits |
| 11:36 | 14 | dash 69 through dash 86. |
| 11:36 | 15 | THE COURT:  Received. |
| 11:36 | 16 | *(Exhibit Nos. 6658-T-69 through 86 received* |
| 11:36 | 17 | *in evidence.)* |
| 11:36 | 18 | MR. QUINN:  If we could look, for example, at dash |
| 11:36 | 19 | 69, just to give the jury an idea what we're looking at |
| 11:36 | 20 | here. |
| 11:36 | 21 | *(Document displayed.)* |
| 11:36 | 22 | BY MR. QUINN: |
| 11:36 | 23 | Q.   Can you explain what this is? |
| 11:36 | 24 | A.   Yes.  It's just a snapshot once again of the e-mails. |
| 11:36 | 25 | As you see, "plot04" is in the left-hand corner there. |

| | | |
|---|---|---|
| 11:37 | 1 | Unfortunately, it seems like the categories kind of |
| 11:37 | 2 | deleted -- or partially -- can't see 'em clearly.  It's the |
| 11:37 | 3 | date of the activity.  The next is the e-mail, and then the |
| 11:37 | 4 | subject matter. |
| 11:37 | 5 | Q.   So are these e-mails that were found on Mr. Machado's |
| 11:37 | 6 | Mattel computer after he left? |
| 11:37 | 7 | A.   That's correct. |
| 11:37 | 8 | Q.   And so these indicate -- these are e-mails that he -- |
| 11:37 | 9 | either were sent to him or he sent in the days leading up to |
| 11:37 | 10 | his resignation? |
| 11:37 | 11 | A.   That is correct. |
| 11:37 | 12 | MR. QUINN:  If we could look at dash 70, the next |
| 11:37 | 13 | page. |
| 11:37 | 14 | (Document displayed.) |
| 11:37 | 15 | BY MR. QUINN: |
| 11:37 | 16 | Q.   Does this page show e-mails received by Mr. Machado |
| 11:37 | 17 | from a tpark@mgae.com? |
| 11:37 | 18 | A.   Yes.  It shows three e-mails. |
| 11:37 | 19 | Q.   And do you understand that to be an MGA e-mail account? |
| 11:37 | 20 | A.   I do. |
| 11:37 | 21 | Q.   In fact, I think, in the other file, we saw Mr. Park's |
| 11:38 | 22 | name -- |
| 11:38 | 23 | A.   We did. |
| 11:38 | 24 | Q.   -- being the chief operating officer of MGA, I think? |
| 11:38 | 25 | A.   That's -- that's correct. |

