1

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

 4                  - - - - - - -

 5

 6   MATTEL, INC., ET AL.,          )
                                    )
 7            Plaintiffs,           )
                                    )
 8        vs.                       ) No. CV 04-9049-DOC
                                    )    Day 30
 9   MGA ENTERTAINMENT, INC., ET AL.,)   Volume 2 of 2
                                    )
10            Defendants.           )
     _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                 Santa Ana, California

18              Wednesday, March 9, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25

     11-03-09 MattelV2
```

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
              By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                   WILLIAM PRICE
 6                   Attorneys at Law
              865 South Figueroa Street
 7              10th Floor
              Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
              4 Park Plaza
13              Suite 1600
              Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                   Attorney at Law
              405 Howard Street
18              San Francisco, California 94105
              (415) 773-5700
19
              - AND -
20
              KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                   Attorney at Law
22              18500 Von Karman Avenue
              Suite 560
23              Irvine, California 92612
              (949) 476-8700

24

25
```

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            – AND –

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            CARLOS GUSTAVO MACHADO GOMEZ, Defendant

16            LILY MARTINEZ, Mattel Employee

17            KEN KOTARSKI, Mattel Technical Operator

18            MIKE STOVALL, MGA Technical Operator

19            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

20            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

21            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

22            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

23            FRANK RORIE, Orrick Herrington & Sutcliffe

24

25
```

CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

4

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DE ANDA, RICHARD | | | | |
| By Ms. Keller | | 5 | | 75 |
| By Mr. Cote | | 45 | | |
| By Mr. Quinn | | | 54 | |
| NORDQUIST, JILL | | | | |
| By Mr. Zeller | 82 | | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Plaintiffs' No. 8147 | | 105 |
| Plaintiffs' No. 8989 | | 111 |
| Defendants' Nos. 1195RS-26, 1195RS-28 | | 42 |
| Defendants' No. 1195RS-27 | | 21 |
| Plaintiffs' No. 24297 | | 110 |
| Plaintiffs' No. 24298 | | 115 |

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 5 of 117   Page ID #:308189
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

5

 1              SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 9, 2011

 2                       DAY 30, VOLUME 2 OF 2

 3                           (12:45 p.m.)

 4              *(The following proceedings is taken in the*

 5         *presence of the jury.)*

 6              THE COURT:  We are back in session.

 7              The jury is present, the alternates, all counsel,

 8    the witness.

 9              And Counsel, if you'd like to continue your direct

10    examination -- I'm sorry, cross-examination, my apologies,

11    by Ms. Keller on behalf of Mr. Larian and MGA.

12              RICHARD DE ANDA, PLAINTIFFS' WITNESS, RESUMED

13                        CROSS-EXAMINATION

14    BY MS. KELLER:

15    Q    Good afternoon, Mr. de Anda.

16    A    Good afternoon.

17    Q    We have not met before, have we?

18    A    Not that I'm aware of.

19    Q    Other than maybe in a previous life or something?

20    A    Possibly.

21    Q    Now, you're aware, aren't you, that one of the issues

22    in this case is the statute of limitations?

23    A    Yes.

24    Q    So you're aware of the fact that how early it was that

25    Mattel became aware of any activity that it now claims

CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

6

1    Carter Bryant engaged in that was against its interest is

2    important, right?

3    A    Yes.

4    Q    Now, at the time in March of 2002 when you first became

5    aware of Carter Bryant, you were a vice president of Mattel,

6    right?

7    A    That's correct.

8    Q    And vice president -- what was the exact title?

9    A    I believe it was vice president global security

10   investigations.

11   Q    And I think you told us you received a call from either

12   Ivy Ross or Cassidy Park about this?

13   A    Yes.

14   Q    And Ivy Ross was the senior vice president for product

15   design of girls' toys at the time?

16   A    I believe that's correct.

17   Q    And Cassidy Park was vice president of product design

18   and actually ran mainline Barbie, true?

19   A    I believe so, yes.

20   Q    Now, during this call in March of 2002, you learned

21   that Carter Bryant had designed the Bratz doll for MGA,

22   true?

23   A    Yes, I was aware of that.

24   Q    And that raised in your mind the suspicion that

25   Mr. Bryant could have done something inappropriate with

1    respect to Mattel property, right?

2    A    With regards to the infringement, yes.

3    Q    Well, whether it was taking confidential information or

4    what, you hadn't investigated it, true?

5    A    I had not investigated it yet, that is true.

6    Q    So it just raised a suspicion in your mind that

7    Mr. Bryant might have done something inappropriate with

8    respect to Mattel property that you needed to investigate,

9    true?

10   A    I don't know that I had to investigate.  I had to

11   determine who is going to take the responsibility, either

12   myself, my department or legal.

13   Q    Okay.  So you, Mattel, had to check it out, true?

14   A    That's correct.

15   Q    And MGA became what I think you've called a company of

16   interest?

17   A    That's correct.

18   Q    Now, did the phone call that you got raise in your mind

19   a suspicion that Carter Bryant may have done something that

20   was inappropriate with respect to Mattel property?  That's

21   the question I'm asking you.

22   A    Yes.

23   Q    Okay.  Now, one way or the other, you determined that

24   some Mattel -- somebody at Mattel was going to have to

25   follow up on that, right?

CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

8

1   A    That's correct.

2   Q    And I think it was after that that you talked to the

3   Mattel legal department, specifically to Michele McShane?

4   A    That's correct.

5   Q    And the Mattel legal department actually set up the

6   meeting that you talked about, right?

7   A    That could have happened, yes.  I don't have a clear

8   recollection.

9   Q    If you'd like to take a look at your deposition

10  transcript of December 19th, 2007, page 182, would that help

11  you remember, do you think?

12  A    Absolutely.

13  Q    Lines 3 to 11.

14  A    Oh, thank you.

15  Q    182.

16          THE COURT:  Read down to line 11, Counsel?

17          MS. KELLER:  Yes.

18          THE WITNESS:  Yes.

19  BY MS. KELLER:

20  Q    Does that refresh your memory?

21  A    Yes.

22  Q    So it was the Mattel legal department that set up the

23  meeting?

24  A    Yes.

25  Q    And that was actually at the Mattel design center?

1    A    Yes.

2    Q    Now, this was still in March of 2002, true?

3    A    That's correct.

4    Q    And in attendance at the meeting were you, Ivy Ross,

5    Cassidy Park, the lawyer, Michele McShane, and your

6    investigative manager, Bob Simoneau?

7    A    Yes.

8    Q    Whose name we had trouble spelling a little earlier.

9    A    That's correct.

10   Q    Was it your -- and again, the purpose of this meeting

11   was to -- to check into these allegations and find out

12   whether Mr. Bryant had actually done something that had

13   harmed Mattel, right?

14   A    Yes.

15   Q    Now, your -- after the meeting, your take-away, as it

16   were, was that Mr. Bryant had created Bratz after he left

17   Mattel and that he had used or copied Lily Martinez's Toon

18   Teen renderings to create Bratz.  Was that your, quote,

19   "take-away," unquote, after the meeting?

20   A    That was my understanding, yes.

21   Q    And you know that Toon Teenz was never released by

22   Mattel, right?

23   A    Yes.

24   Q    So if Mr. Bryant had information that he used to create

25   Bratz and it was based on Toon Teenz, then, in your mind, he

CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

10

1    would have used Mattel proprietary information, true?

2    A    Yes.

3    Q    And it would be a misuse of that proprietary

4    information if he had taken that to a competitor, true, in

5    your mind?

6    A    Yes.

7    Q    That was the discussion that was happening in the room,

8    pretty much, wasn't it?

9    A    Yes.

10   Q    So it was really -- did Carter Bryant somehow use Toon

11   Teenz to create Bratz?  Yes?

12   A    Yes.

13   Q    Now, if we could look at Exhibit 1194 -- I'm sorry,

14   1195RS, which was partially admitted.  That was -- we'll get

15   that for you in a second.  That was the incident report that

16   related to the information you received in the phone call

17   from Ivy Ross or Cassidy Park in March of 2002; do you

18   recall that?

19   A    Yes.

20   Q    And this was the file that you opened -- that was

21   opened at your request after the meeting, or after you got

22   this information from them, right?

23   A    I don't know that it was my request.

24   Q    Would it help to take a look at your deposition

25   transcript?

1    A    Probably.

2    Q    That would be 292, deposition December 19th, 2007,

3    page 292, lines 12 through 18.

4    A    That's what it says.

5    Q    Does that refresh your memory a little bit?

6    A    Yes, it does, Mrs. Keller, that's what it says, that it

7    is at my request.

8    Q    Now, the report that we see here in 1195RS on page 4,

9    00004, where it says "Incident Report," the nature of the

10   incident is described as a suspected theft of proprietary

11   information, true?

12   A    It's classified as category as theft, and the

13   subcategory is proprietary information.  Where are you

14   referring to suspected --

15   Q    That's what I'm referring to, the fact that this

16   incident report says theft, subcategory, proprietary

17   information, we see that, right?

18   A    Yes.

19   Q    And is the nature of the incident being described in

20   the report a suspected theft of proprietary information?

21   A    The narrative portion refers to what appears to be use

22   of proprietary information, yes.

23   Q    So it's a suspected -- suspected theft of proprietary

24   information?

25   A    That can be classified as that, yes.

1    Q    And what the report talks about is MGA Entertainment

2    and Isaac Larian hiring a number of former Mattel employees

3    and manufacturing products, plural, that appear to be Mattel

4    designs, if we look under incident narrative; is that

5    correct?

6    A    That's correct.

7    Q    And if we look at the next page, page 5, we see that

8    the informants are listed as being Evelyn Viohl and Ivy

9    Ross?

10   A    Yes.

11   Q    Now, the incident narrative itself that we are looking

12   at doesn't refer to a single doll by Lily Martinez, does it?

13   A    It does not.

14   Q    Instead, it refers to the fact that Mr. Larian and MGA

15   were manufacturing products, plural, that appeared to be

16   Mattel designs, plural; is that right?

17   A    That's correct.

18   Q    And it identifies -- if you look at page 4, it

19   identifies Isaac Larian, owner of MGA Entertainment, as a

20   suspect?

21   A    Yes.

22   Q    Now, it also identifies Mr. Larian's home address and,

23   although it's been redacted here, his social security

24   number, true?

25            MR. MC CONVILLE:  It's not redacted in the version

1    we're looking at.

2            MS. KELLER:  Okay.

3            THE WITNESS:  I'm sorry.

4    BY MS. KELLER:

5    Q    Does the document also identify Mr. Larian's home

6    address?

7    A    Yes.

8    Q    And social security number?

9    A    I believe this -- this could be his social security

10   number.  I don't know his social security by memory.

11   Q    But when you look under "Employment Details," we see

12   SSN and some numerals that appear to be in the configuration

13   of a social security number, right?

14   A    That's correct.

15   Q    Now, I think earlier you told us that you got the basic

16   information about Mr. Larian from publicly-available

17   information?

18   A    Yes.

19   Q    And in your experience, is a person's social security

20   number generally publicly-available information?

21   A    Back then, it -- it was.  In today's research

22   environment, it's not, the last four digits of the social

23   security number are typically blocked out.

24   Q    Well, in 2002, were you able to just Google somebody's

25   name and pull up their social security number?

1   A    I don't know if you could just Google somebody's name

2   using the Google search.

3   Q    Is it true that you can't explain why someone within

4   your department even obtained Mr. Larian's social security

5   number?

6   A    I don't know that that's true.

7   Q    Do you know why your department obtained Mr. Larian's

8   social security number?

9   A    No, I don't at this time.

10   Q    And I think you also had said that Angela Larian, his

11   wife, that her information was run in order to narrow the

12   search?

13   A    That was my recollection, yes.

14   Q    Do you know that if you run the name Isaac Larian even

15   today on a search engine, you only get one person, Isaac

16   Larian?

17   A    No, I don't know that to be a fact.

18   Q    Do you remember whether, when you ran the information

19   through a search engine, you got any other Isaac Larian

20   other than the one who is the subject of this lawsuit?

21   A    When?

22   Q    When you ran it?

23   A    Back then, I believe I did, but I don't -- I can't

24   recall, but I believe I did.  That's why I ran it the other

25   way.

1  Q    In all of the results that you list in Exhibit 1195, is

2  there any other Isaac Larian who comes up?

3  A    No.

4  Q    And that's many, many pages in your report, right?

5  A    Several.

6  Q    Let's look at page 66, the chronology of -- it says

7  chronological record; do you have that page in front of you?

8  A    I do.

9  Q    And you said this was Robert Simoneau's handwriting

10 except for the last couple of entries that are yours?

11 A    That's correct.

12 Q    And so we see the -- according to the chronology, you

13 met with Ivy Ross on March 20th, 2002, true?

14 A    (No audible response.)

15 Q    And I'm looking at the second entry that says, Met with

16 Ivy Ross on this case and discussed TP protection program --

17 or IP protection program.

18 A    I don't know for a fact that that's the date that I met

19 with the group.  I don't know if Simoneau met with her

20 independent of me on that date.  I'm trying to think back.

21 For some reason, I can't recall the exact date, but I know

22 it was sometime in March.

23 Q    In general, you try to make these entries accurate?

24 A    I do.

25 Q    And Mr. Simoneau, does he also have a police

1   background?

2   A    Yes.

3   Q    What department did he work for?

4   A    The Santa Monica Police Department.

5   Q    And you, I take it, have brought -- brought the skills

6   with you to Mattel that you had acquired in your many years

7   of police work?

8   A    Yes.

9   Q    So if we take this date to be true, March 20th, 2002,

10  this is probably the meeting at the Mattel design center

11  that you attended?

12  A    I can't be certain.

13  Q    Well, we see another entry there, 3/28, and that --

14  according to the notes here, that was a meeting with Cassidy

15  Park to get more info on MGA issue.  She -- can you read

16  that?

17  A    Yes.

18  Q    "Suspected"?

19  A    She suspected, and I can't --

20  Q    "Carter Bryant"?

21  A    Carter Bryant as illustration.

22  Q    "As illustrator, former employee who may have

23  plagiarized design of Lily Martinez and created Bratz dolls

24  for MGA."

25       So at this point, according to your investigation,

1  then, you were focused on whether Carter Bryant had, again,

2  taken proprietary information from Mattel to a competitor

3  and created a doll, right?

4  A    That's correct.

5  Q    So at least as of March of 2002, you were aware that

6  Carter Bryant was the creator of the Bratz dolls, right?

7  A    Yes.

8  Q    And according to, again, this chronology, on

9  March 28th, Mr. Bryant's personnel file was requested?

10  A    According to Mr. Simoneau's log, yes.

11  Q    That same date that the meeting with Cassidy Park

12  occurred, right?

13  A    Yes.

14  Q    Now, during this time, MGA was -- MGA Entertainment was

15  located at an address on Schoenborn Street, correct?

16  A    That was my belief, yes.

17  Q    And let's go to 1195RS, page 4, and if we look at the

18  very bottom.

19  A    I'm sorry.

20  Q    We see that address listed.

21  A    One moment, please.

22       Yes.

23  Q    Now, members of your security department went to MGA

24  Entertainment and conducted surveillance on several

25  occasions during this time period, right?

1   A    I'm not certain what they did.  I know that in the

2   chronological log, there was an entry that Mr. Simoneau went

3   to that location.

4   Q    Well, let's turn back to that.

5   A    Okay.

6   Q    Page 66 of this same exhibit.

7   A    Okay.

8   Q    And it says, "4/9/02, check Schoenborn add for leads."

9   Add short for address, correct?

10  A    Yes.

11  Q    And then it says "Neg" for "negative," right?

12  A    Yes.

13  Q    Same thing on 4/26?

14  A    Yes.

15  Q    Same on May 4th?

16  A    That's correct.

17  Q    Same on June 22nd?

18  A    That's correct.

19  Q    Same on July 3rd?

20  A    Yes.

21  Q    So investigators for Mattel working at your direction

22  went to Schoenborn on at least five occasions between

23  April 9th and July 3rd, right?

24  A    I did not direct them to go to this location.

25  Q    But according to this, they did, right?

1   A    According to this, it would seem likely they did, yes.

2   Q    And so since they were going out there multiple times,

3   you would expect there to be some notation as to what they

4   were doing there, wouldn't you?

5   A    Well, first of all, I didn't know it's they.  As far as

6   I know, it's the individual, Mr. Simoneau, according to his

7   log.  And second of all, I have no idea because it doesn't

8   describe what he's doing other than negative --

9   Q    Well, have you ever followed up with him to say -- to

10  ask him what he was doing?

11  A    No, I did not.  I don't have any recollection of that.

12  Q    But I mean to this very day, you never said, hey, what

13  are all these five entries for going out to MGA?

14  A    No, I haven't seen him in years.

15  Q    And -- so you don't know whether there was

16  surveillance, whether there were witnesses being secretly

17  interviewed, you just don't know; would that be accurate?

18  A    That would be accurate.

19  Q    You don't know if pictures were taken, license plates

20  taken; you just don't know?

21  A    That's correct.

22  Q    Now, you would assume, though, wouldn't you, given the

23  chronology here, that it was in some form in furtherance of

24  your investigation that you were conducting?

25  A    You know, I can't make an assumption of what

 1   Mr. Simoneau is doing and why, other than he's logging in

 2   these entries and going to this location.  I don't know, the

 3   same as you, with regards to interviewing or taking license

 4   plates, I have no idea.

 5   Q    I know that, but I'm saying, though, that you would

 6   assume, would you not, since it was on this page in

 7   connection with this investigation, that it had something to

 8   do with this investigation in some fashion?

 9   A    I would assume so.

10   Q    Now, since Mr. Larian was a suspect in the theft of

11   confidential proprietary Mattel information, you were

12   methodically gathering information about him, right?

13   A    Oh, some years later.

14   Q    And, for example, there was a report on page 27 about

15   individuals reported at Mr. Larian's address, the same

16   address that we've seen as his home address.

17            MS. KELLER:  And your Honor, I think this page is

18   already admitted, page 27.

19            THE WITNESS:  Right, this is part of -- of the

20   Locate Fast run that just lists, I guess it's a category

21   within that run.

22            MS. KELLER:  And your Honor, in case the page

23   isn't already admitted, I'd move 1195RS-27 into evidence.

24            THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 21 of 117   Page ID #:308205
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

21

