1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3         **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                     )
              Plaintiffs,             )
7                                     )
        vs.                           ) No. CV 04-9049 DOC
8                                     )    Day 31
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                     )
                                      )
10             Defendants.            )
   _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Jury Trial

16                 Santa Ana, California

17               Thursday, March 10, 2011

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141
24

25  04cv9049 Mattel 2011-03-10 D31V1

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 2 of 139   Page ID #:308303
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
                 QUINN EMANUEL URQUHART & SULLIVAN
4                BY:  JOHN QUINN
                      WILLIAM PRICE
5                     MICHAEL T. ZELLER
                      Attorneys at Law
6                865 South Figueroa Street
                 10th Floor
7                Los Angeles, California 90017
                 (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12               ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                 BY:  THOMAS S. McCONVILLE
13                    Attorney at Law
                 4 Park Plaza
14               Suite 1600
                 Irvine, California 92614
15               (949) 567-6700

16               - AND -

17               ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                 BY:  ANNETTE L. HURST
18                    Attorney at Law
                 405 Howard Street
19               San Francisco, California 94105
                 (415)773-5700
20
                 - AND -
21
                 KELLER RACKAUCKAS
22               BY:  JENNIFER KELLER
                      Attorney at Law
23               18500 Von Karman Avenue
                 Suite 560
24               Irvine, California 92612
                 (949) 476-8700
25

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 3 of 139   Page ID #:308304
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
           LAW OFFICES OF MARK E. OVERLAND
5          By:  MARK E. OVERLAND
                 Attorney at Law
6          100 Wilshire Boulevard
           Suite 950
7          Santa Monica, California 90401
           (310) 459-2830
8
           - AND -
9
           SCHEPER KIM & HARRIS LLP
10         BY:  ALEXANDER H. COTE
                Attorney at Law
11         601 West 5th Street
           12th Floor
12         Los Angeles, California 90071
           (213) 613-4660
13

14   ALSO PRESENT:

15         MGA ENTERTAINMENT, INC.
           BY:  JEANINE PISONI
16              Attorney at Law
           16360 Roscoe Boulevard
17         Suite 105
           Van Nuys, California 91406
18

19         ROBERT A. ECKERT, MATTEL CEO

20         ISAAC LARIAN, MGA CEO

21         KEN KOTARSKI, Mattel Technical Operator

22         MIKE STOVALL, MGA Technical Operator

23         RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24         CARLOS GUSTAVO MACHADO GOMEZ

25

Case 2:04-cv-09049-DOC-RNB  Document 10183  Filed 03/11/11  Page 4 of 139  Page ID #:308305
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

4

1                          **I N D E X**

2  **WITNESSES**                **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**

3  NORDQUIST, Jill

4  By Mr. Zeller               7                    45

5  By Mr. McConville                    9

6  By Mr. Cote                          18                      57

7

   WARD, James
8
   By Mr. Zeller              63                    70
9
   By Mr. McConville                   67                      71
10

11  WILLENSKY, Allison

12  By Mr. Zeller              74                   115

13  By Mr. Cote                         82

14  By Ms. Hurst                        83                     131

15

16

17                          **EXHIBITS**

18  **EXHIBIT NO.**                 **IDENTIFICATION**   **IN EVIDENCE**

19    6739    2004 Girls' Full Year                      75
              Viability Testing in
20            Mexico

21    8099    State of Barbie report                     91
              dated 2/3/1997
22
      8100    Mattel June 1996 Girls'                    89
23            Tracking Study report

24    8101    State of Barbie report                     93
              dated 7/21/1997
25

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

5

**EXHIBITS (Continued)**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 8102 | Summary of Research on Older Girls and Barbie report dated 10/7/1997 | 96 |
| 8105-A | Mattel research report re: toy packaging dated 1/29/1998 | 96 |
| 8106-A | 1998 Girls' Tracking Study in Europe dated 6/1/1998 | 97 |
| 8172 | Presentation made by Ms. Willensky and Mr. Shore September 1999 | 99 |
| 8175 | Memo from Ms. Polk proposing MyScene cannibalization study dated 12/3/2002 | 132 |
| 8176 | Market Share Defense Task Force Research Team, Action Items | 108 |
| 8190 | Girls' Monthly Brand Tracking Study dated 8/25/2004 | 114 |
| 8193 | Report summarizing Barbie brand from 1991 to 1999 | 115 |
| 9698 | New Brand Cannibalization Study dated 1/14/2002 | 104 |
| 9699 | New Brand Cannibalization Study dated 1/14/2002 | 104 |
| 9700 | New Brand Cannibalization Study dated 1/14/2002 | 104 |

1                        **EXHIBITS (Continued)**

2     **EXHIBIT NO.**                **IDENTIFICATION**      **IN EVIDENCE**

3

4        23415    Shorties in packaging                      53

5        23430    Document of word on BDO                    52
                  and line list compiled
6                 by Ms. Nordquist

7        34475    Shorties in packaging                      15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

7

|  |  |  |
|---|---|---|
|  | 1 | **SANTA ANA, CALIFORNIA, THURSDAY, MARCH 10, 2011** |
|  | 2 | **Day 31, Volume 1 of 3** |
|  | 3 | (8:56 a.m.) |
| 08:56 | 4 | *(In the presence of the jury.)* |
| 08:56 | 5 | THE COURT:  All right.  Then we're back in |
| 08:56 | 6 | session.  The jury's present.  The alternates are present, |
| 08:56 | 7 | all counsel, the parties, and the witness. |
| 08:56 | 8 | And last evening you'd asked to reopen briefly. |
| 08:56 | 9 | That's granted on behalf of Mattel. |
| 10:21 | 10 | **JILL NORDQUIST, MATTEL'S WITNESS, PREVIOUSLY SWORN** |
| 10:21 | 11 | **RESUMED THE STAND** |
| 08:56 | 12 | THE COURT:  This is Mr. Zeller, who has a few more |
| 08:56 | 13 | questions. |
| 08:56 | 14 | MR. ZELLER:  Thank you, Your Honor. |
| 08:56 | 15 | **DIRECT EXAMINATION (Resumed)** |
| 08:56 | 16 | BY MR. ZELLER: |
| 08:56 | 17 | Q.   Good morning, Ms. Nordquist. |
| 08:56 | 18 | A.   Good morning. |
| 08:56 | 19 | Q.   Just as a brief matter, if you can please take a look |
| 08:56 | 20 | at this product that should be up there in front of you. |
| 08:57 | 21 | It's Exhibit 24316. |
| 08:57 | 22 | A.   Yes. |
| 08:57 | 23 | Q.   Do you recognize what this is? |
| 08:57 | 24 | A.   I do. |
| 08:57 | 25 | Q.   Tell us -- tell us what it is, please. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:57 | 1 | A.   This is MyScene Swappin' Styles. |
| 08:57 | 2 | Q.   So this is the one with the interchangeable heads that |
| 08:57 | 3 | we had talked about? |
| 08:57 | 4 | A.   Yes. |
| 08:57 | 5 | Q.   And this was the first release? |
| 08:57 | 6 | A.   Yes. |
| 08:57 | 7 | Q.   Do you know who the designer was on this product? |
| 08:57 | 8 | A.   Yes, I do. |
| 08:57 | 9 | Q.   Who was that? |
| 08:57 | 10 | A.   Lily Martinez. |
| 08:57 | 11 | Q.   And do you know who was the designer of the original |
| 08:57 | 12 | MyScene dolls? |
| 08:57 | 13 | MR. McCONVILLE:  Objection.  Relevance. |
| 08:57 | 14 | THE COURT:  Overruled. |
| 08:57 | 15 | You can answer that question. |
| 08:57 | 16 | BY MR. ZELLER: |
| 08:57 | 17 | Q.   Who was that? |
| 08:57 | 18 | A.   Lily Martinez. |
| 08:57 | 19 | Q.   And that's who's here today? |
| 08:57 | 20 | A.   Yes. |
| 08:57 | 21 | MR. ZELLER:  Thank you very much. |
| 08:57 | 22 | THE COURT:  Cross-examination.  Mr. McConville on |
| 08:57 | 23 | behalf of MGA and Mr. Larian. |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 08:57 | 1 | **CROSS-EXAMINATION** |
| 08:57 | 2 | BY MR. McCONVILLE: |
| 08:57 | 3 | Q.    Ms. Nordquist, you knew Carter Bryant when he was |
| 08:57 | 4 | employed at Mattel as a designer, correct? |
| 08:58 | 5 | A.    Yes, I did. |
| 08:58 | 6 | Q.    In fact, you had daily interaction with him; is that |
| 08:58 | 7 | right? |
| 08:58 | 8 | A.    Almost daily, yes. |
| 08:58 | 9 | Q.    And at some point when -- uh, you learned that Carter |
| 08:58 | 10 | Bryant was resigning his position from Mattel; is that |
| 08:58 | 11 | correct? |
| 08:58 | 12 | A.    Yes. |
| 08:58 | 13 | Q.    And when you learned that he was resigning his position |
| 08:58 | 14 | at Mattel, you went to go talk to him, correct? |
| 08:58 | 15 | A.    I went to see him when I was already going to a meeting |
| 08:58 | 16 | in his building. |
| 08:58 | 17 | Q.    So you went to go talk to him, right? |
| 08:58 | 18 | A.    Yes. |
| 08:58 | 19 | Q.    Okay.  And then, during that conversation, you asked |
| 08:58 | 20 | him whether he was going to work for a competitor, right? |
| 08:58 | 21 | A.    I first asked him where he was going. |
| 08:58 | 22 | Q.    During that conversation, you asked him whether he was |
| 08:58 | 23 | going to go work for a competitor, correct? |
| 08:58 | 24 | A.    Yes. |
| 08:58 | 25 | Q.    And he told you no, correct? |

| | | |
|---|---|---|
| 08:58 | 1 | A.   That's correct, he said, "No." |
| 08:58 | 2 | Q.   And at that time you did not believe his statement, |
| 08:58 | 3 | correct? |
| 08:58 | 4 | A.   Because he didn't want to tell me where he was going, I |
| 08:58 | 5 | didn't believe him. |
| 08:58 | 6 | Q.   Right.   These are yes/noes. |
| 08:59 | 7 | A.   Oh, okay. |
| 08:59 | 8 | Q.   Okay.   I appreciate your thought processes. |
| 08:59 | 9 |         MR. ZELLER:   I'm going to ask that that be |
| 08:59 | 10 | stricken.   He can ask a "yes" or "no" question and say it's |
| 08:59 | 11 | yes or no if he wants. |
| 08:59 | 12 |         THE COURT:   All right.   Sustained. |
| 08:59 | 13 | BY MR. McCONVILLE: |
| 08:59 | 14 | Q.   You were concerned after your meeting with Carter |
| 08:59 | 15 | Bryant that he, in fact, was going to go work for a |
| 08:59 | 16 | competitor, correct? |
| 08:59 | 17 | A.   Yes. |
| 08:59 | 18 | Q.   And at the conclusion -- and then at some point Carter |
| 08:59 | 19 | Bryant left Mattel, right? |
| 08:59 | 20 | A.   Yes. |
| 08:59 | 21 | Q.   And he then, uh -- you ultimately learned that -- well, |
| 08:59 | 22 | let me ask you this: |
| 08:59 | 23 |     While Carter Bryant was employed at Mattel, you |
| 08:59 | 24 | considered him to be a generic designer, correct? |
| 08:59 | 25 | A.   Yes. |

| 08:59 | 1 | MR. ZELLER:  Objection.  Vague. |
|---|---|---|
| 08:59 | 2 | THE COURT:  Overruled. |
| 08:59 | 3 | BY MR. McCONVILLE: |
| 08:59 | 4 | Q.   And he was a generic designer, correct? |
| 08:59 | 5 | A.   Yes. |
| 08:59 | 6 | Q.   And that you thought he was known for designing pretty |
| 09:00 | 7 | dresses, right? |
| 09:00 | 8 | A.   Yes. |
| 09:00 | 9 | Q.   And at some point in 2001, you learned that the Bratz |
| 09:00 | 10 | doll had come to the marketplace, right? |
| 09:00 | 11 | A.   Correct. |
| 09:00 | 12 | Q.   And it was at that point -- do you remember when in |
| 09:00 | 13 | 2001? |
| 09:00 | 14 | A.   I believe it was the summer of 2011 -- of 2001. |
| 09:00 | 15 | Q.   Okay.  So the summer of 2001, you learned that Bratz |
| 09:00 | 16 | was in the marketplace, right? |
| 09:00 | 17 | A.   Correct. |
| 09:00 | 18 | Q.   And at that point in 2001, you also learned -- and you |
| 09:00 | 19 | knew that Bratz was an MGA product, correct? |
| 09:00 | 20 | A.   I don't remember if -- when I first learned that Bratz |
| 09:00 | 21 | came out who it was manufactured by. |
| 09:00 | 22 | Q.   Okay.  In any event, in the summer 2001, you also -- |
| 09:01 | 23 | you also spoke to people in the Mattel design center about |
| 09:01 | 24 | Carter Bryant's involvement with the Bratz doll that was now |
| 09:01 | 25 | on the market, correct? |

| 09:01 | 1 | A.    Yes. |
|---|---|---|
| 09:01 | 2 | Q.    And in the Mattel design center in 2001, there was a |
| 09:01 | 3 | belief that Carter Bryant had worked on the Bratz doll that |
| 09:01 | 4 | was now in the market, correct? |
| 09:01 | 5 | A.    Yes. |
| 09:01 | 6 | Q.    And you heard that from multiple people, right? |
| 09:01 | 7 | A.    I believe I heard it from two to three people. |
| 09:01 | 8 | Q.    And after you learned this from people in the design |
| 09:01 | 9 | center, you then had a conversation with someone named Anne |
| 09:01 | 10 | Parducci, correct? |
| 09:01 | 11 | A.    Yes. |
| 09:01 | 12 | Q.    And Anne Parducci was -- what was her title at the |
| 09:01 | 13 | time? |
| 09:01 | 14 | A.    I believe at the time she was the senior vice |
| 09:01 | 15 | president. |
| 09:01 | 16 | Q.    And after you learned -- well, let me ask you this: |
| 09:01 | 17 | You spoke with Anne Parducci.  Did you ever speak with |
| 09:02 | 18 | Richard de Anda at that time in 2001 about Carter Bryant's |
| 09:02 | 19 | involvement in the development of Bratz? |
| 09:02 | 20 | A.    I don't remember. |
| 09:02 | 21 | Q.    Okay.  Do you remember speaking to Richard de Anda in |
| 09:02 | 22 | 2001 at all? |
| 09:02 | 23 | A.    I'm sure I did. |
| 09:02 | 24 | Q.    Okay.  But do you remember speaking to him in |
| 09:02 | 25 | connection with an investigation of Carter Bryant? |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

13

| | | |
|---|---|---|
| 09:02 | 1 | A.   I do not remember. |
| 09:02 | 2 | Q.   Okay.  And when the doll came out in 2001 -- I'm sorry. |
| 09:02 | 3 | When the Bratz doll came out in 2001, you believed that it |
| 09:02 | 4 | was a knockoff of Diva Starz, correct? |
| 09:02 | 5 | A.   When I first saw the Bratz doll, I thought it had a big |
| 09:02 | 6 | head and big feet like the Bratz -- I'm sorry, like the Diva |
| 09:02 | 7 | Starz doll, and I referred to it as a knockoff, yes. |
| 09:02 | 8 | Q.   So Diva Starz came out before Bratz, right? |
| 09:02 | 9 | A.   Yes. |
| 09:02 | 10 | Q.   And Diva Starz had a big head, right?  Correct? |
| 09:02 | 11 | A.   It did. |
| 09:02 | 12 | Q.   You have to answer audibly. |
| 09:02 | 13 | A.   I'm sorry.  I said, "Correct." |
| 09:03 | 14 | Q.   Okay.  And Bratz had a big head, right? |
| 09:03 | 15 | A.   Correct. |
| 09:03 | 16 | Q.   Diva Starz had big eyes, right? |
| 09:03 | 17 | A.   Yes. |
| 09:03 | 18 | Q.   Bratz had big eyes, right? |
| 09:03 | 19 | A.   Yes. |
| 09:03 | 20 | Q.   Diva Starz had big feet? |
| 09:03 | 21 | A.   Yes. |
| 09:03 | 22 | Q.   And Bratz had big feet, right? |
| 09:03 | 23 | A.   Yes. |
| 09:03 | 24 | Q.   Diva Starz had an attitude? |
| 09:03 | 25 | A.   I didn't work on the product, so I can't speak to the |

| | | |
|---|---|---|
| 09:03 | 1 | positioning or the attitude. |
| 09:03 | 2 | Q.   Doesn't scream attitude to you, the Diva Starz? |
| 09:03 | 3 | A.   No.  They're talking dolls.  I don't know what they |
| 09:03 | 4 | scream. |
| 09:03 | 5 | Q.   It screams -- never mind. |
| 09:03 | 6 | A.   Okay. |
| 09:03 | 7 | Q.   But in any event, uh, your conclusion was in 2001 |
| 09:03 | 8 | that -- that the Bratz doll was a knockoff of Diva Starz, |
| 09:03 | 9 | correct? |
| 09:03 | 10 | A.   Yes, I made that comment. |
| 09:03 | 11 | Q.   You were, uh, asked some questions about, uh -- about a |
| 09:03 | 12 | doll with a swapping head.  Do you remember that? |
| 09:04 | 13 | A.   Yesterday? |
| 09:04 | 14 | Q.   Yeah. |
| 09:04 | 15 | A.   Or in general? |
| 09:04 | 16 | Q.   I'm sorry, yes.  Yesterday. |
| 09:04 | 17 | A.   Yes. |
| 09:04 | 18 | Q.   I'd like to put in front of you Exhibit 34475 and ask |
| 09:04 | 19 | you to take a look at that. |
| 09:04 | 20 | *(Document provided to the witness.)* |
| 09:04 | 21 | BY MR. McCONVILLE: |
| 09:04 | 22 | Q.   Do you recognize it? |
| 09:04 | 23 | A.   I do. |
| 09:04 | 24 | Q.   What is it? |
| 09:04 | 25 | A.   Shorties. |

| | | |
|---|---|---|
| 09:04 | 1 | Q.   Is that a Mattel product? |
| 09:04 | 2 | A.   Yes, it was. |
| 09:04 | 3 | MR. McCONVILLE:  Your Honor, I'd like to admit |
| 09:04 | 4 | 34475. |
| 09:04 | 5 | THE COURT:  Received. |
| 09:04 | 6 | *(Exhibit No. 34475 received in evidence.)* |
| 09:04 | 7 | *(Document displayed.)* |
| 09:04 | 8 | BY MR. McCONVILLE: |
| 09:04 | 9 | Q.   And you said this is a Mattel doll, correct? |
| 09:04 | 10 | A.   It was, yes. |
| 09:04 | 11 | Q.   I'm sorry.  It was a Mattel doll? |
| 09:04 | 12 | A.   Yes. |
| 09:04 | 13 | Q.   Do you remember when it came out? |
| 09:04 | 14 | A.   No, I didn't work on Shorties. |
| 09:04 | 15 | MR. McCONVILLE:  Can we go to the very bottom of |
| 09:04 | 16 | the document in the lower left.  See if we can enlarge that. |
| 09:04 | 17 | *(Technician complies.)* |
| 09:04 | 18 | BY MR. McCONVILLE: |
| 09:04 | 19 | Q.   Okay.  Okay.  Do you see when it was available? |
| 09:05 | 20 | A.   Yes. |
| 09:05 | 21 | Q.   When was it available? |
| 09:05 | 22 | A.   It says, "availability July 2004." |
| 09:05 | 23 | Q.   Okay.  So presumably, as of July 2004, the Shorties was |
| 09:05 | 24 | in market, right? |
| 09:05 | 25 | A.   Correct. |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

16

09:05   1    Q.   And if you look at this Shorties doll, it's fair to say

09:05   2    that it's a doll whose head pops off, correct?

09:05   3    A.   Well, from this image?

09:05   4    Q.   Well, from the -- from the doll.  I thought you were

09:05   5    familiar with it?

09:05   6    A.   Yeah, I've seen it in the office.

09:05   7    Q.   Right.  Are you familiar that the head pops off the

09:05   8    doll?

09:05   9    A.   I believe that it had changing bodies, yes.

09:05   10    Q.   Well, can you change the body without removing the

09:05   11    head?

09:05   12    A.   I don't know.  I haven't tried that.  But, yes, it had

09:05   13    interchangeable parts.

09:05   14    Q.   Which would include a head being put on different

09:05   15    bodies, right?

09:05   16    A.   Correct.

09:05   17    Q.   Okay.  And one final question.  You were asked

09:05   18    questions concerning, um, the value to competitors of

09:06   19    certain things you described as trade secrets.  Do you

09:06   20    remember that?

09:06   21    A.   I do.

09:06   22    Q.   And is it -- is it fair to say that if -- that if MGA

09:06   23    didn't even know that these documents that you're talking

09:06   24    about existed, that they would have no value to MGA?

09:06   25           MR. ZELLER:  Assumes facts.

09:06  1          THE COURT:  Well, I'm not -- I'm not sure of the

09:06  2  question, Counsel.

09:06  3          MR. McCONVILLE:  Okay.

09:06  4  BY MR. McCONVILLE:

09:06  5  Q.   These documents that you described as trade secrets,

09:06  6  you said they would be valuable to a competitor, correct?

09:06  7  A.   Correct.

09:06  8  Q.   They would be -- only be valuable to a competitor if

09:06  9  the competitor had the documents, correct?

09:06  10  A.   If a competitor had them in their possession?

09:06  11  Q.   Yes.

09:06  12  A.   Yes.

09:06  13  Q.   So if a competitor doesn't even know that the documents

09:06  14  exist, they cannot be valuable to the competitor, correct?

09:06  15  A.   No.

09:06  16          MR. ZELLER:  It's vague.

09:06  17  BY MR. McCONVILLE:

09:06  18  Q.   So there's value to the competitor, theoretically,

09:06  19  knowing that Mattel has a document; is that correct?

09:06  20  A.   There's value to the document.

09:07  21  Q.   I understand.  Okay.  The document has value if it is

09:07  22  known to a competitor, right?

09:07  23  A.   No.  A value has -- sorry -- a document has value.

09:07  24  Q.   I understand.  You were asked questions concerning

09:07  25  whether or not the document had value to a competitor.

| | | |
|---|---|---|
| 09:07 | 1 | A.   Yes. |
| 09:07 | 2 | Q.   Right? |
| 09:07 | 3 | It has no value to the competitor if the competitor |
| 09:07 | 4 | doesn't have the document, correct? |
| 09:07 | 5 | MR. ZELLER:  Misspeaks the witness's testimony. |
| 09:07 | 6 | It's asked and answered. |
| 09:07 | 7 | THE COURT:  Overruled. |
| 09:07 | 8 | You can answer. |
| 09:07 | 9 | THE WITNESS:  I don't agree. |
| 09:07 | 10 | BY MR. McCONVILLE: |
| 09:07 | 11 | Q.   Okay.  So in your mind, the document has value to a |
| 09:07 | 12 | competitor if it's on Mattel's system? |
| 09:07 | 13 | A.   Yes. |
| 09:07 | 14 | MR. McCONVILLE:  Okay.  No further questions. |
| 09:07 | 15 | THE COURT:  Mr. Cote, do you have questions? |
| 09:07 | 16 | MR. COTE:  I do.  Thank you. |
| 09:07 | 17 | **CROSS-EXAMINATION** |
| 09:07 | 18 | BY MR. COTE: |
| 09:07 | 19 | Q.   Good morning, Ms. Nordquist. |
| 09:08 | 20 | A.   Good morning. |
| 09:08 | 21 | Q.   In how many countries did Mattel have offices during |
| 09:08 | 22 | 2004? |
| 09:08 | 23 | A.   I don't know that I know that exact number. |
| 09:08 | 24 | Q.   Well, can you give me an estimate? |
| 09:08 | 25 | A.   Uh, maybe around 30 different countries; I don't know. |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

19

| | | |
|---|---|---|
| 09:08 | 1 | Q.    Around 30 is your best estimate? |
| 09:08 | 2 | A.    Yes. |
| 09:08 | 3 | Q.    And was the number about the same in 2003? |
| 09:08 | 4 | A.    I don't know. |
| 09:08 | 5 | Q.    Did you have a rapid international growth in 2004, |
| 09:08 | 6 | where you opened up new offices in lots of different |
| 09:08 | 7 | countries? |
| 09:08 | 8 | A.    I wouldn't know that. |
| 09:08 | 9 | Q.    Now, Mattel creates documents that are important for |
| 09:08 | 10 | all of the offices and all the countries to have access to, |
| 09:08 | 11 | right? |
| 09:08 | 12 | A.    Correct. |
| 09:08 | 13 | Q.    And they're important because they have information |
| 09:08 | 14 | that those subsidiaries or those offices need to know to |
| 09:08 | 15 | sell the dolls, right? |
| 09:09 | 16 | A.    Correct. |
| 09:09 | 17 | Q.    And we talked about Exhibit 7104 yesterday, which is |
| 09:09 | 18 | the preliminary line list, and we talked about 7110, which |
| 09:09 | 19 | was that customized guidelines document.  Do you remember |
| 09:09 | 20 | talking about those documents yesterday? |
| 09:09 | 21 | A.    I do. |
| 09:09 | 22 | Q.    Those two exhibits contain some of this information |
| 09:09 | 23 | that is important for the offices in other countries to know |
| 09:09 | 24 | about, right? |
| 09:09 | 25 | A.    Can we separate the two documents in your question? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

20

| | | |
|---|---|---|
| 09:09 | 1 | Q.   Okay.  Well, okay.  Does the -- does the preliminary |
| 09:09 | 2 | line list contain information that it's important for the |
| 09:09 | 3 | subsidiaries to know -- let me rephrase that -- that's |
| 09:09 | 4 | important for the offices in the other countries to know? |
| 09:09 | 5 | A.   No, because that document wasn't widely distributed |
| 09:09 | 6 | outside of the U.S. |
| 09:09 | 7 | Q.   So that document was not -- that document did not |
| 09:09 | 8 | contain information that was necessary for the offices in |
| 09:10 | 9 | other countries to know about; is that right? |
| 09:10 | 10 | A.   The document that you showed to me yesterday, at the |
| 09:10 | 11 | time that that document was created, was not distributed |
| 09:10 | 12 | outside of the U.S. |
| 09:10 | 13 | MR. COTE:  Could we put up 7104 on the screen, |
| 09:10 | 14 | please. |
| 09:10 | 15 | *(Document displayed.)* |
| 09:10 | 16 | MR. COTE:  Your Honor, I would like to read a |
| 09:10 | 17 | couple sentences from Mattel's interrogatory responses |
| 09:10 | 18 | regarding this document.  I have copies for everyone. |
| 09:10 | 19 | MR. ZELLER:  We haven't gone over these. |
| 09:10 | 20 | THE COURT:  Unless I've seen them, Counsel -- were |
| 09:10 | 21 | they called to my attention? |
| 09:10 | 22 | MR. COTE:  It's impeachment, Your Honor. |
| 09:10 | 23 | THE COURT:  Regardless, let me see them. |
| 09:10 | 24 | If you were going to use those, you should have |
| 09:10 | 25 | been here at 9:00 o'clock last night.  Why am I getting |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

