1

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                  – – – – – – –

5

6   MATTEL, INC., ET AL.,            )
                                     )
7            Plaintiffs,             )
                                     )
8       vs.                          ) No. CV 04-9049-DOC
                                     )    Day 31
9   MGA ENTERTAINMENT, INC., ET AL., )    Volume 2 of 3
                                     )
10           Defendants.             )
    ─────────────────────────────────)

11

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Jury Trial

17            Santa Ana, California

18          Thursday, March 10, 2011

19

20

21

22  Jane C.S. Rule, CSR 9316
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-7755
25
    11-03-10 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 2 of 139   Page ID #:308442
CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     WILLIAM PRICE
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              – AND –

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                – AND –
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ISAAC LARIAN, MGA CEO

16            ROBERT ECKERT, Mattel CEO

17            LILY MARTINEZ, Mattel Employee

18            CARLOS GUSTAVO MACHADO GOMEZ, Defendant

19            KEN KOTARSKI, Mattel Technical Operator

20            MIKE STOVALL, MGA Technical Operator

21            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

22            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

23            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

24            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

25            FRANK RORIE, Orrick Herrington & Sutcliffe
```

CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

4

1                               **I N D E X**

2

3

4                              **EXAMINATION**

5

6    <u>**Witness Name**</u>        <u>**Direct**</u>      <u>**Cross**</u>       <u>**Redirect**</u>      <u>**Recross**</u>

7    MARYMAN, BRADLEY
          By Mr. Quinn        6                        23
8         By Ms. Hurst                    20

9    LARIAN, ISAAC
          By Mr. Price       26                        45
10        By Mr. McConville              36                         51

11   PHOOSOPHA, POOTTIPONG
          By Mr. Quinn       55                        69
12        By Ms. Keller                  60                         72

13   RHEE, ANNA
          By Mr. Quinn       74                        83
14        By Ms. Keller                  78                         86

15   MC COMB, HEATHER
          By Mr. Quinn       99                       135
16        By Ms. Hurst                  129

17

18

19                              EXHIBITS

20

21   <u>**Exhibit**</u>                        <u>**Identification**</u>      <u>**Evidence**</u>

22   Plaintiffs' No. 24305                               30

23   Plaintiffs' No. 24306                               31

24

25

Case 2:04-cv-09049-DOC-RNB  Document 10184  Filed 03/11/11  Page 5 of 139  Page ID #:308445
CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

5

1          SANTA ANA, CALIFORNIA, THURSDAY, MARCH 10, 2011

2                    DAY 31, VOLUME 2 OF 3

3                        (12:45 p.m.)

4              *(The following proceedings is taken in the*

5          *presence of the jury.)*

6              THE COURT:  All right.  The parties are present.

7              Counsel, thank you for your courtesy.  If you'd be

8     seated.  And your next witness would be?

9              MR. QUINN:  Mattel calls Bradley Maryman.

10             THE COURT:  Thank you, Mr. Maryman.

11             Thank you, sir.  Will you stop at that location,

12    Mr. Maryman, and would you raise your right hand, please.

13          **BRADLEY MARYMAN, PLAINTIFFS' WITNESS, SWORN**

14             THE WITNESS:  I do.

15             THE COURT:  Thank you, sir.  If you'd come along

16    the jury railing.  There is an entrance near the wall, and

17    if you'd be seated, sir.

18             Sir, will you be kind enough to state your full

19    name, please.

20             THE WITNESS:  It's Bradley, B-r-a-d-l-e-y, middle

21    initial N, Maryman, M-a-r-y-m-a-n.

22             THE COURT:  Thank you.

23             This is direct examination by Mr. Quinn on behalf

24    of Mattel.

25             MR. QUINN:  Thank you, your Honor.

CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

6

```
 1                        DIRECT EXAMINATION

 2    BY MR. QUINN:

 3    Q    Mr. Maryman, what type of work do you do?

 4    A    I'm a computer forensics and cyber investigator.

 5    Q    And do you have a firm name that you work under?

 6    A    Yes, I do.  Maryman & Associates.

 7    Q    And what is the business of Maryman & Associates?

 8    A    Basically computer forensics, cyber investigations and

 9    some computer security.

10    Q    And what does that mean?

11    A    We handle mostly civil and criminal matters, performing

12    investigations and examinations of digital media for our

13    clients.

14    Q    How long have you been doing this type of work?

15    A    In private practice for about 10 years, 20 years

16    including my service in the FBI.

17    Q    Can you give us a background -- just a rundown on your

18    career and kind of jobs you've held where you've done this

19    kind of computer forensic work?

20    A    Approximately 1990, I was assigned to -- as the

21    information systems administrator for the Los Angeles field

22    office.  In that position, I was instrumental in beginning

23    the first CART team for the FBI, which is a computer

24    analysis response team.  We built out the lab, trained the

25    individuals and set up a protocol for computer forensics for
```

1    the FBI.

2    Q    And for how long did you do that type of work for the

3    FBI?

4    A    For the remainder of my career, for another 10 years.

5    Q    And what type -- did you receive some type of training

6    in computers and computer forensics while you were at the

7    FBI?

8    A    Yes, I did.  I had some computer training just in

9    computers themselves, not in forensics, prior to my

10   appointment.  After that, I received training from such

11   companies as Access Data, which is a software publisher that

12   publishes forensics tool kit, also known as FTK, and

13   Guidance Software, which is a publisher of End Case, both of

14   which are court-approved and industry-standard programs for

15   the analysis of digital media.

16   Q    And you were with the FBI for a total of how many

17   years?

18   A    Twenty-nine and a half years.

19   Q    And what did you do after you left the FBI?

20   A    I started my own firm, Maryman & Associates.

21   Q    And that would have been what year?

22   A    That would be 2001.

23   Q    And can you tell us what type of work your company is

24   doing now?

25   A    A variety of litigation efforts as well as some support

1   to law enforcement.

2   Q    All in the computer forensic --

3   A    All in the --

4            (Interruption in the proceedings.)

5            THE COURT:  We're going to strike the answer and

6   strike the question.

7            You are talking over each other, and we can't get

8   a record.

9            MR. QUINN:  Sorry.

10           THE COURT:  All right.  Please.

11   BY MR. QUINN:

12   Q    All doing this type of computer forensic work?

13   A    Yes, sir.

14   Q    Could you tell us what educational degrees that you

15   have?

16   A    I have a bachelor of science degree.

17   Q    And have you, yourself, been involved in teaching

18   others and giving training in computer forensics and

19   analysis?

20   A    Yes, I have.  I was certified as a law enforcement

21   instructor and master instructor while in the FBI.  I

22   performed teaching assignments domestically and

23   internationally while performing with the FBI.  Since that

24   time, I've also -- at least two international assignments,

25   as well as multiple assignments here in the United States in

CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

9

1    teaching.

2    Q    Can you tell us in approximately how many cases you've

3    performed formal forensic -- computer forensic examination

4    reports?

5    A    The number is in the hundreds, 200 plus.

6    Q    And how many different times have you testified on

7    computer forensics?

8    A    Probably 30 times.

9    Q    And have you ever been found not to be qualified as an

10   expert in computer forensics?

11   A    No, sir.

12           MR. QUINN:  Your Honor, I tender Mr. Maryman as an

13   expert in computer forensics.

14           THE COURT:  You may proceed.

15   BY MR. QUINN:

16   Q    Did you conduct a forensic analysis of a computer

17   system used by a former Mattel Canada employee by the name

18   of Janine Brisbois?

19   A    Yes, I did.

20   Q    And what did you do?

21   A    The two programs I mentioned earlier, both FTK and End

22   Case, were used to process the computer.  After the

23   processing, we did an examination and analysis of the

24   findings, and we looked for things in the recycle bin,

25   e-mail communications, deleted items, communications that

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 10 of 139   Page ID #:308450
CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

10

1    were recent to the period just prior to her resignation.

2    Q    Were you told that she resigned September 26th, 2005?

3    A    Yes, I was.

4    Q    And did your research take into account or focus on the

5    periods immediately prior to her departure?

6    A    Yes, it did.

7    Q    Did you reach any conclusions as a result of your

8    examination of the -- of Ms. Brisbois' computer?

9    A    Yes, I did.  The examination found that there were a

10   number of link files, which are also known as short-cut

11   files.  These basically are an administrative file on

12   Windows systems that points to a file or program that has

13   recently been used.

14        Typically the icon for that would be found on the

15   desktop.  If you -- typically the computers you have at

16   home, you'll have a link file that will be on the desktop,

17   and it will show that you have recently opened a particular

18   file, let's say an Excel spreadsheet, and you can have a

19   link file that will open Excel or you can have one that will

20   point to a specific file within Excel and it will open that

21   for your use.

22        Those link files were found to be pointed to an

23   external USB device which had a volume name of "Backpack."

24   Q    So I got to admit, you lost me there.  When you said

25   these link files pointed to an external USB device named

1    "Backpack," can you say that in simpler terms?

2    A    Certainly.  Basically it means there was an external

3    device, typically -- as a matter of fact, this was a USB

4    storage device which would be a USB thumb drive in normal

5    parlance.  The thumb drive was associated with files on the

6    computer that had been linked to, previously accessed and

7    used.

8    Q    And what does that mean?  What did that tell you?

9    A    That told me that there was a thumb drive that existed

10   beyond this computer and that it had files that the person

11   was working on.

12   Q    Did subsequent analysis of the thumb drive show that

13   some documents had been copied to the thumb drive?

14   A    Yes, it was.  I actually performed an examination on

15   the thumb drive itself, and that examination resulted in my

16   observing well over 200 files on that thumb drive with

17   probably 30 to 35 that were within the -- the recent period

18   of 9/20/2005 to 9/23/2005.

19   Q    Now, have you examined both Ms. Brisbois' computer and

20   the thumb drive?

21   A    Yes, I have.

22   Q    So let's start with your examination of the computer.

23        Can you explain to us how you conducted the examination

24   of her computer?

25   A    Yes, I can.  The examination, again, was processed

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 12 of 139   Page ID #:308452
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

12

1    through a variety of forensics tools programs, that

2    processing basically consists of almost an indexing of -- of

3    every item, both live files and deleted files, anything that

4    would be in the unallocated space.

5        The unallocated space is the space on the hard drive

6    where information may reside there, but it's not active

7    files.  It's not what the operating system sees, nor what

8    the user sees.  So the indexing actually performs across the

9    entire drive regardless of whether they're live or

10   unallocated files.  That allows us to see things that have

11   been deleted, obscured or perhaps things that were temporary

12   files and are now waiting to be erased at some point.

13       Once we've done that indexing, the processing like

14   that, it's subjected to a number of things such as search

15   terms where we are looking for particular names of people,

16   places or things.  We are also looking for items that are in

17   the recycler bin, communications such as e-mails, this type

18   of thing.

19       We'll also be looking for information that is recent to

20   a particular event, in this particular case, the

21   resignation.

22   Q    And did you do -- this link -- you referred to link

23   files.  Did you do a link file analysis with respect to

24   Ms. Brisbois' computer?

25   A    Yes, we did -- or I did.  There are approximately -- I

1    believe I found in the neighborhood of 30 link files that
2    were associated with the volume name of "Backpack."
3            The volume name is basically just what the user named
4    something.  When it comes -- when you purchase a thumb drive
5    or a computer, it's not really named.  During the setup, you
6    usually give it a name of John's computer or Sally's
7    computer.  A thumb drive, you can name it anything you want.
8    It doesn't require a name, but in this particular case, it
9    was given the name of "Backpack."
10   Q    Did you prepare a chart summarizing your findings
11   relating to this link file analysis on the computer?
12   A    Yes, I did.
13   Q    Would that chart be helpful to you in explaining your
14   testimony to the jury?
15   A    I believe it would, yes.
16           MR. QUINN:  Your Honor, we would request
17   permission to publish Exhibit 22856-9 for this purpose.
18           MS. HURST:  May I see that, John?  I don't think I
19   have it.
20           THE COURT:  Is it basically a demonstrative?
21           MR. QUINN:  It's a demonstrative, your Honor.
22           THE COURT:  You may put it up, Counsel, as soon as
23   counsel sees that.  Take it down until counsel sees that.
24           Thank you.
25           I saw that last evening, I believe, or the night

 1   before, or the night before.

 2            MS. HURST:  Thanks.  I got it.

 3            THE COURT:  Or the night before.  I'm just kidding

 4   you, Counsel, both sides.  I've seen this before.

 5            (Laughter.)

 6            MS. HURST:  I have it, your Honor.

 7   BY MR. QUINN:

 8   Q    Okay.  Can you tell us, sir, what we are looking at

 9   here?

10   A    You are looking at a chart or a list of the link files

11   that are related to Backpack --

12            THE COURT:  This is actually on page 3 or page 2

13   of your report; is that right?

14            THE WITNESS:  Page 9, sir.

15            THE COURT:  Page 9.

16   BY MR. QUINN:

17   Q    And what does this show?  I see we have three columns

18   there, and on the left-hand side it says, "link file target

19   path, link target and link created."

20        Can you explain for us what this shows?

21   A    Yes, I can.

22        A link file, while it has its own file properties, just

23   like any other document on your computer, it also has the

24   internal information of the document that -- or the program

25   that it's associated to or linking or targeted to.  In this

1    particular case, you have one here, it's called "F, colon,

2    backslash" --

3            THE COURT:  Just a little slower.

4            THE WITNESS:  -- "Barbie pricing initiative letter

5    dot doc."

6    BY MR. QUINN:

7    Q    What does that mean?

8    A    That means that the file that was associated with this

9    particular link file or the document associated with it,

10   that this was the name and that it was located on the link

11   target which is known as the volume named "Backpack."  In

12   this case, the link was created on 9/20/05 at 12:46:37 p.m.

13   Q    And does that refer to a Microsoft Word processing file

14   of that name?

15   A    Well, the dot doc extension would lead me to believe

16   that it was a Word program.

17   Q    And in your chart, the first entry under "link target,"

18   it says in capped letters, "BACKPACK."  That's the name that

19   was given for this UBS (sic) device?

20   A    Yes, sir.  This was a USB, and it's -- again, it refers

21   to the volume name, the link target, that is where it was

22   pointed to and where it was associated with, so it can go

23   back and retrieve that information for you easily.

24   Q    So Ms. Brisbois had created a folder or a device which

25   she designated "Backpack" and put these files into it; is

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 16 of 139   Page ID #:308456
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

16

1    that correct?

2    A    That's correct.

3    Q    In the chart, the first entry under "link created

4    column" says September 20, 2005 and the time of 12:46 p.m.;

5    what does that date and time mean?

6    A    That's the -- the link created, that's the date that

7    the file was created and accessed on this target volume

8    Backpack.

9    Q    Did you see any other activity on Ms. Brisbois'

10   computer on -- associated with the date of September 23,

11   2005?

12   A    A number of other items, there are a list of

13   approximately 30 documents that were on the thumb drive that

14   were from 9/20 to 9/23/05.

15   Q    All right.  And there are -- some of the titles of

16   these files down at the bottom, one is "Barbie spring 2005,

17   POS analysis," correct?

18   A    That's correct.

19   Q    And "competitive review," is that another one?

20   A    Yes, it is, as well as "GOP March 28, a PowerPoint

21   presentation."

22   Q    All right.  And at some point after you did your

23   analysis of the computer, were you able to do an analysis of

24   this Backpack thumb drive itself?

25   A    Yes, I did.  In examining the Backpack, the thumb

```
 1    drive, we located in excess of 200 files.  Among those files
 2    were some of the files that are linked to via these various
 3    short-cut files.
 4    Q    Okay.  So were you able to confirm that Ms. Brisbois
 5    had downloaded these files from her computer to this
 6    Backpack thumb drive?
 7              MS. HURST:  Objection.  Lacks foundation as to who
 8    was engaged in the activity.
 9              THE COURT:  Well, I think counsel's best question
10    can be asked, was her computer --
11    BY MR. QUINN:
12    Q    At least someone --
13              (Interruption in the proceedings.)
14              THE COURT:  Just reask the question.
15    BY MR. QUINN:
16    Q    Were you able to confirm that someone had downloaded
17    these files from Ms. Brisbois' computer onto this Backpack
18    thumb drive?
19    A    That's correct.
20    Q    And did you review a report that had been done, an
21    analysis of the thumb drive that was done by KPMG, a firm up
22    in Canada?
23    A    Yes, I did.
24    Q    You personally did this analysis of the thumb drive?
25    A    I did.
```

Case 2:04-cv-09049-DOC-RNB  Document 10184  Filed 03/11/11  Page 18 of 139  Page ID #:308458
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

18

1    Q    And did you see -- had KPMG also done an analysis of

2    the thumb drive?

3    A    Yes, they have.

4    Q    And were you able to -- were your findings exactly the

5    same as theirs?

6    A    Yes, sir, they were.

7    Q    If you could take a look at the KPMG report,

8    appendix 1, which is Exhibit 24304-10.

9    A    Yes, sir.

10   Q    And are these the findings, the analysis done by KPMG

11   on the thumb drive?

12   A    I'm sorry.  One moment, please.

13        Yes, sir, they are.

14   Q    And you personally were able to confirm -- and you made

15   the exact same findings as what's reflected here?

16   A    That's correct.

17        MR. QUINN:  Your Honor, we would offer 24304-10

18   through -19.

19        MS. HURST:  Foundation and hearsay, your Honor.

20        THE COURT:  Sustained.

21   BY MR. QUINN:

22   Q    If we could -- in any event, your findings were the

23   same -- the exact same findings in terms of file names and

24   numbers and the electronic data, correct?

25   A    That's correct.  As a matter of fact, the examiners at

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 19 of 139   Page ID #:308459
CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

19

1    KPMG had performed what is known as a hashing, which is a

2    mathematical algorithm.  It takes --

3              MS. HURST:  Objection, your Honor.  Move to

4    strike.  It's publishing hearsay.

5              THE COURT:  Sustained.

6              Now, he's designated as an expert.  He can testify

7    about what the findings are.  They are not for the truth of

8    the matter.  They are for reliances on the reliability of

9    his own findings.  Now, that's a really complicated ruling,

10   if you understand that, great.

11             Once again, let me remind you, certain evidence

12   can come in, they're not for the truth of the matter

13   asserted.  An expert can rely upon hearsay, but those

14   documents don't come into evidence, okay?  But this goes to

15   his credibility and the reliability of the results that are

16   tested against his.

17             Okay, Counsel.

18   BY MR. QUINN:

19   Q    As a result of reviewing that report, did you say they

20   had done this hashing type of analysis?

21   A    Yes, they had.

22   Q    And what is that?

23   A    Again, it's a -- it's a electronic fingerprint, if you

24   will, of one file or a group of files.  Hashing can actually

25   be done against an entire hard drive or even sets of hard

1    drives.  It takes an entire volume of information and

2    creates a lengthy alphanumeric number, A through Z and one

3    through nine -- zero through nine, and in that, it makes it

4    absolutely identical.  If you perform the same type of

5    function at another point, if you make a copy of something,

6    and the file hashes match, then it's an identical copy to

7    the original.

8    Q    And -- and did that -- what did that tell you?  I mean,

9    what did that mean to you as an expert, the results of that

10   analysis?

11   A    That the data that we were looking at was exactly the

12   same data that was being looked at by KPMG.

13          MR. QUINN:  Nothing further, your Honor.

14          THE COURT:  Cross-examination by Ms. Hurst on

15   behalf of Mr. Larian and MGA.

16                    **CROSS-EXAMINATION**

17   BY MS. HURST:

18   Q    Good afternoon, Mr. Maryman.

19   A    Good afternoon.

20          MS. HURST:  Can we see that 22856, page 9 again?

21   I think it was in evidence.

22   BY MS. HURST:

23   Q    You said that you were told that Ms. Brisbois'

24   departure date was September 26th, 2005?

25   A    Yes, I was.

CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

21

1  Q    Is there anything that you found in your analysis that

2  would be inconsistent with the proposition that she

3  continued to work for Mattel right up until the time of her

4  departure?

5  A    No, I don't think so.

6  Q    Did you do an analysis of the entire time period of

7  activity on her computer?

8  A    No, I did not.

9  Q    So you didn't try to do a statistical analysis to find

10 out the frequency with which she accessed files in, say,

11 2003 versus the week prior to her departure, correct?

12 A    Correct.

13 Q    And you can't actually tell us whether this was an

14 unusual amount of activity for her work style; isn't that

15 true?

16 A    I'll agree.

17 Q    So you are also not here to tell us that documents with

18 file names like "Back of Postcard" are Mattel confidential

19 information; is that right?

20 A    No, I'm not.

21 Q    You are not here to tell us that documents with the

22 words "press release" in the title of them are Mattel

23 confidential information, true?

24 A    True.

25 Q    You are not here to tell us with -- that documents with

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 22 of 139   Page ID #:308462
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

22

1    the word "feedback" in the title are Mattel confidential

2    information, true?

3    A    True.

4    Q    Now, you looked at the KPMG report as well?

5    A    Yes, I did.

6    Q    And the KPMG report, and you confirmed this yourself by

7    looking at the thumb -- a thumb drive -- let's just back up

8    here for a second.

9    A    Sure.

10   Q    A thumb drive is a storage -- a computer media storage

11   device, right?

12   A    Yes, it's a removable digital media source.

13   Q    And you can take it around from computer to computer to

14   carry your files when you're working on them, right?

15   A    That's correct.

16   Q    And it would be entirely consistent with your analysis

17   if Ms. Brisbois said, I used to take my thumb drive back and

18   forth between home and work so I could work on things at

19   home and then bring them back and forth to work, true?

20   A    True.

21   Q    In fact, when you looked at the KPMG analysis, you

22   found that of the 200 files on that thumb drive, many of

23   them were several years old, true?

24   A    Yes, they were, certainly.

25   Q    And that aging of those files would be entirely

1    consistent with testimony from Ms. Brisbois that this was a

2    drive that she used to carry back and forth between work and

3    home, true?

4    A    True.

5            MS. HURST:  No further questions.

6            THE COURT:  Mr. Cote, do you have any questions?

7            MR. COTE:  No, thank you, your Honor.

8            THE COURT:  Mr. Quinn on -- redirect on behalf of

9    Mattel.

10                        **REDIRECT EXAMINATION**

11   BY MR. QUINN:

12   Q    Mr. Maryman, did you also find there a resignation

13   letter that Ms. Brisbois had written, in your analysis?

14   A    Yes, sir, I did.

15           MS. HURST:  Objection.  Beyond the scope.

16           THE COURT:  Overruled.

17   BY MR. QUINN:

18   Q    And what was the date of that letter?

19   A    The date of the letter was September 23rd, 2005.  It

20   was located in the recycle bin of the computer.  We also

21   found that it was an attachment to an e-mail from her

22   corporate e-mail address to her personal e-mail address.

23   Q    And you have actually -- you brought with you today the

24   thumb drive?

25   A    Yes, sir.

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 24 of 139   Page ID #:308464
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

24

```
 1              MR. QUINN:  And your Honor, we'd like to mark this
 2    as an exhibit and offer it into evidence.  I understand
 3    there is no issue with respect to the chain.
 4              THE COURT:  Well, that's --
 5              MS. HURST:  Yeah.
 6              THE COURT:  As counsel approaches each other.
 7              Not at this time, probably.  We can take that up
 8    this evening, but --
 9                 (Attorney discussion held off the record.)
10              MS. HURST:  Your Honor, we have no issue as to the
11    chain.
12              THE COURT:  As to the chain itself, then.
13              MR. QUINN:  We would -- the next in order would be
14    24320, I'm told would be the next in order.
15              THE COURT:  24230.
16              MR. QUINN:  I think 24 -- 24320.
17              THE COURT:  My apologies.  I just reversed those
18    numbers on you.
19              And what was the thumb drive, the USB that you've
20    got with you?  What's the number on that, exhibit number?
21              MR. QUINN:  That was the exhibit number, is what I
22    just --
23              THE COURT:  Oh, 24320 is the thumb drive that you
24    brought with you; is that correct, Mr. Maryman?
25              MR. QUINN:  We're just now --
```

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 25 of 139   Page ID #:308465
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

25

 1          THE WITNESS:  We're giving it a number, but that
 2   is the thumb drive, yes.
 3          THE COURT:  The one that counsel has in his hand?
 4          THE WITNESS:  Yes, sir.
 5          THE COURT:  All right.  We will mark that at the
 6   present time, and then let me discuss that and make sure
 7   there are no issues between the two of you later.
 8          MR. QUINN:  Thank you, your Honor.  No further
 9   questions.
10          THE COURT:  Okay.
11          Recross?
12          MS. HURST:  No questions, your Honor.
13          THE COURT:  Mr. Maryman, thank you very much.
14   Just in an abundance of caution, I can't imagine why you'd
15   be coming back to court, but I'm placing all witnesses on
16   call until May 7th.  It just stops any additional subpoenas,
17   any inconvenience, but if you have any professional
18   responsibilities or if you are just taking a personal
19   vacation, keep every commitment in your life.  If we need
20   you, we'll find you.
21          THE WITNESS:  Thank you, sir.
22          THE COURT:  Thank you very much.  You may step
23   down.
24          Your next witness, please.
25          MR. PRICE:  We recall Mr. Larian.

```
 1              THE COURT:  Mr. Larian, thank you.
 2              Mr. Larian, you were administered an oath.  The
 3    same oath applies.  Do you recall that oath, sir?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Thank you.  Come right across the
 6    center of the well, please, sir, and the witness stand is
 7    here, and if you'd please be seated.
 8           ISAAC LARIAN, PLAINTIFFS' WITNESS, RECALLED
 9                    FURTHER DIRECT EXAMINATION
10    BY MR. PRICE:
11    Q    Mr. Larian --
12    A    Hold on.
13         Okay.  I'm sorry, go ahead.
14    Q    You understand that one of the issues in this case is
15    whether MGA would have done a Bratz-like doll if it had not
16    seen Mr. Bryant's drawings; do you understand that's one of
17    the issues?
18    A    Yes.
19    Q    And you understand another issue is whether or not MGA
20    could have created a Bratz doll and a Bratz line in 2000
21    without using Mattel's resources?
22              MR. MC CONVILLE:  Your Honor, this is beyond the
23    scope of what our understanding was of the examination.
24              THE COURT:  Yeah, I thought so too.
25              MR. PRICE:  This is Mattel's resources to
```

1  seamstresses.

2         THE COURT:  All right.  Overruled.

3         THE WITNESS:  I'm sorry, can you repeat the

4  question?

5  BY MR. PRICE:

6  Q    One of the issues is whether or not MGA could have

7  created a Bratz doll, a Bratz line in 2000 without using

8  Mattel's resources?

9  A    Yes.

10  Q    And an important part of the fashion doll is the

11  fashions, correct?

12  A    Yes.

13  Q    An important part of that are the sample makers,

14  correct?

15  A    Sample makers are important.

16  Q    In fact, you had the Hong Kong toy fair where you had

17  the samples on those dolls, correct?

18  A    Yes.

19  Q    And Veronica Marlow was creating the samples using

20  sample makers that worked at Mattel, correct?

21         MR. MC CONVILLE:  Object.  Vague as to time.

22  BY MR. PRICE:

23  Q    Starting straight off, 2000?

24  A    I have found that through this litigation, that that's

25  what she was doing, yes.

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 28 of 139   Page ID #:308468
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

28

1    Q    And Paula Garcia was the product manager over Bratz,

2    correct?

3    A    Yes.

4    Q    And she worked with Ms. Marlow, right?

5    A    Yes.

6    Q    In fact, they were good friends?

7    A    I don't know if they were good friends or not.

8    Q    In fact, Ms. Marlow gave her $8,000 for her wedding,

9    right?

10              MR. MC CONVILLE:  Objection, your Honor.

11              THE COURT:  It's sustained.

12              In its present form, Counsel, that's just a

13   statement.  It's argument, okay?

14   BY MR. PRICE:

15   Q    Ms. Garcia knew that Mattel employees were being used

16   to create the Bratz samples, right?

17   A    I don't know if she did or not.

18   Q    In January of 2008, you knew that Ms. Garcia was going

19   to be giving sworn testimony in her deposition, correct?

20   A    I don't remember the date, but she was deposed.

21   Q    And you wanted to make sure that she would testify that

22   she doesn't know that Veronica was using Mattel

23   seamstresses, correct?

24   A    That is not correct.

25   Q    If you'd look at Exhibit 24305.

```
 1        Do you see this is an e-mail that you sent on
 2   January 19th to Craig Holden?
 3   A    Yes.
 4             MR. PRICE:  Your Honor, we move 24305 into
 5   evidence.
 6             THE COURT:  Received.
 7             (Plaintiffs' Exhibit No. 24305 is received in
 8        evidence.)
 9   BY MR. PRICE:
10   Q    Now, let's start, Craig Holden was an MGA employee at
11   the time, correct?
12   A    Yes.
13   Q    He was, in fact, an inside counsel, a lawyer for MGA,
14   correct?
15   A    Yes.
16   Q    At the time you had outside counsel, correct?
17   A    Yes.
18   Q    But you sent this to the MGA employee, your inside
19   counsel, right?
20   A    Yes.
21   Q    And what you told Mr. Holden was, Make sure Paula is
22   prepped and doesn't know that Veronica was using Mattel
23   seamstresses.
24        Is that what you wrote to your employee, your inside
25   counsel, Craig Holden?
```

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 30 of 139   Page ID #:308470
CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

30

```
 1              MR. MC CONVILLE:  Objection.  Misstates the text
 2    of the e-mail.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Yes.
 5    BY MR. PRICE:
 6    Q    And Mr. Holden responded to you, correct?
 7    A    I don't know if he did or not.
 8    Q    If you'd look at Exhibit 24306.
 9    A    Okay.
10    Q    You recognize that as Mr. Holden's response to you?
11    A    Yes.
12              MR. PRICE:  Move 24306 into evidence.
13              THE COURT:  Received.
14              (Plaintiffs' Exhibit No. 24306 is received in
15         evidence.)
16    BY MR. PRICE:
17    Q    And in response to your saying, Make sure Paula is
18    prepped and doesn't know that Veronica was using Mattel
19    seamsters, his response to you was "yes," correct?
20    A    He was replying to my e-mail saying yes.
21    Q    And on January 19, 2008, certainly at that time, you
22    knew that, quote, "Veronica was using Mattel seamstresses,"
23    correct?
24    A    I had learned that at that time, yes.
25    Q    That Mattel employees were working on a Bratz product,
```

CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

31

1   you knew that as of January 19, 2008, correct?

2   A    That's correct.

3   Q    But you wanted you and Ms. Garcia to have your stories

4   straight so you could both testify you never, ever knew that

5   happened?

6           MR. MC CONVILLE:  Objection.  Argumentative.

7           THE COURT:  In its present form, sustained.

8   BY MR. PRICE:

9   Q    Were you trying to coordinate your testimony with

10  Ms. Garcia so that you could both testify you didn't know if

11  that happened?

12  A    Absolutely not.

13  Q    I'd like you to look at your deposition testimony, just

14  a few months later, on March 26th, 2008.

15          MR. PRICE:  And, your Honor, I would like to read

16  from page 511, line 5, to 512, line 4.

17          THE COURT:  I don't see how line 1 through 4 are

18  relevant, Counsel.

19          MR. PRICE:  It's 511, line 5 -- I'm sorry, 512.

20          THE COURT:  Just a moment.  You asked to read from

21  511, line 5, to 512, line 4, and I don't see how 1 through 4

22  are relevant on 512.

23          MR. PRICE:  In that case, I'll read to line 24.

24          THE COURT:  Now, just a moment.

25          MR. PRICE:  Or, your Honor, to line 14.

```
 1            THE COURT:  No, Counsel.  You may read to line 24.
 2   You may read from page 511, line 5 to line 24.
 3            MR. PRICE:  Question:  "Well, if you found out
 4   that there was a Mattel employee while still employed at
 5   Mattel --"
 6            Answer:  "Uh-huh."
 7            "Who was doing work on Bratz at the same time,
 8   would you be concerned?"
 9            Answer:  "I don't have any -- I cannot guess for
10   you here.  I have no idea if that has happened."
11            Question:  "Have you ever told anyone at MGA to
12   make sure that the persons they have working on MGA projects
13   are not at the same time employed by Mattel?"
14            Answer:  "I don't think I have."
15            Question:  "Or employed by any other competitor of
16   MGA?"
17            Answer:  "I don't think I have to those exact
18   words, no."
19   BY MR. PRICE:
20   Q    And in fact, you had never said anything like that in
21   substance either, correct?
22   A    I'm sorry, I don't understand your question.
23   Q    Not only had you not used those exact words, which is
24   told someone at MGA to make sure that people working on MGA
25   projects aren't also employed by Mattel, not only did you
```

1   not use those exact words, you didn't say that in substance

2   in any words, correct?

3   A    I still don't understand your question, sir.

4   Q    Did you ever say in substance that you didn't want

5   Mattel employees working on MGA projects?

6   A    Did I ever tell anybody?

7   Q    Yes.

8   A    I don't remember if I have or not, but I don't, I don't

9   want Mattel employees working on MGA product.

10   Q    And this is March 26th, 2008.  If we go back and look

11   again at 24306, on your January 19, 2008 e-mail, at that

12   time, you obviously know that, quote, "Veronica was using

13   Mattel seamstresses," right?

14   A    It's possible, yes.  Yes, yes.

15   Q    You wrote that e-mail, right?

16   A    Yes, I wrote this e-mail.  That was after her

17   deposition, yes.

18   Q    But again, after that, you still denied under oath that

19   you knew anything about it, right?

20   A    I do.

21   Q    In fact, even as of August of 2010, you were still

22   denying under oath that you knew anything about Veronica

23   using Mattel seamstresses on Bratz products?

24   A    I found out that Veronica was using Mattel seamstresses

25   after her deposition in 2008.

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 34 of 139   Page ID #:308474
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

34

1    Q    But I'm saying in 2010, you still were denying under

2    oath that you knew that, as you say, in January of 2008,

3    Veronica was using Mattel seamstresses, right?

4    A    I don't remember my testimony in 2010.

5    Q    All right.  If we could look at August 12, 2010.

6    A    Yes.

7              THE COURT:  Just a moment.

8              MR. PRICE:  Your Honor, that would be page 3910,

9    lines 21, to 3911, line 5, or we can go to line 10.

10             THE COURT:  Just a moment.

11             MR. MC CONVILLE:  What's the page?

12             MR. PRICE:  It's 3910, line 21, to 3911, line 5.

13             THE COURT:  The complete answer would be down to

14   line 10.  Just a moment, Counsel.

15             MR. PRICE:  Certainly.

16             THE COURT:  Counsel, I am not certain about this

17   portion because I don't see the reference back to what was

18   being referred to at the time of the deposition.

19             MR. PRICE:  About Mr. Bryant?

20             THE COURT:  Just a moment.

21             MR. PRICE:  3910, line 22, to 3911, line 10.

22             THE COURT:  You may read down to line 10, Counsel.

23   You may read from line 21 on page 3910, to line 10 on 3911.

24             MR. PRICE:  Thank you.

25             Question:  "Other than what you said about

1    Mr. Bryant, is there anyone else that ever came to your

2    attention --"

3             Answer:  "Right."

4             "-- was a person who worked on MGA products --"

5             Answer:  "Uh-huh."

6             Question:  "-- at the same time that that person

7    was employed by Mattel?"

8             Answer:  "No, not that I recall, and not that I

9    recall, no, I -- and I did not prepare for that -- for this

10   deposition."

11   BY MR. PRICE:

12   Q    That was your testimony under oath on August 12, 2010,

13   right?

14   A    It was.

15   Q    And going back to Exhibit 24306 --

16   A    Yes.

17   Q    When you say, "Make sure Paula is prepped," what you

18   mean by "prepped" is "prepared," correct?

19   A    For her deposition, yes.

20   Q    Because Mr. Holden was preparing her to testify under

21   oath, right?

22   A    For her deposition, that's what I believe, yes.

23   Q    And you wanted to make sure that she was prepped and

24   would say that she doesn't know that Veronica was using

25   Mattel seamstresses, correct?

1    A    That's not correct.

2    Q    That's what you wrote, right?

3    A    That's what I wrote.

4    Q    And in order to win this case, you were willing --

5         THE COURT:  Counsel --

6    BY MR. PRICE:

7    Q    You told someone -- you told your attorney to instruct

8    Ms. Garcia to testify falsely under oath so it would look

9    like MGA had the capability of creating these samples by

10   itself, right?

11        MR. MC CONVILLE:  Objection.  Argumentative.

12        THE WITNESS:  And you are 100 percent wrong,

13   absolutely not correct.

14        THE COURT:  Overruled.

15        MR. PRICE:  No further questions.

16        THE COURT:  Cross-examination by Mr. McConville on

17   behalf of MGA and Mr. Larian.

18                    **FURTHER CROSS-EXAMINATION**

19   BY MR. MC CONVILLE:

20   Q    Mr. Larian, do you have --

21        MR. MC CONVILLE:  Could we put up e-mail 24306,

22   please.

23        THE WITNESS:  Yes, I have it.

24        MR. MC CONVILLE:  We don't have it?

25        Oh, there it is.

1   BY MR. MC CONVILLE:

2   Q    Mr. Larian, who is Craig Holden?

3   A    He is our -- he used to be our in-house litigation

4   counsel.

5   Q    And was he that position as of January 19, 2008?

6   A    Yes, he was.

7   Q    And were you in litigation with Mattel as of

8   January 19, 2008?

9   A    Yes.

10   Q    And Mr. Holden was your in-house litigation counsel,

11   right?

12   A    Yes.

13   Q    So how often -- well, tell me this:  We know that there

14   was a previous trial in this matter.  When was that trial?

15   A    May -- I think May of 2008.

16   Q    A few months before this?

17   A    A few months after this.

18   Q    I'm sorry, a few months after this?

19   A    Yes.

20   Q    And -- and as you approached toward trial, were things

21   getting more hectic?

22   A    They were.

23   Q    You were preparing your litigation, correct?

24   A    Yes, I was.

25   Q    And how often did you have contact with Mr. Holden?

1    A    Every day, 10, 15 times, a lot.

2    Q    Where was your office in relation to Mr. Holden's?

3    A    He was right next door to me.

4    Q    And how long had Mr. Holden been working with you up to

5    that time?

6    A    About a year, year and a half.

7    Q    And so --

8    A    I don't remember the exact time.

9    Q    That's okay.

10        So during that time period that Mr. Holden was working

11   for you, had you and he had e-mails exchanges before?

12   A    Yes, we have.

13   Q    And you and he had had conversations before?

14   A    Yes, we have.

15   Q    And Mr. Larian, we've seen a lot of e-mails in this

16   case, haven't we, from you?

17   A    Yes.

18   Q    How many e-mails would you say you write a day -- write

19   and receive a day?

20   A    Three-, 400.

21   Q    And do you -- do you oftentimes when you are writing

22   your e-mails, attempt to get it sort of New York Times

23   quality?

24            MR. PRICE:  Objection.  Argumentative.  Leading.

25            THE COURT:  Sustained.

```
 1   BY MR. MC CONVILLE:

 2   Q    Do you write -- Mr. Larian, when you write your

 3   e-mails, are you concerned about getting the spellings

 4   correctly?

 5   A    No, I don't.

 6   Q    In fact, let's look at this e-mail.

 7        "Make sure Paula is preeped," isn't that what it says,

 8   sir?

 9   A    It does.

10   Q    What does "preeped" mean?

11   A    I meant "prepped."

12   Q    Oh, you meant "prepped"; it was a typo?

13   A    Yes.

14   Q    "And doesn't know that Veronica was using Mattel's

15   seamsters."  What's a "seamster," Mr. Larian?

16   A    I meant "seamstresses."

17   Q    Was that another typo?

18   A    Yes.

19   Q    Mr. Larian, and is that -- you know, I don't want to be

20   harsh on you, but are you -- is it common that you create

21   e-mails with typos?

22   A    Yes.

23   Q    And you had a lot of interaction with Mr. Holden during

24   his employment with you in advance of this litigation?

25   A    Yes.
```

CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

40

1    Q    And did you come to understand that Mr. Holden could

2    interpret your sometimes e-mails that weren't perfect

3    English?

4    A    Yes.

5    Q    Okay.  And when you wrote this e-mail to Mr. Holden,

6    what were you intending by writing this e-mail to

7    Mr. Holden?

8    A    To put him, to make sure -- well, at the time, I think

9    it was in January, the previous judge in this case --

10   Q    Let me ask you a question.

11   A    Yes.

12   Q    In January, at this time, do you recall a specific

13   event that the court, not this judge, but a different court

14   had ordered as of that time?

15   A    Yes.

16   Q    What do you recall?

17   A    He had ordered that 50 depositions to be taken, 50 more

18   depositions to be taken in the month of January.

19   Q    Five zero?

20   A    Yes.

21   Q    And so 50 depositions before the end of January?

22   A    Yes.

23   Q    Okay.  So with that as context, please explain what it

24   is you meant by your e-mail.

25   A    I wanted to make sure that Craig would have Paula

1   prepared for her deposition --

2   Q    Let me stop there.  So make sure Paula is prepared for

3   her deposition.  Was that one of Mr. Holden's jobs?

4   A    Yes.

5   Q    Okay.  Go ahead.

6   A    And to find out if Paula knew about the seamstresses

7   that Veronica was using or not.

8   Q    So you are asking Mr. Holden to make sure that Paula is

9   prepped if she has a deposition and to figure out whether

10  she knows about the seamstresses, right?

11  A    That's correct.

12  Q    And when did you learn -- or do you recall when

13  Veronica Marlow's deposition was in relation to this e-mail?

14  A    It was before, about a month, maybe month and a half

15  before this e-mail.

16  Q    So Veronica -- and you understand that at that

17  deposition, Veronica Marlow testified as to the names of

18  some people who were employed at Mattel who were working for

19  her as seamstresses, right?

20  A    Vaguely I remember that, yes.

21  Q    Okay.  Even as we sit here now, do you recall these

22  people's names?

23  A    I don't.

24  Q    Have you -- is that something -- I understand -- well,

25  let me back up.

CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

42

```
 1        So at the time you sent this e-mail, your intent was to
 2   tell Mr. Holden to make sure Paula gets prepped for her
 3   deposition?
 4   A    That's correct.
 5   Q    And figure out whether she knows about this thing that
 6   Veronica Marlow had just advised in her deposition?
 7   A    I wanted to know if she knew that -- Paula, "she" mean
 8   Paula, knew that Veronica Marlow was using Mattel
 9   seamstresses or not.
10   Q    And while you were preparing for the trial which was
11   going to be a few months away, you understood that Mattel
12   thought this piece of information was significant to at
13   least Mattel's theory of the case, right?
14   A    I'm sorry, can you reask that question?
15   Q    Sure.  You understood -- well, let's put it this way:
16   You've been at this trial, right?
17   A    I have.
18   Q    You were at the last trial?
19   A    I have.
20   Q    There's been a lot of testimony about these
21   seamstresses who -- who worked for Veronica Marlow while all
22   at the same time were working for Mattel, right?
23   A    Yes.
24   Q    So from Mattel's perspective, it's a pretty important
25   fact?
```

1    A    Yes.

2    Q    Okay.  So if there is something that the person you're

3    litigating against thinks is a very important fact, what

4    were you doing, asking your lawyer to do, what was your step

5    you were taking here asking your lawyer to do?

6    A    Asking him to make sure that Paula is prepared for her

7    deposition and also to find out if Paula knew that Mattel

8    was -- that Veronica Marlow was using Mattel seamstresses or

9    not.

10   Q    You were asked some questions about your testimony

11   about -- about -- during depositions that occurred after --

12   after this e-mail exchange; do you recall those questions?

13   A    Yes.

14   Q    Mr. Larian, did you know -- do you even know to this

15   day that these women worked for Mattel?

16   A    Did I know today --

17   Q    Yeah.

18   A    -- at one time someone worked for Mattel.

19   Q    Right, but do you have any personal knowledge?  I mean,

20   did you -- did you watch these women work?

21   A    I don't know who these people are.  I have never met

22   them.

23   Q    So when you are answering questions about your personal

24   knowledge about where these people worked, what were you

25   trying to respond?

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 44 of 139   Page ID
#:308484
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

44

1    A    I don't know where they worked or not.  I found out for

2    the first time in this trial that Mariana, I think it was

3    her name, was fired from Mattel in 2001, for example.  I

4    didn't know that, and I'm talking about this trial.

5              MR. PRICE:  Move to strike the latter as

6    irrelevant.

7              THE COURT:  No, it goes to memory.  Overruled.

8    BY MR. MC CONVILLE:

9    Q    So, Mr. Larian, just to be clear, when you wrote "make

10   sure Paula is preeped and doesn't know that Veronica was

11   using Mattel's seamsters," you weren't saying, "Hey, go

12   use" -- "let me use my attorney to go, you know, make sure I

13   can put some thoughts into Paula's head to stop her from

14   testifying to facts that are accurate"; is that what your --

15   that's not what this says, right?

16             MR. PRICE:  Objection.  Leading and argumentative.

17             THE COURT:  Well, you can lead on

18   cross-examination.  I'm not sure the question is

19   understandable.

20   BY MR. MC CONVILLE:

21   Q    Do you understand --

22             THE COURT:  Just reask it.

23             MR. MC CONVILLE:  Sure.

24   BY MR. MC CONVILLE:

25   Q    When you wrote this e-mail about "preeping," it was not

1    your intention, Mr. Larian, to try to influence Paula

2    Garcia's testimony regarding those seamstresses, right?

3    A    Absolutely not.  I worked with Paula every day.

4    Q    Okay.

5    A    I didn't need to do that through somebody else, if that

6    was my intention.  It's absolutely not.

7             MR. MC CONVILLE:  All right.  No further

8    questions.

9             THE COURT:  Mr. Cote, do you have questions?

10            MR. COTE:  No, thank you, your Honor.

11            THE COURT:  Mr. Price.

12                   **FURTHER REDIRECT EXAMINATION**

13   BY MR. PRICE:

14   Q    Mr. Larian, you spoke with Ms. Garcia practically every

15   day?

16   A    Yes.

17   Q    She was in the same building?

18   A    She was in a different building.  No, not the same

19   building.

20   Q    So you spoke to her every day, and if you wanted to

21   talk to her, "Hey, what do you know about this," you could

22   have gone and talked to her, correct?

23   A    Yes.

24   Q    Now, let's look at 23406.

25            Now, this is an e-mail, though, that you sent to your

1   attorney, correct?

2   A    Yes.

3   Q    And it's your understanding, based upon the litigation

4   that you've been involved in, that normally a communication

5   from you to your attorney would be privileged and no one

6   would see it, that's your understanding after all of this

7   litigation, correct?

8   A    No.  My understanding is some communication with the

9   lawyers are privileged and some are not, and definitely this

10  is not because it's in front of a jury and everyone else.

11  Q    But you know that MGA claimed it was privileged?

12  A    I don't know what our lawyers claim or not, and I still

13  don't know.  I'm not a lawyer.  I don't know if this is

14  privileged or not.

15  Q    You don't know that your lawyers claimed this was

16  privileged and couldn't be used?

17  A    I did not.

18           MR. MC CONVILLE:  Argumentative, your Honor.

19           THE COURT:  Sustained.

20  BY MR. PRICE:

21  Q    Now, let's look at what you wrote.

22       Now, you've told us that what you meant to convey was,

23  find out if Ms. Marlow knows about this, correct?  I'm

24  sorry, Ms. Garcia, that you --

25  A    Yes.

1    Q    And you had known about Ms. Marlow's deposition for a

2    few months, right?

3    A    Yes, before this.  I don't know a few months, but --

4    Q    You talked to Ms. Garcia on a daily basis, you had

5    plenty of time to go to her and ask her if she knew about

6    the fact that your sample makers were employed by Mattel,

7    the sample workers who were working on Bratz, right?

8    A    I'm sorry, can you repeat that question?

9    Q    You had plenty of time to go to Ms. Garcia before

10   January 19, 2008, to find out whether or not Ms. Garcia knew

11   that the seamstresses, the sample makers on the Bratz

12   products were Mattel employees, right?

13   A    Yes.

14   Q    And you see the subject says "Mattel PC"?

15   A    Yes.

16   Q    That means privileged communication, doesn't it?

17   A    It means private and confidential.

18   Q    Okay.  And that's what you thought this would remain,

19   right?

20   A    Usually when I send an e-mail regarding Mattel to my

21   lawyers, that's what I put.

22   Q    And if we look at what you wrote, it says, "Make sure

23   Paula is preeped and doesn't know that Veronica was using

24   Mattel's seamsters," that's what you actually wrote to your

25   employee, correct?

1    A    Yes.

2    Q    And then afterwards you, yourself, testified that you

3    had no idea that Veronica Marlow was using Mattel

4    seamstresses, right?

5    A    Yes.

6    Q    But if we look at this, what you thought was a private

7    and confidential communication to your attorney, we see that

8    January 19, 2008, you did have an idea that Veronica was

9    using Mattel's seamstresses, because that's what you wrote

10   down, right?

11   A    That's not what I wrote down, but I had from that --

12   after Veronica Marlow's deposition, I had come to

13   understanding that she had testified that she had used

14   Mattel seamstresses without MGA's knowledge, I had come to

15   that understanding, yes.

16   Q    Well, you testified March of 2008 that you didn't have

17   knowledge when, in fact, you did?

18   A    I did not.  No, my testimony is very accurate.

19   Q    Well, let's look at page 511 of March 26, 2008, for

20   example.

21            MR. MC CONVILLE:  This is asked and answered, your

22   Honor.

23            THE COURT:  Overruled.

24            MR. PRICE:  Question:  "Well, if you found out

25   that there was a Mattel employee while still employed by

1    Mattel --"

2             Answer:  "Uh-huh."

3             "-- who was doing work on Bratz at the same time,

4    would you be concerned?"

5             And answer, "I -- I don't have any -- I cannot

6    guess for you, here.  I have no idea if that has happened."

7    BY MR. PRICE:

8    Q    That's what you said under oath just a couple of months

9    after telling your attorney to "make sure that Paula is

10   preeped and doesn't know that Veronica was using Mattel's

11   seamstresses," right?

12   A    That is accurate, and that testimony is still accurate.

13   Q    In fact, you backed up that statement by describing how

14   wrong it would be for someone at Mattel to be working on a

15   Bratz project while they were at Mattel, you said in strong

16   language that that was wrong?

17   A    I'm sorry?  I'm not sure I understand your question.

18   Q    Okay.  Look at page 512, I'm just going to ask you to

19   look at this, now.  Lines --

20             MR. MC CONVILLE:  Your Honor, it's beyond my

21   questions to him and now we are now treading into new areas.

22             MR. PRICE:  It's sworn statement in context, your

23   Honor.

24             THE COURT:  What lines are you referring to?

25             MR. PRICE:  I'm going to ask him to look at

1    page 511, 25, to 512, line 4, to discuss how emphatic he

2    was.

3                MR. MC CONVILLE:  He doesn't need his deposition

4    to --

5                THE COURT:  Sustained, Counsel.

6    BY MR. PRICE:

7    Q    And of course, you know that Ms. Garcia, after

8    January 19, 2008, testified that she doesn't know that

9    Veronica Marlow was using Mattel seamstresses?

10   A    I don't know what she testified to.  I don't know that.

11   Q    You didn't talk to her about her deposition afterwards?

12   A    I did not.

13   Q    You didn't attend the trial where she testified?

14   A    I did attend the trial.

15   Q    You attended the trial here where she testified,

16   correct?

17   A    I did.

18   Q    And in January 19, 2008, instead of communicating with

19   her directly --

20   A    Yes.

21   Q    -- about this topic, you decide to communicate with

22   your in-house lawyer, correct?

23   A    I was instructing my lawyer to make sure that she gets

24   prepared for her deposition.

25   Q    You decided to communicate through your lawyer to make

```
 1   sure that Paula, quote, "doesn't know that Veronica was
 2   using Mattel seamstresses," that's the method you decided to
 3   use through your lawyer, right?
 4   A    Yes.
 5   Q    Even though you had a few months before that, after
 6   Ms. Marlow's deposition --
 7             MR. MC CONVILLE:  This is all asked and answered.
 8             THE COURT:  Sustained.
 9             MR. PRICE:  No further questions.
10             THE COURT:  Counsel?
11             Mr. McConville on behalf of MGA.
12                   FURTHER RECROSS-EXAMINATION
13   BY MR. MC CONVILLE:
14   Q    Mr. Larian, if you were attempting to influence
15   someone's testimony in a way so that you can "preep" them,
16   let me ask you this, would it have been more effective if
17   you wanted to influence someone's testimony secretly to go
18   talk to them or to put it in writing?
19   A    It would be better to go and talk to them.
20   Q    That would have been a more effective way to "preep"
21   Paula about the seamsters, if that was your intent, right?
22             MR. PRICE:  Objection.  This is leading.
23             MR. MC CONVILLE:  It's on cross.
24             THE COURT:  Overruled.
25             THE WITNESS:  Yes, that would have been more
```

```
1    effective.

2              And I would appreciate to not make fun of my thing

3    anymore, my "prepped," thank you.

4    BY MR. MC CONVILLE:

5    Q    Okay.  You were asked some questions about whether or

6    not this document was withheld; do you remember those

7    questions?

8    A    Yes.

9    Q    So the questions to you were about whether or not a

10   document they have was withheld, right?

11   A    I don't know how it could have been withheld if they

12   have it.

13   Q    Remarkable?

14             MR. PRICE:  Your Honor, object.  Argument, and it

15   opens up a big door.

16             THE COURT:  Sustained.

17   BY MR. MC CONVILLE:

18   Q    But at the end of the day, Mr. Larian, Craig Holden was

19   your lawyer, right?

20   A    In-house litigation lawyer, yes.

21   Q    And there were 50 depositions that had to be prepped,

22   right?

23   A    For that month of January alone.

24   Q    Within just a few weeks before what's known as

25   discovery would end, right?
```

1    A    That's correct.

2    Q    And you sent an awkwardly-worded e-mail to Mr. Holden,

3    right?

4    A    I --

5              MR. PRICE:  Objection.  This is argumentative.

6              THE COURT:  Sustained.

7              MR. PRICE:  Move to strike.

8              THE COURT:  Stricken.

9    BY MR. MC CONVILLE:

10   Q    And what was your intent when you sent this e-mail to

11   Mr. Holden?

12   A    That she's -- that Paula is prepared for upcoming

13   deposition and to find out if she knew that Veronica Marlow

14   was working with Mattel seamstresses or not.

15   Q    And that has been -- you've heard the testimony of all

16   the MGA employees associated with this trial that no one

17   knew, until Veronica Marlow disclosed, who these

18   seamstresses were, right?

19   A    That is correct.

20             MR. PRICE:  Objection.  Move to strike.  That is

21   an inappropriate question summarizing testimony.

22             THE COURT:  Just a moment.

23             MR. PRICE:  And inaccurate.

24             THE COURT:  Just a moment.

25             Sustained.

1    BY MR. MC CONVILLE:

2    Q    You know that in 2005 --

3    A    2005, yes.

4    Q    -- MGA terminated its relationship with the Marlows

5    because they would not identify the seamstresses, correct?

6    A    That's correct.

7              MR. MC CONVILLE:  No further questions.

8              THE COURT:  Thank you, sir.  You may step down.

9              And Counsel, your next witness, please.

10             MR. QUINN:  Mattel calls Poottipong Phoosopha.

11             THE COURT:  Thank you, sir.

12             If you'd step forward, please, and sir, would you

13    come between the two doors.

14             Thank you.  Now, would you raise your right hand,

15    sir.

16        **POOTTIPONG PHOOSOPHA, PLAINTIFFS' WITNESS, SWORN**

17             THE WITNESS:  I do.

18             THE COURT:  Thank you, sir.

19             If you'd come along the railing.  There is an

20    entrance to the jury box closest to the wall.

21             And if you'd be seated, sir.

22             Would you state your full name, please.

23             THE WITNESS:  My name is Poottipong Phoosopha.

24             THE COURT:  And would you spell your first name,

25    sir.

1        THE WITNESS:  P-o-o-t-t-i-p-o-n-g.

2        THE COURT:  And your last name, sir.

3        THE WITNESS:  Phoosopha is P-h-o-o-s-o-p-h-a.

4        THE COURT:  Thank you.

5        This would be direct examination by Mr. Quinn on

6   behalf of Mattel.

7        MR. QUINN:  Thank you.

8                    **DIRECT EXAMINATION**

9   BY MR. QUINN:

10  Q    Is your last name Phoosopha?

11  A    Phoosopha.

12  Q    Phoosopha.  Try to get the accent on the right

13  syllable.

14       Where are you employed?

15  A    MGA.

16  Q    And what do you do there at MGA?

17  A    Doll face designer.

18  Q    How long have you been employed at MGA?

19  A    Over seven years.

20  Q    And did you work at Mattel before that?

21  A    Yes, uh-huh.

22  Q    Did you -- shortly before this trial started, did Paula

23  Garcia get in touch with you?

24  A    What do you mean by the trial started?

25       THE COURT:  I don't think he's going to know when

1    the trial started.

2            MR. QUINN:  All right.  Right.

3    BY MR. QUINN:

4    Q    In December, did Paula Garcia get in touch with you?

5    A    Yes, uh-huh.

6    Q    And what did she tell you?

7    A    She told me to come into her office and say Isaac

8    want to have a conversation with me.

9    Q    And this was -- can you tell us when this was in

10   relation to Christmas, was it before Christmas, after

11   Christmas?

12   A    I don't remember when is that, but last year is when I

13   remember, yes.

14   Q    And does it seem to you it was in December?

15   A    Probably, yes.

16   Q    So Ms. Garcia contacted you and told you -- asked you

17   to come to her office?

18   A    Yes, uh-huh.

19   Q    And she told you that Mr. Larian wanted to speak with

20   you?

21   A    Yes.

22   Q    Did you then go speak with Mr. Larian?

23   A    Yes, uh-huh.

24   Q    Where -- where did you speak with Mr. Larian?

25   A    In Paula's office.

1    Q    When you came to Paula's office, was Mr. Larian already

2    there?

3    A    No, he was on the phone.

4    Q    He was -- he was on the phone in Paula's office or --

5    A    I don't know where is he, but his call -- he called

6    Paula office, call Paula phone in her office.  I don't know

7    where he is.

8    Q    All right.  And did he then join the two of you in

9    Paula's office or did you go to Mr. Larian's office?

10   A    I go into Paula's office, not Mr. Larian's office.

11   Q    Okay.  Did you speak with -- did Mr. Larian join the

12   two of you or did you just speak to him on the telephone?

13   A    I spoke to him on the telephone, yes.

14   Q    And did Mr. Larian ask you to do something?

15   A    Yes, uh-huh.

16   Q    Did he ask you to contact a witness in this case?

17   A    (No audible response.)

18   Q    Did he ask you to contact Anna Rhee?

19   A    Yes, uh-huh.

20   Q    And did he give you a message that he told you that he

21   wanted you to convey to Anna Rhee?

22   A    Can you explain?  I don't understand that.

23   Q    Did he tell you what he wanted you to say to Anna Rhee?

24   A    No.  He -- he's asked me that he heard that she might

25   get sued from Mattel, and if she need help with a lawyer,

```
1    she will provide her the lawyers.

2    Q    And did he ask you to contact Anna Rhee?

3    A    Yes.

4    Q    And to give a message -- to say that to her?

5    A    Yes.

6    Q    Did he tell you -- did you know -- you knew Anna Rhee?

7    A    Yes, uh-huh.

8    Q    And she was also a face painter?

9    A    Yes.

10   Q    Was she a friend of yours?

11   A    Yes, uh-huh.

12   Q    And Mr. Larian asked you to call Anna Rhee and to tell

13   her that she was going to be sued by Mattel?

14            MS. KELLER:  Objection.  Misstates the testimony.

15            THE COURT:  Sustained.

16   BY MR. QUINN:

17   Q    Well, what did he say that you should tell her about --

18   A    He said he heard that she might been sued by Mattels.

19   Q    All right.  Did you make that telephone call?

20   A    I did, yes.

21   Q    And you told Anna Rhee that?

22   A    Yes, uh-huh.

23   Q    You told her that she might be sued by Mattel?

24   A    Yes, uh-huh.

25   Q    And did you tell her that you were making this call at
```

1    Mr. Larian's request?

2    A    Yes, uh-huh.

3    Q    And you also -- he also said to let Ms. Rhee know that

4    if she needs help with a lawyer, he would be happy to

5    provide that?

6    A    Yes.

7    Q    Is that true?

8    A    Yes, true.

9    Q    And did you tell Ms. Rhee that also --

10   A    Yes.

11   Q    -- when you called her?

12            (Attorney discussion held off the record.)

13   BY MR. QUINN:

14   Q    And all this you did at the direction of Mr. Larian?

15   A    Yes, uh-huh.

16   Q    Had Mr. Larian ever asked you to call Anna Rhee and

17   give a message before?

18   A    No.

19   Q    Had he ever asked you to call anyone before and give a

20   message?

21   A    No.

22            MR. QUINN:  Thank you.

23            THE COURT:  Cross-examination, Ms. Keller, on

24   behalf of MGA and Mr. Larian.

25

CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

60

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | BY MS. KELLER: |
| 3 | Q    Good afternoon. |
| 4 |      Mr. Phoosopha, the first time anybody ever asked you |
| 5 | about any questions about all this, was that on January 27th |
| 6 | of this year in this courtroom at night? |
| 7 | A    The first time, yes, uh-huh. |
| 8 | Q    And did you get a phone call at work asking you to come |
| 9 | into the courtroom to testify about what had happened |
| 10 | between you and Ms. Rhee? |
| 11 | A    They tell me to come to the courtroom, but they didn't |
| 12 | mention what's going on. |
| 13 | Q    So you didn't even know why you were being called to |
| 14 | the courtroom, right? |
| 15 | A    Yes, uh-huh. |
| 16 | Q    And did you know that at the time, there was a court |
| 17 | order that no one was allowed to talk to you about what you |
| 18 | were going to say? |
| 19 | A    When I got to the court and the guy said don't say |
| 20 | anything to him and don't mention anything to him. |
| 21 | Q    Don't talk to anybody about anything until you testify? |
| 22 | A    Yes, yes. |
| 23 | Q    And did you follow that instruction? |
| 24 | A    Yes. |
| 25 | Q    And so before you got on the witness stand, did you |

1    even know what you were going to be asked about?

2    A    Not really, no.

3    Q    Were you a little scared?

4    A    No.

5    Q    Now, I notice that English doesn't seem to be your

6    first language.

7    A    Yes.

8    Q    What's your first language?

9    A    Thai.

10   Q    And let me ask you something else about lawyers talking

11   to you.

12        Before you came here today, did any of the lawyers talk

13   to you about anything that you were going to be testifying

14   about?

15   A    No.

16   Q    Did somebody give you a copy of a transcript from your

17   testimony on January 27th, so you could read what you had

18   said?

19   A    Yes.

20   Q    And everything in that transcript, as far as you know,

21   were you -- was that correct?

22   A    Yes.

23   Q    That's what you testified to?

24   A    Yes.

25   Q    Now, Mr. Larian, was he speaking to you in English or

1    in Thai?

2    A     English.

3    Q     And when he -- when you talked to Mr. Larian, did

4    Mr. Larian tell you that there was another trial coming up

5    or that he thought Ms. Rhee might be sued; do you remember?

6    A     He thought -- he thought what?  Can you say it again?

7    Repeat again?  Sorry.

8    Q     When Mr. Larian talked to you, do you remember -- did

9    he tell you that he thought she might -- Anna Rhee might get

10   sued again?

11   A     That's what he -- that's what he said, yes, he heard.

12   Q     He heard she might be sued again?

13   A     From Mattel, yes.

14   Q     Okay.  So you thought maybe she had been sued before

15   and now she was going to be sued again?

16   A     Well, the lawsuit that's been before -- before they try

17   from since 2006, right?  That's what -- when the lawsuit

18   start.

19   Q     Okay.  So there was suing going on for a long time?

20   A     Yes, uh-huh.

21   Q     And you knew that there had been suing before, right?

22   A     Yes.

23   Q     And now you heard there was going to be suing again?

24   A     I heard because of Isaac said that she might be sue

25   again from Mattel.

1   Q    Okay.  Now, when -- so you thought that Mr. Larian

2   wanted you to contact Ms. Rhee because of suing, right?

3   A    Yes.

4   Q    And to you, is a trial the same as suing?

5   A    (No audible response.)

6   Q    When you think of somebody suing someone, do you think

7   of that as being the same thing as somebody having a trial

8   against someone?

9   A    Probably, yes.

10  Q    And you thought the suing had been over, right?

11  A    Yes.

12  Q    And now the suing was starting up again?

13  A    That's why you are in court today, right?

14  Q    Right.  And do you remember on January -- January 27th,

15  when you were asked, do you remember I asked you about that,

16  and you thought that a trial was the same as suing?

17          MR. QUINN:  Object to the form of the question.

18          MS. KELLER:  I'd ask for a little leeway, your

19  Honor, with the --

20          THE COURT:  Overruled.

21  BY MS. KELLER:

22  Q    Do you remember what I just said?

23  A    Can you repeat again?  Sorry.

24  Q    Do you remember when I asked you that night about

25  whether you think that a trial is the same thing as suing,

1    you said you thought, yes, it was?

2    A    Yes, uh-huh.

3    Q    And do you still think that?

4    A    Well, I don't really know much about what's going on

5    here, but I thought maybe the two company been suing each

6    other or something like that, that's what -- that's what I

7    know.

8    Q    But you thought that Anna Rhee had been part of the

9    suing before, right?

10   A    Yes.

11   Q    And now Anna Rhee was going to be part of the suing

12   again, right?

13   A    Yes.

14   Q    And do you know the difference between suing and --

15   between being sued and being subpoenaed?

16   A    No.

17   Q    Do you know what the word "subpoenaed" means?

18   A    No.

19   Q    So you thought there had been some suing before, but

20   you thought it was over with, right?

21   A    Yes.

22   Q    Now you thought there was maybe more suing that was

23   going to happen, true?

24   A    That's what Isaac told me.

25   Q    He told you more suing was going to start up?

1    A    Yeah.

2    Q    And you know he was part of the suing, right?

3    A    Yes.

4    Q    And you thought Anna Rhee was part of the suing, right?

5    A    Yes.

6    Q    And when Mr. Larian told you he thought Anna Rhee might

7    get sued and that if she needed any help, she could have a

8    lawyer, did you -- what did you think he meant?

9    A    He said he can help me with the lawyer if she need one.

10   Q    Over the suing?

11   A    Yes, uh-huh.

12   Q    Did he tell you that he wanted her to say any

13   particular thing?

14   A    No.

15   Q    Did he tell you that he had a list of things to give

16   you to tell her he wanted her to say, anything like that?

17   A    No, no.

18   Q    And when you talked with Anna Rhee about that, was she

19   laughing?

20   A    Yes.

21   Q    What did she say?

22   A    She said, "Oh, I hope I'm not getting sued again,"

23   something like that, and she's laughing.

24   Q    So "I hope I'm not getting sued again," that's what you

25   thought she said?

1    A    Yes.

2    Q    And did she tell you, "I hope is not suing again, just

3    so tired"; do you remember that?

4    A    That's what I say?  All what I said that Anna said?

5    Q    Yes, would you like to look at -- would it help to look

6    at the papers that have what you said that day on

7    January 27th?

8    A    Yes.

9    Q    Do you have those papers with you?

10   A    No.

11         MS. KELLER:  Do you have that?  Can we show

12   Mr. Phoosopha the bottom of page 36, lines 20 through 25.

13   BY MS. KELLER:

14   Q    Okay.  Have you had a chance to look at that?

15   A    Yes.

16   Q    And so is what you testified to on January 27th, that

17   Anna Rhee was laughing and said, "I hope is not suing again,

18   just so tired," and "we talked something"?

19   A    Yes.

20   Q    Okay.  And when she said, "I hope they're not suing

21   again," what did you think she meant by that?

22   A    I don't think she's mean anything.  It's just kind of

23   like a jokes.

24   Q    Okay.  So you thought she was part of the suing before,

25   right?

1   A   Yes.

2   Q   You thought now -- then you thought the suing was over

3   with when the first trial ended?

4   A   Yes, uh-huh.

5   Q   Now you heard there was going to be more suing, right?

6   A   Yes.

7   Q   So you thought the suing again was -- was that another

8   trial?

9   A   The suing again or not again is kind of like the facts.

10   Because I don't know what's going to happen or not.

11   Q   Okay.

12   A   It's just what Isaac said he heard about it, but it

13   doesn't mean it's going to happen, right?

14   Q   Okay.  But what I'm -- what I'm asking, though, is when

15   she said, "I hope they are not suing again," did you think

16   that meant, "I hope there's not going to be another trial";

17   do you know what I mean?

18   A   Yes, I know what you mean, but I don't know it was

19   going to happen.

20   Q   Okay.  Let's just -- when she said to you, "I hope

21   they're not suing again," what did you think she meant by "I

22   hope they are not suing again"?

23   A   Just not suing again.  It doesn't mean anything.  It's

24   just...

25   Q   Okay.  Do you mean coming to court again, having to go

1    to court again?

2    A    That's -- that's how -- her business is not my

3    business, she can sue or not sue.  This is what -- I

4    delivery what -- because my owner asked me to ask my friend,

5    and I just told my friend what's going on and that's what it

6    is.

7    Q    Okay.  I'm just trying to understand.  I am not trying

8    to trick you.  I'm trying to understand what you thought

9    when she said, "I hope they are not suing again, I'm so

10   tired," what did you think she meant when she said that?

11   A    I don't know.

12   Q    Okay.  And you said she was laughing at the time?

13   A    Yes.

14   Q    Is that a "yes"?

15   A    Yes.

16   Q    This lady has to take it all down.

17   A    Yes, she's laughing.

18   Q    Have you ever been a witness in a courtroom before,

19   other than that one time when you came in here that night?

20   A    Yes, this is my second time.

21   Q    That was the first time?

22   A    Yes.

23   Q    Did Mr. Larian tell you to say anything else to Anna

24   Rhee other than, if she needed a lawyer to help with the

25   suing, that he would provide one?

1    A    No.

2    Q    Did you know -- did Anna Rhee tell you that for the

3    first trial or the first suing, that she had asked MGA for a

4    lawyer many times and MGA hadn't replied; did you know about

5    that?

6    A    I don't know about that story.

7    Q    Okay.  Thank you.

8           MS. KELLER:  I have nothing further.

9           THE COURT:  Redirect, Mr. -- I'm sorry, Mr. Cote?

10          MR. COTE:  No, thank you, your Honor.

11          THE COURT:  Mr. Quinn on behalf of Mattel,

12   redirect.

13                    **REDIRECT EXAMINATION**

14   BY MR. QUINN:

15   Q    Ms. Keller asked you about when you were here before in

16   the evening, and you testified from that chair, and she

17   asked you about whether there had been -- you were told not

18   to talk to anybody; do you recall her asking you that?  That

19   when you came here before, there had been instructions that

20   you shouldn't talk to anybody?

21   A    She said -- when I first came here, one of the guys

22   said don't fill anything, don't let him know anything,

23   that's -- that's the first time, yes.

24   Q    Right.

25          Do you know a Janine Pisoni?

1    A    Janine?

2    Q    Janine Pisoni?

3    A    The lawyer at MGA.

4    Q    Yes.

5    A    Not in person, yes, but --

6    Q    That afternoon of the day --

7    A    She keep -- she calling me to come to the court, yes.

8    Q    She called you, right?

9    A    Yes.

10   Q    And you told Ms. Keller that somebody had given you a

11   copy of what you said before when you were here in the

12   evening in January?

13   A    Today --

14        MS. KELLER:  Objection.  Vague, that we gave him

15   something this morning, your Honor.

16        MR. QUINN:  I don't mean this morning.

17        THE COURT:  Sustained.

18   BY MR. QUINN:

19   Q    You received a copy of what you had said before?

20   A    Yes, just --

21   Q    And who -- who provided that to you?

22   A    Wallen?  Warren?  Warren?

23   Q    Warren?

24   A    Warren.

25        MS. HURST:  It's Mr. Parker.

1    BY MR. QUINN:

2    Q    Oh, Warrington Parker, one of the attorneys for MGA?

3    A    Yes.

4          THE COURT:  And this is confusing.  It sounds like

5    it's today versus the prior occasion.  That should be clear,

6    so I'm going to strike this line of testimony and let you

7    reask it again.

8          MR. QUINN:  I will, your Honor.

9    BY MR. QUINN:

10   Q    The record, the copy of what you said before, that was

11   provided to you by an attorney by the name of Warrington

12   Parker?

13   A    Yes.

14   Q    And he's one of the attorneys for MGA?

15   A    He attorney for -- yes.

16   Q    And when was it that he provided that to you?

17   A    This morning when I get to the office.

18   Q    How many times had you previously had a meeting with

19   just Mr. Larian and Ms. Garcia, just the three of you?

20          MS. KELLER:  Objection.  Asked and answered and

21   beyond the scope.

22          THE COURT:  No, overruled.

23          You can answer the question.  Prior to this --

24          MR. QUINN:  Yeah.

25

1    BY MR. QUINN:

2    Q    Had that ever happened before, this incident we've been

3    discussing, that you had a meeting with just the two of

4    them?

5    A    No.  Most of the time it's about work.

6    Q    Do you know -- are you familiar with the term

7    "subpoena", do you know what a subpoena is?

8    A    No, I don't know what that means.

9    Q    Did Mr. Larian, when he spoke to you, did he use the

10   word "subpoena"?

11   A    No.

12   Q    Did he tell you that he thought that Anna Rhee would be

13   sued or that she would be a witness?

14   A    I think she say she might be sue.

15   Q    And you -- you carried out Mr. Larian's instructions;

16   you did what he asked you to do?

17   A    Yes.

18          MR. QUINN:  Nothing further.

19          THE COURT:  Recross, Ms. Keller.

20                    **RECROSS-EXAMINATION**

21   BY MS. KELLER:

22   Q    Mr. Phoosopha, when Anna Rhee was laughing when you had

23   this conversation with her about the suing, did she tell you

24   why would I -- why would Mattel sue me, I'm working for them

25   right now?

1    A    No, she didn't say anything.

2    Q    So she just was laughing?

3    A    Yes.

4    Q    Did she seem worried?

5    A    No.

6    Q    Did she seem bothered?

7    A    No.

8    Q    Just --

9    A    She didn't sound like that.  She didn't sound worried

10   or bothered or nothing like that, no.

11   Q    Was it your impression after this conversation that she

12   was hoping she wouldn't have to come to court and she was

13   hoping it would all be over?

14   A    I don't know about that.  It was on the phone.

15            MS. KELLER:  All right.  Thank you.

16            Nothing further.

17            THE COURT:  Okay, sir.  Thank you very much.  You

18   may step down.

19            And Counsel, your next witness, please.

20            MR. QUINN:  Mattel calls Anna Rhee.

21            THE COURT:  Ms. Rhee, if you'd step forward,

22   please, between the double doors.

23            And we administered an oath to you on the last

24   occasion.  Do you recall that oath?

25            THE WITNESS:  Yes.

```
 1              THE COURT:  Would you please retake the witness

 2    stand.

 3              ANNA RHEE, PLAINTIFFS' WITNESS, RECALLED

 4              THE COURT:  Once again, would you state for the

 5    jury your name once again.

 6              THE WITNESS:  Anna Rhee.

 7              THE COURT:  And would you spell your name one more

 8    time.

 9              THE WITNESS:  A-n-n-a, R-h-e-e.

10              THE COURT:  Thank you very much.

11              Direct examination by Mr. Quinn on behalf of

12    Mattel.

13              MR. QUINN:  Thank you, your Honor.

14                   FURTHER DIRECT EXAMINATION

15    BY MR. QUINN:

16    Q    Good afternoon, Ms Rhee.

17    A    Hi.

18    Q    Welcome back.

19    A    Thank you.

20    Q    You testified here earlier in this trial on

21    January 27th, 2011?

22    A    Yes.

23    Q    And just to remind us all, you're a face painter?

24    A    Yes, I am.

25    Q    And you work for yourself?
```

1   A    Yes, I do.

2   Q    And you've done work both for Mattel and MGA?

3   A    Yes, I have.

4   Q    You also testified at a previous trial in this matter

5   back in 2008?

6   A    Yes.

7   Q    And before that, you had your deposition taken a few

8   years before, back in 2005?

9   A    Yes.

10  Q    And each time you testified, you talked about -- you

11  told us about the first work you did for MGA and Mr. Bryant

12  face painting a prototype in June of 2000, right?

13  A    Yes.

14  Q    In -- shortly before -- shortly before you test -- in

15  late December, did you receive a telephone call from a

16  Mr. Poottipong?

17  A    Yes, I did.

18  Q    And he's a friend of yours?

19  A    Yes.

20  Q    And what did he say to you?

21  A    Well, he said, hi, and I said, oh, I haven't talked to

22  you in so long, hi.  And he said that, um, that Isaac told

23  him to call me to, um, see if -- if I wanted any help.  And

24  I said, well, what are you talking about?  He said,

25  Mattel -- he said, Mattel is going to sue you because --

1    well, he said basically Mattel is going to sue me, and I

2    said, why?  And he said that -- that -- that they were going

3    to sue me, and that if I wanted any help, that Isaac was

4    willing to help me.

5    Q    Did he tell you whether or not Mr. Larian had asked him

6    to call you?

7    A    Yes, he did.

8    Q    And what did he say about that?

9    A    He said that he knows that I lied in court last time,

10   and that he knows I lied because I was scared, and that if I

11   wanted any help, that he was willing to help me.

12   Q    This is what Mr. Poottipong said that Mr. Larian had

13   said?

14   A    Yes.

15           MS. KELLER:  Objection.  Hearsay.

16           THE COURT:  It's not for the truth of the matter

17   asserted.  Mr. Poottipong just testified and you heard his

18   testimony.  This is what this witness believes that she

19   heard, okay?

20           Counsel?

21   BY MR. QUINN:

22   Q    Was he relating to you -- was he telling you what

23   Mr. Larian had told him; is that what he said?

24   A    Yes.

25   Q    At any time before this telephone call in December, had

```
 1    MGA ever sent any messengers to you offering to help you?

 2    A     No.

 3    Q     When Poottipong -- I think I said Mr. Poottipong, and

 4    it's actually Mr. Phoosopha, I guess, is his last name?

 5    A     He goes by Pooey.

 6    Q     When Pooey said that Isaac knows that you lied the last

 7    time, do you understand that he was referring to your

 8    previous testimony?

 9    A     Yes.

10    Q     Did you lie --

11    A     No.

12    Q     -- in your previous testimony in the previous trial?

13    A     No.

14    Q     Did you lie in your deposition in 2005?

15    A     No.

16    Q     And by the way, you testified about this before at --

17    at night in January when the jury wasn't present, correct?

18    A     Yes, I did.

19          MR. QUINN:  Okay.  Thank you.

20          Nothing further.

21          THE WITNESS:  Thank you.

22          THE COURT:  Cross-examination, Ms. Keller, on

23    behalf of Mr. Larian and MGA.

24    /

25
```

CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

78

**FURTHER CROSS-EXAMINATION**

1

2    BY MS. KELLER:

3    Q    Good afternoon, Ms. Rhee.

4    A    Hi.

5    Q    Ms. Rhee, you are here today with your lawyer, Lawrence

6    Berman?

7    A    Yes.

8    Q    Seated out in the audience here?

9    A    Yes.

10   Q    And I think we talked about this before, that's a

11   lawyer Mattel provided for you?

12   A    Yes.

13   Q    And was it Mr. Berman that you first told about this

14   call or someone else?

15   A    Mr. Berman.

16   Q    And in fact, he's the only person you told about it,

17   right?

18   A    Yes.

19   Q    Is he the only person you told about this?

20   A    Yes.

21   Q    So you didn't mention it to any of your friends, right?

22   A    No.

23   Q    And you have a number of friends in common with Pooey

24   who are face painters, right?

25   A    Yes, I do.

1   Q    Okay.  You'll have to wait until I finish my question.

2   A    Okay, sorry.

3   Q    You have a lot of friends in common, and you never

4   mentioned it, right?

5   A    Right.

6   Q    Now, when Mr. Phoosopha brought up with you this idea

7   that Mr. Larian might provide you a lawyer, did you laugh?

8   A    No.

9   Q    Didn't you tell him, why would they be suing me?  Why

10  would Mattel be suing?

11  A    I was kind of mad.

12  Q    Well, did you say, why would Mattel be suing me,

13  because I'm doing work for them right now?

14  A    Yes, I did.

15  Q    And you laughed, right?

16  A    I don't remember laughing.  I was mad.

17  Q    When you testified here on January 27th --

18  A    Yes.

19  Q    -- of this year --

20  A    Yes.

21  Q    -- did you say you were mad?

22  A    No.

23  Q    Did you say you laughed?

24  A    No.

25  Q    Have you read your testimony?

1    A    No.

2    Q    Now, you were doing work for Mattel, right?

3    A    Yes.

4    Q    At the very time that you had the conversation with

5    Mr. Phoosopha about suing, right?

6    A    Yes.

7    Q    And did Mr. Phoosopha give you a list of things that

8    Mr. Larian wanted you to say at court?

9    A    No.

10   Q    Did he tell you that he wanted to change your

11   testimony -- that Mr. Larian wanted you to change your

12   testimony?

13   A    No.

14   Q    And you had -- before the first trial, you had called

15   MGA many times asking for them to give you a lawyer, right?

16   A    I did.

17   Q    And they didn't give you a lawyer, did they?

18   A    Well, I --

19   Q    Did they give you a lawyer?

20   A    No, but I didn't -- I called to tell them --

21   Q    Hold on.

22   A    Okay, okay.

23   Q    Did anybody even call you back from MGA about giving

24   you a lawyer?

25   A    No.

1    Q    And you were mad at that, weren't you?

2    A    I was annoyed.

3    Q    Remember we talked about the fact that you were scared

4    at the time?

5    A    Yes, yes.

6    Q    And so you thought MGA should help you by giving you a

7    lawyer, right?

8    A    I wasn't expecting them to give me a lawyer.  I was

9    just trying to notify to tell them what was going on.

10   Q    Do you remember testifying in front of this very jury

11   right here in this very trial?

12   A    Yes.

13   Q    That at the time before the first trial, you were

14   scared because you were afraid that Mattel might sue you --

15   A    Yes, yes.

16   Q    Can I finish?

17   A    Yes.

18   Q    Because this lady has to take it down.

19   A    I'm sorry.

20   Q    That's okay.

21        Do you remember saying that you were scared that Mattel

22   was going to sue you before the first trial?

23   A    (No audible response.)

24   Q    In other words, at this trial where you testified last

25   time --

1    A      Okay.

2    Q      -- okay, not very long ago, in front of these people,

3    do you remember saying that way back before the first trial,

4    you had been scared that Mattel was going to sue you, and

5    that's why you wanted a lawyer; do you remember that?

6    A      I remember saying I wanted help.

7    Q      And do you remember saying the reason you wanted help

8    is because you were afraid Mattel was going to sue you?

9    A      It's possible, I just don't remember that, saying that.

10   Honestly, I don't remember saying that.

11   Q      I'm talking about just this time around, just within

12   the last month or so.

13   A      Oh, I thought you meant from years ago.

14   Q      No, I'm talking about this time around, in front of

15   this same jury, didn't you testify that the reason you had

16   asked MGA for a lawyer is because you were afraid Mattel was

17   going to sue you?

18         MR. QUINN:  I object to the form of the

19   question --

20         THE WITNESS:  I didn't ask for a lawyer.

21         THE COURT:  Just a moment.

22         Overruled.

23         What was your answer?

24         THE WITNESS:  I didn't ask for a lawyer.

25

1    BY MS. KELLER:

2    Q    Do you remember testifying that before the first trial,

3    you called MGA and you wanted MGA to provide you with a

4    lawyer?

5    A    No.  I called them multiple times to tell them what was

6    going on.

7    Q    Do you remember testifying in front of this jury not

8    very long ago, that before the first trial, you called MGA

9    over and over because you wanted them to provide you with a

10   lawyer because you were afraid Mattel was going to sue you?

11   A    I don't remember that.

12   Q    When Mr. Phoosopha called you and told you recently, in

13   December, that if you wanted a lawyer, that MGA would

14   provide one, did you laugh?

15   A    I don't remember laughing.  I just remember the emotion

16   of being pissed.

17             MS. KELLER:  Nothing further.

18             THE COURT:  Counsel?  Or I'm sorry, Mr. Cote?

19             MR. COTE:  No, thank you, your Honor.

20             THE COURT:  My apologies.

21             Okay.  Redirect by Mr. Quinn on behalf of Mattel.

22                      **REDIRECT EXAMINATION**

23   BY MR. QUINN:

24   Q    Ms. Rhee, has Mattel ever sued you?

25   A    Never.

1   Q    Has Mattel ever at any time threatened to sue you?

2   A    No.

3   Q    Were you ever worried that Mattel was going to sue you?

4   A    Never.

5   Q    At any time between the last trial in 2008 and December

6   of 2010, when you got this phone call from your friend --

7   A    Right.

8   Q    -- did MGA ever call you and offer to provide you with

9   an attorney?

10  A    Yes.

11  Q    At any time during that time period between the last

12  trial and the time that you got this phone call from Pooey?

13  A    Oh, no, no.

14  Q    The first -- is it true that the first time that MGA

15  ever contacted you through Pooey at the request of Isaac

16  Larian, was in late December --

17  A    Yes.

18  Q    -- of this last year?

19  A    Yes, that was the first time.

20            MR. QUINN:  Nothing further.

21            THE COURT:  Recross, Ms. Keller?

22            MS. KELLER:  May I just have one second, your

23  Honor.

24            THE COURT:  Certainly.

25            (Attorney discussion held off the record.)

 1          THE COURT:  Counsel, if you are looking for

 2   something, I can take a recess.

 3          MS. KELLER:  That would be good, your Honor, if we

 4   could.

 5          THE COURT:  Sure.

 6          Okay.  You're admonished not to discuss this

 7   matter amongst yourselves, nor form or express any opinion

 8   concerning this case.  Why don't you just take 20 minutes.

 9   We'll come and get you at 20 to the hour, which will be 20

10   minutes to the hour.

11          Will you be back at 20 minutes to the hour?

12          THE WITNESS:  Yes.

13          THE COURT:  Thank you.

14          Okay.  Counsel, 20 minutes to the hour.

15          *(Recess.)*

16          *(The following proceedings is taken in the*

17       *presence of the jury.)*

18          THE COURT:  All right.  The jury is present.  All

19   counsel are present.  The witness is present.

20          Counsel, thank you for your courtesy.  If you'd

21   please be seated.

22          This would be recross-examination by Ms. Keller on

23   behalf of Mr. Larian and MGA.

24          MS. KELLER:  Thank you.

25

1                    **RECROSS-EXAMINATION**

2       BY MS. KELLER:

3       Q    Ms. Rhee, before there was a first trial in this case,

4       you received a subpoena to have your deposition taken,

5       right?

6       A    Yes.

7       Q    But you ignored it and threw it away, true?

8       A    I didn't throw it away.

9              MS. KELLER:  Your Honor, if we could have the

10      witness take a look at deposition, page 105, January 27th,

11      2011, in this trial -- I'm sorry, the trial testimony.

12             THE COURT:  Thank you.

13             And lines?

14             MS. KELLER:  It's trial testimony, actually from

15      this trial, page 105.

16             THE COURT:  And lines?

17             MS. KELLER:  Lines 6 through --

18             THE COURT:  I see it, Counsel.  It's 6 through 10.

19             MS. KELLER:  6 through -- or 12.

20             THE COURT:  Or 12.

21             THE WITNESS:  To 12?

22             THE COURT:  You can read, Counsel.

23             MS. KELLER:  Question:  "So you kind of -- you

24      received a subpoena to have your deposition taken, but you

25      ignored it, right?"

```
 1              Answer:  "I through it somewhere and forgot about
 2     it."
 3              Question:  "Okay.  You ignored it and threw it
 4     away?"
 5              Answer:  "Yeah."
 6              Question:  "True?  Is that true?"
 7              Answer:  "Yes."
 8     BY MS. KELLER:
 9     Q    Now, you freaked out because you didn't want to be
10     involved in the whole thing, right?
11     A    Right.
12     Q    You were scared, true?
13     A    Right.
14     Q    Really scared, right?
15     A    Right.
16     Q    And you tried calling a lawyer from MGA about 30 times?
17     A    Yes.
18     Q    And the reason you called a lawyer from MGA was to ask
19     what to do, true?
20     A    Yes, and to notify them.
21     Q    You tried to reach the MGA lawyers to ask them, "What
22     do I do," right?
23     A    Yeah.
24     Q    Is that a "yes"?
25     A    Yes.
```

1   Q    And you wanted somebody to help you because you didn't

2   know what to do, and you were scared, right?

3   A    I don't know if that time around it was that.  I was

4   just telling them what was going on.

5          MS. KELLER:  Your Honor, may I read from

6   deposition -- I'm sorry, the trial testimony from this

7   trial, page 106, lines 21 through 23.

8          THE WITNESS:  Number 6?

9          THE COURT:  You may.

10          MS. KELLER:  Question:  "So you wanted somebody to

11   help you because you didn't know what to do, and you were

12   scared, right?"

13          Answer:  "Right."

14   BY MS. KELLER:

15   Q    And when you say you wanted somebody to help you, that

16   somebody was a lawyer, true?

17   A    (No audible response.)

18   Q    Is that right, Ms. Rhee?

19   A    Yes.

20   Q    Is that a "yes"?

21   A    Yes.

22   Q    And so you didn't get a call back from the MGA lawyers,

23   and you just ignored the subpoena and threw it away, right?

24   A    I didn't throw it away, though.

25   Q    Did you remember the testimony we just read where you

1  said you threw it away?

2  A    I put it away.  I put it somewhere in a pile.  I think

3  I said that last time, too, that I put it somewhere.  I just

4  didn't throw it in the trash.

5          MS. KELLER:  Your Honor, I'd like to read again

6  from page 105, lines 6 through 12.

7          MR. QUINN:  It's not impeaching, your Honor.

8          THE COURT:  Just a moment.

9          Sustained.

10  BY MS. KELLER:

11  Q    Did you ignore the subpoena and throw it away?

12  A    I didn't throw it away.

13          MS. KELLER:  May I read page 105, lines 9 and 10,

14  your Honor -- or line 9 through 12?

15          THE COURT:  Just a moment.

16          THE WITNESS:  Can I say something?

17          THE COURT:  Just a moment.  No, not yet.  Believe

18  me, we have lawyers on both sides that would be happy to ask

19  you questions.

20          THE WITNESS:  Sorry.

21          THE COURT:  Just a moment.

22          Counsel, I think for both sides, why wouldn't it

23  be sufficient to read line 20 -- line 6 down through line

24  24?  Why don't both of you look at that.

25          MS. KELLER:  That's fine, your Honor.

 1            MR. QUINN:  That's fine, your Honor.

 2            THE COURT:  Counsel?

 3            MS. KELLER:  Question:  "So you kind of -- you

 4    received a subpoena to have your deposition taken, but you

 5    ignored it, right?"

 6            Answer:  "I through it somewhere and forgot about

 7    it."

 8            Question:  Okay.  You ignored it, and threw it

 9    away?"

10            Answer:  "Yeah."

11            Question:  "True?  Is that true?"

12            Answer:  "Yes."

13            Question:  "And you kind of freaked out, you said,

14    right?  You freaked out because you didn't want to be

15    involved in the whole thing?"

16            Answer:  "Yeah, yeah, I didn't.  I've never been

17    involved in anything like this before, so yeah."

18            Question:  "It was pretty scary, wasn't it?"

19            Answer.  "Yeah."

20            Question:  "And really, really scary, in fact,

21    right?"

22            Answer:  "Not really, really scary, but I was

23    nervous about it."

24            Question:  "You thought you were being dragged

25    into something that could end up --"

```
 1              Answer:  "I didn't want to be in on it."
 2    BY MS. KELLER:
 3    Q    Okay.  And so you tried calling a lawyer from MGA at
 4    least 30 times, right?
 5    A    Right.
 6    Q    And you didn't get a call back?
 7    A    No.
 8    Q    Right?
 9    A    Right.
10    Q    And you were trying to reach the MGA lawyers to ask
11    them, "What do I do," right?
12    A    Right.
13    Q    And you wanted somebody to help you because you didn't
14    know what to do, and you were scared, right?
15    A    Yeah.  I mean, I don't know if they were going to help
16    me or what.  I was just trying to tell them what was going
17    on.
18    Q    You wanted someone to help you because you didn't know
19    what to do, and you were scared, right?
20    A    Yes, yes.
21    Q    And when you said you wanted somebody to help you, that
22    somebody was a lawyer, true?
23    A    I didn't know that any lawyer would help me.  I was
24    just letting them know so -- I don't know.
25    Q    And when you say you wanted somebody to help you --
```

1   A      Yeah.

2   Q      -- because you were scared, that somebody was a lawyer,

3   true?

4   A      Sure, but I also wasn't thinking that way.  I was just

5   thinking anybody, anybody.

6           MS. KELLER:  Your Honor, I would ask to read page

7   106, lines 24 and 25, to page 107, line 1.

8           MR. QUINN:  It's not impeaching.

9           MS. KELLER:  It's absolutely impeaching.

10          THE COURT:  Well, thank you.  You both are judges.

11  You can make those rulings, okay?

12           (Laughter.)

13          THE COURT:  Let's cut out the dialogue between the

14  two of you.

15          THE WITNESS:  Okay.

16          THE COURT:  Well, no.  Just a moment.

17          You may, Counsel.

18          MS. KELLER:  Question:  "So you wanted somebody to

19  help you because you didn't know what to do, and you were

20  scared, right?"

21           Answer:  "Right."

22           Question:  "And when you say you wanted somebody

23  to help you, that somebody was a lawyer, true?"

24           Answer:  "True."

25

```
 1   BY MS. KELLER:
 2   Q    Now, when you didn't get a call back from the MGA
 3   lawyers, that's when you ignored the whole thing, right?
 4   A    Oh, right.
 5   Q    But at some point, the manager of the face department
 6   at Mattel told you that Michael Moore, Mattel's in-house
 7   lawyer, wanted to talk to you right away; do you remember
 8   that?
 9   A    I do.
10   Q    And you were really freaked out then, right?
11   A    Yeah.
12   Q    At that point you thought you were in trouble with
13   Mattel, true?
14          MR. QUINN:  Your Honor, this is all asked and
15   answered.  I mean, we covered this.
16          THE COURT:  Overruled.
17   BY MS. KELLER:
18   Q    At that point you thought you were in trouble with
19   Mattel, right?
20   A    I wasn't sure.  Just the fact that he was a lawyer
21   scared me.
22   Q    You thought you were in some kind of trouble with
23   Mattel, right?
24   A    Probably so.
25   Q    Is that a "yes"?
```

1    A    Yes.

2    Q    And you thought -- did you have any idea what you were

3    in trouble for?

4    A    No.

5    Q    But Mattel was your biggest client, right?

6    A    Right.

7    Q    And in fact, in 2001 to 2004 alone, you had billed

8    Mattel over $545,000; we talked about that, right?

9    A    Right.

10   Q    So you were afraid you'd lose your livelihood if you

11   were in trouble with them, right?

12   A    Yes, but I also didn't think about it that way.  Just

13   the fact that there was a lawyer scared me.  I had no idea

14   what it was about.

15   Q    It was Mattel's general counsel's office that was

16   calling you, right?

17   A    Yes.

18   Q    And that was Michael Moore, their --

19   A    Yes.

20   Q    -- in-house lawyer?

21   A    Uh-huh.

22   Q    And you knew who he was, didn't you?  You knew he was

23   Mattel's lawyer, right?

24   A    I found out once I got there, yes.

25   Q    And you were freaked out because you thought that since

1   Mattel's lawyer was calling you, you were in trouble with

2   Mattel, right?

3   A    Yes.

4   Q    Legal trouble, right?

5   A    It seems like it, yeah.

6   Q    Like you could get sued, right?

7   A    No.

8   Q    And at that point, you were worried because you didn't

9   think you had the resources to fight back if you got in

10  trouble, right?

11  A    No, I wasn't even thinking that.  I've never gotten

12  sued, so I never thought that kind of thing.

13         MS. KELLER:  Your Honor, I would ask permission to

14  read from trial testimony in this trial, January 27th, 2011,

15  Volume 3, page 30, lines 3 through 13.

16         Actually, we can read lines 3 through 17, because

17  I have a feeling that's coming.

18         MR. QUINN:  You know, it's a different time

19  period, your Honor, and --

20         MS. KELLER:  It's not.

21         THE COURT:  Well, just a moment.

22         You may read, Counsel.

23         MS. KELLER:  Question:  "Now, lastly, you were

24  asked about the fact that you wanted some legal advice?"

25         Answer:  "Right."

1         Question:  "You were scared initially, right?"

2         Answer:  "Right."

3         Question:  "And you were scared that maybe you

4    might be sued, right?"

5         Answer:  "Right."

6         "And if you were sued, you didn't know whether

7    you'd even have the resources to fight back, right?"

8         Answer.  "Right."

9         Question:  "And the reason you called MGA so many

10   times trying to see if MGA would provide you a lawyer is

11   that you were afraid Mattel was going to sue you?"

12        Answer:  "No, not back then.  I just didn't know

13   what to do."

14   BY MS. KELLER:

15   Q    Now, it was not until Mr. Moore, Mattel's general

16   counsel, called you that you were actually afraid you might

17   get sued by Mattel, right?

18   A    I never thought Mattel was going to sue me.

19   Q    You thought you were in some kind of trouble with

20   Mattel, right?

21   A    Yeah.

22   Q    Legal trouble, right?

23   A    I suppose so.  Um -- nevermind.  Nevermind.

24   Q    And you knew that if you were in legal trouble with

25   Mattel, you might not have the resources to fight back,

```
 1   true?

 2   A    True, but I'm also thinking --

 3             MS. KELLER:  Objection.  Nonresponsive.

 4             THE COURT:  No.

 5             You can finish your answer.

 6             THE WITNESS:  I wasn't thinking about getting sued

 7   back then.  I just thought, "Oh, a lawyer, I'm in trouble."

 8   And to tell you the truth, when I -- lots of times I

 9   answered, "Right, right, right."  I just felt pressure -- it

10   just came out that way because when someone says, "Right,

11   right?"  I just said, "Right."

12             THE COURT:  Okay.  Thank you.

13             Counsel?

14   BY MS. KELLER:

15   Q    And that was your testimony in this trial?

16   A    Yes, yes, I remember that, and it never bothered me.  I

17   wasn't thinking --

18   Q    And you have Mr. Berman here to help you again today?

19   A    Yes.

20   Q    And he was here last time?

21   A    Yes.

22             MS. KELLER:  Nothing further.

23             THE COURT:  Okay.  You may step down.

24             THE WITNESS:  Thank you.

25             THE COURT:  Once again, we are going to ask you to
```

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 98 of 139   Page ID #:308538
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

98

1  remain available until May 7th, but any personal vacations,

2  any professional duties or trips you'll want to take.  We'll

3  find you if we need you.

4          Thank you very much.

5          THE WITNESS:  Thank you.

6          THE COURT:  Counsel, your next witness, please.

7          MR. QUINN:  Your Honor, Mattel calls Heather

8  McComb.

9          THE COURT:  Ms. McComb, if you'd come forward,

10 please, and if you'd pass through the double gates.

11         Now will you stop at that location and please

12 raise your right hand.

13         **HEATHER MC COMB, PLAINTIFFS' WITNESS, SWORN**

14         THE WITNESS:  Yes.

15         THE COURT:  Thank you, Ms. McComb.

16         If you'd come along or walk along the jury railing

17 for just a moment, and there's an entrance closest to the

18 wall.

19         If you'd please be seated, face the jury and state

20 your full name, please.

21         THE WITNESS:  My name is Heather McComb.

22         THE COURT:  Will you spell your last name, please.

23         THE WITNESS:  M-c-C-o-m-b.

24         THE COURT:  Would you move the microphone down a

25 little closer to you so we can hear you.

CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

99

```
 1            This is direct examination by Mr. Quinn on behalf
 2    of Mattel.
 3            MR. QUINN:  Thank you, your Honor.
 4                       DIRECT EXAMINATION
 5    BY MR. QUINN:
 6    Q     Good afternoon, Ms. McComb.
 7    A     Good afternoon.
 8    Q     What is it that you do for a living?
 9    A     I am a professional in the field of product design and
10    development primarily in the toy business.
11    Q     And how long have you been acting as a consultant in
12    that field?
13    A     I've been consulting for about six years.
14    Q     And prior to being a consultant, what did you do?
15    A     I was a vice president of R&D for a number of toy
16    companies.
17    Q     And for how many years have you worked in design --
18    product design and development in the toy business?
19    A     About 25 years.
20    Q     And have you worked on design and development of dolls,
21    in particular?
22    A     Yes, dolls -- a full range of dolls, every one you can
23    think of, as well as fashion dolls.
24    Q     So what was the -- your first employment when -- in
25    this area of design and development of toys?
```

1    A    That would be at Tyco Toys in New Jersey.

2    Q    And what years did you work at Tyco?

3    A    I worked at Tyco from 19- -- 1986 to 1997.

4    Q    And what position did you have there?

5    A    Well, I started as a manager, and then I -- I rose up

6    to vice president.

7    Q    What were your responsibilities in those positions at

8    Tyco?

9    A    Well, I was responsible for various segments of the

10   product line.  It was very broad.  I worked on almost every

11   toy, but I was especially responsible for the girls toy

12   category.  In fact, Tyco, when they went into the toys

13   category, I was there, and I was given that -- the first one

14   and sort of put together the entire department.

15   Q    When you say "the first one," what do you mean?

16   A    Well, the first doll.  We got into the doll business.

17   Tyco is more of a boys toy company, the first years when I

18   joined them, and about three years in, they bought a small

19   toy company, they took in several inventor submissions, and

20   we were in the girls toy business.

21   Q    And what was your role in bringing them into the girls

22   toy brings, and in particular, the doll business?

23   A    Well, as it came in to me, I had to put together the

24   team that could do that, and -- and make sure that we figure

25   out how to do it and put together the whole company, so

1   the -- or the team for girls toys.  And we were in a very

2   varied range of things, so it was very -- it was very

3   interesting to do that.  And I worked on every kind of doll

4   that they had.

5   Q    At Tyco?

6   A    Yes, yes.

7   Q    What would be some of the categories?  We heard about

8   categories, different kinds of dolls.  What different kinds

9   of dolls did you work on in developing a girls line of toys

10  at Tyco?

11  A    Well, I worked on large dolls, and there's sort of two

12  kinds of those.  There's feature dolls.  They are usually a

13  doll that has some sort of mechanical feature, something

14  like that.  There's also nurturing dolls.  They are more --

15  they are baby dolls and the plays and nurturing play, and

16  then also small dolls are the collectible dolls.  They are

17  sort of large lines with lots of play sets and things,

18  little dolls.  In fact, I did every one they ever did at

19  that company.  And then also, of course, I did fashion

20  dolls.

21  Q    Now, was Tyco acquired by Mattel?

22  A    Yes, they were.

23  Q    And do you recall when that was?

24  A    That was in 1997.

25  Q    Did you ever work for Mattel?

1    A    No, I did not.

2    Q    So did you end up leaving Tyco shortly after Mattel

3    acquired Tyco?

4    A    Yes, yes, actually at that moment.  That's why I never

5    worked for Mattel.

6    Q    You didn't want to work for Mattel?

7    A    No, no, no.  Actually, my father was entering his elder

8    years at that time, and I -- I just really didn't feel that

9    I could move to the other side of the country.

10   Q    Where were you living then?

11   A    In New Jersey.

12   Q    Is that where you live now?

13   A    I actually live in Philadelphia now.

14   Q    What did you do after you left Tyco?

15   A    I went to work for a startup company called The Family

16   Company, and they were -- the president had a concept she

17   wanted to bring to market for the startup company, and it

18   was a collector doll, I'd say probably the -- something that

19   may be very much like an American Girl doll, something like

20   that.  They are higher end, a little higher priced --

21             THE COURT:  Just a little slower.

22             THE WITNESS:  Oh, I'm sorry.

23             THE COURT:  Watch her forehead.  When she starts

24   frowning --

25             (Laughter.)

```
 1              THE WITNESS:  I'm sorry, I do talk very fast.
 2              THE COURT:  Yeah.  Just slow down a little bit so
 3    Jane --
 4              THE WITNESS:  Slap my hand.
 5    BY MS. KELLER:
 6    Q    So they had an idea for a doll, the owner of this
 7    company had, you were telling us?
 8    A    Oh, yes, yes.  Okay, so it's a -- it's a larger doll,
 9    but it has the fashions are very, very important, and the
10    personality and the character of a doll like that.
11    Q    And did you get involved in -- you joined this company
12    to help this --
13    A    Yes.
14    Q    -- entrepreneur?
15    A    Yes, yes.
16    Q    And what was the name of the company?
17    A    The name was The Family Company.
18    Q    The Family Company?
19    A    The Family Company.
20    Q    And what was your position there?
21    A    I was a vice president of design, development and
22    operations.  It was a small company; you got a lot of
23    titles.
24    Q    And what years are we talking about that you were
25    there?
```

1   A    It would have been 1997, -8.  I think I was there about

2   a year.

3   Q    And what were your responsibilities during the time

4   that you were at The Family Company?

5   A    Well, there was only four employees, the owner, her

6   husband, the finance guy and me, so -- taking this product

7   and finding all of the vendors and the team that you needed

8   to do it, and then make sure it went all the way through to

9   production, all the way in to China, to put it into

10  production.

11  Q    "This product" being this idea for a collector doll --

12  A    Yeah, and --

13  Q    -- is that --

14  A    -- it was several --

15          THE COURT:  I'm going to strike the question, and

16  I'm going to strike the answer, and we're going to take a

17  deep breadth.

18          THE WITNESS:  I'm sorry.

19          THE COURT:  No, no.  We're going to stop.  If I

20  can't get a record from the two of you, we'll just spend

21  some time because it's running time off of Mattel's time.

22          Counsel can control that, can't you Mr. Quinn?

23          MR. QUINN:  I can, your Honor.  I'll -- I'll try

24  harder.

25          THE COURT:  Okay.  Start again.

1    BY MS. KELLER:

2    Q    So what were your responsibilities as it relates to

3    this collector doll idea that the owner of The Family

4    Company had?

5    A    Well, it was a small company, and there was really no

6    one else to do the task of making sure the product got

7    designed to their satisfaction, that it got developed to

8    their satisfaction, and that it got released into Hong Kong

9    and into production.  So I managed all of that.

10   Q    And was that doll actually brought to market?

11   A    Yes, yes, I believe so.

12   Q    Have you worked on doll design and development at any

13   other toy companies other than those that you've told us

14   about so far?

15   A    Yes.  I went to work at Hasbro Toys, which was the

16   second largest toy company in the U.S.  Tyco was number

17   three when I left there.  And I joined that company, and I

18   was -- as a VP of R&D there.

19   Q    When was it that you joined Hasbro?

20   A    2000, I believe, 2000 to 2002.

21   Q    And what position did you have at Hasbro?

22   A    I was a vice president of research and development.

23   Q    And what were your responsibilities as vice president

24   of research and development at Hasbro?

25   A    Well, at Hasbro I was again responsible of design and

1   development of product lines, but I was the VP of one of

2   their divisions.

3   Q    Which division was that?

4   A    It was called "First Fun," and the products in that

5   division were girls toys and activity toys, things like

6   Easy-Bake Oven and Playdough, and then also Preschool toys.

7   Q    Did you have responsibility for design and development

8   of dolls at that time?

9   A    Yes, yes, I did.

10  Q    Can you tell us about that?

11  A    Well, we had a few during that time period.  We did a

12  fashion doll line called "Destiny's Child" based on the

13  singing group, and also we were working on the relaunch of

14  My Little Pony, which you may not think a pony as a doll,

15  but it is.  It is a really small doll line with the same

16  play.  And I also worked on a slightly older girl activity

17  called "E Kara," which is kind of a karaoke sort of thing.

18  Q    Have you had any other experience working with any

19  other toy companies?

20  A    Yes, I -- I worked for Crayola, as in the crayon

21  people.

22  Q    When was it that you worked for Crayola?

23  A    It was in 2003 or '4, I believe.

24  Q    What did you do at Crayola?

25  A    At Crayola -- Crayola, of course, makes crayons, and

1   that's technically not in the toy business.  It's not

2   considered a toy.  It's an arts and craft thing.  So they

3   realized that they had a very strong brand, and they wanted

4   to set up a toy department and a whole toy development

5   system, and so they hired me to do that.

6   Q    And that's what you did at Crayola?

7   A    Yes, yes.

8   Q    All right.  So you've testified that you worked on the

9   design and development of dolls in the various jobs that

10  you've described to us?

11  A    Yes.

12  Q    And can you tell us approximately how many different

13  dolls you've been involved in the design and development of?

14  A    Well, dozens and dozens, actually.

15  Q    Would this include fashion dolls?

16  A    Yes, yes, a significant number of fashion dolls.

17  Q    Can you give us some examples?  I think you may have

18  mentioned one or two along the way, but can you give us

19  examples of fashion dolls that you personally had

20  responsibility for the design and development of?

21  A    I worked on Disney's Ariel, the Little Mermaid, and

22  also a line called "Swan Princess," and the two I mentioned,

23  Destiny's Child and the -- the collector doll line, and then

24  also Blossom, a line called "Blossom."  That was based on a

25  TV show.

1  Q    Were all those fashion dolls that you had

2  responsibility for in terms of design and development, were

3  those all brought to market?

4  A    Those -- the ones I just said were, yes, they were

5  brought to market.  I worked on a couple others that did not

6  get to market.

7  Q    Are you an expert in the process of the design and

8  development of dolls?

9  A    Yes, I am.

10  Q    Including fashion dolls?

11  A    Yes, definitely including fashion dolls.

12  Q    And why are you such an expert?

13  A    Well, by the -- my experience, the depth and the

14  breadth of experience, both with really different types of

15  products, which gives you a really, really expert view of

16  how the process goes, but, you know, in particular, for the

17  breadth of the kinds of dolls I did.  And also, I think, you

18  know, having worked for a number of sizes of companies, from

19  one that was four employees to billion-dollar corporations,

20  gives me sort of a scope of how the product development

21  process works because it's the same process, but it's

22  different at a little bitty company than it is at a great

23  big company.

24          MR. QUINN:  Your Honor, we offer Heather McComb as

25  an expert in the design and development of dolls.

```
 1              THE COURT:  You may proceed.

 2              MS. HURST:  Your Honor, just for the record, we

 3   object as to fashion dolls.

 4              THE COURT:  Thank you.

 5   BY MR. QUINN:

 6   Q    Mattel has retained you as a --

 7              THE COURT:  No.  Let's get the -- just so you are

 8   not here in an unnecessarily long period of time, she can

 9   refer to the physical attributes, the developmental stage.

10   She may not refer to e-mails, bank statements, et cetera.

11   Her expertise is limited to fashion doll development;

12   understood?

13              MR. QUINN:  Your Honor, in her report, she does

14   refer to some of those things as having been relied on.

15              THE COURT:  No, absolutely not.  She may refer to

16   the physical attributes of the dolls and development.  She

17   will not be referring back to e-mails and bank statements.

18              MR. QUINN:  Very well, your Honor.

19   BY MR. QUINN:

20   Q    We have, "we," meaning Mattel, have retained you as an

21   expert witness in this case?

22   A    Yes.

23   Q    And what work did Mattel ask you to do?

24   A    They asked me to give an opinion in the matter of Bratz

25   dolls about Carter Bryant's design drawings and how they
```

1    were used to develop the dolls.

2    Q    Are you being -- are you doing this for free --

3    A    No, no.

4    Q    -- or just to enjoy Southern California or --

5    A    No.  As pleasant as it is, I'm being paid.

6    Q    And what are your charges?  What are your hourly rates?

7    A    $250 an hour.

8    Q    Have you ever served as an expert witness before?

9    A    No.  I'm a rookie.

10   Q    And have you ever at any time testified in court

11   before?

12   A    No, I have not.

13   Q    Now, in connection with your work in this case, did you

14   review any materials relating to your assignment?

15   A    Yes, yes, I did.

16   Q    Okay.  Can you describe, generally, the materials that

17   you reviewed?

18   A    Well --

19           THE COURT:  Let me talk to the jury for a moment.

20           The reason I'm limiting this is because I don't

21   want this to be final argument between Mattel or MGA.  They

22   can each argue what the e-mails mean on both sides.  They

23   can argue different items of evidence, but this expert is

24   limited to the design.  In other words, what did she see

25   within her field of expertise, okay?

1          All right, Counsel.

2     BY MR. QUINN:

3     Q    Can you describe for us, generally, what types of

4     materials you reviewed in connection with your assignment?

5     A    I reviewed drawings, all of Carter Bryant's drawings.

6     I reviewed depositions and other expert witness reports

7     and -- and other materials, as well as actual dolls.

8     Q    Based on your review of those materials, were you able

9     to form any opinions concerning the assignment that was

10    given to you?

11    A    Yes, yes, I did.

12    Q    All right.  I'd like to first discuss the development

13    process for the Bratz, and you mentioned that we had asked

14    you to look at Carter Bryant's drawings for Bratz, and then

15    perhaps if we could put before you a binder which has in it,

16    among other things, Exhibit 5 and Exhibit 302, and I would

17    ask you if you can just take a look at those, just briefly

18    look at those exhibits, 5 and 302, and see if these include

19    the Carter Bryant drawings that you looked at in doing your

20    work in this case.

21    A    Yes, yes.

22    Q    Now, is the term "design drawing" a term of art?  Is

23    that something that has particular meaning in the toy

24    industry?

25    A    Yes, it does.

1    Q    Especially as it relates to dolls?

2    A    Yes.

3    Q    What is a design drawing?

4    A    Well, a design drawing is -- is -- first and foremost,

5    it's a communication tool.  It's the way a designer who has

6    a -- a -- a vision, you know, and it's in his head, and he

7    must get it out of his head and make it a material thing,

8    put it on a piece of paper so that other people can see it.

9    But more than just see it, they need to understand, so it

10   has to contain a lot of information.

11   Q    Like what types of information?  What are you referring

12   to?

13   A    Well, it needs to -- you need to be able to see what

14   the product looks like and understand what it looks -- gonna

15   look like when it gets translated into 3D.  You need to

16   understand how it's going to be played with.  You need to

17   understand the appeal to the child.  You need to understand

18   what position it will occupy in the marketplace.  And the

19   reasons you need to do that is because after you complete

20   this -- these drawings, it's the act of creation of -- of a

21   new product, and you have it now on paper, then you have to

22   sell it to someone.

23   Q    Like what do you mean "sell it"?

24   A    Well, "sell it" -- if you're an in-house designer, you

25   have to sell it to your own senior management.  If you're an

1    outside inventor, you have to take it to management in

2    another company and sell it to them.  And when I say "sell,"

3    it's because these people, who are generally not design

4    people, they need to see the toy, see how it's going to be

5    in the marketplace, understand how it's going function and

6    see the appeal to the child.  I mean, they are toy

7    professionals, so they understand the child appeal.

8         And so they need to do that so strongly that they will

9    buy it.  They are going to commit significant company

10   resources.  Once you -- because the next step is your design

11   hat is off and now you put on your development hat, and now

12   you have these approved drawings.  Now you have to go into

13   development and turn -- and translate that 2D into 3D, and

14   those drawings, they are the guide and the foundation for

15   the translation of the doll from 2D to 3D.

16   Q    How is it possible to envision, as you describe it,

17   what a toy will be by looking at a two-dimensional design

18   drawing?

19   A    Well, there is -- of course we're all trained designers

20   to look at these things, and we understand how to read them.

21   It's -- it's a language, it's a kind of language, and

22   we're -- we're visualizers.  Also, when you are looking at a

23   toy that is the type of toy that is out there, you know, it

24   is a fashion doll, so there is some things that you

25   understand about, you know, how it's played and -- and you

```
 1    also see -- frankly, I see the toy.  I look at that drawing,

 2    and I see the toy.  And other toy professionals, they don't

 3    have to be designers or product developers like me, but they

 4    are toy professionals, and they see the toy right there on

 5    the paper.  It's just a matter of making it into 3D.  That's

 6    a lot of work --

 7            THE COURT:  Counsel, this is unduly consumptive of

 8    time.  Unduly consumptive of time.  You'll shorten this

 9    immediately.

10            MR. QUINN:  All right.

11            THE COURT:  Otherwise, we'll be asking her to step

12    down.

13    BY MR. QUINN:

14    Q    In your opinion, were the drawings prepared by Carter

15    Bryant design drawings for Bratz --

16    A    Yes.

17    Q    -- as you've used that term?

18    A    Yes.

19    Q    Why do you think that Mr. Bryant's drawings were design

20    drawings?

21    A    Because all of the information you needed to take to

22    sell it, to get it approved, to take it through development

23    and turning it from a 2D to a 3D are in those drawings.

24    Q    And -- and what information specifically are you

25    referring to?
```

1    A    You need enough information to do a sculpt.  You need

2    enough information to design and -- and sew the creations.

3              MS. HURST:  Move to strike as nonresponsive.

4              THE COURT:  Overruled.  This is responsive.

5    BY MR. QUINN:

6    Q    Do you have an opinion as to the quality of Carter

7    Bryant's drawings?

8    A    Yes, I do.  I think they are an excellent design

9    package, and it's one of the best I had ever seen.  I should

10   be so lucky to get a package that good every time.

11   Q    And why do you think they are excellent?

12   A    Because they have all the information you need, and

13   also, you know, he thought through the whole product really,

14   really well.  I see -- I see the dolls.  I see their -- what

15   is special and distinctive about them.  I see the

16   characters.  I see his thinking on character development in

17   the drawings.  I see the -- the whole Bratz -- the whole DNA

18   of Bratz I see in those drawings.

19   Q    Let's take a look at Exhibit 302, which has been

20   referred to as the pitch book.  This is among the documents

21   you looked at?

22   A    Yes, yes.

23             MR. QUINN:  And perhaps, Ken, if we could just go

24   through a few of these pages.

25

```
1    BY MR. QUINN:

2    Q    You say that you see the -- the doll that conveys to

3    you the information that you are talking about?

4    A    Yes.

5    Q    And can you call out for us, as you look at these, you

6    know, specifically what types of information you are

7    referring to?

8    A    Well, in the first one, the group drawing, that's where

9    I see the DNA of Bratz.  I see their attitude and their

10   positioning, and they are hip and urban, and they are

11   friends, and -- and I see the name with a very distinctive

12   Z, which is very much part of it.  When you get to the

13   doll --

14   Q    Right.

15   A    -- I see it's not just a doll, it's a girl.  It's Zoey,

16   and she has a personality, and she has a style of her own,

17   and that's very important to do that.

18   Q    Why is that important?

19   A    Well, because in the play of fashion dolls, these are

20   friends of the little girls, and so a friend comes with a

21   name.  I think you can understand it if -- to contrast, if

22   you make a baby doll, and their market is usually with a

23   generic name, like My Pretty Baby or My Little Newborn,

24   that's because the play pattern is the child wants to take

25   that doll, and it's her baby, so she wants to name it.  But
```

1    when you have teenage friends, they have names and they have

2    personalities, and they have their favorable musical

3    instrument and things like that.

4    Q    If you could look at Exhibits 5-88 and 5-89.

5         MR. QUINN:  These are in evidence, your Honor,

6    other Carter Bryant drawings.

7    BY MR. QUINN:

8    Q    5-88 and 89?

9    A    Yes.

10   Q    What did these drawings tell you as a doll

11   design/developer about the development of the Bratz dolls?

12   A    Well, I see all the information, especially in 5-089,

13   that's a straight front view.  I can see the very, very

14   distinct and unique proportions of this doll, all the key

15   points where they are, and so that is enough, in fact, to

16   work on a body sculpt.  I also see -- you know where the

17   articulation is, and --

18   Q    What do you mean by "articulation"?

19   A    Well, generally, the dolls, their heads move on their

20   neck and their shoulders move and their hips move, and

21   sometimes their waist does and sometimes not.  It was

22   obviously under consideration here.  But I can -- mostly

23   it's what I can see is the proportion, the size and the

24   proportion of one thing to the other.

25        On the 05-88, that's a three-quarter view, and that

1    gives me enough -- I can get a sense of the volume of the

2    doll.  It's not really skinny or fat.

3    Q    We don't see a rearview of the dolls here.  I mean, is

4    that significant or surprising?

5    A    No, no.

6    Q    Why not?

7    A    Because while doll bodies are all stylized, some much

8    more so than others, but they are all stylized.  They are

9    still based on the basic human body plan.  So when you look

10   at the front and you see the shoulder, you know that behind

11   that is the rest of the shoulder, not the hip, and so those

12   things are not really hard to do at all.  I've done it many

13   times.

14   Q    In reviewing Mr. Bryant's drawings, design drawings,

15   did you see drawings for things other than female fashion

16   dolls?

17   A    Yes, yes, I did.  I saw boys.  I saw a boy body and

18   head.

19   Q    If we could look at --

20          MR. QUINN:  These are in evidence, your Honor.

21   BY MR. QUINN:

22   Q    -- 5-65 and 5-67.

23   A    Yes.  So you can clearly see, even the body without the

24   head, that it's a boy and it's a Bratz boy; there is no

25   mistaking that.

1   Q     And did you also see designs for other things like

2   Slumber Party and play sets and evening wear and things like

3   that?

4   A     Yes, yes, I did.  It's one of the things --

5             MS. HURST:  Your Honor, objection.  Vague as to

6   time of the drawings that we are now talking about.

7             THE COURT:  No.  The jury will be able to

8   determine, or they will eventually attempt to determine when

9   the drawings took place; that's their decision.  But this

10  witness can testify about design and development.  The time

11  will be jury determination based upon the surrounding

12  evidence.  She is only here for a limited purpose.

13            Counsel?

14            MR. QUINN:  Your Honor, I apologize.  I didn't

15  notice what time I started.

16            THE COURT:  You are almost done.

17            (Laughter.)

18            THE COURT:  I'm just joking.

19            MR. QUINN:  I was afraid you were going to say

20  that.

21            THE COURT:  You started at exactly 2:55.  We may

22  be one or two minutes off, but about 2:55.

23            MR. QUINN:  Okay.  Thank you.

24  BY MR. QUINN:

25  Q     What did it tell you that Mr. Bryant was working on

1    boys and, you know, Pajama Party, themes or play sets and

2    similar things?

3    A    Well, what that -- in fact, that's what rather

4    impressed me so much, that he was -- he was clearly -- he

5    clearly understood what you do with a full line, a brand,

6    and that he was thinking all the way forward, so that if the

7    launch product was successful in the beginning, then that

8    made it possible to have line extensions and things like

9    that, and he was already thinking about it.  He certainly

10   didn't sit down and draw every one of them, but he knew --

11   there were a couple standard themes, Slumber Party, things

12   like that, and that he was looking at other things because

13   he knew that would go forward.  So he was thinking of the

14   whole picture.

15   Q    You use the term "launch product."

16   A    Yes.

17   Q    What do you mean by that?

18   A    The launch product is, in fact, the first product that

19   goes to market, and that's the -- the -- it's the key to

20   everything else.  It's the gatekeeper to everything else.

21   Q    Why is that?

22   A    Well, the launch product does not generate lots of

23   excitement in the marketplace.  It's just not even possible

24   to go forward with any other things.  You know, when you put

25   it out and --

1            MS. HURST:  Your Honor, I object.  I move to

2    strike this as beyond the scope, disclosed opinions.

3            MR. QUINN:  She is talking about the drawings,

4    your Honor.

5            THE COURT:  As long as you confine it to the

6    drawings, Counsel, and the developmental stages, that's

7    fine.

8            MR. QUINN:  Yes.

9            THE COURT:  Overruled.

10            THE WITNESS:  You know, I see that and -- because

11    it's very important because you have to be ready to go

12    forward if it does do a lot of excitement, so it's common in

13    design and development to do that.

14            The launch product goes out.  In this case, it was

15    the first four dolls, and I think some fashion packs.  But

16    your tracking -- the retailers themselves are tracking them

17    very, very closely, looking for velocity --

18            *(Interruption in the proceedings.)*

19            THE WITNESS:  I'm sorry.

20            THE COURT:  When the launch product first goes

21    out, they are looking for velocity and volume to see if it

22    generates --

23            THE WITNESS:  It generates excitement in the

24    marketplace.

25            Thank you, your Honor.

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 122 of 139   Page ID #:308562
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

122

 1              THE COURT:  You are welcome.

 2              THE WITNESS:  And so -- and they will declare

 3      by -- when they are watching that, they will declare

 4      something is -- is gonna be -- it looks like it's going to

 5      move and maybe be a hot toy, or maybe it's sort of going to

 6      lack luster, or maybe it's going to go to the discount shelf

 7      pretty quick.

 8              Now, back in product development, we are already

 9      working on the next year's -- the follow-up product, the

10      first line extensions because --

11      BY MR. QUINN:

12      Q    Why is that?

13      A    Because of time --

14              MS. HURST:  Your Honor, this is not about the

15      drawings.

16              THE COURT:  Sustained.

17              MS. HURST:  And I move to strike that last answer.

18              THE COURT:  It's stricken.

19      BY MR. QUINN:

20      Q    Well, you told us that you saw -- you thought from,

21      looking at these drawings, that Mr. Bryant was thinking in

22      terms of line extensions in a brand, that you could see that

23      in the drawings?

24      A    Absolutely.

25      Q    And without going into specific e-mails or anything

1   like that, could you just tell us whether in the materials

2   that you reviewed, you saw that MGA had the same assessment,

3   understood that that was -- that those drawings had the

4   potential for doing that?

5          MS. HURST:  Objection.  Vague.  Compound.

6          THE COURT:  Sustained.

7   BY MR. QUINN:

8   Q    I mean, do you have an understanding about how --

9   whether or not MGA took any action based on the drawings?

10  A    Yes, yes, I do.  It was fundamental to my opinion about

11  these being design drawings that were used to do the

12  product.  They -- they were very, very excited in the first

13  presentation meeting.  I mean, they --

14         MS. HURST:  Your Honor, this is --

15         THE COURT:  I'll sustain the objection, Counsel.

16         I think what MGA's intent is is for the jury to

17  determine.

18         MR. QUINN:  Right.

19         THE COURT:  She can talk about the design,

20  development from what she sees, and the drawings and --

21         MR. QUINN:  Okay.  Got it.

22         THE COURT:  Okay.

23  BY MR. QUINN:

24  Q    In terms of what you saw in terms of the --

25         THE COURT:  By the way, it's counsel's duty to

1    focus the questions, all right?

2              THE WITNESS:  Okay.

3              MR. QUINN:  All right.

4              THE COURT:  And Mr. Quinn is going to focus the

5    questions.

6    BY MR. QUINN:

7    Q    In terms of the use of those drawings -- I mean, did

8    MGA make use of those drawings to then go out and promote a

9    product?

10   A    Yes.

11   Q    And what evidence did you see of that?

12   A    They're -- they're -- they very quickly went forward to

13   reproduce this.  Mostly I see it in the product.  I just

14   look at the product, and I see the drawings, and I can see

15   the direct translation, and I've done it dozens of times,

16   and I know what that is.

17        Secondly, they moved -- you know, they engaged Carter

18   Bryant.  And when you have a vision that you are very

19   excited about in a product, in the drawings, and you approve

20   these drawings, and then you are going to go forward to use

21   them, the -- the -- one of the cardinal rules is you're --

22   we all know in the toy business we are going to engage a lot

23   of specialists, a lot of different artists and craftsman,

24   and to go through what is a fairly complicated process, a

25   lot of interfaces between various technologies --

```
 1              MS. HURST:  Your Honor, this is a narrative.
 2              THE COURT:  Sustained.
 3    BY MR. QUINN:
 4    Q    In terms of the process, how are the drawings used,
 5    then, in the process of the developing of the dolls?
 6    A    All right.  So everybody knows they're going to go
 7    through this difficult process, so they -- when they see the
 8    drawings and they've engaged -- or they've decided to go
 9    forward with it, that means they made a commitment.  I don't
10    know --
11              (Interruption in the proceedings.)
12              THE WITNESS:  Okay.  Thank you.
13              So they've made a commitment to develop this
14    product, and one of the most important things is they don't
15    want to lose the toy magic that they got, they saw in the
16    drawings, and they don't want to lose it as they make that
17    translation from 2D to 3D.  And so they work themselves
18    using the drawings, which they did very successfully.  And
19    number two, the second best way, or maybe one of the best
20    ways you can do it, actually, is that you engage the
21    original creator, the designer of that product, the person
22    who drew the drawings to -- to -- to be there to help make
23    all of those kinds of judgment calls you make because you
24    are going through this -- this development process.
25
```

1   BY MR. QUINN:

2   Q    All right.  So in -- in the development of a doll, if

3   you -- can you tell us if you have a drawing which you love

4   and you're persuaded is the basis for a product that you

5   want to invest in, would it then be a logical thing to do to

6   take that design and give it to, say, a sculptor to come up

7   with a sculpt and give him a free hand to do what they

8   wanted?

9   A    Definitely not.

10  Q    Why not?

11  A    Because you -- you are not -- you are now -- you have

12  taken off your design hat, and you are in development and

13  want to translate the 2D to 3D, you are not setting out to

14  create a new product.  You want to execute, as closely as

15  you can, the translation of the product from 2D to 3D.

16  Q    And sometimes in translating from the 2D design that

17  you bought into and creating the 3D model, are there -- or

18  the 3D version, are there sometimes some adjustments that

19  need to be made?

20  A    Yes, yes.  They are --

21  Q    Can you explain -- is that commonplace?

22  A    Yes.  And, in fact, right from the beginning, when you

23  look at the drawings, you see the product and you also know

24  some of the adjustments you are probably going to have to

25  do.  But there is often things that come up in engineering

1    for tooling reasons.  There's often cost, there's always

2    some cost of things you have to deal with, and sometimes

3    safety.

4    Q    And do you have an opinion about whether or not the

5    first generation Bratz dolls successfully captured

6    Mr. Bryant's vision as set forth in those drawings?

7    A    Yes, yes, I do.

8             MS. HURST:  Your Honor, this is the ultimate

9    issue.

10            THE COURT:  Yeah.  I'm going to sustain the

11   objection.

12            You'll eventually decide this, as a jury.

13   BY MR. QUINN:

14   Q    Do you have an opinion about whether or not the

15   dolls -- whether the dolls are a translation, as you've used

16   the term, in doll development of those drawings?

17            MS. HURST:  Your Honor, that's a legal term.

18            THE COURT:  Sustained.

19            You don't have to answer that.

20            THE WITNESS:  It's the word I always use.

21            THE COURT:  That's fine.

22            THE WITNESS:  I mean, I don't think it's --

23            THE COURT:  Thank you very much.

24            (Laughter.)

25            THE WITNESS:  No, but I don't mean it as a legal

1    term.  It's a design thing.

2           THE COURT:  I appreciate that.

3    BY MR. QUINN:

4    Q    So do you have an opinion about whether or not

5    Mr. Bryant's drawings were used and were the basis for the

6    first generation Bratz dolls?

7    A    Yes, I do.

8    Q    And what is that opinion?

9    A    I think it's a remarkable -- going from 2D to 3D, I

10   think it's -- it's a really remarkable execution.

11          MR. QUINN:  Can I have just one moment, your

12   Honor?

13          THE COURT:  (No audible response.)

14          (Attorney discussion held off the record.)

15          MR. QUINN:  That's all.  Thank you.

16          THE COURT:  All right.

17          Cross-examination.

18          Now, caution also, very limited purpose for this

19   witness testifying, so if you start opening doors, I'm not

20   going to contain this, all right?  She's here, design, how

21   far along they are, relationship with drawings; that's it.

22          MS. HURST:  Your Honor, I'm just going to confer

23   for a moment, if that's all right.

24          (Attorney discussion held off the record.)

25          THE COURT:  Oh, and also the process, you both can

1    get into the process.  In other words, drawings, further

2    design, to sculpt.

3            And remember these are ultimate issues, among many

4    others, that you'll be ultimately deciding.

5            And that was a direction to the jury.

6                        **CROSS-EXAMINATION**

7    BY MS. HURST:

8    Q    Good afternoon, Ms. McComb.

9    A    Hello.

10   Q    My name is Annette Hurst, and I represent Mr. Larian

11   and MGA.

12   A    Okay.

13   Q    We have not met before, right?

14   A    No, we have not.

15   Q    About how much have you billed Mattel in this matter?

16   A    That's -- I'm -- I haven't looked at my invoice and

17   totaled them up.  I mean, I know my hourly rate.  There was

18   a lot of material to review.  I did a lot of reading, so

19   there's quite a few hours.  I -- I took the time I needed to

20   get all the information I needed.  I'll be honest with you,

21   I really haven't totaled it up.

22   Q    Can you give us any estimate at all of how much you

23   have billed Mattel for your work in this matter?

24   A    It would be a rather flying guess, to be honest with

25   you, because it's been over different periods of time, and I

1    do a lot of other work, so to have those kind of numbers at

2    the top of my head, I really just don't.

3    Q    Can you give us any estimate at all of how much you

4    have billed Mattel for your work in this matter?

5    A    Nothing that I would consider -- I would just make it

6    up.  I just wouldn't know that.  I'm sorry if I -- my hourly

7    rate is what it is.  I did spend all of the appropriate time

8    I needed to review and read all of this material, which

9    certainly was not, you know, five minutes, but I really

10   could not do that.  I do have other clients, and I just

11   don't -- I have to go look at my data, my paperwork, which I

12   don't have with me.  I'm really not trying to be difficult,

13   but I don't know.

14   Q    Can you give us a range of estimates for the amount you

15   have billed Mattel in connection with this matter?

16   A    I -- I really -- I really don't.  Some of it was

17   several years ago, and I really don't know.  I'm sorry.

18   Q    Could you give us a minimum amount that you would be

19   comfortable saying that you billed Mattel in this matter?

20   A    No.  I could make up something silly, you know, like a

21   weeks' worth of work, but I know it's more than that.  I

22   just don't have those kind of numbers in my head, I'm sorry.

23   Q    Okay.  Did you do anything to prepare for your

24   testimony today?

25   A    Yes, yes.  I rereviewed my report and materials.

1    Q    But not your invoices?

2    A    No, of course not.  That would -- no.

3    Q    Because you had no idea that anybody was going to ask

4    you how much you've billed on this matter?

5    A    I understood I would be asked how much I'm paid by the

6    hour.  I -- I understood that.

7    Q    Did Mr. Quinn let you know he'd be asking you that

8    question?

9              MR. QUINN:  Your Honor, we have an agreement

10   that --

11             THE COURT:  Sustained.

12             We're going to keep counsel out of it, okay?

13             MS. HURST:  My mistake, your Honor.  I apologize.

14             THE COURT:  It is a mistake.  The question is

15   stricken.

16             We're going to keep the personalization of counsel

17   out of this lawsuit, okay?

18   BY MS. HURST:

19   Q    You didn't have any understanding at all before you

20   arrived here today that someone might be asking you the

21   total sum you'd billed in connection with this matter?

22   A    No, I really didn't think about that.  I really was

23   thinking about how I could explain what design and

24   development is.  That's where I was really totally focused.

25   Q    You've been working -- when were you first engaged for

1    this matter?

2    A    Two years or three years ago.

3    Q    Can you estimate how many hours you've spent in that

4    period of time?

5    A    From two or three years ago?

6    Q    To the present, since from the time you were engaged to

7    the present, can you give us an estimate of how many hours

8    you've spent on this matter?

9    A    No.  I really think about the work I'm doing.  I'm not

10   thinking about how many hours I'm rolling up.  I think about

11   what I need to look at and how I need to form my opinions.

12   Q    During your career in the toy industry, you worked on

13   four fashion dolls that came to market, correct?

14   A    Four fashion doll lines, more than -- it's more than

15   four dolls.

16   Q    Four short lines of product?

17   A    Yes, uh-huh.

18   Q    Which means they only had a few items in them, correct?

19   A    Correct.

20   Q    And each of those four fashion doll lines were based on

21   licensed material, correct?

22   A    Yes.

23   Q    Which means that you already knew, roughly, what it was

24   supposed to look like, correct?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 133 of 139   Page ID #:308573
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

133

1    Q    So in the case of Destiny's Child, there was already a

2    Destiny's Child that you were looking at, right?

3    A    Well, they were human beings.  That's a lot different

4    than a toy.

5    Q    In the case of Ariel, the Mermaid, you already knew

6    what Ariel was supposed to look like, right?

7    A    In a very limited way.  The movie hadn't been finished,

8    and we had very little reference, much less than the Bratz

9    drawings, much less, as a matter of fact.

10   Q    Well, what did you have?

11   A    We had some drawings -- no turnarounds, no control

12   drawings, no cross sections.  We had some 2D drawings that

13   were a little earlier than the actual movie imagines,

14   because you could see a difference, and we had a short clip

15   from the movie.

16   Q    And you found it challenging to go from that amount of

17   material and translate it into a successful product, true?

18   A    I don't know if I -- we were extremely successful at

19   it, and I'm good at what I do.

20   Q    And you found it challenging to go from the amount of

21   material that you had about Ariel, the Mermaid, and turn it

22   successfully into a toy; is that true?

23   A    I -- I don't think I would use the world "challenging."

24   Q    So it's just a walk in the park, just a foregone

25   conclusion?

1   A    I think it's a broad range between the word

2   "challenging" and a "walk in the park."  It was what I do.

3   Q    Have you ever brought to market a fashion doll based on

4   an original design that was not a licensed product?

5   A    The Family Company doll.

6   Q    And that was a collector doll, you said?

7   A    Yes.

8   Q    Like the American Girl?

9   A    Yes, very similar in that type.

10  Q    So it's a larger doll?

11  A    A little bit larger, yes.

12  Q    Okay.

13  A    But lots and lots of fashion.

14  Q    And did that product come to market?

15  A    Yes.

16  Q    And how did it do?

17  A    I actually don't know.

18  Q    You have no idea how that product sold?

19  A    No.  I left the company, and I was working at another

20  company, so I really wasn't watching that.

21  Q    You agree with me, Ms. McComb, that it's a difficult

22  process to go from drawings to dolls, true?

23  A    It's a process that design professionals do every day.

24  It may seem quite complicated to lay people, but it is what

25  we do every day.

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 135 of 139   Page ID #:308575
CV 04-9049-DOC – 03/10/2011 – Day 31, Vol. 2 of 3

135

1   Q    Didn't you just testify here on direct that it was a,

2   quote-unquote, "difficult process," Ms. McComb?

3   A    I actually don't remember if I used that word.  It's a

4   complicated process.  It would seem difficult to a lay

5   person, but not to a professional.  It is what we do.

6   Q    Did you or didn't you use the phrase "difficult

7   process" during your direct examination?

8   A    Maybe you would have to read it to me.  I don't recall.

9   Q    It's quite possible that you did; you agree with that,

10  don't you?

11  A    Well, I think you just would have to have it read back

12  to me, and then I would know.

13  Q    Your opinion is ultimately that MGA had a remarkable

14  execution of the drawings, true?

15  A    Yes.

16          MS. HURST:  One moment.

17          (Attorney discussion held off the record.)

18          MS. HURST:  No further questions, your Honor.

19          THE COURT:  Okay.

20          Mr. Cote, do you have any questions?

21          MR. COTE:  No, your Honor.

22          THE COURT:  Redirect of Mattel by Mr. Quinn.

23                    **REDIRECT EXAMINATION**

24  BY MR. QUINN:

25  Q    Ms. McComb, you don't remember what you billed Mattel

1    back in April of 2008?

2    A    Not the total.  I do remember the hourly rate, the same

3    as I testified earlier.

4    Q    But you don't remember how much your bill was in

5    April 2008?

6    A    I couldn't tell you what I did for any other clients,

7    either.

8    Q    Or March of 2008?

9    A    No.

10    Q    Or May of 2008?

11    A    No.

12    Q    But you have spent -- I mean, to give some assistance

13    here, you have spent -- can you give us an estimate of how

14    many hours, roughly, ballpark, a range of how much time you

15    spent working on this project since you were first retained

16    several years ago?

17              MS. HURST:  Asked and answered.

18              THE COURT:  No.  Overruled.

19              If either one of you can find --

20    BY MR. QUINN:

21    Q    A range?  If you can, you can --

22              THE COURT:  It has been asked and answered, but --

23              MR. QUINN:  All right.

24              THE COURT:  Maybe another attorney asking it

25    would --

 1          MR. QUINN:  Well, I asked about a number of hours.

 2          THE COURT:  Number of hours?

 3          I thought you had also, Counsel?

 4          MS. HURST:  I did, your Honor.

 5          THE COURT:  Well, if you recall for either counsel

 6   the number of hours, that's what they are asking.

 7          THE WITNESS:  Well, I could say -- you know, I

 8   could probably put together in, you know, a couple of weeks,

 9   you know --

10   BY MR. QUINN:

11   Q    Equivalent?

12   A    Yeah, eight hours a day a couple of weeks.  Now, I

13   didn't do it that way, you know.  I was here in pieces, but

14   I don't know.  That would be a guess.  It's really a guess.

15   Q    So you said the materials that you had to do the doll

16   for the Little Mermaid were actually -- actually were

17   provided much less information for what the

18   three-dimensional doll would be than what Mr. Carter

19   Bryant's --

20   A    Yes.

21   Q    -- type of information they provided?

22   A    And in addition, the kind of information, the quality

23   of the information, of course the drawings, the movie clip

24   was just beautiful and brilliant, but these, of course, were

25   drawings of an animated character, so I could really see the

1    personality, and that was very, very helpful, but it was not

2    drawn as a doll.

3           *(Live reporter switch with Sharon Seffens.)*

4                          -oOo-

Case 2:04-cv-09049-DOC-RNB   Document 10184   Filed 03/11/11   Page 139 of 139   Page ID
#:308579
CV 04-9049-DOC - 03/10/2011 - Day 31, Vol. 2 of 3

139

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 11, 2011

12

13

14                      _____

                        JANE C.S. RULE, U.S. COURT REPORTER
15                      CSR NO. 9316

16

17

18

19

20

21

22

23

24

25