1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                    - - - - - - -

5

6   MATTEL, INC., ET AL.,          )
                                   )
7              Plaintiffs,         )
                                   )
8        vs.                       ) No. CV 04-9049-DOC
                                   )     Day 32
9   MGA ENTERTAINMENT, INC., ET AL.,   )   Volume 3 of 4
                                   )
10             Defendants.         )
    _____)

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                  Santa Ana, California

18                 Friday, March 11, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25

     11-03-11 MattelV3

1     **APPEARANCES OF COUNSEL:**

2

3     FOR PLAINTIFFS MATTEL, INC., ET AL.:

4               QUINN, EMANUEL, URQUHART & SULLIVAN
                By:   JOHN B. QUINN
5                     MICHAEL T. ZELLER
                      WILLIAM PRICE
6                     Attorneys at Law
                865 South Figueroa Street
7               10th Floor
                Los Angeles, California 90017-2543
8               (213) 443-3000

9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:   THOMAS S. MC CONVILLE
12                    Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              – AND –

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:   ANNETTE L. HURST
17                    Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700

19              – AND –

20
                KELLER RACKAUCKAS, LLP
21              BY:   JENNIFER L. KELLER
                      Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700

24

25

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                  Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                 Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             ROBERT ECKERT, Mattel CEO

17             LILY MARTINEZ, Mattel Employee

18             KEN KOTARSKI, Mattel Technical Operator

19             MIKE STOVALL, MGA Technical Operator

20             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

21             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

22             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

23             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

24             FRANK RORIE, Orrick Herrington & Sutcliffe

25

Case 2:04-cv-09049-DOC-RNB   Document 10193   Filed 03/15/11   Page 4 of 70   Page ID #:308827
CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

4

1                        **I N D E X**

2

3

4                      **EXAMINATION**

5

6   **Witness Name**        **Direct**    **Cross**    **Redirect**     **Recross**

7   LUTHER, SUJATA
        By Mr. Price                  5                          34
8       By Ms. Keller                          24

9   FRIEDMAN, NEIL
        By Ms. Keller       44

10

11

12

13

14                        EXHIBITS

15

16  **Exhibit**                        **Identification**    **Evidence**

17  Plaintiffs' No. 8190                                    6

18  Plaintiffs' No. 36041                                   11

19  Defendants' No. 36055                                   13

20

21

22

23

24

25

1          **SANTA ANA, CALIFORNIA, FRIDAY, MARCH 11, 2011**

2                **DAY 32, VOLUME 3 OF 4**

3                     **(2:20 p.m.)**

4          *(The following proceedings is taken in the*

5      *presence of the jury.)*

6          THE COURT:  Then we are back on the record.

7          The jury is present, the alternates, all counsel,

8    the witness.

9          And Counsel, if you'd like to begin your

10   examination on behalf of Mattel.

11          **SUJATA LUTHER, DEFENSE WITNESS, RESUMED**

12              CROSS-EXAMINATION (Continued)

13   BY MR. PRICE:

14   Q    Ms. Luther, when we broke, I asked whether you observed

15   in the market instances where you thought MGA was being

16   inspired by -- by Barbie products.  And I'm going to show

17   you Exhibit 24328, and what I want you to look at, and this

18   is to refresh your memory so don't read it out loud or

19   anything, just read it to yourself.  The very last part of

20   page 1, where the --

21          THE COURT:  Down at the bottom, and then turn the

22   page over to page 2.

23   BY MR. PRICE:

24   Q    And then page 2.

25          Have you read it?

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

6

1    A    Yes.

2    Q    Okay.  You're smiling at the colorful language?

3    A    My colorful language, yes.

4    Q    And were there instances where you looked in the

5    marketplace and you saw times or instances where you thought

6    that MGA was taking their inspiration from Mattel's

7    products?

8    A    Yes, I thought they were looking at some of our

9    products and getting inspiration.

10   Q    Now, let me go through again kind of the chronology of

11   some more of these reports just to see -- see how they were

12   progressing, and if you could look at, let's see, 8190.

13        Do you recognize that as an August 25, 2004 girls'

14   monthly brand tracking study in the U.S. that was sent by

15   Ms. Willensky?

16   A    Yes, I do.

17            MR. PRICE:  Your Honor, move 8190 into evidence.

18            THE COURT:  Received.

19            *(Plaintiffs' Exhibit No. 8190 is received in*

20        *evidence.)*

21   BY MR. PRICE:

22   Q    And if you look at the first page, it may be clearer on

23   the screen than on the hard copy.

24   A    Yes.

25   Q    Can you see it says, "Key finding summary among younger

1    girls 5 to 7 years old, Barbie maintains the leadership

2    position across all key attributes of appeal and

3    demonstrates particular strength in terms of aesthetics,

4    paren, prettiness, aspirations, paren, most want to be like,

5    and clothes most want to wear, paren, and social status,

6    paren, most want to show your friends"; do you see that?

7    A    Yes.

8    Q    So that was the result of the tracking study in August

9    of 2004 for that age group, right?

10   A    Yes.

11   Q    And you said, "In contrast, among older girls 8 to 10

12   years old, Bratz holds the leadership positions across the

13   key attributes and continues to demonstrate particular

14   strength in terms of having aspirational clothes and as

15   having social status"; do you see that?

16   A    Yes.

17   Q    And then the last paragraph, it says, "The recent trend

18   in girls' perceptions, however, is encouraging.  Over the

19   past few months, Bratz' appeal among older and younger girls

20   is declining to the benefit of MyScene.  The decline for

21   Bratz is particularly notable in terms of perceived coolness

22   and play value among older girls"; do you see that?

23   A    Yes.

24   Q    So I think you were asked whether or not MyScene was a

25   competitive response to Bratz; do you recall that?

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

8

1   A   Yes.

2   Q   And was MyScene developed during the time frame that

3   you weren't at Mattel?

4   A   Yes.

5   Q   And --

6   A   It was not developed when I was there.

7   Q   Okay.  Thank you for clarifying probably another double

8   negative.

9       And before you left Mattel in 2000, though, you knew

10  Mattel was trying to come up with a product that appealed to

11  the, you know, 8 to 10-year-old market with the Mystery

12  Girls and those sorts of efforts, right?

13  A   Yes.

14  Q   And while you were gone, another product that was put

15  on the market to try to appeal to this -- the same age group

16  market, the 8 to 10 year olds, was MyScene, correct?

17  A   Correct.

18  Q   And MyScene you saw as -- as appealing or -- let me

19  strike that.

20      You saw MyScene as being in response to the

21  vulnerability that you had been -- that you had been

22  identifying even before leaving Mattel in 2000, correct?

23  A   I didn't understand the question, please.

24  Q   Sure.  When you came back, MyScene was already in the

25  marketplace, right?

1   A     I think so.

2   Q     And you saw MyScene as trying to address the -- that

3   vulnerability in that age group that you had identified

4   prior to leaving Mattel in 2000?

5   A     Yes.

6   Q     So MyScene, from what you could see, was a response to

7   Mattel's -- the concerns Mattel had and had tried to address

8   even before you left in 2000?

9   A     Could you repeat the question?

10  Q     Sure.  Sure.  I'll break it down.

11        Prior to 2000, you and your -- your department had

12  identified the vulnerability in the 8 to 10 year old?

13  A     Yes.

14  Q     And Mattel had introduced products trying to address

15  that vulnerability, correct?

16  A     Yes.

17  Q     And while you were gone, Mattel continued to try to

18  come out with products that addressed that vulnerability,

19  correct?

20  A     Correct.

21  Q     And one of the products that came out while you were

22  gone, in an attempt to address that vulnerability that you

23  have identified, was the MyScene product?

24  A     Correct.

25  Q     And if you would look at Exhibit -- I'm going ahead

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

10

1    here now -- 36041.

2    A    Okay.

3          MS. KELLER:  I'm sorry, Counsel, what was that

4    exhibit number?

5          MR. PRICE:  I think I have it right, 36041, I

6    think.

7          *(Attorney discussion held off the record.)*

8    BY MR. PRICE:

9    Q    You have it in front of you, but I don't have it in

10   front of me, I'm sorry.

11        And you recognize that as an e-mail you sent on

12   September 15, 2005?

13        THE COURT:  It's May 3rd, isn't it, Counsel?

14        MR. PRICE:  Pardon?

15        THE COURT:  May 3rd.

16        THE WITNESS:  May 3rd.

17   BY MR. PRICE:

18   Q    I'm sorry, I'm looking at the wrong one.  And that's

19   because I gave you the wrong number, I apologize.  36041.

20        THE COURT:  That's the same e-mail, Counsel.

21   36041 is the same one you referred to before, it's May 3rd.

22        MR. PRICE:  May 3rd, that's the date I meant to

23   refer to.

24   BY MR. PRICE:

25   Q    And do you see that as an e-mail you authored on

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

11

```
1    May 3rd, 2005?

2    A    Yes, I do.

3            MR. PRICE:  Your Honor, move Exhibit 36041 into

4    evidence.

5            THE COURT:  Received.

6            MR. PRICE:  Thank you.

7            THE COURT:  And also 8190 was not received.  It's

8    received.

9            MR. PRICE:  Thank you.

10           (Plaintiffs' Exhibit Nos. 8190 and 36041 are

11       received in evidence.)

12   BY MR. PRICE:

13   Q    Now, this is sent to Mr. Bousquette, correct?

14   A    Correct.

15   Q    Can you tell me, what is the subject daily requests?

16   A    Probably he had daily requests of information from me.

17   Q    Okay.

18   A    It was a daily conversation, and I would usually at the

19   end of the day summarize and give some -- or at the end of

20   the week give a response.

21   Q    Okay.  And if you look at number 2, it says,

22   "Barbie/MyScene/Bratz imagery, April results are in.  Barbie

23   continues to improve among trans girl, stronger than Bratz

24   across all key dimensions."

25       First of all, can you tell me, what do the April
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

12

1   results refer to?

2   A    I believe in this stage in 2005, we were monitoring

3   Barbie, Bratz, MyScene imagery every month, so that was

4   probably -- April results were in on May 3rd, and I was

5   giving him a heads up in what the data was saying.

6   Q    When you say you were evaluating imagery, what was the

7   process?

8   A    It was -- it was a abbreviated version of the tracking

9   study that we were doing on a monthly basis.

10  Q    And when you say that Barbie continues to improve among

11  trans girl, what does trans refer to?

12  A    We divided the target group into three different age

13  groups, and we had different terms for them, there was

14  younger girls, there was transitional girls, and there were

15  older girls.  Younger girls were, and you can argue about

16  the age, 3 to 5, 3 to 6.  Trans girls, transitional girls in

17  this case, were 6 to 7, 5 to 7ish, and older girls were 8 to

18  10.  So we had broken out the age groups into three distinct

19  segments, so that was transitional girls.

20  Q    All right.  And when it says, "MyScene is also

21  improving slow and steady.  Bratz is declining versus

22  year-ago levels.  Some good news."  When you say "Bratz is

23  declining versus year-ago levels," what are you referring

24  to?

25  A    Bratz' imagery.

1   Q    Under those tracking studies?

2   A    Yes.

3   Q    And in -- in 2005, Barbie sales were about 80 percent

4   more than Bratz sales in that year, correct?

5   A    That, I don't know.

6   Q    You knew Barbie sales in 2005 were more than Bratz

7   sales?

8   A    Yes, worldwide.

9   Q    Was -- December 2005 was your next to last month at

10  Mattel, right, you left in January of '06?

11  A    I don't remember the exact month, January or February.

12  I don't recall.

13  Q    If you'd look at 36055, and do you recognize that as an

14  e-mail you sent around December 5, 2005?

15  A    Yes, I do.

16          MR. PRICE:  And I move 36055 into evidence, your

17  Honor.

18          THE COURT:  Received.

19          *(Plaintiffs' Exhibit No. 36055 is received in*

20      *evidence.)*

21  BY MR. PRICE:

22  Q    And this concerns a 2005 NPD category share report and

23  industry overview?

24  A    Yes.

25  Q    And NPD is the NPD data -- strike that.

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

14

```
 1        Would you use NPD data to monitor the trends in the
 2   market?
 3   A    I would use NPD data to monitor market share.
 4   Q    And if you'll look at the first paragraph, I think it's
 5   the one -- fifth line down, it says, "Competitively, Bratz
 6   and MLP continue to gain share"; do you see that?
 7   A    Yes.
 8   Q    What does MLP refer to?
 9   A    My Little Pony.
10   Q    And whose product was that?
11   A    Hasbro.
12   Q    And it says, "Also note the decline of the fashion doll
13   market minus 8 percent YOY decline"; do you see that?
14   A    Yes.
15   Q    So December 2005, you recognize Bratz at that point is
16   still gaining market share, right?
17   A    Yes.
18   Q    It's still being -- Barbie is still the number 1
19   fashion doll in the world, right?
20   A    Yes.
21   Q    Then you go on to talk about, though, the business by
22   age.  Do you see you say, "If you look at the business by
23   age, Barbie is losing share among the core," and you say
24   "minus 20 percent YOY."  And I guess I should ask, YOY
25   means?
```

Case 2:04-cv-09049-DOC-RNB   Document 10193   Filed 03/15/11   Page 15 of 70   Page ID #:308838
CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

15

1   A    Year over year.

2   Q    Thank you.

3        "Year over year volume decline among the 3 to 5 year

4   olds, and minus 10 percent among the 6 to 8 year olds"; do

5   you see that?

6   A    Yes.

7   Q    And then you say, "The only real growth that Bratz is

8   having is among Barbie's sweet spot, the 3 to 5 year olds";

9   do you see that?

10  A    Yes.

11  Q    So by 2005, that Bratz brand, Bratz doll, had trickled

12  down to where it was -- Bratz was growing only among the 3

13  to 5 year olds?

14           MS. KELLER:  Objection.  Assumes facts not in

15  evidence.  Compound and is vague.

16           THE COURT:  Overruled.

17           THE WITNESS:  Could you repeat the question,

18  please.

19  BY MR. PRICE:

20  Q    Sure.  By 2005 -- let's step back.

21       Do you recall you were asked questions about whether or

22  not Bratz initially targeted the older girls?

23  A    Yes.

24  Q    And we've talked about -- about how that trickles down?

25  A    Yes.

1   Q    And by December 5, 2005, what you had observed is that

2   the only real growth that Bratz was having was in the Barbie

3   sweet spot, the 3 to 5 year olds?

4   A    In market share.

5   Q    Market share?

6   A    Yes.

7   Q    And when you say -- so basically what you are saying is

8   in that category, Bratz' percentage was going up and

9   Barbie's was going down?

10  A    That's what this says, yes.

11  Q    And that was your observation at the time, right?

12  A    Observation -- observation from what?

13  Q    Your observation from -- from the NPD data was that --

14  I mean, that's why you sent this e-mail, that was your

15  observation?

16  A    From NPD, yes.

17  Q    I forgot to ask you about this, on Exhibit 8677.  And

18  that's the 2004 corporate strategic plan report,

19  September 2004, that you were asked questions about in your

20  direct examination; do you see that?

21  A    Yes, I do.

22  Q    And if you would look at -- let me ask you this:  Did

23  you do analysis around the 2004 time frame to see whether or

24  not, you know, future population growth looked like it would

25  positively or negatively affect the sales of Barbie?

1   A    Yes, we were looking at population growth trends in

2   different age segments.

3   Q    And that's because you can have a turnover in the -- in

4   customers year to year because they get older and new ones

5   come into the market, right?

6   A    That's because generally when we were calculating or

7   forecasting, we generally presumed there were 1.5 million

8   girls in the U.S. in an age bracket.  So when we were making

9   forecasts, we had to think about what is the size of the

10  target market.  Is it 1.5 million?  Is it growing or

11  declining?  That was important for us when we were making

12  forecasts.

13  Q    If you'd look at -- I think I have the wrong --

14       Page 8677-00052.

15  A    Is it the same document?

16  Q    It's the same document, yes.

17       MS. KELLER:  Your Honor, there were previous

18  objections by Mattel to using anything in this document that

19  the witness had not previously seen, and I think she had not

20  seen anything but the page that we discussed from her

21  deposition.

22       MR. PRICE:  She saw it at her deposition, and

23  Ms. Keller moved the whole thing into evidence over my

24  objection.

25       THE COURT:  Overruled.

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

18

```
 1              THE WITNESS:  What page are you referring to,

 2    please?

 3    BY MR. PRICE:

 4    Q    You can see it on the screen, it's 867-00052 (sic), it

 5    says page 50 in the document, and you see it says, "MGA,

 6    LeapFrog and Upper Deck are pursuing aggressive growth

 7    strategies, while Hasbro and Lego focus on stabilizing their

 8    businesses"; do you see that?

 9              MS. KELLER:  Your Honor, this is beyond the scope.

10    This document is already in evidence.  I talked about one

11    page with the witness.

12              THE COURT:  While she is here, Counsel, I'll let

13    you inquire.  I'll let you inquire.  Overruled.

14    BY MR. PRICE:

15    Q    Do you see at the top where it says "MGA"?

16    A    I'm looking at it.

17    Q    And you see it talks about company stated strategy?

18    A    (No audible response.)

19    Q    And then at the far right, it says "challenges"; do you

20    see that section?

21    A    Yes, I do.

22    Q    And there it says, "No successes beyond Bratz," and it

23    says, "tween market saturation"; do you see that?

24    A    I see it.

25    Q    Let me ask:  When you say "tween market saturation,"
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

1   what are you taking about?

2   A    I don't know.  I didn't write this, so I don't know

3   what Bain is talking about.

4   Q    Is this from the Bain report?

5        Yeah, if you'd look at the first page, it says,

6   "corporate strategic plan"?

7   A    Oh, I didn't write this document.

8   Q    Did you provide any -- any data in connection with this

9   document?

10  A    I may have, but this is not written by me.

11  Q    Okay.  So I understand it's not written by you.  Do you

12  know if you supplied the marketing research that led to the

13  creation, in part, at least, of 867700052 -- I'm sorry,

14  -0052, I apologize, where it says, "No successes beyond

15  Bratz" and "tween market saturation"; do you know whether

16  you provided data about that?

17  A    I provided a lot of data.  My group was the repository

18  of data, so I must have provided a lot of data to the

19  strategic planning group.

20  Q    And if, in your field, what -- what would it mean to

21  say "tween market saturation"?

22  A    Tween would be pre-teen, which would be anything less

23  than 13.

24  Q    Now, in -- in 2006, Barbie sales increased, right?

25  A    I don't know.

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

20

```
 1   Q    Did you keep track of -- of -- either for nostalgia or

 2   professional curiosity or professionally, of whether or not

 3   after 2005, 2006 and 2007, whether or not Barbie sales began

 4   increasing again?

 5   A    No, I did not because I was still busy with my own

 6   business.

 7   Q    Oh, I wanted to ask you about this cannibalization

 8   study concept.

 9   A    Uh-huh.

10   Q    In one report, you talked about Bratz cannibalizing

11   Barbie, and is that the way normally that word is used in

12   the reports?

13   A    It should not be used in that way.

14   Q    Because by cannibalization, you are taking about within

15   Mattel?

16   A    Within a brand, that's how you refer to, eating into

17   your own brand.

18   Q    And from a business perspective, say from Mattel's

19   business perspective, is it your understanding that what

20   mattered was, you know, overall, are we going to be

21   increasing our sales or decreasing our sales if we put out

22   this product?

23   A    I am not understanding.

24   Q    Sure.  If Mattel puts out a product, say, in the

25   fashion doll category, one of the things it has to consider
```

```
 1    in determining whether it should put the product in the

 2    market is whether or not that product is going to reduce

 3    sales by more than it increases sales, right?

 4    A    For the whole category or for that brand?

 5    Q    For that brand.

 6    A    Okay.

 7    Q    Does that make sense to you?

 8    A    Not really.

 9    Q    Okay.  Mattel is in the position of trying to make a

10    profit, right?

11    A    Yes.

12    Q    Okay.  And Mattel would not want to put out a doll

13    which increased market share for that -- for a certain

14    category, but decreased profits for the entire company,

15    right?

16    A    Increased market share for?

17    Q    Yeah, in that category, but ended up decreasing profits

18    for the entire company?

19    A    I -- I -- I don't know.  Sometimes you make a strategic

20    investment in a brand, and for that particular year, you are

21    willing to take a hit on your profit, but if you see some

22    future earnings.  It's a bigger discussion than what I

23    think.

24    Q    Okay.

25    A    It's not black and white.
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

22

1    Q    Instead of doing it in a single year, then let me

2    expand it.

3    A    Okay.

4    Q    Your understanding is that Mattel, in deciding whether

5    to introduce a doll, for example, would want to examine

6    whether in the long term, the introduction of that doll will

7    increase its business or reduce its business, its profits?

8    A    That's safe to say.

9    Q    And Mattel has some very strong, well-known brands,

10   correct?

11   A    Yes.

12   Q    And so, for example, if you are looking at MyScene, you

13   know, if you are going to introduce MyScene in the market,

14   one thing you are going to want to do is consider, well, if

15   that increases our sales, will it in the long term end up

16   decreasing our sales in Barbie, right?

17   A    Not really following your line of thought or

18   questioning on this one.

19   Q    Okay.  If you want to introduce a product like MyScene,

20   one thing you might want to look at, does it affect the

21   sales of other Mattel products?

22   A    Like a Barbie?

23   Q    Like a Barbie.

24   A    Okay.

25   Q    Is that right?

1    A    You want to know whether it's affecting it or not, yes.

2    Q    And it's -- and in fact, you did some studies on that,

3    those are -- you call it cannibalization study, to see if

4    this doll, for example, MyScene, impacts sales of other

5    Mattel products, such as Barbie, right?

6    A    Yes.

7    Q    And it's -- that's a reasonable decision for the

8    company to make, is to look at that information and decide

9    which direction is going to end up leading to more profits

10   for that company; it's fair to consider --

11   A    It's a point to consider, yes.

12   Q    And one thing you did or help do was provide data

13   points in cannibalization studies to assist in that sort of

14   decision; that is, to see does one product affect another

15   product, right?

16   A    Yes.

17   Q    And the somewhat colorful name that is attached to that

18   is "cannibalization"?

19   A    Yes.

20   Q    Okay.  Sort of like eating your own?

21   A    That's what it implies, which is why -- which is why

22   when you asked about Bratz, that was the wrong term to use.

23   Q    That's what I thought.

24        Now, just a second.

25             (Attorney discussion held off the record.)

Case 2:04-cv-09049-DOC-RNB   Document 10193   Filed 03/15/11   Page 24 of 70   Page ID #:308847
CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

24

 1   BY MR. PRICE:

 2   Q    Did you ever hear Mr. Eckert say that if there is going

 3   to be a Barbie killer in the market, it better be Mattel's

 4   Barbie killer?

 5   A    I didn't hear that.

 6          MR. PRICE:  I'm trying to leave the lectern now,

 7   your Honor.

 8          THE COURT:  Mr. Cote, do you have anything?  I'm

 9   sorry, just want to make sure Mr. Cote --

10          MR. OVERLAND:  We don't have anything.

11          THE COURT:  Okay.  Redirect by Ms. Keller.

12          MS. KELLER:  Thank you, your Honor.

13                   **REDIRECT EXAMINATION**

14   BY MS. KELLER:

15   Q    Ms. Luther, you were asked about Exhibit 36055, which

16   was your e-mail of December 5th, 2005, and one of the things

17   that Mr. Price asked you about is this so-called

18   trickle-down effect, as he's described it, the -- initially

19   the doll might be popular with 8 to 10 year olds, but as

20   time goes by, it may be popular with the younger children;

21   do you recall that?

22   A    Yes, I do.

23   Q    Now, Bratz came out in 2001, right?

24   A    Right.

25   Q    And by 2005, the date of this e-mail where you're

1    talking about the only real growth that Bratz is having is

2    among Barbie's sweet spot, 3 to 5 year olds, by the year

3    2005, in addition to the original Bratz dolls, the market --

4    MGA had brought to the market Baby Bratz, Itsy Bitsy Bratz,

5    Lil' Bratz, and a lot of other products that were

6    specifically designed for much younger children, right?

7    A    Yes.

8    Q    And so the fact that -- the fact that Barbie was losing

9    out to Bratz in that category is more likely to be

10   attributable to the fact that MGA brought out these products

11   targeted to 3 to 5 year olds than it is to any trickle-down

12   effect; would you agree with that?

13   A    No, I wouldn't.  It wouldn't be as clear.

14   Q    Okay.  Would you agree that it's certainly possible

15   that the growth in the 3 to 5-year-old age group was because

16   all of these products like Baby Bratz and Itsy Bitsy Bratz

17   were aimed at that age group?

18            MR. PRICE:  Objection.  Calls for speculation as

19   phrased.

20            THE COURT:  If you have an opinion, you can

21   answer.

22            THE WITNESS:  It's a combination of the regular

23   Bratz line trickling down and the new product that Bratz had

24   launched which were targeted to 3 to 5 year olds, so it's

25   hard to quantify exactly what percentage, but it's a

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

26

 1    combination of all.

 2    BY MS. KELLER:

 3    Q    Without doing a lot of additional research, it would be

 4    tough to --

 5    A    A lot of research, very expensive research would be

 6    done.

 7    Q    And you were also asked about Exhibit 8190, and that

 8    was an August 25th, 2004 study by Allison Willensky, and

 9    this talked about how, at least in August, over the past few

10    months, Bratz' appeal among older and younger girls is

11    declining to the benefit of MyScene.

12         Now, MyScene was Mattel's product that was inspired by

13    MGA's Bratz product, right?

14    A    Do you want my point of view in this?

15    Q    Yes.

16         MR. PRICE:  Object.  There is no foundation.  She

17    wasn't there at the time.

18         MS. KELLER:  Well --

19         THE COURT:  Overruled.

20         THE WITNESS:  There was -- it was inspired.

21    BY MS. KELLER:

22    Q    By Bratz?

23    A    By Bratz.

24    Q    So the fact that MyScene might have been taking some

25    sales from Bratz, that also wasn't too surprising because it

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

27

1    was designed to try to do that, wasn't it?

2              MR. PRICE:  Foundation.  She wasn't there.

3              THE WITNESS:  I can answer?

4              Okay.  It was designed to attract older girls.

5    BY MS. KELLER:

6    Q    And designed to attract girls who might have otherwise

7    bought Bratz, true?

8    A    Possibly.

9    Q    Now, was the idea to make a fashion doll a secret in

10   the year 2000?

11   A    To make a fashion doll?

12   Q    Right.  The idea to make a fashion doll, was that a

13   secret in the year 2000?

14   A    I am not understanding the question.

15   Q    Well, by the year 2000, what a fashion doll was was

16   pretty widely known, right?

17   A    Yes.

18   Q    The idea of a fashion doll?

19   A    Long hair that you can comb, clothes that you can

20   change, yes.

21   Q    And by the year 2000, the idea of developing line

22   extensions for a product, that was not a secret in the

23   marketplace, was it?

24   A    No, it wasn't.

25   Q    And was the idea to engage in licensing of a fashion

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

28

1   doll brand a secret in the year 2000?

2   A     No, it wasn't.

3   Q     And was the idea to build and manage a fashion doll

4   brand and use line extensions to do that a secret in the

5   year 2000?

6   A     What is your definition of a line extension?

7   Q     Well, various accessories sold along -- you know, as

8   part of a branding exercise, for example, a Bratz car, a

9   Bratz house, a Bratz --

10  A     That's pretty much, if I have to say a formula, that's

11  a formula.

12  Q     Yeah, that was a well-known formula by 2000?

13  A     It's a well-known industry formula.

14  Q     And you agree, would you not, that it's the execution

15  of the product that matters the most?  In other words, these

16  ideas were all out there, but not everybody could execute

17  them, right?

18         MR. PRICE:  Objection.  Vague as to "these ideas."

19         THE COURT:  Do you understand the question?

20         THE WITNESS:  Yes, I do.

21         THE COURT:  You may answer.

22         Overruled.

23         THE WITNESS:  Could you reask the question again.

24         (Laughter.)

25

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

29

1    BY MS. KELLER:

2    Q    Sure.  The idea of making a fashion doll, developing

3    line extensions, licensing a fashion doll, building and

4    managing a fashion doll brand, those ideas were already out

5    there by the year 2000, right?

6    A    Yes.

7    Q    But not everybody was able to execute those ideas and

8    produce a great product, right?

9    A    That is correct.

10   Q    So it was really the execution that is what mattered

11   the most, right?

12   A    It's all about the execution and the communication.

13   Q    And the toy industry demands constant innovation,

14   doesn't it?

15   A    Absolutely.

16   Q    Which means you have to constantly innovate and then

17   execute to sell the product, right?

18   A    Innovate, execute, communicate is the third dimension.

19   Q    And when you stop innovating and you stop executing,

20   then you stop selling product, right?

21   A    Not immediately, but sooner or later you will.

22   Q    It goes into a gradual decline?

23   A    Yes.

24   Q    You were also asked about some documents having to do

25   with the diversity of the Barbie brand, and it was mentioned

```
 1    that there were two friends, there was Theresa and Kristee,

 2    one African American and one Latina; do you remember that?

 3    A    Yes.

 4    Q    And if you look at 09704, and you look at numeral 6 --

 5    I'm sorry, 9704, page 14, numeral 6, it says, "Theresa

 6    currently has negligible awareness among Hispanic moms and

 7    girls, and the few who are aware are unsure as to her ethnic

 8    background."

 9         So at that point, certainly the awareness of the

10    consumer was not that there was a Latina Barbie friend who

11    was well known, true?

12    A    No, I don't -- yes, that is true, but we had not

13    clearly communicated either that Theresa is Latina.

14    Q    Right, but if you go to -- if you go to the first page

15    of 9704, and you go to the first paragraph -- or I'm sorry,

16    go to the fourth paragraph, it says, "Barbie seems to be

17    well established among both Hispanic moms and girls.

18    Theresa has very low awareness levels."

19         Now, that's November 19th, 1999 that Theresa --

20    Theresa, when did she come out, that doll?

21    A    I don't remember.

22    Q    But it wasn't happening that Theresa was even scene

23    as -- I mean, she was -- people weren't even aware of her

24    within the Hispanic community, according to this report,

25    right?  Awareness was negligible, meaning very little, true?
```

1   A    It's true, but I'm a little -- I stopped reading the

2   documents and I started looking at the -- at the monitor,

3   and it's not on the monitor, so maybe I should look for the

4   document.

5   Q    Well, let's go to 9704, page 5, and go to numeral 7.

6   And now, this is talking about Kristee, and this says,

7   "Awareness of Kristee was virtually nonexistent."

8        So -- and it goes on to talk about that consideration

9   should be given to developing two distinct sculpts and looks

10  for black Barbie and Kristee to help differentiate the dolls

11  for consumers.

12       So at least as of 1999, awareness of the Theresa doll

13  was negligible and awareness of Kristee was virtually

14  nonexistent, right?

15  A    I need to clarify something here.

16  Q    All right.

17  A    This refers to the doll, the African American doll or

18  the brown-skinned doll to be -- let me take it back.

19       This refers to the names that were attributed to those

20  two dolls.

21  Q    Okay.

22  A    So while consumers may be aware that there is a

23  dark-skinned or a brown-skinned doll with dark hair and

24  curly hair, or whatever it is, they weren't aware of the

25  names of Theresa and Christie, specifically.

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

32

```
1    Q    Okay.

2    A    So the name wasn't important.  People were aware of the

3    fact that there were many dolls that have different hair

4    colors and skin colors, but the names were not clear.

5    Q    Okay.  And let's go to Exhibit 8099, and you were asked

6    about that as well, that was a February 3rd, 1997 state of

7    Barbie focus groups memo from Allison Willensky.  And let's

8    turn to page 4.

9         And this was in association with the product diversity

10   and role models.  There were ideas volunteered for a cooking

11   Barbie that would wear a chef's outfit and come with a

12   cookbook that moms and daughters could use, like Martha

13   Stewart, and a waitress Barbie which would come with a

14   notepad and a tray.

15        Do you see that?

16   A    Yes, I do.

17   Q    And is it fair to say that when you talked about, you

18   personally, talked about diversifying the brand, that's not

19   exactly what you had in mind, the cooking Barbie and the

20   waitress Barbie?

21   A    There are two aspects that I talked about, not I, but

22   the report generator has referred to, is product diversity

23   and role models.  Cooking Barbie and waitress Barbie refers

24   to role models.  Diversity refers to different skin colors

25   and different ethnic groups, so they are two different
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

33

1    aspects.

2    Q    Okay.  And I want to ask you a couple more questions

3    and I'll be finished.

4         You were also asked some questions about Mattel's

5    success and creativity.  Was it your belief that the driving

6    force behind Mattel's success in developing great products

7    in the later -- latter half of the 1990s was due to the CEO,

8    Jill Barad.  In your mind, was she the driving force behind

9    Mattel's success in those years?

10   A    In my belief, yes.

11   Q    She was considered by many people to be something of a

12   genius, wasn't she?

13   A    Yes.

14   Q    And except for the somewhat disastrous purchase of the

15   Learning Company, she did a fantastic job at Mattel, didn't

16   she?

17   A    She did a pretty good job, yes.

18   Q    She left Mattel in the year 2000, didn't she?

19   A    Yes.

20   Q    And she was replaced by Mr. Eckert?

21   A    Yes.

22   Q    The -- you were asked about Mr. Villasenor and your not

23   personally attending his presentations about competitors

24   when he would return from toy fairs, but you said, "I got

25   the deck and went through the deck"; does that mean the deck

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

34

1    of slides that he gave out?

2    A    Yes.

3    Q    And he gave those out to all of the senior executives

4    at Mattel, correct?

5    A    Yes.

6         MS. KELLER:  I have nothing further.

7         THE COURT:  Recross-examination by Mr. Price.

8                      **RECROSS-EXAMINATION**

9    BY MR. PRICE:

10   Q    Ms. -- Ms. Luther, you actually don't know of any facts

11   that support a statement that Mr. Eckert saw

12   Mr. Villasenor's slides, correct?

13   A    Right.

14   Q    And you were asked about -- Ms. Keller used the phrase

15   "losing out to Bratz," that Barbie was losing out to Bratz;

16   do you recall that phrase that was used in the examination

17   that was just made --

18   A    Just finished?

19   Q    Yes.  That Barbie was, quote, "losing out to Bratz"?

20   A    If she said it, I assume she said it.

21   Q    And you believed, based on all these studies you were

22   doing, that Barbie was, in fact, losing sales because of

23   Bratz, right?

24   A    Yes.

25   Q    And if not for introducing MyScene, I mean, Barbie

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

35

1    would have lost even more sales to Bratz, correct?

2    A    Yes.

3    Q    Now, you were asked questions about whether fashion

4    dolls were secret and line extensions were a -- a secret.

5    I'd like to look at Exhibit 302, and we've come to know

6    that, here, affectionately, as the Bratz pitch book.  I

7    don't know if you've ever seen that before.

8              MS. KELLER:  Objection.  Beyond the scope.

9              THE COURT:  It is beyond the scope, Counsel, but

10   --

11             MR. PRICE:  It goes to the idea, the questions she

12   was asked.

13             THE COURT:  You can ask.

14   BY MR. PRICE:

15   Q    You said that the ideas weren't a secret and that line

16   extensions weren't a secret.  This is the first page of

17   Exhibit 302; do you see it says "Bratz," and it has

18   characters on that, correct?

19   A    Yes.

20   Q    Now, you had never seen that by the time you left

21   Mattel in 2000, correct?

22   A    I haven't seen this.  This is the first time I'm seeing

23   this.

24   Q    You are not aware of these designs being widely known

25   in the marketplace by the time you left Mattel, correct?

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

36

1    A    Correct.

2    Q    And so when Ms. Keller asked you whether or not

3    execution was the key and the execution of an idea, first

4    thing you need is a design for the doll, right?

5    A    Yes.

6    Q    And without that good design for a doll and a good

7    doll, you are not going to be successful doing line

8    extensions with the doll, right?

9    A    That's a safe assumption, yes.

10   Q    I mean, you need a good product to go to market with to

11   build a line extension on, right?

12   A    I need to clarify, there's been some words that you're

13   using that we need to understand what the definition is.  A

14   line extension implies that it's an extension to the line

15   that has already launched.

16   Q    And if -- if we go through the -- this 302 a bit, if

17   you look at -- let me show you the second page and the

18   third, if you'd flip through those, these are designs which

19   you had never seen prior to leaving Mattel in 2000, correct?

20   A    No, I have not seen these.

21   Q    And you said a line extension is for something that's

22   already on the market, right?

23   A    Yes, but an accessory is not a line extension.  That's

24   what I just wanted to clarify.  A accessory or a fashion.

25   Q    Okay.  And so a product has to be -- has to be launched

1    on the market, right, before there are what you define as

2    line extensions?

3    A    That's not true.

4    Q    Okay.  Well, then we're probably "definitionly --

5    "definitionly," I guess, miscommunicating.

6         You understood that the Bratz product was launched

7    sometime in 2001?

8    A    That's what I understand.

9    Q    Do you understand that it was a successful launched

10   product?

11   A    Yes, it was.

12   Q    And before those dolls --

13            MR. PRICE:  It's getting cozy.

14            THE COURT:  It's probably the question, Counsel.

15            Just joking.

16            How did we do that?

17            THE WITNESS:  An extension got shorted.

18            THE COURT:  We don't need lights anyway.  Counsel,

19   continue.

20            Are you okay?

21            THE JURY:  Yes.

22            THE COURT:  Everything else is operating.

23            Counsel?

24            MR. PRICE:  Thanks.

25

Case 2:04-cv-09049-DOC-RNB   Document 10193   Filed 03/15/11   Page 38 of 70   Page ID #:308861
CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

38

1   BY MR. PRICE:

2   Q    So prior to 2001, you never heard of a Bratz pony,

3   right?

4   A    No.

5   Q    Or a Bratz backpack?

6   A    Correct, I have not.

7   Q    Or Bratz babies?

8            MS. KELLER:  Your Honor, this is argument.

9            THE COURT:  Sustained.

10  BY MR. PRICE:

11  Q    You were asked about there being Bratz Babies, Itty

12  Bitty Bratz, and other products by MGA by the 2004 time

13  frame; do you recall those questions?

14           MS. KELLER:  Objection.  Misstates the testimony,

15  2005.

16           MR. PRICE:  2005, fine.

17  BY MR. PRICE:

18  Q    Do you remember those questions?

19  A    Yes.

20  Q    About the -- was it your understanding in the 2005 time

21  frame, that MGA began targeting this lower age group?

22  A    Yes.

23  Q    And it was targeting the lower age group with -- with

24  products that were line extensions of the Bratz dolls?

25  A    With Bratz Ponyz, Lil' Bratz, yes.

1   Q    And you were also asked about the -- the genius of the

2   CEO of Mattel in the '90s, and you used the word "genius"

3   even though you wrote all those reports in the '90s saying,

4   we've got these vulnerabilities, right?

5   A    (No audible response.)

6   Q    Correct?

7   A    Correct.

8   Q    And if you'd look at Exhibit 8677.  Ms. Keller asked

9   you about Mr. Eckert becoming the chief executive officer in

10   the year 2000, and we looked at Exhibit 877 previously, but

11   I'd like you to look, if you could --

12        I'm trying to get the right page, ma'am.

13            THE COURT:  Is it page 68, Counsel?

14            MR. PRICE:  Fortunately, I have the page number

15   and not the Bates number written, so I'm trying to --

16            THE COURT:  All right.

17   BY MR. PRICE:

18   Q    If you look at page -- it's Bates 13, do you see where

19   it says, "According to results, these results" -- it's Bates

20   86770-00013, it says, "These results have allowed Mattel to

21   generate 2.75 billion in cash flow, improve its capital

22   structure and return significant value to its shareholders."

23        Now, it's your understanding that the shareholders are

24   the owners of the company, correct?

25   A    Correct.

1    Q    And if you look at the next page, 00014, you'll see,

2    "While growing its share price from $10 to over $16"; do you

3    see that?

4    A    Yes.

5            MS. KELLER:  Objection.  Beyond the scope and

6    irrelevant to this witness.

7            THE COURT:  It is, Counsel.

8            MR. PRICE:  She asked about Mr. Eckert versus the

9    prior CEO and --

10           THE COURT:  What was the genius between the two,

11   and you're trying to get returning capital?

12           MR. PRICE:  Average.

13           THE COURT:  Overruled.

14           THE WITNESS:  I --

15           THE COURT:  No.  It's overruled.

16           MS. KELLER:  Your Honor, I asked about the

17   creativity of Ms. Barad.

18           THE COURT:  Also about the genius, so the

19   inference is that they were doing well under one president

20   and possibly not under another, and I'll allow you to ask a

21   few questions in that regard.

22   BY MR. PRICE:

23   Q    I guess I'll end with this:  By the time that -- well,

24   were you a Mattel shareholder, was that part of your

25   compensation at all?

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

41

```
 1   A     Yes.

 2   Q     Do you continue to be a Mattel shareholder?

 3   A     No, I don't.

 4   Q     Was there a time when you were no longer a Mattel

 5   shareholder?

 6   A     There was.

 7   Q     What time did you get -- what time were you no longer a

 8   Mattel shareholder, if you recall?

 9   A     I don't recall.

10   Q     Do you know whether or not Mattel was twice as valuable

11   in 2010 as it was in 2000?

12   A     2010?

13   Q     Yeah.

14   A     I don't know what the value of the company is right

15   now.

16   Q     You did know that by 2004, the value of the company

17   was -- to the shareholders was significantly more than it

18   was in 2000?

19              MS. KELLER:  Objection.  No foundation.

20              THE COURT:  I'm going to sustain that, Counsel.

21   You can call another witness in that regard if you'd like

22   to, I'm not precluding you, but this is -- she's already

23   answered she doesn't know.

24              MR. PRICE:  Thank you, Ms. Luther.

25              THE COURT:  All right.  Now, we are asking all of
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

42

1   the witnesses to remain on call until May 7th, but you go

2   about your business.  We know that you're needing to leave

3   the country.  I doubt that you'll be returning to the court,

4   but we do need to retain jurisdiction, and if you are

5   needed, we'll find you.

6          THE WITNESS:  I'm sure.

7          THE COURT:  Thank you very much.  You may step

8   down.

9          Counsel, will you call your next witness, please.

10         MS. KELLER:  Your Honor, I wonder if I could have

11  a five-minute break.

12         THE COURT:  That's tough, Counsel.

13         MS. KELLER:  Personal issues, your Honor.

14         THE COURT:  I'm just joking.  We can get a

15  restroom break.

16         First of all, for the record, what we were

17  referring to is the lights went out or some of them do,

18  so -- or did, and -- but we can still see and can still

19  function, so there is no reason to go home right now, okay?

20  Let's take about a 10-minute recess and then get back to

21  work.  You are admonished not to discuss this matter amongst

22  yourselves, nor form or express any opinion concerning this

23  case.

24         Counsel, 10 minutes.

25         *(Recess.)*

```
 1              THE COURT:  Okay.  We are back on the record.

 2              The jury is present.  The alternates are present,

 3     all counsel.

 4              Counsel, will you call your next witness, please.

 5              MS. KELLER:  Yes, your Honor, we would call Neil

 6     Friedman.

 7              THE COURT:  Please step forward, sir.

 8              Now, sir, would you stop at that location, please,

 9     and raise your right hand.

10          NEIL FRIEDMAN, DEFENSE WITNESS, SWORN

11              THE COURT:  Thank you, sir.  If you'd come along

12     the jury railing, please.  There is a entrance closest to

13     the wall.

14              If you'd be seated, sir.

15              And now, sir, will you state your full name for

16     the record, please?

17              THE WITNESS:  Neil Barry Friedman.

18              THE COURT:  And will you spell your last name,

19     please.

20              THE WITNESS:  F-r-i-e-d-m-a-n.

21              THE COURT:  Thank you.

22              Counsel.  This is direct examination by Ms. Keller

23     on behalf of Mattel (sic).

24

25
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

44

|   |   |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MS. KELLER: |
| 3 | Q    Good afternoon, Mr. Friedman. |
| 4 | A    Good afternoon. |
| 5 | Q    Now, we have never met before, have we? |
| 6 | A    We have not. |
| 7 | Q    In October of 2005, you became the president of Mattel |
| 8 | brands; is that correct? |
| 9 | A    That's correct. |
| 10 | Q    And earlier this year, in January, Mattel announced |
| 11 | that you would be leaving the company this month.  Are |
| 12 | you -- have you already left Mattel or will you be leaving |
| 13 | sometime later this month? |
| 14 | A    March 25th will be my last day. |
| 15 | Q    So you are currently president of Mattel brands? |
| 16 | A    No, I'm currently an executive advisor to the CEO. |
| 17 | Q    Okay.  Now, when did your status as president of Mattel |
| 18 | brands change to the current status? |
| 19 | A    January. |
| 20 | Q    And will you be remaining on as a consultant to Mattel? |
| 21 | A    Not after March 25th. |
| 22 | Q    Before you became president of Mattel brands, you were |
| 23 | president of Fisher Price? |
| 24 | A    That's correct. |
| 25 | Q    And from 1995 until '99, were you president of Tyco |

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

45

```
 1   Preschool?
 2   A    That's correct.
 3   Q    You were at Tyco when it was acquired by Mattel?
 4   A    That's correct.
 5   Q    And did you start as president of Tyco Preschool and
 6   hold that position until March of 1999?
 7   A    I did.
 8   Q    Now, you've also been associated with some other toy
 9   companies, right?
10   A    Yes.
11   Q    And before Tyco, you were in the consumer products
12   division of Universal Studios which was responsible for
13   licensing toys?
14   A    That's correct.
15   Q    When you left Universal, you'd been the president of
16   the consumer products division?
17   A    Yes.
18   Q    And you were there from June '94 to August '95?
19   A    Yes.
20   Q    Before Universal, you were at Just Toys, a small toy
21   manufacturer?
22   A    That's correct.
23   Q    And you were a senior vice president of sales,
24   marketing and operations?
25   A    That's correct.
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

46

```
 1    Q    You were at Just Toys from '91 to '93?

 2    A    No, I think it was '92 to '93.

 3    Q    Okay.  And before Just Toys, you were at Lionel

 4    Leisure?

 5    A    That's correct.

 6    Q    Was that a toy retailer?

 7    A    Yes, it was.

 8    Q    And you were the executive vice president and chief

 9    operating officer of Lionel Leisure?

10    A    That's correct.

11    Q    Before Lionel Leisure, you were at Gerber Products

12    Company in the baby care division?

13    A    I was.

14    Q    And that was December 1990 to June 1991?

15    A    December 1989.

16    Q    '89, I'm a year off on everything.

17         Before Gerber, you were at Hasbro from '82 to '89?

18    A    That's correct.

19    Q    And before Hasbro, you were at Lionel Leisure for your

20    first stint at Lionel, correct?

21    A    That's correct.

22    Q    And that was from '72 to '82?

23    A    That's correct.

24    Q    Now, with respect to Mattel, you are the second -- you

25    were, as president, the second highest-paid officer at
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

47

```
 1   Mattel after Mr. Eckert?

 2   A     Yes.

 3   Q     And your compensation over the years varied between

 4   something like -- total compensation varied between, say,

 5   3 million and 11 million, roughly?

 6   A     Yes.

 7   Q     You were brought over in 2006 from Fisher Price to help

 8   Mattel revitalize the sales of Barbie; is that right?

 9   A     Yes.

10   Q     And when you were the head of Fisher Price, you were

11   generally aware from NPD reports of how Barbie was doing; is

12   that true?

13   A     Yes, generally.

14   Q     You understood that Barbie sales were declining?

15   A     Yes.

16   Q     And you understood that the main reason at the time was

17   that Barbie -- the consumers just weren't excited about

18   Barbie anymore, in short; is that true?

19   A     I think that's partly true, yes.

20   Q     When you took over as president of Mattel brands in

21   October of '95, was it '95 -- I'm sorry, 2005?

22   A     Correct.

23   Q     You believe there was no excitement in Barbie that you

24   saw, right?

25   A     It needed more excitement, yes.
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

48

```
1   Q    There was no wow in the brand?
2   A    That's correct.
3   Q    And there were -- were you quoted in the press at the
4   time as saying as much?
5   A    I believe so.
6   Q    And what you meant by there was no wow was that if you
7   looked at a Barbie doll, it should be beautiful, it should
8   have great fashion, it should have great hair play, right?
9   A    Absolutely.
10  Q    That's a wow?
11  A    That's a wow.
12  Q    And that was what was missing, true?
13  A    I believe so, yes.
14  Q    And is hair play one of the main play values of a
15  fashion doll?
16  A    Yes, it is.
17  Q    Little girls really like to arrange the hair of the
18  doll?
19  A    Yes, they do.
20  Q    And to improve that, that hair play, you have to make
21  sure the dolls have enough hair to play with to begin with,
22  true?
23  A    True.
24  Q    And then when you took over the Mattel brands, when you
25  took over at Mattel brands in October of 2005, did you start
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

49

```
 1   to take steps to see if you could improve upon those things,

 2   like the hair play?

 3   A    Yes, we did.

 4   Q    And fashions, see if you could improve the fashions?

 5   A    Yes.

 6   Q    You put the right people in place to do that?

 7   A    I did.

 8   Q    And was the result that there was a greater degree of

 9   or improved hair play for the Barbie dolls after you got

10   there?

11   A    I believe so.

12   Q    And they tried to make her prettier too, right?

13   A    Yes.

14   Q    And that would be fixing the makeup, the overall look

15   of the doll, facial features?

16   A    Correct.

17   Q    And to improve the fashion, you wanted to make it more

18   trendy, give it some bling?

19   A    Yes.

20   Q    And use better quality fabrics?

21   A    Yes.

22   Q    And when you took over as head of Mattel brands in

23   2005, is it fair to say that rather than taking steps to

24   counter the competition from Bratz, you were more concerned

25   with improving your own product, the Barbie product and try
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

50

1    to make the line great?

2    A    That's correct.

3    Q    You thought if you made it into a great line again, it

4    would actually sell?

5    A    That's correct.

6    Q    And the competition with Bratz would take care of

7    itself, if your product was good enough?

8    A    I think that I was concerned -- I focused on my product

9    line, and if I make great product or my people make great

10   product, it will sell, and I don't worry about anything

11   else.

12   Q    Okay.  That sounds like a John Wooden philosophy.

13        I want to talk to you a little bit about Mattel's

14   policy on inventors while you were there.

15        Now, is it true that one of Mattel's, is it a division,

16   Tyco, or what do you call it, a subsidiary?

17   A    Well, we have Fisher Price and then we have Mattel

18   brands.  Tyco is really just the RC brand.

19   Q    Okay.  And one of Tyco's profitable toy lines was based

20   on the Elmo character from Sesame Street?

21   A    That was Tyco Preschool, yes.

22   Q    Now, the Elmo character had become a profitable toy

23   line under your leadership, true?

24   A    It was a Sesame Street line, true.

25   Q    Okay.  But the character Elmo from Sesame Street was

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

51

1   licensed to Mattel?

2   A    That's correct, with -- with Sesame Street.  It was all

3   part of the Sesame Street Muppets.

4   Q    And Tickle Me Elmo became a very popular toy under your

5   leadership, true?

6   A    True.

7   Q    Now, the idea for it had existed before -- the idea for

8   Tickle Me Elmo had existed before you joined Tyco, right?

9   A    Correct.

10  Q    And 80 percent of the work on creating Tickle Me Elmo

11  was done before you joined Tyco?

12  A    Correct.

13  Q    But you were largely credited for the success of the

14  Elmo brand, right?

15  A    In the press, yes.  I always said that it was a team

16  effort, but I was the spokesperson.

17  Q    Okay.  But in the press, you were the person who was

18  prominently named every time the Tickle Me Elmo brand was

19  mentioned, right?

20  A    Correct.

21  Q    And you -- you -- your involvement in Tickle Me Elmo

22  had been -- you wanted the company to do what's called a try

23  me package?

24  A    Correct.

25  Q    And what's that?

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

52

```
1    A    That's when you have an open package and you can

2    actually try the toy to see the actions.

3    Q    Okay.  And you also managed all the public relations

4    for the toy?

5    A    I -- I didn't manage it, but I did all of the

6    interviews.

7    Q    Okay.  You were the public face?

8    A    Yes, I was.

9    Q    And you got Tyco to approve a TV commercial that you

10   wanted to run on the item, right?

11   A    That's correct.

12   Q    And you were very involved in developing that

13   commercial?

14   A    I was.

15   Q    And in approving that commercial?

16   A    I was.

17   Q    If we could -- if I could just show you, just for your

18   own memory refreshment, since we haven't met or talked --

19   A    Yes.

20   Q    -- Exhibit 7921.

21   A    Yes.

22   Q    And do you recognize this article?

23   A    I do.

24   Q    And you were interviewed for an article in Success

25   magazine holding up a Tickle Me Elmo?
```

1    A    Actually an Elmo Live.

2    Q    Elmo Live, okay.

3         And did the article credit you with pioneering the

4    fusion of technology in toys, revitalizing the Barbie brand

5    and ushering in the Elmo effect?

6    A    They did.

7    Q    And did it credit you also with taking a trend a step

8    further by creating technologically-enhanced toys that not

9    only entertain but educate?

10   A    Yes.

11   Q    And was Tickle Me Elmo in that category?

12   A    Yes.

13   Q    Now, you just said that Tickle Me Elmo was a team

14   effort, right?

15   A    I did.

16   Q    A combination of people invented it?

17   A    Yes.

18   Q    You had a couple of inventors and the design department

19   at Tyco Preschool involved in it?

20   A    Correct.

21   Q    Now, during the interview for the article, though, you

22   didn't tell the writer who the inventors of Tickle Me Elmo

23   were, true?

24   A    True.

25   Q    And that's because you don't usually -- as a toy

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

54

1   company executive, you just don't usually talk about the

2   inventors, true?

3   A    Not unless they give us a okay to use their name in an

4   interview.

5   Q    Well, and you actually don't want the names of the

6   inventors to get out because you don't want them to be, A,

7   hired away from the company, true?

8   A    Well, most of the inventors we use are professional --

9   a professional group, and they work for lots of toy

10  companies.

11  Q    Well, but isn't it also true that you want the toy to

12  be associated with your brand?

13  A    The toy, yes.

14  Q    So you wanted the Tickle Me Elmo to be associated with

15  Tyco, right?

16  A    Correct.

17  Q    And you wanted to be the public face and spokesperson

18  for the toy to kind of cement that so that it's identified

19  with Tyco toys, right?

20  A    Correct.

21  Q    Not with an individual inventor, correct?

22  A    Yes and no.  We don't usually do inventors when we do

23  interviews because they generally don't ask us.  However, we

24  have done interviews with the -- Ron Dubren, who was the

25  inventor of Tickle Me Elmo, one of the two.

Case 2:04-cv-09049-DOC-RNB   Document 10193   Filed 03/15/11   Page 55 of 70   Page ID #:308878
CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

55

1    Q    I'm going to get to that in a minute.  But in fact, you

2    personally never identify the names of inventors, correct?

3    A    Correct.

4    Q    And it's Mattel's policy not to identify the inventor

5    of a product in articles, true?

6    A    Not without their permission, true.

7    Q    Well, Mattel wants to keep the identity of the

8    inventors confidential, true?

9    A    It's fair to say.

10   Q    And permission or no permission, it's Mattel's policy

11   not to identify the inventor of a product in articles,

12   correct?

13   A    Not without their permission, correct.

14   Q    And you essentially don't believe that identifying the

15   inventors is even a pertinent thing to do in an interview,

16   true?

17   A    We are usually talking about the toy, so it's not

18   pertinent, correct.

19   Q    And Mattel keeps the identity of the inventors

20   confidential, true?

21   A    In interviews, generally true.

22   Q    And in fact, the reason that you don't talk about the

23   inventors when you are being interviewed for articles is

24   because you keep that information confidential, right?

25   A    In interviews, yes.

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

56

```
1    Q    Now, throughout your almost 40-year career with various
2    toy companies, you typically did not disclose the names of
3    inventors of a toy when being interviewed about a product,
4    right?
5    A    Correct.
6    Q    And let's have you also look at Exhibit 36024.  This is
7    another article entitled "Neil Friedman, a Career Honor."
8         And in this article, were you also credited with the
9    huge success of this original Elmo toy, Tickle Me Elmo?
10   A    Yes.
11   Q    And there was no mention in the article of the inventor
12   of that toy, right?
13   A    Correct.
14   Q    And likewise, you had a biography in the Wall Street
15   Journal, if we can show you Exhibit 36005?
16   A    Okay.
17   Q    And if you look at the second paragraph, you're also
18   credited with the huge success of Tickle Me Elmo and Sing
19   and Snore Ernie, the two big hits of the season in 1996 and
20   1997, respectively; is that right?
21   A    That's correct.
22   Q    And again, no mention anywhere of the inventor of the
23   toy, true?
24   A    True.
25   Q    And if you could take a look at Exhibit 36004-2, an
```

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

57

```
1    article in Business Week.

2    A    Which -- which -- what was the number on that again?

3    Q    3944283.

4    A    283?  Okay.

5    Q    I'm sorry, I'm sorry, I've got the wrong one.  It's

6    36004-2.

7    A    This one?

8         Okay.  Yes.

9    Q    And in that article, Elmo was described as your baby,

10   right?

11   A    Yes.

12   Q    And in one of these articles, in the very last

13   paragraph, there is a designer who's mentioned, right, and

14   that happens to be your wife?

15   A    Correct.

16   Q    But that's the only mention of an inventor in any of

17   these articles about the Elmo, true?

18   A    In -- in these articles, yes.

19   Q    And -- okay.  Your interviews, true?

20   A    In my interviews, yes, that's correct.

21   Q    Now, over the course of your career in the toy

22   industry, you've also been involved in negotiating with

23   inventors over their inventions?

24   A    Yes.

25   Q    And you negotiate licensing deals with the toy
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

58

1    inventors, right?

2    A    Correct.

3    Q    You've probably been involved in those negotiations

4    many, many times?

5    A    Yes.

6    Q    Over 20?

7    A    Probably.

8    Q    And you were involved in negotiating with toy inventors

9    while you were at Mattel, true?

10   A    No, I was at Hasbro, is where I did most of my toy

11   negotiations.

12   Q    Did you also do some, though, at Mattel?

13   A    Maybe one or two.  I have an inventing group that

14   usually does that.

15   Q    Well, of the previous companies you worked at, you said

16   Hasbro was the one where you had the most experience

17   negotiating with inventors?

18   A    Correct.

19   Q    And when you license a product from an inventor, you

20   typically get what are called reps and warranties, right?

21   A    Correct.

22   Q    Just representations and warranties that they were

23   actually the inventor, true?

24   A    That's correct.

25   Q    And you get an agreement with them to that effect?

1   A   That's correct.

2   Q   And they in essence tell you, this is my idea and it's

3   not somebody else's, it belongs to me, and therefore, I can

4   sell it to you, true?

5   A   True.

6   Q   And you typically rely on that representation in moving

7   forward with the license, right?

8   A   True.

9   Q   And if the person tells you they have a copyright or a

10  patent, you check that out also, right?

11  A   That's correct.

12  Q   And that would -- that would be due diligence that you

13  would do if they say they have a patent or a copyright,

14  true?

15  A   That's true.

16  Q   But other than that, there is nothing else that you do,

17  to your knowledge, to make sure the person created what they

18  say they created, correct?

19  A   That's correct, but we do deal with professional

20  inventors, and they are a very small group of people that we

21  deal with on a general basis, and we've dealt with them for

22  a long time.

23  Q   And at Mattel, you said you've only done these a couple

24  times?

25  A   Yes.

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

60

```
 1    Q    And you deal with a lot of different inventor houses,
 2    though, right?
 3    A    Yes, we do.
 4    Q    And in fact, you deal with a big inventor house in
 5    Chicago, true?
 6    A    Correct.
 7    Q    And you don't know who all their inventors are, you
 8    just know you deal with the inventor house, true?
 9    A    That's true.
10    Q    So you're trusting the inventor house to have done some
11    due diligence as well as your getting reps and warranties,
12    correct?
13    A    That's correct.
14    Q    So when you, for example, have an inventor at an
15    inventor house who comes up with a toy, you, from the
16    inventor house, gets reps and warranties, right?
17    A    Yes.
18    Q    And that's it, that's all you do, unless you find out
19    there's a copyright or a patent, correct?
20    A    Correct.
21    Q    And the only time that you can remember where you
22    conducted any kind of investigation to determine if someone
23    created something they said they created, was in two
24    instances where somebody else came forward and said they had
25    invented the product, right?
```

1    A    That's correct.

2    Q    Those instances were both at Fisher Price?

3    A    Yes, they were.

4    Q    So during your tenure at all of the companies that we

5    talked about earlier, I don't want to run through them all

6    again, but a lot of toy companies, it was only twice in your

7    career at all those companies combined that you did anything

8    more than get reps and warranties from inventors, right,

9    before licensing a product?

10   A    Correct.

11   Q    And the two instances were the ones we just talked

12   about?

13   A    That's correct.

14   Q    I want to turn your attention for a minute to the

15   subject of toy fair showrooms.

16        There are toy fairs every year that people in the toy

17   industry attend, right?

18   A    Correct.

19   Q    There's a New York toy fair in February?

20   A    Yes.

21   Q    Hong Kong toy fair in January?

22   A    Yes.

23   Q    So a lot of frequent flier miles picked up in those two

24   months?

25   A    Absolutely.

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

62

```
 1   Q    And is it true that not just toy manufacturers attend

 2   those but also toy retailers?

 3   A    That's correct.

 4   Q    And toy manufacturers --

 5   A    Wow.

 6          MS. KELLER:  Hope the air comes on.

 7          (Laughter.)

 8   BY MS. KELLER:

 9   Q    Toy manufacturers like Fisher Price and Mattel have

10   private showrooms at those toy fairs, correct?

11   A    That's correct.

12   Q    And in the private showrooms, they will show their

13   upcoming products to people they invite to see them?

14   A    That's correct.

15   Q    Those might include retailers or licensees, correct?

16   A    That's correct.

17   Q    And they don't show all of their products, just a

18   select group of products, right?

19   A    That's correct, usually new.

20   Q    Yeah, something -- something new that you might want

21   retailers to get excited about, for example?

22   A    Yes.

23   Q    And typically, if you're finding out about competitors'

24   products at toy fairs, it's usually in ads that they take

25   out, isn't it?
```

1    A    That's correct.

2    Q    And that would be trade magazines, toy fair

3    publications, big signs out in the atrium when you walk in?

4    A    Yeah, and the press.

5    Q    And the press, if somebody has chosen to publicize a

6    particular toy, right?

7    A    That's correct.

8    Q    But those are -- those groups that we are talking

9    about, those are advertisements that are intended to be seen

10   by everybody, correct?

11   A    Correct.

12   Q    But in addition, Mattel and other toy companies also

13   create ads or promotional materials that are intended to be

14   seen only by the invitees to the private showrooms, right?

15   A    Right.

16   Q    And is that fairly typical of all the toy fairs?

17   A    I would say so, yes.

18   Q    And so, for example, you'll create a promotional --

19   promotional materials that you'll give to a customer, say

20   Walmart or something like that, but not to competitors?

21   A    Correct.

22   Q    And it's distributed to a limited group, right?

23   A    Right.

24   Q    And Mattel employees might see products made by

25   friendly competitive companies with the permission of those

1    companies, right?

2    A    That's correct.

3    Q    Say Fisher Price, for example, in 2003, Fisher Price

4    might typically announce to retailers their product line in

5    October of -- well, say in October of 2002, Fisher Price

6    might announce their 2003 line to a limited group of

7    retailers, correct?

8    A    That's correct.

9    Q    And you would want to see how that limited audience

10   reacted to the product?

11   A    That's correct.

12   Q    See if they were excited about it?

13   A    Yes.

14   Q    But you wouldn't be disclosing that information to the

15   general retail class, right?

16   A    Correct.

17   Q    Or to consumers?

18   A    Correct.

19   Q    Because at that point, you are still keeping your

20   product line under wraps for the upcoming year?

21   A    That's correct.

22   Q    And when you were president of Fisher Price in 2003,

23   Fisher Price had private showrooms at the Hong Kong toy

24   fair, true?

25   A    In 2003, we shared with -- I'm trying to think -- I'm

```
 1    not sure if we shared with Mattel or not, but yes, we did

 2    have private showrooms, in any event.

 3    Q    And same thing, you disclosed some of your products to

 4    a limited audience in those private showrooms, correct?

 5    A    Correct.

 6    Q    And the only way competitors would be invited into

 7    those private showrooms is if they were licensees, right?

 8    A    Or friendly competitors.  Occasionally we would have

 9    some friendly competitors come in that didn't -- that

10    weren't really competing directly on our products --

11    Q    Or if you licensed a product --

12    A    Yes, if we licensed --

13              (Interruption in the proceedings.)

14    Q    So if Fisher Price gave XYZ company the right to make a

15    toy of Fisher Price's, then they can also be invited into

16    the showroom?

17    A    That's correct.

18    Q    But if they weren't in that category, they wouldn't --

19    one of those categories we mentioned, they wouldn't

20    generally be invited into the private showroom, right?

21    A    That's right.

22    Q    And these private showrooms where information is

23    provided to this limited audience, they are kept pretty

24    secured, aren't they?

25    A    Yes, they are.
```

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

66

```
 1   Q    And that is to prevent competitors from getting access
 2   to your product lines and your pricing, true?
 3   A    Yes.
 4   Q    And the competitors are not supposed to be trying to
 5   obtain that information under, for example, an assumed
 6   identity, right?
 7   A    That's correct.
 8   Q    And it would have been improper for either Mattel or
 9   MGA to try to get that kind of information without
10   permission of the other company, right?
11   A    That's correct.
12   Q    And it would be improper to ask retailers, let's say
13   MGA had a private showroom and invited a select group of
14   retailers in to see the products in the private showroom, it
15   would have been improper for Mattel to try to get the
16   information out of those retailers as to what they saw,
17   right?
18   A    That's correct.
19   Q    And in your view, it would be improper, would it not,
20   for somebody from Mattel to gain access to MGA's private
21   showroom without MGA's permission?
22   A    Yes.
23   Q    And you are not aware of anybody ever having done that,
24   right?
25   A    Since this case, yes.
```

1   Q    Okay.  Before you learned of -- of some of that in this

2   case, you had never been aware of anybody at Mattel doing

3   that, right?

4   A    Right.

5   Q    Nobody at Mattel ever came up to you and reported, for

6   example, that they had gained some information from being at

7   an MGA private showroom?

8   A    That's correct.

9   Q    Have you ever heard anybody at Mattel ever being

10  disciplined for having obtained competitive information from

11  a private showroom without the permission of a manufacturer?

12  A    I have now.

13  Q    I'm sorry?

14  A    I have now, yes.

15  Q    And who was that?

16  A    It was Jerry Pilgrim, Michael Shore and Carey Plunkett,

17  they were either verbally or written reprimanded.

18  Q    When was that?

19  A    It would have been in 2000 -- I want to say 2003 or '4,

20  I'm not sure of the exact date.  I can't really -- I don't

21  know the date exactly.

22  Q    Jerry Pilgrim, Carey Plunkett and who?

23  A    Michael Shore.  And I am not sure of the exact date.

24  Q    As of your deposition last year, you hadn't heard of

25  it, right?

CV 04-9049-DOC - 03/11/2011 - Day 32, Vol. 3 of 4

68

1    A    I had not.

2    Q    And at the time, you had never even heard of anybody

3    being reprimanded at Mattel for obtaining information from a

4    competitor's private showroom, right?

5    A    That's correct.

6    Q    And if you had been told that that had taken place, as

7    head of Mattel brands, a reprimand surely would have been in

8    order, right?

9    A    Absolutely.  It's unacceptable.

10   Q    You were familiar, weren't you, with a group at Mattel

11   called Market Intelligence?

12   A    Yes.

13   Q    And that group was headed by a Mattel employee named

14   Sal Villasenor?

15   A    That's what I understand, yes.

16   Q    And you now know, don't you, that Sal Villasenor was

17   using fake business cards to sneak into competitors' private

18   showrooms, misrepresenting his identity and posing as a

19   retailer?

20   A    I didn't know that, but I knew that he was

21   misrepresenting himself, yes.

22   Q    Didn't you know that he was manufacturing essentially

23   fake identities for himself and the other people working

24   with him?

25   A    No, I didn't.

CV 04-9049-DOC – 03/11/2011 – Day 32, Vol. 3 of 4

69

1    Q     When you say you learned about the -- when you say you

2    learned about this disciplinary action that was taken, when

3    was it that you learned of it and from whom?

4    A     When I saw the -- the information in -- in the

5    documents that I was shown.

6    Q     At your deposition?

7    A     At the deposition.  There was a document that -- that

8    actually wasn't at the deposition, it was -- it was after

9    that.  When I saw that document, I -- I investigated and

10   found out that these three people were reprimanded, and also

11   this gentleman, Sal, had left on a stress claim about two

12   months after I got there, and -- and so that's what I found

13   out.

14   Q     Did -- when you say you inquired, what did you do to

15   find out exactly what they had done?

16   A     Well, I -- I -- there was a claim in there about

17   improprieties, and I wanted to find out what went on, and I

18   found out that they had entered these showrooms improperly,

19   and that -- that these three people had been reprimanded and

20   that Sal obviously had left.

21              *(Live reporter switch with Sharon Seffens.)*

22                          -oOo-

23

24

25

1                            -oOo-

2                         **CERTIFICATE**

3

4           I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 12, 2011

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25