1

<pre>
 1

 2

 3

 4                 UNITED STATES DISTRICT COURT

 5               CENTRAL DISTRICT OF CALIFORNIA

 6                      SOUTHERN DIVISION

 7                          - - -

 8      THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

 9
         MATTEL, INC., et al.,
10                    Plaintiffs,
           vs.
11
                                    CV-04-9049-DOC
12       MGA ENTERTAINMENT, INC.,   DAY 32
         et al.,                    Volume 4 of 4
13                    Defendants.

14      ---------------------------

15

16

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                 Santa Ana, California

19               Friday, March 11, 2011

20

21                      SHARON A. SEFFENS, RPR
22                      United States Courthouse
                        411 West 4th Street, Suite 1-1053
23                      Santa Ana, CA  92701
                        (714) 543-0870
24

25
</pre>

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
5    865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
6    (213) 443-3000

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
9    4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14
     KELLER RACKAUCKAS LLP
15   JENNIFER L. KELLER
     18500 Von Karman Avenue, Suite 560
16   Irvine, CA
     (949) 476-8700
17

18   FOR CARLOS GUSTAVO MACHADO GOMEZ:

19   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
20   Santa Monica, CA  90401
     (310) 459-2830
21

22   ALEXANDER COTE
     SCHEPER KIM AND HARRIS LLP
23   601 West Fifth Street, 12th Floor
     Los Angeles, CA  90071-2025
24   (213) 613-4655

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

3

1    ALSO PRESENT:

2    MGA ENTERTAINMENT, INC.
     JEANINE PISONI
3    16360 Roscoe Boulevard, Suite 105
     Van Nuys, CA  91406
4

5    ALSO PRESENT:

6    ISAAC LARIAN, MGA CEO

7    KEN KOTARSKI, Mattel Technical Operator

8    MIKE STOVALL, MGA Technical Operator

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2                              INDEX

3                                                    PAGE

4    PLAINTIFF'S
     WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS
5

6     (None)

7
     PLAINTIFF'S
8    EXHIBITS:                      MARKED            RECEIVED

9    Exhibit 9484                                       18

10

11   DEFENSE
     WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS
12
     Neil Friedman
13     (Continued)        5(K)      15(Q)

14   DEFENSE
     EXHIBITS:                      MARKED            RECEIVED
15
     Exhibit 36027                                      8
16   Exhibit 24322                                      10

17

18

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   SANTA ANA, CALIFORNIA; FRIDAY, MARCH 11, 2011; 4:00 P.M.
 2            (Jury present.)
 3         NEIL FRIEDMAN, DEFENSE WITNESS, PREVIOUSLY SWORN
 4                 DIRECT EXAMINATION (Continued)
 5   BY MS. KELLER:
 6   Q    Did you ask to see all documentation about it?
 7   A    I did not.
 8   Q    Did you ask to see a letter from Mr. Villasenor
 9   describing what he had done?
10   A    I saw the letter from Mr. Villasenor that said that he
11   had -- that he was leaving because he was stressed.  I am
12   not sure of all the exact wording of it.
13   Q    I'm talking about what he did to seek into the
14   showrooms.
15   A    No, I did not see that letter.
16   Q    Did you ask Mattel's attorneys as President of Mattel
17   Brands to --
18            MR. QUINN:  What he did or didn't ask Mattel's
19   attorneys --
20            THE COURT:  That's privileged.
21   BY MS. KELLER:
22   Q    Did you ask any of the in-house counsel at Mattel or
23   any of Mattel's outside attorneys to share with you all the
24   documents that dealt with that matter?
25            MR. QUINN:  Same objection.
```

```
 1                  THE COURT:  That's sustained.
 2     BY MS. KELLER:
 3     Q     Did you request documents?
 4     A     I did not.
 5     Q     Did you request to see copies of testimony at
 6     depositions or trials?
 7     A     I did not.
 8     Q     Did you interview people?
 9     A     I did not.
10     Q     Did you ask Mattel security -- do you know who Richard
11     de Anda is?
12     A     I do.
13     Q     Did you ask Richard de Anda to interview them and
14     report back to you?
15     A     I did not.
16     Q     Did you ask Mr. de Anda to investigate it at all?
17     A     I did not.
18     Q     Michael Shore, one of the three people that you named,
19     he is not actually the Head of Research at Mattel isn't he?
20     A     Yes.
21     Q     So he was promoted into a rather prestigious position
22     at Mattel after you had learned that he was sneaking into
23     competitive showrooms, right?
24     A     He was actually promoted before.
25     Q     Is he still there?
```

1    A    Yes.

2    Q    Still the Head of Research?

3    A    Yes.

4    Q    What you learned was that they were printing up phony

5    business cards, creating phony identities, using phony

6    telephones and phony business addresses to sneak into the

7    showrooms, right?

8    A    I didn't have all that detail, but I will accept that

9    that's what happened.

10    Q    Well, if you didn't have the detail, Mr. Friedman, is

11    it because you didn't ask for it?

12    A    Correct.

13    Q    And Mr. Shore was promoted after the reprimand, right?

14    A    Correct.

15    Q    Now, you have met with Sal Villasenor yourself to

16    discuss marketing intelligence?

17    A    I am not sure I did.

18    Q    Did you meet with him right after you became President

19    of Mattel Brands in October 2005?

20    A    I am not sure that meeting actually took place because

21    there were some irregularities in the calendars between his

22    and mine.

23    Q    When you say I am not sure of that meeting, it sounds

24    like you are talking about Exhibit 36027.  This says,

25    "Updated Marketing Intelligence Update With Sal Villasenor

1    Brand Profit-Sharing."  This is an appointment sheet?

2    A    This is his appointment sheet, yes.

3              MR. QUINN:  Lacks foundation, Your Honor.

4              MS. KELLER:  As President of Mattel Brands, Your

5    Honor.

6              MR. QUINN:  It's one calendar.  It's one employee.

7              THE COURT:  Are you familiar with this?

8              THE WITNESS:  I saw it yesterday.

9              THE COURT:  Who showed it to you?

10             THE WITNESS:  My attorney.

11             THE COURT:  Overruled.

12             MS. KELLER:  Your Honor, I would move 36027 into

13   evidence.

14             THE COURT:  I will take it subject to a motion to

15   strike.

16             (Exhibit 36027 received.)

17   BY MS. KELLER:

18   Q    When you say you were shown this yesterday, was that

19   during your preparation for your testimony today?

20   A    Yes.

21   Q    And you are being represented by Mattel's lawyers?

22   A    Yes.

23   Q    This shows an October 31, 2005, meeting between you and

24   Sal Villasenor, and at the bottom, "As per your discussion

25   with Sal, this meeting has been set up."

1        You understand that "your discussion" refers to you?

2    A    No, I don't.

3    Q    Are there any other people listed on this other than

4    you and Mr. Villasenor?

5    A    It looks like his note, not mine.

6    Q    As per your discussion with Sal, do you think he is

7    referring to himself as Sal?

8    A    I don't know whose discussion it was, but it wasn't

9    with me.

10   Q    Under "Meeting Status," it says "Accepted"?

11   A    It says that.

12   Q    And lists required attendees:  Friedman, Neil, and

13   Villasenor, Sal?

14   A    Correct.

15   Q    Now, when you say that there appears to be a

16   discrepancy in calendars between yours and his, let's look

17   at Exhibit 24322.  I take it you were shown this calendar

18   also during your preparation.

19            MR. QUINN:  Objection.  This question is about

20   what he was shown.

21            THE COURT:  Sustained.

22   BY MS. KELLER:

23   Q    I take it during your preparation you saw this

24   calendar.

25            MR. QUINN:  Same objection.

```
 1              THE COURT:  Are you familiar with this, sir?

 2              THE WITNESS:  Yes.  This is my calendar.

 3  BY MS. KELLER:

 4  Q    But is this a document you reviewed during your

 5  preparation for testimony today?

 6              MR. QUINN:  Objection as to what he saw with

 7  lawyers.

 8              MS. KELLER:  Any witness can be asked about any

 9  document he reviewed.

10              THE COURT:  Overruled.

11              MR. QUINN:  Refresh his recollection, Your Honor.

12              THE COURT:  Overruled.

13              THE WITNESS:  This is my calendar.

14  BY MS. KELLER:

15  Q    That's 24322?

16  A    Correct.

17  Q    And we see on October 31, 2005 --

18              MS. KELLER:  Your Honor, I would move 24322 into

19  evidence.

20              THE COURT:  Received.

21              (Exhibit 24322 received.)

22  BY MS. KELLER:

23  Q    Looking at page 15 of your calendar, we see on Monday,

24  October 31, 2005, an entry.  If we look under Eastern, it

25  says 6:00, and under Pacific it says 3:00.  It says,
```

```
 1   "Marketing Intelligence Update With Sal Villasenor, Brand
 2   Conference Room"?
 3   A    That's correct.  It says 3:00.
 4   Q    This is your own calendar, right?
 5   A    That's correct.
 6   Q    And then if we look at -- you also see a Mattel Bates
 7   stamp at the bottom?  Do you see an "M" for Mattel?
 8   A    Yes.
 9   Q    Now, let's also look at Exhibit 36027.
10        Does this appear also to be a calendar with the words
11   "Sal Villasenor" at the bottom left?
12   A    It appears to be, yes.
13            MS. KELLER:  I would move 36027 into evidence.
14            THE COURT:  Received.
15   BY MS. KELLER:
16   Q    This also is for Monday, October 31, 2005?
17   A    Yes.
18   Q    And under 2:00, we see, "Updated Marketing Intelligence
19   Update With Sal Villasenor, Brands Conference Room."
20        Now this calendar says "Updated," and your calendar
21   says, "Marketing Intelligence Update With Sal Villasenor,"
22   but it doesn't have "Updated" in front of it, right?
23   A    That's correct.
24   Q    "Updated" on this program means that the date has been
25   changed, right -- the time has been changed?
```

1    A    I don't know.

2    Q    Do you know what program this is for this calendar?

3    A    My assistant does it.  I don't do the calendar.

4    Q    You don't make any entries yourself?

5    A    Very few.

6    Q    Do you have any reason to believe that where this says

7    "Updated" that that's not referring to a change of the time

8    from 3:00 to 2:00?

9    A    I can't answer that.  I don't know.

10    Q    As President of Mattel Brands in October 2005, you were

11    ultimately responsible for the marketing groups at Mattel?

12    A    That's correct.

13    Q    Am I right that you are not aware of Mr. Villasenor

14    ever been reprimanded for his misconduct?

15    A    That's correct.

16    Q    Mr. Villasenor was given a pretty lucrative severance

17    package by Mattel when he left as long as he agreed not to

18    discuss his activities outside of Mattel, true?

19    A    I believe that's correct.

20         THE COURT:  "I believe" has no meaning to the

21    jury.  Answer the question.

22         THE WITNESS:  Yes.

23    BY MS. KELLER:

24    Q    The question again, Mr. Villasenor was given a

25    lucrative severance package when he left Mattel so long as

1   he agreed that he wouldn't talk about his Mattel activities

2   except with Mattel, right?

3   A    I don't know the exact wording.

4   Q    But that was the gist of it?

5   A    I believe so -- yes.

6   Q    You still think it would be improper to sneak into a

7   competitor's private showroom to get a competitor's

8   information?

9   A    Absolutely.

10  Q    The fact that this all happened under your watch and

11  you took no steps to investigate it yourself --

12  A    I don't believe it happened under my watch.

13           MR. QUINN:  Objection.  Assumes facts.

14           THE COURT:  Sustained.  Just reask that and

15  establish the foundation.

16  BY MS. KELLER:

17  Q    Didn't you find out that in fact this had been

18  happening on an annual basis?

19  A    No.

20  Q    You didn't think that this was a one-time event did

21  you?

22  A    I don't know.

23  Q    Didn't you know that Mr. Villasenor was doing this on a

24  regular basis and reporting back to large numbers of Mattel

25  employees about what he had found?

```
 1   A    I showed up in Mattel Brands in October 2005.  He left
 2   in December of 2005.  There was no Toy Fair.
 3   Q    Didn't Mr. Villasenor's reports also cover infant and
 4   preschool brands?
 5   A    Not to my knowledge.
 6   Q    Did you check to see?
 7   A    I did not.
 8   Q    So you really don't know very much at all about what
 9   Mr. Villasenor and his colleagues were up to because you
10   didn't undertake steps to find out, right?
11   A    He was gone two months after I got there.
12   Q    But the other people remained, right?
13   A    Correct.
14   Q    Including the one who is now the Head of Research at
15   Mattel, right?
16   A    Right.
17   Q    Who was one of the people who you didn't investigate,
18   true?  In other words, you didn't have Mr. de Anda
19   investigate him?  You didn't ask to see any documents?  You
20   didn't ask to see any deposition testimony, nothing?  True?
21   A    Correct.
22   Q    What happened under your watch was that Mr. Villasenor
23   came forward and admitted what he had done?
24   A    Correct.
25   Q    And was never reprimanded, right?
```

1    A    He left on a stress claim.

2    Q    And he got a lucrative severance package?

3    A    Correct.

4    Q    As long as he didn't discuss what he had done with

5    anybody?

6    A    Correct.

7         MS. KELLER:  Nothing further.

8

9         THE COURT:  Cross-examination by Mr. Quinn.

10                    CROSS-EXAMINATION

11   BY MR. QUINN:

12   Q    Good afternoon, Mr. Friedman.

13   A    Good afternoon, Mr. Quinn.

14   Q    You indicated that you became President of Mattel

15   Brands I think you said in October of 2005; is that correct?

16   A    Correct.

17   Q    And before that, where had you one been?

18   A    At Fisher-Price.

19   Q    Where was that located?

20   A    The Buffalo, New York, store in New York City.

21   Q    So you moved out here to Southern California when you

22   became President of Mattel Brands?

23   A    Correct.

24   Q    Were your first few weeks on the job in El Segundo

25   pretty busy?

1    A    They were.  I was trying to get up to date on all the

2    businesses.  We also had line reviews and customer previews.

3    Q    If we could take a look at 24322, which is in evidence

4    which I think you have told us is your calendar, and it

5    begins on the first page.

6             MR. QUINN:  If we could look at page -1, Ken.

7    BY MR. QUINN:

8    Q    This is October 17.  Is that the date you started in

9    El Segundo?

10   A    It was the first full week that I was in El Segundo,

11   yes.

12   Q    As we page through these, it kind of looks like you had

13   appointments scheduled pretty much every day all day.

14   A    That's correct.

15   Q    You were getting to know the different people here at

16   Mattel Toys in El Segundo?

17   A    That's correct.

18   Q    Then counsel called your attention to an entry where

19   there was an appointment scheduled with Sal Villasenor.

20   That's on page -- it's -15 I think.

21   A    Correct.

22   Q    If we could look at that.  It's 3:00 on your calendar,

23   and we looked at Mr. Villasenor's calendar, Exhibit 36027,

24   and he had it down at 2:00 p.m.?

25   A    That's correct.

1  Q    Do you have any explanation for why he had an

2  appointment with you at 2:00 and you had an appointment down

3  at 3:00?

4  A    I do not.

5  Q    So whatever happened, whether it was updated or not, do

6  you have any recollection of having met with Mr. Villasenor?

7  A    I do not.

8  Q    You indicated that you learned after your deposition

9  was taken that Mr. Villasenor had been involved in some

10 activities that you do not approve of.

11 A    That's correct.

12 Q    And Mr. Villasenor was there how much longer in

13 El Segundo after you got there?

14 A    He left at the end of December.

15 Q    You indicated that he left on a stress claim.

16 A    Correct.

17 Q    What did you mean by that?

18 A    He left employment and claimed that he was leaving

19 because of stress.

20 Q    Did he hire a lawyer?

21 A    He did.

22 Q    Did he bring assert some claims against Mattel?

23 A    He did.

24 Q    I don't mean filing a lawsuit, but he basically said I

25 have some claims against the company?

1    A    That's correct.

2    Q    If you take a look at Exhibit 9484, do you see that?

3    A    I do.

4    Q    Does that appear to be a copy of a letter dated

5    December 22, 2005, written by Mr. Villasenor to "Mattel,

6    Inc., Attention:  Vice-President, Law Division"?

7    A    Yes.

8             MR. QUINN:  We would offer this in evidence, Your

9    Honor.

10            THE COURT:  Received.

11            (Exhibit 9484 received.)

12            MR. QUINN:  If we could put that up on the screen.

13   BY MR. QUINN:

14   Q    This is dated December 22?

15   A    Yes.

16   Q    And I think you told us this was around the time

17   Mr. Villasenor left on a stress claim and never came back,

18   right?

19   A    Correct.

20   Q    What he writes here is:  "Dear Mattel Representatives:

21   I have worked for Mattel for almost 14 years.  I am

22   currently the Manager of Market Intelligence.  I have

23   recently met with my direct supervisor, John Luey, regarding

24   Mattel's goals and expectations of me with respect to market

25   intelligence at upcoming trade shows and events.

1      "I believe that my work conditions have become

2    intolerable, and I am writing to complain about Mattel's

3    directives and instructions to gather market intelligence

4    from competitors through unlawful means.  I no longer wish

5    to engage in misrepresentations in uncover assignments inb

6    which I am paid by Mattel to attend trade shows and events.

7    I fear that my actions may expose me to personal criminal

8    liability, and I am stressed about the fallout which may

9    occur.  My conscious does not allow me to continue in this

10   role, and I do not feel I can take the pressure to engage in

11   misprestations any longer.  I know that Mattel has gained

12   a superior competitive advantage through my hard work, and I

13   appreciate your consideration of my complaint.

14      "Because of my fears, I have retained a legal

15   representative, and I would ask that you direct all future

16   communications concerning this complaint and my continued

17   role with the company to my attorney, Pat Barrera" and then

18   he gives the phone number for Mr. Barrera.  Do you see that?

19   A    I do.

20         THE COURT:  There is another line.

21         MR. QUINN:  "Thank you for your consideration in

22   this matter."

23         THE COURT:  Thank you.

24   BY MR. QUINN:

25   Q   You said "right" or "yes" in response to one of Ms.

1    Keller's questions about he received a lucrative severance

2    as long as he wouldn't discuss what he had done.  Do you

3    recall those questions?

4    A    Yes.

5    Q    Are you aware that there were then negotiations that

6    took place with his attorney to resolve his claim?

7    A    Yes.

8    Q    What was the severance that he got?

9    A    $160,000 and $30,000 for psychological help.

10   Q    Was that in the nature of a severance?

11   A    I believe so.

12   Q    Now, toy fairs -- basically what is the purpose of a

13   toy fair?  From the standpoint of a toy manufacturer, what

14   you doing there?

15   A    We are showing our retailers, our press, our licensors,

16   analysts, bankers, our product line.

17   Q    That includes new products?

18   A    Yes, specifically new products.

19   Q    Are there a lot of new products that get unveiled for

20   the first time at toy fairs?

21   A    Some, yes.

22   Q    So there are new products that have been in the

23   pipeline that you are working on in-house that nobody knows

24   about, and a lot of them are shared with the world at toy

25   fairs?  Is that fair?

1    A    That's fair.

2    Q    Is part of the purpose from the standpoint of a toy

3    manufacturer of going to a toy fair to tell the world about

4    the neat toys that you have got?

5    A    That's correct.

6    Q    Including the new toys?

7    A    Yes.

8    Q    Now, as Ms. Keller says, it's common at least at some

9    of the toy fairs to have private booths for the

10   manufacturers -- that they will have some private booths

11   which won't be open to the whole world; is that true?

12   A    True.

13   Q    Mattel would have that?

14   A    That's correct.

15   Q    And other companies, including MGA, would have those at

16   some toy fairs?

17   A    Yes.

18   Q    With respect to these private booths, though, only --

19   people by invitation would be invited to come to those

20   booths or showrooms?

21   A    That's correct.

22   Q    Can you tell us based on your career in the toy

23   industry and your participation -- I'm assuming a toy fair

24   is on behalf of many different companies.  What types of

25   people as a toy manufacturer would you invite into private

1   booths?

2   A    We would invite our retailers, the press, trade press,

3   licensors, bankers, analysts, inventors, and licensees.

4   Q    So you wouldn't necessarily invite -- say if you're

5   Hasbro, you wouldn't necessarily invite Mattel?

6   A    No, you wouldn't necessarily invite Mattel.

7   Q    But there are a lot of people that you would invite

8   into your showroom, and you would show them your neat new

9   stuff?

10  A    Yes.

11  Q    At that point, it's not a secret anymore?

12  A    No, it is not.

13  Q    Concurrently at the toy fairs, would it be common

14  practice to issue press releases describing and announcing

15  your new products?

16  A    Yes.

17          THE COURT:  Counsel, at about 4:30, I promised the

18  jury they could go home today, so whenever you get to a

19  logical breaking point around that time --

20          MR. QUINN:  Okay.

21          THE COURT:  We can leave now if you want to or

22  around 4:30, a convenient place for you.

23          MR. QUINN:  Thank you, Your Honor.

24  BY MR. QUINN:

25  Q    You were asked some questions about your experience and

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 1 | at Mattel in particular when you are dealing with inventors |
| 2 | who have submitted ideas or you're going to license or buy a |
| 3 | concept for a toy -- you were asked some questions about |
| 4 | whether you rely on representations and warranties.  Do you |
| 5 | recall those questions? |
| 6 | A    I do. |
| 7 | Q    And you said that we deal with -- I think you said you |
| 8 | deal with a professional group or small group of inventors. |
| 9 | A    Professional inventors.  That's correct. |
| 10 | Q    Could you explain what you mean by that? |
| 11 | A    It's a very small community of professional inventors |
| 12 | that you work with year after year.  You trust them.  They |
| 13 | bring you great products, and you have never had any |
| 14 | problems with them. |
| 15 | Q    What is the significance of that in terms of whether |
| 16 | you can rely on whether they own something or don't own |
| 17 | something that they are bringing to you? |
| 18 | A    They are reliable, and we can count on them to bring |
| 19 | ideas that are their ideas. |
| 20 | Q    You say you deal with some inventor houses, and you |
| 21 | rely on inventor houses you told Ms. Keller. |
| 22 |     Do you regard that as reasonable to rely on these |
| 23 | inventor houses? |
| 24 | A    I do. |
| 25 | Q    Why? |

1    A    Because they're honorable.  They bring great product.

2    We know where their ideas are coming from.

3    Q    Is it typical that you will be dealing with these

4    inventor houses year after year?

5    A    Yes.

6    Q    Would it affect your willingness to deal with them in

7    the future if they brought you an idea that it turned out

8    there was a conflict over who owned it?

9    A    Yes.

10    Q    In sum, are these people that you have some kind of

11    ongoing relationship with and a basis to trust that they

12    will have done the due diligence and research?

13    A    Yes.

14    Q    In your experience at any of the toy companies you have

15    ever worked at, are you aware of any instance where you know

16    you have entertained a concept for a new toy that was

17    brought to you by a current employee of a competitor?  Has

18    that every happened?

19    A    No, it has not.

20    Q    Would you consider under those circumstances that idea

21    for a toy that was brought to you?

22    A    No, I would not.

23    Q    Why not?

24    A    Because we don't know where that idea came from.  If he

25    is working for another company, he could very well have

1   gotten it from that company.

2   Q    Would you regard that as something that would be too

3   risky?

4   A    Yes.

5   Q    Has it been your job at Mattel or at Fisher-Price

6   really to deal with the outside inventors?

7   A    No, not really.  We have an in-house inventor group

8   that deals with that, the Inventor Relations Group.

9   Q    They have more knowledge than you do about what

10  Mattel's policies are in terms of who they will deal with

11  and what they expect --

12          MS. KELLER:  Objection, leading.

13          THE COURT:  Overruled.

14  BY MR. QUINN:

15  Q    -- how to deal with inventors?

16  A    Yes.

17  Q    Isn't it true that MGA representatives have also snuck

18  into Mattel's showrooms?

19          MS. KELLER:  Objection.  This is --

20          THE COURT:  Sustained.

21  BY MR. QUINN:

22  Q    Mr. Villasenor when he engaged his attorney and brought

23  a claim after he wrote this letter on December 22, 2005,

24  isn't it true that he demanded a payment of $3 million?

25  A    I don't know that.

```
 1              MS. KELLER:  Your Honor, the Court has foreclosed
 2    us from discussing any of the negotiations on a motion of
 3    Mattel.
 4              THE COURT:  I will need to speak to both of you
 5    after court.  This might be a good time to recess.
 6              You are not to form or express any opinions on the
 7    case.  We will see you at 8:30 on Tuesday.  Have a nice
 8    weekend.
 9              (Jury not present.)
10              THE COURT:  Counsel, if you would have a seat.
11              Sir, you may step down.
12              Ms. Hurst, if you could help the Court and, Mr.
13    Zeller, if you could help the Court.  Would you do your best
14    to get the hours up so we have a running calculation.
15              Second, the Court last evening took lead counsel
16    into an adjacent courtroom that will be used for jury
17    deliberations and had talked to the two able assistants,
18    Chris and Diane.  Both sides have been extraordinarily
19    helpful.  I just want to publicly say to each of you young
20    people I can't imagine having more support.  From the
21    Court's perspective, I want to thank both of you.
22              I am going to have another meet with you on Monday
23    again because I need to go down this evening and get final
24    clearance that we can use this adjacent courtroom.  Then we
25    plan out shelving and so forth.
```

```
 1              Counsel, we only have four glorious weekends left
 2   with each other.  I think we have an extraordinary amount of
 3   work still left to do.  I promised I would give you tomorrow
 4   off, and I will give you tomorrow off, but then I think I am
 5   going to need you unless I say differently every Saturday
 6   and Sunday from that point forward.
 7              Now, for the court reporters, one of counsel is
 8   flying back from San Francisco at 11:00.  Therefore, I am
 9   not going to need a court reporter until 11:00.
10              Is that acceptable, Ms. Hurst?
11              MS. HURST:  Yes.  Thank you, Your Honor.
12              THE COURT:  So 11:00 for the court reporter.
13              I want to hear before we he get into this area
14   once again who the witnesses are on Tuesday after
15   Mr. Friedman testifies from MGA because we are going to
16   start the preparation of the books.
17              MS. HURST:  We sent them a list.
18              THE COURT:  I want to know.
19              MS. HURST:  Margaret Leahy,
20              THE COURT:  Now, remember you have a little bit of
21   what I call wiggle room.  If one witness is out of order,
22   I'm not concerned, but basically I want the other side
23   prepared.
24              Who else?
25              MS. HURST:  Jacqueline Ramona Prince.
```

```
 1                THE COURT:  Next.

 2                MS. HURST:  Dr. Albert Lyter.

 3                THE COURT:  Next.

 4                MS. HURST:  Cassidy Park.

 5                MS. HURST:  We have three more names.  Do you want

 6     those?

 7                THE COURT:  Yes.

 8                MS. HURST:  Alan Kaye, Adrienne Fontanella, Teresa

 9     Newcomb.

10                THE COURT:  Now, will that cover the week, Mr.

11     Quinn?

12                MR. QUINN:  I would be surprised frankly.

13                THE COURT:  I think that will probably not cover

14     the entire week.

15                MR. QUINN:  I don't think so.

16                THE COURT:  What do you think, Ms. Hurst?

17                MS. HURST:  I think it depends on cross estimates,

18     which we haven't had a chance to discussion with Mattel.  I

19     know a couple of those witnesses -- Ms. Leahy took days in

20     Phase I.

21                THE COURT:  Besides the argument on intentional

22     interference and conclusion of the ownership and contract

23     issues, I think that that should have a limit of no more

24     than an hour half per side now.  I have heard a good portion

25     of it.  I have another iteration on it, but I will give that
```

1    to you on Sunday.

2            MR. QUINN:  I thought we heard that they were

3    calling Greg Holden.  Is that apparently not going to

4    happen?

5            THE COURT:  Apparently not.  We will go over

6    these.

7            How much time do we need to accomplish this so you

8    are prepared because I am moving my calendar around Monday

9    also, but I don't want to hear a complaint from Mattel that

10   you are not prepared in time, so do you want to be in

11   session tomorrow?

12           MR. QUINN:  My suspicion is that both sides

13   probably could use tomorrow to put binders together.

14   Speaking for us for sure, we don't have binders yet for any

15   of these people.

16           MS. HURST:  Please let us have tomorrow off.

17           MR. QUINN:  I would hope, Your Honor, that we can

18   get some of the binders for some of these witnesses tomorrow

19   so that we are not seeing all of them on Sunday if that's

20   possible.

21           THE COURT:  I am just going to ask if there is

22   anything this evening -- if I excuse most of counsel so you

23   catch your plane back to San Francisco --

24           MS. HURST:  May I be excused?

25           THE COURT:  Yes, Ms. Hurst.

```
 1              Is there anything we can do tonight?
 2              MR. MCCONVILLE:  I know we have two of the
 3    witnesses ready to go.
 4              THE COURT:  Who are they?
 5              MR. MCCONVILLE:  Leahy and Prince.
 6              THE COURT:  Why don't we do those after we send
 7    everybody home.
 8              MR. MCCONVILLE:  Okay.
 9              MR. QUINN:  That's fine.
10              THE COURT:  Mr. Quinn, Mr. Zeller, Mr. McConville,
11    stay with me.
12              MR. MCCONVILLE:  And Mr. Overland.  We want him
13    here.
14              THE COURT:  Now, the third thing is the damages
15    expert for MGA.  When is that person available?
16              MR. MCCONVILLE:  Next Saturday.  I think you asked
17    for the Daubert next Saturday.
18              THE COURT:  I want to just double-check with -- is
19    that okay with you, 8:00?
20              MR. MCCONVILLE:  Yes.
21              THE COURT:  Jane, I will need a court reporter
22    here at 8:00.
23              You have an hour and 15 minutes per side.
24              Mr. McConville, what did I just say?
25              MR. MCCONVILLE:  Hour and 15 minutes per side.
```

1              THE COURT:  Mr. Quinn, what did I just say?

2              MR. QUINN:  An hour and 15 minutes per side.

3              THE COURT:  Excellent.  Now I need the time

4    written up on the board.

5              MR. QUINN:  While those computations are being

6    done --

7              THE COURT:  Let's excuse your clients.

8              (Whereupon, the proceedings were concluded.)

9                          -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                                   CERTIFICATE

5

6                I hereby certify that pursuant to Section 753,

7      Title 28, United States Code, the foregoing is a true and

8      correct transcript of the stenographically reported

9      proceedings held in the above-entitled matter and that the

10     transcript page format is in conformance with the

11     regulations of the Judicial Conference of the United States.

12

13     Date:  March 12, 2011

14

15
                            Sharon A. Seffens 3/12/11
16                          _____
                            SHARON A. SEFFENS, U.S. COURT REPORTER
17

18

19

20

21

22

23

24

25