| | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| 2 | **CENTRAL DISTRICT OF CALIFORNIA** |
| 3 | **HONORABLE DAVID O. CARTER, JUDGE PRESIDING** |
| 4 | – – – – – – – |
| 5 | |
| 6 | MATTEL, INC., ET AL.,               ) |
| 7 |              Plaintiffs,          ) |
| 8 |        vs.                        ) No. CV 04-9049-DOC |
|   |                                   )     Day 33 |
| 9 | MGA ENTERTAINMENT, INC., ET AL.,   )     Volume 1 of 3 |
| 10 |              Defendants.          ) |
| 11 | _____) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Status Conference

Santa Ana, California

Sunday, March 13, 2011

Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-03-13 MattelV1

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER   (Not Present)
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25
```

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4             SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
 5                  Attorney at Law
               601 West Fifth Street
 6             12th Floor
               Los Angeles, California 90071
 7             (213) 613-4660

 8             - AND -

 9             LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND  (Not Present)
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CV 04-9049-DOC - 03/13/2011 - Vol. 1 of 3

4

```
 1                           I N D E X

 2

 3

 4                     STATUS CONFERENCE

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SANTA ANA, CALIFORNIA, SUNDAY, MARCH 13, 2011

2                          VOLUME 1 OF 3

3                          (12:00 p.m.)

4          THE COURT:  All right.  We are on the record, and

5     all counsel are present.

6          And the Court is laying out a series of

7     instructions on the table after the last argument by

8     counsel.

9          Mattel had previously become concerned about the

10    Court including the phraseology, "both interpretations are

11    reasonable."

12          Is that correct, Mr. Quinn, Mr. Price, Mr. Zeller?

13          MR. QUINN:  Yes.

14          MR. ZELLER:  Yes.

15          MR. PRICE:  Yes.

16          THE COURT:  All right.

17          I somewhat agree with that, but if I were to

18    strike that phrase, then I would give 3-2-0, and the reason

19    for that is the consistency in the use notes.  Remember the

20    BAJI uses the word "ambiguous," which Mattel had objected to

21    and felt that the use of the word "ambiguous" would lead the

22    jury automatically to a finding adverse to Mattel.

23          The Court had heard from Ms. Hurst suggesting the

24    statement that "both interpretations are reasonable."

25    Mattel has also objected to that interpretation.  In looking

 1    at the use notes, it's very clear that if I strike that,

 2    this Court would raise 3.20, and 3.20 is the instruction

 3    that you should be paying very close attention to in

 4    relation to these two instructions.

 5            Now, I want you to take a moment and look at

 6    those.

 7            This is off the record.

 8            *(Discussion held off the record.)*

 9            THE COURT:  If I put this set of instructions at

10    the beginning of the case, and if the jury decided

11    non-ownership, for one of a better word, that would end the

12    case.  Read them again.  If these go at the beginning of the

13    case, find non-ownership, they don't go on.

14            This is off the record.

15            *(Discussion held off the record.)*

16            THE COURT:  All right.  We are back on the record.

17            I'm going to anticipate Mattel's argument in just

18    a moment.

19            Ms. Hurst?

20            MS. HURST:  I'm listening.

21            THE COURT:  And Mattel's argument should be as

22    follows:  "Judge, if you follow the BAJI use notes, you

23    shouldn't give 3-2-0 unless the jury is hung," and I would

24    anticipate your response would be, "Then why shouldn't I

25    follow the BAJI use notes and identify the terms or the

1    disputed terms of the contract as ambiguous?"  In other

2    words, "Judge, be consistent."

3            And remember BAJI uses the word "ambiguous."

4            Now, on behalf of MGA, Ms. Hurst, you recommended

5    that the Court -- and requested that the BAJI instruction be

6    altered to read, quote, "both interpretations are

7    reasonable."

8            If you so stipulate, I'll consider this language,

9    but otherwise, I'm going to rely on my own resources.

10            Now, second question I had asked previously,

11   Mr. Zeller, was about Catherine Sullivan's case, City of

12   Hope.  The 3-2-0 was given in City of Hope National Medical

13   Center v. Genetech, and the Quinn Emanuel firm represented

14   the appellants in that case.  In that case, the Supreme

15   Court affirmed the use of instruction 3-2-0, and it appears

16   from the opinion that the trial court did not wait until the

17   jury was hung to give the instruction.  Instead, the

18   instruction was given before deliberations even started.

19            So since your firm represented the appellants,

20   maybe today you can provide me with more of an answer about

21   what happened at the trial level in that case, and, of

22   course, that may be anecdotal, and if so, I'll strike that,

23   but I'm very interested why the trial court did that, and

24   especially with the affirmant.

25            So I don't care which side you start on, but this

1    is your opportunity.

2           MR. ZELLER:  Well, perhaps taking the City of Hope

3    issue first.  Just factually what appears to have happened

4    in that case at the trial court level was that there were

5    two trials before it went up to the California Supreme

6    Court.  The first trial resulted in a deadlock jury, and the

7    judge in the first trial refused to give instruction 320 at

8    all during the first trial.

9           THE COURT:  Was it the same judge in the second

10   trial?

11          MR. ZELLER:  You know, we actually I looked into

12   that and couldn't figure that out.

13          THE COURT:  Is Catherine Sullivan around?

14          MR. ZELLER:  We have checked with her, and since

15   we didn't handle the trial court level of it, we were

16   somewhat constrained by what we have in the record, and

17   we'll continue to look into that, but we, so far, were

18   unable to determine if it was the same judge for both

19   juries, both -- both jury trials.

20          So at the first trial -- so when the second trial

21   began, there was already -- the trial judge knew, of course,

22   that this had already gone to a jury and hung, that there

23   was already a deadlock jury.  In the second trial, the judge

24   did give 320 prior to there being, you know, some indication

25   that that second jury had become stymied or deadlocked.  So

1    it's sort of an unusual circumstance there because of the

2    fact that, you know, historically what had happened is is

3    that there had been a deadlock or hung jury.

4            I would also add that certainly the -- the -- you

5    know, that's factually what occurred, but, of course, the

6    California Supreme Court decision in City of Hope doesn't

7    really give us guidance as to, you know, as to when and

8    whether that instruction should be given.  That just wasn't

9    the logical compass of what was up on appeal at that point

10   as to the timing of the instruction.  And we can provide the

11   Court with some -- some of the excerpts of record that we

12   found that actually describes the circumstances.

13           THE COURT:  I don't think I want to go that far.

14   I think that I'm going to rely on the opinion and the best

15   fact situation I can gather from the opinion, then.

16           I want to go back to the first question, and

17   perhaps I am misinterpreting what you are going to say, but

18   I would think that your strongest argument involving 320

19   would be that I shouldn't follow that instruction unless the

20   jury was deadlocking.  By the same token, if that's the

21   case, why shouldn't I, then, take MGA's position and define

22   the disputed terms of the contract as ambiguous?  In other

23   words, if I'm consistent across the use notes and their

24   usage, then it seems to me that I've heard Mattel's concern

25   about the language, but by the same token, I should either

 1   be using the word "ambiguous" and following BAJI, or if I'm

 2   going to use the term "both interpretations are reasonable"

 3   and not give 320, then I think that MGA's going to have to

 4   be in the position of stipulating away the use of the word

 5   "ambiguous."  In other words, it's not something I'm just

 6   going to substitute.

 7            I'm going to listen to MGA in just a moment, but

 8   Mr. Zeller, why don't you continue on, because 320 is the

 9   reality that you've got to deal with.

10            MR. ZELLER:  And certainly, we believe that the

11   Court should follow the use note instruction for 320, which

12   is only given with a deadlock jury, and our concern is

13   and -- and, of course, we've heard the Court's kind of

14   alternative --

15            THE COURT:  Now, assuming I'm going to do that,

16   why wouldn't I give the ambiguous?  Why wouldn't I go right

17   back to the BAJI instruction and say, basically, that this

18   is ambiguous, which is the very thing that Mattel has been

19   complaining about.

20            MR. ZELLER:  Right, or the alternative of

21   reasonable.  That was the other language that MGA was

22   suggesting.

23            THE COURT:  I don't know that I'm going to do

24   that.  They suggested that before you put MGA in the

25   driver's seat right now, though.

1           MR. ZELLER:  Right.  And part of our concern would

2   be the same concern that I raised previously, which is if

3   the Court says in one instruction that both parties'

4   interpretation of the agreement is reasonable or those terms

5   are ambiguous, that regardless of when 320 is given, whether

6   it's at the outset or following the use notes, it's only

7   given to a deadlock jury.  Once those things are combined,

8   the jury is going to take that as basically having been

9   instructed to construe the agreement against Mattel.  And

10  what we would suggest is is -- I mean, we don't think the

11  jury needs to be told that the terms are ambiguous or both

12  interpretations are reasonable because the Court is saying

13  very clearly in the instructions, in the preceding sentence,

14  "this is a dispute for you to decide."  That's neutral, it

15  doesn't add a value judgment by the Court that can be -- can

16  distract the jury from the task that it really has at hand,

17  which is for it to make this determination.  And what we

18  would -- what we would suggest is that there not be language

19  in there that would seem to, you know, diminish the jury's

20  responsibility from doing this.  Somehow they might read

21  into the instructions some tea leaves about what they are

22  supposed to do.  You know, just -- we give them the rules of

23  contract interpretation.  That is, frankly, what we think,

24  you know, the Ninth Circuit is -- is saying, that these are

25  terms that need to go to a jury to -- to determine.

CV 04-9049-DOC - 03/13/2011 - Vol. 1 of 3

12

 1          THE COURT:  Okay.  All right.

 2          Now let me hear from MGA for just a moment.

 3          Ms. Hurst?

 4          Let me repeat back to Mattel what I just heard,

 5     that they didn't hear at all that the Court was going to be

 6     consistent, and that I didn't hear anything other than

 7     "Judge, you shouldn't give 320, and you shouldn't give both

 8     interpretations are reasonable and you shouldn't give

 9     ambiguous."

10          So MGA?

11          MS. HURST:  Your Honor, the only reason I

12     suggested the language "both interpretations are reasonable"

13     was in an effort to reach a compromise.  We're okay with the

14     use notes for BAJI, the language of the use notes of BAJI,

15     if that's the direction the Court ultimately goes in.

16          THE COURT:  Just a moment.

17          What that means is that I would give ambiguous,

18     but I wouldn't give 320.

19          MS. HURST:  No, but our first preference is that

20     you give 320.  So if the Court is forcing a choice, as I

21     understand it to be, then our first preference is that you

22     give 320.

23          THE COURT:  Now, just a moment.

24          So what I would give, then, is both

25     interpretations are reasonable, and I would give 320.

 1          MS. HURST:  Well, obviously that would be our

 2     first choice.  I understood that the Court was actually

 3     putting us to the choice of you don't give any bracketed

 4     language about whether it's ambiguous or reasonable versus

 5     do you give 320.

 6          THE COURT:  You are right.

 7          MS. HURST:  Okay.

 8          THE COURT:  All bracketed language would be taken

 9     out.

10          MS. HURST:  Right.  So if that's the option, then

11     our hierarchy of ranking is give 320 first, and we think

12     that's proper, and we also think it should be described as

13     ambiguous, especially the way the Court currently has the

14     instructions drafted, it's got one first sentence that says

15     it unambiguously does include something.

16          THE COURT:  Yeah.

17          MS. HURST:  And that's really putting the thumb on

18     the scale, now.  So I would just ask that if the Court is

19     going to take out the bracketed language, that it doesn't

20     have that unambiguously cover something, because that just

21     really puts the thumb on the scale for Mattel.

22          Just while we are discussing those proposed

23     instructions by the Court, the proposed instruction for the

24     disputed term "at any time during my employment" uses the

25     word "created" --

```
 1          MR. ZELLER:  Your Honor, I actually would object
 2    if they are going to start going into more aspects of this,
 3    because I never had an opportunity to talk.  Ms. Hurst has
 4    been able to talk at some length already about these issues
 5    and these other instructions, and so I would ask that I'd be
 6    permitted to do that --
 7          THE COURT:  Oh, you are.
 8          MR. ZELLER:  -- rather than going into all these
 9    other issues at this juncture.
10          MS. HURST:  Your Honor, there was one other issue
11    that I wanted to raise at this time, which is the word
12    "created" in the instruction "at any time during my
13    employment."  We're concerned because that's not the
14    language of the contract.  As the Court knows, the language
15    of the contract is "conception or reduction of practice,"
16    and relatedly, if we are going to give 316, which we had
17    previously suggested -- but we -- we think it's only proper
18    to give 316 if you also instruct the jury on the technical
19    meaning of the words, which in this case are "conception or
20    reduction of practice," and those are legal terms with the
21    specific meaning under the law of inventions.
22          So we would reiterate our request, but we do think
23    that "at any time during my employment" instruction has to
24    track the language of the contract.  "Created" is not a word
25    that's in the contract.
```

```
 1              THE COURT:  So this is the word that's in
 2    contention in this one instruction?
 3              MS. HURST:  Correct.
 4              THE COURT:  Okay.
 5              Mr. Zeller?
 6              MR. ZELLER:  Dealing with the issue about the
 7    instructions relating to 320, I mean, if -- to the extent
 8    that we're being provided a choice between omitting "both
 9    interpretations are reasonable" and omitting 320, our -- our
10    choice would be omitting language of "both interpretations
11    are reasonable."  And really, the reason is for the one that
12    I described earlier --
13              THE COURT:  Just a moment.
14              Does that mean that you would prefer the word
15    "ambiguous"?
16              MR. ZELLER:  Well, if there is going to be this
17    sentence, if the sentence must be in there, we would prefer
18    "ambiguous."
19              THE COURT:  And then you would request that 320
20    not be given?
21              MR. ZELLER:  Well, that would be our very first
22    preference, but to the extent we are given a choice, we
23    would prefer to have 320 in the instructions at the outset
24    rather than have the Court give an instruction that says
25    "both interpretations are reasonable" or the terms are
```

 1    "ambiguous," and it all does kind of has its route cause,

 2    your Honor.  Our concern is if both statements are

 3    eventually made to the jury; namely, number one, "both

 4    interpretations are reasonable" or the terms are

 5    "ambiguous," and then the jury, whether at the outset or

 6    later on, hears 320, they are going to that the Court is

 7    instructing, as a matter of law, that it must be construed

 8    against us.

 9            THE COURT:  That's confusing.  Giving your best

10    choice and having you make a choice, if you decide to, do

11    you want, without waiving your prior arguments, "ambiguous"

12    substituted for "both interpretations are reasonable" --

13            MR. ZELLER:  Right.

14            THE COURT:  -- or 320 not being given?

15            MR. ZELLER:  Yes, that's right.

16            THE COURT:  Okay.  Just a moment.

17            Let me turn back to MGA.

18            If the Court followed BAJI, and I substituted the

19    literal BAJI instruction and use the word "ambiguous," then

20    if I was consistent, at least, with the use notes in my

21    research thus far, why would I give 320?

22            MS. HURST:  I mean, 320 is a standard form

23    instruction in CACI.  It is --

24            THE COURT:  No.  I'm dealing with use notes, now.

25            MS. HURST:  I understand, but there is no

1    authority at all cited for the proposition that 320 should

2    only be given in the case.

3            THE COURT:  I understand that, and that's why I've

4    been asking about the City of Hope and what occurred there.

5            MS. HURST:  And in BAJI -- BAJI and the use notes,

6    there is authority for the instruction that you -- the --

7    the direction that you say which is unambiguous and not in

8    dispute and which is ambiguous and is in dispute.  There is

9    case authority cited for that proposition, and it makes

10   sense.

11           In the case of 320 -- I mean, look, the other

12   reason here is we are dealing with an adhesion contract, and

13   the rule in California is that when it's an adhesion

14   contract, the rule construed against the drafter applies

15   even more strongly than in the case of a negotiated

16   agreement.  So 320 got given in Genetech v. City of Hope,

17   and that was a clearly heavily negotiated contract.  In

18   fact, if you read the opinion, one of the arguments as to

19   why 320 shouldn't be given at all, and apparently wasn't

20   given in that first trial, was because it was such a

21   negotiated agreement.  Even -- but the Court specifically

22   said, the supreme court said in the case, just because it's

23   a negotiated agreement doesn't mean we don't give 320.

24   We -- it's still proper to give 320 even with a negotiated

25   agreement.

```
 1              Here, we have an adhesion contract.  If the
 2    principle is to have any meaning at all, and it's supposed
 3    to have special force in the case of an adhesion contract,
 4    then the instruction has to be given.  So our position would
 5    be that the instruction should be given.
 6              Certainly, the Court should not give some
 7    interpretations preference by calling them unambiguous and
 8    not specifying that the others are ambiguous, so if the
 9    Court is choosing between the two, then we would ask for
10    320, and we would ask that it simply not characterize any of
11    the other interpretations.  In other words, in the ideas
12    disputed term, the Court would just say, "the term
13    'invention' includes," and track the language of the
14    contract.
15              Frankly, I'm not sure whether that sentence is
16    even necessary.  I think you can just jump straight to the
17    second sentence, which is "the parties dispute the meaning
18    of the term 'inventions' and whether it includes ideas or
19    not," and then you don't need to worry about the issue of
20    you calling some things ambiguous and other things
21    unambiguous; we just go straight to the core of the dispute,
22    which is basically what CACI 314 provides.
23              THE COURT:  Okay.
24              Mr. Zeller or Mr. Quinn?
25              MR. ZELLER:  One thing I would suggest on -- on
```

Case 2:04-cv-09049-DOC-RNB   Document 10195   Filed 03/15/11   Page 19 of 45   Page ID #:308944
CV 04-9049-DOC - 03/13/2011 - Vol. 1 of 3

19

1    this, sort of as a further point, including in response to

2    some of the MGA's concerns, is that these instructions could

3    just simply take out the "unambiguous" and the "ambiguous"

4    part and just simply say, "there is no dispute that the

5    contract includes," and then quote the language.  There is a

6    dispute, however, as to whether or not inventions includes

7    ideas.  That is for you to decide.

8            So what -- we're not suggesting there be some sort

9    of asymmetry between unambiguously and ambiguously in those

10   instructions.  We would live with both of them being out.

11           MR. QUINN:  Your Honor, I think the use notes to

12   320 give us salutary logic as to why it makes sense to only

13   give that to a deadlock jury.  It says you give it only to a

14   deadlock jury so as to avoid giving this tool to resolve the

15   case before they have truly exhausted the other avenues of

16   approach.  Otherwise, if it's given to the jury at the

17   outset, it's an easy out for them, and they could avoid

18   doing the hard work of applying the other rules of contract

19   construction and seeing if they can construe the contract,

20   because I take it that it's agreed that this is a default

21   provision that's only to be applied if the other rules of

22   contract construction don't yield an interpretation that

23   everyone can agree on.  And the use note cites Pacific Gas

24   and Electric v. Superior Court for the proposition that this

25   is to be used only when none of the other canons of

1    constructions succeed in dispelling the uncertainty.

2         So just from the standpoint of practical jury

3    deliberations and dynamics and applying the instructions, it

4    would seem important to only give this if they've used -- if

5    they've been given the other rules for interpretation and

6    have not been able to reach a decision applying those rules.

7         MS. HURST:  The problem with that approach is that

8    it's a transactional approach to application of the rule

9    rather than a substantive application of the rule.  The rule

10   is that if the other canons of interpretation do not dispel

11   the uncertainty, then construe against the drafter.  That

12   rule doesn't only apply if the jury can't reach an

13   agreement.  In other words, if there is some negotiation,

14   and they can't reach an agreement, that rule should be

15   available to each individual juror to make a decision about

16   whether the -- this uncertainty has been dispelled or not.

17        In the absence of doing that, the substantive law

18   that actually applies in the case is never applied.  In

19   other words, they may, unaware of the possibility of this

20   rule, be forced to pick something else, each of them not

21   really morally satisfied that the uncertainty has been

22   dispelled, and that's not appropriate.  That's not the

23   substantive law.  The substantive law isn't, "Well, only if

24   the jury disagrees, does this rule apply."  It's not a

25   transactional rule.  It's a substantive rule of

 1    interpretation.  And that's particularly true in the case of

 2    an adhesion contract drafted by lawyers, which this is.

 3            So I appreciate practicality, but the force of

 4    Mr. Quinn's argument is ultimately the jury simply isn't

 5    going to follow the instruction to apply this rule last, and

 6    the rationale for refusing to give an instruction that is

 7    otherwise a correct statement of the substantive principle

 8    cannot be that the jury will fail to do what their told.

 9    That's simply not the way jury instructions work.  You can't

10    assume that they are going to do something other than what

11    they are told and use that as a ground for refusing to give

12    the instruction; that would be improper.

13            THE COURT:  Okay.  I want to make certain each

14    side has had an opportunity, and you can go back and forth

15    as many times as you'd like, and then I'm going to close the

16    door on this for today.

17            MR. ZELLER:  I don't think we have anything

18    further on that specific issue.

19            THE COURT:  Ms. hurst?

20            MS. HURST:  Agreed.

21            THE COURT:  All right.  What's the next issue

22    you'd like to cover?

23            MR. ZELLER:  Well, there were some issues that had

24    been raised previously that I hadn't had a chance to

25    address, and then some -- also I think some lingering issues

 1   with some of the jury instructions, so while -- I'll

 2   probably intermix these to a degree.

 3          One dispute over the instructions that the Court

 4   is aware of is that when describing the elements for the

 5   tortious interference claim, MGA has deviated from the

 6   standard instructions by changing the elements of knowing

 7   about the contract, for example, or interfering with the

 8   contract to knowing about the contract obligations or the

 9   contract obligations at issue.  CACI is clear that the

10   knowledge element goes to knowledge of the contract, not the

11   particular obligations.

12          The issue that I'm anticipating MGA is going to

13   say as to why it needs to be that way is because particular

14   obligations form the basis for Mattel's tortious

15   interference claim, and that's certainly true enough, but

16   the Court spells that out in the other aspects of the

17   instructions.  To change the knowledge element, which is

18   knowledge of the contract, to knowledge of the contract

19   obligations at issue is -- is a misstatement of the law.

20   That's just not -- we don't have to prove that Mr. Larian

21   knew about the -- the specific language in paragraph 2, and

22   that -- that -- in changing that instruction in the way MGA

23   has advocated will -- will be a misstatement of the law.

24          The other aspect is that MGA's attempted in its

25   instructions to basically limit Mattel's tortious

1   interference with contract damages to what they are calling,

2   quote, "loss of services," end quote.  And, in fact, their

3   instructions include language like, "that Mattel must prove

4   a financial loss resulting from the loss of services."  That

5   also is not the law.

6          CACI makes it very clear and states explicitly

7   that the remedies that are available for lost profits in

8   tortious interference, for example, include consequential

9   damages.  In other words, the loss that's flowing from the

10  tortious interference, not just simply the loss of services.

11  In fact, CACI breaks out three different kinds of damages

12  that are available just as direct relief for tortious

13  interference, only one of which is loss of services.  So MGA

14  is literally riding out of CACI a particular form of relief

15  that, on its face, is available and -- and essentially is an

16  argument on MGA's part that it would leave us with no

17  remedy.

18          And also, this change that MGA is advocating, the

19  deviation from the standard instructions, really doesn't

20  fit.  One of the Bryant obligations that we have alleged,

21  MGA tortiously interfered with, which was Bryant's failure

22  to disclose his Bratz inventions to Mattel, as required by

23  the contract.  Limiting us to a loss-of-services kind of

24  remedy for that particular interference really doesn't make

25  any sense at all, and it doesn't -- it doesn't fit that

1    scenario.

2           The -- so we believe that the basic instructions

3    on lost profits and tortious and unjust enrichment for

4    tortious interference should be given mutually.  I mean,

5    these really -- these kinds of arguments that MGA wants to

6    make about loss of services and the like are just really

7    matters for arguments and not instructions.

8           Turning to the instruction about the disputed term

9    that "at any time during my employment," our principal

10   concern about that instruction is that it refers to the

11   scope of Carter Bryant's employment, and it sort of switches

12   back and forth between that phraseology and then the timing;

13   namely, did he do it basically during work hours as opposed

14   to nights and weekends.  And we're concerned that using the

15   phrase, "the scope of Carter Bryant's employment," sounds

16   like a different -- different kind of dispute.

17          We have offered an instruction that makes it

18   clear, in our view, that the real dispute is over whether or

19   not the phrase "at any time during my employment" includes

20   inventions created by Mr. Bryant entirely on his own time,

21   on nights and weekends, while he was a Mattel employee.

22   Part of the concern we actually have about this, too, is it

23   seems to be stating, in some ways, that, you know, this is

24   Mattel's position in terms of this is a scope of employment

25   issue as opposed to whether or not the phrase "at any time

Case 2:04-cv-09049-DOC-RNB   Document 10195   Filed 03/15/11   Page 25 of 45   Page ID #:308950
CV 04-9049-DOC - 03/13/2011 - Vol. 1 of 3

25

 1    during my employment" means only during business hours as

 2    opposed to nights and weekends.  And also, the scope of

 3    employment term doesn't really advances the ball in terms of

 4    helping the jury understand what it needs to decide.  It

 5    basically begs the question and -- because it just sort of

 6    leads to the question of what is really the scope of Carter

 7    Bryant's employment.  So we think that it needs to be

 8    rephrased as to simply focus the jury more on the timing of

 9    it rather than using this kind of broader, you know,

10    somewhat legalistic phrase about scope of employment.

11            And with respect to, then, the issue that MGA

12    raised today about that same instruction about "if you find

13    that the Bratz-related inventions were created between

14    January 4th, 1999 and October 19, 2000," and then it

15    continues on.  The term "created" is grounded in the

16    contract language.  The very beginning of it, and I'm

17    pointing to Carter Bryant's agreement, 9924, the very first

18    paragraph says, quote, "inventions that I create will be

19    owned by the company," end quote.

20            So the language is entirely appropriate for -- for

21    describing this.  Obviously, if MGA thinks that there are

22    other terms that need to be disputed or the subject of

23    instructions, that's one thing.  That's sort of a different

24    issue I think we can discuss separately, but I think to then

25    build in different terms that they seem to now be saying are

1   disputed and put them into this instruction, which is really

2   to describe the dispute over, quote, "at any time during my

3   employment," end quote, risk confusion.

4           THE COURT:  Okay.

5           MGA?

6           MS. HURST:  I'm going to make a few of our

7   affirmative points, and then respond to those by Mr. Zeller,

8   if that's okay with the Court.

9           THE COURT:  Sure.

10          MS. HURST:  Our view is that on the conflict of

11  interest provisions, the claim for interference with the

12  conflict of interest provisions, we need to have the

13  independently wrongful act requirement under Reeves v.

14  Hanlon, and the rationale for that is this conflict with

15  other activities provision is really just -- it's a

16  condition of an at-will employment agreement, and there is

17  no dispute that this was an at-will employment agreement.

18  And under Reeves v. Hanlon, interference with the conditions

19  of at-will employment agreements require the independently

20  wrongful act requirement.  And the reason for that is the

21  recognition of the employee mobility policies, Business and

22  Professions Code Section 16,600, the privilege of

23  competition operating in this arena, and, of course, we have

24  previously requested those defenses, right of mobility,

25  privilege of competition, be given in the context of --

 1            THE COURT:  Just a moment.

 2            *(Interruption in the proceedings.)*

 3            THE COURT:  Counsel, why don't you continue.

 4            MS. HURST:  So the California Supreme Court held

 5   in Reeves v. Hanlon that when the claim is for interference

 6   with the at-will employment relationship, the wrongful act

 7   or wrongful conduct requirement also needs to be satisfied.

 8   This is, in other words, the at-will employment is akin to a

 9   claim for interference of perspective economic advantage

10   because that contract can be terminated at any time by

11   either party for any reason, other than a bad reason, of

12   course, when prohibited by law, I mean.

13            And this conflict with activities requirement is

14   one that really invokes that rule because it is -- it's

15   clearly a condition of the at-will employment, and it also

16   alters the statutory framework of the labor code as set

17   forth in 2863, and so we -- we request that -- that with

18   respect to those conflict -- conflict of interest

19   provisions, the wrongful act requirement, wrongful conduct

20   requirement be given, and that the BAJI instruction defining

21   wrongful conduct be given.  And if the Court can give me one

22   second, I can get you the number of that.  I think it's

23   7.86.1.

24            Yes, wrongful conduct defined.  So we would

25   request that that be given in conjunction with the wrongful

 1    conduct requirement.

 2           This really relates to something that Mr. Zeller

 3    said, which was that there really only has to be knowledge

 4    of the contract and not knowledge of the particular

 5    obligation.  The mischief of that is really evident in this

 6    context.  It's evident in other contexts as well, but it's

 7    really evident in this context.

 8           The form instructions are drafted to deal with the

 9    simple single obligation contract, such as delivery of goods

10    and exchange, a UCC-type contract, delivery of goods in

11    exchange for payment.  Here we are dealing with contracts

12    that have multiple independent obligations, and, in fact,

13    the contract has a severability provision in it, which

14    recognizes there are multiple independent obligations on its

15    face.

16           This is -- the interference with contract tort is

17    somewhere in between specific intent and general intent.

18    It's not quite specific intent, but it's pretty darn close

19    with that substantial certainly requirement under Quelimane.

20    It's California Supreme Court in Quelimane.  And there is a

21    form instruction under both BAJI and I think CACI, as well,

22    defining what is does the substantial certainty requirement

23    mean.  And without that, limiting it to the particular

24    obligations at issue, there is no way to measure the intent.

25    Intent with respect to what, just any old thing or with

1    respect to the obligation at issue?

2            And so that -- that was the point that Mr. Zeller

3    identified as one of our -- I think at the first point he

4    identified as one of our arguments.  Yes, we do think it

5    should be with respect to the particular obligations at

6    issue, both because there are multiple severable obligations

7    here, and because the intent requirement is pretty stringent

8    for this tort.  It's not just a general intent requirement.

9    And third, because of the employee mobility, principle and

10   the need to carve out that zone of protection under 16,600.

11           If we just have a generic interference without

12   some of these other elements, then it really -- the sum

13   total of all those things together, it will run afoul of

14   those policies, and the holdings of California law to just

15   say, "Well, they had a contract, and there's a general

16   intent requirement," and what we're really dealing with here

17   is a condition of at-will employment.  So we do think that

18   the Court should make it clear that it's interference with

19   the particular obligations at issue.  It's an intent to

20   interfere with the particular obligation at issue, and that

21   the Court should also give the inference of intent

22   instruction in the form as proposed by BAJI 7.83.

23           THE COURT:  Okay.

24           MS. HURST:  So that's that issue.

25           Your Honor, in this instance, we also think it

 1    really does need to be "but for" rather than "substantial

 2    factor."  We have two material concurrent causes, here, in

 3    the case of the seamstresses, Veronica Marlow, and in the

 4    case of Mr. Bryant's obligation to disclose Mr. Bryant

 5    himself.  And if the Court does not give the but-for claim,

 6    then it leaves open the possibility that MGA or Mr. Larian

 7    are held responsible for acts that were independently

 8    conducted by others, and that would not be consistent with

 9    California law.  And so we do think it needs to be the

10    but-for causation stab card, here, given that -- especially

11    because the evidence supports that.

12            Mr. -- Mr. Bryant long made the decision not to

13    disclose to Mattel before MGA and Isaac Larian ever came on

14    the scene.  He pitched it to others, Alaska Mama, you know,

15    and so there is no evidence at all that he would have ever

16    disclosed it to Mattel in the -- in the absence of MGA and

17    Isaac Larian coming on the scene, none whatsoever.  He

18    disclosed it to Veronica Marlow to help him go elsewhere,

19    and so to -- to, you know, frankly, we don't think that that

20    claim should even go to the jury, but if it does, it should

21    go with the but-for standard, because Mr. Bryant

22    independently made that decision without any input

23    whatsoever from MGA or Isaac Larian.

24            Similarly with respect to the conflict in

25    activities provisions of the seamstresses, Mr. Tumaliuan,

 1   Mr. Bryant, you know, with respect to the seamstresses in

 2   particular, Veronica Marlow was employing them, and, you

 3   know, there's no evidence that they wouldn't have wished to

 4   moonlight in the absence of MGA, and she could find them

 5   other positions, and that they would have worked to, you

 6   know, earn money for their families.  And so, again, it is,

 7   you know -- I'll leave it at that for the conflict and

 8   activities provision.

 9            I think that -- let me see my notes from before.

10   It brings us to, I think, the remedy issue that Mr. Zeller

11   raised.  The real mischief here is they are trying to get

12   the entire value of Bratz on that disclosure obligation, and

13   that is just not proper.  They are trying to get the whole

14   value of Bratz on the seamstresses' obligation not to engage

15   in employment elsewhere, assuming that's enforceable.  They

16   are trying to get the whole value of Bratz on these two.

17   That, the Court, has to rule out somehow, whether it's by

18   saying that consequential damages are too speculative, which

19   is clearly true, or simply saying it's not legally available

20   in a situation like this, which also we believe is correct.

21   Something has to be done, because to leave open the

22   possibility that they are going to seek the entire value of

23   Bratz on that interference with contract claim is

24   inappropriate, and, in fact, I think it's probably

25   foreclosed by the -- at least the logic of the Ninth Circuit

1    opinion, since it was that very claim that was on appeal and

2    was the basis for the constructive trust, which was

3    reversed.

4              So that's the reason for our proposal, that it

5    should be limited to loss of services, because that's what

6    makes sense.  But clearly, somehow, it has to be ruled out,

7    the remedy -- that all of Bratz would be remedied for that.

8              Mr. Zeller identified a concern that the proposed

9    "at any time" instruction by the Court switches --

10   basically, he felt that the concept of scope shouldn't be

11   there.  Actually, that, in our view, correctly characterizes

12   our position as to what we said the contract means.  In

13   other words, just insofar as the Court has to set forth the

14   parties to respective positions were satisfied that that

15   sets forth MGA's position appropriately.  In other words, we

16   are focused on scope.

17             Mr. Zeller noted that he felt the word "created"

18   in that draft instruction was appropriate because of the

19   first sentence of the contract, but that's not the assigning

20   language.  The assigning language has got some very specific

21   language, and as the Court undoubtedly knows, having done

22   patent cases, that phrase "conception and reduction of

23   practice" has a specific meaning in patent law.  In here, we

24   have "conception or reduction of practice," and those are

25   also both specific terms in the law of invention.

1        Ms. Ross testified that conception -- "reduction
2    to practice" means to bring to fruition.  And we need to
3    give the Court -- or the jury some guidance on what those
4    terms mean, and we need to reflect that the assignment is
5    limited by those concepts.  So the preamble of the contract
6    identifies the general subject matter, yes, and it uses the
7    word "create" in identifying the general subject matter in
8    the preamble, but the operative assigning language uses the
9    words "conception or reduction of practice."

10       Now, we've offered a special instruction defining
11   those two terms, and we took it right out of the Hornbook
12   patent law about what they mean.  If Mattel disagrees that
13   we've correctly defined those legal terms as they come from
14   the law of invention, then the remedy would be to submit
15   alternative instructions defining "conception and reduction
16   of practice" and for us to work that out based on what is
17   the law about what those terms mean because they are legal
18   terms.  They come from a statutory basis and a case law
19   basis, and that lawyers drafted this contract from this --
20   from the -- the circumstances.  It's clear they meant to use
21   the technical meaning, but we're not asking the Court to
22   force the jury to use the technical meaning.

23       By combining 318 -- let me just make sure that's
24   the right one.

25       Pardon me, 316 -- with the proposed instructions

CV 04-9049-DOC - 03/13/2011 - Vol. 1 of 3

34

1    on "conception and reduction of practice," it gives the jury

2    the choice.  In other words, it says, "if you find that

3    these terms had a technical meaning, then this is the

4    meaning you should employ."  We're not saying they

5    definitely did have a technical meaning.  We are giving the

6    jury the choice, and that's clearly a choice they should be

7    given.  They should be allowed to determine because the

8    civil code rules of interpretation requires us to do so, if

9    there was a technical meaning when you have a term like this

10   where we know there is a technical meaning.  We all know it,

11   all the lawyers in the room know there are technical

12   meanings for those terms.  And so we have to give the jury a

13   choice about how to apply that technical meaning if they

14   decide it's applicable.  So that's why 316 requires us,

15   then, to offer the technical meanings on "conception and

16   reduction of practice," which we've done and, again,

17   reiterate that those should be given.

18          THE COURT:  Now, Mr. Zeller?

19          MR. ZELLER:  Taking these in reverse order, it --

20   it really wouldn't be appropriate for the Court to be

21   providing some instruction that basically says, "here is

22   what Hornbook law says.  These terms mean for a patent

23   context," and that would be true regardless of how that

24   instruction is framed.

25          Number one, although MGA is not consistent about

1    this, clearly the Ninth Circuit has said the contract is

2    going to the jury.  Now MGA is picking and choosing and

3    trying to pull things out that they now want to argue should

4    somehow be taken away from the jury, and, in particular, on

5    terms such as "conception or reduction to practice."

6           I'll also point out that the contract itself makes

7    it clear that these terms are not limited.  Paragraph 2B

8    ends the definition of inventions by saying "whether

9    patentable or unpatentable."  That language is wholly

10   inconsistent with the notion that the ownership inventions

11   is only limited to some technical meaning of conception and

12   reduce to practice, as is the word "create" that's used

13   elsewhere in this agreement.

14          And, of course, the jury -- excuse me, both the

15   Court and the jury has already heard testimony from

16   witnesses giving meaning and life to these terms that are

17   well outside the notion of some technical patent terms.  So

18   there's already testimony in record on the meaning of those

19   terms that contradict what MGA is now trying to impose upon

20   them.

21          With respect to the "at any time" section or

22   instruction, the fact is that whether or not it properly

23   characterizes MGA's position, that's not how this draft

24   instruction is framed right now.  I mean, obviously if

25   that's what MGA wants to state as its position, that's one

1    thing, but that's not what the instruction says.  It doesn't

2    lay it out as this is MGA's position as to this being

3    equivalent to the scope of employment.  But there wasn't a

4    response to my point, which is scope of employment is a

5    broad term that unnecessarily introduces this kind of

6    legalistic terminology into the jury instructions without

7    really any -- any further guidance on it.  So we really

8    think it ultimately just begs the question of what the jury

9    is supposed to determine.

10         What is quite clear is in plain English, that

11   dispute over scope of employment at least with respect to

12   "at any time during my employment" is was it nights, was it

13   weekends, that's -- that particular phrase -- if MGA has

14   other arguments about the scope of employment, that's

15   something completely different, but to keep on trying to

16   build these other complicating arguments into that

17   instruction detracts from the language that's actually in

18   dispute, which is, quote, "at any time during my

19   employment," end quote.

20         MGA's now also claimed that Mattel -- "something

21   needs to be done," was the phrase about foreclosing Mattel's

22   damages on tortious interference.

23         Number one, the law is very clear that substantial

24   factor is the standard for causation that applies here, and

25   the jury would be well within its rights to decide that

 1   these various causes, particularly when taken in combination

 2   of MGA having Bryant, the inventor, as well as these sample

 3   makers who are making literally dozens and hundreds of Bratz

 4   products for MGA, that at Mattel's lost profits -- whether

 5   those were a substantial cause of Mattel's lost profits,

 6   that's perfectly clear and a perfectly reasonable inference

 7   for the jury to -- to draw from this.  And that's -- that's

 8   the standard for -- for torts.  And the kind of argument

 9   that preceded that, which kind of bleeds into the same

10   point, is where MGA is saying, "Well, you know, that they

11   cannot be held responsible for conduct independently done by

12   others," but the fact is is that Mr. Bryant's decision not

13   to disclose his inventions, his Bratz inventions to Mattel,

14   was not a one-time crystallized event.  It was something

15   that occurred on an ongoing basis.  The jury is more than

16   entitled to infer and decide that MGA was, in fact, a cause

17   of that.

18          Moreover, the jury is certainly entitled to reject

19   MGA's assertions that it didn't know about Carter Bryant's

20   obligations, and it didn't know about the sample makers'

21   obligations.  I mean, what this really boils down to, in

22   many respects, or these arguments that MGA is making, hung

23   jury instructions are -- they are JMALs, and the jury

24   instructions -- these are standard jury instructions for the

25   tortious interference tort, and we believe that they are

 1   appropriate, and these are not arguments for not instructing

 2   the jury, but rather these are just kind of a preview of

 3   their JMAL arguments, and we can obviously, at some point

 4   when it's appropriate, go through the record and give the

 5   Court the specific cites of the facts supporting why it is

 6   that these claims should go to the jury.

 7            The first point that -- that MGA made on this

 8   round was that the jury instructions need to take into

 9   account the fact that there has to be independently wrongful

10   conduct where you have an at-will employment contract, and

11   there's no dispute about that general principle.  The fact

12   is it's already taken into account by the general

13   instruction for tortious interference.

14            The Court will recall that we spent a fair amount

15   of time, I think last weekend and perhaps the weekend

16   before, where we went through and identified the particular

17   provisions that are at issue for each of the individual

18   contracts that are the subject of this tortious interference

19   claim.  So that's already laid out and taken into account of

20   this -- this very legal principle.

21            What MGA now wants to do is go further, and this

22   confuses the basis for the claim, which are those particular

23   obligations that were independent of the at-will obligation

24   or the at-will employment dimension of this, and -- and

25   conflate it with the knowledge element.  And the knowledge

 1    element for tortious interference is knowledge of the

 2    contract.  It is not knowledge of particular provisions or

 3    the so-called conditions of at-will employment.  I mean,

 4    none of that is found anywhere either in the instructions or

 5    in any of the authorities that MGA is citing.  None of those

 6    cases say that because you have to prove this phrase

 7    "independently wrongful conduct" is kind of the one that's

 8    frequently used, but no one ever imposes that and says that

 9    is part of the knowledge requirement.  It's just something

10    that's a different element, just a completely different

11    element, and it confuses the basis for the claim versus the

12    knowledge element.

13            I think two more brief points about these

14    instructions, and these are really -- I think we believe

15    that should be given in addition to what we already have.

16    One is that there is a 305 of CACI, which is for implied in

17    fact contracts, which we think is appropriate to give in

18    this circumstance, and then the other one, and we proposed

19    this, and I have a copy of it for the Court, and we also

20    have now filed it, is that -- and this gets us into

21    another -- it's not directly a contract, but it's

22    sufficiently related that I think it's an appropriate time

23    to raise this discussion.  But the Court will recall that

24    it -- it appears to be inclined to give an instruction on

25    joint authorship, and, you know, joint authorship, while it

1    takes something out of copyright, nevertheless, imposes

2    additional obligations on the parties, and in particular on

3    MGA, which are really in the nature of implied at law

4    obligations.  And joint authorship provides for the sharing

5    of profits.  So to the extent that the jury decides,

6    pursuant to this instruction that's been proposed by MGA and

7    that the Court appears inclined to give on joint authorship,

8    the jury also ought to be told and the verdict form should

9    reflect that if they find that any of these works are

10   jointly owned by Mattel and MGA, that they should award half

11   the profits for that.  That's the rule of accounting that

12   applies in the joint authorship or co-owner situation.  In

13   other words, I mean, basically it's -- it's not a copyright

14   remedy and it's not a copyright issue.  It's one that's

15   imposed by, essentially, the law of contract because both

16   parties become undivided owners of the work.  And if the

17   jury is going to be instructed on that issue, they should be

18   awarding -- or they should -- they should know what the

19   consequence of that is and should award damages based on it.

20           MS. HURST:  I'm going to take that --

21           MR. ZELLER:  That's it.  Thank you, your Honor.

22           MS. HURST:  I'm going to take that last point

23   first.

24           We are now six and seven weeks into trial, and now

25   they want to make a new claim?  They'd never ever once in

 1    any pleading made a claim for accounting of profits based on

 2    copyright joint authorship; never happened.

 3          Now, here we go again, they are trying to make a

 4    whole new claim in the middle of trial, and we will file a

 5    brief responding to that instruction.  Not only that, we

 6    closed out the copyright instructions already.  So here they

 7    come with some claim that it's a disguised whatever

 8    instruction trying to make a whole new claim.

 9          If there is a finding based on a declaratory

10    relief of some kind, that the parties are joint authors with

11    respect to some work, then there would have to be -- you

12    know, that is -- their claim of accounting based on that is

13    now barred by the statute of limitations, as a matter of

14    fact.  But even assuming it's a viable claim that weren't

15    barred by the statute of limitations, the rules of law

16    associated with that have not been briefed or ever been

17    argued.  It's never been separately considered a claim in

18    this case in any way, shape or form.  And now, they want to

19    hedge their bets with some whole new claim where before,

20    they were arguing that joint authorship wasn't even an

21    appropriate concept to be given to the jury, and that's just

22    inappropriate sand bagging.  So the Court should not let

23    them bring in this 11th-hour claim for accounting between

24    co-owners.  And we'll file a brief responding to their

25    proposed instruction on that, which came in yesterday, long

Case 2:04-cv-09049-DOC-RNB   Document 10195   Filed 03/15/11   Page 42 of 45   Page ID
#:308967
CV 04-9049-DOC - 03/13/2011 - Vol. 1 of 3

42

1    after the deadline; it's ridiculous.

2              On CACI 305, implied in fact contract, as we have

3    repeatedly briefed ad nauseam, so I won't get into -- that's

4    inconsistent with copyright law.  You can't get an implied

5    in fact transfer of copyright.  You'd either have to have a

6    work made for hire, or you have to have an expressed

7    assignment transfer in writing under Section 204, and this

8    applied in fact concept plainly violates the Effects

9    Associates v. Cohen case in the Ninth Circuit.

10             Moreover, it violates California law, which says

11   when you have an expressed contract on the issue, you don't

12   look for an implied in fact additional obligation.  So

13   given, 305 would violate both federal and California law,

14   here.

15             And I don't need to belabor any of these other

16   points that we've gone back and forth on endlessly.

17             THE COURT:  Okay.  As many rounds as you'd like,

18   and then that's the door, so anything further on behalf of

19   MGA?

20             MS. HURST:  No thank you, your Honor.

21             THE COURT:  On behalf of Mattel?

22             MR. ZELLER:  Just with respect to this request for

23   accounting issue.

24             Number one, it is not a claim.  A request for

25   accounting is a remedy.  It's not a claim.  And it was also

1    something that we, in fact, specifically did raise in

2    response to their request for an instruction on joint

3    authorship.  We specifically raised that, so it's not new,

4    and it's not a claim.

5            Number two, it's not a copyright instruction, so

6    the point that somehow copyright instructions were closed

7    out misses the boat.  As a matter of law, and there is

8    actually a number of Ninth Circuit cases that describe this,

9    the concept of accounting between joint authors does not

10   arise under the copyright act.  That's Ninth Circuit law.

11   And the fact is is that the statute of limitations argument

12   that they are making, I guess they can -- they can try and

13   assert that, but -- but that doesn't preclude, as a matter

14   of law, the giving of this instruction.  And they are the

15   ones submitting this to the jury.  The jury should, at the

16   same time if it's going to make that determination, also

17   make the determination of the appropriate consequences if it

18   is found to be, as MGA urges, a joint work or jointly-owned

19   work or -- or work that both parties own.

20           And it's certainly true that we argued that we

21   didn't think that that jury instruction should be given at

22   all, but we've lost that battle, and we now believe that --

23   to the extent that the jury -- that the judge, your Honor,

24   is going to give that instruction to the jury, they should

25   have the -- have the further instruction that goes with it

```
 1    and calculate the damages.  There is nothing remarkable,

 2    extraordinary or surprising about that.  We said that very

 3    clearly in our response to their proposed jury instructions.

 4               THE COURT:  Ms. Hurst?

 5               MS. HURST:  I'll leave further comment on that

 6    issue for the brief we intend to file in response to their

 7    late proposed instruction yesterday.

 8               THE COURT:  Okay.  Anything further from either

 9    party?

10               MR. ZELLER:  Nothing from Mattel, your Honor.

11               THE COURT:  Okay.  What else would you like to

12    argue today, what other instructions?

13               (No audible response.)

14               THE COURT:  Why don't we do this and take a break

15    for a moment.  I'd like to go back and just reflect a little

16    in chambers about your arguments.  Why don't you go to

17    Starbucks, or wherever, and get some coffee or have some

18    lunch, and I'll see you at 2:00.

19               (Recess.)

20               (Sharon Seffens reported Volume 2 of the

21          proceedings held after the recess.)

22                              -oOo-

23

24

25
```

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  March 13, 2011

12

13

14                      _____

                        JANE C.S. RULE, U.S. COURT REPORTER
15                      CSR NO. 9316

16

17

18

19

20

21

22

23

24

25