1

2

3

4                    UNITED STATES DISTRICT COURT

5                  CENTRAL DISTRICT OF CALIFORNIA

6                        SOUTHERN DIVISION

7                            - - -

8         THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

10        MATTEL, INC., et al.,
                         Plaintiffs,
11           vs.

                                    CV-04-9049-DOC
12        MGA ENTERTAINMENT, INC.,  STATUS CONFERENCE
          et al.,                   Volume 2 of 3
13                       Defendants.

14        ---------------------------

15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                  Santa Ana, California

19               Sunday, March 13, 2011

20

21                    SHARON A. SEFFENS, RPR
22                    United States Courthouse
                      411 West 4th Street, Suite 1-1053
23                    Santa Ana, CA  92701
                      (714) 543-0870
24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    QUINN EMANUEL URQUHART & SULLIVAN, LLP
     865 South Figueroa Street, 10th Floor
5    Los Angeles, CA  90017
     (213) 443-3000
6

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
9    4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14

15   FOR CARLOS GUSTAVO MACHADO GOMEZ:

16
     ALEXANDER COTE
17   SCHEPER KIM AND HARRIS LLP
     601 West Fifth Street, 12th Floor
18   Los Angeles, CA  90071-2025
     (213) 613-4655
19

20   ALSO PRESENT:

21   MGA ENTERTAINMENT, INC.
     JEANINE PISONI
22   16360 Roscoe Boulevard, Suite 105
     Van Nuys, CA  91406
23

24

25

3

1

2                                    INDEX

3                                                                  PAGE

4    STATUS CONFERENCE                                              4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SANTA ANA, CALIFORNIA; SUNDAY, MARCH 13, 2011; 2:45 P.M.

 2            (Jury not present.)

 3            THE COURT:  I want to give you another opportunity

 4   to argue these instructions.  The Court has put out another

 5   set, another iteration,

 6            Mr. Zeller.

 7            MR. ZELLER:  Thank you, Your Honor.

 8            We had two thoughts on the most recent iterations.

 9   Number one sort of goes back to a point that the Court had

10   raised a little bit earlier today, which is the idea of,

11   well, if Mattel loses on these contract interpretation

12   issues, is the game over for Mattel?  We have also sort of

13   talked about that at some prior sessions.

14            It's our view that even if the jury were to find

15   against us on these contract interpretation issues we would

16   still have viable ownership claims.  Part of that really has

17   to do with the fact that there are certain defined

18   inventions that without a doubt come within the scope of the

19   agreement.  For example, designs would be such a term.

20            I mean, there are tangibles.  There are

21   approximately 90 or so drawings that we believe Carter

22   Bryant created when he was a Mattel employee and that the

23   jury would be entitled to determine that they are well

24   within the scope of the contract, therefore, owned by

25   Mattel, and even if they were to resolve the contract terms
```

 1    against us, particularly with respect to ideas.

 2              The most recent version of the disputed term for

 3    an "ideas" instruction suggests that the Court is

 4    contemplating deleting that bracketed language where it says

 5    at the end -- maybe if I can just get it to quote it.  It

 6    says here in this very last sentence:  "Mattel must prove

 7    that the term 'inventions' includes ideas in order to

 8    exercise ownership of Bryant's ideas (for the names Bratz

 9    and Jade)."

10              Of course the origin of that language including

11    when it was in brackets was from MGA and MGA's statement on

12    the record that that's really the crux of the dispute over

13    whether or not ideas are covered or not.  Does it include

14    the ideas for the names Bratz and Jade?  We think it's

15    appropriate because MGA has itself acknowledged that that's

16    really the core of that dispute.

17              Now to the extent that the bracketed language for

18    the names Bratz and Jade gets deleted, then we are concerned

19    that the rest of that sentence starts to look a little

20    ambiguous and may confuse the jury into thinking we don't

21    have ownership rights beyond that which is encompassed in

22    this notion of ideas, and if they don't find that the term

23    "ideas" is covered by the Inventions Agreement that Mattel

24    loses, which we don't think is the right decision tree under

25    the terms of the agreement, including as it was constructed

1   by the Ninth Circuit where they said without question the

2   drawings and the sculpts were inventions within the meaning

3   of the Carter Bryant Inventions Agreement.

4           The second reaction we had was to the scope of

5   employment instruction.  The Court is absolutely right that

6   the language about scope of employment comes from the Ninth

7   Circuit decision.  That we completely acknowledge and

8   understand that that is its origins, but that doesn't in our

9   view mean that those are the words that should be given to

10  the jury.  Part of it is that they are just not appropriate

11  for these particular jury instructions we believe.  I mean,

12  they are legal terms.  They are terms that the jury we

13  believe should be given some assistance and definition in

14  understanding what that dispute is.

15          Of course we have talked about that as being the

16  case in other situations as well.  Just because it's in a

17  legal decision doesn't mean that that's just de facto the

18  way of trying to describe the concept to a jury and what we

19  would hope would be plain English kind of terms,

20  particularly here what they are really trying to resolve --

21  what we are asking the jury to resolve here are factual

22  disputes; namely, is it a fact that this covers nights and

23  weekend or not?  That's ultimately the fact that we are

24  asking the jury to determine.

25          Part of our concern stems from the fact, too,

```
 1   that -- I mean, our theory isn't that -- well, I should --
 2             THE COURT:  Here is the problem with scope of
 3   employment.  Let me see if I can repeat some of the thoughts
 4   I have had.  Scope of employment can be confusing because it
 5   can be perceived to be durational from 1999 to 2000.  The
 6   issue really is scope of employment being used to try to
 7   find an answer to the novel idea of when ownership of your
 8   ideas ceases.
 9             So, conceptually, if I had a salaried position and
10   I worked 8:00 to 5:00, the real issue we are trying to find
11   out is what happens when I leave my place of employment or
12   on a weekend?  The problem becomes what happens if I work
13   until 7:00 and I am paid overtime?  So "scope of employment"
14   is a word that I am using in relation to the Ninth Circuit's
15   opinion, but it can cause some confusion because what we are
16   really talking about is duration.  But, more importantly, we
17   are talking about what do we do on an everyday basis when we
18   go to work, and when does our "work" cease?  And who owns
19   those ideas either contractually through an Inventions
20   Agreement like this or not?
21             MR. ZELLER:  Right.
22             THE COURT:  So I have used "scope of employment"
23   because the Circuit has used "scope of employment."  I am
24   going to continue to work on that.  I am not closing the
25   door on that issue yet.
```

```
 1              MR. ZELLER:  Here is part of -- one reason why it
 2    seems to maybe set up, No. 1, sort of a dichotomy that we
 3    don't think really exists -- our view is, of course, if he
 4    was doing something that was related to Mattel's business,
 5    even if he was doing it nights and weekends, we think that
 6    is within the scope of his employment, so --
 7              THE COURT:  That argument -- then scope of
 8    employment seems appropriately applied by the Circuit.
 9              MR. ZELLER:  But that still gets us back to the
10    issue of that issue is going to the jury.  I understand that
11    that's our theory.
12              THE COURT:  Why wouldn't I leave it with the
13    Circuit's wording?  In other words, it's an ambiguous term
14    anyway.  Why don't I leave that for your argument.  The
15    scope of employment means the following.  Now, if the jury
16    comes back and asks a question and is specific, then I would
17    respond to that question, but it leaves both parties free to
18    argue what scope of employment is.
19              MR. ZELLER:  The way the instruction now suggests
20    is that we have to prove that it was within the scope of his
21    employment or the contract applies to nights and weekend.
22    That's the difficulty.  We think that they are one and the
23    same.  Duration isn't really a scope of employment per se
24    issue.  I understand it can and was addressed in that
25    context.  In other words, was it nights and weekends during
```

1   the time he was a Mattel employee?

2          Scope of employment also suggests -- this is

3   another reason why it can be somewhat confusing I think to

4   the jury potentially is that MGA has been making other

5   arguments about scope of employment.  Namely, he just made

6   dresses for Barbie.  It potentially conflates these two very

7   separate notions into this one phrase which is really only

8   about time, in other words, nights and weekend because it's

9   at any time.

10          Mr. Quinn.

11          MR. QUINN:  The language in the contract is during

12  my employment.  That's what they are being asked to

13  construe.  By injecting "scope of employment," we are

14  injecting yet another phrase in, which I don't think we need

15  and creates the potential for misunderstanding and --

16          THE COURT:  Let me read it to you.

17          MR. QUINN:  All right.

18          THE COURT:  Judge Kosinsky, Note 10:  "Because the

19  agreement's language is ambiguous," which is why I focused

20  on the word 'ambiguous' as well as the BAJI instruction and

21  some extrinsic evidence supports each party's reading --

22  "the District Court errored by granting summary judgment to

23  Mattel on this issue and holding that the agreement clearly

24  assigned works made outside the scope of Bryant's

25  employment.  See City of Hope, National Medical Center."

1              The issue should have been submitted to the jury,

2    which they could then have been instructed to determine,

3    first, whether Bryant's agreement assigned works created,

4    which is why I used the word 'created' outside the scope of

5    his employment at Mattel, and, second, whether Bryant's

6    creation of the Bratz sketches and sculpt was outside the

7    scope of his employment.

8              Now, I somewhat agree with you and Ms. Hurst.  I

9    think "creation" and "created" works for the Circuit, but I

10   do think it's reduced, so I have changed the wording at

11   least to that extent.

12             Mr. Quinn.

13             MR. QUINN:  I think we ought to give Judge

14   Kosinsky the benefit of the doubt here.  I don't interpret

15   that as speaking with precision in terms of what the

16   contract construction issue is --

17             THE COURT:  Do you want to phone him?  I bet he is

18   working this weekend just like we are.

19             MR. QUINN:  We phone everybody.  Get him on the

20   phone.  I think it's better if you place that call, Your

21   Honor.

22             THE COURT:  Okay.

23             MR. QUINN:  The contract -- really consistent with

24   what we are doing with the other instruction, it seems to me

25   we should go back to the contract language, and that's

```
 1    "during my employment."  If we put scope of employment here,
 2    the jurors may be scratching their heads and think that
 3    means something different.  As Mike says, I think this draft
 4    creates a false dicotomy, and then it says we either have to
 5    prove its within the scope of employment, or we have to
 6    prove that nights and weekends are covered.  Phrasing it
 7    that way assumes the conclusion that nights and weekends are
 8    not within the scope of employment, which is precisely the
 9    issue to be decided if by scope of employment -- if that's
10    just another phrase for during my employment, which is the
11    contract language.
12              THE COURT:  Okay.  Let me hear from MGA for a
13    moment.  I think this is going to be the most difficult
14    instruction to deal with.
15              MS. HURST:  It probably is.  I'm going to grab it
16    so I can look at it while I am talking if that's okay.
17              THE COURT:  Yes.
18              MS. HURST:  Mattel's argument is exactly wrong,
19    and it's exactly the error that was reversed.  They are
20    saying that "during" is a word that implies only time.  I
21    wrote this down carefully.  The phrase is only about time.
22    That was Judge Larson's interpretation.  That was the
23    interpretation that was rejected.
24              They are pushing towards the same error again by
25    arguing that it's only about time.  What the Ninth Circuit
```

1  found is that the word "during" is ambiguous.  If you look

2  it up in the dictionary, you can see why.  There are

3  multiple meanings, one of which encompasses the notion of

4  scope, so hence the footnote, hence exactly the Court's

5  proposed instruction.

6          The Court has proposed the term "and at any time

7  during my employment" in the January 4, 1999, Employee

8  Confidential Information and Inventions Agreement refers to

9  the scope of Carter Bryant employment between January 4,

10  1999, and October 19, 2000.  However, the parties dispute

11  whether the term also extends beyond the scope of Carter

12  Bryant's employment and includes nights and weekends.

13          This is another dispute you must resolve.  1.

14  Mattel must prove that Carter Bryant's Bratz-related

15  inventions were conceived or reduced to practice between

16  January 4, 1999, and October 19, 2000.

17          Two, Mattel must also prove that the inventions

18  were conceived or reduced to practice at any time during

19  Carter Bryant's employment either because (A) the inventions

20  were conceived or reduced to practice during the scope of

21  Carter Bryant's employment, or (b), the term "at any time

22  during my employment" extends outside the scope of Carter

23  Bryant's employment and includes nights and weekends.  I

24  read that into the record because we are okay with it, and I

25  wanted it to be clear what we are saying we are okay with.

1    MGA is fine with this.

2              THE COURT:  Now, if I make another iteration, I

3    will come back to you and inform you.  I just want some time

4    to think about it.

5              It's 3:00 on Sunday, and I want to move on to some

6    other matters.

7              MS. HURST:  May I comment on the ideas one as

8    well?

9              THE COURT:  Certainly.

10             MS. HURST:  It's true that the other day I said I

11   think that the crux of this is the ideas for the names Bratz

12   and Jade.  However, having since thought on the issue, I

13   realize the trade secret claim has a whole bunch of other

14   ideas in it.  I was thinking about this from the Phase I

15   perspective to be quite honest with the Court, so I am going

16   to retract that concession.  I am doing it expressly to the

17   extent that's available.

18             THE COURT:  That's why I bracketed it.

19             MS. HURST:  Yeah.  Having thought better of that

20   because of the trade secret claim, which was not there

21   before, and now that it is here and they are claiming ideas

22   are trade secrets and are assigned to them under the

23   agreement, it's not just the drawings and the names.  It's

24   whatever other ideas are there.

25             THE COURT:  I can take off that second question I

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

 1   have then.  That may have been resolved it for me.

 2           Mr. Zeller.

 3           MR. ZELLER:  I'm sorry.  When you say the second

 4   question --

 5           THE COURT:  The second question was Bratz and

 6   Jade.  I didn't think that that was an appropriate

 7   limitation now in light of the trade secret misappropriation

 8   claim.

 9           MR. ZELLER:  If the Court is going to delete the

10   bracketed language, then the whole last sentence has to be

11   changed because it makes it sound like our only avenue of

12   ownership is if we own through ideas.

13           THE COURT:  Go take a pencil and just write on the

14   instruction.  Let me see your best thought.

15           Finally, I want to come back to the last I think

16   significant change, and that's from 320 to the 1654.  I took

17   that right from the statutory language.  I thought that that

18   was more appropriate.  I think it captured the concept.  I

19   think it saves the interpretation by jury committees.  It's

20   literally out of the statutory language.

21           So let me hear from MGA.

22           MS. HURST:  We're good.

23           (Pause in proceedings.)

24           THE COURT:  Mr. Quinn is going to read or

25   Mr. Zeller what their additional or proposed language is.

1          MR. QUINN:  This would be the disputed term

2     "inventions."  Our only change is to the last sentence.

3          Should I read the whole thing?

4          THE COURT:  Yes, so the Circuit has the courtesy

5     of having that.

6          MR. QUINN:  "The term 'inventions' in the

7     January 4, 1999, Inventions Agreement includes:

8     'discoveries, improvements, processes, developments,

9     designs, knowhow, data computer programs, and formulae,' and

10    you therefore need not determine whether such items are

11    covered by the term 'inventions.'  However, the parties

12    dispute whether the term 'inventions' also includes 'ideas,'

13    and this is the dispute that you must resolve."

14         Here is our proposed new sentence, the last

15    sentence:  "In order to exercise ownership over a Carter

16    Bryant creation under the agreement, Mattel must prove that

17    the creation is an 'invention' within the meaning of the

18    agreement."

19         So we have told them it's undisputed what the

20    agreement says.  We have told them there is one issue about

21    ideas, and that's something you are going to have to decide.

22    Then we have a concluding it's up to you to decide.

23         THE COURT:  Frankly, it's another way of not

24    including the word "ambiguous," which gives leverage to one

25    side, or a reasonable interpretation, which gives leverage

```
 1    to one side.  What both of you are suggesting -- or at least
 2    one of you is suggesting is that I not go back to the
 3    liberal language of the Ninth Circuit opinion because the
 4    Ninth Circuit can write with those terms in reversal, but
 5    that might not be the appropriate way to fairly instruct the
 6    jury.
 7              MR. QUINN:  Right.
 8              THE COURT:  Ms. Hurst.
 9              MS. HURST:  I think the language they added if I
10    have read it correctly is in order to exercise ownership
11    over Carter Bryant's Bratz creation under the agreement,
12    Mattel must prove that the creation is an invention under
13    the agreement.  I just object to the word "creation."  I
14    don't think that's grounded in the contract or the dispute
15    or anything else.  I would change it to "idea."
16              MR. QUINN:  That's a problem then because what if
17    it's a design?  It can't be limited to just -- we have got a
18    number of potential ways of describing a piece of property,
19    whether it's an idea, a design, a process, or a formula, and
20    the concluding sentence has got to be we have got to prove
21    that it falls within that umbrella.  If you just say "idea,"
22    you have left out the possibility that we may recover on one
23    of the other bases even if ideas are not included.
24              THE COURT:  All that we are really saying is you
25    don't want "idea" isolated without a reference back to
```

designs, knowhow, data, et cetera?  In other words, you

don't want your concluding sentence to isolate "idea"?

MR. QUINN:  Right.  It's a catchall.  We have told

them this is the universe.  You now decide if it falls

within the agreement, and we have told them there is a

dispute about whether ideas are in the agreement.

MS. HURST:  But this is where they are trying to

have their cake and eat it, too.  They caused the problem

for themselves by making the trade secret claim, and now

that they have made the trade secret claim in 9801 they have

put at issue ownership of a bunch of different combinations

of ideas, whether or not embodied in a design.  That's the

way 9801 is written, and now that they have done that they

have got to live with it, and the instructions have got to

be tailored to that.  That's what is different now that we

didn't have before, this claim in 9801 for these ideas and

combinations of ideas.

MR. QUINN:  A design can be an idea.  Any one of

these things can be ideas.  If we put to the jury the sole

question you to have decide whether it's an idea, then we

need a decision tree.  If you decide it's not an idea, then

you have to decide if it's this, and you have to decide if

it's this, and you have to decide if it's this.  They have

to find yes or no as to each.

THE COURT:  Well, I toyed with this idea, but I

```
 1    have rejected it so far.  In the special verdict form, I
 2    actually toyed last week or the week before with going down
 3    each of the categories of formula, data, and having them put
 4    a checkmark including ideas.  The problem is it's ridiculous
 5    because they are already being instructed that you have
 6    don't have to worry about formula, computer programs,
 7    designs, knowhow, data processing, improvements,
 8    discoveries.  I basically tell them in the opening it's off
 9    the books.  You don't have to be concerned about it.
10              For a while I want you to know, conceptually, I
11    actually decided in the special verdict form just to have
12    them check them off, although I thought that was ridiculous
13    after a while.
14              MR. QUINN:  The other problem is that it includes
15    the phrase, "including, but not limited to."  So then you
16    would have a box to check, well, we think it's some other
17    invention which isn't named.
18              THE COURT:  Okay.  Well, unless there is something
19    else, let me move on.  I am still looking at this
20    instruction.  I think it's the most difficult instruction I
21    am going to deal with frankly.  You can see where I am going
22    in terms of 1654.  I am pretty far along in terms of taking
23    out "ambiguity" and taking out the "reasonable
24    interpretations.
25              Let me raise three more things for you today.
```

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | First, I want to go over this choice of law.  At least at              |
| 2  | the present time, we need to instruct the jury about how to            |
| 3  | decide whether to apply the law of Mexico or California as             |
| 4  | to MGA Mexico and Machado.  Second, I need to instruct the             |
| 5  | jury about what Mexican law requires.                                  |
| 6  |            How are we going to go about that?                          |
| 7  |            MR. QUINN:  Are you sure that you want to submit            |
| 8  | to the jury the choice of law question?  That seems to me to          |
| 9  | be really a question for the Court.                                   |
| 10 |            THE COURT:  Well, there are a lot of questions             |
| 11 | that the Court thinks it should resolve, including ideas,             |
| 12 | including statute of limitations, but since it's being               |
| 13 | submitted all the way across the board and the Ninth Circuit         |
| 14 | has given me directions -- you have to remember a colleague          |
| 15 | who I truly love, Judge Pregerson -- I keep reminding you of         |
| 16 | Judge Whelan's case down in San Diego involving offshore             |
| 17 | narcotics boats -- who reversed Judge Whelan on the issue of         |
| 18 | jurisdiction.                                                         |
| 19 |            Jurisdiction is typically -- or historically has          |
| 20 | been a Court determination.  Did the United States have              |
| 21 | jurisdiction 800 miles or 1,500 miles at sea?  Judge                 |
| 22 | Pregerson in that opinion stated -- the case was reversed on         |
| 23 | one sole issue and, that is, that Judge Whelan should have           |
| 24 | submitted that to the jury on the issue of jurisdiction.             |
| 25 |            Right or wrong that has a huge repercussion, and          |

1    since we are going to spend three or four months together, I

2    might as well take the Ninth Circuit's wise advice, and they

3    say bascially submit it to the jury.  So whether I think I

4    should be deciding the idea of ideas or not it's to the

5    jury.  It's the same with the statute of limitations.

6            MR. ZELLER:  Well, I am wondering on this -- there

7    might actually be an agreement among all the parties tht

8    choice of law notwithstanding what the law could or should

9    be -- I know for our part we would be willing regardless

10    submit it to the Court as a legal issue to decide.  There

11    may be a consensus also on the side that it's appropriate

12    for the Court to make that determination.  Obviously if they

13    don't, then we are into a jury issue.

14            THE COURT:  Have you talked to them?

15            MR. ZELLER:  We have not discussed that.

16            THE COURT:  Why don't you go over and talk to

17    them.

18            (Counsel conferring.)

19            THE COURT:  I want to share a thought with you.

20    If you both agree, then I am going to require you to

21    stipulate how the jury would be instructed, because without

22    without a stipulation, I am going to hear a complaint

23    possibly that one side is being prejudiced.  I talked to

24    counsel informally this morning before the court reporter

25    came in about whether the Court should literally decide the

1   Rule 50 motion a short time before this went to the jury and

2   subject to the briefing which I think, Mr. Cote, you were

3   going to file next Sunday, which is only two weeks from the

4   date that the case will go to the jury, and I expressed a

5   concern that if Mr. Machado was removed from this case at

6   this time with the standard instruction that doesn't inform

7   the jury anything other than you are not to basically be

8   concerned about why Mr. Machado is no longer with us, you

9   are not to speculate, then MGA potentially is hired because

10  one of the reasonable inferences that the jury might draw is

11  that there was a settlement reached between Mattel and Mr.

12  Machado just as it was between Carter Bryant on the eve of

13  trial and Mattel in Phase I.  I would decline to go any

14  further unless there was a stipulation between the parties

15  in terms of an explanation.

16          I also indicated to Mr. Cote that the easiest way

17  to resolve this was if I let this go to the jury, I could

18  certainly decide that even while the jury was deliberating

19  or a short time after a verdict if there was a verdict.

20          It's also quite apparent to the Court that without

21  Mr. Machado's involvement in the case that Mattel would have

22  never been able to present any evidence concerning the MGA

23  de Mexico proceedings, and I was deeply concerned about the

24  two major litigants at this time having any prejudice befall

25  to them because either Mr. Machado departed without

| | |
|---|---|
| 1 | explanation -- without that stipulation, I am sending it in |
| 2 | all likelihood to the jury.  I think the prejudice to MGA is |
| 3 | particularly overwhelming at this point because of the |
| 4 | assumption that Mattel had made a deal with Carter Bryant. |
| 5 | I leave that both of you.  If you have a stipulation, I am |
| 6 | glad to listen to it. |
| 7 | MR. COTE:  I don't believe the parties have a |
| 8 | stipulation right now. |
| 9 | THE COURT:  I didn't think you did either, but I |
| 10 | wanted to let you discuss it.  You can always come back to |
| 11 | the Court, and it doesn't mean that the Court is going to |
| 12 | accept it. |
| 13 | MR. COTE:  Can I just be heard briefly on that |
| 14 | point? |
| 15 | THE COURT:  Sure. |
| 16 | MR. COTE:  I would suggest that the prejudice the |
| 17 | Court is concerned about could be remedied with an |
| 18 | instruction that says that Mr. Machado is no longer a part |
| 19 | of this case or language that could be agreed upon but |
| 20 | conveys that it's inappropriate to decide the issue in |
| 21 | Mexico or -- |
| 22 | THE COURT:  There is a standard instruction on |
| 23 | this that the Court would read, both a civil and an old BAJI |
| 24 | instruction, that the jury is not to speculate about why the |
| 25 | party is no longer before them for consideration.  Now, I am |

```
 1    just paraphrasing that.  Without a stipulation of the

 2    parties as to the exact wording, I am reluctant to say

 3    anything further than that rather neutral instruction.

 4              MR. COTE:  I understand that is the Court's

 5    holding.  I just wanted to articulate our view.

 6              THE COURT:  As soon as you reach a stipulation

 7    with the other party, I will certainly listen.

 8              MS. HURST:  I have a third way.

 9              THE COURT:  Okay.

10              MS. HURST:  In the absence of a stipulation, we

11    still don't think it's appropriate to submit the choice of

12    law to the Court.  I am not saying we won't reach a

13    stipulation.  Don't get me wrong.  The Court should be

14    deciding not only the choice of law, but also should be

15    making the preliminary factual determinations necessary for

16    the application of the choice of law.

17              There is very little case law on this.  I am sure

18    the Court has probably spent more time looking at it than we

19    have at this point.

20              THE COURT:  Let me repeat there is very little

21    case law.

22              MS. HURST:  Based on the limited case law I have

23    seen and the restatement of conflict of laws and so forth

24    contemplates that the Court makes the decision not only on

25    the choice of law, but also on the preliminary factual
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    determinations necessary for application of the law.

2            Now, the Court is -- I don't agree with you that

3    they wouldn't have had evidence about their Mexico claims

4    because we would have produced our witnesses and so forth,

5    but nonetheless the Court has proceeded in the fashion it

6    has proceeded in based on a fully justified desire to have

7    the jury hear all the evidence that's pertinent to the

8    claims of Mattel versus MGA and Mr. Larian, but that doesn't

9    mean that the Court has to give what would undoubtedly be an

10   excessively confusing, complicated, and improper issue to

11   the jury at the end of the day, and you also don't have to

12   let Mr. Machado out before the jury deliberates.

13           THE COURT:  Explain that to me.  I want to know

14   how to do that.  I am just joking with you.

15           MS. HURST:  You're right.  The issue is the

16   verdict form, but the instructions -- instructing on this

17   choice of law issue does not make sense.  That's something

18   we all agree on.

19           MR. COTE:  It is hard to imagine how to instruct

20   the jury particularly to balance --

21           THE COURT:  We're working on it.

22           MR. COTE:  -- competing interests.  I'm not sure

23   how they could even make such a decision even if they were

24   instructed.

25           THE COURT:  We are pretty far down the line.  I am

| | |
|---|---|
| 1 | not saying it's good.  I am just giving you an opportunity |
| 2 | to control it.  We have been working on it quite a while. |
| 3 | MR. MCCONVILLE:  One other point, I know you were |
| 4 | focusing on the prejudicial effect on MGA if Mr. Machado |
| 5 | leaves the case and you give the standard instruction.  One |
| 6 | other concern that we have is if the Court ultimately |
| 7 | decides as a matter of law that Mr. Machado should be out of |
| 8 | the case -- and I understand you haven't made that decision. |
| 9 | THE COURT:  I can delay that until after the |
| 10 | verdict. |
| 11 | MR. MCCONVILLE:  Well, our concern is if you have |
| 12 | made the legal determination prior to the case going to the |
| 13 | jury, then we think that the decision likely would be |
| 14 | beneficial to us, because then when it comes to closing |
| 15 | argument, if the Court makes a findings as a matter of law |
| 16 | that Mr. Machado is out, then we believe we would have a |
| 17 | good argument that MGA de Mexico is out as well, so both |
| 18 | would be out.  Then no one would be arguing to the jury |
| 19 | unless in a prejudicial manner the evidence that was adduced |
| 20 | during trial related to MGA Mexico. |
| 21 | We would like the Court to consider the |
| 22 | prejudicial effect of if you find as a matter of law that |
| 23 | Mr. Machado is out and hopefully MGA Mexico is out, then we |
| 24 | wouldn't have to argue to the jury information which is |
| 25 | prejudicial because it's legally irrelevant.  I mean, there |

```
 1    is an additional prejudice to MGA from delaying a decision
 2    about the effect of the Mexican choice of law because then
 3    no one would have to argue to the jury unless it -- in an
 4    improper manner the evidence as it relates to Mexico.  I
 5    just wanted to say that for the record.
 6              THE COURT:  Mr. Zeller.
 7              MR. ZELLER:  Just briefly on that last point, it's
 8    simply not the case that even if Mr. Machado and MGA Mexico
 9    were dismissed as parties that the evidence of the thefts in
10    Mexico would become improper and wouldn't have continued
11    relevance.  Regardless, those thefts will still be asserted
12    against MGA and against Mr. Larian.
13              THE COURT:  I understand that.  It's the
14    impression that it makes on the jury.
15              MR. ZELLER:  Right.  That's a separate issue, but
16    Mr. McConville seemed to be invoking an additional level of
17    prejudice.  I just don't think that that's correct.  As the
18    Court has pointed out, there is a standard instruction for
19    this.  It happens in all civil cases whenever a party is
20    dismissed or has settled or whatever the case may be.  This
21    instruction has literally been given thousands of times by
22    trial courts.  It's in fact very routine.
23              THE COURT:  Well, we will leave that for another
24    day, but I want to raised that with you.
25              Right now, in all likelihood, I am waiting for
```

1    Mr. Cote's briefing that you said would be next Sunday.

2              MR. COTE:  Next Sunday.

3              THE COURT:  With the volume of work that the Court

4    is doing, I will get to it as soon as I can, but I am not

5    promising you that it will be even that week.  The case

6    needs to keep moving.

7              MR. COTE:  I understand.  If we can get it to you

8    earlier -- we hope to.

9              THE COURT:  I don't know if a day or two makes a

10   difference.  I need to keep the case going as best I can.

11   There are lots of evidentiary issues, and there is going to

12   be some profound arguments and legal issues to decide.

13             Now, I want to talk to you about a special verdict

14   form for just a moment.

15             MR. COTE:  Can I just say one thing?

16             THE COURT:  Sure.

17             MR. COTE:  I just want to say this on the record

18   even though we talked about it earlier informally.  Even if

19   the Court is not inclined to grant judgment as a matter of

20   law as to the entirety of the claim against Mr. Machado, we

21   would still like to ask the Court to consider arguments that

22   we raised narrowing the issues because it would radically

23   affect closing arguments, how much time we need for closing

24   argument, how much time we need to share with MGA for

25   closing argument.

 1              THE COURT:  When do you want to raise this?

 2              MR. COTE:  It will be in the motion.  We don't

 3    need a decision on that until closing argument, but --

 4              THE COURT:  Remember I am going to do my best.  I

 5    have got you in here on Saturdays and Sundays.  I will try

 6    to get to it, but I am warning you I am going to keep the

 7    case moving at six hours a day with all the evidentiary

 8    objections and with the different firms, Mr. Quinn's firm

 9    and Ms. Hurst's firm and all their associates.  We will get

10    to it, but remember if I have to, I will decide it after the

11    verdict comes in.

12              MR. COTE:  We will be available to argue it at any

13    time.

14              THE COURT:  The law allows me to do that, so I am

15    just saying to you we will do our best.

16              How do we ask the jury to specify which theory of

17    liability applies under the Uniform Trade Secret Act?  Mark

18    Linley wrote in that article -- he's at Stanford.  Remember

19    he used to be over at Cal, over at Berkeley.  He talks about

20    the Trade Secret Act incorporating different laws like

21    fiduciary duty, contract law, criminal law, property law.

22    Some of these laws may be preempted by the Copyright Act but

23    not others.  Therefore, some of the theories of liability

24    under the Trade Secret Act may be preempted but not others.

25              So how do I get special findings to aid this Court

```
 1    and the Circuit on that preemption issue?  In other words,
 2    how do I deal with that?  Along those lines, I referred you
 3    to the LDS case up in Idaho that I was sitting by
 4    designation on.  That's LDS Church and Boys Scouts of
 5    America, 09-351 -- Doe versus LDS Church.  That of course
 6    involves the question of whether a single claim for abuse
 7    can be subject to the laws of two states, as well as two
 8    statutes of limitations, when the alleged abuse occurred in
 9    both Idaho and Oregon.
10            Any thoughts?
11            If none, then I am going to go back probably AND
12    possibly have you go home today, and I am going to get to
13    work on your special instructions apparently without your
14    help, which you don't want me to do by myself, but --
15            MR. MCCONVILLE:  I thought -- as I recall, you
16    mentioned that cite, and you said you would let us know when
17    you want us to file a brief.
18            THE COURT:  I don't want you to file a brief.
19    Have you read the case?  That's all I know I want to know.
20            MR. MCCONVILLE:  Mr. Parker is reading.
21            MR. ZELLER:  We have read it.  As the Court is
22    aware, we think conceptually that is the proper analysis,
23    that it needs to be segmented, particularly when it comes to
24    trade secret.  We think that's true of statute of
25    limitations.  We think that's true of really a number of
```

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | different doctrines that we have all been struggling with.             |
| 2  | We definitely agree that's the right conceptual approach.  I           |
| 3  | mean, for our part, it's a little hard for Mattel to propose           |
| 4  | instructions on this simply because -- at the outset, as the           |
| 5  | Court is aware, we think that supersession has already been            |
| 6  | applied too broadly.                                                    |
| 7  | One thing, too, that we haven't quite grappled                         |
| 8  | with -- we being the parties -- there is a tension between             |
| 9  | the MGA and Machado parties' positions on the application of           |
| 10 | Mexican law and supersession.  I mean, they have already               |
| 11 | been out there in front for quite some time and already                |
| 12 | obtained some rulings about supersession.  That's of course            |
| 13 | under the California Trade Secret Act.                                  |
| 14 | If it is the case as they now have sort of also                        |
| 15 | been arguing that Mexican law applies and not California,              |
| 16 | supersession shouldn't be applying at all, so there is a               |
| 17 | another layer of complexity that the defendants have put               |
| 18 | here, and I think there is a significant tension between               |
| 19 | their positions on this.  For those reasons, it's very                 |
| 20 | difficult for us to come up with a jury instruction because           |
| 21 | we as you know substantively disagree with some of these --            |
| 22 | with the application of supersession and the way that MGA              |
| 23 | and Macahdo have argued it.                                             |
| 24 | What I would say is that -- what we have said in                       |
| 25 | the past is that we don't think it's something that the jury           |

```
 1    should be instructed on.  That strikes us as something that
 2    is purely a legal issue.  The jury ought to be told
 3    factually what they are going to be determining and make
 4    those determinations.  We agree conceptually with the
 5    Court's approach in the Idaho decision, which is it can be
 6    segmented and compartmentalized and not treated just as all
 7    one big bucket of trade secrets.  We don't think there is
 8    probably much reason to go to the jury and say -- which I
 9    think was the MGA proposal at one point -- by the way, even
10    if you find in favor of Mattel on these claims, some of this
11    stuff is preempted if you decide to preempt it.
12              THE COURT:  Why is the conversion claim going to
13    the jury?  If the jury finds trade secret misappropriation,
14    I certainly know what to do, and if they don't, I certainly
15    know what to do.  Why am I submitting the conversion claim
16    to the jury?
17              MR. ZELLER:  The first part of that answer I think
18    is just simply that it's not superseded.  Obviously the
19    conversion claim is for the tangible items that have been
20    converted, so it is not superseded by the Trade Secret Act.
21              THE COURT:  Why wouldn't I simply act upon their
22    finding?  In other words, it causes some confusion.  It's
23    almost needless.  I take my direction from the trade secret
24    misappropriation.
25              MR. ZELLER:  Because the jury still has to
```

```
 1   determine what the damages are.
 2            THE COURT:  Well, the damages as Judge Larson said
 3   were minimal, almost diminimus, so it doesn't cause -- you
 4   know, you acquiesced to dismissal.  I am just wondering why
 5   I as the Court am submitting it to the jury.
 6            MR. ZELLER:  Just to elaborate a little bit on the
 7   damage point, the fact is that the first jury made a
 8   determination as to what the value of the drawings were
 9   based upon a theory that MGA's counsel espoused in closing.
10   It wasn't our theory.  We have other theories as to how that
11   ought to be valued.  That said, I certainly would perhaps
12   give some thought to whether or not this is something we can
13   simply --
14            THE COURT:  I am just raising this for one reason.
15   You are asking for under hundreds of millions of dollars,
16   and you throw in a claim that I am going to limit you on.
17   When I get done with the instructions, I am just informing
18   Mattel that is going to be a very finite amount of damages.
19   All of a sudden you get the Court instructing on a
20   conversion claim.  Basically I am going to return the
21   property.
22            I mean, that's why I need Mr. Quinn here to think
23   through that as trial counsel and Mr. Price if that's really
24   the position you want to be in.  It looks like you are
25   chasing chicken feed, you know, when you are after bales of
```

1  hay, but I leave that t you.   I may submit it to the jury.

2  I am not saying I am not.   I am just wondering why, and I

3  don't want to do a lot of work on it if in fact that's not

4  your decision.   I am just curious how that plays out.

5          Now, the problem is I know you can't dismiss that

6  because you have got -- you know, in Phase I -- depending

7  upon what happens in Phase I, that could have some

8  implications, and I understand the tactical disadvantage,

9  which is why in some ways without your acquiescence I don't

10  want to put you if that position.   I want to preserve your

11  Phase I appeal and not put you in these boxes.

12          MR. ZELLER:  That's where I was headed.   There may

13  be reasons -- practical reasons not to submit it, so we will

14  discuss that and let the Court know because obviously we

15  completely understand and recognize and wouldn't want the

16  Court to be putting work into something that ultimately if

17  you can just simply apply it --

18          THE COURT:  It's not even that.   Actually it's

19  already done.   I have condensed it down to one instruction.

20  That's what I am going to give to the jury.   I don't have to

21  do that much more work.   I am just wondering if Mattel

22  really wants to be in that position of asking for hundreds

23  of millions of dollars and having a claim worth the paper

24  it's printed on.

25          MR. ZELLER:  It does complicate the jury's task.

1    I mean, they obviously already have enough to do.  Those are

2    all obviously very well-taken suggestions.

3            THE COURT:  Let me know by sometime early in the

4    week because the final instructions are being submitted and

5    given to me now.

6            MR. COTE:  Can I respond briefly to the perceived

7    conflicts between the positions of applying Mexican law and

8    applying California law that Mr. Zeller raised?

9            THE COURT:  Sure.  Let's change subjects.

10           MR. COTE:  If Mexico law applies, preemption

11   doesn't matter because every single claim is barred by the

12   statute of limitations, which is just two years.  If

13   California law applies, then every single claim except for

14   the trade secret claim is preempted by the trade secret

15   cause of action.  So there is no conflict.  Under either

16   scenario, those torts don't go to the jury.  I just wanted

17   to make sure that's clear on the record.

18           MS. HURST:  I want to make sure we have the right

19   case that the Court referred to, Doe versus Corporation of

20   the Association of the Presiding Bishop of the Church of

21   Jesus Christ of the Latter Day Saints and Boy Scouts of

22   America.  This was a venue transfer?

23           THE COURT:  Yes.  It's 09-351.  The fact situation

24   is that the adult I believe was taking children out of the

25   Boise area.  Significant molestations allegedly occurred in

```
 1   Idaho, but a number of molestations took place in Oregon
 2   just across the border at a camp.  Oregon literally has the
 3   broadest statute of limitations that you can find in this
 4   area, and Idaho has the most restrictive.  I think Idaho is
 5   seven years if I am not mistaken, and I think that the
 6   Oregon statute is literally indefinite, so you have these
 7   two neighboring states where this molestation is taking
 8   place at various times with different young boys.
 9            MS. HURST:  Then if I understand the Court's
10   question correctly, I don't think that would have any
11   pertinence to the preemption issue as between copyright and
12   trade secret because there we are really dealing with the
13   supremcacy clause issue.  I think the Court -- so the
14   position that we have taken, which I think is the correct
15   one -- and we have all acknowledged that there is not a lot
16   of law in this area -- is that if the trade secrets boil
17   down to the specific expression in the drawings -- which, by
18   the way, we think in Docket 9829 they conceded that they
19   do -- then copyright preemption applies, and they cannot get
20   damages for the trade secret claim on top of the copyright
21   claim because there is a conflict between the federal law
22   and the state law where the state law would arguably allow
23   for a greater range of protection than the federal law
24   would.
25            Now, if instead we view the Ninth Circuit opinion
```

```
 1    as determining that those elements aren't original for
 2    either copyright or trade secret purposes and we understand
 3    the trade secret claim to be limited to the scope of the
 4    copyright claim, then the problem -- that's another way that
 5    the problem goes away effectively, because in essence the
 6    Court can determine that the trade secrets to be submitted
 7    to the jury can't be anything more than what the copyright
 8    claim would be in which case allowing recovery on both
 9    claims would be a duplicative recovery.
10              THE COURT:  And that's potentially Judge
11    Kosinsky's opinion in a backdoor way in this argument about
12    complete preemption because it's being limited by the amount
13    of damages pursuant to the copyright claim.  Here is the
14    clash once again.  It's a very simple clash.  First, it's a
15    state like California that encourages employee mobility from
16    company to company unlike the state of Washington, but
17    guards itself by a fairly strict trade secret
18    misappropriation state law claim.
19                   In other words, policywise, my belief has always
20    been that that's the way California in a sense allows its
21    employee the mobility and the creativity to move from
22    company to company, but they have a rather stringent trade
23    secret misappropriation claim.  The state of Washington is
24    not as encouraging in terms of employee mobility, but if you
25    look by comparison at their trade secret misappropriation,
```

 1    it's a much more watered down version.

 2            Second, you have this historic clash that the

 3    Circuit and the Supreme Court are eventually going to have

 4    to decide, and, that is -- although Judge Kosinsky in the

 5    tapes we watched was not enamored with the different state

 6    misappropriation claims -- I think he made the statement he

 7    didn't like the patchwork -- the Supreme Court might readily

 8    disagree with that.

 9            Since I think this case is eventually going to the

10    Supreme Court, it's not only the Ninth Circuit but

11    eventually the Supreme Court is going to have to make a

12    decision, and it may be as simple as this.  A generation

13    like mine might believe that if you stole the car from my

14    family and you put mufflers on it and you fix the car up,

15    then when the car was returned to me, the thief didn't get

16    sweat equity -- now, that's a bad analogy.  I can think of a

17    lot better analogies -- and there was no profit that went

18    into that, so concept of sweat equity.  That's somewhat what

19    California trade secret misappropriation may represent.

20            There is a newer generation.  It's my children's

21    generation, so let me pick on my children.  They go on the

22    internet.  Information flows freely.  They think nothing

23    more about downloading an I-Tunes because the information,

24    for goodness sakes, is on the internet.

25            Conceptually, my generation dealt with a piece of

1    paper that we literally locked up or had in our house, and

2    if somebody came in and took that piece of paper and

3    physically took it out of the house, there's your trade

4    secret misappropriation.  Now the information is so

5    free-moving that the new generation, rightly or wrongly, has

6    a much broader view because it's out there on the internet.

7            I think Judge Kosinsky is inclined to move towards

8    what I call the newer generation, not that it's even

9    perceived to be theft.  It's just there, and it's public.

10   The clash that we are facing I think is generational.  I

11   think it's state and federal.

12           I am not too certain that this Court is going to

13   be in a position of literally defining what the Circuit and

14   the Supreme Court hasn't defined yet, which is the Catch 22

15   that I have been very blunt with both of you about.  On the

16   one hand, I have indicated to Mattel that I am not concerned

17   about letting the trade secret misappropriation go up as

18   long as you have a basis for that, as long as I have the

19   ability of the Circuit to look at this record and reverse me

20   in total or parts.

21           If it's just thrown together, I am very concerned

22   because Judge Kosinsky and the panel won't know what

23   occurred here.  If the verdict is large,                    $500

24   million, $300 million, $200 million, whatever that is, I

25   might expect that they might overturn it based upon the

| | |
|---|---|
| 1 | sweat equity concept, and I would find no fault with that. |
| 2 | By the same token, I have indicated to you that I |
| 3 | think the wave of the future, Ms. Hurst, really will become |
| 4 | -- I think eventually it's going to be preemption.  I think |
| 5 | down the line, five, 10, 15 years from now, that copyright |
| 6 | is going to preempt these trade secret claims, but we are |
| 7 | not there yet.  The Supreme Court is going to have to decide |
| 8 | what deference they want to pay to these different states, |
| 9 | which are all over the place in terms of preemption, and I |
| 10 | only have to look at the Pacific Northwest to see how |
| 11 | different it is. |
| 12 | Now, that doesn't resolve any of your problems. |
| 13 | It's just some of the philosophical issues that I have been |
| 14 | trying to simplify in my own mind.  I am realizing more and |
| 15 | more that so much of this is generational, and so much of |
| 16 | this has to do with employee mobility.  Therefore, if I can |
| 17 | give this to the Circuit within reason in the broadest |
| 18 | context and have the Circuit reverse me where I have made an |
| 19 | inappropriate decision, but not taking away from each of you |
| 20 | arbitrarily or making a decision that might be wrong and |
| 21 | then having this case literally come back to this Court in |
| 22 | two or three years -- I think that's extraordinarily |
| 23 | detrimental to Mr. Larian who can't afford this litigation |
| 24 | at some point and the last thing that you want.  I think |
| 25 | it's extraordinarily detrimental to Mattel.  You have |

1    already been reversed one time.

2            So I am going to come back and ask a very

3    philosophical question of both of you and on the record.  It

4    may be that this is a unique case where trade secret

5    misappropriation should not go to the jury on lost profits

6    or unjust enrichment, that this is what I call a running

7    royalty case, which then would be potentially synonymous

8    with your argument about copyright.

9            Now, there are broader categories you understand.

10   The funnel is wider, but you had indicated to me

11   informally -- and I am not holding you to that -- that I

12   thought that you want to see what the money damages award

13   was, because if it's diminimus, you prevail.  That's a huge

14   victory.  If it's neglible or if it's reversed, you prevail.

15   Mattel has to get $100 million or more on this case to

16   prevail.

17           So I am only asking you both to think through

18   that, because at one time I did toy with taking away unjust

19   enrichment, lost profits -- this was four weeks by the

20   way -- and saying this is a very complicated situation where

21   the jury really shouldn't be involved in this area and

22   taking it down the right of copyright preemption only in the

23   sense that a royalty would apply.

24           Now, I have decided to back off of that in

25   deference to state rights.  I agree with something

1    Mr. Zeller said.  If you do that, Judge, where was our

2    Seventh Amendment right to a trial on this?  So, therefore,

3    I am not concerned whether this verdict comes back $1 on the

4    trade secret misappropriation or $700 million, and I am not

5    concerned quite frankly happens over the copyright as long

6    as I instruct appropriately.  The copyright claim may drive

7    this whole ship, but that's for the Circuit to eventually

8    decide.  I would hate to be in a position of just precluding

9    one of the parties and having this spin back to the Court in

10   two or three years.  I think that's extraordinarily

11   detrimental.  I am not putting you in a box, but I will just

12   say to you if you make the record that you think that a

13   running royalty or a royalty is the appropriate remedy and

14   you don't want to see a damages figure out there, so be

15   it.

16          Also, I have got the ability after this trial

17   and after this verdict -- maybe this Court eventually

18   takes the position that there should be preemption in

19   this area.  I haven't written in that area yet, but at

20   least the Circuit would have this.  They would have a

21   verdict.    If Mattel disagreed, you haven't been

22   foreclosed under your Seventh Amendment right if Judge

23   Carter preempts trade secret misappropriation into

24   copyright.  You could take it up to the Circuit, and they

25   can reapply it, tell me I am wrong, but taking away these

1   issues I am trying not to do.

2          (Deborah Parker reported Vol. 3.)

3                          -oOo-

1

2

3

4                              CERTIFICATE

5

6            I hereby certify that pursuant to Section 753,

7   Title 28, United States Code, the foregoing is a true and

8   correct transcript of the stenographically reported

9   proceedings held in the above-entitled matter and that the

10  transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13  Date:  March 14, 2011

14

15

16                          Sharon A. Seffens 3/14/11
                          _____
17                          SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25