1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

MATTEL, INC., ET AL.,              )

7                                   )

            PLAINTIFFS,             )

8                                   )

        vs.                         ) CV NO. 04-9049-DOC

9                                   ) STATUS CONFERENCE

MGA ENTERTAINMENT, INC., ET AL.,   ) VOLUME 3 of 3

10                                  )

            DEFENDANTS.             )

11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  JURY TRIAL

16              SANTA ANA, CALIFORNIA

17            SUNDAY, MARCH 13, 2011

18                  4:01 P.M.

19

20        **DEBORAH D. PARKER, CSR 10342**

21          **OFFICIAL COURT REPORTER**
        **UNITED STATES DISTRICT COURT**

22          **411 WEST FOURTH STREET**
                **SUITE 1-053**

23      **SANTA ANA, CALIFORNIA 92701**
              **(714) 542-8409**

24        **D.PARKER@IX.NETCOM.COM**

25

```
 1    APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                            JOHN QUINN
                             MICHAEL T. ZELLER
 4                           QUINN EMANUEL URQUHART
                             & SULLIVAN, LLP
 5                           865 S. FIGUEROA STREET
                             10TH FLOOR
 6                           LOS ANGELES, CALIFORNIA 90017
                             (213) 443-3000
 7

 8        FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:

 9                            THOMAS S. MC CONVILLE
                             ORRICK HERRINGTON & SUTCLIFFE, LLP
10                           4 PARK PLAZA
                             SUITE 1600
11                           IRVINE, CALIFORNIA 92614
                             (949) 567-6700
12

13                            ANNETTE L. HURST
                             ORRICK HERRINGTON & SUTCLIFFE, LLP
14                           THE ORRICK BUILDING
                             405 HOWARD STREET
15                           SAN FRANCISCO, CALIFORNIA 94105
                             (415) 773-5700
16

17        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

18                            ALEXANDER H. COTE
                             SCHEPER KIM & HARRIS, LLP
19                           601 WEST FIFTH STREET
                             12TH FLOOR
20                           LOS ANGELES, CALIFORNIA 90071
                             (213) 613-4660
21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

3

```
 1      SANTA ANA, CALIFORNIA; SUNDAY, MARCH 13, 2011; 4:01 P.M.
 2          (The following proceedings were had outside the
 3          presence of the jury:)
 4              MS. HURST:  It's a pleasure, your Honor, to work
 5  with a jurist who is so dedicated and putting so much time
 6  and thought into this.  And I really mean that.
 7              THE COURT:  Mr. Zeller joins you.
 8              MS. HURST:  Of course, he does.
 9              THE COURT:  I'm just joking with you, Mr. Zeller.
10              MR. ZELLER:  I had more elaborate conversation.  I
11  feel like I'm being unfairly cut off.
12              MR. QUINN:  Your Honor has some other fine
13  qualities that I really like.
14              THE COURT:  Thank you.
15              The giant particular sucking sounds --
16              MR. MCCONVILLE:  Your Honor, I'm not like them.  I
17  just, you know -- you know how I feel.
18              THE COURT:  You just don't care, do you,
19  Mr. McConville?
20              Well, thank you very much, anyway.
21              MS. HURST:  Anyway, your Honor --
22              Well, look, I understand the court's very
23  practical viewpoint.  But, you know, $800 million damages
24  verdict on a trade secret claim, in our view should never be
25  going to the jury, will destroy MGA.
```

4

```
 1          THE COURT:  I've got lots of issues out there:
 2   Motions for new trial.  Motion for reduction.  Preemption.
 3   For goodness sakes, you got an unfair competition clause.  I
 4   can do anything I want within reason.  I can balance that,
 5   if you reach a verdict on that.  There's a whole set of
 6   things that we have to go through, after this trial, if a
 7   verdict hits.
 8          And, by the way, who says the verdict is not for
 9   you?
10          MS. HURST:  Exactly.  After all, we are finally
11   sitting at the plaintiffs' table.
12          THE COURT:  It works both ways.  I mean, we have a
13   long, long way to go, and I can't predict.  But trust me,
14   I'm trying to think of every possible scenario that can hit
15   me, because your briefing schedule is going to be as onerous
16   as the trial has been.  When this verdict comes in, what I
17   can't afford to do -- I'm putting both of you on notice --
18   is the following:  I can't wait 30, 40, 50 days.  I won't be
19   granting any extensions.  I want this case right back to
20   me -- Mr. Zeller and Ms. Hurst -- just immediately in terms
21   of briefing while it's fresh in my mind.  I can't sit
22   through 40 more cases or 100 cases and then come back and
23   have the clarity.
24          Second, we've got to start working the moment that
25   jury goes out the door on punitives.  Not that we'll ever
```

1   get there; but if we do, you got to remember when the jury

2   comes in, after anywhere from five to 15 days –– and they

3   are very proud of having reached some kind of verdict –– and

4   if that verdict has any consequential damages to Mattel, I

5   then say to them, *Hi, ladies and gentlemen.  Surprise.*

6   *You've got some more work to do.*

7          They're not going to be a very happy jury.

8          So, lastly, we have been working up against that

9   Easter break, which I talked to counsel informally.  We need

10  to get the jury into deliberations, hopefully, on the week

11  of –– as early as June –– strike that, April 8th and as late

12  as, Monday, April 11th, because Easter is on the 24th, and

13  we're going to lose them for at least a week, which is

14  devastating for each side.

15         Okay.  Is there anything else you want to do

16  tonight on the record?

17         MS. HURST:  Your Honor, on the preemption issue, I

18  would just urge the court to take look at Daystar as well.

19  I understand the court is conceptualizing that it's in the

20  state's rights framework.  But the Supreme Court, whenever

21  it has looked at the issue of scope of copyright, has been

22  excessively protective of the limitations inherent in

23  copyright.  And the *Daystar* case is a good example of that.

24  There was a clash of two federal laws, even.  So I would

25  just ––

```
 1              You know, in Harper & Row, the court said, you
 2    know, 102(b) in particular embodies and strikes the balance
 3    in the tension between copyright and ideas.  It's necessary
 4    for First Amendment protection.  And as we know, the
 5    First Amendment is certainly incorporated against the state.
 6    So that -- because, you know, you look at how solicitous the
 7    court has said of the scope of the Copyright Act.  You look
 8    at how 102(b) is understood to reflect First Amendment
 9    protection.  You look at how the First Amendment is
10    incorporated against the state.  It is consistent, entirely
11    consistent with the Supreme Court's jurisprudence in this
12    area.  Even from, you know, a state's rights perspective, to
13    think 102(b) and the Copyright Act do have a strong
14    preemptive effect when you're dealing with a trade secret
15    case, that is obsessively the idea for something.  And that
16    is what we have here.  And I will tell the court,
17    candidly -- I mean, you are going to see arguments from this
18    that this doesn't even meet the statutory definition,
19    because it's not information.  It's not information about
20    something.
21              These drawings are not -- the fundamental basic
22    definition in the statute is information.  That's not what
23    these drawings are.  So there's a lot of different ways to
24    skin the cat, as the court has noted.  There are a lot of
25    different ways.  I certainly understand the court's
```

```
 1    practical approach.  We can go all the way back to a Rule 15
 2    analysis, in terms of why we think the claim shouldn't be in
 3    the case.  There's a lot of different ways of looking at it.
 4              But, you know, to the extent the court has put so
 5    much thought into this, I would just commend that line of
 6    thinking to the court as well.
 7              THE COURT:  Well, of course, Mr. Zeller wants to
 8    add a couple of thoughts about that.
 9              MR. ZELLER:  Obviously, I think this is a
10    discussion for another day.  But she keeps on, apparently,
11    thinking that she is churning this ground.  I mean, the
12    reality is, is, number one, as the court has pointed out,
13    MGA's position risks wasting four months of trial.  That's
14    just stark.  The idea that somehow, as MGA is advocating, it
15    should be taken away from the jury based on this theory,
16    which I'll talk about in a moment, really is risking
17    tremendous waste.
18              Number two, there's absolutely no case.  It's not
19    Daystar.  Not Harper & Row.  No case of the Supreme Court,
20    Court of Appeals, or any district court that applied the
21    scope of copyright and preemption to the extent that they
22    are arguing here.  Never has happened.  They are talking
23    about conflicts preemption.  That is saying, basically, that
24    this is a field so occupied by federal law -- namely, the
25    Copyright Act -- that the states simply cannot legislate in
```

1      this area.  And, historically -- I mean, this has gone for

2      decades.  Both the Copyright Act of 1976 and trade secret

3      law have coexisted.  No court has suggested or found that

4      the Copyright Act by its preemption section is meant to

5      eradicate trade secret law.  And, quite to the contrary, the

6      preemption provision of the Copyright Act is written in a

7      very specific way.  It doesn't simply say that it's anything

8      that might occupy the area of copyright, it's preempted.

9      In fact, there is a specific legal test, as the court is

10     very well aware of, that defines that particular scope of

11     preemption.  That is what conflicts with the Copyright Act.

12            And to be sure, there can be individual cases

13     where particular state law claims are preempted because of

14     the language.  But this broad, grandiose scheme that MGA is

15     talking about of conflicts preemption has never been

16     endorsed by any court.  And, in fact, the *Kewanee Oil* case

17     from the U.S. Supreme Court considered conflicts preemption

18     in the patent context and rejected it.  And, by the way,

19     clearly, the patent context had more potential conflict

20     between the Patent Act and trade secret, because as the

21     Supreme Court pointed out, patent law encourages disclosure.

22     Trade secret law brings it back and discourages disclosure.

23     So there it actually appeared that there were policies that

24     were somewhat at loggerheads.

25            Copyright has no such conflict.  Copyright rights

1   do not spring forth, do not rely upon whether or not the

2   work is disclosed or not.  It has nothing to do with it.  So

3   even those areas where, at least, potentially the Patent Act

4   had more of a conflict with trade secret law do not exist

5   for copyright.

6          But I would just simply go back to the point that,

7   fundamentally, whatever academic issues might arise out of

8   this, we're also dealing with a very classical situation of

9   these claims which, you know, are well-recognized,

10  traditional, trade-secret-type claims.  You know, we're in

11  the midst of a very lengthy jury trial for this jury to

12  decide these factual issues and these issues under

13  well-established law and we are risking months of wasted

14  effort, if not years.

15         THE COURT:  I'm not sure, though, that Ms. Hurst

16  disagrees with wanting to get a number.  Obviously, on

17  behalf of MGA, she doesn't want that to be a large number,

18  if any number.  But I don't think she's ever proposed to the

19  court that I take the position that this is a royalty on the

20  trade secret misappropriation; that I get rid of unjust

21  enrichment and that I get rid of the lost profits.

22         MR. ZELLER:  I'm talking more generally.  They

23  think that the issue of trade secret ought to be completely

24  wiped out.  I mean, regardless of the remedy, they're not

25  even at the point of a remedy to be administered.  They're

1    talking about trade secret just, basically, a dead in the

2    water theory because of conflict preemption with copyright,

3    so we shouldn't even be having a trial or a jury verdict

4    about it at all.

5              THE COURT:  Oh, I was joking with you, too.  I

6    used the word "S," or "sucking."

7              I want to apologize to you.  I don't know mean

8    that -- I don't know what that record is going to look like.

9    So let me just say, could I replace that with "mooching,"

10   and I'll make sure nobody is offended.

11             Mr. Quinn, are you offended by that?

12             MR. QUINN:  No.

13             Mr. Zeller?

14             MR. ZELLER:  I was absolutely --

15             THE COURT:  Ms. Hurst?

16             MS. HURST:  I wasn't offended.

17             THE COURT:  All right.  I want to make sure.

18             I just realized, my goodness, how that might read

19   when I was joking around with you and should have used the

20   word "mooching."

21             But thank you for the wonderful accolades this

22   evening.

23             Let's do this.  How am I going to get at this

24   special verdict form now without your help?

25             In other words, should I start drafting my

 1    thoughts and put them out on the table again?

 2            Because regardless of what you argue about the

 3    special verdict, I've got to start working on that.  And I

 4    think it might be just wiser if I start working on that this

 5    evening, and I'm going to leave, for the time being,

 6    jurisdiction, choice of law, et cetera, on the table.

 7            But before I do that, let me ask you this

 8    fundamental question:  Concerning ideas, I indicated to you

 9    before that if I put those -- including the statute of

10    limitations, as a first question and the jury responds

11    favorably to MGA, Ms. Hurst, there's an argument that the

12    case is over.

13            The question is:  What happens if the Ninth

14    Circuit disagrees; but more importantly, the Supreme Court

15    disagrees?

16            In other words, one of the things you have to help

17    me with on the special verdict form is:  Does that just end

18    the inquiry?  Or do you want, you know, a verdict in light

19    of possibly the protection for MGA that the statute of

20    limitations is outside the statute of limitations, or that

21    "ideas" hasn't been met, but you still want a verdict?

22            Now, that's -- on one hand, it's notoriously bad

23    press for your client.  And I think you got to talk to

24    Mr. Larian about that, even though there's a strong argument

25    that Mattel couldn't go forward.

1          Number two, tactically, I don't know that you want

2     Mattel to be in the position of having a large verdict,

3     going forward.  You might just want to end it.

4          That's -- my biggest question, right now, is how

5     to shape that verdict form.  From Mattel's perspective, I

6     think Mattel would want, regardless of those questions, an

7     answer, a dollar figure on the trade secret

8     misappropriation, and the intentional --

9          MR. QUINN:  Sure.  And, your Honor, if they

10    check -- if there is a separate question for ideas, and they

11    say no, ideas aren't included, we can still win on

12    various -- plenty of other theories and bases for us to win:

13    Designs, copyright, work-for-hire.

14         THE COURT:  How would I know that, though?

15         That's what I'm asking both of you.  How do I set

16    up that special verdict form?

17         MR. QUINN:  I don't -- I think the idea -- the

18    idea of separately isolating out ideas is not a great idea,

19    frankly.

20         THE COURT:  Putting it --

21         MR. QUINN:  Because that doesn't tell you

22    anything -- that doesn't tell you whether we win or lose.

23    If they say ideas aren't covered, you still have to have a

24    decision tree after that.

25         Okay.  Well, how about -- if we're going to do

1    something like that, it ought to be:  Is it an invention

2    within the meaning of the Inventions Agreement?

3           And they have been instructed, there's a dispute

4    about whether ideas be covered, that's for you to decide.

5    And just keep it opaque.

6           THE COURT:  Let me turn to Ms. Hurst.

7           Those are the -- we're in that now, starting into

8    this special verdict.  In other words, I'm not closing the

9    door on these instructions.  I couldn't close it last week.

10   What are your initial thoughts?  I'm not holding you to

11   those.  I just want to start having a discussion, because

12   there's going to be a lot of work that I just put in this

13   evening on it.

14          MS. HURST:  Well, I definitely think the contract

15   questions are, logically, prior to everything else.  I can

16   understand why the court said, *Statute of limitations, no,*

17   *I'm not going to put that first, because that really is an*

18   *affirmative defense.*

19          But these contract questions really are,

20   logically, prior to all of the other claims.  They have to

21   come first.

22          THE COURT:  Exactly.  And that's why I'm

23   philosophically asking that question this evening, because

24   the case could end right at that juncture.

25          MR. QUINN:  We would be delighted, obviously.

```
 1            THE COURT:  So Mr. Quinn is right.  I mean, what
 2    happens if we focus on idea, but --
 3            Well, designs.  Designs.  I mean, how do we know
 4    that?  How does Mattel feel, you know, that -- if that's the
 5    case, that that door has been closed?
 6            Otherwise, I would be the first if I was in
 7    Mattel's position to be up at the Ninth Circuit and up at
 8    the Supreme Court, eventually, saying, There's no way we can
 9    discern this from the form.
10            See, there is the art that goes into this.  That's
11    where we're starting on tonight, quite frankly, after you
12    leave.
13            MS. HURST:  I'm looking, again, at the -- "at any
14    time during my employment."  And I know that we have not
15    made clear that this aspect of the dispute covers
16    everything; in other words, any type of invention.  Even
17    something that would be otherwise an invention could still
18    be excluded from the scope of the contract based on this.
19            THE COURT:  You're right.  I can do it in the
20    instruction so that the special verdict didn't require a
21    checklist.  But it has to be covered in the instruction, and
22    I don't like to ever instruct on the law in a special
23    verdict form.
24        (Pause.)
25            MR. QUINN:  You know, there's another alternative
```

1    on this that if we're going to talk about scope of his

2    employment -- and that means what his job duties were and

3    Barbie collectibles -- the jury could find that it wasn't

4    within the scope of his employment, but it's still related

5    to Mattel's business.  And pursuant to that labor code

6    section parenthetical there we still get it.

7              Do you see what I'm saying?

8              THE COURT:  Repeat it to me.

9              MR. QUINN:  The contract includes a paraphrase of

10   the California Labor Code provision that says that --

11             THE COURT:  34260.

12             MR. QUINN:  Exactly.  2870.

13             THE COURT:  Thank you.  2870.

14             MR. QUINN:  That says that the section provides

15   that *the requirement to assign shall not apply to an*

16   *invention that the employee developed entirely on his or her*

17   *own time, without using the employer's supplies, facilities,*

18   *trade secret information,* okay?

19             So there is a class of things that it's on his own

20   time, unless:  *One, they relate at the time of conception or*

21   *reduction to practice of the invention to the employer's*

22   *business.*

23             So let's say that scope of employment means what

24   he did at Barbie Collectibles isn't just designing dresses.

25   In that sense, it wasn't within the scope of employment, but

1    it falls within this provision, and it relates to Mattel's

2    business.  Therefore, we own it anyway, even though it

3    wasn't --

4              THE COURT:  Okay.  I can understand that.

5              MS. HURST:  May I respond to that?

6              MR. QUINN:  Or if they used Mattel resources, it

7    doesn't matter.  Even it weren't within the scope of

8    Mattel's business.  The other prong is, if he used Mattel

9    resources.  And, of course, we've got him making that

10   prototype and enlisting the help of his coworkers.

11             THE COURT:  And faxing, for --

12             MR. QUINN:  And faxing.  But I would cite to using

13   the hair rooter, coming up with what's been referred to as

14   either the prototype or dummy doll but things that he found

15   there at Mattel.

16             So I come back to, I think, really injecting this

17   idea of scope of employment, which I'm now understanding

18   what MGA is arguing that it means:  What are the nature of

19   his duties in Barbie Collectibles, in addition to duration,

20   i.e., the nights and weekends.

21             We can still win under this provision if it

22   relates to Mattel's business, even if he did it on his own

23   time and even if it doesn't relate to his Barbie's

24   Collectible work.

25             That's why simpler is better.

```
 1              THE COURT:  Okay.
 2              MS. HURST:  That's just wrong.  The Labor Code
 3    2860 exclusion is an independent defense that is statutorily
 4    assigned to the employee.  You don't get assignment by
 5    negative implication by the failure to meet all of the
 6    conditions of that defense.  You get assignment of what's
 7    assigned.  And that's the provision that we're interpreting.
 8    If they want to get up in front of a jury and argue that the
 9    Labor Code 2860 exclusion should be considered in
10    interpreting the scope of invention, they can do that.
11    That's the basis for their line of business argument.
12              But that doesn't mean that they would get an
13    assignment by negative implication by the failure to meet
14    the conditions of that statute.  That statute provides an
15    independent defense to the employee, if the terms of it can
16    be met.  That's a different issue than what is the scope of
17    the assignment.
18              THE COURT:  Let me come back to the issue that I'm
19    working on this evening.  Again, I can either segment out
20    the special verdict form which becomes very convoluted.
21    When a court does that, it takes the chance that it's also
22    instructing in a special verdict form.
23              Now, oftentimes, courts get away with that but
24    it's not appropriate.  All the instructions should be in the
25    law.  The special verdict form should be very simple.  I
```

1    don't mean not lengthy but very, very simple.  So what I

2    worry about is:  How do I instruct so that we take the

3    simplest special verdict form and incorporate the fact that

4    it could have been a design, for instance?

5            I mean, that's one of the few logical hooks that

6    Mattel has besides ideas.  So that's what I need, and that's

7    conceptually why I haven't been able to straighten it out --

8    to work to your special verdict.  And I don't think the back

9    and forth is, really, helpful to me.  Unless has somebody

10   has a concrete way of doing that, I'm going to be left to my

11   own devices, and I'll undertake it.

12           I agree with you, Ms. Hurst.  It seems to me that

13   the better thing to do is to take your position, Mr. Quinn;

14   and that is, a simplified verdict form, but it has the

15   adequate instructions so if they reach liability, we know.

16           Well, we can't sort out, apparently, whether it's

17   design or ideas.  And it's never going to answer the

18   question that society seems to be asking him, and the Ninth

19   Circuit finds fascinating, about who does -- when do you own

20   ideas, or do you ever in this situation?

21           I think that's what this case is so much about.

22   So if I follow Mr. Quinn's suggestion, we never get that

23   answer.

24           MS. HURST:  Well, we could structure the verdict

25   form -- look, we know that the ideas issue would preclude

ownership of the trade secret, based on 9801.  So the
verdict form can be structured, if you ask the question and
if they say -- you know, if you give them a choice of
interpretation, MGA's interpretation and Mattel fails to
prevail on its interpretation, then you don't answer any of
the trade secret misappropriation claims.  If they also say
Mattel has failed to prove its interpretation "at any time
during my employment phase" is correct, then you really
stop.  That's it.  You're done.  Now -- unless you're going
to leave open the option for them to do work-for-hire, which
is within the scope of employment -- although, frankly, I
think -- actually, no, because if they say "no" to this
instruction on "at any time during my employment" the way
it's drafted in that precludes "work made for hire", they're
done.

        So if they say "no" to ideas -- by "no," I mean
"no" to Mattel.  If they say "no" to Mattel on ideas, then
the trade secret claim is done.  If they also say "no" to
"at any time during my employment," then the copyright claim
is done.  You're done, and that's the logical flow, right?

        So if you said "no" to question one; then, you
don't have to answer question 7 through 14.  If you also
said "no" to question 2, then you don't have to answer
questions 8 through 20, whatever they are.  You see what I'm
getting at.

```
 1              These two questions cover everything.  And that is
 2    the logical structure and import.  What I had added to this
 3    just in my handwriting was in questions 1 and 2 on the "at
 4    any time during my employment," the phrase "in order to own
 5    any inventions," comma, Mattel must prove that Carter
 6    Bryant's Bratz-related inventions were conceived or reduced
 7    to practice, blah, blah, blah.
 8              THE COURT:  Read from the top.
 9              MS. HURST:  Sure.  Question 1, I added:  "In order
10    to own any inventions, comma, Mattel must prove that Carter
11    Bryant's Bratz-related inventions were conceived or reduced
12    to practice between January 4th, 1999 and October 19th,
13    2000."
14              And then, paragraph 2, insert -- I inserted:  *In
15    order to own any inventions, comma, Mattel must also prove*
16    *that the inventions were conceived or reduced to practice at*
17    *any time during Carter Bryant's employment, either*
18    *because* -- and then, the "A" or "B" remain the same.
19              THE COURT:  Where was Mr. Quinn's language on
20    this?
21              MR. QUINN:  That's on this one.
22              THE COURT:  Okay.  Then, one more question this
23    evening:  In the trade secret misappropriation --
24         *(Pause.)*
25              THE COURT:  We're back on the record.
```

```
1              I want you to take this misappropriation of trade

2     secrets that I've been working on for a moment and a

3     suggestion is that --

4              First of all, I see very little difference between

5     bucket one and what I'm going to call bucket two, other than

6     Bratz.  So why wouldn't I start with Bratz; and then, I'm

7     going to call it Bratz Plus and then non-Bratz so it will

8     look this way, conceptually.

9              MS. HURST:  You're talking about the verdict form

10    now?

11             THE COURT:  I'm talking about the instructions,

12    both.

13             First of all, let's say, your idea is that Bratz

14    has $200 as a value.  Just Bratz.  And Mr. Quinn has the

15    idea that Bratz has, you know, $100 million, hypothetically.

16    We wouldn't go on -- and if the jury checks "yes," then they

17    would go on to -- I'm going to call it -- the second bucket,

18    which is not that form that is Bratz Plus all the --

19             I'm just going to call it "accessory" for a

20    moment.  But if they don't find Bratz, and they don't find

21    what I call Bratz Plus, whichever referred to accessories,

22    et cetera, they would consider 3.  But they can't do both.

23    See, there's double recovery.  It conceptually gets rid of

24    the double recovery.  I'll break it down in the instruction

25    and also break it down on the verdict form.
```

1          Am I making sense, conceptually?  Not that you

2     agree.  Let me say this, again:  There's Bratz and

3     Accessories and then, there is a category that I'm just

4     going to refer to as "accessories" for a moment, just for

5     fun.

6          All the Bratz universe.  We never know if that's

7     double recovery.  And you can't have this.  You can't have

8     Bratz in bucket one that says $200.  Bratz plus accessories

9     for, let's say, $10 million, and not have --

10          I'm sorry.  And ever know that with this third

11     bucket that they didn't find another $10 million is

12     confusion then added on, so they have only got a choice.

13     You can either have Bratz; and then, you should consider

14     Bratz plus accessorizes.  You never answer the third

15     question.  You never go to "accessories."

16          Or you don't find Bratz.  You don't find Bratz

17     plus accessories, and you can only consider the third box.

18     Because, otherwise, you raise the problem of double

19     recovery.  You never know.  I want you to think about that

20     for a moment.

21          Number two, I'm only putting down the specific

22     exhibits, because I asked Mr. Quinn to do that.  That was my

23     check.  But, obviously, I'm not going to do this, because

24     it's potentially prejudicial, okay?

25          So I want you to fill in for a moment the way I

```
 1   would conceptualize that for the jury:  But then I'm going

 2   to hear the argument, Well, Judge, we on MGA's side don't

 3   think that this is fair, because it's too overbroad.  They

 4   never defined with specificity what they were claiming.

 5            So how do I conceptualize that?

 6            MR. QUINN:  For what it's worth, I agree with what

 7   you said about those three.  That is a logical order, and it

 8   prevents double recovery, properly.

 9            THE COURT:  Thank you.

10            Now, I'm trying to think through that, because I

11   asked you and you performed, admirably.  I expect that.

12            Of course, they are broad.  But the double

13   recovery question -- and I understand why you are doing

14   that.  You got to.  You got to have something besides Bratz,

15   Bratz plus accessories, because I can hear MGA's argument

16   now.

17            MR. QUINN:  Those are the easy ones, though,

18   because then you get down to sculpt, Hero Shot, things which

19   are not ideas.

20            THE COURT:  But Hero Shot, giving you minimal

21   amounts.

22            MR. QUINN:  I don't know.  It's on most of their

23   packages.

24            MS. HURST:  Hero Shot wasn't in 9801, and it isn't

25   on here.
```

1          Actually, it is on here.  I don't think this is

2    9801.  I think this is one of the later versions.

3          MR. ZELLER:  That's where the sculpt --

4          MS. HURST:  My mistake.  I didn't think it was.

5          THE COURT:  Think about it.  It doesn't call for

6    an answer this evening, but certainly I need to preclude my

7    chance of double recovery.

8          MS. HURST:  Well, I mean, you're going to have to

9    instruct --

10         THE COURT:  I'm going to.  Be the juror for a

11   moment.  How do they start checking the form?

12         MS. HURST:  Right.  In our view, that's a Rule 50

13   problem; and then, under 0-2, their failure to offer

14   testimony on each bucket means it doesn't go to the jury at

15   all.

16         THE COURT:  I understand that.  What Mr. Quinn is

17   saying is something that is starting to gain some credence;

18   and that is, why isn't there just a verdict?

19         I think that's your position.

20         MR. QUINN:  Yes.

21         THE COURT:  And as long as you properly instruct

22   just in the instructions, you've resolved the issue.

23   Whereas, if you try to break that down finitely in the

24   special verdict form, there's significant problems.  So I'm

25   giving you, kind of, the lead on that right now to make

1   suggestions.

2          Number two, I need to get your trade secret

3   misappropriation set out, also, at some point, because I

4   can't go any further with the instruction.

5          Number three, I have to find a way of dealing with

6   all those exhibit numbers.  I asked Mr. Quinn to list those

7   for me.  Now that he has done those, I want to bring that

8   down into a finite package because, I think, it's

9   prejudicial if you see -- you know, 150 to 160 exhibits.

10         MS. HURST:  Some of these are duplicative also.

11         THE COURT:  Even if you take them out, you will

12   get down to a huge number.

13         MS. HURST:  Well, there are ways to conceptually

14   describe these, and then put the numbers in parentheticals,

15   sort of, like the pitch book.

16         THE COURT:  That's what I'm asking you.

17         MS. HURST:  The notarized drawings, parenthetical.

18         THE COURT:  I need to see how much we're going to

19   narrow trade secrets versus what are non-trade secrets.

20         And you don't have the same issue, though,

21   involving what I call accessories.  You don't have the same

22   issue involving sculpt.

23         MR. COTE:  Our is simply a list of documents.  And

24   our motion will ask to narrow that list for a variety of

25   reasons; and then, we would suggest that that list which,

1    hopefully, will be a handful, go to the jury and have

2    them --

3            THE COURT:  I just need to get that motion.

4            MS. HURST:  I think the problem is that we need to

5    have all of the elements that they've defined as part of the

6    trade secret so that when we make our argument about whether

7    the prior art discloses the elements, the jury can -- you

8    know, like my big board I brought in the other --

9    yesterday -- the jury can check them off.  Because,

10   otherwise, the concept of whether it's secret or not,

11   there's no way for the jury to check that.  Somehow there

12   has to be a way -- and, maybe, it's a question on the

13   verdict form:  Do you find this to be a trade secret?  Or,

14   you know, has Mattel established trade secret

15   misappropriation as to trade secret one?

16           Has Mattel established trade secret as to trade

17   secret misappropriation as to trade secret two?

18           THE COURT:  That's what that is attempting to do

19   in a clumsy way.

20           MS. HURST:  This is defining what trade secret one

21   and two are; and then, on the verdict form, if you just --

22   then you just put the basic question:  Have they established

23   trade secret misappropriation of trade secret one?  Trade

24   secret two?  Trade secret three?

25           You define that in the instruction so the verdict

1   form doesn't have all the definitions and everything.

2   Because we talked about why there would be problems with

3   that.  But it could just have a series of questions, and

4   then that would be the best way to know whether the verdict

5   supported any damages award.

6           THE COURT:  Do you want this kind of finiteness?

7   I don't mean the volume.  But do you want these kinds of

8   buckets?

9           Remember, that was just a suggestion so that the

10  circuit could easily overturn any damage award or portion of

11  it.  And because Mr. Quinn started from the very beginning

12  with putting all of this into one decision by the jury, I

13  think the critical question I'm going to be asking you is:

14  What do you want this to look like?

15          MS. HURST:  Well, our view was one of two things:

16  Either it has to be in the instruction, or there has to be

17  some exhibit that's admitted which is the description of

18  trade secret for each side.  But I think that we've been

19  going for a couple weeks now in the direction of it's got to

20  be in the instruction, and I think that's right.  Clearly,

21  we can't just wait for it to be in the verdict form.

22  Because as we had previously discussed, then the implication

23  would be that it had passed through the test required of the

24  instruction and had satisfied those elements.  If the first

25  place they ever see it is on the verdict form, that would be

 1   very prejudicial.

 2           I mean, look, practically speaking, the only two

 3   options are:  Either it's defined in the instructions, or

 4   it's defined in a separate exhibit somewhere, the contents

 5   of which are dependent upon each party's trade secret

 6   disclosure that met the final deadline and, you know, with

 7   fixing up some things with these numbers and so forth.

 8           THE COURT:  Okay.  Thank you very much.

 9           I'll be right back; and then, I'll ask you two

10   more questions and, maybe, send you on your way this

11   evening.

12       (Pause.)

13           THE COURT:  Okay.  One more issue tonight, then.

14           Mr. McConville has left, but the court's concerned

15   about one exhibit that were the notes of the gentleman that

16   Mattel called who was what I called the ink expert.  Mr. --

17           MR. ZELLER:  Aginsky.

18           THE COURT:  -- Aginsky.

19           And Mr. Quinn had approached the court a number of

20   times about that exhibit.  While I'm inclined to follow the

21   evidence code, it seems rather ridiculous that this exhibit

22   is not in evidence at the present time, because it's not for

23   the truth of his calculations.  It's the fact that he either

24   took or didn't take records.  And his credibility was called

25   into question.

1     So both sides, trust me, I haven't forgotten that

2     issue.  Now, whether it comes in now, or later on, or it

3     doesn't, I don't think it is of critical importance.

4          I haven't, Mr. Quinn, forgotten that.

5          MR. QUINN:  Thank you.

6          THE COURT:  I just quite don't know what to do

7     with it in light of the evidence code, which I'm supposed to

8     be obeying.

9          Second, on Friday, I had -- the end of the day, I

10    sustained MGA's objection to Mattel's question to

11    Mr. Friedland concerning whether Sal Villasenor initially

12    requested $3 million.  I think that that was an attempt,

13    quite frankly, to negate the impression that Mattel had just

14    paid $160,000 in severance fees.  The inference being, that

15    he had basically received what I call "hush money."

16         It's obvious to the jury by your questions,

17    Mr. Quinn, that there is $3 million, apparently, that must

18    have been on the table concerning negotiations with

19    Mr. Moore.

20         MR. QUINN:  That was the demand.

21         THE COURT:  The demand.

22         But it's hearsay right now.  And the problem I'm

23    having is that up to this time, Mattel generally,

24    Mr. Zeller, resisted any inquiry about the settlement

25    negotiations with Mr. Villasenor in the attorney-client work

1   privilege –– I'm sorry, the attorney-client privilege and

2   the work product privileges.  And there had also been a

3   request of the court not to allow a deposition of Mr. Moore,

4   its in-house counsel and, in fact, I think Mr. Corey, also,

5   outside counsel.

6          I had granted protective orders on both

7   depositions in light of the impending discovery cut-off. But

8   it's becoming clear to me that the sequence of events

9   concerning Mr. Villasenor has now become critical to both

10  sides.  On one hand, on behalf of MGA, there is a logical

11  inference that Mr. Villasenor was paid "X" amount of money,

12  as Ms. Keller intimated, to leave and, quote, unquote, be

13  quiet.

14         On the other hand, if there's evidence about a

15  3 million-dollar negotiation, it's nothing more than, from

16  Mattel's perspective, a holdup.  So I was, therefore,

17  inclined just to order Mr. Moore to sit for a deposition

18  with the discovery master, and I called Robert O'Brien.

19  However, I'm realizing that there would be several

20  instructions in all likelihood not to answer questions on

21  the basis of the attorney-client privilege and the work

22  product doctrine, and it might simply be a waste of time

23  running him into a deposition, quickly.

24         But I asked Mr. Zeller this morning at 8:30 or

25  9:00 o'clock this morning to give Mr. Moore a call.  I'm

1  going to examine him in-camera tomorrow, and I want to

2  determine whether the privilege assertions are meritorious.

3      So for the benefit of the parties and the

4  discovery matter, I'll then set out a permissible scope of

5  MGA's eventual deposition of Mr. Moore, if any.

6      That's why I wanted him.  You asked this morning

7  why I wanted him.

8      MR. ZELLER:  If I could interject for a moment.

9      There are actually some separate issues here.

10 Number one, I'm pretty confident -- and I will

11 double-check -- Mr. Moore was not part of the Sal Villasenor

12 negotiations.  He was part of an initial approach, and I

13 won't go, obviously, into the substance of it, but it's

14 reflected in that resignation letter where he and Mr. Corey

15 spoke to Sal Villasenor.  That was not part of the demand

16 and that wasn't part of this settlement or the demand, or

17 anything else.  So, at least with respect to that, I don't

18 believe Mr. Moore is the right attorney to be talking to in

19 terms of a demand.

20     Number two, we did bring a motion *in limine* in

21 order to preclude discussion about settlement negotiations

22 and the like.  That was true for Carter Bryant.  That was

23 true of Sal Villasenor, and I believe some others.

24     The court denied that, that motion *in limine*.  And

25 MGA has taken the position that this information should come

1   into play.

2          But number three, they, in fact, did take

3   discovery on the Sal Villasenor settlement and on the

4   settlement negotiations.  They asked Mr. Villasenor.  They

5   asked other witnesses about it.  They have the settlement

6   agreement.  So that discovery, in fact, was not cut off.

7          We brought a motion *in limine* for trial purposes.

8   But that wasn't because the discovery had been cut off on it

9   previously.  We just didn't think it should be admissible

10  for trial purposes.  MGA took a contrary position and

11  prevailed.

12         So I think these are somewhat separate issues.

13  And to the extent that the court is interested in talking to

14  the attorneys who were actually involved in the settlement

15  demands, I believe that those are Mattel's employment

16  lawyers.  I can double-check for the court to make sure that

17  I have that precisely correct.  But I am very confident that

18  Mr. Moore would not be the right person to inquire as to any

19  communications between Mattel and Sal Villasenor and his

20  counsel, insofar as it pertained to severance agreement, the

21  demands that were made and the like.

22         THE COURT:  You may be right.  I want to order

23  Mr. Moore in here.  I want to speak to him tomorrow.  It can

24  be tomorrow afternoon.  I don't want to inconvenience him.

25  Because right now, the only thing the court has is

```
 1   Ms. Keller questioning Mr. Friedland.  Mr. Moore is the only
 2   name that's coming to me.  And I think I can find out very,
 3   very quickly.  I think it may save a prolonged deposition
 4   just to order him in here.
 5          MR. ZELLER:  Understood.  We're happy to do that.
 6   He will be here at 8:00 a.m. tomorrow.  And it's all set.
 7          THE COURT:  Move it later.  I went back and
 8   checked, and I still have a morning calendar.  I'm just
 9   suggesting, maybe, we do it at 11:00 o'clock, or
10   2:00 o'clock.  Give him his choice, okay; and then, tell me
11   what time to reconvene tomorrow on this matter.
12          Two more things.  We only got through the
13   following:  We got through Margaret Leahy today, Jacqueline
14   Prince and Dr. Albert Lyter.
15          We got through the books concerning Cassidy Park
16   from Orrick.  But you need time to assemble your books,
17   because you didn't know the order.
18          Alan Kaye.  Can I do Alan Kaye tonight?
19          MS. HURST:  Yes, we're ready.
20          THE COURT:  Excellent.  Hold on.  Can we also --
21   well, you tell me who else.
22          Adrienne Fontanella?
23          We'll go as far as we can.
24          MS. HURST:  We're ready with Kaye Fontanella (sic)
25   and Newcomb.
```

34

```
 1              THE COURT:  Excellent.  How long do you think that
 2     will take next week?
 3              What's your best guess?
 4              MS. HURST:  Well, Ms. Leahy was on the stand for
 5     days last time.  Obviously, we're doing things a lot more
 6     efficiently in this trial.  But that's going to be -- I
 7     mean, I can't imagine that's not going to be at least three
 8     full days, that number of witnesses.
 9              THE COURT:  What do you think, Mr. Quinn, because
10     I want you equally well prepared as the other side?
11              MR. QUINN:  Well, I think Leahy will be a
12     substantial witness and probably Kaye.
13              THE COURT:  Why don't we cover -- at least, let's
14     get those three out of the way, so we've got three or four
15     days of -- and then, I can judge that as we go.  And if we
16     need to go over more books this week, we will.
17              Okay.  Fair enough?
18              MS. HURST:  May I just address that Villasenor
19     point, your Honor?
20              THE COURT:  Sure.
21              MS. HURST:  Both Mr. Villasenor and his attorney
22     and Mattel invoked the mediation privilege to bar our
23     discovery into those discussions.  So we never received any
24     demands, any exchanges of drafts of settlement.  We've never
25     been told what the discussions were, if they went to a
```

1    mediation.  At one point, the court had inquired of this and

2    learned that there was some individual solo practice private

3    mediator who had been present; and then, we never got

4    anything more.

5          So when Mr. Quinn asked the question about the

6    $3 million, that is specifically what we were precluded for

7    ever getting information about in discovery.

8          THE COURT:  Well, I sustained the objection at the

9    time, but it's ruled out.  And I don't know if that's waiver

10   yet.  I don't know if he's going to take the attorney-client

11   privilege position, or work product.  I don't know.  And I

12   don't have time to find out, unless I run him into a

13   deposition tomorrow with Mr. O'Brien.  Now, I can do that

14   down here, but he's going to be sitting in a deposition all

15   day claiming the privilege.  I thought I would shortcut it,

16   because I've got time.  And I thought I would try to do it

17   on Monday, rather than doing it on Tuesday night or

18   Wednesday night when you are all exhausted.

19         MS. HURST:  Your Honor, actually, the court did

20   not strike that particular question and answer, the

21   $3 million one and it immediately excused the jury

22   afterwards.

23         THE COURT:  Well, thank you.

24         MS. HURST:  But in addition to that, there should

25   be documents on this.  And that may obviate the need for any

1    deposition.  If we can get whatever documents were

2    exchanged, then we can look at them and figure it out.

3              THE COURT:  I don't have time.  In other words,

4    all I need is Mr. Moore in here.  Is he taking the

5    attorney-client privilege, or work-product privilege, or

6    they are going to be turned over?

7              MS. HURST:  Understood.

8              THE COURT:  Mattel has 29 -- yeah, 29 hours left.

9    That's it.

10             And you've got 49 hours left.  So I'm trying to

11   keep my lead counsel, you know, alert, because it will

12   actually pick up the pace towards the end of the trial.  It

13   won't get any easier.

14             MS. HURST:  Your Honor, the other outstanding --

15   another outstanding discovery issue is that the court has

16   raised several times the issue of whether there were

17   investigations of other employees leaving Mattel that

18   demonstrated any type of downloading of trade secrets, or

19   whatever the court had inquired about that a couple of

20   times.

21             We have not gotten that in discovery.  Mattel,

22   based on the testimony of one of its 30(b)(6) witnesses, one

23   of its investigators, has what are called case logbooks,

24   which are just the number of the investigation, what year

25   and a brief description.  And we had asked for those case

1    logbooks so that we can determine, in order to answer the

2    court's question.  We would like to get those case logbooks

3    from the year 2000 when Carter Bryant left through, let's

4    call it, 2007 because that's after the last employee that's

5    alleged to have done anything left.  And look at them and

6    see, in order to try to answer the question that the court

7    has repeatedly asked, whether there are others who have also

8    been investigated, people who were not coming to MGA.

9            We have asked for this information, but we have

10    not received it from Mattel.

11            THE COURT:  Well --

12            MR. ZELLER:  As MGA has said many, many times,

13    whenever we have asked for anything, including things that

14    the court ordered produced already, we get the answer

15    discovery is closed.  So MGA, as you can see, has really

16    been running this gamut now, for some period of time.

17    Whereas, they just are now insisting that it be a one-way

18    street in discovery.  That's just not right at all.  It's

19    not fair.  It's not right.

20            The idea that we should give them every single

21    investigation that Mattel has conducted for any reason into

22    any employee is just hideously overbroad.  It's just not

23    right and it's not proper.  They will then have all manner

24    of employee information about any manner of issues that have

25    nothing to do with this case.  And they'll be getting it in

1    the middle of discovery.

2              And given Mr. Larian's penchant for publishing our

3    materials in the press, or just leaking it to the press,

4    that's a real concern.  I mean, at a bare minimum, if we're

5    going to be required to turn over materials like this,

6    implicating, I mean, really dozens of individuals'

7    interests --

8              Because, remember, an investigation doesn't mean

9    anything.  It's like being arrested.  That is, just because

10   the allegation is made doesn't mean anything.  And certainly

11   it doesn't mean that someone should be tainted with the

12   suggestion of wrongdoing, just because some file was opened

13   up which, you know, Mr. Larian will do.  So the bare

14   minimum, to the extent --

15             THE COURT:  -- how it comes into evidence anyway.

16   I know that by the time we're done doing all of this, how

17   does that come rolling into evidence?

18             MS. HURST:  Well, we can call their investigator

19   to authenticate the logbooks.

20             I'm sorry.  That was ridiculous.  I mean, if they

21   can market --

22             MR. ZELLER:  I wasn't even done.

23             THE COURT:  Excuse me.  Let him finish.

24             Mr. Zeller.

25             MR. ZELLER:  What I would, at a bare minimum,

 1   suggest is to the extent that anything like this should be

 2   turned over -- and I mean, by the way, then I also do think

 3   that we should be permitted to be raising our discovery

 4   issues -- I mean, continue to raise them, because we have

 5   been denied discovery on some pretty basic fundamental

 6   issues in this case in our view.  Even after being ordered

 7   by the court, MGA has not complied.

 8           Setting that aside, at a bare minimum, if we're

 9   going to get into this, we would suggest that any logs or

10   whatever be provided to the court to review.  Certainly not

11   MGA.  I mean, this is really --

12           I mean, this is -- to give an example, there would

13   be logs.  These would reflect allegations of, say, sexual

14   harassment, other inappropriate detention conduct,

15   associated names with this conduct that would then be in the

16   hands of Mr. Larian.

17           THE COURT:  And, potentially, unproven.

18           MR. ZELLER:  Just allegations.

19           THE COURT:  No different than I'm tearing a Social

20   Security number up.

21           MR. ZELLER:  That certainly seems to be actually

22   far less than a concern, but they're the ones who are

23   complaining about even that.  But, you know, these logs, you

24   know, this is the Mattel security department.  It has

25   hundreds of logs on all manner of conceivable issues that

1  have nothing to do with misappropriation or downloading of
2  Mattel information.
3          THE COURT:  Well, now that we're on all these
4  security issues, what's going to happen with the Brawer
5  tape?  You brought that to my attention during discovery,
6  all of this -- you know, the surveillance of Brawer when he
7  left.
8          MS. HURST:  Well, I mean, I would just like to
9  address those assertions.  If they mark those documents
10  attorneys' eyes only, I mean --
11          I'm sorry.  But the accusations against Mr. Larian
12  are totally unfounded and unwarranted with respect to
13  attorneys' eyes only material.  That was just completely
14  inappropriate.  If there is anybody in this lawsuit who has
15  violated the protective order by going and disclosing
16  information confidential under the protective order, it's
17  them.  They attached exhibits to pleadings.  They went and
18  filed a state court lawsuit based on attorneys' eyes only
19  information.  I mean, give me a break.
20          Mr. Zeller's approach is always, whenever we want
21  anything, he thinks he can throw it all up and block us from
22  discovery.  And you know what, unfortunately, that has
23  worked one too many times.  It has.
24          Now, the court inquired of it.  We are trying to
25  answer the court's question.  We went back through the

1    deposition transcripts, and we found a reasonable way of

2    trying to get the information.  These records would not be

3    voluminous.  I mean, look, we're trying to avoid having them

4    print out the entire database.  That's the reason for asking

5    for the logbook.

6                I don't care if we go and inspect the document and

7    take notes of it with Robert O'Brien sitting there, you

8    know, so that we make sure that we can then request what

9    appear to be all the pertinent files, whatever manner the

10   court thinks is appropriate.

11               The reason that we're asking for this, however, is

12   that the court requested it.  The court requested it at the

13   summary judgment hearing.  The court requested it, again,

14   recently.  The court has said, repeatedly, it considers this

15   information to be important.  We don't want to just take

16   their word for it, and moreover, they haven't come forward

17   with the information.  So we are trying to get it.

18               And to somehow try to link this up to old

19   discovery disputes, or accuse Mr. Larian in advance of

20   disclosing things is completely inappropriate.

21               THE COURT:  Okay.

22               MR. ZELLER:  It's a matter of record, as the court

23   already knows, that Mr. Larian disseminated Mattel

24   attorneys' eyes information.  It's attached to his own

25   e-mail.  And, moreover, as the court knows, they went in.

 1    They ginned up publicity for their claims that included a

 2    massive amount of AO materials.  And there is no dispute

 3    over that.

 4            So somehow that Mr. Larian has been unfairly

 5    accused here, you know, really, I don't think bears

 6    scrutiny.

 7            MS. HURST:  I'm just going to say, for the record,

 8    that is once again the same false statement that has been

 9    repeatedly made in this court.  The only document that

10    Mr. Larian e-mailed was a document that had been

11    declassified as a trial exhibit in the prior trial.  It was

12    a public document, and I am tired of a lie.

13            MR. ZELLER:  I wish I could cap or top that kind

14    of rhetoric, but I feel I'm not really not up to the task.

15            MR. QUINN:  Can I bring up my favorite hobby

16    horse, your Honor?

17            Mr. Kinrich's slides?

18            THE COURT:  I'm still considering them.

19            MS. HURST:  We're ready with additional binders

20    whenever the court is, your Honor.

21            THE COURT:  Okay.  Well, then, why don't we get to

22    the binders.

23            And do we need a court reporter any longer?

24            What time do you want to have Mr. Moore here

25    tomorrow?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

43

```
 1            What is convenient for him?

 2            MR. ZELLER:  If I can just make one phone call,

 3   and I'll find out.

 4            THE COURT:  In fact, the earlier the better.

 5   11:00 o'clock would be great.

 6            MR. ZELLER:  I suspect that will work.

 7            THE COURT:  If it works for him, that will be

 8   great.

 9        (At 5:04 p.m., proceedings were adjourned.)

10

11                           -oOo-

12

13                       CERTIFICATE

14            I hereby certify that pursuant to Section 753,

15   Title 28, United States Code, the foregoing is a true and

16   correct transcript of the stenographically reported

17   proceedings held in the above-entitled matter and that the

18   transcript page format is in conformance with the

19   regulations of the Judicial Conference of the United States.

20

21   Date:  March 13, 2011

22

23

24            _____

25                       Deborah D. Parker, Official Reporter
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*