CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5
    MATTEL, INC., et al.,            )
6                                    )
               Plaintiffs,           )
7                                    )
          vs.                        ) No. CV 04-9049 DOC
8                                    )    Day 33
    MGA ENTERTAINMENT, INC., et al., )    Volume 1 of 3
9                                    )
                                     )
10             Defendants.           )
    _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16              Santa Ana, California

17            Tuesday, March 15, 2011

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141

24

25  04cv9049 Mattel 2011-03-15 D33V1

Case 2:04-cv-09049-DOC-RNB  Document 10204  Filed 03/16/11  Page 2 of 167  Page ID #:309262
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

2

```
1    APPEARANCES OF COUNSEL:

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
               QUINN EMANUEL URQUHART & SULLIVAN
4              BY:  JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6              865 South Figueroa Street
               10th Floor
7              Los Angeles, California 90017
               (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             – AND –

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700
20
               – AND –
21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700
25
```

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 3 of 167   Page ID #:309263
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

3

1   **APPEARANCES OF COUNSEL (Continued):**

2

3   FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5           LAW OFFICES OF MARK E. OVERLAND
            By:  MARK E. OVERLAND
                 Attorney at Law
6           100 Wilshire Boulevard
            Suite 950
7           Santa Monica, California 90401
            (310) 459-2830
8
            - AND -
9
            SCHEPER KIM & HARRIS LLP
10          BY:  ALEXANDER H. COTE  (Not present)
                 Attorney at Law
11          601 West 5th Street
            12th Floor
12          Los Angeles, California 90071
            (213) 613-4660
13

14  ALSO PRESENT:

15          MGA ENTERTAINMENT, INC.
            BY:  JEANINE PISONI
16               Attorney at Law
            16360 Roscoe Boulevard
17          Suite 105
            Van Nuys, California 91406
18

19          ROBERT A. ECKERT, Mattel CEO

20          ISAAC LARIAN, MGA CEO

21          KEN KOTARSKI, Mattel Technical Operator

22          MIKE STOVALL, MGA Technical Operator

23

24

25

Case 2:04-cv-09049-DOC-RNB  Document 10204  Filed 03/16/11  Page 4 of 167  Page ID #:309264
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

4

```
 1                            I N D E X

 2    MGA'S WITNESSES           DIRECT  CROSS  REDIRECT  RECROSS

 3    FRIEDMAN, Neil

 4    By Mr. Quinn                       6               109

 5    By Ms. Keller                              31

 6

 7    LEAHY, Margaret

 8
      By Mr. McConville        132
 9

10

11                            EXHIBITS

12    EXHIBIT NO.              IDENTIFICATION     IN EVIDENCE

13      1123    Ms. Leahy's resignation               139
                letter
14
        1137    Ms. Leahy's notebook                  159
15
        9266    Separation Agreement and                9
16              General Release for
                Mr. Villasenor dated
17              7/17/2006

18      9275    WW Strategic Planning                  59
                and Business Development
19              Department document
                dated 4/22/2003
20
        9504    WW Boys Marketing                      57
21              Research Department -
                Toy Fair 2001
22              Competitive Toy Review

23      12118-1 Drawing provided by                   148
                Mr. Bryant to Ms. Leahy
24              of Fiona/Cloe

25
```

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 1 | **EXHIBITS (Continued)** | |
| 2 | **EXHIBIT NO.**          **IDENTIFICATION**          **IN EVIDENCE** | |

| | EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|---|
| 4 | 12118-7 | Drawing provided by Mr. Bryant to Ms. Leahy | 148 |
| 6 | 12118-8 | Drawing provided by Mr. Bryant to Ms. Leahy | 149 |
| 7 | 17383 | Diva Starz doll in packaging | 155 |
| 9 | 24323 | Mattel 2004 Inventors' Awards brochure | 28 |
| 10 | 25103 | Mattel Code of Conduct document | 14 |
| 12 | 25107 | Letter to Ms. Pilgrim from Mr. Kaye | 18 |
| 13 | 35312 | Diva Starz doll in packaging | 155 |
| 15 | 35313 | Diva Starz doll in packaging | 155 |
| 16 | 36083 | Personnel file for Carey Plunkett | 100 |
| 18 | 36088 | E-mail To: Distribution from Mr. Villasenor, dated 2/17/2004 | 64 |
| 20 | 36098 | Personnel file for Geri Pilgrim | 99 |
| 21 | 38064 | Personnel file for Michael Shore | 85 |

Case 2:04-cv-09049-DOC-RNB  Document 10204  Filed 03/16/11  Page 6 of 167  Page ID #:309266
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

6

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 15, 2011**           |
|       | 2  | **Day 33, Volume 1 of 3**                                    |
|       | 3  | (8:35 a.m.)                                                  |
| 08:35 | 4  | *(In the presence of the jury.)*                            |
| 08:35 | 5  | THE COURT:  The jury's present.  All counsel are            |
| 08:35 | 6  | present.  The parties are present.  The witness is present. |
| 10:21 | 7  | **NEIL FRIEDMAN, MGA'S WITNESS, PREVIOUSLY SWORN**          |
| 10:21 | 8  | **RESUMED THE STAND**                                       |
| 08:35 | 9  | THE COURT:  If you would like to continue on with           |
| 08:35 | 10 | your examination, Mr. Quinn.                                |
| 08:35 | 11 | MR. QUINN:  Thank you, Your Honor.                          |
| 08:35 | 12 | **CROSS-EXAMINATION (Resumed)**                             |
| 08:35 | 13 | BY MR. QUINN:                                               |
| 08:35 | 14 | Q.   Good morning.                                          |
| 08:35 | 15 | THE COURT:  Once again, this is Mr. Quinn, for the          |
| 08:35 | 16 | record.                                                     |
| 08:35 | 17 | Mr. Quinn.                                                  |
| 08:35 | 18 | BY MR. QUINN:                                               |
| 08:35 | 19 | Q.   Mr. Friedman, last week we looked at -- at the end of  |
| 08:35 | 20 | the day, we had been looking at some calendar entries on Sal |
| 08:36 | 21 | Villasenor's and your calendar, if you recall that.        |
| 08:36 | 22 | And perhaps we could look at Exhibit 36027,                 |
| 08:36 | 23 | Mr. Villasenor's calendar.                                  |
| 08:36 | 24 | *(Document provided to the witness.)*                       |
| 08:36 | 25 | MR. QUINN:  And, Ken, if we could look at the              |

| 08:36 | 1 | actual calendar page and enlarge the entry at 2:00 o'clock. |
| 08:36 | 2 | *(Document displayed.)* |
| 08:36 | 3 | BY MR. QUINN: |
| 08:36 | 4 | Q.   And Ms. Keller pointed out to you that there was an |
| 08:36 | 5 | update on Mr. Villasenor's calendar.  This indicated at |
| 08:36 | 6 | 2:00 o'clock it was updated.  Do you recall that? |
| 08:36 | 7 | A.   I do. |
| 08:36 | 8 | Q.   If we could look at your calendar, Exhibit 27322-15 -- |
| 08:37 | 9 | I'm sorry.  24322-15. |
| 08:37 | 10 | *(Document provided to the witness.)* |
| 08:37 | 11 | BY MR. QUINN: |
| 08:37 | 12 | Q.   And we saw that you had a meeting with Mr. Villasenor |
| 08:37 | 13 | on your calendar for 3:00 o'clock, a different time. |
| 08:37 | 14 | *(Document displayed.)* |
| 08:37 | 15 | BY MR. QUINN: |
| 08:37 | 16 | Q.   Correct? |
| 08:37 | 17 | A.   That's correct. |
| 08:37 | 18 | Q.   And at 2:00 o'clock, where he showed an updated |
| 08:37 | 19 | meeting, you actually had a meeting scheduled with -- is |
| 08:37 | 20 | that DreamWorks? |
| 08:37 | 21 | A.   That was a prep meeting with Holly Stein and Judy |
| 08:37 | 22 | Willis in my office on -- prep meeting to meet with |
| 08:37 | 23 | DreamWorks on Kung Fu Panda, actually. |
| 08:37 | 24 | Q.   Kung Fu Panda? |
| 08:37 | 25 | A.   Yes, that's correct. |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

8

| 08:37 | 1 | Q.   And do you recall whether that meeting at 2:00 o'clock |
| 08:37 | 2 | actually happened?  Do you recall that meeting? |
| 08:37 | 3 | A.   I do.  It did take place. |
| 08:37 | 4 | Q.   Ms. Keller also asked you some questions about the |
| 08:37 | 5 | agreement that Mattel entered into with Mr. Villasenor.  And |
| 08:38 | 6 | that is Exhibit 9266. |
| 08:38 | 7 | MR. QUINN:  If we could show that -- this is not |
| 08:38 | 8 | in evidence yet, but if we could show that to Mr. Friedman, |
| 08:38 | 9 | 9266. |
| 08:38 | 10 | *(Document provided to the witness.)* |
| 08:38 | 11 | BY MR. QUINN: |
| 08:38 | 12 | Q.   Now, is that an agreement dated July 17, 2006, between |
| 08:38 | 13 | Mr. Villasenor and Mattel entitled "Separation Agreement and |
| 08:38 | 14 | General Release"? |
| 08:38 | 15 | A.   It is. |
| 08:38 | 16 | MR. QUINN:  We'd offer that in evidence, |
| 08:38 | 17 | Your Honor. |
| 08:38 | 18 | THE COURT:  Received. |
| 08:38 | 19 | MS. KELLER:  Objection.  Your Honor, no foundation |
| 08:38 | 20 | as to this witness. |
| 08:38 | 21 | THE COURT:  Well, I believe this is the -- is this |
| 08:38 | 22 | the letter? |
| 08:38 | 23 | MS. KELLER:  No, it is not. |
| 08:38 | 24 | THE COURT:  My apologies.  Could I see that, sir. |
| 08:38 | 25 | THE WITNESS:  Certainly. |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

9

| 08:39 | 1 | THE COURT:  One of you bring me that exhibit. |
| 08:39 | 2 | MR. QUINN:  He was asked about this by Ms. Keller, |
| 08:39 | 3 | Your Honor. |
| 08:39 | 4 | *(Document provided to the Court.)* |
| 08:39 | 5 | THE COURT:  Received. |
| 08:39 | 6 | *(Exhibit No. 9266 received in evidence.)* |
| 08:39 | 7 | MR. QUINN:  If we could perhaps just put the first |
| 08:39 | 8 | page up there. |
| 08:39 | 9 | *(Document displayed.)* |
| 08:39 | 10 | BY MR. QUINN: |
| 08:39 | 11 | Q.   Does this appear to you to be the separation agreement |
| 08:39 | 12 | between Mattel and Salvador Villasenor? |
| 08:39 | 13 | A.   It does. |
| 08:39 | 14 | Q.   Do you recall that Ms. Keller asked you some questions |
| 08:39 | 15 | about didn't Mr. Villasenor get a lucrative arrangement with |
| 08:39 | 16 | Mattel, pursuant to which he'd get a lucrative amount of |
| 08:39 | 17 | money in return for his not talking about what he had been |
| 08:39 | 18 | doing?  Do you recall those questions? |
| 08:39 | 19 | A.   I do. |
| 08:39 | 20 | THE COURT:  Just a moment before we continue. |
| 08:39 | 21 | There was a question asked concerning moneys outside of this |
| 08:40 | 22 | agreement by Mr. Quinn, the last portion of Friday.  I think |
| 08:40 | 23 | it was the last question of the day.  And the Court simply |
| 08:40 | 24 | took a recess to discuss it with counsel.  That question is |
| 08:40 | 25 | stricken and any answer is stricken concerning that. |

08:40   1              Mr. Sal Villasenor will be here.  He'll testify

08:40   2       about what compensation he either received or asked for.  So

08:40   3       we'll have that rather than hearsay.

08:40   4              MR. QUINN:  Thank you, Your Honor.

08:40   5       BY MR. QUINN:

08:40   6       Q.   If we could look at that first section.

08:40   7              MR. QUINN:  Ken, if we could blow that up.

08:40   8                 (Technician complies.)

08:40   9       BY MR. QUINN:

08:40  10       Q.   Does that set forth there what Mr. Villasenor received

08:40  11       from Mattel?

08:40  12       A.   Yes, it does.

08:40  13       Q.   And it refers to 18 months at his current regular rate

08:40  14       of $3,409.77 less deductions.  Do you see that in sub one?

08:40  15       A.   I do.

08:40  16       Q.   And then in sub two, $20,000 for medical expenses for

08:40  17       psychological and psychiatric medical assistance?

08:41  18       A.   I do.

08:41  19       Q.   And then sub three, some $20,000 for his attorney's

08:41  20       fees?

08:41  21       A.   Yes.

08:41  22       Q.   Does that appear to be the amount that Mr. Villasenor

08:41  23       received pursuant to the separation agreement?

08:41  24       A.   It does.

08:41  25       Q.   And then in terms of whether he promised not to talk

| | | |
|---|---|---|
| 08:41 | 1 | about his activities, could you take a look at on page |
| 08:41 | 2 | dash 4, the sub (f) nondisclosure.  Do you see that |
| 08:41 | 3 | provision? |
| 08:41 | 4 | A.    I do. |
| 08:41 | 5 | Q.    It says, (as read:)  "I acknowledge that I possess |
| 08:41 | 6 | secret, confidential, or proprietary information or trade |
| 08:41 | 7 | secrets concerning the operations, future plans, or business |
| 08:41 | 8 | methods of the company and its subsidiaries and |
| 08:41 | 9 | affiliates" -- confidential information as defined in |
| 08:41 | 10 | parentheses. |
| 08:41 | 11 | "I agree that the company and its subsidiaries and |
| 08:41 | 12 | affiliates would be severely damaged and irreparably harmed |
| 08:42 | 13 | by any actual or threatened use or disclosure of such |
| 08:42 | 14 | confidential information or my solicitation of company's |
| 08:42 | 15 | employees, customers, or suppliers, and that the company |
| 08:42 | 16 | will be entitled to an injunction prohibiting me from |
| 08:42 | 17 | committing any such violation.  To prevent this potential |
| 08:42 | 18 | harm, I make the following promises and acknowledgments: |
| 08:42 | 19 | That the company would be irreparably harmed if I broke any |
| 08:42 | 20 | of them.  These promises supersede other promises I may have |
| 08:42 | 21 | made only to the extent these promises are more protective |
| 08:42 | 22 | of the company's interests as it determines." |
| 08:42 | 23 | And then it goes on. |
| 08:42 | 24 | Can you tell us whether or not this is a standard |
| 08:42 | 25 | provision that Mattel enters into with its departing |

| | | |
|---|---|---|
| 08:42 | 1 | employees to remind them and obligate them to continue to |
| 08:42 | 2 | respect the confidentiality of Mattel's proprietary |
| 08:43 | 3 | information? |
| 08:43 | 4 | MS. KELLER:  Objection.  No foundation. |
| 08:43 | 5 | THE COURT:  Just a moment. |
| 08:43 | 6 | Overruled. |
| 08:43 | 7 | You can answer the question. |
| 08:43 | 8 | THE WITNESS:  It is -- it is pretty standard on |
| 08:43 | 9 | all of our separation agreements. |
| 08:43 | 10 | BY MR. QUINN: |
| 08:43 | 11 | Q.   In fact, you've told us that you're gonna be retiring |
| 08:43 | 12 | soon? |
| 08:43 | 13 | A.   I am. |
| 08:43 | 14 | Q.   And do you have a form of agreement that you've been |
| 08:43 | 15 | asked to sign that has a similar type of language? |
| 08:43 | 16 | A.   I do. |
| 08:43 | 17 | Q.   And have you now had a chance to read Mr. Villasenor's |
| 08:43 | 18 | separation agreement, Exhibit 9266? |
| 08:43 | 19 | A.   Yes, I have. |
| 08:43 | 20 | Q.   Is there anything in there pursuant to which |
| 08:43 | 21 | Mr. Villasenor promises that he won't talk about his |
| 08:43 | 22 | activities at toy fairs? |
| 08:43 | 23 | A.   There is nothing. |
| 08:43 | 24 | Q.   Why did you respond to Ms. Keller's questions when she |
| 08:43 | 25 | asked you, "Wasn't he getting a lucrative deal so long as he |

| | | |
|---|---|---|
| 08:43 | 1 | didn't discuss what he had done?"  And you said, |
| 08:43 | 2 | "Correct" -- why did you respond that way? |
| 08:43 | 3 | A.   Well, I assumed that the -- that Ms. Keller had |
| 08:44 | 4 | actually read the document and was stating facts.  And so I |
| 08:44 | 5 | agreed. |
| 08:44 | 6 | Q.   But you hadn't seen it yourself? |
| 08:44 | 7 | A.   I had not. |
| 08:44 | 8 | Q.   All right.  There was also some discussion about two |
| 08:44 | 9 | employees last week, Michael Shore and Geri Pilgrim, who |
| 08:44 | 10 | received reprimands.  Do you recall that? |
| 08:44 | 11 | A.   I do. |
| 08:44 | 12 | Q.   If you'd turn to Exhibit 25103. |
| 08:44 | 13 | *(Document provided to the witness.)* |
| 08:44 | 14 | BY MR. QUINN: |
| 08:44 | 15 | Q.   Can you identify Exhibit 25103 for us? |
| 08:44 | 16 | A.   Yes.  This is the code of conduct and corporate values, |
| 08:44 | 17 | a reprimand to Michael Shore. |
| 08:44 | 18 | Q.   And it's signed by? |
| 08:44 | 19 | A.   Alan Kaye. |
| 08:44 | 20 | Q.   Who is that? |
| 08:45 | 21 | A.   The senior vice president of Human Resources. |
| 08:45 | 22 | MR. QUINN:  Your Honor, we'd offer this exhibit. |
| 08:45 | 23 | THE COURT:  Is Mr. Kaye going to testify? |
| 08:45 | 24 | MR. QUINN:  Yes, he is, Your Honor. |
| 08:45 | 25 | THE COURT:  All right.  Received. |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

14

| | | |
|---|---|---|
| 08:45 | 1 | *(Exhibit No. 25103 received in evidence.)* |
| 08:45 | 2 | *(Document displayed.)* |
| 08:45 | 3 | BY MR. QUINN: |
| 08:45 | 4 | Q.   If you would take a look there at, um -- the references |
| 08:45 | 5 | to what Mr. Shore was being reprimanded for are in the third |
| 08:45 | 6 | paragraph, are they not? |
| 08:45 | 7 | A.   They are. |
| 08:45 | 8 | Q.   And that says, "Recently allegations of past conduct |
| 08:45 | 9 | that would be incompatible with Mattel's principles have |
| 08:45 | 10 | surfaced.  Although the allegations relate to past conduct |
| 08:45 | 11 | and that conduct may not have been illegal, we were |
| 08:45 | 12 | disappointed to learn of it.  We also were disappointed that |
| 08:45 | 13 | it was not reported earlier. |
| 08:45 | 14 | "We want to take this opportunity to emphasize again |
| 08:45 | 15 | that any conduct that violates our code of conduct cannot |
| 08:45 | 16 | occur.  If you have a good faith belief that your coworkers |
| 08:45 | 17 | are acting in a way that would violate our code of conduct, |
| 08:45 | 18 | you are obligated to report it to the human resources |
| 08:45 | 19 | department, the law department, internal audit department, |
| 08:46 | 20 | the global security department, or the confidential ethics |
| 08:46 | 21 | line." |
| 08:46 | 22 | Do you see that? |
| 08:46 | 23 | A.   I do. |
| 08:46 | 24 | Q.   And based upon that, what is your understanding as to |
| 08:46 | 25 | what Mr. Shore was being reprimanded for? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 15 of 167   Page ID #:309275
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

15

| 08:46 | 1 | MS. KELLER: Objection. To the characterization |
| 08:46 | 2 | of a reprimand. |
| 08:46 | 3 | THE COURT: Sustained. |
| 08:46 | 4 | BY MR. QUINN: |
| 08:46 | 5 | Q. Well, what was your understanding as to why Mr. Shore |
| 08:46 | 6 | was receiving this letter from the head of human resources? |
| 08:46 | 7 | MS. KELLER: I would object that the document |
| 08:46 | 8 | speaks for itself. |
| 08:46 | 9 | THE COURT: Well, if we're going to expand his |
| 08:46 | 10 | expertise -- |
| 08:46 | 11 | What position do you hold at the present time, |
| 08:46 | 12 | again, sir? |
| 08:46 | 13 | THE WITNESS: I'm an executive adviser to the CEO. |
| 08:46 | 14 | THE COURT: Are you aware of this code of conduct? |
| 08:46 | 15 | THE WITNESS: I am. |
| 08:46 | 16 | THE COURT: Were you aware of this letter prior to |
| 08:46 | 17 | your testimony today? |
| 08:46 | 18 | THE WITNESS: Just prior to the testimony today. |
| 08:46 | 19 | THE COURT: Friday? |
| 08:46 | 20 | THE WITNESS: Actually, yesterday. |
| 08:46 | 21 | THE COURT: Saturday? Sunday? |
| 08:46 | 22 | THE WITNESS: Monday. |
| 08:46 | 23 | THE COURT: Monday. |
| 08:46 | 24 | I'm going to sustain the objection, Counsel. |
| 08:46 | 25 | You can get the human resources person in here if |

| | | |
|---|---|---|
| 08:46 | 1 | you'd like to, or whoever wrote this letter. |
| 08:47 | 2 | MR. QUINN:  All right. |
| 08:47 | 3 | THE COURT:  You can take that off the screen now. |
| 08:47 | 4 | *(Document taken down.)* |
| 08:47 | 5 | BY MR. QUINN: |
| 08:47 | 6 | Q.   When you testified last week, had you actually seen |
| 08:47 | 7 | this letter before? |
| 08:47 | 8 | A.   I had not. |
| 08:47 | 9 | Q.   I mean, do you have -- when you testified last week, |
| 08:47 | 10 | did you have any knowledge about what Mr. Shore's activities |
| 08:47 | 11 | had been? |
| 08:47 | 12 | A.   I had not. |
| 08:47 | 13 | Q.   And since then, have you acquired such information? |
| 08:47 | 14 | A.   I have. |
| 08:47 | 15 | Q.   And how did you acquire it? |
| 08:47 | 16 | A.   I had talked to Alan Kaye, our head of human resources. |
| 08:47 | 17 | Q.   I mean, do you have any information that Mr. Shore |
| 08:47 | 18 | actually went into toy fair booths? |
| 08:47 | 19 | A.   I do not. |
| 08:47 | 20 | Q.   Is it your understanding that he did or did not? |
| 08:47 | 21 | A.   Did not. |
| 08:47 | 22 | Q.   If you'd look now at Exhibit 25107. |
| 08:47 | 23 | MS. KELLER:  Your Honor, I'm gonna object that |
| 08:47 | 24 | that is entirely based on hearsay and move to strike. |
| 08:47 | 25 | THE COURT:  Stricken. |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 17 of 167   Page ID #:309277
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

17

| | | |
|---|---|---|
| 08:47 | 1 | You're to disregard his answer. |
| 08:48 | 2 | MR. QUINN:  Your Honor, there was testimony |
| 08:48 | 3 | elicited by Ms. Keller. |
| 08:48 | 4 | THE COURT:  Thank you.  Thank you very much. |
| 08:48 | 5 | BY MR. QUINN: |
| 08:48 | 6 | Q.   Will you look at Exhibit 25107. |
| 08:48 | 7 | *(Document provided to the witness.)* |
| 08:48 | 8 | BY MR. QUINN: |
| 08:48 | 9 | Q.   Can you identify this document? |
| 08:48 | 10 | A.   It's the code of conduct and corporate values document |
| 08:48 | 11 | for Geri Pilgrim. |
| 08:48 | 12 | Q.   And Geri Pilgrim was the other employee that you |
| 08:48 | 13 | referred to in your testimony last Friday? |
| 08:48 | 14 | A.   Correct. |
| 08:48 | 15 | Q.   Do you have any information that Ms. Pilgrim ever |
| 08:48 | 16 | entered toy fair showrooms under false pretenses? |
| 08:48 | 17 | MS. KELLER:  Objection.  No foundation. |
| 08:48 | 18 | THE COURT:  I thought that Mr. Quinn, though, may |
| 08:48 | 19 | be correct about examination concerning both Mr. Shore and |
| 08:48 | 20 | Mr. *(sic)* Pilgrim last Friday. |
| 08:49 | 21 | Am I mistaken? |
| 08:49 | 22 | MS. KELLER:  Yes, Your Honor. |
| 08:49 | 23 | MR. QUINN:  I don't think you are, Your Honor. |
| 08:49 | 24 | THE COURT:  Well, there, see we have. |
| 08:49 | 25 | MS. KELLER:  I didn't mean you were mistaken.  I |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 18 of 167   Page ID #:309278
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

18

| | | |
|---|---|---|
| 08:49 | 1 | meant yes, I did inquire. |
| 08:49 | 2 | THE COURT:  Okay.  I'm going to reverse my prior |
| 08:49 | 3 | ruling.  You can inquire as to both Shore and Pilgrim. |
| 08:49 | 4 | MR. QUINN:  All right. |
| 08:49 | 5 | BY MR. QUINN: |
| 08:49 | 6 | Q.   So, can you identify this document, Exhibit 25107, |
| 08:49 | 7 | addressed to Geri Pilgrim? |
| 08:49 | 8 | A.   Yes.  It was her reprimand also signed by Alan Kaye. |
| 08:49 | 9 | MR. QUINN:  We'd offer that, Your Honor. |
| 08:49 | 10 | THE COURT:  Received. |
| 08:49 | 11 | *(Exhibit No. 25107 received in evidence.)* |
| 08:49 | 12 | *(Document displayed.)* |
| 08:49 | 13 | MR. QUINN:  If we could enlarge that last |
| 08:49 | 14 | paragraph. |
| 08:49 | 15 | *(Technician complies.)* |
| 08:49 | 16 | MS. KELLER:  Your Honor, I do want to enter an |
| 08:49 | 17 | objection to the term "reprimand" in connection with this |
| 08:49 | 18 | letter. |
| 08:49 | 19 | THE COURT:  I'll let Alan Kaye testify to that, |
| 08:49 | 20 | Counsel.  You can refer to this as a letter. |
| 08:49 | 21 | MR. QUINN:  As a letter. |
| 08:49 | 22 | THE COURT:  Let the jury determine whether this is |
| 08:49 | 23 | a reprimand or not. |
| 08:49 | 24 | BY MR. QUINN: |
| 08:49 | 25 | Q.   It says, "Recently allegations of past conduct that |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 19 of 167   Page ID #:309279
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

19

| | | |
|---|---|---|
| 08:49 | 1 | would be incompatible with Mattel's principles have |
| 08:49 | 2 | surfaced.  Although the allegations relate to past conduct |
| 08:50 | 3 | and that conduct may not have been illegal, we were |
| 08:50 | 4 | disappointed to learn of it.  We also were disappointed that |
| 08:50 | 5 | it was not reported earlier.  We want to take this |
| 08:50 | 6 | opportunity to emphasize again that any conduct that |
| 08:50 | 7 | violates our code of conduct cannot occur.  If you have a |
| 08:50 | 8 | good faith belief that your coworkers are acting in a way |
| 08:50 | 9 | that would violate our code of conduct, you are obligated to |
| 08:50 | 10 | report it to human resources department, the law department, |
| 08:50 | 11 | the internal audit department, the global security |
| 08:50 | 12 | department, or the confidential Ethics Hotline." |
| 08:50 | 13 | BY MR. QUINN: |
| 08:50 | 14 | Q.   Do you have any understanding as to what the conduct |
| 08:50 | 15 | was that Geri Pilgrim engaged in which resulted in her |
| 08:50 | 16 | receiving this letter? |
| 08:50 | 17 | A.   Well, I think she had knowledge -- |
| 08:50 | 18 | MS. KELLER:  I'm gonna object that there's no |
| 08:50 | 19 | foundation. |
| 08:50 | 20 | MR. QUINN:  This was inquired into, Your Honor. |
| 08:50 | 21 | MS. KELLER:  No foundation, Your Honor. |
| 08:50 | 22 | THE COURT:  I'm going to sustain the objection. |
| 08:51 | 23 | I think we've got Mr. Kaye testifying, don't we? |
| 08:51 | 24 | MR. QUINN:  Yes, he will be testifying. |
| 08:51 | 25 | THE COURT:  We'll resolve this matter just like |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 20 of 167   Page ID #:309280
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

20

08:51  1    Mr. Sal Villasenor will resolve the other matter, Counsel.
08:51  2    I think this is unduly consumptive of time.
08:51  3           MR. QUINN:  All right.  A couple more questions,
08:51  4    if I may, Your Honor.
08:51  5    BY MR. QUINN:
08:51  6    Q.   Do you have any information that Ms. Pilgrim -- that's
08:51  7    a woman, Geri Pilgrim?
08:51  8    A.   Correct.
08:51  9    Q.   Do you have any information that Geri Pilgrim ever
08:51  10   entered any toy fair showroom booths under false pretenses?
08:51  11   A.   I do not.
08:51  12   Q.   And the same question for Mr. Shore.
08:51  13          MS. KELLER:  Your Honor, I object again to no
08:51  14   foundation for this.
08:51  15          THE COURT:  Overruled.  There were questions about
08:51  16   this on Friday, Counsel.
08:51  17          You can answer the question, sir.
08:51  18          THE WITNESS:  I do not.
08:51  19          MR. QUINN:  And, Your Honor, I'd offer
08:51  20   Exhibit 25103, as well.  I think 25107 was already received.
08:51  21   I would offer 25103, the letter to Michael Shore.
08:51  22          THE COURT:  Each are received.
08:51  23          *(Exhibit No. 25103 previously received in*
08:51  24       *evidence.)*
       25

| 08:51 | 1 | BY MR. QUINN: |
| 08:51 | 2 | Q.   You've told us that, by my count, you've been in the |
| 08:52 | 3 | toy business almost 40 years? |
| 08:52 | 4 | A.   Almost. |
| 08:52 | 5 | Q.   Based on your experience in the toy business, can you |
| 08:52 | 6 | tell us whether or not it's standard in the industry for toy |
| 08:52 | 7 | companies to enter into agreements with their employees that |
| 08:52 | 8 | provide that any toy ideas or creations or designs relating |
| 08:52 | 9 | to the toy business, that "they" come up while they are |
| 08:52 | 10 | employed, are owned by the company? |
| 08:52 | 11 | MS. KELLER:  Objection.  No foundation. |
| 08:52 | 12 | THE COURT:  Overruled. |
| 08:52 | 13 | THE WITNESS:  They do. |
| 08:52 | 14 | BY MR. QUINN: |
| 08:52 | 15 | Q.   They do? |
| 08:52 | 16 | A.   They do.  They do -- they are -- there's an agreement |
| 08:52 | 17 | that we sign that says that, yes. |
| 08:52 | 18 | Q.   And is that pretty consistent in your business in |
| 08:52 | 19 | the -- in your experience in the toy business? |
| 08:52 | 20 | A.   Yes, every company I've been in. |
| 08:52 | 21 | Q.   And we've had some questions in this trial about |
| 08:52 | 22 | layoffs and reduction in force.  Do you know how many |
| 08:53 | 23 | employees Mattel had back in 2000? |
| 08:53 | 24 | A.   I believe it was 30,000.  30,000, yes. |
| 08:53 | 25 | Q.   And how many employees did Mattel have as of the end of |

| | | |
|---|---|---|
| 08:53 | 1 | 2010? |
| 08:53 | 2 | A.   Approximately 31,000. |
| 08:53 | 3 | Q.   So over that ten-year period of time, the total |
| 08:53 | 4 | workforce has gone up by 1,000 employees? |
| 08:53 | 5 | A.   That's correct. |
| 08:53 | 6 | Q.   And then we were talking last week about acquiring |
| 08:53 | 7 | ideas for toys for outside inventors.  And I think you said |
| 08:53 | 8 | that Mattel tends to deal with a small community of known |
| 08:53 | 9 | inventors? |
| 08:53 | 10 | A.   That's correct. |
| 08:53 | 11 | Q.   Why is that? |
| 08:53 | 12 | A.   Because if you deal with someone who you're not sure of |
| 08:53 | 13 | where the idea is coming from, you could wind up owning |
| 08:53 | 14 | nothing. |
| 08:53 | 15 | Q.   What do you mean by that? |
| 08:53 | 16 | A.   Well, if it's not their idea and somebody else comes up |
| 08:53 | 17 | to you and says, "This is my idea," and can prove it, then |
| 08:53 | 18 | what you own is nothing. |
| 08:53 | 19 | Q.   All right.  And then, finally, you were asked some |
| 08:54 | 20 | questions by Ms. Keller about whether Mattel keeps the names |
| 08:54 | 21 | of inventors that it works with confidential.  And she |
| 08:54 | 22 | showed you some newspaper articles.  They were |
| 08:54 | 23 | Exhibits 7921, from *SUCCESS* Magazine, Exhibit -- perhaps we |
| 08:54 | 24 | could get those out.  7921 is the first one -- |
| 08:54 | 25 | *(Document provided to the witness.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

23

| | | |
|---|---|---|
| 08:54 | 1 | BY MR. QUINN: |
| 08:54 | 2 | Q.   -- from *SUCCESS* Magazine.  And that's dated June 29, |
| 08:54 | 3 | 2009; is that correct? |
| 08:54 | 4 | A.   That's correct. |
| 08:54 | 5 | Q.   And then she also showed you Exhibit 36024, an article |
| 08:54 | 6 | from *Royaltie$* Magazine.  36024.  And these all related to a |
| 08:54 | 7 | toy called "Tickle me Elmo."  Right? |
| 08:55 | 8 | A.   Most of it, yes.  There's some other information in |
| 08:55 | 9 | there too, but mostly Tickle Me Elmo. |
| 08:55 | 10 | THE COURT:  The other one is 36004-2, Counsel. |
| 08:55 | 11 | MR. QUINN:  36024.  *Royalty*.  Do you have that |
| 08:55 | 12 | before you? |
| 08:55 | 13 | (Document provided to the witness.) |
| 08:55 | 14 | THE WITNESS:  Yes. |
| 08:55 | 15 | BY MR. QUINN: |
| 08:55 | 16 | Q.   That's dated May of 2007? |
| 08:55 | 17 | A.   Correct. |
| 08:55 | 18 | Q.   And then 36005? |
| 08:55 | 19 | THE COURT:  That was simply a biography in the |
| 08:55 | 20 | *Wall Street Journal*. |
| 08:55 | 21 | MR. QUINN:  Right.  I think it referred to the |
| 08:55 | 22 | Tickle Me Elmo toy, as well. |
| 08:55 | 23 | BY MR. QUINN: |
| 08:55 | 24 | Q.   Do you have that before you, 36005? |
| 08:55 | 25 | A.   Not yet. |

| | | |
|---|---|---|
| 08:55 | 1 | *(Document provided to the witness.)* |
| 08:55 | 2 | THE WITNESS:  Yes. |
| 08:55 | 3 | BY MR. QUINN: |
| 08:55 | 4 | Q.   And that's dated March 2, 2011? |
| 08:55 | 5 | A.   Yes. |
| 08:55 | 6 | Q.   And that's a biography.  It also makes reference to |
| 08:55 | 7 | this toy, correct? -- the Tickle Me Elmo. |
| 08:56 | 8 | A.   It does. |
| 08:56 | 9 | Q.   And then, again, you were asked, there's no mention of |
| 08:56 | 10 | the inventor.  Do you recall that? |
| 08:56 | 11 | A.   I do. |
| 08:56 | 12 | Q.   And then, finally, Ms. Keller showed you Exhibit 36004. |
| 08:56 | 13 | 36004.  That's going to be in the tab before the last one. |
| 08:56 | 14 | THE COURT:  3604-2, Counsel. |
| 08:56 | 15 | MR. QUINN:  Dash 2. |
| 08:56 | 16 | Thank you, Your Honor. |
| 08:56 | 17 | BY MR. QUINN: |
| 08:56 | 18 | Q.   That's a Bloomberg article dated -- *Bloomberg* |
| 08:56 | 19 | *BusinessWeek*, September 25, 2006? |
| 08:56 | 20 | A.   Yes. |
| 08:56 | 21 | Q.   And Ms. Keller pointed out that although the toy, |
| 08:56 | 22 | Tickle Me Elmo, was referred to in each of those articles, |
| 08:56 | 23 | the name of the inventor wasn't referred to.  Do you recall |
| 08:56 | 24 | that? |
| 08:56 | 25 | A.   I do. |

| 08:56 | 1 | Q.   Well, do you know whether or not prior to the time any |
| 08:56 | 2 | of these articles came out there had been press identifying |
| 08:56 | 3 | the inventor of Tickle Me Elmo? |
| 08:56 | 4 | A.   There had. |
| 08:56 | 5 | Q.   If you'd look at Exhibit 34318 -- I'm sorry.  24318. |
| 08:57 | 6 | *(Document provided to the witness.)* |
| 08:57 | 7 | BY MR. QUINN: |
| 08:57 | 8 | Q.   Isn't that a *Daily News* article? |
| 08:57 | 9 | A.   It is. |
| 08:57 | 10 | Q.   And you're quoted in that? |
| 08:57 | 11 | A.   I am. |
| 08:57 | 12 | MR. QUINN:  We'd offer this, Your Honor. |
| 08:57 | 13 | MS. KELLER:  Your Honor, objection.  Hearsay. |
| 08:57 | 14 | THE COURT:  Sustained. |
| 08:57 | 15 | BY MR. QUINN: |
| 08:57 | 16 | Q.   Well, is this an article in which the name of the |
| 08:57 | 17 | inventor of Tickle Me Elmo appears? |
| 08:57 | 18 | A.   It is. |
| 08:57 | 19 | Q.   Along with your name? |
| 08:57 | 20 | A.   Yes. |
| 08:57 | 21 | Q.   And, in fact, is there a picture there of the inventor? |
| 08:57 | 22 | A.   There is. |
| 08:57 | 23 | Q.   And what's his name? |
| 08:57 | 24 | A.   Ron Dubren, D-U-B-R-E-N. |
| 08:57 | 25 | Q.   And again, there's December 14th, 1996? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 26 of 167   Page ID #:309286
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

26

| 08:57 | 1 | A.   That's correct. |
| 08:57 | 2 | Q.   So -- |
| 08:57 | 3 | MR. QUINN:  Your Honor, this is not offered for |
| 08:57 | 4 | the truth, but merely for date of the disclosure. |
| 08:58 | 5 | THE COURT:  Thank you. |
| 08:58 | 6 | Sustained. |
| 08:58 | 7 | BY MR. QUINN: |
| 08:58 | 8 | Q.   Mattel wasn't keeping Mr. Dubren's name secret? |
| 08:58 | 9 | A.   We were not. |
| 08:58 | 10 | Q.   If you'd look at Exhibit 24319, the next tab. |
| 08:58 | 11 | A.   Yes. |
| 08:58 | 12 | Q.   Is this an article from *USA Today*, which also features |
| 08:58 | 13 | Mr. Ron Dubren, the creator of Tickle Me Elmo? |
| 08:58 | 14 | A.   It does. |
| 08:58 | 15 | Q.   And does that article also refer to the small community |
| 08:58 | 16 | of 2- or 300 inventors that Mattel deals with? |
| 08:58 | 17 | A.   Yes, it does. |
| 08:58 | 18 | MR. QUINN:  We'd offer that, as well, Your Honor, |
| 08:58 | 19 | not for the truth. |
| 08:58 | 20 | MS. KELLER:  Same objection, Your Honor. |
| 08:58 | 21 | THE COURT:  Sustained. |
| 08:58 | 22 | BY MR. QUINN: |
| 08:58 | 23 | Q.   You indicated that in interviews you don't identify |
| 08:59 | 24 | inventors without their permission.  Can you explain that? |
| 08:59 | 25 | A.   Yes.  We never would mention anybody's name if the |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 27 of 167   Page ID #:309287
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

27

08:59   1   inventor did not want to be identified.  So we -- we
08:59   2   don't -- unless we're knowing in advance to ask, we don't
08:59   3   typically name the inventor.
08:59   4   Q.   Is it, in fact, the case that Mattel takes a policy --
08:59   5   has a policy of always keeping the names of its inventors
08:59   6   under wraps and keeping that confidential and not disclosing
08:59   7   it?
08:59   8            MS. KELLER:  Objection.  Leading.
08:59   9            THE COURT:  Overruled.
08:59   10           You can answer the question.
08:59   11           THE WITNESS:  Only during interviews, if we
08:59   12   haven't gotten the appropriate approval from the inventor.
08:59   13   BY MR. QUINN:
08:59   14   Q.   Does Mattel actually have an event where it recognizes
08:59   15   and honors the inventors who have submitted successful ideas
08:59   16   to Mattel?
08:59   17   A.   We do.
08:59   18   Q.   What is that event?
08:59   19   A.   It is our inventor night at our pretoy fair that
08:59   20   typically takes place in October.
09:00   21   Q.   And how often does this happen, this event?
09:00   22   A.   At least once a year.
09:00   23   Q.   And if you would take a look, please, at Exhibit 24323.
09:00   24   24323.
09:00   25   A.   Yes.

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

28

| | | |
|---|---|---|
| 09:00 | 1 | Q.    Can you identify this for us? |
| 09:00 | 2 | A.    Yeah.  This is our inventor awards brochure that we |
| 09:00 | 3 | give out to all of our inventors and our marketing and |
| 09:00 | 4 | design and engineering folks and our -- it comes from |
| 09:00 | 5 | inventor relations group. |
| 09:00 | 6 | Q.    And is this a brochure that's released by Mattel? |
| 09:00 | 7 | A.    It is. |
| 09:00 | 8 | Q.    And is it released in connection with that event that |
| 09:00 | 9 | you identified a -- that annual event that you identified a |
| 09:00 | 10 | moment ago? |
| 09:00 | 11 | A.    It is. |
| 09:00 | 12 | MR. QUINN:  Your Honor, we would offer |
| 09:00 | 13 | Exhibit 24323. |
| 09:00 | 14 | THE COURT:  Received. |
| 09:00 | 15 | *(Exhibit No. 24323 received in evidence.)* |
| 09:00 | 16 | *(Document displayed.)* |
| 09:00 | 17 | BY MR. QUINN: |
| 09:00 | 18 | Q.    If we could put the first page up on the screen.  At |
| 09:00 | 19 | the top there it says, "Mattel 2004 Inventors' Awards"? |
| 09:01 | 20 | A.    Yes. |
| 09:01 | 21 | Q.    And then, if we could skip to dash 3, there's a letter. |
| 09:01 | 22 | *(Document displayed.)* |
| 09:01 | 23 | BY MR. QUINN: |
| 09:01 | 24 | Q.    -- from some people at Mattel addressed to the |
| 09:01 | 25 | inventor -- to the inventor community? |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

29

09:01   1    A.    Yes.

09:01   2    Q.    It says, "You are our partners and friends.  Your

09:01   3    creativity and innovation never cease to amaze us.  We

09:01   4    cannot thank you enough for choosing and entrusting Mattel

09:01   5    with your ideas."  You see that?

09:01   6    A.    I do.

09:01   7    Q.    And then if you would skip over to page dash 6, from

09:01   8    page dash 6 through to the end, dash 34, can you tell us

09:01   9    what we see?

09:01   10   A.    Well, we see each individual product that the inventors

09:01   11   created and the name of the inventor or inventing group

09:01   12   underneath it.

09:01   13   Q.    So, for example, on that first page there, under

09:01   14   Barbie, there's Trendy and Bendy Barbie doll, and then under

09:01   15   that there's the name Sente Creations?

09:01   16   A.    It's Sente Creations.

09:02   17   Q.    And what was their role with respect to Trendy and

09:02   18   Bendy Barbie doll?

09:02   19   A.    They would have brought us the concept.

09:02   20   Q.    Then below that, there's Wonder Fairy Barbie doll, and

09:02   21   it says BangZoom Design, Limited?

09:02   22   A.    That's correct.  That's another design group, design

09:02   23   house.

09:02   24   Q.    If we can kind of page through these and enlarge some

09:02   25   of the pictures.

| | | |
|---|---|---|
| 09:02 | 1 | MS. KELLER:  Your Honor, I'm gonna object that |
| 09:02 | 2 | based on the timeframe, it's irrelevant. |
| 09:02 | 3 | THE COURT:  As of 2004? |
| 09:02 | 4 | Overruled. |
| 09:02 | 5 | BY MR. QUINN: |
| 09:02 | 6 | Q.   Well, let me ask.  Is this an event that Mattel has |
| 09:02 | 7 | been having for some number of years even before 2004? |
| 09:02 | 8 | A.   Yes. |
| 09:02 | 9 | Q.   And every time it had this event, can you tell us |
| 09:02 | 10 | whether or not it issued a brochure like this? |
| 09:02 | 11 | A.   We did. |
| 09:02 | 12 | Q.   If you would look at dash 11, there's a toy there, |
| 09:02 | 13 | Cinx-O.  And below that, Mel Taft and Associates, Reynolds |
| 09:03 | 14 | W. Guyer. |
| 09:03 | 15 | A.   Yes. |
| 09:03 | 16 | Q.   Is that the inventor of that particular toy? |
| 09:03 | 17 | BY MR. QUINN: |
| 09:03 | 18 | Q.   Can you tell us whether, in each case in this 33-page |
| 09:03 | 19 | document, there's an inventor identified for every single |
| 09:03 | 20 | new toy? |
| 09:03 | 21 | A.   There is. |
| 09:03 | 22 | Q.   And do you know when Mattel started to have these |
| 09:03 | 23 | events and issue these brochures identifying Mattel's |
| 09:03 | 24 | inventors? |
| 09:03 | 25 | A.   Sometime before 1999, 'cause that 1999 I actually came |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 31 of 167   Page ID #:309291
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

31

| | | |
|---|---|---|
| 09:03 | 1 | across when I was cleaning out my office. |
| 09:03 | 2 | MR. QUINN:  Nothing further. |
| 09:03 | 3 | THE COURT:  Redirect by Ms. Keller on behalf of |
| 09:04 | 4 | Mr. Larian and MGA. |
| 09:04 | 5 | **REDIRECT EXAMINATION** |
| 09:04 | 6 | BY MS. KELLER: |
| 09:04 | 7 | Q.   Mr. Friedman, let's start with this document you were |
| 09:04 | 8 | just talking about, 24323.  This is the 2004 Mattel inventor |
| 09:04 | 9 | awards? |
| 09:04 | 10 | A.   Yes. |
| 09:04 | 11 | Q.   That is not published to the general public, is it? |
| 09:04 | 12 | A.   It is not. |
| 09:04 | 13 | Q.   It is an internal Mattel document, correct? |
| 09:04 | 14 | A.   It is an internal Mattel document that we give to the |
| 09:04 | 15 | inventors. |
| 09:04 | 16 | Q.   In fact, it's considered to be confidential, correct? |
| 09:04 | 17 | A.   Uh, no, not once we give it out to the inventors. |
| 09:04 | 18 | Q.   It is not to be released to the general public, and the |
| 09:04 | 19 | inventors have to sign a statement to that effect, correct? |
| 09:04 | 20 | A.   I'm not aware of that. |
| 09:04 | 21 | Q.   Now, not all of the ideas that Mattel licenses from |
| 09:05 | 22 | inventors are from big inventor houses, correct? |
| 09:05 | 23 | A.   Correct. |
| 09:05 | 24 | Q.   And some of the inventors are big houses, like BMT. |
| 09:05 | 25 | You know what BMT is? |

| | | |
|---|---|---|
| 09:05 | 1 | A.   I do. |
| 09:05 | 2 | Q.   BangZoom, right? |
| 09:05 | 3 | A.   Correct. |
| 09:05 | 4 | Q.   But as we discussed on Friday, you don't even know who |
| 09:05 | 5 | the inventor is many times from these big houses, so you're |
| 09:05 | 6 | trusting the inventor house to do the due diligence, |
| 09:05 | 7 | correct? |
| 09:05 | 8 | A.   That is correct. |
| 09:05 | 9 | Q.   And various toy companies use the same inventor houses, |
| 09:05 | 10 | right? |
| 09:05 | 11 | A.   Also correct. |
| 09:05 | 12 | Q.   MGA could be using the same inventor house that you're |
| 09:05 | 13 | using, right? |
| 09:05 | 14 | A.   That's correct. |
| 09:05 | 15 | Q.   And do you know that MGA also licenses product ideas |
| 09:05 | 16 | from Big Monster Toys and BangZoom, right? |
| 09:05 | 17 | A.   I didn't know that, but I'll accept that. |
| 09:05 | 18 | Q.   And so someone -- so someone inventing something for |
| 09:05 | 19 | Mattel may have invented something for MGA last year, last |
| 09:05 | 20 | month, last week, true? |
| 09:05 | 21 | A.   Very possible. |
| 09:05 | 22 | Q.   And some of the inventors that Mattel has licensed |
| 09:06 | 23 | inventions from are independent inventors, right? |
| 09:06 | 24 | A.   Correct. |
| 09:06 | 25 | Q.   Do you know who Burton Trattner is? |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

33

| | | |
|---|---|---|
| 09:06 | 1 | A.    No. |
| 09:06 | 2 | Q.    Let's take a look at 24323-00018. |
| 09:06 | 3 | A.    Okay. |
| 09:06 | 4 | Q.    That's a Mattel invention, right?  Mattel toy? |
| 09:06 | 5 | A.    Yes. |
| 09:06 | 6 | *(Document displayed.)* |
| 09:06 | 7 | BY MS. KELLER: |
| 09:06 | 8 | Q.    And that was -- Burton C. Trattner is listed as the |
| 09:06 | 9 | inventor, right? |
| 09:06 | 10 | A.    It is. |
| 09:06 | 11 | Q.    Do you know whether he previously worked for an |
| 09:06 | 12 | competitor? |
| 09:06 | 13 | A.    I have no idea.  That would be our inventor relations |
| 09:06 | 14 | department.  I don't work with them. |
| 09:06 | 15 | Q.    Well, even the next day after he invented a Mattel toy, |
| 09:06 | 16 | do you know whether he would be working for a competitor? |
| 09:06 | 17 | A.    I would not personally. |
| 09:06 | 18 | Q.    Do you know who Norman and Arlene Fabricant are? |
| 09:06 | 19 | A.    I do. |
| 09:06 | 20 | Q.    They're husband and wife, independent inventors, true? |
| 09:07 | 21 | A.    They are. |
| 09:07 | 22 | Q.    Do you know who Joe Wetherell is? |
| 09:07 | 23 | A.    Yes. |
| 09:07 | 24 | Q.    And he's another independent inventor, right? |
| 09:07 | 25 | A.    Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

34

09:07   1    Q.   He just licensed an invention to Hasbro, your

09:07   2    competitor, for Scrabble Slam, right?

09:07   3    A.   I don't know that.  I'll accept it if you're saying so.

09:07   4    Q.   And Maurene Souza, another independent inventor?

09:07   5    A.   Yes.

09:07   6    Q.   Ms. Souza used to work for Hasbro too, right?

09:07   7    A.   She did.

09:07   8    Q.   So Mr.-- Mr. Dubren, was he an independent inventor?

09:07   9    A.   He was.

09:07   10   Q.   Tickle Me Elmo?

09:07   11   A.   He was.

09:07   12   Q.   And when you deal with these independent investors, you

09:07   13   get reps and warranties from them, right.

09:07   14   A.   We do.

09:07   15   Q.   And that's pretty much all you do ordinarily, true?

09:07   16   A.   True.  Like I said, we --

09:07   17   Q.   Well, is that true?

09:07   18   A.   It is true.

09:07   19   Q.   And there's a rule, isn't there, something called a

09:07   20   "Bona fide purchaser for value" rule for creative works?

09:08   21   You know what that is, right?

09:08   22          MR. QUINN:  Lacks foundation.

09:08   23          THE COURT:  Overruled.

09:08   24          THE WITNESS:  I do not.

        25

| | | |
|---|---|---|
| 09:08 | 1 | BY MS. KELLER: |
| 09:08 | 2 | Q.   Well, isn't it true that if a company in good faith |
| 09:08 | 3 | agrees to pay a royalty and relies also in good faith on |
| 09:08 | 4 | representations and warranties, then, the company owns the |
| 09:08 | 5 | creative work? |
| 09:08 | 6 | MR. QUINN:  Misstates the law.  And the Court has |
| 09:08 | 7 | ruled on this, Your Honor. |
| 09:08 | 8 | THE COURT:  Overruled. |
| 09:08 | 9 | THE WITNESS:  I have not heard that before. |
| 09:08 | 10 | BY MS. KELLER: |
| 09:08 | 11 | Q.   Well, you know that the reason that "reps and |
| 09:08 | 12 | warranties" do matter is because they convey the |
| 09:08 | 13 | intellectual property rights to the company from the |
| 09:08 | 14 | inventor, right? |
| 09:08 | 15 | A.   Correct. |
| 09:08 | 16 | Q.   And that's why everybody relies on them, true? |
| 09:08 | 17 | A.   True. |
| 09:08 | 18 | Q.   And who was the inventor of Mattel's product, Diva |
| 09:08 | 19 | Starz? |
| 09:08 | 20 | A.   I have no idea. |
| 09:08 | 21 | Q.   Who was the inventor of Mattel's product, |
| 09:08 | 22 | What's Her Face? |
| 09:08 | 23 | A.   I have no idea. |
| 09:08 | 24 | Q.   So that's just not your area? |
| 09:08 | 25 | A.   It's -- it was not my area when -- when I was at |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 36 of 167   Page ID #:309296
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:08 | 1 | Fisher-Price, no.  That was girls, and it was before I took |
| 09:09 | 2 | over Mattel brands.  Also that's the inventor relations |
| 09:09 | 3 | group that does that. |
| 09:09 | 4 | Q.   Well, but you're testifying here today -- when |
| 09:09 | 5 | Mr. Quinn was asking you questions, my understanding is that |
| 09:09 | 6 | you have developed, before coming in today, some expertise |
| 09:09 | 7 | in this area.  Right?  You were able to answer Mr. Quinn's |
| 09:09 | 8 | questions, true? |
| 09:09 | 9 | MR. QUINN:  It's vague and ambiguous. |
| 09:09 | 10 | Argumentative and compound. |
| 09:09 | 11 | THE COURT:  Well, at least in this area, |
| 09:09 | 12 | overruled. |
| 09:09 | 13 | You don't have to answer.  That was somewhat of a |
| 09:09 | 14 | statement by counsel. |
| 09:09 | 15 | Now she's going to ask you a question. |
| 09:09 | 16 | THE WITNESS:  Okay. |
| 09:09 | 17 | BY MS. KELLER: |
| 09:09 | 18 | Q.   Let me go back to these individual inventors.  You get |
| 09:09 | 19 | "reps and warranties" from them even if they have worked for |
| 09:09 | 20 | a competitor, true? |
| 09:09 | 21 | A.   True. |
| 09:09 | 22 | Q.   And the big inventor houses, even if they're churning |
| 09:09 | 23 | out works for your competitors, you just get reps and |
| 09:09 | 24 | warranties from them, right? |
| 09:09 | 25 | A.   Correct. |

Case 2:04-cv-09049-DOC-RNB  Document 10204  Filed 03/16/11  Page 37 of 167  Page ID #:309297
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

37

09:09  1  Q.   And you don't know whether any of them have overlaps in

09:09  2  their contracts with other companies when they're doing work

09:09  3  for Mattel, true?

09:09  4  A.   I'm not sure what you're -- what you mean.

09:10  5  Q.   You don't know if they have an overlapping contract to

09:10  6  work for one company over here and Mattel over here at the

09:10  7  same time?

09:10  8          MR. QUINN:  Vague and ambiguous.  "Overlap."

09:10  9          THE COURT:  Overruled.

09:10  10         THE WITNESS:  I wouldn't know that.

09:10  11 BY MS. KELLER:

09:10  12 Q.   And does Mattel hire private investigators or forensic

09:10  13 experts to follow the inventors and examine ink on their

09:10  14 contracts and that sort of thing?

09:10  15 A.   Not that I'm aware of.

09:10  16 Q.   Now, let's turn to a different topic.  I want to talk

09:10  17 with you for a little bit about Mr. Villasenor.

09:10  18      Um, if we could put Exhibit 9484-R, which is already in

09:10  19 evidence, up.

09:10  20          *(Document provided to the witness.)*

09:10  21          *(Document displayed.)*

09:10  22 BY MS. KELLER:

09:10  23 Q.   This is the December 22, 2005 e-mail from Sal

09:10  24 Villasenor, the head of -- the manager of Market

09:11  25 Intelligence, to Bob Normile, Mark Kimball, with a copy to

| 09:11 | 1 | Michael Moore.  Who was Bob Normile? |
| 09:11 | 2 | A.    He's our chief counsel. |
| 09:11 | 3 | Q.    In-house? |
| 09:11 | 4 | A.    In-house. |
| 09:11 | 5 | Q.    Who is Mark Kimball? |
| 09:11 | 6 | A.    Mark Kimball was the HR person for the Mattel brands |
| 09:11 | 7 | business at that time. |
| 09:11 | 8 | Q.    And Michael Moore? |
| 09:11 | 9 | A.    Michael Moore is one of our corporate attorneys. |
| 09:11 | 10 | Q.    He was Mattel's intellectual property attorney, |
| 09:11 | 11 | correct? |
| 09:11 | 12 | A.    I believe so. |
| 09:11 | 13 | Q.    And the letter says, this December 22nd, 2005, letter |
| 09:11 | 14 | says, "Attention Vice President Law Division, Human |
| 09:11 | 15 | Resources. |
| 09:11 | 16 | "I have worked for Mattel, Inc. for almost 14 years.  I |
| 09:11 | 17 | am currently the manager of Market Intelligence.  I have |
| 09:11 | 18 | recently met with my direct supervisor, John Louie, |
| 09:11 | 19 | regarding Mattel's goals and expectations of me with respect |
| 09:11 | 20 | to Market Intelligence at upcoming tradeshows and events.  I |
| 09:12 | 21 | have also been approached by Mattel's attorneys, Michael |
| 09:12 | 22 | Moore and --" |
| 09:12 | 23 | Do you know the name that was redacted there? |
| 09:12 | 24 | MR. QUINN:  Your Honor -- |
|  | 25 | |

09:12  1   BY MS. KELLER:

09:12  2   Q.   Without asking the name, do you know whether this was

09:12  3   one of Mattel's outside attorneys --

09:12  4            MR. QUINN:  It's absolutely irrelevant,

09:12  5   Your Honor.

09:12  6            THE COURT:  Overruled.  As long as it's referred

09:12  7   to as an outside attorney, overruled.

09:12  8            THE WITNESS:  I do not.

09:12  9   BY MS. KELLER:

09:12  10  Q.   And then there's another redaction.

09:12  11      "This recent activity and the fact that the tradeshows

09:12  12  are fast approaching has forced me to evaluate my role in

09:12  13  the company.

09:12  14      "I believe that my work conditions have become

09:12  15  intolerable, and I am writing to complain about Mattel's

09:12  16  directives and instructions to gather Market Intelligence

09:12  17  from competitors through unlawful means.  I no longer wish

09:12  18  to engage in misrepresentations and undercover assignments

09:12  19  in which I am paid by Mattel to attend tradeshows and

09:12  20  events.  I fear that my actions may expose me to personal

09:13  21  criminal liability, and I am stressed about the fallout

09:13  22  which may occur.  My conscience does not allow me to

09:13  23  continue in this role, and I do not feel I can take the

09:13  24  pressure to engage in misrepresentations any longer.

09:13  25      "I know that Mattel has gained a superior competitive

| 09:13 | 1 | advantage through my hard work, and I appreciate your |
| 09:13 | 2 | consideration of my complaint.  Because of my fears, I have |
| 09:13 | 3 | retained a legal representative, and I would ask that you |
| 09:13 | 4 | direct all future communications concerning this complaint |
| 09:13 | 5 | and my continued role with the company to my attorney." |
| 09:13 | 6 | Now, you've already testified, Mr. Friedman, that it |
| 09:13 | 7 | would be absolutely improper for Mattel to get access to |
| 09:13 | 8 | competitors' showrooms using fake identities, right? |
| 09:13 | 9 | A.  Correct. |
| 09:13 | 10 | Q.  And, um, toy fairs occur once a year, right? |
| 09:13 | 11 | A.  The New York toy fair does. |
| 09:13 | 12 | Q.  Yeah, I mean, it's kind of the great reveal for |
| 09:13 | 13 | American toys, isn't it? |
| 09:13 | 14 | A.  It is. |
| 09:13 | 15 | Q.  Because in the toy industry the bulk of your money is |
| 09:14 | 16 | made around the Christmas season, isn't it? |
| 09:14 | 17 | A.  Yes, it is. |
| 09:14 | 18 | Q.  And so you work hard all year getting the latest and |
| 09:14 | 19 | greatest toys ready for the toy fair, right? |
| 09:14 | 20 | A.  Well, we -- we do it all year round, but toy fair's a |
| 09:14 | 21 | great reveal. |
| 09:14 | 22 | Q.  And they're mostly for buyers and retailers, right? |
| 09:14 | 23 | A.  Correct.  And there's also bankers and analysts and |
| 09:14 | 24 | licensors and inventors who come through, as well, but for |
| 09:14 | 25 | the most part, it's the press and it's the retailers. |

| | | |
|---|---|---|
| 09:14 | 1 | Q.   And you have to protect your ideas for the toy fair, |
| 09:14 | 2 | right? |
| 09:14 | 3 | A.   We -- we make sure that -- we try to make sure that |
| 09:14 | 4 | only the appropriate people are coming in. |
| 09:14 | 5 | Q.   Yeah.  The private, invitation-only rooms, showrooms, |
| 09:14 | 6 | those products that you're going to be releasing, you want |
| 09:14 | 7 | to keep secret, right? |
| 09:14 | 8 | A.   At Mattel we -- we have private showrooms, yes.  And we |
| 09:14 | 9 | know that once we've shown the press and -- |
| 09:14 | 10 | Q.   That's not my question.  My question is, you want to |
| 09:15 | 11 | keep that information confidential to only those people you |
| 09:15 | 12 | have invited into the showroom, true? |
| 09:15 | 13 | A.   I would say it's correct, yes. |
| 09:15 | 14 | Q.   And you know that that's generally, the standard for |
| 09:15 | 15 | other toy companies in the industry, true? |
| 09:15 | 16 | A.   I would assume so. |
| 09:15 | 17 | Q.   And so if something is given deliberately to a member |
| 09:15 | 18 | of the press, then that's one thing, but if somebody is -- |
| 09:15 | 19 | if the press is not permitted in a private showroom, only |
| 09:15 | 20 | certain invited retailers are, you expect them to keep that |
| 09:15 | 21 | information confidential, right? |
| 09:15 | 22 | A.   Only if we have 'em sign nondisclosures.  If they don't |
| 09:15 | 23 | sign nondisclosures, then we can't really expect everybody |
| 09:15 | 24 | who comes into the sunroom to keep it confidential. |
| 09:15 | 25 | Q.   Well, you try to keep security at toy fairs pretty |

| | | |
|---|---|---|
| 09:15 | 1 | tight.  Mattel certainly does, doesn't it? |
| 09:15 | 2 | A.   We try to, yes. |
| 09:15 | 3 | Q.   And no one is allowed knowingly, at least to Mattel, to |
| 09:15 | 4 | come in with fake credentials, right? |
| 09:15 | 5 | A.   That's correct. |
| 09:15 | 6 | Q.   Particularly competitors, true? |
| 09:15 | 7 | A.   True. |
| 09:15 | 8 | Q.   And you know that using fake credentials to get access |
| 09:16 | 9 | to Mattel's private showrooms at toy fairs would be |
| 09:16 | 10 | completely contrary to the Mattel code of conduct, true? |
| 09:16 | 11 | A.   True.  It would be unacceptable. |
| 09:16 | 12 | Q.   Because you have a policy of playing fair, being |
| 09:16 | 13 | accountable, and acting with unwavering integrity, right? |
| 09:16 | 14 | A.   Correct. |
| 09:16 | 15 | Q.   Your code of conduct requires that employees deal |
| 09:16 | 16 | fairly with Mattel's competitors, right? |
| 09:16 | 17 | A.   That is correct. |
| 09:16 | 18 | Q.   And never take advantage of anyone through |
| 09:16 | 19 | manipulation, concealment, misrepresentation of material |
| 09:16 | 20 | facts, or any other unfair-dealing practice, right? |
| 09:16 | 21 | A.   That is correct. |
| 09:16 | 22 | Q.   And the code of conduct includes a section on your |
| 09:16 | 23 | responsibility to competitors, true? |
| 09:16 | 24 | A.   That is correct. |
| 09:16 | 25 | Q.   It includes a subsection on gathering competitive |

| | | |
|---|---|---|
| 09:16 | 1 | information, right? |
| 09:16 | 2 | A.   Correct. |
| 09:16 | 3 | Q.   And, in fact, you're code of conduct says, "Mattel does |
| 09:16 | 4 | not -- not seek to obtain competitive information by illegal |
| 09:16 | 5 | or unethical means, and we do not knowingly use any |
| 09:17 | 6 | information obtained in this manner," right? |
| 09:17 | 7 | A.   That is correct. |
| 09:17 | 8 | Q.   And so, again, using fake identities to gain access to, |
| 09:17 | 9 | say, trade secrets would be absolutely forbidden, right? |
| 09:17 | 10 | A.   Absolutely. |
| 09:17 | 11 | Q.   And certainly anything that involved criminal conduct |
| 09:17 | 12 | to get access to competitors' trade secrets would be |
| 09:17 | 13 | absolutely forbidden by the code of conduct, right? |
| 09:17 | 14 | A.   That is correct. |
| 09:17 | 15 | Q.   And the criminal conduct, that's what Mr. Villasenor |
| 09:17 | 16 | says in this letter, 9484-R, that he is so worried about, |
| 09:17 | 17 | right? |
| 09:17 | 18 | A.   Yes, that's what it says. |
| 09:17 | 19 | Q.   And you would agree, don't you, that an employee who |
| 09:17 | 20 | feels pressured by an employer to commit crimes may find |
| 09:17 | 21 | that his work conditions are intolerable? |
| 09:17 | 22 | A.   That's correct. |
| 09:17 | 23 | Q.   And you would agree, I would imagine, that an employee |
| 09:17 | 24 | who feels pressured by his employer to commit crimes may |
| 09:17 | 25 | feel a large amount of stress, true? |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:18 | 1 | A.    That would be true. |
| 09:18 | 2 | Q.    And now, you understand, don't you, that Mattel |
| 09:18 | 3 | originally sued Carter Bryant on April 27th, 2004? |
| 09:18 | 4 | A.    I'm not sure of the exact date, but I'll accept what |
| 09:18 | 5 | you say. |
| 09:18 | 6 | Q.    And MGA intervened in that lawsuit in December of 2004? |
| 09:18 | 7 | A.    Again, I'll accept your... |
| 09:18 | 8 | Q.    And -- okay.  And MGA filed a complaint against Mattel |
| 09:18 | 9 | April 13, 2005? |
| 09:18 | 10 | A.    I'll accept your timing. |
| 09:18 | 11 | Q.    Mr. Villasenor's letter was dated December 2005, right? |
| 09:18 | 12 | A.    It is.  What I don't understand, though, for sure on |
| 09:18 | 13 | this letter is whether he felt stressed 'cause he was told |
| 09:18 | 14 | not to deal with anything improper anymore, or whether he's |
| 09:18 | 15 | saying that he feels stressed because he was being forced to |
| 09:18 | 16 | do something improper. |
| 09:18 | 17 | Q.    Well, you're telling us that you never even met |
| 09:19 | 18 | Mr. Villasenor, right? |
| 09:19 | 19 | A.    Well, you're asking me questions based on this letter, |
| 09:19 | 20 | so I'm just trying to give an answer. |
| 09:19 | 21 | Q.    Let me ask you, you never met Mr. Villasenor? |
| 09:19 | 22 | A.    That is correct. |
| 09:19 | 23 | Q.    That was your testimony? |
| 09:19 | 24 | A.    That is correct. |
| 09:19 | 25 | Q.    And, um, you understand that MGA alleged in its |

| | | |
|---|---|---|
| 09:19 | 1 | complaint that Mattel employees had used fake identities, |
| 09:19 | 2 | false pretenses to gain access -- |
| 09:19 | 3 | MR. QUINN:  Your Honor -- |
| 09:19 | 4 | BY MS. KELLER: |
| 09:19 | 5 | Q.   -- to MGA's private showrooms at toy fairs and |
| 09:19 | 6 | misappropriate trade secrets, right? |
| 09:19 | 7 | MR. QUINN:  Your Honor, completely false and lacks |
| 09:19 | 8 | any foundation. |
| 09:19 | 9 | THE COURT:  Just a moment. |
| 09:19 | 10 | MS. KELLER:  I'll rephrase, Your Honor.  I'll ask |
| 09:19 | 11 | a different question. |
| 09:19 | 12 | BY MS. KELLER: |
| 09:19 | 13 | Q.   You know that Mattel's attorneys, including Michael |
| 09:19 | 14 | Moore and one of Mattel's outside lawyers, had gone to |
| 09:19 | 15 | Mattel employees -- |
| 09:19 | 16 | MR. QUINN:  Object. |
| 09:19 | 17 | BY MS. KELLER: |
| 09:19 | 18 | Q.   -- asking for documents -- |
| 09:19 | 19 | MR. QUINN:  Objection.  Lacks any foundation.  And |
| 09:19 | 20 | I think, Your Honor, this is beyond the Court's ruling. |
| 09:19 | 21 | THE COURT:  Overruled. |
| 09:20 | 22 | BY MS. KELLER: |
| 09:20 | 23 | Q.   You are aware, aren't you, that Mattel's attorneys, |
| 09:20 | 24 | including Michael Moore and one of Mattel's outside lawyers, |
| 09:20 | 25 | had gone to Mattel employees asking for documents after |

| | | |
|---|---|---|
| 09:20 | 1 | MGA -- |
| 09:20 | 2 | MR. QUINN:  Again -- |
| 09:20 | 3 | BY MS. KELLER: |
| 09:20 | 4 | Q.   -- filed its lawsuit? |
| 09:20 | 5 | MR. QUINN:  Your Honor, this is discovery.  The |
| 09:20 | 6 | Court has ruled -- made rulings on this. |
| 09:20 | 7 | THE COURT:  Overruled. |
| 09:20 | 8 | You can answer the question. |
| 09:20 | 9 | THE WITNESS:  I was not aware of that. |
| 09:20 | 10 | BY MS. KELLER: |
| 09:20 | 11 | Q.   You know that MGA alleged unfair competition and |
| 09:20 | 12 | copying of its products in this complaint, right? |
| 09:20 | 13 | A.   I didn't see the whole complaint, but I will accept |
| 09:20 | 14 | your statement. |
| 09:20 | 15 | Q.   And you know that in the letter it says, "This recent |
| 09:20 | 16 | activity and the fact that the tradeshows are fast |
| 09:20 | 17 | approaching has forced me to evaluate my role in the |
| 09:20 | 18 | company."  You see that right after all that redacted stuff |
| 09:21 | 19 | about the attorneys? |
| 09:21 | 20 | A.   Yes. |
| 09:21 | 21 | Q.   It says, "I have also been approached by Mattel's |
| 09:21 | 22 | attorneys, Michael Moore and --" and then something is |
| 09:21 | 23 | blacked out -- "who have --" and something else is blacked |
| 09:21 | 24 | out -- "This recent activity --" |
| 09:21 | 25 | You know that the recent activity Mr. Villasenor is |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

47

| 09:21 | 1 | referring to is the request by Mattel's lawyer for documents |
| 09:21 | 2 | for this litigation that we're in right now, right? |
| 09:21 | 3 | A.   I do not know that.  I don't think what he was |
| 09:21 | 4 | thinking. |
| 09:21 | 5 | Q.   From reading this letter, you certainly are aware that |
| 09:21 | 6 | the meeting with Mattel's attorneys triggered this letter |
| 09:21 | 7 | from Mr. Villasenor, right? |
| 09:21 | 8 | MR. QUINN:  Lacks any foundation, Your Honor. |
| 09:21 | 9 | THE COURT:  Overruled. |
| 09:21 | 10 | You can answer the question. |
| 09:21 | 11 | THE WITNESS:  I don't know that. |
| 09:21 | 12 | BY MS. KELLER: |
| 09:21 | 13 | Q.   You understand that Mr. Villasenor was afraid that this |
| 09:21 | 14 | litigation that we're in between Mattel and MGA could |
| 09:21 | 15 | bring -- |
| 09:21 | 16 | THE COURT:  Counsel -- |
| 09:21 | 17 | BY MS. KELLER: |
| 09:21 | 18 | Q.   -- his criminal conduct to light? |
| 09:21 | 19 | THE COURT:  -- concerning Mr. Villasenor, he'll be |
| 09:22 | 20 | testifying. |
| 09:22 | 21 | BY MS. KELLER: |
| 09:22 | 22 | Q.   Well, you understand, don't you, that Mr. Villasenor is |
| 09:22 | 23 | expressing here how stressed he is about the fallout that |
| 09:22 | 24 | could occur if his actions came to light, right? |
| 09:22 | 25 | A.   It says that he's stressed.  I see he's concerned.  I |

DEBBIE GALE, U.S. COURT REPORTER

48

| | | |
|---|---|---|
| 09:22 | 1 | don't think what he's thinking. |
| 09:22 | 2 | Q.   And he's worried that he would be criminally liable, |
| 09:22 | 3 | right? |
| 09:22 | 4 | A.   He says that. |
| 09:22 | 5 | Q.   Now, I think you testified last Friday that you had |
| 09:22 | 6 | just started as president of Mattel brands in October of |
| 09:22 | 7 | 2005.  Do you remember that? |
| 09:22 | 8 | A.   I do. |
| 09:22 | 9 | Q.   And you said Mr. Villasenor left in December of 2005, |
| 09:22 | 10 | two months after you got there, true? |
| 09:22 | 11 | A.   True. |
| 09:22 | 12 | Q.   And you said that's why you didn't know anything he was |
| 09:22 | 13 | doing, true? |
| 09:22 | 14 | A.   True. |
| 09:22 | 15 | Q.   But Mr. Villasenor didn't actually leave Mattel until |
| 09:22 | 16 | July of 2006, correct? |
| 09:22 | 17 | A.   He was on stress leave. |
| 09:22 | 18 | Q.   Well, he didn't actually leave Mattel until July of |
| 09:22 | 19 | 2006, right? |
| 09:22 | 20 | A.   That's when his severance took place. |
| 09:23 | 21 | Q.   Let's look at the separation agreement, 9266. |
| 09:23 | 22 | (Document provided to the witness.) |
| 09:23 | 23 | BY MS. KELLER: |
| 09:23 | 24 | Q.   And if you look at page 9, it says -- it has a date of |
| 09:23 | 25 | July 17, 2006, right? |

| | | |
|---|---|---|
| 09:23 | 1 | A.   That's correct. |
| 09:23 | 2 | Q.   And he wasn't fired, was he? |
| 09:23 | 3 | A.   I don't know that.  I don't know what the arrangement |
| 09:23 | 4 | was. |
| 09:23 | 5 | Q.   Even today, as president of Mattel brands, you haven't |
| 09:23 | 6 | educated yourself about what happened to this guy who said |
| 09:23 | 7 | Mattel was asking him to commit crimes for your Market |
| 09:23 | 8 | Intelligence unit? |
| 09:23 | 9 | A.   I have only found out the things that needed to be |
| 09:23 | 10 | found out for this trial. |
| 09:23 | 11 | Q.   Well, isn't it true you don't want to know?  This is |
| 09:23 | 12 | plausible deniability? |
| 09:23 | 13 | A.   No. |
| 09:23 | 14 | Q.   You know Mr. Villasenor wasn't docked any pay.  You can |
| 09:23 | 15 | tell that from reading this agreement, right? |
| 09:23 | 16 | A.   I can tell that from reading the agreement, correct. |
| 09:23 | 17 | Q.   And nobody said to him, "You're lying.  You didn't |
| 09:24 | 18 | engage in criminal conduct at the direction of Mattel. |
| 09:24 | 19 | We're not paying you any money."  Nobody said that, did |
| 09:24 | 20 | they? |
| 09:24 | 21 | A.   I don't know what anybody said. |
| 09:24 | 22 | Q.   Well, you don't have any documentation to that effect, |
| 09:24 | 23 | do you? |
| 09:24 | 24 | A.   No, I don't. |
| 09:24 | 25 | Q.   And you were president of Mattel brands that entire |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 50 of 167   Page ID #:309310
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:24 | 1 | time, from October 2005 through July 2006? |
| 09:24 | 2 | A.   That's correct. |
| 09:24 | 3 | Q.   And you knew this litigation was going on, right? |
| 09:24 | 4 | A.   Which litigation are we talking about? |
| 09:24 | 5 | Q.   This case.  This case, Mattel versus MGA, you knew it |
| 09:24 | 6 | was going on, right? |
| 09:24 | 7 | A.   That's correct. |
| 09:24 | 8 | Q.   And you knew this was pretty explosive stuff, that the |
| 09:24 | 9 | manager of your Market Intelligence rules was saying that |
| 09:24 | 10 | they had been using fake ID's to get into competitors' |
| 09:24 | 11 | showrooms and -- and steal information from competitors? |
| 09:24 | 12 | A.   As I said before, I did not find out about this until |
| 09:24 | 13 | this trial, so I did not know about it back then. |
| 09:24 | 14 | Q.   Well, you know from reading this agreement that Mattel |
| 09:25 | 15 | paid Mr. Villasenor 160,000 and another 30,000, right? |
| 09:25 | 16 | A.   That's correct. |
| 09:25 | 17 | Q.   And I think you testified that -- just a few minutes |
| 09:25 | 18 | ago -- that this agreement has nothing that says he has to |
| 09:25 | 19 | keep quiet about his wrongdoing.  Do you remember that? |
| 09:25 | 20 | A.   That's correct. |
| 09:25 | 21 | Q.   Just a few minutes ago. |
| 09:25 | 22 | Let's turn to page 5, and let's look at the first |
| 09:25 | 23 | paragraph, "This agreement is to be kept confidential."  And |
| 09:25 | 24 | let's go down to where it starts "except" on the sixth line. |
| 09:25 | 25 | "Except for my confidantes, I represent, understand, |

| | | |
|---|---|---|
| 09:25 | 1 | and agree that I will keep completely confidential and not |
| 09:25 | 2 | discuss or disclose to any person or entity (a) the fact of |
| 09:25 | 3 | this agreement --" |
| 09:25 | 4 | A.   Wait a second.  I just found "except."  I'm sorry. |
| 09:25 | 5 | Okay.  I'm ready. |
| 09:26 | 6 | Q.   "(a) the fact of this agreement, (b) any allegations of |
| 09:26 | 7 | alleged wrongful conduct by the company or any released |
| 09:26 | 8 | party that allegedly occurred while I was employed with the |
| 09:26 | 9 | company." |
| 09:26 | 10 | And you know that that means "I won't tell anyone about |
| 09:26 | 11 | my wrongful conduct," right? |
| 09:26 | 12 | A.   That's what it says. |
| 09:26 | 13 | Q.   And then, if you go down to the next paragraph it says, |
| 09:26 | 14 | "Again, neither I nor anyone to whom it may be disclosed |
| 09:26 | 15 | pursuant to this subsection shall disclose any confidential |
| 09:26 | 16 | information to (i) any representative of any print, radio, |
| 09:26 | 17 | or television media, any counsel for any party threatening |
| 09:26 | 18 | or asserting claims against any of the released parties" -- |
| 09:26 | 19 | "Released parties" being Mattel and Mr. Villasenor, |
| 09:26 | 20 | right? |
| 09:26 | 21 | A.   Yes. |
| 09:26 | 22 | Q.   "Any counsel for any current or former employee of any |
| 09:27 | 23 | of the released parties or for the public at large.  I agree |
| 09:27 | 24 | that if any inquiry is made as to the termination of my |
| 09:27 | 25 | employment, I will respond without elaboration that, 'I left |

DEBBIE GALE, U.S. COURT REPORTER

| 09:27 | 1 | to pursue other opportunities.'"  Right? |
| 09:27 | 2 | A.   That's what it says. |
| 09:27 | 3 | Q.   So he's promising -- you said there was nothing in here |
| 09:27 | 4 | that he has to keep quiet about his wrongdoing, but it was |
| 09:27 | 5 | made an express term of this settlement agreement that he |
| 09:27 | 6 | had to do just that:  Keep quiet about his wrongdoing, |
| 09:27 | 7 | right? |
| 09:27 | 8 | A.   It does say that, yes. |
| 09:27 | 9 | Q.   And, in addition to that, he's supposed to lie if he's |
| 09:27 | 10 | asked why he left. |
| 09:27 | 11 | A.   I don't -- |
| 09:27 | 12 | Q.   Instead of saying, "I left because there was an uproar |
| 09:27 | 13 | when I said that Mattel was asking me to commit crimes and |
| 09:27 | 14 | sneak into competitors' showrooms," he's supposed to say, "I |
| 09:27 | 15 | left to pursue other opportunities," right? |
| 09:27 | 16 | A.   Which is very typical in most contracts. |
| 09:27 | 17 | Q.   Yeah.  But this is not a typical situation at Mattel, |
| 09:28 | 18 | is it? -- where the head of your Market Intelligence unit |
| 09:28 | 19 | comes to you and tells you that his superiors have been |
| 09:28 | 20 | forcing him to commit crimes? |
| 09:28 | 21 | I mean, this is not a typical situation, is it, I hope? |
| 09:28 | 22 | A.   Well, certainly not.  And we certainly aren't -- do |
| 09:28 | 23 | not, uh, think that what he did was right at all.  And it is |
| 09:28 | 24 | unacceptable.  We totally agree.  There's -- there's no |
| 09:28 | 25 | question that was wrong. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 53 of 167   Page ID #:309313
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

53

09:28  1        But I think what they were saying is they didn't want

09:28  2   them going to the press and speaking to anybody outside the

09:28  3   company on any wrongdoings because the company would be

09:28  4   embarrassed by that.

09:28  5   Q.   So what you did was wrong.  So here's 190 grand, but

09:28  6   you gotta keep quiet.  Basically that was it, right?

09:28  7   A.   Well, it was all part of the whole confidentiality

09:28  8   agreement.  That's a piece of it, yes.

09:28  9   Q.   Basically we think you did something so terrible that

09:28  10  we're giving you 190 grand if you shut up about it; don't

09:28  11  tell anybody, right?

09:28  12  A.   That's not the way this thing was set up.  It may be

09:29  13  the way you're interpreting it, but I don't agree with that.

09:29  14  Q.   Now, on Friday you testified that the conduct of the

09:29  15  Market Intelligence group did not happen under your watch,

09:29  16  right?

09:29  17  A.   That's correct.

09:29  18  Q.   Oh, and, by the way, before we move on, this language

09:29  19  here about how we weren't allowed -- Mr. Villasenor wasn't

09:29  20  allowed to tell any party asserting claims against a

09:29  21  released party, that was saying don't tell MGA, right?

09:29  22  A.   I can't -- I can't speak for what that language says.

09:29  23  Q.   Well, you know that at the time MGA was asserting

09:29  24  claims against Mattel for unfair competition, right?

09:29  25  A.   I know that, yes.

| | | |
|---|---|---|
| 09:29 | 1 | Q.   And the released party was Mattel.  We see that right |
| 09:29 | 2 | in the contract.  Released -- |
| 09:29 | 3 | A.   Yes. |
| 09:29 | 4 | Q.   -- parties were Villasenor and Mattel. |
| 09:30 | 5 | So among other people and among other entities, |
| 09:30 | 6 | Mr. Villasenor was being told:  Don't tell MGA or you'll |
| 09:30 | 7 | violate this separation agreement, true? |
| 09:30 | 8 | A.   It's anybody.  It was not specifically any particular |
| 09:30 | 9 | company. |
| 09:30 | 10 | Q.   Well, but MGA had a lawsuit for unfair competition |
| 09:30 | 11 | going against Mattel at the time, right? |
| 09:30 | 12 | A.   That's right, but I think on the next page there's an |
| 09:30 | 13 | ongoing agreement to be available for legal proceedings. |
| 09:30 | 14 | Q.   Yes.  If Mattel asks him to, right?  If Mattel calls |
| 09:30 | 15 | Mr. Villasenor and wants him to be a witness, he has to do |
| 09:30 | 16 | that, right? |
| 09:30 | 17 | A.   Correct. |
| 09:30 | 18 | Q.   Now, let's go back to whether this was on your watch, |
| 09:30 | 19 | because I think you testified Friday that this conduct of |
| 09:30 | 20 | the Market Intelligence group, which you have never even |
| 09:30 | 21 | looked into to find out what it was, did not happen under |
| 09:30 | 22 | your watch, right? |
| 09:30 | 23 | A.   Correct. |
| 09:30 | 24 | Q.   And you said that was because you were at the |
| 09:30 | 25 | Fisher-Price unit of Mattel, true? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 55 of 167   Page ID #:309315
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:30 | 1 | A.    True. |
| 09:30 | 2 | Q.    And Fisher-Price was headquartered in East Aurora, |
| 09:31 | 3 | New York, right? |
| 09:31 | 4 | A.    That's correct. |
| 09:31 | 5 | Q.    So you didn't become president of Mattel brands in |
| 09:31 | 6 | October 2005, right? |
| 09:31 | 7 | A.    That is correct. |
| 09:31 | 8 | Q.    So you didn't know about Mr. Villasenor's regular |
| 09:31 | 9 | reporting to large numbers of Mattel employees because you |
| 09:31 | 10 | showed up in October 2005 and Villasenor left in December |
| 09:31 | 11 | 2005 and there was no toy fair between that time. |
| 09:31 | 12 | Is that what you testified to last Friday? |
| 09:31 | 13 | MR. QUINN:  Okay -- |
| 09:31 | 14 | THE WITNESS:  That's correct. |
| 09:31 | 15 | MR. QUINN:  -- it assumes facts not in evidence |
| 09:31 | 16 | and lacks foundation. |
| 09:31 | 17 | THE COURT:  Just a moment. |
| 09:31 | 18 | Overruled. |
| 09:31 | 19 | THE WITNESS:  Can you repeat the question? |
| 09:31 | 20 | THE COURT:  Well, your answer was, "That's |
| 09:31 | 21 | correct." |
| 09:31 | 22 | THE WITNESS:  Yeah.  Okay. |
| 09:31 | 23 | BY MS. KELLER: |
| 09:31 | 24 | Q.    Now, as we've mentioned Mr. Villasenor's letter was |
| 09:31 | 25 | dated December 22, 2005, and that was while you were |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

56

| | | |
|---|---|---|
| 09:31 | 1 | president, right? |
| 09:32 | 2 | A.   That's correct. |
| 09:32 | 3 | Q.   And it was less than two months after at least your |
| 09:32 | 4 | calendar reflected a meeting with Mr. Villasenor, true? |
| 09:32 | 5 | A.   I don't remember the meeting, so I don't know that it |
| 09:32 | 6 | happened. |
| 09:32 | 7 | Q.   I'm asking whether your calendar reflects it. |
| 09:32 | 8 | A.   It does reflect it. |
| 09:32 | 9 | Q.   And Mr. Villasenor wrote his letter to Mattel's general |
| 09:32 | 10 | counsel and the head of human resources -- this letter |
| 09:32 | 11 | claiming he was engaged in criminal activity, but you're -- |
| 09:32 | 12 | is it your testimony that you were never told about that? |
| 09:32 | 13 | You as president of Mattel brands were not told? |
| 09:32 | 14 | A.   Absolutely, that's correct. |
| 09:32 | 15 | Q.   And you also, while president at Mattel -- we see that |
| 09:32 | 16 | Mr. Villasenor was paid this severance package that we just |
| 09:32 | 17 | looked at, right? |
| 09:32 | 18 | A.   Correct. |
| 09:32 | 19 | Q.   And your testimony is you didn't know about that either |
| 09:32 | 20 | until you were preparing to testify in this trial last week, |
| 09:32 | 21 | right? |
| 09:32 | 22 | A.   That is correct. |
| 09:32 | 23 | Q.   Now, Fisher-Price, where you were president from |
| 09:32 | 24 | October -- from 1999 to October 2005, that was the division |
| 09:33 | 25 | at Mattel that did infant and preschool products, true? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:33 | 1 | A.    True. |
| 09:33 | 2 | Q.    And you testified on Friday that to your knowledge |
| 09:33 | 3 | Mr. Villasenor's reports did not cover infant and preschool, |
| 09:33 | 4 | right? |
| 09:33 | 5 | A.    Correct. |
| 09:33 | 6 | Q.    Let's look at Exhibit 9504. |
| 09:33 | 7 | (Document provided to the witness.) |
| 09:33 | 8 | BY MS. KELLER: |
| 09:33 | 9 | Q.    And this is a 98-page document that on the front says, |
| 09:33 | 10 | "WW Boys Marketing Research Department," dated April 2001, |
| 09:33 | 11 | and it is to be sent "To:  Distribution." |
| 09:33 | 12 | A.    Yes. |
| 09:33 | 13 | Q.    "From Sal Villasenor and Kelly Osier, WW Boys Marketing |
| 09:34 | 14 | Research Department.  Subject:  Toy Fair 2001 Competitive |
| 09:34 | 15 | Toy Review." |
| 09:34 | 16 | You got that in front of you? |
| 09:34 | 17 | A.    I do. |
| 09:34 | 18 | MS. KELLER:  Your Honor, I would move 9504 into |
| 09:34 | 19 | evidence. |
| 09:34 | 20 | THE COURT:  Received. |
| 09:34 | 21 | (Exhibit No. 9504 received in evidence.) |
| 09:34 | 22 | (Document displayed.) |
| 09:34 | 23 | BY MS. KELLER: |
| 09:34 | 24 | Q.    Now, let's look at page 1.  And it says at the top, |
| 09:34 | 25 | "Attached is a summary of new key competitive products for |

| | | |
|---|---|---|
| 09:34 | 1 | 2001.  This information was gathered from competitive |
| 09:34 | 2 | catalogs and price lists acquired at the 2001 New York toy |
| 09:34 | 3 | fair. |
| 09:34 | 4 | Now, let's go to page 58, and it says, |
| 09:34 | 5 | "Infant/Preschool." |
| 09:34 | 6 | And let's look at page 64, where we see price lists for |
| 09:35 | 7 | infant and preschool toys made by Hasbro, LeapFrog, Little |
| 09:35 | 8 | Tykes, Team Concepts, Tiger, Tomy, Trendmasters, and VTech, |
| 09:35 | 9 | and those are competitors of Mattel's, right? |
| 09:35 | 10 | A.   Correct. |
| 09:35 | 11 | Q.   In the infant preschool category? |
| 09:35 | 12 | A.   I've never seen this document, so I'm saying "correct" |
| 09:35 | 13 | because I see it. |
| 09:35 | 14 | Q.   You know that they're competitors of Mattel's, right? |
| 09:35 | 15 | A.   Correct. |
| 09:35 | 16 | Q.   And do you know why it is that the people on this list |
| 09:35 | 17 | that this document was going to were never named?  In other |
| 09:35 | 18 | words, that it just says "to distribution."  Can you tell us |
| 09:35 | 19 | the answer to that? |
| 09:35 | 20 | A.   Well, generally, they have a special distribution list, |
| 09:35 | 21 | so it goes to distribution, and it's whatever that was on |
| 09:35 | 22 | that distribution list. |
| 09:35 | 23 | Q.   And usually when it says "distribution," it's because |
| 09:35 | 24 | there might be even hundreds of people on such a list, |
| 09:35 | 25 | right? |

| | | |
|---|---|---|
| 09:36 | 1 | A.    Very possibly, yes. |
| 09:36 | 2 | Q.    It's a very large list.  So rather than list them all, |
| 09:36 | 3 | it just says "distribution," true? |
| 09:36 | 4 | A.    That's correct. |
| 09:36 | 5 | Q.    Let's look at Exhibit 9275. |
| 09:36 | 6 | *(Document provided to the witness.)* |
| 09:36 | 7 | BY MS. KELLER: |
| 09:36 | 8 | Q.    And this are an April 22, 2003, document entitled "WW |
| 09:36 | 9 | Strategic Planning and Business Development Department."  It |
| 09:36 | 10 | is 9275.  This is another one entitled "To distribution. CC |
| 09:36 | 11 | Matt Bousquette, from Sal Villasenor, Kelly Osier, and Carey |
| 09:37 | 12 | Plunkett." |
| 09:37 | 13 | Who was Matt Bousquette at that time? |
| 09:37 | 14 | A.    He was the president -- 2003 president of Mattel |
| 09:37 | 15 | brands. |
| 09:37 | 16 | Q.    And you were the head of? |
| 09:37 | 17 | A.    Fisher-Price. |
| 09:37 | 18 | Q.    Now -- and it's -- if you look at the subject line -- |
| 09:37 | 19 | New York Toy Fair 2003 Competitive Review. |
| 09:37 | 20 | MS. KELLER:  And, Your Honor, I'd move 9275 into |
| 09:37 | 21 | evidence. |
| 09:37 | 22 | THE COURT:  Received. |
| 09:37 | 23 | *(Exhibit No. 9275 received in evidence.)* |
| 09:37 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

60

| 09:37 | 1 | BY MS. KELLER: |
|---|---|---|

09:37   1   BY MS. KELLER:

09:37   2   Q.   Now, these three people -- Sal Villasenor and Kelly

09:37   3   Osier and Carey Plunkett -- were listed here.  You know that

09:37   4   they were all people who used fake ID's to get into

09:37   5   competitor showrooms?

09:37   6       You know that now, don't you?

09:37   7   A.   I do know that now, yes.

09:37   8   Q.   And if we look at page 173.

09:38   9       (Document displayed.)

09:38   10   BY MS. KELLER:

09:38   11   Q.   -- we see "Mattel key drivers.  Fisher-Price, My Little

09:38   12   Mommy."

09:38   13       Fisher-Price was your unit, right?

09:38   14   A.   No.  Actually, this was done by our girls unit under

09:38   15   the Fisher-Price brand name.

09:38   16   Q.   Fisher-Price was the brand name of which you were in

09:38   17   charge, right?

09:38   18   A.   Yes, but not this piece of business.

09:38   19   Q.   And this follows with competitive products -- if we

09:38   20   look at the next page -- from Zapf, Playmates, MGA?

09:38   21   A.   They're all baby dolls.  They're all baby dolls from

09:38   22   girls group.

09:38   23   Q.   Pia Back to School -- Jumping on the Bed Baby Bouncy --

09:38   24   we see a lot of -- if we can go through these pages -- 175

09:39   25   is Zapf's Baby Annabelle.  Got a lot of competitors'

61

| | | |
|---|---|---|
| 09:39 | 1 | products in here, don't we, Mr. Friedman? |
| 09:39 | 2 | A.    There are a lot of competitors' products.  They made a |
| 09:39 | 3 | lot of products. |
| 09:39 | 4 | Q.    And if we go to page -- if we go to page 183, we see |
| 09:39 | 5 | MGA large dolls. |
| 09:39 | 6 | (Document displayed.) |
| 09:39 | 7 | BY MS. KELLER: |
| 09:39 | 8 | Q.    And if we go to page 157 -- I'm sorry.  184. |
| 09:39 | 9 | (Document displayed.) |
| 09:39 | 10 | BY MS. KELLER: |
| 09:39 | 11 | Q.    We see more MGA large dolls, right? |
| 09:40 | 12 | A.    Yeah.  Correct. |
| 09:40 | 13 | Q.    And in this document, dated April 22nd, 2003, it tells |
| 09:40 | 14 | us that these MGA products are gonna be released in the -- |
| 09:40 | 15 | they'll be available in the fall.  They're gonna be TV |
| 09:40 | 16 | advertised.  And it tells us how much they're gonna be |
| 09:40 | 17 | listed at, right? |
| 09:40 | 18 | A.    It does. |
| 09:40 | 19 | Q.    And if we go back to page 183, this tells us that My |
| 09:40 | 20 | Beautiful Ballerina -- on top -- is gonna be available in |
| 09:40 | 21 | spring 2003, and it tells what she does, "Point her toes, |
| 09:40 | 22 | spin her in circles, and touch her bar to produce ballet |
| 09:40 | 23 | music."  And it's got a picture, right? |
| 09:40 | 24 | A.    Yeah, it does. |
| 09:40 | 25 | Q.    And same thing with Pia, on the bottom, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 62 of 167   Page ID #:309322
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

62

| | | |
|---|---|---|
| 09:40 | 1 | A.   Pia is a friend doll that does everything a little girl |
| 09:40 | 2 | would do.  It says will be available in the spring, and Pia |
| 09:41 | 3 | Back to School will be available in fall 2003. |
| 09:41 | 4 | Were these items that were already released to the |
| 09:41 | 5 | press? |
| 09:41 | 6 | Q.   Well, did you find out? |
| 09:41 | 7 | A.   No, I didn't.  I've never seen this document.  You're |
| 09:41 | 8 | showing it to me the first time. |
| 09:41 | 9 | Q.   So again, as president of Fisher-Price, you really |
| 09:41 | 10 | didn't have any idea what Market Intelligence was doing for |
| 09:41 | 11 | you, right? |
| 09:41 | 12 | A.   They weren't doing anything for me.  They were doing it |
| 09:41 | 13 | for the Mattel brands group.  They did not work for |
| 09:41 | 14 | Fisher-Price.  I had my own research department. |
| 09:41 | 15 | Q.   Let's look at page 187. |
| 09:41 | 16 | *(Document displayed.)* |
| 09:42 | 17 | BY MS. KELLER: |
| 09:42 | 18 | Q.   And 187 has "Plush," and under "Mattel:  Fisher-Price |
| 09:42 | 19 | Friends, Fisher-Price Core." |
| 09:42 | 20 | Do you see that? |
| 09:42 | 21 | A.   I do. |
| 09:42 | 22 | Q.   And let's go to page 188. |
| 09:42 | 23 | *(Document displayed.)* |
| 09:42 | 24 | BY MS. KELLER: |
| 09:42 | 25 | Q.   Top ten product ranking year to date.  Fisher-Price has |

| 09:42 | 1  | the bottom three, right? |
|-------|----|---|
| 09:42 | 2  | A.    We do. |
| 09:42 | 3  | Q.    And No. 6 -- |
| 09:42 | 4  | A.    Actually, Fisher-Price only has two of the bottom -- |
| 09:42 | 5  | I'm sorry, it's all three. |
| 09:42 | 6  | Q.    And MGA has No. 6, Palm Puppy/Kitty, right? |
| 09:42 | 7  | A.    Correct. |
| 09:42 | 8  | Q.    Now, you knew that Market Intelligence routinely sent |
| 09:42 | 9  | their reports to people at Fisher-Price while you were |
| 09:43 | 10 | president of Fisher-Price, right? |
| 09:43 | 11 | A.    I did not know that. |
| 09:43 | 12 | Q.    There's a whole section in here for -- there's a whole |
| 09:43 | 13 | section in here of the preschool toys that you were in |
| 09:43 | 14 | charge of, right? |
| 09:43 | 15 | A.    There is a section of toys in here.  They were not the |
| 09:43 | 16 | toys that I was responsible for.  And just printing a |
| 09:43 | 17 | product listing that says something probably from NPD or |
| 09:43 | 18 | from one of the toy books, they probably just got that out |
| 09:43 | 19 | of the newspaper.  And it does not necessarily mean that it |
| 09:43 | 20 | was going to Fisher-Price Core. |
| 09:43 | 21 | Q.    Let's look at Exhibit 36 -- do you know who Michael |
| 09:43 | 22 | Sullivan is? |
| 09:43 | 23 | A.    No. |
| 09:43 | 24 | Q.    When you were president of Fisher-Price, was he the |
| 09:43 | 25 | senior marketing manager at Fisher-Price? |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

64

| | | |
|---|---|---|
| 09:43 | 1 | A.   I'm not aware.  I don't know.  Don't recognize the |
| 09:43 | 2 | name. |
| 09:43 | 3 | Q.   Was Jeff Miller the director of design at Fisher-Price? |
| 09:43 | 4 | A.   We have a Doug Miller.  I don't know a Jeff Miller. |
| 09:43 | 5 | And Tina Zinter was the head of Fisher-Price design. |
| 09:44 | 6 | Q.   Let's look at 36088.1. |
| 09:44 | 7 | *(Document provided to witness.)* |
| 09:44 | 8 | BY MS. KELLER: |
| 09:44 | 9 | Q.   And is this an e-mail to a large number of people on a |
| 09:44 | 10 | distribution list dated February 17, 2004 -- |
| 09:44 | 11 | A.   It appears -- |
| 09:44 | 12 | Q.   -- from Sal Villasenor? |
| 09:44 | 13 | A.   Yes. |
| 09:44 | 14 | MS. KELLER:  Your Honor, I'd move Exhibit 36088 |
| 09:44 | 15 | into evidence. |
| 09:44 | 16 | THE COURT:  Received. |
| 09:44 | 17 | *(Exhibit No. 36088 received in evidence.)* |
| 09:44 | 18 | *(Document displayed.)* |
| 09:44 | 19 | BY MS. KELLER: |
| 09:44 | 20 | Q.   Now, if you go to the first page, this long |
| 09:44 | 21 | distribution list, and look about halfway down, you see Jeff |
| 09:44 | 22 | Miller FP.  FP stands for Fisher-Price? |
| 09:44 | 23 | A.   That's correct. |
| 09:44 | 24 | Q.   And Michael Sullivan, several lines down from there, |
| 09:45 | 25 | and after his name it says Fisher-Price spelled out, right? |

| 09:45 | 1 | A.   Correct. |
|-------|---|---------------|

09:45   1   A.   Correct.

09:45   2   Q.   And so Jeff Miller doesn't ring a bell as director of

09:45   3   design at Fisher-Price while you were president?

09:45   4   A.   He does not.  But it's very possible.

09:45   5   Q.   And Michael Sullivan doesn't ring a bell as the senior

09:45   6   marketing manager?

09:45   7   A.   It doesn't.  But it's possible.

09:45   8   Q.   And let's look --

09:45   9   A.   We had more than one senior market manager.  We have

09:45   10  many, many designers and marketing folks.

09:45   11  Q.   Well, do you have many, many, many directors of design?

09:45   12  A.   We have a few, yeah.

09:45   13  Q.   Let's --

09:45   14  A.   Yes, we do.

09:45   15  Q.   Let's look at the second page.

09:45   16  A.   Uh-huh.

09:45   17  Q.   And at the top after "Sal Villasenor," it says "Weekly

09:45   18  Insights, Issue 7."

09:45   19  A.   Okay.

09:45   20  Q.   And it shows this as being from the Market Intelligence

09:46   21  department, right?

09:46   22  A.   Right.

09:46   23  BY MS. KELLER:

09:46   24  Q.   So you know that -- let's take a look at page 3.

09:46   25           (Document displayed.)

| | | |
|---|---|---|
| 09:46 | 1 | BY MS. KELLER: |
| 09:46 | 2 | Q.   And you have a synopsis here of various things that |
| 09:46 | 3 | other toy companies are doing, including, in the bottom |
| 09:46 | 4 | left, MGA, right? |
| 09:46 | 5 | A.   Correct. |
| 09:46 | 6 | Q.   So you knew, then, that -- oh, the primary source of |
| 09:46 | 7 | competitor information in these reports is the New York toy |
| 09:46 | 8 | fair, isn't it? |
| 09:46 | 9 | A.   I can't answer that.  It may -- could be that.  It |
| 09:46 | 10 | could be the newspaper, it could be the trade magazines, |
| 09:46 | 11 | could be almost anything, so I don't know.  And I've never |
| 09:46 | 12 | seen this document before, so I can't really answer it. |
| 09:46 | 13 | Q.   You lived in New York at the time, didn't you? |
| 09:46 | 14 | A.   I did. |
| 09:46 | 15 | Q.   You attended the New York toy fair pretty regularly, |
| 09:46 | 16 | didn't you? |
| 09:46 | 17 | A.   I did. |
| 09:47 | 18 | Q.   Never ran into Mr. Villasenor there? |
| 09:47 | 19 | A.   No. |
| 09:47 | 20 | Q.   Now, last Friday I think we were talking about, um, |
| 09:47 | 21 | your testimony that you didn't know that Mr. Villasenor had |
| 09:47 | 22 | been using fake business cards and fake identities with his |
| 09:47 | 23 | group to sneak into showrooms posing as retailers, correct? |
| 09:47 | 24 | A.   Yes. |
| 09:47 | 25 | Q.   Did you know he was actually manufacturing fake |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 67 of 167   Page ID #:309327
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

67

| | | |
|---|---|---|
| 09:47 | 1 | identities for the people who worked with him? |
| 09:47 | 2 | A.   I did not until you mentioned it. |
| 09:47 | 3 | Q.   Now, you testified you were shown information in |
| 09:47 | 4 | documents at your deposition, though, right? |
| 09:47 | 5 | A.   It was actually after the deposition.  I corrected |
| 09:47 | 6 | myself. |
| 09:47 | 7 | Q.   And after that you investigated and found out that |
| 09:47 | 8 | three people were reprimanded and Mr. Villasenor left on a |
| 09:47 | 9 | stress claim, right? |
| 09:47 | 10 | A.   Correct. |
| 09:47 | 11 | Q.   And it was only after that deposition that you learned |
| 09:48 | 12 | that these people had entered showrooms improperly, right? |
| 09:48 | 13 | A.   Yes. |
| 09:48 | 14 | Q.   Isn't it true that this was a systematic practice by |
| 09:48 | 15 | Mattel employees over the course of at least 13 years? |
| 09:48 | 16 | A.   I can't answer that.  I don't know. |
| 09:48 | 17 | Q.   And when I say "systematic practice," I mean using fake |
| 09:48 | 18 | business cards and fake identities to enter competitors' |
| 09:48 | 19 | private showrooms and steal catalogs and price lists and new |
| 09:48 | 20 | products? |
| 09:48 | 21 | A.   Not to my knowledge. |
| 09:48 | 22 | Q.   Well, what have you done to investigate that, |
| 09:48 | 23 | Mr. Friedman? |
| 09:48 | 24 | A.   I wasn't aware of it, and I haven't done anything |
| 09:48 | 25 | beyond the things that we talked about, talking to some |

09:48    1    people, and I found out that of the people that went into

09:48    2    the showrooms, all the people are either gone from Mattel

09:48    3    now or have been reprimanded.

09:48    4    Q.   Now, I think you testified earlier today, as well as on

09:48    5    Friday, about the reprimands for Sal Villasenor, Michael

09:49    6    Shore, Carey Plunkett and Geri Pilgrim, right?

09:49    7    A.   I talked about, actually, Geri Pilgrim and Michael

09:49    8    Shore.

09:49    9    Q.   Well, you wouldn't want to have an employee, working

09:49   10    for Mattel that you know unlawfully got important

09:49   11    information from MGA or other competitors, right?

09:49   12    A.   We -- we -- it depends on the circumstances.

09:49   13    Q.   Would you want to have that person that you know

09:49   14    violated your code of conduct working at Mattel?

09:49   15    A.   Depends on what the situation is.  Generally speaking,

09:49   16    the people that went into the showrooms are all gone with

09:49   17    the exception of one who was reprimanded.

09:49   18    Q.   Well, let's talk about that.  You wouldn't want to

09:49   19    employ someone who did those things 'cause you wouldn't

09:49   20    trust 'em anymore, right?

09:49   21    A.   We probably would not, that would be correct.

09:49   22    Q.   And it's an important promise that they make when you

09:49   23    ask 'em not to engage in misrepresentations or unlawful

09:49   24    conduct to acquire confidential information from

09:50   25    competitors, right?

| | | |
|---|---|---|
| 09:50 | 1 | A.    Correct. |
| 09:50 | 2 | Q.    And if -- if that's important to Mattel, you would |
| 09:50 | 3 | certainly want to discipline that employee in some real way, |
| 09:50 | 4 | wouldn't you? |
| 09:50 | 5 | A.    We would. |
| 09:50 | 6 | Q.    You would want to send a message to other employees |
| 09:50 | 7 | that if you do this you're gonna be punished, right? |
| 09:50 | 8 | A.    We would make sure that the punishment suited the |
| 09:50 | 9 | crime, yes. |
| 09:50 | 10 | Q.    You would want to send a message about how seriously |
| 09:50 | 11 | you take the promise in the code of conduct that these |
| 09:50 | 12 | employees won't acquire information from competitors by |
| 09:50 | 13 | unlawful means, right? |
| 09:50 | 14 | A.    We would make sure that those employees knew that they |
| 09:50 | 15 | weren't allowed to do that, yes. |
| 09:50 | 16 | Q.    My question is, wouldn't you want to send a message to |
| 09:50 | 17 | your other employees that you were serious about that; that |
| 09:50 | 18 | it wasn't just lip service you were paying to it? |
| 09:50 | 19 | A.    We are serious about it, yes. |
| 09:50 | 20 | Q.    Wouldn't you want to send that message? |
| 09:50 | 21 | A.    We are serious about it.  We have reprimanded or the |
| 09:50 | 22 | people are gone that were involved with this. |
| 09:50 | 23 | Q.    We're gonna talk -- we're gonna talk about that in a |
| 09:50 | 24 | minute.  But what I'm asking is, isn't what you do when you |
| 09:51 | 25 | find out about a violation more important than what you |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

70

| | | |
|---|---|---|
| 09:51 | 1 | write on a piece of paper? |
| 09:51 | 2 | A.   I think it is just as important, yes. |
| 09:51 | 3 | Q.   You don't want to be sending a message to your other |
| 09:51 | 4 | employees that you don't take these promises seriously, |
| 09:51 | 5 | right? |
| 09:51 | 6 | A.   That's correct. |
| 09:51 | 7 | Q.   You don't want to tell these employees of yours it's |
| 09:51 | 8 | really okay to acquire information from competitors |
| 09:51 | 9 | unlawfully -- |
| 09:51 | 10 | A.   No, that's totally unacceptable. |
| 09:51 | 11 | Q.   And you wouldn't want to appear to be just winking at |
| 09:51 | 12 | the conduct, right? |
| 09:51 | 13 | A.   That's correct. |
| 09:51 | 14 | Q.   Because you know that sometimes actions speak louder |
| 09:51 | 15 | than words, right? |
| 09:51 | 16 | A.   Yes. |
| 09:51 | 17 | Q.   And so employees might be looking at you to see what |
| 09:51 | 18 | you do when you learn that an employee has intentionally |
| 09:51 | 19 | used unlawful means to acquire information of a competitor, |
| 09:51 | 20 | right? |
| 09:51 | 21 | A.   Yes. |
| 09:51 | 22 | Q.   Now, it's certainly -- Mattel certainly knew that Sal |
| 09:51 | 23 | Villasenor himself had used unlawful means to acquire |
| 09:51 | 24 | confidential information from competitors including MGA, |
| 09:51 | 25 | right? |

| | | |
|---|---|---|
| 09:52 | 1 | A.    That's correct. |
| 09:52 | 2 | Q.    But he was never reprimanded for his conduct, true? |
| 09:52 | 3 | A.    He had left on stress leave. |
| 09:52 | 4 | Q.    Am I right that he was never reprimanded? |
| 09:52 | 5 | A.    I don't know that. |
| 09:52 | 6 | Q.    Have you looked at -- have you checked to see? |
| 09:52 | 7 | A.    No, I have not. |
| 09:52 | 8 | Q.    Are you aware that throughout his entire time in Market |
| 09:52 | 9 | Intelligence Mr. Villasenor consistently got raises, |
| 09:52 | 10 | bonuses, and promotions based on his work obtaining |
| 09:52 | 11 | competitors' confidential information? |
| 09:52 | 12 | A.    I don't know that it was confidential information.  It |
| 09:52 | 13 | could have been public information that he obtained. |
| 09:52 | 14 | Q.    Do you think he had to have manufacture fake ID's and |
| 09:52 | 15 | sneak in to get public information?  Is that your testimony? |
| 09:52 | 16 | A.    No, I'm not saying that.  I'm saying that I don't know |
| 09:52 | 17 | it was confidential information.  That's all I'm saying. |
| 09:52 | 18 | Q.    Do you think he had to manufacture fake ID's and sneak |
| 09:52 | 19 | into showrooms to get public information? |
| 09:52 | 20 | A.    I don't know whether it was confidential or it was |
| 09:52 | 21 | information available to the public.  I can't say, because I |
| 09:52 | 22 | don't know what information he received. |
| 09:52 | 23 | Q.    Because you didn't ask? |
| 09:52 | 24 | A.    Because I don't know. |
| 09:52 | 25 | Q.    Because you didn't take any steps to find out? |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

72

| | | |
|---|---|---|
| 09:53 | 1 | A.   I did not. |
| 09:53 | 2 | Q.   And even knowing that he -- even knowing as you now |
| 09:53 | 3 | know that he admitted using fake credentials to get |
| 09:53 | 4 | confidential information from your competitors, Mattel has |
| 09:53 | 5 | been paying Mr. Villasenor's legal fees, right? |
| 09:53 | 6 | A.   I don't know that. |
| 09:53 | 7 | Q.   Don't you know that Mattel is continuing pay his legal |
| 09:53 | 8 | fees even to this day? |
| 09:53 | 9 | A.   I did not know that. |
| 09:53 | 10 | Q.   That would be wrong, wouldn't it? |
| 09:53 | 11 | A.   I don't know.  I don't know the circumstances.  I can't |
| 09:53 | 12 | answer that. |
| 09:53 | 13 | Q.   And you were the head -- you were the head guy at |
| 09:53 | 14 | Mattel brands, right? |
| 09:53 | 15 | A.   I was -- not during the time that these things took |
| 09:53 | 16 | place. |
| 09:53 | 17 | Q.   Really? |
| 09:53 | 18 | THE COURT:  Now, that's not a question. |
| 09:53 | 19 | BY MS. KELLER: |
| 09:53 | 20 | Q.   Okay. |
| 09:53 | 21 | THE COURT:  Disregard the "really."  That's for |
| 09:53 | 22 | emphasis.  It's improper.  Strike it. |
| 09:53 | 23 | Now, your question, Counsel. |
| 09:54 | 24 | BY MS. KELLER: |
| 09:54 | 25 | Q.   Mattel even paid Mr. Villasenor $50 an hour to be |

DEBBIE GALE, U.S. COURT REPORTER

| 09:54 | 1 | deposed by MGA in this case, true? |
| 09:54 | 2 | A.   I don't know that. |
| 09:54 | 3 | Q.   Now, I think you testified on Friday that you have only |
| 09:54 | 4 | now learned that Geri Pilgrim, Michael Shore, and Carey |
| 09:54 | 5 | Plunkett were either verbally or orally reprimanded for |
| 09:54 | 6 | obtaining competitive information without the competitor's |
| 09:54 | 7 | permission.  Do you remember testifying to that on Friday? |
| 09:54 | 8 | A.   I do. |
| 09:54 | 9 | Q.   So of course Mattel would want to dock their salary, |
| 09:54 | 10 | demote them, not give them bonuses, right? |
| 09:54 | 11 | A.   I don't know that.  I can't answer that. |
| 09:54 | 12 | Q.   Well, Mattel didn't do any of that, right? |
| 09:54 | 13 | A.   I don't know that. |
| 09:54 | 14 | Q.   You said these reprimands were in 2003 or 2004, but you |
| 09:54 | 15 | weren't sure? |
| 09:54 | 16 | A.   That's correct.  I wasn't. |
| 09:54 | 17 | Q.   But those dates were dates, of course, before you |
| 09:54 | 18 | became president of Mattel brands, right? |
| 09:54 | 19 | A.   That's correct. |
| 09:54 | 20 | Q.   Since Friday, though, you've learned that these |
| 09:55 | 21 | supposed reprimands were not until May of 2006? |
| 09:55 | 22 | MR. QUINN:  Object. |
| 09:55 | 23 | MS. KELLER:  Right? |
| 09:55 | 24 | MR. QUINN:  Object to the form of the question. |
| 09:55 | 25 | Argumentative. |

| 09:55 | 1 |  THE COURT:  Just restate it. |
|---|---|---|
| 09:55 | 2 | BY MS. KELLER: |
| 09:55 | 3 | Q.   Since Friday you've learned that what you have |
| 09:55 | 4 | characterized as reprimands were not until May of 2006, |
| 09:55 | 5 | right? |
| 09:55 | 6 | A.   Correct. |
| 09:55 | 7 | Q.   Let's look at Exhibit 25103. |
| 09:55 | 8 |  (Document provided to the witness.) |
| 09:55 | 9 | BY MS. KELLER: |
| 09:55 | 10 | Q.   This is a letter from Alan Kaye -- |
| 09:55 | 11 |  Was he the head -- the head of human resources? |
| 09:55 | 12 | A.   He is. |
| 09:55 | 13 | Q.   -- to Michael Shore dated May 26, 2006.  And then we've |
| 09:55 | 14 | got -- |
| 09:55 | 15 |  (Document displayed.) |
| 09:55 | 16 | BY MS. KELLER: |
| 09:55 | 17 | Q.   -- if we look at 25107, this is Mr. Kaye's letter |
| 09:55 | 18 | from -- letter to Geri Pilgrim, dated May 22nd, 2006. |
| 09:55 | 19 |  (Document displayed.) |
| 09:56 | 20 | BY MS. KELLER: |
| 09:56 | 21 | Q.   But when we looked as Mr. Villasenor's letter to |
| 09:56 | 22 | Mattel, we saw that was December 22, 2005, right? |
| 09:56 | 23 | December 22, 2005, was the date of Mr. Villasenor's letter, |
| 09:56 | 24 | true? |
| 09:56 | 25 | A.   True. |

| 09:56 | 1 | Q.   And so it was only after MGA had filed a lawsuit |
| 09:56 | 2 | against Mattel and began asking about Mattel employees using |
| 09:56 | 3 | false pretenses to gain access to private showrooms that |
| 09:56 | 4 | these employees were given these letters, right? |
| 09:56 | 5 | A.   That's correct. |
| 09:56 | 6 | Q.   Now, let's talk about the topic of whether these were |
| 09:56 | 7 | reprimands. |
| 09:56 | 8 | Let's look at Exhibit 25103. |
| 09:56 | 9 | *(Document displayed.)* |
| 09:56 | 10 | BY MS. KELLER: |
| 09:56 | 11 | Q.   The first paragraph talks about how Mattel prides |
| 09:56 | 12 | itself on leading the way with innovative and creative |
| 09:57 | 13 | ideas, but also wants the employees to commit to their code |
| 09:57 | 14 | of conduct, right? |
| 09:57 | 15 | A.   Correct. |
| 09:57 | 16 | Q.   And then the paragraph says, "In 2000, Mattel formally |
| 09:57 | 17 | adopted a "vision and values" statement that acts as a moral |
| 09:57 | 18 | compass for the way we work within the walls of Mattel and |
| 09:57 | 19 | interact with our coworkers, our partners, our customers, |
| 09:57 | 20 | and our communities.  As an organization and individually, |
| 09:57 | 21 | we are responsible for acting with integrity, treating |
| 09:57 | 22 | others with dignity and respect, being honest and fair in |
| 09:57 | 23 | all transactions, and consistently striving to," quote, "'do |
| 09:57 | 24 | the right thing," unquote. |
| 09:57 | 25 | "We have repeatedly trained our employees and |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 76 of 167   Page ID #:309336
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

76

| 09:57 | 1 | communicated to them that –– that Mattel does not seek to |
|---|---|---|
| 09:57 | 2 | obtain competitive information by illegal or unethical |
| 09:57 | 3 | means, and we should not knowingly use any information |
| 09:57 | 4 | obtained in this manner." |
| 09:57 | 5 | Now, in those first two paragraphs, do you see any |
| 09:58 | 6 | reprimands to Mr. Shore?  Is there any statement "Mr. Shore, |
| 09:58 | 7 | it's come to our attention you've done something wrong"? |
| 09:58 | 8 | A.   No. |
| 09:58 | 9 | Q.   And, "You better not do it again"? |
| 09:58 | 10 | A.   No. |
| 09:58 | 11 | Q.   Now, let's look at the third paragraph. |
| 09:58 | 12 | "Recently allegations of past conduct that would be |
| 09:58 | 13 | incompatible with Mattel's principles have surfaced." |
| 09:58 | 14 | Does this say, "Recently, Mr. Shore, we learned that |
| 09:58 | 15 | you have committed misconduct"? |
| 09:58 | 16 | A.   No, it doesn't say that. |
| 09:58 | 17 | Q.   It doesn't saying anything about who, just, "Recently |
| 09:58 | 18 | allegations of past conduct that would be incompatible with |
| 09:58 | 19 | Mattel's principles have surfaced.  Although the allegations |
| 09:58 | 20 | relate to past conduct, and that conduct may not have been |
| 09:58 | 21 | illegal, we were disappointed to learn of it.  We were also |
| 09:58 | 22 | disappointed that it was not reported earlier.  We want to |
| 09:58 | 23 | take this opportunity to emphasize again that any conduct |
| 09:58 | 24 | that violates our code of conduct cannot occur." |
| 09:58 | 25 | Okay.  Up until that point, has Mr. Shore been told, |

| | | |
|--|--|--|
| 09:59 | 1 | "We found out about something you did that's bad and you're |
| 09:59 | 2 | in trouble"? |
| 09:59 | 3 | A.   Well, what it's saying is that you knew of it and you |
| 09:59 | 4 | didn't do anything. |
| 09:59 | 5 | Q.   Where does it -- |
| 09:59 | 6 | A.   Pass it on. |
| 09:59 | 7 | Q.   Where does it say, Mr. Shore, you knew about this? |
| 09:59 | 8 | A.   It says, "We are disappointed that it was not |
| 09:59 | 9 | reported." |
| 09:59 | 10 | Q.   Well, what it says is, "Recently, allegations of past |
| 09:59 | 11 | conduct that would be incompatible with Mattel's principles |
| 09:59 | 12 | have surfaced."  It doesn't say what they were or who did |
| 09:59 | 13 | what, does it?  It just says something has surfaced, right? |
| 09:59 | 14 | A.   Correct. |
| 09:59 | 15 | Q.   Right? |
| 09:59 | 16 | "Although the allegations relate to past conduct and |
| 09:59 | 17 | that conduct may not have been illegal, we were disappointed |
| 09:59 | 18 | to learn of it." |
| 09:59 | 19 | Okay.  Up until that point, he still hasn't been told |
| 09:59 | 20 | we have learned you did something wrong.  There's no |
| 10:00 | 21 | statement here of who did what, right? |
| 10:00 | 22 | A.   Correct. |
| 10:00 | 23 | Q.   And then it says, "We were also disappointed it was not |
| 10:00 | 24 | reported earlier.  We want to take this opportunity to |
| 10:00 | 25 | emphasize again that any conduct that violates our code of |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 78 of 167   Page ID #:309338
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:00 | 1 | conduct cannot occur.  If you have a good faith belief that |
| 10:00 | 2 | your coworkers are acting in a way that would violate our |
| 10:00 | 3 | code of conduct, you are obligated to report it to the human |
| 10:00 | 4 | resources department, the law department, the internal audit |
| 10:00 | 5 | department, the global security department, or the |
| 10:00 | 6 | confidential Ethics Hotline." |
| 10:00 | 7 | So he's still not being told, "Mr. Shore, the |
| 10:00 | 8 | information has come to our attention that you did something |
| 10:00 | 9 | wrong."  Now, he's being told, basically, "If you think your |
| 10:00 | 10 | coworkers have done something wrong, you should rat 'em |
| 10:00 | 11 | out," right? |
| 10:00 | 12 | I mean, "rat 'em out" is shorthand.  I just didn't want |
| 10:00 | 13 | to read the whole thing, but that's basically what he's |
| 10:00 | 14 | being told here, right? |
| 10:00 | 15 | A.   That he should notify the proper people if he's aware |
| 10:00 | 16 | of it.  And that's correct; that's what it says. |
| 10:01 | 17 | Q.   And so up until this point, there has not been one |
| 10:01 | 18 | statement about, "Michael Shore, you've done something wrong |
| 10:01 | 19 | and you're being reprimanded." |
| 10:01 | 20 | A.   Well, Michael Shore didn't do anything wrong.  What |
| 10:01 | 21 | Michael Shore didn't do was report what he knew was wrong. |
| 10:01 | 22 | Q.   It doesn't say that either, does it? |
| 10:01 | 23 | It doesn't say, "and, Michael Shore, we know that you |
| 10:01 | 24 | learned of misconduct and you didn't report it."  This was |
| 10:01 | 25 | another vague "if you have a good faith belief." |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 79 of 167   Page ID #:309339
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

79

| | | |
|---|---|---|
| 10:01 | 1 | And then it says -- |
| 10:01 | 2 | MR. QUINN:  Your Honor, that's not a question. |
| 10:01 | 3 | It's argument.  It's compound. |
| 10:01 | 4 | THE COURT:  Question is stricken. |
| 10:01 | 5 | BY MS. KELLER: |
| 10:01 | 6 | Q.   And the next line says, "Please refer to the section of |
| 10:01 | 7 | the code of conduct --" |
| 10:01 | 8 | MR. QUINN:  I move to strike it, Your Honor. |
| 10:01 | 9 | THE COURT:  Stricken. |
| 10:01 | 10 | BY MS. KELLER: |
| 10:01 | 11 | Q.   The next line says, "Please refer to the section of |
| 10:01 | 12 | code of conduct entitled 'How to Get Help and Raise |
| 10:01 | 13 | Concerns.'  Finally, if we find that people at present or in |
| 10:01 | 14 | the future are either engaging in or knowingly permitting |
| 10:01 | 15 | others to violate our code of conduct, they will be subject |
| 10:02 | 16 | to discipline, up to and including termination." |
| 10:02 | 17 | So here he's told that, "If we ever find in the future |
| 10:02 | 18 | that anybody has done something wrong along these lines, |
| 10:02 | 19 | they'll be subject to discipline," right? |
| 10:02 | 20 | A.   That's what it says. |
| 10:02 | 21 | Q.   He's not being told, based on what we know, "We're |
| 10:02 | 22 | subjecting you to discipline," correct? |
| 10:02 | 23 | A.   I think it says that we found out that there was |
| 10:02 | 24 | wrongdoings, that you knew something about it, you should |
| 10:02 | 25 | have reported it, and that this goes into your file. |

| | | |
|---|---|---|
| 10:02 | 1 | Q.   Well, let's read it again. |
| 10:02 | 2 | "Recently allegations of past conduct that would be |
| 10:02 | 3 | incompatible with Mattel's principles have surfaced." |
| 10:02 | 4 | Nothing about who committed the misconduct, right? |
| 10:02 | 5 | A.   Correct. |
| 10:02 | 6 | Q.   And then the next line says that "Although the |
| 10:02 | 7 | allegations relate to past conduct and that conduct may not |
| 10:02 | 8 | have been illegal, we were disappointed to learn of it." |
| 10:03 | 9 | Okay.  Disappointed. |
| 10:03 | 10 | A.   Uh-huh. |
| 10:03 | 11 | Q.   Right? |
| 10:03 | 12 | A.   Correct. |
| 10:03 | 13 | Q.   No discipline there.  We don't know who did what, and |
| 10:03 | 14 | all we know is Mattel as disappointed, right?  So throughout |
| 10:03 | 15 | this document -- |
| 10:03 | 16 | MR. QUINN:  Your Honor, that wasn't even a |
| 10:03 | 17 | question.  Is this closing argument time now? |
| 10:03 | 18 | THE COURT:  Sustained. |
| 10:03 | 19 | MR. QUINN:  Move to strike. |
| 10:03 | 20 | THE COURT:  Sustained.  Stricken. |
| 10:03 | 21 | BY MS. KELLER: |
| 10:03 | 22 | Q.   So throughout this document, this document could |
| 10:03 | 23 | literally be addressed to any person in the entire company, |
| 10:03 | 24 | right?  Just notifying people about the code of conduct, |
| 10:03 | 25 | true? |

| | | |
|---|---|---|
| 10:03 | 1 | MR. QUINN:  Your Honor, it's compound.  Move to |
| 10:03 | 2 | strike.  There's a preamble. |
| 10:03 | 3 | THE COURT:  Overruled. |
| 10:03 | 4 | You can answer the question. |
| 10:03 | 5 | THE WITNESS:  If they were in violation of the |
| 10:03 | 6 | code of conduct, this could be sent to other people.  But it |
| 10:03 | 7 | was sent to Michael Shore because he was the one who was in |
| 10:03 | 8 | violation of the code of conduct. |
| 10:03 | 9 | BY MS. KELLER: |
| 10:03 | 10 | Q.   But back again to this reprimand.  Nowhere in this |
| 10:03 | 11 | whole letter does it say, "Mr. Shore, it has come to our |
| 10:03 | 12 | attention that you, Michael Shore, did something wrong?" |
| 10:04 | 13 | A.   That -- it says here that we are disappointed that it |
| 10:04 | 14 | was not reported earlier, and we want to take this |
| 10:04 | 15 | opportunity to emphasize again that any conduct that |
| 10:04 | 16 | violates our code of conduct cannot occur. |
| 10:04 | 17 | Q.   My question was, does it say Michael Moore -- or, |
| 10:04 | 18 | "Michael Shore, you did something wrong," anywhere?  Does it |
| 10:04 | 19 | identify him as the wrongdoer anywhere in this letter? |
| 10:04 | 20 | A.   It does because the letter's addressed to him.  I |
| 10:04 | 21 | believe it does. |
| 10:04 | 22 | Q.   So it was the addressing of the letter to him with no |
| 10:04 | 23 | identification in the letter of what he was supposed to have |
| 10:04 | 24 | done that served as the reprimand? |
| 10:04 | 25 | MR. QUINN:  It's argumentative. |

| | | |
|---|---|---|
| 10:04 | 1 | THE COURT:  Restate the question.  Sustained. |
| 10:04 | 2 | BY MS. KELLER: |
| 10:04 | 3 | Q.   Was it putting his name and address on it that served |
| 10:04 | 4 | as the reprimand? |
| 10:04 | 5 | A.   No.  It was the body of the letter that serves as the |
| 10:04 | 6 | reprimand. |
| 10:04 | 7 | Q.   But, Mr. Friedman, again, this letter could have |
| 10:04 | 8 | literally been sent to anyone at Mattel because it doesn't |
| 10:05 | 9 | identify any wrongdoer whatsoever, right? |
| 10:05 | 10 | MR. QUINN:  Asked and answered. |
| 10:05 | 11 | THE COURT:  Overruled. |
| 10:05 | 12 | BY MS. KELLER: |
| 10:05 | 13 | Q.   Correct? |
| 10:05 | 14 | A.   It identifies Michael Shore 'cause it was sent to him. |
| 10:05 | 15 | Q.   It identifies him as the recipient, but the letter |
| 10:05 | 16 | doesn't say he did anything wrong anywhere. |
| 10:05 | 17 | A.   I believe the letter does say he did something wrong. |
| 10:05 | 18 | Q.   Well, and the identical letter was sent to the others |
| 10:05 | 19 | who were supposed to have been reprimanded, right? |
| 10:05 | 20 | A.   To Geri Pilgrim, yes. |
| 10:05 | 21 | Q.   Well, since -- since Friday, has your memory changed |
| 10:05 | 22 | about who was reprimanded? |
| 10:05 | 23 | A.   No.  It's just those -- as far as I know, those three |
| 10:05 | 24 | people were the only ones who were reprimanded.  I don't |
| 10:05 | 25 | know of any others. |

| | | |
|---|---|---|
| 10:05 | 1 | Q.   And this was the sum total of the so-called reprimand |
| 10:05 | 2 | they got? |
| 10:05 | 3 | A.   That's what Geri Pilgrim and Michael Shore did.  As I |
| 10:05 | 4 | understand it, Carey Plunkett would have received a verbal |
| 10:05 | 5 | reprimand. |
| 10:06 | 6 | Q.   And their letters were identical except for the name |
| 10:06 | 7 | and address at the top, right? |
| 10:06 | 8 | A.   Correct. |
| 10:06 | 9 | Q.   Now -- so that was enough discipline by Mattel for |
| 10:06 | 10 | people who entered the private showrooms of your competitors |
| 10:06 | 11 | with fake identities and brought that information back to |
| 10:06 | 12 | Mattel? |
| 10:06 | 13 |         MR. QUINN:  Assumes facts not in evidence. |
| 10:06 | 14 |         THE COURT:  Overruled. |
| 10:06 | 15 |         THE WITNESS:  Those people did not enter |
| 10:06 | 16 | showrooms, those two people. |
| 10:06 | 17 | BY MS. KELLER: |
| 10:06 | 18 | Q.   Mr. Shore received no adverse action, right? |
| 10:06 | 19 | A.   Not to my knowledge. |
| 10:06 | 20 | Q.   His pay wasn't cut, correct? |
| 10:06 | 21 | A.   I don't know. |
| 10:06 | 22 | Q.   He wasn't demoted, correct? |
| 10:06 | 23 | A.   That's correct. |
| 10:06 | 24 | Q.   He wasn't fired, correct? |
| 10:06 | 25 | A.   Correct. |

| 10:06 | 1 | Q. And since this -- this letter expressing disappointment |
| 10:06 | 2 | by Mattel, he was promoted to the head of consumer research, |
| 10:06 | 3 | right? |
| 10:06 | 4 | A. Correct. |
| 10:06 | 5 | Q. He oversaw some of the people who engaged in this |
| 10:06 | 6 | conduct of sneaking into competitors' showrooms, right? |
| 10:06 | 7 | A. I don't -- I don't actually know that. But -- I don't |
| 10:07 | 8 | know that. |
| 10:07 | 9 | Q. Was he actually commended over the years for his role |
| 10:07 | 10 | in the presentation Mr. Villasenor and others made of the |
| 10:07 | 11 | information that they got at these toy fairs? |
| 10:07 | 12 | A. I can't answer that. |
| 10:07 | 13 | Q. Have you reviewed his personnel file before testifying |
| 10:07 | 14 | today? |
| 10:07 | 15 | A. I did not. |
| 10:07 | 16 | Q. Or any of the employees' personnel files? |
| 10:07 | 17 | A. I did not. |
| 10:07 | 18 | Q. You knew you were gonna be asked questions about this, |
| 10:07 | 19 | though, true? |
| 10:07 | 20 | A. True. |
| 10:07 | 21 | Q. And is it again that you would just rather not know? |
| 10:07 | 22 | A. No. I found out what I thought I needed to know for |
| 10:07 | 23 | today. I know that the people that engaged in going into |
| 10:07 | 24 | the showrooms are all either gone or have been reprimanded. |
| 10:07 | 25 | Q. And in the same fashion that this reprimand that we |

| | | |
|---|---|---|
| 10:07 | 1 | just looked at, right?  That doesn't even say -- |
| 10:07 | 2 | A.   I don't know that, 'cause I have not -- it was verbal |
| 10:07 | 3 | reprimand, and I don't know what was said. |
| 10:07 | 4 | Q.   Let's look at Exhibit 38064. |
| 10:07 | 5 | *(Document provided to the witness.)* |
| 10:07 | 6 | MS. KELLER:  I'm sorry.  3608 --- 36084. |
| 10:08 | 7 | BY MS. KELLER: |
| 10:08 | 8 | Q.   Is this Mr. Shore's personnel file? |
| 10:08 | 9 | A.   No, it's the review.  I haven't gone through the whole |
| 10:08 | 10 | thing, so I don't know.  But I see review in the front. |
| 10:08 | 11 | Evaluation. |
| 10:08 | 12 | Q.   Does it appear to be a personnel file from Mattel? |
| 10:08 | 13 | A.   It appears to be. |
| 10:08 | 14 | MS. KELLER:  Your Honor, I would move 38064 into |
| 10:08 | 15 | evidence. |
| 10:08 | 16 | THE COURT:  Received. |
| 10:08 | 17 | MR. QUINN:  Assume we'll redact the Social |
| 10:08 | 18 | Security numbers and the like, Your Honor. |
| 10:08 | 19 | MS. KELLER:  I'm sorry.  36084. |
| 10:08 | 20 | THE COURT:  Received. |
| 10:08 | 21 | *(Exhibit No. 38064 received in evidence.)* |
| 10:08 | 22 | *(Document displayed.)* |
| 10:08 | 23 | BY MS. KELLER: |
| 10:08 | 24 | Q.   Now, if we go to page 122. |
| 10:09 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 10:09 | 1 | BY MS. KELLER: |
| 10:09 | 2 | Q.   This was Mr. Shore's evaluation given in 2003? |
| 10:09 | 3 | A.   You said 122? |
| 10:09 | 4 | Q.   122. |
| 10:09 | 5 | A.   This doesn't look like an evaluation. |
| 10:09 | 6 | Q.   Let's look at 129. |
| 10:09 | 7 | (Document displayed.) |
| 10:09 | 8 | THE WITNESS:  This looks like a part of a review. |
| 10:09 | 9 | BY MS. KELLER: |
| 10:09 | 10 | Q.   And we see under "Targeted result," "Catch new waves. |
| 10:09 | 11 | Oversee trend bulletin and trend presentations including toy |
| 10:09 | 12 | fair 2002." |
| 10:09 | 13 | And on that same page, we see that he was commended for |
| 10:10 | 14 | his work.  "Toy fair presentation format was modified and |
| 10:10 | 15 | presented in a more timely manner with more relevant |
| 10:10 | 16 | findings." |
| 10:10 | 17 | Now, let's look at page 133. |
| 10:10 | 18 | A.   The assessment is actually his own. |
| 10:10 | 19 | Q.   So he's commending himself? |
| 10:10 | 20 | A.   Yes. |
| 10:10 | 21 | Q.   Let's look at page 131. |
| 10:10 | 22 | (Document displayed.) |
| 10:10 | 23 | BY MS. KELLER: |
| 10:10 | 24 | Q.   And we see under "reviewer's comments," if we look at |
| 10:10 | 25 | the second sentence, "He has created an environment that has |

10:11   1   allowed researchers like Vera Chien and Carey Plunkett to

10:11   2   develop and prosper."

10:11   3       Plunkett actually admitted using fake business cards to

10:11   4   get into showrooms, correct?

10:11   5   A.   We know she went in there.  I don't know if she

10:11   6   admitted it, but I assume so.

10:11   7   Q.   And let's look at page 132, the last part of the

10:11   8   reviews comments.

10:11   9           (Document displayed.)

10:11   10  BY MS. KELLER:

10:11   11  Q.   It says, "Michael also took on additional

10:11   12  responsibility as a spokesperson for the girls division.

10:11   13  Through --"

10:11   14      Well, wait a second, where are we?

10:11   15      "Through this and other public forums, such as the

10:11   16  state of presentation and toy fair competitive reports,

10:11   17  Michael is well positioned as a leader of the girls research

10:11   18  team."

10:11   19      So, now, Mr. Shore got substantial raises and bonuses

10:12   20  while he was overseeing the Market Intelligence group's work

10:12   21  on toy fairs, right?

10:12   22  A.   I don't know what his pay rate was.

10:12   23  Q.   Pardon?

10:12   24  A.   I don't know what his pay rate was.

10:12   25  Q.   Well, you remember on Friday testifying that Mr. Shore

| | | |
|---|---|---|
| 10:12 | 1 | was promoted to the head of research before he was |
| 10:12 | 2 | reprimanded?  You remember that? |
| 10:12 | 3 | A.   I -- you know, I really don't remember.  I know I said |
| 10:12 | 4 | something like that, but I'm not sure exactly what. |
| 10:12 | 5 | Q.   Well, do you have any idea how much time before his |
| 10:12 | 6 | reprimand he was promoted? |
| 10:12 | 7 | A.   I do not. |
| 10:12 | 8 | Q.   Let's look at Exhibit 38064-99. |
| 10:12 | 9 | I'm sorry, I think we have the wrong number on that |
| 10:12 | 10 | one.  36084, again, page 99. |
| 10:13 | 11 | A.   Okay. |
| 10:13 | 12 | *(Document displayed.)* |
| 10:13 | 13 | BY MS. KELLER: |
| 10:13 | 14 | Q.   You see he's notified of his promotion on May 8, 2006? |
| 10:13 | 15 | If it helps you see, by the way, we have it on the screen |
| 10:13 | 16 | there too where it's highlighted. |
| 10:13 | 17 | A.   Okay.  99 is a different page for this. |
| 10:13 | 18 | Q.   Let's look -- |
| 10:13 | 19 | A.   I'm sorry, I was looking on the wrong page.  I've -- |
| 10:13 | 20 | I've got it on the screen, yes. |
| 10:13 | 21 | Q.   And you see he was notified of his promotion on May 8, |
| 10:13 | 22 | 2006? |
| 10:13 | 23 | A.   Correct. |
| 10:13 | 24 | Q.   And this disappointment letter was May 22nd, 2006? |
| 10:13 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 10:13 | 1 | Q.   And if we look at what the promotion notification says, |
| 10:13 | 2 | it says, "Congratulations on your promotion.  The following |
| 10:13 | 3 | changes were effective with your promotion:  Title, VP |
| 10:13 | 4 | Consumer Insights.  Current salary, 165,996.  Increase |
| 10:14 | 5 | amount 19,004.  Net new annual salary, 185,000.  Job band: |
| 10:14 | 6 | Leadership." |
| 10:14 | 7 | So while being in the process of receiving what has |
| 10:14 | 8 | been characterized as a reprimand, he was also being |
| 10:14 | 9 | promoted to the head of consumer research? |
| 10:14 | 10 | A.   That's correct. |
| 10:14 | 11 | Q.   And he's been promoted further since that |
| 10:14 | 12 | disappointment letter, right? |
| 10:14 | 13 | A.   I believe that's correct, but I'm not positive. |
| 10:14 | 14 | Q.   Let's look at 38084-70.  38084-70. |
| 10:15 | 15 | *(Document displayed.)* |
| 10:15 | 16 | BY MS. KELLER: |
| 10:15 | 17 | Q.   And this is dated October 12, 2009.  "Congratulations |
| 10:15 | 18 | on your promotion.  The following changes were effective |
| 10:15 | 19 | with your promotion:  VP consumer insights.  Current salary, |
| 10:15 | 20 | 204,925.  Increase amount, 25,075.  New salary, 230,000. |
| 10:15 | 21 | Job band:  Senior leadership." |
| 10:15 | 22 | Now, Mr. Shore's personnel file, do you know whether it |
| 10:15 | 23 | even contains the so-called disappointment letter? |
| 10:15 | 24 | A.   I assume it does, but I don't know for a fact. |
| 10:15 | 25 | MS. KELLER:  And, Your Honor, would this be a good |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 90 of 167   Page ID #:309350
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:15 | 1 | time for a break? |
| 10:15 | 2 | THE COURT:  This would be a good time for a break. |
| 10:15 | 3 | Now, you're admonished not to discuss this matter, |
| 10:15 | 4 | nor form or express any opinion concerning this case. |
| 10:15 | 5 | Could I borrow you for one moment, though, and |
| 10:15 | 6 | just walk through some timing schedules so you can plan your |
| 10:15 | 7 | lives, including Easter, et cetera. |
| 10:16 | 8 | All right.  Counsel have a seat. |
| 10:16 | 9 | Would you turn on the ELMO. |
| 10:16 | 10 | Mr. Zeller, Ms. Hurst, I want to have an informal |
| 10:16 | 11 | discussion.  This is off the record. |
| 10:16 | 12 | *(Pause in the proceedings at 10:16 a.m.)* |
| 10:16 | 13 | *(Jury recesses at 10:20 a.m.)* |
| 10:16 | 14 | *(Proceedings resumed at 10:23 a.m.)* |
| 10:23 | 15 | *(Outside the presence of the jury.)* |
| 10:23 | 16 | THE COURT:  This is on the record. |
| 10:23 | 17 | We had an *in camera* session yesterday involving |
| 10:23 | 18 | Ms. Bongiavanni, Mr. Normile, Mr. Moore, a number of Mattel |
| 10:23 | 19 | counsel, outside counsel Wagner, Evans, and I want to be |
| 10:24 | 20 | mild in my comments.  I'm going to order the deposition of |
| 10:24 | 21 | Mr. Moore.  It will take place this Saturday. |
| 10:24 | 22 | Without making a complete record at the present |
| 10:24 | 23 | time and being cautious of my comments, I'm dissatisfied |
| 10:24 | 24 | with the answers that one or more persons have given from |
| 10:24 | 25 | Mattel's counsel. |

| | | |
|---|---|---|
| 10:24 | 1 | Mr. Normile is to be on call on that date.  I'm |
| 10:24 | 2 | not certain quite how the Court is eventually sorting out |
| 10:24 | 3 | his *in camera* testimony, but I'm quite certain that |
| 10:24 | 4 | Mr. Moore will be testifying. |
| 10:24 | 5 | I'll leave it at that.  The special master has |
| 10:24 | 6 | been called.  It will commence 8:00 o'clock in the morning. |
| 10:24 | 7 | It will commence across the street.  It will not be in |
| 10:24 | 8 | Los Angeles.  I want to know if the privilege is taken and |
| 10:24 | 9 | under what circumstances.  And that's my order. |
| 10:24 | 10 | Now, Mr. Zeller, make that call to Mr. Moore. |
| 10:24 | 11 | MR. ZELLER:  Yes, sir. |
| 10:24 | 12 | THE COURT:  I'll leave my comments as mild as they |
| 10:25 | 13 | are for the present time. |
| 10:25 | 14 | All right.  You're in recess now. |
| 10:25 | 15 | *(Recess held at 10:25 a.m.)* |
| 10:45 | 16 | *(Proceedings resumed at 10:45 a.m.)* |
| 10:45 | 17 | *(In the presence of the jury.)* |
| 10:45 | 18 | THE COURT:  All right.  We're back in session. |
| 10:45 | 19 | All counsel are present.  The witness is present.  The |
| 10:45 | 20 | parties are present. |
| 10:45 | 21 | If you would be seated.  Thank you for your |
| 10:45 | 22 | courtesy. |
| 10:45 | 23 | And, Ms. Keller, if you would like to continue |
| 10:45 | 24 | with your redirect examination. |
| 10:46 | 25 | MS. KELLER:  Thank you, Your Honor. |

| | | |
|---|---|---|
| 10:46 | 1 | BY MS. KELLER: |
| 10:46 | 2 | Q.   Mr. Friedman, Geri Pilgrim received the identical |
| 10:46 | 3 | letter from Mattel that we've previously seen, expressing |
| 10:46 | 4 | disappointment in someone, perhaps in the past, doing |
| 10:46 | 5 | something wrong personally, right? |
| 10:46 | 6 | MR. QUINN:  This is argumentative, Your Honor. |
| 10:46 | 7 | Vague and ambiguous. |
| 10:46 | 8 | THE COURT:  Well, the disappointment in someone |
| 10:46 | 9 | perhaps doing something wrong -- sustained. |
| 10:46 | 10 | Counsel, just restate the question. |
| 10:46 | 11 | BY MS. KELLER: |
| 10:46 | 12 | Q.   Let's look at Exhibit 23107. |
| 10:46 | 13 | A.   Okay. |
| 10:46 | 14 | Q.   Do we have that? |
| 10:47 | 15 | A.   Yes. |
| 10:47 | 16 | Q.   25107.  I'm sorry. |
| 10:47 | 17 | (Document displayed.) |
| 10:59 | 18 | BY MS. KELLER: |
| 10:47 | 19 | Q.   Is this Geri Pilgrim's letter expressing the same |
| 10:47 | 20 | disappointment that we just saw Mr. Shore -- |
| 10:47 | 21 | A.   Yes. |
| 10:47 | 22 | Q.   It's identical in every way, right -- except -- |
| 10:47 | 23 | A.   Yes. |
| 10:47 | 24 | Q.   -- except it has her name and address? |
| 10:47 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:47 | 1 | Q.   So again, it doesn't identify Ms. Pilgrim as having |
| 10:47 | 2 | done anything wrong, right? |
| 10:47 | 3 | A.   It was addressed to her. |
| 10:47 | 4 | Q.   Other than that, nothing in here about, "We have |
| 10:47 | 5 | learned that you engaged in the following conduct," correct? |
| 10:47 | 6 | A.   No, it doesn't say that.  We say that we're |
| 10:47 | 7 | disappointed that it was not reported earlier, and we want |
| 10:47 | 8 | to take this opportunity to emphasize that your conduct |
| 10:47 | 9 | violates -- your conduct, uh, violates the Code of Conduct. |
| 10:47 | 10 | Q.   But it doesn't say what the conduct was, right? |
| 10:47 | 11 | A.   It doesn't say it.  It's -- it does not say |
| 10:48 | 12 | specifically what it was in here, no. |
| 10:48 | 13 | Q.   It doesn't say anything about what it was, other than |
| 10:48 | 14 | conduct, right?  "Recently, allegations of past conduct that |
| 10:48 | 15 | would be incompatible with Mattel's principles have |
| 10:48 | 16 | surfaced."  Right? |
| 10:48 | 17 | MR. QUINN:  Your Honor, that's compound. |
| 10:48 | 18 | THE COURT:  Overruled. |
| 10:48 | 19 | Your answer to the question, sir? |
| 10:48 | 20 | THE WITNESS:  It's what it says. |
| 11:59 | 21 | BY MS. KELLER: |
| 10:48 | 22 | Q.   And then it has that same line, "Although the |
| 10:48 | 23 | allegations relate to past conduct and that conduct may not |
| 10:48 | 24 | have been illegal, we were disappointed to learn of it.  We |
| 10:48 | 25 | were -- we also were disappointed that it was not reported |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 94 of 167   Page ID #:309354
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:48 | 1 | earlier." |
| 10:48 | 2 | But it doesn't say what the "it" was, right? |
| 10:48 | 3 | A.   It does not. |
| 10:48 | 4 | Q.   And it doesn't say the -- who the "who" was either, |
| 10:48 | 5 | correct? |
| 10:48 | 6 | A.   Well, it's -- it's to Geri Pilgrim. |
| 10:48 | 7 | Q.   It's addressed to her? |
| 10:48 | 8 | A.   It's addressed to her.  And it is her Code of Conduct |
| 10:48 | 9 | and Corporate Values that this is written for. |
| 10:48 | 10 | Q.   But would you agree with me that this could be a |
| 10:49 | 11 | generic letter that could be given out to any employee, |
| 10:49 | 12 | because it doesn't specify who committed the conduct or what |
| 10:49 | 13 | the conduct was? |
| 10:49 | 14 | MR. QUINN:  Compound. |
| 10:49 | 15 | THE COURT:  Overruled. |
| 10:49 | 16 | THE WITNESS:  It says that it's to Geri Pilgrim. |
| 10:49 | 17 | MS. KELLER:  Except for that -- |
| 10:49 | 18 | MR. QUINN:  Your Honor, I don't think the witness |
| 10:49 | 19 | had finished his answer. |
| 10:49 | 20 | THE COURT:  Had you finished? |
| 10:49 | 21 | THE WITNESS:  I said, it's to Geri Pilgrim.  And |
| 10:49 | 22 | it states that -- that there was a -- that she -- that we |
| 10:49 | 23 | were disappointed that she didn't report the conduct that |
| 10:49 | 24 | she had heard about. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 95 of 167   Page ID #:309355
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

95

| | | |
|---|---|---|
| 08:49 | 1 | BY MS. KELLER: |
| 10:49 | 2 | Q.   Where does it say she heard about it? |
| 10:49 | 3 | A.   No.  It's says we are disappointed that it was not |
| 10:49 | 4 | reported earlier. |
| 10:49 | 5 | Q.   Doesn't say she heard of any conduct.  It's the same as |
| 10:49 | 6 | Mr. Shore.  It says –– |
| 10:49 | 7 | MR. QUINN:  This is argument or objectionable |
| 10:49 | 8 | preamble to a question, Your Honor. |
| 10:49 | 9 | THE COURT:  Just a question, Counsel. |
| 10:49 | 10 | BY MS. KELLER: |
| 10:49 | 11 | Q.   Isn't this identical to Mr. Shore's letter? |
| 10:49 | 12 | A.   It is, except that it's addressed to Geri Pilgrim. |
| 10:49 | 13 | Q.   It's addressed to her.  And it says, "We also were |
| 10:49 | 14 | disappointed that it was not reported earlier." |
| 10:49 | 15 | It doesn't say that she heard of any –– of any |
| 10:50 | 16 | misconduct that she didn't report, true? |
| 10:50 | 17 | A.   It says that we were also disappointed it was not |
| 10:50 | 18 | reported, so –– |
| 10:50 | 19 | Q.   But doesn't say what the "it" was –– |
| 10:50 | 20 | MR. QUINN:  Your Honor, excuse me.  I think the |
| 10:50 | 21 | witness was cut off. |
| 10:50 | 22 | THE COURT:  No.  Overruled. |
| 10:50 | 23 | BY MS. KELLER: |
| 10:50 | 24 | Q.   Doesn't say what the "it" was, correct? |
| 10:50 | 25 | A.   It doesn't say specifically what the "it" was, yes. |

| | | |
|---|---|---|
| 10:50 | 1 | Q.   And it doesn't say the "who" either -- |
| 10:50 | 2 | A.   It's -- |
| 10:50 | 3 | THE COURT:  You two are talking over each other. |
| 10:50 | 4 | That's the problem.  I don't know if we have an accurate |
| 10:50 | 5 | record. |
| 10:50 | 6 | BY MS. KELLER: |
| 10:50 | 7 | Q.   Mr. Friedman, this doesn't even have a generic "you" in |
| 10:50 | 8 | the letter.  In other words, it has come to our attention |
| 10:50 | 9 | that you have committed misconduct. |
| 10:50 | 10 | It doesn't have that anywhere in the letter, right? |
| 10:50 | 11 | MR. QUINN:  Compound, Your Honor. |
| 10:50 | 12 | THE COURT:  Overruled. |
| 10:50 | 13 | THE WITNESS:  No, it doesn't. |
| 10:50 | 14 | BY MS. KELLER: |
| 10:50 | 15 | Q.   Now, Geri Pilgrim is now a director of Human Resources |
| 10:50 | 16 | at Mattel, right? |
| 10:50 | 17 | A.   Now? |
| 10:50 | 18 | Q.   Uh-huh, yes. |
| 10:50 | 19 | A.   You mean today? |
| 10:51 | 20 | Q.   Yes. |
| 10:51 | 21 | A.   I -- I think I could be wrong, but I thought Geri had |
| 10:51 | 22 | retired. |
| 10:51 | 23 | Q.   Well, the year that she received this disappointment |
| 10:51 | 24 | letter, she got a $39,000 bonus, right? |
| 10:51 | 25 | A.   I -- I don't know that. |

| | | |
|---|---|---|
| 10:51 | 1 | Q.    She wasn't demoted/docked any pay, right? |
| 10:51 | 2 | A.    Again, I don't know that. |
| 10:51 | 3 |       MS. KELLER:  And, Your Honor, we have a document |
| 10:51 | 4 | the Court hasn't reviewed 'cause it was just produced to us, |
| 10:51 | 5 | Exhibit –– doesn't even have an exhibit number yet. |
| 10:51 | 6 |       THE COURT:  Just a moment.  Usually, I wouldn't |
| 10:51 | 7 | allow it.  Did you just receive it? |
| 10:51 | 8 |       MS. KELLER:  We just received it.  It would be |
| 10:51 | 9 | trial Exhibit 36098. |
| 10:51 | 10 |       I mean, literally, just received it. |
| 10:51 | 11 |       THE COURT:  Have I gotten it? |
| 10:51 | 12 |       MR. QUINN:  What is it? |
| 10:51 | 13 |       THE COURT:  What's happening here? |
| 10:51 | 14 |       MR. McCONVILLE:  It was the document you ordered |
| 10:51 | 15 | produced over the weekend, Your Honor. |
| 10:51 | 16 |       THE COURT:  Well, let me see the document. |
| 10:51 | 17 |       I ordered a couple things over the weekend. |
| 10:52 | 18 |        (Document provided to the Court.) |
| 10:52 | 19 |       THE COURT:  Oh.  You may examine on this.  Thank |
| 10:52 | 20 | you. |
| 10:52 | 21 |       Actually, this was already in a binder, wasn't it? |
| 10:52 | 22 | No.  That's correct.  This is one of those that was just |
| 10:52 | 23 | produced. |
| 10:52 | 24 |       MS. KELLER:  I think it was just produced, |
| 10:52 | 25 | Your Honor. |

| | | |
|---|---|---|
| 10:52 | 1 | THE COURT:  Thank you. |
| 10:52 | 2 | *(Document provided to the witness.)* |
| 10:52 | 3 | MS. KELLER:  And, Your Honor, because we –– it was |
| 10:52 | 4 | just produced, we're gonna have to use the Bates number to |
| 10:52 | 5 | identify it. |
| 10:52 | 6 | THE COURT:  That's fine. |
| 10:52 | 7 | MS. KELLER:  All right. |
| 10:52 | 8 | BY MS. KELLER: |
| 10:52 | 9 | Q.   If you turn to Exhibit 36098, does that appear to be |
| 10:52 | 10 | the personnel file of Geri Phillips? |
| 10:52 | 11 | A.   Pilgrim. |
| 10:52 | 12 | Q.   Pilgrim.  I'm sorry.  I know somebody named Geri |
| 10:53 | 13 | Phillips. |
| 10:53 | 14 | Does it appear to be her personnel file? |
| 10:53 | 15 | A.   Yes, it does –– |
| 10:53 | 16 | Q.   From –– from –– |
| 10:53 | 17 | A.   It appears to be, yes. |
| 10:53 | 18 | Q.   Okay.  And if you look at Bates stamp page 2028126. |
| 10:53 | 19 | A.   Yes. |
| 10:53 | 20 | Q.   Do you see that Ms. Phillips *(sic)* received a $39,000 |
| 10:53 | 21 | bonus for the year 2006? |
| 10:53 | 22 | A.   I do. |
| 10:53 | 23 | Q.   And do you see that she also received a merit increase |
| 10:53 | 24 | on her current pay of 130,000? |
| 10:53 | 25 | A.   I do. |

| | | |
|---|---|---|
| 10:53 | 1 | Q.   And it brought her new salary to 136,000? |
| 10:53 | 2 | A.   Yes. |
| 10:53 | 3 | MS. KELLER:  And, Your Honor, I move to introduce |
| 10:54 | 4 | 36098. |
| 10:54 | 5 | THE WITNESS:  Yes. |
| 10:54 | 6 | THE COURT:  Received. |
| 10:54 | 7 | *(Exhibit No. 36098 received in evidence.)* |
| 10:54 | 8 | BY MS. KELLER: |
| 10:54 | 9 | Q.   Now, Ms. Plunkett's file doesn't contain even the |
| 10:54 | 10 | written disappointment letter, right? |
| 10:54 | 11 | A.   I don't know.  I haven't seen it. |
| 10:54 | 12 | Q.   Did Ms. Plunkett receive an oral reprimand? |
| 10:54 | 13 | A.   That's my understanding, yes. |
| 10:54 | 14 | Q.   And who administered that reprimand? |
| 10:54 | 15 | A.   I don't know. |
| 10:54 | 16 | Q.   And is it true that there are no notes of it in the |
| 10:54 | 17 | file anywhere? |
| 10:54 | 18 | A.   I have seen the file.  I don't know. |
| 10:54 | 19 | Q.   And Ms. Plunkett received raises every year at Mattel |
| 10:54 | 20 | between 2000 and 2009, correct? |
| 10:54 | 21 | A.   I don't know that. |
| 10:54 | 22 | Q.   If you look at the Bates No. 36083. |
| 10:54 | 23 | *(Document provided to the witness.)* |
| 10:54 | 24 | BY MS. KELLER: |
| 10:55 | 25 | Q.   Now, let's talk about Exhibit 36083. |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 100 of 167   Page ID #:309360
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:55 | 1 | And this is Carey Plunkett's personnel file? |
| 10:55 | 2 | A.   Appears to be. |
| 10:55 | 3 | MS. KELLER:  Your Honor, I would move 36083 into |
| 10:55 | 4 | evidence. |
| 10:55 | 5 | THE COURT:  Received. |
| 10:55 | 6 | *(Exhibit No. 36083 received in evidence.)* |
| 10:55 | 7 | THE COURT:  We redact the Social Security numbers, |
| 10:55 | 8 | et cetera, later on, any personal information like that. |
| 10:55 | 9 | BY MS. KELLER: |
| 10:55 | 10 | Q.   Now, since you testified on Friday about Ms. Plunkett's |
| 10:55 | 11 | oral reprimand, did you check the file to see if there were |
| 10:56 | 12 | any notes about it? |
| 10:56 | 13 | A.   I did not. |
| 10:56 | 14 | Q.   Did you look at the file at all? |
| 10:56 | 15 | A.   I did not. |
| 10:56 | 16 | Q.   Did you look at her file before you testified last |
| 10:56 | 17 | week? |
| 10:56 | 18 | A.   I did not. |
| 10:56 | 19 | Q.   Did you look at any of the files at all? |
| 10:56 | 20 | A.   I did not. |
| 10:56 | 21 | Q.   Now, is it true that, over the years 2000 to 2009, she |
| 10:56 | 22 | went from 64,000 to $132,000 in salary? |
| 10:56 | 23 | A.   I don't know that. |
| 10:56 | 24 | Q.   If you take a look at page 117 of 36083. |
| 10:56 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:56 | 1 | THE WITNESS:  Okay. |
| 10:56 | 2 | BY MS. KELLER: |
| 10:56 | 3 | Q.   Do you see the -- June 22, 2001, Ms. Plunkett had a |
| 10:56 | 4 | base salary of $64,000, then received a four-and-a-half |
| 10:57 | 5 | percent merit increase to come up to 66,880. |
| 10:57 | 6 | A.   Yes. |
| 10:57 | 7 | Q.   And now let's look at page 104. |
| 10:57 | 8 | *(Document displayed.)* |
| 10:57 | 9 | BY MS. KELLER: |
| 10:57 | 10 | Q.   And that's also on the screen, if you need it. |
| 10:57 | 11 | A.   Yes, yes. |
| 10:57 | 12 | Q.   We see that by October 12, 2009, she had the title |
| 10:57 | 13 | Director of Consumer Insights, at a salary of $132,000, |
| 10:57 | 14 | right? |
| 10:57 | 15 | A.   Correct. |
| 10:57 | 16 | Q.   And we see that her supervisor was? |
| 10:57 | 17 | A.   Michael Shore. |
| 10:57 | 18 | Q.   And so throughout her years at Mattel, she never failed |
| 10:57 | 19 | to gain promotions and salary increases, right? |
| 10:57 | 20 | A.   That looks correct. |
| 10:57 | 21 | Q.   And all three of these people that we've just been |
| 10:57 | 22 | talking about -- Plunkett, Shore and Pilgrim -- they're all |
| 10:58 | 23 | still at Mattel, right? |
| 10:58 | 24 | A.   That's correct.  I'm not sure about Pilgrim.  I think |
| 10:58 | 25 | Pilgrim may be retired. |

| | | |
|---|---|---|
| 10:58 | 1 | Q.   And Plunkett has also been promoted since the |
| 10:58 | 2 | reprimand, right? |
| 10:58 | 3 | A.   Correct. |
| 10:58 | 4 | Q.   And gotten bonuses, true? |
| 10:58 | 5 | A.   Yes. |
| 10:58 | 6 | Q.   And is this the message Mattel wants to send to its |
| 10:58 | 7 | employees who commit misconduct? |
| 10:58 | 8 | A.   We reprimanded the people that were involved.  And we |
| 10:58 | 9 | don't -- we don't believe that this was right.  This was |
| 10:58 | 10 | wrongdoing.  We totally agree.  Um, don't know all the |
| 10:58 | 11 | circumstances around it.  We certainly don't accept the fact |
| 10:58 | 12 | that this was -- was done.  The people were -- were |
| 10:58 | 13 | reprimanded, and it hasn't happened since. |
| 10:58 | 14 | Q.   Well, you wouldn't know, would you?  'Cause you didn't |
| 10:58 | 15 | know about this, you're telling us.  You wouldn't know if |
| 10:58 | 16 | it's happened since, would you? |
| 10:58 | 17 | A.   It hasn't happened since. |
| 10:58 | 18 | Q.   And so after this disappointment letter that you've |
| 10:59 | 19 | referred to as a reprimand, these people were punished by |
| 10:59 | 20 | being given bonuses, raises, and promotions into pretty |
| 10:59 | 21 | important jobs, right? |
| 10:59 | 22 | A.   I think they were promoted based on their current job |
| 10:59 | 23 | performance, not past. |
| 10:59 | 24 | Q.   As president of the Mattel Brands, are you now aware |
| 10:59 | 25 | that witnesses have admitted that this conduct was going on |

| | | |
|---|---|---|
| 10:59 | 1 | at Mattel since 1992? |
| 10:59 | 2 | A.    I was not aware of that. |
| 10:59 | 3 | Q.    Has -- have you inquired? |
| 10:59 | 4 | A.    I did not. |
| 10:59 | 5 | Q.    Have you done anything to educate yourself about it at |
| 10:59 | 6 | all? |
| 10:59 | 7 | A.    Just the things we've talked about. |
| 10:59 | 8 | Q.    Now, are you aware that, in addition to Sal Villasenor |
| 10:59 | 9 | and Carey Plunkett, that three people -- Kelly Osier, Tyler |
| 10:59 | 10 | Bradley and Sharon Rahimi -- admitted to using fake business |
| 11:00 | 11 | cards and identities to get into competitor's showrooms to |
| 11:00 | 12 | get their catalogues and price lists, and specifically |
| 11:00 | 13 | MGA's? |
| 11:00 | 14 | A.    Well, I know that -- I found out during the course of |
| 11:00 | 15 | this trial that they were involved.  I don't know |
| 11:00 | 16 | specifically that they went into MGA.  I don't know who went |
| 11:00 | 17 | into what showrooms. |
| 11:00 | 18 | Q.    You understand, don't you, that Kelly Osier and Sharon |
| 11:00 | 19 | Rahimi are still consulting for Mattel and being paid |
| 11:00 | 20 | substantial amounts of money for their work? |
| 11:00 | 21 | A.    But I -- as I understand it, it has nothing to do with |
| 11:00 | 22 | toy fairs. |
| 11:00 | 23 | Q.    Well, but, what I'm asking you is -- Sharon Rahimi, for |
| 11:00 | 24 | example, was she paid $160,000 in 2010 for consulting for |
| 11:00 | 25 | Mattel? |

| | | |
|---|---|---|
| 11:00 | 1 | A. I have no idea. |
| 11:00 | 2 | Q. 147,000 in 2009? |
| 11:00 | 3 | A. I don't know. |
| 11:00 | 4 | Q. And Ms. Osier, is she also being paid as a consultant? |
| 11:00 | 5 | A. I am not aware. |
| 11:00 | 6 | Q. Now, you know who Matt Turetzky is, right? |
| 11:01 | 7 | A. I know who he was when he was at Mattel, for sure. |
| 11:01 | 8 | Q. He was the Vice President of Strategic Planning, who |
| 11:01 | 9 | supervised several of the people who -- who did this, |
| 11:01 | 10 | right? -- snuck into the toy fairs with fake credentials? |
| 11:01 | 11 | A. Again, I don't know what Matt Turetzky knew and didn't |
| 11:01 | 12 | know. |
| 11:01 | 13 | Q. Are you aware that he admitted he knew they were doing |
| 11:01 | 14 | it and approved of their trips to the toy fairs to do this? |
| 11:01 | 15 | A. I do not know that. |
| 11:01 | 16 | Q. Have you taken any steps to find out? |
| 11:01 | 17 | A. I have not. |
| 11:01 | 18 | Q. Have you even asked anyone? |
| 11:01 | 19 | A. I have not. And Matt Turetzky is no longer with |
| 11:01 | 20 | Mattel. |
| 11:01 | 21 | Q. And Ms. Osier was never reprimanded, right? |
| 11:01 | 22 | A. I have no knowledge to that. |
| 11:01 | 23 | Q. Ms. Rahimi was never reprimanded, right? |
| 11:01 | 24 | A. I have no knowledge of that. They weren't Mattel |
| 11:01 | 25 | employees. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:01 | 1 | Q.   Do you -- are you aware that Mr. Turetzky even let |
| 11:01 | 2 | Mattel employees use his own home address on their fake, |
| 11:01 | 3 | toy -- their fake toy retailer cards so that Mattel's |
| 11:02 | 4 | competitors couldn't figure out who they really were? |
| 11:02 | 5 | A.   I had no idea. |
| 11:02 | 6 | Q.   You're not aware of Mattel ever having reprimanded |
| 11:02 | 7 | Mr. Turetzky either, right? |
| 11:02 | 8 | A.   I am not aware. |
| 11:02 | 9 | Q.   And he was a senior vice president, right? |
| 11:02 | 10 | A.   I don't believe he was a senior vice president. |
| 11:02 | 11 | Q.   Wasn't he senior VP for -- a vice president of |
| 11:02 | 12 | Strategic Planning? |
| 11:02 | 13 | A.   He might have been a vice president. |
| 11:02 | 14 | Q.   Now, Mr. Turetzky also got a nice severance when he |
| 11:02 | 15 | left Mattel in June 2006, as long as he agreed to keep his |
| 11:02 | 16 | activities at Mattel a secret, right? |
| 11:02 | 17 | A.   I have not seen any separation agreement from Matt |
| 11:02 | 18 | Turetzky. |
| 11:02 | 19 | Q.   Did you know that Mr. Turetzky was also paid hundreds |
| 11:02 | 20 | of thousands of dollars by Mattel for consulting services |
| 11:02 | 21 | after he left? |
| 11:02 | 22 | A.   I did not. |
| 11:02 | 23 | Q.   Did you know he was paid $225,000? |
| 11:02 | 24 | A.   I did not. |
| 11:02 | 25 | Q.   Now, Mr. Turetzky's termination date was June 3rd, |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 106 of 167   Page ID #:309366
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

106

| | | |
|---|---|---|
| 11:02 | 1 | 2006, right? |
| 11:02 | 2 | A.   I don't know. |
| 11:02 | 3 | Q.   Well, by that time, you'd been president of Mattel |
| 11:03 | 4 | Brands for more than seven months, true? |
| 11:03 | 5 | A.   True. |
| 11:03 | 6 | Q.   And Sharon Rahimi, she never got reprimanded for |
| 11:03 | 7 | getting into showrooms using false pretenses, right? |
| 11:03 | 8 | A.   She was not a Mattel employee. |
| 11:03 | 9 | Q.   She was a Mattel consultant? |
| 11:03 | 10 | A.   But not an employee. |
| 11:03 | 11 | Q.   And still is? |
| 11:03 | 12 | A.   Not an employee. |
| 11:03 | 13 | Q.   Still a consultant for Mattel? |
| 11:03 | 14 | A.   That's what I understand. |
| 11:03 | 15 | Q.   And she's still earning –– 160,000 last year alone? |
| 11:03 | 16 | A.   I have no idea. |
| 11:03 | 17 | Q.   And one of the things that Ms. Rahimi actually did as a |
| 11:03 | 18 | consultant was sneak into toy rooms for Mattel using fake |
| 11:03 | 19 | ID's, right? |
| 11:03 | 20 | A.   I don't know that for a fact, but that's what I've |
| 11:03 | 21 | heard. |
| 11:03 | 22 | Q.   Have you ever sat down and looked at any documents |
| 11:03 | 23 | about that? |
| 11:03 | 24 | A.   Have not. |
| 11:03 | 25 | Q.   Ever asked to read anything? |

| | | |
|---|---|---|
| 11:03 | 1 | A.   Have not. |
| 11:03 | 2 | Q.   Ms. Rahimi was actually paid by Mattel for attending |
| 11:04 | 3 | these toy fairs, right? |
| 11:04 | 4 | A.   I -- I don't know. |
| 11:04 | 5 | Q.   Ever checked it out? |
| 11:04 | 6 | A.   No. |
| 11:04 | 7 | Q.   Ever looked at the bills she submitted? |
| 11:04 | 8 | A.   No. |
| 11:04 | 9 | Q.   Ever seen that she was submitting bills for, quote, |
| 11:04 | 10 | "identifying new releases"? |
| 11:04 | 11 | A.   No. |
| 11:04 | 12 | Q.   Now, how about Mattel's employees Candace Cheng and |
| 11:04 | 13 | Jeff Lange.  Did they use fake business cards to get into |
| 11:04 | 14 | showrooms, too? |
| 11:04 | 15 | A.   I don't know who they are. |
| 11:04 | 16 | Q.   Did you take any steps at all to actually figure out |
| 11:04 | 17 | who these people were, what they did, and to make sure they |
| 11:04 | 18 | were punished for this? |
| 11:04 | 19 | A.   I did not. |
| 11:04 | 20 | Q.   And Mr. Bousquette, the president before you, you know |
| 11:04 | 21 | he was a regular recipient of Mr. Villasenor's competitive |
| 11:04 | 22 | intelligence report, right? |
| 11:04 | 23 | A.   Yes. |
| 11:04 | 24 | Q.   Mr. Bousquette regularly sent reports of -- was |
| 11:04 | 25 | regularly sent reports of what Mr. Villasenor discovered in |

| | | |
|---|---|---|
| 11:05 | 1 | the private toy rooms, right? |
| 11:05 | 2 | A.   I have no idea of that. |
| 11:05 | 3 | Q.   Was Mr. Bousquette ever reprimanded for his role? |
| 11:05 | 4 | A.   I have no idea. |
| 11:05 | 5 | Q.   And did Mr. Bousquette get a severance package?  When |
| 11:05 | 6 | he left as president of Mattel, did he get a severance |
| 11:05 | 7 | package in the millions? |
| 11:05 | 8 | A.   I believe so. |
| 11:05 | 9 | Q.   And it also contained a confidentiality requirement, |
| 11:05 | 10 | right? |
| 11:05 | 11 | A.   They all do. |
| 11:05 | 12 | Q.   Well, specifically, Mr. Bousquette's did, right? |
| 11:05 | 13 | A.   I don't know.  I didn't read his severance. |
| 11:05 | 14 | Q.   And Mr. Bousquette, was he getting a million and a half |
| 11:05 | 15 | a year as long as he didn't talk? |
| 11:05 | 16 | A.   I have no idea what Mr. Bousquette is getting.  He |
| 11:05 | 17 | didn't report to me. |
| 11:05 | 18 | Q.   But he was your immediate predecessor, wasn't he? |
| 11:05 | 19 | A.   Yes.  But he didn't report to me. |
| 11:05 | 20 | Q.   Well, but, I mean, you succeeded him in the job, right? |
| 11:05 | 21 | A.   I did, yes. |
| 11:05 | 22 | Q.   And you have no idea that he was being paid a million |
| 11:05 | 23 | and a half a year? |
| 11:05 | 24 | A.   No, I -- and I -- |
| 11:06 | 25 | Q.   For consulting? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 109 of 167   Page ID #:309369
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

109

| | | |
|---|---|---|
| 11:06 | 1 | A.    -- still don't. |
| 11:06 | 2 | Q.    -- as long as he didn't say anything to anybody? |
| 11:06 | 3 | MR. QUINN:  This is argumentative, Your Honor. |
| 11:06 | 4 | THE COURT:  Sustained. |
| 11:06 | 5 | MR. QUINN:  Assumes facts. |
| 11:06 | 6 | THE COURT:  Sustained in its present form. |
| 11:06 | 7 | MS. KELLER:  Nothing further, Your Honor. |
| 11:06 | 8 | THE COURT:  Recross. |
| 11:06 | 9 | **RECROSS-EXAMINATION** |
| 11:06 | 10 | BY MR. QUINN: |
| 11:06 | 11 | Q.  Did you understand that last question to mean that |
| 11:06 | 12 | Mr. Keller was suggesting that Mr. Bousquette was paid |
| 11:06 | 13 | millions of dollars, so long as he didn't talk about Sal |
| 11:06 | 14 | Villasenor's activities? |
| 11:06 | 15 | THE COURT:  I thought I just sustained that |
| 11:06 | 16 | objection. |
| 11:06 | 17 | MS. KELLER:  I was going to say that's -- |
| 11:06 | 18 | THE COURT:  Do you want me to unsustain the |
| 11:06 | 19 | objection?  I'm glad to. |
| 11:06 | 20 | MR. QUINN:  I withdraw the question. |
| 11:06 | 21 | THE COURT:  I'm happy to open that up for you |
| 11:06 | 22 | both. |
| | 23 | BY MR. QUINN: |
| 11:06 | 24 | Q.  Perhaps I should ask you, Mr. Friedman, to describe -- |
| 11:06 | 25 | let's start -- there are many -- there are more -- there are |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

110

| | | |
|---|---|---|
| 11:06 | 1 | more than one toy fair in the world? |
| 11:06 | 2 | A.   Yes, there are. |
| 11:06 | 3 | Q.   Let's talk about the New York toy fair.  Could you |
| 11:06 | 4 | please describe for the jury what the New York toy fair is |
| 11:06 | 5 | like, like where it takes place, and sort of what the venue |
| 11:07 | 6 | is like? |
| 11:07 | 7 | A.   It's the Javits Center in New York City.  It's a huge |
| 11:07 | 8 | building, covers seven blocks, I believe, maybe more.  It |
| 11:07 | 9 | has three floors.  And, this year, had over 22,000 buyers |
| 11:07 | 10 | attending. |
| 11:07 | 11 | Q.   22,000 buyers? |
| 11:07 | 12 | A.   Just buyers, including international, yes. |
| 11:07 | 13 | Q.   And are there other people besides buyers who attend? |
| 11:07 | 14 | A.   Yes.  There are licensors, there are inventors, there's |
| 11:07 | 15 | licensees, there's bankers, there's analysts, there's press. |
| 11:07 | 16 | Q.   And presumably retailers? |
| 11:07 | 17 | A.   And retailers. |
| 11:07 | 18 | Q.   Um, and we've heard a lot of talk about these booths. |
| 11:07 | 19 | Could you describe for the jury what these toy fair booths |
| 11:07 | 20 | are and what they're like? |
| 11:07 | 21 | A.   Well, the booths are anywhere from a -- maybe a table |
| 11:07 | 22 | this big, depending on the size of the company.  Could be an |
| 11:07 | 23 | individual, with just a table and a backdrop, to -- to, um, |
| 11:08 | 24 | showrooms bigger than this courtroom that display a lot of |
| 11:08 | 25 | product.  So it really depends on the size of the company, |

| | | |
|--|--|--|
| 11:08 | 1 | the type of the company, how big and how private it is. |
| 11:08 | 2 | Q.   Are there some booths that are private and some that |
| 11:08 | 3 | are not private? |
| 11:08 | 4 | A.   Yes. |
| 11:08 | 5 | Q.   Let's talk about the booths that are private.  Do most |
| 11:08 | 6 | of the major toy manufacturers, like Mattel and Hasbro, and |
| 11:08 | 7 | the others like that, MGA -- do they have private toy |
| 11:08 | 8 | booths? |
| 11:08 | 9 | A.   Yes. |
| 11:08 | 10 | Q.   And can you describe who gets access, in your |
| 11:08 | 11 | experience, to these private toy booths? |
| 11:08 | 12 | A.   Well, it's generally by invitation only.  There's an |
| 11:08 | 13 | occasional walk-in, but it the retailers, um, the press, the |
| 11:08 | 14 | licensors, the licensees, uh, we have, um, bankers, |
| 11:08 | 15 | analysts, and occasionally there will be some -- some people |
| 11:09 | 16 | will drop in, but mostly, that's -- that's the main people |
| 11:09 | 17 | of the trade. |
| 11:09 | 18 | Q.   You say, "including press"? |
| 11:09 | 19 | A.   Yes. |
| 11:09 | 20 | Q.   Why would someone who has a private -- one of these -- |
| 11:09 | 21 | what you referred to as a "private booth" invite the press |
| 11:09 | 22 | to attend? |
| 11:09 | 23 | A.   Well, press is one of the biggest things you do in toy |
| 11:09 | 24 | fair because you want to -- you want to start hyping your |
| 11:09 | 25 | new items that are coming out in the fall, and you want |

| | | |
|---|---|---|
| 11:09 | 1 | people to kind of get a sampling of what you think's gonna |
| 11:09 | 2 | be hot. |
| 11:09 | 3 | Q.   So why is it that if -- you would invite the press, but |
| 11:09 | 4 | I gather you wouldn't invite your competitor -- they |
| 11:09 | 5 | wouldn't be on the list who you would invite? |
| 11:09 | 6 | A.   No, they wouldn't. |
| 11:09 | 7 | Q.   And can you tell us why that is? |
| 11:09 | 8 | A.   Well, for a number of reasons.  One, we don't want them |
| 11:09 | 9 | seeing all the details of our toys.  But for -- the second |
| 11:09 | 10 | reason is, we have all our customers there.  We have all our |
| 11:09 | 11 | licensors there.  And it's a very crowded booth, and we |
| 11:09 | 12 | don't want people coming in who aren't there to buy or to -- |
| 11:09 | 13 | or to talk about our toys. |
| 11:09 | 14 | Q.   Well, you, in response to one of Ms. Keller's questions |
| 11:10 | 15 | about retailers coming in -- she asked you, well, you know, |
| 11:10 | 16 | if retailers come in, do you expect that it's going to be |
| 11:10 | 17 | confidential, or something like that, and you made reference |
| 11:10 | 18 | to an "NDA." |
| 11:10 | 19 | A.   That's a non-disclosure form. |
| 11:10 | 20 | Q.   Well, what do you mean by that? |
| 11:10 | 21 | A.   That's -- that says that you won't disclose what you |
| 11:10 | 22 | see.  And if they don't sign that, then the chances of them |
| 11:10 | 23 | keeping it quiet -- I mean, you'd like 'em to, but they |
| 11:10 | 24 | don't. |
| 11:10 | 25 | Q.   I mean, is it a practice that you have members of the |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 113 of 167   Page ID #:309373
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

113

| | | |
|---|---|---|
| 11:10 | 1 | press and retailers who come into your -- your booth sign |
| 11:10 | 2 | nondisclosure agreements? |
| 11:10 | 3 | A.   Uh, no, we don't. |
| 11:10 | 4 | Q.   Ms. Keller asked you the question, you know, why would |
| 11:10 | 5 | someone, you know, fake an ID to get access.  I mean, you've |
| 11:10 | 6 | indicated that that's -- you regard that as reprehensible |
| 11:10 | 7 | conduct and something that Mattel does not approve of. |
| 11:10 | 8 |      That was your testimony? |
| 11:10 | 9 | A.   That is correct. |
| 11:10 | 10 | Q.   Ms. Keller asked you, well, uh, if it's not |
| 11:10 | 11 | confidential, why would somebody fake an ID to get in.  Do |
| 11:11 | 12 | you recall that question? |
| 11:11 | 13 | A.   Yes, I do.  I do recall about that. |
| 11:11 | 14 | Q.   And what would a fake ID -- what might that accomplish? |
| 11:11 | 15 | If -- if -- I mean, what use would that be to someone? |
| 11:11 | 16 | A.   It would get them into a competitor's booth, uh, so |
| 11:11 | 17 | they could go look around and see what -- what products they |
| 11:11 | 18 | had. |
| 11:11 | 19 |      I think that it's absolutely reprehensible and should |
| 11:11 | 20 | never be done. |
| 11:11 | 21 | Q.   But, um, if MGA or Mattel or some other manufacturer |
| 11:11 | 22 | permitted somebody to come in their booth who was bearing a |
| 11:11 | 23 | fake ID, a fake persona, would that tell you anything about |
| 11:11 | 24 | whether they regarded what they had in their booth as being |
| 11:11 | 25 | confidential or proprietary? |

| | | |
|---|---|---|
| 11:11 | 1 | MS. KELLER:  Objection.  Calls for speculation. |
| 11:11 | 2 | No foundation. |
| 11:11 | 3 | THE COURT:  Overruled. |
| 11:11 | 4 | THE WITNESS:  Generally, if somebody comes in that |
| 11:11 | 5 | is a small company or something -- whether it's fake or |
| 11:11 | 6 | real -- we have somebody escort 'em through.  But if we're |
| 11:12 | 7 | letting somebody in that we don't know and have no knowledge |
| 11:12 | 8 | of, then we can't expect them to actually keep anything |
| 11:12 | 9 | confidential. |
| 11:12 | 10 | BY MR. QUINN: |
| 11:12 | 11 | Q.   So if -- if MGA was permitting people to come in who |
| 11:12 | 12 | had fake ID's, and were admitting them into the booth, does |
| 11:12 | 13 | that indicate to you that they were letting people in who |
| 11:12 | 14 | they didn't know who they were? |
| 11:12 | 15 | MS. KELLER:  Objection.  Calls for speculation. |
| 11:12 | 16 | No foundation. |
| 11:12 | 17 | THE COURT:  Sustained, Counsel. |
| 11:12 | 18 | BY MR. QUINN: |
| 11:12 | 19 | Q.   You were shown some Exhibits. |
| 11:12 | 20 | MR. QUINN:  9274, if we could perhaps put the |
| 11:12 | 21 | first page of that on the screen -- these marketing reports, |
| 11:12 | 22 | 9274.  And that's, I believe, dated -- if we look at the |
| 11:12 | 23 | attachment -- I'm sorry.  9275.  My mistake. |
| 11:12 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

115

| | | |
|---|---|---|
| 09:03 | 1 | BY MR. QUINN: |
| 11:13 | 2 | Q.   And that's dated -- this is one of these marketing |
| 11:13 | 3 | reports that you were shown? |
| 11:13 | 4 | A.   Yes. |
| 11:13 | 5 | Q.   And that's dated April 22, 2003? |
| 11:13 | 6 | A.   Yes. |
| 11:13 | 7 | Q.   And if we could look at Exhibit 9504, the first page of |
| 11:13 | 8 | that. |
| 11:13 | 9 | *(Document displayed.)* |
| 11:13 | 10 | BY MR. QUINN: |
| 11:13 | 11 | Q.   That's also dated in April of 2003. |
| 11:13 | 12 | That's another report from Mr. Villasenor? |
| 11:13 | 13 | A.   That's -- yes, it is. |
| 11:13 | 14 | Q.   Can you tell us whether or not, by April in the year, |
| 11:13 | 15 | the products for the upcoming season are pretty much -- |
| 11:13 | 16 | they're known in the industry? |
| 11:13 | 17 | A.   The important -- |
| 11:13 | 18 | MS. KELLER:  Objection.  No foundation. |
| 11:13 | 19 | THE COURT:  Overruled. |
| 11:13 | 20 | THE WITNESS:  The important ones are known because |
| 11:13 | 21 | there's been press.  There's been lots of hall talk of what |
| 11:13 | 22 | people see that are hot, that they think are gonna be hot. |
| 11:13 | 23 | You hear it from retailers and from everybody else.  It's a |
| 11:13 | 24 | lot of hall talk.  And everybody's showing their stuff off. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:13 | 1 | BY MR. QUINN: |
| 11:13 | 2 | Q.   We've heard that the toy business is seasonal? |
| 11:13 | 3 | A.   Yes, it is. |
| 11:13 | 4 | Q.   All right.  So for the next Christmas season, when is |
| 11:14 | 5 | it that toy companies are kind of advertising, sending word |
| 11:14 | 6 | out to retailers and people in the industry about what |
| 11:14 | 7 | they're gonna be offering in the next Christmas season? |
| 11:14 | 8 | A.   Well, when we -- for the retailers, we start showing |
| 11:14 | 9 | them -- 'cause we want their feedback -- generally in |
| 11:14 | 10 | September/October of the previous year, so even before the |
| 11:14 | 11 | current season's coming up. |
| 11:14 | 12 | For the press and everybody else, we don't do that |
| 11:14 | 13 | until toy fair. |
| 11:14 | 14 | Q.   All right. |
| 11:14 | 15 | A.   And so we really not -- we're keeping confidential with |
| 11:14 | 16 | the big retailers early; and then, later on in February, we |
| 11:14 | 17 | really are -- have it out, so that everybody can see, |
| 11:14 | 18 | because you really don't have a lot of time between February |
| 11:14 | 19 | and December to make any changes. |
| 11:14 | 20 | Q.   Is that because -- can you -- when are orders placed by |
| 11:14 | 21 | the big retailers for the next Christmas season? |
| 11:14 | 22 | A.   We start getting the plans, really, in January. |
| 11:14 | 23 | Q.   All right.  So is it obviously -- if orders are being |
| 11:14 | 24 | placed, people in the industry, retailers, do -- they need |
| 11:14 | 25 | to know, obviously, what the products are that are gonna be |

| | | |
|---|---|---|
| 11:15 | 1 | offered in the next Christmas season? |
| 11:15 | 2 | A.   Yes. |
| 11:15 | 3 | Q.   You were asked some questions about Sal Villasenor. |
| 11:15 | 4 |      And at one point you said you didn't know if |
| 11:15 | 5 | Mr. Senior *(sic)* was stressed because of what he was doing |
| 11:15 | 6 | or because he had been told not to do it. |
| 11:15 | 7 |      Do you recall giving that answer? |
| 11:15 | 8 | A.   I do. |
| 11:15 | 9 | Q.   Do you know whether -- do you know who Sal Villasenor's |
| 11:15 | 10 | supervisor was? |
| 11:15 | 11 | A.   In September it was John Louie. |
| 11:15 | 12 |           MR. QUINN:  And if we could look at |
| 11:15 | 13 | Exhibit 9484-R. |
| 11:15 | 14 |              *(Document provided to the witness.)* |
| 11:15 | 15 |               *(Document displayed.)* |
| 11:15 | 16 |           MR. QUINN:  And enlarge that first paragraph or |
| 11:15 | 17 | two. |
| 11:15 | 18 |              *(Technician complies.)* |
| 11:15 | 19 | BY MR. QUINN: |
| 11:15 | 20 | Q.   And do you see a reference there to Mr. Louie? |
| 11:15 | 21 | A.   I do. |
| 11:15 | 22 | Q.   He says, "I have recently met with my director, John |
| 11:16 | 23 | Louie, regarding Mattel's goals and expectations of me with |
| 11:16 | 24 | respect to Market Intelligence at upcoming tradeshows and |
| 11:16 | 25 | events." |

| | | |
|---|---|---|
| 11:16 | 1 | Do you see that? |
| 11:16 | 2 | A.   I do. |
| 11:16 | 3 | Q.   Do you know whether Mr. Louie had just told |
| 11:16 | 4 | Mr. Villasenor that he didn't want him operating in a gray |
| 11:16 | 5 | area anymore? |
| 11:16 | 6 | MS. KELLER:  Objection.  Hearsay.  And no |
| 11:16 | 7 | foundation. |
| 11:16 | 8 | THE COURT:  It is hearsay, Counsel.  But it also |
| 11:16 | 9 | goes to your investigation or lack thereof. |
| 11:16 | 10 | (To the jury:) And whatever Mr. Louie said is |
| 11:16 | 11 | hearsay, but I'll allow counsel to ask the question to see |
| 11:16 | 12 | if there was some kind of input that this gentleman knows |
| 11:16 | 13 | about. |
| 09:07 | 14 | BY MR. QUINN: |
| 11:16 | 15 | Q.   Do you know whether, just before Mr. Villasenor sent |
| 11:16 | 16 | this letter saying he was stressed out and leaving -- |
| 11:16 | 17 | whether he had just had a conversation with his boss, John |
| 11:16 | 18 | Louie, where Mr. Louie told him he wasn't gonna tolerate any |
| 11:16 | 19 | gray area activities? |
| 11:17 | 20 | A.   I do. |
| 11:17 | 21 | Q.   How do you know that? |
| 11:17 | 22 | A.   I talked to John Louie yesterday. |
| 11:17 | 23 | MS. KELLER:  Objection.  Hearsay.  Motion to |
| 11:17 | 24 | strike. |
| 11:17 | 25 | THE COURT:  Sustained. |

| | | |
|---|---|---|
| 11:17 | 1 | Mr. Louie can be produced, Counsel. |
| 11:17 | 2 | MS. KELLER:  Is it stricken, Your Honor? |
| 11:17 | 3 | THE COURT:  Stricken. |
| 11:17 | 4 | BY MR. QUINN: |
| 11:17 | 5 | Q.   Well, do you have any reason to think that |
| 11:17 | 6 | Mr. Villasenor was pressured by anyone at Mattel to do |
| 11:17 | 7 | anything improper? |
| 11:17 | 8 | A.   No. |
| 11:17 | 9 | Q.   And counsel asked you -- counsel asked you isn't it |
| 11:17 | 10 | true that Mr. Villasenor did not leave Mattel until July of |
| 11:17 | 11 | 2006. |
| 11:17 | 12 | Do you recall that? |
| 11:17 | 13 | A.   I do. |
| 11:17 | 14 | Q.   After he sent that letter in December saying he was |
| 11:17 | 15 | going out on stress leave, did he ever return to work at |
| 11:17 | 16 | Mattel? |
| 11:17 | 17 | A.   No, he did not. |
| 11:17 | 18 | Q.   Do you have any reason to believe that Sal Villasenor |
| 11:17 | 19 | ever entered an MGA showroom at any toy fair anywhere? |
| 11:17 | 20 | MS. KELLER:  Objection.  No foundation. |
| 11:17 | 21 | MR. QUINN:  He was questioned about this, |
| 11:17 | 22 | Your Honor. |
| 11:17 | 23 | THE COURT:  Just a moment. |
| 11:18 | 24 | You can answer the question, sir. |
| 11:18 | 25 | Overruled. |

| | | |
|---|---|---|
| 11:18 | 1 | THE WITNESS:  I do not. |
| 09:06 | 2 | BY MR. QUINN: |
| 11:18 | 3 | Q.   Do you know whether there are -- do you know whether |
| 11:18 | 4 | there are executives -- Mattel executives who went to work |
| 11:18 | 5 | for MGA? |
| 11:18 | 6 | A.   I do. |
| 11:18 | 7 | Q.   Would that include a Ron Brawer? |
| 11:18 | 8 | A.   Yes. |
| 11:18 | 9 | Q.   Was he a senior -- |
| 11:18 | 10 | MS. KELLER:  Objection.  Irrelevant, and beyond |
| 11:18 | 11 | the scope. |
| 11:18 | 12 | THE COURT:  Sustained. |
| 11:18 | 13 | BY MR. QUINN: |
| 11:18 | 14 | Q.   Well, do you know whether there were Mattel executives |
| 11:18 | 15 | who went to work for MGA who knew about Mr. Villasenor? |
| 11:18 | 16 | MS. KELLER:  Objection.  No foundation and -- |
| 11:18 | 17 | THE COURT:  Sustained. |
| 11:18 | 18 | BY MR. QUINN: |
| 11:18 | 19 | Q.   You were asked some questions about whether -- |
| 11:19 | 20 | information provided to MGA about Mr. Villasenor and his |
| 11:19 | 21 | agreement. |
| 11:19 | 22 | Do you know whether or not Mr. Villasenor's was deposed |
| 11:19 | 23 | in this case, whether he gave testimony? |
| 11:19 | 24 | A.   I do. |
| 11:19 | 25 | Q.   Do you know whether or not in that severance agreement |

| | | |
|---|---|---|
| 11:19 | 1 | he's required to give testimony? |
| 11:19 | 2 | A.   It says so in the agreement. |
| 11:19 | 3 | Q.   Do you know whether or not Mattel provided documents |
| 11:19 | 4 | concerning Mr. Villasenor's activities to MGA? |
| 11:19 | 5 | MS. KELLER:  Your Honor, that -- |
| 11:19 | 6 | THE COURT:  Sustained. |
| 11:19 | 7 | The question's stricken. |
| 09:07 | 8 | BY MR. QUINN: |
| 11:19 | 9 | Q.   Lot of questions about the disappointment letters to |
| 11:19 | 10 | Mr. Shore and Ms. Pilgrim. |
| 11:20 | 11 | Did Mr. Shore or Ms. Pilgrim ever go into any toy fair |
| 11:20 | 12 | booth under a false ID, so far as you're aware? |
| 11:20 | 13 | A.   I'm not aware of them ever doing that. |
| 11:20 | 14 | Q.   And, in your understanding, why were they told that the |
| 11:20 | 15 | company was disappointed in them? |
| 11:20 | 16 | A.   Because -- |
| 11:20 | 17 | MS. KELLER:  Objection.  No foundation from what |
| 11:20 | 18 | this witness has previously testified to. |
| 11:20 | 19 | THE COURT:  Just a moment. |
| 11:20 | 20 | Overruled. |
| 11:20 | 21 | You can answer that question, sir. |
| 11:20 | 22 | THE WITNESS:  I'm sorry.  The question was? |
| 11:20 | 23 | BY MR. QUINN: |
| 11:20 | 24 | Q.   Well, do you have an understanding as to why these |
| 11:20 | 25 | people received these letters? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 122 of 167   Page ID #:309382
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:20 | 1 | A.   Yes. |
| 11:20 | 2 | MS. KELLER:  Objection.  Vague as to which people. |
| 11:20 | 3 | MR. QUINN:  Ms. Pilgrim and Mr. Shore. |
| 11:20 | 4 | THE COURT:  Overruled. |
| 11:20 | 5 | You can answer the question. |
| 11:20 | 6 | THE WITNESS:  Yes.  They -- they had known this |
| 11:20 | 7 | was going on, and they didn't report it to the appropriate |
| 11:20 | 8 | people. |
| 11:20 | 9 | MR. QUINN:  If we could look at Exhibit 25103. |
| 11:21 | 10 | *(Document provided to the witness.)* |
| 11:21 | 11 | *(Document displayed.)* |
| 11:21 | 12 | BY MR. QUINN: |
| 11:21 | 13 | Q.   Does the letter say that? |
| 11:21 | 14 | A.   It does.  It's to Michael Shore.  And it says, |
| 11:21 | 15 | "Recent allegations of past conduct that would be |
| 11:21 | 16 | incompatible with Mattel's principles have surfaced. |
| 11:21 | 17 | Although the allegations relate to past conduct, and that |
| 11:21 | 18 | conduct may not have been illegal, we are *(sic)* disappointed |
| 11:21 | 19 | to learn of it.  We are *(sic)* -- also were disappointed that |
| 11:21 | 20 | it was not reported earlier." |
| 11:21 | 21 | Q.   And then does it go on to say, "We want to take this |
| 11:21 | 22 | opportunity --"? |
| 11:21 | 23 | A.   Yeah. |
| 11:21 | 24 | Q.   -- "If you have a good faith belief that your coworkers |
| 11:21 | 25 | are acting in a way that would violate our Code of Conduct, |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 123 of 167   Page ID #:309383
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

123

| | | |
|---|---|---|
| 11:21 | 1 | you are obligated to report it." |
| 11:21 | 2 | Does it say that? |
| 11:21 | 3 | A.   It does say that. |
| 11:21 | 4 | Q.   In both instances? |
| 11:21 | 5 | A.   In both instances. |
| 11:21 | 6 | Q.   And Matt Turetzky, was it your under- -- uh, he left in |
| 11:22 | 7 | June of 2006? |
| 11:22 | 8 | A.   That's correct. |
| 11:22 | 9 | Q.   Left the company? |
| 11:22 | 10 | A.   Yes. |
| 11:22 | 11 | Q.   Ms. Osier -- at the time that these allegations |
| 11:22 | 12 | surfaced, when Mr. Villasenor wrote his letter, was |
| 11:22 | 13 | Ms. Osier still a Mattel employee -- |
| 11:22 | 14 | A.   She -- |
| 11:22 | 15 | Q.   -- at that time? |
| 11:22 | 16 | A.   She was not. |
| 11:22 | 17 | Q.   Had Ms. Ranier?  Ramier? |
| 11:22 | 18 | A.   "Rahimi," I think it is. |
| 11:22 | 19 | Q.   Rahimi.  Had she ever been a Mattel employee? |
| 11:22 | 20 | A.   Yes. |
| 11:22 | 21 | Q.   You were asked some questions about whether -- was she |
| 11:22 | 22 | used as a consultant with respect to toy fairs? |
| 11:22 | 23 | A.   No. |
| 11:22 | 24 | MS. KELLER:  Objection.  That misstates the |
| 11:22 | 25 | evidence, Your Honor. |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:22 | 1 | THE COURT:  We didn't get the question, Counsel. |
| 11:22 | 2 | MR. QUINN:  Okay. |
| 09:08 | 3 | BY MR. QUINN: |
| 11:22 | 4 | Q.   You indicated that Ms. Rahimi is still used by Mattel |
| 11:23 | 5 | as a consultant? |
| 11:23 | 6 | A.   Correct. |
| 11:23 | 7 | Q.   Still used with re- -- as consulting with respect to |
| 11:23 | 8 | toy fairs? |
| 11:23 | 9 | A.   No. |
| 11:23 | 10 | Q.   What's your understanding about when Mattel ceased to |
| 11:23 | 11 | use her as a consultant with respect to toy fairs? |
| 11:23 | 12 | A.   It was certainly before my coming to Mattel Brands in |
| 11:23 | 13 | October 2005. |
| 11:23 | 14 | Q.   And then, finally, you were asked some questions about |
| 11:23 | 15 | the issue about confidentiality and identity of inventors. |
| 11:23 | 16 | If you'd look at Exhibit 24323, the Mattel inventor's |
| 11:23 | 17 | awards program. |
| 11:23 | 18 | *(Document provided to the witness.)* |
| 11:23 | 19 | *(Document displayed.)* |
| 11:23 | 20 | BY MR. QUINN: |
| 11:23 | 21 | Q.   You indicated this was for an event that Mattel |
| 11:23 | 22 | sponsors, where these inventors are recognized? |
| 11:23 | 23 | A.   Yes. |
| 11:23 | 24 | Q.   Now, do you see on this anywhere something that says -- |
| 11:23 | 25 | stamped, "Confidential.  Not to be disclosed to anyone |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 125 of 167   Page ID #:309385
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

125

| | | |
|---|---|---|
| 11:24 | 1 | outside the company?" |
| 11:24 | 2 | A.   No. |
| 11:24 | 3 | Q.   Do people -- so far as you know, people who receive |
| 11:24 | 4 | this brochure, recognizing inventors, are they required to |
| 11:24 | 5 | sign some nondisclosure agreement? |
| 11:24 | 6 | A.   Not to my knowledge. |
| 11:24 | 7 | Q.   Have you actually been to this event, yourself? |
| 11:24 | 8 | A.   I have. |
| 11:24 | 9 | Q.   Did you -- were you asked to sign a nondisclosure |
| 11:24 | 10 | agreement not to tell anybody who the inventors are -- |
| 11:24 | 11 | MS. KELLER:  Objection. |
| 11:24 | 12 | BY MR. QUINN: |
| 11:24 | 13 | Q.   -- that Mattel is recognizing? |
| 11:24 | 14 | MS. KELLER:  Assumes facts not in evidence that |
| 11:24 | 15 | "all inventors"... |
| 11:24 | 16 | THE COURT:  Well, it depends on where he's going |
| 11:24 | 17 | in toy fair.  It's too broad.  Is he going into a |
| 11:25 | 18 | competitor's showroom and being asked to sign a |
| 11:25 | 19 | nondisclosure?  Is this his own showroom? |
| 11:25 | 20 | MR. QUINN:  No. |
| 11:25 | 21 | THE COURT:  I'm going to sustain the objection. |
| 11:25 | 22 | MR. QUINN:  Your Honor, I'm sorry. |
| 11:25 | 23 | BY MR. QUINN: |
| 11:25 | 24 | Q.   This inventor's award brochure that we're looking at, |
| 11:25 | 25 | that's not something -- that's an event where Mattel |

| | | |
|---|---|---|
| 11:25 | 1 | recognizes inventors? |
| 11:25 | 2 | A.   Right.  At our pre-toy fair. |
| 11:25 | 3 | MR. QUINN:  And if we could maybe look at a couple |
| 11:25 | 4 | of those pages, Ken. |
| 11:25 | 5 | *(Various documents displayed.)* |
| 11:59 | 6 | BY MR. QUINN: |
| 11:25 | 7 | Q.   Have you been to this event? |
| 11:25 | 8 | A.   Yes, I have. |
| 11:25 | 9 | Q.   And was this brochure handed out to the people who were |
| 11:25 | 10 | there present? |
| 11:25 | 11 | A.   Yes. |
| 11:25 | 12 | Q.   Uh, were you asked to sign a nondisclosure agreement |
| 11:25 | 13 | that you wouldn't identify to anyone these inventors |
| 11:25 | 14 | associated with these toys? |
| 11:25 | 15 | A.   No. |
| 11:25 | 16 | Q.   And, uh, you indicated that Mattel works with a small |
| 11:25 | 17 | community of inventors.  Does this include -- in addition to |
| 11:25 | 18 | these inventor houses, as you described them, does it also |
| 11:25 | 19 | include -- include some individuals? |
| 11:26 | 20 | A.   It does. |
| 11:26 | 21 | Q.   And you were asked about Norman and Arlene Fabricant. |
| 11:26 | 22 | Are they among this group of community -- of inventors who |
| 11:26 | 23 | Mattel works with? |
| 11:26 | 24 | A.   Yes. |
| 11:26 | 25 | Q.   And has some experience with and some basis to trust? |

| 11:26 | 1 | A.   Yes. |
|---|---|---|

11:26    1    A.   Yes.

11:26    2    Q.   Similarly for Joe Wetherell:  Is he another one who's a

11:26    3    member of this small community who Mattel has experience

11:26    4    with?

11:26    5    A.   Yes.

11:26    6          MS. KELLER:  Objection.  Repeatedly leading,

11:26    7    Your Honor.

11:26    8          THE COURT:  Overruled.

11:26    9    BY MR. QUINN:

11:26   10    Q.   How about Maurene Souza?

11:26   11    A.   Yes.

11:26   12    Q.   For any of these inventors, do you have any reason to

11:26   13    believe that any of them were ever an employee of a

11:26   14    competing toy company when they came to Mattel with a toy

11:26   15    design?

11:26   16          MS. KELLER:  Objection.  No foundation.

11:26   17          THE COURT:  Overruled.

11:26   18          You can answer that question.

11:26   19          THE WITNESS:  They were not.

        20    BY MR. QUINN:

11:26   21    Q.   How do you know that?

11:26   22    A.   Because we know these people.  And we would never look

11:26   23    at a product from somebody working from -- for another toy

11:26   24    company.

11:27   25          THE COURT:  (To the jury:)  Now, this is his

Case 2:04-cv-09049-DOC-RNB  Document 10204  Filed 03/16/11  Page 128 of 167  Page ID #:309388
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

128

| 11:27 | 1 | opinion.  I'll allow him to cast his opinion. |
|---|---|---|
| 11:27 | 2 | MR. QUINN:  Nothing further. |
| 11:27 | 3 | THE COURT:  All right.  Ladies and gentlemen, if |
| 11:27 | 4 | you would excuse yourself for just a moment.  Give me about |
| 11:27 | 5 | five minutes, and we'll come and get you immediately. |
| 11:27 | 6 | You're admonished not to discuss this matter |
| 11:27 | 7 | amongst yourselves, nor form or express any opinion |
| 11:27 | 8 | concerning the case. |
| 11:27 | 9 | Counsel, if you would remain for just a moment. |
| 11:27 | 10 | *(Jury recesses at 11:27 p.m.)* |
| 11:27 | 11 | *(Outside the presence of the jury.)* |
| 11:27 | 12 | THE COURT:  All right.  Mr. Friedman, if you would |
| 11:27 | 13 | have a seat. |
| 11:27 | 14 | Normally, I would extend the same admonition; and |
| 11:27 | 15 | that is, that you're to remain available until May 7th.  But |
| 11:27 | 16 | I heard that you were recently retiring within the next week |
| 11:27 | 17 | or two. |
| 11:27 | 18 | THE WITNESS:  Yes. |
| 11:27 | 19 | THE COURT:  I don't know what your future plans |
| 11:27 | 20 | is -- are -- I'm sorry -- but I'm going to require you to |
| 11:28 | 21 | remain available until April 11th. |
| 11:28 | 22 | If you have a planned vacation, cancel it.  If |
| 11:28 | 23 | you're leaving the country or the state, cancel it.  I want |
| 11:28 | 24 | you within 24 hours' call. |
| 11:28 | 25 | Is that understood? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 129 of 167   Page ID #:309389
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

129

| | | |
|---|---|---|
| 11:28 | 1 | THE WITNESS:  Yes, sir. |
| 11:28 | 2 | THE COURT:  Okay.  Now, let me pay you the |
| 11:28 | 3 | courtesy of telling you why. |
| 11:28 | 4 | I want to be cautious with my record, but I'm, |
| 11:28 | 5 | let's say, concerned about some *in camera* testimony I heard |
| 11:28 | 6 | yesterday from members of your legal department, |
| 11:28 | 7 | specifically Mr. Moore.  I'm not ready to make findings yet, |
| 11:28 | 8 | but I'm deeply concerned.  I'm going to cause a deposition. |
| 11:28 | 9 | I went through six boxes of information last night after |
| 11:28 | 10 | counsel left about 10:00 o'clock.  And it's apparent to me |
| 11:28 | 11 | that he's intimately involved in every single decision; and |
| 11:28 | 12 | yet, there's an extraordinary lapse of memory concerning |
| 11:28 | 13 | some of the questions the Court asked.  So I don't know if |
| 11:28 | 14 | you're being insulated.  I don't know where this |
| 11:28 | 15 | information -- why it's not available through Mr. Moore. |
| 11:28 | 16 | I'm still -- the jury is still out, as far as I'm |
| 11:28 | 17 | concerned, which means I'm still out, concerning |
| 11:28 | 18 | Mr. Normile.  I'm not certain if he was generally struggling |
| 11:28 | 19 | to recall last night, but I'm not satisfied, as you can |
| 11:29 | 20 | hear, with at least one member of your legal department. |
| 11:29 | 21 | Okay.  Hopefully, you're being insulated.  We'll |
| 11:29 | 22 | see.  Thank you very much. |
| 11:29 | 23 | MR. QUINN:  Your Honor, may I say one thing? |
| 11:29 | 24 | THE COURT:  No, you may not, Counsel. |
| 11:29 | 25 | MR. QUINN:  The -- |

| | | |
|---|---|---|
| 11:29 | 1 | THE COURT:  You may not say a word. |
| 11:29 | 2 | Maybe just one more time.  Maybe that's too abrupt |
| 11:29 | 3 | on my part, but that's the record I'm making. |
| 11:29 | 4 | MR. QUINN:  He has a honeymoon planned, |
| 11:29 | 5 | Your Honor. |
| 11:29 | 6 | THE COURT:  Oh.  When? |
| 11:29 | 7 | THE WITNESS:  April 15th. |
| 11:29 | 8 | THE COURT:  You're going.  Plan on it. |
| 11:29 | 9 | THE WITNESS:  Okay. |
| 11:29 | 10 | THE COURT:  Okay. |
| 11:29 | 11 | MR. QUINN:  Thank you, Your Honor. |
| 11:29 | 12 | THE COURT:  In fact, up until April, let's say -- |
| 11:29 | 13 | keep your honeymoon. |
| 11:29 | 14 | THE WITNESS:  Thank you.  Thank you very much. |
| 11:29 | 15 | THE COURT:  That Tuesday -- in fact, I think we |
| 11:29 | 16 | can pretty safely let you go by April 1st.  Okay.  But I |
| 11:29 | 17 | don't want to have to hunt for you.  You're the one witness |
| 11:30 | 18 | who's going to remain available. |
| 11:30 | 19 | THE WITNESS:  Everybody -- everybody knows how to |
| 11:30 | 20 | get ahold of me, sir. |
| 11:30 | 21 | THE COURT:  Okay. |
| 11:30 | 22 | THE WITNESS:  Thank you, Your Honor. |
| 11:30 | 23 | THE COURT:  I didn't want to have that admonition |
| 11:30 | 24 | in front of the jury, though.  I think it would be |
| 11:30 | 25 | prejudicial if they heard this, but you're going to be |

131

| | | |
|---|---|---|
| 11:30 | 1 | available. |
| 11:30 | 2 | THE WITNESS:  Okay. |
| 11:30 | 3 | MR. QUINN:  Your Honor -- |
| 11:30 | 4 | THE COURT:  I'll know more after Saturday, after |
| 11:30 | 5 | the deposition. |
| 11:30 | 6 | THE WITNESS:  Okay. |
| 11:30 | 7 | THE COURT:  Maybe some members will return.  Okay. |
| 11:30 | 8 | *(Jury returns to the courtroom.)* |
| 11:30 | 9 | *(In the presence of the jury.)* |
| 11:30 | 10 | THE COURT:  All right.  The jury's present, the |
| 11:30 | 11 | alternates. |
| 11:30 | 12 | Mr. Friedman, thank you very much, sir.  If you |
| 11:30 | 13 | would remain available and -- thank you very much, sir.  You |
| 11:30 | 14 | may step down. |
| 11:30 | 15 | THE WITNESS:  Thank you, Your Honor. |
| 11:30 | 16 | THE COURT:  Thank you. |
| 11:30 | 17 | *(Witness steps down subject to recall.)* |
| 11:31 | 18 | THE COURT:  Counsel, your next witness. |
| 11:31 | 19 | MR. McCONVILLE:  MGA calls Margaret Leahy. |
| 11:31 | 20 | THE COURT:  Thank you. |
| 11:31 | 21 | Margaret Leahy, please. |
| 11:31 | 22 | Thank you.  Ms. Leahy, would you raise your right |
| 11:31 | 23 | hand, please. |
| 11:31 | 24 | **MARGARET ANNE LEAHY, MGA'S WITNESS, SWORN** |
| 11:31 | 25 | THE WITNESS:  I do. |

Case 2:04-cv-09049-DOC-RNB  Document 10204  Filed 03/16/11  Page 132 of 167  Page ID #:309392
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

132

| | | |
|---|---|---|
| 11:31 | 1 | THE COURT:  Thank you.  If you would walk along |
| 11:31 | 2 | the side of the box.  And there's an entrance to the witness |
| 11:31 | 3 | box right here. |
| 11:31 | 4 | If you would please be seated. |
| 11:31 | 5 | Now, you're going to have to pull that chair, as |
| 11:31 | 6 | best you can, forward.  It's hard to move. |
| 11:32 | 7 | THE WITNESS:  Okay.  Thank you. |
| 11:32 | 8 | THE COURT:  Okay.  Would you state your full name |
| 11:32 | 9 | for the jury, please. |
| 11:32 | 10 | THE WITNESS:  Margaret Anne Leahy. |
| 11:32 | 11 | THE COURT:  Would you spell your last name, |
| 11:32 | 12 | please. |
| 11:32 | 13 | THE WITNESS:  L-E-A-H-Y. |
| 11:32 | 14 | THE COURT:  Thank you. |
| 11:32 | 15 | This is Direct Examination by Mr. McConville on |
| 11:32 | 16 | behalf of MGA. |
| 11:32 | 17 | **DIRECT EXAMINATION** |
| 11:32 | 18 | BY MR. McCONVILLE: |
| 11:32 | 19 | Q.   Good morning, Ms. Leahy. |
| 11:32 | 20 | A.   Good morning. |
| 11:32 | 21 | Q.   Could you please tell us what you do for a living? |
| 11:32 | 22 | A.   I make toy prototypes.  I'm a sculptor. |
| 11:32 | 23 | Q.   How long have you been a sculptor? |
| 11:32 | 24 | A.   Um, since 1985. |
| 11:32 | 25 | Q.   And did you have any formal education on how to become |

| 11:32 | 1  | a sculptor? |
| 11:32 | 2  | A.   Yes.  I have a Bachelor of Fine Arts, with a sculpting |
| 11:32 | 3  | degree from Virginia Commonwealth University. |
| 11:32 | 4  | Q.   When did you receive that degree? |
| 11:32 | 5  | A.   1988. |
| 11:32 | 6  | Q.   And after receiving that degree, did you begin working |
| 11:33 | 7  | as a sculptor? |
| 11:33 | 8  | A.   Yes.  I had a job at a place called Frame-O-Rama. |
| 11:33 | 9  | Q.   Okay.  And have you -- putting aside Frame-O-Rama, let |
| 11:33 | 10 | me ask you a broader question.  Have you worked as a |
| 11:33 | 11 | sculptor since the time of your graduation? |
| 11:33 | 12 | A.   Yes.  Luckily, I have. |
| 11:33 | 13 | Q.   What have you done since the time of your graduation in |
| 11:33 | 14 | your work as a sculptor? |
| 11:33 | 15 | A.   At first, I started working on very big exhibits for |
| 11:33 | 16 | museums, like the National History Museum in San Francisco. |
| 11:33 | 17 | Then, I moved to Los Angeles. |
| 11:33 | 18 | Q.   I'm sorry.  Were you doing toy sculpting for -- |
| 11:33 | 19 | A.   No.  It's -- |
| 11:33 | 20 |         THE COURT:  Strike the question and strike the |
| 11:33 | 21 | answer. |
| 11:33 | 22 |         Counsel, your question again. |
| 11:33 | 23 | BY MR. McCONVILLE: |
| 11:33 | 24 | Q.   Were you sculpting toys for the Natural History Museum? |
| 11:33 | 25 | A.   No, I was not. |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 134 of 167   Page ID #:309394
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

134

| | | |
|---|---|---|
| 11:33 | 1 | Q.   Okay.  What were you doing for the Natural History |
| 11:33 | 2 | Museum? |
| 11:33 | 3 | A.   Permanent exhibits of the cretaceous era and the coal |
| 11:33 | 4 | forests. |
| 11:33 | 5 | Q.   And at some point, did you begin sculpting toys? |
| 11:34 | 6 | A.   Yes, I did. |
| 11:34 | 7 | Q.   Could you please describe for us what a sculptor does |
| 11:34 | 8 | in the toy-making process? |
| 11:34 | 9 | A.   What a sculptor does, is make the three-dimensional |
| 11:34 | 10 | prototype of a designer's vision.  And then it is |
| 11:34 | 11 | producible, and they send it to the factory, and it's |
| 11:34 | 12 | produced -- mass-produced. |
| 11:34 | 13 | Q.   So your job is to make the first prototype from |
| 11:34 | 14 | whatever the designer has conceived; is that a fair summary? |
| 11:34 | 15 | A.   That's a fair summary. |
| 11:34 | 16 | Q.   And do you have a specialty within -- and how long have |
| 11:34 | 17 | you been a toy sculptor?  I'm sorry. |
| 11:34 | 18 | A.   Since 1994. |
| 11:34 | 19 | Q.   And since 1994, do you have a specialty of a type of |
| 11:34 | 20 | toy that you sculpt? |
| 11:34 | 21 | A.   I sculpt girls toys.  That's been my forte since I |
| 11:34 | 22 | started toys. |
| 11:34 | 23 | Q.   And have you had -- have you worked for different toy |
| 11:35 | 24 | companies in the course of your career? |
| 11:35 | 25 | A.   Yes, many. |

| | | |
|---|---|---|
| 11:35 | 1 | Q.   Have you ever worked for Mattel? |
| 11:35 | 2 | A.   Yes, I did.  I did work at Mattel. |
| 11:35 | 3 | Q.   When did you work at Mattel? |
| 11:35 | 4 | A.   I worked there from 1994 to 2000. |
| 11:35 | 5 | Q.   What was your position at Mattel when you left in 2000? |
| 11:35 | 6 | A.   I was a manager of the Disney Group. |
| 11:35 | 7 | Q.   Okay.  And what were some of the projects you worked on |
| 11:35 | 8 | in your -- is it six years you were at Mattel? |
| 11:35 | 9 | A.   Roughly. |
| 11:35 | 10 | Q.   Okay.  What were some of the toys that you worked on |
| 11:35 | 11 | while you were at Mattel? |
| 11:35 | 12 | A.   I worked on many, many Disney toys.  Um, specifically, |
| 11:35 | 13 | I can remember Ariel.  I've done Cinderella, Snow White, all |
| 11:35 | 14 | Ariel's little friends, all of Snow White's little friends, |
| 11:36 | 15 | evil queen from Snow White, Maleficent from Sleeping Beauty. |
| 11:36 | 16 | She's the dragon.  The evil queen from Sleeping Beauty -- |
| 11:36 | 17 | Q.   I don't want to cut you off 'cause it sounds like the |
| 11:36 | 18 | list is long. |
| 11:36 | 19 | A.   It's a long list. |
| 11:36 | 20 | Q.   Did -- but is that a fair sample of the products -- |
| 11:36 | 21 | types of products you worked on? |
| 11:36 | 22 | A.   Yes. |
| 11:36 | 23 | Q.   Did you -- did you sculpt the entire doll in that |
| 11:36 | 24 | process when you were working at Mattel? |
| 11:36 | 25 | A.   Normally, at Mattel, they would use various Barbie |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 136 of 167   Page ID #:309396
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

136

| | | |
|---|---|---|
| 11:36 | 1 | bodies that were already produced; but occasionally, we |
| 11:36 | 2 | would change arms or legs or make a neck longer.  I always |
| 11:36 | 3 | did moor heads, but never a body from start to finish; just |
| 11:36 | 4 | parts -- parts of a -- bodies -- of the bodies.  But we had |
| 11:36 | 5 | a big group.  And all of them -- we all worked on the |
| 11:36 | 6 | projects together. |
| 11:36 | 7 | Q.   Okay.  And who was your supervisor at Mattel when you |
| 11:36 | 8 | left in 2000? |
| 11:36 | 9 | A.   My supervisor was Michael Hebden, H-E-B-D-E-N. |
| 11:37 | 10 | Q.   How much money did you -- were you making at Mattel in, |
| 11:37 | 11 | say, 2000, if you remember? |
| 11:37 | 12 | A.   Somewhere between 80- and 90,000, I believe. |
| 11:37 | 13 | Q.   Okay.  And while you were employed at Mattel, did you |
| 11:37 | 14 | work jobs on the side outside of Mattel? |
| 11:37 | 15 | MR. PRICE:  Objection -- |
| 11:37 | 16 | THE WITNESS:  Occasionally. |
| 11:37 | 17 | MR. PRICE:  -- irrelevant. |
| 11:37 | 18 | THE COURT:  Overruled. |
| 11:37 | 19 | BY MR. McCONVILLE: |
| 11:37 | 20 | Q.   I'm sorry? |
| 11:37 | 21 | A.   Occasionally. |
| 11:37 | 22 | Q.   And why did you work these jobs on the side? |
| 11:37 | 23 | A.   To make extra money. |
| 11:37 | 24 | Q.   Did Mr. Hebden, your supervisor, know about your doing |
| 11:37 | 25 | work on the side? |

| | | |
|--|--|--|
| 11:37 | 1 | A.    He didn't know when I was specifically doing it, but he |
| 11:37 | 2 | knew I would do it, occasionally. |
| 11:37 | 3 | Q.    What -- please explain that answer. |
| 11:38 | 4 | A.    He knew that sculptors -- even he had done stuff -- |
| 11:38 | 5 | MR. PRICE:  Objection.  Now, we're talking about |
| 11:38 | 6 | hearsay. |
| 11:38 | 7 | THE COURT:  Overruled. |
| 11:38 | 8 | You can answer the question. |
| 11:38 | 9 | THE WITNESS:  Can you ask the question again? |
| 11:38 | 10 | BY MR. McCONVILLE: |
| 11:38 | 11 | Q.    Sure.  You said that Mr. Hebden doesn't know -- I'm |
| 11:38 | 12 | paraphrasing here -- but he was aware.  And my question is |
| 11:38 | 13 | how do you know Mr. Hebden was aware? |
| 11:38 | 14 | A.    That I was doing work on the outside? |
| 11:38 | 15 | Q.    Yes. |
| 11:38 | 16 | A.    He told me how to get work on the outside. |
| 11:38 | 17 | Q.    What do you mean he told you how to? |
| 11:38 | 18 | A.    I had, uh, money problems.  My husband wasn't working |
| 11:38 | 19 | at the time, and I needed extra money.  And he suggested |
| 11:38 | 20 | this is the way that you do it.  This is the way that you |
| 11:38 | 21 | get extra work on the outside of Mattel. |
| 11:38 | 22 | Q.    Mr. Hebden told you that? |
| 11:38 | 23 | A.    Yes, he did. |
| 11:38 | 24 | Q.    And in your years employed at Mattel, were there other |
| 11:38 | 25 | Mattel employees who were also moonlighting on the side? |

| | | |
|--|--|--|
| 11:39 | 1 | MR. PRICE:  Objection.  Lack of foundation. |
| 11:39 | 2 | THE COURT:  Overruled. |
| 11:39 | 3 | THE WITNESS:  Yes.  There were quite a few. |
| 11:59 | 4 | BY MR. McCONVILLE: |
| 11:39 | 5 | Q.   Was it a common practice at Mattel? |
| 11:39 | 6 | MR. PRICE:  Objection.  Lack of foundation |
| 11:39 | 7 | THE COURT:  Overruled. |
| 11:39 | 8 | THE WITNESS:  It was a common practice. |
| 11:39 | 9 | BY MR. McCONVILLE: |
| 11:39 | 10 | Q.   And, I think, you ultimately said you left Mattel in |
| 11:39 | 11 | 2000.  Why did you leave Mattel? |
| 11:39 | 12 | A.   We had just adopted my newborn daughter, and I had to |
| 11:39 | 13 | drive quite a way to get to Mattel.  And I wanted to be home |
| 11:39 | 14 | to be closer to my daughter and spend more time with her. |
| 11:39 | 15 | Q.   Do you recall when it was you resigned from Mattel in |
| 11:39 | 16 | 2000? |
| 11:39 | 17 | A.   It was in September. |
| 11:39 | 18 | MR. McCONVILLE:  Could we please show Ms. Leahy |
| 11:39 | 19 | Exhibit 1123. |
| 11:39 | 20 | *(Document provided to the witness.)* |
| 11:39 | 21 | BY MR. McCONVILLE: |
| 11:40 | 22 | Q.   I'll ask you if you recognize this exhibit? |
| 11:40 | 23 | A.   Yes, I do. |
| 11:40 | 24 | Q.   What, is it? |
| 11:40 | 25 | A.   It's my resignation letter from Mattel. |

| 11:40 | 1 | MR. McCONVILLE:  Your Honor, offer 1123 into |
|---|---|---|
| 11:40 | 2 | evidence. |
| 11:40 | 3 | THE COURT:  Received. |
| 11:40 | 4 | *(Exhibit No. 1123 received in evidence.)* |
| 11:40 | 5 | *(Document displayed.)* |
| 11:40 | 6 | MR. McCONVILLE:  If you could just highlight that |
| 11:40 | 7 | language, please. |
| 11:40 | 8 | *(Technician complies.)* |
| 11:40 | 9 | BY MR. McCONVILLE: |
| 11:40 | 10 | Q.   It says -- Let me see here -- what's the date of the |
| 11:40 | 11 | letter?  What's the date? |
| 11:40 | 12 | A.   August 22nd. |
| 11:40 | 13 | Q.   Okay.  And it says, "I have made the decision to resign |
| 11:40 | 14 | from my position here at Mattel so I can stay at home to be |
| 11:40 | 15 | with my daughter." |
| 11:40 | 16 | What was your daughter's name? |
| 11:40 | 17 | A.   My daughter's name was Fiona. |
| 11:40 | 18 | Q.   "My job here has been exceptional since you have taken |
| 11:40 | 19 | charge of the department, and I will be sorry to leave." |
| 11:40 | 20 | And then it goes on to say, "My last day will be |
| 11:41 | 21 | September 5th." |
| 11:41 | 22 | Were you excited to be leaving Mattel in the summer |
| 11:41 | 23 | 2000? |
| 11:41 | 24 | A.   I was very sad to leave Mattel. |
| 11:41 | 25 | Q.   Why is that? |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 140 of 167   Page ID #:309400
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

140

| 11:41 | 1 | A.    Because I really loved the group I worked with, and I |
|---|---|---|
| 11:41 | 2 | really loved the job and the camaraderie between the |
| 11:41 | 3 | sculpting department.  And I also enjoyed everybody in the |
| 11:41 | 4 | Disney Group, as well. |
| 11:41 | 5 | Q.    Within Mattel? |
| 11:41 | 6 | A.    Within Mattel, yes. |
| 11:41 | 7 | Q.    Okay.  And it looks like the letter's dated August 22, |
| 11:41 | 8 | 2000; your last day was September 5th, 2000. |
| 11:41 | 9 |       Was it -- were you giving two week's notice? |
| 11:41 | 10 | A.    Yes. |
| 11:41 | 11 | Q.    Okay.  And after you -- you ultimately left around |
| 11:41 | 12 | September 5th; is that right? |
| 11:41 | 13 | A.    Yes. |
| 11:41 | 14 | Q.    And what -- did you continue to work as a sculptor |
| 11:41 | 15 | after September 5th? |
| 11:41 | 16 | A.    Yes, I did. |
| 11:41 | 17 | Q.    What did you do after leaving Mattel? |
| 11:42 | 18 | A.    After I left Mattel, I worked freelance. |
| 11:42 | 19 | Q.    What does that mean? |
| 11:42 | 20 | A.    It means -- um, my first job was the Bratz.  Carter |
| 11:42 | 21 | called me -- Carter Bryant -- and -- |
| 11:42 | 22 | Q.    Hold on.  I'm sorry.  I don't want to cut you off. |
| 11:42 | 23 |       What does "freelancing" mean? |
| 11:42 | 24 | A.    Oh. |
| 11:42 | 25 | Q.    Where -- where were you working? |

| | | |
|---|---|---|
| 11:42 | 1 | A.   I was working at home, for myself.  So many different |
| 11:42 | 2 | clients would call me and say, "I have a job for you to do." |
| 11:42 | 3 | And then I would execute the job and get paid and move on. |
| 11:42 | 4 | Q.   I think you said -- were you doing the work out of your |
| 11:42 | 5 | house? |
| 11:42 | 6 | A.   Yes, I was. |
| 11:42 | 7 | Q.   So I think you said you'd done some work for MGA.  Did |
| 11:42 | 8 | you do any work for other toy companies while you were a |
| 11:42 | 9 | freelancer? |
| 11:42 | 10 | A.   Yes, many companies. |
| 11:42 | 11 | Q.   Could you name some of them? |
| 11:42 | 12 | A.   Well, Jakks Pacific, Disney Consumer Products, um, |
| 11:42 | 13 | there was Play Along Toys. |
| 11:42 | 14 | Q.   Did you do any work for Mattel while you were a |
| 11:42 | 15 | freelancer? |
| 11:42 | 16 | A.   Very little work, but I did a few jobs here and there |
| 11:43 | 17 | for them. |
| 11:43 | 18 | Q.   And how long were you a -- well, at some point, did you |
| 11:43 | 19 | stop being a freelancer? |
| 11:43 | 20 | A.   Yes. |
| 11:43 | 21 | Q.   What -- when was that? |
| 11:43 | 22 | A.   That was in 2005. |
| 11:43 | 23 | Q.   And what did you do in 2005 after stopping as a |
| 11:43 | 24 | freelancer? |
| 11:43 | 25 | A.   I took a job at Mattel -- I'm sorry -- MGA as a |

DEBBIE GALE, U.S. COURT REPORTER

| 11:43 | 1 | full-time sculptor. |
| 11:43 | 2 | Q.   So in 2005 you began working at MGA as a full-time |
| 11:43 | 3 | sculptor? |
| 11:43 | 4 | A.   Correct. |
| 11:43 | 5 | Q.   Did you work on the Bratz projects after the 2005 |
| 11:43 | 6 | timeframe? |
| 11:43 | 7 | A.   I did not work on any Bratz after 2005.  I was in a |
| 11:43 | 8 | different group. |
| 11:43 | 9 | Q.   Okay.  And then -- are you still employed by MGA |
| 11:43 | 10 | currently? |
| 11:43 | 11 | A.   No, I'm not. |
| 11:43 | 12 | Q.   Did you -- there -- was there a time when you left MGA? |
| 11:43 | 13 | A.   Yes.  I left MGA in 2007. |
| 11:43 | 14 | Q.   And where did you go then? |
| 11:43 | 15 | A.   I went to work at the Disney Store. |
| 11:43 | 16 | Q.   As a sculptor? |
| 11:43 | 17 | A.   As a sculptor. |
| 11:43 | 18 | Q.   And what did you, uh -- when was that? |
| 11:44 | 19 | A.   I believe it was April or -- no -- it was March 2009 -- |
| 11:44 | 20 | no -- 2007. |
| 11:44 | 21 | Q.   March 2007, you left MGA to go work for the Disney |
| 11:44 | 22 | Store, right? |
| 11:44 | 23 | A.   Yes. |
| 11:44 | 24 | Q.   And why did you leave MGA? |
| 11:44 | 25 | A.   I didn't want to leave MGA.  But I've always wanted to |

| 11:44 | 1 | work at Disney proper, Disney, the company.  So it was an |
| 11:44 | 2 | ideal job.  It was a ground-floor operation at the time. |
| 11:44 | 3 | And I really wanted to take the job.  It was also in |
| 11:44 | 4 | Pasadena, which is close to where my daughter's school was |
| 11:44 | 5 | so I could go have lunch with her and be closer to her. |
| 11:44 | 6 | Q.   And do you still work at the Disney Store now? |
| 11:44 | 7 | A.   No, I do not. |
| 11:44 | 8 | Q.   And when did you leave there? |
| 11:44 | 9 | A.   I left there in June of 2009, roughly. |
| 11:44 | 10 | Q.   Why did you leave Disney? |
| 11:45 | 11 | MR. PRICE:  Objection to relevance. |
| 11:45 | 12 | MR. McCONVILLE:  That's all right.  Never mind. |
| 11:59 | 13 | BY MR. McCONVILLE: |
| 11:45 | 14 | Q.   What are you doing now? |
| 11:45 | 15 | A.   Now, I'm freelance again. |
| 11:45 | 16 | Q.   Okay.  Okay.  So let's go back now.  You said, when I |
| 11:45 | 17 | asked you earlier -- after you resigned from Mattel in |
| 11:45 | 18 | September 2000, you said you got a call from Carter Bryant. |
| 11:45 | 19 | Do you remember that testimony? |
| 11:45 | 20 | A.   Yes, I did. |
| 11:45 | 21 | Q.   Okay.  So tell me, did you -- did you get a call from |
| 11:45 | 22 | Carter Bryant in the September 2000 timeframe? |
| 11:45 | 23 | A.   Yes, I did. |
| 11:45 | 24 | Q.   Did you know Carter Bryant when you were at Mattel? |
| 11:45 | 25 | A.   I only knew him from passing in the halls, and I knew |

| | | |
|---|---|---|
| 11:45 | 1 | he worked in the Collector Group.  But right before I left, |
| 11:45 | 2 | he had brought a job to the sculpting department, and I was |
| 11:45 | 3 | in charge of it, so we had a brief meeting about the job he |
| 11:45 | 4 | was working on. |
| 11:45 | 5 | Q.   That was while you were still at Mattel? |
| 11:45 | 6 | A.   While I was still at Mattel.  And that's the only |
| 11:45 | 7 | interaction I ever had with him. |
| 11:45 | 8 | Q.   Okay.  So then you resigned from Mattel September 5th, |
| 11:46 | 9 | 2000.  Tell us -- I think you said you got a phone call from |
| 11:46 | 10 | Carter Bryant sometime after September 5th, 2000, right? |
| 11:46 | 11 | A.   Correct. |
| 11:46 | 12 | Q.   So tell me about the phone call. |
| 11:46 | 13 | A.   He said -- Carter said he had a job he was -- wanted me |
| 11:46 | 14 | to work on.  Um, it was a fashion doll.  And that was about |
| 11:46 | 15 | it. |
| 11:46 | 16 | Q.   Do you remember when that call was, roughly? |
| 11:46 | 17 | A.   Roughly, it -- maybe a week or so after I left. |
| 11:46 | 18 | Q.   So in the mid September timeframe? |
| 11:46 | 19 | A.   Yes. |
| 11:46 | 20 | Q.   Okay.  And you said he said that -- Carter Bryant told |
| 11:46 | 21 | you he had a project he wanted to work on? |
| 11:46 | 22 | A.   Yes. |
| 11:46 | 23 | Q.   Did he tell you the name of the project? |
| 11:46 | 24 | A.   He did not tell me the name of the project. |
| 11:46 | 25 | Q.   Did he tell you, uh, who the project would be for? |

| 11:46 | 1 | A.    Yes.  He said the project was for a company called |
| 11:46 | 2 | "MGA," which I had not heard of at the time. |
| 11:46 | 3 | Q.    Okay.  And so how long did this phone call last with |
| 11:46 | 4 | Carter Bryant? |
| 11:46 | 5 | A.    Few minutes. |
| 11:46 | 6 | Q.    And then after that phone call, the mid September phone |
| 11:47 | 7 | call, did you have a meeting with Mr. Bryant? |
| 11:47 | 8 | A.    Yes, I did. |
| 11:47 | 9 | Q.    When was your first meeting with Mr. Bryant after that |
| 11:47 | 10 | phone call? |
| 11:47 | 11 | A.    I'm not sure of the exact date. |
| 11:47 | 12 | Q.    Do you remember if it was in -- a week or so of the |
| 11:47 | 13 | call?  I mean, put -- putting exact date aside -- |
| 11:47 | 14 | A.    Okay. |
| 11:47 | 15 | Q.    -- give us your best estimate for when that meeting |
| 11:47 | 16 | occurred with Carter Bryant. |
| 11:47 | 17 | A.    Best estimate would be a week or so. |
| 11:47 | 18 | Q.    Okay.  So -- and where did you meet with Mr. Bryant? |
| 11:47 | 19 | A.    At my house. |
| 11:47 | 20 | Q.    And how long did that meeting last? |
| 11:47 | 21 | A.    Maybe half an hour. |
| 11:47 | 22 | Q.    And what did you discuss at the meeting? |
| 11:47 | 23 | A.    We discussed my daughter, 'cause I had her with me, and |
| 11:47 | 24 | we discussed his project that he had. |
| 11:47 | 25 | Q.    Okay.  Did you -- did -- what did he describe for you |

CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

146

| | | |
|---|---|---|
| 11:47 | 1 | about the project? |
| 11:48 | 2 | A.   He said it was a fashion doll.  He had some rough |
| 11:48 | 3 | drawings and -- |
| 11:48 | 4 | Q.   Okay.  Maybe we can put in front of you Exhibit 12118. |
| 11:48 | 5 | *(Document provided to the witness.)* |
| 11:48 | 6 | BY MR. McCONVILLE: |
| 11:48 | 7 | Q.   So you said Carter Bryant gave you, um, some drawings |
| 11:48 | 8 | at this meeting that you had with him. |
| 11:48 | 9 | I'm gonna -- is it fair to say it was third week of |
| 11:48 | 10 | September? |
| 11:48 | 11 | A.   That's fair to say. |
| 11:48 | 12 | Q.   Okay.  So this meeting the third week of September, he |
| 11:48 | 13 | gave you some drawings while he was describing the project? |
| 11:48 | 14 | A.   Correct. |
| 11:48 | 15 | Q.   Now, in front of you is an exhibit that I know you've |
| 11:48 | 16 | looked at.  Um -- well, let me ask you this: |
| 11:48 | 17 | Prior to testifying today, you and I have met, right? |
| 11:48 | 18 | A.   Correct. |
| 11:48 | 19 | Q.   Okay.  And you've met with some of the other lawyers |
| 11:48 | 20 | who represent MGA, right? |
| 11:48 | 21 | A.   Yes, I have. |
| 11:48 | 22 | Q.   Okay.  So prior to, uh, testifying today, you looked at |
| 11:49 | 23 | this exhibit, right? |
| 11:49 | 24 | A.   Right. |
| 11:49 | 25 | Q.   And I think you identified some of the pages you could |

Case 2:04-cv-09049-DOC-RNB Document 10204 Filed 03/16/11 Page 147 of 167 Page ID #:309407
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

147

| | | |
|---|---|---|
| 11:49 | 1 | recall as drawings that Carter Bryant had given you at that |
| 11:49 | 2 | meeting, the third week of September-ish. |
| 11:49 | 3 | So why -- could you -- why don't you take a look at |
| 11:49 | 4 | 12118. |
| 11:49 | 5 | THE COURT:  Counsel, she didn't say the "third |
| 11:49 | 6 | week of September-ish." |
| 11:49 | 7 | MR. McCONVILLE:  I asked her if that was a fair |
| 11:49 | 8 | estimate. |
| 11:49 | 9 | THE COURT:  Fair estimate? |
| 11:49 | 10 | MR. McCONVILLE:  And she agreed with me. |
| 11:49 | 11 | THE WITNESS:  Yes. |
| 11:49 | 12 | THE COURT:  You agreed with him? |
| 11:49 | 13 | THE WITNESS:  Yes, I agree with him. |
| 11:49 | 14 | THE COURT:  Okay.  My apologies. |
| 11:49 | 15 | MR. McCONVILLE:  My apologies. |
| 11:49 | 16 | BY MR. McCONVILLE: |
| 11:49 | 17 | Q.   So page 1 of that exhibit, do you recognize that as a |
| 11:49 | 18 | drawing that Carter Bryant gave you? |
| 11:49 | 19 | A.   Yes.  Yes, I do. |
| 11:49 | 20 | MR. McCONVILLE:  I'd move Exhibit 12118-1 into |
| 11:49 | 21 | evidence. |
| 11:49 | 22 | THE COURT:  Is she identifying this as one of the |
| 11:49 | 23 | drawings -- |
| 11:49 | 24 | MR. McCONVILLE:  She said it was one of the |
| 11:49 | 25 | drawings she received. |

| 11:49 | 1 | THE COURT:  Is this one of the drawings? |
| 11:49 | 2 | THE WITNESS:  Yes, it is. |
| 11:49 | 3 | THE COURT:  I want to make sure. |
| 11:49 | 4 | Okay.  Received. |
| 11:50 | 5 | *(Exhibit No. 12118-1 received in evidence.)* |
| 11:50 | 6 | *(Document displayed.)* |
| | 7 | BY MR. McCONVILLE: |
| 11:50 | 8 | Q.   How big was the drawing that he handed to you? |
| 11:50 | 9 | A.   It would have been on a page this size -- an 8 and a |
| 11:50 | 10 | half by 11 page -- so it would have fit into maybe three |
| 11:50 | 11 | quarters of the page. |
| 11:50 | 12 | Q.   Okay.  And look at -- the same exhibit, look at pages |
| 11:50 | 13 | dash 7 and dash 8. |
| 11:50 | 14 | A.   Pages 7 and 8? |
| 11:50 | 15 | Q.   Yes, please.  Is page 7 a page you recognize as a |
| 11:50 | 16 | drawing that Carter Bryant gave you in the third week of |
| 11:50 | 17 | September-ish? |
| 11:50 | 18 | A.   Yes, it is. |
| 11:50 | 19 | MR. McCONVILLE:  Okay.  Your Honor, I'd move |
| 11:50 | 20 | page 7, 12118-7, into evidence. |
| 11:50 | 21 | THE COURT:  Received. |
| 11:50 | 22 | *(Exhibit No. 12118-7 received in evidence.)* |
| 11:50 | 23 | *(Document displayed.)* |
| 11:50 | 24 | BY MR. McCONVILLE: |
| 11:50 | 25 | Q.   Same size -- this drawing was also on 8 and a half by |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 149 of 167   Page ID #:309409
CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

149

| | | |
|---|---|---|
| 11:50 | 1 | 11 when he gave it to you? |
| 11:51 | 2 | A.   Yes. |
| 11:51 | 3 | Q.   And if we could look at the next page, dash 8. |
| 11:51 | 4 | *(Document displayed.)* |
| 11:51 | 5 | BY MR. McCONVILLE: |
| 11:51 | 6 | Q.   Is this also one that you recognize? |
| 11:51 | 7 | A.   Yes, it is. |
| 11:51 | 8 | MR. McCONVILLE:  And, Your Honor, I'd move dash 8 |
| 11:51 | 9 | into evidence, as well. |
| 11:51 | 10 | THE COURT:  Received. |
| 11:51 | 11 | *(Exhibit No. 12118-8 received in evidence.)* |
| 11:51 | 12 | *(Document displayed.)* |
| 11:51 | 13 | BY MR. McCONVILLE: |
| 11:51 | 14 | Q.   Were there other drawings that Carter Bryant may have |
| 11:51 | 15 | given you at that meeting? |
| 11:51 | 16 | A.   Yes, he may have given me other drawings. |
| 11:51 | 17 | Q.   But you don't -- you don't recall all the drawings he |
| 11:51 | 18 | gave you at that time, right? |
| 11:51 | 19 | A.   Right.  I remember these specifically. |
| 11:51 | 20 | Q.   And then, did he give you anything else other than |
| 11:51 | 21 | drawings at this meeting? |
| 11:51 | 22 | A.   He gave me a picture of a Steve Madden ad. |
| 11:51 | 23 | MR. McCONVILLE:  Okay.  If we could look at |
| 11:51 | 24 | Exhibit 1127, please. |
| 11:51 | 25 | *(Document provided to the witness.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 150 of 167   Page ID #:309410
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

150

| | | |
|---|---|---|
| 11:51 | 1 | (Document displayed.) |
| 11:51 | 2 | MR. McCONVILLE:  Is that in evidence already?  Oh, |
| 11:51 | 3 | there you go. |
| 11:51 | 4 | BY MR. McCONVILLE: |
| 11:51 | 5 | Q.   Is that the Steve Madden ad that Carter Bryant gave |
| 11:51 | 6 | you? |
| 11:51 | 7 | A.   Yes, it is. |
| 11:51 | 8 | Q.   And what is this a picture of?  I mean, describe it. |
| 11:52 | 9 | A.   This is an ad for shoes. |
| 11:52 | 10 | Q.   And what -- what are the things depicted wearing the |
| 11:52 | 11 | shoes? |
| 11:52 | 12 | A.   Oh.  They're people -- girls wearing the shoes. |
| 11:52 | 13 | Q.   Okay.  So now Carter Bryant's given you some drawings; |
| 11:52 | 14 | he's given you this ad. |
| 11:52 | 15 | And what did he ask you to do? |
| 11:52 | 16 | A.   He said, "Here are my rough drawings.  Here's this |
| 11:52 | 17 | poster.  Just go and do your magic.  Get started.  Run with |
| 11:52 | 18 | it." |
| 11:52 | 19 | Q.   And was that the -- was that the end of the -- I mean, |
| 11:52 | 20 | was that the substance of the meeting? |
| 11:52 | 21 | A.   Yes, it was. |
| 11:52 | 22 | Q.   Okay.  And then -- meeting ended.  What did you do |
| 11:52 | 23 | next? |
| 11:52 | 24 | A.   Well, I went straight back into my studio and got |
| 11:52 | 25 | started.  I was very excited. |

| | | |
|---|---|---|
| 11:52 | 1 | Q.   Why were you excited? |
| 11:52 | 2 | A.   Because, number one, this was the first job I got as a |
| 11:52 | 3 | freelance artist.  And I wasn't sure if I would get any work |
| 11:53 | 4 | at all after I left Mattel, so I was excited to have work. |
| 11:53 | 5 | And it was also very exciting to get free rein over it, just |
| 11:53 | 6 | to get it and go and come up with what I thought it should |
| 11:53 | 7 | be and what I thought looked good. |
| 11:53 | 8 | Q.   Is it -- in your experience, is it typical to have the |
| 11:53 | 9 | designer say, "Just run with it.  Do your magic"? |
| 11:53 | 10 | A.   Not from my experience at Mattel.  It was not at all. |
| 11:53 | 11 | Q.   Okay.  So how did you -- you said you went |
| 11:53 | 12 | downstairs -- or, I'm sorry.  Maybe you didn't say |
| 11:53 | 13 | "downstairs." |
| 11:53 | 14 |      You went somewhere to begin working on the -- the |
| 11:53 | 15 | project, right? |
| 11:53 | 16 | A.   There were five stairs. |
| 11:53 | 17 | Q.   Thank you for that exact description. |
| 11:53 | 18 | A.   You're welcome. |
| 11:53 | 19 | Q.   So you went down the five stairs -- |
| 11:53 | 20 | A.   Yes. |
| 11:53 | 21 | Q.   -- and what did you -- what did you do? |
| 11:53 | 22 | A.   I went to my studio, which is a separate garage. |
| 11:53 | 23 | Q.   Okay. |
| 11:53 | 24 | A.   And I started what they call "roughing it out," |
| 11:54 | 25 | sketching it out in clay. |

| | | |
|---|---|---|
| 11:54 | 1 | Q.   All right.  So describe what the clay was like? |
| 11:54 | 2 | A.   The clay is called plastiline.  It's an oil-based clay. |
| 11:54 | 3 | It's super hard, but it never dries, because it's oil-based. |
| 11:54 | 4 | So you heat it up with a lamp, and then it gets really soft. |
| 11:54 | 5 | You take it and you just kinda pitch it all together to what |
| 11:54 | 6 | you think is, you know, a good starting point, a good |
| 11:54 | 7 | block-out.  And then, from there, after it cools, it gets |
| 11:54 | 8 | harder, and you can go through and fine-tune it more. |
| 11:54 | 9 | Q.   And do you do your fine-tuning with your hands or with |
| 11:54 | 10 | tools or -- or what? |
| 11:54 | 11 | A.   My hands and tools.  It's usually my hands first. |
| 11:54 | 12 | Q.   And what type of -- what type of tool do you use? |
| 11:54 | 13 | A.   There are handmade tools.  There -- it's brass tubing |
| 11:54 | 14 | with guitar string bent to make certain shapes in it.  And |
| 11:54 | 15 | then you use that to -- to like score it.  It puts lines in |
| 11:54 | 16 | it and makes it -- you know, it's able to take off a certain |
| 11:55 | 17 | amount without ruining the integrity of the surface. |
| 11:55 | 18 | Q.   Um, okay.  And while you were doing this sketching and |
| 11:55 | 19 | clay process, were you referring to the drawings that Carter |
| 11:55 | 20 | Bryant had given you? |
| 11:55 | 21 | A.   No.  I couldn't refer to Carter's drawings for the |
| 11:55 | 22 | actual sculpt. |
| 11:55 | 23 | Q.   Why not? |
| 11:55 | 24 | A.   There just wasn't enough information on the drawings. |
| 11:55 | 25 | They were very vague.  And I got the idea of the |

| | | |
|---|---|---|
| 11:55 | 1 | big head/big foot thing, 'cause it was the trend at the |
| 11:55 | 2 | time, but I couldn't use that for my actual flushing-out of |
| 11:55 | 3 | the sculpt. |
| 11:55 | 4 | Q.   And why couldn't you use it? |
| 11:55 | 5 | A.   Well, like I said, there wasn't enough information. |
| 11:55 | 6 | And plus, it just didn't -- it just didn't make sense.  It's |
| 11:55 | 7 | pretty much impossible to sculpt that in three dimensions. |
| 11:55 | 8 | Q.   Well, were you sculpting something that would have |
| 11:55 | 9 | clothes on? |
| 11:55 | 10 | A.   No.  It was -- naked. |
| 11:55 | 11 | Q.   It's okay to say "naked." |
| 11:55 | 12 | A.   Okay. |
| 11:55 | 13 | Q.   That's all right. |
| 11:56 | 14 | So -- and the drawings that Carter Bryant gave you, did |
| 11:56 | 15 | they have clothes on? |
| 11:56 | 16 | A.   Yes, they do. |
| 11:56 | 17 | Q.   Okay.  And so he also -- you put aside the Carter |
| 11:56 | 18 | Bryant drawings.  And then you -- uh, you also had the Steve |
| 11:56 | 19 | Madden ad. |
| 11:56 | 20 | *(Document displayed.)* |
| 11:56 | 21 | BY MR. McCONVILLE: |
| 11:56 | 22 | Q.   You did refer to that while you were sculpting? |
| 11:56 | 23 | A.   Yes.  I did refer to the Steve Madden ad. |
| 11:56 | 24 | Q.   And why did you look at that one? |
| 11:56 | 25 | A.   Well, the Steve Madden ad is -- it's a manipulated |

| | | |
|--|--|--|
| 11:56 | 1 | photograph.  And it implies more dimensions than Carter's |
| 11:56 | 2 | drawings, which were just pen on paper; whereas this, you |
| 11:56 | 3 | can see -- like in her legs and -- *(Indicating.)* |
| 11:56 | 4 | You know, the boots have -- they have a light source, |
| 11:56 | 5 | so that gives the idea of depth.  So I was able to use that |
| 11:56 | 6 | much more than I was able to use his drawings to start. |
| 11:56 | 7 | Q.   Okay.  And did you -- you said that the big head/big |
| 11:57 | 8 | feet thing was already -- what was the word you used? |
| 11:57 | 9 | A.   The trend. |
| 11:57 | 10 | Q.   It was the trend at the time. |
| 11:57 | 11 | Can you give us some examples of dolls that were in the |
| 11:57 | 12 | market that were similar to that trend? |
| 11:57 | 13 | A.   Well, first it was the fashion trend, obviously, with |
| 11:57 | 14 | the Steve Madden ad.  And he was making those big brick-like |
| 11:57 | 15 | shoes and platform shoes.  And Lisa Frank, her products |
| 11:57 | 16 | at -- Target, mainly, is where I saw it -- they had the big |
| 11:57 | 17 | heads/big feet.  I mean, I had a Blythe doll when I was a |
| 11:57 | 18 | kid, um -- that was in the 70's -- that had the big head and |
| 11:57 | 19 | the big eyes and the big feet, which -- this is kind of -- |
| 11:57 | 20 | the platform craze was like reincarnation of the 70's |
| 11:57 | 21 | period.  There was also Diva Starz. |
| 11:57 | 22 | Q.   And were -- I'm sorry.  Go ahead.  Diva Starz.  That |
| 11:57 | 23 | was a Mattel product?  We've heard a lot of testimony about |
| 11:58 | 24 | Diva Starz already. |
| 11:58 | 25 | A.   Yes, that was a Mattel product. |

| | | |
|---|---|---|
| 11:58 | 1 | Q.   Big head/big feet? |
| 11:58 | 2 | A.   Big head/big feet. |
| 11:58 | 3 | Q.   Did you work on Diva Starz when you were at Mattel? |
| 11:58 | 4 | A.   Slightly, briefly. |
| 11:58 | 5 | Q.   What does that mean? |
| 11:58 | 6 | A.   It means I just did a few clothes.  She had snap-on |
| 11:58 | 7 | clothes, and I sculpted a few of her -- her clothes. |
| 11:58 | 8 | Q.   If we -- |
| 11:58 | 9 | MR. McCONVILLE:  Your Honor, we have some |
| 11:58 | 10 | tangibles of Diva Starz. |
| 11:58 | 11 | We'd like to admit Exhibit 17383. |
| 11:58 | 12 | THE COURT:  17383. |
| 11:58 | 13 | MR. McCONVILLE:  35313. |
| 11:58 | 14 | THE COURT:  351 -- |
| 11:58 | 15 | MR. McCONVILLE:  35313. |
| 11:58 | 16 | THE COURT:  Thank you.  I'm sorry.  35313. |
| 11:58 | 17 | MR. McCONVILLE:  And 35312. |
| 11:58 | 18 | THE COURT:  35312. |
| 11:58 | 19 | Each are received. |
| 11:58 | 20 | (Exhibit No. 17383 received in evidence.) |
| 11:58 | 21 | (Exhibit No. 35313 received in evidence.) |
| 11:58 | 22 | (Exhibit No. 35312 received in evidence.) |
| 11:58 | 23 | MR. McCONVILLE:  Thank you. |
| 11:58 | 24 | THE COURT:  They should all be Diva Starz? |
| | 25 | |

| | | |
|---|---|---|
| 11:58 | 1 | BY MR. McCONVILLE: |
| 11:58 | 2 | Q.   Ma'am, are those all Diva Starz? |
| 11:59 | 3 | A.   Yes, they are. |
| 11:59 | 4 | Q.   All right. |
| 11:59 | 5 | (Document displayed.) |
| 11:59 | 6 | BY MR. McCONVILLE: |
| 11:59 | 7 | Q.   Now, you talked about these examples of -- you want to |
| 11:59 | 8 | turn 'em and show 'em.  I appreciate that you're looking at |
| 11:59 | 9 | them, but maybe we can show them to the jury, too. |
| 11:59 | 10 | (Exhibits displayed.) |
| 11:59 | 11 | BY MR. McCONVILLE: |
| 11:59 | 12 | Q.   What did you do on the Diva Starz project, if you |
| 11:59 | 13 | recall? |
| 11:59 | 14 | A.   They have these fashions here that -- they're hard |
| 11:59 | 15 | plastic, and they snap on and off the doll.  So I sculpted |
| 11:59 | 16 | one set of clothes.  (Indicating.) |
| 11:59 | 17 | Q.   Okay.  And you've talked about -- |
| 11:59 | 18 | THE COURT:  Excuse me. |
| 11:59 | 19 | Did you say you "sculpted one set of clothes"? |
| 11:59 | 20 | THE WITNESS:  "Clothes." |
| 11:59 | 21 | THE COURT:  That's all? |
| 11:59 | 22 | THE WITNESS:  That's all.  Just one set like this. |
| 11:59 | 23 | (Indicating.) |
| 11:59 | 24 | THE COURT:  The clothes? |
| 11:59 | 25 | THE WITNESS:  The clothes. |

157

| 11:59 | 1 | THE COURT:  Okay.  Thank you.  I'm sorry. |
| 11:59 | 2 | Counsel. |
| 11:59 | 3 | BY MR. McCONVILLE: |
| 11:59 | 4 | Q.  So you've talked about the Steve Madden ad, the Diva |
| 11:59 | 5 | Starz, the person from Target, the Blythe -- were those |
| 12:00 | 6 | sources of inspiration for you as you did your sculpting? |
| 12:00 | 7 | A.  They were not. |
| 12:00 | 8 | Q.  How did you go about making your decisions about what |
| 12:00 | 9 | this -- what the clay would look like -- what the sculpt |
| 12:00 | 10 | would look like? |
| 12:00 | 11 | A.  I just came up with it in my head. |
| 12:00 | 12 | Q.  Okay.  Did you refer to the -- to these other things |
| 12:00 | 13 | around you while you were preparing that clay? |
| 12:00 | 14 | A.  I didn't refer to them -- |
| 12:00 | 15 | Q.  Right. |
| 12:00 | 16 | A.  -- in the academic sense of the word, but they were all |
| 12:00 | 17 | spinning around in my head. |
| 12:00 | 18 | Q.  Um, I was gonna make a comment about things spinning |
| 12:00 | 19 | around in your head, but -- |
| 12:00 | 20 | MR. McCONVILLE:  Could we take a lunch? |
| 12:00 | 21 | Your Honor, is this a good time for a break? |
| 12:00 | 22 | All right. |
| 12:00 | 23 | BY MR. McCONVILLE: |
| 12:00 | 24 | Q.  So, ultimately, did you -- did the -- did you finish |
| 12:01 | 25 | your magic and make the clay into a sculpt? |

| | | |
|---|---|---|
| 12:01 | 1 | A.   "Finish" is a strong word. |
| 12:01 | 2 | Q.   What word would you use? |
| 12:01 | 3 | A.   I sketched it out.  It was just one rough tangible |
| 12:01 | 4 | thing so that Carter could come and look at it and see what |
| 12:01 | 5 | he thought of my progress. |
| 12:01 | 6 | Q.   And how long did that take between your third week of |
| 12:01 | 7 | September-ish meeting to getting your rough clay sketch? |
| 12:01 | 8 | A.   A few days. |
| 12:01 | 9 | Q.   And do you recall when that was -- the date in |
| 12:01 | 10 | September that was? |
| 12:01 | 11 | A.   Sometime around the 29th. |
| 12:01 | 12 | Q.   Okay.  Let me ask you this:  So, when you were doing |
| 12:01 | 13 | your work as a freelancer, did you record some notes in a |
| 12:01 | 14 | notebook? |
| 12:01 | 15 | A.   Yes.  I kept one notebook. |
| 12:01 | 16 | MR. McCONVILLE:  Okay.  Your Honor, could we put |
| 12:01 | 17 | in front of the witness Exhibit 1137? |
| 12:01 | 18 | THE COURT:  1137. |
| 12:01 | 19 | *(Document provided to the witness.)* |
| 12:02 | 20 | BY MR. McCONVILLE: |
| 12:02 | 21 | Q.   And I'll ask you if you recognize that? |
| 12:02 | 22 | A.   Okay. |
| 12:02 | 23 | Q.   Do you recognize it? |
| 12:02 | 24 | A.   Yes.  Oh, yes, I do. |
| 12:02 | 25 | Q.   What is it? |

| | | |
|---|---|---|
| 12:02 | 1 | A.   It's my notebook. |
| 12:02 | 2 | MR. McCONVILLE:  Your Honor, we'd move into |
| 12:02 | 3 | evidence -- |
| 12:02 | 4 | THE COURT:  1137. |
| 12:02 | 5 | MR. McCONVILLE:  -- 1137. |
| 12:02 | 6 | THE COURT:  Received. |
| 12:02 | 7 | *(Exhibit No. 1137 received in evidence.)* |
| 12:02 | 8 | *(Document displayed.)* |
| 12:02 | 9 | BY MR. McCONVILLE: |
| 12:02 | 10 | Q.   What is that? |
| 12:02 | 11 | A.   It's Wonder Woman. |
| 12:02 | 12 | Q.   Appreciate that.  What is the object that you're |
| 12:02 | 13 | holding? |
| 12:02 | 14 | A.   It's my notebook. |
| 12:02 | 15 | Q.   Okay.  And was this something that you used to track |
| 12:02 | 16 | what was going on in your freelancing life at the time? |
| 12:02 | 17 | A.   Yes, it is. |
| 12:02 | 18 | Q.   If you could look at page 14.  We actually have the |
| 12:02 | 19 | thing copied and numbered as an exhibit, so it might be |
| 12:03 | 20 | easier to refer to that 'cause they're numbered. |
| 12:03 | 21 | *(Document displayed.)* |
| 12:03 | 22 | BY MR. McCONVILLE: |
| 12:03 | 23 | Q.   Okay.  Do you recognize this as your handwriting -- |
| 12:03 | 24 | A.   Yes, I do. |
| 12:03 | 25 | Q.   -- on page 1137-14? |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

160

| | | |
|---|---|---|
| 12:03 | 1 | A.   Yes, I do. |
| 12:03 | 2 | Q.   And you see at the very top there?  What does it say? |
| 12:03 | 3 | A.   "Carter Bryant." |
| 12:03 | 4 | Q.   And has a phone number next to it? |
| 12:03 | 5 | A.   Yes.  It has his extension and his home phone number. |
| 12:03 | 6 | Q.   And do you know where that extension was? |
| 12:03 | 7 | A.   That was from Mattel. |
| 12:03 | 8 | Q.   And underneath it, it says "Doll," hyphen, "play," |
| 12:03 | 9 | slash "fashion"? |
| 12:03 | 10 | A.   Yes. |
| 12:03 | 11 | Q.   What does that mean? |
| 12:03 | 12 | A.   It means it was a fashion doll. |
| 12:03 | 13 | Q.   So do you think -- does the note at the top of the page |
| 12:03 | 14 | reflect your first phone call with Carter Bryant? |
| 12:03 | 15 | A.   Yes. |
| 12:03 | 16 | Q.   Okay.  And then at the bottom of the page, you had said |
| 12:03 | 17 | that the meeting you had with Carter Bryant to discuss your |
| 12:03 | 18 | clay sketch was on September 29th, right? |
| 12:04 | 19 | A.   Correct. |
| 12:04 | 20 | Q.   So look at the bottom of the page.  Do you see the date |
| 12:04 | 21 | "September 29" anywhere? |
| 12:04 | 22 | A.   Yes, I do. |
| 12:04 | 23 | Q.   And what does it say underneath September 29th? |
| 12:04 | 24 | A.   It says, Fiona. |
| 12:04 | 25 | Q.   What does "Fiona" mean? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:04 | 1 | A.   Fiona was the name that Carter wanted for the Cloe -- |
| 12:04 | 2 | the blonde-haired character, because he liked my daughter's |
| 12:04 | 3 | name. |
| 12:04 | 4 | Q.   So at this time you were -- were you calling the clay |
| 12:04 | 5 | sketch Fiona? |
| 12:04 | 6 | A.   Yes. |
| 12:04 | 7 | Q.   And what does it say next to Fiona? |
| 12:04 | 8 | A.   It says, "Head bigger, 2.575." |
| 12:04 | 9 | Q.   What does that mean? |
| 12:04 | 10 | A.   That would have been a measurement that I came up with |
| 12:04 | 11 | just to ensure that I got the head size right. |
| 12:04 | 12 | Q.   When you say you came up with it, what do you mean? |
| 12:04 | 13 | A.   I have calipers.  Like they're -- |
| 12:04 | 14 | Q.   A measuring device? |
| 12:04 | 15 | A.   It's a mechanical measuring device. |
| 12:05 | 16 | Q.   Okay. |
| 12:05 | 17 | A.   And it's just a way to get a certain measurement. |
| 12:05 | 18 | Q.   So you took the caliper out and you put it on the clay |
| 12:05 | 19 | sketch's head and make a calculation to figure out what the |
| 12:05 | 20 | size needed to be? |
| 12:05 | 21 | A.   Right.  At that time, for the big -- for the big doll. |
| 12:05 | 22 | Q.   Okay.  What does it say underneath that?  "Smaller |
| 12:05 | 23 | waist, smaller hips and thighs, and ankles, neck longer." |
| 12:05 | 24 |     What's it say next to "neck longer"? |
| 12:05 | 25 | A.   The "thickness" is "okay." |

| | | |
|---|---|---|
| 12:05 | 1 | Q.   "Thickness okay." |
| 12:05 | 2 | "Feet bulkier on top." |
| 12:05 | 3 | And were those general comments that you had at the |
| 12:05 | 4 | September 29 meeting? |
| 12:05 | 5 | A.   Yes. |
| 12:05 | 6 | THE COURT:  Well, just a moment, Counsel. |
| 12:05 | 7 | Whose comments? |
| 12:05 | 8 | MR. McCONVILLE:  I was going to follow up on that. |
| 12:05 | 9 | BY MR. McCONVILLE: |
| 12:05 | 10 | Q.   Who was at -- do you remember who was at the |
| 12:05 | 11 | September 29 meeting? |
| 12:05 | 12 | A.   I remember Carter being there. |
| 12:05 | 13 | Q.   Do you remember if anyone else was there? |
| 12:05 | 14 | A.   I don't remember if anybody else was there or not. |
| 12:06 | 15 | Q.   If you look at the bottom of the page, there's a name. |
| 12:06 | 16 | It's faint.  It says, "Paula Treantafelles"? |
| 12:06 | 17 | A.   Yes. |
| 12:06 | 18 | Q.   And we've heard testimony that her name is Paula Garcia |
| 12:06 | 19 | now? |
| 12:06 | 20 | A.   Yes. |
| 12:06 | 21 | Q.   Do you remember whether Paula Garcia was at the |
| 12:06 | 22 | September 29 meeting? |
| 12:06 | 23 | A.   I don't remember if she was there or not. |
| 12:06 | 24 | Q.   Okay.  So these comments that you've reflected in your |
| 12:06 | 25 | notes here, who's comments were those that you think you |

| | | |
|---|---|---|
| 12:06 | 1 | were capturing? |
| 12:06 | 2 | A.   I think they were Carter's comments. |
| 12:06 | 3 | Q.   Okay.  And prior to the September 29 meeting, had |
| 12:06 | 4 | you -- and you were doing your clay sketch -- had you been |
| 12:06 | 5 | having phone calls with Carter Bryant about the progress of |
| 12:06 | 6 | the -- of the clay sketch? |
| 12:06 | 7 | A.   Not until I called him and said I was ready for him to |
| 12:06 | 8 | look at it. |
| 12:06 | 9 | Q.   Okay.  So while you were doing your sketching, your |
| 12:06 | 10 | original clay sketch, between the time you got the drawings |
| 12:06 | 11 | from Carter Bryant to the time you met with him, you had |
| 12:06 | 12 | no -- you didn't have face-to-face contact with him? |
| 12:07 | 13 | A.   No, I did not. |
| 12:07 | 14 | Q.   Okay.  And where did the -- where was this meeting that |
| 12:07 | 15 | took place on September 29? |
| 12:07 | 16 | A.   It was at my house. |
| 12:07 | 17 | Q.   Okay.  Now, your testimony is you're not sure if Paula |
| 12:07 | 18 | Garcia was there. |
| 12:07 | 19 |      But you've testified a number of times in this |
| 12:07 | 20 | litigation, right? |
| 12:07 | 21 | A.   Yes, I have. |
| 12:07 | 22 |           MR. PRICE:  Object to the preamble.  It misstates |
| 12:07 | 23 | her testimony. |
| 12:07 | 24 |           THE COURT:  I'm sorry, Mr. Price? |
| 12:07 | 25 |           MR. PRICE:  Object to the preamble 'cause it |

| | | |
|---|---|---|
| 12:07 | 1 | misstates the testimony. |
| 12:07 | 2 | THE COURT:  A "number of times during this |
| 12:07 | 3 | hearing."  Sustained. |
| 12:07 | 4 | MR. McCONVILLE:  I'm sorry. |
| 12:07 | 5 | BY MR. McCONVILLE: |
| 12:07 | 6 | Q.   You've testified a number of times throughout the |
| 12:07 | 7 | course of this litigation, right? |
| 12:07 | 8 | A.   Yes, I have. |
| 12:07 | 9 | Q.   And throughout the course of this litigation, you've |
| 12:07 | 10 | been shown different versions of your notebook, right? |
| 12:07 | 11 | A.   Different copies. |
| 12:07 | 12 | Q.   Different copies, right? |
| 12:07 | 13 | A.   Yes. |
| 12:07 | 14 | Q.   And sometimes there are words that are blanked out in |
| 12:07 | 15 | versions that you've been shown, right? |
| 12:07 | 16 | A.   Yes. |
| 12:07 | 17 | Q.   And sometimes you get to see the whole page? |
| 12:07 | 18 | A.   Yes. |
| 12:08 | 19 | Q.   And sometimes you get to see part of a page? |
| 12:08 | 20 | A.   Yes. |
| 12:08 | 21 | Q.   But your testimony today, your best recollection is |
| 12:08 | 22 | carter Bryant was there and you don't know if Paula Garcia |
| 12:08 | 23 | was there? |
| 12:08 | 24 | A.   Right. |
| 12:08 | 25 | Q.   Okay.  Do you recall -- other than these comments, do |

| 12:08 | 1 | you recall anything else happening at that September 29 |
| 12:08 | 2 | meeting? |
| 12:08 | 3 | A.   No, I don't. |
| 12:08 | 4 | Q.   Did you know -- you've got the name "Fiona" down there. |
| 12:08 | 5 | Did you know at that time that the name "Bratz" was being |
| 12:08 | 6 | considered for this project? |
| 12:08 | 7 | A.   At the time we were calling it "Grlzz," G-R-L-Z-Z.  I |
| 12:08 | 8 | think that's the spelling. |
| 12:08 | 9 | Q.   But you don't remember the name "Bratz" coming up? |
| 12:08 | 10 | A.   No, I don't, not at that time. |
| 12:08 | 11 | Q.   And among the drawings that Carter Bryant gave you when |
| 12:08 | 12 | you first met with him, was the name "Bratz" on any of those |
| 12:08 | 13 | drawings? |
| 12:08 | 14 | A.   I don't remember it being on there. |
| 12:08 | 15 | MR. McCONVILLE:  Okay. |
| 12:08 | 16 | THE COURT:  Counsel, would this now be a good |
| 12:09 | 17 | time? |
| 12:09 | 18 | MR. McCONVILLE:  Sure. |
| 12:09 | 19 | THE COURT:  Okay.  Ladies and gentlemen, I'm going |
| 12:09 | 20 | to send you to lunch.  I'm going to ask you to come back at |
| 12:09 | 21 | 1:00 o'clock.  We're gonna get a good six hours in today. |
| 12:09 | 22 | You're admonished not to discuss this matter |
| 12:09 | 23 | amongst yourselves, nor form or express any opinion |
| 12:09 | 24 | concerning the case. |
| 12:09 | 25 | We'll see you at 1:00 o'clock. |

CV 04-9049 DOC – 3/15/2011 – Day 33, Volume 1 of 3

166

| | | |
|---|---|---|
| 12:09 | 1 | Ms. Leahy, if you would return at 1:00 o'clock. |
| 12:09 | 2 | Just come in and be seated, so we're ready to go at |
| 12:09 | 3 | 1:00 o'clock. |
| 12:09 | 4 | THE WITNESS:  Yes, Your Honor. |
| 12:09 | 5 | THE COURT:  Thank you very much. |
| 12:09 | 6 | Counsel, we'll see you at 1:00 o'clock. |
| 12:09 | 7 | *(Lunch recess held at 12:09 p.m.)* |
| 12:09 | 8 | *(Further proceedings reported by Jane Sutton* |
| 12:09 | 9 | *Rule in Volume II.)* |
| 12:09 | 10 | -oOo- |
| 12:09 | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10204   Filed 03/16/11   Page 167 of 167   Page ID #:309427
CV 04-9049 DOC - 3/15/2011 - Day 33, Volume 1 of 3

167

-oOo-


CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  March 15, 2011


_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR