1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3          **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
   MATTEL, INC., ET AL.,                  )
7                                         )
                    PLAINTIFFS,           )
8                                         )
             vs.                          ) CV NO. 04-9049-DOC
9                                         ) DAY 33
   MGA ENTERTAINMENT, INC., ET AL.,       ) VOLUME 3 of 3
10                                        )
                    DEFENDANTS.           )
11    _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    JURY TRIAL

16               SANTA ANA, CALIFORNIA

17            TUESDAY, MARCH 15, 2011

18                   4:16 P.M.

19

20           **DEBORAH D. PARKER, CSR 10342**
             **OFFICIAL COURT REPORTER**
21          **UNITED STATES DISTRICT COURT**
             **411 WEST FOURTH STREET**
22                   **SUITE 1-053**
            **SANTA ANA, CALIFORNIA 92701**
23               **(714) 542-8409**
             **D.PARKER@IX.NETCOM.COM**
24

25

```
 1   APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF, MATTEL, INC.:

 3                           JOHN QUINN
                             WILLIAM PRICE
 4                           MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                           & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                           (213) 443-3000

 8
         FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                           (949) 567-6700

13
                             ANNETTE L. HURST
14                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                           (415) 773-5700

17
                             JENNIFER L. KELLER
18                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                           SUITE 560
                             IRVINE, CALIFORNIA 92612
20                           (949) 476-8700

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                              MARK E. OVERLAND
                               LAW OFFICES OF MARK E. OVERLAND
 4                              100 WILSHIRE BOULEVARD
                               SUITE 950
 5                              SANTA MONICA, CALIFORNIA 90401
                               (310) 459-2830
 6

 7                              ALEXANDER H. COTE (Not Present)
                               SCHEPER KIM & HARRIS, LLP
 8                              601 WEST FIFTH STREET
                               12TH FLOOR
 9                              LOS ANGELES, CALIFORNIA 90071
                               (213) 613-4660
10

11    ALSO PRESENT:
12
                               JEANINE PISONI
13                              MGA ENTERTAINMENT, INC.
                               16360 ROSCOE BOULEVARD
14                              SUITE 105
                               VAN NUYS, CALIFORNIA 91406
15

16                              ROBERT ECKERT, MATTEL CEO
                               ISAAC LARIAN, MGA CEO
17                              KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                               MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
1                        I N D E X

2

3    DEFENDANTS' WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

4     MARGARET LEAHY                     5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      SANTA ANA, CALIFORNIA; TUESDAY, MARCH 15, 2011; 4:16 P.M.

 2                          CROSS-EXAMINATION

 3   BY MR. PRICE:

 4   Q.   And in that picture her thighs aren't together;

 5   correct?

 6   A.   Correct.

 7   Q.   So you understood when Mr. Bryant gave you the drawings

 8   that you weren't supposed to help him sculpt a figurine.

 9   You were supposed to help sculpt a drawing that looked

10   like -- I mean, you were supposed to sculpt a sculpt that

11   looked like the drawings he was giving you; correct?

12   A.   Not right.

13   Q.   Well, when he asked you to help with this sculpt, did

14   he give you a blank piece of paper?

15   A.   No, he didn't.

16   Q.   He gave you drawings he had done; correct?

17   A.   Correct.

18   Q.   And he also gave you a Steve Madden ad; correct?

19   A.   Yes.

20   Q.   If you look at the Steve Madden ad, I think,

21   Exhibit 1127 --

22           MR. PRICE:  I believe that's already in evidence.

23   BY MR. PRICE:

24   Q.   So, this is the Steve Madden ad that he gave you;

25   correct?
```

6

```
 1   A.    Correct.

 2   Q.    Did he give you any other ads?

 3   A.    No, he did not.

 4   Q.    If you look at Exhibit 10179, do you see that that

 5   appears to be an August 1999, Seventeen Magazine?

 6   A.    Yes, I see it.

 7   Q.    And if you would turn to page 133.  And do you see that

 8   that August Seventeen Magazine has an ad which looks almost

 9   identical to the ad that Mr. Bryant gave you?

10   A.    I don't have the magazine in front of me.  Just the

11   cover and this picture (indicating).

12             MR. PRICE:  Okay.

13             Your Honor, may I approach?

14             THE COURT:  You may.

15        (Pause.)

16   BY MR. PRICE:

17   Q.    Do you have the original in front of you?

18   A.    Yes.

19   Q.    Maybe --

20             MR. PRICE:  Can we put up Seventeen Magazine,

21   10179-133 next to Exhibit 1127.

22   BY MR. PRICE:

23   Q.    So comparing those, can you see that the Seventeen

24   Magazine in August 1999, that ad appears to be virtually the

25   same as the Steve Madden ad that was given to you, along
```

1    with Mr. Bryant's drawings?

2    A.    Yes.

3    Q.    Now, let me ask you if you were given this --

4          I would like you to look at Exhibit 17246.

5          And you see this appears to be a copy of a

6    Seventeen Magazine in August 1998.

7          Do you see that?

8    A.    Yes.

9    Q.    Now, I would like you to turn to what's marked at the

10   bottom as page, I think, 115.

11         Now, did Mr. Bryant give you a drawing like this,

12   a Steve Madden ad from 1998?

13   A.    No, he did not.

14   Q.    Now, if you would look at page 126, in this 1998,

15   Seventeen Magazine, did he give you a copy of this picture

16   here of the Dixie Chicks?

17   A.    No, he did not.

18   Q.    And if you look at page 193, did he give you a copy of

19   this page that seems to have a Coca-Cola ad?

20   A.    No, he did not.

21   Q.    So the only thing that he gave you, in addition to his

22   drawings, was that Steve Madden ad which seems to also

23   appear in the August 1999, Seventeen Magazine; correct?

24   A.    Correct.

25   Q.    Now, in connection with those drawings, going back to

1125 -- now, I think, you also testified about the arms, and
you were saying that as a sculptor, again, having the arms
out like this, would be like a figurine.

Do you recall that?

A.   I didn't say it "would be like a figurine."  I said
it's not done when you make a doll.

Q.   So you understood this was Mr. Bryant's drawing that he
wanted to convert into a doll; correct?

A.   Yes.

Q.   This concept?

So you knew at the time that you were going to
have to put in ball joints?

A.   No, I didn't.

Q.   Well, you knew that fashion dolls usually have movable
parts?

A.   Yes.

Q.   You knew that they had to be able to put clothes on and
off; right?

A.   Yes.

Q.   So you knew the fashion doll wouldn't have permanently
its thighs together; correct?

A.   Correct.

Q.   And when you said that you didn't know about ball
joints, whether this would require ball joints; is that
right?

1   A.   Correct.

2   Q.   I think you said you'd never done a doll from start to

3   finish while you were at Mattel; correct?

4   A.   Just separate parts.

5   Q.   And, in fact, mainly what you concentrated on was the

6   head?

7   A.   Yes.

8   Q.   So this was -- one of the things about this being

9   exciting to you, it was going to be doing something that you

10  had never done before:  A doll from start to finish; right?

11  A.   I didn't think of that being exciting.  I thought it

12  was exciting that I had free reign, as we said before.

13  Q.   Well, when you say "free reign," let me talk to you

14  about your understanding of the process.  It's typical, in

15  your experience, prior to working with Mr. Bryant, that a

16  designer will bring a sculptor a design; correct?

17  A.   Or verbal direction.

18  Q.   And that, then, the sculptor will go sculpt something;

19  right?

20  A.   Yes.

21  Q.   And then, the sculptor will show the sculpt to the

22  designer?

23  A.   Yes.

24  Q.   And then, you'll get more comments; right?

25  A.   Yes.

1    Q.    And then --

2    A.    Hopefully not; but, yes.

3    Q.    And then, sometimes, you'll go and do another sculpt

4    to, basically, make sure that you're both on the same page;

5    right?

6    A.    Not necessarily.  But just, hopefully, everybody is

7    happy at the end.

8    Q.    Okay.  But it's a -- in that process, the experience

9    you had prior to working with Mr. Bryant, in connection with

10   this MGA project, in that experience the designer doesn't

11   usually hover over your shoulder and watch you do the

12   sculpt; correct?

13   A.    They do at Mattel.

14   Q.    What was -- was that what you expected, that a designer

15   would hover over your shoulder and just stand there while

16   you did the sculpt?

17   A.    It depends on the designers.  Some did; some didn't.

18   Q.    You said this took some amount of time to do a full

19   sculpt?

20   A.    The Bratz; correct?

21   Q.    Yeah.  A head-to-toe sculpt of a doll would take some

22   time?

23   A.    Yes, it takes some time.

24   Q.    And so, you are saying the designer would sit there

25   next to you for all those hours, watching you do what you're

1   doing?

2           MR. MCCONVILLE:  Objection.  Argumentative.

3           She said she didn't work on dolls at Mattel --

4           THE COURT:  Overruled.

5           THE WITNESS:  It felt like it sometimes, but

6   there's some designers that would be in your office quite a

7   bit, checking up, making sure and making changes and things

8   like that and there were some that were not like that.

9   BY MR. PRICE:

10  Q.   But none who would actually plant themselves in your

11  office and stay there until you were done; correct?

12  A.   Not for the duration of the project, no.

13  Q.   And going back, then, to the drawings, which is 1125 --

14          In Mr. McConville's question you said there

15  were -- you were aware of dolls in the market with big eyes

16  or big feet.

17          Do you recall that?

18  A.   It was the trend.  I wasn't aware of actual dolls on

19  the market, except -- oh, excuse me, except for Diva Starz.

20  Q.   And so the only doll that you were aware of that had

21  the large head and the large feet was Diva Starz, which I

22  think -- I think you already showed that to the jury, those

23  two Diva Starz?

24  A.   It was three.

25  Q.   Three, okay.

```
 1              So while I'm trying to find that exhibit number,
 2    let me ask you this:  Did you think that Mr. Bryant's
 3    drawings were unique?
 4    A.    I did not.
 5    Q.    Did you have discussions with Ms. Garcia as to whether
 6    or not she thought that these drawings were unique and
 7    exciting?
 8    A.    No.
 9    Q.    Did you have discussions with Mr. Bryant as to whether
10    he thought these drawings were unique or exciting?
11    A.    Not specifically to the drawings.  But, you know, in
12    protocol when a designer gives you a project, whether you
13    like it or not, you say you like it.  You blow their skirt
14    up.
15    Q.    So you were blowing Mr. Bryant's skirt up a bit when
16    you talked to him about his drawings?
17    A.    Yes.
18    Q.    How about when you talked to Ms. Garcia?  Were you
19    blowing her skirt up as well?
20    A.    No, I was not.
21    Q.    Or Ms. Ward?
22    A.    No.
23    Q.    Did you ever tell anyone that you thought Mr. Bryant's
24    concept of the Bratz girls and his drawings was something
25    which was not unique because it was trendy or there was
```

1  something already on the market like it?

2  A.   No, I did not.

3  Q.   And I think I have a number now for Diva Starz.

4       Look at 17583.

5       MS. JUAREZ:  I have 17384.

6       MR. PRICE:  Okay.  That's good.

7  BY MR. PRICE:

8  Q.   So is it your testimony that 17384 is similar to, looks

9  like Mr. Bryant's Bratz drawings?

10  A.   No.  His drawings were very different.

11  Q.   Okay.

12  A.   You are asking about the product?

13  Q.   I'm asking about the product, the one you answered

14  questions about on direct.

15  A.   Yes.  The doll is not similar to Carter's drawings.

16  Q.   You also mentioned on direct, I think, the Blythe doll?

17  A.   Yes.

18  Q.   That doll doesn't have oversized feet, does it?

19  A.   You know, the Blythe doll was out when I was a kid in

20  the '70s.  I just remember the blinking eyes where you pull

21  the string; and then, it started to be reproduced because it

22  got popular.  I believe the feet were small feet, but I just

23  remember the big head and eyes.

24  Q.   So you didn't mean to suggest that it had large feet.

25  You don't recall that looking back nostalgically at your

1    childhood?

2    A.    No, I don't remember the big feet.  But it was the

3    trend at the time:  Oversized head, and --

4    Q.    So to go through the chronology, again.  Mr. Bryant

5    calls you and says he has got a project for MGA he wants you

6    to walk on, and that's a telephone call in mid-September;

7    right?

8    A.    Right.

9    Q.    And then, he comes to his house, and he meets with you

10   face-to-face; correct?

11   A.    Yes.

12   Q.    Then you go and you start a sculpt; correct?

13   A.    Correct.

14   Q.    Then, in September, Mr. Bryant comes to your house

15   again to look at the sculpt; correct?

16   A.    Yes.

17   Q.    And we've been numbering these sculpts, and maybe --

18         This is the first sculpt that you created in

19   connection with the Bratz project?

20   A.    The one I -- can you say that again, please?

21   Q.    Sure.  The sculpt that you showed Mr. Bryant toward the

22   end of September was the first sculpt that you created in

23   connection with the Bratz project; correct?

24   A.    Yes.

25   Q.    And if you look at your notes, again, on page 1137,

1    page 14, and you look at September 29, 2000, under Fiona,

2    which is your daughter's name, do you see it has these

3    comments:  Head, bigger; smaller waist; smaller hips; thighs

4    and ankles; neck longer; feel bulkier on top.

5              Do you see that?

6    A.    Feet.

7    Q.    Feet.  Thank you.

8              So those were all comments that were given to you

9    by Mr. Bryant who first gave you his designs in the

10   Steve Madden ad; correct?

11   A.    Correct.

12   Q.    And you said something about Ms. Treantafelles.  It may

13   not come through on this blow-up.

14             But can you see that the name "Paula

15   Treantafelles" is in a different color ink than what we've

16   just read?

17   A.    Yes, I can.

18   Q.    What you wrote under Fiona, and then Diane -- is it --

19   is that Saffren?

20   A.    It's Denise Saffren.

21   Q.    That is all in blue ink; correct?

22   A.    Yes.

23   Q.    In fact, everything on the page above Ms. Saffren is in

24   blue ink; correct?

25   A.    Yes.

16

1    Q.    And the X104 is also in blue ink?

2    A.    Yes.

3    Q.    What's X104?

4    A.    I don't remember.

5    Q.    And then the Paula Treantafelles and then the

6    Ms. New Monterey Park, that's in black ink, a different type

7    of ink; correct?

8    A.    Yes.

9    Q.    So after Mr. Bryant gave you these comments, you then

10   went back to start sculpting again; correct?

11   A.    Correct.

12   Q.    That sculpt, by the way, that you showed to Mr. Bryant,

13   on September 29, 2000, that no longer exists; correct?

14   A.    Yes, it does.

15   Q.    The sculpt itself?

16   A.    Oh, currently?

17   Q.    Yes.

18   A.    No, it's gone.

19   Q.    So you next have a meeting on October 6th, face-to-face

20   with Mr. Bryant, Ms. Garcia and Mr. Marlow; right?

21   A.    Mrs. Marlow?

22   Q.    Mrs. Marlow.

23   A.    Yes.

24   Q.    And this is a different sculpt that you showed

25   Mr. Bryant; correct?

17

```
 1   A.    It's the sculpt I showed Carter with the changes he
 2   asked for.
 3   Q.    So it looks different.  This is sort of your second
 4   attempt at getting the sculpt; correct?
 5   A.    Yeah.  The second iteration.
 6   Q.    So when you looked at that second sculpt, you got
 7   comments from Ms. Garcia, Mr. Bryant and Mrs. Marlow;
 8   correct?
 9   A.    Yes.
10   Q.    And at that point, after getting those comments, your
11   job was to make this sculpt mass producible, which is
12   something that a sculptor has the unique ability and talent
13   to do?
14   A.    At this point, it was to get the sculpt aesthetically
15   to a point where everybody agreed on the look.
16   Q.    Is it true that after you received the comments, your
17   job was to try it make this into a marketable -- into a
18   producible sculpt; right?
19   A.    At this point, like I said, it was to get the sculpt to
20   aesthetically where everybody liked it.
21   Q.    After getting the October 6 comments, was your job to
22   incorporate those in a way that makes the sculpt actually
23   producible?
24   A.    Well, I started incorporating the possible production
25   of it, the technical part of it with the technical part in
```

1    mind, but still trying to please everybody with the look.

2    Q.   But having received the comments in your job as a

3    sculptor is to incorporate those in a way that make these

4    things actually producible; right?

5    A.   In part, yes.

6    Q.   And that is something Mr. Bryant did not know how to

7    do; correct?

8    A.   Correct.

9    Q.   And Mrs. Marlow did not know how to do, as far as you

10   know; correct?

11   A.   Correct.

12   Q.   And Ms. Garcia did not know how to do?

13   A.   Correct.

14   Q.   So you have to bring your talent into making this

15   sculpt something everyone likes and that can be produced;

16   right?

17   A.   Correct.

18   Q.   Now, one of the comments that you got on October 6, I

19   think you said, was that the sculpt was too mature; is that

20   right?

21   A.   Yes.

22   Q.   And if we look at the sculpt --

23          Let me ask this:  Is Exhibit 1136-A that

24   grayish-looking sculpt?

25   A.   Yes.

1  Q.   Does that look similar to what you presented on

2  October 6th?

3  A.   Yes.  This is —— yes.

4  Q.   If you can take that out.

5  A.   *(Witness so complies.)*

6  Q.   And you can show that —— hold the body up, at least.

7        You can see that's a fairly —— it has fairly large

8  hips; correct?

9  A.   Yes.

10  Q.   Has fairly large thighs?

11  A.   Yes.

12  Q.   Somewhat busty?

13  A.   Yes.

14  Q.   And that wasn't what Mr. Bryant drew.  I mean, that

15  didn't look like the drawings he had given you in

16  mid—September; correct?

17  A.   Correct.

18  Q.   If you look at 1125, for example.  If you'll go to

19  page 7.

20        So ——

21  A.   I'm not on the page yet.  I'm sorry.

22  Q.   It's blown up, too.

23        MR. PRICE:  Is it on the monitor?  Rachel, is that

24  working?

25        THE WITNESS:  I can look at that.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    BY MR. PRICE:

 2    Q.   So the sculpt had like a larger bust than appears in

 3    this drawing; correct?

 4    A.   Correct.

 5    Q.   And it has larger hips and thighs than appear in this

 6    drawing; correct?

 7    A.   It's hard it say, because the drawing has clothes on

 8    it.

 9    Q.   Yes, it does.  But looking at it, does it look kind of

10    skinny?

11    A.   Does what look skinny?

12    Q.   The drawing.

13    A.   The drawing?

14    Q.   Yeah.

15    A.   Her waist looks skinny.  And her ankles look skinny.

16    But the hips in comparison with the waist look exaggerated.

17    Q.   Well, in doing this project, you thought that when you

18    first did these first few attempts that you made mistakes,

19    because you hadn't done this sort of thing before; right?

20    A.   I never thought I made any mistakes.

21    Q.   In doing this, you never thought that you had made some

22    mistakes, because you were a little bit inexperienced?

23    A.   No, I wouldn't say I was inexperienced, either.  I just

24    never made a doll from head to toe.

25    Q.   Well, you never made the body?
```

1   A.   I had made body parts, and I knew how body parts were

2   put together.

3   Q.   If you look at -- I'm going to show you, August 12,

4   2008.  I want to call your attention to page 6839.  And if

5   you would look at lines 23 to 6840, line 7.

6   A.   Okay.

7        *(Pause.)*

8            THE COURT:  Counsel.

9   BY MR. PRICE:

10  Q.   So, Ms. Leahy, does that refresh your recollection that

11  you thought that in going through this process because you

12  weren't experienced then as you are now that you might have

13  made some mistakes along the way?

14  A.   I said this here, but "mistakes" mean like you did

15  something wrong, you know, and I might have made, you know,

16  the body look older than they wanted, but that's what I

17  wanted.  It's subjective.  You know, I know I said that

18  there, but --

19  Q.   Okay.  Well, let's talk -- that's objective.

20            You said, for example, a mistake is you might have

21  made the body look older than they had wanted; correct?

22  A.   Correct.

23  Q.   And older than appears in Mr. Bryant's drawings?

24  A.   I didn't use Mr. Bryant's drawings.

25  Q.   Well, I'm just saying.  Does it look older than you see

1   in Mr. Bryant's drawings?

2   A.    His drawings have nothing to do with what I sculpted.

3   Q.    So you've talked to Mr. Bryant about the production

4   dolls; right?

5   A.    In what way?  You mean, after the dolls came out?

6   Q.    Yes.

7   A.    Spoken to him?

8   Q.    Yes.

9   A.    Yes, a few times.

10  Q.    And hasn't he told you that he thinks the dolls look

11  like his drawings?

12  A.    No.

13  Q.    You understand he has said that; correct?

14  A.    I didn't know.

15          MR. MCCONVILLE:  Objection.  Hearsay.

16          THE COURT:  Overruled.

17  BY MR. PRICE:

18  Q.    Is it your belief that the production dolls don't look

19  like Mr. Bryant's drawings?

20          MR. MCCONVILLE:  Objection.  Relevance.

21          THE COURT:  Overruled.

22          THE WITNESS:  That is my belief.  As far as them

23  naked, without face or hair, which is my part in the job,

24  that's what I can comment on.

25  ////

1    BY MR. PRICE:

2    Q.   And your testimony is that when you spoke to

3    Mr. Bryant, was it your understanding that MGA had made a

4    decision in the late September, early October time frame to

5    invest millions of dollars to create a doll, based upon

6    Mr. Bryant's drawings?

7    A.   I have no idea how much they invested in it.  And I

8    don't know if it was based on his drawings, as much as it

9    was based on the concept.

10   Q.   When you met with Ms. Garcia and Mrs. Marlow and

11   Mr. Bryant -- let me step back.

12          When you met with Mr. Bryant September 29th, 2000,

13   did he tell you I don't want this to look like my drawings?

14   A.   No, not -- no.

15   Q.   When you -- and, indeed, he gave you a number of

16   comments to change the sculpt; correct?

17   A.   On September 29th, yes.

18   Q.   And then, October 6th, did anyone tell you, change your

19   sculpts so it doesn't look like the drawings?

20   A.   No.

21   Q.   Now, you are understandably proud of your work;

22   correct?

23   A.   I am proud of what I've accomplished.

24   Q.   Because this was a very successful doll and, therefore,

25   a successful sculpt; right?

```
 1   A.   Correct.
 2   Q.   So getting on the timeline now, you've met August 6th
 3   and you're going to go and make some more changes after
 4   getting those comments; correct -- I'm sorry, you met
 5   October 6th, and then you went to make some more changes
 6   based upon the comments; correct?
 7   A.   I just went to General Giant to make a mold and start
 8   over in wax.
 9   Q.   Well, you took note of the comments; right?
10   A.   Yes.
11   Q.   And at this point, you've gotten comments from
12   Mr. Bryant.  You've gotten comments from Mr. Bryant, and
13   Ms. Garcia and Mrs. Marlow.  At this point, you are not
14   looking at any of the drawings themselves this far along;
15   correct?
16   A.   Correct.
17   Q.   So if you look at Exhibit -- I think it's 1136.  Is
18   that what's up there?  Is that what was made, then, after --
19           Yes, that's what was made after you got the
20   comments on October 6th; correct?
21   A.   No.
22   Q.   Okay.  When --
23   A.   Oh, excuse me.  This cast was made after October 6.
24   Q.   And you got it around October 11th; correct?
25   A.   Somewhere around that time.
```

1   Q.   And that's when you took a jeweler's saw to make -- try

2   to make this into a feasible production doll; correct?

3   A.   Correct.  After I poured a wax into the mold.

4   Q.   Between August -- between October 6th and October 19th,

5   did you have any meetings with Carter Bryant to discuss the

6   Bratz sculpt?

7   A.   I can't remember.

8   Q.   Do you recall -- if you look at the July 3, 2008 --

9   A.   July?

10   Q.   July 3, 2008.  Look at page 4259, lines 20 through 24.

11        Are you there?

12   A.   Yes.

13   Q.   It's correct at the last trial you testified that

14   between October 1st and October 19th, you had just one

15   meeting with Carter Bryant and that was the one on

16   October 6th.

17        Do you recall that?

18   A.   Right.

19   Q.   And you testified to that, because you did not want it

20   to appear that Mr. Bryant had influenced the sculpt;

21   correct?

22        MR. MCCONVILLE:  Objection.  Argumentative.

23        THE COURT:  No, overruled.

24        You can answer the question.

25        THE WITNESS:  Can you ask that question again?

1    BY MR. PRICE:

2    Q.    The reason you said you hadn't met with Mr. Bryant

3    between October 6th and October 19th, his last day at

4    Mattel, is because you did not want anyone to think that he

5    had influenced the changes in your sculpt; correct?

6              MR. MCCONVILLE:  Same objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  You're asking me if I lied?

9    BY MR. PRICE:

10   Q.    Misstated the truth.

11   A.    Misstated the truth on purpose?

12   Q.    Well, let me ask it this way:  Was it your

13   understanding that one of the issues is how much influence

14   Mr. Bryant had on the sculpt?

15   A.    Can you ask that one more time?

16   Q.    Did you understand that in this case one of the issues

17   is how much influence did Mr. Bryant have on the sculpt?

18   A.    Yes.

19   Q.    And knowing that your testimony at the last trial was

20   that the only meeting you had between October 1st and

21   October 19th was that October 6th meeting when Ms. Garcia

22   and Mrs. Marlow were there; correct?

23   A.    Correct.

24   Q.    And after that trial, you testified in another case.

25              Do you recall that, the Belaire case?

1   A.   Yes.  It was the deposition.

2   Q.   And in that testimony, did you understand, sort of,

3   what that case was about?

4   A.   Yes.  Yes.

5   Q.   So at trial, you had -- in 2008, you had testified, as

6   you did here, that that you used Mr. Madden's ad, Steve

7   Madden's ad for your inspiration and not Mr. Bryant's

8   drawings; right?

9   A.   I looked more at the Steve Madden ad.  I used it more

10  for reference.

11  Q.   So when you say "used it more," you're saying you did

12  use Mr. Bryant's drawings as well?

13  A.   I did not use Mr. Bryant's drawings.

14  Q.   Okay.  So at the prior trial, you said that you used

15  Mr. Madden's ads; correct?

16  A.   Yes.  I had looked at them.

17  Q.   Or at least the one ad that you got; correct?

18  A.   Correct.

19  Q.   And then your understanding was that the photographer

20  of that ad claimed that, well, you copied his ad?

21  A.   Yes.

22          MR. MCCONVILLE:  Objection, your Honor.

23          This is an area that we would like to discuss with

24  the court.

25          THE COURT:  Well, it depends.  If we're getting

1    into prior inconsistent testimony, I want you to proceed; if

2    we're not, we're going into another lawsuit.

3              MR. PRICE:  We're going to prior inconsistent

4    testimony.

5    BY MR. PRICE:

6    Q.   So at the deposition in that case, you testified, did

7    you not, that you had meetings with Carter Bryant at his

8    house about the Bratz sculpt in October?

9    A.   If I said that, I didn't -- I didn't have meetings with

10   him until after -- after the Bratz had come out, like

11   working on the shoes and things.

12   Q.   You had meetings with Mr. Bryant after October 6th,

13   2000 before he left Mattel October 19th where you went to

14   his house, and you talked to him about the Bratz sculpt;

15   correct?

16   A.   No.

17   Q.   Well, look at the -- let's look at your notes to begin

18   with, 1137, page 15.

19              Now, the page before you had -- you had notes of

20   the September 29th meeting; correct?

21   A.   The page we looked at before.  Not the page before in

22   my notebook.

23   Q.   The page 14, 1137-14, talks about the September 29th

24   meeting which was at your house; correct?

25   A.   Correct.

1   Q.   And then if we go to the next page, you see there's a

2   Fiona, October 6th.

3           Do you see that?  And that's the meeting that you

4   referred to with Ms. Garcia and Mrs. Marlow; right?

5   A.   Yes.

6   Q.   Okay.  And then at the bottom of the page in a

7   different ink, you see it says:  "Carter's home"?

8   A.   Yes.

9   Q.   Do you see that there are instructions on how to get to

10  his house?

11  A.   Yes.

12  Q.   Correct?

13          And it's true that sometime after the October 6th

14  meeting, you went to Mr. Bryant's home to talk to him about

15  the Bratz sculpt?

16  A.   At some point I did go to Carter's house, but it wasn't

17  before he left Mattel, if that's what you are asking.  I'm a

18  little confused.

19  Q.   What's your best recollection as to when you went to

20  Mr. Bryant's home to discuss the sculpt?

21  A.   It wasn't -- it was accessories to the sculpt, which

22  would have been after I had finished with the tooling model

23  for the sculpt.

24  Q.   If you look at 1137, page 17, do you see there's a

25  calendar there, October -- starting with October 17th?

1    A.    Yes.

2    Q.    And then, go to the next page, page 18, and you see in

3    blue, it says "MGA"; and then, it goes through comments.

4             Do you see that?

5    A.    Yes.

6    Q.    Now, those are the comments that you told

7    Mr. McConville you got on October 25th; right?

8    A.    Correct.

9    Q.    And those are the comments -- by that time, did you

10   have a finished sculpt?

11   A.    No, I did not.

12   Q.    So you went to Mr. Bryant's home -- the page 15 --

13   before October 25th; right?

14   A.    That's wrong.  There is nothing here that says I went

15   to his home.  It's just directions to his house.  There

16   might have been several times that I got directions to his

17   house, but I never went there until later.

18   Q.    Why were you getting directions to his house?

19   A.    So I could know where it was.

20   Q.    Because you wanted to go there?

21   A.    I didn't necessarily want to.

22   Q.    Because you thought you had to go there?

23   A.    Because we might have been meeting there at some point,

24   and it didn't happen.  All I know is I didn't go there until

25   later.

1    Q.    You went to Mr. Bryant's house to talk about something

2    related to Bratz; correct?

3    A.    At some point in time, I did.

4    Q.    And you don't recall exactly what you were showing him,

5    but you said it was something related to Bratz; correct?

6    A.    Correct.

7    Q.    And you have no recollection of whatever it was that

8    you showed him; correct?

9    A.    My recollection is that it was accessories, meaning

10   shoes.  Shoes.

11   Q.    It was a sculpture, right?

12   A.    Yes.  Something I had sculpted.

13   Q.    And you don't recall whether or not it was before or

14   after the October 6th meeting?

15   A.    I just told you it was after I finished with the

16   tooling model which was in December.

17   Q.    Well, if you look at page 126, this is November 17,

18   2010.

19   A.    *(Witness so complies.)*  Okay.  Would you like me to

20   read it?

21   Q.    126, line 5 through line 21.

22   A.    Through which one?  I apologize.

23   Q.    Lines 5 through 21.

24   A.    *(Witness so complies.)*

25   Q.    So November 17, 2010, your testimony was that you

1    really didn't remember?

2    A.    Excuse me.  I had one more line to read.

3    Q.    I would like you to read that last line.

4          That's true?

5    A.    *(Witness so complies.)*  Yes.

6    Q.    When there was a claim that you had copied Steve

7    Madden --

8          MR. MCCONVILLE:  Objection.  Argumentative.

9          THE COURT:  Sustained.

10   BY MR. PRICE:

11   Q.    On November 17, 2010, you testified you would be

12   assuming if you were to state whether or not you're going to

13   Mr. Bryant's home was before or after the September 29 and

14   October 6th meetings; right?  It would just be an

15   assumption?

16   A.    That's what it says there, yes.

17   Q.    And you said that you didn't think Mr. Bryant's

18   drawings looked like the dolls that came out.

19         I would like to show you -- I would like to show

20   you a demonstrative.  It's 2433 (sic)-000013.  This has a

21   number of the exhibits side by side.

22         24333.  And it shows Exhibit 3-13, the doll;

23   Exhibit 12286 and Exhibit 1127 that are all in evidence.

24         Have you found it?  It's 24333-zeros and 13.

25         THE COURT:  Counsel, you can put this up.

```
 1              MR. PRICE:  Thank you.
 2   BY MR. PRICE:
 3   Q.   And you recognize the drawing on the left as a drawing
 4   by Mr. Bryant?
 5   A.   Yes.  It looks like a drawing, yes.
 6   Q.   And the doll in the middle is one of the production
 7   dolls?
 8   A.   Yes.
 9   Q.   And at the far right, you have Mr. Madden's ads?
10   A.   Yes.
11   Q.   The ad that you were given by Mr. Bryant?
12   A.   Yes.
13   Q.   In connection with this project that is doing the
14   sculpt, you understand that in the end, Mr. Bryant, in
15   connection with Bratz, made over $30 million; right?
16   A.   I had no idea how much Carter made.
17   Q.   Up until today, you have no idea how much Mr. Bryant
18   made in connection with Bratz?
19   A.   No, I don't.
20   Q.   You never heard, prior to today, that he had made in
21   excess of $30 million?
22              MR. MCCONVILLE:  Objection.  Asked and answered.
23              THE COURT:  Sustained.
24   BY MR. PRICE:
25   Q.   Well, you were at the last trial; correct?
```

34

1   A.   Correct.

2   Q.   Did you learn at that time that Mr. Bryant had made

3   over $30 million?

4            MR. MCCONVILLE:  Objection.  Asked and answered.

5            THE COURT:  No, overruled.

6            THE WITNESS:  I knew Carter made money, but I

7   didn't remember the number.  So it's not important to me.

8   So it didn't stick in my head.

9   BY MR. PRICE:

10  Q.   How much did you make for just sculpting the Bratz doll

11  between, I guess, up until the time you finished -- you

12  finished your last sculpt?

13  A.   Which -- do you include the shoes and things?  Or?

14  Q.   I think you might have been asked this question by

15  Mr. McConville.  I think you said you finished the body and

16  the face, you say, in December of 2000; is that right?

17  A.   Yes.

18  Q.   And so, in that time frame, how much money were you

19  paid by MGA?

20  A.   Around 20,000.

21  Q.   Do you believe that Mr. Bryant's designs for the Bratz

22  dolls had something to do with why he was paid millions of

23  dollars?

24            MR. MCCONVILLE:  Objection.  Lacks foundation.

25            THE COURT:  Overruled.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE WITNESS:  Are you talking about his drawings,

2    the design, the concept?

3          Can you be more specific?

4    BY MR. PRICE:

5    Q.    Sure.  The designs that he gave MGA and you in

6    September of 2000 about the Bratz?

7    A.    I believe that his concept did, yes.

8    Q.    But the way Mr. Bryant, who's a designer, the way he

9    expressed his concept was to do the drawings; correct?

10   A.    No, not at all.  Oh, not for me to sculpt from the

11   drawings but the way he expressed his concept was that he

12   did the drawings himself?  Is that what you're asking?

13   Q.    The way that Mr. Bryant, a designer, expressed his

14   concepts was to present the designs, those drawings to MGA;

15   correct?

16   A.    I wasn't there when he presented to MGA.  I just got

17   his drawings.

18   Q.    You understood at the time that this is what he gave to

19   MGA, those drawings; correct?

20   A.    I had no idea what he gave to MGA.  Sorry.

21   Q.    If you look at 1125, I think you said that these are

22   the drawings that you -- these are the drawings that you

23   believed you gave to your counsel; correct?

24   A.    Yes.

25   Q.    And these include drawings from the Bratz pitch book;

1    correct?

2    A.    Those are the drawings that I received.

3    Q.    Did you have any understanding, as you flip through

4    these, as to whether or not these drawings, these designs

5    were given to MGA in pitching the Bratz?

6              MR. MCCONVILLE:  Objection.  Foundation.  Calls

7    for speculation.

8              THE COURT:  Overruled.

9              THE WITNESS:  Can you, please, ask the question

10   again.

11   BY MR. PRICE:

12   Q.    Sure.  If you look at Exhibit 1125, and you flip

13   through there, do you have any understanding that these

14   designs were what was presented to MGA, prior to you getting

15   involved as a sculptor?

16   A.    I don't know what Carter gave to MGA.

17   Q.    All you know is that this is what he gave to you?

18   A.    Correct.

19             THE COURT:  Counsel, why don't you pick a

20   convenient time.  I don't want to interrupt you.  So when

21   you get to a logical breaking point --

22             MR. PRICE:  Yes, I'm fine.

23             THE COURT:  I didn't mean to interrupt you.  When

24   you get to a logical breaking point, so you just --

25             MR. PRICE:  It's logical.

1              THE COURT:  Are you sure?

2              MR. PRICE:  Yeah, I like a good attention span.

3              THE COURT:  Okay.  Then, you're admonished not to

4    discuss this matter with anybody else, or form or express

5    any opinion.

6              Has anybody talked to somebody so I get to start

7    the case all over again?  I'll do it.

8              Okay.  Have a good night now.  I'll see you

9    tomorrow at 8:30.

10        (*Jury out.*)

11        (*The following proceedings were had outside the*

12         *presence of the jury:*)

13             THE COURT:  Now, counsel, the jury is no longer

14   present.  You have to remember the court will probably agree

15   to anything that counsel for MGA and Mattel agree to, since

16   there hasn't been literally one agreement in this case.

17             But it appears to me that it might be absolutely

18   valuable that you just know that you have the court's

19   acquiescence not to be too concerned about the evidence code

20   concerning demonstratives.  So they might be extraordinarily

21   beneficial to Mattel and extraordinarily beneficial to MGA.

22   But without that stipulation, I'll simply follow the

23   evidence code concerning *Johnson,* and they won't be coming

24   in.

25             So these are being shown.  Frankly, the jury can

```
 1   recall them, but they will be struggling with dolls, or
 2   whatever.  You know, you got the court's consent, if you
 3   reach an agreement; otherwise, it's been interesting for
 4   both of you to just explain them briefly, and I hope the
 5   jury remembers them for both sides.
 6            Second, what I'm not going to do is allow
 7   quibbling over, or bargaining between the two of you so that
 8   if other demonstratives that still haven't been introduced,
 9   or we're still discussing concerning Mr. Quinn -- the
10   gentleman, Mr. Quinn?
11            MR. PRICE:  Kinrich.
12            THE COURT:  Mr. Kinrich.  You know, it's not two
13   for one, or anything like that.  So at the end of the case,
14   just discuss that with him.  He just raised that.
15            Number two, what's your decision since I raised it
16   on Sunday?  Do you want three hours on argument, or four
17   hours?
18            We're in the final stages now, so make a decision.
19       (Pause.)
20            THE COURT:  On the record, I'll guarantee there
21   won't be an agreement.
22            Now, remember how that plays out.  If there's more
23   than a day, either you have to think about that tactically
24   for both sides and who is responding.
25            Number two, you have to take into account Mr. Cote
```

 1    and Mr. Overland and how long is their argument.  Mr. Cote

 2    was here Sunday.  Mr. Overland was at the beach.

 3            Number three, there won't be a break between the

 4    evidence and your argument, unless you finish on Monday; and

 5    then, I'll consider Wednesday.  But, otherwise, we're going

 6    straight through.

 7            Number four, you are required to be here on both

 8    Saturday and Sunday, and we'll start at 8:00 o'clock on both

 9    days.

10            MS. KELLER:  Your Honor, on behalf of MGA, we

11    would be requesting three hours.

12            THE COURT:  Three hours.  Okay.

13            MR. QUINN:  We agree, your Honor.  We're sorry to

14    disappoint the court.

15            THE COURT:  Mark that, Debbie.  Put a big asterisk

16    by it.

17            All right.  Now, how long for Mr. Cote and

18    Mr. Overland?  Because that then takes it into MGA's time

19    for your argument.  So why don't you talk to Mr. Overland

20    and see what time he needs.

21            MR. OVERLAND:  Half hour to 40 minutes.

22            THE COURT:  I know.  How long?

23            MR. OVERLAND:  How long?

24            THE COURT:  Half hour to 40 minutes.  How much?

25    Half hour, or 40 minutes.  So we have designated times and

 1    MGA isn't complaining or asking for additional time, because

 2    I'm not going to give it.

 3            MR. OVERLAND:  35 minutes.

 4            THE COURT:  Okay.  Now, third, during the closing

 5    argument, we'll switch.

 6            Mattel will be at the table now occupied by MGA,

 7    and MGA will be at the table occupied by Mattel.

 8            I believe that, as I have stated formally and

 9    informally that Mattel began this lawsuit with Carter

10    Bryant.  There was intervention in a sense that you are the

11    true plaintiff in this matter, so you have a -- well, not

12    the true plaintiff.  The claim is balanced.  But you have

13    the last opportunity.  You're limited to 15 minutes.  So

14    there won't be any sandbagging.

15            There will be two hours and 45 minutes of straight

16    argument.  MGA they will have 15 minutes.  That's straight

17    rebuttal.  So you will have to be organized.

18            Now, Mr. Quinn wants to bargain with me.

19            Mr. Quinn, how much time you would like again so

20    you'll have a record?

21            MR. QUINN:  I would like what you suggested on

22    Sunday, your Honor.

23            THE COURT:  Yeah.  What was it?

24            MR. QUINN:  Half an hour.

25            THE COURT:  No, it's going to be 15 minutes.  That

1    way there can't be sandbagging.

2            Tell you what.  I'll compromise.  20 minutes.

3    That's your time frame on rebuttal.  So you have two hours

4    and 40 minutes.

5            Now, that means it's accomplished in one day.  Is

6    there going to be a PowerPoint demonstration?  In other

7    words, remember that every courtesy that the court extended

8    to both parties in this matter has been a courtesy that the

9    court is giving to you, not required to.  So when we started

10   this lawsuit, I had offered you the opportunity for a

11   PowerPoint presentation during opening statements.  That was

12   declined by MGA at that time.  No PowerPoint.

13           In addition to that, the court has decided that I

14   would allow you to put up exhibits as they were received

15   into evidence.  And the reason for that is, I don't think

16   that this case could be presented by either side, frankly,

17   if the jury just had a number and an exhibit with the

18   thousands of exhibits, if they referred to Exhibit 1147, and

19   you were reading from a letter, or you were reading from

20   e-mail.  That would never make any sense of the case for

21   both sides.  But that was a courtesy extended to you.  The

22   court doesn't have to do that.  That also will increase the

23   court's error rate, though, because I'm making snap

24   decisions so that I'm not taking time off from your clock

25   looking at each exhibit.  That's a chance the court will

```
 1   take.

 2              Are we going to have a PowerPoint presentation?

 3              MS. KELLER:  Your Honor, when the court says

 4   PowerPoints, are you talking all manner of demonstratives?

 5              THE COURT:  No, I'm just talking about evidence

 6   that's been received and properly received by the court, so

 7   that you can argue from that.  I don't have to let you do

 8   that.  Most federal courts, quite frankly, don't.  It's a

 9   little barbaric --

10              MS. KELLER:  I'm thinking --

11              THE COURT:  Now, PowerPoint.

12              Just a moment.  Demonstratives.

13              I saw you walk through the door just a moment ago.

14   I've offered both sides to not be too concerned about the

15   evidence code, if you'll agree concerning demonstratives.

16   So if Mattel believes that these demonstratives that you

17   have shown are beneficial to you, and you reach an agreement

18   and Mattel thinks that the demonstratives that you're about

19   to go through are beneficial to you and you can reach an

20   agreement, I'm happy to do that.  Otherwise, there won't be

21   any demonstratives.

22              MS. KELLER:  But we are going to be allowed to

23   display the exhibits that have been already entered, and the

24   trial testimony that has already been given?

25              THE COURT:  Yes.  But you won't be putting them
```

1   together in demonstrative form.  So you two can discuss that

2   informally.

3          Now, any questions before I call you back later

4   this evening?  I have got another case that I have got to

5   start at 5:30, unrelated to your matter, for about an hour

6   and a half, two hours.

7          MR. QUINN:  Two things, your Honor.

8          We have filed a motion for reconsideration.  This

9   would be for rebuttal for the expert witness, Mr. Keiser,

10   the one who did the scan.

11          THE COURT:  I have already denied it.  Check your

12   e-mail.

13          MR. QUINN:  You've denied the motion for

14   reconsideration?

15          THE COURT:  One sentence.  It's on your e-mail.

16   It was sent out about 10:00 o'clock this morning.

17          What else?

18          MR. QUINN:  The other thing, your Honor, is when

19   Mr. De Anda was on the stand, there was -- we offered the

20   thumb drive, the backpack thumb drive, Exhibit 24320.  There

21   was a stipulation as to chain of --

22          I'm sorry, Maryman was on the stand.  There's a

23   stipulation as to the chain of custody.  We would like to

24   offer that into evidence.

25          THE COURT:  Do you want to read that stipulation?

1    Has that been read before the jury?

2         MR. QUINN:  It was on the record live.  Ms. Hurst

3    said that they stipulated to the chain of custody.

4         MS. HURST:  Your Honor, we had no problem with the

5    chain.  The problem is the contents.  Nobody has come and

6    testified that those are trade secrets, or anything else.

7    So it's irrelevant.  It's hearsay.  It's inadmissible.  They

8    have no sponsoring witness to make that apart of this case.

9         MR. QUINN:  As to the contents, she's right.  But

10   as to the thumb drive, itself, as a piece of evidence that

11   the jury has heard about, there is a stipulation.  It's a

12   chain of custody and we would just offer the drive.

13        THE COURT:  And from Merriman, is this the thumb

14   drive from --

15        MR. QUINN:  Janine Brisbois.

16        THE COURT:  From Brisbois in Canada.  Let me

17   consider that.

18        MS. HURST:  Could I respond to that last point,

19   your Honor?

20        THE COURT:  Not right now.  We'll be back this

21   evening.

22        MR. QUINN:  You know, your Honor, our motion for

23   reconsideration was denied, and I don't know whether it

24   would be irrelevant to point out that Ms. Leahy just

25   testified about a digital scan that she used to discuss

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    differences in sculpt.  We have lay witnesses testifying

2    about differences from their own visual observation.

3    Ms. Garcia also did.

4            THE COURT:  Thank you.  Now, what else?

5            MR. MCCONVILLE:  Your Honor, during Ms. Leahy's

6    examination, I wanted to display and get into evidence a

7    letter that was sent by her attorneys to Quinn Emanuel.

8            THE COURT:  Well, the problem with that letter,

9    counsel, is that it has Mr. Quinn's name on it.  It draws

10   the parties into the lawsuit, and I've forbidden that.

11           MR. MCCONVILLE:  There are other letters that are

12   in evidence that have been sent to the Quinn Emanuel law

13   firm, including the cease and desist letter which has been

14   published to the jury.

15           THE COURT:  This letter is highly prejudicial.

16   What it basically is, if my memory is correct -- and let's

17   refer back to the exhibit number for just a moment.  It's

18   exhibit number --

19           Help me, counsel.

20       (Pause.)

21           THE COURT:  It's the resignation -- strike that.

22           It's not 1123.  It is -- this is what I call

23   the -- you're harassing me letter.  It's my letter -- if my

24   memory is correct, and I don't have the number at hand

25   mentally for a moment, until you find it for me.

1          MR. MCCONVILLE:  18572.

2          THE COURT:  It's a letter, if my memory is

3     correct -- it's a two-page letter, and you sought to

4     introduce page 2.  On the top left-hand corner is

5     Mr. Quinn's name.  And the import of that letter is that it,

6     basically, speaks to Ms. Leahy allegedly being harassed by

7     Mr. Moore.  That's the gist of the letter.  And let's pull

8     out that exhibit for a moment.

9        (Pause.)

10         THE COURT:  That means get it for me.  Thank you.

11         Now, put that letter up on the screen.  Now, go to

12    page 2 in the upper left-hand corner.

13         8483.  That's it.  I think you've gotten the

14    evidence in that she was concerned about Mr. Moore's

15    actions.  And if you go back to the first page, I think it

16    also speaks to the husband being contacted.  Yeah, her

17    client's husband is the sixth line down.

18         I warned all counsel not to draw each other in

19    this case.  I think the prejudicial effect outweighs the

20    probative value concerning this letter.  You got in the fact

21    that she's being harassed by Mr. Moore, allegedly, and that

22    calls took place.  But as far as this letter is concerned,

23    it's unduly prejudicial.

24         I don't think I'm going to allow it at this time.

25    So it's not received at this time.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          Now, what else?

2          MS. KELLER:  Your Honor, we understand that the

3    court has ordered the deposition of Michael Moore this

4    Saturday.

5          THE COURT:  It can be Sunday.

6          MS. KELLER:  Well, no.  Saturday is fine.  But we,

7    of course, haven't been privy to all the in-camera

8    procedures.

9          THE COURT:  And you won't be.  There's a lot of

10   attorney-client privilege.  It involved Mr. Quinn and

11   Mr. Zeller and literally the legal staff at Mattel.

12         MS. KELLER:  Your Honor, our --

13         THE COURT:  And if you want to delay that, that's

14   fine.  You'll, quite frankly, have to open your books and

15   put your thinking hat on.  You got the evidence right in

16   front of you.

17         The same issue concerning -- concerned Paula

18   Garcia and some e-mails involving Mr. Nolan that you sat

19   with.  Mattel ended up with that information and did the

20   best they could with it.  You're ending up with some

21   information also.

22         MS. KELLER:  Your Honor, are there any documents?

23   Because I know the court has reviewed many boxes.  Are there

24   any documents that the court would feel could be released to

25   us that are not privileged so we would have some kind of a

1    guidepost.

2            THE COURT:  I think you've already shown me the

3    documents, and I think that whoever was with me Sunday

4    evening -- Mr. McConville, or Ms. Hurst.

5            Ms. Hurst, you took Mr. McConville's place.  He

6    had to leave about 4:00 o'clock, and I asked you on Sunday

7    and pointed out with Mr. Zeller here some concerns I had

8    about two exhibits and how those had, in fact, been

9    redacted.  You have that evidence right in front of you.

10   I'm not going to go any further with this conversation, so.

11           All right.  Then, I'm going to order you back at

12   7:30.

13           Mr. Larian, and Mr. Eckert, have a good evening.

14           MS. KELLER:  Your Honor, may I -- may I request

15   leave to go, because I've been feeling quite ill all

16   afternoon.

17           THE COURT:  Take one of the opposing counsel with

18   you who wants to leave also, so we always have balance.

19           Who would like to leave?

20           Mr. Quinn or Mr. Price?

21           MR. QUINN:  I'm not feeling 100 percent myself,

22   your Honor.

23           THE COURT:  Mr. Quinn is leaving and Ms. Keller.

24   You two are carpooling.

25           Then, I'll meet everybody else at 7:30, except

```
 1    Mr. Overland.

 2         (At 5:17 p.m., proceedings were adjourned.)

 3

 4                         -oOo-

 5

 6                       CERTIFICATE

 7         I hereby certify that pursuant to Section 753,

 8    Title 28, United States Code, the foregoing is a true and

 9    correct transcript of the stenographically reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the

12    regulations of the Judicial Conference of the United States.

13

14    Date:   March 16, 2011

15

16

17                         _____

18                         Deborah D. Parker, Official Reporter

19

20

21

22

23

24

25
```