1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                     )
              Plaintiffs,             )
7                                     )
       vs.                            ) No. CV 04-9049 DOC
8                                     )    Day 34
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 4
9                                     )
                                      )
10            Defendants.             )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16               Santa Ana, California

17             Wednesday, March 16, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-16 D34V1

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 2 of 135   Page ID #:309727
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
                 QUINN EMANUEL URQUHART & SULLIVAN
4                BY:  JOHN QUINN
                      WILLIAM PRICE
5                     MICHAEL T. ZELLER
                      Attorneys at Law
6                865 South Figueroa Street
                 10th Floor
7                Los Angeles, California 90017
                 (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12               ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                 BY:  THOMAS S. McCONVILLE
13                    Attorney at Law
                 4 Park Plaza
14               Suite 1600
                 Irvine, California 92614
15               (949) 567-6700

16               – AND –

17               ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                 BY:  ANNETTE L. HURST
18                    Attorney at Law
                 405 Howard Street
19               San Francisco, California 94105
                 (415)773-5700
20
                 – AND –
21
                 KELLER RACKAUCKAS
22               BY:  JENNIFER KELLER
                      Attorney at Law
23               18500 Von Karman Avenue
                 Suite 560
24               Irvine, California 92612
                 (949) 476-8700
25

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 3 of 135   Page ID #:309728
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830

8            – AND –

9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660

13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406

18

19           ROBERT A. ECKERT, MATTEL CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

Case 2:04-cv-09049-DOC-RNB  Document 10224  Filed 03/18/11  Page 4 of 135  Page ID #:309729
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

4

1                                **I N D E X**

2    **WITNESSES**                    **DIRECT  CROSS  REDIRECT  RECROSS**

3    LEAHY, Margaret Anne (Resumed)

4    By Mr. Price                             6                    47

5    By Mr. McConville                              34

6

7    PRINCE, Jacqueline Ramona

8    By Ms. Keller                    51            98

9    By Mr. Price                             72                  102

10

11   LYTER III, Albert H.

12
     By Ms. Hurst                    108
13

14

15

16                               **EXHIBITS**

17   **EXHIBIT NO.**                  **IDENTIFICATION   IN EVIDENCE**

18     60-A    Notary Journal of                           54
19             Ms. Prince

       60      Photocopy of contents of                    54
20             Notary Journal of
               Ms. Prince
21
       62      Series of drawings                          72
22
       63      Drawings by Mr. Bryant                      86
23
       537-B   E-mail from Ms. Ward                        27
24             dated 10/25/2000 with
               attachments
25

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

5

**EXHIBITS (Continued)**

| EXHIBIT NO. | | IDENTIFICATION | IN EVIDENCE |
|---|---|---|---|
| 1129 | Drawing with notations on it | | 17 |
| 1139-1 | Drawings by Mr. Bryant | | 7 |
| 17821 | Invoice/Quote from Ms. Leahy to MGA dated 10/12/2000 | | 22 |
| 24136 | 1996 California Notary Law Primer | | 90 |
| 35817 | E-mail from Ms. Prince to Ms. Cendali dated 7/9/2004 | | 69 |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

6

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 16, 2011**        |
|       | 2  | **Day 34, Volume 1 of 4**                                  |
|       | 3  | (8:32 a.m.)                                                 |
| 08:32 | 4  | THE COURT:  All right.  We're back in session.             |
| 08:32 | 5  | The jury's present.  The alternates, all counsel, the      |
| 08:32 | 6  | parties, Ms. Leahy.                                         |
| 08:32 | 7  | And, Counsel, if you would like to continue on             |
| 08:32 | 8  | with your examination.                                     |
| 08:32 | 9  | This is once again Mr. Price on behalf of Mattel.          |
| 10:21 | 10 | **MARGARET ANNE LEAHY, MGA'S WITNESS, PREVIOUSLY SWORN**    |
| 10:21 | 11 | **RESUMED THE STAND**                                      |
| 08:33 | 12 | **CROSS-EXAMINATION (Resumed)**                            |
| 08:33 | 13 | BY MR. PRICE:                                               |
| 08:33 | 14 | Q.   Good morning, Ms. Leahy.                               |
| 08:33 | 15 | A.   Good morning, Mr. Price.                               |
| 08:33 | 16 | Q.   When we left, we were talking about Mr. Bryant, whether |
| 08:33 | 17 | he had any influence on the sculpts.  And as soon as I get  |
| 08:33 | 18 | someone up there to help you -- I'd like you to look at     |
| 08:33 | 19 | Exhibit 1139.                                               |
| 08:33 | 20 | MR. PRICE:  1139, Chris.  1139.                             |
| 08:33 | 21 | *(Document provided to the witness.)*                       |
| 08:33 | 22 | BY MR. PRICE:                                               |
| 08:33 | 23 | Q.   Ms. Leahy, if you would look at 1139-1, do you        |
| 08:33 | 24 | recognize that as some drawings that you received from     |
| 08:34 | 25 | Mr. Bryant?                                                 |

| | | |
|---|---|---|
| 08:34 | 1 | A.   Yes, I do. |
| 08:34 | 2 | MR. PRICE:  Your Honor, move Exhibit 1139 into |
| 08:34 | 3 | evidence. |
| 08:34 | 4 | THE COURT:  Received. |
| 08:34 | 5 | *(Exhibit No. 1139 received in evidence.)* |
| 08:34 | 6 | MR. PRICE:  If we can just show that, Ken. |
| 08:34 | 7 | *(Document displayed.)* |
| 08:34 | 8 | BY MR. PRICE: |
| 08:34 | 9 | Q.   And so this looks like some heads of dolls.  Do you see |
| 08:34 | 10 | that? |
| 08:34 | 11 | A.   Yes. |
| 08:34 | 12 | Q.   And there are some -- some figures on that to the side |
| 08:34 | 13 | of, for example, the second doll on the right, where it has |
| 08:34 | 14 | percentages and things of that nature.  Do you know whose |
| 08:34 | 15 | writing that is? |
| 08:34 | 16 | A.   That is my writing. |
| 08:34 | 17 | Q.   And could you point out to the jury what is your |
| 08:34 | 18 | writing, or tell us which of this is your handwriting? |
| 08:34 | 19 | A.   This is my handwriting, my little drawings and -- yeah, |
| 08:34 | 20 | this, with the numbers.  *(Indicating.)* |
| 08:34 | 21 | Q.   And the purpose of those notations was to allow for a |
| 08:34 | 22 | shrink rate; is that right? |
| 08:34 | 23 | A.   Correct. |
| 08:35 | 24 | Q.   Is there a portion that says -- I'm trying to look |
| 08:35 | 25 | at -- so above what you've pointed to, for example, there's |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 8 of 135   Page ID #:309733
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

8

| 08:35 | 1 | a number, 6 percent; is that right? |
| 08:35 | 2 | A.   Yes. |
| 08:35 | 3 | Q.   Is that the shrink rate? |
| 08:35 | 4 | A.   Yes. |
| 08:35 | 5 | Q.   And then there's 2.28, 2.02.  Next to that it has 1.96, |
| 08:35 | 6 | and looks like 116, or 2.16.  What do those indicate? |
| 08:35 | 7 | A.   It's 2.26.  It indicates a 6 percent -- it's just the |
| 08:35 | 8 | math of, you know, 94 percent. |
| 08:35 | 9 | Q.   And that's something a sculptor would be aware of; that |
| 08:35 | 10 | is, how the process itself would shrink the sculpt? |
| 08:35 | 11 | A.   Well, maybe not a general sculptor, but I was aware of |
| 08:35 | 12 | it. |
| 08:35 | 13 | Q.   Okay.  Now, I'd like you to look, if you would, at |
| 08:35 | 14 | Sculpt 1141-A.  This is the one you said you believe you |
| 08:35 | 15 | presented sometime around October 25th.  It should be in a |
| 08:35 | 16 | bag -- oh, a folder. |
| 08:36 | 17 | *(Exhibit provided to the witness.)* |
| 08:36 | 18 | *(Exhibit displayed.)* |
| 08:36 | 19 | THE WITNESS:  Would you like me to look at the |
| 08:36 | 20 | head? |
| 08:36 | 21 | BY MR. PRICE: |
| 08:36 | 22 | Q.   Oh, no.  If you could just have it in front of you, I |
| 08:36 | 23 | want to talk about the dating of that. |
| 08:36 | 24 | A.   Okay. |
| 08:36 | 25 | Q.   Now, the molds from which that was created, |

9

| | | |
|---|---|---|
| 08:36 | 1 | Exhibit 1141, were dated October 23; is that right? |
| 08:36 | 2 | A.   (No response.) |
| 08:36 | 3 | Q.   Let me show you something so you don't have to |
| 08:36 | 4 | remember.  It's 1140-A, I think.  I think they have the |
| 08:36 | 5 | actual molds there. |
| 08:36 | 6 |      If we could put 1140-A up. |
| 08:36 | 7 |         *(Document displayed.)* |
| 08:36 | 8 | BY MR. PRICE: |
| 08:36 | 9 | Q.   You see that's some scratchings there.  It says, |
| 08:36 | 10 | "Leahy, legs, three-quarter, 10, 23, 2000.  Do you see that? |
| 08:36 | 11 | A.   Yes.  Thank you. |
| 08:36 | 12 | Q.   And that -- and your understanding is that has to be |
| 08:37 | 13 | inscribed after the mold hardens overnight; is that right? |
| 08:37 | 14 | A.   Correct. |
| 08:37 | 15 | Q.   So there would have been something going on, on the |
| 08:37 | 16 | 22nd, and then there had to be hardening overnight, and then |
| 08:37 | 17 | that would be inscribed the next day? |
| 08:37 | 18 | A.   Correct. |
| 08:37 | 19 | Q.   And then before that's done, you have to actually have |
| 08:37 | 20 | a sculpt to give to Gentle Giant, right? |
| 08:37 | 21 | A.   Correct. |
| 08:37 | 22 | Q.   Because the molds are made from the sculpt? |
| 08:37 | 23 | A.   Correct. |
| 08:37 | 24 | Q.   So if we look at a calendar, and maybe we can look at |
| 08:37 | 25 | the one that you've drawn out in your notebook at 1137-17. |

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

10

| | | |
|---|---|---|
| 08:37 | 1 | *(Document provided to the witness.)* |
| 08:37 | 2 | *(Document displayed.)* |
| 08:37 | 3 | BY MR. PRICE: |
| 08:37 | 4 | Q.   You see in your notebook you've kind of written a |
| 08:37 | 5 | calendar here of October, and you see you have the 23rd as |
| 08:38 | 6 | being Monday, correct? |
| 08:38 | 7 | A.   Yes.  Do you mind if I find the page in my actual |
| 08:38 | 8 | notebook? |
| 08:38 | 9 | Q.   Yes.  It's 1137-17 in the copy of your notebook which |
| 08:38 | 10 | we've all been using so it's easy to find. |
| 08:38 | 11 | A.   I found it. |
| 08:38 | 12 | Q.   Okay.  So the 23rd's a Monday.  That's when the molds |
| 08:38 | 13 | are inscribed, right? |
| 08:38 | 14 | A.   Correct. |
| 08:38 | 15 | Q.   And they have to harden before that happens, correct? |
| 08:38 | 16 | A.   Correct. |
| 08:38 | 17 | Q.   Now, does Gentle Giant work on Sundays? |
| 08:38 | 18 | A.   They work over the weekends, yes. |
| 08:38 | 19 | Q.   So they could have done that on a Sunday, right? |
| 08:38 | 20 | A.   Yes. |
| 08:38 | 21 | Q.   So they have to be given the sculpt, right? |
| 08:38 | 22 | A.   Yes. |
| 08:38 | 23 | Q.   So, uh, can you tell when you've got the 17th, 18th, |
| 08:38 | 24 | 19, 20th, 21st here -- can you give us -- do you have any |
| 08:38 | 25 | documentation or anything as to when the sculpt was done |

| | | |
|---|---|---|
| 08:38 | 1 | that you eventually gave the Gentle Giant that they then |
| 08:39 | 2 | made the molds and put the October 23 inscription on them? |
| 08:39 | 3 | A.   Do you mind if I look at my notebook for a second? |
| 08:39 | 4 | Q.   Please do, if it gives you any indication here. |
| 08:39 | 5 | A.   Okay.  I don't believe this calendar has anything to do |
| 08:39 | 6 | with me dropping the mold off at Gentle Giant.  But I would |
| 08:39 | 7 | have dropped it off on Friday or Saturday. |
| 08:39 | 8 | Q.   Do you think it would have been the 20th or the 21st? |
| 08:39 | 9 | A.   Correct. |
| 08:39 | 10 | Q.   And would have been working on it for -- how long did |
| 08:39 | 11 | you say it takes to make this kind of -- this kind of a |
| 08:39 | 12 | sculpt? |
| 08:39 | 13 | A.   The -- this? (Indicating.) |
| 08:39 | 14 | Q.   Yes.  How long did it take you to create this? |
| 08:39 | 15 | A.   How long did it take me to create this? |
| 08:39 | 16 | Q.   Yes. |
| 08:39 | 17 | A.   Excuse me.  Give me one minute. |
| 08:39 | 18 |      It would have been in between the meetings. |
| 08:39 | 19 | Q.   The last meeting you had with everyone was on the 6th, |
| 08:39 | 20 | right?  And then on the 11th, you get that -- you get 1136? |
| 08:40 | 21 | A.   Correct. |
| 08:40 | 22 | Q.   Okay.  And so is that when you started working on the |
| 08:40 | 23 | next sculpt? |
| 08:40 | 24 | A.   This -- excuse me, 1141-A? |
| 08:40 | 25 | Q.   Yes, 1141-A. |

08:40    1    A.    Okay.  I would have started working on this after they
08:40    2    did another mold of the big one.  So that would have been a
08:40    3    day or two.  So let's say two or three days after the
08:40    4    October 6th meeting.
08:40    5    Q.    So it's your best recollection you were working on that
08:40    6    1141 from after the October 6th meeting up through at least
08:40    7    the 20th of October, correct?
08:40    8    A.    Correct.
08:40    9    Q.    Okay.  Is it possible you finished working on it on the
08:40   10    19th or the 18th or the 17th?
08:41   11    A.    If we were having Gentle Giant work over the weekend,
08:41   12    it's more than likely I would have rushed it over there as
08:41   13    soon as I was done and given it to them, so it would have
08:41   14    been towards the later end of the week.
08:41   15    Q.    Okay.  It might be the 19th, 20th, or 21st?
08:41   16    A.    Correct.
08:41   17    Q.    Uh, Mr. Bryant was an employee of Mattel up until
08:41   18    October 19th?
08:41   19    A.    I wasn't sure when he left Mattel.
08:41   20    Q.    But you're working on this 1141 between October 6th and
08:41   21    the end of this week sometime, the 19th, 20th, and 21st,
08:41   22    correct?
08:41   23    A.    Correct.  I can't give you the exact date.
08:41   24    Q.    Sure.
08:41   25    A.    But it would have been towards the end of the week,

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

13

| | | |
|---|---|---|
| 08:41 | 1 | yes. |
| 08:41 | 2 | Q.   And that mold, 1114-A, that you've shown to the jury -- |
| 08:41 | 3 | A.   The sculpt? |
| 08:41 | 4 | Q.   The sculpt, I'm sorry.  Yes, the sculpt, 1141-A. |
| 08:41 | 5 | Mr. Bryant made the drawing in connection with that sculpt, |
| 08:41 | 6 | that particular sculpt, right? |
| 08:41 | 7 | A.   After I had sculpted it, yes.  But it was after he had |
| 08:42 | 8 | seen the cast of it, which would have been after the mold |
| 08:42 | 9 | was made.  He didn't see the wax of this.  That was molded, |
| 08:42 | 10 | you know, the -- towards the end of that week. |
| 08:42 | 11 | Q.   So -- so -- |
| 08:42 | 12 | A.   Of the 18th or 19th. |
| 08:42 | 13 | Q.   So I want to get your testimony, then.  You're saying |
| 08:42 | 14 | that Mr. Bryant made a drawing, basically, based on that |
| 08:42 | 15 | sculpt sometime after October 25th? |
| 08:42 | 16 | A.   Yes.  Yes. |
| 08:42 | 17 | Q.   That he decided to draw your sculpt? |
| 08:42 | 18 | A.   Correct. |
| 08:42 | 19 | Q.   After you had already made the sculpt, he drew this |
| 08:42 | 20 | sculpt that you created? |
| 08:42 | 21 | A.   Well, he thought he was making a helpful drawing for |
| 08:42 | 22 | the next level of -- |
| 08:42 | 23 | Q.   Well -- well, I think you said yesterday you don't |
| 08:42 | 24 | recall him ever telling you why he did that, correct? |
| 08:42 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 14 of 135   Page ID #:309739
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

14

| | | |
|---|---|---|
| 08:42 | 1 | Q.   And it would not be helpful for you -- for Mr. Bryant |
| 08:42 | 2 | to give you a drawing of a sculpt you already did, right? |
| 08:43 | 3 | A.   Not in my view, but in his view it was. |
| 08:43 | 4 | Q.   And you would admit he's a fairly good artist? |
| 08:43 | 5 | A.   I am reluctant to say it, but he's not very talented at |
| 08:43 | 6 | drawing, to put it in a nice way. |
| 08:43 | 7 | Q.   Okay.  Okay.  Well, let's look at Exhibit 323-32. |
| 08:43 | 8 | (Document provided to the witness.) |
| 08:43 | 9 | (Document displayed.) |
| 08:43 | 10 | THE WITNESS:  Thank you. |
| 08:43 | 11 | BY MR. PRICE: |
| 08:43 | 12 | Q.   This is the drawing that you say Mr. Bryant did of the |
| 08:43 | 13 | sculpt that you had already created, and he did it after |
| 08:43 | 14 | October 25th, correct? |
| 08:43 | 15 | A.   Correct. |
| 08:43 | 16 | Q.   So if he did the drawing of the sculpt, there are |
| 08:43 | 17 | obviously going to be similarities between the drawing and |
| 08:43 | 18 | the sculpt, correct? |
| 08:43 | 19 | A.   Correct. |
| 08:43 | 20 | Q.   And you agree with that, that this drawing resembles |
| 08:43 | 21 | the sculpt, Exhibit 1141? |
| 08:44 | 22 | A.   It -- yes, it's a front view and it resembles it, you |
| 08:44 | 23 | know.  I could spend a long time pointing out the |
| 08:44 | 24 | differences, but it resembles what he remembered my sculpt |
| 08:44 | 25 | was, 'cause he didn't have it in front of him when he was |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 15 of 135   Page ID #:309740
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

15

| | | |
|---|---|---|
| 08:44 | 1 | making the drawing. |
| 08:44 | 2 | Q.   And as a sculptor -- I mean, you're a professional, |
| 08:44 | 3 | kind of an expert in sculpting, correct? |
| 08:44 | 4 | A.   Correct. |
| 08:44 | 5 | Q.   So you're going to notice differences that someone |
| 08:44 | 6 | who's not a sculptor, say, an artist or, heaven forbid, a |
| 08:44 | 7 | lawyer might not notice, correct? |
| 08:44 | 8 | A.   Correct.  Possible. |
| 08:44 | 9 | Q.   So the question is, then, this drawing which he did, |
| 08:44 | 10 | which resembles your sculpt, 1141, was it done before or |
| 08:44 | 11 | after your sculpt? |
| 08:44 | 12 | Let me ask you this:  Would you have any explanation as |
| 08:44 | 13 | to why Steven Linker received a copy of this drawing on |
| 08:44 | 14 | October 17th before you even did the sculpt? |
| 08:45 | 15 | MR. McCONVILLE:  Objection.  This is |
| 08:45 | 16 | argumentative.  Goes to closing argument. |
| 08:45 | 17 | THE COURT:  Overruled. |
| 08:45 | 18 | THE WITNESS:  I have no idea of Steven Linker's |
| 08:45 | 19 | involvement at this at all -- in this at all.  I have -- I |
| 08:45 | 20 | can't say. |
| 08:45 | 21 | BY MR. PRICE: |
| 08:45 | 22 | Q.   Well, would you have any explanation as to -- as to why |
| 08:45 | 23 | Ms. Garcia would say that this drawing was done before |
| 08:45 | 24 | October 19th, before Mr. Bryant left Mattel? |
| 08:45 | 25 | MR. McCONVILLE:  Same objection. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 16 of 135   Page ID #:309741
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

16

| | | |
|---|---|---|
| 08:45 | 1 | THE COURT: I'm not certain what her relationship |
| 08:45 | 2 | is yet with Ms. Garcia, so I'm going to allow you to answer |
| 08:45 | 3 | that question and the conversations that were had. I know |
| 08:45 | 4 | there were some conversations. So you can answer Counsel's |
| 08:45 | 5 | questions. |
| 08:45 | 6 | THE WITNESS: Okay. Would you mind asking the |
| 08:45 | 7 | question one more time. |
| 08:45 | 8 | BY MR. PRICE: |
| 08:45 | 9 | Q.   Yeah. Would you have any explanation as to why |
| 08:45 | 10 | Ms. Garcia would say that this drawing, 323-32, was done |
| 08:45 | 11 | before October 19th? |
| 08:45 | 12 | A.   I would have no explanation, 'cause I don't know |
| 08:46 | 13 | anything about that. |
| 08:46 | 14 | Q.   So -- because according to you, that would be |
| 08:46 | 15 | absolutely impossible, 'cause it was actually based on 1141, |
| 08:46 | 16 | correct? |
| 08:46 | 17 | A.   Correct. |
| 08:46 | 18 | Q.   So when you received this from Mr. Bryant, then, you |
| 08:46 | 19 | had no use for it; is that right? |
| 08:46 | 20 | A.   Correct. |
| 08:46 | 21 | Q.   Yeah. Just -- just tossed it away? |
| 08:46 | 22 | A.   Well, I didn't toss it away. I just put it aside. |
| 08:46 | 23 | Q.   Okay. And did you ever, you know, use it? |
| 08:46 | 24 | A.   No, I did not. |
| 08:46 | 25 | Q.   I'd like you to look at Exhibit 1129. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 17 of 135   Page ID #:309742
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

17

| | | |
|---|---|---|
| 08:46 | 1 | *(Document provided to the witness.)* |
| 08:46 | 2 | BY MR. PRICE: |
| 08:46 | 3 | Q.   Do you recognize 1129 as the same drawing as 323-32 but |
| 08:47 | 4 | with no notations on it? |
| 08:47 | 5 | A.   Correct. |
| 08:47 | 6 |         MR. PRICE:  Move 1129 into evidence, Your Honor. |
| 08:47 | 7 |         THE COURT:  Received. |
| 08:47 | 8 |     *(Exhibit No. 1129 received in evidence.)* |
| 08:47 | 9 |       *(Document displayed.)* |
| 08:47 | 10 |         MR. PRICE:  If we can put that up next to 323-32. |
| 08:47 | 11 |       *(Document displayed.)* |
| 08:47 | 12 | BY MR. PRICE: |
| 08:47 | 13 | Q.   So on the right here we have 323-32, which you say is a |
| 08:47 | 14 | drawing you received from Mr. Bryant after you created your |
| 08:47 | 15 | sculpt, 1141, and that you didn't use in any manner.  Do you |
| 08:47 | 16 | recall that testimony? |
| 08:47 | 17 | A.   Yes.  I didn't use it for sculpting purposes. |
| 08:47 | 18 | Q.   I thought you just told us you didn't use it at all; |
| 08:47 | 19 | you kind of put it away.  It was no use to you.  It was a |
| 08:47 | 20 | drawing of something you'd already done, right? |
| 08:47 | 21 | A.   Correct. |
| 08:47 | 22 | Q.   Okay.  Now, let's look at 1129.  We can take |
| 08:47 | 23 | 323-32 down.  Look at 1129. |
| 08:48 | 24 |         MR. PRICE:  If we can blow this up here, Ken. |
| 08:48 | 25 |       *(Technician complies.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 18 of 135   Page ID #:309743
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

18

| | | |
|---|---|---|
| 08:48 | 1 | BY MR. PRICE: |
| 08:48 | 2 | Q.   There's some notations here on the left of this, |
| 08:48 | 3 | correct? |
| 08:48 | 4 | A.   Correct. |
| 08:48 | 5 | Q.   Those are yours? |
| 08:48 | 6 | A.   Yes, they are. |
| 08:48 | 7 | Q.   And those notations are in connection with the same |
| 08:48 | 8 | shrinkage issue that you had spoken of before, correct? |
| 08:48 | 9 | A.   Are they the same numbers? |
| 08:48 | 10 | Q.   Not the same numbers.  Are they in connection with |
| 08:48 | 11 | dealing with the shrinkage issue that you spoke of before, |
| 08:48 | 12 | you know, when we were looking at the faces? |
| 08:48 | 13 | A.   I don't know.  I can't say. |
| 08:48 | 14 | Q.   So sitting here today, you can't say what those numbers |
| 08:48 | 15 | represent? |
| 08:48 | 16 | A.   I can't.  It could have been dollars.  I really |
| 08:48 | 17 | honestly cannot say truthfully what I used those numbers |
| 08:48 | 18 | for. |
| 08:48 | 19 | Q.   Okay.  Now, let's get a -- by the way, this is your |
| 08:49 | 20 | handwriting on the lower right-hand corner as well, correct? |
| 08:49 | 21 | A.   Yes.  The phone number. |
| 08:49 | 22 | Q.   And the phone number down there, that handwriting, |
| 08:49 | 23 | that's Mr. Bryant's phone number, correct? |
| 08:49 | 24 | A.   I'd have to look up his number, but I'll take your word |
| 08:49 | 25 | for it. |

| 08:49 | 1 | MR. PRICE:  And if we can -- we can step back a |
| 08:49 | 2 | little bit, Ken. |
| 08:49 | 3 | *(Technician complies.)* |
| 08:49 | 4 | BY MR. PRICE: |
| 08:49 | 5 | Q.   Is there anything else on this which is your |
| 08:49 | 6 | handwriting? |
| 08:49 | 7 | A.   No.  I don't see -- the rest is Carter's handwriting. |
| 08:49 | 8 | MR. PRICE:  And if we could look at -- put |
| 08:49 | 9 | demonstrative, Ken, 24333-0009. |
| 08:49 | 10 | *(Document provided to the witness.)* |
| 08:50 | 11 | *(Document displayed.)* |
| 08:50 | 12 | BY MR. PRICE: |
| 08:50 | 13 | Q.   Now, on the right here, we have -- this is |
| 08:50 | 14 | Exhibit 1141, correct? |
| 08:50 | 15 | A.   Correct. |
| 08:50 | 16 | Q.   And then we have on the left Exhibit 1129.  And that's |
| 08:50 | 17 | the drawing that Mr. Bryant gave you at some point with your |
| 08:50 | 18 | notations on it, correct? |
| 08:50 | 19 | A.   Correct. |
| 08:50 | 20 | Q.   Now, as you said, Mr. Bryant wasn't an engineer, right? |
| 08:50 | 21 | A.   No, he was not. |
| 08:50 | 22 | Q.   I mean, he didn't know how you were going to have to |
| 08:50 | 23 | actually attach the legs or the arms; is that correct? |
| 08:50 | 24 | A.   He did after the October 25th meeting with Mercedeh. |
| 08:50 | 25 | Q.   Mercedeh Ward was an engineer? |

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

20

| | | |
|---|---|---|
| 08:50 | 1 | A.   Yes. |
| 08:50 | 2 | Q.   And she's the one who knew in detail how you were |
| 08:50 | 3 | actually going to be able to make this a -- a production |
| 08:50 | 4 | doll with the correct hip joints and the correct arm joints, |
| 08:50 | 5 | correct? |
| 08:50 | 6 | A.   Correct. |
| 08:51 | 7 | Q.   And with respect to 1129 -- |
| 08:51 | 8 | MR. PRICE:  If we can put that up. |
| 08:51 | 9 | (Document displayed.) |
| 08:51 | 10 | BY MR. PRICE: |
| 08:51 | 11 | Q.   Even though you don't have a specific recollection as |
| 08:51 | 12 | to why you wrote these numbers, it's true that a lot of |
| 08:51 | 13 | times you have to adjust sizes and proportions, correct? |
| 08:51 | 14 | A.   That is true. |
| 08:51 | 15 | Q.   And that's your -- your -- your best recollection as to |
| 08:51 | 16 | what these numbers represent, correct? |
| 08:51 | 17 | A.   I wasn't sure what the numbers -- I can't say, I'm |
| 08:51 | 18 | sorry.  I'm not -- I don't know what the numbers |
| 08:51 | 19 | represented. |
| 08:51 | 20 | Q.   Sometimes Ms. Garcia or Ms. Ward would tell you -- give |
| 08:51 | 21 | you an idea of what the shrink rate was, correct? |
| 08:51 | 22 | A.   Not Paula, but Mercedeh did. |
| 08:51 | 23 | Q.   And then you will have to do equations to modify the |
| 08:52 | 24 | head according to whatever would be the change in size, |
| 08:52 | 25 | correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 21 of 135   Page ID #:309746
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

21

| | | |
|---|---|---|
| 08:52 | 1 | A.   Correct. |
| 08:52 | 2 | Q.   And that was your best guess as to what this –– these |
| 08:52 | 3 | numbers were on Exhibit 1129? |
| 08:52 | 4 | MR. McCONVILLE:  Objection.  Asked and answered. |
| 08:52 | 5 | THE COURT:  Overruled. |
| 08:52 | 6 | THE WITNESS:  I didn't –– I'm not sure what the |
| 08:52 | 7 | numbers were for, and I feel uncomfortable guessing. |
| 08:52 | 8 | BY MR. PRICE: |
| 08:52 | 9 | Q.   Sure.  Well, do you remember you were asked at your |
| 08:52 | 10 | deposition –– actually –– a deposition –– if you had any |
| 08:52 | 11 | recollection as to what these numbers were for, and then you |
| 08:52 | 12 | talked about doing calculations for shrink rates, things |
| 08:52 | 13 | like that? |
| 08:52 | 14 | A.   Which deposition? |
| 08:52 | 15 | Q.   12/12/2007. |
| 08:52 | 16 | A.   The first one? |
| 08:52 | 17 | Q.   Yeah.  I mean, do you recall you looked at it and you |
| 08:52 | 18 | thought it had something to do with shrink rates and having |
| 08:52 | 19 | to do equations for shrink rates? |
| 08:52 | 20 | A.   It could have had something to do with shrink rate. |
| 08:53 | 21 | If –– if you did the math right now and told me that was |
| 08:53 | 22 | 6 percent, then I would assume that it was more for shrink |
| 08:53 | 23 | rate. |
| 08:53 | 24 | Q.   That's over my head, so let's move on. |
| 08:53 | 25 | So 1141-A, that –– that sculpt is what you described as |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 22 of 135   Page ID #:309747
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

22

| 08:53 | 1 | the final body before the tooling model body; is that right? |
| 08:53 | 2 | *(Document displayed.)* |
| 08:53 | 3 | THE WITNESS:  Correct. |
| 08:53 | 4 | BY MR. PRICE: |
| 08:53 | 5 | Q.   And the one that came later, 1234, you've described as |
| 08:53 | 6 | a tooling model body, correct? |
| 08:53 | 7 | *(Document displayed.)* |
| 08:53 | 8 | THE WITNESS:  Right.  I wouldn't call it the final |
| 08:53 | 9 | body, I apologize.  I would call the tooling model the |
| 08:53 | 10 | final –– final-final. |
| 08:53 | 11 | BY MR. PRICE: |
| 08:53 | 12 | Q.   Okay.  If you would look at Exhibit 17821. |
| 08:54 | 13 | *(Document provided to the witness.)* |
| 08:54 | 14 | BY MR. PRICE: |
| 08:54 | 15 | Q.   And do you recognize that, ma'am, as a quote you gave |
| 08:54 | 16 | MGA on October 12, 2000, for a rough body and then a final |
| 08:54 | 17 | body and then an extra head? |
| 08:54 | 18 | A.   Excuse me while I read it. |
| 08:54 | 19 | Yes, I recognize it as a quote. |
| 08:54 | 20 | Q.   Okay. |
| 08:54 | 21 | MR. PRICE:  Your Honor, move Exhibit 17821 into |
| 08:54 | 22 | evidence. |
| 08:54 | 23 | THE COURT:  Received. |
| 08:54 | 24 | *(Exhibit No. 17821 received in evidence.)* |
| 08:54 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 08:54 | 1 | BY MR. PRICE: |
| 08:54 | 2 | Q.   So this is something you do before you do the work? -- |
| 08:54 | 3 | the quote. |
| 08:54 | 4 | A.   Ideally, yes.  But many times it -- the invoicing and |
| 08:54 | 5 | quotes falls through the cracks. |
| 08:55 | 6 | Q.   In this case, the rough body, you'd already done, |
| 08:55 | 7 | correct? |
| 08:55 | 8 | A.   Correct. |
| 08:55 | 9 | Q.   And that was what was presented October 6th? |
| 08:55 | 10 | A.   Correct. |
| 08:55 | 11 | Q.   So here we have the invoice now for a final body and |
| 08:55 | 12 | extra head. |
| 08:55 | 13 | If you would look at Exhibit 17823. |
| 08:55 | 14 | *(Document provided to the witness.)* |
| 08:55 | 15 | MR. PRICE:  And that one is in evidence, |
| 08:55 | 16 | Your Honor. |
| 08:55 | 17 | *(Document displayed.)* |
| 08:55 | 18 | THE COURT:  That should be the October 25th |
| 08:55 | 19 | invoice? |
| 08:55 | 20 | MR. PRICE:  Yes. |
| 08:55 | 21 | THE COURT:  All right.  Thank you. |
| 08:55 | 22 | BY MR. PRICE: |
| 08:55 | 23 | Q.   And if we look at -- that's October 25th.  If we look |
| 08:55 | 24 | at the body here of this, it says, "Item" -- I'm sorry -- |
| 08:55 | 25 | the body of the invoice, it says, "Item:  Final body", and |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 24 of 135   Page ID #:309749
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

24

| 08:55 | 1 | then it has "Rate" and the "Total." |
|-------|---|-------------------------------------|
| 08:55 | 2 | Do you see that? |
| 08:55 | 3 | A.   Yes, I do. |
| 08:55 | 4 | Q.   And this is for work -- the actual invoice is for work |
| 08:55 | 5 | already done, correct? |
| 08:56 | 6 | A.   It's really hard to say.  Like I said, the invoices get |
| 08:56 | 7 | mixed up because I'm not the best recordkeeper, as far as |
| 08:56 | 8 | bookkeeping. |
| 08:56 | 9 | Q.   But there's a difference between a quote and an |
| 08:56 | 10 | invoice? |
| 08:56 | 11 | A.   Yes, there is. |
| 08:56 | 12 | Q.   And you might take awhile to do the quote, correct? |
| 08:56 | 13 | A.   Yes. |
| 08:56 | 14 | Q.   But the invoice -- |
| 08:56 | 15 | A.   Correct. |
| 08:56 | 16 | Q.   -- you don't send a bill for something until you've |
| 08:56 | 17 | done it, right? |
| 08:56 | 18 | A.   Not always. |
| 08:56 | 19 | Q.   Well, if we assume this invoice is for something you've |
| 08:56 | 20 | already done, this invoice for final body is for 11 -- I'm |
| 08:56 | 21 | sorry, I forgot -- 1141-A, same day you presented it, right? |
| 08:56 | 22 | A.   I would say we could assume -- assume, from all the |
| 08:57 | 23 | dates and everything, that it was for this, yes. |
| 08:57 | 24 | *(Indicating.)* |
| 08:57 | 25 | Q.   And then, 1234 is -- which is the one that you told us |

| | | |
|---|---|---|
| 08:57 | 1 | was -- was finally done in December, you described that -- |
| 08:57 | 2 | is there some kind of a terminology in your profession that |
| 08:57 | 3 | you call something the "tooling model body"? |
| 08:57 | 4 | *(Document displayed.)* |
| 08:57 | 5 | THE WITNESS:  There is a term for that, yes. |
| 08:57 | 6 | BY MR. PRICE: |
| 08:57 | 7 | Q.   And that's what you used to refer to the one you did |
| 08:57 | 8 | later after -- after the one you did in the invoice on |
| 08:57 | 9 | 17823, correct? |
| 08:57 | 10 | A.   Correct. |
| 08:57 | 11 | Q.   All right.  And you mentioned that between the time you |
| 08:57 | 12 | did 1141-A, where we have that invoice for the final body, |
| 08:57 | 13 | and the time you did 1234, the one in December, that there |
| 08:57 | 14 | were -- I guess Mercedeh Ward gave you numerous comments and |
| 08:58 | 15 | engineering comments, where the ball joints go, technical -- |
| 08:58 | 16 | to make a technical, feasible, toolable doll, correct? |
| 08:58 | 17 | A.   Correct. |
| 08:58 | 18 | Q.   And that's something that's her expertise, how to make |
| 08:58 | 19 | something toolable so it can actually be produced in volume, |
| 08:58 | 20 | correct? |
| 08:58 | 21 | A.   Correct. |
| 08:58 | 22 | Q.   And if you'd look at Exhibit 537-B. |
| 08:58 | 23 | *(Document provided to the witness.)* |
| 08:58 | 24 | BY MR. PRICE: |
| 08:58 | 25 | Q.   Now, Ms. Leahy, this is an e-mail -- you're not on this |

| 08:58 | 1 | string, but there's some attachments to it. |
| 08:58 | 2 | A.   Okay. |
| 08:58 | 3 | Q.   And I want you to look at the attachments and tell me |
| 08:58 | 4 | if you recognize them. |
| 08:58 | 5 | A.   Can you define "attachments"? |
| 08:58 | 6 | Q.   Sure.  It's the second and third pages following the |
| 08:58 | 7 | body of the e-mail. |
| 08:58 | 8 | A.   Okay.  I see them. |
| 08:59 | 9 | Q.   Do you recognize the second page of that picture there? |
| 08:59 | 10 | A.   The Barbie picture? |
| 08:59 | 11 | Q.   If that's what you recognize it as. |
| 08:59 | 12 | A.   Yes. |
| 08:59 | 13 | Q.   Okay.  So second page is a Barbie picture. |
| 08:59 | 14 | And what's -- what's the third page? |
| 08:59 | 15 | A.   The third page is the 1141 -- the middle sculpt I did. |
| 08:59 | 16 | Q.   So these are -- it's four pictures of -- of sculpt |
| 08:59 | 17 | 1141, which you presented on October 25th, correct? |
| 08:59 | 18 | A.   Correct.  That's the one. |
| 08:59 | 19 | Q.   And if you look at the first page, you see this is |
| 08:59 | 20 | dated October 25th, 2000? |
| 08:59 | 21 | A.   Which page? |
| 08:59 | 22 | Q.   The first page of the e-mail. |
| 08:59 | 23 | A.   Okay.  Yes. |
| 08:59 | 24 | Q.   And on the bottom of it has an MGA Bates stamp?  Bottom |
| 08:59 | 25 | right? |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

27

| | | |
|---|---|---|
| 08:59 | 1 | A.   Yes, yes. |
| 08:59 | 2 | MR. PRICE:  Your Honor, move Exhibit 537-B into |
| 09:00 | 3 | evidence. |
| 09:00 | 4 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:00 | 5 | THE COURT:  Received. |
| 09:00 | 6 | *(Exhibit No. 537-B received in evidence.)* |
| 09:00 | 7 | *(Document displayed.)* |
| 09:00 | 8 | BY MR. PRICE: |
| 09:00 | 9 | Q.   And Mercedeh Ward -- it says "from Mercedeh Ward." |
| 09:00 | 10 | That's who you were working with on all these technical |
| 09:00 | 11 | issues, correct? |
| 09:00 | 12 | A.   Correct. |
| 09:00 | 13 | Q.   And you met with her and Ms. Garcia and Mr. Bryant |
| 09:00 | 14 | around October 25th, right? |
| 09:00 | 15 | A.   Yes. |
| 09:00 | 16 | MR. McCONVILLE:  Your Honor, she's not on this |
| 09:00 | 17 | e-mail.  She's testified to that. |
| 09:00 | 18 | THE COURT:  I know she's not, Counsel, but Paula |
| 09:00 | 19 | Garcia Treantafelles is and so is Carter Bryant.  If we need |
| 09:00 | 20 | to bring them back, we'll certainly do that.  I'm going to |
| 09:00 | 21 | receive it, subject to further discussion. |
| 09:00 | 22 | MR. McCONVILLE:  Then can I have a continuing |
| 09:00 | 23 | objection for any response she's going to give to this |
| 09:00 | 24 | e-mail? |
| 09:00 | 25 | THE COURT:  Continuing objection.  Thank you. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:00 | 1 | MR. McCONVILLE:  Thank you. |
| 09:00 | 2 | BY MR. PRICE: |
| 09:00 | 3 | Q.  And you see the first paragraph, "I'm forwarding doll |
| 09:00 | 4 | images of the sculpting we reviewed today.  And I need HK |
| 09:00 | 5 | help on supplying the armature to L.A. sculptor for the |
| 09:00 | 6 | dolls arms.  I need one armature for the right arm and one |
| 09:01 | 7 | for the left arm."  Do you see that? |
| 09:01 | 8 | A.  Yes, I do. |
| 09:01 | 9 | Q.  Did you receive those armatures? |
| 09:01 | 10 | A.  No, I did not. |
| 09:01 | 11 | Q.  It says, "I'm sending the sculpting to you via FedEx |
| 09:01 | 12 | tonight.  I'm also sending the following to you:  A few of |
| 09:01 | 13 | our competitors' dolls so you can take into consideration |
| 09:01 | 14 | the look we are trying to achieve." |
| 09:01 | 15 | And I think you said the second page here is a sculpt |
| 09:01 | 16 | of a -- of a Barbie doll? |
| 09:01 | 17 | A.   Yes. |
| 09:01 | 18 | THE COURT:  Now, ladies and gentlemen, Counsel's |
| 09:01 | 19 | right.  Technically, this is hearsay, but if we need to get |
| 09:01 | 20 | Paula Garcia back, we will.  I'm going to let the |
| 09:01 | 21 | examination continue so Ms. Leahy doesn't have to come back |
| 09:01 | 22 | at a later time also. |
| 09:01 | 23 | THE WITNESS:  Thank you. |
| 09:01 | 24 | THE COURT:  Otherwise, I'll have to have you come |
| 09:01 | 25 | back. |

| | | |
|---|---|---|
| 09:01 | 1 | Counsel. |
| 09:01 | 2 | BY MR. PRICE: |
| 09:01 | 3 | Q.   And then if we would look at the third page, you |
| 09:01 | 4 | mentioned there were pictures of the Exhibit 1141-A, the |
| 09:01 | 5 | sculpt you did.  This is what you're talking about, these |
| 09:01 | 6 | pictures? |
| 09:01 | 7 | A.   What am I talking about? |
| 09:01 | 8 | Q.   When you -- before the jury saw this, you said there |
| 09:01 | 9 | was a picture of -- of the sculpt you did? |
| 09:01 | 10 | A.   Yes. |
| 09:01 | 11 | Q.   1141-A? |
| 09:02 | 12 | A.   Yes. |
| 09:02 | 13 | Q.   This is the picture -- pictures of the sculpt you did, |
| 09:02 | 14 | correct? |
| 09:02 | 15 | A.   Correct. |
| 09:02 | 16 | Q.   And if we can put up exhibit -- demonstrative |
| 09:02 | 17 | 24333-0008. |
| 09:02 | 18 | *(Document provided to the witness.)* |
| 09:02 | 19 | *(Document displayed.)* |
| 09:02 | 20 | BY MR. PRICE: |
| 09:02 | 21 | Q.   You see, Ms. Leahy, we have a -- a -- I put up here |
| 09:02 | 22 | the -- the drawing, 1129, where you had these numbers on |
| 09:02 | 23 | them and Mr. Bryant's phone number; 1141, the sculpt that |
| 09:02 | 24 | you billed for as the final sculpt; and then 1234, the |
| 09:02 | 25 | tooling sculpt. |

09:02 1       Uh, and let me ask you, is it -- again, is it fair to

09:02 2   say that because you are, uh -- you're someone who is fairly

09:02 3   dedicated to your work?

09:02 4   A.    Yes.

09:03 5   Q.    Very dedicated to your work?

09:03 6   A.    Very dedicated, yes.

09:03 7   Q.    And -- and you're going to notice differences that

09:03 8   other people aren't going to notice between sculpts, right?

09:03 9   A.    I don't know what people and others think and what

09:03 10   people don't.  But I do notice many things.

09:03 11   Q.    Now, I want to ask, you talked about getting a call

09:03 12   from an attorney, uh, named Michael Moore.  Do you recall

09:03 13   that?

09:03 14   A.    Yes, I do.

09:03 15   Q.    And, uh, I want to ask you, by the way, yesterday we

09:03 16   talked about -- about your husband having not had a job, uh,

09:03 17   and having difficulty paying your car payments.  Did your --

09:03 18   did your husband eventually get a job with Mattel?

09:03 19   A.    Yes, he did.

09:03 20   Q.    Okay.  When was that?

09:03 21   A.    I can't recall the actual date.  It was soon after --

09:03 22   soon -- it was before I left, not long before I left.

09:03 23   Q.    Sometime in 2000?

09:03 24   A.    I'd have to look it up officially.

09:04 25   Q.    Okay.  If you left in September of 2000, it was some

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

31

| | | |
|--|--|--|
| 09:04 | 1 | time that year before you left, you think? |
| 09:04 | 2 | A.   I -- I think so. |
| 09:04 | 3 | Q.   Is it -- |
| 09:04 | 4 | A.   But I can't attest to the actual date. |
| 09:04 | 5 | Q.   Okay.  Is he still working there? |
| 09:04 | 6 | A.   Yes, he is. |
| 09:04 | 7 | Q.   Okay.  And you got a phone call from -- from a |
| 09:04 | 8 | Mr. Moore sometime around June of 2004, correct? |
| 09:04 | 9 | A.   Correct. |
| 09:04 | 10 | Q.   And -- and that's before there was ever a -- a trial in |
| 09:04 | 11 | this case, right? |
| 09:04 | 12 | A.   Trial, by trial you mean like sitting in here? |
| 09:04 | 13 | Q.   Yeah.  You mean -- like remember last time when you |
| 09:04 | 14 | took the witness stand? |
| 09:04 | 15 | A.   Yes. |
| 09:04 | 16 | Q.   So that was several years before a trial in this case, |
| 09:04 | 17 | correct? -- when he called you. |
| 09:04 | 18 | A.   Correct.  About the actual trial, like sitting in the |
| 09:04 | 19 | room. |
| 09:04 | 20 | Q.   And when he called you in June 2004, he left you an |
| 09:04 | 21 | e-mail -- I mean, I'm sorry -- sorry.  When he called you in |
| 09:04 | 22 | June 2004, he left you a voicemail? |
| 09:04 | 23 | A.   Correct. |
| 09:04 | 24 | Q.   And at that point you then called him back to talk to |
| 09:05 | 25 | him, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:05 | 1 | A.   I did. |
| 09:05 | 2 | Q.   And when you talked to him, he began talking to you |
| 09:05 | 3 | about the dispute between MGA and Mattel, correct? |
| 09:05 | 4 | A.   Correct. |
| 09:05 | 5 | Q.   And you had, a few months previously, filled out |
| 09:05 | 6 | applications actually to be a vendor for Mattel, right? |
| 09:05 | 7 | A.   Correct. |
| 09:05 | 8 | Q.   And -- and when he talked to you about -- about this, |
| 09:05 | 9 | you, you felt uncomfortable talking about it, right? |
| 09:05 | 10 | A.   Yes, I did. |
| 09:05 | 11 | Q.   And at the time he called you, you weren't represented |
| 09:05 | 12 | by counsel, correct? -- at the time you talked to him? |
| 09:05 | 13 | A.   The first time, yes. |
| 09:05 | 14 | Q.   And then you called Ms. Gronich, who was in-house |
| 09:05 | 15 | counsel for MGA, correct? |
| 09:05 | 16 | A.   Correct. |
| 09:05 | 17 | Q.   Then MGA got you counsel, right? |
| 09:05 | 18 | A.   Yes. |
| 09:05 | 19 | Q.   Was that pretty quick? |
| 09:06 | 20 | A.   It was pretty quick, I believe. |
| 09:06 | 21 | Q.   I mean, like within a day or so, correct? |
| 09:06 | 22 | A.   I don't know the actual date, but they said I had |
| 09:06 | 23 | counsel. |
| 09:06 | 24 | Q.   And then, uh, you say you had another conversation with |
| 09:06 | 25 | Mr. Moore? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 33 of 135   Page ID #:309758
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

33

| 09:06 | 1 | A.   Yes, he called at my house. |
| 09:06 | 2 | Q.   Okay.  And in that conversation you told him, uh, that |
| 09:06 | 3 | you were represented by counsel, correct? |
| 09:06 | 4 | A.   Correct. |
| 09:06 | 5 | Q.   And after telling him you were represented by counsel, |
| 09:06 | 6 | he never called you back or attempted to get in touch with |
| 09:06 | 7 | you, correct? |
| 09:06 | 8 | A.   He kept talking after I told him he (*sic*) was |
| 09:06 | 9 | represented by counsel.  He kept asking me questions. |
| 09:06 | 10 | Q.   After that phone call, did you ever hear from Mr. Moore |
| 09:06 | 11 | again? |
| 09:06 | 12 | A.   No, I did not. |
| 09:06 | 13 | Q.   And that was back in 2004, correct? |
| 09:06 | 14 | A.   Correct. |
| 09:06 | 15 | Q.   And you -- you testified in 2008; is that right? |
| 09:06 | 16 | A.   In 2008? |
| 09:06 | 17 | Q.   We've shown you these transcripts of August 2008, for |
| 09:06 | 18 | example? |
| 09:06 | 19 | A.   Okay.  Yes. |
| 09:06 | 20 | Q.   And there's been a couple of years since you've had the |
| 09:07 | 21 | pleasure of taking the witness stand in a case involving MGA |
| 09:07 | 22 | and Mattel, correct? |
| 09:07 | 23 | A.   Correct. |
| 09:07 | 24 | Q.   Uh, and during that timeframe, uh, Mr. Moore has not, |
| 09:07 | 25 | uh, called you, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 34 of 135   Page ID #:309759
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

34

| | | |
|---|---|---|
| 09:07 | 1 | A.   He has not called me. |
| 09:07 | 2 | MR. PRICE:  No further questions, Your Honor. |
| 09:07 | 3 | THE COURT:  Redirect examination by |
| 09:07 | 4 | Mr. McConville. |
| 09:07 | 5 | **REDIRECT EXAMINATION** |
| 09:07 | 6 | BY MR. McCONVILLE: |
| 09:07 | 7 | Q.   Ms. Leahy, one of the questions counsel asked you was |
| 09:07 | 8 | whether or not Mr. Moore attempted to contact you in any |
| 09:07 | 9 | way.  Do you remember that question that you were asked? |
| 09:07 | 10 | A.   Yes. |
| 09:07 | 11 | MR. PRICE:  Objection. |
| 09:07 | 12 | BY MR. McCONVILLE: |
| 09:07 | 13 | Q.   Did Mr. Moore -- |
| 09:07 | 14 | MR. PRICE:  Objection.  That was not the question. |
| 09:07 | 15 | THE COURT:  Sustained.  "In anyway." |
| 09:07 | 16 | MR. McCONVILLE:  What was the question that was |
| 09:07 | 17 | asked? |
| 09:08 | 18 | MR. PRICE:  The question was "did he contact." |
| 09:08 | 19 | THE COURT:  Just a moment.  We have a transcript. |
| 09:08 | 20 | MR. McCONVILLE:  It was the first question of the |
| 09:08 | 21 | series. |
| 09:08 | 22 | THE COURT:  All right.  Stop the clock, Debbie. |
| 09:08 | 23 | Was it just after "You were very dedicated to your |
| 09:08 | 24 | work"? |
| 09:08 | 25 | MR. McCONVILLE:  Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 35 of 135   Page ID #:309760
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

35

| | | |
|---|---|---|
| 09:08 | 1 | MR. PRICE:  Yes. |
| 09:08 | 2 | THE COURT:  (Reading realtime:) |
| 09:08 | 3 | "QUESTION:  Now, wait a minute.  You asked -- you |
| 09:09 | 4 | talked about getting a call from an attorney, uh, named |
| 09:09 | 5 | Michael Moore.  Do you recall that? |
| 09:09 | 6 | "ANSWER:  Yes, I do. |
| 09:09 | 7 | "QUESTION:  And, uh, I want to ask you, by the |
| 09:09 | 8 | way, yesterday we talked about -- about your husband |
| 09:09 | 9 | having -- not having a job, uh, and having difficulty paying |
| 09:09 | 10 | for car payments.  Did your -- did your husband eventually |
| 09:09 | 11 | get a job with Mattel? |
| 09:09 | 12 | "ANSWER:  Yes, he did." |
| 09:09 | 13 | Is it after that, Counsel? |
| 09:09 | 14 | MR. McCONVILLE:  It's after that. |
| 09:09 | 15 | THE COURT:  Okay.  (Reading realtime:) |
| 09:09 | 16 | "QUESTION:  Okay.  When was that? |
| 09:09 | 17 | "ANSWER:  I can't recall the actual date.  It was |
| 09:09 | 18 | soon after.  Soon.  It was before I left, not long before I |
| 09:09 | 19 | left. |
| 09:09 | 20 | "QUESTION:  Sometime in 2000? |
| 09:09 | 21 | "ANSWER:  I'd have to look it up officially. |
| 09:09 | 22 | "QUESTION:  Okay.  If you left in September of |
| 09:09 | 23 | 2000, it was sometime that year before you left." |
| 09:09 | 24 | MR. McCONVILLE:  It's after that. |
| 09:09 | 25 | THE COURT:  (Reading:) |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 36 of 135   Page ID #:309761
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

36

| | | |
|---|---|---|
| 09:09 | 1 | "ANSWER:  I think -- I think so." |
| 09:09 | 2 | So it's not the first question. |
| 09:09 | 3 | MR. McCONVILLE:  I'm -- |
| 09:09 | 4 | THE COURT:  We've established that.  Okay. |
| 09:09 | 5 | "QUESTION:  Is it -- |
| 09:10 | 6 | "ANSWER:  But I can't attest to that actual date. |
| 09:10 | 7 | "QUESTION:  Is he still working there? |
| 09:10 | 8 | "ANSWER:  Yes, he is. |
| 09:10 | 9 | "QUESTION:  Okay.  And you got a call from -- from |
| 09:10 | 10 | Mr. Moore sometime around June of 2004, correct? |
| 09:10 | 11 | "ANSWER:  Correct. |
| 09:10 | 12 | "QUESTION:  And that's before there was a -- a |
| 09:10 | 13 | trial in this case, right? |
| 09:10 | 14 | "ANSWER:  Trial, by trial you mean like sitting in |
| 09:10 | 15 | here?" |
| 09:10 | 16 | Now, how am I doing? |
| 09:10 | 17 | MR. McCONVILLE:  It's after that.  I'm sorry, |
| 09:10 | 18 | Your Honor. |
| 09:10 | 19 | THE COURT:  Okay. |
| 09:10 | 20 | MR. McCONVILLE:  I stand corrected. |
| 09:10 | 21 | THE COURT:  No, no, fine.  Enjoying the reading. |
| 09:10 | 22 | "QUESTION:  Yeah, you remember like last time when |
| 09:10 | 23 | you took the witness stand? |
| 09:10 | 24 | "ANSWER:  Yes. |
| 09:10 | 25 | "QUESTION:  So that was several years before a |

| | | |
|---|---|---|
| 09:10 | 1 | trial in this case, correct, when he called you? |
| 09:10 | 2 | "ANSWER:  Correct.  About the actual trial, like |
| 09:10 | 3 | sitting in the room. |
| 09:10 | 4 | "QUESTION:  And when he called you in June 2004, |
| 09:10 | 5 | he left you an e-mail -- I mean, I'm sorry.  Sorry.  When |
| 09:10 | 6 | he -- well, he called you in June --" |
| 09:11 | 7 | Is that "join" or "June"? |
| 09:11 | 8 | "Well, he called you" -- let's say, "2004, he left |
| 09:11 | 9 | you a voicemail? |
| 09:11 | 10 | "ANSWER:  Correct. |
| 09:11 | 11 | "QUESTION:  And at that point you then called him |
| 09:11 | 12 | back to talk to him, right? |
| 09:11 | 13 | "ANSWER:  I did. |
| 09:11 | 14 | "QUESTION:  And when you talked to him he began |
| 09:11 | 15 | talking to you about the suit between MGA and Mattel, |
| 09:11 | 16 | correct? |
| 09:11 | 17 | "ANSWER:  Correct." |
| 09:11 | 18 | How am I doing so far?  Getting close? |
| 09:11 | 19 | MR. McCONVILLE:  You're doing great. |
| 09:11 | 20 | THE COURT:  Okay.  Thank you. |
| 09:11 | 21 | "QUESTION:  And you had, a few months previously, |
| 09:11 | 22 | filled out an application to be a vendor for Mattel, right? |
| 09:11 | 23 | "ANSWER:  Correct. |
| 09:11 | 24 | "QUESTION:  And when he talked to you about this |
| 09:11 | 25 | you -- you felt uncomfortable talking about it, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 38 of 135   Page ID #:309763
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

38

| | | |
|---|---|---|
| 09:11 | 1 | "ANSWER:  Yes, I did. |
| 09:11 | 2 | "QUESTION:  And at the time he called you, you |
| 09:11 | 3 | weren't represented by counsel, correct? -- at the time you |
| 09:11 | 4 | talked to him? |
| 09:11 | 5 | "ANSWER:  The first time, yes. |
| 09:11 | 6 | "QUESTION:  And then you called Ms. Gronich, who |
| 09:11 | 7 | was in-house counsel for MGA, correct? |
| 09:11 | 8 | "ANSWER:  Correct. |
| 09:11 | 9 | "QUESTION:  Then MGA got you counsel, right? |
| 09:11 | 10 | "ANSWER:  Yes. |
| 09:12 | 11 | "QUESTION:  Was that pretty quick? |
| 09:12 | 12 | "ANSWER:  It was pretty quick, I believe. |
| 09:12 | 13 | "QUESTION:  I mean, like within a day or so, |
| 09:12 | 14 | correct? |
| 09:12 | 15 | "ANSWER:  I don't know the actual date, but they |
| 09:12 | 16 | said I had counsel. |
| 09:12 | 17 | "QUESTION:  And then, uh, you say you had another |
| 09:12 | 18 | conversation with Mr. Moore? |
| 09:12 | 19 | "ANSWER:  Yes, he called at my house. |
| 09:12 | 20 | "QUESTION:  Okay.  In that conversation you told |
| 09:12 | 21 | him, uh, that you were represented by counsel, correct? |
| 09:12 | 22 | "ANSWER:  Correct." |
| 09:12 | 23 | Is it after that? |
| 09:12 | 24 | MR. McCONVILLE:  Yes, you're warming up now. |
| 09:12 | 25 | THE COURT: |

| | | |
|---|---|---|
| 09:12 | 1 | "QUESTION:  And after telling him you were |
| 09:12 | 2 | represented by counsel, he never called you back or |
| 09:12 | 3 | attempted to get in touch with you, correct? |
| 09:12 | 4 | "ANSWER:  He kept talking after I told him he was |
| 09:12 | 5 | represented by counsel.  He kept asking me questions. |
| 09:12 | 6 | "QUESTION:" -- |
| 09:12 | 7 | MR. McCONVILLE:  That was it, Your Honor. |
| 09:12 | 8 | THE COURT:  Pardon me? |
| 09:12 | 9 | MR. McCONVILLE:  "He never attempted to get in |
| 09:12 | 10 | touch with you."  That was the question that was asked. |
| 09:12 | 11 | THE COURT:  Just a moment. |
| 09:12 | 12 | "And never attempted to get in touch with you." |
| 09:12 | 13 | MR. McCONVILLE:  That's what I'm following up on. |
| 09:12 | 14 | MR. PRICE:  I don't think -- did she answer that |
| 09:12 | 15 | question? |
| 09:12 | 16 | THE COURT:  She certainly did.  Just a moment. |
| 09:12 | 17 | "QUESTION:  And after telling him you were |
| 09:12 | 18 | represented by counsel, he never called you back or |
| 09:12 | 19 | attempted to get in touch with you, correct? |
| 09:13 | 20 | "ANSWER:  He kept talking after I told him he was |
| 09:13 | 21 | represented by counsel.  He kept asking me questions." |
| 09:13 | 22 | MR. PRICE:  Move to strike as nonresponsive. |
| 09:13 | 23 | MR. McCONVILLE:  So I want to follow up -- |
| 09:13 | 24 | THE COURT:  (Reading realtime:) |
| 09:13 | 25 | "QUESTION:  After that phone call, did you hear |

| | | |
|---|---|---|
| 09:13 | 1 | from Mr. Moore again? |
| 09:13 | 2 | "ANSWER:  No, I did not." |
| 09:13 | 3 | Now, dock 'em both time from that.  Each side gets |
| 09:13 | 4 | time subtracted. |
| 09:13 | 5 | Counsel, please continue. |
| 09:13 | 6 | BY MR. McCONVILLE: |
| 09:13 | 7 | Q.   Ms. Leahy, you were asked by counsel whether Mr. Moore |
| 09:13 | 8 | attempted to contact you.  Do you remember that question? |
| 09:13 | 9 | A.   Yes, I do. |
| 09:13 | 10 | Q.   Did Mr. Moore attempt to contact you after you told him |
| 09:13 | 11 | you were represented by counsel? |
| 09:13 | 12 | MR. PRICE:  I'm going to object to foundation. |
| 09:13 | 13 | THE COURT:  Overruled. |
| 09:13 | 14 | THE WITNESS:  He didn't attempt to contact me |
| 09:13 | 15 | personally, but he attempted to contact me through my |
| 09:13 | 16 | husband at Mattel. |
| 09:13 | 17 | BY MR. McCONVILLE: |
| 09:13 | 18 | Q.   And please describe how Mr. Moore attempted to contact |
| 09:13 | 19 | you through your husband. |
| 09:13 | 20 | MR. PRICE:  I'm going to object.  One, that's |
| 09:13 | 21 | hearsay.  And, two, they asserted the marital privilege on |
| 09:13 | 22 | such communications between wife and husband. |
| 09:13 | 23 | THE COURT:  Are you waiving the marital privilege? |
| 09:13 | 24 | You have the privilege not to testify about conversations |
| 09:13 | 25 | between you and your husband, but you're the holder of that |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:13 | 1 | privilege.  If you want to waive that, you can testify in |
| 09:14 | 2 | this regard. |
| 09:14 | 3 | THE WITNESS:  I would rather not waive that, sir. |
| 09:14 | 4 | THE COURT:  All right.  Sustained. |
| 09:14 | 5 | BY MR. McCONVILLE: |
| 09:14 | 6 | Q.   Ms. Leahy -- |
| 09:14 | 7 | THE COURT:  Now, in addition, just a moment. |
| 09:14 | 8 | I've decided not to dock both counsel for time, |
| 09:14 | 9 | because I enjoyed the reading.  So we'll let them have the |
| 09:14 | 10 | time back in a moment of graciousness. |
| 09:14 | 11 | And second, I'm going to allow the introduction of |
| 09:14 | 12 | that letter, but not now.  You'll show it to opposing |
| 09:14 | 13 | counsel and all other correspondence in return, Mr. Zeller. |
| 09:14 | 14 | It can be introduced in this regard also, but it's redacted, |
| 09:14 | 15 | and both of you understand what I'm talking about. |
| 09:14 | 16 | MR. PRICE:  And, Your Honor, given the assertion, |
| 09:14 | 17 | I move to strike the prior answer. |
| 09:14 | 18 | THE COURT:  I will strike the prior answer because |
| 09:14 | 19 | of the marital privilege. |
| 09:14 | 20 | MR. McCONVILLE:  Okay. |
| 09:14 | 21 | BY MR. McCONVILLE: |
| 09:14 | 22 | Q.   Let's move on to a different topic, Ms. Leahy.  Do you |
| 09:14 | 23 | remember you were asked questions yesterday concerning |
| 09:14 | 24 | whether you knew Carter Bryant made many millions of dollars |
| 09:14 | 25 | on the Bratz project?  Do you remember that? |

| 09:14 | 1 | A.   Yes. |
| 09:14 | 2 | Q.   Were you aware that -- |
| 09:14 | 3 | THE COURT:  Let me explain that.  There's |
| 09:15 | 4 | privileges that we have.  Attorney-client privileges, which |
| 09:15 | 5 | you've heard an awful lot about.  Marital privileges, a |
| 09:15 | 6 | privilege between you and your minister or priest or rabbi, |
| 09:15 | 7 | all those by law are privileged communications.  You're not |
| 09:15 | 8 | to draw any inference from a person taking that privilege. |
| 09:15 | 9 | But everybody has a right to have certain confidential |
| 09:15 | 10 | communications, whether it's religious, whether with a |
| 09:15 | 11 | lawyer, and between husband and wife.  There's a lot of |
| 09:15 | 12 | other privileges that will also apply, but that privilege |
| 09:15 | 13 | can be asserted at any time. |
| 09:15 | 14 | And you may hear the attorney-client privilege |
| 09:15 | 15 | asserted by counsel, which I think you have in the case, and |
| 09:15 | 16 | you may hear marital privileges asserted in the case also. |
| 09:15 | 17 | Okay? |
| 09:15 | 18 | No inferences should be drawn from it. |
| 09:15 | 19 | Okay.  Counsel. |
| 09:15 | 20 | MR. McCONVILLE:  Thank you. |
| 09:15 | 21 | BY MR. McCONVILLE: |
| 09:15 | 22 | Q.   So you recall being asked questions about whether you |
| 09:15 | 23 | were aware Carter Bryant had been paid millions of dollars |
| 09:15 | 24 | for the Bratz project?  Do you remember that? |
| 09:15 | 25 | A.   Yes, I do. |

| | | |
|---|---|---|
| 09:15 | 1 | Q.   Were you aware that the only guarantee Carter Bryant |
| 09:16 | 2 | had when he signed his contract with MGA was that he might |
| 09:16 | 3 | make approximately $40,000? |
| 09:16 | 4 | A.   Yes. |
| 09:16 | 5 | Q.   And that the many millions he made as a result of the |
| 09:16 | 6 | work was not that was ever guaranteed at the time Carter |
| 09:16 | 7 | Bryant signed his agreement with MGA, right? |
| 09:16 | 8 | A.   Correct. |
| 09:16 | 9 | Q.   You were asked some questions yesterday concerning |
| 09:16 | 10 | whether, uh, you had made mistakes in sculpting.  Do you |
| 09:16 | 11 | remember those questions? |
| 09:16 | 12 | A.   Yes, I do. |
| 09:16 | 13 | Q.   Now, I want to ask you again.  Can you explain whether |
| 09:16 | 14 | you made mistakes while you were sculpting the Bratz |
| 09:16 | 15 | project? |
| 09:16 | 16 | A.   Because of the fact that I had free rein on the doll, |
| 09:16 | 17 | it wasn't possible to make official mistakes on the doll. |
| 09:16 | 18 | As a sculptor, I'm very hard on myself and very critical of |
| 09:17 | 19 | myself.  So I make personal mistakes all the time.  But as |
| 09:17 | 20 | far as the grand picture of the thing, it wasn't a mistake |
| 09:17 | 21 | like the sculptor is late or, you know, you made her head |
| 09:17 | 22 | where her feet should be.  That would be a blatant mistake. |
| 09:17 | 23 | Q.   I think I could identify that mistake, as well. |
| 09:17 | 24 | A.   Okay.  It's a loose -- it's a loose term. |
| 09:17 | 25 | Q.   Okay.  But during the course of your sculpting, because |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 44 of 135   Page ID #:309769
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

44

| | | |
|---|---|---|
| 09:17 | 1 | you were given creative license, could you -- could you make |
| 09:17 | 2 | a mistake? |
| 09:17 | 3 | A.   Not until Mercedeh got involved.  And then the mistakes |
| 09:17 | 4 | could happen. |
| 09:17 | 5 | Q.   And what was Ms. Ward's role? |
| 09:17 | 6 | A.   She was the engineer of the project, and she helped me |
| 09:17 | 7 | establish the technical aspects of the doll, as we talked |
| 09:17 | 8 | about yesterday, the joints and parting lines and tooling |
| 09:17 | 9 | models and things like that. |
| 09:18 | 10 | Q.   She was more of a technical engineer on the doll? |
| 09:18 | 11 | A.   Yes. |
| 09:18 | 12 | Q.   Um, okay.  You were also asked some questions |
| 09:18 | 13 | concerning whether Exhibit, uh, let's -- |
| 09:18 | 14 | MR. McCONVILLE:  Can we put up Exhibit 17823, |
| 09:18 | 15 | please.  Just put it on the screen for me. |
| 09:18 | 16 | *(Document provided to the witness.)* |
| 09:18 | 17 | *(Document displayed.)* |
| 09:18 | 18 | BY MR. McCONVILLE: |
| 09:18 | 19 | Q.   And you were asked questions about this -- you |
| 09:18 | 20 | submitted an invoice in -- what's the date on that? |
| 09:18 | 21 | A.   October 25th. |
| 09:18 | 22 | Q.   October 25th -- whether that invoice reflected your |
| 09:18 | 23 | request for payment to MGA for the final body on the Bratz |
| 09:18 | 24 | project.  Do you remember those questions? |
| 09:18 | 25 | A.   Yes, I do. |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

45

| | | |
|---|---|---|
| 09:18 | 1 | Q.   Now, Ms. Leahy, did you continue to work on the Bratz |
| 09:18 | 2 | project after October 25th, 2000? |
| 09:18 | 3 | A.   Yes, quite a bit. |
| 09:18 | 4 | Q.   And when, in fact, did you complete the final sculpt |
| 09:19 | 5 | for the Bratz project? |
| 09:19 | 6 | A.   In December. |
| 09:19 | 7 | Q.   And that would be -- the final sculpt would be sculpt |
| 09:19 | 8 | 1234-A, correct? |
| 09:19 | 9 | A.   The tooling sculpt. |
| 09:19 | 10 | Q.   The tooling sculpt, yeah. |
| 09:19 | 11 |     And exhibit -- the final body that's referenced here, |
| 09:19 | 12 | would -- would it be safe to say that your forte is in |
| 09:19 | 13 | sculpting and not in recordkeeping? |
| 09:19 | 14 | A.   Yes, that would be very accurate. |
| 09:19 | 15 | Q.   Um, you were asked a question yesterday concerning |
| 09:19 | 16 | whether or not the doll, the final doll, the final Bratz |
| 09:19 | 17 | doll that was on the shelf, was similar to Carter Bryant's |
| 09:19 | 18 | drawings.  Do you remember that question? |
| 09:19 | 19 | A.   I remember that question a lot. |
| 09:19 | 20 | Q.   Okay.  So I want to follow up.  You gave a response |
| 09:19 | 21 | that I believe you said the drawings were not similar to the |
| 09:20 | 22 | doll, right? |
| 09:20 | 23 | A.   Correct. |
| 09:20 | 24 | Q.   So can you tell me from what perspective you were |
| 09:20 | 25 | responding to that question?  Let me ask a better question. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 46 of 135   Page ID #:309771
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

46

| | | |
|---|---|---|
| 09:20 | 1 | So I move to strike my question.  I object to my |
| 09:20 | 2 | question. |
| 09:20 | 3 | The question I want to ask you is, why did you give |
| 09:20 | 4 | that response? |
| 09:20 | 5 | A.   Because the doll looks nothing like the drawings. |
| 09:20 | 6 | Q.   And -- and your profession is a sculptor? |
| 09:20 | 7 | A.   Yes. |
| 09:20 | 8 | Q.   So when you say the doll looks nothing like the |
| 09:20 | 9 | drawings, are you giving your answer from the perspective of |
| 09:20 | 10 | the sculptor? |
| 09:20 | 11 | A.   Yes, I am. |
| 09:20 | 12 | Q.   And could you explain what you mean when you say they |
| 09:20 | 13 | look nothing like -- the doll looks nothing like the |
| 09:20 | 14 | drawings? |
| 09:20 | 15 | A.   That's what I mean. |
| 09:20 | 16 | Q.   Are you talking about the doll -- because the doll has |
| 09:20 | 17 | hair and the sculpt doesn't have hair?  Is that the notion |
| 09:20 | 18 | you're getting at, or is it something else? |
| 09:21 | 19 | A.   In -- in my world, the dolls don't have clothes, hair |
| 09:21 | 20 | or face paint.  So they're just all flesh-tone dolls. |
| 09:21 | 21 | Q.   Okay.  And that's -- and that's what you meant when you |
| 09:21 | 22 | gave your response? |
| 09:21 | 23 | A.   Yes. |
| 09:21 | 24 | MR. McCONVILLE:  No further questions, Your Honor. |
| 09:21 | 25 | THE COURT:  Recross. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 47 of 135   Page ID
#:309772
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

47

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
| 09:21 | 1  | **RECROSS-EXAMINATION**                                   |
| 09:21 | 2  | BY MR. PRICE:                                             |
| 09:21 | 3  | Q.   Ms. Leahy, I want to follow up on the last questions |
| 09:21 | 4  | that you were asked about whether the doll looked like    |
| 09:21 | 5  | Mr. Bryant's drawings.                                    |
| 09:21 | 6  | A.   Correct.                                             |
| 09:22 | 7  | Q.   First let me ask you what you're not talking about.  |
| 09:22 | 8  | And I'd like to put up -- it's a demonstrative I think we've |
| 09:22 | 9  | used earlier, 23797-0003.                                 |
| 09:22 | 10 | (Document provided to the witness.)                       |
| 09:22 | 11 | (Document displayed.)                                     |
| 09:22 | 12 | BY MR. PRICE:                                             |
| 09:22 | 13 | Q.   And here, ma'am, we have two of Mr. Bryant's drawings, |
| 09:22 | 14 | Exhibit 302-B, Exhibit 1108, and then the doll, Sasha, that |
| 09:22 | 15 | came out.                                                 |
| 09:22 | 16 | So you're not saying that what we're showing now, for    |
| 09:22 | 17 | example, the face of the doll, doesn't look like          |
| 09:22 | 18 | Mr. Bryant's drawings.  That's not what you're saying?    |
| 09:22 | 19 | A.   I don't understand what I'm not saying.              |
| 09:22 | 20 | (Laughter in the courtroom.)                              |
| 09:22 | 21 | BY MR. PRICE:                                             |
| 09:22 | 22 | Q.   Maybe you don't understand the question.            |
| 09:22 | 23 | Uh, the drawing, 302-B; the drawing, 1108; the doll,     |
| 09:23 | 24 | 17558, they have some rather striking similarities, correct? |
| 09:23 | 25 | A.   Yes, they have similarities.                         |

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

48

| | | |
|---|---|---|
| 09:23 | 1 | Q.   And when I asked you whether or not, you know, the |
| 09:23 | 2 | dolls look like his drawing, were you talking about this |
| 09:23 | 3 | sort of comparison or some other comparison? |
| 09:23 | 4 | A.   I was talking about what I just said, the comparison -- |
| 09:23 | 5 | I see things without hair, makeup, hats, shirts, shoes, |
| 09:23 | 6 | clothes. |
| 09:23 | 7 | Q.   Okay.  Then if you'd look at demonstrative 23797-00005. |
| 09:23 | 8 | *(Document provided to the witness.)* |
| 09:23 | 9 | *(Document displayed.)* |
| 09:23 | 10 | BY MR. PRICE: |
| 09:23 | 11 | Q.   On this we have side-by-side Exhibit 323-0032 and the |
| 09:24 | 12 | doll, 12286, that actually came out.  Is this the kind of |
| 09:24 | 13 | comparison that you're talking about, a comparison of a doll |
| 09:24 | 14 | without clothes to Mr. Bryant's drawings? |
| 09:24 | 15 | A.   I -- I didn't compare it -- can you rephrase your |
| 09:24 | 16 | question, please? |
| 09:24 | 17 | Q.   Yeah.  When you said yesterday you don't think they |
| 09:24 | 18 | look similar, in your mind were the drawings you were |
| 09:24 | 19 | thinking of, were you thinking of, for example, comparing |
| 09:24 | 20 | 323-0032, which is the same as 1129, the one with your |
| 09:24 | 21 | notes -- were you thinking of comparing that, which has no |
| 09:24 | 22 | clothes on it, with the body that came out in the -- with |
| 09:24 | 23 | the Bratz doll? |
| 09:24 | 24 | A.   Just to be clear, you're asking if I was comparing the |
| 09:24 | 25 | line drawing to the final doll? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

49

09:24  1   Q.   Is that the sort of "thinking" that you were thinking
09:24  2   of when you answered my question yesterday?  That you don't
09:24  3   think that they're similar?
09:25  4   A.   I was thinking of the initial drawings he gave me, not
09:25  5   the drawings he did of the sculpt that I was doing.
09:25  6   Q.   Okay.  You're thinking of the posed drawings?
09:25  7   A.   Well, this is also posed.  So the very first drawings
09:25  8   he gave me, the initial drawings, not the drawings he did
09:25  9   after I had already sculpted.
09:25  10  Q.   Now, you said that -- that you couldn't make a mistake
09:25  11  because you had free rein.  You were given comments along
09:25  12  the way, correct?
09:25  13  A.   Correct.  They were subjective aesthetic comments, not
09:25  14  technical comments just --
09:25  15  Q.   Right?
09:25  16  A.   -- to be clear to make a distinction between the two.
09:25  17  Q.   By "aesthetic" you mean appearance?  The way it looks?
09:25  18  A.   Right.
09:25  19  Q.   And if you look at 2433-00014, that has the sculpt
09:25  20  1136, the gray one, and then 1141, and then 1234, which you
09:26  21  termed the "tooling sculpt."  Do you see those?
09:26  22  A.   Yes, I see those.
09:26  23  Q.   And 1136 looks a lot different than 1141 and 1234,
09:26  24  correct?
09:26  25  A.   It looks a lot different, especially 'cause it never

09:26    1    had the feet cut off.

09:26    2    Q.    It was a -- it was bigger, different proportions,

09:26    3    right?

09:26    4    A.    Correct.

09:26    5    Q.    And there were changes made as a result of comments to

09:26    6    make the doll look aesthetically different than what you

09:26    7    initially did when you thought you had free rein, correct?

09:26    8    A.    The comments were made on the gray sculpt at the

09:26    9    October 6th meeting.  And then there were no comments made

09:26   10    until the 1141 sculpt at the October 25th meeting.

09:26   11    Q.    And there's a -- if you just hold those two up, there's

09:26   12    a lot of differences --

09:26   13    A.    Yes.

09:26   14    Q.    -- right?

09:26   15             MR. PRICE:  Nothing else.

09:26   16             THE COURT:  All right.  Now, I'm going to ask you

09:26   17    to remain for a few moments.  I need to work out with

09:26   18    counsel this one hearsay objection concerning one of the

09:26   19    exhibits.  I apologize for that.  I don't know if that will

09:27   20    take five minutes or 25 hours.  We'll do that as quickly as

09:27   21    we can so you won't be inconvenienced.

09:27   22             If you would remain out in the hallway, please.

09:27   23             THE WITNESS:  Thank you.

09:27   24             THE COURT:  Counsel, your next witness, please.

09:27   25             MS. KELLER:  MGA calls Ramona Prince, Your Honor.

DEBBIE GALE, U.S. COURT REPORTER

| 09:27 | 1 | THE COURT:  Thank you, Ms. Prince.  If you will |
| 09:27 | 2 | step forward between the double doors.  Now, if you will |
| 09:27 | 3 | stop and raise your right hand, please. |
| 09:27 | 4 | **JACQUELINE RAMONA PRINCE, MGA'S WITNESS, SWORN** |
| 09:27 | 5 | THE WITNESS:  I do. |
| 09:27 | 6 | THE COURT:  Thank you.  If you would please walk |
| 09:28 | 7 | along the side of the jury rail.  And there's an entrance |
| 09:28 | 8 | right here next to the wall by the boxes. |
| 09:28 | 9 | Please be seated. |
| 09:28 | 10 | Would you state your full name for the jury, |
| 09:28 | 11 | please. |
| 09:28 | 12 | THE WITNESS:  Jacqueline Ramona Prince. |
| 09:28 | 13 | THE COURT:  Would you spell your last name, |
| 09:28 | 14 | please. |
| 09:28 | 15 | THE WITNESS:  P-R-I-N-C-E. |
| 09:28 | 16 | THE COURT:  Thank you. |
| 09:28 | 17 | Direct examination by Ms. Keller on behalf of MGA |
| 09:28 | 18 | and Mr. Larian. |
| 09:28 | 19 | MS. KELLER:  Thank you, Your Honor. |
| 09:28 | 20 | **DIRECT EXAMINATION** |
| 09:28 | 21 | BY MS. KELLER: |
| 09:28 | 22 | Q.   Good morning, Ms. Prince. |
| 09:28 | 23 | A.   Good morning. |
| 09:28 | 24 | Q.   I'm Jennifer Keller, and we have not met before, have |
| 09:28 | 25 | we? |

| | | |
|---|---|---|
| 09:28 | 1 | A.   No. |
| 09:28 | 2 | Q.   Now, do you -- you go by the name of Ramona Prince now? |
| 09:28 | 3 | A.   I go by Ramona, Ramona Prince. |
| 09:28 | 4 | Q.   Where do you live now? |
| 09:28 | 5 | A.   In Mississippi. |
| 09:28 | 6 | Q.   What's your occupation? |
| 09:28 | 7 | A.   Special Ed teacher. |
| 09:28 | 8 | Q.   How long have you been a Special Ed teacher? |
| 09:28 | 9 | A.   Seven, eight -- eight years. |
| 09:28 | 10 | Q.   Now, before your trial testimony today, did you meet |
| 09:28 | 11 | with an attorney for MGA named Warrington Parker? |
| 09:28 | 12 | A.   Before today, yes. |
| 09:29 | 13 | Q.   And did he show you your deposition transcript and have |
| 09:29 | 14 | you look at some documents? |
| 09:29 | 15 | A.   Yes. |
| 09:29 | 16 | Q.   Now, is it true that you were a notary public for a |
| 09:29 | 17 | previous employer? |
| 09:29 | 18 | A.   Yes. |
| 09:29 | 19 | Q.   What was that -- what was the employer for whom you |
| 09:29 | 20 | first became a notary public? |
| 09:29 | 21 | A.   Western States Mechanical. |
| 09:29 | 22 | Q.   At some point did you begin working for Mattel? |
| 09:29 | 23 | A.   Yes. |
| 09:29 | 24 | Q.   And when was that? |
| 09:29 | 25 | A.   I don't remember dates well.  Maybe '98.  I forget. |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

53

| | | |
|---|---|---|
| 09:29 | 1 | Q.   Um, at some point did your commission in California as |
| 09:29 | 2 | a notary expire? |
| 09:29 | 3 | A.   Yes. |
| 09:29 | 4 | Q.   And do you remember when that was? |
| 09:29 | 5 | A.   I believe it was '99, maybe December. |
| 09:29 | 6 | Q.   And up until that happened, did you maintain what's |
| 09:29 | 7 | called a notary journal; in other words, a journal that a |
| 09:29 | 8 | notary public writes everything down in that the notary is |
| 09:29 | 9 | notarizing? |
| 09:29 | 10 | A.   Yes. |
| 09:29 | 11 | Q.   And after your commission expired in late December of |
| 09:30 | 12 | 1999, did you put your notary journal away? |
| 09:30 | 13 | A.   Yes. |
| 09:30 | 14 | Q.   Let's take a look at Exhibit 60.  We have a young lady |
| 09:30 | 15 | who's going to be helping you. |
| 09:30 | 16 | *(Document provided to the witness.* |
| 09:30 | 17 | BY MS. KELLER: |
| 09:30 | 18 | Q.   You were just handed a black bag.  Do you recognize |
| 09:30 | 19 | that? |
| 09:30 | 20 | A.   Yes. |
| 09:30 | 21 | Q.   And if we have -- |
| 09:30 | 22 | *(Document displayed.)* |
| 09:30 | 23 | BY MS. KELLER: |
| 09:30 | 24 | Q.   And that black bag, was that your black bag? |
| 09:30 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 54 of 135   Page ID #:309779
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

54

| | | |
|---|---|---|
| 09:30 | 1 | Q.   And you just took something out of it.  What did you |
| 09:30 | 2 | take out of it? |
| 09:30 | 3 | A.   The journal. |
| 09:30 | 4 | Q.   When you say "the journal," is that your original |
| 09:30 | 5 | notary journal? |
| 09:30 | 6 | A.   Yes. |
| 09:30 | 7 |        MS. KELLER:  Now, and I think, Your Honor, that is |
| 09:30 | 8 | Exhibit 60-A. |
| 09:30 | 9 |        THE COURT:  It's already been received.  If not, |
| 09:30 | 10 | it's re-received. |
| 09:31 | 11 |        (Exhibit No. 60-A received in evidence.) |
| 09:31 | 12 | BY MS. KELLER: |
| 09:31 | 13 | Q.   And then we also have Exhibit 60, which is a photocopy |
| 09:31 | 14 | of its contents. |
| 09:31 | 15 |        MS. KELLER:  And, Your Honor, we'd ask that that |
| 09:31 | 16 | be marked and received, as well. |
| 09:31 | 17 |        THE COURT:  Received. |
| 09:31 | 18 |        (Exhibit No. 60 received in evidence.) |
| 09:31 | 19 |         (Document displayed.) |
| 09:31 | 20 | BY MS. KELLER: |
| 09:31 | 21 | Q.   Now, after your commission expired, you put your notary |
| 09:31 | 22 | journal away? |
| 09:31 | 23 | A.   Yes. |
| 09:31 | 24 | Q.   Did you know at the time that when your commission |
| 09:31 | 25 | expired, you were actually supposed to surrender your |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 55 of 135   Page ID #:309780
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

55

| | | |
|---|---|---|
| 09:31 | 1 | journal to a county clerk somewhere? |
| 09:31 | 2 | A.   No. |
| 09:31 | 3 | Q.   So what did you do with it then? |
| 09:31 | 4 | A.   I put it in a storage box. |
| 09:31 | 5 | Q.   And, um, obviously, at some point you moved from |
| 09:31 | 6 | California? |
| 09:31 | 7 | A.   Yes. |
| 09:31 | 8 | Q.   Where did you first store the notary journal here in |
| 09:31 | 9 | California? |
| 09:31 | 10 | A.   I stored it in Gilroy, California.  After I left |
| 09:31 | 11 | California?  I'm sorry.  In Mountain City, Georgia. |
| 09:31 | 12 | Q.   So as I understand it, there was -- first, you had a |
| 09:31 | 13 | closet in an apartment in Torrance that you stored it in? |
| 09:31 | 14 | A.   Yes. |
| 09:32 | 15 | Q.   And then in a storage box in your garage in Gilroy? |
| 09:32 | 16 | A.   Yes. |
| 09:32 | 17 | Q.   Then in a locked cupboard in your garage when you moved |
| 09:32 | 18 | back here to Redondo Beach? |
| 09:32 | 19 | A.   Right. |
| 09:32 | 20 | Q.   Then you moved in with your mother in Mountain City? |
| 09:32 | 21 | A.   Yes. |
| 09:32 | 22 | Q.   Mountain City where? |
| 09:32 | 23 | A.   Georgia. |
| 09:32 | 24 | Q.   And that went into your mother's storage room in her |
| 09:32 | 25 | basement? |

| | | |
|---|---|---|
| 09:32 | 1 | A.   Yes. |
| 09:32 | 2 | Q.   And then you moved to Lawrenceville, Georgia? |
| 09:32 | 3 | A.   Yes. |
| 09:32 | 4 | Q.   And where did you put the journal, then? |
| 09:32 | 5 | A.   In the same storage box.  It never left the storage |
| 09:32 | 6 | box. |
| 09:32 | 7 | Q.   And where did the storage box "live" in your house? |
| 09:32 | 8 | A.   In the attic above the garage. |
| 09:32 | 9 | Q.   Now, at some point an attorney for Mr. Bryant |
| 09:32 | 10 | approached you and asked about the journal, right? |
| 09:32 | 11 | A.   Yes. |
| 09:32 | 12 | Q.   Up until that point, did you or anybody else ever open |
| 09:32 | 13 | that notary book? |
| 09:32 | 14 | A.   No. |
| 09:32 | 15 | Q.   Let me back up a little bit.  When was it that you |
| 09:33 | 16 | first began working at Mattel? |
| 09:33 | 17 | A.   I don't remember. |
| 09:33 | 18 | Q.   Does September 1996 sound about right? |
| 09:33 | 19 | A.   Yes. |
| 09:33 | 20 | Q.   How did you come to work at Mattel? |
| 09:33 | 21 | A.   I remember a neighbor across the way from where I lived |
| 09:33 | 22 | named Mary -- I don't remember her last name -- she knew I |
| 09:33 | 23 | was looking for a job at the time, and she said that I could |
| 09:33 | 24 | try to maybe temp at Mattel, and that that would be an easy |
| 09:33 | 25 | way to get in.  If I did well with that, I might be able to |

| | | |
|---|---|---|
| 09:33 | 1 | become permanent. |
| 09:33 | 2 | Q.   And is that what you did? |
| 09:33 | 3 | A.   Yes. |
| 09:33 | 4 | Q.   Now, at some point after you temped at Mattel, did it |
| 09:33 | 5 | work and you did, in fact, become permanent? |
| 09:33 | 6 | A.   Yes. |
| 09:33 | 7 | Q.   And also at some point did you move over to Barbie |
| 09:33 | 8 | Collectibles? |
| 09:33 | 9 | A.   Yes. |
| 09:33 | 10 | Q.   What job did you have there? |
| 09:33 | 11 | A.   Administrative assistant to Ruby Knauss.  She was the |
| 09:33 | 12 | current vice president, I think. |
| 09:33 | 13 | Q.   And did you always remain an administrative assistant, |
| 09:33 | 14 | or did your duties shift at some point to research? |
| 09:33 | 15 | A.   They -- when I was working for Ron Longsdorf, he had me |
| 09:33 | 16 | do more research, and then he hired another administrative |
| 09:33 | 17 | assistant.  But the title never officially changed, but I |
| 09:34 | 18 | did do more research and attend brainstorm meetings, that |
| 09:34 | 19 | kind of thing. |
| 09:34 | 20 | Q.   When you mentioned Ron Longsdorf, was he head of Barbie |
| 09:34 | 21 | Collectibles? |
| 09:34 | 22 | A.   Yes, he was a senior vice president. |
| 09:34 | 23 | Q.   And then at some point did you move to another |
| 09:34 | 24 | department? |
| 09:34 | 25 | A.   Toward the end, when I decided I was gonna look for |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:34 | 1 | another job at another company, I decided to go work in |
| 09:34 | 2 | sculpting for a while with Abby Belknap.  She offered me |
| 09:34 | 3 | that position while I looked around. |
| 09:34 | 4 | Q.   And how long did you remain in the sculpting |
| 09:34 | 5 | department, roughly? |
| 09:34 | 6 | A.   Just a few months.  I don't remember exactly. |
| 09:34 | 7 | Q.   And then at some point you left for a job in the |
| 09:34 | 8 | Silicon Valley? |
| 09:34 | 9 | A.   Yes. |
| 09:34 | 10 | Q.   And then you began your odyssey toward becoming a |
| 09:34 | 11 | Special Ed teacher? |
| 09:34 | 12 | A.   Yes. |
| 09:34 | 13 | Q.   In Mississippi. |
| 09:34 | 14 | Now, by December of 1999, was that when your commission |
| 09:34 | 15 | as a notary had expired? |
| 09:34 | 16 | A.   Yes. |
| 09:34 | 17 | Q.   While you were at Mattel, did you meet a person named |
| 09:34 | 18 | Carter Bryant? |
| 09:34 | 19 | A.   Yes. |
| 09:34 | 20 | Q.   How did you happen to meet him? |
| 09:35 | 21 | A.   I don't remember exactly when I met him.  He's real |
| 09:35 | 22 | quiet, real down to earth.  I just sort of saw him around |
| 09:35 | 23 | and eventually talked to him a little bit.  But he was the |
| 09:35 | 24 | more mellow one in the whole department. |
| 09:35 | 25 | Q.   Did you become friends, or just did you consider |

| | | |
|---|---|---|
| 09:35 | 1 | yourself just acquaintances? |
| 09:35 | 2 | A.   Acquaintances, but I really did -- I was fond of him |
| 09:35 | 3 | because he was such a down-to-earth person.  But we didn't |
| 09:35 | 4 | have time to really spend time together.  Our paths didn't |
| 09:35 | 5 | cross that much. |
| 09:35 | 6 | Q.   At some point did Mr. Bryant come to you and ask for |
| 09:35 | 7 | your phone number at home? |
| 09:35 | 8 | A.   Yes. |
| 09:35 | 9 | Q.   And the next day, did he call you at home? |
| 09:35 | 10 | A.   Yes. |
| 09:35 | 11 | Q.   Do you remember what he said he wanted -- why he said |
| 09:35 | 12 | he wanted to come over to your home? |
| 09:35 | 13 | A.   I don't remember what he said on the telephone.  I just |
| 09:35 | 14 | remember opening the door, and he had a -- rolled-up |
| 09:35 | 15 | drawings. |
| 09:35 | 16 | Q.   So did Mr. Bryant at this point know that you were a |
| 09:35 | 17 | notary public? |
| 09:35 | 18 | A.   Yes. |
| 09:35 | 19 | Q.   Now, was this on August 26th, 1999, that he came to |
| 09:36 | 20 | your house with his drawings? |
| 09:36 | 21 | A.   That sounds right. |
| 09:36 | 22 | Q.   And what did he ask you to do? |
| 09:36 | 23 | A.   He asked me to notarize the drawings.  He said, "I want |
| 09:36 | 24 | some proof that these are my original drawings." |
| 09:36 | 25 | And I said, "Well, I don't have authority to do that, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 60 of 135   Page ID #:309785
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

60

| | | |
|---|---|---|
| 09:36 | 1 | but I can notarize your signature and this date.  That's |
| 09:36 | 2 | really all I can do.  I mean, I don't know if that will do |
| 09:36 | 3 | any good." |
| 09:36 | 4 | But he said, "Sure, let's just do that." |
| 09:36 | 5 | So I just did like an acknowledgment of his signature |
| 09:36 | 6 | and the date. |
| 09:36 | 7 | Q.   Okay.  And let's look at Exhibit 62. |
| 09:36 | 8 | *(Document provided to the witness.)* |
| 09:36 | 9 | *(Document displayed.)* |
| 09:36 | 10 | BY MS. KELLER: |
| 09:36 | 11 | Q.   Do you recognize Exhibit 62 as some of those |
| 09:36 | 12 | drawings -- photocopies of the drawings that he asked you to |
| 09:36 | 13 | notarize? |
| 09:36 | 14 | A.   Yes. |
| 09:37 | 15 | Q.   Now, when you notarized Mr. Bryant's drawings, what was |
| 09:37 | 16 | the first thing that you did? |
| 09:37 | 17 | A.   Made comments. |
| 09:37 | 18 | Q.   Do you remember the comments? |
| 09:37 | 19 | A.   Yeah.  I said, "These are really cute."  Um, I just, |
| 09:37 | 20 | um, I don't really remember.  I just said where -- we'll |
| 09:37 | 21 | notarize your signature.  I don't really remember a lot |
| 09:37 | 22 | about it. |
| 09:37 | 23 | Q.   Did you put your notary stamp on the drawings? |
| 09:37 | 24 | A.   Oh, yes. |
| 09:37 | 25 | Q.   And did you sign all of them? |

| | | |
|---|---|---|
| 09:37 | 1 | A.   Yes. |
| 09:37 | 2 | MS. KELLER:  And let's see if we can blow up that |
| 09:37 | 3 | particular signature. |
| 09:37 | 4 | *(Document displayed.)* |
| 09:37 | 5 | BY MS. KELLER: |
| 09:37 | 6 | Q.   I see a signature of Carter Bryant and date on the |
| 09:37 | 7 | bottom, and then is that your signature on the top? |
| 09:37 | 8 | A.   Yes. |
| 09:37 | 9 | Q.   Now, let's look at pages 11 and 12 of your notary book. |
| 09:38 | 10 | *(Document displayed.)* |
| 09:38 | 11 | THE WITNESS:  I have it. |
| 09:38 | 12 | BY MS. KELLER: |
| 09:38 | 13 | Q.   Okay.  And page 11 doesn't look like it has any of |
| 09:38 | 14 | Mr. Bryant's items on it, but we see that's -- it ends with |
| 09:38 | 15 | a date of July 2nd, 1996, right? |
| 09:38 | 16 | A.   What are you looking at? |
| 09:38 | 17 | Q.   I'm looking at page 11. |
| 09:38 | 18 | A.   Uh-huh.  August 26th? |
| 09:38 | 19 | Q.   And then page 12. |
| 09:38 | 20 | A.   Uh-huh. |
| 09:38 | 21 | Q.   That appears to be things other than Carter Bryant's |
| 09:38 | 22 | materials? |
| 09:38 | 23 | A.   Right. |
| 09:38 | 24 | Q.   And then we go down to page 19. |
| 09:39 | 25 | *(Document displayed.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 62 of 135   Page ID #:309787
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

62

| | | |
|---|---|---|
| 09:39 | 1 | BY MS. KELLER: |
| 09:39 | 2 | Q.   Are we at page 19? |
| 09:39 | 3 | MGA ASSISTANT:  Of the stamped exhibit or the |
| 09:39 | 4 | notary book? |
| 09:39 | 5 | MS. KELLER:  The notary book, 60. |
| 09:39 | 6 | MGA ASSISTANT:  Okay. |
| 09:39 | 7 | THE WITNESS:  Okay. |
| 09:39 | 8 | MGA ASSISTANT:  16. |
| 09:39 | 9 | THE WITNESS:  There's nothing there.  It's blank. |
| 09:39 | 10 | BY MS. KELLER: |
| 09:39 | 11 | Q.   Well, we're looking at the trial exhibit number. |
| 09:39 | 12 | I'll tell you what. |
| 09:39 | 13 | A.   Okay. |
| 09:39 | 14 | Q.   Let's make it easy.  Let's look at the Trial |
| 09:39 | 15 | Exhibit 60-A, because there's a difference between what the |
| 09:39 | 16 | pages of your notary book are numbered and what our trial |
| 09:39 | 17 | exhibit pages are numbered.  I think that's creating the |
| 09:39 | 18 | problem. |
| 09:39 | 19 | *(Document provided to the witness.)* |
| 09:40 | 20 | THE WITNESS:  I've got it. |
| 09:40 | 21 | BY MS. KELLER: |
| 09:40 | 22 | Q.   Okay.  Do you have Trial Exhibit 19 in front of you? |
| 09:40 | 23 | MGA ASSISTANT:  60, page 19, correct? |
| 09:40 | 24 | MS. KELLER:  Uh-huh. |
| 09:40 | 25 | THE COURT:  Why don't you come up and turn the |

| | | |
|---|---|---|
| 09:40 | 1 | page.  Save a lot of time. |
| 09:40 | 2 | MS. KELLER:  I think it's page 11 in the actual |
| 09:40 | 3 | notary book.  Is that page 11? |
| 09:40 | 4 | THE WITNESS:  Yeah, page 11. |
| 09:40 | 5 | MS. KELLER:  Okay.  We're all right, then. |
| 09:40 | 6 | THE WITNESS:  Okay. |
| 09:40 | 7 | BY MS. KELLER: |
| 09:40 | 8 | Q.  So if we look at page 11 in your notary book, which is |
| 09:40 | 9 | in 60-A, would be page -- |
| 09:41 | 10 | MGA ASSISTANT:  16. |
| 09:41 | 11 | THE WITNESS:  16. |
| 09:41 | 12 | BY MS. KELLER: |
| 09:41 | 13 | Q.  And what do you see there for the entry? |
| 09:41 | 14 | A.  You mean the document kind or type? |
| 09:41 | 15 | Q.  Yes. |
| 09:41 | 16 | A.  Okay.  "Original sketches of doll idea, characters, six |
| 09:41 | 17 | total, names are Zoe, Lupe, Hallidae, Jade, 2 males, from |
| 09:41 | 18 | 1998 Missouri." |
| 09:41 | 19 | Q.  And that handwriting there, whose is it? |
| 09:41 | 20 | A.  That's mine. |
| 09:41 | 21 | Q.  Did you make all of those entries at the same time or |
| 09:41 | 22 | at different times? |
| 09:41 | 23 | A.  At the same time. |
| 09:41 | 24 | Q.  And it looks like there's some stuff kind of squeezed |
| 09:41 | 25 | in there? |

| | | |
|---|---|---|
| 09:41 | 1 | A.   I ran out of room. |
| 09:41 | 2 | Q.   Why did you decide to squeeze it all into that box, |
| 09:41 | 3 | rather than go into another box? |
| 09:41 | 4 | A.   I have no idea. |
| 09:42 | 5 | Q.   Now, on this page, also, is there a name and address of |
| 09:42 | 6 | signer to the right of it? |
| 09:42 | 7 | A.   Yes. |
| 09:42 | 8 | Q.   And who was that? |
| 09:42 | 9 | A.   Carter Bryant.  You want the address? |
| 09:42 | 10 | Q.   Yes.  Thank you. |
| 09:42 | 11 | A.   1319 West 160th Street, Gardena, California 90247. |
| 09:42 | 12 | Q.   Let's look at the date of this entry to the left. |
| 09:42 | 13 | A.   Okay. |
| 09:42 | 14 | Q.   And what's the day of the entry? |
| 09:42 | 15 | A.   August 26, '99. |
| 09:42 | 16 | Q.   And then if we look at, um, let's see -- it would be |
| 09:42 | 17 | page 12, I guess.  This is page 11 you're on? |
| 09:42 | 18 | A.   Yes.  So the next page is 12, yeah. |
| 09:42 | 19 | Q.   And the next page is 12.  And what does that say? |
| 09:42 | 20 | A.   "13" -- well, it's checked "Personally known by the |
| 09:43 | 21 | notary."  And then the next section, "13 drawings, each |
| 09:43 | 22 | drawing stamped and signed to acknowledge signature of |
| 09:43 | 23 | Carter." |
| 09:43 | 24 | Q.   And what does it say directly beneath that? |
| 09:43 | 25 | A.   On the next section?  Oh.  "Eight pages, same document, |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 65 of 135   Page ID #:309790
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

65

| | | |
|---|---|---|
| 09:43 | 1 | signature notarized." |
| 09:43 | 2 | Q.   And then at the top right, under signature of signer, |
| 09:43 | 3 | we see? |
| 09:43 | 4 | A.   Carter Bryant. |
| 09:43 | 5 | Q.   And then what's that signature right below? |
| 09:43 | 6 | A.   I believe that's John -- Joseph Kubachek (phonetic). |
| 09:43 | 7 | Q.   Who's Joseph Kubachek? |
| 09:43 | 8 | A.   He was someone -- a neighbor of mine that I did a lot |
| 09:43 | 9 | of -- I did several notary -- notarizations for. |
| 09:43 | 10 | Q.   Okay.  So that doesn't relate to the top one? |
| 09:43 | 11 | A.   No. |
| 09:43 | 12 | Q.   And the "13 drawings each, drawing stamped and signed |
| 09:43 | 13 | to acknowledge signature of Carter," who's writing was that? |
| 09:43 | 14 | A.   Mine. |
| 09:43 | 15 | Q.   Now, pages 11 and 12 in your notary book, which are |
| 09:44 | 16 | also Trial Exhibit 60-A, 19 and 20, were both of those |
| 09:44 | 17 | pages -- did you -- did you write all those things |
| 09:44 | 18 | contemporaneously?  In other words, was it all at the same |
| 09:44 | 19 | time, or did you write those at different times? |
| 09:44 | 20 | A.   At the same time. |
| 09:44 | 21 | Q.   And did you use the same pen or a different pen to |
| 09:44 | 22 | write those things? |
| 09:44 | 23 | A.   I'm sure I used the same pen. |
| 09:44 | 24 | Q.   And when Mr. Bryant signed and dated your notary book, |
| 09:44 | 25 | was that also contemporaneous; in other words, was it right |

| | | |
|---|---|---|
| 09:44 | 1 | at the same time that you were making your entries? |
| 09:44 | 2 | A.    Yes. |
| 09:44 | 3 | Q.    And if you look at that document type or kind where it |
| 09:44 | 4 | says, "Original sketches of doll idea, characters, |
| 09:45 | 5 | six total," and it gives the names Zoe, Lupe, Hallidae, and |
| 09:45 | 6 | Jade, 2 males," underneath that it says, "from 1998 |
| 09:45 | 7 | Missouri"? |
| 09:45 | 8 | A.    Yes. |
| 09:45 | 9 | Q.    And where did you get all that information that you put |
| 09:45 | 10 | up there including "from 1998 Missouri"? |
| 09:45 | 11 | A.    From Carter. |
| 09:45 | 12 | Q.    And did he tell you why it was that he wanted to have |
| 09:45 | 13 | you notarize those drawings for him? |
| 09:45 | 14 | A.    I remember he wanted to try to prove that he did those |
| 09:45 | 15 | when he was in Missouri.  But, you know, I told him all I |
| 09:45 | 16 | could do is notarize the signature.  But I did make a note |
| 09:45 | 17 | of what he said. |
| 09:45 | 18 | Q.    Okay.  And about how long altogether was it that Carter |
| 09:45 | 19 | Bryant was there at your house that night? |
| 09:45 | 20 | A.    Maybe 30 minutes. |
| 09:45 | 21 | Q.    Now, aside from his coming to your house to notarize |
| 09:45 | 22 | these, did you ever have any social contact with him outside |
| 09:46 | 23 | of work? |
| 09:46 | 24 | A.    I went to dinner at his house once. |
| 09:46 | 25 | Q.    And that was it? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 67 of 135   Page ID #:309792
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

67

| | | |
|---|---|---|
| 09:46 | 1 | A.   That's it, that I remember. |
| 09:46 | 2 | Q.   In the years since, have you seen Mr. Bryant at all? |
| 09:46 | 3 | A.   No. |
| 09:46 | 4 | Q.   Spoken with him on the phone call? |
| 09:46 | 5 | A.   Not that I remember. |
| 09:46 | 6 | Q.   Or e-mailed with him? |
| 09:46 | 7 | A.   Not that I remember. |
| 09:46 | 8 | Q.   Do you even know where he's living today? |
| 09:46 | 9 | A.   No. |
| 09:46 | 10 | Q.   After you notarized these drawings for Mr. Bryant, did |
| 09:46 | 11 | you ever discuss the notary book or its contents at any |
| 09:46 | 12 | point until you were contacted by an attorney? |
| 09:46 | 13 | A.   Not at all. |
| 09:46 | 14 | Q.   Do you remember somebody named Dale Cendali? |
| 09:46 | 15 | A.   Oh, yes. |
| 09:46 | 16 | Q.   Who was Dale Cendali? |
| 09:46 | 17 | A.   She said she was an attorney, and I think she was |
| 09:46 | 18 | calling from New York, possibly, and she started talking to |
| 09:46 | 19 | me about the case, or that she was representing Carter |
| 09:46 | 20 | Bryant and that she would like to get a copy of the page |
| 09:46 | 21 | from the notary book. |
| 09:46 | 22 | Q.   And what was the next thing that happened with respect |
| 09:47 | 23 | to that? |
| 09:47 | 24 | A.   I believe I scanned the page -- the two pages and tried |
| 09:47 | 25 | to send them as an attachment by e-mail so she could look at |

| | | |
|---|---|---|
| 09:47 | 1 | them.  And I remember they weren't clear.  She said she |
| 09:47 | 2 | couldn't read them, and she would have to get the original |
| 09:47 | 3 | journal and would that be okay.  And I didn't see why that |
| 09:47 | 4 | would not be okay, so I said sure. |
| 09:47 | 5 | Q.    Was this in the summer of 2004? |
| 09:47 | 6 | A.    That sounds right, yes. |
| 09:47 | 7 | Q.    When the attorney called you, did she want to know if |
| 09:47 | 8 | you still had your notary book? |
| 09:47 | 9 | A.    Yes. |
| 09:47 | 10 | Q.    And did she want to know if anybody had tampered with |
| 09:47 | 11 | it in any way? |
| 09:47 | 12 | A.    Yes. |
| 09:47 | 13 | Q.    What did you tell her? |
| 09:47 | 14 | A.    That it's been in the same storage bin that it had been |
| 09:47 | 15 | in since I put it in there. |
| 09:47 | 16 | Q.    So I assume after this phone call, that's when you got |
| 09:47 | 17 | it out of the attic and tried to send her copies? |
| 09:47 | 18 | A.    Yes.  I had to find it. |
| 09:47 | 19 | Q.    And by the way, had you seen Bratz dolls on the toy |
| 09:47 | 20 | shelves before you even got this phone call from -- |
| 09:47 | 21 | A.    Yes. |
| 09:48 | 22 | Q.    Did you know that Mr. Bryant was the person who had |
| 09:48 | 23 | designed them? |
| 09:48 | 24 | A.    Yes.  I was excited about that. |
| 09:48 | 25 | Q.    Now, if I can show up Exhibit 35817. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 69 of 135   Page ID #:309794
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

69

| | | |
|---|---|---|
| 09:48 | 1 | *(Document provided to the witness.)* |
| 09:48 | 2 | BY MS. KELLER: |
| 09:48 | 3 | Q.   Do you recognize this as an e-mail from you to Dale |
| 09:48 | 4 | Cendali, dated July 9, 2004? |
| 09:48 | 5 | A.   Yes. |
| 09:48 | 6 | MS. KELLER:  Move to admit 35817, Your Honor. |
| 09:48 | 7 | THE COURT:  Received. |
| 09:48 | 8 | *(Exhibit No. 35817 received in evidence.)* |
| 09:48 | 9 | *(Document displayed.)* |
| 09:48 | 10 | BY MS. KELLER: |
| 09:48 | 11 | Q.   And it refers to an attachment to the e-mail.  Was that |
| 09:48 | 12 | Exhibit 62, page 11, that we've just been talking about? |
| 09:48 | 13 | A.   Page 11? |
| 09:48 | 14 | Q.   Or page 60 -- I mean, Exhibit 60. |
| 09:48 | 15 | A.   Yes. |
| 09:48 | 16 | Q.   Is that -- the attachment referred to here, is that |
| 09:49 | 17 | your attempt to send Ms. Cendali the notary page with the |
| 09:49 | 18 | notation of the 1998 Missouri and names of the dolls? |
| 09:49 | 19 | A.   Yes. |
| 09:49 | 20 | Q.   Did you later give the journal to another attorney for |
| 09:49 | 21 | Carter Bryant? |
| 09:49 | 22 | A.   Yes. |
| 09:49 | 23 | Q.   Do you remember her name? |
| 09:49 | 24 | A.   No. |
| 09:49 | 25 | Q.   Does Charlotte McClusky ring a bell? |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

70

| | | |
|---|---|---|
| 09:49 | 1 | A.   Yes. |
| 09:49 | 2 | Q.   When did she visit you? |
| 09:49 | 3 | A.   I don't remember the date.  I just remember her coming |
| 09:49 | 4 | to the house. |
| 09:49 | 5 | Q.   Was it shortly after your e-mail to Dale Cendali? |
| 09:49 | 6 | A.   Yes. |
| 09:49 | 7 | Q.   Does July of 2004 ring a bell? |
| 09:49 | 8 | A.   That sounds right. |
| 09:49 | 9 | Q.   And you were given -- you gave a deposition in this |
| 09:49 | 10 | case some years back, right? |
| 09:49 | 11 | A.   Yes. |
| 09:49 | 12 | Q.   Would it be fair to say your memory was probably just a |
| 09:49 | 13 | little fresher than it is now -- |
| 09:49 | 14 | A.   A lot. |
| 09:49 | 15 | Q.   -- than -- |
| 09:49 | 16 | A.   A lot. |
| 09:49 | 17 | Q.   Did Ms. McClusky come to your house and leave with the |
| 09:49 | 18 | journal? |
| 09:49 | 19 | A.   Yes. |
| 09:49 | 20 | Q.   And let's look at exhibit -- oh, did you give her your |
| 09:49 | 21 | notary stamp, too, by the way? |
| 09:50 | 22 | A.   Yes.  I gave her the whole -- the little case that had |
| 09:50 | 23 | everything in it. |
| 09:50 | 24 | Q.   Did she give you a letter that constituted a receipt |
| 09:50 | 25 | for having taken those things? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 71 of 135   Page ID #:309796
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

71

| | | |
|---|---|---|
| 09:50 | 1 | A.   I believe she sent it to me.  She had to make a copy to |
| 09:50 | 2 | send it to me.  We both signed. |
| 09:50 | 3 | Q.   Let's look at Exhibit 61 and see if you recognize that |
| 09:50 | 4 | as that letter/receipt. |
| 09:50 | 5 | *(Document provided to the witness.)* |
| 09:50 | 6 | BY MS. KELLER: |
| 09:50 | 7 | Q.   That look like it? |
| 09:50 | 8 | A.   Yes. |
| 09:50 | 9 | MS. KELLER:  Your Honor, I move Exhibit 61 into |
| 09:50 | 10 | evidence. |
| 09:50 | 11 | THE COURT:  Received. |
| 09:50 | 12 | *(Document displayed.)* |
| 09:50 | 13 | BY MS. KELLER: |
| 09:50 | 14 | Q.   So this is dated July 21, 2004, addressed to you.  And |
| 09:50 | 15 | it says, "Dear Ms. Prince, this letter will confirm that I |
| 09:50 | 16 | have this day personally taken receipt of your notary book. |
| 09:50 | 17 | We appreciate your cooperation in this matter.  Should you |
| 09:50 | 18 | have any questions or concerns, please do not hesitate to |
| 09:50 | 19 | contact me."  And it's signed Charlotte K. McClusky. |
| 09:51 | 20 | Did she send you a copy of your journal, as well? |
| 09:51 | 21 | A.   I don't think I remember that. |
| 09:51 | 22 | Q.   And is this the same date that she visited you and left |
| 09:51 | 23 | with the journal? |
| 09:51 | 24 | A.   Yes. |
| 09:51 | 25 | Q.   So I think -- it's probably fair to say you never got |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 72 of 135   Page ID #:309797
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

72

| 09:51 | 1 | your notary journal back? |
| 09:51 | 2 | A.    Right. |
| 09:51 | 3 | Q.    As of the time that you were -- that you had your |
| 09:51 | 4 | deposition taken in December of 2004, is it true that when |
| 09:51 | 5 | you looked at the notary journal that day, that you didn't |
| 09:51 | 6 | have any reason to believe that anyone had altered it in any |
| 09:51 | 7 | way since August 26th, 1999? |
| 09:51 | 8 | A.    Yeah, nobody has touched it, I'm sure. |
| 09:51 | 9 | Q.    It looks the same to you? |
| 09:51 | 10 | A.    Yes. |
| 09:51 | 11 |         MS. KELLER:  Nothing further, Your Honor. |
| 09:51 | 12 |         THE COURT:  Cross-examination by Mr. Price on |
| 09:51 | 13 | behalf of Mattel. |
| 09:52 | 14 |         MS. KELLER:  Your Honor, I don't remember if I |
| 09:52 | 15 | moved in the series of drawings, 62.  I think they're |
| 09:52 | 16 | already in evidence. |
| 09:52 | 17 |         THE COURT:  If not, they're received at this time, |
| 09:52 | 18 | Counsel. |
| 09:52 | 19 |         MS. KELLER:  Thank you. |
| 09:52 | 20 |         *(Exhibit No. 62 received in evidence.)* |
| 09:52 | 21 | **CROSS-EXAMINATION** |
| 09:52 | 22 | BY MR. PRICE: |
| 09:52 | 23 | Q.    Good morning, Ms. Prince. |
| 09:52 | 24 | A.    Good morning. |
| 09:52 | 25 | Q.    I'm Bill Price.  We haven't met, have we? |

| | | |
|---|---|---|
| 09:52 | 1 | A.   I don't think so, no. |
| 09:52 | 2 | Q.   I want to ask you, you were asked about getting this |
| 09:52 | 3 | call from Ms. Cendali.  When you got the call from |
| 09:52 | 4 | Ms. Cendali, she told you that she represented Carter |
| 09:52 | 5 | Bryant, correct? |
| 09:52 | 6 | A.   Right. |
| 09:52 | 7 | Q.   And she -- you understood she was Carter Bryant's |
| 09:52 | 8 | attorney, not MGA's attorney, correct? |
| 09:52 | 9 | A.   Right.  I remember his name. |
| 09:52 | 10 | Q.   In fact, as of the time of your deposition in |
| 09:52 | 11 | December 21, 2004, your feeling was you had never talked to |
| 09:52 | 12 | an MGA attorney, correct? |
| 09:52 | 13 | A.   I don't remember MGA being mentioned. |
| 09:53 | 14 | Q.   And then do you remember when you got the call from |
| 09:53 | 15 | Ms. Cendali, you said to her, "I love Carter and I think |
| 09:53 | 16 | he's a good guy, and I would do anything to help him"? |
| 09:53 | 17 | A.   I would have said that. |
| 09:53 | 18 | Q.   And but at that time when you got that call, were you |
| 09:53 | 19 | living in Georgia? |
| 09:53 | 20 | A.   If that's when they called me, I would have been in |
| 09:53 | 21 | Georgia, yes. |
| 09:53 | 22 | Q.   I just -- are you originally from the South? |
| 09:53 | 23 | A.   Uh-huh, yes. |
| 09:53 | 24 | Q.   So let me walk through, then, what happened before you |
| 09:53 | 25 | got that call from Ms. Cendali and said you loved Carter and |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

74

| 09:53 | 1 | thought he was a good guy and would do anything to help him. |
| 09:53 | 2 | First of all, when you were at Mattel -- Carter's a very |
| 09:53 | 3 | likeable guy? |
| 09:53 | 4 | A.   Yes. |
| 09:53 | 5 | Q.   And he came up to you one day and said, "Can I have |
| 09:53 | 6 | your phone number?  I want to talk to you about something," |
| 09:53 | 7 | correct? |
| 09:53 | 8 | A.   Correct. |
| 09:53 | 9 | Q.   And you asked him, "What's it about?"  Right? |
| 09:54 | 10 | A.   I might have.  I don't remember. |
| 09:54 | 11 | Q.   Okay.  It was a long time ago.  So let me have your |
| 09:54 | 12 | deposition placed in front of you, which was taken, you |
| 09:54 | 13 | know, six years ago, plus, and see if that helps you out. |
| 09:54 | 14 | And I'm looking at page 118. |
| 09:54 | 15 | *(Document provided to the witness.)* |
| 09:54 | 16 | BY MR. PRICE: |
| 09:54 | 17 | Q.   And as Ms. Keller said, your memory was better then |
| 09:54 | 18 | than it is today about these events, right? |
| 09:54 | 19 | A.   Of course. |
| 09:54 | 20 | Q.   Actually, look at page 119, lines 7 through 9.  Does |
| 09:54 | 21 | that refresh your memory, 119, lines 7 through 9? |
| 09:55 | 22 | A.   Okay. |
| 09:55 | 23 | Q.   Where you asked him, "What's this about?" and he said, |
| 09:55 | 24 | "Can I talk to you about it later?" |
| 09:55 | 25 | A.   I'm sure that's right. |

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

75

| | | |
|---|---|---|
| 09:55 | 1 | Q.   And -- and so you believe that's what you said, |
| 09:55 | 2 | correct? |
| 09:55 | 3 | A.   I believe that's what I said. |
| 09:55 | 4 | Q.   And he -- he -- uh, he asked you for your phone number, |
| 09:55 | 5 | correct? |
| 09:55 | 6 | A.   Correct. |
| 09:55 | 7 | Q.   Then later he called you to ask to come by, right? |
| 09:55 | 8 | A.   Right. |
| 09:55 | 9 | Q.   And at that time you were kind of wondering and |
| 09:55 | 10 | curious, you know, why is he coming by, right? |
| 09:55 | 11 | A.   I probably was busy and didn't think about it. |
| 09:55 | 12 | Q.   Well, look at page 120. |
| 09:55 | 13 | A.   Okay. |
| 09:55 | 14 | Q.   And look at lines 25. |
| 09:55 | 15 | A.   Okay. |
| 09:55 | 16 | Q.   To 121, line 1.  Do you see that? |
| 09:55 | 17 | A.   Yes. |
| 09:55 | 18 | Q.   So at the time he was coming by, you were very curious |
| 09:55 | 19 | as to why he was coming by, correct? |
| 09:55 | 20 | A.   Correct. |
| 09:55 | 21 | Q.   And you didn't really have any idea what it was about |
| 09:56 | 22 | when he was on his way over to your home, correct? |
| 09:56 | 23 | A.   Right. |
| 09:56 | 24 | Q.   Okay.  So, uh, at that time -- you know, when he had |
| 09:56 | 25 | said that he wanted to talk to you about something and he'd |

| 09:56 | 1 | tell you about it later, and then he called to ask if he |
| 09:56 | 2 | could come by -- at that time before he arrived at your |
| 09:56 | 3 | door, you didn't know that he wanted drawings notarized? |
| 09:56 | 4 | A.   No. |
| 09:56 | 5 | Q.   Is that correct? |
| 09:56 | 6 | A.   Correct. |
| 09:56 | 7 | Q.   Okay.  And you didn't know that till he -- till he |
| 09:56 | 8 | actually came in and sat in your living room, right? |
| 09:56 | 9 | A.   Correct. |
| 09:56 | 10 | Q.   So let's talk about what happened in the living room. |
| 09:56 | 11 | Uh, Mr. Bryant didn't say anything to you about, uh, Alaska |
| 09:56 | 12 | Momma, correct? |
| 09:56 | 13 | A.   I don't remember that. |
| 09:56 | 14 | Q.   Okay.  Uh, he didn't say anything about wanting to |
| 09:56 | 15 | establish on August 29, 1999, that he created something |
| 09:56 | 16 | before sending something out to Alaska Momma?  He didn't |
| 09:56 | 17 | saying anything like that, correct? |
| 09:56 | 18 | A.   I don't remember that at all. |
| 09:56 | 19 | Q.   Let's talk about what you do remember. |
| 09:57 | 20 | If you need help, by the way, at this point I'm at |
| 09:57 | 21 | page 124 in your deposition.  This is just in case -- |
| 09:57 | 22 | A.   I got it. |
| 09:57 | 23 | Q.   -- you need help. |
| 09:57 | 24 | He said that he wanted to create some documentation |
| 09:57 | 25 | that he created some drawings before he started work at |

| | | |
|---|---|---|
| 09:57 | 1 | Mattel, correct? |
| 09:57 | 2 | A.   Correct. |
| 09:57 | 3 | Q.   And he said the reason he wanted that was that he |
| 09:57 | 4 | didn't want anyone to think that he did these while he was |
| 09:57 | 5 | at Mattel, correct? |
| 09:57 | 6 | A.   I don't remember. |
| 09:57 | 7 | Q.   Okay.  If you'd look at page 125, lines 14 through 18. |
| 09:57 | 8 | A.   I see it. |
| 09:57 | 9 | Q.   And so you now recall that he came in and said he |
| 09:57 | 10 | wanted some documentation that he did drawings before he |
| 09:57 | 11 | started at Mattel and he didn't want anyone to think he did |
| 09:58 | 12 | it while he was at Mattel.  Do you recall that? |
| 09:58 | 13 | A.   Correct, yes. |
| 09:58 | 14 | Q.   And, uh, sitting there observing him, uh, you thought |
| 09:58 | 15 | that he seemed a little concerned? |
| 09:58 | 16 | A.   Yes. |
| 09:58 | 17 | Q.   Now, let's talk about what you could do as a notary and |
| 09:58 | 18 | the -- you kind of moved throughout the country.  It's your |
| 09:58 | 19 | understanding there are notaries in every state? |
| 09:58 | 20 | A.   Yes. |
| 09:58 | 21 | Q.   Including Missouri in 1998, 1999, 2000? |
| 09:58 | 22 | A.   Yes. |
| 09:58 | 23 | Q.   And let's talk about what a notary can do.  You can |
| 09:58 | 24 | notarize -- a notary can notarize that a document exists on |
| 09:58 | 25 | the day that it is presented to you, correct? |

| 09:58 | 1 | A.   Yes. |
| 09:58 | 2 | Q.   So if you notarized a document in August of 1999, that |
| 09:58 | 3 | would establish that that document was in existence on -- in |
| 09:58 | 4 | August of 1999? |
| 09:58 | 5 | A.   Right. |
| 09:59 | 6 | Q.   Uh, you can't notarize that something was created |
| 09:59 | 7 | before the date you notarize it, correct? |
| 09:59 | 8 | A.   Correct. |
| 09:59 | 9 | Q.   As far as you know, for example, in -- in this case, |
| 09:59 | 10 | there were, uh, drawings that you -- you notarized on |
| 09:59 | 11 | August 26, 1999, correct? |
| 09:59 | 12 | A.   Correct. |
| 09:59 | 13 | Q.   And, uh -- uh, as far as you know, those could have |
| 09:59 | 14 | been created that very day, correct? |
| 09:59 | 15 | A.   Correct. |
| 09:59 | 16 | Q.   I mean, you have no idea one way or the other, right? |
| 09:59 | 17 | A.   Right. |
| 09:59 | 18 | Q.   When you sat there and talked to Mr. Bryant, by the |
| 09:59 | 19 | way, did he talk to you anything about his personal life, |
| 09:59 | 20 | like he had once been a songwriter and had had songs |
| 09:59 | 21 | copyrighted, anything like that? |
| 09:59 | 22 | A.   I remember him mentioning that his sister did something |
| 09:59 | 23 | in music, but that's all I remember. |
| 09:59 | 24 | Q.   So let me show you now the drawings that were |
| 09:59 | 25 | notarized.  And let's go through the timing. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

79

| | | |
|---|---|---|
| 09:59 | 1 | The first thing he tells you is, "I want to establish |
| 09:59 | 2 | that I didn't do these at Mattel, that I did them in 1998 |
| 10:00 | 3 | Missouri," right? |
| 10:00 | 4 | A.   Right. |
| 10:00 | 5 | Q.   That's right out of the box? |
| 10:00 | 6 | A.   Right. |
| 10:00 | 7 | Q.   Then he shows you the drawings, correct? |
| 10:00 | 8 | A.   Correct. |
| 10:00 | 9 | Q.   And if you would look at Exhibit 62. |
| 10:00 | 10 | *(Document provided to the witness.)* |
| 10:00 | 11 | MR. PRICE:  If we can show the first page, Ken.  I |
| 10:00 | 12 | think this is in evidence, 62. |
| 10:00 | 13 | *(Document displayed.)* |
| 10:00 | 14 | BY MR. PRICE: |
| 10:00 | 15 | Q.   So he showed you these faces, right? |
| 10:00 | 16 | A.   Right. |
| 10:00 | 17 | Q.   And that has names:  Jade, Lupe, Zoe, and Hallidae? |
| 10:00 | 18 | A.   Right. |
| 10:00 | 19 | Q.   And that's your stamp at the bottom which indicates |
| 10:00 | 20 | this was in existence August 26, 1999, correct? |
| 10:00 | 21 | A.   Correct. |
| 10:00 | 22 | Q.   And there was nothing on the document that indicated it |
| 10:00 | 23 | was done in 1998, correct? |
| 10:00 | 24 | A.   Correct. |
| 10:00 | 25 | Q.   And then, if we go to the second page here, you see |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

80

| | | |
|---|---|---|
| 10:00 | 1 | 62-00002.  That's another drawing which you could notarize |
| 10:00 | 2 | was in existence on August 26, 1999, correct? |
| 10:00 | 3 | A.   Correct. |
| 10:00 | 4 | Q.   Nothing on the document that said it was done in 1998, |
| 10:01 | 5 | correct? |
| 10:01 | 6 | A.   Correct. |
| 10:01 | 7 | Q.   In fact, you see the name "Bratz" there? |
| 10:01 | 8 | A.   Yes. |
| 10:01 | 9 | Q.   I mean, you don't recall that being on the original |
| 10:01 | 10 | document that you notarized, correct? |
| 10:01 | 11 | A.   No. |
| 10:01 | 12 | Q.   I'm sorry.  Is that correct? |
| 10:01 | 13 | A.   Correct. |
| 10:01 | 14 | Q.   And, in fact, in the notary book where you have an |
| 10:01 | 15 | entry for these documents, you have the names Jade, Lupe, |
| 10:01 | 16 | Zoe, and Hallidae, but you didn't put down Bratz, correct? |
| 10:01 | 17 | A.   Correct. |
| 10:01 | 18 | Q.   So if we flip through these, these are all drawings |
| 10:01 | 19 | which you could notarize were in existence August 26, 1999, |
| 10:01 | 20 | correct? |
| 10:01 | 21 | A.   Correct. |
| 10:01 | 22 | Q.   And, uh, none of these had anything that said 1998 on |
| 10:01 | 23 | them, correct? |
| 10:01 | 24 | A.   Correct. |
| 10:01 | 25 | Q.   But Mr. Bryant was concerned -- uh, he wanted somehow |

CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

81

| | | |
|---|---|---|
| 10:01 | 1 | to be able to help you get him to prove that they were done |
| 10:01 | 2 | in 1998, correct? |
| 10:02 | 3 | A.   I think so. |
| 10:02 | 4 | Q.   Did you ask him, "Why didn't you go to a notary in |
| 10:02 | 5 | 1998?" |
| 10:02 | 6 | A.   No. |
| 10:02 | 7 | Q.   Okay.  So, uh, you knew, uh, that he wanted you to help |
| 10:02 | 8 | him establish that this was done in Missouri in 1998, and |
| 10:02 | 9 | after notarizing the drawings, then you go to your book, |
| 10:02 | 10 | correct? |
| 10:02 | 11 | A.   Correct. |
| 10:02 | 12 | Q.   And if we could look at Exhibit 60.  And let's do 60-A |
| 10:02 | 13 | page 19.  And if you want to look at the original, I think |
| 10:02 | 14 | we've kind of established that's page 11 in your actual |
| 10:02 | 15 | notary book. |
| 10:02 | 16 | A.   Okay. |
| 10:02 | 17 | *(Document provided to the witness.)* |
| 10:02 | 18 | *(Document displayed.)* |
| 10:02 | 19 | BY MR. PRICE: |
| 10:02 | 20 | Q.   So it's kind of hard to see.  You see where you say it |
| 10:02 | 21 | says "original sketches"?  Do you see that? |
| 10:02 | 22 | A.   Yes. |
| 10:02 | 23 | Q.   And I'm gonna blow this up there -- we have a |
| 10:02 | 24 | demonstrative which has no title on it, which shows this |
| 10:02 | 25 | entry.  It's a 23822-22-B. |

| | | |
|---|---|---|
| 10:03 | 1 | Is that right? |
| 10:03 | 2 | MR. PRICE:  Let's get a big view of this. |
| 10:03 | 3 | *(Technician complies.)* |
| 10:03 | 4 | BY MR. PRICE: |
| 10:03 | 5 | Q.   So in the notary book it says "document kind or type," |
| 10:03 | 6 | correct? |
| 10:03 | 7 | A.   Correct. |
| 10:03 | 8 | Q.   So before you started writing this, you –– you, uh –– |
| 10:03 | 9 | your current memory, your memory in 2004 was that Mr. Bryant |
| 10:03 | 10 | wanted you to put down that this was in 1998 from Missouri, |
| 10:03 | 11 | correct? |
| 10:03 | 12 | A.   Correct. |
| 10:03 | 13 | Q.   And so you wrote the first line, correct? |
| 10:03 | 14 | A.   Correct. |
| 10:03 | 15 | Q.   Then you wrote the second? |
| 10:03 | 16 | A.   Correct. |
| 10:03 | 17 | Q.   Then the third, correct? |
| 10:03 | 18 | A.   Correct. |
| 10:03 | 19 | Q.   Then the fourth, right? |
| 10:03 | 20 | A.   Correct. |
| 10:03 | 21 | Q.   And what I'd like to do is I'd like to get a view of |
| 10:04 | 22 | what this looked like when you were done with that fourth |
| 10:04 | 23 | line; that is, what was in front of you on the paper.  And |
| 10:04 | 24 | uh –– uh, through some magic here, I'm going to show you |
| 10:04 | 25 | 23822-23-B.  And you'll be able to see this on your screen |

| 10:04 | 1 | eventually. |
| 10:04 | 2 | *(Document displayed.)* |
| 10:04 | 3 | BY MR. PRICE: |
| 10:04 | 4 | Q.   Here we go.  This is what it looked like before you |
| 10:04 | 5 | added that fifth line, correct? |
| 10:04 | 6 | A.   I would assume. |
| 10:04 | 7 | Q.   If you look at your notary book, and does this look |
| 10:04 | 8 | like everything you wrote down before you went into that |
| 10:04 | 9 | fifth line? |
| 10:04 | 10 | A.   I think so. |
| 10:04 | 11 | Q.   And your memory is that when you started writing |
| 10:04 | 12 | this -- |
| 10:04 | 13 | A.   Yes. |
| 10:04 | 14 | Q.   -- that Mr. Bryant wanted you to put down "Missouri |
| 10:04 | 15 | 1998," correct? |
| 10:04 | 16 | A.   Correct. |
| 10:04 | 17 | Q.   So when you wrote the fourth line, you knew that?  You |
| 10:05 | 18 | knew that that was supposed to go in there too? |
| 10:05 | 19 | A.   Yes.  He mentioned it, so I squeezed it in. |
| 10:05 | 20 | Q.   Well, I think you said he mentioned it before you |
| 10:05 | 21 | started writing, correct? |
| 10:05 | 22 | A.   My memory's not that good.  Long time ago. |
| 10:05 | 23 | Q.   Okay.  So here, though, you've got this -- you did this |
| 10:05 | 24 | comma, which kind of blocks that last line, correct? |
| 10:05 | 25 | A.   Excuse me? |

| 10:05 | 1 | Q.   You see this comma here, which goes into that last |
|---|---|---|
| 10:05 | 2 | space there? |
| 10:05 | 3 | THE COURT:  I don't think what she sees what |
| 10:05 | 4 | you're lasering. |
| 10:05 | 5 | MR. PRICE:  I thought it was on the monitor, Your |
| 10:05 | 6 | Honor. |
| 10:05 | 7 | THE COURT:  No, it's not.  When you laser it, it |
| 10:05 | 8 | doesn't come up on that monitor.  Just laser it again. |
| 10:05 | 9 | BY MR. PRICE: |
| 10:05 | 10 | Q.   Can you see there?  Do you see that comma? |
| 10:05 | 11 | A.   Yes. |
| 10:05 | 12 | Q.   It kind of goes down to that last line, right? |
| 10:05 | 13 | A.   Yes. |
| 10:05 | 14 | Q.   And then that comma does too, after Hallidae, correct? |
| 10:05 | 15 | A.   Correct. |
| 10:05 | 16 | Q.   And the one in Jade goes all the way down, correct? |
| 10:05 | 17 | A.   Correct, correct. |
| 10:05 | 18 | Q.   And then at the end of that line, there's a period? |
| 10:05 | 19 | A.   Correct. |
| 10:06 | 20 | THE COURT:  See, your problem is you were lasering |
| 10:06 | 21 | that screen, and she was looking at this screen.  As long as |
| 10:06 | 22 | you don't get lasered in the eyes. |
| 10:06 | 23 | MR. PRICE:  I'm trying to aim high. |
| 10:06 | 24 | THE COURT:  You're doing fine. |
|  | 25 |  |

| | | |
|---|---|---|
| 10:06 | 1 | BY MR. PRICE: |
| 10:06 | 2 | Q.   So if you knew at the time you wrote this that you were |
| 10:06 | 3 | going to be putting in, uh, you know, "from Missouri in |
| 10:06 | 4 | 1998," why did you put those commas blocking the last line, |
| 10:06 | 5 | and why did you put the period after "two males"?  Do you |
| 10:06 | 6 | recall? |
| 10:06 | 7 | A.   I don't remember. |
| 10:06 | 8 | Q.   Now, you have no knowledge at all as to whether or not |
| 10:06 | 9 | any of these drawings were done before August 26, 1999, |
| 10:06 | 10 | correct. |
| 10:06 | 11 | A.   No knowledge. |
| 10:06 | 12 | Q.   And if you'd look at, uh, Exhibit 63. |
| 10:06 | 13 | *(Document provided to the witness.)* |
| 10:07 | 14 | BY MR. PRICE: |
| 10:07 | 15 | Q.   Do you see these as drawings in front of you? |
| 10:07 | 16 | A.   I see it. |
| 10:07 | 17 | MR. PRICE:  Actually, let's look at 302, then. |
| 10:07 | 18 | This isn't in evidence. |
| 10:07 | 19 | Let's look at 302.  I apologize.  I've been told |
| 10:07 | 20 | this isn't in evidence. |
| 10:07 | 21 | MS. KELLER:  I think 63 was moved.  No? |
| 10:07 | 22 | THE COURT:  Well, what is 63?  Maybe I can move it |
| 10:07 | 23 | into evidence for you. |
| 10:07 | 24 | MR. PRICE:  They're drawings by Mr. Bryant that |
| 10:07 | 25 | were attached to -- |

| | | |
|---|---|---|
| 10:07 | 1 | THE COURT:  Counsel, they're received. |
| 10:07 | 2 | *(Exhibit No. 63 received in evidence.)* |
| 10:07 | 3 | THE COURT:  Counsel, they're received. |
| 10:07 | 4 | MR. PRICE:  Do we have 63 in front -- |
| 10:07 | 5 | *(Document provided to the witness.)* |
| 10:07 | 6 | THE COURT:  They're drawings inside 302, aren't |
| 10:07 | 7 | they? |
| 10:07 | 8 | MR. PRICE:  Yes. |
| 10:07 | 9 | MS. KELLER:  Your Honor, these are irrelevant. |
| 10:07 | 10 | These are not what she notarized. |
| 10:08 | 11 | MR. PRICE:  That's actually the point. |
| 10:08 | 12 | MS. KELLER:  Which is why it's irrelevant with |
| 10:08 | 13 | this witness. |
| 10:08 | 14 | THE COURT:  Overruled. |
| 10:08 | 15 | BY MR. PRICE: |
| 10:08 | 16 | Q.   So you saw these drawings on August 26, 1999.  If you'd |
| 10:08 | 17 | look through 63, just kind of flip through there and imagine |
| 10:08 | 18 | them in color.  Did -- did you see any of these drawings in |
| 10:08 | 19 | August 26th? |
| 10:08 | 20 | A.   I don't recall these. |
| 10:08 | 21 | Q.   Did you see any color drawings at all on August 26, |
| 10:08 | 22 | 1999? |
| 10:08 | 23 | A.   I don't recall seeing any color. |
| 10:08 | 24 | THE COURT:  Well, then, Counsel, you're |
| 10:08 | 25 | technically right.  You can show them, but I'm not going to |

| | | |
|---|---|---|
| 10:08 | 1 | receive them into evidence without further foundation. |
| 10:08 | 2 | MR. PRICE:  I think the --- |
| 10:08 | 3 | THE COURT:  We need these in color, don't we? |
| 10:08 | 4 | MR. PRICE:  Let's look at 302. |
| 10:08 | 5 | THE COURT:  Okay. |
| 10:08 | 6 | *(Document provided to the witness.)* |
| 10:08 | 7 | *(Document displayed.)* |
| 10:09 | 8 | BY MR. PRICE: |
| 10:09 | 9 | Q.   I guess I wanted to ask you in 63, actually -- |
| 10:09 | 10 | MR. PRICE:  Your Honor, if I can put up the first |
| 10:09 | 11 | page and ask her if that's her notary signature at the |
| 10:09 | 12 | bottom.  I don't want any confusion by the jury. |
| 10:09 | 13 | THE COURT:  Sure. |
| 10:09 | 14 | BY MR. PRICE: |
| 10:09 | 15 | Q.   63001, you see at the bottom there, that's not a notary |
| 10:09 | 16 | stamp, is it? |
| 10:09 | 17 | A.   No. |
| 10:09 | 18 | Q.   And if we go to 302, which I believe Rachel put in |
| 10:09 | 19 | front of you -- |
| 10:09 | 20 | MR. PRICE:  If you can put 302 in front of |
| 10:09 | 21 | Ms. Prince. |
| 10:09 | 22 | MATTEL ASSISTANT:  We don't have it. |
| 10:09 | 23 | MR. PRICE:  We don't have it?  Okay. |
| 10:09 | 24 | BY MR. PRICE: |
| 10:09 | 25 | Q.   It's in evidence, so if I can just put the pages up |

| | | |
|---|---|---|
| 10:09 | 1 | here. |
| 10:09 | 2 | *(Document displayed.)* |
| 10:09 | 3 | BY MR. PRICE: |
| 10:09 | 4 | Q.   This page, where it says "copyright 2000," this isn't |
| 10:09 | 5 | anything that you saw in August of '99, correct? |
| 10:09 | 6 | A.   Correct. |
| 10:09 | 7 | MR. PRICE:  And, Ken, if you can flip through the |
| 10:09 | 8 | pages. |
| 10:09 | 9 | BY MR. PRICE: |
| 10:09 | 10 | Q.   Did you see this in August of '99? |
| 10:09 | 11 | A.   No. |
| 10:09 | 12 | Q.   Nothing in color? |
| 10:09 | 13 | A.   No. |
| 10:09 | 14 | Q.   So Mr. Bryant didn't bring you any of these drawings |
| 10:09 | 15 | that are in Exhibit 302.  He didn't bring those to you in |
| 10:09 | 16 | August of '99 to ask you to notarize those to establish they |
| 10:10 | 17 | were done in August of '99, correct? |
| 10:10 | 18 | A.   No, I don't remember seeing anything in color. |
| 10:10 | 19 | Q.   Uh, is it true also that you never, uh, told anyone |
| 10:10 | 20 | that you had notarized Mr. Bryant's drawings? |
| 10:10 | 21 | A.   No, I never told anyone. |
| 10:10 | 22 | Q.   You were working at the time for, uh, Mr. -- what was |
| 10:10 | 23 | his name? |
| 10:10 | 24 | A.   Longsdorf. |
| 10:10 | 25 | Q.   -- Longsdorf.  And at some point you had kind of a |

| | | |
|---|---|---|
| 10:10 | 1 | falling-out with Mr. Longsdorf over a promotion you thought |
| 10:10 | 2 | you were promised? |
| 10:10 | 3 | A.   Right. |
| 10:10 | 4 | Q.   And -- and that, uh -- at that point you decided you |
| 10:10 | 5 | wanted to work somewhere else? |
| 10:10 | 6 | A.   Right. |
| 10:10 | 7 | Q.   And not just somewhere else within Mattel, but you |
| 10:10 | 8 | wanted to work somewhere else outside of Mattel -- |
| 10:10 | 9 | A.   Right. |
| 10:10 | 10 | Q.   -- correct? |
| 10:10 | 11 | Now, Ms. Keller also asked you about whether or not you |
| 10:10 | 12 | knew that, you know, you were supposed to, when your |
| 10:10 | 13 | commission expired, give this book, you know, to the County |
| 10:11 | 14 | Clerk's Office where you got the -- the, uh, commission; do |
| 10:11 | 15 | you recall that? |
| 10:11 | 16 | A.   I recall that, but I didn't know that. |
| 10:11 | 17 | Q.   Is there some kind of test you have to take to become a |
| 10:11 | 18 | notary? |
| 10:11 | 19 | A.   Yes, I did. |
| 10:11 | 20 | Q.   And -- and you got that black packet? |
| 10:11 | 21 | A.   Yes. |
| 10:11 | 22 | Q.   And that packet contained in it the 1996 California |
| 10:11 | 23 | Notary Law Primer? |
| 10:11 | 24 | A.   Yes. |
| 10:11 | 25 | Q.   And if you'd look at Exhibit 24136. |

| 10:11 | 1 | *(Document provided to the witness.)* |
| 10:11 | 2 | BY MR. PRICE: |
| 10:11 | 3 | Q.   Is that a copy of the 1996 California Notary Law Primer |
| 10:11 | 4 | that came with your packet? |
| 10:11 | 5 | A.   Yes. |
| 10:11 | 6 | MR. PRICE:  Move 24136 into evidence, Your Honor. |
| 10:11 | 7 | THE COURT:  Received. |
| 10:11 | 8 | *(Exhibit No. 24136 received in evidence.)* |
| 10:11 | 9 | *(Document displayed.)* |
| 10:11 | 10 | BY MR. PRICE: |
| 10:11 | 11 | Q.   And if you'd look at the -- it's 24136-00003, you see |
| 10:11 | 12 | there's a section "California laws pertaining to notaries |
| 10:11 | 13 | public"? |
| 10:11 | 14 | A.   Yes. |
| 10:12 | 15 | Q.   And in the bottom part of that where it has "Notary |
| 10:12 | 16 | Public Handbook published by the Office of Secretary of |
| 10:12 | 17 | State," do you see that? |
| 10:12 | 18 | A.   Yes. |
| 10:12 | 19 | Q.   It says, "Carefully read this handbook and rely on the |
| 10:12 | 20 | relevant code sections in performing your notary duties." |
| 10:12 | 21 | Do you see that? |
| 10:12 | 22 | A.   Yes. |
| 10:12 | 23 | Q.   And you understand that the records you kept could be |
| 10:12 | 24 | records of very important transactions? |
| 10:12 | 25 | A.   Yes.  That's why I kept them stored away. |

| | | |
|---|---|---|
| 10:12 | 1 | Q.   It involved property, correct? |
| 10:12 | 2 | A.   Yes. |
| 10:12 | 3 | Q.   Uh, some kind of transactions, at least currently, I |
| 10:12 | 4 | know you need a fingerprint for.  I don't know if you did |
| 10:12 | 5 | then.  Did you? |
| 10:12 | 6 | A.   I don't think so.  I don't remember.  I'd have to look. |
| 10:12 | 7 | Yes, I had some. |
| 10:12 | 8 | Q.   But the idea is to have a public record establishing |
| 10:12 | 9 | the date that something took place, correct? |
| 10:12 | 10 | A.   Correct. |
| 10:12 | 11 | Q.   And, uh, and you kept that record? |
| 10:12 | 12 | A.   Yes. |
| 10:12 | 13 | Q.   You did it contemporaneously, right? -- at the time you |
| 10:12 | 14 | would keep records? |
| 10:13 | 15 | A.   Yes. |
| 10:13 | 16 | Q.   And then, uh, at the bottom you see it says -- of that |
| 10:13 | 17 | paragraph, "It is your responsibility as a notary public |
| 10:13 | 18 | commissioner, commissioned to a public office, to know the |
| 10:13 | 19 | relevant law and perform your duties accordingly."  Do you |
| 10:13 | 20 | see that? |
| 10:13 | 21 | A.   Yes. |
| 10:13 | 22 | Q.   And that's what you thought that -- that because you're |
| 10:13 | 23 | basically a public officer here, you have a public office, |
| 10:13 | 24 | that you have to take steps to ensure the integrity of the |
| 10:13 | 25 | records that you're keeping? |

| | | |
|---|---|---|
| 10:13 | 1 | A.    Right.  What I did was I stored it and forgot about it. |
| 10:13 | 2 | Q.    And then -- and then moved a few times? |
| 10:13 | 3 | A.    But I kept it in that box.  But I'd forgot it was in |
| 10:13 | 4 | there.  I just kept it with all my documents -- other |
| 10:13 | 5 | documents. |
| 10:13 | 6 | Q.    If you look at the next page, 24136-00004. |
| 10:13 | 7 | (Document displayed.) |
| 10:13 | 8 | BY MR. PRICE: |
| 10:13 | 9 | Q.    On the -- I think it's the third full paragraph, |
| 10:13 | 10 | begins, "Your notary public commission belongs to you."  Do |
| 10:14 | 11 | you see that? |
| 10:14 | 12 | A.    Yes. |
| 10:14 | 13 | Q.    And it says, "If you resign your commission or it |
| 10:14 | 14 | expires and you do not obtain another within 30 days, you |
| 10:14 | 15 | must submit all notarial records and papers to the clerk of |
| 10:14 | 16 | the county where your last oath of office is filed."  Do you |
| 10:14 | 17 | see that? |
| 10:14 | 18 | A.    Yes. |
| 10:14 | 19 | Q.    And, uh, the -- you understand the reason for that |
| 10:14 | 20 | public requirement is so that -- that we make sure that the |
| 10:14 | 21 | public, you know, has a copy of -- of your notarization of |
| 10:14 | 22 | these -- these important transactions? |
| 10:14 | 23 | A.    I understand. |
| 10:14 | 24 | Q.    But, uh, you had -- you forgot about that? |
| 10:14 | 25 | A.    I forgot about that. |

| | | |
|---|---|---|
| 10:14 | 1 | MR. PRICE:  Thank you very much. |
| 10:14 | 2 | THE COURT:  Thank you.  Re- –– |
| 10:14 | 3 | (To the jury:) Well, you need a restroom break. |
| 10:15 | 4 | You're admonished not to discuss this matter |
| 10:15 | 5 | amongst yourselves, nor form or express any opinion |
| 10:15 | 6 | concerning the case.  We'll come and get you in 15 minutes. |
| 10:15 | 7 | That was a reference to the jury needing a break. |
| 10:15 | 8 | *(Jury recesses at 10:15.)* |
| 10:15 | 9 | THE COURT:  Would you return to us right at 10:30. |
| 10:15 | 10 | THE WITNESS:  Sure. |
| 10:15 | 11 | THE COURT:  Thank you very much. |
| 10:15 | 12 | *(Witness exits the courtroom.)* |
| 10:15 | 13 | THE COURT:  Counsel, if you would remain seated. |
| 10:15 | 14 | *(Outside the presence of the jury.)* |
| 10:15 | 15 | THE COURT:  The jury is no longer present. |
| 10:15 | 16 | If you would put Exhibit 63 back up on the screen, |
| 10:15 | 17 | Mr. Price.  I lost that line of questioning, and I don't |
| 10:15 | 18 | want to preclude it if it has relevance, and if it |
| 10:15 | 19 | doesn't –– now, what were the import of the questions?  Were |
| 10:15 | 20 | you trying to show what she hadn't observed? |
| 10:15 | 21 | MR. PRICE:  Had not observed, and that this is not |
| 10:15 | 22 | a notarization on these. |
| 10:15 | 23 | THE COURT:  I'm sorry. |
| 10:15 | 24 | MR. PRICE:  And, see, at the bottom there, these |
| 10:15 | 25 | statements there, I didn't want the jury to be confused and |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 94 of 135   Page ID #:309819
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

94

| | | |
|---|---|---|
| 10:16 | 1 | think this was some kind of notarization. |
| 10:16 | 2 | THE COURT:  This is Mr. Larian.  This is nothing |
| 10:16 | 3 | to do with Carter Bryant's drawings; is that correct? |
| 10:16 | 4 | MS. KELLER:  It has absolutely -- |
| 10:16 | 5 | THE COURT:  One at time.  I've got plenty of time. |
| 10:16 | 6 | Mr. Price. |
| 10:16 | 7 | MR. PRICE:  What is at the bottom should have |
| 10:16 | 8 | nothing to do with Carter Bryant, except these were the |
| 10:16 | 9 | drawings that Carter Bryant filed in the Hong Kong actions |
| 10:16 | 10 | as his drawings, that MGA filed, and I think, actually, they |
| 10:16 | 11 | are or should be in evidence.  But in any event, the purpose |
| 10:16 | 12 | in showing them to this witness is these are Carter Bryant |
| 10:16 | 13 | drawings, and I wanted to establish that these aren't |
| 10:16 | 14 | drawings he brought to her on August 26, 1999, which of |
| 10:16 | 15 | course suggests that they were created after August 26, |
| 10:16 | 16 | 1999. |
| 10:16 | 17 | THE COURT:  All right.  Let me repeat back to you |
| 10:16 | 18 | what I think I just heard. |
| 10:16 | 19 | These drawings come out of the Hong Kong |
| 10:16 | 20 | litigation.  They were filed in the Hong Kong litigation, |
| 10:17 | 21 | and apparently some kind of attachment to the Hong Kong |
| 10:17 | 22 | pleadings. |
| 10:17 | 23 | MR. PRICE:  Yes, yes. |
| 10:17 | 24 | THE COURT:  And what you're attempting to show -- |
| 10:17 | 25 | if you would blow up the bottom portion, please. |

| | | |
|---|---|---|
| 10:17 | 1 | *(Technician complies.)* |
| 10:17 | 2 | THE COURT:  -- is that these drawings were not, |
| 10:17 | 3 | one, brought to the notary; and second, what else? |
| 10:17 | 4 | MR. PRICE:  Second, I just wanted to make sure |
| 10:17 | 5 | there was no confusion that what's at the bottom right here, |
| 10:17 | 6 | which is blown up, has anything to do with notarization, |
| 10:17 | 7 | 'cause it looks kind of official. |
| 10:17 | 8 | THE COURT:  But it's irrelevant to this proceeding |
| 10:17 | 9 | because it has nothing to do with this notary. |
| 10:17 | 10 | MR. PRICE:  Well, it's -- that part is relevant, |
| 10:17 | 11 | and I think we asked questions about this because Mr. Larian |
| 10:17 | 12 | puts the contract date as September 18, 2000. |
| 10:17 | 13 | THE COURT:  That's something that you can -- well, |
| 10:18 | 14 | we've stayed away from the Hong Kong litigation, remember |
| 10:18 | 15 | that? |
| 10:18 | 16 | MR. PRICE:  And you'll recall -- I don't know if |
| 10:18 | 17 | it was this exhibit number, but you permitted us to put into |
| 10:18 | 18 | evidence some of exhibits in Hong Kong. |
| 10:18 | 19 | THE COURT:  Yeah, I did, but it was for a |
| 10:18 | 20 | different purpose, I believe. |
| 10:18 | 21 | MS. KELLER:  May we be heard? |
| 10:18 | 22 | THE COURT:  Yes.  Now it's Ms. Keller's turn. |
| 10:18 | 23 | MS. KELLER:  Your Honor, this is nothing more than |
| 10:18 | 24 | an attempt -- this is not a notary stamp.  This is nothing |
| 10:18 | 25 | more than an attempt to remind the jurors again of the |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 96 of 135   Page ID #:309821
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

96

10:18  1    contract date written on here, 9/18/2000.  If the idea had

10:18  2    been, in fact, to say, you wouldn't notarize these drawings

10:18  3    that went to MGA, then he could have showed her the pitch

10:18  4    book.  But instead he chose to show her this so that the

10:18  5    jurors will once again be looking at the 9/18/2000 date.

10:18  6    And that's really what it is, pure and simple.  That's why

10:18  7    it's completely irrelevant.

10:18  8            You could show her a universe of things and say

10:18  9    none of those were what he brought you, but the only

10:19  10   relevance is what he brought her.

10:19  11           THE COURT:  I'm going to sustain the objection

10:19  12   concerning 63, but I'm going to allow you to continue to get

10:19  13   into the drawings.

10:19  14           In other words, out of 302, apparently, she wasn't

10:19  15   shown any colored drawings.  She was -- those were creations

10:19  16   from your position that occurred subsequent, too, correct?

10:19  17           MS. KELLER:  Your Honor --

10:19  18           MR. PRICE:  Yeah.

10:19  19           THE COURT:  Mr. Quinn, you can join the

10:19  20   conversation.

10:19  21           Mr. Price.

10:19  22           MR. PRICE:  Nothing in 302 was shown to her on

10:19  23   August 26, 1999.

10:19  24           THE COURT:  Exactly.  And you're more than welcome

10:19  25   to delve into that.  There's no preclusion in that regard,

| | | |
|---|---|---|
| 10:19 | 1 | but I think that the 63 is irrelevant. |
| 10:19 | 2 | MS. KELLER:  Well, at this point, Mr. Price has |
| 10:19 | 3 | concluded his examination, Your Honor.  I think he made his |
| 10:19 | 4 | election of what to show. |
| 10:19 | 5 | THE COURT:  Well, I think we have two more |
| 10:19 | 6 | rounds -- one more round, don't we? |
| 10:19 | 7 | MS. KELLER:  We have one more round if we're gonna |
| 10:19 | 8 | be -- if I go into these, and I don't see any reason why I |
| 10:19 | 9 | want to go into this. |
| 10:19 | 10 | THE COURT:  I think I just precluded 63. |
| 10:19 | 11 | MS. KELLER:  Yeah. |
| 10:19 | 12 | THE COURT:  If you want me to reverse that, I'm |
| 10:19 | 13 | happy to. |
| 10:19 | 14 | MS. KELLER:  I don't intend to go into -- |
| 10:19 | 15 | THE COURT:  If I was you, I'd sit down.  If you're |
| 10:20 | 16 | prevailing on this, wise attorneys just take the Court's |
| 10:20 | 17 | ruling. |
| 10:20 | 18 | MS. KELLER:  I've never been accused of being wise |
| 10:20 | 19 | before, Your Honor. |
| 10:20 | 20 | THE COURT:  Yeah.  Right. |
| 10:20 | 21 | All right.  But there's no preclusion as to 302. |
| 10:20 | 22 | MR. PRICE:  Thank you. |
| 10:20 | 23 | THE COURT:  And you can make your point concerning |
| 10:20 | 24 | them not being shown to this witness. |
| 10:20 | 25 | All right.  Then we'll see you in nine minutes. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 98 of 135   Page ID #:309823
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

98

| | | |
|---|---|---|
| 10:20 | 1 | MR. QUINN:  Your Honor, for the next witness, we |
| 10:20 | 2 | have a demonstrative. |
| 10:20 | 3 | THE COURT:  Well, show it to opposing counsel for |
| 10:20 | 4 | just a moment. |
| 10:20 | 5 | MR. QUINN:  I have.  Yeah, they have seen it. |
| 10:20 | 6 | MR. McCONVILLE:  Ms. Leahy, Your Honor. |
| 10:20 | 7 | THE COURT:  There's an objection on your part. |
| 10:20 | 8 | MR. McCONVILLE:  You said you wanted her to stay |
| 10:20 | 9 | around. |
| 10:20 | 10 | THE COURT:  She's staying around.  We'll get to it |
| 10:20 | 11 | over the lunch hour. |
| 10:20 | 12 | MS. HURST:  They've shown me that exhibit, but we |
| 10:20 | 13 | don't agree that it can be -- |
| 10:20 | 14 | THE COURT:  I know.  I'd start Paula down here for |
| 10:20 | 15 | a moment so I have the foundation and I can get rid of one |
| 10:20 | 16 | hearsay objection.  So that will resolve it in one second. |
| 10:20 | 17 | *(Proceedings recessed at 10:21 a.m.)* |
| 10:32 | 18 | *(Proceedings resumed at 10:32 a.m.)* |
| 10:32 | 19 | THE COURT:  Counsel, the jury's present.  All |
| 10:32 | 20 | counsel are present, and the witness is present. |
| 10:32 | 21 | Ms. Keller is now on redirect examination. |
| 10:32 | 22 | **REDIRECT EXAMINATION** |
| 10:32 | 23 | BY MS. KELLER: |
| 10:32 | 24 | Q.  Ms. Prince, you were asked just now about the fact that |
| 10:32 | 25 | when Mr. Bryant's attorney contacted you, you said you just |

| | | |
|---|---|---|
| 10:33 | 1 | loved Carter and you would do anything to help him. |
| 10:33 | 2 | A.   Correct. |
| 10:33 | 3 | Q.   Now, you're not just living in the South now, but |
| 10:33 | 4 | you're originally from the South? |
| 10:33 | 5 | A.   Originally. |
| 10:33 | 6 | Q.   You have a warm personality? |
| 10:33 | 7 | A.   I think so. |
| 10:33 | 8 | Q.   When you said that you loved Carter and you'd just do |
| 10:33 | 9 | anything to help him, did that include lying for him? |
| 10:33 | 10 | A.   Absolutely not. |
| 10:33 | 11 | Q.   Would that include adding a line to your notary book |
| 10:33 | 12 | and then claiming that it was there all along? |
| 10:33 | 13 | A.   No. |
| 10:33 | 14 | Q.   And the fact that you never told anyone that you had |
| 10:33 | 15 | notarized Carter's drawings -- did you generally chitchat |
| 10:33 | 16 | with various people about stuff you notarized? |
| 10:33 | 17 | A.   Never. |
| 10:33 | 18 | Q.   Not terribly interesting either, is it? |
| 10:33 | 19 | A.   Boring. |
| 10:33 | 20 | Q.   And the fact that you had a falling out with your boss, |
| 10:33 | 21 | Mr. Longsdorf, at Mattel, did that make you want to have an |
| 10:33 | 22 | axe to grind against Mattel so that you'd fake an entry in |
| 10:33 | 23 | your notary book? |
| 10:33 | 24 | A.   No.  I'd love to work there again. |
| 10:33 | 25 | Q.   Really?  You liked it? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 100 of 135   Page ID #:309825
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

100

| 10:33 | 1 | A. Yes. |
| 10:34 | 2 | Q. Now, you said -- you were also asked about the fact |
| 10:34 | 3 | that Mr. Bryant told you that he wanted you to put in this |
| 10:34 | 4 | "1998" entry, and yet you squeezed it in at the end? |
| 10:34 | 5 | A. Yes. |
| 10:34 | 6 | Q. Are you telling us the truth? |
| 10:34 | 7 | A. Yes. |
| 10:34 | 8 | Q. Well, let me finish the sentence. |
| 10:34 | 9 | Are you telling us the truth that you did all that at |
| 10:34 | 10 | the time? |
| 10:34 | 11 | A. Yes. |
| 10:34 | 12 | Q. Do you have any financial or personal interest in the |
| 10:34 | 13 | outcome of this trial? |
| 10:34 | 14 | A. No. |
| 10:34 | 15 | Q. Do you have any ongoing relationship at all with Carter |
| 10:34 | 16 | Bryant? |
| 10:34 | 17 | A. No. |
| 10:34 | 18 | Q. Has Carter Bryant ever paid you a dime to do anything? |
| 10:34 | 19 | A. No. |
| 10:34 | 20 | Q. Did he even pay you to notarize this? |
| 10:34 | 21 | A. No. |
| 10:34 | 22 | Q. It was a freebie? |
| 10:34 | 23 | A. Yes. |
| 10:34 | 24 | Q. Uh, you were also asked about the Notary Primer, the |
| 10:34 | 25 | notary handbook, California Notary Handbook? |

| | | |
|---|---|---|
| 10:35 | 1 | A.    Yes. |
| 10:35 | 2 | Q.    And I see it has a whole lot of code sections in it? |
| 10:35 | 3 | A.    Right. |
| 10:35 | 4 | Q.    Really dense stuff that was obviously written by a |
| 10:35 | 5 | bunch of lawyers? |
| 10:35 | 6 | A.    Right. |
| 10:35 | 7 | Q.    Did you memorize every line of this? |
| 10:35 | 8 | A.    Absolutely not. |
| 10:35 | 9 | *(Document displayed.)* |
| 10:35 | 10 | BY MS. KELLER: |
| 10:35 | 11 | Q.    And I also notice here on page 4 that -- or page 3 that |
| 10:35 | 12 | you can actually pass the notary examine with a 70 percent. |
| 10:35 | 13 | A.    That sounds right. |
| 10:35 | 14 | Q.    So, apparently, the Secretary of State didn't expect |
| 10:35 | 15 | that people would have a perfect understanding of this in |
| 10:35 | 16 | order to be notaries, right? |
| 10:35 | 17 | A.    I would say, yes. |
| 10:35 | 18 | Q.    And you were also asked about what Mr. Bryant told you |
| 10:35 | 19 | about why he wanted to notarize these drawings.  Did |
| 10:35 | 20 | Mr. Bryant also tell you, as you were chatting about them, |
| 10:35 | 21 | that he had worked on these while he was back home with his |
| 10:35 | 22 | family? |
| 10:35 | 23 | A.    Yes. |
| 10:35 | 24 | Q.    And did he tell you where his family had lived? |
| 10:36 | 25 | A.    Missouri. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | Q. And did he say that -- that he had done the drawings |
| 10:36 | 2 | while he was visiting and reuniting with them in Missouri? |
| 10:36 | 3 | A. Yes. |
| 10:36 | 4 | Q. You're a Special Ed teacher now in Mississippi, and |
| 10:36 | 5 | have been, for eight years, right? |
| 10:36 | 6 | A. Yes. |
| 10:36 | 7 | Q. And the only reason that you came out here for this |
| 10:36 | 8 | trial is you got a subpoena to come, right? |
| 10:36 | 9 | A. Right. |
| 10:36 | 10 | Q. Do you have any particular relationship with any of the |
| 10:36 | 11 | attorneys on either side of this case? |
| 10:36 | 12 | A. No. |
| 10:36 | 13 | Q. So is the reason that you're here today telling us what |
| 10:36 | 14 | you're telling us just that it happens to be the truth? |
| 10:36 | 15 | A. It's the truth. |
| 10:36 | 16 | MS. KELLER: I have nothing further. |
| 10:36 | 17 | THE COURT: This would be recross-examination by |
| 10:37 | 18 | Mr. Price. |
| 10:37 | 19 | **RECROSS-EXAMINATION** |
| 12:59 | 20 | BY MR. PRICE: |
| 10:37 | 21 | Q. So how did you do on that test? Barely passed? |
| 10:37 | 22 | A. Probably barely passed it. |
| 10:37 | 23 | Q. If you look at -- Ms. Keller asked about 24136, and she |
| 10:37 | 24 | said there's a lot of "lawyery" stuff in here. And I want |
| 10:37 | 25 | you to look at the page I was referring you to: |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 103 of 135   Page ID #:309828
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

103

| | | |
|---|---|---|
| 10:37 | 1 | 24136-00003. |
| 10:37 | 2 | *(Document provided to the witness.)* |
| 10:37 | 3 | *(Document displayed.)* |
| 10:37 | 4 | BY MR. PRICE: |
| 10:37 | 5 | Q.   You know, at the bottom where it says, "Notary Public |
| 10:37 | 6 | Handbook, Published by Office of Secretary of State, Notary |
| 10:37 | 7 | Public Division." |
| 10:37 | 8 | A.   I see it. |
| 10:37 | 9 | Q.   And the second page, I pointed out that paragraph at |
| 10:37 | 10 | the end.  And at the end of that part, on page 0004. |
| 10:37 | 11 | *(Document displayed.)* |
| 10:38 | 12 | MR. PRICE:  Yeah, there we go.  The last two |
| 10:38 | 13 | paragraphs, down to the –– Ken, can you actually include the |
| 10:38 | 14 | "State of California"? |
| 10:38 | 15 | *(Technician complies.)* |
| 10:38 | 16 | THE WITNESS:  Yes. |
| 10:38 | 17 | BY MR. PRICE: |
| 10:38 | 18 | Q.   This doesn't seem like legalese to you, does it? |
| 10:38 | 19 | A.   Somewhat. |
| 10:38 | 20 | Q.   Well, it says, "If you resign your commission or it |
| 10:38 | 21 | expires, and you do not obtain another within 30 days, you |
| 10:38 | 22 | must submit all notarial records and papers to the client |
| 10:38 | 23 | *(sic)* of the county where your last oath of office is |
| 10:38 | 24 | filed." |
| 10:38 | 25 | That's pretty understandable? |

| | | |
|---|---|---|
| 10:38 | 1 | "Clerk."  I'm sorry.  "Clerk of the county." |
| 10:38 | 2 | A.   Yes. |
| 10:38 | 3 | Q.   And then it says, "Notaries public perform invaluable |
| 10:38 | 4 | services to the legal business, financial, and real estate |
| 10:38 | 5 | communities.  Take the time to study this handbook so that |
| 10:38 | 6 | you are confident of your knowledge in the law.  Your role |
| 10:38 | 7 | is an important public service for the people of California. |
| 10:38 | 8 | Know the relevant law, perform your duties accordingly, and |
| 10:38 | 9 | serve them well." |
| 10:38 | 10 | See that? |
| 10:38 | 11 | A.   Yes. |
| 10:38 | 12 | Q.   And that's -- that's not legalese, right? |
| 10:39 | 13 | A.   No. |
| 10:39 | 14 | Q.   Okay.  And you were asked about, uh, leaving Mattel. |
| 10:39 | 15 | And I think you said that you wouldn't mind coming back. |
| 10:39 | 16 | As of 2004, though, you -- you still had what you |
| 10:39 | 17 | called a sour taste in your mouth for the environment at |
| 10:39 | 18 | Mattel? |
| 10:39 | 19 | A.   For Ron Longsdorf. |
| 10:39 | 20 | Q.   Well, didn't you say you wanted to leave Mattel and not |
| 10:39 | 21 | work anywhere else at Mattel? |
| 10:39 | 22 | A.   At the time I was looking around, and I found an offer |
| 10:39 | 23 | in the Silicon Valley.  So I thought that'd be great. |
| 10:39 | 24 | Q.   And you thought that -- you know, that -- |
| 10:39 | 25 | A.   And it paid more. |

| | | |
|---|---|---|
| 10:39 | 1 | Q.   That's always good. |
| 10:39 | 2 | Said you sorta -- you get a sour taste for the |
| 10:39 | 3 | environment and it's hard to shake it, right? |
| 10:39 | 4 | A.   Yes. |
| 10:39 | 5 | Q.   Uh, and at the time of -- of your deposition in 2004 -- |
| 10:39 | 6 | and, you know, Ms. Keller asked some questions about what |
| 10:39 | 7 | Mr. Bryant told you -- at that time, you couldn't remember |
| 10:40 | 8 | if Mr. Bryant said Missouri or Minnesota or what state he |
| 10:40 | 9 | said 'cause it was a while ago, right? |
| 10:40 | 10 | A.   Yes, long time ago. |
| 10:40 | 11 | Q.   But what you did remember was that, at the time |
| 10:40 | 12 | Mr. Bryant came to you, on August 26, 1999, at that time he |
| 10:40 | 13 | didn't want anyone to think he had done these drawings at |
| 10:40 | 14 | Mattel, right? |
| 10:40 | 15 | A.   Yes. |
| 10:40 | 16 | Q.   That's what he told you? |
| 10:40 | 17 | A.   Yes. |
| 10:40 | 18 | Q.   At that time you observed him, and your observation was |
| 10:40 | 19 | he looked concerned, right? |
| 10:40 | 20 | A.   He didn't look that concerned. |
| 10:40 | 21 | Q.   Well, didn't you say he looked concerned? |
| 10:40 | 22 | A.   Maybe a little. |
| 10:40 | 23 | Q.   He certainly wanted to somehow show he had done these |
| 10:40 | 24 | at a time when he wasn't working at Mattel.  That's what he |
| 10:40 | 25 | told you, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 106 of 135   Page ID #:309831
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

106

| | | |
|---|---|---|
| 10:40 | 1 | A.    Yes.  He just thought it would be a good idea. |
| 10:40 | 2 | Q.    Well, when you -- |
| 10:40 | 3 | A.    I remember him saying that. |
| 10:40 | 4 | Q.    You said, "Be a good idea.  What he told you was that |
| 10:41 | 5 | he wanted to document that he did the drawings at Mattel |
| 10:41 | 6 | (sic), and he didn't want anyone to think he'd did these |
| 10:41 | 7 | while he was at Mattel? |
| 10:41 | 8 | A.    Correct. |
| 10:41 | 9 | Q.    That's -- that's specific -- what you remember him |
| 10:41 | 10 | saying, right? |
| 10:41 | 11 | A.    Uh-huh.  But I do remember him saying it would be a |
| 10:41 | 12 | good idea. |
| 10:41 | 13 | Q.    Well, when you said "a good idea," that was in response |
| 10:41 | 14 | to you saying, "Well, let's -- I can't help you on '98, but |
| 10:41 | 15 | let's go ahead and notarize these and add the '98."  Right? |
| 10:41 | 16 | That's when he said 'That's a good idea"? |
| 10:41 | 17 | A.    I don't remember. |
| 10:41 | 18 |         MR. PRICE:  Okay.  Nothing further. |
| 10:41 | 19 |         THE COURT:  All right.  Thank you very much. |
| 10:41 | 20 |         Now, we're asking all of the witnesses to remain |
| 10:41 | 21 | on call, originally until May 17th, but I was just being |
| 10:41 | 22 | cautious. |
| 10:41 | 23 |         The case is going to conclude the first week of |
| 10:41 | 24 | April.  I doubt that you're coming back to Court.  But, just |
| 10:41 | 25 | in case, we need you to remain available, because I don't |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 107 of 135   Page ID #:309832
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

107

| | | |
|---|---|---|
| 10:41 | 1 | want subpoenas flying across the country again -- or |
| 10:41 | 2 | internationally.  And I want you to go about your |
| 10:41 | 3 | professional responsibilities or personal vacations you |
| 10:42 | 4 | have.  If we need you, we'll find you. |
| 10:42 | 5 | THE WITNESS:  Okay. |
| 10:42 | 6 | THE COURT:  You may step down. |
| 10:42 | 7 | *(Witness steps down subject to recall.)* |
| 10:42 | 8 | THE COURT:  Counsel, your next witness, please. |
| 10:42 | 9 | MS. HURST:  MGA calls Dr. Albert Lyter. |
| 10:42 | 10 | THE COURT:  Thank you, sir. |
| 10:42 | 11 | If you would now raise your right hand. |
| 10:42 | 12 | **ALBERT H. LYTER III, MGA'S WITNESS, SWORN** |
| 10:42 | 13 | THE WITNESS:  I do. |
| 10:42 | 14 | THE COURT:  Thank you, sir.  If you would please |
| 10:42 | 15 | walk along the jury railing.  And there's an entrance to the |
| 10:42 | 16 | witness stand next to the wall. |
| 10:42 | 17 | If you would be seated. |
| 10:42 | 18 | State your full name, please. |
| 10:42 | 19 | THE WITNESS:  Yes.  It's Albert H. Lyter, |
| 10:42 | 20 | L-Y-T-E-R, the third. |
| 10:42 | 21 | THE COURT:  Your last name is spelled, once again? |
| 10:42 | 22 | THE WITNESS:  L-Y-T-E-R. |
| 10:42 | 23 | THE COURT:  Thank you very much. |
| 10:42 | 24 | Direct examination by Ms. Hurst on behalf of MGA |
| 10:42 | 25 | and Larian. |

| | | |
|---|---|---|
| 10:43 | 1 | **DIRECT EXAMINATION** |
| 10:43 | 2 | BY MS. HURST: |
| 10:43 | 3 | Q.    Good morning, Dr. Lyter. |
| 10:43 | 4 | A.    Good morning. |
| 10:43 | 5 | Q.    What do you do? |
| 10:43 | 6 | A.    I'm a forensic chemist.  I specialize in the |
| 10:43 | 7 | examination of questioned documents, and specifically the |
| 10:43 | 8 | analysis of inks and papers. |
| 10:43 | 9 | Q.    And were you asked to examine a notary book in this |
| 10:43 | 10 | case? |
| 10:43 | 11 | A.    Yes, I was. |
| 10:43 | 12 | Q.    And did you form an opinion about that notary book? |
| 10:43 | 13 | A.    I did. |
| 10:43 | 14 | Q.    All right.  Before we get into that, I'm gonna ask you |
| 10:43 | 15 | a few questions about how you became a forensic chemist. |
| 10:43 | 16 | Do you have college degrees related to the practice of |
| 10:43 | 17 | forensic chemistry? |
| 10:43 | 18 | A.    I do.  I have a Bachelor of Science degree in both |
| 10:43 | 19 | chemistry and biology.  Those are from Oklahoma City |
| 10:43 | 20 | University.  I have a Master of Science degree in forensic |
| 10:43 | 21 | sciences.  That's from George Washington University.  And I |
| 10:43 | 22 | have a Ph.D in analytical chemistry.  That's from the |
| 10:43 | 23 | University of North Carolina at Chapel Hill. |
| 10:44 | 24 | Q.    And have you worked as a forensic chemist? |
| 10:44 | 25 | A.    I have.  I started my career in January of 1975 working |

| | | |
|---|---|---|
| 10:44 | 1 | for the U.S. Treasury Department, the Bureau of Alcohol, |
| 10:44 | 2 | Tobacco and Firearms.  Proceeded to work with them for |
| 10:44 | 3 | approximately seven years, and then started my own company |
| 10:44 | 4 | which is called Federal Forensic Associates.  And I've been |
| 10:44 | 5 | employed in that capacity ever since. |
| 10:44 | 6 | Q.   All right.  And let's back up to that stint with the |
| 10:44 | 7 | Treasury Department. |
| 10:44 | 8 | Beginning in 1975, what type of work did you do there? |
| 10:44 | 9 | A.   I was assigned to the identification branch and |
| 10:44 | 10 | specifically the group that did analysis of inks and papers. |
| 10:44 | 11 | My responsibilities included the maintenance -- meaning, |
| 10:44 | 12 | collection, sampling and analysis -- of the standard |
| 10:44 | 13 | reference collection of inks that was maintained by the U.S. |
| 10:44 | 14 | Government at that time. |
| 10:44 | 15 | I also examined physical evidence, testified in Court |
| 10:45 | 16 | as an expert witness, was asked to do research, usually |
| 10:45 | 17 | again with inks or papers, and also did some training with |
| 10:45 | 18 | other forensic scientists or investigators that come to the |
| 10:45 | 19 | laboratory. |
| 10:45 | 20 | Q.   So you did expert reports for the federal government? |
| 10:45 | 21 | A.   I did, yes. |
| 10:45 | 22 | Q.   And that was for -- that included the Secret Service? |
| 10:45 | 23 | A.   Um, we actually did all of the ink analysis for any of |
| 10:45 | 24 | the federal agencies.  So we did work for the Secret |
| 10:45 | 25 | Service, Internal Revenue Service, Securities and Exchange |

| | | |
|---|---|---|
| 10:45 | 1 | Commission, FBI, Veteran's Administration, all of the armed |
| 10:45 | 2 | forces. |
| 10:45 | 3 | Q.   And how many people were doing ink analysis for the |
| 10:45 | 4 | federal government while you were there at the Treasury |
| 10:45 | 5 | Department. |
| 10:45 | 6 | A.   Uh, there were two of us. |
| 10:45 | 7 | Q.   So you were one of two go-to guys for the entire |
| 10:45 | 8 | federal government? |
| 10:45 | 9 | A.   That's right. |
| 10:45 | 10 | Q.   And how long were you in that position? |
| 10:45 | 11 | A.   Just a few months short of seven years. |
| 10:45 | 12 | Q.   All right.  How many times did you testify while you |
| 10:46 | 13 | were working on behalf of the federal government? |
| 10:46 | 14 | A.   It was several dozen.  I would say somewhere in the |
| 10:46 | 15 | neighborhood of 50 or 60. |
| 10:46 | 16 | Q.   And did you receive any awards for your service? |
| 10:46 | 17 | A.   I did.  I received an outstanding performance award |
| 10:46 | 18 | from the U.S. Treasury Department. |
| 10:46 | 19 | Q.   Do you belong to any professional organizations related |
| 10:46 | 20 | to the practice of forensic chemistry? |
| 10:46 | 21 | A.   I do.  I'm a fellow of the American Academy of Forensic |
| 10:46 | 22 | Sciences.  I'm a member of the California Association of |
| 10:46 | 23 | criminalists, the Mid Atlantic Association of Forensic |
| 10:46 | 24 | Scientists, the Southwestern Association of Forensic |
| 10:46 | 25 | Document Examiners.  I also belong to the American Chemical |

| | | |
|---|---|---|
| 10:46 | 1 | Society, and the Society for Applied Spectroscopy. |
| 10:46 | 2 | Q.   And do you have any certifications related to your |
| 10:47 | 3 | practice as a forensic chemist? |
| 10:47 | 4 | A.   Yes.  I carry the diplomat status with the American |
| 10:47 | 5 | Board of Criminalistics, which is the national certifying |
| 10:47 | 6 | board for those individuals involved in the analysis of |
| 10:47 | 7 | evidence in laboratories that would be characterized at |
| 10:47 | 8 | criminalistics. |
| 10:47 | 9 | Q.   Have you published papers over the course of your |
| 10:47 | 10 | career as a forensic chemist? |
| 10:47 | 11 | A.   I have.  I've published approximately a dozen papers |
| 10:47 | 12 | that deal with different types of inks and papers, carbon |
| 10:47 | 13 | paper, pencil, et cetera. |
| 10:47 | 14 | Q.   And have any of those papers concerned the examination |
| 10:47 | 15 | of gel pen ink specifically? |
| 10:47 | 16 | A.   Yes. |
| 10:47 | 17 | Q.   Do you ever lecture in your capacity as an expert |
| 10:47 | 18 | forensic chemist? |
| 10:47 | 19 | A.   Um, yeah.  I've given presentations before some of the |
| 10:48 | 20 | scientific organizations that I've described, the American |
| 10:48 | 21 | Academy, and the American Society for Questioned Document |
| 10:48 | 22 | Examiners.  I've also lectured at the FBI academy in |
| 10:48 | 23 | Quantico, Virginia, and the Federal Law Enforcement Training |
| 10:48 | 24 | Center in Georgia. |
| 10:48 | 25 | Q.   Since having your own business, beginning in 1981, have |

| | | |
|---|---|---|
| 10:48 | 1 | you been retained as an expert witness in the analysis of |
| 10:48 | 2 | inks and papers? |
| 10:48 | 3 | A.   Yes. |
| 10:48 | 4 | Q.   Approximately how many times have you been retained as |
| 10:48 | 5 | an expert witness in the analysis of inks and papers? |
| 10:48 | 6 | A.   Somewhere over 2000. |
| 10:48 | 7 | Q.   And have you testified in Court as an expert witness in |
| 10:48 | 8 | connection with the analysis of inks and papers? |
| 10:48 | 9 | A.   Yes.  Testimony in court, probably about 200 times. |
| 10:48 | 10 | Q.   Have you been -- I apologize. |
| 10:48 | 11 | A.   Yeah.  And the same number of depositions. |
| 10:48 | 12 | Q.   Have you been qualified as an expert in any courts? |
| 10:49 | 13 | A.   Yes, I have. |
| 10:49 | 14 | Q.   Approximately how many? |
| 10:49 | 15 | A.   Um, I don't know the number of different courts.  I |
| 10:49 | 16 | know I've given testimony in the California courts, federal |
| 10:49 | 17 | and state, Los Angeles, San Francisco, San Jose, um -- |
| 10:49 | 18 | Q.   What are some of the interesting cases that you've |
| 10:49 | 19 | worked on that we might have heard of? |
| 10:49 | 20 | A.   The oldest one's probably the Will of Howard Hughes, |
| 10:49 | 21 | that I was involved in back in the 70's.  I've also done |
| 10:49 | 22 | work for attorneys representing CBS, 60 Minutes and Dan |
| 10:49 | 23 | Rather in a slander trial, here in Los Angeles, that |
| 10:49 | 24 | involved insurance fraud. |
| 10:49 | 25 | I was involved with the investigation into the murder |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:49 | 1 | trials of Sam Sheppard that occurred in the year 2000.  That |
| 10:49 | 2 | this was some new -- new evidence was being examined. |
| 10:50 | 3 | And I was also involved in the Martha Stewart matter in |
| 10:50 | 4 | New York a number of years ago. |
| 10:50 | 5 | MS. HURST:  Your Honor, we offer Dr. Lyter as a |
| 10:50 | 6 | forensic chemist with a specialty in the analysis of inks |
| 10:50 | 7 | and papers. |
| 10:50 | 8 | THE COURT:  You may proceed. |
| 10:50 | 9 | BY MS. HURST: |
| 10:50 | 10 | Q.   You mentioned, Dr. Lyter, that there was a reference |
| 10:50 | 11 | collection of ink at the Treasury Department. |
| 10:50 | 12 | Did I hear that right? |
| 10:50 | 13 | A.   That's correct. |
| 10:50 | 14 | Q.   What is that? |
| 10:50 | 15 | A.   In the early 1970's, it was decided that the way in |
| 10:50 | 16 | which we might be able to determine the age of writing on |
| 10:50 | 17 | documents was by identifying exactly what kind of ink was |
| 10:50 | 18 | used to prepare those writings, and the best way to do that |
| 10:50 | 19 | would be to amass a collection of ink formulations that were |
| 10:50 | 20 | made by the various manufacturers.  So that we could then |
| 10:50 | 21 | develop analytical methodologies that would allow us to say |
| 10:51 | 22 | that the ink that we find on this paper matches an ink that |
| 10:51 | 23 | was made by, let's say, the BIC company or Paper Mate or |
| 10:51 | 24 | Formulabs -- any number of companies. |
| 10:51 | 25 | And by doing that, and by obtaining information from |

| | | |
|---|---|---|
| 10:51 | 1 | the manufacturers as to when they started making this ink, |
| 10:51 | 2 | we could then give some evidence as to how old the writing |
| 10:51 | 3 | had to be in order for it to be used or be prepared with |
| 10:51 | 4 | this particular writing -- this particular ink. |
| 10:51 | 5 | So the Treasury Department started collecting samples. |
| 10:51 | 6 | They did this by sending out letters to all of the domestic |
| 10:51 | 7 | manufacturers in the U.S.  They continued to do that.  They |
| 10:51 | 8 | also contacted various forensic laboratories in Europe, |
| 10:51 | 9 | including the Zurick Cantonal, C-A-N-T-O-N-A-L, Police |
| 10:51 | 10 | Department, which is like the state police in that area. |
| 10:52 | 11 | Q.   Let me just stop you there.  The bottom line is, |
| 10:52 | 12 | eventually, they amassed a large collection of ink pens, |
| 10:52 | 13 | correct? |
| 10:52 | 14 | A.   That's right.  When I left the government, the number |
| 10:52 | 15 | in the collection was in excess of 4,000. |
| 10:52 | 16 | Q.   So since 1981, you've had your own business as an |
| 10:52 | 17 | expert forensic chemist, correct? |
| 10:52 | 18 | A.   That's right. |
| 10:52 | 19 | Q.   That means that's what you do for a living, true? |
| 10:52 | 20 | A.   That's right. |
| 10:52 | 21 | Q.   And you expect to be compensated for it, right? |
| 10:52 | 22 | A.   That's correct. |
| 10:52 | 23 | Q.   And how much an hour have you billed in connection with |
| 10:52 | 24 | this case? |
| 10:52 | 25 | A.   My normal hourly rate is $400. |

| 10:52 | 1 | Q.   And you were originally retained in 2004; is that true? |
| 10:52 | 2 | A.   That's correct. |
| 10:52 | 3 | Q.   And, actually, at first, you were retained by MGA, but |
| 10:52 | 4 | then Mattel also tried to hire you, true? |
| 10:52 | 5 | A.   The attorneys from Mattel, yes. |
| 10:52 | 6 | Q.   Okay.  But you had to tell 'em you had a conflict of |
| 10:52 | 7 | interest? |
| 10:52 | 8 | A.   That's correct. |
| 10:52 | 9 | Q.   Okay.  Has your assignment in this case included |
| 10:52 | 10 | responding to the reports of four different expert witnesses |
| 10:53 | 11 | of Mattel? |
| 10:53 | 12 | A.   Yes.  Initially, that's the case. |
| 10:53 | 13 | Q.   And so you billed MGA in connection with reports |
| 10:53 | 14 | related to all four of those experts, true? |
| 10:53 | 15 | A.   That's exactly right, including examination of nine |
| 10:53 | 16 | boxes full of documents. |
| 10:53 | 17 | Q.   Okay.  And what's the total amount that you've billed |
| 10:53 | 18 | MGA since 2004 for that work? |
| 10:53 | 19 | A.   It -- it approximates 150,000. |
| 10:53 | 20 | Q.   Okay.  Now, you understand that you're here today, and |
| 10:53 | 21 | we're gonna talk specifically, about Dr. Aginsky's work, |
| 10:53 | 22 | right? |
| 10:53 | 23 | A.   That's correct. |
| 10:53 | 24 | Q.   And it would be some fraction of that 150,000 that |
| 10:53 | 25 | would relate to his work, true? |

| | | |
|---|---|---|
| 10:53 | 1 | A.    Sure.  I would guess about 25 percent. |
| 10:53 | 2 | Q.    Okay.  So one of your assignments was to look at |
| 10:53 | 3 | Dr. Aginsky's reports and do analysis to see whether you |
| 10:53 | 4 | could verify his work; is that true? |
| 10:53 | 5 | A.    That's correct. |
| 10:53 | 6 | Q.    All right.  And part of that involved looking at a |
| 10:53 | 7 | notary book, true? |
| 10:53 | 8 | A.    Yes. |
| 10:54 | 9 | Q.    All right. |
| 10:54 | 10 |         MS. HURST:  Could we put before the witness |
| 10:54 | 11 | Exhibit 60, please. |
| 10:54 | 12 |             (Document provided to the witness.) |
| 10:54 | 13 |             (Document displayed.) |
| 10:54 | 14 | BY MS. HURST: |
| 10:54 | 15 | Q.    Do you recognize that as the notary book that you've |
| 10:54 | 16 | examined in connection with your work on this case?  You may |
| 10:54 | 17 | want to turn to page 11 and 12. |
| 10:54 | 18 | A.    Yes, I do recognize it. |
| 10:54 | 19 | Q.    And what page are you looking at? |
| 10:54 | 20 | A.    11 and 12. |
| 10:54 | 21 | Q.    And that's 11 and 12 based on the numbering of the |
| 10:54 | 22 | original notary book pages, correct? |
| 10:54 | 23 | A.    That's correct, the printed page number. |
| 10:54 | 24 | Q.    And there's an entry there, a five-line entry dated |
| 10:54 | 25 | August 26, 1999, correct? |

| | | |
|---|---|---|
| 10:54 | 1 | A.    Yes. |
| 10:54 | 2 | Q.    And did your work involve examining that entry in the |
| 10:54 | 3 | notary book? |
| 10:55 | 4 | A.    Um, yes.  The focus was on that entry and, |
| 10:55 | 5 | specifically, the last line of that entry.  We did, in fact, |
| 10:55 | 6 | examine, though, all of the portions of that August 26, 1999 |
| 10:55 | 7 | entry. |
| 10:55 | 8 | Q.    All right.  And did you understand that the principal |
| 10:55 | 9 | question is whether the words "from 1998 Missouri" were |
| 10:55 | 10 | written at the same time or added later? |
| 10:55 | 11 | A.    That's correct. |
| 10:55 | 12 | Q.    And you were asked to see whether you could verify |
| 10:55 | 13 | Dr. Aginsky's opinion that it was -- "from 1998 Missouri" |
| 10:55 | 14 | was a different ink containing menthol and, therefore, |
| 10:55 | 15 | likely added later, true? |
| 10:55 | 16 | A.    That's right. |
| 10:55 | 17 | Q.    And did you form an opinion about that? |
| 10:55 | 18 | A.    I did. |
| 10:55 | 19 | Q.    And what is your opinion? |
| 10:55 | 20 | A.    I did not find the presence of any menthol in my |
| 10:55 | 21 | examination, and I had no evidence to indicate that the line |
| 10:55 | 22 | was added at a later time. |
| 10:55 | 23 | Q.    So now let's back up and talk about all the things you |
| 10:55 | 24 | did to reach that conclusion. |
| 10:55 | 25 |       What was the first thing that you did? |

| 10:56 | 1 | A.   Well, the first examination that I perform is to just |
| 10:56 | 2 | visually look at the document, usually with the unaided eye. |
| 10:56 | 3 | I also use hand magnifiers ranging from about 3X to 10X. |
| 10:56 | 4 | And then, I'll normally use a microscope to look at it, in |
| 10:56 | 5 | this case a stereo microscope; and I did do that in this |
| 10:56 | 6 | particular matter, as well. |
| 10:56 | 7 | Q.   And based on those forms of examination, were you able |
| 10:56 | 8 | to determine what type of ink this was in the entry in the |
| 10:56 | 9 | notary book? |
| 10:56 | 10 | A.   Yes.  "Type," from the standpoint of being able to |
| 10:56 | 11 | classify it as to the type of writing instrument that would |
| 10:56 | 12 | have been used, not to the point where we were able to say |
| 10:56 | 13 | who the manufacturer might have been. |
| 10:56 | 14 | But we did, in fact, find that the characteristics |
| 10:56 | 15 | within the confines of the written line were consistent with |
| 10:56 | 16 | a gel ink, which is -- the pen for a gel pen has a ball |
| 10:57 | 17 | mechanism, so that it looks like a ballpoint pen; but the |
| 10:57 | 18 | ink within the cartridge is usually a clear, water-based |
| 10:57 | 19 | gel, similar to the gel you might put on your hair, that -- |
| 10:57 | 20 | it has a dispersion of pigments in it that give it its |
| 10:57 | 21 | color, so that the color is not something that is |
| 10:57 | 22 | solubilized by the gel.  It's actually something that is |
| 10:57 | 23 | suspended in it. |
| 10:57 | 24 | And then the actual act of writing, rolling the ball |
| 10:57 | 25 | over the paper, causes the gel to melt.  And then the ink |

| 10:57 | 1 | kind of sits on top of or slightly dissolves into the paper. |
| 10:57 | 2 | Q.   And based on your experience looking at inks and papers |
| 10:57 | 3 | and publishing about gel inks, you were able to tell, by |
| 10:57 | 4 | looking at it, that it was a water-based gel ink; is that |
| 10:57 | 5 | right? |
| 10:57 | 6 | A.   That's right. |
| 10:57 | 7 | Q.   Because it was something that you had seen before? |
| 10:57 | 8 | A.   Many times, yes. |
| 10:57 | 9 | Q.   And would it even be possible to distinguish different |
| 10:58 | 10 | types of gel inks under a microscope? |
| 10:58 | 11 | A.   There's a possibility that you could tell that more |
| 10:58 | 12 | than one writing instrument was used, if they were different |
| 10:58 | 13 | manufacturers of gel inks, because the distribution of the |
| 10:58 | 14 | pigment within the written line will vary depending upon the |
| 10:58 | 15 | formula of the gel.  Therefore, if one manufacturer has a |
| 10:58 | 16 | certain formula of gel and another manufacturer has a |
| 10:58 | 17 | different one, when the ink line is written down, the |
| 10:58 | 18 | melting occurs at different rates; and, therefore, the |
| 10:58 | 19 | pigment, depending upon the size, would be distributed |
| 10:58 | 20 | within the line of that gel in different ways.  So the lines |
| 10:58 | 21 | will actually look different from different manufacturers. |
| 10:58 | 22 | Q.   So it is possible to tell, even just using a |
| 10:58 | 23 | microscope, if the ink was from -- even if it was the same |
| 10:58 | 24 | type of ink -- black gel ink -- from different pens? |
| 10:58 | 25 | A.   Yes, that is a possibility. |

| | | |
|---|---|---|
| 10:58 | 1 | Q.    And here, when you looked at it under the microscope, |
| 10:58 | 2 | did you see that the ink looked the same or different? |
| 10:59 | 3 | A.    Yeah.  There was no differences between the fifth line |
| 10:59 | 4 | of that one entry and the remainder of the lines of that |
| 10:59 | 5 | entry, or from those five lines, in their entirety, with the |
| 10:59 | 6 | other portions of the August 26th notation. |
| 10:59 | 7 | Q.    All right.  Did you also -- after looking under the |
| 10:59 | 8 | microscope and the magnifying glass, did you also use |
| 10:59 | 9 | another type of test on -- on the entry? |
| 10:59 | 10 | A.    Yes.  We used what is known as a video spectral |
| 10:59 | 11 | comparator.  It's an instrument that is a video-based |
| 10:59 | 12 | system, where you alter the, um -- the wavelength of light |
| 10:59 | 13 | that's being used to shine onto the document.  And you also |
| 10:59 | 14 | put filters in front of a camera of differing wavelengths so |
| 10:59 | 15 | that you can determine how the particular ink is going to |
| 10:59 | 16 | absorb and/or reflect ink in the near-infrared region. |
| 10:59 | 17 |       And what we found in that particular case was that |
| 10:59 | 18 | there was no difference, both within this entry -- the |
| 11:00 | 19 | five-line entry, and it's called "Document Type or Kind" -- |
| 11:00 | 20 | or from that entry and the other portions of that |
| 11:00 | 21 | August 26th entry. |
| 11:00 | 22 | Q.    All right.  So all the way up until this point, having |
| 11:00 | 23 | performed multiple tests and using your expertise in the |
| 11:00 | 24 | examination of ink, you've seen no difference at all; is |
| 11:00 | 25 | that correct? |

| | | |
|---|---|---|
| 11:00 | 1 | A.   That's right. |
| 11:00 | 2 | Q.   Now, you know Dr. Aginsky also did a chemical test |
| 11:00 | 3 | called a GC-MS, right? |
| 11:00 | 4 | A.   Yes. |
| 11:00 | 5 | Q.   And could you just remind us what the GC-MS does.  It's |
| 11:00 | 6 | been awhile since Dr. Aginsky was here. |
| 11:00 | 7 | A.   Sure.  GC-MS stands for Gas Chromatography-Mass |
| 11:00 | 8 | Spectrometry.  That's two different techniques.  It's what |
| 11:00 | 9 | is called a hyphenated technique.  The GC, or gas |
| 11:00 | 10 | chromatograph, is designed to separate a mixture of |
| 11:00 | 11 | components so that you can analyze or detect individual |
| 11:01 | 12 | components that might be in a mixture. |
| 11:01 | 13 | Ink is a very good mixture for that; not necessarily |
| 11:01 | 14 | gel ink, but regular ballpoint ink. |
| 11:01 | 15 | The mass spectrometer is actually a detector.  When the |
| 11:01 | 16 | GC is separating its components, the components are eluded |
| 11:01 | 17 | off of a column.  And they would come off individually as |
| 11:01 | 18 | they've been separated.  Well, if they come off, they're |
| 11:01 | 19 | volatile components.  You can't see them.  So you need |
| 11:01 | 20 | something to tell you something just came off the column. |
| 11:01 | 21 | And that's what the mass spectrometer does. |
| 11:01 | 22 | In addition to telling you that something has come off |
| 11:01 | 23 | the column, it can also then breakdown what that component |
| 11:01 | 24 | is by ionizing it and determining the -- the mass spectra; |
| 11:01 | 25 | in other words, the little -- the fragments that come off |

CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

122

| | | |
|---|---|---|
| 11:01 | 1 | when you ionize it.  And what those fragments weigh give you |
| 11:01 | 2 | an idea of the actual component that you're talking about, |
| 11:01 | 3 | or the compound that's coming off the GC. |
| 11:02 | 4 | Q.  All right.  Did you do GC-MS tests of the notary entry |
| 11:02 | 5 | in this case? |
| 11:02 | 6 | A.  I did. |
| 11:02 | 7 | Q.  All right.  Let me ask you to look at Exhibit 23962, |
| 11:02 | 8 | pages 9 and 10. |
| 11:02 | 9 | (Document provided to the witness.) |
| 11:02 | 10 | (Document displayed.) |
| 11:02 | 11 | BY MS. HURST: |
| 11:02 | 12 | Q.  And do you see there copies of the notary books with |
| 11:02 | 13 | the series of numbered areas? |
| 11:02 | 14 | A.  Yes. |
| 11:02 | 15 | Q.  And, um, this is how Dr. Aginsky numbered the areas in |
| 11:02 | 16 | the notary book, correct? |
| 11:02 | 17 | A.  That's right. |
| 11:02 | 18 | Q.  And then you came along and tried to duplicate his |
| 11:02 | 19 | work.  So you did exactly the same thing in taking plugs |
| 11:02 | 20 | from those same numbered areas; is that correct? |
| 11:02 | 21 | A.  Yes, I did. |
| 11:02 | 22 | Q.  Okay.  And Dr. Aginsky was present when you took the |
| 11:03 | 23 | plugs, true? |
| 11:03 | 24 | A.  That's correct. |
| 11:03 | 25 | Q.  Okay.  And did you follow the Court order in this case |

| | | |
|---|---|---|
| 11:03 | 1 | providing for him to be present while you took those plugs? |
| 11:03 | 2 | A.   Yes.  That was the only sample that I took. |
| 11:03 | 3 | Q.   All right.  And the reason that you took it from the |
| 11:03 | 4 | same areas as Dr. Aginsky was because you wanted to try to |
| 11:03 | 5 | replicate his test using the same definition of the problem; |
| 11:03 | 6 | is that right? |
| 11:03 | 7 | A.   That's right. |
| 11:03 | 8 | Q.   Okay.  And so you followed his numbering system of |
| 11:03 | 9 | Samples 1 through 17, and the blanks, and you did that |
| 11:03 | 10 | all -- that whole numbering system the same way, right? |
| 11:03 | 11 | A.   Yes, I did.  The only -- the only difference was I took |
| 11:03 | 12 | a paper sample from an area that contained a lot of the |
| 11:03 | 13 | printed lines, which Dr. Aginsky had not done. |
| 11:03 | 14 | Q.   And you did that in order to try to have a reference |
| 11:03 | 15 | sample so that you would be able to correctly interpret the |
| 11:03 | 16 | results; is that true? |
| 11:04 | 17 | A.   That's correct. |
| 11:04 | 18 | Q.   All right.  Now, was this the first time that you ever |
| 11:04 | 19 | took samples for use in a GC-MS machine? |
| 11:04 | 20 | A.   No. |
| 11:04 | 21 | Q.   Have you done that many times before? |
| 11:04 | 22 | A.   Yes.  I don't know how many, but many. |
| 11:04 | 23 | Q.   And you've used GC-MS machines before in your work in |
| 11:04 | 24 | the analysis of inks and papers? |
| 11:04 | 25 | A.   I have, yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 124 of 135   Page ID #:309849
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

124

| | | |
|---|---|---|
| 11:04 | 1 | Q.   Okay.  About how many different cases have you used the |
| 11:04 | 2 | GC-MS to test inks? |
| 11:04 | 3 | A.   I would say at least a couple of dozen. |
| 11:04 | 4 | Q.   And for each one of those cases, you would run multiple |
| 11:04 | 5 | GC-MS tests; is that right? |
| 11:04 | 6 | A.   Oh, certainly.  Any matter that involves the |
| 11:04 | 7 | examination of writing inks is gonna usually involve |
| 11:04 | 8 | somewhere in the neighborhood of 10 to 12 samples.  There |
| 11:04 | 9 | may be more, but that's kind of an average. |
| 11:04 | 10 | Q.   And, now, do you own your own GC-MS machine? |
| 11:04 | 11 | A.   No, I do not. |
| 11:05 | 12 | Q.   So there was a different machine that -- well, not a |
| 11:05 | 13 | different machine. |
| 11:05 | 14 |      You used somebody else's machine for this testing, |
| 11:05 | 15 | right? |
| 11:05 | 16 | A.   That's correct. |
| 11:05 | 17 | Q.   And whose machine did you use? |
| 11:05 | 18 | A.   It's one that's maintained by the Mass Spectrometry |
| 11:05 | 19 | Division of Duke University. |
| 11:05 | 20 | Q.   Now, is Duke University, to your knowledge, a |
| 11:05 | 21 | prestigious research institution? |
| 11:05 | 22 | A.   Uh, yes, it is.  It's oftentimes referred to as the |
| 11:05 | 23 | Harvard of the South. |
| 11:05 | 24 | Q.   All right.  And before you started using this GC-MS |
| 11:05 | 25 | machine, did you satisfy yourself that it was maintained |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 125 of 135   Page ID #:309850
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

125

| 11:05 | 1 | properly there at Duke University? |
| 11:05 | 2 | A.   Yes. |
| 11:05 | 3 | Q.   All right.  And have you ever had any problems using |
| 11:05 | 4 | that machine? |
| 11:05 | 5 | A.   No. |
| 11:05 | 6 | Q.   Have you used it in connection with other matters in |
| 11:05 | 7 | which you've testified? |
| 11:05 | 8 | A.   I have, yes. |
| 11:05 | 9 | Q.   And has anybody ever raised a problem with your use of |
| 11:05 | 10 | the Duke University machine in connection with your expert |
| 11:05 | 11 | reports? |
| 11:05 | 12 | A.   No. |
| 11:05 | 13 | Q.   All right.  So you'll recall that Dr. Aginsky says he |
| 11:06 | 14 | found menthol in Area 8 and nowhere else, right? |
| 11:06 | 15 | A.   That's correct. |
| 11:06 | 16 | Q.   And you tested all the same areas, true? |
| 11:06 | 17 | A.   I did, yes. |
| 11:06 | 18 | Q.   And what did you find when you tested the -- those |
| 11:06 | 19 | areas? |
| 11:06 | 20 | A.   The only components that I found were components that |
| 11:06 | 21 | could be related to the paper of the little disks that were |
| 11:06 | 22 | being extracted.  There was nothing that was related to the |
| 11:06 | 23 | ink, and there certainly was no menthol. |
| 11:06 | 24 | Q.   So let me make sure we hear this:  No menthol in |
| 11:06 | 25 | Area 8; is that right? |

| | | |
|---|---|---|
| 11:06 | 1 | A.    That's correct. |
| 11:06 | 2 | Q.    And no menthol anywhere else either? |
| 11:06 | 3 | A.    That's right. |
| 11:06 | 4 | Q.    So when you sampled from that line "from 1998 |
| 11:06 | 5 | Missouri," you found no menthol, true? |
| 11:06 | 6 | A.    That's right. |
| 11:06 | 7 | Q.    And then did you try to repeat the test? |
| 11:06 | 8 | A.    Yes.  I -- I used two different samples of hole punches |
| 11:06 | 9 | that came from that particular entry.  And neither of them |
| 11:07 | 10 | illustrated the presence of any menthol. |
| 11:07 | 11 | In the second one, I increased the number of hole |
| 11:07 | 12 | punches so it increased the amount of ink, and I also |
| 11:07 | 13 | decreased the amount of extraction solvent so, in essence, |
| 11:07 | 14 | to concentrate whatever was there.  And all I got were the |
| 11:07 | 15 | components from the paper. |
| 11:07 | 16 | Q.    And that was consistent with all your physical |
| 11:07 | 17 | examinations, true? |
| 11:07 | 18 | A.    Yes. |
| 11:07 | 19 | Q.    So based on all the tests that you ran, is it fair to |
| 11:07 | 20 | say that your opinion is all five lines are the same ink? |
| 11:07 | 21 | A.    That's correct. |
| 11:07 | 22 | Q.    Okay.  And you, based on your analysis, identified this |
| 11:07 | 23 | as black gel water-based ink, correct? |
| 11:07 | 24 | A.    Yes. |
| 11:07 | 25 | Q.    And have you maintained your own ink library since you |

| | | |
|---|---|---|
| 11:07 | 1 | left the Treasury Department? |
| 11:07 | 2 | A.   Uh, yes.  I started collecting ink samples, uh, back in |
| 11:07 | 3 | the, say, late 1970's. |
| 11:08 | 4 | Q.   Okay.  And so, for -- how many years does that make? -- |
| 11:08 | 5 | 30 years you've been collecting ink samples? |
| 11:08 | 6 | A.   Yes. |
| 11:08 | 7 | Q.   Okay.  And how many ink samples do you think you've |
| 11:08 | 8 | collected over that period of time? |
| 11:08 | 9 | A.   I have over 2,500 samples. |
| 11:08 | 10 | Q.   All right.  And where do you get these pens? |
| 11:08 | 11 | A.   Well, I do contact manufacturers directly in order to |
| 11:08 | 12 | receive samples of ink formulations.  I also go out into the |
| 11:08 | 13 | marketplace, usually, the big box stores -- Office Depot, |
| 11:08 | 14 | Staples, Office Max, Kmart, Walmart, Target -- those types |
| 11:08 | 15 | of stores where they would have a good selection.  And I |
| 11:08 | 16 | also go to stationery stores where there might be some |
| 11:08 | 17 | speciality writing instruments. |
| 11:08 | 18 | Q.   So what you do is you go and buy pens because -- you go |
| 11:08 | 19 | buy them at the places regular people buy them because |
| 11:08 | 20 | that's what regular people would have, right? |
| 11:08 | 21 | A.   That's right. |
| 11:08 | 22 | Q.   Okay.  And most of the time what you're doing is |
| 11:08 | 23 | looking at whether some regular person has, unfortunately, |
| 11:09 | 24 | forged an entry somewhere, right? |
| 11:09 | 25 | A.   That's right. |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 128 of 135   Page ID #:309853
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

128

| 11:09 | 1 | Q.   And that's why you want to go to Target, Staples, and |
|---|---|---|

11:09   1   Q.   And that's why you want to go to Target, Staples, and

11:09   2   Walmart to buy pens, same place everybody else does, right?

11:09   3   A.   Yes.  You have to go where the pens are.

11:09   4   Q.   Okay.  Now, have you ever had, in your collection, a

11:09   5   black gel water-based ink pen with menthol in it?

11:09   6           THE COURT:  Just a moment.

11:09   7           (To the jury:) Ladies and gentlemen, I'm going to

11:09   8   send you to lunch for just a moment.  This would be a good

11:09   9   breaking time.  It's my personal need.  I apologize to you.

11:09   10          (To the witness:) So, Doctor, we'll continue on in

11:09   11  just a moment.

11:09   12          (To the jury:)  Could you come back about, oh,

11:09   13  12:00 o'clock.  Would that work for you?

11:09   14          Okay.  I'm going to admonish you not to discuss

11:09   15  this matter amongst yourselves, nor form or express any

11:09   16  opinion concerning the case.

11:09   17          Please have a nice recess.

11:09   18           *(Jury recesses for lunch at 11:09 a.m.)*

11:09   19           *(Outside the presence of the jury.)*

11:10   20          THE COURT:  Counsel, if you will remain seated for

11:10   21  just a moment.  Doctor, if you would remain for just one

11:10   22  moment.  I'll be right back with you.

11:10   23           *(Pause in the proceedings at 11:10 a.m.)*

11:15   24           *(Outside the presence of the jury.)*

11:15   25           *(Proceedings resumed at 11:15 a.m.)*

| | | |
|---|---|---|
| 11:15 | 1 | THE COURT:  I want to go back on the record. |
| 11:15 | 2 | Dr. Lyter, you can listen to our discussion. |
| 11:15 | 3 | During the testimony of Dr. Aginsky, I had limited |
| 11:15 | 4 | the introduction by Mattel -- |
| 11:15 | 5 | In fact, maybe, sir, you should step down just to |
| 11:15 | 6 | preserve -- |
| 11:15 | 7 | THE WITNESS:  No problem.  Thank you. |
| 11:15 | 8 | THE COURT:  -- your testimony and credibility. |
| 11:15 | 9 | *(Witness exits the courtroom.)* |
| 11:15 | 10 | THE COURT:  I had limited Dr. Aginsky concerning |
| 11:15 | 11 | the -- at least "type" of pen that existed, one of those |
| 11:16 | 12 | being a pen from Japan and possibly a pen from France, I |
| 11:16 | 13 | believe. |
| 11:16 | 14 | And, in the literature, I felt under 703 that it |
| 11:16 | 15 | was the type of evidence that could not credibly be relied |
| 11:16 | 16 | upon, and invited Mattel to bring a person from Japan or |
| 11:16 | 17 | from France, if such a pen existed. |
| 11:16 | 18 | My belief, at that time, was that Aginsky could |
| 11:16 | 19 | testify whether there was menthol or not on the page; that |
| 11:16 | 20 | Aginsky could testify as to the commas and the period, and |
| 11:16 | 21 | any differentiation he noted.  And I allowed that testimony. |
| 11:16 | 22 | It somewhat left the record in a neutral position |
| 11:16 | 23 | as to whether a pen existed or not someplace in the world, |
| 11:17 | 24 | or how many.  The difficulty I'm having with where you're |
| 11:17 | 25 | about to go, Ms. Hurst, is the following: |

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 130 of 135   Page ID #:309855
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

130

| | | |
|---|---|---|
| 11:17 | 1 | I don't know that the sampling of this expert -- |
| 11:17 | 2 | whether it's 4,000 pens or 200 pens -- should not preclude, |
| 11:17 | 3 | if you ask the following sets of questions, which I |
| 11:17 | 4 | anticipate you're about to ask; and that is, "And in all of |
| 11:17 | 5 | your days and in all of the collection of your pens, there's |
| 11:17 | 6 | no such pen that has menthol." |
| 11:17 | 7 | Now, I know that you're seeking to limit that. |
| 11:17 | 8 | But if you go down that route, I want to have a thorough and |
| 11:17 | 9 | thoughtful discussion with you about whether this Court is |
| 11:17 | 10 | then going to limit what I previously deemed to be not only |
| 11:17 | 11 | 703, but also, quite frankly, prejudicial hearsay, when |
| 11:17 | 12 | Mattel could have produced that. |
| 11:18 | 13 | You remember, they were the genesis of this.  They |
| 11:18 | 14 | were the moving and driving force.  And I agreed with MGA |
| 11:18 | 15 | that this was an attempt to get into evidence, even though I |
| 11:18 | 16 | would caution the jury that this was hearsay and not |
| 11:18 | 17 | reasonably relied upon evidence -- that this -- that this |
| 11:18 | 18 | ink pen didn't exist.  So Aginsky was limited at that time |
| 11:18 | 19 | to menthol, the placement on the pages. |
| 11:18 | 20 | And, in just a moment, we'll have a discussion and |
| 11:18 | 21 | you can disagree with me. |
| 11:18 | 22 | If you're going to ask, though, about a |
| 11:18 | 23 | collection -- I don't care whether it's 4,000 or 250 or |
| 11:18 | 24 | whether he goes to Walmart or Target or whatever -- and then |
| 11:18 | 25 | seek to place in front of the jury the inference that, "Of |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 131 of 135   Page ID #:309856
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

131

11:18  1   course, there can't be any other ink pen because, in my

11:18  2   personal examination, in my 4,000 ink pens at the Treasury,

11:18  3   there's no pen capable of menthol," I'm forewarning you;

11:18  4   then that puts this absolutely and potentially in issue

11:18  5   concerning any other literature or any other information he

11:18  6   received.

11:19  7          And while I initially agreed with MGA's position

11:19  8   that this was limiting, I don't know why the Court, then,

11:19  9   would not allow an expert to rely upon hearsay and, at

11:19  10  least, have to explain if this does exist someplace.

11:19  11         Now, up to this point, let me repeat to you, I'm

11:19  12  very satisfied with my rulings.  I'm very satisfied that

11:19  13  there may be an ink pen; there may not be an ink pen.

11:19  14  Aginsky says there's menthol; this expert says there's no

11:19  15  menthol.  Aginsky says the fifth line was added; this expert

11:19  16  says it is not, et cetera.

11:19  17         I think, though, that it's your turn to make a

11:19  18  record.  But I wanted to stop the jury at that point

11:19  19  because, if you're moving into the ink pen area now, now I'm

11:19  20  very concerned.

11:19  21         MS. HURST:  Well, the Court had permitted me to

11:19  22  inquire of Dr. Aginsky, whether he had ever possessed or

11:19  23  tested a pen with the characteristics that he agrees this

11:20  24  ink comprises, so black --

11:20  25         THE COURT:  And he's --

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 132 of 135   Page ID #:309857
CV 04-9049 DOC - 3/16/2011 - Day 34, Volume 1 of 4

132

11:20   1          MS. HURST:  -- water, gel -- and he said no.

11:20   2          THE COURT:  He said no.

11:20   3          MS. HURST:  And I was only seeking to ask

11:20   4    Dr. Lyter the same question, and not go further.

11:20   5          THE COURT:  It kind of reminds me of Mattel's

11:20   6    position, on occasion.

11:20   7          MS. HURST:  I mean, basically, the last question

11:20   8    you heard is the last question I'm planning to ask him:

11:20   9          "Have you personally ever possessed or tested a

11:20   10   pen with that characteristic?"

11:20   11         THE COURT:  And Mr. Quinn would then like to be

11:20   12   able ask the following:

11:20   13         MR. QUINN:  "Isn't it true you had a

11:20   14   correspondence with Bruce Gindelberger of National Ink,

11:20   15   where he told you they did a pen called "Smelly Jelly,"

11:20   16   which include mostly fruit scents.  One was called

11:20   17   "Chocolate Mint Metallic Green," and it probably contained

11:20   18   menthol.  Isn't it true, sir, that, in response to your

11:20   19   e-mail, you received that e-mail doing your work on this

11:20   20   case?"

11:20   21         THE COURT:  Now, your choice.  Up to this point,

11:20   22   there may or may not be an ink pen in the world.  I've

11:20   23   precluded, under 703, Mattel from going into this area

11:21   24   concerning a Japanese pen, because I thought it not only

11:21   25   didn't qualify under 703, it was hearsay, it was unreliable

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 133 of 135   Page ID #:309858
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

133

| 11:21 | 1 | and it was Mattel's attempt in their case in chief, if you |
|---|---|---|

11:21  1   and it was Mattel's attempt in their case in chief, if you

11:21  2   will, to drive hearsay into this case without calling an

11:21  3   expert from Japan.  They never did.

11:21  4        If you ask that question, then I'm going to allow

11:21  5   Mattel to go into -- regardless of a sample of 4,000 pens or

11:21  6   200 pens or 8,000 pens -- I'm going to allow Mattel, then,

11:21  7   to ask the question.  Because now you've put in issue

11:21  8   whether there's an ink pen in the world or not by inference,

11:21  9   regardless of your sampling.  This very question.

11:21  10       Your choice.  And I think you need to take a break

11:21  11  for a moment and talk about that.

11:21  12       MS. HURST:  May I -- may we come back?

11:21  13       THE COURT:  I'm going to be sitting here.

11:21  14       MS. HURST:  Okay.  Just give me a moment,

11:21  15  Your Honor.

11:21  16       THE COURT:  Okay.  That way everybody knows.

11:21  17       Because, right now, Mr. Quinn, it's called "What's

11:21  18  good for the goose is good for the gander."  Okay?  This is

11:21  19  not going to be an issue.  In other words, it may be left

11:21  20  that there is, there isn't.  But so far this has been

11:22  21  limited to menthol placement -- but I don't want there to be

11:22  22  any misgivings.  If we go into this area, in all likelihood,

11:22  23  you'll be able to ask those questions.

11:25  24       MS. HURST:  We'll strike the question, Your Honor.

11:25  25       THE COURT:  All right.  Then we'll see you at

Case 2:04-cv-09049-DOC-RNB   Document 10224   Filed 03/18/11   Page 134 of 135   Page ID #:309859
CV 04-9049 DOC – 3/16/2011 – Day 34, Volume 1 of 4

134

| | | |
|---|---|---|
| 11:25 | 1 | 12:00 noon, Your Honor. |
| 11:25 | 2 | MR. McCONVILLE:  Your Honor, the question I was |
| 11:25 | 3 | going to ask IS related to Ms. Leahy, who's still here. |
| 11:25 | 4 | I've spoken to counsel for Mattel, and they've agreed that |
| 11:25 | 5 | whatever issue that we have to resolve related to these |
| 11:25 | 6 | documents will not involve the testimony of Ms. Leahy. |
| 11:25 | 7 | THE COURT:  Oh, I know that.  But whether Paula |
| 11:25 | 8 | Garcia's coming down or not, I don't know; but until that's |
| 11:25 | 9 | resolved, here she sits.  Okay.  So work it out. |
| 11:25 | 10 | All right.  12:00 noon. |
| 11:25 | 11 | *(Recess held at 11:25 a.m.)* |
| 11:25 | 12 | *(Further proceeding reported by Denise* |
| 11:25 | 13 | *Paddock in Volume II.)* |
| 11:25 | 14 | –oOo– |
| 11:25 | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| 11:25 | 1 | -oOo- |
|---|---|---|
| 11:25 | 2 | |
| 11:25 | 3 | CERTIFICATE |
| 11:25 | 4 | |
| 11:25 | 5 | I hereby certify that pursuant to Section 753, |
| 11:25 | 6 | Title 28, United States Code, the foregoing is a true and |
| 11:25 | 7 | correct transcript of the stenographically reported |
| 11:25 | 8 | proceedings held in the above-entitled matter and that the |
| 11:25 | 9 | transcript page format is in conformance with the |
| 11:25 | 10 | regulations of the Judicial Conference of the United States. |
| 11:25 | 11 | |
| 11:25 | 12 | Date:  March 16, 2011 |
| 11:25 | 13 | |
| 11:25 | 14 | |
| 11:25 | 15 | _____ |
| 11:25 | 16 | DEBBIE GALE, U.S. COURT REPORTER<br>CSR NO. 9472, RPR |
| 11:25 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |