UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,           )
                                )
                Plaintiffs,     )
                                )
        vs.                     )
                                )
MGA ENTERTAINMENT, INC., et al.,)  No. CV 04-9049-DOC (RNBx)
                                )     Day 34
                                )     Volume 2 of 4
                Defendants.     )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
WEDNESDAY, MARCH 16, 2011


Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
031611 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 34 V2
03/16/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

UNITED STATES DISTRICT COURT

1    **APPEARANCES OF COUNSEL (Continued):**

2

3

4     FOR CARLOS GUSTAVO MACHADO GOMEZ:

5             LAW OFFICES OF MARK E OVERLAND
              BY: Mark E Overland
6                 Attorney at Law
              100 Wilshire Boulevard, Suite 950
7             Santa Monica, CA 90401
              310-459-2830
8
              -AND-
9
              SCHEPER KIM AND HARRIS LLP
10            BY: ALEXANDER H COTE
                  Attorney at Law
11            601 West Fifth Street, 12th Floor
              Los Angeles, CA 90071-2025
12            213-613-4655

13            ALSO PRESENT:

14            MGA ENTERTAINMENT, INC.
              BY: JEANINE PISONI
15                Attorney at Law
              16360 Roscoe Boulevard, Suite 105
16            Van Nuys, California 91406

17

18   ALSO PRESENT:

19            KEN KOTARSKI, Mattel Technical Operator

20            MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

## CHRONOLOGICAL INDEX

031611 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 34 V2
CV 04-9049 DOC

**WITNESS:**                                                              **PAGE:**

**ALBERT H LYTER, III**
DIRECT EXAMINATION RESUMED
BY MS. HURST...........................................    5
CROSS-EXAMINATION
BY MR. QUINN...........................................    6

**ALAN KAYE**
DIRECT EXAMINATION
BY MS. KELLER..........................................   27
DIRECT EXAMINATION RESUMED
BY MS. KELLER..........................................   33
DIRECT EXAMINATION RESUMED
BY MS. KELLER..........................................   52


**PROCEEDINGS:**
Open court - jury not present..........................    5
Open court - jury present..............................    5
Open court - jury not present..........................   31
Open court - jury present..............................   32
Discussion held of the record..........................   40
Open court - jury not present..........................   69
Recess taken...........................................   69
Adjournment............................................   69


**EXHIBIT(S) RECEIVED INTO EVIDENCE:**

 537 B                  ...................................    5

 9077                   ...................................   36

 9081                   ...................................   39

 9083                   ...................................   41

 9084                   ...................................   41

 9085                   ...................................   43

 9086                   ...................................   43

 9087 and 9088          ...................................   45

 9089                   ...................................   49

 9090                   ...................................   51

Case 2:04-cv-09049-DOC-RNB   Document 10225   Filed 03/18/11   Page 5 of 69   Page ID #:309865
CV 04-9049 DOC - 03/16/2011 - Volume 2 of 4

5

1          SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 16, 2011

2                     Day 34, Volume 2 of 4

3               (Open court - jury not present at 11:59.)

4               THE COURT:  Counsel are present and Mr. Zeller and

11:59  5    Mr. McConville have reached an accomodation concerning 537 B,

6     which is --

7               MR. MCCONVILLE:  We withdraw our objection to the

8     admission of the e-mail.

9               THE COURT:  It's received.

12:00 10           And thank Ms. Leahy and send her on her way.

11              (Exhibit(s) 537 B, received.)

12              (Open court - jury present.)

13              THE COURT:  We're back in session.

14              The jury's present, the alternates, all counsel,

12:01 15   the witnesses and the parties.

16              Counsel, thank you for your courtesy.

17              If you'd please be seated.

18              And this is the continued examination by Ms. Hurst

19     on behalf of MGA, Mr. Larian.

12:01 20             **ALBERT H LYTER, III**,

21         witness, called by Defendant(s), previously sworn

22              **DIRECT EXAMINATION RESUMED**

23     BY MS. HURST:

24     Q.   Okay.  Mr. Lyter, let's just go back over this briefly

12:01 25   and then we'll be concluded -- I'll be concluded with my part

1    of the examination.

2              You attempted to duplicate Dr. Aginsky's

3    results; correct?

4    A.   Yes.

12:01 5    Q.   You took plugs from all the same areas; right?

6    A.   Yes.

7    Q.   You CG-MS tested them?

8    A.   That's right.

9    Q.   You found no menthol in area 8 or anywhere else?

12:02 10   A.   That's correct.

11   Q.   And in your opinion the five lines in the entry are all

12   the same ink?

13   A.   Yes.

14             MS. HURST:  Okay.  No further questions.

12:02 15           THE COURT:  Cross-examination by Mr. Quinn on

16   behalf of Mattel.

17                    **CROSS-EXAMINATION**

18   BY MR. QUINN:

19   Q.   Good afternoon, Dr. Lyter, my name is John Quinn and I

12:02 20   represent Mattel.

21   A.   Good afternoon.

22   Q.   You also looked at the report that was done, the expert

23   report, that was done by a gentleman by the name of

24   Lloyd Cunningham; correct?

12:02 25   A.   Yes, I did.

CV 04-9049 DOC - 03/16/2011 - Volume 2 of 4

7

```
 1    Q.   And you know who Mr. Cunningham is?

 2    A.   I do.

 3    Q.   And in your view he is a qualified forensic document

 4    examiner?

12:02 5    A.   Yes, that's correct.

 6    Q.   And you saw in your report where he did some work and

 7    expressed some opinions concerning some of the handwriting

 8    and entries that were in that notary book, commas and things

 9    like that?

12:02 10    A.   Yes.

 11           MS. HURST:  Objection; hearsay.

 12           THE COURT:  One expert can rely upon or can read

 13    another expert's report, but it's hearsay.

 14           It can change their opinion, they can keep their

12:03 15    opinion; but, in fact, experts are one of the few areas that

 16    can take into account literally hearsay, but it's not for the

 17    truth.

 18           Counsel.

 19    Q.   BY MR. QUINN:  You saw that Mr. Cunningham addressed

12:03 20    those things in his report?

 21    A.   Yes; that's correct.

 22    Q.   And you're also asked to review his report concerning

 23    Exhibit 1155 C, the black notebook; correct?

 24           MS. HURST:  Objection; beyond the scope,

12:03 25    Your Honor.
```

```
 1                    THE COURT:  I'm not sure.

 2              I don't like surprises, but we'll see.

 3              You can answer the question.

 4              THE WITNESS:  Yes.  The exhibit number doesn't mean

12:04 5   anything to me --

 6              MR. QUINN:  Yes, I'm sorry.

 7              THE WITNESS:  -- but it appears to be similar to

 8   what I'd looked at.

 9   Q.   BY MR. QUINN:  Yes.  That's that spiral notebook, and

12:04 10  you did some work on that as well; correct?

11   A.   Yes.

12   Q.   And you're not here to express any opinions concerning

13   Mr. Cunningham's work; correct?

14   A.   That's right.

12:04 15  Q.   So let's talk about the ink analysis that you did.

16              And in your report dated May 6, 2008, amended on

17   May 21, 2008, Exhibit 5928-1, if we could put that before

18   Dr. Lyter, 5928-1.

19              THE COURT:  Did you do work on this notebook?

12:04 20             Did you do work on this exhibit?

21              THE WITNESS:  This one?

22              THE COURT:  5982-1.

23              THE WITNESS:  This is a report.  This is one of my

24   reports.

12:05 25             THE COURT:  Does it pertain to that notebook which
```

```
 1    is Exhibit number -- what's the exhibit number?
 2              THE WITNESS:  1155 C.
 3              THE COURT:  1155.
 4              Did you do work on that notebook, sir?
 5              THE WITNESS:  Yes, it was examined.
 6              THE COURT:  Okay.
 7              Counsel.
 8    Q.   BY MR. QUINN:  So we're looking at your report
 9    concerning the forensic -- the ink analysis that you did,
10    sir, Exhibit 5928; correct?
11    A.   Yes.
12    Q.   Do you have that before you?
13    A.   I do.
14    Q.   And if you could turn to Page -6, you identify there in
15    the second to the last paragraph on the Page 3 possible
16    reasons for what you say is the discrepancy between
17    Dr. Aginsky's results and my results; correct?
18    A.   Yes.
19    Q.   And what you're referring to, the discrepancy is the
20    fact that Dr. Aginsky detected menthol in that fifth line in
21    the ink and you did not; correct?
22    A.   That's right.
23    Q.   And you give us, there in that paragraph in your report,
24    you give us three reasons; right?
25    A.   Yes, it's the next to the last paragraph.
```

CV 04-9049 DOC - 03/16/2011   Volume 2 of 4

```
 1    Q.    And you say one possible is that Dr. Aginsky is mistaken

 2    about the presence of menthol; right?

 3    A.    Yes.

 4    Q.    And the second possible reason is that menthol is

 5    present in such small quantity that my methodology and

 6    equipment did not detect it; correct?

 7    A.    Yes.

 8    Q.    And then the third reason you give is that the menthol

 9    could have been localized in such small quantities that the

10    samples taken by Dr. Aginsky and myself were not homogenous;

11    right?

12    A.    Yes.

13    Q.    And what you mean by that is there might have been --

14    it's so localized that his microplugs might have picked up

15    something that had menthol in it and your microplugs might

16    not have, basically --

17    A.    That's correct.

18    Q.    -- essentially?

19          And so I'd like to talk to you about these

20    different explanations in your report for the different

21    findings that you and Dr. Aginsky reached; okay?

22    A.    Okay.

23    Q.    So talking first about the first one that Dr. Aginsky is

24    mistaken about the presence of menthol, you actually have no

25    reason to believe that Dr. Aginsky's testing is
```

1   in error; correct?

2   A.   That's correct, except that I was not there, so I don't

3   know.

4   Q.   But you have no reason to believe that his testing was

12:07   5   in error?

6   A.   That's right, other than the absence of menthol in my

7   testing.

8   Q.   You say you didn't find any; right?

9   A.   Yes.

12:07 10   Q.   But you can't say for certainty that there is or is not

11   menthol present; correct?

12   A.   That's correct.

13   Q.   And you have high regard for Dr. Aginsky?

14   A.   He certainly is a competent chemist.

12:07 15   Q.   Well, I mean, more than that, you believe that he has a

16   very good reputation; correct?

17   A.   Well, it's -- reputation is not something that I can say

18   that he has because I'm -- I'm only one person.  I mean, I

19   can tell you what I think of him, but I don't know what his

12:08 20   reputation is within the legal community or the remainder of

21   the scientific community.

22   Q.   If you could take a look at your deposition Page 663.

23   This is the deposition dated December 6th, 2010, Page 663,

24   Lines 1 to 3.

12:08 25          And it's true, sir, that you have testified on

```
 1   multiple times that you believe that Dr. Aginsky has a very
 2   good reputation; true?
 3   A.   Yes.
 4   Q.   And you believe that that reputation is earned; correct?
 5   A.   From what I have seen, yes.
 6   Q.   And not -- not to -- not to make too much of it, you've
 7   testified a lot and there have been some occasions where
 8   courts have rejected or criticized your opinions; correct?
 9            MS. HURST:  Objection; improper.
10            THE COURT:  Overruled; it goes to your expertise.
11            THE WITNESS:  I'm -- I'm aware of --
12            THE COURT:  You mean by not qualifying, counsel, or
13   qualifying --
14            MR. QUINN:  Rejecting his opinion as being
15   unreliable.
16            MS. HURST:  Objection; improper.
17            THE COURT:  It depends upon the area; I'm going to
18   sustain the objection.
19   Q.   BY MR. QUINN:  Your opinion with respect to ink
20   analysis?
21            MS. HURST:  Objection; improper.
22            THE COURT:  I'm going to sustain the objection.
23            It can either qualify or not qualify by courts.  I
24   don't know if that's a jury that might have found a verdict
25   that contradicted one expert or another.
```

 1          That's way too speculative, Counsel.

 2          MR. QUINN:  I am talking about rulings by --

 3          THE COURT:  It is sustained.

 4          It's absolutely sustained, Mr. Quinn.

12:09 5          MR. QUINN:  All right.  Very well, Your Honor.

 6          THE COURT:  Okay.  Thank you.

 7          Now, we can have that discussion at 3:30 if you'd

 8  like to and we'll keep the gentleman around.

 9  Q.   BY MR. QUINN:  And you looked at -- we've -- I mean,

12:09 10  you've looked at, obviously -- Dr. Aginsky's report; correct?

 11  A.   Yes.

 12  Q.   And you have -- if we could look at 23496-1 and -2.  As

 13  you've indicated, you and Dr. Aginsky sort of both divided --

 14  if we could put this up on the screen, Your Honor, that is in

12:10 15  evidence -- divided the pages of this notary book up into

 16  different zones, correct, and numbered the zones and you used

 17  the same numbers?

 18  A.   Yes; Dr. Aginsky took his samples first --

 19  Q.   Right?

12:10 20  A.   -- and he had designed the zones and I simply followed

 21  those.

 22  Q.   Right; and we appreciate your doing that.

 23          If we could take the -- the -- the area where he

 24  found the menthol was -- was designated by both of you, you

12:10 25  used the convention of calling that zone or area 8; correct?

CV 04-9049 DOC - 03/16/2011 Volume 2 of 4

1   A.   Yes; that's right.

2   Q.   And you know that Dr. Aginsky took some plugs, some

3   microplugs from that zone; correct?

4   A.   Yes.

12:10  5   Q.   And tested them and with the CG-MS equipment and ran

6   some chromatograms showing the results; correct?

7   A.   Yes, that's correct.

8   Q.   If we could look at Exhibit 23962-7 and -8, you have --

9   that's -7 and then -8, you have seen these chromatograms

12:11 10   being correct, that Dr. Aginsky -- his research -- his

11   testing yielded?

12   A.   Yes, I have.

13   Q.   And you agree that the particular chromatographic peak

14   reflecting on his chromatograms from this -- both of those

12:11 15   are from that Zone 8; correct?

16   A.   Yes, there's actually three runs and all three of them

17   are from Zone 8.

18   Q.   Right; and you agree that the particular chromatographic

19   peak seem to have the correct mass characteristics for

12:12 20   menthol; correct?

21   A.   Yes, I'll agree with that statement.

22   Q.   And you agree that this data, Dr. Aginsky's data

23   indicated that, you know, menthol was consistent with the

24   particular characteristics of the retention time and the mass

12:12 25   for menthol; correct?

Case 2:04-cv-09049-DOC-RNB   Document 10225   Filed 03/18/11   Page 15 of 69   Page ID #:309875
CV 04-9049 DOC - 03/16/2011   Volume 2 of 4

15

1    A.    Yes.

2    Q.    All right.  So let's turn, then, to the second possible

3    explanation you've given us for the discrepancy and that is

4    that menthol is present in such a small quantity that your

12:12 5    methodology and equipment did not detect it.

6             Are you with me?

7    A.    Yes.

8    Q.    And you state in your report that we were just looking

9    at, Exhibit 5928 at Page -7 -- if I could ask you to turn to

12:12 10    that --

11    A.    Okay.

12    Q.    -- at the very top of that report you state "due to the

13    limited amount of sample examined and variations in

14    examination protocols used by Dr. Aginsky and me, due to

12:13 15    differences in instrument configurations, it is possible that

16    there were trace amounts of menthol in the microplugs taken

17    from the fifth line of the August 26, 1999, entry, which my

18    CG-MS tests were not able to detect."

19             Correct?

12:13 20    A.    Yes.

21    Q.    All right.  So let's talk about what you and Dr. Aginsky

22    did differently.  You knew from Dr. Aginsky's report that he

23    used two microliters of chloroform for each of his tests;

24    correct?

12:13 25    A.    Yes.

1    Q.   And could you explain to us what the role of the

2    chloroform is.  Why do you folks that do this CG-MS testing

3    use chloroform?

4    A.   Well, it's an extraction solvent and in particular the

12:14 5    chloroform as an extraction solvent is chosen because most of

6    the time when you're doing CG-MS on inks you're looking for

7    some of the volatile components that are in the inks, some of

8    the solvents that are used to make the ink and chloroform is

9    very good at dissolving those solvents.

12:14 10    Q.   Right.  So you knew that Dr. Aginsky used two

11    microliters of chloroform for each of his tests; correct?

12    A.   Yes.

13    Q.   But you diluted the sample much more, correct, with more

14    chloroform?

12:14 15    A.   I used the higher amount of chloroform because I was

16    using an instrument with an automatic sampler.

17    Q.   And you started out -- you diluted the samples where he

18    had used two microliters, you used 15 microliters to start

19    out with; correct?

12:14 20    A.   Yes; and I believe that I additionally used more -- more

21    ink sample, more of the microplugs than he did as well.

22    Q.   Well, you initially did a series of three or four

23    samples where you used 15 microliters, right, of chloroform?

24    A.   Yes; but in -- in those particular samples there were, I

12:15 25    believe, four of the hole punches of ink, and I believe that

UNITED STATES DISTRICT COURT

```
 1      Dr. Aginsky only used two.
 2      Q.   And then after those samples you realized you needed to
 3      decrease the amount of chloroform to increase the amount of
 4      ink; true?
12:15 5  A.   Yes, I increased -- or decreased the amount of
 6      chloroform in order to increase the concentration of whatever
 7      was extracted from the ink and paper samples.
 8      Q.   Exactly, because you weren't getting much of a response
 9      from the machine; correct?
12:15 10 A.   Oh, I was getting the response from the machine, it was
11      just that the components that I was seeing was from the
12      paper.
13      Q.   Right.
14      A.   And I wasn't seeing anything that I could associate to
12:15 15 the ink itself, and certainly not -- and certainly not
16      menthol.
17      Q.   You went from 15 microliters to 12 microliters,
18      decreasing the chloroform, because you weren't getting much
19      of a signal, correct, from the CG-MS machine; correct?
12:16 20 A.   No, I was getting a signal; it was just that I wasn't
21      getting any signal in the area where there was -- the menthol
22      would be.  In other words, the retention time around 8 and a
23      half minutes.
24      Q.   Let's take a look at your deposition, page -- this is
12:16 25 May 21, 2008, Page 341, Lines 21 to 25.
```

UNITED STATES DISTRICT COURT

```
 1              I'd request permission to read that, Your Honor,

 2      Page 341, Lines 21 to 25.

 3              THE COURT:  Just a moment.

 4              (Pause in the proceedings.)

12:17 5         THE COURT:  You may read.

 6              MR. QUINN:  (Reading.)

 7              "Question:  Why did you feel the need to decrease

 8      the amount of chloroform.

 9              "Answer:  I wasn't getting much of a signal from

12:17 10    the CG-MS so I tried that to see if it would increase it."

 11     Q.   So basically what you're doing is you're increasing the

 12     concentration of ink by lowering the amount of chloroform;

 13     correct?

 14             MS. HURST:  Objection; misstates the testimony.

12:17 15        THE COURT:  Overruled.

 16             THE WITNESS:  You're increasing the amounts of

 17     materials that you've extracted from your sample.

 18             MR. QUINN:  Right.

 19             THE WITNESS:  Which in this case was both the ink

12:17 20    and the paper.

 21     Q.   BY MR. QUINN:  Right; so adding -- and you -- you

 22     couldn't use, whereas Mr. -- Dr. Aginsky was using just the

 23     two microliters, you could not go below 12 microliters

 24     because you were using what's called an auto sampler;

12:18 25    correct?
```

CV 04-9049 DOC - 03/16/2011  Volume 2 of 4

```
 1    A.    That's correct.

 2    Q.    And that's an instrument that was -- that was on the

 3    CG-MS machine that you were using; correct?

 4    A.    Yeah, it's an attachment that allows you to analyze a

12:18 5    series of samples sequentially, even in your absence.

 6    Q.    And it requires you to -- that particular auto sampler

 7    required you to use at least a solution of 12 microliters;

 8    correct?

 9    A.    Yes, it was a minimum volume requirement.

12:18 10    Q.    So using that auto sampler, you could not duplicate what

11    Dr. Aginsky had done, where he had used two microliters;

12    correct?

13    A.    Not with the regular injection; that's correct.

14    Q.    The -- the -- the auto sampler could have been removed

12:18 15    to allow you to use less chloroform and have a higher

16    concentration of ink; correct?

17    A.    It is an attachment that can be removed.  The people at

18    Duke University would not allow me to remove it.

19    Q.    So you did the best you could?

12:19 20    A.    That's right.

21    Q.    And so that's the second possible explanation that you

22    gave us that the -- that menthol is present in such quantity

23    that my methodology and equipment did not detect it; correct?

24    We've been discussing that?

12:19 25    A.    That's right.
```

UNITED STATES DISTRICT COURT

```
 1    Q.   And the third explanation that you gave us is that the
 2    menthol could have been localized in such small quantities
 3    that the samples taken by Dr. Aginsky and myself were not
 4    homogenous; correct?  That's the third possible explanation?
12:19 5   A.   Yes; that's right.
 6    Q.   What do you mean by "localized" in that sentence?
 7    A.   In areas that were not consistent throughout the writing
 8    so that it was simply a matter of the samples that were
 9    taken, some of them had menthol and some did not.
12:20 10  Q.   Well, let's take a look at Exhibit 23496-1 again.
11              And so what we're talking about is within that area
12    8, that writing from 1998 Missouri; correct?  That's --
13    that's the area we're talking about; right?
14    A.   Yes.
12:20 15  Q.   And Dr. Aginsky took something like 12 plugs from there?
16    A.   I believe that's about right.
17    Q.   And how many plugs did you take?
18    A.   The same number, I believe.
19    Q.   All from that little area, area 8; right?
12:20 20  A.   Yes.
21    Q.   And you could tell, when you got it, you can tell which
22    are his plugs and which are your plugs; right?
23    A.   Normally I can.  He tends to use a somewhat larger hole
24    punch than I did, but I'm not -- I don't recall specifically
12:20 25  if that occurred in this instance or not.
```

1    Q.   Well, let me -- let me see if I can refresh your

2    recollection.

3         Does it seem right that his plugs were smaller,

4    that his were a half a millimeter -- now, that your plugs

12:21 5  were smaller, half a millimeter, and that his were a little

6    bit larger, a full millimeter?  Does that seem right to you?

7    A.   That's normally the way things occur.  I use a smaller

8    hole punch than he does.

9    Q.   So that -- when you received this, obviously his plugs

12:21 10 were already there; right?

11   A.   He had already taken his sampling; that's right.

12   Q.   And you could see all those?  I mean, knowledge of those

13   plugs were hidden from you; right?

14   A.   No, that's right.

12:21 15 Q.   And he had taken, in this small area, this small local

16   area, area 8, he had taken at least one plug out of every

17   word?  Isn't that true?

18   A.   I don't recall specifically, but I would assume so.

19   Q.   Right; and you took a plug out of every word; correct?

12:21 20 A.   Yes, I did.

21   Q.   And so when you say "localized" you're saying that, you

22   know, somewhere in that small space where between the two of

23   you you took 22 plugs, there might have been variations in

24   the presence of menthol in that small space?  Is that what

12:22 25 you're -- is that what you're saying, basically?

1    A.    Yes.

2    Q.    Well, did you -- you didn't run any tests to see

3    whether, you know, whether you could duplicate this to

4    explain the presence of menthol by any contamination, did

12:22  5    you?

6    A.    I don't understand your question.

7    Q.    Well, you saw that Dr. Aginsky ran a number of tests to

8    try to see whether the presence of menthol could be accounted

9    for by certain forms of contamination?  You saw that;

12:22 10    correct?

11    A.    Yes, I did.

12    Q.    Like cough drops, Vicks VapoRub, things like that?

13    A.    Yes.

14    Q.    And then he tested it to sort of see if that might be an

12:22 15    explanation and compare it to the results of his testing;

16    right?

17    A.    He did some testing.  It certainly was not complete.

18    Q.    Well, you didn't do any of that type of testing, did

19    you?  Testing for possible contamination; correct?

12:22 20    A.    No, and the reason being is that without knowing what

21    the contamination source was, any experimental design would

22    be flawed.

23    Q.    Well, at least, in your report, you didn't indicate that

24    you did any type of contamination testing, correct, of any

12:23 25    kind?

CV 04-9049 DOC - 03/16/2011 - Volume 2 of 4

```
 1   A.    I did not do any testing other than the testing of the
 2   ink on the paper.
 3   Q.    And in your report you conclude Exhibit 5928-7 in the
 4   second paragraph, if I could ask you to take a look at that,
12:23 5   it's actually -- it's in the middle paragraph -- you say that
 6   "if it were assumed that Dr. Aginsky" --
 7              MS. HURST:  Objection; objection to publication of
 8   the hearsay and the report, and this also goes to the earlier
 9   ruling by the court which is an issue present in that
12:24 10  paragraph.
 11             THE COURT:  I just don't have that paragraph in
 12  front of me, Counsel.
 13             MS. HURST:  May we request a sidebar, Your Honor?
 14             THE COURT:  Just a moment.
12:24 15            Just give me the paragraph.
 16             MR. QUINN:  It's 5928-7.
 17             (Pause in the proceedings.)
 18             THE COURT:  Well, if you can move on, Mr. Quinn,
 19  I'd suggest that we can come back, if you like.  This is
12:24 20  valuable time for you.
 21             MR. QUINN:  It is.
 22             We've got it, Your Honor.  It's coming up to the
 23  bench right now.
 24             THE COURT:  It's up to you.
12:24 25            I can take it up at 3:30, but this is your time.
```

1          MR. QUINN:  This will be quick, I hope.

2          THE COURT:  And which paragraph?

3          MR. QUINN:  It's the middle paragraph beginning

4     "if."

12:25   5          THE COURT:  And your objection, Counsel?

6          MS. HURST:  The reasoning goes to the court's prior

7     ruling and they're trying to open the door on that again

8     because he can't answer the question fairly, Your Honor.

9          THE COURT:  All right.

12:25  10          Counsel, I don't want to stop the testimony at this

11     point.  We can come back to this.

12          MR. QUINN:  All right.

13     Q.   Well, one of the -- one of the explanations that you

14     offer, Dr. Lyter, is that it's possible that Ms. Prince wrote

12:26  15     the first four lines with one pen and then put it down and

16     within seconds or minutes later, you know, picked up another

17     pen and wrote the fifth line.

18          You offer that as one potential explanation;

19     correct?

12:26  20     A.   No.  I -- I -- I don't know that I offered that specific

21     explanation.  My point is is that in the presence of multiple

22     ink formulations or multiple kinds of ink there's no way,

23     given the type of ink that was used here, to determine how

24     much time lapsed between when one writing was done and when

12:26  25     another writing was done, so --

```
 1    Q.   Sir, if you'd look at -- if you can take a look at

 2    Page -7 in your report, 5928-7, the last paragraph in the

 3    middle of the page, you wrote, and I quote, "indeed" --

 4         MS. HURST:  Objection to the publication of the

12:27 5    hearsay.

 6         THE COURT:  I'm going to sustain it.

 7    Q.   BY MR. QUINN:  Sir, isn't it true that you said it's

 8    your belief that one possible explanation is that Ms. Prince

 9    wrote the first four lines with one pen, put that pen down

12:27 10   and then minutes or seconds later wrote the fifth line;

11    correct?

12    A.   No; I did not make that conclusion.

13    Q.   Did you make that statement?

14    A.   No, I did not make that statement.

12:27 15        MR. QUINN:  Your Honor, I'd request permission to

16    read that sentence.

17         MS. HURST:  Your Honor, objection.

18         THE COURT:  I don't believe he's being offered as

19    an expert concerning that paragraph.  I thought this was

12:28 20   restricted to menthol and the testing.

21         But I'm going to hear you out of the presence of

22    the jury, but you're going to continue on at the present time

23    so we don't take valuable time away from Mattel.

24         MR. QUINN:  I don't have anything further,

12:28 25   Your Honor.
```

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  All right.

 2              Then you may be coming back, Doctor.

 3              I'll hear briefly from MGA.

 4              Sir, I'm going to ask you to rejoin us at 3:30

 5   today.

 6                    THE WITNESS:  Okay.

 7                    THE COURT:  Do you have any further questions,

 8   Ms. Hurst?

 9              Now, do you want to reserve your recross and your

10   redirect until we have this discussion outside the presence

11   of the jury?

12                    MS. HURST:  I'm sorry?

13                    THE COURT:  Do you want to reserve your recross and

14   redirect, Ms. Hurst?

15                    MS. HURST:  I'm prepared to proceed.

16                    THE COURT:  He's coming back regardless at 3:30.

17                    MS. HURST:  I'll reserve.

18                    THE COURT:  Sir, if you step down we'll come back

19   to you.

20              I just don't want to waste time right now.  I want

21   to hear them out of the presence of the jury.

22              Counsel, your next witness, please.

23                    MS. KELLER:  Yes, Your Honor.

24              MGA calls Alan Kaye.

25                    THE COURT:  And that's a courtesy to both parties
```

12:28  5
12:29 10
12:29 15
12:29 20
12:29 25

UNITED STATES DISTRICT COURT

```
 1   by the court so that they don't use valuable time on behalf

 2   of MGA and Mattel.

 3            MS. KELLER:  We just have to get some exhibits,

 4   Your Honor, and a couple of binders switched out.

12:30 5           THE COURT:  Mr. Kaye, this is valuable time, sir.

 6   If you'd come forward.

 7            We've got a clock running right now.

 8                        ALAN KAYE,

 9            witness, called by Defendant(s), sworn

12:30 10          THE COURT:  Sir, if you'd walk along the side of

11   the jury box, please.

12            Mr. Kaye, if you'd be seated.

13            Would you turn and face the jury and state your

14   full name.

12:30 15          THE WITNESS:  Alan Kaye.

16            THE COURT:  And spell your last name, sir.

17            THE WITNESS:  K-a-y-e.

18            THE COURT:  Direct examination by Ms. Keller.

19                     DIRECT EXAMINATION

12:31 20  BY MS. KELLER:

21   Q.   Mr. Kaye, you're the senior vice president of human

22   resources at Mattel; correct?

23   A.   I was up until about a month ago.  I received a new

24   title change.  I'm now the executive vice president of human

12:31 25  resources.
```

UNITED STATES DISTRICT COURT

1   Q.   Okay.  And before that, obviously, you were the senior

2   vice president?

3   A.   Yes.

4   Q.   And you've been in human resources for over 30 years;

12:31 5   true?

6   A.   Yes.

7   Q.   You joined Mattel in 1997 as vice president of human

8   resources?

9   A.   No.  When I joined Mattel it was senior vice president

12:31 10   of human resources.

11   Q.   Okay.  The bottom line is you've been in human resources

12   at Mattel and in some form of executive position since 1997?

13   A.   Yes.

14   Q.   And you report directly to the CEO, Mr. Eckert, who is

12:31 15   seated over here at counsel table?

16   A.   Yes.

17   Q.   And in your senior capacity you have worldwide

18   responsibility for human resources at Mattel?

19   A.   Yes.

12:31 20   Q.   Now you've also testified at depositions in this case;

21   right?

22   A.   Yes.

23   Q.   During some of those depositions you were a so-called

24   30(b)(6) witness for Mattel?

12:32 25   A.   Yes.

         1    Q.   And when you were testifying as a 30(b)(6) witness you

         2    understood that you weren't testifying just as to your own

         3    knowledge but also as the corporate representative of the

         4    company; true?

12:32    5    A.   Yes.

         6    Q.   And you were identified as Mattel's corporate

         7    representative on the issue of Mattel's understanding of the

         8    meaning of all terms of all agreements between Carter Bryant

         9    and Mattel, including the employee confidential information

12:32   10    and inventions agreement dated January 4th, 1999; correct?

        11    A.   Certainly with regards to that agreement.  I don't know

        12    it was all agreements with regard to what Carter Bryant

        13    signed.

        14    Q.   All the terms of all agreements between Carter Bryant

12:32   15    and Mattel, including the employee confidential information

        16    and inventions agreement dated January 4th, 1999; right?

        17    A.   Again, I -- definitely on that specific agreement.  I

        18    don't know if it's all agreements he signed.

        19    Q.   Turn to your deposition, please, the deposition of

12:33   20    June 19th, 2010, Page 4, Line 24 through Page 5, Line 10.

        21    A.   I'm sorry.  Can you repeat that.

        22    Q.   Page 4, Line 24, through Page 5, Line 10.

        23              (Pause in the proceedings.)

        24              THE WITNESS:   Okay.  I see it now.

12:33   25    Q.   BY MS. KELLER:   So that statement that I just asked you

| | |
|---|---|
| 1 | about, that would be correct? |
| 2 | A.   Yes. |
| 3 | Q.   And you were also identified as Mattel's 30(b)(6) |
| 4 | corporate representative on the issue of each form of |
| 12:34 5 | agreement in use by Mattel from 1975 to the present between |
| 6 | Mattel and its employees or independent contractors that |
| 7 | Mattel contends governed the ownership or assignment of any |
| 8 | original works of authorship or inventions of its employees |
| 9 | or independent contractors; true? |
| 12:34 10 | A.   I'd have to reread this -- the deposition to know if all |
| 11 | of that is true. |
| 12 | Q.   Take a look at Page 5, Line 14 through Page 6, Line 25. |
| 13 |      THE WITNESS:  Yes. |
| 14 | Q.   BY MS. KELLER:  So that was a true statement? |
| 12:35 15 | A.   Yes. |
| 16 | Q.   And you reviewed your deposition before testifying |
| 17 | today; correct? |
| 18 | A.   Yes. |
| 19 | Q.   And you are aware that each of the parties has been |
| 12:35 20 | given a finite amount of time to put on their case; right? |
| 21 | A.   Yes. |
| 22 | Q.   And you understand that every time you ask to pause and |
| 23 | read your deposition transcript that's deducted from MGA's |
| 24 | time; right? |
| 12:35 25 |      MR. QUINN:  Objection, Your Honor; he didn't ask. |

1        She asked him.

2                THE COURT:  I'll strike the question at the present

3        time.

4        Q.    BY MS. KELLER:  Now, were you also designated on the

12:35  5        use, disclosure or protection of information that Mattel

6        considers to be confidential to which its employees or

7        independent contractors were privy?

8        A.    Again, there -- there was -- there was over a thousand

9        pages of deposition.

12:35 10                THE COURT:  I see, thank you very much.

11                Ladies and Gentlemen, excuse us for just a moment.

12                You are admonished not to discuss this matter

13        amongst yourselves nor form or express any opinions about

14        this case.

12:36 15                I'll be right with you.

16                (Open court - jury not present.)

17                THE COURT:  Counsel, have a seat, please.

18                For my record I think each counsel have been

19        concerned about different executives for both companies

12:36 20        unduly taking time to look at a deposition.

21                Have you read this deposition, sir?

22                THE WITNESS:  Yes.

23                THE COURT:  Answer the questions, then.

24                Do you understand me?

12:36 25                THE WITNESS:  Yes.

 1              THE COURT:  Do you need to step down and read this
 2   deposition again?
 3              THE WITNESS:  I --
 4              THE COURT:  I'd be glad to take the time if you
12:36  5   want to.
 6              THE WITNESS:  I think I know most of the
 7   deposition.
 8              THE COURT:  Then answer the questions.
 9              Get the jury, please.
12:37 10              If you need time we'll be glad to provide it.
11              If you need to read this again, step out of the
12   court and we'll call another witness.
13              THE WITNESS:  If it's an area --
14              THE COURT:  No, sir.
12:37 15              I'm not speaking to you now.
16              If you need to have your memory refreshed, you tell
17   us.  If it's too often or too much time I'll call you off of
18   the stand.
19              Understood?
12:38 20              THE WITNESS:  Understood.
21              THE COURT:  The time's valuable to both sides now.
22              (Open court - jury present.)
23              THE COURT:  Mr. Kaye be seated.
24              The jury's present, the alternates are present
12:38 25   also.

UNITED STATES DISTRICT COURT

```
 1              Ladies and Gentlemen, you've heard an inference by
 2      both sides at different times.
 3              Mattel's counsel you've heard complain, you've
 4      heard MGA's counsel complain on occasion when different
12:39 5  witnesses were testifying who were really adverse witnesses
 6      from another party.  I think Mr. Zeller referred to that at
 7      one time and now Ms. Keller has referred to that at one time.
 8              These witnesses are prepared.
 9              I've asked Mr. Kaye, outside your presence, if he's
12:39 10 prepared to go forward.  If not, he's excused, and he can
11      reread the deposition.
12              He's assured the court that he is.
13              Counsel.
14              MS. KELLER:  Thank you.
12:39 15              DIRECT EXAMINATION RESUMED
16      BY MS. KELLER:
17      Q.   Mr. Kaye, you were also designated as Mattel's 30(b)(6)
18      witness on the issue of the use, disclosure or protection of
19      information that Mattel considers to be confidential, to
12:39 20 which its employees or independent contractors were privy;
21      correct?
22      A.   Yes.
23      Q.   And you were asked to give 30(b)(6) testimony about
24      Mattel's understanding of the meeting of each and every term
12:39 25 of each form of agreement in use from 1975 to present; right?
```

Case 2:04-cv-09049-DOC-RNB   Document 10225   Filed 03/18/11   Page 34 of 69   Page ID
#:309894
CV 04-9049 DOC - 03/16/2011   Volume 2 of 4

34

1   A.    Yes.

2   Q.    And that included the identity of the drafters of each

3   form of the agreement; true?

4   A.    Where I could determine that.

12:40  5   Q.    And the reasons for all changes in the form of the

6   agreement over time; correct?

7   A.    Yes.

8   Q.    And you were also designated as to Mattel's practices or

9   procedures with respect to requiring employees to sign

12:40 10   revised forms of such agreements and whether Mattel offered

11   any continual or new consideration for that; correct?

12   A.    Yes.

13   Q.    You were also supposed to give 30(b)(6) testimony about

14   the policies, practices and procedures used by Mattel from

12:40 15   1985 to the present to limit the disclosure of purportedly

16   confidential information or concerning the ownership or

17   assignment of original works of authorship or inventions of

18   its employees, specifically with respect to the Mattel 2004

19   code of conduct survey and the conflict of interest

12:40 20   questionnaires Mattel used during that time period; correct?

21   A.    Yes.

22   Q.    And for the deposition you were supposed to be briefed

23   so that you could testify about any of the topics designated;

24   true?

12:41 25   A.    To the best of the ability; yes.

UNITED STATES DISTRICT COURT

Q.   And you understood that your answers as Mattel's

30(b)(6) witness on these topics were those of the Mattel

corporate representative and would bind Mattel; correct?

A.   I -- I -- the first part of the answer I'd say yes.  I'm

12:41  not sure about the binding of Mattel, but --

Q.   You understood that since you were the corporate

representative your testimony would be binding upon the

corporation with respect to those topics; correct?

A.   As -- yes.

12:41  Q.   And it was not your own personal knowledge that was the

sum of your testimony, you were supposed to educate yourself

and learn information pertaining to the topics you were

testifying about; right?

A.   Yes.

12:42  Q.   And you were prepared to testify about those topics at

the time of your deposition; right?

A.   To the best of my ability; yes.

Q.   And you consented to testify on behalf of Mattel as to

all those topics I've just identified; right?

12:42  A.   Yes.

Q.   And in preparation for your testimony you relied on your

experience and knowledge at Mattel, as well as the

information you gathered; true?

A.   Yes.

12:42  Q.   You went out and gathered information on

1   those topics; true?

2   A.   Yes.

3   Q.   For example, you talked to your outside counsel and to

4   Mattel's internal counsel, Todd Piccus, concerning some of

12:42 5   these topics; right?

6   A.   Yes.

7   Q.   And you investigated whether the agreements you were

8   testifying about were a complete set; true?

9   A.   Yes.

12:42 10   Q.   Now, I want to talk to you a little bit about those

11   agreements themselves from 1975 until 1993 and '94.

12         What you learned during this process of being

13   Mattel's 30(b)(6) witness is that Mattel has had many

14   different forms of invention agreements since 1975; true?

12:43 15   A.   Yes.

16   Q.   Let's look at Exhibit 9077.

17         Do you recognize this as an employee patent and

18   confidence agreement used by Mattel in 1975?

19   A.   Yes.

12:43 20         MS. KELLER:  Your Honor, move Exhibit 9077 into

21   evidence.

22         THE COURT:  It's received.

23         (Exhibit(s) 9077, received.)

24   Q.   BY MS. KELLER:  And this form agreement was the one you

12:43 25   believe was in use at Mattel in 1975?

 1    A.    Yes.

 2    Q.    If you look at Paragraph 1(a) it says "my interest in

 3    any and all inventions, improvements, and ideas (whether

 4    patentable or not patentable) which I have made or conceived

12:44  5    or may make or conceive at any time during the period of my

 6    employment" and it goes on at the bottom to say "herein after

 7    be referred to collectively as "proprietary subject matter."

 8          And then if you look at Paragraph 3 it says "I

 9    shall promptly do such acts and execute as may be necessary

12:44 10    to vest in the company the entire right, title and interest

11    in and to proprietary subject matter" and if you look at

12    Paragraph 1(b), it also states that it covers work "at any

13    time during the period of my employment with the company" and

14    then if you skip down a little bit "with which my work for

12:45 15    the company is concerned during my employment or which relate

16    or are applicable, directly or indirectly, to any phase of

17    the company's business."

18          Now, you don't know who the author of 9077 was;

19    correct?

12:45 20    A.    No, I don't.

21    Q.    And you ask Todd -- is it Piccus or Piccus?

22    A.    Piccus.

23    Q.    You asked Todd Piccus, the in-house counsel at Mattel,

24    and you asked Mattel's outside counsel, and they didn't know

12:45 25    either; correct?

```
 1   A.   Yes.  We -- we did try to find out.  We called previous

 2   general counsels, but could not find out who authored this.

 3   Q.   And you don't know where the language in Paragraph 1

 4   came from; correct?

12:46  5   A.   I don't know who wrote it, no.

 6   Q.   Now, it looks like language that you've dealt with since

 7   you've been in human resources for a long time in many

 8   companies; true?

 9   A.   Yes.

12:46 10   Q.   Even so, you wouldn't say that that was standard

11   language; right?

12   A.   I think it's -- I actually think it's pretty standard in

13   a number of organizations that I've been in.  Not the

14   specific words and terms, but the concept.

12:46 15   Q.   Well, take a look at your deposition June 19th, 2010,

16   Page 34, Lines 11 through 16.

17   A.   Yes.

18   Q.   Now, this is language directed towards Mattel and the

19   things Mattel does; correct?

12:47 20   A.   Yes.

21   Q.   Let's look also at Exhibit 9081.

22        And Exhibit 9081 you recognize as an employee

23   patent and confidence agreement from 1978; true?

24   A.   Yes.

12:48 25        MS. KELLER:  Your Honor, I'd move 9081
```

 1    into evidence.

 2              THE COURT:  Received.

 3              (Exhibit(s) 9081, received.)

 4              THE COURT:  These should be the full agreements.  I

12:48 5    was only given a cover page, if you'll recall.

 6              MR. QUINN:  Your Honor, I think this should be

 7    just -- 2 and -- 3.

 8              THE COURT:  Regardless.  During the evening I was

 9    given a cover page, remember?

12:48 10              MR. QUINN:  (Nodded head.)

 11              THE COURT:  All right.  You may proceed, Counsel.

 12              Who else was with me that evening?  Mr. McConville,

 13    Ms. Hurst, look at these two exhibits.

 14              MS. HURST:  It was the objection to the cover page,

12:48 15    which is why we're not displaying it, Your Honor, we're just

 16    displaying the agreement.

 17              THE COURT:  And that's correct.  It was the second

 18    two.

 19              Mr. Quinn.

12:48 20              MR. QUINN:  Yes.

 21              THE COURT:  Mr. McConville and Ms. Hurst,

 22    thank you.

 23              Page 2 and 3.

 24    Q.   BY MS. KELLER:  And if we look at Page 2, the language

12:48 25    in Paragraph 1 --

CV 04-9049 DOC - 03/16/2011 Volume 2 of 4

```
 1    A.    Page 2.

 2    Q.    -- Paragraph 1 --

 3    A.    Oh, I'm sorry.  Page 2, Paragraph 1.

 4    Q.    -- this is the same language that we just saw in the

12:49  5  1975 agreement; right?

 6    A.    It appears that way, yes.

 7    Q.    And it talks in two places about any time during the

 8    period of my employment with the company, and that -- you can

 9    see that in the second line of Paragraph 1?

12:49 10  A.    Yes, I see it there.

11    Q.    And in the fifth line?

12    A.    Yes.

13    Q.    And if we go down a couple more lines we also see that

14    same language about "which relate or are applicable directly

12:49 15  or indirectly to any phase of the company's business"; right?

16    A.    Yes.

17    Q.    Now let's look at Exhibit 9082 --

18    A.    Okay.

19    Q.    -- I'm sorry -- 908- --

12:50 20         (Discussion held of the record.)

21    Q.    BY MS. KELLER:  Let's look at 9083.

22    A.    Okay.

23    Q.    And this is an employee patent and confidence agreement

24    used by Mattel in 1985; correct?

12:50 25  A.    Correct.
```

```
 1              MS. KELLER:  Your Honor, I would move 9083

 2      into evidence.

 3      A.    Received.

 4              (Exhibit(s) 9083, received.)

12:50 5 Q.    BY MS. KELLER:  And no changes were made to Exhibit 9083

 6      from the two we've seen earlier; correct?

 7      A.    It doesn't appear so.

 8      Q.    Now let's look at 9084.

 9              That's an employee patent confidence agreement used

12:50 10 by Mattel in 1986; correct?

11      A.    Correct.

12      Q.    And if we look at Paragraph 1(a) --

13              Oh, Your Honor, move 9084 into evidence.

14              THE COURT:  Received.

12:51 15         (Exhibit(s) 9084, received.)

16      Q.    BY MS. KELLER:  And if we look at Paragraph 1 and,

17      specifically, in A, we see that it continues to use the word

18      "ideas"; correct?

19      A.    Correct.

12:51 20 Q.    And if we go down four from the bottom we see it also

21      continues to use this phrase "at any time during the period

22      of my employment with the company"; right?

23      A.    I'm sorry.  Four from the bottom of 111?

24              Yes; "at any time during the period of my

12:51 25 employment."
```

```
 1    Q.   And okay.  Paragraph 1(b) continues to say that it
 2    covers work "at any time during the period of my employment
 3    with the company which relate or are applicable, directly or
 4    indirectly, to any phase of the company's business"; right?
12:52  5    A.   No, I'm sorry.  It says "at any time during the period
 6    of my employment which relate or applicable, directly or
 7    indirectly, to the phase of the company's business."
 8    Q.   Well, let's just for the record let's read it line for
 9    line.
12:52 10          "At any time during the period of my employment
11    which relate or are applicable, directly or indirectly, to
12    any phase of the company's business"; right?
13    A.   Yes.
14    Q.   Okay.  Now let's look at 9085.
12:53 15          And this is an employee patent and confidence
16    agreement used by Mattel in 1989; right?
17    A.   Yes.
18    Q.   And look at Page 2?
19    A.   Okay.
12:53 20    Q.   And we see in Paragraph 1(a) that this document
21    continues to use the word "ideas"?
22    A.   Yes.
23    Q.   That the employee is assigning to Mattel my interest in
24    any and all inventions, improvement or ideas, whether or not
12:53 25    patentable, which I have made or conceived, and --
```

```
 1              And, Your Honor, I'd move in 9085.

 2              THE COURT:  It's received.

 3              (Exhibit(s) 9085, received.)

 4    Q.  BY MS. HURST:  So we see "ideas" there in Paragraph 1,

12:54  5    numeral 1 --

 6    A.  Yes.

 7    Q.  -- and "at any time during the period of my employment

 8    with the company" we see that again?

 9    A.  Yes.

12:54 10    Q.  And then again we see the language "which I have made or

11    conceived or may make or conceive at any time during the

12    period of my employment which relate or are applicable,

13    directly or indirectly, to any phase of the company's

14    business."

12:54 15              Right?

16    A.  Yes.

17    Q.  Now let's look at Exhibit 9086.

18              And that's an inventions agreement used by Mattel

19    in 1991; correct?

12:54 20    A.  Yes.

21              MS. HURST:  I'd move 9086 in, Your Honor.

22              THE COURT:  Received.

23              (Exhibit(s) 9086, received.)

24    Q.  BY MS. KELLER:  And Paragraph 1(a) continues to use the

12:55 25    word "ideas"; right?
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/16/2011   Volume 2 of 4

44

1    A.    Yes, yes.

2    Q.    And Paragraph 1(b) continues to say "at any time during

3    the period of my employment with the company which relate or

4    are applicable, directly or indirectly to any phase of the

12:55 5    company's business"; right?

6    A.    Yes.

7    Q.    Now, in 1992 Mattel had two different versions of its

8    employee patent and confidence agreement; correct?

9    A.    I don't recall if it was '92.  There was some period of

12:55 10    time where I think there was duplicate or -- or different

11    agreements used.

12    Q.    Take a look at your deposition of June 19th, 2010,

13    Page 95.

14    A.    Which line?

12:56 15    Q.    Lines 11 through 13 -- actually, 11 through 15.

16    A.    Okay.

17            (Pause in the proceedings.)

18            THE WITNESS:  I'm not sure, is this referring to

19    the same exhibits here, 98 and --

12:56 20    Q.    BY MS. KELLER:  97 and 98 are both 1992 era agreements;

21    right?

22    A.    I'm sorry.  Can you -- are you talking about 9087 as it

23    appears?  This talks -- Page 11 or Line 7 refers to 9087.

24            MR. QUINN:  It's ambiguous, Your Honor, as to the

12:56 25    exhibit numbers.

 1          THE COURT:  Just reread that, Counsel.

 2    Q.   BY MS. KELLER:  Well, in 1992 did Mattel have two

 3    different versions of its employee patent and confidence

 4    agreement, one being Exhibit 9087 dated March 1992 and the

12:57  5    other Exhibit 9088 dated October 1992?

 6    A.   Apparently, yes, from the deposition there are two

 7    different agreements.

 8    Q.   And both 9087 and 9088, Your Honor, I would move into

 9    evidence.

12:57 10          THE COURT:  Received.

 11          (Exhibit(s) 9087 and 9088, received.)

 12    Q.   BY MS. KELLER:  Both of these exhibits contain

 13    provisions that cover ideas, and both of these use the phrase

 14    "at any time during my period of employment with the

12:57 15    company"; correct?

 16    A.   I'm sorry.  Do I have both agreements in the book?

 17          Yes; correct.

 18    Q.   You do.

 19          THE COURT:  They should be turning those pages for

12:57 20    you, Mr. Kaye, so you don't have to.

 21          THE WITNESS:  Oh, I'm sorry.

 22          THE COURT:  No, you don't have to do that.

 23          They should be doing that for you.

 24          MS. KELLER:  And we're also putting things on the

12:58 25    monitor as well.

|   |   |
|---|---|
| 1 | THE COURT:  No, that's regardless. |
| 2 | They should do both. |
| 3 | Turn the pages for him, quickly, so he doesn't have |
| 4 | to struggle with it. |
| 12:58 5 | Q.   BY MS. KELLER:  Well, first let's just go to 9087-1, |
| 6 | Paragraph 1(a). |
| 7 | A.   Got it. |
| 8 | Q.   And you see that that exhibit covers "ideas"? |
| 9 | A.   Yes. |
| 12:58 10 | Q.   And you also see the language "at any time during the |
| 11 | period of my employment with the company"? |
| 12 | A.   Yes. |
| 13 | Q.   Now look at 9088, Paragraph 1(a). |
| 14 | A.   Okay. |
| 12:58 15 | Q.   And that says the same thing? |
| 16 | A.   Yes. |
| 17 | Q.   And Paragraph 1(b) in both 97 -- 9087 and 9088, both use |
| 18 | the language "at any time during the period of my employment |
| 19 | with the company which relate or are applicable directly or |
| 12:59 20 | indirectly to any phase of the company's business"; right? |
| 21 | A.   Yes. |
| 22 | Q.   And Paragraph 3 in both say "I shall promptly do such |
| 23 | acts and execute as may be necessary to vest in the company |
| 24 | the entire right, title and interest in and to proprietary |
| 12:59 25 | subject matter"; correct? |

1   A.   Where -- where in Paragraph 3?  "I shall promptly do

2   such acts," I see that in the second line.

3   Q.   Uh-huh.

4   A.   Okay.  I see the -- the -- that piece of the agreement.

12:59  5   I -- yes, and the two agreements appear similar or the same.

6   Q.   Okay.  And they contain that language that I just talked

7   about in Paragraph 3?

8   A.   Again, I -- I didn't follow, did you read all -- did you

9   read that paragraph word for word or not, but --

13:00 10   Q.   No, I left out some stuff.  I'll read the whole thing.

11   A.   Okay.

12   Q.   I'm starting at the second line:

13        "I shall promptly do such acts and execute,

14   acknowledge and deliver all such papers, including, without

13:00 15   limitation, assignments and patent applications as may be

16   necessary or desirable in the sole discretion of the company

17   to confirm, obtain, maintain, protect or vest in the company

18   the entire right, title and interest in and to proprietary

19   subject matter" -- and I'm going to stop reading there

13:00 20   because that's the part I'm interested in.

21   A.   Okay.

22   Q.   And Paragraph 3, still includes that language that I

23   just read, that I shall promptly do such acts and execute,

24   et cetera, and the same as the previous agreement; right?

13:01 25   A.   Yeah; yes.  The previous agreement,

I'm sorry, meaning --

Q.    The previous agreement being --

A.    Meaning 9086?

Q.    9088.

13:01 A.    Oh, 9088.

Q.    If we look at 9088 it also contains that in numeral 3.
And that's 9088-1 numeral 3.

A.    Yeah, I -- I -- I see the two.  I'd really have to -- it
looks like Paragraph 3 in 9088 is much smaller but maybe it's
13:01 the print, so I'd have to be specific and read, are all the
words the same.

Q.    And, in fact, you were asked about that in your
deposition the fact that they were different fonts?

A.    Yes.

13:02 Q.    And you said, in fact, at your deposition that you
didn't know why they were in different fonts; true?

A.    True.

Q.    But that the language was the same; correct?

A.    Okay.  Okay.

13:02 Q.    And is it also true that you don't know exactly why --
I'm sorry -- you don't know exactly whether Mattel has ever
used different types of agreements for different classes of
employees?

        Is that also true?

13:02 A.    Yes.

1    Q.   And if you take a look at 9089 -- have you got that in

2    front of you?

3    A.   Yes.

4    Q.   -- that was the inventions agreement entitled employee

13:02 5    patent confidence agreement used by Mattel in 1993; true?

6    A.   True.

7         MS. KELLER:  And, Your Honor, I would move 9089

8    into evidence.

9         THE COURT:  Received.

13:03 10       (Exhibit(s) 9089, received.)

11   Q.   BY MS. KELLER:  And Paragraph 1 still says -- it still

12   uses that "ideas" word that the agreement covers "my interest

13   in any and all inventions, improvements and ideas (whether

14   patentable or nonpatentable) which I have made or conceived,

13:03 15   or may make or conceive at any time during the period of my

16   employment with the company"; right?

17   A.   Yes.

18   Q.   And Paragraph 3 still contains the same language about

19   "I shall promptly do such acts and execute, acknowledge and

13:03 20   deliver" et cetera, "anything necessary to vest in the

21   company the entire right, title and interest in and to the

22   proprietary subject matter" the same paragraph we've been

23   reading in the other agreements; right?

24   A.   Yes.

13:04 25   Q.   Now, is it also correct that you don't know how Mattel

CV 04-9049 DOC - 03/16/2011   Volume 2 of 4

50

```
 1    varied the form of its agreements to take into account the

 2    differences in job requirements or responsibilities from 1975

 3    to the present in its form agreements?

 4          Was that a correct statement?

13:04  5  A.   I'm sorry.  Can you repeat that.

 6    Q.   You don't know how Mattel varied the form of its

 7    agreements to take into account the differences in job

 8    requirements or responsibilities from 1975 to the present in

 9    its form agreements?

13:04 10  A.   I think via these agreements.

11    Q.   But you don't know how Mattel varied the form of its

12    agreements to take into account differences in job

13    requirements or responsibilities; correct?

14          MR. QUINN:  It assumes facts not in evidence,

13:05 15  Your Honor.

16          THE COURT:  That they did, in fact, do so.

17          MR. QUINN:  Yeah.

18          THE COURT:  You can ask that question

19    foundationally, counsel; sustained.

13:05 20  Q.   BY MS. KELLER:  Take a look at Exhibit 9090.

21    A.   Okay.

22    Q.   And is that a Mattel inventions agreement from 1994?

23    A.   Yes.

24          MS. KELLER:  I move 9090 into evidence, Your Honor.

13:05 25          THE COURT:  Received.
```

UNITED STATES DISTRICT COURT

1              (Exhibit(s) 9090, received.)

2     Q.   BY MS. KELLER:  Now, look at Paragraph 2(b) defining

3     "inventions."

4     A.   Yes.

13:05  5     Q.   And now we see that "inventions" it says "as used in

6     this agreement, the term" inventions "includes, but is not

7     limited to, all discoveries, improvements, processes,

8     developments, designs, know-how, data, computer programs and

9     formulae, whether patentable or unpatentable."

13:06 10           Do you see that?

11    A.   Yes.

12    Q.   And the word "ideas" is no longer in this definition;

13    correct?

14    A.   The word "idea" is not there, but I think the concept

13:06 15    is.

16    Q.   The word "ideas" is missing; true?

17    A.   True.

18    Q.   And in addition Paragraph 2(a) no longer uses the term

19    "during the period of my employment."

13:06 20           Now if we look at 2(a) it says "I agree to

21    communicate to the company as promptly and fully as

22    practicable all inventions (as defined below) conceived or

23    reduced to practice by me (alone or jointly by others) at any

24    time during my employment by the company"; right?

13:06 25    A.   Yes.

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/16/2011  Volume 2 of 4

```
 1    Q.   So "period of employment" has now been changed to
 2    "during my employment" in this new version; correct?
 3    A.   Yes, at any time "during my employment."
 4    Q.   And --
13:07 5          THE COURT:  Just a moment, Counsel.
 6          Why don't we all just stand up for a moment and
 7    take a stretch.
 8          Ten jumping jacks and go back to work.
 9          (Pause in the proceedings.)
13:07 10         THE COURT:  Okay.
 11         Counsel.
 12              DIRECT EXAMINATION RESUMED
 13   BY MS. KELLER:
 14   Q.   Now, Exhibit 9090 represented an overhaul in Mattel's
13:07 15  inventions agreement; correct?
 16   A.   Yes.
 17   Q.   And the person that drafted this agreement was somebody
 18   named Joe McKay; correct?
 19   A.   Correct.
13:07 20  Q.   And McKay was your predecessor at Mattel?
 21   A.   Yes.
 22   Q.   Was he a lawyer?
 23   A.   Yes.
 24   Q.   And his focus as head of human resources had been mainly
13:07 25  on the legal side of things?
```

1    A.    Yes.

2    Q.    And he had -- he had been in human resources in that

3    arena for ten years, from 1987 through 1997; correct?

4    A.    Yes, there was a period of time where he was -- he had

13:08 5    left Mattel and came back during this time.

6    Q.    And you personally were unable to say, either in an

7    individual capacity or as Mattel's corporate representative,

8    why the reasons were for the change in the form of the

9    agreement between this new one, 9090, and, for example,

13:08 10    Exhibit 9089 that we had been looking at earlier, that

11    contained ideas and contained the term "during the period of

12    my employment"?  You don't know what the reason was for the

13    change; right?

14    A.    Correct; I -- I did not -- I could not get into the mind

13:08 15    of Joe McKay as he did that.

16    Q.    And there were some differences in placement of these

17    terms as well, including the -- in 1990, this new one, the

18    term "inventions" was defined in the first paragraph and in

19    1989 it was farther down; right?

13:09 20    A.    I'm sorry.  In 90 -- in 90 it's in the -- is in 2, so

21    it's not the first paragraph.

22    Q.    You're right; it's in 2(b).

23    A.    Right.

24    Q.    And it's in a different placement in 1989?

13:09 25    A.    Correct; I don't see -- I don't see definitions

```
  1    of -- of "inventions."

  2    Q.   And you agree that in 1990 the term "inventions" is not

  3    fully defined in 2(b) because it says "as used in this

  4    agreement, the term" inventions "includes, but is not limited

13:10 5  to"; right?

  6    A.   I'm sorry.  Can you repeat that question.

  7    Q.   The term "inventions" is not fully defined in

  8    Paragraph 2(b) --

  9    A.   Correct.

13:10 10 Q.   -- because it says "includes but is not limited to"?

 11    A.   Correct.

 12    Q.   And you don't know why it was not more fully defined;

 13    correct?

 14    A.   I know the reason the individual didn't define it.  My

13:10 15 assumption is that it would be very difficult to define.

 16    Q.   Well, you don't know why; right?

 17    A.   I don't know why the writer didn't define it.

 18    Q.   And you don't know what was left out either; correct?

 19    A.   I don't know what was left out.

13:10 20 Q.   And you don't know what the source was of the definition

 21    of the term "inventions" in this new agreement, 9090;

 22    correct?

 23    A.   Where the writer got -- how the writer was trying to

 24    define "inventions"?

13:10 25 Q.   You just don't know what the source of that
```

CV 04-9049 DOC - 03/16/2011   Volume 2 of 4

1    definition was; true?

2    A.   I don't know what the source.

3    Q.   And you don't know if it was language taken from some

4    other form agreement; right?

13:11 5   A.   I don't know.

6    Q.   Or whether it was taken from case law or a statute, for

7    example?  You don't know that either; true?

8    A.   I don't know that.

9    Q.   And at least as -- as of your deposition you couldn't

13:11 10  identify anybody at the company who could tell us that

11   information; right?

12   A.   Correct; Mr. McKay was no longer at the company.

13   Q.   And not just in 2(b), defining "inventions" but anywhere

14   in this agreement we don't see the word "ideas"; correct?

13:11 15  A.   The word itself "ideas" does not appear.

16   Q.   Now we do know that changes in the inventions agreement

17   were made to reflect changes in the law and changes in

18   Mattel's expectations; right?

19   A.   I think these agreements would have been changed to

13:11 20  reflect changes in the law.  I think the expectations have

21   always been the same.

22   Q.   Was it changed to better reflect Mattel's expectation?

23   A.   I wouldn't use the word "better."

24   Q.   Take a look at your deposition, June 19th, 2010,

13:12 25  Page 70, Line 10, through 71, Line 10.

Case 2:04-cv-09049-DOC-RNB  Document 10225  Filed 03/18/11  Page 56 of 69  Page ID
#:309916
CV 04-9049 DOC - 03/16/2011  Volume 2 of 4

56

| | |
|---|---|
| 1 | MR. QUINN:  I'm sorry, which lines? |
| 2 | MS. KELLER:  70, Line 10, through 71, Line 10. |
| 3 | (Pause in the proceedings.) |
| 4 | THE WITNESS:  Through Line 10, did you say? |
| 13:13 5 | MS. KELLER:  Yes. |
| 6 | THE WITNESS:  Okay. |
| 7 | Q.  BY MS. KELLER:  Were those -- were among the reasons for |
| 8 | the changes the desire to better reflect Mattel's |
| 9 | expectations? |
| 13:13 10 | MR. QUINN:  Your Honor, I object to the form of the |
| 11 | question; use of prior testimony. |
| 12 | THE COURT:  Well, the -- the question's more |
| 13 | encompassing and the answer's well -- strike that.  The |
| 14 | answer's more encompassing.  It's found on Lines 9 and 10 |
| 13:13 15 | of 71, isn't it, Counsel? |
| 16 | Q.  And, Your Honor, that's why I asked the question were |
| 17 | among the reasons to better reflect Mattel's expectations? |
| 18 | THE COURT:  No, among the multiple reasons. |
| 19 | MS. KELLER:  Among the multiple reasons. |
| 13:13 20 | THE COURT:  Well, then ask the question, Lines 9 |
| 21 | and 10. |
| 22 | Q.  BY MS. KELLER:  Were among the multiple reasons for the |
| 23 | changes in the contract the desire to better reflect Mattel's |
| 24 | expectations? |
| 13:13 25 | A.  Yes. |

1   Q.   And you agree that the phase "at any time during the

2   period of my employment" is not included in Exhibit 9090;

3   right?

4   A.   Yes -- I'm sorry.  I missed -- I don't know if I heard

13:14 5   that question correctly.

6   Q.   Do you agree that the phrase "at any time during the

7   period of my employment" is not found in 9090?

8   A.   The words about "period" are not found; correct.

9   Q.   Beginning in 1994 the words "period of" were dropped;

13:14 10   correct?

11   A.   Correct.

12   Q.   And, again, you don't know the reason why they were

13   dropped; true?

14   A.   I don't know the reason why those specific words were

13:14 15   dropped.

16   Q.   And if we look at 9089, this 1993 agreement, we see

17   Paragraph 1(b) covers "any suggestions, designs, trademarks,

18   copyrightable subject matter, literary works, artistic works,

19   and computer software."

13:15 20          Have you seen that?

21   A.   Yes.

22   Q.   And the word "suggestions" doesn't appear in the

23   following year's version, 9090?

24   A.   Correct; a number of these words do not appear from one

13:15 25   to the other.

CV 04-9049 DOC - 03/16/2011  Volume 2 of 4

```
 1    Q.    Yes, trademark doesn't appear in 9090; correct?

 2    A.    Right; copy -- copy -- trademarks --

 3    Q.    Well, let's take them one at a time.

 4          The word "suggestions" does not appear; true?

13:15 5    A.    True.

 6    Q.    And you don't know the reason that change was made;

 7    true?

 8    A.    Correct.

 9    Q.    The work "trademark" doesn't appear in 9090; correct?

13:15 10    A.    I don't see the word "trademark" either.

 11    Q.    And you don't know why that change was made; correct?

 12    A.    Correct.

 13    Q.    "Trade secrets" does appear in 9090; right?

 14    A.    Yes; yes.

13:16 15    Q.    And you don't know if there is a difference between the

 16    definitions of "trademark" and "trade secrets"; true?

 17    A.    I do now.

 18    Q.    But at the time of your deposition you didn't even know;

 19    right?

13:16 20    A.    I don't know if I understood the question, but I know I

 21    didn't respond that I did.

 22    Q.    Well, specifically, at the time of your deposition, you,

 23    yourself, didn't know the difference between "trademark" and

 24    "trade secrets"; right?

13:16 25    A.    That's what I had said in the deposition.
```

UNITED STATES DISTRICT COURT

1    Q.   And you were, at the time of the deposition in 2010, you

2    had been in human resources for how many years?

3    A.   Thirty-three.

4    Q.   So even after having been prepared and working with

13:16 5    lawyers, you, yourself, wouldn't have understood in this

6    agreement at the time in 2010 the difference in that language

7    "trademark" and "trade secrets"; correct?

8    A.   I don't think that's correct.  I think I misspoke at the

9    deposition, probably.  I think I did understand the

13:17 10   difference between "trade secret" and "trademark," but I did

11   respond inaccurately.

12   Q.   Well, you said at the time, did you not, that you didn't

13   know if there was a definition difference between the two?  I

14   mean, isn't that what you testified to?

13:17 15   A.   Yes.

16   Q.   You do know that these agreements were drafted by

17   lawyers; right?

18   A.   Yes.

19   Q.   And they were drafted specifically by Mattel lawyers;

13:17 20   right?

21   A.   No, I don't -- I don't know that that's true.

22   Q.   Well, they were either drafted by lawyers in-house at

23   Mattel or outside counsel for Mattel; correct?

24   A.   Right.

13:17 25   Q.   So Mattel's lawyers; true?

| | |
|---|---|
| 1 | A.   If you're including outside lawyers as part of that, |
| 2 | yes, true. |
| 3 | Q.   And that's -- that's also true of the draft's of |
| 4 | Carter Bryant's 1999 -- 1999 agreement; right? |
| 13:18 5 | A.   Yes. |
| 6 | Q.   The drafts of that agreement came from Mattel's legal |
| 7 | department or its outside counsel; true? |
| 8 | A.   I think the agreement came from Joe McKay. |
| 9 | Q.   So Mattel's in-house legal department? |
| 13:18 10 | A.   He was a human resource person. |
| 11 | Q.   In-house lawyer within human resources? |
| 12 | A.   I wouldn't have said Joe was an in-house lawyer.  He |
| 13 | happened to be the -- he happened to be the vice president of |
| 14 | human resources and he happened to be a lawyer.  I wouldn't |
| 13:18 15 | call him Mattel's lawyer. |
| 16 | Q.   Okay.  A lawyer employed within Mattel within human |
| 17 | resources drafted the agreement; true? |
| 18 | A.   Yes. |
| 19 | Q.   Now, at the time of your deposition, June 19th, 2010, |
| 13:19 20 | did you think otherwise as to who drafted the agreement? |
| 21 | And I'm referring you to Page 166, Lines 7 |
| 22 | through 11. |
| 23 | MR. QUINN:  I object to the form of the question, |
| 24 | Your Honor. |
| 13:19 25 | THE COURT:  Just a moment. |

```
 1                    (Pause in the proceedings.)

 2                    THE WITNESS:  Okay.  I -- I see that.

 3                    THE COURT:  Overruled.

 4                    You can answer the question, sir.

13:19  5             THE WITNESS:  Can you repeat the question.

 6      Q.   BY MS. KELLER:  At your deposition in -- on June 19th,

 7      2010, you said that the main drafters of the 1999

 8      Carter Bryant agreement came from the legal department of

 9      Mattel; right?

13:20 10     A.   Yes.

 11     Q.   And you had done that after thoroughly investigating all

 12     of these issues in preparation for --

 13                   MR. QUINN:  Your Honor, I object.  It's a different

 14     agreement he's being questioned about.

13:20 15              THE COURT:  Is it the -- are you concerned that,

 16     for both parties, that we're referring to 9090?  I thought

 17     that that was what the question referenced.

 18                   MR. QUINN:  The question in the deposition is 9091.

 19                   THE COURT:  Just a moment.

13:20 20              (Pause in the proceedings.)

 21                   THE COURT:  Which would be the -- counsel show

 22     me 9091.

 23     Q.   BY MS. KELLER:  Well --

 24                   THE COURT:  No, just a moment.

13:20 25              I want to see 9091.
```

```
 1                  (Pause in the proceedings.)
 2                  MS. KELLER:  Your Honor, we're having it brought.
 3                  We're referring to the Carter Bryant agreement of
 4       1999.
13:21  5            THE COURT:  Well, the question was asked was, can
 6       you tell me who are the drafters of the 1999 Carter Bryant
 7       agreement marked as Exhibit 9091.
 8                  Now, do I have lawyers at the deposition miss
 9       marking this exhibit?  It's rather clear that the question is
13:21 10      1999 Carter Bryant agreement, but the Exhibit referred to is
11       9091.
12                  And here in court, which is Carter Bryant's
13       agreement, Counsel?  You and Mr. Quinn can quickly stipulate.
14                  MR. QUINN:  There are two of them.
13:21 15            THE COURT:  Okay.
16                  MR. QUINN:  90 -- I'm sorry.
17                  THE COURT:  9090 was the 1994 that's been referred
18       to concerning ideas being missing.
19                  MR. QUINN:  9090 and 9091 are Mr. Bryant's two
13:22 20      agreements.
21                  THE COURT:  Is 9091 the agreement that Mr. Bryant
22       signed?
23                  MS. KELLER:  Your Honor, I don't think that's
24       correct.
13:22 25            THE COURT:  Okay.  Just a moment.
```

          1          MS. KELLER:  His two agreements are 25 and 91.

          2          THE COURT:  Well, they were marked multiple times

          3   with multiple depositions, probably.  There is the confusion,

          4   probably.

13:22     5          MS. KELLER:  It was premarked as 9091, Your Honor.

          6          It is also Exhibit 25.

          7          THE COURT:  Okay.

          8          Now, Mr. Quinn, agree or disagree?

          9          MR. QUINN:  I believe that's a correct statement.

13:22    10          THE COURT:  So we have -- what we've got is some

         11   confusion, but the question at the deposition, I think

         12   counsel can stipulate to as follows, is that correct,

         13   Counsel, reading from Page 166, Line 7?  There shouldn't be

         14   any disagreement about this.

13:22    15          MS. KELLER:  Yes; that's correct.

         16          THE COURT:  Mr. Quinn?

         17          MR. QUINN:  Yes.  The reference there to 9091 is to

         18   one of Mr. Bryant's agreements.

         19          THE COURT:  All right.  So why don't you both agree

13:23    20   to read that question and then Mr. Kaye won't have any

         21   difficulty.

         22          So Mr. -- who would like to read.

         23          MR. QUINN:  I'd be happy to read it, Your Honor.

         24          MS. KELLER:  Since I'm questioning, I'd be happy to

13:23    25   read it, Your Honor.

CV 04-9049 DOC - 03/16/2011 Volume 2 of 4

64

```
 1              THE COURT:  Since you're questioning, you can read

 2    it.

 3              MS. KELLER:  (Reading.)

 4              "Question:  All right.  Can you tell me who were

13:23 5   the drafters of the 1999 Carter Bryant agreement marked as

 6    9091?"

 7              THE WITNESS:  Do you want -- can I see the exhibit?

 8              I don't know who exactly was the drafter of this

 9    agreement.

13:23 10          MS. KELLER:  Your Honor, I'd ask to read the

11    deposition.

12              MR. QUINN:  It's not impeaching.

13              THE COURT:  You may.

14              You may read Lines 9 and 10.

13:24 15          I'm sorry; 10 and 11.

16              MS. KELLER:  And may I read the question,

17    Your Honor?

18              THE COURT:  You may.

19              MS. KELLER:  (Reading.)

13:24 20          "Question:  All right.  Can you tell me who were

21    the drafters of the 1999 Carter Bryant agreement marked as

22    Exhibit 9091?

23              "Answer:  This came from the -- the main drafters

24    came from the legal department of Mattel."

13:24 25          THE WITNESS:  Yes.
```

UNITED STATES DISTRICT COURT

```
 1   Q.    BY MS. KELLER:  And does that remain true?

 2   A.    I believe so.

 3   Q.    Now, Mr. Bryant's agreement 9091 --

 4              And, Your Honor, we also have that as Exhibit 25?

 5              THE COURT:  Now that exhibit was previously

 6   received, wasn't it, Counsel?

 7              MS. KELLER:  It was.

 8              THE COURT:  9091.

 9              Mr. Quinn.

10              MR. QUINN:  It was.

11              THE COURT:  And that's been double marked.

12              It's also Exhibit 25.

13              Is that agreed between counsel?

14              MR. QUINN:  Yes.

15              MS. KELLER:  Yes.

16              THE COURT:  All right.  So some of these exhibits

17   have been double marked so 9091 and Exhibit 25 is the

18   agreement that Carter Bryant signed.

19              MS. KELLER:  And, Your Honor, we're going to use

20   Exhibit 25, since it's easier for our database, if we may?

21              THE COURT:  That will really get confusing, but,

22   all right, you can use 25.  But if they refer to 25, it's

23   9091.

24              All is well.

25              All right, Counsel.
```

Timestamps (left margin): 13:24 (line 5), 13:24 (line 10), 13:24 (line 15), 13:25 (line 20), 13:25 (line 25)

UNITED STATES DISTRICT COURT

 1          MR. QUINN:  Your Honor, 9924 is the better copy.

 2          You'll recall some important --

 3          THE COURT:  Mr. Quinn, we'll take 9924.

 4          MR. QUINN:  That's the original.

13:25  5     THE COURT:  That will mess the whole thing up.

 6          MR. QUINN:  I was trying to be --

 7          MS. KELLER:  We can use 9924.

 8          THE COURT:  So we also have 9924 along with

 9     Exhibit 9091 and Exhibit 25.

13:25 10         See how much fun we're having.

11          MS. KELLER:  If Mr. Quinn says that's the clearer

12     one, we'll go with that.

13          THE COURT:  Let's refer to this as that as the

14     Carter Bryant 1999 agreement.

13:25 15    Q.   BY MS. KELLER:  So 9091 -- I'm sorry -- 9924 as it is

16     now -- the clearest one, as I hear -- this is an inventions

17     agreement signed by Carter Bryant in 1995; right?

18     A.   I --

19     Q.   I'm sorry; 1999.

13:26 20    A.   Correct.

21     Q.   And Paragraph 2 concerns ownership of inventions?

22     A.   No. 2; correct.

23     Q.   2(b) defines "inventions" to say, as used in this

24     agreement, "the term 'inventions' includes, but is not

13:26 25    limited to, all discoveries, improvements, processes,

UNITED STATES DISTRICT COURT

```
 1   developments, designs, know-how, data computer programs and
 2   formulae, whether patentable or unpatentable"; correct?
 3   A.   Correct.
 4   Q.   Missing is the word "ideas"; right?
 5   A.   Yes, a number of words are missing.
 6   Q.   But I'm asking you about the word "ideas."
 7   A.   Yes, the word "ideas" is missing.
 8   Q.   And you know, as Mattel's 30(b)(6) witness, that at the
 9   time Mr. Bryant signed this agreement he had not been
10   employed by Mattel at a time where there was a Mattel
11   agreement that included the word "ideas"; right?
12   A.   Mr. Bryant was employed prior to this time as well.
13   Q.   But what I'm asking is, he hadn't seen any Mattel
14   agreements that included the word "ideas"; right?
15   A.   I'd have to go back to the time that he was first
16   employed and see that agreement.
17   Q.   Take a look at Page --
18        Well, he started in 1995; right?
19   A.   I think so.
20   Q.   So he would have not seen an agreement with the word
21   "ideas" in it; true?
22   A.   Correct.
23   Q.   Okay.  Now, is it true that Mattel will not hire someone
24   who refuses to sign an inventions agreement?
25   A.   That is correct.
```

| | |
|---|---|
| 1 | Q.   And that's whether that inventions agreement is modified |
| 2 | or not?  I mean, in other words, the employee can't take it |
| 3 | and start writing on it and changing things and then sign it; |
| 4 | true? |
| 13:28  5 | A.   I don't know of all instances, but I have not heard an |
| 6 | instance where somebody has changed the agreement. |
| 7 | Q.   As Mattel's 30(b)(6) witness you know that Mattel will |
| 8 | not employ someone who refuses to sign an inventions |
| 9 | agreement, whether modified or not; true? |
| 13:28 10 | A.   I believe that's the case, yes. |
| 11 | Q.   And human resources is responsible for compiling the |
| 12 | documents that new employees are expected to sign; right? |
| 13 | A.   Not in all cases. |
| 14 | Q.   Take a look at your deposition of December 10th, 2004. |
| 13:29 15 | A.   Yes. |
| 16 | Q.   Page 87, Lines 11 through 13. |
| 17 | A.   Yes. |
| 18 | Q.   Is human resources responsible for compiling the |
| 19 | documents that new employees are expected to sign? |
| 13:29 20 | A.   I don't know at that time if we were restricting our |
| 21 | conversation to Southern California or the rest of the Mattel |
| 22 | world.  There are a lot of places in the world where HR |
| 23 | people are not present and -- and -- and are required to |
| 24 | sign, so I'd -- I'd -- I'd have to read prior to to see if we |
| 13:29 25 | had already discussed the concept that the -- the person |

```
 1   wanted me to limit it to El Segundo, California, or
 2   domestically.
 3              MS. KELLER:  Your Honor --
 4              THE COURT:  Why don't we take a recess at this
13:30  5   time, then, and give you a chance to look at that.
 6              Okay.  I give you an admonishment not to form or
 7   discuss this matter amongst yourselves nor form or express
 8   any opinion about this case.
 9              We'll see you in about 15 minutes.
13:30 10              Mr. Kaye, that will give you a chance to look at
11   that.
12              THE WITNESS:  Okay.  I'll do that.
13              (Open court - jury not present.)
14              THE COURT:  All right.  Counsel, that will give
13:30 15   Mr. Kaye a chance to go back and take a look at the
16   transcript and see what it is.
17              We'll see you in 15 minutes or a quarter to.
18              I'd go use the restroom, if I were you.
19              (Recess taken.)
14:05 20              (Adjournment at 13:31 to resume on Wednesday,
21   March 16, 2011, at 13:45.  Next session reported by
22   Jane Sutton-Rule.)
23
24
25
```

UNITED STATES DISTRICT COURT