1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

– – – – – – –

MATTEL, INC., ET AL.,               )
                                    )
          Plaintiffs,               )
                                    )
     vs.                            ) No. CV 04-9049-DOC
                                    )     Day 34
MGA ENTERTAINMENT, INC., ET AL.,    )     Volume 3 of 4
                                    )
          Defendants.               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Wednesday, March 16, 2011

Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-03-16 MattelV3

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
5                   MICHAEL T. ZELLER
                    WILLIAM PRICE
6                   Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             – AND –

20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE (Not Present)
5                 Attorney at Law
             601 West Fifth Street
6            12th Floor
             Los Angeles, California 90071
7            (213) 613-4660

8            - AND -

9            LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO

16           ROBERT ECKERT, Mattel CEO

17           LILY MARTINEZ, Mattel Employee

18           KEN KOTARSKI, Mattel Technical Operator

19           MIKE STOVALL, MGA Technical Operator

20           RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

21           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

22           WARRINGTON PARKER, Orrick Herrington & Sutcliffe

23           MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

24           FRANK RORIE, Orrick Herrington & Sutcliffe

25           DIANA RUTOWSKI, Orrick Herrington & Sutcliffe

1                              **I N D E X**

2

3

4                            **EXAMINATION**

5

6   <u>**Witness Name**</u>        <u>**Direct**</u>   <u>**Cross**</u>      <u>**Redirect**</u>     <u>**Recross**</u>

7   KAYE, ALAN
        By Ms. Keller          5

8

9

10

11                             EXHIBITS

12

13  <u>**Exhibit**</u>                        <u>**Identification**</u>   <u>**Evidence**</u>

14  Defendants' No. 389-12                                17

15  Defendants' No. 9687A                                 30

16  Defendants' No. 20531                                 12

17  Defendants' No. 36092                                 65

18  Defendants' No. 36096                                 34

19

20

21

22

23

24

25

 1              SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 16, 2011

 2                      DAY 34, VOLUME 3 OF 4

 3                          (1:46 p.m.)

 4              *(The following proceedings is taken in the*

 5         *presence of the jury.)*

 6              THE COURT:  All right.  We are back in session.

 7     All counsel are present, the jury, the alternates, the

 8     witness.

 9              Thank you for your courtesy.  If you'd please be

10     seated.

11              Counsel, if you'd like to continue.

12              MS. KELLER:  Your Honor, I'd ask to read from

13     deposition transcript December 10th, 2004, lines 11 through

14     13.

15              THE COURT:  Is this page 87?

16              MS. KELLER:  Yes, your Honor.

17              THE COURT:  You may –– well, just a moment.  I

18     want to make sure you completed your answer, though.  You

19     wanted to check back and see what you were referring, so

20     re-ask Mr. Kaye the question.

21              **ALAN KAYE, DEFENSE WITNESS, RESUMED**

22                  **DIRECT EXAMINATION (Continued)**

23     BY MS. KELLER:

24     Q    Is human resources responsible for compiling the

25     documents that new employees are expected to sign; yes or

6

1    no?

2    A     No.

3          MS. KELLER:  Your Honor, I'd ask to read from

4    deposition December 10th 2004, lines 11 through 13.

5          MR. QUINN:  Page?

6          THE COURT:  Page 87.

7          You may.

8    BY MS. KELLER:

9    Q     "Question:  But is HR responsible for compiling the

10   documents that new employees are expected to sign?

11         "Answer:  Yes.

12         "Are they also responsible -- is HR also responsible

13   for making sure that they get signed?"

14   A     Where HR is responsible, yes.

15   Q     Now, Teresa Newcomb, a recruiter within Mattel human

16   resources, is listed as a witness on Mr. Bryant's 1999

17   inventions agreement?

18   A     Yes.

19   Q     That means she was with Carter Bryant when he signed

20   it?

21   A     That's how I would interpret it.

22   Q     But you've never instructed anybody at human resources

23   to explain this agreement to any employee, right?

24   A     Correct.

25   Q     And you are not aware of any human resources person

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 7 of 109   Page ID #:309936
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

7

1   ever explaining this agreement to anyone, right?

2   A    Correct, I don't think that would be the human

3   resource --

4   Q    My question is, you're not aware of anybody at human

5   resources ever explaining this agreement to anyone, true?

6   A    True.

7   Q    And as Mattel's 30(b)(6) witness, you investigated and

8   researched whether Mattel had any talking points or training

9   documents for its human resources personnel so they could

10  explain what the terms of this agreement meant if an

11  employee asked, correct?

12  A    True.

13  Q    And what you learned was there were none, right?

14  A    None that I can find.

15  Q    And in fact, you didn't want to have people in human

16  resources even attempting to explain these contracts, right?

17  A    Correct.

18  Q    You just wanted the employee to be handed it and for

19  the employee to sign it, right?

20  A    Not correct.  I would have asked -- I would have hoped

21  that if the employee did not understand something, the

22  employee would have brought it forward, and then we would

23  have had the appropriate person explain the contract.

24  Q    Given the fact that you, yourself, didn't understand

25  some of the terms in the contract that we've looked at,

1    despite your decades in human resources, it never occurred

2    to you that you should have somebody in human resources

3    prepared with some talking points to explain the contract to

4    laypeople with no human resources training?

5    A    I think I understand the contract.  I think I

6    understand it very well.  And I think most people who read

7    this contract would understand it very well.

8    Q    Well, and you --

9          MS. KELLER:  Well, I would move to strike that,

10   your Honor, the latter part?

11         THE COURT:  No, overruled.

12         Answer the question.

13   BY MS. KELLER:

14   Q    Of course, you've had decades of training, right?

15   A    Training in what?

16   Q    Human resources.

17   A    Correct.

18   Q    Which involves contracts of all kinds for employment,

19   right?

20   A    Contracts of employment are definitely involved.  I

21   don't think I'd have -- I'd say I have any specific training

22   in contract law, I'm not a lawyer.

23   Q    And you had a lawyer working with you, right, in human

24   resources?  True?

25   A    One more time.

1    Q    You told us about Joe McKay?

2    A    He wasn't working with me.

3    Q    You had a lawyer within human resources, right?

4    A    There was a lawyer --

5         MR. QUINN:  Objection.  Time frame.  Vague and

6    ambiguous.

7         THE COURT:  Just a moment.

8         MS. KELLER:  I'll rephrase.

9         THE COURT:  Just a moment.

10   BY MS. KELLER:

11   Q    In the past, you have even had a lawyer within human

12   resources itself, Joe McKay, right?

13   A    Correct.

14   Q    And you have a whole legal department if you have any

15   questions that you want to ask, right?

16   A    Correct.

17   Q    And you were prepared extensively for your depositions

18   in this matter, correct?

19   A    Correct.

20   Q    And you had lawyers helping you prepare for your

21   depositions, right?

22   A    Correct.

23   Q    And you had the benefit of study and research into all

24   of the areas that you were going to testify about, right?

25   A    Correct.

```
 1    Q    And you knew that a central issue you were going to be

 2    asked about was the meaning of the contract because you knew

 3    that was a big deal in this case, right?

 4    A    Correct.

 5    Q    And as the human resources person, you were designated

 6    to do that, right?

 7    A    Correct.

 8    Q    And you still didn't understand the difference between

 9    trademarks and trade secrets when you were asked about it?

10    A    I think I misspoke when I was asked about it.

11    Q    And what you said was, you didn't know the difference

12    between the two, right?

13    A    That is correct.  What I said at the time.

14    Q    In 2010?

15    A    Correct.

16    Q    But any Joe off the street coming to work at Mattel

17    ought to be instantly able to understand this contract

18    without any help?

19              MR. QUINN:  Objection.  Argumentative.

20              THE WITNESS:  I think that --

21              THE COURT:  Overruled, but we can strike Joe.

22              (Laughter.)

23              MS. KELLER:  I'll withdraw, your Honor.

24              THE COURT:  We'll have a Josephine also.  I'm just

25    joking with you.  We'll strike the Joe.  You meant any
```

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 11 of 109   Page ID #:309940
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

11

1    person.

2              MS. KELLER:  I'll go on.

3              THE COURT:  With regard to the question, strike

4    it.

5    BY MS. KELLER:

6    Q    In 2004, Mattel added the words -- the word "ideas"

7    back into its contracts and began asking existing employees

8    to sign this newly revised contract, right?

9    A    Some existing employees, correct.  Not all existing

10   employees.

11   Q    Mattel revised its contract in 2004 to add the word

12   "ideas" back into it, right?

13   A    The contract was revised with a lot of words, ideas was

14   one of them.

15   Q    Let me ask again:  In 2004, the word "ideas" was put

16   back into the contract, right?

17   A    Correct.

18   Q    And existing employees were asked to sign the revised

19   contract with the word "ideas" in it, right?

20   A    Correct.

21   Q    Let's look at Exhibit 20531.

22        And this is a memo sent by the president of Mattel

23   Brands, March 18, 2004, entitled "Protecting Mattel's

24   Intellectual Property," addressed to employees of Mattel

25   Brands, correct?

1    A    Correct.

2         MS. KELLER:  Your Honor, I'd move 20531 into

3    evidence.

4         THE COURT:  Received.

5         *(Defendants' Exhibit No. 20531 is received in*

6    *evidence.)*

7         MS. KELLER:  And may I have a moment, your Honor.

8         THE COURT:  Yes.

9         *(Attorney discussion held off the record.)*

10   BY MS. KELLER:

11   Q    And March 18, 2004, that was about a month before

12   Mattel filed its lawsuit against Carter Bryant?

13   A    I don't know the specific date of the lawsuit filed.

14   Q    This memo was dated March 18th, 2004?

15   A    Correct.

16   Q    And if you take a look at paragraph 2, it says, and I'm

17   looking at three lines from the bottom, "We are requesting

18   that employees reaffirm their intent to abide by our

19   employee confidentiality and inventions agreement.  Please

20   read the attached employee confidentiality and inventions

21   agreement very carefully"; do you see that?

22   A    Yes.

23   Q    And then underneath that it says, There will be a

24   mandatory meeting on March -- Monday, March 22nd.

25   Immediately following the close of the meeting, we will be

1   collecting the signed documents.  Right?

2   A    Yes.

3   Q    And again, this is addressed to employees of Mattel

4   Brands, correct?

5   A    Correct.

6   Q    And so all the employees of Mattel Brands were being

7   asked to sign the new agreement and, in fact, turn it in at

8   a meeting convened for the express purpose of having them

9   sign it, right?

10  A    I don't know if all the employees.  It looks like the

11  employee groups that were named below were definitely

12  invited.

13  Q    Do you see "To employees of Mattel Brands" at the top?

14  A    Yes.

15  Q    And it gives different times for the different groups

16  to show up, right?

17  A    Correct.

18  Q    Because if they all showed up at once, the room

19  wouldn't hold them all, right?

20  A    Correct.

21  Q    And so we see girls' Barbie design and packaging, for

22  example, shows up at 8:30 to 9:30; development, 10 to 11,

23  and so on, right?

24  A    Correct.

25  Q    And then it says, "Please read the attached by Monday.

1    There will be time to answer any questions you may have

2    during the meeting."

3         And so this attaches a new employee and confidentiality

4    and inventions agreement that we see starting at page 2 of

5    20531, right?

6    A    Correct.

7    Q    And this time employees could actually ask questions

8    about it from people prepared to answer them, right?

9              MR. QUINN:  Objection.  Argumentative.  It assumes

10   facts.

11             THE COURT:  Sustained.

12   BY MS. KELLER:

13   Q    Well, according to this document, employees at this

14   meeting were actually going to have the opportunity to ask

15   questions about the new agreement they were being told to

16   sign, right?

17   A    I think employees at the other meetings had that

18   opportunity as well.

19   Q    Well, no one at human resources, as you've previously

20   testified, was ever available to Carter Bryant to answer any

21   questions he had about his agreement, true?

22   A    If Carter Bryant had a question, he could have asked

23   human resources to help him get it answered, and it would

24   have been answered.

25   Q    Do you understand my question?  Your previous

1   testimony --

2   A     I think I responded to that.

3   Q     Your previous testimony was that no one at human

4   resources even had so much as bullet points to talk to the

5   employees to answer any questions that they had, right?

6   A     That is correct.

7   Q     This -- this memo came out as Mattel was preparing to

8   sue Carter Bryant, right?

9            MR. QUINN:  Objection.  Lacks foundation.

10           THE WITNESS:  I don't know if that's why this memo

11   came out.

12   BY MS. KELLER:

13   Q     And this memo changed the agreement to include ideas an

14   employee might have, right?

15           MR. QUINN:  Objection.  Calls for a legal

16   conclusion.

17           THE WITNESS:  The word "ideas" was added.  I don't

18   think it changed the agreement to include the concept of

19   ideas.  I think the concept was included.

20   BY MS. KELLER:

21   Q     Well, the reason that Mattel was having its current

22   employees sign this new agreement was based on the advice of

23   counsel, right?

24   A     I don't believe so.  I think it was Mr. Bousquette who

25   wanted to have that done.

1    Q    This was Mattel's lawyers telling you a month before

2    they sued Carter Bryant that you had to have a new agreement

3    because there was something wrong with the old one?

4              MR. QUINN:  Objection.  Compound.  Lacks

5    foundation.  Argumentative.

6    BY MS. KELLER:

7    Q    Okay, I'll ask --

8              THE COURT:  Sustained.

9    BY MS. KELLER:

10   Q    -- one question, you had the employees execute this new

11   agreement on the advice of counsel, lawyers, right?

12   A    Lawyers gave us this new agreement.

13   Q    You had them executed based on the advice of counsel,

14   right?

15   A    I think we had them executed based on Mr. Bousquette's

16   wishes.

17   Q    Was it based on the advice of counsel?

18             MR. QUINN:  Vague and ambiguous.

19             THE COURT:  Overruled.

20             THE WITNESS:  I think this agreement was signed by

21   employees after counsel did provide advice that this was the

22   appropriate agreement.

23   BY MS. KELLER:

24   Q    Did Mattel have its current employees execute another

25   confidentiality and inventions agreement based on advice of

1    counsel; yes or no?

2    A    Yes.

3    Q    And if we look at Exhibit 389, page 12; do you

4    recognize that as a letter that you sent entitled "Dear

5    Employee" on March 20th, 2006, about having Mattel employees

6    execute yet another confidentiality and inventions

7    agreement?

8    A    I'm sorry, I do not have that in front of me.

9         Yes.  From 2006.

10   Q    Yes.  This is another updated inventions agreement that

11   you wanted your employees to sign, right?

12   A    Yes.

13         MS. KELLER:  And your Honor, I'd move 389-12 into

14   evidence.

15         THE COURT:  Received.

16         *(Defendants' Exhibit No. 389-12 is received*

17         *in evidence.)*

18   BY MS. KELLER:

19   Q    And if we look at the last paragraph, we see that you

20   were asking the employees, you, yourself, Alan Kaye, are

21   asking the employees to review this letter agreement,

22   including attachment A, which describes your obligations to

23   protect Mattel's confidential information and avoid

24   conflicts, right?

25   A    Yes.

1   Q    And let's look at Exhibit 20531-6, is this an example

2   of one of the signed 2004 employer confidentiality and

3   inventions agreements?

4   A    I -- I have that.  Two zero --

5        This -- is this the right one, 20531?

6   Q    -6.

7   A    -6.

8        Okay.  No.

9   Q    20531-6, is this a signed 2004 employee confidentiality

10  and inventions agreement signed by a Stephanie Soto -- or

11  Cota, I'm sorry?

12  A    Yes, this is.

13  Q    And if we look at page 2 of this agreement, we see

14  there's a provision called "Work Made for Hire"?

15  A    Yes.  You want me to go to the 2004 or the 2006?  They

16  are different agreements.

17  Q    Right now we are looking at 2004.

18  A    Okay.

19  Q    We are looking at the signed agreement by Miss Cota.

20  A    Okay.

21  Q    And if we look at page 2, we see, "Work Made for Hire.

22  I acknowledge that all work that is made by me solely or

23  jointly with others that is within the scope of my

24  employment with Mattel and is protectable by the copyright

25  is, quote, 'work made for hire,' unquote, as that term is

 1    defined in the United States copyright act, with the result

 2    that Mattel will be the sole owner of such work."

 3         Now, that was not in Carter Bryant's inventions

 4    agreement, correct?

 5    A    Correct.

 6    Q    And if you look at B, you see "Disclosure of

 7    inventions, ownership and assignment of my Mattel

 8    inventions.  I will promptly disclose in confidence to

 9    Mattel all inventions, discoveries, improvements,

10    developments, designs, works, original works of authorship,

11    ideas, know-how, formulas, processes, methods, software

12    programs, databases, mask works and trade secrets, whether

13    or not patentable, copyrightable or protectable as trade

14    secrets, collectively inventions, that I alone or jointly

15    with others conceive, create, develop or reduce to practice

16    during my period of employment with Mattel, whether or not

17    in the course of my employment with Mattel."

18         That latter clause was not in Carter Bryant's

19    agreement, right?

20    A    The "whether or not"?

21    Q    "Whether or not in the course of my employment with

22    Mattel" was not in Carter Bryant's agreement, correct?

23    A    Those words were not in his agreement.

24    Q    Nor was the word "ideas"?

25    A    Nor was the word "ideas."

1    Q    So -- and in fact, this entire work for hire provision
2    was not in Carter Bryant's agreement, right?
3    A    Correct.
4    Q    And you changed "during my employment here" back to the
5    previous version "during the period of my employment,"
6    right?
7    A    I didn't make any of these changes.
8    Q    Mattel changed "during my employment" back to "during
9    the period of my employment," correct?
10   A    I see "during my period of employment."
11   Q    Okay.
12   A    At the end, yes.
13   Q    Okay.  And "conceived or reduced to practice" was
14   changed to the present tense, "conceive, create, develop or
15   reduce to practice," right?
16   A    Yes.
17   Q    And you added -- now, you would agree with me, would
18   you not, that those terms in this new 2004 agreement, I
19   think you've already agreed, these changes were made on the
20   advice of counsel, right?
21   A    Yes.
22   Q    And you would agree with me that these terms are far
23   broader than the terms in Carter Bryant's agreement, right?
24   A    I -- I don't know if I used the descriptive "far."  I
25   do think that broader.

1   Q    Well, the phrase alone "whether or not in the course of

2   my employment with Mattel" is extraordinarily broad, right?

3   A    I think no broad -- no more broad than "at any time

4   during my employment."

5   Q    Well, "whether or not in the course of my employment

6   with Mattel" could mean anything I did anytime, anywhere,

7   right?

8   A    I think that's what anytime during my employment means.

9   Q    I'm talking about the phrase "whether or not in the

10  course of my employment," the phrase "during the period of

11  my employment," or "during my employment," those are terms

12  that this jury is going to have to define.

13       For you, I'm asking this --

14            MR. QUINN:  Your Honor, I object to the preamble

15  and request that it be stricken.

16            THE COURT:  Stricken.

17  BY MS. KELLER:

18  Q    I'm asking about one phrase, "whether or not in the

19  course of my employment with Mattel," that would cover

20  things that were either done while you were an employee at

21  Mattel or any other time, right?

22  A    During my employment.

23  Q    "Whether or not in the course of my employment with

24  Mattel," let's focus on that phrase.  Okay, let's break it

25  down, "whether or not," you understand what that phrase

Case 2:04-cv-09049-DOC-RNB  Document 10226  Filed 03/18/11  Page 22 of 109  Page ID #:309951
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

22

1    means?  It means whether in the course of my employment with

2    Mattel or whether not in the course of my employment with

3    Mattel, right?

4    A    Yes.

5    Q    And "in the course of my employment with Mattel," we

6    can debate about forever, but we don't need to here because

7    what I'm asking you is --

8              MR. QUINN:  Objection.  Move to strike.  Object to

9    the preamble.  Move to strike.

10             THE COURT:  Stricken.

11   BY MS. KELLER:

12   Q    The phrase "whether or not in the course of my

13   employment with Mattel," could mean anytime, anywhere,

14   nights, weekends, for example, right?

15   A    Yes, I think it's supposed to mean that.

16   Q    And it wasn't in Carter Bryant's agreement?

17   A    I disagree.  I think it was --

18   Q    The phrase "whether or not in the course of my

19   employment with Mattel" was not in Carter Bryant's

20   agreement, true?

21   A    I'm sorry, if you are talking about the words, the

22   words were not there.

23   Q    Thank you.

24        Now, let's go back to Mr. Bryant's own agreement,

25   Mr. Bryant's agreement, we'll use 9924.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 23 of 109   Page ID #:309952
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

23

 1        These agreements are -- the normal practice is to have

 2   this form of agreement signed without any change whatsoever,

 3   right?

 4   A    Correct.  We are talking about Mr. Carter's agreement

 5   from --

 6   Q    Talking about Carter Bryant's agreement, January 4th,

 7   1999.

 8   A    Correct.

 9   Q    And the normal course in those days at that time when

10   he signed this agreement was, they got signed as is, right?

11   A    As best I know, yes.

12   Q    Now, let's talk about --

13        THE COURT:  Now, just a moment.  Remember, 9924 is

14   9091 and also 25.  So you are going to hear it referred to,

15   it's the same agreement, okay?

16   BY MS. KELLER:

17   Q    I want to talk to you for a little bit about what

18   happens when employees leave Mattel, okay, when they depart?

19   A    Okay.

20   Q    Mattel's normal practice is to ask all employees who

21   are leaving Mattel, not just leaving for the day, but

22   leaving their employment at Mattel, to do an exit interview,

23   right?

24   A    Correct.

25   Q    And human resources is responsible for making sure that

1    all of the separation documentation is complete when an

2    employee leaves Mattel in El Segundo, right?

3    A    In El Segundo, yes, I would say so.

4    Q    And that's where Carter Bryant was working, right?

5    A    Yes.

6    Q    And let's look at Exhibit 27.

7    A    I'm sorry?

8    Q    This is Carter Bryant's proprietary information

9    checkout.

10       Do you have that document in front of you?

11   A    Yes.

12   Q    Now, Mattel employees are expected to sign this when

13   they terminate their employment with the company, true?

14   A    Yes.

15   Q    And we see there's a witness listed here named Sandy

16   Yonemoto?

17   A    Yes.

18   Q    She works in the HR department, right?

19   A    Yes.

20   Q    No attorney present, correct?

21   A    Do I know if there was an attorney present at this

22   time, no.

23   Q    Was there an attorney present?

24   A    Not to my knowledge.

25   Q    Just like the agreement, the inventions agreement, you

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 25 of 109   Page ID #:309954
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

25

1   have never given any human resources staff instruction in

2   explaining this document to departing employees, true?

3   A    I -- I don't think that's true.  I think I -- I can

4   remember two instances where I've talked to an HR employee

5   about words and issues in here.

6   Q    Have you ever instructed your staff in human resources

7   to explain this document to departing employees?

8   A    Not the staff.

9   Q    So the answer is no?  Have you ever instructed your

10  staff --

11  A    Staff.

12  Q    -- in human resources to explain this document to

13  departing employees?

14  A    No.

15  Q    Do you know if anyone at human resources has ever

16  issued such an instruction to anyone else at human

17  resources?

18  A    I do not know.

19  Q    Isn't -- isn't the answer no?

20  A    No.

21  Q    Has anyone at human resources ever issued such an

22  instruction to anyone else at human resources?

23  A    I do not know.

24  Q    You are not aware of it, though?

25  A    I'm not aware of it.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 26 of 109   Page ID #:309955
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

26

1    Q    And in fact, it's Mattel's policy not to explain this

2    document to departing employees, correct?

3    A    I don't know if I'd consider that a policy.  I don't

4    know if it's written anywhere as a policy.

5    Q    Is it the common practice to explain this to employees?

6    A    No.

7    Q    And basically what happens when the employee's leaving

8    Mattel, is he's just given this form and told, please sign

9    this?

10   A    Yes.

11   Q    And he doesn't get anything of value in return, right?

12   In other words, the employee isn't given an extra check, a

13   bonus, vacation pay or anything?

14   A    No, no.

15   Q    So he just gets handed the form, told sign it, and you

16   take it back, and that's it, he's done, right?

17   A     It's a possibility that -- yes, yes.  It's not -- not

18   signed all the time, but I mean, somebody can say I don't

19   want to sign it now, I want to take it home and look at it

20   or read it, sure.

21   Q    Yeah, and still no one explains it to them, true?

22   A     If someone asked us to explain it, I'm sure we would

23   get it explained.

24   Q    Mattel has how many employees?

25   A     Mattel has roughly 30,000.  I don't know what time

1    period you are asking for, but roughly 30,000.

2    Q    And I think you said that, to your knowledge, you can

3    think of twice when somebody has asked a question and you've

4    answered it, or you, Mattel, has answered it, right?

5    A    No, I was talking about me individually, not all of

6    Mattel.  I wouldn't know all the instances of all of Mattel.

7    Q    And how many years have you been at Mattel?

8    A    Thirteen.

9    Q    Okay.  All right.  Move on to a different area.

10         Now, is it true that Mattel routinely hires people from

11   competitors to work for Mattel?

12   A    Mattel often hires people from competitors.

13   Q    It's routine, right?

14   A    I -- I wouldn't use the word "routine."  Routine would,

15   to me, denote more often that we do.

16   Q    Is it unusual?

17   A    It's unusual.

18   Q    It's unusual to hire competitors?

19   A    Yeah --

20   Q    Employees' competitors?

21   A    I think it's more unusual --

22             (Interruption in the proceedings.)

23             THE COURT:  Just a moment.

24             Counsel, just wait a moment.  Stop.

25

1    BY MS. KELLER:

2    Q    You've hired people who used to work at MGA, right?

3    A    To the best of my knowledge, yes.

4    Q    Well, not just to the best of your knowledge, but you

5    checked into this all stuff before your deposition, right?

6    A    Whether or not --

7             MR. QUINN:  Vague and ambiguous as to "all this

8    stuff."

9             THE COURT:  Sustained.

10   BY MS. KELLER:

11   Q    Has Mattel ever hired anyone who used to work at MGA?

12            MR. QUINN:  Asked and answered.

13            THE COURT:  Overruled.

14            THE WITNESS:  Best to my knowledge, yes.

15   BY MS. KELLER:

16   Q    Has Mattel hired people from Hasbro?

17   A    Yes.

18   Q    Has Mattel hired people from JAKKS Pacific?

19   A    I do not know specifically.

20            MS. KELLER:  Your Honor, I'd ask that the witness

21   examine his deposition testimony at page 186, and that would

22   be December 10th, 2004, pretty much the whole page, your

23   Honor, at least down to line 18, your Honor.

24            MR. QUINN:  Does it refresh recollection or

25   impeachment?  I'm unclear, your Honor.

 1          MS. KELLER:  I'm following the Court's procedure.

 2          MR. QUINN:  I am not sure what that means, your

 3   Honor.

 4          THE COURT:  Well, Counsel, it doesn't refer to

 5   MGA.

 6          MS. KELLER:  No, we are talking about JAKKS

 7   Pacific, that was the last question, your Honor.

 8          THE COURT:  Just a moment.

 9          Well, you can use this to refresh his

10   recollection.

11   BY MS. KELLER:

12   Q    Did you have a chance to read that, sir?

13   A    Yes.

14   Q    Has Mattel ever hired anyone from JAKKS Pacific?

15   A    Yes.

16   Q    JAKKS Pacific is a competitor?

17   A    Yes.

18   Q    MGA is a competitor, right?

19   A    Yes.

20   Q    Hasbro is a competitor, right?

21   A    Yes.

22   Q    And if Mattel is going to hire someone, let's say, from

23   MGA, Mattel doesn't require that employee to resign from MGA

24   first before accepting the position at Mattel, true?

25   A    True.

1    Q    I want to discuss with you for a moment the Carter

2    Bryant personnel file.  If you could take a look at 9687A.

3         Do you have that in front of you?

4    A    I have, yes, some, I guess, documents about Carter

5    Bryant in front of me.

6    Q    Now, you actually brought that with you to your

7    deposition as a Mattel 30(b)(6) witness in September of

8    2010, right?

9    A    Correct.

10   Q    And before that, the box containing this Carter Bryant

11   file was missing from 2003 to 2010, right?

12   A    Correct.

13   Q    Even during the first trial, it was missing, right?

14   A    Correct.

15   Q    That was two weeks before you were scheduled to testify

16   as a Mattel 30(b)(6) witness for this second trial that this

17   document was located, right?

18   A    Correct.

19   Q    Let's look at Exhibit 9686.

20        MS. KELLER:  Your Honor, I'd -- before I do that,

21   I'm going to move 9687 into evidence.

22        THE COURT:  Received.

23        *(Defendants' Exhibit No. 9687A is received in*

24        *evidence.)*

25

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 31 of 109   Page ID
#:309960
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

31

1  BY MS. KELLER:

2  Q    And 9686 --

3          MR. QUINN:  Is that A, 9687A into evidence?

4          THE COURT:  9687A was what she marked.  I think

5  Mr. Quinn is correct.

6          MS. KELLER:  9687A.

7          THE COURT:  It's received, and we can redact any

8  social security numbers.

9          MS. KELLER:  That's why I was not going to go into

10  it, your Honor, and just move on.

11          THE COURT:  I think if you put that up on the

12  board, the jury is not going to memorize the social security

13  number.  We can edit those out this evening, so some of

14  these we'll go over during the evening outside of your

15  presence, get rid of personal information like social

16  security numbers.

17          MS. KELLER:  So, your Honor, 9686 is admitted into

18  evidence at this time.

19          THE COURT:  Well, 9687A you marked.  You asked me

20  to receive it and I received it.  Now, you've marked 9686,

21  do you want that received?

22          MS. KELLER:  Yes, your Honor.

23          MR. QUINN:  What is it, your Honor?  He hasn't

24  identified --

25          THE COURT:  This is the thing, Mr. Quinn.  Let me

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 32 of 109   Page ID
#:309961
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

32

1   ask the question.

2            MR. QUINN:  I apologize.

3            THE COURT:  What is it?

4            MS. KELLER:  This appears to be, your Honor, a

5   copy of Carter Bryant's personnel file that was produced in

6   this case.

7            THE COURT:  On 9687A?

8            MS. KELLER:  Yes.

9            MR. QUINN:  Again, foundation, your Honor.

10           THE COURT:  Just a moment.

11           MS. KELLER:  I've been informed by Ms. Hurst, your

12   Honor --

13           MR. QUINN:  Your Honor --

14           THE COURT:  Sustained.  Stricken.

15           Counsel?

16   BY MS. KELLER:

17   Q    This is a copy of the file that was produced while the

18   file was missing --

19           MR. QUINN:  Your Honor, object.  Move to strike.

20           THE COURT:  Sustained.  I want you to strike the

21   comment, disregard it.

22           Counsel --

23           MS. KELLER:  I'll ask a question.

24           THE COURT:  Good.  Ask a question.

25

1   BY MS. KELLER:

2   Q    Do you recognize 9686 as documents relating to Carter

3   Bryant that were originally produced in this litigation?

4           THE COURT:  So 9686 originally produced in this

5   litigation.

6           MS. KELLER:  Before --

7           THE COURT:  Give me a date, a time period; what

8   are we talking about?

9           MR. QUINN:  I think it's vague and ambiguous.  And

10  I think this is --

11          THE COURT:  Sustained, but let's find out the date

12  that this was produced.

13          Do you know, Mr. Kaye?

14          THE WITNESS:  No, I don't.

15          THE COURT:  All right.  Thank you, sir.

16          MS. KELLER:  Your Honor, I don't have a specific

17  date.

18  BY MS. KELLER:

19  Q    But I would ask the witness, was 9686 produced by

20  Mattel before Mr. Bryant's personnel file was finally

21  located?

22          MR. QUINN:  Your Honor, this runs afoul of issues

23  the Court has decided, I believe.

24          THE COURT:  Well, something tells me in caution I

25  better talk to counsel about this.  I think this is the way

1    we can spend our evening hours tonight.  I am not sure where

2    both counsel are going, so let me talk to them outside your

3    presence for a moment.

4              Can we move on to another area?

5              MS. KELLER:  We can.

6              THE COURT:  Okay.

7    BY MS. KELLER:

8    Q    I want to ask you some questions about a woman by the

9    name of Sharon Rahimi.  Do you know who I'm talking about?

10   A    (No audible response.)

11   Q    Sharon Rahimi?

12   A    Yes, I learned who Sharon Rahimi was in preparation for

13   this trial.

14   Q    You didn't know anything about her before that?

15   A    No.

16   Q    Let's look at Exhibit 36096.

17   A    Okay, I have -- I have it.

18   Q    Is this a Mattel personnel file for Sharon Rahimi?

19   A    It looks like excerpts from.  I don't know if it's the

20   whole file or --

21             MS. KELLER:  Your Honor, I'd move 36096 into

22   evidence.

23             THE COURT:  Received.

24             *(Defendants' Exhibit No. 36096 is received in*

25        *evidence.)*

1  BY MS. KELLER:

2  Q    Let's look at 36096-10.

3  A    Okay.

4  Q    Is this an offer of employment to Ms. Rahimi from

5  Mattel dated September 29th, 1997?

6  A    I think it's a confirmation, right.

7  Q    And for the position of business analyst?

8  A    Yes.

9  Q    And in fact, this file shows that Miss Rahimi was a

10 Mattel employee, right?

11 A    This appears like the offer is there.  Do you want me

12 to look back in the file and see if she actually --

13 Q    Let's -- let's look at page 7.  This is what's called

14 as an employee turnaround document; do you have that in

15 front of you?

16 A    Yes.

17 Q    And that shows that she was actually hired

18 October 20th, 1997?

19 A    Yes.

20 Q    So she was a Mattel employee, true?

21 A    Yes, it appears that way, yes.

22 Q    Let's look at 36096-4.

23 A    Is that a letter to Michael Shore?

24 Q    A letter from Sharon Rahimi to Michael Shore,

25 January 13th, 2000.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 36 of 109   Page ID #:309965
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

36

1    A    Yes.

2    Q    Informing him she's resigning her position with Mattel

3    effective January 28th, 2000, right?

4    A    Yes.

5    Q    So between 1997 and 2000, Ms. Rahimi was a Mattel

6    employee, true?

7    A    I don't know if it's solid, but -- through the whole

8    time, but definitely has resigned -- resigned in 2000 and

9    began, based on what we just discussed.  I don't -- again, I

10   don't know if she left and came back in between time.

11   Q    Do you see the little M stamped on the bottom of each

12   of these pages, standing for Mattel production?

13   A    Yes.

14   Q    Do you see anything in here to indicate that she left,

15   came back, left, came back, left, came back, or anything

16   like that?

17   A    In this letter?

18   Q    No, in this file.

19   A    I'd have to give it a bit of a further look.

20   Q    Well --

21            THE COURT:  You can come back to that, Counsel.

22            MS. KELLER:  We'll leave it at that.

23   BY MS. KELLER:

24   Q    The bottom line is, we know from looking at that that

25   she was a Mattel employee?  Yes?

1   A    Yes.

2   Q    And that at least in 2000, she resigned as a Mattel

3   employee?

4   A    Yes.

5   Q    True?

6   A    True.

7   Q    Do you know who Carey Plunkett is?

8   A    I -- I know who Carey Plunkett is based on the

9   preparation for this testimony.

10  Q    And you know now that she was one of the Mattel

11  employees who used fake identities to get in competitive

12  showrooms including that of MGA, right?

13  A    That's what I've been told, yes.

14  Q    And you understand --

15  A    I don't know that, but that's what I've been told.

16  Q    You understand that that's inconsistent with Mattel's

17  code of conduct, right?

18  A    Yes.

19  Q    And Mattel doesn't consider its code of conduct to be a

20  contract, though, right?

21  A    I -- I don't know if I can answer the legal obligation

22  of a contract.  I think it's an obligation of our employees.

23  Q    As Mattel's 30(b)(6) witness, did you testify that you

24  don't know -- that Mattel doesn't consider its code of

25  conduct to be a contract?

1    A    I don't recall what I testified there.

2         MS. KELLER:  I'd ask the witness to look at his

3    deposition from July 23rd, 2010, page 219, lines 15 through

4    20.

5         THE WITNESS:  Yes.

6    BY MS. KELLER:

7    Q    "Does Mattel consider its code of conduct to be a

8    contract to which Mattel is bound regarding its conduct?"

9    Lines 15 through 20.

10   A    Yes, I see it.  I don't think -- I don't think -- I

11   think my answer was, to the first part of the question, I

12   think it was a -- a complex question.

13   Q    Does Mattel consider its code of conduct to be a

14   contract?

15   A    I think my answer was I don't think so.

16   Q    And you don't know if the employee handbook is

17   considered to be a contract either, right?

18   A    I don't know if it's a contract.

19   Q    And in fact, you didn't know that as a 30(b)(6)

20   witness, and to this day, you still don't know whether the

21   employee handbook is considered a contract, right?

22   A    Correct.

23        MR. QUINN:  Your Honor, he's not a lawyer, your

24   Honor.  I move to strike and object to the question.

25        THE COURT:  Overruled.

1   BY MS. KELLER:

2   Q    Now, let's go back to Mr. Shore.  We just talked about

3   him for a moment.  He was Carey Plunkett's boss in 2006?

4   A    I don't know that.

5   Q    Did you send a memo to Mr. Shore in 2006 telling him

6   that you were disappointed in his conduct?

7   A    Yes.

8   Q    And this was because he supervised Plunkett and others

9   who illegally entered competitors' showrooms?

10  A    No.

11  Q    Was this because he was the -- he supervised Plunkett

12  and others who went into competitors' showrooms using fake

13  credentials?

14  A    No.

15  Q    What was the source of your disappointment with

16  Mr. Shore?

17  A    Source of my disappointment with Mr. Shore is that he

18  had knowledge that another gentleman, Sal Villasenor --

19  Senor, had used fake identification for market -- to gather

20  market data, and he did not bring it forward.  That was the

21  source of my disappointment when I wrote the letter at the

22  time.

23  Q    And if we could -- if we could see Exhibit 25103.

24       This is the letter telling him that you were

25  disappointed?

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 40 of 109   Page ID #:309969
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

40

1    A    Shall I respond on the screen?

2         Yes.

3    Q    But you don't tell him in here that you were

4    disappointed in him specifically or in anybody, right?

5    A    Oh, I think this letter -- I think this letter

6    definitely -- it was addressed to him from me.  That's a

7    very uncommon practice.  I think it definitely was focused

8    on him.

9    Q    Well, it's an identical letter to the letter you sent

10   to several other people, right?  Absolutely identical except

11   for the name and address of the person it went to, right?

12   A    That's not correct.

13   Q    Let's look at Exhibit 25107 addressed to Geri Pilgrim.

14        MS. KELLER:  If we can put these side by side on

15   the screen.

16        THE WITNESS:  Yes.

17   BY MS. KELLER:

18   Q    Absolutely identical to the one you sent to Mr. Shore,

19   right?

20   A    Yes, only one other person.  You said several other

21   people.

22   Q    Okay.  This is several identical letters that you sent,

23   right?

24        Correct?

25   A    These are two identical records --

1          MR. QUINN:  Excuse me, it's argumentative and it

2    misstates the testimony and her own -- misstates her own

3    question.

4          THE COURT:  Just restate the question.

5    BY MS. KELLER:

6    Q    And there was a third one, too, right?

7    A    I don't recall a third one.

8    Q    Well, let's look at 25107 to Geri Pilgrim.

9    A    Yes.

10   Q    There is nowhere in here where you specifically

11   identify the conduct that Ms. Pilgrim is supposed to have

12   engaged in, right?

13   A    I think I do.  I think it says, you have -- you have

14   to -- you have to bring forward conduct that violates our

15   code of conduct.

16   Q    But it doesn't say, Miss Pilgrim, you knew about people

17   sneaking into competitors' showrooms with fake credentials

18   and you didn't do anything about it; that's not in here,

19   right?

20   A    I didn't know that was the issue at the time.  You're

21   stating something -- I mean, you said "sneaking into

22   competitors' showrooms."  I did not know that when I wrote

23   these letters.

24   Q    What was the letter about?

25   A    The letter was about that an individual had used false

1    identification to get market data.

2    Q    Where does it say that in here, anywhere?

3    A    It -- it -- I didn't need this put in here.  I told

4    them what they were responsible for.  Geri wasn't the one

5    who snuck into or did anything like that.  She just didn't

6    bring it forward.

7    Q    Where is anything mentioned about, Geri Pilgrim, you

8    did not come forward with knowledge that you had that one of

9    your colleagues was sneaking into competitors' showrooms

10   with fake ID's?

11   A    I think it covers it under if you have good faith

12   belief that your coworkers are acting in a way that would

13   violate our code of conduct, you're obligated to report it

14   to the human resource department, law department, the

15   internal audit department, global security or the ethics

16   line.

17   Q    Well, you kind of forgot one word, "if," if you have a

18   good faith belief, not you knew and you did nothing?

19   A    I think at the time Geri knew what this letter was

20   about.

21   Q    You wrote it this way because you didn't want lawyers

22   to get ahold of it later and have documentation of what your

23   people had actually done, right?

24   A    That is not correct.

25   Q    You didn't want anybody in this litigation that we are

1   in right now to know that your employees had illegally snuck

2   into MGA's showrooms, you didn't want any documentation of

3   that, right?

4           MR. QUINN:  Your Honor, this is compound.

5           THE COURT:  Sustained.

6           Reask the question.

7   BY MS. KELLER:

8   Q    You didn't want a paper trail showing that your

9   employees had illegally entered competitors' showrooms,

10  true?

11  A    Not true.

12  Q    You sent a generic letter talking about unnamed

13  disappointments by unnamed people, and if you have a good

14  faith belief, you're obligated to report it to human

15  resources, but it doesn't say anything about what these

16  people actually did, correct?

17  A    No, I think these people are named.  I think Geri and

18  Michael were named in these letters.

19  Q    Oh, is it just -- it says their name at the top as a

20  recipient?

21          THE COURT:  Counsel, we'll strike the "oh."  Just

22  ask the question, now.

23  BY MS. KELLER:

24  Q    So the fact that their names are at the top as a

25  recipient of this generic letter means they should know up

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 44 of 109   Page ID #:309973
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

44

1   here the conduct they engaged in, right?

2          MR. QUINN:  Object to generic, your Honor.

3   Assumes facts.

4          THE COURT:  Overruled.

5          THE WITNESS:  I fully believe they knew.

6   BY MS. KELLER:

7   Q    You believed they knew so it could remain unsaid?

8   A    No.

9   Q    You believed they knew so you didn't have to put it in

10  writing?

11  A    No.

12  Q    There is no reprimand in here, is there?

13  A    I think it is a reprimand.

14  Q    They were supposed to just understand that it was a

15  reprimand?

16  A    I think they knew.

17  Q    Was this a wink type of reprimand?

18          MR. QUINN:  This is argumentative, your Honor.

19          THE COURT:  Sustained.

20  BY MS. KELLER:

21  Q    Now, Miss Plunkett, Carey Plunkett, received only an

22  oral reprimand, right?

23  A    I'm aware of that, yes.

24  Q    But it's not documented anywhere in her personnel file,

25  is it?

1    A    I do not know.  I did not see it in her personnel file.

2    Q    I was about to ask you, as head of human resources,

3    there would be nobody in a better position to know the

4    answer than you, right?  You can go through her file any

5    time you want, true?

6    A    I can.  There are thousands of files, actually.

7    Q    Well, but you don't have thousands of employees who are

8    in issue in this case that you know you're going to be asked

9    about, right?

10   A    I didn't know I was going to be asked about Carey

11   Plunkett until preparing for this --

12   Q    And you know that there is no documentation whatsoever

13   in her file of any oral reprimand, right?

14   A    I did not see any.

15   Q    So the answer is, you're correct, there is no evidence

16   of it in her file, right?

17   A    That I know of, there is no evidence that I know of in

18   my file -- in her file.

19   Q    Now, let me ask you a little bit about Mr. Villasenor.

20        Is it true that Mattel had a whole market intelligence

21   department within Mattel using false and misleading

22   credentials, but that that never came to your attention as

23   head of human resources, and I mean as of 2010?

24   A    To -- let me try to answer both of those questions.

25        I've never heard until preparation for this trial that

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 46 of 109   Page ID #:309975
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

46

1   anything was called market intelligence, a department.

2   There is no official name of market intelligence, but I

3   understand that you are trying to get to consumer research

4   and market research.  And I only learned in connection with

5   preparing for this trial that there was a group of people

6   who did use false identification.

7   Q    Well, you knew there was also a trial in 2008, right?

8   A    Yes.

9   Q    And so as of July 2010, you testified that you never

10  even knew you had a market intelligence department at all;

11  is that what you are telling us?

12  A    Market intelligence, that -- that name, "market

13  intelligence," I've never seen at Mattel.

14  Q    So you didn't know you had a whole market intelligence

15  unit within Mattel using false and misleading credentials?

16          MR. QUINN:  It's argumentative, your Honor.

17  Assumes facts.

18          THE COURT:  Overruled.

19  BY MS. KELLER:

20  Q    Is that a correct statement?

21  A    Until what time?

22  Q    At -- let's just, as a cutoff, say when you were

23  testifying in July of 2010 as Mattel's 30(b)(6) witness,

24  okay, as of then, you had had no idea that you had a whole

25  market intelligence department within Mattel using false and

1   misleading credentials?

2          MR. QUINN:  Objection.  Argumentative.  He was not

3   a 30(b)(6) witness on this subject.  It's an improper

4   suggestion, your Honor.

5          THE COURT:  Let me see the 30(b)(6) designation

6   from both of you.

7          MS. KELLER:  We're going to look for it, your

8   Honor.

9          THE COURT:  Okay.

10  BY MS. KELLER:

11  Q    In the meantime, let me just ask you, as head of human

12  resources, it had never come to your attention that you had

13  a whole department within Mattel using false and misleading

14  credentials?

15         MR. QUINN:  Assumes facts not in evidence.

16         THE COURT:  Overruled.

17         Well, whole department, that's sustained,

18  Mr. Quinn.  My apologies.

19         MS. KELLER:  If I could just have a moment, your

20  Honor.

21         (Attorney discussion held off the record.)

22  BY MS. KELLER:

23  Q    Did it come to your attention that you had a group of

24  people within Mattel -- and I'm asking as of July 2010, did

25  you know as head of human resources, that you had a group of

1    people within Mattel doing market intelligence work using

2    false and misleading credentials to get into competitors'

3    showrooms?

4    A    I do not recall in the deposition if I had that

5    recollection at the time, I don't believe so.

6    Q    And you would, in fact, find it hard to believe that

7    such a thing was happening, right?

8    A    I would find that a concern, yes.

9    Q    Hard to believe, is what I'm asking?  Is that what you

10   thought as of July 23rd, 2010?

11   A    It very well could be a description.

12   Q    So I'm not asking if it could very well be a

13   description.  I'm asking, is it true that on July 23rd,

14   2010, you found it hard to believe?

15   A    Today, I don't -- I don't know how to define whether I

16   said hard to believe or not.  If I said it in my testimony,

17   I would say it's -- it could definitely be something I would

18   have said.

19   Q    Could definitely be something you said.  Let me ask you

20   this:  As of July 2010, did you know that Mattel employees

21   had been sneaking into competitors' showrooms with fake

22   credentials; did you know that?

23   A    I don't think so.

24   Q    And you know that --

25   A    I don't remember if I knew it at that point.

1    Q    You don't know if you knew that Mattel employees had

2    been using phony credentials to sneak into competitors'

3    showrooms as of July 23rd, 2010?

4    A    Right, I don't remember.

5    Q    You don't remember or you didn't know?

6    A    I don't remember if I knew.

7    Q    You know Mattel's code of conduct prohibits employees

8    from seeking to obtain competitive information by illegal or

9    unethical means?

10   A    Yes.

11   Q    And you know that people within the market intelligence

12   group at Mattel did just that?

13   A    Can you repeat the question, please?

14   Q    There was a person by the name of Sal Villasenor --

15           MR. QUINN:  Your Honor, is she withdrawing the

16   question?

17           THE COURT:  Did he ask you to repeat the question?

18           MS. KELLER:  I'm going to ask a foundational

19   question, your Honor.

20           MR. QUINN:  Move to strike.

21           THE COURT:  Stricken.

22   BY MS. KELLER:

23   Q    A Mattel employee named Sal Villasenor was the manager

24   of market intelligence, right?  That was his title?

25   A    I do not know that.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 50 of 109   Page ID #:309979
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

50

1    Q    You know there is a market intelligence group within

2    Mattel, right?

3    A    As I said, you're using the term "market intelligence."

4    I've not heard, except in preparation for this, that the

5    title of the department is market intelligence --

6    Q    Have you pulled --

7    A    I have heard --

8              MR. QUINN:  Excuse me, your Honor, he hadn't

9    finished his answer.

10             THE COURT:  Just a moment.

11             Had you finished your answer, sir?

12             THE WITNESS:  No.

13             THE COURT:  Please finish.

14             THE WITNESS:  I have heard that there's consumer

15   research, marketing research, those kind of titles, so

16   that's what I'm reacting to, market intelligence.

17   BY MS. KELLER:

18   Q    Did you pull Sal Villasenor's file, his personnel file,

19   and look at it?

20   A    No.

21   Q    You know he's a big issue in this case, surely?

22   A    Yes.

23   Q    And so, of course, his personnel file was important to

24   you because you're head of human resources for the whole

25   company, right?

1  A    I think that --

2             MR. QUINN:  Objection.  Compound.

3             THE COURT:  Overruled.

4  BY MS. KELLER:

5  Q    Right?

6  A    Legal was -- at the time I found out about Sal, legal

7  was dealing with this issue, and I left it to legal, so I

8  did not pull his file.  I figured legal was looking at it,

9  which they often do in these situations.

10 Q    Well, surely as head of human resources, you at least

11 wanted to know what his title was as an employee, right?

12 A    No.

13 Q    Manager, market intelligence?

14            MR. QUINN:  Is that a question?

15            THE COURT:  Sustained.  Stricken.

16 BY MS. KELLER:

17 Q    So you are telling us, then, that you have never --

18            MR. QUINN:  Objection, your Honor.  Argumentative.

19            THE COURT:  Sustained.

20 BY MS. KELLER:

21 Q    So before testifying today, you didn't even pull Sal

22 Villasenor's personnel file and look at it?

23            MR. QUINN:  Objection.  Argumentative.

24            THE COURT:  Overruled.

25            THE WITNESS:  I did not pull Sal Villasenor's

1    personnel file.

2    BY MS. KELLER:

3    Q    Is that because you didn't want to know what was in it?

4    A    No.

5    Q    Is that because you didn't want to be asked questions

6    on the stand about what was in it?

7    A    No.

8    Q    Is that because you wanted to be able to say, I don't

9    know, I haven't looked at it?

10   A    No.  I have looked at the file.

11   Q    Does Mattel have a policy of trying to insulate people

12   who are in positions of authority from knowledge about such

13   things?

14              MR. QUINN:  Vague and ambiguous.

15              THE COURT:  Sustained.

16              MR. QUINN:  Move to strike.

17              THE COURT:  Stricken.  Disregard the question,

18   please.

19              MR. QUINN:  No good faith basis for the question,

20   your Honor.

21              THE COURT:  Counsel, just a moment.  I think I

22   sustained the objection, didn't I?

23              MR. QUINN:  I'm sorry.

24              THE COURT:  No, he was just adding a comment, so

25   we'll strike the comment also.  The question was -- you

```
 1   prevailed, you got it sustained.  I struck the question.

 2              MS. KELLER:  Could we have Exhibit 9484R, please.

 3              I think we may only have that one on screen.

 4   BY MS. KELLER:

 5   Q    Do you see this letter to the legal department and Mark

 6   Kimball from Sal Villasenor?

 7   A    Yes.

 8   Q    And Mark Kimball is your direct report in human

 9   resources, right?

10   A    Yes.

11   Q    And what's the date of this letter?

12   A    December 22nd, 2005.

13   Q    2005?

14   A    Correct.

15   Q    And you were at Mattel in 2005?

16   A    Correct.

17   Q    And you were in human resources in 2005?

18   A    Correct.

19   Q    What was your title in 2005?

20   A    Senior vice president of human resources.

21   Q    And in --

22              THE COURT:  I'm sorry, pull the mic just a little

23   closer.

24              Counsel.

25
```

1    BY MS. KELLER:

2    Q    And in 2005, Mark Kimball was your direct report,

3    right?

4    A    Correct.

5    Q    And in -- this is the letter where Mr. Villasenor says

6    he is worried that he is exposed to criminal liability by

7    engaging in unlawful conduct at the direction of Mattel,

8    right?

9    A    Correct.

10   Q    Pretty explosive issue for human resources, right?

11   A    Correct.

12   Q    And you knew that what he was referring to was the

13   practice of using fake identities to gain access to Mattel

14   competitors' private toy fair showrooms, right?

15   A    I knew when?

16   Q    You knew as soon as you checked this out, right?

17   A    Is that as soon as I checked out the letter?

18   Q    As soon as you checked in to the allegations in this

19   letter, you knew exactly what it was about, true?

20   A    Yes, that was in -- within the last week.

21   Q    So your subordinate, Mr. Kimball, in 2005 never told

22   you what was going on?

23   A    He never told me about this letter.

24   Q    He never brought to the attention of the director --

25   the head of human resources, that one of the Mattel

```
 1   employees was saying he had been directed to engage in

 2   criminal conduct at the direction of Mattel?

 3   A    No.

 4   Q    So you were insulated from that?

 5   A    I did not know anything about this letter until

 6   preparing for this trial.

 7   Q    And you didn't know --

 8   A    I see that Mr. Normile is on the trial, which, to me,

 9   is -- on the letter, which is very significant.

10   Q    Let's look at Exhibit 25103 dated May 22nd, 2006.

11        This is your letter to Mr. Shore, your "disappointed in

12   you" letter?

13   A    Yes.

14   Q    So you signed this letter -- this has your signature at

15   the bottom, right?

16   A    Correct.

17   Q    You signed this disappointment letter May 22, 2006, you

18   signed letters to Mr. Shore and Miss Pilgrim without even

19   really knowing what conduct they had failed to report?

20   A    No, that's not correct.

21   Q    Are you aware it's Mattel's position that these letters

22   of yours are a written reprimand for either knowing about

23   and failing to report this practice of using fake

24   identities?

25            MR. QUINN:  Objection.  Argumentative.  Assumes
```

1    facts.

2              THE COURT:  No, I think in the present situation,

3    otherwise the question is going to be asked about other

4    witnesses having testified.  I'll overrule the objection.

5              You can answer the question.

6              THE WITNESS:  Okay, can you repeat the question,

7    please?

8    BY MS. KELLER:

9    Q    Are you aware it's Mattel's position that these letters

10   from you are written reprimands for these people having --

11             THE COURT:  Well, strike that, Counsel.  I think

12   it's a correct objection, technically.  It had to be worded

13   a different way.  It's argumentative.

14             MR. QUINN:  Move to strike.

15             THE COURT:  Stricken.

16             It's appropriate area.

17   BY MS. KELLER:

18   Q    Do you consider these two letters identical, except for

19   the names and addresses of the people on them, to be written

20   reprimands for either engaging in or knowing about and

21   failing to report this practice of using fake identities to

22   unlawfully get secret information from your competitors?

23             MR. QUINN:  Assumes -- assumes facts not in

24   evidence, your Honor.

25             THE COURT:  Overruled.

```
 1                MR. QUINN:  Secret, unlawful.

 2                THE COURT:  Overruled.

 3                THE WITNESS:  Failing to report, these are --

 4    these are definitely reprimand letters for Geri and Michael

 5    failing to report what they knew.

 6    BY MS. KELLER:

 7    Q    Failing to report what?

 8    A    Failing to report a violation of the code of conduct.

 9    Q    Failing to report what violation of the code of

10    conduct?

11    A    This says code of conduct.

12    Q    Failing to report what violation of the code of

13    conduct?  What did they do, sir?

14    A    They knew, they had knowledge of an individual using

15    false identification to get market intelligence.

16    Q    And you knew that in May of 2006 at the latest, right?

17    A    I knew that in May of 2006.

18    Q    So as head of human resources, you would have wanted to

19    investigate this and find out how wide and deep this

20    practice was, right?

21    A    No.  Legal was investigating it.

22    Q    So you could just turn a blind eye to it?

23                MR. QUINN:  Objection.  Argumentative.

24                THE COURT:  Sustained.  Stricken.

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 58 of 109   Page ID #:309987
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

58

1    BY MS. KELLER:

2    Q    In these letters, you didn't say exactly what you said

3    now, you didn't say the conduct that you engaged in was

4    knowing that others were using fake identities to get into

5    showrooms and doing nothing about it, you didn't say that,

6    did you?

7    A    No, I said it's a violation of code of conduct.

8    Q    But you didn't say what the "it" is, what the conduct

9    was, right?

10   A    I didn't think it was necessary, probably.  I don't

11   recall the actual thought process going into these letters.

12   Q    You wanted to avoid leaving a paper trail of what the

13   actual conduct was, right?

14            MR. QUINN:  Your Honor, this has been asked and

15   answered.

16            THE COURT:  Overruled.

17            THE WITNESS:  No.

18            THE COURT:  Your answer, sir?

19            THE WITNESS:  No.

20   BY MS. KELLER:

21   Q    And you thought this was enough discipline for people

22   who were violating the Mattel code of conduct in this

23   manner?

24   A    Yes, in this manner.

25   Q    Mr. Shore received no adverse action, right?

1    A    Correct.

2    Q    His pay wasn't cut?

3    A    No.

4    Q    He wasn't demoted?

5    A    No.

6    Q    He wasn't fired?

7    A    No.

8    Q    In fact, he got promoted, right?

9    A    He did get promoted, yes.

10   Q    Way up?

11   A    He was promoted, I think, twice since then.

12   Q    He ended up being promoted to head up the unit that he

13   was committing the misconduct in, consumer research, right?

14   A    (No audible response.)

15        MR. QUINN:  Assumes facts not in evidence.

16   Misstates the testimony.

17        THE COURT:  Just a moment.

18        Restate your question, Counsel.  Sustained.

19   BY MS. KELLER:

20   Q    He ended up being promoted to the head of consumer

21   research, right?

22   A    Yes, he was promoted to the head of consumer research.

23   Q    And Exhibit 5 -- 25103 that you signed, did you read it

24   before you signed it?

25   A    I don't recall, but I assume so.

1    Q    Did you mean it?

2    A    Yes.

3    Q    And when you said that allegations of past conduct that

4    would be incompatible with Mattel's principles had recently

5    surfaced, you knew when you wrote that that you were talking

6    about the marketing intelligence department?

7    A    I did not.

8    Q    Now, you also knew that the group had used these false

9    credentials, right?

10   A    No.

11   Q    And this is the very thing that you denied four years

12   later in your 30(b)(6) deposition, right?

13           MR. QUINN:  Again, your Honor, we are back to

14   that.  He wasn't designated a 30(b)(6) witness on this

15   subject.

16           THE COURT:  Well, I'm waiting for that designation

17   from each of you.  As soon as that is produced, then I can

18   make a ruling.

19           MS. KELLER:  Ms. Hurst informs me that she didn't

20   think he was.  So this would be his own testimony as head of

21   HR.

22           THE COURT:  Sustained.  Question is stricken.

23           MR. QUINN:  Move to strike.

24           THE COURT:  Stricken.

25           You can ask him about human resources, but he

1    wasn't designated, apparently, as the 30(b)(6) witness.

2            Mr. Quinn's objection is sustained, and the

3    question is stricken.

4    BY MS. KELLER:

5    Q    Did you, as head of human resources in July of 2010,

6    know that there was a market intelligence operation within

7    Mattel using false and misleading credentials?

8    A    I don't recall.

9            MR. QUINN:  Objection.  Asked and answered.

10            THE COURT:  Overruled.

11            THE WITNESS:  I don't recall if I have knew at

12    that point.

13    BY MS. KELLER:

14    Q    But it had come to your attention at least as of 2006,

15    right?

16    A    No, I think that's not what I said.  I think this is

17    not -- has nothing to do with market intelligence

18    department.  Again, we are on that title, and I don't

19    know -- at the time I didn't know there was more than one

20    person other than this one individual.

21    Q    You didn't know anything about Sal Villasenor?

22    A    I said, this one individual, and that's Sal Villasenor.

23    Q    And Michael Shore?

24    A    As the people --

25            MR. QUINN:  Vague and ambiguous.

```
 1              THE COURT:  Sustained.  Reask the question.
 2   BY MS. KELLER:
 3   Q    People who were involved in either sneaking into
 4   competitors' showrooms or knowing about it and doing
 5   nothing, you knew about those people, right?
 6   A    I have thought --
 7              MR. QUINN:  Vague and ambiguous.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  I knew about those three
10   individuals.
11   BY MS. KELLER:
12   Q    And yet, as of 2010, you said that you found it hard to
13   believe, right?
14   A    Yes.
15   Q    You found it hard to believe something you had known
16   about four years earlier, right?
17   A    No.  I don't think I said -- I don't think I said that.
18   Q    And let's look at the final sentence of Exhibit 25103.
19        "Finally, if we find that people at present or in the
20   future are either engaging in or knowingly permitting others
21   to violate our code of conduct, they will be subject to
22   discipline, up to and including termination."
23        Did you mean that?
24   A    Yes.
25   Q    And when you found out about Mr. Villasenor, was he
```

1    subjected to discipline?

2    A    He was not.  He was already out on leave --

3    Q    Mr. Villasenor --

4         MR. QUINN:  Excuse me.  I don't think he finished

5    his answer, your Honor.

6         THE COURT:  Finish your answer, sir.

7         THE WITNESS:  He was already out on leave when I

8    found this out.  I understood it to be a stress leave.  I

9    would not issue a reprimand to someone who was out on a

10   stress leave.

11   BY MS. KELLER:

12   Q    Because you felt sorry for him?

13   A    No, I don't think it's wise to do.  I think it creates

14   more of a stressful situation.  I think it could be

15   hazardous, so I wouldn't do that until the person came back

16   to work and then probably address it at that point.

17   Q    And the reason he was stressed was because he said

18   Mattel had caused him to engage in criminal conduct, right?

19        MR. QUINN:  Assumes facts.

20        THE WITNESS:  I don't know.

21   BY MS. KELLER:

22   Q    You read his letter, didn't you?

23   A    I read his letter, yes.

24   Q    And if we could --

25        THE COURT:  Just a moment, Counsel.

 1            In what time period, though?  It's unclear to the

 2   Court and unclear to the jury.  Is this prior to the

 3   deposition of 2010 or back in 2006?

 4            MS. KELLER:  Your Honor, it was a letter that was

 5   previously on the board, and I'm trying to recall the

 6   exhibit number and I can't.

 7            9484.

 8            THE COURT:  All right.

 9   BY MS. KELLER:

10   Q   As a result of that letter, Mr. -- well, let me begin

11   again.

12       Mr. Villasenor said the stress he was under was that

13   Mattel was directing him to engage in misconduct, and he was

14   concerned about criminal liability, right?  That's the

15   stress?

16            MR. QUINN:  Your Honor, it's compound.  It assumes

17   facts.

18            THE COURT:  Just restate the question.

19            MR. QUINN:  The document speaks for itself.

20            THE COURT:  No, sustained, but you can ask the

21   question, Counsel.  It's compound.

22   BY MS. KELLER:

23   Q   Isn't it true that the stress Mr. Villasenor refers to

24   in this letter is the stress of being told by Mattel to

25   engage in misconduct that he thought could subject him to

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 65 of 109   Page ID #:309994
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

65

1    criminal liability?

2    A    That's what Mr. Villasenor says, yes.

3    Q    And if we could have Exhibit 36092.  This is

4    Mr. Villasenor's personnel file?

5    A    Excerpts of, it looks like -- looks like it was part of

6    his file.  I don't know if it's all of it.

7    Q    Do you see the little M at the bottom where --

8    A    Yes.

9    Q    -- Mattel production?

10   A    Yes.

11   Q    Okay.  Does this look like Mr. Villasenor's personnel

12   file to you?

13   A    It looks like it's what it would be.

14            MS. KELLER:  I would move 36092 into evidence,

15   your Honor.

16            THE COURT:  Received.

17            (Defendants' Exhibit No. 36092 is received in

18        evidence.)

19            MS. KELLER:  May we see page 61.  Specifically

20   under job title.

21            THE WITNESS:  I'm sorry.

22            THE COURT:  She should have it for you.  You don't

23   have to turn a page.  They should have that for you.

24            THE WITNESS:  Sorry, okay.

25

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 66 of 109   Page ID #:309995
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

66

1    BY MS. KELLER:

2    Q    This says effective date, 4/12/04.  Let's look under

3    job title.

4         MS. KELLER:  If we could expand that.

5    BY MS. KELLER:

6    Q    What does the job title say, sir?

7    A    Manager, market intelligence.

8    Q    Under former job title, what does it say?

9    A    Oh, manager, market intelligence.

10   Q    So even before April 12th, 2004, Mr. Villasenor's title

11   was manager, market intelligence?

12   A    Yes.

13   Q    And afterwards, correct?

14   A    I don't know about afterwards.

15   Q    And you don't know because you haven't looked at his

16   file, right?

17   A    I have looked through his file.  I don't recall his

18   exact titles at every year.

19   Q    You didn't look through his -- you didn't look through

20   his file in preparation for today, right?

21   A    I did.

22   Q    And when you looked through his file, did you see his

23   job title "manager, market intelligence"?

24   A    It did not ring any bell, so maybe I missed that piece.

25   Q    Well, you've been telling us for about the last hour

```
 1    that you didn't think there was --

 2             MR. QUINN:  Objection.  Argumentative.

 3             THE COURT:  Well, "the last hour" is stricken,

 4    Counsel.

 5             MR. QUINN:  And objection.

 6             THE COURT:  Sustained.

 7    BY MS. KELLER:

 8    Q    You've been telling us today --

 9             MR. QUINN:  Again, object, your Honor.  Move to

10    strike.

11             THE COURT:  Sustained.  We'll strike --

12             (Interruption in the proceedings.)

13    BY MS. KELLER:

14    Q    Do you recall your testimony today that you didn't

15    think there was any such thing as manager of market

16    intelligence?

17    A    Yes.

18    Q    And did you recall telling us today that you didn't

19    think there was any kind of market intelligence department

20    or unit; do you remember that?

21    A    I just said with the name "market intelligence."

22    Q    Do you recall your testimony that you didn't think

23    there was a market intelligence department or unit?

24    A    With the name "market intelligence."

25    Q    Now, if someone is to be the manager of market
```

1    intelligence, that indicates to you, as head of human

2    resources, that there is such a group within Mattel as

3    market intelligence for him to be manager of, right?

4    A    Correct.

5    Q    And this is, today, right now, the first you've ever

6    heard of that?

7    A    I had heard of market intelligence.  I don't remember

8    seeing his title being manager of market intelligence.

9    Q    But is today, right now, the first time --

10   A    Yes.

11   Q    -- that you have realized that there was actually a

12   market intelligence department for him to be manager of?

13   A    With the name of "market intelligence."

14   Q    You never knew that until just now?

15   A    Correct.

16   Q    And you've been denying it, in fact, today, right?

17   A    Yes.

18   Q    Is there a policy at Mattel for executives testifying

19   in this trial to insulate themselves from information that

20   they believe could be damaging if brought before the jury?

21   A    No.

22              MS. KELLER:  I have nothing further.

23              THE COURT:  Cross-examination, Mr. Quinn?

24              Mr. Quinn on behalf --

25              MR. QUINN:  Your Honor, may we have 5 minutes?

 1              THE COURT:  Certainly.

 2              Okay.  Ladies and gentlemen, you are admonished

 3    not to discuss this -- well, just a moment.

 4              This is off the record.

 5              *(Discussion held off the record.)*

 6              THE COURT:  All right.  You are admonished not to

 7    discuss this matter amongst yourselves, nor form or express

 8    any opinion concerning this case.  We'll see you tomorrow at

 9    8:30.  Have a nice evening.

10              *(The following proceedings is taken outside*

11        *the presence of the jury.)*

12              THE COURT:  Mr. Kaye, I've had a series of in

13    camera hearings involving almost every in-house and out

14    house -- or outside counsel from Mattel, and I've had the

15    pleasure of meeting both Mr. Normile.

16              THE WITNESS:  Normile.

17              THE COURT:  Thank you, sir, Normile, and

18    Mr. Moore.

19              I obviously will not disclose the nature of that

20    in camera hearing.  I think only Mr. Zeller has been here.

21    Mr. Gordon has been invited, who is in the audience.

22    Mr. Price was not here.  And Mr. Quinn was asked to remain

23    outside, and of course, MGA has not been present.

24              You have a number of times in your testimony

25    referred to legal handled that, legal handled that.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 70 of 109   Page ID #:309999
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

70

1           THE WITNESS:  Yes.

2           THE COURT:  Now, I'm quite capable of calling

3    everybody back down from legal.  I've got lots of time.  I

4    don't have enough to do, frankly, and if I need to, I will.

5           Who in legal was handling this?

6           THE WITNESS:  Which part of it?

7           THE COURT:  Well, we'll start with any part and go

8    through each part with you.  You start and tell me.

9           THE WITNESS:  As far as the -- as far as the Sal

10   Villasenor.

11          THE COURT:  Yes.

12          THE WITNESS:  The person I was aware of that was

13   handling that was a woman by the name of Jill Thomas.

14          THE COURT:  Jill Thomas, okay.

15          THE WITNESS:  The fact of the letter --

16          THE COURT:  Just a moment.  I couldn't hear you.

17   Could you pull that microphone closer, please.

18          THE WITNESS:  Sorry.

19          THE COURT:  Thank you, sir.

20          THE WITNESS:  The fact of the -- of the letter,

21   I -- I assume that was Bob Normile himself.

22          THE COURT:  Do you know or is that just an

23   assumption?

24          THE WITNESS:  I don't know if he assigned it to

25   any other attorney.

```
 1              THE COURT:  I'm trying to cause as few depositions
 2    Saturday as possible and not inconvenience people
 3    needlessly, okay?
 4              I had the privilege of going through at least six
 5    boxes of heretofore privileged information concerning
 6    counsel for Mattel.  One of the attorneys who I continually
 7    read documents about is Mr. Moore.
 8              THE WITNESS:  Yes.
 9              THE COURT:  Did you have direct dealings with
10    Mr. Moore concerning this; yes or no?
11              THE WITNESS:  No.
12              THE COURT:  No?
13              THE WITNESS:  No.
14              THE COURT:  Okay.  Was it with Mr. Normile?  Was
15    it with Mr. Normile that you had direct dealings?
16              THE WITNESS:  With which --
17              THE COURT:  Sal Villasenor.
18              THE WITNESS:  Sal Villasenor, it was Jill Thomas,
19    not Mr. Moore.
20              THE COURT:  Jill Thomas, okay.
21              Did you have any dealings with Mr. Moore
22    concerning Sal Villasenor?
23              THE WITNESS:  No.
24              THE COURT:  Thank you.  I think that will be very
25    helpful.
```

 1            Concerning Shore, Pilgrim or Plunkett or Rahimi or

 2    Rahim -- I'm sorry, Rahimi, I believe, did you do any

 3    investigation concerning any of those three people?  And I'm

 4    going to take you back to 2005 to begin with, about the time

 5    of this letter.

 6            THE WITNESS:  No, I did not know the names Rahimi,

 7    Plunkett at all.

 8            THE COURT:  Thank you.  And I think my final

 9    question to you, sir, is:  There's been some confusion about

10    whether you were a 30(b)(6) witness or not, so bear with me

11    for just a moment.  I don't want to go through this in front

12    of the jury tomorrow.

13            Was he designated -- well, when he was designated

14    a 30(b)(6) witness, I want to see the document now, I mean

15    right now, concerning what that designation was.

16            Excuse us for just a second.  It may clear up a

17    lot of problems.

18            THE WITNESS:  Do you want me to leave?

19            THE COURT:  No, you stay with me, now.  It may

20    clear up a lot of problems for tomorrow, about the scope of

21    what your testimony was in July of 2010.

22            MR. QUINN:  Your Honor, I have Mr. Kaye's

23    deposition from June 19th, 2010, where at the beginning,

24    Miss Hurst reads to him the subjects on which he's been

25    designated, and he acknowledges that.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 73 of 109   Page ID #:310002
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

73

1          THE COURT:  Let me have that.

2          MR. QUINN:  Now, I don't know whether there are

3     any other subjects.

4          THE COURT:  Well, Ms. Hurst is going to

5     double-check what I'm going to read into the record, that

6     will save a lot of confusion, and it will also give the

7     Circuit clear indication of how broad you are expected to be

8     prepared as a 30(b)(6) witness or how narrowly, okay?

9          Mr. Kaye, I'm going to read to you.  It's one of

10    your great pleasures in life.

11         Question:  "Mr. Kaye, do you also understand that

12    you've been designated on Topic 2 of MGA's third Phase 2

13    deposition notice, which reads as follows:

14         "Quote, 'Each form of agreement in use by Mattel

15    from 1975 to the present between Mattel and its employees or

16    independent contractors that Mattel contends governs, A, the

17    ownership or assignment of any original works of authorship

18    or inventions of its employees or independent contractors,

19    and/or B, the use disclosure or protection of information

20    that Mattel considers to be confidential to which its

21    employees or independent contractors were privy, including,

22    without limitations, subparagraph (a), Mattel's

23    understanding of the meaning of each and every term of each

24    such form of agreement and use during the applicable time

25    period;

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 74 of 109   Page ID #:310003
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

74

1          "'Subparagraph (b), the consideration for each

2     term of each such form of agreement and use during the

3     applicable time period;

4          "'Subparagraph (c), the categories of employees at

5     Mattel who signed or were expected to sign each such form of

6     agreement;

7          "'(d), the total number of employees in each

8     category who signed or were expected to sign each such form

9     agreement;

10         "'(e), the identity of the drafters that reach

11    such form of agreement;

12         "'(f), the reasons for all change in the form of

13    agreement over time;

14         "'(g), any practices or procedures in use at

15    Mattel for the disclosure of original works of authorship or

16    inventions pursuant to such form of agreement;

17         "'(h), Mattel's practices or procedures with

18    respect to requiring employees to sign revised forms of such

19    agreements after such employees were employed, and whether

20    Mattel offered any additional or new consideration;

21    therefore.

22         "'(i), Mattel's waiver or modification for any

23    employment of any term of any form of agreement encompassed

24    by this topic.'"

25              Answer:  "Yes."

1           "And have you prepared yourself to testify in the

2    entirety of Topic 2, and its subparts, and I've just read to

3    you here today?"

4           Answer:  "Yes."

5           "Thank you, Mr. Kaye.

6           "Do you understand that you've been designated to

7    testify here today on behalf of Mattel with respect to Topic

8    3, any form of agreement not already identified in response

9    to Topic 2, as well as policies, practices and procedures

10   used by Mattel during the period 1985 to the present time,

11   the disclosure of purportedly confidential information or

12   concern, the author" --

13          I think that's a misprint on page 7, but I'll read

14   it the way it is.

15          "The disclosure of purportedly confidential

16   information or concern the ownership or assignment of

17   original works of authorship or inventions of its employees,

18   including, without limitation" --

19          And I think the way, if I understand the

20   designation correctly.

21          -- "you are only designated with respect to the

22   specific parts, subparagraph (d), quote, 'The Mattel survey

23   found at M0097977,' which we've identified as the Mattel

24   2004 code of conduct survey, and subparagraph (f), the

25   conflict of interest questionnaires Mattel used during the

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 76 of 109   Page ID #:310005
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

76

1   specified time period; is that correct?"

2          Answer:  "Yes."

3          Question:  "And you've prepared yourself or will

4   have prepared yourself by the time we get to those topics to

5   testify on 3-D and F here today, correct?"

6          Answer:  "Yes."

7          "All right.  And you consent to testify."

8          Is that what you recall you were designated to

9   testify to, sir?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.

12          Then counsel, there will not be any further

13   reference to a 30(b)(6) witness in this area.  You can

14   question about his position as human resources and what he

15   would logically do or investigate or what he knew, but there

16   is absolutely no more designation that he is prepared on

17   30(b)(6).

18          Now, what did I just say, Ms. Keller?  Repeat it

19   back to me.

20          MS. KELLER:  You said on this topic, there will be

21   no more questioning about anything under 30(b)(6), that I

22   can question him about anything he would logically

23   investigate as head of human resources.

24          THE COURT:  Who is cross-examining in this regard?

25          Mr. Quinn, what did I just say?

 1          MR. QUINN:  You said no more questioning on this

 2   subject as a 30(b)(6) witness.

 3          THE COURT:  As a 30(b)(6) witness.  All right.

 4          Now, do you need his preparation for tomorrow in

 5   terms of any of these files so he is not caught by surprise?

 6   In other words, the area of inquiry is proper.  The way he's

 7   being question and the expectation that he was designated as

 8   a 30(b)(6) is not.  So if so, then you can prepare him

 9   tonight and tell him what you need tomorrow, but there is no

10   reason you should be caught unprepared in that regard.

11          And if they are going to be questioning you about

12   your role as the human resources director and what you

13   should have known, you are entitled to look at documents, if

14   at all possible.

15          Anything else you wanted to look at on behalf of

16   MGA?

17          MS. KELLER:  No, your Honor.

18          THE COURT:  On behalf of Mattel?

19          MR. QUINN:  No, your Honor.

20          THE COURT:  And sir, if you'd return promptly at

21   8:30.  Just come in and be seated, and we'll get started

22   right at 8:30.

23          THE WITNESS:  Right here?

24          THE COURT:  Yes, sir.  Thank you very much.

25   Goodnight.

1           THE WITNESS:  Good night.

2           THE COURT:  All right.  Let's go back to the

3    doctor who should be in the hallway, and let's have a

4    discussion concerning this doctor.

5           Mr. Quinn, I'm going to take your first objection

6    concerning Dr. Albert Lyter, and that is, from memory, and

7    we'll need -- I may need to take a recess, but let's see if

8    we can encapsulate some of your concerns.

9           The first concern is --

10          Oh, Mr. Gordon, what a pleasure to have you here,

11   sir.  You'll be here at 8:00 on Saturday; is that correct?

12          MR. GORDON:  (No audible response.)

13          THE COURT:  You'll be here at 8:00 on Saturday; is

14   that correct?

15          MR. GORDON:  Across the street, I will be.

16          THE COURT:  You will be, but I will be sitting

17   here waiting for you.

18          And Mr. O'Brien will be present.  If there is an

19   issue, you get over here.

20          MS. HURST:  Your Honor, may we have the deposition

21   of Ms. Thomas on Saturday as well?

22          THE COURT:  Well, I'm going to get that.  We may

23   have a number of depositions Saturday.  I'm learning more

24   and more, and I don't know that Mr. Moore, now, is my focus,

25   but we'll start with him.  You already requested to depose

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 79 of 109   Page ID #:310008
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

79

1    Mr. Moore, and I simply cut off that deposition because we

2    were at the last portion of the discovery, and I didn't feel

3    there was time, quite frankly.  But regardless, it's taken

4    on renewed interest by the Court, so you're going to be able

5    to depose Mr. Moore.  We're starting there, anyway.

6            Now, the first concern that you had was his being

7    discredited by virtue of what I believe you are referencing

8    is a magistrate judge in the Northern District of Illinois.

9            Mr. Quinn?

10           MR. QUINN:  I actually have three opinions.  Let

11   me see.

12           One is the Learning Curve Toys case.  That is --

13           MS. HURST:  I don't have any of them, your Honor.

14   May I --

15           MR. QUINN:  That is Northern District Illinois.

16           THE COURT:  Okay.

17           MR. QUINN:  It says Paul Meyer J., it says.  It

18   doesn't identify Paul Meyer J. as being a magistrate judge

19   or not.

20           THE COURT:  It's a magistrate judge.

21           MR. QUINN:  All right.  So that is Learning Curve

22   Toys LP v. Playwood Toys.

23           THE COURT:  Okay.  What else?

24           MR. QUINN:  Does the Court want the citation or

25   no?  It sounds like the Court's familiar --

```
 1              THE COURT:  Yeah, I've got it.

 2              MR. QUINN:  Okay.  The other case is in my

 3   favorite place in the world, your Honor, Hong Kong.  It

 4   doesn't relate to toys, it doesn't relate to toys or dolls,

 5   believe it or not.

 6              THE COURT:  The whole -- nevermind.

 7              MR. QUINN:  But it's a case called Lau King Ting

 8   Katie, et al., v. Chang Miu Har Stella, et al., in which --

 9              THE COURT:  And the Hong Kong magistrate found?

10              MR. QUINN:  This is the Honorable Reyes J. in

11   court.  Beyond that, I know not, your Honor.

12              THE COURT:  Thank you.  Your next case.

13              MR. QUINN:  And the Court did reject his opinion

14   on dating of ink.

15              THE COURT:  Okay.

16              MR. QUINN:  Oh, this is, your Honor, the

17   magistrate opinion.  It's also from the Northern District of

18   Illinois.  It's Watts v. Cypress Hill, March 12th, 2008.

19   This is by Martin C. Ashman, United States magistrate judge,

20   which leads me to believe that Paul Meyer may have been a

21   district court judge.

22              THE COURT:  You may be right.  I'll go back and

23   check.  This is the case I'm thinking about.

24              MR. QUINN:  Yeah, I believe so, your Honor.

25              THE COURT:  Let me ask you two questions.  If I
```

 1   allowed that type of testimony to come in, that means

 2   virtually every expert could be credited or discredited not

 3   only by an individual magistrate or district court's

 4   finding, but also could be discredited every time we reject,

 5   and you've got a few of those in this case, correct?

 6            MR. QUINN:  Yes, your Honor.

 7            THE COURT:  And you can imagine Wagner, for

 8   instance, if I wanted to make a complete record not allowing

 9   the Georgia Pacific factors.  I find it hard to make a

10   ruling based on that kind of rejection because it literally

11   could also be argued in every occasion where an expert

12   testified and a jury reached the opposite result that that's

13   also the discrediting of that expert.

14            So what I think you probably have is a Kumho

15   Daubert issue staring at you in the face in the Northern

16   District of Illinois, but I'll go back again and look at my

17   records, okay?  I don't think that that's the qualifier.  I

18   think the qualifier for both of you is whether this person's

19   qualified or not or have been rejected in terms of

20   qualification.  And if the person has been rejected in terms

21   of qualification, in other words, going forward, I think

22   that person has to state "I did not qualify on such and such

23   a date."

24            The disqualification, if a person is testifying

25   20, 40, 50, 60 times I think is literally stepping over the

1    bounds in terms of my allowing either of you to get into

2    that, whether it's so Aginsky or whether it's Lyter, but I'm

3    going to hear from both of you.  I'm happy, remember, to

4    keep opening the box, as long as you both.

5              Who are you?

6              MR. DE CORSO:  Tony DeCorso, your Honor.

7              THE COURT:  Who is he?

8              I can't hear you.

9              MR. DE CORSO:  Tony DeCorso.

10             THE COURT:  What are you doing here?

11             MR. DE CORSO:  I'm a lawyer for Orrick,

12   Herrington & Sutcliffe.

13             THE COURT:  That's nice.  Have a seat in the back,

14   sir.  You are not lead counsel.

15             Now, I want to hear from you.

16             MR. QUINN:  Your Honor, it's my experience that if

17   there's a court opinion where a court has found that an

18   expert, he's qualified, he has qualified, but the work he

19   has done is unreliable, rejecting the expert's opinion, that

20   that's something that sticks with the expert, and it's fair

21   cross-examination.  I think if you look at Wright Miller

22   or --

23             THE COURT:  I'll take a look at it tonight.  I'm

24   not certain.  In other words, it's something I've never done

25   before.  I'm not used to that.  Usually it's been a

```
 1    qualification, but I have an open mind.  Let's take a look
 2    at that tonight.
 3              MR. QUINN:  Okay.
 4              THE COURT:  Okay.  Let me hear from Ms. Hurst.
 5              MS. HURST:  Your Honor, my experience has been the
 6    opposite in any time I've tried to cross-examine an expert
 7    based on prior rejected opinions.  I've been shut down
 8    and --
 9              THE COURT:  I'll expect five pages by 8:00 tonight
10    from both of you.
11              MS. HURST:  And may I just add --
12              THE COURT:  Ms. Hurst?
13              MS. HURST:  May I just add the following point?
14              THE COURT:  Certainly, but I'm not going to make
15    up my mind until --
16              MS. HURST:  I understand, your Honor, but at a
17    minimum, they would have to show that it's the same type of
18    issue.  In other words, that it's on all fours, which is
19    going to be a mini trial in a mini trial, then, when you are
20    going to hear two competing views about what was that really
21    about, and why it's not pertinent, and so forth.
22              THE COURT:  That's why I am not going to guess.
23    That's why you are both going to go out and do the research.
24    You're going to give me five pages by 8:00 tonight; it's
25    very simple.  That way I'll know the facts, I'll know
```

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 84 of 109   Page ID #:310013
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

84

 1   whether this is synonymous, and I'm not doing this on a wing

 2   and a prayer.

 3          MS. HURST:  Can we be provided with this so-called

 4   Hong Kong thing, because I've never seen that before.

 5          THE COURT:  Mr. Quinn is walking over to you to

 6   give you a copy right now.

 7          MR. QUINN:  I have one copy, your Honor.  I'll be

 8   happy to --

 9          THE COURT:  As the two of you are sharing that

10   copy.

11          All right.  Now, the second concern you had is

12   this continuing saga, which is 05928-0007.  And the

13   paragraph that Mr. Quinn wants to read and have put up on

14   the board reads as follows:

15          "If, and only if, it were assumed both that

16   Dr. Aginsky is correct in his detection of menthol, and that

17   the menthol was from the ink sample itself rather than from

18   an external containment, would it be appropriate to conclude

19   that a second writing instrument was used for prepare the

20   fifth line of the August 26th, 1999 entry?

21          "The acceptance of these assumptions is dangerous,

22   however, in light of the previously stated unlikelihood that

23   menthol would be found in black ink," or I'm sorry, "in

24   black gel ink.  Due to the unlikely presence of menthol in

25   the ink, if there is menthol present, it's likely that it

 1    came from some external containment as stated above."

 2              So let's go over the history of this, once again,

 3    for the Circuit.

 4              Mattel had initially come forward with an expert,

 5    Mr. Aginsky, who I allowed to testify about his finding of

 6    menthol and the testing that went into it and his reasons

 7    and expertise for that.  But pursuant to that, either

 8    Mr. Price, Mr. Quinn?

 9              MR. QUINN:  Quinn.

10              THE COURT:  Mr. Quinn, okay.

11              Mr. Quinn had asked the Court, then, to allow the

12    expert to rely upon a document from Japan showing that such

13    a pen existed, and I think you mentioned a pen of some type

14    from Europe also.  I think France.  I may be mistaken.

15    Let's just take Japan --

16              MR. QUINN:  I'm remembering Japan, the Zebra.

17              THE COURT:  Okay, Japan.

18              And the Court declined to do so because I found

19    under 703, it was not appropriate at that time and invited

20    Mattel to fly whoever this person was over to testify

21    personally, because although it wasn't for the truth of the

22    matter asserted, it would be taken such by the jury.

23              MGA, of course, objected.  I thought that was the

24    improper way to bring this evidence in front of the jury,

25    although if such a pen existed, Mattel was not precluded.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 86 of 109   Page ID #:310015
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

86

1    That person was not produced.

2          Now, on cross-examination, MGA comes forward, and

3    I thought limiting itself to menthol, but then got into an

4    area that would cause the very thing that now Mr. Quinn

5    would be concerned about, and that is 4,000 pens collected

6    by Dr. Lyter, and apparently what was going to be an opinion

7    that all of his examination of the 4,000 pens, he can't find

8    a pen with menthol.  In addition, Ms. Hurst called to the

9    Court's attention that this Court allowed Ms. Hurst to ask

10   Dr. Aginsky if such a pen existed, and Dr. Aginsky said no.

11         Once this box opens under 703, it's very, very

12   speculative, and you've now withdrawn that question.  What

13   is this paragraph about, and what's your concern, first of

14   all, on behalf of MGA?

15         MS. HURST:  My concern is that Mr. Quinn wants to

16   ask about this portion of the opinion, which is expressly

17   supported with reference to the witness' experience and

18   lack -- the lack of such a pen, the lack of existence of

19   such an ink sample or pen.  And if a portion --

20         THE COURT:  No.  Just a moment.  He doesn't say

21   that.  In other words, I'm not inclined to let either one of

22   you to get into pens, quite frankly.

23         MS. HURST:  Right.

24         THE COURT:  But he doesn't say that.  What he said

25   is that this could be accounted for.  He simply states,

1    "Rather than from an external containment, it would be

2    appropriate to conclude that a second writing instrument was

3    used to prepare the fifth line of the August 26th, 1999

4    entry."

5            And I think that's what Mr. Quinn is after, so I

6    am not quite certain what your concern is.

7            MS. HURST:  My concern is the next sentence, your

8    Honor.

9            THE COURT:  Well, just a moment.  Let's see if

10   Mr. Quinn is going to ask that.

11           MS. HURST:  Well, no.  In order to give the basis

12   for the opinion that is expressed and the qualifications to

13   it -- in other words, just reading the first sentence is

14   completely unfair because the rest of the paragraph

15   qualifies the first sentence.

16           THE COURT:  Just a moment.

17           MS. HURST:  Expressly qualifies it.

18           THE COURT:  Just a moment.

19           Nothing in this paragraph seems to speak to

20   whether there is or isn't a pen in the entire world that

21   contains menthol.

22           MS. HURST:  Your Honor, the sentence referencing

23   the previously stated unlikelihood that menthol would be

24   found in black gel ink --

25           THE COURT:  No.  Just a moment.  That doesn't say

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 88 of 109   Page ID #:310017
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

88

1   a pen.  It says "black gel ink."

2          MS. HURST:  Right, but it's a reference to prior

3   portions of the witness' opinion which include the issue of

4   the pen.  It's this -- it's one of the same.

5          THE COURT:  Let's find out if he's going there.  I

6   mean, if he's not going there, and that testimony came in

7   and was limited, I don't understand your concern.

8          MS. HURST:  My concern is Mr. Quinn wants to read

9   the first sentence, okay?

10         THE COURT:  Just a moment.  He wants to read the

11  entire paragraph?

12         MS. HURST:  No.  He only wants to read the first

13  sentence.

14         MR. QUINN:  Actually, just the first sentence,

15  your Honor.

16         THE COURT:  All right.  Just a moment.

17         So you want to read "if and only if"?

18         MR. QUINN:  Yes.

19         THE COURT:  "It were assumed that both Dr. Aginsky

20  was correct in his detection of menthol and that the menthol

21  was from the ink sample itself rather than from external

22  containment, would it be appropriate to conclude that a

23  second writing instrument was used to prepare the fifth line

24  of August 26th, 1999."  And what is your concern now?

25         MS. HURST:  My concern is that sentence was

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 89 of 109   Page ID #:310018
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

89

 1   expressly qualified with the remainder of the paragraph.

 2            THE COURT:  Okay.  Now, just a moment.

 3            MS. HURST:  And it's, therefore --

 4            THE COURT:  Just a moment.

 5            So to respond to that, you feel that you'd have to

 6   read the second sentence.

 7            MS. HURST:  And the third.

 8            THE COURT:  What's your concern?  That doesn't

 9   speak -- now, just a moment.

10            That doesn't speak to whether there's a pen or not

11   that exists, does it?

12            MS. HURST:  It does.

13            THE COURT:  Is that because you're concerned about

14   "in black ink gel" or "black gel ink"?

15            MS. HURST:  Yes, yes, because I know that if the

16   witness is asked to explain that, one of the reasons for

17   what he's put here is his familiarity with pens and ink

18   samples, which is exactly what I asked about, and the Court

19   precluded, and I thanked the Court for the opportunity to

20   draw back and not solicit that.

21            So now what Mr. Quinn wants to do is get it

22   another way.  He wants the first sentence knowing that I,

23   then, got to read the other sentences and inquire into the

24   foundation for that, and, once again, it's another route to

25   try and open the door for this hearsay about pens.  And it's

1    not fair to introduce the first sentence without the

2    qualifications and preclude the witness from testifying one

3    of the major bases for his opinions, which is that in all

4    his experience with pen and ink samples, he's never seen an

5    ink like this.

6              Now, we've already --

7              THE COURT:  Now, just a moment.  I'm happy to open

8    that up, but once I do, then in the response, Mr. Quinn is

9    going to be allowed to ask, although it's not for the truth

10   of the matter, what the expert relies upon.  So there we are

11   again, we've --

12             MS. HURST:  It will be for the truth of the

13   matter.  They are trying to get the fact of the existence of

14   the Japanese pen in.

15             THE COURT:  No, no, just a moment.  I trust the

16   American jury system more than you do.  When I say it's not

17   for the truth, it's not for the truth.

18             MS. HURST:  It's not relevant if it's not for the

19   truth.  It's not relevant if it's not for the truth.  It has

20   to be for the truth.

21             MR. QUINN:  It goes to his credibility, your

22   Honor.

23             MS. HURST:  No.

24             THE COURT:  Well, just a moment, you two.

25             Okay.  Let me think about that because we are

1    going to have a meeting.

2           MR. QUINN:  And your Honor, there is one other

3    sentence I asked to read.  It's in the next paragraph.  It's

4    in the middle of the next paragraph, the sentence beginning

5    "Indeed, even if the entry on the fifth line" --

6           THE COURT:  Just a moment.

7           "Indeed, even if the entry on the fifth line of

8    the 8/26/99 entry had been made with a different writing

9    instrument, it could have been made by Ms. Prince within

10   seconds or minutes after she wrote the first four lines."

11          Now, just a moment.  The other opposite argument

12   for both of you is, how is he qualified to make this kind of

13   statement, regardless?  He's here for menthol and his

14   testing, quite frankly, and he's speculating about what a

15   person did, and he has absolutely no relevance.

16          MR. QUINN:  Well, Dr. Aginsky -- as he states

17   here, he -- in this it passage, he's criticizing the

18   Aginsky's opinion.  If you read the beginning of the

19   paragraph, "Aginsky said these were different inks written

20   necessarily different times, that the fifth line was not

21   prepared contemporaneously."

22          THE COURT:  Okay.

23          MR. QUINN:  And Dr. Lyter recites that, and he

24   says, "I disagree," and then he goes on to say that.

25          THE COURT:  Okay.  I'll take a look at this.

 1   We're going to have a meeting tonight.

 2          All right.  Now, what else do we need to do before

 3   we get back to these notebooks?  Because I think we're

 4   covering ground rapidly, now, and I'm worried about Mattel

 5   having the information that you need for tomorrow and the

 6   next day.

 7          MR. QUINN:  We have some issues on witnesses.

 8   They want to call Mattel witness by the name of Ramano -- I

 9   mean, there's been a big change in who they want since we've

10   reviewed binders this weekend, which is fine; we are trying

11   to roll with them and crank out the binders.  I'm not --

12          THE COURT:  Time out.  Where have I heard this

13   before?

14          MR. QUINN:  You know, we have no problem with it,

15   your Honor.  We have no problem it.

16          THE COURT:  Okay, good.

17          MR. QUINN:  They now want tomorrow -- well, here

18   is one problem.  A new witness, Ramano, who's a gentleman

19   who lives in France.  He's a Mattel employee.  We are going

20   to get him on an airplane.  They want him here tomorrow.

21          THE COURT:  Well, I don't think we can accomplish

22   that.

23          MR. QUINN:  You know, the space shuttle retired,

24   your Honor.

25          MS. HURST:  Well, we asked them yesterday, and

1    they had never told us he was out of the country; never.

2    They accepted service of a subpoena.  They didn't tell us he

3    was out of the country.  We asked him yesterday.  It was

4    two-days' notice.

5            THE COURT:  Has he been served?

6            MS. HURST:  Yes.  They accepted service on January

7    25th, and they never notified us that there were any issues.

8            THE COURT:  Just a moment.

9            MR. ZELLER:  I will show the Court the e-mail.  It

10   was after we left session yesterday, we got a series of

11   e-mails, not alerted to any problem at all on this.  First

12   one said, "We are going to call Dr. Joachimsthaler as our

13   additional witness for the week."  And then well after 5:00,

14   or whenever it was, we received another e-mail, so that now

15   in the middle of the night in France when they first asked

16   for Mateo Ramano.  So we've been making arrangements today

17   to get him here.  But somehow that in the middle of the

18   night France-time is proper due notice to us?  It doesn't

19   really wash.

20           THE COURT:  I'll send you, Mr. Zeller, personally

21   to go get him.

22           MR. ZELLER:  Oh, I will volunteer.

23           (Laughter.)

24           THE COURT:  All right.  Well, let's do this.

25   Obviously, he's not going to be here.  When -- when will he

1   be here?

2          MR. ZELLER:  I think he can be prepared and ready

3   to testify on Tuesday.

4          THE COURT:  Okay.

5          MS. HURST:  Your Honor, they told us Friday

6   earlier --

7          MR. ZELLER:  No, we did not.

8          THE COURT:  No.  This quibbling is unnecessary

9   because, first, he can't be here.

10          MS. HURST:  He can be here.

11          THE COURT:  He can?

12          MS. HURST:  They told us earlier they could have

13   him here, but there wouldn't be time to prepare him before

14   Friday, so they would get him on the stand on Friday.  So

15   really?  When Mr. Machado had showed up, he was ordered to

16   come directly from the airport.  That's what we are talking

17   about here.

18          THE COURT:  Well, when does he fly in?

19          MR. ZELLER:  I've been in court, so I don't know

20   the details of his itinerary.  I will -- I will go find out,

21   but --

22          THE COURT:  Watch.  Watch.

23          MR. ZELLER:  But Judge --

24          THE COURT:  No, no.  Just tell me when he flies

25   in.

1          MR. ZELLER:  I mean, it's 11:00 now in France.

2          THE COURT:  Well, I know, but he must already have

3   a plane ticket, so tell me when he's flying in.

4          MR. ZELLER:  I have to find out who I should be

5   asking who made the arrangements.

6          THE COURT:  Go ahead.

7          MR. ZELLER:  Judge, can I say something about -- I

8   mean, if the standard is Machado, then frankly, we should

9   have weeks to produce Mr. Ramano.

10          THE COURT:  I think I may agree with you.  I just

11   want to know when he's flying in.  That doesn't mean he's

12   coming to court that day.  I just want to know when he's

13   flying in.

14          All right.  Let's cover our next witness while

15   Mr. Zeller is checking.

16          After Alan Kaye, I thought that we had Cassidy

17   Park?

18          MS. HURST:  We're going to go to Fontanella next.

19          THE COURT:  Okay.  Now, remember, as I'm preparing

20   these -- so Adrienne Fontanella?

21          MS. HURST:  Yes.

22          THE COURT:  Do I have notebooks for Adrienne

23   Fontanella?

24          MS. HURST:  Yes, and you reviewed them.

25          THE COURT:  I know, but I usually get updates,

1     lots of updates.  Do we have updates?  Are you both

2     satisfied?

3               How long will Adrienne Fontanella take?

4               MS. HURST:  Not very.

5               THE COURT:  No, that doesn't answer my question.

6               MS. HURST:  I know.  I'm just thinking.

7               THE COURT:  Well, think; how long?

8               MS. HURST:  An hour for us.

9               THE COURT:  Okay.  Who is cross-examination

10    Adrienne Fontanella?

11              MR. ZELLER:  I am, your Honor.

12              THE COURT:  How long do you think?

13              MR. ZELLER:  It's going to be extremely brief,

14    from our perspective.  There's nothing --

15              THE COURT:  How long?

16              MR. ZELLER:  I'm sorry, what was our estimate

17    again?

18              One hour?  I would imagine a half an hour.

19              THE COURT:  Take an hour.

20              MR. ZELLER:  All right.

21              THE COURT:  And I'm not holding either one, but

22    just trying to get an idea of how we can keep both sides as

23    well prepared as possible.

24              Now, since you two are talking outside of my

25    presence, apparently, after Adrienne Fontanella, who is your

1    next witness for tomorrow; is that correct?

2              MS. HURST:  Mr. Kilpin.

3              THE COURT:  No.  Adrienne Fontanella is your next

4    witness after Mr. Kaye?

5              MS. HURST:  Yes.

6              THE COURT:  And Mr. Kilpin, I believe we have gone

7    through Mr. Kilpin's books.

8              MR. ZELLER:  We have not.

9              THE COURT:  We have not?

10             And do we have those books ready for tonight.

11             MS. HURST:  We do.

12             MR. ZELLER:  We were told today that they want

13   him, now.

14             THE COURT:  All right.

15             How long do you believe you'll be with Mr. Kilpin?

16             MS. KELLER:  About an hour and a half, your Honor.

17             THE COURT:  And who is going to cross-examine

18   concerning Mr. Kilpin?

19             MR. QUINN:  I will, your Honor.

20             THE COURT:  Okay.  How long do you think?

21             MR. QUINN:  Maybe half-hour, 45 minutes.

22             THE COURT:  I'm just going to put down an hour.

23   I'm not holding either one of you to it.  It's just giving

24   me a rough estimate of how I can keep you both prepared.

25             After that, who did you plan to call?

1           MS. HURST:  Mr. Ramano.

2           THE COURT:  Mr. Ramano, who Mr. Zeller is waking

3     up right now.

4           Don't worry, you'll have your record in just a

5     moment.

6           If Mr. Ramano was here, how long?

7           MS. HURST:  Forty-five minutes.

8           THE COURT:  So one hour.

9           And how long do you think on cross-examination?

10    Who has Mr. Ramano?

11          MR. ZELLER:  I assume I will.

12          THE COURT:  Okay.  About?  Remember I'm not

13    holding you to this.  It just depends how many books you go

14    through tonight.

15          MR. ZELLER:  I would say the same amount of time.

16    There is nothing affirmative, then, that we need from --

17          THE COURT:  Okay.  And after Mr. Ramano, since I'm

18    not privy to some these conversations, who will you call

19    next?

20          MS. HURST:  Well, we had asked Ms. McShane, and

21    she's on pain medication and doesn't want to testify until

22    next week.

23          THE COURT:  And where is she located?

24          MS. HURST:  Here in California.

25          THE COURT:  Where?

 1            MS. HURST:  Yucca Valley.

 2            THE COURT:  And how long is your examination of

 3   McShane?

 4            MS. HURST:  An hour.

 5            THE COURT:  And how long do you estimate?

 6            MR. QUINN:  I will do McShane; half-hour.

 7            THE COURT:  Hour.

 8            Now, this doesn't count recross or redirect.

 9            Who after that do you plan to call?

10            MS. HURST:  Probably Eric Joachimsthaler.

11            THE COURT:  Okay.  Tell me who he is.

12            MS. HURST:  He's our expert in branding issues.

13            THE COURT:  And how long do you believe you'll be

14   on direct?

15            MS. KELLER:  An hour, your Honor.

16            THE COURT:  Mr. Zeller, what do you think?

17            Mr. Quinn?

18            MR. QUINN:  We'll be doing him, if he testifies.

19   We have a motion on him, your Honor.

20            THE COURT:  Okay.  And after Joachimsthaler?

21            MS. HURST:  One second, your Honor.

22            I'm not sure exactly which order yet, but people

23   we have lined up for Friday include Mr. Turetzky, we've

24   requested Ms. Plunkett from Mattel, Mr. Villasenor and

25   Mr. Bousquette.  So far Mr. Bousquette's attorney is not

1    responding to us.

2          THE COURT:  Does he live in California?

3          MS. HURST:  I know he has a residence in

4    California.  That's where we served him.

5          THE COURT:  He's been served?

6          MS. HURST:  Yes.

7          THE COURT:  And do I have jurisdiction over him?

8          MS. HURST:  I believe so, yes.

9          THE COURT:  Who is his attorney?

10         MS. HURST:  Mr. Caldwell?

11         MR. MC CONVILLE:  Caldwell.

12         MS. HURST:  Mr. Caldwell at the Caldwell Leslie

13   firm.

14         THE COURT:  Do you want to get him on the phone

15   for me?  What's his number?

16         MS. HURST:  Just a moment, your Honor.

17         MR. MC CONVILLE:  (213)629-9049.

18         THE COURT:  Okay.  Who after Mr. Bousquette?

19         MS. HURST:  We figured that would get us through

20   the end of the week, your Honor.

21         THE COURT:  Well, it's your time.

22         MS. HURST:  If it doesn't get us through the end

23   of the week, then we'll --

24         THE COURT:  The clock continues to run.

25         MS. HURST:  Understood.

1          THE COURT:  Simple as that; it's a running clock.

2          MS. HURST:  And your Honor, we still have that

3    problem with Tyler Bradly.  We've tried repeatedly.  We

4    wanted to get her on Friday as well.

5          THE COURT:  Tyler Bradly?

6          MS. HURST:  And she's in Georgia.

7          THE COURT:  She's in Georgia.  Okay, we'll try.

8    We'll call in just a few moments, although there is a

9    three-hour time difference.

10          Who else?

11          MR. MC CONVILLE:  Do you want that number, Judge,

12    or no?

13          THE COURT:  Not yet.  I don't think we'll probably

14    get her at this time, but --

15          Now, here is the big change I see between the two

16    of you that I wasn't aware of.  Let me read back to you what

17    I believe the order of witnesses were that each of you were

18    going to call for just a moment.

19          I wasn't holding you necessarily to this order,

20    but the one witness that's now been deleted was rather

21    significant.  So we knew we were finishing Margaret Leahy.

22    We had gone over the next witness, which was to be Albert

23    Lyter, who we finished.  We've gone through all of the

24    notebooks on Cassidy Park except the cross-examination by

25    Mattel.  Those books hadn't been prepared.

1          Cassidy Park seems to be a rather significant

2    change if you are not calling her, because I believe that

3    that would fill a significant period of time.

4          Alan Kaye is presently on the stand, but I don't

5    know how much longer.

6          Teresa Newcomb?

7          MS. HURST:  We don't think we're going to need

8    her, in light of Mr. Kaye's testimony.

9          THE COURT:  That's another significant change, and

10   those were two witnesses that I thought that each party was

11   going to call so that we fill the rest of the week, or at

12   least until Thursday.

13         MS. HURST:  Originally, Mattel had indicated that

14   they would call Cassidy Park and ultimately decided not to,

15   and I think we find ourselves in the same position.

16         THE COURT:  Those are the changes occurring

17   between the two of you where I'm preparing, and I don't mind

18   each you changing, but as I'll remind you, it's your clock,

19   and you can complain all you want to, but I don't know if

20   Ramano is going to be here.  Now, I'm going to find out when

21   the plane lands, and we are going to sit here until we do.

22         MR. ZELLER:  He lands -- he's on a flight that

23   hands at 1:00 p.m. on Saturday.

24         THE COURT:  On Saturday.

25         MS. HURST:  There is an Air France flight leaving

1   Paris tomorrow morning at 10:45 French time and arriving LAX

2   at 2:15.  He can be here tomorrow if he wanted to.

3          THE COURT:  And what occurred between the two of

4   you?  In other words, Fontanella will take a little bit of

5   time tomorrow.  Kilpin will take a little bit of time, and

6   we'll go through those notebooks this evening, but I'd hate

7   to see a running clock where you're just sitting.

8          And so my question is why can't Turetzky or

9   Plunkett or Villasenor be here?  Why can't we get Bousquette

10  in here, which I think I can certainly do?

11         MS. HURST:  Turetzky lives in Seattle.

12         THE COURT:  That's a 2 hour and 15 minute flight.

13         MS. HURST:  Right, and we asked him to be here on

14  Friday, and he agreed to be here on Friday.

15         THE COURT:  Okay.  Plunkett?

16         MS. HURST:  She's a current Mattel employee.

17         THE COURT:  And where is she located?

18         MS. HURST:  I believe in Southern California.

19         THE COURT:  She can be here also.

20         Sal Villasenor?  There doesn't appear to be a

21  problem, once again, and as Mattel has had to disrupt

22  sometimes in their order of presentation, there is no reason

23  that you can't disrupt, to a certain extent.

24         So the big change for me is Newcomb and Cassidy,

25  which we'd all prepared for, and I'm not forcing you to put

1    them on the stand, but I am not very sympathetic, quite

2    frankly, to the claim that one particular witness has to be

3    here and especially when I haven't been included in that

4    conversation.

5            So I'm not going to get into a quibbling match

6    with either of you or between either of you.

7            Adrienne Fontanella will be here tomorrow morning;

8    is that correct?

9            MR. ZELLER:  Yes.

10           THE COURT:  Is that correct?

11           MS. HURST:  I hope so.

12           THE COURT:  Well, I know how to issue a warrant.

13           MS. HURST:  Okay.  We are --

14           THE COURT:  Mr. Zeller, fine, thank you.

15           He said she'll be here.

16           MR. ZELLER:  She has been here, and she has been

17   waiting.

18           THE COURT:  Thank her for her courtesy.

19           Kilpin?

20           MS. HURST:  He's our current executive.

21           THE COURT:  He'll be here.

22           Regardless, it doesn't sound to me like Ramano is

23   going to be getting on the plane regardless of how

24   frustrated you are and without me getting into the middle of

25   your various e-mails and the exchanges that are coming to

1    this Court at the last moment, and I'm not going to decide

2    that between the two of you.

3             So if you choose not to include me, then you both

4    go along your merry way with your own problems.

5             So McShane, Joachimsthaler, Turetzky, Plunkett,

6    Villasenor, at least four of those people are available, and

7    Mr. Bousquette --

8             Place a call to Mr. Caldwell, if you could,

9    please.

10            Well, I don't have anybody to do that.

11            If I can get Mr. Bousquette here tomorrow

12   afternoon?

13            MR. QUINN:  Just need binders.

14            THE COURT:  Well, don't worry about that.  We'll

15   do the binders, or do you want some other order?  In other

16   words, it's your case, it's your time, but I don't think you

17   are going to have Ramano here, frankly, regardless of what

18   you say, and I'm not going to step in with a heavy hand when

19   I'm not included in the conversation.

20            MS. HURST:  We'd rather have Ms. McShane tomorrow,

21   your Honor.

22            THE COURT:  McShane, all right.

23            How do we get her here?

24            MS. HURST:  She has an attorney as well, whose

25   name is William Cruz.

1          THE COURT:  Okay.  And do we have his number?  Do

2    you want to place the first call to him?

3          MS. HURST:  Sure.

4          THE COURT:  Okay.  And do you want to do -- and

5    who is -- remind me about McShane.

6          MS. HURST:  Attorney at Mattel who had been

7    involved in the early 2002 investigation.

8          THE COURT:  First name?

9          MS. HURST:  Michelle.

10         THE COURT:  What is the nature of the pain

11   medication?

12         MS. HURST:  Apparently, she has some kind of back

13   injury.

14         THE COURT:  That's going to be awfully difficult

15   to get her here, if that's true.

16         MS. HURST:  She was deposed about a week or so

17   ago.  The Court will recall, we had an evening deposition

18   last week, and Mr. O'Brien was there as well.

19         THE COURT:  Was that Saturday?

20         MS. HURST:  No.  I think it was Monday.

21         THE COURT:  Monday?

22         MS. HURST:  Monday.

23         THE COURT:  If you want to go place a call

24   initially, along with Mr. Zeller, do you --

25              Can you help?

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 107 of 109   Page ID #:310036
CV 04-9049-DOC - 03/16/2011 - Day 34, Vol. 3 of 4

107

 1          Do you two want to jointly place the call?

 2          MR. ZELLER:  I'm happy to do that.  I haven't been

 3  in contact with her.

 4          THE COURT:  Okay.  Well, Villasenor is no problem

 5  for you to get here, is he, on behalf of MGA?  I know you

 6  prefer not to.  I know that's not your order, but there's

 7  been a couple of changes here that took the time that I

 8  thought that you were going to use, and that's your problem,

 9  now, or the time runs, and we just sit here.  And I don't

10  think you want that, so you come up with a solution and tell

11  me so I know what binders to go over this evening.

12          MS. HURST:  I'm going to step out and make a phone

13  call, your Honor.

14          THE COURT:  Now, I know you gentlemen are sitting

15  here.  Thank you for your attendance.  We'll see you

16  tomorrow, sir.

17          Thank you for your attendance, sir.  We'll see you

18  tomorrow.  I should have excused you earlier, my apologies.

19          MR. PRICE:  Before Mr. Eckert and Mr. Larian

20  leave, I'd like to tell the Court there's been an agreement,

21  one of those rare things.  I believe Mr. Larian has agreed

22  that Mr. Eckert can be absent on March 22nd and March 23rd.

23          THE COURT:  Excellent, thank you very much, sir.

24  I appreciate you two reaching that agreement.  It's very

25  courteous.

Case 2:04-cv-09049-DOC-RNB   Document 10226   Filed 03/18/11   Page 108 of 109   Page ID #:310037
CV 04-9049-DOC – 03/16/2011 – Day 34, Vol. 3 of 4

108

1          Go off the record.

2          *(Discussion held off the record.)*

3          *(Recess.)*

4                         -oOo-

1                          -oOo-

2                       **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  March 17, 2011

12

13

14    _____

15    JANE C.S. RULE, U.S. COURT REPORTER
      CSR NO. 9316

16

17

18

19

20

21

22

23

24

25