1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3          **SOUTHERN DIVISION AT SANTA ANA**

4          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

   MATTEL, INC., ET AL.,                    )
7                                            )
                 PLAINTIFFS,                 )
8                                            )
            vs.                              ) CV NO. 04-9049-DOC
9                                            ) DAY 34
   MGA ENTERTAINMENT, INC., ET AL.,          ) VOLUME 4 of 4
10                                           ) PAGES 1 - 32
                 DEFENDANTS.                 )
11  _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                        JURY TRIAL

16                   SANTA ANA, CALIFORNIA

17                 WEDNESDAY, MARCH 16, 2011

18                        9:00 P.M.

19

20

              **DEBORAH D. PARKER, CSR 10342**
21            **OFFICIAL COURT REPORTER**
              **UNITED STATES DISTRICT COURT**
22            **411 WEST FOURTH STREET**
                     **SUITE 1-053**
23            **SANTA ANA, CALIFORNIA 92701**
                    **(714) 542-8409**
24            **D.PARKER@IX.NETCOM.COM**

25

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                            JOHN QUINN (Not Present)
                              WILLIAM PRICE (Not Present)
 4                            MICHAEL T. ZELLER
                              QUINN EMANUEL URQUHART
 5                            & SULLIVAN, LLP
                              865 S. FIGUEROA STREET
 6                            10TH FLOOR
                              LOS ANGELES, CALIFORNIA 90017
 7                            (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                              THOMAS S. MC CONVILLE
10                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                              4 PARK PLAZA
11                            SUITE 1600
                              IRVINE, CALIFORNIA 92614
12                            (949) 567-6700

13
                              ANNETTE L. HURST
14                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                              THE ORRICK BUILDING
15                            405 HOWARD STREET
                              SAN FRANCISCO, CALIFORNIA 94105
16                            (415) 773-5700

17
                              JENNIFER L. KELLER(Not Present)
18                            KELLER RACKAUCKAS, LLP
                              18500 VON KARMAN AVENUE
19                            SUITE 560
                              IRVINE, CALIFORNIA 92612
20                            (949) 476-8700

21

22

23

24

25
```

```
1    APPEARANCES OF COUNSEL:

2          FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

3                               MARK E. OVERLAND (Not Present)
                                LAW OFFICES OF MARK E. OVERLAND
4                               100 WILSHIRE BOULEVARD
                                SUITE 950
5                               SANTA MONICA, CALIFORNIA 90401
                                (310) 459-2830
6

7                               ALEXANDER H. COTE (Not Present)
                                SCHEPER KIM & HARRIS, LLP
8                               601 WEST FIFTH STREET
                                12TH FLOOR
9                               LOS ANGELES, CALIFORNIA 90071
                                (213) 613-4660
10

11
     ALSO PRESENT:
12
                                JEANINE PISONI (Not Present)
13                              MGA ENTERTAINMENT, INC.
                                16360 ROSCOE BOULEVARD
14                              SUITE 105
                                VAN NUYS, CALIFORNIA 91406
15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1        SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 16, 2011; 9:00 P.M.
 2            (The following proceedings were had outside the
 3            presence of the jury:)
 4                THE COURT:  Expert report.
 5                Is there anything further either counsel wants to
 6        argue on that?
 7                MR. ZELLER:  Just briefly, your Honor.
 8                We believe that -- and the court will recall --
 9        that the way that MGA proceeded with Dr. Lyter was to speak
10        in very broad glowing terms about how other courts had
11        accepted him.  The court will recall that they even went to
12        the point of having him recite the scope of the courts who
13        had accepted him as an expert.  So it is absolutely a fair,
14        appropriate impeachment of this witness to say, Well, not
15        every court has accepted you, and there have been some
16        courts that have been critical of you.
17                MGA put itself out there by affirmatively
18        eliciting that testimony from Dr. Lyter.  So we think this
19        is a straightforward impeachment, which, you know, I think,
20        does address the court's concerns as to whether or not he
21        would be articulating or enunciating some rule that would
22        always allow it in.  This is a very tailored situation here,
23        given what testimony MGA chose to elicit from Dr. Lyter, and
24        the testimony that he chose to give about how he was broadly
25        accepted by courts.
```

5

```
1              THE COURT:  Counsel.
2              MS. KELLER:  I'm sorry, your Honor.  I'm confused.
3              THE COURT:  Well, I --
4              MS. KELLER:  Did you want me to address the --
5              THE COURT:  That wasn't the issue I wanted to
6   start with, but now that we're on it, why don't you address
7   it.
8              MS. KELLER:  All right.
9              MR. ZELLER:  I apologize.  Maybe I was confused.
10  I thought that was the issue.
11             THE COURT:  Well, let's just start with that
12  issue.
13             MS. KELLER:  Your Honor, I elicited testimony from
14  the witness that he had been qualified as an expert.  And
15  that is all true, and there is nothing that Mattel offers in
16  any way, shape, or form that contradicts that.  Instead,
17  Mattel is trying to offer opinions from other judicial
18  officers that, apparently, criticized methodology.  Although
19  in one case, it's really not methodology.  It's just the
20  sufficiency of his report.  And in another case, it's that
21  he didn't look at a certain document.  So, frankly, it's not
22  even methodology in the three instances.
23             This is hearsay.  These are out-of-court judicial
24  statements.  They can't be used to cross-examine the expert.
25  And there is an opinion of Judge Weinstein right on point
```

1    here, which is very helpful in the *Blue Cross and Blue*

2    *Shield versus Philip Morris* case, where the court explains

3    at length why you don't allow other judicial findings to be

4    used to cross-examine an expert.  They are not admissible at

5    all, and they can't be used for that purpose.

6          THE COURT:  What's the case?  Did you cite it in

7    your brief?

8          MS. HURST:  We did, your Honor.

9          THE COURT:  The case?

10         MS. HURST:  *Blue Cross and Blue Shield of*

11   *New Jersey versus Philip Morris*, 141 F.Supp.2d 320.

12         THE COURT:  Now, let me go back to the issue I

13   started with, and this is the report.  And the sentence that

14   Mr. Quinn wants to read is:  *If and only if it were assumed*

15   *that Dr. Aginsky was correct in his detection of menthol and*

16   *that the menthol were from an ink sample, itself, other*

17   *rather than from an external contaminant, would it be*

18   *appropriate to conclude that a second writing instrument was*

19   *used to prepare the fifth line of the August 26 entry?*

20         I want to say to both of you -- and then, I'm

21   going to listen to your argument one more time -- it's a

22   fair question, I think, to pose to Mr. Lyter, or Dr. Lyter,

23   by Mr. Quinn.  However, pursuant to the rule of

24   completeness, I would require Mattel to read the -- from the

25   entirety of that paragraph that begins with that.

```
 1              I know, Ms. Hurst, your argument, on behalf of
 2    MGA, that in order to fully explain that sentence you will
 3    need to inquire into Mr. Lyter's conclusion that no blank
 4    gel ink pens contain menthol, which then opens the door to
 5    previously excluded hearsay evidence and 703 evidence about
 6    the fact that the Japanese company produces a gel ink pen
 7    with menthol ink.
 8              I think your argument, though, is unconvincing.  I
 9    think Dr. Lyter only reaches his conclusion after first
10    assuming, for the purposes of argument, that Mr. Aginsky was
11    correct about the presence of menthol in the ink itself.
12              The next sentence, which Mattel would be required
13    to read, pursuant to the rule of completeness, makes it
14    absolutely clear that Mr. Lyter does not agree with that
15    foundation, or assumption.  Moreover, MGA, itself, would not
16    be precluded from confirming with Mr. Lyter during his
17    redirect examination that he does not agree with the
18    foundational assumption made in the sentence at issue.
19              I just don't see how that opens the door to ink
20    pens.  But remember, I've given you that choice.  If you
21    want to go there, you're more than welcome to about the
22    4,000 ink pens; but then, I think it's fair inquiry of an
23    expert that, although it's hearsay -- and I would admonish
24    the jury not for the truth -- that the other side can get
25    into the fact of this Japanese ink pen.
```

```
 1              Quite frankly, I don't think this doctor was

 2    produced for that purpose by either one of you, nor is

 3    Aginsky.  Both of those doctors were allowed by this court,

 4    originally and initially for one thing, menthol, and their

 5    tests.  And whether they have 200 pens, or 4,000 pens, or

 6    they heard of a pen in Japan seems to be absolutely

 7    irrelevant.  That doesn't mean, though, that MGA is unduly

 8    prejudiced from not being able to elicit testimony about why

 9    Mr. Lyter disagrees with this foundational assumption.

10              First, Mr. Lyter's report offers many

11    disagreements with the foundational assumption that are

12    unrelated, the existence of gel ink pens with menthol.  For

13    instance, he discusses the minuscule amount of menthol, as

14    well as the deficiency of Mr. Aginsky's methodology, and he

15    may testify to those issues.

16              Second, just as Mr. Lyter is precluded from

17    testifying about the nonexistence of a gel ink pen with

18    black ink, so too is Mr. Aginsky restricted from using his

19    knowledge of the Japanese gel ink pen which is absolutely

20    hearsay, but more importantly could be elicited with a

21    limiting instruction.

22              I found under 703 that it was -- 703 issue, and I

23    restricted Mr. Aginsky from using his knowledge of the

24    Japanese ink, or -- gel ink pen in support of his conclusion

25    about the presence of menthol.
```

```
 1              So, those are my tentative thoughts.  I'm wide
 2   open listening to you one more time this evening, and I
 3   don't care which party I start with.
 4              MS. KELLER:  May I just inquire, your Honor?
 5              Is the court saying that it would require a
 6   reading of the --
 7              THE COURT:  The entire paragraph.
 8              MS. KELLER:  -- entire paragraph?
 9              THE COURT:  Absolutely.
10              MS. HURST:  And that that would not open the door?
11              THE COURT:  That's exactly right.
12              It's a rule of completeness.
13              MS. HURST:  May I consult with my colleague for a
14   moment?
15              THE COURT:  Sure.  Take a moment and read it all
16   the way through.
17        (Pause.)
18              MS. KELLER:  That's acceptable to us, your Honor.
19              THE COURT:  And let me turn back to Mattel.
20              MR. ZELLER:  Well --
21              THE COURT:  You see, I'm not going to let you open
22   the door through that reading, and I'm not going to, under
23   the rule of completeness, let you selectively use one
24   sentence.  If you want to use it, I'm not precluding you,
25   but it's the entire paragraph.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1      MR. ZELLER:  It seems to me that this is just --

2 if I could just, first, address the rule of completeness

3 issue.  From our perspective, these things are -- can be

4 decoupled and should be.

5      And the reason is this:  As the court has pointed

6 out, there are really two things that are going on here.

7 What the experts should, in the court's perspective, as

8 you've said, should be discussing is:  Was there menthol in

9 this ink sample, or not?

10      THE COURT:  That's why I'm really curious why

11 Mr. Quinn is going into this hypothetical.  It has nothing

12 to do with why I perceive he's on the stand.

13      MR. ZELLER:  But that's actually -- we weren't the

14 ones who inquired into this or started the issue on this

15 second point, which is, was a MGA rebuttal to Dr. Aginsky,

16 which was:  Well, it couldn't be that menthol was found in

17 the ink, because no such thing exists.

18      So this was part of their rebuttal to Dr. Aginsky.

19 Those can be decoupled, and they should be.  And that's why

20 the first point of this sentence, and the point -- the

21 reason why we want to read this sentence is to simply say:

22 *Look, you agree that if there's menthol in that ink and that*

23 *Dr. Aginsky is correct, then there has to be a second*

24 *writing instrument.*

25      But the fact is, is that then what Dr. Lyter does

1    in his own paragraph, is then he goes on to say, *Well, but I*
2    *don't agree with that assumption, because you can't find*
3    *menthol-based inks.*

4           But that's part of their rebuttal.  That is part
5    of there retort, which is a second layer kind of response.
6    But all we want to point out is, is that this expert,
7    himself, agrees that if there's menthol in the ink, and
8    Dr. Aginsky's test is correct, it must mean that there is a
9    second pen.  And the rest of it -- of that sentence doesn't
10   actually -- doesn't refute that proposition.

11          MS. KELLER:  That's actually not what it says at
12   all, your Honor.

13          THE COURT:  No.  That's my ruling, Counsel.

14          Mattel is more than welcome to read this
15   paragraph, but I'm going to require you to read the entire
16   paragraph, if you are going to do so.  And I leave that
17   choice to you.

18          MS. KELLER:  I think we were still on cross,
19   weren't we?

20          MR. ZELLER:  Yes, we were.

21          MS. KELLER:  Well, if I'm not still on cross, then
22   can we have Mr. Quinn give the option to read -- decide
23   whether he wants to reopen and read this thing in its
24   entirety?

25          That why I know what's going to happen before I

```
 1    get up for my last time with the witness.
 2              THE COURT:  Well, just a moment.
 3              MS. KELLER:  I think we were still on cross
 4    anyway.
 5              THE COURT:  We're on cross anyway.  Mr. Quinn has
 6    the opportunity with this court's ruling to make the
 7    decision whether he's going to read; and if he's going to
 8    read, he's going to read the entire paragraph.
 9              MR. ZELLER:  Just, technically, it does remind me
10    that, technically, we had moved on to the redirect, but I
11    think we're all with the understanding that we will deem
12    cross not to have closed.  So Mr. Quinn can make his
13    election.
14              THE COURT:  And he has also got recross?
15              MS. KELLER:  But then, I wouldn't get another turn
16    to address it.
17              THE COURT:  That's true.  That's true.
18              MS. KELLER:  So Mr. Quinn we all agree, I think,
19    will go first.
20              THE COURT:  All right.  Now, the second issue this
21    evening is the issue of concerning Michele McShane and
22    whether she can be asked questions about whether she
23    corresponded with Quinn Emanuel's attorneys in 2002.
24              MR. ZELLER:  I'm sorry, your Honor.
25              There was a second sentence that Mr. Quinn was
```

 1    interested in reading from the report of Dr. Lyter?

 2              THE COURT:  Oh, that's correct.  Let me go get

 3    that.  It's in the back.  Just a second.

 4              You know, I'm going to come back to that.  I'm

 5    going to wrestle with a couple of other problems we have

 6    instead of taking directions from counsel.  I'll give you

 7    directions this evening.

 8              Concerning Michele McShane and the question about

 9    whether she corresponded with Quinn Emanuel's attorney in

10    2002, now, this is a difficult issue for the court.  I'm

11    going to allow MGA to make the inquiry, but you may not

12    inquire into the subject matter or content of the

13    communication, since Mattel has not waived the privilege and

14    the holder of this privilege is actually Mattel.  It's not

15    McShane.

16              So my bottom line is:  The mere fact of a

17    communication with an outside attorney is not privileged.

18    But Mattel has argued that the fact of communication between

19    Ms. McShane and outside counsel has limited probative value,

20    because McShane was only investigating a claim based on the

21    misappropriation of Toon Teens.  If that's the case, a

22    reasonable jury, I think, could conclude that if Mattel

23    thought that Bryant misappropriated Toon Teens, then it was

24    on notice of the fact that he created Bratz while at Mattel.

25              Mattel has also argued that the investigation of a

1   Toon Teens misappropriation claim would not have put it on

2   notice of the fact that if Bryant was working for MGA while

3   still at Mattel.  But the fact of Bryant's dual employment

4   may be irrelevant into a claim for trade secret

5   misappropriation.  Because the Uniform Trade Secrets Act may

6   make it wrongful to use a trade secret than an employee

7   obtained during his first -- I'm sorry, during his prior

8   employment, whether or not that prior employment overlaps

9   with his current employment.

10          These are all facts that the fact-finder, I think,

11  is entitled to consider.  However, MGA is not allowed to go

12  into any of the content, once again, of Ms. McShane's

13  conversation with counsel, even the subject matter of those

14  communications is privileged pursuant to law of this case.

15          But MGA may later argue to the jury about what the

16  subject matter of those communications might be by pointing

17  to the proximity and time between McShane's investigation of

18  Carter Bryant and McShane's communication with outside

19  counsel.

20          Now, having tentatively decided that, the most

21  difficult issue for the court then becomes these privilege

22  logs which intertwine with this.  And once those privilege

23  logs come in, in their present form, then it once again

24  embroils the litigants in this lawsuit, the firm of Quinn

25  Emanuel; and, of course, that's going to open the door for

1   the bickering that's been going back and forth between

2   counsel.

3          I'm faced with the same problem, Mr. McConville,

4   that I faced with that letter that you have been waiting

5   around.

6          Let me see that exhibit for a moment.  You're

7   going to have to come up with some solution, Ms. Hurst and

8   Mr. McConville, that doesn't draw the parties into this.  In

9   other words, I think the area is relevant.  But I'm going to

10  look at that privilege log after you leave this evening, and

11  I'm going to withhold any final determination on this

12  pending your advice to the court about how this can be

13  accomplished.  I don't want to take the issue away from you,

14  but I'm deeply concerned that the law firms now become

15  involved in this process.

16         All right.  This is Exhibit 18572, and it's the

17  Sidley Brown & Wood, LLP letter.  And the court had

18  previously excluded this.  And the reason for that was the

19  initial 403 determination and the fact that Quinn, or "John

20  Quinn's" name appeared on this letter.  That's finally been

21  excised, because Mr. McConville, apparently, got the

22  message.  But if I received this letter, I think the Quinn

23  Emanuel firm is allowed to get subsequent correspondence

24  that Mr. Zeller wants on this subject.

25         MR. ZELLER:  We're going to put an attorney up to

1    respond to this.

2            And, your Honor, it's still hearsay, this letter.

3    There has already been testimony on it.  Bringing the letter

4    and the lawyers into this is not going to resolve this.

5    In fact, the Michele McShane point, what the court is going

6    to allow them to do is, basically, put us in a position

7    where either we will have to be mute and won't be able to

8    defend against it, or we're going to have to --

9            THE COURT:  You'll bring Michele McShane now or

10   this letter?

11           MR. ZELLER:  I'm talking about both, really.

12   Because I think these are comparable issues, and the court

13   was sort of discussing them in some way.

14           It is not fair to go into these tangential issues

15   and the reason why is, is because -- I mean, it's being done

16   specifically because MGA is desperate to embroil the lawyers

17   and embroil us, in particular, in this.  They spent all day

18   doing that, your Honor.  You saw that today.

19           Ms. Hurst also admitted off the record that the

20   real agenda was, is so they can point a finger at me:  Trial

21   counsel.

22           THE COURT:  Just a moment.  Let me go back to this

23   letter, first of all, and talk to Mr. McConville.  Let's do

24   this one at a time, okay?

25           Why, with the testimony of Ms. Leahy, where she

1    testified that her husband was contacted, why should I

2    receive this letter?

3              MR. MCCONVILLE:  Your Honor --

4              THE COURT:  I'm worried about the hearsay problem.

5    I'm worried about the prejudicial effect.

6              You got that testimony in front of the jury

7    regardless.  You know, the jury knows that her husband was

8    contacted.  She made that statement.  And I just don't know

9    why -- what this letter adds, frankly.  Because it's equally

10   disconcerting as Mr. Moore's contact with her client's

11   husband who is employed by the Mattel.

12             Now, she testified that she got that contact.  She

13   informed him that he had an attorney -- or that she had an

14   attorney; that he kept questioning her in that phone call

15   itself and then never contacted her again.

16             MR. MCCONVILLE:  Right.  And during

17   cross-examination, she was asked whether Mr. Moore had made

18   any attempt to contact her after that.  And the answer is,

19   yes, through her husband.  So that was an effort by

20   Mr. Moore to contact her through her husband.

21             And when I attempted -- I did ask that question,

22   and I believe she responded.  The court -- there was an

23   objection as to marital privilege, and I believe the court

24   struck the answer.

25             THE COURT:  Well, she did take the privilege.  So

1    now -- in taking that privilege, why am I now inclined to

2    admit this letter?

3              MR. MCCONVILLE:  Well --

4              THE COURT:  Because she has already testified that

5    Mattel contacted her husband.

6              It goes on:  *In such conversations, Mr. Moore has*

7    *made disparaging remarks about counsel representing other*

8    *parties and just repeated the offer of Mattel to provide our*

9    *client with an attorney.*

10             Well, I haven't heard from Mr. Moore, yet -- oh,

11   yes, I have heard from Mr. Moore.

12             MR. ZELLER:  Not on that.

13             THE COURT:  Not on this subject.

14             And there is also, in the last sentence the

15   inflammatory statement:  *Such communications could suggest*

16   *that Mattel is attempting to interfere with a witness'*

17   *selection of counsel through pressure on a family member in*

18   *its employment.*

19             I mean, you can argue that.  But why am I letting

20   in a letter from Steven Contopulos?

21             Who is he?

22             MR. MCCONVILLE:  Her attorney.

23             THE COURT:  Well, that's nice.  Where is he?

24             In other words, what this letter is doing in a

25   sense is testimony about what his opinion is on that

```
 1    subject, and I've had the actual witness on the stand, and
 2    she's chosen to take the marital privilege.  Fine.  But she
 3    also got in the fact that contact was attempted through her
 4    husband.
 5              You're worried about the timing.  Apparently,
 6    you're are worried that that's not clear to the jury that
 7    this contact came after.
 8              Is that your concern?  That's -- to me, that's the
 9    only thing that, potentially, is confusing about what she
10    said on the stand.  Everything else is crystal clear,
11    excluding this suggestion by Contopulos.  So I don't
12    understand.
13              MR. MCCONVILLE:  Well, a number of points:  One,
14    there has not been an explanation to the jury as to the
15    effect of the contact had on her -- on her -- on her family,
16    right?  She invoked the privilege --
17              THE COURT:  Well --
18              MR. MCCONVILLE:  -- marital privilege.  So it's
19    not clear to the jury; and then, the answer was struck.
20              THE COURT:  But how is this letter help concerning
21    the effect it's had on her family, evoking the privilege,
22    this letter, nor did she say, this affected me in some way.
23              MR. MCCONVILLE:  Once she invoked the privilege, I
24    wasn't going to probe her any further on it, but --
25              THE COURT:  She doesn't have to invoke the
```

1    privilege.

2          MR. MCCONVILLE:  The second issue, your Honor, is

3    there has been testimony during MGA's case by -- the

4    inference being, Isaac Larian attempting to influence the

5    testimony of Anna Rhee by trying to provide her with a

6    lawyer.

7          THE COURT:  Sure.

8          MR. MCCONVILLE:  This parallels that exact

9    situation.

10          THE COURT:  No, she didn't take the privilege.  In

11    other words, I have a witness on the stand who's more than

12    welcome to talk about that.

13          MR. MCCONVILLE:  She did invoke the privilege.

14          THE COURT:  I know.  She didn't have to.

15          MR. MCCONVILLE:  No, Anna Rhee invoked the

16    privilege.

17          THE COURT:  The marital privilege?

18          MR. MCCONVILLE:  The attorney-client privilege.

19          MR. ZELLER:  Which the court found was waived.

20          THE COURT:  Absolutely waived.

21          MR. MCCONVILLE:  The court --

22          THE COURT:  I don't see any similarity between the

23    two, frankly.  I'm baffled by that contact.

24          MR. MCCONVILLE:  I'm addressing the notion that

25    there's some unfairness to Mattel by someone trying to

```
 1   interject an irrelevant point about someone trying to
 2   influence testimony through interfering with counsel which
 3   is what's been interjected multiple times by Mattel.
 4           THE COURT:  Just a moment.  You can call Anna
 5   Rhee.  You can call her back, if you want to.  You can
 6   say --
 7           She can say that this affected her in some way.
 8   It made her mad, just like Ray did.  She can say that she
 9   felt harassed by it.  She can talk about her state of mind.
10   But what I really got is Contopulos writing this, on her
11   behalf.  And that last sentence just, really, strikes me
12   that it's not anything to do with her thoughts and feelings
13   at all.
14           MR. MCCONVILLE:  I hear what you're saying.
15           THE COURT:  And it's causing me tremendous
16   problems.  So you're not being foreclosed from this at all.
17   In fact, I welcome her to come back, and she say --
18           Without violating the marital privilege, she can
19   get on the stand and say, *You know, this really made me*
20   *angry.*  She can testify, *You know, they talked to my husband*
21   *at Mattel, after I said I've got an attorney, and I don't*
22   *want to talk to you.*
23           So if you're worried about timing, for goodness
24   sakes, get her back.  I'm not precluding you one bit.
25           MR. MCCONVILLE:  Okay.  I appreciate that.
```

```
 1              THE COURT:  I don't think I'm going to -- I think
 2    the prejudicial effect of this outweighs the probative
 3    value, only because it's Contopulos.  Now, if it came from
 4    her, I'm concerned about that.
 5              MR. MCCONVILLE:  I understand.  And I just wanted
 6    to address square on the argument that was just made that
 7    somehow it's unfair to Mattel to do this when they've done
 8    it, you know, not only through Anna Rhee, but then
 9    Mr. Zeller making comments, baseless comments about
10    Ms. Hurst in a deposition interfering with some other
11    relationship with Sujata Luther, which is, you know,
12    baseless, and I just think, you know --
13              Just so the record is clear.
14              THE COURT:  I've disregarded it.  I'm not
15    concerned about that.
16              MR. PRICE:  If I may, on this point --
17              THE COURT:  No, we're done.  We've belabored this
18    enough now.
19              MR. ZELLER:  It's just that the court is going to
20    allow them to essentially circumvent our ability to
21    cross-examine her.  If she gets up there and basically says,
22    *My husband told me something.  It made me bad,* but we can't
23    get into the substance of what that was?
24              I mean, that to me would be prejudicial, because
25    we'll have no means of cross-examining her if she's going to
```

```
 1    invoke the privilege, the marital privilege.  I mean, it
 2    can't be the case that she can comment upon --
 3              THE COURT:  In all seriousness, I doubt that
 4    they're going to call her back.  I think we're wasting time.
 5              Now, if they call her back, we'll all discuss this
 6    again.  That's Mr. McConville's choice.  We'll be put on
 7    notice.  We're wasting a lot of time this evening.
 8              MR. ZELLER:  Fair enough, your Honor.  I
 9    apologize.
10              THE COURT:  I'm more concerned, frankly, with -- I
11    don't want you excluded, Ms. Hurst, from your ability to
12    examine McShane, or Mr. McConville, whichever one of you is
13    doing this.
14              MS. KELLER:  It's me, your Honor.
15              THE COURT:  I don't want you excluded in this.
16    I'm not artful enough yet, until I look at this again this
17    evening, probably after you leave, how to handle the
18    privilege log that intertwines right into this, I guess, the
19    attorneys just intermeshed.  It's the same problem I
20    initially had with this letter when I first rejected it.
21              So I got to find some balance to that without
22    getting the law firms intertwined.
23              MS. HURST:  Maybe we can have a stipulation as to
24    the retention of outside counsel on such and such a date,
25    and we wouldn't have to identify the counsel, and maybe that
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    could solve the problem.

2            THE COURT:  I'm almost going to push that

3    stipulation on Mattel.  I think it's important enough, it's

4    relevant enough, and you are entitled to it.

5            And Mattel is either going to stipulate to that,

6    or I'm probably going -- regardless of the argument I'm

7    about to hear, probably, allow you to get into that.  But

8    that's the first time that, once again, now, the counsel are

9    starting to get involved when I've absolutely tried to keep

10   the two of you out of this.

11           So I think that that's actually the solution.  It

12   allows you the area and the argument, but it keeps Quinn

13   Emanuel, in a sense, out of this.  It's outside counsel, and

14   I was going to suggest that earlier, so I want to sleep on

15   that for a while.

16           Now, I don't know if you're willing to enter into

17   that kind of stipulation, or if you're going to end up

18   getting drawn into this.

19           MR. ZELLER:  The difficulty is this, Judge:  If I

20   just sort this step by step, as the court is properly -- I

21   don't disagree with the premise of what the court has

22   started with, which is, number one, that --

23           Let me say, I do disagree with it, but I

24   understand where the court is coming from in terms what the

25   fact-finder is engaged in doing.  Number one is, as you say,

1     a jury could conclude that basically this issue about

2     Toon Teens put Mattel on notice that it had a claim such

3     that it should start the statute of limitations running.

4     That's number one.  And we don't agree with it, but I

5     understand, at least, that portion of the reasoning.

6                Or number two, as the court would say --

7                THE COURT:  Just a moment.  That's not a finding

8     by me.  That's only a relevant piece of evidence for the

9     jury to consider.

10                MR. ZELLER:  Right.  And maybe I should be a

11    little bit more precise about, I agree that within the

12    parameters of the court's ruling, that would be a proper

13    purpose from which this evidence could be submitted to the

14    jury; namely, this investigation was about Toon Teens.  That

15    alone should have started the clock running on Mattel.

16                I mean, again, we don't disagree with it, but at

17    least it's a proper purpose for this evidence.

18                Another proper purpose that the court has

19    identified is, is that, well, it doesn't really matter

20    whether or not there was an overlap in employment between --

21    with MGA and Mattel by Carter Bryant, because the

22    misappropriation of Toon Teens was enough to start the

23    statute of limitations running for trade secret.

24                Now, again, I don't agree with that as a legal

25    proposition.

 1          THE COURT:  I'll be right back.  Don't go away.

 2     *(Pause.)*

 3          THE COURT:  Never mind, counsel.  Why don't you

 4     continue on.

 5          MR. ZELLER:  So I was identifying what I think the

 6     court has said are two proper purposes for which evidence

 7     about the Toon Teens matter could be submitted to the jury.

 8     However, as to the -- those basic facts, those are

 9     undisputed.  Those can be stipulated to.  Those are shown in

10     the file.  There are nonlawyers who are available, such as

11     Ivy Ross, to testify to them and has.

12          Here is what MGA is going to do, however, that

13     goes far beyond those proper purposes.  What they want to do

14     is put a lawyer up to, basically, force the invocation of

15     the privilege and suggest that, in fact, Mattel knew more

16     than it knew.  And that will force Mattel to respond, and it

17     will force response that, in fact, it was outside counsel

18     who was doing this, and what it is that outside counsel did.

19     I'm perfectly comfortable making an in-chambers offer of

20     proof with regard to this matter.  But I will say, your

21     Honor, it is going -- the reason why MGA is doing this -- it

22     did it today and it's going to continue to do it -- is it is

23     commenting upon the assertion of privilege to invite the

24     jury to speculate that Mattel must be hiding something.

25          Ms. Keller did this actually repeatedly now.

1    There is the letter, the Sal Villasenor letter, which the
2    court has ruled was properly redacted.  She has commented
3    upon it more than once in front of the jury, even asking the
4    witness, *What was redacted here?*

5             That is the sort of insinuation and the sort of
6    point that MGA is going to be making of this, which
7    necessarily requires -- it, basically, puts us in an
8    untenable position, we, Mattel.  Number one, we either have
9    to just not respond; and, in fact, we can't really respond
10   without dragging outside counsel into it as well as, you
11   know, running the risk of having to waive privilege; or
12   we're going to have to respond.  And that is going to, of
13   course, bring in very, very difficult issues of privilege.

14             The court has already told the jury more than
15   once:  *It is entirely proper to invoke privilege.  They*
16   *should not speculating as to the content of those*
17   *communications.*  And that is the agenda here by MGA.  It has
18   no reason to go any further.  The two proper purposes that
19   this court has identified is already a matter of record, and
20   that can continue to be a matter of record.  It's never been
21   disputed by Mattel that that was, in fact -- this Toon Teens
22   issue was, in fact, the subject of discussion and further
23   actions in 2002.

24             THE COURT:  I'm going to wait until tomorrow.
25   McShane won't be testifying until 1:00 o'clock.

```
 1            That's going to give me a little bit more time
 2   this evening without keeping all of you the rest of the
 3   evening to think about it.  It's also going to give you time
 4   to come up with your best solution to the problem
 5   confronting the court.  That's not bringing Quinn Emanuel
 6   into it.
 7            MS. KELLER:  May I respond a bit for the record,
 8   your Honor?
 9            THE COURT:  Certainly.
10            MS. KELLER:  I don't mean to belabor the issue.
11            The fact of retention of outside counsel shows the
12   seriousness with which they were taking the matter and is
13   highly pertinent.  Honestly, we think the fact that it was
14   Mr. Zeller and Quinn Emanuel, given Mr. Zeller's expertise
15   in intellectual property and so forth is also highly
16   relevant.  But I'm willing --
17            I understand the court's admonition, and I'm
18   willing to live with the stipulation that doesn't identify
19   Quinn Emanuel If we can get the date of retention.  They
20   know what it is; we don't.  I'm willing to live with that.
21            And I really resent the suggestion that we're
22   calling a witness for the purpose of getting them to assert
23   the privilege.  But I will remind the court that when
24   Mr. Larian was on the stand and was being vigorously
25   cross-examined about that Victoria O'Connor e-mail -- when
```

```
 1   there's no doubt that Mr. Nolan made the ultimate decision
 2   to that -- and we were told, Well, your choice is to either
 3   suffer or waive the privilege.  And, now, Mattel is in the
 4   same motion.  And there's nothing improper about this.  This
 5   is highly relevant to the statute of limitations defense.
 6   When you have a statute of limitations defense, and you've
 7   hired lawyers to investigate claims, that's the nature of
 8   the beast.  That's what happens.
 9             THE COURT:  You come up with your best solution
10   tomorrow.
11             MS. HURST:  We'll do.
12             THE COURT:  That's initially what stopped me in
13   the tracks concerning 18572.  Although I'm not admitting it
14   now on other grounds, that immediately caused a reaction by
15   the court.
16             MS. HURST:  Understood, your Honor.
17             MR. ZELLER:  Can we have an offer --
18             MS. KELLER:  And may I just say this also?
19             With respect to the privilege logs, it is a
20   discovery response.  I mean, discovery responses are
21   ordinarily admissible.
22             THE COURT:  I understand that.
23             I'm waiting for your best solution, because it has
24   Mr. Zeller's name all over that privilege log.
25             MS. HURST:  I understand.
```

1          THE COURT:  So it effectuates the same thing.  So
2     I'm going to see what -- you tell me is your best solution
3     first; and then, I'll make my decision.
4          MR. ZELLER:  And, of course, we did previously
5     confront the issue of the privilege logs when it came to
6     that very e-mail that MGA withheld for years on the
7     privilege log.  You know, when Mr. Larian was up there, we
8     didn't go into the privilege logs.  We certainly could have
9     and, presumably, if this ruling goes the way that MGA wants
10    to, we will ask to have Mr. Larian brought back and we will
11    go through that privilege log.
12         THE COURT:  You can see where this potentially
13    goes on both sides.  I'm just saying, I'm not precluding
14    you.  It's relevant evidence concerning the statute of
15    limitations.  You just got to come up with some kind of
16    ruling that doesn't put the court in a position of deciding
17    whether this is cumulative -- which I could easily do --
18    prejudicial effect outweighs the probative value -- which at
19    this point, I don't believe.  But drawing counsel into the
20    lawsuit, itself, regardless, there's the danger in the
21    jury's eyes.
22         MS. HURST:  I would ask the court if it could ask
23    Quinn Emanuel, please provide us with the date on which they
24    were first retained in connection with this, so that I can
25    draft up a proposed two- or three-sentence stipulation.

1          MR. ZELLER:  I will describe the situation to the

2   court in chambers.  But when she talks about a date of

3   retention, it is a non-sequitur.

4          MS. HURST:  For this particular matter that we're

5   talking about.

6          THE COURT:  Why don't you wait outside for just a

7   moment.

8          Let me hear from Mr. Zeller in camera and under

9   seal from this point forward.

10       *(Ms. Hurst and Mr. McConville exited the*

11       *courtroom.)*

12       *(At 9:40 p.m., sealed proceedings follow.)*

13

14                            -oOo-

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  March 17, 2011

10

11

12                      _____

13                      Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*