1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                     )
              Plaintiffs,             )
7                                     )
       vs.                            ) No. CV 04-9049 DOC
8                                     )    Day 35
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                     )
                                      )
10            Defendants.             )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17            Thursday, March 17, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-17 D35V1

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 2 of 158   Page ID #:310097
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

2

```
 1   APPEARANCES OF COUNSEL:

 2
     FOR PLAINTIFF MATTEL, INC., ET AL.:
 3
               QUINN EMANUEL URQUHART & SULLIVAN
 4             BY:  JOHN QUINN
                    WILLIAM PRICE
 5                  MICHAEL T. ZELLER
                    Attorneys at Law
 6             865 South Figueroa Street
               10th Floor
 7             Los Angeles, California 90017
               (213) 443-3000
 8

 9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700
20
               - AND -
21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700
25
```

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 3 of 158   Page ID #:310098
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             - AND -
9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660
13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406
18

19           ROBERT A. ECKERT, MATTEL CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 4 of 158   Page ID #:310099
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

4

1                              **I N D E X**

2   **MGA'S WITNESSES**              **DIRECT  CROSS  REDIRECT  RECROSS**

3   KAYE, Alan (Resumed)

4   By Mr. Quinn                            6                84

5   By Ms. Keller                                   54

6

7   FONTANELLA, Adrienne

8   By Ms. Hurst                    90

9

10                            **EXHIBITS**

11  **EXHIBIT NO.**              **IDENTIFICATION      IN EVIDENCE**

12    9643    E-mail string, Subject:              138
            Bratz MGA Update, dated
13           2/21/2002

14    17383   Diva Starz doll in                    97
            packaging
15
      17384   Diva Starz doll in                    97
16           packaging

17    26703   Girls Division, Adrienne             145
            Fontanella, 2002 Goals,
18           dated 2/25/2002

19    34828   Severance/Termination                 93
            agreement between Mattel
20           and Ms. Fontanella

21    34832   E-mail chain regarding               148
            Fashion Divas
22
      34833   E-mail thread                        111
23
      35302   Pages 1, 90 and 91 of                 96
24           2000 Mattel catalogue re
            Diva Starz
25

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 5 of 158  Page ID #:310100
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

5

|   |   |   |   |
|---|---|---|---|
| 1 | **EXHIBITS (Continued)** | | |
| 2 | **EXHIBIT NO.** | **IDENTIFICATION** | **IN EVIDENCE** |
| 3 | 35312   Diva Starz doll in | | 97 |
|   | packaging | | |
| 4 | | | |
|   | 35313   Diva Starz doll in | | 97 |
| 5 | packaging | | |

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, THURSDAY, MARCH 17, 2011**       |
|       | 2  | **Day 35, Volume 1 of 3**                                 |
|       | 3  | (8:32 a.m.)                                               |
| 08:31 | 4  | *(In the presence of the jury.)*                          |
| 08:32 | 5  | THE COURT:  All right.  The jury is present.  The         |
| 08:32 | 6  | alternates are present.  All counsel are present.  And    |
| 08:32 | 7  | Mr. Kaye's present.                                        |
| 08:32 | 8  | Counsel, would you like to continue with your             |
| 08:32 | 9  | cross-examination.  This is Mr. Quinn on behalf of Mattel.|
| 08:33 | 10 | MR. QUINN:  Thank you, Your Honor.                        |
| 08:33 | 11 | **ALAN KAYE, MGA'S WITNESS, PREVIOUSLY SWORN**            |
| 08:33 | 12 | **RESUMED THE STAND**                                     |
| 08:33 | 13 | **CROSS-EXAMINATION**                                     |
| 08:33 | 14 | BY MR. QUINN:                                             |
| 08:33 | 15 | Q.   Mr. Kaye, I'd like to begin by asking you some       |
| 08:33 | 16 | questions about the inventions agreement that Carter Bryant|
| 08:33 | 17 | signed.                                                   |
| 08:33 | 18 | If we could take a look at Exhibit 9924.                  |
| 08:33 | 19 | *(Document provided to the witness.)*                     |
| 08:33 | 20 | *(Document displayed.)*                                   |
| 08:33 | 21 | BY MR. QUINN:                                             |
| 08:33 | 22 | Q.   This is the agreement signed by Carter Bryant on     |
| 08:33 | 23 | January 4, 1999?                                          |
| 08:33 | 24 | A.   Yes.                                                 |
| 08:33 | 25 | Q.   Does this agreement refer in the very first          |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:33 | 1 | paragraph -- |
| 08:33 | 2 | MR. QUINN: If we can enlarge that, blow that up, |
| 08:33 | 3 | Ken. |
| 08:33 | 4 | *(Technician complies.)* |
| 08:33 | 5 | BY MR. QUINN: |
| 08:33 | 6 | Q. -- to the concept that this relates to ownership of |
| 08:33 | 7 | inventions? |
| 08:33 | 8 | A. Yes. In Subset No. 3, it says, "inventions That I |
| 08:33 | 9 | create --" |
| 08:33 | 10 | Q. -- "will be owned by the company"? |
| 08:33 | 11 | A. -- "will be owned by the company." |
| 08:34 | 12 | Q. And at the bottom just above the signature line, |
| 08:34 | 13 | there's some language there in -- that's bold and in |
| 08:34 | 14 | capital -- solid caps letters? |
| 08:34 | 15 | A. Yes. There's a bold sentence under -- right before the |
| 08:34 | 16 | signature block. It says, "Caution, this agreement creates |
| 08:34 | 17 | important obligations of trust and affects -- trust and |
| 08:34 | 18 | affects the employee's rights to inventions the employee may |
| 08:34 | 19 | make during his or her employment." |
| 08:34 | 20 | Q. And then is the -- there's a paragraph 2 that's |
| 08:34 | 21 | entitled "Ownership of Inventions." |
| 08:34 | 22 | Do you see that there? |
| 08:34 | 23 | MR. QUINN: If we could enlarge that. |
| 08:34 | 24 | *(Technician complies.)* |
| 08:34 | 25 | THE WITNESS: Yes, I see that. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 8 of 158   Page ID #:310103
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:34 | 1 | BY MR. QUINN: |
| 08:34 | 2 | Q.   It says, "I agree to communicate to the company as |
| 08:34 | 3 | promptly and fully as practicable all inventions as defined |
| 08:34 | 4 | below." |
| 08:34 | 5 | So in your understanding, is that, then, a defined |
| 08:34 | 6 | term, "inventions"? |
| 08:35 | 7 | A.   Yes, apparently so.  It's specifically defined in this |
| 08:35 | 8 | agreement. |
| 08:35 | 9 | Q.   That's in the next -- the definition's in the next |
| 08:35 | 10 | paragraph? |
| 08:35 | 11 | A.   Is in (b). |
| 08:35 | 12 | Q.   And then it goes on to say, "conceived or reduced to |
| 08:35 | 13 | practice." |
| 08:35 | 14 | Let's pause for a moment on those two terms.  What do |
| 08:35 | 15 | you understand "conceived" to mean? |
| 08:35 | 16 | MS. KELLER:  Objection.  No foundation. |
| 08:35 | 17 | THE COURT:  Overruled. |
| 08:35 | 18 | Now, this is his personal opinion.  He's somewhat |
| 08:35 | 19 | been asked about this throughout the process, but you'll |
| 08:35 | 20 | eventually decide what these terms mean. |
| 08:35 | 21 | BY MR. QUINN: |
| 08:35 | 22 | Q.   So what -- in your understanding, the consent of |
| 08:35 | 23 | something being conceived, what does that mean? |
| 08:35 | 24 | A.   Thought of, ideas.  I think it's very clearly that -- |
| 08:35 | 25 | those kinds of concepts. |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:35 | 1 | Q.   As opposed to "conceived or reduced to practice." |
| 08:35 | 2 | What does "reduced to practice" mean? |
| 08:35 | 3 | A.   To me, "reduced to practice" means made tangible.  So I |
| 08:35 | 4 | think both are -- you know, if it didn't mean ideas, it |
| 08:35 | 5 | would just say, "made tangible." |
| 08:36 | 6 | MS. KELLER:  Objection.  Conclusion of the witness |
| 08:36 | 7 | with respect to ideas. |
| 08:36 | 8 | THE COURT:  Yeah, I'm going to sustain that, |
| 08:36 | 9 | Counsel. |
| 08:36 | 10 | MS. KELLER:  Motion to strike, Your Honor. |
| 08:36 | 11 | THE COURT:  I'm going to strike it.  I think |
| 08:36 | 12 | ultimately this is a decision for the jury. |
| 08:36 | 13 | BY MR. QUINN: |
| 08:36 | 14 | Q.   Just in terms of your own understanding, can you |
| 08:36 | 15 | contrast what's conceived versus what's reduced to practice? |
| 08:36 | 16 | MS. KELLER:  Objection.  Irrelevant. |
| 08:36 | 17 | MR. QUINN:  His understanding as the designated |
| 08:36 | 18 | witness, Your Honor. |
| 08:36 | 19 | THE COURT:  Well, just a moment. |
| 08:36 | 20 | We got him as a 30(b)(6). |
| 08:36 | 21 | MR. QUINN:  Yes, on this subject. |
| 08:36 | 22 | THE COURT:  Overruled. |
| 08:36 | 23 | You can answer the question. |
| 08:36 | 24 | THE WITNESS:  Um, can you repeat the question, |
| 08:36 | 25 | please? |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 10 of 158   Page ID #:310105
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:36 | 1 | MR. QUINN:  Yeah. |
| 08:36 | 2 | BY MR. QUINN: |
| 08:36 | 3 | Q.   In your understanding the idea of conceived versus |
| 08:36 | 4 | reduced to practice, can you explain what the difference is? |
| 08:36 | 5 | A.   I think conceived is the "thought of."  So if you |
| 08:36 | 6 | have -- if there's something, a toy, in our vernacular, |
| 08:36 | 7 | something related to our business, in our vernacular, if you |
| 08:37 | 8 | have the thought, if you have the notion, if you have the |
| 08:37 | 9 | idea of it, that's one thing.  When you then put it into |
| 08:37 | 10 | practice, when you then either make a drawing of it, make a |
| 08:37 | 11 | model of it, make a scale of it, a rotocast of it, many |
| 08:37 | 12 | things they do, that's reducing it to an actual two- or |
| 08:37 | 13 | three-dimensional form. |
| 08:37 | 14 | Q.   And as you understand that, does this paragraph, |
| 08:37 | 15 | ownership of inventions, cover both that which is conceived |
| 08:37 | 16 | and that which is reduced to practice? |
| 08:37 | 17 | A.   Yes, it does. |
| 08:37 | 18 | Q.   And then the next line it says, "at any time during my |
| 08:37 | 19 | employment" -- and we'll come back and talk about that -- |
| 08:37 | 20 | "by the company, I hereby assign to the company and/or its |
| 08:37 | 21 | nominees all my right, title, and interest in such |
| 08:37 | 22 | inventions, and all my right, title, and interest in any |
| 08:37 | 23 | patents, copyright --" I'm sorry -- "in any patents, |
| 08:37 | 24 | copyrights, patent applications or copyright applications |
| 08:38 | 25 | based thereon." |

| 08:38 | 1 | That's the rest of that sentence, right? |
|---|---|---|

08:38   1          That's the rest of that sentence, right?

08:38   2   A.   Correct.

08:38   3   Q.   And then in paragraph (b), do we have the definition of

08:38   4   inventions?

08:38   5   A.   Yes, we do.  As used in -- used in the agreement, which

08:38   6   is the entire agreement, the entire page.

08:38   7   Q.   It -- let me -- let me read it to you, and then I'll

08:38   8   ask you some questions about it.

08:38   9          "The term," quote, "'inventions,'" closed quote,

08:38   10  "includes but is not limited to all discoveries,

08:38   11  improvements, processes, developments, designs, know-how,

08:38   12  data computer programs and formulae, whether patentable or

08:38   13  unpatentable."

08:38   14         I mean, what -- how do you understand that definition

08:38   15  of inventions?

08:38   16  A.   Well, I -- I understand it as all inventions, all

08:38   17  inventions both tangible and intangible as defined.  I also

08:38   18  understand it that -- where it says, "but is not limited

08:38   19  to," that there's no way the author felt -- and I would

08:39   20  agree -- that you can list everything possible to put in

08:39   21  here.

08:39   22              MS. KELLER:  Objection.

08:39   23              THE WITNESS:  Very broadly.

08:39   24              THE COURT:  Sustained.  Stricken.

08:39   25              MS. KELLER:  Motion to strike.

08:39    1              THE COURT:  His prior testimony was he didn't know
08:39    2    what the author --
08:39    3              MR. QUINN:  Well, let me --
08:39    4              THE COURT:  Sustained.
08:39    5              MR. QUINN:  Let me rephrase the question, if I
08:39    6    may, Your Honor.
08:39    7    BY MR. QUINN:
08:39    8    Q.   In your understanding as Mattel's 30(b)(6) witness,
08:39    9    what do understand "including but not limited to" --
08:39   10              MS. KELLER:  Same objection, Your Honor.
08:39   11              MR. QUINN:  -- to mean?
08:39   12              THE COURT:  You can answer the question.
08:39   13              THE WITNESS:  One more time, repeat the question.
08:39   14    BY MR. QUINN:
08:39   15    Q.   In your understanding, what does "included but not
08:39   16    limited to" at the beginning of that list mean?
08:39   17    A.   I think it includes everything associated with the
08:39   18    business, all inventions associated with the business.  I
08:39   19    think it's a very broad definition, and I think it's there
08:39   20    to mean a broad definition -- to be a broad definition.
08:40   21    Q.   Would it be possible to list every kind of invention?
08:40   22    A.   I don't believe so.  I don't believe so.  I don't think
08:40   23    so.  Matter of fact, I think there are things we don't know
08:40   24    of today that would be inventions of tomorrow.
08:40   25    Q.   You said that some of these things in this list there

08:40   1   are tangible and some are intangible.  What do you mean by
08:40   2   that?
08:40   3   A.   Well, some of these things like a -- like a data
08:40   4   computer program is something you can get your arms around
08:40   5   or you can feel.  It's tangible.  Something like know-how,
08:40   6   which would be a skill or a -- some -- something in your
08:40   7   mind is not tangible.  So I think there's a combination of
08:40   8   things in here.  Discoveries could be tangible or
08:40   9   intangible.  So I think it's just a list of things that
08:40   10  would be applicable that, uh -- that try to describe,
08:40   11  partly, what inventions are.
08:41   12  Q.   And then the next paragraph, subparagraph (c), it's got
08:41   13  this reference to the California Labor Code that we've seen
08:41   14  several times.  Can you explain your understanding of how
08:41   15  that section -- that subsection (c) of paragraph 2 works?
08:41   16          MS. KELLER:  Objection.  No foundation.
08:41   17          THE COURT:  Sustained.
08:41   18  BY MR. QUINN:
08:41   19  Q.   In terms of your own understanding as Mattel's 30(b)(6)
08:41   20  witness, could you explain to us what you understand this to
08:41   21  mean?
08:41   22          MS. KELLER:  Objection.  No foundation.
08:41   23          THE COURT:  Sustained.  He can talk about the
08:41   24  words inside.  The comparison is left for the jury.
        25

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 14 of 158  Page ID #:310109
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

14

08:41  1  BY MR. QUINN:

08:41  2  Q.    In terms of the words that you see here, can you

08:41  3  explain that to us?

08:41  4  A.    Well, I think this -- my impression is the definition

08:41  5  of this 2870, which is part of the California Labor Code, is

08:41  6  very important.  It basically says to the person signing

08:41  7  this that, look, Mattel doesn't own everything you do.  And

08:42  8  that's probably by law.  Doesn't own everything you do.

08:42  9       What it doesn't own -- and it clearly states that, and

08:42  10  I think it's even in quotes -- it doesn't own things that

08:42  11  you do on your own time that has -- that have no

08:42  12  relationship to the business.  That you don't -- that you

08:42  13  don't use company resources, company, uh, facilities,

08:42  14  company ideas, et cetera.

08:42  15       It says those ideas are your own.  It then says very

08:42  16  specifically, except for those inventions that relate at the

08:42  17  time of conception.

08:42  18       So it's all of that -- all of that applies to your own

08:42  19  invention, except if it relates to the business.

08:42  20            MS. KELLER:  Objection.  That misstates the labor

08:42  21  code.

08:42  22            THE COURT:  Sustained.

08:42  23            MS. KELLER:  Motion to strike.

08:42  24            THE COURT:  Stricken.

08:42  25

| | | |
|---|---|---|
| 08:42 | 1 | BY MR. QUINN: |
| 08:42 | 2 | Q.   Well, when you -- you see the language there where it |
| 08:42 | 3 | says, "relate at the time of conception or reduction to |
| 08:42 | 4 | practice of the invention to the employer's business."  Do |
| 08:43 | 5 | you see that? |
| 08:43 | 6 | A.   Yes. |
| 08:43 | 7 | Q.   And what did you -- what do you understand that phrase |
| 08:43 | 8 | to mean? |
| 08:43 | 9 | A.   I understand that phrase to mean that if -- if you do |
| 08:43 | 10 | something that relates to the employer's business, it is |
| 08:43 | 11 | excepted -- excepted from this 2870, which means it isn't |
| 08:43 | 12 | covered. |
| 08:43 | 13 | Q.   And that means in terms of -- if someone -- you see a |
| 08:43 | 14 | reference here to things done on the employee's own time? |
| 08:43 | 15 | A.   Yes. |
| 08:43 | 16 | Q.   And you say that this doesn't mean that the employer, |
| 08:43 | 17 | Mattel, owns everything? |
| 08:43 | 18 | A.   Correct. |
| 08:43 | 19 | Q.   You said it owns, in your understanding, what? |
| 08:43 | 20 | A.   It owns -- |
| 08:43 | 21 |        MS. KELLER:  Objection.  That's the ultimate issue |
| 08:43 | 22 | for the jury. |
| 08:43 | 23 |        THE COURT:  Sustained. |
| 08:43 | 24 |        MR. QUINN:  Your Honor, again, as a 30(b)(6) |
| 08:43 | 25 | witness, his understanding. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 16 of 158   Page ID #:310111
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

16

08:43  1          THE COURT:  That is the ultimate issue for the

08:43  2  jury.

08:43  3          Sustained.

08:43  4  BY MR. QUINN:

08:44  5  Q.   If we could turn -- well, let me just ask you.  Can you

08:44  6  explain why, for a company like Mattel, it's important to

08:44  7  have inventions agreements like this entered into with its

08:44  8  employees?

08:44  9  A.   I think that inventions, ideas, these kind of things

08:44  10  described in (a) and (b) are essential for a company like

08:44  11  Mattel.

08:44  12  Q.   Why -- why is that?

08:44  13  A.   Because ideas and new product ideas are the lifeblood

08:44  14  of our company.  We produce, uh, many, many, many different

08:44  15  types of products each year.  80 to 90 percent of them are

08:44  16  new each year.  These all come from ideas.  So those ideas

08:44  17  are key to how we operate the business, paramount to how

08:44  18  successful we are.

08:44  19  Q.   You were asked a number of questions yesterday by

08:44  20  Mr. Keller about the different versions of this agreement

08:44  21  that existed over the years.  I think the first one went

08:45  22  back to 1975, and you were designated as Mattel's 30(b)(6)

08:45  23  witness to investigate and try to learn the history of this.

08:45  24          Were there -- was there anyone that you could talk to,

08:45  25  going back to 1975 and 1980s, who could tell you what they

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

17

08:45  1    intended by the prior versions of this form?

08:45  2    A.   We -- we did find -- we did find one previous general

08:45  3    counsel.  As a matter of fact, one of the earliest general

08:45  4    counsels.  But he could not give us -- he's a retired judge

08:45  5    in, I think, North Carolina.

08:45  6          MS. KELLER:  Objection.  Motion to strike.

08:45  7    Nonresponsive.

08:45  8          THE COURT:  Sustained.

08:45  9          MS. KELLER:  Attempt to ingratiate with the jury.

08:45 10          MR. QUINN:  Your Honor, I object to the comments.

08:45 11          THE COURT:  The comment's stricken by counsel also

08:45 12    in terms of ingratiation.

08:45 13          Ask the question now.

08:45 14    BY MR. QUINN:

08:45 15    Q.   You were asked questions about the investigation that

08:45 16    you did?

08:45 17    A.   Yes.

08:45 18    Q.   And did you try to find whether there are people you

08:45 19    could talk to who had some knowledge about these earlier

08:45 20    versions of the agreements?

08:45 21    A.   Yes.

08:45 22    Q.   And you made reference to one person you were able to

08:46 23    track down?

08:46 24    A.   Yes.

08:46 25    Q.   Could you tell us about that?

| | | |
|---|---|---|
| 08:46 | 1 | MS. KELLER:  Objection.  Irrelevant. |
| 08:46 | 2 | MR. QUINN:  He was asked about his investigation. |
| 08:46 | 3 | MS. KELLER:  Only relevant to his deposition |
| 08:46 | 4 | testimony, Your Honor.  It calls for hearsay. |
| 08:46 | 5 | THE COURT:  You can -- eventually it's going to |
| 08:46 | 6 | lead to hearsay, though.  That's our issue. |
| 08:46 | 7 | MR. QUINN:  Right.  I think he's going to -- he's |
| 08:46 | 8 | not going to -- |
| 08:46 | 9 | THE COURT:  I think he is. |
| 08:46 | 10 | MR. QUINN:  All right.  I understand. |
| 08:46 | 11 | BY MR. QUINN: |
| 08:46 | 12 | Q.   In any event, you were able to track down one person |
| 08:46 | 13 | and you spoke to him? |
| 08:46 | 14 | A.   Yes. |
| 08:46 | 15 | Q.   All right.  And then you made reference to a person who |
| 08:46 | 16 | was responsible -- you said a Joe McKay, who was responsible |
| 08:46 | 17 | for the changes to the inventions agreement between the 1993 |
| 08:46 | 18 | version, which is Exhibit 9089, and the 1994 version, which |
| 08:46 | 19 | is 9924. |
| 08:46 | 20 | Now, that was -- those were some pretty significant |
| 08:46 | 21 | changes between those two versions? |
| 08:46 | 22 | A.   Yes.  I -- I'd classify it as an overhaul. |
| 08:46 | 23 | Q.   And Mr. McKay you couldn't speak with because he has |
| 08:46 | 24 | passed away, correct? |
| 08:47 | 25 | A.   Yes, he had passed away at the time. |

| | | |
|---|---|---|
| 08:47 | 1 | Q.   Now, would incoming employees like Mr. Bryant have had |
| 08:47 | 2 | any occasion to see previous versions or drafts of these |
| 08:47 | 3 | inventions agreements? |
| 08:47 | 4 | A.   No. |
| 08:47 | 5 | Q.   Or versions of the inventions agreement that were |
| 08:47 | 6 | introduced after their employment ended? |
| 08:47 | 7 | A.   No. |
| 08:47 | 8 | Q.   Mr. Bryant actually signed two versions or two |
| 08:47 | 9 | inventions agreements? |
| 08:47 | 10 | A.   That is correct, '95 and '99, I believe. |
| 08:47 | 11 | Q.   And that's Exhibit 23 and Exhibit 9924. |
| 08:47 | 12 | (Documents provided to the witness.) |
| 08:47 | 13 | BY MR. QUINN: |
| 08:47 | 14 | Q.   Have you compared those two versions of the inventions |
| 08:47 | 15 | agreement? |
| 08:47 | 16 | A.   Uh, yes. |
| 08:47 | 17 | Q.   And in terms of the language regarding inventions that |
| 08:47 | 18 | we started out talking about this morning, can you tell us |
| 08:47 | 19 | whether or not that language is the same in the 1995 |
| 08:47 | 20 | agreement that he signed -- or the agreement that he signed |
| 08:48 | 21 | when he joined the company in 1995 and the agreement that he |
| 08:48 | 22 | signed when he joined in 1999? |
| 08:48 | 23 | A.   It is the same. |
| 08:48 | 24 | Q.   So he has -- at least as it relates to the inventions |
| 08:48 | 25 | assignment, he signed up to that same language twice? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 20 of 158   Page ID #:310115
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

20

| | | |
|---|---|---|
| 08:48 | 1 | A.    Yes. |
| 08:48 | 2 | Q.    And is it true that at Mattel that you have employees, |
| 08:48 | 3 | I would assume, with different levels, who have been with |
| 08:48 | 4 | the company different lengths of time? |
| 08:48 | 5 | A.    Yes.  Different levels of seniority throughout the |
| 08:48 | 6 | company, sure. |
| 08:48 | 7 | Q.    Does that mean that they would have -- if there was a |
| 08:48 | 8 | different form of agreement in effect when they joined the |
| 08:48 | 9 | company, that they obviously -- they wouldn't necessarily |
| 08:48 | 10 | have all signed the same form? |
| 08:48 | 11 | A.    Correct. |
| 08:48 | 12 | Q.    In your experience has there been any different |
| 08:48 | 13 | treatments of employees in terms of ownership of inventions |
| 08:49 | 14 | based on how long they've been with the company or which |
| 08:49 | 15 | version of the agreement they happened to sign when they |
| 08:49 | 16 | joined? |
| 08:49 | 17 | A.    No. |
| 08:49 | 18 | Q.    Now, you were asked some questions about the concept of |
| 08:49 | 19 | ideas.  And it was pointed out that in Exhibit 9089 -- |
| 08:49 | 20 |         MR. QUINN:  If we could take a look at that. |
| 08:49 | 21 |         *(Document provided to the witness.)* |
| 08:49 | 22 | BY MR. QUINN: |
| 08:49 | 23 | Q.    -- which is the form of agreement that was in effect in |
| 08:49 | 24 | 1993. |
| 08:49 | 25 |         MR. QUINN:  If we could put that up on the screen, |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 21 of 158   Page ID #:310116
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

21

| | | |
|---|---|---|
| 08:49 | 1 | Ken, 9089. |
| 08:49 | 2 | *(Document displayed.)* |
| 08:49 | 3 | BY MR. QUINN: |
| 08:49 | 4 | Q.   It was pointed out that that version that was in effect |
| 08:49 | 5 | in 1993 did include the word "ideas."  Do you see that? |
| 08:49 | 6 | A.   Yes. |
| 08:49 | 7 | Q.   In the first paragraph it says, "my interest in (a) any |
| 08:50 | 8 | and all inventions, improvements, and ideas, whether or not |
| 08:50 | 9 | patentable."  You see that? |
| 08:50 | 10 | A.   Yes. |
| 08:50 | 11 | Q.   And then in the version that goes into effect –– went |
| 08:50 | 12 | into effect in 1994, Exhibit 9090, it was pointed out that |
| 08:50 | 13 | the word "ideas" does not appear there. |
| 08:50 | 14 | *(Document provided to the witness.)* |
| 08:50 | 15 | THE WITNESS:  That is correct.  The word "ideas" |
| 08:50 | 16 | does not appear. |
| 08:50 | 17 | *(Document displayed.)* |
| 08:50 | 18 | BY MR. QUINN: |
| 08:50 | 19 | Q.   Is that the only change that was made in going from the |
| 08:50 | 20 | 1993 version, Exhibit 9089, and the 1994 version, |
| 08:50 | 21 | Exhibit 9090? |
| 08:50 | 22 | A.   No.  As I said earlier, it was kind of a complete |
| 08:50 | 23 | overhaul.  There were a lot of words that were changed. |
| 08:50 | 24 | Q.   If we could look at Exhibit 9089. |
| 08:50 | 25 | MR. QUINN:  And just enlarge that first paragraph |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 22 of 158   Page ID #:310117
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

22

| | | |
|---|---|---|
| 08:50 | 1 | if we could, Ken. |
| 08:50 | 2 | *(Technician complies.)* |
| 08:51 | 3 | BY MR. QUINN: |
| 08:51 | 4 | Q.   And there, it begins in paragraph 1 with that language, |
| 08:51 | 5 | "any and all inventions, improvements, and ideas, whether or |
| 08:51 | 6 | not patentable," et cetera.  Do you see that? |
| 08:51 | 7 | A.   Uh, yes. |
| 08:51 | 8 | Q.   And then if we could look at Exhibit-- the 1994 |
| 08:51 | 9 | version, Exhibit 9090. |
| 08:51 | 10 | *(Document displayed.)* |
| 08:51 | 11 | BY MR. QUINN: |
| 08:51 | 12 | Q.   Can you tell us whether or not that agreement is |
| 08:51 | 13 | structured completely differently? |
| 08:51 | 14 | A.   Completely differently. |
| 08:51 | 15 | Q.   And we have in the 1990 *(sic)* version, do we see that |
| 08:51 | 16 | paragraph that we've seen in Mr. Bryant's agreement, |
| 08:51 | 17 | ownership of inventions in Paragraph 2? |
| 08:51 | 18 | A.   Yes. |
| 08:51 | 19 | Q.   And that's where you have the definition of inventions |
| 08:51 | 20 | that's -- we've seen that's introduced in paragraph 2(b)? |
| 08:51 | 21 | A.   Yes. |
| 08:51 | 22 | Q.   So the fact that the word "ideas" appeared in the |
| 08:51 | 23 | earlier -- in the 1993 version and doesn't appear in the |
| 08:52 | 24 | 1994 version, that's not the only change? |
| 08:52 | 25 | A.   No. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 23 of 158   Page ID #:310118
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

23

| 08:52 | 1 | Q.   Was the agreement basically essentially redone? |
| 08:52 | 2 | A.   I believe so.  I wasn't there at the time, but it |
| 08:52 | 3 | appears to me. |
| 08:52 | 4 | Q.   The new version, or the 1994 version, 9090, |
| 08:52 | 5 | specifically uses the word "conceived"? |
| 08:52 | 6 | A.   Yes. |
| 08:52 | 7 | Q.   And can we take -- can you show us where that appears? |
| 08:52 | 8 | A.   It appears in 2(a), the second line.  It says, "as |
| 08:52 | 9 | practical, all inventions conceived or reduced to practice |
| 08:52 | 10 | by me." |
| 08:52 | 11 | Q.   So inventions that are conceived, is it your |
| 08:52 | 12 | understanding that those are assigned to the company even |
| 08:52 | 13 | before they're reduced to practice? |
| 08:52 | 14 | A.   Yes. |
| 08:52 | 15 | Q.   And what do you understand "conceived" to mean in this |
| 08:52 | 16 | agreement, in your understanding? |
| 08:52 | 17 | A.    In my understanding, I think "conceived" means ideas. |
| 08:52 | 18 | I was so concerned I -- |
| 08:52 | 19 | MS. KELLER:  Objection.  That's the ultimate issue |
| 08:52 | 20 | for the jury, Your Honor. |
| 08:53 | 21 | MR. QUINN:  Your Honor, this is our witness on the |
| 08:53 | 22 | understanding.  30(b)(6) witness.  He was questioned about |
| 08:53 | 23 | it. |
| 08:53 | 24 | MS. KELLER:  No foundation, Your Honor. |
| 08:53 | 25 | THE COURT:  (To the jury:)  He's designated as a |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

24

| | | |
|---|---|---|
| 08:53 | 1 | 30(b)(6) witness by Mattel, and as such he is speaking on |
| 08:53 | 2 | behalf of Mattel.  When he uses the word "I," you're hearing |
| 08:53 | 3 | his representation on behalf of Mattel. |
| 08:53 | 4 | These are some of the ultimate issues that you'll |
| 08:53 | 5 | decide.  Ideas will be something I'll be submitting to you |
| 08:53 | 6 | for a decision. |
| 08:53 | 7 | And I'm going to allow him to testify about what |
| 08:53 | 8 | the company's position is, but in no way does this supplant |
| 08:54 | 9 | your individual determination.  Because, obviously, the |
| 08:54 | 10 | parties have a diametrically opposed belief in, one, what |
| 08:54 | 11 | these words mean; and, two, whether they were included or |
| 08:54 | 12 | not included in these various contracts, and how you should |
| 08:54 | 13 | be affected or not affected by that in your decision making. |
| 08:54 | 14 | So you can see that in this particular contract, |
| 08:54 | 15 | the word "ideas" is not included in Carter Bryant's |
| 08:54 | 16 | contract.  But the company's position is, as you've |
| 08:54 | 17 | continually heard, that the contract should be interpreted |
| 08:54 | 18 | to include the word "ideas." |
| 08:54 | 19 | I will instruct you thoroughly in this area, but |
| 08:54 | 20 | I'm trying to tell you why you're seeing this debate take |
| 08:54 | 21 | place now, okay. |
| 08:55 | 22 | (To the witness:)  Sir, you can cast your opinion |
| 08:55 | 23 | on behalf of the company. |
| 08:55 | 24 | THE WITNESS:  Can I have the question, please? |
| 08:55 | 25 | THE COURT:  Counsel, your question. |

| | | |
|---|---|---|
| 08:55 | 1 | MR. QUINN:  All right. |
| 08:55 | 2 | BY MR. QUINN: |
| 08:55 | 3 | Q.   Can you tell us why, in your understanding, this new |
| 08:55 | 4 | form of agreement, this overhauled agreement that came out |
| 08:55 | 5 | in 1994, even though the word "ideas" doesn't appear, why |
| 08:55 | 6 | you remember inventions which are ideas are included? |
| 08:55 | 7 | A.   I actually think there's a number of reasons, uh, |
| 08:55 | 8 | for -- that I have that -- that rationale or I have that |
| 08:55 | 9 | belief. |
| 08:55 | 10 | One is, the word "conceived" itself I truly believe |
| 08:55 | 11 | means ideas.  I was so concerned about the word I looked it |
| 08:55 | 12 | up.  I looked it up in several dictionaries, and it's |
| 08:55 | 13 | defined by the word -- |
| 08:55 | 14 | MS. KELLER:  Objection, Your Honor. |
| 08:55 | 15 | THE COURT:  Sustained.  Company's don't look up |
| 08:55 | 16 | words.  Okay?  This is his personal opinion.  We're going to |
| 08:55 | 17 | strike that. |
| 08:55 | 18 | You represent the company.  Okay? |
| 08:55 | 19 | THE WITNESS:  Okay. |
| 08:55 | 20 | THE COURT:  Okay. |
| 08:55 | 21 | BY MR. QUINN: |
| 08:55 | 22 | Q.   Any other reasons why?  We won't get into the |
| 08:56 | 23 | dictionary definitions at this point. |
| 08:56 | 24 | THE COURT:  Trust me, and I'm going to stop that |
| 08:56 | 25 | immediately. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 26 of 158   Page ID #:310121
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

26

| | | |
|---|---|---|
| 08:56 | 1 | If I went to a Webster's Dictionary and looked up |
| 08:56 | 2 | a word compared to a Black's Law Dictionary -- we use words |
| 08:56 | 3 | that may have slightly and sometimes dramatically different |
| 08:56 | 4 | meanings legally.  At the end of the case, I promise you I |
| 08:56 | 5 | will read to you for hours -- no, it will be relatively |
| 08:56 | 6 | short -- but I'll read to you the instructions on the law. |
| 08:56 | 7 | It will cover all these areas. |
| 08:56 | 8 | Counsel. |
| 08:56 | 9 | MR. QUINN:  Thank you. |
| 08:56 | 10 | THE COURT:  We're done with dictionaries. |
| 08:56 | 11 | MR. QUINN:  We're done with dictionaries. |
| 08:56 | 12 | BY MR. QUINN: |
| 08:56 | 13 | Q.   Setting dictionaries aside, you've told us about your |
| 08:56 | 14 | understanding of the word "conceived."  Are there any other |
| 08:56 | 15 | reasons why you believe ideas are still included, even |
| 08:56 | 16 | though the word doesn't appear in the new version that came |
| 08:56 | 17 | out in 1994? |
| 08:56 | 18 | MS. KELLER:  Objection.  No foundation. |
| 08:56 | 19 | THE COURT:  No.  You can -- you can state your |
| 08:56 | 20 | opinion on behalf of the company, why this is incorporated |
| 08:56 | 21 | in your opinion. |
| 08:56 | 22 | THE WITNESS:  Okay.  I believe in 2(b), where it |
| 08:57 | 23 | says, "inventions includes but is not limited," is very |
| 08:57 | 24 | broad.  So I think that has -- very easily includes the |
| 08:57 | 25 | words "ideas."  And then the third -- |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

27

| 08:57 | 1 | MS. KELLER: Your Honor, objection. There is -- |
|-------|---|---|

08:57  1  MS. KELLER:  Your Honor, objection.  There is --

08:57  2  THE WITNESS:  The concept --

08:57  3  MS. KELLER:  -- no foundation for this.

08:57  4  MR. QUINN:  This is his understanding, Your Honor.

08:57  5  THE COURT:  Now, just a moment.

08:57  6  Well, Counsel, I'll think out loud for a moment,

08:57  7  which is dangerous in front of the jury and in front of you.

08:57  8  If I let this go much further -- this is really

08:57  9  argument for counsel.  I'm going to give each of you the

08:57  10  opportunity to argue this.  By the same token, I'm about to

08:57  11  see an expert from the other side interpreting what it

08:57  12  doesn't mean.

08:58  13  Why don't we move on to another area.

08:58  14  MR. QUINN:  Move on to another area?

08:58  15  THE COURT:  Let's move on to another area.

08:58  16  MR. QUINN:  Um, okay.

08:58  17  BY MR. QUINN:

08:58  18  Q.  Were there some other words that were in the 1993

08:58  19  agreement that don't appear in the 1994 agreement that you

08:58  20  think the concept is still included, even though the word

08:58  21  dropped out?

08:58  22  A.  Um, yes, I do.

08:58  23  Q.  And what are you thinking of?

08:58  24  A.  I think there's a number of 'em.  Copyrightable subject

08:58  25  matter is one that's in the earlier agreement that, uh,

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 28 of 158   Page ID #:310123
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

28

| 08:58 | 1 | those words do not appear and –– like that in the '90 –– in |
| 08:58 | 2 | the agreement Carter Bryant signed. |
| 08:58 | 3 | Q.   Let's take a look at Exhibit 9089, the earlier 1994 |
| 08:58 | 4 | version, in the first paragraph. |
| 08:58 | 5 | *(Document provided to the witness.)* |
| 08:58 | 6 | THE WITNESS:  Yes. |
| 08:58 | 7 | BY MR. QUINN: |
| 08:58 | 8 | Q.   And you said "copyrightable subject matter" in the |
| 08:59 | 9 | third line? |
| 08:59 | 10 | A.   Yes. |
| 08:59 | 11 | MR. QUINN:  If we could put that up on the screen, |
| 08:59 | 12 | Ken. |
| 08:59 | 13 | *(Document displayed.)* |
| 08:59 | 14 | THE COURT:  And, Counsel, I'm going to reverse |
| 08:59 | 15 | that decision and let you inquire. |
| 08:59 | 16 | I think that –– |
| 08:59 | 17 | MR. QUINN:  Okay. |
| 08:59 | 18 | THE COURT:  –– this needs to be drawn out by both |
| 08:59 | 19 | sides. |
| 08:59 | 20 | (To the jury:)  Speaking to you as members of the |
| 08:59 | 21 | jury, my constant admonition to you is that you'll |
| 08:59 | 22 | independently decide this.  You'll not only decide what |
| 08:59 | 23 | these words mean, whether they incorporate the word "ideas," |
| 08:59 | 24 | whether ideas is or isn't in a particular contract, and, |
| 08:59 | 25 | obviously, it's not in the contract that Carter Bryant |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 29 of 158   Page ID #:310124
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

29

| | | |
|---|---|---|
| 08:59 | 1 | signed, and therefore Mattel is going to explain through |
| 08:59 | 2 | this witness, through your inquiry -- |
| 08:59 | 3 | MR. QUINN:  Yes. |
| 08:59 | 4 | THE COURT:  -- why they believe that the word |
| 08:59 | 5 | "ideas" is included.  And I'm going to allow |
| 09:00 | 6 | cross-examination -- or I'm sorry -- redirect examination |
| 09:00 | 7 | about why the word wasn't included, and why these words |
| 09:00 | 8 | don't mean that from MGA's perspective. |
| 09:00 | 9 | The whole idea is eventually going to be who owns |
| 09:00 | 10 | your ideas. |
| 09:00 | 11 | MR. QUINN:  And designs as well, Your Honor. |
| 09:00 | 12 | THE COURT:  Well, now, just a moment, Counsel, |
| 09:00 | 13 | we're focused on ideas for the time being. |
| 09:00 | 14 | MR. QUINN:  All right. |
| 09:00 | 15 | THE COURT:  That's for argument. |
| 09:00 | 16 | BY MR. QUINN: |
| 09:00 | 17 | Q.  So we were talking about other phrases that are not -- |
| 09:00 | 18 | were not carried forward, but you believe the concept is |
| 09:00 | 19 | still there.  That's what we were discussing just a moment |
| 09:00 | 20 | ago. |
| 09:00 | 21 | And you mentioned "copyrightable subject matter," which |
| 09:00 | 22 | was in the earlier agreement, 9089.  And do you see that |
| 09:00 | 23 | there? |
| 09:00 | 24 | A.  Yes. |
| 09:00 | 25 | MR. QUINN:  Could we underline that? |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

30

| 09:00 | 1 | (Technician complies.) |
|---|---|---|

09:00   2          MR. QUINN:  It appears we're having some computer

09:01   3   issues.

09:01   4          THE COURT:  It's underlined.

09:01   5          MR. QUINN:  Okay.  Thank you.

09:01   6   BY MR. QUINN:

09:01   7   Q.   Now, does that appear in the version in 1994,

09:01   8   Exhibit 9090?

09:01   9   A.   Those specific words do not appear.

09:01   10   Q.   But is copyrightable -- are copyrights covered?

09:01   11   A.   Yes.  In the third line -- oh, I'm sorry -- I don't

09:01   12   know if I'm looking at the right --

09:01   13   Q.   If we're looking at Exhibit 9090?

09:01   14   A.   Yes.  The fourth line in 2(a) it would say, "in any

09:01   15   patents, copyrights, patent applications, copyright

09:01   16   applications," I believe it is covered.

09:01   17          MS. KELLER:  Objection.  No foundation.

09:01   18   Your Honor, the document speaks for itself as to whether

09:01   19   it's covered or not on this issue.

09:01   20          THE COURT:  On this issue, sustained.

09:01   21          MS. KELLER:  Motion to strike.

09:01   22          THE COURT:  Strike the answer.

09:01   23   BY MR. QUINN:

09:01   24   Q.   But the phrase doesn't appear -- "copyrightable subject

09:01   25   matter" does not appear in the earlier agreement?

| | | |
|---|---|---|
| 09:01 | 1 | A.   Correct. |
| 09:01 | 2 | Q.   But the words -- different words appear that refer to |
| 09:01 | 3 | copyrights? |
| 09:02 | 4 | A.   Yes. |
| 09:02 | 5 | Q.   In the next -- in the 1994 agreement, Exhibit 9090? |
| 09:02 | 6 | A.   Correct. |
| 09:02 | 7 | MR. QUINN:  Um, if I can return, then, Your Honor, |
| 09:02 | 8 | to the concept of ideas? |
| 09:02 | 9 | THE COURT:  Okay.  I've reversed my ruling. |
| 09:02 | 10 | BY MR. QUINN: |
| 09:02 | 11 | Q.   You indicated -- we were talking about why you thought |
| 09:02 | 12 | ideas were still included, even though the word didn't |
| 09:02 | 13 | appear in the version introduced in 1994, and you told us |
| 09:02 | 14 | about your understanding of conception, that that to you |
| 09:02 | 15 | meant something thought of.  Were there any other reasons |
| 09:02 | 16 | why you thought ideas were included, even though the word |
| 09:02 | 17 | isn't there? |
| 09:02 | 18 | A.   Yes.  I said that in 2(b) it -- it talks about |
| 09:02 | 19 | "inventions includes but is not limited to," so I think that |
| 09:02 | 20 | is a broad statement.  It is meant to be a broad statement |
| 09:02 | 21 | or interpreted to be a broad statement, which definitely can |
| 09:02 | 22 | include the word "ideas."  So I don't think it could be in |
| 09:02 | 23 | there. |
| 09:02 | 24 | And then the third -- the third piece is that this is |
| 09:03 | 25 | the lifeblood of the organization.  Ideas are the lifeblood |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 32 of 158   Page ID #:310127
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

32

09:03  1    of the organization.  And I can't -- I think it's
09:03  2    inconceivable for a -- someone to try to exclude the
09:03  3    concept -- or purposely exclude the concept of ideas in a
09:03  4    company that depends on ideas to -- to produce new product,
09:03  5    to come up with new product, to -- to make money.
09:03  6              MS. KELLER:  Objection.
09:03  7              THE WITNESS:  My own perception of the industry.
09:03  8              MS. KELLER:  Objection.  Speculation as to whether
09:03  9    anyone -- whether it would be inconceivable for anyone.
09:03  10             THE COURT:  I'm going to strike "anyone" and "my
09:03  11   own perception."  The rest of the answer stands.  He
09:03  12   represents the company as a 30(b)(6) witness.
09:03  13   BY MR. QUINN:
09:03  14   Q.   And earlier you had referred to the idea -- the idea
09:03  15   that this list of things in the definitions of inventions
09:03  16   includes both tangible and intangible things?
09:03  17   A.   Correct.  So some of those are ideas.  I view some of
09:04  18   those as -- are ideas and some are more tangible items, like
09:04  19   something more two- or three-dimensional.
09:04  20   Q.   All right.  You were also asked some questions about
09:04  21   the fact that in the phrase "during my employment," that the
09:04  22   words "the period of" did not appear in the version of the
09:04  23   agreement introduced in 1994.
09:04  24             Do you recall that?
09:04  25   A.   Yes.

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

33

| | | |
|---|---|---|
| 09:04 | 1 | Q.   I mean, to you, in your own understanding, was that a |
| 09:04 | 2 | substantive change, to change from "the period of my |
| 09:04 | 3 | employment" to "during my employment" in your own |
| 09:04 | 4 | understanding? |
| 09:04 | 5 | A.   No. |
| 09:04 | 6 | Q.   And why is that? |
| 09:04 | 7 | A.   I think "the period of employment" or "during my |
| 09:04 | 8 | employment" mean pretty much -- mean the same thing.  I |
| 09:04 | 9 | think "during my employment" starts when you start |
| 09:04 | 10 | employment and ends when you end employment.  And I think |
| 09:04 | 11 | that's actually reflected elsewhere in, uh, in this |
| 09:04 | 12 | agreement, specifically down in 3 -- 3(a). |
| 09:05 | 13 | Q.   Is that -- |
| 09:05 | 14 | A.   It uses the same term. |
| 09:05 | 15 | Q.   If we could take a look at -- this is in Exhibit 990 |
| 09:05 | 16 | (*sic*), paragraph 3(a). |
| 09:05 | 17 | THE REPORTER:  Nine, nine, zero? |
| 09:05 | 18 | MR. QUINN:  I'm sorry.  9090. |
| 09:05 | 19 | THE COURT:  Which is also 9096, which is also -- |
| 09:05 | 20 | MR. QUINN:  Don't get me started, Your Honor. |
| 09:05 | 21 | This one is not Mr. Bryant's agreement -- it's signed by |
| 09:05 | 22 | him -- although it's the same form, Your Honor. |
| 09:05 | 23 | BY MR. QUINN: |
| 09:05 | 24 | Q.   If we could take a look at paragraph 3(a) that's |
| 09:05 | 25 | entitled "Conflicts and Other Activities."  And you're |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 34 of 158   Page ID #:310129
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:05 | 1 | referring to the fact that the phrase -- the period of |
| 09:05 | 2 | doesn't appear here.  But yet you believe it refers to the |
| 09:05 | 3 | entire time of the person's employment, whether it's nights |
| 09:05 | 4 | or weekends? |
| 09:05 | 5 | A.   Yes, I do. |
| 09:05 | 6 | Q.   Can you explain that to us, please? |
| 09:05 | 7 | A.   Um, well, I think this refers to "Therefore, during |
| 09:05 | 8 | employment with the company, I will fully comply with the |
| 09:06 | 9 | company's conflict of interest policy." |
| 09:06 | 10 | You know, you take any examples of that, say, one of |
| 09:06 | 11 | our employees who are selling vending machines or buying |
| 09:06 | 12 | vending machines from a vendor.  If -- you know, one of our |
| 09:06 | 13 | conflict of interests is you can't accept bribes, et cetera. |
| 09:06 | 14 | If that vendor says, gee, if you buy these machines, I'll |
| 09:06 | 15 | give you and your family a trip to Hawaii, you can't accept |
| 09:06 | 16 | that, whether it's at 4:00 o'clock in the afternoon or at |
| 09:06 | 17 | 6:00 o'clock when you're home or on the weekends. |
| 09:06 | 18 | MS. KELLER:  Objection.  Motion to strike as |
| 09:06 | 19 | nonresponsive. |
| 09:06 | 20 | THE COURT:  Sustained. |
| 09:06 | 21 | MS. KELLER:  Motion to strike. |
| 09:06 | 22 | THE COURT:  Stricken. |
| 09:06 | 23 | BY MR. QUINN: |
| 09:06 | 24 | Q.   Could you explain why the conflict or the fact that the |
| 09:06 | 25 | same phrase "during my employment" in this conflict of |

| | | |
|---|---|---|
| 09:06 | 1 | interest section you believe supports the idea that the same |
| 09:06 | 2 | phrase "during my employment" in the inventions clause |
| 09:07 | 3 | covers nights and weekends? |
| 09:07 | 4 | MS. KELLER:  No foundation, Your Honor. |
| 09:07 | 5 | THE COURT:  Sustained. |
| 09:07 | 6 | MR. QUINN:  In his understanding, Your Honor. |
| 09:07 | 7 | THE COURT:  No.  Sustained.  I'm not going to |
| 09:07 | 8 | allow the comparisons back and forth.  You can talk about |
| 09:07 | 9 | the content of the document, what it means. |
| 09:07 | 10 | MR. QUINN:  Okay. |
| 09:07 | 11 | THE COURT:  But relating it back to the facts of |
| 09:07 | 12 | this case is... |
| 09:07 | 13 | MR. QUINN:  All right.  Focusing, then, on this |
| 09:07 | 14 | phrase here, "during my employment," in the conflict |
| 09:07 | 15 | section, can you tell us whether or not you think that |
| 09:07 | 16 | relates only to business hours, 9:00 to 5:00? |
| 09:07 | 17 | MS. KELLER:  Objection.  No foundation. |
| 09:07 | 18 | THE COURT:  No, you can answer that question. |
| 09:07 | 19 | THE WITNESS:  No, I don't think it does.  It |
| 09:07 | 20 | doesn't. |
| 09:07 | 21 | BY MR. QUINN: |
| 09:07 | 22 | Q.  And why would that not make -- |
| 09:07 | 23 | A.  That doesn't make sense, doesn't make business sense. |
| 09:07 | 24 | It's, uh, I think it's -- I mean, I think you're bound by |
| 09:07 | 25 | the conflict of interest policy, for instance, in this |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 36 of 158   Page ID
#:310131
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:07 | 1 | section, whether it's 9:00 to 5:00 or after hours. |
| 09:07 | 2 | Q.   And that's the same phrase, "during my employment," |
| 09:07 | 3 | that appears in the assignment of inventions clause? |
| 09:07 | 4 | A.   Uh, yes.  I would even extend the -- |
| 09:08 | 5 | MS. KELLER:  Objection.  Nonresponsive. |
| 09:08 | 6 | THE COURT:  Sustained. |
| 09:08 | 7 | Reask the question.  It's an appropriate question. |
| 09:08 | 8 | It's just the answer started off... |
| 09:08 | 9 | BY MR. QUINN: |
| 09:08 | 10 | Q.   This phrase, "during my employment," which is in the |
| 09:08 | 11 | conflict section, that's the same phrase, "during my |
| 09:08 | 12 | employment," that appears in the assignment of inventions |
| 09:08 | 13 | section? |
| 09:08 | 14 | A.   Yes. |
| 09:08 | 15 | Q.   And can you tell us, did the creative process -- and |
| 09:08 | 16 | you've been in human resources, I assume that you've gotten |
| 09:08 | 17 | some familiarity with the creative process at Mattel and |
| 09:08 | 18 | creative people and how they work? |
| 09:08 | 19 | A.   I believe so, yes. |
| 09:08 | 20 | Q.   And can you tell us how -- you know, how that creative |
| 09:08 | 21 | process works in terms of time of day, or is that something |
| 09:08 | 22 | that only happens during daylight hours or between 9:00 and |
| 09:08 | 23 | 5:00 and Monday through -- |
| 09:08 | 24 | MS. KELLER:  Objection. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 37 of 158  Page ID #:310132
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

37

| 09:08 | 1 | BY MR. QUINN: |
| 09:08 | 2 | Q.   -- Friday? |
| 09:08 | 3 | MS. KELLER:  Objection.  Beyond the scope of this |
| 09:08 | 4 | witness's -- |
| 09:08 | 5 | THE COURT:  Yeah.  Sustained. |
| 09:08 | 6 | BY MR. QUINN: |
| 09:08 | 7 | Q.   Let me ask this.  At Mattel, is it uncommon for |
| 09:09 | 8 | employees to, for example, work at home? |
| 09:09 | 9 | A.   Uh, no. |
| 09:09 | 10 | Q.   And under what circumstances can employees work at |
| 09:09 | 11 | home? |
| 09:09 | 12 | A.   With permission of their manager, there's numerous |
| 09:09 | 13 | circumstances where an employee can work at home.  There are |
| 09:09 | 14 | times when an employee has to be at work.  We think the |
| 09:09 | 15 | creative process, uh -- |
| 09:09 | 16 | MS. KELLER:  Objection.  Again, Your Honor. |
| 09:09 | 17 | THE COURT:  Overruled.  You can finish your |
| 09:09 | 18 | answer. |
| 09:09 | 19 | THE WITNESS:  The creative process works well in |
| 09:09 | 20 | both cases.  Sometimes you have to be around people. |
| 09:09 | 21 | Sometimes you have to be on your own, and that's allowed, |
| 09:09 | 22 | just with permission of the manager. |
| 09:09 | 23 | BY MR. QUINN: |
| 09:09 | 24 | Q.   If we could to turn now to -- if we could go back to |
| 09:09 | 25 | Mr. Bryant's 1995 -- I'm sorry -- his 1999 agreement, |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

38

| 09:09 | 1 | Exhibit 9924.  And this is essentially the same form as the |
| 09:09 | 2 | form that was introduced in 1995 that we've been looking at, |
| 09:09 | 3 | Exhibit 9090, the overhauled version? |
| 09:10 | 4 | *(Document provided to the witness.)* |
| 09:10 | 5 | *(Document displayed.)* |
| 09:10 | 6 | THE WITNESS:  Yes. |
| 09:10 | 7 | BY MR. QUINN: |
| 09:10 | 8 | Q.   If you look at paragraph 2(c), do you see anything in |
| 09:10 | 9 | there, in that paragraph 2(c), that supports or has any |
| 09:10 | 10 | relevance to the question about whether the inventions |
| 09:10 | 11 | agreement also includes inventions which are arrived at, you |
| 09:10 | 12 | know, outside Monday through Friday ordinary working hours? |
| 09:10 | 13 | A.   Um, yes.  In this, uh -- in this quote of California |
| 09:10 | 14 | Labor Code 2870, it says that in things you do on your own |
| 09:10 | 15 | time and, basically, says, unless it relates to the |
| 09:10 | 16 | business, and that -- |
| 09:10 | 17 | Q.   Okay. |
| 09:10 | 18 | A.   -- unless it relates to the business doesn't specify on |
| 09:10 | 19 | your own time. |
| 09:10 | 20 | MS. KELLER:  Objection.  Misstates the code. |
| 09:10 | 21 | MR. QUINN:  We're talking about the language of |
| 09:10 | 22 | the contract, Your Honor. |
| 09:10 | 23 | THE COURT:  Well, it's a reference back to the |
| 09:10 | 24 | code. |
| 09:11 | 25 | Sustained. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

39

| 09:11 | 1 | BY MR. QUINN: |
|---|---|---|
| 09:11 | 2 | Q.   Well, do you see the -- |
| 09:11 | 3 | MR. QUINN:  Could we underscore the language |
| 09:11 | 4 | there, "developed entirely on his or her own time."  Could |
| 09:11 | 5 | we underscore that, please. |
| 09:11 | 6 | *(Technician complies.)* |
| 09:11 | 7 | BY MR. QUINN: |
| 09:11 | 8 | Q.   And what do you -- in your understanding, what does |
| 09:11 | 9 | this mean in terms of ownership of inventions?  Like under |
| 09:11 | 10 | what circumstances something that an employee develops on |
| 09:11 | 11 | their own time is owned by the company or not owned by the |
| 09:11 | 12 | company, in your understanding? |
| 09:11 | 13 | A.   I think an employee who develops something on his own |
| 09:11 | 14 | time that relates to our business is owned by the company. |
| 09:11 | 15 | Q.   And does it say that, that relates to the employer's |
| 09:11 | 16 | business? |
| 09:11 | 17 | MS. KELLER:  Objection.  Misstates the code. |
| 09:11 | 18 | MR. QUINN:  I'm talking about the language of the |
| 09:11 | 19 | contract now. |
| 09:11 | 20 | THE COURT:  This is just limited to the contract. |
| 09:11 | 21 | You can answer the question. |
| 09:11 | 22 | Overruled. |
| 09:11 | 23 | BY MR. QUINN: |
| 09:11 | 24 | Q.   Does it refer there, developed entirely on his or her |
| 09:11 | 25 | own time? |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 40 of 158   Page ID #:310135
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:11 | 1 | A.    I'm sorry, can you restate the question from the -- |
| 09:12 | 2 | Q.    Well, that's -- you've called our attention to the |
| 09:12 | 3 | phrase, "developed entirely on his or her own time." |
| 09:12 | 4 | A.    Correct. |
| 09:12 | 5 | Q.    And then below that, there's a reference to -- "relates |
| 09:12 | 6 | to the employer's business."  Do you see that below that? |
| 09:12 | 7 | THE COURT:  Could you blow that up a little bit. |
| 09:12 | 8 | I think it's almost impossible for the jury to see. |
| 09:12 | 9 | MR. QUINN:  Yeah.  It's kind of small.  Let me |
| 09:12 | 10 | read the whole language there. |
| 09:12 | 11 | (Technician complies.) |
| 09:12 | 12 | BY MR. QUINN: |
| 09:12 | 13 | Q.    "That the requirement to assign shall not apply to an |
| 09:12 | 14 | invention that the employee developed entirely on his or her |
| 09:12 | 15 | own time without using the employer's equipment, supplies, |
| 09:12 | 16 | facilities, or trade secret information, except for those |
| 09:12 | 17 | inventions that are either, one," in parentheses, "relate at |
| 09:12 | 18 | the time of conception or reduction to practice of the |
| 09:12 | 19 | invention to the employer's business, or actual or |
| 09:12 | 20 | demonstrably anticipated research or development of the |
| 09:12 | 21 | employer, or, two," in parens, "result from any work |
| 09:12 | 22 | performed by the employee for the employer." |
| 09:13 | 23 | Do you see that language there? |
| 09:13 | 24 | A.    Yes, I do. |
| 09:13 | 25 | Q.    And so is it -- can you tell us, is it your |

09:13   1   understanding that this says that if it relates to the

09:13   2   employer's business, it's subject to the assignment -- it's

09:13   3   assigned to the company even if it's developed on the

09:13   4   employee's own time?

09:13   5           MS. KELLER:  Objection.  Misstates the labor code,

09:13   6   and it goes to the ultimate issue for the jury.

09:13   7           MR. QUINN:  Just talking about the language of the

09:13   8   contract, Your Honor.

09:13   9           MS. KELLER:  It's the language of the labor code,

09:13   10  Your Honor, in the contract.

09:13   11          THE COURT:  Well, the labor code isn't set forth.

09:13   12  It's referred to Section 2870.

09:13   13          MR. QUINN:  There's actually --

09:13   14          THE COURT:  Portions of this may be a paraphrase,

09:13   15  Counsel, or even a line may be.

09:13   16          MR. QUINN:  Actually, Your Honor, there are

09:13   17  quotations around, quote, "shall not apply to an invention."

09:13   18          THE COURT:  Counsel, I understand that, and I just

09:13   19  got done saying where a portion might be quoted, you know,

09:13   20  literally.  But a portion.

09:13   21          I'm going to allow you to answer the question,

09:13   22  sir.

09:13   23  BY MR. QUINN:

09:13   24  Q.   Okay.  So the question again is, if -- in your

09:14   25  understanding, if it's developed on the employee's own time,

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

42

09:14     1     but it relates to the employer's business, how does the

09:14     2     assignment come into play?

09:14     3     A.    It belongs to the company.

09:14     4     Q.    And if it doesn't relate to the employer's business and

09:14     5     the employee does it on their own time, does the employer

09:14     6     own it?

09:14     7     A.    The employer?  No.

09:14     8     Q.    Unless they use the company's resources?

09:14     9     A.    Correct.

09:14    10     Q.    All right.  That would be like, uh, parts or assistance

09:14    11     from coworkers or things like that?

09:14    12     A.    Correct.

09:14    13     Q.    All right.  Now, this language, the definition,

09:14    14     inventions, we talked about ideas, but it also includes

09:14    15     "discoveries, improvements, processes, developments,

09:14    16     designs."  Do you see that?

09:14    17     A.    Yes.

09:14    18     Q.    Including some other things.

09:14    19           I mean, is it -- have you seen Carter Bryant's designs?

09:14    20     A.    Uh, no, I haven't.

09:14    21     Q.    But do you have an understanding that Carter Bryant had

09:15    22     more than ideas?  Did he actually reduce some things to

09:15    23     practice and wrote some things down?

09:15    24           MS. KELLER:  Objection.  Assumes facts.

09:15    25           THE COURT:  Sustained.

| | | |
|---|---|---|
| 09:15 | 1 | BY MR. QUINN: |
| 09:15 | 2 | Q.   You were asked some questions yesterday about when a |
| 09:15 | 3 | new employee shows up for work at Mattel, whether -- you |
| 09:15 | 4 | know, how they're handed agreements and whether they have a |
| 09:15 | 5 | chance to, uh, ask questions or whether it's take it or |
| 09:15 | 6 | leave it.  Do you recall those series of questions? |
| 09:15 | 7 | A.   Yes. |
| 09:15 | 8 | Q.   Are you familiar with the practice by which new hires |
| 09:15 | 9 | actually receive these inventions agreements and the |
| 09:15 | 10 | conflict-of-interest questionnaire? |
| 09:15 | 11 | A.   Uh, in -- in Southern California, in El Segundo mostly. |
| 09:15 | 12 | In other places, less so, but definitely in Southern |
| 09:15 | 13 | California. |
| 09:15 | 14 | Q.   And would that include -- if you're recruiting somebody |
| 09:15 | 15 | from out of state to come to work for Mattel in Southern |
| 09:16 | 16 | California, would you be familiar with that process as to |
| 09:16 | 17 | how they get copies of -- how they get these agreements? |
| 09:16 | 18 | A.   Yes. |
| 09:16 | 19 | Q.   And how do -- how does that happen?  How is that |
| 09:16 | 20 | handled? |
| 09:16 | 21 | MS. KELLER:  Objection.  Vague as to time. |
| 09:16 | 22 | THE COURT:  Just a moment. |
| 09:16 | 23 | What agreements are you referring to? |
| 09:16 | 24 | MR. QUINN:  Inventions agreements, |
| 09:16 | 25 | conflict-of-interest questionnaire. |

| | | |
|---|---|---|
| 09:16 | 1 | THE COURT:  From out of state.  The question was, |
| 09:16 | 2 | "and would that include if you're recruiting somebody from |
| 09:16 | 3 | out of state to come to work for Mattel in Southern |
| 09:16 | 4 | California, would you be familiar with that process as to |
| 09:16 | 5 | how they get copies of -- how they get these agreements?" |
| 09:16 | 6 | Are you talking about the inventions agreement from Mattel |
| 09:16 | 7 | being sent to out-of-state employees being recruited? |
| 09:17 | 8 | MR. QUINN:  That's the question I'm asking him. |
| 09:17 | 9 | THE COURT:  All right.  Thank you. |
| 09:17 | 10 | BY MR. QUINN: |
| 09:17 | 11 | Q.   Are you familiar with that process? |
| 09:17 | 12 | A.   Yes. |
| 09:17 | 13 | MS. KELLER:  Objection.  Irrelevant to this case. |
| 09:17 | 14 | THE COURT:  Overruled. |
| 09:17 | 15 | You can answer that question. |
| 09:17 | 16 | THE WITNESS:  Yes. |
| 09:17 | 17 | BY MR. QUINN: |
| 09:17 | 18 | Q.   And how are employees -- how do they get these |
| 09:17 | 19 | agreements?  Do they just show up at the company |
| 09:17 | 20 | headquarters and receive the agreements for the first time |
| 09:17 | 21 | and -- told "sign here"?  Is that how it's done? |
| 09:17 | 22 | MS. KELLER:  Objection.  Irrelevant. |
| 09:17 | 23 | THE COURT:  Overruled. |
| 09:17 | 24 | I think, isn't, Counsel, the -- there was a letter |
| 09:17 | 25 | sent to Carter Bryant in 1998.  But that was not the |

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 45 of 158  Page ID #:310140
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:17 | 1 | inventions agreement.  He signed the inventions agreement on |
| 09:17 | 2 | January 4th.  That's what is causing the confusion.  There's |
| 09:17 | 3 | a solicitation letter, so I'm going to reverse that. |
| 09:17 | 4 | I'm going to sustain the objection because the |
| 09:17 | 5 | inventions agreement was signed, according to the testimony, |
| 09:17 | 6 | January 4th of 1999.  He didn't get that inventions |
| 09:17 | 7 | agreement out of state.  He got a solicitation letter. |
| 09:17 | 8 | MR. QUINN:  That was not his testimony, |
| 09:17 | 9 | Your Honor. |
| 09:17 | 10 | I apologize, Your Honor. |
| 09:17 | 11 | THE COURT:  We'll look back at that.  I could be |
| 09:18 | 12 | mistaken.  We'll pass to another subject, and we'll pull the |
| 09:18 | 13 | transcript. |
| 09:18 | 14 | Ladies and gentlemen, I apologize.  I just don't |
| 09:18 | 15 | have a good memory about -- I know a letter, according to |
| 09:18 | 16 | the testimony, was sent up to him offering a position.  I |
| 09:18 | 17 | don't recall if the inventions agreement was actually sent |
| 09:18 | 18 | up. |
| 09:18 | 19 | It may be actually that it was, but the actual |
| 09:18 | 20 | signature took place, I believe, in El Segundo, so I'll look |
| 09:18 | 21 | back. |
| 09:18 | 22 | Counsel. |
| 09:18 | 23 | MR. QUINN:  I think the Court was referring to |
| 09:18 | 24 | Exhibit 13, which is where I was going to go next. |
| 09:18 | 25 | If we could put that up on the screen. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 46 of 158   Page ID #:310141
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:18 | 1 | THE COURT:  That may resolve it, then. |
| 09:18 | 2 | 13. |
| 09:18 | 3 | *(Document provided to the witness.)* |
| 09:18 | 4 | *(Document displayed.)* |
| 09:18 | 5 | BY MR. QUINN: |
| 09:18 | 6 | Q.   This is a letter dated December 11, 1998, addressed to |
| 09:18 | 7 | Mr. Carter Bryant. |
| 09:18 | 8 | THE COURT:  Now, just a moment, Counsel.  This |
| 09:18 | 9 | doesn't resolve it.  This is the solicitation letter that |
| 09:18 | 10 | went to Mr. Bryant, correct? |
| 09:18 | 11 | MR. QUINN:  No, Your Honor.  If you look at the |
| 09:18 | 12 | second page.  This is in evidence.  If you can look at the |
| 09:18 | 13 | second page. |
| 09:18 | 14 | *(Document displayed.)* |
| 09:18 | 15 | MR. QUINN:  The Court may recall.  If you look at |
| 09:18 | 16 | the last two paragraphs, the Court may recall the testimony |
| 09:18 | 17 | on this. |
| 09:19 | 18 | THE COURT:  I do.  I'm referring to the |
| 09:19 | 19 | solicitation letter.  And there's an inventions agreement, |
| 09:19 | 20 | and I believe that that was signed in El Segundo, wasn't it? |
| 09:19 | 21 | MR. QUINN:  The point is when did he receive it, |
| 09:19 | 22 | Your Honor. |
| 09:19 | 23 | THE COURT:  When did he receive the invention |
| 09:19 | 24 | agreement? |
| 09:19 | 25 | MR. QUINN:  It didn't show up -- I'm reluctant |

| 09:19 | 1  | to -- |
| 09:19 | 2  | THE COURT:  That's fine.  I'm just curious how he |
| 09:19 | 3  | would know.  He doesn't seem to be too familiar with Carter |
| 09:19 | 4  | Bryant's file, or at least he is with the contents of it. |
| 09:19 | 5  | So how does he know what Carter Bryant received? |
| 09:19 | 6  | MR. QUINN:  Well, we're going to -- I think if we |
| 09:19 | 7  | take a look at this it will be -- it will be clear, |
| 09:19 | 8  | Your Honor. |
| 09:19 | 9  | There has been testimony from Carter Bryant on |
| 09:19 | 10 | this, and we can find it on the record, Your Honor. |
| 09:19 | 11 | THE COURT:  Ladies and gentlemen, I'm going to |
| 09:19 | 12 | make counsel pass on.  I want a little bit of time just to |
| 09:19 | 13 | look back at the testimony in this regard.  I apologize to |
| 09:19 | 14 | you.  I should have a good memory about this, and apparently |
| 09:19 | 15 | I don't.  And I don't want to take a chance. |
| 09:19 | 16 | You've got the testimony of Carter Bryant and |
| 09:19 | 17 | other people about where or how he received the letter. |
| 09:19 | 18 | I'm not too certain that this is the reason that |
| 09:20 | 19 | Mr. Kaye should be on the stand testifying, unless he has |
| 09:20 | 20 | personal knowledge about how this letter went up and how it |
| 09:20 | 21 | came back, as well as the inventions agreement. |
| 09:20 | 22 | MR. QUINN:  Well, can I -- |
| 09:20 | 23 | THE COURT:  He wasn't employed, apparently, so... |
| 09:20 | 24 | MR. QUINN:  I won't refer to the inventions |
| 09:20 | 25 | agreement, Your Honor. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 48 of 158   Page ID #:310143
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:20 | 1 | THE COURT:  Okay. |
| 09:20 | 2 | BY MR. QUINN: |
| 09:20 | 3 | Q.   Do you know -- I mean, this is -- you've seen this |
| 09:20 | 4 | letter -- you see this letter addressed to Carter Bryant in |
| 09:20 | 5 | Kimberline, Missouri, dated December 1998? |
| 09:20 | 6 | A.   Yes. |
| 09:20 | 7 | Q.   And if we look at the last paragraph, it's signed by |
| 09:20 | 8 | Lynne Robinson, vice president human resources? |
| 09:20 | 9 | A.   Yes. |
| 09:20 | 10 | Q.   She work for you? |
| 09:20 | 11 | A.   She did. |
| 09:20 | 12 | Q.   And the last two paragraphs say, "Enclosed is a packet |
| 09:20 | 13 | containing various information and forms required to |
| 09:20 | 14 | activate your employment.  Please complete these forms and |
| 09:20 | 15 | bring them with you on your first day of employment.  Also, |
| 09:20 | 16 | you will need to bring with you certain documents as set |
| 09:20 | 17 | forth in the enclosed directions.  Upon your arrival in the |
| 09:21 | 18 | second floor lobby, please advise the security officer that |
| 09:21 | 19 | you are a new employee.  You will be escorted to an |
| 09:21 | 20 | orientation session, beginning at 8:00 a.m., which will last |
| 09:21 | 21 | most of the morning. |
| 09:21 | 22 | "Carter, we are all looking forward to you joining the |
| 09:21 | 23 | Mattel team on January 4, 1999.  As a new member of the |
| 09:21 | 24 | Mattel family, please feel free to call me at (310)252-2535 |
| 09:21 | 25 | if you have any questions." |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 49 of 158   Page ID #:310144
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:21 | 1 | Do you see that? |
| 09:21 | 2 | A.   Yes. |
| 09:21 | 3 | Q.   Can you tell us whether or not it's the practice that |
| 09:21 | 4 | Mattel sends the form of inventions agreement and other |
| 09:21 | 5 | paperwork that an employee needs to sign before they show up |
| 09:21 | 6 | for work on the first day? |
| 09:21 | 7 | MS. KELLER:  Objection.  Vague as to time. |
| 09:21 | 8 | THE COURT:  Sustained. |
| 09:21 | 9 | Is this in 1998? |
| 09:21 | 10 | BY MR. QUINN: |
| 09:21 | 11 | Q.   Sir, in 1998, were you familiar with Mattel's practice? |
| 09:21 | 12 | A.   Yes. |
| 09:21 | 13 | Q.   What was your position at Mattel in 1998? |
| 09:22 | 14 | A.   Senior vice president of human resources. |
| 09:22 | 15 | Q.   All right.  Can you tell us what -- whether or not it |
| 09:22 | 16 | was Mattel's practice to send to new hires in advance of |
| 09:22 | 17 | their coming -- reporting to work on the first day copies of |
| 09:22 | 18 | the inventions agreement and other documents that they |
| 09:22 | 19 | needed to sign? |
| 09:22 | 20 | A.   I believe all these -- I believe all these documents |
| 09:22 | 21 | were in that orientation package. |
| 09:22 | 22 | Q.   And were they sent in advance to the employee before |
| 09:22 | 23 | they first showed up? |
| 09:22 | 24 | A.   It depends on the circumstances.  If the employee was |
| 09:22 | 25 | showing up that day, obviously, they couldn't send it.  If |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 50 of 158   Page ID #:310145
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:22 | 1 | the employee had some time to -- to read it, um, or there |
| 09:22 | 2 | was time in between, uh, then they would send it. |
| 09:22 | 3 | Q.   I mean, if someone does have -- would it be unusual to |
| 09:22 | 4 | send a letter, such as we're seeing here -- this is in |
| 09:22 | 5 | evidence -- that was sent to Mr. Bryant, in advance of his |
| 09:22 | 6 | actually showing up for work? |
| 09:22 | 7 | A.   No. |
| 09:23 | 8 | MS. KELLER:  Objection. |
| 09:23 | 9 | THE COURT:  I'm going to sustain the objection. |
| 09:23 | 10 | I'm not precluding either one of you.  You can ask |
| 09:23 | 11 | directly if the inventions agreement was sent.  But from |
| 09:23 | 12 | this, it says, "...enclosed a packet containing various |
| 09:23 | 13 | information and forms."  Those could be health forms.  Those |
| 09:23 | 14 | could be anything. |
| 09:23 | 15 | So I'm not precluding either one of you from |
| 09:23 | 16 | getting into direct or cross and explicitly asking in his |
| 09:23 | 17 | opinion, but there should be some documentation about that. |
| 09:23 | 18 | And my belief is that the testimony thus far has been -- |
| 09:23 | 19 | MR. QUINN:  There's testimony.  There's testimony |
| 09:23 | 20 | from Mr. Bryant on that which we can show the Court. |
| 09:23 | 21 | THE COURT:  We'll pull that, then.  Thank you. |
| 09:23 | 22 | MR. QUINN:  We will. |
| 09:23 | 23 | THE COURT:  But I'm not precluding you.  You can |
| 09:23 | 24 | ask it while he's on the stand.  Save him from coming back. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 51 of 158   Page ID #:310146
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:23 | 1 | BY MR. QUINN: |
| 09:23 | 2 | Q.   Are you familiar -- I take it you are familiar with |
| 09:23 | 3 | Mattel's practice in terms of whether or not they supply |
| 09:23 | 4 | this type of information to employees in advance of their |
| 09:23 | 5 | starting work? |
| 09:23 | 6 | MS. KELLER:  Objection.  Vague. |
| 09:23 | 7 | THE COURT:  Sustained. |
| 09:23 | 8 | The inventions agreement or health forms? |
| 09:24 | 9 | MR. QUINN:  Inventions agreement specifically. |
| 09:24 | 10 | BY MR. QUINN: |
| 09:24 | 11 | Q.   Are you familiar with Mattel's practice in that regard? |
| 09:24 | 12 | THE COURT:  All right. |
| 09:24 | 13 | THE WITNESS:  I'm familiar with their practice. |
| 09:24 | 14 | BY MR. QUINN: |
| 09:24 | 15 | Q.   Would it have been consistent with Mattel's practice in |
| 09:24 | 16 | 1998 to send a copy of the inventions agreement to a new |
| 09:24 | 17 | hire before they started work? |
| 09:24 | 18 | A.   I believe so. |
| 09:24 | 19 | MS. KELLER:  Objection.  The answer is vague. |
| 09:24 | 20 | THE COURT:  I'm going to sustain the objection. |
| 09:24 | 21 | MS. KELLER:  Motion to strike. |
| 09:24 | 22 | THE COURT:  Stricken. |
| 09:24 | 23 | You can reask it, Counsel. |
| 09:24 | 24 | BY MR. QUINN: |
| 09:24 | 25 | Q.   Do you -- do you -- if -- would it be a practice if |

| 09:24 | 1 | somebody was coming from out of state, would it -- can you |
| 09:24 | 2 | tell us whether or not it would be Mattel's practice to send |
| 09:24 | 3 | them the inventions agreement in advance? |
| 09:24 | 4 | A.   Yes. |
| 09:24 | 5 | Q.   Do you know specifically in this case whether |
| 09:24 | 6 | Mr. Bryant received the inventions agreement in this packet? |
| 09:24 | 7 | A.   No. |
| 09:24 | 8 | Q.   Ms. Robinson is the one who handled his being hired? |
| 09:24 | 9 | A.   Correct. |
| 09:24 | 10 | Q.   Like to change subjects now.  And you were -- if we |
| 09:24 | 11 | could look at -- now I'd like to go to Mr. Villasenor's |
| 09:25 | 12 | e-mail dated -- it's Exhibit 9484. |
| 09:25 | 13 | *(Document provided to the witness.)* |
| 09:25 | 14 | MR. QUINN:  If we could put that up on the screen. |
| 09:25 | 15 | *(Document displayed.)* |
| 09:25 | 16 | BY MR. QUINN: |
| 09:25 | 17 | Q.   And you were asked some questions about this Mark |
| 09:25 | 18 | Kimball, who is indicated here as being one of the |
| 09:25 | 19 | addressees on this? |
| 09:25 | 20 | A.   Yes. |
| 09:25 | 21 | Q.   And I think you indicated Mark Kimball was a human |
| 09:25 | 22 | resources person who worked in your group? |
| 09:25 | 23 | A.   Yes.  He was a vice president who worked for me, |
| 09:25 | 24 | directly for me. |
| 09:25 | 25 | Q.   And you were asked didn't Mr. Kimball come and bring |

09:25    1    this to your attention when this was received in 2005; do
09:25    2    you recall that?
09:25    3    A.    Yes.
09:25    4    Q.    And I think you said he didn't?
09:25    5    A.    He did not.
09:25    6    Q.    Looking at this, does it surprise you that Mr. Kimball
09:25    7    wouldn't come and bring this to your attention?
09:25    8    A.    No.
09:25    9    Q.    Why?
09:25   10    A.    Well, the key for me -- or two things:  One, it was
09:26   11    also addressed to Bob Normile.  Bob Normile was the general
09:26   12    counsel at Mattel, so that says to me that there's
09:26   13    definitely a legal issue here.  And then, secondly, at the
09:26   14    bottom of this letter it -- it refers to, uh, "you direct
09:26   15    all further communications to my lawyer."
09:26   16         In Mattel, it's our practice that if we get a
09:26   17    communication from a lawyer regarding an individual, we give
09:26   18    that to the legal department and the legal department
09:26   19    manages it from there.
09:26   20    Q.    So if somebody writes some type of letter, a claim
09:26   21    letter or something to the company and they say, "contact my
09:26   22    lawyer," it's the human resources' practice not to contact
09:26   23    the lawyer, but to leave that to the legal department?
09:26   24              MS. KELLER:  Objection.  Leading the witness.
09:26   25              THE COURT:  Overruled.

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 54 of 158   Page ID #:310149
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:26 | 1 | THE WITNESS:  Yes.  We -- we go lawyer to lawyer. |
| 09:26 | 2 | That's our philosophy. |
| 09:26 | 3 | If the lawyer writes, if there's a lawyer |
| 09:26 | 4 | involved, we have our lawyers call. |
| 09:27 | 5 | BY MR. QUINN: |
| 09:27 | 6 | Q.   And is it your understanding that Bob Normile's |
| 09:27 | 7 | department, the legal department, then did, in fact, deal |
| 09:27 | 8 | with Mr. Villasenor and his attorney with respect to his |
| 09:27 | 9 | claim? |
| 09:27 | 10 | A.   Yes. |
| 09:27 | 11 | MS. KELLER:  Objection.  Foundation. |
| 09:27 | 12 | THE COURT:  Just a moment. |
| 09:27 | 13 | Overruled.  Your answer was "Yes"? |
| 09:27 | 14 | THE WITNESS:  Yes, yes. |
| 09:27 | 15 | BY MR. QUINN: |
| 09:27 | 16 | Q.   And then finally, Ms. Robinson, Lynne Robinson, the one |
| 09:27 | 17 | who signed that letter that we looked at to Mr. Bryant -- |
| 09:27 | 18 | A.   Yes. |
| 09:27 | 19 | Q.   -- she can't testify.  She's passed away as well? |
| 09:27 | 20 | A.   Yes. |
| 09:27 | 21 | MR. QUINN:  No further questions. |
| 09:27 | 22 | THE COURT:  Redirect. |
| 09:27 | 23 | **REDIRECT EXAMINATION** |
| 09:27 | 24 | BY MS. KELLER: |
| 09:28 | 25 | Q.   Mr. Kaye, you have a significant financial interest in |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 55 of 158   Page ID #:310150
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:28 | 1 | the outcome of this lawsuit, correct? |
| 09:28 | 2 | A.   Um, I'm not sure. |
| 09:28 | 3 | Q.   Well, you know that stock prices move up and down |
| 09:28 | 4 | depending on things like good or bad publicity for a |
| 09:28 | 5 | company, right? |
| 09:28 | 6 | A.   Uh, yes. |
| 09:28 | 7 | Q.   And, you know, that this case is being followed in the |
| 09:28 | 8 | *Wall Street Journal*, *Bloomberg* -- |
| 09:28 | 9 | MR. QUINN:  Objection.  Your Honor, the jury has |
| 09:28 | 10 | been asked to disregard all that. |
| 09:28 | 11 | THE COURT:  Well -- |
| 09:28 | 12 | MR. QUINN:  There's no evidence of it and will be |
| 09:28 | 13 | no evidence. |
| 09:28 | 14 | THE COURT:  Just a moment. |
| 09:28 | 15 | *(To the jury:)*  Obviously, the case has gotten |
| 09:28 | 16 | some notoriety.  I've informed you about that.  In fact, I |
| 09:28 | 17 | chose to take that issue head-on.  That's why I've asked you |
| 09:28 | 18 | not to read the press and the papers, so if you are and you |
| 09:28 | 19 | recognize any articles about the case, please put it aside. |
| 09:28 | 20 | *(To Ms. Keller:)*  But you can inquire, Counsel, as |
| 09:28 | 21 | long as you don't get into the content of those articles -- |
| 09:28 | 22 | MS. KELLER:  I will not. |
| 09:29 | 23 | THE COURT:  -- just how widespread the notoriety |
| 09:29 | 24 | is. |
| | 25 | |

| | | |
|---|---|---|
| 09:29 | 1 | BY MS. KELLER: |
| 09:29 | 2 | Q.   Mr. Kaye, you know that stock prices can be greatly |
| 09:29 | 3 | affected by positive or negative publicity of a company, |
| 09:29 | 4 | true? |
| 09:29 | 5 | A.   True. |
| 09:29 | 6 | Q.   And you know that this lawsuit is being followed, not |
| 09:29 | 7 | just by the L.A. Times, by the *Wall Street Journal*, CNBC, |
| 09:29 | 8 | *Bloomberg*, *Forbes*, *BusinessWeek*, virtually every significant |
| 09:29 | 9 | financial publication, right? |
| 09:29 | 10 | MR. QUINN:  Objection. |
| 09:29 | 11 | THE COURT:  Ladies and gentlemen, that means you |
| 09:29 | 12 | should read absolutely nothing. |
| 09:29 | 13 | I'm just kidding you, Counsel.  Okay. |
| 09:29 | 14 | MS. KELLER:  You understand that, don't you? |
| 09:29 | 15 | THE WITNESS:  Yes. |
| 09:29 | 16 | THE COURT:  I'm just joking with you. |
| 09:29 | 17 | BY MS. KELLER: |
| 09:29 | 18 | Q.   And you understand that if there is a verdict against |
| 09:29 | 19 | Mattel in this case, it could greatly affect Mattel's share |
| 09:29 | 20 | prices, true? |
| 09:29 | 21 | A.   Uh, I don't know that. |
| 09:29 | 22 | Q.   And you know that the negative publicity associated |
| 09:29 | 23 | with the issue of corporate espionage by Mr. Villasenor |
| 09:29 | 24 | could affect the stock prices, right? |
| 09:29 | 25 | MR. QUINN:  Your Honor, objection.  Argumentative. |

| | | |
|---|---|---|
| 09:29 | 1 | THE COURT:  Corporate espionage. |
| 09:30 | 2 | MS. KELLER:  I'll rephrase. |
| 09:30 | 3 | MR. QUINN:  Assumes facts. |
| 09:30 | 4 | THE COURT:  Sustained.  I'm gonna strike the |
| 09:30 | 5 | question. |
| 09:30 | 6 | Proper area to ask, but... |
| 09:30 | 7 | MS. KELLER:  I'll change the word. |
| 09:30 | 8 | BY MS. KELLER: |
| 09:30 | 9 | Q.   You know that the issue of Mr. Villasenor and the |
| 09:30 | 10 | market intelligence group and their corporate spying is |
| 09:30 | 11 | something that could significantly affect Mattel's share |
| 09:30 | 12 | prices, right? |
| 09:30 | 13 | MR. QUINN:  Objection.  Assumes facts not in |
| 09:30 | 14 | evidence, Your Honor.  It's argumentative. |
| 09:30 | 15 | THE COURT:  First of all, I'm not agreeing that |
| 09:30 | 16 | that's a correct rendition.  You'll decide that. |
| 09:30 | 17 | But I'll allow the question. |
| 09:30 | 18 | THE WITNESS:  Well, I don't know there was any |
| 09:30 | 19 | corporate spying done.  That was part of your question. |
| 09:30 | 20 | I -- |
| 09:30 | 21 | BY MS. KELLER: |
| 09:30 | 22 | Q.   I understand you've never looked into it, right? |
| 09:30 | 23 | That's what you told us yesterday? |
| 09:30 | 24 | MR. QUINN:  Excuse me.  Compound, Your Honor. |
| 09:30 | 25 | THE COURT:  No. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 58 of 158   Page ID #:310153
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:30 | 1 | Overruled. |
| 09:30 | 2 | THE WITNESS:  Can you repeat that last question? |
| 09:30 | 3 | BY MS. KELLER: |
| 09:30 | 4 | Q.   You've never looked into whether there was or wasn't |
| 09:30 | 5 | any spying going on by Mattel against MGA; isn't that what |
| 09:31 | 6 | you told us yesterday? |
| 09:31 | 7 | A.   Yes, it is. |
| 09:31 | 8 | Q.   And despite that, though, you know it's a big issue in |
| 09:31 | 9 | this case, true? |
| 09:31 | 10 | A.   True. |
| 09:31 | 11 | Q.   And you've been prepared to address that issue if need |
| 09:31 | 12 | be by saying you don't know anything about it, right? |
| 09:31 | 13 | MR. QUINN:  You know, it's argumentative, |
| 09:31 | 14 | Your Honor. |
| 09:31 | 15 | THE COURT:  Well, in its present form, it is.  You |
| 09:31 | 16 | can ask the question.  It's an appropriate area. |
| 09:31 | 17 | Sustained. |
| 09:31 | 18 | Stricken. |
| 09:31 | 19 | Reask it. |
| 09:31 | 20 | BY MS. KELLER: |
| 09:31 | 21 | Q.   You understand if that's a big verdict against Mattel |
| 09:31 | 22 | in this case, it's gonna hit the business news, right? |
| 09:31 | 23 | MR. QUINN:  Calls for speculation, Your Honor. |
| 09:31 | 24 | THE COURT:  Overruled. |
| 09:31 | 25 | MR. QUINN:  And it's argumentative. |

| | | |
|---|---|---|
| 09:31 | 1 | THE COURT:  Overruled. |
| 09:31 | 2 | BY MS. KELLER: |
| 09:31 | 3 | Q.   True? |
| 09:31 | 4 | A.   Correct. |
| 09:31 | 5 | Q.   And you know that could cause your share prices to |
| 09:31 | 6 | fall, right? |
| 09:31 | 7 | A.   Uh, no, that's not correct. |
| 09:31 | 8 | Q.   And you get a lot –– you get quite a few stock options |
| 09:31 | 9 | and shares as part of your compensation, right? |
| 09:31 | 10 | A.   Yes, I do. |
| 09:31 | 11 | Q.   In fact, in your K-25 just last month you sold 45,000 |
| 09:32 | 12 | shares of Mattel stock, right? |
| 09:32 | 13 | MR. QUINN:  Objection.  Irrelevant, Your Honor. |
| 09:32 | 14 | THE COURT:  Overruled. |
| 09:32 | 15 | BY MS. KELLER: |
| 09:32 | 16 | Q.   True? |
| 09:32 | 17 | A.   Um –– |
| 09:32 | 18 | Q.   On February 25th, 2011? |
| 09:32 | 19 | A.   I don't –– I don't know the exact number. |
| 09:32 | 20 | Q.   Well, does around 45,000 sound right to you? |
| 09:32 | 21 | A.   Around 40,000, yes. |
| 09:32 | 22 | Q.   In fact, those were options that the company gave you |
| 09:32 | 23 | and you exercised 'em and sold 'em the same day, true? |
| 09:32 | 24 | A.   That is true. |
| 09:32 | 25 | Q.   And you still have 67,340 shares in the Alan Kaye |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 60 of 158   Page ID #:310155
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:32 | 1 | Living Trust as of now, right?  Does that sound about right? |
| 09:32 | 2 | A.   Sounds about right. |
| 09:32 | 3 | Q.   And you have another 18,800 shares as an individual, |
| 09:32 | 4 | right? |
| 09:32 | 5 | A.   Sounds about right.  Again, I don't know the exact |
| 09:33 | 6 | numbers. |
| 09:33 | 7 | Q.   And the shares are now valued at about $25 a share, |
| 09:33 | 8 | right? |
| 09:33 | 9 | A.   Correct. |
| 09:33 | 10 | Q.   So those shares that you own, your 86,140 shares, if |
| 09:33 | 11 | this case and the attendant publicity from it causes |
| 09:33 | 12 | Mattel -- if Mattel wins, you stand to gain, right? |
| 09:33 | 13 | A.   I don't know if -- I don't know how the stock market |
| 09:33 | 14 | reacts.  I think a lot of this has been built into the stock |
| 09:33 | 15 | market, personally, because we've been doing this for a very |
| 09:33 | 16 | long time.  So I don't really know if there's a plus or a |
| 09:33 | 17 | minus. |
| 09:33 | 18 | Q.   You don't know whether a cascade of negative publicity |
| 09:33 | 19 | in the business press would cause Mattel shares to drop? |
| 09:33 | 20 | A.   No, I don't really know that. |
| 09:33 | 21 | Q.   And you don't know whether a cascade of positive |
| 09:33 | 22 | publicity would cause Mattel shares to rise? |
| 09:33 | 23 | A.   No, I don't know if that's been baked into the numbers |
| 09:33 | 24 | already. |
| 09:33 | 25 | Q.   No idea? |

| | | |
|---|---|---|
| 09:34 | 1 | A.   No. |
| 09:34 | 2 | Q.   Well, let's -- |
| 09:34 | 3 | A.   I would guess.  I don't know. |
| 09:34 | 4 | Q.   You would guess that the answer is, yes, it would |
| 09:34 | 5 | affect the share price, true? |
| 09:34 | 6 | A.   I would guess that it would affect the share price.  I |
| 09:34 | 7 | don't know if it's significant in any -- at any rate. |
| 09:34 | 8 | Q.   Sir, you know, having owned millions and millions of |
| 09:34 | 9 | dollars worth of Mattel stock, that share prices are very |
| 09:34 | 10 | sensitive to positive or negative publicity about a company. |
| 09:34 | 11 | You know that, don't you? |
| 09:34 | 12 | A.   It depends on when it's known. |
| 09:34 | 13 | Q.   You know that share prices are sensitive to negative |
| 09:34 | 14 | publicity about a company, don't you? |
| 09:34 | 15 | A.   Share prices are in general sensitive to negative |
| 09:34 | 16 | publicity or positive publicity. |
| 09:34 | 17 | Q.   That's exactly it.  And so you know that you have a |
| 09:34 | 18 | very significant personal financial interest in the outcome |
| 09:34 | 19 | of this lawsuit, right? |
| 09:34 | 20 | A.   I would disagree.  I don't know if that's gonna be the |
| 09:34 | 21 | case. |
| 09:35 | 22 | Q.   Now, let's turn to -- you were asked some questions |
| 09:35 | 23 | about Carter Bryant's contract and your interpretation of it |
| 09:35 | 24 | on behalf of Mattel. |
| 09:35 | 25 |      I gather it's not your personal interpretation; it's |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 62 of 158   Page ID #:310157
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

62

09:35  1    your interpretation on behalf of your company?

09:35  2    A.   I would expect it depends -- I'm not sure which way if

09:35  3    you're answer -- asking me as head of HR or you're asking me

09:35  4    as this 30(b) witness.

09:35  5    Q.   Well, you're not a lawyer, right?

09:35  6    A.   That is correct.

09:35  7    Q.   And you only know the legal significance of contracts

09:35  8    as lawyers have told it to you, right?

09:35  9    A.   That is correct.

09:35  10   Q.   And, in fact, you said that these agreements that we've

09:35  11   been talking about, the employee confidential information

09:35  12   and inventions agreements, were drafted by lawyers, right?

09:35  13   A.   For the most part, yes.

09:35  14   Q.   And, in fact, you said in your 30(b)6 deposition,

09:36  15   June 19, 2010, that they've been, quote, "lawyerized,"

09:36  16   unquote, right?

09:36  17   A.   I don't recall saying that, but they've been -- they

09:36  18   have been drafted by the attorneys.

09:36  19   Q.   And because they've been lawyerized, you're not even in

09:36  20   a position to interpret the meaning of these contracts,

09:36  21   right?

09:36  22   A.   I would disagree.

09:36  23   Q.   You're only relaying what you've been told by Mattel's

09:36  24   lawyers, right?

09:36  25   A.   No, that's not the case.

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 63 of 158   Page ID #:310158
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

63

| | | |
|---|---|---|
| 09:36 | 1 | Q.   And you know that the interpretation of this contract |
| 09:36 | 2 | is one of the major issues in this case, right? |
| 09:36 | 3 | A.   I believe it is. |
| 09:36 | 4 | Q.   Now, let's talk for a minute about Carter Bryant's |
| 09:36 | 5 | contract, his specifically. |
| 09:36 | 6 | And if we to turn to -- let's -- the legible version, I |
| 09:36 | 7 | guess -- may be most legible, 9924. |
| 09:36 | 8 | (Document provided to the witness.) |
| 09:36 | 9 | (Document displayed.) |
| 09:36 | 10 | BY MS. KELLER: |
| 09:36 | 11 | Q.   And let's look at 2(a). |
| 09:36 | 12 | A.   Yes. |
| 09:36 | 13 | Q.   And you were asked about this, I believe, by Mr. Quinn? |
| 09:37 | 14 | A.   Yes. |
| 09:37 | 15 | Q.   And 2(a) says, "I agree to communicate to the company |
| 09:37 | 16 | as promptly and fully as practicable all inventions as |
| 09:37 | 17 | defined below conceived or reduced to practice by me alone |
| 09:37 | 18 | or jointly with others at any time during my employment with |
| 09:37 | 19 | the company." |
| 09:37 | 20 | And I think you testified just a few minutes ago that |
| 09:37 | 21 | in your mind and as the company's representative, you |
| 09:37 | 22 | believe "conceived" means "thought of," right? |
| 09:37 | 23 | A.   I think I mentioned a number of things, and "thought |
| 09:37 | 24 | of" is one of them. |
| 09:37 | 25 | Q.   Thought of or had the idea, I think that's what you |

| 09:37 | 1 | just said, right? |
|---|---|---|
| 09:37 | 2 | A.   I don't remember the exact words, yes. |
| 09:37 | 3 | Q.   Okay.  Conceived, though? |
| 09:37 | 4 | A.   Yes. |
| 09:37 | 5 | Q.   Conceived.  Something you conceived of, something you |
| 09:37 | 6 | thought of, something you had the idea for, right? |
| 09:37 | 7 | A.   Right. |
| 09:37 | 8 | Q.   And "at any time during my employment by the company." |
| 09:37 | 9 | Let's focus on just the word "conceived" for a minute. |
| 09:38 | 10 | A.   Okay. |
| 09:38 | 11 | Q.   So conceived, as you understand it as Mattel's |
| 09:38 | 12 | corporate representative, if somebody thought of or had an |
| 09:38 | 13 | idea for something before he joined the company, that's not |
| 09:38 | 14 | covered, right? |
| 09:38 | 15 | A.    (No response.) |
| 09:38 | 16 | Q.   That's what you just said, isn't it? |
| 09:38 | 17 | A.   Before he joined the company? |
| 09:38 | 18 | Q.   Right. |
| 09:38 | 19 | A.   If he thought of an idea before he joined the company? |
| 09:38 | 20 | Q.   That's right. |
| 09:38 | 21 | A.   Not covered. |
| 09:38 | 22 | Q.   So if he conceived of something, if he thought of, had |
| 09:38 | 23 | the idea for something before joined the company, not |
| 09:38 | 24 | covered, right? |
| 09:38 | 25 | A.   Correct. |

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 65 of 158  Page ID #:310160
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

65

| | | |
|---|---|---|
| 09:38 | 1 | Q.   Now, let's move on to the next term. |
| 09:38 | 2 | "or reduced to practice by me."  Okay? |
| 09:38 | 3 | And "reduced to practice" means, essentially, you've |
| 09:38 | 4 | taken the idea and you've now made a tangible, right? |
| 09:38 | 5 | A.   You've done something with it, yes. |
| 09:38 | 6 | Q.   Well, it doesn't say "done something with it."  I'm |
| 09:38 | 7 | talking about reduced to practice. |
| 09:39 | 8 | MR. QUINN:  Excuse me.  It's argumentative, |
| 09:39 | 9 | Your Honor. |
| 09:39 | 10 | THE COURT:  Overruled. |
| 09:39 | 11 | BY MS. KELLER: |
| 09:39 | 12 | Q.   So reduced to practice means you've taken an idea and |
| 09:39 | 13 | you've brought it to life; you've made it concrete, right? |
| 09:39 | 14 | Reduced to practice. |
| 09:39 | 15 | A.   Uh, done something with it. |
| 09:39 | 16 | Q.   Well, does it say "done something with it," or does it |
| 09:39 | 17 | say -- |
| 09:39 | 18 | A.   It doesn't say -- well, doesn't say -- |
| 09:39 | 19 | Q.   Reduced to practice? |
| 09:39 | 20 | A.   Says, "reduced to practice." |
| 09:39 | 21 | Q.   Reduced to practice means you took the idea and you |
| 09:39 | 22 | made it come to life, right? |
| 09:39 | 23 | A.   I think. |
| 09:39 | 24 | MR. QUINN:  Vague and ambiguous, Your Honor. |
| 09:39 | 25 | THE COURT:  Come to life.  Sustained. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 66 of 158   Page ID #:310161
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

66

| | | |
|---|---|---|
| 09:39 | 1 | BY MS. KELLER: |
| 09:39 | 2 | Q.   You've made it tangible, right? |
| 09:39 | 3 | A.   Um, more tangible. |
| 09:39 | 4 | Q.   Well, more tangible.  An idea, okay?  We're talking |
| 09:39 | 5 | about the idea that you've got.  You reduce it to practice. |
| 09:39 | 6 | You take that idea and you put it into tangible form, right? |
| 09:40 | 7 | A.   Um, I -- again, I think there I'm trying to think of |
| 09:40 | 8 | forms that are not physically tangible.  Could be -- |
| 09:40 | 9 | Q.   Okay. |
| 09:40 | 10 | A.   -- for instance -- |
| 09:40 | 11 | Q.   I can think of an example for you. |
| 09:40 | 12 | MR. QUINN:  Excuse me.  She interrupted the |
| 09:40 | 13 | witness, Your Honor. |
| 09:40 | 14 | THE COURT:  Finish your answer, sir. |
| 09:40 | 15 | THE WITNESS:  Um, I don't remember where I was. |
| 09:40 | 16 | BY MS. KELLER: |
| 09:40 | 17 | Q.   Let me give you an example.  Let's say I think, gee, it |
| 09:40 | 18 | would be wonderful to write a love song about a romance that |
| 09:40 | 19 | begins on St. Patrick's Day, right? |
| 09:40 | 20 | A.   Right. |
| 09:40 | 21 | Q.   Okay.  And I'm working for a music company, right? |
| 09:40 | 22 | A.   Right. |
| 09:40 | 23 | Q.   And I have the idea.  And let's say my contract says |
| 09:40 | 24 | that the company owns anything that I conceive or reduce to |
| 09:40 | 25 | practice during my employment with the company, right?  I |

| 09:40 | 1 | get the idea for a love song. |
| 09:41 | 2 | A.   This is before you work for the company? |
| 09:41 | 3 | Q.   No.  Let's say I'm working for a music company. |
| 09:41 | 4 | A.   Okay. |
| 09:41 | 5 | Q.   Okay?  And my contract says my company owns any ideas |
| 09:41 | 6 | that's about music that I conceive or reduce to practice |
| 09:41 | 7 | during my employment with the company.  Okay? |
| 09:41 | 8 | A.   Okay. |
| 09:41 | 9 | Q.   I have this idea of a love song for a romance that |
| 09:41 | 10 | starts on St. Patrick's Day; true?  You with me? |
| 09:41 | 11 | A.   With you. |
| 09:41 | 12 | Q.   So that's an idea.  That's something that I conceived |
| 09:41 | 13 | of, right? |
| 09:41 | 14 | A.   Idea, conceived, yes. |
| 09:41 | 15 | Q.   But unless I actually sit down and write the song and |
| 09:41 | 16 | put the music on the paper and put the words with it, I |
| 09:41 | 17 | haven't reduced it to practice, right? |
| 09:41 | 18 | A.   Uh, I would disagree.  If you sing the song to |
| 09:41 | 19 | somebody, I think that's reducing it to practice.  It's not |
| 09:41 | 20 | just sitting down and writing the words or writing the |
| 09:41 | 21 | music.  If you sing it without writing it down, I would |
| 09:41 | 22 | still think that's reduced to practice. |
| 09:41 | 23 | Q.   Okay.  Let's go with that idea. |
| 09:41 | 24 | Let's say I've sung the song.  That means I created it |
| 09:42 | 25 | already, right?  There's a song to sing? |

| | | |
|---|---|---|
| 09:42 | 1 | A.   Yeah, you created, maybe not all of the pieces of it, |
| 09:42 | 2 | yes. |
| 09:42 | 3 | Q.   Well, yes.  And you understand, of course, that that's |
| 09:42 | 4 | also one of the issues in this case, right? |
| 09:42 | 5 | MR. QUINN:  This is vague and ambiguous, |
| 09:42 | 6 | Your Honor. |
| 09:42 | 7 | THE COURT:  Sustained. |
| 09:42 | 8 | BY MS. KELLER: |
| 09:42 | 9 | Q.   The idea of how much Carter created or reduced to |
| 09:42 | 10 | practice, you know that's one of the issues here, right? |
| 09:42 | 11 | A.   I do not. |
| 09:42 | 12 | Q.   Is that something else that you don't have any |
| 09:42 | 13 | knowledge about? |
| 09:42 | 14 | MR. QUINN:  Argumentative. |
| 09:42 | 15 | THE COURT:  Well, strike the "something else," but |
| 09:42 | 16 | you can ask the question. |
| 09:42 | 17 | BY MS. KELLER: |
| 09:42 | 18 | Q.   This is -- even though you're Mattel's corporate |
| 09:42 | 19 | representative, you don't have any idea what. |
| 09:42 | 20 | MR. QUINN:  Your Honor -- |
| 09:42 | 21 | BY MS. HURST: |
| 09:42 | 22 | Q.   This lawsuit is about? |
| 09:42 | 23 | MR. QUINN:  Your Honor instructed counsel not to |
| 09:42 | 24 | use that 30(b)(6) language for things he wasn't designated |
| 09:42 | 25 | on yesterday.  I move to strike. |

| | | |
|---|---|---|
| 09:42 | 1 | THE COURT:  Just a moment. |
| 09:42 | 2 | Overruled.  We've gotten into the subject of ideas |
| 09:42 | 3 | now, and I've given latitude to both sides. |
| 09:43 | 4 | Overruled. |
| 09:43 | 5 | You can answer that question, sir. |
| 09:43 | 6 | THE WITNESS:  Can you ask the question once again, |
| 09:43 | 7 | please? |
| 09:43 | 8 | BY MS. KELLER: |
| 09:43 | 9 | Q.   Even though you were Mattel's corporate representative |
| 09:43 | 10 | on the issue of the meaning of Carter Bryant's contract, are |
| 09:43 | 11 | you telling us you actually don't know what this lawsuit is |
| 09:43 | 12 | all about? |
| 09:43 | 13 | A.   I don't know all the details of the lawsuit. |
| 09:43 | 14 | Q.   You know one of the details is when Carter Bryant |
| 09:43 | 15 | conceived or reduced to practice his idea for Bratz, right? |
| 09:43 | 16 | A.   I do know that piece is part of the lawsuit. |
| 09:43 | 17 | Q.   And that's what we're talking about here, the meaning |
| 09:43 | 18 | of conceived or reduced to practice.  So let's go back to |
| 09:43 | 19 | the songs. |
| 09:43 | 20 | MR. QUINN:  Move to strike the question, |
| 09:43 | 21 | Your Honor.  It's not a question. |
| 09:43 | 22 | THE COURT:  Sustained. |
| 09:43 | 23 | The question is stricken. |
| 09:43 | 24 | BY MS. KELLER: |
| 09:43 | 25 | Q.   Let's go back to the St. Patrick's Day song.  I've |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

| | | |
|---|---|---|
| 09:43 | 1 | conceived of the idea, but if I don't get any farther than, |
| 09:43 | 2 | "Oh, we..." and that's it, I haven't reduced it to practice, |
| 09:43 | 3 | have I? |
| 09:43 | 4 | MR. QUINN:  Irrelevant.  Incomplete hypothetical, |
| 09:43 | 5 | Your Honor. |
| 09:43 | 6 | THE COURT:  Overruled. |
| 09:44 | 7 | THE WITNESS:  I don't know how to define that for |
| 09:44 | 8 | the song industry. |
| 09:44 | 9 | BY MS. KELLER: |
| 09:44 | 10 | Q.   That's no song yet, right?  We're just talking about as |
| 09:44 | 11 | human beings, not defining stuff for the song industry.  I |
| 09:44 | 12 | mean, there's no song yet, right? |
| 09:44 | 13 | A.   Well, it would be very hard.  I think there are a |
| 09:44 | 14 | number of songs where you hear the first few notes, and you |
| 09:44 | 15 | know it's the song, so maybe the first few notes that you |
| 09:44 | 16 | just went would be valuable.  I just don't know the song |
| 09:44 | 17 | industry. |
| 09:44 | 18 | Q.   We're not talking about a song that's already there |
| 09:44 | 19 | that everybody knows.  We're not talking about Penny Lane or |
| 09:44 | 20 | any other song that everybody's familiar with.  We're |
| 09:44 | 21 | talking about a song that I just thought of.  I'm thinking, |
| 09:44 | 22 | gee, this would be a good idea to write a St. Patrick's Day |
| 09:44 | 23 | song about romance that starts on St. Patrick's Day.  Right? |
| 09:44 | 24 | Okay? |
| 09:44 | 25 | A.   Yes, I'm with you so far. |

| | | |
|---|---|---|
| 09:44 | 1 | Q.   So this isn't a song that anyone would recognize by the |
| 09:44 | 2 | first few bars, 'cause there is no song yet. |
| 09:44 | 3 |      You with me? |
| 09:44 | 4 | A.   I agree that no one would recognize it.  I just don't |
| 09:45 | 5 | know if it's valuable to a song company if you come up |
| 09:45 | 6 | with -- |
| 09:45 | 7 | Q.   Not asking you that. |
| 09:45 | 8 | A.   Okay. |
| 09:45 | 9 | Q.   I understand you're not an expert on song companies, |
| 09:45 | 10 | right? |
| 09:45 | 11 | A.   Right. |
| 09:45 | 12 | Q.   I'm asking you about the meaning of the terms |
| 09:45 | 13 | "conceived or reduced to practice."  Wouldn't you agree with |
| 09:45 | 14 | me that if I've gotten as far as "Oh, we..." and that's it, |
| 09:45 | 15 | I have not reduced my idea to practice? |
| 09:45 | 16 | A.   I wouldn't think that's practice, but again, I don't |
| 09:45 | 17 | know that industry, but I wouldn't think so. |
| 09:45 | 18 | Q.   Well, we're talking about the meaning of conceived or |
| 09:45 | 19 | reduced to practice.  Okay? |
| 09:45 | 20 |      MR. QUINN:  Move to strike, Your Honor.  This is |
| 09:45 | 21 | irrelevant, the music industry. |
| 09:45 | 22 |      THE COURT:  Well, you can use it for the |
| 09:45 | 23 | hypothetical, but let me inform the jury we're not dealing |
| 09:45 | 24 | with the music industry here.  I'll let counsel asked her |
| 09:45 | 25 | hypothetical, but our fact situation is entirely different. |

| | | |
|---|---|---|
| 09:45 | 1 | All right. |
| 09:45 | 2 | BY MS. KELLER: |
| 09:45 | 3 | Q.   Now, the fact of the matter is you have been educated |
| 09:45 | 4 | on this issue in your role as Mattel's so-called 30(b)(6) |
| 09:46 | 5 | witness. |
| 09:46 | 6 | MR. QUINN:  "So-called," Your Honor, move to |
| 09:46 | 7 | strike. |
| 09:46 | 8 | THE COURT:  Sustained.  Strike "so-called." |
| 09:46 | 9 | MS. KELLER:  Well, using the phrase 30(b)(6), |
| 09:46 | 10 | Your Honor, sounds like such legalese. |
| 09:46 | 11 | THE COURT:  That's okay.  I understand it. |
| 09:46 | 12 | MS. KELLER:  I know you do. |
| 09:46 | 13 | BY MS. KELLER: |
| 09:46 | 14 | Q.   Okay.  I'm going to say, in your role as Mattel's |
| 09:46 | 15 | 30(b)(6) witness, you were educated about the issues you |
| 09:46 | 16 | were to testify about, right? |
| 09:46 | 17 | A.   Correct. |
| 09:46 | 18 | Q.   And so, for example, you were educated about the |
| 09:46 | 19 | meaning of these terms, right?  Conceived or reduced to |
| 09:46 | 20 | practice, true? |
| 09:46 | 21 | A.   Yes. |
| 09:46 | 22 | Q.   And you were educated, among other things, by lawyers |
| 09:46 | 23 | about the meaning of these terms, right? |
| 09:46 | 24 | A.   Yes. |
| 09:46 | 25 | Q.   And lawyers drafted the contract, right? |

| | | |
|---|---|---|
| 09:46 | 1 | A.   Yes. |
| 09:46 | 2 | Q.   And you know, of course, as a result of your education |
| 09:46 | 3 | in this, that this phrase, "reduced to practice," is legal |
| 09:46 | 4 | terminology, right? |
| 09:46 | 5 | A.   Yes. |
| 09:46 | 6 | Q.   It's -- it's what's called a, quote, "term of art" in |
| 09:46 | 7 | the law, right? |
| 09:47 | 8 | A.   I didn't know it was called a term of art. |
| 09:47 | 9 | Q.   And -- |
| 09:47 | 10 | A.   But it seemed to me like legal terminology. |
| 09:47 | 11 | Q.   And when you were educated about this topic by the |
| 09:47 | 12 | lawyers who educated you, you learned that this is a term |
| 09:47 | 13 | related to patent law, true? |
| 09:47 | 14 | A.   Uh, not true. |
| 09:47 | 15 | Q.   And you were informed, were you not, that reduced to |
| 09:47 | 16 | practice means you have turned the idea into something that |
| 09:47 | 17 | works, right? |
| 09:47 | 18 | A.   Uh, no, that's not correct.  I never -- never heard |
| 09:47 | 19 | that till you just said it. |
| 09:47 | 20 | Q.   You understood as a result of all the education you |
| 09:47 | 21 | received that reduced to practice means you brought the idea |
| 09:47 | 22 | to fruition, right? |
| 09:47 | 23 | A.   No, never heard that. |
| 09:47 | 24 | Q.   It means that you made it.  Whatever the idea was, you |
| 09:47 | 25 | made something that works out of it, right? |

| 09:47 | 1 | MR. QUINN:  This is just argument, Your Honor. |
| 09:47 | 2 | THE COURT:  Overruled. |
| 09:47 | 3 | THE WITNESS:  No. |
| 09:47 | 4 | I think -- no.  Could be -- could be something |
| 09:48 | 5 | that doesn't work.  It could be something that isn't to |
| 09:48 | 6 | fruition.  It could be a piece of something. |
| 09:48 | 7 | BY MS. KELLER: |
| 09:48 | 8 | Q.   Well, let me ask you this:  You said earlier that you |
| 09:48 | 9 | consulted dictionaries to look up things.  You remember |
| 09:48 | 10 | that? |
| 09:48 | 11 | A.   The word "conceived." |
| 09:48 | 12 | Q.   I'm not even -- I'm not even gonna ask you what it was |
| 09:48 | 13 | that you learned in the dictionary, but did you ask for a |
| 09:48 | 14 | legal dictionary at any point? |
| 09:48 | 15 | A.   No. |
| 09:48 | 16 | Q.   Did you say, you know, since this is a contract drafted |
| 09:48 | 17 | by lawyers with legal language in it, "I need a copy of |
| 09:48 | 18 | something called Black's Law Dictionary"?  Did you ask for |
| 09:48 | 19 | that? |
| 09:48 | 20 | A.   No. |
| 09:48 | 21 | Q.   Your preparation, sir, was designed to help Mattel win |
| 09:48 | 22 | this lawsuit, right? |
| 09:48 | 23 | MR. QUINN:  Objection.  Argumentative. |
| 09:48 | 24 | THE COURT:  Sustained in its present form. |
| 09:48 | 25 | The question's stricken. |

09:49  1    BY MS. KELLER:

09:49  2    Q.   Now, you will agree with me, don't you, that words in

09:49  3    contracts are actually important?

09:49  4    A.   Yes.

09:49  5    Q.   And at Mattel, the employee doesn't get to draft the

09:49  6    contract; Mattel drafts it, right?

09:49  7    A.   Yes.

09:49  8    Q.   And the employee gets to sign it.  Basically, take it

09:49  9    or leave it as Mattel drafted it, right?

09:49  10   A.   Are we talking about this contract?

09:49  11   Q.   Yes, we are.

09:49  12   A.   Yes.

09:49  13   Q.   And Mr. Quinn took you through a number of changes in

09:49  14   the contractual language over the years, as I did yesterday,

09:49  15   and we saw that there was some as you -- I think you said

09:49  16   there was some significant changes over the years, right?

09:49  17   A.   Yes.

09:49  18   Q.   And yet you said there was really no change in how

09:49  19   Mattel treated its employees based on the different

09:49  20   contracts, right?

09:49  21   A.   Correct.

09:49  22   Q.   As far as you're concerned, no matter what the

09:49  23   contracts actually say, they all mean the same thing, right?

09:50  24   A.   I think the earlier contracts that we went over

09:50  25   yesterday and the contract for Carter Bryant basically had

| | | |
|---|---|---|
| 09:50 | 1 | the same key meanings, yes. |
| 09:50 | 2 | Q.  Well, you thought every contract that you looked at, no |
| 09:50 | 3 | matter what the words in it said, to you, they all meant the |
| 09:50 | 4 | same thing? |
| 09:50 | 5 | MR. QUINN:  Your Honor, it's vague as to what |
| 09:50 | 6 | contract provisions. |
| 09:50 | 7 | THE COURT:  Overruled. |
| 09:50 | 8 | You can answer the question, sir. |
| 09:50 | 9 | THE WITNESS:  I don't think the -- I don't know if |
| 09:50 | 10 | I could say the entire contract meant the same thing.  I |
| 09:50 | 11 | think the assignment of inventions meant the same thing. |
| 09:50 | 12 | BY MS. KELLER: |
| 09:50 | 13 | Q.  It doesn't really matter to you what the words actually |
| 09:50 | 14 | said themselves, right? |
| 09:50 | 15 | A.  On the ones I read, I think they mean the same thing, |
| 09:50 | 16 | yes. |
| 09:50 | 17 | Q.  So what I'm saying is you don't think that the words, |
| 09:50 | 18 | the change in the words, means anything at all, right? |
| 09:50 | 19 | MR. QUINN:  Vague and ambiguous as to what words, |
| 09:50 | 20 | Your Honor. |
| 09:50 | 21 | THE COURT:  You're referring to? |
| 09:50 | 22 | MS. KELLER:  The assignment. |
| 09:50 | 23 | THE COURT:  Overruled. |
| 09:50 | 24 | THE WITNESS:  I think the concepts were the same. |
| | 25 | |

09:51   1   BY MS. KELLER:

09:51   2   Q.   Do you think the change in the words meant anything

09:51   3   whatsoever?

09:51   4   A.   I -- I'm not -- I'm not sure that I understand the

09:51   5   question.  Did change in words mean something?  Yes.

09:51   6   Q.   Well, for example, in 2004 when Mattel added the word

09:51   7   "ideas" back into the contracts, you don't think that really

09:51   8   changed anything, right?

09:51   9   A.   I don't think it changed the concept of the agreement.

09:51   10  Q.   And, of course, um, you would agree with me, wouldn't

09:51   11  you, that those were changes made by lawyers?

09:51   12  A.   Correct.

09:51   13  Q.   You're telling us you can't track down any of the

09:51   14  lawyers involved in making the changes to find out why the

09:51   15  change was made, true?

09:51   16           MR. QUINN:  Objection.  Argumentative.

09:51   17           THE COURT:  As to "you're telling me," stricken.

09:51   18  BY MS. KELLER:

09:51   19  Q.   Are you testifying that you can't track down any of the

09:51   20  lawyers who made the changes to tell you why they were made?

09:51   21  A.   What changes are you referring to?

09:51   22  Q.   Any of them.  Isn't that what you testified to a little

09:52   23  earlier today?

09:52   24  A.   Uh, I don't believe so.  I can track down the attorneys

09:52   25  who drafted -- current language.

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 78 of 158   Page ID #:310173
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

78

| | | |
|---|---|---|
| 09:52 | 1 | Q.    Would you -- |
| 09:52 | 2 | A.    Not the language of '75, et cetera, through |
| 09:52 | 3 | Mr. Bryant's agreement. |
| 09:52 | 4 | Q.    Because those people are all of -- all dead, every one |
| 09:52 | 5 | of them are gone? |
| 09:52 | 6 | A.    Um -- |
| 09:52 | 7 | THE COURT:  Well, there's a difference between |
| 09:52 | 8 | "dead" and "gone," Counsel. |
| 09:52 | 9 | MS. KELLER:  I guess dead and gone would be pretty |
| 09:52 | 10 | much the same. |
| 09:52 | 11 | MR. QUINN:  Your Honor, is there a question, or |
| 09:52 | 12 | does she care about an answer? |
| 09:52 | 13 | THE COURT:  Well, thank you very much.  I'm going |
| 09:52 | 14 | to sustain the objection. |
| 09:52 | 15 | Reask the question. |
| 09:52 | 16 | BY MS. KELLER: |
| 09:52 | 17 | Q.    Presumably the lawyers who added "ideas" back in, in |
| 09:52 | 18 | 2004 had a reason, right? |
| 09:52 | 19 | A.    I would presume so. |
| 09:52 | 20 | Q.    But you didn't find out what the reason was, right? |
| 09:52 | 21 | A.    Uh, no. |
| 09:52 | 22 | Q.    And presumably the lawyers who made the changes in 2007 |
| 09:53 | 23 | and had everybody come in and sign brand-new contracts, |
| 09:53 | 24 | presumably they had a reason, right? |
| 09:53 | 25 | MR. QUINN:  Assumes facts not in evidence. |

| | | |
|---|---|---|
| 09:53 | 1 | THE WITNESS:  Um -- |
| 09:53 | 2 | THE COURT:  Overruled.  Remember, he's speaking as |
| 09:53 | 3 | a corporate designee.  He's speaking for Mattel. |
| 09:53 | 4 | You can answer the question. |
| 09:53 | 5 | THE WITNESS:  Can you repeat the question, please? |
| 09:53 | 6 | BY MS. KELLER: |
| 09:53 | 7 | Q.   Presumably when the contract was changed again in 2007 |
| 09:53 | 8 | by lawyers, they had a reason for that, right? |
| 09:53 | 9 | MR. QUINN:  Misstates the evidence. |
| 09:53 | 10 | THE COURT:  Just a moment. |
| 09:53 | 11 | In 2007? |
| 09:53 | 12 | MS. KELLER:  Yes. |
| 09:53 | 13 | THE COURT:  Or 2004? |
| 09:53 | 14 | MS. KELLER:  Both.  I've asked about 2004. |
| 09:53 | 15 | THE COURT:  Overruled. |
| 09:53 | 16 | BY MS. KELLER: |
| 09:53 | 17 | Q.   You recall again the contract was changed in 2007, |
| 09:53 | 18 | right? |
| 09:53 | 19 | A.   I -- I thought this -- I thought the next change was |
| 09:53 | 20 | 2006. |
| 09:53 | 21 | Q.   Okay.  Let's even -- let's talk about that.  The next |
| 09:54 | 22 | change, 2006, that also was changed by the lawyers, right? |
| 09:54 | 23 | A.   Yes. |
| 09:54 | 24 | Q.   Presumably the lawyers had a reason for changing it, |
| 09:54 | 25 | right? |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

80

| | | |
|---|---|---|
| 09:54 | 1 | A.    Presumably. |
| 09:54 | 2 | Q.    Presumably the lawyers thought words were actually |
| 09:54 | 3 | important, right? |
| 09:54 | 4 | A.    Presumably. |
| 09:54 | 5 | Q.    But you didn't find out why that change was made |
| 09:54 | 6 | either, right? |
| 09:54 | 7 | A.    No. |
| 09:54 | 8 | Q.    And when the employees were asked to execute again |
| 09:54 | 9 | another confidentiality and inventions agreement, you said |
| 09:54 | 10 | that was based on advice from counsel, right? |
| 09:54 | 11 | A.    Yes. |
| 09:54 | 12 | Q.    You didn't ask counsel why that was, right? |
| 09:54 | 13 | A.    Why which was? |
| 09:54 | 14 | Q.    You didn't ask counsel why -- when the attorneys said |
| 09:54 | 15 | the current employees needed to execute another |
| 09:54 | 16 | confidentiality and inventions agreement in 2006, you didn't |
| 09:54 | 17 | ask them why that was, right? |
| 09:54 | 18 |         MR. QUINN:  Your Honor, communications with |
| 09:54 | 19 | counsel. |
| 09:55 | 20 |         THE COURT:  Overruled. |
| 09:55 | 21 |         THE WITNESS:  I'm sorry.  I thought -- I'm -- I |
| 09:55 | 22 | may have misunderstood.  I thought you were talking about |
| 09:55 | 23 | the specific words.  If you're talking about the general |
| 09:55 | 24 | concept of changing the agreement. |
| | 25 | |

| | | |
|---|---|---|
| 09:55 | 1 | BY MS. KELLER: |
| 09:55 | 2 | Q.   No.  Specific words? |
| 09:55 | 3 | A.   Specific words.  I did not asked them about the change |
| 09:55 | 4 | in the specific words. |
| 09:55 | 5 | Q.   But you knew that you would be testifying in this trial |
| 09:55 | 6 | about the specific words, right? |
| 09:55 | 7 | A.   At that time, no. |
| 09:55 | 8 | Q.   You knew in 2007 that you were being asked about the |
| 09:55 | 9 | employees executing another confidentiality and inventions |
| 09:55 | 10 | agreement based on advice from counsel, right?  You knew |
| 09:55 | 11 | that as of June 21st, 2007, true? |
| 09:55 | 12 | A.   I'm sorry.  I'm not following the question. |
| 09:55 | 13 | Q.   You were deposed June 21st, 2007, right? |
| 09:55 | 14 | A.   Yes. |
| 09:55 | 15 | Q.   One of the things you were asked about was this |
| 09:55 | 16 | confidentiality and inventions agreement, right? |
| 09:55 | 17 | A.   Yes. |
| 09:55 | 18 | Q.   You were asked about the meaning of specific terms, |
| 09:55 | 19 | right? |
| 09:55 | 20 | A.   Uh, I believe so. |
| 09:55 | 21 | Q.   You were -- you said that the agreement was -- the |
| 09:55 | 22 | wording of the agreement was changed based on advice from |
| 09:56 | 23 | counsel, right? |
| 09:56 | 24 | A.   Yes. |
| 09:56 | 25 | Q.   But before coming here today, you haven't investigated |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 82 of 158   Page ID #:310177
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

82

| | | |
|---|---|---|
| 09:56 | 1 | why the specific words were changed, right? |
| 09:56 | 2 | A.    Correct. |
| 09:56 | 3 | Q.    And, for example, the language was added to that |
| 09:56 | 4 | agreement that the employee would "disclose in confidence to |
| 09:56 | 5 | Mattel all inventions, discoveries, improvements, |
| 09:56 | 6 | developments, design, works, original works of authorship, |
| 09:56 | 7 | ideas," and also the language was added "conceived, create, |
| 09:56 | 8 | develop, or reduce to practice during my period of |
| 09:56 | 9 | employment with Mattel, whether or not in the course of my |
| 09:56 | 10 | employment with Mattel." |
| 09:56 | 11 | Right?  Talked about that yesterday? |
| 09:56 | 12 | A.    Yes. |
| 09:57 | 13 | Q.    And so that language, of course, um -- well, you would |
| 09:57 | 14 | agree, was much broader than the previous language, "whether |
| 09:57 | 15 | or not in the course of my employment with Mattel," right? |
| 09:57 | 16 | A.    Yes. |
| 09:57 | 17 | Q.    And that was added by the lawyer, right? |
| 09:57 | 18 | A.    Yes. |
| 09:57 | 19 | Q.    That was added after this lawsuit began, right? |
| 09:57 | 20 | A.    Yes. |
| 09:57 | 21 | Q.    That was added after this case was already heavily |
| 09:57 | 22 | litigated, right? |
| 09:57 | 23 | A.    Yes. |
| 09:57 | 24 | Q.    And you knew you'd be asked about that again today, the |
| 09:57 | 25 | various contracts that Mattel had and the meaning of terms, |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

83

| | | |
|---|---|---|
| 09:57 | 1 | right? |
| 09:57 | 2 | A.    Yes. |
| 09:57 | 3 | Q.    But you have never investigated why those changes to |
| 09:57 | 4 | the words were made? |
| 09:57 | 5 | A.    Correct. |
| 09:57 | 6 | Q.    And the reason that you didn't investigate it was you |
| 09:57 | 7 | didn't want to know, right? |
| 09:57 | 8 | A.    No. |
| 09:57 | 9 | Q.    You did not want to know that it was changed in |
| 09:57 | 10 | response to this lawsuit? |
| 09:57 | 11 | A.    No. |
| 09:57 | 12 | Q.    Right? |
| 09:57 | 13 | A.    That is incorrect. |
| 09:58 | 14 | Q.    You did not want to know that the lawyers changed the |
| 09:58 | 15 | language so that it would actually be clear that the kind |
| 09:58 | 16 | of -- the kind of situation that Carter Bryant described |
| 09:58 | 17 | would actually be covered? |
| 09:58 | 18 | MR. QUINN:  Assumes facts.  It's argumentative. |
| 09:58 | 19 | THE COURT:  Overruled. |
| 09:58 | 20 | THE WITNESS:  I'm sorry, can you repeat that |
| 09:58 | 21 | question? |
| 09:58 | 22 | BY MS. KELLER: |
| 09:58 | 23 | Q.    You didn't want to know why the language was changed to |
| 09:58 | 24 | this specific language that I just talked about because you |
| 09:58 | 25 | didn't want to find out that the lawyers changed it so that |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

84

| | | |
|---|---|---|
| 09:58 | 1 | the kind of situation that Carter Bryant has described would |
| 09:58 | 2 | actually be covered by a Mattel contract, right? |
| 09:58 | 3 | A.   No, that's not correct. |
| 09:58 | 4 | MS. KELLER:  Nothing further. |
| 09:58 | 5 | THE COURT:  Recross. |
| 09:58 | 6 | **RECROSS-EXAMINATION** |
| 09:58 | 7 | BY MR. QUINN: |
| 09:58 | 8 | Q.   So the kind of situation that Carter Bryant described, |
| 09:58 | 9 | would you -- would you understand that the inventions would |
| 09:58 | 10 | include doll designs written on paper? |
| 09:59 | 11 | A.   Yes. |
| 09:59 | 12 | Q.   Would you understand that inventions would include |
| 09:59 | 13 | an -- uh, concepts reduced to paper for an entire doll line |
| 09:59 | 14 | with personalities, names, back stories, icons, nicknames, |
| 09:59 | 15 | favorites, likes, dislikes, clothing, images? |
| 09:59 | 16 | A.   Absolutely. |
| 09:59 | 17 | MS. KELLER:  Objection.  Compound. |
| 09:59 | 18 | THE COURT:  Overruled. |
| 09:59 | 19 | BY MR. QUINN: |
| 09:59 | 20 | Q.   Talking about the -- following up on what counsel just |
| 09:59 | 21 | said, the Carter Bryant situation, would you understand that |
| 09:59 | 22 | if all those things were put in writing by a Mattel doll |
| 09:59 | 23 | designer working in the Mattel design center, that that |
| 09:59 | 24 | would be covered by the definition of inventions? |
| 09:59 | 25 | A.   Absolutely. |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

85

| | | |
|--|--|--|
| 09:59 | 1 | Q.   Did you need a lawyer to tell you what a doll design |
| 09:59 | 2 | was? |
| 09:59 | 3 | A.   No. |
| 09:59 | 4 | Q.   Did you need a lawyer -- you told us what "conceived" |
| 10:00 | 5 | means to you.  Did you need a lawyer to tell you that -- |
| 10:00 | 6 | what "conceived" means? |
| 10:00 | 7 | A.   No. |
| 10:00 | 8 | Q.   That it means something that you think of? |
| 10:00 | 9 | A.   Correct. |
| 10:00 | 10 | Q.   Is that something you needed a lawyer to tell you? |
| 10:00 | 11 | A.   No. |
| 10:00 | 12 | Q.   You said -- counsel asked you about dictionaries and |
| 10:00 | 13 | law dictionaries, whose idea was it to go look in the |
| 10:00 | 14 | dictionary? |
| 10:00 | 15 | A.   Mine.  Mine alone. |
| 10:00 | 16 | Q.   And did you look up the definition of "conceived"? |
| 10:00 | 17 | A.   I looked up the word "conceived." |
| 10:00 | 18 | Q.   And what was the definition, since counsel brought it |
| 10:00 | 19 | up? |
| 10:00 | 20 | MS. KELLER:  Objection. |
| 10:00 | 21 | THE COURT:  Sustained. |
| 10:00 | 22 | BY MR. QUINN: |
| 10:00 | 23 | Q.   Counsel asked -- just asked you a question about the |
| 10:00 | 24 | 2004 agreement.  By the way, 2004, that's four years after |
| 10:00 | 25 | Carter Bryant has left Mattel's employment? |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 86 of 158   Page ID #:310181
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:00 | 1 | A.    Uh, yes. |
| 10:00 | 2 | Q.    So if we could look at Exhibit 20531-6, she asked you a |
| 10:00 | 3 | question about the language -- |
| 10:01 | 4 | *(Document displayed.)* |
| 10:01 | 5 | BY MR. QUINN: |
| 10:01 | 6 | Q.    -- "whether or not in the course of my employment."  Do |
| 10:01 | 7 | you see that language there? |
| 10:01 | 8 | A.    I'm sorry.  I don't have it yet. |
| 10:01 | 9 | *(Document provided to the witness.)* |
| 10:01 | 10 | MR. QUINN:  Might be dash 1 or 2. |
| 10:01 | 11 | BY MR. QUINN: |
| 10:01 | 12 | Q.    Do you see the language that's referred to, that |
| 10:01 | 13 | counsel was asking you about, "whether or not in the course |
| 10:01 | 14 | of my employment"? |
| 10:01 | 15 | 20531-2 in the 2004 agreement? |
| 10:01 | 16 | A.    I have the 2004 agreement.  "Whether or not" is the |
| 10:01 | 17 | last line of the page.  Is that what you're referring to? |
| 10:02 | 18 | Q.    Yeah.  Counsel -- counsel didn't -- when counsel was |
| 10:02 | 19 | asking you that question, she did not show you this |
| 10:02 | 20 | paragraph, did she? |
| 10:02 | 21 | A.    Just now, no. |
| 10:02 | 22 | MR. QUINN:  If we could take a look at that last |
| 10:02 | 23 | paragraph, if we can enlarge that. |
| 10:02 | 24 | *(Technician complies.)* |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 87 of 158   Page ID #:310182
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

87

| | | |
|---|---|---|
| 10:02 | 1 | BY MR. QUINN: |
| 10:02 | 2 | Q.   "Disclosure of all inventions."  This relates to a |
| 10:02 | 3 | disclosure obligation with respect to inventions, correct? |
| 10:02 | 4 | A.   Yes, apparently so.  It says, "disclosure of." |
| 10:02 | 5 | Q.   In the last line, it relates to "whether or not in the |
| 10:02 | 6 | course of my employment with Mattel," correct? |
| 10:02 | 7 | A.   Yes. |
| 10:02 | 8 | Q.   And it relates to something that employee needs to |
| 10:02 | 9 | disclose.  It doesn't say all of that whether or not in the |
| 10:02 | 10 | course of my employment is assigned to the company? |
| 10:02 | 11 | A.   Correct. |
| 10:02 | 12 | Q.   Does it?  So it's not talking about an assignment of |
| 10:02 | 13 | inventions, right? |
| 10:02 | 14 | A.   No, it's just talking about a disclosure. |
| 10:02 | 15 | MR. QUINN:  Nothing further, Your Honor. |
| 10:02 | 16 | THE COURT:  Mr. Kaye, we're going to ask you to |
| 10:03 | 17 | remain available until probably April 5th or at least |
| 10:03 | 18 | through that week.  If you have any planned vacations, keep |
| 10:03 | 19 | them.  Any personal obligations or professional obligations, |
| 10:03 | 20 | keep them.  We'll be courteous.  If we need you back to |
| 10:03 | 21 | court, we'll find you. |
| 10:03 | 22 | THE WITNESS:  Thank you very much. |
| 10:03 | 23 | THE COURT:  You may step down. |
| 10:03 | 24 | *(Witness steps down subject to recall.)* |
| 10:03 | 25 | THE COURT:  Why don't we take a recess before the |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 88 of 158   Page ID #:310183
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:03 | 1 | next witness and reconvene at 20 after the hour. |
| 10:03 | 2 | You're admonished not to discuss this matter |
| 10:03 | 3 | amongst yourselves, nor to form or express any opinion |
| 10:03 | 4 | concerning the case. |
| 10:03 | 5 | Have a nice recess. |
| 10:03 | 6 | *(Jury recesses at 10:03 a.m.)* |
| 10:03 | 7 | *(Outside the presence of the jury.)* |
| 10:03 | 8 | THE COURT:  Sir, thank you. |
| 10:03 | 9 | Off the record. |
| 10:16 | 10 | *(Proceedings recessed at 10:03 a.m.)* |
| 10:22 | 11 | *(Proceedings resumed at 10:22 a.m.)* |
| 10:22 | 12 | *(In the presence of the jury.)* |
| 10:22 | 13 | THE COURT:  All right.  We're back on the record. |
| 10:22 | 14 | Counsel are present.  The -- thank you, Counsel, for your |
| 10:22 | 15 | courtesy.  The parties are present, the jury and alternates. |
| 10:22 | 16 | Ladies and gentlemen, during the recess, counsel |
| 10:22 | 17 | were kind enough to find for the Court some passages from |
| 10:22 | 18 | the prior testimony of Carter Bryant.  And the Court's |
| 10:22 | 19 | memory was faulty. |
| 10:22 | 20 | I made the mistake of not recalling that there was |
| 10:22 | 21 | testimony, in fact, about the inventions agreement having |
| 10:22 | 22 | been received.  It came during Carter Bryant's testimony |
| 10:22 | 23 | from Carter Bryant. |
| 10:22 | 24 | And, basically, at least one portion of the |
| 10:22 | 25 | transcript indicates that he apparently received this at |

| | | |
|---|---|---|
| 10:22 | 1 | least two weeks before his eventual signing of the actual |
| 10:23 | 2 | confidentiality agreement back on January 4th of 1999. |
| 10:23 | 3 | Now, Counsel will go through the transcripts, just |
| 10:23 | 4 | to make certain.  But this passage has been pointed out to |
| 10:23 | 5 | me on Day No. 12.  So I wanted to inform you of that |
| 10:23 | 6 | immediately, and I want to thank counsel. |
| 10:23 | 7 | Counsel. |
| 10:23 | 8 | MS. HURST:  Your Honor, MGA and Mr. Larian call |
| 10:23 | 9 | Adrienne Fontanella. |
| 10:23 | 10 | THE COURT:  All right.  If you would step forward, |
| 10:23 | 11 | please, between the double doors.  And would you stop at |
| 10:23 | 12 | that location. |
| 10:23 | 13 | Ms. Fontanella, raise your right hand, please. |
| 10:23 | 14 | **ADRIENNE FONTANELLA, MGA'S WITNESS, SWORN** |
| 10:23 | 15 | THE WITNESS:  Yes. |
| 10:23 | 16 | THE COURT:  Thank you. |
| 10:23 | 17 | If you would please come along the side of the |
| 10:23 | 18 | jury railing.  And there's an entrance closest to the wall. |
| 10:24 | 19 | And if you would please be seated. |
| 10:24 | 20 | THE WITNESS:  Thank you. |
| 10:24 | 21 | THE COURT:  Now, you may have to pull as hard as |
| 10:24 | 22 | you can to move the chair.  It's really hard to move. |
| 10:24 | 23 | Then, if you'd move the microphone closer to you, |
| 10:24 | 24 | and state your full name to the jury. |
| 10:24 | 25 | THE WITNESS:  Adrienne Fontanella. |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:24 | 1 | THE COURT:  Spell your last name. |
| 10:24 | 2 | THE WITNESS:  F, as in Frank, O-N-T-A-N-E, double |
| 10:24 | 3 | L-A. |
| 10:24 | 4 | THE COURT:  Thank you. |
| 10:24 | 5 | This is direct examination by Ms. Hurst on behalf |
| 10:24 | 6 | of MGA and Mr. Larian. |
| 10:24 | 7 | **DIRECT EXAMINATION** |
| 10:24 | 8 | BY MS. HURST: |
| 10:24 | 9 | Q.   Good morning, Ms. Fontanella. |
| 10:24 | 10 | A.   Good morning. |
| 10:24 | 11 | Q.   We've never met, correct? |
| 10:24 | 12 | A.   Correct. |
| 10:24 | 13 | Q.   Are you presently employed? |
| 10:24 | 14 | A.   No. |
| 10:24 | 15 | Q.   When was the last time you were employed? |
| 10:24 | 16 | A.   Uh, in February of 2003. |
| 10:24 | 17 | Q.   And that was for Mattel, correct? |
| 10:24 | 18 | A.   Correct. |
| 10:24 | 19 | Q.   And at that time you were the president of the Girls |
| 10:24 | 20 | Division of Mattel? |
| 10:24 | 21 | A.   That's correct. |
| 10:24 | 22 | Q.   You had joined Mattel in 1996, true. |
| 10:25 | 23 | A.   Correct. |
| 10:25 | 24 | Q.   You originally were involved in, uh, licensing for |
| 10:25 | 25 | Barbie at Mattel. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 91 of 158   Page ID #:310186
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

91

| 10:25 | 1 | A. Yes. |
| 10:25 | 2 | Q. And over the course of your tenure, between 1996 and |
| 10:25 | 3 | 1999, you held several different positions in Barbie |
| 10:25 | 4 | licensing, true? |
| 10:25 | 5 | A. Correct. |
| 10:25 | 6 | Q. And then, in 1999, you became the president of the |
| 10:25 | 7 | Girls Division of Mattel. |
| 10:25 | 8 | A. Correct. |
| 10:25 | 9 | Q. And in that role you had responsibility for, among |
| 10:25 | 10 | other things, the Barbie brand in its entirety? |
| 10:25 | 11 | A. Correct. |
| 10:25 | 12 | Q. The Barbie brand was extremely important to Mattel in |
| 10:25 | 13 | that period from 1999 to 2003, correct? |
| 10:25 | 14 | A. Correct. |
| 10:25 | 15 | Q. It was an important -- the most important contributor |
| 10:25 | 16 | to the financial bottom line of the company, true? |
| 10:25 | 17 | A. Yes. |
| 10:25 | 18 | Q. You were -- you were terminated in February 2003, |
| 10:25 | 19 | correct? |
| 10:25 | 20 | A. Yes. |
| 10:25 | 21 | Q. And one of the reasons that you were terminated was |
| 10:26 | 22 | dissatisfaction with the performance of the Barbie brand, |
| 10:26 | 23 | true? |
| 10:26 | 24 | A. Not necessarily. |
| 10:26 | 25 | Q. Well, was that a factor or wasn't it? |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 92 of 158   Page ID #:310187
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

92

| | | |
|---|---|---|
| 10:26 | 1 | A.   Um, the year I left, our sales on a worldwide basis |
| 10:26 | 2 | were up and our operating profit was up.  I think there were |
| 10:26 | 3 | other factors that contributed to that. |
| 10:26 | 4 | Q.   Okay.  So, in your view, there was no role at all of |
| 10:26 | 5 | dissatisfaction with the Barbie brand performance that led |
| 10:26 | 6 | to your termination; is that -- |
| 10:26 | 7 | A.   I would say there was a role. |
| 10:26 | 8 | MR. ZELLER:  Misstates the witness's testimony. |
| 10:26 | 9 | THE COURT:  Sustained. |
| 10:26 | 10 | Just reask it. |
| 10:26 | 11 | BY MS. HURST: |
| 10:26 | 12 | Q.   You agree there was a role, in other words, that the |
| 10:26 | 13 | factor of dissatisfaction with Barbie brand performance did |
| 10:26 | 14 | contribute to your termination? |
| 10:26 | 15 | A.   Probably. |
| 10:26 | 16 | Q.   Now, when you were terminated, uh, you had a severance |
| 10:27 | 17 | package, correct? |
| 10:27 | 18 | A.   Correct. |
| 10:27 | 19 | Q.   There was a termination agreement that you entered into |
| 10:27 | 20 | with Mattel? |
| 10:27 | 21 | A.   Correct. |
| 10:27 | 22 | Q.   Would you look at Exhibit 34828, please. |
| 10:27 | 23 | *(Document provided to the witness.)* |
| 10:27 | 24 | BY MS. HURST: |
| 10:27 | 25 | Q.   Do you recognize that document? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:27 | 1 | A.   Yes. |
| 10:27 | 2 | Q.   And is that your severance agreement, termination |
| 10:27 | 3 | agreement with Mattel? |
| 10:27 | 4 | A.   Yes. |
| 10:27 | 5 | MS. HURST:  Your Honor, move 34828 into evidence. |
| 10:27 | 6 | THE COURT:  Received. |
| 10:27 | 7 | *(Exhibit No. 34828 received in evidence.)* |
| 10:27 | 8 | *(Document displayed.)* |
| 10:27 | 9 | BY MS. HURST: |
| 10:27 | 10 | Q.   Now, pursuant to this agreement, if you look in |
| 10:27 | 11 | Paragraph 2(a), you were paid a lump sum severance of |
| 10:27 | 12 | $6.5 million, correct? |
| 10:27 | 13 | A.   Correct. |
| 10:28 | 14 | Q.   And if you look at Paragraph 2(d) on the next page, |
| 10:28 | 15 | Mattel also agreed to pay taxes on two loans that had been |
| 10:28 | 16 | made to you and forgiven by the company, true? |
| 10:28 | 17 | A.   Correct. |
| 10:28 | 18 | Q.   And those loans themselves were compensation to you, |
| 10:28 | 19 | right? |
| 10:28 | 20 | A.   Correct. |
| 10:28 | 21 | Q.   One of the loans is worth a million dollars; is that |
| 10:28 | 22 | right? |
| 10:28 | 23 | A.   Yes. |
| 10:28 | 24 | Q.   The other loan was worth $2 million, true? |
| 10:28 | 25 | A.   I believe so. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 94 of 158   Page ID #:310189
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:28 | 1 | Q.   And then in this -- in the termination, Mattel also |
| 10:28 | 2 | paid the taxes on those loans, right? |
| 10:28 | 3 | A.   Yes. |
| 10:28 | 4 | Q.   Mattel also agreed to pay for three years of health, |
| 10:28 | 5 | dental, and vision insurance for you? |
| 10:28 | 6 | A.   Yes. |
| 10:28 | 7 | Q.   Paid for three years of a country club membership for |
| 10:28 | 8 | you? |
| 10:28 | 9 | A.   Yes. |
| 10:28 | 10 | Q.   Kept paying the lease on your Jaguar? |
| 10:28 | 11 | A.   Yes. |
| 10:28 | 12 | Q.   And you got the option to purchase that Jaguar for a |
| 10:29 | 13 | hundred dollars at the end of the lease? |
| 10:29 | 14 | A.   Correct. |
| 10:29 | 15 | Q.   That was part of your terms, right?  Is that correct? |
| 10:29 | 16 | A.   Yes, that's correct. |
| 10:29 | 17 | Q.   Thank you.  And -- and this generous severance package |
| 10:29 | 18 | has basically enabled you to retire; is that correct? |
| 10:29 | 19 | A.   Not exclusively. |
| 10:29 | 20 | Q.   You have not been employed since you left Mattel, true? |
| 10:29 | 21 | A.   True. |
| 10:29 | 22 | Q.   You, despite being terminated, in fact, have, uh, |
| 10:29 | 23 | friendly feelings toward Mattel, correct? |
| 10:29 | 24 | A.   Absolutely. |
| 10:29 | 25 | Q.   And you've been represented by Mattel's lawyers in |

| | | |
|---|---|---|
| 10:29 | 1 | connection with your participation as a witness in this |
| 10:29 | 2 | suit, true? |
| 10:29 | 3 | A.   Yes. |
| 10:29 | 4 | Q.   Are you familiar with a product that Mattel released in |
| 10:29 | 5 | or about the year 2000 called Diva Starz? |
| 10:29 | 6 | A.   Yes. |
| 10:29 | 7 | Q.   And that was a fashion doll product, correct? |
| 10:29 | 8 | A.   Correct. |
| 10:29 | 9 | Q.   And it was put out into the marketplace while you were |
| 10:29 | 10 | president of the Girls Division? |
| 10:30 | 11 | A.   Yes. |
| 10:30 | 12 | Q.   And you had a role in connection with the development |
| 10:30 | 13 | and approval and marketing of that product, right? |
| 10:30 | 14 | A.   Yes. |
| 10:30 | 15 | Q.   Diva Starz was released in the fall of 2000, true? |
| 10:30 | 16 | A.   I believe so. |
| 10:30 | 17 | MS. HURST:  Please show the witness Exhibit 35302. |
| 10:30 | 18 | *(Document provided to the witness.)* |
| | 19 | BY MS. HURST: |
| 10:30 | 20 | Q.   Ms. Fontanella, do you recognize that as a catalogue of |
| 10:30 | 21 | Mattel's products for the year 2000? |
| 10:30 | 22 | A.   Yes, I do. |
| 10:30 | 23 | Q.   Would you turn to the pages -- and now I'm referring to |
| 10:30 | 24 | the stamped number pages on the bottom, starting with |
| 10:30 | 25 | TX35302 -- turn to pages 90 and 91, please. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 96 of 158   Page ID #:310191
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:31 | 1 | A.    *(Witness complies.)* |
| 10:31 | 2 | Q.    Do you see those? |
| 10:31 | 3 | A.    Yes. |
| 10:31 | 4 | Q.    And are those the catalogue pages in the 2000 Mattel |
| 10:31 | 5 | catalogue for the Diva Starz product? |
| 10:31 | 6 | A.    I believe so. |
| 10:31 | 7 | MS. HURST:  All right.  Your Honor, move to admit |
| 10:31 | 8 | the first and pages 90 and 91 of Exhibit 35302. |
| 10:31 | 9 | THE COURT:  Received. |
| 10:31 | 10 | *(Exhibit No. 35302 received in evidence.)* |
| 10:31 | 11 | *(Document displayed.)* |
| 11:59 | 12 | BY MS. HURST: |
| 10:31 | 13 | Q.    And it may be -- we're gonna spend a little while |
| 10:31 | 14 | looking at these two pages.  It may be easier for you to |
| 10:31 | 15 | take them out of the binder and lay them next to each other |
| 10:31 | 16 | on the desk. |
| 10:31 | 17 | Now, that was the -- that -- those photos and language |
| 10:31 | 18 | were the descriptions that Mattel provided to the trade |
| 10:32 | 19 | regarding the Diva Starz product in the year 2000, correct? |
| 10:32 | 20 | A.    Correct. |
| 10:32 | 21 | Q.    And the catalogue would go out to the retailers and -- |
| 10:32 | 22 | before the product was actually released, right? |
| 10:32 | 23 | A.    I don't recall. |
| 10:32 | 24 | Q.    Was it consistent, in the ordinary course of business, |
| 10:32 | 25 | that you would give the catalogues to the retailers before |

| | | |
|---|---|---|
| 10:32 | 1 | hand in order to educate them and assist them in making |
| 10:32 | 2 | decisions about whether to order products? |
| 10:32 | 3 | A.   Yes. |
| 10:32 | 4 | MS. HURST:  Could we also give the witness the |
| 10:32 | 5 | Diva Starz dolls:  17383, 17384, 35312 and 35313. |
| 10:32 | 6 | *(Exhibits provided to the witness.)* |
| 11:59 | 7 | BY MS. HURST: |
| 10:32 | 8 | Q.   Do you have those before you, Ms. Fontanella? |
| 10:32 | 9 | A.   Yes, I do.  Thank you. |
| 10:33 | 10 | Q.   Do you recognize each of those as Diva Starz fashion |
| 10:33 | 11 | doll products that were marketed by Mattel? |
| 10:33 | 12 | A.   Yes. |
| 10:33 | 13 | MS. HURST:  Your Honor, move to admit those four |
| 10:33 | 14 | dolls, if they haven't been already. |
| 10:33 | 15 | THE COURT:  Received. |
| 10:33 | 16 | *(Exhibit No. 17383 received in evidence.)* |
| 10:33 | 17 | *(Exhibit No. 17384 received in evidence.)* |
| 10:33 | 18 | *(Exhibit No. 35312 received in evidence.)* |
| 10:33 | 19 | *(Exhibit No. 35313 received in evidence.)* |
| 10:33 | 20 | BY MS. HURST: |
| 10:33 | 21 | Q.   Now, focusing on the language in that catalogue, |
| 10:33 | 22 | there's a description there on the right-hand side of |
| 10:33 | 23 | page 91, correct. |
| 10:33 | 24 | A.   Correct. |
| 10:33 | 25 | Q.   And let's just -- let's just spend a little time |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 98 of 158   Page ID #:310193
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

98

| 10:33 | 1 | looking at that. |
|---|---|---|
| 10:33 | 2 | It says, "Check out the Diva Starz figures, Alexa, |
| 10:33 | 3 | Paige, Summer and Tia, the only interactive cool-talking |
| 10:33 | 4 | teens that really 'know,'" quote/unquote, "what's up.  They |
| 10:33 | 5 | are fascinating, fun, and fashionable." |
| 10:33 | 6 | Did I read that correctly? |
| 10:33 | 7 | A.   Yes. |
| 10:33 | 8 | Q.   "The Diva Starz figures are four teen friends, each |
| 10:34 | 9 | with their own personality, ultra-trendy look, and cool |
| 10:34 | 10 | attitude." |
| 10:34 | 11 | Do you see that? |
| 10:34 | 12 | A.   Yes, I do. |
| 10:34 | 13 | Q.   You liked this product, right? -- when it was released |
| 10:34 | 14 | in 2000. |
| 10:34 | 15 | A.   Yes. |
| 10:34 | 16 | Q.   And you thought it was hip and edgy and a great new |
| 10:34 | 17 | advance for Mattel in the electronic fashion doll area, |
| 10:34 | 18 | true? |
| 10:34 | 19 | A.   Correct. |
| 10:34 | 20 | Q.   And the next part of the description in the catalogue |
| 10:34 | 21 | talks about the intelligence of the dolls, right? |
| 10:34 | 22 | A.   *(No response.)* |
| 10:34 | 23 | Q.   Sorry.  I need you to answer audibly. |
| 10:34 | 24 | A.   Yes. |
| 10:34 | 25 | Q.   Thank you.  And that's related to the electronics which |

| | | |
|---|---|---|
| 10:34 | 1 | were in the head, right? |
| 10:34 | 2 | A.    Correct. |
| 10:34 | 3 | Q.    And that's one of the reasons why it had such an |
| 10:34 | 4 | oversized head, true? |
| 10:34 | 5 | A.    Um, I don't recall where the electronics were. |
| 10:34 | 6 | Q.    You agree it has an oversized head? |
| 10:34 | 7 | A.    Yes. |
| 10:34 | 8 | Q.    The intelligence bullet point there, it says, "The Diva |
| 10:34 | 9 | Starz figures are smart; they have" -- "they talk" -- pardon |
| 10:35 | 10 | me -- "9 minutes of speech," in parens, and have life-like |
| 10:35 | 11 | conversations with you and with each other.  Diva Starz know |
| 10:35 | 12 | when you speak to them and they respond to you and each |
| 10:35 | 13 | other." |
| 10:35 | 14 | You see that? |
| 10:35 | 15 | A.    Yes. |
| 10:35 | 16 | Q.    And you really considered that to be a cutting-edge |
| 10:35 | 17 | product at the time, true? |
| 10:35 | 18 | A.    Yes. |
| 10:35 | 19 | Q.    Now, the next bullet point says, "Cool look, |
| 10:35 | 20 | personality, and attitude:  Diva Starz have an ultra-trendy |
| 10:35 | 21 | look and distinctive personalities," right? |
| 10:35 | 22 | A.    Yes. |
| 10:35 | 23 | Q.    And you thought that was correct at the time this |
| 10:35 | 24 | catalogue was put on the market, right? |
| 10:35 | 25 | A.    Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 100 of 158   Page ID #:310195
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:35 | 1 | Q.   And then the next four bullet points go on to describe |
| 10:35 | 2 | each of the four doll characters in the Diva Starz line, |
| 10:35 | 3 | correct? |
| 10:35 | 4 | A.   Correct. |
| 10:35 | 5 | Q.   And the first is "Glam Girl Alexa:  Into fashion and |
| 10:36 | 6 | loves pretty things.  She comes with a cat and a teddy |
| 10:36 | 7 | bear."  Right? |
| 10:36 | 8 | A.   Yes. |
| 10:36 | 9 | Q.   So "Alexa" that's a pretty distinctive name, right? |
| 10:36 | 10 | A.   Yes. |
| 10:36 | 11 | Q.   And "Glam Girl," that's her nickname, right? |
| 10:36 | 12 | A.   I don't know if that was her nickname. |
| 10:36 | 13 | Q.   You see there that for each of the four dolls -- |
| 10:36 | 14 | there's a "Glam Girl," an "Earthy Girl," a "Sporty Girl," |
| 10:36 | 15 | and an "Urban Girl"; do you see that? |
| 10:36 | 16 | A.   Yes. |
| 10:36 | 17 | Q.   Would it be fair to say those were nicknames for each |
| 10:36 | 18 | of the dolls describing their personalities? |
| 10:36 | 19 | A.   I would say they were descriptions. |
| 10:36 | 20 | Q.   Okay.  Now, Alexa, she came with a cat and a teddy |
| 10:36 | 21 | bear; is that right? |
| 10:36 | 22 | A.   Correct. |
| 10:36 | 23 | Q.   And were those -- was either the cat or the teddy bear |
| 10:36 | 24 | the mascots for Alexa? |
| 10:36 | 25 | A.   I don't recall. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | Q.   Now, the next doll was "Earthy Girl Summer:  Who loves |
| 10:37 | 2 | animals and cares about the environment.  She comes with a |
| 10:37 | 3 | bunny and a pretend CD player."  Right? |
| 10:37 | 4 | A.   Correct. |
| 10:37 | 5 | Q.   And then there was "Sporty Girl Paige:  Who loves the |
| 10:37 | 6 | outdoors and is fun to be around.  She comes with a dog and |
| 10:37 | 7 | a skateboard."  Right? |
| 10:37 | 8 | A.   Correct. |
| 10:37 | 9 | Q.   "Urban Girl Tia:  Is into computers and loves to surf |
| 10:37 | 10 | the net.  She comes with a dog and a pretend laptop." |
| 10:37 | 11 | Right? |
| 10:37 | 12 | A.   Correct. |
| 10:37 | 13 | Q.   Now, all of these things that came with the dolls were |
| 10:37 | 14 | called accessories, right? |
| 10:37 | 15 | A.   Correct. |
| 10:37 | 16 | Q.   And, of course, since these were fashion dolls, they |
| 10:37 | 17 | came with fashions, right? |
| 10:37 | 18 | A.   Correct. |
| 10:37 | 19 | Q.   And, as the next bullet point describes, there was |
| 10:37 | 20 | fashion play.  That was part of the play pattern of the |
| 10:37 | 21 | dolls, true? |
| 10:37 | 22 | A.   Correct. |
| 10:37 | 23 | Q.   "Fashion play," it says, "You can dress the Diva Starz |
| 10:37 | 24 | figures in their trendy fashions and they 'know,'" |
| 10:37 | 25 | quote/unquote, "what you put on them.  Six interactive |

| | | |
|---|---|---|
| 10:37 | 1 | fashions." Right? |
| 10:37 | 2 | A.   Correct. |
| 10:37 | 3 | Q.   And then "hair play."  That's also a standard feature |
| 10:38 | 4 | of fashion dolls, true? |
| 10:38 | 5 | A.   Correct. |
| 10:38 | 6 | Q.   And it says, "Hair play:  You can style the Diva Starz |
| 10:38 | 7 | figures' hair and they respond to your touch," paren, "(e.g. |
| 10:38 | 8 | ouch,)" end paren. |
| 10:38 | 9 | Did I read that correctly? |
| 10:38 | 10 | A.   Correct. |
| 10:38 | 11 | Q.   And the idea of having fashion play and hair play for |
| 10:38 | 12 | dolls, as of the year 2000 that was not a secret, right? |
| 10:38 | 13 | A.   No. |
| 10:38 | 14 | Q.   That was well-known to the industry, true? |
| 10:38 | 15 | A.   True. |
| 10:38 | 16 | Q.   Next it talks about, "Accessory play.  The Diva Starz |
| 10:38 | 17 | figures react and respond to their accessories, prompting |
| 10:38 | 18 | you to play and chat with them."  Is that right? |
| 10:38 | 19 | A.   Yes. |
| 10:38 | 20 | Q.   Again, having accessories with fashion dolls was not a |
| 10:38 | 21 | secret to the industry in the Fall of 2000, correct? |
| 10:38 | 22 | A.   Correct. |
| 10:38 | 23 | Q.   Then it says, "The Diva Starz figures really come to |
| 10:38 | 24 | life with realistic head and eye movements and motions." |
| 10:39 | 25 | Right? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 103 of 158  Page ID #:310198
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

103

| | | |
|---|---|---|
| 10:39 | 1 | A.  Correct. |
| 10:39 | 2 | Q.  "Each Diva Starz figure comes with six pieces of |
| 10:39 | 3 | clothing, five accessories, two hair clips and a brush." |
| 10:39 | 4 | Have I covered the description now? |
| 10:39 | 5 | A.  Yes. |
| 10:39 | 6 | Q.  All right.  Now, this is a -- if you look at the four |
| 10:39 | 7 | dolls there -- a multi-ethnic group, right? |
| 10:39 | 8 | A.  Correct. |
| 10:39 | 9 | Q.  And it's four dolls, right? |
| 10:39 | 10 | A.  Correct. |
| 10:39 | 11 | Q.  And they're hip and trendy, true? |
| 10:39 | 12 | A.  Correct. |
| 10:39 | 13 | Q.  And they have large oversized heads and feet, right? |
| 10:39 | 14 | A.  Correct. |
| 10:39 | 15 | Q.  Small noses, true? |
| 10:39 | 16 | A.  Correct. |
| 10:39 | 17 | Q.  Small bodies, true? |
| 10:39 | 18 | A.  Correct. |
| 10:39 | 19 | Q.  And you'd say they have an attitude, right? |
| 10:39 | 20 | A.  Yes. |
| 10:39 | 21 | Q.  They've got distinctive names, right? |
| 10:39 | 22 | A.  Correct. |
| 10:39 | 23 | Q.  They've got fashions, true? |
| 10:39 | 24 | A.  Correct. |
| 10:40 | 25 | Q.  They've got personalities, right? |

| | | |
|---|---|---|
| 10:40 | 1 | A.   As described, yes. |
| 10:40 | 2 | Q.   And those personalities are like a little back story |
| 10:40 | 3 | about who they are, right? |
| 10:40 | 4 | A.   Correct. |
| 10:40 | 5 | Q.   All right.  So let me ask you to look also at the box |
| 10:40 | 6 | with the accessories under Alexa there.  The first one on |
| 10:40 | 7 | the left. |
| 10:40 | 8 | Do you see that? |
| 10:40 | 9 | (Document displayed.) |
| 10:40 | 10 | THE WITNESS:  What box do you want me to look at? |
| 10:40 | 11 | MS. HURST:  Just that square that -- I'm sorry -- |
| 10:40 | 12 | in the catalogue.  My mistake. |
| 10:40 | 13 | THE WITNESS:  Yes. |
| 10:40 | 14 | BY MS. HURST: |
| 10:40 | 15 | Q.   You see that's a little picture depicting the fashions |
| 10:40 | 16 | and accessories that come with Alexa? |
| 10:40 | 17 | A.   Yes. |
| 10:40 | 18 | Q.   And Alexa was the one who comes with a cat and a teddy |
| 10:40 | 19 | bear, right? |
| 10:40 | 20 | A.   Yes. |
| 10:40 | 21 | Q.   And do you see there a little icon of a cat on Alexa's |
| 10:40 | 22 | fashions and accessories? |
| 10:40 | 23 | A.   Yes. |
| 10:40 | 24 | Q.   So this also had icons related to the little animals |
| 10:40 | 25 | that came with the dolls, true? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

105

| | | |
|---|---|---|
| 10:40 | 1 | A.   It appears to be. |
| 10:41 | 2 | Q.   Now, you actually had kind of a hard time coming up |
| 10:41 | 3 | with the name for this doll, right? |
| 10:41 | 4 | A.   I recall the same process that we had with any other |
| 10:41 | 5 | new toy.  We did our homework.  We looked at a lot of names, |
| 10:41 | 6 | and we generally did research and were very thoughtful about |
| 10:41 | 7 | the process. |
| 10:41 | 8 | Q.   In that thoughtful process, you considered a number of |
| 10:41 | 9 | different names? |
| 10:41 | 10 | A.   Correct. |
| 10:41 | 11 | Q.   And one of the names that you considered was "Bratz," |
| 10:41 | 12 | true? |
| 10:41 | 13 | A.   Correct. |
| 10:41 | 14 | Q.   Now, was that Bratz with an "S" or Bratz with a "Z"? |
| 10:41 | 15 | A.   I don't remember. |
| 10:41 | 16 | Q.   So it might even have been that you considered "Bratz" |
| 10:41 | 17 | with a "Z" for this doll, right? |
| 10:41 | 18 | A.   I -- |
| 10:41 | 19 | MR. ZELLER:  Calls for speculation. |
| 10:41 | 20 | THE COURT:  Overruled. |
| 10:41 | 21 | You can answer the question. |
| 10:41 | 22 | BY MS. HURST: |
| 10:42 | 23 | Q.   Do you think that looking at your deposition might |
| 10:42 | 24 | help? |
| 10:42 | 25 | A.   Absolutely.  That would be great. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:42 | 1 | Q.   Let me ask you to take a look in your deposition of |
| 10:42 | 2 | January 6, 2008.  Mr. Rorie's got it there for you.  Just |
| 10:42 | 3 | make sure I've got the right page for you here.  Take a look |
| 10:42 | 4 | at page 138. |
| 10:42 | 5 | (Document provided to the witness.) |
| 10:42 | 6 | MS. HURST:  The bottom of 137 at line 24, and |
| 10:42 | 7 | carrying over to 138, line 14. |
| 10:43 | 8 | THE WITNESS:  Yes. |
| 10:43 | 9 | BY MS. HURST: |
| 10:43 | 10 | Q.   Okay.  Does that help you remember whether you |
| 10:43 | 11 | considered "Bratz" with a "Z"? |
| 10:43 | 12 | A.   Yes, it's very helpful. |
| 10:43 | 13 | Q.   And what was the answer. |
| 10:43 | 14 | A.   The answer was, "Yes, of course." |
| 10:43 | 15 | Q.   Okay.  Thank you. |
| 10:43 | 16 | Now, at the time that you considered the name Bratz, |
| 10:43 | 17 | you believed that Mattel had a strong obligation and loyalty |
| 10:43 | 18 | to girls not to market anything that was negative or |
| 10:43 | 19 | inappropriate, true? |
| 10:43 | 20 | A.   Correct. |
| 10:43 | 21 | Q.   And you did not like the idea of what Bratz connoted, |
| 10:43 | 22 | correct? |
| 10:43 | 23 | A.   Specifically, I thought that the word "Bratz" connoted |
| 10:43 | 24 | a spoiled brat and, in the context of Diva Starz, did not |
| 10:43 | 25 | think that it was appropriate and the best name for the |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

107

| | | |
|---|---|---|
| 10:44 | 1 | brand that we were set to market. |
| 10:44 | 2 | Q.   It's true, in looking at the "Bratz" name, you didn't |
| 10:44 | 3 | like the idea of what Bratz connoted, correct? |
| 10:44 | 4 | MR. ZELLER:  Question's vague. |
| 10:44 | 5 | THE COURT:  Overruled. |
| 10:44 | 6 | THE WITNESS:  I did not like the name "Bratz" in |
| 10:44 | 7 | relationship to the product Diva Starz. |
| 10:44 | 8 | MS. HURST:  Your Honor, I request permission to |
| 10:44 | 9 | read from the transcript at page 150, lines 5 through 12. |
| 10:44 | 10 | And, Ms. Fontanella, you may wish to look at that, |
| 10:44 | 11 | as well, 150, 5 through 12. |
| 10:45 | 12 | THE COURT:  You may. |
| 10:45 | 13 | THE WITNESS:  Yes. |
| 10:45 | 14 | *(Document displayed.)* |
| 10:45 | 15 | MS. HURST:  (Reading:) |
| 10:45 | 16 | "QUESTION:  What do you recall about that? |
| 10:45 | 17 | "ANSWER:  I recall that I had -- I and also the |
| 10:45 | 18 | marketing group had a very strong obligation and loyalty to |
| 10:45 | 19 | girls to present things that were in -- in good taste and |
| 10:45 | 20 | had -- didn't suggest anything negative or not appropriate. |
| 10:45 | 21 | And I think, in looking at the 'Bratz' name, I didn't like |
| 10:45 | 22 | the idea of what Bratz connoted." |
| 10:45 | 23 | THE WITNESS:  This was said in the context of did |
| 10:45 | 24 | I think the name was appropriate for Diva Starz.  And I |
| 10:45 | 25 | didn't think that the positioning of Diva Starz was about |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:46 | 1 | spoiled brats. |
| 10:46 | 2 | MS. HURST:  Your Honor, there's no question |
| 10:46 | 3 | pending. |
| 10:46 | 4 | THE COURT:  Overruled. |
| 10:46 | 5 | BY MS. HURST: |
| 10:46 | 6 | Q.   You have page 150 there in front of you, that question |
| 10:46 | 7 | and answer that I just read? |
| 10:46 | 8 | A.   Yes. |
| 10:46 | 9 | Q.   And you gave testimony at the time that, in looking at |
| 10:46 | 10 | the Bratz name, you didn't like the idea of what Bratz |
| 10:46 | 11 | connoted, true? |
| 10:46 | 12 | A.   In the context of Diva Starz. |
| 10:46 | 13 | Q.   Okay.  Did you say "in the context of Diva Starz" in |
| 10:46 | 14 | that sentence there? |
| 10:46 | 15 | A.   Well, I think that the sentence before says, "You |
| 10:46 | 16 | mentioned before, the name Bratz was a name you considered |
| 10:46 | 17 | for Diva Starz."  So it's in the context of Diva Starz. |
| 10:46 | 18 | Q.   So you're saying you -- you rejected the name Bratz for |
| 10:46 | 19 | Diva Starz, true? |
| 10:46 | 20 | A.   I didn't think it was the best name. |
| 10:46 | 21 | Q.   Okay.  And you rejected it, right? |
| 10:47 | 22 | A.   I did not think this was the best name. |
| 10:47 | 23 | Q.   And you rejected it, correct? |
| 10:47 | 24 | A.   Correct. |
| 10:47 | 25 | Q.   You rejected it for a doll that was four multi-ethnic |

| 10:47 | 1 | friends and oversized heads and feet with fashion play and |
| 10:47 | 2 | hair play, correct? |
| 10:47 | 3 | A.   That had voice recognition.  And that was the key |
| 10:47 | 4 | component of Diva Starz:  The voice recognition and they |
| 10:47 | 5 | were smart. |
| 10:47 | 6 | Q.   You rejected the name "Bratz" for a doll with big head, |
| 10:47 | 7 | oversized feet, four multi-ethnic friends, fashion play, |
| 10:47 | 8 | hair play, and talking, correct? |
| 10:47 | 9 | MR. ZELLER:  This is compound and misstates her |
| 10:47 | 10 | testimony. |
| 10:47 | 11 | THE COURT:  Overruled. |
|  | 12 | BY MS. HURST: |
| 10:47 | 13 | Q.   Is that correct? |
| 10:47 | 14 | A.   Correct. |
| 10:47 | 15 | Q.   Now, you first saw MGA's Bratz sometime in around July |
| 10:48 | 16 | of 2001, before it was even released in the United States, |
| 10:48 | 17 | right? |
| 10:48 | 18 | A.   Correct. |
| 10:48 | 19 | Q.   It was first released in Spain in mid 2001.  You were |
| 10:48 | 20 | aware of that? |
| 10:48 | 21 | A.   Correct, yes. |
| 10:48 | 22 | Q.   You learned that Bratz was being distributed in Spain |
| 10:48 | 23 | by a company called Bandai, right? |
| 10:48 | 24 | A.   Correct. |
| 10:48 | 25 | MS. HURST:  Can we give the witness Exhibit 34833, |

| | | |
|---|---|---|
| 10:48 | 1 | please. |
| 10:48 | 2 | (Document provided to the witness.) |
| 10:48 | 3 | BY MS. HURST: |
| 10:48 | 4 | Q.   Now, as with many e-mail threads, Ms. Fontanella, this |
| 10:48 | 5 | is the kind where you start at the bottom on the last page |
| 10:48 | 6 | and read up in order to understand the e-mails in |
| 10:49 | 7 | chronological order.  So you may wish to turn to the third |
| 10:49 | 8 | page of Exhibit 34833. |
| 10:49 | 9 | And do you see that's an e-mail from Linda DeHaven on |
| 10:49 | 10 | behalf of Adrienne Fontanella to Ben van Doesburgh, dated |
| 10:49 | 11 | August 29, 2001? |
| 10:49 | 12 | A.   Yes. |
| 10:49 | 13 | Q.   And who was Melinda DeHaven in August 2001? |
| 10:49 | 14 | A.   She was my assistant. |
| 10:49 | 15 | Q.   And who was Mr. Doesburgh? |
| 10:49 | 16 | A.   He was in charge of, I believe, Europe, an executive or |
| 10:49 | 17 | senior vice president. |
| 10:49 | 18 | Q.   And Ms. DeHaven was authorized to send e-mails on your |
| 10:49 | 19 | behalf like this; is that true? |
| 10:49 | 20 | A.   Yes. |
| 10:49 | 21 | Q.   And you see, if you continue up through the e-mail |
| 10:49 | 22 | thread, that your name appears on the next e-mail in time, |
| 10:50 | 23 | August 30th 2001, correct? |
| 10:50 | 24 | A.   Correct. |
| 10:50 | 25 | Q.   And then on the September 3rd, 2001 e-mail, correct? |

| | | |
|---|---|---|
| 10:50 | 1 | A.   Correct. |
| 10:50 | 2 | Q.   And then you're a CC on the September 5th, 2001, |
| 10:50 | 3 | correct? |
| 10:50 | 4 | A.   Correct. |
| 10:50 | 5 | Q.   And again, you're a CC on the second September 5th, |
| 10:50 | 6 | 2001 e-mail on this thread? |
| 10:50 | 7 | A.   Correct. |
| 10:50 | 8 | Q.   And now we're at the bottom of the first page.  You're |
| 10:50 | 9 | a CC on the September 6th, 2001 e-mail, correct? |
| 10:50 | 10 | A.   Correct. |
| 10:50 | 11 | Q.   And on the second September 6th, 2001 e-mail, right? |
| 10:50 | 12 | A.   Correct. |
| 10:50 | 13 | Q.   And then there's a jump in time, and the thread |
| 10:50 | 14 | continues from you on September 17, 2001, right? |
| 10:50 | 15 | A.   Correct. |
| 10:50 | 16 | Q.   And then, finally, the last e-mail in time, which is to |
| 10:50 | 17 | you, is dated September 18, 2001, right? |
| 10:50 | 18 | A.   Correct. |
| 10:50 | 19 |        MS. HURST:  Your Honor, move to admit the thread, |
| 10:50 | 20 | 34833, in its entirety. |
| 10:50 | 21 |        THE COURT:  Received. |
| 10:50 | 22 |        *(Exhibit No. 34833 received in evidence.)* |
| 10:51 | 23 |         *(Document displayed.)* |
| | 24 | BY MS. HURST: |
| 10:51 | 25 | Q.   Now, let's start with that bottom e-mail on the third |

| | | |
|---|---|---|
| 10:51 | 1 | page. |
| 10:51 | 2 | (Document displayed.) |
| 10:51 | 3 | BY MS. HURST: |
| 10:51 | 4 | Q.   Ms. DeHaven wrote on your behalf to Mr. Doesburgh, |
| 10:51 | 5 | "Adrienne is out of town right now, but just wanted me to |
| 10:51 | 6 | make sure that you had spoken with Anne, and that all was |
| 10:51 | 7 | okay.  You had called Adrienne on 8/20/01 and said you would |
| 10:51 | 8 | either speak with Anne or e-mail Adrienne, and we haven't |
| 10:51 | 9 | received an e-mail, so she wanted to follow up." |
| 10:51 | 10 | And Ms. DeHaven sent that on your behalf to |
| 10:51 | 11 | Mr. Doesburgh, correct? |
| 10:51 | 12 | A.   Correct. |
| 10:51 | 13 | Q.   And then Mr. Doesburgh, in the next e-mail, responded |
| 10:51 | 14 | to you, correct? |
| 10:51 | 15 | A.   Correct. |
| 10:51 | 16 | Q.   And he said he discussed the subject matter with Anne, |
| 10:51 | 17 | "Thanks for following up," right? |
| 10:51 | 18 | A.   Yes. |
| 10:51 | 19 | Q.   And you understood that to be a reference to Anne |
| 10:51 | 20 | Parducci, right? |
| 10:51 | 21 | A.   Correct. |
| 10:51 | 22 | Q.   And at the time she was responsible for Barbie |
| 10:52 | 23 | marketing, right? |
| 10:52 | 24 | A.   Correct. |
| 10:52 | 25 | Q.   Now, Mr. Doesburgh goes on to say, "One other matter |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

113

| | | |
|---|---|---|
| 10:52 | 1 | that I wanted to discuss with Adrienne is the Bratz doll |
| 10:52 | 2 | recently launched in Spain.  They achieved 15 percent share |
| 10:52 | 3 | in the first share reading.  I just saw the commercial, and |
| 10:52 | 4 | I find it very aggressive versus Barbie.  The commercial |
| 10:52 | 5 | starts with four Barbie-like pink girls with straight blonde |
| 10:52 | 6 | hair who are somewhat ridiculed and, in the next scene, |
| 10:52 | 7 | replaced with the cool Bratz dolls." |
| 10:52 | 8 | And then Mr. Doesburgh continued, "I would not worry |
| 10:52 | 9 | too much about that if they did not have such a success in |
| 10:52 | 10 | the first share period and if Bratz was not a Bandai |
| 10:52 | 11 | product.  I find the approach too aggressive for a company |
| 10:52 | 12 | who is a partner elsewhere in the world.  Furthermore, I am |
| 10:52 | 13 | afraid the Spanish launch is a test for a wider European |
| 10:52 | 14 | launch. |
| 10:52 | 15 | "By copy of this memo, I am asking Rosa to send the |
| 10:53 | 16 | commercial and a sample of the doll to your and Anne's |
| 10:53 | 17 | attention.  Maybe you can raise the subject at a higher |
| 10:53 | 18 | level." |
| 10:53 | 19 | That was an e-mail you received from Mr. Doesburgh on |
| 10:53 | 20 | or about October 30th, 2001, true? |
| 10:53 | 21 | A.   Correct. |
| 10:53 | 22 | Q.   And at that time Bandai had a business relationship |
| 10:53 | 23 | with Mattel, correct? |
| 10:53 | 24 | A.   Correct. |
| 10:53 | 25 | Q.   What was that business relationship with Mattel? |

| | | |
|---|---|---|
| 10:53 | 1 | A.   I was not involved in that.  That was, I believe, a |
| 10:53 | 2 | Boys business relationship. |
| 10:53 | 3 | Q.   Okay.  Did Bandai distribute for Mattel in Latin |
| 10:53 | 4 | America? |
| 10:53 | 5 | A.   I really was not familiar with Bandai.  I recall that |
| 10:53 | 6 | it was a Boys arrangement. |
| 10:53 | 7 | Q.   Now, the next response on the thread was from |
| 10:53 | 8 | Ms. Parducci; is that right? -- on September 3rd. |
| 10:53 | 9 | A.   Correct. |
| 10:53 | 10 | Q.   And that was to Mr. van Doesburgh and to you, right? |
| 10:54 | 11 | A.   Correct. |
| 10:54 | 12 | Q.   And then it was CC'd to a number of other people, |
| 10:54 | 13 | right? |
| 10:54 | 14 | A.   Correct. |
| 10:54 | 15 | Q.   Rosa Zeegers, what was she doing she doing at the time? |
| 10:54 | 16 | A.   She was the Barbie brand person based in Europe that |
| 10:54 | 17 | worked with the U.S. team. |
| 10:54 | 18 | Q.   Okay.  So she was like the interface between Barbie |
| 10:54 | 19 | brand in Europe and Barbie brand in U.S.? |
| 10:54 | 20 | A.   Yes. |
| 10:54 | 21 | Q.   And she facilitated communication between those groups? |
| 10:54 | 22 | A.   Correct. |
| 10:54 | 23 | Q.   And then Jamie Cygielman, she was in Barbie marketing |
| 10:54 | 24 | at the time? |
| 10:54 | 25 | A.   Correct. |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

115

| 10:54 | 1 | Q.   Matthew Turetzky, he was VP of strategic planning at |
| 10:54 | 2 | the time? |
| 10:54 | 3 | A.   He had a number of different roles.  I'm not sure what |
| 10:54 | 4 | his roles was at this. |
| 10:54 | 5 | Q.   It's true he always held the title of vice president or |
| 10:54 | 6 | above, correct? |
| 10:54 | 7 | A.   Correct. |
| 10:54 | 8 | Q.   Bill Guarisco, he was in sales? |
| 10:54 | 9 | A.   Bill Guarisco, I remember when he was in finance.  He |
| 10:55 | 10 | may have subsequently been in sales. |
| 10:55 | 11 | Q.   All right.  He was also a fairly senior executive, |
| 10:55 | 12 | true? |
| 10:55 | 13 | A.   Correct. |
| 10:55 | 14 | Q.   And who was John Cullen? |
| 10:55 | 15 | A.   John Cullen, I believe, had the same position as Rosa, |
| 10:55 | 16 | but had the scope of Asia. |
| 10:55 | 17 | Q.   Okay.  So responsible for coordinating Barbie brand |
| 10:55 | 18 | communications between the U.S. and the Asia groups? |
| 10:55 | 19 | A.   I believe so. |
| 10:55 | 20 | Q.   And then Chris Willson-White, who was that at the time? |
| 10:55 | 21 | A.   He was part of the international team based in the |
| 10:55 | 22 | U.S., I believe. |
| 10:55 | 23 | Q.   All right.  Now, Ms. Parducci was the head of all |
| 10:55 | 24 | Barbie marketing at the time this e-mail was wrote, true? |
| 10:55 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

116

| 10:55 | 1 | Q. She wrote, "We have a sample of the doll, and thanks |
| 10:55 | 2 | for sending the commercial. The dolls are also being |
| 10:55 | 3 | distributed in the U.S. at TRU and Target. TRU says they |
| 10:56 | 4 | are doing very well. Bratz is actually a MGA product |
| 10:56 | 5 | distributed in Spain by Bandai." |
| 10:56 | 6 | And that reference there to "TRU," that means Toys R |
| 10:56 | 7 | Us, right? |
| 10:56 | 8 | A. Correct. |
| 10:56 | 9 | Q. Now, the next sentence is, "The Brand" –– with a |
| 10:56 | 10 | capital B –– "is investigating if we have any actions to |
| 10:56 | 11 | take with Bandai," right? |
| 10:56 | 12 | A. Correct. |
| 10:56 | 13 | Q. And "the Brand," capital B, around Mattel, that was the |
| 10:56 | 14 | Barbie brand, right? |
| 10:56 | 15 | A. Correct. |
| 10:56 | 16 | Q. "We should at least know what their plans are. |
| 10:56 | 17 | "John, any input?" |
| 10:56 | 18 | That's how the e-mail finishes, right? |
| 10:56 | 19 | A. Correct. |
| 10:56 | 20 | Q. And then Chris Willson-White, was that a man or woman? |
| 10:56 | 21 | I'm sorry. |
| 10:56 | 22 | A. A man. |
| 10:56 | 23 | Q. A man. Mr. Willson-White responds next, right? |
| 10:56 | 24 | A. Correct. |
| 10:56 | 25 | Q. And he says, "We raised this issue with Bandai senior |

| | | |
|---|---|---|
| 10:56 | 1 | management a couple of weeks ago, and expressed concern that |
| 10:56 | 2 | one of their subsidiaries was distributing competitive |
| 10:56 | 3 | product." |
| 10:56 | 4 | That's what it says, right? |
| 10:56 | 5 | A.   Correct. |
| 10:56 | 6 | Q.   And then it goes on to say that, "Bandai tried to argue |
| 10:57 | 7 | that Bratz was not a competitive product," right? |
| 10:57 | 8 | A.   Correct. |
| 10:57 | 9 | Q.   And that this was limited to Spain only so Mattel |
| 10:57 | 10 | shouldn't be worried about it, right? |
| 10:57 | 11 | A.   Correct. |
| 10:57 | 12 | Q.   And Mr. Willson-White says, "But we're negotiating with |
| 10:57 | 13 | Bandai right now," true? |
| 10:57 | 14 | A.   True. |
| 10:57 | 15 | Q.   You see that? |
| 10:57 | 16 | A.   Yes. |
| 10:57 | 17 | Q.   And he says, "Hopefully we can include some terminology |
| 10:57 | 18 | in the revised contract that will preclude them from |
| 10:57 | 19 | entering into future distribution agreements of this |
| 10:57 | 20 | nature," right? |
| 10:57 | 21 | A.   Correct. |
| 10:57 | 22 | Q.   So you were looking to leverage Bandai not to |
| 10:57 | 23 | distribute Bratz, right? |
| 10:57 | 24 | A.   It appears that that's what this implies. |
| 10:57 | 25 | Q.   Okay.   Then Ms. Parducci responds further, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:57 | 1 | A.   Yes. |
| 10:57 | 2 | Q.   She says, "Thanks for the update," right? |
| 10:58 | 3 | A.   Yes. |
| 10:58 | 4 | Q.   "I think the immediate goal would be to ensure the |
| 10:58 | 5 | distribution does not go beyond Spain." |
| 10:58 | 6 |      That's what Parducci wrote, right? |
| 10:58 | 7 | A.   Correct. |
| 10:58 | 8 | Q.   Okay.  So, in other words, go to Bandai and negotiate |
| 10:58 | 9 | and make sure they don't distribute anywhere other than |
| 10:58 | 10 | Spain, right?  That was Ms. Parducci's instruction? |
| 10:58 | 11 | A.   No, not necessarily.  I think that whenever we had a |
| 10:58 | 12 | distributor that was distributing a competitive product, it |
| 10:58 | 13 | was absolutely a concern.  I mean, that made perfect sense. |
| 10:58 | 14 | It was just something that we questioned, we wanted to |
| 10:58 | 15 | understand. |
| 10:58 | 16 |      They had access to information that was confidential, |
| 10:58 | 17 | that was proprietary, um, because they were distributing the |
| 10:58 | 18 | product, and they were working with a competitor.  And so |
| 10:58 | 19 | that was an absolutely natural concern. |
| 10:58 | 20 | Q.   In other words, she gave the instruction to try to get |
| 10:59 | 21 | Bandai to agree not to distribute anywhere other that Spain, |
| 10:59 | 22 | for whatever justifications you may wish to offer? |
| 10:59 | 23 |           MR. ZELLER:  That's argumentative. |
| 10:59 | 24 |           THE COURT:  Sustained. |
| 10:59 | 25 |           Strike the "wish to offer." |

| | | |
|---|---|---|
| 10:59 | 1 | Just restate the question, Counsel. |
| 10:59 | 2 | BY MS. HURST: |
| 10:59 | 3 | Q.   Isn't it true that Ms. Parducci instructed these people |
| 10:59 | 4 | to try to get Bandai to agree not to distribute Bratz |
| 10:59 | 5 | outside of Spain? |
| 10:59 | 6 | A.   That's not how I interpret it. |
| 10:59 | 7 | Q.   Okay.  Let me see if I'm reading it correctly, then. |
| 10:59 | 8 | Does it say, "I think the immediate goal would be to ensure |
| 10:59 | 9 | the distribution does not go beyond Spain." |
| 10:59 | 10 | Is that what it says? |
| 10:59 | 11 | A.   That's what it says. |
| 10:59 | 12 | Q.   Okay.  Now, the next e-mail is from Ms. Zeegers, right? |
| 10:59 | 13 | A.   Yes. |
| 10:59 | 14 | Q.   That liaison between U.S. and Europe? |
| 10:59 | 15 | A.   Yes. |
| 10:59 | 16 | Q.   And she says, "The package I have on my desk has |
| 11:00 | 17 | Spanish, German, English, Dutch and French on it," right? |
| 11:00 | 18 | A.   Correct. |
| 11:00 | 19 | Q.   "Regine, Trudy, Angela, Maria" -- now she's added a |
| 11:00 | 20 | bunch of people to the e-mail, right? |
| 11:00 | 21 | A.   It appears that way. |
| 11:00 | 22 | Q.   Okay.  She's added Regine Jean-Rabechault, J-E-A-N, |
| 11:00 | 23 | hyphen, R-A-B-E-C-H-A-U-L-T, right? |
| 11:00 | 24 | A.   Correct. |
| 11:00 | 25 | Q.   She's added Trudy van Oosten, O-O-S-T-E-N, right? |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

120

| | | |
|---|---|---|
| 11:00 | 1 | A.   Correct. |
| 11:00 | 2 | Q.   She's added Angela Zirilli, Z-I-R-I-L-L-I, true? |
| 11:00 | 3 | A.   Correct. |
| 11:00 | 4 | Q.   And she's added Maria Busch, B-U-S-C-H, there on the |
| 11:00 | 5 | end there, right? |
| 11:00 | 6 | A.   Correct. |
| 11:00 | 7 | Q.   These are all people with country management |
| 11:00 | 8 | responsibilities for fashion dolls, right? |
| 11:00 | 9 | A.   I don't recall. |
| 11:00 | 10 | Q.   That would be reasonable to conclude, looking at the |
| 11:01 | 11 | e-mail, right? |
| 11:01 | 12 | A.   It would be reasonable to conclude.  Absolutely. |
| 11:01 | 13 | Q.   All right.  So she says, "Regine, Trudy, Angela, Maria, |
| 11:01 | 14 | can you give any feedback to Chris as to whether the product |
| 11:01 | 15 | is already distributed in your market or expected," right? |
| 11:01 | 16 | A.   Correct. |
| 11:01 | 17 | Q.   So you're trying -- I mean, we've got, you know, maybe |
| 11:01 | 18 | ten people now trying to find out where is Bratz gonna be |
| 11:01 | 19 | distributed in Europe, right? |
| 11:01 | 20 | A.   Correct. |
| 11:01 | 21 | Q.   Okay.  And then Angela Zirilli responds, right? |
| 11:01 | 22 | A.   Correct. |
| 11:01 | 23 | Q.   And she responds on September 6th, 2001, right? |
| 11:01 | 24 | A.   Correct. |
| 11:01 | 25 | Q.   "Hi, Rosa.  For the UK, this is all I know: |

DEBBIE GALE, U.S. COURT REPORTER

| 11:01 | 1 | "Definitely being launched in the market. |
| 11:01 | 2 | "Very good trade response and listings so far. |
| 11:01 | 3 | "Being distributed by Bandai. |
| 11:01 | 4 | "Is set for launch and TV advertising in October 2001." |
| 11:01 | 5 | Right?  That was what she wrote? |
| 11:02 | 6 | A.   Correct. |
| 11:02 | 7 | Q.   And then she said, "I thought this was a mini doll not |
| 11:02 | 8 | a fashion doll?  Please clarify.  Thanks."  Right? |
| 11:02 | 9 | A.   Correct. |
| 11:02 | 10 | Q.   Because a mini doll would not be considered to be in |
| 11:02 | 11 | the same category as a fashion doll, true? |
| 11:02 | 12 | MR. ZELLER:  Question's vague. |
| 11:02 | 13 | THE COURT:  Overruled. |
| 11:02 | 14 | You can answer the question. |
| 11:02 | 15 | THE WITNESS:  Correct. |
| 11:02 | 16 | THE COURT:  Thank you. |
| 11:02 | 17 | BY MS. HURST: |
| 11:02 | 18 | Q.   And then you responded, right? |
| 11:02 | 19 | A.   Yes. |
| 11:02 | 20 | Q.   On September 17th? |
| 11:02 | 21 | A.   Yes. |
| 11:02 | 22 | Q.   "Is Bratz being distributed in other countries," paren, |
| 11:02 | 23 | "(other than Spain and UK)" end paren, "by Bandai?"  Right? |
| 11:02 | 24 | A.   Correct. |
| 11:02 | 25 | Q.   You were focused specifically on where Bandai was |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

122

| 11:02 | 1 | distributing the product, right? |
|---|---|---|
| 11:02 | 2 | A.   No.  I was responsible for understanding where a |
| 11:02 | 3 | competitive product was being distributed in Europe. |
| 11:02 | 4 | We were in the business of making dolls and were |
| 11:03 | 5 | responsible for the -- the ensuring the success of our doll. |
| 11:03 | 6 | We clearly were interested in where competitive product was |
| 11:03 | 7 | being launched, regardless of who was launching it or |
| 11:03 | 8 | distributing it. |
| 11:03 | 9 | Q.   Does the e-mail say, "Where else is the product being |
| 11:03 | 10 | launched, regardless of who's distributing it?"  Does it say |
| 11:03 | 11 | that? |
| 11:03 | 12 | A.   Well, Bandai was distributing it, so I just assumed |
| 11:03 | 13 | that they would continue to distribute it.  And all I wanted |
| 11:03 | 14 | to know in this question was where else is it being |
| 11:03 | 15 | distributed. |
| 11:03 | 16 | MS. HURST:  Your Honor, that's nonresponsive. |
| 11:03 | 17 | THE COURT:  Overruled. |
| 11:03 | 18 | BY MS. HURST: |
| 11:03 | 19 | Q.   Does the e-mail say, "Is Bratz being distributed in |
| 11:03 | 20 | other countries by other distributors?"  Does it say that? |
| 11:03 | 21 | A.   No. |
| 11:03 | 22 | Q.   Does it say, "Is Bratz being distributed in other |
| 11:03 | 23 | countries by MGA?"  Does it say that? |
| 11:03 | 24 | A.   No. |
| 11:03 | 25 | Q.   It says, "Is Bratz being distributed in other countries |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 123 of 158   Page ID #:310218
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

123

| | | |
|---|---|---|
| 11:04 | 1 | by Bandai?"  True? |
| 11:04 | 2 | A.   I -- yes.  I mean, I just wanted to know where it was |
| 11:04 | 3 | distributed. |
| 11:04 | 4 | Q.   By Bandai, right? |
| 11:04 | 5 | A.   I didn't really care who was distributing it.  I was |
| 11:04 | 6 | more concerned where it was being distributed and what |
| 11:04 | 7 | markets it was entering. |
| 11:04 | 8 | Q.   You didn't care at all that it was your business |
| 11:04 | 9 | partner, Bandai, who was distributing it throughout Europe; |
| 11:04 | 10 | is that your testimony? |
| 11:04 | 11 | MR. ZELLER:  Misstates the witness's testimony. |
| 11:04 | 12 | Argumentative. |
| 11:04 | 13 | THE COURT:  Overruled. |
| 11:04 | 14 | THE WITNESS:  My concern was where was this |
| 11:04 | 15 | competitive product -- that we need to beware of and |
| 11:04 | 16 | understand what their strategy was -- where was it being |
| 11:04 | 17 | distributed. |
| 11:04 | 18 | BY MS. HURST: |
| 11:04 | 19 | Q.   And by whom, correct? |
| 11:04 | 20 | A.   That was a tangential issue but it was, obviously, |
| 11:05 | 21 | gonna be distributed by somebody. |
| 11:05 | 22 | Q.   Well, Mr. Cullen responded to your e-mail, right? |
| 11:05 | 23 | A.   Correct. |
| 11:05 | 24 | Q.   And you said he was a finance guy? |
| 11:05 | 25 | A.   No.  John was basically, I believe at the time, in the |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 124 of 158   Page ID #:310219
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

124

| 11:05 | 1 | same position as, uh, Rosa was, representing the brand -- |
| 11:05 | 2 | the doll brand with Asia -- |
| 11:05 | 3 | Q.   Thank you. |
| 11:05 | 4 | A.   -- the liaison. |
| 11:05 | 5 | Q.   Thank you.  I forgot some of the names as we were going |
| 11:05 | 6 | through there.  I apologize. |
| 11:05 | 7 | So Mr. Cullen responded to you and Ms. Parducci and |
| 11:05 | 8 | Rosa, right? |
| 11:05 | 9 | A.   Yes. |
| 11:05 | 10 | Q.   And now he's -- actually, Jerome Bossick has been added |
| 11:05 | 11 | to the thread here by you on September 17th, right? |
| 11:05 | 12 | A.   Correct. |
| 11:05 | 13 | Q.   And Jerome Bossick was a senior vice president of |
| 11:05 | 14 | strategy at the time? |
| 11:05 | 15 | A.   And finance. |
| 11:05 | 16 | Q.   Okay.  Senior vice president of strategy and finance, |
| 11:06 | 17 | right? |
| 11:06 | 18 | A.   Correct. |
| 11:06 | 19 | Q.   And you added him because you thought this was |
| 11:06 | 20 | significant, right? |
| 11:06 | 21 | A.   Jerry was on every -- almost every e-mail that I wrote. |
| 11:06 | 22 | He was my right-hand man.  He, uh, was -- operated like a |
| 11:06 | 23 | COO for me.  And it was very, very common for Jerry to be on |
| 11:06 | 24 | an e-mail on anything large/small that I wrote. |
| 11:06 | 25 | Q.   Okay.  He was your go-to guy? |

| | | |
|---|---|---|
| 11:06 | 1 | A.   He was my go-to guy. |
| 11:06 | 2 | Q.   All right.  Now, Mr. Cullen responded to you and |
| 11:06 | 3 | Ms. Parducci and Ms. Zeegers and Mr. Bossick and |
| 11:06 | 4 | Mr. Willson-White, right? |
| 11:06 | 5 | A.   Correct. |
| 11:06 | 6 | Q.   And he said, "Bratz is being distributed by TOMY" -- |
| 11:06 | 7 | all caps T-O-M-Y -- "in Japan," right? |
| 11:06 | 8 | A.   Correct. |
| 11:06 | 9 | Q.   And he also goes on to talk about the Bratz Europe |
| 11:07 | 10 | deal, right? |
| 11:07 | 11 | A.   Correct. |
| 11:07 | 12 | Q.   He says, "The Bratz Europe deal, if there is such a |
| 11:07 | 13 | thing, was apparently brokered by Bandai UK and covers UK, |
| 11:07 | 14 | Spain, and one other country, Italy, I believe," right? |
| 11:07 | 15 | A.   Correct. |
| 11:07 | 16 | Q.   So Mr. Cullen responded to your e-mail with information |
| 11:07 | 17 | about who was distributing Bratz in Japan, and where Bandai |
| 11:07 | 18 | was distributing Bratz in Europe, right? |
| 11:07 | 19 | A.   Correct. |
| 11:07 | 20 | Q.   So Mr. Cullen certainly understood that you were asking |
| 11:07 | 21 | who and where was the product being distributed, true? |
| 11:07 | 22 | A.   I just wanted to know where it was gonna show up on the |
| 11:07 | 23 | shelves. |
| 11:07 | 24 | Q.   And you didn't want to know who? |
| 11:07 | 25 | A.   It wasn't as important.  But, yes, as a matter of fact, |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

126

| 11:07 | 1 | I mean, sure tell me who if you know who. |
|---|---|---|
| 11:07 | 2 | Q.   Okay.  And then Mr. Cullen writes, "In bringing this up |
| 11:07 | 3 | with Bandai, they seemed to think it was not big business, |
| 11:07 | 4 | but they may have been purposely downplaying it," right? |
| 11:07 | 5 | A.   Yes. |
| 11:08 | 6 | Q.   And they would purposely downplay it because they don't |
| 11:08 | 7 | want Mattel to hammer them for distributing a competitive |
| 11:08 | 8 | product, right? |
| 11:08 | 9 | A.   I don't know. |
| 11:08 | 10 | MR. ZELLER:  Argumentative. |
| 11:08 | 11 | THE COURT:  Overruled. |
| 11:08 | 12 | MR. ZELLER:  Hammered? |
| 11:08 | 13 | THE COURT:  Well, "hammering," you're correct |
| 11:08 | 14 | Counsel.  Sustained as to that. |
| 11:08 | 15 | BY MS. HURST: |
| 11:08 | 16 | Q.   And they would downplay it because they don't want |
| 11:08 | 17 | Mattel to take reprisals against them in their business |
| 11:08 | 18 | relationship, right? |
| 11:08 | 19 | A.   Not necessarily. |
| 11:08 | 20 | Q.   Isn't that one of the reasons that you would expect |
| 11:08 | 21 | that they would downplay the distribution of a competitive |
| 11:08 | 22 | product:  That they did not want Mattel to take reprisals |
| 11:08 | 23 | against them in consideration with the business |
| 11:08 | 24 | relationship? |
| 11:08 | 25 | A.   I don't know what they were thinking.  I wasn't |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

127

| | | |
|---|---|---|
| 11:08 | 1 | involved in any of those discussions. |
| 11:08 | 2 | Q.   Okay.  Have you ever heard of a company called Early |
| 11:08 | 3 | Light? |
| 11:08 | 4 | A.   Yes. |
| 11:08 | 5 | Q.   And that's one of the largest Chinese manufacturers of |
| 11:08 | 6 | toys, right? |
| 11:08 | 7 | A.   Correct. |
| 11:08 | 8 | Q.   And in this timeframe, in 2001, Mattel had a |
| 11:08 | 9 | relationship with Early Light, right? |
| 11:08 | 10 | A.   I believe so. |
| 11:08 | 11 | Q.   And Francis Choi was the head of Early Light? |
| 11:09 | 12 | A.   I do not recall that. |
| 11:09 | 13 | Q.   Do you know Tom Debrowski? |
| 11:09 | 14 | A.   Absolutely. |
| 11:09 | 15 | Q.   He was the executive vice president of worldwide |
| 11:09 | 16 | operations for Mattel? |
| 11:09 | 17 | A.   Correct. |
| 11:09 | 18 | Q.   And he had that role while you were the president of |
| 11:09 | 19 | Girls Division, right? |
| 11:09 | 20 | A.   Correct. |
| 11:09 | 21 | Q.   And as the head of operations, Mr. Debrowski was |
| 11:09 | 22 | responsible for dealing with Mattel's relationships with |
| 11:09 | 23 | Asian vendors, true? |
| 11:09 | 24 | A.   Correct. |
| 11:09 | 25 | Q.   And isn't it true that you went to Mr. Debrowski and |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

128

| 11:09 | 1 | you asked him to tell Francis Choi of Early Light to stop |
| 11:09 | 2 | producing MGA's Bratz product? |
| 11:09 | 3 | A.   I don't recall exactly that.  I am sure that I |
| 11:09 | 4 | questioned, um, and was curious as to what one of our |
| 11:09 | 5 | vendors was producing for a competitive vendor.  That was an |
| 11:09 | 6 | absolutely, um, normal common question. |
| 11:10 | 7 | Um, we had proprietary information in that |
| 11:10 | 8 | manufacturing plant.  And if they were manufacturing |
| 11:10 | 9 | something for a competitor, then our competitor had access |
| 11:10 | 10 | to that.  So it was a normal course of business question. |
| 11:10 | 11 | Q.   I want you to see if you can answer this question "yes" |
| 11:10 | 12 | or "no," Ms. Fontanella. |
| 11:10 | 13 | Is it true that you went to Mr. Debrowski –– that you |
| 11:10 | 14 | went into his office and in a face-to-face conversation with |
| 11:10 | 15 | him you requested that he ask Frances Choi of Early Light to |
| 11:10 | 16 | stop producing MGA's Bratz product?  Yes or no, please. |
| 11:10 | 17 | A.   I don't recall that. |
| 11:10 | 18 | Q.   Okay.  Are you denying it? |
| 11:10 | 19 | A.   I'm not denying it. |
| 11:10 | 20 | MR. ZELLER:  Argumentative. |
| 11:10 | 21 | THE WITNESS:  I absolutely don't remember. |
| 11:10 | 22 | THE COURT:  Overruled. |
| | 23 | BY MS. HURST: |
| 11:10 | 24 | Q.   You don't remember trying to shut down the |
| 11:10 | 25 | manufacturing of MGA's Bratz? |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

129

| | | |
|---|---|---|
| 11:10 | 1 | A.   I remember asking the question was a manufacturer of |
| 11:11 | 2 | ours manufacturing something for our competitor.  It was a |
| 11:11 | 3 | question that I asked about many manufacturers. |
| 11:11 | 4 | Q.   And you asked it about MGA and Bratz specifically? |
| 11:11 | 5 | A.   Specifically, yes. |
| 11:11 | 6 | Q.   Did Early Light also manufacture products for Hasbro? |
| 11:11 | 7 | A.   Probably. |
| 11:11 | 8 | Q.   Did Hasbro have a fashion doll? |
| 11:11 | 9 | A.   I don't remember. |
| 11:11 | 10 | Q.   You didn't try to shut Hasbro down, did you? |
| 11:11 | 11 | A.   I don't understand what that has to do with anything. |
| 11:11 | 12 | Hasbro is a competitor.  I would be curious as to what |
| 11:11 | 13 | Hasbro did with any of our manufacturers or distributors. |
| 11:11 | 14 | That was just how -- that's -- we competed against one |
| 11:12 | 15 | another. |
| 11:12 | 16 | Q.   Did you go to Mr. Debrowski and ask him to get Early |
| 11:12 | 17 | Light to stop producing product for Hasbro? |
| 11:12 | 18 | A.   I don't believe so. |
| 11:12 | 19 | Q.   Have you ever been to Early Light's factories? |
| 11:12 | 20 | A.   Possibly. |
| 11:12 | 21 | Q.   Isn't it true that they wall off the manufacturing for |
| 11:12 | 22 | the different toy companies that they do business with? |
| 11:12 | 23 | MR. ZELLER:  Assumes facts. |
| 11:12 | 24 | THE COURT:  Overruled. |
| 11:12 | 25 | THE WITNESS:  I -- I have been to China once, and |

| 11:12 | 1  | was in a very quick tour through a number of factories.  Um, |
| 11:12 | 2  | and I really don't remember precisely what I saw. |
| 11:12 | 3  | BY MS. HURST: |
| 11:12 | 4  | Q.   Is it true that Early Light takes steps to wall off the |
| 11:12 | 5  | manufacturing it does for different toy companies so as to |
| 11:13 | 6  | avoid any concerns about sharing confidential information? |
| 11:13 | 7  | A.   I don't mean to be -- |
| 11:13 | 8  | MR. ZELLER:  Assumes facts. |
| 11:13 | 9  | THE COURT:  Overruled. |
| 11:13 | 10 | THE WITNESS:  I don't mean to be difficult; but, |
| 11:13 | 11 | honestly, I did not spend a lot of time in manufacturing |
| 11:13 | 12 | plants, and I don't know what precautions they took.  Um, |
| 11:13 | 13 | I'm just not familiar with that.  That would have been |
| 11:13 | 14 | something that Tom Debrowski and a whole team that were |
| 11:13 | 15 | employed under him would have had responsibility for. |
| 11:13 | 16 | BY MS. HURST: |
| 11:13 | 17 | Q.   And when you went to Mr. Debrowski and asked him to |
| 11:13 | 18 | shut down Early Light's production of Bratz, you didn't care |
| 11:13 | 19 | whether they had taken steps to maintain confidentiality of |
| 11:13 | 20 | Mattel information, right? |
| 11:13 | 21 | MR. ZELLER:  Misstates the witness's testimony. |
| 11:13 | 22 | Argumentative, and assumes facts. |
| 11:13 | 23 | THE COURT:  Sustained, in its present form. |
|       | 24 | BY MS. HURST: |
| 11:13 | 25 | Q.   When you went to Mr. Debrowski and asked him to get |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

131

| 11:13 | 1 | Early Light to stop producing MGA's Bratz product, you |
|---|---|---|

11:13   1   Early Light to stop producing MGA's Bratz product, you

11:13   2   didn't know one way or another whether Early Light had taken

11:14   3   steps to protect Mattel confidential information, right?

11:14   4          MR. ZELLER:  There's no such testimony.

11:14   5          THE COURT:  Overruled.

11:14   6          You can answer the question.

11:14   7          MS. HURST:  It's in the Debrowski deposition --

11:14   8          MR. ZELLER:  Your Honor --

11:14   9          MS. HURST:  -- at page 79.

11:14   10         MR. ZELLER:  -- that is totally improper.

11:14   11         THE COURT:  Oh, stop, stop.

11:14   12         Oh, my goodness.

11:14   13         MR. ZELLER:  That's completely --

11:14   14         THE COURT:  *(To the jury:)* They're feeling a

11:14   15   little tired, I think.  So I want you to disregard both

11:14   16   counsel's comments.  Okay?

11:14   17         Counsel, each of you write out a check for $25,000

11:14   18   and put it on the corner of your tables.

11:14   19         Pull it out.

11:14   20         MS. HURST:  I don't have a checkbook with me,

11:14   21   Your Honor.

11:14   22         THE COURT:  Counsel, pull it out.

11:14   23         MR. ZELLER:  I'll have to go get it.

11:14   24         THE COURT:  Okay.  Next time it will be 50-.

11:14   25         Your next question.

| | | |
|---|---|---|
| 11:14 | 1 | MS. HURST:  Thank you, Your Honor. |
| 11:14 | 2 | BY MS. HURST: |
| 11:14 | 3 | Q.   Is it, true -- |
| 11:14 | 4 | MR. ZELLER:  I would move to strike the comment. |
| 11:14 | 5 | THE COURT:  I haven't heard the question yet. |
| | 6 | BY MS. HURST: |
| 11:14 | 7 | Q.   Is it true that when you went to Mr. Debrowski and |
| 11:15 | 8 | asked him to shut down MGA's production of Bratz, that you |
| 11:15 | 9 | didn't know one way or another whether Early Light had taken |
| 11:15 | 10 | steps to protect any supposed confidential information of |
| 11:15 | 11 | Mattel? |
| 11:15 | 12 | MR. ZELLER:  Misstates the witness's testimony. |
| 11:15 | 13 | Assumes facts. |
| 11:15 | 14 | THE WITNESS:  No, that's not what I said. |
| 11:15 | 15 | THE COURT:  Um -- |
| 11:15 | 16 | THE WITNESS:  I mean, honestly, I don't understand |
| 11:15 | 17 | what the big deal is. |
| 11:15 | 18 | THE COURT:  Just a moment.  There's no comment. |
| 11:15 | 19 | And you'll quit any gratuitous comments.  Understood. |
| 11:15 | 20 | THE WITNESS:  Sure. |
| 11:15 | 21 | THE COURT:  Thank you. |
| 11:16 | 22 | I think that the difficulty between the two of you |
| 11:16 | 23 | is that each of you are assuming what she previously |
| 11:16 | 24 | testified to. |
| 11:16 | 25 | MS. HURST:  I'll try to rephrase, Your Honor. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:16 | 1 | THE COURT:  Counsel. |
| 11:16 | 2 | BY MS. HURST: |
| 11:16 | 3 | Q.   Ms. Fontanella, if you assume that it's true that you |
| 11:16 | 4 | went to Mr. Debrowski and asked him to get Early Light to |
| 11:16 | 5 | stop producing MGA's Bratz product, then it is also the |
| 11:16 | 6 | case, at the time that you made that request, you didn't |
| 11:16 | 7 | know one way or another whether Early Light had taken steps |
| 11:16 | 8 | to protect either parties' confidential information in |
| 11:16 | 9 | connection with its manufacturing of products? |
| 11:16 | 10 | A.   I don't. |
| 11:16 | 11 | MR. ZELLER:  Assumes facts.  Calls for |
| 11:16 | 12 | speculation.  Misstates the witness's testimony. |
| 11:16 | 13 | THE COURT:  Overruled.  You can answer the |
| 11:16 | 14 | question. |
| 11:17 | 15 | THE WITNESS:  Okay.  I don't think that one is |
| 11:17 | 16 | related to the other. |
| 11:17 | 17 | Um, that -- I think I was just asking a question, |
| 11:17 | 18 | trying to understand what the extent of Early Light's |
| 11:17 | 19 | involvement was with Bratz; and that Bratz was a competitor |
| 11:17 | 20 | to ours, and they had access to proprietary information. |
| 11:17 | 21 | And that was a concern. |
| 11:17 | 22 | And I think that the basis of my questioning was I |
| 11:17 | 23 | was concerned and I trusted that Tom Debrowski would |
| 11:17 | 24 | research and find out if I -- if I should be concerned. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:17 | 1 | BY MS. HURST: |
| 11:17 | 2 | Q.   'Cause you had particular concern about Bratz, didn't |
| 11:17 | 3 | you? |
| 11:17 | 4 | A.   They were a competitor.  Of course, I did. |
| 11:18 | 5 | Q.   And you wanted to get as much information about Bratz |
| 11:18 | 6 | as you could from any available source, true? |
| 11:18 | 7 | MR. ZELLER:  Question's argumentative.  Overbroad. |
| 11:18 | 8 | THE COURT:  Overruled. |
| 11:18 | 9 | THE WITNESS:  Well, I think that we were in the |
| 11:18 | 10 | business –– the doll business, and I think that we were |
| 11:18 | 11 | always interested in what our competitors were doing.  So |
| 11:18 | 12 | that was a normal course of business to, um –– whether we |
| 11:18 | 13 | were in a retail store or in a manufacturer, we wanted to |
| 11:18 | 14 | see what our competitors were doing and understand what |
| 11:18 | 15 | their plan was. |
| 11:18 | 16 | MS. HURST:  Let's put before the witness |
| 11:18 | 17 | Exhibit 9643, please. |
| 11:18 | 18 | *(Document provided to the witness.)* |
| 11:18 | 19 | BY MS. HURST: |
| 11:19 | 20 | Q.   Do you have that before you, Ms. Fontanella? |
| 11:19 | 21 | A.   Yes, I do.  Thank you. |
| 11:19 | 22 | Q.   And you see that that's an e-mail from Tyler Snyder, |
| 11:19 | 23 | dated February 21st, 2002? |
| 11:19 | 24 | A.   Yes. |
| 11:19 | 25 | Q.   All right.  And it's to Joe Franke –– is that "Frank" |

| | | |
|---|---|---|
| 11:19 | 1 | or "Franke"?  It's got a "E" on the end. |
| 11:19 | 2 | A.    Franke. |
| 11:19 | 3 | Q.    And he was a vice president in design at the time? |
| 11:19 | 4 | A.    Correct. |
| 11:19 | 5 | Q.    And Lisa Gaudio, G-A-U-D-I-O, true? |
| 11:19 | 6 | A.    Correct. |
| 11:19 | 7 | Q.    And she was in marketing, correct? |
| 11:19 | 8 | A.    Correct. |
| 11:19 | 9 | Q.    Ivy Ross, who was the senior vice president for girls |
| 11:19 | 10 | product design at that time? |
| 11:19 | 11 | A.    Correct. |
| 11:19 | 12 | Q.    Anne Parducci we've already discussed, the head of |
| 11:19 | 13 | Barbie marketing, correct? |
| 11:19 | 14 | A.    Correct. |
| 11:19 | 15 | Q.    Lisa Tauber, who was she in or about February 2002? |
| 11:19 | 16 | A.    She would have been in marketing, as well. |
| 11:19 | 17 | Q.    Cassidy Park was in product design? |
| 11:19 | 18 | A.    Correct. |
| 11:19 | 19 | Q.    Allison Willensky was in consumer research? |
| 11:20 | 20 | A.    Correct. |
| 11:20 | 21 | Q.    Michael Shore the same? |
| 11:20 | 22 | A.    Correct. |
| 11:20 | 23 | Q.    Mr. Turetzky, we've discussed previously, had a variety |
| 11:20 | 24 | of positions, right? |
| 11:20 | 25 | A.    Uh-huh.  Correct. |

| | | |
|---|---|---|
| 11:20 | 1 | Q.   And Carey Plunkett, she was in the market intelligence |
| 11:20 | 2 | group, right? |
| 11:20 | 3 | A.   I do not know what the market intelligence group was or |
| 11:20 | 4 | is. |
| 11:20 | 5 | Q.   Never heard of that, right? |
| 11:20 | 6 | A.   Um, I have not heard of that, no. |
| 11:20 | 7 | Q.   And -- and who was it that let you know of the |
| 11:20 | 8 | witnesses in the case would be coordinating to deny that |
| 11:20 | 9 | they knew anything about marketing intelligence? |
| 11:20 | 10 | MR. ZELLER:  Your Honor, that is argumentative.  I |
| 11:20 | 11 | move -- |
| 11:20 | 12 | THE COURT:  Sustained. |
| 11:20 | 13 | MR. ZELLER:  -- move to strike it. |
| 11:20 | 14 | THE COURT:  Sustained.  Stricken. |
| 11:20 | 15 | BY MS. HURST: |
| 11:20 | 16 | Q.   You ever heard of Sal Villasenor, Ms. Fontanella? |
| 11:20 | 17 | A.   No. |
| 11:20 | 18 | Q.   And you've never heard of market intelligence within |
| 11:20 | 19 | Mattel; is that right? |
| 11:20 | 20 | A.   I didn't. |
| 11:20 | 21 | Q.   Never heard of Sal Villasenor being the manager of |
| 11:20 | 22 | market intelligence? |
| 11:20 | 23 | A.   No, I did not. |
| 11:20 | 24 | Q.   Never heard of the Annual Toy Fair Competitive Review? |
| 11:21 | 25 | A.   Yes.  I did hear of the Annual Toy Fair Competitive |

| 11:21 | 1 | Review.  That was something that we did every toy fair.  We |
| 11:21 | 2 | collected public information, whether it was tear sheets or |
| 11:21 | 3 | press releases, and after toy fair gathered what our |
| 11:21 | 4 | competitors were doing. |
| 11:21 | 5 | Q.  And you don't know who Sal Villasenor is at all, right? |
| 11:21 | 6 | A.  I'm sorry, but I don't. |
| 11:21 | 7 | Q.  And so you have no idea whether he was collecting |
| 11:21 | 8 | public information, do you? |
| 11:21 | 9 | A.  No, I don't. |
| 11:21 | 10 | Q.  In fact, he could have been using fake credentials to |
| 11:21 | 11 | sneak into competitor's private showrooms and you wouldn't |
| 11:21 | 12 | know that, right? |
| 11:21 | 13 | MR. ZELLER:  Assumes facts.  Lacks foundation. |
| 11:21 | 14 | THE WITNESS:  I don't know who he is. |
| 11:21 | 15 | THE COURT:  Just a moment. |
| 11:21 | 16 | You don't have to answer that.  Just a moment. |
| 11:21 | 17 | You don't know who he is? |
| 11:21 | 18 | THE WITNESS:  No. |
| 11:21 | 19 | THE COURT:  Okay. |
| 11:21 | 20 | Counsel. |
| 11:21 | 21 | MS. HURST:  All right.  Your Honor, move the |
| 11:21 | 22 | admission of 9643. |
| 11:22 | 23 | MR. ZELLER:  She's not on this e-mail.  Lacks |
| 11:22 | 24 | foundation. |
| 11:22 | 25 | MS. HURST:  Your Honor, I ask the Court take it |

| | | |
|---|---|---|
| 11:22 | 1 | conditionally, subject to a motion to strike.  We'll be |
| 11:22 | 2 | calling several of these people. |
| 11:22 | 3 | THE COURT:  Who's on that e-mail?  I don't have it |
| 11:22 | 4 | readily at my disposal.  I can get it.  Just a moment. |
| 11:22 | 5 | MS. HURST:  Your Honor, we're handing it to you. |
| 11:22 | 6 | *(Document provided to the Court.)* |
| 11:22 | 7 | THE COURT:  Thank you. |
| 11:22 | 8 | Thank you very much. |
| 11:22 | 9 | Which person would you be calling? |
| 11:22 | 10 | MS. HURST:  Your Honor, we'll be calling |
| 11:22 | 11 | Ms. Plunkett, Mr. Turetzky, and Ms. Snyder if we can |
| 11:22 | 12 | overcome the previously discussed issues -- at least.  We |
| 11:22 | 13 | may call some of these others, as well. |
| 11:22 | 14 | THE COURT:  All right.  I'll take it subject to a |
| 11:22 | 15 | motion to strike.  That will save Ms. Fontanella from coming |
| 11:22 | 16 | back. |
| 11:23 | 17 | MS. HURST:  Thank you, Your Honor. |
| 11:23 | 18 | *(Exhibit No. 9643 received in evidence.)* |
| 11:23 | 19 | *(Document displayed.)* |
| 11:23 | 20 | BY MS. HURST: |
| 11:23 | 21 | Q.   All right.  The title or the subject of this e-mail is |
| 11:23 | 22 | "Bratz MGA Update," right? |
| 11:23 | 23 | A.   Yes. |
| 11:23 | 24 | Q.   And the date on it is February 21, 2002? |
| 11:23 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 11:23 | 1 | Q.   And that's -- every year the New York toy fair was in |
| 11:23 | 2 | February of 2002 *(sic)*, right? |
| 11:23 | 3 | A.   Correct. |
| 11:23 | 4 | Q.   Now, if you turn to the second page of this document, |
| 11:23 | 5 | it says, "Bratz 2002," paren, "MGA," right? |
| 11:23 | 6 | A.   Correct. |
| 11:23 | 7 | Q.   And it says, "Carey Plunkett" asterisk "3253."  That's |
| 11:23 | 8 | her phone number, right?  Phone extension? |
| 11:23 | 9 | A.   I don't know. |
| 11:23 | 10 | Q.   Do you think that's a reasonable conclusion from the |
| 11:23 | 11 | document? |
| 11:23 | 12 | A.   I don't know. |
| 11:23 | 13 | Q.   Is it true that Mattel had four-digit extensions that |
| 11:23 | 14 | you could use to call each other there within the |
| 11:24 | 15 | headquarters? |
| 11:24 | 16 | A.   I really don't remember. |
| 11:24 | 17 | Q.   Okay.  "Carey Plunkett and Tyler Snyder walked the MGA |
| 11:24 | 18 | showroom on Tuesday, February 12th.  The following is an |
| 11:24 | 19 | update on what is happening in 2002 with the Bratz brand." |
| 11:24 | 20 | You see that? |
| 11:24 | 21 | A.   Yes, I do. |
| 11:24 | 22 | Q.   And the first thing it says, in bold, there is, "New |
| 11:24 | 23 | Character," right? |
| 11:24 | 24 | A.   Yes. |
| 11:24 | 25 | Q.   "There will be a 'refresh,'" quote/unquote, "released |

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 140 of 158   Page ID #:310235
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

140

| 11:24 | 1 | in June or July that includes one new female character, |
| 11:24 | 2 | Sasha," right? |
| 11:24 | 3 | A.   Correct. |
| 11:24 | 4 | Q.   "FOB HK $10.25," right? |
| 11:24 | 5 | A.   Correct. |
| 11:24 | 6 | Q.   And "FOB HK," that's the price MGA charges the |
| 11:24 | 7 | retailers to take delivery of the product in Hong Kong, |
| 11:24 | 8 | right? |
| 11:24 | 9 | A.   Yes. |
| 11:24 | 10 | Q.   And that's how you understand that, true? |
| 11:24 | 11 | A.   Yes. |
| 11:25 | 12 | Q.   Next, it talks about, in bold there, "Bratz Funk 'N |
| 11:25 | 13 | Glow."  You see that? |
| 11:25 | 14 | A.   Yes. |
| 11:25 | 15 | Q.   "In June/July a new group will come out with glowing |
| 11:25 | 16 | clothes.  The symbol," quote/unquote, "for the girl will |
| 11:25 | 17 | light up on her clothing," paren "like a princess crown on |
| 11:25 | 18 | the back of her jacket," end paren.  "Fiberoptic technology |
| 11:25 | 19 | is being used," paren, "FOB HK $18.99." |
| 11:25 | 20 | That's what it says, right? |
| 11:25 | 21 | A.   Yes. |
| 11:25 | 22 | Q.   Then in bold, "Boys:  Two new male characters will be |
| 11:25 | 23 | introduced this June/July.  At this time their names are |
| 11:25 | 24 | Cameron and Tyler, but Tyler's name may be changed.  The |
| 11:25 | 25 | prototypes were a little feminine looking and it was |

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:25 | 1 | mentioned that they would be changed.  These are not meant |
| 11:25 | 2 | to be," quote/unquote, "boyfriends, but boys the girls hang |
| 11:26 | 3 | out with," paren "FPB HK $10.25." |
| 11:26 | 4 | Right? |
| 11:26 | 5 | A.   Correct. |
| 11:26 | 6 | Q.   Next it talks about the "Bratz Mobile," right? |
| 11:26 | 7 | A.   Yes. |
| 11:26 | 8 | Q.   "Releasing in June/July is an FM radio that is also a |
| 11:26 | 9 | car for the girls.  Accessories will be included," right? |
| 11:26 | 10 | A.   Yes. |
| 11:26 | 11 | Q.   Then it talks about "Bratz Funky Fashion Makeover."  A |
| 11:26 | 12 | styling head, right? |
| 11:26 | 13 | A.   Yes. |
| 11:26 | 14 | Q.   Then "Bratz Secret Safe," right? |
| 11:26 | 15 | A.   Yes. |
| 11:26 | 16 | Q.   Then the "Bratz Spa Playset, right? |
| 11:26 | 17 | A.   Yes. |
| 11:26 | 18 | Q.   Then "Micro Bratz," right? |
| 11:26 | 19 | A.   Yes. |
| 11:26 | 20 | Q.   Then "Fashion Accessories," true? |
| 11:26 | 21 | A.   Yes. |
| 11:26 | 22 | Q.   "Please contact us with any questions.  More |
| 11:26 | 23 | information will be available at the toy fair presentation," |
| 11:26 | 24 | right? |
| 11:26 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 142 of 158   Page ID #:310237
CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

142

11:26   1   Q.   Now, it's true, isn't it, that this information came to

11:26   2   your attention in February of 2002?

11:27   3           MR. ZELLER:   The question is vague as to "this

11:27   4   information."

11:27   5           THE COURT:   Overruled.

11:27   6           THE WITNESS:   I may have seen this memo if I was

11:27   7   copied on this, yes.

11:27   8   BY MS. HURST:

11:27   9   Q.   Whether you were copied on it or not, these were all

11:27   10   people -- senior people involved in the design and marketing

11:27   11   of Barbie products, right?

11:27   12   A.   They were from consumer research, um, strategic

11:27   13   planning, design, marketing, and manufacturing.

11:27   14   Q.   Many of them were direct reports to you, right?

11:27   15   A.   Uh, one person was.

11:27   16   Q.   And that was Ivy Ross?

11:27   17   A.   I'm sorry.   Two.   Yes.

11:27   18   Q.   And who else?

11:27   19   A.   And Anne Parducci.

11:27   20   Q.   Okay.   So you had two direct reports on here, right?

11:28   21   A.   Correct.

11:28   22   Q.   And this information came to you in the February of

11:28   23   2002, right?

11:28   24   A.   Yes.   We always saw information like this as a result

11:28   25   of toy fair.   I mean, this was public information.

| | | |
|---|---|---|
| 11:28 | 1 | Q.   Well, did you talk to Tyler Snyder about whether this |
| 11:28 | 2 | was public information or not? |
| 11:28 | 3 | A.   I don't know who Tyler Snyder is. |
| 11:28 | 4 | Q.   Did you talk to Carey Plunkett about whether it was |
| 11:28 | 5 | public information or not? |
| 11:28 | 6 | A.   I didn't ask that question because I assumed that -- |
| 11:28 | 7 | well, I didn't assume.  I just know that Mattel has a code |
| 11:28 | 8 | of conduct and -- and does things a certain way, and that I |
| 11:28 | 9 | assumed that this was public knowledge that was part of sell |
| 11:28 | 10 | sheets and catalogues and media kits that were circulated at |
| 11:28 | 11 | toy fair and everybody had access to. |
| 11:28 | 12 | Q.   That's what you assumed, right? |
| 11:29 | 13 | A.   Yes. |
| 11:29 | 14 | Q.   Because it would have been wrong for Carey Plunkett to |
| 11:29 | 15 | use fake business cards to gain access to this information, |
| 11:29 | 16 | right? |
| 11:29 | 17 | A.   Yes. |
| 11:29 | 18 | Q.   And it would have been wrong for Tyler Snyder to use |
| 11:29 | 19 | fake business cards to gain access to this information, |
| 11:29 | 20 | true? |
| 11:29 | 21 | A.   Absolutely. |
| 11:29 | 22 | Q.   But you never asked whether that was what was |
| 11:29 | 23 | happening -- |
| 11:29 | 24 | A.   Correct. |
| 11:29 | 25 | Q.   -- right? |

| | | |
|---|---|---|
| 11:29 | 1 | And it never came to your attention at any time while |
| 11:29 | 2 | you were at Mattel that there were people there at Mattel |
| 11:29 | 3 | using fake business cards to get access to competitor's |
| 11:29 | 4 | shows rooms; is that right? |
| 11:29 | 5 | MR. ZELLER:  Question's compound. |
| 11:29 | 6 | THE COURT:  Overruled. |
| 11:29 | 7 | You can answer the question, please. |
| 11:29 | 8 | THE WITNESS:  No. |
| 11:29 | 9 | BY MS. HURST: |
| 11:29 | 10 | Q.   I'm correct?  You're saying it did not come to your |
| 11:29 | 11 | attention? |
| 11:29 | 12 | A.   It did not come to my attention, no. |
| 11:29 | 13 | MS. HURST:  Can we give the witness Exhibit 26703, |
| 11:30 | 14 | please. |
| 11:30 | 15 | *(Document provided to the witness.)* |
| 11:30 | 16 | BY MS. HURST: |
| 11:30 | 17 | Q.   Do you see that, Ms. Fontanella? |
| 11:30 | 18 | A.   Yes, I do.  Thank you. |
| 11:30 | 19 | Q.   And it's a memo "Girls Division, Adrienne Fontanella, |
| 11:30 | 20 | 2002 Goals," correct? |
| 11:30 | 21 | A.   Correct. |
| 11:30 | 22 | Q.   And it's dated February 25th, 2002, right? |
| 11:30 | 23 | A.   Correct. |
| 11:30 | 24 | Q.   And that's four days after the e-mail -- the "walk the |
| 11:30 | 25 | MGA showroom" e-mail that we were just looking at in |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

145

| 11:30 | 1 | Exhibit 9643, true? |
|---|---|---|
| 11:30 | 2 | A.   Correct. |
| 11:30 | 3 |          MS. HURST:  All right.  Move the admission of |
| 11:30 | 4 | 26703. |
| 11:30 | 5 |          THE COURT:  Received. |
| 11:30 | 6 |          *(Exhibit No. 26703 received in evidence.)* |
| 11:30 | 7 |           *(Document displayed.)* |
| 11:30 | 8 | BY MS. HURST: |
| 11:30 | 9 | Q.   Now, every year you would go through a process of |
| 11:31 | 10 | defining goals for your division as part of the company's |
| 11:31 | 11 | annual performance, true? |
| 11:31 | 12 | A.   Correct. |
| 11:31 | 13 | Q.   And this is one of those memos, right? |
| 11:31 | 14 | A.   Correct. |
| 11:31 | 15 | Q.   I'd like you to turn to 26703, page 3, please. |
| 11:31 | 16 |           *(Document displayed.)* |
| 11:31 | 17 | BY MS. HURST: |
| 11:31 | 18 | Q.   And you've -- you've used numbering and bullet points |
| 11:31 | 19 | to set out the different parts of your goals; is that right? |
| 11:31 | 20 | A.   Correct. |
| 11:31 | 21 | Q.   And the goal numbered 2.3.2 is "Develop and execute |
| 11:31 | 22 | Bratz defense plan," right? |
| 11:31 | 23 | A.   Correct. |
| 11:31 | 24 | Q.   And that was one of your corporate goals for the Girls |
| 11:31 | 25 | Division in 2002, right? |

| | | |
|---|---|---|
| 11:31 | 1 | A.   Correct. |
| 11:31 | 2 | Q.   And the first -- who all helped come up with the Bratz |
| 11:32 | 3 | defense plan as it was then put in your corporate goals? |
| 11:32 | 4 | A.   Um, I think that was just a terminology that was used |
| 11:32 | 5 | in terms of the marketing group, um, how were we going to |
| 11:32 | 6 | respond to the competition. |
| 11:32 | 7 | Q.   Okay.  So marketing was involved, right? |
| 11:32 | 8 | A.   Correct. |
| 11:32 | 9 | Q.   Advertising was involved? |
| 11:32 | 10 | A.   Correct. |
| 11:32 | 11 | Q.   You had to have the design people involved to the |
| 11:32 | 12 | extent you wanted new products, right? |
| 11:32 | 13 | A.   Correct. |
| 11:32 | 14 | Q.   Okay.  So was -- it was a group effort to develop and |
| 11:32 | 15 | execute the Bratz defense plan, right? |
| 11:32 | 16 | A.   Correct. |
| 11:32 | 17 | Q.   All right.  So you wanted to "Use advertising/creative |
| 11:32 | 18 | to position products more effectively against Bratz," right? |
| 11:32 | 19 | A.   Correct. |
| 11:32 | 20 | Q.   You wanted to "Target ad spending against appropriate |
| 11:32 | 21 | products," right? |
| 11:32 | 22 | A.   Correct. |
| 11:32 | 23 | Q.   You wanted to "Manage the flow and advertising globally |
| 11:32 | 24 | to emphasize Fashion Divas," right? |
| 11:33 | 25 | A.   Correct. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10230   Filed 03/18/11   Page 147 of 158   Page ID #:310242
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

147

| 11:33 | 1 | Q. "Reduce price in Spring." |
| 11:33 | 2 | A. Correct. |
| 11:33 | 3 | Q. "Develop direct competitor to Bratz, as well as |
| 11:33 | 4 | alternative older girl doll for Spring 2003," right? |
| 11:33 | 5 | A. Correct. |
| 11:33 | 6 | Q. These were all the steps that you had as part of the |
| 11:33 | 7 | Bratz defense plan, February 25th, 2002, right? |
| 11:33 | 8 | A. Correct. |
| 11:33 | 9 | Q. And that was right after getting that information from |
| 11:33 | 10 | toy fair, right? |
| 11:33 | 11 | A. Correct. But the brand had been out for a while, so |
| 11:33 | 12 | it's not like I didn't know about this -- about Bratz, the |
| 11:33 | 13 | brand. |
| 11:33 | 14 | Q. You did know about it? |
| 11:33 | 15 | A. I did know about it, correct. |
| 11:33 | 16 | Q. You were paying particular attention to it, right? |
| 11:33 | 17 | A. It was a competitor. That was the business that we |
| 11:33 | 18 | were in. |
| 11:33 | 19 | Q. So your first strategy for your Bratz defense plan was |
| 11:33 | 20 | Fashion Divas, right? |
| 11:33 | 21 | A. I -- I don't remember exactly if that was part of the |
| 11:34 | 22 | defense plan, but Fashion Divas was an evolution of Diva |
| 11:34 | 23 | Starz that may have come out at the same time. |
| 11:34 | 24 | Q. Okay. Let me ask you to take a look at 34832. |
| 11:34 | 25 | *(Document provided to the witness.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

148

| | | |
|---|---|---|
| 11:34 | 1 | MS. HURST:  34832.  I seem to be momentarily |
| 11:34 | 2 | impaired with copying. |
| 11:34 | 3 | BY MS. HURST: |
| 11:34 | 4 | Q.   Do you see that that is an e-mail chain regarding |
| 11:34 | 5 | Fashion Divas? |
| 11:34 | 6 | A.   Yes. |
| 11:34 | 7 | Q.   And there's a January 14, 2002 e-mail from Anita |
| 11:35 | 8 | O'Brien to you? |
| 11:35 | 9 | A.   Yes. |
| 11:35 | 10 | Q.   Describing the Fashion Diva launch in Fall 2002? |
| 11:35 | 11 | A.   Yes. |
| 11:35 | 12 | MS. HURST:  Your Honor, move to admit 34832. |
| 11:35 | 13 | THE COURT:  Received. |
| 11:35 | 14 | (Exhibit No. 34832 received in evidence.) |
| 11:35 | 15 | (Document displayed.) |
| 11:59 | 16 | BY MS. HURST: |
| 11:35 | 17 | Q.   All right.  Now, there's an e-mail from you in this |
| 11:35 | 18 | thread.  It's dated -- on page 2, dated January 15, 2002; is |
| 11:35 | 19 | that right? |
| 11:36 | 20 | A.   I don't see that. |
| 11:36 | 21 | Q.   It's in the middle of the page. |
| 11:36 | 22 | A.   Oh, yes. |
| 11:36 | 23 | Q.   Page 2. |
| 11:36 | 24 | A.   Yes, I'm sorry.  I see it. |
| 11:36 | 25 | Q.   From you to Mr. Debrowski, actually, right? |

| | | |
|---|---|---|
| 11:36 | 1 | A.   Yes. |
| 11:36 | 2 | Q.   And you're forwarding the thread below about Fashion |
| 11:36 | 3 | Divas to Mr. Debrowski, right? |
| 11:36 | 4 | A.   Yes. |
| 11:36 | 5 | Q.   And what you're trying to do is figure out when are you |
| 11:36 | 6 | gonna be able to get the product to the market, right? |
| 11:36 | 7 | A.   Correct. |
| 11:36 | 8 | Q.   And Mr. Debrowski is the go-to guy on that because he |
| 11:36 | 9 | controls the operations? |
| 11:36 | 10 | A.   Correct. |
| 11:36 | 11 | Q.   You were going to the highest-level person in Mattel |
| 11:36 | 12 | responsible for the manufacturing of product with this |
| 11:36 | 13 | e-mail, right? |
| 11:36 | 14 | A.   Correct. |
| 11:36 | 15 | Q.   And you said, "Tom, listed below is the availability |
| 11:36 | 16 | status of Fashion Diva.  Fashion Diva is critical to our |
| 11:36 | 17 | global Bratz defense plan."  Right? |
| 11:36 | 18 | A.   Correct. |
| 11:36 | 19 | Q.   "Needless to say, the earlier we are on shelf, the more |
| 11:36 | 20 | effective the plan will be.  So we are basically about a |
| 11:37 | 21 | month behind.  There is no question this was a late addition |
| 11:37 | 22 | and everybody has already done a great job to pull in the |
| 11:37 | 23 | avail." |
| 11:37 | 24 | Does that mean they've done a great job to try to get |
| 11:37 | 25 | it to market as fast as they had could? |

DEBBIE GALE, U.S. COURT REPORTER

| 11:37 | 1 | A. That was always our goal. |
|-------|----|------|

11:37   1   A.   That was always our goal.

11:37   2   Q.   "However, I would be remiss if I didn't ask for the

11:37   3   impossible.  Do you have any recommendations on how to

11:37   4   further improve.

11:37   5        "Thank you.  Adrienne."

11:37   6        That's the e-mail you wrote, right?

11:37   7   A.   Yes.

11:37   8   Q.   Because you wanted to accomplish the impossible:  To

11:37   9   get Fashion Divas on the market as part of your Bratz

11:37   10  defense plan, right?

11:37   11  A.   We wanted to get Fashion Divas on the market as soon as

11:37   12  possible.

11:37   13  Q.   And it was critical to the success of your Bratz

11:37   14  defense plan?

11:37   15  A.   It was one of the strategies that we had to compete

11:38   16  against Bratz.

11:38   17  Q.   Does it say in this e-mail that you wrote, "Fashion

11:38   18  Divas is critical to our global Bratz defense plan"?

11:38   19  A.   Yes.

11:38   20  Q.   Okay.  Now, is it true that Fashion Divas failed?

11:38   21  A.   It was not as well-received as we would have expected.

11:38   22  Q.   And, actually, Diva Starz didn't last as long as you

11:38   23  hoped it would either, true?

11:38   24  A.   Not necessarily.  I mean, it's hard to say what the

11:38   25  life span of a product is.  Diva Starz was certainly very

Case 2:04-cv-09049-DOC-RNB  Document 10230  Filed 03/18/11  Page 151 of 158  Page ID #:310246
CV 04-9049 DOC - 3/17/2011 - Day 35, Volume 1 of 3

151

| | | |
|---|---|---|
| 11:38 | 1 | successful for a period of time. |
| 11:38 | 2 | I think that girls are very fickle and are always |
| 11:38 | 3 | looking for something new.  And that's just -- was par for |
| 11:38 | 4 | the course. |
| 11:38 | 5 | Q.   And because girls are very fickle and always looking |
| 11:38 | 6 | for something new, it's really important to innovate product |
| 11:38 | 7 | in order to establish the brand, right? |
| 11:38 | 8 | A.   Yes. |
| 11:38 | 9 | Q.   And you have to keep executing year after year after |
| 11:39 | 10 | year in order to keep those brands alive, right? |
| 11:39 | 11 | A.   In order to stay in business, yes. |
| 11:39 | 12 | Q.   And in order to build and maintain those brands, you |
| 11:39 | 13 | have to innovate, execute, and communicate every year, |
| 11:39 | 14 | right? |
| 11:39 | 15 | A.   I think that's what everybody did in order to have a |
| 11:39 | 16 | success. |
| 11:39 | 17 | Q.   Including MGA with Bratz, right? |
| 11:39 | 18 | A.   Absolutely. |
| 11:39 | 19 | MS. HURST:  Your Honor, would now be a good time |
| 11:39 | 20 | for the lunch break? |
| 11:39 | 21 | THE COURT:  It appears this would be a good time |
| 11:39 | 22 | for the lunch break. |
| 11:39 | 23 | (To the jury:)  All right.  You're admonished not |
| 11:39 | 24 | to discuss this matter amongst yourselves nor form or |
| 11:39 | 25 | express any opinion concerning the case. |

| | | |
|---|---|---|
| 11:39 | 1 | Do you want to come back at 20 minutes until the |
| 11:39 | 2 | hour? |
| 11:39 | 3 | Please don't discuss this matter amongst |
| 11:39 | 4 | yourselves nor form or express any opinion concerning the |
| 11:39 | 5 | case.  Thank you. |
| 11:40 | 6 | *(Jury recesses for lunch at 11:40 a.m.)* |
| 11:40 | 7 | THE COURT:  Ms. Fontanella, would you come back |
| 11:40 | 8 | and just be seated at 12:40. |
| 11:40 | 9 | THE WITNESS:  Yes. |
| 11:40 | 10 | THE COURT:  We'll start promptly. |
| 11:40 | 11 | THE WITNESS:  Okay.  Perfect.  Thank you. |
| 11:40 | 12 | THE COURT:  Thank you very much.  You may step |
| 11:40 | 13 | down and step out of the courtroom. |
| 11:40 | 14 | Counsel, if you would have a seat for just a |
| 11:40 | 15 | moment. |
| 11:40 | 16 | *(Witness steps down and exits the* |
| 11:40 | 17 | *courtroom.)* |
| 11:40 | 18 | THE COURT:  Ms. Hurst, please sit down. |
| 11:40 | 19 | MS. HURST:  Thank you, Your Honor. |
| 11:40 | 20 | *(Outside the presence of the jury.)* |
| 11:40 | 21 | THE COURT:  Let me make the following record |
| 11:40 | 22 | concerning Ms. Hurst and Mr. Zeller. |
| 11:40 | 23 | First of all, you have the Court's absolute |
| 11:40 | 24 | compliments to begin with, and that is, you're the two |
| 11:40 | 25 | mainstays that the Court has relied upon from the beginning |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:40 | 1 | of this case.  I think I met you well over a year ago, and |
| 11:40 | 2 | you both have to be nearing exhaustion with the magnificent |
| 11:40 | 3 | efforts on behalf of both of your parties. |
| 11:40 | 4 | I've been extremely generous in terms of lead |
| 11:40 | 5 | counsel.  Mr. Price, excusing him most days.  Mr. Quinn's |
| 11:41 | 6 | been with me a longer period of time during the evening |
| 11:41 | 7 | hours and weekends, but he's also been excused on many |
| 11:41 | 8 | occasions. |
| 11:41 | 9 | So I've allowed counsel the courtesy, also, to let |
| 11:41 | 10 | Ms. Keller get caught up with the case, because you came in |
| 11:41 | 11 | at a last moment, and allowed Mr. McConville to be present |
| 11:41 | 12 | about a co-equal time as Mr. Quinn. |
| 11:41 | 13 | Let me remind you that you're the first group of |
| 11:41 | 14 | attorneys who I've ever let out of my courtroom in complex |
| 11:41 | 15 | litigation, in trials much, much longer than this and much |
| 11:41 | 16 | more strenuous, quite frankly, with much more involved -- I |
| 11:41 | 17 | mean, the death penalty is much more serious, believe it or |
| 11:41 | 18 | not, than your case. |
| 11:41 | 19 | Now, having paid you that compliment, something |
| 11:41 | 20 | just occurred that's not tolerable from my perception.  I've |
| 11:41 | 21 | seen you bicker with each other, yell at each other, in |
| 11:41 | 22 | fact, have been with you probably much more time than -- |
| 11:42 | 23 | well, certainly my family and your family -- and have |
| 11:42 | 24 | tolerated it on weekends, both on and off the record.  I |
| 11:42 | 25 | will not tolerate it in front of the jury. |

| | | |
|---|---|---|
| 11:42 | 1 | There's two ways to handle it:  Formally or |
| 11:42 | 2 | informally. |
| 11:42 | 3 | I think, Mr. Eckert, you have a wonderful hospital |
| 11:42 | 4 | you're building at the present time.  You're about to |
| 11:42 | 5 | receive a $25,000 contribution.  It won't come out of your |
| 11:42 | 6 | pocketbook. |
| 11:42 | 7 | Is that understood, sir? |
| 11:42 | 8 | MR. ECKERT:  Yes. |
| 11:42 | 9 | THE COURT:  I'm sure, Mr. Larian, you have a |
| 11:42 | 10 | wonderful charity. |
| 11:42 | 11 | MR. LARIAN:  Yes.  Orange County Children |
| 11:42 | 12 | Hospital. |
| 11:42 | 13 | THE COURT:  Terrific. |
| 11:42 | 14 | That will not come out of your pocketbook though, |
| 11:42 | 15 | understood? |
| 11:42 | 16 | MR. LARIAN:  Yes. |
| 11:42 | 17 | THE COURT:  Now, Counsel, we can get very formal |
| 11:42 | 18 | about it or you just do that informally and voluntarily, and |
| 11:42 | 19 | I'll inform the jury at the end of the day that you've both |
| 11:42 | 20 | decided to do that voluntarily.  Your choice. |
| 11:42 | 21 | And what I won't do is bicker about it.  Because |
| 11:42 | 22 | your continued participation in these proceedings in any way |
| 11:42 | 23 | is terminated. |
| 11:42 | 24 | Understood, Mr. Zeller? |
| 11:43 | 25 | MR. ZELLER:  Yes, sir. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:43 | 1 | THE COURT:  Ms. Hurst, understood? |
| 11:43 | 2 | MS. HURST:  I apologize, Your Honor. |
| 11:43 | 3 | THE COURT:  I want much more than that. |
| 11:43 | 4 | MS. HURST:  I understand. |
| 11:43 | 5 | THE COURT:  Understood? |
| 11:43 | 6 | MS. HURST:  But I'm starting with an apology. |
| 11:43 | 7 | THE COURT:  Up out of your chairs. |
| 11:43 | 8 | You approach each other.  You both go to that |
| 11:43 | 9 | lectern.  You decide how you're going to handle it.  If I |
| 11:43 | 10 | need to get formal and make findings, I will.  I hope to |
| 11:43 | 11 | avoid that.  No.  Closer to each other.  This is wonderful |
| 11:43 | 12 | Irish day.  You two talk to each other now. |
| 11:43 | 13 | MS. HURST:  I apologize, Mr. Zeller. |
| 11:43 | 14 | MR. ZELLER:  I apologize to the Court. |
| 11:43 | 15 | THE COURT:  Okay.  Get out your checkbooks. |
| 11:43 | 16 | MS. HURST:  I actually do not have one present, |
| 11:43 | 17 | Your Honor, but I will make arrangements to get it here from |
| 11:43 | 18 | San Francisco. |
| 11:43 | 19 | THE COURT:  Mr. Zeller. |
| 11:43 | 20 | MR. ZELLER:  I will have to get mine. |
| 11:43 | 21 | THE COURT:  I will take that representation, then. |
| 11:43 | 22 | All right.  Now, don't let it happen again. |
| 11:43 | 23 | MS. HURST:  Understood. |
| 11:43 | 24 | THE COURT:  Understood? |
| 11:43 | 25 | I know you're both near the breaking point, but if |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:43 | 1 | you are, then don't be counsel and don't go to that lectern. |
| 11:43 | 2 | Understood? |
| 11:43 | 3 | MR. ZELLER:  Yes, sir. |
| 11:43 | 4 | THE COURT:  All right.  Then, I'll have that by |
| 11:43 | 5 | Friday.  And how do we handle this in front of the jury so |
| 11:43 | 6 | it's co-equal far as I'm concerned.  Because I've heard this |
| 11:44 | 7 | bickering go back and forth between the two of you.  How do |
| 11:44 | 8 | we handle that? |
| 11:44 | 9 | Mr. Zeller, out of your chair.  Get up at that |
| 11:44 | 10 | lectern.  How are we gonna handle it? |
| 11:44 | 11 | Do I inform the jury that you two have apologized |
| 11:44 | 12 | to the jury, and to each other? |
| 11:44 | 13 | MR. ZELLER:  Your Honor, I just don't think this |
| 11:44 | 14 | is co-equal.  I don't. |
| 11:44 | 15 | THE COURT:  I do. |
| 11:44 | 16 | MR. ZELLER:  The fact is she published information |
| 11:44 | 17 | to the jury she knew full well was improper.  I said it was |
| 11:44 | 18 | improper. |
| 11:44 | 19 | THE COURT:  But, Mr. Zeller, I've also seen, you |
| 11:44 | 20 | know, on a number of occasions, the back and forth between |
| 11:44 | 21 | the two of you. |
| 11:44 | 22 | You want to take that position, I've got |
| 11:44 | 23 | discretion.  You're both excused from the case. |
| 11:44 | 24 | Have a nice day. |
| 11:44 | 25 | MS. HURST:  Your Honor.  I'm satisfied with the |

| | | |
|---|---|---|
| 11:44 | 1 | notion that we -- |
| 11:44 | 2 | THE COURT:  We're in recess. |
| 11:45 | 3 | *(Lunch recess held at 11:44 a.m.)* |
| 11:45 | 4 | *(Further proceedings reported by Deborah* |
| 11:45 | 5 | *Parker in Volume II.)* |
| 11:45 | 6 | -oOo- |
| 11:45 | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

CV 04-9049 DOC – 3/17/2011 – Day 35, Volume 1 of 3

158

| | | |
|---|---|---|
| 11:45 | 1 | -oOo- |
| 11:45 | 2 | |
| 11:45 | 3 | CERTIFICATE |
| 11:45 | 4 | |
| 11:45 | 5 | I hereby certify that pursuant to Section 753, |
| 11:45 | 6 | Title 28, United States Code, the foregoing is a true and |
| 11:45 | 7 | correct transcript of the stenographically reported |
| 11:45 | 8 | proceedings held in the above-entitled matter and that the |
| 11:45 | 9 | transcript page format is in conformance with the |
| 11:45 | 10 | regulations of the Judicial Conference of the United States. |
| 11:45 | 11 | |
| 11:45 | 12 | Date:  March 17, 2011 |
| 11:45 | 13 | |
| 11:45 | 14 | |
| 11:45 | 15 | _____ |
| 11:45 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR |
| 11:45 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER