1  **UNITED STATES DISTRICT COURT**

2  **CENTRAL DISTRICT OF CALIFORNIA**

3  **SOUTHERN DIVISION AT SANTA ANA**

4  HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

MATTEL, INC., ET AL.,                )
7                                     )
              PLAINTIFFS,             )
8                                     )
         vs.                         ) CV NO. 04-9049-DOC
9                                     ) DAY 35
MGA ENTERTAINMENT, INC., ET AL.,     ) VOLUME 2 of 3
10                                    )
              DEFENDANTS.            )
11  _____)

12

13

14  REPORTER'S TRANSCRIPT OF PROCEEDINGS

15  JURY TRIAL

16  SANTA ANA, CALIFORNIA

17  THURSDAY, MARCH 17, 2011

18  12:38 P.M.

19

20  **DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
21  **UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
22  **SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
23  **(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**
24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    APPEARANCES OF COUNSEL:

2         FOR THE PLAINTIFF, MATTEL, INC.:

3                              JOHN QUINN
                               WILLIAM PRICE
4                              MICHAEL T. ZELLER
                               QUINN EMANUEL URQUHART
5                              & SULLIVAN, LLP
                               865 S. FIGUEROA STREET
6                              10TH FLOOR
                               LOS ANGELES, CALIFORNIA 90017
7                              (213) 443-3000

8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
9
                               THOMAS S. MC CONVILLE
10                             ORRICK HERRINGTON & SUTCLIFFE, LLP
                               4 PARK PLAZA
11                             SUITE 1600
                               IRVINE, CALIFORNIA 92614
12                             (949) 567-6700

13
                               ANNETTE L. HURST
14                             ORRICK HERRINGTON & SUTCLIFFE, LLP
                               THE ORRICK BUILDING
15                             405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
16                             (415) 773-5700

17
                               JENNIFER L. KELLER
18                             KELLER RACKAUCKAS, LLP
                               18500 VON KARMAN AVENUE
19                             SUITE 560
                               IRVINE, CALIFORNIA 92612
20                             (949) 476-8700

21

22

23

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                            MARK E. OVERLAND
                             LAW OFFICES OF MARK E. OVERLAND
 4                            100 WILSHIRE BOULEVARD
                             SUITE 950
 5                            SANTA MONICA, CALIFORNIA 90401
                             (310) 459-2830
 6

 7                            ALEXANDER H. COTE
                             SCHEPER KIM & HARRIS, LLP
 8                            601 WEST FIFTH STREET
                             12TH FLOOR
 9                            LOS ANGELES, CALIFORNIA 90071
                             (213) 613-4660
10

11
     ALSO PRESENT:
12
                             JEANINE PISONI
13                            MGA ENTERTAINMENT, INC.
                             16360 ROSCOE BOULEVARD
14                            SUITE 105
                             VAN NUYS, CALIFORNIA 91406
15

16                            ROBERT ECKERT, MATTEL CEO
                             ISAAC LARIAN, MGA CEO
17                            KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                             MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                         I N D E X

 2

 3   DEFENDANTS' WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4     ADRIENNE FONTANELLA       9      27      40       54

 5
       MICHELE LOUISE MCSHANE   65      97     104      108
 6

 7

 8

 9                       E X H I B I T S

10   DEFENDANTS' EXHIBITS:              IDENTIFICATION  EVIDENCE

11     1261, 17818, 17371, 31331, 31343, 17378              14
             TANGIBLES
12
       8154  RESUME                                         68
13
       8277  FILE WRAPPER                                   90
14
       9633  PRIVILEGE LOG                                  72
15
       34829 E-MAIL                                          9
16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; THURSDAY, MARCH 17, 2011; 12:38 P.M.

2        *(The following proceedings were had outside the*

3        *presence of the jury:)*

4            THE COURT:  I want everything on the record

5    concerning this.

6            MR. ZELLER:  Can I --

7            THE COURT:  First of all, you don't have to

8    apologize to me.  On the weekends, I haven't minded the

9    bickering between the two of you.  I've let all of you get

10   that out.  In fact, I've spent needless hours listening to

11   it, and I'm happy to do so again.  Nor am I going to chill

12   you.  You do not have to apologize to me.

13           MR. ZELLER:  It was my starting point, your Honor.

14           And I do believe that the way of resolving it is

15   for the court to say at the end of the day to the jury that,

16   you know, as you pointed out, the attorneys are tired.

17   You're working us very hard.  The attorneys are going to

18   make, you know, charitable donations, and leave it at that.

19   That would be my suggestion.

20           THE COURT:  I want to resolve this, quickly.

21   Obviously, I want you participating.

22           Let me, both, you remind in front of your

23   respective clients -- Mr. Eckert and Mr. Larian -- of the

24   two people who have been with me from the very beginning and

25   have done an admirable job are Ms. Hurst and Mr. Zeller.

```
 1              I'll repeat to both of you gentlemen, I've never

 2   let lead counsel go home, including a nine-month case, I

 3   think, with Mr. Overland.

 4              Is that right, Mr. Overland?

 5              I think we were here countless hours.  Hours that

 6   pale in comparison, because it was a death penalty case.  So

 7   these are the really fortunate -- I want each of you to know

 8   as clients -- fortunate counsel that I let go home in waves

 9   of attorneys that come in.

10              I want to tell you that each of them have been

11   admirable in terms of their preparation.  I think that

12   they're probably pretty near exhaustion.  I think Mr. Zeller

13   was here with me to 11:00 o'clock last night, and Ms. Hurst

14   11:00 o'clock last night.  I think both of you have been the

15   mainstays on the weekends from 8:00 o'clock in the morning

16   until whatever.  So I do know and appreciate the fact that

17   you're tired.

18              I can't have that carry over, though, to the jury

19   for both of you.  That's where it has to end.  And so, I

20   don't mind on the weekends.  I don't want any chilling

21   effect on you.  I want you arguing your motions this

22   weekend.

23              But what I was going to do, is simply have

24   Adrienne Fontanella step down and go on with the next

25   witness -- because neither side was prepared to go
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    forward -- and give her some time in the hallway and then

2    bring her back.

3           But once I have said it, I don't change it.  And

4    now I've said it.  And there's two ways of handling.  I

5    don't care how you handle it.  But, right now, you are not

6    appearing at that lectern unless the two of you can reach

7    out an accommodation.  It's coequal.

8           And I do not accept that you were not involved in

9    this, Mr. Zeller.  In fact, I not only pulled the

10   transcript, but I listened to it again.  And I don't want to

11   go any further with it.  You'll see it in the record.  It's

12   absolutely coequal on both your parts.

13          You two work it out.  You don't need Mr. Quinn to

14   do this.  You don't need Mr. Price to do this.  You don't

15   need your clients.  You don't need Mr. McConville or

16   Ms. Keller.

17          You two talk to each other.

18       *(Apologies exchanged between counsel.)*

19          MR. ZELLER:  Okay.  Along with, I think the rest

20   of it which would be, we'll make a -- it will be stated that

21   it will be a charitable donation.

22          THE COURT:  Charitable donation.

23          I don't want to funnel that.  I just know that

24   each of you gentleman are doing outstanding work in the

25   community with children and hospitals, et cetera.

1          Whether it's 300,000, or 300 million to one firm

2     and approaching 200 million to another, I'm not too

3     concerned about 25,000.

4          MS. HURST:  Your Honor, I would suggest that the

5     jury be told that we have apologized to the jury and to one

6     another and are going to make donations.

7          THE COURT:  Okay.  Acceptable?

8          MR. ZELLER:  Yes, sir.

9          THE COURT:  Acceptable?

10         MS. HURST:  Yes, your Honor.

11         THE COURT:  All right.  That's the end of it.

12         Let's get the jury.

13         *(The following proceedings were had in open court*

14         *in the presence of the jury:)*

15         THE COURT:  We're back on the record.

16         Let me say on the record and outside your

17    presence, counsel have been very courteous to each other.

18    They both apologized to one another and they are apologizing

19    to you.

20         They will make the appropriate gratuitous whatever

21    to their charities of choice.  And the incident is

22    forgotten, and we're going to move on.  It's as simple as

23    that.

24         Counsel, I want to thank you.

25         By the way, they're working extremely hard.

9

```
1    They'll be here at 8:00 o'clock on Saturday, and they will
2    be here 8:00 o'clock on Sunday.  So they're getting tired.
3    It's entirely understandable and probably my responsibility
4    for keeping these insane hours.  So blame it on me.
5              Counsel.
6              MS. HURST:  Thank you, your Honor.
7     ADRIENNE FONTANELLA, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
8                         DIRECT EXAMINATION
9    BY MS. HURST:
10   Q.   Ms. Fontanella, would you look at Exhibit 34829,
11   please.
12   A.   (Witness so complies.)  Yes.
13   Q.   Do you recognize that as an e-mail sent to you and
14   Ms. Parducci, among others, on September 5th, 2001?
15   A.   Yes.
16             MS. HURST:  Your Honor, move the admission of
17   34829.
18             THE COURT:  Received.
19         (Defendants' Exhibit 34829 received in evidence.)
20   BY MS. HURST:
21   Q.   Mr. Turetzky, on September 5th, 2001, was reporting to
22   you on the subject of the Bratz and Loving Family sales
23   update; is that right?
24   A.   Correct.
25   Q.   And he was reporting on --
```

```
 1                THE COURT:  Does somebody have a cell phone?

 2                If you have a cell phone, we're picking that up,

 3     somehow.  If you would be kind enough just to turn it off.

 4          (Pause.)

 5                THE COURT:  All right, Counsel.

 6     BY MS. HURST:

 7     Q.   And Mr. Turetzky says:  I'm reporting to you on the

 8     basis of the latest July USNPD sales data; right?

 9     A.   Correct.

10     Q.   And he says:  July was Bratz first full month of wide

11     distribution; right?

12     A.   Correct.

13     Q.   After $17,000 of sales in June, July sales skyrocketed

14     to $117,000, ranking as the 95th best selling fashion doll

15     and related SKU.

16                That's S-K-U; right?

17     A.   Correct.

18     Q.   Hard to believe that TRU would classify that as a hot

19     seller, although I believe that this is still pre-TV?

20                That's what Mr. Turetzky wrote at that point;

21     right?

22     A.   Correct.

23     Q.   Is it fair to say that at that point that you weren't

24     really too concerned about Bratz?  In fact, he was being a

25     little sarcastic there in his e-mail; right?
```

1  A.   Seems to indicate that, yes.

2  Q.   And he went on to write in July:  *Holiday Barbie was*

3  *No. 1 with 1.7 million*; right?

4  A.   Correct.

5  Q.   It's about -- I don't know -- 10 times as much as

6  Bratz; right?

7  A.   Correct.

8  Q.   *And Bedtime was No. 2 with 1.1 million.*  Again,

9  substantially larger than Bratz; right?

10  A.   Correct.

11  Q.   And he also reported that Diva Starz was at about

12  2.5 million for the month; right?

13  A.   Correct.

14  Q.   And Mr. Turetzky was reporting at the time that he

15  couldn't even understand why Toys "R" Us would consider this

16  to be a hot selling product; right?

17  A.   He seems to imply that.

18  Q.   In fact, there was a period of time in which you

19  thought that Bratz was just a fad; right?  That it would be

20  a short-term sensation and would quickly go away?

21  A.   I don't recall that.

22  Q.   Is it true that Mr. Turetzky prepared a set of talking

23  points for the sales force at Mattel to let the retailers

24  know that Mattel just considered Bratz a fad and a

25  short-lived sensation?

```
 1   A.    I don't recall.
 2   Q.    Well, certainly, by February 2002, you felt the
 3   necessity to adopt as a corporate goal the Bratz defense
 4   plan; right?
 5   A.    Correct.
 6   Q.    So between September 2000 and February 2002 things
 7   changed; is that right?
 8   A.    Bratz had been on the market for, you know, a
 9   considerable period of time.
10   Q.    Now, if we could go back to 34832, and we were looking
11   there at the second page, and we talked about how Fashion
12   Diva was critical to the global Bratz defense plan; right?
13   A.    Right.
14   Q.    And Fashion Diva did not work out as well as you had
15   hoped?
16   A.    Correct.
17   Q.    And if you go back to your corporate goals, 26703,
18   page 3 --
19          Do you have that?
20   A.    Yes.
21   Q.    The final bullet point there was:  Develop direct
22   competitor to Bratz as well as alternative older girl doll
23   for spring 2003; right?
24   A.    Correct.
25   Q.    And the direct competitor to Bratz that's referred to
```

1    here, that became MyScene; correct?

2    A.    Correct.

3    Q.    And then, the alternative older girl doll for spring

4    2003 was for a time called Hip Sistas and eventually was

5    released as Flavas; correct?

6    A.    I don't recall that.

7    Q.    You left in February 2003?

8    A.    Yes.

9    Q.    You were involved in the development of the product of

10   what --

11   A.    I saw it.

12   Q.    You saw it.  And what was it called when you saw it?

13   A.    I don't remember.

14   Q.    Okay.  But you know there was a product, eventually,

15   released as Flavas --

16   A.    Right.

17   Q.    -- and that was in development while you were still

18   there?

19   A.    Correct.

20   Q.    Pursuant to this corporate goal; right?

21   A.    Correct.

22   Q.    Okay.  All right.  We've got some MyScene dolls, and

23   I'm going to show this to you.

24         MS. HURST:  Your Honor, we have a stipulation for

25   the admission of these dolls.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

14

1           THE COURT:  Do you want to read that now?

2           MS. HURST:  Trial Exhibit 1261, that's 2002

3  MyScene Barbie; Trial Exhibit 17818, a 2002 MyScene Bryant;

4  Trial Exhibit 17371, a 2003 MyScene Chillin' Out Chelesa;

5  Trial Exhibit 31331, a 2005 MyScene My Bling Bling Nolee.

6           THE COURT:  Just one moment, Counsel.

7      *(Pause.)*

8           THE COURT:  I'm sorry, Counsel.

9           What was your last exhibit number?

10          MS. HURST:  31331, your Honor.

11          THE COURT:  Thank you.

12          MS. HURST:  Trial Exhibit 31343, a 2006 MyScene My

13 Bling Bling Kennedy, and 17378, a 2004 Miami Getaway Nolee.

14          THE COURT:  Are these to be received by

15 stipulation?

16          MR. ZELLER:  Yes, sir.

17          THE COURT:  Those are received.

18          Thank you, Counsel.

19     *(Defendants' Exhibits 1261, 17818, 17371, 31331,*

20     *31343 AND 17378 received in evidence.)*

21 BY MS. HURST:

22 Q.   Now, I just want to focus on the ones that you were

23 there for, Ms. Fontanella, so I know that some of these were

24 released after your tenure.

25          Could you take a look at Exhibit 1261.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    *(Witness so complies.)*   Yes.

2    Q.    Okay.  And that was -- that was the original MyScene

3    Barbie as it was first released; is that right?

4    A.    Correct.

5    Q.    And at the time, you had considered carefully whether

6    the MyScene brand should be part of the Barbie brand, or

7    stand-alone brand; right?

8    A.    Correct.

9    Q.    Ultimately, you decided to have a Barbie character in

10   the MyScene brand, in order to create an affiliation with

11   the Barbie brand.

12          True?

13   A.    Correct.

14   Q.    And you felt that it would be beneficial to MyScene to

15   have -- to be part of the Barbie brand; right?

16   A.    Correct.

17   Q.    But you didn't want it to be closely linked, because

18   you knew that those older girls targeted dolls, that the

19   older girls didn't want to see the product as associated

20   with baby-ish things; right?

21   A.    Correct.

22   Q.    And so you had to carefully manage over the years that

23   association between MyScene and Barbie.

24          True?

25   A.    It wasn't difficult.  They were very different.

1   Q.   Okay.  And, in fact, MyScene became more different from

2   Barbie as time went on.

3            True?

4            MR. ZELLER:  The question is vague as to time

5   period.

6            THE COURT:  Sustained, counsel.  Just approximate

7   time period.

8            Remind the jury, MyScene Barbie.

9            MS. HURST:  Thank you, your Honor.

10  BY MS. HURST:

11  Q.   This is 2002 MyScene Barbie.  We're looking at 1261;

12  right?

13  A.   Yes.

14  Q.   And approximately when in 2002 was that released?

15  A.   I believe in September, maybe, it was on counter.

16  Q.   At that time, you were working on the spring 2003

17  MyScene products; right?

18  A.   Yes.

19  Q.   And the spring 2003 MyScene products were actually

20  quite different from the 2002 products.

21            True?

22  A.   I don't recall.

23  Q.   Could you take a look at 17371, the 2003 MyScene

24  Chillin' Out Chelesa.

25            Is that one you recognize from your period at

1    Mattel?

2    A.    No.

3    Q.    Is it true that in that early, early part of the

4    decade, 2000, What's Her Face was also a product that Mattel

5    released that was targeted to older girls?

6    A.    Yes.

7    Q.    And is it true that that was a product that had only a

8    short life?

9    A.    It was probably out for a year and a half, which was

10   not unusual.

11   Q.    And Generation Girl, was that an older targeted product

12   in that 2000 time frame as well?

13   A.    Yes.

14   Q.    Did that also have a relatively short life?

15   A.    I think Generation Girl, if I remember, existed for

16   maybe two years.  It was always part of -- we had age

17   segmentation with what we called slots for our dolls.  And

18   it was part of an older age segmentation slot.  And the

19   understanding was that as long as it was successful, it

20   would stay; and when it wasn't, we would have a backup.  And

21   that's just how we ran a business.  That was the normal

22   course of business.

23   Q.    You had those older girl targeted slots because over

24   time the main core Barbie line of dolls had become younger

25   in their appeal; right?

18

1    A.   Correct.

2    Q.   And you also wanted to carefully manage those older

3    girl slots so that they weren't taking away more sales from

4    the Barbie brand than they were adding to the overall bottom

5    rung.

6         True?

7    A.   Correct.

8    Q.   And you called that cannibalization?

9    A.   Correct.

10   Q.   And it's true -- is it true that none of these older

11   girl targeted products became a brand with the staying power

12   of Barbie?

13   A.   Correct.

14   Q.   Now, your first reaction to Bratz when you saw it was

15   to think that MGA copied Diva Starz; is that right?

16   A.   I believe I used the word "copy" referencing that there

17   were a lot of similarities to Diva Starz.

18   Q.   And you thought it was obvious to anybody who saw Bratz

19   that it looked like Diva Starz; right?

20   A.   I think it was obvious that they both had big heads.

21   Q.   You thought that Bratz had a lot of similarities to

22   Diva Starz that were obvious to you and to anybody who saw

23   Bratz.

24        True?

25   A.   I don't know about anybody else.  But I know that when

1    I looked at it, I thought there was similarities.

2    Q.   Let me ask you to look at your deposition at page 246,

3    line -- beginning at line 22 through 247, line 4.

4    A.   Yes.

5    Q.   Do you see that?

6    A.   Yes.

7    Q.   It's true that you recall that Bratz had a lot of

8    similarities to Diva Starz that were obvious to you and to

9    anybody who saw Bratz; right?

10   A.   Correct.

11   Q.   And, in fact, there were people on your staff who

12   shared your view that Bratz looked like Diva Starz; right?

13   A.   Correct.

14   Q.   And some of the similarities that you saw included the

15   large eyes; right?

16   A.   I don't know if I said that.

17   Q.   Is it true that that's the similarity that you saw?

18   A.   I don't remember how large anyone's eyes were.

19   Q.   Okay.  Let me ask you to take a look at your deposition

20   at page 135.

21   A.   *(Witness so complies.)*

22   Q.   And you could start there at line 5 through line 14.

23   A.   Yes.

24   Q.   And when you gave testimony at the deposition in 2008

25   that was closer in time to these events than we are today;

1    right?

2    A.    Exactly.

3    Q.    And your recollection was better then than it is now.

4          True?

5    A.    True.

6    Q.    And one of the things that you thought was a similarity

7    was the large eyes; right?

8    A.    Correct.

9    Q.    And the large head, you thought was a similarity?

10   A.    Correct.

11   Q.    The big feet?

12   A.    Correct.

13   Q.    The eye shadow?

14   A.    Correct.

15   Q.    The detail in the face paint?

16   A.    Correct.

17   Q.    The little nose?

18   A.    Correct.

19   Q.    And the long hair?

20   A.    Correct.

21   Q.    And you also thought that there were similarities

22   between the packaging for Bratz and for Diva Starz; right?

23   A.    I don't recall.

24   Q.    Okay.  Let me give you some examples and that may help.

25         MS. HURST:  Could we show the witness

```
 1    Exhibit 35313, which should be one of the Diva Starz
 2    tangibles.
 3    BY MS. HURST:
 4    Q.    Do you have that, Ms. Fontanella?
 5    A.    Yes.  Thank you.
 6          MS. HURST:  Can we also show the witness 17561,
 7    which should be a Bratz Yasmin.
 8    BY MS. HURST:
 9    Q.    I want to focus you, in particular, on the character
10    art on those two packages, Ms. Fontanella.
11    A.    Yes.
12    Q.    Do you see that?
13    A.    Yes, I do.
14    Q.    And the character art is a little cartoonish graphic of
15    the four dolls that are in the product line; is that right?
16    A.    Correct.
17    Q.    And both of these products had character art with four
18    cartoonish-looking dolls that were multi-ethnic in, sort of,
19    a sassy pose; right?
20    A.    Correct.
21    Q.    And you thought that was -- that was a similarity
22    between the products; right?
23    A.    Correct.
24    Q.    And you also thought the packaging overall was similar
25    in connection with its clear presentation.  Is that true?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

22

1  A.    Now, I thought they there were a lot of differences,

2  and I thought there were similarities.

3  Q.    And this was your reaction upon first seeing the

4  product when Bratz was released into the market; right?

5  A.    Correct.

6  Q.    Now, you've also heard of a product called Toon Teens

7  that was designed by Ms. Martinez; right?

8  A.    Correct.

9  Q.    And that was a product that was developed to the

10 prototype stage but never brought to market; right?

11 A.    Correct.

12 Q.    So that was a confidential product design at Mattel.

13          True?

14 A.    Correct.

15 Q.    And you also believed that there were similarities

16 between Bratz and Toon Teens; right?

17 A.    Correct.

18 Q.    Some of those similarities you believed were the shape

19 of the eyes; right?

20 A.    Correct.

21 Q.    The eye face paint?

22 A.    Yes.

23 Q.    The shape of the lips; right?

24 A.    Yes.

25 Q.    The small nose?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    Yes.

2    Q.    The big feet?

3    A.    Yes.

4    Q.    The short waist?

5    A.    Yes.

6    Q.    Okay.  And you had also heard rumors that Carter Bryant

7    was involved in Bratz; right?

8    A.    No.  I had heard rumors that Carter Bryant was in

9    Missouri.  He was working for American Greetings.  He was on

10   vacation.  We weren't quite sure what Carter Bryant was

11   doing after he left Mattel.

12   Q.    Let me ask you to look at page 110 of your deposition.

13   A.    *(Witness so complies.)*

14   Q.    Starting at lines 12 through 18.

15   A.    Yes.

16   Q.    And does that help you remember that you heard some

17   kind of rumbling that Carter Bryant was involved in Bratz?

18   A.    I think at some point I heard that he had gone to work

19   for MGA.

20   Q.    Did you hear a rumbling that -- that Carter Bryant was

21   involved in Bratz sometime in 2002?

22   A.    I think I assumed that if he was working for MGA, he

23   was working on Bratz, since that was their doll brand, and

24   that's what he did.

25   Q.    Okay.  So you -- you thought there were similarities

1   between Bratz and Diva Starz; right?

2   A.   Correct.

3   Q.   You thought there were similarities between Bratz and

4   Toon Teens, an unreleased product design; right?

5   A.   Right.

6   Q.   And you heard that Carter Bryant was working with MGA,

7   and you assumed he was working on Bratz because that was

8   their doll line; right?

9   A.   Correct.

10  Q.   And then at that point, in 2002, you decided it was

11  time to involve the legal department; right?

12  A.   Correct.

13  Q.   And you met with Michele McShane to determine whether

14  Bratz was violating the legal rights of Mattel; right?

15        MR. ZELLER:  Objection.  Vague.

16        THE COURT:  Overruled.

17        You can answer that question.  Do you recall the

18  question?

19        THE WITNESS:  Yes.  Correct.

20  BY MS. HURST:

21  Q.   And outside counsel was also present for that meeting.

22        True?

23  A.   Correct.

24  Q.   And that was in early 2002; right?

25  A.   Correct.

1    Q.   And it was more than two years after that before Mattel

2    sued Carter Bryant; right?

3              MR. ZELLER:  Lacks foundation.

4              THE COURT:  If you know, you can answer that

5    question.

6              THE WITNESS:  I believe so.

7    BY MS. HURST:

8    Q.   And it was another two years after that before Mattel

9    sued MGA?

10              MR. ZELLER:  That misstates the record.  There is

11   a stipulation.

12              THE COURT:  Sustained.

13              There's a whole series, counsel, of events in

14   there.  That's why I'm sustaining the objection.

15              The intervention.  Okay.

16              MS. HURST:  I'm just trying to work it out.

17        *(Pause.)*

18   BY MS. HURST:

19   Q.   You took this seriously enough to meet -- let me start

20   that again.

21              Ms. McShane was your head intellectual property

22   lawyer for trademarks and copyrights at the time of that

23   meeting; right?

24   A.   Yes.

25   Q.   She was the chief legal officer responsible for

1    enforcing Mattel's trademarks and copyrights; right?

2    A.    I believe so.

3    Q.    And you were worried enough about this to have a

4    meeting with her and outside counsel; right?

5    A.    I was concerned that there was similarities between

6    Bratz and Toon Teens and Diva Starz and, basically, brought

7    it to her attention and wanted her to be aware of that.

8    Q.    And at that point, that was early 2002; right?

9    A.    Correct.

10   Q.    And you left in February 2003; right?

11   A.    Correct.

12   Q.    And as of February 2003, Mattel had not taken any

13   action with respect to your concerns regarding whether Bratz

14   was violating the legal rights of Mattel.

15           True?

16           MR. ZELLER:  Misstates the testimony.

17           THE COURT:  Just a moment.

18           What was your question again, Counsel?

19           My realtime is down, and I apologize.

20   BY MS. HURST:

21   Q.    I believe it was at the time you left Mattel had not

22   taken any action with respect to your concern that Bratz was

23   violating the legal rights of Mattel?

24           THE COURT:  Overruled.

25           You can answer that question.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE WITNESS:  Again, I brought it up to Michele
 2   McShane's attention.  We discussed --
 3              MR. ZELLER:  Your Honor, I would ask that the
 4   witness not disclose.
 5              THE COURT:  I don't want any conversation.
 6              THE WITNESS:  Okay.  Okay.
 7              THE COURT:  They're confined to the meetings, who
 8   you met with.  But no conversation about what you had with
 9   other counsel.
10              THE WITNESS:  Okay.  Thank you.
11              THE COURT:  Or with counsel.
12              THE WITNESS:  Would you repeat the question,
13   please?
14   BY MS. HURST:
15   Q.   When you left in February 2003, as far as you knew,
16   Mattel had not taken any action with respect to your
17   concerns that Bratz was violating the legal rights of
18   Mattel.
19              True?
20   A.   Correct.
21              MS. HURST:  Pass the witness.
22                        CROSS-EXAMINATION
23   BY MR. ZELLER:
24   Q.   Good afternoon.
25              We have met before, you and I.  I'm Mike Zeller,
```

1   you'll remember?

2   A.   Yes.

3   Q.   When is it -- we'll start with the subject you were

4   last discussing which was being phrased about how MGA was

5   violating the legal rights of Mattel back in 2002.

6        What was your understanding of what was being

7   looked into at that time in 2002 that you testified about?

8        MS. HURST:  Objection, your Honor.  That would

9   waive the privilege which counsel has heretofore declined to

10  do.

11       THE COURT:  Counsel, that's speaking.

12       MS. HURST:  Sorry, your Honor.

13       THE COURT:  Re-ask the question, Mr. Zeller.

14       MR. ZELLER:  I'm asking for her understanding.

15  BY MS. HURST:

16  Q.   I'm not asking you to disclose any communications you

17  had with lawyers.  I'm just trying to find out your

18  understanding.

19       You were asked questions about some concern that

20  you had or some question you had in your mind as to whether

21  or not MGA was violating the legal rights of Mattel.

22       THE COURT:  You are confining it to her concerns?

23       MR. ZELLER:  Correct.

24       THE COURT:  Overruled.

25       You can answer that question.  What we're going to

```
 1   avoid is any conversations and the content of those
 2   conversations and communications between you and
 3   Ms. McShane, for instance, or any other lawyer.
 4              THE WITNESS:  Okay.
 5              THE COURT:  That's privileged information.  And
 6   that's -- sometimes the lines get crossed inadvertently by
 7   people who aren't lawyers, so you never disclose those
 8   communications.  But this is directed to you.
 9              THE WITNESS:  Uh-huh.
10              THE COURT:  What were your thoughts or concerns?
11              THE WITNESS:  We were always concerned about
12   proprietary information leaving Mattel.  I think at the
13   time, I recall that something on the boy's side had left the
14   design center and people were aware of models leaving Mattel
15   that were proprietary information.  So there was just
16   concern when something looked similar to something else that
17   we had.
18   BY MS. HURST:
19   Q.   And back in that time period, there was -- the
20   particular concern that you had about MGA or Bratz was
21   whether or not it looked too similar to Toon Teens?
22   A.   Correct.
23   Q.   At that time, did you -- did you have any concern or
24   did you have any information that was brought to your
25   attention that Carter Bryant had created Bratz while he was
```

1    a Mattel employee and Mattel therefore owned Bratz?

2    A.    No.

3    Q.    When did you first hear about that as a possibility?

4    A.    Maybe a year after I left.  So that would have been

5    sometime in 2004.

6    Q.    And do you recall if that was after you left Mattel,

7    and then you learned that a lawsuit had been filed by

8    Mattel?

9    A.    That was definitely after I left Mattel.

10   Q.    So you didn't have any information that was brought to

11   your attention?

12   A.    No.

13   Q.    Or any facts that you knew of?

14   A.    No.

15   Q.    Prior to the time the lawsuit was filed that Carter

16   Bryant had created Bratz while a Mattel employee?

17   A.    None at all.

18            MS. HURST:  Objection.  Assumes facts.

19            THE COURT:  Overruled.

20   BY MR. ZELLER:

21   Q.    What was your reaction when you first heard or learned

22   of that information?

23            MS. HURST:  Objection.  Assumes facts.  Hearsay.

24   Relevance.

25            THE COURT:  Overruled.

```
 1              This is after her employment, 2004, 2005?

 2              MR. ZELLER:  Right.  I'm just trying to find out

 3    the circumstances around which she first learned or heard

 4    from any source.

 5              THE WITNESS:  I think I was very disturbed,

 6    because I would have liked to have had the opportunity to

 7    see that product, and have it tested and go through our

 8    normal course of Blue Sky Events.  And so I think I was -- I

 9    was upset.

10              MS. HURST:  Objection.  Move to strike.  That is

11    nonresponsive.

12              THE COURT:  Overruled.

13    BY MR. ZELLER:

14    Q.   You mentioned that you -- back when Diva Starz was in

15    process, was in development, you recall at least one of the

16    names that was considered for one of the dolls or some

17    product part of the line was Bratz.

18              Do you recall that?

19    A.   Yes.

20    Q.   And you said that you didn't like the name for

21    Diva Starz?

22    A.   Correct.

23    Q.   And please tell us why.

24    A.   Bratz to me implied a spoiled brat, and it just didn't

25    have anything to do with the whole concept of Diva Starz.
```

1    Q.    And when you say "the concept of Diva Starz," what are

2    you referring to?

3    A.    I'm referring to the voice recognition and the smart

4    technology.

5    Q.    And so maybe if you could tell us just what does this

6    mean?  Why were you concerned about maybe having something

7    with a name associated with a bratty attitude and a talking

8    doll?

9    A.    Well, I think that you associate a brat as someone that

10   kind of babbles on and is bratty, and you want to say,

11   *Please stop talking.*  And the whole purpose of Diva Starz

12   was the dolls talked.

13   Q.    Your reaction was specific to using that word as part

14   of Diva Starz because they were talking dolls?

15   A.    Absolutely.

16   Q.    Were you ever given the opportunity in any way to

17   consider or evaluate whether or not to make Carter Bryant's

18   Bratz designs while he was at Mattel?

19   A.    No.

20   Q.    They were never presented to you?

21   A.    They were never presented, no.

22   Q.    To anyone else that you know of?

23   A.    Not --

24   Q.    I'm talking about Carter Bryant's designs.

25   A.    Yes.  No.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    Q.   You were asked questions about your conversation with

2    Tom Debrowski that related to a manufacturer named Early

3    Light?

4    A.   Yes.

5    Q.   And can you give us a sense -- do you have any

6    information as to how large of a company Early Light was

7    back in that time period?

8    A.   I think it was one of the main -- certainly, within the

9    top 10 manufacturers in China as it relates to toys.

10   Q.   And after you had this conversation with Mr. Debrowski,

11   did Early Light continue to manufacture Bratz?

12   A.   Yes.

13   Q.   Did Early Light continue to do that for as long as you

14   were still at Mattel, which I think you said you left in

15   February of 2003?

16   A.   Yes.

17   Q.   You were also asked questions about Bandai as a

18   distributer of Bratz?

19            Do you recall that?

20   A.   Yes.

21   Q.   Did Bandai continue to distribute Bratz products after

22   that e-mail exchange that MGA's counsel asked you about?

23   A.   Yes, they did.

24   Q.   And did MGA continue, or -- excuse me, did Bandai

25   continue to distribute Bratz dolls through Bandai, up until
```

1    the time you left Mattel in February 2003?

2    A.   Yes, that's correct.

3    Q.   And during that time period, both before and after that

4    e-mail exchange, did Mattel continue to do business with

5    Bandai?

6    A.   Yes.

7    Q.   Now, I know that you mentioned in your testimony that

8    you didn't have very much specific information about the

9    relationship with Bandai?

10   A.   Yes.

11   Q.   So let me just try and ask you something a little bit

12   more general, just based on your knowledge and your

13   experience while you were there at Mattel as president of

14   brands.  Generally speaking, why would some people within

15   your group -- what was your understanding as to why some

16   people within your group would be concerned about having a

17   distributor that was distributing both Mattel product and a

18   competing product at the same time?

19             MS. HURST:  Objection.  Leading.  Hearsay.

20             THE COURT:  No, overruled.

21             You can cast your opinion.  You can state what

22   your knowledge is in this area.

23             THE WITNESS:  Well, obviously, if we had a

24   manufacturer that was producing a product for us, we would

25   want their total focus to be on our product and have as much

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    attention, if possible, to our product and not someone

2    else's product, particularly a product that was directly

3    competitive to ours.

4    BY MR. ZELLER:

5    Q.    You mentioned, I think, in your answer "manufacturer."

6            Is the same true of potential distributors, or --

7    A.    I'm sorry.  I meant distributor, yes.

8    Q.    And I think you mentioned in your earlier testimony

9    that another consideration or concern was not having -- a

10   distributor having access to proprietary information of

11   Mattel the same time it's distributing competing product?

12   A.    Correct.

13   Q.    Please tell us why that is a concern.

14   A.    Because that information is proprietary.  They got that

15   information very early, so it could easily be passed to

16   competitors.

17   Q.    You were asked questions about toy fair.  And if you

18   could, please, tell us, just generally speaking, what is

19   New York Toy Fair?

20   A.    New York Toy Fair is like a big Las Vegas show.  There

21   are thousands of people coming in and out of different

22   showrooms, looking at product.  It is basically the

23   introduction of the next season's line to the media, to

24   investors, to licensees, to retailers.  It is basically a

25   "Here we are. Here's what we're going launch next season."

1    And it's a way for everybody to see the product.

2    Q.   I take it you, yourself, have attended New York Toy

3    Fair?

4    A.   Yes.

5    Q.   And, generally speaking, how many people attend this

6    event?

7    A.   Thousands.

8    Q.   And I think you mentioned some groups of categories of

9    people who attend this toy fair are buyers for retailers?

10   A.   Correct.

11   Q.   Analysts also attend?

12   A.   Correct.

13   Q.   Members of the press?

14   A.   Correct.

15   Q.   Members of the public?

16   A.   Correct.

17   Q.   Retailer -- not retailers.  Distributors?

18   A.   Correct.

19   Q.   Licensees?

20   A.   Correct.

21   Q.   And I take it during the time periods when you've been

22   or the episodes or incidents where you have attended

23   New York Toy Fair, you've actually seen people gathering

24   information?

25   A.   Yes.

1  Q.   And do people hand out -- people, perhaps, is not the

2  right word.

3          Let me ask it this way:  Do the toy companies hand

4  out information to the retailers and members of the press,

5  and the others who attend toy fair?

6          MS. HURST:  Vague.

7          THE COURT:  Overruled.

8          THE WITNESS:  Absolutely.  In fact, most of the

9  material is available before we get to toy fair in various

10  forms.

11  BY MR. ZELLER:

12  Q.   And what kind of materials are you referring to?

13  A.   Sale sheets.  Press releases.

14  Q.   What are sale sheets?

15  A.   "Sale sheets" are basically a sheet of paper that has a

16  full description of the product, the item number, the

17  wholesale price and anything else that's necessary for a

18  retailer to distribute the product.

19  Q.   And are catalogs also distributed as part of toy fair

20  by the manufacturers?

21  A.   Yes.

22  Q.   And, generally speaking, what is the purpose of

23  New York Toy Fair?

24  A.   For everybody to know what's coming next season.

25  Q.   And why do you make -- toy manufacturers want people to

1    know that?

2    A.   I'm sorry.  Why do?

3    Q.   Why is it --

4            THE COURT:  Excuse me for just a moment, Counsel.

5            Why don't we all just stand up for just a sec.

6    Stand up for just a sec.

7        *(Pause.)*

8            THE COURT:  If you will be seated.

9            Thank you.

10   BY MR. ZELLER:

11   Q.   And why is it that toy manufacturers want to get this

12   information out to retailers and the press and analysts and

13   others who attend toy fair?

14   A.   To get them excited and ready for the next season and

15   to publicize and -- prepare them for what's coming down the

16   line.

17   Q.   And by this time, by the time New York Toy Fair

18   which -- by the way, that's typically in February?

19   A.   Correct.

20   Q.   By that time, by the time that New York Toy Fair

21   actually starts, is there usually publicity that toy

22   companies engage in prior to that time?

23   A.   Absolutely.

24   Q.   And, generally speaking, what ways do manufacturers,

25   toy manufacturers publicize the products that they'll be

1    showing at New York Toy Fair, in advance of the event?

2    A.    There are press releases that go out, certainly, a week

3    or more before toy fair begins.  There are -- that's

4    probably the main vehicle.

5          There are discussions with retailers that we're

6    going to be launching this, and you'll be seeing this.

7    Sometimes there are retailers who have already seen the

8    product before toy fair.  But there's a lot of anticipation

9    to toy fair and a lot of preparation.

10   Q.    And during the time period you were there at Mattel,

11   what was your expectation once an upcoming product or other

12   kinds of information was shared with a retailer?

13   A.    That it was public.

14   Q.    And why is that?

15   A.    Because we had no way of controlling what retailer or

16   anybody else that had seen the product was going to do once

17   they left our showroom.  Certainly, retailers talk to the

18   competition and oftentimes discussed what they saw in one

19   showroom to another competitor.

20   Q.    And so, is that the case that information at these toy

21   fairs that you've been describing, in your view, was public

22   because it was being shared with the retailers and others?

23   A.    Absolutely.

24          MR. ZELLER:  I have nothing further.

25          THE COURT:  Redirect examination.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1                        REDIRECT EXAMINATION
2    BY MS. HURST:
3    Q.    The word "Bratz" connotes bratty behavior no matter
4    where you apply it; isn't that true?
5    A.    Seems reasonable.
6    Q.    And, in fact, settling on the name of Diva Starz, a
7    "diva" is a haute woman; right?  An uppity woman?
8    A.    I wouldn't use those words.
9    Q.    What do you think the word "diva" means?
10   A.    With "diva," we were trying to capitalize on a
11   California cool, in-the-know-type person.
12   Q.    The word "diva" more generally, though, signifies a
13   prima donna, doesn't it?
14   A.    Yes.
15   Q.    And -- but that did not concern you to apply the name
16   diva to the product; right?
17   A.    Well, we liked the idea that someone that was a diva
18   would be in the know and the first to know.
19   Q.    Have you ever seen Carter Bryant's drawings?
20   A.    In my deposition, yes.
21   Q.    Other than that?
22   A.    No.
23   Q.    And it was -- was it MGA's lawyers who showed them to
24   you in the deposition?
25   A.    I don't recall.
```

```
 1   Q.    Between 2003 and 2008 when your deposition was taken,

 2   did you ever make any effort to obtain Carter Bryant's

 3   drawings in order to look at them?

 4            MR. ZELLER:  Assumes facts.

 5            THE COURT:  What's the relevance?  2003 to 2008?

 6            MS. HURST:  Well, it's on the point on cross.

 7            THE COURT:  I'm sorry.  Overruled.  Overruled.

 8            MS. HURST:  Thank you, your Honor.

 9   BY MS. HURST:

10   Q.    Between 2003 and when your deposition was taken in

11   2008, did you ask anybody to see the Carter Bryant drawings?

12   A.    No.

13   Q.    For that five year period of time, you weren't

14   concerned enough about what you had missed out on to go get

15   the drawings and look at them.

16            True?

17            MR. ZELLER:  Assumes facts.

18            THE COURT:  That she had access to the Carter

19   Bryant drawings.

20            MR. ZELLER:  Correct.

21            THE COURT:  It assumes that she would have access

22   to those drawings.  That's what I'm concerned about.

23            I'm going to sustain the objection.

24   BY MS. HURST:

25   Q.    Ms. Fontanella, your termination agreement called for
```

1    you to have a continuing consulting relationship with

2    Mattel.

3              True?

4    A.    True.

5    Q.    Including consulting with Mattel on any legal

6    proceedings; right?

7    A.    Correct.

8    Q.    And it's your belief as you sit here today that if you

9    had gone to somebody at Mattel and asked them to see the

10   Carter Bryant drawings, they'd give them to you to look at;

11   right?

12             MR. ZELLER:  Assumes facts.

13             THE COURT:  I'm going to sustain the objection.

14   BY MS. HURST:

15   Q.    You have had a continuing relationship with Mattel

16   since the time of your termination; correct?

17   A.    I have had very little contact.  But, yes, I've had

18   some contact.

19   Q.    Okay.  And you know that if you called up the people

20   you knew at Mattel and asked them to get you the Carter

21   Bryant drawings to look at, they would do that for you,

22   wouldn't they?

23             MR. ZELLER:  Assumes facts.

24             THE COURT:  I'm going to sustain the objection.

25   ////

1    BY MS. HURST:

2    Q.    Let me ask you this:  Between the time you left in

3    February 2003 and when your deposition was taken in 2008,

4    did you ever ask anybody for the Carter Bryant drawings?

5              MR. ZELLER:  Assumes facts.

6              THE COURT:  The problem I'm having, once again, is

7    accessibility.  That's the issue.

8              But prior to the deposition, you can inquire.

9    That's a proper question.

10             MS. HURST:  Thank you, your Honor.

11             THE COURT:  You can ask that question.

12   BY MS. HURST:

13   Q.    At any time prior to the deposition in 2008, did you

14   ask anybody to look at the Carter Bryant drawings?

15   A.    Well, I had no idea that Carter Bryant was really

16   involved, or what he did, or -- I would have no reason, and

17   I wasn't employed by Mattel.

18   Q.    You heard about the lawsuit, though; right?  That's

19   what you said on cross; right?

20   A.    I heard there was a lawsuit, yes.

21   Q.    And then you said, *I was really disappointed, because I*

22   *would have liked to consider that product*; right?

23   A.    Correct.

24   Q.    But in all that time between when you heard about the

25   lawsuit and when your deposition was taken, you never asked

44

1    anybody to see those drawings; right?

2              MR. ZELLER:  It assumes facts.

3              THE COURT:  I'm going to sustain the objection,

4    counsel.

5    BY MS. HURST:

6    Q.   Prior to your deposition, did you ever ask anybody to

7    see Carter Bryant's drawings?

8    A.   I wasn't working for Mattel.

9    Q.   If you could answer this question yes or no,

10   Ms. Fontanella, I would appreciate it.  Prior to your

11   deposition, did you ever ask anybody to see the Carter

12   Bryant drawings?

13   A.   I didn't even know the drawings existed.

14   Q.   So you heard about the lawsuit?

15   A.   Yes.

16   Q.   And you heard that Carter Bryant was supposedly working

17   on Bratz while he was still employed at Mattel; right?

18   A.   To be honest with you, I left Mattel, and I went about

19   my merry old business of leading my life and really didn't

20   think about it too much.

21   Q.   Including thinking about whether that was something you

22   would have liked to consider; right?

23              MR. ZELLER:  Argumentative.

24              THE COURT:  Sustained.

25   ////

1    BY MS. HURST:

2    Q.   Is it true that after Mattel raised concerns with

3    Bandai, regarding its distribution of Bratz in Europe, that

4    Bandai refused to distribute Bratz in Latin America?

5            MR. ZELLER:  Assumes facts.

6            THE COURT:  Well, if she knows.  You can ask her

7    if she knows that, Counsel.

8            Now, this isn't a fact, ladies and gentlemen, but

9    she can inquire about your knowledge concerning Bandai.

10           THE WITNESS:  I had no knowledge of that.

11   BY MS. HURST:

12   Q.   To your knowledge, did Bandai ever distribute Bratz in

13   Latin America?

14   A.   I don't know.

15   Q.   So you actually don't know one way or another whether

16   Bandai took any action in response to Mattel's efforts to

17   get it to agree not to distribute Bratz?

18   A.   I don't remember.

19   Q.   Now, is it true that at the New York Toy Fair that

20   Mattel would have a private showroom?

21   A.   I think all the showrooms had, sometimes, private

22   areas.

23   Q.   Okay.  And, in fact, Mattel would have a big sign

24   outside that indicated that access was restricted.

25           True?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    I don't remember that.

2    Q.    Is it true that you could only get into the private

3    areas by invitation?

4    A.    Not necessarily.

5    Q.    So it was okay with you if your competitors just came

6    right into your private areas of your showrooms and looked

7    at your product?

8    A.    I didn't say that.

9    Q.    Because that wasn't okay with you, was it?

10   A.    No.

11   Q.    Okay.  And you -- you agree, right?  That if somebody

12   is using fake ID to get access to something, that's because

13   they couldn't get access to it if they told the truth;

14   right?

15            MR. ZELLER:  Assumes facts.

16            THE COURT:  Would you repeat the question,

17   counsel.

18   BY MS. HURST:

19   Q.    You agree that if somebody uses fake credentials to get

20   access to something, that's because they couldn't get access

21   to it if they told the truth?

22            MR. ZELLER:  Assumes facts.

23            THE COURT:  Ask the question one more time.  I'm

24   sorry.

25            MS. HURST:  Thank you, your Honor.

1   BY MS. HURST:

2   Q.   Do you agree, Ms. Fontanella, that if someone uses fake

3   credentials to get access to information, that's because

4   they couldn't get it if they told the truth?

5            MR. ZELLER:  Incomplete hypothetical.  Assumes

6   facts.

7            THE COURT:  Not to tell the truth but to gain

8   access, counsel.

9            If you ask that question, I'll allow it.

10           MS. HURST:  Thank you.

11  BY MS. HURST:

12  Q.   Do you agree that the reason for using a fake

13  credential to gain access to a private showroom is that you

14  could not otherwise get access if you identified yourself?

15  A.   Probably.

16  Q.   Isn't it also true that if all that information was

17  freely available that there would be no reason to create

18  fake identities to get access to it?

19           MR. ZELLER:  Assumes facts.

20           THE COURT:  I'm going to sustain the objection.

21           I think that it's a little bit of argument, and

22  we're going to have -- I think you're going to be producing

23  people on this very subject.

24           MS. HURST:  All right.  Thank you, your Honor.

25  ////

1    BY MS. HURST:

2    Q.   You said that it was your expectation that any

3    information shared with retailers was public; right?

4    A.   It was my --

5    Q.   Your expectation that any information shared with

6    retailers was public?

7    A.   Yes.  Correct.

8    Q.   And that applied at all times for all reasons.  True?

9    A.   Yes.

10   Q.   And so, for example, if departing employees left Mattel

11   and they took information that came -- that had been shared

12   with retailers, that would be public information; correct?

13           MR. ZELLER:  The question is incomplete

14   hypothetical.

15           THE COURT:  Restate that one more time, counsel.

16   BY MS. HURST:

17   Q.   So, for example, if Mattel employees left, and they

18   took with them copies of information that had been shared

19   with retailers, you would consider that public information;

20   right?

21   A.   I would consider that illegal.

22   Q.   And the reason is because you think that's confidential

23   information; right?

24           MR. ZELLER:  Misstates the witness' testimony.

25           THE COURT:  Overruled.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   BY MS. HURST:

2   Q.    Right?

3   A.    It depends what it was.  If it was something that was

4   readily available to the public, and they -- other people

5   had access to that, then it was public information.  If it

6   was something that other people didn't have access to and

7   wasn't published in a press release and a sale sheet and a

8   catalog and readily available, then, yes, it was

9   confidential.

10  Q.    So it all depends on the circumstances; right,

11  Ms. Fontanella?

12              MR. ZELLER:  Misstates the witness' testimony.

13              THE COURT:  No, overruled.

14              You can answer that question.

15              THE WITNESS:  I'm not sure I understand.

16  BY MS. HURST:

17  Q.    Whether you consider the information to be confidential

18  or not, even if it's been shared with retailers, still

19  depends on the circumstances; right?

20              MR. ZELLER:  Misstates the witness' testimony.

21              THE COURT:  Overruled.

22              THE WITNESS:  I'm sorry, but I'm really not

23  understanding what you're asking.

24  BY MS. HURST:

25  Q.    Let me back up a step, then.  You said that your

```
 1   expectation is that any information shared with retailers is
 2   public; right?
 3   A.    That once you discuss something or present something to
 4   a retailer, that information is probably public, yes.
 5   Q.    And that would include information that remains at
 6   Mattel to which its employees have continuing access; right?
 7              MR. ZELLER:  The question is vague.
 8              THE COURT:  Do you understand the question?
 9              THE WITNESS:  Not really.
10              THE COURT:  Sustained.
11   BY MS. HURST:
12   Q.    That would include information that's been shared with
13   retailers that's sitting around in Mattel's e-mail and
14   computer servers and that kind of thing; right?
15   A.    No.  I'm talking about products that are shown to
16   retailers before we go to toy fair, or products that we're
17   thinking of making, and we want to get an opinion from a
18   retailer.
19   Q.    So, for example, you would show your upcoming products
20   to a retailer at the toy fair; right?
21   A.    Correct.
22   Q.    And that list of products would be reflected on a line
23   list; right?
24   A.    I believe so.
25   Q.    So if somebody took a line list with a list of products
```

1      that you had already shared with retailers, that would be

2      public information, right, at that point?

3                  MR. ZELLER:  Incomplete hypothetical.  Assumes

4      facts.

5                  THE COURT:  Just a minute, counsel.

6          (Pause.)

7      BY MS. HURST:

8      Q.   So the new products that you have coming up when you

9      show them to retailers, that is also reflected on a line

10     list; right?

11     A.   Yes.

12     Q.   And actually the line list has the prices on it that

13     you put on the sales sheets that you give to the retailers;

14     right?

15     A.   Correct.

16     Q.   And it has the item number on it; right?

17     A.   Correct.

18     Q.   Okay.  And it's your view that once that list of

19     products is disclosed to the retailers, then the line list

20     is no longer confidential information.

21                  True?

22                  MR. ZELLER:  Assumes facts not in evidence.

23                  THE COURT:  Overruled.

24                  THE WITNESS:  I would maintain that that list is

25     public.

```
 1   BY MS. HURST:
 2   Q.   Okay.  So if an employee takes that line list with
 3   them, then they're not taking a trade secret; isn't that
 4   right, Ms. Fontanella?
 5            MR. ZELLER:  It's argumentative.  Assumes facts.
 6            THE COURT:  Overruled.
 7            You can answer that question.
 8            THE WITNESS:  You know, I don't know.  It depends
 9   what line list -- you know, I would have to see exactly the
10   line list and what the circumstances are.
11   BY MS. HURST:
12   Q.   But if it's the line list full of the products that
13   have been disclosed to retailers already at the toy fair,
14   then in your view that's a public document; right?
15            MR. ZELLER:  The question is vague.
16            THE COURT:  Overruled.
17            THE WITNESS:  It's a document that other people
18   have access to.
19   BY MS. HURST:
20   Q.   Including members of the public; right?
21   A.   Yes.
22   Q.   And it's not a trade secret.  True?
23   A.   I wouldn't necessarily say that.  I mean, I'm not
24   sure -- we would have to get into the definition of trade
25   secret.
```

1    Q.   It's not Mattel confidential information anymore;

2    right?

3    A.   Well, it's confidential, but it just happens to be

4    available to a wider audience.

5    Q.   It's confidential even though it's been disclosed to

6    retailers?

7              Is that what you're saying?

8              MR. ZELLER:  This is argumentative.

9              THE COURT:  Restate the question, Counsel.

10   BY MS. HURST:

11   Q.   You said it's confidential, but it's been given to the

12   wider audience; right?

13   A.   I'm saying that we would present things to retailers

14   and say, *This is confidential information.*  And what I'm

15   saying, once a retailer saw it, we could not ensure that

16   they were locked in the closet and couldn't speak to anybody

17   ever again.

18   Q.   So was it public or secret at that point?

19   A.   At what point?

20   Q.   At the point that you disclosed it to the retailer.

21   A.   It was public.

22   Q.   Okay.  And if you had a list full of things that had

23   been disclosed to retailers, then that was not a secret.

24             True?

25             MR. ZELLER:  Assumes facts not in evidence.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Not necessarily.

 3              MS. HURST:  No further questions.

 4              THE COURT:  Recross examination, please.

 5                        RECROSS-EXAMINATION

 6    BY MR. ZELLER:

 7    Q.   You were asked questions about line lists.  Are line

 8    lists something that -- as you understand them, an internal

 9    Mattel document?

10    A.   Yes.  To be honest with you, I don't exactly remember

11    what a line list is.  If it was an internal document -- I

12    don't believe it was an external document.  As we're talking

13    about it, I'm beginning to have my memory refreshed, and

14    possibly it was an internal document.

15    Q.   Assuming it's an internal document, do you have any

16    reason to think that line lists, Mattel line lists are

17    shared with retailers?

18    A.   I don't recall exactly what a line list was.  Was it an

19    internal document that we looked at to put the line together

20    so that changed many times before we got to toy fair?  I

21    really can't answer that.

22    Q.   Do you recall that there was a document that was called

23    a line list that was produced within Mattel that anywhere

24    from a year to 18 months projected or forecasted what the

25    line would be about a year or 18 months in advance?
```

1    A.    Yes, I do.

2    Q.    Now, when those documents, those kinds of line lists

3    were generated, those internal Mattel documents, at that

4    stage were they shared with retailers?

5    A.    No.

6    Q.    And is it your belief that information on those line

7    lists showing the product line a year or 18 months in

8    advance, is that something that would be public?

9    A.    No.

10   Q.    You were asked some questions about whether or not it

11   would be okay for departing employees to take certain kinds

12   of information.

13              Do you recall that?

14   A.    Yes.

15   Q.    And you're, of course, aware that Mattel employees,

16   during the time when you were there at Mattel up through

17   2003, signed agreements stating that they would not disclose

18   the information of the company?

19   A.    Correct.

20   Q.    So they had a contract that provided for it?

21   A.    Correct.

22   Q.    You were asked some questions about private showrooms

23   at toy fairs.  And it is the case that sometimes toy

24   manufacturers take additional steps to keep private the

25   products or information that they're showing to the

1    retailers at New York Toy Fair?

2    A.    Absolutely.

3    Q.    And what's your expectation that even with those kinds

4    of separate or secret showrooms that once that product or

5    information is shared with a retailer as to whether or not

6    it's public?

7              MS. HURST:  Objection.  Calls for speculation.

8              THE COURT:  Overruled.

9              You can answer the question.

10             THE WITNESS:  My assumption was once toy fair

11   started, everything was fair game whether it was a private

12   space or not a private space.  There was no assurance that

13   someone couldn't get in.

14   BY MR. ZELLER:

15   Q.    And when you say "fair game," you're saying that it was

16   just widely and generally known?

17   A.    Well, it would be marked, you know, or it would be

18   closed off so people would see, but that doesn't mean that

19   they couldn't go -- they couldn't enter.

20   Q.    And so it was still your view that even when products

21   or other information is being kept in those more private

22   parts of the showroom that once they were shared with

23   retailers, it was still public?

24   A.    Correct.

25   Q.    You were asked some questions about asking for the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

| | |
|---|---|
| 1 | Carter Bryant drawings.  I take it, you don't have any idea |
| 2 | when Mattel or its lawyers first had access to any Carter |
| 3 | Bryant drawings for Bratz? |
| 4 | A.    No. |
| 5 | Q.    You don't know that? |
| 6 | A.    No. |
| 7 | Q.    And I take it you don't know anything about the |
| 8 | circumstances under which they were obtained? |
| 9 | A.    No. |
| 10 | Q.    Do you know whether or not MGA made those drawings |
| 11 | public at any time? |
| 12 | A.    No. |
| 13 | Q.    You were asked some questions about after this lawsuit |
| 14 | was started did you ask for the drawings. |
| 15 |         You had already left Mattel at that time? |
| 16 | A.    Correct. |
| 17 | Q.    And do you even to this day know what these drawings |
| 18 | look like? |
| 19 | A.    I think I saw them in my deposition. |
| 20 | Q.    And have you ever heard of something called a |
| 21 | protective order in a case? |
| 22 |         MS. HURST:  Objection. |
| 23 |         THE COURT:  Sustained. |
| 24 | BY MR. ZELLER: |
| 25 | Q.    Do you know whether or not Mattel attorneys could have |

1   just simply shown you information that was produced by MGA

2   or Carter Bryant as of the time of your deposition?

3   A.   I don't know.

4           MS. HURST:  Objection.  Assumes facts.

5           THE COURT:  Sustained.  In fact, I think I

6   sustained the objections in this area, other than the

7   deposition.

8   BY MR. ZELLER:

9   Q.   Let me try it this way:  Do you know whether or not

10  Mattel was even allowed to show you those drawings?

11          MS. HURST:  Objection.

12          THE COURT:  Sustained.

13          You can once again ask in relation to the

14  deposition.

15          MR. ZELLER:  That's what I'm trying to get to,

16  your Honor.

17  BY MR. ZELLER:

18  Q.   As of the time of your deposition -- and I think you

19  said it was 2008 -- do you even know one way or another

20  whether Mattel or its attorneys were allowed to show you

21  those drawings?

22  A.   That's a good question.  No, I have no idea.  I was

23  shown so many things, and there was some many binders of

24  different images that, no, I don't know what I was allowed

25  to be shown or not allowed to be shown.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. ZELLER:  Thank you.

 2              THE COURT:  Now, we're asking all of the witnesses

 3    to remain on call, but don't become concerned about that.  I

 4    doubt you will returning to court.  I don't want additional

 5    subpoenas going out, people inconvenienced, et cetera.  So

 6    if you have professional responsibilities or even a planned

 7    vacation, you go about your business.  If we need you, we'll

 8    be courteous.  We'll notify you.

 9              THE WITNESS:  Okay.  I appreciate that.

10              THE COURT:  Counsel, your next witness.

11              MS. HURST:  Your Honor, our next witness is

12    Ms. McShane.  It might make sense for us to take a brief

13    recess before that.

14              THE COURT:  All right.  This will be a good time

15    also before starting the next witness.

16              You're admonished not to discuss this matter

17    amongst yourselves, or form, or express any opinion

18    concerning the case.

19              Have a nice recess.  We'll come and get you.

20         (Jury recess.)

21         (The following proceedings were had outside the

22         presence of the jury:)

23              THE COURT:  Counsel, if you would be seated

24    please.

25              Now, with Ms. McShane, you were going to prepare
```

1    and show me your best efforts.

2           MS. HURST:  Your Honor, I have that privilege log

3    with all the references to Quinn Emanuel redacted.

4           THE COURT:  Has Mr. Zeller seen a copy?

5           MS. HURST:  I've just handed it to Mr. Zeller.

6           May I hand it to the court as well?

7           THE COURT:  You may.  Thank you.

8           Now, here are the ground rules concerning McShane:

9    She can be asked questions about whether she corresponded

10   with outside counsel in 2002.  What the court is causing is

11   the redaction concerning Quinn Emanuel, because I don't want

12   the law firms litigating this case personally involved in

13   front of the jury.

14          But you may not inquire into the subject matter

15   content of the communication, since Mattel has not waived

16   the privilege, and Mattel in fact is the holder of the

17   privilege.  So I think the bottom line is that the mere fact

18   of a communication with an outside attorney is not

19   privileged.

20          Now, Mattel previously argued that the fact of a

21   communication between Ms. McShane and outside counsel has

22   limited probative value, because Ms. McShane was only

23   investigating a claim based on the misappropriation of

24   Toon Teens.  But even if that were the case, a reasonable

25   jury could conclude that if Mattel thought that Bryant

1    misappropriated Toon Tunes, then it was on notice of the

2    fact that he created Bratz while at Mattel, which goes to

3    the statute of limitations issue.

4           Mattel has also argued that the investigation of a

5    Toon Teens misappropriation claim would not have been put --

6    would not have put it on notice, or -- would not have put it

7    on notice of the fact that Bryant was working for MGA while

8    still at Mattel.  But I think the fact of Bryant's dual

9    employment may be irrelevant to a claim of trade secret

10   misappropriation, or even a Bratz works, because the

11   Uniform Trade Secrets Act may make it wrongful to use a

12   trade secret that an employee obtained during his prior

13   employment whether or not that prior employment overlaps

14   with his current employment.  I think these are all facts

15   that the fact-finder is still entitled to consider.

16          So MGA is not allowed to go into any of the

17   content of Ms. McShane's conversation with counsel.  And

18   even if the subject matter of those communications is

19   privileged pursuant to the law of the case, MGA, though, may

20   later argue to the jury about the subject matter of those

21   communications and what it might have been by pointing to

22   the proximity of time between McShane's investigation of

23   Carter Bryant and McShane's communication of outside

24   counsel.

25          So the exhibit in question that was discussed

```
 1    amongst many issues last evening was 9633.  And my biggest
 2    concern, besides Quinn Emanuel, was that Mr. Zeller's name
 3    appeared on this, and it seems to have been redacted.
 4           I'm going to accept that representation so that
 5    you can have a brief restroom break.
 6           Mr. Zeller.
 7           MR. ZELLER:  Your Honor, first of all, I do -- we
 8    do continue to object to this.  And in particular, because
 9    the court, as it's stating, MGA will be permitted to do is
10    ask the jury to speculate as to the content of privilege
11    communications, there is, in fact, a standard instruction
12    that says that that is not permissible.  It's not
13    permissible under the law.
14           And, first of all, we don't think that the
15    privilege log should be used at all.  There was a prior
16    ruling where we had considered using it for purposes of
17    impeaching Mr. Larian, and it was rebuffed.  Obviously, we
18    would intend to revisit that depending on this ruling.  But
19    setting that aside, the fact is, is that showing this is
20    just simply going to invite the jury to speculate as to the
21    content of privileged communications.  That's MGA's purpose
22    here.
23           What I would request is, is that the court either
24    give the -- there's a standard instruction on how that is
25    not a permissible purpose, and -- or, alternatively,
```

 1    language to the effect of:  *As I have instructed you, the*
 2    *content of the parties' communications with their lawyers*
 3    *are protected by the attorney-client privilege and may not*
 4    *be asked about.*
 5            THE COURT:  That I will give, counsel, and I will
 6    remind the jury of that.
 7            MR. ZELLER:  And I would also ask that you state:
 8    *You are not to speculate about the contents of these or*
 9    *other attorney-client communications or to draw any*
10    *inferences based upon a parties' claim of privilege.*
11            THE COURT:  I'm inclined to give that, also.  What
12    I'm not going to do, though, is preclude MGA from showing
13    that Mattel, from their perspective, was obviously
14    interested in retaining outside counsel.
15            So I think my ruling was clear last evening.  I
16    think it's clear today.
17            Now, have a nice recess.
18            MS. HURST:  Your Honor, may I ask one more
19    question?
20            Would it be all right if I showed the witness the
21    unredacted version for her recollection purposes, if the
22    court gives her the instruction that she's not to name
23    names?
24            THE COURT:  No.  I do not want any possible slip
25    up with Quinn Emanuel's firm being brought into this, or

1   Mr. Zeller.  None.

2           MS. HURST:  Your Honor, I don't know how -- I

3   mean --

4           All right.  I understand the court's ruling.

5           THE COURT:  Thank you very much.  Have a nice

6   recess.

7       *(Recess taken from 2:01 p.m to 2:16 p.m.)*

8       *(The following proceedings were had in open court*

9       *in the presence of the jury:)*

10          THE COURT:  Counsel are present.  The parties.

11  Thank you for your courtesy.

12          If you will be seated.

13          Ms. Hurst, would you like to call your next

14  witness, please.

15          MS. HURST:  Yes.  MGA and Mr. Larian call Michele

16  McShane.

17          THE COURT:  And would you stop at that location,

18  Ms. McShane.

19          Would you raise your right hand.

20      MICHELE LOUISE MCSHANE, DEFENDANTS' WITNESS, SWORN

21          THE WITNESS:  I do.

22          THE COURT:  If you would walk along the jury

23  railing and there's an entrance closest to me and close to

24  this wall.

25          If you will be seated.

```
 1              Now, would you state your full name for the
 2   record, please.
 3              THE WITNESS:  My name is Michele Louise McShane.
 4              THE COURT:  Would you spell your last name.
 5              THE WITNESS:  Yes.  M-C-S-H-A-N-E.
 6              THE COURT:  This is direct examination by
 7   Ms. Hurst, on behalf of Mr. Larian and MGA.
 8              MS. HURST:  Thank you, your Honor.
 9                       DIRECT EXAMINATION
10   BY MS. HURST:
11   Q.   Good afternoon, Ms. McShane.
12   A.   Good afternoon, Ms. Hurst.
13   Q.   You joined Mattel in March of 1995 as a counsel;
14   correct?
15   A.   That's correct.
16   Q.   And you were an attorney for Mattel; right?
17   A.   Yes.
18   Q.   And you left Mattel in June 2003?
19   A.   That's correct.
20   Q.   And at that time, you were a vice president, assistant
21   general counsel and assistant secretary?
22   A.   Yes.
23   Q.   And you reported directly to Mr. Normile, the general
24   counsel?
25   A.   Yes.
```

```
 1   Q.   And as an assistant secretary, you were actually an
 2   officer of the company.
 3          True?
 4   A.   Correct.  I was also vice president.
 5   Q.   You were an officer --
 6   A.   I was an officer in that capacity also.
 7   Q.   But all of your duties for Mattel were legal duties;
 8   right?
 9   A.   Yes.
10   Q.   Over your eight years with Mattel, you were promoted
11   two or three times?
12   A.   Yes.
13   Q.   You also had good performance reviews?
14   A.   Yes.
15   Q.   Your principal area of responsibility while you were at
16   Mattel was for trademarks and copyrights.
17          True?
18   A.   Right.
19   Q.   And you were responsible for both getting them on
20   behalf of Mattel and enforcing them.
21          True?
22   A.   Yes.  Making filings on behalf of the company and
23   enforcement efforts.
24   Q.   So -- and if sometimes that involved disputes or
25   litigation over trademarks or copyrights, you were
```

1  responsible for that; right?

2  A.   Generally true, yes.

3  Q.   Is it true that you were the highest ranking legal

4  officer with the specific responsibility for trademarks and

5  copyrights while you were there?

6  A.   Yes.

7          MS. HURST:   Now, I would like to place before the

8  witness, Ms. Phillips, Exhibit 17252.

9          This is already in evidence, your Honor.

10 BY MS. HURST:

11 Q.   And, Ms. McShane, you see there that this is a letter

12 sent to Mr. Larian?

13 A.   Yes.

14 Q.   And it's what's commonly called as a cease and desist

15 letter; right?

16 A.   Yes.  I read this in my deposition.

17 Q.   It says:   *Stop using Mattel's trademarks*; right?

18 A.   Correct.

19 Q.   And you were copied on this letter when it was sent on

20 or about February 7, 2002; is that right?

21 A.   Yes.

22 Q.   And in February 2002, you were responsible for the

23 enforcement of trademarks and copyrights; right?

24 A.   Yes.

25 Q.   Would you turn, please, to Exhibit 8154.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

68

1          Do you recognize that as a fax sent from Joseph

2   Franke to you on or about February 20th, 2002?

3   A.   I saw this in my deposition also, and that's what it

4   says.  It's to me from Mr. Franke.

5   Q.   You don't have any reason to doubt that's the case;

6   right?

7   A.   I have no thought one way or another about it.

8   Q.   Mr. Franke was the vice president of design at Mattel?

9   A.   I don't recall.

10  Q.   He was an employee of Mattel; right?

11  A.   I don't recall his name.

12  Q.   You were an employee of Mattel on February 20th, 2002;

13  right?

14  A.   Yes, I was.

15  Q.   You were an attorney for Mattel on that day; right?

16  A.   Yes.

17          MS. HURST:  Your Honor, I move the admission of

18  8154.

19          THE COURT:  Received.

20     (Defendants' Exhibit 8154 received in evidence.)

21  BY MS. HURST:

22  Q.   It's a resume of Mersudo Ward; is that right?

23  A.   Yes.

24  Q.   And on the front page, in the upper right-hand corner,

25  there is a handwritten notation; is that right?

1    A.    Yes.

2    Q.    And you believe that's your handwriting; correct?

3    A.    It probably is.  It looks like it.

4    Q.    And it says Diva/Sassy; right?

5    A.    Yes.

6    Q.    Now, let me ask you to turn to Exhibit 1195RS, and I'll

7    ask you to turn to page 66 of that.  And it's the TX numbers

8    66.

9    A.    Okay.

10   Q.    Now, in the top part of that page, there's an entry on

11   the chronological record dated 3/28.

12             Do you see that?

13   A.    Could you identify the location again?

14   Q.    Sure.  It's about the third one down.  It's highlighted

15   there on the scene.  If you want to look at the monitor

16   there, sometimes that's easy.

17   A.    Okay.  Thank you.  Yes.

18   Q.    The 3/28 entry says:  *Met with Cassidy Park to get more*

19   *info on MGA issue.  She suggested Carter Bryant as*

20   *illustrator/former employee who may have plagiarized design*

21   *of Lily Martinez and created*, quote, unquote, *Bratz dolls*

22   *for MGA.*

23             Do you see that?

24   A.    Yes, I do.

25   Q.    Did you attend that meeting?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   A.   I don't recall.

2   Q.   Did you meet with -- pardon me -- Adrienne Fontanella

3   in the early part of 2002 to discuss Bratz?

4   A.   I have no recollection about that.

5   Q.   Do you have any reason to deny that you met?  In other

6   words, is there anything you know of that makes you doubt

7   whether you met with Ms. McShane -- pardon me, with

8   Ms. Fontanella in the early part of 2002?

9   A.   I have no recollection one way or another.

10  Q.   You do recall that there was some Bratz issue that you

11  worked on?

12  A.   Yes.

13  Q.   And that was in 2002; right?

14  A.   I don't recall the year.

15  Q.   Is it true that at some point you retained outside

16  counsel in connection with the Bratz issue?

17  A.   I don't specifically recall that at all.

18  Q.   You don't know one way or another?

19  A.   I don't recall.  Yes, I don't know one way or another.

20  Q.   If Ms. Fontanella testified that she met with you and

21  outside counsel regarding the Bratz issue, would you have

22  any reason to disagree with that?

23  A.   No.

24            MR. QUINN:  Speculation.

25            THE COURT:  Sustained.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. QUINN:  Move to strike.

2          THE COURT:  Stricken.

3     BY MS. HURST:

4     Q.   Would it refresh your recollection to know that

5     Ms. Fontanella had testified that she met with you and an

6     outside counsel in the early part of 2002 regarding a Bratz

7     issue?

8          MR. QUINN:  Object to form.  Other witness'

9     testimony.

10         THE COURT:  I'm going to sustain the objection,

11    counsel.

12         MR. QUINN:  Move to strike.

13         THE COURT:  Stricken.

14    BY MS. HURST:

15    Q.   Is it true that Sonia Jolicoeur reported to you?

16    A.   That's correct.

17    Q.   Let me ask you to take a look at Exhibit 9633, the

18    first page, please.

19    A.   *(Witness so complies.)*  Yes, I saw this in my

20    deposition.

21    Q.   And you see that's excerpts from privilege log?

22    A.   Yes.

23    Q.   And that's the kind of document where parties put down

24    which documents are privileged that they are going to hold

25    back in litigation?

```
1    A.    Yes.

2    Q.    And it reflects there the fax from Mr. Franke to you

3    dated February 20th, 2002?

4    A.    Yes.  And where is that, please?

5    Q.    The very first line.

6    A.    Okay.  Yes.

7    Q.    And then Ms. Jolicoeur has a communication with outside

8    counsel on June 20th, 2002?

9    A.    Yes.

10   Q.    And Ms. Jolicoeur has another communication with

11   outside counsel on September 30th, 2002?

12         MR. QUINN:  Your Honor, this lacks foundation.

13   Just reading the log, or asking the witness?

14         THE COURT:  Overruled.

15         Now, the question is, the redactions will simply

16   be noted as "outside counsel"; is that correct?

17         MS. HURST:  That's correct.

18         THE COURT:  The redactions are simply noted as

19   outside counsel.

20         THE WITNESS:  Yes.

21         MS. HURST:  Your Honor, may I offer just the first

22   page of 9633?

23         MR. QUINN:  We object to this, your Honor.

24         THE COURT:  You may.  It's received.

25         (Defendants' Exhibit 9633 received in evidence.)
```

```
 1   BY MS. HURST:

 2   Q.   So I think we were at the entry 261, a facsimile dated

 3   September 30th, 2002, and that's Sonia Jillocour; right?

 4   A.   Yes.

 5   Q.   Okay.  And you said she worked for you; right?

 6   A.   That's correct.

 7   Q.   And Anita Kersting, on October 16, 2002, did she work

 8   for you as well?

 9   A.   Yes.

10   Q.   And November 13, 2002, there is a website printout with

11   handwritten notations; right?

12   A.   Yes.

13   Q.   And if you can continue down the page, there's a series

14   of communications involving outside counsel; right?

15   A.   And what's redacted represents outside counsel?

16   Q.   Yes.

17   A.   That would be 11 instances.

18   Q.   Is that what you count?

19   A.   Yes.  It looks like approximately 11.

20   Q.   Okay.

21   A.   That would involve outside counsel.

22   Q.   All right.  You had the authority to retain outside

23   counsel for litigation in 2002 and 2003; correct?

24   A.   Yes.  But it's pursuant to privilege communications,

25   and --
```

1   Q.   Sure.

2   A.   -- I would like for Mattel to weigh in on that.

3   Q.   I'm not asking about the substance of any

4   communication.  I'm just asking about your authority as a

5   lawyer at Mattel.

6   A.   Yes.

7   Q.   You had that authority.  True?

8   A.   Yes.

9         THE COURT:  Let me remind you, once again, that

10  I'm not allowing any inquiry into the communication.  There

11  can be discussion about meetings or the time of meetings,

12  et cetera.  But the attorney-client privilege prevails.

13  Therefore, it's a proper privilege.  You are not required to

14  discuss anything concerning those conversations.

15  BY MS. HURST:

16  Q.   You also had a Michael Moore who reported to you; is

17  that right?

18  A.   Yes.

19  Q.   And he was also an in-house attorney working in the

20  area of trademarks and copyrights?

21  A.   Yes.

22  Q.   And about how many lawyers were there in the in-house

23  legal department of Mattel in the 2002-2003 time frame?

24  A.   I'm unclear as to the number.  The department grew in a

25  period of years, and I'm not -- I'm not really clear how

1   many as a total department.  Under 40.  Under 30, something

2   like that.

3   Q.   Somewhere in the 30 to 40 range by the time you left?

4   A.   Probably fewer than that, but that's a ballpark.

5   Q.   Did you consider it to be a fairly significant

6   circumstance that would cause you to retain outside

7   litigation counsel?

8           MR. QUINN:  Objection.  Relevance, your Honor.

9           THE COURT:  Overruled.

10          You can answer the question.

11          THE WITNESS:  Yes, sir.

12          Circumstances vary at times as to why counsel

13  might be contacted.  And so, it might not be an important

14  matter.  It might be an important matter, ultimately, over

15  time.

16  BY MS. HURST:

17  Q.   All right.  Over the course of your career as an

18  intellectual property lawyer, have you ever heard the phrase

19  "reduced to practice"?

20  A.   No.

21  Q.   You're not familiar with that phrase at all?

22  A.   No.

23  Q.   Do you know whether that's a legal term of art?

24  A.   I don't know anything about it.

25  Q.   Let me ask you to look at Exhibit 8277.

```
 1              Before we look at that, without revealing the

 2    substance of any meetings, was there ever a time when you

 3    met with Mr. De Anda, others may have been present as well,

 4    to discuss a Bratz issue?

 5    A.   I recall there was probably at least one meeting,

 6    but -- as to the substance, attorney-client privilege would

 7    be asserted.

 8    Q.   But you do recall that there was a meeting involving

 9    Mr. De Anda; right?

10    A.   Vaguely, yes.

11    Q.   And is it true that after that, you were responsible

12    for handling the issue?

13    A.   I don't have that understanding, and I wouldn't

14    speculate about it.

15    Q.   So is it correct to say that your belief is that you

16    were not responsible for handling the issue after that

17    meeting with Mr. De Anda?

18    A.   I don't recall specifically a meeting or what was

19    discussed.

20    Q.   Were you ever responsible after that meeting with

21    Mr. De Anda for handling a Bratz issue?

22              MR. QUINN:  Vague and ambiguous.  Speculation.

23              THE COURT:  Overruled.

24              THE WITNESS:  I have a vague recollection of a

25    Bratz issue.  But not specifics.
```

1    BY MS. HURST:

2    Q.    Did you supervise any investigation of a Bratz issue?

3    A.    Again, I have a vague notion of Bratz but very -- it's

4    so skeletal, it's frightening.

5    Q.    If you assume that you were looking -- at some point

6    looking into a question of whether Bratz plagiarized

7    Toon Teens to use the language in 1195RS, would it be fair

8    to say that as part of that investigation you would want to

9    know how MGA got access to Toon Teens?

10             MR. QUINN:   Speculation.

11             THE COURT:   Overruled.

12             THE WITNESS:   We had a number of go-rounds on this

13   issue of, hypothetically, what I would or wouldn't have done

14   at the time, and it's -- it's difficult for me to answer

15   that.

16   BY MS. HURST:

17   Q.    Well --

18   A.    Because I don't really have the structured approach

19   that you're presenting as to how something might have arisen

20   in-house or be understood.

21   Q.    You were a copyright lawyer, amongst other things?

22   A.    Yes.

23   Q.    And you know that if you want to prove that somebody

24   committed copyright infringement that you would need to look

25   at how they got access to the work that you're claiming that

1    they copied; right?

2    A.    If -- access might be presumed in certain instances.

3    I'm not sure that that's true, legally.  I don't know, you

4    know -- I don't know how to answer the question, truly.

5              I understand it's an element that's presented, but

6    how it's proved up is a different question.

7    Q.    I'm just asking you, personally, Michele McShane, about

8    your understanding.  Is it your understanding, as someone

9    who has been a copyright lawyer for many years, that if you

10   want to prove a claim of copyright infringement, access is

11   one of the elements that you need to meet?

12   A.    Yes.

13   Q.    And, generally, "access" means somebody saw, or looked

14   at, or heard, or somehow got ahold of the underlining work;

15   right?

16             MR. QUINN:  Objection.  This is just legal

17   conclusion, your Honor.

18             THE COURT:  Overruled.

19             THE WITNESS:  I'm just not sure there isn't

20   another aspect to this that I'm not considering right here

21   on the stand at the moment.  And it concerns me, because --

22   I would just be ballparking for you, you know, something

23   from a Horn book.  And I'm not clear that that the analysis

24   wouldn't go deeper.  And that's why I was having trouble

25   during the deposition answering the same question.

```
 1   BY MS. HURST:
 2   Q.   You knew in 2002 that Toon Teens was an unreleased
 3   design of Mattel; right?
 4   A.   I had no recollection of Toon Teens in my deposition
 5   and was -- had no recollection about the name or the
 6   product.  There were three -- two or three drawings that you
 7   showed to me, among a few of them -- exhibits, that I
 8   recognized the hairstyle.
 9   Q.   Well, if you wanted to investigate whether Carter
10   Bryant plagiarized Toon Teens, one of the things that you
11   would generally want to know is whether and how and when
12   Carter Bryant got access to Toon Teens; right?
13   A.   Generally, that information -- if someone made an
14   accusation -- might be provided to employment and litigation
15   counsel in-house to investigate, but that's just -- that's
16   hypothetical and not responsive to what actually happened.
17   Q.   You don't remember what actually happened; right?
18   A.   I don't remember.
19   Q.   Okay.  So I'm just asking you to give your best
20   understanding as you sit here today about the practices that
21   you would follow as a competent intellectual property
22   lawyer.
23        Do you understand that?
24   A.   Yes.
25   Q.   Generally speaking, as a competent intellectual
```

```
 1   property lawyer, promoted three times over an eight-year
 2   period to a corporate officer position with responsibilities
 3   for intellectual property, if you wanted to investigate
 4   whether Carter Bryant plagiarized Toon Teens, one of the
 5   things you would want to know is whether, how and when
 6   Carter Bryant got access to Toon Teens; correct?
 7   A.    Personally and hypothetically, if I were apprised that
 8   that -- an employee had stolen something or taken something
 9   from the company in terms of its intellectual property, it
10   would be part of inquiry to have an understanding of how
11   that might have happened.  But, again, that's hypothetical
12   and wasn't my recollection or understanding.
13   Q.    Because you don't have any recollection?
14   A.    I don't have any.
15          MS. HURST:  Your Honor, I request to read from
16   pages 98, lines 11 through 18 of the witness' deposition.
17   Page 98, lines 11 through 18.
18      (Pause.)
19          THE WITNESS:  Yes.  If you wanted to --
20          MS. HURST:  Hold on.
21          THE WITNESS:  You're going to read it?  Sorry.
22          MR. QUINN:  There is an objection there, your
23   Honor.
24      (Pause.)
25          MR. QUINN:  It's also not impeaching.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

81

```
 1              THE COURT:  You can ask her if this refreshes her

 2    recollection, counsel.

 3              THE WITNESS:  Is that the pending question?

 4              THE COURT:  No.  She is going to ask you the

 5    question.

 6              MS. HURST:  Just one moment, your Honor.

 7         (Pause.)

 8    BY MS. HURST:

 9    Q.   All right.  Ms. McShane, I want you to assume that you,

10    personally, are investigating a claim that Carter Bryant

11    infringed Toon Teens in the creation of Bratz.

12              Do you understand that?

13              MR. QUINN:  This is speculation, your Honor.

14              THE COURT:  It is speculation.  She's not here as

15    an expert.  She's here for what she did or didn't do.

16              MS. HURST:  Your Honor --

17    BY MS. HURST:

18    Q.   Is it true that in accordance with your practices as an

19    attorney, an intellectual property attorney, if you,

20    personally, were investigating a claim that Carter Bryant

21    infringed Toon Teens in the creation of Bratz, one of the

22    things that you would want to know the facts about is how

23    did Carter Bryant get access to Toon Teens?

24              MR. QUINN:  Speculation.  Incomplete hypothetical.

25              THE COURT:  You can answer that question.
```

```
 1              THE WITNESS:  In an imaginary practice as an
 2    attorney, is that what --
 3    BY MS. HURST:
 4    Q.   I'm asking about you, Michele McShane.
 5    A.   I'm an attorney in an imaginary practice, and I'm an
 6    experienced intellectual property attorney?
 7    Q.   Right.  You, Michele McShane, promoted three times,
 8    head of IP at Mattel, there for eight years, always got
 9    positive performance reviews and Adrienne Fontanella comes
10    to you and says, I want you to look into this Bratz issue.
11              Now, one things that you would want to know the
12    facts about, if you were investigating, is how did Carter
13    Bryant get access to Toon Teens; right?
14              MR. QUINN:  Speculation.  Incomplete hypothetical.
15              THE COURT:  The problem is Adrienne Fontanella.
16    It just got added.
17              MS. HURST:  I'll rephrase, your Honor.
18    BY MS. HURST:
19    Q.   If you, Michele McShane, competent Mattel intellectual
20    property attorney, were investigating a claim that
21    Carter Bryant infringed Toon Teens in the creation of Bratz,
22    one of the things you would want to know the facts about is
23    how did Carter Bryant get access to Toon Teens; right?
24    A.   This seems to be a rephrasing of your other question
25    that in the course of investigating an employee who's
```

```
 1    allegedly done something, such as taking intellectual
 2    property, that I would be interested in investigating that.
 3    Yes.
 4              MS. HURST:  Your Honor, may I read from page 116,
 5    lines 5 through 15?
 6         (Pause.)
 7              MR. QUINN:  It's not impeaching, your Honor.
 8              THE COURT:  Well, I think you're correct, counsel.
 9              She said that I would be interested in
10    investigating that, yes.
11              Same answer, I think, that you have on line 15.
12              MS. HURST:  Your Honor, I think there were so many
13    qualifications in the answer here in court, I would request
14    a reading --
15              THE COURT:  Slow down then.  Get your answer.
16    BY MS. HURST:
17    Q.   Ms. McShane, I'm asking you to answer this question yes
18    or no, please.
19              Is it true that if you personally were
20    investigating a claim that Carter Bryant infringed
21    Toon Teens in the creation of Bratz, one of the things that
22    you would want to know the facts about is how did
23    Carter Bryant get access to Toon Teens?
24              Yes or no, please.
25    A.   Hypothetically, yes.
```

1    Q.   And you would want to know when and under what

2    circumstances Carter Bryant got access to Toon Teens; right?

3    A.   Hypothetically, I would want to understand what

4    actually transpired.

5    Q.   And that includes, if you can answer yes or no, please,

6    when and under what circumstances Carter Bryant got access

7    to Toon Teens; right?

8    A.   Hypothetically, yes.

9    Q.   And it's true that you would consider the visual

10   appearance of an unreleased design to be confidential

11   information of Mattel.

12            True?

13   A.   I believe that Mattel would consider it to be

14   confidential.

15   Q.   And you, you considered it confidential; right?

16   A.   Well, in the view of the client's policies or

17   understandings and wishes, yes.

18   Q.   Now, you understood that MGA was a competitor of Mattel

19   in the spring of 2002; right?

20   A.   Yes.

21   Q.   So if you were investigating MGA infringing Toon Teens,

22   you would be concerned about how MGA, a competitor, got

23   access to Mattel's confidential information; right?

24            MR. QUINN:  Your Honor, this is -- this is just

25   speculation.  Incomplete hypothetical.

1          THE COURT:  Overruled.

2          You can answer the question.

3          THE WITNESS:  If I were responsible for

4  ascertaining whether or not an employee or a competitor were

5  doing something untoward with respect to a client's property

6  interests, I would want to know those circumstances

7  underlying that.

8  BY MS. HURST:

9  Q.   I want you to listen to my question, and if you can

10  answer it yes or no, I'll appreciate it.  If you were

11  investigating MGA infringing Toon Teens, then you would

12  definitely want to look into how MGA got access to Mattel's

13  confidential information; right?

14  A.   Hypothetically, yes.

15  Q.   Now, it's your recollection that another in-house

16  counsel at Mattel, Jill Thomas, was somehow involved in the

17  Bratz issue you looked into; is that right?

18  A.   I believe I said it was possible that -- and I don't

19  want to paraphrase.  It's in the deposition.  That in view

20  of it being an employee issue, as you've framed it, that it

21  was very possible Jill Burtis Thomas had involvement, but

22  that I didn't know that for a fact.

23  Q.   You believed she had involvement; right?

24          MR. QUINN:  Hypothetical.

25          THE COURT:  Overruled.

1          MR. QUINN:  Speculation, your Honor.

2          MS. HURST:  No, no.

3          THE COURT:  Counsel.

4    BY MS. HURST:

5    Q.   You believed she had involvement; right?

6    A.   I believe I said to you that, because an employee was

7    involved that it was possible or more probable, or -- but to

8    me, it's speculation.  I would believe she would be involved

9    on some level, whether or not Ms. Burtis Thomas was actually

10   involved, I don't know.

11         MS. HURST:  Your Honor, I request to read from

12   page 123, line 14 through 124, line 5.

13         THE COURT:  You may.

14         MS. HURST:  *(Reading):*

15      QUESTION*:  Do you think Jill Thomas was involved*

16      *in this?*

17      *ANSWER:  Yes.*

18      *QUESTION:  Is it your recollection that Jill*

19      *Thomas was involved in the Bratz issue as you have*

20      *used that term here today?*

21         MS. HURST:  *(Reading):*

22         *THE WITNESS:  I believe she had involvement.  I*

23   *don't believe that discloses any communication.*

24         THE WITNESS:  And I was interrupted during our

25   discourse.  And I said that in an exhibit I was shown that

```
 1    Ms. Thomas' name was -- was there in Richard de Anda's log.

 2              MS. HURST:  Your Honor --

 3              THE WITNESS:  And that's what I was referencing

 4    saying that that's a potential.

 5    BY MS. HURST:

 6    Q.  Are you taking back your answer?

 7    A.  I think I should clarify what I said.

 8    Q.  Are you taking it back?

 9    A.  I said -- I will clarify my answer.

10              MR. QUINN:  Your Honor, this is argument.

11              THE COURT:  It is argument, counsel.

12              MR. QUINN:  I move to strike.

13              THE COURT:  Stricken.

14              Just restate it as a question.

15    BY MS. HURST:

16    Q.  Are you withdrawing your answer from the deposition

17    that Ms. Thomas was involved in the Bratz issue?

18    A.  I will clarify if there is an issue in your mind or the

19    court's about what I understand, is that -- it would be

20    probable that an employment litigation counsel would have

21    some involvement.  As to her actual involvement, I have no

22    idea in terms of no recollection, specifically.

23              I had seen an exhibit that you presented from

24    Richard de Anda's log that referenced Ms. Burtis Thomas'

25    name, and that's -- that's where -- you know, from
```

1  practices, as well as that reference point -- that that's a

2  potential.

3  Q.   So when I asked you *do you think Jill Thomas was*

4  *involved in this*, and you answered, *yes,* what you're saying

5  now is:  You're taking that back?

6  A.   To the extent that I would clarify what my answer to --

7  which I tried to do in the deposition relating to the

8  Richard de Anda exhibit.

9  Q.   As a lawyer, you know that what happened in connection

10  with the investigation of Carter Bryant and Bratz could be

11  significant for MGA and Mr. Larian's statute of limitations

12  defense in this case; right?

13          MR. QUINN:  Lacks foundation.

14          THE COURT:  Overruled.

15          THE WITNESS:  I don't have knowledge of the issues

16  before the court, or the pleadings.

17  BY MS. HURST:

18  Q.   You don't know there's a statute of limitations defense

19  in this case?

20  A.   From -- from you pivoting on specific dates and such,

21  that could be the case.

22  Q.   And --

23  A.   I haven't read the pleadings.  I don't know, and I

24  certainly wasn't copied on anything.

25  Q.   If it's the case that there is a statute of limitations

 1    defense in this matter, then you understand that it would be

 2    significant what Mattel knew, when it knew it and what it

 3    did to investigate it; right?

 4    A.    It's -- those would be underlying facts that would be

 5    explored, I assume, in a statute of limitations case.

 6    Q.    And those are the facts that I've been asking you about

 7    here this afternoon; right?

 8    A.    Well, you've asked me about what I would do

 9    hypothetically.

10    Q.    Right.  Because you don't remember anything; right?

11    A.    That's correct.  Yeah.

12    Q.    So all we have left for us is to try to understand what

13    you as a competent attorney, who understands yourself

14    sitting here today, is your best understanding of what you

15    did under the circumstances; right?

16              MR. QUINN:  Excuse me.  This is argument, your

17    Honor.

18              THE COURT:  I'm going to sustain the objection,

19    counsel.

20    BY MS. HURST:

21    Q.    Let's turn to another topic, Ms. McShane.

22              Would you look at Exhibit 8277, please.

23    A.    *(Witness so complies.)*  Yes.  This was presented in my

24    deposition as well.

25    Q.    You've seen it before?

1    A.   Yes.

2    Q.   And it's -- it's a file, what's called a file wrapper

3    from the Patent and Trademark Office; is that right?

4    A.   That's what it looks like, yes.

5    Q.   It's the history of documents at the Patent and

6    Trademark Office related to a trademark called

7    Animal Control; right?

8    A.   Correct.

9    Q.   And that was a trademark that you personally sought to

10   acquire.

11          True?

12   A.   Yes.

13          MS. HURST:  Your Honor, move to admit 8277.

14          THE COURT:  Received.

15     (Defendants' Exhibit 8277 received in evidence.)

16   BY MS. HURST:

17   Q.   Now, let's go to the last page of the exhibit.

18          And that's your name there, Michele McShane;

19   right?

20   A.   That's correct.

21   Q.   And that was your personal address at the time?

22   A.   Yes.

23   Q.   And you filed this trademark application in your

24   personal capacity.

25          True?

1    A.    Yes.

2    Q.    And not as an attorney for Mattel --

3    A.    That's correct.

4    Q.    -- right?

5           And I'm sorry, if you could wait until I finish my

6    question.  I know you want to get this over with.  But for

7    the benefit of the court reporter, we should try not to

8    speak at the same time.

9    A.    I apologize, yes.

10   Q.    Now, there's a date in the lower right-hand corner; is

11   that right?

12   A.    Yes.

13          MS. HURST:  And, actually, not the published date,

14   Mike.

15   BY MS. HURST:

16   Q.    But below the bar code there, it says:  5/28/2002;

17   right?

18   A.    Yes.

19   Q.    And this is actually an online filing system where you

20   can go right to the Patent and Trademark Office and put in

21   the information and do it online?

22   A.    Yes.

23   Q.    So you filed for this trademark for Animal Control on

24   or about May 28th, 2002; right?

25   A.    Yes.

```
1    Q.   And that was while you were still at Mattel?

2    A.   Yes.

3    Q.   In fact, while you were still legal officer of Mattel

4    responsible for trademark and copyright enforcement?

5    A.   Correct.

6    Q.   And the goods and services that you sought for the mark

7    Animal Control were printed matter of all kinds:  Books,

8    periodicals, magazines, stickers, pencils, school supplies,

9    backpacks, clothing of all kinds, apparel, footwear, hair

10   ornaments, prerecorded audio tapes and prerecorded

11   videotapes, television programs and entertainment services;

12   right?

13   A.   Yes.

14   Q.   This was an idea that you had for a TV show and

15   merchandising related to it; right?

16   A.   Basically, either a feature -- a television program

17   concept.

18   Q.   And you believed you owned that idea; right?

19   A.   Yes.

20        MS. HURST:  I'm sorry.  We didn't have this

21   numbered at the time of the deposition, so if you will give

22   me a moment, I'm looking for the right page.  I apologize.

23        (Pause.)

24   BY MS. HURST:

25   Q.   All right.  Let me ask you to turn to page 52 of
```

1    Exhibit 8277.

2    A.    *(Witness so complies.)*   Okay.

3    Q.    And this is a response that you made to something

4    called an office action; right?

5    A.    Yes.

6    Q.    And an office action is when the Patent and Trademark

7    Office tells you, *We got some problem.   Here's the problem.*

8    And then you respond; right?

9    A.    Yes.

10   Q.    And that was what you did.   That was part of your bread

11   and butter as a trademark lawyer at Mattel, right?

12   Responding to office actions, handling trademark

13   prosecution?

14   A.    Trademark prosecution was part of my position.

15   Q.    And that includes, when necessary, responding to office

16   actions; right?

17   A.    Yes.

18   Q.    So this was something you were very experienced at and

19   you absolutely knew how to do?

20   A.    Yes.

21   Q.    In this office action, you amended some of the

22   descriptions of what you were seeking to protect for the

23   trademark, and you added some information; right?   I'm

24   sorry, in this response to the office action.

25   A.    The Patent and Trademark office requires certain

1    specification and in that process classes may be added for

2    certain categories of goods, but it doesn't change the basic

3    goods.  It's just for ease and administration for the patent

4    office.

5    Q.   Okay.  So -- but let's look at your new description

6    after -- when you responded to the office action.  Do you

7    see there, it says: *Applicant hereby amends the following*

8    *class of goods, services in the application as follows*;

9    right?

10   A.   Yes.

11   Q.   And it's got there the original description in the

12   first paragraph; right?

13   A.   Correct.

14   Q.   And then, you got the new proposed description --

15   A.   Yes.

16   Q.   -- right?

17   A.   Right.

18   Q.   And the new proposed description is:  Books,

19   periodicals, newspaper columns for entertainment purposes,

20   magazines relating to entertainment, social, current events

21   and fiction, stickers, pencils and pens, notebooks, folders,

22   binders, stationery, postcards, greeting cards and posters,

23   labels, clips, measuring rulers, straight edges, erasers and

24   pencil cases and pencil boxes; right?

25   A.   Right.

1    Q.    All that was your idea; right?

2    A.    Yes.

3    Q.    Okay.  And then you also added, it says:  New in Class

4    9; right?  On the bottom of that same page?

5    A.    Yes.

6    Q.    It's not an addition of information.  It's specifying

7    it so that it's clear.

8    Q.    Making it more detailed?

9    A.    More detailed, but probably fewer goods encompassed

10   within the language, because it's more specifically drawn.

11   Q.    All right.  And here is what you said at the bottom of

12   the page, 52:  *New, Class 9 for pre-recorded audiotapes,*

13   *pre-recorded videotapes and software featuring stories,*

14   *fiction, music, game playing and role-playing*; right?

15   A.    Correct.

16   Q.    Okay.  Now, let's turn the page.  And you say you have

17   a bona fide intention to use -- and that means you're

18   planning to exploit this; right?

19   A.    Correct.

20   Q.    And you say:  *New Class 25 for T-shirts, shorts, boxer*

21   *shorts, pants, shirts, sweatshirts, tops, jackets, coats,*

22   *caps, hats, ball caps, legging, sweat pants, dresses, vests,*

23   *robes, pajamas, sleepwear and lingerie*; right?

24   A.    Right.

25   Q.    And then, the next new description is:  *Class 41 for*

| | |
|---|---|
| 1 | *entertainment in the nature of ongoing television programs* |
| 2 | *in the field of comedy, variety, drama and reels*; right? |
| 3 | A.    Yes. |
| 4 | Q.    And then you see down there, there's a fee; right? |
| 5 | A.    Yes. |
| 6 | Q.    There at the bottom.  And it says:  *Additional fee in* |
| 7 | *the amount of $1,005 is being submitted*; right? |
| 8 | A.    Right. |
| 9 | Q.    And that you personally paid the Patent and Trademark |
| 10 | Office that $1,005; right? |
| 11 | A.    Yes. |
| 12 | Q.    Not Mattel? |
| 13 | A.    That's correct. |
| 14 | Q.    Because it was your idea? |
| 15 | A.    Yes. |
| 16 | Q.    You made that response on the date 3/15/2003; right? |
| 17 | A.    That's what it says here. |
| 18 | Q.    And you were the vice president and general assistant |
| 19 | counsel and assistant secretary of Mattel at that time; |
| 20 | right? |
| 21 | A.    Yes. |
| 22 | Q.    And it's true that you never had any specific |
| 23 | discussion about this property with anyone at Mattel; right? |
| 24 | A.    I hadn't exploited it, or taken it to any third parties |
| 25 | and there was no discussion. |

```
 1    Q.    You never had any specific discussion with anyone at
 2    Mattel about this property; right?
 3    A.    I believe I just answered the question.
 4    Q.    And the answer is yes; true?
 5    A.    Yes.
 6                MS. HURST:  No further questions.
 7                THE COURT:  Cross-examination, please.
 8                        CROSS-EXAMINATION
 9    BY MR. QUINN:
10    Q.    Good afternoon, Ms. McShane.
11    A.    Good afternoon, Mr. Quinn.
12    Q.    You left Mattel, I think you told us, in 2003?
13    A.    Correct.
14    Q.    So about 11 years ago?
15    A.    About eight years ago --
16    Q.    Eight years.
17    A.    -- and two months or three months.
18    Q.    It is late.
19          About eight years ago?
20    A.    Yes.
21    Q.    What have you been doing since then?
22    A.    A number of things.  I've traveled and engaged in law
23    practice, creative writing, greeting cards, copyrighting and
24    things like that.  Photography.
25    Q.    Do you have occasion very often to reflect back on your
```

1    work at Mattel?

2    A.    No.  I mean, I -- when I left Mattel, it was like a

3    housewife taking her groceries home and dropping five bags

4    on the counter, kind of just left it there.  It was no

5    longer my responsibility.  Nothing I thought about.

6    Q.    Have you been asked about some things today that you

7    haven't had occasion to think about in many years?

8    A.    During my deposition, these same matters were broached

9    and I hadn't thought about them, as to the matters that were

10   supposedly around 2001 and -2, 10 years.

11   Q.    Closer to 11 then?

12   A.    Closer to 11.

13   Q.    Now -- and your deposition, when was that taken?

14   A.    I believe about two weeks ago.

15   Q.    And up until then, had you any occasion to think about

16   what you had been doing or what this Bratz issue might have

17   been back in 2002 since that time?

18   A.    No.  I had been contacted by Annette -- Ms. Hurst, and

19   Ms. Hurst called me in the fall of last year, I believe it

20   was.

21   Q.    Other than that?

22   A.    Other than that type of contact, nothing.

23   Q.    Let's take a look at Exhibit 1195RS-66, which Ms. Hurst

24   showed you.

25          MR. QUINN:  And if we can enlarge that entry,

1    March 28th.

2    BY MR. QUINN:

3    Q.   She asked you about that first line:  *Meeting with*

4    *Cassidy Park to get more info on MGA issue.  She suggested*

5    *Carter Bryant as illustrator/former employee who may have*

6    *plagiarized design of Lily Martinez in creating Bratz dolls*

7    *for MGA.*

8             Do you see that?

9    A.   Yes.

10   Q.   As you look at this chronological record here, do you

11   see any reference to the notion that Mr. Bryant plagiarized

12   or created Bratz while he was employed by Mattel and subject

13   to an Inventions Agreement?

14            MS. HURST:  Objection.  Argumentative.

15            THE WITNESS:  No.

16            THE COURT:  Overruled.

17   BY MR. QUINN:

18   Q.   In fact, in that March 28th entry, does it refer to

19   Mr. Bryant as a former employee?

20   A.   Yes.

21   Q.   And in response to some of Ms. Hurst questions, she was

22   asking you about whether Jill Thomas was involved, and she

23   showed you some deposition testimony.

24            Do you recall that?

25   A.   Yes.

1    Q.    And I understood you to say that you had seen a

2    document.  Ms. Hurst had shown you a document at your

3    deposition which had something to do with your recollection

4    of the name Jill Thomas.

5              Do you recall those questions?

6    A.    Yes.

7    Q.    Can you explain to us what you were talking about?

8    A.    Well, in the course of reviewing, for example, this

9    particular exhibit, Jill Thomas' name appears here.  And so,

10   I just logically, I think, maybe Jill was involved, but I

11   have no idea.

12   Q.    So, do you have --

13   A.    I have no recollection of my -- on my own, just

14   offering that that -- that was the possibility in relation

15   to what might have happened.  I have no idea.

16   Q.    So at your deposition or sitting here now, do you have

17   any recollection of Jill Thomas being involved in some issue

18   relating to Bratz that you were involved with?

19   A.    I have no such recollection.

20   Q.    And when you testified, as you did in your deposition

21   and the passage that Ms. Hurst showed you, is this what

22   you're referring to that had caused that possibility to

23   occur to you?

24   A.    Yes.  Because I was being asked a question in which the

25   sole responsibility for a case matter might fall on my desk,

1    and I was offering that in those hypotheticals that other

2    attorneys might be involved, but that I had no, specific

3    recollection.

4    Q.   Right.  You also asked some questions about a trademark

5    application that you filed for something called -- what is

6    it? -- Animal Control?

7    A.   Yes.

8    Q.   Can you tell us what Animal Control was?  What was that

9    concept?

10   A.   It was, sort of, a one liner concept of -- if you

11   remember the Barney Miller television program, sort of a

12   Barney Miller in a veterinary or an animal shelter setting,

13   where you might have five quirky employees who relate to

14   animals in a certain way.

15   Q.   This was an idea you had for a television show?

16   A.   Yes.

17   Q.   And you say an animal rescue setting?

18   A.   Or an animal shelter, a government controlled kind of

19   setting.  You know, just -- a vague kind of concept like

20   that.

21   Q.   And was it a -- is this -- can you tell us how long it

22   took you to come up with this concept?

23   A.   Oh, about three minutes.  I did pitches prior to

24   joining Mattel in late '80s through '92 or so, you know,

25   with sort of one liners.  It's the kind of thing that just

```
 1    comes to you.  It wasn't something I particularly felt like
 2    writing, per se.  So if you don't want to write it, you can
 3    pitch an idea and if it's picked up, great.
 4    Q.   This is an idea that you had while you were employed by
 5    Mattel for a TV show?
 6    A.   I believe so.  It might have been conceived of during
 7    that prior period.  I really don't recall.  I hadn't even
 8    recalled the application.
 9    Q.   But in any event, it was a TV show and not a toy?
10    A.   Correct.
11    Q.   Did you -- I mean, you did have an Inventions Agreement
12    that you signed as a Mattel employee?
13    A.   Yes.
14    Q.   Did you think that this idea for a TV show relating to
15    animals at an animal shelter was something that was subject
16    to your Inventions Agreement and should be owned by Mattel?
17    A.   No.  Not at all.  I was a lawyer for the company.  I
18    didn't have an understanding that I was involved in
19    development.  And those kinds of workday, during normal work
20    hours, job responsibilities and things that happened after
21    work that were of a creative nature, I understood that those
22    types of things would be differently regarded by someone who
23    wasn't in development and marketing and so forth.
24    Q.   But you were -- this was an idea you had for a -- you
25    did some creative writing?
```

1   A.   Yes.

2   Q.   And this was creative writing -- was this a show that

3   you had in mind that was oriented towards -- what was the

4   intended audience?

5   A.   Adult.

6   Q.   Not kids?

7   A.   Not children.

8   Q.   So did you think this was in Mattel's line of work?

9   A.   No.  It would be something that I -- normally, if I

10   actually took additional steps to exploit it, I would talk

11   to Mr. Normile, or Ned Mansour about -- whoever was my boss

12   at the time -- to make sure that the line of demarcation was

13   very clear vis-à-vis client interest.

14   Q.   Did you ever talk -- had you done creative writing

15   before you joined Mattel?

16   A.   Yes.

17   Q.   And when you joined Mattel, did you disclose to people

18   there that you had done creative writing, and you might

19   continue to do --

20   A.   Yes.

21   Q.   -- creative writing?

22   A.   It had been specifically accepted.  Certain copyright

23   filings I had for scripts and those kinds of things, in view

24   of one of the initial agreements -- I don't know whether I

25   signed more than one.  But I had made it clear that those

*DEBORAH D. PARKER, U.S. COURT REPORTER*

104

```
 1    were certainly my property and carved out and that if I
 2    continued to writing -- to write it would be -- a point of
 3    discussion, you know, to clarify whether or not it was a
 4    concern to my employer; and if it were, then I wouldn't have
 5    done it.
 6              MR. QUINN:  Thank you, nothing further.
 7              THE WITNESS:  I didn't spend much time doing that.
 8              MR. QUINN:  Nothing further.  Thank you.
 9              THE COURT:  Redirect.
10                      REDIRECT EXAMINATION
11    BY MS. HURST:
12    Q.   Did you have any documents that you can show us today
13    where this exception for you was made to the Inventions
14    Agreement?
15    A.   I don't know.  I would have to look.
16    Q.   Do you have one here with you today that we could look
17    at to see that exception?
18    A.   No.
19    Q.   Do you think that if the term "reduced to practice" was
20    a term commonly in use in copyright law that you would be
21    familiar with it?
22    A.   I have no idea.
23    Q.   You've been a copyright lawyer for how long?
24    A.   A number of years.
25    Q.   You write -- you write creative --
```

1   A.   Do you mean "reduce to practice," meaning put in a
2   fixed form.  I'm not sure what you're referring.
3   Q.   Yeah, I was asking you about that before.
4   A.   But I didn't connect it to "reduced to practice",
5   meaning putting something in a fixed form.  I wasn't
6   connecting that.
7   Q.   Okay.  Put aside the issue of putting it in a fixed
8   form, let me just ask you this:  Is the phrase "reduced to
9   practice" one that you're familiar with?
10  A.   No.
11  Q.   Okay.
12  A.   I don't know.
13  Q.   And you're a copyright lawyer; right?
14  A.   Yes.
15  Q.   And you would expect that if that was a legal term of
16  art in copyright law that you would be familiar with it;
17  right?
18  A.   You might.
19  Q.   Wouldn't that be reasonable to conclude?
20  A.   I don't know.  I mean, you're saying it's a term I
21  should be familiar with.
22  Q.   No, not at all.  Not at all.
23  A.   I'm not familiar with it.
24  Q.   Right.  And you're a copyright lawyer, and you're not
25  familiar with it; right?

1    A.    Okay.   I have practiced in the area of copyright and

2    trademarks in-house primarily.   And in that practice, you

3    know, it's not something that I specifically litigated or

4    did, and -- but I'm not familiar with it.   I'm sorry.

5    Q.    In fact, isn't it true that the term "reduced to

6    practice" is a special legal term for patents?

7    A.    I don't know.

8    Q.    Let me ask you to turn back to 1195RS, page 66.

9             We've looked at that a few times now.

10   A.    *(Witness so complies.)*

11   Q.    I think you said that there's no reference on the page

12   to the issue of whether there was overlapping employment; is

13   that right?

14            MR. QUINN:   Misstates the testimony, your Honor.

15            THE WITNESS:   The words "former employee" is on

16   the page.

17            THE COURT:   Overruled.

18   BY MS. HURST:

19   Q.    It also says there at 1500 hours, on 3/28:   *Check with*

20   *HR for Bryant's file.   Term date, 10/20/00*; right?

21   A.    Yes.

22   Q.    So somebody was specifically looking in to Carter

23   Bryant's date of termination here; right?

24            MR. QUINN:   Calls for speculation, your Honor.

25            THE COURT:   Overruled.

1          THE WITNESS:  It says:  *Checked with HR for*

2   *Bryant's file term date,* and the date, you know.

3   BY MS. HURST:

4   Q.   So this investigation reflects that somebody was --

5   right here on this page, somebody was specifically looking

6   into Mr. Bryant's termination date; right?

7              MR. QUINN:  Speculation.

8              THE COURT:  Overruled.

9              MR. QUINN:  No foundation.

10             THE COURT:  Overruled.

11             THE WITNESS:  The words -- the words that you've

12  read are there.

13  BY MS. HURST:

14  Q.   Let's turn back to Exhibit 8277.

15  A.   *(Witness so complies.)*

16  Q.   Is it true that while you were at Mattel that it was in

17  the business of putting out DVDs and other forms of

18  entertainment related to toy product?

19  A.   Yes.

20  Q.   And is it true that while you were at Mattel, Mattel

21  was in the business of licensing merchandise associated with

22  entertainment?

23  A.   Yes.

24  Q.   Is it true that kids like animals?

25  A.   Yes.  I think kids like animals.

1   Q.   And stickers?   That's a product targeted to kids;

2   right?

3   A.   At a film festival, when marketing a product that's

4   intended for television or cable, it's not unusual to have

5   pencils and rules (sic) and other types of material that's

6   marked with the series name.

7   Q.   And it's common to sell stickers to children, isn't it?

8   A.   Yes.   I'm providing you with something specific that I

9   had in mind.

10   Q.   It's common to sell hair ornaments to little girls;

11   right?

12   A.   Yes.

13   Q.   It's common to sell backpacks for children for use in

14   connection with school; right?

15   A.   Yes.

16   Q.   And it's common to sell school supplies to children.

17        True?

18   A.   True.

19   Q.   Game playing was one of Mattel's businesses; right?

20   A.   Mattel has marketed consumer products that include

21   games and role-playing and all that kind of stuff, yes.

22        MS. HURST:  No further questions.

23        THE COURT:  Recross.

24   ////

25   ////

```
 1                    RECROSS-EXAMINATION

 2   BY MR. QUINN:

 3   Q.    If we could put up on the screen the page from that

 4   last exhibit that Ms. Hurst was asking you about,

 5   Exhibit 8277-52, and this is the response to the office

 6   action on your application for a trademark for your idea for

 7   a television series:  Animal Control?

 8   A.    Yes.

 9   Q.    She asked you about game playing.  Do you recall that

10   question you were just asked?

11   A.    Yes.

12   Q.    If we could look at the bottom here, this is a -- you

13   added the following class of goods or services, Class No. 9,

14   and that's for pre-recorded audiotapes and videotapes; is

15   that right?

16   A.    Yes.

17   Q.    And software?

18   A.    Yes.

19   Q.    Featuring stories, fiction, music, game playing and

20   role-playing; right?

21   A.    Correct.

22   Q.    So that's tapes -- videotapes and software for those

23   various things:  Fiction, music, game playing and

24   role-playing; correct?

25   A.    Yes.
```

1    Q.   So far as you are aware, is there a class of

2    trademark -- a trademark class -- each of these has a class;

3    correct?

4              We're looking at Class 9?

5    A.   Yes.

6    Q.   Above that, there is Class 16.  If we could look at

7    that?

8    A.   Yes.

9    Q.   Just above that.  And on the next page, Class 25 for

10   t-shirts, shorts, boxer shorts, et cetera?

11   A.   Yes.

12   Q.   And then, Class 41:  *Entertainment in the nature of*

13   *ongoing television programs*?

14   A.   Yes.

15   Q.   Can you explain to us what these classes are?  In

16   general, what the concept of a class is in the trademark

17   world?

18   A.   They're groupings that the Patent and Trademark Office

19   uses for administrative ease.  So games and play things

20   might be Class 28.

21   Q.   I was going to ask:  Is there a particular class for

22   toys, games, dolls, things like that?

23   A.   Yes.  Class 28, I believe.

24   Q.   And did you seek an application for trademark in

25   Class 28?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    I don't believe so.

2    Q.    Was Mattel in the business of developing television

3    series, whether about Barney Miller's in rescue centers, or

4    on any other subject?

5    A.    Not to my knowledge.

6    Q.    And could you tell us, when you are at Mattel, roughly,

7    how many different matters, types of legal issues, or

8    matters that you might have at any given time?

9    A.    Mattel had an extraordinarily large intellectual

10   property practice in terms of what our group handled in a

11   year.  During my tenure with Mattel of what's, like, eight

12   years, we could have dealt with clearances of marks, for

13   example, that might -- I would give a ballpark in terms of

14   how many reports ordered, plus close to 30 or 40,000 names

15   that were cleared.  A very high number.

16         An average attorney might engage in opinion

17   clearance of any given year, who's in trademark, might be an

18   average of 60 where it says in any one year.  So, you know,

19   we're talking about maybe 200 for a normal practice versus

20   tens of thousands.  That's as to filings of trademark

21   applications and clearing the name, first.

22         The number of applications, I think -- believe,

23   during my tenure there exceeded 10,000 applications.  The

24   number of infringements also exceeded 10,000.

25   Q.    So those --

112

A.    So, you know, in terms of overall matters, it might exceed over 100,000.

MR. QUINN:  Nothing further.

THE COURT:  I'm asking all the witnesses originally to remain available until May 7th, but this case will conclude the first week of April.

If you have any planned vacations, any professional responsibilities, keep them.  I doubt you are returning to court.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Thank you.

Ladies and gentlemen, why don't we take a 15-minute recess.  You're admonished not to discuss this matter amongst yourselves or form or express any opinion concerning the case.

We'll resume within the hour and try to get you out of here.  It's St. Patrick's Day.

Counsel, 20 minutes to the hour.

(*Jury out.*)

(*At 3:26 p.m., proceedings were recessed.*)

-oOo-

*DEBORAH D. PARKER, U.S. COURT REPORTER*

113

```
 1                          CERTIFICATE

 2              I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  March 17, 2011

10

11

12                              _____

13                              Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*