Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 1 of 54   Page ID #:311002
CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                    – – – – – – –

5

6   MATTEL, INC., ET AL.,            )
                                     )
7            Plaintiffs,             )
                                     )
8       vs.                          ) No. CV 04-9049-DOC
                                     )    Day 35
9   MGA ENTERTAINMENT, INC., ET AL., )    Volume 3 of 3
                                     )
10           Defendants.             )
    _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17                Santa Ana, California

18              Thursday, March 17, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-17 MattelV3

Case 2:04-cv-09049-DOC-RNB  Document 10232  Filed 03/18/11  Page 2 of 54  Page ID #:311003
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     WILLIAM PRICE
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 3 of 54   Page ID #:311004
CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

3

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4             SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE (Not Present)
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            – AND –

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14   Also Present:

15            ISAAC LARIAN, MGA CEO

16            ROBERT ECKERT, Mattel CEO

17            LILY MARTINEZ, Mattel Employee

18            KEN KOTARSKI, Mattel Technical Operator

19            MIKE STOVALL, MGA Technical Operator

20            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

21            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

22            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

23            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe

24            FRANK RORIE, Orrick Herrington & Sutcliffe

25            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
```

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 4 of 54   Page ID #:311005
CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

4

```
 1                         I N D E X

 2

 3

 4                        EXAMINATION

 5

 6    Witness Name          Direct    Cross    Redirect    Recross

 7    LYTER, ALBERT H.
         By Ms. Hurst         6
 8       By Mr. Quinn                   9

 9    KILPIN, TIMOTHY
         By Ms. Keller        11
10

11

12

13                         EXHIBITS

14

15    Exhibit                         Identification    Evidence

16    Defendants' No. 1804                                 45

17    Defendants' No. 1812A                                29

18    Defendants' No. 26219                                42

19    Defendants' No. 35936                                16

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 5 of 54   Page ID #:311006
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

5

1              SANTA ANA, CALIFORNIA, THURSDAY, MARCH 17, 2011

2                        DAY 35, VOLUME 3 OF 3

3                            (3:40 p.m.)

4              (The following proceedings is taken in the

5         presence of the jury.)

6              THE COURT:  Okay.  We are back in session.  The

7    jury is present.  The parties are present.  The alternates

8    are present.

9              And Counsel, would you like to call your next

10   witness, please.

11             MS. HURST:  Yes, your Honor.  We recall Dr. Albert

12   Lyter.

13             THE COURT:  Thank you.

14             Thank you, sir.  If you'd please retake the

15   witness stand.

16             And sir, will you, once again, state your full

17   name for the jury?

18             THE WITNESS:  Yes.  It's Albert H. Lyter,

19   L-y-t-e-r, the third.

20             THE COURT:  You were previously sworn yesterday;

21   do you recall that oath?

22             THE WITNESS:  I do.

23             THE COURT:  Counsel, if you'd like to continue.

24             MS. HURST:  Yes, thank you, your Honor.

25             THE COURT:  And all of you recall Dr. Lyter, he

1    was on the stand yesterday.

2          Okay, Counsel?

3          **DR. ALBERT H. LYTER, DEFENSE WITNESS, RECALLED**

4                **REDIRECT EXAMINATION (Continued)**

5    BY MS. HURST:

6    Q    Dr. Lyter, is it true that, at first, Dr. Aginsky did

7    not identify the ink in the notary entry as a water-based

8    gel ink?

9    A    Yes.

10   Q    And it was --

11         MS. HURST:  You know what, Mike?  Let's put up

12   Exhibit 60, page 11, so we remember what we're talking about

13   here after the interval.

14   BY MS. HURST:

15   Q    So at first, Dr. Aginsky -- yes, Dr. Aginsky did not

16   identify that as water-based gel ink, correct?

17   A    That's correct?

18   Q    And it's only after you identified it as water-based

19   gel ink that Dr. Aginsky agreed with you, right?

20   A    Yes.

21   Q    Now, would you expect that a skilled forensic chemist

22   in the analysis of inks would be able to tell using a

23   microscope that all of those entries were water-based gel

24   ink?

25   A    Yes.

1    Q    And that means that either Dr. Aginsky couldn't tell or
2    he didn't say, right?
3    A    That's correct.
4    Q    And one reason not to say that this is a water-based
5    ink is that menthol is not very soluble in water, right?
6    A    Well, it is true that menthol is not very soluble in
7    water.
8    Q    Which means that menthol doesn't spread in water very
9    much, right?
10   A    Well, menthol in its normal state is a solid, a white
11   crystal in substance, and it has very, very little
12   solubility in water, so you would not be able to disperse is
13   efficiently in any chemical that was simply water.
14   Q    So you would need some kind of, say, an oil carrier for
15   the menthol, right?
16   A    That's correct.
17   Q    And you are very familiar with looking at oil-based
18   inks in GCMS testing, right?
19   A    Yes.  Ballpoint inks would be characterized like that,
20   and yes, we do that a lot.
21   Q    And you do a lot of GCMS testing for ballpoint inks,
22   right?
23   A    That's correct.
24   Q    And you looked carefully at Dr. Aginsky's chromatograms
25   for that Area 8, right?

CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

8

1   A     Yes, I studied them.

2   Q     And you looked for any indication that there was an

3   oil-based substance there, right?

4   A     I looked at all of the materials, and the retention

5   times, et cetera, were inconsistent with oil-base

6   components.

7   Q     And so you didn't find any indication at all that there

8   was a carrier substance, that is a substance that could

9   put -- hold on to menthol in a water-based ink, right?

10  A     That's right.

11  Q     And Dr. Aginsky never said that he found any substance

12  in which you can put menthol to disperse it through a

13  water-based ink, correct?

14  A     That's correct.

15  Q     And therefore, it's for that and the other reasons that

16  you've already described, your best understanding, as you

17  sit here today, that there was no menthol in ink as a result

18  of testing of Area 8, correct?

19  A     That's correct.

20            MS. HURST:  No further questions.

21            THE COURT:  And Counsel, technically this would be

22  cross-examination, correct?

23            MR. QUINN:  Yes.

24            THE COURT:  Okay.

25            MR. QUINN:  Recross, your Honor.

1    THE COURT:  Recross?

2    MR. QUINN:  Recross.

3    THE COURT:  Recross.

4    MS. HURST:  We had agreed that --

5    THE COURT:  That's correct.  Recross.

6                    **RECROSS-EXAMINATION**

7  BY MR. QUINN:

8  Q    Good afternoon.

9  A    Good afternoon.

10  Q    After you examined Dr. Aginsky's report and did your

11  own analysis, it was your view that Dr. Aginsky could be

12  right, there could be menthol there, and you didn't find it,

13  correct?

14  A    Yes, that's right.

15  Q    And it's possible that he -- that -- "he" meaning

16  Dr. Aginsky, detected menthol where you didn't find any,

17  correct?

18  A    Yes, that's correct.

19  Q    And you were testing using -- you told us yesterday,

20  the 12 microliters, is it of chloroform; is that correct?

21  A    That's correct.

22  Q    And Dr. Aginsky was testing using the solution, which

23  was much less diluted, only two microliters of chloroform,

24  correct?

25  A    That's right.

```
 1   Q    And the only place --

 2            MR. QUINN:  If we could put up on the screen the

 3   8/26/99 entry page from the book, the one that's got the

 4   areas identified, Exhibit 23496, 23496-1.

 5   BY MR. QUINN:

 6   Q    The only place where Dr. Aginsky detected menthol was

 7   in that Area 8, correct, from 1998, Missouri, true?

 8   A    That's correct.

 9            MR. QUINN:  Nothing further.

10            THE COURT:  All right.

11            Now, I'm going to ask you to remain on call, and

12   both parties have agreed when an expert's called, another

13   expert can be present.  I don't know if you'll be recalled

14   or not in this matter, but if you have any professional

15   responsibilities or even any planned vacations, keep them.

16   The case will conclude the first week in May.

17            THE WITNESS:  Okay.  Thank you.

18            THE COURT:  Thank you very much.

19            Counsel, your next witness.

20            MS. KELLER:  Your Honor, we call Timothy Kilpin.

21            THE COURT:  Thank you.

22            Thank you, sir.  If you'd please come forward

23   through the double doors and raise your right hand, sir.

24        TIMOTHY KILPIN, DEFENSE WITNESS, SWORN

25            THE WITNESS:  I do.
```

```
 1              THE COURT:  Thank you, sir.

 2              If you'd please walk along the side of the jury

 3    rail.  There is an entrance by the wall.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  And if you'd be seated, sir.

 6              Now, will you spell -- strike that.

 7              Will you state your full name for the jury,

 8    please.

 9              THE WITNESS:  Tim Kilpin.

10              THE COURT:  And will you spell your last name,

11    please.

12              THE WITNESS:  K-i-l-p-i-n.

13              THE COURT:  Thank you.

14              Direct examination by Ms. Keller on behalf of MGA

15    and Mr. Larian.

16              MS. KELLER:  Thank you, your Honor.

17                         DIRECT EXAMINATION

18    BY MS. KELLER:

19    Q    Mr. Kilpin, what's your current occupation?

20    A    I am the executive vice president of the boys and girls

21    businesses at Mattel.

22    Q    Mr. Kilpin, do you believe it's wrong for someone to

23    enter into an agreement to joining a new company without

24    having first resigned from his or her old company?

25    A    No, I don't.
```

CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

12

1    Q    Do you believe someone who agrees to join a new company

2    but is staying a few weeks or a few months at his old

3    company may not discuss any business-related matters with

4    the new company?

5    A    Can you ask that again?  I'm sorry.

6    Q    Do you believe that someone who agrees to join a new

7    company but is staying a few weeks or a few months with his

8    old company may not discuss any business-related matters

9    with the new company, assuming they are competitors?

10   A    Oh, they should not discuss anything.

11   Q    Now, if we could go back to your current position as

12   executive vice president of Mattel brands.

13        You've held that position since February, just last

14   month?

15   A    Yes, that's right.

16   Q    And you've worked at Mattel for a total of 19 years, on

17   and off?

18   A    Yes.

19   Q    And you started at Mattel for the first time in 1984,

20   didn't you?

21   A    That's correct.

22   Q    And in 1988, you left Mattel, correct?

23   A    Yes.

24   Q    And returned in 1991, right?

25   A    Yes, that's correct.

```
 1    Q    In October of '99, you left Mattel again?

 2    A    Yes.

 3    Q    And in November of 2000, you went to work for Disney as

 4    the senior vice president of toys, right?

 5    A    That's correct.

 6    Q    And in October 2003, you returned to Mattel as senior

 7    vice president of girls marketing and design, right?

 8    A    That's correct.

 9    Q    So you went from Mattel to Disney and back to Mattel?

10    A    Yes.

11    Q    Now, were you --

12    A    I'm sorry, ma'am.  There was one other company I worked

13    at in between.

14    Q    Okay.

15         Were you contacted in May 2003 about returning to

16    Mattel?

17    A    Yes, I was.

18    Q    And you reviewed with Alan Kaye and Matt Bousquette?

19    A    Yes.

20    Q    And did you accept Mattel's offer while you were still

21    employed at Disney?

22    A    Yes, I did.

23    Q    In fact, you had already accepted the position at

24    Mattel when you resigned from Disney, or tried to, right?

25    A    Yes, I had.
```

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 14 of 54   Page ID #:311015
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

14

1   Q    And I say "try to" because Disney did not accept your

2   resignation, true?

3   A    Yes, Disney asked me to stay.

4   Q    Well, but you actually had an employment contract with

5   Disney for a specific term, true?

6   A    Yes.

7   Q    In other words, you were not an at-will employee where

8   either the employer or the employee is free to terminate the

9   contract at any time, correct?

10  A    Yes, at Disney, that's correct.

11  Q    So by accepting a position at Mattel while you still

12  had a specific term left on your Disney contract, you were

13  breaching your employment contract, right?

14          MR. QUINN:  Calls for a legal conclusion, your

15  Honor, "breaching."

16          MS. KELLER:  How about "breaking"?

17          MR. QUINN:  Same objection, your Honor.

18          THE COURT:  Same objection.  Same issue.

19          MR. QUINN:  It's also irrelevant.

20          MS. KELLER:  Your Honor --

21          THE COURT:  No.  Overruled.

22          You can answer the question, sir.

23          THE WITNESS:  I'm sorry?

24          THE COURT:  You can answer the question.

25          THE WITNESS:  Can you ask the question again?

 1    Sorry.

 2    BY MS. KELLER:

 3    Q    So you were breaking your employment contract at Disney

 4    by accepting a position at Mattel, right?

 5    A    I didn't see it as breaking that, no.

 6    Q    Well, if you looked at just what was written on the

 7    paper that you signed, your contract with Disney, you were

 8    breaking it, right?

 9    A    Well, my assumption was that Disney would be

10    comfortable with me leaving, given the circumstances.

11    Q    I am not asking about your assumption.  I'm asking

12    about the fact that you signed a contract with Disney with

13    your name on it for a specific term, and then before telling

14    them you took a job somewhere else, right?

15    A    Yes.

16    Q    And Mattel knew that you had that contract because you

17    told them, right?

18    A    I don't recall that.

19    Q    And Disney refused to accept your resignation

20    immediately, true?

21    A    Yes, that is correct.

22    Q    So you stayed there from May until October, right?

23    A    Yes.

24    Q    And you accepted the position at Mattel before you told

25    Disney that you were going to accept the position, right?

1    A    Yes, I did.

2    Q    And, in fact, you actually had started meeting with

3    Mattel about an employment opportunity there quite a bit

4    earlier, true?

5    A    No, not that I can recall.

6    Q    Well, you received an offer of employment for Mattel on

7    April 8th, 2003, right?

8    A    Yeah, I believe it was in April.

9    Q    And if we could see Exhibit 35936.

10   A    Is there a page you'd want me to look at?

11   Q    Just for openers, do you recognize that as your Mattel

12   personnel file?

13   A    Yes, I do.

14         MS. KELLER:  Your Honor, I would move 35936 into

15   evidence.

16         THE COURT:  Well, I'll allow it into evidence at

17   this time, but I can assure you, we'll go through redactions

18   of any social security numbers, anything like that will be

19   redacted.

20         THE WITNESS:  Thank you.

21         *(Defendants' Exhibit No. 35936 is received in*

22      *evidence.)*

23   BY MS. KELLER:

24   Q    If you'd look at page 12.

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 17 of 54   Page ID #:311018
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

17

1    Q    Is that your offer letter dated April 8th, 2003?

2    A    Yes, it is.

3    Q    And so since you were offered the position at Mattel on

4    April 8th, 2003, then you must have started discussing

5    opportunities with Mattel before that date, correct?

6    A    Yeah.  I don't remember exactly when.

7    Q    Well, they just didn't send you the letter out of the

8    blue, though, right?

9    A    No, I doubt that.

10   Q    You had been talking about Mattel -- talking with

11   Mattel about taking a job there before April 8th, 2003,

12   right?

13   A    Yes.

14   Q    And at the time that you took the offer at Mattel, you

15   knew that you would be overseeing the design and marketing

16   for the girls group at Mattel, right?

17   A    Yes.

18   Q    And you were keeping in touch with Mattel while you

19   were still working for Disney, right?

20   A    Yes.

21   Q    Now, you had to explain to Mattel that after you had

22   already accepted the offer, that Disney wouldn't let you out

23   of your contract, and you had to stay on at Disney until

24   your contract term was fulfilled, right?

25   A    No.  Actually what happened was I had a conversation

1    with my supervisor at Disney, explained to him my desire to

2    leave.  They wanted me to stay because they wanted me to

3    continue to do the job that I was doing, and we ultimately

4    agreed after a number of months that I would be allowed to

5    leave.

6    Q    Well, you had an employment contract, though, that

7    required you to stay at Disney for a specific term, correct?

8    A    Yes.

9    Q    And the specific term was not up yet when you took the

10   offer with Mattel, true?

11   A    Yes.

12   Q    And no one at Mattel said to you "It's wrong for you to

13   be talking to a competitor after you've entered into a

14   contract with us," correct?

15   A    Well, again, I --

16   Q    Did anyone at Mattel say that to you?

17              MR. QUINN:  Excuse me, your Honor.

18              THE COURT:  Finish your answer.

19              THE WITNESS:  Well, what I recall is talking about

20   that to them and saying I expected that Disney would be fine

21   with me leaving.

22   BY MS. KELLER:

23   Q    Did anyone at Mattel say that because you have a

24   contract with Disney for a specific term, "It's wrong for

25   you to be talking to us, a competitor, about this"; did

CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

19

 1   anybody at Mattel tell you that?

 2   A    Well, the first thing I would tell you is that I don't

 3   think that Mattel and Disney look at themselves as

 4   competitors.

 5   Q    Did anybody at Mattel ask you that?

 6   A    Can you reask the question, please.

 7   Q    Did anybody at Mattel say, "It's wrong for you to be

 8   working for Disney" -- "wrong for you to be working with us

 9   after you've entered into a contract with Disney"?

10          MR. QUINN:  Assumes facts not in evidence,

11   "working with us."

12          MS. KELLER:  I'll ask a different question.

13          THE COURT:  Sustained.

14   BY MS. KELLER:

15   Q    Before you accepted the offer from Mattel in April of

16   2003, did Bob Eckert, the CEO of Mattel, ever say to you,

17   "You can't accept an offer from us unless you resign first

18   from Disney"?

19   A    No, I don't recall that.

20   Q    And are you aware of the fact that Mr. Eckert regards

21   Disney as Mattel's competition?

22   A    No, I wouldn't characterize it as a competition.  We

23   are partners.

24   Q    Are you aware that the CEO of your company does?

25          MR. QUINN:  It assumes facts not in evidence.

```
 1   Argumentative, your Honor.

 2           THE COURT:  Facts not in evidence, Counsel.

 3           Sustained.

 4   BY MS. KELLER:

 5   Q    Have you read any of Mr. Eckert's testimony from this

 6   trial?

 7           MR. QUINN:  Again, your Honor, testimony of

 8   another witness.

 9           THE COURT:  I'll let the jury recall that.

10           Sustained.

11           MR. QUINN:  Move to strike.

12           THE COURT:  Stricken.

13   BY MS. KELLER:

14   Q    Did Mr. Eckert ever say to you, "You can't accept an

15   offer from us unless you first resign from Disney"?

16   A    Not that I recall.

17   Q    Did Mr. Eckert ever say to you, "You've got an

18   employment contract with Disney, so we can't talk to you"?

19   A    No, not that I can recall.

20   Q    Did Mr. Eckert ever say to you, "It would be wrong for

21   us to interfere with your fixed term contract at Disney by

22   talking to you until it expires"?

23   A    No, not that I can recall.

24   Q    And, in fact, nobody at Mattel told you that it would

25   be wrong for Mattel to interfere with your fixed employment
```

```
1    contract at Disney by offering you a job before it expired,

2    right?

3    A    Well, again, they were going off my comment that I

4    didn't believe it was going to be an issue.

5    Q    Did anybody at Mattel say "We need to see your contract

6    with Disney"?

7    A    I don't recall that.

8    Q    So the answer is "no"?

9    A    I don't recall it.

10   Q    Did anybody at Mattel say, "It would be wrong for us to

11   start talking to you until your contract with Disney

12   expires," anyone at Mattel?

13   A    I am not recalling it.

14   Q    Is that a "no"?

15   A    I'm not recalling.

16   Q    Well, don't you think you would recall it if somebody

17   said, "It would be wrong for us to do this, we can't do

18   this," that would stick in your mind, wouldn't it?

19   A    You know, I'm not recalling it.

20   Q    Don't you think that would stick in your mind?

21   A    I don't know.

22   Q    Are you used to people telling you that various things

23   that you are doing are wrong, and I mean like ethically

24   wrong?  Legally wrong?

25            MR. QUINN:  Compound, argumentative, your Honor.
```

```
 1              THE COURT:  Well --

 2              MR. QUINN:  "Used to."

 3              THE COURT:  No.  Overruled.  It's just wrong,

 4    wrong.

 5              MS. KELLER:  We'll stick with "wrong."

 6    BY MS. KELLER:

 7    Q    Are you accustomed to people telling you that things

 8    like -- that you are doing things that are wrong, so

 9    accustomed to it that it's routine to you?

10    A    No.

11    Q    So it would stick in your mind if somebody at Mattel

12    had said that, right?

13    A    I would assume so, yes.

14    Q    And no one from Mattel ever said to you, "You must

15    first resign your position at Disney before you can accept

16    any offer from us," right?

17    A    I'm not recalling that.

18    Q    Is that a "no"?

19    A    You know, I'm not recalling it, no.

20    Q    Now, when you returned to Mattel from Disney in October

21    of 2003, you said you were senior vice president of girls

22    marketing and design at Mattel?

23    A    Yes.

24    Q    And that included overseeing the marketing for Barbie?

25    A    Yes.
```

1   Q    It also included overseeing marketing for MyScene,

2   right?

3   A    Yes.

4   Q    And MyScene was a so-called flanker -- flanker brand of

5   Barbie?

6   A    Yeah, I considered it that.

7   Q    You considered it that because it was designed to

8   appeal to an older girl segment that the regular Barbie

9   didn't appeal to, right?

10  A    Yes.

11  Q    And as senior vice president in charge of girls

12  marketing and design at Mattel, your team prepared marketing

13  reports which you then reviewed, right?

14  A    Yes, that's correct.

15  Q    And you probably prepared these a couple of times a

16  year?

17  A    Yeah.  Sometimes more, sometimes less, but yes.

18  Q    During the time that you were overseeing the marketing

19  for Barbie and MyScene, you engaged in analysis of what your

20  competitors were doing on a regular basis, true?

21  A    Generally, yes.

22  Q    You looked at something you called the "competitive

23  set," right?

24  A    Yes, generally, yes.

25  Q    And the competitive set, meaning a set of products, for

CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

24

1    example, competitive to Barbie, that competitive set between

2    2003 and 2005 included Bratz, right?

3    A    Yes, that's correct.

4    Q    So one of the tasks of your team was to analyze the

5    Bratz line?

6    A    Yes.

7    Q    And that included advertising, product, retail,

8    presence and packaging?

9    A    Yes, generally.

10   Q    And it also included analyzing the Bratz commercials?

11   A    Yeah, generally, yes.

12   Q    Now, you would agree that themes are very important to

13   the success of a particular fashion doll brand?

14   A    Well, yeah, I think most fashion doll brands use a

15   pretty wide variety of themes regularly.

16   Q    And themes are so important that where you had once

17   walked into a product meeting and said, "Show me the toy,"

18   you had come to realize that it was better to say, "Tell me

19   the story of the toy," right?

20   A    I've said that, yes.

21   Q    And, in fact, you told that to the Wall Street Journal,

22   among other things, right?

23   A    Yes, I did.

24   Q    And you were emphasizing the importance of themes in

25   marketing, right?

1    A    Yeah, generally -- for girls toys, in general, yes.

2    Q    That was April 16th, 2004, that you told the Wall

3    Street Journal that?

4    A    Are you asking if I recall the exact date?

5    Q    Yeah.  We can show it to you if you don't.

6    A    Yeah, I don't recall the exact date.

7         MS. KELLER:  Okay.  If we can show the witness

8    Exhibit 1818, just for his own refreshing of his memory.

9         THE WITNESS:  Thank you.

10        THE COURT:  That's April 16th, 2004?

11        MS. KELLER:  Yes, April 16th, 2004, your Honor.

12   Thank you.

13   BY MS. KELLER:

14   Q    And that would be in the fourth column over in the

15   third paragraph.

16   A    Yes.

17   Q    Okay.  So you made that comment April 16th, 2004 about

18   the importance of themes, right?

19   A    Yeah.  It was really -- in this case, it was more about

20   the entertainment and the story lines, not just the themes.

21   It was sort of all of that.

22   Q    Well, plot lines -- plot lines includes that, right?

23   A    Yeah, plot lines in -- in this context, we were talking

24   about the entertainment value and the story-telling.

25   Q    Okay.  But the bottom line is the theme, the story, the

1    plot lines, those were all -- had become critical in selling
2    the toy, right?
3    A    Yeah, yeah.  Actually, after looking at this in the
4    context, we weren't really talking about themes, here.  We
5    were talking about the story-telling and the plots.
6    Q    Okay.  And that makes sense because the story of the
7    fashion doll is a necessity to selling it, isn't it?
8    A    Well, we always review it as an important element for
9    giving girls context for play.
10   Q    Let's go back to themes.  Are themes a necessity, a
11   "price of entry," quote-unquote, into the fashion doll
12   market?
13   A    Well, the price of entry in the fashion doll market is
14   fashion, and the themes are a great way to give girls
15   different context for playing with different types of
16   fashions.
17   Q    Are themes a necessity, a, quote, "price of entry," end
18   quote, into the fashion doll market?
19   A    I don't know if I'd characterize it quite that way.  I
20   mean, I think they are important.
21   Q    Can you take a look at your deposition of January 25th,
22   2008, at page 302.
23   A    I'm sorry, can you tell me, again, where to look.
24   Q    Page 302, line 23 through page 303, line 10.
25   A    Okay.  Okay.

CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

27

1   Q    Those were actually your words, right, that themes were

2   a price of entry?

3   A    Actually, no.  The way I said this was Bratz themes are

4   focused on fashion, and they were all fashion driven, and

5   that's one of the items that made it successful.  I would

6   agree with that.  By the way, that's price of entry in the

7   category "fashion."  What I said was fashion was a price of

8   entry in the category.

9   Q    Okay.  Now, let's talk about something else.  Retail

10  presence, that's how the product line looks like on the

11  shelf, right?

12  A    Yeah, generally, yes.

13  Q    And where it's placed in the stores, right?

14  A    Yes.

15  Q    And how much footage it has on the shelves, right?

16  A    Yes.

17  Q    Retail presence is very, very important in selling the

18  product, right?

19  A    Yes, absolutely.

20  Q    And packaging is also something you think is important

21  to marketing particular products, including fashion dolls,

22  right?

23  A    Sure, yes.

24  Q    So when you analyzed the competitive set for Bratz

25  versus Barbie, you would include all these factors you just

1    talked about; the story of the doll, the fashions for the

2    doll, the retail presence, the packaging, those would all be

3    parts of the competitive set, right?

4    A    Yes, generally, yes.

5    Q    Now, if we could look at some Mattel documents

6    analyzing the Bratz branding, starting with Exhibit 1812A,

7    and this is an August 11th, 2003 presentation?

8    A    Yes, uh-huh.

9    Q    Do you have Exhibit 1812A in front of you?

10   A    Yes, I do.

11   Q    And on this exhibit, you testified for Mattel as a

12   so-called 30(b)(6) witness?

13   A    Yes, that's correct.

14   Q    And also on the issue of trapezoidal packaging, you

15   were a 30(b)(6) witness; is that right?

16   A    Yes, uh-huh.

17   Q    And let's look at 1812A.

18        Now, you prepared --

19             MS. KELLER:  And your Honor, I would move that

20   1812A -- I would move 1812A into evidence.

21             THE COURT:  It's received, but I think the

22   particular discussion last evening referred to pages 23, 24

23   and 25?

24             MS. KELLER:  Well, we are going to be looking at

25   7 and 9, 12, 24, a number of pages, your Honor.

1           THE COURT:  Okay.  Received.

2           (Defendants' Exhibit No. 1812A is received in

3       evidence.)

4   BY MS. KELLER:

5   Q    Now, you prepared yourself to testify about this

6   exhibit by reviewing the document and talking to Mattel

7   employees, true?

8   A    Yes.

9   Q    And this document was created in August 2003, after you

10  had accepted Mattel's offer in April of 2003, right?

11  A    But I wasn't working for Mattel then.

12  Q    But you were still at Disney at the time, right?

13  A    Yes.  I wasn't working for Mattel.

14  Q    I understand.  That's what I'm asking you, though.

15  This was created in August of 2003, right?

16  A    Yes.

17  Q    After you had accepted Mattel's offer in April of 2003,

18  right?

19  A    Before I was working at Mattel.

20  Q    But while you were still at Disney and not yet at

21  Mattel, correct?

22  A    I was not at Mattel.

23  Q    You were still at Disney?

24  A    Yes.

25  Q    Now, let's look at page 3.  This says "Agenda."  The

1    first item is "MyScene v. Bratz Strategy," and the second is

2    "MyScene v. Bratz Product."

3         Now, this presentation was prepared to assess what was

4    happening with the MyScene business and to improve

5    performance of the MyScene brand compared with Bratz, right?

6    A    Yeah.  As I talked to the people who prepared it,

7    that's what they told me.

8    Q    And this -- let's look at page 7, and just to make it

9    clear, you were designated by Mattel as Mattel's corporate

10   representative to discuss this exhibit, right?

11   A    Yes.

12   Q    And if we look at the overall Bratz strategy, it talks

13   about off -- product offerings twice a year.  It talks about

14   promoting collectibility, detail and product focus, driving

15   more products into commercials to create a theme approach,

16   launching with 30-second commercials, and I guess that's a

17   typo, "then move to 15-seconds"; is that right?

18   A    Yes.

19   Q    And then able to execute higher -- higher piece count

20   due to greater price point.

21        So this is looking at -- this is looking at what MGA is

22   doing with Bratz and what you needed to do to respond,

23   right?

24   A    Well, this page refers to what the team recognized was

25   happening with Bratz.

1    Q     Now, let's look at page 9 of this exhibit, and page 9

2    is entitled "Bratz Top Line Strategy."  The first bullet

3    point here says, "Packaging unique pyramid shape packaging

4    with TOTY sticker."  What does "TOTY" mean?

5    A     That stood for "toy of the year."

6    Q     So packaging was something that this team thought was a

7    real advantage for Bratz at this point, right?

8    A     Well, they -- they were looking at every aspect, here.

9    They were looking at packaging and commercials and

10   promotions, website, so, you know, it was -- as you said

11   before, it was all of those elements that the team was

12   looking at.

13   Q     Let's start with "Packaging."  Packaging was one of the

14   things that the team thought Bratz was doing right, right?

15   Unique pyramid shaped packaging with that TOTY sticker; that

16   was considered a positive thing, right?

17   A     Yes.

18   Q     And right under it, it says, "Consistent line look with

19   illustrations.  Embellish collector packaging with soft

20   goods.  Color focus:  Raspberry and dark blue."

21         And then it talks about commercials, a promotion with

22   McDonald's, the website and research.  And among other

23   things, it says under "Research," "Continually conducts

24   focus groups, constantly tapping into fan base for theme

25   ideas."  And that was because, again, themes were important,

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 32 of 54   Page ID #:311033
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

32

1   right?

2   A    Yeah, and again, I take it this is a statement about

3   everything that was happening around the brand.

4   Q    So the whole package of things or the whole list of

5   things that we see here were things that Mattel thought

6   Bratz was doing right, true?

7   A    Generally, yes.

8   Q    And if we look at page 12, "Why is Bratz successful?

9   Brand name is easy for girls to pronounce, and they

10  understand meaning; appeals to older girls who have outgrown

11  Barbie; hip, cool, fun, trendy imagine; color scheme is

12  appealing and creates presence; fashions and accessories are

13  over the top, hip; packaging is innovative; themes are all

14  fashion driven."

15       We do not see anywhere on that page "great sculpt,"

16  right?

17  A    No.

18  Q    We don't see anywhere on that page "Carter Bryant

19  drawings" under why Bratz is successful, right?

20  A    Not on this page, no.

21  Q    Not on any page in this entire handout, right?

22  A    No.

23  Q    We were -- or your team was looking at the way MGA

24  executed its strategy for marketing Bratz, right?

25  A    Yeah, I would say this -- this, to me, refers to all of

CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

33

```
 1    it, the product and -- and the marketing.
 2    Q    Now, did Mattel ask MGA for permission to copy these
 3    Bratz illustrations, by the way?
 4    A    These illustrations?
 5    Q    Yes.
 6    A    I -- I don't know.
 7    Q    Well, you have a pretty good idea, don't you?
 8    A    I don't know.
 9    Q    Have you ever known of Mattel to contact MGA and say,
10    "We're going to put together a piece helping us compete
11    against you, and we want permission to use all your drawings
12    and sketches"; ever known that to happen?
13    A    You are talking about this imagine here?
14    Q    I'm asking you if you've ever known that to happen at
15    Mattel.
16    A    No.
17    Q    Now, let's look at 1812A-24.
18         And this shows a picture of a Lil' Bratz display,
19    right?
20    A    Yes.
21    Q    This looks too dark to be taken in a retail store,
22    right?
23    A    Yeah.  You know, I asked my people where these pictures
24    came from, and they said it came from retail.
25    Q    Who is the "they" that you asked?
```

```
 1    A     The woman who was the project manager at the time.

 2    Q     What's her name?

 3    A     Jean Gomez.

 4    Q     And what retail did she tell you they came from?

 5    A     She didn't recall.

 6    Q     Did she take them?

 7    A     No, she didn't believe she took that.

 8    Q     You personally don't have any way of knowing whether

 9    they came from your marketing intelligence department,

10    right?

11    A     Yeah.  I just asked her where they came from, and she

12    said retail.

13    Q     Let's take a look at page 23.

14    A     Twenty-three --

15    Q     Here is another display that says "New TRU Bratz shop

16    concepts"; do you see that?

17    A     Yes.

18    Q     That looks a little too dark to be a store, too,

19    doesn't it?

20    A     It says "Toys R Us" at the top.  That "TRU" stands for

21    Toys R Us.

22    Q     But you don't know if it's a planogram from Toys R Us

23    or what, right?

24    A     I don't know.

25    Q     Let's take a look at 1812A-21.
```

1      Now, this looks more like it was taken in a retail

2   store, right?

3   A    Yeah, that's probably a store.

4   Q    And we see here, "New TRU Bratz shop concepts," TRU?

5   A    Did you change pages?  I'm sorry.

6   Q    Well, let's look at page 23 -- I'm sorry.  It says at

7   the top, "New TRU Bratz shop concepts," right?

8   A    Yes.

9   Q    And TRU would be Toys R Us, right?

10  A    Yes, that's what I said.

11  Q    But it looks a little too dark to be a retail store,

12  doesn't it?

13  A    Yeah.  I don't know where it came from.

14  Q    Now, if these weren't taken in a store, you would have

15  no idea where they came from, right?

16  A    I don't know where they came from.

17  Q    Let's take a look at 1812A, page 31.

18       Do you have that page?

19  A    Yes.

20  Q    At the top, this says, "Recommendations Summary.

21  Product:  Remove Barbie from characters"; do you see that?

22  A    Yes.

23  Q    And this was a recommendation to improve the MyScene

24  brand, right?

25  A    Yeah, this was discussed.  I don't know if we ever did

1   it.

2   Q    Well, but that's what the recommendation was, right, to

3   try to disassociate Barbie from the MyScene characters?

4   A    Yeah.  What I recall about this conversation was the

5   confusion about, you know, is there an older Barbie in

6   MyScene and a younger Barbie in the regular line, and would

7   it confuse girls.

8   Q    So the recommendation was remove Barbie, right, from

9   the characters?

10  A    That was the recommendation, yeah.

11  Q    And the next bullet point we see, "Offer higher price

12  point products with more value," and that means more value

13  than you had been giving, right?

14  A    Yes, uh-huh.

15  Q    And then "Increasing SKUs to gain store presence and

16  trade support," right?

17  A    Yes.

18  Q    Now, these are all recommendations about the MyScene

19  product, right?

20  A    Yes.

21  Q    The next one has to do with packaging.  It says

22  specifically, "Change color palette."

23  A    Yes.

24  Q    And you had noted earlier, and when I say "you,"

25  Mattel, had noted earlier in this presentation that Bratz

1    had a successful color scheme, right?

2    A    Yes, I believe so.

3    Q    And Mattel actually did tweak its color palette in

4    response to these recommendations, right?

5    A    Yeah.  I asked Jean when we were talking about this

6    document how many -- how many changes we made from a

7    packaging standpoint, and she said they tweaked it.

8    Q    And then the next recommendation is "Merchandising,

9    place product away from Barbie aisle next to Bratz."

10        So you wanted the MyScene product to compete directly

11   with Bratz, right?

12   A    Yeah.  My recollection was, after talking to them, they

13   thought it would sell better apart from Barbie, and I don't

14   know whatever happened, but it was recommended.

15   Q    And the reason they felt that way is because Barbie, at

16   that point, seemed babyish appealing to younger girls, true?

17   A    It was definitely appealing to younger girls.

18   Q    And the MyScene was designed to compete with Bratz for

19   the older girl market, true?

20   A    Yes, MyScene was designed to appeal to older girls and,

21   yes, compete with Bratz.

22   Q    And that's why it was recommended that it should be

23   placed away from the Barbie aisle and next to Bratz, right?

24   A    Uh-huh, yes.

25   Q    Now, let's go to 1812A, page 16.

1   A      Back --

2   Q      And we see "Store check findings."  Now, this is a

3   comparison of MyScene and Bratz, right?

4   A      Yes.

5   Q      And the first -- first line says, "Product, less value

6   than Bratz."  That meant MyScene was offering less value to

7   the consumer than Bratz, right?

8   A      Yes.

9   Q      It says, "Bratz is creating a world with licensed

10  products."  And then the next line says, "Packaging, lacks

11  unique packaging shape, colors do not grab consumers'

12  attention."

13         So your doll that was designed to compete directly with

14  Bratz didn't have the right kind of packaging to be

15  successfully competing, right?  Not at that point, anyway?

16  A      That's correct.

17  Q      And then you see "Placement, lacks significant presence

18  and has few SKUs next to Barbie, which is a deterrent to the

19  older girl."

20         If it's next to Barbie for the older girl market that

21  you wanted to appeal to, there was a little bit of an "ick

22  factor" associated, right?

23  A      Well, we knew that Barbie was working with younger

24  girls and not so much with older girls.

25  Q      You knew that the older girls, if they saw Barbie next

1    to MyScene, that they might mix the two together, and they

2    might not buy either, right?

3    A    Yeah, I don't know if I would characterize it that way.

4    I think we felt it was going to be better if it was

5    positioned next to other older product.

6    Q    Now, again, this whole page, there is nothing here

7    about Bratz sculpt significantly better than Barbie or

8    MyScene sculpt, right?

9    A    No.

10   Q    It's all about how MGA was executing the concept,

11   right?

12   A    Well, this page is about what MyScene wasn't doing as

13   well as we'd like, but --

14   Q    But it's comparing with Bratz.  For example, "Pricing:

15   MyScene dolls priced with Bratz standard dolls, 14.99; Bratz

16   offers additional SKUs at a high price point, 29.99 to

17   99.99," okay?

18        So Bratz was offering some additional SKUs that MyScene

19   didn't have, right?

20   A    Yeah, they -- they had a broader SKU profile with

21   higher prices.

22   Q    And they were being pretty profitable, right?

23   A    I can't speak to their profit.

24   Q    But in this whole study that was done, everything, not

25   one mention was made of need to get better sculpt for

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 40 of 54   Page ID #:311041
CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

40

1   MyScene, right?

2   A    In this document, I'm not recalling that, no.

3          *(Attorney discussion held off the record.)*

4   BY MS. KELLER:

5   Q    The photos that we've just been talking about, for

6   example 1812A-24.

7   A    Yes.

8   Q    You didn't know as of your deposition last year where

9   this picture came from, right?

10   A    No, I did not.

11   Q    You didn't know if it was a retail store or not, right?

12   A    No, I did not.

13   Q    When did you talk to this woman who informed you that

14   this was a retail store?

15   A    That would have been in preparation for the deposition.

16   Q    But as of the deposition, you didn't know, right?  As a

17   30(b)(6) witness, you couldn't say, right?

18   A    Well, yeah.  Based on that investigation, they didn't

19   know.  They didn't recall.

20   Q    She didn't even know if it was a retail store, right?

21   A    They told me they got it from retail, and that's all

22   they knew.

23   Q    Well, take a look at your deposition transcript

24   June 18th, 2010, page 161, line 22, to 162, line 7.

25   A    I'm sorry, to which line?

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 41 of 54   Page ID #:311042
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

41

1    Q    Page 161, line 21, through page 162, line 7.

2    A    Okay.  I'm sorry, can you ask the question again.

3    Q    The question is, as of last year when you were deposed

4    as Mattel's 30(b)(6) on this issue, you didn't know if this

5    picture was an actual retail store or not, true?

6    A    Yeah, I didn't.

7    Q    And you talked to the woman before your deposition to

8    try to find out, right?

9    A    Yes.

10   Q    So would it be true, then, that as you sit here now,

11   you still don't know if it was a retail store or where that

12   picture was taken?

13   A    No, I don't know.

14   Q    Let's look at Exhibit 26219.

15        Do you have that exhibit?

16   A    Yes, I do.

17   Q    And that is entitled "Finance and strategy, retail

18   visits, summary of findings from pre-Easter, March 23 visits

19   dated April 2004," and you were Mattel's 30(b)(6) witness on

20   that issue on June 18th, 2010?

21   A    Yes.

22             MS. KELLER:  Your Honor, I'd move that

23   Exhibit 26219 into evidence.

24             THE COURT:  Just a moment.

25             Received.

1              (Defendants' Exhibit No. 26219 is received in

2        evidence.)

3    BY MS. KELLER:

4    Q    Now, if we look at page 2, we see "31 finance and

5    strategy members, 7 teams, were joined by retail service on

6    3 store visits," and what that means is you literally went

7    out in the field, and you visited retail stores and tried to

8    get an idea of what was going on with your products, right?

9    A    This was a group from the finance group that doesn't

10   really deal with marketing that often, on a regular basis,

11   and so they wanted to go out and get a feel for what

12   happened in the stores at this time.

13   Q    So is that a "yes"?

14   A    Yes.  It wasn't my group.  It was the finance group.

15   Q    Well, when I say "you," since you were Mattel's

16   30(b)(6) witness, I'm just using that as a shorthand for

17   Mattel.

18   A    Yes.

19   Q    I'll try to say "Mattel" instead.

20         Now, let's -- let's look at page 3, and it says,

21   "Objectives of visits were as following:

22         "Visit representative Walmart, Target, and TRU," that's

23   Toys R Us, "retail locations.

24         "Learn more about differences between retailers per

25   retail service.

 1          "Examine key Mattel brands categories.

 2          "Note key differentiators in each category aisle," and

 3     under that is "Strongest presence, hottest toy, innovative

 4     merchandising, private label presence."

 5          Now, let's go to page 4, and this says, "Overall

 6     findings centered on key themes, one of two."  I'm not going

 7     to read the whole thing, but I want to call your attention

 8     to certain portions, okay?

 9     A    (No audible response.)

10     Q    Do you see the first line, "Even where we have better

11     product, like Wee 3 Friends, Bratz wins on packaging with

12     their twosome in hearts."

13          Was it really Mattel's belief that it's product, Wee 3

14     Friends, was better than Bratz' competing product?

15     A    Well, it was my belief.

16     Q    And so you thought even though you had a better actual

17     product, that Bratz was beating you based on packaging in

18     this particular case?

19     A    Well, keep in mind, this is a finance group.

20     Q    Okay.  But this is what the finance group thought,

21     right?

22     A    The finance people.

23     Q    "Bratz wins on packaging with their twosome in hearts,"

24     right?

25     A    That was their opinion.

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 44 of 54   Page ID #:311045
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

44

1    Q    Well, let's go back to page 2, it says, "31 finance and

2    strategy members, 7 teams, were joined by retail service on

3    3 store visits," so it wasn't just the finance people,

4    right?

5    A    Actually, the retail was person was Lulu.

6    Q    Let's go back to page 4.  Let's look at the third

7    bullet point, "Bratz win on packaging."  And then right

8    after that, "Barbie is presented fairly well versus Bratz,

9    but packaging, this is what is better in Bratz with color

10   and grooviness," a term from my youth.

11        And then let's look down a few more bullet points, and

12   then we see "Bratz, more prominent colors, packaging,

13   display setup."  And even though this may have been a

14   finance group, this echoes what we just saw in the previous

15   exhibit, Exhibit 1812A, right?

16   A    Yeah, generally, yes.

17   Q    And 1812A was not done by the finance department,

18   right?

19   A    That's correct.

20   Q    1812A was done by marketing people, right?

21   A    Yes.

22   Q    Now, let's go to page 7, "Barbie losing shelf space to

23   Bratz.  Although still has more total space, Bratz uses less

24   space better by winning the packaging and togetherness

25   battle."

1      So again, Bratz's terrific packaging was selling dolls,

2  right?

3  A    It's their observation, yes.

4  Q    It was also the observation of marketing in 1812A,

5  right?

6  A    Yes.

7  Q    And let's look at Exhibit 1804.

8      Do you recognize this as the October 28th, 2003, dated

9  Barbie 2004 marketing plan?

10  A    Yes, I do.

11          MS. KELLER:  Your Honor, I'd move 1804 into

12  evidence.

13          THE COURT:  Received.

14          (Defendants' Exhibit No. 1804 is received in

15      evidence.)

16  BY MS. KELLER:

17  Q    And you actually wrote this particular marketing plan,

18  right?

19  A    Yes, I did.

20  Q    You wrote it in October of 2003?

21  A    Yes, that's right.

22  Q    And was this right after you started at Mattel for the

23  second time as Mattel's senior vice president in charge of

24  girls marketing and design?

25  A    Yes.  I had come back in early October.

1    Q    And you were responsible for the marketing and design

2    of Mattel's fashion dolls, including Barbie, right?

3    A    Yes.

4    Q    Let's look at 1804, page 2, and it says "Barbie 2003

5    status summary of brand in crisis."

6         Now, the brand you are referring to, here, of course,

7    is Barbie, right?

8    A    Yes.

9    Q    And by a "brand in crisis," you were referring -- you

10   were reacting to what you had learned about the state of the

11   Barbie business, right?

12   A    Yes.

13   Q    You presented this document at a meeting?

14   A    I did.

15   Q    And representatives of marketing were present, right?

16   A    Yeah, that's right.

17   Q    Also design, right?

18   A    I am not actually recalling if design was there.

19   Q    Let's take a look at your deposition from January 25th,

20   2008, page 12 -- page 205, lines 5 through 12.

21   A    Okay.  Okay.

22   Q    So were there representatives from design as well as

23   marketing?

24   A    Yeah.  What I said then was that I couldn't recall the

25   individuals that would have been representatives from

 1   various groups, marketing, design and sales.

 2   Q    Okay.  So marketing, design and sales, those folks were

 3   all present for your presentation, right?

 4   A    Yeah, and I can't recall the individuals, but yeah.

 5   Q    Representatives from those groups, right?

 6   A    Yeah, to the best I can remember, yes.

 7   Q    And the president of Mattel brands was there, true?

 8   A    Yes.

 9   Q    There wasn't anybody who disagreed with your

10   presentation, was there, Mr. Kilpin?

11   A    You know, I don't recall if there was a lot of

12   disagreement about it.

13   Q    Do you recall any disagreement about it?

14   A    I'm sure there were a lot of things we talked about,

15   but I don't recall a major disagreement.

16   Q    Now, if we returned to the marketing plan again, 1804,

17   go to the second bullet point from the bottom, and it says,

18   "Brand losing significant market share to Bratz, Disney

19   Princesses."

20        So Disney was a competitor?

21   A    At that time, those dolls were being made by another

22   company.

23   Q    Well, this is August 28th, 2003, right?  I'm sorry,

24   this is October 28th, 2003, right?

25   A    Yes.

1   Q    And you only left Disney in October of 2003, right?

2   A    Yes.

3   Q    And Disney was selling Disney Princesses to which

4   Barbie was losing market share, right?

5   A    Yes, uh-huh.

6   Q    So Disney was a competitor of Mattel's?

7   A    Well, in this category, yes.

8   Q    The fashion doll category, specifically?

9   A    At that time, yeah.

10  Q    Now, this brand losing significant market share to

11  Bratz and Disney Princess, this was information coming to

12  you from customers, from licensees and consumers, right?

13  A    When we did this document, we were pulling together

14  information from, you know, syndicated sources, market

15  share, from customers --

16  Q    Licensees?

17  A    -- licensees, yes, uh-huh.

18  Q    And this was information you got by reviewing

19  commentary from those people as well as research; is that

20  what you just said?

21  A    Yes.

22  Q    Now, let's look at page 7 of 1804, and under "market

23  share," the first line says, "Barbie has ceded significant

24  share to Bratz YTD per TRSTS."  "YTD" is year to date?

25  A    Yes.

1    Q    And what is TRSTS?

2    A    TRSTS is what we called it, and it was at the time a

3    component of NPD, and they tracked retail sales through

4    actual tracking of sales at retail.

5    Q    Let's look at page 9, entitled "Barbie 2003 key

6    learnings."

7    A    Yes, uh-huh.

8    Q    And the second point from the bottom is "Didn't

9    reinvent the product and packaging fast enough," right?

10   A    Yes.

11   Q    And again, packaging is really important in selling

12   fashion dolls, isn't it?

13   A    It's definitely part of it.

14   Q    It's important, isn't it?

15   A    Yes.

16   Q    And it says underneath that, "Barbie looked tired on

17   the shelf and lacked newness."

18        Now, let's go to page 11, and under "Competition," it

19   says, "Didn't react quickly and decisively to market

20   successes/failures."  Mattel just want nimble enough in

21   reacting at that point, right?

22   A    Yeah, this was my -- this was my response to what was

23   happening when I got back.

24   Q    Let's look at page 13, and under "Key challenges facing

25   Barbie," you wrote, "Retailers are off Barbie," and those

Case 2:04-cv-09049-DOC-RNB   Document 10232   Filed 03/18/11   Page 50 of 54   Page ID #:311051
CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

50

1    were your words, right?

2    A    Yes, they were.

3    Q    And near the middle of the page, you write, "Bratz

4    continues to gain strength," and you write -- you list three

5    bullet points, "Direct hit on world's themes."

6        When you said "direct hit," you meant that was a --

7    they were right on target, that was a big success for them,

8    right?

9    A    Well, actually, what I recall that being about is that

10   we were bunching up and doing the same themes at the same

11   time.

12   Q    But -- okay.  But "direct hit" meant they were

13   competing head to head with you successfully, right?

14   A    Yeah, "direct hit" meant that we were right on top of

15   each other.

16   Q    "High piece count/price value," this is also under

17   "Bratz continues to gain strength."  So Bratz had a high

18   piece count and value for the money, right?

19   A    Yes.

20   Q    And the other thing under "Bratz continues to gain

21   strength" is "Upcoming entertainment."  So Bratz had

22   entertainment in the works that was going to tie in with --

23   with its themes, right?

24   A    Yes.

25   Q    Now, nowhere ever in your summary of all the problems

CV 04-9049-DOC - 03/17/2011 - Day 35, Vol. 3 of 3

51

```
 1   that Barbie was having do we find "need new sculpt,"
 2   correct?
 3   A    Not -- no, not that I'm aware of in this document.
 4   Q    And when you're identifying the great things about the
 5   Bratz product that is causing it to sell so well, you never
 6   identify "Bratz has a dynamite sculpt," right?
 7   A    No.
 8   Q    And the final bullet point, that "Upcoming
 9   entertainment," had you actually investigated to see that
10   Bratz did have entertainment tie-ins coming?
11   A    Yeah, I don't recall specifically what that one was
12   about.
13   Q    But you knew they were coming, right?  You knew
14   something was coming in the entertainment category, true?
15   A    It must have, if I wrote it, yes.
16   Q    Let's look at page 14, "Key challenges facing Barbie."
17   The first bullet point says, "Product line is late,
18   aggressive schedules are taking their toll," and the
19   aggressive schedule you were talking about was that Mattel
20   was trying to rush new dolls to market to compete with
21   Bratz, right?
22   A    Well, what I recall was that the line itself was just
23   late overall, and whether it was for young girls or
24   anything, it was -- we were trying to do a lot.
25   Q    But where it says "Aggressive schedules are taking
```

52

```
 1   their tolls," "aggressive schedule" meaning you were trying
 2   to rush more product in the market than you could produce,
 3   right?
 4   A    Well, I recall that being just about how much work we
 5   were tying to get done in a short amount of time.
 6   Q    And it says, "Advertising effectiveness needs to
 7   improve," and then the last point, "Barbie brand message
 8   must be reinforced across packaging, advertising while still
 9   communicating world differentiation," and Bratz was doing
10   all those things really well already, right?
11   A    Well, I think we talked about that in the other
12   document, yeah.
13   Q    Bratz was already doing those things very well, right?
14   A    Yes.
15   Q    And that last line, you were talking about the
16   challenge of insuring that the brand message overall would
17   still be communicated cohesively, true?
18   A    Yes.
19             MS. KELLER:  And your Honor, would this be a
20   time --
21             THE COURT:  This would be a good time.
22             You are admonished not to discuss this matter
23   amongst yourselves, nor form or express any opinion
24   concerning the case.  Have a happy St. Patrick's Day.  See
25   you tomorrow morning at 8:00.
```

CV 04-9049-DOC – 03/17/2011 – Day 35, Vol. 3 of 3

53

1            And, sir, if you'd return at 8:30 tomorrow, just

2    come in to Court and start promptly at 8:30.

3            THE WITNESS:  Okay.

4            *(The following proceedings is taken outside*

5        *the presence of the jury.)*

6            THE COURT:  Okay.  Counsel, if you'd have a seat.

7            Mr. Larian and Mr. Eckert, I apologize for last

8    evening.  You gentlemen sat here, and I didn't realize it

9    until part way through the evening.  Have a nice evening.

10           Counsel, if you'd be seated.  Your two clients are

11   excused for the evening.

12           All right.  Now, informally and off the record for

13   just a moment.

14           *(Discussion held off the record.)*

15           *(Recess.)*

16           *(No further proceedings reported.)*

17                          -oOo-

18

19

20

21

22

23

24

25

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 18, 2011

12

13

14          _____

            JANE C.S. RULE, U.S. COURT REPORTER
15          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25