Case 2:04-cv-09049-DOC-RNB  Document 10246  Filed 03/22/11  Page 1 of 133  Page ID #:310551
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5

   MATTEL, INC., et al.,            )
6                                    )
                Plaintiffs,          )
7                                    )
          vs.                        ) No. CV 04-9049 DOC
8                                    )    Day 36
   MGA ENTERTAINMENT, INC., et al., )    Volume 1 of 3
9                                    )
                                     )
10              Defendants.          )
   _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               Jury Trial

16            Santa Ana, California

17           Friday, March 18, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-18 D36V1

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 2 of 133   Page ID #:310552
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:

3

               QUINN EMANUEL URQUHART & SULLIVAN
4              BY:  JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6              865 South Figueroa Street
               10th Floor
7              Los Angeles, California 90017
               (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700

20             - AND -

21             KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 3 of 133   Page ID #:310553
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
                   Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830

8            – AND –

9            SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                   Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660

13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                 Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406

18

19           ROBERT A. ECKERT, MATTEL CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

```
1                           I N D E X

2      WITNESSES                   DIRECT  CROSS  REDIRECT  RECROSS

3      KILPIN, Timothy

4      By Ms. Keller                   8

5

6

7

8                             EXHIBITS

9      EXHIBIT NO.                 IDENTIFICATION      IN EVIDENCE

10       1807    2005 Barbie spring line                 26
                 review dated 4/15/2004
11
         1810    MyScene versus Bratz                     37
12               Dolls Competitive
                 Analysis and
13               Recommendations

14       1811    MyScene and Bratz.                       40
                 What's working and
15               what's not

16       1814    Presentation dated                       91
                 5/4/2004
17
         1820    E-mail from Mr. Kilpin                   61
18               to Mr. Bousquette dated
                 12/3/2003
19
         2107    E-mail from Ms. Han,                    106
20               Subject: TRU meeting
                 notes, dated 10/23/2003
21
         2115    E-mail from Ms. Arons                    67
22               dated 12/14/2003

23       5924    Presentation to Mattel's                94
                 Board of Directors dated
24               9/17/2004

25
```

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

5

**EXHIBITS (Continued)**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 7790 | E-mail chain containing e-mail from Mr. Kilpin to Mr. Bousquette and Mr. Zablow re: Bratz info, dated 2/2/2004 | 110 |
| 7795 | E-mail chain containing e-mail from Mr. Totzke dated 1/15/2004 | 116 |
| 8751 | E-mail from Mr. Kilpin to Mr. Zablow dated 12/5/2003 | 63 |
| 8753 | Project:  Double Trouble | 70 |
| 8758 | E-mail from Mr. Kilpin to Ms. Nordquist dated 4/6/2004 | 23 |
| 8766 | E-mail from Mr. Kilpin to Ms.Arons dated 4/8/2004 | 83 |
| 8768 | E-mail from Mr. Kilpin to Ms. Arons dated 8/27/2004 | 93 |
| 8769 | E-mail from Ms. Arons to Mr. Kilpin dated 7/26/2004 | 74 |
| 8772 | Mattel slide show re: Wee 3 Friends | 75 |
| 8776 | Presentation by Ms. Luther and Ms. Willensky | 84 |
| 8785 | Barbie business updated dated 7/14/2004 | 92 |
| 8804 | Happy Birthday Barbie | 55 |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

6

**EXHIBITS (Continued)**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 9072 | Toy Story Barbie Loves Buzz | 55 |
| 9073 | Toy Story Barbie Loves Woody | 55 |
| 9074 | Toy Story Barbie Loves Alien | 55 |
| 9218 | E-mail chain | 29 |
| 9284 | Document from Ms. Page to Mr. Kilpen, et al., dated 2/11/2004 | 124 |
| 9288 | Market Intelligence Department document dated 6/1/2004 | 127 |
| 9789 | Toy Story Barbie "Made For Each Other" | 55 |
| 9790 | Toy Story Great Shape Barbie | 55 |
| 16146 | E-mail from Mr. Kilpin Ms. Nordquist, Ms. Park, Ms. Driskill dated 2/25/2004 | 81 |
| 16255 | E-mail | 26 |
| 24047 | Monster High Laguna Blue doll in packaging | 102 |
| 27507 | Trade dress registration | 51 |
| 35303 | 4Ever Best Friends dolls in packaging | 60 |
| 35304 | Wee 3 Friends dolls in packaging | 72 |
| 35842 | Focus group one three sculpts, 12/19/2007 | 101 |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

7

1                          **EXHIBITS** (Continued)

2    **EXHIBIT NO.**              **IDENTIFICATION**        **IN EVIDENCE**

3

4      35843   Monster High document                        102
               dated 6/24/2008
5
       35902   E-mail chain from                             28
6              Mr. Kilpin

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, FRIDAY, MARCH 18, 2011**    |
|       | 2  | **Day 36, Volume 1 of 3**                            |
|       | 3  | (8:37 a.m.)                                           |
| 08:37 | 4  | *(In the presence of the jury.)*                     |
| 08:37 | 5  | THE COURT:  All right.  We're back in session.       |
| 08:37 | 6  | All counsel are present.  The parties are present.  The |
| 08:37 | 7  | witness is present.                                  |
| 10:21 | 8  | **TIMOTHY KILPIN, MGA'S WITNESS, PREVIOUSLY SWORN**  |
| 10:21 | 9  | **RESUMED THE STAND**                                |
| 08:37 | 10 | THE COURT:  This is continued direct examination     |
| 08:37 | 11 | by Ms. Keller.                                       |
| 08:37 | 12 | **DIRECT EXAMINATION (Resumed)**                     |
| 08:37 | 13 | BY MS. KELLER:                                        |
| 08:37 | 14 | Q.   Good morning, Mr. Kilpin.                        |
| 08:37 | 15 | A.   Good morning.  Now, Mr. Kilpin, I would like to turn |
| 08:37 | 16 | your attention to an exhibit dated March 16, 2004, which is |
| 08:38 | 17 | already in evidence.  Exhibit 1806.                  |
| 08:38 | 18 | *(Document displayed.)*                              |
| 08:38 | 19 | THE WITNESS:  Okay.                                   |
| 08:38 | 20 | BY MS. KELLER:                                        |
| 08:38 | 21 | Q.   And this says, "2004 Marketing Plan Update," and we see |
| 08:38 | 22 | the date on the front there, "3/16/04," although it's a |
| 08:38 | 23 | little hard to see.                                   |
| 08:38 | 24 | A.   Yes, I do.                                       |
| 08:38 | 25 | Q.   This was 11 days before Mattel sued Carter Bryant, |

Case 2:04-cv-09049-DOC-RNB  Document 10246  Filed 03/22/11  Page 9 of 133  Page ID #:310559
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

9

| 08:38 | 1 | correct? |
| 08:38 | 2 | A.   I don't know the actual date of the suit. |
| 08:38 | 3 | Q.   You recognize this document, do you not? |
| 08:38 | 4 | A.   Yes, I do. |
| 08:38 | 5 | Q.   And do you believe you wrote it? |
| 08:38 | 6 | A.   I did not write this.  My team wrote it. |
| 08:38 | 7 | Q.   I'm sorry, what was that? |
| 08:38 | 8 | A.   I did not write this.  My team wrote it. |
| 08:38 | 9 | Q.   Is it possible you wrote it? |
| 08:38 | 10 | A.   My team wrote this. |
| 08:38 | 11 | Q.   Is it possible that you wrote it? |
| 08:38 | 12 | A.   I don't recall writing this.  My team did. |
| 08:38 | 13 | Q.   Take a look at your deposition transcript, January 26, |
| 08:39 | 14 | 2008, page 233, lines 18 through 22 -- say, lines 14 through |
| 08:39 | 15 | 22. |
| 08:39 | 16 | *(Document provided to the witness.)* |
| 08:39 | 17 | THE WITNESS:  Yes, I do see that. |
| 08:39 | 18 | BY MS. KELLER: |
| 08:39 | 19 | Q.   Is it possible that you wrote this? |
| 08:39 | 20 | A.   My recollection at that time was that it was possible. |
| 08:39 | 21 | Q.   Is -- your recollection at that time was a little |
| 08:39 | 22 | fresher than it is today? |
| 08:39 | 23 | A.   Well, actually, having reviewed all these documents, |
| 08:39 | 24 | I -- I don't remember writing this. |
| 08:39 | 25 | Q.   Okay.  But my question is, you testified in 2008 that |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:39 | 1 | it's possible you did write it, correct? |
| 08:39 | 2 | A.    Yes, I did say that. |
| 08:39 | 3 | Q.    Now, if we can turn to page 2, this is a follow up to |
| 08:39 | 4 | the marketing plan 2004, correct? |
| 08:40 | 5 | A.    From the document that we were looking at yesterday. |
| 08:40 | 6 | Q.    Yes.  It's a follow up to that marketing plan, correct? |
| 08:40 | 7 | A.    That's correct, yes. |
| 08:40 | 8 | Q.    And you presented this document at Mattel, did you not? |
| 08:40 | 9 | A.    Yes, I and my team did. |
| 08:40 | 10 | Q.    But you specifically made the presentation, right? |
| 08:40 | 11 | A.    I honestly don't remember if it was me presenting or my |
| 08:40 | 12 | team presenting, but... |
| 08:40 | 13 | Q.    And could you turn to your deposition transcript, |
| 08:40 | 14 | January 25, 2008, lines 24 and 25, to page 237, line 1. |
| 08:40 | 15 | *(Document provided to the witness.)* |
| 08:40 | 16 | THE WITNESS:  I'm sorry.  Which lines again? |
| 08:41 | 17 | MS. KELLER:  Lines 24 and 25 on page 236, to line |
| 08:41 | 18 | 1 on page 237. |
| 08:41 | 19 | THE WITNESS:  Okay.  Yes, I see that. |
| 08:41 | 20 | MR. QUINN:  Should it go to line 4 on 237? |
| 08:41 | 21 | THE COURT:  To line 4. |
| 08:41 | 22 | MS. KELLER:  May I read it, Your Honor? |
| 08:41 | 23 | THE COURT:  Just a moment. |
| 08:41 | 24 | MS. KELLER:  Line 4 is who's present, Your Honor. |
| 08:41 | 25 | THE COURT:  Just a moment. |

| | | |
|---|---|---|
| 08:41 | 1 | You may. |
| 08:41 | 2 | MS. KELLER:  (Reading:) |
| 08:41 | 3 | "QUESTION:  Do you remember presenting this market |
| 08:41 | 4 | update at Mattel? |
| 08:41 | 5 | "ANSWER:  Yeah, I do recall that. |
| 08:41 | 6 | "QUESTION:  And who was present at that meeting? |
| 08:41 | 7 | "ANSWER:  I recall that it included our marketing |
| 08:41 | 8 | and our sales team. |
| 08:41 | 9 | BY MS. KELLER: |
| 08:41 | 10 | Q.   So you made the presentation, correct? |
| 08:42 | 11 | A.   I -- I guess I must have. |
| 08:42 | 12 | Q.   And if we turn to page 3 -- |
| 08:42 | 13 | *(Document displayed.)* |
| 08:42 | 14 | BY MS. KELLER: |
| 08:42 | 15 | Q.   -- we see the title, "The House is on Fire," and to the |
| 08:42 | 16 | right of the title what appears to be a little icon of a |
| 08:42 | 17 | house on fire, right? |
| 08:42 | 18 | A.   Yes, I do. |
| 08:42 | 19 | Q.   And those -- the "house on fire," those were your |
| 08:42 | 20 | words, correct? |
| 08:42 | 21 | A.   Yes, that was my and my team's call to action. |
| 08:42 | 22 | Q.   It was your -- they were your words, right? |
| 08:42 | 23 | A.   Yes, they were. |
| 08:42 | 24 | Q.   And by "The House is on Fire" you meant the brand is in |
| 08:42 | 25 | crisis, right? |

DEBBIE GALE, U.S. COURT REPORTER

| 08:42 | 1 | A.   Yes.  I recall using these words to help motivate and |
| 08:42 | 2 | energize the team about the challenge. |
| 08:42 | 3 | Q.   You meant that the brand was in crisis, correct? |
| 08:43 | 4 | A.   Yes, I did. |
| 08:43 | 5 | Q.   You meant that the Barbie brand in particular was being |
| 08:43 | 6 | challenged, true? |
| 08:43 | 7 | A.   Yes, that's correct. |
| 08:43 | 8 | Q.   And the first bullet says, "Every score card |
| 08:43 | 9 | measurement is down." |
| 08:43 | 10 | And the second bullet, "Bratz is gaining share with |
| 08:43 | 11 | core five- to eight-year-olds." |
| 08:43 | 12 | The third bullet, "worst attribute rating in 45 years |
| 08:43 | 13 | of Barbie." |
| 08:43 | 14 | Now, every month Mattel would measure how the Barbie |
| 08:43 | 15 | brand ranked against various attributes, right? |
| 08:43 | 16 | A.   Yes, we did. |
| 08:43 | 17 | Q.   If you turn to page 5, 1806 -- page 5. |
| 08:43 | 18 | *(Document displayed.)* |
| 08:43 | 19 | BY MS. KELLER: |
| 08:43 | 20 | Q.   You see at the top left under "Barbie score card" |
| 08:43 | 21 | Barbie monthly measures? |
| 08:43 | 22 | A.   I'm sorry, what page? |
| 08:43 | 23 | Q.   I'm on page 5. |
| 08:44 | 24 | A.   All right. |
| 08:44 | 25 | Q.   Top says, "Barbie score card, 3/3/03."  "Barbie monthly |

08:44    1    measures," near the top.  And then, if you see in the far

08:44    2    right-hand column, downward arrows for every one of the

08:44    3    first -- every one of the Barbie monthly measures that are

08:44    4    listed, correct?

08:44    5    A.   Uh, yes, that's correct.

08:44    6    Q.   And that's for February of 2004 we see that far right

08:44    7    column, correct?

08:44    8    A.   Yes.

08:44    9          MS. KELLER:  If we could circle the top to show

08:44    10    that it's February 2004.

08:44    11         *(Technician complies.)*

08:44    12    BY MS. KELLER:

08:44    13    Q.   And you're aware that Mattel sued Carter Bryant in

08:44    14    April 2004, true?

08:44    15    A.   I'm aware it was April.

08:44    16    Q.   Now, Mattel also measured competitor brands, including

08:45    17    Bratz, using the same attributes, right?

08:45    18    A.   Yes, that's correct.

08:45    19    Q.   And if we turn to page -- if we look at the last third

08:45    20    of the page on page 5, it refers to Bratz monthly measures

08:45    21    of, quote, "Fun to play with," unquote, "Doll with best

08:45    22    accessories," quote/unquote, and "The coolest toy,"

08:45    23    quote/unquote.

08:45    24      And those Bratz monthly measures all have arrows

08:45    25    pointing upward, right?

| 08:45 | 1 | A.   Yes, they do. |
| 08:45 | 2 | Q.   If we look at the next page, page 6. |
| 08:45 | 3 | *(Document displayed.)* |
| 08:45 | 4 | BY MS. KELLER: |
| 08:45 | 5 | Q.   The second bullet point under "The House is on Fire" |
| 08:45 | 6 | says, "Bratz has surpassed Barbie in appearance and |
| 08:45 | 7 | aspiration and play value." |
| 08:45 | 8 | And if we go to page 8. |
| 08:46 | 9 | *(Document displayed.)* |
| 08:46 | 10 | BY MS. KELLER: |
| 08:46 | 11 | Q.   We see "Bratz marketing and media is getting more |
| 08:46 | 12 | aggressive." |
| 08:46 | 13 | So you weren't just measuring the decline in Barbie. |
| 08:46 | 14 | You were also measuring the rise of Bratz at this point, |
| 08:46 | 15 | right? |
| 08:46 | 16 | A.   Yes, we were. |
| 08:46 | 17 | Q.   And it was serious enough that you thought, as you just |
| 08:46 | 18 | put it, a call to action was in order, right? |
| 08:46 | 19 | A.   Uh, yes. |
| 08:46 | 20 | Q.   It was serious enough that you used a really dramatic |
| 08:46 | 21 | phrase, "The House is on Fire," right? |
| 08:46 | 22 | A.   Yes, I did. |
| 08:46 | 23 | Q.   Let's look at Exhibit 16255. |
| 08:46 | 24 | *(Document provided to the witness.)* |
| 08:46 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

08:46    1    BY MS. KELLER:

08:46    2    Q.   And if you look at the bottom e-mail -- this is in

08:47    3    evidence.  This is the bottom of page 1, we see an e-mail

08:47    4    from you to various people, including Sujata Luther, Russell

08:47    5    Arons, Cassidy Park, Cynthia Rapp, Christina de Rosa, and

08:47    6    Allison Willensky.  And this e-mail says, "We walked through

08:47    7    a TRU store this a.m. in Austin" -- that was a Toys R Us?

08:47    8    A.   Yes, this would be.

08:47    9    Q.   "Very sobering.  While we were represented with our

08:47   10    newest product to date, we are not surprisingly outdone by

08:47   11    Bratz and other competitors in price, value, and retail

08:47   12    presentation."

08:47   13    Q.   Now, when you say "we walked a TRU store," who was the

08:48   14    we?

08:48   15    A.   I recall at that time that was me and my counterparts

08:48   16    who worked for Matt Bousquette.

08:48   17    Q.   And who were their names?

08:48   18    A.   I don't remember everybody who was on that particular

08:48   19    trip.  It would have been Mark Sullivan and Ron Brawer.  I

08:48   20    could look at a list and give you the names, but I can't

08:48   21    recall them off the top of my head.

08:48   22    Q.   Well, that's okay.  You're saying here you're being

08:48   23    outdone not just by Bratz but by other competitors too,

08:48   24    right?

08:48   25    A.   Uh, yes, I did say that.

08:48  1   Q.   So it wasn't just that Bratz was beating Barbie; other
08:48  2   brands were beating Barbie too, right?
08:48  3   A.   Yeah.  I don't know who I would have been referring to
08:48  4   in that particular point but...
08:49  5   Q.   Other competitors, that included Disney Princess,
08:49  6   right?
08:49  7   A.   Yeah, I don't know who I was referring to in this one.
08:49  8   Q.   And the next paragraph says, "As our spring sales
08:49  9   continue to drop, our customers will be asking increasingly
08:49  10  tough questions about our future plans."
08:49  11       Now, if we look at page 2 of this exhibit at the top.
08:49  12           *(Document displayed.)*
08:49  13  BY MS. KELLER:
08:49  14  Q.   And the paragraph that begins, "it's not enough."
08:49  15  A.   Yes.
08:49  16  Q.   The second sentence says, "As we prepare for the
08:49  17  upcoming research, it's incredibly important that we
08:49  18  accelerate our package redesign, focusing on both graphic
08:49  19  and structural breakthroughs."
08:49  20       Now, you never talked here about it being incredibly
08:50  21  important to get a new sculpt for the doll, right?
08:50  22  A.   No.  What I'm remembering is we were really looking at
08:50  23  those things we thought we could begin to effect from a
08:50  24  marketing and packaging perspective.
08:50  25  Q.   The -- you never said in here "We need to get a new

08:50   1   sculpt for the doll," correct?

08:50   2   A.   Uh, in this note, I did not, no.

08:50   3   Q.   And you never even said here in this e-mail, "We need

08:50   4   to get new face paint for the doll," correct?

08:50   5   A.   Yeah, I don't recall that this was a concern

08:50   6   specifically about our product.  It was more about what we

08:50   7   were or weren't doing from a marketing standpoint.

08:50   8   Q.   My question is, nothing is said in here about we need

08:50   9   to get new face paint for the doll, correct?

08:50   10   A.   No, not in this note.

08:50   11   Q.   And it says, "Let's be prepared, too, to identify

08:50   12   dramatic changes and upgrades in our," quote, "'value in the

08:50   13   box,'" unquote, "proposition and how we tell that story in

08:50   14   packaging.  Let's completely alter the consumer equation in

08:51   15   our accessories."

08:51   16        So one of the problems here was, as we talked about

08:51   17   yesterday, Barbie was not seen as providing much value for

08:51   18   the money compared to Bratz, right?

08:51   19   A.   Yeah.  These were my concerns at the time about what I

08:51   20   was seeing when I walked the stores.

08:51   21   Q.   That's what I'm asking you about, is this e-mail.

08:51   22   That's what I'm inquiring about.

08:51   23        So as you walked the store, it struck you that you

08:51   24   needed to add more accessories to the Barbie package, right?

08:51   25   A.   Yes, I did.

08:51  1    Q.   And you needed to redo the Barbie package, right?

08:51  2    A.   Yes, I was asking about all those things.

08:51  3    Q.   You needed to tell a story in packaging, right?

08:51  4    A.   Uh, yes.  Uh-huh.

08:51  5    Q.   Now, if we look at the third paragraph, you're

08:52  6    literally pleading for help, right?  I mean, that's what you

08:52  7    say, true?

08:52  8    A.   Yes, it does.

08:52  9    Q.   "So I have a request.  I'm pleading.  Take 2 hours this

08:52  10   Thursday or Friday and take your directs to a TRU, a Target,

08:52  11   a Kmart, and maybe even a Walmart.  Yes, this means

08:52  12   canceling meetings and driving.  Come back with five big

08:52  13   ideas that are truly transformational, cost be damned.  This

08:52  14   is frankly more important than anything else.  I don't mean

08:52  15   to be overly dramatic, but the future of Barbie is at

08:52  16   stake."

08:52  17        So you thought that if you could get your people to

08:52  18   actually go out into the stores and look around and see what

08:52  19   was happening, they would be every bit as alarmed as you,

08:52  20   right?

08:52  21   A.   Yeah.  My feeling was that we needed to get everybody

08:53  22   engaged in the challenge that we were facing.

08:53  23   Q.   You felt that if you could get your people to go out

08:53  24   into the stores and look around, they would see that things

08:53  25   were just as bad as you were saying they were, right?

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 19 of 133   Page ID #:310569
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

19

| 08:53 | 1 | A.   That's what I expected, yes. |
| 08:53 | 2 | Q.   Now, let's look at Exhibit 1808. |
| 08:53 | 3 | *(Document provided to the witness.)* |
| 08:53 | 4 | THE WITNESS:  Thank you. |
| 08:53 | 5 | BY MS. KELLER: |
| 08:53 | 6 | Q.   If you'd look at the second e-mail from the top, this |
| 08:53 | 7 | is from you to various people, including Russell Arons and |
| 08:53 | 8 | Cassidy Park, dated April 2nd, 2004, right? |
| 08:53 | 9 | A.   Yes, it is. |
| 08:53 | 10 | Q.   And the group you sent this e-mail to was the marketing |
| 08:54 | 11 | team and the design leaders for Barbie and for the other |
| 08:54 | 12 | girls businesses, right? |
| 08:54 | 13 | A.   Uh, that's correct. |
| 08:54 | 14 | Q.   And they were leading the licensing, media research, |
| 08:54 | 15 | entertainment, and sales of Barbie, true? |
| 08:54 | 16 | A.   Yes, and some other brands, but, yes. |
| 08:54 | 17 | Q.   And the subject says, "Confidential:  The Barbie call |
| 08:54 | 18 | to action, road trip results."  And then it says, "As you |
| 08:54 | 19 | all know, Matt and his team have spent the week zipping from |
| 08:54 | 20 | city to city, planogram room to planogram room to review and |
| 08:54 | 21 | discuss the state of our business." |
| 08:54 | 22 | And Matt is Matt Bousquette, right? |
| 08:54 | 23 | A.   That's correct. |
| 08:54 | 24 | Q.   And Matt at that time was the president of Mattel |
| 08:54 | 25 | brands, true? |

| 08:54 | 1 | A.   Yes, he was. |
| 08:54 | 2 | Q.   And you were a part of Mr. Bousquette's team who zipped |
| 08:54 | 3 | from city to city, planogram room to planogram room, right? |
| 08:54 | 4 | A.   Yes, I was. |
| 08:55 | 5 | Q.   If we look at the last three sentences of the second |
| 08:55 | 6 | paragraph from the bottom, you say, "Simply stated, the old |
| 08:55 | 7 | way of building the Barbie brand just doesn't work anymore. |
| 08:55 | 8 | We have been out-thought and out-executed.  And it stops |
| 08:55 | 9 | now." |
| 08:55 | 10 | You thought at least at that time that MGA was being |
| 08:55 | 11 | more creative than Mattel, right? |
| 08:55 | 12 | A.   Well, I thought that we were not doing our jobs well on |
| 08:55 | 13 | the brand. |
| 08:55 | 14 | Q.   You thought MGA was doing a better job, right? |
| 08:55 | 15 | A.   Among other competitors, yes. |
| 08:55 | 16 | Q.   You thought that MGA was being more creative, true? |
| 08:55 | 17 | A.   Uh, yes, generally. |
| 08:55 | 18 | Q.   And you thought that MGA was out-executing you, right? |
| 08:55 | 19 | A.   Uh, yes, I did. |
| 08:55 | 20 | Q.   And then the paragraph at the bottom includes, "expect |
| 08:56 | 21 | the team to throw a lot of hand grenades, new approaches to |
| 08:56 | 22 | packaging, pricing, design, and marketing.  I expect a lot |
| 08:56 | 23 | of debate and disagreement, which is fine.  Complacency will |
| 08:56 | 24 | kill us." |
| 08:56 | 25 | Now, again, the things you thought needed to be changed |

| 08:56 | 1 | were packaging, pricing, design, and marketing, right? |
| 08:56 | 2 | A.   Uh, yeah, this was my concern about things I thought we |
| 08:56 | 3 | needed to address immediately. |
| 08:56 | 4 | Q.   And you said, "complacency will kill us," you were |
| 08:56 | 5 | trying to remind everyone about the urgency of the overall |
| 08:56 | 6 | situation with the brand, right? |
| 08:56 | 7 | A.   That's correct. |
| 08:56 | 8 | Q.   And your conclusions here about being out-thought and |
| 08:56 | 9 | out-executed, that conclusion was based on this |
| 08:56 | 10 | city-to-city, planogram-to-planogram road trip, true? |
| 08:57 | 11 | A.   Yes, that's correct. |
| 08:57 | 12 | Q.   Now, if we look at the top of 1808, page 2. |
| 08:57 | 13 | *(Document displayed.)* |
| 08:57 | 14 | BY MS. KELLER: |
| 08:57 | 15 | Q.   We see, "Remember the mission for Barbie: |
| 08:57 | 16 | "Regain relevance. |
| 08:57 | 17 | "Regain confidentiality. |
| 08:57 | 18 | "Regain share." |
| 08:57 | 19 | Regain means to get back something that has been lost, |
| 08:57 | 20 | right? |
| 08:57 | 21 | A.   Yes.  This was my call to action consistently to my |
| 08:57 | 22 | team at that time. |
| 08:57 | 23 | Q.   You thought Barbie had lost relevance, right? |
| 08:57 | 24 | A.   Yes, I did. |
| 08:57 | 25 | Q.   You thought Barbie -- people had lost confidence in |

22

| | | |
|---|---|---|
| 08:57 | 1 | Barbie, right? |
| 08:57 | 2 | A.   Yes, I did. |
| 08:57 | 3 | Q.   Specifically retailers, true? |
| 08:57 | 4 | A.   Yeah, that was specifically about retailers. |
| 08:57 | 5 | Q.   And "regain share," that means market share, right? |
| 08:57 | 6 | A.   Yes, that's correct. |
| 08:57 | 7 | Q.   Now, let's look at Exhibit 8758, which actually |
| 08:58 | 8 | forwarded this e-mail we've just been looking at. |
| 08:58 | 9 | *(Document provided to the witness.)* |
| 08:58 | 10 | BY MS. KELLER: |
| 08:58 | 11 | Q.   And this is -- at the top we see this is an e-mail from |
| 08:58 | 12 | you, April 6, 2004, to Jill Nordquist, and then at the |
| 08:58 | 13 | bottom we see the original e-mail is also from you to an |
| 08:58 | 14 | additional group of people, including, generally speaking, |
| 08:58 | 15 | the next level down in terms of marketing and design |
| 08:58 | 16 | leadership for Barbie, correct? |
| 08:58 | 17 | A.   Uh, yes, that's correct. |
| 08:58 | 18 | Q.   So you wanted to make sure that the information that |
| 08:58 | 19 | you had gathered on this road trip was really widely known |
| 08:58 | 20 | among all the people at Mattel that you thought were |
| 08:59 | 21 | important to hear about it, true? |
| 08:59 | 22 | A.   It was to the next level down in terms of design and |
| 08:59 | 23 | marketing. |
| 08:59 | 24 | Q.   You wanted your information to get out there fairly |
| 08:59 | 25 | widely within the people who could make a difference, true? |

| | | |
|---|---|---|
| 08:59 | 1 | A.   I wouldn't characterize it as fairly widely.  I would |
| 08:59 | 2 | say it was to the next level of leadership. |
| 08:59 | 3 | MS. KELLER:  Your Honor, you'd move 8758 into |
| 08:59 | 4 | evidence. |
| 08:59 | 5 | THE COURT:  Received. |
| 08:59 | 6 | *(Exhibit No. 8758 received in evidence.)* |
| 08:59 | 7 | *(Document displayed.)* |
| 08:59 | 8 | BY MS. KELLER: |
| 08:59 | 9 | Q.   Well, you wanted it to get to the next level down from |
| 08:59 | 10 | you in terms of marketing and design leadership for Barbie, |
| 08:59 | 11 | right? |
| 08:59 | 12 | A.   Yes, that's correct. |
| 08:59 | 13 | Q.   You wanted those people to get going and start making |
| 08:59 | 14 | some changes on an urgent basis, right? |
| 08:59 | 15 | A.   That's right. |
| 08:59 | 16 | Q.   Let's look at Exhibit 1807. |
| 08:59 | 17 | *(Document provided to the witness.)* |
| 08:59 | 18 | BY MS. KELLER: |
| 08:59 | 19 | Q.   Which is already in evidence. |
| 09:00 | 20 | *(Document displayed.)* |
| 09:00 | 21 | BY MS. KELLER: |
| 09:00 | 22 | Q.   And this is the 2005 Barbie spring line review, dated |
| 09:00 | 23 | April 15, 2004.  Now, this was just 12 days before Mattel |
| 09:00 | 24 | sued Carter Bryant, right? |
| 09:00 | 25 | A.   I don't know the date that the suit was filed. |

24

09:00   1   Q.   You were part of a meeting where this document was

09:00   2   reviewed, correct?

09:00   3   A.   Yes, I was.

09:00   4   Q.   And this was presented to personnel in the Mattel

09:00   5   marketing group, right?

09:00   6   A.   Yes.

09:00   7   Q.   And it was presented to some other people as well,

09:00   8   correct?

09:00   9   A.   Uh, yes.  I believe the sales group, but I'm not

09:00   10   recalling exactly.

09:00   11   Q.   Now, you don't recall ever telling anybody that this

09:00   12   document was inaccurate, true?

09:00   13   A.   Uh, that the document was inaccurate?  No, I don't

09:00   14   believe I did.

09:00   15   Q.   On the cover of this document, we see the burning house

09:00   16   again, right?

09:00   17   A.   Yes.

09:00   18   Q.   The same one we saw in the earlier exhibit, "The House

09:00   19   is on Fire," right?

09:00   20   A.   Yes.

09:00   21   Q.   And that was the Exhibit 1807 -- this exhibit, I'm,

09:01   22   sorry, 1807 -- let's look at page 3.

09:01   23           (Document displayed.)

09:01   24   BY MS. KELLER:

09:01   25   Q.   This incorporates some of the material from the earlier

| | | |
|---|---|---|
| 09:01 | 1 | exhibit we looked at, right? |
| 09:01 | 2 | A.   Yeah.  About the attribute ratings and the share, yes. |
| 09:01 | 3 | Q.   And so this is yet another reference to the monthly |
| 09:01 | 4 | measurements of Barbie, MyScene, and Bratz, right? |
| 09:01 | 5 | A.   Yes, it is. |
| 09:01 | 6 | Q.   And some of the attributes that Barbie was losing |
| 09:01 | 7 | included "cool, fun to play with, I want to be |
| 09:01 | 8 | her/aspiration, pretty and fashionable." |
| 09:01 | 9 |      Barbie was -- those are all not just key attribute |
| 09:01 | 10 | ratings for Barbie, but for any fashion doll, right? |
| 09:02 | 11 | A.   Yes, these were attribute ratings that girls found |
| 09:02 | 12 | important. |
| 09:02 | 13 | Q.   And it's fair to say that losing those attributes was |
| 09:02 | 14 | really alarming, right? |
| 09:02 | 15 | A.   Yeah.  This tied to my concern about regaining |
| 09:02 | 16 | relevance. |
| 09:02 | 17 | Q.   Let's look at page 4. |
| 09:02 | 18 |      *(Document displayed.)* |
| 09:02 | 19 | BY MS. KELLER: |
| 09:02 | 20 | Q.   It says, "Fight fire with fire.  We must do things |
| 09:02 | 21 | differently around here."  And you agreed very much with |
| 09:02 | 22 | that, didn't you? |
| 09:02 | 23 | A.   Yeah.  The "We must do things differently around here" |
| 09:02 | 24 | was consistent, in my view, with the message I'd already |
| 09:02 | 25 | delivered. |

Case 2:04-cv-09049-DOC-RNB  Document 10246  Filed 03/22/11  Page 26 of 133  Page ID #:310576
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

26

| | | |
|---|---|---|
| 09:02 | 1 | MS. KELLER:  Your Honor, I think I neglected |
| 09:02 | 2 | earlier to move to admit Exhibit 16255. |
| 09:02 | 3 | THE COURT:  It's received. |
| 09:02 | 4 | *(Exhibit No. 16255 received in evidence.)* |
| 09:02 | 5 | THE COURT:  So 1808 was previously received. |
| 09:03 | 6 | 8758 was previously received. |
| 09:03 | 7 | 1807 is received. |
| 09:03 | 8 | *(Exhibit No. 1807 received in evidence.)* |
| 09:03 | 9 | BY MS. KELLER: |
| 09:03 | 10 | Q.   You absolutely agreed with this statement, didn't you? |
| 09:03 | 11 | A.   Yes, as I said. |
| 09:03 | 12 | Q.   And let's look at the next page, page 5. |
| 09:03 | 13 | *(Document displayed.)* |
| 09:03 | 14 | BY MS. KELLER: |
| 09:03 | 15 | Q.   This says that "a rival-led Barbie genocide rapidly |
| 09:03 | 16 | grows." |
| 09:03 | 17 | This was something that you or somebody in your |
| 09:03 | 18 | department came up with? |
| 09:03 | 19 | A.   Yeah.  I did not.  It was someone in the department. |
| 09:03 | 20 | Q.   And it says, "All the talent, power, and history behind |
| 09:03 | 21 | the Barbie brand should be focused to fight back. |
| 09:03 | 22 | "Product, packaging, marketing, and sales must be |
| 09:03 | 23 | launched that is brilliant, tactical, aggressive, |
| 09:04 | 24 | revolutionary, and ruthless." |
| 09:04 | 25 | And you agreed with that, didn't you? |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 27 of 133   Page ID #:310577
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

27

| | | |
|---|---|---|
| 09:04 | 1 | A.   Yeah.   This is a little bit over the top.   Again, it's |
| 09:04 | 2 | about call to action. |
| 09:04 | 3 | Q.   Well, you agreed with it, didn't you? |
| 09:04 | 4 | A.   I agreed with the need to motivate the team to action. |
| 09:04 | 5 | Q.   Did you agree with the words here? |
| 09:04 | 6 | A.   I -- as I said, I thought it was a little over the top. |
| 09:04 | 7 | Q.   And, "Barbie stands for good.   All others stand for |
| 09:04 | 8 | evil." |
| 09:04 | 9 | That does seem a little over the top, doesn't it? |
| 09:04 | 10 | A.   Yeah.   As I said, that was more about getting the team |
| 09:04 | 11 | motivated to -- to action. |
| 09:04 | 12 | Q.   Now, the plan that you had was -- if we look at |
| 09:04 | 13 | page 10. |
| 09:04 | 14 | *(Document displayed.)* |
| 09:04 | 15 | BY MS. KELLER: |
| 09:04 | 16 | Q.   Your "Fight fire with fire" plan says, "The mission. |
| 09:04 | 17 | Regain market share.   The plan, launch new wow words. |
| 09:05 | 18 | Create exciting, innovative packaging.   Reinvent key |
| 09:05 | 19 | segments of fashions."   And what is A-C-C-Y-S? |
| 09:05 | 20 | A.   That's accessories. |
| 09:05 | 21 | Q.   "Kelly and essentials." |
| 09:05 | 22 | So, now, Mattel had regular "house on fire" meetings in |
| 09:05 | 23 | 2004, right? |
| 09:05 | 24 | A.   Yeah, we did. |
| 09:05 | 25 | Q.   In fact, you actually called them by that shorthand, |

| | | |
|---|---|---|
| 09:05 | 1 | HOF meetings, right? |
| 09:05 | 2 | A.   Yes, we did. |
| 09:05 | 3 | Q.   And that was because you wanted to keep uppermost in |
| 09:05 | 4 | people's minds the urgency of the decline of the brand and |
| 09:05 | 5 | the need to fix it, right? |
| 09:05 | 6 | A.   Yeah, I wanted to keep my team motivated. |
| 09:05 | 7 | Q.   Now, let's look at Exhibit 35902. |
| 09:05 | 8 | *(Document provided to the witness.)* |
| 09:05 | 9 | BY MS. KELLER: |
| 09:06 | 10 | Q.   And if we look at the bottom e-mail on the chain, we |
| 09:06 | 11 | see this is from you.  And this is dated April 20th, 2004. |
| 09:06 | 12 | And looking at that, the subject, "House on fire, Older |
| 09:06 | 13 | girl entertainment," and the first few lines say, "We |
| 09:06 | 14 | started discussing this issue on Friday after listening to |
| 09:06 | 15 | girls talk all weekend about how cool and fashionable Bratz |
| 09:06 | 16 | is and about how strong American Idol and about how Barbie |
| 09:06 | 17 | is for younger girls.  We must accelerate development on |
| 09:06 | 18 | older girls." |
| 09:06 | 19 | MS. KELLER:  I'm sorry, Your Honor, I neglected to |
| 09:06 | 20 | moved to enter 35902. |
| 09:06 | 21 | THE COURT:  Received. |
| 09:06 | 22 | *(Exhibit No. 35902 received in evidence.)* |
| 09:06 | 23 | *(Document displayed.)* |
| 09:06 | 24 | BY MS. KELLER: |
| 09:06 | 25 | Q.   "So after listening to girls talk all weekend about how |

| | | |
|---|---|---|
| 09:06 | 1 | cool and fashionable Bratz is and about how strong American |
| 09:06 | 2 | Idol is and about how Barbie is for younger girls, we must |
| 09:07 | 3 | accelerate development on older girls' entertainment on two |
| 09:07 | 4 | fronts, as I'll outline below." |
| 09:07 | 5 | And then, if you look a few lines down from there, you |
| 09:07 | 6 | conclude, "We have to and will be more aggressive about |
| 09:07 | 7 | taking older girls back from Bratz in 2005." |
| 09:07 | 8 | Now, let's look at Exhibit 9218. |
| 09:07 | 9 | *(Exhibit provided to the witness.)* |
| 09:07 | 10 | *(Document displayed.)* |
| 09:07 | 11 | BY MS. KELLER: |
| 09:07 | 12 | Q.   This is an e-mail to you dated June 9, 2004, correct? |
| 09:07 | 13 | A.   Yes. |
| 09:07 | 14 | MS. KELLER:  And, Your Honor, I think this is |
| 09:07 | 15 | already in, but if not, I would move to admit. |
| 09:07 | 16 | THE COURT:  It's received. |
| 09:07 | 17 | *(Exhibit No. 9218 received in evidence.)* |
| 09:07 | 18 | BY MS. KELLER: |
| 09:07 | 19 | Q.   Now, this is an e-mail chain.  And if we look at that |
| 09:08 | 20 | third e-mail down, this is from Mike Salop to you saying, |
| 09:08 | 21 | "Tim, FYI we are forming an internal team to work with |
| 09:08 | 22 | Bain on gaining a deeper understanding of MGA's potential |
| 09:08 | 23 | strategies and operating tactics.  The goal is to help us |
| 09:08 | 24 | determine where they might be going and how we can react |
| 09:08 | 25 | competitively. |

| 09:08 | 1 | "We will involve Sujata and Matt Turetzky, but want to |
| 09:08 | 2 | include marketing on the team, as well." |
| 09:08 | 3 | What was Mr. Salop's position at the time? |
| 09:08 | 4 | A.   Mike was in strategic planning at that time. |
| 09:08 | 5 | Q.   What was his title? |
| 09:08 | 6 | A.   I don't remember his title. |
| 09:09 | 7 | Q.   Now, "an internal team to work with Bain," Bain was a |
| 09:09 | 8 | consultancy group that was brought in to do a thorough |
| 09:09 | 9 | analysis from outside Mattel of why the Barbie brand was |
| 09:09 | 10 | failing against Bratz, correct? |
| 09:09 | 11 | A.   Uh, yes, I believe so. |
| 09:09 | 12 | Q.   And if we look at 8676, which is already in evidence. |
| 09:09 | 13 | (Document provided to the witness.) |
| 09:09 | 14 | (Document displayed.) |
| 09:09 | 15 | BY MS. KELLER: |
| 09:09 | 16 | Q.   At the top we see a June 21st, 2004, e-mail from you to |
| 09:09 | 17 | Matt Bousquette? |
| 09:09 | 18 | A.   Yes, uh-huh. |
| 09:09 | 19 | Q.   And he was the president of Mattel brands? |
| 09:09 | 20 | A.   Yes. |
| 09:09 | 21 | Q.   And this was actually your response to Bob Eckert's |
| 09:10 | 22 | "What happened to Barbie?" e-mail, which is the bottom of |
| 09:10 | 23 | this chain, right? |
| 09:10 | 24 | A.   Yes, it is. |
| 09:10 | 25 | Q.   In fact, the first line of your e-mail says, "Matt, |

| | | |
|---|---|---|
| 09:10 | 1 | sending this on to you before sending to Bob."  And Bob is |
| 09:10 | 2 | Bob Eckert? |
| 09:10 | 3 | A.   Yes, that's correct. |
| 09:10 | 4 | Q.   And your e-mail at the top, the second paragraph, |
| 09:10 | 5 | includes the line, "Around 2000, we moved to counter |
| 09:10 | 6 | Barbie's image as aloof, perfect, cold.  We stressed younger |
| 09:10 | 7 | themes, nurturing, fantasy.  At the same time, we didn't |
| 09:11 | 8 | continue to deliver the best possible older, cool, |
| 09:11 | 9 | trend-right ideas." |
| 09:11 | 10 | Now, as part of your work when you joined Mattel in |
| 09:11 | 11 | 2003, this was one of the things you learned, that Barbie |
| 09:11 | 12 | was perceived as aloof, perfect, and cold, right? |
| 09:11 | 13 | A.   Uh, yes.  This came from looking at some of the |
| 09:11 | 14 | research. |
| 09:11 | 15 | Q.   And Mattel had actually tried to counter that image in |
| 09:11 | 16 | 2000, right? |
| 09:11 | 17 | A.   I'm not aware of what Mattel was specifically doing in |
| 09:11 | 18 | 2000. |
| 09:11 | 19 | Q.   Take a look at your deposition, April 9th, 2010, |
| 09:11 | 20 | page 721. |
| 09:11 | 21 | *(Document provided to the witness.)* |
| 09:12 | 22 | THE WITNESS:  Yes, okay. |
| 09:12 | 23 | BY MS. KELLER: |
| 09:12 | 24 | Q.   So as part of your work at Mattel, you had learned, |
| 09:12 | 25 | even though you weren't there at the time, that Mattel had |

| | | |
|---|---|---|
| 09:12 | 1 | tried to counter Barbie's aloof, perfect, and cold image in |
| 09:12 | 2 | 2000, right? |
| 09:12 | 3 | A.   Yeah.  I'm just not remembering specifically what we |
| 09:12 | 4 | did at the time.  If there was a document that we were |
| 09:12 | 5 | looking at. |
| 09:12 | 6 | Q.   Well, let's look at your own e-mail here, this 8676, |
| 09:12 | 7 | and that second paragraph, it says, "Around 2000 we moved to |
| 09:12 | 8 | counter Barbie's image as aloof, perfect, cold," right? |
| 09:12 | 9 | A.   Yes, uh-huh. |
| 09:12 | 10 | Q.   So you were telling Mr. Bousquette and planning to tell |
| 09:12 | 11 | Mr. Eckert that you were aware that Mattel had already tried |
| 09:12 | 12 | in the year 2000 to counter that image, right? |
| 09:12 | 13 | A.   Uh, yes. |
| 09:12 | 14 | Q.   And the way Mattel had tried to address it was by |
| 09:13 | 15 | stressing younger themes, nurturing and fantasy, right? |
| 09:13 | 16 | A.   Yes, uh-huh. |
| 09:13 | 17 | Q.   And it didn't work, did it? |
| 09:13 | 18 | A.   Well, I recall that those younger segments worked well. |
| 09:13 | 19 | Q.   Well, here it is, 2004, and you're still trying to |
| 09:13 | 20 | figure out what the heck to do, right? |
| 09:13 | 21 |         MR. QUINN:  It's vague and ambiguous. |
| 09:13 | 22 |         THE COURT:  Sustained. |
| 09:13 | 23 | BY MS. KELLER: |
| 09:13 | 24 | Q.   It's -- here it is 2004 and you're still trying to |
| 09:13 | 25 | figure out how you can regain the girls that you have lost |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:13 | 1 | because they haven't seen a cool, trendy Barbie, right? |
| 09:13 | 2 | A.   Yeah, we did say that. |
| 09:13 | 3 | Q.   In fact, you said it right in the very next -- in the |
| 09:13 | 4 | fourth paragraph down, "this lead to the lost generation |
| 09:13 | 5 | Russell speaks of in her presentations.  Girls, five to |
| 09:13 | 6 | eight years old today haven't seen a cool, trendy Barbie |
| 09:14 | 7 | consistently," right? |
| 09:14 | 8 | A.   Yes.  I remember we were working generally pretty well |
| 09:14 | 9 | with younger girls, but not with older girls. |
| 09:14 | 10 | Q.   Well, it was around 2000 before Bratz even came out |
| 09:14 | 11 | that Mattel was trying to do something about this image of |
| 09:14 | 12 | Barbie as aloof, perfect, and cold, right? |
| 09:14 | 13 | MR. QUINN:  Lacks foundation. |
| 09:14 | 14 | THE COURT:  Do you understand the question, sir? |
| 09:14 | 15 | THE WITNESS:  Uh, I do. |
| 09:14 | 16 | THE COURT:  Overruled. |
| 09:14 | 17 | THE WITNESS:  As it relates to this -- to this |
| 09:14 | 18 | note, it's about countering that image with those younger |
| 09:14 | 19 | themes. |
| 09:14 | 20 | BY MS. KELLER: |
| 09:14 | 21 | Q.   Here's my question:  Around 2000, Mattel had moved to |
| 09:14 | 22 | counter Barbie's image as aloof, perfect, cold, true? |
| 09:14 | 23 | A.   Yes. |
| 09:14 | 24 | Q.   Here it is 2004 and you're still trying to figure out |
| 09:14 | 25 | how to recapture the same market that Mattel wasn't even |

| | | |
|---|---|---|
| 09:14 | 1 | able to capture even before Bratz came out, true? |
| 09:14 | 2 | A.   Yeah.   This was where I'm getting confused with your |
| 09:15 | 3 | question.   We did move at that time to go after younger |
| 09:15 | 4 | girls with things like nurturing and fantasy, and those were |
| 09:15 | 5 | successful.   It was the older girls we weren't reaching. |
| 09:15 | 6 | Q.   Well, let's look now -- and the older girls you weren't |
| 09:15 | 7 | reaching even in 2000, true? |
| 09:15 | 8 | A.   Yeah, that is true.   Uh-huh. |
| 09:15 | 9 | Q.   In fact, Barbie was being perceived as babyish by the |
| 09:15 | 10 | older girls.   We talked about that yesterday, right? |
| 09:15 | 11 | A.   Yes, we heard that. |
| 09:15 | 12 | Q.   And that was well before Bratz came out, because Bratz |
| 09:15 | 13 | didn't come out in 2001, right? |
| 09:15 | 14 | A.   Yes, that's correct. |
| 09:15 | 15 | Q.   And when you say that there's a lost generation and |
| 09:15 | 16 | that girls five to eight years old today haven't seen a |
| 09:16 | 17 | cool, trendy Barbie consistently, this is 2004 and you still |
| 09:16 | 18 | have not been able to produce a cool, trendy Barbie |
| 09:16 | 19 | consistently, right? |
| 09:16 | 20 | A.   Well, that was a concern we had coming from our |
| 09:16 | 21 | research, was that we weren't appealing to those girls with |
| 09:16 | 22 | anything cool at that time. |
| 09:16 | 23 | Q.   Well, that is what I'm asking about.   I'm asking about |
| 09:16 | 24 | your e-mail June 21st, 2004, where you yourself are saying |
| 09:16 | 25 | that you have actually -- you have actually had a lost |

| | | |
|---|---|---|
| 09:16 | 1 | generation of girls five to eight years old who haven't seen |
| 09:16 | 2 | a cool, trendy Barbie consistently, right? |
| 09:16 | 3 | A.   Uh, yes. |
| 09:16 | 4 | Q.   And that was true, again, well before Bratz came out, |
| 09:16 | 5 | right? |
| 09:16 | 6 | MR. QUINN:   Lacks foundation, Your Honor.   He |
| 09:16 | 7 | starts there in 2003. |
| 09:16 | 8 | THE COURT:   When did you become employed, sir? |
| 09:17 | 9 | 2003? |
| 09:17 | 10 | THE WITNESS:   Yeah.   October 2003. |
| 09:17 | 11 | THE COURT:   And before that you were with Disney? |
| 09:17 | 12 | THE WITNESS:   That's correct. |
| 09:17 | 13 | THE COURT:   But you've referred back to documents |
| 09:17 | 14 | of 2002 about Barbie? |
| 09:17 | 15 | THE WITNESS:   Uh, yes, in preparation. |
| 09:17 | 16 | THE COURT:   Overruled. |
| 09:17 | 17 | And you were the 30(b)(6) witness? |
| 09:17 | 18 | Not in this area, I understand that, Counsel. |
| 09:17 | 19 | You were a 30(b)(6) witness? |
| 09:17 | 20 | THE WITNESS:   Yes. |
| 09:17 | 21 | THE COURT:   All right.   Overruled. |
| 09:17 | 22 | BY MS. KELLER: |
| 09:17 | 23 | Q.   And, Mr. Kilpin, as we discussed yesterday, when you |
| 09:17 | 24 | were hired back by Mattel, you undertook a thorough review |
| 09:17 | 25 | of the whole Barbie line and its history, right? |

| | | |
|---|---|---|
| 09:17 | 1 | A.   Well, my focus at the time was what was happening with |
| 09:17 | 2 | the business mostly at that time. |
| 09:17 | 3 | Q.   But you were –– you undertook a thorough review of what |
| 09:17 | 4 | had been happening over the recent years.  And we looked at |
| 09:17 | 5 | it yesterday, didn't we? |
| 09:17 | 6 | A.   Yes, that's correct. |
| 09:17 | 7 | Q.   So you were well aware of the fact that before Bratz |
| 09:17 | 8 | even came out, you had a lost generation of girls who had |
| 09:18 | 9 | not seen a cool, trendy Barbie consistently, right? |
| 09:18 | 10 | A.   Well, my view is that was building up over time, over |
| 09:18 | 11 | those years, up to 2004. |
| 09:18 | 12 | Q.   Sir, my question is, because of all the research you |
| 09:18 | 13 | did, you knew that before there was even a Bratz, Barbie was |
| 09:18 | 14 | already in trouble with this lost generation of girls, five |
| 09:18 | 15 | to eight, who had never seen a cool, trendy Barbie |
| 09:18 | 16 | consistently; is that a true statement? |
| 09:18 | 17 | A.   That was my reading of the research at the time, yes. |
| 09:18 | 18 | Q.   Now, after talking about that, you talk about Bratz |
| 09:18 | 19 | positioning, piece count, and margin profile, right? |
| 09:18 | 20 | A.   Yes, uh-huh. |
| 09:18 | 21 | Q.   And you say that Bratz effectively counterprogrammed |
| 09:18 | 22 | versus Barbie, right? |
| 09:18 | 23 | A.   Yes. |
| 09:18 | 24 | Q.   Let's look at Exhibit 1810. |
| 09:19 | 25 | *(Document provided to the witness.)* |

| | | |
|---|---|---|
| 09:19 | 1 | BY MS. KELLER: |
| 09:19 | 2 | Q.   And this document is entitled "MyScene versus Bratz |
| 09:19 | 3 | Dolls Competitive Analysis and Recommendations," correct? |
| 09:19 | 4 | A.   Uh, yes. |
| 09:19 | 5 | Q.   And MyScene was the flanker brand that Mattel brought |
| 09:19 | 6 | out to try to compete directly with Bratz as a kind of a |
| 09:19 | 7 | cool, trendy doll, right? |
| 09:19 | 8 | A.   We -- our concern was, again, as you saw, we weren't |
| 09:19 | 9 | reaching older girls, and we thought that this was an |
| 09:19 | 10 | opportunity to do that. |
| 09:19 | 11 | MS. KELLER:  Your Honor, I'd move 1810 into |
| 09:19 | 12 | evidence. |
| 09:19 | 13 | THE COURT:  Received. |
| 09:19 | 14 | (Exhibit No. 1810 received in evidence.) |
| 09:19 | 15 | (Document displayed.) |
| 09:19 | 16 | BY MS. KELLER: |
| 09:19 | 17 | Q.   Now, let's look under "doll fashions."  We see it says, |
| 09:19 | 18 | "Competitive Analysis and Recommendations" at the top.  You |
| 09:19 | 19 | got MyScene on the left, Bratz on the right. |
| 09:20 | 20 | Under "Doll Fashions" if you go down to the first |
| 09:20 | 21 | bullet point that we see, it says, "Bratz always offers a |
| 09:20 | 22 | soft goods purse; MyScene does not." |
| 09:20 | 23 | What's a soft goods purse? |
| 09:20 | 24 | A.   It's a question before that, if I may?  Do we have a |
| 09:20 | 25 | date for this document? |

| | | |
|---|---|---|
| 09:20 | 1 | Q.   I don't see a date on this document. |
| 09:20 | 2 | Now, you were there when MyScene was competing against |
| 09:20 | 3 | Bratz, right? |
| 09:20 | 4 | MR. QUINN:  Um, Your Honor, I don't think there's |
| 09:20 | 5 | any foundation for questioning this witness on this |
| 09:20 | 6 | document. |
| 09:20 | 7 | THE COURT:  Turn it down.  I want to see the -- |
| 09:20 | 8 | who's the party that supplied this document. |
| 09:20 | 9 | *(Technician complies.)* |
| 09:20 | 10 | THE COURT:  Overruled. |
| 09:20 | 11 | BY MS. KELLER: |
| 09:20 | 12 | Q.   Can you tell us, sir, what is a soft goods purse? |
| 09:20 | 13 | A.   Um, it would be an accessory for a doll that would be |
| 09:21 | 14 | made out of fabric. |
| 09:21 | 15 | Q.   And it says under that, "Bratz girl fashions use a lot |
| 09:21 | 16 | of glitter and sequins/studs, every outfit adorned with |
| 09:21 | 17 | something that shines.  MyScene does not use glitter as |
| 09:21 | 18 | often." |
| 09:21 | 19 | Under that, the bullet point says, "Bratz offers more |
| 09:21 | 20 | soft goods in pack than MyScene." |
| 09:21 | 21 | Were there soft goods in addition to purses that could |
| 09:21 | 22 | be put in a fashion pack? |
| 09:21 | 23 | A.   I'm sorry, can you ask that again? |
| 09:21 | 24 | Q.   Were their soft goods in addition to purses that could |
| 09:21 | 25 | be put in a fashion pack? |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 39 of 133   Page ID #:310589
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

39

| 09:21 | 1 | A.   Oh, sure, yes. |
| 09:21 | 2 | Q.   And under that it says, "Bratz offers more fashions |
| 09:21 | 3 | than MyScene." |
| 09:21 | 4 | So this was another call to action by someone that |
| 09:21 | 5 | Bratz was again beating MyScene in certain categories of |
| 09:22 | 6 | doll fashions, right? |
| 09:22 | 7 | A.   This was a comparison between the product lines, and I |
| 09:22 | 8 | don't know the timing, but, yes. |
| 09:22 | 9 | Q.   Let's look at the bottom where it says packaging. |
| 09:22 | 10 | "More call-outs on front packaging to highlight key |
| 09:22 | 11 | selling points and points of differentiation versus Bratz." |
| 09:22 | 12 | And then look under No. 2, it says, "Bratz front |
| 09:22 | 13 | packaging has more call-outs than MyScene." |
| 09:22 | 14 | "Bratz packaging always has a handle, though not always |
| 09:22 | 15 | thematic." |
| 09:22 | 16 | And if you look at page 2. |
| 09:22 | 17 | *(Document displayed.)* |
| 09:22 | 18 | BY MS. KELLER: |
| 09:22 | 19 | Q.   Under "Recommendations" -- I'm sorry -- let's see -- |
| 09:22 | 20 | let's go to Exhibit 1811.  If we could go to Exhibit 1811. |
| 09:23 | 21 | *(Document provided to the witness.)* |
| 09:23 | 22 | BY MS. KELLER: |
| 09:23 | 23 | Q.   Do you recognize this as a document produced by Mattel |
| 09:23 | 24 | that says, "MyScene and Bratz, what's working and what's |
| 09:23 | 25 | not"? |

| | | |
|---|---|---|
| 09:23 | 1 | A.   I saw this in preparation. |
| 09:23 | 2 | MS. KELLER:  And, Your Honor, move 1811 into |
| 09:23 | 3 | evidence. |
| 09:23 | 4 | THE COURT:  Received. |
| 09:23 | 5 | *(Exhibit No. 1811 received in evidence.)* |
| 09:23 | 6 | *(Document displayed.)* |
| 09:23 | 7 | BY MS. KELLER: |
| 09:23 | 8 | Q.   Now, here we see some columns that show what was |
| 09:23 | 9 | working and what was not working for the MyScene product, |
| 09:23 | 10 | right? |
| 09:23 | 11 | A.   Yes. |
| 09:23 | 12 | Q.   And we see three categories at the top:  "Product," |
| 09:23 | 13 | "Content," and "Marketing." |
| 09:23 | 14 | And we see that in each category the "Not Working" |
| 09:23 | 15 | column for MyScene was longer than the "Working" column, |
| 09:24 | 16 | right? |
| 09:24 | 17 | A.   Yeah.  This is just a cataloging of all those things. |
| 09:24 | 18 | Q.   Well, but if we look at the "Product," "Not Working" |
| 09:24 | 19 | column, longer than the "Working" column, right? |
| 09:24 | 20 | A.   Yes. |
| 09:24 | 21 | Q.   If we look at "Content," "Not Working," longer than the |
| 09:24 | 22 | "Working" column, right? |
| 09:24 | 23 | A.   Uh, yes. |
| 09:24 | 24 | Q.   If we look at "Marketing," "Not Working," longer than |
| 09:24 | 25 | the "Working" column, right? |

| | | |
|---|---|---|
| 09:24 | 1 | A.   This is what I would expect my team to do when they're |
| 09:24 | 2 | going back to assess critically what they're doing and not |
| 09:24 | 3 | doing. |
| 09:24 | 4 | Q.   Well, what I'm asking you is, in each one of these, the |
| 09:24 | 5 | "Not Working" column is longer than the "Working" column, |
| 09:24 | 6 | right? |
| 09:24 | 7 | A.   Yes, it is. |
| 09:24 | 8 | Q.   Now, let's look at the next page, page 2 of this |
| 09:24 | 9 | document. |
| 09:24 | 10 | *(Document displayed.)* |
| 09:24 | 11 | BY MS. KELLER: |
| 09:24 | 12 | Q.   And now we're looking at Bratz, not MyScene.  And we |
| 09:24 | 13 | see that under the "Product" column, "Working" is longer |
| 09:25 | 14 | than "Not Working," right? |
| 09:25 | 15 | A.   If you're going to use just the length of columns to |
| 09:25 | 16 | measure the content, that's one way to look at it, I |
| 09:25 | 17 | suppose. |
| 09:25 | 18 | Q.   Let's look at some of the things within the column. |
| 09:25 | 19 | "Clear packaging equities, themed handle, structure, shapes |
| 09:25 | 20 | always similar if not identical, strong logo." |
| 09:25 | 21 | Second bullet point, "low and mid price segments." |
| 09:25 | 22 | Third bullet point, "innovative themes." |
| 09:25 | 23 | And innovative themes are very important in selling |
| 09:25 | 24 | dolls, aren't they? |
| 09:25 | 25 | A.   Yes, uh-huh. |

09:25 | 1 | Q.   And under that, "Themes well and fully executed
09:25 | 2 | throughout product and package."  And the emphasis on
09:25 | 3 | "fully" indicates that this was -- the themes were executed
09:25 | 4 | thoroughly, right?
09:26 | 5 | A.   Yeah.  This would indicate that.
09:26 | 6 | Q.   And under that it says, "Package copy is very in line
09:26 | 7 | with brand positioning, very edgy."
09:26 | 8 |      And then there are some other things.  And if we go to
09:26 | 9 | the very bottom, it says, "Traded product cost; i.e., piece
09:26 | 10 | count per packaging."
09:26 | 11 |      And then, if we go over to "Content," we see that some
09:26 | 12 | of the things that are seen as not working include the
09:26 | 13 | website, but then it says, "but now newly revamped.  May now
09:26 | 14 | be working."
09:26 | 15 |      And if we go over to marketing, we look at the top,
09:26 | 16 | marketing, we really have a far longer "Working" column than
09:26 | 17 | "Not Working," right?
09:26 | 18 | A.   Yes.
09:26 | 19 | Q.   And at the very top of what's working we see "Strong
09:27 | 20 | branding."
09:27 | 21 |      And right under that we see "Ability to execute on
09:27 | 22 | irreverence."
09:27 | 23 |      Under that, "Product, packaging, and communication fit
09:27 | 24 | with brand image."
09:27 | 25 |      And under that, "Girls and retailers clearly understand

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:27 | 1 | brand positioning." |
| 09:27 | 2 | So in all of your analysis of what made the Bratz brand |
| 09:27 | 3 | successful -- you being Mattel -- you never analyzed the |
| 09:27 | 4 | sculpt of the doll.  In other words, the naked mold, right? |
| 09:27 | 5 | A.   We were looking at all of these elements as you see |
| 09:27 | 6 | here. |
| 09:27 | 7 | Q.   In all of your analysis of what made the Bratz brand |
| 09:27 | 8 | successful, you never analyzed the sculpt of the doll, the |
| 09:27 | 9 | naked mold, right? |
| 09:27 | 10 | A.   I -- my team did not, no. |
| 09:27 | 11 | Q.   Well, you, Mattel, you're not aware of that -- of ever |
| 09:28 | 12 | seeing that, right? |
| 09:28 | 13 | A.   Not in my team, no. |
| 09:28 | 14 | Q.   Now, let's turn to lessons that Mattel learned from |
| 09:28 | 15 | MGA's packaging. |
| 09:28 | 16 | A.   A different document?  Or same document?  Sorry. |
| 09:28 | 17 | Q.   Gonna give you a new document. |
| 09:28 | 18 | Actually, we're not gonna give you a document.  We're |
| 09:28 | 19 | actually gonna give you a doll -- or several dolls. |
| 09:28 | 20 | *(Exhibits provided to the witness.)* |
| 09:28 | 21 | BY MS. KELLER: |
| 09:28 | 22 | Q.   Now, the first generation Bratz dolls -- |
| 09:28 | 23 | MR. QUINN:  Your Honor, I move to strike the |
| 09:28 | 24 | preamble, "we're gonna turn now to the --" |
| 09:28 | 25 | THE COURT:  Sustained.  Stricken. |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 44 of 133   Page ID #:310594
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

44

| 09:28 | 1 | Ladies and gentlemen, disregard the comment. |
| 09:28 | 2 | BY MS. KELLER: |
| 09:28 | 3 | Q.   All of -- |
| 09:28 | 4 | MS. KELLER:  Can we turn those so that the jurors |
| 09:28 | 5 | can see the dolls. |
| 09:28 | 6 | *(MGA Assistant complies.)* |
| 09:29 | 7 | MS. KELLER:  Thank you. |
| 09:29 | 8 | BY MS. KELLER: |
| 09:29 | 9 | Q.   Now, all of the first generation Bratz dolls were in |
| 09:29 | 10 | what's called trapezoidal packaging, right? |
| 09:29 | 11 | A.   Are these first generation dolls? |
| 09:29 | 12 | Q.   Uh-huh, yes. |
| 09:29 | 13 | And we've got Sasha, which is -- |
| 09:29 | 14 | *(Document displayed.)* |
| 09:29 | 15 | MR. QUINN:  Excuse me.  Was that a question? |
| 09:29 | 16 | THE COURT:  Sustained.  Let's find out if he knows |
| 09:29 | 17 | what first generation of dolls is as a 30(b)(6). |
| 09:29 | 18 | MR. QUINN:  Not on this subject, Your Honor. |
| 09:29 | 19 | THE COURT:  Well, he's also done a study on this, |
| 09:29 | 20 | Counsel, so he can answer that question if he knows what |
| 09:29 | 21 | first generation dolls are. |
| 09:29 | 22 | THE WITNESS:  My question is, are these the |
| 09:29 | 23 | original dolls, the first that were produced? |
| 09:29 | 24 | MS. KELLER:  Yes.  If you look at the bottom of |
| 09:29 | 25 | the box, take Sasha, Exhibit 17558.  See what it says on the |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 45 of 133   Page ID #:310595
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:29 | 1 | bottom of the box as far as the date? |
| 09:29 | 2 | THE WITNESS:  Uh, yes. |
| 09:29 | 3 | BY MS. KELLER: |
| 09:29 | 4 | Q.   And what's the date? |
| 09:30 | 5 | A.   2001. |
| 09:30 | 6 | Q.   And then we have Cloe, which is Exhibit 12286.  Want to |
| 09:30 | 7 | take a look at the bottom of that box? |
| 09:30 | 8 | *(Document displayed.)* |
| 09:30 | 9 | THE WITNESS:  Uh, yes. |
| 09:30 | 10 | BY MS. KELLER: |
| 09:30 | 11 | Q.   Is that another 2001? |
| 09:30 | 12 | A.   Yes, it is. |
| 09:30 | 13 | Q.   17561. |
| 09:30 | 14 | *(Document displayed.)* |
| 09:30 | 15 | BY MS. KELLER: |
| 09:30 | 16 | Q.   Also says 2001.  That's Yasmin? |
| 09:30 | 17 | A.   Uh, yes.  Uh-huh. |
| 09:30 | 18 | Q.   And Jade, 17551. |
| 09:30 | 19 | *(Document displayed.)* |
| 09:30 | 20 | BY MS. KELLER: |
| 09:30 | 21 | Q.   Also says 2001, right? |
| 09:30 | 22 | A.   Yes. |
| 09:30 | 23 | Q.   Now, these first generation Bratz dolls were sold in |
| 09:30 | 24 | what's called "trapezoidal packaging," right? |
| 09:30 | 25 | A.   Yes, that's correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 46 of 133   Page ID #:310596
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:30 | 1 | Q.   And trapezoidal packaging, as the name implies, is in |
| 09:30 | 2 | the shape of a trapezoid, right? |
| 09:30 | 3 | A.   Yes. |
| 09:30 | 4 | Q.   Let's look at Exhibit 27507. |
| 09:30 | 5 | *(Document provided to the witness.)* |
| 09:31 | 6 | BY MS. KELLER: |
| 09:31 | 7 | Q.   And 27507 is a trade dress registration, and at the top |
| 09:31 | 8 | right we see that -- |
| 09:31 | 9 | MR. QUINN:  Your Honor, this is not an issue. |
| 09:31 | 10 | This is something that there's been a ruling on. |
| 09:31 | 11 | MS. KELLER:  It's not offered for the purpose of |
| 09:31 | 12 | anything other than showing -- well, I know the Court |
| 09:31 | 13 | doesn't want a speaking objection, but showing why MGA was |
| 09:31 | 14 | successful, Your Honor. |
| 09:31 | 15 | MR. QUINN:  I think this issue has been addressed, |
| 09:31 | 16 | I believe, Your Honor. |
| 09:31 | 17 | THE COURT:  All right.  Let's move on.  I'll hear |
| 09:31 | 18 | you during the recess.  We'll move on to a different area. |
| 09:31 | 19 | I'm not sure what you're talking about right now, so we'll |
| 09:31 | 20 | come back to it. |
| 09:32 | 21 | MS. KELLER:  Your Honor, it's gonna lead directly |
| 09:32 | 22 | into the next area.  Would this be a good time for a break? |
| 09:32 | 23 | THE COURT:  Why don't we take a recess at this |
| 09:32 | 24 | time.  You're not to discuss this matter amongst yourselves, |
| 09:32 | 25 | nor form or express any opinion. |

| | | |
|---|---|---|
| 09:32 | 1 | Why don't you take 20 minutes, and let counsel and |
| 09:32 | 2 | the Court discuss this just so I know what's occurring here. |
| 09:32 | 3 | Counsel, I'll be right back just a moment. |
| 09:32 | 4 | Sir, you may step down.  Thank you very much. |
| 09:32 | 5 | We'll see you in 20 minutes. |
| 09:32 | 6 | *(Witness steps down and exits courtroom.)* |
| 09:32 | 7 | *(Jury recesses at 9:32 a.m.)* |
| 09:32 | 8 | *(Outside the presence of the jury.)* |
| 09:32 | 9 | THE COURT:  All right.  Counsel, the jury is no |
| 09:32 | 10 | longer present.  27507 trade dress, where are we going with |
| 09:32 | 11 | this? |
| 09:32 | 12 | MS. KELLER:  Your Honor, we're gonna be talking |
| 09:32 | 13 | about trapezoidal packaging and copying, and the Court -- |
| 09:32 | 14 | THE COURT:  I know.  I'm allowing that.  I thought |
| 09:32 | 15 | I always was allowing that.  I'm not allowing your claim for |
| 09:33 | 16 | trapezoidal packaging.  I granted that at the summary |
| 09:33 | 17 | judgment, but there was no reason you couldn't show copying |
| 09:33 | 18 | in general, and I opened that up to both sides after |
| 09:33 | 19 | Mr. Quinn requested that.  I thought I'd opened up copying |
| 09:33 | 20 | on Mattel's request.  So what's the concern here? |
| 09:33 | 21 | MR. QUINN:  It's the registration, Your Honor. |
| 09:33 | 22 | They don't have any rights in trapezoidal packaging.  They |
| 09:33 | 23 | want to put before the jury this registration. |
| 09:33 | 24 | THE COURT:  I see. |
| 09:33 | 25 | MR. QUINN:  If they want to show copying, that's a |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 48 of 133   Page ID #:310598
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:33 | 1 | different issue. |
| 09:33 | 2 | THE COURT: Okay. Yeah, I don't think that the -- |
| 09:33 | 3 | why do you have the preemptor of the registration itself? |
| 09:33 | 4 | MS. KELLER: Because it's an important element of |
| 09:33 | 5 | brand protection, Your Honor. Even though we don't have a |
| 09:33 | 6 | trade secret claim for this, it's still -- it shows that we |
| 09:33 | 7 | thought that it was innovative and new, and we took steps to |
| 09:33 | 8 | protect it. |
| 09:33 | 9 | And, in fact, it was innovative. |
| 09:33 | 10 | And it also -- we're also offering it for the |
| 09:33 | 11 | date, Your Honor. |
| 09:33 | 12 | THE COURT: No, I think what you can do, you can |
| 09:34 | 13 | offer it for the date, certainly, but I don't think you have |
| 09:34 | 14 | the preemptor and the increased credibility of, you know, |
| 09:34 | 15 | protecting it because you've registered it. If I was going |
| 09:34 | 16 | to do that, then I can see Mattel's position. There's a |
| 09:34 | 17 | whole lot of trademarks that you have in contention also. |
| 09:34 | 18 | And I really don't want to go back and forth. I |
| 09:34 | 19 | reluctantly opened up the copying area on Mattel's request. |
| 09:34 | 20 | And I think you can show the same thing by date without the |
| 09:34 | 21 | registration itself. But let me hear from you. |
| 09:34 | 22 | MS. KELLER: Well, the only thing I can say, |
| 09:34 | 23 | Your Honor, is it describes the nature of the packaging in |
| 09:34 | 24 | the registration. I'm thinking back to when we had a shoe |
| 09:34 | 25 | patent coming into this case. |

| 09:34 | 1 | THE COURT:  On Mattel's side? |
| 09:34 | 2 | MS. KELLER:  Yes. |
| 09:34 | 3 | THE COURT:  Yeah.  Let me take a moment, just if |
| 09:34 | 4 | nothing else to get a restroom break and to send all of you |
| 09:35 | 5 | out, and I'll see you in 10 minutes. |
| 09:35 | 6 | *(Recess held at 9:35 a.m.)* |
| 09:41 | 7 | *(Proceedings resumed at 9:49 a.m.* |
| 09:49 | 8 | *(Outside the presence of the jury.)* |
| 09:49 | 9 | THE COURT:  All right.  We're back on the record. |
| 09:49 | 10 | I specifically went back and looked at the summary judgment |
| 09:49 | 11 | order. |
| 09:49 | 12 | Counsel, I'm going to let you introduce this. |
| 09:49 | 13 | This describes the packaging and the fact that the trademark |
| 09:49 | 14 | was granted, and it shows the mark and packaging was |
| 09:49 | 15 | valuable. |
| 09:49 | 16 | I granted summary judgment because it was a |
| 09:49 | 17 | functional package or packaging, and I did not want to |
| 09:49 | 18 | restrain people from using a shape, and that was the extent. |
| 09:50 | 19 | Now, once we opened up "copying," you can |
| 09:50 | 20 | introduce this. |
| 09:50 | 21 | MR. QUINN:  Your Honor, may I, just briefly? |
| 09:50 | 22 | THE COURT:  Sure. |
| 09:50 | 23 | MR. QUINN:  In the order, the Court said that, "It |
| 09:50 | 24 | cannot be disputed that toys, and even dolls, have been sold |
| 09:50 | 25 | in trapezoids for decades.  Trapezoidal packaging, standing |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:50 | 1 | alone, is not an usual design.  It is not inherently |
| 09:50 | 2 | distinctive." |
| 09:50 | 3 | What they're trying to do here is suggest that |
| 09:50 | 4 | there is some proprietary issue here, when, really, what -- |
| 09:50 | 5 | all they need to do is copying.  And they can do that |
| 09:50 | 6 | without introducing an ownership, an IP issue, in the |
| 09:50 | 7 | packaging itself. |
| 09:50 | 8 | THE COURT:  Okay.  Thank you. |
| 09:50 | 9 | Bring in the jury. |
| 09:51 | 10 | *(In the presence of the jury.)* |
| 09:51 | 11 | THE COURT:  All right.  Then we're back on the |
| 09:51 | 12 | record.  The jury's present.  All counsel and the parties. |
| 09:51 | 13 | Thank you for your courtesy.  Mr. Kilpin's present. |
| 09:51 | 14 | And, Counsel, if you'd continue, please. |
| 09:51 | 15 | MS. KELLER:  Thank you. |
| 09:51 | 16 | BY MS. KELLER: |
| 09:51 | 17 | Q.   Mr. Kilpin, before we broke, we were talking about the |
| 09:51 | 18 | fact that these original Bratz dolls were sold in |
| 09:51 | 19 | trapezoidal packaging, correct? |
| 09:51 | 20 | A.   Yes. |
| 09:51 | 21 | Q.   And later Bratz products were also sold in trapezoidal |
| 09:51 | 22 | packaging, true? |
| 09:51 | 23 | A.   Yes, I'm aware of that. |
| 09:51 | 24 | Q.   And let's look at exhibit 27507. |
| 09:51 | 25 | *(Document provided to the witness.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 51 of 133   Page ID #:310601
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:51 | 1 | BY MS. KELLER: |
| 09:51 | 2 | Q.   This is a trade dress registration.  And if you look at |
| 09:52 | 3 | page 2, "Registered:  June 13, 2006," it's registered by MGA |
| 09:52 | 4 | for trapezoidal packaging, right? |
| 09:52 | 5 | A.   Yes, it is.  It looks like it's a very specific kind of |
| 09:52 | 6 | packaging, yes. |
| 09:52 | 7 | MS. KELLER:  And, Your Honor, I would move 27507 |
| 09:52 | 8 | into evidence. |
| 09:52 | 9 | THE COURT:  Tentatively, I'm going to allow that. |
| 09:52 | 10 | I'll have one more discussion with both counsel on that |
| 09:52 | 11 | matter when we have a little bit more time. |
| 09:52 | 12 | *(Document displayed.)* |
| 09:52 | 13 | *(Exhibit No. 27507 received in evidence.)* |
| 11:59 | 14 | BY MS. KELLER: |
| 09:52 | 15 | Q.   If you look in the upper right, it says, "Registered: |
| 09:52 | 16 | June 13, 2006."  And then we see a little sketch of a |
| 09:52 | 17 | package underneath that on the left, "MGA |
| 09:52 | 18 | Entertainment, Inc." is the registrant. |
| 09:52 | 19 | And, "Registering for:  Toys, games, and play things; |
| 09:53 | 20 | namely, dolls, doll clothing, all accessories, play sets for |
| 09:53 | 21 | dolls, children's play cosmetics, plush toys, toy action |
| 09:53 | 22 | figures and accessories, therefor," et cetera. |
| 09:53 | 23 | And then, if we look to the right of that, it says, |
| 09:53 | 24 | "The mark consists of the form of a transparent trapezoidal |
| 09:53 | 25 | box." |

| | | |
|---|---|---|
| 09:53 | 1 | And that's what the picture is of, as well, the little |
| 09:53 | 2 | sketch? |
| 09:53 | 3 | A.   It appears to be, yes. |
| 09:53 | 4 | Q.   And then, at the bottom, the file number directly above |
| 09:53 | 5 | the examining attorney says, "Filed:  6/7/2004." |
| 09:53 | 6 | You see that? |
| 09:53 | 7 | A.   Yes. |
| 09:53 | 8 | MS. KELLER:  Could we circle that? |
| 09:53 | 9 | *(Technician complies.)* |
| 09:53 | 10 | BY MS. KELLER: |
| 09:53 | 11 | Q.   Now, did Mattel ever launch products in trapezoidal |
| 09:54 | 12 | packaging after June 2004? |
| 09:54 | 13 | A.   I'm -- I believe there were some products that were |
| 09:54 | 14 | done for Toy Story. |
| 09:54 | 15 | Q.   Let's look at -- for Toy Story or for Barbie? |
| 09:54 | 16 | THE COURT:  Counsel, I may reverse that ruling. |
| 09:54 | 17 | Let's take this down. |
| 09:54 | 18 | *(Document display discontinued.)* |
| 09:54 | 19 | THE COURT:  I think you can inquire.  The more I |
| 09:54 | 20 | look at this -- |
| 09:54 | 21 | *(To the jury:)*  I made a ruling outside your |
| 09:54 | 22 | presence, ladies and gentlemen, that I'm not quite certain |
| 09:54 | 23 | of.  So we're going to take this registration document down, |
| 09:54 | 24 | and I'm going to ask you to disregard the registration at |
| 09:54 | 25 | the present time. |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 53 of 133   Page ID #:310603
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:54 | 1 | But counsel can certainly talk about alleged |
| 09:54 | 2 | copying. |
| 09:03 | 3 | BY MS. KELLER: |
| 09:54 | 4 | Q.   Let's look at Exhibit 8804. |
| 09:54 | 5 | *(Exhibit provided to the witness.)* |
| 09:54 | 6 | MS. KELLER:  And can we show –– also show that to |
| 09:54 | 7 | the jury? |
| 09:54 | 8 | *(Exhibit displayed.)* |
| 09:54 | 9 | MS. KELLER:  Thank you. |
| 09:54 | 10 | BY MS. KELLER: |
| 09:54 | 11 | Q.   This was Happy Birthday Barbie, right? |
| 09:54 | 12 | A.   Uh, yes, it is. |
| 09:55 | 13 | Q.   And this was 2009? |
| 09:55 | 14 | A.   Um, I'm not recalling the year on this one. |
| 09:55 | 15 | MS. KELLER:  Can we assist with finding the day. |
| 09:55 | 16 | *(MGA Assistant assists the witness.)* |
| 09:55 | 17 | THE WITNESS:  Yes, 2009. |
| 09:55 | 18 | BY MS. KELLER: |
| 09:55 | 19 | Q.   And then there were some Toy Story 3 Barbie products, |
| 09:55 | 20 | as well, that were in trapezoidal packaging, right? |
| 09:55 | 21 | A.   Uh, that's correct. |
| 09:55 | 22 | Q.   Let's look at Exhibit 9789. |
| 09:55 | 23 | *(Exhibit provided to the witness.)* |
| 01:59 | 24 | BY MS. KELLER: |
| 09:55 | 25 | Q.   Is this Toy Story Barbie, "Made For Each Other"? |

| | | |
|---|---|---|
| 09:55 | 1 | A.    Yes. |
| 09:55 | 2 | Q.    Trapezoidal packaging? |
| 09:55 | 3 | A.    Yes. |
| 09:55 | 4 | Q.    Exhibit 9790. |
| 09:55 | 5 | *(Exhibit provided to the witness.)* |
| 08:42 | 6 | BY MS. KELLER: |
| 09:55 | 7 | Q.    Toy Story, Great Shape Barbie? |
| 09:55 | 8 | A.    Uh, yes. |
| 09:55 | 9 | Q.    And that's also 2009? |
| 09:55 | 10 | A.    Yes. |
| 09:56 | 11 | Q.    Toy Story Barbie Loves Buzz, and that's Exhibit 9072. |
| 09:56 | 12 | *(Exhibit provided to the witness.)* |
| 11:59 | 13 | BY MS. KELLER: |
| 09:56 | 14 | Q.    Do you see the date on that one? |
| 09:56 | 15 | A.    Yes. |
| 09:56 | 16 | Q.    What's that? |
| 09:56 | 17 | A.    2009. |
| 09:56 | 18 | Q.    Toy Story Barbie Loves Alien, Exhibit 9074. |
| 09:56 | 19 | *(Exhibit provided to the witness.)* |
| 09:56 | 20 | THE WITNESS:  Yes. |
| 11:59 | 21 | BY MS. KELLER: |
| 09:56 | 22 | Q.    What's the date on that one? |
| 09:56 | 23 | A.    2009. |
| 09:56 | 24 | Q.    And Toy Story Barbie Loves Woody, Exhibit 9073. |
| 09:56 | 25 | *(Exhibit provided to the witness.)* |

| | | |
|---|---|---|
| 09:56 | 1 | THE WITNESS: Uh, yes. |
| 09:56 | 2 | THE COURT: Now, Counsel, over the lunch hour, go |
| 09:56 | 3 | back for me, both sides, Mr. Quinn and Ms. Keller, and find |
| 09:56 | 4 | out prior registrations that were allowed and under what |
| 09:56 | 5 | context during Mattel's case and MGA's case. Then I'll |
| 09:56 | 6 | search through that when we've got that hour together. |
| 09:57 | 7 | Okay? |
| 09:57 | 8 | (To the jury:) Right now, I want you to disregard |
| 09:57 | 9 | the registration. Certainly counsel can talk about copying, |
| 09:57 | 10 | for both sides, and trapezoidal packaging. |
| 09:57 | 11 | I'm not receiving this document at the present |
| 09:57 | 12 | time. |
| 09:57 | 13 | MS. KELLER: And, Your Honor, I would move all |
| 09:57 | 14 | those tangibles into evidence. |
| 09:57 | 15 | THE COURT: All the tangibles are received. |
| 09:57 | 16 | *(Exhibit No. 8804 received in evidence.)* |
| 09:57 | 17 | *(Exhibit No. 9789 received in evidence.)* |
| 09:57 | 18 | *(Exhibit No. 9790 received in evidence.)* |
| 09:57 | 19 | *(Exhibit No. 9072 received in evidence.)* |
| 09:57 | 20 | *(Exhibit No. 9074 received in evidence.)* |
| 09:57 | 21 | *(Exhibit No. 9073 received in evidence.)* |
| 08:46 | 22 | BY MS. KELLER: |
| 09:57 | 23 | Q. Now, up until Bratz was launched, Barbie had not had |
| 09:57 | 24 | trapezoidal packaging, right? |
| 09:57 | 25 | MR. QUINN: Lacks foundation, Your Honor. |

| | | |
|---|---|---|
| 09:57 | 1 | Came in 2003. |
| 09:57 | 2 | THE COURT:  Overruled. |
| 09:57 | 3 | THE WITNESS:  I recall looking at some packages |
| 09:57 | 4 | from the 70's, actually, and 80's, of certain products that |
| 09:57 | 5 | were done in trapezoidal packaging. |
| 09:57 | 6 | BY MS. KELLER: |
| 09:57 | 7 | Q.   Well, when you came in and you did a study of Barbie in |
| 09:57 | 8 | the 90's and in the 2000's, did you find any trapezoidal |
| 09:57 | 9 | packaging? |
| 09:57 | 10 | A.   Well, I didn't do any study of Barbie in the 90's. |
| 09:58 | 11 | Q.   Were you the Mattel 30(b)(6) witness on Barbie from |
| 09:58 | 12 | 1997 -- and trapezoidal packaging -- you were the 30(b)(6) |
| 09:58 | 13 | witness on trapezoidal packaging, as well, from 1997 on? |
| 09:58 | 14 | A.   I was the 30(b)(6) on trapezoidal packaging. |
| 09:58 | 15 | Q.   And there had been no Barbie dolls in trapezoidal |
| 09:58 | 16 | packaging in the 90's or in the 2000's until Bratz was |
| 09:58 | 17 | launched, right? |
| 09:58 | 18 | A.   I'm trying to recall.  We had some packages that were |
| 09:58 | 19 | previous to that.  And we also had other brands that did it, |
| 09:58 | 20 | as well, as early as the 70's. |
| 09:58 | 21 | Q.   Well, you, as a 30(b)(6) witness, were supposed to |
| 09:58 | 22 | investigate unit sales of Mattel products sold in |
| 09:58 | 23 | trapezoidal packaging before 2001, right? |
| 09:58 | 24 | A.   Um, yes. |
| 09:59 | 25 | Q.   And you researched that issue as a 30(b)(6) witness, |

| | | |
|---|---|---|
| 09:59 | 1 | right? |
| 09:59 | 2 | A.   I did. |
| 09:59 | 3 | Q.   You looked to see if you could find any documents |
| 09:59 | 4 | establishing trapezoidal packaging of Mattel products before |
| 09:59 | 5 | 2001, correct? |
| 09:59 | 6 | A.   Yes, I did. |
| 09:59 | 7 | Q.   And you were unable to find any, right? |
| 09:59 | 8 | MR. QUINN:  "Any," it's vague and ambiguous. |
| 09:59 | 9 | THE COURT:  Overruled.  It refers to trapezoidal |
| 09:59 | 10 | packaging, obviously. |
| 09:59 | 11 | THE WITNESS:  We discovered packaging that we had |
| 09:59 | 12 | done, you know, in the 70's and the 80's, I believe it was, |
| 09:59 | 13 | that we utilized trapezoidal packaging.  And, to us, it |
| 09:59 | 14 | wasn't that unique of a shape. |
| 09:59 | 15 | MS. KELLER:  Your Honor, I would ask to read from |
| 09:59 | 16 | the witness's deposition, June 18th, 2010, page 52, lines |
| 09:59 | 17 | 2 through 6. |
| 10:00 | 18 | *(Document provided to the witness.)* |
| 10:00 | 19 | THE COURT:  Page 52, lines? |
| 10:00 | 20 | MS. KELLER:  Lines 2 through 6. |
| 10:00 | 21 | MR. QUINN:  It's not impeaching, Your Honor. |
| 10:00 | 22 | MS. KELLER:  Well, I'll ask a preliminary |
| 10:00 | 23 | question, Your Honor. |
| 10:00 | 24 | THE COURT:  I don't know what 9067 and 9068 is. |
| 10:00 | 25 | That's the Court's difficulty. |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 58 of 133   Page ID #:310608
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

58

| | | |
|---|---|---|
| 10:00 | 1 | MS. KELLER:  That was gonna be the preliminary |
| 10:00 | 2 | question, Your Honor. |
| 10:00 | 3 | BY MS. KELLER: |
| 10:00 | 4 | Q.   Other than two items that you found in the -- was it -- |
| 10:00 | 5 | did you say the 70's? -- is it true that you were not able |
| 10:00 | 6 | to locate any other Mattel documents reflecting sales of |
| 10:00 | 7 | Mattel products in trapezoidal packaging prior to 2001? |
| 10:01 | 8 | MR. QUINN:  Your Honor, misstates the testimony. |
| 10:01 | 9 | It's compound.  She said "the 70's." |
| 10:01 | 10 | MS. KELLER:  I'll ask another preliminary |
| 10:01 | 11 | question. |
| 10:01 | 12 | BY MS. KELLER: |
| 10:01 | 13 | Q.   Mr. Kilpin, in your research, did you say you found a |
| 10:01 | 14 | couple of items that were -- Mattel had sold in trapezoidal |
| 10:01 | 15 | packaging in the 70's? |
| 10:01 | 16 | A.   I'm remembering that we identified some packaging from |
| 10:01 | 17 | the 70's, doll packaging and Hot Wheels packaging, that |
| 10:01 | 18 | utilized trapezoidal packages -- shapes. |
| 10:01 | 19 | Q.   So Hot Wheels -- and what was the other product? |
| 10:01 | 20 | A.   There were some Barbie dolls, and I don't remember off |
| 10:01 | 21 | the top of my head.  We'd have to look at the documents -- |
| 10:01 | 22 | exactly which items. |
| 10:01 | 23 | Q.   Was it a product that said "Starring Elvis"? |
| 10:01 | 24 | A.   I'm not recalling that one. |
| 10:01 | 25 | Q.   Other than those products, were you able to locate any |

| | | |
|---|---|---|
| 10:02 | 1 | documents reflecting sales of any Mattel products in |
| 10:02 | 2 | trapezoidal packaging prior to 2001? |
| 10:02 | 3 | A.   We had the items, but we did not have the sales |
| 10:02 | 4 | information. |
| 10:02 | 5 | Q.   Did you bring anything with you today, any Mattel |
| 10:02 | 6 | products in trapezoidal packaging from before 2001? |
| 10:02 | 7 | A.   Did I bring with me today?  Uh, no. |
| 10:02 | 8 | Q.   Now, I would like to talk with you for a moment about a |
| 10:02 | 9 | product called "4Ever Best Friends." |
| 10:02 | 10 |     You're familiar with MGA's product 4Ever Best Friends, |
| 10:02 | 11 | right? |
| 10:02 | 12 | A.   Yes, I am. |
| 10:02 | 13 | Q.   And let's take a look at Exhibit 35303. |
| 10:02 | 14 |         (Exhibit provided to the witness.) |
| 10:02 | 15 | BY MS. KELLER: |
| 10:02 | 16 | Q.   This is MGA's 4Ever Best Friends product, right? |
| 10:03 | 17 | A.   Yes, it is. |
| 10:03 | 18 | Q.   Rounded heart-like box? |
| 10:03 | 19 | A.   I'm sorry.  Say that again? |
| 10:03 | 20 | Q.   Rounded heart-shaped box? |
| 10:03 | 21 | A.   Yes. |
| 10:03 | 22 | Q.   Multiple little girl dolls? |
| 10:03 | 23 | A.   Two dolls in a package, yes. |
| 10:03 | 24 | Q.   Can you show that to the jury? |
| 10:03 | 25 | A.   (Witness complies.) |

| | | |
|---|---|---|
| 10:03 | 1 | Q.   Pink color scheme? |
| 10:03 | 2 | A.   Yes. |
| 10:03 | 3 | Q.   Has "best friends" in the name? |
| 10:03 | 4 | A.   Yes. |
| 10:03 | 5 | Q.   Has number "4" in the name? |
| 10:03 | 6 | A.   Yes. |
| 10:03 | 7 | Q.   Pajama party theme? |
| 10:03 | 8 | A.   Uh, yes. |
| 10:03 | 9 | MS. KELLER:  And, Your Honor, we'd move 35303 into |
| 10:03 | 10 | evidence. |
| 10:03 | 11 | THE COURT:  Received. |
| 10:03 | 12 | *(Exhibit No. 35303 received in evidence.)* |
| 10:03 | 13 | *(Document displayed.)* |
| 08:44 | 14 | BY MS. KELLER: |
| 10:03 | 15 | Q.   Mix-and-match outfits? |
| 10:03 | 16 | A.   Are you asking? |
| 10:03 | 17 | Q.   Does it have mix-and-match outfits? |
| 10:04 | 18 | A.   Um –– does it say that somewhere? |
| 10:04 | 19 | Q.   Well, can you see? |
| 10:04 | 20 | A.   It doesn't say that, but I don't... |
| 10:04 | 21 | Q.   If we could have you look at Exhibit 27503. |
| 10:04 | 22 | *(Document provided to the witness.)* |
| 10:04 | 23 | MS. KELLER:  And, Your Honor, this is another |
| 10:04 | 24 | trademark registration document.  Could it be provisionally |
| 10:04 | 25 | admitted? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:04 | 1 | THE COURT:  Well, I don't want the preemptor of |
| 10:04 | 2 | credibility attached to this, nor do I, at the present time, |
| 10:04 | 3 | want to argue it.  I may agree with Mr. Quinn on that.  And |
| 10:04 | 4 | I want more time to see what occurred during Mattel's case. |
| 10:04 | 5 | So you can get into copying, et cetera?  But I |
| 10:04 | 6 | don't want the preemptor of the trademark registration. |
| 10:04 | 7 | BY MS. KELLER: |
| 10:04 | 8 | Q.   4Ever Best Friends was announced in December 2003, |
| 10:04 | 9 | correct? |
| 10:04 | 10 | A.   Yes, I believe that's right. |
| 10:04 | 11 | Q.   And let's look at Exhibit 1820. |
| 10:04 | 12 | (Document provided to the witness.) |
| 10:05 | 13 | BY MS. KELLER: |
| 10:05 | 14 | Q.   The second e-mail down is a December 3rd, 2003, e-mail |
| 10:05 | 15 | from you responding to an e-mail from Matt Bousquette; is |
| 10:05 | 16 | that right? |
| 10:05 | 17 | A.   Yes, it is. |
| 10:05 | 18 | MS. KELLER:  Move 1820 into evidence, Your Honor. |
| 10:05 | 19 | THE COURT:  Received. |
| 10:05 | 20 | (Exhibit No. 1820 received in evidence.) |
| 10:05 | 21 | (Document displayed.) |
| 10:05 | 22 | BY MS. KELLER: |
| 10:05 | 23 | Q.   So you're responding to an e-mail -- you're responding |
| 10:05 | 24 | to an e-mail from Matt Bousquette about "MGA's new product |
| 10:05 | 25 | 4Ever Best friends." |

10:05   1        Do you see that?

10:05   2   A.   Um, yes, uh-huh.

10:05   3   Q.   And the e-mail -- there's an e-mail from a David Murphy

10:05   4   to Mr. Bousquette on the bottom line.

10:05   5        And it says, "Matt, just heard the news about MGA's new

10:06   6   product 4Ever Best Friends.  Here are some quick tactical

10:06   7   ideas on how Mattel can preempt MGA's launch and make it

10:06   8   harder for them to gain traction:

10:06   9        "Take kids out of the market just before 4EBF launches

10:06   10  its spring TV campaign, e.g., distribute coupons for

10:06   11  purchase of MyScene, execute a tie-in promotion with tween

10:06   12  fashion retailers," paren, "Wet Seal, Abercrombie, PacSun,"

10:06   13  closed paren, "et cetera.

10:06   14       "Dominate share of voice during 4EBF's launch period.

10:06   15  Make it harder for them to be the next big thing.

10:06   16       "Augment your brand TV spend with more aggressive co-op

10:06   17  allowances with key retailers.

10:06   18       "Work with online search engines to buy competitive key

10:06   19  words, e.g., best friends, Bratz, 4Ever Best Friends,

10:07   20  et cetera, so that a MyScene banner pops up whenever kids

10:07   21  attempt to search for MGA's new product."

10:07   22       And your response above here is, "Let's discuss at

10:07   23  meeting," correct?

10:07   24  A.   Uh, yes.

10:07   25  Q.   And your response was dated December 3, 2003, right?

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 63 of 133   Page ID #:310613
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

63

| | | |
|---|---|---|
| 10:07 | 1 | A.   Yes. |
| 10:07 | 2 | Q.   Let's look at Exhibit 8751. |
| 10:07 | 3 | *(Document provided to the witness.)* |
| 10:07 | 4 | *(Document displayed.)* |
| 10:07 | 5 | BY MS. KELLER: |
| 10:07 | 6 | Q.   Is this an e-mail from you to Milt Zablow, dated |
| 10:07 | 7 | December 5th, 2003? |
| 10:07 | 8 | A.   Yes, it is. |
| 10:07 | 9 | MS. KELLER:  Your Honor, move 8751 into evidence. |
| 10:07 | 10 | THE COURT:  Received. |
| 10:07 | 11 | *(Exhibit No. 8751 received in evidence.)* |
| 10:07 | 12 | *(Document displayed.)* |
| 10:07 | 13 | BY MS. KELLER: |
| 10:07 | 14 | Q.   And the first e-mail in the chain is from Sharon |
| 10:07 | 15 | Spaulding to Matt Bousquette, you, and Sujata Luther, dated |
| 10:08 | 16 | December 5th, 2003, and "Subject:  MGA's Best Friend |
| 10:08 | 17 | assortment." |
| 10:08 | 18 | And here we see, in the first line, "I have received |
| 10:08 | 19 | the following confidential information from a reliable |
| 10:08 | 20 | source: |
| 10:08 | 21 | "8-inch dolls, a bit shorter than Bratz. |
| 10:08 | 22 | "FOB Hong Kong cost fourteen ninety-nine. |
| 10:08 | 23 | "FOB LA cost sixteen ninety-nine. |
| 10:08 | 24 | "Available this month. |
| 10:08 | 25 | "When originally previewed, the dolls came in a |

| | | |
|---|---|---|
| 10:08 | 1 | heart-shaped package, with the dolls positioned on the left |
| 10:08 | 2 | and right side of the package, with chotzkas in the middle. |
| 10:08 | 3 | "My source says he's not sure if it's the final |
| 10:08 | 4 | package." |
| 10:08 | 5 | Now, you immediately inquired as to the identity of the |
| 10:08 | 6 | source, right? |
| 10:08 | 7 | A.   Well, I recall that MGA had put a press release out. |
| 10:09 | 8 | Q.   Did you inquire as to the identity of the confidential |
| 10:09 | 9 | information -- the source of the confidential information? |
| 10:09 | 10 | A.   You talking about from Milt or from Sharon? |
| 10:09 | 11 | Q.   From Sharon, where it says, "I have received the |
| 10:09 | 12 | following confidential information from a reliable source." |
| 10:09 | 13 | Does that sound like a press release, Mr. Kilpin? |
| 10:09 | 14 | A.   Well, some of the information about 4Ever Best Friends |
| 10:09 | 15 | was -- |
| 10:09 | 16 | Q.   Sir -- sir, the "I received the following confidential |
| 10:09 | 17 | information from a reliable source," does that sound like a |
| 10:09 | 18 | press release to you? |
| 10:09 | 19 | A.   Well, I'm saying, what I recall, at that time, was |
| 10:09 | 20 | 4Ever Best Friends had been announced to the -- to the |
| 10:09 | 21 | world. |
| 10:09 | 22 | Q.   I'm asking you about this line.  Does that sound like a |
| 10:09 | 23 | press release, sir? |
| 10:09 | 24 | A.   Not that line, no. |
| 10:09 | 25 | Q.   In fact, "confidential information from a reliable |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 65 of 133   Page ID #:310615
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

65

| | | |
|---|---|---|
| 10:09 | 1 | source" sounds like the writer is trying to keep the |
| 10:09 | 2 | identity of the person a secret, right? |
| 10:10 | 3 | A.   Or trying to sound important. |
| 10:10 | 4 | Q.   Did you ask who's the reliable source? |
| 10:10 | 5 | A.   I don't remember doing that, no. |
| 10:10 | 6 | Q.   Did you ask why is this information confidential? |
| 10:10 | 7 | A.   I don't recall remembering that it was confidential. |
| 10:10 | 8 | It was out there.  We had seen the information from MGA in |
| 10:10 | 9 | the newspaper about 4Ever Best Friends, so we knew it was |
| 10:10 | 10 | coming. |
| 10:10 | 11 | Q.   This says, "When originally previewed, the dolls came |
| 10:10 | 12 | in a heart-shaped package with the dolls positioned on the |
| 10:10 | 13 | left and right side of the package with chotzkas in the |
| 10:10 | 14 | middle. |
| 10:10 | 15 | "My source says he's not sure if it's the final |
| 10:10 | 16 | package." |
| 10:10 | 17 | Surely, since it was already in the newspaper, you knew |
| 10:10 | 18 | what the final package looked like, and you wouldn't need |
| 10:10 | 19 | this confidential source, right? |
| 10:10 | 20 | A.   I remember there was a picture of the product in the |
| 10:10 | 21 | press release -- or in the article. |
| 10:10 | 22 | Q.   And it says, "The dolls were developed to look like |
| 10:11 | 23 | eight-year-old girls directed to look like Barbie.  This |
| 10:11 | 24 | buyer was not impressed and passed on it, took the," quote, |
| 10:11 | 25 | "wait and see," unquote, "attitude." |

| 10:11 | 1 | "Bratz.  Here's what we hear from KB.  Remember, |
| 10:11 | 2 | they're higher priced than the rest of the market, but |
| 10:11 | 3 | usually consistent directionally." |
| 10:11 | 4 | And if we go to the top, from you, the answer is, to |
| 10:11 | 5 | Milt Zablow, "You the man.  I turned the team on yesterday |
| 10:11 | 6 | to respond to this big time." |
| 10:11 | 7 | Well, now, sir, if it was already public information, |
| 10:11 | 8 | why would you need to respond to this and turn your team on |
| 10:11 | 9 | to it big time? |
| 10:11 | 10 | A.  We saw the article in the newspaper, and we saw the |
| 10:11 | 11 | press release, and we believed that we were gonna be needing |
| 10:11 | 12 | to compete with 4Ever Best Friends, so we turned the team on |
| 10:11 | 13 | to do that. |
| 10:11 | 14 | Q.  And so, when you say, "You the man.  I turned the team |
| 10:11 | 15 | on yesterday to respond to this big time," you're responding |
| 10:12 | 16 | to this particular e-mail, not to any press release, right? |
| 10:12 | 17 | A.  I recall that we'd already -- |
| 10:12 | 18 | Q.  Sir -- |
| 10:12 | 19 | A.  -- started work on it. |
| 10:12 | 20 | Q.  -- you're responding to this e-mail, right? |
| 10:12 | 21 | MR. QUINN:  Excuse me, Your Honor.  The witness |
| 10:12 | 22 | was interrupted. |
| 10:12 | 23 | THE COURT:  Did you finish your answer? |
| 10:12 | 24 | THE WITNESS:  I recall that I was already turning |
| 10:12 | 25 | the team on to work on this before I'd seen this. |

| | | |
|---|---|---|
| 10:12 | 1 | BY MS. KELLER: |
| 10:12 | 2 | Q.   Does this say, "Oh, I already know about this from |
| 10:12 | 3 | public information and have turned my team on to work on it |
| 10:12 | 4 | already"?  Does it say that, Mr. Kilpin? |
| 10:12 | 5 | A.   It doesn't say that. |
| 10:12 | 6 | Q.   In fact, it sounds, from your e-mail, like this was new |
| 10:12 | 7 | information to you that you were going to immediately act |
| 10:12 | 8 | on? |
| 10:12 | 9 | A.   We already -- |
| 10:12 | 10 | Q.   Right? |
| 10:12 | 11 | A.   -- had the information that we needed. |
| 10:12 | 12 | Q.   Now, let's look at Exhibit 2115. |
| 10:12 | 13 | *(Document provided to the witness.)* |
| 10:13 | 14 | BY MS. KELLER: |
| 10:13 | 15 | Q.   And this is an e-mail from Russell Arons, dated |
| 10:13 | 16 | December 14, 2003, on which you were copied, correct? |
| 10:13 | 17 | A.   Uh, yes, that's correct. |
| 10:13 | 18 | MS. KELLER:  Your Honor, I'd move 2115 into |
| 10:13 | 19 | evidence. |
| 10:13 | 20 | THE COURT:  Received. |
| 10:13 | 21 | *(Exhibit No. 2115 received in evidence.)* |
| 10:13 | 22 | *(Document displayed.)* |
| 10:13 | 23 | BY MS. KELLER: |
| 10:13 | 24 | Q.   And the subject is "Wee 3 feedback and next steps." |
| 10:13 | 25 | And it reads, "Thank you.  Thank you. |

| | | |
|---|---|---|
| 10:13 | 1 | "The presentation of Wee 3 to Matt, Bob Eckert and Tom |
| 10:13 | 2 | Debrowski was very successful.  Everyone is amazed that this |
| 10:13 | 3 | team turned around this concept into creation in one week. |
| 10:13 | 4 | "Here is the feedback that needs to be evaluated and |
| 10:13 | 5 | implemented immediately in order to make our aggressive |
| 10:13 | 6 | schedule." |
| 10:13 | 7 | So Mr. Eckert was involved in this plan to, quote, |
| 10:13 | 8 | "preempt," unquote, MGA's launch of 4Ever Best Friends, |
| 10:14 | 9 | right? |
| 10:14 | 10 | A.   My direction to my team -- |
| 10:14 | 11 | Q.   Sir, my question:  Mr. Eckert was involved in the plan |
| 10:14 | 12 | to preempt MGA's launch of 4Ever Best Friends, correct? |
| 10:14 | 13 | A.   We showed Mr. Eckert what we were doing. |
| 10:14 | 14 | Q.   Mr. Eckert was involved in it, right? |
| 10:14 | 15 | A.   He saw the presentation. |
| 10:14 | 16 | Q.   And you decided to rush to market your own product |
| 10:14 | 17 | called Wee 3 Friends, copied from the Bratz product, 4Ever |
| 10:14 | 18 | Best Friends, and you actually were able to turn the concept |
| 10:14 | 19 | into creation in one week, right? |
| 10:14 | 20 | A.   We didn't view it as a copy.  I don't believe it was |
| 10:14 | 21 | Bratz.  And we were responding to his comment -- MGA's |
| 10:14 | 22 | comment in the marketplace that they wanted to compete |
| 10:14 | 23 | directly with Barbie with this product.  We saw that to be a |
| 10:14 | 24 | valid response to competition. |
| 10:14 | 25 | Q.   Sir, the only way you were able to turn this concept |

| | | |
|---|---|---|
| 10:14 | 1 | into creation in one week was by copying the Bratz |
| 10:15 | 2 | product -- copying it? |
| 10:15 | 3 | A.   And we were not copying it. |
| 10:15 | 4 | Q.   I'm sorry.  Copying the 4Ever Best Friends product. |
| 10:15 | 5 | A.   We were not copying it. |
| 10:15 | 6 | Q.   Okay.  Now, in a week, you came up with something that |
| 10:15 | 7 | looked almost the same. |
| 10:15 | 8 | THE COURT:  Counsel, questions.  Ask a question. |
| 10:15 | 9 | Not a statement.  That's stricken. |
| 10:15 | 10 | Your question?  Counsel, your question is?  What's |
| 10:15 | 11 | the question? |
| 10:15 | 12 | BY MS. KELLER: |
| 10:15 | 13 | Q.   Let's look at the third bullet point under "Packaging |
| 10:15 | 14 | and Pack-Out." |
| 10:15 | 15 | It says, "Name of brand should be Wee 3 Friends. |
| 10:15 | 16 | "Immediately proceed with buying the 'Wee 3' name. |
| 10:15 | 17 | "Add 'friends' to the name." |
| 10:15 | 18 | And the reason you were adding "friends" to the name is |
| 10:15 | 19 | that MGA's product was 4Ever Best Friends, right? |
| 10:15 | 20 | A.   I think we thought Wee 3 Friends was a better name. |
| 10:16 | 21 | Q.   You added "friends" because MGA's product said "4Ever |
| 10:16 | 22 | Best Friends," right? |
| 10:16 | 23 | A.   And I'm saying we thought "Wee 3 Friends" was a better |
| 10:16 | 24 | name. |
| 10:16 | 25 | Q.   So "friends" was just a coincidence that it was added |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

70

| | | |
|---|---|---|
| 10:16 | 1 | to this product; is that your testimony? |
| 10:16 | 2 | A.   "Friends," a common play pattern and theme. |
| 10:16 | 3 | Q.   "Wee 3 Friends."  "4ever Best Friends" -- no -- nothing |
| 10:16 | 4 | was taken from MGA on that, right? |
| 10:16 | 5 | A.   No. |
| 10:16 | 6 | Q.   Let's look at Exhibit 8753. |
| 10:16 | 7 | *(Document provided to the witness.)* |
| 11:59 | 8 | BY MS. KELLER: |
| 10:16 | 9 | Q.   And this is labeled "Project:  Double Trouble," right? |
| 10:16 | 10 | A.   Yes, uh-huh. |
| 10:16 | 11 | Q.   It's got your handwriting on it, true? |
| 10:16 | 12 | A.   That is my handwriting. |
| 10:16 | 13 | MS. KELLER:  Your Honor, I would move 8753 into |
| 10:16 | 14 | evidence. |
| 10:16 | 15 | THE COURT:  Received. |
| 10:16 | 16 | *(Exhibit No. 8753 received in evidence.)* |
| 10:16 | 17 | *(Document displayed.)* |
| 10:16 | 18 | BY MS. KELLER: |
| 10:17 | 19 | Q.   At the top, it says, "Background:  Bratz is launching |
| 10:17 | 20 | 4Ever Friends segment on 1/1/04, which is directly competing |
| 10:17 | 21 | with Barbie.  Item consists of two dolls with significant |
| 10:17 | 22 | piece count for $25 retail.  Unique variations, hair color |
| 10:17 | 23 | eye color, et cetera." |
| 10:17 | 24 | And then your handwriting after that says, "Note: |
| 10:17 | 25 | Dolls have very long hair." |

| 10:17 | 1 | "Objective:  Launch counter-product to compete with |
|---|---|---|
| 10:17 | 2 | 4Ever Best Friends segment to hold market share and retail |
| 10:17 | 3 | space.  Undercut competition in terms of price value and |
| 10:17 | 4 | price." |
| 10:17 | 5 | So you still maintain that the Wee 3 Friends, adding |
| 10:17 | 6 | "friends" to that, had nothing to do with 4Ever Friends, |
| 10:17 | 7 | true? |
| 10:17 | 8 | A.   We have been told publicly that we were gonna have a |
| 10:17 | 9 | product coming directly at Barbie from a competitor, and we |
| 10:18 | 10 | decided to respond. |
| 10:18 | 11 | Q.   I have a simple question.  You added "friends" because |
| 10:18 | 12 | "friends" was in the name of MGA's product, true? |
| 10:18 | 13 | A.   No.  We added "friends" because we thought it made it |
| 10:18 | 14 | for a better product name. |
| 10:18 | 15 | Q.   A better competitor to a product you had found out from |
| 10:18 | 16 | a confidential source was coming from MGA, right? |
| 10:18 | 17 | A.   We found out about this product from the *L.A. Times*. |
| 10:18 | 18 | Q.   Now, let's look at Exhibit 35304. |
| 10:18 | 19 | *(Exhibit provided to the witness.)* |
| 11:00 | 20 | BY MS. KELLER: |
| 10:18 | 21 | Q.   Is this the Wee 3 Friends product? |
| 10:18 | 22 | A.   This is one of them, yes. |
| 10:18 | 23 | MS. KELLER:  Your Honor, I'd move 35304 into |
| 10:18 | 24 | evidence. |
| 10:18 | 25 | THE COURT:  Received. |

| | | |
|---|---|---|
| 10:18 | 1 | *(Exhibit No. 35304 received in evidence.)* |
| 10:18 | 2 | *(Exhibit displayed.)* |
| 10:18 | 3 | BY MS. KELLER: |
| 10:18 | 4 | Q.   And let's take a look at it.  This has a rounded |
| 10:18 | 5 | heart-like box? |
| 10:19 | 6 | A.   Are you saying that's a heart shape? |
| 10:19 | 7 | Q.   Well, rounded. |
| 10:19 | 8 | A.   I would not call it a heart shape. |
| 10:19 | 9 | Q.   Multiple little girl dolls. |
| 10:19 | 10 | A.   Yes, three dolls. |
| 10:19 | 11 | Q.   "Friends" in the name? |
| 10:19 | 12 | A.   Yes. |
| 10:19 | 13 | Q.   Number "3" in the name? |
| 10:19 | 14 | A.   Yes. |
| 10:19 | 15 | Q.   Pajama theme? |
| 10:19 | 16 | A.   Uh, "Dream, Dream, Dream." |
| 10:19 | 17 | Q.   Pajama theme? |
| 10:19 | 18 | A.   Yes. |
| 10:19 | 19 | Q.   Mix-and-match outfits? |
| 10:19 | 20 | A.   I guess.  We didn't call that out. |
| 10:19 | 21 | Q.   Let's -- if we could put 35303 on screen next to 35304. |
| 10:19 | 22 | *(Technician complies.)* |
| 10:19 | 23 | BY MS. KELLER: |
| 10:19 | 24 | Q.   Exactly the same as 4Ever Best Friends, in just about |
| 10:19 | 25 | every way, except the tiny dip in the heart, right? -- and |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 73 of 133   Page ID #:310623
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:19 | 1 | three dolls instead of two, true? |
| 10:19 | 2 | A.   Not exactly the same.  I don't agree at all. |
| 10:20 | 3 | Q.   You even have a multi-ethnic looking set of dolls, just |
| 10:20 | 4 | like 4Ever Best Friends had one dark-skinned doll and one |
| 10:20 | 5 | with light-skinned doll, right? |
| 10:20 | 6 | A.   We used multi-ethnic doll mixes in all of our products. |
| 10:20 | 7 | Q.   I'm asking about this product. |
| 10:20 | 8 |      You see in the MGA product 4Ever Best Friends a |
| 10:20 | 9 | dark-skinned doll and a light-skinned doll, right? |
| 10:20 | 10 | A.   Yes, uh-huh. |
| 10:20 | 11 | Q.   And you see in the Mattel product two light-skinned |
| 10:20 | 12 | dolls and a dark-skinned doll, right? |
| 10:20 | 13 | A.   As we do in most of our products. |
| 10:20 | 14 | Q.   Now, Exhibit 8769, if you could look at that. |
| 10:20 | 15 |          *(Document provided to the witness.)* |
| | 16 | BY MS. KELLER: |
| 10:20 | 17 | Q.   Actually, before we move on, you think of Mattel as a |
| 10:20 | 18 | tremendously creative place, right? |
| 10:20 | 19 | A.   I do. |
| 10:20 | 20 | Q.   A real innovator, right? |
| 10:20 | 21 | A.   I do. |
| 10:21 | 22 | Q.   But there was one company more innovative than you, and |
| 10:21 | 23 | that was MGA -- when you launched this product that we just |
| 10:21 | 24 | looked at, right? |
| 10:21 | 25 | A.   I wouldn't agree with that. |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 74 of 133   Page ID #:310624
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

74

| | | |
|---|---|---|
| 10:21 | 1 | Q.   That's why you had to copy it, right? |
| 10:21 | 2 | A.   And I don't believe we copied it. |
| 10:21 | 3 | Q.   And that's why you turned it around in one week, right? |
| 10:21 | 4 | You could copy MGA; you already had all -- the whole package |
| 10:21 | 5 | right there to look at, right? |
| 10:21 | 6 | A.   I don't believe we were copying it. |
| 10:21 | 7 | Q.   Let's look at 8769. |
| 10:21 | 8 | *(Document provided to the witness.)* |
| 10:21 | 9 | BY MS. KELLER: |
| 10:21 | 10 | Q.   This is an e-mail, at the bottom, from Russell Arons to |
| 10:21 | 11 | you and others, dated July 26, 2004, correct? |
| 10:21 | 12 | A.   Yes, uh-huh. |
| 10:21 | 13 | MS. KELLER:  Move 8769 into evidence, Your Honor. |
| 10:21 | 14 | THE COURT:  Received. |
| 10:21 | 15 | *(Exhibit No. 8769 received in evidence.)* |
| 10:21 | 16 | *(Document displayed.)* |
| 11:59 | 17 | BY MS. KELLER: |
| 10:21 | 18 | Q.   And the subject says "No more F'ing around"? |
| 10:22 | 19 | THE COURT:  Just a moment. |
| 10:22 | 20 | Okay.  Well, that's right.  I'm not cleaning |
| 10:22 | 21 | anything up. |
| | 22 | BY MS. KELLER: |
| 10:22 | 23 | Q.   It's actually, "F" asterisk percentage sign, I-N-G.  So |
| 10:22 | 24 | I'll say "F'ing." |
| 10:22 | 25 | "No more F'ing around." |

| 10:22 | 1 | And it says, "I just read the rather depressing 2003 |
| 10:22 | 2 | European fashion doll business review, where it shows that, |
| 10:22 | 3 | despite everything, MyScene is still barely making a dent |
| 10:22 | 4 | into Bratz.  Then, I began thinking about our very |
| 10:22 | 5 | successful assault on 4Ever Best Friends and how we really |
| 10:22 | 6 | went for it.  We wiped those guys out." |
| 10:22 | 7 | And if we could see 8772-4. |
| 10:22 | 8 | *(Document provided to the witness.)* |
| 10:23 | 9 | THE WITNESS:  Okay. |
| 10:23 | 10 | BY MS. KELLER: |
| 10:23 | 11 | Q.  Do you recognize that as a slide show that Mattel |
| 10:23 | 12 | produced about Wee 3 Friends? |
| 10:23 | 13 | A.  Yes, I do. |
| 10:23 | 14 | Q.  And let's look at page -- or Slide 5. |
| 10:23 | 15 | MS. KELLER:  Your Honor, I would move 8772 into |
| 10:23 | 16 | evidence. |
| 10:23 | 17 | THE COURT:  Received. |
| 10:23 | 18 | *(Exhibit No. 8772 received in evidence.)* |
| 10:23 | 19 | *(Document displayed.)* |
| 10:23 | 20 | BY MS. KELLER: |
| 10:23 | 21 | Q.  Is that a picture of somebody that you recognize? |
| 10:23 | 22 | A.  Yes, I do. |
| 10:23 | 23 | Q.  That's a picture of Mattel brand's president, Matt |
| 10:23 | 24 | Bousquette, holding a 4Ever Best Friends with a price tag |
| 10:23 | 25 | from the discount bin and smiling broadly, right? |

10:24   1   A.   Yes, it appears so.

10:24   2   Q.   Is that what you and Russell Arons meant when you said

10:24   3   you wiped out 4Ever Best Friends?

10:24   4   A.   Yeah.  I viewed Russell's note as venting, frankly.

10:24   5   Q.   I'm saying, this picture of the president of Mattel

10:24   6   brands triumphantly holding MGA's 4Ever Best Friends head

10:24   7   for the clearance bin, is that what you meant when you said

10:24   8   you wiped 4Ever Best Friends out?

10:24   9   A.   Well, I didn't say that.  My goal was to compete

10:24   10  effectively against that product.

10:24   11  Q.   Is that what you took this to mean, that, "We really

10:24   12  wiped 'em out"?

10:24   13  A.   I didn't take it to mean that, no.

10:24   14  Q.   You think it was just a friendly comment about MGA?

10:24   15  A.   I took Russell's note to be venting.

10:24   16  Q.   Now, you've heard the phrase --

10:25   17       MS. KELLER:  Oh, if we could go to Slide 4 of

10:25   18  8772, page 4.

10:25   19          THE WITNESS:  Same document?

10:25   20       MS. KELLER:  Same document.

10:25   21       (Document displayed.)

10:25   22  BY MS. KELLER:

10:25   23  Q.   We see under, "Evolution:  Debuts with 3 dolls and 3

10:25   24  dogs for 3 times the fun.

10:25   25       "2004, February:  4Ever Best Friends launch.

| | | |
|---|---|---|
| 10:25 | 1 | "2004, June, Wee 3 Friends launch with fun, fun, fun, |
| 10:25 | 2 | and party, party, party. |
| 10:25 | 3 | "2004, 4Ever Best Friends hits the discount bin." |
| 10:25 | 4 | So that was what Russell Arons was talking about, |
| 10:25 | 5 | right? |
| 10:25 | 6 | A.   Yeah.  Mr. Larian made no secret of the fact -- |
| 10:25 | 7 | Q.   Sir -- |
| 10:25 | 8 | A.   -- that he wanted to compete directly with Barbie and |
| 10:26 | 9 | we were -- |
| 10:26 | 10 | Q.   Sir -- |
| 10:26 | 11 | A.   -- competing directly back. |
| 10:26 | 12 | Q.   Sir, here's my question for you.  If you could please |
| 10:26 | 13 | answer it. |
| 10:26 | 14 | That's what Russell Arons was talking about in the |
| 10:26 | 15 | e-mail, right? |
| 10:26 | 16 | A.   And I said to you I believe she was just venting. |
| 10:26 | 17 | MS. KELLER:  Your Honor, I would move to strike. |
| 10:26 | 18 | THE COURT:  I'm going to strike the answer. |
| 10:26 | 19 | Remember what I forewarned the jury about: |
| 10:26 | 20 | Gratuitous comments can go to credibility. |
| 10:26 | 21 | Counsel, your next question. |
| 10:26 | 22 | BY MS. KELLER: |
| 10:26 | 23 | Q.   You knew that when Russell Arons sent you the e-mail |
| 10:26 | 24 | about how "We wiped those guys out with our successful |
| 10:26 | 25 | assault on 4Ever Best Friends," and included a picture of |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 78 of 133   Page ID #:310628
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

78

| 10:26 | 1 | Matt Bousquette with a copy of -- with a 4Ever Best Friends |
| 10:26 | 2 | headed for the discount bin, you knew that's what she was |
| 10:26 | 3 | talking about, right? |
| 10:26 | 4 | A.   She was talking about us successfully competing against |
| 10:26 | 5 | 4Ever Best Friends. |
| 10:26 | 6 | Q.   Successfully competing by getting confidential |
| 10:27 | 7 | information from a reliable source, copying MGA's product in |
| 10:27 | 8 | a week, and then launching a marketing blitz designed to |
| 10:27 | 9 | wipe them out, right? |
| 10:27 | 10 | A.   No, I don't agree with that. |
| 10:27 | 11 | Q.   Now, you've heard the phrase that "We need to fix the |
| 10:27 | 12 | Barbie dolls," right? |
| 10:27 | 13 | A.   Yes, I've heard that phrase. |
| 10:27 | 14 | Q.   You heard that phrase from Robert Eckert as a stated |
| 10:27 | 15 | corporate goal of Mattel, right? |
| 10:27 | 16 | A.   I did, yes. |
| 10:27 | 17 | Q.   And the goal "fix the dolls," meant that Mattel's |
| 10:27 | 18 | business was in decline, right? |
| 10:27 | 19 | A.   Well, yes, the Barbie business was in decline. |
| 10:27 | 20 | Q.   And the corporate goal to fix the dolls reflected a |
| 10:27 | 21 | concern with the company's performance, right? |
| 10:27 | 22 | A.   It -- it was about the -- it was the concern over the |
| 10:27 | 23 | Barbie brand performance. |
| 10:27 | 24 | Q.   There was an analysis done of the reasons for that |
| 10:27 | 25 | decline by corporate strategic planning, true? |

Case 2:04-cv-09049-DOC-RNB Document 10246 Filed 03/22/11 Page 79 of 133 Page ID #:310629
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

79

| 10:28 | 1 | A. Well, there were probably a number of different one |
| 10:28 | 2 | done. Are you talking about one specifically? |
| 10:28 | 3 | Q. Yes. I'm talking about one that was done by Sujata |
| 10:28 | 4 | Luther. Do you remember that? |
| 10:28 | 5 | A. I'm not recalling -- exact document. |
| 10:28 | 6 | Q. Let's look at Exhibit 8762. |
| 10:28 | 7 | *(Document provided to the witness.)* |
| 10:28 | 8 | BY MS. KELLER: |
| 10:28 | 9 | Q. Is this an e-mail from Sujata Luther to you, dated |
| 10:28 | 10 | October 27th, 2003? |
| 10:28 | 11 | A. Yes, it is. |
| 10:28 | 12 | *(Document displayed.)* |
| | 13 | BY MS. KELLER: |
| 10:28 | 14 | Q. And you see here, it says there is a desperate need to |
| 10:28 | 15 | position Barbie as trendy? |
| 10:28 | 16 | A. Yes, uh-huh. |
| 10:28 | 17 | Q. Specifically, "There is a desperate need to communicate |
| 10:28 | 18 | and deliver that Barbie is and can be trendy." |
| 10:28 | 19 | Now, at the time, you had received feedback from Sujata |
| 10:28 | 20 | Luther that Barbie was not perceived as cool, right? |
| 10:29 | 21 | A. Uh, yes, that's correct. |
| 10:29 | 22 | Q. And you held Ms. Luther in pretty high regard, didn't |
| 10:29 | 23 | you? |
| 10:29 | 24 | A. Yeah, I thought she was competent. |
| 10:29 | 25 | Q. You held her in high regard, correct? |

| | | |
|---|---|---|
| 10:29 | 1 | A.   Yeah, I thought she was competent. |
| 10:29 | 2 | Q.   Do you have a problem with the words "high regard"? |
| 10:29 | 3 | A.   No. |
| 10:29 | 4 | Q.   In fact, those are words you, yourself, used at your |
| 10:29 | 5 | deposition, correct? -- about her. |
| 10:29 | 6 | A.   I don't recall that, but okay. |
| 10:29 | 7 | Q.   Now, isn't it true that you relied on Ms. Luther as the |
| 10:29 | 8 | person with the most insight as to consumer points of view |
| 10:29 | 9 | in 2003? |
| 10:29 | 10 | A.   Uh, yes, that's correct. |
| 10:29 | 11 | Q.   And she wasn't the only person to hold this view that |
| 10:29 | 12 | there was a desperate need for Barbie to be seen as trendy, |
| 10:29 | 13 | right? |
| 10:29 | 14 | A.   Her point of view was coming from the consumer work |
| 10:29 | 15 | that she was doing. |
| 10:29 | 16 | Q.   But you've also -- we have seen that the term "lost |
| 10:30 | 17 | generation" had been used by yet another person, correct? |
| 10:30 | 18 | A.   Yes, uh-huh. |
| 10:30 | 19 | Q.   And Russell Arons was the vice president of marketing. |
| 10:30 | 20 | She's the one who had used that "lost generation" phrase, |
| 10:30 | 21 | right? |
| 10:30 | 22 | A.   That's correct. |
| 10:30 | 23 | Q.   To describe a group of girls who had never experienced |
| 10:30 | 24 | Barbie as a cool product, right? |
| 10:30 | 25 | A.   Yes, that's right. |

| | | |
|---|---|---|
| 10:30 | 1 | Q.   And Sujata Luther is saying that same thing here, |
| 10:30 | 2 | October 27, 2003, right? |
| 10:30 | 3 | A.   Yes, uh-huh. |
| 10:30 | 4 | Q.   Let's look at Exhibit 16146. |
| 10:30 | 5 | *(Document provided to the witness.)* |
| 10:30 | 6 | BY MS. KELLER: |
| 10:30 | 7 | Q.   This is a February 25, 2005 e-mail from you to Jill |
| 10:30 | 8 | Nordquist, Cassidy Park, and Ann Driskill, with a copy to |
| 10:30 | 9 | Matt Bousquette, is it not? |
| 10:30 | 10 | A.   I'm sorry.  What year did you say? |
| 10:31 | 11 | Q.   February -- I'm sorry.  You're right -- it's 2004. |
| 10:31 | 12 |      Is that what this is? |
| 10:31 | 13 | A.   Yes, uh-huh. |
| 10:31 | 14 |      MS. KELLER:  Your Honor, move 16146 into evidence. |
| 10:31 | 15 |      THE COURT:  Received. |
| 10:31 | 16 |      *(Exhibit No. 16146 received in evidence.)* |
| 10:31 | 17 |       *(Document displayed.)* |
| 10:31 | 18 | BY MS. KELLER: |
| 10:31 | 19 | Q.   And this says, "To the code name G.R.R.L.S. team." |
| 10:31 | 20 |      And that G.R.R.L.S. stood for "Gotta Regain Relevance |
| 10:31 | 21 | Like Soon," right? |
| 10:31 | 22 | A.   Yes. |
| 10:31 | 23 | Q.   And the purpose of this meeting was, we see under |
| 10:31 | 24 | objectives, "How do we make Barbie relevant again," right? |
| 10:31 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 10:31 | 1 | Q.   And this meeting did occur, did it not? |
| 10:31 | 2 | A.   Yes, it did. |
| 10:31 | 3 | Q.   The outcome of this meeting was a Barbie brand |
| 10:31 | 4 | advertising campaign, true? |
| 10:31 | 5 | A.   That was one of the outcomes, yes. |
| 10:31 | 6 | Q.   And this talks about "Our competition's strength." |
| 10:32 | 7 | A.   I'm sorry.  Where are you looking?  I'm sorry. |
| 10:32 | 8 | Q.   Well, I'm trying to find it.  I need stronger reading |
| 10:32 | 9 | glasses. |
| 10:32 | 10 | Okay.  That would be in the second paragraph under "To |
| 10:32 | 11 | the code name," where it says, "I've been struck the past |
| 10:32 | 12 | few weeks by what we've heard from both girls and our |
| 10:32 | 13 | customers around the world about our competition's |
| 10:33 | 14 | strength." |
| 10:33 | 15 | Do you see that? |
| 10:33 | 16 | A.   Yes. |
| 10:33 | 17 | Q.   And when you said, "our competition's strength," that |
| 10:33 | 18 | was a reference to MGA, correct? |
| 10:33 | 19 | A.   Yes, primarily. |
| 10:33 | 20 | Q.   And let's look at Exhibit 8766. |
| 10:33 | 21 | *(Document provided to the witness.)* |
| 10:33 | 22 | THE WITNESS:  Thank you. |
| | 23 | BY MS. KELLER: |
| 10:33 | 24 | Q.   8766, at the top, is an e-mail from you to Russell |
| 10:33 | 25 | Arons, dated April 8, 2004, correct? |

| | | |
|---|---|---|
| 10:33 | 1 | A.   Yes, uh-huh. |
| 10:33 | 2 | MS. KELLER:  Your Honor, move 8766 into evidence. |
| 10:33 | 3 | THE COURT:  Received. |
| 10:33 | 4 | *(Exhibit No. 8766 received in evidence.)* |
| 10:33 | 5 | *(Document displayed.)* |
| 10:33 | 6 | BY MS. KELLER: |
| 10:33 | 7 | Q.   And you're responding to an e-mail from Ms. Arons to |
| 10:33 | 8 | you and Sujata Luther, dated April 7, 2004, correct? |
| 10:33 | 9 | A.   That's right. |
| 10:33 | 10 | Q.   Ms. Arons wrote to you and Ms. Luther -- if we go down |
| 10:34 | 11 | under "Strategic Assessment" -- "Middle age girls," paren, |
| 10:34 | 12 | "six to eight years old," closed paren, "are leaving Barbie |
| 10:34 | 13 | dolls and prematurely graduating to MyScene and Bratz |
| 10:34 | 14 | because there hasn't been cool product in Barbie for the |
| 10:34 | 15 | past four years." |
| 10:34 | 16 | And the past four years would go back to April of 2000, |
| 10:34 | 17 | right? |
| 10:34 | 18 | A.   Uh, yes, uh-huh. |
| 10:34 | 19 | Q.   Before the launch of Bratz, right? |
| 10:34 | 20 | A.   Uh, yes, past four years. |
| 10:34 | 21 | Q.   And if we go down to number 3, we see, "However, |
| 10:34 | 22 | because of the 'lost generation' syndrome, these girls do |
| 10:34 | 23 | not think Barbie has any cool dolls. |
| 10:34 | 24 | "Issue:  We need to communicate to girls that Barbie |
| 10:34 | 25 | has cool dolls for them." |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 84 of 133   Page ID #:310634
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:34 | 1 | And then, if we look down to Numeral 5, we see, "Middle |
| 10:34 | 2 | age girls have turned off from Barbie doll advertising |
| 10:35 | 3 | because they have decided the brand has nothing for them." |
| 10:35 | 4 | Now, you agreed with the analysis in Ms. Arons' e-mail, |
| 10:35 | 5 | and you thought it was excellent, right? |
| 10:35 | 6 | A.   Yeah.  What I was responding to was her plan for the |
| 10:35 | 7 | research. |
| 10:35 | 8 | Q.   If we look at the top, your reply, "Thanks.  This is |
| 10:35 | 9 | excellent" –– the very top, correct? |
| 10:35 | 10 | A.   Yes.  That refers to the plan for the research that's |
| 10:35 | 11 | outlined here. |
| 10:35 | 12 | Q.   Now, if we look at Exhibit 8776. |
| 10:35 | 13 | *(Document provided to the witness.)* |
| 11:59 | 14 | BY MS. KELLER: |
| 10:35 | 15 | Q.   Do you recognize this as a presentation that Allison |
| 10:35 | 16 | Willensky co-authored with Sujata Luther? |
| 10:36 | 17 | A.   Yes, I do. |
| 10:36 | 18 | MS. KELLER:  Your Honor, I'd move 8776 into |
| 10:36 | 19 | evidence. |
| 10:36 | 20 | THE COURT:  Received. |
| 10:36 | 21 | *(Exhibit No. 8776 received in evidence.)* |
| 10:36 | 22 | *(Document displayed.)* |
| 10:36 | 23 | BY MS. KELLER: |
| 10:36 | 24 | Q.   And this says, State of Girls, Barbie, MyScene, |
| 10:36 | 25 | Consumer Insights," and it's dated "30 April 2004". |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | And the handwritten notes that we see on the -- on |
| 10:36 | 2 | page 1 here, those are your notes, right? |
| 10:36 | 3 | A.   Yes, they are. |
| 10:36 | 4 | Q.   And on the left, there are some names? |
| 10:36 | 5 | A.   Yes, uh-huh. |
| 10:36 | 6 | Q.   And we see, eight names down on the left, is "TK." |
| 10:36 | 7 | That stands for "Tim Kilpin," right? |
| 10:36 | 8 | A.   That's right. |
| 10:36 | 9 | Q.   Now, the purpose of this presentation was to report on |
| 10:36 | 10 | focus groups that looked at Barbie and MyScene brands in |
| 10:36 | 11 | relation to competitive products, right? |
| 10:36 | 12 | A.   Yes. |
| 10:36 | 13 | Q.   Looked at the so-called competitive set, true? |
| 10:37 | 14 | A.   That's right, and how girls were perceiving all of |
| 10:37 | 15 | those brands. |
| 10:37 | 16 | Q.   And you were the one requesting this research, true? |
| 10:37 | 17 | A.   Yes, that's correct. |
| 10:37 | 18 | Q.   This information was ultimately used in conducting a |
| 10:37 | 19 | brand campaign for Mattel, right? |
| 10:37 | 20 | A.   Uh, yes, uh-huh. |
| 10:37 | 21 | Q.   And if we look at page 4 of 8776. |
| 10:37 | 22 | *(Document displayed.)* |
| | 23 | BY MS. KELLER: |
| 10:37 | 24 | Q.   This discusses what's called "age segmentation," right? |
| 10:37 | 25 | A.   Uh, yes, that's correct. |

| | | |
|---|---|---|
| 10:37 | 1 | Q.   And this shows again that Barbie is appealing to |
| 10:37 | 2 | younger-through-transitional girls, ages 3 through 7, right? |
| 10:37 | 3 | A.   Yes, uh-huh. |
| 10:37 | 4 | Q.   It shows Bratz and MyScene appealing to older girls, |
| 10:37 | 5 | ages 7 through 10, right? |
| 10:37 | 6 | A.   Yes. |
| 10:37 | 7 | Q.   And it talks about the different play patterns for |
| 10:37 | 8 | different age groups. |
| 10:37 | 9 | A.   Yes, uh-huh. |
| 10:37 | 10 | Q.   Now, if we go to page 10. |
| 10:38 | 11 | *(Document displayed.)* |
| 10:38 | 12 | THE WITNESS:  Hang on. |
| | 13 | BY MS. KELLER: |
| 10:38 | 14 | Q.   We see on the -- under, "Insights," second -- first |
| 10:38 | 15 | bullet point says, "Girls begin to acquire Barbie at age 3. |
| 10:38 | 16 | By age 7 to 8 they are done." |
| 10:38 | 17 | And then, if we look at the second arrow point, it |
| 10:38 | 18 | says, "Girls are ready to move on by age 8." |
| 10:38 | 19 | And the third sentence down in that arrow point says, |
| 10:38 | 20 | "Unless thwarted immediately, Bratz is on its way to |
| 10:38 | 21 | establishing itself as the new Barbie for older girls." |
| 10:38 | 22 | And then the next arrow point says, "MyScene is also |
| 10:38 | 23 | considered relevant to girls who have outgrown Barbie." |
| 10:39 | 24 | And -- and this age segmentation was ultimately adopted |
| 10:39 | 25 | by Mattel, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 87 of 133   Page ID #:310637
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

87

| | | |
|---|---|---|
| 10:39 | 1 | A.   We used this, yeah, to plan for the development of the |
| 10:39 | 2 | brand going forward. |
| 10:39 | 3 | Q.   It was adopted as an outgrowth of the research in 8776, |
| 10:39 | 4 | true? |
| 10:39 | 5 | A.   That's correct. |
| 10:39 | 6 | Q.   Bratz and Barbie targeted different age groups; namely, |
| 10:39 | 7 | Barbie targeted younger girls; Bratz targeted older girls, |
| 10:39 | 8 | right? |
| 10:39 | 9 | A.   Part of our issue with Barbie was that it was appealing |
| 10:39 | 10 | younger and wasn't reaching of any of those older girls. |
| 10:39 | 11 | Q.   Well -- |
| 10:39 | 12 | A.   That was part of our concern. |
| 10:39 | 13 | Q.   -- what you saw in this document was that Barbie and |
| 10:39 | 14 | Bratz were targeting different age groups:  Barbie targeting |
| 10:39 | 15 | younger; Bratz targeting older, right? |
| 10:39 | 16 | A.   Well, I'd use a different word for that.  It wasn't |
| 10:39 | 17 | that we were -- we weren't targeting Barbie just to be |
| 10:39 | 18 | younger.  We'd like to have been appealing older, and we |
| 10:39 | 19 | weren't.  The research told us it was appealing younger. |
| 10:40 | 20 | Q.   Let's turn back to Exhibit 1812-A. |
| 10:40 | 21 | *(Document provided to the witness.)* |
| 10:40 | 22 | *(Document displayed.)* |
| 10:40 | 23 | BY MS. KELLER: |
| 10:40 | 24 | Q.   1812-A, page 10 shows the recipient breakdown, right? |
| 10:40 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 10:40 | 1 | THE WITNESS:  Uh, yes uh-huh. |
| 10:40 | 2 | BY MS. KELLER: |
| 10:40 | 3 | Q.   And the first bullet point at the bottom says, "Barbie |
| 10:40 | 4 | consumers start to decline after age 5." |
| 10:40 | 5 | And then we see on the next bullet line that -- we see |
| 10:40 | 6 | that MyScene peaks at age 7, right? |
| 10:40 | 7 | A.   Uh, yes, uh-huh. |
| 10:40 | 8 | Q.   And we see "Bratz consumers are buying into the brand |
| 10:41 | 9 | between the ages of 5 and 10, with a peak age of 8," right? |
| 10:41 | 10 | A.   Yes. |
| 10:41 | 11 | Q.   Now, let's go back to 1804, page 2. |
| 10:41 | 12 | (Document provided to the witness.) |
| 10:41 | 13 | (Document displayed.) |
| | 14 | BY MS. KELLER: |
| 10:41 | 15 | Q.   And we see here, the first bullet point at the bottom |
| 10:41 | 16 | of page 10, says, "Barbie consumers start to decline" -- I'm |
| 10:41 | 17 | sorry -- "Brand viewed by trade, licensees, and consumers as |
| 10:41 | 18 | having lost trendy edge for younger girls," right? |
| 10:41 | 19 | A.   Yes, uh-huh. |
| 10:41 | 20 | Q.   Now, Mattel introduced MyScene to target the trendy |
| 10:42 | 21 | older girls, the age 6 to 7 or ten-year-olds? |
| 10:42 | 22 | A.   Yes, that's correct. |
| 10:42 | 23 | Q.   And if we could go back to 1804, page 21. |
| 10:42 | 24 | (Document provided to the witness.) |
| 10:42 | 25 | (Document displayed.) |

| | | |
|---|---|---|
| 10:42 | 1 | BY MS. KELLER: |
| 10:42 | 2 | Q.   It's really hard to see this, but it says, "Barbie |
| 10:42 | 3 | Brand Strategy," right? |
| 11:38 | 4 | A.   Yes. |
| 10:42 | 5 | BY MS. KELLER: |
| 10:42 | 6 | Q.   And we see that this is -- and this is a marketing |
| 10:42 | 7 | strategy, right? |
| 10:42 | 8 | A.   Yes.  This was from that first document that we did. |
| 10:42 | 9 | Q.   And we show Barbie, the Barbie brand strategy, Barbie |
| 10:42 | 10 | is being aimed at three years to seven years, right? |
| 10:42 | 11 | A.   Yes. |
| 10:42 | 12 | Q.   And MyScene is being aimed at seven years to ten years, |
| 10:43 | 13 | right? |
| 10:43 | 14 | A.   Yes. |
| 10:43 | 15 | Q.   So Mattel itself at this point is adopting the strategy |
| 10:43 | 16 | of aiming Barbie at three to seven years and MyScene at |
| 10:43 | 17 | seven to ten years, right? |
| 10:43 | 18 | A.   Well, this is where we were at the outset when I first |
| 10:43 | 19 | came back, and that's why we did the search that you were |
| 10:43 | 20 | mentioning in State of Girls to understand what was |
| 10:43 | 21 | happening across these age groups. |
| 10:43 | 22 | Q.   And this was toward the end of 2003, right? |
| 10:43 | 23 | A.   This particular document, yes. |
| 10:43 | 24 | Q.   But at the top here, it didn't say, "Barbie brand |
| 10:43 | 25 | status" on page 21.  It says, "Barbie brand strategy," |

| | | |
|---|---|---|
| 10:43 | 1 | right? |
| 10:43 | 2 | A.   Uh, yes, it does. |
| 10:43 | 3 | Q.   And the strategy shows Barbie Princess, Happy Family |
| 10:43 | 4 | Fairytopia.  We see that targeted to three years to seven |
| 10:43 | 5 | years, correct? |
| 10:43 | 6 | A.   Yes. |
| 10:43 | 7 | Q.   And Barbie brand strategy is to have MyScene target the |
| 10:44 | 8 | older girls seven to ten years? |
| 10:44 | 9 | A.   Yes.  And what I remember about this -- |
| 10:44 | 10 | Q.   Sir, that's all my question was.  Thank you. |
| 10:44 | 11 | Now, and we talked yesterday about the fact that Mattel |
| 10:44 | 12 | actually positioned the MyScene dolls away from the Barbie |
| 10:44 | 13 | dolls because Barbie was perceived as uncool and babyish in |
| 10:44 | 14 | the stores, right? |
| 10:44 | 15 | A.   That was one of the concerns we had, yes. |
| 10:44 | 16 | Q.   And so not just a concern, but you actually decided to |
| 10:44 | 17 | position the doll away -- the MyScene doll away from the |
| 10:44 | 18 | Barbie dolls in the stores, true? |
| 10:44 | 19 | A.   Where we could do that, we did, yes. |
| 10:44 | 20 | Q.   And if we look at Exhibit 1814. |
| 10:44 | 21 | *(Document provided to the witness.)* |
| 10:44 | 22 | BY MS. KELLER: |
| 10:45 | 23 | Q.   If we look at 1814, page 9, here you're -- |
| 10:45 | 24 | MS. KELLER:  I'm sorry, Your Honor, I would -- |
| | 25 | |

| | | |
|---|---|---|
| 10:45 | 1 | BY MS. KELLER: |
| 10:45 | 2 | Q.   1814 is a May 4th, 2004, presentation that you wrote to |
| 10:45 | 3 | summarize everything you had heard up to that point about |
| 10:45 | 4 | the brand, correct? |
| 10:45 | 5 | A.   That's correct. |
| 10:45 | 6 |        MS. KELLER:  Your Honor, I'd move 1814 into |
| 10:45 | 7 | evidence. |
| 10:45 | 8 |           THE COURT:  Received. |
| 10:45 | 9 |        (Exhibit No. 1814 received in evidence.) |
| 10:45 | 10 |         (Document displayed.) |
| 11:59 | 11 | BY MS. KELLER: |
| 10:45 | 12 | Q.   And I'm not gonna go over all the same points again, |
| 10:45 | 13 | but if we look at 1814, page 9, we see, "We should use our |
| 10:45 | 14 | strong, new, older girl product to take back our position." |
| 10:45 | 15 | And if we look at 1814, page 10, "We all agree we must do |
| 10:46 | 16 | this to battle Bratz." |
| 10:46 | 17 |     And if you look at 1814, page 25, the third bullet |
| 10:46 | 18 | point, this discusses ways to separate MyScene from Barbie, |
| 10:46 | 19 | true? |
| 10:46 | 20 | A.   Yes, it does. |
| 10:46 | 21 | Q.   So by this point Mattel had settled on a strategy of |
| 10:46 | 22 | trying to target the older girls with MyScene, correct? |
| 10:46 | 23 | A.   Uh, yeah, this was my out –– output from all the |
| 10:46 | 24 | research and work that we'd done up to that point. |
| 10:46 | 25 | Q.   And, uh, Exhibit 8785, is this a July 14th, 2004, |

| | | |
|---|---|---|
| 10:46 | 1 | Barbie business update? |
| 10:46 | 2 | (Document provided to the witness.) |
| | 3 | BY MS. KELLER: |
| 10:46 | 4 | Q.   With your handwriting on it? |
| 10:47 | 5 | A.   Yes, it is. |
| 10:47 | 6 | MS. KELLER:  Your Honor, I'd move 8785 into |
| 10:47 | 7 | evidence. |
| 10:47 | 8 | THE COURT:  Received. |
| 10:47 | 9 | (Exhibit No. 8785 received in evidence.) |
| 10:47 | 10 | (Document displayed.) |
| 11:59 | 11 | BY MS. KELLER: |
| 10:47 | 12 | Q.   And, again, without going into the whole document, |
| 10:47 | 13 | this, if you look at page 6 -- |
| 10:47 | 14 | (Document displayed.) |
| 10:47 | 15 | BY MS. KELLER: |
| 10:47 | 16 | Q.   -- we see the same age segmentation graph that we saw |
| 10:47 | 17 | in Exhibit 8776, right? |
| 10:47 | 18 | A.   Uh, yes, we do. |
| 10:47 | 19 | Q.   And here we see again that, um, the older girls Mattel |
| 10:47 | 20 | is targeting with the MyScene brand to compete directly |
| 10:47 | 21 | against Bratz.  If we look in the top, right? |
| 10:47 | 22 | A.   Uh, yes.  Uh-huh. |
| 10:47 | 23 | Q.   So at this point the traditional Barbie was not being |
| 10:47 | 24 | pitted against Bratz, correct? |
| 10:47 | 25 | A.   Well, the concern I remember having at the time was -- |

| | | |
|---|---|---|
| 10:48 | 1 | Q.   Sir -- |
| 10:48 | 2 | A.   -- Bratz would start to age down in appeal. |
| 10:48 | 3 | Q.   Sir, at this point, from what we see in these |
| 10:48 | 4 | documents, Barbie was not being pitted against Bratz; |
| 10:48 | 5 | MyScene was, right? |
| 10:48 | 6 | A.   At this time, yes. |
| 10:48 | 7 | Q.   Let's look at Exhibit 8768. |
| 10:48 | 8 | *(Document provided to the witness.)* |
| 10:48 | 9 | BY MS. KELLER: |
| 10:48 | 10 | Q.   Is this an August 27, 2004 e-mail from you to Russell |
| 10:48 | 11 | Arons, copying Matt Bousquette, among others, about a Barbie |
| 10:48 | 12 | September board presentation? |
| 10:48 | 13 | A.   I'm sorry.  Yes. |
| 10:48 | 14 | MS. KELLER:  Your Honor, I'd move 8768 into |
| 10:48 | 15 | evidence. |
| 10:48 | 16 | THE COURT:  Received. |
| 10:48 | 17 | *(Exhibit No. 8768 received in evidence.)* |
| 10:48 | 18 | *(Document displayed.)* |
| 11:59 | 19 | BY MS. KELLER: |
| 10:49 | 20 | Q.   And if we look at page 2, two bullet points down, it's |
| 10:49 | 21 | entitled "younger girl," which is where Barbie falls, right? |
| 10:49 | 22 | A.   Yes, younger and traditional girl is where Barbie |
| 10:49 | 23 | falls. |
| 10:49 | 24 | Q.   Let's look at Exhibit 5924. |
| 10:49 | 25 | *(Document provided to the witness.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 94 of 133   Page ID #:310644
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:49 | 1 | BY MS. KELLER: |
| 10:49 | 2 | Q.   This is a presentation to Mattel's Board of Directors, |
| 10:49 | 3 | which you worked on, for September 17, 2004, true? |
| 10:49 | 4 | A.   Yes, that's correct. |
| 10:49 | 5 | MS. KELLER:  Your Honor, I'd move 5924 into |
| 10:49 | 6 | evidence. |
| 10:49 | 7 | THE COURT:  Received. |
| 10:49 | 8 | *(Exhibit No. 5924 received in evidence.)* |
| 10:49 | 9 | *(Document displayed.)* |
| 10:49 | 10 | BY MS. KELLER: |
| 10:49 | 11 | Q.   And this presentation was a summary of what you had |
| 10:49 | 12 | learned up to this point, right? |
| 10:49 | 13 | A.   Uh, yes.  Uh-huh. |
| 10:49 | 14 | Q.   And if we look at page 2. |
| 10:50 | 15 | *(Document displayed.)* |
| 11:59 | 16 | BY MS. KELLER: |
| 10:50 | 17 | Q.   Under May 4th, it says, "Deeper understanding of |
| 10:50 | 18 | consumer trends, state of girls, Bratz versus Barbie."  You |
| 10:50 | 19 | see under that it says, "Importance of brand versus doll." |
| 10:50 | 20 | And if we look at page 5. |
| 10:50 | 21 | *(Document displayed.)* |
| 10:50 | 22 | BY MS. KELLER: |
| 10:50 | 23 | Q.   And page 6. |
| 10:50 | 24 | *(Document displayed.)* |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 95 of 133   Page ID #:310645
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

95

| | | |
|---|---|---|
| 03:59 | 1 | BY MS. KELLER: |
| 10:50 | 2 | Q.   We see you explaining to the Board of Directors of |
| 10:50 | 3 | Mattel this whole age-segmentation issue again, right? |
| 10:50 | 4 | A.   That's correct. |
| 10:50 | 5 | Q.   Now, during the time that you were in the Girls |
| 10:50 | 6 | Division from 2003 to 2005, I think we've -- we can |
| 10:51 | 7 | summarize that you thought there was some significant |
| 10:51 | 8 | problems with the Barbie brand, which you call a brand in |
| 10:51 | 9 | crisis, right? |
| 10:51 | 10 | A.   Yeah.  I -- yes, that's true. |
| 10:51 | 11 | Q.   And you don't recall anyone suggesting a design change |
| 10:51 | 12 | to the Barbie product itself, right? |
| 10:51 | 13 | A.   Uh, during -- during the time that I was on the |
| 10:51 | 14 | business? |
| 10:51 | 15 | Q.   Yes.  You don't recall from 2003 to 2005 anyone |
| 10:51 | 16 | suggesting a design change to the Barbie product itself? |
| 10:51 | 17 | A.   Uh, no, I don't recall that. |
| 10:51 | 18 | Q.   Nobody was suggesting there should be a change to the |
| 10:51 | 19 | mold, right?  The sculpt, true? |
| 10:51 | 20 | A.   Uh, no, I don't -- I don't believe so. |
| 10:51 | 21 | Q.   You don't believe anybody suggested that, right? |
| 10:51 | 22 | A.   No. |
| 10:51 | 23 | Q.   Did anybody suggest it? |
| 10:51 | 24 | A.   I don't believe so, no. |
| 10:51 | 25 | Q.   And, um, you don't recall the Barbie design team ever |

| | | |
|---|---|---|
| 10:52 | 1 | considering a change to the mold to address the problems of |
| 10:52 | 2 | the declining sales, true? |
| 10:52 | 3 | A.   Uh, no, I don't believe so. |
| 10:52 | 4 | Q.   And instead, Mattel decided that to address the |
| 10:52 | 5 | problems, it needed to concentrate on its brand campaign as |
| 10:52 | 6 | well as marketing and advertising, right? |
| 10:52 | 7 | A.   We were looking at the product development, as well, |
| 10:52 | 8 | across the entire range for 2004 and '5. |
| 10:52 | 9 | Q.   Isn't it true that to address the problems, Mattel was |
| 10:52 | 10 | concentrating on the brand campaign, marketing, and |
| 10:52 | 11 | advertising? |
| 10:52 | 12 | A.   For 2004, yes.  We, of course, were also focused on the |
| 10:52 | 13 | best possible product line for 2005. |
| 10:52 | 14 | Q.   We're talking about 2003 to 2005. |
| 10:52 | 15 | A.   And, yes, we then thought about all of those things. |
| 10:53 | 16 | We thought about the product, the quality of the product as |
| 10:53 | 17 | well as the marketing and –– and all of the other elements |
| 10:53 | 18 | around that. |
| 10:53 | 19 | Q.   You could do the brand campaign and the marketing |
| 10:53 | 20 | without changing the Barbie mold, yes? |
| 10:53 | 21 | A.   We were focused on –– |
| 10:53 | 22 | Q.   Sir, could you do the marketing campaign without |
| 10:53 | 23 | changing the mold? |
| 10:53 | 24 | A.   We were not considering a change to the mold. |
| 10:53 | 25 | Q.   And, in fact, what you were considering was a brand |

| | | |
|---|---|---|
| 10:53 | 1 | campaign, right? |
| 10:53 | 2 | A.   Among other things, including different products. |
| 10:53 | 3 | Q.   Marketing, right? |
| 10:53 | 4 | A.   And marketing. |
| 10:53 | 5 | Q.   And advertising, right? |
| 10:53 | 6 | A.   Yeah.  Through the course of that -- |
| 10:53 | 7 | Q.   Sir -- |
| 10:53 | 8 | A.   -- it was -- |
| 10:53 | 9 | Q.   Sir -- and packaging, right? |
| 10:53 | 10 | A.   Through the course of that time, it was all of those |
| 10:53 | 11 | things. |
| 10:54 | 12 | Q.   You could do the brand campaign and improve Barbie's |
| 10:54 | 13 | performance all without changing the Barbie mold, correct? |
| 10:54 | 14 | A.   We were not focused on the mold. |
| 10:54 | 15 | Q.   You could do all of that without changing the Barbie |
| 10:54 | 16 | mold, correct? |
| 10:54 | 17 | A.   Well, we were gonna try. |
| 10:54 | 18 | Q.   You could do all of that without -- and improve |
| 10:54 | 19 | Barbie's performance all without changing the Barbie mold, |
| 10:54 | 20 | right? |
| 10:54 | 21 | A.   We were focused on, as I said, the product and the |
| 10:54 | 22 | marketing and the advertising, all of those things. |
| 10:54 | 23 | Q.   I'm not asking what you were focused on. |
| 10:54 | 24 | You believed that you could do the brand campaign and |
| 10:54 | 25 | improve Barbie's performance all without changing the Barbie |

| | | |
|---|---|---|
| 10:54 | 1 | mold, correct? |
| 10:54 | 2 | A.   In 2004, yes. |
| 10:54 | 3 | Q.   In 2003 to 2005, correct? |
| 10:54 | 4 | A.   I don't recall that our team ever discussed a change to |
| 10:54 | 5 | the mold. |
| 10:55 | 6 | Q.   What you discussed was a brand campaign, right? |
| 10:55 | 7 | A.   Among a lot of other things, including a better product |
| 10:55 | 8 | in 2005, the marketing, and the advertising. |
| 10:55 | 9 | Q.   Now, let's talk about some of the things that you tried |
| 10:55 | 10 | to come up with as better products.  You were looking for |
| 10:55 | 11 | something that had some of the attributes of Bratz, right? |
| 10:55 | 12 | Fashionable, edgy, appealing to older girls aspiring to be |
| 10:55 | 13 | teens, right? |
| 10:55 | 14 | A.   Among other things, yes. |
| 10:55 | 15 | Q.   And you know that the Barbie brand had never had any |
| 10:55 | 16 | kind of brand positioning that included the quality, edgy; |
| 10:55 | 17 | never, right? |
| 10:55 | 18 | A.   Yeah, I would -- I would agree with that. |
| 10:55 | 19 | Q.   So in 2003, Mattel tried to come up with a new product |
| 10:55 | 20 | that it could be -- that it could position as edgy, and that |
| 10:55 | 21 | was called Flavas, right? |
| 10:55 | 22 | A.   Uh, yes. |
| 10:55 | 23 | Q.   And Flavas was a complete failure, true? |
| 10:56 | 24 | A.   Yeah, I don't believe it worked very well at all. |
| 10:56 | 25 | Q.   Failure? |

| | | |
|---|---|---|
| 10:56 | 1 | A.   Yes. |
| 10:56 | 2 | Q.   And you thought it failed because it was too edgy, |
| 10:56 | 3 | right? |
| 10:56 | 4 | A.   I did believe that. |
| 10:56 | 5 | Q.   Now, Flavas was supposed to be a flanker brand to |
| 10:56 | 6 | Barbie? |
| 10:56 | 7 | A.   You know, I wasn't there when they did it, so I'm not |
| 10:56 | 8 | sure how they were positioning it. |
| 10:56 | 9 | Q.   You know MyScene was supposed to be a flanker brand to |
| 10:56 | 10 | Barbie, right? |
| 10:56 | 11 | A.   Yeah.  And we worked on that.  I worked on that, as |
| 10:56 | 12 | well, my team. |
| 10:56 | 13 | Q.   And other than MyScene, which came out after Bratz, |
| 10:56 | 14 | Mattel had not marketed any flanker brands to Barbie while |
| 10:56 | 15 | you were there, right? |
| 10:56 | 16 | A.   While I was there?  From -- I'm sorry, the time again? |
| 10:56 | 17 | Q.   Say, up to 2008.  Other than MyScene, which came out |
| 10:56 | 18 | after Bratz, Mattel had not marketed any flanker brand to |
| 10:56 | 19 | Barbie, right? |
| 10:56 | 20 | A.   Well, I remember they did Generation Girl in the, I |
| 10:57 | 21 | think, early 2000s.  And Mystery Squad and a couple of |
| 10:57 | 22 | others.  Those -- I recall hearing about those. |
| 10:57 | 23 | Q.   I'm talking about after Bratz came out, okay?  The only |
| 10:57 | 24 | flanker brand Mattel came up with was MyScene, true? |
| 10:57 | 25 | A.   Uh, yes, MyScene. |

| | | |
|---|---|---|
| 10:57 | 1 | Q.   And the only reason MyScene came out was because of |
| 10:57 | 2 | Bratz?  Because Bratz had been so successful, right? |
| 10:57 | 3 | A.   Bratz had been successful with the older girls, yes. |
| 10:57 | 4 | Q.   And MyScene was Mattel's response to Bratz, to try to |
| 10:57 | 5 | compete with Bratz, right? |
| 10:57 | 6 | A.   And to reach the older girl. |
| 10:57 | 7 | Q.   Could I just ask you, though, to answer that question. |
| 10:57 | 8 | It was designed to compete -- |
| 10:57 | 9 | MR. QUINN:  Your Honor, I move to strike. |
| 10:57 | 10 | BY MS. KELLER: |
| 10:57 | 11 | Q.   -- with Bratz. |
| 10:57 | 12 | MR. QUINN:  Strike the preamble. |
| 10:57 | 13 | THE COURT:  Stricken. |
| 10:57 | 14 | BY MS. KELLER: |
| 10:57 | 15 | Q.   Answer me yes or no, was MyScene designed to compete |
| 10:57 | 16 | with Bratz? |
| 10:57 | 17 | A.   I believe it was designed to compete with Bratz and |
| 10:58 | 18 | reach older girls. |
| 10:58 | 19 | Q.   Is that a yes? |
| 10:58 | 20 | A.   Yes. |
| 10:58 | 21 | Q.   And you would agree, would you not, that MyScene was |
| 10:58 | 22 | inspired by Bratz? |
| 10:58 | 23 | A.   I don't know that I'd agree with that.  I don't know |
| 10:58 | 24 | that I can speak to the genesis of the design of it. |
| 10:58 | 25 | Q.   Did you ever discuss with Sujata Luther whether she |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

101

| | | |
|---|---|---|
| 10:58 | 1 | believed MyScene was actually inspired by Bratz? |
| 10:58 | 2 | A.   I don't remember that. |
| 10:58 | 3 | Q.   Now, you're also familiar with a product of Mattel |
| 10:58 | 4 | called Monster High? |
| 10:58 | 5 | A.   Yes, I am. |
| 10:58 | 6 | MS. KELLER:  And if we could have Exhibit 35842. |
| 10:58 | 7 | *(Document provided to the witness.)* |
| 10:58 | 8 | THE WITNESS:  Thank you. |
| 10:58 | 9 | BY MS. KELLER: |
| 10:58 | 10 | Q.   December 19, 2007, did Mattel do a focus group on three |
| 10:58 | 11 | different sculpts that resulted from the drawings you're |
| 10:59 | 12 | looking at? |
| 10:59 | 13 | A.   Yeah.  I had not seen this document until you sent this |
| 10:59 | 14 | over.  It's the first I've seen this. |
| 10:59 | 15 | Q.   Is that what it is? |
| 10:59 | 16 | A.   It appears to be, yes. |
| 10:59 | 17 | MS. KELLER:  Your Honor, I'd move 35842 into |
| 10:59 | 18 | evidence. |
| 10:59 | 19 | THE COURT:  Received. |
| 10:59 | 20 | *(Exhibit No. 35842 received in evidence.)* |
| 10:59 | 21 | *(Document displayed.)* |
| 10:59 | 22 | MS. KELLER:  And if we see -- Exhibit 35843. |
| 10:59 | 23 | *(Document provided to the witness.)* |
| 10:59 | 24 | THE WITNESS:  Thank you.  Yes. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:59 | 1 | BY MS. KELLER: |
| 10:59 | 2 | Q.   Is that a June 24th, 2008 document about Monster High? |
| 10:59 | 3 | A.   Yes, it is. |
| 10:59 | 4 | MS. KELLER:  Your Honor, I'd move 35843 into |
| 10:59 | 5 | evidence? |
| 10:59 | 6 | THE COURT:  Received. |
| 10:59 | 7 | *(Exhibit No. 35843 received in evidence.)* |
| 10:59 | 8 | *(Document displayed.)* |
| 11:59 | 9 | BY MS. KELLER: |
| 10:59 | 10 | Q.   And 35841, is that the fall 2008 Monster High packaging |
| 10:59 | 11 | focus group? |
| 10:59 | 12 | *(Document provided to the witness.)* |
| 10:59 | 13 | MR. QUINN:  We object.  Your Honor, this was in a |
| 10:59 | 14 | binder handed to us literally an hour ago. |
| 11:00 | 15 | THE COURT:  Sustained.  Sustained. |
| 11:00 | 16 | MS. KELLER:  Could we see the tangible -- Monster |
| 11:00 | 17 | High tangible, 24047, called Laguna Blue. |
| 11:00 | 18 | BY MS. KELLER: |
| 11:00 | 19 | Q.   Do you recognize that as one of Mattel's Monster High |
| 11:00 | 20 | products? |
| 11:00 | 21 | A.   Yes, I do. |
| 11:00 | 22 | MS. KELLER:  Your Honor, I'd move to admit 24047. |
| 11:00 | 23 | THE COURT:  Received. |
| 11:00 | 24 | *(Exhibit No. 24047 received in evidence.)* |
| 11:00 | 25 | *(Document displayed.)* |

| 11:00 | 1 | BY MS. KELLER: |
| 11:00 | 2 | Q.   It want to move on to a different topic, sir. |
| 11:00 | 3 | Now, I'd like to talk with you a little bit about |
| 11:00 | 4 | Mattel's -- the steps that Mattel takes to protect the |
| 11:00 | 5 | confidentiality of its unreleased products, all right? |
| 11:00 | 6 | A.   Okay. |
| 11:00 | 7 | Q.   Mattel takes steps to restrict access or impose |
| 11:01 | 8 | confidentiality obligations on people who are getting access |
| 11:01 | 9 | to its unreleased products in private showrooms, true? |
| 11:01 | 10 | A.   Uh, yes. |
| 11:01 | 11 | Q.   For example, Mattel has internal toy fairs twice a |
| 11:01 | 12 | year, true? |
| 11:01 | 13 | A.   That's correct. |
| 11:01 | 14 | Q.   And retailers can come to the internal activities and |
| 11:01 | 15 | look at Mattel's products, right? |
| 11:01 | 16 | A.   Yes, uh-huh. |
| 11:01 | 17 | Q.   And, generally, Mattel does not invite members of the |
| 11:01 | 18 | press to those, true? |
| 11:01 | 19 | A.   Yes, that's true. |
| 11:01 | 20 | Q.   And generally, Mattel does not invite members of the |
| 11:01 | 21 | public to those toy fairs, right? |
| 11:01 | 22 | A.   Yes, that's correct. |
| 11:01 | 23 | Q.   And the same goes for private showrooms at external toy |
| 11:01 | 24 | fairs, for example, the Hong Kong toy fair, right? |
| 11:01 | 25 | A.   Uh, the Hong Kong toy fair is mostly a buyer's show, |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 104 of 133   Page ID #:310654
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

104

| | | |
|---|---|---|
| 11:01 | 1 | yes. |
| 11:01 | 2 | Q.   Well, before somebody can come into your private |
| 11:01 | 3 | showroom, you actually have some kind of a sign-up sheet for |
| 11:02 | 4 | nondisclosure, right? |
| 11:02 | 5 | A.   For our private shows, yes. |
| 11:02 | 6 | Q.   And people actually have to make appointments to come |
| 11:02 | 7 | in, don't they? |
| 11:02 | 8 | A.   That's correct. |
| 11:02 | 9 | Q.   And so you have the appointment, you have the |
| 11:02 | 10 | nondisclosure agreement that they signed, and they promise |
| 11:02 | 11 | in that to keep confidential information that they're |
| 11:02 | 12 | getting about Mattel's unreleased products, right? |
| 11:02 | 13 | A.   Uh, yes, that's correct. |
| 11:02 | 14 | Q.   And that's the whole purpose of having a private |
| 11:02 | 15 | showroom, so that you can invite select people in and show |
| 11:02 | 16 | them your confidential, unreleased products, right? |
| 11:02 | 17 | A.   Uh, yes. |
| 11:02 | 18 | Q.   And you would consider it unacceptable for a competitor |
| 11:02 | 19 | to offer phony credentials in order to gain access to one of |
| 11:02 | 20 | your private showrooms, right? |
| 11:02 | 21 | A.   Yes, I would. |
| 11:02 | 22 | Q.   And, for example, if a competitor made up fake |
| 11:03 | 23 | credentials showing that he actually owned a toy store and |
| 11:03 | 24 | came into your showroom, you would consider that to be |
| 11:03 | 25 | unethical, wouldn't you? |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 105 of 133   Page ID #:310655
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

105

| | | |
|---|---|---|
| 11:03 | 1 | A.   Yes, I would. |
| 11:03 | 2 | Q.   And you understand that the term "FOB Hong Kong" refers |
| 11:03 | 3 | to a particular price that you would quote a buyer for a |
| 11:03 | 4 | product that they would take ownership of in Hong Kong? |
| 11:03 | 5 | A.   Yes, uh-huh. |
| 11:03 | 6 | Q.   Mattel considers FOB Hong Kong pricing information to |
| 11:03 | 7 | be confidential, correct? |
| 11:03 | 8 | A.   Yeah, we share that with the buyers. |
| 11:03 | 9 | Q.   And you would not expect a competitor to have access to |
| 11:03 | 10 | Mattel's confidential pricing information on FOB Hong Kong |
| 11:03 | 11 | items, correct? |
| 11:04 | 12 | A.   Uh, yes, we would expect that. |
| 11:04 | 13 | Q.   You would not? |
| 11:04 | 14 | A.   I'm sorry.  We would not expect that. |
| 11:04 | 15 | Q.   Let's take a look at Exhibit 7790. |
| 11:04 | 16 | *(Document provided to the witness.)* |
| 11:04 | 17 | BY MS. KELLER: |
| 11:04 | 18 | Q.   Do you recognize at the bottom of the page -- |
| 11:04 | 19 | A.   Yes, I'm sorry? |
| 11:04 | 20 | Q.   Oh, I'm sorry.  I've got the wrong exhibit. |
| 11:04 | 21 | Let's go back to 2107. |
| 11:04 | 22 | *(Document provided to the witness.)* |
| 11:04 | 23 | THE WITNESS:  Thank you. |
| 11:04 | 24 | BY MS. KELLER: |
| 11:04 | 25 | Q.   Do you recognize the initial e-mail in this thread as |

| | | |
|---|---|---|
| 11:04 | 1 | an e-mail from Janet Han with the subject, TRU meeting |
| 11:04 | 2 | notes, Toys R Us, dated October 23rd, 2003? |
| 11:05 | 3 | A.   Uh, yes, I do. |
| 11:05 | 4 | MS. KELLER:  Your Honor, I'd move 2107 into |
| 11:05 | 5 | evidence. |
| 11:05 | 6 | THE COURT:  Received. |
| 11:05 | 7 | *(Exhibit No. 2107 received in evidence.)* |
| 11:05 | 8 | *(Document displayed.)* |
| 11:05 | 9 | BY MS. KELLER: |
| 11:05 | 10 | Q.   Now, you were added as a recipient in the third e-mail |
| 11:05 | 11 | from the bottom, right? |
| 11:05 | 12 | A.   Hang on.  Uh, yes.  Uh-huh. |
| 11:05 | 13 | Q.   And if you look at the original e-mail on page 2. |
| 11:05 | 14 | *(Document displayed.)* |
| | 15 | BY MS. KELLER: |
| 11:05 | 16 | Q.   You see that this says, "TRU meeting notes competition. |
| 11:05 | 17 | I wanted to update you on my meeting with TRU today, which |
| 11:05 | 18 | included time in the Wayne Concept Lab.  Please find |
| 11:06 | 19 | outlined below bullet points on SP04 competitive product." |
| 11:06 | 20 | And then this goes through all sorts of information |
| 11:06 | 21 | about what Bratz dolls will be, right? |
| 11:06 | 22 | A.   Uh, yes.  Uh-huh. |
| 11:06 | 23 | Q.   And what Bratz dolls are coming out, right? |
| 11:06 | 24 | A.   Yes. |
| 11:06 | 25 | Q.   And do you see that if you go up to Janet Han's e-mail, |

107

| | | |
|---|---|---|
| 11:06 | 1 | the second from the top on page 1 -- |
| 11:06 | 2 | *(Document displayed.)* |
| 11:06 | 3 | BY MS. KELLER:  - |
| 11:06 | 4 | Q.   -- see that Ms. Han is detailing what the Sun-Kissed |
| 11:07 | 5 | Summer doll will retail for.  And what Toys R Us's current |
| 11:07 | 6 | sales projections were, right? |
| 11:07 | 7 | A.   Yes. |
| 11:07 | 8 | Q.   The Sun-Kissed Summer doll, that was an MGA product, |
| 11:07 | 9 | right? |
| 11:07 | 10 | A.   Yes. |
| 11:07 | 11 | Q.   And the Sun-Kissed Summer pool set will retail for |
| 11:07 | 12 | forty-nine ninety-nine, and there's a sales projection |
| 11:07 | 13 | contained there, as well, right? |
| 11:07 | 14 | A.   Yes. |
| 11:07 | 15 | Q.   Now, you would not have expected Ms. Han to have had |
| 11:07 | 16 | this information, would you? |
| 11:07 | 17 | A.   Yeah.  I have to assume she got it from the buyer. |
| 11:07 | 18 | Q.   Well, you would not have expected her to have it, would |
| 11:07 | 19 | you? |
| 11:07 | 20 | A.   Well, we know that when -- once product's in these |
| 11:07 | 21 | concept labs, that everybody sees it. |
| 11:07 | 22 | Q.   Would you turn to your deposition, page 516. |
| 11:08 | 23 | *(Document provided to the witness.)* |
| 11:08 | 24 | MS. KELLER:  Page 21 to 517, page 2.  This is |
| 11:08 | 25 | dated April 8, 2010. |

| | | |
|---|---|---|
| 11:08 | 1 | THE WITNESS:  I'm sorry. |
| 11:08 | 2 | MS. KELLER:  516, line 21, to 517, line 2. |
| 11:08 | 3 | THE WITNESS:  Yes, uh-huh. |
| | 4 | BY MS. KELLER: |
| 11:08 | 5 | Q.   So you would not have expected that information in this |
| 11:08 | 6 | e-mail to be there, would you? |
| 11:08 | 7 | A.   No.  As I said, I didn't expect it to be there. |
| 11:08 | 8 | Q.   And that's because you saw something wrong with her |
| 11:08 | 9 | seeking out Toys R Us's sales projections for the MGA |
| 11:08 | 10 | products at this point in time, right? |
| 11:08 | 11 | MR. QUINN:  Assumes facts. |
| 11:08 | 12 | THE COURT:  Overruled. |
| 11:08 | 13 | THE WITNESS:  I don't know that she sought it out. |
| 11:09 | 14 | It appears the buyer gave that information. |
| 11:09 | 15 | MS. KELLER:  I would object and move to strike. |
| 11:09 | 16 | The answer is nonresponsive. |
| 11:09 | 17 | THE COURT:  The answer remains.  You can reask the |
| 11:09 | 18 | question. |
| 11:09 | 19 | BY MS. KELLER: |
| 11:09 | 20 | Q.   Did you see anything wrong with her seeking out Toys R |
| 11:09 | 21 | Us's sales projections for the MGA products? |
| 11:09 | 22 | MR. QUINN:  Same objection. |
| 11:09 | 23 | THE COURT:  Overruled. |
| 11:09 | 24 | THE WITNESS:  I don't know that she sought it out. |
| 11:09 | 25 | Again, I think she may have got it from the buyer. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:09 | 1 | MS. KELLER: Your Honor, I would ask to read from |
| 11:09 | 2 | page 516, lines 21 through 25, through 517, 1 and 2. |
| 11:09 | 3 | THE COURT: You may. |
| 11:09 | 4 | MS. KELLER: (Reading:) |
| 11:09 | 5 | "QUESTION: Do you see anything wrong with her |
| 11:09 | 6 | seeking out Toys R Us sales projections for the MGA |
| 11:09 | 7 | products? |
| 11:09 | 8 | "ANSWER: Yeah, I'm -- I would not have expected |
| 11:09 | 9 | that information to be there." |
| 11:09 | 10 | MR. QUINN: Your Honor, may we read to the bottom |
| 11:09 | 11 | of page 517? |
| 11:10 | 12 | MS. KELLER: Your Honor, I would ask that that be |
| 11:10 | 13 | done on cross. |
| 11:10 | 14 | MR. QUINN: That's fine, Your Honor. |
| 11:10 | 15 | THE COURT: All right. |
| 11:59 | 16 | BY MS. KELLER: |
| 11:10 | 17 | Q. Now, let's turn to Exhibit 7790. |
| 11:10 | 18 | *(Document provided to the witness.)* |
| 11:10 | 19 | BY MS. KELLER: |
| 11:10 | 20 | Q. Do you recognize at the bottom of the page an e-mail |
| 11:10 | 21 | from you to Mr. Bousquette and Mr. Zablow entitled, "Bratz |
| 11:10 | 22 | info, dated February 2nd, 2004"? |
| 11:10 | 23 | A. Yes, I do. |
| 11:10 | 24 | MS. KELLER: I'd move 7790 into evidence, |
| 11:10 | 25 | Your Honor. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:10 | 1 | THE COURT:  Received. |
| 11:10 | 2 | *(Exhibit No. 7790 received in evidence.)* |
| 11:10 | 3 | *(Document displayed.)* |
| 11:59 | 4 | BY MS. KELLER: |
| 11:10 | 5 | Q.   And your e-mail is forwarding information on Bratz that |
| 11:10 | 6 | you got from a Steve Totzke? |
| 11:10 | 7 | A.   Yes.  Uh-huh. |
| 11:10 | 8 | Q.   You're forwarding Mr. Totzke's information on to your |
| 11:11 | 9 | boss, Mr. Bousquette, to Milt Zablow, Cassidy Park, Russell |
| 11:11 | 10 | Arons, and Richard Dickson, right? |
| 11:11 | 11 | A.   Yes. |
| 11:11 | 12 | Q.   And in addition to Mr. Bousquette being president of |
| 11:11 | 13 | Mattel brands, Mr. Zablow was head of sales, true? |
| 11:11 | 14 | A.   Yes. |
| 11:11 | 15 | Q.   Ms. Park was head of design? |
| 11:11 | 16 | A.   Yes. |
| 11:11 | 17 | Q.   Ms. Arons was head of Barbie marketing? |
| 11:11 | 18 | A.   Yes. |
| 11:11 | 19 | Q.   And Mr. Dickson was head of Barbie licensing? |
| 11:11 | 20 | A.   Yes. |
| 11:11 | 21 | Q.   And your e-mail reports that you had gone through mail |
| 11:11 | 22 | this weekend, "saw notes from Steve Totzke in Canada re |
| 11:11 | 23 | Bratz '04." |
| 11:11 | 24 | Now, you sent this because you wanted all these people |
| 11:11 | 25 | to know what MGA product was about to be in the marketplace, |

| | | |
|---|---|---|
| 11:11 | 1 | right? |
| 11:11 | 2 | A.   Yeah.  I recall I was reporting on information he'd |
| 11:11 | 3 | gotten, I think, from -- |
| 11:11 | 4 | Q.   Did you send it to the people you sent it to because |
| 11:11 | 5 | you wanted them to know what product from MGA was about to |
| 11:12 | 6 | be in the marketplace?  Is that the reason you sent it to |
| 11:12 | 7 | them? |
| 11:12 | 8 | A.   Yes.  Uh-huh. |
| 11:12 | 9 | Q.   And assume that, like Mattel, MGA had a sign-up about |
| 11:12 | 10 | nondisclosure for retailers and required people to make |
| 11:12 | 11 | appointments to get into private showrooms.  Have you got |
| 11:12 | 12 | that assumption in mind? |
| 11:12 | 13 |        MR. QUINN:  This is gonna be speculation on a -- |
| 11:12 | 14 | as to -- there will be evidence, Your Honor. |
| 11:12 | 15 |        THE COURT:  Just a moment. |
| 11:12 | 16 |        MR. QUINN:  Assumption is contrary to the |
| 11:12 | 17 | evidence. |
| 11:12 | 18 |        THE COURT:  Just a moment. |
| 11:59 | 19 | BY MS. KELLER: |
| 11:12 | 20 | Q.   Have you got that assumption in mind? |
| 11:12 | 21 |        THE COURT:  Counsel, just a moment. |
| 11:12 | 22 |        Overruled.  You can answer that question. |
| 11:12 | 23 | BY MS. KELLER: |
| 11:12 | 24 | Q.   Got that assumption in mind, Mr. Kilpin? |
| 11:12 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:12 | 1 | Q.   And I notice you reading your deposition testimony, or |
| 11:12 | 2 | are you reading the exhibit? |
| 11:12 | 3 | A.   No, I'm reading the exhibit. |
| 11:13 | 4 | Q.   So having that assumption in mind, then, you would be |
| 11:13 | 5 | concerned that Steve Totzke obtained this information and |
| 11:13 | 6 | circulated it within Mattel, right? |
| 11:13 | 7 | A.   Am I -- what I don't know is where he ultimately got |
| 11:13 | 8 | it. |
| 11:13 | 9 | Q.   Well, does it cause you concern that he somehow |
| 11:13 | 10 | obtained this information and circulated it within Mattel? |
| 11:13 | 11 | That cause you any concern? |
| 11:13 | 12 | A.   Well, my expectation is -- |
| 11:13 | 13 | Q.   Sir, does that cause you any concern? |
| 11:13 | 14 | MR. QUINN:  Under the -- we're still assuming, |
| 11:13 | 15 | Your Honor, the assumption? |
| 11:13 | 16 | THE COURT:  You understand the hypothetical? |
| 11:13 | 17 | THE WITNESS:  Yes, I do. |
| 11:13 | 18 | THE COURT:  Answer the question, please. |
| 11:13 | 19 | THE WITNESS:  Under that assumption, that would be |
| 11:13 | 20 | a concern. |
| 11:13 | 21 | BY MS. KELLER: |
| 11:13 | 22 | Q.   And so you inquired, then, of Mr.-- of Mr. Totzke, |
| 11:13 | 23 | didn't you, "Where did you get this info?" |
| 11:13 | 24 | A.   I have inquired. |
| 11:13 | 25 | Q.   When did you inquire? |

| | | |
|---|---|---|
| 11:14 | 1 | A.    In -- preparation. |
| 11:14 | 2 | Q.    You only inquired of him where he got that in |
| 11:14 | 3 | preparation for testifying here? |
| 11:14 | 4 | A.    Yes, that's correct. |
| 11:14 | 5 | Q.    So you never asked him at the time? |
| 11:14 | 6 | A.    No, I don't recall that I did. |
| 11:14 | 7 | Q.    You just took the information and used it, right? |
| 11:14 | 8 | A.    Again, I expected that he got it from talking to people |
| 11:14 | 9 | at shows. |
| 11:14 | 10 | Q.    Sir, you didn't care where he got it, did you?  You |
| 11:14 | 11 | really didn't care, right? |
| 11:14 | 12 | A.    No, that's not true. |
| 11:14 | 13 | Q.    And you didn't care, so you didn't ask him, right? |
| 11:14 | 14 | A.    No, that's not true. |
| 11:14 | 15 | Q.    If you cared, if you were concerned at the time as you |
| 11:14 | 16 | are now, you would have asked him. |
| 11:14 | 17 | MR. QUINN:  Assumes facts not in evidence. |
| 11:14 | 18 | THE COURT:  Sustained. |
| 11:14 | 19 | MR. QUINN:  Move to strike. |
| 11:14 | 20 | THE COURT:  Stricken "as you are now." |
| 11:14 | 21 | BY MS. KELLER: |
| 11:14 | 22 | Q.    You didn't care whether he got the information |
| 11:14 | 23 | ethically, unethically, legally, illegally at the time, |
| 11:14 | 24 | right? |
| 11:14 | 25 | A.    I would have cared about that. |

| | | |
|---|---|---|
| 11:14 | 1 | Q.   The only reason you care now is because you don't want |
| 11:15 | 2 | to look bad in your testimony, right? |
| 11:15 | 3 | MR. QUINN:  This is just argument, Your Honor. |
| 11:15 | 4 | THE COURT:  Sustained. |
| 11:15 | 5 | MR. QUINN:  Move to strike. |
| 11:15 | 6 | THE COURT:  Stricken. |
| 11:15 | 7 | BY MS. KELLER: |
| 11:15 | 8 | Q.   Now, let's look at the substance of what you're |
| 11:15 | 9 | reporting here or forwarding on.  Spring themes are |
| 11:15 | 10 | Sun-Kissed Summer and Girls Nite Out!, basic list price same |
| 11:15 | 11 | as 1095 *(sic)*.  Now, that advance information allows Mattel |
| 11:15 | 12 | to get ready to launch a counterproduct and compete with it |
| 11:15 | 13 | on price, right? |
| 11:15 | 14 | MR. QUINN:  Assumes facts not in evidence. |
| 11:15 | 15 | THE COURT:  Overruled. |
| 11:15 | 16 | THE WITNESS:  These were products that were |
| 11:15 | 17 | probably shipping at that time. |
| 11:15 | 18 | BY MS. KELLER: |
| 11:15 | 19 | Q.   Sir, this information was valuable to Mattel, which is |
| 11:15 | 20 | why you forwarded it, right? |
| 11:16 | 21 | A.   It's always good for us to understand what's coming |
| 11:16 | 22 | from a retailer -- or from a competitor. |
| 11:16 | 23 | Q.   Here's my question:  It was valuable to Mattel.  That's |
| 11:16 | 24 | why you forwarded it, right? |
| 11:16 | 25 | A.   It was good to know. |

| | | |
|---|---|---|
| 11:16 | 1 | Q.   It was valuable, right? |
| 11:16 | 2 | A.   It wasn't anything we were gonna do anything with, |
| 11:16 | 3 | given the fact that this was gonna be in the market at that |
| 11:16 | 4 | time. |
| 11:16 | 5 | Q.   You're sending this to the president of Mattel brands. |
| 11:16 | 6 | It was valuable information, wasn't it? |
| 11:16 | 7 | A.   It's always good to know what competitors are doing. |
| 11:16 | 8 | Q.   Is there a problem with the term "valuable"? |
| 11:16 | 9 | A.   No. |
| 11:16 | 10 | Q.   It was valuable information, wasn't it? |
| 11:16 | 11 | A.   Uh, yes, in terms of competitors, yes. |
| 11:16 | 12 | Q.   And the next one, "new versions of Winter Wonderland |
| 11:16 | 13 | coming for fall.  Russell had this confirmed by buyers last |
| 11:16 | 14 | week." |
| 11:16 | 15 | So the information that had been obtained, Russell had |
| 11:16 | 16 | gone out and contacted buyers to see if it could be |
| 11:17 | 17 | confirmed, right? |
| 11:17 | 18 | A.   Well, that -- you're assuming that Russell contacted |
| 11:17 | 19 | buyers, and we don't know that.  She -- someone told her. |
| 11:17 | 20 | Q.   "Russell had this confirmed by buyers last week."  And |
| 11:17 | 21 | then conveyed that to you, right? |
| 11:17 | 22 | A.   Yeah.  What happens during this timeframe is -- |
| 11:17 | 23 | Q.   Sir, did Russell then convey that to you? |
| 11:17 | 24 | A.   She did, but you're assuming that she contacted buyers, |
| 11:17 | 25 | and that may not be the case. |

| | | |
|---|---|---|
| 11:17 | 1 | Q.   "Fall '04 themes.  Nighty Nite, Flashback Funk, 70s |
| 11:17 | 2 | Retro Style, and Tokyo-A-Go-Go, crazy Japanese styles."  And |
| 11:17 | 3 | then you go on to talk about, "Per Steve, they are also |
| 11:17 | 4 | pushing aggressively into all licensing categories including |
| 11:17 | 5 | pillows, trading cards, scooters, chairs/home furnishings, |
| 11:17 | 6 | skateboards and stationery." |
| 11:17 | 7 | This information also was valuable to Mattel, right? |
| 11:17 | 8 | A.   It was good to know what they were doing, yes. |
| 11:18 | 9 | Q.   It was valuable to Mattel, wasn't it? |
| 11:18 | 10 | A.   Yes. |
| 11:18 | 11 | Q.   Now, let's look at Exhibit 7795. |
| 11:18 | 12 | *(Document provided to the witness.)* |
| 11:18 | 13 | BY MS. KELLER: |
| 11:18 | 14 | Q.   This is an e-mail chain, the last e-mail of which is |
| 11:18 | 15 | from Steve Totzke, same person we were just talking about, |
| 11:18 | 16 | dated January 15, 2004, correct? |
| 11:18 | 17 | A.   Yes.  Uh-huh. |
| 11:18 | 18 | MS. KELLER:  Move that into evidence, Your Honor. |
| 11:18 | 19 | THE COURT:  Received. |
| 11:18 | 20 | *(Exhibit No. 7795 received in evidence.)* |
| 11:18 | 21 | *(Document displayed.)* |
| 11:18 | 22 | BY MS. KELLER: |
| 11:18 | 23 | Q.   And you see at the top, in handwriting on the right, it |
| 11:18 | 24 | says, "Confidential, Kilpin" check mark, "Arons, Bossick." |
| 11:18 | 25 | And Arons is Russell Arons, who we were just talking about, |

CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

117

| | | |
|---|---|---|
| 11:18 | 1 | right? |
| 11:18 | 2 | A.    Yes.  Uh-huh. |
| 11:18 | 3 | Q.    And who's Bossick? |
| 11:18 | 4 | A.    Jerry Bossick. |
| 11:18 | 5 | Q.    And what was Jerry Bossick's title? |
| 11:19 | 6 | A.    At that time I don't recall. |
| 11:19 | 7 | Q.    Now, this is the e-mail that you were referring to in |
| 11:19 | 8 | Exhibit 7790, when you wrote that -- your e-mail -- that you |
| 11:19 | 9 | had gone through your e-mail that weekend and saw notes from |
| 11:19 | 10 | Steve Totzke about Canada re Bratz '04 products and themes, |
| 11:19 | 11 | right? |
| 11:19 | 12 | A.    Uh, yes, uh-huh. |
| 11:19 | 13 | Q.    And there's a check mark to the right of your name |
| 11:19 | 14 | that's written in up here, and that's because you received |
| 11:19 | 15 | this, correct? |
| 11:19 | 16 | A.    Uh, yes uh-huh. |
| 11:19 | 17 | Q.    And you refer to that in your own e-mail, February 2nd, |
| 11:19 | 18 | 2004, Exhibit 7790, where you write, "Guys, below some info |
| 11:20 | 19 | from HK show on our friends.  I leave to your discretion |
| 11:20 | 20 | who/how you share"; is that right? |
| 11:20 | 21 | A.    Yes.  Uh-huh. |
| 11:20 | 22 |          MS. KELLER:  And let's see that part. |
| 11:20 | 23 |          *(Technician complies.)* |
| 11:20 | 24 | BY MS. KELLER: |
| 11:20 | 25 | Q.    "Guys, below some info from HK show on our friends.  I |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

118

| 11:20 | 1 | leave to your discretion who/how you share, Steve." |
| 11:20 | 2 | Leaving it to your discretion meant that you might not |
| 11:20 | 3 | want to let everybody know that you had that information, |
| 11:20 | 4 | right? |
| 11:20 | 5 | A.   Yeah, I don't know -- I don't know what he meant by |
| 11:20 | 6 | that, but, yes. |
| 11:20 | 7 | Q.   Well, you might only -- you might only want to let |
| 11:20 | 8 | people know who you thought could be trusted to know that |
| 11:20 | 9 | you had some confidential information that you weren't |
| 11:20 | 10 | supposed to have, right? |
| 11:20 | 11 | A.   Yeah, I don't know what he meant by that. |
| 11:20 | 12 | Q.   Did you ask him at the time? -- not in preparation for |
| 11:21 | 13 | trial. |
| 11:21 | 14 | A.   No, I did not. |
| 11:21 | 15 | Q.   I mean, did you -- did you find yourself thinking, |
| 11:21 | 16 | gosh, this stuff about "I leave to your discretion who/how |
| 11:21 | 17 | you share," that sounds a little fishy?  Maybe I should of |
| 11:21 | 18 | inquire? |
| 11:21 | 19 | A.   In my view of this information is that it was |
| 11:21 | 20 | information that was out in the market because the product |
| 11:21 | 21 | was coming. |
| 11:21 | 22 | Q.   And in preparation for your 30(b)(6) deposition, |
| 11:21 | 23 | June 30th, 2010, you actually asked Mr. Totzke where he got |
| 11:21 | 24 | the information, right? |
| 11:21 | 25 | A.   Uh, I did. |

| | | |
|---|---|---|
| 11:21 | 1 | Q.   I'm sorry, what was that? |
| 11:21 | 2 | A.   I did. |
| 11:21 | 3 | Q.   And Mattel's -- as Mattel's corporate representative, |
| 11:21 | 4 | is it your position that Mattel doesn't know where the |
| 11:21 | 5 | information came from? |
| 11:22 | 6 | A.   Steve didn't recall. |
| 11:22 | 7 | Q.   So as Mattel's corporate representative, is it Mattel's |
| 11:22 | 8 | position that Mr. Totzke just doesn't know where he got that |
| 11:22 | 9 | information? |
| 11:22 | 10 | A.   That's correct. |
| 11:22 | 11 | Q.   So it's a dead end for us, then, as to where it came |
| 11:22 | 12 | from, right? |
| 11:22 | 13 | A.   Steve didn't recall. |
| 11:22 | 14 | Q.   But if you look at 7790, it says, "from HK show on our |
| 11:22 | 15 | friends."  Okay?  HK show you know to mean Hong Kong toy |
| 11:22 | 16 | show, right? |
| 11:22 | 17 | A.   I'm sorry, you're looking at which document? |
| 11:22 | 18 | Q.   I'm looking at 7790 -- 7795, I'm sorry.  Okay.  Are you |
| 11:23 | 19 | looking at 7795? |
| 11:23 | 20 | A.   Yes.  Uh-huh. |
| 11:23 | 21 | Q.   So here it says -- and this is dated January 15, 2004, |
| 11:23 | 22 | from Steve Totzke, "Guys, below some info from HK show on |
| 11:23 | 23 | our friends."  So he's telling you where he got the |
| 11:23 | 24 | information, right? |
| 11:23 | 25 | A.   Uh, yes.  And I asked him if he remembered any more |

| | | |
|---|---|---|
| 11:23 | 1 | about that, and he didn't. |
| 11:23 | 2 | Q.   He's telling you in this e-mail that he got it at the |
| 11:23 | 3 | Hong Kong toy show, right? |
| 11:23 | 4 | A.   Right.  And he may have gotten it from talking to |
| 11:23 | 5 | buyers -- |
| 11:23 | 6 | Q.   Sir, sir.  It says "from HK toy show," right?  And you |
| 11:23 | 7 | know that to mean Hong Kong toy show, true? |
| 11:23 | 8 | A.   Yes. |
| 11:23 | 9 | Q.   And it says, "on our friends," and you know that's a |
| 11:23 | 10 | code word for MGA, right? |
| 11:23 | 11 | A.   It's information about MGA, yes. |
| 11:23 | 12 | Q.   "Our friends" was MGA, right? |
| 11:23 | 13 | A.   Yes. |
| 11:23 | 14 | Q.   "And I leave to your decision who/how you share," that |
| 11:24 | 15 | indicated to you that that was information that the writer |
| 11:24 | 16 | knew he shouldn't have, right? |
| 11:24 | 17 | A.   And again, I don't know what he meant by it. |
| 11:24 | 18 | Q.   And you don't know what he meant by it because he's had |
| 11:24 | 19 | failure of memory about how he came into the information, |
| 11:24 | 20 | right? |
| 11:24 | 21 | A.   You know, I asked him and he didn't recall. |
| 11:24 | 22 | Q.   And then it lists all the information that you gave in |
| 11:24 | 23 | your e-mail, Exhibit 7790, right? |
| 11:24 | 24 | A.   Hang on a second.  Uh, yes.  Uh-huh. |
| 11:24 | 25 | Q.   And you didn't forward this e-mail, 7795, to Mr. Eckert |

| | | |
|---|---|---|
| 11:24 | 1 | or Mr. Bousquette or any of the other higher-ups 'cause you |
| 11:25 | 2 | didn't want a paper trail that they had gotten it, right? |
| 11:25 | 3 | A.   No, I don't -- I wasn't thinking about it that way. |
| 11:25 | 4 | Q.   Well, you rewrote it all in an e-mail of your own, |
| 11:25 | 5 | right? |
| 11:25 | 6 | A.   Uh, yes, I did. |
| 11:25 | 7 | Q.   If there was nothing shady about it -- it would have |
| 11:25 | 8 | been easy to just forward it, wasn't it -- wouldn't it? |
| 11:25 | 9 | MR. QUINN:  It's argumentative, Your Honor. |
| 11:25 | 10 | THE COURT:  Overruled -- well, "shady."  But you |
| 11:25 | 11 | can ask the question, Counsel.  Just rephrase it. |
| 11:25 | 12 | BY MS. KELLER: |
| 11:25 | 13 | Q.   If there was nothing underhanded about it, you could |
| 11:25 | 14 | have just forwarded the e-mail to Mr. Eckert, |
| 11:25 | 15 | Mr. Bousquette, anybody else you wanted to have it, right? |
| 11:25 | 16 | A.   I didn't get this, I don't believe, in an e-mail form. |
| 11:25 | 17 | I got it in written form.  What I normally do, I'll make a |
| 11:25 | 18 | note or I'll send a note.  That's what I did. |
| 11:25 | 19 | Q.   Did you ask anybody -- when you got 7795 with |
| 11:25 | 20 | "confidential" and "Kilpin" written on it, did you ask |
| 11:26 | 21 | anybody, "How come this is being hand-carried to me as a |
| 11:26 | 22 | printout, rather than forwarded to me?" |
| 11:26 | 23 | A.   No, I don't recall how it came to me. |
| 11:26 | 24 | Q.   Well, it says, "Confidential, Kilpin, Arons, Bossick, |
| 11:26 | 25 | right?  Yes? |

| 11:26 | 1 | A. Yes. Uh-huh. |
| 11:26 | 2 | Q. I think you just told us it wasn't e-mailed to you. |
| 11:26 | 3 | You got a hard copy of it, right? |
| 11:26 | 4 | A. Yeah. It appears that way, yeah. |
| 11:26 | 5 | Q. And you knew that the reason that you didn't get it |
| 11:26 | 6 | forwarded to you is that Mr. Totzke didn't want a paper |
| 11:26 | 7 | trail of higher-ups at Mattel getting it, right? |
| 11:26 | 8 | A. And I don't know that. |
| 11:26 | 9 | Q. Well, and that's why it says, "I leave to your |
| 11:26 | 10 | discretion who/how you share," right? |
| 11:26 | 11 | A. Yeah. Again, I don't know what he meant by that |
| 11:26 | 12 | specifically, but... |
| 11:26 | 13 | Q. Well, when your people got information they weren't |
| 11:26 | 14 | supposed to have, whether from sneaking into private |
| 11:27 | 15 | showrooms with fake credentials or any other way, you didn't |
| 11:27 | 16 | want it forwarded to executives in the company, did you? |
| 11:27 | 17 | MR. QUINN: Your Honor, that's argument. Assumes |
| 11:27 | 18 | facts. |
| 11:27 | 19 | THE COURT: Overruled. |
| 11:27 | 20 | THE WITNESS: You're assuming that's how this came |
| 11:27 | 21 | to be, and we don't know that. |
| 11:59 | 22 | BY MS. KELLER: |
| 11:27 | 23 | Q. And you don't know it 'cause you've never asked, right? |
| 11:27 | 24 | A. And I have asked. |
| 11:27 | 25 | Q. Do you deny that Mattel had a market intelligence |

| 11:27 | 1 | department while you were there? |
|---|---|---|
| 11:27 | 2 | A.   I'm aware of consumer insights department. |
| 11:27 | 3 | Q.   Not aware of a market intelligence department? |
| 11:27 | 4 | THE COURT:  Is that a question?  Ask a question. |
| 11:27 | 5 | BY MS. KELLER: |
| 11:27 | 6 | Q.   Even today, are you unaware of the fact that Mattel had |
| 11:27 | 7 | a market intelligence department? |
| 11:27 | 8 | A.   Well, I saw in one of my depositions a document from |
| 11:27 | 9 | them. |
| 11:27 | 10 | Q.   Are you telling us that you have no personal knowledge |
| 11:27 | 11 | that Mattel had a market intelligence department? |
| 11:28 | 12 | A.   No.  What I'm saying is I saw a document from that |
| 11:28 | 13 | group. |
| 11:28 | 14 | Q.   I'm asking about personal knowledge. |
| 11:28 | 15 | Let's say at the time you got this document back in |
| 11:28 | 16 | January of 2004.  Okay?  Are you telling us that in |
| 11:28 | 17 | January 2004 you had no idea that Mattel had a market |
| 11:28 | 18 | intelligence department? |
| 11:28 | 19 | A.   You know, I'm not remembering one that was separate |
| 11:28 | 20 | from the research group. |
| 11:28 | 21 | Q.   Are you telling us you never heard of a separate group |
| 11:28 | 22 | called the "market intelligence department"? |
| 11:28 | 23 | A.   And I'm telling you I was aware of that when I saw the |
| 11:28 | 24 | document in deposition. |
| 11:28 | 25 | Q.   But not before? |

| | | |
|---|---|---|
| 11:28 | 1 | A.    No.   I thought it was part of the research. |
| 11:28 | 2 | Q.    Let's look at Exhibit -- you know who a gentleman named |
| 11:29 | 3 | Sal Villasenor is? |
| 11:29 | 4 | A.    I know who he is, yes. |
| 11:29 | 5 | Q.    He was actually the manager of market intelligence, |
| 11:29 | 6 | right? |
| 11:29 | 7 | A.    I believe that was his title, yeah. |
| 11:29 | 8 | Q.    You actually got reports from him, didn't you? |
| 11:29 | 9 | A.    Until you sent the documents over today, I wasn't aware |
| 11:29 | 10 | that I had. |
| 11:29 | 11 | Q.    Let's look at Exhibit 9284, dated February 11, 2004, |
| 11:29 | 12 | from Stephanie Page, copy to you, Matt Bousquette, and |
| 11:29 | 13 | various others, Sujata Luther.  Do you recognize this |
| 11:29 | 14 | document? |
| 11:29 | 15 | A.    Uh, yes, from -- from today. |
| 11:29 | 16 |           MR. QUINN:  Your Honor, these were not in binders. |
| 11:29 | 17 | Apparently, were delivered this morning. |
| 11:29 | 18 |           THE COURT:  All right.  Thank you. |
| 11:29 | 19 |           MS. KELLER:  Your Honor, I would move 9284 into |
| 11:29 | 20 | evidence. |
| 11:29 | 21 |           THE COURT:  Received. |
| 11:29 | 22 |           (Exhibit No. 9284 received in evidence.) |
| 11:29 | 23 |           THE COURT:  I assume that these have a Mattel |
| 11:29 | 24 | stamp on them. |
| 11:29 | 25 |           MS. KELLER:  They do. |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 125 of 133   Page ID #:310675
CV 04-9049 DOC – 3/18/2011 – Day 36, Volume 1 of 3

125

| | | |
|---|---|---|
| 11:30 | 1 | THE COURT:  Received. |
| 11:30 | 2 | *(Document displayed.)* |
| 11:30 | 3 | BY MS. KELLER: |
| 11:30 | 4 | Q.   This is an e-mail from a Stephanie Page, sent |
| 11:30 | 5 | Wednesday, February 11, 2004.  Copies:  Matt Bousquette, |
| 11:30 | 6 | Drew Vollero, Matthew Turetzky, Sujata Luther, Tim Kilpin. |
| 11:30 | 7 | Subject:  Beyond the numbers, MGA entertainment update.  And |
| 11:30 | 8 | it says, "Mattel Market Intelligence Department," in bold |
| 11:30 | 9 | letters, larger than the text in the document. |
| 11:30 | 10 | Now -- |
| 11:30 | 11 | THE COURT:  Is that a question? |
| 11:30 | 12 | MS. KELLER:  I was about to ask, Your Honor. |
| 11:30 | 13 | THE COURT:  Ask the question. |
| 11:30 | 14 | BY MS. KELLER: |
| 11:30 | 15 | Q.   You received this document, did you not? |
| 11:30 | 16 | A.   I didn't remember receiving it.  I saw it today. |
| 11:30 | 17 | BY MS. KELLER: |
| 11:30 | 18 | Q.   This, "Beyond the numbers," says, "It provides a look |
| 11:31 | 19 | at the specific trend or issue in the marketplace relating |
| 11:31 | 20 | to current news and today's youth.  This issue discusses |
| 11:31 | 21 | some of MGA Entertainment's key drivers for 2004 products |
| 11:31 | 22 | discussed." |
| 11:31 | 23 | And it goes on to go through Bratz's 2004 products, |
| 11:31 | 24 | correct? |
| 11:31 | 25 | A.   Uh, yes. |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

126

| | | |
|---|---|---|
| 11:31 | 1 | Q.   Sun-Kissed Summer, same one we've just seen in your |
| 11:31 | 2 | e-mail with Mr. Totzke, right? |
| 11:31 | 3 | A.   Uh, yes, uh-huh. |
| 11:31 | 4 | Q.   Girls Nite Out!, Wild Life Safari collection, Bratz |
| 11:31 | 5 | Petz, 4Ever Best Friends, Alien Racers.  And i is says, |
| 11:31 | 6 | "Beyond the number is another example of our continuing |
| 11:31 | 7 | effort to catch the trends and stay on top of," quote, |
| 11:31 | 8 | "'what's hot,'" unquote, "and popular with kids, tweens, |
| 11:32 | 9 | teens, adults." |
| 11:32 | 10 | And it says, "If you have any questions, comments, or |
| 11:32 | 11 | suggestions to contact Sal Villasenor or Steph Page." |
| 11:32 | 12 | And then the next couple of pages, again, all deal with |
| 11:32 | 13 | Bratz products. |
| 11:32 | 14 | *(Document displayed.)* |
| 11:32 | 15 | BY MS. KELLER: |
| 11:32 | 16 | Q.   MGA products, right? |
| 11:32 | 17 | A.   Yeah.  This looks like a copy of the press release from |
| 11:32 | 18 | toy fair from MGA. |
| 11:32 | 19 | Q.   Let's go back -- let's go to Exhibit 9288. |
| 11:32 | 20 | *(Document provided to the witness.)* |
| 11:59 | 21 | BY MS. KELLER: |
| 11:32 | 22 | Q.   Is this a June 1st, 2004, document headed "Market |
| 11:32 | 23 | Intelligence Department," copied, among others, to you, Matt |
| 11:32 | 24 | Bousquette, Drew Vollero, Matt Turetzky, Sujata Luther, and, |
| 11:32 | 25 | quote, "Distribution"? |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

127

| 11:32 | 1 | A.    Uh, yes, it is. |
| 11:32 | 2 | MS. KELLER:  Your Honor, I'd move 9288 into |
| 11:32 | 3 | evidence. |
| 11:33 | 4 | THE COURT:  Received. |
| 11:33 | 5 | *(Exhibit No. 9288 received in evidence.)* |
| 11:33 | 6 | *(Document displayed.)* |
| 11:33 | 7 | BY MS. KELLER: |
| 11:33 | 8 | Q.    And, sir, is it your testimony that you don't remember |
| 11:33 | 9 | ever getting this document either? |
| 11:33 | 10 | A.    I don't. |
| 11:33 | 11 | Q.    In fact, you don't remember ever even knowing at the |
| 11:33 | 12 | time that there was such a thing as a market intelligence |
| 11:33 | 13 | department, right? |
| 11:33 | 14 | A.    Well, as I said, I thought it was part of our research |
| 11:33 | 15 | group. |
| 11:33 | 16 | Q.    So you never noticed the heading "Market Intelligence |
| 11:33 | 17 | Department," right? |
| 11:33 | 18 | A.    Well, as I said, I don't remember getting the document. |
| 11:33 | 19 | Q.    My question is this:  Is it still your testimony that |
| 11:33 | 20 | you don't recall ever even knowing that there was such a |
| 11:33 | 21 | thing as a market intelligence department? |
| 11:33 | 22 | A.    Well, I -- in the conversations we've had in |
| 11:33 | 23 | preparation, I've heard about it, but before that, I didn't |
| 11:33 | 24 | know. |
| 11:33 | 25 | Q.    Is it your testimony that in June of 2004, you did not |

| | | |
|---|---|---|
| 11:33 | 1 | know that this market intelligence department within Mattel |
| 11:33 | 2 | existed?  Is that your testimony? |
| 11:34 | 3 | A.   I didn't -- I thought it was part of research. |
| 11:34 | 4 | Q.   Is it your testimony you didn't know that there was |
| 11:34 | 5 | such a department as market intelligence, yes or no? |
| 11:34 | 6 | A.   Yes, as a separate department, I didn't know. |
| 11:34 | 7 | Q.   And so you got these market intelligence department |
| 11:34 | 8 | reports on a regular basis, didn't you? |
| 11:34 | 9 | A.   I'm not remembering these documents. |
| 11:34 | 10 | THE COURT:  Restroom break.  Why don't we just go |
| 11:34 | 11 | to lunch at this time, Counsel.  The jury needs a restroom |
| 11:34 | 12 | break. |
| 11:34 | 13 | Why don't we take an hour.  Can we reconvene at |
| 11:34 | 14 | 12:30?  At 12:30, is that okay?  You're admonished not to |
| 11:34 | 15 | discuss this matter amongst yourself, nor form or express |
| 11:34 | 16 | any opinion concerning this case. |
| 11:34 | 17 | We'll see you at 12:30. |
| 11:34 | 18 | Have a nice lunch. |
| 11:34 | 19 | *(Jury recesses for lunch at 11:34 a.m.)* |
| 11:35 | 20 | THE COURT:  All right.  Sir, you may step down. |
| 11:35 | 21 | THE WITNESS:  Thank you. |
| 11:35 | 22 | *(Witness steps down.)* |
| 11:35 | 23 | *(Outside the presence of the jury.)* |
| 11:35 | 24 | THE COURT:  Outside the presence of the jury. |
| 11:35 | 25 | All right.  Counsel, concerning this registration, |

DEBBIE GALE, U.S. COURT REPORTER

| 11:35 | 1 | I'm not receiving it at this time, but I'm going to go back |
| 11:35 | 2 | over the record with lead counsel.  I can do that this |
| 11:35 | 3 | evening, or I can do that now.  Your choice. |
| 11:35 | 4 | MS. KELLER:  We're -- |
| 11:35 | 5 | THE COURT:  The only counsel I'm going to be |
| 11:35 | 6 | dealing with are Mr. Quinn and Ms. Keller. |
| 11:35 | 7 | MR. QUINN:  I'd rather do it now, Your Honor. |
| 11:35 | 8 | THE COURT:  Okay.  Dig out the record, then, and |
| 11:35 | 9 | let's look at the record. |
| 11:35 | 10 | Everybody else is excused.  Have a nice lunch. |
| 11:35 | 11 | MS. KELLER:  I may need somebody to help me locate |
| 11:35 | 12 | it.  Yes, I have it, Your Honor. |
| 11:35 | 13 | THE COURT:  I've got the registration here, and I |
| 11:35 | 14 | want to see the registrations that were referred to that |
| 11:35 | 15 | Mattel's concerned about so I have a complete record and I |
| 11:35 | 16 | see how those were used before. |
| 11:35 | 17 | MGA's statements were that registrations came in; |
| 11:35 | 18 | it was quite a while ago.  I want to be cautious.  Right now |
| 11:35 | 19 | I'm concerned that this could give added credibility as |
| 11:35 | 20 | Mr. Quinn's argued and it is only being brought in for that |
| 11:36 | 21 | purpose, not copying.  So have that information for me.  Go |
| 11:36 | 22 | back in the record.  Pull the transcripts.  Let's see what |
| 11:36 | 23 | these registrations are looking at. |
| 11:36 | 24 | MS. KELLER:  Are you talking about deposition |
| 11:36 | 25 | transcripts, Your Honor? |

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 130 of 133   Page ID #:310680
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

130

| | | |
|---|---|---|
| 11:36 | 1 | THE COURT:  No, no, no.  Trial. |
| 11:36 | 2 | MS. KELLER:  Trial transcripts? |
| 11:36 | 3 | THE COURT:  Yeah. |
| 11:36 | 4 | MS. KELLER:  Find what the questions were? |
| 11:36 | 5 | THE COURT:  No.  Find the questions.  Find out -- |
| 11:36 | 6 | you referred back to, "Well, Judge, registrations came in |
| 11:36 | 7 | because..." so, therefore, the inference is we should get |
| 11:36 | 8 | registrations in because...  And I'm a little confused about |
| 11:36 | 9 | that.  I just can't remember, frankly, 'cause now I'm down |
| 11:36 | 10 | to two hours' sleep a night.  So I'm not wasting any more |
| 11:36 | 11 | time.  I'll meet you in half an hour or so. |
| 11:36 | 12 | By the way, I will need all lead counsel this |
| 11:36 | 13 | weekend, and I'll need you at 8:00 o'clock, no exceptions |
| 11:36 | 14 | from this point forward.  And I will only be dealing with |
| 11:36 | 15 | lead counsel.  Ms. Hurst, you're welcome to argue; |
| 11:36 | 16 | Mr. Zeller, you're welcome to argue the motions, but from |
| 11:36 | 17 | now on, lead counsel will be going over the exhibits. |
| 11:37 | 18 | Now, if one of you is participating, like you |
| 11:37 | 19 | were, Mr. Zeller, last night, you're more than welcome. |
| 11:37 | 20 | Ms. Hurst, if you're participating in a particular witness, |
| 11:37 | 21 | you're more than welcome.  So that puts you on notice. |
| 11:37 | 22 | Number two, I'm going to put tremendous stress on |
| 11:37 | 23 | you.  You're going to have to produce a lot of things this |
| 11:37 | 24 | weekend, so have your staff standing by.  I'm sending out |
| 11:37 | 25 | additional orders, and I need about 20 minutes right now. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10246   Filed 03/22/11   Page 131 of 133   Page ID #:310681
CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

131

| | | |
|---|---|---|
| 11:37 | 1 | So I will meet you at what time? |
| 11:37 | 2 | In other words, I'm not wasting any more time on |
| 11:37 | 3 | the record.  You get your records together and you show me |
| 11:37 | 4 | what the registrations are. |
| 11:37 | 5 | MS. KELLER:  The registrations that we propose and |
| 11:37 | 6 | then also the registrations that were put in for Mattel? |
| 11:37 | 7 | THE COURT:  Exactly.  Because your concern is, |
| 11:37 | 8 | "Well, Judge, you allowed the registrations for Mattel." |
| 11:37 | 9 | That's what I'm hearing.  "And that's not fair, because |
| 11:37 | 10 | you're not allowing our registrations."  And I'm looking |
| 11:37 | 11 | back and trying to recall the link, and frankly, I can't. |
| 11:37 | 12 | It's too long ago. |
| 11:37 | 13 | I'm allowing you to get into copying.  The |
| 11:37 | 14 | registration, as Mr. Quinn argues, may give added |
| 11:37 | 15 | credibility, but if I've allowed them before... |
| 11:37 | 16 | So I'm in recess now.  I'll meet you in half an |
| 11:38 | 17 | hour.  Thank you. |
| 11:38 | 18 | MS. KELLER:  Your Honor, I'm going to withdraw it. |
| 11:38 | 19 | I think the Court's right.  We've gotten into copying. |
| 11:38 | 20 | That's all we needed.  We're fine.  That will simplify |
| 11:38 | 21 | things. |
| 11:38 | 22 | THE COURT:  I'll make sure that the jury knows |
| 11:38 | 23 | that they're not coming in. |
| 11:38 | 24 | All right.  I'll see you promptly at 12:30. |
| 11:38 | 25 | MS. KELLER:  Your Honor, just for scheduling, the |

| 11:38 | 1 | Court wants us here 8:00 a.m. Saturday and Sunday? |
| 11:38 | 2 | THE COURT:  Absolutely.  You have a lot of work. |
| 11:38 | 3 | That's lead counsel now. |
| 11:38 | 4 | I'll see you at 12:30. |
| 11:38 | 5 | *(Lunch recess held at 11:38 a.m.)* |
| 11:38 | 6 | *(Further proceeding reported by Deborah* |
| 11:38 | 7 | *Parker in Volume II.)* |
|  | 8 | –oOo– |

CV 04-9049 DOC - 3/18/2011 - Day 36, Volume 1 of 3

133

1                              -oOo-

2

3                           CERTIFICATE

4

5          I hereby certify that pursuant to Section 753,

6     Title 28, United States Code, the foregoing is a true and

7     correct transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12    Date:  March 18, 2011

13

14

15                    _____
                      DEBBIE GALE, U.S. COURT REPORTER
16                    CSR NO. 9472, RPR

17

18

19

20

21

22

23

24

25