**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., ET AL.,                )
                                     )
            PLAINTIFFS,              )
                                     )
        vs.                          ) CV NO. 04-9049-DOC
                                     ) DAY 36
MGA ENTERTAINMENT, INC., ET AL.,     ) VOLUME 2 of 3
                                     )
            DEFENDANTS.              )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

FRIDAY, MARCH 18, 2011

12:39 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**

2

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                           JOHN QUINN
                             WILLIAM PRICE
 4                           MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                           & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                           (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                           (949) 567-6700

13
                             ANNETTE L. HURST
14                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                           (415) 773-5700

17
                             JENNIFER L. KELLER
18                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                           SUITE 560
                             IRVINE, CALIFORNIA 92612
20                           (949) 476-8700

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                          MARK E. OVERLAND
                            LAW OFFICES OF MARK E. OVERLAND
 4                          100 WILSHIRE BOULEVARD
                            SUITE 950
 5                          SANTA MONICA, CALIFORNIA 90401
                            (310) 459-2830
 6

 7                          ALEXANDER H. COTE
                            SCHEPER KIM & HARRIS, LLP
 8                          601 WEST FIFTH STREET
                            12TH FLOOR
 9                          LOS ANGELES, CALIFORNIA 90071
                            (213) 613-4660
10

11
     ALSO PRESENT:
12
                            JEANINE PISONI
13                          MGA ENTERTAINMENT, INC.
                            16360 ROSCOE BOULEVARD
14                          SUITE 105
                            VAN NUYS, CALIFORNIA 91406
15

16                          ROBERT ECKERT, MATTEL CEO
                            ISAAC LARIAN, MGA CEO
17                          KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                            MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                      I N D E X

 2

 3   DEFENDANTS' WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 4    TIMOTHY KILPIN             5      8      69
                                       64      80
 5
      ERICH JOACHIMSTAHLER      86
 6

 7

 8                    E X H I B I T S

 9   PLAINTIFFS' EXHIBITS:            IDENTIFICATION  EVIDENCE

10    8751  LOS ANGELES TIMES ARTICLE                   25

11    8806  TANGIBLE                                     30

12    9350  PRINTOUT                                     11

13    23894 PRESS RELEASE                                20

14    24713 AND 29122 TANGIBLES                          29

15

16                    E X H I B I T S

17   DEFENDANTS' EXHIBITS:            IDENTIFICATION  EVIDENCE

18    9291  E-MAIL                                        5

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1      SANTA ANA, CALIFORNIA; FRIDAY, MARCH 18, 2011; 12:39 P.M.
 2           (The following proceedings were had in open court
 3           in the presence of the jury:)
 4               THE COURT:  We're back in session.
 5               The alternates and jurors are present.  All
 6      parties, the witness.
 7               Ms. Keller, if you will continue on with your
 8      direct examination, please, of Mr. Kilpin.
 9                       DIRECT EXAMINATION
10      BY MS. KELLER:
11      Q.   Mr. Kilpin, would you take a look at Exhibit 9291,
12      please.
13      A.   Yes.
14      Q.   This is an e-mail from Sal Villasenor, dated April 8,
15      2005 to a large number of people, including Matt Bousquette
16      and you; correct?
17      A.   Yes.
18               MS. KELLER:  Your Honor, I would move 9291 into
19      evidence.
20               THE COURT:  Received.
21           (Defendants' Exhibit 9291 received in evidence.)
22      BY MS. KELLER:
23      Q.   And this e-mail begins -- subject says:  DEFCON Alert!
24      MGA/Bratz 2005.
25               And you see in the first paragraph:  DEFCON ALERT.
```

1    DEFCON ALERT.  DEFCON ALERT.

2          What does "DEFCON Alert" mean, sir?

3    A.   I guess he's meaning high alert.

4    Q.   *Below is a new issue of the DEFCON Alert.  The purpose*

5    *of this alert is to notify you of an urgent matter needs*

6    *immediate attention.  It consists of five stages defined as*

7    *follows.*  And it begins:  *The following information is*

8    *currently categorized at:  DEFCON 1.*

9          What did "DEFCON 1" mean?

10   A.   I don't know.  I hadn't seen this until you sent this

11   over today.

12   Q.   So you never got this April 8th, 2005?

13   A.   I don't remember seeing it.

14   Q.   You think you might pay attention to something

15   entitled:  "DEFCON Alert, MGA Bratz"?

16   A.   Well, the information looks like it came from a toy

17   fair website.

18   Q.   Sir, do you think you might pay attention to something

19   that said this is an urgent matter that needs immediate

20   attention?

21   A.   I'm not remembering seeing this.

22   Q.   And what follows is two and a half pages,

23   single-spaced, spelling out all of Bratz's products,

24   upcoming spring and fall; right?

25   A.   Yes.  And this -- this came from a website.

1    Q.   And you know that --

2              Have you researched it now in your role as a

3    corporate representative of Mattel?  Is that what you're

4    telling us?

5    A.   Yeah.  I've seen this information.

6    Q.   You didn't see it at the time, though; right?

7    A.   I'm not remembering this e-mail, no.

8    Q.   And you also likewise don't remember -- you also

9    likewise don't remember there being a market intelligence

10   unit.

11             True?

12   A.   Well, as I said before lunch, I thought they were part

13   of the research group.

14   Q.   Did you know they existed?  Did you know there was a

15   group called market intelligence department?  Yes or no?

16   A.   I was aware of a research group.

17   Q.   Did you know there was a group that existed called

18   market intelligence department?  Yes or no?

19   A.   I didn't remember them as a separate thing.

20   Q.   So the answer is no?

21   A.   No.  I thought it was part of research.

22   Q.   Is it something you're saying now that you thought it

23   was part of research as opposed to simply no such

24   organization existed?

25   A.   I'm sorry.  Ask that again, please.

1   Q.   Is that a new spin that you're giving us that you

2   thought it was part of consumer research, as opposed to no

3   such group existed:  Market intelligence department?

4   A.   As I said before lunch, I don't remember it being a

5   separate department.  I thought it was just something --

6   just part of research.

7   Q.   Did you think that there was an "it" called market

8   intelligence department?

9   A.   I didn't recall something like that.

10   Q.   So the answer is no?

11   A.   No.

12         MS. KELLER:  Nothing further.

13         THE COURT:  Cross-examination, Mr. Quinn, on

14   behalf of Mattel.

15      *(Pause.)*

16         THE COURT:  And, counsel, I believe there's is an

17   agreement.  The prior exhibit, which was 27507, the

18   registration is withdrawn.  You're not seeking its

19   admission; is that correct?

20         MS. KELLER:  That's right, your Honor.

21         THE COURT:  All right.  You can disregard this

22   document which was trademark registration.  It's irrelevant.

23         Counsel.

24         MR. QUINN:  Thank you, your Honor.

25   *////*

                          CROSS-EXAMINATION

1

2    BY MR. QUINN:

3    Q.   Mr. Kilpin, you said several times in response to some

4    of Mr. -- Ms. Keller's question, I'm sorry, that much of

5    this MGA Bratz information was already public; correct?

6    A.   Yes.  That was my understanding.

7    Q.   And at one point you said and when asked, I think, by

8    Ms. Keller why somebody would characterize something as

9    confidential, I think, at one point you said, *So that they*

10   *might seem important*?

11   A.   Yes, it's possible.

12   Q.   Let's take a look at that last exhibit, Exhibit 9291,

13   that Ms. Keller just showed you.  And if we could enlarge --

14          This is from Mr. Villasenor; correct?

15   A.   Yes.

16   Q.   And it's dated April 8th, 2005?

17   A.   Yes.

18   Q.   And it's to a lot of different people within Mattel?

19   A.   Yes.

20   Q.   And he begins with this striking lead-in, in solid

21   caps:  DEFCON ALERT, exclamation mark.  DEFCON ALERT,

22   exclamation mark.  DEFCON ALERT; correct?

23   A.   Yes.

24          MR. QUINN:  And then, if you look down below, Ken,

25   if we could go to the language that begins:  *The traditional*

1    *basic price point.*  It's about in the middle of the page.

2    BY MR. QUINN:

3    Q.   Mr. Villasenor says:  *The traditional basic price point*

4    *for Bratz dolls has been $14.99 starting this year.*

5    *However, they've introduced a new $9.99 price point.*

6         Do you see that?

7    A.   Yes, I do.

8    Q.   And gives some information about *Bratz Candies, Spring*

9    *2004 Bratz sports, Bratz party, Bratz Sport Wave.*

10        Do you see that?

11   A.   Yes, I do.

12   Q.   And then, it goes down, it says:  *Each of these theme*

13   *dolls are dressed in a fashionable outfit associated with*

14   *the theme.*  And then, it goes down and talks about Bratz

15   Dynamite.

16        Do you see that?

17   A.   Yes.

18   Q.   And there's all this information here that

19   Mr. Villasenor says is:  *Urgent information* -- correct? --

20   *categorized as DEFCON 1.*

21        It says it's an urgent matter.  Do you see that in

22   the heading at the top:  *Urgent matter*?

23   A.   Yes.

24   Q.   All this information had already been published at a

25   New York Toy Fair website called Amzeen; correct?

```
 1   A.   Yes.  That's correct.
 2   Q.   If we can take a look at Exhibit 9350, have you seen
 3   this -- this is a printout of some information that's on
 4   a -- on this Amzeen.com website that covers the New York Toy
 5   Fair every year?
 6   A.   Yes.
 7   Q.   And has been covering it every year for 10 years?
 8   A.   Yes.
 9   Q.   And the date of this report from this website, is what?
10   A.   February 19th, 2005.
11   Q.   So that's two months before Mr. Villasenor's Defcon
12   alert?
13   A.   Yes.
14             MR. QUINN:  We would offer Exhibit 9350.
15             THE COURT:  Received.
16        (Plaintiffs' Exhibit 9350 received in evidence.)
17             MR. QUINN:  If we could put that up on the screen.
18   BY MR. QUINN:
19   Q.   If we look at the information here --
20             Perhaps, if we can put the first pages side by
21   side of 93 -- 9291, Mr. Villasenor's Defcon alert and 9350
22   from two months earlier from the New York Toy Fair website,
23   you see it has the exact same information?
24   A.   Yes, it does.
25   Q.   It says:  The traditional -- do you see that language:
```

1   *The traditional price point for Bratz dolls has been $14.99.*

2   *Starting this year, however, they've introduced a new $9.99*

3   *price point, a simple basic doll with a fashion and few*

4   *accessories.*

5   　　　　And it goes on to talk about Bratz iCandy, Bratz

6   Sports, Bratz Party, Bratz Sport Wave.

7   　　　　Do you see that?

8   A.   Yes.

9   Q.   Do you see that?  And Bratz DynaMite?

10  A.   Yes.

11  Q.   And Midnight Dance?

12  A.   Yes.  Uh-huh.

13  Q.   Mr. Villasenor's DEFCON Alert from April 8, 2005

14  appears to be lifted almost entirely from the website for

15  the New York Toy Fair from two months before; correct?

16  A.   Yes, it does.

17  Q.   Take a look at the last paragraph on Mr. Villasenor's

18  Defcon alert.  Even down to the very -- very end of the

19  website -- of the DEFCON Alert, it discusses the same games,

20  the very same products in almost the very same language;

21  correct?

22  A.   Yes, it does.

23  Q.   So let's look at those last few paragraphs here, if we

24  can compare them side by side.  There's some bullets there?

25  A.   Yes.

1    Q.   And both the Defcon alert from April and the New York

2    Toy Fair website both say*: *A European line* -- talking about

3    other Bratz-related products being released.

4              Do you see that?

5    A.   Yes.

6    Q.   And both of them say:   *A European line of bath and*

7    *beauty products that are being imported into the U.S. by MGA*

8    *Entertainment.*

9              That's the first bullet; right?

10   A.   Yes.

11   Q.   The next bullet:   *Various Bratz stationery, including*

12   *Little Bratz Prep Style and Pretty and Punk Bratz,* right?

13   A.   Yes.

14   Q.   *Bratz and Little Bratz activity sets, including one set*

15   *that allows children to make and design their own little*

16   *Bratz room play set*; right?

17   A.   Yes.

18   Q.   The next:   *Plug and Play video games that tie into the*

19   *various Bratz line, such as sports, totally tennis game and*

20   *the guitar game available in regular edition and Rock Angels*

21   *edition*?

22             Do you see that?

23   A.   Yes.

24   Q.   Or *version*.   It says identical in both?

25   A.   Yes, it is.

1    Q.   It goes on:  *A remote control addition of Kendall, one*

2    *the Bratz Petz*; right?

3    A.   Yes.

4    Q.   Then, *Bratz Virtual Buddies, a portable virtual pet*

5    *rendition of the Bratz Petz.*

6          Do you see that?

7    A.   Yes.

8    Q.   And then, *various board games, including the Funky*

9    *Fashion Makeover game, which uses miniature makeover heads*

10    *as game pieces.  The makeover heads are removed around a*

11    *board with each square requiring the player to apply a kind*

12    *of makeup or accessory.  The miniature makeover heads have*

13    *real rooted hair and look beautiful enough to display on*

14    *their own as a collectible*; correct?

15    A.   Yes.

16    Q.   So we've only looked at the beginning paragraphs and

17    the concluding paragraphs of Mr. Villasenor's April DEFCON

18    Alert and compared them to the New York Toy Fair website

19    from two months before.  We could look at every single

20    paragraph, but these two documents are essentially

21    identical; correct?

22    A.   Yes.

23    Q.   And are you aware that Mr. Larian has maintained that

24    Mr. Villasenor's DEFCON Alert disclosed highly confidential

25    proprietary MGA trade secrets?

1              MS. KELLER:  Objection.  Hearsay.

2              THE COURT:  Overruled.

3              I think I allowed that to be couched also

4    concerning Mattel on occasion.

5    BY MR. QUINN:

6    Q.   Are you aware that MGA has maintained in this case that

7    Mr. Villasenor's April DEFCON ALERT, Exhibit 9291, disclosed

8    proprietary and confidential MGA information?

9    A.   Yes.

10   Q.   It's clear from looking at the website printout that

11   all this information was public two months before?

12   A.   Yes, it was.

13   Q.   Is it your experience, sir, that sometimes even at

14   Mattel, there are people trying to make themselves look

15   important?

16   A.   Yes.  Looks like that is what this was.

17   Q.   Ms. Keller also showed you Exhibit 9284.

18             MR. QUINN:  If we could put that up on the screen.

19   BY MR. QUINN:

20   Q.   And that kind of information, by the way, you know,

21   from that magazine, that New York Toy Fair website that we

22   just looked at, I mean, that's the kind of information that

23   you can get at toy fairs every year without faking IDs or

24   sneaking into toy rooms; correct?

25             MS. KELLER:  Objection.  Vague as to "that kind of

1    information."

2           THE COURT:  Well, as it refers to 9291, overruled.

3           MS. KELLER:  And, your Honor, vague as to time.

4           THE COURT:  I thought it pertained to the New York

5    Toy Fair.

6           It's confined to that, is it?

7           MR. QUINN:  Yes.

8    BY MR. QUINN:

9    Q.   I mean, that is the type of information that's

10   available at toy fairs every year; correct?

11   A.   Yes, it is.

12   Q.   Especially if the toy manufacturer puts out a press

13   release saying that's what they're going to do; correct?

14   A.   Yes.  That's correct.

15   Q.   All right.  Let's now take a look at another exhibit

16   that Ms. Keller showed you:  Exhibit 9284.

17   A.   Yes.  Uh-huh.

18           MR. QUINN:  If we could put that up on the screen.

19       *(The document was published in open court.)*

20   BY MR. QUINN:

21   Q.   She showed this to you --

22           THE COURT:  This is 2000 -- strike that.

23   February 11th, 2000?

24           MR. QUINN:  Yes, February 11, 2004.

25           THE COURT:  I'm sorry.

1          MR. QUINN:  9284.  If we could just enlarge the

2     top half, Ken.

3     BY MR. QUINN:

4     Q.   Do you recall Ms. Keller showed this to you and said,

5     you know, this is from Stephanie Page, dated February 11th,

6     2004, copies to Matt Bousquette, Sujata Luther,

7     Matt Turetzky, Drew Vollero and to you; correct?

8     A.   Yes.

9     Q.   And the subject is:  "Beyond the numbers.  MGA update";

10    right?

11    A.   Yes.

12    Q.   And the heading is, with the Mattel sticker there:

13    "Market Intelligence Department."

14          Do you see that?

15    A.   Yes.

16    Q.   And it's dated February 11th, 2004; right?

17    A.   Yes.

18    Q.   And then, below that you see -- if we can look at the

19    text -- this is signed at the bottom by Stephanie Page,

20    analyst marketing intelligence, and she says, quote:  *Beyond*

21    *the numbers*, close quote, *provides a specific -- provides a*

22    *look at a specific trend or issue in the marketplace*

23    *relating to current news and today's youth.  This issue*

24    *discusses some of MGA Entertainment's key drivers for 2004.*

25          Do you see that?

1   A.   Yes.  Uh-huh.

2   Q.   And then, she identifies some specific MGA products:

3   Bratz 2004, Sunkist Summer, Girls Night Out, Wild Life

4   Safari, Bratz Petz, Forever Best Friends, Alien Racer.

5            Do you see that?

6   A.   Yes.

7   Q.   Then, it concludes:  *Beyond the numbers is another*

8   *example of our continuing effort to catch the trends and*

9   *stay on top of what's hot and popular with kids, tweens,*

10  *teens, adults.  If you have any questions, comments, or*

11  *suggestions, please contact Sal Villasenor, or*

12  *Stephanie Page.*

13           Do you see that?

14  A.   Yes.  Uh-huh.

15  Q.   And then, if we turn the page on the second page of

16  Exhibit 9284, page -2, we see that heading at the top

17  "beyond the numbers" with a Mattel sticker, dated

18  February 11th.

19           Do you see that?

20  A.   Yes.

21  Q.   And there is some information here about:  *MGA*

22  *Entertainment follows up on its award-winning year with*

23  *Bratz by introducing exciting new lines in girls and boys*

24  *entertainment in 2004 at 2004 American International Toy*

25  *Fair in New York City.*

1              Do you see that?

2    A.   Yes.

3    Q.   And then, if we go down, there's information about

4    Bratz 2004.  Under that, it says:  *There's a reason why*

5    *Yasmin, Cloe, Sasha, Jade and Dana are the most popular*

6    *fashion dolls on the planet today.  Style, winners of more*

7    *toy and media awards over the past two years than any other*

8    *fashion doll brand.*

9              Do you see that?

10   A.   Yes.

11   Q.   And then, the next heading, it says:  *Sunkist Summer.*

12   *This summer is getting started and it's already a scorcher.*

13   *Join the Bratz as they kick off.*

14             Do you see that?

15   A.   Yes.

16   Q.   And then, the next is:  *Girls night out.  It's Saturday*

17   *night and that can only mean one thing.  It's Bratz.*

18             Do you see that?

19   A.   Yes.

20   Q.   And then the next page, there's a heading for "Bratz

21   Petz and Forever Best Friends and Alien Racers"; right?

22   A.   Yes.

23   Q.   And then at the bottom, it says:  Brought to you by

24   Sal Villasenor and Stephanie Page; correct?

25   A.   Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   All they did was put a Mattel sticker on a MGA press

2    release; isn't that true?

3    A.   Yeah.  This is the MGA press release from that year's

4    toy fair.

5    Q.   Let's take a look at the MGA press release for that

6    year's toy fair.  It's Exhibit 23894.

7    A.   Yes.  Uh-huh.

8          MR. QUINN:  We would offer that in evidence, your

9    Honor?

10         THE COURT:  Received.

11     (Plaintiffs' Exhibit 23894 received in evidence.)

12   BY MR. QUINN:

13   Q.   The MGA press release from the 2004 New York Toy Fair

14   is identical word for word with Mr. Villasenor and

15   Ms. Page's *Beyond the Numbers Internal Report*; correct?

16   A.   Yes, it is.

17         MR. QUINN:  If we can put them up there, side by

18   side, just to confirm that.  I think you have to go to the

19   second page of -- they both have the same -- begin with the

20   language about: *Bratz 2004.  There's a reason why Yasmin*

21   *Cloe, Sasha, Jade and Dana are the most popular fashion*

22   *dolls.*

23         Do you see that?

24   A.   Yes.

25   Q.   And then, both of them say: *Sun-Kissed Summer.  This*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    *summer is just getting started and it's already a scorcher,*

2    exclamation mark.

3             They both say that?

4    A.   Yes.

5    Q.   *Girls Nite Out*?

6    A.   Yes.

7    Q.   *Girls Night Out.  It's Saturday night and that can only*

8    *mean thing:  It's Bratz Nite out.*

9             The same in both of them?

10   A.   Yes.

11   Q.   Word for word.  And then, Mr. Villasenor and Ms. Page

12   have the language -- they report that *Wild-Life Safari*

13   *Collection,* that's coming out; right?

14   A.   Yes.

15   Q.   *Bratz Petz*?

16   A.   Yes.  Uh-huh.

17   Q.   It says:  *This is only the beginning of Bratz 2004, as*

18   *MGA Entertainment is ready to turn up the heat, while*

19   *chillin' it out at the same time with additional incredible*

20   *Bratz collections*; right?

21   A.   Yes.  Uh-huh.

22   Q.   And "4-Ever Best Friends," exact identical language?

23   A.   Yes.

24   Q.   And then, "Alien Racers," the exact identical language?

25   A.   Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   Alien Racers, we haven't talked about that.  It says --

2    both of them say:  *Racing into the fast and furious boys*

3    *market with its newest consumer entertainment property,*

4    *Alien Racers is a high-speed adventure with a strong story*

5    *and amazing characters*; right?

6    A.   Yes.

7    Q.   And then, it goes on to -- in the exact same language

8    to discuss this product which MGA has already announced;

9    right?

10   A.   Yes.  Uh-huh.

11   Q.   And then, finally, it concludes with information about

12   MGA Entertainment 2004, both of them do?

13   A.   Yes.

14   Q.   They say -- both say:  *... will continue to bring*

15   *innovation and imagination to the world of toys with new*

16   *products and continued favorites such as Stealthship,*

17   *Fushion Force, Micro-Blast Racers, youth electronics for*

18   *Spider-Man, Lil'-Bratz, Fairies, 5-Sies, and so much more!*

19   *Welcome to a new world of fun.*

20          So the internal report prepared by Mr. Villasenor

21   consisted simply of the MGA press release?

22   A.   That's correct.

23   Q.   He took off the trademark signs, right?  The TM signs

24   on those names that I just read?

25   A.   Yes, he did.

1    Q.    And he didn't put the name in bold; right?

2    A.    Right.

3    Q.    As it did in the press release?

4          But otherwise it's word for word identical;

5    correct?

6    A.    Yes.

7    Q.    All right.  Let's talk a little bit about We Three

8    Friends.

9          If we could look at Exhibit 8751, which was shown

10   to you by Ms. Keller.  This is the e-mail string.  And she

11   pointed out to you this -- the first e-mail from Sharon

12   Spaulding to Matt Bousquette, Tim Kilpin and you.

13         And this is dated December 5; correct?

14   December 5, 2003?

15   A.    Yes.

16   Q.    And she says, I have received -- the title is:  *MGA's*

17   *Best Friend assortment.  I have received the following*

18   *confidential information from a reliable source.*

19         Do you see that?

20   A.    Yes.

21   Q.    And then, there is a description of some information

22   about what you came to know -- what became MGA's:  We Three

23   Friends; right?

24   A.    MGA's Forever Best Friends.

25   Q.    I'm sorry.  MGA's Forever Best Friends.

```
 1              And your response to that is, you say:  You the
 2  man.  And you said, I turned the team on yesterday in
 3  response to this big time; right?
 4  A.   Yes.
 5  Q.   And this is in your e-mail dated the same date:
 6  December 5; right?
 7  A.   Yes.
 8  Q.   And I think you told Ms. Keller that you had seen an
 9  article already in the Los Angeles Times about this new
10  product that was coming out; correct?
11  A.   Yes.  That's correct.
12              MR. QUINN:  Let's take a look at Exhibit 24711.
13              You don't have it?
14       (Pause.)
15  BY MR. QUINN:
16  Q.   Can you identify Exhibit 24711?
17  A.   Yes.  This is the article in the L.A. Times.
18  Q.   That you were referring to when Ms. Keller was asking
19  you about the We Three Friends?
20  A.   Yes.
21              MR. QUINN:  We would offer this, your Honor.
22              THE COURT:  I'm going to discuss this with
23  counsel.
24              Usually, I've tried to stay away from newspaper
25  articles.  But this article reflects the same information in
```

1    this Exhibit 8751?

2              MS. KELLER:  We have no objection, your Honor.

3              THE COURT:  No objection?

4              MS. KELLER:  None.

5              THE COURT:  Received.

6         (Plaintiffs' Exhibit 8751 received in evidence.)

7              MR. QUINN:  If we could put that up on the screen.

8    BY MR. QUINN:

9    Q.   The first page 8751-1, what is the date there of that

10   article?

11   A.   Thursday, December 4th, 2003.

12             THE COURT:  Now, just a moment.  Let me warn both

13   parties.  You both agreed to this.  But as far as newspaper

14   articles, generally --

15             MR. QUINN:  Understood, your Honor.

16             THE COURT:  -- same rules apply.  They're hearsay.

17   So I don't want to hear later on that wasn't fair.

18             MR. QUINN:  This is for timing, your Honor.  It's

19   not offered for truth.

20             THE COURT:  Either side.

21   BY MR. QUINN:

22   Q.   This is an L.A. Times article from December 4, 2003.

23   That is the day before the Exhibit 8751 e-mails we were just

24   looking at, which are dated December 5; correct?

25   A.   Yes.  That's correct.

1   Q.   And if you go to page-7, 24711-7, you will see an

2   article entitled:  "Bratz dolls little sisters to challenge

3   Barbie."

4           Do you see that?

5   A.   Yes.

6   Q.   And then, there's actually a photograph there:  *The New*

7   *Forever Best Friends' dolls come two to a box holding hands*;

8   right?

9   A.   Yes.

10  Q.   And if we look at -- there's a --

11          Mr. Larian is quoted there.  Do you see at the

12  bottom of the first column?

13  A.   Yes.

14  Q.   He says:  *It* -- meaning Forever Best Friends -- *is*

15  *directly going after Barbie, said Isaac Larian, chief*

16  *executive of privately held MGA.  Bratz, frankly, never went*

17  *after Barbie, he added.*

18          But they announce here that they are launching

19  this new line; correct?  It's in the *Los Angeles Times*, on

20  December 4; correct?

21  A.   Yes.  Uh-huh.

22  Q.   And it also says -- if we can turn to page 9, -9, it

23  says there, at the bottom of the first column:  *The Forever*

24  *Best Friends dolls initially will be sold with two themes:*

25  *Beach Party and Pajama Party.*

1          Do you see that?

2    A.   Yes.

3    Q.   And at the bottom, it says:  *Larian said he expected*

4    *Forever Best Friends, whose launch was first reported*

5    *Wednesday by Reuters --*

6          Apparently, the *L.A. Times* didn't have the scoop

7    on this.  This had been published by MGA before -- announced

8    by MGA before?

9    A.   Yes.

10   Q.   *New service to garner sales of about $300 million in*

11   *their first year*; right?

12   A.   Yes.  Uh-huh.

13   Q.   So if we could go back to exhibit -- the e-mail string,

14   Exhibit 8751, which is dated the next day, December 5, when

15   you got this e-mail from Sharon Spaulding telling you she

16   knew about the subject MGA's Best Friend Assortment, and she

17   says*, I received the following confidential information from*

18   *a reliable source*, at that point, the fact that MGA was

19   coming out with this new product was hardly confidential;

20   right?

21   A.   We knew it already.

22   Q.   In fact, you say -- you say at the top:  *I turned the*

23   *team on yesterday to respond to this big time*; right?

24   A.   Yes.

25   Q.   Tell us, what did you do?

```
 1              I mean, you had seen this article; correct?
 2    A.    Yes.  Uh-huh.
 3    Q.    And what did you do?  What was the "big time" response?
 4    A.    We got our team together to look at what we could do to
 5    respond to it, and what kind of product that we could make
 6    that would be competitive with what we knew.
 7    Q.    And what product did you end up coming up with?
 8    A.    Wee 3 Friends.
 9              MR. QUINN:  If we could look at Exhibit 29122,
10    which is a tangible.
11         (The document was published in open court.)
12              MR. QUINN:  29122.
13              UNIDENTIFIED WOMAN:  What's the name?
14              MR. QUINN:  It's Forever Best Friends.
15    BY MR. QUINN:
16    Q.    Can you identify that as the MGA product, Forever Best
17    Friends?
18    A.    Yes.
19    Q.    And if I could show you now Exhibit 24713.
20    A.    Yes.
21    Q.    What is Exhibit 24713?
22    A.    Wee 3 Friends.
23    Q.    And that's the product that Mattel came out with?
24    A.    Yes.  It's one of them.
25    Q.    Now, is the packaging -- is the one you referred to
```

1    that you went to work on and came out with?

2    A.    That's correct.

3    Q.    And is the packaging the same as Forever Best Friends?

4    A.    Well, no.  I don't see it as the same.

5              MR. QUINN:  Your Honor, we would move into

6    evidence both Exhibit 24713 and 29122.

7              THE COURT:  Each are received.

8         *(Plaintiffs' Exhibits 24713 and 29122 received in*

9         *evidence.)*

10   BY MR. QUINN:

11   Q.    Now, what is the difference in the packaging of those

12   two products?

13   A.    Of these two?

14   Q.    Yes, sir.

15             THE COURT:  You can hold them up, sir, so the jury

16   can see them also.

17             THE WITNESS:  This is a cardboard box in terms of

18   its structure, and this is a vinyl bag with a zipper.

19   BY MR. QUINN:

20   Q.    All right.  So one has a zipper and -- one's cardboard

21   and the other is in a plastic bag?

22   A.    Yes.

23   Q.    And it has a zipper?

24   A.    Yes.

25   Q.    They are very different?

1   A.    Yes.

2   Q.    In making Wee 3 Friends, did Mattel copy Forever Best

3   Friends?

4   A.    No.

5   Q.    You testified that this was something that you started

6   on or were able to do in a week?

7   A.    Yes.  We went and looked for existing dolls that we had

8   the molds for that we could redecorate and put new fashions

9   on and respond quickly.

10  Q.    So this was not a new doll that was created in a week,

11  you know, after you read the *L.A. Times* article.  It's a

12  doll that you already had?

13  A.    Yes.  That's correct.  They were doll bodies that we

14  had.

15  Q.    Could I show you, now, Exhibit 8806.

16  A.    Okay.

17  Q.    What is Exhibit 8806?

18  A.    It appears to be a different package for Forever Best

19  Friends.

20         MR. QUINN:  We would move that into evidence, your

21  Honor.

22         THE COURT:  Received.

23      *(Plaintiffs' Exhibit 8806 received in evidence.)*

24  BY MR. QUINN:

25  Q.    Is that now -- is that a different package than the

1   Exhibit 9 -- 29122, the first Forever Best Friends that you

2   showed us?

3   A.   Yes.  It's a -- it's a vinyl bag with a zipper.

4   Q.   Does it appear to you that, I mean, MGA changed its

5   package for Forever Best Friends to have a plastic-covered

6   package like Mattel's Wee 3 Friends?

7   A.   It appears they did.

8   Q.   Nothing wrong with that?

9   A.   No.

10  Q.   That's competition?

11  A.   Yeah.  Right.

12  Q.   You saw that MGA was coming out with a product that

13  involved multiple dolls, friends, the color pink, a pajama

14  party, mix-and-match fashions.

15          You saw they were doing that?

16  A.   Yes.

17  Q.   You know, had multiple dolls been done before in the

18  doll business?

19  A.   Yes.

20  Q.   Was there anything new, unique, or proprietary about

21  the idea of coming out with multiple dolls in a package?

22  A.   No.

23  Q.   How about friendship themes?  Dolls having friends?

24  A.   No.

25  Q.   Barbie had friends?

1    A.    Yes.

2    Q.    For a long time?

3    A.    Yes.

4    Q.    How about the color pink?  Was that something new to be

5    associated with dolls?

6    A.    No.  A lot of brands use pink.

7    Q.    And the pajama party theme, was that the first time

8    anybody had ever thought to have dolls and pajamas?

9    A.    No.  It's a common theme.

10   Q.    And the idea of mix-and-match fashions, was that

11   something that was new?

12   A.    No.  Nothing unusual.

13   Q.    So that's -- you saw that MGA was coming out with this

14   product that involved multiple dolls and Mattel learned that

15   was coming and responded with its own product involving

16   multiple dolls; right?

17   A.    That's correct.

18   Q.    That's competition?

19   A.    Yeah.

20   Q.    Nothing wrong with that?

21   A.    No.  We viewed it as competing in the marketplace.

22   Q.    One other thing.  On that later Bratz packaging,

23   Exhibit 8806, did --

24            MR. QUINN:  Thank you.

25   ////

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   BY MR. QUINN:

 2   Q.   On that later Forever Best Friends packaging, did MGA

 3   adopt a zipper after Mattel came out with its Wee 3 Friends?

 4   A.   Yeah, they appeared to have.

 5   Q.   Could you show that to the jury?

 6   A.   Sure.

 7   Q.   Again, nothing wrong with that, the idea of having a

 8   package that has a zipper on it, is not new, unique, or

 9   proprietary to anybody?

10   A.   No.

11   Q.   With respect to this Forever Best -- MGA's Forever Best

12   Friends product, you were also shown Exhibit 1820.

13             MR. QUINN:  If we could put that up on the screen.

14   And if we can enlarge the bottom third, Ken.

15   BY MR. QUINN:

16   Q.   Ms. Keller called your attention to this e-mail from

17   David Murphy --

18   A.   Yes.

19   Q.   -- dated December 3, 2003, where he says:  *Matt, just*

20   *heard the news about MGA's new product Forever Best Friends.*

21   *Here are some quick tactical ideas on how Mattel can preempt*

22   *MGA's launch and make it harder for them to gain tracks.*

23             Do you recall Ms. Keller went through that with

24   you?

25             Do you see that?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    Uh-huh.  Yes.

2    Q.    Who is David Murphy?

3    A.    David Murphy at that time was the head of Y&R Irvine

4    office, which was our agency on some of our brands at that

5    time.

6    Q.    By "agency," you mean advertising agency?

7    A.    Yes.  Advertising agency.

8    Q.    So he's not a Mattel employee?

9    A.    No, he's not.

10   Q.    And he's trying to make himself useful, come up with

11   some ideas?

12   A.    Yeah, this struck us as -- he's pitching for business.

13   Q.    And were any of these ideas adopted?

14         Take a moment and look at them and tell us if any

15   of these things were actually done.

16   A.    No.  No, we didn't.

17   Q.    We've looked at a couple of MGA press releases, and the

18   article now about the MGA Forever Best Friends product.

19         Since October of 2000 when you became the head,

20   global head of the toy business at Disney and since then

21   when you've come back to Mattel, have you regularly read the

22   trade press in the toy industry and tried to keep up on what

23   your competitors are doing in the toy business?

24   A.    Yes, I have.

25   Q.    Including reading the press releases they issue about

1   new products?

2   A.   Yes.  Uh-huh.

3   Q.   And reading the trade journal articles about

4   developments in the toy business?

5   A.   Yes.

6   Q.   And also including reading MGA's press releases?

7   A.   Yeah.  That's correct.

8   Q.   I would like you, now, if you would please to take a

9   look at some of these articles and press releases.

10          I would like to begin by asking you to look at

11  Exhibits 22389 -- 22389, 16786, 21301, 22839, 16786 and

12  21301.

13          Do you have those before you?

14  A.   Yes, I do.

15  Q.   And can you identify these documents for us?

16  A.   These are press releases from toy fair 2001 from MGA.

17  Q.   So, 22389 is a MGA press release dated --

18          Do you see a date there on it?

19  A.   Dated January 8th, 2001.

20  Q.   And then, 16786 is a MGA press release, dated

21  February 8th, 2001?

22  A.   That's right.

23  Q.   And then, Exhibit 21301 is a MGA press release, dated

24  February 8th, 2001 also?

25  A.   Yes.  That's correct.

1          MR. QUINN:  We would offer these in evidence,

2    your Honor.

3          THE COURT:  Is this the New York Toy Fair?

4          Should be if it's February, but --

5          MR. QUINN:  22389 is dateline Hong Kong, your

6    Honor.

7          THE COURT:  Hong Kong.

8          MR. QUINN:  And then, the other two are dateline

9    New York.

10          THE COURT:  Any objection?

11          MS. KELLER:  Your Honor, I'm just getting these

12    right now.

13          THE COURT:  All right.  We'll delay that for a

14    while, counsel.  I want to make sure.  We can delay it.

15          MS. KELLER:  Thank you.

16          MR. QUINN:  We provided these yesterday, your

17    Honor.

18          I have a whole number of these.

19          THE COURT:  We can delay it.  We've got plenty of

20    time.

21          MR. QUINN:  Okay.  I have a stack of these, so

22    I'll set them aside for now.

23          THE COURT:  I know.  I saw those yesterday.  I

24    know you do.

25          Now, here's what's going on.  I don't want to go

1    down the road of newspaper articles.  They are hearsay.  But

2    some may come in for limited purposes, such as the

3    similarity of information and whether it's public

4    information.

5            But concerning comments about this case,

6    et cetera, the press isn't going to decide this.  You will

7    as jurors.  So I need to be very certain what each of those

8    articles contain, and I've seen them.  I think Mr. Quinn

9    gave them to me yesterday and counsel will have a chance.

10   And I'll let in relevant information, but not right now.

11   We'll wait for a while.

12            MR. QUINN:  Your Honor, if it makes any

13   difference, these first batches are not articles.  They are

14   MGA press releases, if that makes any difference.

15            MS. KELLER:  Your Honor, the only --

16            We would have no objection as long as we can have

17   a stipulation as to when Mattel received these.

18            THE COURT:  We always run into a little difficulty

19   here.

20            All right.  Counsel, we'll just wait, and we'll

21   work that out.  Is there some idea?  Do you, too, want to

22   have a discussion privately?

23            As Ms. Keller, as you get out of your chair, move

24   towards Mr. Quinn in a nonmenancing manner and vice versa.

25            *(Pause.)*

```
 1              THE COURT:  They're discussing this.

 2         (Pause.)

 3              THE COURT:  Counsel, for both of you, what I want

 4    to make certain of in the future is this:  When one article

 5    starts to come in, then the issue becomes, Well, Judge, you

 6    let that article in.  And even in a nonrelated matter, then

 7    it just starts spinning, and I'm not going to be in the

 8    position of spending my weekends with each of the parties,

 9    hearing that kind of argument any longer, so.

10              MR. QUINN:  Perhaps, we can take that up at a

11    break, your Honor.

12              THE COURT:  Well, certainly.

13              MR. QUINN:  Thank you, your Honor.

14    BY MR. QUINN:

15    Q.   Changing subjects now, when information --

16              Once information is shared with retailers, do you

17    regard that information as still being confidential?

18    A.   We regard the fact that the buyers have that

19    information as information that's likely to be shared with

20    other parties and competitors.

21    Q.   Why would a -- why would Mattel share information in

22    advance with retailers?

23    A.   Well, in general, we're looking to show the product

24    line and get their feedback and plan for the next year's

25    sale -- you know, the sales plan.
```

 1   Q.   So your understanding that other toy companies do the

 2   same thing?

 3   A.   Yes.  And usually what happens is when you get to, you

 4   know, the toy fair time frames, the information is, you

 5   know, pretty well known.

 6   Q.   So did you -- I mean, would you make it a practice

 7   while you've been at Mattel to personally visit biggest

 8   retailers, occasionally, to go over Mattel's product --

 9   upcoming product lines?

10   A.   Yes.  Typically, I would go a couple times a year to

11   key customers and review their -- you know, walk their

12   planogram rooms and work with them.

13   Q.   And who would those be?  What key customers are you

14   talking about?

15   A.   Toys "R" Us.  Wal-Mart.  Target.  Sometimes Kmart.

16   Q.   And when you went on those visits to key customers and

17   walked their rooms, what would the retailers show you?

18   A.   We would see, you know, how our products were assigned

19   in the planogram room, but we would also see, you know, how

20   competitors were aligned.

21   Q.   Describe for us what a planogram room looks like?

22   A.   Planogram room is a large place usually somewhere on

23   the premises or near the premises for the customer, their

24   headquarters, where they lay out the future store set, if

25   you will, of what each -- you know, what each category is

```
 1    going to look like.  Whether it's the doll category, or
 2    their construction category, it's all laid out so that you
 3    can see what the coming season is going to look like when
 4    it's actually placed in the stores.
 5    Q.   Not just Mattel's products?
 6    A.   That's correct.  It's everybody's product.
 7    Q.   Hasbro, MGA, Jakks specifically, the rest of them?
 8    A.   That's correct.  Yes.
 9    Q.   And other -- you would see those products in the way
10    that they were intended to be laid out once they were
11    available in the marketplace?
12    A.   That's right.
13    Q.   And other companies would go through the same process
14    and see Mattel's products and see other people's products?
15    A.   Yes, they would.
16    Q.   And this is routine in the toy business?
17    A.   Yes, it is.
18    Q.   At the time -- you were asked a question about FOB
19    Hong Kong pricing information.
20              Once you tell a retailer about FOB Hong Kong
21    pricing, do you regard that information as being
22    confidential anymore?
23    A.   We would prefer that buyers don't share that
24    information, but we know that they do.
25    Q.   You were asked some questions about Exhibit 2107.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. QUINN:  If we could put that up on the screen.

2    BY MR. QUINN:

3    Q.    And this was the -- if we could look at page -2.  This

4    is the TRU meeting notes written by Debbie Haag, dated

5    October 23, 2003.

6          Do you see that?

7    A.    Yes.  Uh-huh.

8    Q.    And I think you told us "TRU" is Toys "R" Us?

9    A.    That's correct, yes.

10   Q.    And would these -- would this be information that

11   Ms. Haig received in connection with a meeting at TRU?

12   A.    Yes, it would.

13   Q.    And once -- so the retailer in this case, TRU, would

14   actually share this information about other toy companies

15   and other products coming up?

16   A.    Yes.  Debbie said in here she had time in the Wayne

17   Concept Lab, which is their planogram room.

18   Q.    The Wayne Concept Lab is a -- it's what TRU calls its

19   planogram room?

20   A.    Yes, that's correct.

21   Q.    Is this something you have to pump the retailers to get

22   this kind of information?

23   A.    No, when you're that -- those rooms you see how the

24   whole store is going to look.

25   Q.    Do you have any understanding as to why retailers would

*DEBORAH D. PARKER, U.S. COURT REPORTER*

42

```
1    want to share this kind of information?
2    A.   My experience has been that the retailers want you to
3    understand how your brand is positioned in their store, and
4    how it's going to look in terms of the total layout.
5    Q.   Are they also interested in promoting competition?
6    A.   Generally, yes, I would say they are.
7    Q.   So -- I mean, we looked at one -- just a moment ago, we
8    looked at an exhibit where there was a reference to this
9    confidential source relating to Wee 3 Friends.
10             That's 8751.  If we can go back and look at that,
11   where Sharon Spaulding says:  I have received the following
12   confidential information from a reliable source.
13             Do you see that?
14   A.   Yes.  Uh-huh.
15   Q.   Do you think that was probably from a retailer?
16   A.   I expect it was from a buyer, yes.
17   Q.   If a buyer knew that MGA was coming out --
18             MS. KELLER:  Objection.  That's speculation, your
19   Honor.
20             Move to strike.
21             THE COURT:  No, you can testify to that.  You were
22   a 30(b)(6), and I think you've been in the field, so I'll
23   allow you to cast the opinion.
24             Remember this is his opinion, though.
25             THE WITNESS:  Yes, my opinion is this would have
```

43

1    come from a buyer and also because later in the note, it

2    says: *This buyer was not impressed and passed on it.*

3    BY MR. QUINN:

4    Q.   Right.  I mean, if we could underline that language.

5    It says: *This buyer was not impressed and passed on it.*

6    *Took the wait and see attitude.*

7            Do you see that there?

8    A.   Yes.  Uh-huh.

9    Q.   I mean, does that indicate to you that this

10   confidential source was probably one of these retailers also

11   known as a buyer?

12   A.   Yeah.  That's my expectation on this one.

13   Q.   And would a buyer be interested -- if MGA was coming

14   out with a product that had two dolls at a certain price

15   point, would they be interested to see if they could

16   stimulate some competition and share information and see if

17   they could get Mattel to come out with a competitive

18   product?

19   A.   I think that's certainly possible.

20   Q.   Have you seen that phenomenon, by saying: *Hasbro is*

21   *going to do this.  What's Mattel going to do?*  That type of

22   thing?

23   A.   Yeah.  From time to time, yes.

24   Q.   Is that partly why you can't regard information that

25   you share with a retailer as being confidential?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   A.    Yeah.  And that's what we recognize is that:  Once we

2   shared it with them, they may share it with others.

3   Q.    Okay.  If we could go back to exhibit -- the TRU

4   meeting notes, Exhibit 2107-2.  And this appears to be an

5   example of a buyer or retailer, in this case, Toys "R" Us,

6   sharing information about another toy company:  Bratz.

7   Right?

8   A.    Yes, it does in.

9   Q.    Do you believe that Debbie Haig, the author here who's

10  reporting this, was doing anything unethical or improper in

11  reporting this information?

12  A.    No, I didn't.

13  Q.    Let's talk some more about toy fairs.  We've heard a

14  fair amount about that.  The New York Toy Fair, is it every

15  year in February, pretty much the same time?

16  A.    Yes, it is.

17  Q.    And what week, early in the month, or is there a set

18  week when you have that?

19  A.    Generally, the second week or so of February each year.

20  Q.    And we've heard that retailers, analysts, buyers, toy

21  companies, the press, thousands of people attend these

22  events?

23  A.    Licensing partners and promotional partners as well,

24  yes.

25  Q.    When you were working for Disney in their toy division,

1   did you ever visit MGA's showroom in New York at the

2   New York Toy Fair?

3   A.   Yes, I did.

4   Q.   Can you tell us about that?

5   A.   I visited with Mr. Larian and reviewed I believe it was

6   the February 2002 toy fair showroom.

7   Q.   And you visited MGA's showroom at that toy fair?

8   A.   Yes, I did.

9   Q.   Were you asked to sign a nondisclosure agreement when

10  you visited MGA showroom?  That is to say, an agreement

11  saying, *I will keep confidential whatever I see in the MGA*

12  *showroom*?

13  A.   No, I wasn't.

14  Q.   Did you see other people there in the showroom?

15  A.   Yes, I did.

16  Q.   Did you see anybody else being asked to, or signing

17  nondisclosure agreements, or written agreements where they

18  promised to keep confidential what they saw?

19  A.   I don't remember seeing that.

20  Q.   Did Mr. Larian, at that time when you visited the MGA

21  showroom, ask you to keep secret what you saw there, or keep

22  it confidential, or not repeat it?

23  A.   No, I don't remember that.

24  Q.   Would it be true to say, as a general matter, toy

25  companies do show -- at toy fairs they do show to the press

```
 1   their new products that they have planned for the next
 2   season?
 3              MS. KELLER:  Objection.  Vague as to whether
 4   private showrooms are public, your Honor.
 5              THE COURT:  Well, sustained.  He needs to be more
 6   clear.  What is he visiting?  Is he visiting an open
 7   showroom?  A closed showroom?  Portions of a closed
 8   showroom?
 9              I'm not sure what he's doing.
10   BY MR. QUINN:
11   Q.   As a general proposition, I mean, do you -- are toy
12   companies at the toy fair showing their products to the
13   press?
14              MS. KELLER:  Objection.  Vague as to whether
15   private or public.
16              THE COURT:  Yes.  Sustained.
17   BY MR. QUINN:
18   Q.   So you've been -- Mattel has had showrooms at each of
19   the major toy fairs while you have been involved with
20   Mattel?
21   A.   Yes.  That's correct.
22   Q.   And sometimes Mattel has, sort of, a private area in
23   its showroom?
24   A.   Well, the showrooms are by appointment.
25   Q.   And is it true, though, that people walk in, people can
```

1   come and ask to see the showroom and are permitted in?

2   A.   Well, typically, the press will be allowed to come in,

3   if they want to come see the product line.  One of the main

4   reasons we are doing that show is to show the line to the

5   press.

6          MS. KELLER:  Your Honor, I'm going to object,

7   again, that it's vague as to whether these are the public

8   area or the private locked --

9          THE COURT:  Sustained.

10         MS. KELLER:  -- part of the showrooms.

11         THE COURT:  We've heard that there are showrooms,

12  but there are different parts of showrooms that are open;

13  the press is in sometimes; other parts are private.  I'm not

14  certain what's being referred to.

15         MR. QUINN:  Okay.

16         THE COURT:  I don't think the jury is either.

17  BY MR. QUINN:

18  Q.   Have you ever seen any locked showrooms or locked

19  portions of showroom?

20  A.   No.

21  Q.   And have you seen press in -- sometimes Mattel has an

22  area in its showroom which not everybody can see?

23  A.   Well, the way we set up the showrooms at toy fairs is,

24  they are by appointment.  And so, you know, you come in, and

25  you have an appointment, and you can see it.

```
 1              And, again, we bring the press in, so they can
 2      see -- they can see the whole showroom.
 3      Q.   So at least in the case of Mattel's case, the press can
 4      see any part of the showroom.
 5              Is that true?
 6      A.   Yes, it is.
 7      Q.   And are there also -- even if you are not a member of
 8      the press, can you show up and arrive and ask to see the
 9      product?  Ask to be admitted?
10      A.   Well, it depends.  If you're a partner or a buyer,
11      then, yes, usually, we'll make arrangements to have someone
12      take someone through.
13      Q.   Even if you don't have some past experience with them?
14      A.   It really depends on who it is.  But if it's a buyer
15      for retailer or press, they're usually allowed in.
16      Q.   I mean, you were asked some questions -- Ms. Keller
17      asked you to assume -- a line of questions, asking you to
18      assume that MGA had required people who visited its
19      showrooms to sign nondisclosure agreements.
20              Do you recall those questions?
21      A.   Yes.
22      Q.   And I think you told us that your experience was
23      different?
24      A.   That was my experience, yes.
25      Q.   I mean, if you assume that MGA did not ask anyone to
```

1    sign a nondisclosure agreement to visit any portion of its

2    showroom before 2006, would you think that MGA regarded what

3    was in the showroom as being confidential?

4    A.   I wouldn't expect that they would view anything that

5    was in the New York Toy Fair showroom to be confidential,

6    because putting out press releases and bringing the press

7    in.

8              MR. QUINN:  Exhibit 7790, the e-mail and 99 -- or

9    7795.

10         *(The document was published in open court.)*

11   BY MR. QUINN:

12   Q.   This is the e-mail, the information from Steve Totzke?

13   A.   Yes.

14             MR. QUINN:  If we can look at Exhibit 7790.

15   BY MR. QUINN:

16   Q.   And you were asked about -- if we look at 7795, where

17   he said:  *Below is some information from the Hong Kong show*

18   *on our friends.*

19             Was "friends" a code word?

20   A.   I didn't take it as that necessarily, but --

21   Q.   Was it clear that this was -- MGA is what's being

22   discussed there?

23   A.   Yes, it is.

24   Q.   And did you talk to -- I think you told us you talked

25   to Mr. Totzke about where he got this information, and he

1   told you he did not recall?

2   A.   That's correct.  Yeah.

3   Q.   Did you ask him whether he got it from a -- from

4   himself going into a MGA showroom?

5   A.   I did ask him that.

6   Q.   And what was his response to that?

7   A.   He said he'd never been in a MGA showroom.

8   Q.   Would there be other places at a toy fair where you

9   could -- or other people where you could get this type of

10  information without going into a showroom?

11  A.   This kind of information, typically, would be coming

12  from buyers.

13          MR. QUINN:  If we could look at Exhibit 1811.

14  BY MR. QUINN:

15  Q.   Ms. Keller asked you a lot of questions about this

16  document about comparison of MyScene and Bratz, what's

17  working and what's not.

18          Do you recall that?

19  A.   Yes, I do.

20  Q.   And she asked you about the length of the columns:  *The*

21  *column in MyScene not working.  The column is longer than*

22  *working.*

23          Do you see that?

24  A.   Yes.

25  Q.   Do you recall those questions?

1    A.    Yes, I do.

2    Q.    If you count up the bullets, though, the different

3    topics that were addressed, they're actually -- under

4    "product," there's more bullets than -- under "working" than

5    under "nonworking"; right?

6              I mean, if you set aside the length of the column

7    and focused just on the topics, this document indicates

8    there's more things that are working than not working;

9    right?

10   A.    Yeah.  We were taking stock on what we thought across

11   both, working and nonworking.  We didn't feel like things

12   weren't working on this brand.  We were trying to assess it.

13   Q.    And then under content, again, she asked you:  Well,

14   the "not working" column is longer than the "working"

15   column.  The number of bullet topics discussed under

16   "working" and "nonworking," there's five issues, right, on

17   both of them?  It's the same?

18   A.    Yes.  That's true.

19   Q.    And then, in the last column "marketing," there's eight

20   bullets, subjects that are working and not working, seven

21   bullets; right?

22   A.    Yes.

23   Q.    So, I mean, just looking at this document, if we set

24   aside the issue of how long a column is and just look at the

25   number of issues, the author of this seemed to think that

1    more things were working than not working; right?

2    A.    Yes.   Uh-huh.

3    Q.    You were asked a number of questions about trapezoidal

4    packaging, and you said you had found out that Mattel had

5    had trapezoidal packaging in the past?

6    A.    Yes, it had.

7    Q.    And can you tell us what those products were that

8    you're thinking of?

9    A.    There were some fashion doll products from the '70s

10   that had that package shape, generally and Hot Wheels

11   products that had that shape from the '70s.

12   Q.    Ms. Keller called your attention to several packages

13   for Toy Story.

14            Do you recall that exhibit, 9789.   If we could

15   take a look, for example.

16   A.    Yes.

17   Q.    Do you know who -- where this packaging came from?

18   A.    Well, in terms of the design, this was -- this was

19   dictated to Mattel by Disney.   This was Disney's package

20   program.

21   Q.    Can you explain that?   What that's got to do with --

22            How is Disney in a position to dictate the

23   packaging?

24   A.    Toy Story 3 is Disney's license, Disney's property.

25   And so, when they come to us with a program for a licensed

```
 1  property, they have a plan for how they want the entire
 2  range to be packaged, and this was the shape they asked us
 3  to put everything in.
 4  Q.   So Disney came up with the shape of this package?
 5  A.   Yes.  That's correct.
 6  Q.   And is that true for the other Toy Story packages that
 7  Ms. Keller asked you about?
 8  A.   Yes, it is.
 9  Q.   And were there other license -- Toy Story licensees,
10  other than Mattel, in the toy business?
11  A.   On Toy Story 3, there were several:  Hasbro and
12  Thinkway and Etch A Sketch, as examples.
13  Q.   Did they have to have the same packages, as well?
14  A.   Yes, they did.
15  Q.   Again, Disney required it?
16  A.   Yes.  Disney required it.
17  Q.   If Mattel sold some $750 million in total sales of
18  MyScene, would you regard -- do you regard that as a
19  failure?
20  A.   MyScene I regard as a success in that measure.
21  Q.   If we could take a look at a document that we looked at
22  several times, Exhibit 1804, page -7.  And there is some
23  information there about Barbie has ceded significant market
24  share year-to-date -- to Bratz year-to-date per TRSTS.
25           Do you see that?
```

1    A.    Yes.   Uh-huh.

2    Q.    Was that your experience that Barbie had, in fact, lost

3    market share to Bratz?

4    A.    Yes.   This is what I learned upon coming back and

5    studying what was going on.

6    Q.    And that was true at all age levels that Barbie lost

7    market share to Bratz?

8    A.    We were seeing it across the business, yes.

9    Q.    Over time did the particular market share or age level

10   where Bratz started to cut into Barbie sales, did it change?

11   A.    Well, our concern was, as we did our research, that we

12   saw that Bratz was beginning to appeal younger and younger

13   and we expected that market share decline could accelerate.

14   Q.    And did that happen?   Did Bratz start to appeal to

15   younger and younger girls?

16   A.    Yes, we did see that.

17   Q.    And Barbie lost sales to Bratz, to younger girls as

18   well as time went on?

19   A.    Yes, we did.

20          MR. QUINN:   Your Honor, could we deal with -- take

21   a moment to deal with this issue now, or -- no, not a good

22   time.

23   BY MR. QUINN:

24   Q.    You were asked yesterday about --

25          THE COURT:   Here's where we're eventually going to

55

```
1   end up without a stipulation between the two of you.  I can

2   address it, right now, right in front of the jury.

3            I don't want the impression that all those

4   articles match up with all the e-mail information, or they

5   don't.  So if counsel wants to spend their time asking on

6   direct and cross, they can spend the last few hours they

7   have going through every one of those articles.  But,

8   otherwise, there is a potential misimpression for both sides

9   that all those articles contain like information, or all the

10  information doesn't.

11           So their choice.

12  BY MR. QUINN:

13  Q.   Yesterday you were asked about Exhibit 1812-A.  If we

14  could look at that, page -12, and there was a Bratz image

15  there.  1812-A.

16           THE COURT:  And, by the way, I need to read every

17  one of those articles, anyway.  So that's what we'll do,

18  part of this weekend.

19  BY MR. QUINN:

20  Q.   In the upper right-hand corner, there is that image of

21  the Bratz dolls.  Ms. Keller asked you if you had gotten

22  permission from MGA to use those images.

23           Do you recall that question?

24  A.   Yes, I do.

25  Q.   Is this document, Exhibit 1812-A, is that an internal
```

1    Mattel document, or something that was used outside of

2    Mattel?

3    A.    It was an internal document.

4    Q.    And was that shown to any members of the public or used

5    to sell any products?

6    A.    No, it wasn't.

7    Q.    And did Mattel ever use this image to try to suggest to

8    anyone that Bratz was somehow affiliated with Mattel?

9    A.    No, it did not.

10   Q.    You were asked some questions yesterday about your move

11   also from Disney.

12          Now, as I understand it, you had a written

13   employment agreement with Disney?

14   A.    That's correct.

15   Q.    And it had a specific time period?

16   A.    Yes, it did.

17   Q.    And it ran through when?

18   A.    It ran through June of 2004.

19   Q.    And you had -- during the time before your agreement

20   was concluded, you had conversations with Mattel about the

21   potential of going to work for Mattel?

22   A.    Yes, I did.

23   Q.    And did you -- did Mattel know that you had this

24   agreement?

25   A.    Yes, they did.

1   Q.   And did you tell Mattel anything about whether or not

2   you thought Disney would let you out of that agreement?

3   A.   Well, as I mentioned yesterday, I believed that Disney

4   would.  And I said that.

5   Q.   And it turned out, Disney didn't want you to leave just

6   then?

7   A.   That's correct.

8   Q.   And in your experience in the business world, was that

9   kind of unusual?

10  A.   Yes.  I found it unusual.  I thought they would be fine

11  with me leaving.

12  Q.   But in any event, was there ever a time when you were

13  working for both Disney and Mattel at the same time?

14  A.   No.

15  Q.   When Disney wouldn't let you out of your contract, what

16  happened?

17  A.   Mattel revoked the offer, and I continued to work for

18  Disney.

19  Q.   And you continued to perform your duties there at

20  Disney?

21  A.   That's correct.  Yes.

22  Q.   Did you continue to perform your contract?

23  A.   Yes.  Uh-huh.

24  Q.   For how long?

25  A.   It was until October of 2003.

1  Q.   Did there come a point where Disney changed its mind

2  about letting you out of your contract?

3  A.   Disney was ultimately comfortable with that as of

4  October.

5  Q.   And what happened then?

6  A.   Then I returned to Mattel.

7  Q.   How did that come about?  Mattel contact you again, or

8  you contacted them?  What happened?

9  A.   No, I was talking to Mattel.  I was aware there was

10 still a role.

11 Q.   And what happened in terms of how you came to go back

12 there?

13 A.   Well, I ultimately -- ultimately, agreed with Disney

14 that they would let me out of the contract; and then, I

15 signed a new agreement with Mattel.

16 Q.   Did you communicate with Mattel about Disney toy issues

17 during that period?

18 A.   No, I did not.

19 Q.   Or have any communication with anyone at Mattel about

20 Mattel toy issues?

21 A.   No, I did not.

22 Q.   At any time did you ever assist Mattel while you were

23 employed by Disney?

24 A.   No, I didn't.

25 Q.   Have you ever assisted Disney while you were employed

1    by Mattel?

2    A.    No, I do not.

3    Q.    Did you take any confidential information or designs

4    with you when you left Disney and went to Mattel?

5    A.    No, I didn't.

6    Q.    Did you ever take any product designs that you had

7    developed or worked on at Disney and take them to Mattel?

8    A.    No, I didn't.

9    Q.    Or any inventions you had created?

10   A.    No.

11   Q.    When you left Disney and started at Mattel in

12   October 2003, you started in what position?

13   A.    I was ultimately over the -- responsible for the girls

14   marketing group at the beginning.

15   Q.    And Ms. Keller showed you Exhibit 1804.

16          MR. QUINN:  If we could look at that.

17        (The document was published in open court.)

18   BY MR. QUINN:

19   Q.    You created this in October of 2003 when -- when you

20   were just starting your new job at Mattel?

21   A.    Yes.  That's correct.

22   Q.    And at that time, did you have responsibility for

23   design?

24   A.    Directly, no.  That happened later, beginning of 2004.

25   Q.    If you look at page 2 of Exhibit 1804-2, it says:

60

```
 1    Their brand was losing -- Brand losing significant market
 2    share to Bratz and Disney Princess.
 3              Do you see that?
 4    A.    Yes.
 5    Q.    That's what you thought at the time?
 6    A.    Yes.
 7    Q.    And there was a question yesterday that came up as to
 8    whether Disney was a competitor?
 9    A.    Yes.
10    Q.    And I think you said there was a -- there became a
11    different company responsible for this Disney Princess?
12    A.    At that time, the product that was being marketed by --
13    the Disney Princess product at that time was coming from
14    Playmate Toys.
15    Q.    And who are they?
16    A.    Another toy company.
17    Q.    What was their relationship to Disney?
18    A.    They were a licensee of Disney.  They had the rights to
19    sell those dolls at that time.
20    Q.    Did that then change?
21    A.    Yes.
22    Q.    At some point?
23    A.    Well, yes, it changed in 2004 and Mattel had those
24    rights.
25    Q.    When you came back to Mattel and were in charge of
```

1    marketing for girls toys, can you tell us what kinds of

2    things you were focused on?

3    A.    Well, at that time I was primarily focused on

4    understanding the scope of what was happening with the

5    brand.

6    Q.    And when you looked in to see what types of things you

7    might be able to change, what types of things did you think

8    in terms of from a marketing person?

9    A.    Well, I focused first on what we were going to need to

10   do from a marketing standpoint in 2004.  If you remember

11   from yesterday, we were looking at the brand declining in

12   2003.  So I focused on what can we do quickly for 2004 from

13   a marketing standpoint and from a promotional program

14   standpoint.

15           MR. QUINN:  If we could look at pages –18 and –19

16   of Exhibit 1804.

17   BY MR. QUINN:

18   Q.    First, –18, what are you writing about here?

19   A.    These two pages were about what I felt we needed to do

20   quickly across the brand to shore up the marketing, the

21   account plans, the retail plans, as well as the plans with

22   our licensing business, or our consumer products business.

23   Q.    So these are the types of things you thought you could

24   address relatively quickly?

25   A.    Yes.  In 2004.

62

1    Q.    From a marketing standpoint?

2    A.    Yes.

3    Q.    Which was your area of responsibility?

4    A.    At that time, yes.

5    Q.    You indicated yesterday that the story behind the doll,

6    the fashions, packaging, retail presence, those things are

7    all important?

8    A.    Yes.

9    Q.    How about the product itself?

10   A.    Well, the product has to be great to start with;

11   otherwise none of that is going to work.

12   Q.    You don't sell many poor products in great packages?

13   A.    Not usually, no.

14   Q.    In October of 2003 when you returned to Mattel, did you

15   think that Mattel was free to sell dolls that looked just

16   like Bratz?

17   A.    No.

18   Q.    Why not?

19   A.    That was their product.

20   Q.    Did you think that in October of 2003 that Mattel was

21   free to use the Bratz doll sculpt?

22   A.    No, I did not.

23   Q.    In October 2003, did you know who Carter Bryant was?

24   A.    I did not.

25   Q.    In October of 2003, did you know that Bratz had been

 1    developed by a Mattel doll designer working in the Mattel

 2    design center?

 3              MS. KELLER:  Objection.  Assumes facts not in

 4    evidence.

 5              THE COURT:  Just a moment.  Sustained.

 6              MR. QUINN:  Your Honor, may we take a bathroom

 7    break?

 8              THE COURT:  That would be a good idea.

 9              You're admonished not to discuss this matter

10    amongst yourselves, nor form or express any opinion

11    concerning the case.

12              We'll come and get you in 15 minutes.

13              Counsel, then, we'll see you 10 after the hour.

14    Would that be acceptable?

15              MR. QUINN:  Yes, your Honor.

16              THE COURT:  We'll open the doors at that time.

17              Sir, you may step down.

18        *(Recess taken from 1:55 p.m. to 2:11 p.m.)*

19        *(The following proceedings were had in open court*

20        *in the presence of the jury:)*

21              THE COURT:  Back on the record.

22              The jury is present, the witness, counsel and the

23    parties.

24              And, counsel, if you would like to continue with

25    your cross-examination, please.

1          MR. QUINN:  Thank you, your Honor.

2                    CROSS-EXAMINATION

3     BY MR. QUINN:

4     Q.   If we could go back to Exhibit 2107, and this is

5     that -- look at -2, the Debbie Haag TR meeting notes.

6             Do you see that, sir?

7     A.   Yes, I do.

8     Q.   And there's an e-mail on the preceding page, -1, from

9     Janet Han.

10            In that e-mail, she says:  *Milt, see below the*

11    *Sunkist Summer Doll will retail for 19.98.  TRU's current SP*

12    *04 --*

13            What does "SP" mean?

14    A.   Spring.

15    Q.   *'04 sales projection is 100 units.  And then:  The*

16    *Sunkist Summer Pool set will retail for 49.99.  TRU's*

17    *current SP '04 sales projection is 18 units.*

18            Do you see that?

19    A.   Yes.

20    Q.   This is the kind of information that a buyer like TRU

21    might share or would share?

22    A.   Yes.  This would be buyer information.

23            MR. QUINN:  And, your Honor, I would like to, if I

24    could, please, read the rest of the deposition testimony

25    from Mr. Kilpin's deposition.

 1              THE COURT:  Just refer to the page again for the

 2   record and the lines.

 3              MR. QUINN:  Ms. Keller read from -- if my notes

 4   are right -- page 516, line 15.

 5              THE COURT:  Would you designate the area that you

 6   are reading from?

 7              It's just below it.

 8              MR. QUINN:  Yes, it's just below that.  But I

 9   think I have to read the first part to put it in context,

10   your Honor.

11              This is April 8th, 2010.  I'll read from page 516,

12   line 15 to 517, line 25:

13              *Right.  And Ms. Han is the one who got the*

14   *information.  She was a Mattel employee at the time,*

15   *correct?*

16        *ANSWER:  Yes.*

17              *Do you see anything wrong with her seeking out*

18   *Toys "R" Us sales projection for the MGA products?*

19              *Yeah, I'm -- I would not have expected that*

20   *information to be there.*

21        *QUESTION:  Why not?*

22        *ANSWER:  That doesn't seem to be information,*

23        *unlike information -- well, you know, I would be*

24        *speculating.  I don't know how she got it.  Does*

25        *it say -- I don't know.  She doesn't say.*

1          *QUESTION:  And why would you not have expected her*

2          *to have obtained that information, the sales*

3          *projections?*

4          *ANSWER:  Yeah, I -- sorry.  I don't know how she*

5          *would have gotten that.  I understand how she*

6          *would have gotten the information from the concept*

7          *lab because that's sort of -- that's generally*

8          *available information.  You know, I don't know how*

9          *she would have gotten that other information.*

10          *It's available to people who have access to the*

11  *concept lab?*

12          *ANSWER:  This information (indicating), yes.*

13  BY MR. QUINN:

14  Q.   And the concept lab that's referred to -- if we could

15  go back to Exhibit 2107-2, Debbie Haag at the top refers to

16  the Wayne concept lab, which I think you told us is the TRU

17  planogram room; correct?

18  A.   Yes.  That's right.

19  Q.   And the Ms. Han, who we started out on the first page,

20  whose e-mail we started out looking at and who's referred to

21  in your deposition, she has left Mattel and been hired by

22  MGA; correct?

23  A.   She was, yes.

24  Q.   During all of this time since you've returned to Mattel

25  and during the time period that you've looked back and you

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   indicated that you've done some research and tried to
 2   educate yourself about Barbie's recent history, was Barbie
 3   always the number one fashion doll in the world?
 4   A.   Yes, it was.
 5   Q.   So why, house on fire?
 6   A.   We were concerned about the sales declining.  We were
 7   concerned about losing share to Bratz.
 8   Q.   And did you think there were some things that you could
 9   do better?
10   A.   Yes.
11   Q.   And tried to address those?
12   A.   Yes, we did.
13   Q.   But you couldn't bring out Bratz?
14   A.   No, we couldn't.
15   Q.   If you look at Exhibit 9284, the market -- Mattel
16   market intelligence department, beyond the numbers report,
17   dated February 11, 2004, we looked at that when I first
18   started questioning you.
19          Do you recall that?
20   A.   Yes.
21   Q.   And it says at the bottom of the last page, -3, it
22   says:  *Brought to you by Sal Villasenor and Stephanie Page.*
23          Do you have any understanding how this so-called
24   market intelligence department fits into the organization at
25   Mattel?
```

1  A.   Well, as I said, my understanding was, if anything, it

2  was part of the research group.

3          MS. KELLER:  Objection.  Speculation.  Motion to

4  strike.

5          THE COURT:  Sustained.

6  BY MR. QUINN:

7  Q.   Well, I mean, were you at any time aware there was a

8  separate department called "market intelligence department"?

9  A.   I was not.

10 Q.   How many two-person departments do they have at Mattel?

11         MS. KELLER:  Objection.  Assumes facts not in

12 evidence.

13         THE COURT:  Sustained.

14 BY MR. QUINN:

15 Q.   Are you aware of any two-person departments at Mattel?

16         MS. KELLER:  Objection.  Assumes facts not in

17 evidence.

18         THE COURT:  Sustained.

19         I think Mr. Villasenor is going to testify, but I

20 don't know how he knows if it's two-person, three-person, or

21 four-person department, or how many people are in it.

22         Sustained.

23         Now, they may have two people on this note, but

24 that doesn't mean it's a two-person department.

25         MR. QUINN:  Different, yes, your Honor.

69

```
 1   BY MR. QUINN:

 2   Q.   Totally without reference to Mr. Villasenor and market

 3   intelligence, do you know of any two-person departments at

 4   Mattel?

 5           MS. KELLER:  Objection.  Irrelevant.

 6           THE COURT:  Just generally speaking?

 7           MR. QUINN:  Yes.

 8           THE COURT:  Two people in a department.

 9           MR. QUINN:  And they comprise the department.

10           THE COURT:  You can answer that question.

11           Do they have two people in a department?

12           THE WITNESS:  I can't think of any.

13           MR. QUINN:  Nothing further.

14           THE COURT:  Redirect.

15           MS. KELLER:  Thank you, your Honor.

16                      REDIRECT EXAMINATION

17   BY MS. KELLER:

18   Q.   Mr. Kilpin, let's take a look, again, at Exhibit 8751

19   and that's dated Friday, December 5th, 2003; right?

20   A.   Yes.  Uh-huh.

21   Q.   And you are saying the information in this e-mail was

22   available in an article published in the L.A. Times;

23   correct?

24   A.   Yes, generally.

25   Q.   That article was an article entitled:  "Bratz Dolls
```

1   Little Sisters to Challenge Barbie"?

2   A.   Yes, I believe so.

3   Q.   So you've looked at that article, of course, to be able

4   to determine that the same information was available in that

5   article that is available in your e-mail; right?

6   A.   Yes.  Uh-huh.

7   Q.   And can you tell me where in the *L.A. Times* article is

8   found that the dolls are eight inches, a bit shorter than

9   Bratz?

10          It's not in the article, is it?

11  A.   I don't have the article in front of me, but --

12  Q.   Did you compare the two?

13  A.   I read the article again, yes.

14  Q.   And you read it so that you could say that all the

15  information in this e-mail came from that article; right?

16          MR. QUINN:  Misstates his testimony, your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  I'm sorry.  What's the question?

19  BY MS. KELLER:

20  Q.   And you read it so that you could compare it to this

21  e-mail and tell us that all the information in this e-mail

22  was public information in that *L.A. Times* article,

23  December 4th; right?

24  A.   Yes.

25  Q.   Well, nowhere in the article does it say that these

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    eight-inch dolls were a bit shorter than Bratz; right?

2    A.   Yeah, I don't remember that.

3    Q.   Nowhere in the articles does it say, FOB Hong Kong cost

4    14.99; right?

5    A.   I don't believe so, no.

6    Q.   And -- well, you know it's not in there; right?

7    A.   I would have to go back and read the article again, but

8    I don't believe so.

9    Q.   Nowhere in the article does it say FOB L.A. costs

10   16.99; right?

11   A.   I don't believe so.

12   Q.   It doesn't have this confidential price information in

13   it; right?

14           MR. QUINN:  Assumes facts not in evidence, your

15   Honor.

16           THE COURT:  Overruled.

17           THE WITNESS:  I don't believe it does.

18   BY MS. KELLER:

19   Q.   Did Mr. Quinn give you a copy of this article to

20   actually look at?

21   A.   Yes, I looked at it.

22   Q.   And do you need a moment just to make sure that there

23   is absolutely nothing in here about these eight-inch dolls,

24   or FOB Hong Kong, or FOB LA?  Would you like me to bring you

25   a copy?

1   A.   Yes, please.

2          THE COURT:  We'll stop the time clock for a while,

3   so just stop the time clock.

4      *(Pause.)*

5          THE WITNESS:  Okay.

6          THE COURT:  Now, start the time clock.

7   BY MS. KELLER:

8   Q.   That information about eight-inch dolls isn't there, is

9   it?

10  A.   No, it's not.

11  Q.   That information about FOB Hong Kong costs is not in

12  there; right?

13  A.   The retail price is.

14  Q.   Well, is FOB Hong Kong costs 14.99 in there?

15  A.   No, it's not.

16  Q.   And that would be the cost of somebody -- of a store, a

17  retailer purchasing it from MGA; right?

18  A.   That's correct.

19  Q.   And that's not in the article anywhere.  Nothing about

20  the costs of the retailer of any kind; right?

21  A.   That's right.

22  Q.   And nothing is in this article about FOB LA costs,

23  whatsoever; right?

24  A.   That's correct.

25  Q.   Let alone 16.99; right?

1    A.    *(No audible response.)*

2    Q.    That's not in there anyway; right?

3    A.    No.

4    Q.    The only information in here is that the dolls are

5    expected to retail to the public at about $25; right?

6    A.    Yes.  Uh-huh.

7    Q.    And do you -- this article that is now in evidence,

8    you've read all of it?

9    A.    Yes.

10              THE COURT:  Had I received this article?

11              MS. KELLER:  Yes, your Honor.

12              THE COURT:  Is this the one you two stipulated to?

13              MS. KELLER:  Yes, your Honor.

14              MR. QUINN:  Yes.

15              THE COURT:  Then, the rest probably won't be

16    coming in.

17              MS. KELLER:  The rest of the articles?

18              THE COURT:  Yeah, the rest of the articles

19    probably will not be coming in.

20              MS. KELLER:  I understand that, your Honor.

21              THE COURT:  Use your time accordingly, between the

22    two of you.

23    BY MS. KELLER:

24    Q.    And do you agree with the statement that the analyst

25    makes in this article that, quote:  *The tough part is that*

1    *Bratz filled a void where there was no real doll,* speaking

2    of its appeal to the older girl set.

3              Do you see that statement?

4    A.   Yes, I do.

5    Q.   And that's exactly what we've been talking about, that

6    Barbie just wasn't appealing to that age segment; right?

7    A.   Yes.  That's correct.

8    Q.   And so the analyst is basically saying that -- in this

9    article, that MGA is going to have a tougher time with

10   Forever Best Friends, because it's going to be competing

11   against another Mattel product directly, whereas Bratz came

12   in and filled a void where there was no real doll; right?

13   A.   Yes.  Uh-huh.

14   Q.   So at least according to this analyst, Bratz wasn't

15   taking anything away from Barbie, because Barbie and Bratz

16   were competing for a different market; right?

17   A.   According to this analyst, yes.

18   Q.   And that person is a very well-known toy analyst;

19   right?

20             This is Jim Silver, publisher of toy magazines for

21   the trade and consumer markets?

22             MR. QUINN:  Your Honor, this was not admitted for

23   the truth.

24             MS. KELLER:  I'm asking if he agreed with the

25   statement, your Honor.

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  Yes, that was Jim Silver.

 3    BY MS. KELLER:

 4    Q.   Now --

 5                THE COURT:  Now, remember, this -- Mr. Quinn,

 6    right -- it's not admitted for the truth of the matter

 7    asserted.

 8                In other words, somebody wrote this.  We don't

 9    have that person on cross-examination, okay?

10    BY MS. KELLER:

11    Q.   Now, let's look at Exhibit 7795.  And that was the

12    e-mail from Steve Totzke, dated Thursday, January 15th.  It

13    said:  Confidential Kilpin, Arons and Bossick; right?

14    A.   Uh-huh.

15    Q.   And I believe you were you saying that the information

16    available in this e-mail was available in a MGA press

17    release; right?

18                MR. QUINN:  Misstates the testimony.

19                THE COURT:  Overruled.

20                THE WITNESS:  I'm sorry.  On this --

21    BY MS. HURST:

22    Q.   Well, if we look at this e-mail, you took this e-mail

23    and you incorporated it into 7790, your e-mail of

24    February 2nd, 2004; right?

25    A.   Yes.  That's correct.
```

76

1   Q.   Let's go to that e-mail, 7790, and I believe you just

2   testified that you got all that information directly out of

3   a MGA press release; right?

4            MR. QUINN:  Misstates the testimony.

5            MS. KELLER:  I'll rephrase.

6   BY MS. KELLER:

7   Q.   By the time you sent this e-mail, MGA had issued a

8   press release with this information; right?

9   A.   That was what I remembered.

10  Q.   And let's show you the MGA press release 23894.

11           THE COURT:  That does not go up on the screen.

12  Somebody is going to hand that to you.

13  BY MS. KELLER:

14  Q.   Do you have that in front of you?

15  A.   Yes.

16  Q.   And that's the press release; right?

17  A.   Yes.

18  Q.   And let's see, the date is?

19  A.   February 11th.

20  Q.   But your e-mail was February 2nd?

21  A.   Yes.  Uh-huh.

22  Q.   So you didn't get this information out of a press

23  release.  You already had it; right?

24  A.   Yes, it appears so.

25  Q.   You got it from market intelligence; right?  Steve

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Totzke?

2    A.    From Steve, yes.

3    Q.    And is it true that you know of no way that Mattel

4    would have legitimate access to the price MGA charges

5    retailers?

6    A.    I'm sorry.  Could you ask that again.

7    Q.    Is it true that you know of know way that Mattel would

8    have legitimate access to the price MGA charges retailers?

9    A.    The only way that kind of information would come is

10   from buyers.

11   Q.    Do you know of any legitimate way that Mattel would

12   have access to the price MGA charges retailers?

13   A.    Other than from buyers, no.

14   Q.    Is that a legitimate way to get information from

15   buyers?

16   A.    Buyer share, but other than that, no.

17   Q.    It's not legitimate, is it?

18   A.    No.

19   Q.    Aren't buyers told that they should sign nondisclosure

20   agreements to not give that information out?

21            MR. QUINN:  It's overboard, your Honor.

22            THE COURT:  Overruled.

23            THE WITNESS:  Buyers do share that information.

24   BY MS. KELLER:

25   Q.    That's not my question.  They are not supposed to, are

1    they?

2    A.    We prefer they didn't.

3    Q.    They are not supposed, are they?

4    A.    No, we would prefer they didn't.

5    Q.    They sign agreements not to, don't they?

6    A.    I believe they do at least in some cases, yes.

7    Q.    The answer is, yes, isn't it?

8    A.    Generally, yes.

9    Q.    Now, you said that you were able to go into MGA's

10   showroom when you were with Disney and look around, and

11   Mr. Larian showed you around; right?

12   A.    Yes, he did.

13   Q.    And you didn't have to sign any nondisclosure

14   agreement.

15            True?

16   A.    Yes.

17   Q.    Well, at the time, you were with Disney consumer

18   products?

19   A.    Yes, that's correct.

20   Q.    And that includes Disney Toys?

21   A.    I oversaw the toy group for Disney consumer products.

22   Q.    You were the head of it; right?

23   A.    Yes.

24   Q.    And you licensed the Disney Power Rangers toy to MGA;

25   right?

79

1   A.   Yes, I did.

2   Q.   MGA was making it for you; right?

3   A.   Yes.

4   Q.   And when a toy is licensed to a toymaker, both sides on

5   the transaction sign confidentiality agreements already;

6   right?

7   A.   Generally, yes.

8   Q.   So you weren't in the position of a retailer or member

9   of the press when you went to that showroom; right?

10  A.   I was going as a partner.

11  Q.   You were going as a partner?

12  A.   Uh-huh.

13  Q.   You already had confidentiality agreements in place;

14  right?

15  A.   I expect so, yes.

16  Q.   And you knew that when you gave that testimony; right?

17  A.   I hadn't thought of it that way, but, yes.

18  Q.   You knew you weren't in the same position as a member

19  of the press going into a private showroom; right?

20  A.   Not the same as the press, no.

21  Q.   And not the same as a retailer either; right?

22  A.   Yes.

23  Q.   Now, you know, don't you, that after 2003, MGA asked

24  Wal-Mart, Target and other stores to have a separate

25  planogram for MGA products in a separate area.  You know

1   that; right?

2           MR. QUINN:  Objection to the time period, your

3   Honor.

4           THE COURT:  Overruled.  After 2003.

5           You can answer that question, sir.

6           THE WITNESS:  I wasn't aware of that.

7   BY MS. KELLER:

8   Q.   You know that MGA asked for its products to be

9   separately planogramed because Mattel was taking digital

10  pictures of them; right?

11  A.   I wasn't aware of that.

12  Q.   Isn't it true that Wal-Mart actually threatened that --

13  threated Mattel that Mattel would be thrown out of its

14  planogram rooms, unless it agreed not to photograph MGA

15  products?

16  A.   I never heard that.

17          MS. KELLER:  Nothing further.

18          THE COURT:  Redirect, Mr. Quinn, on behalf of

19  Mattel.

20                  REDIRECT EXAMINATION

21  BY MR. QUINN:

22  Q.   You have been in Wal-Mart, Target, Toys "R" Us

23  planogram rooms?

24  A.   Yes, I have.

25  Q.   And you've seen the products of other toy

1    manufacturers?

2    A.    Yes, I have.

3    Q.    In those planogram rooms?

4    A.    Yes.

5    Q.    Including MGA?

6    A.    Yes.

7    Q.    You were asked about Exhibit 87 -- the *L.A. Times*

8    article, Exhibit 24711?

9    A.    Yes.

10            THE COURT:  If he needs to read that, Counsel,

11   I'll stop the clock also.

12            MR. QUINN:  I think he has read it, your Honor.

13   BY MR. QUINN:

14   Q.    You saw this -- you read this before that e-mail was

15   ever sent; correct?

16   A.    Yes, I recall reading that when it came out.

17   Q.    You saw this *L.A. Times* article before you got that

18   e-mail from the so-called confidential source?

19   A.    Yes, I did.

20   Q.    That's Exhibit 8751.  If we could look at that again

21   where Sharon Spaulding says, *I've received the following*

22   *confidential information from a reliable source*; right?

23   A.    Yes.

24   Q.    The information there came from the buyer; correct?

25            MS. KELLER:  Objection.  Assumes facts not in

1   evidence and calls for speculation.

2            THE COURT:  I allowed you to testify concerning

3   your opinion before.

4            Remember, this is his opinion.

5            So you can cast your opinion, if you believe --

6            THE WITNESS:  Yes, I do believe it came from the

7   buyer.

8   BY MR. QUINN:

9   Q.   Well, you see in the second-to-the-last paragraph, it

10  says:  *The dolls were developed to look like eight-year-old*

11  *girls directed to look like Barbie.  This buyer was not*

12  *impressed and passed on it.  Took the wait-and-see attitude.*

13           Do you see that?

14  A.   Yes, I do.

15  Q.   And this -- this is dated December 5th, and the

16  *Los Angeles Times* article is dated December 4; correct?

17  A.   Yes.

18  Q.   So this FOB pricing information appears to have come

19  from the buyer; correct?

20  A.   It appears to, yes.

21  Q.   And it's not a surprise to you, based on your

22  experience in the toy industry, that buyers who are seeking

23  to stimulate competition among toy companies share

24  information like that?

25  A.   Yes, it's not a surprise.

1    Q.    That's consistent with your experience?

2    A.    Yes, it is.

3    Q.    And if we look at the top e-mail where you say, *You,*

4    *the man* -- I think that's usually abbreviated "dah."  *I*

5    *turned the team on yesterday to respond to this big time.*

6              So you set in motion Mattel's competitive response

7    to this the day before, December 4th, after you saw the

8    *L.A. Times* article; correct?

9    A.    That's correct.

10   Q.    The *L.A. Times* article had pictures of the product that

11   MGA was bringing to market?

12   A.    Yes, it did.

13   Q.    And information concerning the themes, including

14   pajama -- a pajama theme?

15   A.    Yes.

16   Q.    If we could look at 24711-7.  Not very good copy, but

17   they're wearing pajamas?

18   A.    This is a Beach Party one.

19   Q.    It's a Beach Party one?

20   A.    Uh-huh.

21   Q.    That's another common theme?

22   A.    Oh, yes.

23   Q.    Beach parties in addition to pajamas?

24   A.    Yes.

25   Q.    Do you know if MGA had retailers sign nondisclosure

1  agreements before sharing pricing information, before 2007?

2  A.   I don't know that they did.

3  Q.   And if we look at --

4       MS. KELLER:  I would move to strike that as

5  speculation, your Honor.

6       Sounds like he doesn't know one way or the other.

7       THE COURT:  Just a moment.

8    (Pause.)

9       THE COURT:  His answer is:  *I don't know that they*

10  *did.*

11  BY MR. QUINN:

12  Q.   Do you know whether MGA employees have taken acquired

13  information about Mattel products in planogram rooms?

14       MS. KELLER:  Objection.  Calls for speculation.

15       THE COURT:  Sustained.

16  BY MR. QUINN:

17  Q.   If we look at Exhibit 24711-9, I think we'll see the

18  reference to the pajama party in the upper right-hand

19  corner.

20  A.   Yes.

21  Q.   So both themes were disclosed in the *Los Angeles Times*

22  article, *Beach Party* and *Pajama Party*; correct?

23  A.   Yes.

24       THE COURT:  This is the one article I've received

25  by stipulation?

```
 1              MR. QUINN:  Yes, your Honor.
 2    BY MR. QUINN:
 3    Q.   And there are toy fairs, other than the New York Toy
 4    Fair; correct?
 5    A.   Yes, there are.
 6    Q.   Like the Tokyo Toy Fair?
 7    A.   Yes.
 8    Q.   Which is totally open?
 9    A.   Yes, it is.
10              MR. QUINN:  Nothing further.
11              THE COURT:  Sir, we're going to ask you to remain
12    on call until the first week in April.  This case will be
13    argued to the jury on April 6, okay?
14              You may step down.
15              Counsel, your next witness, please.
16              MS. KELLER:  Yes, your Honor.  MGA and Mr. Larian
17    call Erich Joachimstahler.
18              THE COURT:  Thank you, sir.  If you'll step
19    forward between the double doors.  Time is valuable.
20              Step forward, sir.
21              Now, raise your right hand please.
22        ERICH JOACHIMSTAHLER, DEFENDANTS' WITNESS, SWORN
23              THE WITNESS:  I do.
24              THE COURT:  Sir, if you would move quickly along
25    the side rail.
```

```
 1              Come up here and have a seat, sir.
 2        (Pause.)
 3              THE COURT:  Sir, would you state your full name
 4   for the jury, please.
 5              THE WITNESS:  My name is Erich Joachimstahler.
 6              THE COURT:  And would you spell your last name,
 7   sir.
 8              THE WITNESS:  J-O-A-C-H-I-M-S-T-A-H-L-E-R.
 9              THE COURT:  Thank you.
10              Direct examination by Mr. Keller, on behalf of MGA
11   and Mr. Larian.
12              MS. KELLER:  Thank you, your Honor.
13                         DIRECT EXAMINATION
14   BY MS. KELLER:
15   Q.   Dr. Joachimstahler, are you a brand and marketing
16   consultant?
17   A.   Yes.
18   Q.   From your last name, we might guess that, perhaps,
19   you're from somewhere else?
20   A.   Yes.
21   Q.   Where are you from, originally?
22   A.   I was in Germany, but I live in New York.
23   Q.   And are you a naturalized United States citizen?
24   A.   Yes.
25   Q.   Now, tell us if you can, what is a brand and marketing
```

1  consultant?

2  A.   A brand and marketing consultant is a person that helps

3  build brands.  We advise all kinds of brands about how to

4  build them over time, how to do advertising, how to get them

5  plans on the shelf, how to re-position brands, how to

6  nurture brands, how to keep that brand in the consumer's

7  mind.

8  Q.   Were you hired by MGA to give your opinions in this

9  case about the role of brand building in the success of

10 Bratz?

11 A.   Yes.

12 Q.   And did you provide three expert reports and deposition

13 testimony about your opinions?

14 A.   Yes.

15 Q.   Let's review your educational and professional

16 background, if we may.

17       THE COURT:  Counsel, he will be on the stand a

18 very short period of time.

19       He'll be on the stand a very short period of time.

20 BY MS. KELLER:

21 Q.   You first came to the United States after graduating

22 with a degree in economics from the University of Frankfurt?

23 A.   Correct.

24 Q.   And then, got a master's degree in -- from the

25 University of Kansas?

```
 1   A.   That's right.
 2   Q.   Ph.D. in business administration from the University of
 3   Kansas?
 4   A.   Correct.
 5   Q.   And post-doctoral work at Harvard Business School; is
 6   that right?
 7   A.   That's correct, yes.
 8   Q.   And after graduating from Harvard, you've been on the
 9   faculty, at IESE, in Barcelona; is that right?
10   A.   That's correct.
11   Q.   Is that an internationally known business school?
12   A.   Absolutely.  Yes.
13   Q.   And then you came to the United States and became a
14   professor at the University of Virginia?
15   A.   Yes, that's right.
16   Q.   That was for five years?
17   A.   That's correct.
18   Q.   And after that, you started your own consulting firm,
19   focusing on brand, strategy and marketing.
20            True?
21   A.   Yes.  That's correct.
22   Q.   After five years, did you sell that company and move to
23   New York?
24   A.   Yes.
25   Q.   And are you now -- do you now have your own consulting
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    called the Vivaldi Partners?

2    A.    That's correct.

3    Q.    What does the Vivaldi Partners do?

4    A.    The Vivaldi Partners is a consigning firm with about 80

5    consultants.  We do help brands in all sorts of things.  We

6    build brands.  We evolve brands.  We re-position brands.  We

7    grow brands.  We work with all sorts of marketing,

8    communications, advertising and brand-related matters with a

9    lot of companies.

10   Q.    You have about 80 employees worldwide both in New York

11   and Latin America and in Europe doing this kind of work?

12   A.    That's correct.

13   Q.    And do you also guest lecture at UC Berkeley, Harvard,

14   Helsinki School of Economics and the University of Munich?

15   A.    Yes.  Always, if time permits.

16   Q.    And when you lecture, you lecture on brand management,

17   building strong brands and marketing?

18   A.    That's correct.  Yes.

19   Q.    You've written over 80 articles in the field?

20   A.    Yes.

21   Q.    And two books?

22   A.    Yes.

23   Q.    And you've written a book called Brand Leadership:  The

24   Next Level of the Brand Revolution?

25   A.    That's correct.  Yes.

90

1    Q.    Translated into 13 languages?

2    A.    Yes, it is.

3    Q.    Another book in 2007 called:  *Hidden in Plain Sight.*

4    *How to find and execute your next big growth* strategy?

5    A.    Yes.

6    Q.    That's in nine languages?

7    A.    Yes.  So far.

8    Q.    And in conjunction with your research for this book,

9    did you study the business or products of MGA?

10   A.    Yes, I did.

11          MS. KELLER:  Your Honor, we would offer

12   Dr. Joachimstahler as an expert in branding.

13          THE COURT:  You may proceed.

14   BY MS. KELLER:

15   Q.    Dr. Joachimstahler, you've been an expert witness in

16   several cases about branding and marketing and brand

17   erosion?

18   A.    That's correct.

19   Q.    Are you and your firm being compensated at your normal

20   hourly rate?

21   A.    Yes.

22   Q.    Is that $700 an hour for your own time?

23   A.    Yes.

24   Q.    $375 for a Vivaldi director's time?

25   A.    Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   Q.   And $325 an hour for a manager's time?

2   A.   Yes.

3   Q.   150 for a research associate?

4   A.   Yes.

5   Q.   What are your fees over the last, roughly, four years?

6        Is it four or five years?

7   A.   Yes.

8   Q.   What have they come to all together?

9   A.   I don't know the exact number.  It's somewhere in the

10  neighborhood of $400,000.

11  Q.   Did that include your work for the first trial as well

12  as this trial?

13  A.   Yes.  All the work, yes.

14  Q.   Now, in reaching your opinions in this case, can you

15  tell us what written materials you looked at?

16  A.   I reviewed a lot of material, mostly in the

17  neighborhood between 2000 and 2008, 2009.  Also, to the

18  recent -- primarily from MGA, and also from Mattel as part

19  of this.

20       I reviewed marketing plans.  I reviewed brand

21  plans.  I reviewed a lot of research with consumers both

22  from MGA and also from Mattel.  I spent an awful lot of

23  time, literally, looking at all the materials that I could

24  get my hands on in this particular case.

25  Q.   And that included business plans, marketing,

1    advertising plans?

2    A.    It included internal briefs, marketing plans.   The

3    answer is yes.

4    Q.    Product lines from both companies?

5    A.    I looked at all the product lines, all the launches of

6    products, all the campaigns they did over the years.   There

7    are many, many campaigns that were launched both by MGA and

8    by Mattel.

9    Q.    And did you also read testimony of witnesses in this

10   case?

11   A.    Yes.

12   Q.    Did you also read academic and industry research

13   articles and books about brand building and management?

14   A.    I did that.   And I also did work on, particularly,

15   about teens and tweens, teenagers and younger audiences,

16   yes.

17   Q.    Did you look at any actual stores where the products

18   have sold?

19   A.    Yes.   As it is customary when I do this kind of work, I

20   spend an awful lot of time in stores.   We call it doing a

21   retail audit.   That is going to stores, checking the prices,

22   checking the shelves.   We actually measure shelf space, how

23   many SKUs units there are, how big shelf space is.   We look

24   across brands.   We look how the shelf is organized.   We try

25   to get how consumers -- a mother, or a child, or a girl --

1    would encounter the brands on the shelf, where they buy and

2    make a choice.

3    Q.    Did you also look at a phenomenon called -- for

4    shorthand -- K-G-O-Y?

5    A.    Yes.

6    Q.    What does that stand for?

7    A.    It's a very well known phenomenon in the children's

8    market; and that is -- it says, kids grow older younger.

9            Something that you have seen over the last 20

10   years.  It's called -- it's called an H compression that

11   kids grow much faster younger.

12   Q.    And did that play a role in your analysis in this case?

13   A.    Yes, absolutely.

14   Q.    Did your field work about the importance of creating

15   strong brand identities in the minds of the consumers, have

16   anything to do with that?

17   A.    My field work?  I didn't hear the question.

18   Q.    Did your field work concerning the importance of

19   creating strong brand identities in the mind of consumers

20   blend with any of your research?

21   A.    Yes.  Absolutely.

22   Q.    And can you explain that?

23   A.    Yes.  When you look at the KGOY phenomenon, what you

24   see is, you see that until maybe 2000 and even before the

25   market for young girls was divided in those girls up to 12

1    years and the girls between 12 years or 13 years and

2    afterwards.

3            From my research, I found that Barbie had always

4    been in that market up to girls up to 12 years.  Beyond

5    that, the girls trade out, we say, or get sort of

6    disillusioned, perhaps, with a brand or sort of trade out of

7    the brand and find other toys.  When they get 13 and 14,

8    they become teenagers.

9            The KGOY, this H compression, did something very

10   unique in the toy industry.  It divided this two pieces into

11   three.  It made it -- there is now a market today and back

12   in 2000, in particular, a market of girls between three and

13   six years, that traditional Barbie segment.

14           Then, there is a market between seven and 12

15   years, that's what we call tweens now.

16           And then, there's a market between 13 and after.

17           What's so important in 2000, from my -- what I

18   found in my research, that those three types of girls --

19   three to six, seven to 12, and then 13 and older -- have

20   very different motivations.

21           The three- to six-year-old want to be like mom,

22   because they emulate mom.  And that was, traditionally, what

23   Barbie was positioned in.

24           The seven- to 12-year-olds, they don't want to be

25   like mom.  They want to be like their older sister.  They

1    want to be teenagers already, even though at the age of

2    eight, or nine, they are not near close to being teenagers.

3    So their reference group, their group they are looking at

4    and try to emulate through play, like toys, is actually no

5    longer mom.  It's actually that older teenager group.

6           And then, there are the 13 and older.  They go

7    into other kinds of toys.  This is what we call the KGOY,

8    and the phenomenon that we saw back in 2000 and how the

9    opportunities in this case sort of emerged.

10   Q.   We all think we know what a brand is.  But in what you

11   do, is there a particular meaning for the term "brand"?

12   A.   Yeah.  When we -- we make big differentiation or

13   difference between what is a brand and what is a product.

14   At the end of the day, consumers don't buy the product, they

15   buy the brand.

16          A brand is everything that a consumer -- a girl,

17   or the mother, or the parent -- stores in their mind.

18   Everything that you have in their mind organized.  When you

19   think of Nike, there's something comes to your mind.  You

20   close your eyes.  And in your mind, there is something:  Oh,

21   the swoosh.  Michael Jordan.  Kobe Bryant, basketball and

22   the icon.  Athleticism.

23          All of those attributes, feelings, emotions,

24   things that's sort of in your mind, that's what the brand

25   is.  This is what consumers carry in the store when they

```
 1    make a decision.  This is when they -- what they have around
 2    themselves when they decide to play with a doll or leave it
 3    in the bin.  This is -- everything is driven by what's in
 4    that head.  That's what we call the brand.
 5    Q.   And when you work with companies, how do you talk to
 6    them about how to go about building a brand?
 7    A.   I always tell them that they need to -- they need to
 8    have a plan.  Branding just doesn't happen.  It is not just
 9    that you do something once.
10         You have to manage your plan.  You can influence
11    it.  You have to -- we call it, you build a brand.  You go
12    have a brand building program that requires many, many
13    things.  You decide on how you run your advertising.  You
14    decide on how you organize your stores.  You decide on what
15    your website looks like.  You decide -- you have to decide
16    on hundreds of things, just in order to get what you want in
17    consumers' mind.
18         So brand building and how to build a brand is, in
19    my world, a very systematic process that we spend years and
20    years over the last 20 years to formulize so we can help
21    companies to do this as well as it can get -- they can do
22    it.
23    Q.   Now, as well as visual elements of brand building,
24    there are verbal elements, too; right?
25    A.   Yes.
```

```
 1   Q.   So you mentioned the Nike swoosh, but is there a verbal
 2   element that goes with the swoosh?
 3   A.   Yes.  There is always a combination of things.  There
 4   are verbal elements.  For example, think of Apple:  Think
 5   different.  Think of Nike:  Just do it.
 6           So there are verbal elements that we associate
 7   with a brand.  They come to mind.  There also could be
 8   things like a store, like Wal-Mart:  Think low price.
 9   Everyday low price.  Good stuff.  Good quality, low price.
10   This is verbal elements.
11           But visual elements play a particular role.  Maybe
12   the color.  Maybe -- I can, just thinking of the swoosh.  If
13   you just give me the swoosh, I can tell you a lot of things
14   just about Nike.  I recognize it instantly.
15           And so visual elements -- now, think of this.  If
16   you're my age, you remember this and you think of an
17   insurance company.  That's a visual symbol, a visual element
18   of the brand.  Insurance company:  You're in good hands with
19   Allstate.  Things like that are very, very powerful, and
20   they can help consumers, especially young consumers, or
21   parents who don't have a lot of time, can help them recall
22   and remember what they must remember about a brand.
23           So building this visual elements over time and
24   creating sort of a logical, sort of, network in your head
25   that takes the time, and this is what we call building
```

1    brands, using visual elements and verbal elements.

2    Q.   If the company has a well designed product, does that

3    necessarily mean it's got a strong brand?

4    A.   Oh, no.  Unfortunately, that's -- in the toy industry,

5    one of 20 products don't stay on the shelf more than one

6    year.  So there are lots of good products that are launched

7    that simply don't make it after one year.

8         The brand is the one thing that open their eyes,

9    but a product can be extremely good, and you still fail in

10   the branding business and vice versa.

11   Q.   What is the difference between a brand and a product?

12   A.   See, a product is just the physical, if you will,

13   manifestation.  If you think of Apple again, Apple is a good

14   company to talk about here in California.  Think about it.

15   There were 12 perfectly great MP3 players in 2001 on the

16   market.  12.  There was Real.  Microsoft came later with

17   Zoom.

18        They are all good technologies.  They all used

19   identically great technology.  Worked much better than the

20   Walkman.  But only one, only one became really a brand, and

21   that's iPod.  The other are lingering around, and then they

22   disappear.  But there were 12 perfect alternatives.  And it

23   took a long time for iPod to establish in the first years to

24   come, and that's what the difference between a brand and the

25   product.

```
1    Q.    Do brands provides value to the company that owns them?
2    A.    Oh, yes.  A brand in my world and in the world,
3    especially, when you think about young kids and fashions and
4    things like that, brand is everything.  In my opinion,
5    it's -- and I know from research, it's the most important
6    part of the total thing.
7              The reason is, because it's -- because, again, how
8    consumers buy?  But brands is that one part that helps
9    consumers to find the product again, because the product
10   changes every year.
11             Cyrus Miles (sic) is interesting today.  Hillary
12   Duff used to be with -- my daughters, five years ago, used
13   to watch Disney.  Hillary Duff was all over the place.
14   Today, I don't hear about Hillary Duff anymore.
15             All of those things in this world of young
16   consumers, change so fast.  Products changes, their
17   preference changes.  They like different kinds of fashions.
18   All of this changes so fast.
19             The brand provides, sort of, this beacon, that
20   lighthouse and says, *This is what we sell for.  This is what*
21   *we own.*
22             The shoes have changed for Nike.  Even the
23   athletes have changed for Nike, but Nike is still, you know,
24   the winning attitude, American attitude athleticism and
25   performance through technology.  That's Nike, regardless
```

```
 1    what happens.  Even the CEOs change.  That's what sort of
 2    the difference between why a brand for a business is so
 3    critical.
 4              In the fashion, or in the toy business, it is
 5    very, very important.  It helps people find the product.  It
 6    helps people sort of like talk about the product.  It helps
 7    people to connect with the product.  It's the product.  It's
 8    the brand that has this longevity and the product, or a
 9    particular design, or a particular sponsorship that changes
10    all along.
11    Q.   Okay.  If a brand is more than the product and it's
12    more than the CEO, and it's more than the ideas, how does a
13    company go about developing a brand?
14    A.   The way these brands are built is -- when you think
15    about this, it starts with day one.  Day one, you may have a
16    name.  You may have a design.  You may have an idea.  But
17    all of what you have is really empty, because consumers
18    don't know it.  There is no value in consumers' mind.  There
19    is nothing there.  It's an empty sheet.
20              You think of Bratz, yes, there's a name, and it
21    may be a good name, or bad name.  It may be a good name.
22    But there's nothing to Bratz.
23              When you first remember of Nike, Nike had no
24    meaning.  "Nike" is the Sea Goddess of Victory.  Who knows
25    that?  Nobody knows that.  Nike had no value.
```

```
 1              Today, Nike has a value.  Because I know exactly
 2    what it is, and that's how it is.
 3              So in the beginning, you don't have nothing.  And
 4    so you start with a program that lasts over several years
 5    and you say, I'm building this program.  There's a certain
 6    type of customer.
 7              So you define a customer, seven to 12 years old.
 8    And then, you build awareness.  You need to find a way to
 9    get to consumers to become aware of the brand.
10              Once you have awareness, that's not the end.
11    People can say, Oh, yes, I know Aflac.  Think of Aflac.
12    Everybody knows Aflac, the duck.  But what do they do?
13    People don't know.
14              What do they stand for?  Most people don't know.
15    Everybody knows Aflac.  It's the strange voice.  But what
16    the hell do they do?  Nobody knows.  And that's a problem.
17              So branding is a systematic process where you say,
18    stage one, we need to create awareness.  Stage two, we need
19    to define a set of associations.  We call personalities, a
20    set of feelings.  We need to develop in consumers' mind a
21    particular perception about this.  This is a systematic
22    process.
23              This is what we want the girls to think.  This is
24    what we want the parents to think.  This is what helps to
25    make the purchase.  We need to get the brand into consumers'
```

1   hands.  The best -- the best brand builder is the

2   experience.

3           You can have megaphone and big advertising.  You

4   need to get the product on the shelf, and you need to get

5   the product in the hands of consumers.  Because girls, they

6   talk to other girls.  And when you get that kind of

7   communications, then you can build a brand.  So you need to

8   really carefully -- especially today, you need to very

9   carefully plan how do you get awareness?  How do you create

10  trial?  How do you create perception?

11          There are different ways to do that.  Then, once

12  you got that, how do you make sure that these people don't

13  just say, *Well, another doll.*  That these people say, *That's*

14  *my doll.  I like that doll.  This is me.  That doll reflects*

15  *my personality.  I, sort of, identify with that doll.  I*

16  *talk about the doll on FaceBook,* and whatever these girls

17  are these days.

18  Q.   Doctor, can I interrupt you?

19  A.   I'm sorry, yeah.  Those are the steps, I think -- I

20  just wanted to explain that this is a really complex,

21  sophisticated process to build a brand over time.

22  Q.   We're going to want to get to the facts of this case

23  fairly quickly, but first I want to ask you if you've got a

24  graphic that serves as a general illustration of a brand;

25  and then, I want like to move to this particular brand,

1    Bratz, okay?

2    A.    Yes.

3    Q.    If we could have Exhibit 36110-2.

4    A.    Yeah.

5    Q.    Is that a graphic that serves as a general illustration

6    of a brand?

7    A.    Yes.  The one on the left, yes.

8              MS. KELLER:  Your Honor, may he publish that for

9    the jury?

10             THE COURT:  You may.

11             THE WITNESS:  Yes.

12        (The document was published in open court.)

13   BY MS. KELLER:

14   Q.    Now, would you tell us, briefly, what this graphic

15   represents?

16   A.    This graphic is my hand -- my -- the way we in our

17   field in marketing researchers, the way we sort of draw what

18   is in consumers' head, what is in people's mind, what we

19   call in people's memory.  The first thing you need to do is

20   you lock in consumers' mind a name.  There needs to be --

21   there needs to be, what I almost like call drawer that you

22   open with a label on it and it says:  *Here's a drawer.  On*

23   *the drawer, it says McDonald's.*

24             And when I see anything about McDonald's, whether

25   on TV, I drive by, I'm in a McDonald's shop, or whatever, I

1    open the drawer, and I file the information in the drawer.

2    That's almost like how a brand operates.

3            So here, I say, a brand in consumers' mind has --

4    we call this a node, N-O-D-E, for scientific reasons.

5    That's a brand name.

6            And then, associated with that or linked to that

7    name, when you close your eyes, you think of McDonald's:

8    Oh, yes, I've been there last time.  I love those

9    hamburgers, and things like that.  I love the fries, and so

10   forth, with my son, in New York.

11           And this is what I refer to here.  These are

12   feelings I have.  I like McDonald's.  Thoughts I have.

13   Well, maybe, it's not the best for my healthy lifestyle and

14   things like that.

15           I think of a brand as a personality.  I think of

16   the colors.  When I close my eyes, I know it's yellow and

17   red.  And I even have an emotion, positive or negative, sort

18   of, like a feeling.  I don't really like this that much.

19           Even the packaging, in this case, maybe the store

20   atmosphere, I can think of.  And that's how it's organized.

21           These links show how a consumer in a consumer's

22   head, these thoughts, feelings and packages -- packaging,

23   color, emotions, how they link to the brain.  That's how we

24   represent a brand in consumers' mind.

25   Q.   Now, if we can move to the graphic, 36110-3, is this a

```
 1    graphic specifically relating to what the Bratz brand would
 2    look like, the so-called Bratz network?
 3    A.   Yes.  In my report, I thought, can I just in a very
 4    simple way explain how this model applies to Bratz to the
 5    Bratz brand?
 6              And that's what you see here.  And this is sort of
 7    what I mentioned about branding.  You need to make all these
 8    decisions of what you want to link to that name "Bratz," you
 9    know, what kind of personality you want to portray.  You
10    know, the decision of -- you know, it should have four
11    personalities.  Each one of them should be different.  Each
12    one of the personalities appeal to a particular kind of
13    girl.  Very, very important.
14              This is like we spend months on just analyzing
15    personality.  Here, I just said "rebellious."  That's just
16    one word.  But, normally --
17              MR. QUINN:  Your Honor, this might be a narrative.
18              THE COURT:  Sustained.
19    BY MS. KELLER:
20    Q.   Let's take some of the -- let's take some of the things
21    one at a time.
22              You've already talked about "rebellious," okay.
23    What does cool tend to mean?
24    A.   Cool is a consumer description, a word that is -- has
25    sort of like a meaning that goes from A to Z.  It's almost
```

1   like a reaction.  Consumer say, *This is cool.*

2          There's not good definition for that, at least not

3   between certain age ranges, I would say.  So cool is sort of

4   like an association with -- this one, is, you know, with its

5   time.  It fits right here.  It has really relevance, right

6   now.  That brand is cool.  "Cool" is one of those very, very

7   hard, extremely hard to hit attributes when you build a

8   brand.  Got to be cool.  It's hard to make this happen.  It

9   takes a lot of effort.

10  Q.   So the feeling, then, that is conveyed by Bratz, you're

11  talking about the importance of feeling in brand building.

12  The feeling conveyed is that it is fun; right?

13  A.   Yes.

14  Q.   And the packaging, how does the packaging tie in with

15  trying to generate that feeling?

16  A.   Oh, packaging is, again, to me -- I call it sometimes a

17  silent salesperson.  Silent salesperson.  Because packaging

18  really is the first time you hold the product.  It's in --

19  if you think of Toys "R" Us, you know when you are in the

20  Bratz world, or you know when you are the Barbie world.  The

21  packaging is almost like a way for the consumer to

22  experience the brand first, even before the purchase.

23         I call it a silent salesperson, because it's an

24  important and extremely powerful brand builder.  It's like

25  the way -- because you can read about it.  You get a feel

1    about it, even before you have put down the money.  So it's

2    an extremely important part of a brand.

3    Q.   And can you describe the personality of Bratz, in terms

4    of its brand?

5    A.   Yes.  To me -- again, I go back to what I say.  This is

6    a seven to 12 years old girl that this is targeted to.  The

7    girl doesn't want to be like Barbie.  They don't want to be

8    like mom.  They want to emulate the teenagers.

9              So when you think of the personality of Bratz,

10   which is so important in this business, you always have

11   something more etchy, you know, even sexy.  Sexy but not in

12   the way you would think as a 14- or 16-year-old girl.  Very

13   much in sort of like the thought of a very healthy way of

14   how they think.  Even rebellious.  Even fun.  It's that kind

15   of personality, but very real.  Very street.  Very hip.

16   That's --

17             Even not aggressive.  Maybe irreverent.  That may

18   be a better word.  You can be irreverent --

19             MR. QUINN:  I think we're on another narrative

20   here.

21             THE COURT:  Sustained.

22   BY MS. KELLER:

23   Q.   Let's talk for a minute about the role color plays in a

24   brand.  You've seen that there is a distinctive color scheme

25   associated with Bratz; right?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    Yes.

2    Q.    Why is that important?

3    A.    Again, a color to me is like a symbol and a symbol is

4    like glue.  Like, a glue that brings this network that you

5    see here, brings it all together.

6          Yellow and red and I know it is John Deere when I

7    think of lawn mowing.  And so, colors really help me.  The

8    Apple colors are well known.  Very simple, plain.  And in

9    the same way, colors is very important.  And, again,

10   remember, this is happening all -- the decisions here are

11   helping all in a retail context when you're in front of the

12   shelf where color plays a very important role to be directed

13   to the right product.

14   Q.    Does it also differentiate the product?

15         For example, when I think of Pepsi, I think of

16   blue.  When I think of Coke, I think of red.

17         Is that one of the uses of color?

18   A.    Exactly.  Especially when you talk about a brand, or

19   things that are seemingly important; but then, they're not

20   that important.  They are not that frequent of a purchase,

21   or they are very frequent, but they are brands like soft

22   drinks, you know.

23         Pepsi had to go through a major re-branding effort

24   to become more blue, because they wanted to make sure they

25   are different from red, which is Coca-Cola.  And the same

1  way color is a very, very important element in kids'

2  marketing to make sure that the parents who don't often buy

3  a doll for a particular child, finds the right shelf and

4  sort of knows and doesn't make a mistake in purchasing a

5  particular gift, for example. So color is extremely

6  important.

7  Q.   When you look at Bratz as a brand, did you find that

8  MGA engaged in a conscious program of brand building?

9  A.   Yes.  I analyzed -- as I said, in my beginning, I

10 analyzed the work from all the way from 2001 to today, and I

11 found that what I have written about in my books, there is a

12 proactive brand management that was taking care -- that was

13 done at MGA.

14 Q.   And did you review any marketing or sales materials

15 from MGA?

16 A.   Yes, I did.

17 Q.   And do you have an exhibit on that exhibit?

18 A.   Yes, I did.

19       MS. KELLER:  Exhibit 14831, your Honor, if we may

20 publish that.

21       THE COURT:  You may.

22       (The document was published in open court.)

23 BY MS. KELLER:

24 Q.   Can you tell us about this exhibit?

25 A.   Yeah.  This is an early -- I think it's, maybe, in the

1    early 2001, 2002, an introduction to the world of Bratz.

2    It's called Meet the Bratz.  They are five Bratzs here in

3    front, but there are actually four girls throughout the --

4    the four Bratz dolls throughout the report, yes.  I know

5    that.

6    Q.   And when you looked at that booklet, that Meet the

7    Bratz booklet, did it embody any of the brand elements you

8    have been talking about?

9    A.   Yes.  If you were to look at this book, you would see

10   in this particular report, you will see how dozens and

11   dozens and hundreds of decisions had been made at MGA, in

12   order to create that Bratz brand.  That's what this book is

13   about.  They decided on what kind of fun.  They decided what

14   kind of graphics.  They decided what kind of color.

15        The whole brand effort was done at MGA.  This

16   is -- I think, if I look here a 2002 report when that was

17   put together.

18   Q.   And that has details about the doll's character, the

19   doll's logos, the doll's fashions?

20   A.   It's a very detailed thing.  It's about the art.  It's

21   about the style.  It's about defining those personality

22   attributes.  It's about what kind of appeal.  It's about

23   what kind of accessories.  It's a very comprehensive report

24   of hundreds of decisions that you have to make to build that

25   brand.

1    Q.    Now, if you look at the issue of colors that we talked

2    about, for example, what colors were associated with this

3    brand, or what types of colors?

4    A.    Well, again, from the very beginning, Bratz has chosen

5    certain darker colors.  Again, colors that are in the more

6    real, more of a street -- more, again, tapping into that --

7    that associations of, this one is like very much in here and

8    today and now type of brand.

9           Very different from the competitor, Barbie, which

10   at that time is more about fantasy, about emulating mothers

11   and mother and, sort of, like a dreaming versus -- this is

12   more, seven to 12 years old, the way they -- the kind of

13   fashions they wear, the sort of darker earthy type colors.

14   Q.    If we go to page 5, that's an example of one of the

15   brand colors?

16   A.    Yes.  There you see, sort of, like dark colors here.

17   That's a darker rendition, yes.

18   Q.    And let's look at page 6.

19   A.    Yes.  Right there.

20   Q.    More bright colors?

21   A.    Yeah.

22   Q.    And let's look at page 60.

23           And does page 60 start a section on character art?

24   A.    Yes.

25   Q.    And what was the importance of that character art in

1    building the Bratz brand?

2    A.    Yeah.   This character art explores, sort of, like

3    how -- it's almost -- it almost creates the attitude that a

4    particular doll sort of expresses.   Is this sort of an aloof

5    attitude?   Is this sort of like a friendly attitude?   Is it

6    sort of like, you know, I don't care attitude.

7              So character and art, this kind of work here, was

8    about defining for each of the four dolls what kind of --

9    you know, what kind of, again, attitude or personality that

10   this doll wants to be.   Is it sort of, like, I'm very smart,

11   or I'm very street?   I'm very cool.   I'm very likable.

12             All of these things had to be decided in those

13   years in order to really create the brand.

14   Q.    And if we look at page 38, we see the Cloe profile?

15   A.    38?   61, you mean.

16   Q.    Okay.   Sorry.

17   A.    Yep.   Cloe.

18   Q.    And you see each doll in here -- and we're not going to

19   go through all this, because we would take much time.

20             But each doll in here has a whole set of

21   attributes that are given to her from personality, to what

22   she studies, to what she likes to do as a hobby, to what

23   kind of pet she has got; right?

24   A.    Yes.

25   Q.    And in the packaging details, let's look at pages 44 to

```
 1    47.
 2    A.    Too many numbers here on this.
 3    Q.    Have you got 44?
 4    A.    That's not packaging.  This one?  Yeah.
 5    Q.    Oh, I see.  It's --
 6    A.    Yeah, two numbers on it.
 7    Q.    Actually, 14 -- this is trial exhibit, page 14, but
 8    it's 44 of the booklet.
 9              Now, there you see we even have different font
10    details?
11    A.    Yes.
12    Q.    And let's look at the next page.
13          (The document was published in open court.)
14    BY MS. KELLER:
15    Q.    And the page after that?
16    A.    Yes.
17    Q.    So all these things are specified in here:  The color
18    palettes, the logo work, editorials.  All those things work
19    together to build a brand?
20    A.    Yeah, all of this has to be done.  My company even
21    employs a specialist on just fonts that then makes decisions
22    on just funds.  And all of these things have to come
23    together in like what I call it a cohesive logical system,
24    the brand -- to build the brand.  They all have to work
25    together.  It's an amazing creative process.  Lots of people
```

 1  are involved.  Lots of specialists.  And that's how you

 2  bring together and define in very clear ways what like the

 3  font would be, color palette would be.

 4  Q.   And all those things are part of conveying to the

 5  consumer an overall set of feelings and perceptions?

 6  A.   And all of these have to come together express that,

 7  yes, to the consumer.

 8  Q.   Now, if we look at Exhibit 16909, is this a Bratz fact

 9  sheet?

10  A.   Yes.

11  Q.   And did you also look at this in forming your opinion?

12  A.   Yes, I did.

13  Q.   How did this play in your opinions?

14  A.   This particular sheet --

15       MS. KELLER:  I'm sorry, your Honor, I would move

16  to admit 16909.

17       THE COURT:  This is part of the demonstrative?

18       MS. KELLER:  Well, no, this is actually from the

19  actual building of the brand by the company.  This is the

20  brand -- MGA Entertainment Bratz fact sheet.

21       *(At 3:18 p.m., live switch with Jane Sutton, court*

22       *reporter.)*

23                          -oOo-

24

25

```
 1                         CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  March 19, 2011

10

11

12                          _____

13                          Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*