1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                      - - - - - - -

5

6   MATTEL, INC., ET AL.,              )
                                       )
7           Plaintiffs,                )
                                       )
8       vs.                            ) No. CV 04-9049-DOC
                                       )    Day 36
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 3
                                       )
10          Defendants.                )
    _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                 Santa Ana, California

18               Friday, March 18, 2011

19

20

21

22  Jane C.S. Rule, CSR 9316
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-7755
25
    11-03-18 MattelV3

1   **APPEARANCES OF COUNSEL:**

2

3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

4           QUINN, EMANUEL, URQUHART & SULLIVAN
            By:   JOHN B. QUINN
5                 MICHAEL T. ZELLER
                  WILLIAM PRICE
6                 Attorneys at Law
            865 South Figueroa Street
7           10th Floor
            Los Angeles, California 90017-2543
8           (213) 443-3000

9

10  FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11          ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:   THOMAS S. MC CONVILLE
12                Attorney at Law
            4 Park Plaza
13          Suite 1600
            Irvine, California 92614
14          (949) 567-6700

15          - AND -

16          ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:   ANNETTE L. HURST
17                Attorney at Law
            405 Howard Street
18          San Francisco, California 94105
            (415) 773-5700

19          - AND -

20          KELLER RACKAUCKAS, LLP
21          BY:   JENNIFER L. KELLER
                  Attorney at Law
22          18500 Von Karman Avenue
            Suite 560
23          Irvine, California 92612
            (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 3 of 61   Page ID #:310801
CV 04-9049-DOC — 03/18/2011 — Day 36, Vol. 3 of 3

3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            — AND —

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ISAAC LARIAN, MGA CEO
              ROBERT ECKERT, Mattel CEO
16            LILY MARTINEZ, Mattel Employee
              KEN KOTARSKI, Mattel Technical Operator
17            MIKE STOVALL, MGA Technical Operator
              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
              WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
              FRANK RORIE, Orrick Herrington & Sutcliffe
20            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
              DENISE MINGRONE, Orrick Herrington & Sutcliffe
21            EVAN JENNESS, Attorney for Sal Villasenor
              JOHN CARLTON, Attorney for Matt Turetzky

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 4 of 61   Page ID #:310802
CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

4

# I N D E X

### EXAMINATION

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JOACHIMSTAHLER, ERICH | | | | |
| By Ms. Hurst | 5 | | 43 | |
| By Mr. Quinn | | 24 | | |

CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

5

1              SANTA ANA, CALIFORNIA, FRIDAY, MARCH 18, 2011

2                      DAY 36, VOLUME 3 OF 3

3                          (3:18 p.m.)

4              *(Live reporter switch with Deborah Parker.)*

5         **ERICH JOACHIMSTAHLER, DEFENSE WITNESS (Continued)**

6                   DIRECT EXAMINATION (Continued)

7    BY MS. KELLER:

8    Q    If we can just display the first page, we see this is

9    the Bratz fact sheet, and going to the second page, we see,

10   "Taking the toy world by surprise, like, totally."

11        And tell us a little bit about the Bratz fact sheet and

12   how that played in to building the brand.

13             THE COURT:  I'm sorry, this is actually the Bratz

14   fact sheet?

15             MS. KELLER:  It is from MGA Entertainment.

16             THE COURT:  Just like I allowed certain exhibits

17   to come in that were actually the ink impressions from the

18   notebook, in all likelihood, I'll receive this, but I don't

19   want to do it right that now, Counsel.

20             MS. KELLER:  I understand.  Can we still display

21   it?

22             THE COURT:  You may.

23   BY MS. KELLER:

24   Q    So if we look at page 3, we see, "Who are the Bratz?"

25   A    Uh-huh.

1    Q     And this explains that the Bratz are all about

2    self-expression and attitude.  They are independent, cool

3    girls with a passion for fashion.

4    A     Yeah.

5    Q     If we go to the next page, we see the information about

6    Cloe as one of the personalities, and then the next page

7    about Jade, the next page about Sasha, the next page about

8    Yasmin.

9          And we've actually -- during the course of the trial,

10   Doctor, we've actually seen some information about these

11   dolls and their accessories and their personalities, so

12   again, we are not going to go into all of those, but --

13            MR. QUINN:  I move to strike, your Honor.  It's

14   not a question.

15            THE COURT:  Stricken.

16   BY MS. KELLER:

17   Q     Why was it so important in brand building to do all

18   this work of building up stories about these characters?

19   A     The reason why this is so important is because the

20   market had so significantly changed in 2000 -- by 2000,

21   2001, that time period.

22         Dolls for the 7 to 12-year-old girl set, these dolls

23   are ways of self-expressing themselves to others,

24   particularly to -- to pretend that they are already a little

25   bit older.  They are like their older teenage sister.

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 7 of 61   Page ID #:310805
CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

7

1    That's the important part, here.

2        They wanted to express this -- the point is that the

3    whole brand is about this expression of -- of attitude, of

4    being a little bit older and sort of like a teenager or

5    pretend to be a teenager even though they are really just 7

6    to 12 year olds.

7        So each of these -- each of these brands or dolls or

8    sub-brands we call it, like Yasmin and Cloe and so forth,

9    had a different sort of like ways of self-expressing, and a

10   girl would choose one or the other because they say that

11   doll is more like me, that brand --

12            MR. QUINN:  Your Honor, I think we are on a

13   narrative.

14            THE COURT:  Sustained.

15   BY MS. KELLER:

16   Q    Doctor, tell us about the important of what are known

17   as brand extensions in building a brand.  First of all, tell

18   us, what is a brand extension?

19   A    A brand extension is something that you do when you

20   have a strong brand, and then you say I -- I offer another

21   product under the brand.  An example is Bratz Petz.

22        Because I have a Bratz brand, I can also offer a

23   toy-like feature like an animal, which is Bratz Petz, for

24   example, or I can offer a -- Bratz, I can also offer

25   something that maybe appeals to another audience, like Lil'

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

8

1  Bratz or something so --

2  Q    And -- I'm sorry.  Can we take a look at Exhibit 16920

3  to maybe give us another example of -- of brand extension?

4  A    Yeah.

5  Q    Let's look, for example -- well, we have so many

6  exhibits here.  Let's look at Exhibit 27011.  This would be

7  the Bratz Rock Angelz.  And this is the Bratz Rock Angelz

8  marketing plan dated August 30th, 2005.

9         MS. KELLER:  And your Honor, may we display this?

10        THE COURT:  You may.

11 BY MS. KELLER:

12 Q    Now, Doctor, did you note that there were a very, very

13 large number of brand extensions generated by MGA over the

14 years?

15 A    Yes.  They are, in fact, a huge number.  That's the

16 whole business, is to build brand extensions or to extend

17 the brand.  That is very much part of building the brand,

18 yes.

19 Q    And this Bratz Rock Angelz, is that an example?

20 A    That's a very good example, yes, of a successful brand

21 extension.

22 Q    And let's look at page 2, that talks about a product

23 positioning statement.

24 A    Yeah.

25 Q    And then let's look at page 3, it goes into brand

1  objectives.  And this is a brand extension for a video game

2  property?

3  A    Yeah.

4  Q    And this is leveraging the -- leveraging the brand to

5  try to sell some video games?

6  A    Yes, it is two parts, I must say.  It is, one,

7  leveraging the brand.  You can do that when you build a

8  strong brand, but there is something that is important, many

9  of the brand extensions generally are not successful for

10  many companies.  It is always dangerous when you brand

11  extend.

12      Here, in this case, is one example of a successful

13  brand extension, and what build the Bratz brand is all of

14  those successful brand extensions that Bratz -- MGA has

15  launched, they're making the right choices of extending the

16  brand in the proper way.

17  Q    And on this page that we are looking at on screen, we

18  see that one of the strategies, it says, "is aggressively

19  market product by leveraging the buzz surrounding the Rock

20  Angelz dolls, DVD and music CD launches to help drive

21  awareness for the game."

22      So there is not only these dolls, but a DVD and a music

23  CD and also a video game all built around this one Rock

24  Angelz?

25  A    That's correct, it's built around Rock Angelz, but it

1    also goes two ways, it creates a new business or more

2    business with -- with DVD and video, but at the same time,

3    it also creates interest for Bratz itself.  It's something

4    new about it.  It sort of keeps the brand relevant.  It

5    creates value, play value for the girl who owns the Bratz.

6    Q    And if we look at the next page of this exhibit,

7    page 5, we see that the game follows a story line of the

8    Bratz.

9         It -- there are character-specific adventures, there is

10   a Bratz town, massive world of Bratz town where the girls

11   can shop in over 30 stores for the latest fashions, and the

12   girls can jet set around the world in this video game.

13        And there were -- tell us what the universe -- without

14   going into every single one, can you give us sort of the

15   universe of types of brand extensions that Bratz had?

16             THE COURT:  And after this answer, why don't we

17   take a brief break.

18             THE WITNESS:  Do I answer the question?  Yeah.

19             The whole -- I think that maybe I'll try to keep

20   it as short as I can.  The real success here is that MGA

21   built an entire Bratz world, you know, that goes from --

22   from literally in every possible brand extension, every

23   possible product, a Bratz backpack, the Bratz magazine,

24   which won an award for one of the best --

25             MR. QUINN:  Your Honor, I think this is

1    nonresponsive, and I move to strike.

2            THE COURT:  Sustained.

3    BY MS. KELLER:

4    Q    Would you tell us some of the other brand extensions

5    you saw?

6    A    Things like the Bratz magazine I just mentioned, which

7    won an excellence award for being the top magazine in that

8    youth group, backpacks, school supplies, entire themes and

9    worlds like Bratz at the beach, Bratz at school, Bratz

10   hanging out with friends at the cinema, all of these things,

11   2,650 licenses that are very difficult to manage, that --

12   that need to be excellent in order that this kind of brand

13   builds, and that is, to me, what has build -- what is the

14   brand extensions to your question at Bratz, it created the

15   Bratz world.

16           MS. KELLER:  Thank you, your Honor.  Would this be

17   the time?

18           THE COURT:  This would be a good time.  Why don't

19   we just take a brief recess.  I'll come back and get you

20   shortly, though, so we can get you on your way this

21   afternoon.

22           Please do not discuss this matter amongst

23   yourselves, nor form or express any opinion concerning this

24   case.  Counsel, I'll come and get you in about 10 minutes.

25   Just go take a brief recess so the jury can have a little

CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

12

1    time.

2             *(Recess.)*

3             *(The following proceedings is taken in the*

4        *presence of the jury.)*

5             THE COURT:  We are back in session.  All counsel

6    are present, the parties are present.

7             Counsel, if you'd like to continue your direct

8    examination, Ms. Keller.

9             MS. KELLER:  Thank you, your Honor.

10            **ERICH JOACHIMSTAHLER, DEFENSE WITNESS, RESUMED**

11                 **DIRECT EXAMINATION (Continued)**

12   BY MS. KELLER:

13   Q    Dr. Joachimstahler, the opinions that you've been

14   giving us, are they based just on your own gut reaction or

15   are they based on research?

16   A    They are based on my research over the years, yes.

17   Q    And is this research research in the psychological

18   literature?

19   A    Yes, as well, yes.

20   Q    Is it -- is it peer-reviewed literature?  In other

21   words, have other people in the academic world reviewed the

22   literature and commented on it?

23   A    Yes, that has been a process over the last 25 years on

24   how to make this happen, yes.

25   Q    And the underpinnings that you've been telling us about

1   about making a brand, is there anything controversial about

2   the basics that you've been telling us that are required to

3   build a brand?

4   A    No, I have been -- I -- really I have been talking

5   about the fundamental principles that I established in my

6   field of building strong brands.

7   Q    Tell us what you found with respect to whether the

8   building of the Bratz brand was successful.

9   A    Well, I found in reviewing the material that the Bratz

10  brand was very successful, year after year during those

11  years after launch.

12  Q    Two years after the introduction of Bratz onto the

13  market, what were awareness levels for Bratz?

14  A    Very high awareness levels.  It's always relative, but

15  in the 60, 70 percentile already among consumers, consumers

16  who would recognize or remember the name "Bratz."

17  Q    And that was just two years after the brand was

18  introduced?

19  A    Yes, that's right.

20  Q    And what associations did the consumers have who

21  recognized that name -- that brand name?

22  A    Very much what was originally intended when -- when the

23  plans were developed at MGA, the personality came out, this

24  was -- people appreciated very much the accessories, the

25  quality of the -- of the product itself, and particularly

1    the accessories, the packaging design, things like that.

2        People literally could remember those key associations,

3    irreverent, cool, very real, very authentic, that kind of

4    things that appeal to those young kids.

5    Q    And did you find any evidence that Mattel executives

6    thought MGA was building a successful brand?

7    A    Exactly, yes.  There are reports that I found, I think,

8    as early as 2000 --

9            MR. QUINN:  Objection, your Honor.

10           THE COURT:  Sustained.

11   BY MS. KELLER:

12   Q    Did you review an Exhibit 9216 called "The Bratz

13   Brief"?

14   A    Yes.

15   Q    And in reviewing that Bratz brief, you saw a number of

16   things that were listed in the brief itself as indicators of

17   tremendous success for Bratz?

18   A    Yes.

19   Q    Did you agree with most of the assessments that you

20   found in the Bratz brief in terms of the brand building?

21           MR. QUINN:  Objection, your Honor.  Beyond the

22   scope.  It's not relevant.

23           THE COURT:  Sustained.  Sustained.  We are talking

24   about building a brand, Counsel.

25

1  BY MS. KELLER:

2  Q    Well, once the brand is being built -- I mean, at what

3  point -- is there ever an end point where you're done

4  building a brand, you're finished?

5  A    No.  Brand -- a brand is building consumers' mind,

6  consumers forget, consumers change.  A brand needs to

7  constantly be remembered, refreshed, renovated, made vivid

8  in consumers' mind, so the brand, you have to always invest

9  and always build with consumers.

10 Q    So even at the end of two years, you found that MGA had

11 already built a successful brand with Bratz?

12 A    That's right.

13 Q    And then did you think that MGA continued to maintain

14 and build on the Bratz brand?

15 A    Yeah, it's not just maintenance, I call it nurturing

16 the brand.  It's very hard to do -- it's very easy to do one

17 good thing for a brand, an occasional brilliance of a great

18 program, but MGA has done this again and again and again

19 twice a year and after those years, to your question.

20 Q    And did some of the extensions that you've looked at,

21 such as Bratz Babyz, Bratz Boyz, Bratz Sportz, new

22 accessories, new characters in the dolls, new advertising,

23 did that -- are those examples of the things that you are

24 talking about consistently refreshing and updating the

25 brand?

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 16 of 61   Page ID #:310814
CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

16

1    A    Precisely, that's what it is, yes.

2    Q    Now, did you see any evidence that MGA actually took

3    additional deliberate strategic steps to try to build and

4    maintain the brand?

5    A    Yes.

6    Q    And if we could look at trial Exhibit 14829, and this

7    is a --

8              MS. KELLER:  Your Honor, could we display this?

9    This is a Bratz attitude and usage study.

10             THE COURT:  You may.

11             Well, just a moment.  Take that down.

12             Has that been received yet?

13             MS. KELLER:  I don't believe it's in evidence yet.

14   We are going to be --

15             THE COURT:  We don't want to display different

16   exhibits to build an argument.  He can talk about the brand,

17   how he builds it, but I don't know that he's going to be

18   allowed to refer to e-mails, et cetera.

19             MS. KELLER:  Oh, no.  This is the Bratz

20   International A and U --

21             THE COURT:  Have I seen this before?

22             MS. KELLER:  It's a strategic plan, your Honor.

23             MR. QUINN:  Your Honor, exhibits have not come in

24   through experts up to this point.

25             THE COURT:  No, I'm not going to receive it.

```
 1              MS. KELLER:  We're going to be calling additional
 2      witnesses to lay the foundation for it.  I'm not even
 3      necessarily offering it, but I wanted to know if we could
 4      simply display some of it to show steps MGA took to build
 5      the brand?  This is December '06.
 6              THE COURT:  Let's see.
 7              Why don't you and Mr. Quinn come here for a
 8      moment.
 9              Excuse us for a moment.  Why don't you visit.  We
10      are over here talking.
11              (Discussion held off the record.)
12      BY MS. KELLER:
13      Q    Doctor, we are not going to display this, but did you
14      examine a 157-page document called "Bratz International A
15      and U, December 2006," that, among other things, provided
16      very, very detailed study of where the Bratz brand was then
17      and where it would be hopefully going and how to get there?
18      A    Yes.
19      Q    And so would it be fair to say that from the things
20      that you looked at, there were many, many, many documents
21      showing that MGA was constantly in the process of figuring
22      out how to make its products better, how to sell more of
23      them and how to strengthen its brand?
24      A    But most importantly, strengthen the brand, yes.
25      Q    And I was going to ask you about that.  The definition
```

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

18

```
1    of the -- of a brand that you gave us, this set of mental
2    associations and perceptions that people have.  Which is
3    more important in selling an item, the product or the brand?
4    A    Well, we have empirical studies, we do that for every
5    business, it's different.  In telephones, it's different
6    than in fashion.  In luxury, it's different, but in this
7    business, in the toy business and the fashion type business,
8    and where there is -- where the brand is a bit of an
9    affordable luxury for parents to give their children, the
10   value of the brand is a significant proportion, oftentimes
11   up to 70 percent.
12   Q    And is this especially true of children?
13   A    It is.
14   Q    Do kids tend to say, you know, I want that particular
15   pair of shorts that have that particular brand on it, not
16   the identical one right next to it that's 20 bucks cheaper?
17   A    I mentioned the research earlier that I covered, the
18   research is overwhelming.  More than 80 percent of research,
19   more than 80 percent of mothers would -- would agree with
20   the statement that girls at the age of 3 already know brands
21   and prefer brands.
22        Brand reference in this young age is extremely fast
23   developed.  A 7 year old knows more than 300 to 400 brands.
24   That's empirical.  There is research that is done here in
25   the United States with young kids.  It's -- it's really what
```

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 19 of 61   Page ID #:310817
CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

19

```
 1    we call being brand conscious.  You come with the wrong

 2    brand, it doesn't matter what product you have.  It's all

 3    about the brand.

 4         If you don't come with the right brand, the product, in

 5    my eyes, looks identical to the kids, it had to have a

 6    particular name and the associations and feelings and

 7    memories they have with a particular name and a brand.

 8    Q    And is this why there's been such a tremendous amount

 9    of research both in the -- in the academic world and in the

10    business world over the last 20 years about how to go about

11    creating brands?

12              MR. QUINN:  This is leading, your Honor.

13              THE COURT:  You can lead an expert, Counsel.

14              THE WITNESS:  I can answer?

15    BY MS. KELLER:

16    Q    Do you remember my question?

17    A    Yes.

18              THE COURT:  Overruled.

19              Children, you can lead and --

20              MR. QUINN:  And experts?

21              THE COURT:  You can lead.

22              THE WITNESS:  It is one of the reasons -- one of

23    the reasons is that -- that -- consumers are drawn to it, to

24    brands, and that products are more and more perceived

25    identical, very similar, not that important relative to the
```

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

20

```
 1    brand, but what makes it so important here is that for most
 2    firms in this business, the value of the entire company, of
 3    the entire brand is all about the brand part, not the
 4    product part.  It's -- yes.
 5    BY MS. KELLER:
 6    Q    Okay.  And you talked about the fact that children have
 7    a very high level of brand recognition at a very early age.
 8    What about the child's preference for buying a particular
 9    brand over another, how fixed is that according to the
10    research at an early age?
11    A    The research shows, again, empirical research, that
12    consumers especially in that age rely very much on what we
13    call social or peer pressure.  They are totally driven by
14    what other kids also have.  So they are -- so that's why the
15    brand becomes so important.
16         Young kids more so than us at older stages, we don't
17    evaluate -- we, perhaps, as adults can evaluate a product
18    and a brand more objectively.  Kids are primarily driven by
19    what their peer groups are using or playing with, and that's
20    why the brand becomes so important in that age group.
21    Q    So you found that MGA built this brand and maintained
22    it consistently, right?
23    A    That's correct.
24    Q    And improved it and extended it and nurtured it and all
25    that?
```

1    A     That's right.

2    Q     Has it been difficult for MGA to maintain the brand in

3    the face of this lawsuit, in your opinion?

4              MR. QUINN:  Objection.  Irrelevant.

5              THE COURT:  Sustained.

6    BY MS. KELLER:

7    Q     In general, if a company has a major lawsuit --

8              MR. QUINN:  Same objection, your Honor.  Move to

9    strike.

10             THE COURT:  Sustained, Counsel.  I'm going to

11   strike that.

12             We can certainly discuss that, if you'd like to,

13   and I'll tell you my reasons why outside of the presence of

14   the jury, so you have some understanding of it.

15             MS. KELLER:  We'll move on to a different subject.

16   BY MS. KELLER:

17   Q     As far as your research showed, was Carter Bryant

18   involved in the packaging design of Bratz?

19   A     As far as I know, no, as far as I've researched this.

20   Q     You never met this gentleman, have you?

21   A     No, I never met Carter Bryant.

22   Q     From your research and everything you read, was Carter

23   Bryant at all involved in the marketing of Bratz?

24   A     No.  I looked through most of the literature or the

25   material they gave to me.  I did not -- and my research in

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 22 of 61   Page ID #:310820
CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

22

 1   talking to executives at MGA, I did not know -- I did not

 2   hear the name Carter Bryant in any one way or the other in

 3   marketing.

 4   Q    Did you -- from your research, did it appear that

 5   Carter Bryant had a voice in the advertising decisions

 6   concerning Bratz?

 7            MR. QUINN:  This is not subject of expert

 8   testimony.

 9            THE COURT:  Sustained.  Sustained.

10   BY MS. KELLER:

11   Q    Other than designing the original -- other than design

12   work, did you find any evidence of Carter Bryant's

13   involvement in building the brand?

14            MR. QUINN:  Same objection.

15            THE COURT:  Sustained.

16            I'll let you determine that.  That's something for

17   the jury to determine.  He's here very limited, how you

18   build a brand.

19   BY MS. KELLER:

20   Q    Can you tell us in your opinion, Doctor, what was the

21   ultimate importance of MGA's building of the Bratz brand to

22   the success financially of MGA with Bratz?

23   A    I think that building the --

24            MR. QUINN:  I think beyond the scope of his

25   opinion, your Honor, and expertise.

```
 1              THE COURT:  Just a moment.
 2              MS. KELLER:  I will ask a different question.
 3    BY MS. KELLER:
 4    Q    Dr. Joachimstahler, how important do you think it was
 5    to MGA's success with Bratz that it built such a successful
 6    brand?
 7    A    I think it's very important in this business.  It is
 8    the biggest factor that drove the success.  It is the one
 9    thing that has grown over time.  Products change, designs
10    change, sponsorships change, marketing campaigns change,
11    everything changes, but over time, and the research shows
12    that the brand has been built and has become the significant
13    part of the success because it has built a consumer base
14    that understands what Bratz stands for because it has -- it
15    has been given assurance to retailers --
16              MR. QUINN:  Your Honor, this is a narrative.
17              MS. KELLER:  We are almost finished, your Honor,
18    with our narrative.
19              THE COURT:  Finish your answer, sir.
20              THE WITNESS:  Because it has given assurance to
21    retailers that when Bratz comes with a new collection twice
22    a year over 10 years so many times, 20 times, that this
23    product is also desired by consumers.  It has built -- it
24    has affected every aspect of this company, how they
25    merchandise in the store, how they market and how they
```

1    create a success for MGA.

2    BY MS. KELLER:

3    Q    So the bottom line is that the building of the brand

4    here was the principal reason that Bratz was successful?

5    A    It is in this particular case and it is in every other

6    case of every kind of business, yes.

7              MS. KELLER:  Thank you.

8              Nothing further.

9              THE COURT:  Cross-examination by Mr. Quinn on

10   behalf of Mattel.

11                        **CROSS-EXAMINATION**

12   BY MR. QUINN:

13   Q    Good afternoon, Doctor.

14   A    Good afternoon.

15   Q    I jotted down a couple of things that you said, I

16   think.  I hope I got this right.  Just a couple of minutes

17   ago, you said, "Without the brand, products look identical."

18   Does that mean Bratz and Barbie look alike?

19   A    No.

20   Q    And I jotted down also that you said that "consumers

21   don't buy the product, they buy the brand, it's all about

22   the brand."

23        Would you go to the movies?

24   A    I don't understand the question, sir.

25   Q    Do you go to the movies?

1    A    To the movies?

2    Q    Yeah.

3    A    Which movies?

4    Q    Any movies.  See --

5    A    If I go to movies, yes.

6    Q    Do you prefer Paramount movies or Warner Brothers'

7    movies, which is your preference?

8    A    Depends.

9    Q    Depends on how good the movie is, right?

10   A    I don't know how good the movie is until I have seen

11   the movie.

12   Q    Right.  And the brand, whether it's Paramount, Warner

13   Brothers, Sony Pictures, MGM, that isn't so big a factor

14   when you decide what movie to go see on a Saturday night,

15   correct?

16   A    The brand is not the company that puts out the movie.

17   Q    Sir, I'm going to -- do you see that paper over there

18   which has got some times written on it?

19   A    Yes.

20   Q    I'm going to ask you to do something which may not come

21   natural to you.  Because I'm on a clock, I only have -- we

22   only have so much time.  And I'm going to ask you, please,

23   if you can, to answer my questions, if you can fairly answer

24   them "yes" or "no," to do that, okay?

25   A    (No audible response.)

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

26

1    Q    I would appreciate it if you would, all right?

2    A    Yes.

3    Q    So movies -- we talked about movies.  Are there some

4    other types of products where brands are really important,

5    say, for example, you know, things that are homogeneous, a

6    lot alike, like bananas, for example, would you agree?

7    Brand is really important, perhaps, there?

8    A    Could be.

9    Q    Okay.  You know, milk, dairy products, brand might be

10   very important there?

11   A    I don't know.  I don't think so.

12   Q    Well, there's -- how about cheese?

13   A    I don't think so.

14   Q    Most of the cheddar cheese that consumers see in the

15   grocery store is probably more alike than different, right?

16   A    That's probably the case.

17   Q    So the brand, for example, the Kraft brand, that might

18   be important to a consumer, correct?

19   A    That could be, yes.

20   Q    But in a creative endeavor, like a movie, when we are

21   trying to decide what we want to see on a Saturday night, we

22   probably don't care so much which production company or

23   distributor made or distributed the movie, correct?

24   A    That could be.

25   Q    So in a creative endeavor, like a motion picture as

```
 1    opposed to cheese, which -- where things maybe tend to be

 2    more alike, the brand is going to be less important,

 3    correct?

 4    A    No.

 5    Q    Okay.

 6    A    That's wrong.

 7    Q    I think you've told us that you regard the fashion doll

 8    business and especially what MGA has done with the fashion

 9    doll business as being very creative; is that fair to say?

10    A    Yes, like fashion is a creative business.

11    Q    Right.  And you talked about the importance of the

12    brand versus the product, and you made reference to an

13    example like McDonald's and fries.  McDonald's fries are

14    really well known as being great fries, true?

15    A    That's correct.

16    Q    Everybody knows that, right?

17    A    That's correct.

18    Q    People order those fries because of the reputation for

19    those fries, correct?

20    A    Correct.

21    Q    And it's a good product?

22    A    That's correct.

23    Q    And you talked also about Nike shoes, right?

24    A    That's right.

25    Q    People don't, you know, that started out with a great
```

```
 1    shoe design, that waffle sole which that Oregon track coach
 2    came up with many years ago, right?
 3    A    Yeah.
 4    Q    That came before --
 5              THE COURT:  Bill Bowerman.
 6              THE WITNESS:  That's correct.
 7    BY MR. QUINN:
 8    Q    Yeah.  I mean, he literally did it on waffle irons,
 9    right?
10    A    That's right.
11    Q    You know the story?
12    A    I do know the story.
13    Q    That was a great product because of the design long
14    before there was ever a swoosh, correct?
15    A    That was a great product, yes.
16    Q    Before there was ever a swoosh, correct?
17    A    Yes.
18    Q    And similarly, Carter Bryant's designs were like
19    nothing MGA had ever seen before, correct?
20    A    Yes.
21    Q    Because you -- one of the things that you did in doing
22    your work on this case is you went and talked to people at
23    MGA, right?
24    A    That's correct.
25    Q    And one of the people -- one of the persons who you
```

1    spoke to was a Paula Garcia, correct?

2    A    That's fine.

3           THE COURT:  Just a moment, Counsel.  I'll allow

4    this, but once we get into specifics again, I somewhat

5    precluded the specifics for exhibits, et cetera, so --

6           MR. QUINN:  All right.

7           THE COURT:  I'm happy to let both sides do that,

8    but I'll do that coequally.

9           MR. QUINN:  This isn't an exhibit, your Honor,

10   it's a statement that -- quotation from Paula Garcia.

11          THE COURT:  Then I'm going to allow MGA to get

12   into those people they talked to and into documents, et

13   cetera, so I'm just forewarning both sides.

14          MS. KELLER:  I'm going to object as hearsay, your

15   Honor.

16          MR. QUINN:  Paula Garcia --

17          MS. KELLER:  Given the rulings to date.

18          THE COURT:  Yeah, I'm going to sustain --

19          MR. QUINN:  Party admission, your Honor.

20          THE COURT:  I'm going to sustain the objection.

21   You can argue it, Counsel.

22   BY MR. QUINN:

23   Q    You are aware that Paula Garcia was the product manager

24   for Bratz at MGA, correct?

25   A    Yes.

1    Q    And she spoke to you, correct?

2    A    That's correct.

3    Q    And she told you how unique she thought the design for

4    Bratz that Carter Bryant had come up with is, correct?

5              MS. KELLER:  Objection.  Hearsay.

6              THE COURT:  Sustained.

7              Now, I can open up this whole area for both

8    parties.

9              MR. QUINN:  I'm okay with opening it up, your

10   Honor.

11             THE COURT:  I know you are, and you started

12   opening it up on behalf of MGA.

13             Hold on.  Let me talk to MGA.

14             You wanted to get into specific ideas and

15   exhibits, et cetera, and I'm happy to open that up.  It's

16   going to be coequal between both of you.

17             MS. KELLER:  Your Honor, the problem is we've

18   already cross-examined all of Mattel's experts.

19             THE COURT:  No, no, no.  It's -- well, here is

20   what's going on, ladies and gentlemen, just so you are not

21   confused.  I'm not allowing a lot of the hearsay.  In other

22   words, when people testify, if counsel in their three hours

23   of argument want to call that back into attention and tie it

24   into an expert, they are not precluded, but a lot of this

25   has been -- although technically experts can rely upon

1    hearsay, I've somewhat limited that so that counsel have

2    enough time for their case and also to stop some of the

3    speculation, and also to stop each counsel walking through

4    their final argument using an expert, quite frankly, which

5    is -- so, I think I'm going to sustain the objection,

6    Counsel.  I think it's been consistent.  That way I'm

7    consistent all the way down the line.  If I'm right, I'm

8    right, and if I'm wrong, I'm wrong.

9              MR. QUINN:  Just so the Court is clear, it's a

10   quotation from Paula Garcia in his report that I wanted to

11   ask.

12             THE COURT:  I've precluded all of the hearsay as

13   much as possible.

14   BY MR. QUINN:

15   Q    Well, one of your own conclusions about the dolls, the

16   Bratz dolls when they are first launched was that they

17   represented a radical innovation, correct?

18   A    I'm a brand expert, and my conclusions is not about the

19   dolls but about the brand of Bratz.

20   Q    Sir, really, I'm short on time.  If you can answer the

21   question "yes" or "no" fairly --

22             MS. KELLER:  I object to the preamble as --

23             THE COURT:  Overruled.

24             If you can answer it "yes" or "no."

25

BY MR. QUINN:

Q    If you can fairly answer it "yes" or "no," I'd appreciate if you would do that, okay?

A    No.

Q    Okay.  One of your conclusions was that the Bratz dolls represented -- the first generation Bratz dolls represented a radical innovation, correct?

A    I don't know my report.  I mean, you would have to give me my report and if you can read that.

Q    Sir, you just don't remember whether or not that was one of the things that you concluded?

A    I don't remember the specific wording if you -- that you have.  I know my conclusions.  I don't know the specific wording on a particular sentence.

Q    All right.  But whether or not you recall the specific wording, would you disagree that you concluded that the first generation Bratz dolls represented a radical innovation?

A    As in reference to my brand, yes.

Q    Okay.  And you know that these dolls, the first generation Bratz dolls -- well, let me ask this:  What was the launch product for the Bratz brand?

A    The launch product was four dolls that launched in particular as four brands, Cloe, Yasmin, Sasha and so forth.

Q    Right.  And you know that those first dolls were an

```
 1    instant success, correct?

 2             MS. KELLER:  Objection, your Honor.  That

 3    misstates the evidence.

 4             THE COURT:  Well, you can ask him if he knows.  I

 5    think the instant success is the problem.

 6             MR. QUINN:  All right.  Let's take a look at --

 7             THE COURT:  And where that occurred.

 8    BY MR. QUINN:

 9    Q    Let's take a look at Exhibit 16909-2.  This is a

10    document that Ms. Keller showed you, 16909-2.

11         This is one of the documents that you looked at with

12    Ms. Keller, correct?

13    A    Yes.

14    Q    And what it says is that the four Bratz dolls, Cloe,

15    Sasha, Yasmin, also known as the Bratz pack, were launched

16    in October of 2000, the girls with a passion for fashion

17    were an instant retail success despite -- despite a crowded

18    fashion doll category.  You saw that, correct?

19    A    (No audible response.)

20    Q    You saw that, sir?

21    A    Yes.

22    Q    And you know that -- let me ask you this:  Are you

23    familiar with the -- the Hopscotch Heather brand?

24    A    Not that name, I don't recall, no.

25    Q    Are you familiar with the My Dream Baby brand?
```

CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

34

1    A    No.

2    Q    Are you familiar with the Bathtime Bouncy Baby brand?

3    A    No, no.

4    Q    It's true, isn't it, that MGA had not had a successful

5    brand prior to August of 2000 when Carter Bryant brought to

6    MGA his designs for Bratz, true?

7    A    I did not study the history of MGA.  I was asked to

8    study Bratz.

9    Q    Sir --

10   A    I can't answer the question.  You need to ask me about

11   my testimony, please.

12   Q    All right.  Do you know whether or not -- let's ask it

13   this way:  Do you know whether or not MGA had ever had a

14   successful brand before Carter Bryant brought his designs to

15   MGA in August of 2000?

16   A    No.

17   Q    You don't know?

18   A    No, I don't know.

19   Q    Do you know -- I mean, a key part of line extension and

20   brand building is licensing, right?

21   A    That's correct.

22   Q    And what you've talked about is what's called out

23   licensing, the ability that MGA has had to license the Bratz

24   name to other companies who make, you know, bicycles or

25   bicycle helmets or sleeping bags or whatever, right?

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

35

1    A    Yes.

2    Q    And do you know whether or not MGA had ever had a

3    single out license prior to August of 2000 when Mr. Bryant

4    brought his designs to MGA?

5    A    No.  Again, this was not part of my testimony.

6    Q    Sir, if you can answer my question "yes" or "no," I

7    would appreciate it.

8    A    Yes.

9         MS. KELLER:  Your Honor, it's beyond the scope of

10   his expertise studying the Bratz brand.

11        THE COURT:  Overruled.

12        *(Attorney discussion held off the record.)*

13   BY MR. QUINN:

14   Q    Sir, in trying to decide whether it's the design or

15   whether it's all the efforts in advertising and brand

16   building that you described that accounts for the success,

17   are you with me so far?

18   A    Yes, I am.

19   Q    All right.  In trying to decide that, whether it's the

20   design or these other things, wouldn't you want to know

21   whether this company had ever before had a successful brand?

22   A    No.

23   Q    Wouldn't it be relevant to know it's the same people

24   exercising the same talent with the same contacts in the

25   industry, knowing the same advertising companies, knowing

1   the same factories in China and all these other things who

2   had been responsible for Bratz as had been responsible for

3   those other products in order to determine the importance of

4   the design to the brand; wouldn't you want to know that?

5   A     No.

6   Q     You are aware that MGA, even since August of 2000 when

7   Mr. Bryant arrived on MGA's doorstep with his designs, you

8   are aware that MGA has not had any brands, even since then,

9   that have been anywhere as successful as Bratz, aren't you?

10  A     I can imagine that.

11          THE COURT:  Did you say I can or you can't?

12          THE WITNESS:  I can, I can.  I do can imagine that

13  there is not something that is more successful.

14  BY MR. QUINN:

15  Q     Or anywhere near as successful, right?

16  A     Yes.

17  Q     Again, the same people with the same talent with the

18  same contacts in the industry have not, so far as you know,

19  come up with another brand that's anywhere near as

20  successful, correct?

21  A     Yes, I would not expect it.

22  Q     The difference, of course, between Singing Bouncy Baby

23  and Heather -- Hopscotch Heather and Bratz's -- or MGA's

24  other products are Carter Bryant's design, correct?

25  A     Very unlikely.

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 37 of 61   Page ID #:310835
CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

37

1   Q     Well, have you looked at Mr. Bryant's designs?

2   A     Yes, I did.

3   Q     And did you see in Mr. Bryant's designs --

4         MR. QUINN:  Perhaps we could put Exhibit 302, the

5   pitch book, up on the screen?

6   BY MR. QUINN::

7   Q     In looking at the pitch book, and if we could go

8   through this, did you see that Mr. Bryant, when he arrived

9   at MGA's doorstep, had ideas for characters' names, perhaps

10  if we can just thumb through that, personality traits,

11  themes, fashions, nicknames, icons, accessories; did you see

12  that?

13  A     Yes.

14  Q     You saw that, sir?

15  A     Yes.

16  Q     And did you also see that he had -- if we could look at

17  Exhibit 5 -- say, 5-55, that Mr. Bryant had ideas for, say,

18  Bratz Boyz as well, 5-55 -- 5-65 as well, 67, 69, you saw

19  that, that when he arrived, he was already thinking about,

20  in terms of other characters, boys, you saw that?

21  A     Yes.

22  Q     And did you see -- if you look at 5-124 where

23  Mr. Bryant has a reference to accessories, and he mentions a

24  car and a slumber party play set; do you see that?

25  A     Yes, I do.

```
 1   Q    And then at 5-126, a pajama party play set that
 2   functions as a real backpack; do you see that?
 3   A    Yes.
 4           MS. KELLER:  Your Honor, are these publishing
 5   hearsay that the Court has asked us not to do?
 6           MR. QUINN:  These are in evidence, your Honor.
 7           THE COURT:  These are already in evidence, and I'm
 8   not sure what counsel is going to refer to between --
 9           MS. KELLER:  Your Honor, I don't believe they are.
10           THE COURT:  I thought 302 was.
11           MS. KELLER:  The others that we've just been
12   saying --
13           THE COURT:  Do I have seven attorneys out here?
14   Do I have seven attorneys here?
15           Now, Ms. Keller, I'm sorry.
16           MS. KELLER:  Your Honor, a number of these, I'm
17   confident, have not been entered into evidence, and I --
18   possibly 302, but a lot of these are from -- I think from
19   this expert's report.
20           THE COURT:  Well, I'm not concerned about that.
21   In other words, if these come from the pitch book, just
22   because the parties have selectively put them in for either
23   side, I'm not sure, because they are being put up so
24   quickly, so --
25           MR. QUINN:  I'll move on, your Honor.
```

 1          MS. KELLER:  Your Honor, I'm confident that a lot

 2   of these were not --

 3          THE COURT:  Time out.  I don't know.  They went up

 4   so quickly, I'm not certain.  So if they are from 302 and

 5   they were already shown, you disagree that these haven't

 6   been shown before?  I recall a couple of them, and a couple

 7   of them I don't, Ms. Keller, so that's the problem.

 8          MS. KELLER:  Your Honor, we can -- I think perhaps

 9   the thing to do would be to ask Mr. Quinn, because he's been

10   flashing them by so quickly.

11          THE COURT:  Just a moment.  Just a moment.

12          If they have been shown before, I'll allow them to

13   go up, okay?  If they haven't been shown before, they're not

14   in evidence, then I'm a little concerned.

15          MR. QUINN:  Understood, your Honor.

16          THE COURT:  Go back through your slides and just

17   show me the ones that have -- and if, in fact, they've been

18   shown before, there is no -- there's no limitation on that.

19          And Mr. Quinn, the reason for Paula Garcia is I

20   don't know the statement quickly enough to ferret out Paula

21   Garcia's statement and see if she made that here in court,

22   so...

23          MR. QUINN:  Your Honor, I'm informed that two of

24   the ones I showed, 5124 and 5126, are not in evidence.

25          THE COURT:  Okay.

 1              MR. QUINN:  Those two are not in evidence.  The

 2    others were.

 3              THE COURT:  The rest are.

 4              MR. QUINN:  Yeah.

 5              THE COURT:  The rest are.

 6              MS. KELLER:  Your Honor, part of these are from

 7    Exhibit 5, and not all pages of Exhibit 5 have been

 8    admitted.

 9              THE COURT:  Well, now we --

10              MR. QUINN:  Counsel is correct about that.

11    Counsel is correct.

12              THE COURT:  All right.  The ones that have been

13    admitted you can show.

14    BY MR. QUINN:

15    Q    So did you review Exhibit 5, Mr. Bryant's drawings?

16    A    You know, I did that so long ago, I don't remember.

17    Q    You're just not sure?

18    A    I am not sure.

19              THE COURT:  Just disregard all those flashing

20    pictures that you saw that went before your eyes that you

21    probably didn't have time to see anyway.

22              I'm just joking with the jury.

23              Okay.  We'll start all over again.  Now, you can

24    put up the exhibits that have been shown -- strike that.

25    That have been received.

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

41

BY MR. QUINN:

Q    Let me ask it this way, to try to save some time.  Did
you see that Carter Bryant was, from the beginning, thinking
in terms of line extensions and other characters?

A    Yes, very typical in the industry.

Q    Sir, is it -- I understood you to say that the Bratz
brand's relevance, I think you said, is embodied in the
tween girls notion of cool?

A    Yes.

Q    And you told us what cool means?

A    Yes.

Q    But your opinion is that it is totally grotesque,
totally grotesque to argue that sketches or sculptures,
early drafting of the Bratz ideas of Carter Bryant or the
original Bratz dolls could possibly have delivered on this
notion of cool; that is your opinion, correct?

A    Yes.  The original designs cannot --

Q    It's impossible for them to deliver?

A    I am just repeating your answer, yes.

Q    And I think you've also said that it is clearly wrong,
clearly wrong that the success of the Bratz dolls are rooted
in the unique design or appearance of the dolls?

A    Yes.

Q    That is your opinion, correct?

A    That's my opinion, yes.

1    Q    And you've talked about the importance of the

2    packaging.  Now, the packaging is mostly clear, right, so

3    that the consumer, the child or the parent or the adult, can

4    see the product, correct?

5    A    No, it's not correct.

6             MR. QUINN:  Do we have one of those dolls up

7    there, one of the original Bratz dolls?

8             MS. JUAREZ:  Not sure.  Not sure.

9             MR. QUINN:  Do we have any Bratz doll?

10            THE WITNESS:  Yeah.

11   BY MR. QUINN::

12   Q    And is there an exhibit number on that so we can see

13   for the record what we are looking at?

14   A    It's 35069.

15   Q    And if you can show that to the jury.

16        The whole point of that package, it's clear so the

17   consumer can see the product, correct?

18   A    That is one objective, yes.

19   Q    Pretty important objective, correct?

20   A    Yes.

21            (Attorney discussion held off the record.)

22            MR. QUINN:  Thank you very much.

23            THE WITNESS:  Thank you.

24            THE COURT:  Now, Mr. Quinn, concerning the

25   reports, so I know, because you can't get to the report

1    quickly enough on the bench.  Go back and check the Paula

2    Bratz statement, let me see if that was called into

3    evidence, and we'll discuss that.  He can be on call.

4              MR. QUINN:  I've got --

5              THE COURT:  No, no, not because it's there.  In

6    other words, if it came in front of the jury, that exact

7    statement, then you can refer to it.  I'll spend some time

8    with you tonight with it.  Don't worry.

9              Counsel, he may be coming back today.

10             MR. QUINN:  It was his prior testimony of this

11   witness at the previous trial, is what I was --

12             THE COURT:  No, no.  Thank you.  I didn't realize

13   that.

14             Okay.  Counsel, redirect.

15                   **REDIRECT EXAMINATION**

16   BY MS. KELLER:

17   Q    Doctor, you were asked whether MGA has ever had any

18   doll brand anywhere as successful as Barbie -- I'm sorry, as

19   Bratz, and you said, no, right?

20   A    Yeah, prior to 2000, yeah.

21   Q    Has Mattel ever had any doll brand anywhere near as

22   successful as Barbie?

23   A    No, absolutely not.

24   Q    Mr. Quinn observed same people, same talent, same

25   context in the industry, and yet MGA couldn't turn out

1    another brand as successful as Bratz, correct?

2    A    That's correct, over 40 years.

3    Q    But same people, same talent, same contacts in the

4    industry and Mattel hasn't been able to turn out a brand as

5    successful as Barbie, right?

6    A    That's correct.

7    Q    So there is more to the brand than the company?

8    A    Exactly.

9    Q    And more to the brand than the product?

10   A    Absolutely.

11   Q    Now, have you ever heard of a brand called What's Her

12   Face?

13   A    No.

14   Q    Have you ever heard of a brand called Flavas?

15   A    Yes.

16   Q    And that was a flop for Mattel, right?

17   A    Yep.

18   Q    Have you ever heard of Diva Starz as a brand?

19   A    Yes.

20   Q    Another flop?

21   A    Yes, significantly.

22   Q    So are you aware that Barbie, over the years, has

23   hundreds of different designers at Mattel?

24   A    That's correct.

25   Q    So no one person designed every Barbie, right?

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

45

1    A    That's correct.

2    Q    And so we can't say that the reason for Barbie's

3    success is that there was a brilliant designer behind it,

4    right?

5    A    That's correct.

6    Q    It's successful because Mattel managed to build a

7    brand?

8    A    Very much so.

9    Q    Are there a lot of single brand companies that are very

10   successful brands?

11   A    Very rarely.

12   Q    Well, how about when you think of Xerox, what do you

13   think of?

14   A    Yeah.

15   Q    Copiers?

16   A    Yep, exactly.

17   Q    When you think of Timex, what do you think of?

18   A    Watches.

19   Q    When you think of Hertz, what do you think of?

20   A    Rental cars.

21   Q    Hyatt?

22   A    Hotel.

23   Q    I don't know if you're into sports, but Callaway?

24   A    Callaway, golf.

25   Q    Golf, okay.

```
 1          So the fact that a company might have a single brand
 2     that really dominates and is tremendously successful, all
 3     that means is as to that one item, they managed to build a
 4     great brand, right?
 5     A    That's right.
 6     Q    And that's true of Bratz?
 7     A    Yes.  That happens exactly the same way there.
 8          MS. KELLER:  Nothing further.
 9          THE COURT:  Now, just a moment, Counsel.  I'll
10     have you reserve until Tuesday morning.  I want to discuss
11     with you and Mr. Quinn.  I thought this came from Paula
12     Garcia's testimony at this trial.  You are requesting to
13     examine him concerning his testimony at another trial, the
14     other trial.
15          MR. QUINN:  It's a statement in his report, his
16     expert report.
17          THE COURT:  No, I can't -- I can't sort that out
18     quickly enough without talking to counsel, so I'm going to
19     send you home, okay?  I don't want to make a mistake, and
20     let me spend some time with counsel to know what they're
21     both talking about.
22          Now, Counsel, my apologies.  I know we have a
23     witness in the hallway.
24          MR. QUINN:  I have a couple questions.
25          THE COURT:  No, no.  You are going to reserve
```

1    until Tuesday.  He's going to come back.

2           MS. KELLER:  Your Honor, we have a problem with

3    the fact that Dr. Joachimstahler is supposed to be leaving

4    for Germany tomorrow.  Would it be possible for him to come

5    back at another time?

6           THE COURT:  No, no.  I need time to decide this,

7    and I'll have that time, because if you are entitled to get

8    into it, I want to pay you that opportunity, and I don't

9    want to get pushed for time.  So it's very simple, you will

10   be returning Tuesday, is that understood, sir?

11          THE WITNESS:  (No audible response.)

12          THE COURT:  Is that understood?

13          THE WITNESS:  Yes, I --

14          THE COURT:  Yes, you are.

15          You're admonished not to discuss this matter

16   amongst yourselves, nor form or express any opinion

17   concerning this case.  And we'll be joining each other at

18   8:30 promptly Tuesday morning.  Enjoy your weekend.

19               *(The following proceedings is taken outside*

20          *the presence of the jury.)*

21          THE COURT:  Now, Counsel, have a seat for just a

22   moment.

23          Dr. Joachimstahler, I don't mean to be

24   discourteous.  Have a seat.  This is not intended as any

25   discourtesy, but this Court does not run on your time

1    schedule.  And when you are called as an expert in my court,

2    you're available to be called at any time; is that

3    understood?

4              THE WITNESS:  I --

5              THE COURT:  You are ordered to be here Tuesday; is

6    that understood?

7              THE WITNESS:  I will go and change --

8              THE COURT:  Do I need your passport?  Do I need

9    your passport?

10              THE WITNESS:  No, you don't need my passport.

11              THE COURT:  Good.  You're ordered back on Tuesday

12    because I want to have time to sort this out with counsel,

13    and unfortunately, I didn't know what this concerned, and

14    I'm getting either miscommunication.

15              I thought that this was -- I know it's in his

16    report.  That's not good enough for me.  The question is, is

17    this based upon Paula Garcia's statements to him and are

18    those statements matching in the testimony that Paula Garcia

19    gave, which I would probably let you refer to if they were

20    identical, or then it changed and I heard that it came from

21    the other trial, which confused me, I didn't understand

22    where we were going with this, so I'm just going to take the

23    time tomorrow.  We'll sort it out tomorrow morning.

24              Sir, you may step down.  I apologize and thank you

25    for your courtesy.

1           THE WITNESS:  Thank you.

2           THE COURT:  Now, we have also another gentleman

3    from Seattle who's out in the audience.

4           Let me repeat to counsel, no discourtesy, but it's

5    not running on these witnesses' schedule.  It's American

6    public sitting on this case, middle class and lower middle

7    class people who are serving for three months on this.

8           So, Doctor, you made $400,000, you will be here on

9    Tuesday, bright and shiny with a happy smile on your face,

10   all right?

11          Now, goodbye.

12          Now, I want to see counsel from Seattle and order

13   him back.  I don't want there to be any delay in this.

14   What's his name, Turetzky?

15          MR. ZELLER:  Turetzky.

16          THE COURT:  Turetzky?

17          MR. ZELLER:  Turetzky.

18          THE COURT:  Counsel, I want to apologize to you.

19   It's completely my fault.  Mr. Turetzky is going to have to

20   return on Tuesday.  There is no way to jam his testimony

21   into this late hour with the jury.  They're hard working.

22          MR. CARLTON:  Your Honor, may I just make a --

23   address you?

24          THE COURT:  Yes.

25          MR. CARLTON:  Would it be possible to ask MGA to

1    bring Mr. Turetzky back on Friday?

2            THE COURT:  No.  Tuesday.

3            And I apologize, Mr. Turetzky, but you are ordered

4    back; is that understood, sir?

5            MR. TURETZKY:  I understand.

6            THE COURT:  All right.  And hopefully we'll have

7    you on and off the stand very early on Tuesday morning and

8    have you return to Seattle, okay?  Thank you for your

9    courtesy.

10           Now, who else is in the hallway so I can give

11   those orders and you don't have to get in the way of your

12   witnesses?

13           MS. KELLER:  We have Mr. Villasenor, your Honor.

14           THE COURT:  Order him in here so there is no

15   misunderstanding.

16           All right.  This is what I need from counsel this

17   evening, I need all of Malackowski's reports.  I need all of

18   Malackowski's supplemental reports and any rebuttal reports

19   prepared by Wagner.  I want to make certain I have them all.

20   I want to go through them and read them outside your

21   presence this evening.

22           So how long will those take to assemble, because

23   they are in different places, and Wagner was certainly a

24   moving report?  I don't know what to expect on Malackowski.

25           MS. HURST:  I think you already have all of

 1    Mr. Wagner's reports on a thumb drive that was submitted by

 2    Mattel right before the last hearing.

 3            THE COURT:  No, I'm not -- did those include all

 4    of his rebuttal reports?

 5            MS. HURST:  Yes, they did.

 6            THE COURT:  I want to make certain of that.  You

 7    don't represent Mattel, so I'm asking Mattel --

 8            MS. HURST:  No, I --

 9            THE COURT:  -- to make certain I've got all of

10    those rebuttal reports.

11            MS. HURST:  Understood.

12            THE COURT:  But I want all of Malackowski's

13    reports and I want any of his supplemental reports, and I've

14    got to read those tonight.

15            MS. HURST:  Do you want those with all the

16    schedules, your Honor?

17            THE COURT:  Yes, I want everything.

18            MS. HURST:  Do you want them on a thumb drive?

19            THE COURT:  I want them on a thumb drive, and I

20    also want them printed, both.

21            What time can you get them for me?

22            MS. HURST:  I'll go and get that started.

23            THE COURT:  No, no.  What time?  How long will it

24    take you?

25            MS. HURST:  I would like to go and ask somebody.

1        THE COURT:  Okay.

2        Number two, I don't want you in court before 8:00,

3    but I want you ready at 8:00.  I want to meet the special

4    master at 6:30 or 7:00 -- well, 6:30 tomorrow, Robert

5    O'Brien, who I'm bringing down, and depending on Mr. Moore's

6    testimony, there may be additional testimony.  Hopefully

7    Mr. Moore will have a better recollection than he did with

8    the Court.

9        MS. KELLER:  Your Honor, will the building be open

10   so we can get into the courtroom by 8:00?

11       THE COURT:  I'll be standing down there and

12   opening the door for you.  You must have missed some of the

13   Saturday sessions we've had.  I'll personally let you in.

14       Now, there's a lot more to do.  I'm sorry,

15   Mr. Eckert and Mr. Larian, you have a wonderful weekend,

16   good night.

17       By the way, if you wanted two branding experts, we

18   probably could have put both of you up on the stand or any

19   one of you and you would have been our branding expert.

20       For $400,000, you are probably both available for

21   short work.  Anyway, have a good weekend.

22       MS. HURST:  Your Honor, we are optimistic we have

23   a paper set across the street, your Honor, so we are going

24   to recover it now, and we're going to work on that thumb

25   drive, we should be able to get it to you soon.

 1              THE COURT:  How about Wagner?  Are there any other

 2    supplemental reports that have not been submitted to me?

 3              MR. ZELLER:  I do not believe so, but I'll

 4    double-check.

 5              THE COURT:  Just double-check.  I have a lot of

 6    reading to do tonight, so my night's just going to begin as

 7    soon as I get you out here.

 8              Now, here is my suggestion.  Go preserve

 9    yourselves tonight.  I'm going to treat myself and take

10    myself out to dinner tonight, but then I need to get back to

11    work, and we'll start promptly at 8:00.  You've got an hour,

12    and what was on the first schedule, an hour and 15?

13              MR. MC CONVILLE:  Yeah.

14              THE COURT:  You have an hour and 15 minutes

15    apiece, and I represent to you, Jane, or whoever is coming

16    in as the court reporter, we'll be at work by 8:00 or 8:05

17    tomorrow, okay?

18              Now, after he finishes, I want some time, and now

19    you have to be available to me, and I'm going to suggest

20    some ways that you can appropriately spend your time

21    tomorrow, Mr. Quinn and Ms. Keller and Mr. Price and

22    Mr. McConville.

23              I assume that -- well, who's going to take

24    Malackowski on direct examination again?

25              MS. KELLER:  I am, your Honor.

CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

54

```
 1              THE COURT:  Ms. Keller, you are?

 2              Who is going to take him on cross?

 3              MR. PRICE:  I will.

 4              THE COURT:  Mr. Price, you are, okay.

 5              You need to give me a little time after his

 6    testimony to try to sort out how I feel concerning his

 7    testimony, just like Wagner, and that took a long time,

 8    partially because there were so many reports.

 9              And I need to pay you the same courtesy to redo

10    the slides, Ms. Keller, in case I don't agree with certain

11    parts of his presentation, so I promise you I'll accomplish

12    that tomorrow or at least by Sunday so you're not surprised

13    or floundering at the last moment and hopefully also not

14    getting 2:00 a.m. slides in the morning like Ms. Hurst did.

15              MS. KELLER:  Your Honor.

16              THE COURT:  I'm sorry, we have the witness

17    present.

18              MR. MC CONVILLE:  Yes.

19              THE COURT:  And first of all, Counsel, it's a

20    pleasure to meet you.  What's your name?

21              MS. JENNESS:  Good afternoon, your Honor.  Evan

22    Jenness.

23              THE COURT:  Oh, I had the pleasure of speaking to

24    you.  Why don't you come on up here for just a moment.  And

25    you're with?
```

 1              MS. JENNESS:  Mr. Villasenor.

 2              THE COURT:  Mr. Villasenor.  Thank you, sir.  If

 3     you'd come up.

 4              We're moving rapidly but, of course, no one can

 5     judge the time, and I've got a standing rule if the witness

 6     is not available or present, that party rests their case.

 7     That's why they are stacking people up in the hallway, so no

 8     discourtesy intended, Mr. Villasenor, we have a Dr. Hox

 9     Miller (sic) up on the stand, Hox --

10              MS. KELLER:  Joachim --

11              THE COURT:  Joachim --

12              MS. KELLER:  -- stahler.

13              THE COURT:  Joachimstahler, I'm sorry.

14     Dr. Joachimstahler, and I think we're almost done, but we

15     ran into some problems, and I need to sort out a little

16     testimony.  That was my fault for being unprepared.

17              So pardon the discourtesy.  And there is one

18     witness before you who they believe is a brief witness, and

19     most of the witnesses they've held to their time schedule,

20     but I order you to be here on Tuesday at 8:30 in the

21     morning.  I can represent to you, though, you'll be on and

22     off the stand that day.  In other words, you can make your

23     plans accordingly.

24              Counsel, you are in Los Angeles, aren't you?

25              MS. JENNESS:  Yes, I am.

```
 1              THE COURT:  Well, thank you for your courtesy, and

 2    I apologize for bringing you all the way down here, but it's

 3    been a three-month case, and counsel are trying to get

 4    people down, so thank you for your courtesy.

 5              MS. JENNESS:  Thank you, your Honor.  We'll see

 6    you on Tuesday.

 7              THE COURT:  See you on Tuesday, sir.

 8              MS. KELLER:  And your Honor, may we ask just one

 9    thing, and that's because hope springs eternal that possibly

10    we might be able to get a conclusion on Dr. Joachimstahler.

11    We had actually tried to get in party admissions to

12    cross-examine Mr. Wagner, both trial testimony and depo

13    testimony under 32(a)(3), and the Court ruled that the party

14    admissions were not coming in.

15              THE COURT:  And I'm inclined to hold to that same

16    ruling.  The problem is I can't sort that out quickly enough

17    because it went from the statement of Paula Garcia, I

18    thought -- strike that.

19              This is what I'm hearing.  It doesn't mean it's

20    accurate, that there's a statement by Paula Garcia in the

21    doctor's report, which under 32(a)(3)?

22              MS. KELLER:  Yes.

23              THE COURT:  Hope that's correct.  I would not

24    normally allow, okay?

25              But then I heard that he also had not only
```

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 57 of 61   Page ID #:310855
CV 04-9049-DOC - 03/18/2011 - Day 36, Vol. 3 of 3

57

 1    personally spoken to her, but I thought I heard it was the
 2    trial testimony in this trial, and I was struggling with
 3    that in that split second.
 4              Now, hold on.
 5              Then I heard, or I thought I heard, no, this is
 6    from the prior trial.  So it's caused mass confusion on my
 7    part, and I'm not going to do that on a wing and a prayer.
 8              MS. KELLER:  I'm just thinking whether it's from
 9    this trial or a prior trial or a depo, no matter what form
10    the party admission is in, if the Court has been holding to
11    a rule that cross-examination of experts will not be -- we
12    will not be permitted to use party admissions or any
13    other -- either hearsay or party admissions to cross-examine
14    them, then it wouldn't matter if it's this trial, previous
15    trial or --
16              THE COURT:  I understand that, and I feel that
17    gentle push to have me make a decision tonight.  It's not
18    going to happen.  He is back on Tuesday morning, and I have
19    time to at least make as decent a ruling as I can, and I'm
20    not going to be pushed by his schedule, not at $400,000.
21              MS. KELLER:  It's not our intention to try to push
22    the Court.
23              MS. HURST:  Your Honor, may I make one other
24    request just regarding the schedule of when he returns.  He
25    has 35 people flying from all over the world to meet him in

 1   Germany on Tuesday.  Could he return on Thursday, your

 2   Honor, he'll turn right around and come back?

 3          THE COURT:  Will your case still be going forward

 4   on Thursday?

 5          MS. HURST:  I believe so, your Honor, yes.  We are

 6   not going to finish by the end of the week.  Would that be

 7   okay, your Honor?

 8          THE COURT:  You're representing that he's coming

 9   back by Thursday?

10          MS. HURST:  He will be back on Thursday.

11          THE COURT:  I can pay him that courtesy.  I just

12   need time to sort out this issue.  You have to understand

13   that up on the bench, I'm making a thousand split decisions,

14   and I just didn't understand, because I can't get the report

15   in front of me, get to that page quickly enough, recall what

16   Paula Garcia had said, recall 32(a)(3) in that split moment

17   when everybody is pushing on a Friday afternoon, so I'm not

18   going to put myself in that position.

19          MS. HURST:  Totally understand, your Honor, if we

20   can just have the courtesy of having him back on Thursday,

21   we'd very much appreciate it.

22          THE COURT:  Certainly.  Now, if he doesn't come

23   back --

24          MS. HURST:  He will be here.

25          THE COURT:  All right.

 1              MS. HURST:  We understand the remedies, your

 2    Honor.

 3              THE COURT:  Okay.  So what happens then is we

 4    reopen on redirect, and he's back for a complete recross,

 5    because we haven't done recross yet.

 6              MS. HURST:  Correct.

 7              MR. QUINN:  Actually, Ms. Keller said she was

 8    done.

 9              MS. KELLER:  I was prepared to waive it if we

10    could get him out of here, because I didn't want to have to

11    be responsible for detaining him.

12              THE COURT:  Well, that leaves Mr. Quinn, I'm not

13    forcing you into anything.  That's a conversation between

14    the two of you.  I don't want to be a part of it, so

15    Mr. Quinn, Ms. Keller, as each of you get up out of your

16    chairs, as you move towards the back.  I really don't care.

17    Right now, he's back here on Thursday.

18              *(Attorney discussion held off the record.)*

19              THE COURT:  And by the way, Mr. Quinn, I'm not

20    demanding or even asking for this, and so you are under no

21    pressure to consent, and you haven't even had

22    recross-examination.

23              *(Attorney discussion held off the record.)*

24              THE COURT:  Mr. Zeller, Ms. Hurst is involved, you

25    may want to be involved also.

CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

60

1          This is off the record.

2          *(Discussion held off the record.)*

3          *(Recess.)*

4                         —oOo—

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10248   Filed 03/22/11   Page 61 of 61   Page ID #:310859
CV 04-9049-DOC – 03/18/2011 – Day 36, Vol. 3 of 3

61

1                            -oOo-

2                        **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  March 19, 2011

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25