1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,                    )
7                                         )
                PLAINTIFFS,               )
8                                         )
        vs.                              ) CV NO. 04-9049-DOC
9                                         )
MGA ENTERTAINMENT, INC., ET AL.,         )
10                                        )
                DEFENDANTS.               )
11      _____)

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      STATUS CONFERENCE

16                    SANTA ANA, CALIFORNIA

17                  SATURDAY, MARCH 19, 2011

18                        8:04 A.M.

19

20
                **DEBORAH D. PARKER, CSR 10342**
21              **OFFICIAL COURT REPORTER**
                **UNITED STATES DISTRICT COURT**
22              **411 WEST FOURTH STREET**
                        **SUITE 1-053**
23              **SANTA ANA, CALIFORNIA 92701**
                        **(714) 542-8409**
24              **D.PARKER@IX.NETCOM.COM**

25

```
 1   APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF, MATTEL, INC.:

 3                           JOHN QUINN
                             WILLIAM PRICE
 4                           MICHAEL T. ZELLER (Not Present)
                             QUINN EMANUEL URQUHART
 5                           & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                           (213) 443-3000

 8
         FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                           (949) 567-6700

13
                             ANNETTE L. HURST
14                           ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                           (415) 773-5700

17
                             JENNIFER L. KELLER
18                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                           SUITE 560
                             IRVINE, CALIFORNIA 92612
20                           (949) 476-8700

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                              MARK E. OVERLAND
                               LAW OFFICES OF MARK E. OVERLAND
 4                              100 WILSHIRE BOULEVARD
                               SUITE 950
 5                              SANTA MONICA, CALIFORNIA 90401
                               (310) 459-2830
 6

 7                              ALEXANDER H. COTE
                               SCHEPER KIM & HARRIS, LLP
 8                              601 WEST FIFTH STREET
                               12TH FLOOR
 9                              LOS ANGELES, CALIFORNIA 90071
                               (213) 613-4660
10

11
      ALSO PRESENT:
12
                               JEANINE PISONI
13                              MGA ENTERTAINMENT, INC.
                               16360 ROSCOE BOULEVARD
14                              SUITE 105
                               VAN NUYS, CALIFORNIA 91406
15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    I N D E X

 2

 3   DEFENDANTS' WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    JAMES EDWARD MALACKOWSKI   13      75

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; SATURDAY, MARCH 19, 2011; 8:04 A.M.

2         *(The following proceedings were had outside the*

3         *presence of the jury:)*

4              THE COURT:  We're on record.

5              Counsel, Mr. Cote, is here.  Mr. McConville,

6    Ms. Keller, Mr. Price -- apparently, Mr. Quinn is on the

7    way -- and Mr. Zeller.

8              I'm going to order the parties undertaking the

9    deposition today to come across the street.  I want to speak

10   to Mr. Gordon, Mr. Monroe, and Ms. Hurst, I believe, who is

11   involved in that deposition.

12             So it's 8:00 o'clock.  They may have started.

13   Please ask them to come over immediately.  I want to have a

14   discussion with them, before we start today.

15             MS. KELLER:  Your Honor, we have a set of slides

16   for you, I believe.

17             THE COURT:  Good.  I can get those.

18             MS. KELLER:  Do you have those?

19             THE COURT:  Were they in the box last night?

20   Thank you.

21             This is off the record.

22        *(Pause.)*

23             THE COURT:  We're back in session.

24             Mr. Moore is present along with Mr. Gordon.  Thank

25   you, for your courtesy.  Mr. Moore, if you will retake the

1  stand.

2              This will be a matter in open court.  I'm inviting

3  lead counsel to be present.  I'm going to have a

4  conversation with Mr. Moore, and I think it would just be

5  wise if all of the other parties, except Mr. Gordon, waited

6  in the hallway.

7              Have a seat, sir.  Good morning.

8              THE WITNESS:  Good morning.

9              THE COURT:  It's 8:15 on Saturday.  And before the

10  deposition started, I wanted to assemble lead counsel.  The

11  only lead counsel who's not present is Mr. Overland, and

12  Mr. Quinn.  I understand Mr. Quinn is sick.  But you are in

13  telephone contact with him.

14              MR. PRICE:  Yes.

15              THE COURT:  Mr. Zeller is here.  Good morning.

16  Mr. Price; Mr. Gordon, who represents Mr. Moore; Ms. Hurst,

17  who is conducting the deposition.

18              Outside.  Outside.

19              Mr. Cote.  Mr. McConville.  Ms. Zeller.

20              MS. KELLER:  Ms. Zeller?

21        (Laughter.)

22              THE COURT:  Ms. Keller.  And Mr. Zeller.  And

23  Mr. Keller.

24              MS. KELLER:  Are we morphing?

25              THE COURT:  It's early morning.

```
 1              I've been most of the night reading again.

 2              I want to have a conversation with you before your

 3     deposition begins and inform you that you'll be coming back

 4     before this court for another in-camera session today.

 5              THE WITNESS:  Okay.

 6              THE COURT:  And I just want to have a talk with

 7     you for a moment, so you understand completely the gravity

 8     of this situation.

 9              THE WITNESS:  Okay.

10              THE COURT:  Our discussion so far has been

11     in camera.  And I want to start with, just a fundamental

12     belief about what the court system represents.  I have

13     literally thousands of law firms and thousands of companies

14     come into this courtroom.  Of which, you work for an

15     esteemed company, just as counsel works for -- or with an

16     esteemed company.

17              And today at your deposition, certainly,

18     Mr. Gordon will represent you ably, and Ms. Hurst will

19     examine you ably, and I expect at certain portions, the

20     attorney-privilege will be invoked and in some occasions the

21     work of privilege.

22              But concerning our discussion, I want you to know

23     that I'm troubled.

24              THE WITNESS:  Okay.

25              THE COURT:  And I want you to understand that the
```

1   ramifications of that can be severe.  First, I can find that

2   you truly don't recall, but I'm going to invite you now to

3   all the binders that I've gone over again on that table.

4   I'm going to invite you before you have the in-camera

5   session to go through each and every one of those.  I'm

6   going to tell you that it's a little implausible for me,

7   after reading all of these e-mails and your involvement, to,

8   at least, at this time, readily accept that you can't recall

9   those specific inquiries that I made.

10          Now, Mr. Normile, the jury was out, and he came in

11   his shorts that day and truly tried to refresh his

12   recollection.  But going through the binders, I just want to

13   you to know, I'm going to use the word "trouble."

14          I'm going to invite you, along with Mr. Gordon, to

15   go through all these binders.  In fact, I'm going to require

16   that to see if there's any refreshment of recollection.

17   When I said I was going to find out that information, I am.

18          Now, first of all, I can accept your testimony and

19   believe it.  I cannot accept your testimony; and if I do

20   not, the following things can happen:  First, the privilege

21   is waived, but it's waived as to Mattel in total.  And I

22   want you to understand that.

23          Second, I can find the crime fraud.  I want you to

24   understand that.

25          Third, Mr. Eckert will be involved in that

```
 1    decision because the ramifications for Mattel are
 2    astounding, if the court makes that finding.
 3               Do you understand that?
 4               THE WITNESS:  Yes, I do.
 5               THE COURT:  Do you understand the responsibility
 6    you're carrying on behalf of Mattel today?
 7               THE WITNESS:  I do.
 8               THE COURT:  If at any time you need Mr. Normile to
 9    come down, I want you to take that time with him.
10               Understood?
11               THE WITNESS:  Okay.
12               THE COURT:  I'll keep the light on for you.  I
13    want this thoroughly and thoughtfully thought out by Mattel.
14    I usually warn one time.  You don't know that yet.
15               THE WITNESS:  Okay.
16               THE COURT:  Understood?
17               THE WITNESS:  I do.
18               THE COURT:  You just have to ask around.  I do it
19    one time.  I'm going to accept, right now, that there's
20    somewhat of a lack of recall.  I'm going to have you go
21    through the binders, while I'm spending my sleepless nights
22    going through.  And I'm going to tell you that it's obvious
23    to me that you're an intimate working part maybe assigned by
24    Mr. Normile to this case from beginning to end.  And those
25    questions that I'm asking you, I hope that this will help
```

 1   refresh your recollection.

 2          Finally, I want to remind you of one other thing:

 3   I'm the judge who decides the 17200 claim in this case.  And

 4   I expect when you're asking for a billion dollars that

 5   you're wearing the white hat.

 6          Enough said?

 7          THE WITNESS:  Yes, I understand.

 8          THE COURT:  Mr. Gordon, have a nice deposition

 9   across the street.  Assert whatever privileges, but I expect

10   you back in my court.  You're welcome to go through these

11   binders as I have one by one; and then, I'll have the

12   gentleman back on the stand.

13          Now -- I'm sorry, Mr. Zeller.

14          Oh, by the way, Quinn Emanuel and for Mr. Quinn,

15   you'll find that I'm not finding any crime fraud.  I have to

16   catch up with that.  You've answered my questions

17   succinctly.  Whether I agree or not with the decision is

18   totally irrelevant.  It's no different, quite frankly, than

19   Mr. Nolan.  Some interesting issues, but I didn't find crime

20   fraud.

21          I think you've been exemplary in responding to me,

22   telling me why this occurred.  I'm troubled.  And you can't

23   help in that regard.

24          MR. ZELLER:  Understood.

25          I advise you to be very careful in stepping into

1  this morass.  This is Mattel now.  This is in-house counsel.

2          Now, it may not make any difference to this court

3  what your answers are, but the *I can't recollect,* and *I*

4  *don't recall* is troubling to the court.  And I'll leave it

5  that time.

6          THE COURT:  Thank you very much, sir.  Have a nice

7  depo.

8          MR. ZELLER:  If we can have a legal ruling then on

9  one point, your Honor.  The court is ordering Mr. Moore to

10 review the documents to -- for purposes of refreshing his

11 recollection.  That will not be deemed a waiver of the

12 attorney-client privilege should it be that some of those

13 documents refresh his memory.

14         THE COURT:  Not a waiver.  I'm giving him every

15 opportunity to have his recollection recalled by reviewing

16 the documents.  I'm being very generous in that.

17         MR. ZELLER:  We just didn't want to, obviously --

18         THE COURT:  I'm being very generous in that.

19         All right.  Thank you, very much.

20         MS. HURST:  Your Honor, may we request that review

21 occur before we start the depo?

22         THE COURT:  Certainly.  In fact, these are the

23 five binders, and it will take a little while.

24         MS. HURST:  That's fine.

25         THE COURT:  Mr. Gordon.

```
 1            MS. HURST:  We'll wait across the street, if
 2   that's all right with the court.
 3            THE COURT:  I would like the binders returned to
 4   me.
 5            Mr. Gordon, why don't you start with Volume I.
 6   Interesting reading.
 7            Now, Mr. Eckert may be coming down here.  If the
 8   court decides to go a different direction, I think the
 9   president of Mattel should be informed of that.  It has
10   tremendous ramifications.
11            Ms. Hurst, if you go get a cup of coffee, go get
12   some sleep --
13            MS. HURST:  Coffee at least, your Honor.
14            THE COURT:  -- I think it's going to take at least
15   until 12:00 noon.
16            MS. HURST:  Yes, it will take a few hours.
17            Thank you, your Honor.  I appreciate it.
18            THE COURT:  And Mr. Zeller, if you want to get
19   some sleep also, sir.
20            MR. ZELLER:  I appreciate the invitation, your
21   Honor.
22            THE COURT:  Okay.  All right.  Let's get
23   Mr. Malackowski in here.
24       (Pause.)
25            THE COURT:  We're on the record with the
```

1    Malackowski matter.

2              All counsel are present.

3              Sir, how are you today?

4              THE WITNESS:  I'm doing good.

5              THE COURT:  Would you raise your right hand,

6    please.

7        JAMES EDWARD MALACKOWSKI, DEFENDANTS' WITNESS, SWORN

8              THE WITNESS:  I do.

9              THE COURT:  Thank you, sir.

10             If you would be seated.  And thank you for your

11   courtesy.  I'm sorry we're 25 minutes late.

12             Would you state your full name for the record,

13   sir.

14             THE WITNESS:  James Edward Malackowski.

15             THE COURT:  And would you spell your last name,

16   sir?

17             THE WITNESS:  M-A-L-A-C-K-O-W-S-K-I.

18             THE COURT:  This is direct examination by

19   Ms. Keller, on behalf of Mr. Larian and MGA.

20             MS. KELLER:  Your Honor, may I have the court's

21   permission to do the examination sitting down?

22             THE COURT:  Certainly.

23             MS. KELLER:  No disrespect intended.

24             THE COURT:  I prefer it.

25   ////

```
 1                         DIRECT EXAMINATION

 2   BY MS. KELLER:

 3   Q.   Mr. Malackowski --

 4             THE COURT:  By agreement, it's an hour and 15

 5   minutes.

 6             Okay.  Counsel.

 7   BY MS. KELLER:

 8   Q.   Mr. Malackowski, please state your name and position

 9   for the record.

10   A.   James E. Malackowski.  I'm the president and chief

11   executive of Ocean Tomo, LLC.

12   Q.   And if you turn to the tab of the notebook in front of

13   you, Trial Exhibit 2482, would you identify that document

14   for the court?

15   A.   Yes, ma'am.

16   Q.   And what is that?

17   A.   It is a copy of my professional resume as of

18   October 2010.

19             MS. KELLER:  And, your Honor, does the court have

20   that tab notebook with his credentials?

21             THE COURT:  I do, but I'm going to work off this

22   board.  In other words, I'm going to work off the screen.

23   BY MS. KELLER:

24   Q.   Mr. Malackowski, would you give us just a brief

25   description of your professional background?
```

```
1   A.    Yes.   Attended the University of Notre Dame, graduating

2   as an accountant and have spent the first 15 years of my

3   career as financial consultant focused of questions of

4   intellectual property, valuation and accounting.

5          Today, I manage Ocean Tomo, which is an

6   intellectual property investment firm.  So we have five

7   groups of people.  We value intellectual property.  We

8   invest in intellectual property, and we help to buy/sell

9   intellectual property.

10  Q.    Have you qualified as an expert witness on the issue of

11  damages in any court?

12  A.    Yes, ma'am.  Many times.

13  Q.    Can you give just a brief rundown?

14  A.    I have testified in open court approximately 30 times.

15  Most of those relate to intellectual property matters, but

16  some relate to general business litigation.

17         MS. KELLER:  And, your Honor, we would ask if we

18  could submit on Mr. Malackowski's CV.

19         THE COURT:  You may proceed.

20         MS. KELLER:  Thank you.  And the court accepts

21  Mr. Malackowski as an expert in this matter?

22         THE COURT:  You may proceed.

23  BY MS. KELLER:

24  Q.    Mr. Malackowski, what was your assignment from MGA?

25  A.    My assignment in this matter was fairly
```

1   straightforward:  First, to calculate MGA's damages related

2   to their asserted trade secret and copyright claims; and

3   second, to re-calculate and correct Mr. Wagner's analysis

4   related to his claims for damage.

5   Q.   And so, you were going to compute MGA's claims for

6   trade secret misappropriation and unfair competition and

7   evaluate Mr. Wagner's computations?

8   A.   Correct.

9   Q.   Did you prepare any reports in connection with so

10  doing?

11  A.   Yes, ma'am.  There were four reports that were

12  prepared:  An original report outlining MGA's damages

13  November 1st of last year; a corrected report on

14  November 5th; a rebuttal report to Mr. Wagner's analysis, on

15  December 1st and then finally a supplemental report at the

16  end of January.

17  Q.   And would those collectively be Trial Exhibits 25845,

18  35236, 34882 and 35236?

19  A.   I believe that's correct.

20  Q.   Now, let's discuss the damages you calculated for MGA's

21  affirmative claim.

22          First of all, are you familiar with concept of the

23  Georgia-Pacific factors?

24  A.   Yes, ma'am.  The Georgia-Pacific factors are a

25  framework for constructing a hypothetical license.

1    Q.   Did you use any of the Georgia-Pacific factors in your

2    computations?

3    A.   Yes.  With respect to the calculation of a reasonable

4    royalty, which I understand is now no longer a matter for

5    the jury.

6    Q.   So you have now excluded any computation of reasonable

7    royalty under Georgia-Pacific; right?

8    A.   Correct.

9    Q.   Now, since you are not testifying about reasonable

10   royalty, do you intend to offer any other opinions that

11   depend upon the Georgia-Pacific factors in any way?

12   A.   No, ma'am.

13   Q.   Let's go to -- let's start with MGA's trade secret

14   claims against Mattel.  Please look at the first slide,

15   which is 36111, page 2.

16         Does this slide summarize your unjust enrichment

17   damages relating to MGA's trade secret claims against

18   Mattel?

19   A.   Yes, ma'am.  This slide presents three different

20   calculations that I made.  Two calculations I refer to as a

21   top down approach, looking holistically at MyScene's actual

22   sales versus what they should have been.  And the first

23   number, 136 million, represents a bottom up approach which

24   is focused on the head start.

25         The first bar of 136 million represents what I

```
 1    call a bottom up approach.  It's based upon looking at
 2    individual doll products.
 3    Q.   So you calculated alternative -- three alternative
 4    scenarios for the damages?
 5    A.   Yes.  I believe that the top down range of 149 to 202
 6    million sets forth the measure of damage.  And the bottom up
 7    approach is really confirming of the top down analysis.
 8    Q.   Okay.  Tell us again what is the bottom up approach.
 9    A.   So, after looking at total sales and understanding what
10    those sales would have been but for the infringement, I then
11    went back to each and every of the 114 unreleased products
12    that are asserted to be misappropriated.
13         And for the ones that I could identify sufficient
14    accounting information, I added up the head start benefit
15    that Mattel received.  And when you total -- actually, only
16    total 32 or 33 of the 114 products, you reach 136 million.
17    Q.   So you did this item-by-item so that in the event that
18    some items were found -- there was liability found as to
19    some and not as to others, you could be able to separate
20    them out?
21    A.   That's exactly right.
22    Q.   Then, you said you also did a top down analysis?
23    A.   Yes, ma'am.  I looked at a top down approach in two
24    different variations.
25    Q.   And the top down approach also breaks out the items one
```

1    by one?

2    A.    The top down approach did not.  It looked holistically

3    at the MyScene sales versus what they would have been but

4    for the misappropriation.

5    Q.    So using these different approaches, what is the range

6    of damages that you calculated that MGA might receive for

7    misappropriation of its trade secrets?

8    A.    The range is between 136 million to 202 million.

9    Q.    And is this cited in your supplemental report,

10   Exhibit 35236?

11   A.    Yes, ma'am.

12   Q.    Now, when you say "unreleased products," what products

13   are you talking about, specifically?

14   A.    I'm specifically referring to the 114 products that

15   were identified by MGA in their claims.  And if you go to

16   the next chart, they're specifically detailed.

17   Q.    Okay.  And so we go to page 3?

18   A.    Yes.

19   Q.    And can you explain this chart?

20         THE WITNESS:  Your Honor, for each and every year

21   what this chart shows is each of the 114 unreleased products

22   that were cited in the Mattel toy fair reports.  Some of

23   them are shaded and the shading represents products that

24   refer specifically to Bratz.  And there are 73 products that

25   are either shaded in dark blue or light blue.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:  Now, if I counted dark blue and light

2    blue, I would come up with 73.

3          THE WITNESS:  Correct.

4          THE COURT:  One, two, three -- I'm just kidding

5    you.  I'll count them later.

6          Thank you.

7          THE WITNESS:  But, your Honor, after I identified

8    the 73 that relate to Bratz, I then went to publicly

9    available information in the documents of this case to

10   determine which of those products Mattel offered competing a

11   product.  And those are actually shown in dark blue.  And so

12   there are 32 products where there is a Bratz-related and a

13   specific Mattel competitive product.

14   BY MS. KELLER:

15   Q.   And why was it important to you to show which ones

16   Mattel had a competitive product on?

17   A.   Well, because I'm basing my bottom up analysis on a

18   head start, intuitively, Mattel can only realize the head

19   start benefit on those products they actually put into the

20   market.  So my analysis for the bottom up approach is

21   limited to those 32 products plus acceleration.

22         THE COURT:  Now, just a moment.  Your head start,

23   then, will be 32 products; is that correct?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  What shade represents the 32 products?

1   The light blue?

2            THE WITNESS:  No, sir.  The dark blue.

3            THE COURT:  Dark blue.  Just a moment.

4            And each one of those are labeled, although they

5   need to be blown up:  Bratz Fashion Makeover Game, Bratz

6   Mobile, Bratz Style It! collection, Bratz Boyz, et cetera.

7            THE WITNESS:  Et cetera.

8            THE COURT:  Now, what's your unjust enrichment

9   figure for those 32?

10           THE WITNESS:  It is $136 million.

11           THE COURT:  And that's your bottom up approach?

12           THE WITNESS:  Yes, sir.

13  BY MS. KELLER:

14  Q.   And then, will you tell us a little more about how you

15  did your top down analysis?

16  A.   Yes.  If you look to the next chart --

17  Q.   And that would be page 4.

18           THE WITNESS:  Your Honor, this represents the

19  first of the two top down analyses that I did.  The top of

20  the chart, the dark blue section, represents the actual

21  MyScene profits, including their licensing revenues, and it

22  is shown on a year-to-year basis.

23           In my view in the but-for world, had there not

24  been misappropriation, total MyScene profits would have been

25  lower.  So the light blue region represents what the MyScene

1    profits should have been.

2            So how did I make that calculation?

3            It's in two pieces.  First, I determined what the

4    2003 MyScene profits would have been, based upon the actual

5    Mattel documents.  I looked at their projections and their

6    business records.  I then estimated what the sales would be

7    for each year following, based upon the MyScene historical

8    performance.  Effectively, I looked how the top line moved

9    and I moved it down towards the bottom.  But I made one

10   adjustment.  There were two products that I had very

11   specific information for which was MyScene Bling Bling and

12   MyScene Chillin' Out.  So I removed the effect of those two

13   products before I calculated that but-for line.

14           And that's simply not to bias the but-for line

15   with the ill-gotten benefit which I could calculate.  And so

16   the end result is of $348 million in profit, I believed that

17   149 million represents excess profit and 199 million

18   represents profits to Mattel.

19   BY MS. KELLER:

20   Q.   Okay.  So to be clear then, the range representing

21   Mattel's profits from MyScene that would amount to unjust

22   enrichment is what?

23   A.   The range for this first scenario is 149 million.  You

24   can see that number in the middle of the chart.  And as we

25   go to the chart, you will see the calculation that shows the

1    202 million.

2    Q.    Okay.

3    A.    So this chart is very similar.  In fact, the dark blue

4    region is exactly the same.

5              THE COURT:  Is this Mr. Silver?

6              Mr. Silver, would you come over to the table and

7    join us, please.

8              Off the record.

9         (Off the record.)

10             THE WITNESS:  So I was merely indicating,

11   your Honor, that for this alternative top down approach, the

12   dark blue section is exactly the same as we just saw, but

13   you can note that the light blue section is smaller.  In

14   other words, in this calculation I assume that the but-for

15   MyScene sales would have been even less but for the

16   misappropriation.

17             And the way I calculated that was the same

18   approach for 2003, looking at Mattel documents.  But then

19   for the future prediction, I look specifically at Mattel's

20   historical performance for other fashion dolls directed at

21   older girls.  And it's noted at the bottom of the chart.

22   That was their performance on Generation Girls, Diva Starz

23   and Flavas.

24             THE COURT:  So not all fashion dolls?

25             THE WITNESS:  Specific to fashion dolls for older

1    girls.

2            THE COURT:   Thank you.

3    BY MS. KELLER:

4    Q.   Now, have you reviewed the Mattel toy fair reports,

5    containing the trade secret information?

6    A.   Yes, ma'am, I've reviewed the toy fair reports, as well

7    as the related testimony and documents of Mattel.

8    Q.   So you didn't just assume that Mattel had information

9    about these unreleased products, based on what you were told

10   by counsel; correct?

11   A.   Correct, ma'am.

12   Q.   Now, we've already talked about your top down approach

13   on page 5.

14           Can you tell us, did the top down approach measure

15   profits that Mattel earned for its entire MyScene product

16   line, as a result of the alleged trade secret

17   misappropriation?

18   A.   It measured total profits for MyScene.   Then, I

19   apportioned between what was due to the misappropriation and

20   what should be retained by Mattel.

21   Q.   How, again, did you make that apportionment?

22   A.   There's the two methods:   One was to look,

23   specifically, at the historical experience of Mattel's

24   fashion dolls for older girls -- Mattel's experience on

25   Generation Girl, Diva Starz and Flavas.   And the second

1    approach was to look at the hypothetical MyScene experience

2    but removing the effect for Bling Bling and Chillin' Out.

3    Q.   Okay.  And so, ultimately, you came -- using this

4    computation that we see here in Exhibit 361115, what was the

5    ultimate result of your computations?

6    A.   The ultimate result was the 348 million in total

7    profit.  Mattel would retain 146 million.  And the measure

8    of damage which should be disgorged for MGA is 202 million.

9    Q.   Now, if we turn to your next slide, page 5 --

10   A.   Page 6.

11   Q.   I'm sorry, page 6.

12        Okay.  So, then, based on the top down approach in

13   number one, you're letting Mattel keep profits from MyScene

14   that are consistent with Mattel's own sales trend

15   experience; right?

16   A.   Yes, ma'am.

17   Q.   After adjusting for Mattel's expectations for 2003 on

18   how the product line would perform; right?

19   A.   That's exactly right.

20   Q.   So, basically, are you using all Mattel's own

21   information?

22   A.   Trying to be as specific as possible.

23   Q.   And under top down approach, number two, you're letting

24   Mattel keep profits from MyScene consistent with Mattel's

25   historical performance with Generation Girl, Diva Starz and

1   Flavas?

2   A.    That's correct.

3   Q.    And those are fashion dolls targeting older girls?

4   A.    Yes, ma'am.

5   Q.    Now, in taking this top down approach, why didn't you

6   compare MyScene to Barbie?

7   A.    A number of reasons:  Barbie targets a different

8   segment of the audience.  Barbie targets younger girls.

9           And second, the business records of both MGA and

10  Mattel show that the competition was between MyScene and

11  Bratz.

12  Q.    And that MyScene was specifically created to compete

13  against Bratz?

14  A.    That is correct.

15  Q.    Now, are you assuming that Mattel never would have come

16  up with another fashion doll aimed at older girls?

17  A.    No.  I assumed that both Mattel and MGA remained in the

18  market with noninfringing product.

19  Q.    And let's go back again to your bottom up approach.

20          The bottom up approach looks at each individual

21  Bratz trade secret alleged to have been misappropriated by

22  Mattel; right?

23  A.    Yes, ma'am.

24  Q.    And measures the profits that Mattel earned for each

25  individual competitive MyScene product.

1        True?

2   A.    Yes, ma'am.  Based upon the head start benefit.

3   Q.    And the top down approach looks at profits from the

4   entire product line all put together, whereas the bottom up

5   approach measures profits for each product; right?

6   A.    Correct.

7   Q.    Although there's different methods, are the damages far

8   apart?

9   A.    They are not.  The bottom up approach is lower in part

10  because we know we're only dealing with 32 of the products

11  and we don't have all of the information we like.

12  Q.    Let's look at 36111, page 6.

13        Can you explain the first box that we see to the

14  left?

15  A.    Yes.

16        THE WITNESS:  So, your Honor, generally what this

17  chart does, is show how we started with the 114 unreleased

18  products that were in toy fair reports and how we actually

19  need to make the calculation, because there's one data

20  challenge that I had to solve.

21        So the first box represents the 114.  Of the 114,

22  we saw that 73 were shaded.  Those were the Bratz-related

23  offering.  Of the 73 that were shaded, we found that there

24  were 32 that Mattel offered a competitive product with.  And

25  it's really that third box that we want to focus our

1    calculations on.

2              The challenges I was not able to find in the

3    record, Mattel accounting information for all 32 of those

4    products.  If I did, the chart would stop here.

5              Your Honor, what I found was MyScene revenue data

6    for 18 of the products.  So what I did is, I started my

7    calculations with the 18, and then I extrapolated back to

8    the 32.

9    BY MS. KELLER:

10   Q.   Do you have any idea why you were not able to get a

11   complete data set from Mattel for those products?

12   A.   Honestly, I don't.  I requested of counsel that I

13   receive monthly data for Mattel for each product,

14   repeatedly, but it was not available to my understanding.

15   Q.   Okay.  So then, just running through that again:  114

16   trade secrets misappropriated from toy fairs, 73 Bratz

17   products, 32 Bratz products with -- that matched MyScene

18   products and then you looked at MyScene revenues for the 18

19   products that you actually had?

20   A.   For the 18 that I had accounting data for, yes, ma'am.

21   Q.   And what did you do next for your bottom up analysis?

22   A.   That's shown on the next chart.

23   Q.   That's 36111, page 7?

24   A.   Yes.  And this chart is really into two pieces.  The

25   first three lines are the first part of the analysis; and

 1    then, the rest of the chart is the second part.

 2           THE WITNESS:  So, your Honor, where I start is

 3    totaling the revenues from those 18 products, and that was

 4    pretty simple to do.  And those 18 products had $312 million

 5    of revenue.  I then went back to the two products that I had

 6    very specific information for -- the Bling Bling and the

 7    Chillin' Out -- and I was able to calculate for those two

 8    products the value of the head start by looking at the

 9    development cycles and specifically the ramp-up and the

10    number of months those products would have been delayed,

11    three to five months generally.

12           What I found is that the head start benefit for

13    those two products was about 24 percent of their revenue.

14    And so, that was the best available data in order to

15    estimate what would be the head start revenue for the rest

16    of the 18.

17           So I take the total 18 revenue of 300 million.  I

18    multiply it by the known head start benefit of 24.1 percent.

19    And what I estimate is that the head start damages for the

20    18 products is 75.3 million.

21           Now, you remember, I don't want to end there.  I

22    want to get back to the 32.  And so, I simply took the total

23    for the 18, divided it to understand it.  That's 4.2 million

24    per product on average.  And then, if you multiply that by

25    the full 32 that we know to be in the market, the bottom up

1    approach for the fashion dolls, 133.8 million.

2            So there are estimates within this calculation,

3    but the estimates are based upon the best available

4    information and very specific to Mattel fashion doll

5    experience.

6    BY MS. KELLER:

7    Q.   Okay.  Can you tell us -- you keep talking about a head

8    start.

9            Can you describe what that head start is, as you

10   understand it?

11   A.   It's really very simple and almost as the name applies.

12   Mattel is alleged to have obtained secret information from

13   MGA, acted upon that secret to launch a new product.  In

14   fact, you'll see memos, like the house is on fire, or rush,

15   or urgent, or accelerate.  So you know they're moving

16   quickly.

17           I'm able to calculate how much of a head start

18   they got, when they should have introduced the product if

19   they only learned of it, for example, when MGA sold it in

20   the market.  So I simply defer or push back the head start

21   benefit that they achieved.  And so, instead of launching in

22   month one, I calculated what the effect would be if they

23   launched in month six.

24   Q.   So for your bottom up approach, you're not awarding

25   Mattel's MyScene profits to MGA after the amount of time it

1    would have taken Mattel independently to develop those

2    products; right?

3    A.   Correct.

4    Q.   You're being conservative?

5    A.   The head start calculation is a conservative approach

6    to trade secret damage, generally, and it is in this case,

7    too.

8    Q.   What happened to the other 81 alleged trade secrets

9    that are not matched up with the MyScene product.

10        Are you saying they are no damages as to those?

11   A.   I'm not saying there are no damages, but I've not

12   calculated individual product specific damages for those,

13   because I simply don't have the information or the data.

14   Q.   Is there any specific product for which you did have

15   data?

16   A.   Yes.  As shown in the next chart.

17   Q.   If we could go to page 7.

18        THE WITNESS:  So, your Honor, when I thought for a

19   moment you were going to read all 32 of the dark blue boxes.

20   I looked up what was the competitive Mattel product for each

21   of those 32.  And this is the result of that analysis.  So

22   I've broken out my bottom up approach for each of those 32

23   products.

24   BY MS. KELLER:

25   Q.   And is there a product called Acceleracers that you

1    were able to calculate damages for?

2    A.    Yes.  In addition to the fashion doll product shown

3    here, there was one other product that was alleged to be

4    part of the trade secret theft, which is a boy's product,

5    Acceleracers.  And I had information to calculate that as

6    well.  It's about $3 million.  And that explains the

7    difference between the 133.8 that you see on Slide 8, and

8    the 136 million you see on the first slide.

9    Q.    Let's go back to Slide 2 and see if that -- does

10   Slide 2 include the damages for Acceleracers that you were

11   able to calculate?

12   A.    Yes, ma'am.  So the bottom up approach of 136 million

13   includes the fashion dolls we just saw by doll, plus

14   Acceleracers.

15   Q.    Okay.  Now, what happens if the jury finds that some of

16   the unreleased Bratz products were not trade secrets?

17          Do you provide any way for the jury to award

18   damages for each trade secret?

19   A.    Yes, ma'am.  The jury can either strike the ones off of

20   Slide 8 they don't find liability for, or they can add up

21   the few that they do.  They have complete flexibility, and

22   it's a simple calculation.

23   Q.    Now, does this slide show calculated damages for each

24   MyScene product whose sales benefited from having advanced

25   trade secret information regarding a competitive Bratz

1    product?

2    A.    That statement is true for each of these products.

3    There may be others that I couldn't identify.  But it's

4    certainly true for these.

5    Q.    Now, let's go on to the area of unfair competition.

6          Besides trade secret misappropriation, did you

7    also calculate restitution for unfair competition?

8    A.    I did.  And that's shown on the next slide.

9    Q.    And would that be on page 9?

10   A.    Yes.

11   Q.    Let's go to page 9.

12         What's your calculation on unfair competition,

13   restitution?

14   A.    Ma'am, there were two specific categories that were

15   asserted.  One was related to the interference with Kohl's

16   which, I think, we all know is a retailer.  And the other

17   related to guaranteed license fees.

18         With respect to Kohl's, there was a period in 2005

19   and 2006 where MGA asserts that as a result of the unfair

20   competition, they lost specific sales to Kohl's.  I was able

21   to go back and identify what the sales were before the

22   unfair competition, what the sales were after the unfair

23   competition, calculate what was lost, ultimately compare

24   that to what Mattel gained and using a profit rate of about

25   40 percent, determined that the damage amount was

1   approximately $4 million.

2           The second item, your Honor, represents guaranteed

3   license fees.  There are a number of license agreements that

4   MGA has related to Bratz where they licensed third parties

5   for their intellectual property.  Many of those license

6   agreements have minimums or required guarantee payments.  I

7   went back to each of those agreements to understand which

8   one had guarantees and compared that to the accounting

9   records to determine which of the guarantees were not met.

10          There's more than 20 agreements.  If you add up

11  all of those guarantees that were not met, it's

12  approximately $6 million.  And so, the total for the

13  restitution claim is $10 million.

14          MS. KELLER:  And, your Honor, it doesn't appear

15  that any *Daubert* challenge has been made to these

16  calculations.  So unless the court has any questions about

17  those, I would probably go on to the next portion.

18          MR. PRICE:  There will be.

19          THE COURT:  There will be.  That's

20  cross-examination.

21  BY MS. KELLER:

22  Q.   Now, did you also in your presentation assess Mattel's

23  damages in rebuttal to Mr. Wagner's analysis?

24  A.   Yes, ma'am.

25  Q.   And what opinions of Mr. Wagner's did you address?

1    A.    There were five, specifically.  First, I looked to his

2    claim for copyright damages related to the 64 drawings and

3    the two sculpts.

4              Second, I looked to his claims for trade secret

5    damages which included the same, plus the concept one and

6    two in the Hero Shot.

7              Three, I looked at his nondoll trade secret claims

8    generally related to documents.

9              Four, his calculations of distributions to

10   Mr. Larian and finally his assertion that he address

11   mitigation.

12   Q.    And, obviously, your conclusions about Mattel's damages

13   present significantly lower numbers than Mr. Wagner

14   calculated.

15             Can you explain why that is?

16   A.    Yes.  In many respects, these are the most important

17   issues.  One is, I focused on what I understand to be the

18   relevant products:  The first 6,000 particular outfits and

19   the first four characters.

20             Two, rather than utilize regression analysis,

21   which I believe is faulty due to data and other reasons to

22   determine the population of lost sales, I looked

23   specifically at Mattel's internal documents and their

24   cannibalization studies where they, themselves, estimated

25   contemporaneously the impact of Bratz.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              Third, for the apportionment analysis, rather than
 2     looking to third-party companies in aggregate -- the
 3     benchmarks and yardsticks that Mr. Wagner used -- I went
 4     specifically to factors quantitatively which show the value
 5     of the trade secrets from the documents of MGA and Mattel.
 6     Q.   So, instead of comparing the fashion doll category to a
 7     toy company that sold Tonka Trucks and Hot Wheels, or you
 8     know, every other kind of toy under the sun, you compared
 9     apples to apples?
10     A.   Yes, ma'am.
11              THE COURT:  Fashion dolls to fashion dolls?
12              THE WITNESS:  Or, for example, payments to
13     Carter Bryant versus licensing for fashion dolls.  But as
14     we'll see, it's I believe an apples to apples comparison in
15     every case.
16              The fourth thing is, I used a head start approach,
17     which is a limitation to damages.
18              And then, fifth, I did not assume as Mr. Wagner
19     did that MGA would have to exit the market.  So I assumed
20     that MGA would still be in the market offering a Bratz-like
21     doll.
22     BY MS. KELLER:
23     Q.   A new doll?
24     A.   A new doll.  A noninfringing doll.
25     Q.   Did you also make a conclusion about similar profit
```

1   figures?

2   A.   I did.  In fact, there's not a lot of disagreement

3   between Mr. Wagner and I on the actual profit percentages.

4   It's much more directed towards what sales they should be

5   applied to.

6   Q.   Now, let's first take a look at Mr. Wagner's unjust

7   enrichment damages.

8        Can you explain the impact if you properly limit

9   the analysis to the six dolls for copyright and the four

10  characters for trade secret?

11       Do you know what I'm referring to, the six dolls

12  that the Ninth Circuit opinion referred to?

13  A.   Absolutely.

14  Q.   Plus the four characters for trade secrets?

15  A.   Absolutely.  If you go to --

16       THE COURT:  Now, if I allow the testimony, we

17  wouldn't be referring to the Ninth Circuit.

18       MS. KELLER:  That's right.  This is only for the

19  court's benefit, your Honor.

20       THE WITNESS:  The next slide details all of the

21  claims.  And, specifically, the first line in the box in the

22  middle of the slide, addresses the unjust enrichment or

23  disgorgement of MGA profits that you referred to.

24       THE COURT:  Now, just a moment.

25       Six dolls for the copyright.  Four characters for

1    the trade secret.

2              What are you referring to?

3              THE WITNESS:  So, your Honor, on a SKU-by-SKU

4    basis, we identified all the products that relate to the

5    first four dolls, including all of the various outfits.

6              THE COURT:  Accessories.

7              THE WITNESS:  Exactly.  So the way we got to these

8    numbers, if you start with the copyrights, we begin with the

9    relevant sales for the six dolls, which is approximately

10   $31 million.  We multiply it by the profit percentage, which

11   Mr. Wagner and I generally agree upon.  And then we

12   apportion it down for 20 percent of apportionment factor.

13   And we're going to talk about how I get to the 20 percent

14   shortly.  But that's the big difference.  Mr. Wagner uses

15   the corporate yardsticks, and I specifically make a

16   calculation.

17             And then, for trade secrets, we start with the

18   sales of the first four characters, which is roughly

19   $1.1 billion.  And then, multiply it by a 12 percent

20   allocation factor.  And the 20 and 12 are just referenced in

21   1(b) above, but we'll go into that in more detail as well.

22             And then, for trade secrets, you'll note that in

23   the second line, there's a head start calculation.  So the

24   head start calculation determines the profits that Mattel

25   gained, because they launched these products sooner than

1    they otherwise would.  MGA launched them sooner than they

2    otherwise would.  And that's $7 million.

3    BY MS. KELLER:

4    Q.   So under your analysis, if Mattel is able to prove its

5    copyright case, you believe Mattel is entitled to more than

6    $2 million of Bratz profits for the first six dolls?

7    A.   Correct.  No more than $2 million.

8    Q.   And if Mattel is able to prove its trade secret case,

9    you believe Mattel should be entitled to no more than

10   $33 million for all generations of the first four dolls;

11   correct?

12   A.   First four characters and absolutely for no more than

13   33.  But, ma'am, I actually think it's the $7 million

14   because the head start is the more appropriate calculation.

15   Q.   Okay.  What if the jury finds that Diva Starz disclosed

16   the Bratz trade secrets in October of 2000?

17   A.   That is the catalyst for the head start.  So as we'll

18   see shortly, if, in fact, Diva Starz discloses all of the

19   relevant trade secrets and that was an opportunity for MGA

20   to begin development and they began at that point, then the

21   benefit they receive is approximately $7 million.

22   Q.   What about damages for the two preliminary sculpts and

23   the Bratz name?

24        Did you calculate that?

25   A.   I did.  Those are very simple calculations.  They are

1    shown in Items No. 2 and 3 at the top, and maybe we can talk

2    about the sculpt first.

3             THE WITNESS:  Your Honor, in order to determine

4    damages for the sculpt.

5             THE COURT:  Just a moment.

6             That's the Bratz name trade secret damages, 10,000

7    and sculpt damages, 20,000?

8             THE WITNESS:  Yes, sir.

9             THE COURT:  Thank you.

10   BY MS. KELLER:

11   Q.   Can you explain how you arrived at that?

12            Have we got a chart on that?

13   A.   I don't believe so, no.

14            THE WITNESS:  Your Honor, for these analyses, I

15   used the cost approach.  You may recall the cost approach is

16   what Mr. Wagner used for the document damages.

17            And the reason I used the cost approach for

18   sculpts, for example, is because MGA does not sell sculpts.

19   They don't produce sculpts.

20            The measure of value they obtained from the sculpt

21   is they didn't have to go out and hire someone to create it

22   for them.  And, in particular, the $20,000 is based upon

23   MGA's actual cost experience for such things.  And,

24   specifically, it's $10,000 per sculpt and there are two

25   sculpts.

1            With respect to the trade name --

2            THE COURT:  Just a moment.

3            You're speaking about the actual cost of the two

4    sculpts; correct?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  What about each sculpt used on each

7    occasion where you have a similar sculpt to what I refer to

8    be 1136, and I think it's 1234.  I may be wrong and have to

9    go back and check those exhibit numbers.

10           In other words, if I have --

11           THE WITNESS:  I think you understand.

12           THE COURT:  If I have 5 million dolls, and I don't

13   mean using Lil' Bratz, or Bratz on a Scooter.  But,

14   basically, one or both of those two sculpts, what is the

15   damage per sculpt multiplied by the doll figure without

16   accessories or clothing?

17           THE WITNESS:  Your Honor, that's an issue that I

18   considered.

19           THE COURT:  Good.  Answer the question.

20           THE WITNESS:  It's included within the trade

21   secret column of the first four characters.  So that

22   includes all the relevant profit for those characters.  The

23   answer to your specific question:  Is it that subset of

24   that?

25           I did not break it down on a doll basis here, but

1   I have a stack of all of those figures by SKU.

2               THE COURT:  I don't mean to be rude or abrupt.

3   That does not help me.

4               THE WITNESS:  Okay.  Then I'm not understanding

5   your question.

6               THE COURT:  I want you to hear my question, again:

7   I have original cost of sculpting two sculpts and I'm going

8   to accept, hypothetically, your figure for $10,000 and

9   $20,000?

10              THE WITNESS:  Okay.

11              THE COURT:  But I don't know, yet, how many of

12  those sculpts were manufactured into subsequent doll figures

13  that were subsequently dressed or accessorized.  And what I

14  want to know is for those two sculpts -- and I'm not talking

15  about Lil' Bratz -- I'm talking about those two sculpts.

16  Were there 5 million of these produced?  10 million?

17              And I want to know what you believe the cost of

18  each of those sculpts is?  Is it 2 cents?  $1.32?

19              I might have a package, for instance, of $34.28

20  for an entire accessorized package.  I'm interested in the

21  cost of that sculpt naked, and I'm interested in the cost of

22  that sculpt without eye paint, okay?  And hair.  What's the

23  damage to that?

24              THE WITNESS:  I don't present that calculation.

25              THE COURT:  Thank you very much.

1            Counsel.

2    BY MS. KELLER:

3    Q.   Why didn't you present that calculation?

4    A.   Because the cost of the sculpt as well as the cost of

5    all of the other building material is reflected in the

6    calculation of profits.  So I can go back to the records and

7    try to break it out, if those records have been produced,

8    and I frankly don't know that they have been on a

9    doll-by-doll basis.  But the value of using that sculpt is

10   inherent within the $33 million, for example, which is why I

11   didn't perceive a need to do it.

12   Q.   So you could go back -- and let's say that each

13   individual doll's production cost from the sculpt was, say,

14   10 cents.  You could probably find that out, how much it

15   cost to manufacture each doll sculpt.  But you didn't do it

16   because the overall value of the total sale is what you were

17   looking at?

18   A.   Yes, ma'am.

19            THE COURT:  That means the accessorized doll?

20            THE WITNESS:  Correct.

21            THE COURT:  With the face paint on and hair?

22            THE WITNESS:  Correct.

23            THE COURT:  And clothing?

24            THE WITNESS:  Ready to go.

25            THE COURT:  Okay.  Thank you.

BY MS. KELLER:

Q.   Now, so you limited your actual damages for the sculpts

to the cost of the sculpts, the cost to produce them; right?

A.   Yes, ma'am.

Q.   And inherent in your overall damages calculation,

factored in, baked in, was the use of the sculpt?

A.   Yes, ma'am.

Q.   Now, are you aware that Mr. Wagner --

        THE COURT:  And this is the copyright analysis

that you are involved in, or the trade secret?  In other

words, the 33 million is your trade secret.

        THE WITNESS:  But the same would be analogous for

the copyright, your Honor.

        THE COURT:  Which is 2 million.

        THE WITNESS:  Yes, sir.

BY MS. KELLER:

Q.   Let's talk about the damages for the Bratz name.

A.   The Bratz name was analyzed in a similar approach.  I

used the cost approach.  So I looked to what it actually

cost to develop a doll name.

        I had two data points, your Honor:  The first was

MGA's actual experience to develop the Moxie name, which is

where the $10,000 derived.  And then, I also have the data

point of Mattel obtaining a list of names, including Brats

with an "S" for about $200.  And I've just conservatively

1    used the 10,000.

2    BY MS. KELLER:

3    Q.    Are you aware that Mr. Wagner has also given an opinion

4    on how Bratz profits should be apportioned between the

5    intellectual property at issue and MGA's sweat equity?

6    A.    Of course.  That is his benchmark or yardstick

7    approach.

8    Q.    Did you find his benchmark apportionment approach to be

9    flawed?

10   A.    Yes, ma'am.

11   Q.    And can you explain that?

12          THE WITNESS:  Yes, your Honor.  I believe that

13   approach is flawed for four reasons.  One, if it's based

14   upon third-party data, it's not specific to the products or

15   the companies at issue and that data is available.

16          Two, there is an accounting error.  Mr. Wagner

17   compares what he calls incremental.  You can think of it as

18   variable profit without all of the fixed costs of Bratz,

19   which is a high profit number to what he calls earnings

20   before interest and taxes, which is a low accounting number.

21          THE COURT:  Okay.

22          THE WITNESS:  So when he compared a high profit

23   definition to a low profit definition for that accounting

24   issue alone, it's going to seem like Bratz is very

25   profitable.

```
 1              THE COURT:  I'm listening.  I'm just going to keep

 2     my attorneys healthy for a moment.

 3              THE WITNESS:  Third, Mr. Wagner did not consider

 4     the scale effect, meaning the volume of Bratz.  Bratz was

 5     such a successful product that you needed to take into

 6     account economies of scale.

 7              And then, finally, by looking at these broad

 8     corporate averages of third party companies, he wasn't able

 9     to see the variability for each individual Bratz dollar

10     theme.  And had he looked a little deeper, I believe he

11     would have realized that the intellectual property is not

12     responsible for the excess profits.  It's the particular

13     value add by MGA.  And there are a couple of slides that

14     really illustrate that point.

15     BY MS. KELLER:

16     Q.   And let's look at page 11.

17     A.   So --

18              THE COURT:  Well, that's interesting.  Is that a

19     Rorschach test?

20         (Laughter.)

21              THE WITNESS:  There's a new doll idea.

22              THE COURT:  I readily understand that.  I'm just

23     kidding you, counsel.

24              Explain this to me.

25              THE WITNESS:  So what I did is, I went back to
```

1    each of the core fashion doll SKUs and looked at their total

2    volume.  And if Mr. Wagner was correct that all of the

3    excess profit was due to the sculpts and the drawings, the

4    intellectual property, then those all should have behaved

5    relatively similar because they all had the same foundation

6    as their driver, but, obviously, that's not the case.  On an

7    individual doll basis, their success varies greatly.

8              THE COURT:  I'm not going to pretend I just

9    understood that.  Explain that to me again.

10             THE WITNESS:  Mr. Wagner says that Bratz was very

11   profitable, very successful.  And the reason it was

12   successful across the board, is because of the 64 drawings

13   and the sculpts.  Well, all of the Bratz products have in

14   common the 64 drawings and the two sculpts.  So if that's

15   all that it took, you would expect them all to perform

16   pretty much the same.  Clearly, they do not.  In fact, you

17   wouldn't really expect them to perform the same.

18             So I started by looking at SKUs.  But if you go to

19   the next chart, which is a probably a little more helpful.

20             THE COURT:  No, I want to stay with this chart.  I

21   don't understand this yet.

22   BY MS. KELLER:

23   Q.  Well, Mr. Wag --

24             THE COURT:  In other words, no slide goes up

25   without some basic understanding of my part, and you just

48

```
1    lost me.
2    BY MS. KELLER:
3    Q.   Mr. Malackowski, did you take all of the dolls that
4    shared the common sculpt and the Carter Bryant intellectual
5    property, the drawings, did you look at every doll that was
6    produced using those things and then plot their sales?
7    A.   Yes, ma'am.
8              THE COURT:  Thank you very much.
9    BY MS. KELLER:
10   Q.   And some of those dolls sold very poorly; right?
11   A.   Correct.
12   Q.   And some sold like gangbusters; right?
13   A.   Correct.
14             THE COURT:  Let me stop.  Then, what do each of
15   those dots represent?  They certainly don't represent one
16   doll.
17             Do they represent 100?  What do they represent?
18             THE WITNESS:  They represent a specific trunk SKU.
19   BY MS. KELLER:
20   Q.   And so, basically, what do you attribute the fact that
21   some were so successful and others tanked?
22   A.   Well, it's attributable to all of the work that MGA did
23   to promote the doll, to advertise the dolls, add the theme
24   expressions.
25             And when we're ready and we go to the next chart,
```

49

```
 1    it becomes a little clearer what happened.

 2             THE COURT:  In other words, without the sweat

 3    equity, you would expect consistency?  With the sweat

 4    equity, we have inconsistency.

 5             Exactly.

 6    BY MS. KELLER:

 7    Q.   Or put another way, if the success of the dolls were

 8    entirely attributable to the sculpt, the two sculpts and the

 9    original drawings, then every doll should be selling the

10    same.

11             Now, let's look at --

12             THE WITNESS:  I like the way you put it better,

13    but I understand your point.

14             THE COURT:  I do too, okay?

15        (Laughter.)

16    BY MS. KELLER:

17    Q.   Let's look at Slide 12.

18             THE COURT:  And by the way, since Mr. Quinn isn't

19    here, both of you can participate.

20             So Mr. Zeller, Mr. Price, I don't want any side

21    disadvantaged.  And, in fact, if there is any disadvantage,

22    we'll wait for Mr. Quinn to be well tomorrow, okay?

23             So we can bring him back and we can preserve the

24    examination, if you choose.  Fair enough?

25             MR. ZELLER:  Thank you.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              THE COURT:  If you need time to prepare your
2    witness, we can go right back in session.  Mr. Quinn can
3    participate, and we can get a transcript over to him.
4    BY MS. KELLER:
5    Q.   Now, if we look at this next slide, this chart shows
6    the number of sales for different Bratz themes.
7              Now, these dolls all have the same sculpt?
8    A.   Yes, ma'am.
9    Q.   All have the same -- they all arose from the original
10   Carter Bryant drawings?
11   A.   Yes, ma'am.
12   Q.   And --
13             THE COURT:  Just a moment.
14             If I counted these lines, how many would I have?
15             THE WITNESS:  There are 101, your Honor.
16             THE COURT:  What do they represent?  Themes?
17             THE WITNESS:  They represent the unit volume of
18   101 different themes.
19             THE COURT:  Find a theme for me.
20             THE WITNESS:  For example, the tall line on the
21   chart is Strut It!
22             THE COURT:  So each line has a separate theme.
23   What's that line?
24             THE WITNESS:  I can look that up in a table for
25   you.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              THE COURT:  Well, get it for me.

2              THE WITNESS:  My team is in the back, and it might

3    take them a few moments.

4              THE COURT:  Ask your team to help you.

5              I want to know that line.  Then, I'm going to pick

6    an itty bitty line.

7              THE WITNESS:  We actually have it broken out for

8    all 101.

9              THE COURT:  For the 114.

10             THE WITNESS:  101, your Honor.  If you look in the

11   box, you can see the count.

12             THE COURT:  I'm not that quick.  I don't have to

13   agree with it.

14             MS. KELLER:  Your Honor, we have a breakdown here.

15   I can get it, but I wanted to make sure counsel --

16             Do you have this?

17             MR. PRICE:  If they can just tell us which

18   schedule.

19             THE COURT:  So if I started across with Bratz

20   Beach Party --

21             THE WITNESS:  That should be your first line, your

22   Honor.

23             THE COURT:  And I just work down?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Bratz Funk and Glo, second line?
```

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  And Bratz Seasonal?

 3              THE WITNESS:  Yes, your Honor.

 4              THE COURT:  Third line.  How is the jury going to

 5    possibly understand that?

 6              THE WITNESS:  The point for the jury, your

 7    Honor --

 8              THE COURT:  Because I'm not going to give them any

 9    demonstratives unless both sides agree.  I want you to know

10    that you're floating out there, just like Mr. Wagner.  These

11    aren't going in to the jury.

12              THE WITNESS:  Your Honor, what I would tell the

13    jury if I was able, is that I simply looked to see if all

14    the products were equally successful or not.  And I looked

15    by SKU and by theme, and they were not.

16              THE COURT:  All right.  Counsel.

17              Now, both sides may decide for Mr. Wagner and for

18    you it's very helpful.  They may stipulate, but I'm just

19    forewarning you as I did Mr. Wagner.

20              THE WITNESS:  I appreciate that.

21              THE COURT:  Without that stipulation under the

22    Johnson case, I doubt that any of these charts are going in

23    for either side.

24              THE WITNESS:  Thank you.

25              MS. KELLER:  So, your Honor, it will be the same
```

```
 1   that we can use the slides to show the jurors, but they

 2   won't be coming into evidence?

 3           THE COURT:  Unless there's agreement between both

 4   sides.  In other words, mutually exclusive or mutually

 5   beneficial.

 6   BY MS. KELLER:

 7   Q.   So, again, this illustrates the point that you can have

 8   the same sculpts, same basic intellectual property Carter

 9   Bryant involved but depending on the themes that are

10   developed by MGA for the dolls, you can have wildly

11   different sales?

12   A.   Exactly.

13           THE COURT:  Once again, validates the concept of

14   sweat equity.

15           THE WITNESS:  Exactly.  Directly, your Honor.

16           THE COURT:  Because if it didn't, you would have

17   this incredible consistency.

18           THE WITNESS:  Exactly, your Honor.

19           THE COURT:  Well, tell me then how we did with

20   Bratz secret data?

21           I see the numbers, but what was the sweat equity

22   that was specifically put into that product and which line

23   is it?

24           I'm sure the jury will understand this.

25           THE WITNESS:  Let's see.  What date?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  Come on down off the stand.  Count
 2    down -- now, I'm the jury sitting here watching you count,
 3    how many over?
 4              THE WITNESS:  20.
 5              THE COURT:  Come on down and count over.
 6              MS. KELLER:  Your Honor, I think Mr. Malackowski,
 7    he was not asked to give an opinion as to why each doll was
 8    successful, or what it was that little girls liked about
 9    each doll, because it's beyond his expertise.  He was just
10    asked to do the quantitative analysis.
11              THE COURT:  I'm sure of that.  Count over for me.
12              THE WITNESS:  20.
13              THE COURT:  We don't know why if our concept of
14    sweat equity applies that was moderately successful, do we?
15              You don't know the specific sweat equity put into
16    that product?
17              THE WITNESS:  I personally do not.
18              THE COURT:  You don't know the advertising or the
19    specific efforts by Mr. Larian or MGA, do you?
20              You weren't retained to look at that?
21              THE WITNESS:  Correct.
22              THE COURT:  Okay.  Counsel.
23    BY MS. KELLER:
24    Q.   Now, let's look at the next slide, which would be
25    page 13.
```

1    A.    Yes, ma'am.

2    Q.    Did you come up with other ways to apportion the value

3    between the claimed intellectual property and MGA's sweat

4    equity?

5    A.    Yes, ma'am.

6              THE WITNESS:  Your Honor, what this page

7    represents are the specific apportionment factors that I

8    used rather than the third-party industry company

9    benchmarks.  There are six on the chart.  The first five I

10   used for trade secrets.  All six I used for copyrights.  I

11   can go through them very quickly.

12             The first related to license rates shows the

13   actual amount of money that was negotiated for the Bryant

14   intellectual property as compared to what MGA was able to

15   charge third parties for licenses related to the Bratz line.

16   And, basically, Mr. Bryant got 21 percent of what MGA could

17   get.

18             The second is investment rates, how much money --

19             THE COURT:  Just a moment.  Mr. Bryant got

20   21 percent of what MGA could get.

21             THE WITNESS:  Could I explain?

22             THE COURT:  Uh-huh.

23             THE WITNESS:  MGA negotiated a license with

24   Mr. Bryant for 3 percent.

25             THE COURT:  That's right.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1           THE WITNESS:  They would go to third parties and

2    negotiate a license for the total, all their sweat equity

3    plus what Mr. Bryant contributed.  And they would get on

4    average about 14 percent of that license.

5           So, if you take 14 divided by three divided by 14,

6    Mr. Bryant's share or the intellectual property share of

7    what the market was actually willing to pay is about

8    20 percent.

9           Does that make sense?

10          THE COURT:  No.

11          THE WITNESS:  The license for intellectual

12   property represents the value of intellectual property to

13   the buyer.  And we have two licenses that we're looking at.

14   I'm going to license, first, from Mr. Bryant and we

15   negotiate $3.  I'm going to pay him $3 for his intellectual

16   property.  I take that and I add my sweat equity to it.

17   Now, I have a bigger package.

18          THE COURT:  And the value of your sweat equity?

19          THE WITNESS:  Well, I can determine that, because

20   I now go license the package to you, and you pay $14.

21          Now, I know that of the 14 total, three was due to

22   Mr. Bryant and 11 I should keep.

23          Three is 20 percent of 14.

24          THE COURT:  Got it.  Okay.  Thank you.

25          THE WITNESS:  I do a very similar calculation for

1   investment.  I look at how much money I paid Mr. Bryant.

2   And I look at how much money I invested to generate that

3   sweat equity.  And the end result of that is about

4   37 percent for Mr. Bryant in some cases and 13 percent in

5   other cases.  And it varies based upon what products you

6   look at.  Because if you're looking at -- trade secrets are

7   a lot more product, so you spread the investment over a

8   bigger volume.

9          Third, I looked at profitability.  I looked at how

10  much money did MGA actually earn on the Bratz product line.

11  And of that money, how much did they give to Carter Bryant?

12  Calculate the same ratio.

13         The next one is pretty interesting.  I have a

14  product pair comparison.  I was able to look at the gross

15  profit, the highest measure of profit that MGA earned on the

16  Bratz dolls.  And then, I compared that to what MGA earned

17  on the Moxie dolls.  Because Moxie had all the sweat equity

18  components, but I didn't have any of the Carter Bryant

19  components.  And what I learned is that Bratz was more

20  profitable and that was 11.2 percent.

21         THE COURT:  What account?

22         THE WITNESS:  Or 13.4 percent.  Sorry.

23         THE COURT:  What --

24         THE WITNESS:  The Bratz doll were more appealing.

25  They could command a higher price in the market place.  They

1    had higher volume; therefore, lower costs.

2         Essentially, it is the value that was added by the

3    alleged trade secrets.

4         THE COURT:  As we sell more, you get --

5         THE WITNESS:  Lower costs.

6         THE COURT:  Next.

7         THE WITNESS:  Fourth or fifth, rather, there was

8    an independent party that conducted a survey of customers

9    and they asked customers how important is the appearance of

10   the doll?  18.6 percent.

11        And then, lastly, your Honor, I looked at the

12   number of hours.  How many hours did Carter Bryant spend on

13   working on the first set of dolls versus how many hours did

14   MGA employees spend.

15        THE COURT:  Now, how do you know that?

16        THE WITNESS:  Through the time records.  Went back

17   and worked with MGA operating accounting staff, identified

18   the people and then looked at their time records.

19        THE COURT:  Number of hours Carter Bryant spent.

20   How many hours did you spend?

21        THE WITNESS:  You ask good questions, your Honor.

22        I can get that data, too, as well as --

23        THE COURT:  Would you?

24        THE WITNESS:  Yes.

25        THE COURT:  I see your team springing into action.

59

```
 1              THE WITNESS:  While they're digging for that,
 2    should I explain how I use it, or will we just --
 3              THE COURT:  No, I just want the hours to begin
 4    with.
 5              THE WITNESS:  Okay.
 6              THE COURT:  You know the question that's going to
 7    follow; and that is, how did you calculate the hours that
 8    others supposedly worked?
 9              THE WITNESS:  Is there water by chance?
10              THE COURT:  No.  I'm just kidding you.
11              MS. KELLER:  Your Honor, I'm a little concerned
12    that with the delays we're going to run about five or 10
13    minutes short.
14              THE COURT:  I'm going to let you do that.
15              I want to also give the courtesy to Mike and Bill.
16    I don't want to put you in the position of examining today.
17    If John is well tomorrow, the gentleman is happy to come
18    back.
19              MR. PRICE:  We'll examine today.
20              THE COURT:  Are you sure?
21              THE WITNESS:  Your Honor, to answer your question,
22    Carter Bryant spent 23 weeks working on this doll.
23              THE COURT:  At MGA?
24              THE WITNESS:  Yes.
25              THE COURT:  How long did he spend over at Mattel?
```

1          THE WITNESS:  I don't know the answer to that,

2  your Honor.

3          THE COURT:  You'll be asked that question.

4          MS. KELLER:  Well, your Honor, we're assuming he

5  worked on the dolls while he was at Mattel, which I don't

6  think there's -- there has not been evidence that he worked

7  on them within Mattel.

8          THE COURT:  I could just tell you he's going to be

9  asked that question.

10          MS. KELLER:  But I mean, that's a disputed fact.

11  That's not something that --

12          THE COURT:  Well, I know he's an expert, and

13  experts know a lot of hypothetical things.  And there are

14  some records over there, also, so you can just expect that

15  question tomorrow.  It's going to be allowed tomorrow --

16  Tuesday, I'm sorry.

17          THE WITNESS:  Sorry.  And then, the number of

18  weeks spent by the Bratz team was 109.2 weeks, and I have

19  data that breaks that down for what they did.

20          THE COURT:  So the Bratz portion of the

21  development times about 21 percent?

22          THE WITNESS:  Carter's portion is 21.

23          THE COURT:  Bryant.  Carter Bryant.

24  BY MS. KELLER:

25  Q.   When we say total original Bratz development time in

```
 1   weeks, is that multiplied for all the different people who
 2   worked on it?
 3   A.   Yes.  There were just over 10 people.
 4             THE COURT:  And you didn't count the time he then
 5   spent clipping his coupons, did you?
 6             THE WITNESS:  Nor going to the bank.
 7             THE COURT:  Counsel.
 8   BY MS. KELLER:
 9   Q.   Now, these are all quantitative considerations?
10   A.   Yes, ma'am.  And so, when you average the first five,
11   it's 13.35.  When you average all six, it's 20.5 percent.
12   Q.   Did you also consider qualitative factors in
13   determining an appropriate --
14             THE COURT:  Just a moment.  So you averaged these?
15             THE WITNESS:  Yes, sir.
16             THE COURT:  Why are you averaging them?
17             THE WITNESS:  Because there's a range of
18   indicators, and there is no basis to say that number one is
19   more important than number two.  And so, in my view, I
20   considered all of them.
21             THE COURT:  Just a moment.  Slow down.
22             But you averaged the first three, I heard.
23             THE WITNESS:  I averaged the first five as it
24   relates to the trade secrets and's I averaged all six as it
25   relates to the copyrights.  And the --
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  Thank you.  I got it.

 2   BY MS. KELLER:

 3   Q.   And the reason that you added in a sixth factor for

 4   copyright, was?

 5   A.   Because that relates very directly to the drawings that

 6   are at issue in the sweat equity of those first four dolls.

 7   Q.   Okay.  Did you also consider any qualitative factors in

 8   determining an appropriate way to apportion MGA's profits?

 9   A.   Yes, your Honor.

10          So after I had the arithmetic numbers, I went back

11   and looked at the business records and the testimony and the

12   expert reports.  I think it's probably important to note

13   that I referred to the fact that the Georgia-Pacific factors

14   also suggest you look at such things like Georgia-Pacific 14

15   says look at expert reports, but I did not do a

16   Georgia-Pacific hypothetical negotiation analysis.

17          THE COURT:  That's for patent law.  It's

18   inapplicable for copyright.

19          THE WITNESS:  So, basically, at the end, given the

20   qualitative evidence which all suggested that MGA's

21   contribution was relatively more important, I just rounded

22   the numbers.  So I went to 12 and 20 percent.

23   BY MS. KELLER:

24   Q.   Let's look at Slide 14.  What does this show us?

25   A.   Slide 14 shows my correction to Mattel's calculations
```

63

1   of unjust enrichment.  Specifically, it looks at the first

2   six dolls and what MGA's revenues were.  It looks to their

3   profitability and then it applies that 20 percent factor

4   that we just determined.  And for trade secrets, it looks at

5   the approximate 1.1 billion, determines the profits and

6   applies the 12 percent factor that we just determined.

7           That's the 2 million and the 33 million that we

8   talked about 10 minutes ago on that first chart.

9           THE COURT:  Now, how do I know the MGA profits?

10          Look at the profits for just a moment and look

11  over in the trade secrets area of 273.7 million.

12          Do you and Mr. Wagner agree on that figure?

13          THE WITNESS:  Very close, your Honor.

14          THE COURT:  What does he say?

15          THE WITNESS:  I believe he says around

16  25.3 percent, and I'm at 24.  But we have the exact numbers

17  if --

18          THE COURT:  But what does he say about MGA profits

19  from 2001 to 2010?

20          THE WITNESS:  Oh, I'm sorry.  If you look at

21  Mr. Wagner's total figures, they're much, much higher.

22          THE COURT:  I know.

23          THE WITNESS:  So for copyright, Mr. Wagner says it

24  ranges --

25          THE COURT:  Just -- I want to go to trade secret.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

64

```
 1              THE WITNESS:  Okay.
 2              THE COURT:  I want MGA profits, 2001 to 2010, not
 3    2008.  I want you to tell me what Wagner says --
 4              THE WITNESS:  He says the appropriate profit
 5    figures are 365 million to 596 million.
 6              THE COURT:  Okay.  Thank you.
 7    BY MS. KELLER:
 8    Q.   Why is the copyright apportionment factor 20 percent
 9    higher than the trade secret apportionment of 12 percent?
10    A.   As we spoke of earlier, the trade secrets are larger
11    volume, so MGA had a relatively higher level of sweat equity
12    especially as it continued to innovate and introduce new
13    themes over the period through 2010.
14    Q.   And what percentage of profits does Mr. Wagner
15    apportion to either the copyrights or trade secrets, based
16    on his third-party toy company profit tables?
17    A.    Mr. Wagner, rather than 12 to 20, says it's 44 to
18    76 percent to Mattel.  And that explains in large part why
19    our numbers are so different.
20    Q.   As an alternative, you also consider a head start
21    methodology to determine unjust enrichment.
22              How did you calculate MGA's head start benefit?
23    A.   If you go to the next slide --
24    Q.   That's page 15?
25              THE WITNESS:  Your Honor, I began by going back to
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1    the calendar, the factual record.  And what I found is, when

 2    Carter Bryant first started working with Paula Garcia,

 3    that's the first box.  I found out when he signed his

 4    agreement, that's the third box.  But in the middle, I noted

 5    that that's when Diva Starz was launched.  And it's my

 6    understanding that one of MGA's positions is that Diva Starz

 7    disclosed all the trade secrets.

 8              So rather than MGA launching the first Bratz

 9    product in May of 2001 where the red line is shown, I

10    assumed that they would have to start their development at

11    that point.  That's a very conservative assumption.  So I

12    assumed they would have to launch it five months later.

13              THE COURT:  Just a moment.

14              What happens if the development started in late

15    September of 2000?

16              THE WITNESS:  In actuality, the damages would go

17    down, your Honor.  Because I assumed it started here, and it

18    took them this number of months to get to market.

19              THE COURT:  No, I'm going to take the first

20    invoice.  And regardless of MGA, I'm just going to take that

21    first invoice -- you can cross out MGA -- and tell you that

22    the first invoice is in September for Bratz.

23              Does that make any difference in your calculation?

24              THE WITNESS:  It would make very little

25    difference, your Honor.  There might be some difference in

1    timing, but effectively it's just moving the calculations

2    back.  But it would still be the approximate 7 million in

3    head start.

4    BY MS. KELLER:

5    Q.    And what would your unjust enrichment damages

6    calculation be for Bratz, based on the head start analysis?

7    A.    That is shown on the next slide, ma'am.

8    Q.    Slide 16?

9    A.    Yes.  And so, this is how we get to the $7 million.

10   It's the 29 million in revenues during the head start

11   period, the profits on those revenues.  And then, I also

12   assumed that because MGA didn't have Carter Bryant's help,

13   they would have to go out and hire someone to give them some

14   design help.  And I included that cost and the total is

15   7.23 million.

16   Q.    Did you also do an analysis of Mr. Wagner's lost

17   profits opinion?

18   A.    Yes.  That is the next slide.

19   Q.    Let's look at Slide 17.  And is this a slide about --

20   that you prepared on lost profit damages, assuming Mattel is

21   able to prove its case?

22   A.    Yes, ma'am.

23   Q.    Can you tell us how you arrived at these numbers?

24         THE WITNESS:  Your Honor, both Mr. Wagner and I

25   start with sales, and we make two adjustments.  He uses a

1   regression analysis to determine what's the population for

2   lost sales.  And then, he uses market share to determine

3   what percentage of that population Mattel would keep.

4           I do a very similar calculation.  But instead of

5   regressions, I use the Mattel cannibalization studies and

6   instead of market share, I use what is call a demand factor

7   which is basically the apportionment considerations we

8   looked at, how would customers make their decision.

9           And the end result is my Mattel lost profits are

10  2.8 million for copyright.  That strikes significantly from

11  Mr. Wagner's 323 million, your Honor.  And for trade secret,

12  I have 8.9 million and compared to, Mr. Wagner uses the same

13  number, 323 million.

14  Q.   And is there an apportionment to contribution of IP

15  with the previously discussed apportionment matters, factors

16  that we see here?

17  A.   It's what I just explained to the court.  It's the

18  demand factor, what portion of the population would buy the

19  Mattel product.

20          THE COURT:  Just a moment.  Just a minute, sir.

21  I'll be right back.

22      (Pause.)

23          THE COURT:  I'm sorry, Counsel.

24          Please continue.

25  ////

1    BY MS. KELLER:

2    Q.   Now, can you tell us why are your lost profits numbers

3    so different from Mr. Wagner's lost profit numbers?

4    A.   There's three reasons:  One, that difference in

5    methodology, I just explained; two, my focus is on the

6    relevant products being as we described for the first 6,000,

7    their outfits and the first characters for trade secrets.

8    And then, another big difference is, I assume that MGA

9    remains in the market with a noninfringing Bratz-like

10   product and so they're able to capture some of the volume.

11   Mr. Wagner assumes they go away.

12   Q.   And Mr. Wagner also failed to consider that Barbie had

13   been already in decline for three years before Bratz entered

14   the market; correct?

15   A.   Correct.  That's one of my concerns with his regression

16   analysis.

17   Q.   And it continued to decline due to internal problems at

18   Mattel?

19   A.   Yes, ma'am.

20   Q.   And Mr. Wagner includes lost profits for Mattel

21   products that did not compete for the same consumers as

22   Bratz; right?

23   A.   Yes.  Because he uses broad market share figures.

24   Q.   He uses the toy company that produces everything from

25   Legos, to trucks, to whatnot; right?

69

```
1    A.   Yes, ma'am.

2              THE COURT:  You understand that I'm not going to

3    allow into evidence this worldwide injunctive relief?

4              THE WITNESS:  Yes, sir.  That has been made clear

5    and that is no longer part of my slides.

6              THE COURT:  Do you understand I'll be starting

7    trial over?

8              THE WITNESS:  It's not going to come from me, your

9    Honor.

10             THE COURT:  Okay.  Counsel.

11   BY MS. KELLER:

12   Q.   And you -- Mr. Wagner also attributes lost profits on

13   nondoll Bratz products not containing intellectual property

14   in dispute; correct?

15   A.   Yes, ma'am.

16   Q.   And did you do that?

17   A.   No.  I was specific to the demand factor or

18   apportionment factors.

19   Q.   And did you also calculate the amount of distributions

20   to Mr. Larian that might be considered for damages?

21   A.   Yes, ma'am.  That's the next chart.

22   Q.   Slide 18?

23   A.   Yes.

24   Q.   And can you explain this to us?

25   A.   This is actually a fairly straightforward calculation.
```

1    It's all on pre-tax basis.  I looked at the distributions of

2    MGA, multiplied them by Mr. Larian's share ownership,

3    approximately, 82 percent and took in the first column the

4    proportion of sales of the first six dolls to total MGA

5    sales and the second column, the first four characters to

6    total MGA sales, determined what portions of those

7    distributions were based upon intellectual property and

8    that's the apportionment factors.

9              So I show unjust enrichment to Mr. Larian of

10   $400,000 for copyright and 13.4 million for trade secrets.

11   Pre-tax in comparison to Mr. Wagner that has a range of

12   164 million to 284 million.

13             THE COURT:  So this is EBIT.  This is before tax?

14             THE WITNESS:  Yes, sir.  Very good.

15   BY MS. KELLER:

16   Q.   And, of course, you're aware that Mr. Larian -- since

17   MGA is a sub S corporation, Mr. Larian will have to pay

18   taxes, or did have to pay taxes on his distribution.  You

19   just didn't account for it.

20             True?

21   A.   Correct.  The pre-tax -- this is also a subset of the

22   other numbers, so you wouldn't add them together.  It would

23   be double counting.

24             MS. KELLER:  And with respect to the mitigation on

25   MyScene, your Honor, we have not seen any *Daubert* challenge

1    to the calculations on that.

2            THE COURT:  There will be.

3            MR. PRICE:  We made one.

4    BY MS. KELLER:

5    Q.   Okay.  Let's talk about the mitigation -- the MyScene

6    mitigation amount you made -- came up with of 256 million.

7    And is that slide -- are we skipping a slide here?

8            It's Slide 19.

9    A.   Yes, ma'am.

10   Q.   Can you explain the basis of your mitigation amount of

11   256 million?

12           THE WITNESS:  Yes, your Honor.  In reviewing the

13   business records, such as the 2002 goals for the Mattel

14   girls division, the Bratz brief, the MyScene PowerPoints and

15   Mr. Wagner's own admission, I determined that MyScene was

16   launched in response to Bratz.  But for Bratz, there would

17   be no MyScene product.

18           So the MyScene response was their level of

19   mitigation.  So it's a relatively simple calculation then to

20   determine what profits they received by selling MyScene.

21           THE COURT:  Just a moment.

22           So MyScene revenues are a total of 770 million.

23   The rest, I assume, are costs of developing that are not

24   shown and the profits, of course, are -- strike that.

25           The costs would be 770 minus 255 million; right?

```
 1              THE WITNESS:  Perfect.
 2              THE COURT:  Counsel.
 3              How did you get that figure for that cost?
 4              THE WITNESS:  I went back to their accounting
 5    records and subtracted not only the cost of developing, but
 6    the cost of marketing and production and sales.
 7    BY MS. KELLER:
 8    Q.   And so, what was the basis for your reaching this
 9    conclusion?
10    A.   It was my review of the documents of Mattel, the
11    documents of MGA, the testimony Mr. Wagner's admission and
12    then the accounting analysis.
13    Q.   And, for example, Adrienne Fontanella's 2002 goals for
14    the Mattel girls division, including the goal to develop the
15    direct competitor Barbie, et cetera?
16    A.   Specifically, that's one of the ones I mentioned, as
17    far as the Bratz brief that talked about the fact that
18    MyScene was extremely accelerated and the PowerPoints that
19    talked about MyScene -- or Bratz as being the reason for
20    being of MyScene.
21    Q.   And the age segmentation where Mattel recognized that
22    Barbie was competing for younger girls; and, therefore,
23    develop MyScene to compete with Bratz?
24    A.   That's absolutely right.
25    Q.   Okay.  And Mr. Wagner also agrees that MyScene was
```

1    launched in response to Bratz; right?

2    A.   Yes, ma'am.

3    Q.   Bottom line, is it your opinion that the mitigation

4    benefit to Mattel exceeds any reasonable measure of

5    potential damages?

6    A.   Yes.  Yes.

7    Q.   By how much?

8    A.   Well, the highest measure of damage I have is

9    33 million, so it's many, many times greater.

10             THE COURT:  255 minus --

11             THE WITNESS:  So my point being, your Honor, if

12   the highest measure of damages that I believe Mattel should

13   claim is 33 million, then there shouldn't be an award

14   because it needs to exceed 255 before a check should be

15   written.

16             THE COURT:  A check should be written.

17   BY MS. KELLER:

18   Q.   Did Mr. Wagner even consider mitigation in his

19   analysis?

20   A.    Mr. Wagner says he considered mitigation by including

21   MyScene in his market share data.  But I went back and

22   checked, and I don't believe that the inclusion of MyScene

23   does result in mitigation.  So I believe he's inaccurate.

24   Q.   How about the nondoll trade secrets?

25             Did you also analyze Mr. Wagner's damages

```
 1   calculations for the nondoll trade secrets at issue in this
 2   case?
 3   A.   Yes, ma'am.  There's a Slide 21 that illustrates that.
 4   Q.   Let's take a look at that.
 5            THE WITNESS:  Very briefly, your Honor,
 6   Mr. Wagner's cost approach included two categories of costs:
 7   One is the labor hours required to prepare and generate the
 8   documents that were allegedly taken.  And the other are
 9   business costs in producing the documents which have
10   multiple values to Mattel, such as, for example, computer
11   systems that were used.
12            In my opinion, I limited the disgorgement to the
13   labor hours and did not include any of the costs that had
14   other benefits to Mattel.  So this is the net conclusion of
15   that.
16            MS. KELLER:  Thank you.  I have no further
17   questions.
18            THE COURT:  If you see a trade secret, you
19   assigned no cost, obviously, because they didn't get from
20   Castilla to MGA?
21            THE WITNESS:  Exactly.  They were intercepted by
22   the FBI.
23            THE COURT:  Okay.  We'll recess for 15 minutes.
24            If you want to start tomorrow, that's fine.
25            MR. PRICE:  We'll try to get it over with today.
```

1              Can I ask one question of Ms. Keller?

2              I noticed she stopped before the last two slides.

3    And I'm wondering if that's going to be part of the opinion.

4    There's a set-off.

5              MS. KELLER:  Currently, we have decided we're

6    going to be withdrawing the set-off.

7              MR. PRICE:  Then, I won't be covering it.

8              If they change their mind, I would like to ask him

9    about it.

10             THE COURT:  You never know what happens between

11   direct and cross.

12             MS. KELLER:  We're just going to withdraw that.

13             I don't think we're going to bother with it.

14             THE COURT:  Would 15 minutes be okay?

15             15 minutes, sir.  If you want to step down.  Thank

16   you.

17        *(Recess taken from 9:48 a.m. to 10:27 a.m.)*

18             THE COURT:  We're back on the record.

19             Counsel, this is cross-examination.

20                       CROSS-EXAMINATION

21   BY MR. PRICE:

22   Q.   Mr. Malackowski, to start off with, could you tell me,

23   a few times the phrase "sweat equity" was used, and I was

24   wondering if you could give me a list of what you mean by

25   "sweat equity," what kind of activities you're talking

1    about?

2    A.    Sure.  It represents the contribution that MGA made to

3    the success of the product.  So it would include their

4    advertising efforts; their creativity as it relates to

5    themes, for example; their pricing strategy.  Other creative

6    contributions to the style, clothing, aspects of the doll

7    itself.

8    Q.    So, for example, if MGA came up with a theme, say, a

9    western theme, after Mattel did, but based on what's in the

10   public, not stealing a trade secret, right?

11         If MGA came up with a similar theme than for that

12   item, for example, you wouldn't want to allocate between

13   what sales generated as a result of a trade secret theft

14   with respect to the doll and what revenues were generated as

15   a result of sweat equity; is that right?

16   A.    In all cases, we want to allocate between the

17   intellectual property issue and the sweat equity.  Yes, sir.

18   Q.    Okay.  So let me ask you about your affirmative

19   opinions as to MGA's damages.

20         Start with chart two.  And I want to ask you,

21   first, about the two top down calculations.  First, you

22   would agree that the purpose of those top down calculations

23   is to get a measure of damages which reflects head start

24   damages from Mattel being competing products and themes to

25   the market?

1    A.    Well, it would include that in part, but it would not

2    be limited to the hard start.

3    Q.    That's what I'm trying to figure out here.  Your

4    understanding of the case is that MGA alleges there were

5    certain information that Mattel got at toy fairs at times

6    when that information was secret; correct?

7    A.    Yes, sir.

8    Q.    And then, there was some later occasion when that

9    information became public?

10   A.    Yes, sir.  In certain cases, not all cases.

11   Q.    But you've identified on page 3, you've got in dark

12   blue here, MGA products which are in those reports from the

13   toy fair that someone at Mattel did; correct?

14   A.    Yes, sir.

15   Q.    And then, you've tried to match those products with

16   something Mattel did that was similar; correct?

17   A.    Yes, sir.

18   Q.    And the idea is, you were trying to find out how much

19   of a head start did Mattel have on that sort of product,

20   because it got the information before it was made public;

21   right?

22   A.    Well, in part it relates to the head start for the top

23   down approach, because there was a market entry advantage.

24   But it also relates to the other benefits that were obtained

25   from the toy fair, such as pricing, advertising strategy

1    that would extend beyond a head start period.

2    Q.    So your testimony is that if you look at those toy fair

3    reports for each of these 32 products, they're going to have

4    pricing on them?

5    A.    Oh, no, they don't.  The toy fair reports are more

6    general.  But then complementing the toy fair reports,

7    Mattel actually had marketing materials that it took from

8    MGA showrooms.  There were some videos and other

9    information.  There's actually, as I understand, a library

10   of sorts where that's contained.

11   Q.    In doing your comparison, you compared the toy fair

12   reports to the -- to some product Mattel had; correct?

13   A.    Yes, sir.  That was part of the bottom up analysis,

14   specifically.

15   Q.    Did you go and try to match other information such as

16   pricing information, or videos, or advertising information

17   that Mattel got?  Did you try to match that up with any

18   particular product?

19   A.    Yes, I did try.  I wasn't able to generally do that,

20   except for conclusionary comments from Mattel's documents

21   saying the information they obtained from the toy fair was

22   successful.  It allowed them to compete in the market.

23   Q.    So the only specific comparison you did was the

24   information in the toy fair reports; correct?

25   A.    Correct.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   Q.   Most of which you say did not include providing

2   information; correct?

3   A.   Not in the toy fair report document.  That would be in

4   the library of other materials.

5   Q.   But you didn't look at that library, so you couldn't

6   match what's in that library with any of these products;

7   right?

8   A.   Well, I looked for what I could.  I did not

9   specifically identify that by product.

10  Q.   So the only matching you did was the information from

11  the toy fair reports to Mattel products that you identified

12  as coming out later that seemed to be similar; correct?

13  A.   On a general level, I would agree with that.

14  Q.   So -- and you've written in your report, have you not,

15  that this figure -- these figures on your top down of

16  149 million and 202 million reflect head start damages from

17  Mattel bringing competing products and themes to the market;

18  correct?

19  A.   I believe in part that's true.  It reflects more than

20  that, as I said.  I don't know which report or which passage

21  you're reading.

22  Q.   Let me read the whole thing.  This is from

23  Exhibit 35236.  I think this is your January 28th, 2011

24  supplemental report.

25  A.   Which page are you on?

1    Q.   Page 8.  Where you say in the first paragraph, under

2    3.1.1:  *Excess MyScene profits due to Mattel's alleged trade*

3    *secret misappropriation range from 148 million to*

4    *200 million, reflecting head start damages from Mattel,*

5    *bringing competing products and themes to the market.*

6              *Mattel's interference with MGA's relationships*

7    *with retailers, suppliers and licensees and Mattel's alleged*

8    *misappropriation of MGA's trade secrets that permitted*

9    *Mattel to enhance its competitive position.*

10             Do you see that?

11   A.   Yes, sir.

12   Q.   Okay.  Now, with respect to the Mattel's interference

13   with MGA's relationships with retailers, is that reflected

14   in part, at least in your analysis that you did with respect

15   to --

16             Let me see if I can find the precise slide.  I

17   think it's Slide 9 where you have Kohl's interference,

18   guaranteed license fees.

19             Do you see that?

20   A.   Yes, sir.

21   Q.   So, is there double counting here?  Are you saying

22   that's also in your top down analysis?

23   A.    If the top down analysis is awarded, I would not add

24   the Kohl's interference.

25   Q.   But you are able, you say, to specifically calculate,

1    identify an amount for Kohl's interference; right?

2    A.    Yes, sir.

3    Q.    And an amount for guaranteed license fees; right?

4    A.    Yes, sir.

5    Q.    Did you specifically identify any amount of damages in

6    this 148 million to $200 million range here that reflected

7    anything other than head start damages?

8    A.    No, sir.  For the specific top down approach, there's

9    no further identification other than those two components:

10   The bottom up and then the restitution.

11   Q.    So let's talk about the top down then with respect to

12   head start damages.

13         You had the information where you could calculate

14   for each of the 32 products that you say matched.  You had

15   the information where you could calculate a head start

16   period; correct?

17   A.    Through estimations as I described before the break,

18   yes, sir.

19   Q.    What you would -- what you did when you attempted to do

20   that was to look at the date that the information was

21   obtained at toy fair; correct?

22   A.    Yes, sir.

23   Q.    And then, you looked at the date of MGA's first invoice

24   on that product when it was clearly public; correct?

25   A.    In part.

1    Q.   And then, you've included some sort of ramp-up time?

2    A.   Yes.  You're specifically referring to the Bling Bling

3    and Chillin' Out analysis.

4    Q.   So that was your methodology to calculate a head start;

5    correct?

6    A.   I generally agree with that, yes, sir.

7    Q.   And you didn't need Mattel information to do that

8    calculation; correct?

9    A.   Well, in those examples, I had further information

10   about Mattel's design and development schedule.  I had to

11   make some estimates, because I didn't have certain Mattel

12   information; correct.

13   Q.   So -- but I'm just saying, if you wanted to calculate

14   the head start, the time between secret information being

15   obtained by Mattel, and the time when that information was

16   public, that is, something was first sold; that information

17   is in MGA's hands?

18   A.   Well, I don't have the information as to when Mattel

19   first sold the competing program.

20   Q.   No, no.  Your head start period is the time between

21   MGA's -- Mattel receiving information from toy fairs and the

22   time that MGA first sold the product and it was there for

23   public; right?

24   A.   But we need to know if Mattel sold in that intervening

25   period.  So I had information, for example, for Accelaracers

1    and Bling Bling.  I did not have further details for all the

2    other products.

3    Q.    But you knew at least the maximum sort of head start

4    time.  You're saying the public wouldn't know about these

5    products until MGA sold the first one?

6    A.    To your point, I did know a maximum or a relevant

7    number, which is how I got the allocations to each of the

8    bottom up numbers.

9    Q.    Let's focus on the top down, because I want to see what

10   you did there.  If we look at your Exhibit 4, your Slide 4,

11   in 2002, it seems that there's -- that's sort of where you

12   start.  Both the dark blue and the light blue converge;

13   correct?

14   A.    Yes, sir.

15   Q.    And there were MyScene dolls sold in 2002; correct?

16   A.    Yes, sir.

17   Q.    And you used that data of sales in 2002 to arrive at

18   what you thought but-for numbers would be in 2003; correct?

19   A.    I used the actual data, the international data and the

20   projection records.

21   Q.    So, let's talk specifically about that.  So in 2002 --

22   and it's your understanding that MyScene was not sold

23   throughout the year in 2002 in the U.S. or international;

24   correct?

25   A.    That's absolutely right.  It was a partial year.

1    Q.    And so you took figures of about 17 million in U.S.

2    sales and 7 million international sales for 2002; correct?

3    A.    From memory, I think that's about right.

4    Q.    And then you tried to predict what those sales would

5    have been in 2003 but for any bad conduct of Mattel;

6    correct?

7    A.    Yes, sir.

8    Q.    Okay.  And for the 17 million in the United States, you

9    basically doubled that number to get to 34 million in 2003,

10   because it was a longer time period that was being sold in

11   2003; right?

12   A.    Yes.  In recognizing that most sales occur in the later

13   half the year due to the holidays.

14   Q.    So you got 34 million in U.S. sales that you're

15   assuming in 2003.  And then, for the international sales,

16   you looked at the percentage of U.S. sales to international

17   sales to come up with what should be the international sales

18   for 2003; correct?

19   A.    Correct.

20   Q.    And that came to about 66 million?

21   A.    From memory that's right.  The total was approximately

22   100.

23   Q.    So the total amount that you came up in 2003 then for

24   MyScene sales absent any wrongdoing by Mattel was about

25   100 million?

1   A.    Yeah.  I believe that is correct.

2   Q.    And so, that's assuming -- taking into account the half

3   year versus the full year, that $100 million is not taking

4   into account any growth in MyScene sales; correct?

5   A.    Well, no, I don't think that that's correct.  Because

6   the 100 million is also informed by the projections of

7   MyScene by Mattel which consider those factors, and there

8   was a projection for 85 million and a projection for

9   116 million.  So my 100 was coincidentally right in the

10  middle.

11  Q.    Well, the method you used was, you doubled the U.S.

12  sales from 2002 to account for the fact that 2003 was a

13  younger year; right?

14  A.    I don't disagree with that.

15  Q.    I'm sorry.  And then, you used a ratio of U.S. to

16  international to come up with the 66 million; correct?

17  A.    Yes, sir.

18  Q.    And that's a total of 100 million; correct?

19  A.    Yes, sir.

20  Q.    And that's assuming no growth in sales between 2002 and

21  2003, other than the fact that's a longer year --

22  A.    Arithmetically, that's accurate.  There are business

23  justifications to support that that are discussed in my

24  report.  Notably, the first year sales tend to be higher.

25  And in many products, you see a drop off in year two.  So by

1    holding it constant, I'm actually giving the benefit of the

2    doubt to Mattel.

3    Q.    Because you're assuming this product MyScene is no

4    different than any other product that would do sales in one

5    year and then decrease in the next year?

6    A.    Correct.  I give that conservative benefit to Mattel.

7    Q.    So we have the 100 million in 2003.  And then, you

8    looked at the actual sales of MyScene, 2003; correct?

9    A.    Yes, sir.

10   Q.    And that was about 166 million?

11   A.    Approximately.  I don't have the number in front of me,

12   but that sounds about right.

13   Q.    And you subtracted the 100 million from the

14   166 million; right?

15   A.    Well, there's also consideration of licensing revenue.

16   But, generally speaking, conceptually, that's right.

17   Q.    And you came up with a difference of $66 million, not

18   including the licensing?

19   A.    I'm with you so far.

20   Q.    Okay.  And your conclusion is that all of that

21   $66 million increase sales in 2003, compared to an assumed

22   full year in 2002, that all of those sales are as a result

23   of Mattel stealing trade secrets from MGA.  All of it?

24   A.    Generally speaking, not considering the licensing

25   revenue; correct.  The benchmark I used is the historical

1    experience.

2    Q.    Now, you did an analysis to see how many of the MyScene

3    SKUs that were sold in 2003, actually, in your view related

4    to any of the Bratz trade secrets; right?

5    A.    In the bottom of the approach I did, yes, sir.

6    Q.    Well, now, you did that analysis at some point?

7    A.    Yes, sir.

8    Q.    And, by the way, is it correct that in 2002, there were

9    about seven SKUs for MyScene?

10   A.    I would have to go look at my data, but I can accept

11   that representation.

12   Q.    In 2003, were there about, I think, 40 SKUs which you

13   associated with the Bratz themes that you list on Chart 3

14   there in 2003?

15   A.    I believe that's fair.

16   Q.    But there were about 177 SKUs that were sold in

17   connection with MyScene in 2003; right?

18   A.    Correct.

19   Q.    So, for 2003 -- and this number we have here on

20   Chart 4 -- you do not calculate a head start period for any

21   of the 30 Mattel products which you say were included in

22   that analysis; correct?

23   A.    Well, I don't specifically calculate such a head start

24   for the top down approach.  The specific head start is shown

25   in the bottom of approach.

1   Q.   I'm talking about your top down, because we're trying

2   to understand that.  Because you said that, generally, your

3   top down approach was based upon projections and Mattel

4   documents.

5           Do you recall saying that?

6   A.   Absolutely.

7   Q.   And we look at 2003, it's based on doubling the U.S.

8   sales and doing a ratio of the international sales that come

9   up with 100 million; correct?

10  A.   With the benefit of the projections and the Mattel

11  documents that range from 85 to 116 million.

12  Q.   But you didn't use those to do your calculation?

13  A.   They were not part of the math, but they're part of the

14  analysis and the opinion.

15  Q.   Okay.  And in subtracting 100 million from 166 million

16  to get $66 million in damages to MGA, as a result of MyScene

17  sales, you did not calculate a single head start period for

18  a single MyScene product for your bottom -- what do you

19  call? -- top down damages; right?

20  A.   Correct.  That's in the bottom up approach.

21  Q.   So you said to Ms. Keller that a juror -- you know, for

22  your bottom up approach -- could allocate among trade

23  secrets.  They could pick and choose.

24          Do you recall that?

25  A.   I do.

```
 1   Q.   But they couldn't do that at all with any of your top
 2   down approaches; correct?
 3   A.   On a specific product basis, they could not.  They
 4   would go to the bottom up approach and eliminate there, or
 5   begin to use the percentage -- I would recommend to use the
 6   percentage reduction from the bottom up approach to adjust
 7   the top down approach.
 8            So if you want to take out 10 percent of the sales
 9   or 10 themes, we can cross them out.  We know the effect of
10   that and we could apply the same adjustment to the top down
11   approach.
12   Q.   You didn't do a chart attempting to do that?
13   A.   Frankly, if the jury is going to start to knock out
14   individual themes, I think they're focused on the bottom up
15   approach.  They're looking one theme at a time, and that's
16   perfectly acceptable.
17   Q.   Well, I'm talking about whether your top down is
18   perfectly acceptable.
19            In addition to not calculating any head start on
20   any product in connection with the top down approach, it's
21   also true that you didn't account for any sweat equity by
22   Mattel; correct?
23   A.   I don't agree with either half of that question.
24            THE COURT:  I was just going to ask that.
25            Where is the sweat equity on MyScene?
```

DEBORAH D. PARKER, U.S. COURT REPORTER

1    BY MR. PRICE:

2    Q.   For the top down approach.

3    A.   The sweat equity is reflected in the profits that I

4    leave with Mattel.  So it's the lighter blue shaded region

5    at the bottom of the chart.

6            THE WITNESS:  It's very similar, your Honor, to

7    Mr. Wagner's benchmark approach.  It is not product buildup

8    specific.  That's the bottom up approach.

9    BY MR. PRICE:

10   Q.   For that yellow -- I mean, the lighter blue, again,

11   what you did was you took Mattel's 2002 sales and adjusted

12   them for the length of the year; right?

13   A.   In part.

14   Q.   And that gets you to the 100 million; right?

15   A.   Well, it's more complex than that, as you know, because

16   you've asked me.  But you adjust for international sales;

17   and then, you take into consideration the business planning

18   documents.

19   Q.   You just told us that you didn't use the business

20   planning documents in calculations; right?

21   A.   But that's not--

22   Q.   Will you answer my question yes or no?

23            You keep saying that.  Did you use those for your

24   calculations to get to the 100 million?

25            MS. KELLER:  Your Honor, I would object.  This is

 1   argumentative.

 2           THE COURT:  Overruled.

 3           THE WITNESS:  Arithmetically, it's based upon 2002

 4   double adjusted for international.  My opinion is based upon

 5   that arithmetic calculation and consideration of the

 6   business record that span either side of that math.

 7   Q.   So the 100 million figure, the mathematical figure, you

 8   don't look at projections.  Yes or no?

 9   A.   I do.  I consider -- in all of my math, the evidence of

10   the case.  So I don't just perform calculations in a vacuum.

11   Your questions -- you alternate your questions.  It's very

12   specific to the spreadsheet math.  There are three numbers

13   are used.  But my conclusion, which is the conclusion of

14   that number, is informed by the business records and the

15   testimony.

16   Q.   Perhaps, my question wasn't clear then.  For your

17   calculation of the 100 million, your spreadsheet math, you

18   don't -- did not take into account any business projections;

19   correct?

20   A.   Fair enough.

21   Q.   And it's that number you subtract from the 166 million

22   in actual MyScene sales?

23   A.   Arithmetically correct.

24   Q.   So let's say, for example, in 2003 Mattel had a product

25   that was similar to playset.  Playset is one of the themes

1  you identify as being revealed in toy fair and then that

2  Mattel came out with; correct?  With me so far?

3  A.   Yes.

4  Q.   So for that particular item, Mattel probably advertised

5  it; correct?

6  A.   I would suspect they did, yes, sir.

7  Q.   There was probably creativity that went into that

8  product?

9  A.   I don't dispute that.

10  Q.   They had to decide on pricing?

11  A.   Yes.

12  Q.   Style?

13  A.   I'm not exactly sure what you mean by "style."  To the

14  extent that it relates to the trade secret theft, yeah,

15  there's style components.

16  Q.   Clothing for the dolls that are in the playset?

17  A.   Of course.

18  Q.   And the only way you, quote, take into account that

19  sort of sweat equity, is you subtract 100 million, the

20  mathematical calculation, just assuming 2002 sales for a

21  full year from Mattel's actual sales in 2003; right?

22  A.   For that year, that's correct, arithmetically.

23  Q.   And then, in the subsequent years -- 2004, 2005, 2006,

24  et cetera -- again, you don't calculate any head start

25  period for any product; correct?

1    A.    I don't specifically identify a head start for any

2    particular product in the top down approach; correct.

3    Q.    Well, when you say "specifically," do you do any

4    calculations in the top down approach for head start period?

5    A.    Not arithmetically.  But one of the reasons MyScene

6    sales were greater than they otherwise would have been, as

7    shown in the evidence of the case, is that it benefited from

8    the information from the toy fair, i.e., it benefited with a

9    head start.

10   Q.    Okay.  But I'm talking about -- you're an economic

11   expert; right?  Damages expert?

12   A.    Yes, sir.

13   Q.    You're not a liability expert; right?

14   A.    No, sir.

15   Q.    I'm sorry.  A double negative.

16         Are you a liability expert?

17   A.    I am not.

18   Q.    So you can't tell us whether the information was

19   actually secret.  That's not your job?

20   A.    I assumed that it was liabilities assumed; correct.

21   Q.    But if you're going to use a methodology of head start

22   damages, it is your responsibility as a damages expert to

23   calculate the head start, right, if that's the methodology

24   you are going to use?

25   A.    But that methodology is the bottom up approach.  And I

1   do exactly do that.

2   Q.   Let me ask that question again:  If you're trying to

3   calculate head start damages, it's your responsibility to

4   calculate a head start, period?

5   A.   I think that's fair.  Yes, sir.

6   Q.   And you told us in your report that you believe that

7   your top down approach, which we've been talking about,

8   quantifies head start damages?

9   A.   I believe reflected within the top down approach are

10  the effects of the head start.  I don't call it head start

11  damages.

12          MS. KELLER:  Your Honor, I would object that the

13  witness has said he's provided two different methods of

14  analysis.  Therefore, the fact that he didn't use the second

15  methods of analysis in the first is really irrelevant.  I

16  mean, he has provided two different sets of -- two different

17  methodologies for how to get to the numbers that he has

18  presented.

19          THE COURT:  I understand that.  But counsel can

20  explore this.

21          MR. PRICE:  The point is the first methodology.

22          THE COURT:  Let me see if I can ask one very

23  simple question:  You have to assume that the product was

24  secret to be able to -- and by secret, a trade secret, or

25  secret -- to be able to calculate the head start

1    methodology, don't you?

2              THE WITNESS:  Yes, sir.  I think that's fair.

3              THE COURT:  I mean, it's yes or no.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  And I think what Mr. Price is saying

6    to you is:  This entire head start methodology is premised

7    on the product being secret and how do you know which

8    product is secret?

9              THE WITNESS:  Because I looked at 114 secrets that

10   are asserted, and I assume they are all secret and that MGA

11   prevails on liability.

12             THE COURT:  So you assume all 114 are secret?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Counsel.

15   BY MR. PRICE:

16   Q.   And then there is a second step; and that is, you as

17   the economic expert have to calculate the head start period,

18   because eventually that information does become public;

19   right?

20   A.   So you're using terms that I think we're using

21   differently that's confusing.

22             THE COURT:  No, no.  It's not confusing.

23             Let's say that again.  You have to calculate not

24   only is the product secret, but then you have to take in

25   this added factor.  And I'm going to make it really simple.

96

1  How long is it secret?  What's that time period?  How do you

2  get that time period for the 114 products, let alone any one

3  of those products?

4         And I will take product No. 57 on your chart.

5         THE WITNESS:  I look.

6         THE COURT:  How do you get that?

7         THE WITNESS:  I look specifically at the head

8  start records for Bling Bling.

9         THE COURT:  Bling Bling?

10        THE WITNESS:  For Chillin' Out, because those --

11 and Acceleracers --

12        THE COURT:  Just a moment.  And then, did you

13 extrapolate to the rest of the 114 categories, or did you go

14 through each category?

15        THE WITNESS:  I extrapolated to the 32 categories.

16        THE COURT:  32 categories.  By using the first

17 two:  Bling Bling, and --

18        THE WITNESS:  Chillin' Out.

19 BY MR. PRICE:

20 Q.  You just explained to the judge how you did head start

21 calculation.

22        None of that was done for your terms here -- it's

23 the top down?

24        THE WITNESS:  Correct.

25        THE COURT:  If you look at pages -- Slide 5 and

1    Slide 4, none of that was done for that approach.  No

2    calculation of any head start period; right?

3              THE WITNESS:  None of the calculations we

4    discussed.  Those were bottom up approaches.

5              THE COURT:  Well, the obvious question is why.

6              THE WITNESS:  In part, largely because the data is

7    not available to do it.  So the next best evidence was to

8    look to general experience, like with Flavas and Generation

9    Girls.

10             THE COURT:  My greatest fear when you tell the

11   jury is going to be why.  And you're going to answer

12   something like, Mattel didn't supply it to us.

13             Is that going to be your answer?

14             THE WITNESS:  I'm going to say, I didn't have the

15   information.

16             THE COURT:  Yes, but I don't want any surprises.

17             Why didn't you think you didn't have the

18   information?

19             THE WITNESS:  I honestly don't know why it was not

20   produced, your Honor.

21             MS. KELLER:  Your Honor, I wasn't present in

22   requesting it, but we had requested it, I know, numerous

23   times, and we were not given it.  So he is doing the best he

24   can.

25             THE COURT:  This has nothing to do with this

1    expert.  This has to do with what I potentially can hear if

2    he's allowed to testify; and that is, it just comes rolling

3    right out.  And now all of a sudden the parties are

4    embroiled in, We didn't get it.  It wasn't respond because

5    and we get into this difficulty in front of the jury where

6    the jury is now drawn in.

7              So what do you need between now, if you're going

8    to testify next Friday?

9              THE WITNESS:  Monthly sales by SKU.

10             THE COURT:  Okay.

11             THE WITNESS:  To the extent, your Honor, the other

12   piece of information is the product development cycles.

13             THE COURT:  Did you ask for that?

14             THE WITNESS:  I have repeatedly.

15             MS. KELLER:  And we have repeatedly.

16             MR. ZELLER:  If I can address that, your Honor, on

17   the record here.

18             I mean, number one, what MGA is omitting is that,

19   of course, the court already considered this and denied it.

20   Number two, is, is that MGA did not disclose until well into

21   this trial this claim as to these MyScene products.  That

22   was the first time that it was ever asserted.

23             So to the extent anyone should be precluded here,

24   it is MGA.  They had every opportunity.  They're the ones

25   who chose this schedule.  The court will recall the

1   chronological of events in which they asserted their trade

2   secret claims.  Those came extremely late.  We were denied

3   discovery on a variety of matters getting into them.

4          MGA asserted absolutely nothing in terms of head

5   start damages or with respect to MyScene products.  In fact,

6   they only claimed damages prior to the close of discovery on

7   three products, and those were:  MyScene, Bling Bling,

8   Accelaracers, and I think it was Winter Wonderland.

9          Mr. Jolicoeur admitted two of those were public by

10  the time of toy fair and the other one he admitted,

11  essentially, the evidence showed that it was public as well

12  but he wasn't as certain about that.  And he was, by the

13  way, MGA's 30(b)(6) witness.

14         Then discovery closed.  MGA attempted then to run

15  this new theory.  And the numbers have varied.  But, you

16  know, they still continue to assert 114 trade secrets, which

17  by the way, definitionally changed during the course of this

18  case, which the court will recall was a complaint they made

19  about us.  But even more so, what is completely different

20  from what happened with our claims, MGA's trade secret

21  claims have changed dramatically as to the accused products.

22  The accused products here, these 32 or so, are completely

23  new.

24         THE COURT:  Okay.  Mr. Price, continue on.

25         MS. KELLER:  Your Honor, just for clarity of the

1    record, we would just inquire -- we asked for monthly sales

2    by SKU and the product development -- at least, monthly

3    sales by SKU back in September, so it's been quite a while.

4              THE COURT:  Mr. Price.

5    BY MR. PRICE:

6    Q.    So let's move from your top down to your bottom up.

7    A.    Yes, sir.

8    Q.    And what you're looking at there were these 32 products

9    that are in dark blue on Chart 3.

10   A.    Yes, sir.

11   Q.    And what you're specifically attempting to do there is

12   to figure out how much of a head start did Mattel have

13   before the information was no longer secret; and then, how

14   much was MGA damaged by that; right?

15   A.    Well, in particular, what was the benefit of the head

16   start from obtaining the secret when they did, yes.

17   Q.    And that benefit is limited to the time frame in which

18   it was secret?

19   A.    I don't disagree with that.

20   Q.    And, again, you said you looked at the date of the toy

21   fair information.  That was obtained by Mattel; correct?

22   A.    Correct.

23   Q.    And then, you looked at that invoice by MGA of its

24   first sale to represent public disclosure; right?

25   A.    No.  I was looking for the first invoice for the Mattel

1    product.  Not all cases did MGA even make one of the

2    products in dark blue.  So I was looking for the Mattel

3    sales information.

4    Q.   When MGA did make a sale of a product in dark blue, did

5    you use their first day of sale to be, that's the time this

6    stuff is no longer secret?

7    A.   No, I did not.

8    Q.   So if, for example, Mattel saw the product in January;

9    correct?

10            With me so far?

11   A.   I am.

12   Q.   And then, MGA came out with it in June?

13   A.   Yes.

14   Q.   And then, Mattel came out with it in August?

15   A.   Yes, sir.

16   Q.   Then, what time frame would you say was the head start?

17   A.   It would be the six months from January to June minus

18   the two months or three months from June to August.  So,

19   approximately, a three-month head start.

20   Q.   So you would take into account in that calculation when

21   the product became public, if MGA made it public?

22   A.   If MGA did, yes.

23   Q.   So we have 32 products, correct, you've identified?

24   A.   Yes, sir.

25            THE COURT:  Just a moment.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1         (Pause.)
 2              THE COURT:  Okay, Counsel.
 3    BY MR. PRICE:
 4    Q.   Mr. Malackowski, for these what you have identified as
 5    32 products, for 18 of them, you had the annual P&L
 6    statements from Mattel?
 7    A.   The yearlies, yes, sir.
 8    Q.   So having that information for those 18, you then took
 9    two of the 18 products to calculate an actual head start
10    damage; correct?
11    A.   I used two products to calculate the profit, yes, sir:
12    Bling Bling and Chillin' Out.
13    Q.   Was that a random selection, two out of the 18?
14    A.   No.  That was the best available evidence that I had.
15    Q.   And the evidence you had with respect to all these 18
16    products was the same for Mattel which were these annual P&L
17    statements; right?
18    A.   Well, I had further information for the two; but
19    otherwise, I think that's generally fair.
20    Q.   What further information did you have for the two?
21    A.   I happen to discover internal correspondence that set
22    forth -- I think, one was called "The House on Fire" memo,
23    and they talked about the rapid acceleration of those two.
24    So there was particular e-mails that I came across.
25    Q.   Did those e-mails give you numbers?  Or were they just
```

 1    kind of generalities, like *We're rapidly accelerating this,*

 2    *we're trying to get on the market quickly,* things like that?

 3    A.    They focused on dates, calendar.

 4    Q.    So you did an analysis of MyScene Chillin' Out?

 5    A.    Yes, sir.

 6    Q.    And your conclusion was that the head start for MyScene

 7    Chillin' Out was five months?

 8    A.    I think that's right.

 9    Q.    And that the number of revenues from MyScene

10    Chillin' Out that was -- a result of that head start was

11    about 42 percent of total revenues; right?

12    A.    That sounds correct.

13    Q.    And then, you did an analysis for MyScene Bling Bling;

14    right?

15    A.    Yes, sir.

16    Q.    You calculated that the head start for that was three

17    months; right?

18    A.    I think that's correct.

19    Q.    And that the additional sales in the marketplace as a

20    result of that head start was 21.8 percent?

21    A.    I think that's correct.

22    Q.    So you had these two data points, 41.7 percent of total

23    revenues and 21.8 percent of sales; correct?

24    A.    Generally, yes.

25          THE COURT:  What was the head start for Chillin'

1    Out, again?  How many months?

2              MR. PRICE:  Five months.  And for MyScene

3    Bling Bling, three months.

4              THE COURT:  Three months.  And it was 28 percent

5    for Bling Bling and 42 percent for Chillin' Out.

6              MR. PRICE:  21.8 percent.

7              THE COURT:  Let me just check for one second.  I

8    want to make sure that those binders are --

9              Hang on for one second.

10      *(Pause.)*

11             THE COURT:  Counsel, please continue.

12             Now, with Bling Bling, three months, 28 percent.

13   Chillin' Out, five months head start, 42 percent and

14   everything is extrapolated, apparently, from that.

15   BY MR. PRICE:

16   Q.   From those two figures, from two out of the 32

17   products, you then do an averaging method?

18   A.   A weighted average, yes, sir.

19   Q.   And, of course, I guess, to average you need at least

20   two figures; correct?

21   A.   Correct.

22   Q.   And you took these two for MyScene Chillin' Out and

23   MyScene Bling Bling?

24   A.   Yes, sir.

25   Q.   And I guess you told us these weren't selected

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    randomly; correct?

2    A.    Correct.

3    Q.    You did no analysis at all to see whether or not these

4    were representative or reflected the full range of possible

5    head starts, or the full range of percentages of sales?

6    A.    No, I disagree with that.  There was confirming data.

7    I think I cited specifically to the Bain & Company report

8    that confirmed this three- to six-month period is

9    representative of the average product development time for

10   Mattel.

11   Q.    Is that what you were using for the head start was the

12   product development time for Mattel?

13   A.    No, I'm just answering your question.  I used,

14   specifically, the data I had for the two products, but it's

15   not that I wasn't informed that that was a representative

16   and reasonable data set to use.  There were documents.

17   There was testimony that supported my selection.

18   Q.    But to calculate head start, you have to know when the

19   information of MGA became public; right?

20   A.    Yes, sir.

21   Q.    The only data you looked at was MyScene Chillin' Out

22   and MyScene Bling Bling?

23   A.    That was the data that was available, as I think we've

24   made very clear.

25   Q.    Well, let's make that clear.

1          MGA could have given you data as to when they made

2     these products public?

3     A.    That wasn't my data gap.  My data gap was when --

4          THE COURT:  I'm sorry.  Answer that question

5     first.

6          MS. KELLER:  Your Honor, that assumes facts not in

7     evidence that we're talking about the same thing here.

8          THE COURT:  I understand.

9          But I just want to know what was given to you and

10    what wasn't.

11         THE WITNESS:  I had MGA data for the products that

12    sold, but they did not sell all of these products.

13    BY MR. PRICE:

14    Q.    How many of the 32 did they sell?

15    A.    I don't know.  I would have to go back and look.

16    Q.    But in calculating head start, you told us one of the

17    data points is when the information became public?

18    A.    Yes.

19    Q.    So if it's a two week time frame, for example, and it

20    took Mattel five months to put something on the market, what

21    would be the head start?

22    A.    By definition to your question, it would be two weeks.

23    Q.    So in calculating the head start, you could calculate

24    that using just MGA's information; right?

25    A.    To the extent MGA sold the product and had a public

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    disclosure, yes.

2    Q.   And it's correct -- you talked about one way of the

3    information becoming public, that's if the product was

4    actually sold?

5    A.   Yes, sir.

6    Q.   And in calculating your -- your bottoms up number, did

7    you look at any products other than MyScene Chillin' Out and

8    MyScene Bling Bling to try to calculate an actual head start

9    period, based on MGA's information?

10            MS. KELLER:  Your Honor, assumes facts not in

11   evidence that he was given anything else.

12            THE COURT:  Overruled.

13            THE WITNESS:  I considered that data, but that

14   data itself was insufficient.

15   BY MR. PRICE:

16   Q.   Did you ask for that data from MGA, and they wouldn't

17   give it to you?

18   A.   No.  I have data on MGA products by SKUs.

19   Q.   So you had data from which you could have calculated

20   the head start that a competitor would have, if they learned

21   of a product at toy fair and then should have learned about

22   it when the product was sold.  You had that information to

23   calculate that head start time period?

24   A.   For some products, yes.

25   Q.   For how many of the 32 did you have that information,

1    but decide not to use it for your calculations?

2    A.   Well, it would only -- all but two.

3    Q.   Well, break it down.  Of the other 30 products, okay,

4    how many of those products did you have the information, the

5    time that it was at the toy fair and the time that MGA

6    actually came out with the products?  How many products of

7    the 30 did you have information?

8    A.   I would say a majority of them.

9    Q.   And for your calculations from -- for top -- for bottom

10   up, you didn't use any except for two; right?

11   A.   Yes.  Because you also need the Mattel data.

12   Q.   Well, you had the same type of Mattel data for all

13   Mattel's products.  You had the annual P&L statements;

14   right?

15   A.   I did have that for all products, but I didn't have the

16   same data.  I had additional data for Chillin' Out and Bling

17   Bling.

18   Q.   And that additional data was internal e-mails where

19   Mattel is talking about trying to rush things along?

20   A.   Setting forth chronology, yes, sir.

21   Q.   But the maximum amount of time for head start would be

22   the amount of time between the information being seen at the

23   toy fair and the time MGA came out with a product.  That

24   would be the maximum amount of time for head start; right?

25   A.   Yes, which is generally consistent with their pattern

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    about the same.  You have the toy fair and the product comes

2    out a number of months later for the following year holiday

3    season.  So it's something I considered.  There's nothing

4    that wasn't addressed.  But the data was insufficient to

5    finish the process, except for two.

6              THE COURT:  Just a moment.  This is off the

7    record.

8         *(Discussion held off the record.)*

9              THE COURT:  Okay.

10   BY MR. PRICE:

11   Q.   Did you do any analysis to see whether or not MGA

12   information about these 32 products was public before

13   releasing the products through a press release, through the

14   Internet?

15             Did you look into that at all?

16   A.   I considered that issue.  I understand that to be the

17   issue of liability.  If it was disclosed before, it wouldn't

18   be a trade secret.  I've assumed liability, so I have not

19   factored that issue into my analysis.

20   Q.   I'm asking you to assume liability, assume the

21   information was secret at the toy fair.  I want to go to

22   head start.  It is your responsibility to calculate the head

23   start period; right?

24             How long was the information secret?

25   A.   Okay.  I don't make the assumption you made, so I can

1    make it for your question.  My assumption is the information

2    was a trade secret at the toy fair.  Meaning, in a holistic

3    sense, it was their trade secret.  Not that it was just

4    secret for that show.

5    Q.    Fine.  Fine.

6           You, then, to calculate damages, have to determine

7    how long that was secret to figure out the head start?

8    A.    Yes, sir.

9    Q.    So did you look at these products to see how long they

10   were secret?

11   A.    Generally, yes.  I discussed the issue of how long

12   they're kept secret with MGA personnel.  I understood the

13   process to keep them secret, until they were launched for

14   the following season.  I know that's a certain number of

15   months.  So I didn't go further and look at every specific

16   product and when it was launched, because that would be a

17   fruitless exercise without having the comparable Mattel

18   data.

19          But I'm comfortable from a business perspective

20   that there wasn't any issue there that would adjust my

21   calculations, because I inquired about that.

22   Q.    So if the information on one of the 32 products became

23   public, say, a week after toy fair, your analysis would

24   still assume a head start of somewhere between three and

25   five months?

1    A.    Yes.

2    Q.    And if we look at how you calculated the number, if we

3    can look at Chart 7, using just MyScene Chillin' Out and

4    MyScene Bling Bling, you came up with an average number for

5    head start damages as a percent of revenue using just those

6    two out of the 32 examples?

7    A.    Yes, sir.

8    Q.    And you came up with a number of 24.1 percent?

9    A.    Yes, sir.

10    Q.    And then, you looked at revenues for 18 products;

11    right?

12    A.    Yes, sir.

13    Q.    And that's because looking at the annual P&L's you

14    couldn't find revenues for the other 14; right?

15    A.    Or they weren't specific to individual products, yes,

16    sir.

17    Q.    You couldn't actually match them with anything

18    reflecting there were any revenues from the 14 at all?

19    A.    There weren't -- there wasn't accounting data

20    sufficient to know the data by product.  It doesn't say that

21    they weren't included in some broader revenue number, but I

22    did not have the information for other than the 18.

23    Q.    But you're assuming that the other 14 were actually

24    sold and there were actually revenues?

25    A.    Yes, sir.

1    Q.   And that's based upon what?

2    A.   An analysis of finding those other 14 products

3    available in the market.  For example, we went to the

4    Internet, and we looked them up.  And we see they were for

5    sale.

6    Q.   You have no idea what the revenue was for any of those

7    other 14 products; correct?

8    A.   Correct.  It's not like I don't want to know.  I just

9    don't know.

10   Q.   And so you multiplied the 24.1 percent, using just the

11   two examples, times the 312.6 million of revenues from all

12   the MyScene -- 18 MyScene products; right?

13   A.   That's exactly right.

14   Q.   And then --

15          THE COURT:  Just a moment.  Just a minute,

16   counsel.

17          This is off the record.

18      (Discussion held off the record.)

19          THE COURT:  Okay.  We're back on the record.

20   BY MR. PRICE:

21   Q.   Mr. Malackowski, we were talking about Slide 7.

22          And we got down to the estimated head start

23   damages for 18 products by multiplying that percentage that

24   you got from doing the two products.  And then, you divide

25   that by 18 to get to your 4.2 million per product?

1   A.   Exactly right.

2   Q.   And then, you multiply that times 32?

3   A.   Yes, sir.

4   Q.   Now, let me ask you quickly about Slide 9.  This is the

5   unfair competition restitution?

6   A.   Yes, sir.

7   Q.   What definition of "restitution" are you using here?

8   A.   I relied upon the legal definition.  It's my

9   understanding from counsel that these are the two acts that

10  they are claiming, and I do not have an opinion on the legal

11  definition of restitution.  My job was to calculate the

12  cost.

13  Q.   Well, when you say you're calculating the cost, for

14  example, guaranteed license fees --

15  A.   Yes, sir.

16  Q.   -- do you see that?  That's $6 million in guaranteed

17  license fees.

18          Is it your understanding those are fees, that

19  $6 million, that went to Mattel?

20  A.   No, sir.  Those are fees that should have gone to MGA.

21  Q.   And you're basing that on -- you talked to a

22  Spencer Woodman.  Is that the gentleman?

23  A.   I think that's right, yes.

24          THE COURT:  Who's he?

25          THE WITNESS:  MGA's licensing department.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Internal.

2    BY MR. PRICE:

3    Q.    And he provided you with a schedule which listed

4    license fees due and license fees paid?

5    A.    That was the summary schedule, yes, sir.

6    Q.    And then license fees, that they weren't paid?

7    A.    Exactly.  There was more to it than that, but

8    everything you said is true.

9    Q.    And you relied entirely on Mr. Woodman in seeing what

10   license fees were supposed to be paid and what were paid and

11   what weren't?

12   A.    Well, no, there was more to it than that.  We actually

13   went and investigated efforts to collect some of the license

14   payments and some of them were collected through legal

15   letters and the types.  We netted that out as well.

16   Q.    For most of the information you were relying on

17   Mr. Woodman's schedule?

18   A.    He gathered the data, yes.

19   Q.    Okay.  And do you have any opinion on why these

20   licensees did not pay the $6 million in license fees to MGA?

21   A.    Well, I believe that --

22           THE COURT:  Just a moment.  Here is my concern.

23   Let me just fast-forward.  The light just went on.  Ah, they

24   didn't pay the license fees to MGA, because MGA had a

25   worldwide injunction on them; and therefore, bingo.  New

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    trial.

2           Now, if they open the door, new trial.  If you

3    want to go there, fine.

4           No, no.  Hold on.  I'm not restricting Mattel,

5    okay?  I'm not restricting Mattel.  But that opens the very

6    door that you've been trying to preclude, and you can talk

7    to him about that today and make your decision.  But once we

8    go into that, we could potentially be into that worldwide

9    injunction.  And, frankly, I don't know how to handle that,

10   because I've been trying it keep that out.  That was at

11   Mattel's request.

12          But go ahead and ask him today, and then --

13          MR. PRICE:  Actually, our point is that such

14   damages shouldn't come into evidence, if that's what it's

15   based on.  Not that we're going to open it up.

16          THE COURT:  We'll find out.  Now, if it's before

17   2008 -- I'm sorry, 2009.  No, no, the injunction went in

18   2009.

19          MR. ZELLER:  But it was dated December of 2008.

20          THE COURT:  But there was still anticipation of

21   the injunction.  So how you really ferret that anticipation

22   out --

23          It's kind of like head start.  I'm just kidding

24   you.

25          MS. KELLER:  Your Honor, it's a continuing problem

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    for us in the case, because we kind of are forced into this
 2    artificiality.  Because there are two things going on, not
 3    just the injunction itself.  But the fact of this lawsuit
 4    and the fact of the damage, it could cause and did cause
 5    looming over the company, does have an effect, and we're
 6    kind of precluded from talking about that.  And yet, the
 7    other side is allowed to hammer on ancillary things around
 8    that --
 9             THE COURT:  Just remember --
10             MS. KELLER:  -- we can't then explain.
11             THE COURT:  Just remember, as soon as the
12    injunction comes out in front of the jury, now the jury
13    knows who prevailed in the first trial.
14             MS. KELLER:  I know that.
15             THE COURT:  I tried not to preclude you.  But
16    remember, I gave the choice also, no damages after 2008.
17    And Ms. Hurst felt it was more beneficial to try to
18    cross-examine Mr. Wagner using those figures.  So that's the
19    box the court is caught in.
20             I think, quite frankly, the figures in 2009, 2010
21    on a dead doll are miniscule.  Now, that's not the issue,
22    though.  It's the calculation.
23             So Ms. Hurst wanted to go into those.  I allowed
24    her to.  But remember, Mattel is knocking at the door.  They
25    would love to get the worldwide injunction out in a lot of
```

```
 1    ways, just like you would.  I think you want it out more,
 2    though.  And if I let you get into that, now the jury knows
 3    who prevails in that first trial.
 4                MS. KELLER:  But even now, let's say, there had
 5    been no injunction.  Even now, as we all sit here with this
 6    huge, as the court likes to say, mushroom-cloud-shaped thing
 7    hanging over our heads, you know, it does have a chilling
 8    effect on sales.  It has a chilling effect on retailers
 9    having confidence in our ability to continue to stock their
10    shelves.  I mean, all those things --
11                THE COURT:  Just tell me how to handle that.  How
12    do I keep this verdict away from the jury?
13                I'm not trying to preclude either side throughout
14    this trial.  But that seemed to be potentially so damaging
15    to MGA.  And remember that was part of the in limine effort
16    on your part to keep that first verdict away.  So it's kind
17    of back and forth in that very difficult issue.  I don't
18    disagree with you.  It's really a balance of the ability to
19    cross-examine these experts effectively.
20                Why don't we just get rid of all the experts,
21    counsel.  I'm just kidding with you.
22                Okay.  Now, ask some more questions and then we'll
23    move on.
24    BY MR. PRICE:
25    Q.   So you prepared a schedule which actually listed when
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    these licensees were due?

2    A.   Yes, sir.

3    Q.   And that's page -- Exhibit 36106-00045.

4            THE COURT:  By the way, the way that can be

5    explained away by both of you is the series of lawsuits,

6    quite frankly.  In other words, you never need to get into

7    injunctive relief in some ways to get the same point across.

8    The jury is going to believe or understand that the pending

9    series of lawsuits caused people not to want to be licensed

10   to MGA, because they couldn't guarantee product.

11           Nobody knew what the value of damages would be if

12   they ever got damages.  That's a mushroom-shaped cloud.

13   It's the injunctive relief that comes out that's so

14   damaging.

15           So in a way nobody is really precluded from it.

16   It's artificial, though.

17           MS. KELLER:  Without getting into any injunctive

18   relief, or what happened in the last trial, or any of that,

19   I tried to ask somebody -- I'm trying to remember who --

20   about the effect of having the lawsuit hanging over the

21   company and what kind of effect that would have.  And the

22   court cut me off from that very quickly.  And I thought --

23           Perhaps, I'm remembering wrong, but I would have

24   sworn that the court had said previously we weren't allowed

25   to get into anything about the results of the prior trial,

1    or the injunction, but that we could talk generally about

2    the sort of chilling effect that having the lawsuit hanging

3    over us could have had on our sales.  I'm not clear at this

4    point, because --

5            THE COURT:  Well, look back and show me.  I may

6    not have been clear either.  It may have come to me quickly

7    on the bench.  I just knew any time I heard "prior lawsuit,"

8    I always had that danger because this was actually MGA's

9    *in limine* motion.  Every time I heard "prior lawsuit," my

10   automatic reaction was, I don't know what counsel is going

11   to ask next.

12           MS. KELLER:  I wasn't even asking about the prior

13   lawsuit.  I'm asking about this one.  This whole lawsuit

14   hanging over your head and the uncertainty of what's going

15   to happen and how that effects -- a little company like MGA

16   is more affected by that than a big publicly traded company

17   that's been around for a long time.

18           THE COURT:  I'm not precluding you from argument.

19   And if I cut you off before, I may have made a mistake.

20   It's just because every time we got on that subject, I

21   didn't know who was going to drive the truck through the

22   front room.

23           MS. KELLER:  I haven't even used the prior --

24           THE COURT:  So it was a tremendous amount of

25   apprehension on my part.  Just kind of a litmus reaction to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    it.  Uh-huh, here we are again.  But if I've cut you off
 2    before, that could absolutely be an incorrect ruling.  I
 3    just didn't know the question that followed, and I didn't
 4    know who asked.  And I was very concerned that your
 5    in limine motion was absolutely correct.  And the injunctive
 6    relief, while in a sense Ms. Hurst complained that it was
 7    unfair, by the same token, it told the jury exactly who
 8    prevailed.
 9              Now, how couldn't that help but affect them?
10              So it was kind of double-edged sword.  I, in fact,
11    didn't want to get into the 2009, 2010 damage period.
12    Ms. Hurst asked specifically to go into that because of the
13    ability to cross-examine Wagner.  But for that, I would have
14    precluded 2009, 2010, or probably would have found that
15    those damages were so minuscule as to be irrelevant, the
16    prejudicial effect outweighed the probative value.  This is
17    a dead doll.  Well, I mean, semi-dead.
18              All right.  Counsel.
19              MR. PRICE:  And the context is that the effective
20    litigation is not a proper measure of damages.  That's an
21    inappropriate area to get into and also insurance,
22    et cetera.  So, if you remember the actual global concern
23    wasn't just the injunction.  It's just that this is an
24    inappropriate thing to bring up before the jury.
25              THE COURT:  It's coming back to me.  I remember
```

1    the series of rulings.

2    BY MR. PRICE:

3    Q.   In any event, Mr. Malackowski, you have a chart.  It's

4    in Exhibit 36106, page 45, which lists these agreements and

5    payment due dates; correct?

6    A.   Yes, sir.

7    Q.   And you see many of these here in 2009, 2010.  So what

8    is your opinion, if any, as to why MGA wasn't paid these

9    license fees?

10   A.   I don't have an opinion in that regard.  My assignment

11   was to calculate the unpaid amounts.

12           THE COURT:  So you wouldn't have an opinion

13   regardless of that, would you?

14           THE WITNESS:  I would not, your Honor.

15   BY MR. PRICE:

16   Q.   So did you assume causation that somehow Mattel did a

17   wrongful act that prevented MGA from getting these license

18   fees?

19   A.   Effectively, I'm assuming that the unpaid amounts are

20   recoverable under the restitution claim.  That's the

21   liability assertion.  Nothing further than that.

22   Q.   What assumption did you make as to liability for the

23   license fees?

24           What assumption did you make that an act that

25   Mattel did that prevented MGA from receiving these fees?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              What was the assumption?
2    A.   That it was unfair competition that resulted in a lack
3    of payment under the restitution, the 17200 statute.
4    Q.   Okay.  And you have no idea what particular act that
5    was?
6    A.   I'm not offering any opinion as to that particular act.
7    Q.   Let me ask you about Slide 11, the one with the dots
8    all over the place.
9    A.   Yes, sir.
10   Q.   This was based -- this analysis, it's a statistical
11   analysis?
12   A.   Generally speaking, sure.
13   Q.   You got means -- you got sums and the standard
14   deviations.
15              Do you see that?
16   A.   I do.
17   Q.   Was this based upon data that you just received?
18   A.   No, sir.
19   Q.   You've had this data for how long?
20   A.   I don't know the precise date, but for a while.
21   Q.   Was this analysis doing the median and the standard
22   deviation, was that in any of your reports?
23   A.   It was not.
24   Q.   And that wasn't because you were -- didn't have the
25   information to do it.  You had the information to do it?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.   Correct.  It was prepared in response to my review of

2    Mr. Wagner's testimony.

3    Q.   The substance of his testimony was contained in his

4    report that you reviewed and did a supplemental report to?

5    A.   Well, it generally was, but there were a lot of things

6    that he said at trial.  And in my review of that record, to

7    me, the data belies the opinions he presented to the court

8    and so I'm presenting the data.

9    Q.   What did Mr. Wagner say in his trial testimony that was

10   not in his report which then led you to do this analysis, in

11   addition to what you did in your supplemental report?

12   A.   Specifically, it was his presentation of the averages

13   benchmark that would attribute all of the access gain to the

14   intellectual property and his admission in cross-examination

15   that there must be something else in effect.  I think that

16   was his exact words.  And his admission that there's

17   something else in effect led me to say, *Well, let's go look*

18   *at the data.*

19   Q.   And you didn't understand that from his report?

20   A.   He didn't make that admission in his report.

21   Q.   If you would look at Slide 14, you see you've got --

22   this is MGA's unjust enrichment.

23        You have an apportionment factor of 20 percent and

24   12 percent.

25        Do you see that?

124

1   A.   I do.

2   Q.   And that's apportioning sweat equity versus

3   intellectual property; is that right?

4   A.   It is.

5   Q.   And then if we look a couple of pages later, you've got

6   Slide 17, and this is lost profits.

7           Do you see that?

8   A.   I do.

9   Q.   And you have the same 20 percent and 12 percent?

10  A.   Arithmetically, it is the same.  It is based upon the

11  same data but it's a different analysis.  It's for a

12  different purpose.

13  Q.   But it's based on the exact same data?

14  A.   Yes, sir.

15  Q.   It's not a coincidence that it's 20 and 12 percent?

16  A.   Of course not.

17  Q.   And you identified 12 percent previously, under

18  Slide 14, as being a sweat equity component; correct?

19  A.   An apportionment for equity, yes.

20  Q.   Here, under trade secret under lost profits, you

21  understand that --

22          Is it your understanding that sweat equity is not

23  to be considered to reduce the damages number for lost

24  profits/trade secrets?

25  A.   I agree with that.  This is not intended to represent

1   sweat equity and lost profits.  It is intended to be the

2   rebuttal to Mr. Wagner's market share analysis by showing

3   what was the demand for the patented features.  If you

4   looked to my quantitative factors, particularly, the brand,

5   it's coincidentally supportive of the same 12 and

6   20 percent.

7   Q.   So instead of apportioning, what you're saying is the

8   public's demand for the product is allocated between

9   intellectual property and something else?

10  A.   No.  What I'm saying is that when -- after we

11  identified the population of dolls that are at issue, we

12  have to determine what percentage of those would Mattel have

13  sold.  Mr. Wagner uses market share.  I say we look at what

14  customers wanted the particular features of the intellectual

15  property.  And it turns out that the apportionment factors I

16  used speak to that demand and in particular the brand we're

17  studying.

18  Q.   Do you do that with respect to your head start

19  analysis?  Do that kind of apportionment?

20  A.   No.  The head start itself is an apportionment.  It's

21  an apportionment to the benefits of access to the trade

22  secret which is you get the head start as compared to the

23  total process.

24  Q.   The head start is a limitation on the damages, period?

25  A.   I agree with that.

1    Q.   It's not an apportionment.  It actually is the period
2    in which there would be damages.
3    A.   But it is at the same time apportioning or recognizing
4    the value of obtaining the trade secret.
5    Q.   And you're using apportionment in a very different way
6    than you use it in connection with your unjust enrichment
7    calculation, or your lost profits calculation?
8    A.   Yes.
9    Q.   Let's use them the same way.  With respect to the head
10   start, you're just identifying the relevant damages period.
11   You're not apportioning between sweat equity and IP?
12   A.   Well, you are apportioning to the value of the trade
13   secrets that were taken, because it was the trade secrets
14   that gave you that head start, so it's a but for causation.
15   You do not apportion head start damages.  There is no tax
16   treatise or case that supports that.
17   Q.   But head start, sir, is just a limitation on the
18   damages, period.  It doesn't change the fact that they are
19   trade secret damages; right?
20   A.   I agree with that.
21   Q.   And maybe -- if you would look at Slide 13 --
22   A.   Yes, sir.
23   Q.   -- where you do the allocation factors, quantitative
24   considerations.
25           You said that you added an average of one, two,

1   three, four and five?

2   A.    Yes, sir.

3   Q.    And are you aware -- is there anything in the

4   literature which talks about just taking a mathematical

5   average of these sorts of -- of a license rate and

6   investment rate, profit rate, product profit comparison,

7   influence factors?

8         Is there somewhere where there is accepted

9   methodology just to average things like that to come up with

10  a number to use?

11  A.    To answer your question, specifically, no.  But that's

12  not what I did.  I did average.  And then I looked to the

13  qualitative evidence.  And it's my opinion or judgment,

14  based upon my experience, that it's 12 percent and

15  20 percent.

16  Q.    Well, when you did that in your report to come up with

17  that judgment, what you did was you considered

18  Georgia-Pacific factors that would indicate the appropriate

19  apportionment; right?

20  A.    I considered the qualitative evidence and in my report

21  noted that things like expert testimony are also referenced

22  in the Georgia-Pacific factors.  I pointed to five factors

23  where there was --

24        THE COURT:  Just a minute.

25        *(Pause.)*

1          THE WITNESS:  So, your Honor, after I did the

2    quantitative analysis, I was looking for qualitative

3    information, and I came up with a list of things, like

4    expert testimony and documents.  And to show that I didn't

5    just make it up out of the air of what qualitative evidence

6    is, I noted that those types of things are considered in the

7    Georgia-Pacific factors, but I did not do a hypothetical

8    license.  I did not use -- reference all the factors, but

9    they are in my report to show the comparison.

10          THE COURT:  Counsel.

11    BY MR. PRICE:

12    Q.   So when I asked you why -- whether or not there was an

13    methodology in the literature that would let you just

14    average these, you said you also looked at qualitative

15    factors; right?

16    A.   Yes, sir.

17    Q.   And that kind of gave you the confidence that it was

18    appropriate as an expert to just average these together, the

19    qualitative analysis?

20    A.   Well, actually, the qualitative analysis suggested that

21    the quantitative factors were probably too high; that the

22    actual apportionment should be lower, because MGA had

23    further sweat equity that wasn't considered in my

24    quantitative factors.

25          THE COURT:  What are your figures, if you take

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1    away any consideration of the Georgia-Pacific factors?

 2              THE WITNESS:  Your Honor, as we talked about

 3    before the break, instead of 20 percent, it's 20.5; and

 4    instead of 12 percent, it's 13.3.

 5              THE COURT:  I'm going to take away, if you

 6    testify, any of the Georgia-Pacific factors.

 7              Do you understand that?

 8              THE WITNESS:  I don't intend to reference the

 9    Georgia-Pacific factors.

10              THE COURT:  That's right.  You do not intend to

11    reference them.

12              THE WITNESS:  I will not reference them.

13              THE COURT:  Good.  Now, does that change your

14    analysis?

15              THE WITNESS:  No, it's the same qualitative

16    evidence.

17              THE COURT:  All right.

18    BY MR. PRICE:

19    Q.   But I thought your testimony is that the -- what gives

20    you the confidence to be able to use the quantitative

21    methodology -- that is, it's the correct methodology -- is

22    that you look at the Georgia-Pacific factors?

23    A.   No, sir.  What gives me the confidence is, A, I

24    specifically identified quantitative factors that relate

25    directly to the issue at hand of what is the relative value

1    of IP versus the --

2            I could have stopped at the quantitative factors

3    and called it a day, but then I went to the qualitative

4    factors.  And in looking to the qualitative factors, I

5    noted -- and in hindsight I wouldn't have made the

6    correlation.  It was not necessary -- that many of the

7    qualitative things I looked at are the types of things the

8    Georgia-Pacific factors considered.

9            But I'm not dependent upon the Georgia-Pacific

10   factors, and you will not hear them from me from this point

11   forward.

12   BY MR. PRICE:

13   Q.   Your understanding of the Georgia-Pacific factors that

14   you referred to is a methodology which is approved in patent

15   cases for calculating a royalty.

16            You understand that?

17   A.   That is a true statement.

18   Q.   That is an approved methodology; correct?

19   A.   It is.

20   Q.   And the methodology that you have used, which is just

21   averaging these quantitative numbers, that is not an

22   approved methodology that you're aware of in any literature;

23   correct?

24   A.   That is not true.  The approved methodology in the

25   literature is the experience and judgment of the expert.

1    There is no apportionment factor test.  There is no

2    apportionment calculation.

3             My 25 years of experience and judgment tell me

4    that the six quantitative factors I have included on the

5    screen are exactly what you should look to.  And there's

6    other evidence that say even that's too high.

7    Q.   Can you point me to anything in the literature,

8    anything that you've published, any case which says, this is

9    an appropriate methodology, taking these factors and

10   averaging them?

11            Other than referring to Georgia-Pacific where it's

12   doing something similar, can you refer me to anything that

13   says this is an appropriate methodology for an expert?

14   A.   I'm sorry, because I'm not making myself clear.  I'm

15   not saying that's the case, no.

16            THE COURT:  Just a moment.  Yes or no to that

17   answer.

18            THE WITNESS:  No, I wouldn't expect it.

19            THE COURT:  Off the record.

20       (Pause.)

21            THE COURT:  While you're talking, here's what I'm

22   thinking.  I'm probably going to send you out for a couple

23   of hours when you're done.

24            My thought is whether I actually need a court

25   reporter this afternoon or not; and if so, I'm going to call

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   off Sharon.
 2        (Pause.)
 3   BY MR. ZELLER:
 4   Q.   Focusing on what you were calling the top down
 5   approach, it's the case that you are awarding to MGA, under
 6   that methodology, every penny of profit for the MyScene
 7   products that MGA is claiming are the subject of this
 8   misappropriation during the head start period?
 9   A.   Not necessarily, no.
10   Q.   Is that what you're doing?
11            THE COURT:  Stop.  Stop.
12            THE WITNESS:  No.
13   BY MR. ZELLER:
14   Q.   What products are you not awarding to MGA during the
15   head start period?
16   A.   The top down approach considers head start benefits but
17   it does not calculate head start benefits.  So I don't have
18   that analysis.  That's a question that's not applicable to
19   the top down approach.
20   Q.   So let's be clear then.  What you're saying is that you
21   consider the question, but you offer no calculation that
22   allows the jury to do anything other than award every penny
23   of profit during the head start period under those two
24   approaches, the top down approach; correct?
25   A.   No, I don't think that's correct.
```

1    Q.   Please tell us how is the jury suppose to make that

2    calculation.

3    A.   I don't believe that the jury should make a calculation

4    of head start for the top down approach.  If the jury wants

5    to base damages on head start, they should look to the

6    bottom up approach, just like I gave two examples for the

7    Mattel:  33 million without head start.

8              THE COURT:  Slow down.  Slow down.

9              THE WITNESS:  7 million with head start.

10   BY MR. ZELLER:

11   Q.   As to those two products that you just gave examples,

12   you are awarding every penny of profit that Mattel made;

13   correct?

14   A.   No, sir.

15             THE COURT:  Okay.

16   BY MR. ZELLER:

17   Q.   Let me ask it this way, then:  You are assuming that

18   with respect to any of these MyScene sales during the head

19   start period that no consumer, not a single consumer would

20   have bought another MyScene doll as a substitute; correct?

21   A.   In the top down approach you're talking about?

22   Q.   Correct.

23   A.   No, that's not the case.

24             MS. KELLER:  I have a question, if I may.  The

25   court was very --

```
 1              MR. ZELLER:  If I can, your Honor.
 2              THE COURT:  We're off the record for a moment.
 3    Just rest your hands.
 4         (Discussion held off the record.)
 5    BY MR. ZELLER:
 6    Q.   With respect to any of your head start methodologies,
 7    you're assuming that every consumer that bought a MyScene
 8    doll with one of these themes that's at issue -- namely, the
 9    subject of these MGA claims -- during the head start period,
10    would not have bought another MyScene doll as a substitute;
11    correct?
12    A.   No, sir.
13    Q.   Please tell us how you are taking that into account.
14    A.   The disgorgement calculation removes the ill-gotten
15    gain irrespective of whether or not they substituted another
16    project.
17    Q.   That's something you didn't take into account at all?
18    A.   Not in the head start approach; correct.
19    Q.   In any of the methodologies, any of the three -- the
20    two, I think you were calling them top down; and then, the
21    one bottom up?
22    A.   No.  The bottom up -- I'm sorry, the top down approach
23    specifically does take into account that they would have
24    bought an alternative doll and that's measured by the light
25    blue sections of both charts.
```

1    Q.   That's my point.  As to the top down approach, you

2    assume that a consumer would have bought a Bratz doll

3    instead of buying a MyScene doll in every single

4    transaction; correct?

5    A.   No, sir.  It's split.  In some cases, it goes to Bratz.

6    That's the damage number.  In some cases, it stays with

7    MyScene.  That's the lower portion of the chart.

8              THE COURT:  And the question is going to be:  How

9    do you determine that?

10             THE WITNESS:  I determine it two ways:  Based upon

11   the Mattel historical experience with older Generation dolls

12   and based upon Mattel's actual experience with MyScene,

13   removing the effect of Bling and Chillin'.

14   BY MR. ZELLER:

15   Q.   And why do you remove those two?

16   A.   Because I specifically have information that allows me

17   to calculate the ill-gotten gain for those two.  And so to

18   remove them would bias the but-for sales in a way that's

19   inappropriate.

20   Q.   Well, if you added them in, how would that change your

21   calculation?

22   A.   It would slightly decrease damages.

23   Q.   To what number?

24   A.   About $27 million less.

25   Q.   And what was the basis for concluding that would bias

1    your numbers?

2    A.   Because I know those two products specifically

3    benefited from the alleged trade secret misappropriation,

4    and I was able to specifically calculate how much.

5    Q.   You say no.  How?

6    A.   Because I had good documents, in particular, the e-mail

7    correspondence that sets forth dates related to the

8    accelerated head start.

9    Q.   And anything else?

10   A.   That's the primary distinction of those two products.

11   Q.   I'm not asking about primary.  Anything else?

12   A.   Oh, we went through at great length what I used for

13   those calculations.

14          THE COURT:  Just answer yes or no.

15          THE WITNESS:  Yes. Yes.

16   BY MR. ZELLER:

17   Q.   What else?

18   A.   I have actual sales data.

19   Q.   What else?

20   A.   I have MGA data.

21   Q.   What else?

22   A.   Toy fair report.  I have the date of the MGA launch.

23   Q.   What else?

24          MS. KELLER:  Your Honor, this is all asked and

25   answered.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1            THE WITNESS:  I believe that's everything.

 2            MR. ZELLER:  This isn't asked and answered.

 3            THE COURT:  Couple more questions; and then, you

 4  can go to lunch and come back and we get Ms. Hurst, or

 5  whatever you want to do.

 6            Counsel, more questions?

 7            MR. ZELLER:  I was done, your Honor.  I just

 8  wanted to make sure that he had completed his answer.

 9            THE COURT:  Make sure you got the completed

10  answer, so ask him one more time.  Make sure.

11            What else?

12  BY MR. ZELLER:

13  Q.   Anything else?

14  A.   No, sir.  Thank you.

15            MR. ZELLER:  Thank you.

16            THE COURT:  Now, if we need to, we'll call you.

17            Where are you staying?

18            THE WITNESS:  I actually don't know, your Honor.

19  Because I was going to leave today, if we were done.  So I

20  can -- the lawyers can reach me 24/7.

21            THE COURT:  Okay.  Where are you going?

22            THE WITNESS:  Either back to Chicago or to

23  Los Angeles.

24            THE COURT:  Well, that's quite a difference.

25            THE WITNESS:  It depends if there are any flights
```

1   available this afternoon.

2            THE COURT:  Okay.  When do you anticipate

3   testifying?

4            THE WITNESS:  I don't think it's for a couple of

5   weeks.

6            MS. KELLER:  That's right, your Honor.

7            THE COURT:  A couple of weeks?

8            MS. KELLER:  That's right.

9            THE COURT:  You don't have any time left.

10           MS. KELLER:  Well, it will be at the very end of

11  our case.

12           THE WITNESS:  I think I'm near last.

13           THE COURT:  Okay.  Is there going to be time for

14  rebuttal?

15           MS. KELLER:  That's a good question.

16           THE COURT:  Well, that is a good question.  We're

17  going to have to sort that out.  I'm not saying that either

18  side is getting rebuttal, because the time clock can run.

19  And Mattel had a huge amount of time on the front side, 80

20  some hours.

21           By the same token, there are two people who have

22  to be able to testify again.  That's Larian and Eckert.  As

23  far as the experts are concerned, I've limited the experts

24  to two hours, but what's unfair about that is if in MGA's

25  presentation, you have the benefit of not only the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    presentation of your damages expert but then the criticism

2    of Wagner.  That has to balance out somehow.

3                MS. KELLER:  I'm not sure I'm following, your

4    Honor.

5                THE COURT:  Because Wagner couldn't anticipate --

6    he wasn't allowed really to get into an anticipation of this

7    expert and criticize your methodology, or your figures.  And

8    so I have to be certain that if we get into dueling experts

9    that Mattel has the right to respond.

10               MS. KELLER:  I think that was said at the time

11   that they could recall Wagner, and we're both trying to

12   manage our time as best we can to leave a little bit left

13   for rebuttal.

14               THE COURT:  Okay.  It will all work out.

15               MS. KELLER:  And that's why I asked the court this

16   morning.  Because I had remembered two different things I

17   had heard, and I wanted to make sure that before we finished

18   budgeting the rest of our time that we knew that we would

19   actually be allowed to make some rebuttal.

20               THE COURT:  Rebuttal and surrebuttal.

21               MS. KELLER:  It's just a question of how much we

22   save.

23               THE COURT:  It's how much.  The two people that

24   represented would get back on the stand who were the center

25   of this lawsuit are Larian and Eckert.  But I am assuming

140

1  that that's very brief.  This isn't another go-around.  And
2  we've got to manage the time to provide that.
3          Well, sir, I think you could be testifying as
4  early as the latter part of this week, regardless of what
5  counsel said, or the following week.
6          THE WITNESS:  I will be available.
7          THE COURT:  Okay.  If I need you, though, I'm
8  going to call upon you and not hesitate.  And I'm not going
9  to hear I'm inconveniencing you, or you're not available.
10         I want to think about what you've said today, but
11 I've got, it sounds to me, like, at least a week to sort out
12 any issues or problems I have, and I could actually get a
13 transcript.
14         Okay.  Now, I've had the problem of what I call
15 training slides before.
16         Now, we're going to take a break.
17         Thank you very much.  You may step down.
18         Off the record.
19     (Discussion held off the record.)
20     (At 11:57 p.m., proceedings were adjourned.)
21
22                      -oOo-
23
24
25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

141

```
 1                      CERTIFICATE

 2           I hereby certify that pursuant to Section 753,

 3   Title 28, United States Code, the foregoing is a true and

 4   correct transcript of the stenographically reported

 5   proceedings held in the above-entitled matter and that the

 6   transcript page format is in conformance with the

 7   regulations of the Judicial Conference of the United States.

 8

 9   Date:  March 20, 2011

10

11

12                      _____

13                      Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*