Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING


MATTEL INC., et al.,            )
                                )
                Plaintiff,      )
                                )      STATUS CONFERENCE
        vs.                     ) No. CV 04-9049-DOC
                                )      VOLUME 1 OF 1
MGA ENTERTAINMENT, INC.,        )
                                )
                Defendant.      )
_____)



REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

MONDAY, MARCH 21, 2011




Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                           and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                           (213)443-3000

6

     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                          BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
8                           SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                         BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                          SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                           (949)567-6700

14
                             KELLER RACKAUCKAS
15                          BY:  JENNIFER KELLER, ESQ.
                             18500 VON KARMAN AVENUE
16                          SUITE 560
                             IRVINE, CALIFORNIA 92612
17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                          BY:  MARK OVERLAND, ESQ.
                             100 WILSHIRE BLVD
20                          SUITE 950
                             SANTA MONICA, CA. 90401
21                           (310) 459-2830

22

23

24

25

```
 1                          - AND -

 2                          SCHEPER KIM & HARRIS LLP
                            BY:  ALEXANDER COTE, ESQ.
 3                          601 WEST 5TH STREET_12TH FLOOR
                            LOS ANGELES, CA. 90071
 4                          (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1    SANTA ANA, CALIFORNIA; MONDAY, MARCH 21, 2011

2          -oOo-

3   **THE COURT:**  Counsel are present this evening.  The Court

4 has reviewed yesterday's depositional testimony of transcript that

5 came from that deposition.  And I'm almost done reviewing today's.

6 Between the next two hours I'll finish it.  This is the Court's

7 ruling.

8   Mattel has objected to 15 rulings by the discovery

9 master during Sunday's March 20 deposition of Mr. Michael Moore.

10 It was in-house counsel from Mattel.  Mattel has lodged with the

11 Court a binder which contains a transcript of that deposition and

12 isolates the challenged rulings by the discovery master.

13   I think there are a few broad principles that guide my

14 review of the discovery master's rulings.

15   First, Mattel's counsel instructed the witness not to

16 disclose facts including response to "yes" or "no" questions that

17 we divulge the content of any attorney-client communications.  On

18 at least one occasion Mr. Moore commented that he learned a fact

19 from another attorney; presumably Mattel's outside counsel.  That

20 does not render counsel's instruction proper.  If the outside

21 counsel who relayed the fact to Mr. Moore learned the underlying

22 fact from a nonconfidential source, then the communication between

23 the outside counsel and Mr. Moore is not privileged.  Citing In Re

24 Sealed case, 636 F.2d 600 at 604.  Mattel failed to make that

25 showing.

Page 5

1          Mr. Moore also intimated in response to certain

2     questions that he learned of some facts from discussions with

3     Mattel employees.  That does not mean that the privilege protects

4     the communications or the fact of the communications.  It settled

5     that, "With respect to internal communications involving the

6     in-house counsel, a party asserting the attorney-client privilege

7     must make a clear showing that the speaker made the communications

8     for the purposes of obtaining or providing legal advice."  United

9     States versus Chevron Texaco Corporation, 241 F.Supp.2d 1065.  The

10    language is found at 1076.  Northern District of California 2001.

11         Mattel's not made that showing.  Indeed, the

12    communications that disclose the facts concerning the market

13    intelligence group were not made for the purpose of obtaining

14    legal advice since they were inadvertently disclosed during an

15    internal investigation unconnected with that issue.  The law does

16    not summarily cloak every fact known to an in-house counsel and

17    the privilege simply because he is the company's attorney.

18         Mattel repeatedly objects on work product grounds to

19    questions about Mr. Moore's state of mind, the nature of any

20    investigations he conducted, and his knowledge about a 2003 Wall

21    Street Journal article that supposedly shed light on Carter

22    Bryant's involvement in the Bratz project.

23         These instructions were properly overruled because the

24    work product doctrine must yield where there is a substantial need

25    for the information and the party seeking the work product

Page 6

1    information would face undue hardship under Federal Rule of Civil

2    Procedure 26(b)(3).

3           The attorney-client privilege is waived when a party

4    selectively discloses the content of the communications, under

5    Wheel versus Investment Indicators Research and Management Inc. at

6    647 F.2d 18 at page 24, Ninth Circuit, 1981.  This is because the

7    privilege cannot be used as both a sword and a shield.

8           Mr. Moore selectively disclosed supposedly privileged

9    communications on the issue of whether Mattel employees suspected

10   Bryant's involvement in Bratz and the issue of whether Mattel

11   employees provided information to the Wall street Journal about

12   the potential misappropriation of the Toon Teens' concept.

13          The discovery master properly concluded that these

14   disclosures constituted a limited waiver on that subject matter.

15   The privilege also does not protect the fact of a communication

16   between a client and an attorney, or even the date of that

17   communication under Ramsuer versus Chase Manhattan Bank, 865 F.2d

18   460 at 467, Second Circuit 1989.

19          Moreover, to the extent Mattel invokes the work product

20   doctrine as to the fact of its internal communications about

21   either the market intelligence group or the suspicions concerning

22   Mr. Bryant, MGA has a substantial need for such communications and

23   will face undue hardship if forced to obtain discovery else.

24          On the basis of these principles, this Court overrules

25   Mattel's objections to all 15 discovery master rulings at issue.

Page 7

1    The first eight rulings at issue concern internal Mattel

2    suspicions about Carter Bryant and the sources for the Wall Street

3    Journal article.  Mattel's privilege and work product instructions

4    were properly overruled by the discovery master pursuant to the

5    first through fourth principles that I just identified.

6           The ninth, eleventh and twelfth rulings at issue concern

7    the genesis of Mr. Moore's knowledge about the market intelligence

8    group, and the discovery master properly overruled Mattel's

9    privilege and work product instructions pursuant to the first,

10   second and third principles I just identified.

11          The tenth and thirteenth rulings at issue concern

12   Mr. Moore's legal instructions either to Villaseñor or outside

13   counsel.  And Mattel's objection to the discovery master's rulings

14   are sustained because they were privileged communications.

15          The fifteenth ruling concerns the identity of any

16   individuals at a meeting concerning Villaseñor as well as the date

17   of that meaning.  This Court finds the discovery master properly

18   overruled Mattel's privilege and work product instruction pursuant

19   to the fifth principle I just identified.  And even if this was

20   privileged information, Mr. Moore waived the privilege when he

21   identified one of Mattel's outside counsel who participated in the

22   conversations concerning Villaseñor.  The information is therefore

23   either privileged or the privilege has been wavered.

24          I'm going to give you an example of what is happening

25   across the street so the circuit a clear indication of what is

Page 8

1   going on just as this Court does.

2           On page 154, "When did you first hear any information of

3   any kind suggesting that the employees of Mattel were using fake

4   business cards to gain access to competitor's AO showrooms?

5           "MR. GORDON:  Objection.  Attorney-client privilege.

6   Attorney work product.  Don't disclose any confidential

7   attorney-client communications that's the basis for that answer or

8   that provides you the basis for that answer, and don't disclose

9   any November 24, 2003, or thereafter attorney work product.  So if

10  you have got to reveal that you received that information in an

11  attorney-client information or work product, you should not

12  disclose and answer at all.

13          "THE WITNESS:  Yes.  On that basis I can't answer.

14          "MS. HURST:  I believe a date is not privileged

15  information and I'll ask the discovery master per to --

16          "DISCOVERY MASTER O'BRIEN:  The objection is overruled.

17  You can give the date if you know it.

18          "THE WITNESS:  Okay.

19          DISCOVERY MASTER O'BRIEN:  Are you -- John, are you

20  objecting?  No?

21          "MR. GORDON:  Yeah, I will object.  We will appeal.  Let

22  me talk to my client for a second.

23          "DISCOVERY MASTER O'BRIEN:  Okay.

24          Now, this review is simply based on yesterday's

25  deposition, which has apparently declined significantly in my

1   brief reading this evening and apparently an unwillingness to make

2   a good faith effort.  I want this depo finished and I want these

3   questions answered.  And I will await the special master's report

4   back to me this evening.  I'll see what the record looks like at

5   that time.

6           I want to inform Mr. Mattel -- Mr. Quinn, I hope, is

7   present, counsel and Mr. Bryant -- that this Court is prepared and

8   will be handing down sanctions if this continues.  This is bad

9   faith.

10          I'm going to ask Mr. Quinn, since you are the head

11  person that I have relied upon anyway, to go across the street.

12  Mr. Gordon is more than welcome to participate, but I want you to

13  be present to hear these objections.

14          **MR. QUINN:**  May I respond to the Court's comments?

15          **THE COURT:**  Certainly, but that is my ruling.

16          **MR. QUINN:**  I understand, Your Honor.

17          This Court has --

18          **THE COURT:**  And by the way, it got more absurd this

19  evening with the deposition I'm reading back in chambers.  I'm

20  very disappointed.

21          **MR. QUINN:**  Your Honor, this Court has ruled in previous

22  motions that the subject matter of a communication with an

23  attorney cannot be inquired into.  The Court made that ruling in

24  the case of some objections we raised with respect to Mr. Brower's

25  deposition, and the privilege was asserted.  That privilege really

1   was sustained.  It was appealed to this Court.

2        And in an opinion that was about three pages in length,

3   single-spaced, this Court, with citations to many authorities,

4   analyzed the question and concluded that this specific subject

5   matter that's being discussed with an attorney is itself

6   privileged, and we were not permitted to inquire into that with

7   respect to Mr. Brower.

8        Some of these questions, Your Honor, I submit are very

9   cleverly designed to inquire into the subject matter of

10  communications.  They are sort of, generally speaking, did you

11  discuss the subject of A, B, C, D with an employee?  Or, what was

12  the first date on which you discussed the subject of A, B, C, D?

13       So it's a back door way of addressing that same

14  question, Your Honor, I submit, of getting into the subject matter

15  of the communication.  Did he talk about getting into toy fairs

16  using fake business cards with so-and-so?

17       Well, one way of acquiring into that subject matter is

18  to ask what is the date on which you first learned about that?  It

19  is a variety of, "when did you stop beating your wife," Your

20  Honor.  I submit that those objections, consistent with this

21  Court's prior ruling with respect to Mr. Brower's testimony and

22  the ruling that the subject matter of a communication with an

23  attorney is properly privileged consistent with those.  Those

24  objections, I respectfully submit, Your Honor, are well-taken.

25       That sort of addresses the last category, the fifth

Page 11

1    category the Court addressed.  But to take it from the top, the

2    notion that outside counsel -- if outside counsel learns

3    information from a nonconfidential source and then passes it on to

4    the client, that if it comes to outside counsel from a

5    nonconfidential source, that therefore that communication cannot

6    be privileged, I submit would represent a radical change in the

7    law.

8           Any outside counsel starts any engagement with a blank

9    sheet.  We know nothing.  We acquire information in order to

10   represent our clients and to give advice.  Some of that

11   information we acquire from the client.  Some of that information

12   we acquire by our own investigation and other sources.  All that

13   is taken in and forms the basis of legal advice.

14          I don't think -- and I candidly I haven't read the In Re

15   Sealed case from the Second Circuit, but to me that is a radical

16   change in the law.  That is really news to me, the idea that in

17   representing a client, if I learn something from a nonconfidential

18   source and I pass it on to my client, that is not a privileged

19   communication.  Your Honor, I just don't -- I doubt that -- I

20   strongly doubt that that's the law.

21          With respect to communications with Mattel employees

22   that we're obligated to make a clear showing that those were for

23   the purposes of obtaining information to render legal advice, we

24   haven't had a chance to do that.  Mr. Gordon is reacting in the

25   course of a deposition.  He is taking the position that he takes,

1   I submit, in good faith.  We haven't had the chance to brief that

2   or making the showing.  That's not something that we can do in the

3   course of a deposition.  And we're now here before the Court.

4          We could respond to each of these and say why he -- and

5   make that showing, but we simply haven't had a chance to do that.

6          With respect to the work product issue, I thought that

7   was only asserted after a date in November when litigation was

8   anticipated, after the materials from Hong Kong were received.  I

9   don't think it's a question of undo hardship.  It's not as if

10  there aren't any other sources of information available to MGA to

11  inquire into when we learned what from nonlawyer sources.  I don't

12  think that this would fall within the parameters of the undue

13  hardship exception to the attorney-client privilege.

14         With respect to selective disclosure, Your Honor, this

15  is not a case where Mr. Moore has disclosed privileged information

16  in order to advance a defense like reliance on advice of counsel,

17  which is what we have seen elsewhere in this case.  So what it

18  comes down to is, under the law, was there a disclosure -- I think

19  the statutory definition is, was there a disclosure of a

20  substantial part of a privileged communication.  If you disclose a

21  substantial part of a privileged communication, that waives the

22  privilege as to that communication.

23         Here, naming one name I don't think is a disclosure of a

24  substantial part of a privileged communication.  This isn't,

25  again, a case of the privilege being used as a sword and a shield.

1    So, Your Honor, I really wish -- I know we're working

2    under exigent circumstances here, but these are important issues

3    and I wish we had some more time to address them.

4          **THE COURT:** You've got plenty of time.

5          **MR. QUINN:** I can assure the Court these positions are

6    taken in good faith and I respectfully submit that under the law

7    they are well-taken.

8          **THE COURT:** You have perfected your record.

9          Counsel?

10         **MS. HURST:** Your Honor, I don't want to belabor the

11   point.  We're satisfied with the Court's ruling.  Facts are not

12   privileged.  And facts about when communications occurred, the

13   general subject matter of a communication that's necessary to even

14   determine whether something is privileged or not, none of these

15   things are privileged.

16         MGA has gotten the runaround on the statute of

17   limitations defense for literally years.  These talking points

18   that the Court recently ordered produced, we have final versions

19   of these documents now.  They don't bear any editing from lawyers

20   on them.  Mr. Moore testified yesterday that this was drafted by a

21   nonlawyer.  And this was withheld despite a Court order of

22   September 2007 regarding all statute of limitations material,

23   withheld for literally for three and a half to four years after

24   that Court order.

25         On its face, this document said after Mr. Bryant left,

1   the design studio suspected that Mr. Bryant may have been a

2   conflict of interest while he was working at Mattel.  We cannot

3   get a straight answer about what that means and we're entitled to

4   one.

5          Like I said, I don't want to belabor the point.  There

6   are no other sources available for this information at this point.

7   Witness after witness has said, "I don't remember."  "I don't

8   recall."  Witness after witness has said the only person that they

9   can identify with information on this point is Mr. Zeller.

10          We have been very, very respectful of the Court's ruling

11   not to drag outside counsel into this.  And I diligently tried to

12   refer to outside counsel without identifying people so that the

13   form of the questions will be acceptable in front of the jury and

14   otherwise.  But we're at the point if Mr. Moore doesn't give

15   answers, we're going to have nowhere else left to go.  And that is

16   an additional good reason for many of the principles that the

17   Court has articulated as a basis for its reasoning here and

18   affirming the discovery master's rulings.

19          Your Honor, with respect to the Villaseñor matter,

20   Mr. Moore testified that he had at least 10 communications with

21   Mr. Villaseñor between June and December of 2005.  Ten

22   communications including one the day he testified this evening,

23   the day before that December 22, 2005, e-mail was sent.

24          Now, as the Court knows, we did not get those documents

25   for a very long time.  Your Honor, respectfully there are 14 or so

Page 15

1   witnesses who testified they have never heard of the Market

2   Intelligence Group, including the general counsel, Mr. Robert

3   Normile, who was a recipient of that December 22, 2005, e-mail for

4   Mr. Villaseñor stating, "I am the manager of Market Intelligence."

5           The Court is properly being conservative in its ruling

6   because the next step is crime fraud.  And we are absolutely going

7   to assert that if we can't get these answers.

8           And I guess I would also ask that the Court in addition

9   to what it's already done, order that Mr. Moore be a 30(B)(6)

10  witness on these topics so that he is obligated to get the

11  information in a form that cannot be argued to be privileged.  In

12  other words, he has to obtain the information in order to answer

13  factual questions.  And that can be taken as well as a

14  precautionary measure so then there is no -- they don't even have

15  to worry.  They don't have to worry then about whether they're

16  waving some privilege.

17          He is obligated to get the information and answer the

18  questions.  And I would ask the Court do that as well, and that we

19  have available to us, if we can't get the answers, Ms. Bongiavanni

20  who was involved in the drafting of these talking points,

21  Ms. Thomas who was involved in this Villaseñor investigation that

22  occurred in 2006 and also involved in the statute of limitations

23  issues.  Thank you, Your Honor.

24          **THE COURT:**  Okay.

25          **MR. QUINN:**  Your Honor, I referred to this Court's

1  previous ruling with respect to -- on the Brower matter.  If I

2  could just read from the Court's order.

3            "Assuming for the moment that the subject matter of an

4  attorney-client communication is conceptually separable from the

5  content of the communication, there is no good reason why a client

6  has a lesser interest in the confidentiality of the subject matter

7  of the communication than the client does in the confidentiality

8  of the content of the communication."

9            The question at issue in that case was something like,

10  Your Honor, to Mr. Brower, did you talk to MGA's counsel about

11  Mr. Villaseñor?  It's the flip side of the type of question that's

12  being asked to Mr. Moore except Ms. Hurst, in a clever way, is

13  expanding the question; phrases it in terms of a date, "On what I

14  date did you first talk to Mr. Villaseñor about sneaking into

15  showrooms?"

16            It's clearly into the specifics of the subject matter.

17  She prefaces the question with, "Generally speaking, when did you

18  first talk to," and there is very detailed description of a

19  subject.  It's a calculated backdoor way of doing what this Court

20  has ruled, when it was the other way around, is not appropriately

21  done.

22            With respect to facts, here is the Court's order with

23  respect to waiver with respect to the Glaser e-mails.  The Court

24  said in the order on the Glaser e-mails, and I quote now,

25  "Although the privilege cannot curtail discovery into relevant

Page 17

1   factual matter, a party may not expedite the discovery process by

2   seeking the attorney-client communications that convey that

3   factual matter.  Those attorney-client communications, though

4   purely factual, are still privileged."

5           So we have been down some of these roads before.  And

6   these questions have been addressed on the other side, and I see

7   no reason at this late date to be taking a very different route.

8           And on the issue of there literally is nobody else to

9   aid them, or there is a unique need here for sources of

10  information on the statute of limitations issues, there have been

11  I don't know how many witnesses have addressed this issue of what

12  the suspicions were; who thought what when; what were the

13  investigations.  There is documents on this.  There is already

14  testimony in the record on it.

15          There has been -- this is not a situation where there is

16  no other source of information available to them.

17          So I think that there is no reason for putting Mr. Moore

18  at the center of this inquiry.  And I'm certainly not aware of any

19  authority -- I have never heard of the concept of an involuntary

20  30(B)(6) witness; that the Court requires that somebody,

21  particularly a lawyer, be appointed to know everything a client

22  knows about something.

23          Your Honor, with all respect, I think this is a

24  manufactured -- an effort to create a manufactured emergency

25  crisis.  We have had a lot of testimony in this trial related to

1    the statute of limitations and what was suspected and by whom.

2    There was no reason to put the inside lawyer in the middle of that

3    and require him to divulge what he learned by reason of his

4    investigation or his communications with Mattel employees.  It

5    runs exactly contrary to the purpose of the attorney-client

6    privilege.

7              Thank you, Your Honor.

8              **MS. HURST:**  It seems that every time we're in a position

9    that MGA is pressing Mattel for some information that it doesn't

10   want to give, the response is invariably, well, we didn't get

11   something.  Enough already.

12             The fact of the matter is the Glaser e-mails were

13   produced.  The fact of the matter is Mr. Brower answered about his

14   communications.

15             Now, the next step here is dismissal.  We have an order

16   from September of 2007 that said produce everything you know

17   related to the statute of limitations.  We got those case

18   management -- thank the Court -- the other day.  And on that 2002

19   case management log, it was clear that these two investigations

20   files have been monkeyed with.  That that anonymous letter and

21   that weird e-mail with a whited-out date on it strongly appears

22   were removed from that MGA case file and stuck into another case

23   file at the end of 2002.  And that the date on the document was

24   manipulated and Mr. deAnda testified, oh no, that was the date.

25   And then it became clear from that case management log it's not

1   the date.

2         We have what amounts to perjury from witnesses here,

3   withholding of evidence, apparent alteration of evidence.  That

4   2002 case management log on its face refers to both MGA and Carter

5   Bryant.  There is no way conceivable, legitimate reason for having

6   never previously produced that document.  None at all.

7         Now, Your Honor, under rule 37 given that prior order

8   and the failure to produce this evidence, and the fact that it is

9   necessary for MGA's defense on the statute of limitations, the

10  Court is certainly justified with respect to the orders it's taken

11  tonight.  The Court would also be justified in dismissing the case

12  as a terminating sanction at this point.

13        And in that regard, I would point out the framework set

14  out for the state secret privilege by the Ninth Circuit in the

15  Mohammed case, 579 F.3d, 943.  The Court says when you have an

16  evidentiary privilege and the party invokes the privilege, if the

17  result is that the specific privileged evidence is indispensable

18  to establishing a valid defense that would otherwise be available

19  to the defendant, then dismissal is warranted.

20        And the Court analogizes to all evidentiary privileges

21  citing Upjohn, in that case.  So it's clear this is a rule of

22  general application.  Now, the Supreme Court said in Upjohn that

23  facts are not privileged.  The fact that lawyers possess facts

24  doesn't make them privileged, and we are out of options here.

25        And MGA has gotten the runaround.  We have gotten

1    doctored evidence.  It's clear something is very wrong on this

2    Villaseñor thing, and the withholding of these documents.  And

3    Your Honor's ruling are correct.  And I would like to go forward

4    and complete these depositions and get the information.  I would

5    be in a position to come back to the Court and say we are out of

6    options and ask for that ultimate sanction.  Thank you.

7              **MR. QUINN:**  Your Honor, Mr. Brower never answered that

8    question.  Contrary to what Ms. Hurst just represented to the

9    Court, that privilege assertion with respect that question about

10   whether he spoke to Mr. Villaseñor, that was sustained.  We never

11   got an answer to that question.

12              This Court knows we did not get all the Glaser e-mails.

13   We argued for them.  We didn't get them all.

14              **THE COURT:**  Believe me, you got the pertinent e-mails.

15              **MR. QUINN:**  All right.  We got some that were redacted,

16   but --

17              **THE COURT:**  They may have redactions, but you got the

18   pertinent e-mails.

19              **MR. QUINN:**  Your Honor, we're now leaping to Mr. deAnda

20   and others have doctored files.  Mr. deAnda testified at

21   deposition and at trial that the reasons for the difference in

22   dates as to his investigation file and current state and when the

23   file was open was because it wasn't until 2003 that he got --

24   cleaned up his files, got caught up on them.  He testified to that

25   on the stand.  I think that explains what the Court saw in the law

Page 21

1    and why it's in different ink and why it is where it is, and it's

2    not in sequence.  But that is consistent with his testimony.

3              THE COURT:  Well, the strongest argument that you have

4    is even if MGA is right, on page 66 in the second paragraph, it's

5    of -- is it 1187?

6              MS. HURST:  1195.

7              THE COURT:  1195, thank you.  That as of 2002 it's

8    apparent that Mattel is not only concerned about Carter Bryant but

9    is literally pulling his file out of storage.

10             In the log in 2002 in red ink is the date in September.

11   And regardless of Mr. deAnda's testimony and whether it's doctored

12   or not, in MGA's argument, it's obvious that by 2002 you have got

13   evidence in this record.  So from your position, so what?

14             In other words --

15             MR. QUINN:  It's beyond dispute --

16             THE COURT:  Page 66, 2002, Mattel is inquiring.  The

17   problem is that from MGA's perspective, it looks like a doctored

18   record.

19             MR. QUINN:  The document says that there was -- issue

20   been raised about whether he plagiarized certain Lily Martinez

21   designs.  That is the March 2002 -- the first investigation file

22   with deAnda.  Then in August you have the anonymous letter that

23   comes in.  And we have that exchange of it's forwarded then

24   ultimately to deAnda.  You have the e-mail that's redacted, they

25   say, with the whited-out date.  That goes from deAnda to Alan

Page 22

1    Kaye, the HR person.

2            It's that file that deAnda says it's got one of the

3    dates, I forget the reported date or a current date, but a year

4    later, 2003 in the upper left.  He's got the date right of the

5    anonymous letter in the body of the description.  But at the top

6    it has a 2003 date.  He was asked about that on the stand.  He

7    said, I was behind -- it wasn't until a year later that I actually

8    got around to officially opening a file.  That would explain why

9    it is where it is in the logs.  It's entirely consistent.

10           **THE COURT:**  From MGA's perspective it looks like, from

11   their perspective, that there was no room to insert it either at

12   the beginning of 2003 nor in the middle.  So he stuck it in 2002

13   at the very end in a pang of consciousness.  That's what they're

14   argument is.

15           **MR. QUINN:**  They will argue and attach any sinister

16   explanation they can to anything they can.  Sure.  They will say

17   you should reject Mr. deAnda's explanation; that that undated

18   e-mail that is in that file represents a printout of something

19   that he actually did send to Alan Kaye.  Let them argue that.

20   That's fair game for them to argue.  But to stand before the Court

21   and ask this Court to accept as a proven fact that deAnda, or

22   anybody at Mattel, doctored in that file in the face of the

23   consistent explanations that have been provided is ridiculous, and

24   as a basis for setting aside the privilege and talking about crime

25   fraud.

1        I fully appreciate they are very eager to exercise

2   turnabout here and looking for any occasion to do that.  But they

3   haven't made anywhere near the showing here.  We have an

4   explanation for that, which on its face holds together.  This

5   Court has had an opportunity to examine witnesses in camera.  I'm

6   sure Mr. deAnda would be happy to come down here and talk to the

7   Court about this some more if the Court has any question about it.

8        But this is not a -- we should really -- we are reacting

9   to this on the fly here.  There is a lot of case law under work

10  product doctrine of what it means to be indispensable such that

11  work product needs to be set aside.  And I'm highly confident that

12  if we have a chance to brief this, we all look at this, this is

13  not a case that would come anywhere near meeting those criteria,

14  given all the other evidence, witnesses surrounding this, who they

15  have spoken to and can speak to it, from Ivy Ross, to Cassidy

16  Park, Lily Martinez, to all the different witnesses they have

17  asked in deposition and at trial, were there rumors about Carter

18  Bryant and Bratz?  Did you have suspicions?

19       There is a lot of testimony about that.  There is really

20  no secret about that.  They haven't come anywhere near making the

21  case that they should be able to get into a lawyer's thought

22  processes and what he was thinking on these issues.

23       THE COURT:  Some of this information the Court had asked

24  for as early as the summary judgment.

25       MR. QUINN:  Which -- I'm sorry, specifically?

Page 24

1          **THE COURT:**  Log and the personnel files.

2          **MR. QUINN:**  The log, Your Honor, I think -- I thought

3    the Court asked for that the first time in the middle of trial.

4          **THE COURT:**  Personnel files I know asked for at the

5    summary judgment.

6          **MR. QUINN:**  Personnel files of which persons, Your

7    Honor?

8          **THE COURT:**  Of the people leaving.

9          **MR. QUINN:**  We have a pretty good understanding of this

10   Court's intolerance for disregard of its instructions and order.

11   If the Court ordered us to produce a file and we simply failed to

12   do it months ago, I'm just not knowing what file that would be,

13   Your Honor.  And it doesn't sound like something we would do or

14   something this Court would tolerate.

15        I've just been handed a note by Mr. Zeller.  He says he

16   asked if a file was in the record.

17        **MR. ZELLER:**  You may recall, Your Honor, during the

18   summary judgment argument itself, you inquired of me and I believe

19   Mr. Molinski as well, whether or not this was evidence in the

20   record.  And we both responded no, it was not.

21        Now, I had no understanding or recollection of the Court

22   ordering that produced at that time.  In fact, discovery was over

23   as of that time, Your Honor.

24        **MR. QUINN:**  Thank you, Your Honor.

25        **THE COURT:**  Thank you.  Satisfied?

Page 25

1          MS. HURST:  Submitted, Your Honor.

2          THE COURT:  That's my ruling.  I'll be sitting there

3    waiting for you for the deposition.

4          I suggest, though, that Mr. Quinn I'll leave that to Mr.

5    Quinn.  Go across with Mr. Gordon.  I think ultimately if the

6    Court acts, I think you are going to want to be privy to every

7    opportunity to be present.  And the ultimately responsibility if I

8    act, will be yours, Mr. Quinn.

9          MR. QUINN:  I understand that.

10         THE COURT:  Therefore, I appreciate if you're present;

11   therefore, there can't be any concern or complaint if I do act.

12         MS. KELLER:  Your Honor, on a different topic, Mr. Quinn

13   and I have been discussing a kind of last ditch attempt to see if

14   there is any resolution possible in this matter.

15         THE COURT:  Of what matter?

16         MS. KELLER:  Of the case.  But we can't do that without

17   talking to the carriers and I think the Court was aware we

18   recently tried to round them up.

19         THE COURT:  I can round them up.

20         MS. KELLER:  We're trying to round them up again.

21         THE COURT:  If you need my help in rounding them up, you

22   have got my help.  You have got my blessings, and I'll step in

23   with a heavy hand.

24         MS. KELLER:  I will be contacting the Court about that

25   as soon as we have some details.

1          **THE COURT:**  Okay.  Let's do this.  Let me try to get

2    my -- who is up tomorrow on the examination of witnesses?

3          **MS. KELLER:**  Your Honor, one of the witnesses is

4    Villaseñor, and that's a big problem because we still don't have

5    answers.

6          **THE COURT:**  I have said what I had to say on Saturday.

7    I hope everyone was listening carefully.  I leave that to all of

8    you.  I usually don't repeat myself two or three times because

9    that causes in a sense, a lack of credibility when somebody has to

10   say it three times.  Everybody should be very, very careful and

11   listen very intently to what I have said.

12         So what I'm worried about, frankly, and I'll put it on

13   the record, is exhaustion of counsel.  I'm feeling great.  I lost

14   my voice yesterday, which all judges should lose.  It was a

15   blessing.  Now, it's back.  I'm worried about Ms. Hurst.  I'm not

16   worried about Mr. Gordon.  He's just floating in and out of the

17   case.  I'm worried about Mr. Quinn being up tonight.  But there's

18   no other options.  So here I am.

19         I suggest to you that you get back to the depositions.

20   If you need my help with the carriers, I'll order them in.  I

21   don't need Judge Tevrezian to order them.  In fact, if you get

22   serious about this, you can take place right here in the

23   courthouse.  No reason to be running down the highway to Judge

24   Tevrezian.  He can come up the highway here.

25         **MS. KELLER:**  We would not be having Judge Tevrezian

Page 27

1   preside over that mediation with the carriers.

2          THE COURT:  I don't want to go any further.  I don't

3   want to know.  But I can order them in here if you want, John,

4   Jennifer.

5          MR. QUINN:  What they talked about was ordering them in

6   tomorrow.

7          THE COURT:  That's up to you two.  Remember this --

8          MR. QUINN:  It's their issue with the carriers.  It

9   isn't a Mattel issue.

10          THE COURT:  I see.  I don't want to know too much.  Let

11   me leave it that way.

12          John, I'm at your disposal.  I'll put it on the record

13   on a first name basis.

14          Jennifer, also known as Ms. Keller, Mr. Quinn, I'm at

15   your disposal.  But what I don't want to do is become involved in

16   settlement negotiations because if I stepped into this case and

17   tried to settle it, it would be with a heavy hand.  And then the

18   other party would distrust my rulings.

19          What do I need to do for both of you?

20          MS. KELLER:  Your Honor, if we can get the carriers and

21   contact them, we will let the Court know.  It's now a quarter of

22   nine.  I have to examine witnesses tomorrow.  My voice is going

23   too.

24          THE COURT:  Go.  Go.  I was going to do jury

25   instructions tonight but that seems ludicrous now, doesn't it?

1              Mr. Overland, I would like to put this on the record.  I

2    would like to memorialize our informal conversation, I think it

3    was Sunday, and that is, do I have your consent to take out the

4    two instructions that refer to a translator?

5              **MR. OVERLAND:**  Yes, Your Honor.

6              **THE COURT:**  Second, you know I have had a discussion

7    with Mr. Cote, you and everyone concerning Machado.  If all

8    parties want the Court to go forward and decide this -- and there

9    is no prejudice in deciding this, Mr. Zeller, to Mattel; and there

10   is no prejudice in deciding this to MGA, and you are asking for

11   that to occur, Mr. Overland, Mr. Cote, I'm happy to do that.

12             I was deeply concerned about two things:  At the summary

13   judgment that was a close call for the Court.  I thought that my

14   wisdom would be that I wanted to hear actual evidence on that

15   issue up to a rule 50.  And my wisdom at that time was there was

16   no harm in hearing the conclusion of the defendant's case at

17   either deciding it at that time or letting it go to the jury and

18   deciding it either before or after a verdict.  It didn't matter.

19             If all three of you want me to go forward with that

20   ruling, we can argue it one more time sometime this weekend.  And

21   I will be prepared to hand out a ruling for you.  Because I know

22   one or more of you may be in a box.  But I was deeply concerned

23   about what I would do to instruct the jury, how each party might

24   complain.  And I'll just leave it at that, because that's a

25   private discussion between counsel.

1        I think wisdom says that I'm going sit here and wait for

2    Mr. Quinn and Ms. Hurst, and you are going to go home tonight.

3        **MR. OVERLAND:**  Appreciate that.

4        **THE COURT:**  I guess I'm going to sit here.

5        **MR. MCCONVILLE:**  Judge, I have some courtesy copies of

6    things that I have filed today.  Do you want me to hand them to

7    you?

8        **THE COURT:**  I'll lose them tonight.  Give me the

9    courtesy copies.  I might as well read them while I'm waiting.

10        (Whereupon the reported proceedings were adjourned

11    at 8:45 p.m.)

12

13                            -oOo-

14

15                         CERTIFICATE

16

17        I hereby certify that pursuant to Section 753, Title 28,

18    United States Code, the foregoing is a true and correct transcript

19    of the stenographically reported proceedings held in the

20    above-entitled matter.

21

22    Date:  MARCH 22, 2011

23

24    _____

25    MARIA DELLANEVE, U.S. COURT REPORTER