1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     John B. Quinn (Bar No. 090378)
2    (johnquinn@quinnemanuel.com)
     William C. Price (Bar. No. 108542)
3    (williamprice@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
4    (michaelzeller@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:   (213) 443-3100

7  Attorneys for Mattel, Inc. and
   Mattel de Mexico, S.A. de C.V.

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                        SOUTHERN DIVISION

12  | MATTEL, INC., a Delaware | CASE NO. CV 04-9049 DOC (RNBx) |
    | corporation, and Mattel de Mexico, | Consolidated with |
13  | S.A. de C.V., | Case No. CV 04-09059 |
    | | Case No. CV 05-02727 |
14  |             Plaintiff, | |
    | | Hon. David O. Carter |
15  |        vs. | |
    | | **MATTEL'S TRIAL BRIEF RE MGA'S** |
16  | MGA ENTERTAINMENT, INC., a | **LIABILITY FOR ITS SUBSIDIARIES'** |
    | California corporation, et al., | **INFRINGEMENT OF MATTEL'S** |
17  | | **COPYRIGHTS AND** |
    |             Defendant. | **MISAPPROPRIATION OF MATTEL'S** |
18  | | **TRADE SECRETS** |

19  AND CONSOLIDATED ACTIONS

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Statement of Facts................................................................................................ 1

Argument ............................................................................................................ 3

I.   U.S. COPYRIGHT LAW AND THE UNIFORM TRADE SECRETS ACT PERMIT MATTEL TO RECOVER FEES PAID TO MGA ENTERTAINMENT BY ITS SUBSIDIARIES. .................................... 3

II.  MGA ENTERTAINMENT IS LIABLE BECAUSE ITS SUBSIDIARIES ARE ITS ALTER EGOS. .................................... 6

     A.   MGA And Its Subsidiaries Clearly Meet The Unity Of Interest And Ownership Test. ........................................................ 6

     B.   Recognizing Corporate Separateness Where None Exists Would Prejudice Mattel. ............................................................ 8

III. MGA ENTERTAINMENT IS LIABLE BECAUSE ITS SUBSIDIARIES ARE ITS AGENTS. .................................... 10

     A.   MGA Entertainment Is Liable Under The Law Of Agency Because Its Subsidiaries Act For It While MGA Entertainment Retains Control. ............................................................... 10

          1.   MGA Entertainment Manifested That Its Subsidiaries Act As Its Agents ......................................................... 11

          2.   Assent by MGA Subsidiaries ....................................... 13

          3.   Control by MGA Entertainment ................................... 14

     B.   MGA Entertainment Is Also Liable Under Agency Principles Because Without Subsidiaries, MGA Entertainment Would Design, Distribute, And Sell Bratz Products Internationally............... 16

Conclusion ........................................................................................................ 18

# TABLE OF AUTHORITIES

**Page**

## Cases

Aurora World v. Ty,
719 F. Supp. 2d 1115 (C.D. Cal. 2009)....................................................................5

Bauman v. DaimlerChrysler AG,
2005 WL 3157472 (N.D. Cal. Nov. 22, 2005) .......................................................18

Bouchat v. Bon-Ton Department Stores,
506 F.3d 315 (4th Cir. 2007)...................................................................................5

Bowoto v. Chevron Texaco Corp.,
312 F. Supp. 2d 1229 (N.D. Cal. 2004)..................................................10, 13, 15

Chan v. Society Expeditions, Inc.,
39 F.3d 1398 (9th Cir. 1994)..................................................................................18

In re Coupon Clearing Service, Inc.,
113 F.3d 1091 (9th Cir. 1997).................................................................................14

Dong AH Tire & Rubber Co., Ltd. v. Glasforms, Inc.,
2009 WL 975817 (N.D. Cal. April 10, 2009) ......................................9, 11, 13, 14

E. & J. Gallo Winery v. EnCana Energy Services, Inc.,
2008 WL 2220396 (E.D. Cal. May 27, 2008).........................................................11

First Western Bank & Trust Co. v. Bookasta,
267 Cal. App. 2d 910 (1968) ...................................................................................6

Greenspan v. LADT, LLC,
2010 WL 5395685 (Cal. Ct. App. December 30, 2010) .......................................6, 7

Hoffman v. Harmony Pictures, Inc.,
2002 WL 31716686 (Cal. Ct. App. Dec. 4, 2002) ..................................................7

Kohn v. Kohn,
95 Cal. App. 2d 708 (1950) ...................................................................................10

Larball Pub. Co., Inc. v. CBS Inc.,
664 F. Supp. 704 (S.D.N.Y. 1987) ........................................................................18

Lockheed Martin Corp. v. Network Solutions, Inc.,
1997 WL 381967 (C.D. Cal. March 19, 1997).........................................................3

Logix Development Corp. v. Faherty,
2007 WL 3358745 (Cal. Ct. App. Nov. 14, 2007)...................................................9

Los Angeles News Service v. Reuters Television International,
149 F.3d 987 (9th Cir. 1998)...................................................................................5

Magnecomp Corp. v. Athene Co.,
209 Cal. App. 3d 526 (1989)...................................................................................5

00505.07975/4046198.1

1   Mahurkar v. C.R. Bard, Inc.,
2       2003 WL 355636 (N.D. Ill. Feb. 13, 2003) ................................................. 3

3   McCollum v. Friendly Hills Travel Center,
        172 Cal. App. 3d 83 (1985) ................................................................. 11

4   McCormack & Dodge Corporation v. ABC Management Systems, Inc. et al.,
5       222 U.S.P.Q. 432 (Wash. Super. Ct. 1983) .......................................... 5

6   Mesler v. Bragg Management Co.,
        39 Cal. 3d 290 (1985) ...................................................................... 8

7   Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.,
8       969 F.2d 764 (9th Cir. 1992) ............................................................ 6

9   Modesto City Schools v. Riso Kagaku Corp.,
        157 F. Supp. 2d 1128 (E.D. Cal. 2001) ......................................... 11, 14

10  Mohammed v. Watson Pharmaceuticals Inc.,
11      2009 WL 857517 (C.D. Cal. March 26, 2009) ................................. 17

12  Neu v. Terminix Intern., Inc.,
        2008 WL 962096 (N.D. Cal. April 8, 2008) ................................... 17

13  Nichols v. Arthur Murray, Inc.,
14      248 Cal. App. 2d 610 (1967) .......................................................... 14

15  Oculus Innovative Sciences, Inc. v. Nofil Corp.,
        2007 WL 205068 (N.D. Cal. Jan. 25, 2007) ................................... 3

16  Paramount Farms, Inc. v. Ventilex B.V.,
17      735 F. Supp. 2d 1189 (E.D. Cal. 2010) ......................................... 16

18  Remington Rand Corporation-Delaware v. Business Systems Inc.,
        830 F.2d 1260 (3d Cir. 1987) ........................................................ 5

19  Salton v. Philips Domestic Appliances and Personal Care,
20      391 F.3d 871 (7th Cir. 2005) ........................................................ 3

21  Shanghai Minguang Intern. Group Co., Ltd. v. Yang,
        2008 WL 4004697 (Cal. Ct. App. Aug. 29, 2008) .......................... 9

22  Smith v. Schuttpelz,
23      1 Cal. 2d 158 (1934) .................................................................... 12

24  Standing v. Watson Pharmaceuticals, Inc.,
        2009 WL 842211 (C.D. Cal. March 26, 2009) ............................... 17

25  Temple v. Synthes Corp., Ltd.,
26      498 U.S. 5 (1990) ........................................................................ 3

27  Therapeutic Research Faculty v. NBTY, Inc.,
        488 F. Supp. 2d 991 (E.D. Cal. 2007) ......................................... 5

28  Troyk v. Farmers Group, Inc.,
        171 Cal. App. 4th 1305 (2009) ..................................................... 7

1

## **Statutes**

2

17 U.S.C. § 504(b) .................................................................................................4-5

3

## **Miscellaneous**

4

Restatement (Third) of Agency § 1.03 (2006) ................................................... 12, 13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Preliminary Statement**

MGA is liable for sales of Bratz anywhere in the world, even if sold through an MGA subsidiary.  The jury should decide whether to award damages for such sales.  Corporate parents are routinely held liable for their subsidiary's tortious conduct under federal copyright law, the Uniform Trade Secrets Act, alter ego theory, and the law of agency.  Because all apply here, Mattel can recover damages from MGA based on its foreign and domestic subsidiaries' infringement of Mattel's copyrights and misappropriation of Mattel's trade secrets.

MGA is liable under U.S. copyright law because it contributes to the design and sale of infringing Bratz product, making it a joint tortfeasor.  MGA is liable under the Uniform Trade Secrets Act because it applies to *all* acts of misappropriation, allowing recovery of profits from foreign sales.  MGA is liable under an alter ego theory because its subsidiaries are completely owned and controlled by MGA, really Larian, such that the difference between MGA and its subsidiaries is in name only.  Because MGA disregards the corporate separateness between itself and its subsidiaries, it would be inequitable to allow MGA to assert previously unobserved separateness to defeat Mattel's claims.  MGA is also liable under the law of agency because its subsidiaries exist only to conduct business on behalf of MGA, which completely controls its subsidiaries' activities and in their absence, would transact the same business.

**Statement of Facts**

Before 2002, MGA had a very basic corporate structure, composed of two separate companies – MGA Hong Kong ("MGA HK") and MGA US.[1]  MGA HK functioned as a sourcing agent for MGA US, coordinating with third-party vendors to manufacture all MGA's Bratz products, while MGA US performed almost all of the Bratz design, development, and planning and made sales of Bratz products to

1  customers worldwide.  In October of 2002, soon after the introduction of Bratz to

2  the US market, MGA's corporate structure became more convoluted.  MGA US

3  continued to make sales to US customers, but MGA HK, now made all sales of

4  Bratz products to non-US customers.  Moreover, MGA HK began to manufacture

5  Bratz products for the entire MGA organization under an intellectual property ("IP")

6  license granted from MGA Mauritius, a holding company.  MGA Mauritius licensed

7  MGA's claimed Bratz intellectual property from MGA US.  Accordingly, MGA HK

8  paid royalties to MGA Mauritius, which, in turn, paid royalties to MGA US on each

9  and every Bratz doll sold by MGA HK.  Beginning in 2005, shortly after the filing

10  of this lawsuit, MGA's corporate structure became even more complicated.  While

11  MGA established a global network of subsidiaries and holding companies, the end

12  result did not change.  MGA HK manufactures all of MGA's Bratz products, MGA

13  HK and other of MGA's subsidiaries make all sales of Bratz products to non-US

14  customers, and revenue from these operations flows back to MGA US and its

15  shareholders in the form of royalties and dividends.

16      Each of MGA's subsidiaries is entirely owned and unquestionably controlled

17  by MGA US, and ultimately, Isaac Larian who owns 82 percent of MGA US.  MGA

18  US has two shareholders – Isaac Larian and Jahangir Makabi, Isaac's brother-in-law

19  – who are also on the board of directors MGA US and – almost all of MGA's

20  international subsidiaries.  While there are other directors for some of these

21  international subsidiaries, as is required by local law, none of these subsidiaries act

22  independently from MGA US or exercise any independence with respect to their

23  operations.  As detailed herein, trial testimony and exhibits have shown that (1)

24  MGA US and Larian routinely disregarded legal separateness by commingling funds

25  and assets of one corporation with another, treating corporate funds as personal, and

26  mirroring ownership and management across the organization, and (2) MGA US and

27 

28  [1]  Formally, "MGA Entertainment, Inc.," but for clarity, referred to here as (footnote continued)

1  Larian ultimately made sure that all profits from Bratz sales worldwide were
2  repatriated MGA US.  In reality, MGA's global network of subsidiaries is merely an
3  extension of MGA US, and ultimately, Isaac Larian.

<strong><u>Argument</u></strong>

4  **I.   <u>U.S. COPYRIGHT LAW AND THE UNIFORM TRADE SECRETS</u>**
5  **<u>ACT PERMIT MATTEL TO RECOVER FEES PAID TO MGA</u>**
6  **<u>ENTERTAINMENT BY ITS SUBSIDIARIES.</u>**

7          In patent, trademark, misappropriation of trade secrets, and copyright
8  infringement cases, a plaintiff may sue any member of the distribution chain as an
9  alleged joint tortfeasor.  <u>Temple v. Synthes Corp., Ltd.</u>, 498 U.S. 5, 7 (1990) ("not
10 necessary for all joint tortfeasors to be named as defendants in a single lawsuit");
11 <u>Salton v. Philips Domestic Appliances and Personal Care</u>, 391 F.3d 871, 877 (7th
12 Cir. 2005) ("Under the principle of joint and several liability, which governs not
13 only the common law tort of misappropriation of trade secrets but also the federal
14 statutory tort of copyright infringement, the victim of a tort is entitled to sue any of
15 the joint tortfeasors and recover his entire damages from that tortfeasor. While the
16 defendant may have a right to contribution (<i>i.e.</i>, to a sharing of the pain) from the
17 other tortfeasors, the victim is not required to sue more than one of his
18 oppressors."); <u>Oculus Innovative Sciences, Inc. v. Nofil Corp.</u>, 2007 WL 205068, at
19 *2 (N.D. Cal. Jan. 25, 2007) (not necessary for all joint tortfeasors to be named as
20 defendants in action for misappropriation of trade secrets, trademark infringement,
21 unfair competition, and interference with economic advantage.); <u>Mahurkar v. C.R.</u>
22 <u>Bard, Inc.</u>, 2003 WL 355636, at *5 (N.D. Ill. Feb. 13, 2003) (summary judgment
23 denied because parent could be held liable on joint tortfeasor theory of liability with
24 subsidiary for patent infringement.); <u>Lockheed Martin Corp. v. Network Solutions,</u>
25 <u>Inc.</u>, 1997 WL 381967, at *3 (C.D. Cal. March 19, 1997) ("Courts have long held

_____

"MGA US."

that in patent, trademark, literary property, and copyright infringement cases, any member of the distribution chain can be sued as an alleged joint tortfeasor. Since joint tortfeasors are jointly and severally liable, the victim of trademark infringement may sue as many or as few of the alleged wrongdoers as he chooses; those left out of the lawsuit are not indispensable parties.") (citations and internal punctuation omitted).  The fact that others may have contributed to a plaintiff's injuries does not absolve a defendant of liability, nor is a plaintiff required to join all potential joint tortfeasors.

MGA and its subsidiaries are tortfeasors.  Prior to 2002, almost all design, development, and production planning work of Bratz occurred at MGA US.[2] However, beginning in 2002, in conjunction with MGA's corporate reorganization, MGA HK[3] took partial responsibility for product design and development, actively managed the production planning process, and conducted quality control and testing activities.[4]  MGA HK also took full responsibility for Bratz manufacturing and all non-US distribution of Bratz products.  Moreover, as MGA's corporate structure further developed and MGA established its global network of subsidiaries, each of those subsidiaries assumed responsibility for the distribution of Bratz products within their respective global regions.  MGA and these subsidiaries work together to design, manufacture, advertise, and sell Bratz products to customers around the world.  Accordingly, they all jointly contribute to the design and sale of infringing Bratz products, making them joint torfeasors under the law.

Under section 504(b) of the Copyright Act, a copyright owner may recover damages as follows:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, *and any*

---

[2]   TX 22013-7.
[3]   MGA had no subsidiaries prior to 2002 and MGA HK was the first of MGA's international subsidiaries.
[4]   TX 22013-10.

> *profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.*

17 U.S.C. § 504(b) (emphasis added).  The plain language of the statute provides that profits obtained from the infringement of a copyright are recoverable, in addition to actual damages suffered.  Revenues obtained from licensing an infringing copyright may be considered "infringement profits" under section 504(b). Bouchat v. Bon-Ton Department Stores, 506 F.3d 315, 329-330 (4th Cir. 2007).

The Ninth Circuit has held that a plaintiff may "recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants."  Los Angeles News Service v. Reuters Television International, 149 F.3d 987, 992 (9th Cir. 1998) ("Reuters III").  Here, MGA Entertainment's design, control and direction of the production, sales and marketing of Bratz products qualify as domestic acts of infringement which establish a basis for Mattel's recovery.  See Aurora World v. Ty, 719 F. Supp. 2d 1115, 1131, n.38 (C.D. Cal. 2009) (considering whether evidence that design of an accused product was accomplished or directed from the U.S.).

A plaintiff can prevail on a claim of misappropriation of trade secrets under California law by showing either damage as a result of the misappropriation or unjust enrichment.  Therapeutic Research Faculty v. NBTY, Inc., 488 F. Supp. 2d 991, 1000 (E.D. Cal. 2007).  Under the Uniform Trade Secrets Act, damages from misappropriation of trade secrets may include profits from overseas sales or through transactions with foreign agents.  See McCormack & Dodge Corporation v. ABC Management Systems, Inc. et al., 222 U.S.P.Q. 432, 444 (Wash. Super. Ct. 1983) (Uniform Trade Secrets Act "applies to all acts of misappropriation . . . caused by agents, licensees, employees, and those in privity" therewith); see also Remington Rand Corporation-Delaware v. Business Systems Inc., 830 F.2d 1260, 1262 (3d Cir. 1987) (U.S. trade secret owner permitted to sue in the United States to prevent unauthorized foreign disclosure or use); cf. Magnecomp Corp. v. Athene Co., 209 Cal. App. 3d 526, 538-539 (1989) (misappropriation of trade secrets from California

- 5 -

corporation imputed to foreign corporation by virtue of its domestic agent's act of misappropriation).  As detailed above,  MGA Entertainment, Inc.'s conduct resulted in significant profits from overseas sales through transactions and payment of royalties by its wholly-owned and controlled foreign subsidiaries.  Whether through distributions to the shareholders or royalty payments to the parent corporation, profits from these overseas sales flowed up through the corporation – ending up in the coffers of MGA Entertainment, Inc. and Mr. Larian's pocket.[5]  Under the Uniform Trade Secrets Act, Mattel is entitled to recover those profits.

## II.   MGA ENTERTAINMENT IS LIABLE BECAUSE ITS SUBSIDIARIES ARE ITS ALTER EGOS.

### A.   MGA And Its Subsidiaries Clearly Meet The Unity Of Interest And Ownership Test.

California courts have long "followed a liberal policy of applying the alter-ego doctrine where the equities and justice of the situation appear to call for it."[6] First Western Bank & Trust Co. v. Bookasta, 267 Cal. App. 2d 910, 915 (1968); accord Greenspan v. LADT, LLC, 2010 WL 5395685, at *9 (Cal. Ct. App. December 30, 2010) ("The essence of the alter ego doctrine is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.") (internal punctuation and citations omitted).

Two conditions must exist to establish alter ego liability:

_____

[5]   TX 8124-R-2; Trial Tr., dated February 22, 2011, Vol. 2 at 152:19-23.
[6]   The Court need not determine whether federal common law or California state law governs alter ego liability in this case, as the tests are functionally identical.  See Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc., 969 F.2d 764, 769 n.3 (9th Cir. 1992) (Federal and California alter ego doctrines are "substantially similar" and application of either doctrine would produce the same result); Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1236 n.6 (N.D. Cal. 2004) ("California law on piercing the corporate veil is substantially similar to the rule announced in federal cases.") (citations omitted).

First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.

Troyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305, 1341 (2009).

Unity of interest and ownership depends on the facts of a particular case. See Greenspan, 2010 WL 5395685, at *14 ("a court must examine all the circumstances to determine whether to apply the [alter ego] doctrine"). No one factor is determinative; even if corporate formalities are observed, alter ego liability will be imposed if the difference between the parent and subsidiary is, in substance, minimal. See Hoffman v. Harmony Pictures, Inc., 2002 WL 31716686, at *4 (Cal. Ct. App. Dec. 4, 2002) (alter ego liability was appropriate even though parent and subsidiary maintained separate corporate books, bank accounts, contracts, employees, and business addresses).[7] Here, MGA's relationship with its

---

[7]   Other factors courts have considered include (1) "commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses," (2) "the treatment by an individual of the assets of the corporation as his own,  (3) "the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities" (4) "the identical equitable ownership in the two entities," (5) "the identification of the equitable owners thereof with the domination and control of the two entities," (6) "identification of the directors and officers of the two entities in the responsible supervision and management," (7) "sole ownership of all of the stock in a corporation by one individual or the members of a family," (8) "the use of the same office or business location," (9) "the employment of the same employees and/or attorney," (10) "the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization," (11) "the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation," (12) "the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities," (13) "the disregard of legal formalities and the failure to maintain arm's length relationships among related entities," (14) "the use of the corporate entity to procure labor, services or merchandise for another person or entity," (15) "the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another," (16) "the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal (footnote continued)

1   subsidiaries clearly satisfies the test.   Mattel has presented ample and

2   uncontradicted evidence of commingling of funds, unauthorized diversion of

3   corporate assets, treatment of the corporation's assets as belonging to an individual,

4   similar identification of directors and managers, the disregard of legal formalities,

5   such as shareholder and board meetings, and diversion of assets of the corporation

6   by a stockholder.

7          All of MGA's international subsidiaries are "100 percent owned by the MGA

8   parent corporation"[8] and "ultimately controlled by MGA U.S.A.," the MGA parent

9   company – MGA Entertainment.[9]  MGA Entertainment, Inc.'s two owners comprise

10  the board of directors of most of MGA's international subsidiaries.[10]  MGA

11  routinely disregards any legal formalities between itself and its subsidiaries –

12  directing the concentration of assets in one subsidiary and liabilities in another or

13  the transfer of assets from a subsidiary to the shareholders of the parent company.[11]

14  MGA treats itself and its international subsidiaries as a single company.[12]

15          **B.       <u>Recognizing Corporate Separateness Where None Exists Would</u>

16                   <u>Prejudice Mattel.</u>**

17          Allowing MGA to hide behind its purportedly separate foreign subsidiaries

18  would be inequitable.  As the California Supreme Court recognized in a suit against

19  parent to hold it liable for tort of its subsidiary under alter ego theory, "separate

20  corporate entity will not be honored where to do so would be to defeat the rights and

21  equities of third persons."  <u>Mesler v. Bragg Management Co.</u>, 39 Cal. 3d 290, 300-

22  _____

23  transactions," and (17) "the formation and use of a corporation to transfer to it the
24  existing liability of another person or entity."  <u>Greenspan</u>, 2010 WL 5395685, at *14
    (quoting <u>Zoran Corp. v. Chen</u>, 185 Cal. App. 4th 799, 811-812 (2010).
        [8]   Trial Tr., dated February 22, 2011, Vol. 2, at 155:16-22.
25      [9]   <u>Id.</u> at 156:3-6.
        [11]  <u>See</u> TX 23947 (MGA's VP of Finance and Taxation determined the size and
26  amount of a distribution to be paid from one of MGA's subsidiaries in the
    Netherlands, enacting their plan without any consultation of the Netherlands).
27      [11]  <u>See</u> TX 23947 (MGA's VP of Finance and Taxation determined the size and
    amount of a distribution to be paid from one of MGA's subsidiaries in the
28  Netherlands, enacting their plan without any consultation of the Netherlands).

00505.07975/4046198.1

1  301 (1985).   Indeed, "the paradigm for the application of the alter ego doctrine" is

2  the inequitable result caused when a defendant "create[s] a corporate shell for the

3  purpose of shielding him from liabilities that he has created" – precisely what would

4  happen here if MGA were able to escape liability for the wrongdoing of its

5  subsidiaries, denying Mattel a full recovery for the wrongs at issue here.  See Logix

6  Development Corp. v. Faherty, 2007 WL 3358745, at *13 (Cal. Ct. App. Nov. 14,

7  2007) (inequitable result if corporate form shielded individual from adverse

8  economic impact); accord Shanghai Minguang Intern. Group Co., Ltd. v. Yang,

9  2008 WL 4004697, at *8 (Cal. Ct. App. Aug. 29, 2008) (inequitable result if

10  corporate form was used by an individual to evade liability created by an entity with

11  which he had a unity of interest).

12        Here, the evidence shows that MGA and its subsidiaries regularly engage in

13  strategic, orchestrated intercompany transactions to avoid responsibility for taxes

14  and other obligations under the law.  For example, Brian Wing, MGA's Senior Vice

15  President of Finance and Taxation and later, its CFO, devised a plan to allow Isaac

16  Larian to extract money from MGA and avoid US tax consequences.[13]  Mr. Wing

17  proposed and Isaac Larian approved a plan for MGA and its subsidiaries in Hong

18  Kong and the Netherlands to engage in a structured transaction to move money from

19  the United States to the Netherlands, the goal being to allow Isaac Larian to extract

20  $30 million from the organization "and save at least $4.5M in tax."[14]  Similarly, Mr.

21  Wing ordered artificial payments between MGA subsidiaries to occur to "clear our

22  [MGA's] US payables…before tax payments in the US are due."[15]  MGA's abuse of

23  the corporate form should not permit it to evade liability and deprive Mattel of any

24  remedy for infringing Mattel's copyrights and misappropriating Mattel's trade

25  secrets.  See Dong AH Tire & Rubber Co., Ltd. v. Glasforms, Inc., 2009 WL

26  _____

27  [12] Trial Tr., dated February 22, 2011, Vol. 2, at 151:21-156:6, 158:15-24.
    [13] TX 23947.
28  [14] Id.

975817, at *6 (N.D. Cal. April 10, 2009) (equity required disregarding subsidiary's separate corporate identity because parent was "equally responsible for harm caused."); see also Kohn v. Kohn, 95 Cal. App. 2d 708, 719-720 (1950) (finding it would be inequitable not to include income generated by defendant's half-owned corporation in the calculation of his liability).

There is no question that MGA HK manufactures Bratz dolls for the entire MGA organization and that MGA US and its global subsidiaries sell Bratz dolls to customers within the US and abroad, respectively.  There is no question that profits from MGA's sales of Bratz products eventually make their way back to MGA US or to its individual shareholders in the form of dividends or royalties.[16]  All that is left to decide is whether the Bratz dolls were created with Mattel's intellectual property. If the jury finds that MGA created the Bratz dolls using the Bratz designs and concepts that Bryant created at Mattel, then Mattel should be able to recover damages for all infringing sales – both foreign and domestic.

## III.  MGA ENTERTAINMENT IS LIABLE BECAUSE ITS SUBSIDIARIES ARE ITS AGENTS.

### A.  MGA Entertainment Is Liable Under The Law Of Agency Because Its Subsidiaries Act For It While MGA Entertainment Retains Control.

MGA Entertainment can also be directly liable for the conduct of its subsidiaries under agency law.  Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1238-40 (N.D. Cal. 2004) (applying agency law to deny summary judgment because "it may be found that the parent company is the real party to a transaction conducted by the illusory subsidiary and responsible for its transactions as a principal").  To establish a principal-agent relationship, "(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must

---

[15]  TX 8129.

accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking." Dong AH Tire & Rubber Co., Ltd., 2009 WL 975817, at *7; accord McCollum v. Friendly Hills Travel Center, 172 Cal. App. 3d 83, 91 (1985) (holding that because "[a]n agent is anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter, and to render an account of such transactions," an agency relationship was established).[17] Each of the factors considered by courts in determining whether an agency relationship exists are clearly met here.

### 1. MGA Entertainment Manifested That Its Subsidiaries Act As Its Agents

The first factor is whether there has been "a manifestation by the principal that the agent shall act for him." Dong AH Tire & Rubber Co., Ltd., 2009 WL 975817, at *7. Such a manifestation can be shown by sales, marketing, or licensing arrangements between the parent and its subsidiary. See E. & J. Gallo Winery v. EnCana Energy Services, Inc., 2008 WL 2220396, at *8 (E.D. Cal. May 27, 2008) (manifestation that subsidiary would act for parent evidenced by fact subsidiary was set up and sales occurred); Modesto City Schools v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1136 (E.D. Cal. 2001) (denying motion to dismiss because jury

_____

[16] TX 22013-6 to -7.
[17] For Mattel's copyright claims, federal common law, which relies on the Restatement of Agency, governs the existence of an agency relationship between MGA and its subsidiaries. See E. & J. Gallo Winery v. EnCana Energy Services, Inc., 2008 WL 2220396, at *5 (E.D. Cal. May 27, 2008) (agency with respect to Sherman Act claim determined by federal common law, which relies on the Restatement of Agency). The existence of an agency relationship with respect to MGA's misappropriation of trade secrets is determined by California law. See id.(agency with respect to claims arising from California's Cartwright Act and Unfair Competition Law determined by California state law.). It appears the determination of agency under both federal and state law requires the same analysis; Mattel relies predominantly on federal law, but cites California state court decisions when they are consistent with federal law. See id. at *11 n.5 (propositions from state court decision are persuasive because they are supported by both state and federal authority).

could find agency relationship from fact that subsidiary was the exclusive means parent marketed and sold its products abroad, the subsidiary's product line was comprised solely of parent's products, and nearly 20% of parent's production sold through subsidiary).  Manifestation need not be express; it can be implied from conduct.  Smith v. Schuttpelz, 1 Cal. 2d 158, 161 (1934) ("relation of agency need not depend upon express appointment and acceptance thereof, but it may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case."); see Restatement (Third) of Agency § 1.03 (2006) ("A person manifests assent or intention through written or spoken words or other conduct.").

MGA's licensing agreements with MGA Hong Kong, MGA UK, MGA Canada, and MGA France, among others, manifest MGA Entertainment's intent that its international subsidiaries act on its behalf to sell product internationally.  MGA Entertainment licenses the Bratz intellectual property to foreign subsidiaries.[18] These subsidiaries license the Bratz intellectual property to MGA HK, which manufactures all Bratz products.[19]  In addition to selling Bratz products directly to retailers, MGA HK sells the Bratz products to each of MGA's international subsidiaries, which then sell the Bratz products to retailers, for sale to non-US customers.[20]

MGA has also manifested that it has an agency relationship with its subsidiaries by the actions of its principal.  Isaac Larian and MGA were actively involved in the creation and staffing of MGA's subsidiaries.  Isaac Larian, as MGA's President, CEO, and 82% shareholder made the decision to establish each of these international subsidiaries.  In addition, he, Ron Brawer, Thomas Pfau, and other MGA employees hand selected and hired individuals to operate the

---

[18]  Trial Transcript, dated February 22, 2011, Vol. 2, at 160:21-161:25.
[19]  Id. at 159:6-10.

1  subsidiaries.[21]  MGA shared information with its subsidiaries, sent them Bratz

2  product manufactured by it HK subsidiary to sell, and allowed them access to

3  MGA's systems and processes.  MGA has clearly manifested the intent  that these

4  subsidiaries act as its agents.

### 2.  Assent by MGA Subsidiaries

6  The second factor is whether the agent accepted the undertaking.  Dong AH

7  Tire & Rubber Co., Ltd., 2009 WL 975817, at *7.  Assent may be inferred from the

8  conduct of the subsidiary.  See Restatement (Third) of Agency § 1.03 cmt. d ("[I]t is

9  not necessary to the formation of a relationship of agency that the agent manifest

10  assent to the principal, as when the agent performs the service requested by the

11  principal following the principal's manifestation.").

12  MGA's licensing agreements with MGA Hong Kong, MGA UK, MGA

13  Canada, and MGA France, among others, establish that MGA's international

14  subsidiaries assented to act on its behalf to sell product internationally.  In addition

15  to selling Bratz products directly to retailers, MGA HK sells the Bratz products to

16  each of MGA's international subsidiaries, which then sell the Bratz products to

17  retailers, for sale to non-US customers.[22]  MGA's international subsidiaries assented

18  to the agency relationship by agreeing to the licensing agreements,  selling Bratz

19  product abroad and returning profits to MGA Entertainment.  See Bowoto v.

20  Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1245 (N.D. Cal. 2004) (summary

21  judgment denied because finding that subsidiary's revenues directly benefited the

22  parent supported agency relationship).

23  MGA's international subsidiaries also assented to the agency relationship by

24  taking commands from MGA, its shareholders, and its employees.  MGA's

25

---

26  [20]  See TX 21622-7; Trial Transcript, dated February 22, 2011, Vol. 2, at 154:12-20.

27  [21]  TX 21384, 21599, and 21606.

28  [22]  See TX 21622-7; Trial Transcript, dated February 22, 2011, Vol. 2, at 154:12-20.

1  subsidiaries willingly engaged in structured transactions to help MGA and its

2  shareholders avoid tax liability,[23] and acted in the best interests of MGA without

3  regard to their own needs.[24]   Moreover, these subsidiaries never disobeyed directives

4  from MGA or its shareholders.[25]   MGA's subsidiaries have clearly agreed to act as

5  MGA's agents and have assented to an agency relationship.

6  ### 3.   Control by MGA Entertainment

7          The third factor is whether there was "an understanding between the parties

8  that the principal is to be in control of the undertaking."   Dong AH Tire & Rubber

9  Co., Ltd., 2009 WL 975817, at *7.   The principal need not *exercise* any control to

10  establish an agency relationship; the *ability* to control the subsidiary is sufficient.

11  See In re Coupon Clearing Service, Inc., 113 F.3d 1091, 1099 (9th Cir. 1997) ("The

12  right to control, rather than its exercise is sufficient to meet [the agency] standard.");

13  Nichols v. Arthur Murray, Inc., 248 Cal. App. 2d 610, 614 (1967) (liability under

14  agency established because "control over almost every aspect of the operation" was

15  retained by the licensor by contract with licensee); Modesto City Schools v. Riso

16  Kagaku Corp., 157 F. Supp. 2d at 1134 (control need not be exercised to establish

17  agency relationship).

18          MGA and Mr. Larian have precisely such power over MGA's subsidiaries.

19  Lisa Chan, MGA's 30(b)(6) witness on the MGA corporate structure and former

20  Vice-President of Tax, testified that all of MGA's international subsidiaries are "100

21  percent owned by the MGA parent corporation"[26] and "ultimately controlled by

22  MGA U.S.A.," the MGA parent company.[27]   Moreover, MGA personnel can and do

23  actively direct MGA's subsidiaries.[28]   Indeed, Ms. Chan, who served on the board of

24

25    [23]  TX 23947.
26    [24]  See TX 8129.
      [25]  Trial Transcript, dated February 22, 2011, Vol. 2, at 164:1-6.
      [26]  Trial Transcript, dated February 22, 2011, Vol. 2, at 155:16-22.
27    [27]  Id. at 156:3-6.
28    [28]  See TX 23947 (Isaac Larian and MGA's VP of Finance and Taxation
  determine the size and amount of a distribution to be paid from one of MGA's
  (footnote continued)

directors of both MGA U.S. and several of its international subsidiaries, could not recall a single instance where the board of a subsidiary ever passed a resolution against MGA's CEO's wishes.[29]

Other factors considered in evaluating control include  (1) the degree and content of communications between parent and subsidiary, (2) the degree to which the parent set or participated in setting policy, (3) the officers and directors which parent and subsidiary had in common, (4) the reliance on the subsidiary for revenue production and acknowledgment of the importance of the subsidiary and other international operations to the overall success of parent's operations, and (5) the extent to which the subsidiary, if acting as parent's agent, was acting within the scope of its authority during the events at issue.  Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1243 (N.D. Cal. 2004).

Each of these factors is met here.  There are frequent communications between MGA Entertainment and its subsidiaries, on topics ranging from the selection and hiring of MGA subsidiary personnel,[30] to the development of MGA Entertainment's forecasting and inventory management processes,[31] to discussions of Mattel analyst calls.[32]  MGA Entertainment regularly sets the policies of its subsidiaries and governs their operations, such as directing the flow of capital between the subsidiaries and to the parent company or its shareholders.[33]  MGA Entertainment, Inc. and its subsidiaries have a strikingly similar director composition.  MGA Entertainment, Inc. has two shareholders – Isaac Larian and

---

subsidiaries in the Netherlands, enacting their plan without any consultation of the Netherlands); Trial Transcript, dated February 23, 2011, Vol. 1, at 35:21-36:4 (BY MR. QUINN: Q.   Mr. Larian could instruct -- for example, if he decided that he wanted to get some money out of MGA Netherlands, say, $30 million, he could contact Brian Wing, the CFO, and say, "Get me $30 million"?  He could do that?  A. Yes. Q.   All right.  And he could direct that money be moved around these various entities, correct? A.   Yes.").

[29]   Trial Transcript, dated February 22, 2011, Vol. 2, at 164:1-6.
[30]   TX 21384, 21599, and 21606.
[31]   TX 22517.
[32]   TX 20789.

00505.07975/4046198.1

1   Jahangir Makabi, Isaac's brother-in-law.  Its board of directors is composed of Isaac

2   Larian, Jahangir Makabi, and Angela Larian (Isaac's wife and Jahangir's sister).[34]

3   Isaac Larian is sole director of MGA's subsidiaries in the UK, France, Belgium, and

4   Spain, and Isaac Larian and Jahangir Makabi, are the only directors of MGA's

5   subsidiaries in Mexico and Canada.[35]   In fact, by 2009, Larian and/or Makabi were

6   on the board of directors of all but one of MGA's subsidiaries.[36]  Finally, the

7   evidence is clear that MGA Entertainment, Inc. relies heavily on its international

8   subsidiaries to generate revenue and to support its operations,[37] as the various

9   international subsidiaries sell MGA products to all non-US customers, hold

10  intellectual property licenses, and manufacture all of MGA's products.

11      **B.    MGA Entertainment Is Also Liable Under Agency Principles**

12          **Because Without Subsidiaries, MGA Entertainment Would Design,**

13          **Distribute, And Sell Bratz Products Internationally.**

14          Agency liability may also attach under the representative services doctrine.

15  To establish agency liability under this test, Mattel need only demonstrate that the

16  subsidiaries function as MGA Entertainment's corporate representatives.  Here, The

17  international sales of Bratz product are important enough to MGA Entertainment

18  that in the absence of its subsidiaries, MGA Entertainment would itself conduct

19  international sales.  See Paramount Farms, Inc. v. Ventilex B.V., 735 F. Supp. 2d

20  1189, 1211 (E.D. Cal. 2010) (In evaluating corporate parent's liability for acts of its

21  subsidiary, "[t]he agency test is satisfied by a showing that the subsidiary functions

22  as the parent corporation's representative in that it performs services that are

23  'sufficiently important to the foreign corporation that if it did not have a

24  _____

25      [33]  TX 8129 and 23947.
        [34]  Trial Transcript, dated February 22, 2011, Vol. 2, at 141:10-142:5.
26      [35]  Deposition of Lisa Tonnu, dated July 19, 2007, at 67:5-81:16.
        [36]  TX 24022.
27      [37]  TX 23913 and 23914 (Consolidated Statements of Operations for 2007 and
28  2008, respectively, showing quantity of sales by each of MGA's international
    subsidiaries).

1   representative to perform them, the corporation's own officials would undertake to

2   perform substantially similar services.") (punctuation and  citations omitted);

3   Standing v. Watson Pharmaceuticals, Inc., 2009 WL 842211, at *7 (C.D. Cal. March

4   26, 2009) (general rule that parent is not liable for acts of subsidiary subject to an

5   exception "when the subsidiary performs services sufficiently important to the

6   parent such that the parent would perform them in the subsidiaries absence");

7   Mohammed v. Watson Pharmaceuticals Inc., 2009 WL 857517, at *7 (C.D. Cal.

8   March 26, 2009) (same); Neu v. Terminix Intern., Inc., 2008 WL 962096, at *6

9   (N.D. Cal. April 8, 2008) (In determining whether parent should be liable for acts of

10   its subsidiary, the plaintiff must show "that the subsidiary represents the parent

11   corporation by performing services sufficiently important to the parent corporation

12   that if it did not have a representative to perform them, the parent corporation would

13   undertake to perform substantially similar services.").

14         MGA has made international sales of Bratz products since 2001 when Bratz

15   was first released in Spain.  Prior to September of 2002, MGA Entertainment made

16   those international sales to all customers of Bratz product worldwide.[38]  It also

17   performed almost all of MGA's design, engineering, planning and distribution of

18   Bratz products.[39]  From 2002 through 2005, MGA Entertainment made all sales to

19   U.S. customers.  Mr. Larian created MGA Hong Kong ("MGA HK") to make all

20   international sales.[40]  Shortly after this suit began in 2005, Mr. Larian restructured

21   MGA and created additional international subsidiaries that exist solely to distribute

22   MGA product in their respective markets,[41] just as the MGA parent did before

23   Larian created subsidiaries to do so.

---

[38]   TX 22013-7.
[39]   Id. at 7-8.
[40]   Id. at 9.
[41]   See TX 21622-7; Trial Transcript, dated February 22, 2011, Vol. 2, at 154:12-20 (Q   And then so we've got kind of a waterfall here.  We have the various foreign entities, and those along the top, those are basically distribution companies in different countries?  A   For the most part, yes.  Q   So they are getting involved
     (footnote continued)

1      MGA's international subsidiaries are the exclusive licensees in their particular

2  regions of the world, easily meeting the requirement that the conduct of the

3  subsidiary be "important" to the parent.  See Chan v. Society Expeditions, Inc., 39

4  F.3d 1398, 1406 (9th Cir. 1994) (exclusivity is considered in determining whether a

5  subsidiary is "sufficiently important" to parent in order to satisfy the agency test);

6  Bauman v. DaimlerChrysler AG, 2005 WL 3157472, at *11 (N.D. Cal. Nov. 22,

7  2005) (same); Larball Pub. Co., Inc. v. CBS Inc., 664 F. Supp. 704, 708 (S.D.N.Y.

8  1987) (agency relationship established by licensing agreements between domestic

9  parent and foreign subsidiaries).  MGA Entertainment now sells only to customers

10  in the United States.  It would make all international sales of Bratz, but Larian, as

11  majority shareholder and CEO, directed the creation of international subsidiaries to

12  sell Bratz abroad.  That is all that is required to hold MGA Entertainment liable for

13  the acts of its subsidiaries under the representative services doctrine of agency.

**Conclusion**

15      For the foregoing reasons, MGA's corporate parent is liable for its

16  subsidiaries' infringement of Mattel's copyrights and misappropriation of Mattel's

17  trade secrets.

19  DATED:  March 22, 2011      QUINN EMANUEL URQUHART &
                          SULLIVAN. LLP

21                 By *_/s/ John B. Quinn_*
                    John B. Quinn
22                    Attorneys for Mattel, Inc., and
23                    Mattel de Mexico. S.A. de C.V.

27  ——————————————

28  in distributing MGA products in those countries where they are incorporated,
    correct? A   Yes.").