Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 1 of 175  Page ID #:311195
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

1

1                    **UNITED STATES DISTRICT COURT**

2                    **CENTRAL DISTRICT OF CALIFORNIA**

3              **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                        - - - - - - -

5
    MATTEL, INC., et al.,            )
6                                    )
              Plaintiffs,            )
7                                    )
         vs.                         ) No. CV 04-9049 DOC
8                                    )    Day 37
    MGA ENTERTAINMENT, INC., et al., )    Volume 1 of 3
9                                    )
                                     )
10            Defendants.            )
    _____)

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                        Jury Trial

16                    Santa Ana, California

17                   Tuesday, March 22, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-22 D37V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:

3

             QUINN EMANUEL URQUHART & SULLIVAN
4            BY:  JOHN QUINN
                  WILLIAM PRICE
5                 MICHAEL T. ZELLER
                  Attorneys at Law
6            865 South Figueroa Street
             10th Floor
7            Los Angeles, California 90017
             (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12           ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
             BY:  THOMAS S. McCONVILLE
13                Attorney at Law
             4 Park Plaza
14           Suite 1600
             Irvine, California 92614
15           (949) 567-6700

16           - AND -

17           ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
             BY:  ANNETTE L. HURST
18                Attorney at Law
             405 Howard Street
19           San Francisco, California 94105
             (415)773-5700

20           - AND -

21           KELLER RACKAUCKAS
22           BY:  JENNIFER KELLER
                  Attorney at Law
23           18500 Von Karman Avenue
             Suite 560
24           Irvine, California 92612
             (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 3 of 175  Page ID #:311197
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
             LAW OFFICES OF MARK E. OVERLAND
5            By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             - AND -
9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660
13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406
18

19           ROBERT A. ECKERT, MATTEL CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 4 of 175   Page ID #:311198
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

4

1                          I N D E X

2   WITNESSES                    DIRECT  CROSS  REDIRECT  RECROSS

3   DEBROWSKI, Thomas A.

4   By Ms. Hurst                    7               17

5   By Mr. Quinn                          14

6

7   TURETZKY, matthew

8   By Mr. McConville               20              154

9   By Mr. Zeller                         125              168

10

11

12

13                          EXHIBITS

14  EXHIBIT NO.              IDENTIFICATION      IN EVIDENCE

15    8412     Business card for The                35
              Toy Tree
16
      9272     Mattel organizational               130
17             chart

18    9368     Promotion recommendation             46
              for Carey Plunkett
19
      9369     Mattel HR document re:               49
20             Carey Plunkett

21    9441     Notes from MyScene 360              122
              Task Force meeting
22
      9442     Girls Division 2002                106
23             annual goals

24    9443     Turetzky separation                 25
              agreement
25

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 5 of 175  Page ID #:311199
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

5

| | | |
|---|---|---|
| **EXHIBITS** | | |
| **EXHIBIT NO.** | **IDENTIFICATION** | **IN EVIDENCE** |
| 9449 | Expense report for Sal Villasenor | 73 |
| 9450 | Mattel HR document re: Sal Villasenor | 52 |
| 9643 | E-mail from Ms. Snyder to Mr. Turetsky dated 2/21/2002 | 38 |
| 25155 | E-mail between Mr. Turetsky and Ms. Page | 77 |
| 26701-A | Memo from Mr. Turetzky to Mr. Bossock dated 8/21/2001 | 116 |
| 31265 | Representation agreement | 28 |
| 34830 | E-mail | 102 |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 22, 2011**         |
|       | 2  | **Day 37, Volume 1 of 3**                                  |
|       | 3  | (8:34 a.m.)                                                |
| 08:34 | 4  | *(In the presence of the jury.)*                          |
| 08:34 | 5  | THE COURT: All right. Then we're back in                   |
| 08:34 | 6  | session. The jury's present. The alternates are present.   |
| 08:34 | 7  | All counsel and the parties.                               |
| 08:34 | 8  | Counsel, if you would like to call your next               |
| 08:34 | 9  | witness, please.                                           |
| 08:34 | 10 | MR. McCONVILLE: Mr. Larian and MGA call Matthew            |
| 08:34 | 11 | Turetzky -- I'm sorry, Your Honor.                         |
| 08:34 | 12 | MS. HURST: We're going to call Mr. Debrowski               |
| 08:34 | 13 | first.                                                      |
| 08:34 | 14 | THE COURT: Mr. Debrowski. All right. Thank you.            |
| 08:35 | 15 | Mr. Debrowski, if you will step forward, sir.              |
| 08:35 | 16 | Now, would you stop at to that location and raise          |
| 08:35 | 17 | your right hand.                                           |
| 08:35 | 18 | **THOMAS DEBROWSKI, MGA'S WITNESS, SWORN**                 |
| 08:35 | 19 | THE WITNESS: I do.                                         |
| 08:35 | 20 | THE COURT: Thank you, sir. If you would walk               |
| 08:35 | 21 | alongside of the jury railing.                             |
| 08:35 | 22 | If you'd be seated. Pull that microphone closer            |
| 08:35 | 23 | to you.                                                     |
| 08:35 | 24 | Would you state your full name for the jury,               |
| 08:35 | 25 | please.                                                     |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:35 | 1 | THE WITNESS:  Thomas Anthony Debrowski. |
| 08:35 | 2 | THE COURT:  And would you spell your last name. |
| 08:35 | 3 | THE WITNESS:  D-E-B-R-O-W-S-K-I. |
| 08:35 | 4 | THE COURT:  Thank you. |
| 08:35 | 5 | This is direct examination by Ms. Hurst on behalf |
| 08:35 | 6 | of MGA and Mr. Larian. |
| 08:35 | 7 | **DIRECT EXAMINATION** |
| 08:35 | 8 | BY MS. HURST: |
| 08:35 | 9 | Q.  Good morning, Mr. Debrowski. |
| 08:35 | 10 | A.  Good morning, Ms. Hurst. |
| 08:36 | 11 | Q.  Are you presently employed by Mattel? |
| 08:36 | 12 | A.  Yes, I am. |
| 08:36 | 13 | Q.  And are you still the executive vice president of |
| 08:36 | 14 | Worldwide Operations? |
| 08:36 | 15 | A.  Yes, I am. |
| 08:36 | 16 | Q.  And you've held that position since November of 2000, |
| 08:36 | 17 | right? |
| 08:36 | 18 | A.  That's correct. |
| 08:36 | 19 | Q.  And you report directly to Mr. Eckert? |
| 08:36 | 20 | A.  No, I don't. |
| 08:36 | 21 | Q.  Okay.  Is it true that you used to report directly to |
| 08:36 | 22 | Mr. Eckert? |
| 08:36 | 23 | A.  Yes, that's true. |
| 08:36 | 24 | Q.  Okay.  To whom do you report now? |
| 08:36 | 25 | A.  Brian Stockton, chief operating officer. |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

8

| 08:36 | 1 | Q.   As the executive vice president of Worldwide |
| 08:36 | 2 | Operations, you're the person who is ultimately responsible |
| 08:36 | 3 | for the manufacturing of Mattel's products, right? |
| 08:36 | 4 | A.   That's correct. |
| 08:36 | 5 | Q.   And one of the countries in which Mattel moves products |
| 08:36 | 6 | is China, true? |
| 08:36 | 7 | A.   True. |
| 08:36 | 8 | Q.   And you've heard of a company there called Early Light; |
| 08:36 | 9 | is that right? |
| 08:36 | 10 | A.   That's correct. |
| 08:36 | 11 | Q.   Early Light is one of the largest Chinese toy |
| 08:36 | 12 | manufacturers, true? |
| 08:36 | 13 | A.   True. |
| 08:37 | 14 | Q.   And Francis Choi is the head of that company; is that |
| 08:37 | 15 | right? |
| 08:37 | 16 | A.   That's correct.  He's the owner. |
| 08:37 | 17 | Q.   It's a family business.  He and his daughter, Carmen, |
| 08:37 | 18 | you've met with them, and you understand they run the |
| 08:37 | 19 | company; is that right? |
| 08:37 | 20 | A.   That's correct. |
| 08:37 | 21 | Q.   Now, Mattel's done business with Early Light for more |
| 08:37 | 22 | than 20 years; is that right? |
| 08:37 | 23 | A.   That's correct. |
| 08:37 | 24 | Q.   And you also know that MGA uses Early Light, right? |
| 08:37 | 25 | A.   Yes, I do. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:37 | 1 | Q.    Now, is it true that Adrienne Fontanella came to talk |
| 08:37 | 2 | to you in your office about the fact that Early Light |
| 08:37 | 3 | manufactured for MGA? |
| 08:37 | 4 | A.    That's correct. |
| 08:37 | 5 | Q.    And at the time Ms. Fontanella was the president of the |
| 08:37 | 6 | Girls Division and had responsibility for Barbie, right? |
| 08:37 | 7 | A.    Yes, that's correct. |
| 08:37 | 8 | Q.    She came to your office one day? |
| 08:37 | 9 | A.    She did. |
| 08:37 | 10 | Q.    And she asked you to tell Francis Choi, the head of |
| 08:37 | 11 | Early Light, that he was no longer allowed to produce |
| 08:37 | 12 | product for MGA; is that right? |
| 08:37 | 13 | A.    That's true. |
| 08:37 | 14 | Q.    And that was the point of the conversation, right? |
| 08:38 | 15 | A.    Correct. |
| 08:38 | 16 | Q.    The point of the conversation when she came to your |
| 08:38 | 17 | office was to tell you that Francis Choi was no longer |
| 08:38 | 18 | allowed to produce product for MGA, right? |
| 08:38 | 19 | A.    I believe she may have said Early Light versus Francis |
| 08:38 | 20 | Choi, but, yes. |
| 08:38 | 21 | Q.    And you understood that Ms. Fontanella was not happy |
| 08:38 | 22 | about the fact that Mattel was doing business with the |
| 08:38 | 23 | manufacturer of the Bratz products, right? |
| 08:38 | 24 | A.    That's correct. |
| 08:38 | 25 | Q.    And you thought there was no good business reason for |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 10 of 175  Page ID #:311204
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

10

| 08:38 | 1 | that request, true? |
| 08:38 | 2 | A.   That's correct. |
| 08:38 | 3 | Q.   So you told her no? |
| 08:38 | 4 | A.   I did. |
| 08:38 | 5 | Q.   She was not pleased with your answer, right? |
| 08:38 | 6 | A.   That's correct. |
| 08:38 | 7 | Q.   She turned around and stomped out of your office |
| 08:38 | 8 | without saying anything, true? |
| 08:38 | 9 | A.   Well, she turned around and walked away, yes. |
| 08:38 | 10 | Q.   Without saying anything? |
| 08:38 | 11 | A.   Correct. |
| 08:38 | 12 | Q.   Now, as the person ultimately responsible for the |
| 08:38 | 13 | manufacture of Mattel's products, you're also responsible |
| 08:39 | 14 | for ensuring that there's operational security at Mattel's |
| 08:39 | 15 | manufacturing plants, right? |
| 08:39 | 16 | A.   Correct. |
| 08:39 | 17 | Q.   And that the product manufacturing process is kept |
| 08:39 | 18 | confidential, right? |
| 08:39 | 19 | A.   Correct. |
| 08:39 | 20 | Q.   And that the products are kept confidential in |
| 08:39 | 21 | connection with the shipping and logistic processes as well, |
| 08:39 | 22 | right? |
| 08:39 | 23 | A.   As well. |
| 08:39 | 24 | Q.   And despite being responsible for all of that, you |
| 08:39 | 25 | thought there was no good business reason for |

DEBBIE GALE, U.S. COURT REPORTER

| 08:39 | 1  | Ms. Fontanella's request, right? |
| 08:39 | 2  | A.   That's correct. |
| 08:39 | 3  | Q.   And you do consider the attributes of any Mattel |
| 08:39 | 4  | product not yet on store shelves to be confidential |
| 08:39 | 5  | information to Mattel, true? |
| 08:39 | 6  | A.   In some cases, yes. |
| 08:40 | 7  | Q.   Do you consider the attributes of a product, a Mattel |
| 08:40 | 8  | product, that has not yet been released to the public; that |
| 08:40 | 9  | is, not yet released to retail shelves -- do you consider |
| 08:40 | 10 | that to be confidential information to Mattel? |
| 08:40 | 11 | A.   Is that a question? |
| 08:40 | 12 | Q.   Yes. |
| 08:40 | 13 | A.   Yes. |
| 08:40 | 14 | Q.   And you also agree that's true for other toy companies |
| 08:40 | 15 | as well, right? |
| 08:40 | 16 | A.   I believe so. |
| 08:40 | 17 | Q.   You've attended the Hong Kong toy fair, correct? |
| 08:40 | 18 | A.   I have. |
| 08:40 | 19 | Q.   And you believe Mattel restricts access to its |
| 08:40 | 20 | showrooms at the Hong Kong toy fair? |
| 08:40 | 21 | A.   Mattel restricts access to its showrooms in our office |
| 08:40 | 22 | in Hong Kong. |
| 08:40 | 23 | Q.   It restricts access to the showrooms of products that |
| 08:40 | 24 | it runs in conjunction with the Hong Kong toy fair? |
| 08:40 | 25 | A.   That's correct, yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 12 of 175   Page ID #:311206
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

12

| 08:40 | 1 | Q.   And you would consider it improper for someone to gain |
| 08:40 | 2 | access to your showroom using fake credentials, wouldn't |
| 08:40 | 3 | you? |
| 08:40 | 4 | A.   Yes, I would. |
| 08:40 | 5 | Q.   And you would consider it improper if someone from |
| 08:40 | 6 | Mattel used fake credentials to get access to a restricted |
| 08:41 | 7 | showroom of a competitor, wouldn't you? |
| 08:41 | 8 | A.   Yes, I would. |
| 08:41 | 9 | Q.   Now, as the person responsible for manufacturing |
| 08:41 | 10 | Mattel's products, you pay attention to how many products |
| 08:41 | 11 | you need to manufacture each year, right? |
| 08:41 | 12 | A.   Yes, I do. |
| 08:41 | 13 | Q.   It's part of your job to make sure that you manufacture |
| 08:41 | 14 | the products efficiently and effectively, true? |
| 08:41 | 15 | A.   True. |
| 08:41 | 16 | Q.   And that means trying to get the right numbers, right? |
| 08:41 | 17 | A.   The right numbers for? |
| 08:41 | 18 | Q.   For manufacturing.  Not too many, not too little. |
| 08:41 | 19 | A.   Oh, the right volume? |
| 08:41 | 20 | Q.   Yes. |
| 08:41 | 21 | A.   Yes. |
| 08:41 | 22 | Q.   Okay.  And in the effort to make sure that you |
| 08:41 | 23 | manufacture not too many, not too little, it's important |
| 08:41 | 24 | that you pay attention to the volume of products that Mattel |
| 08:41 | 25 | is manufacturing, right? |

| | | |
|---|---|---|
| 08:41 | 1 | A.    That's correct. |
| 08:41 | 2 | Q.    And you know that Barbie is a fashion doll product |
| 08:41 | 3 | manufactured by Mattel, right? |
| 08:41 | 4 | A.    Yes, I do. |
| 08:41 | 5 | Q.    And that's one of products that you have to pay |
| 08:42 | 6 | attention to the numbers for, right? |
| 08:42 | 7 | A.    Yes. |
| 08:42 | 8 | Q.    You're also aware that Bratz is a fashion doll product, |
| 08:42 | 9 | right? |
| 08:42 | 10 | A.    Right. |
| 08:42 | 11 | Q.    And it was manufactured by MGA, true? |
| 08:42 | 12 | A.    Um, I don't know if it was manufactured by MGA.  It |
| 08:42 | 13 | might have been manufactured by a subcontractor or a third |
| 08:42 | 14 | party vendor. |
| 08:42 | 15 | Q.    For MGA? |
| 08:42 | 16 | A.    For MGA. |
| 08:42 | 17 | Q.    MGA is the party who puts the product out, right? |
| 08:42 | 18 | A.    Right. |
| 08:42 | 19 | Q.    And you consider Bratz to be a competing product to |
| 08:42 | 20 | Barbie, right? |
| 08:42 | 21 | A.    Yes, I do. |
| 08:42 | 22 | Q.    But you have no way of stating whether sales that would |
| 08:42 | 23 | have gone to Barbie in fact went to Bratz; isn't that right? |
| 08:42 | 24 | A.    Um, I don't have any data to state that, no. |
| 08:42 | 25 | Q.    You have no quantifiable way of stating that, correct? |

| | | |
|---|---|---|
| 08:42 | 1 | A.    Not in my possession, no. |
| 08:42 | 2 | MS. HURST:  No further questions. |
| 08:43 | 3 | THE COURT:  Mr. Quinn on behalf of Mattel. |
| 08:43 | 4 | **CROSS-EXAMINATION** |
| 08:43 | 5 | BY MR. QUINN: |
| 08:43 | 6 | Q.    Good morning, Mr. Debrowski.  On that last subject, you |
| 08:43 | 7 | have never yourself personally undertaken a study to try to |
| 08:43 | 8 | determine whether and, if so, how many sales have been |
| 08:43 | 9 | diverted from Barbie fashion dolls to Bratz fashion dolls; |
| 08:43 | 10 | is that correct? |
| 08:43 | 11 | A.    That's correct. |
| 08:43 | 12 | Q.    You have testified about this conversation with |
| 08:43 | 13 | Ms. Fontanella where she asked you to talk to Early Light |
| 08:43 | 14 | about not doing business with Bratz, correct? |
| 08:43 | 15 | A.    Correct. |
| 08:43 | 16 | Q.    And your response was, "No, I'm not going to do that," |
| 08:43 | 17 | correct? |
| 08:43 | 18 | A.    My response was I had no intention of doing so, |
| 08:43 | 19 | correct. |
| 08:43 | 20 | Q.    And did you ever do that?  Did you have speak to |
| 08:43 | 21 | Mr. Choi or Francis Light *(sic)* about not doing business |
| 08:43 | 22 | with MGA? |
| 08:43 | 23 | A.    No. |
| 08:43 | 24 | Q.    So as far as you know, did anyone from Mattel at any |
| 08:43 | 25 | time ever speak to Early Light about not doing business with |

| | | |
|---|---|---|
| 08:43 | 1 | MGA? |
| 08:43 | 2 | A.   No, not that I know of. |
| 08:43 | 3 | Q.   Isn't it true that after that conversation, Early Light |
| 08:44 | 4 | continued to manufacture Bratz products for MGA for many |
| 08:44 | 5 | years? |
| 08:44 | 6 | A.   That's what I understand, yes. |
| 08:44 | 7 | Q.   And you've traveled to China a lot? |
| 08:44 | 8 | A.   Yes, I do. |
| 08:44 | 9 | Q.   You have occasion to visit Early Light's factories? |
| 08:44 | 10 | A.   Yes, I do. |
| 08:44 | 11 | Q.   And you have occasion to see the types of security |
| 08:44 | 12 | measures they have in effect there to protect Mattel |
| 08:44 | 13 | proprietary information? |
| 08:44 | 14 | A.   Absolutely, yes. |
| 08:44 | 15 | Q.   Based on that, can you tell whether or not you were |
| 08:44 | 16 | comfortable that Early Light could both manufacture Mattel |
| 08:44 | 17 | products and MGA products and that Mattel's confidential |
| 08:44 | 18 | information would be protected? |
| 08:44 | 19 | A.   I was very satisfied to that effect, yes. |
| 08:44 | 20 | Q.   Now, do you know whether Ms. Fontanella had that same |
| 08:44 | 21 | knowledge? |
| 08:44 | 22 | A.   She did not. |
| 08:44 | 23 | Q.   Do you know whether or not she had ever toured Early |
| 08:44 | 24 | Light factories and seen those security measures that were |
| 08:44 | 25 | in place? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:44 | 1 | MS. HURST:  Objection.  Calls for hearsay, and |
| 08:44 | 2 | move to strike the prior answer on the same ground. |
| 08:44 | 3 | THE COURT:  Overruled. |
| 08:44 | 4 | You can answer the question. |
| 08:44 | 5 | THE WITNESS:  I can answer the question?  Thank |
| 08:45 | 6 | you. |
| 08:45 | 7 | I'm sorry, Mr. Quinn.  Could you repeat, please. |
| 08:45 | 8 | BY MR. QUINN: |
| 08:45 | 9 | Q.   Do you know whether Ms. Fontanella had ever toured |
| 08:45 | 10 | Early Light's factories like you had and had occasion to |
| 08:45 | 11 | observe those security measures that were in place to |
| 08:45 | 12 | protect Mattel's confidential and proprietary information? |
| 08:45 | 13 | A.   I know that she had not visited Early Light or toured |
| 08:45 | 14 | their factory. |
| 08:45 | 15 | Q.   And then you were asked some questions, also, about |
| 08:45 | 16 | whether Mattel considered the attributes of products not yet |
| 08:45 | 17 | on store shelves to be confidential.  Let me ask you, if a |
| 08:45 | 18 | product has been shown to the press at, for example, a toy |
| 08:45 | 19 | fair before it reaches the retailer's shelves, do you still |
| 08:45 | 20 | consider it confidential? |
| 08:45 | 21 | A.   No. |
| 08:45 | 22 | Q.   If a product has been the subject of a press release |
| 08:45 | 23 | before it has reached the retailer's shelves, do you |
| 08:45 | 24 | consider it confidential? |
| 08:45 | 25 | MS. HURST:  Objection.  Incomplete hypothetical. |

| | | |
|---|---|---|
| 08:45 | 1 | THE COURT:  Overruled.  You can answer the |
| 08:45 | 2 | question. |
| 08:45 | 3 | THE WITNESS:  Yes, I would -- I'm sorry, |
| 08:45 | 4 | Mr. Quinn, one more time? |
| 08:45 | 5 | BY MR. QUINN: |
| 08:45 | 6 | Q.   If the product has been described in a press release |
| 08:45 | 7 | before it's reached retailer's shelves, do you still |
| 08:46 | 8 | consider it confidential? |
| 08:46 | 9 | A.   No, I don't. |
| 08:46 | 10 | Q.   Or been the subject of newspaper articles? |
| 08:46 | 11 | A.   No, I wouldn't. |
| 08:46 | 12 | MR. QUINN:  Thank you. |
| 08:46 | 13 | THE COURT:  Redirect. |
| 08:46 | 14 | **REDIRECT EXAMINATION** |
| 08:46 | 15 | BY MS. HURST: |
| 08:46 | 16 | Q.   So in your view, it is perfectly acceptable for a |
| 08:46 | 17 | vendor to Mattel, who takes adequate security measures, to |
| 08:46 | 18 | manufacture both for Mattel and for MGA, right? |
| 08:46 | 19 | A.   If they take adequate security measures, absolutely. |
| 08:46 | 20 | Q.   And you don't know whether Ms. Fontanella made similar |
| 08:46 | 21 | inquiries with respect to Mattel's distributors, right? |
| 08:47 | 22 | MR. QUINN:  Vague and ambiguous, Your Honor. |
| 08:47 | 23 | THE COURT:  Do you understand the question, sir? |
| 08:47 | 24 | Do you understand the question? |
| 08:47 | 25 | THE WITNESS:  Maybe you should ask it again, |

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 18 of 175  Page ID #:311212
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

18

| 08:47 | 1 | please, I'm sorry. |
|---|---|---|
| 08:47 | 2 | BY MS. HURST: |
| 08:47 | 3 | Q.   You don't know whether Ms. Fontanella went to anybody |
| 08:47 | 4 | and said terminate a distributor because they're |
| 08:47 | 5 | distributing Bratz product, right? |
| 08:47 | 6 | A.   I don't have any knowledge of that, no. |
| 08:47 | 7 | Q.   You don't know whether Ms. Fontanella or others at |
| 08:47 | 8 | Mattel went to retailers and tried to get them to agree not |
| 08:47 | 9 | to carry Bratz product, right? |
| 08:47 | 10 | A.   I have no such knowledge of that. |
| 08:47 | 11 | Q.   You don't know that one way or the other, right? |
| 08:47 | 12 | A.   One way or the other. |
| 08:47 | 13 | Q.   And you don't know whether Mattel went to licensees and |
| 08:47 | 14 | threatened them with termination because they were doing |
| 08:47 | 15 | business with MGA, right? |
| 08:47 | 16 | A.   I have of no such knowledge, no. |
| 08:47 | 17 | Q.   But you do know that Ms. Fontanella came to you and |
| 08:47 | 18 | tried to get you to stop Francis Choi from manufacturing |
| 08:47 | 19 | Bratz, right? |
| 08:47 | 20 | A.   That's correct? |
| 08:47 | 21 |          MS. HURST:  No further questions. |
| 08:47 | 22 |          THE COURT:  Recross. |
| 08:47 | 23 |          MR. QUINN:  No questions, Your Honor. |
| 08:47 | 24 |          THE COURT:  Sir, I doubt that you're returning to |
| 08:47 | 25 | testify, but I'm asking all of the witnesses now to remain |

| 08:48 | 1 | available until about April 11th.  If -- you go about your |
| 08:48 | 2 | professional responsibilities; any planned vacations, take |
| 08:48 | 3 | them.  If we need you, we'll be courteous and find you. |
| 08:48 | 4 | THE WITNESS:  Thank you, Your Honor. |
| 08:48 | 5 | THE COURT:  You may step document. |
| 08:48 | 6 | THE WITNESS:  Thank you. |
| 08:48 | 7 | *(Witness steps down subject to recall.)* |
| 08:48 | 8 | THE COURT:  Counsel, your next witness, please. |
| 08:48 | 9 | MR. McCONVILLE:  Now, we'll call Matthew Turetzky. |
| 08:48 | 10 | THE COURT:  Thank you, sir.  Would you be kind |
| 08:48 | 11 | enough to raise your right hand, please. |
| 08:48 | 12 | **MATTHEW TURETZKY, MGA'S WITNESS, SWORN** |
| 08:48 | 13 | THE WITNESS:  I do. |
| 08:48 | 14 | THE COURT:  Thank you, sir.  If you would walk |
| 08:48 | 15 | along the side of the jury railing, please. |
| 08:49 | 16 | Would you state your full name for the jury, |
| 08:49 | 17 | please. |
| 08:49 | 18 | THE WITNESS:  Matthew Turetzky. |
| 08:49 | 19 | THE COURT:  And would you spell your last name. |
| 08:49 | 20 | THE WITNESS:  Sure.  T-U-R-E-T-Z-K-Y. |
| 08:49 | 21 | THE COURT:  Thank you. |
| 08:49 | 22 | Direct examination by Mr. McConville on behalf of |
| 08:49 | 23 | MGA and Mr. Larian. |
| | 24 | |
| | 25 | |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

20

| | | |
|---|---|---|
| 08:49 | 1 | **DIRECT EXAMINATION** |
| 08:49 | 2 | BY MR. McCONVILLE: |
| 08:49 | 3 | Q.   Good morning, Mr. Turetzky. |
| 08:49 | 4 | A.   Hi. |
| 08:49 | 5 | Q.   Have you been employed by Mattel in the past? |
| 08:49 | 6 | A.   Yes. |
| 08:49 | 7 | Q.   When did you work for Mattel? |
| 08:49 | 8 | A.   Uh, from early 2000 to mid-2006. |
| 08:49 | 9 | Q.   And so you started at Mattel in 2000? |
| 08:49 | 10 | A.   Yes, in 2000. |
| 08:49 | 11 | Q.   And prior to starting at Mattel, were you asked to sign |
| 08:49 | 12 | forms in order to start your employment? |
| 08:49 | 13 | A.   I remember some of those, sure. |
| 08:49 | 14 | Q.   Do you remember signing something called an "inventions |
| 08:49 | 15 | agreement"? |
| 08:49 | 16 | A.   Uh, not specifically. |
| 08:49 | 17 | Q.   Do you remember something that -- where you made |
| 08:49 | 18 | representations to Mattel about maintaining confidentiality, |
| 08:49 | 19 | uh -- |
| 08:49 | 20 | A.   Uh, yes. |
| 08:49 | 21 | Q.   -- information? |
| 08:49 | 22 | A.   Yes. |
| 08:49 | 23 | Q.   And you would have to assign inventions to Mattel if |
| 08:50 | 24 | you developed 'em during your employment.  Do you remember |
| 08:50 | 25 | those? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:50 | 1 | A.   I do. |
| 08:50 | 2 | Q.   Did anybody tell you during that process that Mattel |
| 08:50 | 3 | might very well own any idea that was in your head that you |
| 08:50 | 4 | had come up with prior to ever being employed at Mattel? |
| 08:50 | 5 | A.   I don't recall that part. |
| 08:50 | 6 | Q.   That's something that would stick out in your mind if |
| 08:50 | 7 | somebody told you that they owned your ideas for the years |
| 08:50 | 8 | preceding your work at Mattel, right? |
| 08:50 | 9 | A.   I think so, yes. |
| 08:50 | 10 | Q.   And you don't remember that, right? |
| 08:50 | 11 | A.   I don't remember that. |
| 08:50 | 12 | Q.   And you said you started in 2000; is that right? |
| 08:50 | 13 | A.   Yes. |
| 08:50 | 14 | Q.   Could you give us just a brief description of your |
| 08:50 | 15 | educational background prior to starting at Mattel. |
| 08:50 | 16 | A.   Uh, sure.  I went -- with college, I guess? |
| 08:50 | 17 | Q.   Sure. |
| 08:50 | 18 | A.   I went to Williams College and graduated with a degree |
| 08:50 | 19 | in economics.  And later I went back to business school at |
| 08:50 | 20 | Harvard. |
| 08:50 | 21 | Q.   And did you graduate from Harvard? |
| 08:50 | 22 | A.   I did. |
| 08:50 | 23 | Q.   And you had a master's in business administration? |
| 08:51 | 24 | A.   I do. |
| 08:51 | 25 | Q.   And you said you were employed at Mattel from 2000 to |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

22

| | | |
|---|---|---|
| 08:51 | 1 | 2006? |
| 08:51 | 2 | A.   That's right. |
| 08:51 | 3 | Q.   Throughout that time period, did you hold the title of |
| 08:51 | 4 | vice president of some sort? |
| 08:51 | 5 | A.   Yes. |
| 08:51 | 6 | Q.   Okay.  Let's start with in early 2000.  Do you remember |
| 08:51 | 7 | what your title was in early 2000? |
| 08:51 | 8 | A.   I joined Mattel as vice president of strategic planning |
| 08:51 | 9 | and consumer research for the Girls Division. |
| 08:51 | 10 | Q.   And who was the president of the Girls Division at that |
| 08:51 | 11 | time? |
| 08:51 | 12 | A.   That was Adrienne Fontanella. |
| 08:51 | 13 | Q.   So she, in effect, was your overall boss? |
| 08:51 | 14 | A.   That's right. |
| 08:51 | 15 | Q.   And sometime in 2003, there was a reorganization at |
| 08:51 | 16 | Mattel? |
| 08:51 | 17 | A.   Yes. |
| 08:51 | 18 | Q.   And did you receive a different position under that |
| 08:51 | 19 | reorganization? |
| 08:51 | 20 | A.   I did. |
| 08:51 | 21 | Q.   And what was that? |
| 08:51 | 22 | A.   That was vice president of strategic planning and |
| 08:51 | 23 | business development for the Mattel Brands division. |
| 08:51 | 24 | Q.   And who was the president of Mattel Brands? |
| 08:51 | 25 | A.   That was Matt Bousquette. |

| | | |
|---|---|---|
| 08:52 | 1 | Q. And so he was your boss in the 2003 time frame? |
| 08:52 | 2 | A. He was my boss's boss. |
| 08:52 | 3 | Q. Okay. Who was your direct boss at that time? |
| 08:52 | 4 | A. Drew Vollero. |
| 08:52 | 5 | Q. And in this position as vice president of strategic |
| 08:52 | 6 | planning for the Mattel Brands, one of the people who |
| 08:52 | 7 | reported to you was Sal Villasenor, correct? |
| 08:52 | 8 | A. That's right. |
| 08:52 | 9 | Q. And Sal Villasenor in the 2003 time frame, was the |
| 08:52 | 10 | manager of Market Intelligence, correct? |
| 08:52 | 11 | A. Yes. |
| 08:52 | 12 | Q. And when you left -- |
| 08:52 | 13 | A. Well, I think we -- I think he started as a supervisor |
| 08:52 | 14 | maybe, during that time, and I think we promoted him to |
| 08:52 | 15 | manager. |
| 08:52 | 16 | Q. Okay. So he was -- whatever his title was -- |
| 08:52 | 17 | A. Yes. |
| 08:52 | 18 | Q. He was in charge of Market Intelligence in the |
| 08:52 | 19 | 2003/2004 time frame? |
| 08:52 | 20 | A. Yes. |
| 08:52 | 21 | Q. And you said you left Mattel in 2006? |
| 08:52 | 22 | A. Yes. |
| 08:52 | 23 | Q. What were the reasons for your leaving Mattel in 2006? |
| 08:53 | 24 | A. Uh, couple-fold. I'd been there for about six years. |
| 08:53 | 25 | I had worked for three different presidents, so there was a |

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 24 of 175  Page ID #:311218
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

24

08:53   1    lot of management turnover.  I had seven direct bosses in

08:53   2    those six years, and during my last role, they passed me

08:53   3    over for an expanded job that I was interested in.

08:53   4    Q.   Who was the boss when you were -- when you left in

08:53   5    2006?

08:53   6    A.   That -- who was my direct boss?

08:53   7    Q.   Right.

08:53   8    A.   Was Tim Kilpin.

08:53   9    Q.   Who was president of Mattel Brands at that time?

08:53   10   A.   Neil Friedman.

08:53   11   Q.   So the sequencing was Fontanella, then Bousquette, then

08:53   12   Friedman?

08:53   13   A.   That's right.

08:53   14   Q.   And when you left Mattel, did you enter into an

08:53   15   agreement, a separation agreement with Mattel?

08:53   16   A.   I did.

08:53   17        MR. McCONVILLE:  Could we put in front of the

08:53   18   witness Exhibit 9443, please.

08:53   19        *(Document provided to the witness.)*

08:53   20   BY MR. McCONVILLE:

08:53   21   Q.   I'll ask you if you recognize that document.

08:54   22   A.   Sure.  Yeah, this looks like the separation agreement.

08:54   23        MR. McCONVILLE:  Your Honor, move Exhibit 9443

08:54   24   into evidence.

08:54   25        THE COURT:  Received.

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 25 of 175  Page ID #:311219
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

25

| 08:54 | 1 | *(Exhibit No. 9443 received in evidence.)* |
|---|---|---|
| 08:54 | 2 | *(Document displayed.)* |
| 08:54 | 3 | BY MR. McCONVILLE: |
| 08:54 | 4 | Q.   And, Mr. Turetzky, you'll see under the title called |
| 08:54 | 5 | "Consideration," it says that you'll receive a severance |
| 08:54 | 6 | payment totaling $56,250.  Do you see that? |
| 08:54 | 7 | A.   I do see that, yes. |
| 08:54 | 8 | Q.   And then you'll also see on page 3 -- |
| 08:54 | 9 | *(Document displayed.)* |
| 08:54 | 10 | BY MR. McCONVILLE: |
| 08:54 | 11 | Q.   I'm sorry.  Page 5 of 9 -- |
| 08:54 | 12 | *(Document displayed.)* |
| 08:54 | 13 | BY MR. McCONVILLE: |
| 08:54 | 14 | Q.   It also refers you to receiving consulting payments. |
| 08:54 | 15 | Do you see that? |
| 08:54 | 16 | A.   I do see that. |
| 08:54 | 17 | Q.   Totaling $168,750, right? |
| 08:55 | 18 | A.   Yes. |
| 08:55 | 19 | Q.   And so the total amount of money you received upon your |
| 08:55 | 20 | departure from Mattel was $225,000, right? |
| 08:55 | 21 | A.   Uh, yes. |
| 08:55 | 22 | Q.   That was equal to one year's pay that you were |
| 08:55 | 23 | receiving at that time, right? |
| 08:55 | 24 | A.   Uh, yes, roughly. |
| 08:55 | 25 | Q.   Okay.  And this notion here under -- on page 5, under |

| | | |
|---|---|---|
| 08:55 | 1 | "Consulting Services," how many hours were you required to |
| 08:55 | 2 | work in order to receive the $168,750? |
| 08:55 | 3 | A.   It says up to 450 hours over a twelve-month period. |
| 08:55 | 4 | Q.   And during your consulting time, did you work a total |
| 08:55 | 5 | of 450 hours? |
| 08:55 | 6 | A.   Uh, I probably worked less than 450 hours. |
| 08:55 | 7 | Q.   So –– but you did receive the total of $168,750? |
| 08:56 | 8 | A.   I did. |
| 08:56 | 9 | Q.   And if we go back to page 4 as part of this |
| 08:56 | 10 | agreement –– |
| 08:56 | 11 | *(Document displayed.)* |
| 08:56 | 12 | BY MR. McCONVILLE: |
| 08:56 | 13 | Q.   –– you also agreed to release Mattel from any claims |
| 08:56 | 14 | under paragraph (b) there; is that right? |
| 08:56 | 15 | A.   Paragraph (b), sure.  Yes, I did. |
| 08:56 | 16 | Q.   And, in fact, you agreed not to pursue any claims |
| 08:56 | 17 | against Mattel as part of this separation agreement, as |
| 08:56 | 18 | well, right? |
| 08:56 | 19 | A.   Uh, yes. |
| 08:56 | 20 | Q.   And under page –– I'm sorry.  On page 7 –– |
| 08:56 | 21 | *(Document displayed.)* |
| 08:56 | 22 | BY MR. McCONVILLE: |
| 08:56 | 23 | Q.   –– under paragraph (k), you also –– in the middle of |
| 08:56 | 24 | that paragraph, you agree to cooperate fully in any |
| 08:56 | 25 | investigation the company may undertake into matters that |

| | | |
|---|---|---|
| 08:56 | 1 | occurred during your employment; is that right? |
| 08:56 | 2 | A.   Yes, I did. |
| 08:56 | 3 | Q.   And you have undertaken to cooperate fully with Mattel; |
| 08:57 | 4 | is that right? |
| 08:57 | 5 | A.   Just as it pertains to being here today, I guess. |
| 08:57 | 6 | Q.   Well, prior to being here today, you were deposed, |
| 08:57 | 7 | right? |
| 08:57 | 8 | A.   By MGA, yes. |
| 08:57 | 9 | Q.   And prior to being deposed, you retained counsel, |
| 08:57 | 10 | right? |
| 08:57 | 11 | A.   That's correct. |
| 08:57 | 12 | Q.   And that was counsel that was recommended to you by |
| 08:57 | 13 | Mattel, right? |
| 08:57 | 14 | A.   Uh, that's correct. |
| 08:57 | 15 | Q.   And that was counsel who's being paid by Mattel, |
| 08:57 | 16 | correct? |
| 08:57 | 17 | A.   Yes. |
| 08:57 | 18 | MR. McCONVILLE:  If we could put in front of the |
| 08:57 | 19 | witness Exhibit 31265. |
| 08:57 | 20 | *(Document provided to the witness.)* |
| 08:57 | 21 | BY MR. McCONVILLE: |
| 08:57 | 22 | Q.   And I'll ask if you recognize that document. |
| 08:57 | 23 | A.   Uh, yes, sure. |
| 08:57 | 24 | MR. McCONVILLE:  Your Honor, move into evidence |
| 08:57 | 25 | Exhibit 31265. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 28 of 175   Page ID #:311222
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

28

| | | |
|---|---|---|
| 08:57 | 1 | THE COURT:  Received. |
| 08:57 | 2 | *(Exhibit No. 31265 received in evidence.)* |
| 08:57 | 3 | *(Document displayed.)* |
| 08:57 | 4 | BY MR. McCONVILLE: |
| 08:57 | 5 | Q.   And if we go to the first page of the agreement, it's |
| 08:57 | 6 | called "representation agreement," right? |
| 08:58 | 7 | A.   Yes. |
| 08:58 | 8 | Q.   And if we go to the last page of the agreement -- |
| 08:58 | 9 | *(Document displayed.)* |
| 08:58 | 10 | BY MR. McCONVILLE: |
| 08:58 | 11 | Q.   -- we see that this is signed on behalf of Mattel by |
| 08:58 | 12 | Jill Thomas; is that right? |
| 08:58 | 13 | A.   Yes. |
| 08:58 | 14 | Q.   And who is Jill Thomas? |
| 08:58 | 15 | A.   She's a lawyer with Mattel. |
| 08:58 | 16 | Q.   In-house lawyer? |
| 08:58 | 17 | A.   She was when I was there. |
| 08:58 | 18 | Q.   And if you look at the first page of the agreement |
| 08:58 | 19 | again, under paragraph 3, it says, "There are joint |
| 08:58 | 20 | clients." |
| 08:58 | 21 | Do you see that? |
| 08:58 | 22 | A.   Yes. |
| 08:58 | 23 | Q.   And it says you, along with Kelly Osier, Carey |
| 08:58 | 24 | Plunkett, and Sharon Rahimi are the firm's joint clients |
| 08:58 | 25 | with regard to the actions; is that right? |

| | | |
|---|---|---|
| 08:58 | 1 | A.   Yes. |
| 08:58 | 2 | Q.   And who is Kelly Osier? |
| 08:58 | 3 | A.   She was somebody who worked in Boys Market Research |
| 08:59 | 4 | when I was at Mattel.  I didn't work directly with her. |
| 08:59 | 5 | Q.   And who is Carey Plunkett? |
| 08:59 | 6 | A.   Carey Plunkett was another researcher who had been on |
| 08:59 | 7 | the Girls side of the business, who had been part of my |
| 08:59 | 8 | team. |
| 08:59 | 9 | Q.   And who's Sharon Rahimi? |
| 08:59 | 10 | A.   Sharon Rahimi was -- or is -- or was, I guess, an |
| 08:59 | 11 | outside contractor we hired to help with the toy industry |
| 08:59 | 12 | trends when I was at Mattel. |
| 08:59 | 13 | Q.   Each of these people did research on behalf of Mattel? |
| 08:59 | 14 | A.   I can't speak to what Kelly did from direct |
| 08:59 | 15 | knowledge -- |
| 08:59 | 16 | Q.   Okay.  But you said -- |
| 08:59 | 17 | A.   -- what Kelly and Sharon did. |
| 08:59 | 18 | Q.   But you said she was in the research department, right? |
| 08:59 | 19 | A.   The Boys Research department. |
| 08:59 | 20 | Q.   Now, going to your -- when you first started at Mattel, |
| 08:59 | 21 | what was your title again? |
| 08:59 | 22 | A.   Vice president of strategic planning and consumer |
| 08:59 | 23 | research for the Girls Division. |
| 08:59 | 24 | Q.   And one of the things that -- one of the groups of |
| 09:00 | 25 | people you supervised was the Market Intelligence group, |

| | | |
|---|---|---|
| 09:00 | 1 | right? |
| 09:00 | 2 | A.    I don't think we called it that at the time. |
| 09:00 | 3 | Q.    What did you call it? |
| 09:00 | 4 | A.    Just we had business analysts. |
| 09:00 | 5 | Q.    So the business analysts performed the same function |
| 09:00 | 6 | that ultimately became Market Intelligence? |
| 09:00 | 7 | A.    Yes. |
| 09:00 | 8 | Q.    Okay.  And -- but you did supervise, by whatever title, |
| 09:00 | 9 | the people who gathered market research for Mattel, right? |
| 09:00 | 10 | A.    Yes.  For the Girls business at that time. |
| 09:00 | 11 | Q.    For the Girls business? |
| 09:00 | 12 | A.    Yes. |
| 09:00 | 13 | Q.    And one of the things those researchers did was to |
| 09:00 | 14 | attend the New York Toy Fair, correct? |
| 09:00 | 15 | A.    They had pretty broad responsibilities, but that was |
| 09:00 | 16 | part of their responsibility. |
| 09:00 | 17 | Q.    And one of the things that these researchers would do |
| 09:00 | 18 | after attending the New York Toy Fair was to put on |
| 09:00 | 19 | presentations, right? |
| 09:00 | 20 | A.    Yes, yes. |
| 09:00 | 21 | Q.    And those presentations described for the people who |
| 09:01 | 22 | didn't go to the New York Toy Fair what the researchers had |
| 09:01 | 23 | learned at the New York Toy Fair, right? |
| 09:01 | 24 | A.    Yes. |
| 09:01 | 25 | Q.    And describe for us how -- where these presentations |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 31 of 175   Page ID #:311225
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

31

| | | |
|---|---|---|
| 09:01 | 1 | took place after the New York Toy Fair? |
| 09:01 | 2 | A.   We had a presentation hall, I guess on the – I guess |
| 09:01 | 3 | the first level of the Mattel office building. |
| 09:01 | 4 | Q.   And how many people could fit into this –– this hall? |
| 09:01 | 5 | A.   Um, you know, I never counted it, but I guess it was |
| 09:01 | 6 | probably more than a hundred, less than 150, somewhere in |
| 09:01 | 7 | that range. |
| 09:01 | 8 | Q.   But in any event, there were a lot of people from |
| 09:01 | 9 | Mattel who attended these presentations after the New York |
| 09:01 | 10 | Toy Fair? |
| 09:01 | 11 | A.   Uh, yes. |
| 09:01 | 12 | Q.   Uh, and two of the –– well, let me ask you this:  Who's |
| 09:01 | 13 | Michael Shore? |
| 09:01 | 14 | A.   Michael Shore was –– well, is a researcher –– director |
| 09:01 | 15 | of research, who worked for me when I was at Mattel. |
| 09:02 | 16 | Q.   And in the 2002 time frame, Michael Shore reported to |
| 09:02 | 17 | you? |
| 09:02 | 18 | A.   For most of 2002. |
| 09:02 | 19 | Q.   And as did Carey Plunkett? |
| 09:02 | 20 | A.   Carey reported to Michael. |
| 09:02 | 21 | Q.   In any event, they were both under your supervision? |
| 09:02 | 22 | A.   Yes. |
| 09:02 | 23 | Q.   And, in fact, Michael Shore, he's your best friend, |
| 09:02 | 24 | right? |
| 09:02 | 25 | A.   He's a very good friend of mine. |

| | | |
|---|---|---|
| 09:02 | 1 | Q.   And at some point you considered him to be your best |
| 09:02 | 2 | friend? |
| 09:02 | 3 | A.   Sure. |
| 09:02 | 4 | Q.   As with all relationships, they grow and change, yes? |
| 09:02 | 5 | A.   Yes. |
| 09:02 | 6 | Q.   And, in fact, Michael Shore, do you know if he still |
| 09:02 | 7 | works at Mattel? |
| 09:02 | 8 | A.   As far as I know, yes. |
| 09:02 | 9 | Q.   He's the head of all Mattel research at this point? |
| 09:02 | 10 | A.   I -- I've been gone, but I believe so, yes. |
| 09:02 | 11 | Q.   Going back to the 2001/2002 time frame, do you recall |
| 09:02 | 12 | you had a conversation with Carey Plunkett and Michael Shore |
| 09:02 | 13 | about how they will need to gather information that would be |
| 09:03 | 14 | included in these annual presentations? |
| 09:03 | 15 | A.   Uh, yes. |
| 09:03 | 16 | Q.   And, um, you recall that they told you that in |
| 09:03 | 17 | preparation for the New York Toy Fair, they had to assign |
| 09:03 | 18 | somebody from the research team to go to New York to collect |
| 09:03 | 19 | competitive information? |
| 09:03 | 20 | A.   Yes. |
| 09:03 | 21 | Q.   And they told you during that conversation that they |
| 09:03 | 22 | needed to establish a fake toy company in order to get |
| 09:03 | 23 | competitive information? |
| 09:03 | 24 | A.   Uh, one of the ways that they get information would be |
| 09:03 | 25 | requiring some -- yes, a fake toy company -- toy retailer |

33

| | | |
|---|---|---|
| 09:03 | 1 | name. |
| 09:03 | 2 | Q.   So they told you that they needed to establish a fake |
| 09:03 | 3 | toy retailer in order to gather competitive information, |
| 09:03 | 4 | right? |
| 09:03 | 5 | A.   Some of the information would be gathered, yes. |
| 09:03 | 6 | Q.   And they told that you one of the ways they would have |
| 09:03 | 7 | to establish this fake retailer was to create fake |
| 09:04 | 8 | letterhead and fake business cards, right? |
| 09:04 | 9 | A.   Yes. |
| 09:04 | 10 | Q.   And you understood at the time that they -- well, when |
| 09:04 | 11 | do you remember this conversation taking place? |
| 09:04 | 12 | A.   Um, well, it would have been prior to the February 2001 |
| 09:04 | 13 | New York Toy Fair.  So sometime either year-end 2000 or |
| 09:04 | 14 | early 2001. |
| 09:04 | 15 | Q.   So in late 2000, early 2001 they told you about having |
| 09:04 | 16 | to create this fake retailer, right? |
| 09:04 | 17 | A.   Yes. |
| 09:04 | 18 | Q.   And you understood at that time that it was a practice |
| 09:04 | 19 | that Mattel had engaged in for a long period of time, right? |
| 09:04 | 20 | A.   That's what I was told. |
| 09:04 | 21 | Q.   You understood it was a routine practice at Mattel |
| 09:04 | 22 | for -- as a way to gather competitive information, was to |
| 09:04 | 23 | establish these fake retailers, correct? |
| 09:04 | 24 | A.   That's what I was told. |
| 09:04 | 25 | Q.   Um, and, in fact, they told you that in establishing |

| | | |
|---|---|---|
| 09:05 | 1 | these fake retailers that they couldn't use their Mattel |
| 09:05 | 2 | address in order to, uh -- on the letterhead or the business |
| 09:05 | 3 | cards, right? |
| 09:05 | 4 | A.   Right. |
| 09:05 | 5 | Q.   Because you didn't want the competitors who were -- |
| 09:05 | 6 | whose information they were gathering to know that the |
| 09:05 | 7 | information was going to Mattel, right? |
| 09:05 | 8 | A.   Right. |
| 09:05 | 9 | Q.   And you understood that they would need this |
| 09:05 | 10 | information, these fake "retail" information, in order to |
| 09:05 | 11 | gather information at the New York Toy Fair from |
| 09:05 | 12 | competitors, right? |
| 09:05 | 13 | A.   There were many other sources of information, like news |
| 09:05 | 14 | releases, like public halls, but one of the ways that they |
| 09:05 | 15 | got information was using that identification. |
| 09:05 | 16 | Q.   So one of the things that they used to gather |
| 09:05 | 17 | competitive information at the New York Toy Fair was to set |
| 09:05 | 18 | up fake retailers, right? |
| 09:05 | 19 | A.   That's what I was told. |
| 09:06 | 20 | Q.   And were you comfortable with this method? |
| 09:06 | 21 | A.   Uh, no.  I mean, it seemed a little gray to me, uh, but |
| 09:06 | 22 | because it had been an established practice, I didn't object |
| 09:06 | 23 | to it. |
| 09:06 | 24 | Q.   In fact, you approved it, right? |
| 09:06 | 25 | A.   I did.  I approved the travel -- well, yeah, I guess I |

| | | |
|---|---|---|
| 09:06 | 1 | approved it, because I approved the expenses on the travel. |
| 09:06 | 2 | Sure. |
| 09:06 | 3 | Q.   In fact, not only did you approve the practice, you |
| 09:06 | 4 | approved the use of your home address on the fake business |
| 09:06 | 5 | cards, correct? |
| 09:06 | 6 | A.   I did.  They needed a place to send the catalogs, and I |
| 09:06 | 7 | did say they could use my address. |
| 09:06 | 8 | MR. McCONVILLE:  Why don't we look at |
| 09:06 | 9 | Exhibit 8412, please. |
| 09:06 | 10 | *(Document provided to the witness.)* |
| 09:06 | 11 | THE WITNESS:  I've never seen these before. |
| 09:06 | 12 | BY MR. McCONVILLE: |
| 09:06 | 13 | Q.   Do you recognize that? |
| 09:06 | 14 | A.   Well, I don't recognize the card itself. |
| 09:06 | 15 | Q.   Do you recognize the address on the card? |
| 09:07 | 16 | A.   I do. |
| 09:07 | 17 | MR. McCONVILLE:  Your Honor, I'd move |
| 09:07 | 18 | Exhibit 8412 in evidence. |
| 09:07 | 19 | THE COURT:  Received. |
| 09:07 | 20 | *(Exhibit No. 8412 received in evidence.)* |
| 09:07 | 21 | MR. McCONVILLE:  Could we zoom in on that, please. |
| 09:07 | 22 | *(Technician complies.)* |
| 09:07 | 23 | *(Document displayed.)* |
| 09:07 | 24 | BY MR. McCONVILLE: |
| 09:07 | 25 | Q.   This is a business card for one of the fake retailers |

| 09:07 | 1 | call The Toy Tree, correct? |
| 09:07 | 2 | A.    Yes. |
| 09:07 | 3 | Q.    And the address on the right-hand side, that's your |
| 09:07 | 4 | home address, 7729? |
| 09:07 | 5 | A.    That's my home address at the time, yes. |
| 09:07 | 6 | Q.    And you see there that Carey Plunkett is one of the |
| 09:07 | 7 | co-owners, right? |
| 09:07 | 8 | A.    Yes. |
| 09:07 | 9 | Q.    And she's one of the people that you met with? |
| 09:07 | 10 | A.    Yes. |
| 09:07 | 11 | Q.    And who's Tyler Snyder? |
| 09:07 | 12 | A.    Tyler Snyder was one of the business analysts on the |
| 09:07 | 13 | team at this time. |
| 09:07 | 14 | Q.    She was one of the researchers as well? |
| 09:07 | 15 | A.    Right. |
| 09:07 | 16 | Q.    And you see the e-mail address there, |
| 09:07 | 17 | thetoytree@yahoo.com? |
| 09:07 | 18 | A.    I do. |
| 09:07 | 19 | Q.    Do you know what that is? |
| 09:07 | 20 | A.    I assume it's an e-mail address. |
| 09:07 | 21 | Q.    Do you know if it was a fake e-mail address or a real |
| 09:07 | 22 | e-mail address? |
| 09:07 | 23 | A.    I don't know if they ever registered it, if that's your |
| 09:08 | 24 | question. |
| 09:08 | 25 | Q.    Do you know what that phone number is? |

| | | |
|---|---|---|
| 09:08 | 1 | A.   It's not mine. |
| 09:08 | 2 | Q.   And at some point you actually received catalogs from |
| 09:08 | 3 | competitors at your house, right? |
| 09:08 | 4 | A.   I -- I wouldn't say they were competitors.  The people |
| 09:08 | 5 | who actually mailed out the catalogs tended to be small arts |
| 09:08 | 6 | and crafts retailers and people like that. |
| 09:08 | 7 | Q.   Well, whatever they were, they were -- there was |
| 09:08 | 8 | information that Mattel wanted to get, right? |
| 09:08 | 9 | A.   Uh, sure. |
| 09:08 | 10 | Q.   Because why would they be asking for it otherwise, |
| 09:08 | 11 | right? |
| 09:08 | 12 | A.   Right. |
| 09:08 | 13 | Q.   Okay.  So, um, and you knew that this method of |
| 09:08 | 14 | establishing fake businesses was going to be used to access |
| 09:08 | 15 | competitors' showrooms, correct? |
| 09:08 | 16 | A.   You know, at the time I don't think I really understood |
| 09:08 | 17 | what the New York Toy Fair layout was.  I kind of thought it |
| 09:08 | 18 | was more like a car show with a big open floor, so I don't |
| 09:09 | 19 | think I really understood exactly what they were trying to |
| 09:09 | 20 | do at the time. |
| 09:09 | 21 | Q.   But later you learned that fake information was being |
| 09:09 | 22 | used to access competitors' showrooms at the New York Toy |
| 09:09 | 23 | Fair, correct? |
| 09:09 | 24 | A.   Sometime later, yes. |
| 09:09 | 25 | Q.   All right.  Why don't we -- well, at least as early as |

| 09:09 | 1 | February 2002, right? |
|-------|---|-----------------------|

09:09  1   February 2002, right?

09:09  2   A.   Uh, yes, I think I was at toy fair that year, so that's

09:09  3   when I understood how it was all laid out.

09:09  4           MR. McCONVILLE:  Can we put in front of

09:09  5   Mr. Turetzky Exhibit 9643.

09:09  6           Which was conditionally admitted, Your Honor,

09:09  7   subject to calling Mr. Turetzky.

09:09  8           THE COURT:  Received.

09:09  9           *(Exhibit No. 9643 received in evidence.)*

09:09  10          *(Document displayed.)*

09:09  11          MR. McCONVILLE:  I'll ask if you recognize this

09:09  12  document.

09:09  13          THE COURT:  It's received.

09:09  14          MR. McCONVILLE:  Thank you.

09:09  15  BY MR. McCONVILLE:

09:09  16  Q.   It's up on the screen, Mr. Turetzky, but whatever works

09:09  17  for you.

09:09  18  A.   Okay.  It's out of focus on the screen, so, um, okay.

09:09  19  I see that.

09:09  20  Q.   And the first page of this document is an e-mail from

09:09  21  Tyler Snyder.

09:10  22          And you said she was one of the researchers, right?

09:10  23  A.   Yes.

09:10  24  Q.   And it's dated February 21, 2002?

09:10  25  A.   Correct.

| 09:10 | 1 | Q. | And it's sent to, among others, you, right? |

09:10    1    Q.    And it's sent to, among others, you, right?

09:10    2    A.    Yes.

09:10    3    Q.    And the subject line is "Bratz MGA Update."

09:10    4         Do you see that?

09:10    5    A.    I do.

09:10    6    Q.    And there's a document attached to it, right?

09:10    7    A.    Uh, yes.

09:10    8    Q.    And if you go to the second page of the exhibit.

09:10    9              (Document displayed.)

09:10   10    BY MR. McCONVILLE:

09:10   11    Q.    That actually says, "Bratz 2002 MGA," right?

09:10   12    A.    Yes.

09:10   13    Q.    And the first sentence reads, "Carey Plunkett and Tyler

09:10   14    Snyder walked the MGA showroom on Tuesday, February 12th"?

09:10   15    A.    Yes.

09:10   16    Q.    That's walking the MGA showroom at the New York Toy

09:10   17    Fair, right?

09:10   18    A.    I assume so.

09:10   19    Q.    And then the paragraph goes on to say, "The following

09:11   20    is an update on what is happening in 2002 with the Bratz

09:11   21    brand."  And it lists various items that Plunkett and Snyder

09:11   22    saw while walking the MGA showroom, right?

09:11   23    A.    Yes.

09:11   24    Q.    And, for example, under -- it says, "New Character"?

09:11   25    A.    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 40 of 175   Page ID #:311234
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:11 | 1 | MR. McCONVILLE:  If we could zoom in, make that -- |
| 09:11 | 2 | can you make that -- thank you. |
| 09:11 | 3 | (Technician complies.) |
| 09:11 | 4 | BY MR. McCONVILLE: |
| 09:11 | 5 | Q.   We've made that larger.  It says there will be a |
| 09:11 | 6 | "refresh" released in June/July that includes one new female |
| 09:11 | 7 | character, Sasha," and then it has "FOB HK, $10.25."  Do you |
| 09:11 | 8 | see that? |
| 09:11 | 9 | A.   I do. |
| 09:12 | 10 | Q.   What did you understand "HOB HK $10.25" to be? |
| 09:12 | 11 | A.   That would be the unit price that a retailer would pay |
| 09:12 | 12 | for that doll if they were to pick it up in Hong Kong. |
| 09:12 | 13 | Q.   So in this case, it would be -- let's use an example of |
| 09:12 | 14 | Toys R Us would -- would pay MGA $10.25 to get the products |
| 09:12 | 15 | in Hong Kong? |
| 09:12 | 16 | A.   Right. |
| 09:12 | 17 | Q.   And you understood that this FOB HK pricing was very |
| 09:12 | 18 | sensitive information, correct? |
| 09:12 | 19 | A.   Uh, I -- I don't know if I would agree it was very |
| 09:12 | 20 | sensitive. |
| 09:12 | 21 | Q.   Well, it's not information that Mattel should have, |
| 09:12 | 22 | right? |
| 09:12 | 23 | A.   Um, it wouldn't normally be available. |
| 09:12 | 24 | Q.   It's not information that Mattel should have, right? |
| 09:12 | 25 | A.   I guess not. |

| | | |
|---|---|---|
| 09:12 | 1 | Q.   And you'll see that the FOB HK prices are listed under |
| 09:12 | 2 | each of the products? |
| 09:12 | 3 | A.   Yes. |
| 09:12 | 4 | Q.   Correct? |
| 09:13 | 5 | And you understood that the use of the fake retailer's |
| 09:13 | 6 | name to get into MGA showrooms was wrong, right? |
| 09:13 | 7 | A.   I -- I felt uncomfortable with it. |
| 09:13 | 8 | Q.   You knew it was wrong, right? |
| 09:13 | 9 | A.   I felt uncomfortable with it. |
| 09:13 | 10 | Q.   Well, did you think it was unethical? |
| 09:13 | 11 | A.   Yes. |
| 09:13 | 12 | Q.   Did you think it was consistent with Mattel's code of |
| 09:13 | 13 | conduct? |
| 09:13 | 14 | A.   Uh, I probably didn't give that enough thought at the |
| 09:13 | 15 | time. |
| 09:13 | 16 | Q.   Well, giving it thought now, do you think it's |
| 09:13 | 17 | consistent with Mattel's code of conduct? |
| 09:13 | 18 | A.   Well, you know, we actually refigured the code of |
| 09:13 | 19 | conduct several -- well, I guess maybe later that year or |
| 09:13 | 20 | the next year, and at that point we were more explicit what |
| 09:13 | 21 | was in and out of the code of conduct. |
| 09:13 | 22 | Q.   Under any code of conduct, can you conceive of how it |
| 09:13 | 23 | would be ethical to access a competitor's showroom under |
| 09:14 | 24 | false pretenses to gather competitive information? |
| 09:14 | 25 | A.   None that I've experienced. |

| 09:14 | 1 | Q. In fact, that's not something you need a code of |
| 09:14 | 2 | conduct to tell you, right? |
| 09:14 | 3 | A. My own opinion was that it was unethical. |
| 09:14 | 4 | Q. Well, that's something that you learn as a kid, right? |
| 09:14 | 5 | A. Me, personally? |
| 09:14 | 6 | Q. Yeah. |
| 09:14 | 7 | A. Not specific to this issue, but, yes. |
| 09:14 | 8 | Q. Well, you learned right and wrong as a kid, right? |
| 09:14 | 9 | A. Yes. |
| 09:14 | 10 | Q. And this was wrong, right? |
| 09:14 | 11 | A. In my opinion, yes. |
| 09:14 | 12 | Q. In fact, that was something you learned at the Harvard |
| 09:14 | 13 | Business School, right? |
| 09:14 | 14 | A. Again, not specific to this issue, but, yes. |
| 09:14 | 15 | Q. I mean, this wasn't -- although you were uncomfortable, |
| 09:14 | 16 | it wasn't a gray area in your mind, was it? |
| 09:14 | 17 | A. Uh, no. |
| 09:14 | 18 | Q. And you understood that in the showrooms, that Mattel's |
| 09:14 | 19 | competitors would display their unreleased products, right? |
| 09:14 | 20 | A. Right. |
| 09:15 | 21 | Q. And you understand that if Mattel had access to a |
| 09:15 | 22 | competitor's unreleased products, that would give Mattel a |
| 09:15 | 23 | competitive advantage, right? |
| 09:15 | 24 | MR. ZELLER: Assumes facts. |
| 09:15 | 25 | THE COURT: Overruled. |

| | | |
|---|---|---|
| 09:15 | 1 | THE WITNESS:  Do I answer that? |
| 09:15 | 2 | THE COURT:  You can answer the question. |
| 09:15 | 3 | THE WITNESS:  Could you repeat the question, |
| 09:15 | 4 | please. |
| 09:15 | 5 | MR. McCONVILLE:  Sure. |
| 09:15 | 6 | BY MR. McCONVILLE: |
| 09:15 | 7 | Q.   You understood that if Mattel had access to a |
| 09:15 | 8 | competitor's unreleased products, that it would give Mattel |
| 09:15 | 9 | a competitive advantage, right? |
| 09:15 | 10 | A.   It would certainly help our marketing plans. |
| 09:15 | 11 | Q.   Well, you weren't sneaking into these showrooms for |
| 09:15 | 12 | sport, right? |
| 09:15 | 13 | A.   I wasn't sneaking into the showrooms at all. |
| 09:15 | 14 | Q.   I'm sorry.  I appreciate that. |
| 09:15 | 15 | Mattel wasn't directing people to sneak into these |
| 09:15 | 16 | showrooms for fun, right? |
| 09:15 | 17 | A.   No. |
| 09:15 | 18 | Q.   The idea was to gather competitive information, right? |
| 09:15 | 19 | A.   Right. |
| 09:15 | 20 | Q.   And you -- because it would be -- it would be to |
| 09:15 | 21 | Mattel's advantage -- competitive advantage to get |
| 09:15 | 22 | information from -- |
| 09:16 | 23 | THE COURT:  I didn't hear that.  I'm sorry, please |
| 09:16 | 24 | ask your question. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 44 of 175   Page ID #:311238
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:16 | 1 | BY MR. McCONVILLE: |
| 09:16 | 2 | Q.   It would be to Mattel's competitive advantage to get |
| 09:16 | 3 | information from competitors about their unreleased |
| 09:16 | 4 | products, right? |
| 09:16 | 5 | A.   It would help us compete in the marketplace to know |
| 09:16 | 6 | that information. |
| 09:16 | 7 | Q.   Right.  So it would be helpful to Mattel to get |
| 09:16 | 8 | competitive information about competitors' unreleased |
| 09:16 | 9 | products, right? |
| 09:16 | 10 | A.   Yes. |
| 09:16 | 11 | Q.   And one of the things that would help you would -- it |
| 09:16 | 12 | would help Mattel in planning its toy lines, right? |
| 09:16 | 13 | A.   Um, yes. |
| 09:16 | 14 | Q.   And it would help Mattel in its marketing decisions, |
| 09:16 | 15 | right? |
| 09:16 | 16 | A.   Yes. |
| 09:16 | 17 | Q.   And it would help Mattel in its advertising plans, |
| 09:16 | 18 | right? |
| 09:16 | 19 | A.   Potentially. |
| 09:16 | 20 | Q.   And it could help Mattel develop competing products, |
| 09:16 | 21 | right? |
| 09:17 | 22 | A.   Yes. |
| 09:17 | 23 | Q.   And you understood at the time when you were asked to |
| 09:17 | 24 | approve this practice, that it was something that Mattel had |
| 09:17 | 25 | been doing over a long period of time, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:17 | 1 | A.    Uh, yes.  I'm not sure what period, but prior to my |
| 09:17 | 2 | arrival. |
| 09:17 | 3 | Q.    Well, by the time you were asked to approve this |
| 09:17 | 4 | technique, it had been routine at Mattel, right? |
| 09:17 | 5 | A.    That's what I understood. |
| 09:17 | 6 | Q.    And you understood that after Ms. Plunkett returned |
| 09:17 | 7 | from the New York Toy Fair, that she put on a presentation |
| 09:17 | 8 | concerning the competitive products that she had seen while |
| 09:17 | 9 | at the toy fair, right? |
| 09:17 | 10 | A.    Yeah.  It was a combination of things that she had seen |
| 09:17 | 11 | as well as materials sourced through other mediums, like |
| 09:17 | 12 | news releases and websites. |
| 09:17 | 13 | Q.    And this presentation was done to over a hundred people |
| 09:18 | 14 | at Mattel in the big -- in the big presentation theater, |
| 09:18 | 15 | right? |
| 09:18 | 16 | A.    Yes. |
| 09:18 | 17 | Q.    And after you received this exhibit that's on the -- |
| 09:18 | 18 | let's see, this Exhibit 9643 that describes walking the MGA |
| 09:18 | 19 | showrooms, you understood that Ms. Plunkett was recommended |
| 09:18 | 20 | for a promotion, right? |
| 09:18 | 21 | A.    Uh, I don't know that the two were connected. |
| 09:18 | 22 | Q.    I understand that some might not perceive a connection. |
| 09:18 | 23 | I'm asking about a time sequence. |
| 09:18 | 24 | A.    Okay.  I don't know the time sequence exactly, but she |
| 09:18 | 25 | was promoted at some point. |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

46

| 09:18 | 1 | Q. Okay. Let's look at Exhibit 9368, please. |
|---|---|---|
| 09:18 | 2 | *(Document provided to the witness.)* |
| 09:18 | 3 | THE WITNESS: Okay. |
| 09:18 | 4 | BY MR. McCONVILLE: |
| 09:18 | 5 | Q. And do you recognize that document? |
| 09:18 | 6 | A. I do. |
| 09:18 | 7 | Q. What is it? |
| 09:19 | 8 | A. It is a promotion recommendation for Carey Plunkett. |
| 09:19 | 9 | MR. McCONVILLE: Your Honor, I'd move it into |
| 09:19 | 10 | evidence. |
| 09:19 | 11 | THE COURT: Received. |
| 09:19 | 12 | *(Exhibit No. 9368 received in evidence.)* |
| 09:19 | 13 | *(Document displayed.)* |
| 09:19 | 14 | BY MR. McCONVILLE: |
| 09:19 | 15 | Q. Now, who was Mr. Shore in March 11, 2002? |
| 09:19 | 16 | A. He was director of Girls Research. |
| 09:19 | 17 | Q. And he would have been Carey Plunkett's direct boss? |
| 09:19 | 18 | A. Yes. |
| 09:19 | 19 | Q. And you'll see the date is March 11, 2002? |
| 09:19 | 20 | A. Yes. |
| 09:19 | 21 | Q. And that date is after the New York Toy Fair, right? |
| 09:19 | 22 | A. It is after the New York Toy Fair. |
| 09:19 | 23 | Q. And that's after the presentation that's made to the |
| 09:19 | 24 | hundreds of people at the Mattel presentation theater, |
| 09:19 | 25 | right? |

| | | |
|---|---|---|
| 09:19 | 1 | A.   I'm actually not sure what the date of the presentation |
| 09:19 | 2 | was that year. |
| 09:19 | 3 | Q.   Okay.  Do you have a general recollection of the delay |
| 09:19 | 4 | between the end of the New York Toy Fair and when the |
| 09:19 | 5 | presentation would be made in the Mattel theater? |
| 09:19 | 6 | A.   It would be anywhere from, you know, a month to two |
| 09:19 | 7 | months, typically. |
| 09:20 | 8 | Q.   Okay.  So let's -- and I'm sorry, what did you -- could |
| 09:20 | 9 | you describe in general -- in general what this document is? |
| 09:20 | 10 | A.   It's a promotion recommendation for Carey Plunkett that |
| 09:20 | 11 | goes through all of her successful projects over the |
| 09:20 | 12 | previous year and a half, including some of the innovative |
| 09:20 | 13 | research projects she did for plush and large dolls, you |
| 09:20 | 14 | know, which were high growth categories for us that we were |
| 09:20 | 15 | targeting in the future. |
| 09:20 | 16 | Q.   Okay.  I'd like to focus on the bottom, the last |
| 09:20 | 17 | paragraph, if I could. |
| 09:20 | 18 | A.   Okay.  So skipping all the other stuff that talks about |
| 09:20 | 19 | her responsibilities down to the bottom? |
| 09:20 | 20 | Q.   Correct. |
| 09:20 | 21 | A.   Okay. |
| 09:20 | 22 | Q.   Correct. |
| 09:20 | 23 |      And if we see, there's a description of her expanded |
| 09:20 | 24 | duties managing research on plush and large doll brands? |
| 09:20 | 25 | A.   Right. |

| | | |
|---|---|---|
| 09:20 | 1 | Q.   And it talks about her being given added responsibility |
| 09:20 | 2 | for overseeing trend research for Girls Division, right? |
| 09:21 | 3 | A.   Yes. |
| 09:21 | 4 | Q.   And it talks about her coordinating presentations and |
| 09:21 | 5 | issuing the Girls Trend Bulletin, right? |
| 09:21 | 6 | A.   Yes. |
| 09:21 | 7 | Q.   And the last sentence says, "In this capacity, Carey |
| 09:21 | 8 | has already successfully compiled and presented a |
| 09:21 | 9 | competitive review of Toy Fair 2002," right? |
| 09:21 | 10 | A.   Right. |
| 09:21 | 11 | Q.   So does that indicate to you that this promotion was |
| 09:21 | 12 | recommended to her after she had made the presentation to |
| 09:21 | 13 | the Mattel -- in the Mattel theater? |
| 09:21 | 14 | A.   From the time frame perspective, yes, but as you can |
| 09:21 | 15 | see from the document, it's one small part of her |
| 09:21 | 16 | accomplishments. |
| 09:21 | 17 | Q.   I appreciate that. |
| 09:21 | 18 |      In any event she was recommended for promotion, right? |
| 09:21 | 19 | A.   Yes. |
| 09:21 | 20 | Q.   And you approved that promotion? |
| 09:21 | 21 | A.   Yes. |
| 09:21 | 22 | Q.   And the promotion included a pay raise, right? |
| 09:21 | 23 | A.   Uh, I don't recall the details. |
| 09:22 | 24 | Q.   All right.  Let's look at Exhibit 9369, please. |
| 09:22 | 25 |      *(Document provided to the witness.)* |

DEBBIE GALE, U.S. COURT REPORTER

| 09:22 | 1 | THE WITNESS: Okay. |
| 09:22 | 2 | BY MR. McCONVILLE: |
| 09:22 | 3 | Q. Do you -- while you were at Mattel, did you receive -- |
| 09:22 | 4 | you personally, did you receive HR action notices? |
| 09:22 | 5 | A. I think so. |
| 09:22 | 6 | Q. Does this document look generally familiar for -- for |
| 09:22 | 7 | what Mattel personnel files look like? |
| 09:22 | 8 | A. Yeah. I actually have never seen this type of form |
| 09:22 | 9 | before. I assume this is just something they used |
| 09:22 | 10 | internally in the HR department. |
| 09:22 | 11 | Q. This appears to be a Mattel HR document, correct? |
| 09:22 | 12 | A. Yes. |
| 09:22 | 13 | MR. McCONVILLE: Your Honor, I'd move Exhibit 9369 |
| 09:22 | 14 | into evidence. |
| 09:22 | 15 | THE COURT: Received. |
| 09:22 | 16 | *(Exhibit No. 9369 received in evidence.)* |
| 09:22 | 17 | *(Document displayed.)* |
| 09:22 | 18 | BY MR. McCONVILLE: |
| 09:22 | 19 | Q. And we were discussing whether this promotion that |
| 09:23 | 20 | Carey Plunkett received included a raise, right? |
| 09:23 | 21 | A. Yes. |
| 09:23 | 22 | Q. And if you go to the last page of this exhibit, you'll |
| 09:23 | 23 | see it's an e-mail chain? |
| 09:23 | 24 | A. Yes. |
| 09:23 | 25 | Q. And, um, the first e-mail in order, so the last one on |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

50

09:23  1    the page, is from Mary Choi.  Do you know who that is?

09:23  2    A.    She was, um, in HR, I think, at the time.

09:23  3    Q.    To Michael Shore?

09:23  4    A.    Yes.

09:23  5    Q.    And talks about Carey Plunkett's promotion.  And it

09:23  6    says, "Michael, as we discussed, Carey's promotion

09:23  7    recommendation has been approved.  The general guideline for

09:23  8    salary increases related to promotions is between 7 to 10

09:23  9    percent.  Please let me know your thoughts on new salary and

09:24  10   effective date so we can make this happen."

09:24  11         And then -- did I read that correctly?

09:24  12   A.    Uh, yes.

09:24  13   Q.    And then the next e-mail in the chain is from Michael

09:24  14   Shore to Mary Choi, and it says, "Hello, Mary, I just met

09:24  15   with Matt, and we would like to implement a 10 percent

09:24  16   increase effective, if possible, this week.  Thanks,

09:24  17   Michael."

09:24  18         Did I read that correctly?

09:24  19   A.    Yes.

09:24  20   Q.    And this Matt here, would that be you?

09:24  21   A.    It probably would have been.

09:24  22   Q.    And do you recall approving a 10 percent increase for

09:24  23   Carey Plunkett on her promotion?

09:24  24   A.    Not specifically, but I approved lots of raises and

09:24  25   promotions over the years.

| | | |
|---|---|---|
| 09:24 | 1 | Q. And this promotion was after Carey Plunkett and |
| 09:24 | 2 | Ms. Snyder had walked the MGA showroom, correct? |
| 09:25 | 3 | A. Chronologically, yes. |
| 09:25 | 4 | Q. One of the other people that you supervised in your |
| 09:25 | 5 | tenure at Mattel was a man named Sal Villasenor, correct? |
| 09:25 | 6 | A. Yes. |
| 09:25 | 7 | Q. And I believe -- did you begin supervising him in |
| 09:25 | 8 | approximately 2003? |
| 09:25 | 9 | A. Uh, yes, April or May 2003, I think. |
| 09:25 | 10 | Q. I'm sorry, April? |
| 09:25 | 11 | A. Somewhere between April/May 2003, I think. |
| 09:25 | 12 | Q. And at some point I think you, uh, said that |
| 09:25 | 13 | Mr. Villasenor was the manager of Market Intelligence; is |
| 09:25 | 14 | that right? |
| 09:25 | 15 | A. I think supervisor and then manager maybe. |
| 09:25 | 16 | Q. All right. Let's take a look at Exhibit 9450, please? |
| 09:26 | 17 | MGA ASSISTANT: Mr. McConville, I don't have it. |
| 09:26 | 18 | *(Document provided to the witness.)* |
| 09:26 | 19 | THE WITNESS: Okay. |
| 09:26 | 20 | BY MR. McCONVILLE: |
| 09:26 | 21 | Q. Mr. Turetzky, you have in front of you Exhibit 9450, |
| 09:26 | 22 | and I ask whether you recognize this document in general as |
| 09:26 | 23 | a Mattel Human Resources document? |
| 09:26 | 24 | A. Yes. |
| 09:26 | 25 | MR. McCONVILLE: Your Honor, move Exhibit 9450 |

| | | |
|---|---|---|
| 09:27 | 1 | into evidence. |
| 09:27 | 2 | THE COURT:  Received. |
| 09:27 | 3 | *(Exhibit No. 9450 received in evidence.)* |
| 09:27 | 4 | *(Document displayed.)* |
| 09:27 | 5 | BY MR. McCONVILLE: |
| 09:27 | 6 | Q.   And if we see at the top of this, its dated March 3rd, |
| 09:27 | 7 | 2004.  And this relates to a promotion for Sal Villasenor, |
| 09:27 | 8 | correct? |
| 09:27 | 9 | A.   Yes. |
| 09:27 | 10 | Q.   And if you go down to the bottom -- to the middle |
| 09:27 | 11 | it -- it says, "employee name, Sal Villasenor," right? |
| 09:27 | 12 | A.   Yes. |
| 09:27 | 13 | Q.   And his title is manager of Market Intelligence, right? |
| 09:27 | 14 | A.   Right. |
| 09:27 | 15 | Q.   And at the bottom it says his supervisor is Matthew |
| 09:27 | 16 | Turetzky, right? |
| 09:27 | 17 | A.   Yes. |
| 09:27 | 18 | Q.   And so at least as of March 3rd, 2004, Sal Villasenor |
| 09:27 | 19 | was the manager of Market Intelligence? |
| 09:27 | 20 | A.   Right.  It seems like that's when he was promoted. |
| 09:27 | 21 | Q.   Okay.  And prior to that time, I'm sorry, you said he |
| 09:27 | 22 | was -- |
| 09:27 | 23 | A.   The title was supervisor. |
| 09:27 | 24 | Q.   Okay.  And Mr. Villasenor's job was to gather |
| 09:28 | 25 | information about competitors, right? |

| 09:28 | 1 | A.   Well, uh, generally, the Market Intelligence group was |
| 09:28 | 2 | responsible for gathering consumer information from sources |
| 09:28 | 3 | like NPD or Simmons or Nickelodeon, Yankelovich research, |
| 09:28 | 4 | et cetera.  Okay?  And in addition, collecting competitive |
| 09:28 | 5 | and trend information, as well. |
| 09:28 | 6 | Q.   One of his jobs was to collect competitive information |
| 09:28 | 7 | using false identification, correct? |
| 09:28 | 8 | A.   Well, one of his jobs was to collect competitive |
| 09:28 | 9 | information.  At that time he would not have been using or |
| 09:28 | 10 | he should not have been using competitive information -- I |
| 09:28 | 11 | mean, fake credentials. |
| 09:28 | 12 | Q.   You understood at some point when you were supervising |
| 09:29 | 13 | Mr. Villasenor that he was using fake credentials to get |
| 09:29 | 14 | access to competitor's showrooms, correct? |
| 09:29 | 15 | A.   He should not have been. |
| 09:29 | 16 | Q.   Understood.  It's not my question.  You knew at some |
| 09:29 | 17 | point when you were supervising him that he was doing it, |
| 09:29 | 18 | right? |
| 09:29 | 19 | A.   I don't know that. |
| 09:29 | 20 | Q.   Mr. Villasenor told you he was doing it, right? |
| 09:29 | 21 | A.   Prior to me -- I think we -- early on we would have |
| 09:29 | 22 | discussed that that was not the appropriate practice under |
| 09:29 | 23 | our new code of conduct. |
| 09:29 | 24 | Q.   So you had to know the practice in order to understand |
| 09:29 | 25 | it was inappropriate, right? |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

54

| 09:29 | 1 | A.    Yes. |
| 09:29 | 2 | Q.    So you knew at some point that Sal Villasenor was using |
| 09:29 | 3 | fake credentials to get access to competitor's showrooms, |
| 09:29 | 4 | right? |
| 09:29 | 5 | A.    Yeah, I don't recall the exact timeline.  I think in |
| 09:29 | 6 | late 2002, sometime in 2002, Mattel revised its code of |
| 09:29 | 7 | conduct, which was very explicit about what we could and |
| 09:30 | 8 | couldn't do, and at that time we -- at least for my team on |
| 09:30 | 9 | the Girls side, we told people not to use the practice that |
| 09:30 | 10 | had been practiced prior. |
| 09:30 | 11 | Q.    At some point Sal Villasenor told you he was doing it, |
| 09:30 | 12 | right? |
| 09:30 | 13 | A.    Uh, when I began to manage him in, you know, |
| 09:30 | 14 | whenever -- early 2003, we discussed what was appropriate |
| 09:30 | 15 | and what wasn't appropriate going forward. |
| 09:30 | 16 | Q.    And what was inappropriate was what he had described to |
| 09:30 | 17 | you was his practice, correct? |
| 09:30 | 18 | A.    Prior to that, yes. |
| 09:30 | 19 | Q.    And Mr. Villasenor, after gathering information, would |
| 09:30 | 20 | also -- would be part of the team that presented reports in |
| 09:30 | 21 | the Mattel presentation theater, right? |
| 09:30 | 22 | A.    Yes. |
| 09:30 | 23 | Q.    Let's take a look at Exhibit 9275, please. |
| 09:31 | 24 | *(Document provided to the witness.)* |
| 09:31 | 25 | THE WITNESS:  Okay. |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:31 | 1 | *(Document displayed.)* |
| 09:31 | 2 | MR. McCONVILLE:  This is already in evidence. |
| 09:31 | 3 | BY MR. McCONVILLE: |
| 09:31 | 4 | Q.   And at the top, it's dated April 22nd, 2003, to |
| 09:31 | 5 | distribution, CC Matt Bousquette? |
| 09:31 | 6 | A.   Yes. |
| 09:31 | 7 | Q.   Whose Matt Bousquette at this time? |
| 09:31 | 8 | A.   He was the president of Mattel Brands. |
| 09:31 | 9 | Q.   And it's from Sal Villasenor, Kelly Osier, and Carey |
| 09:31 | 10 | Plunkett, right? |
| 09:31 | 11 | A.   Yes. |
| 09:31 | 12 | Q.   And the subject is the "New York Toy Fair 2003 |
| 09:31 | 13 | Competitive Review," right? |
| 09:31 | 14 | A.   Yes. |
| 09:31 | 15 | Q.   Is this -- have you seen this type of document -- I |
| 09:31 | 16 | understand you've seen this document.  Have you seen this |
| 09:31 | 17 | type of document for other years? |
| 09:31 | 18 | A.   Uh, the format varied, but, yes. |
| 09:31 | 19 | Q.   And this would be, in essence, the PowerPoint that was |
| 09:31 | 20 | presented in the theater, in the Mattel theater, after the |
| 09:32 | 21 | New York Toy Fair? |
| 09:32 | 22 | A.   Yes. |
| 09:32 | 23 | Q.   And if we go to page 19 -- |
| 09:32 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:32 | 1 | BY MR. McCONVILLE: |
| 09:32 | 2 | Q.   -- you'll see that one of the things that was presented |
| 09:32 | 3 | in this report in April 2003 was information concerning MGA, |
| 09:32 | 4 | correct? |
| 09:32 | 5 | A.   I see that. |
| 09:32 | 6 | Q.   And how often did -- these annual competitive reviews |
| 09:32 | 7 | occurred every year you were at Mattel? |
| 09:32 | 8 | A.   Annually, yes. |
| 09:32 | 9 | Q.   It's not something that stopped at some point when you |
| 09:32 | 10 | were there, right? |
| 09:32 | 11 | A.   Uh, you know, I don't remember.  I -- you know, I |
| 09:32 | 12 | remember them being, you know, roughly every year, but I'm |
| 09:33 | 13 | not sure if we ever changed the practice.  I wasn't |
| 09:33 | 14 | responsible for it every year. |
| 09:33 | 15 | Q.   And if we look at page -- at page 19. |
| 09:33 | 16 | *(Document displayed.)* |
| 09:33 | 17 | MR. McCONVILLE:  And if we zoom in on -- let's |
| 09:33 | 18 | look at new Bratz Boyz there. |
| 09:33 | 19 | *(Technician complies.)* |
| 09:33 | 20 | BY MR. McCONVILLE: |
| 09:33 | 21 | Q.   And it -- it again provides a title, it says, "adding |
| 09:33 | 22 | Eitan and Koby."  And it gives the FOB pricing, correct? |
| 09:33 | 23 | A.   I see that. |
| 09:33 | 24 | Q.   If we zoom out and go to the left, you see there's a |
| 09:33 | 25 | picture -- |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 57 of 175   Page ID #:311251
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:33 | 1 | A.   I see that. |
| 09:33 | 2 | Q.   -- of Eitan and Koby, right? |
| 09:33 | 3 | *(Technician complies.)* |
| 09:33 | 4 | BY MR. McCONVILLE: |
| 09:33 | 5 | Q.   Is that right? |
| 09:33 | 6 | A.   Yes. |
| 09:33 | 7 | Q.   And we've discussed that at some point you had a |
| 09:33 | 8 | meeting with Mr. Villasenor after you began supervising him |
| 09:34 | 9 | in 2003, right? |
| 09:34 | 10 | A.   Right.  During the period of this presentation, none of |
| 09:34 | 11 | the three people involved in this reported to me.  I wasn't |
| 09:34 | 12 | involved in this for this year, so... |
| 09:34 | 13 | Q.   Okay.  So this was April 2003? |
| 09:34 | 14 | A.   During the period of the collection of the toy fair -- |
| 09:34 | 15 | during the period of the toy fair, I was not responsible for |
| 09:34 | 16 | any of these people. |
| 09:34 | 17 | Q.   Okay.  So it was -- it was after -- I'm trying to get a |
| 09:34 | 18 | date.  So it was after April 2003 is when you believe you |
| 09:34 | 19 | began supervising, among others, Sal Villasenor? |
| 09:34 | 20 | A.   Uh, no.  February 2003, none of them worked for me.  I |
| 09:34 | 21 | believe Sal actually did report to me in April of 2003. |
| 09:34 | 22 | Q.   I see what you're saying. |
| 09:34 | 23 | A.   So when they were at toy fair, I had no responsibility |
| 09:34 | 24 | for any of them. |
| 09:34 | 25 | Q.   I got it.  I got it. |

09:34   1        Well, you did supervise Carey Plunkett at some point,
09:34   2    right?
09:34   3    A.   Yes.  But I had a different assignment from the end of
09:34   4    2002 to early of 2003, so I wasn't involved in this process.
09:34   5    Q.   Okay.  But in -- when you began supervising
09:35   6    Mr. Villasenor in 2003, you recall a discussion with him
09:35   7    concerning his need -- or the direction he had received to
09:35   8    gather competitive information, correct?
09:35   9    A.   Right.  I mean, you know, I don't recall the exact
09:35  10    chain of events, but I imagine having seen this presentation
09:35  11    that I would not -- I recognized that these practices were
09:35  12    not consistent with our policy and, therefore, we shouldn't
09:35  13    have had them, and that's when I would have discussed it
09:35  14    with Sal.
09:35  15    Q.   So you had this meeting with Mr. Villasenor to discuss
09:35  16    this practice of using fake credentials to get into a
09:35  17    competitor's showrooms; is that right?
09:35  18    A.   Yes.
09:35  19    Q.   And during that meeting, Mr. Villasenor expressed a
09:35  20    concern to you that he was receiving demands or requests to
09:36  21    gather more competitive information about Bratz in
09:36  22    particular, right?
09:36  23    A.   Yes.
09:36  24    Q.   And that those requests to gather competitive
09:36  25    information concerning Bratz were coming from Matt

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 59 of 175   Page ID #:311253
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:36 | 1 | Bousquette, right? |
| 09:36 | 2 | A.   Uh, yes, among others. |
| 09:36 | 3 | Q.   And he told you that -- during this meeting that he was |
| 09:36 | 4 | getting too many requests for the competitive information |
| 09:36 | 5 | related to Bratz that he couldn't satisfy all the demands of |
| 09:36 | 6 | his job, right? |
| 09:36 | 7 | A.   I -- I don't recall that part of it. |
| 09:36 | 8 | Q.   Well, you recall that part of the -- one of the things |
| 09:36 | 9 | you discussed was a need for him to figure out how to |
| 09:36 | 10 | prioritize the competing requests he was getting? |
| 09:36 | 11 | A.   I -- I don't remember the specifics of it. |
| 09:36 | 12 | Q.   Well, he let you know that he was getting requests for |
| 09:36 | 13 | information that he didn't have and wanted to know how to |
| 09:37 | 14 | approach it? |
| 09:37 | 15 | A.   Yes. |
| 09:37 | 16 | Q.   Right? |
| 09:37 | 17 |      And the requests were becoming more demanding and -- |
| 09:37 | 18 | the requests were becoming more demanding, right? |
| 09:37 | 19 | A.   Yes. |
| 09:37 | 20 | Q.   And the requests for information were coming in and he |
| 09:37 | 21 | didn't feel it was easy to get the type of information that |
| 09:37 | 22 | was being requested as it relates to Bratz, right? |
| 09:37 | 23 | A.   Yes. |
| 09:37 | 24 | Q.   And you said Mr. Bousquette was one of the people who |
| 09:37 | 25 | was making these requests for Bratz information, right? |

60

| Time | Line | |
|------|------|---|
| 09:37 | 1 | A.   Yes. |
| 09:37 | 2 | Q.   And what was his title in 2003? |
| 09:37 | 3 | A.   President of Mattel Brands. |
| 09:37 | 4 | Q.   And during this meeting, Mr. Villasenor told that you |
| 09:37 | 5 | one of the ways he was obtaining information relating to |
| 09:37 | 6 | Bratz was through the use of the -- of the fake retailer |
| 09:38 | 7 | approach, right? |
| 09:38 | 8 | A.   I don't remember the specifics of how he did it, but, I |
| 09:38 | 9 | mean, we discussed some of the ways he was -- you know, that |
| 09:38 | 10 | there were things he was doing that violated the code of |
| 09:38 | 11 | conduct. |
| 09:38 | 12 | Q.   Right.  And one of the things that violated the code of |
| 09:38 | 13 | conduct was using the fake -- creating fake retailer |
| 09:38 | 14 | identities to get information, right? |
| 09:38 | 15 | A.   Yes. |
| 09:38 | 16 | Q.   And you were concerned enough after this meeting with |
| 09:38 | 17 | Mr. Villasenor to go talk to Mattel's legal counsel, right? |
| 09:38 | 18 | A.   Yeah.  I believe I spoke with the counsel before and |
| 09:38 | 19 | after. |
| 09:38 | 20 | Q.   Okay.  So when did you -- who was the counsel you spoke |
| 09:38 | 21 | to? |
| 09:38 | 22 | A.   Michael Moore. |
| 09:38 | 23 | Q.   And what was Michael Moore's title at Mattel? |
| 09:38 | 24 | A.   I don't recall. |
| 09:38 | 25 | Q.   One of the -- one of the lawyers who worked there? |

| | | |
|---|---|---|
| 09:38 | 1 | A.   Yes.   That was one of the lawyers. |
| 09:39 | 2 | Q.   Okay.   And what do you recall about your first meeting |
| 09:39 | 3 | with Mr. Moore? |
| 09:39 | 4 | MR. ZELLER:   This is calling for privileged |
| 09:39 | 5 | information if it's going into the substance. |
| 09:39 | 6 | THE COURT:   You may not go into the substance at |
| 09:39 | 7 | this time about the conversation.   There's an |
| 09:39 | 8 | attorney-client work privilege involved. |
| 09:39 | 9 | THE WITNESS:   Okay. |
| 09:39 | 10 | THE COURT:   Okay. |
| 09:39 | 11 | THE WITNESS:   I'm sorry.   I can't answer this |
| 09:39 | 12 | question, then. |
| 09:39 | 13 | BY MR. McCONVILLE: |
| 09:39 | 14 | Q.   Well, why did you go see Mr. Moore? |
| 09:39 | 15 | A.   The initial conversation with Michael was -- was, uh -- |
| 09:39 | 16 | there was a draft of a new code of conduct relating to the |
| 09:39 | 17 | collection of competitive information.   And so I was -- |
| 09:39 | 18 | wanted to discuss how we -- you know, what approved methods |
| 09:39 | 19 | of collecting information we could figure out. |
| 09:39 | 20 | Q.   Okay.   And then after that meeting with Mr. Moore, you |
| 09:39 | 21 | met with Mr. Villasenor? |
| 09:39 | 22 | A.   This was prior to that.   This was when I was still |
| 09:39 | 23 | running the Girls Research group. |
| 09:39 | 24 | Q.   How -- how -- so what year do you think you had that |
| 09:39 | 25 | meeting with Mr. Moore? |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 62 of 175   Page ID #:311256
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

62

| | | |
|---|---|---|
| 09:40 | 1 | A.    Uh, I believe it would have been 2002. |
| 09:40 | 2 | Q.    Okay.  So roughly 2002 you had a meeting with Michael |
| 09:40 | 3 | Moore to discuss in general collecting competitive |
| 09:40 | 4 | information as it relates to the code of conduct that Mattel |
| 09:40 | 5 | was drafting? |
| 09:40 | 6 | A.    Yes. |
| 09:40 | 7 | MR. ZELLER:  Your Honor, if he's asking about his |
| 09:40 | 8 | reason for going to Mr. Moore, I'm fine with that answer, |
| 09:40 | 9 | but if it's about the substance of that communication, I |
| 09:40 | 10 | would ask that it be disregarded. |
| 09:40 | 11 | THE COURT:  I believe that that was his question, |
| 09:40 | 12 | Counsel, not why. |
| 09:40 | 13 | MR. ZELLER:  As long as that's the understanding. |
| 09:40 | 14 | THE WITNESS:  Yeah, I think, yes, would be the |
| 09:40 | 15 | motivation. |
| 09:40 | 16 | BY MR. McCONVILLE: |
| 09:40 | 17 | Q.    Okay.  And then in 2003, when you began supervising |
| 09:40 | 18 | Mr. Villasenor, you had another conversation with Mr. Moore; |
| 09:40 | 19 | is that right? |
| 09:40 | 20 | A.    Yes. |
| 09:40 | 21 | Q.    And why did you go see Michael Moore that time? |
| 09:41 | 22 | A.    To confirm that a proposed practice for gathering trend |
| 09:41 | 23 | information was okay. |
| 09:41 | 24 | Q.    Well, the proposed practice was -- it was the routine |
| 09:41 | 25 | of using fake retailers to gather competitive information, |

| | | |
|---|---|---|
| 09:41 | 1 | right? |
| 09:41 | 2 | A.    No. |
| 09:41 | 3 | Q.    At the time in -- well, let's back up.  You knew in -- |
| 09:41 | 4 | I think you said end of 2000, beginning of 2001, that Carey |
| 09:41 | 5 | Plunkett and Michael Shore told you that they were using |
| 09:41 | 6 | fake retailers to get competitive information, right? |
| 09:41 | 7 | A.    Right. |
| 09:41 | 8 | Q.    And then later on, you learned that however they were |
| 09:41 | 9 | getting the information, Carey Plunkett and Tyler Snyder |
| 09:41 | 10 | sent you a memo reflecting MGA's -- at a minimum, its |
| 09:41 | 11 | pricing.  That was in 2002, right? |
| 09:41 | 12 | A.    Right. |
| 09:41 | 13 | Q.    And then you began supervising Sal Villasenor, and you |
| 09:41 | 14 | knew he was using fake retailer credentials to get access to |
| 09:42 | 15 | competitive information, true? |
| 09:42 | 16 | A.    Well, there's a gap in between.  So when we drafted the |
| 09:42 | 17 | new -- when the new policy was drafted, the instructions |
| 09:42 | 18 | given to my team were to no longer do that.  And we, um, |
| 09:42 | 19 | hired a, uh, journalist, a trend expert to come in and help |
| 09:42 | 20 | us gather competitive information. |
| 09:42 | 21 | Q.    And that was Sharon Rahimi? |
| 09:42 | 22 | A.    That was Sharon Rahimi. |
| 09:42 | 23 | Q.    So in order to not violate the code of conduct, you |
| 09:42 | 24 | hired an outsider to do the same thing? |
| 09:42 | 25 | A.    No.  My understanding was that she was gathering |

| | | |
|---|---|---|
| 09:42 | 1 | information for a trend newsletter, and we wanted her to be |
| 09:42 | 2 | an expert.  We had other people we hired to do trend |
| 09:42 | 3 | research as well, like the Yankelovich research, that I |
| 09:42 | 4 | mentioned before, or the Zandl group, people like that to |
| 09:42 | 5 | provide us with insights on what was happening in the |
| 09:42 | 6 | marketplace. |
| 09:42 | 7 | Q.   So I want to focus on Sharon Rahimi, who you understood |
| 09:43 | 8 | is represented by the same lawyer as you, right? |
| 09:43 | 9 | A.    Apparently. |
| 09:43 | 10 | Q.   And so, because there was a change in policy where |
| 09:43 | 11 | Mattel was going to tell its internal people it couldn't |
| 09:43 | 12 | gather competitive information using false pretenses, you |
| 09:43 | 13 | hired Sharon Rahimi, who was gonna write a newsletter on the |
| 09:43 | 14 | same topic? |
| 09:43 | 15 | A.    Not exactly.  My understanding was Sharon was going to |
| 09:43 | 16 | start up a kids' trend newsletter, and as part of that, she |
| 09:43 | 17 | would be visiting toy fair and meeting with manufacturers |
| 09:43 | 18 | and the press -- meeting with manufacturers and researchers |
| 09:43 | 19 | and other services as part of this project.  And, therefore, |
| 09:43 | 20 | we asked her to report for us on the trends as other folks |
| 09:43 | 21 | did for us, as well. |
| 09:43 | 22 |    The other thing is that, you know, the quality of our |
| 09:43 | 23 | presentations wasn't particularly good, so I thought |
| 09:43 | 24 | Sharon's help could help upgrade the quality, as well. |
| 09:44 | 25 | Q.   And prior to Sharon Rahimi becoming a reporter -- is |

09:44  1   that what you considered her?

09:44  2   A.   A journalist.

09:44  3   Q.   Okay.  Prior to her becoming a journalist, she was a

09:44  4   Mattel employee, right?

09:44  5   A.   Not under my experience, but I think she was before.

09:44  6   Q.   Right.  So you know that she was a Mattel employee

09:44  7   prior to becoming a journalist, right?

09:44  8   A.   Right.

09:44  9   Q.   And -- and you know that as a journalist, she would

09:44  10  then present herself as a journalist to get into the

09:44  11  competitive showrooms, right?

09:44  12  A.   I'm not sure what she did.  But that would be my

09:44  13  impression.

09:44  14  Q.   And you're aware that Sharon Rahimi authored no article

09:44  15  whatsoever as a journalist, right?

09:44  16  A.   I've never seen anything she's written.  At the time I

09:44  17  was told that that's what she was going to do, though.

09:44  18  Q.   Understood.  You've never seen one article written by

09:44  19  Sharon Rahimi, right?

09:44  20  A.   I have not.

09:44  21  Q.   But she gathered information for Mattel as a journalist

09:44  22  to assist in these competitive reviews and the

09:44  23  presentations, right?

09:45  24  A.   Uh, yes.

09:45  25  Q.   Turning back to -- uh, I'm trying to get the sequencing

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 66 of 175   Page ID #:311260
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

66

| | | |
|---|---|---|
| 09:45 | 1 | of the meeting you had with Sal Villasenor. |
| 09:45 | 2 | A.   Right. |
| 09:45 | 3 | Q.   You -- you learned from Sal Villasenor that he's |
| 09:45 | 4 | getting demands together, information related to Bratz, |
| 09:45 | 5 | right? |
| 09:45 | 6 | A.   Uh-huh. |
| 09:45 | 7 | Q.   Correct? |
| 09:45 | 8 | A.   Yes.  Yes.  Sorry, yes. |
| 09:45 | 9 | Q.   And then after that, you then had a meeting with |
| 09:45 | 10 | Michael Moore after your meeting with Mr. Villasenor, right? |
| 09:45 | 11 | A.   Right. |
| 09:45 | 12 | Q.   Okay.  And following -- and why did you go see |
| 09:45 | 13 | Mr. Moore that time? |
| 09:45 | 14 | A.   To make sure that I had full clarity on the policy |
| 09:45 | 15 | that -- on the code of conduct.  And also to get |
| 09:45 | 16 | confirmation that we could continue to use outside resources |
| 09:45 | 17 | to -- for gathering information. |
| 09:46 | 18 | Q.   And as part of that meeting with Mr. Moore, you told |
| 09:46 | 19 | him that Sal Villasenor was still doing this? |
| 09:46 | 20 | MR. ZELLER:  This invades the attorney-client |
| 09:46 | 21 | privilege. |
| 09:46 | 22 | THE COURT:  Overruled. |
| 09:46 | 23 | BY MR. McCONVILLE: |
| 09:46 | 24 | Q.   You can answer. |
| 09:46 | 25 | THE WITNESS:  Can you repeat the question? |

| | | |
|---|---|---|
| 09:46 | 1 | BY MR. McCONVILLE: |
| 09:46 | 2 | Q.   Sure. |
| 09:46 | 3 | You met with Sal Villasenor roughly April 2003 time |
| 09:46 | 4 | frame? |
| 09:46 | 5 | A.   Something like that, yes. |
| 09:46 | 6 | Q.   Okay.  And he tells you he's using the, you know, fake |
| 09:46 | 7 | retailer approach to gather competitive information, right? |
| 09:46 | 8 | A.   False credentials, yes, he did. |
| 09:46 | 9 | Q.   Okay.  False credentials. |
| 09:46 | 10 | And he tells you this, and then you go talk to Michael |
| 09:46 | 11 | Moore, right? |
| 09:46 | 12 | A.   Yes. |
| 09:46 | 13 | Q.   And -- and you told Michael Moore at that meeting what |
| 09:46 | 14 | Sal Villasenor had told you, right? |
| 09:46 | 15 | MR. ZELLER:  Objection. |
| 09:46 | 16 | THE COURT:  Overruled. |
| 09:46 | 17 | THE WITNESS:  I don't think I did. |
| 09:46 | 18 | BY MR. McCONVILLE: |
| 09:46 | 19 | Q.   You don't think you told -- |
| 09:46 | 20 | THE COURT:  Nothing back from counsel, Mr. Moore. |
| 09:47 | 21 | BY MR. McCONVILLE: |
| 09:47 | 22 | Q.   Right.  You don't think you told Mr. Moore what you had |
| 09:47 | 23 | just learned from Sal Villasenor? |
| 09:47 | 24 | A.   No. |
| 09:47 | 25 | Q.   But you were going to him to seek legal guidance? |

09:47   1    A.    Yes.

09:47   2    Q.    So you had a specific fact in your head that gave you

09:47   3    concern, so you went to the lawyer and didn't tell him about

09:47   4    it?

09:47   5    A.    What I went to discuss with him was what other

09:47   6    approaches to gathering information we could use.

09:47   7    Q.    And it did not include a description of what you knew?

09:47   8    A.    Not at that time.

09:47   9    Q.    And you also didn't tell him that you were using Sharon

09:47   10   Rahimi as a journalist, right?

09:47   11           MR. ZELLER:  Can I have a standing objection on

09:47   12   privilege grounds?

09:47   13           THE COURT:  Standing objection, Counsel.

09:47   14           MR. ZELLER:  Thank you.

09:47   15           THE WITNESS:  I believe I did.

09:47   16   BY MR. McCONVILLE:

09:47   17   Q.    Oh, you did tell him about Sharon Rahimi as a

09:47   18   journalist?

09:47   19   A.    Yeah.  I believe I said, you know, if we had a third

09:47   20   party who was going to gather the information as part of her

09:47   21   job, you know, would it be okay for us to get this

09:47   22   information from that person.

09:48   23   Q.    And part of the reason that you went to see Mr. Moore

09:48   24   was because you were concerned about the ethics and legality

09:48   25   of using fake credentials to get competitive information,

DEBBIE GALE, U.S. COURT REPORTER

| 09:48 | 1 | right? |
|---|---|---|
| 09:48 | 2 | A.    Yes. |
| 09:48 | 3 | Q.    Who was Michael Moore's boss at the time? |
| 09:48 | 4 | A.    Bob Normile, maybe. |
| 09:48 | 5 | Q.    He was the general counsel of Mattel? |
| 09:48 | 6 | A.    I think so. |
| 09:48 | 7 | Q.    Do you know if he's still the general counsel of |
| 09:48 | 8 | Mattel? |
| 09:48 | 9 | A.    I don't know. |
| 09:48 | 10 | Q.    Do you know if Michael Moore still works at Mattel? |
| 09:48 | 11 | A.    I think he does. |
| 09:48 | 12 | Q.    And after you left your meeting with Michael Moore, you |
| 09:48 | 13 | understood it would be okay to continue the practice? |
| 09:48 | 14 | MR. ZELLER:  Misstates. |
| 09:48 | 15 | THE COURT:  Sustained.  I'll sustain. |
| 09:48 | 16 | MR. ZELLER:  Misstates the witness's testimony. |
| 09:48 | 17 | MR. McCONVILLE:  I'm sorry. |
| 09:49 | 18 | THE COURT:  I'll sustain the objection.  That |
| 09:49 | 19 | calls for advice of counsel. |
| 09:49 | 20 | BY MR. McCONVILLE: |
| 09:49 | 21 | Q.    In any event, after this meeting you had with -- well, |
| 09:49 | 22 | try and see if we can get a time frame on it.  Shortly after |
| 09:49 | 23 | April 2003? |
| 09:49 | 24 | A.    In that time period. |
| 09:49 | 25 | Q.    Okay.  After this meeting with Mr. Moore you went back |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 70 of 175   Page ID #:311264
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

70

| | | |
|---|---|---|
| 09:49 | 1 | to Mr. Villasenor and told him that he was still expected to |
| 09:49 | 2 | gather competitive information on Bratz, right? |
| 09:49 | 3 | A.   I think we need to clarify the question.  He was -- he |
| 09:49 | 4 | was not allowed to use the means that -- of using false |
| 09:49 | 5 | credentials.  He was -- but he was -- uh, should be trying |
| 09:49 | 6 | to collect the information needed per the requests as long |
| 09:49 | 7 | as it didn't violate the code of conduct. |
| 09:49 | 8 | Q.   Okay.  So he -- understanding that you told him that he |
| 09:49 | 9 | couldn't use false credentials, but he still had to gather |
| 09:49 | 10 | the competitive information, right? |
| 09:50 | 11 | A.   I believe it was a best effort's basis. |
| 09:50 | 12 | Q.   Okay.  And after that meeting with Mr. Villasenor, he |
| 09:50 | 13 | was concerned, right? |
| 09:50 | 14 | A.   I -- yes. |
| 09:50 | 15 | Q.   I shouldn't say after the meeting.  During the meeting, |
| 09:50 | 16 | he expressed concern to you -- |
| 09:50 | 17 | THE COURT:  Well, just a moment. |
| 09:50 | 18 | What meeting? |
| 09:50 | 19 | This gentleman and Mr. Villasenor? |
| 09:50 | 20 | MR. McCONVILLE:  Yes. |
| 09:50 | 21 | THE COURT:  All right.  Make that clear. |
| 09:50 | 22 | BY MR. McCONVILLE: |
| 09:50 | 23 | Q.   Okay.  So just sequencing it, after your meeting with |
| 09:50 | 24 | Mr. Moore, you went and had a conversation with Sal |
| 09:50 | 25 | Villasenor, right? |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

71

| | | |
|---|---|---|
| 09:50 | 1 | A.   Yes. |
| 09:50 | 2 | Q.   And at that meeting you had with Sal Villasenor, you |
| 09:50 | 3 | told him you can no longer use the technique of false |
| 09:50 | 4 | credentials, but you still have to use best efforts to |
| 09:50 | 5 | gather Bratz information, right? |
| 09:50 | 6 | A.   Yes. |
| 09:50 | 7 | Q.   And Mr. Villasenor, at that meeting, expressed concern |
| 09:50 | 8 | to you that he would be unable to do his job if that |
| 09:51 | 9 | restriction were placed on him, right? |
| 09:51 | 10 | A.   He had concerns that he would not be able to get all |
| 09:51 | 11 | the information that was requested. |
| 09:51 | 12 | Q.   And in particular, he was concerned about Matt |
| 09:51 | 13 | Bousquette being disappointed with his inability to get the |
| 09:51 | 14 | information, right? |
| 09:51 | 15 | A.   Yes. |
| 09:51 | 16 | Q.   And as a result of that, you went to your boss, Drew |
| 09:51 | 17 | Vollero, right? |
| 09:51 | 18 | A.   Yes. |
| 09:51 | 19 | Q.   And you went to Drew Vollero to try and get cover in |
| 09:51 | 20 | case Matt Bousquette got upset that he wasn't getting the |
| 09:51 | 21 | information he was requesting, right? |
| 09:51 | 22 |          MR. ZELLER:  Argumentative. |
| 09:51 | 23 |          THE COURT:  Sustained.  Just restate it. |
| 09:51 | 24 | BY MR. McCONVILLE: |
| 09:51 | 25 | Q.   You went to go see Mr. Vollero to make sure that he |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:51 | 1 | understood in the event Matt Bousquette was disappointed, |
| 09:51 | 2 | there was a reason for the disappointment, right? |
| 09:51 | 3 | A.   Yeah.  I discussed with Drew that, uh, we might have |
| 09:51 | 4 | some challenges in collecting the information that Matt |
| 09:51 | 5 | wanted based on our adherence to the code of conduct. |
| 09:52 | 6 | Q.   And so in 2003, you told Mr. Villasenor no more fake |
| 09:52 | 7 | credentials, right? |
| 09:52 | 8 | A.   Yes. |
| 09:52 | 9 | Q.   And no more fake business cards, right? |
| 09:52 | 10 | A.   Yes. |
| 09:52 | 11 | Q.   But you continued to supervise him through 2004 time |
| 09:52 | 12 | frame? |
| 09:52 | 13 | A.   Yes. |
| 09:52 | 14 | Q.   And one of the things you did as a supervisor was |
| 09:52 | 15 | approve his expense reports, right? |
| 09:52 | 16 | A.   Yes. |
| 09:52 | 17 | MR. McCONVILLE:  Could we look at Exhibit 9449, |
| 09:52 | 18 | please. |
| 09:52 | 19 | *(Document provided to the witness.)* |
| 09:53 | 20 | BY MR. McCONVILLE: |
| 09:53 | 21 | Q.   Do you recognize this as a printout from Mattel's |
| 09:53 | 22 | system pertaining to expense reports? |
| 09:53 | 23 | A.   Yeah.  It's an expense report, yes. |
| 09:53 | 24 | MR. McCONVILLE:  Your Honor, I move into evidence |
| 09:53 | 25 | Exhibit 9449. |

| | | |
|---|---|---|
| 09:53 | 1 | THE COURT: Received. |
| 09:53 | 2 | *(Exhibit No. 9449 received in evidence.)* |
| 09:53 | 3 | BY MR. McCONVILLE: |
| 09:53 | 4 | Q.   And you'll see -- do you recognize this as an expense |
| 09:53 | 5 | report for Sal Villasenor? |
| 09:53 | 6 | A.   Uh, yes, I do. |
| 09:53 | 7 | Q.   You'll see under general information, it says, "Name: |
| 09:53 | 8 | Sal Villasenor"? |
| 09:53 | 9 | A.   I see that. |
| 09:53 | 10 | Q.   And it says the purpose -- or, I'm sorry, the "Expenses |
| 09:53 | 11 | Date" are February 25, 2004, through March 17, 2004? |
| 09:53 | 12 | A.   Yes. |
| 09:53 | 13 | Q.   And you'll see the purpose is the Pomona Toy Fair and |
| 09:53 | 14 | miscellaneous expenses? |
| 09:53 | 15 | A.   Yes. |
| 09:53 | 16 | Q.   And if you'll go to page 4 of the exhibit, it has 004 |
| 09:53 | 17 | at the bottom. |
| 09:53 | 18 | *(Document displayed.)* |
| 09:53 | 19 | BY MR. McCONVILLE: |
| 09:53 | 20 | Q.   You'll see -- |
| 09:54 | 21 | A.   Okay. |
| 09:54 | 22 | Q.   -- under "Sal Villasenor, Expenses," it's got one, two, |
| 09:54 | 23 | three, four -- the fifth line down, "March 7, 2004." |
| 09:54 | 24 | A.   Yes. |
| 09:54 | 25 | Q.   Can you read that for me, please? |

| | | |
|---|---|---|
| 09:54 | 1 | A.    Yes.  It says, "Kinko's for tradeshow business cards." |
| 09:54 | 2 | Q.    You understood, based on your conversations with |
| 09:54 | 3 | Plunkett and Shore and Villasenor, that the place they |
| 09:54 | 4 | received these fake business cards was the Kinko's right |
| 09:54 | 5 | around the corner from Mattel, right? |
| 09:54 | 6 | A.    I actually didn't know that. |
| 09:54 | 7 | Q.    Mattel has a process by which if a Mattel employee |
| 09:54 | 8 | wants to get business cards, you just order them through the |
| 09:54 | 9 | Mattel system, right? |
| 09:54 | 10 | A.    Right. |
| 09:54 | 11 | Q.    I mean, Mattel employees aren't going to Kinko's to |
| 09:54 | 12 | print up their business cards, right? |
| 09:54 | 13 | A.    Not as far as I know. |
| 09:54 | 14 | Q.    So this expense right here, you can't tell whether that |
| 09:54 | 15 | was for making additional fake business cards for retailers, |
| 09:54 | 16 | right? |
| 09:54 | 17 | A.    Typically, I didn't look at the detail of the expense |
| 09:54 | 18 | reports as long as they were within a reasonable range. |
| 09:54 | 19 | Q.    But you were his supervisor, so you had to approve the |
| 09:54 | 20 | expense report? |
| 09:55 | 21 | A.    I did approve it, yes. |
| 09:55 | 22 | Q.    And so it's possible that as of March 7, 2004, Sal |
| 09:55 | 23 | Villasenor was continuing to make fake business cards to |
| 09:55 | 24 | pose as a retailer, right? |
| 09:55 | 25 | A.    I didn't see the business cards, but he did print up |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:55 | 1 | business cards for the tradeshow, it appears. |
| 09:55 | 2 | Q.   And he'd have no reason to go to Kinko's to get a |
| 09:55 | 3 | Mattel business card, right? |
| 09:55 | 4 | A.   Not that I can think of. |
| 09:55 | 5 | Q.   And you said that you told Mr. Villasenor to stop using |
| 09:55 | 6 | the false credentials, right? |
| 09:55 | 7 | A.   I did. |
| 09:55 | 8 | Q.   Did you ever confirm that Mr. Villasenor stopped using |
| 09:55 | 9 | false credentials? |
| 09:55 | 10 | A.   All employees of Mattel had signed the revised code of |
| 09:55 | 11 | conduct, so my assumption was that everybody was abiding by |
| 09:55 | 12 | that code of conduct. |
| 09:55 | 13 | Q.   Did you independently do anything to investigate |
| 09:55 | 14 | whether Mr. Villasenor had stopped using false credentials? |
| 09:56 | 15 | A.   No. |
| 09:56 | 16 | Q.   And the existence of the code of conduct doesn't mean |
| 09:56 | 17 | that people comply with it, right? |
| 09:56 | 18 | A.   I think you have to assume that people do the right |
| 09:56 | 19 | thing. |
| 09:56 | 20 | Q.   Right.  I understand.  So if they signed a code of |
| 09:56 | 21 | conduct, then there's nothing else that Mattel could have |
| 09:56 | 22 | done in that situation, right? |
| 09:56 | 23 |         MR. ZELLER:  Argumentative. |
| 09:56 | 24 |         THE COURT:  Sustained. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:56 | 1 | BY MR. McCONVILLE: |
| 09:56 | 2 | Q.   Regardless of whether -- so let's assume Mr. Villasenor |
| 09:56 | 3 | stopped using false credentials after your meeting with him |
| 09:56 | 4 | in 2003.  The Market Intelligence Department still had to |
| 09:56 | 5 | gatherer competitive information, right? |
| 09:56 | 6 | A.   That was part of their role. |
| 09:56 | 7 | Q.   And if we look at Exhibit 2515, please. |
| 09:57 | 8 | MGA ASSISTANT:  2515? |
| 09:57 | 9 | MR. McCONVILLE:  25155.  Sorry. |
| 09:57 | 10 | *(Document provided to the witness.)* |
| 09:57 | 11 | BY MR. McCONVILLE: |
| 09:57 | 12 | Q.   Ask if you recognize this as an e-mail between you and |
| 09:57 | 13 | Stephanie Page? |
| 09:57 | 14 | A.   It appears to be. |
| 09:57 | 15 | Q.   I mean, you can go ahead and look.  It's a multipage |
| 09:57 | 16 | document, if you want to look at it. |
| 09:57 | 17 | A.   Yeah, I mean, the pictures are all missing, so it's |
| 09:57 | 18 | just -- but, yeah, I mean, it's -- appears to be something |
| 09:57 | 19 | from Stephanie Page to me. |
| 09:58 | 20 | Q.   I'm sorry.  Do you recognize this as an e-mail document |
| 09:58 | 21 | describing information gathered concerning MGA? |
| 09:58 | 22 | A.   Yes. |
| 09:58 | 23 | MR. McCONVILLE:  Your Honor, I move into evidence |
| 09:58 | 24 | Exhibit 25155. |
| 09:58 | 25 | THE COURT:  Received. |

| | | |
|---|---|---|
| 09:58 | 1 |        *(Exhibit No. 25155 received in evidence.)* |
| 09:58 | 2 |        *(Document displayed.)* |
| 09:58 | 3 | BY MR. McCONVILLE: |
| 09:58 | 4 | Q.   If we go to the first page of exhibit, that's an e-mail |
| 09:58 | 5 | from Stephanie Page to you, right? |
| 09:58 | 6 | A.   Yes. |
| 09:58 | 7 | Q.   Who's Stephanie Page? |
| 09:58 | 8 | A.   She was a business analyst who worked for Sal. |
| 09:58 | 9 | Q.   In the Market Intelligence group? |
| 09:58 | 10 | A.   Yes. |
| 09:58 | 11 | Q.   All right.  And it says, "Matt, here are pictures for |
| 09:58 | 12 | some of the products.  Some just aren't that easy to find. |
| 09:58 | 13 | Stephanie"? |
| 09:58 | 14 | A.   Yes. |
| 09:58 | 15 | Q.   And then, apparently, there's some pictures that may or |
| 09:58 | 16 | may not have been there. |
| 09:58 | 17 |      But I want to turn to page 11 of the exhibit at the |
| 09:59 | 18 | bottom. |
| 09:59 | 19 |        *(Document displayed.)* |
| 09:59 | 20 | BY MR. McCONVILLE: |
| 09:59 | 21 | Q.   And you'll see there's an e-mail from Stephanie Page? |
| 09:59 | 22 | A.   Okay.  Yes. |
| 09:59 | 23 | Q.   Dated February 11, 2004? |
| 09:59 | 24 | A.   Okay. |
| 09:59 | 25 | Q.   Do you see that? |

| | | |
|---|---|---|
| 09:59 | 1 | A.   Yes. |
| 09:59 | 2 | Q.   And there's a long list of people who are receiving the |
| 09:59 | 3 | e-mail, subject of which is "Beyond the Numbers - MGA |
| 09:59 | 4 | Entertainment Update." |
| 09:59 | 5 | Do you see that? |
| 09:59 | 6 | A.   Yes. |
| 09:59 | 7 | Q.   And I don't think this -- so the CC's include |
| 09:59 | 8 | Bousquette, Vollero, you, Sujata Luther, and Tim Kilpin, |
| 09:59 | 9 | right? |
| 09:59 | 10 | A.   Yes. |
| 09:59 | 11 | Q.   And you see the date is February 11th, 2004? |
| 09:59 | 12 | A.   Yes. |
| 09:59 | 13 | Q.   Was that roughly the time frame of the New York Toy |
| 09:59 | 14 | Fair? |
| 09:59 | 15 | A.   Would have been before it typically.  I don't know. |
| 09:59 | 16 | Sometime around New York Toy Fair, sure. |
| 09:59 | 17 | Q.   So you don't know if this was before or after the |
| 09:59 | 18 | New York Toy Fair? |
| 09:59 | 19 | A.   I don't know the dates.  Right. |
| 10:00 | 20 | Q.   All right.  Let's go to the next page.  And you'll see |
| 10:00 | 21 | there's a memo? |
| 10:00 | 22 | A.   Yes. |
| 10:00 | 23 | Q.   From the Market Intelligence Department, right? |
| 10:00 | 24 | A.   Yes. |
| 10:00 | 25 | Q.   Dated February 11, 2004, right? |

| | | |
|---|---|---|
| 10:00 | 1 | A.   Yes. |
| 10:00 | 2 | Q.   And it says, "Beyond the Numbers provides a look at a |
| 10:00 | 3 | specific trend or issue in the marketplace relating to |
| 10:00 | 4 | current news and today's youth.  This issue discusses some |
| 10:00 | 5 | of MGA Entertainment's key drivers for 2004," right? |
| 10:00 | 6 | A.   That's right. |
| 10:00 | 7 | Q.   And so this effort by Market Intelligence to gather |
| 10:00 | 8 | information concerning MGA continued after you had your |
| 10:00 | 9 | conversation with Mr. Villasenor in April 2003, right? |
| 10:00 | 10 | A.   There was plenty of information available through |
| 10:00 | 11 | public sources.  These pictures could have been pulled off |
| 10:01 | 12 | the Internet. |
| 10:01 | 13 | Q.   No, I understand.  I'm just -- once you had your |
| 10:01 | 14 | conversation with Sal Villasenor, market intelligence didn't |
| 10:01 | 15 | stop, right? |
| 10:01 | 16 | A.   Right.  It was still important for us to understand |
| 10:01 | 17 | what was happening in the marketplace. |
| 10:01 | 18 | Q.   Right.  It didn't cease to exist.  It continued to go? |
| 10:01 | 19 | A.   Right. |
| 10:01 | 20 | Q.   Okay.  And then if you look at the prior page, which is |
| 10:01 | 21 | page 11, above the e-mail that has the long distribution |
| 10:01 | 22 | list, it says, from you, Matt Turetzky, to Stephanie Page. |
| 10:01 | 23 | And you say, "Any chance of seeing pictures," right? |
| 10:01 | 24 | A.   Yes. |
| 10:01 | 25 | Q.   And you -- so as of 2004, whether that relates to the |

| | | |
|---|---|---|
| 10:01 | 1 | New York Toy Fair or not, someone came back from the |
| 10:01 | 2 | New York Toy Fair and made a presentation about what |
| 10:01 | 3 | happened there, right? |
| 10:01 | 4 | A.   I -- |
| 10:01 | 5 | MR. ZELLER:  Assumes facts. |
| 10:01 | 6 | THE COURT:  Overruled. |
| 10:02 | 7 | THE WITNESS:  I assume so. |
| 10:02 | 8 | BY MR. McCONVILLE: |
| 10:02 | 9 | Q.   I mean, you don't remember specifically 2004, but you |
| 10:02 | 10 | remember that annually there was a presentation about the |
| 10:02 | 11 | competitive information that was gathered at the New York |
| 10:02 | 12 | Toy Fair, right? |
| 10:02 | 13 | A.   As far as I remember, yes. |
| 10:02 | 14 | Q.   Uh, and after -- after assuming -- um, that because |
| 10:02 | 15 | Mr. Villasenor had signed the code of conduct, you assumed |
| 10:02 | 16 | he had stopped the use of false credentials, right? |
| 10:02 | 17 | A.   Yes. |
| 10:02 | 18 | Q.   And you didn't do anything to investigate him further, |
| 10:02 | 19 | right? |
| 10:02 | 20 | A.   No. |
| 10:02 | 21 | Q.   And after -- at the 2004 presentation, you didn't do |
| 10:02 | 22 | anything to assess where the information came from, from -- |
| 10:02 | 23 | for that competitive review, right? |
| 10:02 | 24 | A.   No.  As I said, there were plenty of other sources. |
| 10:03 | 25 | People posted them on their websites all the time. |

| | | |
|---|---|---|
| 10:03 | 1 | Q.   Understood.  But you didn't do any research into |
| 10:03 | 2 | whether the information came from an MGA showroom, right? |
| 10:03 | 3 | A.   No, I didn't. |
| 10:03 | 4 | Q.   And I understand that there was this code of conduct. |
| 10:03 | 5 | You know that after this code of conduct was revised that |
| 10:03 | 6 | Sal Villasenor was never disciplined for what he did in |
| 10:03 | 7 | gathering competitive information, using false credentials, |
| 10:03 | 8 | right? |
| 10:03 | 9 | A.   I -- yeah, to my knowledge, I'm not sure if he did or |
| 10:03 | 10 | didn't do anything after the code of conduct was revised. |
| 10:03 | 11 | Q.   But you know he was never disciplined, in any event, |
| 10:03 | 12 | for the behavior of using false credentials? |
| 10:03 | 13 | A.   Not that I'm aware. |
| 10:03 | 14 | MR. ZELLER:  Assumes facts. |
| 10:03 | 15 | THE COURT:  Overruled. |
| 10:04 | 16 | THE WITNESS:  Sorry.  Not that I'm aware. |
| 10:04 | 17 | BY MR. McCONVILLE: |
| 10:04 | 18 | Q.   I know you're talking about the code of conduct, but |
| 10:04 | 19 | you admitted that you knew right from wrong as a kid, right? |
| 10:04 | 20 | A.   Right. |
| 10:04 | 21 | Q.   So it didn't have to be in Mattel's code of conduct for |
| 10:04 | 22 | you to know it was wrong for what Mattel's Market |
| 10:04 | 23 | Intelligence was doing using false credentials, right? |
| 10:04 | 24 | A.   It's not something I would have done. |
| 10:04 | 25 | Q.   Right.  You knew it was wrong, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 82 of 175   Page ID #:311276
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:04 | 1 | A.   Yes. |
| 10:04 | 2 | Q.   You didn't need to see that in a code of conduct to |
| 10:04 | 3 | tell you that, right? |
| 10:04 | 4 | A.   Right. |
| 10:04 | 5 | Q.   And, uh, as far as you know, Sal Villasenor was never, |
| 10:04 | 6 | uh, disciplined, right? |
| 10:04 | 7 | A.   Uh, right. |
| 10:04 | 8 | Q.   And as far as you know, uh, Mr. Shore and Ms. Plunkett, |
| 10:04 | 9 | who came to you about the first business card, they were |
| 10:04 | 10 | never disciplined for what they did, right? |
| 10:04 | 11 |             MR. ZELLER:  Assumes facts. |
| 10:04 | 12 |             THE COURT:  Overruled. |
| 10:04 | 13 |             THE WITNESS:  Not that I'm aware of. |
| 10:04 | 14 | BY MR. McCONVILLE: |
| 10:04 | 15 | Q.   You were never disciplined, right? |
| 10:04 | 16 | A.   Uh, not that I'm aware of. |
| 10:05 | 17 | Q.   Well, that's something you probably would know about, |
| 10:05 | 18 | right? |
| 10:05 | 19 | A.   Probably, yes. |
| 10:05 | 20 | Q.   I mean, nobody took any money out of your paycheck, |
| 10:05 | 21 | right? |
| 10:05 | 22 | A.   No. |
| 10:05 | 23 | Q.   You weren't demoted because of it, right? |
| 10:05 | 24 | A.   No. |
| 10:05 | 25 | Q.   In fact, it was your address on that first business |

| 10:05 | 1 | card, and no one took any action against you and Mattel, |
| 10:05 | 2 | right? |
| 10:05 | 3 | A.   That's right. |
| 10:05 | 4 | Q.   And you never -- you personally never reprimanded |
| 10:05 | 5 | anybody once you became aware of the practice, right? |
| 10:05 | 6 | A.   I did not. |
| 10:05 | 7 | Q.   In fact, you approved raises and promotions for at |
| 10:05 | 8 | least Plunkett and Villasenor, right? |
| 10:05 | 9 | A.   They were unrelated to that. |
| 10:05 | 10 | Q.   Understood.  You had knowledge of something that you |
| 10:05 | 11 | considered wrong, right? |
| 10:05 | 12 | A.   Yes. |
| 10:05 | 13 | Q.   And you gave -- you recommended these people for |
| 10:05 | 14 | promotions and raises, right? |
| 10:05 | 15 | A.   That's right. |
| 10:05 | 16 | Q.   And you agreed, as part of your separation agreement, |
| 10:06 | 17 | that you would cooperate with Mattel in any investigation |
| 10:06 | 18 | that occurred after 2006, right? |
| 10:06 | 19 | A.   Uh, yes. |
| 10:06 | 20 | Q.   But after 2006, up until the time your deposition was |
| 10:06 | 21 | taken, no one from Mattel ever contacted you, right? |
| 10:06 | 22 | A.   About what? |
| 10:06 | 23 | Q.   About the Market Intelligence group, right? |
| 10:06 | 24 | A.   No. |
| 10:06 | 25 | Q.   Uh, and when you left, uh, in 2006 -- and you disclosed |

| | | |
|---|---|---|
| 10:06 | 1 | your concerns to Mr. Moore, right? -- the in-house lawyer at |
| 10:06 | 2 | Mattel. |
| 10:06 | 3 | A.   Yes. |
| 10:06 | 4 | Q.   And he never took any steps to investigate anything, as |
| 10:06 | 5 | far as you know, right? |
| 10:06 | 6 | MR. ZELLER:  Objection. |
| 10:06 | 7 | THE COURT:  Overruled. |
| 10:06 | 8 | THE WITNESS:  Not to my knowledge. |
| 10:06 | 9 | BY MR. McCONVILLE: |
| 10:06 | 10 | Q.   And when you left in 2006, you were paid in excess of |
| 10:06 | 11 | $200,000, right? -- from Mattel? |
| 10:06 | 12 | A.   Yeah.  I assume it was unrelated to this, as well. |
| 10:07 | 13 | MR. McCONVILLE:  Okay.  Your Honor, is this a good |
| 10:07 | 14 | time for a break? |
| 10:07 | 15 | THE COURT:  This is an excellent time for a break. |
| 10:07 | 16 | You're admonished not to discuss this matter |
| 10:07 | 17 | amongst yourselves, nor form or express any opinion |
| 10:07 | 18 | concerning this case.  Have a nice recess. |
| 10:07 | 19 | Counsel, if you will remain and be seated, please. |
| 10:07 | 20 | The audience will also remain for just a moment. |
| 10:07 | 21 | Have a seat. |
| 10:07 | 22 | *(Jury recesses at 10:07 a.m.)* |
| 10:07 | 23 | *(Outside the presence of the jury.)* |
| 10:07 | 24 | THE COURT:  All right.  The jury is no longer |
| 10:07 | 25 | present.  I thought I was very clear about cell phones not |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 85 of 175   Page ID #:311279
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:07 | 1 | going off in this court during critical pieces of |
| 10:07 | 2 | information, which are evidence and testimony, which is |
| 10:07 | 3 | almost every witness.  I didn't want that discourtesy |
| 10:07 | 4 | occurring to Mr. Larian or Mr. Eckert, who were primary |
| 10:07 | 5 | witnesses, and I was very clear about that.  I took |
| 10:07 | 6 | Ms. Pisconi's phone and put it in the trash can the first |
| 10:07 | 7 | time and then was gracious enough to return it. |
| 10:08 | 8 | There's a cell phone that went off in my court. |
| 10:08 | 9 | And I think the young lady in the black and white has that |
| 10:08 | 10 | cell phone.  Now, we're going to sit here until I get that |
| 10:08 | 11 | cell phone, or whoever had it and whoever set it off is |
| 10:08 | 12 | going to voluntarily give it to my marshal. |
| 10:08 | 13 | So, Steve, go find the cell phone for me.  I think |
| 10:08 | 14 | that will be given to you voluntarily. |
| 10:08 | 15 | And this is voluntary, Steve.  You don't have to |
| 10:08 | 16 | conduct any search.  Somebody's going to hand you something. |
| 10:08 | 17 | Thank you.  Now, take that down to the marshal's |
| 10:08 | 18 | office and seal it up. |
| 10:08 | 19 | Now, am I clear about cell phones not going off in |
| 10:08 | 20 | this courtroom?  Is there any miscommunication with anybody |
| 10:08 | 21 | about this? |
| 10:08 | 22 | There's not to be any interruption of any of these |
| 10:08 | 23 | witnesses, any discourtesy to any of these witnesses, and I |
| 10:08 | 24 | mean it. |
| 10:08 | 25 | Now, I've been very gracious with both counsel.  I |

| | | |
|---|---|---|
| 10:08 | 1 | want you to have your cell phones for Mike and Annette to |
| 10:08 | 2 | get the information over here.  All parties are welcome to |
| 10:09 | 3 | them, but I don't want cell phones going off in this |
| 10:09 | 4 | courtroom.  And that's my last word on it.  I've said it |
| 10:09 | 5 | twice now.  There will not be a third time. |
| 10:09 | 6 | All right.  We'll see you in 15 minutes, then. |
| 10:09 | 7 | MS. KELLER:  Your Honor, before we begin with -- |
| 10:09 | 8 | we don't have to do it right this second; but before we |
| 10:09 | 9 | begin with the Villasenor examination, may we discuss some |
| 10:09 | 10 | new binders we just received this morning with the Court? |
| 10:09 | 11 | THE COURT:  You may. |
| 10:09 | 12 | MS. KELLER:  We just this morning were presented |
| 10:09 | 13 | with two pretty good-sized supplemental binders by Mattel. |
| 10:09 | 14 | THE COURT:  Mr. Turetzky, you can step down.  Sir, |
| 10:09 | 15 | thank you.  If you'll return to us in 15 minutes and just be |
| 10:09 | 16 | seated. |
| 10:09 | 17 | *(Witness steps down and exits courtroom.)* |
| 10:09 | 18 | MS. KELLER:  It's pretty voluminous information. |
| 10:09 | 19 | It looks -- I haven't really had a chance to go through it. |
| 10:09 | 20 | But -- |
| 10:09 | 21 | THE COURT:  Well, then he'll be on call.  He'll be |
| 10:09 | 22 | coming back. |
| 10:09 | 23 | MS. KELLER:  It's just that I'm concerned that |
| 10:09 | 24 | the -- you know, we want to get the examination underway, |
| 10:09 | 25 | but with -- would it be the Court's ruling that Mattel can't |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 87 of 175   Page ID #:311281
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

87

| 10:10 | 1 | use these materials on cross since we haven't previewed them |
| 10:10 | 2 | with the Court? |
| 10:10 | 3 |           THE COURT:  Well, I don't know.  I know you were |
| 10:10 | 4 | all here until 2:00 a.m. last night, some of you were |
| 10:10 | 5 | anyway. |
| 10:10 | 6 |           Mr. Quinn, I think you were, weren't you? |
| 10:10 | 7 |           MR. QUINN:  No.  I didn't stay until the end. |
| 10:10 | 8 |           THE COURT:  Mr. Gordon? |
| 10:10 | 9 |           MR. GORDON:  Yes, about 2:30. |
| 10:10 | 10 |           THE COURT:  Yeah, I was communicating with |
| 10:10 | 11 | Mr. O'Brien last night about 2:30 in the morning. |
| 10:10 | 12 |           So I imagine that some of you are pretty tired, at |
| 10:10 | 13 | least three of us are. |
| 10:10 | 14 |           Mr. Gordon, are you tired? |
| 10:10 | 15 |           I feel great.  I don't know about you. |
| 10:10 | 16 |           You feel good? |
| 10:10 | 17 |           MR. GORDON:  In this courtroom, I never say I'm |
| 10:10 | 18 | tired. |
| 10:10 | 19 |           THE COURT:  You're never tired.  You're doing |
| 10:10 | 20 | great, Mr. Gordon. |
| 10:10 | 21 |           Ms. Hurst, you were up until 2:30 last night, |
| 10:10 | 22 | weren't you? |
| 10:10 | 23 |           MS. HURST:  Yes, Your Honor. |
| 10:10 | 24 |           THE COURT:  Well, Mr. O'Brien was.  I think a lot |
| 10:10 | 25 | of us were.  But apparently some of you weren't. |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 88 of 175   Page ID #:311282
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:10 | 1 | I don't know what this is all about, so I can't |
| 10:10 | 2 | make a ruling on the fly, and I don't know what you're |
| 10:10 | 3 | asking.  You can call a witness out of order.  But, by the |
| 10:10 | 4 | same token, it's not fair that you have to do that if you're |
| 10:10 | 5 | just receiving binders at the last moment and you don't know |
| 10:10 | 6 | what they are. |
| 10:10 | 7 | MS. KELLER:  Well -- |
| 10:10 | 8 | THE COURT:  And I think, at this late date, I'd |
| 10:11 | 9 | probably preclude the party who's dumping them or giving |
| 10:11 | 10 | them to you at the last moment from using them on cross. |
| 10:11 | 11 | Now, the problem is that it might be very valuable |
| 10:11 | 12 | for both sides, so I'd like to get as much evidence in front |
| 10:11 | 13 | of the jury as possible.  So maybe Mr. Villasenor comes back |
| 10:11 | 14 | after the initial go-around, and you have some additional |
| 10:11 | 15 | opportunities to question him. |
| 10:11 | 16 | But this is exactly what we've sought to avoid. |
| 10:11 | 17 | MR. PRICE:  Your Honor, you'll recall, because we |
| 10:11 | 18 | got the binders so late, you said -- |
| 10:11 | 19 | THE COURT:  Yeah, I do.  I'm not finding fault, |
| 10:11 | 20 | believe me, with Quinn Emanuel at all; in fact, quite the |
| 10:11 | 21 | opposite.  Let me repeat for the record so there's no |
| 10:11 | 22 | misunderstanding -- in front of your client, in fact -- |
| 10:11 | 23 | you've performed magnificently, and Mr. Zeller, getting the |
| 10:11 | 24 | binders to the Court. |
| 10:11 | 25 | Some of the last-moment issues have been, frankly, |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 89 of 175   Page ID #:311283
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:11 | 1 | getting the binders from MGA back to Mattel.  So I don't see |
| 10:11 | 2 | why Mattel is being punished.  By the same token, neither |
| 10:11 | 3 | one of you should be caught unaware. |
| 10:12 | 4 | MS. KELLER:  These binders were -- Villasenor |
| 10:12 | 5 | binders were given to Mattel on Thursday, Your Honor. |
| 10:12 | 6 | THE COURT:  Oh that's -- you're right.  I'm sorry. |
| 10:12 | 7 | This weekend we did all the rest.  Villasenor was early on |
| 10:12 | 8 | in the game. |
| 10:12 | 9 | MS. KELLER:  Right. |
| 10:12 | 10 | THE COURT:  My apologies.  I got my eight |
| 10:12 | 11 | witnesses that we went over this weekend confused with my |
| 10:12 | 12 | two or three witnesses last Thursday. |
| 10:12 | 13 | You're right.  Villasenor was early in the game. |
| 10:12 | 14 | There's no reason that these should be coming to you at the |
| 10:12 | 15 | last moment. |
| 10:12 | 16 | MR. PRICE:  Your Honor -- |
| 10:12 | 17 | THE COURT:  I have -- no.  Just a moment.  I have |
| 10:12 | 18 | no solution for it.  In other words, this is a practical |
| 10:12 | 19 | problem between trials.  So let's have one go-around with |
| 10:12 | 20 | Mr. Villasenor.  He'll wait out in the hallway, and he'll be |
| 10:12 | 21 | here until we examine the binders. |
| 10:12 | 22 | MR. PRICE:  That's fine, Your Honor.  Just so you |
| 10:12 | 23 | know what the binders are, the new ones, they're the toy |
| 10:12 | 24 | fair reports and then press releases and articles. |
| 10:12 | 25 | THE COURT:  Yeah.  But see, the toy fair reports |

| | | |
|---|---|---|
| 10:12 | 1 | may be critical, because what MGA will probably do is the |
| 10:12 | 2 | same thing Mattel would like to do; and that is, go through |
| 10:12 | 3 | the binders and see what's truly, you know, a trade secret |
| 10:12 | 4 | and what's not. |
| 10:12 | 5 | What's just garbage coming out of the press -- |
| 10:12 | 6 | well, let me rephrase that -- information coming out of the |
| 10:13 | 7 | press that's not a trade secret or, you know, press releases |
| 10:13 | 8 | from MGA, harmless.  And you don't want the same effect |
| 10:13 | 9 | that's occurring between both sides.  It's what I call the |
| 10:13 | 10 | "avalanche effect." |
| 10:13 | 11 | Here's this whole competitive review coming from |
| 10:13 | 12 | New York on behalf of MGA.  They seek to introduce this, |
| 10:13 | 13 | Mr. Price.  And the implication is that this whole stack of |
| 10:13 | 14 | thousands of documents are trade secrets that Mr. Villasenor |
| 10:13 | 15 | got. |
| 10:13 | 16 | MR. PRICE:  And those are their exhibits. |
| 10:13 | 17 | THE COURT:  But that's not what's about to happen. |
| 10:13 | 18 | You see what I mean?  It's potentially prejudicial to |
| 10:13 | 19 | Mattel.  But the same thing's happened on the other side |
| 10:13 | 20 | with MGA. |
| 10:13 | 21 | In other words, I've had so many cases where |
| 10:13 | 22 | documents have come in and the impression has been that all |
| 10:13 | 23 | of these documents are surreptitiously obtained when, in |
| 10:13 | 24 | fact, there's very little information on both sides, only a |
| 10:13 | 25 | few documents, and they pertain to Bratz. |

| | | |
|---|---|---|
| 10:13 | 1 | MS. KELLER:  And, Your Honor, that's why we need |
| 10:13 | 2 | time to analyze these.  We can't do it on the fly. |
| 10:14 | 3 | THE COURT:  I've got all the time in the world, as |
| 10:14 | 4 | you know. |
| 10:14 | 5 | MR. PRICE:  Your Honor, if it's going to be that |
| 10:14 | 6 | laser-focused, that is, if MGA has to say, "Of the reports, |
| 10:14 | 7 | these are the ones we want in" -- |
| 10:14 | 8 | THE COURT:  Just a moment.  As the two of you get |
| 10:14 | 9 | up out of your chair -- Mr. Price, as you get up out of your |
| 10:14 | 10 | chair, as you rise from you chair, as Ms. Keller rises from |
| 10:14 | 11 | her chair, you have a conversation.  Lead counsel at the |
| 10:14 | 12 | back, decide what to do. |
| 10:14 | 13 | Those are things I can't work out for you. |
| 10:14 | 14 | As far as Mr. Villasenor, I'm not too worried |
| 10:14 | 15 | about his availability.  He's available all the time. |
| 10:14 | 16 | The problem is, with the witness schedule, I don't |
| 10:14 | 17 | see why I'm going to then take time off the clock for one of |
| 10:15 | 18 | the parties that isn't -- can't be prepared because the |
| 10:15 | 19 | binders come at the last moment, so it leaves the Court in |
| 10:15 | 20 | the position of stopping the time clock, if there's nobody |
| 10:15 | 21 | out in the hallway, and having the jury come back at |
| 10:15 | 22 | 1:00 o'clock or getting some direction from counsel on this. |
| 10:15 | 23 | MS. KELLER:  Your Honor, we just object to this |
| 10:15 | 24 | coming in at the last minute.  It's gonna be too hard to |
| 10:15 | 25 | analyze it all.  Some of these don't have dates on them.  It |

| | | |
|---|---|---|
| 10:15 | 1 | would require some real analysis to sit down and figure out |
| 10:15 | 2 | dates of press releases. |
| 10:15 | 3 | THE COURT:  Well, the way I've handled that on |
| 10:15 | 4 | complex criminal cases is very simple.  And I think |
| 10:15 | 5 | Mr. Overland can verify that because he went through this |
| 10:15 | 6 | with me.  You take 'em on direct examination, and |
| 10:15 | 7 | cross-examination isn't going to occur until it's been |
| 10:15 | 8 | analyzed.  Mr. Sal Villasenor will go away.  We've done that |
| 10:15 | 9 | with numerous government witnesses before, who the |
| 10:15 | 10 | government dumped last-minute information on the defense, |
| 10:15 | 11 | and the defense is always given the option of, you know, you |
| 10:15 | 12 | come back and cross-examine when you're ready.  Meanwhile, |
| 10:15 | 13 | the informant sits in the back hallway.  That gives both |
| 10:16 | 14 | sides a chance to prepare.  So if you want to take him on |
| 10:16 | 15 | direct, there won't be any cross until you've analyzed it. |
| 10:16 | 16 | MR. PRICE:  Your Honor, may I ask, first, if I can |
| 10:16 | 17 | do cross on everything but that topic? |
| 10:16 | 18 | THE COURT:  Certainly. |
| 10:16 | 19 | MR. PRICE:  And second -- |
| 10:16 | 20 | THE COURT:  And that doesn't cause any prejudice |
| 10:16 | 21 | to what you're prepared for. |
| 10:16 | 22 | But the difficulty, it means on redirect, there's |
| 10:16 | 23 | no such thing as beyond the scope.  In other words, that |
| 10:16 | 24 | whole thing's opened up again. |
| 10:16 | 25 | MR. PRICE:  Right.  I understand that. |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 93 of 175   Page ID #:311287
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

93

| | | |
|---|---|---|
| 10:16 | 1 | THE COURT:  But that doesn't create the |
| 10:16 | 2 | misimpression, you know, that Mattel's in a position where |
| 10:16 | 3 | something untoward's happened. |
| 10:16 | 4 | I really don't care. |
| 10:16 | 5 | MR. PRICE:  And what I'd ask is -- my |
| 10:16 | 6 | understanding is the Court's saying these huge toy fair |
| 10:16 | 7 | reports don't come in; that it's going to be focused on -- |
| 10:16 | 8 | THE COURT:  No.  Right now, I'd probably let them |
| 10:16 | 9 | in.  And I don't want to because the impression is, as they |
| 10:16 | 10 | flow in, that they're full of trade secrets from one to page |
| 10:16 | 11 | 10,000.  There may be two pages of the entire competitive |
| 10:16 | 12 | analysis that pertains to Bratz, but you remember, Mattel's |
| 10:17 | 13 | also been doing that to MGA.  I can pick numerous occasions |
| 10:17 | 14 | where there's been an effort to get in, co-equally for both |
| 10:17 | 15 | sides, the impression that thousands of documents are |
| 10:17 | 16 | flowing in that are trade secrets when, in fact, there's a |
| 10:17 | 17 | couple pages. |
| 10:17 | 18 | So you're both very good at doing that, both |
| 10:17 | 19 | Mattel and MGA.  And I pay you the equal compliment. |
| 10:17 | 20 | MS. KELLER:  It's kind of the other way around |
| 10:17 | 21 | here.  I think -- |
| 10:17 | 22 | THE COURT:  I know. |
| 10:17 | 23 | MS. KELLER:  I think what they -- I haven't even |
| 10:17 | 24 | had a chance to read these.  So the idea that if I could |
| 10:17 | 25 | just not cross on that topic, I don't even know what that |

| | | |
|---|---|---|
| 10:17 | 1 | "topic" is yet.  I can flip through as fast as I can to see |
| 10:17 | 2 | what some of this stuff is.  I don't even know if there's a |
| 10:17 | 3 | foundation for some of this stuff.  I don't know what the |
| 10:17 | 4 | dates of some of these things are. |
| 10:17 | 5 | THE COURT:  Well, so far, I've been fairly |
| 10:17 | 6 | inconsistent (*sic*).  This would be the first inconsistency |
| 10:17 | 7 | on my part in terms of not allowing. |
| 10:17 | 8 | So really what you're asking me to do, I think, |
| 10:17 | 9 | Mr. Price, is break my longstanding commitment that things |
| 10:17 | 10 | don't come in.  By the same token, if you are prepared on |
| 10:18 | 11 | certain documents, I've allowed you, in the past, to examine |
| 10:18 | 12 | on those. |
| 10:18 | 13 | MR. PRICE:  And I -- and I appreciate that.  This |
| 10:18 | 14 | was, as you know, a time crunch.  And what I was saying -- |
| 10:18 | 15 | THE COURT:  No.  Just a moment. |
| 10:18 | 16 | Were you here Monday? |
| 10:18 | 17 | MR. PRICE:  Uh, I was here Monday until about |
| 10:18 | 18 | 8:00. |
| 10:18 | 19 | THE COURT:  Were you here Sunday? |
| 10:18 | 20 | MR. PRICE:  Yes. |
| 10:18 | 21 | THE COURT:  Were you here Saturday? |
| 10:18 | 22 | MR. PRICE:  I was. |
| 10:18 | 23 | THE COURT:  Were you here Friday? |
| 10:18 | 24 | MR. PRICE:  I was. |
| 10:18 | 25 | THE COURT:  It's not a time crunch. |

| | | |
|---|---|---|
| 10:18 | 1 | MR. PRICE:  But -- but -- |
| 10:18 | 2 | THE COURT:  Was I here? |
| 10:18 | 3 | MR. PRICE:  You definitely were. |
| 10:18 | 4 | THE COURT:  Were other counsel here?  Mr. Zeller |
| 10:18 | 5 | is always here. |
| 10:18 | 6 | MR. PRICE:  He's always here. |
| 10:18 | 7 | THE COURT:  Ms. Hurst. |
| 10:18 | 8 | MR. PRICE:  What I was suggesting is -- my |
| 10:18 | 9 | understanding is they want to use the toy fair reports. |
| 10:18 | 10 | Once that's done, we will know what's relevant and what's |
| 10:18 | 11 | not.  We can cut it down to probably ten pages. |
| 10:18 | 12 | THE COURT:  Well, the problem is they can't use |
| 10:18 | 13 | toy fair reports until they know what's in them. |
| 10:18 | 14 | MR. PRICE:  That's in their exhibit list, not |
| 10:18 | 15 | ours. |
| 10:18 | 16 | MS. KELLER:  We are gonna reference some pages of |
| 10:18 | 17 | some toy fair reports in the examination, and we'd already |
| 10:18 | 18 | given those binders to the other side. |
| 10:19 | 19 | THE COURT:  Are these just duplicates coming back? |
| 10:19 | 20 | Because we've had numerous duplicates. |
| 10:19 | 21 | MS. KELLER:  I don't even know that.  I haven't |
| 10:19 | 22 | had a chance -- |
| 10:19 | 23 | THE COURT:  Ask him. |
| 10:19 | 24 | MR. PRICE:  So -- I think this will work out. |
| 10:19 | 25 | They're duplicates.  They may have different numbers, but we |

| 10:19 | 1 | put in there the toy fair reports, which also MGA's counsel |
| 10:19 | 2 | has as the toy fair reports. |
| 10:19 | 3 | THE COURT:  Why don't we do this:  Why don't we |
| 10:19 | 4 | limit it to the toy fair reports that you examine on direct |
| 10:19 | 5 | examination, and there's no other toy fair reports until |
| 10:19 | 6 | both of you have a chance to look at these binders?  That |
| 10:19 | 7 | way you can go forward with your cross-examination, and |
| 10:19 | 8 | there's no harm. |
| 10:19 | 9 | And, by the same token, any other report that |
| 10:19 | 10 | hasn't been submitted previously is off limits until we get |
| 10:19 | 11 | the next go-around.  Now, that shouldn't stop a good direct |
| 10:19 | 12 | and a good cross-examination. |
| 10:19 | 13 | MS. KELLER:  Thank you. |
| 10:19 | 14 | THE COURT:  Okay.  All right? |
| 10:19 | 15 | MR. PRICE:  Fine. |
| 10:19 | 16 | THE COURT:  Now, how long would you like for a |
| 10:19 | 17 | restroom break?  I'll pretend like I'm late so you get a |
| 10:19 | 18 | little bit of a break. |
| 10:19 | 19 | How about 10:30?  And I'll just tell the jury I'm |
| 10:20 | 20 | late. |
| 10:20 | 21 | MR. McCONVILLE:  Thank you. |
| 10:20 | 22 | *(Recess held at 10:20 a.m.)* |
| 10:30 | 23 | *(Proceedings resumed at 10:30 a.m.)* |
| 10:30 | 24 | THE COURT:  All right.  The jury's present.  All |
| 10:30 | 25 | parties are present.  Counsel are present.  The witness is |

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 97 of 175  Page ID #:311291
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

97

| 10:30 | 1 | present. |
| 10:30 | 2 | And, Mr. McConville, if you'd like to continue |
| 10:30 | 3 | with your examination of Mr. Turetzky. |
| 10:30 | 4 | MR. McCONVILLE:  Yes, sir. |
| 10:30 | 5 | BY MR. McCONVILLE: |
| 10:30 | 6 | Q.   Mr. Turetzky, when you began working at Mattel in 2000, |
| 10:30 | 7 | you were aware at that time that Mattel was concerned about |
| 10:30 | 8 | how quickly the -- or that the Barbie market wasn't growing, |
| 10:30 | 9 | right? |
| 10:30 | 10 | A.   Not as fast as it had historically, yes. |
| 10:30 | 11 | Q.   So there were concerns -- when you started, you knew |
| 10:30 | 12 | there were concerns about Barbie's performance, right? |
| 10:30 | 13 | A.   Right. |
| 10:30 | 14 | Q.   And that was one of the things that Mattel was focused |
| 10:31 | 15 | on while you were employed, was trying to improve Barbie's |
| 10:31 | 16 | performance, right? |
| 10:31 | 17 | A.   Yes. |
| 10:31 | 18 | Q.   And when -- uh, one of the things that gave Barbie -- |
| 10:31 | 19 | one of the things that competed with Barbie was Bratz, |
| 10:31 | 20 | right? |
| 10:31 | 21 | A.   Not at the time.  Later on, it's launch. |
| 10:31 | 22 | Q.   Right.  I'm sorry.  I -- while you were at Mattel, one |
| 10:31 | 23 | of the things that competed with Barbie was Bratz. |
| 10:31 | 24 | A.   Right.  Just one of the things, right. |
| 10:31 | 25 | Q.   And, um, you said it wasn't -- obviously, Bratz |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

98

| | | |
|---|---|---|
| 10:31 | 1 | couldn't compete with Barbie until Bratz came onto the |
| 10:31 | 2 | marketplace, right? |
| 10:31 | 3 | A.   Right. |
| 10:31 | 4 | Q.   Do you remember when Bratz came on the marketplace? |
| 10:31 | 5 | A.   Would be the middle of 2001, maybe. |
| 10:31 | 6 | Q.   Okay.  Call it Summer 2001? |
| 10:31 | 7 | A.   Sure. |
| 10:32 | 8 | Q.   When Bratz first came out, you, Matt Turetzky, weren't |
| 10:32 | 9 | necessarily concerned that it was gonna be a real threat to |
| 10:32 | 10 | Barbie, right? |
| 10:32 | 11 | A.   Not immediately. |
| 10:32 | 12 | Q.   Let's look at Exhibit 34928, please. |
| 10:32 | 13 | MR. McCONVILLE:  This is already into evidence. |
| 10:32 | 14 | *(Document displayed.)* |
| 10:32 | 15 | *(Document provided to the witness.)* |
| 10:32 | 16 | BY MR. McCONVILLE: |
| 10:32 | 17 | Q.   This is an e-mail from you to others, including |
| 10:32 | 18 | Adrienne Fontanella.  She was your boss at the time? |
| 10:32 | 19 | A.   My boss's boss. |
| 10:32 | 20 | Q.   The president of Mattel Brands? |
| 10:32 | 21 | A.   Yes -- no.  The president of the Girls Division. |
| 10:32 | 22 | Q.   President of the Girls Division.  I'm sorry. |
| 10:32 | 23 | And also included is Jerome Bossick, right? |
| 10:33 | 24 | A.   Yes. |
| 10:33 | 25 | Q.   Was he Fontanella's right-hand man? |

| | | |
|---|---|---|
| 10:33 | 1 | A.    Uh, he was the senior vice president of financial and |
| 10:33 | 2 | planning. |
| 10:33 | 3 | Q.    Was that something -- based on your experience, was |
| 10:33 | 4 | that somebody that she turned to regularly for |
| 10:33 | 5 | problem-solving? |
| 10:33 | 6 | A.    Uh, yes. |
| 10:33 | 7 | Q.    Okay.  And the data of this e-mail, September 5, 2001? |
| 10:33 | 8 | A.    Yes. |
| 10:33 | 9 | Q.    And this would have been, you know, roughly shortly |
| 10:33 | 10 | after the release of Bratz, right? |
| 10:33 | 11 | A.    Yes. |
| 10:33 | 12 | Q.    Okay.  And let's look at the second paragraph here.  It |
| 10:33 | 13 | says, "July was Bratz' first full month of wide |
| 10:33 | 14 | distribution." |
| 10:33 | 15 | Is that consistent with your recollection? |
| 10:33 | 16 | A.    Uh, yes. |
| 10:33 | 17 | Q.    "After 17,000 of sales in June, July sales skyrocketed |
| 10:33 | 18 | to 117,000, ranking as the 95th best selling fashion doll |
| 10:33 | 19 | and related SKU.  Hard to believe that TRU would" -- |
| 10:34 | 20 | What's TRU? |
| 10:34 | 21 | A.    Toys R Us. |
| 10:34 | 22 | Q.    -- "hard to believe that Toys R Us would classify that |
| 10:34 | 23 | as a hot seller, although I believe that this is still |
| 10:34 | 24 | pre-TV." |
| 10:34 | 25 | So as of this time, September 5, 2001, you didn't think |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:34 | 1 | that Mattel -- or that Bratz was gonna be the competitor it |
| 10:34 | 2 | turned out to be against Barbie? |
| 10:34 | 3 | A.   Well, it was just -- it was just coming on the radar at |
| 10:34 | 4 | that point.  You know, we'd heard reports back from Toys R |
| 10:34 | 5 | Us that the dolls were selling well, so we were trying to |
| 10:34 | 6 | confirm that through independent sources. |
| 10:34 | 7 | Q.   But as of this date, you -- you hadn't confirmed that |
| 10:34 | 8 | Bratz was gonna be the competitor it turned out to be for -- |
| 10:34 | 9 | against Barbie? |
| 10:34 | 10 | A.   Yeah, at that time, we didn't know. |
| 10:34 | 11 | Q.   And you -- it was -- it was Mattel's message at that |
| 10:34 | 12 | time that Bratz would just be a fad, right? |
| 10:35 | 13 | A.   I'm not sure I understand that. |
| 10:35 | 14 | Q.   Sure.  So let me ask a better question. |
| 10:35 | 15 |      Mattel was communicating to retailers that the |
| 10:35 | 16 | retailers need not be concerned about Bratz because Bratz |
| 10:35 | 17 | was a flash in the pan? |
| 10:35 | 18 | A.   Uh, during this period of time? |
| 10:35 | 19 | Q.   Yeah. |
| 10:35 | 20 | A.   I'm not sure of the period of time that we would have |
| 10:35 | 21 | done that. |
| 10:35 | 22 | Q.   Okay.  During any period of time, do you recall |
| 10:35 | 23 | Mattel's position was, to retailers, to tell them Bratz is a |
| 10:35 | 24 | flash in the pan? |
| 10:35 | 25 | A.   Right.  I mean, Barbie was a brand that had been around |

DEBBIE GALE, U.S. COURT REPORTER

| 10:35 | 1 | for decades, and Bratz was a new brand, and so our position |
| 10:35 | 2 | to them was that it would be -- you know, Barbie would be |
| 10:35 | 3 | here forever and Bratz would be a short-term trend. |
| 10:35 | 4 | Q.   Okay.  And that was something you were communicating -- |
| 10:35 | 5 | having your sales force communicate to retailers in the |
| 10:35 | 6 | 2002 timeframe? |
| 10:35 | 7 | A.   I -- I don't know if they communicated it to them or |
| 10:35 | 8 | not.  I know that we discussed, uh, that with -- I discussed |
| 10:35 | 9 | that with our, um -- let me back up on the language. |
| 10:35 | 10 | I believe I sent an e-mail out to, uh, at least the |
| 10:36 | 11 | head of sales -- I'm not sure who else -- with some |
| 10:36 | 12 | information to that effect. |
| 10:36 | 13 | MR. McCONVILLE:  Okay.  Could we look at |
| 10:36 | 14 | Exhibit 34830, please. |
| 10:36 | 15 | *(Document provided to the witness.)* |
| 10:36 | 16 | THE WITNESS:  Okay. |
| 09:58 | 17 | BY MR. McCONVILLE: |
| 10:36 | 18 | Q.   I ask if you recognize that document? |
| 10:36 | 19 | A.   Um, yes, it looks familiar, but -- okay. |
| 10:36 | 20 | Q.   You said you had prepared information that you provided |
| 10:36 | 21 | to the head of sales; is that right? |
| 10:36 | 22 | A.   Uh, it was an e-mail. |
| 10:36 | 23 | Q.   An e-mail? |
| 10:36 | 24 | A.   Yes. |
| 10:36 | 25 | Q.   Does this -- does this document, 34830, appear to be |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 102 of 175   Page ID #:311296
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

102

| | | |
|---|---|---|
| 10:36 | 1 | talking points that you prepared in the 2002 timeframe? |
| 10:36 | 2 | A.   It looks like it, but I'm not sure what this was for. |
| 10:36 | 3 | Q.   Okay.  But it look like something that you prepared |
| 10:36 | 4 | right? |
| 10:36 | 5 | A.   Yes. |
| 10:36 | 6 | MR. McCONVILLE:  All right.  Your Honor, I move |
| 10:36 | 7 | into evidence 34830, please. |
| 10:37 | 8 | THE COURT:  Received. |
| 10:37 | 9 | *(Exhibit No. 34830 received in evidence.)* |
| 10:37 | 10 | *(Document displayed.)* |
| 10:37 | 11 | BY MR. McCONVILLE: |
| 10:37 | 12 | Q.   And you'll see that -- do you remember the reason you |
| 10:37 | 13 | created this document? |
| 10:37 | 14 | A.   I don't. |
| 10:37 | 15 | Q.   Is it something that -- you know, in looking at it, is |
| 10:37 | 16 | it something that is consistent with what you just testified |
| 10:37 | 17 | to, which was, you know, we wanted to communicate to |
| 10:37 | 18 | retailers that Barbie was a longstanding brand and Bratz was |
| 10:37 | 19 | a fad? |
| 10:37 | 20 | A.   I don't know what the purpose of this was for.  You |
| 10:37 | 21 | know, I prepared many documents which were used for internal |
| 10:37 | 22 | purposes -- for planning, for strategy, et cetera -- so I |
| 10:37 | 23 | don't know if this was intended to be internally or |
| 10:37 | 24 | externally used. |
| 10:37 | 25 | Q.   Right.  But I'm asking for the content.  Is the content |

| 10:37 | 1 | of this document consistent with what Mattel was |
| 10:37 | 2 | communicating to retailers, which was that Barbie's been |
| 10:38 | 3 | around a long time and Bratz will be, you know, a flash in |
| 10:38 | 4 | the pan? |
| 10:38 | 5 | A.   I -- you know, I haven't read through the whole thing. |
| 10:38 | 6 | Um, so, again, I don't know what the intent of this was. |
| 10:38 | 7 | Q.   Well, let's take a look at some of these bullet points |
| 10:38 | 8 | here.  Let's go down to middle of the first page. |
| 10:38 | 9 | Bullet point begins, "Bratz." |
| 10:38 | 10 | A.   Yes. |
| 10:38 | 11 | Q.   "Bratz remains just a small player in the fashion doll |
| 10:38 | 12 | category." |
| 10:38 | 13 | A.   Yes. |
| 10:38 | 14 | Q.   Next bullet, "Through February, Mattel retail sales |
| 10:38 | 15 | were nearly 18 times that of Bratz." |
| 10:38 | 16 | A.   Right. |
| 10:38 | 17 | Q.   Is that consistent with the message that Mattel was |
| 10:38 | 18 | communicating at that time to retailers, which was Barbie |
| 10:38 | 19 | was a big brand and Bratz is, you know, negligible -- I |
| 10:38 | 20 | don't want to say "negligible." |
| 10:38 | 21 | What's a better word? |
| 10:38 | 22 | MR. ZELLER:  Assumes facts.  Argumentative. |
| 10:38 | 23 | THE COURT:  Just restate the question. |
| 10:38 | 24 | MR. McCONVILLE:  Sure. |
|  | 25 | |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

104

| | | |
|---|---|---|
| 10:38 | 1 | BY MR. McCONVILLE: |
| 10:38 | 2 | Q.   How you would you characterize the bullet points I just |
| 10:38 | 3 | read? |
| 10:39 | 4 | A.   I think it was intended to support our position that |
| 10:39 | 5 | Mattel was still a much larger player in the doll business. |
| 10:39 | 6 | Q.   And -- |
| 10:39 | 7 | A.   And that -- |
| 10:39 | 8 | Q.   Go ahead. |
| 10:39 | 9 | A.   And that Bratz was still a relatively small, but |
| 10:39 | 10 | growing, competitor. |
| 10:39 | 11 | Q.   And if you go to the second page. |
| 10:39 | 12 | (Document displayed.) |
| 08:53 | 13 | BY MR. McCONVILLE: |
| 10:39 | 14 | Q.   You can see there's a bullet point there called "Bratz |
| 10:39 | 15 | Defense Strategy" -- |
| 10:39 | 16 | A.   Yes. |
| 10:39 | 17 | Q.   -- right? |
| 10:39 | 18 | And part of the defense strategy was to develop |
| 10:39 | 19 | products to compete with Bratz for the older girls in the |
| 10:39 | 20 | fashion doll market, right? |
| 10:39 | 21 | A.   Yes. |
| 10:39 | 22 | Q.   And one of the bullet points under "Bratz Defense |
| 10:39 | 23 | Strategy," there, entitled, "We believe" -- "We believe that |
| 10:39 | 24 | Bratz could have a longer-term positive impact on Barbie and |
| 10:40 | 25 | other dolls by extending older girls', aged nine plus, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 105 of 175   Page ID
#:311299
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

105

| | | |
|---|---|---|
| 10:40 | 1 | interest in dolls and driving them to the doll aisle." |
| 10:40 | 2 | Do you see that? |
| 10:40 | 3 | A.   I do see that. |
| 10:40 | 4 | Q.   So based on your experience at Mattel in, say, the |
| 10:40 | 5 | 2002 time frame, did you understand it was -- one of the |
| 10:40 | 6 | Mattel's plans was to communicate to retailers that Barbie |
| 10:40 | 7 | was long-staying and would thrive, and Bratz would -- would |
| 10:40 | 8 | go the way of other fashion dolls and fade out? |
| 10:40 | 9 | A.   Yes. |
| 10:40 | 10 | Q.   Did you -- did you personally have that belief that |
| 10:40 | 11 | Bratz was going to die a peaceful death like other fashion |
| 10:40 | 12 | dolls? |
| 10:40 | 13 | A.   Uh, you know, it's hard to predict that.  So I would |
| 10:40 | 14 | say I didn't have a sense one way or the other, which was |
| 10:40 | 15 | why we were taking it very seriously. |
| 10:40 | 16 | Q.   Seriously enough to launch a Bratz defense strategy, |
| 10:41 | 17 | right? |
| 10:41 | 18 | A.   Uh, yes. |
| 10:41 | 19 | MR. McCONVILLE:  Let's take a look at |
| 10:41 | 20 | Exhibit 9442, please. |
| 10:41 | 21 | *(Document provided to the witness.)* |
| 10:41 | 22 | BY MR. McCONVILLE: |
| 10:41 | 23 | Q.   And I'll ask, once it's in front of you, if you |
| 10:41 | 24 | recognize this document? |
| 10:41 | 25 | A.   I do. |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

106

| 10:41 | 1 | Q.   And what is this document? |
| 10:41 | 2 | A.   It looks like the annual goals for the Girls Division |
| 10:41 | 3 | for 2002. |
| 10:41 | 4 | MR. McCONVILLE:  Your Honor, I move into evidence |
| 10:41 | 5 | Exhibit 9442, please. |
| 10:41 | 6 | THE COURT:  Received. |
| 10:41 | 7 | *(Exhibit No. 9442 received in evidence.)* |
| 10:41 | 8 | *(Document displayed.)* |
| 10:41 | 9 | BY THE COURT: |
| 10:41 | 10 | Q.   Now, Mr. Turetzky, the version you have in your book is |
| 10:41 | 11 | sort of diced up and -- |
| 10:41 | 12 | A.   Right.  Yeah, somebody helped me and taped it all |
| 10:41 | 13 | together. |
| 10:41 | 14 | Q.   Oh, thank you.  So could you hold that up? |
| 10:41 | 15 | A.   It's a big spreadsheet.  *(Indicating.)* |
| 10:41 | 16 | Q.   It's a spreadsheet of multi pages that's been assembled |
| 10:42 | 17 | for you to look at? |
| 10:42 | 18 | A.   Yes. |
| 10:42 | 19 | Q.   And this is the 2002 Girls Division goals? |
| 10:42 | 20 | A.   Yes. |
| 10:42 | 21 | Q.   And when would something like this be created? |
| 10:42 | 22 | A.   Um, likely late 2001, early 2003. |
| 10:42 | 23 | Q.   Okay.  And if you look at line 52. |
| 10:42 | 24 | A.   Okay. |
| 10:42 | 25 | Q.   And there's a line there that says, "Develop and |

| | | |
|---|---|---|
| 10:42 | 1 | execute Bratz defense strategy for 2002 and 2003." |
| 10:42 | 2 | Do you see that? |
| 10:42 | 3 | A.   Yeah, yeah.  Actually, the taped up version's kind of |
| 10:42 | 4 | hard to read. |
| 10:42 | 5 | Uh, yes, I think so, although it's taped over so I |
| 10:42 | 6 | can't really see all the words. |
| 10:42 | 7 | Q.   What does it look like, best you can read? |
| 10:42 | 8 | A.   "Develo- and execute Bratz defense strategy for |
| 10:42 | 9 | 2002/2003." |
| 10:42 | 10 | Q.   And, uh, so that was something that was a Girls |
| 10:42 | 11 | Division goal that you -- that this would have been a focus |
| 10:43 | 12 | at the end of 2001? |
| 10:43 | 13 | A.   Yeah, end of 2001, early 2002. |
| 10:43 | 14 | Q.   And part of the defense strategy to Bratz was to |
| 10:43 | 15 | "position creative to target Bratz more directly and target |
| 10:43 | 16 | spending towards appropriate products," right? |
| 10:43 | 17 | A.   Yes. |
| 10:43 | 18 | Q.   What do you recall about that? |
| 10:43 | 19 | A.   We wanted to try to go more directly after the older |
| 10:43 | 20 | girl audience. |
| 10:43 | 21 | Q.   In what way? |
| 10:43 | 22 | A.   With our TV commercials. |
| 10:43 | 23 | Q.   For Barbie? |
| 10:43 | 24 | A.   Not just Barbie, but all of our products that were |
| 10:43 | 25 | appropriate for older girls. |

| | | |
|---|---|---|
| 10:43 | 1 | Q.   And do you recall the name of some of those in this |
| 10:43 | 2 | time frame? |
| 10:43 | 3 | A.   Um, I think it would have been, you know, |
| 10:43 | 4 | What's Her Face and Diva Starz. |
| 10:43 | 5 | Q.   Okay.  And what's the next line there?  Can you read |
| 10:43 | 6 | that? |
| 10:43 | 7 | A.   "Manage flow and advertising globally to emphasize |
| 10:44 | 8 | Fashion Diva." |
| 10:44 | 9 | Q.   And what was Fashion Diva? |
| 10:44 | 10 | A.   Fashion Divas was an extension of the Diva Starz brand |
| 10:44 | 11 | that was more fashion doll oriented. |
| 10:44 | 12 | Q.   And then line 55 says what? |
| 10:44 | 13 | A.   "Reduce price in spring." |
| 10:44 | 14 | Q.   And what would -- what would be the effect of that? |
| 10:44 | 15 | A.   Lower prices tend to sell more than higher prices. |
| 10:44 | 16 | Q.   Makes sense. |
| 10:44 | 17 | A.   Yep. |
| 10:44 | 18 | Q.   Was that typical of Mattel to cut prices in response to |
| 10:44 | 19 | a competitive product? |
| 10:44 | 20 | A.   Uh, it depended on the situation. |
| 10:44 | 21 | Q.   Not uncommon? |
| 10:44 | 22 | A.   I would say it's not uncommon. |
| 10:44 | 23 | Q.   All right.  And can you look at line 56. |
| 10:44 | 24 | A.   Okay. |
| 10:44 | 25 | Q.   Under Column E. |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

109

| | | |
|---|---|---|
| 10:44 | 1 | A.   Yes. |
| 10:44 | 2 | Q.   What does that say? |
| 10:44 | 3 | A.   It says, "Develop direct Bratz competitor as well as |
| 10:44 | 4 | alternative older girl doll for Spring 2003." |
| 10:45 | 5 | Q.   And what do you recall about that goal for 2002? |
| 10:45 | 6 | A.   I'm not sure if I understand the question. |
| 10:45 | 7 | Q.   Sure.  So this document is a Girls Division goal for |
| 10:45 | 8 | 2002, right? |
| 10:45 | 9 | A.   Yes. |
| 10:45 | 10 | Q.   And I'm just trying to figure out what this means, as |
| 10:45 | 11 | of 2002, to "develop a direct Bratz competitor as well as |
| 10:45 | 12 | alternative older girl doll for Spring." |
| 10:45 | 13 | A.   Yeah.  I think, basically, if I remember correctly, we |
| 10:45 | 14 | were looking at developing two older girl targeted doll |
| 10:45 | 15 | lines to, uh, you know, enhance our position with the older |
| 10:45 | 16 | girls in the marketplace. |
| 10:45 | 17 | Q.   Do you recall the names of those products? |
| 10:45 | 18 | A.   Uh, at the time, I don't think we knew what the names |
| 10:45 | 19 | were. |
| 10:45 | 20 | Q.   Do you know what they ultimately became? |
| 10:45 | 21 | A.   Um, probably MyScene and Flavas. |
| 10:45 | 22 | Q.   Okay.  So what was Fashion Divas? |
| 10:45 | 23 | A.   Fashion Divas was something we had already developed |
| 10:45 | 24 | previously and, you know, it was -- I guess, it was due to |
| 10:46 | 25 | be launched in 2002. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:46 | 1 | Q.   Okay.  So, in developing direct Bratz competitor, those |
| 10:46 | 2 | were products that ultimately became MyScene and Flavas? |
| 10:46 | 3 | A.   I think so. |
| 10:46 | 4 | Q.   Okay.  And MyScene and Flavas, were they developed |
| 10:46 | 5 | in-house at Mattel? |
| 10:46 | 6 | A.   I think so.  I really don't recall the origin of them. |
| 10:46 | 7 | Q.   Okay.  Well, Barbie, MyScene and Flavas were produced |
| 10:46 | 8 | by Mattel, right? |
| 10:46 | 9 | A.   Yes. |
| 10:46 | 10 | Q.   Barbie, MyScene and Flavas had the same Mattel |
| 10:46 | 11 | framework behind them, right? |
| 10:46 | 12 | A.   I'm not sure what you mean by "framework." |
| 10:46 | 13 | Q.   Sure.  They had -- you know, there was a marketing |
| 10:46 | 14 | department that supported -- at Mattel that supported Barbie |
| 10:46 | 15 | Flavas and MyScene, right? |
| 10:46 | 16 | A.   Yes. |
| 10:46 | 17 | Q.   There was a sales department at Mattel that supported |
| 10:46 | 18 | Barbie, MyScene, and Flavas, right? |
| 10:46 | 19 | A.   Yes. |
| 10:46 | 20 | Q.   There was advertising people who supported Barbie, |
| 10:47 | 21 | MyScene, and Flavas at Mattel? |
| 10:47 | 22 | A.   Yes. |
| 10:47 | 23 | Q.   So based on this common structure, did Flavas and |
| 10:47 | 24 | MyScene perform the same as Barbie? |
| 10:47 | 25 | MR. ZELLER:  Question's vague. |

| | | |
|---|---|---|
| 10:47 | 1 | THE COURT:  Do you understand the question, sir? |
| 10:47 | 2 | THE WITNESS:  I'm -- yeah.  I'm not exactly sure |
| 10:47 | 3 | by "perform." |
| 10:47 | 4 | BY MR. McCONVILLE: |
| 10:47 | 5 | Q.   Did they sell as much as Barbie? |
| 10:47 | 6 | A.   No. |
| 10:47 | 7 | Q.   So the fact that Mattel had in place salespeople, |
| 10:47 | 8 | advertising people and marketing people who could turn |
| 10:47 | 9 | Barbie into a success, didn't mean that Flavas and MyScene |
| 10:47 | 10 | would become a Mattel success, as well? |
| 10:47 | 11 | A.   MyScene did pretty well, and Flavas did not. |
| 10:47 | 12 | Q.   But they didn't perform as well as Barbie, right? |
| 10:47 | 13 | A.   Well, I mean, MyScene was -- I think at the time, it |
| 10:47 | 14 | was part of the Barbie brand so, um -- I don't recall the |
| 10:47 | 15 | exact numbers. |
| 10:47 | 16 | Q.   Okay.  And how -- you say Flavas did not do well.  Do |
| 10:47 | 17 | you remember how -- what happened to Flavas, ultimately? |
| 10:48 | 18 | A.   I think we launched it, and then it didn't sell very |
| 10:48 | 19 | well, and then we stopped making them. |
| 10:48 | 20 | Q.   Do you remember how long that period of time was -- |
| 10:48 | 21 | A.   I don't -- |
| 10:48 | 22 | Q.   -- that Flavas was on the market? |
| 10:48 | 23 | A.   It was a pretty short period of time. |
| 10:48 | 24 | Q.   A year? |
| 10:48 | 25 | A.   Maybe less. |

| | | |
|---|---|---|
| 10:48 | 1 | Q.   Okay.  And if we go -- if we go to -- I'm sorry. |
| 10:48 | 2 | Just to go back, the notion to communicate to retailers |
| 10:48 | 3 | that -- that the Mattel was communicating to retailers that |
| 10:48 | 4 | Barbie was strong and Bratz would be a fad, that's |
| 10:48 | 5 | inconsistent with developing a Bratz defense strategy, |
| 10:48 | 6 | right? |
| 10:48 | 7 | A.   I -- you know, I think we have to take any -- we had to |
| 10:48 | 8 | take any major competitor seriously.  And we saw the |
| 10:48 | 9 | business was growing, and our consumer research results |
| 10:48 | 10 | showed that girls liked the brand, so we wanted to make sure |
| 10:48 | 11 | we were prepared for -- to compete with them in the future. |
| 10:49 | 12 | Q.   Right.  I understand.  You're communicating one thing |
| 10:49 | 13 | to retailers -- that Bratz is a fad, and Barbie's there for |
| 10:49 | 14 | the long haul -- but at the same time developing a strategy |
| 10:49 | 15 | to compete directly with Bratz, right? |
| 10:49 | 16 | A.   I'm not sure what was communicated directly to the |
| 10:49 | 17 | retailers.  I didn't have those communications. |
| 10:49 | 18 | Q.   Understood.  But you communicated to the sales team to |
| 10:49 | 19 | make sure that they had the knowledge they needed to |
| 10:49 | 20 | address -- to tell retailers Barbie's here for the long haul |
| 10:49 | 21 | and Bratz is a fad, right? |
| 10:49 | 22 | A.   It wanted the sales team to be confident that they, um, |
| 10:49 | 23 | you know, had, uh, products coming that would be competitive |
| 10:49 | 24 | in the marketplace, because that would help them in selling |
| 10:49 | 25 | into the retailers. |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

113

| | | |
|---|---|---|
| 10:49 | 1 | Q.   And that was something that you communicated to the |
| 10:49 | 2 | sales force, and you assumed this communicated it to |
| 10:49 | 3 | retailers? |
| 10:49 | 4 | A.   I believe I communicated to the head of sales.  I don't |
| 10:49 | 5 | know what happened after that. |
| 10:49 | 6 | Q.   So you don't know if anybody accepted your words for |
| 10:49 | 7 | how to develop sales? |
| 10:49 | 8 | A.   I don't know. |
| 10:50 | 9 | Q.   Okay.  And I wanted to turn to one other thing.  It's |
| 10:50 | 10 | on line 138, which is -- and under Column E of line 138. |
| 10:50 | 11 | A.   Okay. |
| 10:50 | 12 | Q.   And you'll see -- can you read that for us? |
| 10:50 | 13 | A.   It's -- sorry -- "Design task force presents ideas to |
| 10:50 | 14 | Rich de Anda." |
| 10:50 | 15 | Is that the one you're talking about? |
| 10:50 | 16 | Q.   Yes, please. |
| 10:50 | 17 | Do those three lines appear to come together on line |
| 10:50 | 18 | 138 -- |
| 10:50 | 19 | A.   Yes. |
| 10:50 | 20 | Q.   All right.  So let me finish.  Lines 138, 139 and 140 |
| 10:50 | 21 | appear to be one common thought. |
| 10:50 | 22 | A.   This is related to "develop process to improve |
| 10:50 | 23 | confidentiality"? |
| 10:50 | 24 | Q.   Yes. |
| 10:50 | 25 | A.   Okay. |

| | | |
|---|---|---|
| 10:50 | 1 | "Design task force presents ideas to Rich de Anda. |
| 10:50 | 2 | "Security to present plan. |
| 10:50 | 3 | "Action plan presented by task force." |
| 10:51 | 4 | Q.   And you recall who Rich de Anda was? |
| 10:51 | 5 | A.   Yes. |
| 10:51 | 6 | Q.   Who was Rich de Anda at that time? |
| 10:51 | 7 | A.   Mattel's head of security. |
| 10:51 | 8 | Q.   And you see here there was a task force created? |
| 10:51 | 9 | A.   Yes. |
| 10:51 | 10 | Q.   To -- to address what? |
| 10:51 | 11 | A.   Uh, well, we, uh, believed that there were leaks in our |
| 10:51 | 12 | process that were allowing confidential information to leak |
| 10:51 | 13 | out.  Specifically, I think we were focused on product |
| 10:51 | 14 | prototypes and other preliminary designs. |
| 10:51 | 15 | Q.   And so what was the notion behind getting Rich de Anda |
| 10:51 | 16 | involved in end of 2001, beginning 2002? |
| 10:51 | 17 | A.   He was our head of security, so I guess he would be the |
| 10:51 | 18 | person responsible for helping to enforce the |
| 10:51 | 19 | confidentiality and the security of our products. |
| 10:51 | 20 | Q.   And he was dealing with the design team on that front? |
| 10:51 | 21 | A.   Yes. |
| 10:51 | 22 | Q.   Okay.  And you said that there was some concern at that |
| 10:52 | 23 | time that information was -- was not being controlled well |
| 10:52 | 24 | enough at Mattel and was getting to competitors; is that |
| 10:52 | 25 | right? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

115

| | | |
|---|---|---|
| 10:52 | 1 | A.   Right. |
| 10:52 | 2 | Q.   And -- and was one of the competitors that Mattel was |
| 10:52 | 3 | concerned about MGA? |
| 10:52 | 4 | A.   Yes.  They were launching products that, uh, appeared |
| 10:52 | 5 | to bear some resemblance to our products. |
| 10:52 | 6 | Q.   So, as of the end of 2001, beginning of 2002, the time |
| 10:52 | 7 | frame in which this document was created, there was a |
| 10:52 | 8 | concern at Mattel that MGA was getting access to Mattel's |
| 10:52 | 9 | intellectual property? |
| 10:52 | 10 | A.   Right. |
| 10:52 | 11 | Q.   And in response, they created a task force, right? |
| 10:52 | 12 | A.   Yes. |
| 10:52 | 13 | Q.   I'm sorry.  "They," Mattel created a task force, right? |
| 10:52 | 14 | A.   Yes. |
| 10:52 | 15 | Q.   And one of the other things that happened in 2001, even |
| 10:53 | 16 | before the end of 2001, was Mattel began investigating MGA |
| 10:53 | 17 | and Carter Bryant regarding the origins of Bratz, right? |
| 10:53 | 18 | A.   I'm not aware of that. |
| 10:53 | 19 |        MR. McCONVILLE:  Let's take a look at |
| 10:53 | 20 | Exhibit 26701, please -- 26701-A. |
| 10:53 | 21 |        *(Document provided to the witness.)* |
| 10:53 | 22 | BY MR. McCONVILLE: |
| 10:53 | 23 | Q.   I'll ask you to take a look at that and ask you if you |
| 10:53 | 24 | recognize this document. |
| 10:53 | 25 | A.   Sure.  It looks like a memo that I sent to Jerry |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 116 of 175   Page ID #:311310
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

116

| | | |
|---|---|---|
| 10:53 | 1 | Bossick. |
| 10:53 | 2 | MR. McCONVILLE:  Your Honor, I move into evidence |
| 10:53 | 3 | Exhibit 26701-A. |
| 10:53 | 4 | THE COURT:  Received. |
| 10:53 | 5 | *(Exhibit No. 26701-A received in evidence.)* |
| 10:53 | 6 | *(Document displayed.)* |
| 10:53 | 7 | BY MR. McCONVILLE: |
| 10:54 | 8 | Q.   If we can -- so this is an e-mail dated August 21, |
| 10:54 | 9 | 2001, right? |
| 10:54 | 10 | A.   Right. |
| 10:54 | 11 | Q.   It's from you to Jerry Bossick? |
| 10:54 | 12 | A.   Yes. |
| 10:54 | 13 | Q.   And who is Jerry Bossick? |
| 10:54 | 14 | A.   Jerry Bossick was my boss.  He was the senior vice |
| 10:54 | 15 | president of financial and planning, I think, or -- I think |
| 10:54 | 16 | that was his title. |
| 10:54 | 17 | Q.   And as of 2001, you wrote to him, "Very little |
| 10:54 | 18 | information was available on MGA.  Here's what I could |
| 10:54 | 19 | scrounge up.  Let me know if I should pass it on to anyone," |
| 10:54 | 20 | right? |
| 10:54 | 21 | A.   Yes. |
| 10:54 | 22 | Q.   And then there's a document attached? |
| 10:54 | 23 | A.   Yes. |
| 10:54 | 24 | Q.   Does this appear to be the document that you created |
| 10:54 | 25 | before August 21, 2001? |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

117

| | | |
|---|---|---|
| 10:54 | 1 | *(Document displayed.)* |
| 10:54 | 2 | THE WITNESS:  Uh, yes. |
| 08:59 | 3 | BY MR. McCONVILLE: |
| 10:54 | 4 | Q.   And this talks about research you had done as of |
| 10:54 | 5 | August 2001 regarding MGA, right? |
| 10:55 | 6 | A.   Right. |
| 10:55 | 7 | Q.   And in the first paragraph, it says, "Recently, we have |
| 10:55 | 8 | grown increasingly concerned due to the similarity of some |
| 10:55 | 9 | of their products to ours:  Scooter Samantha, Bratz, and One |
| 10:55 | 10 | Man Jam DJ Mixer," right? |
| 10:55 | 11 | A.   Yes. |
| 10:55 | 12 | Q.   So one of the products that you were investigating as |
| 10:55 | 13 | of August 21, 2001 was Bratz, right? |
| 10:55 | 14 | A.   Uh, yes.  As well as the -- you know, the |
| 10:55 | 15 | Scooter Samantha, given the disappearance of our prototypes |
| 10:55 | 16 | for Scooter Shannon. |
| 10:55 | 17 | Q.   Understood.  I'm just focusing on Bratz right now. |
| 10:55 | 18 | A.   Okay. |
| 10:55 | 19 | Q.   And as of August 21, 2001, the senior vice president of |
| 10:55 | 20 | finance was concerned enough about Bratz to have you do some |
| 10:55 | 21 | research on it, right? |
| 10:55 | 22 | A.   Yes. |
| 10:55 | 23 | Q.   And you see that it describes who the owner is of MGA? |
| 10:56 | 24 | It's on the last page. |
| 10:56 | 25 | A.   Oh, okay. |

| | | |
|---|---|---|
| 10:56 | 1 | Q.   I'm sorry.  Page 4. |
| 10:56 | 2 | *(Document displayed.)* |
| 10:56 | 3 | THE WITNESS:  Yes. |
| 10:56 | 4 | BY MR. McCONVILLE: |
| 10:56 | 5 | Q.   And it says Isaac Larian is the president, right? |
| 10:56 | 6 | A.   Yes. |
| 10:56 | 7 | Q.   And if you look under -- on page 2 -- |
| 10:56 | 8 | *(Document displayed.)* |
| 10:56 | 9 | BY MR. McCONVILLE:  - |
| 10:56 | 10 | Q.   -- under Product Lineup," it has -- I'm sorry.  Page 3. |
| 10:56 | 11 | *(Document displayed.)* |
| 10:56 | 12 | THE WITNESS: Yes. |
| 10:56 | 13 | BY MR. McCONVILLE: |
| 10:56 | 14 | Q.   There's a bullet there that says, "Product Lineup: |
| 10:56 | 15 | Dolls"? |
| 10:56 | 16 | A.   Right. |
| 10:56 | 17 | Q.   And then it has "Bratz," right. |
| 10:56 | 18 | A.   Yes. |
| 10:56 | 19 | Q.   And as of August 21, 2001, based on your investigation, |
| 10:57 | 20 | you concluded that Bratz was "bearing significant |
| 10:57 | 21 | resemblance to Diva Starz in both appearance and attitude," |
| 10:57 | 22 | right? |
| 10:57 | 23 | A.   Uh, yes. |
| 10:57 | 24 | Q.   And you believed that Bratz was essentially a Diva |
| 10:57 | 25 | Starz knockoff? |

| | | |
|---|---|---|
| 10:57 | 1 | A.    Uh, I don't know if I'd use those words, but Diva Starz |
| 10:57 | 2 | had been very successful the year before, and had the big |
| 10:57 | 3 | head and the big feet; and so, going into Fall of 2001, a |
| 10:57 | 4 | couple of competitors had had dolls that also had a similar |
| 10:57 | 5 | look with, you know, larger heads and feet to -- to Diva |
| 10:57 | 6 | Starz. |
| 10:57 | 7 | Q.    And as of this time, as of August 2001, there was |
| 10:57 | 8 | already discussion at Mattel that Carter Bryant was the |
| 10:57 | 9 | person who developed Bratz, right? |
| 10:57 | 10 | A.    I wasn't aware of that at the time.  At least, I'm not |
| 10:58 | 11 | sure if I was aware of that at that time. |
| 10:58 | 12 | Q.    Well, you had heard that potentially Carter Bryant was |
| 10:58 | 13 | a Mattel employee when he developed the brand, right? |
| 10:58 | 14 | A.    I'm not sure when I learned of that. |
| 10:58 | 15 | Q.    You did ultimately learn that, though, right? |
| 10:58 | 16 | A.    Yes. |
| 10:58 | 17 | Q.    And that would have been before October 2002, right? |
| 10:58 | 18 | A.    I'm not sure. |
| 10:58 | 19 |         MR. ZELLER:  Misstates the witness's testimony. |
| 10:58 | 20 |         THE COURT:  I'm sorry?  I didn't hear. |
| 10:58 | 21 |         MR. ZELLER:  I was saying it misstates the |
| 10:58 | 22 | witness's testimony. |
| 10:58 | 23 |         THE COURT:  I think it's a question.  But reask |
| 10:58 | 24 | the question, 'cause the time frames got confusing. |
| 10:58 | 25 |         MR. McCONVILLE:  Right.  Understood. |

| | | |
|---|---|---|
| 10:58 | 1 | THE COURT:  So strike the answer. |
| 10:58 | 2 | Reask it. |
| 07:59 | 3 | BY MR. McCONVILLE: |
| 10:58 | 4 | Q.   At some point in 2002, you had heard that potentially |
| 10:58 | 5 | Carter Bryant was a Mattel employee when he developed the |
| 10:58 | 6 | Bratz brand, right? |
| 10:58 | 7 | MR. ZELLER:  Misstates the witness's testimony. |
| 10:58 | 8 | MR. McCONVILLE:  That was a question. |
| 10:58 | 9 | BY MR. McCONVILLE: |
| 10:58 | 10 | Q.   Right? |
| 10:58 | 11 | THE COURT:  Overruled. |
| 10:58 | 12 | It's a question. |
| 10:58 | 13 | THE WITNESS:  I'm not sure.  I think there's sort |
| 10:58 | 14 | of two questions in what you're asking. |
| 10:59 | 15 | MR. McCONVILLE:  Okay.  I'm sorry.  What can I do? |
| 10:59 | 16 | THE WITNESS:  So -- well, maybe if you break the |
| 10:59 | 17 | question up into two questions, maybe? |
| 10:59 | 18 | MR. McCONVILLE:  Okay. |
| 10:59 | 19 | BY MR. McCONVILLE: |
| 10:59 | 20 | Q.   Um, you learned at some point that Carter Bryant was a |
| 10:59 | 21 | Mattel employee when he developed the Bratz brand, right? |
| 10:59 | 22 | A.   I've heard that before, yes. |
| 10:59 | 23 | Q.   And you heard that as early as October 2002, right? |
| 10:59 | 24 | A.   I'm not sure of the date. |
| 10:59 | 25 | Q.   It was well-known at Mattel that Carter Bryant |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 121 of 175   Page ID #:311315
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

121

| | | |
|---|---|---|
| 10:59 | 1 | developed the Bratz brand before -- I'm sorry.  "Objection. |
| 10:59 | 2 | Sustained." |
| 10:59 | 3 | It was well-known before October 2002, within Mattel, |
| 10:59 | 4 | that Carter Bryant had developed the Bratz brand, right? |
| 10:59 | 5 | A.   Yes.  Your previous question was "while at Mattel." |
| 10:59 | 6 | And that was the part that I think wasn't as clear. |
| 10:59 | 7 | Q.   But you ultimately did learn -- you heard from numerous |
| 10:59 | 8 | sources while you were at Mattel that Carter Bryant |
| 11:00 | 9 | developed the Bratz brand while he was a Mattel employee? |
| 11:00 | 10 | MR. ZELLER:  This is asked and answered and vague |
| 11:00 | 11 | as to time. |
| 11:00 | 12 | THE COURT:  Overruled. |
| 11:00 | 13 | But "as to time," Counsel, there's the problem. |
| 11:00 | 14 | BY MR. McCONVILLE: |
| 11:00 | 15 | Q.   Let me get the answer, and then we'll get a time frame. |
| 11:00 | 16 | A.   Yes.  I believe I heard that while I was at Mattel. |
| 11:00 | 17 | Q.   And you heard that as early as 2002, right? |
| 11:00 | 18 | MR. ZELLER:  Asked and answered. |
| 11:00 | 19 | THE COURT:  Overruled. |
| 11:00 | 20 | THE WITNESS:  Honestly, as I said, I was aware of |
| 11:00 | 21 | the fact that he had been -- he had been credited as |
| 11:00 | 22 | designing Bratz.  I don't know when I had heard that he had |
| 11:00 | 23 | been employed at Mattel, when he was -- had done that. |
| 11:00 | 24 | MR. McCONVILLE:  Okay.  Let's look at |
| 11:00 | 25 | Exhibit 9441. |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:00 | 1 | *(Document provided to the witness.)* |
| 11:00 | 2 | BY MR. McCONVILLE: |
| 11:00 | 3 | Q.   And ask if you recognize that. |
| 11:00 | 4 | A.   Sure. |
| 11:00 | 5 | Q.   What is it? |
| 11:01 | 6 | A.   These are notes from a MyScene 360 Task Force meeting. |
| 11:01 | 7 | MR. McCONVILLE:  Your Honor, I move into evidence |
| 11:01 | 8 | Exhibit 9441. |
| 11:01 | 9 | THE COURT:  Received. |
| 11:01 | 10 | *(Exhibit No. 9441 received in evidence.)* |
| 11:01 | 11 | *(Document displayed.)* |
| 11:59 | 12 | BY MR. McCONVILLE: |
| 11:01 | 13 | Q.   What's the MyScene 360 Task Force? |
| 11:01 | 14 | A.   We had a series of 360's for each major brand within |
| 11:01 | 15 | the Girls group.  And the MyScene 360 was the one that was |
| 11:01 | 16 | responsible for the MyScene brand.  They were basically |
| 11:01 | 17 | cross-functional teams with people from market, design, |
| 11:01 | 18 | licensing, strategic planning, research, um, promotions, |
| 11:01 | 19 | advertising -- designed to focus on the brands and help |
| 11:01 | 20 | improve communication and make us more responsive. |
| 11:01 | 21 | Q.   And what's the date of this report?  You see at the |
| 11:01 | 22 | top? |
| 11:01 | 23 | A.   October 24th, 2002. |
| 11:01 | 24 | Q.   Okay.  And you'll see at the bottom under number "1," |
| 11:02 | 25 | it says, "MyScene brand update," "Product."  And the second |

| | | |
|---|---|---|
| 11:02 | 1 | bullet says, quote, "Bryant," closed quote, "cleared |
| 11:02 | 2 | Worldwide, as well, but Lily pointed out that the former |
| 11:02 | 3 | Mattel designer, who is a creator of Bratz, was named |
| 11:02 | 4 | Bryant." |
| 11:02 | 5 | Do you see that? |
| 11:02 | 6 | A.   I do see that, yes. |
| 11:02 | 7 | Q.   And you understood "Lily" to be Lily Martinez? |
| 11:02 | 8 | A.   Yes. |
| 11:02 | 9 | Q.   The woman who's sitting here.  *(Indicating.)* |
| 11:02 | 10 | A.   Yes. |
| 11:02 | 11 | Q.   And so you understood that, by October 2002, it was |
| 11:02 | 12 | well-known that Carter Bryant was the creator of Bratz, |
| 11:02 | 13 | right? |
| 11:02 | 14 | A.   I -- the notes were taken by an outside consultant, so |
| 11:02 | 15 | I'm not sure that they fully represent what was said in the |
| 11:02 | 16 | meeting. |
| 11:02 | 17 | Q.   I appreciate that.  So I'm gonna ask you the question. |
| 11:03 | 18 | Ask you to focus on my question. |
| 11:03 | 19 | A.   Okay. |
| 11:03 | 20 | Q.   Answer my question. |
| 11:03 | 21 | MR. ZELLER:  I -- strike the commentary, |
| 11:03 | 22 | Your Honor. |
| 11:03 | 23 | THE COURT:  Strike the comments. |
| 11:03 | 24 | Reask the question, Counsel. |
| | 25 | |

| 11:03 | 1  | BY MR. McCONVILLE: |
|-------|----|--------------------|

11:03    1    BY MR. McCONVILLE:

11:03    2    Q.    It was well-known within Mattel by October 2002 that

11:03    3    Carter Bryant, a former Mattel designer, was the creator of

11:03    4    Bratz?

11:03    5    A.    Yes.

11:03    6    Q.    So regardless of whether these notes are accurate, that

11:03    7    was something that was commonly known at Mattel, right?

11:03    8    A.    That he was involved in the creation, yes.

11:03    9    Q.    And whether these notes are accurate, that's what's

11:03    10   reflected in these notes, right?

11:03    11   A.    Yes.

11:03    12   Q.    So -- and, in fact, you knew before October 2002 that

11:03    13   Carter Bryant was the person who developed Bratz, right?

11:03    14   A.    Uh, yes.

11:03    15   Q.    In fact, you knew it as early as August 2001, right?

11:04    16   A.    I'm not sure.

11:04    17   Q.    But in any event, not only was it -- not only was there

11:04    18   common knowledge about Carter Bryant's involvement in the

11:04    19   development of Bratz, it went up at the executive levels,

11:04    20   too, right?

11:04    21   A.    Me being an executive, yes, I guess so.

11:04    22   Q.    Well, there were conversations at executive-level

11:04    23   meetings where Carter Bryant's involvement in the creation

11:04    24   of Bratz was discussed, right?

11:04    25   A.    Yes.

| | | |
|---|---|---|
| 11:04 | 1 | Q.   And those occurred at least in 2002, right? |
| 11:04 | 2 | A.   Uh, very likely. |
| 11:04 | 3 | MR. McCONVILLE:  No further questions. |
| 11:05 | 4 | THE COURT:  This would be cross-examination by |
| 11:05 | 5 | Mr. Zeller on behalf of Mattel. |
| 11:05 | 6 | **CROSS-EXAMINATION** |
| 11:05 | 7 | BY MR. ZELLER: |
| 11:05 | 8 | Q.   Good afternoon.  I don't think we've met.  My name is |
| 11:05 | 9 | Mike Zeller.  I represent Mattel. |
| 11:05 | 10 | A.   Nice to meet you. |
| 11:05 | 11 | Q.   You were asked some questions about Sal Villasenor. |
| 11:05 | 12 | And was it your understanding that he had actually |
| 11:05 | 13 | established fake businesses or retailers of some kind or |
| 11:05 | 14 | were these just printed cards that he had? |
| 11:05 | 15 | A.   Uh, I assume they were just printed cards. |
| 11:05 | 16 | Q.   That's all you ever saw. |
| 11:05 | 17 | A.   That related to this -- the toy business, yes. |
| 11:06 | 18 | Q.   Yes. |
| 11:06 | 19 | A.   Yeah. |
| 11:06 | 20 | Q.   And you'd mentioned that these catalogues that were |
| 11:06 | 21 | obtained, were sent to your house, were mostly from arts and |
| 11:06 | 22 | crafts retailers. |
| 11:06 | 23 | A.   Yeah, arts and crafts manufacturers.  I misspoke. |
| 11:06 | 24 | Q.   And are catalogues from retailers or other businesses |
| 11:06 | 25 | in the toy industry confidential or trade secret |

| | | |
|---|---|---|
| 11:06 | 1 | information? |
| 11:06 | 2 | A.    I don't believe so. |
| 11:06 | 3 | Q.    Are you aware of any such catalogues that are trade |
| 11:06 | 4 | secrets or confidential in the industry? |
| 11:06 | 5 | A.    You know -- I mean, my assumption is, once something's |
| 11:06 | 6 | printed on paper and given to other people it's -- outside |
| 11:06 | 7 | of that business, it's no longer confidential. |
| 11:06 | 8 | Q.    In other words, information that's shared with |
| 11:06 | 9 | retailers, it's widely understood in the toy industry, |
| 11:06 | 10 | becomes public? |
| 11:06 | 11 | A.    Yes, absolutely. |
| 11:06 | 12 | Q.    Now, you'd mentioned that you had some meetings with |
| 11:06 | 13 | Michael Moore the in-house lawyer there at Mattel? |
| 11:06 | 14 | A.    Yes. |
| 11:06 | 15 | Q.    And after seeing Mr. Moore, you told Mr. Villasenor to |
| 11:07 | 16 | stop using, uh, false pretenses; is that correct? |
| 11:07 | 17 | A.    That's correct. |
| 11:07 | 18 | Q.    You don't know what Mr. Moore did with others, or what |
| 11:07 | 19 | he did or didn't do?  I mean, you just don't have any |
| 11:07 | 20 | knowledge one way to another about that; is that true? |
| 11:07 | 21 | A.    I'm sorry.  You said "Mr. Moore."  Did you mean |
| 11:07 | 22 | Mr. Villasenor? |
| 11:07 | 23 | Q.    No.  Mr. Moore. |
| 11:07 | 24 | A.    No, I don't -- I don't know. |
| 11:07 | 25 | Q.    'Cause you were asked what steps did Mr. Moore take |

| | | |
|---|---|---|
| 11:07 | 1 | after these conversations with you, and you said you didn't |
| 11:07 | 2 | know.  And my question to you is, is, you don't know one way |
| 11:07 | 3 | or another.  He might have taken steps, might not have; you |
| 11:07 | 4 | just don't have any information on that? |
| 11:07 | 5 | A.    Yeah, I have no idea. |
| 11:07 | 6 | Q.    Now, you were asked questions about whether certain |
| 11:07 | 7 | people were disciplined.  You left Mattel in 2006? |
| 11:07 | 8 | A.    That's correct. |
| 11:07 | 9 | Q.    So you don't have any knowledge as to who was |
| 11:07 | 10 | disciplined or reprimanded, or in what way, after the time |
| 11:07 | 11 | you left? |
| 11:07 | 12 | A.    I do not. |
| 11:07 | 13 | Q.    And during the time you were with Mattel, Sal |
| 11:08 | 14 | Villasenor left the company? |
| 11:08 | 15 | A.    While I was at Mattel? |
| 11:08 | 16 | Q.    Yes. |
| 11:08 | 17 | A.    I -- I don't think so, but I'm not sure.  He wasn't |
| 11:08 | 18 | working -- |
| 11:08 | 19 | Q.    Well -- |
| 11:08 | 20 | A.    -- for me anymore. |
| 11:08 | 21 | Q.    Let me try and be a little bit more specific, then. |
| 11:08 | 22 | You left the company in 2006.  And sometime prior to |
| 11:08 | 23 | the time you left, did it come to your attention that |
| 11:08 | 24 | Mr. Villasenor took a stress leave or a medical leave of |
| 11:08 | 25 | some kind? |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

128

| | | |
|---|---|---|
| 11:08 | 1 | A.   I recall hearing that.  I don't remember if it was |
| 11:08 | 2 | before or after I left Mattel, though. |
| 11:08 | 3 | Q.   And, generally, you understand that a company in |
| 11:08 | 4 | Mattel's position, when someone takes a stress or medical |
| 11:08 | 5 | leave, can't start disciplining the employee without |
| 11:08 | 6 | potential legal consequences, right? |
| 11:08 | 7 | MR. McCONVILLE:  Objection.  No foundation. |
| 11:08 | 8 | Hearsay. |
| 11:08 | 9 | THE COURT:  Well, you were a manager there.  If |
| 11:08 | 10 | you have an understanding, you can cast your opinion. |
| 11:08 | 11 | THE WITNESS:  Yes.  In fact, I had prior |
| 11:08 | 12 | experience with another employee, where the employee did |
| 11:08 | 13 | something similar. |
| 11:08 | 14 | BY MR. ZELLER: |
| 11:08 | 15 | Q.   And it's your understanding that once that happens, |
| 11:08 | 16 | it's really in the legal process and there's not -- the |
| 11:09 | 17 | company can't start reprimanding or taking other adverse |
| 11:09 | 18 | employment action against the employee who's claiming a |
| 11:09 | 19 | stress or medical leave? |
| 11:09 | 20 | A.   That's correct. |
| 11:09 | 21 | MR. McCONVILLE:  Objection.  Foundation. |
| 11:09 | 22 | THE COURT:  Overruled. |
| 11:09 | 23 | THE WITNESS:  That -- that's correct. |
| 11:09 | 24 | THE COURT:  You understand that in your position |
| 11:09 | 25 | as vice president? |

| | | |
|---|---|---|
| 11:09 | 1 | THE WITNESS:  Yes. |
| 11:09 | 2 | THE COURT:  Okay.  Overruled. |
| | 3 | BY MR. ZELLER: |
| 11:09 | 4 | Q.   You were asked some questions about Mr. Villasenor's |
| 11:09 | 5 | position there at Mattel. |
| 11:09 | 6 | Now, in fact, he was initially -- his -- his title was |
| 11:09 | 7 | something along the lines of research assistant, wasn't it? |
| 11:09 | 8 | A.   I -- you know, that would have predated my involvement |
| 11:09 | 9 | with him. |
| 11:09 | 10 | Q.   In -- sometimes questions were asked of you of the |
| 11:09 | 11 | notion of something called a "Market Intelligence |
| 11:09 | 12 | Department." |
| 11:09 | 13 | Focusing here on the word "department," I mean, are you |
| 11:09 | 14 | aware of an actual department that was within Mattel called |
| 11:09 | 15 | the Market Intelligence Department? |
| 11:09 | 16 | A.   No.  It was really a name adopted by Sal as a way to |
| 11:10 | 17 | encompass the projects he was working on.  It was really |
| 11:10 | 18 | just integrated into the overall research team, and then the |
| 11:10 | 19 | strategic planning team. |
| 11:10 | 20 | Q.   And this name that Mr. Villasenor used, this Market |
| 11:10 | 21 | Research Department really consisted of two people, right? |
| 11:10 | 22 | A.   The Market Intelligence Department?  Yes.  It was just, |
| 11:10 | 23 | at the time -- during my involvement, it was Sal and |
| 11:10 | 24 | Stephanie. |
| 11:10 | 25 | Q.   Uh, Stephanie Page? |

| | | |
|---|---|---|
| 11:10 | 1 | A.   That's correct. |
| 11:10 | 2 | Q.   If we can please take a look at Exhibit 9272, which is |
| 11:10 | 3 | an "org" chart. |
| 11:10 | 4 | *(Document provided to the witness.)* |
| 11:10 | 5 | MR. ZELLER:  If I could approach, Your Honor? |
| 11:11 | 6 | THE COURT:  You may. |
| 11:11 | 7 | MR. McCONVILLE:  Could I get a copy? |
| 11:11 | 8 | *(Document provided to counsel.)* |
| 11:11 | 9 | *(Document provided to the witness.)* |
| 11:11 | 10 | THE WITNESS:  Okay. |
| 11:11 | 11 | BY MR. ZELLER: |
| 11:11 | 12 | Q.   If you could take a look at Exhibit 9272, do you |
| 11:11 | 13 | recognize this as a Mattel organizational chart? |
| 11:11 | 14 | A.   Uh, yep.  Looks like one, yes. |
| 11:11 | 15 | Q.   And you'll see there's a date of February 2003 on it? |
| 11:11 | 16 | A.   Yes, I see that. |
| 11:11 | 17 | Q.   Do you generally recognize this as an organizational |
| 11:11 | 18 | chart that reflects some of the structure of Mattel at that |
| 11:11 | 19 | time? |
| 11:11 | 20 | A.   Yes.  I recognize many of the names. |
| 11:11 | 21 | MR. ZELLER:  I would move Exhibit 9272 into |
| 11:11 | 22 | evidence. |
| 11:11 | 23 | THE COURT:  Received. |
| 11:11 | 24 | *(Exhibit No. 9272 received in evidence.)* |
| 11:11 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:11 | 1 | BY MR. ZELLER: |
| 11:11 | 2 | Q.   If we can take a look at the second page, this is the |
| 11:11 | 3 | first page that shows people in the organization.  At the |
| 11:12 | 4 | very top there you'll see Matt Bousquette, who you've |
| 11:12 | 5 | mentioned, the president at the time? |
| 11:12 | 6 | A.   Yes. |
| 11:12 | 7 | Q.   Did you ever tell Matt Bousquette that Sal Villasenor |
| 11:12 | 8 | or other people were using fake credentials to get into toy |
| 11:12 | 9 | fairs? |
| 11:12 | 10 | A.   No, I never did. |
| 11:12 | 11 | Q.   And then you'll see a little bit lower down, also, |
| 11:12 | 12 | however, on the first page here, there's a Ron Brawer.  It |
| 11:12 | 13 | shows "SVP"? |
| 11:12 | 14 | A.   I see that. |
| 11:12 | 15 | MR. ZELLER:  If we can highlight that, Ken.  Do |
| 11:12 | 16 | you see?  It's on the second to the left column, second |
| 11:12 | 17 | down. |
| 11:12 | 18 | *(Technician complies.)* |
| 11:12 | 19 | BY MR. ZELLER: |
| 11:12 | 20 | Q.   And you knew Mr. Brawer? |
| 11:12 | 21 | A.   Uh, sure. |
| 11:12 | 22 | Q.   You knew Mr. Brawer at Mattel? |
| 11:12 | 23 | A.   Yes. |
| 11:12 | 24 | Q.   And you know that he went to MGA? |
| 11:12 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:12 | 1 | Q.   Then if we can go through the next pages, and we'll see |
| 11:12 | 2 | how -- until we get to Sal Villasenor.  So if you can just |
| 11:12 | 3 | continue to scroll through these pages, until we get to |
| 11:13 | 4 | 97- -- or, excuse me -- 9272-25. |
| 11:13 | 5 | (Document displayed.) |
| 11:13 | 6 | BY MR. ZELLER: |
| 11:13 | 7 | Q.   Going all the way through the organization is where, |
| 11:13 | 8 | then -- here, near the bottom, we find "Sal Villasenor." |
| 11:13 | 9 | Do you see him? |
| 11:13 | 10 | A.   Uh, yes, I do now.  Yes. |
| 11:13 | 11 | Q.   You can also see it highlighted on the screen there. |
| 11:13 | 12 | A.   Yep. |
| 11:13 | 13 | Q.   And then you'll see there, as of February of 2003, he's |
| 11:13 | 14 | listed as "Specialist, Consumer Research"? |
| 11:13 | 15 | A.   Yes, I see that. |
| 11:13 | 16 | Q.   As you testified to, you knew at some point about Sal |
| 11:13 | 17 | Villasenor misrepresenting himself at these toy fairs, |
| 11:13 | 18 | right? |
| 11:13 | 19 | A.   Yes. |
| 11:13 | 20 | Q.   And these toy fairs, by the way, I mean, these are -- |
| 11:14 | 21 | these are annual events?  I mean, they're "once a year" type |
| 11:14 | 22 | of events? |
| 11:14 | 23 | A.   Uh, yes.  There's -- the New York Toy Fair is the big |
| 11:14 | 24 | one, but there's some smaller ones, as well. |
| 11:14 | 25 | Q.   So with respect to your understanding of what his job |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:14 | 1 | and duties were, it wasn't -- he wasn't spending all of his |
| 11:14 | 2 | time getting into showrooms? |
| 11:14 | 3 | A.   No, no.  Absolutely not.  No.  As I said before, he was |
| 11:14 | 4 | responsible for a lot of other types of research, as well. |
| 11:14 | 5 | Q.   And that other research that you saw from |
| 11:14 | 6 | Mr. Villasenor and others there at Mattel you understood |
| 11:14 | 7 | came from sources other than showrooms? |
| 11:14 | 8 | A.   Absolutely. |
| 11:14 | 9 | Q.   In fact, most of that information came from publicly |
| 11:14 | 10 | available sources? |
| 11:14 | 11 | A.   Yeah.  Publicly available sources and trend reports to |
| 11:14 | 12 | which we subscribed and -- yeah, exactly. |
| 11:14 | 13 | Q.   And some of these sources where Mattel obtained |
| 11:14 | 14 | information about competitors and the -- even unreleased |
| 11:15 | 15 | products, included press releases or other announcements by |
| 11:15 | 16 | companies such as MGA about product launches? |
| 11:15 | 17 | A.   That's right. |
| 11:15 | 18 | Q.   They included photo opportunities? |
| 11:15 | 19 | A.   I believe so. |
| 11:15 | 20 | Q.   They included news coverage? |
| 11:15 | 21 | A.   Sometimes. |
| 11:15 | 22 | Q.   There was coverage in the trade magazines and -- and |
| 11:15 | 23 | the trade news? |
| 11:15 | 24 | A.   Yes. |
| 11:15 | 25 | Q.   Information from these publicly available catalogues |

| | | |
|---|---|---|
| 11:15 | 1 | you had mentioned? |
| 11:15 | 2 | A.   Yes. |
| 11:15 | 3 | Q.   Information from publicly available price lists that |
| 11:15 | 4 | companies like MGA and others gave to retailers? |
| 11:15 | 5 | A.   That's correct. |
| 11:15 | 6 | Q.   And, in fact, that was the source of most of this |
| 11:15 | 7 | information in these toy fair presentations that MGA's |
| 11:15 | 8 | counsel asked you about? |
| 11:15 | 9 | A.   Yes. |
| 11:15 | 10 | Q.   And you've seen these toy fair reports, right? |
| 11:15 | 11 | A.   Absolutely, yes. |
| 11:15 | 12 | Q.   And these are -- these are product photographs that -- |
| 11:16 | 13 | that shows these competitive products, right? |
| 11:16 | 14 | A.   Yes. |
| 11:16 | 15 | Q.   I mean, these aren't pictures that are taken in the |
| 11:16 | 16 | showrooms.  These are glamor shots of products that are |
| 11:16 | 17 | actually taken by the manufacturers and distributed to the |
| 11:16 | 18 | world at large. |
| 11:16 | 19 | A.   Yeah, they -- they generally appear to be press photos. |
| 11:16 | 20 | Q.   And you understand that MGA, in connection with toy |
| 11:16 | 21 | fairs, issues press releases? |
| 11:16 | 22 | A.   Yes. |
| 11:16 | 23 | Q.   Issues press kits? |
| 11:16 | 24 | A.   Yes. |
| 11:16 | 25 | Q.   Takes journalists through its showrooms? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:16 | 1 | MR. McCONVILLE:  Objection.  Foundation. |
| 11:16 | 2 | THE COURT:  Overruled. |
| 11:16 | 3 | THE WITNESS:  Yes. |
| 11:16 | 4 | BY MR. ZELLER: |
| 11:16 | 5 | Q.   Distributes these shots -- these product shots before |
| 11:16 | 6 | and during toy fairs? |
| 11:16 | 7 | A.   Yes. |
| 11:16 | 8 | Q.   And this is even of products that are not yet on the |
| 11:16 | 9 | shelf, right? |
| 11:16 | 10 | A.   That's right. |
| 11:16 | 11 | Q.   I mean, in fact, the purpose of toy fair is to |
| 11:16 | 12 | publicize and sell your products? |
| 11:16 | 13 | A.   That's right.  It's for holiday season. |
| 11:17 | 14 | Q.   And that is how MGA has approached it, as well, as you |
| 11:17 | 15 | understand it? |
| 11:17 | 16 | A.   Yes. |
| 11:17 | 17 | Q.   You were asked questions about FOB Hong Kong prices or |
| 11:17 | 18 | other kinds of prices and whether this was information that |
| 11:17 | 19 | Mattel shouldn't have.  Do you recall that? |
| 11:17 | 20 | A.   Yes. |
| 11:17 | 21 | Q.   This FOB Hong Kong price is information that is, by |
| 11:17 | 22 | definition, shared with the retailers, right? |
| 11:17 | 23 | A.   Yes, absolutely. |
| 11:17 | 24 | Q.   This is the price that the retailers, themselves, are |
| 11:17 | 25 | charged by manufacturers such as MGA? |

DEBBIE GALE, U.S. COURT REPORTER

| 11:17 | 1 | A.    Yes. |
| 11:17 | 2 | Q.    And would you be surprised to learn that people at MGA |
| 11:17 | 3 | get such pricing information about Mattel products from |
| 11:17 | 4 | retailers? |
| 11:17 | 5 | A.    Not at all. |
| 11:17 | 6 | Q.    In fact -- |
| 11:17 | 7 | A.    Yeah, I mean -- in fact, I mean, the retailers would |
| 11:17 | 8 | encourage the price competition between manufacturers. |
| 11:17 | 9 | Q.    In fact, I mean, you understand that the retailers do |
| 11:17 | 10 | that because they want companies to compete on matters such |
| 11:17 | 11 | as price? |
| 11:18 | 12 | A.    Right. |
| 11:18 | 13 | Q.    Now, to do that, the manufacturers will say "Some other |
| 11:18 | 14 | company is charging me this amount," um, "What are you gonna |
| 11:18 | 15 | do for me?  How you gonna make it better?" |
| 11:18 | 16 |             MR. McCONVILLE:  Objection.  Leading. |
| 11:18 | 17 |             THE COURT:  Overruled. |
| 11:18 | 18 |             THE WITNESS:  That's right. |
| 11:18 | 19 | BY MR. ZELLER: |
| 11:18 | 20 | Q.    You were asked questions about the promotion of Carey |
| 11:18 | 21 | Plunkett. |
| 11:18 | 22 | A.    Yes. |
| 11:18 | 23 | Q.    Do you recall that? |
| 11:18 | 24 | A.    Yes, I do. |
| 11:18 | 25 | Q.    Was she promoted for going into a toy fair showroom? |

| | | |
|---|---|---|
| 11:18 | 1 | A.   No, she was not. |
| 11:18 | 2 | Q.   If we could take a look at Exhibit 9368, which you were |
| 11:18 | 3 | asked about. |
| 11:18 | 4 | *(Document provided to the witness.)* |
| 11:18 | 5 | *(Document displayed.)* |
| 11:18 | 6 | THE WITNESS:  Yes. |
| 11:59 | 7 | BY MR. ZELLER: |
| 11:18 | 8 | Q.   So this is a memo that you put together -- oh, I'm |
| 11:18 | 9 | sorry -- that Mr. Shore put together, describing some of the |
| 11:18 | 10 | reasons why it is that Carey Plunkett should get a |
| 11:18 | 11 | promotion? |
| 11:18 | 12 | A.   Yes. |
| 11:18 | 13 | Q.   And you'll see in the second paragraph, it says, "Over |
| 11:19 | 14 | the past year and a half, Carey's responsibilities |
| 11:19 | 15 | included." |
| 11:19 | 16 | So you understood that Mr. Shore is describing here a |
| 11:19 | 17 | fairly -- or a year-and-a-half time period of her |
| 11:19 | 18 | performance that he's evaluating. |
| 11:19 | 19 | MR. McCONVILLE:  Objection.  Leading and compound. |
| 11:19 | 20 | THE COURT:  Overruled. |
| 11:19 | 21 | Do you understand question? |
| 11:19 | 22 | THE WITNESS:  Yes. |
| 11:19 | 23 | THE COURT:  You can answer. |
| 11:19 | 24 | THE WITNESS:  Yes.  It was a year and a half of |
| 11:19 | 25 | work managing -- successfully managing research projects. |

| | | |
|---|---|---|
| 11:19 | 1 | BY MR. ZELLER: |
| 11:19 | 2 | Q.   Was she sneaking in showrooms for a year and a half? |
| 11:19 | 3 | A.   No, no.  These were primary research projects with |
| 11:19 | 4 | consumers. |
| 11:19 | 5 | Q.   Is there anything in this document that you saw that |
| 11:19 | 6 | says she was being rewarded or promoted because she had |
| 11:19 | 7 | obtained information from some showroom? |
| 11:19 | 8 | A.   I -- I don't see that. |
| 11:19 | 9 | Q.   During the course of these discussions, and other |
| 11:19 | 10 | actions that were taken in considering whether or not to |
| 11:19 | 11 | promote Ms. Plunkett, did anyone say we should reward her |
| 11:19 | 12 | for getting into a toy fair showroom? |
| 11:20 | 13 | A.   No, not at all.  I mean, she was, you know, a fantastic |
| 11:20 | 14 | performer.  And, you know, visiting toy fair represented one |
| 11:20 | 15 | week out of the 52 weeks of the year. |
| 11:20 | 16 | Q.   And, in fact, as we were talking about earlier, the |
| 11:20 | 17 | presentations that you saw that she put together or worked |
| 11:20 | 18 | on, these toy fair presentations had information from |
| 11:20 | 19 | sources that had nothing to do with showrooms? |
| 11:20 | 20 | A.   That's correct. |
| 11:20 | 21 | Q.   I mean, these are -- this is public information? |
| 11:20 | 22 | A.   That's correct. |
| 11:20 | 23 | Q.   And also, in fact, at these toy fairs, I mean, you |
| 11:20 | 24 | understand that, um, many manufacturers actually put outside |
| 11:20 | 25 | their booths catalogues and pricing information and fliers |

| | | |
|---|---|---|
| 11:20 | 1 | and press releases and other information for anyone who is |
| 11:20 | 2 | attending the toy fair to -- to obtain? |
| 11:20 | 3 | A.   Yes. |
| 11:20 | 4 | Q.   So it's -- it's true that, when Mr. Villasenor went to |
| 11:20 | 5 | the toy fairs, after you told him he needed to stop |
| 11:20 | 6 | misrepresenting himself, there was still information that, |
| 11:21 | 7 | as you understood it, he could obtain that was completely |
| 11:21 | 8 | public and had nothing to do with getting into a showroom? |
| 11:21 | 9 | MR. McCONVILLE:  Objection.  Compound and leading. |
| 11:21 | 10 | THE COURT:  Overruled. |
| 11:21 | 11 | THE WITNESS:  In my experience, there was lots of |
| 11:21 | 12 | information that could be gathered without entering a |
| 11:21 | 13 | showroom. |
| 11:21 | 14 | BY MR. ZELLER: |
| 11:21 | 15 | Q.   And if you could please tell us a little bit about what |
| 11:21 | 16 | that is? |
| 11:21 | 17 | A.   Well, as you said, there were catalogues, press |
| 11:21 | 18 | releases, things like that, that would often be available. |
| 11:21 | 19 | There were also, you know, smaller tradeshows which were |
| 11:21 | 20 | much less secure, where, you know, things like prices and |
| 11:21 | 21 | catalogues might actually be stacked on tables for anyone |
| 11:21 | 22 | attempting to -- to take. |
| 11:21 | 23 | Q.   And, in fact, some of these events are completely |
| 11:21 | 24 | public, like Tokyo Toy Fair? |
| 11:21 | 25 | A.   Uh, yeah.  I've never been to Tokyo Toy Fair, so I'm |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 140 of 175   Page ID #:311334
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

140

| | | |
|---|---|---|
| 11:21 | 1 | not sure. |
| 11:21 | 2 | Q.   Well, let me ask you about one that you might have been |
| 11:21 | 3 | to.  Maybe you haven't.  I don't know. |
| 11:21 | 4 | But you saw in the expense report that MGA's counsel |
| 11:21 | 5 | showed you that there was reference to a Pomona Fair of some |
| 11:21 | 6 | kind? |
| 11:22 | 7 | A.   Right, yes. |
| 11:22 | 8 | Q.   That is a totally public and open event? |
| 11:22 | 9 | A.   Yeah.  I mean, I've never been to that one, but that |
| 11:22 | 10 | was my understanding, is that that was one that was much |
| 11:22 | 11 | more accessible and unprotected, and information was left |
| 11:22 | 12 | out for passersby to obtain. |
| 11:22 | 13 | MR. McCONVILLE:  Objection.  Lacks foundation. |
| 11:22 | 14 | Hearsay.  Move to strike. |
| 11:22 | 15 | THE COURT:  I'm going to sustain the objection as |
| 11:22 | 16 | to "Pomona," Counsel. |
| 11:22 | 17 | MR. ZELLER:  Thank you. |
| 11:59 | 18 | BY MR. ZELLER: |
| 11:22 | 19 | Q.   You were asked questions about something that's called |
| 11:22 | 20 | the "Bratz Defense Strategy," and some of your earlier |
| 11:22 | 21 | take -- your early take on Bratz, as a competitor. |
| 11:22 | 22 | Do you recall that? |
| 11:22 | 23 | A.   Yes. |
| 11:22 | 24 | Q.   And, in fact, it turned out over time that Bratz took a |
| 11:22 | 25 | significant market share from Barbie? |

| 11:22 | 1 | A.   Yes, that's right. |
| 11:22 | 2 | Q.   I mean, the time period that you were being asked about |
| 11:22 | 3 | with respect to your documents was early on in 2001/2002 |
| 11:22 | 4 | time period? |
| 11:23 | 5 | A.   Right.  Those were sort of the first inkling we had of |
| 11:23 | 6 | the success of the brand. |
| 11:23 | 7 | Q.   And then, after that, Bratz continued to take a larger |
| 11:23 | 8 | and larger market share from Barbie? |
| 11:23 | 9 | A.   Yes. |
| 11:23 | 10 | Q.   But even before all that happened, back in this early |
| 11:23 | 11 | time period of 2001/2002, I think you said that you and |
| 11:23 | 12 | others at Mattel took Bratz seriously as a competitor.  I |
| 11:23 | 13 | mean, you took steps to try and address it? |
| 11:23 | 14 | A.   Yes. |
| 11:23 | 15 | Q.   So it wasn't something new -- some kind of action that |
| 11:23 | 16 | Mattel attempted to take in response to Bratz? |
| 11:23 | 17 | A.   I'm sorry.  I'm not -- I'm not sure I fully understand |
| 11:23 | 18 | the question. |
| 11:23 | 19 | Q.   Sure.  I'll -- I'm happy to rephrase it. |
| 11:23 | 20 | So, early on, you were asked questions in this |
| 11:23 | 21 | 2001/2002 time period, and you took Bratz seriously as a |
| 11:23 | 22 | competitor -- even from that early time period? |
| 11:23 | 23 | A.   Yeah.  We saw the sales, you know, especially during |
| 11:23 | 24 | the holiday season of 2001 were getting fairly strong. |
| 11:24 | 25 | Q.   And this was even before, when Bratz started to take |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:24 | 1 | significant amounts of market share from Bratz -- excuse |
| 11:24 | 2 | me -- from Barbie? |
| 11:24 | 3 | A.   Yes. |
| 11:24 | 4 | Q.   So from the beginning in this kind of early -- we'll |
| 11:24 | 5 | call it late 2001 time period, 2002 time period -- already |
| 11:24 | 6 | by then, you and others at Mattel were taking steps to |
| 11:24 | 7 | address Bratz as competition? |
| 11:24 | 8 | A.   Yes. |
| 11:24 | 9 |         MR. ZELLER:  Let's please take a look at |
| 11:24 | 10 | Exhibit 26701-A, which is in evidence. |
| 11:24 | 11 |             (Document provided to the witness.) |
| 11:24 | 12 |             (Document displayed.) |
| | 13 | BY MR. ZELLER: |
| 11:24 | 14 | Q.   And this is a -- you were asked some questions about |
| 11:24 | 15 | this document.  It is a summary that you wrote and sent to |
| 11:24 | 16 | Jerry Bossick on or about August 21, 2001? |
| 11:24 | 17 | A.   Yes. |
| 11:24 | 18 | Q.   And this pertains to MGA? |
| 11:25 | 19 | A.   Yes. |
| 11:25 | 20 | Q.   And you were -- you were talking a bit about -- there |
| 11:25 | 21 | was a concern during this time period about certain |
| 11:25 | 22 | prototypes that went missing? |
| 11:25 | 23 | A.   Yes. |
| 11:25 | 24 | Q.   And do you recall whether any of those -- there was |
| 11:25 | 25 | concern whether any of those prototypes that went missing |

| | | |
|---|---|---|
| 11:25 | 1 | from the Mattel design center ended up at MGA? |
| 11:25 | 2 | A.   Yes.  We had -- we had -- in the case of Scooter |
| 11:25 | 3 | Shannon, we had early prototypes disappear.  And then, you |
| 11:25 | 4 | know, coincidentally, there was a Scooter Samantha doll from |
| 11:25 | 5 | MGA that had some -- similar appearance and functionality. |
| 11:25 | 6 | Q.   And Mattel was -- was developing this product when it |
| 11:25 | 7 | was -- when it was taken out of the Mattel design center? |
| 11:25 | 8 | MR. McCONVILLE:  Objection.  Lacks foundation. |
| 11:25 | 9 | THE COURT:  Overruled. |
| 11:25 | 10 | THE WITNESS:  Uh, the prototypes disappeared. |
| 11:59 | 11 | BY MR. ZELLER: |
| 11:25 | 12 | Q.   Of the Mattel product? |
| 11:25 | 13 | A.   Of the Mattel product, yes. |
| 11:25 | 14 | Q.   And that's, in fact, reflected on the second page of |
| 11:25 | 15 | Exhibit 26071-A that you wrote back in August 2001, where it |
| 11:26 | 16 | refers to the disappearance of an early Scooter Shannon |
| 11:26 | 17 | sample? |
| 11:26 | 18 | A.   Right. |
| 11:26 | 19 | Q.   And then MGA later came out with a product that was |
| 11:26 | 20 | also a scooter product that was called Scooter Samantha? |
| 11:26 | 21 | A.   Yes. |
| 11:26 | 22 | Q.   You were asked questions about -- about Carter Bryant. |
| 11:26 | 23 | You actually knew Carter Bryant, didn't you? |
| 11:26 | 24 | A.   Vaguely, yes. |
| 11:26 | 25 | Q.   I mean, you ran across him, at least, at Mattel? |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 144 of 175   Page ID #:311338
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

144

| 11:26 | 1 | A.   Yes. |
| 11:26 | 2 | Q.   And you never heard about Carter Bryant creating Bratz |
| 11:26 | 3 | while he was a Mattel employee until after you had heard |
| 11:26 | 4 | that Mattel had filed a lawsuit; is that correct? |
| 11:26 | 5 | A.   In regard to the timing of his creation, yes, exactly. |
| 11:27 | 6 | Q.   And just to be very clear about this, early on, you -- |
| 11:27 | 7 | you had heard, and you believed, that Carter Bryant had |
| 11:27 | 8 | involvement with Bratz? |
| 11:27 | 9 | A.   Yes. |
| 11:27 | 10 | Q.   And this is after he had left Mattel? |
| 11:27 | 11 | A.   I heard that after he'd left Mattel, yes. |
| 11:27 | 12 | Q.   But you weren't aware at that time, and didn't hear |
| 11:27 | 13 | from -- from people during that time period that Carter |
| 11:27 | 14 | Bryant had created Bratz while he was still a Mattel |
| 11:27 | 15 | employee? |
| 11:27 | 16 | A.   Yeah.  I -- yeah, that's right.  I had not heard that |
| 11:27 | 17 | until the lawsuit was filed. |
| 11:27 | 18 | Q.   And at any time before this lawsuit was filed, back in |
| 11:27 | 19 | 2004, did Carter Bryant tell you that he was working with |
| 11:27 | 20 | MGA while he was still a Mattel employee? |
| 11:27 | 21 | A.   No. |
| 11:27 | 22 | Q.   At any time before this lawsuit was filed in 2004, did |
| 11:27 | 23 | Carter Bryant tell you that he had created Bratz while was |
| 11:27 | 24 | still a Mattel employee? |
| 11:27 | 25 | A.   No. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

145

| 11:27 | 1 | Q.   And you understand that it's okay for a designer to, |
| 11:28 | 2 | uh, leave Mattel and go to another company, right? |
| 11:28 | 3 | A.   Uh, yes. |
| 11:28 | 4 | Q.   And go and start designing for another company after |
| 11:28 | 5 | they've left? |
| 11:28 | 6 | A.   Yes. |
| 11:28 | 7 | Q.   I mean, there was nothing wrong for Carter Bryant to go |
| 11:28 | 8 | and -- to a -- to a competitor and work on another doll such |
| 11:28 | 9 | as Bratz -- |
| 11:28 | 10 | A.   Uh. |
| 11:28 | 11 | Q.   -- so long as he was doing it after he'd left Mattel? |
| 11:28 | 12 | A.   Right.  Uh, yeah, many of our employees left to go to |
| 11:28 | 13 | other competitors. |
| 11:28 | 14 | Q.   And you understand that the reason why we're here in |
| 11:28 | 15 | this lawsuit -- |
| 11:28 | 16 | MR. McCONVILLE:  Objection.  Argumentative. |
| 11:28 | 17 | BY MR. ZELLER: |
| 11:28 | 18 | Q.   -- is because -- |
| 11:28 | 19 | THE COURT:  Sustained.  Sustained. |
| 11:28 | 20 | There's going to be a problem:  Ten issues, |
| 11:28 | 21 | Counsel.  I'm just kidding you, but there will be a lot of |
| 11:28 | 22 | issues. |
| 11:28 | 23 | MR. ZELLER:  Can I say one with of the issue, |
| 11:28 | 24 | then? |
| 11:28 | 25 | THE COURT:  No, no.  That's fine. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 146 of 175   Page ID #:311340
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

146

| | | |
|---|---|---|
| 11:28 | 1 | MR. ZELLER:  Thank you. |
| 11:28 | 2 | BY MR. ZELLER: |
| 11:28 | 3 | Q.   You were asked some questions about your separation |
| 11:28 | 4 | agreement; do you recall that? |
| 11:28 | 5 | A.   Yes. |
| 11:28 | 6 | Q.   And, in fact, you've testified in this case at the |
| 11:29 | 7 | request of MGA? |
| 11:29 | 8 | A.   That's right. |
| 11:29 | 9 | Q.   You answered questions in the deposition and you |
| 11:29 | 10 | provided information at the deposition, right? |
| 11:29 | 11 | A.   Yes. |
| 11:29 | 12 | Q.   You answered, in fact, the same kinds of questions that |
| 11:29 | 13 | MGA asked you during your deposition that you are answering |
| 11:29 | 14 | here today? |
| 11:29 | 15 | A.   Yes. |
| 11:29 | 16 | Q.   And you never said, at the deposition or before the |
| 11:29 | 17 | deposition, that the separation agreement blocked you or |
| 11:29 | 18 | prevented you from sharing information in this case?  It was |
| 11:29 | 19 | part of your testimony, right? |
| 11:29 | 20 | A.   Uh, right. |
| 11:29 | 21 | Q.   In fact, the only person who suggested that somehow the |
| 11:29 | 22 | separation agreement stopped you from talking about what you |
| 11:29 | 23 | know was MGA's counsel, right? |
| 11:29 | 24 | MR. McCONVILLE:  Objection.  Argumentative. |
| 11:29 | 25 | THE COURT:  Overruled. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 147 of 175   Page ID #:311341
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

147

| 11:29 | 1 | THE WITNESS:  Yeah, I'm not sure that -- I guess |
| 11:29 | 2 | that's what he was suggesting today, perhaps. |
| 11:29 | 3 | BY MR. ZELLER: |
| 11:29 | 4 | Q.  Well, I was also -- I was also asking about at your |
| 11:29 | 5 | deposition.  Do you remember that being suggested by MGA's |
| 11:29 | 6 | counsel at your deposition, too? |
| 11:29 | 7 | A.  Not really. |
| 11:29 | 8 | Q.  Um, well, you do recall saying at your deposition |
| 11:30 | 9 | that -- |
| 11:30 | 10 | MR. McCONVILLE:  Objection.  Hearsay. |
| 11:30 | 11 | BY MR. ZELLER: |
| 11:30 | 12 | Q.  -- the separation agreement -- |
| 11:30 | 13 | MR. McCONVILLE:  Objection.  Hearsay. |
| 11:30 | 14 | BY MR. ZELLER: |
| 11:30 | 15 | Q.  -- would not prevent you from -- |
| 11:30 | 16 | THE COURT:  It's sustained.  Counsel, it's |
| 11:30 | 17 | hearsay.  Just show him.  If he needs his memory refreshed, |
| 11:30 | 18 | just show him the document. |
| 11:30 | 19 | MR. ZELLER:  Well, if we could show the witness |
| 11:30 | 20 | pages 149 and 150 from his deposition.  And this would be to |
| 11:30 | 21 | refresh, Your Honor.  I don't intend to read it. |
| 11:30 | 22 | MR. McCONVILLE:  There's no question pending |
| 11:30 | 23 | Your Honor, to refresh. |
| 11:30 | 24 | MR. ZELLER:  This is pages 149, line 10, through |
| 11:30 | 25 | 150, line 21. |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

148

| | | |
|---|---|---|
| 11:30 | 1 | And, again, this is just for him to read it to |
| 11:30 | 2 | refresh himself.  I don't intend to publish it. |
| 11:30 | 3 | THE WITNESS:  Just read it to myself? |
| 11:31 | 4 | MR. ZELLER:  Yes, please, without reading aloud. |
| 11:31 | 5 | THE WITNESS:  Okay.  Yes. |
| 11:31 | 6 | BY MR. ZELLER: |
| 11:31 | 7 | Q.   And you understood that the separation agreement in no |
| 11:31 | 8 | way has stopped you from providing factual information, |
| 11:31 | 9 | right? |
| 11:31 | 10 | A.   I would -- I would assume not.  I mean, that's -- yeah, |
| 11:31 | 11 | that was the implication, that it would -- I think, and I |
| 11:31 | 12 | felt that, obviously, I've been telling the truth and, you |
| 11:31 | 13 | know, sharing information. |
| 11:31 | 14 | Q.   When you say "the implication," you're saying that was |
| 11:31 | 15 | the implication that was made -- |
| 11:31 | 16 | A.   Yes. |
| 11:31 | 17 | Q.   -- during the deposition? |
| 11:31 | 18 | MR. McCONVILLE:  Objection.  Argumentative. |
| 11:31 | 19 | THE COURT:  Overruled. |
| 11:31 | 20 | THE WITNESS:  Yes, that was the implication, yes. |
| 11:31 | 21 | THE COURT:  Goes to state of mind. |
| | 22 | BY MR. ZELLER: |
| 11:31 | 23 | Q.   You told -- well, you said that that implication was |
| 11:31 | 24 | wrong? |
| 11:31 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:31 | 1 | Q. In other words, let's set aside your deposition, then, |
| 11:31 | 2 | for a moment. I mean, you -- you -- it's your understanding |
| 11:31 | 3 | that the separation agreement in no way prohibits you or |
| 11:31 | 4 | prevents you or hinders from testifying truthfully and |
| 11:32 | 5 | fully; is that right? |
| 11:32 | 6 | A. Right. |
| 11:32 | 7 | Q. And from providing factual information? |
| 11:32 | 8 | A. Right. |
| 11:32 | 9 | Q. And pursuant to this separation agreement, um, you did |
| 11:32 | 10 | provide services to Mattel? |
| 11:32 | 11 | A. Yes. |
| 11:32 | 12 | Q. And tell us what is it that you did, generally? |
| 11:32 | 13 | A. Uh, well, during my last role at Mattel, I managed our |
| 11:32 | 14 | interactive and youth electronics business. And one of the |
| 11:32 | 15 | key parts of that business was the Scene It, S-C-E-N-E, I-T, |
| 11:32 | 16 | board game brand. |
| 11:32 | 17 | And during my tenure, we'd grown it to be the largest |
| 11:32 | 18 | board game brand in the world, so it was bigger than |
| 11:32 | 19 | Monopoly, Scrabble, Trivial Pursuit. And it was a very |
| 11:32 | 20 | profitable business for Mattel. And, you know, there's a |
| 11:32 | 21 | significant risk to Mattel, if I weren't able to share my |
| 11:32 | 22 | knowledge of the business with the people who took the |
| 11:32 | 23 | business over when I left. |
| 11:32 | 24 | Q. And so a large part of this was to help transition what |
| 11:33 | 25 | your job's responsibilities had been to your successors? |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 150 of 175   Page ID #:311344
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

150

| | | |
|---|---|---|
| 11:33 | 1 | A.   Right.  The business was, you know, a hundred-plus |
| 11:33 | 2 | million dollars, and made over $30 million for Mattel.  So, |
| 11:33 | 3 | you know, I didn't think that salary was a significant |
| 11:33 | 4 | amount of money relative to that. |
| 11:33 | 5 | Q.   Now, prior to the time that you left Mattel in 2006, |
| 11:33 | 6 | you sent your resumé to MGA? |
| 11:33 | 7 | A.   Uh, I don't remember if I sent the resumé, but I did |
| 11:33 | 8 | reach out to MGA, I think. |
| 11:33 | 9 | Q.   And you arranged to have a meeting with Ron Brawer |
| 11:33 | 10 | about potentially working at MGA? |
| 11:33 | 11 | A.   I was curious about what my options would be, yes. |
| 11:33 | 12 | Q.   And, as we talked about, Ron Brawer -- well, at the |
| 11:33 | 13 | time in 2006, Ron Brawer was an executive at MGA? |
| 11:33 | 14 | A.   Uh, yes. |
| 11:33 | 15 | Q.   And, as we talked about earlier, Mr. Brawer was a -- an |
| 11:33 | 16 | executive at Mattel up until October of 2004, and then he |
| 11:34 | 17 | went to MGA? |
| 11:34 | 18 | A.   Uh, yeah.  I don't remember the exact time frame but, |
| 11:34 | 19 | yes, something like that. |
| 11:34 | 20 | Q.   Generally, that -- you recall that as the time period? |
| 11:34 | 21 | A.   Yes. |
| 11:34 | 22 | Q.   And -- and did Mr. Brawer say to you, during the course |
| 11:34 | 23 | of any conversation that you've had with him, that MGA would |
| 11:34 | 24 | not hire you because of your involvement with these toy fair |
| 11:34 | 25 | issues and Sal Villasenor? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:34 | 1 | A.   No. |
| 11:34 | 2 | Q.   And you know that, in fact, Ron Brawer was aware, by |
| 11:34 | 3 | the time he went to MGA, that Sal Villasenor had used false |
| 11:34 | 4 | credentials to get into toy fair showrooms? |
| 11:34 | 5 |         MR. McCONVILLE:  Objection.  Lacks foundation. |
| 11:34 | 6 | Assumes facts. |
| 11:34 | 7 |         THE COURT:  Well, it may lack foundation, Counsel. |
| 11:34 | 8 | But it's an appropriate area to inquire into. |
| 11:34 | 9 |         THE WITNESS:  I don't know what Ron knew about |
| 11:34 | 10 | that. |
| 11:34 | 11 |         THE COURT:  Okay. |
| 11:59 | 12 | BY MR. ZELLER: |
| 11:34 | 13 | Q.   You wouldn't be surprised if -- |
| 11:34 | 14 |         MR. McCONVILLE:  Objection.  Argumentative. |
| 11:35 | 15 |         THE COURT:  Sustained. |
| 11:35 | 16 | BY MR. ZELLER: |
| 11:35 | 17 | Q.   Well, did you ever learn from any source that |
| 11:35 | 18 | Mr. Brawer -- |
| 11:35 | 19 |         MR. McCONVILLE:  Objection. |
| 11:35 | 20 | BY MR. ZELLER: |
| 11:35 | 21 | Q.   -- while he was at MGA actually -- |
| 11:35 | 22 |         MR. McCONVILLE:  Objection. |
| 11:35 | 23 | BY MR. ZELLER: |
| 11:35 | 24 | Q.   -- interviewed Sal Villasenor for a job? |
| 11:35 | 25 |         THE COURT:  Just a moment.  Just a moment. |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

152

| 11:35 | 1 | MR. McCONVILLE:  Calls for hearsay. |
|---|---|---|
| 11:35 | 2 | THE COURT:  I'm going to sustain the objection. |
| 11:35 | 3 | You can reask the prior objection *(sic)* just to |
| 11:35 | 4 | make certain if he has any knowledge of that.  But I don't |
| 11:35 | 5 | want that implanted in the jury's mind, if he doesn't know. |
| 11:35 | 6 | And I don't know. |
| 11:35 | 7 | MR. ZELLER:  Understood.  I am just trying to find |
| 11:35 | 8 | out if he knows. |
| 11:35 | 9 | THE COURT:  Well I know.  But just ask him one |
| 11:35 | 10 | more time and make sure.  Okay. |
| 11:35 | 11 | MR. ZELLER:  Okay. |
| 11:35 | 12 | BY MR. ZELLER: |
| 11:35 | 13 | Q.   Do you know whether or not Mr. Brawer or others at MGA |
| 11:35 | 14 | ever interviewed Sal Villasenor for a job at MGA after he'd |
| 11:35 | 15 | left Mattel? |
| 11:35 | 16 | MR. McCONVILLE:  Objection.  Hearsay. |
| 11:35 | 17 | THE WITNESS:  I'm sorry. |
| 11:35 | 18 | THE COURT:  Well, answer the question. |
| 11:35 | 19 | THE WITNESS:  Answer? |
| 11:35 | 20 | THE COURT:  Yeah. |
| 11:35 | 21 | THE WITNESS:  I'm not aware of that. |
| 11:35 | 22 | THE COURT:  Okay. |
| 11:35 | 23 | BY MR. ZELLER: |
| 11:36 | 24 | Q.   Do you know a Thomas Fowell *(phonetic)*? |
| 11:36 | 25 | A.   That doesn't sound familiar, no. |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 153 of 175   Page ID #:311347
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

153

| | | |
|---|---|---|
| 11:36 | 1 | Q.   If I told you he'd been -- |
| 11:36 | 2 | MR. McCONVILLE:  Objection. |
| 11:36 | 3 | BY MR. ZELLER: |
| 11:36 | 4 | Q.   -- at Mattel Europe at one point -- |
| 11:36 | 5 | THE COURT:  Just a moment. |
| 11:36 | 6 | BY MR. ZELLER: |
| 11:36 | 7 | Q.   -- would that refresh -- |
| 11:36 | 8 | THE COURT:  Well, you can refresh his |
| 11:36 | 9 | recollection.  He'd be in Mattel Europe? |
| 11:36 | 10 | MR. ZELLER:  Yes. |
| 11:36 | 11 | THE WITNESS:  It doesn't sound familiar, no. |
| 11:36 | 12 | BY MR. ZELLER: |
| 11:36 | 13 | Q.   Well, do you know whether or not MGA has gained |
| 11:36 | 14 | access -- |
| 11:36 | 15 | MR. McCONVILLE:  Objection.  Hearsay. |
| 11:36 | 16 | THE COURT:  Sustained.  Sustained. |
| 11:36 | 17 | MR. McCONVILLE:  Thank you. |
| 12:59 | 18 | BY MR. ZELLER: |
| 11:36 | 19 | Q.   Based on your knowledge of the toy industry, would you |
| 11:36 | 20 | be surprised -- |
| 11:36 | 21 | MR. McCONVILLE:  Same objection. |
| 11:36 | 22 | THE COURT:  I think I know where this is going. |
| 11:36 | 23 | Sustained.  I can foresee this. |
| 11:36 | 24 | Now you can present evidence, remember?  All |
| 11:36 | 25 | right.  We'll wait. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:36 | 1 | MR. ZELLER:  You mean separately? |
| 11:36 | 2 | THE COURT:  Absolutely.  I've already said that -- |
| 11:36 | 3 | MR. ZELLER:  Okay. |
| 11:36 | 4 | THE COURT:  -- 20 times. |
| 11:36 | 5 | MR. ZELLER:  I appreciate the 21st, Your Honor. |
| 11:36 | 6 | THE COURT:  Okay. |
| 11:37 | 7 | MR. ZELLER:  I don't have anything further right |
| 11:37 | 8 | now. |
| 11:37 | 9 | THE COURT:  Okay.  Thank you. |
| 11:37 | 10 | Redirect. |
| 11:37 | 11 | **REDIRECT EXAMINATION** |
| 11:37 | 12 | BY MR. McCONVILLE: |
| 11:37 | 13 | Q.   You were shown Ms. Plunkett's evaluation where she got |
| 11:37 | 14 | the promotion; do you remember that? |
| 11:37 | 15 | A.   Yes. |
| 11:37 | 16 | Q.   And it's your testimony that she was not rewarded for |
| 11:37 | 17 | her efforts of using false credentials to get into |
| 11:37 | 18 | showrooms.  That's your testimony, right? |
| 11:37 | 19 | MR. ZELLER:  Argumentative as to "testimony." |
| 11:37 | 20 | THE COURT:  No.  Overruled. |
| 11:37 | 21 | THE WITNESS:  Not that I'm aware of. |
| 11:37 | 22 | BY MR. McCONVILLE: |
| 11:37 | 23 | Q.   Right.  So -- and you're also aware that Mattel |
| 11:37 | 24 | executives deny the existence of the Market Intelligence |
| 11:38 | 25 | Department, too, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:38 | 1 | A.   I'm not sure that -- I mean, as I said, I don't think |
| 11:38 | 2 | it was a formal department.  It was a subgroup within |
| 11:38 | 3 | another group. |
| 11:38 | 4 | Q.   So this was just Sal Villasenor doing what he wanted to |
| 11:38 | 5 | do, and no one could control him? |
| 11:38 | 6 | A.   Uh, no.  I okayed it. |
| 11:38 | 7 | Q.   So this wasn't like Sal Villasenor hatched a plan to |
| 11:38 | 8 | say, "I'm gonna create a Market Intelligence Department, and |
| 11:38 | 9 | I'm gonna force it on Mattel," right? |
| 11:38 | 10 |         MR. ZELLER:  This is argument. |
| 11:38 | 11 |         THE COURT:  Well, it's confusing also. |
| 11:38 | 12 |         So just reask. |
| 11:38 | 13 |         MR. McCONVILLE:  Sure. |
| 11:38 | 14 | BY MR. McCONVILLE: |
| 11:38 | 15 | Q.   Sal Villasenor didn't overpower you and tell you, you |
| 11:38 | 16 | must create a Market Intelligence Department, right? |
| 11:38 | 17 | A.   He -- he and Stephanie had a specific function which |
| 11:38 | 18 | was different from the rest of my team, so they asked if |
| 11:38 | 19 | they could call it something to have some identity. |
| 11:38 | 20 | Q.   Okay.  So he didn't coerce you into naming something |
| 11:38 | 21 | called Market Intelligence, right? |
| 11:38 | 22 | A.   Uh, no.  I think we looked at a number of names -- |
| 11:38 | 23 | Q.   Okay.  So -- |
| 11:38 | 24 | A.   -- and that's the one that -- |
| 11:38 | 25 |         MR. McCONVILLE:  Your Honor, if I'm conducting an |

| 11:38 | 1 | examination, where I'm permitted to ask leading questions -- |
| 11:39 | 2 | THE COURT:  Counsel, no.  Thank you very much. |
| 11:39 | 3 | You can ask him "yes" or "no," if you want to. |
| 11:39 | 4 | BY MR. McCONVILLE: |
| 11:39 | 5 | Q.   I'm gonna ask you "yes" or "no" questions and just -- I |
| 11:39 | 6 | would prefer a "yes" or "no" answer. |
| 11:39 | 7 | A.   Okay. |
| 11:39 | 8 | Q.   Okay.  Were you coerced by Sal Villasenor into the |
| 11:39 | 9 | creation of a Market Intelligence group? |
| 11:39 | 10 | A.   No. |
| 11:39 | 11 | Q.   Did you and Sal Villasenor, then, conspire to keep |
| 11:39 | 12 | secret the Market Intelligence group from Adrienne |
| 11:39 | 13 | Fontanella? |
| 11:39 | 14 | A.   Uh, Adrienne Fontanella was no longer with Mattel. |
| 11:39 | 15 | Q.   So the answer's no? |
| 11:39 | 16 | A.   I think there's -- the question doesn't make any sense. |
| 11:39 | 17 | Q.   Okay.  Did you -- did you and Sal Villasenor, then, |
| 11:39 | 18 | conspire to keep the Market Intelligence Department secret |
| 11:39 | 19 | from Bousquette? |
| 11:39 | 20 | A.   No. |
| 11:39 | 21 | Q.   Did you conspire to keep it secret from Mr. Eckert? |
| 11:39 | 22 | A.   No. |
| 11:39 | 23 | Q.   So the Market Intelligence Department existed at |
| 11:39 | 24 | Mattel, right? |
| 11:39 | 25 | MR. ZELLER:  This is argument. |

DEBBIE GALE, U.S. COURT REPORTER

| 11:39 | 1 | THE COURT: Overruled. |
| 11:39 | 2 | THE WITNESS: Uh, yeah. I mean, not as -- |
| 11:59 | 3 | BY MR. McCONVILLE: |
| 11:39 | 4 | Q. Yes or no? |
| 11:39 | 5 | A. Yes. |
| 11:39 | 6 | Q. And that was something that you approved the creation |
| 11:39 | 7 | of, right? |
| 11:39 | 8 | A. Yes. |
| 11:39 | 9 | Q. This wasn't something that Sal Villasenor forced on |
| 11:40 | 10 | you, right? |
| 11:40 | 11 | A. No. |
| 11:40 | 12 | Q. You were asked questions about whether, uh, the |
| 11:40 | 13 | information that Mr. Villasenor gathered was essentially all |
| 11:40 | 14 | public information. |
| 11:40 | 15 | Do you remember those questions? |
| 11:40 | 16 | A. Uh, in the cross-exam? |
| 11:40 | 17 | Q. Yeah. |
| 11:40 | 18 | A. Yes. |
| 11:40 | 19 | Q. And in essence, you said this stuff's all publicly |
| 11:40 | 20 | available, right? |
| 11:40 | 21 | A. Yes. |
| 11:40 | 22 | Q. So it makes sense, then, because this information is |
| 11:40 | 23 | all publicly available, that you approved the use of false |
| 11:40 | 24 | credentials, right? |
| 11:40 | 25 | A. I -- I approved the use of false credentials earlier |

| | | |
|---|---|---|
| 11:40 | 1 | on. |
| 11:40 | 2 | Q.   Right.  So the information's publicly available, under |
| 11:40 | 3 | your testimony, right? |
| 11:41 | 4 | A.   Right. |
| 11:41 | 5 | Q.   But there was a need to create false retailers to get |
| 11:41 | 6 | the publicly available information, right? |
| 11:41 | 7 | A.   Yeah, I mean, if -- is this gonna be one of the "yes" |
| 11:41 | 8 | or "no" questions? |
| 11:41 | 9 | Q.   Yeah, I'd prefer -- yeah. |
| 11:41 | 10 | A.   Could you ask the question again? |
| 11:41 | 11 | Q.   Sure. |
| 11:41 | 12 | The premise is this information that was gathered was |
| 11:41 | 13 | publicly available information, right? |
| 11:41 | 14 | A.   Yes. |
| 11:41 | 15 | Q.   And so, what I'm asking you is, does it make sense to |
| 11:41 | 16 | you that this publicly available information could only be |
| 11:41 | 17 | gathered by creating a fake retailer? |
| 11:41 | 18 | A.   No. |
| 11:41 | 19 | Q.   Because the information wasn't publicly available, |
| 11:41 | 20 | right? |
| 11:41 | 21 | A.   There was lots of information that was publicly |
| 11:41 | 22 | available. |
| 11:41 | 23 | Q.   And because it was publicly available, you approved Sal |
| 11:41 | 24 | Villasenor creating false retailers because you could have |
| 11:41 | 25 | gotten it in any event, right? |

| | | |
|---|---|---|
| 11:41 | 1 | A.   I'm not sure. |
| 11:41 | 2 | Q.   Because the information was not publicly available, |
| 11:41 | 3 | right? |
| 11:41 | 4 | A.   It depends what the definition of "publicly available" |
| 11:42 | 5 | is. |
| 11:42 | 6 | Q.   Okay.  You believe that, if Sal Villasenor and Carey |
| 11:42 | 7 | Plunkett and Kelly Osier and Tyler Snyder showed up at an |
| 11:42 | 8 | MGA showroom and said, "We work for Mattel.  May we enter?" |
| 11:42 | 9 | that they would have been permitted to enter; is that what |
| 11:42 | 10 | you're saying? |
| 11:42 | 11 | A.   No.  If they –– but there were plenty of other people |
| 11:42 | 12 | like journalists and retailers who did enter. |
| 11:42 | 13 | Q.   Okay.  So did you ever show up at one of these toy fair |
| 11:42 | 14 | showrooms and misrepresent who you were? |
| 11:42 | 15 | A.   No. |
| 11:42 | 16 | Q.   And, in fact, one of the people that you used was |
| 11:42 | 17 | Sharon Rahimi, right? |
| 11:42 | 18 | A.   Yes. |
| 11:42 | 19 | Q.   And you used her because she was a journalist who would |
| 11:42 | 20 | not say she was working for Mattel, right? |
| 11:42 | 21 | A.   If somebody were to share information with a |
| 11:42 | 22 | journalist, the assumption would be that that would be |
| 11:42 | 23 | published information. |
| 11:43 | 24 | Q.   Okay.  I'm gonna ask you again to do your best to |
| 11:43 | 25 | provide me with "yes" or "no" answers. |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

160

| 11:43 | 1 | A.   Okay. |
|---|---|---|
| 11:43 | 2 | Q.   Do you understand? |
| 11:43 | 3 | A.   Sure. |
| 11:43 | 4 | Q.   Okay.  So, as I understand it, this publicly available |
| 11:43 | 5 | information, um, was available to the public, right? |
| 11:43 | 6 | A.   It's hard to answer the question as a "yes" or "no" |
| 11:43 | 7 | question. |
| 11:43 | 8 | Q.   By definition "publicly available information" is |
| 11:43 | 9 | available to the public, right? |
| 11:43 | 10 | A.   Yes. |
| 11:43 | 11 | Q.   And because it was available to the public, you thought |
| 11:43 | 12 | it would be a good idea to approve Sharon Rahimi posing as a |
| 11:43 | 13 | reporter to get access to MGA's showroom, right? |
| 11:43 | 14 | A.   I think I -- I thought she was a reporter.  I thought |
| 11:43 | 15 | she was writing a trend newsletter.  So "posing as a |
| 11:43 | 16 | reporter" wouldn't be the right characterization. |
| 11:43 | 17 | Q.   Okay.  And you're not aware of any article that Sharon |
| 11:44 | 18 | Rahimi ever published, right? |
| 11:44 | 19 | A.   That's after -- |
| 11:44 | 20 | Q.   Yes or no? |
| 11:44 | 21 | A.   That's after the fact. |
| 11:44 | 22 | Q.   Yes or no? |
| 11:44 | 23 | A.   I'm not aware of any that she published. |
| 11:44 | 24 | Q.   Okay.  And as I understand your testimony, the -- the |
| 11:44 | 25 | information, which was available publicly, you saw no |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 161 of 175   Page ID #:311355
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

161

| | | |
|---|---|---|
| 11:44 | 1 | problem with Mattel getting access to MGA's information; is |
| 11:44 | 2 | that what you're saying? |
| 11:44 | 3 | A.   Depending on how it was obtained. |
| 11:44 | 4 | Q.   Well, if it's publicly available, why do you have to |
| 11:44 | 5 | sneak around? |
| 11:44 | 6 | A.   I don't know. |
| 11:44 | 7 | Q.   Yeah.  Who was supervising 'em? |
| 11:44 | 8 | A.   Who was supervising who? |
| 11:44 | 9 | Q.   The Market Intelligence group. |
| 11:44 | 10 | A.   I was. |
| 11:44 | 11 | Q.   And you don't know, right? |
| 11:44 | 12 | A.   Uh, I don't know what? |
| 11:44 | 13 | Q.   You don't know why they were doing it? |
| 11:44 | 14 | A.   I -- I -- yeah, I was under the impression there were |
| 11:45 | 15 | alternative means to get it that would not violate our code |
| 11:45 | 16 | of conduct. |
| 11:45 | 17 | Q.   Okay.  And you said once information is shared with a |
| 11:45 | 18 | retailer, it's, in essence, publicly available, right? |
| 11:45 | 19 | A.   Right. |
| 11:45 | 20 | Q.   But it's true that you think it would be inappropriate |
| 11:45 | 21 | for a retailer to share information from Mattel's private |
| 11:45 | 22 | showroom, right? |
| 11:45 | 23 | A.   Uh. |
| 11:45 | 24 | Q.   This is a "yes" or "no," if you can answer it. |
| 11:45 | 25 | A.   I don't think I can answer it, then. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

162

| | | |
|---|---|---|
| 11:45 | 1 | Q.   Okay. |
| 11:45 | 2 | A.   If you can ask it a different way, I can -- |
| 11:45 | 3 |        MR. McCONVILLE:  Um, so can we please put in front |
| 11:45 | 4 | of the witness, and give to the Judge, his deposition, page |
| 11:45 | 5 | 317, line 8 to 21. |
| 11:45 | 6 |        And I'd ask to read. |
| 11:45 | 7 |        THE COURT:  No, Counsel.  You'll stop now. |
| 11:46 | 8 |        May I see it. |
| 11:46 | 9 |         *(Document provided to the witness.)* |
| 11:46 | 10 |         *(Document provided to the Court.)* |
| 11:46 | 11 |        THE WITNESS:  I'm sorry? |
| 11:46 | 12 |        THE COURT:  Just a moment.  You don't have to |
| 11:46 | 13 | answer a question, sir. |
| 11:46 | 14 |        THE WITNESS:  Okay.  Thank you. |
| 11:46 | 15 |        What am I doing?  Am I reading this?  I'm not |
| 11:46 | 16 | doing anything?  Okay. |
| 11:46 | 17 |        THE COURT:  You may read. |
| 11:46 | 18 |        MR. McCONVILLE:  (Reading:) |
| 11:46 | 19 |        "QUESTION:  Do you think it would have been |
| 11:47 | 20 | inappropriate for a retailer to take a catalogue of Mattel's |
| 11:47 | 21 | for its upcoming products and give it to Mattel's competitor |
| 11:47 | 22 | MGA? |
| 11:47 | 23 |        "ANSWER:  Was the question would I think it was |
| 11:47 | 24 | inappropriate?  Yes." |
| 11:47 | 25 |        MR. McCONVILLE:  Oh, can I read -- I asked for 21. |

| | | |
|---|---|---|
| 11:47 | 1 | I'm sorry.  (Reading:) |
| 11:47 | 2 | "QUESTION:  Why is that? |
| 11:47 | 3 | "ANSWER:  Because it reflects our future plans |
| 11:47 | 4 | and, you know, I think the expectation is that they wouldn't |
| 11:47 | 5 | share it." |
| 11:47 | 6 | BY MR. McCONVILLE: |
| 11:47 | 7 | Q.   So you were asked questions about whether your |
| 11:48 | 8 | separation agreement precluded you from providing testimony. |
| 11:48 | 9 | Do you remember those questions? |
| 11:48 | 10 | A.   Uh, yes. |
| 11:48 | 11 | Q.   And let's back up.  You didn't voluntarily present |
| 11:48 | 12 | yourself to MGA, right? -- for testimony. |
| 11:48 | 13 | A.   No, I didn't. |
| 11:48 | 14 | Q.   In fact, you were subpoenaed to testify, right? |
| 11:48 | 15 | A.   Correct. |
| 11:48 | 16 | Q.   And you understood under your agreement with Mattel, |
| 11:48 | 17 | which is 9443 -- |
| 11:48 | 18 | MR. McCONVILLE:  I'm on page 4, last sentence of |
| 11:48 | 19 | Paragraph (b). |
| 11:48 | 20 | *(Document provided to the witness.)* |
| 11:48 | 21 | *(Document displayed.)* |
| 11:48 | 22 | BY MR. McCONVILLE: |
| 11:48 | 23 | Q.   You understand that you "promised never, directly or |
| 11:48 | 24 | indirectly, to bring or participate in an action against any |
| 11:49 | 25 | released party under California Business and Profession Code |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 164 of 175   Page ID #:311358
CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

164

| | | |
|---|---|---|
| 11:49 | 1 | Section 17200, or under any other unfair competition law of |
| 11:49 | 2 | any jurisdiction."  Right? |
| 11:49 | 3 | A.   Uh, yes.  I signed that, yes. |
| 11:49 | 4 | Q.   And you understand that MGA is pursuing -- |
| 11:49 | 5 |         MR. ZELLER:  Objection.  Getting into the claims |
| 11:49 | 6 | at this point. |
| 11:49 | 7 |         THE COURT:  Sustained. |
| 01:59 | 8 | BY MR. McCONVILLE: |
| 11:49 | 9 | Q.   You understood that if there were a party making an |
| 11:49 | 10 | unfair competition claim -- |
| 11:49 | 11 |         MR. ZELLER:  Again, we're getting into the claims, |
| 11:49 | 12 | Your Honor. |
| 11:49 | 13 |         THE COURT:  Well -- |
| 11:49 | 14 |         MR. McCONVILLE:  His understanding of the |
| 11:49 | 15 | agreement. |
| 11:49 | 16 |         THE COURT:  Well, just a minute. |
| 11:49 | 17 |         Just one moment. |
| 11:49 | 18 |         Overruled.  You can ask the question. |
| 11:49 | 19 | BY MR. McCONVILLE: |
| 11:49 | 20 | Q.   You understand that, if there were a party making a |
| 11:49 | 21 | claim against Mattel for unfair competition relating to |
| 11:50 | 22 | sneaking in showrooms, you couldn't participate in that, |
| 11:50 | 23 | right? |
| 11:50 | 24 |         MR. ZELLER:  Misstates the claims. |
| 11:50 | 25 |         THE COURT:  Well, we can find out his |

Case 2:04-cv-09049-DOC-RNB  Document 10258  Filed 03/24/11  Page 165 of 175  Page ID #:311359
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

165

| 11:50 | 1 | understanding. |
| 11:50 | 2 | Do you understand the question? |
| 11:50 | 3 | THE WITNESS:  I think I understand the question. |
| 11:50 | 4 | Um, you know, honestly, I -- I -- at the time I |
| 11:50 | 5 | signed this, I really had given this no thought at all.  You |
| 11:50 | 6 | know, I just wanted to get my money and move on.  So I -- |
| 11:50 | 7 | this is really the first time that I've, you know, looked at |
| 11:50 | 8 | that.  And, frankly, I didn't really understand the claims |
| 11:50 | 9 | in the case, so, you know, I wasn't aware that this would be |
| 11:50 | 10 | an issue. |
| 11:50 | 11 | BY MR. McCONVILLE: |
| 11:50 | 12 | Q.   Okay. |
| 11:50 | 13 | A.   Hopefully, I don't owe Mattel any money. |
| 11:50 | 14 | Q.   Okay.  Well, um, so you just wanted to sign this |
| 11:50 | 15 | agreement, get your money, and move on; is that right? |
| 11:50 | 16 | A.   Correct. |
| 11:50 | 17 | Q.   Is that right? |
| 11:50 | 18 | A.   Yeah.  I think that's what I said, yes. |
| 11:50 | 19 | Q.   Okay.  So let's look at another provision you signed |
| 11:50 | 20 | under Paragraph (k).  It's on page 7. |
| 11:51 | 21 | *(Document displayed.)* |
| 11:51 | 22 | BY MR. McCONVILLE: |
| 11:51 | 23 | Q.   "While I was employed by the company, I did not engage |
| 11:51 | 24 | in any conduct that I believe to be in violation of any |
| 11:51 | 25 | local, state or federal laws.  I also am not aware of any |

CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

166

| | | |
|---|---|---|
| 11:51 | 1 | conduct that any other company employee engaged in that I |
| 11:51 | 2 | believe to be in violation of any local, state or federal |
| 11:51 | 3 | laws."  Right? |
| 11:51 | 4 | A.   Yes. |
| 11:51 | 5 | Q.   That's something you agreed to at the time you signed |
| 11:51 | 6 | it? |
| 11:51 | 7 | A.   Yes. |
| 11:51 | 8 | Q.   And because -- you signed it 'cause you wanted to get |
| 11:51 | 9 | your money and move on, right? |
| 11:51 | 10 | A.   I wasn't aware that anybody did anything illegal. |
| 11:51 | 11 | Q.   Okay.  So you signed it 'cause you wanted your money to |
| 11:51 | 12 | move on, right? |
| 11:51 | 13 | A.   Uh, yes.  But I didn't sign anything I didn't believe |
| 11:51 | 14 | to be truthful. |
| 11:51 | 15 | Q.   And, uh, because you understood that using false |
| 11:51 | 16 | credentials to steal competitor's trade secrets is okay? |
| 11:51 | 17 | MR. ZELLER:  Argument. |
| 11:52 | 18 | THE COURT:  In its present form, sustained. |
| 11:00 | 19 | BY MR. McCONVILLE: |
| 11:52 | 20 | Q.   You understood that using false credentials -- strike |
| 11:52 | 21 | that. |
| 11:52 | 22 | You understood that, at the time that Mattel had a |
| 11:52 | 23 | Market Intelligence Department whose job was to sneak into |
| 11:52 | 24 | competitor's showrooms to steal its unreleased product |
| 11:52 | 25 | information, that that would be okay under the law? |

167

| | | |
|---|---|---|
| 11:52 | 1 | MR. ZELLER:  This is argument as to the law. |
| 11:52 | 2 | THE COURT:  Well, it's more of an accusation. |
| 11:52 | 3 | Can you frame that in a question? |
| 11:52 | 4 | BY MR. McCONVILLE: |
| 11:52 | 5 | Q.   Did you believe when you signed this agreement that you |
| 11:52 | 6 | were unaware that Mattel's practice of having a department |
| 11:52 | 7 | dedicated to sneaking into competitor's showrooms would be |
| 11:52 | 8 | okay under the law? |
| 11:52 | 9 | MR. ZELLER:  Misstates the testimony.  It's |
| 11:52 | 10 | argument. |
| 11:52 | 11 | THE COURT:  Overruled. |
| 11:52 | 12 | THE WITNESS:  I –– I do think that |
| 11:52 | 13 | mischaracterizes the role of the department. |
| 11:52 | 14 | BY MR. McCONVILLE: |
| 11:52 | 15 | Q.   So you can't answer my question? |
| 11:52 | 16 | A.   Uh, I was not aware that it was illegal. |
| 11:52 | 17 | Q.   Or a violation of any law, right? |
| 11:53 | 18 | A.   I'm not a lawyer. |
| 11:53 | 19 | Q.   Right.  Your only concern was whether it violated the |
| 11:53 | 20 | code of conduct, right? |
| 11:53 | 21 | A.   The code of conduct was a legality, covered the things |
| 11:53 | 22 | that were legal and illegal, as well. |
| 11:53 | 23 | Q.   Okay.  'Cause if it wasn't written in the code of |
| 11:53 | 24 | conduct, then it would have been okay? |
| 11:53 | 25 | A.   Uh, I'm not –– yeah, I'm not sure. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

168

| | | |
|---|---|---|
| 11:53 | 1 | MR. McCONVILLE:  Okay.  No further questions. |
| 11:53 | 2 | THE COURT:  Recross. |
| 11:53 | 3 | Mr. Zeller on behalf of Mattel. |
| 11:53 | 4 | MR. ZELLER:  Thank you. |
| 11:53 | 5 | **RECROSS-EXAMINATION** |
| 11:59 | 6 | BY MR. ZELLER: |
| 11:53 | 7 | Q.   You were asked questions, and you were shown some |
| 11:53 | 8 | deposition testimony where you were asked about whether it |
| 11:53 | 9 | would be appropriate or inappropriate for a retailer to have |
| 11:53 | 10 | a -- to share a Mattel catalogue with a competitor. |
| 11:53 | 11 | Do you recall that? |
| 11:53 | 12 | A.   Yes. |
| 11:53 | 13 | Q.   And, appropriate or inappropriate, do you have an |
| 11:54 | 14 | understanding or view as to whether or not information in |
| 11:54 | 15 | toy company catalogues, whether it's MGA's, Mattel's or |
| 11:54 | 16 | others, is trade secret information? |
| 11:54 | 17 | A.   I would assume that, you know, what you give someone |
| 11:54 | 18 | else would be potentially shared with another party. |
| 11:54 | 19 | Q.   And you, in fact, said that at your deposition? |
| 11:54 | 20 | A.   Yes. |
| 11:54 | 21 | MR. ZELLER:  And if I could, Your Honor, this is |
| 11:54 | 22 | pages 314, line 23, through 316, line 15.  And I would like |
| 11:54 | 23 | to publish this -- |
| 11:54 | 24 | THE COURT:  Just a moment. |
| 11:54 | 25 | MR. ZELLER:  -- for completeness. |

| | | |
|---|---|---|
| 11:54 | 1 | THE COURT:  314, line 23. |
| 11:54 | 2 | MR. ZELLER:  Yes, Your Honor.  Line 23, page 314, |
| 11:54 | 3 | through 316, line 15. |
| 11:55 | 4 | THE COURT:  You may. |
| 11:55 | 5 | MR. ZELLER:  So if we could pull that up. |
| 11:55 | 6 | *(Document displayed.)* |
| 11:55 | 7 | MR. ZELLER:  (Reading:) |
| 11:55 | 8 | "QUESTION:  Did Mattel have its own catalogue that |
| 11:55 | 9 | it would give out at toy fairs? |
| 11:55 | 10 | "THE WITNESS:" -- that's you -- "Yes. |
| 11:55 | 11 | "QUESTION:  And did they have that each of the |
| 11:55 | 12 | years that you attended the toy fair in New York? |
| 11:55 | 13 | "ANSWER:  You know, it was never something I |
| 11:55 | 14 | confirmed or not, so I don't know if they had it every year |
| 11:55 | 15 | or not. |
| 11:55 | 16 | "QUESTION:  But they had it some of the years you |
| 11:55 | 17 | were there? |
| 11:55 | 18 | "ANSWER:  Yes." |
| 11:55 | 19 | And then, this is the part that I'd like to read |
| 11:55 | 20 | further: |
| 11:55 | 21 | "QUESTION:  Okay.  And what was in the Mattel |
| 11:55 | 22 | catalogue that it would have at the New York Toy Fair? |
| 11:55 | 23 | "ANSWER:  Pictures and descriptions of our |
| 11:55 | 24 | forthcoming product. |
| 11:55 | 25 | "QUESTION:  Was that information marked |

| | | |
|---|---|---|
| 11:55 | 1 | confidential? |
| 11:55 | 2 | "ANSWER:  I don't remember the text of the |
| 11:55 | 3 | catalogue. |
| 11:55 | 4 | "QUESTION:  Did you consider that information to |
| 11:55 | 5 | be confidential at Mattel? |
| 11:55 | 6 | "THE WITNESS:  I -- my general sense is, once you |
| 11:56 | 7 | print something in a catalogue and give it to people, it's |
| 11:56 | 8 | no longer confidential. |
| 11:56 | 9 | "QUESTION:  And so you wouldn't consider that |
| 11:56 | 10 | information to be a trade secret? |
| 11:56 | 11 | "THE WITNESS:  So, am I commenting on that or not? |
| 11:56 | 12 | Yeah, I mean, it's just not -- I think -- I don't know that |
| 11:56 | 13 | it's a trade secret or confidential once you've printed |
| 11:56 | 14 | something and given it to people because people share stuff |
| 11:56 | 15 | and trade it with each other." |
| 11:56 | 16 | BY MR. ZELLER: |
| 11:56 | 17 | Q.   And that was your testimony at the deposition? |
| 11:56 | 18 | A.   Yes. |
| 11:56 | 19 | Q.   You've been asked now a number of times about Sal |
| 11:56 | 20 | Villasenor being a -- Market Intelligence Department -- |
| 11:56 | 21 | wanted to make sure I got that right -- and the word |
| 11:56 | 22 | "department" has been stressed by MGA in these questions? |
| 11:56 | 23 | A.   Yes. |
| 11:56 | 24 | Q.   And it's true that, for years, there was no group or |
| 11:56 | 25 | department called Market Intelligence? |

| | | |
|---|---|---|
| 11:57 | 1 | A.   That's right. |
| 11:57 | 2 | Q.   And by 2003 there was nothing called Market |
| 11:57 | 3 | Intelligence? |
| 11:57 | 4 | A.   Yeah.  I'm not sure what year, but I think, you know, |
| 11:57 | 5 | going into 2003 there wasn't, at least. |
| 11:57 | 6 | Q.   At some point, in 2003 or 2004, um, there was some sort |
| 11:57 | 7 | of announcement that Mr. Villasenor and Ms. Page were now |
| 11:57 | 8 | calling themselves the, quote, "Market Intelligence |
| 11:57 | 9 | Department," right? |
| 11:57 | 10 | A.   Yes. |
| 11:57 | 11 | Q.   And that was -- and they were known -- they weren't |
| 11:57 | 12 | previously known as that? |
| 11:57 | 13 | A.   No. |
| 11:57 | 14 | Q.   Are there other departments that you ever knew of -- |
| 11:57 | 15 | something that was an actual department at Mattel, in all |
| 11:57 | 16 | the years you were there, that had two people in it? |
| 11:57 | 17 | A.   Not that I'm aware of. |
| 11:57 | 18 | Q.   You were asked some questions about why would someone, |
| 11:57 | 19 | um, use false credentials to get into a showroom if the |
| 11:57 | 20 | information is public there? |
| 11:58 | 21 | Do you recall that? |
| 11:58 | 22 | A.   Yes. |
| 11:58 | 23 | Q.   Um, now, you're aware, generally speaking, in the toy |
| 11:58 | 24 | industry, there are lot of private events, like award |
| 11:58 | 25 | banquets, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:58 | 1 | A.   Yes. |
| 11:58 | 2 | Q.   I mean, things that you have to have an invitation or |
| 11:58 | 3 | other credentials or -- somehow to get access to, right? |
| 11:58 | 4 | A.   Yes. |
| 11:58 | 5 | Q.   And -- and did you ever attend an awards banquet? |
| 11:58 | 6 | A.   Yes. |
| 11:58 | 7 | Q.   And when you were there, even though it was a private |
| 11:58 | 8 | event, did you think that the information in there was a |
| 11:58 | 9 | trade secret? |
| 11:58 | 10 | A.   No. |
| 11:58 | 11 | Q.   You were talking -- and asked some questions about |
| 11:58 | 12 | Sharon Rahimi.  Was that her name? |
| 11:58 | 13 | A.   Uh, yes. |
| 11:58 | 14 | Q.   And you said that she was acting as a journalist? |
| 11:58 | 15 | A.   I believe she was a journalist, yes. |
| 11:58 | 16 | Q.   That was your understanding at the time? |
| 11:58 | 17 | A.   Yes. |
| 11:58 | 18 | Q.   And your understanding/expectation is, is that, if a |
| 11:58 | 19 | toy company shares information with a journalist, or someone |
| 11:58 | 20 | who presents themself as a journalist, they're going to |
| 11:58 | 21 | publish that information? |
| 11:59 | 22 | A.   I think so. |
| 11:59 | 23 |         MR. ZELLER:  Nothing further. |
| 11:59 | 24 |         THE COURT:  All right.  We're -- I'm placing all |
| 11:59 | 25 | of the witnesses on-call.  The reason for that is so that no |

Case 2:04-cv-09049-DOC-RNB   Document 10258   Filed 03/24/11   Page 173 of 175   Page ID #:311367
CV 04-9049 DOC - 3/22/2011 - Day 37, Volume 1 of 3

173

| 11:59 | 1  | additional subpoenas have to be served. |
| 11:59 | 2  | THE WITNESS:  Okay. |
| 11:59 | 3  | THE COURT:  It's an inconvenience for the parties, |
| 11:59 | 4  | but -- it's an inconvenience for the person being |
| 11:59 | 5  | subpoenaed, but I want you to go about any planned |
| 11:59 | 6  | vacations, any personal responsibilities.  If we need you, |
| 11:59 | 7  | we'll find you. |
| 11:59 | 8  | THE WITNESS:  Okay. |
| 11:59 | 9  | THE COURT:  But the case will conclude, actually, |
| 11:59 | 10 | on April 7th. |
| 11:59 | 11 | THE WITNESS:  Okay. |
| 11:59 | 12 | THE COURT:  Okay? |
| 11:59 | 13 | THE WITNESS:  Okay. |
| 11:59 | 14 | THE COURT:  Thank you very much. |
| 11:59 | 15 | You may step down. |
| 11:59 | 16 | *(Witness steps down subject to recall.)* |
| 11:59 | 17 | THE COURT:  Now, Counsel, I'm going to talk to the |
| 11:59 | 18 | jury for just a moment off the record just where we're at, |
| 11:59 | 19 | if that's okay with both counsel, with all of you present. |
| 11:59 | 20 | So, Debbie, rest your hands. |
| 11:59 | 21 | *(Discussion off the record.)* |
| 11:59 | 22 | *(Lunch recess held at 12:05 p.m.)* |
| 12:05 | 23 | *(Further proceedings reported by Jane Sutton* |
| 12:05 | 24 | *Rule in Volume II.)* |
| 12:05 | 25 | -oOo- |

CV 04-9049 DOC – 3/22/2011 – Day 37, Volume 1 of 3

174

12:05



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| 12:05 | 1 | -oOo- |
| 12:05 | 2 | |
| 12:05 | 3 | CERTIFICATE |
| 12:05 | 4 | |
| 12:05 | 5 | I hereby certify that pursuant to Section 753, |
| 12:05 | 6 | Title 28, United States Code, the foregoing is a true and |
| 12:05 | 7 | correct transcript of the stenographically reported |
| 12:05 | 8 | proceedings held in the above-entitled matter and that the |
| 12:05 | 9 | transcript page format is in conformance with the |
| 12:05 | 10 | regulations of the Judicial Conference of the United States. |
| 12:05 | 11 | |
| 12:05 | 12 | Date:  March 22, 2011 |
| 12:05 | 13 | |
| 12:05 | 14 | |
| 12:05 | 15 | _____ |
| 12:05 | 16 | DEBBIE GALE, U.S. COURT REPORTER CSR NO. 9472, RPR |
| 12:05 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER