1

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                   – – – – – – –

5

6   MATTEL, INC., ET AL.,              )
                                       )
7           Plaintiffs,                )
                                       )
8       vs.                            ) No. CV 04-9049-DOC
                                       )    Day 37
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                       )
10          Defendants.                )
   _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17               Santa Ana, California

18             Tuesday, March 22, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-22 MattelV2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     WILLIAM PRICE
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 3 of 135   Page ID #:311372
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ISAAC LARIAN, MGA CEO
              ROBERT ECKERT, Mattel CEO
16            LILY MARTINEZ, Mattel Employee
              KEN KOTARSKI, Mattel Technical Operator
17            MIKE STOVALL, MGA Technical Operator
              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
              WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
              FRANK RORIE, Orrick Herrington & Sutcliffe
20            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
              DENISE MINGRONE, Orrick Herrington & Sutcliffe
21            EVAN JENNESS, Attorney for Sal Villasenor

22

23

24

25
```

1                          **I N D E X**

2

3

4                         **EXAMINATION**

5

6       **Witness Name**        **Direct**     **Cross**       **Redirect**      **Recross**

7       ROMANO, MATEO
            By Mr. McConville    7                          38
8           By Mr. Zeller                    26                            44

9       VILLASENOR, SAL
            By Ms. Keller       47

10

11

12

13                          **EXHIBITS**

14

15      **Exhibit**                          **Identification**       **Evidence**

16      Defendants' No. 9273                                        113

17      Defendants' No. 9286                                        106

18      Defendants' No. 9480-5                                       55

19      Defendants' No. 9486                                        122

20      Defendants' No. 9496                                        121

21      Defendants' No. 9497                                        122

22      Defendants' No. 9498                                         75

23      Defendants' No. 9502                                         80

24      Defendants' No. 9503                                         87

25      Defendants' No. 9506                                         60

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 5 of 135   Page ID #:311374
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

5

1        I N D E X (Continued)

2

3

4               EXHIBITS

5

6    <u>Exhibit</u>                    <u>Identification</u>      <u>Evidence</u>

7    Defendants' No. 9507                                89

8    Defendants' No. 9508                                92

9    Defendants' No. 9509                                60

10   Defendants' No. 9510                                100

11   Defendants' No. 9511                                102

12   Defendants' No. 9516                                69

13   Defendants' No. 9517                                59

14   Defendants' No. 9518                                123

15   Defendants' No. 9519                                124

16   Defendants' No. 9521                                60

17   Defendants' No. 9593                                111

18   Defendants' No. 25857                               21

19   Defendants' No. 25858                               18

20   Defendants' No. 25860                               8

21   Defendants' No. 27464                               67

22   Defendants' No. 27464-92                            133

23   Defendants' No. 36028                               127

24

25

         1              SANTA ANA, CALIFORNIA, TUESDAY, MARCH 22, 2011

         2                    DAY 37, VOLUME 2 OF 3

         3                         (1:03 p.m.)

         4              *(The following proceedings is taken in the*

         5         *presence of the jury.)*

         6              THE COURT:  All right.  We're back in session.

         7    The jury is present, the alternates, all counsel, the

         8    parties.

         9              And Counsel, if you'd like to call your next

        10    witness.

        11              MR. MC CONVILLE:  Yes, your Honor.  We call Mateo

        12    Romano.

        13              THE COURT:  Sir, if you'd be kind enough to step

        14    forward, and now would you raise your right hand, please.

        15         **MATEO ROMANO, DEFENSE WITNESS, SWORN**

        16              THE WITNESS:  I do.

        17              THE COURT:  Thank you, sir.  If you'd walk along

        18    the side of the jury railing, please.

        19              If you'd be seated, please.

        20              Would you state your full name for the record,

        21    please.

        22              THE WITNESS:  Mateo Romano.

        23              THE COURT:  And would you spell your last name,

        24    please.

        25              THE WITNESS:  R-o-m-a-n-o.

```
 1              THE COURT:  Thank you.
 2              Direct examination by Mr. McConville on behalf of
 3   Mr. Larian and MGA.
 4                        DIRECT EXAMINATION
 5   BY MR. MC CONVILLE:
 6   Q    Hello, Mr. Romano.
 7   A    Hello.
 8   Q    Where do you work?
 9   A    In Mattel France.
10   Q    In 2001, where did you work?
11   A    I worked for Mattel Latin America.
12   Q    And where was your office located in 2001?
13   A    In Mexico.
14   Q    And what were your responsibilities in 2001 for
15   Mattel -- was it Mattel Latin America?
16   A    Yes.  I was in charge of a third-party business, which
17   meant --
18              (Interruption in the proceedings.)
19              THE WITNESS:  Third-party business, which meant
20   the distribution that we made in Latin America of products
21   that were not from Mattel.
22   BY MR. MC CONVILLE:
23   Q    So your job was to determine whether Mattel would
24   distribute toys made by other companies; is that right?
25   A    I was in charge of looking for products to submit for
```

1    approval to my boss to be distributed in Latin America.

2    Q    Right, but they were not Mattel products?

3    A    Right.

4    Q    They were products made by other toy companies?

5    A    Yes.

6    Q    As part of your job, did you attend toy fairs in 2001?

7    A    Yes.

8    Q    For example, did you attend the Hong Kong toy fair in

9    January 2001?

10   A    Yes.

11           MR. MC CONVILLE:  I'd like to show Mr. Romano

12   Exhibit 25860, please.

13   BY MR. MC CONVILLE:

14   Q    And ask you if you recognize that document.

15   A    Yes, I do.

16   Q    This is an e-mail from Martin Hitch to you dated

17   January 16, 2001?

18   A    Yes.

19           MR. MC CONVILLE:  Your Honor, I move Exhibit 25860

20   into evidence.

21           THE COURT:  Received.

22           *(Defendants' Exhibit No. 25860 is received in*

23       *evidence.)*

24   BY MR. MC CONVILLE:

25   Q    It's the same one we were just talking about.

CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

9

```
1   A    Yes, sorry.

2   Q    Okay.  Who is Martin Hitch?

3   A    Martin Hitch was the person that -- person with the

4   line in -- in Hong Kong from MGA.

5   Q    Martin Hitch worked for MGA in 2001?

6   A    Yes.

7   Q    And you'll see from the e-mail, it says, "Dear Mateo,

8   it was great to see you again in Hong Kong.  Thanks for

9   taking time to visit our showroom."

10       And the showroom that's referenced there is MGA's

11  showroom in Hong Kong?

12  A    Yes, sir.

13  Q    And skipping down, it says, "The following lines were

14  of interest," and then there's a list of products, and at

15  the bottom of that list is Bratz and Bratz fashions; do you

16  see that?

17  A    Yes.

18  Q    And the bottom paragraph says, "Thanks again for your

19  time.  I look forward to hearing from you and meeting again

20  at the New York toy fair"; is that right?

21  A    Yes.

22  Q    And did you, in fact, go to the New York toy fair after

23  the Hong Kong toy fair in 2001?

24  A    Yes, I did.

25  Q    When you attended the Hong Kong toy fair and attended
```

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 10 of 135   Page ID #:311379
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

10

1   the MGA showroom, did you meet with Mr. Hitch?

2   A    Yes.

3   Q    Did you meet with anyone else from MGA?

4   A    I don't remember.

5   Q    Do you think maybe you met with Mr. Larian?

6   A    I don't remember.

7   Q    It's possible?

8   A    It's possible.

9   Q    And during that -- your attending the MGA showroom,

10  were you required to sign a confidentiality agreement about

11  the products you were going to see?

12  A    No.

13  Q    Did you agree with MGA that you would keep the

14  information you were about to see confidential?

15  A    No.

16          MR. MC CONVILLE:  I'd like to put in front of the

17  witness Exhibit 36079, and in particular, paragraph 3.

18          And your Honor -- well --

19  BY MR. MC CONVILLE:

20  Q    And I'd like you to read paragraph 3.

21  A    Out loud?

22  Q    Have you read it?

23  A    You want me to read it?

24  Q    Just paragraph 3, yes.

25          And I'm sorry, to yourself.

1   A    Okay.

2   Q    Have you read that?

3   A    Yes.

4   Q    Now, did you discuss and agree with MGA that the

5   products you saw would be kept confidential from Mattel,

6   Inc., because of their potentially competitive nature?

7   A    From the Mattel, Inc., in the U.S., yes.

8   Q    Okay, I'm sorry.  So you did have an agreement with MGA

9   when you saw their products at the Hong Kong showroom that

10  you would keep the information from Mattel, Inc.; is that

11  right?

12  A    Since we were going to distribute the product in Latin

13  America, I had to share the information with the different

14  countries in Latin America, and Mr. Hitch asked me to keep

15  it confidential from the U.S.

16  Q    Okay.

17  A    And I agreed.

18  Q    And you agreed?

19  A    Yes.

20  Q    Okay.  So the items that you saw -- among the items

21  that you saw at the Hong Kong toy fair was Bratz, correct?

22  A    Yes.

23  Q    And do you recall that you saw versions of the Bratz

24  doll at the Hong Kong toy fair in 2001?

25  A    Yes.

1   Q    And you saw drawings of the Bratz figures at the

2   Hong Kong toy fair?

3   A    Yeah, as the decoration of the showroom.

4   Q    Okay.  And do you recall that MGA told you at the

5   Hong Kong toy fair that Carter Bryant was the one who

6   created the Bratz drawings?

7   A    No.

8   Q    And after the Hong Kong toy fair, you then attended the

9   New York toy fair as well?

10  A    Yes.

11  Q    And what date was that New York toy fair?

12  A    February -- the second week of February, I believe.

13  Q    And did you again go to the MGA showroom at the

14  New York toy fair in February 2001?

15  A    Yes.

16  Q    And at -- were you again asked to keep the information

17  that you saw confidential from Mattel, Inc.?

18  A    I don't remember.

19  Q    Do you want to read that paragraph we just read,

20  paragraph 3 of your -- of Exhibit 36079?

21  A    I -- in Hong Kong, it was mentioned to me, but I don't

22  remember if it was mentioned to me again in New York.

23          MR. MC CONVILLE:  Your Honor, permission to

24  publish this.  This is a declaration of Mr. Romano's.

25          THE COURT:  36079?

 1              MR. MC CONVILLE:  36079.

 2              MR. ZELLER:  It's not impeaching.

 3              THE COURT:  The page?

 4              MR. MC CONVILLE:  Second page of the exhibit,

 5     paragraph 3.

 6              THE COURT:  Paragraph 3 pertains to -- just a

 7     moment.

 8              You may read.

 9              MR. MC CONVILLE:  Do you have it, Mike?

10     BY MR. MC CONVILLE:

11     Q    Okay.  "In January and February of 2001, I attended the

12     Hong Kong and New York toy fairs on behalf of Mattel Latin

13     America.  At the toy fairs, Isaac Larian and others at MGA

14     showed me several products for potential distribution in

15     Latin America.  Among the various MGA products I saw were

16     Bratz dolls.  I discussed and agreed with MGA that the

17     products I saw would be kept confidential from Mattel, Inc.,

18     because of their potentially competitive nature."

19          And this -- you understood that this was a statement

20     you made under penalty of perjury, correct?

21     A    Yes.

22     Q    And after reviewing the -- I'm sorry, so at the

23     New York toy fair, you again saw the Bratz dolls; is that

24     right?

25     A    Yes.

1   Q    And you saw the Bratz drawings again?

2   A    Yes.

3   Q    And did you have discussions at the New York toy fair

4   with Mr. Larian?

5   A    I don't remember.

6   Q    Did you discuss the Bratz product with Martin Hitch?

7   A    Yes.

8   Q    And at the conclusion and -- I'm sorry, at the New York

9   toy fair, you were told that Carter Bryant had made the

10  Bratz drawings, correct?

11  A    Can you repeat the question?

12  Q    Sure.  At the New York toy fair, you were told that

13  Carter Bryant had made the Bratz drawings, correct?

14  A    No.

15  Q    And your -- the reason you were at the toy fairs

16  reviewing the Bratz product was to determine whether it was

17  a product -- whether the Bratz would be a product that

18  Mattel would distribute in Latin America, right?

19  A    Yes.

20  Q    And so when you were done reviewing the Bratz product,

21  you decided that the Bratz product would be something that

22  you -- that you, Mr. Romano, would like to distribute in

23  Latin America; is that right?

24  A    In New York I went with my boss, which was the vice

25  president for Latin America, to show him the product, and

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 15 of 135   Page ID #:311384
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

15

1     after we saw the line, we agreed on -- that it was a good

2     line for us.

3     Q     To distribute --

4     A     To distribute in Latin America.

5     Q     -- in Latin America.

6           And after you -- after the New York toy fair, you still

7     agreed to keep the information that you had seen

8     confidential, correct?

9     A     From the people from the U.S.

10    Q     From Mattel --

11    A     From Mattel U.S.

12    Q     From Mattel U.S.?

13    A     Mattel U.S.

14    Q     Okay.  But after the New York toy fair, because you

15    had decided that it was a product that you thought you

16    could distribute in Latin America, you input a description

17    of the Bratz products into the Mattel computer system in

18    El Segundo, correct?

19    A     The information that was put in the Mattel

20    International system, it was the name of the product, so the

21    countries could be able to put in their demands, the

22    quantities that they wanted.

23    Q     So information about the Bratz product ended up in a

24    system that was accessible in El Segundo, correct?

25    A     The name "Bratz" was in the system of Mattel

CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

16

1    International.

2    Q    And whatever information that you put in the system, it

3    permitted Mattel, Inc., to decide that the Bratz product was

4    too similar to a Mattel product, correct?

5              MR. ZELLER:  Assumes facts.

6              THE COURT:  Would you restate that question,

7    Counsel?

8              MR. MC CONVILLE:  Sure.

9    BY MR. MC CONVILLE:

10   Q    Whatever information you put into the Mattel system

11   concerning the Bratz product, are you with me so far?

12   A    Yes.

13   Q    It permitted the people in El Segundo to conclude that

14   Bratz was too similar to other Mattel products, correct?

15   A    The only information was the name.

16   Q    Pardon me?

17   A    The only information that was placed in the system was

18   the name "Bratz."

19   Q    Well, ultimately, Mattel decided not to distribute

20   Bratz in Latin America, correct?

21   A    Yes.

22   Q    And the basis for that decision was because Bratz was

23   too similar to Mattel products, correct?

24   A    Yes.

25   Q    So whatever information you put into the system allowed

```
 1   someone to decide that the Bratz product was too similar to
 2   a Mattel product, right?
 3   A    No.
 4   Q    And this information you put into the system, you put
 5   it in in roughly February of 2001; is that correct?
 6   A    After the New York toy fair.
 7   Q    So I'm just trying to get a -- was it in February of
 8   2001?
 9   A    Yes.
10   Q    Okay.  And following your meeting with Mr. Hitch at the
11   New York toy fair, he followed up with you to determine
12   whether, in fact, Mattel would distribute the Bratz product
13   in Latin America, correct?
14   A    Yes.
15   Q    And he sent you an e-mail?
16   A    Yes.
17            MR. MC CONVILLE:  If we could put in front of
18   Mr. Romano Exhibit 25858, please.
19            THE COURT:  This is a March 5th e-mail; is that
20   correct?
21            MR. MC CONVILLE:  Yes, sir.
22   BY MR. MC CONVILLE:
23   Q    Do you recognize that?
24   A    Yes.
25   Q    This is an e-mail between you and Mr. Hitch?
```

1    A     Yes.

2          MR. MC CONVILLE:  Your Honor, I move

3    Exhibit 2585 -- I'm sorry, 25858 into evidence.

4          THE COURT:  Received.

5          *(Defendants' Exhibit No. 25858 is received in*

6          *evidence.)*

7    BY MR. MC CONVILLE:

8    Q     And if you'd go to the e-mail at the bottom, there is

9    Bullet Point Number 1, that's an e-mail from Martin Hitch to

10   you dated March 2nd, 2001; do you see that?

11   A     Yes.

12   Q     And after Bullet Point 1, Mr. Hitch writes, "Please

13   advise status of MGA products with Mattel Latin America,"

14   right?

15   A     Yes.

16   Q     And then in response, you write on March 5th, 2001, "I

17   regret to inform you that this year, we will not be carrying

18   any product from MGA.  The reason is because some products

19   are very similar to our own concepts, and this is a very

20   sensitive issue with the brand groups Bratz and Samantha.

21   On the other hand, Shadow and the Puppies is a unique

22   concept, but the price is very high for our markets; did I

23   read that correctly?

24   A     Yes.

25   Q     So whatever information you provided into the Mattel

1    system in El Segundo permitted someone to decide that Bratz

2    was very similar to Mattel's own concepts, correct?

3              MR. ZELLER:  It was asked and answered.

4              THE COURT:  Overruled.

5              THE WITNESS:  This was after the New York toy

6    fair, so the information was already available for the

7    people.

8    BY MR. MC CONVILLE:

9    Q    So whatever information that you provided -- well, let

10   me ask you this:  You agreed to keep the information you had

11   seen confidential, correct?

12   A    Yes.

13   Q    And you kept it confidential, right?

14   A    Yes.

15   Q    So whatever information that you put into the system

16   permitted someone at Mattel El Segundo to conclude that

17   Bratz was very similar to Mattel's own concepts, correct?

18   A    No.

19             MR. ZELLER:  It misstates the witness' testimony.

20             THE COURT:  Overruled.

21             You answer was "no"?

22             THE WITNESS:  The answer is "no."

23   BY MR. MC CONVILLE:

24   Q    The information that you put into the Mattel computer

25   system describing Bratz, it was widely available, correct?

```
1    A    The only information was the name "Bratz."

2    Q    Understood.

3         Whatever information you put in was accessible by many

4    other people at Mattel, Inc., correct?

5              MR. ZELLER:  It misstates the witness' testimony.

6              THE COURT:  Overruled.

7              THE WITNESS:  Can you repeat the question?

8    BY MR. MC CONVILLE:

9    Q    Sure.  Mattel -- the information you put into that

10   computer system was accessible by Mattel, Inc., correct?

11   A    The people that works in Mattel International at

12   Mattel, Inc.

13   Q    Right, so someone at El Segundo had access to the

14   information that you put into the Mattel system, correct?

15   A    Yes.

16   Q    And let's look -- and do you recall there came a time

17   when Mr. Hitch later asked you to confirm that you had kept

18   MGA's information concerning Bratz confidential?

19   A    Yes.

20             MR. MC CONVILLE:  If we could put in front of

21   Mr. Romano Exhibit 25857, please.

22   BY MR. MC CONVILLE:

23   Q    And ask you if you recognize this as an e-mail between

24   you and Martin Hitch dated April 27th, 2001?

25   A    Yes.
```

```
 1              MR. MC CONVILLE:  Your Honor, I move Exhibit 25857

 2    into evidence.

 3              THE COURT:  Received.

 4              (Defendants' Exhibit No. 25857 is received in

 5         evidence.)

 6    BY MR. MC CONVILLE:

 7    Q    This is an e-mail string, correct?

 8    A    Yes.

 9    Q    So if we go to the first e-mail in time, which is on

10    the second page, it's an e-mail from Martin Hitch to you

11    dated April 24, 2001; do you see that?

12    A    Yes.

13    Q    And the e-mail says, in part, "At New York toy fair, I

14    returned a Mattel Latin America price list to you after

15    finding it in the reception of the toy building.  I kept the

16    information confidential despite MGA requesting copies, and

17    I did this in good faith to you and your business."  Did I

18    read that correctly?

19    A    Yes.

20    Q    Next paragraph, "We have received an e-mail today from

21    a friend at Mattel who was surprised to find our Bratz and

22    Scooter Samantha products loaded in the Mattel system after

23    information had been received by Mattel Latin America"; do

24    you see that?

25    A    Yes.
```

1    Q    So after the information was accessible in El Segundo,

2    someone from Mattel, Inc., saw the information concerning

3    Bratz, correct?

4    A    Saw the name "Bratz" in the system.

5    Q    Understood.

6         And then you said in response, the next e-mail up,

7    "Originally, when you presented the line to me, I was very

8    interested in those two items."  Do you remember being

9    interested in -- in Bratz and Scooter Samantha?

10   A    Yes.

11   Q    "For this reason, the item number and description has

12   to be loaded into the system so the subsidiaries can place

13   their demands through the system."  Did I read that

14   correctly?

15   A    Yes.

16   Q    And this is what you were describing for a decision to

17   be made whether to distribute Bratz, you had to input an

18   item number and a description of the products into the

19   Mattel system, correct?

20   A    To get the input from the countries that would carry

21   the product, if it was distributed.

22   Q    The next sentence says, "At the end, your friends were

23   reluctant to let us carry the products"; do you see that?

24   A    Yes.

25   Q    Who were the friends?

1   A    The previous part of the e-mail, he says that "We have

2   received an e-mail today from a friend of Mattel," so I was

3   referring to the same person that told him that the --

4   Q    Okay.

5   A    That information.

6   Q    And then the last sentence, you say, "I have respected

7   the confidentiality of your line with the people in El

8   Segundo," right?

9   A    Yes.

10  Q    And if we go to the next e-mail in the chain, it starts

11  on the first page of Exhibit 25857, it says, "Dear Mateo,

12  thanks for the clarification.  I was certain it would be a

13  simple explanation, particularly given that we gave you very

14  little information on the product up to New York toy fair";

15  do you see that?

16  A    Yes.

17  Q    So you had little information up to the New York toy

18  fair, right?

19  A    (No audible response.)

20  Q    You have to answer.

21  A    Yes.

22  Q    But at the New York toy fair, you got more information,

23  right?

24  A    I don't remember.

25  Q    Well, you understand that there's a difference between

1    seeing the product as you saw it, right, versus describing

2    what the product is, correct?

3    A    I don't understand your question.

4    Q    Well, you've said that you had an opportunity to see

5    the product, right?

6    A    Yes.

7    Q    And based on that, you were able to describe what the

8    product was, correct?

9    A    Yes.

10   Q    And based on the description that you provided of the

11   product, someone at Mattel, Inc., was able to conclude that

12   MGA -- that the Bratz product was very similar to Mattel's

13   own concepts, correct?

14   A    No.

15            MR. ZELLER:  It misstates the witness' testimony.

16            THE COURT:  Overruled.

17            Your answer was "no"?

18            THE WITNESS:  The answer is "no" because the only

19   information was the name "Bratz."

20   BY MR. MC CONVILLE:

21   Q    You communicated with people in ways other than an

22   e-mail, correct?

23   A    Yes.

24   Q    E-mail is not the only way that you would provide

25   information to El Segundo, right?

```
 1    A     I don't understand your question.

 2    Q     Sure.  Did you ever talk to people?

 3    A     Yes.

 4    Q     Did you ever meet with people?

 5    A     Yes.

 6    Q     Those are different ways of communicating than by

 7    e-mail, right?

 8    A     Yes.

 9    Q     And those are ways that you communicated with people at

10    Mattel in El Segundo back in 2001, right?

11    A     Yes.

12    Q     So when MGA invited you to its showroom, you understood

13    that it wasn't concealing Bratz from you, right?

14    A     Concealing?  Can you explain the word "concealing"?

15    Q     Sure.  You were a Mattel Latin America employee, right?

16    A     Yes.

17    Q     And MGA invited a Mattel Latin America employee into

18    its showroom, right?

19    A     Yes.

20    Q     And in that showroom, you were permitted to see the

21    Bratz dolls, right?

22    A     Yes.

23    Q     And, in fact, the reason MGA showed you the product was

24    in the hopes that Mattel would distribute the Bratz doll in

25    Latin America, right?
```

1  A    Yes.

2  Q    And that's not the action of a company concerned that

3  it had knowingly taken Mattel's property, right?

4            MR. ZELLER:  Assumes facts, argumentative.

5            THE COURT:  Sustained.

6            MR. MC CONVILLE:  No further questions.

7            THE COURT:  Cross-examination.

8                    **CROSS-EXAMINATION**

9  BY MR. ZELLER:

10  Q    Good afternoon.  You are currently the head of Mattel

11  France?

12  A    Yes, I am.

13  Q    And let me ask you some questions about the MGA

14  showrooms that you saw first in Hong Kong toy fair and then

15  New York toy fair back in 2001.  And to be clear, MGA asked

16  you to go into these showrooms, right?

17  A    Yes.

18  Q    What they sometimes call their private showroom, right?

19  A    Yes.

20  Q    And in -- was there any particular area that was

21  blocked off to the press or place that they kept

22  particularly secret in the toy fair showrooms?

23  A    Not that I have seen.

24  Q    In fact, when you went to the showroom, and let's focus

25  on the New York toy fair of MGA in February of 2001, you saw

1    lots of other people there?

2    A    Yes.

3    Q    You saw retailer representatives?

4    A    There were other -- other people.

5    Q    Members of the press?

6    A    Possible.

7    Q    Well, you do know that MGA invites members of the press

8    into its showrooms.

9            MR. MC CONVILLE:  Objection.  No foundation.

10           THE COURT:  Repeat the question, Counsel.

11   BY MR. ZELLER:

12   Q    You are aware, based upon your visits to the MGA

13   showrooms personally, that MGA invites members of the press

14   into the showrooms?

15   A    Yes.

16   Q    And if it we could take a look at Exhibit 911.

17           MR. ZELLER:  This is already in evidence.

18           And if we can look at the photographs.

19   BY MR. ZELLER:

20   Q    All right.  Do you recognize these generally as

21   photographs from the MGA showroom at New York -- excuse me,

22   Hong Kong toy fair that you saw in 2001?

23   A    Yes.

24   Q    And what you see there is you see some artwork, what

25   you recall in the decoration, I think?

CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

28

```
1    A    Yes.

2    Q    And you see some samples of the dolls?

3    A    Yes.

4    Q    And then if we go to the next page --

5              MR. ZELLER:  If we can blow up this area right

6    here.  It's a little fuzzy with this digital photo.

7    BY MR. ZELLER:

8    Q    But do you see this sort of page with a photograph and

9    some writing in the middle of the page?

10   A    Yes.

11   Q    And do you recognize that, generally, of what people

12   call a sell sheet?

13   A    Yes.

14   Q    And this is something that MGA put together that had

15   pictures of the Bratz dolls as well as certain kinds of

16   information about the products on them, right?

17   A    Yes.

18   Q    And they gave you sell sheets regarding the Bratz

19   dolls, these Bratz products, during the times you visited

20   MGA showrooms by invitation in 2001, right?

21   A    Yes.

22   Q    And you didn't sign any nondisclosure agreement, and

23   MGA didn't ask you to sign one; is that true?

24   A    That's true.

25   Q    Did you see anybody at MGA's New York toy fair showroom
```

1   sign nondisclosure agreements?

2   A    No.

3   Q    Did you see anyone sign any nondisclosure agreements at

4   MGA's Hong Kong toy fair's showroom in 2001?

5   A    No.

6   Q    And at these toy fairs, these times where you met with

7   MGA representatives, did they tell you that Carter Bryant

8   created Bratz?

9   A    No.

10  Q    Did they tell you that Bratz was created by a former

11  Mattel employee?

12  A    No.

13  Q    Did they tell you that Bratz was created by Carter

14  Bryant while he was a Mattel employee?

15  A    No.

16  Q    And any of the posters that you saw or any of the

17  artwork or other materials that you saw in the MGA showrooms

18  in 2001 had Carter Bryant's name on it that you saw?

19  A    No.

20  Q    Had you even heard of the name Carter Bryant prior to

21  the time Mattel filed this lawsuit in April of 2004?

22  A    No.

23  Q    That's the first time you've heard of it?

24  A    Yes.

25  Q    So you are confident that MGA didn't mention to you

 1   the name Carter Bryant when you visited the toy fair

 2   showrooms?

 3   A    Yes.

 4   Q    Now, after you went to the Hong Kong toy fair, you told

 5   your boss about -- about the visit?

 6   A    Yes.

 7   Q    And who was your boss at that time?

 8   A    Hector Andreu.

 9          (Interruption in the proceedings.)

10   BY MR. ZELLER:

11   Q    And can you spell that for the reporter?

12   A    H-e-c-t-o-r, and the last name is Andreu, A-n-d-r-e-u.

13   Q    And you and your boss, then, together attended, by

14   invitation, MGA's New York toy fair showroom in February of

15   2001?

16   A    Yes.

17   Q    In other words, you shared the information that you saw

18   at the Hong Kong toy fair from MGA's showroom with other

19   people within Mattel Latin America?

20   A    Yes.

21   Q    And that was consistent with your understanding that

22   you had reached with MGA that the only people you were going

23   to keep the information from were the people in the U.S. --

24   A    Yes.

25   Q    -- at Mattel?

1    A    Yes.

2    Q    Was it your understanding that you were prohibited from

3    sharing this information with anybody other than the people

4    at Mattel, Inc., in El Segundo?

5    A    No.

6    Q    Anytime during the toy fair when you were there with

7    your boss, did anyone mention Carter Bryant's name?

8    A    No.

9    Q    And is it true that by February of 2001, by the

10   beginning of New York toy fair, I mean, you understood that

11   the information about the Bratz dolls was already made

12   public by MGA?

13   A    Yes.

14   Q    You saw press releases and press announcements by MGA

15   and news articles about Bratz?

16   A    Yes.

17   Q    Did you have an understanding why it is that Mr. Hitch

18   was asking you to keep the information confidential, not as

19   against everybody, but just to the people in El Segundo at

20   Mattel, Inc.?

21   A    I think it's because he didn't want that to be the

22   source of the information for a competitor in the U.S.

23   Q    And did you understand that agreement with Mr. Hitch to

24   mean that the information was secret?

25   A    I was able to share that with the -- with the countries

1    in Latin America, so it was not a secret.

2    Q    You understood you were free to share it with anybody

3    else other than the people at Mattel, Inc., in El Segundo?

4    A    Yes.

5    Q    And that was with MGA's agreement?

6    A    Yes.

7    Q    I think you were testifying that with respect to this

8    information that counsel was asking you about that ended up

9    in a Mattel system, this was -- this was a computer system

10   of Mattel International, not Mattel, Inc.?

11   A    Yes.

12   Q    And Mattel International at that time, where was that

13   located?

14   A    Can you repeat the question?

15   Q    Right.  Where was Mattel International located at that

16   time?

17   A    Mattel International had people at El Segundo and had

18   people around the world in different countries.

19   Q    And what was the information about Bratz that Mattel

20   International had on its computer system?

21   A    The name "Bratz."

22   Q    And this was put onto the system after New York toy

23   fair?

24   A    Yes.

25   Q    And why was it put onto the Mattel system, Mattel

1  International system?

2  A    Because in order to get Argentina, Brazil and other

3  countries in Latin America to place the quantities, the

4  product would have to be in the system.

5  Q    You were asked a number of questions about the fact

6  that there was a decision that the Bratz -- well, actually

7  let me step back for a moment.

8       It wasn't just one product that you were interested of

9  MGA's and potentially pursuing, there was both Bratz and

10 Scooter Samantha?

11 A    Yes.

12 Q    And you received a response back from Mattel in the

13 U.S. that the products were too similar to Mattel's owns --

14 own products?

15 A    The information came from my boss.

16 Q    And what was your understanding of what was meant by

17 they were too similar?

18 A    That they were in the same category and -- and product,

19 and that we should focus our efforts to -- to develop our

20 product.

21 Q    In other words --

22 A    -- our products.

23 Q    They were competitive products as opposed to actually

24 the way that they looked or operated?

25 A    Yes.

1    Q    And during that time period, were there other products

2    by other manufactures that you considered possibly

3    distributing other than the MGA products that, likewise,

4    ultimately Mattel, Inc., in the U.S. said that Mattel Latin

5    America shouldn't carry it?

6    A    Yes.

7    Q    What were the other products or product that you can

8    think of?

9    A    Some accessories from the company Famosa from Spain,

10   accessories for fashion doll, from the doll called "Nancy."

11   Q    So this wasn't something that happened just to MGA?

12   A    No.

13   Q    And why was it that that doll wasn't carried from, I

14   think, you said from Formosa?

15   A    Famosa.

16   Q    Okay.

17   A    Because the accessories sold, they were very compet- --

18   competitive with our products.

19   Q    And generally speaking, why is it that Mattel, Inc.,

20   the parent company, wouldn't want Mattel Latin America

21   distributing both Mattel products and competitor products in

22   certain categories at the same time?

23             MR. MC CONVILLE:  Objection.  Compound.

24             THE COURT:  Overruled.

25             THE WITNESS:  I think the answer is because the

```
 1   idea was to focus our efforts and our resources in -- in
 2   selling our products, the Mattel products.
 3   BY MR. ZELLER:
 4   Q    Wanted your best efforts to sell the Mattel products as
 5   opposed to the competing products?
 6   A    Yes.
 7   Q    If we can go back to -- let me see if I've got the
 8   right exhibit number.
 9        This is Exhibit 25857, and specifically, we can look at
10   the second page.  This is an e-mail exchange between you and
11   Mr. Hitch of MGA from the April 2001 time period; do you see
12   that?
13   A    Yes.
14   Q    And then focusing on this e-mail that Mr. Hitch sent to
15   you on April 24th, 2001, and the first paragraph is where he
16   talks about this price list that he found.  And you'll see
17   in here, he says that other people at MGA wanted that
18   information; do you see that?
19   A    Yes.
20   Q    Now, did you even respond to this part of his e-mail?
21   A    No.
22   Q    Why not?
23   A    I -- I was surprised on his comment because we know
24   that once the information is going out from the showroom or
25   even to the customers, it is no longer confidential.
```

1    Q    So you didn't respond because you thought this was odd

2    that you would --

3    A    I thought it was a little bit obsessed with the

4    confidentiality.

5    Q    Did you consider a price list of this kind to be

6    confidential information?

7    A    No.

8    Q    Because it's shared with retailers?

9    A    Yes.

10   Q    And then directing your attention to the next

11   paragraph, this is Mr. Hitch to you, and it says, "We have

12   received an e-mail today from a friend at Mattel"; do you

13   see that?

14   A    Yes.

15   Q    So this is referring to some internal source that

16   Mr. Hitch and others at MGA had at Mattel?

17   A    That's my understanding.

18   Q    And they don't tell you the name of the person, right?

19   A    Right.

20   Q    They call this person a friend?

21   A    Right.

22   Q    And that was the person who told them about what

23   Mattel's system showed?

24   A    Yes.

25   Q    And that was why when you responded, you said, "Dear

1   Martin, you don't have to be disappointed.  Ask your
2   friend."
3   A    Yes.
4   Q    And you used words "your friend" because Mr. Hitch was
5   the one who wasn't using a name?
6   A    That is right.
7   Q    And didn't tell you who that person was?
8   A    Yes.
9   Q    So you weren't the one who was hiding the person's
10  identity, right?
11  A    No, I didn't know who this person was.
12  Q    And then Mr. Hitch, when he responded, and this is at
13  the bottom of the first page of Exhibit 25857, says, "Thanks
14  for the clarification.  I was certain it would be a simple
15  explanation, particularly given that we gave you very little
16  information on the product up to NYTF"; do you see that?
17  A    Yes.
18  Q    And "NYTF" is New York toy fair?
19  A    Yes.
20  Q    Did Mr. Hitch ever give you any response other than the
21  fact that he was satisfied with what you had told him had
22  happened about the information; namely, the Bratz name being
23  put on the Mattel International computer system?
24  A    He sent another e-mail to offer some other products to
25  continue to do business.

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 38 of 135   Page ID #:311407
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

38

```
 1   Q     But he never expressed to you any further concern or
 2   dissatisfaction with your explanation?
 3   A     No.
 4             MR. ZELLER:  I have nothing further.  Thank you.
 5             THE COURT:  Redirect by Mr. McConville.
 6                      REDIRECT EXAMINATION
 7   BY MR. MC CONVILLE:
 8   Q     Mr. Romano, I think you said that Martin Hitch was
 9   obsessed with confidentiality; is that right?
10   A     Yes, that's what I said.
11   Q     Not something that's a big focus at Mattel, right?
12             MR. ZELLER:  The question is argumentative.
13             THE COURT:  Overruled.
14             THE WITNESS:  I thought that his concern about the
15   confidentiality when he was showing me the line and when he
16   found the price list, it was a little bit excessive.
17   BY MR. ZELLER:
18   Q     Right, because you are trained at Mattel that if you
19   can get your hands on competitor information, you should
20   take it, right?
21             MR. ZELLER:  Argumentative.
22             THE COURT:  Sustained.
23   BY MR. MC CONVILLE:
24   Q     Um --
25             THE COURT:  The question is stricken.
```

 1   BY MR. MC CONVILLE:

 2   Q    Do you know a man named Sal Villasenor?

 3   A    Sorry?

 4   Q    Do you know a person named Sal Villasenor?

 5   A    No.

 6   Q    As I understand your description -- well, let me show

 7   you Exhibit 25857.

 8           MR. MC CONVILLE:  It's already in evidence.

 9           If you'd go to the second page, please,

10   Mr. Romano's response, it says, "Dear Martin."

11   BY MR. MC CONVILLE:

12   Q    It says, "You don't have to be disappointed.  Ask your

13   friend if he or she has seen the product."  What you meant

14   when you wrote that is it's a lot different from reading

15   something in a press release versus actually seeing a

16   product, right?

17   A    I don't understand your question.

18   Q    Sure.  Words on a paper don't describe what it is you

19   can learn from actually seeing a product, right?

20           MR. ZELLER:  Assumes facts, overbroad.

21           THE COURT:  Overruled.

22           THE WITNESS:  I'm sorry, I still don't understand

23   your question.

24   BY MR. MC CONVILLE:

25   Q    Sure.  Do you understand that -- you were asked

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 40 of 135   Page ID #:311409
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

40

1    questions about whether or not MGA had put things down on a

2    piece of paper, right?  Press releases, for example?

3    A    Yes.

4    Q    Do you understand there is a big difference between

5    reading something on a piece of paper versus actually seeing

6    the product that you are trying to compete with, right?

7              MR. ZELLER:  Assumes facts.

8              THE COURT:  Yeah, it's -- I've previously allowed

9    the question, but I think you are going to have be more

10   specific, Counsel.

11             MR. MC CONVILLE:  Sure.

12   BY MR. MC CONVILLE:

13   Q    There was a reason why you didn't rely on press

14   releases for making a decision about whether you would

15   distribute Bratz, right?

16   A    The product was shown to me and my boss, and we decided

17   if we wanted to carry this, and then later on, we were

18   informed that we couldn't distribute the product because it

19   was very similar.

20   Q    Right.  So you made your decision about whether you

21   would distribute Bratz based on a visual inspection of the

22   product at MGA's showroom, right?

23   A    Yes.

24   Q    You didn't make your decision based on a piece of paper

25   where someone described the product, right?

CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

41

1    A    Right.

2    Q    And as I understand it, under the same -- on the same

3    paragraph, it says, "Originally when you presented the line

4    to me, I was very interested in those two items.  For this

5    reason, the item number and description has to be loaded

6    into the system so the subsidiaries can place their demands

7    through the system, right?

8    A    Yes.

9    Q    And you've said that the only description you provided

10   at that time was the Bratz name, right?

11   A    Yes.

12   Q    And as I understand what you've said, ultimately

13   someone concluded that the products -- that Bratz was too

14   similar to a Mattel product, right?

15   A    Yes.

16   Q    And, in fact, I think you said because it's in the same

17   category as a Mattel product, you couldn't distribute it,

18   right?

19   A    I said it was a fashion doll.

20   Q    I'm sorry.  So it was a fashion doll, so you couldn't

21   distribute it, right?

22   A    Right.

23   Q    Because it fell into a toy that Mattel had a competing

24   product, right?

25   A    Yes.

1    Q    Now, it's true that Mattel is the largest toy

2    manufacturer in the world, right?

3    A    Yes.

4    Q    And, in fact, it has lots of toys that it makes, right?

5    A    Yes.

6    Q    In fact, if there is another toy company who makes a

7    product that Mattel doesn't make, Mattel will think about

8    making that product, right?

9              MR. ZELLER:  This is argumentative.

10             THE COURT:  Sustained.

11   BY MR. MC CONVILLE:

12   Q    Sir, as I understand the description -- the reason that

13   the product was too similar was because Mattel carried a

14   fashion doll, right?

15   A    Yes.

16   Q    But isn't it true that Mattel carries virtually every

17   toy product in the world, right?

18             MR. ZELLER:  Assumes facts, overbroad.  It's

19   vague.

20             THE COURT:  No.  You can answer that question,

21   the --

22             THE WITNESS:  I'm sorry, can you repeat the

23   question?

24   BY MR. MC CONVILLE:

25   Q    Sure.  Let me ask it a different way.  There is no

1   other company in the world that has a broader product line

2   than Mattel, right?

3   A    I don't know.

4   Q    Can you think of one?

5   A    Hasbro.

6   Q    And -- okay.  So let's assume that Mattel has a vast

7   array of toys, okay; are you with me?

8   A    Yes.

9   Q    And as I understand, your job was to decide which toys

10  you would distribute in Latin America that Mattel didn't

11  make, right?

12  A    Yes.

13  Q    And if a product competed with a Mattel toy, your job

14  was to not distribute that product, right?

15  A    No.

16  Q    The reason you didn't carry Bratz was because it was

17  too similar to a Mattel product, right?

18  A    Yes.

19  Q    Based on the sole description that it was a fashion

20  doll, right?

21  A    I don't know what information the U.S. had to make the

22  decision.

23  Q    Your testimony was that Mattel made a decision to not

24  distribute Bratz because it competed with a Mattel product,

25  right?

1   A     Yes.

2   Q     And so as I understand it, as the largest toymaker in

3   the world, isn't it true that you would have no job because

4   every other product that Mattel makes would be made by

5   another company?

6            MR. ZELLER:  This is argument.

7            THE COURT:  Sustained.

8            MR. MC CONVILLE:  No further questions.

9            THE COURT:  Recross, please.

10                      **RECROSS-EXAMINATION**

11  BY MR. ZELLER:

12  Q     Focusing on the time period of this e-mail, Exhibit

13  25857, which is the April 2001 time period, do you think you

14  were the only person within Mattel to have knowledge about

15  Bratz?

16  A     No.

17  Q     In fact, by this time there were press releases,

18  catalogs, sell sheets, all manner of information about Bratz

19  that were publicly distributed?

20  A     Yes.

21  Q     And when you were referring to the fact, here, in this

22  e-mail, 25857-2, you were asked about, where it says, "You

23  don't have to be disappointed.  Ask your friend if he or she

24  has seen the product," end quote.  There, were you referring

25  to the fact that the product was secret?

1   A    I didn't share any photograph that I could have of the

2   product.

3   Q    You were referring to the fact that you didn't share a

4   photograph, not that photographs of the Bratz dolls were

5   already public?

6   A    Right.

7   Q    And, in fact, you were asked questions about a mere

8   description on a piece of paper isn't enough information

9   about a product; do you recall those questions?

10  A    Yes.

11  Q    In fact, in the toy industry, a number of these pieces

12  of paper, press releases, press announcements by MGA, sell

13  sheets, have photographs of the products on them?

14  A    Yes.

15  Q    In fact, it's extremely common?

16  A    Yes.

17  Q    Because you want consumers to see what the products

18  look like?

19  A    Yes.

20  Q    You were asked some questions about Mr. Hitch, and I

21  apologize, I couldn't quite tell if you were saying he was

22  excessive or obsessive about secrecy.

23  A    Excessive.

24  Q    Excessive, like e-x-c-e-s-s-i-v-e?

25  A    Yes.

1    Q    Did you have an understanding of how long Mr. Hitch was

2    in the toy industry at the time you were dealing with him

3    back in 2001?

4    A    The only thing that I know was that he was recently

5    hired by MGA when I met him.

6    Q    So you don't know whether he had had dealings on a

7    regular basis with retailers and the press and familiar with

8    the kinds of information that MGA itself was routinely

9    distributing to the public and the press and retailers?

10            MR. MC CONVILLE:  Objection.  Compound.

11            THE COURT:  No.  Overruled.

12            You can answer the question.

13            THE WITNESS:  No, I don't know.

14            MR. ZELLER:  Just one moment, please.

15            (Attorney discussion held off the record.)

16            MR. ZELLER:  Thank you.  Nothing further.

17            THE COURT:  Sir, we are going to ask you to remain

18    on call.  We are asking all of the witnesses in the case to

19    remain on call until April -- April 11th.  Go about your

20    professional responsibilities, take any planned vacations.

21    If we need you, we'll get you.

22            THE WITNESS:  Okay.

23            THE COURT:  Thank you very much, sir.  Step down.

24            Counsel, your next witness, please.

25            MS. KELLER:  Yes, your Honor.  We call Sal

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 47 of 135   Page ID #:311416
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

47

```
 1   Villasenor.
 2            THE COURT:  Thank you.
 3            Thank you, sir.  If you'd step forward, please.
 4            Now would you stop, sir, and raise your right
 5   hand.
 6            SAL VILLASENOR, DEFENDANTS' WITNESS, SWORN
 7            THE WITNESS:  I do.
 8            THE COURT:  Sir, if you'd walk along the railing,
 9   please.
10            Have a seat.
11            THE WITNESS:  Thank you.
12            THE COURT:  And sir, will you state your full name
13   for the jury, please.
14            THE WITNESS:  Salvador Villasenor.
15            THE COURT:  Thank you.  And will you spell your
16   last name, please.
17            THE WITNESS:  V like in Victor, i-l-l-a-s-e-n-o-r.
18            THE COURT:  Thank you.
19            Direct examination by Ms. Keller on behalf of
20   Mr. Larian and MGA.
21            MS. KELLER:  Thank you, your Honor.
22                        DIRECT EXAMINATION
23   BY MS. KELLER:
24   Q    Mr. Villasenor, you're a former Mattel employee,
25   correct?
```

CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

48

1   A    That's correct.

2   Q    And is Mattel paying your legal fees today?

3   A    Yes, they are.

4   Q    And are you being represented by your lawyer, Evan

5   Jenness, who is present in the courtroom?

6   A    That's correct.

7   Q    Before testifying here today, did you review any

8   depositions that you've given in the past?

9   A    Repeat the question, please.

10  Q    Before testifying here today, did you review any

11  deposition testimony that you have given in the past?

12  A    I have.

13  Q    And how many volumes did you review?

14  A    I don't remember the exact number.

15  Q    Did you review any exhibits?

16  A    I think so, correct, yes.

17  Q    You reviewed some documents?

18  A    I did.

19  Q    Did you meet at all with Mattel's lawyers?

20  A    What time?  What period are you talking about?  What --

21  Q    In preparation for your testimony here today?

22  A    No.

23  Q    Did you meet with Mattel's lawyers in preparation for

24  your deposition testimony?

25  A    No.

1    Q    Did, to your knowledge, your lawyer meet with Mattel's

2    lawyers to prepare for testimony today?

3    A    I don't think so, no.

4    Q    Now, you started working for Mattel in 1992?

5    A    That's correct.

6    Q    And you continued working for Mattel until the summer

7    of 2006?

8    A    That's correct.

9    Q    Your job at Mattel was the first you ever had in the

10   toy industry, right?

11   A    That is correct.

12   Q    And to this day, it's the only job you've had in the

13   toy business?

14   A    That is correct.

15   Q    So anything you learned about the toy business, then,

16   you learned at Mattel, true?

17   A    That is correct.

18   Q    Now, your first job at Mattel was as a junior analyst

19   in the marketing and business analysis department, right?

20   A    Correct.

21   Q    And you had a supervisor named Jeff Lang in 1992?

22   A    Correct.

23   Q    You reported to him from 1992 to 1995?

24   A    Correct.

25   Q    I want to talk to you a little bit about your -- your

1   position there from '92 to '95.

2       One of your jobs was maintaining a Mattel library on

3   the ninth floor of the Mattel building in El Segundo,

4   correct?

5   A    That is correct.

6   Q    And among other things, the library contained catalogs

7   for toys made by Mattel's competitors, true?

8   A    True.

9   Q    But at least from 1992 to 1995, it wasn't your job to

10  get those catalogs, was it?

11  A    No, it was not.

12  Q    It was your boss, Mr. Lang, who got those catalogs; is

13  that true?

14  A    Correct.

15  Q    And he told you that he got those catalogs by getting

16  into competitors' private showrooms, right?

17          MR. PRICE:  Object.  Hearsay.

18          THE COURT:  Sustained.

19          MS. KELLER:  It's foundation, your Honor, for

20  what's coming next.

21          THE COURT:  Well, I'm not sure what's coming next,

22  so it's hearsay.  Sustained.

23  BY MS. KELLER:

24  Q    Your understanding was that there was already a system

25  in place at Mattel between 1992 and 1995 for Mattel

```
 1   employees sneaking into competitors' private showrooms and

 2   getting their catalogs, correct?

 3           MR. PRICE:  Objection.  Argumentative and lack of

 4   foundation.

 5           THE COURT:  Overruled.

 6           You can answer the question.

 7           THE WITNESS:  Yes, correct.

 8   BY MS. KELLER:

 9   Q    So you weren't the person who came up with that, true?

10   A    True.

11   Q    And you knew when you were working for Mattel, that

12   Mattel's competitors would typically not let a Mattel

13   employee into their private showrooms at toy fairs, right?

14   A    Correct.

15   Q    Because generally those showrooms are not opened to

16   competitors, right?

17   A    Correct.

18   Q    And you personally attended toy fairs after you joined

19   what became known as the "market intelligence department";

20   is that true?

21   A    Correct.

22   Q    For example, you got information about your competitors

23   at the 2001 New York toy fair, right?

24           MR. PRICE:  Objection.  Assumes facts about his

25   being in the market intelligence department at that time.
```

 1            THE COURT:  Overruled.

 2            THE WITNESS:  Correct.

 3   BY MS. KELLER:

 4   Q    And you got that information after your boss, Mr. Lang,

 5   explained to you how he was able to get into Mattel's

 6   competitors' confidential showrooms, right?

 7   A    Correct.

 8   Q    For example, you were -- it was explained to you how to

 9   create fictitious business cards, right?

10   A    Correct.

11   Q    And the Mattel practice of presenting its employees as

12   toy store owners was explained to you, right?

13   A    Correct.

14   Q    The practice of creating fake business cards and having

15   them printed up at Kinko's was explained to you, right?

16   A    Correct.

17   Q    And the practice of using those fake business cards at

18   toy fairs to try to convince competitors that you were there

19   to buy their product was explained to you, right?

20   A    Correct.

21   Q    And your understanding is that when Mr. Lang finished

22   using the catalogs himself, he would give them to you to

23   store in the Mattel library, correct?

24   A    Correct.

25   Q    Now, at some point after 1995, you used this training

1    that you got at Mattel yourself to start getting false

2    information from Mattel's competitors' private showrooms,

3    right?

4    A    Correct.

5    Q    You started working in the sales research department

6    after 1995?

7    A    That is correct.

8    Q    And then around 1999, you left the sales research

9    department to get into the marketing and business analysis

10   department, right?

11   A    Somewhere around 1999, correct.

12   Q    And that later became known as the market intelligence

13   department, true?

14   A    The name of the department would change periodically,

15   but yes, it became market intelligence.

16   Q    And the market -- you actually became the manager of

17   the market intelligence department in the year 2003,

18   correct?

19   A    Correct.

20   Q    And you remained the manager from 2003 to 2006, right?

21   A    Correct.

22   Q    And once you rejoined what became known as the "market

23   intelligence department" around 1999, you personally began

24   using fake business cards to get into competitors' showrooms

25   at toy fairs, right?

 1    A    That's correct.

 2    Q    And you engaged in that practice until at least 2005,

 3    personally, right?

 4    A    Correct.

 5    Q    So we're talking about a period of six or seven years

 6    that you engaged in the practice at Mattel of using false

 7    identity information to get into competitors' private

 8    showrooms, correct?

 9    A    That's correct.

10    Q    Now, let's look at Exhibit 9480.  Do you see on this

11    page any of the cards that you used to get into private

12    showrooms?

13    A    (No audible response.)

14    Q    I'm sorry, go to -- go to page 5, top right?

15    A    I do.

16         MS. KELLER:  Your Honor, I move 9480, page 5, into

17    evidence.

18         MR. PRICE:  Your Honor, I object to --

19         THE COURT:  He hasn't --

20         MS. KELLER:  I'm sorry.

21    BY MS. KELLER:

22    Q    Do you recognize this as one of your fake business

23    cards that you had made up so you could get into

24    competitors' private showrooms?

25    A    Are you referring to the top right hand?

1    Q    Yes.

2    A    Correct.

3         THE COURT:  Received.

4         MR. PRICE:  Your Honor, it's just that one that's

5    received?

6         THE COURT:  The page so far, Counsel.  We'll see

7    what happens on direct and cross.

8         *(Defendants' Exhibit No. 9480-5 is received*

9    *in evidence.)*

10        MS. KELLER:  And may we see that card displayed.

11   BY MS. KELLER:

12   Q    And this describes you as "Sal Villasenor, co-owner,

13   The Toy Shop," and it even gives an e-mail address, right?

14   A    Correct.

15   Q    And this is really one of many fake business cards that

16   you had made up while you were an employee at Mattel, right?

17   A    One of a few, correct.

18   Q    There never was any toy -- any store called The Toy

19   Shop, right?

20   A    That's correct.

21   Q    It's just a name you made up?

22   A    That's correct.

23   Q    And did you also make up the fact that this toy shop

24   was in the business of vehicles, dolls, action figures,

25   games, plush and video?

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 56 of 135   Page ID #:311425
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

56

1   A    Correct.

2   Q    And the address on the card is not your Mattel address,

3   right?

4   A    No, it's not.

5   Q    Was this an address of some friends of yours, Tony,

6   David and Chuy Velasquez?

7   A    That is correct.

8   Q    And you used their home address as your business

9   address because you didn't want to use either your own

10  Mattel address or your own home address, true?

11  A    Correct.

12  Q    And the reason you had this address was so that toy

13  manufacturers, thinking you were a retailer, could mail you

14  catalogs, right?

15  A    That's correct.

16  Q    And toy manufacturers actually did send catalogs to the

17  Velasquez house somewhere between 10 and 20 times?

18  A    Somewhere around there.

19  Q    And would Mr. Velasquez call you and tell you that they

20  had arrived so you can pick them up?

21  A    That's correct.

22  Q    And let's look at 9480, page 5, at the bottom, we see

23  this -- at the very bottom right, we see the little "M"

24  stamp showing this was produced by Mattel; is that right?

25  A    I'm sorry, I am not sure what that is.

```
 1   Q    Mattel knew that you had these fake business cards --

 2              MR. PRICE:  Objection.  Vague and ambiguous as to

 3   "Mattel."

 4              THE COURT:  Well, sustained in its present form.

 5   BY MS. KELLER:

 6   Q    Executives as Mattel knew you were using fake business

 7   cards, right?

 8              MR. PRICE:  Same objection.

 9              THE COURT:  Overruled.

10              THE WITNESS:  That's correct.

11   BY MS. KELLER:

12   Q    And sometimes you used your real name and sometimes you

13   used a fake name on these business cards, right?

14   A    That's correct.

15   Q    During your early years of using the fake business

16   cards to get into Mattel's competitors private showrooms,

17   you used a different name on your card than your own, right?

18   A    That's correct.

19   Q    And you would just pick a name that you liked or a name

20   you remembered and used that?

21   A    That's correct.

22   Q    If we could look at Exhibit 35986, is this a business

23   card that you used in the name of Anthony Villa?

24   A    That's correct.

25              MS. KELLER:  Move 35986 into evidence, your Honor.
```

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 58 of 135   Page ID #:311427
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

58

```
 1              THE COURT:  Received.

 2              (Defendants' Exhibit No. 35986 is received in

 3      evidence.)

 4  BY MS. KELLER:

 5  Q    So this is the same Toy Shop card but only this time

 6  you're describing yourself as Anthony Villa, right?

 7  A    That's correct.

 8  Q    Owner of The Toy Shop.

 9       And did you also sometimes use the name Sal Villa?

10  A    I don't remember.

11  Q    Now, you would submit reimbursement for the copying

12  charges for the fake business cards to Mattel, right?

13  A    Correct.

14  Q    And Mattel would, in fact, reimburse you for the cost

15  of these fake cards, right?

16  A    That's correct.

17  Q    Let's look at Exhibit 9517.

18       Do you recognize this as an expense report for

19  Mattel -- or for you to Mattel, February 25th, 2004 to

20  March 17th, 2004?

21  A    I do.

22              MS. KELLER:  Your Honor, I'd move 9517 into

23  evidence.

24              THE COURT:  Received.

25
```

1          *(Defendants' Exhibit No. 9517 is received in*

2     *evidence.)*

3     BY MS. KELLER:

4     Q    And if you look at the first page, it says under -- it

5     says, "Expense dates, 25 Feb., 2004 to 17 March, 2004,

6     purpose, Pomona toy fair and miscellaneous expenses for

7     February and March, 2004."

8          And then if we look at page 4, the fifth item down,

9     there's an entry for Kinko's for trade show business cards,

10    right?

11    A    Correct.

12    Q    And those -- those are some of the phony business cards

13    printed up for the toy fair, true?

14    A    Correct.

15    Q    And you didn't need to do that when you were having --

16    using official, real Mattel cards because Mattel provided

17    them to you, true?

18    A    Correct.

19    Q    So you didn't need to go to Kinko's to have Mattel

20    cards made, right?

21    A    Correct.

22    Q    Now, Mattel also paid the cost for you to travel to the

23    New York, Hong Kong and Germany toy fairs, right?

24    A    That's correct.

25    Q    And Mattel reimbursed you for all those expenses?

```
 1   A    That's correct.

 2   Q    So if we look at Exhibit 9506, that's an expense report

 3   for the 2001 New York toy fair?

 4   A    That's correct.

 5            MS. KELLER:  Move 9506 into evidence, your Honor.

 6            THE COURT:  Received.

 7            (Defendants' Exhibit No. 9506 is received in

 8       evidence.)

 9   BY MS. KELLER:

10   Q    9509, that's an expense report for the 2003 Hong Kong

11   toy fair, correct?

12   A    That's correct.

13            MS. KELLER:  Move 9509 into evidence.

14            THE COURT:  Received.

15            (Defendants' Exhibit No. 9509 is received in

16       evidence.)

17   BY MS. KELLER:

18   Q    Exhibit 9521, that's for the 2005 Nuremberg toy fair?

19   A    That's correct.

20            MS. KELLER:  Move 9521 in.

21            THE COURT:  Received.

22            (Defendants' Exhibit No. 9521 is received in

23       evidence.)

24   BY MS. KELLER:

25   Q    And you were reimbursed for all of your expenses going
```

1    to all these toy fairs, right?

2    A    Correct.

3    Q    Mattel, for example, paid your round trip -- paid for

4    your round trip to New York, right?

5    A    That's correct.

6    Q    Put you up in hotels like the Waldorf Astoria in

7    New York, true?

8    A    That's true.

9    Q    Paid for all your meals?

10   A    That's correct.

11   Q    Paid for you to fly to Hong Kong and Germany?

12   A    That's correct.

13   Q    And your primary job at those toy fairs was to get

14   information about your competitors, right?

15   A    That's correct.

16   Q    And your primary method was to get into the private

17   showrooms of Mattel's competitors, true?

18   A    That's correct.

19   Q    Now, you had various bosses from 1999 to 2005, right?

20   A    That's correct.

21   Q    In 1999 and 2000, you reported to a Candice Chang,

22   correct?

23   A    Correct.

24   Q    And Ms. Chang approved of your using the fake business

25   cards, right?

1    A    That's correct.

2    Q    And in fact, she, herself, was using fake business

3    cards to get into private showrooms, right?

4    A    That's correct.

5    Q    And Ms. Chang reported to somebody called Bennett Wolk,

6    the director of consumer research, did she not?

7    A    She did.

8    Q    He later became your supervisor, right?

9    A    Correct.

10    Q    And Mr. Wolk also knew about the practice because you

11    had conversations with him about it on several occasions,

12    right?

13    A    That's correct.

14    Q    In fact, Mr. Wolk not only knew you were going into the

15    showrooms with fake credentials, he directed you to do that,

16    right?

17    A    That's correct.

18    Q    And from 2003 to 2005, you reported to a guy named Matt

19    Turetzky, the vice president of strategy planning and

20    business development, right?

21    A    That's correct.

22    Q    And Mr. Turetzky and you also discussed your use of

23    fake business cards and fake toy store retailer information

24    to get into competitors' showrooms, right?

25    A    That's correct.

1   Q    And Mr. Turetzky never once told you not to do that,

2   did he?

3   A    That's correct.

4   Q    He never told you that you shouldn't go into

5   competitors' showrooms using improper means, right?

6   A    That's correct.

7   Q    He never said, oh, Mattel's come up with a revised code

8   of conduct, and so now it's very important that you not go

9   into competitors' showrooms, right?

10  A    That's correct.

11  Q    And in fact, Mr. Turetzky himself directed and

12  instructed you to keep on doing this, right?

13  A    That's correct.

14  Q    Now, you also reported for a period in 2002 and 2003 to

15  a man named Daniel, is it Frechtling?

16  A    Correct.

17  Q    He was vice president of strategic planning?

18  A    Correct.

19  Q    And you and he also discussed your use of the fake

20  business cards to get into competitors' showrooms, right?

21  A    That's correct.

22  Q    He never once told you not to do it, did he?

23  A    No, he did not.

24  Q    Did he ever reprimand you for doing it?

25  A    No, he did not.

1    Q    Did he tell you he expected you to keep doing it?

2    A    Yes, he did.

3    Q    Now, Mr. Drew Vollero, he was Mr. Turetzky's boss?

4    A    That's correct.

5    Q    And he had also been Bennett Wolk's supervisor?

6    A    I think Bennett reported to Dan Frechtling who reported

7    to Drew Vollero.

8    Q    Well, at any rate, you had also -- in addition to the

9    others we've talked about, you had discussions with

10   Mr. Vollero about using the phony credentials, right?

11   A    That's correct.

12   Q    So this was actually Mattel's existing practice when

13   you got there, right?

14   A    Correct.

15   Q    Kept on going while you were there, right?

16   A    Correct.

17   Q    And you were directed to keep on doing it in a very

18   systematic way, right?

19   A    Correct.

20   Q    And not one of your supervisors or superiors ever

21   reprimanded you or told you to stop doing it, right?

22   A    (No audible response.)

23   Q    I'll break it in two.  Not one of your superiors ever

24   reprimanded you for using fake credentials to get into

25   competitors' showrooms, correct?

1   A     That's correct.

2   Q     And let me talk to you about a person by the name of

3   Matt Bousquette.  At the time that you were engaged in this

4   practice of using false ID to get into competitors' private

5   showrooms, Matt Bousquette was the president of the Mattel

6   Brands, was he not?

7   A     That's correct.

8   Q     And you and Mr. Bousquette are personal friends, aren't

9   you?

10  A     We were friends.

11  Q     You copied Mr. Bousquette on your toy fair reports,

12  right?

13  A     That's correct.

14  Q     And in fact, you copied senior management on all of the

15  things that you put out in the market intelligence group,

16  right?

17        MR. PRICE:  Objection.  Vague as to senior

18  management.

19        THE COURT:  Well, you've asked the question about

20  executives so far.  I think it lacks some foundation,

21  Counsel, so if you want to go through some of those alleged

22  people.

23  BY MS. KELLER:

24  Q     Do you consider the president of Mattel Brands to be a

25  senior executive within Mattel?

1    A    I do.

2    Q    And senior management?

3    A    I do.

4    Q    And the same thing would be true of vice presidents at

5    Mattel, they would be considered senior executives, right?

6    A    Correct.

7    Q    Senior management.

8         And was it common practice for the market intelligence

9    group, when you were in it, to CC senior management on

10   various things you put out about market intelligence?

11   A    Yes, it was.

12   Q    And not only were you E-mailing this stuff and handing

13   it out, but you were also a trusted confidante of

14   Mr. Bousquette, were you not?

15            MR. PRICE:  Objection.  Lack of foundation.

16            THE COURT:  Overruled.

17            MR. PRICE:  And ambiguous.

18            THE COURT:  Overruled.

19            THE WITNESS:  That's correct.

20            MS. KELLER:  And if we can have Exhibit 27464.

21   BY MS. KELLER:

22   Q    You received a subpoena from MGA requiring you to

23   provide to MGA all documents you had that were relevant to

24   this case, correct?

25   A    That's correct.

1   Q    And if you look at this stack of documents, are these

2   the documents that you turned over, and I'm referring to

3   Exhibit 27464?

4   A    Do you mind repeating the question one more time?

5   Q    Yeah.  Do you recognize this as the documents that you

6   provided to MGA in response to MGA's subpoena?  And if you'd

7   look at the little VILS stamp on the bottom right.

8   A    I do.

9   Q    Now, if you look at -- starting on page 12, does that

10  appear to be your personnel file?  Or part of it, anyway?

11          MR. PRICE:  Object to lack of foundation as to

12  what is in his personnel file.

13          THE COURT:  Overruled.  Overruled.

14          THE WITNESS:  That's correct.

15          MS. KELLER:  And -- your Honor, I'd move 27464

16  into evidence.

17          MR. PRICE:  We object.  It's everything handed

18  over.  We don't know what it all is.

19          THE COURT:  Well, I'll receive it at this time,

20  we'll see what's referred to and then go over it outside the

21  presence of the jury.  See if there's any personal

22  information, social security numbers, et cetera.

23          *(Defendants' Exhibit No. 27464 is received in*

24      *evidence.)*

25

1    BY MS. KELLER:

2    Q    So looking at page 12, then --

3             MS. KELLER:  And your Honor, is page 12 received?

4             THE COURT:  Page 12 is received.

5    BY MS. KELLER:

6    Q    We see here, "Mattel, Inc., targeted results assessment

7    and coaching, Trac."  And then at the top right, we see

8    Bennett's evaluation of Sal Villasenor, right?  And let's go

9    to page 141, under "Assessment for targeted results, result

10   one"; do you see that?

11   A    I do.

12   Q    And the last paragraph under assessment for targeted

13   result one says, I continued -- and this is something you

14   filled out yourself, right?  This is a -- this was a

15   self-assessment?

16   A    That's correct.

17   Q    And it says, "I continued serve as a trusted resource

18   to Matt Bousquette by making myself available to assist him

19   with competitive intelligence, category analysis and

20   consumer trend reports."

21        So you were providing -- as a trusted resource, you

22   were providing competitive intelligence to the president of

23   Mattel Brands himself, right?

24   A    That's correct.

25   Q    And you also would send Mr. Bousquette e-mails directly

 1   to him to tell him what you were learning as a result of

 2   sneaking into competitors' showrooms at toy fairs, right?

 3   A    That's correct.

 4   Q    And among the other things that Mattel paid for in

 5   addition to business cards, Mattel actually paid for you to

 6   have camera equipment, video camera equipment, and

 7   photography supplies so that you could take photographs at

 8   the toy fairs, true?

 9   A    I can't remember the video camera, but it was a digital

10   camera.

11   Q    A digital camera?

12   A    Correct.

13   Q    And if we look at Exhibit 9516, is this an expense

14   report you submitted for expenses incurred from January 6th,

15   2004 to January 30th, 2004?

16   A    That's correct.

17          MS. KELLER:  Your Honor, I would move 9516 into

18   evidence.

19          THE COURT:  Received.

20          (Defendants' Exhibit No. 9516 is received in

21      evidence.)

22   BY MS. KELLER:

23   Q    So this is a January 2004 expense report, and the New

24   York toy fair is held in February of 2004, right?

25   A    That's correct.

CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

70

```
1    Q    And if we turn to page 2, the third row down from the
2    top, it says, "Purchase camera supplies, $1,006.69."  And
3    then if we go to the third page, we see, "Soft carrying
4    case, Sony digital camera for work, drive time for camera
5    purchase each way," so the total amount ends up being over a
6    thousand dollars, right?
7    A    That's correct.
8    Q    And you were reimbursed for that, too, correct?
9    A    Correct.
10   Q    Now, you weren't the only one at Mattel using fake
11   business cards to get into competitors' showrooms under the
12   guise of being somebody other than who you really were,
13   right?
14   A    That's correct.
15   Q    You said Jeff Lang did this, right?
16   A    Correct.
17   Q    Candice Chang?
18   A    Correct.
19   Q    Kelly Osier?
20   A    Correct.
21   Q    Sharon Rahimi?
22   A    Correct.
23   Q    Tyler Snyder?
24   A    Correct.
25   Q    Carey Plunkett?
```

1    A    Correct.

2    Q    And you knew this from either conversations that you

3    had with them or from actually going to the toy fairs with

4    them and all of you pretending to be retailers, right?

5    A    That's correct.

6    Q    And Sharon Rahimi in particular was somebody who later

7    on it was decided that instead of her remaining a Mattel

8    employee, she should become a consultant and a journalist

9    and then continue sneaking into toy rooms, right?

10              MR. PRICE:  Objection.  Lack of foundation.

11              THE COURT:  Overruled.

12              THE WITNESS:  Please repeat the question.

13   BY MS. KELLER:

14   Q    Sharon Rahimi started out as a Mattel employee, right?

15   A    That is correct.

16   Q    And then later on, it was decided that she should

17   become an independent consultant to Mattel, right?

18              MR. PRICE:  Same objection.  Lack of foundation.

19              THE COURT:  If you know that answer, then you can

20   answer.  If you don't know, then just say you don't know.

21              THE WITNESS:  I don't know.

22              THE COURT:  Okay.

23   BY MS. KELLER:

24   Q    At some point, it became harder for you to try to go

25   into toy rooms because people began to recognize you as

1    being a Mattel employee, right?

2    A    A Mattel employee?

3    Q    Somebody from Mattel?

4            THE COURT:  Do you understand the question?

5            THE WITNESS:  I don't, no.

6            THE COURT:  Yeah.

7    BY MS. KELLER:

8    Q    At some point, you decided that you wanted to quit

9    going into showrooms yourself because you were afraid people

10   might recognize you, right?

11   A    Right, but not as a Mattel employee.

12   Q    Well, did you have any discussions with Mr. Turetzky at

13   any time from 2001 to 2006 about your inability of gain

14   entry into the MGA showrooms?

15   A    Correct.

16   Q    And did you ever tell him that you might not be able to

17   get into those showrooms because people might recognize you?

18   A    Correct.

19   Q    And did you and Mr. Turetzky discuss having you assign

20   someone to gain entry into MGA showrooms who might not be

21   recognized?

22   A    I vaguely remember the conversation.

23   Q    And the person you hired was Sharon Rahimi, right?

24   A    Sharon was brought on board, correct.

25   Q    And she was hired to go around to these toy fairs and

1    try to retrieve the information that we've been talking

2    about, right?

3    A    That's correct.

4    Q    Now, when you got back from various toy fairs, you gave

5    oral presentations of what you had found, true?

6    A    True.

7    Q    And in fact, there was an annual event for this that

8    was held at Mattel, right?

9    A    That's correct.

10   Q    It was every year in March or April after you had

11   gotten back from the New York toy fair, right?

12   A    That's correct.

13   Q    Held in the Mattel presentation theater?

14   A    That's correct.

15   Q    And there would sometimes be 2- or 300 people showing

16   up for this in two or three different groups?

17   A    Not sure on the exact amount of people.

18   Q    Was that just an estimate?

19   A    Correct.

20   Q    And you would sometimes give that presentation two or

21   three times to different groups?

22   A    That's correct.

23   Q    And so there would be hundreds of Mattel executives and

24   employees showing up to see a presentation of competitors'

25   upcoming toys that you and your group had gotten from these

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 74 of 135   Page ID #:311443
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

74

1    private showrooms using fake credentials, true?

2    A    Correct.

3    Q    And you and the others in the group, Sharon Rahimi,

4    Kelly Osier, Carey Plunkett, you would show pictures of

5    competitors' toys that you got from the toy fairs, right?

6    A    That is correct.

7    Q    And members of senior management sometimes attended

8    these presentations, right?

9    A    Correct.

10   Q    Now, in addition, you would also prepare written

11   reports of what you obtained from the private toy fair

12   showrooms, right?

13   A    That's correct.

14   Q    For example, when you got back from the New York toy

15   fair, you prepared a report of what you had gotten from or

16   seen in competitors' showrooms, right?

17   A    Correct.

18   Q    If we take a look at Exhibit 9498.  And do you

19   recognize this as a document for distribution, April 2000,

20   subject, New York toy fair, 2000, competitive review?

21   A    I do.

22         MS. KELLER:  Your Honor, I would move 9498 into

23   evidence.

24         THE COURT:  Received.

25

1          (Defendants' Exhibit No. 9498 is received in

2     evidence.)

3  BY MS. KELLER:

4  Q    And if you see the first paragraph here, you see,

5  "Attached is a summary of new trends and key competitive

6  products for 2000.  This information was gathered from

7  competitive catalogs and price lists acquired at the 2000

8  New York toy fair."  And some of those competitive catalogs

9  and price lists were ones that were obtained using fake

10 credentials, correct?

11 A    That's correct.

12          MS. KELLER:  And your Honor, would this be a time

13 for a break?

14          THE COURT:  This would be a good time.

15          You are admonished not to discuss this matter

16 amongst yourselves, nor form or express any opinion

17 concerning the case.  We'll come and get you in 20 minutes.

18 Thank you.

19          Sir, please step down.

20          All right.  Counsel, 20 minutes.

21          (Recess.)

22          (The following proceedings is taken in the

23     presence of the jury.)

24          THE COURT:  All right.  We are back in session.

25 The jury is present, the alternates, all counsel, the

1    parties.

2              Thank you, if you'd be seated.

3              And Ms. Keller, if you'd like to continue with

4    your direct examination.

5              MS. KELLER:  Thank you, your Honor.

6              **SAL VILLASENOR, DEFENDANTS' WITNESS, RESUMED**

7                   **DIRECT EXAMINATION (Continued)**

8    BY MS. KELLER:

9    Q    Mr. Villasenor, before we broke, one of the things we

10   talked about was that you were reporting competitive

11   intelligence that you gained at these toy fairs directly to

12   Mr. Bousquette; do you remember that?

13   A    I do.

14   Q    And Mr. Bousquette was -- he directly reported to

15   Mr. Eckert, seated over here at counsel table, right, the

16   CEO?

17   A    That's correct.

18   Q    Now, let's go back to Exhibit 9498, and this is your --

19   your report of the information you obtained at the New York

20   toy fair in 2000.  If we look directly under that first

21   paragraph, the second paragraph says, "Although the WW boys'

22   marketing research department tries to acquire as many

23   competitive catalogs as possible, time constraints and

24   availability as well as other factors dictate catalog

25   priorities."

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 77 of 135   Page ID #:311446
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

77

```
 1          And among the other factors was the fact that sometimes
 2   it was harder to sneak into some private showrooms than
 3   others, correct?
 4   A    (No audible response.)
 5   Q    Some had more security than others?
 6   A    That's correct.
 7   Q    Now, if we look at the last two paragraphs, it says,
 8   "The 2000 competitive catalogs and price lists are available
 9   for viewing and copying.  Both are kept in the WW marketing
10   research library located on the ninth floor tower building
11   in El Segundo.  Videotapes of the presentations which cover
12   the toy categories in this report are available from visual
13   services."
14          Now, this report that we see here, 9488 -- 9498, only
15   contains some of the products that you saw, correct?
16   A    That's correct.
17   Q    You actually got information on many products that you
18   did not include in the written report, true?
19   A    That's correct.
20   Q    Let's look at Exhibit 9499.  Do you recognize this as a
21   document entitled "Toy Fair 2000 Competitive Update for the
22   Girls' Marketing Research Department"?
23   A    I do.
24   Q    And do you see in small letters on the first page,
25   Osier, comma, Kelly?
```

1   A     I do.

2           MS. KELLER:  Your Honor, I would move 9499 into

3   evidence.

4           MR. PRICE:  Object if it's beyond the trade secret

5   allegations.

6           THE COURT:  Just a moment.

7           No, overruled.  This should be 2000, and it's not

8   limited by the trade secret foundation, Counsel.

9   BY MS. KELLER:

10  Q     Now, we see the Kelly Osier on the front page?

11  A     I do.

12  Q     And she was one of the people that we spoke about a

13  little earlier with whom you worked, correct?

14  A     Correct.

15  Q     And she was also one of the people who used fake

16  credentials to sneak into private showrooms, true?

17  A     That's true.

18  Q     And if we look at page 2, and this is dated May 2000,

19  right?

20  A     Um.

21  Q     Look at page 2.

22  A     Yes, it is.

23  Q     And it says, "Subject, 2000 New York Toy Fair," and

24  then underneath, the first paragraph says, "The attached

25  New York toy fair 2000 competitive review consists of a

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 79 of 135   Page ID #:311448
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

79

```
 1    summary of new key competitive products for 2000.  This
 2    information was gathered from competitive catalogs acquired
 3    at the 2000 toy fair."
 4        And if we look at the bottom of the page, we see, "The
 5    2000 competitive catalogs and price lists are available for
 6    viewing and copying.  Both are kept in the WW marketing
 7    research library located on the ninth floor tower building
 8    in El Segundo."
 9        Let's go on to -- if we could go on to Exhibit 9502 --
10    I'm sorry, I'm sorry.
11            (Attorney discussion held off the record.)
12    BY MS. KELLER:
13    Q    You also attended the New York toy fair in 2001?
14    A    That's correct.
15    Q    And at that toy fair, you also got into competitors'
16    showrooms using false information, true?
17    A    That's correct.
18    Q    And if we go to Exhibit 9502, on the cover page of
19    9502, do you see an e-mail that you sent on February 16th,
20    2001, to boys' business unit?
21    A    I do.
22            MS. KELLER:  Your Honor, I'd move 9502 into
23    evidence.
24            THE COURT:  Received.
25
```

```
 1              (Defendants' Exhibit No. 9502 is received in

 2         evidence.)

 3    BY MS. KELLER:

 4    Q    Now, this says on the cover page, "The attached report

 5    is a brief summation of my observations made at this year's

 6    New York toy fair.  I have included in my report

 7    descriptions of our competitors' upcoming key toys.  A more

 8    detailed presentation and subsequent report are

 9    forthcoming."

10         And you attached a copy of the 2001 toy fair report,

11    right?

12    A    I don't remember exactly which report was attached.

13    Q    If you take a look at 9502, page 2, you'll see, "To

14    distribution, from Sal Villasenor, date 2/16/01, subject,

15    2001 New York Toy Fair Report."

16         And if you look at page 3, you begin giving the report;

17    do you see all that?

18    A    I do.

19    Q    Okay.  So this cover page e-mail, if you look at the

20    bottom of the cover page, you see that there are

21    attachments, little attachment icons?

22    A    I do.

23    Q    And you were attaching the 2001 New York toy fair

24    report, correct?

25    A    Just by looking at the icons, I can't really see what
```

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 81 of 135   Page ID #:311450
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

81

1    they are called, and it's not clear.

2    Q    Well, if you look at page 2, though, of this, you begin

3    to see the report, right?

4    A    I do.

5    Q    And if you want to take a look at your deposition

6    transcript, would that help --

7    A    Sure.

8    Q    -- to refresh your memory?

9         Take a look at the deposition September 13th, 2010, and

10   that would be at page 534, lines 4 through 11.  Does that

11   refresh your memory?

12   A    It does.

13   Q    So this exhibit that we've just looked at,

14   Exhibit 9502, the cover page had accompanied an attachment

15   that was a New York toy fair report 2001, correct?

16   A    That's correct.

17   Q    Now, that report contained information about key

18   competitive products, right?

19   A    That's correct.

20   Q    And it also, at page 10, contained information about

21   MGA's plan to launch Bratz later that year.  Do you have

22   page 10 in front of you?

23   A    I do.

24   Q    And we see under MGA, toward the bottom of the page, it

25   says, "Bratz, their biggest title this year is Bratz.  A

1    website of WWWBratzpack.com has been set up to start to

2    promote the girls.  They are Diva Starz with a smarty

3    attitude.  Their names are Sasha, Cloe, Jade and Yasmin.

4    FOB, L.A. price is 11.99."

5        Now, you prepared this before Bratz was on the market,

6    right?

7    A    That, I don't recall.

8    Q    Well, Bratz wasn't introduced until later in 2001,

9    right?  Europe in June, U.S. in the fall?

10   A    I don't recall.

11   Q    You sent this report to a number of people in key

12   departments at Mattel, true?

13   A    That is true.

14   Q    Including design, marketing and sales?

15   A    Correct.

16   Q    And typically you distribute these reports to over a

17   hundred people at Mattel?

18   A    That's correct.

19   Q    So there would be many, many employees at Mattel,

20   including people in the design group who would know by

21   February 2001, that MGA was going to sell a line of dolls

22   that looked like Diva Starz with a smarty attitude, right?

23   A    Correct.

24   Q    And this FOB, L.A. price, 11.99, that's -- FOB prices

25   are what retailers pay for the products, not consumers,

1    right?

2    A    That's correct.

3    Q    So it's what the retailer buys it for from the

4    manufacturer, true?

5    A    That's correct.

6    Q    And you can't find those prices on store shelves

7    anywhere, can you?

8    A    That's correct.

9    Q    Now, FOB, L.A. is the kind of information you would

10   only find on a confidential price list of MGA, true?

11   A    That's correct.

12   Q    The kind of information MGA wouldn't want its

13   competitors getting ahold of, right?

14   A    I -- I don't know that for sure.

15   Q    Kind of information a toy company wouldn't want his

16   competitors' getting ahold of, right?

17   A    Probably not.

18   Q    And if we look at Exhibit 9504, this is dated April

19   2001, from Sal Villasenor and Kelly Osier, and the subject

20   is "Toy Fair 2001 Competitive Toy Review."

21        You and Ms. Osier prepared this?

22   A    That is correct.

23   Q    And the first paragraph of this one says, "This

24   information was gathered from competitive catalogs and price

25   lists acquired at the 2001 New York toy fair," right?

1   A    That's correct.

2   Q    So same process, you used false credentials to get into

3   the private showrooms, you gathered the competitive catalogs

4   and price lists, came back to Mattel with them and put them

5   in the library, right?

6   A    That's correct.

7   Q    And videotapes of the presentation covering the toy

8   catalogs in the report were available to anybody at Mattel

9   from Mattel visual services, right?

10  A    (No audible response.)

11  Q    Is that true?

12  A    That's correct.

13  Q    And if we look at page 12, we again see MGA's plan to

14  introduce Bratz described as Diva Starz with a smarty

15  attitude.  And then if we go to page 33, we see a whole

16  section on dolls and doll accessories that were going to be

17  introduced that year by Mattel's competitors, right?

18  A    I don't think I'm at the right page.

19  Q    9504, at the bottom, it's -33, -0033.

20       Okay.  Have you got it?

21  A    Yes, I do.

22  Q    And so, for example, if you go to the next page, 34, we

23  see Blue Box, Hello Kitty line, some of their lines, we see

24  DCI, Too Cute Twins, we see Get Real Girl, Inc., and we

25  see -- we see on this -- this page the listed prices are

1   listed as A price; do you see that?

2   A    (No audible response.)

3   Q    What does that A price mean?

4   A    It's the price that the retailers pay from –– the

5   manufacturer.

6   Q    I'm sorry?

7   A    It's the price the retailers pay.

8   Q    So it's the price the retailers pay to buy it

9   wholesale, right?

10  A    Correct.

11  Q    And then let's look at the next page, 35.  Well, let's

12  look at page 36, first.

13       Page 36, we see some dolls listed that are made by Play

14  by Play, Playmates and Spin Master, and those prices, the

15  top one is listed "SR price."  What does SR price mean?

16  A    Suggested retail.

17  Q    And then the middle one says, "Price, NA," so you

18  couldn't get ahold of a price list for that one, right?

19  A    Probably not.

20  Q    And then the bottom one says, "A price, 7.20," and the

21  A price, you said, is the price that the retailer pays to

22  purchase it from the maker?

23  A    That's correct.

24  Q    And now let's look at page 35.  This is MGA's –– MGA's

25  products, and at the top we see, "Bratz, MGA Bratz dolls and

1    accessories, features, four fully-articulated, hip fashion

2    dolls, mix and match fashions, accessories and snap-on

3    shoes, keep the Bratz in new and exciting looks."

4         And to the left, it has FOB price.  And what, again, is

5    FOB price?

6    A    It's the price the retailers pay.

7    Q    And that's the price that the retailers are going to

8    pay if they buy it directly, say, from Hong Kong?

9    A    That's correct.

10   Q    Now, all three of the MGA products listed here have FOB

11   prices listed, right?

12   A    They do.

13   Q    Now, let's look at Exhibit 9503.

14        Do you recognize this as an MGA Entertainment document

15   price list U.S.A. fall 2001, confidential?

16   A    It looks to be that, correct.

17             MS. KELLER:  I'd move to admit 9503, your Honor.

18             THE COURT:  Received.

19             (Defendants' Exhibit No. 9503 is received in

20        evidence.)

21   BY MS. KELLER:

22   Q    And that confidential stamp that you see at the top,

23   that tells you that MGA did not intend Mattel to have this

24   document, right?

25   A    Not sure if they were referring to Mattel.

1  Q    Well, was Mattel the biggest competitor in the fashion

2  doll category?

3  A    Yes, they were.

4  Q    Let's look at the bottom of this page on the right and

5  see the production stamp; do you see that M for Mattel?

6  A    I do.

7  Q    Now, one of the things that you did every year at toy

8  fairs using the fake business credentials was to get

9  competitors' price lists, right?

10  A    Correct.

11  Q    And you did that every year from 1999 to 2005, right?

12  A    Somewhere around there, correct.

13  Q    And these were for products that were not yet on the

14  market, correct?

15  A    Some were, some were not.

16  Q    Well, if we go to 9504-35, these products we were just

17  looking at, those products were surely not on the market

18  yet, were they?

19  A    I don't know if they were or if they weren't.

20  Q    As of the time of the New York toy fair, these products

21  were many months away from being released, right?

22  A    I'm not sure about that.

23  Q    Let's go to -- let's take 9503-3, this confidential MGA

24  fall 2001 price list, 9503 page 3, and for the FOB prices in

25  the New York toy fair report that you prepared,

1    Exhibit 9504, let's look at these side by side, and 9504-35,

2    Bratz doll FOB price 11.99.  Turns out that's the same price

3    as on the confidential price list, right?

4    A    It does.

5    Q    Bratz accessories, the top of 9504-35, FOB price 4.55,

6    and that's the same thing that we see here on the

7    confidential price list, 9503 page 3, right?

8    A    That's correct.

9    Q    And same with Scooter Samantha, Jumpin' Jenni.  I mean,

10   these were all -- you got it right, I mean, the prices you

11   put in your New York toy fair report were the same as the

12   ones on MGA's confidential price list, weren't they?

13   A    Well, just to clear something up, I didn't work in this

14   category, so this was not my category.  I didn't put those

15   numbers in that category.

16   Q    Which of the people that was working with you did that?

17   A    It probably was Kelly Osier.

18   Q    Let's go to Exhibit 9507.

19        Is this a document dated March 20th, 2002, from you and

20   Kelly Osier, subject 2002 competitive toy review?

21   A    It is.

22             MS. KELLER:  Your Honor, I'd move 9507 into

23   evidence.

24             THE COURT:  Received.

25

```
 1                (Defendants' Exhibit No. 9507 is received in

 2         evidence.)

 3    BY MS. KELLER:

 4    Q    And this attaches a summary of new key competitive

 5    products for 2002, information gathered from competitive

 6    catalogs and price lists acquired at the 2002 New York toy

 7    fair, right?

 8    A    That's correct.

 9    Q    So it's the same basic format as the last one in terms

10    of how you prepared it, right?

11    A    That's correct.

12    Q    And this was prepared by you and Ms. Osier, right?

13    A    That's correct.

14    Q    And the information in this, like the last one, came

15    primarily from getting catalogs and price lists that you

16    acquired from private showrooms by sneaking in with fake

17    credentials, right?

18    A    That's correct.

19    Q    And you had different themes each year for your toy

20    fair presentations and reports, true?

21    A    That is true.

22    Q    And the theme for 2002, if we turn to page 2 of 9507,

23    was 2002 Toy Olympics, right?

24    A    That's correct.

25    Q    And if we look at page 141, we see girlie girl event,
```

1    and we see the Olympic rings, correct?

2    A    That's correct.

3    Q    And then if we look at 142, we see Bratz Boyz, and it

4    says, "Bratz Boyz Cameron and Tyler are also being added to

5    the line.  They are being positioned as the friends of the

6    girls, not boyfriends.  The current look of the boys is

7    being revamped due to retailer concerns that they look too

8    girly.  FOB, L.A. price, 11.99."

9         So you are telling the people at Mattel -- your market

10   intelligence department is telling the people at Mattel that

11   these Bratz Boyz are going to be coming out, which are not

12   out yet, right?

13   A    That's correct.

14   Q    And you are telling them what the FOB, L.A. price is

15   going to be, right?

16   A    That's correct.

17   Q    And when a toy company knows what somebody else's

18   prices are, they can undercut those prices, right?

19   A    I don't know that.

20   Q    Well, you know that's very valuable information for a

21   toy company to have, what the competitor's pricing is going

22   to be before it happens, right?

23   A    They can use it as an advantage, correct.

24   Q    Well, it can save a toy company a lot of money, can't

25   it, to know what the competitor is doing and how the

1    competitor is going to price its product?

2              MR. PRICE:  Object.  Speculation.

3              THE COURT:  Overruled.

4              THE WITNESS:  Probably can.

5    BY MS. KELLER:

6    Q    Well, there were times -- and we'll talk about this in

7    a little bit, but there were times at Mattel where you were

8    actually congratulated for the amount of money that you were

9    saving the company by getting this information, right?

10   A    I recall an e-mail, correct.

11   Q    I mean, that was the whole idea of this project that

12   Mattel was directing you to do, was get this information

13   that they could use to help them make more money, right?

14   And that's the long and the short of it, isn't it?

15   A    Something like that.

16   Q    Let's look at page 143, here we see MGA Bratz -- Bratz

17   mobile.  It says, "The Bratz mobile is a '50s style

18   convertible that can fit two Bratz dolls.  There is a

19   working FM radio, an opening trunk, glove compartment and

20   doors, wheels that move and turn, and a moving stick shift

21   and steering wheel."  And again, you have the FOB L.A.

22   price, 29.99.

23        Now, another reason why this is very helpful to a

24   company is a company could rush a similar product out to

25   compete with the one they know is coming, right?

```
 1            MR. PRICE:  Objection.  Speculation.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  They probably can.

 4   BY MS. KELLER:

 5   Q    And if we look at page 154, you see another MGA

 6   product, My Beautiful Mermaid, and it describes My Beautiful

 7   Mermaid and the FOB price.

 8        And look at exhibit -- let's look now at Exhibit 9508.

 9   And do you recognize 9508 as another MGA Entertainment

10   document, specifically a fall 2002 confidential price list?

11   A    I do.

12            MS. KELLER:  Your Honor, I'd move 9508 into

13   evidence.

14            THE COURT:  Received.

15            (Defendants' Exhibit No. 9508 is received in

16        evidence.)

17   BY MS. KELLER:

18   Q    And we know it's confidential because it says so at the

19   top, right?

20   A    It does.

21   Q    And again, if you look at the bottom of this document

22   on the right, we see this little M which tells us this

23   document was produced by Mattel, right?

24   A    It looks -- it looks that way.

25   Q    And if we go to page 3, about eight boxes down, under
```

 1    Bratz, we see a whole section for Bratz, right?

 2    A    (No audible response.)

 3    Q    Now, one of the things we see is the Bratz fall 2000

 4    Boyz, and it's got that same 11.99 FOB, L.A. price.  If we

 5    look at the top of the page, I think we'll see an FOB, HK

 6    for Hong Kong and an FOB, L.A.?

 7    A    That's correct.

 8    Q    Okay.  And if we go to page 4 at the bottom, under

 9    "large dolls," we see that same FOB, L.A. price for My

10    Beautiful Mermaid that we just saw a second ago, right?

11    A    That's correct.

12    Q    So these confidential MGA FOB, L.A. prices for these

13    unreleased products are identical to the prices that were in

14    your toy fair reports that we saw in Exhibit 9507, right?

15    A    That's correct.

16    Q    And that's really why the name of your department was

17    market intelligence, right?

18            MR. PRICE:  Object.  That assumes facts not in

19    evidence as of this date.

20            THE COURT:  As -- just a moment.

21            MR. PRICE:  It's 2002.

22            MS. KELLER:  I'll change it, your Honor.

23            THE COURT:  Question I had was, "Question, that's

24    really why the name of your department was market

25    intelligence, right?"  And the objection is?

```
 1              MR. PRICE:  It's vague as to time.  This is a 2002

 2    document.

 3              MS. KELLER:  I'll rephrase.

 4    BY MS. KELLER:

 5    Q    That actually is why your department was eventually

 6    renamed market intelligence, because that's precisely what

 7    you were doing, you were intelligence gathering, true?

 8              MR. PRICE:  Object.  Lack of foundation.

 9              THE COURT:  Overruled.

10              THE WITNESS:  I'm not sure why it was renamed and

11    called market intelligence.

12    BY MS. KELLER:

13    Q    Do you know who renamed it?

14    A    I do not.

15    Q    Would it be true that it wasn't you?

16    A    That is correct.

17    Q    So it wasn't just you trying to act important, right?

18    A    That is correct.

19    Q    This was a Mattel decision, wasn't it?

20    A    (No audible response.)

21              MR. PRICE:  Objection.  Ambiguous.

22              THE COURT:  Well, ladies and gentlemen, Mattel

23    denotes all sorts of different people, different levels,

24    different hierarchy.

25              MS. KELLER:  I'll withdraw it, your Honor.
```

1            THE COURT:  You can reask the question.  It's a

2    proper question.  It's just I'd like to get it narrowed for

3    the jury and see who is a reasonable person that might have

4    named this within Mattel, if he knows, but when you say

5    "Mattel," it encompasses almost everybody.

6    BY MS. KELLER:

7    Q    I think you said you didn't know who was the person who

8    picked the name "market intelligence department," right?

9    A    That's correct.

10   Q    Your immediate boss was?

11   A    My immediate boss?  It depends on which year.

12   Q    Let's say this year, 2002?

13   A    It could have been Bennett or it could have been Dan

14   Frechtling.  I don't recall exactly who was my boss in 2002.

15   Q    You just know it was one of your bosses who picked the

16   market intelligence department title?

17           MR. PRICE:  Objection.  Lack of foundation.

18           THE COURT:  Overruled.

19           THE WITNESS:  Again, I'm not sure who picked it or

20   where it came from.

21           THE COURT:  I'm going to reverse it because

22   bosses.  I don't know if it's a coworker, a boss, I'm not

23   sure, Counsel, so I'll sustain the objection.

24   BY MS. KELLER:

25   Q    Let's look at Exhibit 9275.  And do you recognize this

```
 1   as an April 22nd, 2003, New York toy fair competitive report

 2   by you, Kelly Osier and Carey Plunkett to distribution with

 3   a copy to Matt Bousquette?

 4   A    I do.

 5   Q    And Matt Bousquette, again, at this point was president

 6   of Mattel Brands, right?

 7   A    That's correct.

 8   Q    Direct report to Mr. Eckert, right?

 9   A    That's correct.

10   Q    And this document was prepared the same way that the

11   previous ones we talked about were prepared, specifically by

12   people in your unit going to the toy fair, presenting fake

13   credentials, sneaking into private showrooms, falsely

14   presenting themselves as retailers, getting competitors'

15   catalogs and confidential price lists and then bringing them

16   back to Mattel, right?

17   A    Not necessarily from my unit.  Kelly Osier did not work

18   in my department.

19   Q    Okay.  So not necessarily from your unit, but groups of

20   people going to the toy fair engaged in that activity,

21   groups of Mattel people, right?

22   A    Right.

23   Q    And when you specifically copied Mr. Bousquette but

24   nobody else on that CC line, that's because you particularly

25   wanted to direct this to Mr. Bousquette's attention, right?
```

1    A    Standard procedure, I don't remember exactly why.

2    Q    It was important to keep him informed of all these

3    breaking developments with new toys, right?

4    A    It was.

5    Q    And you personally did attend this 2003 New York toy

6    fair as well, right?

7    A    I think so.

8    Q    And this was distributed to the same people that we've

9    talked about before, key departments including the design

10   group at Mattel?

11   A    Design could have been part of it, correct.

12   Q    And in fact, if you take a look at your deposition,

13   page -- July 12th, 2010, page 142, lines 6 through 11, this

14   was distributed to the same broad group of key departments

15   and individuals that we talked about earlier, right?

16   A    That's correct.

17   Q    And again, you tell recipients that they can get these

18   catalogs up in the library and there are videotapes of the

19   presentation available at visual services, right?

20   A    That's correct.

21   Q    Now, in this year, the theme was -- if we turn to

22   page 2, the theme was News Today.  Well, it doesn't seem to

23   be on this page.

24        There we go, at the bottom, it's very dark, News Today.

25   And if we go to page 15, we see Fashion News.  And if we go

1   to 19, we see News Fashion Dolls, and we see MGA Bratz

2   Dolls, and at the top right is the style and collection,

3   right?

4   A    Correct.

5   Q    And it says, "Yasmin, Dana, Cloe, Jade, TV advertised,

6   available June 2003."  Now, this is only being written in

7   April of 2003, right?  If you go back to page 1.

8   A    That's correct.

9   Q    And back again to page 19, here we see Bratz Boyz,

10  Bratz Winter Wonderland collection, Bratz Formal Funk

11  collection, and once again, all of the FOB prices are

12  listed, right?

13  A    That's correct.

14  Q    And we see Strutit collection, spring '03, Itan

15  (phonetic) and Koby (phonetic) '03, Slumber Party, spring

16  '03, and you've got photographs of those last three, true?

17  A    Correct.

18  Q    And if we turn the page to page 20, we see that you've

19  inquired intelligence on what MGA is going to do with its

20  upcoming Bratz play sets, right?

21  A    That's correct.

22  Q    And so you again have the Bratz runway formal funk play

23  set, Bratz FM limo, Bratz motorcycle, Bratz pet assortment,

24  and you have the FOB prices on those, right?

25  A    That's correct.

1   Q    And on the bottom left, you've got a photograph of the

2   Bratz FM cruiser '02, but the Bratz FM limo is not going to

3   be available until July of '03, right?

4   A    That's correct.

5   Q    And if we go to 21 of this exhibit, 9275, we see the

6   Bratz city play set, and this one says, "In conjunction with

7   Richard Landry, home architectural designer for the likes of

8   Eddie Murphy, MGA will be designing a city play set complete

9   with a stratosphere, department towers, a club, clothing

10  stores, restaurants and cafes.  The idea is to create a

11  community where the Bratz can hang out.  The first play set

12  is due December of 2003."

13       And again, you're writing this in April, after having

14  gone to the New York toy fair, right?

15  A    Once again, I didn't write this.  This is -- this

16  wasn't my category.  I focused on the boys categories, not

17  the girls.

18  Q    But this document is dated April 22nd, right?  If you

19  look at page 1.

20  A    That's correct.

21  Q    And your name is the first name on the "from" line,

22  correct?

23  A    That's correct.

24  Q    And you were the manager of this group of people,

25  right?

1    A    I don't think I was manager in 2003.  I don't recall

2    exactly when I was promoted, but I'm not sure if it was

3    April or not.

4    Q    Well, all of the information in this report is

5    describing MGA products that are not yet on the market,

6    right?

7    A    (No audible response.)

8    Q    And if you'd like to take a look at your deposition.

9    A    You're correct.

10   Q    Okay.  Let's look at Exhibit 9510, and 9510 is an

11   e-mail you sent to a number of people on January 15th, 2003,

12   subject, "2003 Competitive Toy Catalogs and Price Lists,"

13   right?

14   A    Correct.

15           MS. KELLER:  I'd move 9510 into evidence, your

16   Honor.

17           THE COURT:  Received.

18           *(Defendants' Exhibit No. 9510 is received in*

19       *evidence.)*

20   BY MS. KELLER:

21   Q    And if you look at -- if you look at the CC line of

22   this January 15th, 2003 e-mail, you see, among others, that

23   it's being cc'd to Dan Frechtling, Drew Vollero and Matt

24   Bousquette, right?

25   A    That's correct.

1   Q    And you say in your e-mail, "Guys, the intent of this

2   e-mail is to inform you that I now have in my possession,

3   2003 price lists and catalogs from a variety of key

4   manufacturers, including Toy State, Maisto," and then if we

5   look at the third one down, it says, "MGA now in the micro

6   and RC vehicles business," and then you list some other key

7   manufacturers.  And you conclude, "Let me know what you are

8   interested in viewing, and I will forward you a copy."  And

9   you sign the e-mail Sal V.

10       Now, the price lists you're referring to in here are

11  all confidential, right?

12  A    I am not sure if all of them were labeled confidential.

13  Q    Whether they were labeled that or not, you knew that

14  all of the price lists that you were referring to here were

15  confidential, correct?

16           MR. PRICE:  Objection.  Lack of foundation.

17           THE COURT:  Overruled.

18           I'm sorry, overruled.

19           THE WITNESS:  Do you mind repeating the question?

20  BY MS. KELLER:

21  Q    Well, the reason it was a big deal to be able to

22  provide this intelligence to senior executives including the

23  president of Mattel is that these price lists were

24  confidential and not readily available, right?

25  A    Right, they weren't readily available.

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 102 of 135   Page ID #:311471
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

102

1   Q    And in fact, you wrote this e-mail only five days after

2   getting back from the 2003 Hong Kong toy fair, true?

3   A    Correct.

4   Q    And you got competitive catalogs and confidential price

5   lists from various private showrooms at the 2003 Hong Kong

6   toy fair, right?

7   A    Not all of the showrooms were private at the toy fair,

8   you had private and you had nonprivate showrooms.

9   Q    Well, you got into companies' private showrooms at the

10  Hong Kong toy fair by using a fake business card, right?

11  A    I did.

12  Q    So while not every single one was private, some of them

13  were, true?

14  A    That is true.

15  Q    And let's look at Exhibit 9511.  Is this an e-mail

16  chain on which you are either the sender or the recipient of

17  each e-mail in the chain during the months of November

18  through January, 2002 through 2003?

19  A    Correct.

20          MS. KELLER:  Your Honor, I'd move 9511 into

21  evidence.

22          THE COURT:  Received.

23          (Defendants' Exhibit No. 9511 is received in

24      evidence.)

25

1    BY MS. KELLER:

2    Q    And if we start at the e-mail on the bottom of 9511,

3    you see an e-mail from Drew Vollero to you, November 21st,

4    2002, with Dan Frechtling copied, right?

5    A    I do.

6    Q    You can see that it attaches an original message and

7    that the original message is from you, right, on page 2?

8    A    Correct.

9    Q    And the original message was an e-mail you sent

10   November 20th, 2002 to a number of recipients, the first one

11   of whom listed is Matt Bousquette, right?

12   A    Correct.

13   Q    And here you're reporting that you have a copy of

14   Hasbro's fall 2002 and spring 2003 price lists, media plans,

15   merchandise display offerings and information on products,

16   right?

17   A    That's correct.

18   Q    The subject line says, "Important information regarding

19   Hasbro's fall '02 and spring '03 product lines," right?

20   A    That's correct.

21   Q    And then at the bottom you say, "Do not hesitate to

22   contact me with any questions or if you are interested in

23   receiving a copy," right?

24   A    Correct.

25   Q    Now, when we go back to the e-mail from Mr. Vollero to

1    you, if we go back to page 1, the e-mail Mr. Vollero sent

2    you September 21, 2002, it says, "Matt asked me about SSPs

3    for fall 2003.  What do you know?"

4         Do you see that?

5    A    I do.

6    Q    The next e-mail in the chain is again from Drew Vollero

7    to you, this time December 9th, 2002; do you see that?

8    A    I do.

9    Q    And it's responding to an attached original message

10   from you December 2nd, 2002, right?

11   A    Correct.

12   Q    And then the final e-mail is from you to Drew Vollero

13   and Matt Bousquette sent January 13th, 2003.  And this

14   was -- again, this was three days after you got back from

15   the Hong Kong toy fair, right?

16   A    Something like that.

17   Q    And you wrote, "Matt and Drew, as you know, I attended

18   the Hong Kong toy fair last week and was able to see up

19   close Hasbro's new line of SSP racers and track sets."

20        So Matt Bousquette, then, was aware that you had

21   attended the 2003 Hong Kong toy fair the previous week,

22   right?

23   A    That's correct.

24   Q    And in the second paragraph, you wrote, "I was also

25   able to get hold of other interesting price lists and

1    catalogs from a variety of key manufacturers," and the third

2    one down is MGA, and then you end, "Let me know what you are

3    interested in viewing, and I will forward you a copy," and

4    you sign it Sal V., right?

5    A    That's correct.

6    Q    So there is no question that Matt Bousquette, president

7    of Mattel Brands, knew you were getting confidential price

8    lists and catalogs at the 2003 Hong Kong toy fair, right?

9              MR. PRICE:  Objection.  Calls for speculation,

10   confidential.

11             THE COURT:  Overruled.

12             THE WITNESS:  That's correct.

13   BY MS. KELLER:

14   Q    You weren't just out doing this on your own, right?

15   A    Correct.

16   Q    No matter what anybody may say, you had the full

17   knowledge and authority of the president of the company,

18   right?

19             MR. PRICE:  Objection.  Argumentative.

20             THE COURT:  Overruled.

21             THE WITNESS:  That is correct.

22   BY MS. KELLER:

23   Q    Now, if you look at Exhibit 9286, do you recognize that

24   as a document that says "2004 competitive toy review

25   presentation theater"?

1    A    I do.

2         MS. KELLER:  And your Honor, I'd move 9286 into

3    evidence.

4         THE COURT:  Received.

5         *(Defendants' Exhibit No. 9286 is received in*

6    *evidence.)*

7    BY MS. KELLER:

8    Q    And this says, "The 2004 competitive toy review

9    presentation offers a once-in-a-lifetime opportunity for you

10   and others in our organization to witness the most exciting

11   news, toys coming out of New York and Nuremberg toy fairs,

12   learn about emerging trends in the toy arena this year, know

13   which licenses to watch out for, plus more.

14        "The presentation will be held March 18th from 2 to

15   3:30 p.m. in the tower's presentation theater.  As always,

16   this year's presentation will include a new twist, surprise

17   theme and a host of VIPs, celebrities, et cetera,

18   presentation contacts, Sal Villasenor."  You pronounce it

19   Villasenor, right?

20   A    Correct.

21   Q    Sal Villasenor and Stephanie Page.

22        Now, you and Ms. Page would put a presentation together

23   based on information you got from the Nuremberg and New York

24   toy fairs?

25   A    Correct.

1    Q    And then you'd disseminate the information throughout

2    Mattel, which -- as we've seen, right?

3              MR. PRICE:  Objection.  Vague as to "throughout

4    Mattel."

5              THE COURT:  Overruled.

6              THE WITNESS:  I don't think this presentation --

7    this report was presented or disseminated.

8    BY MS. KELLER:

9    Q    You think this was just an announcement of the --

10   A    No, it was created, but I don't think we presented this

11   or disseminated this presentation.

12   Q    So this one you don't think -- this wasn't one of the

13   ones at the presentation theater that happened?

14   A    It was meant to be, but I don't think it was ever

15   presented.

16   Q    Well, as far as the reports from the toy fairs that

17   we've just seen, though, those were disseminated to a fairly

18   wide distribution list, right?

19   A    Are you referring to the reports prior to 2004?

20   Q    The reports that we were just looking at, 2000, 2001,

21   2002, 2003?

22   A    Correct.

23   Q    Now, as far as the competitive toy report, these

24   reports -- all these reports we've been talking about would

25   be put in the Mattel ninth floor library for anybody who

1    wanted to use them; is that right?

2    A    I don't think they were in the library.  I think they

3    were in my -- I had the hard copies, the originals.  They

4    were --

5    Q    The presentation we've been talking about, this

6    Exhibit 9286, are you telling us that was rescheduled?

7    A    The one dated 2004 competitive toy review?

8    Q    Uh-huh.

9    A    I don't remember exactly why we didn't present it, but

10   it was not -- I don't think it was presented.

11   Q    Do you recall at your deposition, being shown a video

12   of that presentation, and recognizing your voice on the

13   video?

14   A    I do.

15   Q    And do you remember the female voice on that video was

16   Stephanie Page?

17   A    I do.

18   Q    And you remember helping prepare the video?

19   A    Correct.

20   Q    Was this one of the presentations where hundreds of

21   Mattel executives or employees would come in to see what the

22   market intelligence group had found out about competitors'

23   upcoming products?

24   A    It was meant to be that way, but again, I don't think

25   it was presented.  I don't think it was shared.

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 109 of 135   Page ID #:311478
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

109

```
 1            MS. KELLER:  Your Honor, we would ask permission
 2   to just play a clip taken from 9488.
 3            THE COURT:  You may.
 4            MS. KELLER:  Pardon?
 5            THE COURT:  You may.
 6            (Videotape played.)
 7   BY MS. KELLER:
 8   Q    And as we discussed, you recognized your voice on that
 9   video, right?
10   A    Well, the voice I just heard was Stephanie Page.
11   Q    And yours, you recognize your voice on the video that
12   you heard played at your deposition, right?
13   A    That's correct.
14   Q    And this is the same video that we've just taken some
15   snippets from, right?
16   A    That is correct.
17   Q    And that's what -- what you would do, is you would come
18   back from the toy fairs and you would produce a video, the
19   competitive toy review for that year, and then you would
20   show that in the Mattel presentation theater, right?
21   A    Once again, it was created, it was meant to be an
22   interactive presentation; however, I don't think it was ever
23   presented.
24   Q    If you take a look at your deposition, page 454,
25   lines 14 through 20; does that refresh your memory?
```

CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

110

1   A    I mean, I -- it does, but again, I don't think this

2   presentation was presented.  It was created, we were ready

3   to put it on, but it never took place.

4   Q    Well, when you watched the videotape at your

5   deposition, you saw a number of toys that were taken from

6   your 2004 New York toy fair competitive review, correct?

7   A    That -- that was meant to be the competitive toy review

8   presentation.

9   Q    Now, if we can go back to how that -- for example,

10  9275, how that document was created, again, this was created

11  the same way that the previous ones had been created, which

12  is continuing to use fake business cards to get into private

13  showrooms, as well as collecting information from other

14  sources, correct?

15  A    Which year are you referring to?  I'm looking at 2003

16  here.

17  Q    I'm -- let's talk about 2003.

18  A    Okay.

19  Q    Same in 2004, right?

20  A    Correct.

21  Q    Same in 2005, right?

22  A    I am not sure if I went to toy fair in 2005.

23  Q    But the same practices were in effect at Mattel, right?

24         MR. PRICE:  Objection.  Ambiguous.

25         THE COURT:  Overruled.

```
 1              THE WITNESS:  I'm not sure if it continued in
 2  2005.
 3  BY MS. KELLER:
 4  Q    Let's look at 9593.  Do you recognize this as the 2005
 5  New York toy fair report?
 6  A    I do.
 7              MS. KELLER:  And your Honor, I'd move 9593 into
 8  evidence.
 9              THE COURT:  Received.
10              (Defendants' Exhibit No. 9593 is received in
11      evidence.)
12  BY MS. KELLER:
13  Q    If you take a look at page 15, this page contains
14  images of MGA products that are not yet on the market,
15  right?
16  A    Correct.
17  Q    This talks about MGA products that will be coming out
18  but are not out yet, true?
19  A    Not sure if they were out or -- if they were out
20  already or if they were not.
21  Q    Well, if we look at the top, Baby Bratz, it says,
22  "Available spring.  Baby Bratz will be the largest brand
23  extension for Bratz in 2005," right?
24  A    Correct.
25  Q    They will be available in the spring, so it's not out
```

1   yet, right?

2   A    Correct.

3   Q    And you are talking about what Baby Bratz will be, so

4   it's not out yet, right?

5   A    (No audible response.)

6   Q    Is that true?

7   A    That's what it says, correct.

8   Q    And you attended the 2005 New York toy fair personally,

9   true?

10  A    I don't recall attending New York.  I do recall -- it

11  might have been Nuremberg.  I'm not a hundred percent sure.

12  Q    Among other things that you did, you also would -- you

13  also called up MGA and used a fake name to try to get

14  confidential information, right?

15  A    That's correct.

16  Q    And sometimes you would use your real name but give a

17  fake toy company, right?

18          MR. PRICE:  Objection.  In calling -- it's

19  ambiguous.

20  BY MS. KELLER:

21  Q    Sometimes you would telephone --

22          THE COURT:  Just a minute, Counsel.  Just a

23  minute.

24          Sometimes you would use your real name but give a

25  fake toy, right?

```
 1              Ambiguous?

 2              Overruled.

 3              THE WITNESS:  Can you repeat the question, please?

 4   BY MS. KELLER:

 5   Q    Beginning in 2001 going through 2006, sometimes you

 6   would use your real name but say you were with a fake toy

 7   company, right?

 8   A    That's correct.

 9   Q    And the fake toy company that you would use would be

10   The Toy Shop, right?

11   A    That's correct.

12   Q    And that's the one we saw the fake business cards for,

13   true?

14   A    True.

15   Q    Let's look at Exhibit 9273.  Do you recognize this

16   document dated May 13th, 2003, to distribution from you and

17   Stephanie Page?

18   A    I do.

19              MS. KELLER:  Your Honor, I'd move Exhibit 9273

20   into evidence.

21              THE COURT:  Received.

22              (Defendants' Exhibit No. 9273 is received in

23        evidence.)

24   BY MS. KELLER:

25   Q    So May 13th, 2003, to distribution, copy Matt
```

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 114 of 135   Page ID #:311483
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

114

1   Bousquette, from Sal Villasenor and Stephanie Page, and the

2   subject is "MGA Bratz Update."

3       And under -- it starts, "Below is a summary of a recent

4   discussion with MGA's vice president of public relations.

5   While he was understandably reluctant to provide me with any

6   pictures, he did confirm the following."

7       And then you go down and list several of the products

8   and promotions that are coming out for MGA, right?

9   A   That's correct.

10  Q   And the MGA vice president of public relations did

11  provide you with that information, correct?

12  A   That's correct.

13  Q   But it's because you made up a fake identity for

14  yourself to get the information, right?

15  A   I don't remember exactly who I said I was.

16  Q   Well, made up the name of some toy company that you

17  were from, right?

18  A   I don't remember.

19  Q   Made up a fake name?

20  A   I don't recall.

21  Q   Did you say, I'm Sal Villasenor from Mattel?

22  A   Once again, I don't recall what I used.

23  Q   Well, you know that if he had known you were from

24  Mattel, he wouldn't have given you this information, right?

25  A   Probably not.

1   Q   And you believe you probably used a fake name, right?

2   A   Probably.

3   Q   And you believe you probably made up the name of some

4   toy company that you were from, right?

5   A   I don't remember what I used.

6   Q   But you believe that's probably what you did, right?

7   A   Probably.

8   Q   And that's because you know this is competitively

9   sensitive information that somebody would only want --

10   somebody at MGA in that position would only want in the

11   hands of customers, right?

12   A   Correct.

13   Q   And this information was provided to you by the MGA

14   vice president of public relations, right?

15   A   Correct.

16   Q   Now, if we look at Exhibit 9273, the information

17   described in that document is about products of MGA's that

18   were not yet on the market, right?

19   A   Correct.

20   Q   For example, let's look under Bratz Style It

21   collection, it says, "Pictures.  No pictures or other

22   information will be released until the licensing show on

23   June 10th through 12th in New York."  So that's a product

24   that wasn't on the market, right?

25   A   Correct.

1    Q    And Musi Kidz never came on the market, did it?

2    A    I don't know if it did or didn't.

3    Q    Under Bratz Style It collection, Lima show, it says,

4    "MGA's commitment to licensees is so strong that the Bratz

5    Style It collection and other lines are kept confidential

6    until they are released at the show."

7         Now, all this information was put right in your memo

8    for all of the people to see on the distribution list,

9    right?

10   A    Correct.

11   Q    And the only way that you got this information was to

12   call up and fake an identity pretending you were someone you

13   were not, right?

14   A    Correct.

15   Q    And when you distributed this memo to the president,

16   Matt Bousquette, and all of the other people on the

17   distribution list, not one single person contacted you to

18   say, how did you get this information, did they?

19   A    Correct.

20   Q    Nobody asked you if you used a fake identity to get it,

21   right?

22   A    I don't think so.

23   Q    Not one question was raised by any of the executives

24   you sent this to about the methods that you were using,

25   true?

1    A    Not that I recall.

2    Q    And that's because you were expected by your bosses to

3    get information about your competitors through any means

4    possible, right?

5            MR. PRICE:  Objection.  Argumentative and vague as

6    to "bosses."

7            THE COURT:  Sustained.

8    BY MS. KELLER:

9    Q    Senior management at Mattel, including Matt Bousquette

10   himself, expected you to get information about your

11   competitors through any means possible, right?

12           MR. PRICE:  Argumentative.

13           THE COURT:  "Any means possible" being defined as?

14           MS. KELLER:  Ethical or unethical, legal or

15   illegal.

16           THE COURT:  Overruled.  You can answer the

17   question.

18           THE WITNESS:  Repeat the question, please.

19   BY MS. KELLER:

20   Q    You were expected by senior executives at Mattel,

21   including the president of Mattel Brands himself, to get

22   information about your competitors through any means

23   possible, ethical or unethical, legal or illegal, true?

24   A    Correct.

25   Q    Is that a yes?

1    A    Yes.

2    Q    Now, in -- in 2004 and 2005, Sharon Rahimi was brought

3    into Mattel, and Sharon Rahimi began going into private

4    showrooms with fake credentials, right?

5    A    What was the time?

6    Q    2004 and 2005.

7         MR. PRICE:  Object as to vague as to "brought into

8    Mattel."  I mean employee, independent contractor.

9         THE COURT:  Sustained.

10   BY MS. KELLER:

11   Q    In 2004, was there an ex-Mattel employee who used to

12   work with you in the marketing and business analysis

13   department named Sharon Rahimi?

14   A    Correct.

15   Q    And was she brought back as a consultant to help out

16   with the toy shows?

17   A    That's correct.

18   Q    Was that in 2004 and 2005?

19   A    I'm not sure if it was 2004 or '5, but she was brought

20   back, correct.

21   Q    If you take a look at your deposition, page 80 and 81,

22   lines -- line 80 -- line 23, to page 81, line 5.

23        Did you have a chance to review that?

24   A    I did.

25   Q    Ms. Rahimi was brought back to help out in 2004 and

1    2005, right?

2             MR. PRICE:  Objection.  Misstates the testimony.

3             THE WITNESS:  According to my best recollection,

4    correct.

5             THE COURT:  Overruled.

6    BY MS. KELLER:

7    Q    And specifically she was brought back to help with the

8    toy shows in 2004 and 2005, right?

9    A    To the best of my recollection, correct.

10   Q    And one of the reasons that she was brought back as a

11   consultant was so she could, using fake credentials, get

12   into MGA's private showrooms to gain information, right?

13   A    I don't remember if it was specifically to get into

14   MGA.

15   Q    Was she one of the competitors at the time that Mattel

16   was interested in gaining information from in its private

17   showrooms?

18   A    I'm sorry, who are you --

19   Q    Was MGA one of the competitors at the time that Mattel

20   was interested in gaining information from in its private

21   showrooms?

22   A    Correct.

23   Q    And Ms. Rahimi was brought in as a consultant so that

24   Mattel could deny, if necessary, in the future, using its

25   actual employees to sneak into the private showrooms using

1    the phony credentials, true?

2    A    No, I don't recall that.

3         MS. KELLER:  Your Honor, would it be possible to

4    have a five-minute break.

5         THE COURT:  Certainly.

6         You are admonished not to discuss this matter

7    amongst yourselves, nor form or express any opinion

8    concerning this case.  We'll come and get you in 10 minutes.

9         Counsel, you have 10 minutes to use the restroom.

10        Oh, I'm sorry, and sir, if you'd be kind enough to

11   return in 10 minutes.  Thank you.

12        (Recess.)

13        THE COURT:  The jury is present, all counsel are

14   present.  And counsel is continuing with direct examination.

15        **SAL VILLASENOR, DEFENDANTS' WITNESS, RESUMED**

16             **DIRECT EXAMINATION (Continued)**

17   BY MS. KELLER:

18   Q    Mr. Villasenor, throughout your time at Mattel doing

19   the work we've been discussing, you received bonuses and

20   promotions, correct?

21   A    That is correct.

22   Q    And from 1999 to 2005, you consistently got high marks

23   from your supervisors, raises and bonuses, true?

24   A    That is correct.

25   Q    And if we could look at Exhibit 9496.  Is this your

121

```
 1    performance evaluation for June 1999 through June of 2000
 2    signed by your supervisor, Bennett Wolk?
 3    A    Correct.
 4    Q    And one of the major accomplishments that was discussed
 5    in this valuation was your ability to obtain competitive toy
 6    industry information from the New York toy fair, right?
 7    A    Is that on page 1?
 8    Q    That is on page 1, numeral 1.
 9    A    Correct.
10         MS. KELLER:  Your Honor, I'd move 9496 into
11    evidence.
12              THE COURT:  Received.
13         (Defendants' Exhibit No. 9496 is received in
14    evidence.)
15    BY MS. KELLER:
16    Q    And if you look at Exhibit 9497, this is another very
17    positive review of your performance for 2000 and 2001 from
18    Mr. Wolk again, correct?
19    A    Correct.
20    Q    And if you look at page 3, your -- Mr. Wolk says, "Sal
21    did an excellent job in obtaining competitive catalogs and
22    price lists"; do you see that?
23    A    Correct.
24         MS. KELLER:  Your Honor, I think 9497 is already
25    in, but if not, I move it in.
```

 1              THE COURT:  It's received, Counsel.

 2              (Defendants' Exhibit No. 9497 is received in

 3       evidence.)

 4    BY MS. KELLER:

 5    Q    If you look at Exhibit 9486, this is another --

 6    informing you of a merit-based raise in August of '99,

 7    correct?

 8    A    Correct.

 9              MS. KELLER:  Your Honor, I would move 9486 into

10    evidence.

11              THE COURT:  Received.

12              (Defendants' Exhibit No. 9486 is received in

13       evidence.)

14    BY MS. KELLER:

15    Q    9487, another raise you got in March of 2000?

16    A    Correct.

17    Q    And this was a 15 percent -- 15.7 percent raise, right?

18    A    Correct.

19    Q    And by this time, your supervisor was somebody named

20    Cathleen O'Reilly, correct?

21    A    Correct.

22    Q    And Miss O'Reilly had also been one of the people who

23    was aware of your practice of going into competitors'

24    showrooms at toy fairs with fake business cards, right?

25              MR. PRICE:  Objection.  Lack of foundation.

1           THE COURT:  Overruled.

2           THE WITNESS:  Correct.

3    BY MS. KELLER:

4    Q    And you actually had discussions with her about it,

5    right?

6    A    That is correct.

7    Q    And she approved of it, true?

8    A    That is correct.

9    Q    Exhibit 9518, this is a merit review that reflects a

10   bonus of $3,000 for work you did in 2004, right?

11   A    That's correct.

12   Q    Plus a merit raise for 2005, true?

13   A    Correct.

14   Q    And if we look again at 9518.

15          MS. KELLER:  And your Honor, I'd move 9518 into

16   evidence.

17          THE COURT:  Received.

18          *(Defendants' Exhibit No. 9518 is received in*

19      *evidence.)*

20   BY MS. KELLER:

21   Q    If you look, it says, "Compensation summary, 2004

22   incentive and 2005 merit review."  If we look under Salvador

23   Villasenor, in very, very small letters, we see something

24   that looks like maybe SEQ, number 3479, something

25   Bousquette, Matt, Vollero, Andrew, Turetzky, Matthew,

1  Turetzky, Matthew, again.  Do you know what those things

2  stand for?

3  A    They're names of my supervisors.

4  Q    Those are the four people recommending you for these

5  merit increases, pay raise?

6         MR. PRICE:  Objection.  Lack of foundation of all

7  four.

8         THE COURT:  Overruled.

9         If you know, you can answer that.  If you don't,

10  you don't.

11        THE WITNESS:  I am not a hundred percent sure.

12  BY MS. KELLER:

13  Q    And all of these people knew about your going into

14  private showrooms with fake IDs, correct?

15  A    That is correct.

16  Q    And if we look at Exhibit 9519.  This is a notice to

17  you from human resources, March 3rd, 2004, with a promotion,

18  right?

19  A    Correct.

20        MS. KELLER:  And your Honor, we'd move into

21  evidence 95 -- 9519.

22        THE COURT:  Received.

23        *(Defendants' Exhibit No. 9519 is received in*

24     *evidence.)*

25

1    BY MS. KELLER:

2    Q    Subject, it says, "Salary action, congratulations on

3    your promotion.  The following changes are effective with

4    your promotion."

5         It has your name, and under it, it says, "Title,

6    manager, market intelligence."  It gives you a 10.9 percent

7    raise, supervisor, Matthew Turetzky.

8         Now, again, when it says, "Manager, market

9    intelligence," was -- was that a title the company gave

10   you?

11   A    It's a title the company gave me.

12   Q    And just one month before this promotion, you had

13   attended the New York toy fair and Nuremberg toy fair, and

14   had gotten confidential information about Mattel's

15   competitors from private showrooms, right?

16   A    (No audible response.)

17   Q    Would it help to refresh your memory to look at your

18   deposition?

19   A    Please.

20   Q    That would be page 209, lines 6 through 13.

21        So at both the Nuremberg and New York toy fairs, did

22   you obtain confidential information about your competitors'

23   products by visiting their private showrooms, and I mean in

24   2004?

25   A    Correct.

1  Q    And you received this promotion shortly thereafter; is

2  that right?  Just about a month later?

3  A    Correct.

4  Q    And as we discussed earlier, Mr. Turetzky knew all

5  along that you were misrepresenting yourself to get into the

6  showrooms?

7  A    That is correct.

8  Q    He knew that when he approved your promotion?

9  A    That is correct.

10  Q    Now, I want to turn to a different topic.  Please look

11  at Exhibit 36028.

12      And do you see at the bottom of this on the right, it

13  says "VILS," meaning that you were the person who produced

14  these documents, right, not Mattel?

15      MR. PRICE:  Objection.  This particular document.

16  It's vague otherwise.

17      THE COURT:  I don't understand, I'm sorry.

18      MS. KELLER:  I'll --

19      THE COURT:  No, no.  Well, maybe I don't

20  understand both of you, so I apologize to each of you.

21      Your objection is as to this document being

22  produced by Mr. Villasenor?

23      MR. PRICE:  The objection, she used plural as if

24  there were others, and this particular document obviously

25  was produced by Mr. Villasenor.

1          THE COURT:  Thank you.

2          Just reask the question.

3    BY MS. KELLER:

4    Q    Mr. Villasenor, did you produce this document and hand

5    it over in this litigation?

6    A    Correct, I did.

7    Q    And you recognize this as -- if you look at 360281 at

8    the top of the page, it says, "Project, toy fair competitive

9    review.  Time frame, annual"; do you recognize that?

10   A    I see it, correct.

11         MS. KELLER:  Your Honor, I'd move 36028 into

12   evidence.

13         THE COURT:  Received.

14         *(Defendants' Exhibit No. 36028 is received in*

15   *     evidence.)*

16   BY MS. KELLER:

17   Q    And it says, "A presentation after the New York toy

18   fair that gives an overview of top trends and toys.  This

19   project can be done jointly with the boys' group or

20   separately."

21         And if we look at -- now, we discussed that each year

22   you were at Mattel, your group gave a presentation of the

23   top toys and trends after the New York toy fair?

24   A    That's correct.

25   Q    And if we go to page 3, it says, "Toy fairs events,"

1    and it lists all of the different toy fairs around the

2    world, right?

3    A    Correct.

4    Q    So it gives you the Hong Kong toy fair, Nuremberg,

5    New York, Pomona, Tokyo and E3 for Electronic Entertainment

6    Expo, correct?

7    A    Correct.

8    Q    And look under Nuremberg toy fair, under other, it

9    says, it is -- it's best to go -- go is as a U.S. retailer

10   since you were -- you will not be asked as many questions,

11   i.e., where is your store, et cetera.

12        So you are telling anybody who uses this handout, that

13   when they go to the Nuremberg toy fair, say they are a U.S.

14   retailer and they won't be asked as many questions, right?

15   A    Well, I'm not telling anyone anything because I did not

16   create this document, so --

17   Q    But you've seen this document, right?

18   A    I've seen this document, correct.

19   Q    And this document was actually given to people at

20   Mattel to instruct them in how to fake their credentials and

21   how to get into toy fairs, right?

22            MR. PRICE:  Objection.  Lack of foundation and

23   ambiguous.

24            THE COURT:  Sustained as to "people."

25

1    BY MS. KELLER:

2    Q    This was actually given to the people that you worked

3    with who snuck into toy fairs using false credentials,

4    right?

5            MR. PRICE:  Same objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  It's not my reports, I'm not sure

8    exactly who it was given to.

9    BY MS. KELLER:

10   Q    But this was a document that Mattel used as part of its

11   custom of instructing people on how to get into toy fairs,

12   right?

13           MR. PRICE:  Objection.  Lack of foundation.

14           THE COURT:  The difficulty that each counsel are

15   having is the use of the word "Mattel" and what that means.

16           MS. KELLER:  Well, I'll rephrase, your Honor.

17           THE COURT:  Counsel, for both of you, the

18   objection is proper.

19           I'm going to sustain the objection, Mr. Price.

20   BY MS. KELLER:

21   Q    You had this in your possession, right?

22   A    It was in one of my files, correct.

23   Q    You had this in your possession when you were working

24   at Mattel, right?

25   A    Correct.

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 130 of 135   Page ID
#:311499
CV 04-9049-DOC – 03/22/2011 – Day 37, Vol. 2 of 3

130

1    Q    You actually used some of the instructions and

2    information in this document, right?

3    A    Not sure if I did or didn't.

4    Q    You didn't create this document yourself, right?

5    A    That is correct.

6    Q    It was given to you by someone else, right?

7    A    That is correct.

8    Q    It was given to you by someone else at Mattel, right?

9    A    That is correct.

10   Q    That is correct.

11        And if we look under Pomona toy fair, it says,

12   "Although this is a small fair, it's a great place to pick

13   up extra catalogs and price lists.  Also, the manufacturers

14   who didn't have the catalogs at the New York toy fair will

15   have them available here."

16        And if you look down under E3, Electronic Entertainment

17   Expo, it says, "Since the main objective of this show is for

18   exhibitors to hype their products, it's best that you go to

19   E3 as media, e.g., writer for Parenting magazine, et cetera,

20   rather than as a buyer.  See business card section."

21        So this section is instructing you that to go to the

22   E3, it's best to pretend to be a reporter or a writer,

23   right?

24   A    Correct.

25   Q    And then if we look at the next page, 36028, page 4, it

1    talks about the New York toy fair, and it says -- oh, and

2    before we leave the Pomona toy fair, you went to the Pomona

3    toy fair while at Mattel and got a MGA price list there,

4    didn't you?

5    A    It was a team effort.  I don't recall if I did or

6    didn't get one, but we would get some from Pomona.

7    Q    If we look at your deposition, page 325.

8              THE COURT:  Lines?

9              MS. KELLER:  I think it is 325, 8 to 16, your

10   Honor, and 326, line 4, through 327, line 4.

11             MR. PRICE:  Your Honor, I object to skipping a

12   section.

13             THE COURT:  Just a moment.

14             Do you recall what the question was?

15             MS. KELLER:  Well, I can ask it again, your Honor.

16             THE COURT:  Ask the question again.  It was so

17   long ago, I'm afraid the witness can't recall it.

18   BY MS. KELLER:

19   Q    You went to the Pomona toy fair while you were a Mattel

20   employee and you got an MGA price list there, right?

21   A    I did attend the Pomona toy fair, correct.

22   Q    And you got an MGA price list, right?

23   A    I got numerous price lists.  I don't recall if MGA was

24   one or not as part of the ones I gathered.

25   Q    You used a fake name and fake company, right?

1    A    That is correct.

2    Q    And you used The Toy Shop again?

3    A    That is correct.

4    Q    Now, if you had said you were from Mattel -- if you had

5    said you were from Mattel, you knew that competitor toy

6    companies would not have given you a catalog or a price

7    list, right?

8    A    That is correct.

9    Q    And one of the things that you got at the Pomona toy

10   show was an MGA domestic price list, right?  Referring to

11   page 325, lines 8 through 11.

12   A    I'm sorry, that was 8 through 11?

13   Q    Yes, on 325.

14   A    Right, I'm identifying it as an MGA price list.

15   Q    That you got at the Pomona toy show, right?

16   A    I didn't see that in there.

17   Q    An MGA price list that got to Mattel from the Pomona

18   toy show that you attended, right, with fake ID, true?

19   A    Correct.  Again, there -- there was a group of us who

20   attended.

21   Q    Now, you also attended the E3 convention while you were

22   a Mattel employee, right?

23   A    That is correct.

24   Q    And just as this document instructs, you told the E3

25   convention that you were with the media, right?

1  A    That is correct.

2  Q    And in fact, you -- you had a fake business card

3  printed up for the Daily 49er newspaper at Cal State

4  Long Beach, right?

5  A    That is correct.

6         MS. KELLER:  Your Honor --

7  BY MS. KELLER:

8  Q    If you could take a look at 27464, is that a copy of

9  that fake business card?

10     I'm sorry, 27464-92; do you recognize that?

11  A    I do.

12         MS. KELLER:  I'd move it into evidence, your

13  Honor.

14         THE COURT:  Received.

15         (Defendants' Exhibit No. 27464-92 is received

16     in evidence.)

17  BY MS. KELLER:

18  Q    And here you saying you are the editor of the Daily

19  49er newspaper, right?

20  A    That is correct.

21  Q    And you even have a fraudulent e-mail address, correct?

22  A    That is correct.

23  Q    And the -- if we look at 360284 again, this talks about

24  what you are going to need to fake your identity for the New

25  York toy fair, right?

Case 2:04-cv-09049-DOC-RNB   Document 10259   Filed 03/24/11   Page 134 of 135   Page ID #:311503
CV 04-9049-DOC - 03/22/2011 - Day 37, Vol. 2 of 3

134

1    A     Correct, it says that.

2              *(Live reporter switch with Maria Dellaneve.)*

3                          -oOo-

1                              –oOo–

2                          **CERTIFICATE**

3

4        I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 23, 2011

12

13

14       _____

15                JANE C.S. RULE, U.S. COURT REPORTER
                 CSR NO. 9316

16

17

18

19

20

21

22

23

24

25