UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

| | |
|---|---|
| MATTEL INC., et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) DAY 37 |
| vs. | ) No. CV 04-9049-DOC |
| | ) VOLUME 3 OF 3 |
| MGA ENTERTAINMENT, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

TUESDAY, MARCH 22, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                          BY:  MICHAEL ZELLER, ESQ.
 3                        and  JOHN QUINN, ESQ.
                          865 S. FIGUEROA
 4                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA 90017
 5                        (213)443-3000

 6
      FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
 7                         BY:  ANNETTE HURST, ESQ.
                           405 HOWARD STREET
 8                         SAN FRANCISCO, CALIFORNIA 94105
                           (415)773-5700
 9

10
      FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                         BY:  THOMAS MCCONVILLE, ESQ.
                           4 PARK PLAZA
12                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
13                          (949)567-6700

14
                           KELLER RACKAUCKAS
15                         BY:  JENNIFER KELLER, ESQ.
                           18500 VON KARMAN AVENUE
16                         SUITE 560
                           IRVINE, CALIFORNIA 92612
17

18
      FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                         BY:  MARK OVERLAND, ESQ.
                           100 WILSHIRE BLVD
20                         SUITE 950
                           SANTA MONICA, CA. 90401
21                         (310) 459-2830

22

23

24

25
```

Page 3

```
 1                        - AND -

 2                  SCHEPER KIM & HARRIS LLP
                    BY:  ALEXANDER COTE, ESQ.
 3                  601 WEST 5TH STREET_12TH FLOOR
                    LOS ANGELES, CA. 90071
 4                  (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

cb4c3241-e822-4b0b-a066-be3fd6566f09

```
                                                                 Page 4

 1                          I N D E X

 2
     DEFENDANT'S                                              VOIR
 3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS  DIRE

 4   SAL VILLASEÑOR             5

 5

 6

 7                             EXHIBITS

 8
     DEFENDANT'S                            FOR          IN
 9   EXHIBIT  DESCRIPTION             IDENTIFICATION  EVIDENCE

10    27464 PAGE 129                                    12
      27464 page 158                                    13
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

cb4c3241-e822-4b0b-a066-be3fd6566f09

Page 5

1          SANTA ANA, CALIFORNIA; TUESDAY, MARCH 22, 2011

2                              -oOo-

3                  DIRECT EXAMINATION (RESUMED)

4    BY MS. KELLER

5    **Q**     And this is that Mattel document that you didn't make that

6    you were given by someone at Mattel; right?

7    **A**     That is correct.

8    **Q**     And it says, "What you need.  Your driver's license,

9    comfortable shoes.  Dress is business casual.  Business cards.

10   You can get them from Kinko's.  See business card section.  A

11   carrying case to carry all the catalogs and price list.  You

12   should either bring a shoulder bag or briefcase with wheels.

13   Proof of your business.  Any one of these documents is acceptable.

14   Resale tax certificate or business license for an industry-related

15   business.  Industry-related business advertisement.  Wholesalers,

16   imports, exporters must present catalogs illustrating their

17   products.  At least three recent industry manufacturer's invoices

18   for goods purchased wholesale and meant for retail.  This is

19   probably the easiest proof of business.  You can contact someone

20   in the accounts payable retailer invoicing department to have them

21   proctor an invoice with your company name on it.  Each invoice

22   should be for at least $500 dated within the last year."

23          So Mattel's accounts payable department would phoney up

24   an invoice for you with the phoney company name on it; right?

25   **A**     I don't know that for a fact.

cb4c3241-e822-4b0b-a066-be3fd6566f09

Page 6

1    **Q**    That's what you are being told to do in this; right?

2    **A**    That what it says, correct.

3    **Q**    When it says to have them proctor an invoice, that just means

4    to have them fake it; right?

5    **A**    I'm not sure.

6    **Q**    There would be no real company to invoice Mattel for

7    anything; right?

8    **A**    Again, I'm not sure.  I didn't create this or write this.

9    **Q**    This was so commonplace at Mattel, that people who were going

10   to sneak into toy shows were simply handed a copy of this; right?

11   You don't even remember who gave it to you?

12              **MR. PRICE:**  Objection.  Lack of foundation.

13              **THE COURT:**  Well, just the question is compound and plus

14   it's a statement.  So I'm going to strike the question.

15              Counsel can ask a question.

16   BY MS. KELLER

17   **Q**    Under "proof of your business," any one of these documents is

18   acceptable.  Which one did you use?

19   **A**    The business card.

20   **Q**    No.  I'm looking at the list "under any one of these

21   documents is acceptable.  Resale tax certificate or business

22   license for an industry-related business."

23              Did you have one of those phoneyed up?

24   **A**    No, I did not.

25   **Q**    "Industry-related business advertisement."  Did you have like

Page 7

1    an ad in the newspaper that you made up?

2    **A**    I don't think so, no.

3    **Q**    "Wholesalers, importers, exporters must present catalogs

4    illustrating their products."

5          Did you fake a catalog?

6    **A**    I did not.

7    **Q**    "At least three recent industry manufacturer's invoices for

8    goods purchased wholesale and meant for resale."

9          You didn't have that either; right?

10   **A**    I did not.

11   **Q**    So the only one that you could really have on this list is

12   the one that it says, "this is probably the easiest proof of

13   business.  You can contact someone in the accounts payable

14   retailer invoicing department to have them proctor an invoice with

15   your company name on it.  Each invoice should be for at least $500

16   and dated within the year."

17          Is that what you took with you?

18   **A**    I don't even think I had one of those.

19   **Q**    Now, on the next page, page 5 about New York toy fair, it

20   says, "What to know before you get there.  You should think about

21   the size of your store.  Try to keep it reasonably small.  What

22   type of toys you sell.  How many employees.  Where exactly your

23   store is located.  How many stores you have."

24          And the reason that you were supposed to think about

25   these things was so you would have a lie ready; correct?

1       **MR. PRICE:**  Objection.  Assumes facts not in evidence.

2   He says he didn't use this.

3       **THE COURT:**  Sustained.  Just foundation, counsel.

4   BY MS. KELLER

5   **Q**   Well, you understand that these instructions are telling

6   somebody to think of all these things in advance so they will be

7   able to come up with a quick lie; right?

8   **A**   Can you rephrase that?

9   **Q**   You understand that this "you should think about the size of

10  your store, try to keep it reasonably small," you understand what

11  this is telling the person is lie and say you have got a really

12  small store and then you don't have to keep as many things

13  straight in your head.  It will help you lie; right?

14      **MR. PRICE:**  Argumentative and lacks foundation.

15      **THE COURT:**  I want to remember, did you receive one of

16  these?

17      **THE WITNESS:**  I had a copy in my files.

18      **THE COURT:**  Overruled.

19  BY MS. KELLER

20  **Q**   So you understand that all of this is to tell you to think in

21  advance about the lies you are going to be telling at the toy

22  fair; right?

23  **A**   That's what it says.

24  **Q**   "Think about how many employees you have."

25      You know you wouldn't have any.  So that would be a lie;

1   right?

2   **A**   In my case, correct.

3   **Q**   And were you a good liar?  Were you convincing when you went

4   to the stores?

5   **A**   I don't know.  I don't know the answer to that question.

6   **Q**   Well, when you told them that you were an editor of a

7   newspaper, did anybody say no, you are not?

8   **A**   Correct.

9   **Q**   Did anyone challenge you?

10   **A**   I don't recall.

11   **Q**   Well, you were convincing enough to get into places.  You

12   were a good enough liar to get; right?

13   **A**   I got into several places, correct.

14   **Q**   And it bothers you to think back on it because you don't like

15   to think of yourself as a liar; right?

16   **A**   Correct.  I don't like to be called a liar.

17   **Q**   And it bothered you at the time, didn't it, because you don't

18   like having to lie, am I right?

19   **A**   Correct.

20   **Q**   And it bothered you to say that you owned a small toy shop

21   and to do that over and over, year-in and year-out; right?

22   **A**   I don't recall how I felt about that part.

23   **Q**   Well, you didn't like lying to people about who you were and

24   what you did for a living, did you?

25   **A**   Correct.

Page 10

1   **Q**     And you were lying because Mattel told you to lie; right?

2                **MR. PRICE:**  Objection.  Ambiguous.  Overbroad.

3                **THE COURT:**  Mattel, remember, ladies and gentlemen of

4   the jury, is used in a generic sense, but I'm not going to allow

5   the question for a generic sense.  Or if you believe this

6   testimony or whatever you believe, etcetera.

7                The end result is that, counsel, you can use the

8   supervisor if you want to, other employees.  But Mattel is being

9   used in a generic sense.  That's my concern.

10  BY MS. KELLER

11  **Q**     You knew that if you were going to keep your job, you needed

12  to go ahead and lie and get this information; right?

13  **A**     That is correct.

14  **Q**     And because you lied, you were patted on the back and

15  promoted and given bonuses and rewarded by your bosses, including

16  the president of the company; right?

17               **MR. PRICE:**  Objection.  Lacks foundation.

18               **THE COURT:**  Overruled.

19               **THE WITNESS:**  That is correct.

20  BY MS. KELLER

21  **Q**     But it really started getting to you over time, didn't it?

22  **A**     That is correct.

23  **Q**     Even the money wasn't enough after a while, was it?

24  **A**     I'm not sure about that part.

25  **Q**     After a while, the extra money that they were paying to you

1   wasn't enough for you to keep up this life of constant lies.  It

2   was getting to you.  You were getting -- it was getting more and

3   more difficult to do, wasn't it?

4            **MR. PRICE:**  Objection.  Compound.

5            **THE COURT:**  Overruled.

6            **THE WITNESS:**  It was more the pressure, the anxiety, the

7   stress.

8   BY MS. KELLER

9   **Q**    And the pressure was to get the information at any cost;

10  right?

11  **A**    I'm not sure about any cost.

12  **Q**    Well, it was all about dollars and cents at Mattel, wasn't

13  it?  I mean, to your supervisors?

14           **MR. PRICE:**  Objection.  Argumentative.  Vague.

15           **THE COURT:**  Overruled.

16           **THE WITNESS:**  I'm not sure.

17  BY MS. KELLER

18  **Q**    Well, let's look at an e-mail, Exhibit 27464.  27464, page

19  129.  This is actually a document that you voluntarily produced;

20  right?  Do you see your BIOS at the bottom?

21  **A**    I do.

22  **Q**    When you were given a subpoena, you actually honestly

23  responded and gave us this; right?

24  **A**    That is correct.

25           **MS. KELLER:**  Your Honor, I would ask that 27464 be

Page 12

1    admitted.

2              **THE COURT:**  Received.

3                    (Exhibit 27464 PAGE 129 received in evidence.)

4    BY MS. KELLER

5    **Q**    This is an e-mail dated Friday, November 12, 2004 from you to

6    Matthew Turetzky; right?

7    **A**    That is correct.

8    **Q**    This is actually not sent from your Mattel e-mail address,

9    but from your private e-mail address; right?

10   **A**    That is correct.

11   **Q**    And this is sent over Yahoo Mail?

12   **A**    That is correct.

13   **Q**    And the subject is what?

14   **A**    Data.

15   **Q**    And at the bottom it says, "Attachment.  File.  TV games,

16   price list 09/24/04," and then it says, "Matt, please let me know

17   that you received it.  Thanks.  Sal V."

18          Matt was Matt Turetzky?

19   **A**    That is correct.

20   **Q**    And you are sending him a price list that you have obtained

21   from a competitor and you are sending it to him November 12, 2004?

22   **A**    That is correct.

23   **Q**    Now, look at Exhibit 27464, page 158.

24          **MS. KELLER:**  Your Honor, I would move that into

25   evidence.

1          **THE COURT:**  Received.

2                   (Exhibit 27464 page 158 received in evidence.)

3     BY MS. KELLER

4     **Q**    This is Mr. Turetzky's reply to you; right?  You had said,

5     "Matt, please let me know that you received it.  Thanks.  Sal V."

6     And then if you look above that, on November 12, 2004,

7     Mr. Turetzky says, "This is great.  You just saved Mattel close to

8     1 million."

9             And if you look right above that, you reply, "Hope this

10    helps me get a good bonus this year.  See you on Monday."

11            You remember this, don't you?

12    **A**    I do.  Correct.

13          **MS. KELLER:**  Your Honor, would this be a good place to

14    break?  Do you want me to keep going?

15          **THE COURT:**  No.  I need to speak to all counsel for just

16    a moment before we excuse the jury.  Could you go back in the jury

17    room for just a moment.  And we'll be right back with you for just

18    a moment.  This has nothing to do with the case, by the way.  It's

19    a timing issue.

20                        (Jury out.)

21          **THE COURT:**  Nancy was approached by the counsel who

22    represents and is with the witness today, Mr. Villaseñor.  She is

23    here.  And you had asked -- I had called a number of witnesses at

24    both counsels' request.  I think you are the fifth or sixth

25    witness I have called when both parties asked the Court to call

1  trying to get people to come to court.  She reminded all of us

2  that the representation was that he would be here today and he

3  would be put on the stand promptly and he would be done today.

4  Now, if I find myself in the position of having represented that

5  on all of your behalves.

6        And I think, counsel, you were kind enough to remind us

7  of that.  I don't quite know what to do about that.  It's apparent

8  that he is not finished, and I feel badly about that because both

9  counsel for both sides asked me to reach out.  I'm happy to keep

10  going tonight and I'm happy to conclude the testimony as long as

11  the jury is able to stay.

12        But I suggest as a courtesy, since each of you asked me

13  to place the call, Mr. Quinn, Ms. Keller, would you be kind enough

14  to talk to counsel who is politely waiting in the back?  If you

15  want to waive the rest of your examination, if you want to waive

16  cross-examination -- Mr. Price, whatever you two want to do.  Let

17  them sort this out in just a moment.

18        **MS. KELLER:**  Your Honor, I agree we had promised counsel

19  that Mr. Villaseñor would be on his way, but he is local.  He is

20  not --

21        **THE COURT:**  I understand that.

22        **MS. KELLER:**  He is not the witness from Seattle.

23        **THE COURT:**  Remember, each of you asked me to call over

24  five or six witnesses, and I've done that.  My word is my bond.  I

25  say X and I do X.  You go work that out with her.  Maybe you are

1   waiving the rest of your direct; maybe you are waiving your cross.

2   Or maybe she is going to be so kind that she is going to let you

3   come back tomorrow, which you probably are anyway.  I think you

4   are almost going to have to.  One reason for that is the jury is

5   just --

6                    (Counsel confer)

7            **THE COURT:**  By the way, who is paying his fee, either

8   MGA or Mattel?  Who is paying for counsel?

9            **MS. KELLER:**  Mattel, Your Honor.

10           **THE COURT:**  Mr. Price, you might be involved in this

11  conversation then.

12           **MR. PRICE:**  Counsel informs us that there is no conflict

13  for tomorrow for either the witness or her.  But it would be her

14  preference that we keep going tonight.

15           **THE COURT:**  It's up to each of you and it's up to the

16  ability of the jury to absorb, quite frankly.  Let me speak to

17  counsel.

18           I don't think it's going to make much difference in

19  terms of tomorrow.  In other words, the jury isn't going to be

20  able to sit and absorb the information probably past 5:30.  They

21  have been at it all day.  I think that 45 minutes places everybody

22  in kind of a precarious position over 45 minutes.

23           With our consent, why don't we just resume tomorrow at

24  8:30.

25           **MS. JENNESS:**  Your Honor, we were asked to be here by

 1   MGA the first thing on Friday and my client waited here at the

 2   courthouse all day.

 3          **THE COURT:**  That's been a continuing problem for both

 4   sides.  Mattel suffered for that also, and you should know why.

 5          If I call for a witness and the witness isn't available,

 6   I rest their case.  They're on a time of 120 hours per side.

 7   That's the end of it.  Let me be the bad person in your eyes.  Let

 8   me help you.  You are ordered back tomorrow 8:30.  Is that clear?

 9          **MS. JENNESS:**  We'll be here.  Thank you.

10          **THE COURT:**  Sir, my apologies.  You are ordered back

11   tomorrow.  Be seated, have a seat at that time.  Goodnight.  You

12   may step down.

13          Now, counsel, if you would remain in session for just a

14   moment.  What are we going to do about the alternate jurors?  In

15   other words, some decisions now.  I'm sorry.

16          Mr. Larian, Mr. Eckert.  Thank you very much.  My

17   apologies.

18          **MS. JENNESS:**  Your Honor, may I be excused?

19          **THE COURT:**  Yes, please.  Thank you.

20          **MS. KELLER:**  From MGA's perspective --

21          **THE COURT:**  Why don't you have a conversation with Mr.

22   Quinn.  Do that informally first and decide if you want all six

23   retained.  I'm happy to do that.  I usually have.  If you want to

24   insulate them in a sense from any workplace, Mr. Quinn, I'm happy

25   to do that.  I can be the bad person and order all six back.

1   Don't worry about that.  If you want to do that sequentially and

2   draw numbers, so be it.

3           But Mr. Quinn, Ms. Keller, if you do, I don't want you

4   to know the numbers so nobody is playing to them.  See what I

5   mean?  We can go it sequentially one through six and order the

6   first three back.  We can wait and tell them nothing.  Or we can

7   bring all six of them back and see how it goes for the first

8   couple of days.  You don't have to make a decision.  And I'll be

9   the bad person in their eyes.  You don't have to worry about it.

10          Mr. Price, it's two to one.  I want you up there with

11   them.  Now, it's two to two.

12          (Counsel confer)

13          **THE COURT:**  Would somebody get Mr. Eckert before he

14   leaves.

15          Mr. Zeller, quick as fast as you can go.  I don't want

16   one side disadvantaged when they're excused for the evening at any

17   time.  My apologies.

18          **MS. KELLER:**  Your Honor, one thing that I brought up and

19   that Mr. Quinn is saying, I don't really know how you deal with

20   that and maybe there isn't a way.  But one of the things that has

21   occurred to me is that at least one and maybe two of the

22   alternates have already expressed a desire to get back to work and

23   all that.

24          My preference is if there is a way to put those

25   alternates last on the list, so to speak -- no.

1     **THE COURT:**  No.  It has to be a random draw.  Neither

2   one of you can walk out if there is a substitution, feeling that

3   the deck got stacked.  It's either a random draw and we know one

4   through six and send maybe the first four or three back to work

5   hoping we never use them.

6         My suggestion is, folks, just keep all six and that's

7   the way it is.  They come in at 10:00, and they go home at 2:00 or

8   3:00, they'll probably be pretty happy.  I'll tell you why, too.

9   With the flu season on us, we're probably going to lose one or two

10  in the next two weeks.

11    **MS. KELLER:**  Maybe once they start deliberating, maybe

12  three could be excused and three remain in the building.

13  Something like that.

14    **THE COURT:**  Let's just tell them -- I'll just tell

15  them -- I'll take the responsibility.

16        Now, I want to wait for Mr. Eckert to come back.  I just

17  don't want a disadvantage.

18        Mr. Eckert, my apologies.

19        Let's bring the jury back.

20              (Jury in.)

21    **THE COURT:**  The jury is present, all counsel are

22  present.

23        We're going to stay on the record for a moment.  You are

24  going to home right now and reconvene at 8:30.  Let me tell you

25  what we're talking about.  We're talking about the alternates.

1    Okay.  And we haven't been able to work that out yet.  Let me tell

2    you our greatest fear.  We know that eight of you are in

3    deliberation hoping no flu, take care of yourselves, drive slowly,

4    don't drive at all.  Just kidding you.  But the other six of you

5    are alternates.  So we can draw you randomly at any time.  And as

6    soon as we send you back to work, I promise you, everybody is

7    going to ask where you've been.  And at some point whether it's a

8    supervisor or coworker, you are going to crack under the pressure.

9    I'm just kidding you.  But you have got to.  No matter what I say,

10   that's human nature.  You have been gone too long.

11          So one of the six of you would be drawn randomly.  If

12   the jury deliberates a few hours, that probably takes cares of the

13   problem.  If you deliberate days or weeks, you just don't know

14   yet.  And you don't know how you are doing in terms of health and

15   family issues.  One of you would have to take their place.

16          So we're really going through a strong discussion here

17   about how we handle that.  And we don't know whether that should

18   be sequentially and we secretly draw one through six at the

19   present time, which I'm not in favor of.  Or if we keep all six of

20   you with us during the initial part.

21          I would like you to enter into that discussion also

22   concerning that one week.  Remember, we don't have to take a week.

23   But around Easter, what I'm trying to do is find out if you are

24   going to take a week, I would rather give you two weeks to try to

25   get through deliberations and get up to Easter and then take a

Page 20

1    week if you want a week off, other than before because the time

2    frame, we just don't know.

3            So why don't all 14 of you talk about whether you want

4    that week off after Easter or not.  And if you don't, for goodness

5    sakes, we're all here.  There is no problem.  But if you do, then

6    you can start making plans.  And if you resolve the case, it

7    resolves it.  If you don't resolve the case, at least your

8    families would know that you have a definite time period.  Okay?

9            We'll see you tomorrow at 8:30.  You are admonished not

10   to discuss this matter amongst yourselves nor form or express any

11   opinion concerning the case.

12                        (Jury out.)

13           **THE COURT:**  Now, deepest apologies to Mr. Larian and Mr.

14   Eckert.  Now please go with my blessings and have a nice evening.

15           Mr. Zeller, thank you for that lightening foot speed.

16   Amazing.

17           Could I speak, with your consent, to just Ms. Keller for

18   a moment and just Mr. Quinn?  Be okay?  Just informally?  We'll be

19   right back with you.

20       (Brief pause in proceedings)

21           **THE COURT:**  There has been an agreement between MGA and

22   Mattel that concerning rule 50 the Court is particularly

23   interested in hearing the argument on Saturday mourning at

24   8:00 o'clock concerning the duty of loyalty and the conversion

25   claims.  MGA will make its best efforts to file by 5:00 o'clock on

1   Thursday.

2            And by best efforts, Annette, that means?

3            **MS. HURST:**  It will be done, Your Honor.

4            **THE COURT:**  Okay.  And Mr. Zeller will make his best

5   efforts to file by Friday evening between 5:00 and 11:00.  And

6   that just means best efforts.  The arguments will be heard on

7   Saturday morning at 8:00 o'clock on both of those issues.

8            Next, there is a rule 50 that's been brought by

9   Mr. Overland and Mr. Cote on behalf of Mr. Machado.  And the Court

10  has expressed a concern about deciding that rule 50 concerning

11  potential prejudice, if there was any, to either of the parties by

12  deciding it at this stage of the proceedings.

13           I think the representation is that the parties seem

14  fairly comfortable with having the Court decide this issue, but I

15  want to make certain that that's a position of MGA and Mattel's

16  position also.

17           **MS. HURST:**  It's definitely our position.  Our belief is

18  the Ninth Circuit law requires the Court to decide it.

19           **THE COURT:**  Well, I know that.  It's when.

20           **MS. HURST:**  Before.

21           **THE COURT:**  Okay.  Before.

22           And what is your thought?

23           **MR. ZELLER:**  I wasn't sure if you were looking at Mark

24  or not.

25           **THE COURT:**  Looking at Mark, speaking to you.

1        **MR. ZELLER:**  Probably a better view.  So the -- I sort

2   of go back to the summary judgment decision.  I mean, there is a

3   predicate, a factual dispute that is a predicate to determine

4   which law applies.  I mean, one course that I could envision is

5   that we just ask the jury to make factual findings and then, you

6   know, presumably this would be at least in part by agreement of

7   the parties, is that the Court would then take those factual

8   findings and make a determination.  California, Mexico.  I mean,

9   that would be one option, I would think.

10        But otherwise, our perspective is, is that it would

11   ultimately have to go to the jury because there are these

12   underlying facts that are in dispute as the Court identified on

13   summary judgment.

14        **THE COURT:**  Your preference is that the rule 50 not be

15   decided?

16        **MR. ZELLER:**  I don't think so.  I mean, the Court --

17        **THE COURT:**  Mr. Quinn, you join that?

18        **MR. QUINN:**  Yes, Your Honor.

19        **THE COURT:**  Mr. Price?

20        **MR. PRICE:**  Yes.

21        **THE COURT:**  Okay.  If I was to decide this, one of the

22   things that's occurring to me is what is the scope of the evidence

23   the parties believe that you would be able to argue.  Let me go

24   back and think about that this evening.  Because I would expect

25   that MGA's position would rapidly become all of this is

1   irrelevant; right?

2           MR. MCCONVILLE:  Legally irrelevant.

3           THE COURT:  Legally irrelevant.  And none of this should

4   be referred to.  And your position would be it doesn't matter if

5   Mr. Machado is in the case or out of the case, or MGA Mexico; it's

6   still legally relevant evidence?

7           MR. ZELLER:  Yes.  Certainly is to MGA.

8           THE COURT:  Okay.  I have been waiting to hear more

9   evidence about Tyler Snyder.  I received a motion from MGA that

10  had two parts to it.  The first was the depositional testimony be

11  read.  The second was if that was not acceptable, that a video

12  conference be permitted.  And third, but not necessarily in that

13  order, an adverse inference.

14          MS. HURST:  We also had, Your Honor, that Mr. Story as a

15  30(B)(6) witness on the issue come and admit the facts on behalf

16  of the Mattel.  That was the other option we suggested.

17          THE COURT:  You are right.  That was the other option.

18  I quickly rejected that.  That's why I didn't focus on it.  I

19  apologize.

20          Could you pull up 8412 for me for a moment?

21          MS. HURST:  8412?

22          THE COURT:  8412.  Is he gone?  That's okay.  I can look

23  over the screen.  In fact, I can get it myself.  Just a minute.

24          The Court is discussing with counsel a piece of evidence

25  that concerns Tyler Snyder, and during Matt Turetzky's testimony

Page 24

1  8412 was referred to.  And Tyler Snyder should appear as a CC or

2  co-owner along with Plunkett.

3          **MS. HURST:**  Yes, she does.  Co-owner.

4          **THE COURT:**  And 9643, e-mail Snyder to Turetzky, there

5  it's allegedly a Bratz update and Carey Plunkett and Tyler Snyder

6  allegedly are mentioned walking in the MGA showrooms.  I need to

7  see 9463.

8          **MS. KELLER:**  Your Honor, I spoke with Justice Trotter.

9          **THE COURT:**  Off the record for just a moment.

10          (Discussion held off the record.)

11          **THE COURT:**  The record should reflect that I was asked

12  by one or both parties -- I have forgotten which one.  I think it

13  was MGA -- to phone a former judge in Atlanta, Georgia to see if

14  Ms. Snyder was available.  And the Court will understand that I

15  don't have jurisdiction in Georgia, even with proper service.

16          And I don't think there is any disagreement, is there,

17  Mr. Zeller?

18          **MR. ZELLER:**  No.  And we, too, tried to get her here.

19          **THE COURT:**  And Ms. Hurst, the Court has no

20  jurisdiction?

21          **MS. HURST:**  No jurisdiction, Your Honor.

22          **THE COURT:**  I'm a little concerned that you didn't

23  request my help earlier because apparently as you listened to the

24  phone call and I listened to the phone call, it was apparent that

25  whether she ever intended to appear or not, what apparently

1    became, at least according to the judge, the straw that broke the

2    camel's back, was the service of process on the door, and that

3    being late at night, that somewhat set off her husband and finding

4    the subpoena tacked to the door next day.

5         That makes her appearance kind of like pushing a rock up

6    a hill.  I am not inclined to allow a deposition.  I mean, my word

7    is my bond.  And if I did that, the end result is if I don't hold

8    to my own standards or try to most of the time, other than the

9    evidence constantly changing in the case, it means that we would

10   have had, once again, a trial that would have been a series of

11   depositions and declarations and interrogatories, because a huge

12   number of these witnesses would not have come but for, quite

13   frankly, being a pretty heavy hand by the Court and counsel at

14   different times:  E-mails that Mr. Zeller sent using my name,

15   e-mails that MGA sent using my name, and kind of the general

16   belief that the Court was going to enforce their appearance in any

17   way possible.

18        And I had consciously tried to set that tone, although I

19   have to admit to counsel that now that we're in the case, it's an

20   unpleasant thing to do from the very beginning of the case to

21   insure that people did show up who, in my opinion, weren't going

22   to show up starting with Carter Bryant, which left both sides, and

23   I think particularly at that time, and Mattel with Mr. Price, at a

24   tremendous disadvantage if Mr. Bryant didn't show up.

25        And I think Matt Turetzky is the next one just to point

Page 26

1   out some of the more obvious ones.  If Mr. Turetzky wasn't here

2   for MGA, I don't think you could have captured the moments for

3   either Mr. Bryant when he was on the stand or Mr. Turetzky in

4   terms of who they are and their appearance in court.

5        The question is, it only leaves me with one of two

6   options because I can allow testimony to come in from Georgia via

7   a video conference, or I can issue an adverse inference.  And the

8   difficulty with the adverse inference is if I issued it, it would

9   be against Mattel.  And I'll read a bunch of case law, and it's

10  the last thing I want to do.

11       First of all, Mr. Zeller has represented that he too has

12  tried to contact the person.  I take that in good faith.  On the

13  other hand, they're paying the bill.  And the attorney apparently

14  is being paid by Mattel.  So I'm going to leave that for the

15  evening.

16       Better yet, let me read into the record a couple

17  thoughts.

18      (Brief pause in proceedings)

19       **THE COURT:**  Back on the record, which is not what the

20  Court is doing at the present time.  I'm trying to think through

21  this and see if there is any other way that this can be approached

22  and I think there may be.

23       In the appropriate circumstances, a trial court judge

24  has the discretion to give a so-called missing witness instruction

25  citing Miller versus Rykoff-Sexton Inc. 845 F.2d 209, 212 Ninth

cb4c3241-e822-4b0b-a066-be3fd6566f09

Page 27

1    Circuit 1998, stating that the decision to give a missing witness

2    instruction rests in the sound discretion of the district court.

3    A missing witness instruction informs the jury that it may infer

4    that a party's failure to call a witness within that party's

5    control means that the absent witness' testimony would have been

6    unfavorable to that party.

7             Whether a missing witness instruction is proper depends

8    on two things:  First, whether the witness is peculiarly within

9    the power of the party against whom the instruction is sought.

10            And the cases I'm citing are Brutzman 731 F.2d 1449,

11   1453, Ninth Circuit 1984.  It was overruled on other grounds.  By

12   United States versus Charmley, 764, F.2d 675, 677, note one.

13   Chicago College of Osteopathic Medicine versus Fuller at 719 F.2d

14   1335 at 1353, Seventh Circuit 1983.

15            And second, whether under the circumstances an inference

16   of unfavorable testimony from an absent witness is a natural and

17   reasonable one under United States versus Bramble, 680 F.2d 590,

18   592.

19            Whether a witness is peculiarly within the power of the

20   party against whom the instruction is given depends upon all the

21   facts and circumstances bearing on the witness' relation to the

22   parties and not merely upon his physical presence at trial or

23   accessibility or service of subpoena, citing Kean versus CIR, 469

24   F.2d 1183, 1188, Ninth Circuit, 1972.

25            In appropriate circumstances or instances, former

Page 28

1    employees with important testimony have been held to be peculiarly

2    within the power of their former employer for the purposes of an

3    adverse inference instruction.

4         In there the Court cites Miller once again which upheld

5    the district court's decision to give a missing witness

6    instruction when the defendant failed to secure its former

7    employees' attendance at trial.

8         Also Rad Services versus Aetna Casualty at 808 F.2d,

9    271, Third Circuit 1986, upholding the trial court's decision to

10   allow the jury to draw an adverse inference against the defendant

11   for the silence of one of the defendant's former officers and

12   another former employee.

13        Also, Harry versus Safeway Stores Inc. at 215 F.Supp

14   324, 326, 327, stating that the jury was permitted to infer that

15   the past employer/employee relationship made a missing witness

16   still peculiarly available to the defendant because of that past

17   employer/employee relationship.

18        In this case, the former employment relationship between

19   Snyder and Mattel and the fact that Mattel is paying Snyder's

20   legal feet gives the Court some concern as to whether an adverse

21   inference should be drawn because it's peculiarly within Mattel's

22   control that a missing witness instruction would be proper if

23   Snyder does not appear to testify.

24        Now, that's not a ruling.  The first concern I have is

25   that disincentivizes any further efforts to get Snyder here on

Page 29

1   MGA's part.  But MGA has been categorically rejected apparently,

2   and part of that allegedly was the service of process and the way

3   it was served, according to the judge who's now the attorney for

4   Ms. Snyder.

5           Second, I needed to hear some foundation before I formed

6   any tentative thoughts on this.  And today, finally in 8412 and

7   89643 I'm seeing Snyder come up for literally the first time in

8   the CC's, if you will, or the e-mail.  But even if Snyder was

9   here, my question back to MGA before I ever consider an adverse

10  intense is, why is Snyder important in light of now Turetzky's, or

11  Matt Turetzky's testimony and now Sal Villaseñor who is literally

12  breaking down on the witness stand and crying, which the record

13  doesn't reflect because it can't.

14          And why isn't it clear whether he can appear or she can

15  appear or not that this is an important witness that the Court

16  should be concerned about, because once I draw an adverse

17  inference, it's devastating.  It inserts the Court.  And it's the

18  same problem, by the way, I'm having in a curative instruction on

19  the privilege and a curative instruction that Mr. Quinn is looking

20  for concerning Mattel and magnets and people or babies dying.

21          The Court doesn't make factual findings.  And so I want

22  to hear for a moment from MGA in light of the 8412 and 9643.  9643

23  in particular being an e-mail from Snyder to Turetzky saying that

24  Plunkett and Snyder are literally walking the MGA showroom floors.

25  We now have access.  We know that Sal Villaseñor says she is part

1   of this team.  That she has entered showrooms.  So I understand

2   it's one more witness.  I understand it is a live witness.  I

3   understand that she may be one of the few people who actually

4   admits to going in, physically going into the showroom.  But Sal

5   Villaseñor has also admitted that.

6           So let me hear first from Ms. Hurst and then from Mr.

7   Zeller.

8           **MS. HURST:**  Ms. Bradley, formerly Snyder is the one

9   person who clearly and unequivocally admitted going into an MGA

10  showroom.  Mr. Villaseñor has consistently waffled on that

11  subject.  Carey Plunkett claimed a total lack of memory despite

12  having been recited in 9643 as one of the people who walked the

13  MGA showroom.

14          But Ms. Bradley was different.  She clearly with memory

15  and cogently testified as to the procedure that she used to obtain

16  fake credentials.  And she confirmed that she used those fake

17  credentials to gain access to MGA's showroom.

18          **THE COURT:**  But is she another minnow in a big pond?  In

19  other words, the effort on your part has to be to move up to a big

20  fish.  To move up to somebody like Matt Bousquette, who you

21  already have.  And/or to somebody like Mr. Eckert who is the head

22  of Mattel.  Otherwise, it seems to me another person who is going

23  into a showroom.

24          **MS. HURST:**  If the Court will recall, the basis upon

25  which this evidence was withheld for so long was the claim that it

Page 31

1    never happened to MGA.  And in fact, that is still being claimed.

2    And I think we're going to hear that in the cross-examination of

3    Mr. Villaseñor.  "Oh, but you never went MGA's showroom; right?"

4              THE COURT:  Maybe I should wait for a date.

5              Let me hear from Mr. Zeller briefly.  I want to table

6    this for a moment.

7              MS. HURST:  Your Honor, can I add a couple of points

8    quickly?

9              THE COURT:  Very quickly.

10             MS. HURST:  Ms. Bradley was the only one who clearly

11   admitted using phoney invoices, mocked-up invoices from Mattel,

12   created with Mattel.  She was the only one who admitted using

13   phoney advertisements.  She described how she would go and

14   register using her fake business card, her phoney invoice and her

15   phoney advertisement and get the fake credential.  Nobody else

16   described it with that level of memory and detail.  Nobody said

17   invoices and advertisements clearly the way she did.  She

18   unequivocally admitted going into the MGA showroom.

19             On the manner of service issue, I just want to address

20   that.  We asked Mr. Hill to accept service.  The only reason we

21   pursued service is because we understood that that was the

22   directive of the Court, to always try to serve people and get them

23   to comply.  And I hear the Court and what Mr. Hill is apparently

24   saying.

25             THE COURT:  They hired a stupid process to do it at

1    10:00 o'clock at night and pound on the door.

2              **MS. HURST:**  We asked Mr. Hill to accept it and he

3    refused.

4              **THE COURT:**  That's fine.

5              Now, Mr. Zeller.

6              And by the way, I would think that from Mattel's

7    perspective that just as they point out the importance of

8    Ms. Snyder, that you can come up with a witness that you feel

9    equally strong that you weren't able to produce.  One of those by

10   the way is not -- the lady in Canada.  Brisbois.  She is a willing

11   witness, quite frankly.  Apparently she'll come down at time.  And

12   that's a choice not to bring her down.  That's why that

13   foundational problem is really not coming in right now.

14             And we have got a way to cure that.  You have got a way

15   to get that in very, very easily.  And I'll walk through that with

16   you without you doing a whole lot of work.  But it will perfect my

17   record.

18             But I want to go back to Snyder.  I think you can come

19   up a witness that you wanted to have produced that if they weren't

20   produced you could set a good record on that.  I'm just not

21   convinced yet that you one or both of you don't have the ability

22   to minimally get her on a video conference.

23             **MR. ZELLER:**  Your Honor, I mean, as a practical

24   matter -- and I would like to, just for the record, address some

25   of the points that MGA has raised here.

1          **THE COURT:**  It's going to be very brief now.

2          **MR. ZELLER:**  Yes, very brief.

3          But just as a practical matter we would be agreeable to

4     video conference if it's acceptable to the Court.

5          **THE COURT:**  It is.  It is.  I think that that's the way

6     around it.  By the way, that doesn't leave her any excuse at that

7     point.  In other words, that's minimal.  Drive down to Kinko's,

8     put the American flag behind you, sit in the chair.  We have done

9     that in Indiana.  We have done that across the country.  This

10    Court is infamous for allowing counsel to do that on the civil

11    side.  So that no longer becomes a matter of inconvenience,

12    because she is not even getting on the plane.  That's getting her

13    over to a Kinko's and coordinating with my staff, which is easy.

14    And since we have done it so many times, I'm at a loss why that

15    can't be done.

16         **MR. ZELLER:**  And I think it should be here.  As the

17    Court has pointed out -- and I don't mean to point the finger at

18    MGA about this -- but there was the complication because someone

19    was a little -- on the MGA side was a little aggressive with this

20    service of process and it seemed to have alienated --

21         **THE COURT:**  Let's short-circuit this.  Why don't we

22    place a call tomorrow if I can get two of you in here again.

23         Mr. McConville, you were here the first time.  Who else

24    was with me?  Mr. Zeller?  Could you two meet me at, let's say,

25    7:30 or 8:00 o'clock, whatever is good for you so lead counsel can

1    sleep in a little bit.  And will you bring that number again?

2         **MR. MCCONVILLE:**  Yes.

3         **THE COURT:**  Let me call the judge first.  I just can't

4    recommend that highly enough.  Have him call her.  And then we'll

5    know.  And then if she is not willing to come, then I'll wrestle

6    with all the rest of the issues.  But you can expect the

7    depositional testimony is not going to be coming to this court.

8         Okay.  Now, two more questions I have got for you.  If

9    you can't sort out for me a stipulation to the exact curative

10   instruction that I need to give if Machado and MGA Mexico were

11   dismissed from this lawsuit as well as the scope of the evidence

12   in Mexico, and whether and in what context that may be referenced

13   during closing argument, then I'm not too certain I'm deciding

14   that rule 50 right now.

15        I just don't know.  And I need one more night to think

16   about that.  But I know your respective positions and now it's

17   split.  I thought at one time there was the possibility that there

18   would be a stipulation between the parties, so I delayed some of

19   that thought process and some of the work this weekend.

20        Finally, tonight, before I turn this over to you for any

21   lose strings that you want to address the Court on, Mattel had

22   filed a motion for reconsideration of the order on MGA's 43rd

23   motion in limine regarding the theft of nontrade secret

24   information.  I don't recall if MGA ever asked for a limiting

25   instruction on that issue.  And if you did, I need to look back

1    and find it.  And if you didn't, is the motion for reconsideration

2    moot.  In other words, I don't know where I stand on that motion

3    based upon the record.  I'm having a hard time going back and just

4    recalling it.  So I wanted to raise with each of you.

5              MS. HURST:  I think we did -- I mean, we asked that the

6    evidence be precluded.  That, I think, morphed into the copying

7    issue, the nonactionable copying issue, and the water has gone

8    under the bridge at this point on that issue.

9              THE COURT:  So is the motion for reconsideration moot?

10             MS. HURST:  I think so.

11             THE COURT:  I don't know.  Let me turn to Mattel.

12             MR. ZELLER:  I think that the motion for reconsideration

13   is moot to the extent that there is no longer a controversy that

14   nontrade secret information is relevant and admissible obviously

15   on a case-by-case basis, but there is just no longer the general

16   prohibition.

17             And, of course, I would add I think another changed

18   circumstance that's the now occurring in this court is that MGA is

19   bringing in such information as well.  I mean, there is obviously

20   a fair amount of information that MGA is putting in front of the

21   jury through these toy fair reports and the like, which there will

22   never be a showing that it's trade secret.

23             THE COURT:  Now, I'm more than willing to try to

24   preserve tonight don't.  I know you had a late night last night,

25   but if there is business that you need with me tonight, we can

Page 36

1   take it up now or you can go to dinner and come back.  But what do

2   you need to do right now to keep the case moving tomorrow other

3   than the briefs you just handed me on which I made you additional

4   copies of?

5           MS. HURST:  Mr. Vilppu, Your Honor.

6           THE COURT:  Why don't you give me each an extra copy.  I

7   wandered around with it for a moment.  If you have an extra copy,

8   give it to me.  I probably put it back in chambers when I went

9   back, but I'm not sure.

10          MR. PRICE:  We can also go over Mr. Villaseñor's -- the

11  supplemental exhibits we gave.

12          THE COURT:  That's right.  Is there anything in there

13  that is startling to Ms. Keller?

14          MS. KELLER:  No.  I still haven't had a chance today to

15  even look at it.

16          THE COURT:  You want to go over those right now?

17          MS. KELLER:  I'll look at it right now.

18          THE COURT:  Now, is there anything else that you need to

19  do this evening?

20          MS. HURST:  I don't think we have any slides or exhibits

21  for Vilppu from Mattel.  We don't have a binder from you for

22  Vilppu.

23          MR. QUINN:  I use my magic words, "abracadabra," there

24  it is.

25          THE COURT:  I saw it.  It's right there.  I'm just

Page 37

1   kidding.

2            When do you want to read this?  In other words, I'm not

3   going to intrude.  When you want to read this stipulation, just

4   read it.

5            **MR. MCCONVILLE:**  How about tomorrow morning first thing?

6            **THE COURT:**  Okay.  You remind me and both of you get up

7   and read it.  Okay.

8            What else do you need done tonight?  Otherwise, I'll try

9   to get you some sleep because that way you'll stay alert for

10  Wednesday and Thursday.

11           **MR. MCCONVILLE:**  I think the rest of the issues, Your

12  Honor, relate to exhibits and witnesses.  I don't know that we

13  need to do it on the record.

14           **MS. HURST:**  There is one issue that we have hanging out

15  there, not that we need to address tonight, but we need to get it

16  on calendar to be addressed, which is our motion for

17  reconsideration on the 205(d) defense.

18           **THE COURT:**  Okay.  Does that need to be done tonight?

19           MS. HURST:  No.

20           **THE COURT:**  Are you sure?

21           **MS. HURST:**  Yes.  Maybe Saturday.

22           **THE COURT:**  Saturday is great.  Saturday is the day that

23  you ought to be fairly well rested.  I have tried keep you up for

24  trial.

25           **MS. HURST:**  I appreciate it.

1        **THE COURT:**  Anything else?

2        **MS. KELLER:**  Your Honor, just a point of curiosity.

3   Looking at the two supplemental binders for Villaseñor, and

4   supplemental binder one, the whole thing appears to be the

5   deposition of Ron Brawer, and I'm wondering if I have got it wrong

6   or just not getting it.

7        **MR. ZELLER:**  That was our secret strategy of getting

8   that whole deposition in.

9        **THE COURT:**  That's a joke, for the record.

10        **MR. PRICE:**  There are two volumes of supplemental twos.

11   I think that's supplement --

12        **MS. KELLER:**  Was this just mislabeled.

13        **MR. PRICE:**  Yes.  I'm not going to -- apparently --

14        **MS. KELLER:**  So you have another supplement volume for

15   me?

16        **MR. PRICE:**  You do.  You have supplemental two.

17        **THE COURT:**  We can do that off the record.  Let me go

18   back to Mattel.

19        What is hanging -- oh.  I finally understand.

20   Concerning Erich Joachimstahler, the questions that Mr. Quinn

21   wanted to ask are entirely proper.  The only question that's not

22   from the first trial that he asked is the reference back to the

23   first trial.  You have got to remember -- and he is not going to

24   do that.

25        In the first trial, it was phase 1A and 1B, and they

1  were in 1B.  And Mr. Quinn was questioning back about the verdict

2  in 1A.  So I'm going to give you back your transcript.  It's

3  entirely appropriate.

4          **MS. HURST:**  Your Honor, they're asking to examine the

5  witness on hearsay.

6          **THE COURT:**  Thank you.  That's the ruling.

7          Now, the next is --

8          **MS. HURST:**  Your Honor, the Court had expressly

9  precluded us from doing that under 32(a)(2) with Mr. Wagner.

10         **THE COURT:**  I think that this is significantly

11 different, so now we're going to enter into a debate this evening,

12 and I'm going to prevail on this.  Not only is it limited, but

13 this witness specifically talked to Paula Garcia.  And the only

14 thing I'm not allowing is a walk-through of a final argument, and

15 that's not a walk-through of a final argument.

16         Finally, hearsay can be used.  This is such a limited

17 extent.  It's a percipient witness.  And he personally talked to

18 him.  So I'm done with that ruling now.  There is no further

19 comment.

20         What else is done --

21         **MR. MCCONVILLE:**  I recall one, Your Honor.

22         **THE COURT:**  No.  I'm with Mattel now.

23         **MR. PRICE:**  Your Honor, we filed a corrected offer of

24 proof regarding articles and press releases establishing timing of

25 public disclosure include of MGA's claimed trade secrets.

Page 40

1        **THE COURT:**  I haven't read that yet.  If you want to

2   give me a courtesy copy.  Did you file it today?

3        **MR. QUINN:**  This was filed on March 21.

4        **THE COURT:**  I didn't see it.  Today is the 22nd.  I

5   didn't see it today.  What else?  In other words, what keeps the

6   case going tomorrow?

7        **MR. ZELLER:**  As part of that, what we did to also

8   address just the issue and the concerns about the totality of

9   these articles, we have submitted them in redacted form.  So that

10  they are -- in our view they have the salient portion of the

11  articles that show what was public and when.

12       **THE COURT:**  So in other words, if I look at page 3, is

13  this the only thing I'd see, "Welcome to ASM's Toy Fair 2005

14  coverage MGA girls toy report?"

15       **MR. ZELLER:**  Right, of the redacted set.

16       **THE COURT:**  Is everything else redacted?

17       **MR. ZELLER:**  Yes.

18       **THE COURT:**  This is too confusing.  Just hold up 09859.

19  In other words, what I am not going to do is search through

20  hundreds or even tens of articles in a redacted form.

21       **MR. ZELLER:**  This one is a little unusual because we

22  have less redaction than most of them do.  That's because all of

23  that has been reproduced.  And the Court will recall that DEFCON

24  e-mail.  So we took out the portions that aren't --

25       **THE COURT:**  Okay.

1      **MR. MCCONVILLE:**  There is one other issue we discussed

2  at around lunchtime, which is the Court has ordered Susanna

3  Kuemmerle to appear March 24.  That's a standing order.  We have

4  discussed the parties agree that Ms. Kuemmerle does not need to be

5  here March 24, and have yet to discuss with them the date that

6  they would like to continue that order to.

7      **THE COURT:**  Right now she is coming on March 24.  Unless

8  I get a stipulation on the record by tomorrow, she is here.

9      **MR. MCCONVILLE:**  Okay.

10      **THE COURT:**  So, get together.  What day?

11      **MR. ZELLER:**  If I could have just the night to figure

12  out that because --

13      **THE COURT:**  Call her in the tomorrow morning.  That

14  gives you plenty of time.  Tomorrow is the 23rd.  Call her in the

15  morning.

16      Mr. Overland, good night.

17      Mr. Cote, good night.  Have a safe drive home.

18      What else keeps the case rolling tomorrow?  Who are our

19  witnesses after Mr. Sal Villaseñor.

20      **MR. MCCONVILLE:**  We have Mr. Vilppu.  We have Plunkett,

21  and Vollero, and then Mr. Larian.  We decided we do not need --

22      **MR. PRICE:**  Apparently there are 16 volumes of Larian.

23      **THE COURT:**  Aren't they the same volumes?

24      **MR. PRICE:**  I just asked.  McConville didn't know.

25      **MS. HURST:**  They're not the same because they're all the

Page 42

1   documents necessary to do the underlying support for our trade

2   secret chart which he is going to authenticate and describe.

3          THE COURT:  Okay.  How many days before he testifies?

4          MS. HURST:  I don't think we're going to get to him

5   tomorrow.  We're going to have -- Bill said he had two hours on

6   Villaseñor, and we'll have whatever we have.  Vilppu is going to

7   go a couple hours probably.  Then we have Plunkett and --

8          THE COURT:  But 16 volumes takes some time.  16 volumes

9   is like half a day minimally of work.  That's what we have been

10  doing Saturdays.  In fact, 16 volumes can take almost a whole day.

11  It's your choice.  Start on them tonight, but they're going to be

12  prepared.  And I'm not going to let him on the stand until we've

13  seen them.

14         MS. HURST:  Then I think we better start on them tonight

15  because he may get on tomorrow.

16         THE COURT:  No, he is not going on tomorrow.  Let me

17  help you.  You'd better get your witness order squared away

18  because at the last moment one night before he will not be taking

19  the stand tomorrow unless we've gone through these.

20         MS. HURST:  They got those binders two days ago.

21         THE COURT:  They got them last night they say.

22         MS. HURST:  Last night.  And we're putting him on at the

23  end of the day tomorrow.  So that's two days.

24         THE COURT:  No.  They got them last night.

25         MR. PRICE:  They originally said he was going on

Page 43

1    Thursday, I think.

2         THE COURT:  He is going on Thursday or Friday.  That's

3    when he is going on.  So now what are we going to do?  We're going

4    to have time to look at these binders.  I'm going to go to dinner

5    and then you're coming back.  I'd better hear something from

6    somebody because I'll just outwait you.

7         MS. HURST:  We wanted --

8         THE COURT:  I'm off the record now.  You two get up and

9    talk.  Okay?  I'm happy to spend all evening, but my lead counsel

10   are going to be dying.  That's up to you.

11        (Brief pause in proceedings)

12        THE COURT:  We're on the record.  I want to memorialize

13   the conversations that we have had informally concerning these

14   newspaper articles.

15        First, the Court agrees with Mattel that the articles

16   and press releases are not being offered for the truth of the

17   matter asserted.  They're instead being offered in an attempt to

18   establish that the information in MGA showrooms was not a secret

19   or minimally readily ascertainable.  But the press releases must

20   still be authenticated through either Mr. Larian, as we discussed,

21   Mr. Price, or Mr. Villaseñor.

22        Who can lay a foundation for their admission?  Because

23   the press releases are not necessarily through self-authentication

24   but they have the MGA stamp on them, there is some ambiguity in

25   the law.  I have asked the law clerks to do some research while we

Page 44

1    were out here typing, and I had a chance to quickly scan a case

2    called Trans-Tec, which I want you to look at.  Trans-Tec Asia

3    versus m/v Harmony Container, 435 F.Supp.2d 1015, 1031 note 20.

4    Central District of California.  My colleague in 2005, Judge

5    Wilson, wrote the following concerning that case.

6            So I think that there is enough for the newspaper --

7    strike that, for the press releases with the MGA stamp on it.  I

8    think there is enough if you ask Mr. Larian those questions.  The

9    question becomes Mr. Sal Villaseñor in terms of the press

10   releases.

11           Before I make a ruling, I want to switch to newspaper

12   articles and what Judge Peckman has been writing on the subject.

13   "Newspaper articles, on the other hand, need not be authenticated

14   under Federal Rule of Evidence 9026.  I refer you to Price versus

15   Rochford, 947 F.2d 829 at 833.  It's a Seventh Circuit 1991 case.

16   That renders them admissible if offered for nonhearsay purpose as

17   in this case.

18           But in Carson Harbor Village Limited versus Unocal

19   Corporation 287 F.Supp.2d 1118 and 1146 at 160, Judge Morrow

20   wrote, who is my colleague in the Central District in 2003.  "And

21   it appears that it does not excuse the offering party from its

22   burden of proving that the documents that it has identified as

23   newspaper articles are, in fact, purported newspaper articles

24   pronounced from a website do not bear the indicia of reliability

25   demanded for self-authenticating documents under Federal Rule of

Page 45

1    Evidence 902."

2            And I'm going to cite to you HomeStore.com Inc.

3    Securities Litigation 347 F.Supp.2d 769, 782, Central District

4    2004, Judge Peckman sitting by designation.

5            And there, it seems to indicate that Mattel would be

6    required to either supply the Court with the originals or summon

7    the webmaster or microfiche.

8            Now, here is the problem.  I think I mildly disagree

9    with both of my colleagues on that.  I don't think that it's

10   sufficient that you simply pull articles off of a website.  I

11   agree with Judge Morrow and Judge Peckman about that.  And I don't

12   see newspaper articles the same as I do press releases, which are

13   generated from one of the parties.  It has the MGA stamp, so I

14   think that the press releases are the easiest authentication issue

15   for Mattel to overcome.

16           And I think you can talk to Sal Villaseñor about those

17   and if he is aware of them.  But I think the hesitancy that Judge

18   Peckman speaks to, and Judge Morrow and Judge Wilson to some

19   extent, is at least the judges in the Central District are

20   concerned that witnesses get taken down a path of having a

21   newspaper article shown to them on the stand, and then the end

22   result is, the litmus answer is, "Oh.  Yeah, I read that.  I read

23   that.  I have read that.  I have read that."

24           The second problem is that the web itself is not

25   becoming an authenticating -- well, there is not the inherent

Page 46

1    credibility apparently with the web that the courts are seeking.

2            Now, all of that I mildly disagree with from my

3    colleagues.  But it's a mild disagreement.  And I think the safest

4    thing in this case is the uniqueness of Sal Villaseñor being

5    engaged in a finite effort to sneak into showrooms that of all the

6    people who would have some understanding of what he read or did,

7    it would be that very person.  This, after all, is not a witness

8    just getting up on the stand who might be a general employee of a

9    company and being shown a document, and that general employee

10   saying, "Oh, yeah, I think I might have read that in the L.A.

11   Times, and it came out in such-and-such a date."  After all, this

12   was his occupation.

13           And I think our facts are more conducive to what I'm

14   going to say is the appropriate remedy in this case that I

15   discussed with counsel informally rather than the formalistic

16   approach that you can read from Judge Morrow, Judge Wilson and

17   Judge Peckman.  And I mean that no criticism on my colleagues.  I

18   think their fact situations are different than our fact situation.

19           So therefore, you are going to be allowed to ask Sal

20   Villaseñor about press releases.  And if he can state to us that

21   he recognizes the press release and you're specific about the

22   date, I think that's a fair way to approach it.  If he can't, you

23   have got to move on.  Because Mr. Larian, after all, can supply

24   that.  And I'm going to hold Mr. Larian to, in fact, supplying

25   that.  And even if he can't with the MGA stamp, it seems rather

1    ridiculous that all those press releases, frankly, don't come

2    tumbling in.  I don't have the problem of what I call the internet

3    and the way-back machine problem.

4         So I think whether it's through Villaseñor on a selected

5    basis or Larian on a total basis, you are not going to have any

6    problems in terms of the press releases.  Understood?

7         **MR. PRICE:**  Yes.

8         **THE COURT:**  The most difficult is the one that Ms.

9    Keller raised informally with the Court, and that is the net.  And

10   there, Judge Peckman and Judge Morrow somewhat join together.  And

11   that is, that you are required usually to call a webmaster in, or

12   get microfiche, or present the original article.  Unfortunately, I

13   somewhat also mildly disagree with my three wiser and esteemed

14   colleagues on that.

15        I tend to be a little bit more liberal in terms of what

16   each side can present because, first, it's for a nonhearsay

17   purpose.  Second, its tailor-made towards the facts of this case.

18   This particular witness should certainly be aware of what he has

19   focused on in investigating rather than a general witness, which I

20   think is their case.

21        With the newspaper articles, if you can once again --

22   and here you have to be much more finite -- give me that date of

23   the article in relation to the toy fair, in relation to the fact

24   that the product hadn't come out, I think that's acceptable.  And

25   I don't think that I would be requiring the webmaster to come in.

Page 48

1    I don't think I would be requiring the microfiche.

2           But what happens if he doesn't recognize it?  What

3    happens if he says, "I don't know where this newspaper came from."

4    Or, "I can't remember."  Then I think that Judge Peckman, Judge

5    Wilson, Judge Morrow are correct, especially Judge Peckman in this

6    issue and Judge Morrow.  I think there if those newspaper articles

7    are coming in and they're simply prints off the web, then there is

8    awfully strong language from my colleagues.  And I think I do

9    subscribe that we have got to get a webmaster or somebody in here

10   to authenticate those, because the web isn't being accepted by

11   most of the courts.

12          So I think it's going to resolve itself, and I'll tell

13   you why I think it will.  I don't think you are going to care that

14   every one of the articles come in, just like Ms. Keller, as a

15   practical matter, doesn't care about every one of the documents

16   come in.  It's the selectivity that both of you are going to put

17   in front of the jury, frankly.  It would be the FOB prices that

18   are so unique from MGA's perspective that they couldn't be got

19   without sneaking into a showroom.

20          And from your perspective, it's some of the little

21   Bratz, the generalized name, the coming out with the product

22   although it doesn't contain the FOB that you need to get in front

23   of the jury also to show them that the names, some of the

24   accessories, the diamond, there is nothing unique about that, that

25   it was public information.  And the jury can balance.  In other

1   words, I think it's going to work out.  Okay.

2          So, I think that's the best ruling the Court can make

3   after doing some research.  And I think I'm right back to where I

4   started with the informal conversation.  Let's try it with Sal

5   Villaseñor.  Let's see how it goes for both of you.

6          Now I'll be right back.  Let me see if I can get to the

7   next gentleman.  Give me about 20 minutes okay, on Vilppu.  What

8   else to we need to do after I do that?  Otherwise, I want to send

9   you out for dinner and come back so you get a little bit of food.

10  Anything else this evening after I do Vilppu?

11         **MR. QUINN:**  I don't think so.

12         **MR. PRICE:**  Do you need both of us?

13         **THE COURT:**  Yes, I do.  Don't go away.

14         (Brief pause in proceedings.)

15         **THE COURT:**  Back on the record.  Counsel are present.

16         Concerning Mr. Vilppu, the Court has already ruled when

17  I ruled on the parties' motions in limine that Mr. Vilppu possess

18  both the expertise and the methodology required to make a

19  comparison between Bryant's works and the allegedly infringing

20  works.  And I reached the same conclusion, if Mattel recalls,

21  concerning your expert Lee Loetz.  In fact, I wrote quite a

22  lengthy in limine motion on both of these gentlemen and tried to

23  lay out the reasons why I thought they were qualified.

24         Mr. Vilppu is an artist with expertise in renaissance

25  art which Mattel argued strongly against.  And you have argued

1  that his opinion should be excluded.  And now harken back, because

2  I precluded other witnesses, including Frank Keiser and Heather

3  McComb from testifying about similarities or dissimilarities

4  between Bryant's works and the allegedly infringing works.

5         I want you to remember though, for both parties.  I only

6  categorically precluded testimony and opinions about the

7  similarities between Bryant's work and the dolls at issue in other

8  cases, including the cases filed in Hong Kong.  I precluded Mattel

9  witnesses Heather McComb and Frank Keiser from testifying about

10 similarities between the sketches of the dolls only because I felt

11 McComb lacked the expertise and I felt Keiser's methodology was

12 inadequate and unreliable.

13        I also allowed multiple lay witnesses, including Paula

14 Garcia thus far, and Margaret Leahy to compare the creative works

15 at issue upon determining that these witnesses had a proper

16 foundation to render such testimony.  But even that was somewhat

17 brief.

18        And to the extent you feel, Mr. Quinn or Mr. Price, that

19 you need to admit an expert opinion to rebut Vilppu's opinion,

20 I'll allow you to call Lee Loetz in rebuttal as you indicated that

21 you would prior to trial.  He has long been your key expert

22 witness on the copyright infringement.  He is the person I first

23 faced in the in limine motions.  His analysis was the only

24 analysis offered at the time of summary judgment.  And he has the

25 proper expertise in this area.  In other words, I believe he is

 1   qualified.  So I'm going to deny Mattel's motion.

 2          **MR. QUINN:**  Your Honor, just a couple of things.

 3          The Court precluded Mr. Price -- basically what he is

 4   going to say is that the dolls, first generation dolls are very

 5   dissimilar to the drawings.  This is a man who has never made a

 6   doll.  Has no -- admits he is incompetent at doll making.  His

 7   word.  He is not an expert at dolls, unlike Ms. Holcomb who's

 8   actually seen the process through numerous times.  So he is just

 9   going to give an opinion as an artist whether he thinks the

10   drawing -- as to the dissimilarities he sees between the drawings

11   and the dolls.

12          And the Court may recall that we were precluded from

13   asking Mr. Bryant if the dolls, in his opinion, were similar to

14   the drawings.  But if this is going to happen, Your Honor, I will

15   respectfully request that we be permitted to introduce the

16   evidence, the statements under oath that MGA has made in other

17   litigation that, in fact, the first generation dolls were based on

18   the drawings, and that other dolls which look much less like the

19   first generation dolls, according to MGA, are too close to the

20   drawings.

21          This is the subject I have been -- my particular

22   hobbyhorse for the last two months now.  But now we're now coming

23   to the nub of it because the man is going to get on the stand and

24   say these drawings and these dolls are dissimilar, and it's a

25   completely different position than MGA has taken elsewhere.

cb4c3241-e822-4b0b-a066-be3fd6566f09

Page 52

1            **THE COURT:**  Okay.  MGA?

2            **MS. HURST:**  Your Honor, first of all, the statements,

3     the factual statements about things being based on other things

4     were admitted already through Mr. Larian's testimony.  But we're

5     not just now coming to this issue.  Mr. Quinn has reargued this

6     Hong Kong issue no fewer than a dozen times.  It's a different

7     system loss and, most importantly, it's inconsistent with the

8     Ninth Circuit opinion.

9            They can call -- Ms. McComb was permitted, the Court

10    said five times during her examination she could describe the

11    development, the physical characteristics, the drawings.  The

12    Court actually said, expressly, she can make comparisons if she

13    wants to during the McComb examination.  So even apart from

14    calling Loetz the Court specifically said they can do it if they

15    want to.

16           They have crossed Paul Garcia and Margaret Leahy on

17    similarities.  They have crossed Mr. Larian on similarities.  They

18    have not been precluded from going into similarities.  This is --

19    it's clearly admissible and appropriate opinion testimony.  He is

20    absolutely qualified to come and testify about the depiction of

21    the human form in two and three dimensions.  He is absolutely one

22    of the world's leading experts on that subject.

23           And so they're -- he should not be excluded.  And we are

24    not opening the door to the accused products in Hong Kong by

25    offering testimony here about the first generation dolls and the

Page 53

1    drawings.

2              **MR. QUINN:**  Submitted, Your Honor.

3              **MS. HURST:**  Submitted.

4              **THE COURT:**  That's my final ruling.  Now, I look forward

5    to see Mr. Loetz in court also with Mr. Vilppu.  But short,

6    counsel.  Don't overextend these witnesses of the same thing is

7    going to happen that happened with McComb.

8              Have a good night.

9              (Whereupon the proceedings were adjourned at 7:42.)

10

11                             -oOo-

12

13                          CERTIFICATE

14

15         I hereby certify that pursuant to Section 753, Title 28,

16   United States Code, the foregoing is a true and correct transcript

17   of the stenographically reported proceedings held in the

18   above-entitled matter.

19

20   Date:  MARCH 23, 2011

21

22

23   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

24

25