| 11:38 | 1 | Q.   And are there other e-mails in the plot -- in this |
|---|---|---|
| 11:38 | 2 | "plot04" e-mail account on Mr. Machado's Mattel computer? |
| 11:38 | 3 | A.   Yes. |
| 11:38 | 4 | MR. QUINN:  If we could look at the next page, |
| 11:38 | 5 | dash 71. |
| 11:38 | 6 | (Document displayed.) |
| 11:38 | 7 | BY MR. QUINN: |
| 11:38 | 8 | Q.   You see e-mails there from mparker@mgae.com and |
| 11:38 | 9 | LarianIL@mgae.com? |
| 11:38 | 10 | A.   Yes.  There's two for each of them on this page. |
| 11:38 | 11 | Q.   And then, if you would turn, please, to page dash 90. |
| 11:38 | 12 | (Document displayed.) |
| 11:38 | 13 | BY MR. QUINN: |
| 11:38 | 14 | Q.   My question to you is going to be whether -- if you can |
| 11:38 | 15 | identify this document. |
| 11:38 | 16 | A.   Yes. |
| 11:38 | 17 | Q.   What, is it? |
| 11:38 | 18 | A.   Um, this is a document that was -- these are items that |
| 11:38 | 19 | were pulled from Machado's hard drive, indicating that these |
| 11:39 | 20 | documents were moved -- or -- should say, copied from his |
| 11:39 | 21 | hard drive, the C drive, to the F drive, which is a |
| 11:39 | 22 | UBS (sic) drive, which is a portable port. |
| 11:39 | 23 | Q.   Does it indicate the time period where these documents |
| 11:39 | 24 | were copied from the hard drive to a USB drive? |
| 11:39 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:39 | 1 | Q.   And what date?  What time period was this done? |
| 11:39 | 2 | A.   It starts -- it's a bad copy.  It starts -- looks like |
| 11:39 | 3 | it starts April 14th of '04, through the 16th. |
| 11:39 | 4 | Q.   Again, it's your understanding those are the days |
| 11:39 | 5 | leading up to his resignation? |
| 11:39 | 6 | A.   Yes. |
| 11:39 | 7 | MR. QUINN:  We'd offer this document, Your Honor. |
| 11:39 | 8 | THE COURT:  Received. |
| 11:39 | 9 | (Exhibit No. 6658-T-90 received in evidence.) |
| 11:39 | 10 | BY MR. QUINN: |
| 11:39 | 11 | Q.   And then dash 147 to 154, if you could turn to those, |
| 11:39 | 12 | please.  And I'll ask you the same question:  If you can |
| 11:39 | 13 | identify these pages? |
| 11:39 | 14 | A.   Yes.  These were taken from Pablo Vargas's Mattel |
| 11:40 | 15 | computer.  And this is a directory, which would be a contact |
| 11:40 | 16 | list -- it would be similar to a contact list. |
| 11:40 | 17 | MR. QUINN:  We'd offer pages dash 147 through 154. |
| 11:40 | 18 | THE COURT:  Received. |
| 11:40 | 19 | (Exhibit No. 6658-T-147 through 6658-T-154 |
| 11:40 | 20 | received in evidence.) |
| 11:40 | 21 | MR. QUINN:  If we could put 147 -- say, 148 up on |
| 11:40 | 22 | the screen. |
| 11:40 | 23 | THE COURT:  147 or 148? |
| 11:40 | 24 | MR. QUINN:  148.  I'm sorry, Your Honor.  Dash |
| 11:40 | 25 | 148. |

CV 04-9049 DOC – 3/9/2011 – Day 30, Volume 1 of 2

139

| | | |
|---|---|---|
| 11:40 | 1 | (Document displayed.) |
| 11:40 | 2 | BY MR. QUINN: |
| 11:40 | 3 | Q.   What are we looking at here? |
| 11:40 | 4 | A.   I can hardly see it. |
| 11:40 | 5 | This is just -- this is part of the contact list, but |
| 11:40 | 6 | it -- it refers to -- well, plot08 -- "plot04" -- I'm |
| 11:40 | 7 | sorry -- is what it refers to. |
| 11:40 | 8 | And "tpark@mgae.com." |
| 11:41 | 9 | "Larian1," I believe it is, "@mgae.com." |
| 11:41 | 10 | Q.   And there's another MGA? |
| 11:41 | 11 | A.   You can't see it on this copy. |
| 11:41 | 12 | Q.   Can't really see it. |
| 11:41 | 13 | All right.  If we could turn to dash 157 to 168.  And |
| 11:41 | 14 | can you tell us what those are:  157 to 168? |
| 11:41 | 15 | A.   Uh, yes. |
| 11:41 | 16 | Q.   What are these? |
| 11:41 | 17 | A.   These are files that were accessed by Gustavo Machado, |
| 11:41 | 18 | Maria (sic) Trueba, and -- Pablo Vargas, I believe is the |
| 11:41 | 19 | last one -- not there yet -- yes. |
| 11:42 | 20 | Q.   Accessed on Mattel computers before they left? |
| 11:42 | 21 | A.   Yes. |
| 11:42 | 22 | MR. QUINN:  We'd offer these pages, Your Honor. |
| 11:42 | 23 | THE COURT:  Received. |
| 11:42 | 24 | (Exhibit No. 6658-T-157 through 6658-T-168 |
| 11:42 | 25 | received in evidence.) |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

140

| | | |
|---|---|---|
| 11:42 | 1 | MR. QUINN:  If we could just, for example, take a |
| 11:42 | 2 | look at dash 158. |
| 11:42 | 3 | *(Document displayed.)* |
| 11:42 | 4 | BY MR. QUINN: |
| 11:42 | 5 | Q.   And does this list files accessed here by Mr. Machado |
| 11:42 | 6 | and Ms. Trueba and the dates and times that they were |
| 11:42 | 7 | accessed? |
| 11:42 | 8 | A.   That's correct. |
| 11:42 | 9 | Q.   And then finally pages dash 767 to 785. |
| 11:42 | 10 | A.   Yes. |
| 11:42 | 11 | Q.   767 to 785, can you tell us what these are? |
| 11:42 | 12 | A.   These are the -- the IT policies, the electronic |
| 11:42 | 13 | information policies that were signed by the three |
| 11:42 | 14 | individuals:  Gustavo Machado, Maria (sic) Trueba, and Pablo |
| 11:43 | 15 | Vargas. |
| 11:43 | 16 | Q.   Were these the Mattel Mexico "e-mail use" policies -- |
| 11:43 | 17 | A.   Yes. |
| 11:43 | 18 | Q.   -- that were in effect at the time they worked, and |
| 11:43 | 19 | that these employees acknowledged? |
| 11:43 | 20 | A.   That's correct. |
| 11:43 | 21 | Q.   As well as English translations at the back?  Certified |
| 11:43 | 22 | translations? |
| 11:43 | 23 | A.   That's what I was trying to find. |
| 11:43 | 24 | Q.   I think you'll find the certification at dash 805. |
| 11:43 | 25 | A.   Oh, okay.  Yes, okay.  That is -- yes, that's correct. |

| | | |
|---|---|---|
| 11:43 | 1 | MR. QUINN:  And we'd offer pages 767 to 785, |
| 11:43 | 2 | Your Honor. |
| 11:43 | 3 | THE COURT:  Received. |
| 11:43 | 4 | *(Exhibit No. 6658-T-767 through 6658-T-785* |
| 11:43 | 5 | *received in evidence.)* |
| 11:43 | 6 | BY MR. QUINN: |
| 11:43 | 7 | Q.   All right.  Changing subjects now. |
| 11:43 | 8 | Did you become aware of a downloading of information by |
| 11:43 | 9 | a Mattel employee in Canada by the name of Janine Brisbois? |
| 11:43 | 10 | A.   I did. |
| 11:43 | 11 | Q.   And how did you become aware of that? |
| 11:43 | 12 | MR. McCONVILLE:  Objection.  Calls for hearsay, |
| 11:43 | 13 | Your Honor. |
| 11:43 | 14 | THE COURT:  Overruled. |
| 11:43 | 15 | BY MR. QUINN: |
| 11:43 | 16 | Q.   Well, let me ask -- I mean, was the downloading of |
| 11:44 | 17 | information by a departing employee something that would |
| 11:44 | 18 | come to your attention in the security department? |
| 11:44 | 19 | A.   Yes. |
| 11:44 | 20 | Q.   And was there an employee by the name of Janine |
| 11:44 | 21 | Brisbois who you learned left Mattel in Canada and went to |
| 11:44 | 22 | work for MGA in Canada? |
| 11:44 | 23 | MS. KELLER:  Objection.  Calls for hearsay. |
| 11:44 | 24 | THE COURT:  Well, it depends, Counsel.  It depends |
| 11:44 | 25 | if he receives a document. |

| | | |
|---|---|---|
| 11:44 | 1 | So let me hear your answer first. |
| 11:44 | 2 | Your answer? |
| 11:44 | 3 | THE WITNESS:  The answer is yes. |
| 11:44 | 4 | THE COURT:  Okay. |
| 11:44 | 5 | You can question again. |
| 11:44 | 6 | BY MR. QUINN: |
| 11:44 | 7 | Q.   How did –– did this become an issue that your |
| 11:44 | 8 | department, the security department at Mattel, assumed some |
| 11:44 | 9 | responsibility for? |
| 11:44 | 10 | A.   Uh, yes. |
| 11:44 | 11 | Q.   And in that connection what did you learn that |
| 11:44 | 12 | Ms. Brisbois had done before leaving Mattel? |
| 11:44 | 13 | MR. McCONVILLE:  Objection.  Hearsay. |
| 11:44 | 14 | THE COURT:  Sustained. |
| | 15 | BY MR. QUINN: |
| 11:44 | 16 | Q.   Did you –– did you oversee an investigation concerning |
| 11:45 | 17 | certain activity by Ms. Brisbois before she left Mattel? |
| 11:45 | 18 | A.   Yes. |
| 11:45 | 19 | Q.   And can you tell what that investigation consisted of? |
| 11:45 | 20 | A.   It consisted of analyzing her Mattel computer hard |
| 11:45 | 21 | drive to determine if, in fact, there were any Mattel |
| 11:45 | 22 | propriety –– proprietary information taken by her. |
| 11:45 | 23 | Q.   And is that something –– that analysis that you just |
| 11:45 | 24 | referred to, is that something that was done under your |
| 11:45 | 25 | direction and supervision? |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

143

| | | |
|---|---|---|
| 11:45 | 1 | A.   Yes. |
| 11:45 | 2 | Q.   And as a result of that analysis, what did you learn? |
| 11:45 | 3 | A.   Well, we had found that she had a file called |
| 11:45 | 4 | "Backpack," and that proprietary information of Mattel's was |
| 11:45 | 5 | taken and downloaded approximately within a half hour prior |
| 11:45 | 6 | to her departure. |
| 11:45 | 7 | Q.   And was it downloaded onto some device? |
| 11:46 | 8 | A.   Yes. |
| 11:46 | 9 | Q.   And did you -- as a result of your investigation, did |
| 11:46 | 10 | you learn what that device was? |
| 11:46 | 11 |         MS. KELLER:  Your Honor, this entire segment is |
| 11:46 | 12 | hearsay.  I would have -- I would lodge a continuing |
| 11:46 | 13 | objection. |
| 11:46 | 14 |         THE COURT:  If he has -- if he's personally seen |
| 11:46 | 15 | or looked at the documents, it's not.  But I'm not certain |
| 11:46 | 16 | where we part with information he's received from somebody |
| 11:46 | 17 | else and what he's personally -- |
| 11:46 | 18 |         MR. QUINN:  Right. |
| 11:46 | 19 |         THE COURT:  -- done himself. |
| 11:46 | 20 |         So, Counsel. |
| 11:59 | 21 | BY MR. QUINN: |
| 11:46 | 22 | Q.   Have you personally seen information and this data that |
| 11:46 | 23 | was downloaded by Ms. Brisbois in Canada? |
| 11:46 | 24 |         MS. KELLER:  Objection.  Vague as to time. |
| 11:46 | 25 |         THE COURT:  Overruled. |

CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

144

| | | |
|---|---|---|
| 11:46 | 1 | THE WITNESS:  Yes. |
| 11:59 | 2 | BY MR. QUINN: |
| 11:46 | 3 | Q.   And in what connection did you see that? |
| 11:46 | 4 | A.   In connection with the investigation. |
| 11:46 | 5 | Q.   And as part of that, did you learn whether she had |
| 11:46 | 6 | downloaded this data which you saw onto some device? |
| 11:46 | 7 | MS. KELLER:  Same objection. |
| 11:46 | 8 | THE COURT:  Overruled. |
| 11:46 | 9 | THE WITNESS:  Yes. |
| 11:59 | 10 | BY MR. QUINN: |
| 11:47 | 11 | Q.   And what was that device? |
| 11:47 | 12 | A.   It was a USB drive, a thumb drive. |
| 11:47 | 13 | Q.   If you could take a look at Exhibit 7989. |
| 11:47 | 14 | *(Document provided to the witness.)* |
| 11:47 | 15 | BY MR. QUINN: |
| 11:47 | 16 | Q.   Can you identify Exhibit 7989? |
| 11:47 | 17 | A.   It's the Brisbois investigation. |
| 11:47 | 18 | Q.   And is this a report that you -- your department |
| 11:48 | 19 | prepared under your supervision? |
| 11:48 | 20 | A.   Yes. |
| 11:48 | 21 | MR. QUINN:  We'd offer that -- Exhibit 7989, |
| 11:48 | 22 | Your Honor. |
| 11:48 | 23 | MS. KELLER:  Objection.  Hearsay. |
| 11:48 | 24 | THE COURT:  All right.  I'll take that up later |
| 11:48 | 25 | today, Counsel.  You can refer to certain pages, and we'll |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 145 of 151   Page ID #:308178
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

145

| | | |
|---|---|---|
| 11:48 | 1 | go page by page that's of interest to you. |
| 11:48 | 2 | BY MR. QUINN: |
| 11:48 | 3 | Q.   If you could -- can you tell -- just to refresh your |
| 11:48 | 4 | recollection, from looking at this, does this -- can you |
| 11:48 | 5 | tell what it was that Ms. Brisbois took? |
| 11:48 | 6 | MS. KELLER:  Objection.  Calls for hearsay. |
| 11:48 | 7 | THE COURT:  Just a moment. |
| 11:48 | 8 | MS. KELLER:  No personal knowledge, Your Honor. |
| 11:48 | 9 | No foundation. |
| 11:48 | 10 | THE COURT:  Is this the Global Security |
| 11:48 | 11 | Investigation? |
| 11:48 | 12 | THE WITNESS:  Yes, Your Honor. |
| 11:49 | 13 | THE COURT:  Did you undertake that investigation |
| 11:49 | 14 | yourself or another agency? |
| 11:49 | 15 | THE WITNESS:  We did, Your Honor. |
| 11:49 | 16 | THE COURT:  You did? |
| 11:49 | 17 | THE WITNESS:  This portion, Your Honor. |
| 11:49 | 18 | THE COURT:  So Global is somebody you contracted |
| 11:49 | 19 | with? |
| 11:49 | 20 | THE WITNESS:  No.  Global is our department. |
| 11:49 | 21 | THE COURT:  It's your department? |
| 11:49 | 22 | THE WITNESS:  Right. |
| 11:49 | 23 | THE COURT:  You refer to yourself as Global, also? |
| 11:49 | 24 | THE WITNESS:  Right. |
| 11:49 | 25 | THE COURT:  Overruled. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 146 of 151   Page ID #:308179
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

146

| | | |
|---|---|---|
| 11:49 | 1 | Counsel. |
| 11:59 | 2 | BY MR. QUINN: |
| 11:49 | 3 | Q.   So, from reviewing this, can you refresh your |
| 11:49 | 4 | recollection as to what it was that Ms. Brisbois took or |
| 11:49 | 5 | downloaded within a half hour of leaving Mattel? |
| 11:49 | 6 | MS. KELLER:  Your Honor, there's a further |
| 11:49 | 7 | objection.  If the Court looks at page 6, this is from a |
| 11:49 | 8 | third-party analysis -- forensic analysis. |
| 11:49 | 9 | THE COURT:  Remember, that's what we'll do at |
| 11:49 | 10 | night.  I'm not going to receive the entire document, |
| 11:49 | 11 | Counsel. |
| 11:49 | 12 | MS. KELLER:  But the question calls for hearsay, |
| 11:49 | 13 | Your Honor.  And it calls -- it calls for the results of an |
| 11:49 | 14 | analysis that was done by a third party. |
| 11:49 | 15 | THE COURT:  Is that 006? |
| 11:49 | 16 | MS. KELLER:  Yes, Your Honor. |
| 11:49 | 17 | THE COURT:  What paragraph? |
| 11:49 | 18 | MS. KELLER:  Starting at the top, where it says |
| 11:49 | 19 | "3.1." |
| 11:50 | 20 | THE COURT:  Does this document actually contain |
| 11:50 | 21 | the downloads?  Do you know?  Does it? |
| 11:50 | 22 | MR. QUINN:  We can ask the question. |
| 11:50 | 23 | THE WITNESS:  Page 6 of the report? |
| 11:50 | 24 | MR. QUINN:  The internal page 6, Your Honor, which |
| 11:50 | 25 | would be dash 7. |

| | | |
|---|---|---|
| 11:50 | 1 | MS. KELLER:  And, Your Honor, that all relies on a |
| 11:50 | 2 | the third party -- |
| 11:50 | 3 | THE COURT:  Counsel, just a minute. |
| 11:50 | 4 | Just a minute. |
| 11:50 | 5 | Now, your objection?  I'm sorry. |
| 11:50 | 6 | MS. KELLER:  It's hearsay.  It relies on a third |
| 11:50 | 7 | party that Mattel contracted with -- all of this.  We can't |
| 11:50 | 8 | cross-examine that person. |
| 11:50 | 9 | THE COURT:  I thought that this was an internal |
| 11:50 | 10 | Mattel investigation by Global? |
| 11:50 | 11 | MR. McCONVILLE:  Your Honor, this starts, "Mattel |
| 11:50 | 12 | hired Evident Data to perform" -- if the Court looks at |
| 11:50 | 13 | that. |
| 11:51 | 14 | THE COURT:  All right.  Just a moment. |
| 11:51 | 15 | Did you hire another company? |
| 11:51 | 16 | THE WITNESS:  Just to do the analysis on the hard |
| 11:51 | 17 | drive. |
| 11:51 | 18 | THE COURT:  The analysis on the hard drive? |
| 11:51 | 19 | THE WITNESS:  That's all, Your Honor. |
| 11:51 | 20 | THE COURT:  Have you actually looked at each these |
| 11:51 | 21 | files? |
| 11:51 | 22 | THE WITNESS:  Yes.  It's been some time, but, yes, |
| 11:51 | 23 | we did. |
| 11:51 | 24 | THE COURT:  Yes or no? |
| 11:51 | 25 | THE WITNESS:  Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 148 of 151   Page ID #:308181
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

148

| 11:51 | 1 | THE COURT: Did you? |
|---|---|---|
| 11:51 | 2 | THE WITNESS: Yes. |
| 11:51 | 3 | THE COURT: Okay. Overruled. |
|  | 4 | BY MR. QUINN: |
| 11:51 | 5 | Q. And so, Mr. de Anda, can you tell -- from reviewing |
| 11:51 | 6 | this report, can you refresh your recollection as to what it |
| 11:51 | 7 | was that Ms. Brisbois took with her and downloaded to a |
| 11:51 | 8 | thumb drive a half hour before she left Mattel? |
| 11:51 | 9 | A. It's listed on page 6 of 9 of this report. And there's |
| 11:51 | 10 | a graph showing -- with a short -- the shortcut target |
| 11:51 | 11 | called "Backpack," as I had previously mentioned. |
| 11:51 | 12 | THE COURT: Excuse me for a moment. |
| 11:51 | 13 | This will be confusing to you. Refer to that as |
| 11:51 | 14 | 7. See the bottom number? |
| 11:51 | 15 | THE WITNESS: Oh, okay. |
| 11:51 | 16 | MR. QUINN: I'm sorry, Your Honor. |
| 11:51 | 17 | THE WITNESS: All right. |
| 11:51 | 18 | THE COURT: Use that number. |
| 11:51 | 19 | THE WITNESS: All right. |
| 11:51 | 20 | It's referred to as "07" in the Bates stamp here. |
| 11:52 | 21 | And it's the graph showing the targeted path of items and |
| 11:52 | 22 | the shortcut, which is "Backpack," and the shortcut created |
| 11:52 | 23 | at the time and date it was created. |
| 11:52 | 24 | BY MR. QUINN: |
| 11:52 | 25 | Q. Can you explain what you mean by "shortcut"? |

Case 2:04-cv-09049-DOC-RNB   Document 10181   Filed 03/11/11   Page 149 of 151   Page ID #:308182
CV 04-9049 DOC - 3/9/2011 - Day 30, Volume 1 of 2

149

| | | |
|---|---|---|
| 11:52 | 1 | A.   "Shortcut" is just, basically, the path in which it was |
| 11:52 | 2 | collected.  I don't know the technical aspects of this.  I'm |
| 11:52 | 3 | sorry.  I'm not expert in this field. |
| 11:52 | 4 | Q.   But the path that the data -- |
| 11:52 | 5 | A.   Travels. |
| 11:52 | 6 | Q.   -- that was downloaded, the electronic path? |
| 11:52 | 7 | A.   That is correct. |
| 11:52 | 8 |         MR. QUINN:  I have nothing further, Your Honor. |
| 11:52 | 9 |         THE COURT:  Do you want to go to lunch at this |
| 11:52 | 10 | time, and come back and start?  Or do you want to start now |
| 11:52 | 11 | and go until 12:15?  What's better? |
| 11:52 | 12 |         MS. KELLER:  Your Honor, I'd rather start after |
| 11:52 | 13 | lunch, if we can. |
| 11:52 | 14 |         THE COURT:  Okay.  Let's do that. |
| 11:52 | 15 |         We're going to take 40 minutes for lunch today, |
| 11:52 | 16 | and then recess at 3:30.  Was that the schedule? |
| 11:53 | 17 |         Okay.  Then -- it's too complicated for me.  Why |
| 11:53 | 18 | don't we make it at 20 till the hour.  Okay?  45 minutes. |
| 11:53 | 19 |         You're admonished not to discuss this matter |
| 11:53 | 20 | amongst yourselves nor form or express any opinion |
| 11:53 | 21 | concerning this case. |
| 11:53 | 22 |         We'll see you at 20 minutes until the hour.  I'll |
| 11:53 | 23 | open the doors at that time. |
| 11:53 | 24 |              *(Jury recesses at 11:53 for lunch.)* |
| 11:53 | 25 |              *(Outside the presence of the jury.)* |

| | | |
|---|---|---|
| 11:53 | 1 | THE COURT: All right. Counsel, 20 till the hour? |
| 11:53 | 2 | MR. McCONVILLE: Yes, sir. |
| 11:53 | 3 | THE COURT: 20 till the hour? |
| 11:53 | 4 | MS. KELLER: Yes. |
| 11:53 | 5 | MR. QUINN: Okay. |
| 11:53 | 6 | THE COURT: Thank you very much. |
| 11:53 | 7 | MR. McCONVILLE: Judge, I gave initial inserts for |
| 11:53 | 8 | Mr. de Anda and this, first. Thank you. |
| 11:53 | 9 | *(Documents provided to the Court.)* |
| 11:53 | 10 | THE COURT: Thank you. |
| 11:53 | 11 | *(Lunch recess held at 11:53 a.m.)* |
| 11:54 | 12 | *(Further proceedings reported by Jane Sutton* |
| 11:54 | 13 | *Rule in Volume II.)* |
| 11:54 | 14 | -oOo- |
| 11:54 | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

-oOo-


CERTIFICATE


       I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  March 9, 2011



                              _____
                              DEBBIE GALE, U.S. COURT REPORTER
                              CSR NO. 9472, RPR