```
 1              (Defendants' Exhibit No. 1195RS-27 is

 2         received in evidence.)

 3    BY MS. KELLER:

 4    Q    And if we look at the next page, page 28, we see phone

 5    numbers at the MGA Entertainment address, right?

 6    A    One moment, please.

 7         I see Schoenborn, but it says "none reported" under

 8    "phones."  What are you referring to?

 9    Q    Well, a search for that.

10    A    I'm on page -- what page was it?

11              THE COURT:  28.

12              THE WITNESS:  I'm on 28.

13              THE COURT:  Page 28, Counsel?

14              THE WITNESS:  Yes.

15              Oh, are you referring to the top header where it

16    says "listed phone numbers at"?

17    BY MS. KELLER:

18    Q    Yes.

19    A    Yes.

20    Q    And there was also a search for property ownership at

21    that address, right?

22    A    Yes.

23    Q    Individuals at that address?

24    A    Yes.

25    Q    Possible neighbors at that address?
```

1   A    Yes.

2   Q    And the bottom line was, there was a computerized

3   research into Mr. Larian, his wife, MGA Entertainment,

4   various individuals associated with it and neighbors, true?

5   A    In 2004, yes.

6   Q    Now, let's look at the bottom of -- let's look at

7   page 27 that we were just looking at.  I think you said that

8   was in 2004 that that was done?

9   A    Yes.

10  Q    Let's look at the very, very bottom of the page on

11  page 27.

12  A    Okay.

13  Q    I'm sorry, it's the previous page.  Look at the very

14  bottom of page 26.

15  A    Yes.

16  Q    And after a string -- a search string at the end on the

17  far right?

18  A    Right.

19  Q    Do you see 3/20/2002?

20  A    Right, so I did not do that.  It must have been

21  Simoneau's investigation, then.  I stand corrected.

22  Q    Let's look at every one of these pages until you get to

23  page 65.  And does every one of those pages bare a

24  3/20/2002 date?

25  A    Yes, it does.

1    Q    So, then, this search was -- that we're talking about

2    here in pages 6 through 64 was not done in 2004, it was done

3    in 2002, correct?

4    A    Wait one moment, please.

5         You are referring to 06?

6    Q    Yeah, 000 --

7    A    Well, 06 shows 2005.

8    Q    Okay.  Let me take a look here.

9         That's -- yeah.  Let's look starting at page -- let's

10   start on the public record searches involving Mr. Larian,

11   the -- the earlier part is about Mr. Bryant, right?

12   A    When you say "earlier part," can you give me a page?

13   Q    The first -- yeah, the first pages of your search,

14   pages 6 through -- and some of this -- the whole page is

15   redacted, but the pages I have that are not blank would be

16   pages 6 through 12.

17   A    6 through 12?

18   Q    Right.

19   A    Um --

20   Q    And that -- that is all about Carter Bryant, true?

21   A    No.  It says "Isaac Larian" on the top.

22   Q    Take a look at page 12 under "e-mail addresses."

23   A    I'm looking at page 6.

24        Okay.  Page 12?

25   Q    Under "e-mail address," "BryantCA@Mattel.com"?

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 24 of 117   Page ID #:308208
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

24

1    A    I'm sorry, give me a moment, here.  I'm trying to

2    figure out --

3        Oh, yes, I see where you are, the e-mail address at the

4    very bottom.

5    Q    Now, let's look at page 8, with the individual being

6    searched all the way down.

7    A    One moment, please.

8        Yes.

9    Q    Carter Bryant?

10   A    Yes.

11   Q    Same with page 9?

12   A    Yes.

13   Q    And 10?

14   A    10 is Carter Bryant, yes.

15   Q    And 11?

16   A    Carter Bryant.

17   Q    Okay.  So until we get to page 21, it's Carter Bryant

18   information, true?

19        MR. QUINN:  Objection.  Vague as to from where to

20   where, your Honor.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes.

23   BY MS. KELLER:

24   Q    And the reason I'm asking you is that I recall you

25   saying on your direct examination that the information you

1    gathered about Mr. Larian was to update the investigation

2    file after, in 2004, it had come to Mattel's attention that

3    he might have possession of some drawings of Mattel's

4    Flavas; do you remember that?

5    A    I believe I said that I did a background information at

6    the time because he -- for several reasons.  One, that I was

7    informed that he had Mattel's proprietary property, which is

8    Flavas -- a Flavas rendering, drawing, and that we had just

9    began the investigation in Mexico City with regards to three

10   of our employees taking proprietary information to MGA.

11   Q    Right, but this 2004 update, it appears, was actually

12   done in 2002 from all these pages about Mr. Larian, and I'm

13   referring to pages 21 through 64?

14   A    Okay.  21 through 64.

15   Q    All those are dated 3/20/2002 at the bottom right of

16   every page.

17   A    I'm sorry, through 64?

18              THE COURT:  64.

19              THE WITNESS:  Okay.  Thank you, your Honor.

20              Okay.  Yes, that's correct.

21   BY MS. KELLER:

22   Q    So obviously it wasn't a 2004 update, this was done in

23   2002, correct?

24   A    Right, I did not do this.  I stand corrected.  I stand

25   corrected.

1  Q    And, in fact, we don't see any 2004 updated information

2  run here by anyone, you or anybody else, right?

3  A    I haven't examined the file that closely to determine

4  if there is or isn't at this time.

5  Q    Well, let me ask --

6  A    Well, yes, there is.  There's 2004 and -- I see it

7  right here.

8  Q    What page are you referring to?

9  A    Well, hold on.  I'll tell you where it starts.  And

10  this is in conjunction with what I was referring to as my

11  research.

12       So the chronological log shows that on June 21st of

13  '04, I conducted a background, and if you start on 76 -- I'm

14  sorry, if you start on 77 and through -- through 90, you

15  will see that that's what I'm referring to.  That's my --

16  that's the background that I did.

17  Q    Well, let me ask you a little bit about that.  Let's

18  look at page 75.  Is that part of the updated information

19  that you did?

20  A    Yeah, I believe it to be so.  It's been so long, so

21  many years, but that's -- I believe it to be in conjunction

22  with the last few pages that were done in '04 that I just

23  gave you.

24  Q    Well, today you said you created -- the confidential

25  information that you got you created from information that

1    you either received online or from individuals who knew

2    Mr. Larian; do you remember that?

3    A    Yes.

4    Q    But previously you testified that you didn't remember

5    how you got that information, right, or you didn't know how

6    Mattel got it, true?

7    A    That's true, I didn't recall back then, and

8    unfortunately, reading all of this over and over again, it

9    kind of jars up in my head that I believe that's where it

10   came from.

11   Q    Well, January 28th, 2010, you told us you didn't know

12   how Mattel got any of this information, right?

13   A    Yes.

14   Q    And you were asked line by line to explain how Mattel

15   got the information that Mr. Larian's wife was totally

16   devoted to him and their children's development, and you

17   said you couldn't explain, you didn't know, right?

18   A    Could you refer to which page you are referring to?

19   Q    I'm referring to page 585.

20   A    No, no, I meant in the -- the book that I have here.

21   Q    I'm sorry, that's -- on the screen right now, it's

22   page 75.  All of this confidential information.

23   A    Right, I -- once again, I didn't recall back then.

24   Q    So you didn't know how you came into possession of any

25   information about Mr. Larian's resignation from the parent

1    El Rodeo School Council, right?

2    A    No, I did that.  I believe that I told you I went on a

3    Google search.

4    Q    Was there any legitimate business interest in

5    Mr. Larian's being a supporter or donor to Beverly Hills

6    High School?

7    A    I don't know.  I don't think so.

8    Q    And as far as the information, for example, that

9    Mr. Larian has a short fuse -- hot-tempered, short fuse,

10   easy to ignite, you said you got that from some individuals

11   you interviewed?

12   A    Yes.

13   Q    Who?

14   A    I couldn't give you names, it's been so long.

15   Q    Well, male or female?

16   A    Probably both, but I can't recall.

17   Q    Where?

18   A    Probably at Mattel.

19   Q    Do you know?

20   A    No, I don't.

21   Q    And you didn't write any reports about any of that?

22   A    No, it was conversation.  Well, I did write a report.

23   I put it in -- this is considered a report, this

24   chronological --

25   Q    Well, I'm saying you never wrote a report of an

1   interview of a specific person, like, say, a police officer

2   would do, you know, on such and such a date, I interviewed

3   Jane Doe at such and such a place, at such and such a time,

4   you didn't write a single report like that, right?

5   A    No, this was more of a casual conversation.

6   Q    And so, for example, you wrote that Mr. Larian is

7   persistent and will not give up to a fault, right?

8   A    Yes.

9   Q    Is extremely defensive if challenged?

10  A    Yes.

11  Q    Requires a great deal of recognition?

12  A    Yes.

13  Q    And as a police officer, you know -- former police

14  officer, you know that the source of information is often

15  really critical to evaluating how accurate that information

16  is, right?

17  A    It depends on the information.  If the information is

18  just general information just to establish the background of

19  an individual, it's not necessarily that critical to know

20  who, what, where, when, it's more of what we would call

21  intel.

22  Q    Well, but that intel, for example, if it came from

23  somebody who knew the guy for five minutes as opposed to

24  somebody who was his best friend for 20 years, that would

25  make a difference, would it not?

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 30 of 117   Page ID #:308214
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

30

1   A    It would depend on how perceptive that individual is,

2   to be honest with you, but of course.

3   Q    So we have no source information for any of this

4   confidential information that you say you received from

5   individuals who knew Mr. Larian, right?

6   A    No.

7   Q    No sources whatsoever?

8   A    Other than people that I've spoken to, but I don't know

9   their names and can't remember who they were because it was

10  so long ago.

11  Q    Or even what gender they were?

12  A    Probably female and male.

13  Q    But you don't know?

14  A    It could have been.  I believe --

15  Q    I'm not asking you what could have been.  You don't

16  know, right?

17  A    No, it could have been, it probably was.

18  Q    I'm asking, you don't know, do you?

19  A    I believe it was a male and a female.

20  Q    And in addition to not remembering anything about these

21  people, you also, in terms of the information that you say

22  you got that was publicly available, you never before have

23  said that you got that information from a Google search or

24  using any search engine, you never said that until today,

25  right?

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 31 of 117   Page ID #:308215
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

31

1    A    I don't know that to be a fact.

2    Q    You were deposed three times previously, right?

3              MR. QUINN:  Your Honor, this is improper, if she's

4    going to use prior testimony.

5              THE COURT:  Overruled.

6              MR. QUINN:  I object to the form.

7              THE COURT:  Overruled.

8              THE WITNESS:  I'm sorry, can you read the

9    question?

10   BY MS. KELLER:

11   Q    Today is the first time that you have ever testified

12   that you got any of this information about Mr. Larian from

13   Googling or using any form of search engine, true?

14   A    I don't know that to be a fact.  I -- like you said, I

15   have had several depos on this, it's been many years, and I

16   don't recall what I've done throughout the years.

17   Q    Now, you don't know why Mattel would have a legitimate

18   business interest in knowing that Mr. Larian is

19   hot-tempered, has a short fuse and is easy to ignite, would

20   you?

21   A    I wouldn't no either way if he would or wouldn't have

22   an interest.

23   Q    It might -- no, if Mattel would have an interest?

24   A    I don't know that -- I don't know either way.

25   Q    It might be useful in litigation if you were trying to

1    set somebody off, right?

2    A    Possibly.

3    Q    Now, your -- I want to turn to a different topic.  Your

4    definition -- your interpretation of intellectual property

5    is anything and everything that Mattel uses for business

6    purposes that is proprietary and confidential to Mattel in

7    conducting business, right?

8    A    That's a very good statement, yes.

9    Q    And you mean things that are developed and are --

10   developed by and are exclusive to Mattel and not for the

11   general public to possess at that time, right?

12   A    (No audible response.)

13   Q    In other words, things that only Mattel would know

14   about at the time, not available to the general public and

15   designed to benefit the company in its business, true?

16   A    That's correct.

17   Q    And you would agree that proprietary information is

18   confidential, right?

19   A    Yes.

20   Q    And for example, Toon Teenz being an unreleased

21   product, that would be something that's confidential to

22   Mattel?

23   A    Yes.

24   Q    And that would, again, mean only Mattel people should

25   know about it, true?

1    A    That's true.

2    Q    And Toon Teenz, after you talked to Ivy Ross and

3    Cassidy Park, you understood had been an internal, secret

4    Mattel project, right?

5    A    Yes.

6    Q    And they thought Carter Bryant had based Bratz on Toon

7    Teenz, true?

8    A    Yes.

9    Q    You, yourself, we've talked about, characterized the --

10   this in your files as a case involving a theft of

11   proprietary information, right?

12   A    Mr. Simoneau did, yes.

13   Q    And you thought Ivy Ross and Cassidy Park were credible

14   people, true?

15   A    I do.

16   Q    And so you believed based on the statements by those

17   two people that you regarded as credible, that Mr. Bryant

18   probably stole secret information from Mattel, right?

19   A    It's a possibility, yes.

20   Q    Well, that's what your investigation was all about,

21   right?

22   A    I wasn't conducting an investigation.  That's what I

23   was told, and we were researching to see if, in fact, it --

24   it was a copy of Toon Teenz.

25   Q    Now, I think you said you were with LAPD for many years

1    as a detective, true?

2    A    Yes.

3    Q    And were you a detective for 10 years or was it more

4    than 10?

5    A    A detective for 15 years.

6    Q    And you were in homicides?

7    A    Yes, I both worked in and ran a homicide unit.

8    Q    Homicide units, generally the people who are regarded

9    as the better detectives are assigned to homicides, true?

10   A    That's correct.

11   Q    It's a prestigious assignment within a police

12   department, right?

13   A    Yes.

14   Q    And you were the head of the homicide detectives for

15   some period of time?

16   A    Yes.

17   Q    And how long was that?

18   A    Ten years.

19   Q    So just to short-cut it, you knew how to do an

20   investigation, right?

21   A    I know how to do an investigation.

22   Q    And you kept your investigative skills sharp even after

23   you retired from the LAPD in the various things you've told

24   us about, Columbia Savings, for example, right?

25   A    Yes.

1    Q    And in your private investigation service, right?

2    A    That's correct.

3    Q    And so when you identify a suspect, basically you're

4    supposed to do background research, right?  You build a

5    profile?

6    A    Are you referring to criminal matters or civil matters?

7    Q    Well, either one, really.  When you suspect somebody's

8    done something that could be actionable civilly or

9    prosecutable criminally, basically the process isn't too

10   different from investigating it, right?

11   A    No, it's not.  You want to develop as much information

12   as you can.  Factual information.

13   Q    Now, you didn't interview a person named Elise Cloonan

14   once you got this information about Mr. Bryant, correct?

15   A    I don't know who the person is.

16   Q    You didn't know that that was Carter Bryant's roommate

17   when he worked at Mattel?

18   A    No.

19   Q    And you didn't talk to Anna Rhee?  Do you know who Anna

20   Rhee is?

21   A    I've heard the name.  I didn't talk to her, no.

22   Q    You didn't talk to somebody named Carmen Monteagudo?

23   A    I don't recognize the name.

24   Q    Or Steve Linker?

25   A    I don't recognize the name.

1    Q    Did you talk to Jill Nordquist, the senior director of

2    marketing with Barbie collectibles?

3    A    I've talked to Jill several times.

4    Q    About Carter Bryant?

5    A    No.

6    Q    About this investigation?

7    A    No.

8              *(Interruption in the proceedings.)*

9              MS. KELLER:  About Carter Bryant, and I think the

10   answer was "no," about this investigation.

11             MR. QUINN:  Objection.  Assumes facts.

12             THE COURT:  Well, as to which question?

13             MR. QUINN:  That there was an investigation.

14             THE COURT:  Overruled.

15   BY MS. KELLER:

16   Q    Did you try to find out if Mr. Bryant still had any

17   friends who were working at Mattel who might give you

18   information that would shed some light on all this?

19   A    Are you referring to a point in time?

20   Q    Yeah.  I mean, when you find out that this guy is being

21   accused of theft of proprietary information.  And you are

22   the head of security, so you are the fact gatherer, right?

23   You are the person who gathers the facts, generally?

24   A    Generally.

25   Q    Did you try to find out if Mr. Bryant had friends

1    working at Mattel who might have information pertinent to

2    whether he really did rip off Mattel?

3    A    No.  I wasn't conducting an investigation at that time.

4    Q    Did you talk to Ron Longsdorf, his supervisor in Barbie

5    collectibles?

6    A    I don't believe so.

7    Q    Did you talk to a woman named Ramona Prince,

8    Mr. Longdorf's secretary?

9    A    No.

10   Q    Did you speak to a person named Mateo Romano?

11   A    I've spoken to Mateo on many occasions, but I don't

12   believe --

13   Q    About this, about Carter Bryant?

14   A    No.

15   Q    You didn't try to speak to Mr. Bryant either, did you?

16   A    No.

17   Q    You didn't call MGA, right?

18   A    No, I would not call MGA.

19   Q    You didn't look at Mr. Bryant's phone records from

20   Mattel, right?

21   A    No.

22   Q    And Mattel had the ability to -- its phone system

23   captured ingoing and outgoing telephone numbers, true?

24   A    That's correct.

25   Q    Didn't talk to Sheila Kyaw?

1   A    I don't know who she is.  I did not.

2   Q    Okay.  Now, while -- not too long after, several --

3   well, some months after Cassidy Park and -- Cassidy Park and

4   Ivy Ross made this report to you, you got a copy of this

5   anonymous letter that had been sent to the CEO, Mr. Eckert,

6   right?

7   A    Yes.

8   Q    And that was sometime in early August of 2002?

9   A    I believe it was August 5th.

10  Q    And that was Exhibit 1193, I believe.  That was stamped

11  August 5th, 2002, by Mr. Eckert's office, apparently?

12          MS. KELLER:  Could we -- that's already in

13  evidence.

14          THE WITNESS:  It's stamped by Mr. Eckert with

15  Mr. Eckert's name under the date.

16  BY MS. KELLER:

17  Q    And there was this note from Mr. Eckert to Mr. Kaye

18  saying "worth having Richard explore," right?

19  A    With a question mark.

20  Q    And you are the Richard, true?

21  A    I am the Richard.

22  Q    And so this deals with the same subject matter that the

23  complaint from Ivy Ross and Cassidy Park dealt with, right?

24  A    That was my belief at the time.

25  Q    And it was after this that you talked with Michele

1    McShane in the legal department?

2    A    After this, are you referring to my meeting with

3    Cassidy Park or this item?

4    Q    After getting a copy of this letter.

5    A    Yes.

6    Q    And after you spoke to Ms. McShane, you prepared an

7    e-mail to Alan Kaye in response to the letter, right?

8    A    Yes.

9    Q    And this is the one that you say wasn't dated, this is

10   Exhibit 1194.

11           MS. KELLER:  If we could display that?

12   BY MS. KELLER:

13   Q    This is the one -- the e-mail that doesn't have a date

14   on it?

15   A    That's correct.

16   Q    And you said that you printed it before sending it and

17   that's why it didn't have a date?

18   A    Yes.

19   Q    Where is the dated one that you sent?

20   A    I don't have a copy of that.  I don't know.  I sent it

21   and that was the last I saw of it.

22   Q    You never checked your computer to see if there was a

23   dated copy in there in your sent folder?

24   A    When would I have done that?  When are you referring?

25   Typically I would get hundreds of e-mails per day and I

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 40 of 117   Page ID #:308224
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

40

```
 1   would have to delete them to be able to let my system run,
 2   so I don't know what you're --
 3   Q    Well, say, you know, after this became an issue in this
 4   case, after you were deposed about it?
 5             MR. QUINN:  Your Honor, I object.  We've had
 6   discussions about this subject.
 7             THE COURT:  No, you can answer the question if you
 8   checked.
 9             THE WITNESS:  Thank you, your Honor.
10             No, I did not check.  By the time this became
11   years later, that would not have existed.
12   BY MS. KELLER:
13   Q    But you didn't check to see?
14   A    No.
15   Q    Now, among other things, if we look at Exhibit 1194, it
16   says, "I am aware of this situation and have been working on
17   it for several months."  And when you wrote that statement,
18   you were referring to the investigation about the Cassidy
19   Park, Ivy Ross matter?
20   A    I was referring to the -- yes, but I was referring to
21   the Michele McShane waiting for an answer.
22   Q    Well, specifically, though, this says, "I am aware of
23   this situation and have been working on it for several
24   months," as opposed to "I have been waiting for somebody
25   else to be doing something for several months."
```

1   A    Right, I see that, but I'm telling you what I meant

2   when I wrote that.

3   Q    So you really hadn't been working on it for several

4   months, you just wrote that?

5   A    No, I had been working on it waiting for the

6   information to return, and once the information returned, I

7   would understand if either the legal department would

8   continue -- or would open an investigation or I would.

9   Q    So -- but when you wrote that statement, you were

10  referring to the investigation which is reflected in

11  Exhibit 1195RS, right?

12  A    I was referring to the matter because we did not know

13  that there was an issue because at the time we did not

14  receive the information back yet.

15  Q    If you would take a look at your deposition transcript

16  from January 27th, 2010, page 449.

17  A    What line, please?

18  Q    Lines 15 through 20, page 449.

19       Okay.  Have you had a chance to read that?

20  A    Through what, I'm sorry?

21  Q    Through 20.

22  A    Yes.

23  Q    Does that refresh your memory as to whether this

24  referred to the investigation already under way?

25  A    Well, I answered the question in the affirmative, was

1    yes, and the question was asked, "Does this refer to the

2    investigation?"

3    Q    And you said yes?

4    A    Yes, but once again, there was no investigation.

5    Q    And you understand that if there was an investigation

6    ongoing at that time into this matter, that your

7    investigation might trigger the running of the statute of

8    limitations, right?

9              MR. QUINN:  Argumentative.

10             THE COURT:  Overruled.

11             You can answer the question.

12             THE WITNESS:  Yes.

13   BY MS. KELLER:

14   Q    And after you got this -- after you got this -- after

15   you sent this memo, you -- basically you did nothing to

16   further investigate the matter?

17   A    I wasn't investigating the matter.  I had made

18   additional calls to Michele McShane for an answer to the

19   question that we were waiting on.

20             MS. KELLER:  Your Honor, I move 1195RS, pages 26

21   and 28 into evidence.

22             THE COURT:  Received.

23             *(Defendants' Exhibit Nos. 1195RS-26 and*

24        *1195RS-28 are received in evidence.)*

25

1    BY MS. KELLER:

2    Q    Bottom line is, after you got the anonymous letter, you

3    didn't do anything about it, true?

4    A    Other than wait for an answer, that is true.

5    Q    And as a police officer, you sometimes got anonymous

6    tips, right?

7    A    Sometimes.

8    Q    And in fact, there are police departments that set up

9    anonymous tip lines to get anonymous tips, right?

10   A    That's true.

11   Q    And that's because all you have to have with an

12   anonymous tip is corroboration, and it could actually be

13   very useful information, true?

14   A    At times.

15   Q    And this particular anonymous tip told you that Carter

16   Bryant had been working at Mattel when he created Bratz and

17   then left and took it to MGA and gave -- got a lot of money

18   from MGA for it, right?

19   A    No.  What it says, basically, is that Mattel -- that

20   Carter Bryant was working at Mattel creating dolls, and one

21   of the dolls that he was working on for Mattel is basically

22   the Bratz doll, and so I assumed since that was

23   misinformation, because my understanding is that Mattel was

24   not working on a Bratz doll, was that it related to the Toon

25   Teenz copy that we were exploring.

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 44 of 117   Page ID #:308228
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

44

1          MS. KELLER:  Can we blow that up a little bit?

2     BY MS. KELLER:

3     Q    Specifically it says, "I have information that I think

4     Mattel should investigate.  In 2000, a Mattel employee by

5     the name of Carter Bryant was working with Mattel to design

6     dolls.  One of the dolls that he was working on creating was

7     the Bratz dolls.  MGA Entertainment found out about his

8     creation and approached him to plan a way that he could sell

9     the dolls to MGA and never tell Mattel.

10         "While he was working with Mattel and working to create

11    these dolls, he worked out a deal with MGA that let him

12    collect a large sum of money each year from MGA to exchange

13    for his secrecy about the dolls and the fact that they are

14    rightly Mattel dolls."

15         That information only mildly interested you, right?

16    A    It did because we were already exploring the

17    possibility of the Bratz doll being a copy of the Toon

18    Teenz, and if you look at the letter where it says that this

19    one doll in particular that was being created by Mattel was

20    Bratz, well, that would only make logical that it was Toon

21    Teenz, in my mind at the time.

22    Q    But it would be theft of Mattel's confidential

23    information if somebody had looked at an unreleased product,

24    gotten an inspiration from it and then took it to a

25    competitor, true?

```
 1   A     If we can prove that, yes.

 2             MS. KELLER:  Thank you.

 3             Nothing further.

 4             THE COURT:  Mr. Cote, do you have any questions?

 5             MR. COTE:  I do, your Honor, thank you.

 6                        CROSS-EXAMINATION

 7   BY MR. COTE:

 8   Q     Good afternoon, Mr. de Anda.

 9   A     Good afternoon.

10   Q     I'd like to start with Exhibit 35952, which I'm not

11   sure you have in front of you.

12             MR. COTE:  This is already in evidence.

13             THE WITNESS:  I don't believe so.  Three five --

14             Thank you.

15   BY MR. COTE:

16   Q     Do you have 35952 in front of you now, sir?

17   A     I don't see a number that says 35952.

18   Q     Bottom right-hand corner, TX359 --

19   A     Oh, I'm sorry, there it is.  0001?

20   Q     Yes.

21   A     Yes.

22   Q     This is part of your investigative report related to

23   Mexico, right?

24   A     Give me a moment, please.

25   Q     Sure.
```

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 46 of 117   Page ID #:308230
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

46

 1   A    I haven't seen this in years.

 2            THE COURT:  Jane, stop the clock.

 3            THE WITNESS:  Yes.

 4            THE COURT:  Now start it again.

 5            THE WITNESS:  Sorry, your Honor.

 6   BY MR. COTE:

 7   Q    And this portion of your investigative report has a

 8   reported date of April 19, 2004 at 5:06 p.m., right?

 9   A    1706 hours, yes.

10   Q    That's 5:06 p.m.?

11   A    Yes.

12   Q    And if you flip the page to the second page, you'll see

13   a incident person details, four of six; do you see that

14   heading?

15   A    Yes, I see the four of six.

16            MR. COTE:  This is in evidence, your Honor.  We

17   are going to display it.

18   BY MR. COTE:

19   Q    Do you have that in front of you?

20   A    Oh, yes, I do.

21   Q    Four of six, and the first name under there is Pablo

22   Vargas, correct?

23   A    That's correct.

24   Q    And he's a person typed suspect?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 47 of 117   Page ID #:308231
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

47

1    Q    And down, person details five of six, Gustavo Machado?

2    A    Yes.

3    Q    Another suspect?

4    A    Yes.

5    Q    And the last name on that page, Mariana Trueba?

6    A    Yes.

7    Q    She's a suspect too, right?

8    A    Yes, she is.

9    Q    If you'd flip back to the very first page.

10   A    Yes.

11   Q    The third line down, seized proprietary information,

12   right?

13   A    Yes.

14   Q    And you suspected that these three suspects had copied

15   Mattel's proprietary information, right?

16   A    Yes.

17   Q    As of the date of this report date, which is April 19th

18   at 5:06 p.m., right?

19   A    Evidently, yes.

20   Q    And that's why you started this investigation?

21   A    Well, I assigned it to Jaime Elias.

22   Q    That's why you asked Mr. Elias to start this

23   investigation?

24   A    Yes.

25   Q    And that's also why you looked at Mr. Machado's

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 48 of 117   Page ID #:308232
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

48

1    computer, to see what kind of e-mails he was sending, right?

2    A    Yes, I don't -- I don't have a very clear recollection

3    of this at this time.  It's the first time I've seen this in

4    years, so...

5    Q    Let me show you an exhibit that we looked at before

6    lunch.

7    A    Okay.

8    Q    Which is 6658T.

9    A    There we go.  Yes.

10   Q    And I'm going to ask you to turn to page 70, which is

11   actually the -- ironically, the second page in that

12   document.  Maybe it's the third page, my apologies.

13   A    Seven zero?

14   Q    Yes.

15   A    I don't think so.

16   Q    6658T is the short one we looked at with Mattel's

17   counsel this morning.  It's probably in a different book.

18   A    6658T -- it is.  It's not...

19        It's the third page in.

20   Q    Do you have that in front of you?

21   A    I do.

22   Q    And does this refresh your recollection that as part of

23   the investigation, Mattel had someone pull up Mr. Machado's

24   e-mails from his computer at Mattel Servicios?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 49 of 117   Page ID #:308233
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

49

1    Q    And there is a date on the bottom right-hand corner of

2    this page, page 70, right?  Do you see that date?

3    A    I do.

4    Q    What's that date?

5    A    It's 7/7 of 2004.

6    Q    So you were investigating Mr. Machado's e-mail

7    correspondence as of July 7th, '04, correct?

8    A    That's correct.

9    Q    As part of your investigation to see whether he had

10   taken proprietary information of Mattel?

11   A    That's correct.

12   Q    And actually, can you flip two more pages to page 72?

13   A    Yes.

14   Q    That page has a date on it also, right?

15   A    Yes, of -- yes.

16   Q    And I'm talking about in the bottom right-hand corner.

17   A    Yes.

18   Q    It's May 13th, 2004?

19   A    That's correct.

20   Q    So you were looking at Mr. Machado's e-mails by

21   May 13th, 2004, to see if he had taken Mattel's proprietary

22   information, right?

23   A    Yes.

24   Q    And that's also why you looked to see what kind of

25   activity he had done on his computer, to see if he taken

1    proprietary information, right?

2    A    That's correct.

3    Q    The exhibit you have in front of you, if you could turn

4    to page 90.

5    A    Yes.

6    Q    You have that in front of you, right?

7    A    I do.

8    Q    You testified this morning that this was a list of

9    files that your investigation disclosed that -- or showed

10   that Mr. Machado had copied, right?

11   A    Yes.

12   Q    How many unique files are on that list?

13   A    Oh, let me --

14   Q    We can make it bigger if that would help.

15   A    No.  I'll try and count it here.  It's very difficult

16   to see.  Maybe you can't.

17           MR. COTE:  Can you make it a little bigger?

18           THE WITNESS:  No, I can't see it.

19   BY MR. COTE:

20   Q    There is a large screen behind you, if that's any

21   easier.

22   A    I'm almost here.

23        Eleven.

24   Q    There's 11 files listed, but you'll notice, for

25   example, that the second and third are identical, right?

1    A    Yes, they are.

2    Q    And then the fourth and the fifth are identical?

3    A    Yes, they are.

4    Q    So how many unique files are there?

5    A    Appears six.

6    Q    Six files.  That's how many your investigation found,

7    according to this page, that Mr. Machado copied to the USB

8    drive, right?

9    A    Yes.

10   Q    How many did Mr. Vargas copy?

11   A    I don't -- I don't recall.

12   Q    You don't know?

13   A    I don't know.

14   Q    Now, one of the security measures that Mattel has for

15   its employees -- or for its information, rather, is to limit

16   the employees' access to certain parts of their computer

17   systems, right?

18   A    Yes.

19   Q    So, for example, an employee in accounting would have

20   access to accounting data but wouldn't have access to design

21   data, right?

22   A    That's pretty accurate.

23   Q    And vice versa, a design employee wouldn't be able to

24   get accounting data?

25   A    I don't have any particular knowledge, but that's the

1    idea of the system.

2    Q    Let me show you 35980, please.

3         Do you have that in front of you, sir?

4    A    I do, yes.

5    Q    Do you recognize this document?

6    A    It appears to be a declaration that I signed on

7    October 7th of 2010.

8    Q    And you signed it under penalty of perjury, right?

9    A    I did.

10   Q    Could you just take a look at paragraph 6 of this

11   declaration?

12   A    Yes.

13   Q    And I'm talking about lines 16 to 20 in particular.

14   A    Okay.

15   Q    Just read those to yourself.

16   A    Okay, one moment, please.

17   Q    Sure.

18   A    Yes, I do recall that now.

19   Q    Does that refresh your recollection that an employee in

20   the accounting department would only have access to

21   accounting information?

22   A    Yes, like I had said, that's the general idea.

23   Q    Because that's the information they'd need for their

24   job, right?

25   A    Precisely.

1   Q    And was that limitation also in place in Mexico in
2   2004?
3   A    Yeah, I cannot answer that on the affirmative, but I
4   believe it was.  Yes, it was.  It would have been.
5   Q    It was?
6   A    Well, I'm not certain.  Okay, I don't recall, to be
7   very honest with you, it's been so long.
8   Q    Well, let's see if we can refresh your recollection,
9   same declaration, same paragraph, line 9.
10  A    I'm sorry, line what?
11  Q    Nine.
12  A    Oh, I see.  Here we go.
13       Yes.
14  Q    Did that refresh your recollection?
15  A    Yes, it does.
16  Q    So you remember that the same restriction that we
17  talked about with the hypothetical accountant only being
18  able to access accounting information, that restriction
19  would be in place in Mexico, too, in 2004, right?
20  A    Yes.
21  Q    So that means that Mr. Machado, using his unique user
22  ID or log-in, would only be able to have access to
23  information in Mexico that he needed to do his job, right?
24  A    I would believe so, yes.
25            MR. COTE:  No further questions, your Honor.

1          THE COURT:  Recross by Mr. Quinn on behalf of

2    Mattel.

3          My apologies.  I believe I said recross, but

4    redirect.

5          MR. QUINN:  Redirect.  Thank you, your Honor.

6                    **REDIRECT EXAMINATION**

7    BY MR. QUINN:

8    Q    You were asked by Ms. Keller whether it was true that

9    based upon the conversations you had with Cassidy Park and

10   Ivy Ross in March of 2002, whether you had a suspicion that

11   Mr. Bryant had done something wrong with Mattel property; do

12   you recall those questions?

13   A    Yes.

14   Q    And -- and what was it at that time you were

15   suspecting?

16   A    I believe -- well, they told me their belief, and my

17   belief was that he had copied Toon Teenz to create Bratz.

18   Q    And was it your understanding at that time that there

19   was a suspicion he had done that while he was a Mattel

20   employee?

21   A    No.

22   Q    And if you'd look, please, in Exhibit 11 -- 1195RS-66,

23   and the entry for March 28th, which says, "Met with Cassidy

24   Park" -- by the way, this is in Mr. Simoneau's handwriting;

25   is that correct?

1    A    That's correct.

2    Q    "Met with Cassidy Park to get more information on MGA

3    issue.  She suggested Carter Bryant as illustrator/former

4    employee who may have plagiarized design of Lily Martinez

5    and created Bratz doll for MGA"; do you see that?

6    A    Yes.

7    Q    And "plagiarized" to you means what?

8    A    Copied.

9    Q    So is that consistent with what you were telling us,

10   that that's what you were referring to, that there was a

11   suspicion that he had seen Toon Teenz, and then after he

12   left Mattel, had copied it or plagiarized it in creating

13   Bratz?

14   A    Precisely.

15   Q    And then you -- you said several times in response to

16   Ms. Keller's questions that you didn't do an investigation

17   on that issue yourself; is that correct?

18   A    That's correct.

19   Q    You said there was a meeting with the legal department

20   early on which you said in response to Ms. Keller's

21   questions was at the design center?

22   A    That's correct.

23   Q    And the purpose of that meeting was?

24   A    To determine the next step, and the next step was that

25   the legal department would determine if, in fact, this was a

1    copy or not.

2    Q    They were going to look into that issue?

3    A    Yes.

4            MS. KELLER:  Objection.  Objection.  Hearsay.

5            THE COURT:  Sustained.

6    BY MR. QUINN:

7    Q    Well, what was your understanding as of the conclusion

8    of that meeting as to who was going to look into this issue

9    about whether it was a copy?

10   A    The legal department.

11   Q    And then if we could look at this file, you were asked

12   a number of questions about where this information came from

13   and when it was pulled up.  There are a number of pages in

14   the beginning, it looks like some that are run in

15   November 2005, if we could look at page -6.

16   A    Yes.

17   Q    And up at the top it says, "California civil index

18   search"; do you know what that is?

19   A    It's a Locate Fast index search.

20   Q    And Locate Fast is, again, remind us?

21   A    The search engine that Mattel subscribes through it

22   through the security department, investigative department to

23   do searches on public records.

24   Q    And down at the bottom, this refers to -- Mr. Larian's

25   name appears there several times?

1    A    Yes.

2    Q    As being the subject of this Locate search?

3    A    Yes.

4    Q    And down at the bottom, what's the date on the lower

5    right there?

6    A    11/21/2005.

7    Q    And then if we -- the next page, same thing, same date?

8    A    Same date.

9    Q    And then if we can go over to -8, what are we looking

10   at there?  Is there another Locate Fast printout?

11   A    Yes.

12   Q    And this relates to Carter Bryant?

13   A    Yes.

14   Q    And is there a date there?

15   A    Yes.

16   Q    What -- what is that date?

17   A    7/22/2003.

18   Q    And then the next page, what's the date of the next

19   page?

20   A    The same date, 7/22/2003.

21   Q    And then if we could skip over and look at page -21,

22   that says, "Search Bug, People Finder, White Pages"; do you

23   know what this is?

24   A    Just an online search.  I don't -- I don't think it's a

25   subscription.  I think it's just an internet search.

1   Q     And it refers to, the second listed entry there is ABC

2   International Traders on Schoenborn; do you see that?

3   A     Yes.

4   Q     And do you recall whether or not MGA was once known as

5   ABC International Traders?

6   A     I believe they were.

7   Q     And down at the bottom, the date of that is March 20th,

8   2002?

9   A     Yes.

10  Q     And in fact, the next pages up to, it looks like, -71

11  are all dated in 2002; is that how it appears to you?

12  A     So far.  Give me one moment, please.

13  Q     Up to -65.

14  A     65?

15  Q     Yes.

16  A     Yes.

17  Q     And these are all, appear to be public record search

18  printouts?

19  A     Yes.  Yes, they do.

20  Q     If we look at, for example, -45.

21         MR. QUINN:  If we could put that on the screen.

22  BY MR. QUINN:

23  Q     That's another Search Bug result?

24  A     Yes.

25  Q     And then you indicated in 2004 -- if we go back to -66.

1              MR. QUINN:  If you put that up on the screen.

2    BY MR. QUINN:

3    Q    You said you made this entry June 21, '04, "Update

4    Isaac Larian background," and that's in your handwriting

5    there at the bottom?

6    A    Yes.

7    Q    And then after that, the following pages starting at

8    -77 through to the end are all dated in 2004, correct?

9    A    Yes.

10   Q    Have you ever had the occasion before in your career

11   where you've gone back to a file and updated the research,

12   you know, checked to see if there is any new information and

13   done a printout and put that in the file just to update the

14   research?

15   A    Yes.

16   Q    But you indicated that in 2004, there had been some

17   other issues with Mr. Larian that had brought -- made him

18   someone who Mattel was interested in, the issues down in

19   Mexico and the like?

20   A    Yes.

21   Q    If we could look again back at the chronological

22   record, -66, Ms. Keller called your attention to

23   Mr. Simoneau's entries about checking Schoenborn --

24   Schoenborn Street, and it says, "Negative," and I think you

25   said you don't have any idea why Mr. Schoen- -- Mr. Simoneau

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 60 of 117   Page ID #:308244
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

60

1   was doing this?

2   A    Right.

3   Q    Is it possible he was checking to see if Carter Bryant

4   was there --

5           MS. KELLER:  Objection.  Calls for speculation.

6           THE COURT:  Sustained.

7   BY MR. QUINN:

8   Q    As a matter of practice --

9           THE COURT:  I'll let you get into that as long as

10  the other side can ask lots of other questions about who

11  else could be there, so I don't think you want to go there.

12          MR. QUINN:  All right.

13          THE COURT:  All right.  Sustained.

14  BY MR. QUINN:

15  Q    If -- if there -- it says, "Neg," N-e-g, and that -- to

16  you, does that mean negative?

17  A    To mean it means negative.

18  Q    So he was presumably looking for something and didn't

19  find it; is that how you would interpret that?

20          MS. KELLER:  Objection.  Calls for speculation.

21          THE COURT:  Sustained.

22          Ladies and gentlemen, you'll figure out what "neg"

23  means when you get the document, okay?

24  BY MR. QUINN:

25  Q    Well, if he found positive results, if he found what he

1    was looking for, would you have expected to see an entry

2    indicating that?

3    A    I would imagine so.

4    Q    And then you were asked some questions about

5    individuals reported at address on -27, can you take a look

6    at that?

7            MR. QUINN:  If we can put that up on the screen.

8    BY MR. QUINN:

9    Q    And if we can enlarge that at the top, it says on the

10   printout, "Individuals reported at 237 North Carolwood

11   Drive, Los Angeles"; do you see that?

12   A    Yes.

13   Q    Do you have some understanding about what that means in

14   the context of this search?

15   A    Yes.

16   Q    And what does that mean?

17   A    If I may, typically in this Locate Fast search, you

18   would ask for a -- there would be categories, and the

19   categories would be lumped into, for instance, if you want a

20   general search, it would search all -- a variety of

21   categories, and this would be one of the categories.  And

22   it's basically anyone who ever resided there since the house

23   was built or since they have public records, this company

24   has public records, that's all.  It's just a very broad

25   search.

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 62 of 117   Page ID #:308246
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

62

1    Q    Well, is it -- in your understanding, does this mean

2    that these are like visitors who had gone to that address

3    and someone had written down their license plate numbers or

4    determined that these people had visited that location?

5    A    No, it's not that at all.  My understanding of Locate

6    Fast, once again, it's -- this deals with people who have --

7    who have either resided there and/or have listed this as

8    their personal address.

9    Q    And -28, it says at the top, "Listed phone numbers" at

10   the head of the printout.

11              MR. QUINN:  If we could enlarge that.

12   BY MR. QUINN:

13   Q    Is that another category you could search as to what

14   phone numbers are connected with a particular location?

15   A    Yes, as I said before, these searches are custom

16   searches done by Locate Fast, in other words, they clump a

17   bunch of search areas together, and then you have a choice

18   to buy one or the other.

19        And this is one of the categories within that list, and

20   basically it would list phone numbers that are active or

21   inactive at that location that have been.

22   Q    And then if we would look at -77 up at the top, is this

23   the first page of the search that you ran on Locate Fast in

24   June of 2004?

25   A    I believe so.

1    Q    And in the upper left, what does that say, Locate --

2    A    The upper left, it says, "Locate Fast search."

3    Q    Ms. Keller asked you about Exhibit 1194, the copy that

4    you would have sent to Mr. Kaye.

5              MR. QUINN:  If we could put that up on the screen.

6    BY MR. QUINN:

7    Q    You said that years later, when this became of

8    interest, you -- that it wouldn't have existed anymore.  The

9    question was asked to you, did you go back and see if it was

10   there in your computer; do you recall that?

11   A    Yes.

12   Q    And why is that, it wouldn't exist anymore?

13   A    Because I would delete literally, you know, hundreds of

14   e-mails per week and usually start with the -- the latest

15   date -- or excuse me, the earliest date.

16   Q    Did there come a point where you provided your computer

17   to the legal department in connection with this case so that

18   they could search for documents?

19   A    Yes.

20   Q    And then 1193, the anonymous letter that Mr. Eckert

21   got.

22              MR. QUINN:  If we can enlarge that.

23   BY MR. QUINN:

24   Q    You said it didn't make sense to you that it said that

25   Carter Bryant was working with Mattel to design dolls.  One

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 64 of 117   Page ID #:308248
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

64

1    of the dolls that he was working on creating was Bratz

2    dolls.  You said that didn't make sense to you.  Can you

3    explain that to us?

4    A    Well, once again, the preceding sentence basically says

5    that he was working at Mattel to create dolls, and one of

6    these dolls was the Bratz dolls.  Well, my understanding,

7    then, that Mattel was not working at creating a Bratz doll,

8    to my knowledge.

9    Q    You understand that at the time the Bratz doll was made

10   by --

11   A    MGA.

12   Q    Did you ever -- did you have any way of determining who

13   wrote this anonymous letter?

14   A    No.

15   Q    Or determining how they knew whatever it was that they

16   were saying here?

17   A    No.

18   Q    Did you have any reason to believe that this anonymous

19   letter at that time, back in August of 2002, was credible?

20   A    No.

21   Q    Is this the first time that Mr. Eckert, to your

22   knowledge, has ever received an anonymous letter?

23   A    I -- I don't know what Mr. Eckert has or has not

24   received.  I -- I don't know.

25   Q    But in your -- you've dealt with anonymous letters

1    before, I assume, in your career?

2    A    Yes.

3    Q    In your own view, is an anonymous letter something on

4    which, you know, would be responsible and appropriate to

5    bring a lawsuit?

6            MS. KELLER:  Objection.  Way beyond this witness'

7    scope.

8            THE COURT:  Sustained.

9    BY MR. QUINN:

10   Q    Well, at the time that you received this anonymous

11   letter, was there any discussion about bringing a lawsuit

12   based on this anonymous letter, to your knowledge?

13           THE COURT:  Now, just a moment.  Let me read that.

14   Just a minute.

15           Ladies and gentlemen, I think you need a recess.

16           (Laughter.)

17           THE COURT:  I can see that.  You are admonished

18   not to discuss this matter amongst yourselves, nor form or

19   express any opinion concerning this case.  We'll come and

20   get you in about 10 minutes.  We'll have you leave about

21   3:20 today so you can make that class for sure.

22           Counsel doesn't need a break.  They're feeling

23   very good about themselves.  All right.

24           Sir, please step down for a moment.

25           And Counsel, I'd like to speak with you.

1          Thank you very much, sir.  If you'd please return

2    in 10 minutes.

3          THE WITNESS:  Okay.

4          *(The following proceedings is taken outside*

5      *the presence of the jury.)*

6          THE COURT:  Question:  "Well, at the time that you

7    received this anonymous letter, was there any discussion,

8    any discussion about bringing a lawsuit based on this

9    anonymous letter, to your knowledge?"

10          You've taken the position on behalf of Mattel that

11    there's an attorney-client privilege that you've not been

12    willing to divulge, for good reason, it's attorney-client

13    privilege, I'm not concerned about that, concerning this

14    meeting, which MGA desperately wants to get into.  If you

15    ask that question, privilege is waived.

16          MR. QUINN:  I'll ask a different question.

17          THE COURT:  I thought you would want to ask a

18    different question.  I thought that's why we might want to

19    take a recess.

20          *(Laughter.)*

21          MR. QUINN:  I appreciate it, your Honor.

22          THE COURT:  That question, as soon as he would

23    have answered yes, that privilege is waived.

24          MR. QUINN:  Very well.

25          THE COURT:  And all of the repercussions would

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 67 of 117   Page ID #:308251
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

67

 1    have followed, so I'm glad you wanted that recess.

 2            Now, there is one more question.  I want you to go

 3    back to 1195, and I want you to go back to the social

 4    security -- I want you to put up the page that has the

 5    redacted e-mail where the social security is not included in

 6    that e-mail.

 7            Mr. McConville, you look shocked in awe.

 8            There is a -- in 1195 --

 9            MR. QUINN:  Is this RS, your Honor?  There's two

10    versions of it.

11            THE COURT:  Yes.

12            MS. KELLER:  I think the fault was ours, actually,

13    your Honor.

14            THE COURT:  No, no.  We're going to get this -- my

15    record will be pristine for the Circuit.

16            Put that up on the board again, I want to see that

17    e-mail.

18            It's the e-mail where there was a redaction of the

19    social security number, but one of the electronic people

20    then put the social security number up.

21            MS. HURST:  It's --

22            THE COURT:  I know, I want to see this.  Okay?

23            All right.  Now, I want that identified.  That

24    should be by number.  Is that pages 292?

25            MR. QUINN:  It's 1195RS-4, I believe.

```
 1              THE COURT:  Four?
 2              All right.  Now, when this was being shown, do you
 3    see where that "redacted" is?
 4              MR. MC CONVILLE:  Yes.
 5              THE COURT:  Somebody put up the social security
 6    number.
 7              MS. KELLER:  That's why I said, I think it's our
 8    fault, I think it's my fault.
 9              THE COURT:  There's no problem, there's no fault
10    to it.
11              Just a moment.  Put up the social security number
12    for a moment, whoever did this.
13              MR. MC CONVILLE:  RS.
14              MS. HURST:  It's in RS.
15              MR. QUINN:  It's RS-4.  1195RS-4.
16              THE COURT:  Okay.
17              MS. HURST:  There you go, Judge.
18              THE COURT:  Okay.  Now, this came up on the board,
19    and I won't read the social security number into the record
20    because we are trying to protect it, and none of you can
21    memorize it that fast, so take it down.
22              Your point is, and the jury is going to be
23    confused, how did Mattel get their hands on a social
24    security number when, frankly, regardless of what
25    Mr. de Anda says, you can't get it.
```

1           MS. KELLER:  Right.

2           THE COURT:  And the problem with this being

3    redacted is that you can't make that point to the jury.

4           So the question is legitimate, the area is

5    legitimate, but because of the agreement between parties

6    rightfully to redact social security numbers, it creates the

7    difficulty that they should be able to see that social

8    security number, or at least know that that was, in fact, on

9    that document and that Mattel had to do a much deeper

10   investigation than Mr. de Anda is alleging that they did.

11          Now, how are we going to resolve that?

12          MS. KELLER:  I think we can stipulate that there

13   was a social security number there.

14          THE COURT:  This would be the first stipulation in

15   the history of this litigation.

16          MR. QUINN:  I don't think so, your Honor, but we

17   can stipulate to that.

18          THE COURT:  Can you?

19          MR. QUINN:  (No audible response.)

20          THE COURT:  Okay.  So can each of you then

21   stipulate to the jury that there was a social security

22   number, that it's been redacted because both counsel agree

23   that that would be the appropriate thing to do?  Rather than

24   the Court's ordering it, it just makes you both of you

25   look --

```
 1              MS. KELLER:  Yes.

 2              MR. QUINN:  Right.

 3              And your Honor, I would like to offer the entire

 4    1195RS, subject to redacting social security numbers.  I

 5    think the jury has seen almost -- most of the pages now.

 6              THE COURT:  Well, not most.  They've seen some.

 7              There's some newspaper articles in there.

 8    Mr. Zeller, you and I went over --

 9              MR. QUINN:  There is an article in the Hollywood

10    Reporter.

11              THE COURT:  Hollywood Reporter.

12              MR. QUINN:  And that, they have seen.

13              THE COURT:  Well, they saw the first page.  They

14    couldn't read it.

15              Is there any objection to that article?

16              MS. KELLER:  We'll have to take another look at

17    it.

18              THE COURT:  You need a magnifying glass, it's that

19    small.

20              MS. KELLER:  Yeah, I think we need to take a look

21    at it first.

22              THE COURT:  Yeah, I thought we would.  Basically

23    you can count on 99 percent of this coming in.

24              MR. QUINN:  Okay.

25              THE COURT:  The quibbling that we got into was
```

1  simply over the content of the newspaper article and a

2  couple other items, Mr. McConville, Mr. Zeller, there was

3  concern about --

4            MR. QUINN:  I think the newspaper article is

5  already in evidence, your Honor.

6            THE COURT:  The Hollywood Reporter?

7            MR. QUINN:  That's what Ken is saying, that it's

8  already been received.

9            THE COURT:  Okay.  We'll take that as the gospel,

10 then.

11            (Laughter.)

12            THE COURT:  Why don't we just wait and make sure.

13            MR. QUINN:  Okay.

14            THE COURT:  So will it come in?  You can expect

15 it's coming in, 99 percent of it for your purposes.  I just

16 want to make certain if there is an objection, each of you

17 have a chance to lodge it.

18            And I think actually both parties were concerned,

19 Mr. Zeller, Mr. McConville.  Mr. McConville a little bit

20 more because we didn't have time to read it.

21            Okay.  Now, five minutes, and then we'll start at

22 3:15.  I'll open the doors in four minutes, so go use the

23 restrooms as quick as you can.

24            (Recess.)

25            THE COURT:  The jury is present, all counsel, the

1   witness.

2           And Counsel, would you like to continue, please.

3           MR. QUINN:  Yes, thank you, your Honor.

4           **RICHARD DE ANDA, PLAINTIFFS' WITNESS, RESUMED**

5               REDIRECT EXAMINATION (Continued)

6   BY MR. QUINN:

7   Q    Mr. de Anda, I think you can take a seat.

8   A    All right.

9   Q    There is some question about social security numbers,

10  and I don't want to display this up on the screen, but if

11  you turn to page 1195RS-44 --

12          THE COURT:  And Counsel, do you both want to enter

13  into the stipulation so the jury knows?

14          MR. QUINN:  We do have a stipulation that there

15  are social security numbers in this document, including that

16  of Mr. Larian, and it's going to be redacted, but the social

17  security numbers are there.

18          THE COURT:  Yeah.  What counsel have agreed, many

19  of these documents that you see redactions in have

20  information that the Court's ordered to be redacted because

21  I didn't think it was relevant, but there is an awful lot of

22  information that's just very private, like a social security

23  number, and both counsel and the Court felt that that should

24  not become a matter of public record, so this is one of the

25  issues where one of the e-mails was put up with -- redacted

CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

73

1   but there was a social security number in the document, and

2   that was 1195 -- or 1195RS.

3            Counsel?

4            MR. QUINN:  Thank you, your Honor.

5   BY MR. QUINN:

6   Q   We are looking now at 1195RS-44, and it's very small,

7   and it's up on the screen, but it's so small, I'm sure

8   nobody can read it.

9        Do you, in fact, see social security numbers here in

10  this Locate Fast printout?

11  A   In the printout that I have where it shows "redacted,"

12  it does have the numbers, yes.

13  Q   And if you'd turn also to page -77, this is another

14  Locate Fast printout?

15  A   Yes.

16  Q   And does that indicate there under Angela Larian, the

17  printout included her social security number?

18  A   Yes.

19  Q   So that kind of information you could get by doing a

20  Locate Fast search, at least back in this time period; is

21  that true?

22  A   Back in this time period, yes.

23  Q   Now, you indicated that you're waiting on the legal

24  department to get back to you on this Toon Teenz issue.  You

25  don't have a law degree?

CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

74

```
1    A     No.

2    Q     Would you consider yourself qualified to make a

3    judgment as to whether or not something -- one doll is a

4    copyright infringement of another doll?

5              MS. KELLER:  Objection, your Honor.  This is

6    getting into the same area we previously discussed.

7              THE COURT:  It's sustained.

8    BY MR. QUINN:

9    Q     You've never taken a course in copyright?

10             MS. KELLER:  Same objection, your Honor.

11             THE COURT:  That's irrelevant.  He's not here for

12   that, Counsel.

13   BY MR. QUINN:

14   Q     And before we broke, I was asking you about that

15   anonymous letter.  Did you have any discussion with Mr. Kaye

16   about the possibility of bringing a lawsuit against

17   Mr. Larian or MGA or Carter Bryant based only on that

18   anonymous letter?

19             MS. KELLER:  Objection.  Irrelevant whether he had

20   a discussion with Mr. Kaye.

21             THE COURT:  Just a moment.

22             No, you can answer that question.  This is as to

23   Mr. Kaye.

24             THE WITNESS:  Thank you.

25             No, I did not.
```

1    BY MR. QUINN:

2    Q    And any such discussion with Mr. Eckert?

3    A    No.

4    Q    Prior to around Thanksgiving of 2003, did you have any

5    information that Mr. Bryant worked with MGA while he was an

6    employee of Mattel to create Bratz?

7    A    No.

8    Q    And did you learn around Thanksgiving of 2003 that

9    Mattel received some information from some attorneys in

10   Hong Kong?

11   A    I received -- I think it was sometime in '04 that we

12   did -- had back in '03, yes.

13            MR. QUINN:  Nothing further.  Thank you.

14            THE COURT:  Recross-examination, Ms. Keller.

15            MS. KELLER:  Thank you.

16            THE COURT:  On behalf Mr. Larian and MGA.

17                      **RECROSS-EXAMINATION**

18   BY MS. KELLER:

19   Q    So Mr. de Anda, you had had this meeting with Ivy Ross

20   and Cassidy Park in March of 2002, right?

21   A    Yes.

22   Q    And then in August of 2002, Alan Kaye had asked you to

23   start checking into the anonymous letter by talking to

24   Ms. Ross about it, right?

25   A    Yes, he asked me if there was any worth in talking to

1   Ivy about this.

2   Q    Did you call Ms. Ross in and interview her about the

3   anonymous letter?

4   A    I don't recall.

5   Q    Well, you haven't made any notes about doing that,

6   right?

7   A    I don't recall.

8   Q    Did you make any notes about it that appear in any of

9   the logs that you've looked at today?

10  A    No.

11  Q    Is there any documentation that you did any such thing?

12  A    Documentation, I haven't found any, no.

13  Q    And in fact, since Ivy Ross and Cassidy Park were the

14  ones who came in with the initial complaint, taking that

15  anonymous letter down to them and at least asking them, hey,

16  read this, do you have any idea who this might be from,

17  would have been a good idea, wouldn't it?

18  A    I don't know.

19  Q    You don't know because you didn't do it, right?

20  A    I don't know that I did or didn't.

21  Q    You just know that you have no documentation of it,

22  right?

23  A    That's correct.

24  Q    And in fact, in the whole investigation file, neither

25  you or anyone else documents any such conversation, correct?

1    A    That I showed the letter to --

2    Q    To Ivy Ross?

3    A    Right, that's correct.

4    Q    And in fact, there is no documentation in your

5    investigation file that anyone in security showed a copy of

6    that anonymous letter to either Cassidy Park or Ivy Ross,

7    right?

8    A    That's correct.

9    Q    And as head of the department, she would have been the

10    logical person to ask about it, right?

11    A    Ask about?

12    Q    The anonymous letter.

13    A    I don't -- I don't know that at this time to be a fact.

14    Q    And is there any documentation of your following up

15    with Alan Kaye and saying, Alan, this direction that maybe I

16    should start with Ivy Ross, I don't intend to do it; is

17    there any documentation of that?

18    A    No.

19    Q    Any e-mails to Mr. Kaye where you tell him, you know,

20    your suggestion, I'm not going to take it?

21    A    Not that I'm aware of.

22    Q    Now, when you had your meeting in March of 2002 with

23    Cassidy Park and Ivy Ross, their claim was that Mr. Bryant

24    saw Toon Teenz while he was an employee at Mattel, right?

25    A    Yes.

1    Q    And in fact, he would have had to have been an employee

2    at Mattel to have seen it because it was an unreleased

3    product, right?

4    A    Yes.

5    Q    And so, therefore, kept in a secure area in the design

6    center, true?

7    A    Kept within the design center.

8    Q    Which itself was secure?

9    A    Yes.

10   Q    And so their contention was, well he -- while he was a

11   Mattel employee, he saw Toon Teenz, and then he went out and

12   he basically created Bratz because he was looking at Toon

13   Teenz, right?

14   A    That's the assumption.

15   Q    Well, I mean, that's what they told you in the

16   conversation, whether it was true or not, right?

17   A    That's exactly, yes.

18   Q    And -- and so, of course, this would have had to have

19   been in 1999, right?

20   A    I'm sorry -- whenever he was employed there, yes,

21   probably in '99.

22   Q    And did you -- did you actually ask him when was the

23   Toon Teenz project done?

24   A    I don't know.

25   Q    Now, basically, as you said, the takeaway from that

1    conversation was that Carter Bryant had looked at

2    confidential proprietary Mattel information, and then he had

3    left Mattel's employment and had gone out and had gone to

4    MGA and had created these Bratz dolls, right?

5    A    Yes.

6    Q    And the idea that he created the Bratz dolls from

7    information that he got while he was a Mattel employee, did

8    you try to verify that?

9    A    It was told to me that he saw and made a comment to

10   Lily Martinez about her renderings, and they had a

11   conversation about it.

12   Q    And so was it your belief that even if he had taken the

13   idea of something that he got from looking at confidential

14   proprietary information while he worked at Mattel, that even

15   if he had taken the idea and had gone over to MGA and

16   created something from that idea, that still would have been

17   theft of proprietary information in your mind, right?

18   A    Yes.

19             MR. QUINN:  Objection.  Relevance.  Foundation.

20             THE COURT:  Overruled.

21   BY MS. KELLER:

22   Q    And that was a "yes"?

23   A    That was a "yes," sorry.

24   Q    Now, your responsibility at Mattel was to investigate

25   the potential misappropriation of proprietary information by

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 80 of 117   Page ID #:308264
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

80

1  employees who left the employment of Mattel, that was one of

2  your responsibilities, right?

3  A    It was a shared responsibility with legal.  It wasn't

4  my exclusive responsibility.

5  Q    Well, was it a responsibility that you had?

6  A    It's a response that I shared with legal, yes.

7  Q    And when you would do investigations -- you did other

8  investigations of whether employees had taken proprietary

9  information out of Mattel, right?

10  A    Yes.

11  Q    And in doing those investigations, you had come to

12  learn and understand that all Mattel employees had signed an

13  agreement obligating them to keep confidential the

14  proprietary information of Mattel, right?

15          MR. QUINN:  This is beyond the scope, your Honor.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18  BY MS. KELLER:

19  Q    And as head of global security for Mattel, you knew

20  that there was an agreement that the employee signed called

21  an inventions and confidentiality agreement, right?

22  A    I know of the agreement, yes.

23  Q    And so at the very minimum, then, you suspected in

24  March of 2002 that Carter Bryant had violated at least his

25  confidentiality agreement, right?

1    A     I did not know that because --

2    Q     I'm asking whether you suspected it.

3    A     Suspected?

4    Q     Yes.

5    A     There could be a possibility, yes.

6    Q     Okay.

7          Nothing further.

8              THE COURT:  Okay.  Mr. Cote?

9              MR. COTE:  Nothing, your Honor.

10             THE COURT:  Okay.  Mr. de Anda, we are asking all

11   of the witnesses to remain available until May 7th.  The

12   case is going to conclude, though, in the last part of

13   March, early April.  If we need you, we'll find you.  So you

14   go about your professional responsibility or any plans you

15   have, but be available until that date, sir.

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  You may step down, please.

18             Counsel, your next witness, please.

19             MR. ZELLER:  Mattel calls Jill Nordquist.

20             THE COURT:  And Ms. Nordquist, thank you.

21             Would you be kind enough to raise your right hand,

22   please.

23             **JILL NORDQUIST, PLAINTIFFS' WITNESS, SWORN**

24             THE WITNESS:  Yes.

25             THE COURT:  Thank you.

 1               If you'd come along the side of the jury well,

 2       please.

 3               Are you comfortable?

 4               Would you state your full name for the jury,

 5       please.

 6               THE WITNESS:  Jill Nordquist.

 7               THE COURT:  That chair doesn't move very far.  See

 8       if you can scoot in a little bit.

 9               Jill Nordquist, and would you spell your last

10       name.

11               THE WITNESS:  N-o-r-d-q-u-i-s-t.

12               THE COURT:  This will be direct examination by

13       Mr. Zeller on behalf of Mattel.

14               MR. ZELLER:  Thank you, your Honor.

15                        **DIRECT EXAMINATION**

16       BY MR. ZELLER:

17       Q    Good afternoon, Ms. Nordquist.

18       A    Good afternoon.

19       Q    You currently work for Mattel?

20       A    Yes.

21       Q    And for how long have you worked for Mattel?

22       A    Almost 14 years.

23       Q    And what's your current title at Mattel?

24       A    Senior director of marketing.

25       Q    And is there a particular area that you have

1    responsibility for?

2    A    Yes.  I work in the boys division, specifically the

3    entertainment brands.

4    Q    And when you say "entertainment brands," what do you

5    mean by that?

6    A    We make all of the toys to support brands like

7    Superman, Batman, Green Lantern, WWE.

8    Q    And where are your offices located?

9    A    In El Segundo, California.

10   Q    So you work at the parent company Mattel, Inc.?

11   A    Yes.

12   Q    If you could please take a look at Exhibit 7104, which

13   is in evidence.

14   A    Okay.

15   Q    Do you recognize this document?

16   A    Yes, I do.

17   Q    Please tell us what it is.

18   A    This is the Barbie 2005 Preliminary Line List, which

19   was part of our brand directional outline for 2005.

20   Q    And is this something that's sometimes also called the

21   "All Worlds" document?

22   A    Yes.

23   Q    And is it your understanding that this is a document

24   that was taken in April of 2004 by Mr. Machado, Mr. Vargas

25   and Ms. Trueba?

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 84 of 117   Page ID #:308268
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

84

1    A    Yes.

2            MR. COTE:  Objection.  Compound.  Lacks

3    foundation.

4            THE COURT:  Overruled.

5    BY MR. ZELLER:

6    Q    And please tell us, generally speaking, what's a line

7    list?

8            THE COURT:  Well, the word is "and" that you're

9    objecting to.  "And/or," any of the three.

10           MR. ZELLER:  And that was -- that is what I meant.

11   BY MR. ZELLER:

12   Q    All right.  If you could please tell us, generally

13   speaking, what a line list is there at Mattel.

14   A    The line list is a document that consists of every

15   single item or product that we will make during a given year

16   and contains information such as the description of the

17   product, how much -- how many units we'll manufacturer, what

18   we'll charge as our list price, what we'll sell on a

19   worldwide basis, what would be TV advertised, what our

20   margins are.

21   Q    And does this show that kind of information for

22   multiple products?

23   A    Yes.

24   Q    In fact, does it show it for the entire anticipated

25   line as of that time?

1    A      Yes.

2    Q      And focusing on the time period of April 2004, when

3    this document was taken, this was a forward-looking document

4    at the time?

5    A      Yes.

6    Q      So this was the plan -- Mattel's plan for the year 2005

7    for its product line?

8    A      Yes.

9    Q      And did you have a role in creating this document?

10   A      Yes, I did.

11   Q      What was your role?

12   A      I was a director of marketing, and I, along with some

13   colleagues, developed everything from the themes to the

14   specific items to what the prices should be, how many we

15   thought we should make, which items would be TV advertised,

16   which wouldn't; everything.

17   Q      And was this document created in Mexico?

18   A      No.

19   Q      Where was it created?

20   A      It was created in El Segundo in our offices.

21   Q      And who at Mattel, just kind of what functions,

22   generally speaking, use this kind of document, a line list,

23   a forward-looking line list?

24   A      At this preliminary stage, it's pretty much three-fold.

25   The first would be the marketing group would develop this to

1    determine what the framework of our 2005 line would be, and

2    then we would share it with our design and development

3    partner so that they could determine -- they could start

4    working on some of the concepts and determine what it would

5    cost to manufacture if it was manufacturable.  And then the

6    third piece would be for the finance team so that they would

7    be aware of what we were setting our financial goals for for

8    the -- the year.

9    Q    Is this something you would consider to be an important

10   document within Mattel?

11   A    Extremely, yes.

12   Q    And why is that?

13   A    Because this lists our entire line for every single

14   product what we were intending to make for 2005.

15   Q    So as of April of 2004, was this information

16   information that was shared outside of Mattel?

17   A    No.

18   Q    This line list that we are talking about, Exhibit 7104,

19   does that cover Mattel's plan line for 2005 for the entire

20   world?

21   A    Of Barbie?

22   Q    Yes.

23   A    Yes.

24   Q    So it's worldwide?

25   A    Yes.

1    Q    And so it includes the U.S. and every other market

2    around the world?

3    A    Yes.  There are columns that specifically break out

4    units and volume by U.S., international and then total

5    worldwide.

6    Q    So maybe if we can take a look at a couple of pages,

7    here, on this.  This is 7104, if we could look at -41.

8              MR. ZELLER:  Do you have that there, Ken?

9              Maybe we could blow up the bottom part that talks

10   about Hollywood.

11             THE WITNESS:  Okay.

12   BY MR. ZELLER:

13   Q    So you'll see here, just as an example to talk about,

14   the kind of information on this document on page -41, we

15   have "Wave 3, Hollywood backlot," and then it has

16   information below that, and then as well as, of course, to

17   the right; do you see that?

18   A    Yes.

19   Q    And so please tell us, generally, what does this show.

20   A    This specific page is the entire line for 2005 for

21   MyScene, and that portion that you've highlighted and

22   enlarged for me is Wave 3, specifically Hollywood, which

23   would be the items for the second part of the year, 7/1

24   through 12/31.

25   Q    And when you say the second part of the year, you are

1    referring to fall of 2005?

2    A    Yes.

3    Q    So this is the information within Mattel as of

4    April 2004 about a product that was to hit the market over a

5    year later, in the fall of 2005?

6    A    That's correct.

7    Q    And there are various columns there.

8            MR. ZELLER:  If we can get the columns at the top,

9    and then maybe put them next to it.

10   BY MR. ZELLER:

11   Q    There is an entry that says, after "toy name," "TV"?

12   A    Correct.

13   Q    And what does that information tell you?

14   A    That's a column that if you are planning on TV

15   advertising that item, you would put an X next to it

16   indicating that yes, you would TV advertise that item.

17   Q    All right.  And is it something that's valuable to a

18   competitor in the toy industry to know whether or not over a

19   year in advance a particular product is going to be TV

20   advertised?

21           MR. MC CONVILLE:  Objection.  Foundation.

22           THE COURT:  Overruled.

23   BY MR. ZELLER:

24   Q    You can go ahead.

25   A    I'm sorry, yes.

CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

89

1    Q    And please tell us why.

2              MR. MC CONVILLE:  Objection.  Foundation.

3              THE COURT:  Overruled.

4              You can answer the question.

5              THE WITNESS:  Sorry.

6              It would be -- it's -- it's highly proprietary

7    information, and it would be basically telling anybody

8    outside of the company what we were planning on doing and

9    what -- which items we consider to be our most valuable, per

10   se, items because we would choose to put TV against them and

11   generate the most volume against those items.

12   BY MR. ZELLER:

13   Q    And I take it by this time, in April 2004, for a fall

14   of 2005 product, Mattel wouldn't have shared that

15   information even with retailers?

16   A    That's correct.

17   Q    So it was purely internal Mattel information at that

18   time?

19   A    At that time, yes.

20   Q    And then I take it at some point it does become known

21   to others outside of Mattel whether or not a product is

22   going to be TV advertised?

23   A    Yes.

24   Q    But not as of this time, in April of 2004?

25   A    No.

CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

90

1   Q    That's correct?

2   A    Yes, that's correct.

3   Q    And then to take a couple more examples of the various

4   fields in here, you'll see that there is a -- an entry that

5   says column -- it's the column further to the right, and it

6   says "A" in quotation marks?

7   A    Yes.

8   Q    What's that referring to?

9   A    "A" is a Mattel term that we use for our list price.

10  Q    And so that's the expected price for the item?

11  A    That's the wholesale price that we sell it to

12  retailers.

13  Q    And I take it at that time, that was purely internal

14  Mattel information as well?

15  A    Yes.

16  Q    It hadn't been shared even with retailers as of that

17  time?

18  A    Correct.

19  Q    And would it be valuable information for a competitor

20  to have to know as of that time, in April of 2004, what the

21  wholesale price was that Mattel intended to sell an item

22  at?

23  A    Yes.

24  Q    And why is that?

25  A    Well, if you are a competitor and you knew what your

```
 1   competitor was pricing items for, you could price your own
 2   items accordingly.
 3   Q    And for the fall of 2005 products, and we've been --
 4   we've been talking about the April of 2004 time period and
 5   with this document in particular, is it the case that the
 6   products listed in here would have been shown to retailers
 7   the following year in 2005 at the New York toy fair?
 8   A    Fall items were always shown in the -- it would have
 9   been shown at -- I'm trying to remember the calendar now,
10   sorry.
11        Generally, a pre-toy fair, we would show spring of the
12   next year, and at toy fair, we would show fall of that year.
13   So it would be fall of -- I'm sorry, toy fair, February
14   New York toy fair of '05, we would show fall '05 products.
15   Q    So then just focusing on the fall 2005 products that
16   are shown in this document, those -- those products
17   eventually were shown to retailers at the New York toy fair
18   in February of 2005?
19   A    Correct.
20   Q    And then they were on the market, subsequently, for the
21   fall 2005 selling season?
22   A    Yes.
23   Q    And generally speaking in this time period in 2005,
24   when were the products actually hitting the market if they
25   were fall products?
```

1    A    Hitting the market?

2    Q    Right.  When they would actually be in the hands of the

3    retailers before on the shelves?

4    A    Anywhere between usually 6/1 to 8/1, so June to August

5    would be the time frame that retailers would receive the

6    goods and then set them on shelves.

7    Q    All right.  And then also on this document, there's a

8    field that's called "EA Target Margins"?

9    A    Yes.

10   Q    What does that mean?

11   A    EA is executive approval, and Target Margin would be

12   the marketing contribution, the margin we would target,

13   which is how much -- how much money we would make on a given

14   SKU, the profitability.

15   Q    So when you say "we," you are talking about Mattel's

16   internal profit margin?

17   A    Yes.

18   Q    And that's what was anticipated or projected for

19   these -- these products?

20   A    Yes.

21   Q    And is that the kind of information that's valuable for

22   a competitor to have over a year prior to the time the

23   product is shipped to retailers?

24   A    Yes.

25   Q    And why is that?

1    A    You can calculate how much profit we're making, and you

2    can use that to determine how you can provide perhaps a more

3    appealing retailer margin for the retailer.

4    Q    And does Mattel publicly release margins by brand or

5    by what people sometimes call "SKU" or "item"?

6    A    Not to my knowledge.

7    Q    You'll also see, and I think we can go to, perhaps, an

8    earlier page, -5, some of the products have a field that's

9    called "Rationale"?

10   A    Correct.

11   Q    And what is that referring to?

12   A    The rationale would be the reason behind each and every

13   SKU why we were creating it.

14   Q    All right.  And is that information that a

15   competitor -- what would be valuable to a competitor as of

16   the April 2004 time period?

17   A    Yes.

18   Q    And why is that?

19   A    Rationale, as you can see here, would range anywhere

20   from identifying what our TV advertised drivers were, as

21   well as identifying how we might take a world, like Fairy,

22   and extend it into different sized dolls or accessories.

23   Q    And where was the information reflected here in the

24   line list compiled from?  Where did they come from?

25   A    We usually did analyses, and we used everything from

1  research to trends we were seeing in the marketplace to

2  historical data.

3  Q    And about how long did it take to put this document

4  together?

5  A    This first draft took several months.  It was done over

6  the course of two to three months.

7  Q    And does this document in your view, as of the

8  April 2004 time period, have Mattel trade secret information

9  in it?

10  A    Yes.

11  Q    And for the reasons we've talked about?

12  A    Yes.

13  Q    Is the -- as of the April 2004 time period, was this

14  line list public in any way?

15  A    No.

16  Q    It wasn't shared with people outside of Mattel?

17  A    No.

18  Q    All right.  Is there anything that's specific in this

19  document to Mexico?

20  A    No.

21  Q    And when you worked on this document, was it stored

22  somewhere on Mattel computers?

23  A    Yes.  This document was on the Mattel network.

24  Q    And where was that network located?

25           MR. MC CONVILLE:  Objection.  Foundation.

```
 1            THE COURT:  Overruled.

 2            THE WITNESS:  In the United States.

 3   BY MR. ZELLER:

 4   Q    And was access to that system here in the United States

 5   restricted?

 6   A    Yes.

 7   Q    And how was it restricted?

 8   A    First and foremost, you had to be an employee of Mattel

 9   to have access to the Mattel network, and -- by way of

10   having a user name and a password, and --

11        Oh, that just disappeared.

12        -- and then the -- in order to get to that specific

13   document, you had to have access to a specific area within

14   the network.

15   Q    And was this -- this document, the access to it, was

16   protected by logins and passwords?

17   A    Yes.

18   Q    If you would please take a look at Exhibit -- well,

19   this exhibit we're talking about, 7104, was -- was protected

20   against improper access?

21   A    Yes.

22   Q    In the ways that you talked about?

23   A    Yes.

24   Q    And this document was created by Mattel, Inc.,

25   employees, employees here in the U.S.?
```

1   A     Yes.

2   Q     And at some point did you spend time to determine how

3   much money Mattel spent in just employee time to develop

4   this line list?

5   A     Yes, I did.

6   Q     And how much did it cost just in employee time to

7   develop as of, and we are focused on this exhibit -- I

8   apologize.  I'll find the number.  Seven --

9             (Attorney discussion held off the record.)

10  BY MR. ZELLER:

11  Q     7104.

12            MR. MC CONVILLE:  Objection.  Foundation.  It

13  hasn't been laid yet.

14            THE COURT:  I'd like to hear just a little bit

15  more foundation, once again, about what her actual position

16  was, what the depth of her involvement is.  Is she the top

17  of the chain?  And how she would have this information about

18  cost.

19            MR. ZELLER:  Certainly.

20            THE COURT:  Please.

21  BY MR. ZELLER:

22  Q     So let's step back a little bit.

23        You, yourself, was personally involved in the creation

24  of this document?

25  A     Correct.

1    Q    And would you say you were pretty extensively involved?

2    A    Yes.

3    Q    All right.  And you worked personally with other people

4    within different functions within Mattel to prepare it?

5    A    Yes.

6    Q    And if you could tell me, just generally speaking, some

7    of the groups you remember working with in order to -- and

8    bring them together to prepare this document?

9    A    I worked -- I was in marketing.  I worked with my -- I

10   was a director, and I worked with the other directors in

11   marketing, as well as a couple of the associate managers and

12   managers who reported to us.  We also worked with our design

13   counterparts, development and engineering counterparts and

14   the -- our research partners.

15              THE COURT:  But is she the person who is bringing

16   together these different directors?  In other words, I still

17   don't have a clear indication other than being -- not "other

18   than," but being --

19              Virtually, you being the marketing director, there

20   are other groups contributing to these -- this document.

21   That's what I need to know.

22   BY MR. ZELLER:

23   Q    If you could, please, tell us, then, what your

24   involvement was in terms of bringing the various other

25   directors together.  Were you a central repository for this

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 98 of 117   Page ID #:308282
CV 04-9049-DOC - 03/09/2011 - Day 30, Vol. 2 of 2

98

 1   information?  Did you coordinate it?  If you could tell us

 2   about that.

 3   A    I reported to the vice president of marketing.  It was

 4   her responsibility to have this developed.  She then handed

 5   it to me and my fellow directors, my counterparts, and we

 6   built this line list.  We created it from scratch, put it in

 7   the Mattel network, and then we worked with our respective

 8   counterparts in research and design and development to then

 9   gather the information, and then we, ourselves, physically

10   would type it into the document.

11   Q    And so was your -- your role in this a day-to-day

12   responsibility?

13   A    Yes.

14   Q    So while you reported to someone else for this,

15   ultimately, you were someone who had day-to-day lead

16   responsibility for it?

17   A    Yes.

18   Q    All right.  And at some point you undertook an effort

19   to determine how much it cost in employee time to pull this

20   document together and prepare it?

21   A    Yes --

22              MR. COTE:  Vague as to time.

23              THE COURT:  Overruled.

24              And your answer was "yes"?

25              THE WITNESS:  Yes.

1              THE COURT:  Thank you.

2    BY MR. ZELLER:

3    Q    And can you please tell us, generally speaking, what

4    did you do in order to determine that?

5    A    I identified the individuals who helped me prepare the

6    document.  By person, I identified how much time each person

7    spent over the course of the time that they helped develop

8    it, and then I multiplied the hours by an hourly rate.

9    Q    And what was the cost of development in terms of

10   employee time that -- that you decided or you reached?

11             MR. COTE:  Objection.  Foundation.

12             THE COURT:  Overruled.

13             You can --

14             THE WITNESS:  $202,000.

15             THE COURT:  And that's employee time?

16             THE WITNESS:  In employee hourly rate.

17             THE COURT:  Thank you.

18             THE WITNESS:  Yes.

19   BY MR. ZELLER:

20   Q    And that doesn't include other costs, just the employee

21   time?

22   A    Yes.

23   Q    If you can please take a look at Exhibit 7110.

24             MR. ZELLER:  This was on the CD, your Honor, so

25   it's already in evidence.

1   BY MR. ZELLER:

2   Q    And do you recognize this document?

3   A    I do.

4   Q    Was this something that you were involved with?

5   A    Yes.

6   Q    And did you actually create this document?

7   A    I did.

8   Q    And when did you create this document?

9   A    I created this document in -- I think it was

10  approximately June of 2003.

11  Q    And where did you actually prepare this document?

12  A    In my office in El Segundo.

13  Q    Is it your understanding that this is another document

14  that, some combination of Mr. Machado, Ms. Vargas --

15  Mr. Vargas and Ms. Trueba took?

16          MR. COTE:  Objection.

17          MR. MC CONVILLE:  Objection.  Foundation.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

20  BY MR. ZELLER:

21  Q    And that was, as you understood it, and we'll focus on

22  the April of 2004 time period?

23  A    Yes.

24  Q    So was this, as of the April 2004 time period, a

25  forward-looking document?

1    A    Yes.

2    Q    Because you'll see -- I mean, you put the title on here

3    of "Fall of 2004"?

4    A    Yes.

5    Q    So this was something that was planned as opposed to

6    something that already happened?

7    A    Correct.

8    Q    And this document is about something that says "Barbie

9    customized opportunities."  What are "customized

10   opportunities"?

11   A    "Customized" is the term that we used to describe an

12   item that is created exclusively for a retailer.

13   Q    And what's the purpose of -- of this document?  Why did

14   you create it?

15   A    I created it so that we would have guidelines as to

16   when we would or would not honor customized product.

17   Q    And generally speaking, why is it that retailers want

18   exclusives or customized opportunities, as you understand

19   it?

20   A    It gives them a reason for being a point of

21   differentiation.

22   Q    And when you say "differentiation," what do you mean by

23   that?

24   A    It gives them something that no other retailer will

25   have.

1   Q    Does Mattel benefit for offering exclusives to

2   retailers?

3   A    Yes.

4   Q    And how does Mattel benefit in that way?

5   A    Customized opportunities are only given as an

6   incremental opportunity, so this would be incremental volume

7   to the basic line that's offered to retailers.

8   Q    Now, these guidelines that you developed as reflected

9   in this document, were they specific or unique to Mexico?

10  A    No.

11  Q    What -- what was the geographic area that these

12  guidelines covered?

13  A    May I look at the document?

14  Q    Yes.

15  A    It addresses global accounts, it addresses the MOQs

16  that are required to create an item.

17  Q    What's an MOQ?

18  A    Minimum order quantity.

19  Q    And why is -- why is that kind of criteria important?

20  A    That's the minimum order that is required for the plant

21  to actually produce an item at a profitable level.

22  Q    Is the information that's reflected in this document

23  something that as of the April 2004 time period was shared

24  with people outside of Mattel?

25  A    No.

1    Q    Was this a document that was provided to retailers?

2    A    No.

3    Q    Were the details of these criteria for exclusives given

4    to retailers?

5    A    No.

6    Q    And why didn't you share them with the public or even

7    retailers?

8    A    Because it contains proprietary information.

9    Q    In what way is it proprietary?

10   A    It tells what the strategies are that we, at Mattel,

11   employ.  It discusses our profitability by way of

12   illustrating what the MOQs are for both packaging and

13   product.

14   Q    And is this information that was valuable for a

15   competitor to have in the April of 2004 time period?

16             MR. MC CONVILLE:  Objection.  Foundation.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes.

19   BY MR. ZELLER:

20   Q    Please tell us why.

21   A    If a competitor would know what our guidelines were, it

22   could help give them insight and possibly give them a leg up

23   to create something maybe more desirable.

24   Q    Did you save a copy of this Exhibit 7110 in electronic

25   form on Mattel's computers?

1   A     Yes.

2   Q     What Mattel computers were they -- was this document

3   kept on?

4   A     The same Mattel network in the U.S.

5   Q     And -- and that same system was restricted in the ways

6   that you talked about earlier?

7   A     Yes.

8   Q     Do you know a Mariana Trueba?

9   A     Yes.

10  Q     You actually dealt with her when she worked at Mattel?

11  A     Yes, I did.

12  Q     All right.  And did Ms. Trueba ever ask you to provide

13  her with confidential Mattel information that she ordinarily

14  would not have access to?

15           MR. MC CONVILLE:  Objection.  Vague.

16           MR. COTE:  Foundation.

17           THE COURT:  Overruled.  This is her opinion about

18  what confidential information is.

19           That doesn't mean it is or it isn't, but you can

20  state your answer.

21           THE WITNESS:  Yes.

22  BY MR. ZELLER:

23  Q     Please take a look at Exhibit 8147.

24        Do you recognize this?

25  A     I do.

1   Q   Was this an e-mail you were involved in?

2   A   Yes.

3   Q   Back in -- what's the date of it?

4   A   March 11, 2004.

5           MR. ZELLER:  I would move into evidence 8147.

6           THE COURT:  Received.

7           (Plaintiffs' Exhibit No. 8147 is received in

8       evidence.)

9   BY MR. ZELLER:

10  Q   Please tell us what this e-mail exchange was.

11  A   It was Mariana asking me who could send her the Barbie

12  2004 viability results.

13  Q   And this was on this particular date, March 11th, 2003?

14  A   Yes.

15  Q   And what -- what is it -- and by the way, when you

16  received this e-mail from Ms. Trueba, she sent it to you

17  while you were in El Segundo in your office?

18  A   Yes.

19  Q   And you don't have any reason to doubt that she knew

20  you were here in the United States, right?

21  A   Yes.

22  Q   You --

23  A   I mean, I have no reason to believe that she felt that

24  I was anywhere other than the U.S.

25  Q   Let me try it this way:  You dealt with her in the

1   past?

2   A    Correct.

3   Q    And it was certainly your understanding that she was

4   aware that you worked at Mattel, Inc., at the headquarters?

5   A    Yes.

6   Q    And you mentioned that what she was asking for was

7   something called a viability report?

8   A    Yes.

9   Q    What is a viability report, just generally speaking?

10  A    It's a report that's conducted by our research group,

11  and it gauges the appeal or viability of a product line.

12  Q    Is it something that you would consider to be an

13  important or sensitive document?

14  A    Yes.

15  Q    And why is that?

16  A    Because it takes the product line for that year and

17  determines on an item-by-item basis how many appeal each

18  item has.

19  Q    And there's a Theresa Wilbur who's mentioned on this

20  e-mail?

21  A    Yes.

22  Q    Was she also here in the United States?

23  A    Yes, she was.

24  Q    And other than Ms. Wilbur, who is on this e-mail, did

25  you ever discuss Ms. Trueba's request for this viability

1    report with anyone else?

2    A    Yes, I did.

3    Q    Who did you discuss it with?

4    A    Vivian Weisman.

5    Q    And who was she?

6    A    She was a coworker.

7    Q    Here in the United States as well?

8    A    Yes, in El Segundo.

9    Q    All right.  And what did you and she discuss?

10            MR. MC CONVILLE:  Objection.  Relevance.  Hearsay.

11            MR. COTE:  Also hearsay.

12            THE COURT:  Just a moment.

13            No.  Overruled.

14            You can answer that question.  You're an actual

15    participant in this conversation?

16            THE WITNESS:  Yes.

17            THE COURT:  Overruled.

18            THE WITNESS:  On the date that I received the

19    information, I didn't consult Vivi.  However, when I learned

20    that Mariana had left the company, I mentioned to Vivi that

21    I -- that it was interesting that she had left because she

22    had just, a couple weeks prior, had asked me for proprietary

23    information.

24    BY MR. ZELLER:

25    Q    And you thought that was a little unusual?

1   A     Yes.

2   Q     Did you discuss anything else with Ms. Weisman?

3              MR. MC CONVILLE:  Objection.  Relevance.  Hearsay.

4              THE COURT:  Just a moment.

5              And once again, let me find out who Ms. Weisman

6   is, once again.

7              MR. ZELLER:  She was --

8              THE COURT:  In other words, I don't know if she's

9   a coworker or the head of your management team.

10  BY MR. ZELLER:

11  Q     If you could please tell us what her position was at

12  the time there at Mattel, Inc.

13  A     She was a coworker in Barbie marketing.

14  Q     And she worked --

15             THE COURT:  This may be hearsay.

16             This simply goes to state of mind, then, to show

17  that the witness was concerned at this time.  So the

18  conversation itself is hearsay, but the conduct and actions

19  and her thought process may go to credibility as well, okay?

20             Counsel?

21  BY MR. ZELLER:

22  Q     And so could you please tell us was there anything else

23  that you discussed with her at that time?

24  A     She also had received requests for information from

25  Mariana.

1    Q    And did you and she then, at some point, reported to --

2    to the lawyers?

3    A    Yes, we did.

4    Q    Have you ever heard of something called "Swappin'

5    Styles"?

6    A    Yes, I have.

7    Q    If you could please take a look at Exhibit 24297.  It's

8    actually a tangible item.

9    A    Sorry.

10   Q    Do you recognize this?

11   A    I do.

12   Q    What do you recognize it as?

13   A    As MyScene Swappin' Styles.

14   Q    This is a product that Mattel came out with?

15   A    Yes.

16   Q    Do you know a Ron Brawer?

17   A    I do.

18   Q    And was Mr. Brawer, at one time, with Mattel?

19   A    Yes, he was.

20   Q    Do you know what level he was within Mattel?

21   A    At the time that he left Mattel?

22   Q    Yes.

23   A    I believe he was a senior vice president.

24   Q    And he left in about the October of 2004 time period?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 110 of 117   Page ID #:308294
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

110

1   Q    Do you know if Ron Brawer, while he was still at

2   Mattel, ever saw Swappin' Styles prior to the time that

3   Mattel released the doll?

4            MR. MC CONVILLE:  Your Honor, objection.  Based on

5   the claims, this is irrelevant.

6            THE COURT:  No.  Overruled.

7            You can answer the question.

8            THE WITNESS:  Yes, he did.

9   BY MR. ZELLER:

10  Q    And, in fact, Mr. Brawer then went to MGA in October of

11  2004?

12  A    Yes.

13  Q    If you please take a look at Exhibit 8989.

14  A    Yes.

15           MR. ZELLER:  And your Honor, I would move Exhibit

16  24297 into evidence.  It's the doll.

17           THE COURT:  Let me see the doll.

18           MR. MC CONVILLE:  Relevance.

19           THE COURT:  All right.  Received.

20           (Plaintiffs' Exhibit No. 24297 is received in

21       evidence.)

22  BY MR. ZELLER:

23  Q    Do you recognize Exhibit 8989?

24  A    Yes.

25  Q    And what is it?

1    A    This is an e-mail from me to my senior vice president.

2              MR. ZELLER:  I would move Exhibit 8989 into

3    evidence.

4              MR. MC CONVILLE:  Relevance.

5              THE COURT:  Who was your senior vice president?

6              THE WITNESS:  Tim Kilpin.

7              THE COURT:  Okay.

8              Overruled.  It's received.

9              *(Plaintiffs' Exhibit No. 8989 is received in*

10       *evidence.)*

11   BY MR. ZELLER:

12   Q    And then focusing on the e-mail that you were involved

13   with here, there's one dated September 17, 2004?

14   A    Yes.

15   Q    And it has a subject of "line review"?

16   A    Yes.

17   Q    What's the line review?

18   A    We had just completed our global line reviews, I

19   believe, in -- just prior to this date, where we show our

20   entire offerings for the next season to our salespeople and

21   our subsidiaries from around the world.

22   Q    So this is an internal Mattel review of products that

23   are to be released at some point in the future?

24   A    Yes.

25   Q    And there was such a line review in September of 2004?

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 112 of 117   Page ID #:308296
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

112

1   A    I'm not sure if it was September or August, but yes, in

2   that approximate time frame.

3   Q    Approximately around the time of this e-mail?

4   A    Yes.

5   Q    And during that line review, was there something called

6   "Too Popular," T-o-o Popular, that was part of the line

7   review?

8   A    Yes.

9   Q    And was that what became Swappin' Styles?

10  A    Yes.

11  Q    And maybe if you can just tell us a little bit about,

12  what was the -- what was the idea behind Swappin' Styles?

13          THE COURT:  Okay.  Counsel, you are over your 30

14  minutes.  Do you want to use that 30 minutes you had in

15  rebuttal also?

16          MR. ZELLER:  Yes, sir, just to finish this up.

17          THE COURT:  All right.

18          THE WITNESS:  The concept was that you could take

19  different hairstyles and mix them and match them by popping

20  one head off of -- taking one head and popping it onto the

21  doll, or taking that off and popping a different head onto

22  the doll.

23  BY MR. ZELLER:

24  Q    And that was for fashion dolls?

25  A    It was for the MyScene fashion doll line.

1    Q    All right.  And as of the time of this e-mail, 8989,

2    and at the time of the line review, had Mattel disclosed Too

3    Popular or Swappin' Styles to the public?

4    A    No.

5    Q    It was still an internal Mattel project at the time?

6    A    Yes.

7    Q    Was it -- was Too Popular and Swappin' Styles public by

8    the time Mr. Brawer left Mattel in October of 2004 --

9    A    No.

10   Q    -- the following month after this e-mail?

11   A    No.

12   Q    And Mr. Brawer saw Too Popular, which later became

13   Swappin' Styles, as part of this line review?

14   A    Yes.

15   Q    And do you see that referenced somewhere in

16   Exhibit 8989?

17   A    Yes.

18   Q    Perhaps is that the part where it says, "On 8/9, the

19   following MyScene items were presented at global line

20   reviews with Ron present"?

21   A    Yes.

22   Q    And "Ron" is Ron Brawer?

23   A    Yes.

24   Q    So if you can perhaps read Item Number 1 for us.

25   A    "Too Popular, mix and match the hairstyle and fashion

 1    by removing the head and replacing it with another.  It

 2    comes with four heads and complete fashions."

 3         Should I continue?

 4    Q    Yes, please.

 5    A    "Comments by Ron:  Thumbs up, really strong, make it

 6    $20 A versus 15 A and keep all the piece count."

 7    Q    And "Ron" here, again, refers to Ron Brawer?

 8    A    Yes.

 9    Q    And what did the A, what was that referred to?

10    A    The list or wholesale price.

11    Q    And then it says, "Keep all the piece count"; what's

12    that mean?

13    A    That means that all of the other pieces you get with

14    the doll, whether they be hair brushes or fashions or other

15    items.

16    Q    So was Mr. Brawer directing that the -- the price of

17    this item should actually be increased from $15 to $20?

18    A    It appears so, yes.

19    Q    And then after this, about October 4th, right after

20    this e-mail, Mr. Brawer went to MGA?

21    A    Yes.

22    Q    And after Mr. Brawer left Mattel and went to MGA, did

23    MGA come out with a product that had swapping heads or

24    changeable heads?

25    A    Yes.

1   Q     What was that product called?

2   A     I believe it was called "Head Games."

3   Q     If you could please take a look at Exhibit 24298.

4         Do you recognize this?

5   A     Yes.

6   Q     What is this?

7   A     It's the Bratz Head Games item.

8              MR. ZELLER:  I would move Exhibit 24298 into

9   evidence?

10             THE COURT:  Received.

11             *(Plaintiffs' Exhibit No. 24298 is received in*

12         *evidence.)*

13  BY MR. ZELLER:

14  Q     And generally speaking, what is -- what is this Head

15  Games product?

16  A     It shows -- it shows a fashion doll with a head on it,

17  as well as three accompanying heads that you can mix and

18  match.

19  Q     And so it was the same concept of the -- of a fashion

20  doll having these changeable heads with hairstyles that

21  Swappin' Styles had?

22  A     Yes.

23  Q     The same concept that Mr. Brawer had seen prior to the

24  time he left Mattel?

25  A     Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10182   Filed 03/11/11   Page 116 of 117   Page ID #:308300
CV 04-9049-DOC – 03/09/2011 – Day 30, Vol. 2 of 2

116

```
 1              MR. ZELLER:  Nothing further, your Honor.

 2              THE COURT:  All right.

 3              Now, ladies and gentlemen, I'm going to send you

 4   home this evening.  We'll start the cross-examination

 5   tomorrow, Ms. Hurst?

 6              MR. MC CONVILLE:  Yes, sir.

 7              THE COURT:  Or Mr. McConville?

 8              All right.  You are admonished not to discuss this

 9   matter amongst yourselves, nor form or express any opinion

10   concerning this case.  See you tomorrow.  Please drive safe.

11              Please return tomorrow morning and be seated.

12              THE WITNESS:  Okay.

13              THE COURT:  All right.  We are off the record for

14   just a moment, Counsel.

15              (Discussion held off the record.)

16              THE COURT:  Okay.  Counsel, I'll see you between

17   8:00 and 9:00 this evening.

18              (Recess.)

19              (No further proceedings reported.)

20                              -oOo-

21

22

23

24

25
```

1                              -oOo-

2                          **CERTIFICATE**

3

4         I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  March 10, 2011

12

13

14         _____

15         JANE C.S. RULE, U.S. COURT REPORTER
           CSR NO. 9316

16

17

18

19

20

21

22

23

24

25