21

| 09:11 | 1 | these now?  Now, have I seen these before, Counsel? |
| 09:11 | 2 | MR. COTE:  I didn't know how the witness was going |
| 09:11 | 3 | to answer the question, Your Honor. |
| 09:11 | 4 | THE COURT:  Well, what do you want to read from? |
| 09:11 | 5 | MR. COTE:  I was under the impression we were |
| 09:11 | 6 | allowed to hold back impeachment documents. |
| 09:11 | 7 | THE COURT:  Well, occasionally you are, but I want |
| 09:11 | 8 | to know when that occurs. |
| 09:11 | 9 | MR. COTE:  It's the two sentences on page 108, |
| 09:11 | 10 | Your Honor. |
| 09:11 | 11 | THE COURT:  I've got Interrogatory No. 20.  Just a |
| 09:11 | 12 | moment. |
| 09:12 | 13 | Reask the question, so I understand, Counsel, what |
| 09:12 | 14 | the impeachment is. |
| 09:12 | 15 | MR. COTE:  Certainly. |
| 09:12 | 16 | BY MR. COTE: |
| 09:12 | 17 | Q.   The line list, the preliminary line list that's in |
| 09:12 | 18 | front of you, Exhibit 7104, that contains information that |
| 09:12 | 19 | the employees in the offices outside the United States at |
| 09:12 | 20 | Mattel needed to do their jobs, right? |
| 09:12 | 21 | A.   Not at the point in time that this was created. |
| 09:12 | 22 | MR. COTE:  Your Honor. |
| 09:12 | 23 | MR. ZELLER:  This isn't impeachment. |
| 09:12 | 24 | MR. COTE:  Same Bates number, Your Honor. |
| 09:12 | 25 | THE COURT:  Just a moment. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:12 | 1 | I don't understand how this is impeachment, |
| 09:12 | 2 | Counsel.  You can ask her about it.  You can show it to her. |
| 09:13 | 3 | MR. COTE:  Let me ask -- |
| 09:13 | 4 | THE COURT:  It's not impeachment at the present |
| 09:13 | 5 | time. |
| 09:13 | 6 | MR. COTE:  Let me ask one more question, |
| 09:13 | 7 | Your Honor. |
| 09:13 | 8 | BY MR. COTE: |
| 09:13 | 9 | Q.   While Ms. Trueba was working at Mattel Servicios, she |
| 09:13 | 10 | actually used line lists like Exhibit 7104 in order to |
| 09:13 | 11 | figure out which products to sell in Mexico, right? |
| 09:13 | 12 | A.   I don't know how Mariana used documents to determine |
| 09:13 | 13 | her line. |
| 09:13 | 14 | Q.   Well, you just said that you knew she didn't have it, |
| 09:13 | 15 | right? |
| 09:13 | 16 | MR. ZELLER:  Misstates the witness's testimony. |
| 09:13 | 17 | THE WITNESS:  I don't understand the question. |
| 09:13 | 18 | THE COURT:  I don't either, Counsel. |
| 09:13 | 19 | BY MR. COTE: |
| 09:13 | 20 | Q.   Ms. Trueba worked in Mexico, right? |
| 09:13 | 21 | A.   Yes. |
| 09:13 | 22 | Q.   And one of her jobs in Mexico was selecting which |
| 09:13 | 23 | Barbie dolls to actually sell in the Mexican market, right? |
| 09:13 | 24 | A.   Correct. |
| 09:13 | 25 | Q.   You didn't sell every Barbie doll in the Mexico market, |

| | | |
|---|---|---|
| 09:13 | 1 | right? |
| 09:13 | 2 | A.   I don't know which dolls they sold. |
| 09:14 | 3 | Q.   And in order to pick which dolls were sold and which |
| 09:14 | 4 | dolls were not sold, she had to have the complete list to |
| 09:14 | 5 | make that choice, right? |
| 09:14 | 6 | A.   Not a line -- |
| 09:14 | 7 | MR. ZELLER:  Objection.  Vague as to time. |
| 09:14 | 8 | THE COURT:  Overruled. |
| 09:14 | 9 | You can answer the question. |
| 09:14 | 10 | THE WITNESS:  Not a line list. |
| 09:14 | 11 | BY MR. COTE: |
| 09:14 | 12 | Q.   So she -- is it your testimony that she did not use a |
| 09:14 | 13 | line list to make that selection? |
| 09:14 | 14 | A.   She would not have used this line list. |
| 09:14 | 15 | Q.   And what's the Bates number on that document, just so |
| 09:14 | 16 | we have it for the record, please?  Do you know what I mean |
| 09:14 | 17 | by Bates number? |
| 09:14 | 18 | A.   I don't know what a Bates number -- |
| 09:14 | 19 | Q.   It's the number on the bottom that starts with "MGA." |
| 09:14 | 20 | A.   Oh, okay.  Yes. |
| 09:14 | 21 | Q.   Can you read that into the record, please? |
| 09:14 | 22 | A.   3815506.013308. |
| 09:14 | 23 | MR. COTE:  Your Honor, it's the same Bates number. |
| 09:15 | 24 | THE COURT:  Just a moment.  What was the date of |
| 09:15 | 25 | this filing? |

Case 2:04-cv-09049-DOC-RNB  Document 10183  Filed 03/11/11  Page 24 of 139  Page ID
#:308325
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

24

| | | |
|---|---|---|
| 09:15 | 1 | MR. COTE:  The signature page is on the last page, |
| 09:15 | 2 | Your Honor.  It's October 26th, 2010. |
| 09:15 | 3 | THE COURT:  All right.  You may read, Counsel. |
| 09:15 | 4 | MR. COTE:  I'm reading from Interrogatory No. 20. |
| 09:15 | 5 | The question is:  "Identify with specificity each |
| 09:15 | 6 | alleged trade secret, including the identity of each |
| 09:15 | 7 | document that embodies or refers or relates to each alleged |
| 09:15 | 8 | trade secret." |
| 09:15 | 9 | And the part of the answer that I'm gonna read is: |
| 09:15 | 10 | "MGA 3815506013308 through MGA 3815506013353." |
| 09:16 | 11 | That's the same Bates number on the document in |
| 09:16 | 12 | front of you, right?  The 13308? |
| 09:16 | 13 | THE WITNESS:  Yes. |
| 09:16 | 14 | BY MR. COTE: |
| 09:16 | 15 | Q.  And the answer is:  "While at Mattel, Trueba used line |
| 09:16 | 16 | lists like this to figure out what products would be sold in |
| 09:16 | 17 | Mexico." |
| 09:16 | 18 | Now, after -- |
| 09:16 | 19 | MR. ZELLER:  Your Honor, he didn't read the entire |
| 09:16 | 20 | statement. |
| 09:16 | 21 | THE COURT:  Read the entire -- the entire |
| 09:16 | 22 | interrogatory, Counsel, the entire response. |
| 09:16 | 23 | MR. COTE:  The response goes for pages, |
| 09:16 | 24 | Your Honor. |
| 09:16 | 25 | THE COURT:  Counsel. |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

25

| 09:16 | 1 | MR. COTE:  I have to get it. |
| 09:17 | 2 | "After the document is finalized, it is |
| 09:17 | 3 | provided --" |
| 09:17 | 4 | THE COURT:  You can read down to their specific |
| 09:17 | 5 | needs on the first page.  The rest is irrelevant. |
| 09:17 | 6 | MR. COTE:  "After the document is finalized, this |
| 09:17 | 7 | provided --" |
| 09:17 | 8 | MR. ZELLER:  I'm sorry, Your Honor.  He's still |
| 09:17 | 9 | not reading -- |
| 09:17 | 10 | THE COURT:  Yeah.  Counsel, start -- |
| 09:17 | 11 | MR. COTE:  I'm sorry. |
| 09:17 | 12 | THE COURT:  -- with the beginning -- |
| 09:17 | 13 | MR. COTE:  I'm sorry. |
| 09:17 | 14 | THE COURT:  -- "While at Mattel." |
| 09:17 | 15 | MR. COTE:  Okay.  I'll start -- I missed a |
| 09:17 | 16 | sentence.  I'm sorry. |
| 09:17 | 17 | "While at Mattel, Trueba used line lists like this |
| 09:17 | 18 | to figure out what products would be sold in Mexico.  The |
| 09:17 | 19 | list is used --" |
| 09:17 | 20 | THE COURT:  "This list." |
| 09:17 | 21 | MR. COTE:  "This list is used by a small group of |
| 09:17 | 22 | Mattel employees in the," quote, "'conceptual development |
| 09:17 | 23 | phase,'" closed quote, "for each of the products mentioned |
| 09:17 | 24 | in the document.  After the document is finalized, it is |
| 09:17 | 25 | provided to each of the brand and group managers at each of |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

26

| | | |
|---|---|---|
| 09:18 | 1 | Mattel's subsidiaries in order for them to review and place |
| 09:18 | 2 | orders for products according to their specific needs." |
| 09:18 | 3 | BY MR. COTE: |
| 09:18 | 4 | Q.   The other document we talked about yesterday was the |
| 09:18 | 5 | customized guidelines.  That was Exhibit 711 –– I'm sorry –– |
| 09:18 | 6 | 7110. |
| 09:18 | 7 | A.   Yes. |
| 09:18 | 8 | *(Document provided to the witness.)* |
| 09:18 | 9 | *(Document displayed.)* |
| 09:18 | 10 | BY MR. COTE: |
| 09:18 | 11 | Q.   Do you have that in front of you? |
| 09:18 | 12 | A.   I do. |
| 09:18 | 13 | Q.   This document also contains information that the |
| 09:18 | 14 | offices outside of the United States needed to know to do |
| 09:18 | 15 | their jobs, to sell the Barbie dolls, right? |
| 09:18 | 16 | A.   Yes. |
| 09:18 | 17 | Q.   And to make sure that the offices outside the |
| 09:18 | 18 | United States had this information, the documents were |
| 09:18 | 19 | mailed to them, right? |
| 09:18 | 20 | A.   Not by me. |
| 09:18 | 21 | Q.   But by someone at Mattel? |
| 09:19 | 22 | A.   Presumably. |
| 09:19 | 23 | Q.   And after they were mailed, each of those offices had |
| 09:19 | 24 | their own copy of those documents, right? |
| 09:19 | 25 | A.   I assume if they were mailed, they would have received |

| | | |
|---|---|---|
| 09:19 | 1 | their copy. |
| 09:19 | 2 | Q.   Mailed or e-mailed? |
| 09:19 | 3 | A.   I didn't personally send them, so I can't attest to how |
| 09:19 | 4 | they were delivered. |
| 09:19 | 5 | Q.   But either way, they would have their own copies, |
| 09:19 | 6 | right? |
| 09:19 | 7 | A.   Yes. |
| 09:19 | 8 | Q.   So they didn't need to log into or access the U.S. |
| 09:19 | 9 | system to get this information, right? |
| 09:19 | 10 | MR. ZELLER:  Calls for speculation. |
| 09:19 | 11 | THE COURT:  Overruled. |
| 09:19 | 12 | You can answer the question if you know. |
| 09:19 | 13 | THE WITNESS:  The document was only stored in the |
| 09:19 | 14 | Mattel network, which is based in the U.S.  So the only way |
| 09:19 | 15 | they could have -- they could not have logged into the U.S. |
| 09:19 | 16 | to get them. |
| 09:19 | 17 | BY MR. COTE: |
| 09:19 | 18 | Q.   There was a copy in the U.S.  That's your testimony, |
| 09:19 | 19 | right? |
| 09:19 | 20 | A.   Yes. |
| 09:19 | 21 | Q.   But if copies were e-mailed to all of the subsidiaries, |
| 09:19 | 22 | then they would have copies in their e-mail, right? |
| 09:20 | 23 | A.   If they were e-mailed, yes. |
| 09:20 | 24 | MR. COTE:  I'd like to put in front of the witness |
| 09:20 | 25 | Exhibit 8864. |

| 09:20 | 1 | Put that on the screen too, please. |
| 09:20 | 2 | This is in evidence, Your Honor. |
| 09:20 | 3 | THE COURT:  Thank you. |
| 09:20 | 4 | *(Document provided to the witness.)* |
| 09:20 | 5 | *(Document displayed.)* |
| 09:20 | 6 | BY MR. COTE: |
| 09:20 | 7 | Q.   This is an e-mail from Carol Lyn Robinson, which is |
| 09:20 | 8 | Ms. Wilbur's assistant, right? |
| 09:20 | 9 | A.   Correct. |
| 09:20 | 10 | Q.   Therese Wilbur, correct? |
| 09:20 | 11 | A.   Correct. |
| 09:20 | 12 | Q.   And this is sent to -- rather, I'm talking about the |
| 09:20 | 13 | bottom e-mail of the document.  This is sent to a large |
| 09:20 | 14 | number of people, right? |
| 09:20 | 15 | A.   Yes. |
| 09:21 | 16 | Q.   Including Mariana Trueba, the last line right above the |
| 09:21 | 17 | cc.  About the middle of the -- I know it's hard to read. |
| 09:21 | 18 | A.   Yes. |
| 09:21 | 19 | THE COURT:  Just a moment.  Are you on this e-mail |
| 09:21 | 20 | chain also? |
| 09:21 | 21 | Counsel, do you know if she's on this e-mail |
| 09:21 | 22 | chain? |
| 09:21 | 23 | MR. COTE:  I don't believe she is, Your Honor. |
| 09:21 | 24 | But it was produced by Mattel. |
| 09:21 | 25 | MR. McCONVILLE:  It's in evidence already. |

| | | |
|---|---|---|
| 09:21 | 1 | MR. COTE:  It's in evidence. |
| 09:21 | 2 | BY MR. COTE: |
| 09:21 | 3 | Q.   So I'm not sure if I heard your answer.  The question |
| 09:21 | 4 | was:  Ms. Trueba is copied on this e-mail, right? |
| 09:21 | 5 | A.   Yes.  You've highlighted it. |
| 09:21 | 6 | Q.   And the other -- some of the other people on this |
| 09:21 | 7 | e-mail are employees in other offices of Mattel throughout |
| 09:21 | 8 | the United States, right? |
| 09:21 | 9 | A.   Correct. |
| 09:21 | 10 | Q.   You recognize some of the names? |
| 09:21 | 11 | A.   Some of them. |
| 09:21 | 12 | Q.   And you recognize 'em to be people who worked outside |
| 09:21 | 13 | the United States for Mattel, right? |
| 09:21 | 14 | A.   Yes. |
| 09:21 | 15 | Q.   And the attachment to this e-mail is the Barbie |
| 09:22 | 16 | customized fall guidelines, right? |
| 09:22 | 17 | A.   Yes. |
| 09:22 | 18 | Q.   And the e-mail says, "Attached are the guidelines for |
| 09:22 | 19 | customized products and global account exclusives." |
| 09:22 | 20 | That's the first sentence of the e-mail, right? |
| 09:22 | 21 | A.   Yes. |
| 09:22 | 22 | Q.   If you skip down a line, "a CD-ROM with all product |
| 09:22 | 23 | images will be sent to the attention of WW product managers |
| 09:22 | 24 | April 2, 2004," right? |
| 09:22 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 30 of 139   Page ID #:308331
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

30

| | | |
|---|---|---|
| 09:22 | 1 | Q.   So the customized guidelines are e-mailed, and then a |
| 09:22 | 2 | CD is sent following up, right? |
| 09:22 | 3 | A.   Appears so. |
| 09:22 | 4 | Q.   So once Ms. Trueba received this e-mail, she didn't |
| 09:22 | 5 | need to go to the United States computer servers to get this |
| 09:22 | 6 | document anymore, right? |
| 09:22 | 7 | MR. ZELLER:  Assumes facts. |
| 09:22 | 8 | THE COURT:  Overruled. |
| 09:23 | 9 | You can answer the question, if you know. |
| 09:23 | 10 | THE WITNESS:  Okay. |
| 09:23 | 11 | So can you -- I'm sorry.  Can you ask the question |
| 09:23 | 12 | again? |
| 09:23 | 13 | BY MR. COTE: |
| 09:23 | 14 | Q.   Once Ms. Trueba received this e-mail -- |
| 09:23 | 15 | A.   Correct. |
| 09:23 | 16 | Q.   -- she had the customized guidelines in her in-box, |
| 09:23 | 17 | right? |
| 09:23 | 18 | A.   Yes. |
| 09:23 | 19 | Q.   Her in-box in Mexico? |
| 09:23 | 20 | A.   Correct. |
| 09:23 | 21 | MR. COTE:  Just a moment, Your Honor. |
| 09:23 | 22 | BY MR. COTE: |
| 09:23 | 23 | Q.   And, in fact, Ms. Trueba couldn't log onto the |
| 09:23 | 24 | United States computer systems from Mexico, right? |
| 09:23 | 25 | MR. ZELLER:  Assumes facts. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 31 of 139   Page ID #:308332
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

31

| | | |
|---|---|---|
| 09:23 | 1 | THE COURT:  Overruled. |
| 09:23 | 2 | THE WITNESS:  To my knowledge, no.  But I'm not an |
| 09:23 | 3 | IT expert.  But I would assume so. |
| 09:23 | 4 | BY MR. COTE: |
| 09:23 | 5 | Q.   I had a double negative.  Let me ask the question a |
| 09:23 | 6 | different way. |
| 09:23 | 7 | Could Ms. Trueba log into the U.S. system from her desk |
| 09:23 | 8 | in Mexico? |
| 09:24 | 9 | A.   I don't know how her system was mapped.  I know that I |
| 09:24 | 10 | can only log into the U.S. from my computer. |
| 09:24 | 11 | Q.   You can't log into Mexico's system? |
| 09:24 | 12 | A.   Not that I know of. |
| 09:24 | 13 | Q.   You understand Mexico has its own internal system, |
| 09:24 | 14 | right? |
| 09:24 | 15 | A.   Yes. |
| 09:24 | 16 | Q.   And the reason why this e-mail -- this e-mail was sent |
| 09:24 | 17 | with the attachment was because those employees couldn't get |
| 09:24 | 18 | to the U.S. copy of it, right? |
| 09:24 | 19 | A.   It was sent with a copy. |
| 09:24 | 20 | Q.   Right.  Because they couldn't log into the U.S. system |
| 09:24 | 21 | and get it there, right? |
| 09:24 | 22 | A.   That's what it appears to be. |
| 09:24 | 23 | Q.   Does it appear to be anything else? |
| 09:24 | 24 | A.   No. |
| 09:24 | 25 | Q.   Now, let's look at the preliminary line list again, |

| | | |
|---|---|---|
| 09:24 | 1 | which is 7104, I believe. |
| 09:25 | 2 | (Document provided to the witness.) |
| 09:25 | 3 | (Document displayed.) |
| 09:25 | 4 | BY MR. COTE: |
| 09:25 | 5 | Q.   You testified about the cost of making this document, |
| 09:25 | 6 | right? |
| 09:25 | 7 | A.   I did. |
| 09:25 | 8 | Q.   And those costs were employment costs or labor costs, |
| 09:25 | 9 | right? |
| 09:25 | 10 | A.   I believe they were hourly rates. |
| 09:25 | 11 | Q.   So you had to figure out the number of hours spent on |
| 09:25 | 12 | it and then the hourly rates of the individuals who did the |
| 09:25 | 13 | work, right? |
| 09:25 | 14 | A.   Correct. |
| 09:25 | 15 | Q.   I didn't hear you? |
| 09:25 | 16 | A.   Correct. |
| 09:25 | 17 | Q.   Who were the individuals who worked on this document? |
| 09:25 | 18 | A.   There was a list of individuals that ranged in their |
| 09:25 | 19 | roles from marketing, design, uh, engineering, development, |
| 09:25 | 20 | and research. |
| 09:25 | 21 | Q.   Who made the list? |
| 09:25 | 22 | A.   Of who the people were that worked -- who determined |
| 09:25 | 23 | who worked on it? |
| 09:25 | 24 | Q.   Who made the list? |
| 09:26 | 25 | A.   Of who worked on it? |

| | | |
|---|---|---|
| 09:26 | 1 | Q.   Yes. |
| 09:26 | 2 | A.   I created the list. |
| 09:26 | 3 | Q.   And when did you do that? |
| 09:26 | 4 | A.   I don't remember the exact date. |
| 09:26 | 5 | Q.   Was it in the last couple of months? |
| 09:26 | 6 | A.   I don't know if it was in the last couple of months or |
| 09:26 | 7 | if it was in the last six months or twelve -- I -- I don't |
| 09:26 | 8 | remember the exact date I did it. |
| 09:26 | 9 | Q.   You can't narrow it down for me at all? |
| 09:26 | 10 | A.   Probably in the last -- definitely in the last, let's |
| 09:26 | 11 | say, twelve months, I think. |
| 09:26 | 12 | Q.   When did you last look at the list? |
| 09:26 | 13 | A.   Yesterday. |
| 09:26 | 14 | Q.   And who were the individuals on that list? |
| 09:26 | 15 | A.   Do you need me to refer -- do you need me to go through |
| 09:26 | 16 | the list? |
| 09:26 | 17 | Q.   I'm just asking -- |
| 09:26 | 18 | A.   Or just from memory? |
| 09:26 | 19 | Q.   I'm just asking you if you know who's on the list.  You |
| 09:26 | 20 | looked at it yesterday, right? |
| 09:26 | 21 | A.   Yes. |
| 09:26 | 22 | Q.   Who's on it? |
| 09:26 | 23 | A.   I was on it.  My boss, Russell Arons, was on it.  The |
| 09:26 | 24 | head of design at the time was on it.  My counterparts in |
| 09:27 | 25 | marketing who were other directors were on it, a few of our |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 34 of 139   Page ID #:308335
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:27 | 1 | direct reports were on it.  Uh, some of the leads in design |
| 09:27 | 2 | who reported into the head of design were on it.  A couple |
| 09:27 | 3 | of women from research, and I believe maybe one or two |
| 09:27 | 4 | people from the development or engineering area. |
| 09:27 | 5 | Q.   Well, let's take Mr. Arons.  Is that his name? |
| 09:27 | 6 | A.   No.  It was a woman. |
| 09:27 | 7 | Q.   Ms. Arons? |
| 09:27 | 8 | A.   Yes. |
| 09:27 | 9 | Q.   That's your boss? |
| 09:27 | 10 | A.   At the time she was, yes. |
| 09:27 | 11 | Q.   How many hours did Ms. Arons work on this document? |
| 09:27 | 12 | A.   Without having it in front of me, I believe she put |
| 09:27 | 13 | in -- the total number of hours?  It was probably -- I'd |
| 09:27 | 14 | have to look at the list again so I could give you the exact |
| 09:27 | 15 | number.  Are you looking for the exact number or an |
| 09:27 | 16 | estimate? |
| 09:27 | 17 | Q.   You can give me an estimate, that's fine. |
| 09:27 | 18 | A.   I'd say between 80 and 150 hours. |
| 09:28 | 19 | Q.   Now, does Mattel keep track of the number of hours |
| 09:28 | 20 | spent on each project? |
| 09:28 | 21 | A.   I don't know. |
| 09:28 | 22 | Q.   Well, did you consult any records that showed how much |
| 09:28 | 23 | time people spend? |
| 09:28 | 24 | A.   Only this document. |
| 09:28 | 25 | Q.   On given projects? |

35

| | | |
|---|---|---|
| 09:28 | 1 | A. On certain projects, I can refer to my calendar. |
| 09:28 | 2 | Q. Well, your calendar is for you, right? |
| 09:28 | 3 | A. Yes. |
| 09:28 | 4 | Q. You don't have Ms. Arons' calendar? |
| 09:28 | 5 | A. Not anymore, I don't. |
| 09:28 | 6 | Q. Did you have it when you made the list? |
| 09:28 | 7 | A. I had meetings that included her. |
| 09:28 | 8 | Q. But you didn't know everything she was doing, right? |
| 09:28 | 9 | A. No. |
| 09:28 | 10 | Q. She was your boss? |
| 09:28 | 11 | A. Correct. |
| 09:28 | 12 | Q. And did you actually see Ms. Arons work that 80 to 150 |
| 09:28 | 13 | hours? |
| 09:28 | 14 | A. I was with her for a good portion of time when we |
| 09:28 | 15 | worked on it together. |
| 09:28 | 16 | Q. Were you there for all 80 to 150 hours? |
| 09:28 | 17 | A. No. |
| 09:28 | 18 | Q. Now, was Ms. Arons paid by the hour by Mattel? |
| 09:29 | 19 | A. I believe she was a salaried employee who had an hourly |
| 09:29 | 20 | rate. |
| 09:29 | 21 | Q. So you had to calculate her hourly rate somehow, right? |
| 09:29 | 22 | A. Yes. |
| 09:29 | 23 | Q. How did you do that? |
| 09:29 | 24 | A. It was provided to me. |
| 09:29 | 25 | Q. By who? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 36 of 139   Page ID #:308337
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:29 | 1 | A.    The law department. |
| 09:29 | 2 | Q.    Okay.  Who in the law department? |
| 09:29 | 3 | A.    I believe that -- I believe that there was a woman in |
| 09:29 | 4 | the law department by the name of Carolyn Graham, who was |
| 09:29 | 5 | able to provide me with the information. |
| 09:29 | 6 | Q.    So your testimony is based on estimating the number of |
| 09:29 | 7 | hours that were used and then multiplying that by numbers |
| 09:29 | 8 | given to you by the law department; is that right? |
| 09:29 | 9 | A.    Uh-huh, yes. |
| 09:29 | 10 | Q.    No other source? |
| 09:29 | 11 | A.    No. |
| 09:29 | 12 | Q.    If we could put up Exhibit 7110, please. |
| 09:30 | 13 | (Document provided to the witness.) |
| 09:30 | 14 | (Document displayed.) |
| 09:30 | 15 | BY MR. COTE: |
| 09:30 | 16 | Q.    This is a customized guidelines; is that right? |
| 09:30 | 17 | A.    Yes. |
| 09:30 | 18 | Q.    And these are designed to show -- let me restart that. |
| 09:30 | 19 | These are requirements that Mattel has in order to sell |
| 09:30 | 20 | a customized Barbie, right? |
| 09:30 | 21 | A.    Correct. |
| 09:30 | 22 | Q.    So if Walmart wants to do a Firefighter Barbie, these |
| 09:30 | 23 | are the rules they have to follow, right? |
| 09:30 | 24 | A.    Correct. |
| 09:30 | 25 | Q.    Those rules are shared with Walmart, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 37 of 139   Page ID #:308338
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

37

| | | |
|---|---|---|
| 09:30 | 1 | A.   Are what? |
| 09:30 | 2 | Q.   Are shared with Walmart.  They're told to Walmart, |
| 09:30 | 3 | right? |
| 09:30 | 4 | A.   Not all of it. |
| 09:30 | 5 | Q.   Well, Walmart knows the rules, don't they? |
| 09:30 | 6 | A.   This document was not shared with Walmart. |
| 09:30 | 7 | Q.   That wasn't my question.  Walmart knows the rules if it |
| 09:30 | 8 | wants to do a customized Barbie with Mattel, right? |
| 09:30 | 9 | MR. ZELLER:  Question's vague. |
| 09:30 | 10 | THE COURT:  Do you understand the question? |
| 09:30 | 11 | THE WITNESS:  No.  If he could restate it. |
| 09:31 | 12 | THE COURT:  Reask it. |
| 09:31 | 13 | BY MR. COTE: |
| 09:31 | 14 | Q.   Let's go to the second page and let's look at the |
| 09:31 | 15 | middle bullet.  I guess it's a flower, not a bullet, right? |
| 09:31 | 16 | A.   Yes. |
| 09:31 | 17 | Q.   And it has an MOQ of 50,000 and a lead time of 15 |
| 09:31 | 18 | months, right? |
| 09:31 | 19 | A.   Correct. |
| 09:31 | 20 | Q.   MOQ is minimum order quantity, right? |
| 09:31 | 21 | A.   Yes, MOQ is minimum order quantity. |
| 09:31 | 22 | Q.   And lead time is how long it takes to actually get the |
| 09:31 | 23 | dolls on the shelf, right? |
| 09:31 | 24 | A.   From start to time on shelf, correct. |
| 09:31 | 25 | Q.   The retailers know these requirements, right? |

| | | |
|---|---|---|
| 09:31 | 1 | A.   I don't know if that's widely known. |
| 09:31 | 2 | Q.   Well, you tell them to the retailers when they want to |
| 09:31 | 3 | do a customized product, right? |
| 09:31 | 4 | A.   I don't know if we shared the MOQ with the retailer. |
| 09:31 | 5 | Q.   So Walmart or Toys R Us calls up Mattel, says, "I want |
| 09:32 | 6 | to do a Firefighter Barbie.  I think it's gonna be a great |
| 09:32 | 7 | hit." |
| 09:32 | 8 | A.   Uh-huh. |
| 09:32 | 9 | Q.   "But I don't know how many I want to sell or how many I |
| 09:32 | 10 | can sell.  What's the minimum order that I need in order to |
| 09:32 | 11 | do that with you?"  Mattel says, "I can't tell you"? |
| 09:32 | 12 | A.   No, I didn't -- it was not my role to -- at the time of |
| 09:32 | 13 | this document -- to interface with a Walmart.  When I wrote |
| 09:32 | 14 | this policy, I was working in international, and these were |
| 09:32 | 15 | guidelines of what I knew internally the plant needed to do |
| 09:32 | 16 | to be profitable.  So I'm not sure if Walmart ever asked |
| 09:32 | 17 | specifically a number. |
| 09:32 | 18 | Q.   So you don't know if this information was shared with |
| 09:32 | 19 | the retailers, right? |
| 09:32 | 20 | A.   I don't. |
| 09:32 | 21 | Q.   Let's flip to Exhibit 8417, please. |
| 09:33 | 22 | This is one of the e-mails that Mattel showed, if that |
| 09:33 | 23 | helps you find it. |
| 09:33 | 24 | I'm told I might have the wrong number.  One moment. |
| 09:33 | 25 | 8147.  My apologies. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 39 of 139   Page ID #:308340
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

39

| | | |
|---|---|---|
| 09:33 | 1 | *(Document provided to the witness.)* |
| 09:33 | 2 | *(Document displayed.)* |
| 09:33 | 3 | THE WITNESS:  I have it. |
| 09:33 | 4 | BY MR. COTE: |
| 09:33 | 5 | Q.   All right.  This is an e-mail where Ms. Trueba is |
| 09:33 | 6 | asking you for the 2004 Barbie viability report for Mexico, |
| 09:33 | 7 | right? |
| 09:33 | 8 | A.   Correct. |
| 09:33 | 9 | Q.   And that report describes, I believe what you said was |
| 09:33 | 10 | the appeal of the products to the Mexican consumer, right? |
| 09:33 | 11 | A.   No. |
| 09:33 | 12 | Q.   That's not right? |
| 09:33 | 13 | A.   Not to the Mexican consumer. |
| 09:34 | 14 | Q.   This -- the viability report, the Mexico viability |
| 09:34 | 15 | report, was a study of Mexican consumer preferences, right? |
| 09:34 | 16 | A.   This e-mail asks for the last Barbie 2004 viability. |
| 09:34 | 17 | Q.   Right.  And there's a Mexican 2004 viability report, |
| 09:34 | 18 | right? |
| 09:34 | 19 | A.   I presume there would have been. |
| 09:34 | 20 | Q.   And that's what you understood Ms. Trueba to be asking |
| 09:34 | 21 | for, right? |
| 09:34 | 22 | A.   No, that's not correct. |
| 09:34 | 23 | Q.   Well, you did follow up?  Did you ask her what she was |
| 09:34 | 24 | asking for? |
| 09:34 | 25 | A.   No, I did not. |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:34 | 1 | Q.    Did you just assume it was something other than Mexico? |
| 09:34 | 2 | A.    I was working in the U.S.  I had no responsibility for |
| 09:34 | 3 | international, and therefore, I didn't even engage in an |
| 09:34 | 4 | e-mail conversation.  I instead forwarded it to the head of |
| 09:34 | 5 | international.  And wrote, "Therese, dot, dot, dot." |
| 09:34 | 6 | Q.    You forwarded the e-mail to Therese Wilbur, correct? |
| 09:34 | 7 | A.    Right. |
| 09:34 | 8 | Q.    And Ms. Wilbur was in charge of international products? |
| 09:34 | 9 | A.    Right.  International Barbie or girls marketing, I'm |
| 09:35 | 10 | not sure of her exact title. |
| 09:35 | 11 | Q.    And the reason you sent it to Ms. Wilbur is because you |
| 09:35 | 12 | understood that Ms. Trueba was asking for the Mexico report, |
| 09:35 | 13 | right? |
| 09:35 | 14 | A.    No. |
| 09:35 | 15 | Q.    Well, you understood she was asking for some report |
| 09:35 | 16 | outside the United States, didn't you? |
| 09:35 | 17 | A.    No. |
| 09:35 | 18 | Q.    Well, you just said that Ms. Wilbur was in charge of |
| 09:35 | 19 | international marketing, wasn't she? |
| 09:35 | 20 | A.    What I just said, which I believe I just said, was that |
| 09:35 | 21 | I was working in the U.S. and had no responsibility for |
| 09:35 | 22 | international, but Therese was in charge of international, |
| 09:35 | 23 | and so I sent it to her because it was one of her |
| 09:35 | 24 | subsidiaries. |
| 09:35 | 25 | Q.    And if you were in charge of the U.S., you could have |

| 09:35 | 1 | sent the report to Ms. Trueba, right? |
| 09:35 | 2 | A.    No. |
| 09:35 | 3 | Q.    You couldn't have? |
| 09:35 | 4 | A.    The structure of the organization at that time was such |
| 09:35 | 5 | that the subsidiaries interfaced with international Barbie |
| 09:36 | 6 | marketing and funneled their requests through that |
| 09:36 | 7 | department.  Requests for proprietary information or reports |
| 09:36 | 8 | did not come to people in the -- people who had no |
| 09:36 | 9 | international responsibility. |
| 09:36 | 10 | Q.    So you forwarded it to Ms. Wilbur because that was the |
| 09:36 | 11 | right person to ask the question of? |
| 09:36 | 12 | A.    Yes. |
| 09:36 | 13 | Q.    And then Ms. Wilbur would have asked you for the U.S. |
| 09:36 | 14 | report, right? |
| 09:36 | 15 | A.    I don't know.  I wasn't -- she probably would have gone |
| 09:36 | 16 | to research.  I don't know where she would have gone. |
| 09:36 | 17 | Q.    Well, didn't you have the report, the U.S. report? |
| 09:36 | 18 | A.    I had a copy. |
| 09:36 | 19 | Q.    You understood that Ms. Trueba was the marketing |
| 09:36 | 20 | manager for Mexico, for the girls division, right? |
| 09:36 | 21 | A.    Yes. |
| 09:36 | 22 | Q.    And it was her responsibility to know what consumers in |
| 09:36 | 23 | Mexico thought about the product, right? |
| 09:36 | 24 | A.    Yes. |
| 09:36 | 25 | Q.    When you got this e-mail from Ms. Trueba, you didn't |

| 09:36 | 1 | write back and say, "No, you can't have it," right? |
| 09:37 | 2 | A.   I wrote, "Therese, dot, dot, dot," and forwarded it on. |
| 09:37 | 3 | Q.   And you did that because you knew that Ms. Trueba |
| 09:37 | 4 | needed the Mexico viability report to do her job, right? |
| 09:37 | 5 | A.   No.  I can explain it again if you'd like. |
| 09:37 | 6 | Q.   Go ahead. |
| 09:37 | 7 | A.   I worked in the U.S. and had no responsibility for |
| 09:37 | 8 | international, so I forwarded it to the person who had |
| 09:37 | 9 | responsibility for international so she could do whatever |
| 09:37 | 10 | she needed to do with the request. |
| 09:37 | 11 | Q.   And you knew that Ms. Wilbur was responsible for |
| 09:37 | 12 | interfacing with the international markets, correct? |
| 09:37 | 13 | A.   Yes. |
| 09:37 | 14 | Q.   We saw from the e-mail previously that she sent the |
| 09:37 | 15 | customized guidelines to all the offices outside the |
| 09:37 | 16 | United States, right? |
| 09:37 | 17 | A.   Yes. |
| 09:37 | 18 | Q.   That was one of her responsibilities, right? |
| 09:38 | 19 | A.   I would assume so if she sent it. |
| 09:38 | 20 | Q.   Did you discuss Ms. Trueba's request with Ms. Wilbur in |
| 09:38 | 21 | person? |
| 09:38 | 22 | A.   Not that day. |
| 09:38 | 23 | Q.   Did you ever discuss it with her? |
| 09:38 | 24 | A.   Weeks later. |
| 09:38 | 25 | Q.   How many weeks later? |

| 09:38 | 1 | A.   I don't remember the exact date, but it was several |
| 09:38 | 2 | weeks later. |
| 09:38 | 3 | Q.   Well, this e-mail is dated March 11, 2004, right? |
| 09:38 | 4 | A.   Okay. |
| 09:38 | 5 | Q.   And that's more than a month before Ms. Trueba |
| 09:38 | 6 | resigned, right? |
| 09:38 | 7 | A.   I don't know her date of resignation. |
| 09:38 | 8 | Q.   Well, if she resigned on April 19th, this would be more |
| 09:38 | 9 | than a month before that, right? |
| 09:38 | 10 | A.   Sure. |
| 09:38 | 11 | Q.   And did you discuss this request with Ms. Wilbur before |
| 09:38 | 12 | or after she resigned? |
| 09:38 | 13 | A.   After she resigned. |
| 09:38 | 14 | Q.   Was it months after?  Weeks after?  Years after? |
| 09:38 | 15 | A.   I learned that Mariana had resigned.  The day I learned |
| 09:39 | 16 | was not necessarily the day she resigned, but on whatever |
| 09:39 | 17 | day I was told she had resigned, it triggered a memory that |
| 09:39 | 18 | Mariana had asked me for something, and so I went and I |
| 09:39 | 19 | spoke to a coworker, as discussed yesterday. |
| 09:39 | 20 | Q.   And when was that conversation? |
| 09:39 | 21 | A.   At the presentation -- the first presentation we had |
| 09:39 | 22 | when I saw people from the Mexico team after Mariana had |
| 09:39 | 23 | already left the company. |
| 09:39 | 24 | Q.   And what date was that? |
| 09:39 | 25 | A.   I don't know. |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:39 | 1 | Q.    Can you give me a month? |
| 09:39 | 2 | A.    It was right after she left.  I don't know if it was |
| 09:39 | 3 | within a few days or within a week. |
| 09:39 | 4 | Q.    When you had the conversation with Ms. Wilbur, did she |
| 09:39 | 5 | tell you that it was all right to send to Ms. Trueba the |
| 09:39 | 6 | Mexico viability report and that it should also be sent in a |
| 09:40 | 7 | like manner to other colleagues holding the same position in |
| 09:40 | 8 | all of the Latin American region?  Did she tell you that? |
| 09:40 | 9 | A.    No. |
| 09:40 | 10 | Q.    Did she tell you that on March 25th, 2004, at |
| 09:40 | 11 | approximately 2:00 p.m. Mexico time, she was on a conference |
| 09:40 | 12 | call about the report? |
| 09:40 | 13 | A.    No. |
| 09:40 | 14 | Q.    Did she tell you that during that conference call, uh, |
| 09:40 | 15 | Ms. Trueba was present? |
| 09:40 | 16 | A.    No. |
| 09:40 | 17 | Q.    Did she tell you that they discussed the Mexico |
| 09:40 | 18 | viability report during a call on March 25th? |
| 09:40 | 19 | A.    No. |
| 09:40 | 20 | Q.    Did she tell you that at the beginning of the call, |
| 09:40 | 21 | Ms. Wilbur asked the participants if they all had a copy of |
| 09:40 | 22 | the viability report? |
| 09:40 | 23 | A.    No. |
| 09:40 | 24 | Q.    Did she tell you that every single person on that call |
| 09:40 | 25 | said, "Yes, I have it"? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 45 of 139   Page ID #:308346
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

45

| 09:40 | 1 | A.    No. |
| 09:40 | 2 | Q.    Did she tell you that the people on that call were all |
| 09:40 | 3 | the heads of marketing throughout Latin America? |
| 09:41 | 4 | A.    No. |
| 09:41 | 5 | MR. COTE:  No further questions. |
| 09:41 | 6 | THE COURT:  Redirect? |
| 09:41 | 7 | Now, we've been using, I believe, a little bit |
| 09:41 | 8 | more time than each side had agreed to, so how much more |
| 09:41 | 9 | time, Counsel? |
| 09:41 | 10 | MR. ZELLER:  About 16 minutes, but I don't -- |
| 09:41 | 11 | THE COURT:  About how long? |
| 09:41 | 12 | MR. ZELLER:  Although, I may be proven wrong. |
| 09:41 | 13 | THE COURT:  About 15? |
| 09:41 | 14 | MR. ZELLER:  Fifteen is fine. |
| 09:41 | 15 | THE COURT:  Is that acceptable, Counsel, on the |
| 09:41 | 16 | defense side? |
| 09:41 | 17 | MR. McCONVILLE:  Yes, sir. |
| 09:41 | 18 | THE COURT:  All right. |
| 09:41 | 19 | **REDIRECT EXAMINATION** |
| 09:41 | 20 | BY MR. ZELLER: |
| 09:41 | 21 | Q.    If we could take a look at Exhibit 8147.  This is the |
| 09:41 | 22 | e-mail Mr. Cote was asking you questions about in this |
| 09:41 | 23 | communication. |
| 09:41 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 09:41 | 1 | BY MR. ZELLER: |
| 09:41 | 2 | Q.   Where Mariana Trueba asked you for the viability |
| 09:42 | 3 | report. |
| 09:42 | 4 | Were you aware that the -- that this e-mail -- that she |
| 09:42 | 5 | sent, this e-mail asking you for the last Barbie 2004 |
| 09:42 | 6 | viability report, was on the day after Mr. Machado met with |
| 09:42 | 7 | Isaac Larian at the W Hotel in Mexico City?  Did you know |
| 09:42 | 8 | that at the time? |
| 09:42 | 9 | A.   No. |
| 09:42 | 10 | Q.   And I take it you didn't know that she and Mr. Machado |
| 09:42 | 11 | and Mr. Vargas, after this time period, after meeting with |
| 09:42 | 12 | Mr. Larian and up until the time that they resigned over a |
| 09:42 | 13 | month later -- that they were downloading information from |
| 09:42 | 14 | Mattel's computers? |
| 09:42 | 15 | MR. McCONVILLE:  Objection, Your Honor.  Arguing |
| 09:42 | 16 | the case through this witness. |
| 09:42 | 17 | MR. COTE:  Also compound. |
| 09:42 | 18 | THE COURT:  Mr. Cote just opened that door again. |
| 09:42 | 19 | I'm going to let this go on just a little while. |
| 09:42 | 20 | It's apparent that neither side's objecting until they feel |
| 09:42 | 21 | that it's advantageous. |
| 09:42 | 22 | So we went through a whole line of questioning, |
| 09:42 | 23 | Mr. Cote, that I normally wouldn't have allowed in; Mattel |
| 09:43 | 24 | didn't object, probably strategically, and now we're going |
| 09:43 | 25 | through a whole line of questioning that's probably improper |

Case 2:04-cv-09049-DOC-RNB Document 10183 Filed 03/11/11 Page 47 of 139 Page ID #:308348
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:43 | 1 | on behalf of Mattel. |
| 09:43 | 2 | (To the jury:)  I've got a very smart jury.  We'll |
| 09:43 | 3 | let this go just a little bit, but this is argument on both |
| 09:43 | 4 | sides.  Mr. Cote just entered into it through a series of, |
| 09:43 | 5 | quite frankly, statements that may be hearsay that are |
| 09:43 | 6 | trying to come in, and this is what Mr. Zeller is doing also |
| 09:43 | 7 | in return. |
| 09:43 | 8 | Very limited, Counsel. |
| 09:43 | 9 | MR. McCONVILLE:  On behalf of MGA, we object. |
| 09:43 | 10 | THE COURT:  (To the jury:) this does not apply to |
| 09:43 | 11 | MGA.  This is going to apply to Mr. Machado and to Mattel, |
| 09:43 | 12 | but on behalf of MGA, they did not enter into this.  So |
| 09:43 | 13 | whatever questions are asked or whatever questions are |
| 09:43 | 14 | answered do not apply to MGA or Mr. Larian. |
| 09:43 | 15 | Counsel, you have five minutes. |
| 09:43 | 16 | MR. ZELLER:  Thank you. |
| 09:43 | 17 | BY MR. ZELLER: |
| 09:43 | 18 | Q.  Let me just ask generally speaking, when did it first |
| 09:43 | 19 | come to your attention that Mariana Trueba, Mr. Vargas, or |
| 09:43 | 20 | Mr. Machado had been asking for information prior to their |
| 09:43 | 21 | departure? |
| 09:44 | 22 | Let me actually rephrase that.  That was probably |
| 09:44 | 23 | confusing. |
| 09:44 | 24 | I take it you didn't know at the time when Mariana |
| 09:44 | 25 | Trueba was asking you for this information that she was in |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 48 of 139   Page ID #:308349
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:44 | 1 | contact with MGA? |
| 09:44 | 2 | A.   No. |
| 09:44 | 3 | Q.   When did you first learn that she and the others had |
| 09:44 | 4 | been in contact with MGA? |
| 09:44 | 5 | A.   It wasn't until that -- that line review that I just |
| 09:44 | 6 | referenced to Mr. Cote, that people from the Mexico office |
| 09:44 | 7 | mentioned that they had left the company and had gone to |
| 09:44 | 8 | MGA. |
| 09:44 | 9 | Q.   If you would please take a look at the line list, which |
| 09:44 | 10 | is 7104. |
| 09:44 | 11 | *(Document provided to the witness.)* |
| 09:44 | 12 | *(Document displayed.)* |
| 09:44 | 13 | THE WITNESS:  Yes. |
| 09:44 | 14 | BY MR. ZELLER: |
| 09:44 | 15 | Q.   You were asked questions about whether this document |
| 09:44 | 16 | was shared with people in other Mattel companies such as |
| 09:44 | 17 | subsidiaries.  Do you recall that? |
| 09:44 | 18 | A.   I do. |
| 09:45 | 19 | Q.   Now, this particular version of the line list that |
| 09:45 | 20 | existed as of April of 2004, was this document, this version |
| 09:45 | 21 | of it, shared outside of Mattel El Segundo? |
| 09:45 | 22 | A.   No, not this version. |
| 09:45 | 23 | Q.   There would be subsequent versions of the line lists |
| 09:45 | 24 | that were prepared?  They were finalized? |
| 09:45 | 25 | A.   A finalized version would eventually be issued. |

09:45   1   Q.   And about how long did it take after this preliminary
09:45   2   line list, Exhibit 7104, was prepared when there was
09:45   3   actually a final one that was then distributed to the
09:45   4   subsidiaries?
09:45   5   A.   Oh, I don't know an exact number, but it would be -- it
09:45   6   would be a significant amount of time.
09:45   7   Q.   Can you tell us, would it be a matter of weeks or
09:45   8   months?
09:45   9   A.   Oh, months at least.  This -- this version had, you
09:45   10   know, margins and things we would never release.
09:45   11   Q.   So even the finalized version didn't have that
09:46   12   information in it?
09:46   13   A.   I don't know that it would have.
09:46   14   Q.   If you can please take a look at Exhibit 8453. I'm
09:46   15   sorry.  It's actually 8864.  It's in evidence.
09:46   16           (Document provided to the witness.)
09:46   17           (Document displayed.)
09:46   18   BY MR. ZELLER:
09:46   19   Q.   And this is an e-mail that you were asked about.  And
09:46   20   you'll see that this is originally from -- it says, "Carol
09:46   21   Lyn Robinson on behalf of Therese Wilbur."  Do you see that?
09:46   22   A.   I do.
09:46   23   Q.   And that was the person who was forwarding these Barbie
09:46   24   customized fall guidelines?
09:46   25   A.   Yes, it appears she forwarded them.

| | | |
|---|---|---|
| 09:46 | 1 | Q.   And it was your understanding that that's -- those were |
| 09:46 | 2 | the customized fall guidelines that you talked about |
| 09:46 | 3 | earlier, Exhibit 7110? |
| 09:46 | 4 | A.   I assume it's the same document, but it's just an icon |
| 09:46 | 5 | here. |
| 09:47 | 6 | Q.   It's some version of it? |
| 09:47 | 7 | A.   Sure, yes. |
| 09:47 | 8 | Q.   Now, as you were saying, that document was prepared in |
| 09:47 | 9 | the United States, here in El Segundo? |
| 09:47 | 10 | A.   Yes. |
| 09:47 | 11 | Q.   And this -- this e-mail sent on behalf of Therese |
| 09:47 | 12 | Wilbur, this was sent from the US? |
| 09:47 | 13 | A.   Yes. |
| 09:47 | 14 | Q.   Therese Wilbur, although she headed up international, |
| 09:47 | 15 | was based here in California? |
| 09:47 | 16 | A.   Yes. |
| 09:47 | 17 | Q.   At Mattel headquarters? |
| 09:47 | 18 | A.   Yes, she was. |
| 09:47 | 19 | Q.   You were asked questions about access to various |
| 09:47 | 20 | computer systems.  Do you know how Mr. Machado, Ms. Vargas, |
| 09:47 | 21 | and Ms. Trueba gained access to Mattel computer systems to |
| 09:47 | 22 | download? |
| 09:47 | 23 |           MR. COTE:  Objection.  Assumes facts. |
| 09:47 | 24 |           THE COURT:  Just a moment. |
| 09:47 | 25 |           Overruled. |

| | | |
|---|---|---|
| 09:47 | 1 | You can answer. |
| 09:47 | 2 | THE WITNESS:  Oh, I don't know how people outside |
| 09:47 | 3 | of the U.S. access information. |
| 09:47 | 4 | BY MR. ZELLER: |
| 09:47 | 5 | Q.   Whether they were able to in some way access U.S. |
| 09:48 | 6 | systems or other systems, you don't know? |
| 09:48 | 7 | MR. COTE:  Calls for speculation. |
| 09:48 | 8 | THE COURT:  Overruled. |
| 09:48 | 9 | And your answer was? |
| 09:48 | 10 | THE WITNESS:  I don't know. |
| 09:48 | 11 | BY MR. ZELLER: |
| 09:48 | 12 | Q.   You were asked some questions about how you calculated |
| 09:48 | 13 | or came up with the cost estimates for the line list and |
| 09:48 | 14 | also the Barbie collectibles guidelines.  And you said you |
| 09:48 | 15 | were provided some information by the law department. |
| 09:48 | 16 | Can you take a look at Exhibit 23430. |
| 09:48 | 17 | *(Document provided to the witness.)* |
| 09:48 | 18 | THE WITNESS:  Yes. |
| 09:48 | 19 | BY MR. ZELLER: |
| 09:48 | 20 | Q.   Do you recognize this? |
| 09:48 | 21 | A.   I do. |
| 09:48 | 22 | Q.   What is it? |
| 09:48 | 23 | A.   This is the document that I had compiled that outlined |
| 09:48 | 24 | who worked on the BDO and line list and the amount of time |
| 09:48 | 25 | they spent, multiplied by the hourly rate. |

| | | |
|---|---|---|
| 09:49 | 1 | Q.   So this is some of the backup you had? |
| 09:49 | 2 | A.   Yes. |
| 09:49 | 3 | MR. ZELLER:  I would move Exhibit 23430 into |
| 09:49 | 4 | evidence, Your Honor. |
| 09:49 | 5 | MR. COTE:  Objection.  Your Honor, misstates the |
| 09:49 | 6 | document. |
| 09:49 | 7 | THE COURT:  Overruled.  It's received. |
| 09:49 | 8 | *(Exhibit No. 23430 received in evidence.)* |
| 09:49 | 9 | *(Document displayed.)* |
| 09:49 | 10 | BY MR. ZELLER: |
| 09:49 | 11 | Q.   And while you got this from the law department -- the |
| 09:49 | 12 | person who gave it to you was from the law department -- is |
| 09:49 | 13 | it your understanding that the information came from |
| 09:49 | 14 | Mattel's business records? |
| 09:49 | 15 | A.   Yes. |
| 09:49 | 16 | Q.   And this was the information that you then used to |
| 09:49 | 17 | actually calculate the costs of development that you've |
| 09:49 | 18 | testified to? |
| 09:49 | 19 | A.   Correct. |
| 09:49 | 20 | MR. ZELLER:  If we could please take a look at a |
| 09:49 | 21 | product here.  It's Exhibit 24315. |
| 09:49 | 22 | *(Exhibit provided to the witness.)* |
| 09:50 | 23 | THE WITNESS:  Yes. |
| 09:50 | 24 | BY MR. ZELLER: |
| 09:50 | 25 | Q.   Do you recognize this? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 53 of 139   Page ID #:308354
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:50 | 1 | A.   I do. |
| 09:50 | 2 | Q.   This is the Shorties product that you were asked about? |
| 09:50 | 3 | A.   Yes. |
| 09:50 | 4 | MR. ZELLER:  I would move this exhibit into |
| 09:50 | 5 | evidence, Your Honor. |
| 09:50 | 6 | THE COURT:  Received. |
| 09:50 | 7 | *(Exhibit No. 23415 received in evidence.)* |
| 09:50 | 8 | BY MR. ZELLER: |
| 09:50 | 9 | Q.   And if you could, you'll see that it says on here that |
| 09:50 | 10 | it has "five styling pop bods," B-O-D-S? |
| 09:50 | 11 | A.   Yes. |
| 09:50 | 12 | Q.   And maybe if you could just turn this a little bit -- |
| 09:50 | 13 | MR. ZELLER:  Do we have a photo of this to show? |
| 09:50 | 14 | THE WITNESS:  Do you want me to turn it? |
| 09:50 | 15 | BY MR. ZELLER: |
| 09:50 | 16 | Q.   Yeah.  If you can show where the interchangeable parts |
| 09:50 | 17 | are between the head and the bodies? |
| 09:50 | 18 | A.   Oh, wait.  I'm not that well versed in the product. |
| 09:50 | 19 | Q.   If you look at the top, it's by that part I was talking |
| 09:50 | 20 | where it says, "five styling pop bods." |
| 09:50 | 21 | A.   Well, there's -- there appears to be -- can I stand |
| 09:50 | 22 | 'cause I'm kind of short? |
| 09:50 | 23 | THE COURT:  You can stand.  And just turn your |
| 09:50 | 24 | back to me, so the jury can see. |
| 09:51 | 25 | THE WITNESS:  Okay.  It looks like there's a |

| 09:51 | 1  | doll -- a little doll here, and then next to her are these |
| 09:51 | 2  | little fat little bodies.  *(Indicating.)* |
| 09:51 | 3  | *(Exhibit displayed.)* |
| 09:51 | 4  | BY MR. ZELLER: |
| 09:51 | 5  | Q.   So the changing parts was there was one head and then |
| 09:51 | 6  | there were multiple bodies? |
| 09:51 | 7  | A.   Yes.  It looks like there's three, four additional |
| 09:51 | 8  | bodies. |
| 09:51 | 9  | Q.   And this isn't a fashion doll? |
| 09:51 | 10 | A.   No. |
| 09:51 | 11 | Q.   It doesn't have hair play? |
| 09:51 | 12 | A.   It's a -- it looks like it's a changing body doll. |
| 09:51 | 13 | Q.   Would you consider this to be the same concept as "Too |
| 09:51 | 14 | Popular" or what became, then, the MyScene Swappin' Styles? |
| 09:51 | 15 | A.   The same as that? |
| 09:51 | 16 | Q.   Yeah. |
| 09:51 | 17 | A.   No. |
| 09:51 | 18 | Q.   And why is that? |
| 09:51 | 19 | A.   Um, the -- can I reference -- can we grab the MyScene |
| 09:51 | 20 | one? |
| 09:51 | 21 | Q.   Sure.  If we could, please. |
| 09:52 | 22 | *(Exhibit provided to the witness.)* |
| 09:52 | 23 | THE WITNESS:  The MyScene doll came with one |
| 09:52 | 24 | complete doll and two additional heads, and the idea was |
| 09:52 | 25 | that you could get different hairstyles, and it was all |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 55 of 139   Page ID #:308356
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:52 | 1 | about the hairstyles.  And it looks like -- and I didn't |
| 09:52 | 2 | work on Shorties, but it looks like Shorties was all about |
| 09:52 | 3 | changing these little bodies. |
| 09:52 | 4 | BY MR. ZELLER: |
| 09:52 | 5 | Q.   You were asked some questions about conversations that |
| 09:52 | 6 | you had about Carter Bryant -- well, actually with Carter |
| 09:52 | 7 | Bryant and about Carter Bryant? |
| 09:52 | 8 | A.   Correct. |
| 09:52 | 9 | Q.   Did anyone tell you at the time when you were having |
| 09:52 | 10 | these conversations that Carter Bryant had worked on Bratz |
| 09:52 | 11 | while he was a Mattel employee? |
| 09:52 | 12 | A.   No. |
| 09:52 | 13 | Q.   I take it Carter Bryant didn't say that to you when you |
| 09:52 | 14 | were asking him questions about his departure? |
| 09:52 | 15 | A.   No. |
| 09:52 | 16 | Q.   Did you hear any rumors to that effect in the aftermath |
| 09:52 | 17 | of his departure and during the time when Bratz came out in |
| 09:52 | 18 | 2001, as you were asked about? |
| 09:52 | 19 | And I'm talking about, did you hear anything along the |
| 09:53 | 20 | lines or learn information that Carter Bryant had actually |
| 09:53 | 21 | been working on Bratz while a Mattel employee? |
| 09:53 | 22 | A.   Oh, no. |
| 09:53 | 23 | Q.   Okay.  And when did that first come to your attention? |
| 09:53 | 24 | MR. McCONVILLE:  Objection.  Hearsay. |
| 09:53 | 25 | THE COURT:  It's hearsay, Counsel.  It's hearsay. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 56 of 139   Page ID #:308357
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

56

| | | |
|---|---|---|
| 09:53 | 1 | MR. ZELLER:  I'm just trying -- it's not for the |
| 09:53 | 2 | truth; it's just for when she learned. |
| 09:53 | 3 | THE COURT:  All right.  Whatever this rumor is, |
| 09:53 | 4 | it's only for the timeframe when she learned it.  We don't |
| 09:53 | 5 | have the person or the rumor subject to cross-examination, |
| 09:53 | 6 | so you're not to take this as the truth.  But this will show |
| 09:53 | 7 | why she either reported this or the timeframe that she |
| 09:53 | 8 | became suspicious. |
| 09:53 | 9 | Counsel. |
| 09:53 | 10 | BY MR. ZELLER: |
| 09:53 | 11 | Q.  So if you could, tell us when it first came to your |
| 09:53 | 12 | attention in any way that Carter Bryant had worked on Bratz |
| 09:53 | 13 | in some way while he was a Mattel employee? |
| 09:53 | 14 | A.  I believe it was a few years later when there was an |
| 09:53 | 15 | article in the news. |
| 09:53 | 16 | Q.  And was -- was the article about this lawsuit? |
| 09:53 | 17 | MR. McCONVILLE:  Objection.  Hearsay. |
| 09:53 | 18 | THE COURT:  Overruled. |
| 09:54 | 19 | THE WITNESS:  Yes. |
| 09:54 | 20 | BY MR. ZELLER: |
| 09:54 | 21 | Q.  So it wasn't until the -- after the lawsuit was filed |
| 09:54 | 22 | when you -- anyone first even suggested to you that Carter |
| 09:54 | 23 | Bryant had been working on Bratz while a Mattel employee? |
| 09:54 | 24 | A.  Correct.  That's the first time. |
| 09:54 | 25 | Q.  You were asked some questions about your reaction to |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:54 | 1 | Diva Starz when it came out, and you referred to it as a |
| 09:54 | 2 | knockoff. |
| 09:54 | 3 | Did you think Diva Starz was a -- or did you think that |
| 09:54 | 4 | Bratz, when it came out, was a copy of Diva Starz? |
| 09:54 | 5 | A.   I thought they had similar features like the big head |
| 09:54 | 6 | and the big feet. |
| 09:54 | 7 | Q.   But did you think that it was more than just they had |
| 09:54 | 8 | some similarities?  Did you actually think that Bratz was a |
| 09:54 | 9 | copy of Diva Starz? |
| 09:54 | 10 | A.   No. |
| 09:54 | 11 | Q.   And I take it that you don't consider yourself someone |
| 09:54 | 12 | qualified to determine what would be, um, too close or not |
| 09:54 | 13 | too close, from a legal perspective, between products? |
| 09:55 | 14 | A.   No, I'm not a trained attorney. |
| 09:55 | 15 | MR. ZELLER:  Just one second. |
| 09:55 | 16 | That's all I have. |
| 09:55 | 17 | Thank you. |
| 09:55 | 18 | THE COURT:  Recross, Mr. McConville. |
| 09:55 | 19 | MR. McCONVILLE:  No questions, Your Honor. |
| 09:55 | 20 | THE COURT:  Mr. Cote. |
| 09:55 | 21 | MR. COTE:  Thank you, Your Honor. |
| 09:55 | 22 | **RECROSS-EXAMINATION** |
| 09:55 | 23 | BY MR. COTE: |
| 09:55 | 24 | Q.   Let's go back to that preliminary line list, if we |
| 09:55 | 25 | could, please.  7104 is the exhibit number. |

| 09:55 | 1 | *(Document provided to the witness.)* |
| 09:55 | 2 | *(Document displayed.)* |
| 09:55 | 3 | THE WITNESS:  Okay. |
| 09:55 | 4 | BY MR. COTE: |
| 09:55 | 5 | Q.   What does prelim mean? |
| 09:55 | 6 | A.   Preliminary. |
| 09:55 | 7 | Q.   What does that mean? |
| 09:55 | 8 | A.   Like a first draft. |
| 09:55 | 9 | Q.   A first draft? |
| 09:55 | 10 | A.   Uh-huh. |
| 09:55 | 11 | Q.   Was there ever a final draft? |
| 09:55 | 12 | A.   Yes. |
| 09:55 | 13 | Q.   What changed between the first draft and the final |
| 09:56 | 14 | draft? |
| 09:56 | 15 | A.   A lot. |
| 09:56 | 16 | Q.   Well, tell me. |
| 09:56 | 17 | A.   Well, the first draft were -- contains -- I mean, not a |
| 09:56 | 18 | lot in terms of -- I guess that's not a correct statement. |
| 09:56 | 19 | What changed were maybe some of the columns that we would |
| 09:56 | 20 | have not shared outside of the building. |
| 09:56 | 21 | Q.   What columns would you have deleted? |
| 09:56 | 22 | A.   Probably the -- like the margins. |
| 09:56 | 23 | Q.   Any others? |
| 09:56 | 24 | A.   Let me go column by column and let me look.  Well, the |
| 09:56 | 25 | product line was the product line.  TV was TV.  Introduction |

| 09:56 | 1 | date would have most likely remained, unless there was a |
|---|---|---|
| 09:56 | 2 | glitch, which I don't know about.  Um, let's see, I think on |
| 09:56 | 3 | the first page, uh, most of the columns probably would not |
| 09:57 | 4 | have.  Um, I don't know if -- you know, uh, I think probably |
| 09:57 | 5 | the column I just -- well, I guess it's two columns I just |
| 09:57 | 6 | referenced, the EA target margin and the margin at EA, would |
| 09:57 | 7 | probably not have been shared outside of, um, a small group. |
| 09:57 | 8 | Q.   Other than the margin columns, can you identify |
| 09:57 | 9 | anything else that changed between the preliminary and the |
| 09:57 | 10 | final? |
| 09:57 | 11 | A.   And we probably would not have shared the rationale. |
| 09:57 | 12 | Q.   Okay.  Anything else? |
| 09:57 | 13 | A.   I don't know. |
| 09:57 | 14 | Q.   Okay.  You can't think of any other changes as you look |
| 09:57 | 15 | at the document? |
| 09:57 | 16 | A.   Maybe the packaging dimensions?  I don't know. |
| 09:57 | 17 | Q.   How many versions did it go through before it reached |
| 09:58 | 18 | final? |
| 09:58 | 19 | A.   That I can't remember. |
| 09:58 | 20 | Q.   So you don't know how close this is to the final, |
| 09:58 | 21 | right? |
| 09:58 | 22 | A.   Not without having it in front of me. |
| 09:58 | 23 | Q.   And the final is what you would actually use at Mattel |
| 09:58 | 24 | to run the business, right? |
| 09:58 | 25 | A.   Correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 60 of 139   Page ID #:308361
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:58 | 1 | Q.   So you'd use the final to, uh, order TV advertising? |
| 09:58 | 2 | A.   I didn't order TV advertising. |
| 09:58 | 3 | Q.   Mattel would use the final as a reference for ordering |
| 09:58 | 4 | TV advertising? |
| 09:58 | 5 | A.   Uh, well, there's a different document that would be |
| 09:58 | 6 | used for that.  The items on here were identified as what we |
| 09:58 | 7 | would TV advertise, and then would provide a different |
| 09:58 | 8 | document -- uh, we would take the information from this |
| 09:58 | 9 | document and give it to a media planning worksheet. |
| 09:58 | 10 | Q.   And to make the media planning worksheet, you would use |
| 09:58 | 11 | the final version of the line list, not the preliminary, |
| 09:58 | 12 | right? |
| 09:58 | 13 | A.   For the final media buy, they will use the final.  For |
| 09:59 | 14 | the initial media composite, they would use the preliminary. |
| 09:59 | 15 | Q.   So the actual TV ads -- let me start over. |
| 09:59 | 16 | The TV ads that Mattel actually bought would be listed |
| 09:59 | 17 | in the final preliminary line list, not this preliminary |
| 09:59 | 18 | one, right? |
| 09:59 | 19 | A.   Well, they're -- they're in both places. |
| 09:59 | 20 | Q.   Well, this is preliminary, right? |
| 09:59 | 21 | A.   Right. |
| 09:59 | 22 | Q.   Things can change in a preliminary document, right? |
| 09:59 | 23 | A.   They can. |
| 09:59 | 24 | Q.   And the final prices provided to the retailers would |
| 09:59 | 25 | come from the final document, not the preliminary document, |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

61

| | | |
|---|---|---|
| 09:59 | 1 | right? |
| 09:59 | 2 | A.   Assuming they changed. |
| 09:59 | 3 | Q.   And the final orders placed with the factories would |
| 09:59 | 4 | come from the final document, not the preliminary document, |
| 09:59 | 5 | right? |
| 09:59 | 6 | A.   I'm not sure if the plants used this document for |
| 09:59 | 7 | orders. |
| 09:59 | 8 | Q.   Well -- |
| 09:59 | 9 | A.   So I can't speak to that. |
| 10:00 | 10 | Q.   Did Mattel use this document to figure out how many |
| 10:00 | 11 | dolls to order? |
| 10:00 | 12 | A.   Well, this is a marketing document, so I'm -- I -- I |
| 10:00 | 13 | don't know the -- who exactly from where somebody in the |
| 10:00 | 14 | plants took the exact number. |
| 10:00 | 15 | Q.   So this is just a marketing document? |
| 10:00 | 16 | A.   No, it's generated by marketing. |
| 10:00 | 17 | Q.   Uh-huh. |
| 10:00 | 18 | A.   For the reasons that I had outlined yesterday. |
| 10:00 | 19 | Q.   And does it contain the orders to the factory? |
| 10:00 | 20 | A.   No.  It contains estimated quantities. |
| 10:00 | 21 | Q.   Now, the margins and the rationale columns were the |
| 10:00 | 22 | columns that were taken out in the final, right? |
| 10:00 | 23 | A.   That's my belief. |
| 10:00 | 24 | Q.   Who used that information?  Strike that. |
| 10:00 | 25 | Did anyone get a copy of this document with those |

| | | |
|---|---|---|
| 10:00 | 1 | columns in it? |
| 10:00 | 2 | A.   I can't say for certain now.  I know who was supposed |
| 10:00 | 3 | to see it. |
| 10:01 | 4 | MR. COTE:  No further questions.  Thank you. |
| 10:01 | 5 | THE COURT:  Okay.  Thank you very much. |
| 10:01 | 6 | We're placing all of the witnesses on call.  I |
| 10:01 | 7 | doubt you're returning to court, but I need you to be |
| 10:01 | 8 | available until May 7th.  But if you have any professional |
| 10:01 | 9 | responsibilities, planned vacations, keep those.  If we need |
| 10:01 | 10 | you, we'll find you. |
| 10:01 | 11 | THE WITNESS:  Okay.  Thank you. |
| 10:01 | 12 | THE COURT:  Thank you very much. |
| 10:01 | 13 | *(Witness steps down, subject to recall.)* |
| 10:01 | 14 | THE COURT:  Counsel, your next witness, please. |
| 10:01 | 15 | MR. ZELLER:  Mattel calls Jim Ward. |
| 10:01 | 16 | THE COURT:  Thank you, sir.  Would you step |
| 10:01 | 17 | forward, stop at that location, and raise your right hand. |
| 10:01 | 18 | **JAMES WARD, MATTEL'S WITNESS, SWORN** |
| 10:01 | 19 | THE WITNESS:  I do. |
| 10:01 | 20 | THE COURT:  Sir, if you would come along the jury |
| 10:01 | 21 | railing, please.  If you will be seated, sir. |
| 10:02 | 22 | Now, could you state your full name, please. |
| 10:02 | 23 | THE WITNESS:  James Ward. |
| 10:02 | 24 | THE COURT:  Would you spell your last name, sir. |
| 10:02 | 25 | THE WITNESS:  W-A-R-D. |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

63

| | | |
|---|---|---|
| 10:02 | 1 | THE COURT:  Direct examination by Mr. Zeller on |
| 10:02 | 2 | behalf of Mattel. |
| 10:02 | 3 | **DIRECT EXAMINATION** |
| 10:02 | 4 | BY MR. ZELLER: |
| 10:02 | 5 | Q.   Good morning, Mr. Ward.  Where do you work? |
| 10:02 | 6 | A.   Mattel. |
| 10:02 | 7 | Q.   And how long have you been there? |
| 10:02 | 8 | A.   About 17 years. |
| 10:02 | 9 | Q.   What's your current position? |
| 10:02 | 10 | A.   Vice president of finance for the international |
| 10:02 | 11 | division. |
| 10:02 | 12 | Q.   What are your duties, just generally speaking, there at |
| 10:02 | 13 | Mattel? |
| 10:02 | 14 | A.   My group is primarily responsible for all financial |
| 10:02 | 15 | forecasting, planning, and analysis activities for the |
| 10:02 | 16 | international division. |
| 10:02 | 17 | Q.   If you could please take a look at Exhibit 24033, which |
| 10:02 | 18 | is in evidence. |
| 10:02 | 19 | *(Document provided to the witness.)* |
| 10:02 | 20 | THE WITNESS:  Okay. |
| 10:02 | 21 | *(Document displayed.)* |
| 10:02 | 22 | BY MR. ZELLER: |
| 10:02 | 23 | Q.   Do you generally understand that this is a document |
| 10:03 | 24 | that Jorge Castilla took from Mattel? |
| 10:03 | 25 | A.   Yes, I do. |

| | | |
|---|---|---|
| 10:03 | 1 | Q.   And please tell us what this document is. |
| 10:03 | 2 | A.   This document is basically a work product of a process |
| 10:03 | 3 | whereby each of the regions within the international |
| 10:03 | 4 | division created a five-year strategic plan for their region |
| 10:03 | 5 | which outlined the strategic direction and priorities for |
| 10:03 | 6 | their region.  From there, each of those regional strategic |
| 10:03 | 7 | plans were consolidated, summarized, and formed this |
| 10:03 | 8 | document, which is the divisional strategic plan, which |
| 10:03 | 9 | outlines the strategic direction and priorities for the |
| 10:03 | 10 | overall division. |
| 10:03 | 11 | Q.   And this is dated September 20, 2005? |
| 10:03 | 12 | A.   Correct. |
| 10:03 | 13 | Q.   As of that time was this a forward-looking document, |
| 10:03 | 14 | then? |
| 10:03 | 15 | A.   Yes, it was. |
| 10:03 | 16 | Q.   A forward-looking strategic document that was internal |
| 10:03 | 17 | to Mattel? |
| 10:03 | 18 | A.   Yes. |
| 10:03 | 19 | Q.   And did you have a role in creating this document? |
| 10:03 | 20 | A.   I did. |
| 10:03 | 21 | Q.   And what was your position at the time when you were |
| 10:04 | 22 | involved in creating this document? |
| 10:04 | 23 | A.   At that time I was the finance director for Mattel |
| 10:04 | 24 | Northern Europe, which was one of the regions within Mattel |
| 10:04 | 25 | international. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 65 of 139   Page ID #:308366
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

65

| | | |
|---|---|---|
| 10:04 | 1 | Q.   And what did you do as finance director in that |
| 10:04 | 2 | position?  Just generally speaking, your responsibilities? |
| 10:04 | 3 | A.   I was responsible for all finance and accounting |
| 10:04 | 4 | activities for that region. |
| 10:04 | 5 | Q.   And so you held that position as of September 2005? |
| 10:04 | 6 | A.   I did. |
| 10:04 | 7 | Q.   And how long did you hold that will position in total? |
| 10:04 | 8 | A.   About five years. |
| 10:04 | 9 | Q.   So if you could tell us, just briefly, what was the |
| 10:04 | 10 | process by which this document was created? |
| 10:04 | 11 | A.   So this document was basically two parts.  So the first |
| 10:04 | 12 | part was each of the regions within international developed |
| 10:04 | 13 | their five-year strategic plan, where it was a very |
| 10:04 | 14 | comprehensive review.  They had the marketing team involved, |
| 10:04 | 15 | where they looked at the category opportunities based on |
| 10:05 | 16 | their local market.  We had sales involved, where they |
| 10:05 | 17 | looked at where the sales opportunities were in terms of |
| 10:05 | 18 | channel growth.  They got input from their sales |
| 10:05 | 19 | organization.  The finance team would look at what the |
| 10:05 | 20 | financial implications were based on different categories. |
| 10:05 | 21 | The entire organization would have kind of leveraged their |
| 10:05 | 22 | key learnings from past experiences on different categories |
| 10:05 | 23 | that they entered in the past to determine where they may |
| 10:05 | 24 | have been successful and where they may have not been |
| 10:05 | 25 | successful.  And then we would have weighed all of that |

| | | |
|---|---|---|
| 10:05 | 1 | information to come up with our strategic direction and |
| 10:05 | 2 | priorities for the region. |
| 10:05 | 3 | Q.   And to your knowledge, was Mr. Castilla involved in |
| 10:05 | 4 | preparing this document in any way? |
| 10:05 | 5 | A.   Not that I'm aware of, no. |
| 10:05 | 6 | Q.   Is this a document you considered at the time in |
| 10:05 | 7 | September/October 2005 to be a Mattel trade secret? |
| 10:06 | 8 | A.   Yes. |
| 10:06 | 9 | Q.   If you could please tell us why. |
| 10:06 | 10 | A.   It was a product with a lot of analysis and a lot of |
| 10:06 | 11 | confidential information, and it pretty much laid out the |
| 10:06 | 12 | strategic direction and the priorities and the actions that |
| 10:06 | 13 | Mattel planned to take over the next five years. |
| 10:06 | 14 | Q.   Are there some -- maybe an example you can give us from |
| 10:06 | 15 | this document of that? |
| 10:06 | 16 | A.   Yes.  For example, we identified infant and preschool |
| 10:06 | 17 | as a key opportunity.  The infant and preschool category. |
| 10:06 | 18 | THE COURT:  Why don't you lean forward to the mike |
| 10:06 | 19 | so we can hear you. |
| 10:06 | 20 | THE WITNESS:  Yes.  We identified infant and |
| 10:06 | 21 | preschool as one of the key categories -- key priorities for |
| 10:06 | 22 | us.  We identified large dolls as a key priority for us.  We |
| 10:06 | 23 | also talked about how we would invest differently in |
| 10:06 | 24 | different parts of the world, depending on whether the |
| 10:06 | 25 | markets were developing markets or mature markets. |

| | | |
|---|---|---|
| 10:06 | 1 | BY MR. ZELLER: |
| 10:06 | 2 | Q.   And that kind of information's reflected in this |
| 10:07 | 3 | document in various places? |
| 10:07 | 4 | A.   Yes, it is. |
| 10:07 | 5 | Q.   Did you undertake an analysis to determine what the |
| 10:07 | 6 | cost was to create this international strategic plan? |
| 10:07 | 7 | A.   I did. |
| 10:07 | 8 | Q.   And what conclusion did you reach about that? |
| 10:07 | 9 | A.   The conclusion that I reached was that it took -- the |
| 10:07 | 10 | cost of developing this document would have been |
| 10:07 | 11 | approximately $669,000. |
| 10:07 | 12 | Q.   And is that the labor cost, the time of employees spent |
| 10:07 | 13 | on the document?  That's how you calculated it? |
| 10:07 | 14 | A.   Exactly. |
| 10:07 | 15 | MR. ZELLER:  Nothing further, Your Honor. |
| 10:07 | 16 | THE COURT:  Cross-examination by Mr. McConville. |
| 10:07 | 17 | **CROSS-EXAMINATION** |
| 10:07 | 18 | BY MR. McCONVILLE: |
| 10:08 | 19 | Q.   Hello. |
| 10:08 | 20 | A.   Hi. |
| 10:08 | 21 | Q.   You testified that you were aware that this was a |
| 10:08 | 22 | document that Castilla took from Mattel, correct? |
| 10:08 | 23 | A.   Yes. |
| 10:08 | 24 | Q.   And you also understand that it's a document that never |
| 10:08 | 25 | made it to MGA, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 68 of 139   Page ID #:308369
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

68

| | | |
|---|---|---|
| 10:08 | 1 | A.   I do not understand that, no. |
| 10:08 | 2 | Q.   Okay.  You've -- we've heard some testimony concerning |
| 10:08 | 3 | point-of-sale information in this case, and I want to |
| 10:08 | 4 | know -- well, let me ask a better question. |
| 10:08 | 5 | You agree that you can identify no use or benefit to |
| 10:08 | 6 | Mattel of having point-of-sale information about |
| 10:08 | 7 | competitor's products, correct? |
| 10:08 | 8 | MR. ZELLER:  Assumes facts. |
| 10:08 | 9 | THE COURT:  Do you understand the question? |
| 10:09 | 10 | THE WITNESS:  I don't understand the question. |
| 10:09 | 11 | Could you please repeat it? |
| 10:09 | 12 | BY MR. McCONVILLE: |
| 10:09 | 13 | Q.   Sure.  Do you understand what point-of-sale information |
| 10:09 | 14 | is? |
| 10:09 | 15 | A.   I do. |
| 10:09 | 16 | Q.   Do you understand that point-of-sale information can be |
| 10:09 | 17 | valuable to the company that has the point-of-sale |
| 10:09 | 18 | information? |
| 10:09 | 19 | A.   I do. |
| 10:09 | 20 | Q.   You also understand that from Mattel's perspective, it |
| 10:09 | 21 | sees no value in having competitor's point-of-sale |
| 10:09 | 22 | information, correct? |
| 10:09 | 23 | MR. ZELLER:  Question's vague. |
| 10:09 | 24 | THE COURT:  Overruled. |
| 10:09 | 25 | THE WITNESS:  I don't understand that, no. |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

69

| | | |
|---|---|---|
| 10:09 | 1 | BY MR. McCONVILLE: |
| 10:09 | 2 | Q.   Okay. |
| 10:09 | 3 | MR. McCONVILLE:  Could you please put in front of |
| 10:09 | 4 | the witness his deposition testimony, page 12, line 24, |
| 10:09 | 5 | through page 13, line 5. |
| 10:10 | 6 | I'd ask to read that testimony, Your Honor. |
| 10:10 | 7 | *(Document provided to the witness.)* |
| 10:10 | 8 | MR. ZELLER:  I'm sorry, what were the lines again? |
| 10:10 | 9 | MR. McCONVILLE:  Page 12, line 24, through |
| 10:10 | 10 | page 13, line 5. |
| 10:10 | 11 | THE COURT:  Page 12, line 24, the question "so." |
| 10:10 | 12 | MR. McCONVILLE:  Yes. |
| 10:10 | 13 | THE COURT:  Through page? |
| 10:10 | 14 | MR. McCONVILLE:  To page 13, line 5. |
| 10:10 | 15 | THE COURT:  Just a moment. |
| 10:11 | 16 | You may. |
| 10:11 | 17 | MR. McCONVILLE:  Put it on the screen. |
| 10:11 | 18 | *(Document displayed.)* |
| 10:11 | 19 | MR. McCONVILLE:  (Reading:) |
| 10:11 | 20 | "QUESTION:" -- |
| 10:11 | 21 | Well, let me ask you this:  You remember being |
| 10:11 | 22 | deposed in this case? |
| 10:11 | 23 | THE WITNESS:  I do. |
| 10:11 | 24 | MR. McCONVILLE:  (Reading:) |
| 10:11 | 25 | "QUESTION:  So as you sit here today, Mr. Ward, |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

70

| 10:11 | 1 | you cannot identify any use or benefit to Mattel from having |
| 10:11 | 2 | point-of-sale information about your competitor's products, |
| 10:11 | 3 | correct? |
| 10:11 | 4 | "ANSWER:  Correct.  I'm not aware." |
| 10:11 | 5 | MR. McCONVILLE:  No further questions. |
| 10:11 | 6 | THE COURT:  Mr. Cote, questions on behalf of |
| 10:11 | 7 | Mr. Machado. |
| 10:11 | 8 | MR. COTE:  No, thank you. |
| 10:11 | 9 | THE COURT:  Redirect, Mr. Zeller, on behalf of |
| 10:11 | 10 | Mattel. |
| 10:11 | 11 | **REDIRECT EXAMINATION** |
| 10:12 | 12 | BY MR. ZELLER: |
| 10:12 | 13 | Q.   Point-of-sale information isn't something that is part |
| 10:12 | 14 | of your day-to-day responsibilities? |
| 10:12 | 15 | A.   That's correct. |
| 10:12 | 16 | Q.   And are you generally aware that there's many different |
| 10:12 | 17 | types of point-of-sale information? |
| 10:12 | 18 | A.   Yes. |
| 10:12 | 19 | Q.   Different levels of detail? |
| 10:12 | 20 | A.   Yes. |
| 10:12 | 21 | MR. ZELLER:  For completeness, Your Honor, I'd ask |
| 10:12 | 22 | that the following be read from his deposition. |
| 10:12 | 23 | This would be line -- excuse me -- page 12, line |
| 10:12 | 24 | 4, through line 11? |
| 10:12 | 25 | THE COURT:  I'll need the deposition back, |

| | | |
|---|---|---|
| 10:12 | 1 | Counsel. |
| 10:12 | 2 | MR. McCONVILLE:  Your Honor, we'd object. |
| 10:12 | 3 | THE COURT:  I haven't had a chance to read it yet. |
| 10:12 | 4 | MR. McCONVILLE:  Okay.  Understood. |
| 10:12 | 5 | THE COURT:  What lines? |
| 10:12 | 6 | MATTEL ASSISTANT:  Lines 4 through 11. |
| 10:13 | 7 | MR. ZELLER:  Page 12, Your Honor. |
| 10:13 | 8 | THE COURT:  You may read. |
| 10:13 | 9 | MR. ZELLER:  (Reading:) |
| 10:13 | 10 | "QUESTION:  Okay.  So you can't identify any use |
| 10:13 | 11 | that Mattel would have of -- for point-of-sale information |
| 10:13 | 12 | about your competitor's products, correct? |
| 10:13 | 13 | "THE WITNESS:" -- and that's you -- "I'm not an |
| 10:13 | 14 | expert on that field, but I would speculate it's helpful to |
| 10:13 | 15 | know which products are selling well." |
| 10:13 | 16 | BY MR. ZELLER: |
| 10:13 | 17 | Q.   And that's the testimony you gave before the question |
| 10:13 | 18 | and answer that MGA's counsel provided to you? |
| 10:13 | 19 | A.   Yes. |
| 10:13 | 20 | MR. ZELLER:  Nothing further. |
| 10:13 | 21 | THE COURT:  Recross, Mr. McConville. |
| 10:13 | 22 | **RECROSS-EXAMINATION** |
| 10:13 | 23 | BY MR. McCONVILLE: |
| 10:13 | 24 | Q.   Sir, when you testified at your deposition, you were |
| 10:13 | 25 | designated by Mattel as a 30(b)(6) witness, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 72 of 139   Page ID #:308373
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

72

| | | |
|---|---|---|
| 10:14 | 1 | A.    Correct. |
| 10:14 | 2 | MR. ZELLER:  Objection.  It wasn't on that topic. |
| 10:14 | 3 | THE COURT:  Overruled. |
| 10:14 | 4 | BY MR. McCONVILLE: |
| 10:14 | 5 | Q.   And during the course of your testimony, you provided |
| 10:14 | 6 | the response as a 30(b)(6) witness that competitor's point |
| 10:14 | 7 | of sale –– that Mattel would have no value for a |
| 10:14 | 8 | competitor's point-of-sale information, correct? |
| 10:14 | 9 | MR. ZELLER:  Objection.  Not his designation. |
| 10:14 | 10 | THE COURT:  Overruled. |
| 10:14 | 11 | BY MR. McCONVILLE: |
| 10:14 | 12 | Q.   Correct? |
| 10:14 | 13 | A.   In that specific line, I did answer that. |
| 10:14 | 14 | MR. McCONVILLE:  No further questions. |
| 10:14 | 15 | THE COURT:  Mr. Cote. |
| 10:14 | 16 | MR. COTE:  No, thank you, Your Honor. |
| 10:14 | 17 | THE COURT:  Sir, we're asking all of the witnesses |
| 10:14 | 18 | to remain available until May 7th.  If you have any |
| 10:14 | 19 | professional responsibilities, though, any planned |
| 10:14 | 20 | vacations, keep them.  If we need, you we'll find you. |
| 10:14 | 21 | You may step down. |
| 10:14 | 22 | THE WITNESS:  Thank you. |
| 10:14 | 23 | *(Witness steps down, subject to recall.)* |
| 10:14 | 24 | THE COURT:  Counsel, your next witness, please. |
| 10:14 | 25 | MR. ZELLER:  Allison Willensky. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 73 of 139   Page ID #:308374
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:15 | 1 | MS. HURST:  Can we take a morning break at this |
| 10:15 | 2 | point, Your Honor? |
| 10:15 | 3 | THE COURT:  My apologies.  Let's take a morning |
| 10:15 | 4 | break. |
| 10:15 | 5 | You're admonished not to discuss this matter |
| 10:15 | 6 | amongst yourselves, nor form or express any opinion |
| 10:15 | 7 | concerning the case. |
| 10:15 | 8 | 15 minutes or so.  We'll see you in 15 minutes. |
| 10:15 | 9 | Okay.  We'll come get you at 10:30. |
| 10:15 | 10 | Counsel, then, 15 minutes. |
| 10:15 | 11 | *(Recess held at 10:15 a.m.)* |
| 10:31 | 12 | *(Proceedings resumed at 10:31 a.m.)* |
| 10:31 | 13 | *(In the presence of the jury.)* |
| 10:31 | 14 | THE COURT:  All right.  The jury's present, the |
| 10:31 | 15 | alternates, all counsel. |
| 10:31 | 16 | Thank you for your courtesy.  If you would be |
| 10:31 | 17 | seated. |
| 10:31 | 18 | And the parties are present. |
| 10:31 | 19 | And, Counsel, would you like to call your next |
| 10:31 | 20 | witness, who I believe was Willensky. |
| 10:31 | 21 | MR. ZELLER:  Allison Willensky. |
| 10:31 | 22 | THE COURT:  Thank you very much.  If you would |
| 10:31 | 23 | step forward between the double doors, please. |
| 10:31 | 24 | Now would you stop at that location, please, and |
| 10:31 | 25 | raise your right hand. |

| | | |
|---|---|---|
| 10:31 | 1 | **ALLISON WILLENSKY, MATTEL'S WITNESS, SWORN** |
| 10:31 | 2 | THE WITNESS:  I do. |
| 10:31 | 3 | THE COURT:  Thank you.  If you would come along |
| 10:31 | 4 | the jury railing, please.  There's an entrance closest to |
| 10:31 | 5 | the wall to the jury box.  If you would be seated. |
| 10:32 | 6 | Would you state your full name for the jury. |
| 10:32 | 7 | THE WITNESS:  Allison Lynn Willensky. |
| 10:32 | 8 | THE COURT:  And would you spell your last name, |
| 10:32 | 9 | please. |
| 10:32 | 10 | THE WITNESS:  W-I-L-L-E-N-S-K-Y. |
| 10:32 | 11 | THE COURT:  Thank you.  Direct examination by |
| 10:32 | 12 | Mr. Zeller on behalf of Mattel. |
| 10:32 | 13 | MR. ZELLER:  Thank you. |
| 10:32 | 14 | **DIRECT EXAMINATION** |
| | 15 | BY MR. ZELLER: |
| 10:32 | 16 | Q.   Good morning. |
| 10:32 | 17 | A.   Good morning. |
| 10:32 | 18 | Q.   Where do you work? |
| 10:32 | 19 | A.   I work at Mattel in El Segundo, California. |
| 10:32 | 20 | Q.   So you work at the parent company, Mattel, Inc.? |
| 10:32 | 21 | A.   Yes, I do. |
| 10:32 | 22 | Q.   How long have you worked there? |
| 10:32 | 23 | A.   About 27 years. |
| 10:32 | 24 | Q.   And what's your current position? |
| 10:32 | 25 | A.   Senior Director, Worldwide Consumer Insights. |

| | | |
|---|---|---|
| 10:32 | 1 | Q.   And has marketing research been part of your duties |
| 10:32 | 2 | there at Mattel? |
| 10:32 | 3 | A.   Yes. |
| 10:32 | 4 | Q.   And for about how long have you been involved in market |
| 10:32 | 5 | research? |
| 10:32 | 6 | A.   For all of my 27 years. |
| 10:32 | 7 | Q.   If you can please take a look at Exhibit 6739. |
| 10:33 | 8 | *(Document provided to the witness.)* |
| 10:33 | 9 | BY MR. ZELLER: |
| 10:33 | 10 | Q.   Do you have that there in front of you? |
| 10:33 | 11 | A.   Yes, I do. |
| 10:33 | 12 | Q.   Do you recognize it? |
| 10:33 | 13 | A.   Yes, I do. |
| 10:33 | 14 | Q.   And I take it this is something you reviewed to speed |
| 10:33 | 15 | up your testimony here? |
| 10:33 | 16 | A.   Yes, I did. |
| 10:33 | 17 | Q.   You reviewed it previously. |
| 10:33 | 18 |       MR. ZELLER:  I would move Exhibit 6739 into |
| 10:33 | 19 | evidence, Your Honor. |
| 10:33 | 20 |       THE COURT:  Received. |
| 10:33 | 21 | *(Exhibit No. 6739 received in evidence.)* |
| 10:33 | 22 |       *(Document displayed.)* |
| 10:33 | 23 | BY MR. ZELLER: |
| 10:33 | 24 | Q.   And please tell us what this document is? |
| 10:33 | 25 | A.   This is a report summarizing the 2004 Girls' Full Year |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 76 of 139   Page ID #:308377
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

76

| | | |
|---|---|---|
| 10:33 | 1 | Viability Testing in Mexico. |
| 10:33 | 2 | Q.   So this is something -- sometimes called a viability |
| 10:33 | 3 | report? |
| 10:33 | 4 | A.   Yes, it is. |
| 10:33 | 5 | Q.   And were you involved in preparing this document? |
| 10:33 | 6 | A.   Yes, I was. |
| 10:33 | 7 | Q.   In fact, you were the person who led the team that |
| 10:33 | 8 | created this? |
| 10:33 | 9 | A.   That's correct. |
| 10:33 | 10 | Q.   If you could please tell us, just generally speaking, |
| 10:33 | 11 | what's viability testing? |
| 10:34 | 12 | A.   Viability testing is a type of testing we do to |
| 10:34 | 13 | evaluate the strength of our concepts and identify the |
| 10:34 | 14 | strongest candidates within our girls' toy brands. |
| 10:34 | 15 | Q.   And is that something that is considered an important |
| 10:34 | 16 | kind of testing that's done there at Mattel? |
| 10:34 | 17 | A.   Yes, it is. |
| 10:34 | 18 | Q.   And why is that? |
| 10:34 | 19 | A.   It helps us to, um, identify those concepts that we |
| 10:34 | 20 | will be spending advertising expenditures against.  It also |
| 10:34 | 21 | helps us to reduce risk by allowing us to drop products that |
| 10:34 | 22 | don't test strongly.  And it also helps us to guide |
| 10:34 | 23 | quota-setting forecasting so that we can help evaluate |
| 10:34 | 24 | potential performance in the marketplace. |
| 10:34 | 25 | Q.   And these viability reports, the written reports of the |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

77

| | | |
|---|---|---|
| 10:34 | 1 | example we have here, are those prepared on a yearly basis? |
| 10:34 | 2 | A.   Yes, they are. |
| 10:34 | 3 | Q.   And are they prepared for different markets? |
| 10:35 | 4 | A.   Yes, they -- yes, they are. |
| 10:35 | 5 | Q.   And what kinds of markets are they prepared for? |
| 10:35 | 6 | A.   Usually what we identify is key markets.  So, for |
| 10:35 | 7 | instance, we would be doing the U.S., in this case Mexico, |
| 10:35 | 8 | and several markets in Europe. |
| 10:35 | 9 | Q.   If we could go back to Exhibit 6739.  Is this a |
| 10:35 | 10 | document -- this is an internal Mattel document? |
| 10:35 | 11 | A.   Yes, it is. |
| 10:35 | 12 | Q.   Is this a document that back in 2004, in the April time |
| 10:35 | 13 | period, was shared outside of Mattel? |
| 10:35 | 14 | A.   Outside of Mattel, no. |
| 10:35 | 15 | Q.   Is this -- is this viability report something that you |
| 10:35 | 16 | considered at the time to be trade secret? |
| 10:35 | 17 | A.   Yes. |
| 10:35 | 18 | Q.   And why is that? |
| 10:35 | 19 | A.   Because it contains information that is, um, |
| 10:35 | 20 | confidential to Mattel, and it also has value to Mattel, and |
| 10:35 | 21 | would be -- could be used by competitors to gain an |
| 10:36 | 22 | advantage over us. |
| 10:36 | 23 | Q.   And what ways could a competitor use a document -- this |
| 10:36 | 24 | viability report? |
| 10:36 | 25 | A.   Well, the -- |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | MS. HURST: Objection. Lacks foundation. Calls |
| 10:36 | 2 | for speculation. |
| 10:36 | 3 | THE COURT: Overruled. |
| 10:36 | 4 | THE WITNESS: They could learn from this document |
| 10:36 | 5 | what our strongest-performing, most-appealing products were, |
| 10:36 | 6 | and, um, could use that perhaps to plan development of |
| 10:36 | 7 | future products; or they could know where we were gonna be |
| 10:36 | 8 | spending our advertising and -- and perhaps use that in |
| 10:36 | 9 | developing their own advertising plans. |
| 10:36 | 10 | BY MR. ZELLER: |
| 10:36 | 11 | Q. And maybe if we can take a look at a couple of pages of |
| 10:36 | 12 | Exhibit 6739. If we can go to dash 9. |
| 10:36 | 13 | (Document displayed.) |
| 10:36 | 14 | BY MR. ZELLER: |
| 10:36 | 15 | Q. And this document, it's entitled, "2004 Girls' Full |
| 10:36 | 16 | Year Mexico Viability Testing Report." |
| 10:37 | 17 | Does it have information about marketing research for |
| 10:37 | 18 | markets other than Mexico? |
| 10:37 | 19 | A. Yes, it does. It has -- the same information that it |
| 10:37 | 20 | has for Mexico, it also includes the U.S. information for |
| 10:37 | 21 | comparison. So a market such as Mexico would use the U.S. |
| 10:37 | 22 | information to see how they were benchmarking against the |
| 10:37 | 23 | U.S. in terms of their development. |
| 10:37 | 24 | Q. And we have an example of that here on page 9? |
| 10:37 | 25 | A. Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 79 of 139   Page ID #:308380
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

79

| 10:37 | 1 | Q.   And that's that chart there?  If we could show -- it |
| 10:37 | 2 | has both a U.S. column and a Mexico column? |
| 10:37 | 3 | A.   Yes. |
| 10:37 | 4 | Q.   And here it also has some information about research |
| 10:37 | 5 | that was done on competitive products such as Bratz? |
| 10:37 | 6 | A.   Yes.  Part of how we do viability testing is we do -- |
| 10:37 | 7 | it's a simulated shopping study in which we try to replicate |
| 10:38 | 8 | what a consumer would be purchasing for girls in a typical |
| 10:38 | 9 | toy store aisle.  So it would have our products as well as |
| 10:38 | 10 | products from our key competitors so that we could benchmark |
| 10:38 | 11 | against that. |
| 10:38 | 12 | MR. ZELLER:  If you can go back to the first page. |
| 10:38 | 13 | *(Document displayed.)* |
| | 14 | BY MR. ZELLER: |
| 10:38 | 15 | Q.   You'll see that it says -- it says on it, it's "Limited |
| 10:38 | 16 | Distribution"? |
| 10:38 | 17 | A.   Yes. |
| 10:38 | 18 | Q.   And then below that it says, "This is an extremely |
| 10:38 | 19 | confidential report with very limited distribution." |
| 10:38 | 20 | Do you see that? |
| 10:38 | 21 | A.   Yes. |
| 10:38 | 22 | Q.   And can you tell us what that means? |
| 10:38 | 23 | A.   It means that, because of the very confidential nature |
| 10:38 | 24 | of the information contained in the report, we wanted to |
| 10:38 | 25 | make sure that it was only distributed to those people who |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

80

| | | |
|---|---|---|
| 10:38 | 1 | needed to make marketing and product decisions. |
| 10:38 | 2 | Q.    And were there certain steps that you took to try and |
| 10:38 | 3 | keep the number of copies of this document to a minimum? |
| 10:38 | 4 | A.    Yes.  We established a distribution list, which you'll |
| 10:39 | 5 | see on that page, as well, who we identified as the key |
| 10:39 | 6 | players who needed this information.  And we -- you can see |
| 10:39 | 7 | on the top of it, we -- we numbered each of the copies and |
| 10:39 | 8 | put the person's name on it to whom it was being |
| 10:39 | 9 | distributed, and also put in a note saying, "Please refrain |
| 10:39 | 10 | from distributing additional copies of this report.  If you |
| 10:39 | 11 | think there is someone who absolutely needs a copy, please |
| 10:39 | 12 | contact my office." |
| 10:39 | 13 |       And we only distributed this as hard copies.  We did |
| 10:39 | 14 | not issue it electronically. |
| 10:39 | 15 | Q.    And even if copies of it were not distributed in |
| 10:39 | 16 | electronic form, was this document stored electronically |
| 10:39 | 17 | somewhere? |
| 10:39 | 18 | A.    Yes, I believe it was. |
| 10:39 | 19 | Q.    Where was it stored electronically? |
| 10:39 | 20 | A.    In -- I believe in either El Segundo or Arizona, or |
| 10:39 | 21 | wherever our computer database was at the time. |
| 10:40 | 22 | Q.    The U.S. servers? |
| 10:40 | 23 | A.    U.S. servers, yes. |
| 10:40 | 24 | Q.    And where was this document actually created? |
| 10:40 | 25 | A.    In the U.S. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:40 | 1 | Q.   And about how long did it take you and your team to |
| 10:40 | 2 | create it? |
| 10:40 | 3 | A.   From start to finish, about four months. |
| 10:40 | 4 | Q.   And over that time period, can you give us a sense of |
| 10:40 | 5 | how much work your team spent preparing it? |
| 10:40 | 6 | A.   Approximately -- over the four months, approximately |
| 10:40 | 7 | 20 percent of my team's time, or about two hours a day, was |
| 10:40 | 8 | spent in preparation of this study and the resulting report, |
| 10:40 | 9 | including planning the study -- data, overseeing a data |
| 10:40 | 10 | tabulation and analysis, and creating the report. |
| 10:40 | 11 | Q.   And where did the underlying research information about |
| 10:40 | 12 | Mexico come from? |
| 10:40 | 13 | A.   The field work was actually conducted in Mexico with |
| 10:40 | 14 | Mexico consumers. |
| 10:40 | 15 | Q.   At some point were you, for purposes of this case, |
| 10:41 | 16 | asked to calculate how much it cost Mattel to make this |
| 10:41 | 17 | document? |
| 10:41 | 18 | A.   Yes. |
| 10:41 | 19 | Q.   And, generally speaking, you did go ahead and you did |
| 10:41 | 20 | that? |
| 10:41 | 21 | A.   Yes. |
| 10:41 | 22 | Q.   Did you come to a conclusion as to how much in total |
| 10:41 | 23 | the cost of this study was? |
| 10:41 | 24 | A.   Yes, I did. |
| 10:41 | 25 | Q.   And what's that number? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 82 of 139   Page ID #:308383
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:41 | 1 | A.    It was approximately about $325,000. |
| 10:41 | 2 | Q.    And that includes actual costs that Mattel incurred in |
| 10:41 | 3 | the research as well as the employee time? |
| 10:41 | 4 | A.    Yes. |
| 10:41 | 5 | MR. ZELLER:  Nothing further, Your Honor. |
| 10:41 | 6 | THE COURT:  Cross-examination, Mr. Cote, on behalf |
| 10:41 | 7 | of Mr. Machado. |
| 10:41 | 8 | MR. COTE:  Thank you, Your Honor. |
| 10:41 | 9 | **CROSS-EXAMINATION** |
| 10:41 | 10 | BY MR. COTE: |
| 10:41 | 11 | Q.    Good morning. |
| 10:41 | 12 | A.    Good morning. |
| 10:42 | 13 | Q.    This 2004 Barbie viability report for Mexico was sent |
| 10:42 | 14 | to a Mr. Ibarra, right? |
| 10:42 | 15 | A.    I believe it was. |
| 10:42 | 16 | Q.    Is it Ricardo Ibarra? |
| 10:42 | 17 | A.    I believe it is. |
| 10:42 | 18 | Q.    And he was the head of marketing for Mexico, right? |
| 10:42 | 19 | A.    I don't recall his exact title at this point. |
| 10:42 | 20 | Q.    But you testified that people who were responsible for |
| 10:42 | 21 | marketing in Mexico would need this document, right? |
| 10:42 | 22 | A.    Yes. |
| 10:42 | 23 | Q.    And you're aware that Ms. Trueba worked for Mr. Ibarra? |
| 10:42 | 24 | A.    I don't recall specifically who the employees in -- |
| 10:42 | 25 | marketing employees at Mattel Mexico were in 2004. |

| | | |
|---|---|---|
| 10:42 | 1 | Q.   What was Mattel de Mexico's advertising budget in 2004? |
| 10:42 | 2 | A.   I'm not aware. |
| 10:42 | 3 | Q.   The electronic document of this copy was kept in U.S. |
| 10:42 | 4 | servers? |
| 10:42 | 5 | A.   I believe it was. |
| 10:42 | 6 | Q.   Does that mean it could not be accessed outside the |
| 10:42 | 7 | United States? |
| 10:42 | 8 | A.   That I don't know. |
| 10:43 | 9 | MR. COTE:  No further questions. |
| 10:43 | 10 | Thank you. |
| 10:43 | 11 | THE COURT:  Ms. Hurst, on behalf of MGA and |
| 10:43 | 12 | Mr. Larian. |
| 10:43 | 13 | MS. HURST:  Thank you, Your Honor. |
| 10:43 | 14 | **CROSS-EXAMINATION** |
| 09:51 | 15 | BY MS. HURST: |
| 10:43 | 16 | Q.   Good morning, Ms. Willensky. |
| 10:43 | 17 | A.   Good morning. |
| 10:43 | 18 | Q.   The entire 27 years you've been working for Mattel |
| 10:43 | 19 | you've been involved in consumer research, true? |
| 10:43 | 20 | A.   That's correct. |
| 10:43 | 21 | Q.   And you also have an MBA, a Master's in Business |
| 10:43 | 22 | Administration? |
| 10:43 | 23 | A.   That's correct. |
| 10:43 | 24 | Q.   Would you sit forward a little bit so we can hear you |
| 10:43 | 25 | in the microphone.  Thank you. |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:43 | 1 | A.   Okay. |
| 10:43 | 2 | Q.   Your focus in your MBA was also on marketing research? |
| 10:43 | 3 | A.   Yes. |
| 10:43 | 4 | Q.   You're a skillful consumer researcher, true? |
| 10:43 | 5 | A.   I like to think I am. |
| 10:43 | 6 | Q.   All right. |
| 10:43 | 7 | And Mattel spends millions of dollars every year on |
| 10:43 | 8 | consumer research, true? |
| 10:43 | 9 | A.   Yes, they do. |
| 10:43 | 10 | Q.   It does that in order to help it sell products, right? |
| 10:44 | 11 | A.   Yes. |
| 10:44 | 12 | Q.   And there are different types of research that Mattel |
| 10:44 | 13 | conducts, true? |
| 10:44 | 14 | A.   Yes. |
| 10:44 | 15 | Q.   And you've described the viability testing as one type |
| 10:44 | 16 | of research so far this morning? |
| 10:44 | 17 | A.   Yes. |
| 10:44 | 18 | Q.   Another type of research that Mattel conducts regularly |
| 10:44 | 19 | is called a tracking study -- |
| 10:44 | 20 | A.   Yes. |
| 10:44 | 21 | Q.   -- right? |
| 10:44 | 22 | A.   Yes. |
| 10:44 | 23 | Q.   The tracking study is designed to assess attitudes |
| 10:44 | 24 | towards a brand, right? |
| 10:44 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 85 of 139   Page ID #:308386
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:44 | 1 | Q.   So an example of a brand tested in a tracking study |
| 10:44 | 2 | would be the Barbie brand, true? |
| 10:44 | 3 | A.   That's -- that's true. |
| 10:44 | 4 | Q.   Mattel also conducts focus groups, right? |
| 10:44 | 5 | A.   Yes. |
| 10:44 | 6 | Q.   That's where you sit down with moms and children, and |
| 10:44 | 7 | you show them things and you ask them questions, and you try |
| 10:44 | 8 | to assess what do they think, right? |
| 10:44 | 9 | A.   Yes. |
| 10:44 | 10 | Q.   And sometimes Mattel conducts really in-depth focus |
| 10:44 | 11 | groups that it uses to prepare reports called "State of |
| 10:45 | 12 | Barbie," right? |
| 10:45 | 13 | A.   That's one of the methodologies we would use for |
| 10:45 | 14 | that -- |
| 10:45 | 15 | Q.   And -- |
| 10:45 | 16 | A.   -- typically. |
| 10:45 | 17 | Q.   And that methodology results in a report that's |
| 10:45 | 18 | actually called "State of Barbie" -- |
| 10:45 | 19 | A.   Yes. |
| 10:45 | 20 | Q.   -- true? |
| 10:45 | 21 | A.   Yes. |
| 10:45 | 22 | Q.   And those State of Barbie reports were used to help |
| 10:45 | 23 | guide development of products, right? |
| 10:45 | 24 | A.   Or strategies behind that, yes. |
| 10:45 | 25 | Q.   But also development of product, true? |

| | | |
|---|---|---|
| 10:45 | 1 | A.   Yes. |
| 10:45 | 2 | Q.   Now, you have always done your best to accurately |
| 10:45 | 3 | portray the key information from all these studies for the |
| 10:45 | 4 | higher-ups at Mattel -- |
| 10:45 | 5 | A.   Yes. |
| 10:45 | 6 | Q.   -- right? |
| 10:45 | 7 | And, as far as you know, everybody else there working |
| 10:45 | 8 | in Mattel consumer research is doing their best to |
| 10:45 | 9 | accurately convey the information from the research to the |
| 10:45 | 10 | higher-ups -- |
| 10:45 | 11 | A.   Yes. |
| 10:45 | 12 | Q.   -- true? |
| 10:45 | 13 | A.   That's true. |
| 10:45 | 14 | Q.   Now, one thing that you believe is that positive |
| 10:46 | 15 | attitudes towards a brand can help sell product, right? |
| 10:46 | 16 | A.   Yes. |
| 10:46 | 17 | Q.   And you also believe that negative attitudes towards a |
| 10:46 | 18 | brand can impair sales of the product, true? |
| 10:46 | 19 | A.   Potentially, yes. |
| 10:46 | 20 | Q.   You've heard the term "House on Fire" used at Mattel, |
| 10:46 | 21 | right? |
| 10:46 | 22 | A.   Yes, I have. |
| 10:46 | 23 | Q.   You heard that term used by Matt Bousquette, correct? |
| 10:46 | 24 | A.   Yes. |
| 10:46 | 25 | Q.   And Matt Bousquette was the president of Mattel brands |

| | | |
|---|---|---|
| 10:46 | 1 | when you heard him use that term, right? |
| 10:46 | 2 | A.   I believe that was his title. |
| 10:46 | 3 | Q.   And he had, at that time, overall responsibility for |
| 10:46 | 4 | the Barbie brand when he was using that "House on Fire" |
| 10:46 | 5 | term, right? |
| 10:46 | 6 | A.   Yes, I think so. |
| 10:46 | 7 | Q.   And, in fact, he used that "House on Fire" term, |
| 10:46 | 8 | Mr. Bousquette, the president of Mattel brands, with respect |
| 10:46 | 9 | to the Barbie brand specifically, true? |
| 10:46 | 10 | A.   Yes. |
| 10:46 | 11 | Q.   He used it to convey a sense of urgency that the |
| 10:47 | 12 | situation with the Barbie brand needed to be addressed, |
| 10:47 | 13 | right? |
| 10:47 | 14 | A.   I think that was his intent. |
| 10:47 | 15 | Q.   He was making clear that he was dissatisfied with the |
| 10:47 | 16 | sales performance of Barbie, true? |
| 10:47 | 17 | A.   I couldn't say that absolutely, but I would think he |
| 10:47 | 18 | was. |
| 10:47 | 19 | Q.   Let me ask you to take a look at your deposition, at |
| 10:47 | 20 | page 203, at lines 4 through 9. |
| 10:47 | 21 | *(Document provided to the witness.)* |
| 10:47 | 22 | THE COURT:  Counsel? |
| 10:48 | 23 | THE WITNESS:  I'm there. |
| 10:48 | 24 | BY MS. HURST: |
| 10:48 | 25 | Q.   And does that refresh your recollection? |

| | | |
|---|---|---|
| 10:48 | 1 | THE COURT: Counsel, just a minute. |
| 10:48 | 2 | MS. HURST: Okay. |
| 10:48 | 3 | THE COURT: Thank you. |
| 10:48 | 4 | You may continue. |
| 10:48 | 5 | BY MS. HURST: |
| 10:48 | 6 | Q. Does that refresh your recollection that you understood |
| 10:48 | 7 | Mr. Bousquette's use of the term "House on Fire" to convey a |
| 10:48 | 8 | sense of urgency with respect to the sales situation with |
| 10:48 | 9 | Barbie? |
| 10:48 | 10 | MR. ZELLER: This is improper. It's not |
| 10:48 | 11 | inconsistent with what she testified to. It's improper use |
| 10:48 | 12 | of a deposition. |
| 10:48 | 13 | THE COURT: Overruled. |
| 10:48 | 14 | You can answer the question. |
| 10:48 | 15 | I don't think the jury takes this as impeaching. |
| 10:48 | 16 | I don't, Counsel. She's simply asking. |
| 10:49 | 17 | THE WITNESS: I'm not sure what -- where you think |
| 10:49 | 18 | it's being inconsistent. |
| 10:49 | 19 | MS. HURST: I wasn't. I'm just asking you. |
| 10:49 | 20 | THE WITNESS: Oh. |
| 10:49 | 21 | BY MS. HURST: |
| 10:49 | 22 | Q. Let's just focus on sales now. |
| 10:49 | 23 | We talked about brand, and now we're talking about |
| 10:49 | 24 | sales. Do you understand that? |
| 10:49 | 25 | A. Yes. And I said here I was -- I'm assuming he was |

| | | |
|---|---|---|
| 10:49 | 1 | dissatisfied with the sales. |
| 10:49 | 2 | Q.   All right.  But you also said that he used the term as |
| 10:49 | 3 | a sense of urgency addressing the situation with Barbie -- |
| 10:49 | 4 | the sales situation with Barbie, true? |
| 10:49 | 5 | A.   Yes. |
| 10:49 | 6 | Q.   Now, concerns over the Barbie brand arose long before |
| 10:49 | 7 | Mr. Bousquette became the president of Mattel brands, true? |
| 10:49 | 8 | A.   Yes. |
| 10:49 | 9 | Q.   In fact, those concerns arose by the 1996 and 1997 time |
| 10:49 | 10 | frame, correct? |
| 10:49 | 11 | A.   Yes. |
| 10:49 | 12 | Q.   All right. |
| 10:50 | 13 |         MS. HURST:  Can we show the witness Exhibit 8100, |
| 10:50 | 14 | please. |
| 10:50 | 15 |         *(Document provided to the witness.)* |
| 10:50 | 16 | BY MS. HURST: |
| 10:50 | 17 | Q.   Ms. Willensky, is Exhibit 8100 a Mattel June '96 Girls' |
| 10:50 | 18 | Tracking Study -- |
| 10:50 | 19 | A.   Yes, it is. |
| 10:50 | 20 | Q.   -- Report? |
| 10:50 | 21 | A.   Yes, it is. |
| 10:50 | 22 |         MS. HURST:  Okay.  Your Honor, I offer |
| 10:50 | 23 | Exhibit 8100. |
| 10:50 | 24 |         THE COURT:  Received. |
| 10:50 | 25 |         *(Exhibit No. 8100 received in evidence.)* |

| 10:50 | 1 | (Document displayed.) |
| 10:50 | 2 | BY MS. HURST: |
| 10:50 | 3 | Q.   Would you look at the first page of that document -- |
| 10:50 | 4 | actually, let me ask you to look at the second page of that |
| 10:50 | 5 | document, Ms. Willensky, I apologize. |
| 10:50 | 6 | (Document displayed.) |
| 11:59 | 7 | BY MS. HURST: |
| 10:50 | 8 | Q.   You see there, there's the first full paragraph, |
| 10:51 | 9 | "Though accessory purchasing" -- do you see that? |
| 10:51 | 10 | A.   Yes, I do. |
| 10:51 | 11 | Q.   Okay.  And the report in August of 1996 indicated that |
| 10:51 | 12 | "Accessory purchasing has shown modest increases with three- |
| 10:51 | 13 | to six-year-olds, but poor perceptions of quality hamper -- |
| 10:51 | 14 | continue to hamper growth"; is that correct? |
| 10:51 | 15 | A.   Yes. |
| 10:51 | 16 | Q.   And that was a problem that Mattel identified with the |
| 10:51 | 17 | perceptions of the quality of its fashion doll accessories |
| 10:51 | 18 | in 1996, true? |
| 10:51 | 19 | A.   Two specific accessories. |
| 10:51 | 20 | Q.   It says, "Continue to hamper growth," right? |
| 10:51 | 21 | A.   Yes. |
| 10:51 | 22 | Q.   Would you take a look at Exhibit 8099, please. |
| 10:52 | 23 | (Document provided to the witness.) |
| 09:21 | 24 | BY MS. HURST: |
| 10:52 | 25 | Q.   And is this a State of Barbie Focus Group's report |

| | | |
|---|---|---|
| 10:52 | 1 | dated February 3rd, 1997? |
| 10:52 | 2 | A.   Yes, it is. |
| 10:52 | 3 | MS. HURST:  Your Honor, move it into evidence. |
| 10:52 | 4 | THE COURT:  Received. |
| 10:52 | 5 | *(Exhibit No. 8099 received in evidence.)* |
| 10:52 | 6 | *(Document displayed.)* |
| 10:52 | 7 | BY MS. HURST: |
| 10:52 | 8 | Q.   You distributed this report to Adrienne Fontanella; is |
| 10:52 | 9 | that true? |
| 10:52 | 10 | A.   I would have to check the distribution list.  I don't |
| 10:52 | 11 | recall offhand. |
| 10:52 | 12 | Q.   The distribution's indicated on the last page there; is |
| 10:52 | 13 | that correct? |
| 10:52 | 14 | A.   Should be.  Okay.  Hang on one second. |
| 10:53 | 15 | Q.   My apologies.  I was looking at the wrong last page. |
| 10:53 | 16 | A.   Okay. |
| 10:53 | 17 | Q.   You distributed this report to senior management, true? |
| 10:53 | 18 | A.   Yes.  That's a trick question there. |
| 10:53 | 19 | Q.   Okay.  So in this report that you distributed to senior |
| 10:53 | 20 | management in February 1997, let's go back and look at the |
| 10:53 | 21 | first page. |
| 10:53 | 22 | A.   Okay. |
| 10:53 | 23 | Q.   The second to last paragraph there in the first page. |
| 10:53 | 24 | A.   Yes. |
| 10:53 | 25 | Q.   And it starts, "One of the key challenges"; is that |

| | | |
|---|---|---|
| 10:53 | 1 | right? |
| 10:53 | 2 | A.    Yes. |
| 10:53 | 3 | Q.    All right.  It says, "One of the key challenges |
| 10:53 | 4 | involves social pressure against public association with |
| 10:53 | 5 | Barbie, which, as seen in the U.S. tracking study, is |
| 10:53 | 6 | becoming evident among the seven- to eight-year-olds, where |
| 10:53 | 7 | previously it was most noticeably affecting the nine to |
| 10:54 | 8 | ten-year-olds." |
| 10:54 | 9 | That was what you reported in the State of Barbie Focus |
| 10:54 | 10 | Groups in February '97, true? |
| 10:54 | 11 | A.    That's true. |
| 10:54 | 12 | Q.    And you also reported, "While the Barbie brand has |
| 10:54 | 13 | successfully increased ownership among the very young, three |
| 10:54 | 14 | to four-year-olds, a resultant downside effect may be to |
| 10:54 | 15 | exhaust girls from Barbie play at an earlier age, as well as |
| 10:54 | 16 | to cause a desire by girls to publicly distance themselves |
| 10:54 | 17 | from toys that are considered babyish, especially by older |
| 10:54 | 18 | children." |
| 10:54 | 19 | You also reported that in February of '97, true? |
| 10:54 | 20 | A.    Yes, true. |
| 10:54 | 21 | Q.    And that was long before Bratz ever entered the market, |
| 10:54 | 22 | correct? |
| 10:54 | 23 | A.    That's correct. |
| 10:54 | 24 | Q.    Could you turn, please, to Exhibit 8101.  And this is a |
| 10:55 | 25 | State of Barbie Focus Group's report, dated July 21st, 1997; |

| | | |
|---|---|---|
| 10:55 | 1 | is that correct? |
| 10:55 | 2 | A.   Yes, that's correct. |
| 10:55 | 3 | Q.   And you distributed this report within Mattel on or |
| 10:55 | 4 | about that date -- |
| 10:55 | 5 | A.   Yes. |
| 10:55 | 6 | Q.   -- true? |
| 10:55 | 7 | A.   True. |
| 10:55 | 8 | MS. HURST:  Your Honor, move to admit 8101. |
| 10:55 | 9 | THE COURT:  Received. |
| 10:55 | 10 | *(Exhibit No. 8101 received in evidence.)* |
| 10:55 | 11 | *(Document displayed.)* |
| 10:59 | 12 | BY MS. HURST: |
| 10:55 | 13 | Q.   Let's just focus on the first page there of |
| 10:55 | 14 | Exhibit 8101.  In the very first sentence it says, "Retail |
| 10:55 | 15 | sales of several key Barbie SKU's have not met expectations |
| 10:55 | 16 | to date," true? |
| 10:55 | 17 | A.   True. |
| 10:55 | 18 | Q.   "Research with girls and moms was therefore conducted |
| 10:55 | 19 | to further investigate this situation," right? |
| 10:55 | 20 | A.   Yes. |
| 10:55 | 21 | Q.   This study was especially conducted to investigate why |
| 10:55 | 22 | sales were not meeting expectations in mid '97, true? |
| 10:55 | 23 | A.   True. |
| 10:56 | 24 | Q.   And the report goes on to say that, "While Barbie |
| 10:56 | 25 | remains a perennial favorite among our target market, the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

94

| 10:56 | 1 | brand is not considered hot or topical," true? |
| 10:56 | 2 | A.   True. |
| 10:56 | 3 | Q.   "There are no 'gotta have' Barbie dolls currently in |
| 10:56 | 4 | the market to fuel excitement for the brand." |
| 10:56 | 5 |      That's what you reported, true? |
| 10:56 | 6 | A.   True. |
| 10:56 | 7 | Q.   "Moreover, there appears to be a declining interest in |
| 10:56 | 8 | acquiring more Barbie dolls." |
| 10:56 | 9 |      You reported that, as well? |
| 10:56 | 10 | A.   Yes.  Yes, I did. |
| 10:56 | 11 | Q.   And you reported factors that were contributing to this |
| 10:56 | 12 | situation, correct? |
| 10:56 | 13 | A.   Yes. |
| 10:56 | 14 | Q.   The first factor you reported was "perceived |
| 10:56 | 15 | saturation," right? |
| 10:56 | 16 | A.   Yes. |
| 10:56 | 17 | Q.   And that meant there were already so many dolls out |
| 10:56 | 18 | there that people didn't want more of 'em, right? |
| 10:56 | 19 | A.   That was the perception, yes. |
| 10:57 | 20 | Q.   "Boredom and predictability."  That was a factor that |
| 10:57 | 21 | you reported, true? |
| 10:57 | 22 | A.   Yes, yes. |
| 10:57 | 23 | Q.   "Product similarity."  That meant all the products were |
| 10:57 | 24 | too much alike; they weren't differentiated enough -- |
| 10:57 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:57 | 1 | Q.    -- true? |
| 10:57 | 2 | A.    Yes. |
| 10:57 | 3 | Q.    "Commercial disbelief."  That meant girls didn't |
| 10:57 | 4 | believe your advertising commercials, true? |
| 10:57 | 5 | A.    Uh, true. |
| 10:57 | 6 | Q.    And you also reported on "competition" as a factor, |
| 10:57 | 7 | correct? |
| 10:57 | 8 | A.    Correct. |
| 10:57 | 9 | Q.    And that was July 1997, four years before Bratz entered |
| 10:57 | 10 | the market, true? |
| 10:57 | 11 | A.    True. |
| 10:57 | 12 | Q.    And would you turn to Exhibit 8102, please. |
| 10:57 | 13 |       MR. ZELLER:  Your Honor, there were agreed times |
| 10:57 | 14 | on this. |
| 10:57 | 15 |       THE COURT:  All right.  Thank you. |
| 10:57 | 16 | BY MS. HURST: |
| 10:57 | 17 | Q.    Do you have Exhibit 8102 before you, ma'am? |
| 10:57 | 18 | A.    Yes, I do. |
| 10:57 | 19 | Q.    And that's a Summary of Research on Older Girls and |
| 10:58 | 20 | Barbie report, true? |
| 10:58 | 21 | A.    True. |
| 10:58 | 22 | Q.    Dated October 7, 1997? |
| 10:58 | 23 | A.    True. |
| 10:58 | 24 |       MS. HURST:  Your Honor, move to admit 8102. |
| 10:58 | 25 |       THE COURT:  Received. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 96 of 139   Page ID #:308397
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:58 | 1 | (Exhibit No. 8102 received in evidence.) |
| 10:58 | 2 | MS. HURST:  Let's go to 8105-A, please. |
| 10:58 | 3 | BY MS. HURST: |
| 10:58 | 4 | Q.   That's a Mattel research report dated January 29, 1998, |
| 10:58 | 5 | on toy packaging, correct? |
| 10:58 | 6 | A.   Yes. |
| 10:58 | 7 | Q.   And that was distributed within Mattel regarding toy |
| 10:58 | 8 | packaging at that time? |
| 10:58 | 9 | A.   Yes. |
| 10:58 | 10 | MS. HURST:  Your Honor, move to admit 8105-A. |
| 10:58 | 11 | THE COURT:  Received. |
| 10:58 | 12 | (Exhibit No. 8105-A received in evidence.) |
| 10:58 | 13 | BY MS. HURST: |
| 10:58 | 14 | Q.   Let's stop there for a moment.  Let's look at the first |
| 10:58 | 15 | page of 8105-A, the second full paragraph. |
| 10:58 | 16 | (Document displayed.) |
| 10:58 | 17 | BY MS. HURST: |
| 10:58 | 18 | Q.   Now, in this research, you're reporting a summary of |
| 10:58 | 19 | findings and guidelines for packaging, true? |
| 10:58 | 20 | A.   Yes, true. |
| 10:59 | 21 | Q.   And the reason for that is because packaging was an |
| 10:59 | 22 | important factor influencing consumers, true? |
| 10:59 | 23 | A.   It's one of the factors. |
| 10:59 | 24 | Q.   "It is an important selling tool for the product," |
| 10:59 | 25 | that's what you reported, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 97 of 139   Page ID #:308398
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

97

| 10:59 | 1 | A. Yes. That's what this report says, yes. |
| 10:59 | 2 | Q. And one of the reasons why the report found packaging |
| 10:59 | 3 | to be so important is "because only one in five traditional |
| 10:59 | 4 | toys purchased is requested specifically by name. Thus, a |
| 10:59 | 5 | well-designed toy package that makes an impact on the retail |
| 10:59 | 6 | shelf can play an important role in influencing the purchase |
| 10:59 | 7 | decision." True? |
| 10:59 | 8 | A. For moms in particular. |
| 10:59 | 9 | Q. But that's -- and that's what you said in this report, |
| 10:59 | 10 | true? |
| 10:59 | 11 | A. Yes, that it's a -- primarily a selling tool with |
| 10:59 | 12 | respect to moms, and so it's impactful for moms. |
| 11:00 | 13 | Q. And moms are the ones who usually have the money when |
| 11:00 | 14 | you go to the store, right? |
| 11:00 | 15 | A. Usually, yes. |
| 11:00 | 16 | Q. All right. Let me ask you to look at Exhibit 8106-A. |
| 11:00 | 17 | That's a report of the 1998 Girls' Tracking Study in Europe, |
| 11:00 | 18 | dated June 1, 1998, true? |
| 11:00 | 19 | A. True. |
| 11:00 | 20 |         MS. HURST: Your Honor, move to admit 8106-A. |
| 11:00 | 21 |         THE COURT: Received. |
| 11:00 | 22 |         (Exhibit No. 8106-A received in evidence.) |
| 11:00 | 23 |          (Document displayed.) |
| 11:59 | 24 | BY MS. HURST: |
| 11:00 | 25 | Q. And the first page of that report, Ms. Willensky -- |

| 11:00 | 1 | let's just look at the very first sentence there under the |
| 11:00 | 2 | Executive Summary regarding Barbie. |
| 11:00 | 3 | Now, in that -- and this was your report, true? |
| 11:00 | 4 | A.   True. |
| 11:00 | 5 | Q.   You reported in June 1998, "The current market |
| 11:00 | 6 | situation for Barbie in Europe is similar to the U.S., with |
| 11:00 | 7 | both internal and external factors negatively affecting |
| 11:01 | 8 | consumer's satisfaction with the brand." |
| 11:01 | 9 | That's what you reported, right? |
| 11:01 | 10 | A.   Yes. |
| 11:01 | 11 | Q.   So there were problems both in Europe and in the |
| 11:01 | 12 | United States by this point, June of '98, true? |
| 11:01 | 13 | A.   True. |
| 11:01 | 14 | Q.   All right.  Let me ask you to go to 8172. |
| 11:01 | 15 | Now, 8172, that's a presentation that you and Michael |
| 11:01 | 16 | Moore -- Michael Shore -- pardon me -- made, true? |
| 11:01 | 17 | A.   True. |
| 11:01 | 18 | Q.   And Michael Shore is also one of the consumer |
| 11:01 | 19 | researchers at Mattel, right? |
| 11:01 | 20 | A.   Yes, he is. |
| 11:01 | 21 | Q.   He's actually your boss right now, right? |
| 11:01 | 22 | A.   Now he is, yes. |
| 11:01 | 23 | Q.   He's presently the head of research at Mattel -- |
| 11:01 | 24 | A.   Yes. |
| 11:01 | 25 | Q.   -- true? |

| | | |
|---|---|---|
| 11:02 | 1 | A.    True. |
| 11:02 | 2 | MS. HURST:  Your Honor, move to admit 8172. |
| 11:02 | 3 | THE COURT:  Received. |
| 11:02 | 4 | *(Exhibit No. 8172 received in evidence.)* |
| 11:59 | 5 | BY MS. HURST: |
| 11:02 | 6 | Q.    Now, this was a presentation that you and Mr. Shore |
| 11:02 | 7 | made in or about September 1999, true? |
| 11:02 | 8 | A.    True. |
| 11:02 | 9 | Q.    And this was a report -- a State of Barbie report based |
| 11:02 | 10 | on focus groups that you conducted; is that right? |
| 11:02 | 11 | A.    Yes. |
| 11:02 | 12 | Q.    All right.  I want to ask you to turn to page 4.  It |
| 11:02 | 13 | says TX8172-00004.  Do you see that? |
| 11:02 | 14 | A.    Yes, I do. |
| 11:02 | 15 | Q.    Up at the top there, one of your findings that you |
| 11:02 | 16 | reported is that "The girls' world of leisure time |
| 11:02 | 17 | activities encompass a myriad of categories that were not |
| 11:02 | 18 | observed in the past," right? |
| 11:02 | 19 | A.    Yes. |
| 11:02 | 20 | Q.    "A myriad of" -- that means a lot, right? |
| 11:02 | 21 | A.    That's correct. |
| 11:02 | 22 | Q.    Okay.  And one of the categories that you identified, |
| 11:03 | 23 | even back in September of 1999, was electronics, right? |
| 11:03 | 24 | A.    That's correct. |
| 11:03 | 25 | Q.    And "Game Boy," that's a video game, right? |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

100

| | | |
|---|---|---|
| 11:03 | 1 | A.    Yes, that is.  Yes. |
| 11:03 | 2 | Q.    "N64."  That was a video game, right? |
| 11:03 | 3 | A.    It was a platform. |
| 11:03 | 4 | Q.    "PlayStation."  That was a video game platform -- |
| 11:03 | 5 | A.    Yes. |
| 11:03 | 6 | Q.    -- right? |
| 11:03 | 7 | A.    Yes. |
| 11:03 | 8 | Q.    So even as early as September 1999, you were already |
| 11:03 | 9 | concerned about video games taking interest away from |
| 11:03 | 10 | fashion dolls, true? |
| 11:03 | 11 | A.    True. |
| 11:03 | 12 | Q.    Would you turn to the next page, please. |
| 11:03 | 13 | (Document displayed.) |
| 11:03 | 14 | BY MS. HURST: |
| 11:03 | 15 | Q.    Now, on page 5, you reported your finding that "New |
| 11:03 | 16 | categories of product marketed to girls have made a dent in |
| 11:03 | 17 | girl's preoccupation with Barbie," true? |
| 11:03 | 18 | A.    True. |
| 11:03 | 19 | Q.    And on page 6 of the report, the next page. |
| 11:03 | 20 | (Document displayed.) |
| 11:03 | 21 | BY MS. HURST: |
| 11:03 | 22 | Q.    You reported, "There is a certain amount of |
| 11:03 | 23 | indifference or lethargy toward Barbie that seems to be |
| 11:04 | 24 | affecting girls," true? |
| 11:04 | 25 | A.    True. |

| | | |
|---|---|---|
| 11:04 | 1 | Q.   On page 7 of the report. |
| 11:04 | 2 | *(Document displayed.)* |
| 11:04 | 3 | BY MS. HURST: |
| 11:04 | 4 | Q.   Do you have that? |
| 11:04 | 5 | A.   Yes. |
| 11:04 | 6 | Q.   You reported, "There was an overwhelming sense of |
| 11:04 | 7 | saturation with the Barbie dolls," right? |
| 11:04 | 8 | A.   Yes. |
| 11:04 | 9 | Q.   And that was all in September of 1999, right? |
| 11:04 | 10 | A.   Right. |
| 11:04 | 11 | Q.   Finally, on page 8 of the report. |
| 11:04 | 12 | *(Document displayed.)* |
| 11:04 | 13 | BY MS. HURST: |
| 11:04 | 14 | Q.   You found, "Of great concern" -- "that seven- to |
| 11:04 | 15 | eight-year-olds seem to be brand weary and ready to adopt |
| 11:04 | 16 | alternative playtime habits," correct? |
| 11:04 | 17 | A.   Correct. |
| 11:04 | 18 | Q.   And that was all long before Bratz ever came into the |
| 11:04 | 19 | market, correct? |
| 11:04 | 20 | A.   Correct. |
| 11:05 | 21 | Q.   Let me ask you to look at Exhibit 9698, 9699 and 9700 |
| 11:05 | 22 | all together there right in a row. |
| 11:05 | 23 | A.   "9698" did you say? |
| 11:05 | 24 | Q.   Yes.   -98, -99 and 9700. |
| 11:05 | 25 | Do you see those? |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

102

| | | |
|---|---|---|
| 11:05 | 1 | A.   I do. |
| 11:05 | 2 | Q.   Now, those are all reports from Mattel's consumer |
| 11:05 | 3 | research department regarding a single study called the New |
| 11:05 | 4 | Brand Cannibalization Study, right? |
| 11:05 | 5 | MR. ZELLER:  Question's compound. |
| 11:05 | 6 | THE COURT:  Overruled. |
| 11:05 | 7 | BY MS. HURST: |
| 11:05 | 8 | Q.   You can answer. |
| 11:05 | 9 | A.   Yes. |
| 11:05 | 10 | Q.   And those reports are all dated January 14, 2002, |
| 11:05 | 11 | correct? |
| 11:06 | 12 | A.   Yes, they are. |
| 11:06 | 13 | Q.   Three different reports regarding the same study, true? |
| 11:06 | 14 | A.   I don't know if they're different reports. |
| 11:06 | 15 | Q.   If you compare 9698 to 9699, do you notice that the |
| 11:06 | 16 | Summary of Findings are presented in a different order? |
| 11:06 | 17 | A.   Between 9698 and which one? |
| 11:06 | 18 | Q.   9699. |
| 11:06 | 19 | THE COURT:  Are these reports that you prepared? |
| 11:06 | 20 | THE WITNESS:  Oh, I didn't prepare either of these |
| 11:06 | 21 | reports. |
| 11:06 | 22 | THE COURT:  Have you seen these reports before you |
| 11:06 | 23 | testified? |
| 11:06 | 24 | THE WITNESS:  I have seen the reports. |
| 11:06 | 25 | THE COURT:  All right.  Then you can answer the |

| | | |
|---|---|---|
| 11:06 | 1 | question. |
| 11:06 | 2 | THE WITNESS:  I'm just looking to see what the |
| 11:06 | 3 | differences are.  It looks like ones -- |
| 11:06 | 4 | THE COURT:  (To the reporter:)  Stop the clock. |
| 11:06 | 5 | BY MS. HURST: |
| 11:06 | 6 | Q.   You note, Ms. -- |
| 11:07 | 7 | THE COURT:  Just a moment.  Let her go through the |
| 11:07 | 8 | reports. |
| 11:07 | 9 | MS. HURST:  Okay. |
| 11:07 | 10 | THE COURT:  We're stopping the clock. |
| 11:07 | 11 | MS. HURST:  I was trying to help, that's all. |
| 11:07 | 12 | THE WITNESS:  Okay.  You're going to point out |
| 11:07 | 13 | where it's different? |
| 11:07 | 14 | MS. HURST:  Yeah. |
| 11:07 | 15 | BY MS. HURST: |
| 11:07 | 16 | Q.   In 9698, Ms. Willensky, you notice that under the |
| 11:07 | 17 | Summary of Findings, Bratz is discussed first, true? |
| 11:07 | 18 | A.   Oh, got you.  Yes, yes.  Thank you. |
| 11:07 | 19 | Q.   And then in 9699, under the Summary of Findings, |
| 11:07 | 20 | Fashion Poly is discussed first, right? |
| 11:07 | 21 | A.   Yes. |
| 11:07 | 22 | Q.   Okay.  So you note there are some differences between |
| 11:07 | 23 | the two reports, true? |
| 11:07 | 24 | THE COURT:  (To the reporter:) Deb, start again. |
| 11:07 | 25 | THE WITNESS:  Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 104 of 139   Page ID #:308405
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

104

| 11:07 | 1 | MS. HURST:  Your Honor, request admission of 9698, |
| 11:07 | 2 | 9699 and 9700. |
| 11:07 | 3 | THE COURT:  Received. |
| 11:07 | 4 | *(Exhibit No. 9698 received in evidence.)* |
| 11:07 | 5 | *(Exhibit No. 9699 received in evidence.)* |
| 11:07 | 6 | *(Exhibit No. 9700 received in evidence.)* |
| 11:07 | 7 | BY MS. HURST: |
| 11:07 | 8 | Q.   The third report, 9700, that's entitled, "Bratz |
| 11:07 | 9 | Highlights only," right? |
| 11:07 | 10 | *(Document displayed.)* |
| 11:07 | 11 | THE WITNESS:  Yes. |
| | 12 | BY MS. HURST: |
| 11:07 | 13 | Q.   This was really your first big study there at Mattel |
| 11:07 | 14 | looking at Bratz, right? |
| 11:07 | 15 | MR. ZELLER:  Question's vague. |
| 11:07 | 16 | THE COURT:  Overruled. |
| 11:07 | 17 | THE WITNESS:  I don't -- I don't know that.  I -- |
| 11:08 | 18 | that's not clear. |
| 11:59 | 19 | BY MS. HURST: |
| 11:08 | 20 | Q.   Bratz came out in the summer of 2001, right? |
| 11:08 | 21 | A.   Yes.  But I'm -- I couldn't say for certain that this |
| 11:08 | 22 | was the first study that looked at Bratz. |
| 11:08 | 23 | Q.   Okay.  This was a study involving interviews of a |
| 11:08 | 24 | thousand and five girls six to ten years old, true? |
| 11:08 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:08 | 1 | Q.   Let's just focus on 9698 for a moment.  I think you're |
| 11:08 | 2 | looking at 9700 there. |
| 11:08 | 3 | A.   Yes. |
| 11:08 | 4 | MS. HURST:  Mike, can we look at 9698. |
| 11:08 | 5 | *(Document displayed.)* |
| 11:08 | 6 | THE WITNESS:  Okay. |
| | 7 | BY MS. HURST: |
| 11:08 | 8 | Q.   1,005 interviews, right? |
| 11:08 | 9 | A.   Yes. |
| 11:08 | 10 | Q.   This study had a control group, so it was actually |
| 11:08 | 11 | designed to measure the cause of people's attitudes, right? |
| 11:08 | 12 | A.   Um, I'd have to -- yeah, I believe so. |
| 11:09 | 13 | Q.   And what you found -- now this is -- the report of the |
| 11:09 | 14 | results is January 14, 2002, right? |
| 11:09 | 15 | A.   Yes. |
| 11:09 | 16 | Q.   So this is that very first set of Bratz products in the |
| 11:09 | 17 | marketplace that you're studying at this point in time, the |
| 11:09 | 18 | ones from the Summer and the Fall of 2001, correct? |
| 11:09 | 19 | A.   Yes.  It doesn't say which specific products were in |
| 11:09 | 20 | here, but I would assume that that's what that was. |
| 11:09 | 21 | Q.   Presumably you didn't have the as-yet-unreleased MGA |
| 11:09 | 22 | products -- |
| 11:09 | 23 | A.   Oh, no, we did not. |
| 11:09 | 24 | Q.   -- to conduct the study, did you? |
| 11:09 | 25 | A.   No, we did not. |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

106

| 11:09 | 1 | Q.   Okay.  You found that "Bratz has no observable impact |
| 11:09 | 2 | on Barbie among six- to seven-years-olds," right? |
| 11:09 | 3 | MR. ZELLER:  Question's compound.  She's referring |
| 11:09 | 4 | to more than one report at this point, Judge. |
| 11:09 | 5 | THE COURT:  Overruled. |
| 11:09 | 6 | BY MS. HURST: |
| 11:09 | 7 | Q.   Is that what you found? |
| 11:09 | 8 | A.   To clarify, it didn't have impact on the two Barbie |
| 11:10 | 9 | products that were included in this test.  This did not |
| 11:10 | 10 | include all of the Barbie products available.  It only had |
| 11:10 | 11 | Mystery Squad Barbie and Salon Surprise Barbie.  So it was |
| 11:10 | 12 | based on the impact Bratz had on these two particular Barbie |
| 11:10 | 13 | dolls. |
| 11:10 | 14 | MS. HURST:  Your Honor, I'll ask that answer be |
| 11:10 | 15 | stricken, and the witness be directed to answer my question. |
| 11:10 | 16 | THE COURT:  Just reask the question. |
| 11:10 | 17 | BY MS. HURST: |
| 11:10 | 18 | Q.   In this report, Ms. Willensky, you found -- it's right |
| 11:10 | 19 | there under the Summary of Findings, right?  These were the |
| 11:10 | 20 | words, "Bratz has no observable impact on Barbie among |
| 11:10 | 21 | six- to seven-year-olds," true? |
| 11:10 | 22 | A.   That's what it says.  That's what the sentence says. |
| 11:10 | 23 | Q.   Okay.  On the other hand, down there at the third |
| 11:10 | 24 | bullet point, you found that "Fashion Polly" -- and that was |
| 11:10 | 25 | a Mattel product at the time, right? |

| | | |
|---|---|---|
| 11:10 | 1 | A.   Yes. |
| 11:10 | 2 | Q.   "Fashion Polly results in the greatest loss of share |
| 11:10 | 3 | for the mainline Barbie segment," true? |
| 11:10 | 4 | A.   For the two -- the two dolls that were included -- the |
| 11:11 | 5 | two Barbie dolls that were included, yes. |
| 11:11 | 6 | Q.   You also found in the second bullet point that "Fashion |
| 11:11 | 7 | Diva results in minor loss of share for Barbie," true? |
| 11:11 | 8 | A.   Yes.  It says, "And, most notably, a loss for the |
| 11:11 | 9 | Mystery Squad segment" -- so one of the two segments that |
| 11:11 | 10 | was in here. |
| 11:11 | 11 | Q.   And Fashion Divas was also a Mattel product, right? |
| 11:11 | 12 | A.   Yes. |
| 11:11 | 13 | Q.   All right.  So you reported that two Mattel products |
| 11:11 | 14 | caused loss of share among six- and seven-year-olds, but |
| 11:11 | 15 | Bratz had no observable impact, true? |
| 11:11 | 16 | MR. ZELLER:  Misstates the document. |
| 11:11 | 17 | THE COURT:  Overruled. |
| 11:11 | 18 | You can answer the question, please. |
| 11:11 | 19 | THE WITNESS:  It had no observable impact on those |
| 11:11 | 20 | two segments that were included, those two Barbie segments. |
| 11:11 | 21 | BY MS. HURST: |
| 11:11 | 22 | Q.   Let me ask you to turn to Exhibit 8176, Ms. Willensky. |
| 11:12 | 23 | Do you have that before you? |
| 11:12 | 24 | A.   Yes, I do. |
| 11:12 | 25 | Q.   And that's a document entitled, "Market Share Defense |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 108 of 139   Page ID #:308409
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

108

| | | |
|---|---|---|
| 11:12 | 1 | Task Force Research Team, Action Items," dated March 15, |
| 11:12 | 2 | 2003 –– |
| 11:12 | 3 | A.   Yes. |
| 11:12 | 4 | Q.   –– true? |
| 11:12 | 5 | A.   Yes. |
| 11:12 | 6 | Q.   And you see there your name is listed on the second |
| 11:12 | 7 | page as one of Market Share Defense Task Force Team members? |
| 11:12 | 8 | A.   Yes. |
| 11:12 | 9 | Q.   Okay. |
| 11:12 | 10 | MS. HURST:  Your Honor, move to admit 8176. |
| 11:12 | 11 | THE COURT:  Received. |
| 11:12 | 12 | *(Exhibit No. 8176 received in evidence.)* |
| 11:12 | 13 | *(Document displayed.)* |
| 11:12 | 14 | BY MS. HURST: |
| 11:12 | 15 | Q.   This was your –– you were one of the team members on |
| 11:12 | 16 | the Market Share Defense Task Force in March 15, 2003; is |
| 11:12 | 17 | that right, Ms. Willensky? |
| 11:12 | 18 | A.   I would say, yes, I was. |
| 11:12 | 19 | Q.   Okay.  And would you look at page 5 of that |
| 11:12 | 20 | presentation, please. |
| 11:12 | 21 | *(Document displayed.)* |
| 11:59 | 22 | BY MS. HURST: |
| 11:12 | 23 | Q.   This was the summary of key findings of your Market |
| 11:12 | 24 | Share Defense Task Force, right? |
| 11:13 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:13 | 1 | Q.   And what you found is that "Bratz serves as a," |
| 11:13 | 2 | quote/unquote, "disruptive introduction in the older girls' |
| 11:13 | 3 | toy space, generating significant new interest in dolls |
| 11:13 | 4 | through innovative styling and positioning." |
| 11:13 | 5 | Right? |
| 11:13 | 6 | A.   Yes. |
| 11:13 | 7 | Q.   And then you reported what you had found in your |
| 11:13 | 8 | research about why girls like Bratz, true? |
| 11:13 | 9 | A.   True. |
| 11:13 | 10 | Q.   You found that "The look and positioning are unique, |
| 11:13 | 11 | not Barbie," right? |
| 11:13 | 12 | A.   Yes. |
| 11:13 | 13 | Q.   At this point sometimes you were calling Bratz the |
| 11:13 | 14 | anti-Barbie, right? |
| 11:13 | 15 | A.   I wasn't, but... |
| 11:13 | 16 | Q.   Some people in Mattel consumer research were, true? |
| 11:13 | 17 | A.   They may have. |
| 11:13 | 18 | Q.   The "Brand name instantly communicates personality." |
| 11:13 | 19 | You found that to be a strength of Bratz, true? |
| 11:13 | 20 | A.   True. |
| 11:13 | 21 | Q.   The "Personality is alluring, sexy and rebellious. |
| 11:13 | 22 | Older girls are intrigued by bad popular girls." |
| 11:14 | 23 | That was one of the key findings regarding Bratz, |
| 11:14 | 24 | right? |
| 11:14 | 25 | A.   At the time, yes. |

| | | |
|---|---|---|
| 11:14 | 1 | Q.   They were "Pretty dolls with cool fashions," right? |
| 11:14 | 2 | A.   Yes. |
| 11:14 | 3 | Q.   They were "Real teenagers with real teen fashions," |
| 11:14 | 4 | true? |
| 11:14 | 5 | A.   True. |
| 11:14 | 6 | Q.   And that was particularly important amongst the older |
| 11:14 | 7 | girls who played with fashion dolls because that appealed to |
| 11:14 | 8 | their sense of what you call "aspirational reality"; in |
| 11:14 | 9 | other words, it let them imagine what they would like to be |
| 11:14 | 10 | in a Phoosapha years' time, right? |
| 11:14 | 11 | A.   Yes. |
| 11:14 | 12 | Q.   She "was recognized" -- that's Bratz -- as a "uniquely |
| 11:14 | 13 | older girl," right? |
| 11:14 | 14 | A.   As appealing to older girls. |
| 11:14 | 15 | Q.   Thank you for helping me there.  That was bad language. |
| 11:14 | 16 | "Recognized as" -- Bratz was appealing uniquely to the |
| 11:14 | 17 | older girl population, right? |
| 11:14 | 18 | A.   "Recognized as uniquely older girl."  That's a little |
| 11:14 | 19 | ambiguous. |
| 11:14 | 20 | Q.   In other words, the point was that, because it was a |
| 11:15 | 21 | brand that was recognized as being for older girls -- |
| 11:15 | 22 | A.   For older girls -- |
| 11:15 | 23 | Q.   -- it was cool to older girls -- |
| 11:15 | 24 | A.   Yes. |
| 11:15 | 25 | Q.   -- right? |

11:15   1    A.   Yes.

11:15   2    Q.   She had "cool removable feet," right?

11:15   3    A.   Yes.

11:15   4    Q.   And was "popular"?

11:15   5    A.   Yes.

11:15   6    Q.   True?

11:15   7    A.   Yes.

11:15   8    Q.   And those were all the reasons you reported in 2003 for

11:15   9    why Bratz was serving as a successful, as you called it,

11:15   10   "disruptive introduction in girls fashion dolls"; is that

11:15   11   right?

11:15   12   A.   Yes.

11:15   13              THE COURT:  All right.

11:15   14              Counsel, could I see each of you just for a moment

11:15   15   in the hallway, Mr. Zeller, Ms. Hurst.

11:15   16              Excuse us for just a minute.  I want to have a

11:15   17   conversation with counsel.  This has nothing to do with the

11:15   18   case and facts for a moment.  We're going to talk about

11:15   19   timing.

11:16   20              *(Sidebar proceedings reported as follows:)*

11:16   21              THE COURT:  Last evening there was some time

11:16   22   frames worked out, and the day before.  And the agreement

11:16   23   was, as to this witness, there would be 20 minutes on

11:16   24   direct.

11:16   25              MR. ZELLER:  Correct.

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 112 of 139   Page ID #:308413
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

112

| | | |
|---|---|---|
| 11:16 | 1 | THE COURT:  15 minutes on -- |
| 11:16 | 2 | MR. ZELLER:  Cross and recross. |
| 11:16 | 3 | THE COURT:  No, no.  Well, thank you, Judge |
| 11:16 | 4 | Zeller.  I'm just kidding with you.  Now I'm talking; you're |
| 11:16 | 5 | listening. |
| 11:16 | 6 | All right.  There would be 30 minutes on direct, |
| 11:16 | 7 | 30 minutes on cross and recross, and 15 minutes on recross. |
| 11:16 | 8 | MR. ZELLER:  No. |
| 11:16 | 9 | THE COURT:  I'm sorry.  Redirect. |
| 11:16 | 10 | MR. ZELLER:  No. |
| 11:16 | 11 | THE COURT:  Yes.  30 minutes -- I'm sorry.  My |
| 11:16 | 12 | apologies. |
| 11:16 | 13 | 20 minutes on direct, 15 minutes on redirect, and |
| 11:17 | 14 | 30 minutes on cross and recross. |
| 11:17 | 15 | MS. HURST:  Right. |
| 11:17 | 16 | THE COURT:  Now, I also added one statement.  I |
| 11:17 | 17 | gave you five more minutes, because I thought it was unfair |
| 11:17 | 18 | yesterday, and I gave that to you informally and within |
| 11:17 | 19 | earshot of everybody, and told you to even out the five |
| 11:17 | 20 | minutes.  So you're within your time. |
| 11:17 | 21 | Number two, it's obvious to me that you |
| 11:17 | 22 | underestimated your time, but you're within the time I gave |
| 11:17 | 23 | you.  You're exactly 35 minutes right now. |
| 11:17 | 24 | So, Mr. Zeller, if you disagree with that, I want |
| 11:17 | 25 | you to make your record over "five minutes" because what I'm |

| | | |
|---|---|---|
| 11:17 | 1 | going to do is limit Mr. Price to five minutes with |
| 11:17 | 2 | Mr. Larian.  Because I originally said five minutes, and |
| 11:17 | 3 | then you approached me last night and I graciously gave you |
| 11:17 | 4 | another five.  So if we're playing five minutes back and |
| 11:17 | 5 | forth, you're limited to five minutes with Mr. Larian. |
| 11:17 | 6 | You reach an agreement back here very quickly |
| 11:17 | 7 | about that. |
| 11:18 | 8 | All right.  Now, Mr. Zeller I want to hear your |
| 11:18 | 9 | complaint. |
| 11:18 | 10 | MR. ZELLER:  No complaint, Your Honor. |
| 11:18 | 11 | THE COURT:  Any complaint at all? |
| 11:18 | 12 | MR. ZELLER:  I have no complaint. |
| 11:18 | 13 | THE COURT:  Do you think you've been harmed; that |
| 11:18 | 14 | the Court's gone back on its word?  If so, I want that on |
| 11:18 | 15 | the record. |
| 11:18 | 16 | MR. ZELLER:  No. |
| 11:18 | 17 | THE COURT:  All right.  You have ten minutes with |
| 11:18 | 18 | Larian. |
| 11:18 | 19 | MR. PRICE:  Last night you said 15. |
| 11:18 | 20 | THE COURT:  I just cut it down.  This nonsense is |
| 11:18 | 21 | going to stop.  This nonsense over five minutes is going to |
| 11:18 | 22 | stop. |
| 11:18 | 23 | MR. ZELLER:  It wasn't over five minutes.  I |
| 11:18 | 24 | apologize. |
| 11:18 | 25 | THE COURT:  All right.  15 minutes, then. |

| | | |
|---|---|---|
| 11:18 | 1 | MR. ZELLER:  I apologize. |
| 11:18 | 2 | THE COURT:  You're very fortunate.  I used my |
| 11:18 | 3 | grace to give you that extra ten.  I don't expect to hear |
| 11:18 | 4 | that nonsense again.  Thank you. |
| 11:18 | 5 | *(End of sidebar proceedings.)* |
| 11:19 | 6 | *(In open court in the presence of the jury.)* |
| 11:19 | 7 | THE COURT:  We're back on the record. |
| 11:19 | 8 | Mr. Zeller, if you have any additional questions. |
| 11:19 | 9 | MS. HURST:  Your Honor, just two more documents I |
| 11:19 | 10 | want to admit. |
| 11:19 | 11 | THE COURT:  Please. |
| 11:19 | 12 | BY MS. HURST: |
| 11:19 | 13 | Q.  Ms. Willensky, would you look at Exhibit 8190, please. |
| 11:19 | 14 | That's a Girls' Monthly Brand Tracking Study in the U.S, |
| 11:19 | 15 | dated August 25th, 2004, true. |
| 11:19 | 16 | A.  True. |
| 11:19 | 17 | MS. HURST:  And, Your Honor, move to admit 8190. |
| 11:19 | 18 | THE COURT:  Received. |
| 11:19 | 19 | *(Exhibit No. 8190 received in evidence.)* |
| | 20 | BY MS. HURST: |
| 11:19 | 21 | Q.  And would you look 8193, please, Ms. Willensky. |
| 11:19 | 22 | A.  Okay. |
| 11:19 | 23 | Q.  Do you have that before you? |
| 11:19 | 24 | A.  Yes, I do. |
| 11:19 | 25 | Q.  And that's a report summarizing from 1991 to 1999 the |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 115 of 139   Page ID #:308416
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

115

| | | |
|--|--|--|
| 11:20 | 1 | research regarding the Barbie brand, and it was dated |
| 11:20 | 2 | May 12th, 2005, correct? |
| 11:20 | 3 | A.   That's correct. |
| 11:20 | 4 | MS. HURST:  Move to admit, Your Honor. |
| 11:20 | 5 | THE COURT:  Received. |
| 11:20 | 6 | *(Exhibit No. 8193 received in evidence.)* |
| 11:20 | 7 | MS. HURST:  No further questions. |
| 11:20 | 8 | THE COURT:  This would be redirect by Mr. Zeller. |
| 11:20 | 9 | **REDIRECT EXAMINATION** |
| 11:20 | 10 | BY MR. ZELLER: |
| 11:20 | 11 | Q.   If you could take a look at Exhibit 8176, which is the |
| 11:20 | 12 | March 15, 2003 PowerPoint that you were asked about, and |
| 11:20 | 13 | specifically on page 5. |
| 11:20 | 14 | *(Document provided to the witness.)* |
| 11:20 | 15 | *(Document displayed.)* |
| 11:20 | 16 | BY MR. ZELLER: |
| 11:20 | 17 | Q.   So these were key findings that you made about Bratz; |
| 11:20 | 18 | is that right? |
| 11:21 | 19 | MS. HURST:  Did you mean "8172," Mr. Zeller? |
| 11:21 | 20 | MR. ZELLER:  I thought it was 8176-5. |
| 11:21 | 21 | MS. HURST:  Thank you.  My apologies. |
| 11:59 | 22 | BY MR. ZELLER: |
| 11:21 | 23 | Q.   And this is the page that is called "Key Findings"? |
| 11:21 | 24 | A.   Yes. |
| 11:21 | 25 | Q.   Do you see that? |

11:21   1    A.    Yes.

11:21   2    Q.    And these are key findings that you made about Bratz

11:21   3    back in this 2003 time period?

11:21   4    A.    Yes.

11:21   5    Q.    And one thing that you found was, is that "The brand

11:21   6    name instantly communicates personality."

11:21   7      And what you're referring to was the "Bratz" name,

11:21   8    B-R-A-T-Z, the word Bratz associated with this doll?

11:21   9    A.    That's correct.

11:21  10    Q.    And also what you were conveying in this is among the

11:21  11    key findings of what was -- actually, let me step back and

11:21  12    ask this:

11:21  13      When you say "key findings" here, you're talking about

11:21  14    aspects of the dolls -- of these products that were driving

11:21  15    sales?

11:21  16          MS. HURST: Objection. Leading.

11:21  17          THE COURT: Overruled.

11:21  18          You can answer the question.

11:22  19          THE WITNESS: I believe so, yes.

11:22  20    BY MR. ZELLER:

11:22  21    Q.    At least according to your research?

11:22  22    A.    Yes.

11:22  23    Q.    And so the brand name "Bratz" was one of them. Another

11:22  24    part was, is that they had removable feet, right? Is that

11:22  25    reflected here?

| 11:22 | 1 | A.   Yes, that is. |
| 11:22 | 2 | Q.   And also part of it was, is that the appearance of the |
| 11:22 | 3 | product -- how it looked, what it conveyed -- was also a key |
| 11:22 | 4 | selling feature of this product? |
| 11:22 | 5 | A.   Yes. |
| 11:22 | 6 | Q.   And that was borne out by not only research from this |
| 11:22 | 7 | time period in 2003, but other research you had done? |
| 11:22 | 8 | A.   I believe so. |
| 11:22 | 9 | Q.   And can you give us a sense of -- I mean, how many |
| 11:22 | 10 | market research studies have you been involved in over the |
| 11:22 | 11 | course of, say, since 2001? |
| 11:22 | 12 | A.   Probably hundreds. |
| 11:22 | 13 | Q.   And many of those have included research into Barbie |
| 11:22 | 14 | products, Bratz products, and other fashion dolls? |
| 11:22 | 15 | A.   Yes, that's correct. |
| 11:23 | 16 | Q.   And is it the case that you believe, as a result of all |
| 11:23 | 17 | this research that you've done over the years, that a bad |
| 11:23 | 18 | product, a product that doesn't have appeal, will |
| 11:23 | 19 | nevertheless still sell if it's put in good packaging? |
| 11:23 | 20 | MS. HURST:  Objection.  Leading. |
| 11:23 | 21 | THE COURT:  Overruled. |
| 11:23 | 22 | Well, technically, Counsel, she is your witness. |
| 11:23 | 23 | It is leading. |
| 11:23 | 24 | MS. HURST:  And lacks foundation. |
| 11:23 | 25 | THE COURT:  Yeah, sustained. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 118 of 139   Page ID #:308419
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

118

| | | |
|---|---|---|
| 11:23 | 1 | BY MR. ZELLER: |
| 11:23 | 2 | Q.   Well, why don't you tell us, do you believe, one way or |
| 11:23 | 3 | another, whether or not the product is the most important |
| 11:23 | 4 | selling feature? |
| 11:23 | 5 |              MS. HURST:  Objection.  Lacks foundation. |
| 11:23 | 6 |              THE COURT:  Overruled. |
| 11:23 | 7 |              You can answer that question. |
| 11:23 | 8 |              THE WITNESS:  Are you referring to a doll product? |
| | 9 | BY MR. ZELLER: |
| 11:23 | 10 | Q.   Yes.  I'm focused on fashion dolls. |
| 11:23 | 11 | A.   Yes.  That is the key, um -- the key, uh, factor of |
| 11:23 | 12 | appeal for a fashion doll is its look. |
| 11:23 | 13 | Q.   And so, you would put something like packaging, |
| 11:23 | 14 | that's -- that's not the main selling point of a fashion |
| 11:24 | 15 | doll? |
| 11:24 | 16 |              MS. HURST:  Objection.  Lacks foundation and |
| 11:24 | 17 | leading. |
| 11:24 | 18 |              THE COURT:  Overruled. |
| 11:24 | 19 |              You can answer the question. |
| 11:24 | 20 |              THE WITNESS:  In terms of packaging, it's why we |
| 11:24 | 21 | put fashion dolls in window packaging, so that the consumer, |
| 11:24 | 22 | in most cases being children who don't read, can see the |
| 11:24 | 23 | product.  We haven't had success in putting fashion dolls in |
| 11:24 | 24 | closed packaging, because it's the product itself that is |
| 11:24 | 25 | what drives appeal on the shelf for a doll. |

| | | |
|---|---|---|
| 11:24 | 1 | BY MR. ZELLER: |
| 11:24 | 2 | Q.   It's because consumers, according to the research that |
| 11:24 | 3 | you've seen, are -- are attracted, and a key driving force |
| 11:24 | 4 | of how they -- their purchasing decisions is -- is the look |
| 11:24 | 5 | of the doll? |
| 11:24 | 6 | A.   That's correct. |
| 11:24 | 7 | Q.   And -- and packaging that doesn't play that up can |
| 11:24 | 8 | actually hinder sales; that is, it makes it less visible to |
| 11:25 | 9 | the consumer?  Does that make sense?  I can rephrase it. |
| 11:25 | 10 | A.   Could you rephrase that? |
| 11:25 | 11 | Q.   Sure.  If I understood what you're saying correctly, is |
| 11:25 | 12 | that being able to see the doll through the packaging is -- |
| 11:25 | 13 | is an important feature for -- for good packaging? |
| 11:25 | 14 | A.   Yes. |
| 11:25 | 15 | Q.   I mean, it's because the consumers need to see the |
| 11:25 | 16 | dolls? |
| 11:25 | 17 | A.   Yes.  And what the doll is wearing. |
| 11:25 | 18 | Q.   Obviously, a lot of these documents that you've been |
| 11:25 | 19 | asked about, um, contain some pretty self-critical analysis? |
| 11:25 | 20 | A.   Yes. |
| 11:25 | 21 | Q.   Is that your job? |
| 11:25 | 22 | A.   Part of it. |
| 11:25 | 23 | Q.   It's to try and figure out how Mattel could do better? |
| 11:25 | 24 | A.   Yes. |
| 11:25 | 25 | Q.   And is it true that, if we went through every year |

| | | |
|---|---|---|
| 11:25 | 1 | you've been working there at Mattel, we could find lots of |
| 11:25 | 2 | documents where -- that you prepared where you were |
| 11:25 | 3 | saying -- you were being self-critical about Mattel and its |
| 11:25 | 4 | products? |
| 11:25 | 5 | MS. HURST:  Objection.  Compound.  Vague. |
| 11:25 | 6 | Overbroad. |
| 11:26 | 7 | THE COURT:  Do you understand the question? |
| 11:26 | 8 | THE WITNESS:  I believe I do. |
| 11:26 | 9 | THE COURT:  Okay.  You can answer the question. |
| 11:26 | 10 | Overruled. |
| 11:26 | 11 | THE WITNESS:  Yes, we do.  We do point that out |
| 11:26 | 12 | with... |
| 11:26 | 13 | BY MR. ZELLER: |
| 11:26 | 14 | Q.   And is the purpose of that just -- is it to do better? |
| 11:26 | 15 | A.   Yeah. |
| 11:26 | 16 | Q.   You want the company to do better? |
| 11:26 | 17 | A.   Yes, absolutely.  We -- we usually make recommendations |
| 11:26 | 18 | along with the criticism of -- suggestions on how to |
| 11:26 | 19 | improve. |
| 11:26 | 20 | Q.   And at the time when you were writing these reports |
| 11:26 | 21 | that counsel went through, back in 1996, 1997, 1998, and so |
| 11:26 | 22 | on, what was the top-selling fashion doll? |
| 11:26 | 23 | A.   Barbie. |
| 11:26 | 24 | Q.   And during the time period when you wrote that 2003 -- |
| 11:26 | 25 | March 15, 2003 document, Exhibit 1876, what was the number |

| 11:26 | 1 | one fashion doll? |
| 11:27 | 2 | A.   Barbie. |
| 11:27 | 3 | Q.   And during the time when Matt Bousquette was expressing |
| 11:27 | 4 | his sense of "urgency," I think was the word you used or |
| 11:27 | 5 | was -- over the Barbie sales situation, what was the number |
| 11:27 | 6 | one selling fashion doll at that time? |
| 11:27 | 7 | A.   Barbie. |
| 11:27 | 8 | Q.   I think you said that you've been involved in hundreds |
| 11:27 | 9 | of market research studies? |
| 11:27 | 10 | A.   Yes. |
| 11:27 | 11 | Q.   And as a result of all that information that you've |
| 11:27 | 12 | learned over the years, in doing these kinds of studies -- |
| 11:27 | 13 | which I think you've mentioned include focus groups, |
| 11:27 | 14 | tracking studies and the like -- do you have a belief or an |
| 11:27 | 15 | understanding or an opinion as to whether or not Bratz has |
| 11:27 | 16 | taken away sales from Mattel products? |
| 11:27 | 17 | MS. HURST:  Objection.  Improper -- |
| 11:27 | 18 | THE COURT:  Sustained. |
|  | 19 | BY MR. ZELLER: |
| 11:27 | 20 | Q.   Well, let me ask this:  The consumer research that you |
| 11:28 | 21 | have been involved with there at Mattel, has that shown that |
| 11:28 | 22 | there have been lost sales of Mattel Barbie products to |
| 11:28 | 23 | Bratz? |
| 11:28 | 24 | MS. HURST:  Same objection.  Vague. |
| 11:28 | 25 | THE COURT:  Sustained. |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

122

| 11:28 | 1 | MS. HURST:  Compound.  Leading. |
| 11:28 | 2 | THE COURT:  Sustained. |
| 11:28 | 3 | BY MR. ZELLER: |
| 11:28 | 4 | Q.   Please take a look at Exhibit 9698.  This was one of |
| 11:28 | 5 | the cannibalization studies that you were asked about? |
| 11:28 | 6 | THE COURT:  Now, if it's mentioned in a |
| 11:28 | 7 | cannibalization study, yes.  Okay?  If it's not, no. |
| 11:28 | 8 | MR. ZELLER:  I apologize.  I'm not following. |
| 11:28 | 9 | THE COURT:  I'll be very clear. |
| 11:28 | 10 | She's not going to be allowed to testify to lost |
| 11:28 | 11 | profits.  If there's mention of that in the cannibalization |
| 11:28 | 12 | study, though, if there's reference, you can absolutely ask |
| 11:28 | 13 | the question. |
| 11:28 | 14 | MR. ZELLER:  Understood.  Thank you. |
| 11:29 | 15 | THE COURT:  Okay.  Just so it's very clear. |
| 11:29 | 16 | MR. ZELLER:  Understood.  I appreciate that. |
| 11:29 | 17 | So if we can pull up the first page of 9698. |
| 11:29 | 18 | *(Document displayed.)* |
| 11:29 | 19 | BY MR. ZELLER: |
| 11:29 | 20 | Q.   And you were asked about this paragraph.  And this is |
| 11:29 | 21 | under the Summary of Findings.  It says, "Based on 1,005 |
| 11:29 | 22 | interviews with girls six to ten years old, the following |
| 11:29 | 23 | key conclusions are reached." |
| 11:29 | 24 | And then the first part of that bullet point says, |
| 11:29 | 25 | "Bratz has no observable impact on Barbie among six to |

| | | |
|---|---|---|
| 11:29 | 1 | seven-year-olds."  Do you see that? |
| 11:29 | 2 | A.    Yes, I do. |
| 11:29 | 3 | Q.    And you were asked questions about that sentence? |
| 11:29 | 4 | A.    Yes. |
| 11:29 | 5 | Q.    And I think you were saying that this was based on a |
| 11:29 | 6 | particular -- um, a particular segment that was studied? |
| 11:29 | 7 | A.    Yes.  If you reference the following page, it shows |
| 11:29 | 8 | what was included in terms of what was used to represent the |
| 11:29 | 9 | Barbie brand.  And there's one segment entitled "Mary Kate & |
| 11:30 | 10 | Ashley," which is -- was a licensed -- I guess, it was |
| 11:30 | 11 | considered part of the Barbie brand, but it was really Mary |
| 11:30 | 12 | Kate and Ashley dolls.  The second is "Mystery Squad |
| 11:30 | 13 | Barbie," which is a segment of dolls that were designed to |
| 11:30 | 14 | appeal to older girls.  And "Salon Surprise Barbie," which I |
| 11:30 | 15 | think is -- probably had to do with hair play.  So there was |
| 11:30 | 16 | really only two segments of Barbie that were used in this |
| 11:30 | 17 | study to represent the entire brand.  So there were no -- |
| 11:30 | 18 | that was it. |
| 11:30 | 19 |         I mean, the Barbie brand, every year, probably has |
| 11:30 | 20 | hundreds of products in the line.  And so these particular |
| 11:30 | 21 | researchers used these two segments to represent the entire |
| 11:30 | 22 | line.  So that's why I was referencing that. |
| 11:30 | 23 |         Bratz did not have an observable impact on Barbie |
| 11:31 | 24 | among six to seven-year-olds based on appeal of these two |
| 11:31 | 25 | particular segments. |

| 11:31 | 1 | Q.   And this document -- this report was prepared in |
| 11:31 | 2 | January of 2002? |
| 11:31 | 3 | A.   It appears, yes, from the date. |
| 11:31 | 4 | Q.   So this was a Phoosapha months after Bratz was -- was |
| 11:31 | 5 | first in the market in the U.S.? |
| 11:31 | 6 | A.   I believe so. |
| 11:31 | 7 | Q.   Did there come a time, then, when you, uh, had other |
| 11:31 | 8 | consumer research or other girls research that showed that |
| 11:31 | 9 | there was an observable impact on Barbie among six to |
| 11:31 | 10 | seven-year-olds? |
| 11:31 | 11 | MS. HURST:  Objection.  Vague.  Leading. |
| 11:31 | 12 | THE COURT:  Overruled. |
| 11:31 | 13 | You can answer that question. |
| 11:31 | 14 | THE WITNESS:  So, we did not -- and I'm in charge |
| 11:31 | 15 | of girls research -- did not choose to do this methodology |
| 11:31 | 16 | again because of the limitations on the number of products |
| 11:31 | 17 | that could be accurate -- could be represented in it. |
| 11:31 | 18 | So, in terms of looking at market share, we used |
| 11:32 | 19 | NPD data, which looks at a brand, and it -- it looked at |
| 11:32 | 20 | hundreds of products that make up the Barbie brand, as a |
| 11:32 | 21 | more accurate way of evaluating market share gains and |
| 11:32 | 22 | losses. |
| 11:32 | 23 | BY MR. ZELLER: |
| 11:32 | 24 | Q.   And what did that show to you? |
| 11:32 | 25 | A.   Um, I believe, at some point, you know, the fashion |

| | | |
|---|---|---|
| 11:32 | 1 | doll category was not growing.  And Bratz was gaining share |
| 11:32 | 2 | at the expense of Barbie. |
| 11:32 | 3 | Q.   And that was among older girls at some point, six to |
| 11:32 | 4 | seven-year-olds and older? |
| 11:32 | 5 | A.   Uh, I believe among all girls.  But, yes, six to seven, |
| 11:32 | 6 | six to ten. |
| 11:32 | 7 | Q.   And so was it the case that over time, then, there was |
| 11:32 | 8 | more -- more cannibalization of Barbie sales by Bratz among |
| 11:32 | 9 | all the age ranges? |
| 11:32 | 10 | MS. HURST:  Objection, Your Honor.  This goes |
| 11:33 | 11 | afoul of the Court's earlier ruling. |
| 11:33 | 12 | MR. ZELLER:  It's causation. |
| 11:33 | 13 | MS. HURST:  Your Honor? |
| 11:33 | 14 | THE COURT:  Sustained. |
| 01:59 | 15 | BY MR. ZELLER: |
| 11:33 | 16 | Q.   Well, did market research that you did -- that you did, |
| 11:33 | 17 | subsequently show that there was -- and I'm talking about |
| 11:33 | 18 | market research.  I'm not talking about the NPD data that |
| 11:33 | 19 | you've already talked about.  But were there studies that |
| 11:33 | 20 | were done that you were involved with -- that show that |
| 11:33 | 21 | Bratz subsequently did have an observable impact on Barbie |
| 11:33 | 22 | among six to seven-year-old girls? |
| 11:33 | 23 | A.   There may be some evidence in tracking studies in |
| 11:33 | 24 | terms of attitudes, and in terms of viability testing, you |
| 11:33 | 25 | know, which is hypothetical, but, yes, there may be. |

| | | |
|---|---|---|
| 11:33 | 1 | Q.   And what did that research show? |
| 11:33 | 2 | MS. HURST:  Objection.  Lacks foundation.  Calls |
| 11:33 | 3 | for speculation. |
| 11:33 | 4 | THE COURT:  Yeah.  Sustained. |
| 11:33 | 5 | BY MR. ZELLER: |
| 11:33 | 6 | Q.   Let's go back to Exhibit 9698. |
| 11:34 | 7 | *(Document displayed.)* |
| 11:34 | 8 | BY MR. ZELLER: |
| 11:34 | 9 | Q.   The next sentence after what we were discussing says, |
| 11:34 | 10 | "However, Bratz does appear to cannibalize Barbie, Fashion |
| 11:34 | 11 | Poly, and the Fashion Divas among older eight- to |
| 11:34 | 12 | ten-year-old girls." |
| 11:34 | 13 | Do you see that? |
| 11:34 | 14 | A.   Yes. |
| 11:34 | 15 | Q.   What does "cannibalize" mean here? |
| 11:34 | 16 | A.   "Cannibalize" means it takes share.  So the presence of |
| 11:34 | 17 | Bratz would result in a decrease in the percentage of chips |
| 11:34 | 18 | or girls picking the Barbie segment. |
| 11:34 | 19 | Q.   And was that consistent with other research, then, that |
| 11:34 | 20 | was performed subsequent to this January of 2002 time |
| 11:34 | 21 | period? |
| 11:34 | 22 | MS. HURST:  Objection.  Vague. |
| 11:34 | 23 | THE COURT:  Do you understand the question? |
| 11:34 | 24 | THE WITNESS:  I mean -- this type of research? |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:34 | 1 | BY MR. ZELLER: |
| 11:34 | 2 | Q.   Well, no, any kind of research that you were involved |
| 11:34 | 3 | with. |
| 11:34 | 4 | I can rephrase it this way:  This is a finding in the |
| 11:35 | 5 | January 2002 report about cannibalization, right? |
| 11:35 | 6 | A.   Yes. |
| 11:35 | 7 | Q.   And so my question is, is that, was there further |
| 11:35 | 8 | research done after January of 2002 that was consistent with |
| 11:35 | 9 | the conclusion that Bratz does appear to cannibalize Barbie |
| 11:35 | 10 | among other products among older eight to ten-year-old |
| 11:35 | 11 | girls? |
| 11:35 | 12 | A.   To be specific, we didn't do any more cannibalization |
| 11:35 | 13 | studies after this one, due to the limitations in the |
| 11:35 | 14 | methodology.  So, in terms of doing a cannibalization study |
| 11:35 | 15 | in this manner, we did not. |
| 11:35 | 16 | Q.   So when you use the term "cannibalization study," you |
| 11:35 | 17 | mean something very specific, a particular kind of |
| 11:35 | 18 | methodology? |
| 11:35 | 19 | A.   Yes, I do. |
| 11:35 | 20 | Q.   And that's the very particular kind of methodology |
| 11:35 | 21 | reflected in Exhibits 9698, 9699, and 9700 that you were |
| 11:35 | 22 | asked about? |
| 11:35 | 23 | A.   Yes. |
| 11:35 | 24 | Q.   And then were further cannibalization studies of any |
| 11:36 | 25 | kind performed after that? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:36 | 1 | A.    I don't believe they were. |
| 11:36 | 2 | Q.    And that was because you didn't think it was a -- you |
| 11:36 | 3 | didn't agree with the methodology?  Or perhaps could you |
| 11:36 | 4 | tell us why -- why you discontinued them. |
| 11:36 | 5 | A.    I didn't agree with the methodology as an accurate way |
| 11:36 | 6 | of doing this type of testing. |
| 11:36 | 7 | Q.    And why did you reach that conclusion? |
| 11:36 | 8 | A.    Because it's based on a very small -- a very small |
| 11:36 | 9 | sample of Barbie product to represent an entire brand.  I |
| 11:36 | 10 | mean, it could work if your brand only has a couple of |
| 11:36 | 11 | SKU's, a couple of products.  But given the breadth of the |
| 11:36 | 12 | Barbie line, I couldn't say that this is a totally reliable, |
| 11:36 | 13 | accurate way of doing cannibalization. |
| 11:36 | 14 | Q.    And then with -- with respect to subsequent |
| 11:36 | 15 | methodologies that you used for -- for research, did you |
| 11:36 | 16 | ever learn that Bratz was SKUing younger? |
| 11:37 | 17 | A.    I believe if -- if we looked at some tracking studies |
| 11:37 | 18 | over time, that the age appeal of Bratz, which may have |
| 11:37 | 19 | started with nine to ten-year-olds, started to filter down |
| 11:37 | 20 | to effect, you know, six-year-olds, five- and six-year-olds. |
| 11:37 | 21 | It was appealing younger and younger over time. |
| 11:37 | 22 | Q.    And did it go even lower than that age? |
| 11:37 | 23 | A.    Probably -- well, the Bratz brand over time started to |
| 11:37 | 24 | incorporate other segments, as well as the original dolls. |
| 11:37 | 25 | So it's hard to -- it's hard to, you know -- if there were |

CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

129

| | | |
|---|---|---|
| 11:37 | 1 | younger appealing products in the line, in the late 2000's, |
| 11:37 | 2 | that may have -- may have happened.  I don't know. |
| 11:37 | 3 | Q.   Well, let me try it this way:  Did the market research |
| 11:37 | 4 | that you conducted subsequent to this time show that Bratz |
| 11:37 | 5 | was appealing to younger and younger girls over time? |
| 11:37 | 6 | MS. HURST:  Objection.  Asked and answered. |
| 11:38 | 7 | Misstates the witness's testimony. |
| 11:38 | 8 | THE COURT:  Sustained. |
| 11:38 | 9 | If it's after the cannibalization study, Counsel, |
| 11:38 | 10 | it's sustained. |
| 11:38 | 11 | BY MR. ZELLER: |
| 11:38 | 12 | Q.   If we can go to Exhibit 8101. |
| 11:38 | 13 | *(Document provided to the witness.)* |
| 11:38 | 14 | *(Document displayed.)* |
| 11:38 | 15 | BY MR. ZELLER: |
| 11:38 | 16 | Q.   And this is the July 21st, 1997 study that you were |
| 11:38 | 17 | involved with? |
| 11:38 | 18 | A.   Yes. |
| 11:38 | 19 | Q.   And you were asked some questions about the first page, |
| 11:38 | 20 | where it talks about perceived saturation, boredom, |
| 11:39 | 21 | predictability, commercial disbelief, and other factors? |
| 11:39 | 22 | A.   Yes. |
| 11:39 | 23 | Q.   And this is the kind of self-critical analysis that we |
| 11:39 | 24 | were talking about earlier that -- that you do as a matter |
| 11:39 | 25 | of course? |

DEBBIE GALE, U.S. COURT REPORTER

130

| | | |
|---|---|---|
| 11:39 | 1 | A.   Yes, it is. |
| 11:39 | 2 | Q.   It's your job? |
| 11:39 | 3 | A.   Yes. |
| 11:39 | 4 | Q.   And during this actual period in July of 1997, what was |
| 11:39 | 5 | the number one fashion doll? |
| 11:39 | 6 | A.   Barbie. |
| 11:39 | 7 | Q.   In fact, was this the time period when the Barbie doll |
| 11:39 | 8 | was selling the most, historically? |
| 11:39 | 9 | A.   It may have been. |
| 11:39 | 10 | Q.   Was it -- |
| 11:39 | 11 | A.   It was around the late 90's, yes. |
| 11:39 | 12 | Q.   And it was selling, by this time in 1997, more than it |
| 11:39 | 13 | ever had? |
| 11:39 | 14 | A.   It may have.  It may have.  I couldn't tell you |
| 11:39 | 15 | offhand. |
| 11:39 | 16 | Q.   What do you remember as being the peak of the sales? |
| 11:39 | 17 | A.   Somewhere in the late 90's. |
| 11:40 | 18 | Q.   Somewhere around 1997, 1998, 1999? |
| 11:40 | 19 | A.   Perhaps, yes. |
| 11:40 | 20 |          MR. ZELLER:  Nothing further. |
| 11:40 | 21 |          MS. HURST:  Very short, Your Honor. |
| 11:40 | 22 |          THE COURT:  You and Mr. Zeller talk for a moment. |
| 11:40 | 23 | Let's see if we can reach an agreement here. |
| 11:40 | 24 |          Mr. Zeller, you're approaching Ms. Hurst to talk |
| 11:40 | 25 | to her now. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 131 of 139   Page ID #:308432
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

131

| | | |
|---|---|---|
| 11:40 | 1 | *(Counsel confer off the record.)* |
| 11:40 | 2 | **RECROSS-EXAMINATION** |
| | 3 | BY MS. HURST: |
| 11:41 | 4 | Q.   Ms. Willensky, did you say that Mattel never did |
| 11:41 | 5 | another cannibalization study after the Bratz |
| 11:41 | 6 | cannibalization study? |
| 11:41 | 7 | A.   Similar to this one?  No. |
| 11:41 | 8 | Q.   Yes. |
| 11:41 | 9 | A.   With chip allocations, I don't believe we did. |
| 11:41 | 10 | THE COURT:  If we can have the year again, just to |
| 11:41 | 11 | remind the jury? |
| 11:41 | 12 | MS. HURST:  Yes. |
| 11:41 | 13 | BY MS. HURST: |
| 11:41 | 14 | Q.   That study was in 2002, correct? |
| 11:41 | 15 | A.   Yeah.  I'm not aware of any chip allocation study that |
| 11:41 | 16 | I can recall. |
| 11:41 | 17 | Q.   But there were other cannibalization studies, true? |
| 11:41 | 18 | A.   I believe there probably were, but not -- not for this. |
| 11:41 | 19 | Q.   Would you look at Exhibit 8175 in your binder, please. |
| 11:41 | 20 | And that's a memo that you received from Heather Polk |
| 11:41 | 21 | on or about December 3rd, 2002, proposing a MyScene |
| 11:42 | 22 | cannibalization study; is that correct? |
| 11:42 | 23 | A.   Yes. |
| 11:42 | 24 | MS. HURST:  Your Honor, move to admit 8175. |
| 11:42 | 25 | THE COURT:  Received. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 132 of 139   Page ID #:308433
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

132

| 11:42 | 1 | *(Exhibit No. 8175 received in evidence.)* |
|---|---|---|
| 11:42 | 2 | *(Document displayed.)* |
| | 3 | BY MS. HURST: |
| 11:42 | 4 | Q.   And the date on that proposal, that's December 3rd, |
| 11:42 | 5 | 2002, correct? |
| 11:42 | 6 | A.   Yes. |
| 11:42 | 7 | Q.   And MyScene was introduced in 2002; is that right? |
| 11:42 | 8 | A.   I don't recall. |
| 11:42 | 9 | Q.   The objective of this research was to determine what |
| 11:42 | 10 | impact -- what other brands would be impacted by MyScene, |
| 11:42 | 11 | right? |
| 11:42 | 12 | A.   Yes. |
| 11:42 | 13 | Q.   Okay.  Would you turn, please, to Exhibit 1277 in your |
| 11:42 | 14 | binder. |
| 11:42 | 15 | *(Document provided to the witness.)* |
| 11:42 | 16 | *(Document displayed.)* |
| 11:43 | 17 | MS. HURST:  This is already in evidence, |
| 11:43 | 18 | Your Honor. |
| 11:59 | 19 | BY MS. HURST: |
| 11:43 | 20 | Q.   You see there, that's the MyScene cannibalization |
| 11:43 | 21 | study.  That's the report of the actual study that was |
| 11:43 | 22 | proposed, right? |
| 11:43 | 23 | A.   Right. |
| 11:43 | 24 | Q.   I think we agreed at your deposition the date on this |
| 11:43 | 25 | should be January 9, 2003, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 133 of 139   Page ID #:308434
CV 04-9049 DOC - 3/10/2011 - Day 31, Volume 1 of 3

133

| | | |
|---|---|---|
| 11:43 | 1 | A.   Yes. |
| 11:43 | 2 | Q.   Sometimes when you roll over into January, you forget |
| 11:43 | 3 | to add the extra year, right? |
| 11:43 | 4 | A.   Yes. |
| 11:43 | 5 | Q.   So Mattel did, in fact, conduct a MyScene |
| 11:43 | 6 | cannibalization study that it reported in January 9, 2003, |
| 11:43 | 7 | right? |
| 11:43 | 8 | A.   That's correct. |
| 11:43 | 9 | Q.   And after reporting on that study -- well, one thing |
| 11:43 | 10 | that you were concerned about was, is MyScene taking too |
| 11:43 | 11 | many sales away from Barbie, right? |
| 11:43 | 12 | A.   That was the concern. |
| 11:43 | 13 | Q.   And if you look at page 4, your recommendation was |
| 11:44 | 14 | "continue with MyScene as currently positioned," true? |
| 11:44 | 15 | A.   True. |
| 11:44 | 16 | Q.   So you, in fact, did use another cannibalization study |
| 11:44 | 17 | and made a business recommendation on that basis, correct? |
| 11:44 | 18 | A.   Again, this was -- um -- |
| 11:44 | 19 | Q.   Is that correct, Ms. Willensky? |
| 11:44 | 20 | A.   I didn't do this, but, yes, this was done. |
| 11:44 | 21 | MS. HURST:  Thank you. |
| 11:44 | 22 | MR. COTE:  No questions, Your Honor.  Thank you. |
| 11:44 | 23 | THE COURT:  We're asking all the witnesses to |
| 11:44 | 24 | remain on call until May 7th.  The case is going to |
| 11:44 | 25 | conclude, though, in -- um, a few hours. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 134 of 139   Page ID #:308435
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

134

| 11:44 | 1 | *(Laughter in the courtroom.)* |
|---|---|---|

11:44  2        THE WITNESS:  Okay.

11:44  3        THE COURT:  But I'm just doing that out of caution

11:44  4  because I don't want subpoenas to have to be served across

11:44  5  the country, let alone across the world.

11:45  6        THE WITNESS:  Okay.

11:45  7        THE COURT:  If you have professional

11:45  8  responsibilities, even planned vacations, don't disturb your

11:45  9  personal life.  Take all of those.

11:45  10        THE WITNESS:  Thank you very much.

11:45  11        THE COURT:  Okay.  You may step down.

11:45  12      *(Witness steps down subject to recall.)*

11:45  13        THE COURT:  Counsel, who's the next witness.

11:45  14        MR. QUINN:  Brad Maryman.  I'm wondering if it

11:45  15  makes sense to go a little early to lunch, Your Honor?

11:45  16        THE COURT:  It apparently makes sense to go a

11:45  17  little early to lunch.

11:45  18        (To the jury:) Come back at 12:45, then.  Okay?

11:45  19        Then, you're admonished not to discuss this matter

11:45  20  amongst yourselves nor form or express any opinion

11:45  21  concerning this case.

11:45  22        Have a nice lunch.  We'll see you at 12:45.  Okay?

11:45  23  All right.

11:45  24       *(Jury recesses at 11:45 a.m.)*

11:45  25        THE COURT:  Counsel, have a seat for a minute.

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 135 of 139   Page ID #:308436
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

135

| | | |
|---|---|---|
| 11:45 | 1 | *(Outside the presence of the jury.)* |
| 11:46 | 2 | THE COURT:  I want to make certain we don't run |
| 11:46 | 3 | into the same problem we just ran into, so this is on the |
| 11:46 | 4 | record. |
| 11:46 | 5 | There were agreements on Sunday morning and Sunday |
| 11:46 | 6 | afternoon between counsel concerning certain time limits.  I |
| 11:46 | 7 | don't want any counsel to ever call this Court's credibility |
| 11:46 | 8 | into question; and if so, I want to respond to it. |
| 11:46 | 9 | Mr. Molinski -- or Ms. Willensky was to have |
| 11:46 | 10 | 20 minutes on direct, 30 minutes on cross and recross, and |
| 11:46 | 11 | another 15 minutes on redirect. |
| 11:46 | 12 | I'd indicated, as to Ms. Willensky, and one other |
| 11:46 | 13 | witness -- and I believe it was Jill Nordquist -- that I |
| 11:46 | 14 | thought that that was silly; that those were times that |
| 11:46 | 15 | could be evened out. |
| 11:46 | 16 | Apparently, one of you didn't hear that. |
| 11:46 | 17 | Number two, I was approached to stave off the next |
| 11:46 | 18 | complaint by MGA, as Mattel just complained, or started to, |
| 11:46 | 19 | that I'd given five minutes for one of the upcoming |
| 11:46 | 20 | witnesses, after I'd had a conversation with counsel last |
| 11:47 | 21 | evening about 9:30 or 10:00 -- I forget the hour.  I'd |
| 11:47 | 22 | granted you 15 minutes on that.  I thought that that was |
| 11:47 | 23 | wise. |
| 11:47 | 24 | So I want to inform Mattel that the time period I |
| 11:47 | 25 | put out of five minutes I thought was too short after I |

| | | |
|---|---|---|
| 11:47 | 1 | heard from Mattel. |
| 11:47 | 2 | Now, I want to hear any other complaints or |
| 11:47 | 3 | concerns. |
| 11:47 | 4 | MR. McCONVILLE:  Just, I don't think we had an |
| 11:47 | 5 | estimate for Maryman.  'Cause we weren't sure he was going |
| 11:47 | 6 | to be testifying. |
| 11:47 | 7 | THE COURT:  I didn't have a time estimate either. |
| 11:47 | 8 | Why don't you two get together. |
| 11:47 | 9 | As Mr. Quinn rises from his chair and speaks to |
| 11:47 | 10 | Mr. McConville, as they approach the lectern and reach an |
| 11:47 | 11 | agreement. |
| 11:47 | 12 | *(Counsel confer off the record.)* |
| 11:47 | 13 | THE COURT:  I wish I had a photographer. |
| 11:47 | 14 | MR. QUINN:  Fifteen on direct and five on |
| 11:47 | 15 | redirect. |
| 11:47 | 16 | THE COURT:  How long? |
| 11:47 | 17 | MR. QUINN:  Fifteen and five for me. |
| 11:47 | 18 | THE COURT:  Fifteen and five. |
| 11:47 | 19 | MS. HURST:  I'm not even sure we have any |
| 11:47 | 20 | questions, so ten. |
| 11:47 | 21 | THE COURT:  No, no.  No, no. |
| 11:47 | 22 | See, that's what we got before. |
| 11:47 | 23 | MS. HURST:  Twenty.  Fine, we'll take twenty. |
| 11:48 | 24 | THE COURT:  Fifteen and twenty. |
| 11:48 | 25 | When you were five and ten minutes off between the |

CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

137

| | | |
|---|---|---|
| 11:48 | 1 | sides, that's what I indicated -- I thought everybody had |
| 11:48 | 2 | indicated Sunday.  Maybe you all were all asleep, but that |
| 11:48 | 3 | was silly.  It didn't matter to me within that time range. |
| 11:48 | 4 | After Mr. Maryman, do we need time limits on the |
| 11:48 | 5 | next witnesses? |
| 11:48 | 6 | I've already raised it from five to fifteen on one |
| 11:48 | 7 | witness. |
| 11:48 | 8 | MR. PRICE:  And there will be fifteen on the other |
| 11:48 | 9 | side -- |
| 11:48 | 10 | THE COURT:  Absolutely. |
| 11:48 | 11 | MR. PRICE:  -- used for direct or redirect or |
| 11:48 | 12 | whatever. |
| 11:48 | 13 | THE COURT:  All right. |
| 11:48 | 14 | MS. KELLER:  Which witness are we talking about |
| 11:48 | 15 | now? |
| 11:48 | 16 | THE COURT:  Mr. Larian. |
| 11:48 | 17 | MR. PRICE:  Mr. Larian. |
| 11:48 | 18 | THE COURT:  Mr. Larian. |
| 11:48 | 19 | MR. PRICE:  I mean, if we can bargain up to |
| 11:48 | 20 | twenty, I'd be glad to do that. |
| 11:48 | 21 | MS. KELLER:  No.  Thank you. |
| 11:48 | 22 | THE COURT:  Okay. |
| 11:48 | 23 | MS. KELLER:  And we also have Ms. Rhee and |
| 11:49 | 24 | Mr. Phoosopha, P-H-O-O -- |
| 11:49 | 25 | THE COURT:  Mr. Pootipong Phoosopha. |

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 138 of 139   Page ID #:308439
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

138

| | | |
|---|---|---|
| 11:49 | 1 | There are only two areas that the Court was |
| 11:49 | 2 | concerned.  But we're going back through that entire amount |
| 11:49 | 3 | of testimony.  Mr. Larian was rather consistent with most of |
| 11:49 | 4 | that testimony.  There were two areas of concern. |
| 11:49 | 5 | So Pootipong is very, very limited. |
| 11:49 | 6 | Now, I want to make sure, before I send you to |
| 11:49 | 7 | lunch:  Any complaints? |
| 11:49 | 8 | Because I don't want to have to respond in front |
| 11:49 | 9 | of the jury. |
| 11:49 | 10 | MS. HURST:  None here, Your Honor. |
| 11:49 | 11 | MS. KELLER:  No complaints. |
| 11:49 | 12 | MR. QUINN:  None here, Your Honor. |
| 11:49 | 13 | THE COURT:  Then go have a nice lunch.  We'll see |
| 11:49 | 14 | you in 55 minutes. |
| 11:49 | 15 | *(Lunch recess held at 11:49 a.m.)* |
| 11:49 | 16 | *(Further proceedings reported by Jane Sutton* |
| 11:49 | 17 | *Rule in Volume II.)* |
| 11:49 | 18 | -oOo- |
| 11:49 | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10183   Filed 03/11/11   Page 139 of 139   Page ID #:308440
CV 04-9049 DOC – 3/10/2011 – Day 31, Volume 1 of 3

139

| | | |
|---|---|---|
| 11:49 | 1 | -oOo- |
| 11:49 | 2 | |
| 11:49 | 3 | CERTIFICATE |
| 11:49 | 4 | |
| 11:49 | 5 | I hereby certify that pursuant to Section 753, |
| 11:49 | 6 | Title 28, United States Code, the foregoing is a true and |
| 11:49 | 7 | correct transcript of the stenographically reported |
| 11:49 | 8 | proceedings held in the above-entitled matter and that the |
| 11:49 | 9 | transcript page format is in conformance with the |
| 11:49 | 10 | regulations of the Judicial Conference of the United States. |
| 11:49 | 11 | |
| 11:49 | 12 | Date:  March 10, 2011 |
| 11:49 | 13 | |
| 11:49 | 14 | |
| 11:49 | 15 | _____ |
| 11:49 | 16 | DEBBIE GALE, U.S. COURT REPORTER<br>CSR NO. 9472, RPR |
| 11:49 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |