1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                 - - - - - - -

5

   MATTEL, INC., et al.,              )
6                                      )
             Plaintiffs,               )
7                                      )
        vs.                            ) No. CV 04-9049 DOC
8                                      )    Day 38
   MGA ENTERTAINMENT, INC., et al.,    )    Volume 1 of 3
9                                      )
                                       )
10          Defendants.                )
   _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   Jury Trial

16              Santa Ana, California

17            Wednesday, March 23, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-23 D38V1

Case 2:04-cv-09049-DOC-RNB Document 10269 Filed 03/25/11 Page 2 of 138 Page ID #:311596
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3

            QUINN EMANUEL URQUHART & SULLIVAN
4           BY:   JOHN QUINN
                  WILLIAM PRICE
5                 MICHAEL T. ZELLER
                  Attorneys at Law
6           865 South Figueroa Street
            10th Floor
7           Los Angeles, California 90017
            (213) 443-3000

8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12          ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
            BY:   THOMAS S. McCONVILLE
13                Attorney at Law
            4 Park Plaza
14          Suite 1600
            Irvine, California 92614
15          (949) 567-6700

16          - AND -

17          ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
            BY:   ANNETTE L. HURST
18                Attorney at Law
            405 Howard Street
19          San Francisco, California 94105
            (415)773-5700

20          - AND -

21          KELLER RACKAUCKAS
22          BY:   JENNIFER KELLER
                  Attorney at Law
23          18500 Von Karman Avenue
            Suite 560
24          Irvine, California 92612
            (949) 476-8700

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
            LAW OFFICES OF MARK E. OVERLAND
5           By:  MARK E. OVERLAND
                 Attorney at Law
6           100 Wilshire Boulevard
            Suite 950
7           Santa Monica, California 90401
            (310) 459-2830
8
            - AND -
9
            SCHEPER KIM & HARRIS LLP
10          BY:  ALEXANDER H. COTE
                 Attorney at Law
11          601 West 5th Street
            12th Floor
12          Los Angeles, California 90071
            (213) 613-4660
13

14   ALSO PRESENT:

15          MGA ENTERTAINMENT, INC.
            BY:  JEANINE PISONI
16               Attorney at Law
            16360 Roscoe Boulevard
17          Suite 105
            Van Nuys, California 91406
18

19          ROBERT A. ECKERT, MATTEL CEO

20          ISAAC LARIAN, MGA CEO

21          KEN KOTARSKI, Mattel Technical Operator

22          MIKE STOVALL, MGA Technical Operator

23          RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

1

2                              **I N D E X**

3    **MGA'S WITNESSES           DIRECT  CROSS  REDIRECT  RECROSS**

4    VILLASENOR, Sal

5    By Ms. Keller              6
     (Continued)

6    By Mr. Price                           45

7

8                              **EXHIBITS**

9    **EXHIBIT NO.              IDENTIFICATION        IN EVIDENCE**

10     9274    E-mail string re                       124
               "MGA/Bratz Update"

11
       9293    E-mail exchange between                70
12             Mr. Villasenor and
               Mr. Machado

13
       9510    E-mail                                 70

14
       9511    E-mail chain from                      70
15             Mr. Villasenor in
               january 2003

16
       9640    Document on how to get                 10
17             into toy fairs using
               false identification

18
       16005   November 2001                          49
19             Boys/Entertainment
               organizational chart

20
       16008   September 2002                         53
21             Boys/Entertainment
               organizational chrt

22
       16786   Press release by MGA                   94
23             dated 2/8/2001
               (conditionally received)

24
       16786   Press Release by MGA                   102
25             dated 2/8/2001

```
1                      EXHIBITS (Continued)

2     EXHIBIT NO.                IDENTIFICATION      IN EVIDENCE

3
         20951    License! magazine page                      108
4
         21233-00077  Kidscreen magazine                       104
5              page

6        21235    Kidscreen magazine page                      112

7        23890    Reuters page                                 116

8        27464-94  Business card of                             20
               Michael Moore
9
         36023   Business card                                  83
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB  Document 10269  Filed 03/25/11  Page 6 of 138  Page ID #:311600
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

6

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 23, 2011**                  |
|       | 2  | **Day 38, Volume 1 of 3**                                            |
|       | 3  | (8:37 a.m.)                                                           |
| 08:37 | 4  | *(In the presence of the jury.)*                                     |
| 08:38 | 5  | THE COURT:  All right.  We're back in session.                       |
| 08:38 | 6  | The jury's present.  The alternates are present.                     |
| 08:38 | 7  | All counsel and the parties.                                         |
| 08:38 | 8  | Counsel, thank you for your courtesy.  If you'd                      |
| 08:38 | 9  | please be seated.                                                    |
| 10:21 | 10 | This is the continued direct examination by                          |
| 08:38 | 11 | Ms. Keller on behalf of MGA and Mr. Larian.                          |
| 08:38 | 12 | MS. KELLER:  Thank you, Your Honor.                                  |
|       | 13 | **SALVADOR VILLASENOR, MGA'S WITNESS, PREVIOUSLY SWORN,**            |
|       | 14 | **RESUMED THE STAND**                                                |
| 08:38 | 15 | **DIRECT EXAMINATION (Resumed)**                                     |
| 08:38 | 16 | BY MS. KELLER:                                                        |
| 08:38 | 17 | Q.   Good morning, Mr. Villasenor.                                    |
| 08:38 | 18 | A.   Good morning.                                                    |
| 08:38 | 19 | Q.   Mr. Villasenor, when we broke yesterday, we were                |
| 08:38 | 20 | looking at Exhibit 36028.  We had been looking at                    |
| 08:38 | 21 | Exhibit 36028-5.                                                      |
| 08:38 | 22 | A.   Can I interrupt for a second?  Is it possible for me to         |
| 08:38 | 23 | make a correction to something I said yesterday?                     |
| 08:38 | 24 | THE COURT:  I think they both are gonna ask you                      |
| 08:38 | 25 | questions, so if either one of them want that to occur, let          |

| | | |
|---|---|---|
| 08:38 | 1 | them ask you.  Okay? |
| 08:38 | 2 | BY MS. KELLER: |
| 08:38 | 3 | Q.   Mr. Villasenor looking at Exhibit 36028, and |
| 08:38 | 4 | specifically, let's turn to page 5. |
| 08:39 | 5 | *(Document displayed.)* |
| 08:39 | 6 | BY MS. KELLER: |
| 08:39 | 7 | Q.   This is the Mattel handout describing how to get into |
| 08:39 | 8 | toy fairs using false identification, correct? |
| 08:39 | 9 | A.   That's what it appears to be. |
| 08:39 | 10 | Q.   And this was the document that you actually had in your |
| 08:39 | 11 | possession that you had gotten from Mattel, not that you |
| 08:39 | 12 | created yourself, right? |
| 08:39 | 13 | A.   That is correct. |
| 08:39 | 14 | Q.   And under "what to know" -- it says New York Toy Fair |
| 08:39 | 15 | at the top, and then it tells how to register.  And then |
| 08:39 | 16 | under "what to know," we had already gone into the before |
| 08:39 | 17 | you got there part. |
| 08:39 | 18 |      Now, underneath that, it says, "Once you're there |
| 08:39 | 19 | coordinate with your partner -- generally, two people from |
| 08:39 | 20 | the research department attend the NYTF -- as to what floors |
| 08:39 | 21 | of the toy building each person will go to so you don't |
| 08:39 | 22 | duplicate efforts.  Once you've gone to a manufacturer, ask |
| 08:40 | 23 | them if you can have a tour of their showroom.  If they are |
| 08:40 | 24 | full, then make an appointment to come back at a later |
| 08:40 | 25 | time/date.  Manufacturers also accept appointment |

Case 2:04-cv-09049-DOC-RNB  Document 10269  Filed 03/25/11  Page 8 of 138  Page ID #:311602
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:40 | 1 | reservations prior to toy fair; however, it's best that you |
| 08:40 | 2 | make them while you are at -- there, in case they want to |
| 08:40 | 3 | run a background check on your store; i.e., if you've bought |
| 08:40 | 4 | from them before, et cetera." |
| 08:40 | 5 | So what this is telling you, or anyone who has this |
| 08:40 | 6 | handout is that you don't want to try to make the |
| 08:40 | 7 | appointment in advance because they might find out that your |
| 08:40 | 8 | identity is false, right? |
| 08:40 | 9 | A.   That's what it appears to say, correct. |
| 08:40 | 10 | Q.   And let's look at page 6. |
| 08:40 | 11 | (Document displayed.) |
| 08:40 | 12 | BY MS. KELLER: |
| 08:40 | 13 | Q.   This describes business cards, and at the top it says, |
| 08:40 | 14 | "where."  Describes the local Kinko's.  And then under "time |
| 08:41 | 15 | frame," it tells you that you should give them at least a |
| 08:41 | 16 | week to design and print, tells them how much they will |
| 08:41 | 17 | cost.  And then at the bottom, under "what to include," it |
| 08:41 | 18 | says, "Name," you should always use your own name since you |
| 08:41 | 19 | usually need to present your business cards with a picture |
| 08:41 | 20 | ID, driver's license. |
| 08:41 | 21 | But we learned yesterday that you sometimes used a |
| 08:41 | 22 | different name, right? |
| 08:41 | 23 | A.   That is correct. |
| 08:41 | 24 | Q.   And under "address," it says, "Use your home address in |
| 08:41 | 25 | case the manufacturers want to send you materials.  If you |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 9 of 138   Page ID #:311603
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:41 | 1 | live in an apartment, call it suite or just put the number |
| 08:41 | 2 | sign in front of it rather than apartment." |
| 08:41 | 3 | And the point of that was so that the manufacturer |
| 08:41 | 4 | would not know that -- so the manufacturer would think it |
| 08:41 | 5 | was a business address, right? |
| 08:41 | 6 | A.   I'm not sure about that. |
| 08:41 | 7 | Q.   And under "phone number," it says, "You can either put |
| 08:41 | 8 | down your home phone or make up a fake number.  Just don't |
| 08:41 | 9 | put down your Mattel number." |
| 08:42 | 10 | And then, if we go to page 7. |
| 08:42 | 11 | *(Document displayed.)* |
| 08:42 | 12 | BY MS. KELLER: |
| 08:42 | 13 | Q.   Oh, I'm sorry, on page -- page -- yeah, page 7 of this |
| 08:42 | 14 | exhibit, there's a space here for examples of two kinds of |
| 08:42 | 15 | business cards. |
| 08:42 | 16 | Q.   One "Retailer Business Card:  Best for toy fairs."  And |
| 08:42 | 17 | one "Press Business Card:  Best for E." |
| 08:42 | 18 | And the "E," again, stood for the electronics fair? |
| 08:42 | 19 | A.   Correct. |
| 08:42 | 20 | Q.   Now, if we go to Exhibit 9640. |
| 08:42 | 21 | *(Document provided to the witness.)* |
| 08:42 | 22 | BY MS. KELLER: |
| 08:42 | 23 | Q.   You see that this is the same document as we've just |
| 08:43 | 24 | been looking, here, 36028, except this document has the |
| 08:43 | 25 | little M stamp for Mattel, and the one we've just been |

| 08:43 | 1 | looking at had VILS, showing it was produced by you, |
| 08:43 | 2 | correct? |
| 08:43 | 3 | A.   That's correct. |
| 08:43 | 4 | MS. KELLER:  Your Honor, I'd move 9640 into |
| 08:43 | 5 | evidence. |
| 08:43 | 6 | THE COURT:  Received. |
| 08:43 | 7 | *(Exhibit No. 9640 received in evidence.)* |
| 08:43 | 8 | *(Document displayed.)* |
| 08:43 | 9 | BY MS. KELLER: |
| 08:43 | 10 | Q.   So this document from Mattel files is essentially the |
| 08:43 | 11 | master document from which you got your copy? |
| 08:43 | 12 | A.   I don't know. |
| 08:43 | 13 | MR. PRICE:  Object.  Lack of foundation on that. |
| 08:43 | 14 | MS. KELLER:  Okay.  I'll rephrase. |
| 08:43 | 15 | THE COURT:  I was going to sustain, but that's -- |
| 08:43 | 16 | just rephrase it. |
| 08:43 | 17 | BY MS. KELLER: |
| 08:43 | 18 | Q.   So you've previously testified that Mattel knew all |
| 08:43 | 19 | along exactly what you had been doing when you used fake |
| 08:43 | 20 | ID's and fake business cards to get into competitors' |
| 08:44 | 21 | private showrooms and take confidential information, right? |
| 08:44 | 22 | MR. PRICE:  Your Honor, I object.  That misstates |
| 08:44 | 23 | the testimony.  Overbroad. |
| 08:44 | 24 | THE COURT:  Instead of restating the question, |
| 08:44 | 25 | just ask a question, Counsel.  That's a summary.  You can |

| | | |
|---|---|---|
| 08:44 | 1 | argue that. |
| 08:44 | 2 | BY MS. KELLER: |
| 08:44 | 3 | Q.   Your boss and Matt Bousquette, president of Mattel, |
| 08:44 | 4 | knew all along what you had been doing when you used fake |
| 08:44 | 5 | ID's and business cards to get into competitors' private |
| 08:44 | 6 | showrooms and steal confidential information, right? |
| 08:44 | 7 | MR. PRICE:  Objection.  Lack of foundation. |
| 08:44 | 8 | THE COURT:  Overruled. |
| 08:44 | 9 | THE WITNESS:  That is correct. |
| 08:44 | 10 | BY MS. KELLER: |
| 08:44 | 11 | Q.   And various other people that we discussed yesterday |
| 08:44 | 12 | within Mattel also knew about it, correct? -- including some |
| 08:44 | 13 | of the people you worked with going into the toy fairs? |
| 08:44 | 14 | A.   That is correct, but I don't know if "stealing" is the |
| 08:44 | 15 | right word to use. |
| 08:44 | 16 | Q.   Okay.  I'll rephrase that, then. |
| 08:44 | 17 | Using fake credentials to go in and get information |
| 08:44 | 18 | from competitors' private showrooms.  Is that -- |
| 08:44 | 19 | A.   That's correct. |
| 08:45 | 20 | Q.   Okay.  Now, we also talked yesterday about the fact |
| 08:45 | 21 | that this practice of misrepresenting yourself to get this |
| 08:45 | 22 | information was stressful to you; is that right? |
| 08:45 | 23 | A.   That is correct. |
| 08:45 | 24 | Q.   And that was -- that was real stress, not made up |
| 08:45 | 25 | stress, right? |

| | | |
|---|---|---|
| 08:45 | 1 | A.    No.  It was real stress. |
| 08:45 | 2 | Q.    And part of that was that you thought the practice was |
| 08:45 | 3 | simply wrong, right? |
| 08:45 | 4 | A.    I -- I wasn't sure exactly how to feel about it at the |
| 08:45 | 5 | time. |
| 08:45 | 6 | Q.    Well, you were uncomfortable with it, right? |
| 08:45 | 7 | MR. PRICE:  I'm going to object as to time frame. |
| 08:45 | 8 | Vague. |
| 08:45 | 9 | THE COURT:  Overruled. |
| 08:45 | 10 | BY MS. KELLER: |
| 08:45 | 11 | Q.    You were uncomfortable with it? |
| 08:45 | 12 | A.    There was times where I was. |
| 08:45 | 13 | Q.    But you did it anyway because you thought you wouldn't |
| 08:45 | 14 | have a job if you didn't do it, true? |
| 08:45 | 15 | A.    It was part of my job. |
| 08:45 | 16 | Q.    But you thought if you didn't do it, you wouldn't have |
| 08:45 | 17 | a job, right? |
| 08:45 | 18 | A.    There was a chance that could happen. |
| 08:45 | 19 | Q.    And you got even more stressed out after you got a new |
| 08:45 | 20 | boss in 2005, named John Louie, right? |
| 08:46 | 21 | A.    That is correct. |
| 08:46 | 22 | Q.    Mr. Louie told you he wanted you to keep getting |
| 08:46 | 23 | competitors' information, but without misrepresenting |
| 08:46 | 24 | yourself, right? |
| 08:46 | 25 | A.    That is correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 13 of 138   Page ID #:311607
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

13

| | | |
|---|---|---|
| 08:46 | 1 | Q.   And that was after this lawsuit was filed, right? |
| 08:46 | 2 | MR. PRICE:  Objection.  Lack of foundation. |
| 08:46 | 3 | THE COURT:  Overruled. |
| 08:46 | 4 | THE WITNESS:  Not exactly sure on the timing. |
| 08:46 | 5 | BY MS. KELLER: |
| 08:46 | 6 | Q.   Well, in December 2005, you wrote to senior executives |
| 08:46 | 7 | at Mattel about the situation, right? |
| 08:46 | 8 | A.   There was -- there was a letter sent out, correct. |
| 08:46 | 9 | Q.   Well, that letter was signed by you, right? |
| 08:46 | 10 | A.   I think, correct. |
| 08:46 | 11 | Q.   And let's look at -- in fact, this was an e-mail from |
| 08:46 | 12 | you to Bob Normile and Mark Kimball on December 22nd, 2005. |
| 08:47 | 13 | MS. KELLER:  And, Your Honor, I think this is |
| 08:47 | 14 | already in evidence, Exhibit 9484-R. |
| 08:47 | 15 | *(Document displayed.)* |
| 08:47 | 16 | BY MS. KELLER: |
| 08:47 | 17 | Q.   Do you recognize this letter? |
| 08:47 | 18 | A.   Correct.  And it's not signed, by the way. |
| 08:47 | 19 | Q.   Yeah.  It just says, "Very truly yours, Sal Villasenor" |
| 08:47 | 20 | at the bottom, right? |
| 08:47 | 21 | A.   It does. |
| 08:47 | 22 | Q.   And at the top it says, "From Sal Villasenor"? |
| 08:47 | 23 | A.   Correct. |
| 08:47 | 24 | Q.   Sent Thursday December 22, 2005? |
| 08:47 | 25 | A.   That is correct. |

| 08:47 | 1 | Q. "To Bob Normile." Who was he at the time? |
| 08:47 | 2 | A. The -- I think he was the head attorney at Mattel. |
| 08:47 | 3 | Q. Mark Kimball. Who was he at the time? |
| 08:47 | 4 | A. Head of HR. |
| 08:47 | 5 | Q. CC Michael Moore. Another attorney at Mattel? |
| 08:47 | 6 | A. That is correct. |
| 08:47 | 7 | Q. And Bob Normile's title was general counsel, head |
| 08:47 | 8 | lawyer? |
| 08:47 | 9 | A. I don't remember his exact title. |
| 08:47 | 10 | Q. And the reason you copied Michael Moore is because you |
| 08:48 | 11 | had already met Mr. Moore, right? |
| 08:48 | 12 | A. That is correct. |
| 08:48 | 13 | Q. And in the letter it says, "I have also been approached |
| 08:48 | 14 | by Mattel's attorneys, Michael Moore" -- and then there's |
| 08:48 | 15 | something redacted. There was -- you also met with Mattel's |
| 08:48 | 16 | outside counsel? |
| 08:48 | 17 | A. That is correct. |
| 08:48 | 18 | Q. And that was the outside counsel handling this MGA |
| 08:48 | 19 | case? |
| 08:48 | 20 | MR. PRICE: Objection, Your Honor. |
| 08:48 | 21 | THE COURT: Sustained. |
| 08:48 | 22 | THE WITNESS: I think so. |
| 08:48 | 23 | MR. PRICE: Move to strike. |
| 08:48 | 24 | THE COURT: Stricken. |
| | 25 | |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

15

| 08:48 | 1 | BY MS. KELLER: |
| 08:48 | 2 | Q.   And then it says, "who have," and then there's another |
| 08:48 | 3 | redaction.  "This event activity and the fact that the |
| 08:48 | 4 | tradeshows are fast approaching has forced me to evaluate my |
| 08:48 | 5 | role in the company." |
| 08:48 | 6 | And you begin here by identifying yourself as the |
| 08:48 | 7 | Manager of Market Intelligence, right? |
| 08:48 | 8 | A.   That is correct. |
| 08:48 | 9 | MR. PRICE:  Your Honor, may I request instruction? |
| 08:49 | 10 | This letter is not for the truth -- or the e-mail. |
| 08:49 | 11 | THE COURT:  Well, I'm not certain about that, |
| 08:49 | 12 | Counsel.  The letter itself is potentially hearsay and not |
| 08:49 | 13 | for the truth of matter, but I also have the witness on the |
| 08:49 | 14 | stand testifying to this letter. |
| 08:49 | 15 | MR. PRICE:  I understand. |
| 08:49 | 16 | THE COURT:  So I -- I don't think I'm going to |
| 08:49 | 17 | give that instruction at this time. |
| 08:49 | 18 | You may proceed, Counsel. |
| 08:49 | 19 | BY MS. KELLER: |
| 08:49 | 20 | Q.   So this letter identifies you in the first line as the |
| 08:49 | 21 | Manager of Market Intelligence, right? |
| 08:49 | 22 | A.   That is correct. |
| 08:49 | 23 | Q.   And as we've discussed that was a recognized group |
| 08:49 | 24 | within Mattel, right? |
| 08:49 | 25 | A.   That is correct. |

| 08:49 | 1 | Q.   And as we've seen, for example, with HR's documents |
| 08:49 | 2 | showing your promotions and raises, this was the group you |
| 08:49 | 3 | were assigned to at the time, right? |
| 08:49 | 4 | A.   That is correct. |
| 08:49 | 5 | Q.   And you write, "I believe that my work conditions have |
| 08:49 | 6 | become intolerable, and I am writing to complain about |
| 08:49 | 7 | Mattel's directives and instructions to gather market |
| 08:50 | 8 | intelligence from competitors through unlawful means." |
| 08:50 | 9 | What you were referring to here is this practice that |
| 08:50 | 10 | we've been talking about of getting catalogs and |
| 08:50 | 11 | confidential price lists from the private showrooms of |
| 08:50 | 12 | Mattel's competitors by misrepresenting your identity and |
| 08:50 | 13 | posing as either a retailer or member of the press, right? |
| 08:50 | 14 | A.   That is correct. |
| 08:50 | 15 | Q.   And when you used the words "directives and |
| 08:50 | 16 | instructions," you were referring to the fact that your |
| 08:50 | 17 | supervisor at Mattel had directed and instructed you to |
| 08:50 | 18 | gather confidential information through unlawful means, |
| 08:50 | 19 | correct? |
| 08:50 | 20 | MR. PRICE:  Objection.  Vague as to which |
| 08:50 | 21 | supervisor and also as to "unlawful." |
| 08:50 | 22 | THE COURT:  Overruled. |
| 08:50 | 23 | THE WITNESS:  Correct.  Through unethical means, |
| 08:50 | 24 | correct. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 17 of 138   Page ID #:311611
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

17

| | | |
|---|---|---|
| 08:50 | 1 | BY MS. KELLER: |
| 08:50 | 2 | Q.   And the next thing you wrote was, "I no longer wish to |
| 08:50 | 3 | engage in misrepresentations and undercover assignments in |
| 08:50 | 4 | which I am paid by Mattel to attend tradeshows and events." |
| 08:50 | 5 |     And you wrote that because Mattel had, in fact, paid |
| 08:51 | 6 | you and it was part of your job -- well, you wrote that |
| 08:51 | 7 | because Mattel had paid you and it was part of your job to |
| 08:51 | 8 | attend tradeshows where you misrepresented yourself to get |
| 08:51 | 9 | confidential information, right? |
| 08:51 | 10 | A.   That's correct. |
| 08:51 | 11 | Q.   And the next sentence you wrote says, "I fear my |
| 08:51 | 12 | actions may expose me to personal criminal liability, and I |
| 08:51 | 13 | am stressed about the fallout that may occur" -- which -- |
| 08:51 | 14 | "the fallout which may occur." |
| 08:51 | 15 |     And you were being honest when you said that, weren't |
| 08:51 | 16 | you? |
| 08:51 | 17 | A.   That is correct. |
| 08:51 | 18 | Q.   And you next wrote, "My conscience does not allow me to |
| 08:51 | 19 | continue in this role, and I do not feel I can take the |
| 08:51 | 20 | pressure to engage in misrepresentations any longer." |
| 08:51 | 21 |     And the pressure you were feeling was coming from your |
| 08:52 | 22 | supervisor, right? |
| 08:52 | 23 | A.   Are you referring to John Louie? |
| 08:52 | 24 | Q.   To either him or to or to other people higher than he. |
| 08:52 | 25 | A.   Mainly John Louie, correct. |

Case 2:04-cv-09049-DOC-RNB  Document 10269  Filed 03/25/11  Page 18 of 138  Page ID #:311612
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

18

| | | |
|---|---|---|
| 08:52 | 1 | Q.   And you next wrote, "I know that Mattel has gained a |
| 08:52 | 2 | superior competitive advantage through my hard work." |
| 08:52 | 3 | And the superior competitive advantage that you were |
| 08:52 | 4 | talking about means that Mattel was getting insight about |
| 08:52 | 5 | what was coming down the pipeline of other companies before |
| 08:52 | 6 | that information became public, right? |
| 08:52 | 7 | A.   Something like that. |
| 08:52 | 8 | Q.   Well, yesterday we saw an e-mail from Matt Turetzky to |
| 08:52 | 9 | you, dated November 12, 2004, where he told you that just |
| 08:52 | 10 | getting one particular price list had saved Mattel a million |
| 08:52 | 11 | dollars.  Do you remember that? |
| 08:52 | 12 | A.   I do. |
| 08:52 | 13 | Q.   And is that the sort of thing you were referring to |
| 08:52 | 14 | when you talk about the superior competitive advantage? |
| 08:52 | 15 | A.   That could have been part of it, correct. |
| 08:53 | 16 | Q.   Now, this Exhibit 9484-R was copied to Michael Moore. |
| 08:53 | 17 | When it says, "I also been approached by Mattel's attorneys, |
| 08:53 | 18 | Michael Moore and --" redacted -- "who have --" redacted, |
| 08:53 | 19 | and them it says, "this recent activity and the fact that |
| 08:53 | 20 | the trade shows are fast approaching has forced me to |
| 08:53 | 21 | evaluate my role with the company." |
| 08:53 | 22 | This e-mail, as we've said, was written December 22, |
| 08:53 | 23 | 2005, right? |
| 08:53 | 24 | A.   That is correct. |
| 08:53 | 25 | Q.   Hong Kong Toy Fair was coming up in January '06, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 19 of 138   Page ID #:311613
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

19

| 08:53 | 1 | A.   Not sure what month Hong Kong was. |
| 08:53 | 2 | Q.   New York Toy Fair was coming up in February; 06? |
| 08:53 | 3 | A.   That is correct. |
| 08:53 | 4 | Q.   Nuremberg Toy Fair was coming up in March '06? |
| 08:53 | 5 | A.   Not sure on the month.  Don't remember the month. |
| 08:54 | 6 | Q.   Well, you knew some toy fairs were approaching, right? |
| 08:54 | 7 | A.   That is correct. |
| 08:54 | 8 | Q.   And at least up until the date of this e-mail, you had |
| 08:54 | 9 | continued the practice of using a false identity to get into |
| 08:54 | 10 | the trade shows, right? |
| 08:54 | 11 | MR. PRICE:  Object.  Vague as to time. |
| 08:54 | 12 | THE COURT:  Overruled. |
| 08:54 | 13 | THE WITNESS:  That is correct. |
| 08:54 | 14 | BY MS. KELLER: |
| 08:54 | 15 | Q.   And this e-mail says you had been approached by |
| 08:54 | 16 | Mattel's attorneys, including Michael Moore, right? |
| 08:54 | 17 | And you had, in fact, met with him before writing this |
| 08:54 | 18 | e-mail, hadn't you? |
| 08:54 | 19 | A.   That is correct. |
| 08:54 | 20 | Q.   And if we look at 27464-94. |
| 08:54 | 21 | *(Document provided to the witness.)* |
| 08:54 | 22 | BY MS. KELLER: |
| 08:54 | 23 | Q.   This is actually Michael Moore's business card that you |
| 08:54 | 24 | produced in this litigation, right? |
| 08:54 | 25 | A.   That is correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 20 of 138   Page ID #:311614
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

20

| | | |
|---|---|---|
| 08:54 | 1 | MS. KELLER:  Move to admit 27464-00094, |
| 08:54 | 2 | Your Honor. |
| 08:54 | 3 | THE COURT:  Received. |
| 08:55 | 4 | *(Exhibit No. 27464-94 received in evidence.)*, |
| 08:55 | 5 | MR. PRICE:  Object on relevance. |
| 08:55 | 6 | THE COURT:  Received. |
| 08:55 | 7 | *(Document displayed.)* |
| 08:55 | 8 | BY MS. KELLER: |
| 08:55 | 9 | Q.   And you got this from Mr. Moore, and you provided this |
| 08:55 | 10 | to MGA when you were subpoenaed for documents, right? |
| 08:55 | 11 | A.   That is correct. |
| 08:55 | 12 | Q.   Is it your testimony that you met with Michael Moore |
| 08:55 | 13 | only once or twice before writing this e-mail, or was it |
| 08:55 | 14 | more? |
| 08:55 | 15 | A.   Not sure exactly how many times.  Definitely we met |
| 08:55 | 16 | once. |
| 08:55 | 17 | Q.   Could it have been eight to ten times? |
| 08:55 | 18 | A.   I don't remember exactly how many times. |
| 08:55 | 19 | Q.   Was it a lot of times? |
| 08:55 | 20 | A.   No, it wasn't a lot of times. |
| 08:55 | 21 | Q.   At your deposition September 13, 2010, please take a |
| 08:55 | 22 | look at page 429, lines 5 through 8. |
| 08:55 | 23 | *(Document provided to the witness.)* |
| 08:55 | 24 | BY MS. KELLER: |
| 08:55 | 25 | Q.   Page 429, lines 5 through 8.  Have you had a chance to |

| | | |
|---|---|---|
| 08:56 | 1 | look at that? |
| 08:56 | 2 | A.   I did. |
| 08:56 | 3 | Q.   Did you meet with Mr. Moore once or twice or more like |
| 08:56 | 4 | eight to ten times before writing this e-mail? |
| 08:56 | 5 | MR. PRICE:  Your Honor, I object if that's the |
| 08:56 | 6 | question.  She should read the question and answer.  This is |
| 08:56 | 7 | not impeaching. |
| 08:56 | 8 | THE COURT:  It's not impeaching.  It's used for |
| 08:56 | 9 | refreshing recollection apparently. |
| 08:56 | 10 | MR. PRICE:  And he said exactly that, so he |
| 08:56 | 11 | doesn't need it. |
| 08:56 | 12 | THE COURT:  You can ask him if this refreshes his |
| 08:56 | 13 | recollection, Counsel. |
| 08:56 | 14 | BY MS. KELLER: |
| 08:56 | 15 | Q.   Well, on how many occasions had you met with Michael |
| 08:56 | 16 | Moore before writing this December e-mail? |
| 08:56 | 17 | A.   I -- I don't remember the exact number of times. |
| 08:56 | 18 | Q.   Was it once or twice? |
| 08:56 | 19 | A.   Well, here I stated, "Once or twice.  I don't remember |
| 08:56 | 20 | the exact number." |
| 08:56 | 21 | Q.   But would you agree with me there's quite a difference |
| 08:57 | 22 | between once or twice versus eight to ten? |
| 08:57 | 23 | MR. PRICE:  It's argumentative, Your Honor. |
| 08:57 | 24 | THE COURT:  No.  Overruled.  Well, it infers, |
| 08:57 | 25 | though, that there's eight to ten.  There's no evidence of |

| 08:57 | 1 | that at the present time. |
| 08:57 | 2 | So reask the question. |
| 08:57 | 3 | MS. KELLER:  I do have a good faith basis for it, |
| 08:57 | 4 | Your Honor. |
| 08:57 | 5 | THE COURT:  I'll let you ask the question, then, |
| 08:57 | 6 | but is there some other document that I should be looking |
| 08:57 | 7 | at? |
| 08:57 | 8 | MS. KELLER:  There's another witness, Your Honor. |
| 08:57 | 9 | THE COURT:  Well, we'll see.  I'm going to strike |
| 08:57 | 10 | the colloquy between the Court and counsel. |
| 08:57 | 11 | I'll let you ask the question. |
| 08:57 | 12 | BY MS. KELLER: |
| 08:57 | 13 | Q.   Was it once or twice or more like eight to ten times? |
| 08:57 | 14 | A.   Once again, I don't remember how many times, but it's |
| 08:57 | 15 | closer to once or twice. |
| 08:57 | 16 | Q.   Now, you met with Michael Moore before sending this |
| 08:57 | 17 | e-mail after you had received a phone call asking you to |
| 08:57 | 18 | come up to the 15th floor to talk about something, right? |
| 08:57 | 19 | A.   That is correct. |
| 08:57 | 20 | Q.   And you don't know how much before that e-mail you were |
| 08:57 | 21 | asked to come up to the 15th floor, right? |
| 08:58 | 22 | A.   That is correct. |
| 08:58 | 23 | Q.   But when you went to the 15th floor, you weren't |
| 08:58 | 24 | seeking any legal advice from Mr. Moore, right? |
| 08:58 | 25 | A.   No, I was not. |

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

23

| | | |
|---|---|---|
| 08:58 | 1 | Q.   And he wasn't providing you with any, was he? |
| 08:58 | 2 | A.   I don't think so. |
| 08:58 | 3 | Q.   You just went up and answered his questions? |
| 08:58 | 4 | A.   That is correct. |
| 08:58 | 5 | Q.   And at the time of this e-mail, you were nervous about |
| 08:58 | 6 | some issues raised in pending litigation against Mattel, |
| 08:58 | 7 | right? |
| 08:58 | 8 | A.   That is correct. |
| 08:58 | 9 | Q.   And, in fact, the pending litigation you were nervous |
| 08:58 | 10 | about was this litigation with MGA, right? |
| 08:58 | 11 | A.   Bear with me, I'm trying to remember. |
| 08:58 | 12 | Q.   Would it help for you to take a look at your |
| 08:58 | 13 | deposition? |
| 08:58 | 14 | A.   Sure. |
| 08:58 | 15 | Q.   Page 695, lines 4 through 12. |
| 08:58 | 16 | A.   (Witness complies.) |
| 08:59 | 17 | Q.   It was this litigation, wasn't it? |
| 08:59 | 18 | A.   That is correct. |
| 08:59 | 19 | Q.   And you became nervous about the MGA litigation as a |
| 08:59 | 20 | result of the meeting you had with Mr. Moore that you |
| 08:59 | 21 | described in your December e-mail, right? |
| 08:59 | 22 | A.   That is correct. |
| 08:59 | 23 | Q.   And that's because the subject of your meeting with |
| 08:59 | 24 | Mr. Moore was the MGA litigation, right? |
| 08:59 | 25 | A.   That I do not remember. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:59 | 1 | Q.   Please refer to your deposition, page 716 -- and this |
| 09:00 | 2 | is just your deposition of September 13, 2010, page 716, |
| 09:00 | 3 | lines 2 through 12 -- 2 through 11. |
| 09:00 | 4 | The subject of your meeting with Mr. Moore was this MGA |
| 09:00 | 5 | litigation, right? -- lines 2 through 11. |
| 09:01 | 6 | A.   I think it was, correct. |
| 09:01 | 7 | Q.   Well, it was, wasn't it? |
| 09:01 | 8 | A.   From what I remember. |
| 09:01 | 9 | Q.   Well, your deposition in which you gave that deposition |
| 09:01 | 10 | was only six month ago, wasn't it? |
| 09:01 | 11 | A.   I gave a deposition July and September, correct. |
| 09:01 | 12 | Q.   Of 2010? |
| 09:01 | 13 | A.   That is correct. |
| 09:01 | 14 | Q.   September 13th, 2010? |
| 09:01 | 15 | A.   Don't remember the exact date. |
| 09:01 | 16 | Q.   Take a look at page 716, and now refer back to page 350 |
| 09:01 | 17 | where it begins, and look at the date, the third line from |
| 09:01 | 18 | the bottom. |
| 09:01 | 19 | A.   (Witness complies.) |
| 09:01 | 20 | Q.   September 13, 2010? |
| 09:01 | 21 | A.   That is correct. |
| 09:01 | 22 | Q.   Okay.  So the subject of your meeting with Mr. Moore |
| 09:01 | 23 | before you sent this e-mail was the MGA litigation, right? |
| 09:01 | 24 | A.   That's correct. |
| 09:02 | 25 | Q.   And in your December 22, 2005 you reported that you had |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 25 of 138   Page ID #:311619
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

25

| | | |
|---|---|---|
| 09:02 | 1 | been approached by Mr. Moore and -- it was outside counsel, |
| 09:02 | 2 | right? |
| 09:02 | 3 | A.   That is correct. |
| 09:02 | 4 | Q.   I'm not gonna say who. |
| 09:02 | 5 | And then you wrote, "This recent activity and the fact |
| 09:02 | 6 | that the trade shows are fast approaching, has forced me to |
| 09:02 | 7 | evaluate my role in the company." |
| 09:02 | 8 | Um, so it was meeting with Mr. Moore and outside |
| 09:02 | 9 | counsel together with the fact that the trade shows that |
| 09:02 | 10 | were fast approaching that triggered your e-mail, right? |
| 09:02 | 11 | A.   Correct. |
| 09:02 | 12 | Q.   And you actually had started meeting with Mr. Moore in |
| 09:02 | 13 | June of 2005, right? |
| 09:02 | 14 | A.   I don't remember exactly when I first started meeting |
| 09:02 | 15 | with him. |
| 09:02 | 16 | Q.   You remember it was only a couple of months after MGA |
| 09:02 | 17 | filed a complaint against Mattel, right? |
| 09:03 | 18 | A.   Once again, I don't remember exactly when it was. |
| 09:03 | 19 | Q.   It was -- you only began meeting with Mr. Moore after |
| 09:03 | 20 | Mattel replaced Matt Turetzky as your supervisor with John |
| 09:03 | 21 | Louie, right? |
| 09:03 | 22 | A.   Once again, I don't remember. |
| 09:03 | 23 | Q.   I'm sorry.  It was after you began meeting with |
| 09:03 | 24 | Mr. Moore in -- it was after you began meeting with |
| 09:03 | 25 | Mr. Moore that Mattel replaced Matt Turetzky as your |

| | | |
|---|---|---|
| 09:03 | 1 | supervisor, right? |
| 09:03 | 2 | A.   I don't remember.  I mean, keep in mind this is more |
| 09:03 | 3 | than half a decade ago.  I don't recall exactly. |
| 09:03 | 4 | Q.   Had Mr. Louie come from Disney? |
| 09:03 | 5 | A.   I think he did. |
| 09:03 | 6 | Q.   And he only joined Mattel at the end of September 2005? |
| 09:03 | 7 | A.   Towards the end of 2005, correct. |
| 09:03 | 8 | Q.   And in between the time that you began talking with |
| 09:03 | 9 | Attorney Moore and the time that Mr. Louie became your new |
| 09:04 | 10 | supervisor, you actually had multiple conversations with |
| 09:04 | 11 | Mr. Moore, right? |
| 09:04 | 12 | MR. PRICE:  I'm gonna object, Your Honor.  The |
| 09:04 | 13 | first part of that assumes facts not in evidence.  He hasn't |
| 09:04 | 14 | said that. |
| 09:04 | 15 | THE COURT:  Overruled. |
| 09:04 | 16 | THE WITNESS:  I -- once again, I don't remember |
| 09:04 | 17 | how many times I met with Michael. |
| 09:04 | 18 | BY MS. KELLER: |
| 09:04 | 19 | Q.   When you met with Mr. Moore, you gave him documents |
| 09:04 | 20 | showing your use of fake ID's? |
| 09:04 | 21 | A.   I don't remember whether I did or didn't. |
| 09:04 | 22 | Q.   You gave him toy fair reports containing confidential |
| 09:04 | 23 | information you had gotten using fake ID's? |
| 09:04 | 24 | A.   I don't remember if I did that or not. |
| 09:04 | 25 | Q.   And, Jill Thomas, you recognize here, don't you? |

| | | |
|---|---|---|
| 09:04 | 1 | A.   I do. |
| 09:04 | 2 | Q.   Is she in this courtroom, sitting right here taking |
| 09:04 | 3 | notes? |
| 09:04 | 4 | A.   That is correct. |
| 09:04 | 5 | Q.   And Jill Thomas and outside counsel were also involved |
| 09:04 | 6 | in collecting documents from you, right? |
| 09:04 | 7 | A.   That I don't remember. |
| 09:04 | 8 | Q.   Now, when Mr. Louie, late that year, suddenly announced |
| 09:05 | 9 | that you had to keep gathering confidential information but |
| 09:05 | 10 | you couldn't misrepresent yourself, this was again after MGA |
| 09:05 | 11 | sued Mattel, true? |
| 09:05 | 12 |         MR. PRICE:  I'll object as argumentative as to |
| 09:05 | 13 | "suddenly." |
| 09:05 | 14 |         THE COURT:  Overruled.  Strike the word |
| 09:05 | 15 | "suddenly." |
| 09:05 | 16 |         You can answer the question. |
| 09:05 | 17 | BY MS. KELLER: |
| 09:05 | 18 | Q.   When Mr. Louie told you in late 2005 that you had to |
| 09:05 | 19 | quit misrepresenting yourself, that was the first time that |
| 09:05 | 20 | your supervisor at Mattel had ever told you that, right? |
| 09:05 | 21 | A.   That is correct. |
| 09:05 | 22 | Q.   And he told you you had to keep getting the same |
| 09:05 | 23 | information you had been getting, but you could no longer |
| 09:05 | 24 | misrepresent your identity, right? |
| 09:05 | 25 | A.   That is correct. |

| | | |
|---|---|---|
| 09:05 | 1 | Q.   And after you had these conversations with the Mattel |
| 09:05 | 2 | legal department about what you had been doing, you weren't |
| 09:05 | 3 | fired or disciplined in any way, correct? |
| 09:05 | 4 | A.   That is correct. |
| 09:06 | 5 | Q.   And, in fact, you were actually paid roughly a couple |
| 09:06 | 6 | hundred thousand dollars, right? |
| 09:06 | 7 | A.   Paid for what?  I'm sorry. |
| 09:06 | 8 | Q.   In your separation agreement, you were actually paid a |
| 09:06 | 9 | couple hundred thousand dollars, right?  Roughly. |
| 09:06 | 10 | A.   I got a severance package, that is correct. |
| 09:06 | 11 | Q.   And all you had to do in return for the money that was |
| 09:06 | 12 | being paid was to keep your conduct that you viewed as |
| 09:06 | 13 | subjecting you to criminal liability secret and keep |
| 09:06 | 14 | Mattel's approval of it secret, right? |
| 09:06 | 15 | A.   That I do not recall. |
| 09:06 | 16 | Q.   Well, we've talked about the fact that the president of |
| 09:06 | 17 | Mattel Brands knew all about what you had been doing, right? |
| 09:06 | 18 | A.   Correct. |
| 09:06 | 19 | Q.   And wanted you to keep on doing it, right? |
| 09:06 | 20 | A.   Well, he never came out as saying that. |
| 09:07 | 21 | Q.   And you know that Matt Turetzky had sent you e-mails |
| 09:07 | 22 | praising you for gathering the information about the |
| 09:07 | 23 | confidential price lists and catalogs, right? |
| 09:07 | 24 | A.   That is correct. |
| 09:07 | 25 | Q.   Now -- and you told us that during the whole period, up |

| | | |
|---|---|---|
| 09:07 | 1 | until December 2005, you'd been repeatedly given promotions, |
| 09:07 | 2 | raises, and bonuses, right? |
| 09:07 | 3 | A.    That is correct. |
| 09:07 | 4 | Q.    Let's look at Exhibit 9266. |
| 09:07 | 5 | (Document provided to the witness.) |
| 09:07 | 6 | BY MS. KELLER: |
| 09:07 | 7 | Q.    And, by the way, nobody at Mattel suggested you leave |
| 09:07 | 8 | Mattel, right? |
| 09:07 | 9 | A.    Not that I remember, no. |
| 09:07 | 10 | Q.    In other words, nobody said now that we've learned what |
| 09:07 | 11 | you're -- what you were doing, we're firing you.  Nobody |
| 09:07 | 12 | said that, right? |
| 09:07 | 13 | A.    That is correct. |
| 09:07 | 14 | Q.    In fact, it was your decision to leave Mattel, true? |
| 09:07 | 15 | A.    That is correct. |
| 09:07 | 16 | Q.    So let's look at 9266.  Do you recognize this as your |
| 09:07 | 17 | separation agreement? |
| 09:08 | 18 | A.    That is correct. |
| 09:08 | 19 | Q.    And you signed this on July 17, 2006? |
| 09:08 | 20 | A.    That is correct. |
| 09:08 | 21 | Q.    And in Section -- |
| 09:08 | 22 | (Document displayed.) |
| 09:08 | 23 | BY MS. KELLER: |
| 09:08 | 24 | Q.    -- 9266-1, it says, Section 1, "Consideration."  In |
| 09:08 | 25 | exchange for your entering into the agreement, Mattel would |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

30

| 09:08 | 1 | give you severance payments for a total of 18 months to be |
| 09:08 | 2 | paid in biweekly installments in an amount equal to your |
| 09:08 | 3 | current biweekly regular rate of pay, which was $3,409.77, |
| 09:08 | 4 | right? |
| 09:08 | 5 | A.   That is correct. |
| 09:08 | 6 | Q.   And you would get a lump sum of $20,000 to assist you |
| 09:08 | 7 | with your ongoing medical expenses for psychological and |
| 09:08 | 8 | psychiatric medical assistance? |
| 09:08 | 9 | A.   That is correct. |
| 09:09 | 10 | Q.   Did you actually have to get that assistance? |
| 09:09 | 11 | A.   I'm sorry? |
| 09:09 | 12 | Q.   Did you actually get that assistance? |
| 09:09 | 13 | A.   I did.  I saw a therapist.  That's correct. |
| 09:09 | 14 | Q.   And so you really, um -- and this was directly related |
| 09:09 | 15 | to the stress that you were under as a result of being, um, |
| 09:09 | 16 | directed to do these activities that you thought were |
| 09:09 | 17 | questionable? |
| 09:09 | 18 | A.   It's part of the reason, correct. |
| 09:09 | 19 | Q.   And you also were gonna get $20,000 in a lump sum for |
| 09:09 | 20 | attorney's fees.  You see that? |
| 09:09 | 21 | A.   Correct.  They paid for my attorney fees. |
| 09:09 | 22 | Q.   And that's because you had an attorney trying to |
| 09:09 | 23 | negotiate for you -- actually, you had an attorney |
| 09:09 | 24 | negotiating for you with the company to get this severance |
| 09:09 | 25 | package, right? |

| | | |
|---|---|---|
| 09:09 | 1 | A.    That is correct. |
| 09:09 | 2 | Q.    And if we look under Section 2, "Complete Release," it |
| 09:09 | 3 | says you irrevocably and unconditionally released all the |
| 09:10 | 4 | claims described in subsection (b) that you might have |
| 09:10 | 5 | against the released parties." |
| 09:10 | 6 | And released parties included Mattel, right?  In fact, |
| 09:10 | 7 | the released party was Mattel, wasn't it? |
| 09:10 | 8 | A.    I'm not sure on that.  I didn't really pay a lot of |
| 09:10 | 9 | attention to it; my attorney did. |
| 09:10 | 10 | Q.    Okay.  Let's look at subdivision (d) where it says who |
| 09:10 | 11 | the released parties are.  And it says the released parties |
| 09:10 | 12 | are the company –– that's Mattel, right? |
| 09:10 | 13 | A.    I would assume so, correct. |
| 09:10 | 14 | Q.    And all current or former related companies of the |
| 09:10 | 15 | company, including, et cetera.  And then all of its |
| 09:10 | 16 | employees, officers, directors, stockholders and others, |
| 09:10 | 17 | including its lawyers, right? |
| 09:10 | 18 | A.    Once again, I'm not sure. |
| 09:11 | 19 | Q.    Well, you see that listed in subdivision (d), fourth |
| 09:11 | 20 | line from the bottom? |
| 09:11 | 21 | A.    I do. |
| 09:11 | 22 | Q.    One of the groups of people you're agreeing that you |
| 09:11 | 23 | won't sue as a result of this are the attorneys of the |
| 09:11 | 24 | company, right? |
| 09:11 | 25 | A.    I see attorneys in there, correct. |

| | | |
|---|---|---|
| 09:11 | 1 | Q.   And let's look at page 5. |
| 09:11 | 2 | *(Document displayed.)* |
| 09:11 | 3 | BY MS. KELLER: |
| 09:11 | 4 | Q.   Subdivision (h).  And this says, "I agree not to |
| 09:11 | 5 | disclose the terms or amount of this agreement to anyone |
| 09:11 | 6 | other than a member of my immediate family, my attorney, |
| 09:11 | 7 | Patricio Barrera, or any other professional adviser, |
| 09:11 | 8 | collectively, my confidants, and even as to such a person, |
| 09:11 | 9 | only if the person agrees to honor this confidentiality |
| 09:11 | 10 | agreement." |
| 09:11 | 11 | And it goes on in the second paragraph to say, "Neither |
| 09:12 | 12 | I nor anyone to whom it may be disclosed pursuant to this |
| 09:12 | 13 | subsection shall disclose any confidential information to |
| 09:12 | 14 | any representative of any print, radio, or television media, |
| 09:12 | 15 | any counsel for any party threatening or asserting claims |
| 09:12 | 16 | against any of the released parties." |
| 09:12 | 17 | So you understood that to mean anybody who was suing |
| 09:12 | 18 | Mattel you weren't gonna tell about this, right? |
| 09:12 | 19 | A.   Not sure exact -- what that means exact -- one again, I |
| 09:12 | 20 | did not really pay a whole lot of attention to this.  I let |
| 09:12 | 21 | my attorney take care of that for me. |
| 09:12 | 22 | Q.   Well, the next line says, "any counsel for any current |
| 09:12 | 23 | or former employee of the released parties." |
| 09:12 | 24 | You knew that counsel means attorney, right? |
| 09:12 | 25 | A.   That is true. |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

33

| 09:12 | 1 | Q.   And it says, "I agree that if any inquiry is made as to |
|---|---|---|

09:12   1   Q.   And it says, "I agree that if any inquiry is made as to

09:12   2   the termination of my employment, I will respond without

09:12   3   elaboration that, quote, "I left to pursue other

09:13   4   opportunities," right?

09:13   5   A.   That's what it says there, correct.

09:13   6   Q.   And let's go back to the paragraph above, to the fifth

09:13   7   line, and it says, "Except for my confidants, I represent,

09:13   8   understand, and agree that I will keep completely

09:13   9   confidential and not discuss or disclose to any person or

09:13   10   entity: (a) the fact of this agreement, (b) any allegations

09:13   11   of alleged wrongful conduct by the company or any released

09:13   12   party that allegedly occurred while I was employed with the

09:13   13   company."

09:13   14      Now, you knew that the terms of this agreement meant

09:13   15   you were not to disclose to anyone what you had been doing

09:13   16   in market intelligence to get confidential information,

09:13   17   right?

09:13   18   A.   Correct.

09:13   19   Q.   And you were not to disclose to anyone the role, for

09:13   20   example, of the president of Mattel Brands in all this,

09:14   21   right?

09:14   22   A.   I'm not sure if that was part of it.

09:14   23   Q.   Well, you knew that you were not supposed to discuss

09:14   24   any aspect of your conduct or Mattel's knowledge of it with

09:14   25   anybody, right?

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

34

| 09:14 | 1 | A.   Correct. |
| 09:14 | 2 | Q.   And in particular, you understood you weren't supposed |
| 09:14 | 3 | to let MGA know about it, right? |
| 09:14 | 4 | A.   I don't think -- I'm not sure if that's in there. |
| 09:14 | 5 | Q.   Well, you knew that MGA was in a lawsuit with Mattel; |
| 09:14 | 6 | that's the reason that you ended up being called up to |
| 09:14 | 7 | Michael Moore's office to be talked to, right? |
| 09:14 | 8 | A.   I was called up to Michael Moore's office.  That's |
| 09:14 | 9 | correct. |
| 09:14 | 10 | Q.   But that was the reason, the MGA litigation, true? |
| 09:14 | 11 | A.   Correct. |
| 09:14 | 12 | Q.   And so you knew that, in particular, you weren't |
| 09:14 | 13 | supposed to let MGA know anything about this, right? |
| 09:15 | 14 | A.   That I do not recall. |
| 09:15 | 15 | Q.   Now, there's a portion in here that says that if you're |
| 09:15 | 16 | subpoenaed or receive legal notice -- and I'm talking about |
| 09:15 | 17 | the third paragraph down on this page -- "where you may be |
| 09:15 | 18 | asked to testify or provide information about the company or |
| 09:15 | 19 | any confidential information, you would notify the general |
| 09:15 | 20 | counsel of Mattel as promptly as possible." |
| 09:15 | 21 |      You see that? |
| 09:15 | 22 | A.   I see that. |
| 09:15 | 23 | Q.   And it says, "nor does this subsection prohibit me from |
| 09:15 | 24 | responding to a valid subpoena or other legal notice." |
| 09:15 | 25 |      Do you see that in line 3 of the third paragraph? |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 35 of 138   Page ID #:311629
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

35

| 09:15 | 1 | A. Is it highlighted? |
|---|---|---|
| 09:15 | 2 | Q. Line 3, where it says, "nor does this subsection |
| 09:15 | 3 | prohibit me from responding to a valid subpoena." |
| 09:15 | 4 | A. I see that. |
| 09:15 | 5 | Q. Now, you knew that nothing in this agreement could |
| 09:15 | 6 | possibly prohibit you from responding to a valid subpoena |
| 09:15 | 7 | anyway, right? |
| 09:16 | 8 | A. I'm not sure. |
| 09:16 | 9 | Q. Well, you knew if you got a subpoena from a court in |
| 09:16 | 10 | this state or -- of the United States, you had to respond to |
| 09:16 | 11 | it, right? |
| 09:16 | 12 | A. Correct. |
| 09:16 | 13 | Q. I mean, you know nobody is above the law, right? |
| 09:16 | 14 | A. That is correct. |
| 09:16 | 15 | Q. And no agreement that you -- that Mattel made with you |
| 09:16 | 16 | could prohibit you from responding to a subpoena, true? |
| 09:16 | 17 | A. That is correct. |
| 09:16 | 18 | Q. So this line really doesn't mean much of anything, |
| 09:16 | 19 | correct? |
| 09:16 | 20 | A. Not sure exactly what it means. |
| 09:16 | 21 | Q. And if you look under the portion where you agree to |
| 09:16 | 22 | notify the general counsel of Mattel if you are subpoenaed, |
| 09:16 | 23 | and it gives -- you see Mr. Normile's name and address? |
| 09:16 | 24 | A. I do. |
| 09:16 | 25 | Q. And it says, "I agree to cooperate with the company in |

| | | |
|---|---|---|
| 09:16 | 1 | taking all steps it deems to be legally appropriate to |
| 09:17 | 2 | comply, limit, or prevent the required disclosure." |
| 09:17 | 3 | Do you see that? |
| 09:17 | 4 | A.   I do. |
| 09:17 | 5 | Q.   And you did cooperate with the company in trying to |
| 09:17 | 6 | prevent or limit disclosure of your activities, right? |
| 09:17 | 7 | MR. PRICE:  Objection.  Compound. |
| 09:17 | 8 | THE COURT:  Overruled. |
| 09:17 | 9 | THE WITNESS:  That's correct. |
| 09:17 | 10 | BY MS. KELLER: |
| 09:17 | 11 | Q.   And it was only when you were forced to disclose your |
| 09:17 | 12 | activities that you did so, true? |
| 09:17 | 13 | MR. PRICE:  Objection.  Argumentative.  Vague. |
| 09:17 | 14 | THE COURT:  Overruled. |
| 09:17 | 15 | THE WITNESS:  What do you mean by "forced"? |
| 09:17 | 16 | BY MS. KELLER: |
| 09:17 | 17 | Q.   Forced by a court of law. |
| 09:17 | 18 | MR. PRICE:  Same objection.  Vague. |
| 09:17 | 19 | THE COURT:  Overruled. |
| 09:17 | 20 | THE WITNESS:  That's correct. |
| 09:17 | 21 | BY MS. KELLER: |
| 09:17 | 22 | Q.   And the company, Mattel, if you look at page 6, agreed |
| 09:17 | 23 | that it would pay your attorney's fees in connection with |
| 09:17 | 24 | anything you had to do with respect to litigation about this |
| 09:18 | 25 | case, right? |

| | | |
|---|---|---|
| 09:18 | 1 | A.   That's correct. |
| 09:18 | 2 | Q.   And your attorney was to be paid a rate of $400 an |
| 09:18 | 3 | hour? |
| 09:18 | 4 | A.   That is correct. |
| 09:18 | 5 | Q.   And you yourself, if you had to testify, would be paid |
| 09:18 | 6 | $50 an hour? |
| 09:18 | 7 | A.   That's correct. |
| 09:18 | 8 | Q.   And Mattel is paying your lawyer to be here with you |
| 09:18 | 9 | when you are here, including right now, right? |
| 09:18 | 10 | A.   That is correct. |
| 09:18 | 11 | Q.   And all the hours you've had to wait at the courthouse, |
| 09:18 | 12 | you've had -- your attorney's been paid for that, right? |
| 09:18 | 13 | A.   I think so. |
| 09:18 | 14 | Q.   You too? |
| 09:18 | 15 | A.   I would think so. |
| 09:18 | 16 | Q.   And yesterday's and today's testimony, in fact, you |
| 09:18 | 17 | will submit a bill to Mattel for, correct? |
| 09:18 | 18 | A.   That's correct. |
| 09:18 | 19 | Q.   So in return, then, for this severance agreement with |
| 09:19 | 20 | Mattel, the main thing you had to do was agree to keep your |
| 09:19 | 21 | wrongful conduct a secret and help Mattel try to prevent it |
| 09:19 | 22 | from being disclosed, right? |
| 09:19 | 23 | A.   Can you rephrase that? |
| 09:19 | 24 | Q.   In return for being paid this severance amount, what |
| 09:19 | 25 | you had to do in return was keep your wrongful conduct a |

Case 2:04-cv-09049-DOC-RNB    Document 10269    Filed 03/25/11    Page 38 of 138    Page ID #:311632
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

38

| | | |
|---|---|---|
| 09:19 | 1 | secret and try to assist Mattel in keeping it a secret, |
| 09:19 | 2 | right? |
| 09:19 | 3 | A.   Complying with the agreement, correct. |
| 09:19 | 4 | Q.   And that's what the agreement required you to do:  Help |
| 09:19 | 5 | Mattel keep your wrongful conduct a secret, right? |
| 09:19 | 6 | A.   I don't know if "secret" is the right word. |
| 09:19 | 7 | Q.   Not disclose it? |
| 09:19 | 8 | A.   That's correct. |
| 09:19 | 9 | Q.   To your knowledge, did Mattel ever contact any |
| 09:20 | 10 | manufacturers from whom you got confidential information |
| 09:20 | 11 | under false pretenses and notify them that employees of |
| 09:20 | 12 | Mattel's had taken information to which they were not |
| 09:20 | 13 | entitled and had done so by lying about who they were and |
| 09:20 | 14 | where they worked? |
| 09:20 | 15 | A.   To my knowledge, I don't recall that ever happening. |
| 09:20 | 16 | Q.   Now, you didn't -- in the course of your job, you |
| 09:20 | 17 | didn't just get information by sneaking into showrooms; |
| 09:20 | 18 | sometimes you got information from public sources, true? |
| 09:20 | 19 | A.   Correct. |
| 09:20 | 20 | Q.   Press releases, trade magazines, that sort of thing? |
| 09:20 | 21 | A.   Correct. |
| 09:20 | 22 | Q.   But the information that was most valuable to Mattel |
| 09:20 | 23 | was the information that you got from the private showrooms, |
| 09:20 | 24 | true? |
| 09:20 | 25 |         MR. PRICE:  Object to lack of foundation. |

| | | |
|---|---|---|
| 09:20 | 1 | THE WITNESS:  Not necessarily. |
| 09:20 | 2 | THE COURT:  Overruled. |
| 09:20 | 3 | You can answer the question. |
| 09:20 | 4 | THE WITNESS:  Not necessarily. |
| 09:20 | 5 | THE COURT:  Okay.  Thank you. |
| 09:20 | 6 | BY MS. KELLER: |
| 09:20 | 7 | Q.   But that's the sort of information you were expected to |
| 09:20 | 8 | keep providing Mattel, right? |
| 09:21 | 9 | A.   Well, part of my job was to keep senior management and |
| 09:21 | 10 | key departments up to date on the latest and greatest, not |
| 09:21 | 11 | necessarily stuff from catalogs nor price lists. |
| 09:21 | 12 | Q.   But after six years of being directed to gather |
| 09:21 | 13 | information using unlawful means, Mr. Louie now told you you |
| 09:21 | 14 | had to gather the same quality of intelligence without |
| 09:21 | 15 | misrepresenting yourself, right? |
| 09:21 | 16 | MR. PRICE:  Objection.  Assumes facts. |
| 09:21 | 17 | THE COURT:  Overruled. |
| 09:21 | 18 | THE WITNESS:  That is correct. |
| 09:21 | 19 | BY MS. KELLER: |
| 09:21 | 20 | Q.   That was pretty stressful, wasn't it? |
| 09:21 | 21 | A.   Yes, it was. |
| 09:21 | 22 | Q.   'Cause you knew you weren't gonna be able to do it, |
| 09:21 | 23 | true? |
| 09:21 | 24 | A.   That is correct. |
| 09:21 | 25 | Q.   Now, did you at some point, some months after your |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:21 | 1 | separation agreement, actually talk about getting a job at |
| 09:21 | 2 | MGA? |
| 09:21 | 3 | A.   That is correct. |
| 09:21 | 4 | Q.   And did you talk with a gentleman by the name of Ron |
| 09:21 | 5 | Brawer? |
| 09:21 | 6 | A.   That is correct. |
| 09:21 | 7 | Q.   Now, when you talked to Ron Brawer, he wasn't aware -- |
| 09:22 | 8 | and Ron Brawer had been at Mattel too, hadn't he? |
| 09:22 | 9 | A.   Yes, he had. |
| 09:22 | 10 | Q.   But he was now working for MGA? |
| 09:22 | 11 | A.   Correct. |
| 09:22 | 12 | Q.   And Ron Brawer had not known, when he was at Mattel, of |
| 09:22 | 13 | your gaining access to private showrooms using fake ID's, |
| 09:22 | 14 | correct? |
| 09:22 | 15 | MR. PRICE:  Objection.  Lack of foundation. |
| 09:22 | 16 | MS. KELLER:  I'll rephrase. |
| 09:22 | 17 | BY MS. KELLER: |
| 09:22 | 18 | Q.   You don't think that Mr. Brawer had been aware, when he |
| 09:22 | 19 | was at Mattel, of your gaining access to the private |
| 09:22 | 20 | showrooms using fake ID's, correct? |
| 09:22 | 21 | A.   I don't know if he was aware or not aware of it. |
| 09:22 | 22 | Q.   You don't think he was, though, right? |
| 09:22 | 23 | A.   I don't know. |
| 09:22 | 24 | Q.   You had nothing to indicate that he was, correct? |
| 09:22 | 25 | A.   Once again, I do not know if he knew or not. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:22 | 1 | Q.   Can you take a look at your deposition, page 320, lines |
| 09:22 | 2 | 18 through 23.  And this is a deposition July 12, 2010. |
| 09:23 | 3 | *(Document provided to the witness.)* |
| 09:23 | 4 | THE WITNESS:  (Witness complies.) |
| 09:23 | 5 | BY MS. KELLER: |
| 09:23 | 6 | Q.   Is it true that you don't think Ron Brawer was aware |
| 09:23 | 7 | when he was at Mattel of your gaining access to private |
| 09:23 | 8 | showrooms using fake ID's? |
| 09:23 | 9 | A.   Once again, I didn't think so.  I'm not sure. |
| 09:23 | 10 | Q.   You don't think so, correct? |
| 09:23 | 11 | A.   I wasn't sure.  I don't think so, correct. |
| 09:23 | 12 | MS. KELLER:  Your Honor, I'd ask to read lines 18 |
| 09:23 | 13 | through 23. |
| 09:23 | 14 | THE COURT:  I think that was his answer, wasn't |
| 09:23 | 15 | it, at the depo?  "I don't think so." |
| 09:23 | 16 | MR. PRICE:  It was his answer. |
| 09:24 | 17 | THE COURT:  I don't see there's any impeachment. |
| 09:24 | 18 | BY MS. KELLER: |
| 09:24 | 19 | Q.   Did you ever discuss with Ron Brawer while he was at |
| 09:24 | 20 | Mattel you're getting information from private showrooms? |
| 09:24 | 21 | A.   No, I don't think so. |
| 09:24 | 22 | Q.   Is it an "I don't think so" or a "no"? |
| 09:24 | 23 | A.   From what I remember, no. |
| 09:24 | 24 | Q.   And you actually kept your agreement with Mattel that |
| 09:24 | 25 | you signed in -- your separation agreement -- you kept your |

09:24    1    promise not to tell anybody about what you were doing at
09:24    2    Mattel to acquire the confidential information, right?
09:24    3    A.    That is correct.
09:24    4    Q.    So you didn't tell Mr. Brawer about it when you were
09:24    5    talking about a job at MGA, right?
09:24    6    A.    No.  No, I did not.
09:24    7    Q.    You also -- in addition to Mr. Brawer, you met a
09:24    8    gentleman named Gustavo Machado in mid-December when you
09:24    9    were exploring the possibility of a job at MGA, correct?
09:25   10    A.    That is correct.
09:25   11    Q.    And you didn't tell Mr. Machado anything about getting
09:25   12    into the private showroom using fake ID's, true?
09:25   13    A.    That is true.
09:25   14    Q.    What you told Mr. Machado is that you could be a
09:25   15    valuable resource at the New York Toy Fair, right?
09:25   16    A.    Correct.
09:25   17    Q.    But you didn't mean by that that you would gain access
09:25   18    to private showrooms like you had at Mattel, true?
09:25   19    A.    I don't recall exactly what I meant.
09:25   20    Q.    Take a look at your deposition, July 12, 2010,
09:25   21    page 318, lines 23, through 320, line 2.
09:25   22                 (Document provided to the witness.)
09:26   23                 THE COURT:  Just a moment, Counsel.
09:26   24                 I don't believe I've got 318.
09:26   25                 MS. KELLER:  It's 319, Your Honor.

| | | |
|---|---|---|
| 09:26 | 1 | THE COURT:  319? |
| 09:26 | 2 | MS. KELLER:  23 through 25, to 320. |
| 09:26 | 3 | THE COURT:  319, 23 through 25.  And 320 through |
| 09:26 | 4 | what? |
| 09:26 | 5 | MS. KELLER:  Through line 10. |
| 09:26 | 6 | THE COURT:  Just a moment. |
| 09:26 | 7 | All right.  Thank you.  And your question was? |
| 09:26 | 8 | BY MS. KELLER: |
| 09:26 | 9 | Q.   When you told Mr. Machado that you could be a valuable |
| 09:27 | 10 | resource at the New York Toy Fair, you didn't mean you could |
| 09:27 | 11 | gain access to private showrooms like you had for Mattel, |
| 09:27 | 12 | right? |
| 09:27 | 13 | A.   Correct. |
| 09:27 | 14 | Q.   And, in fact, you were actually talking about getting |
| 09:27 | 15 | into marketing, weren't you? |
| 09:27 | 16 | A.   No.  I think I was looking into research, and he might |
| 09:27 | 17 | have offered a position in marketing or talked about the |
| 09:27 | 18 | possibility of something being available in marketing. |
| 09:27 | 19 | Q.   Okay.  So you were offering -- well, you were offering, |
| 09:27 | 20 | then, that you might go to the New York Toy Fair to help |
| 09:27 | 21 | present MGA's products? |
| 09:27 | 22 | A.   Possibly, correct. |
| 09:27 | 23 | Q.   Not to steal information from competitors, true? -- not |
| 09:27 | 24 | to gain information from competitors by misrepresenting |
| 09:27 | 25 | yourself, right? |

| 09:27 | 1 | A.    Correct. |

09:27   1   A.    Correct.

09:27   2   Q.    And in the end, MGA did not offer you the job, true?

09:27   3   A.    There was -- correct, not that there was a job

09:27   4   available.

09:27   5              MS. KELLER:  Nothing further.

09:28   6              THE COURT:  Cross-examination by Mr. Price.

09:28   7          Mr. Price, before we start cross, do you want to

09:28   8   take a recess?  Take it a little bit early, just a

09:28   9   logical...

09:28   10             MR. PRICE:  I think we could arrange things.

09:28   11             THE COURT:  Otherwise, you're starting 10 or 15

09:28   12   minutes.

09:28   13         Ladies and gentlemen, we're taking an early

09:28   14   recess.  You're admonished not to discuss this matter

09:28   15   amongst yourselves, nor form or express any opinion

09:28   16   concerning the case program.  I'll come and get you at

09:28   17   quarter till the hour.  Little over 15 minutes, thank you.

09:28   18             *(Jury recesses at 9:28 a.m.)*

09:28   19             THE COURT:  All right.  Sir, if you step down and

09:28   20   return.

09:28   21         Thank you.

09:28   22             *(Witness steps down.)*

09:28   23             THE COURT:  Counsel, at 9:45.  Thank you.

09:28   24             *(Proceedings recessed at 9:28 a.m.)*

09:46   25             *(Proceedings resumed at 9:46 a.m.)*

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:46 | 1 | *(In the presence of the jury.)* |
| 09:46 | 2 | THE COURT:  All right.  We're back in session. |
| 09:47 | 3 | The jury's present, the alternates, all counsel, the |
| 09:47 | 4 | parties, the witness. |
| 09:47 | 5 | And counsel, this would be Mr. Price on behalf of |
| 09:47 | 6 | Mattel, cross-examination. |
| 09:47 | 7 | **CROSS-EXAMINATION** |
| 09:47 | 8 | BY MR. PRICE: |
| 09:47 | 9 | Q.   Good morning, Mr. Villasenor. |
| 09:47 | 10 | A.   Good morning. |
| 09:47 | 11 | Q.   My name's Bill Price.  We haven't met; is that right? |
| 09:47 | 12 | A.   That is correct. |
| 09:47 | 13 | Q.   You testified that your deposition was taken in this |
| 09:47 | 14 | place (*sic*) over a two-day period, correct? |
| 09:47 | 15 | A.   I'm sorry? |
| 09:47 | 16 | Q.   Your deposition in this case was taken over a two-day |
| 09:47 | 17 | period? |
| 09:47 | 18 | A.   I -- correct. |
| 09:47 | 19 | Q.   And you said that in preparing for that deposition, you |
| 09:47 | 20 | did not meet with any Mattel counsel, correct? |
| 09:47 | 21 | A.   Correct. |
| 09:47 | 22 | Q.   And in preparing for your testimony here, you did not |
| 09:47 | 23 | meet with any Mattel counsel, correct? |
| 09:47 | 24 | A.   That is correct. |
| 09:47 | 25 | Q.   And in connection with your deposition, it was your |

| | | |
|---|---|---|
| 09:47 | 1 | understanding that, uh, under the settlement agreement, |
| 09:47 | 2 | Mattel was paying for your counsel at the deposition, |
| 09:48 | 3 | correct? |
| 09:48 | 4 | A.   That is correct. |
| 09:48 | 5 | Q.   And at that deposition, you were asked questions by |
| 09:48 | 6 | MGA's counsel, right? |
| 09:48 | 7 | A.   That is correct. |
| 09:48 | 8 | Q.   And you recall being asked whether it was your |
| 09:48 | 9 | understanding that Mattel had indicated it would not pay |
| 09:48 | 10 | your legal fees if you refused to testify and exercised a |
| 09:48 | 11 | Fifth Amendment right? |
| 09:48 | 12 | A.   That is correct. |
| 09:48 | 13 | Q.   So your understanding going into the deposition was |
| 09:48 | 14 | that if you refused to testify at that deposition, your |
| 09:48 | 15 | attorney's fees were not going to get paid, right? |
| 09:48 | 16 | A.   Not necessary -- no.  Can you repeat -- I'm sorry, can |
| 09:48 | 17 | you repeat that one more time? |
| 09:48 | 18 | Q.   Was it your understanding going through that deposition |
| 09:48 | 19 | that Mattel had indicated that they may not pay your legal |
| 09:48 | 20 | fees if, at the deposition, you refused to testify and |
| 09:48 | 21 | exercised your Fifth Amendment rights? |
| 09:48 | 22 | A.   Correct. |
| 09:48 | 23 | Q.   And that question at your deposition was asked of you |
| 09:49 | 24 | by -- by MGA, correct? |
| 09:49 | 25 | A.   I don't recall if they asked the question or not. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 47 of 138   Page ID #:311641
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

47

09:49  1   Q.   By Mr. -- uh, Molinsky, do you recall that?

09:49  2   A.   I recall Mr. Molinsky, correct.

09:49  3   Q.   If you look at -- this is the September 13, 2010

09:49  4   deposition.  It's at page 724, and if you'd look at lines 8

09:49  5   through 14.

09:49  6   A.   I'm sorry, which page?

09:49  7   Q.   724, lines 8 through 14.  In fact, if you go to line

09:49  8   6 you can see who is asking the question there.

09:49  9            *(Document provided to the witness.)*

09:49  10  BY MR. PRICE:

09:49  11  Q.   Do you recall being asked whether or not it was your

09:49  12  understanding -- let me start over.

09:49  13           Do you recall being asked by MGA's counsel whether it

09:49  14  was your understanding that Mattel has indicated that they

09:50  15  may not pay your legal fees for your attorney, Ms. Jenness,

09:50  16  if you exercised your rights under the Fifth Amendment?  Do

09:50  17  you recall being asked that by MGA's attorney?

09:50  18  A.   That is correct.

09:50  19  Q.   So your view was, at the deposition, that if you did

09:50  20  not testify, if you did not -- if you did not come forward

09:50  21  and testify to the truth, that there was a possibility your

09:50  22  attorney's fees would have to be on your own bill?

09:50  23  A.   That's correct.

09:50  24  Q.   Now, Ms. Keller asked you a number of questions about a

09:50  25  Mr. Brawer.  Do you recall Mr. Brawer when he worked at

| | | |
|---|---|---|
| 09:50 | 1 | Mattel? |
| 09:50 | 2 | A.    I do. |
| 09:50 | 3 | Q.    And it's your understanding that in October of 2004 |
| 09:50 | 4 | he -- he left work at MGA as an executive vice president of |
| 09:50 | 5 | sales reporting directly to Mr. Larian? |
| 09:50 | 6 | A.    Not sure exactly when he left or who he was reporting |
| 09:50 | 7 | to at MGA, but he did leave Mattel to go to MGA. |
| 09:50 | 8 | Q.    Well, let's talk about him at Mattel.  He was in |
| 09:50 | 9 | your -- you testified that when you would send out your, uh, |
| 09:50 | 10 | reports, uh, you would send them to pretty much everyone |
| 09:51 | 11 | that was up the chain of command, right? |
| 09:51 | 12 | A.    To certain members of senior management, correct. |
| 09:51 | 13 | Q.    And that was your practice, that whenever you sent a |
| 09:51 | 14 | toy fair report or a DEFCON alert or some sort of marketing |
| 09:51 | 15 | report, you would tend to send that to everyone up the chain |
| 09:51 | 16 | of command, right? |
| 09:51 | 17 | A.    To senior management, correct. |
| 09:51 | 18 | Q.    Well, let's look, if you can, at the organizational |
| 09:51 | 19 | chart here.  And I'd like you to look at Exhibit -- let's |
| 09:51 | 20 | start with Exhibit 16005. |
| 09:51 | 21 | *(Document provided to the witness.)* |
| 09:52 | 22 | MS. KELLER:  I'm sorry, Counsel, what exhibit |
| 09:52 | 23 | number was that? |
| 09:52 | 24 | MR. PRICE:  16005. |
| 09:52 | 25 | MS. KELLER:  Thank you. |

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:52 | 1 | BY MR. PRICE: |
| 09:52 | 2 | Q.   Do you have that in front of you, sir? |
| 09:52 | 3 | A.   I do. |
| 09:52 | 4 | Q.   If you flip through this and pay particular attention |
| 09:52 | 5 | to pages 2 and then pages -- page 48, where we see your |
| 09:52 | 6 | name.  Did Mattel have organizational charts for the |
| 09:52 | 7 | Boys/Entertainment area? |
| 09:52 | 8 | A.   They did. |
| 09:52 | 9 | Q.   And do you recognize this as being a, uh, |
| 09:52 | 10 | organizational chart for the Boys/Entertainment area in |
| 09:52 | 11 | November 2001? |
| 09:52 | 12 | A.   I do. |
| 09:52 | 13 |        MR. PRICE:  Your Honor, move Exhibit 16005 into |
| 09:52 | 14 | evidence. |
| 09:52 | 15 |        THE COURT:  Received. |
| 09:52 | 16 |        (Exhibit No. 16005 received in evidence.) |
| 09:52 | 17 |         (Document displayed.) |
| 09:52 | 18 | BY MR. PRICE: |
| 09:53 | 19 | Q.   If we could look at the second page, and we see at the |
| 09:53 | 20 | head of the chart we've got Mr. Bousquette.  Bousquette is |
| 09:53 | 21 | in charge of the -- president, Boys/Entertainment.  Do you |
| 09:53 | 22 | see that? |
| 09:53 | 23 | A.   I do. |
| 09:53 | 24 | Q.   And down here there's a name Drew Vollero.  Now, was he |
| 09:53 | 25 | your boss's boss? |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

50

| 09:53 | 1 | A.   That's correct. |
| 09:53 | 2 | Q.   And over here in the chain of command we have a Ron |
| 09:53 | 3 | Brawer.  That's Mr. Brawer that we talked about? |
| 09:53 | 4 | A.   Correct. |
| 09:53 | 5 | Q.   He was senior vice president of Account Marketing and |
| 09:53 | 6 | Marketing Services, right? |
| 09:53 | 7 | A.   Correct. |
| 09:53 | 8 | Q.   And you would, on occasion, speak to him, correct? |
| 09:53 | 9 | A.   Correct. |
| 09:53 | 10 | Q.   And you were asked questions, by the way, as to whether |
| 09:53 | 11 | or not Mr. Brawer knew that you used false identifications |
| 09:54 | 12 | to get into showrooms at toy fairs.  Do you recall that |
| 09:54 | 13 | question? |
| 09:54 | 14 | A.   I do. |
| 09:54 | 15 | Q.   Now, you were at Mattel for a number of years, correct? |
| 09:54 | 16 | A.   That is correct. |
| 09:54 | 17 | Q.   And do you recall everyone that you talked to and |
| 09:54 | 18 | everything you talked about? |
| 09:54 | 19 | A.   Across the 14 years? |
| 09:54 | 20 | Q.   Yes. |
| 09:54 | 21 | A.   No. |
| 09:54 | 22 | Q.   Uh, would you have any reason to dispute Mr. Brawer if |
| 09:54 | 23 | he said under oath you told him while he was at Mattel that |
| 09:54 | 24 | you used false for identifications to get into showrooms? |
| 09:54 | 25 | MS. KELLER:   Objection. |

| | | |
|---|---|---|
| 09:54 | 1 | THE WITNESS:  I don't recall. |
| 09:54 | 2 | MS. KELLER:  Hearsay.  Improper question, |
| 09:54 | 3 | Your Honor. |
| 09:54 | 4 | THE COURT:  Sustained. |
| 08:19 | 5 | BY MR. PRICE: |
| 09:54 | 6 | Q.   Do you know where Mr. Brawer is working now? |
| 09:54 | 7 | A.   I have no idea. |
| 09:54 | 8 | Q.   Do you know how long he was working at MGA? |
| 09:54 | 9 | A.   No, I do not. |
| 09:54 | 10 | Q.   He was working at MGA when you, uh -- when you |
| 09:54 | 11 | communicated about a job at MGA, correct? |
| 09:54 | 12 | A.   That is correct. |
| 09:54 | 13 | Q.   So let's look at the -- continue looking at |
| 09:55 | 14 | Exhibit 16005.  And if we look at the chart, we've got your |
| 09:55 | 15 | boss's boss here, correct?  And then, if you would look -- |
| 09:55 | 16 | MR. PRICE:  Just flip through this, Ken, and kind |
| 09:55 | 17 | of get to page, uh, 44. |
| 09:55 | 18 | *(Technician complies.)* |
| 09:28 | 19 | BY MR. PRICE: |
| 09:55 | 20 | Q.   So this is Mr. Vollero here, correct? |
| 09:55 | 21 | A.   That's correct. |
| 09:55 | 22 | Q.   And then reporting to Mr. Vollero is Mr. Wolk; is that |
| 09:55 | 23 | right? |
| 09:55 | 24 | A.   Bennett's on there, correct. |
| 09:55 | 25 | Q.   And at this time was it Mr. Wolk that you reported to? |

52

| | | |
|---|---|---|
| 09:55 | 1 | A.   That's correct. |
| 09:55 | 2 | Q.   And if we look at page 48 of Exhibit 16005. |
| 09:55 | 3 | *(Document displayed.)* |
| 09:55 | 4 | BY MR. PRICE: |
| 09:55 | 5 | Q.   Here we have Mr. Wolk.  And you are one of three people |
| 09:56 | 6 | reporting to Mr. Work, correct? |
| 09:56 | 7 | A.   That is correct. |
| 09:56 | 8 | Q.   And he is -- says, "Director Consumer Research," right? |
| 09:56 | 9 | A.   Correct. |
| 09:56 | 10 | Q.   It says, "Specialist Consumer Research," correct? |
| 09:56 | 11 | A.   Correct. |
| 09:56 | 12 | Q.   And if we go back to see what Mr. Vollero was, at |
| 09:56 | 13 | page 2. |
| 09:56 | 14 | *(Document displayed.)* |
| 11:59 | 15 | BY MR. PRICE: |
| 09:56 | 16 | Q.   He was the Senior Vice President Strategic Plan and |
| 09:56 | 17 | Finance, right? |
| 09:56 | 18 | A.   That's correct. |
| 09:56 | 19 | Q.   So in -- in 2001 -- and by the way, how long had you |
| 09:56 | 20 | been at Mattel as of 2001? |
| 09:56 | 21 | A.   Well, I started in 1992, so let's do the math. |
| 09:56 | 22 | Q.   So over that nine-year period, you had not been in any |
| 09:56 | 23 | group called Market Intelligence Group, correct? |
| 09:56 | 24 | A.   Up to 2001? |
| 09:56 | 25 | Q.   Yes. |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:56 | 1 | A.    Correct. |
| 09:57 | 2 | Q.    So let's go now, if you'd look at Exhibit 16008. |
| 09:57 | 3 | *(Document provided to the witness.)* |
| 09:57 | 4 | BY MR. PRICE: |
| 09:57 | 5 | Q.    Do you recognize this as an organizational chart for |
| 09:57 | 6 | Boys/Entertainment in September 2002? |
| 09:57 | 7 | A.    I do. |
| 09:57 | 8 | MR. PRICE:  Move 16008 into evidence, Your Honor. |
| 09:57 | 9 | THE COURT:  Received. |
| 09:57 | 10 | *(Exhibit No. 16008 received in evidence.)* |
| 09:57 | 11 | MR. PRICE:  If we can put up page 2. |
| 09:57 | 12 | *(Document displayed.),* |
| 09:57 | 13 | MR. PRICE:  16008-002. |
| 09:57 | 14 | BY MR. PRICE: |
| 09:57 | 15 | Q.    And we have again at the top here Mr. Bousquette, |
| 09:57 | 16 | President Boys/Entertainment, correct? |
| 09:57 | 17 | A.    That's correct. |
| 09:57 | 18 | Q.    And below that we have a bunch of people reporting to |
| 09:58 | 19 | him, right? |
| 09:58 | 20 | A.    That's correct. |
| 09:58 | 21 | Q.    And right here, I guess the second column in, you have |
| 09:58 | 22 | Mr. Brawer -- who's a senior vice president, right? |
| 09:58 | 23 | A.    That's correct. |
| 09:58 | 24 | Q.    And one of the people reporting to Mr. Bousquette is |
| 09:58 | 25 | again Mr. Vollero, right? |

| | | |
|---|---|---|
| 09:58 | 1 | A.    That's correct. |
| 09:58 | 2 | Q.    And then if you'd go to page 39. |
| 09:58 | 3 |          (Document displayed.) |
| 08:47 | 4 | BY MR. PRICE: |
| 09:58 | 5 | Q.    So in 2002, you have Mr. Vollero here at the top, |
| 09:58 | 6 | correct? |
| 09:58 | 7 | A.    Correct. |
| 09:58 | 8 | Q.    And his title is -- hard to read -- SVP Strategic Plan |
| 09:58 | 9 | and Finance; is that right? |
| 09:58 | 10 | A.    It's also hard to read here.  I'm not sure. |
| 09:58 | 11 | Q.    Yeah.  If you look at the hard copy, it might be |
| 09:58 | 12 | easier. |
| 09:59 | 13 | A.    It's still hard to read. |
| 09:59 | 14 | Q.    It's not Market Intelligence? |
| 09:59 | 15 | A.    Correct. |
| 09:59 | 16 | Q.    And then we have reporting to Mr. Vollero a number of |
| 09:59 | 17 | people including Mr. Wolk, correct? |
| 09:59 | 18 | A.    Correct. |
| 09:59 | 19 | Q.    And am I pronouncing that name right?  Is it Wolk? |
| 09:59 | 20 | A.    That's correct. |
| 09:59 | 21 |          THE COURT:  Can we blow that up so the jury can |
| 09:59 | 22 | see it all? |
| 09:59 | 23 |          MR. PRICE:  Yeah.  Let's see if we can blow up the |
| 09:59 | 24 | Mr. Wolk part here. |
| 09:59 | 25 |          THE COURT:  I may have been missing what you're |

| | | |
|---|---|---|
| 09:59 | 1 | trying to show. |
| 09:59 | 2 | MR. PRICE:  Can you blow up just Mr. Wolk? |
| 09:59 | 3 | *(Technician complies.)* |
| 09:59 | 4 | BY MR. PRICE: |
| 09:59 | 5 | Q.   So down here we have Mr. Wolk, correct? |
| 09:59 | 6 | A.   That's correct. |
| 09:59 | 7 | Q.   He's the Director Consumer Research, right? |
| 09:59 | 8 | A.   That's correct. |
| 09:59 | 9 | Q.   And then you are one of the people reporting to him as |
| 09:59 | 10 | a specialist in consumer research, correct? |
| 09:59 | 11 | A.   That's correct. |
| 09:59 | 12 | Q.   And for years this was called, what you were doing, |
| 09:59 | 13 | consumer research, and you were a specialist in consumer |
| 09:59 | 14 | research, correct? |
| 10:00 | 15 | A.   At that time that was my title. |
| 10:00 | 16 | Q.   And -- and in the years leading up to 2002, what was |
| 10:00 | 17 | your title? |
| 10:00 | 18 | A.   I don't remember exactly.  I mean, it would change |
| 10:00 | 19 | periodically.  Department name would also change |
| 10:00 | 20 | periodically.  But that time I was considered a specialist |
| 10:00 | 21 | in consumer research. |
| 10:00 | 22 | Q.   By 2002, there was nothing called a Marketing |
| 10:00 | 23 | Intelligence Department, correct? |
| 10:00 | 24 | A.   Correct. |
| 10:00 | 25 | Q.   And then, if you would look at Exhibit 9272, which I |

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

56

| | | |
|---|---|---|
| 10:00 | 1 | believe already is in evidence. |
| 10:00 | 2 | (Document provided to the witness.) |
| 10:00 | 3 | (Document displayed.) |
| 06:59 | 4 | BY MR. PRICE: |
| 10:00 | 5 | Q.   And if we look at the second page, you see this is a |
| 10:00 | 6 | February 2003 organizational chart for Boys/Entertainment; |
| 10:00 | 7 | do you see that? |
| 10:00 | 8 | A.   I do. |
| 10:01 | 9 | Q.   And at the top we have, again, Mr. Bousquette, correct? |
| 10:01 | 10 | A.   That's correct. |
| 10:01 | 11 | Q.   We have a whole bunch of people here who report to him, |
| 10:01 | 12 | correct? |
| 10:01 | 13 | A.   That's correct. |
| 10:01 | 14 | Q.   One of them, we have Mr. Ron Brawer, who's a senior |
| 10:01 | 15 | vice president, right? |
| 10:01 | 16 | A.   That's correct. |
| 10:01 | 17 | Q.   We also have Mr. Vollero, correct? |
| 10:01 | 18 | A.   That's correct. |
| 10:01 | 19 | Q.   And then if you look at page 25, 9272-25. |
| 10:01 | 20 | (Document displayed.) |
| 11:59 | 21 | BY MR. PRICE: |
| 10:01 | 22 | Q.   Over here at the far right, we have Mr. Vollero, Senior |
| 10:01 | 23 | Vice President Finance and Strategic Plan. |
| 10:01 | 24 | Do you see that? |
| 10:01 | 25 | A.   I do. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 57 of 138   Page ID #:311651
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

57

| | | |
|---|---|---|
| 10:01 | 1 | Q.   And there are two people who report directly to him. |
| 10:01 | 2 | Daniel Frechling and Emily Brown, correct? |
| 10:02 | 3 | A.   That's correct. |
| 10:02 | 4 | Q.   And there is an executive secretary up here on the |
| 10:02 | 5 | right, Jennifer Mennell, correct? |
| 10:02 | 6 | A.   Correct. |
| 10:02 | 7 | Q.   And under Mr. Frechling there are a number of people |
| 10:02 | 8 | who report to him, correct? |
| 10:02 | 9 | A.   That's correct. |
| 10:02 | 10 | Q.   And your name is on this line here, this vertical line |
| 10:02 | 11 | where it has Salvador Villasenor, again, Specialist Consumer |
| 10:02 | 12 | Research, correct? |
| 10:02 | 13 | A.   That's correct. |
| 10:02 | 14 | Q.   And up through this time, through 2003, when you would |
| 10:02 | 15 | send out reports, what would it have as the area, group, |
| 10:02 | 16 | department, or whatever, sending out the reports? |
| 10:02 | 17 | A.   Whatever name we were using at the time. |
| 10:02 | 18 | Q.   Now, let me ask you to look at Exhibit 25042. |
| 10:03 | 19 | *(Document provided to the witness.)* |
| 10:03 | 20 | BY MR. PRICE: |
| 10:03 | 21 | Q.   Do you have that in front of you? |
| 10:03 | 22 | A.   I do. |
| 10:03 | 23 | Q.   And do you recognize this as a 2005 document concerning |
| 10:03 | 24 | Market Intelligence? |
| 10:03 | 25 | A.   I don't recall ever seeing this. |

| | | |
|---|---|---|
| 10:03 | 1 | Q. Well, as of 2005, was there a two-person group called |
| 10:03 | 2 | "Market Intelligence"? |
| 10:03 | 3 | A. There was. Correct. |
| 10:03 | 4 | Q. And who were the two people in that group? |
| 10:03 | 5 | A. Myself and a woman named Stephanie Page. |
| 10:03 | 6 | Q. By the way, Ms. Page, how long did she work with you at |
| 10:04 | 7 | Mattel? |
| 10:04 | 8 | A. Roughly two years. Something -- somewhere around |
| 10:04 | 9 | there. |
| 10:04 | 10 | Q. Did she report to you? |
| 10:04 | 11 | A. She did. |
| 10:04 | 12 | Q. Is she the only one who was a direct report to you |
| 10:04 | 13 | during your time at Mattel? |
| 10:04 | 14 | A. During my entire 14 years? |
| 10:04 | 15 | Q. Yeah, that was a direct report that you were managing? |
| 10:04 | 16 | A. I had a few interns. I had some temps reporting to me, |
| 10:04 | 17 | and Stephanie Page. |
| 10:04 | 18 | Q. Other than interns and temps, during your entire time |
| 10:04 | 19 | at Mattel, did anyone report to you at Mattel other than |
| 10:04 | 20 | Stephanie Page? |
| 10:04 | 21 | A. I think it was only Stephanie Page. |
| 10:04 | 22 | Q. And Ms. Page, at any time, did she go to toy fairs and |
| 10:04 | 23 | use false identifications to get into showrooms? |
| 10:04 | 24 | A. No, she did not. |
| 10:04 | 25 | Q. And how do you know she didn't? |

| | | |
|---|---|---|
| 10:04 | 1 | A.    She never traveled with me. |
| 10:04 | 2 | Q.    Do you know whether or not Ms. Page was the one who |
| 10:05 | 3 | prepared the 2006, uh, toy fair report? |
| 10:05 | 4 | A.    I wasn't at Mattel in 2006, so I'm not aware of whether |
| 10:05 | 5 | or not she did or did not. |
| 10:05 | 6 | Q.    So let me get, uh, back then, to, uh -- to Mr. Brawer. |
| 10:05 | 7 | And if you'd look at Exhibit 9510. |
| 10:05 | 8 | *(Document provided to the witness.)* |
| 10:05 | 9 | MR. PRICE:  And this is already in evidence. |
| 10:05 | 10 | *(Document displayed.)* |
| 11:59 | 11 | BY MR. PRICE: |
| 10:05 | 12 | Q.    Do you recall Ms. Keller asked you questions about, uh, |
| 10:05 | 13 | this document yesterday you sent January 15, 2003.  Do you |
| 10:05 | 14 | see that? |
| 10:05 | 15 | A.    I do. |
| 10:05 | 16 | Q.    And, again, there's a distribution list that says "to," |
| 10:05 | 17 | correct? |
| 10:05 | 18 | A.    I'm sorry, where is that? |
| 10:05 | 19 | Q.    See where it says "to" and it has these names? |
| 10:06 | 20 | A.    Oh, I'm sorry, yes. |
| 10:06 | 21 | Q.    And it was your intent to send this information |
| 10:06 | 22 | basically to everyone that was up the chain of command, |
| 10:06 | 23 | correct? |
| 10:06 | 24 | A.    To the distribution list, correct. |
| 10:06 | 25 | Q.    And down here at the bottom you have "To:  Ron Brawer." |

| | | |
|---|---|---|
| 10:06 | 1 | Do you see that?  It's at the bottom -- actually, I'm not |
| 10:06 | 2 | pointing at your screen; I'm pointing at the big screen. |
| 10:06 | 3 | A.   Should I turn around? |
| 10:06 | 4 | Q.   The last name on the "To" list. |
| 10:06 | 5 | A.   Okay. |
| 10:06 | 6 | Q.   Do you see that? |
| 10:06 | 7 | A.   I see it now. |
| 10:06 | 8 | Q.   And then you have a CC here to some others including |
| 10:06 | 9 | Mr. Bousquette, correct? |
| 10:06 | 10 | A.   That is correct. |
| 10:06 | 11 | Q.   And you were informing these folks that you now had in |
| 10:06 | 12 | your possession 2003 price lists and catalog from a variety |
| 10:06 | 13 | of key manufacturers.  Do you see that? |
| 10:06 | 14 | A.   I do. |
| 10:06 | 15 | Q.   Now, let me ask you, it was fairly common for employees |
| 10:06 | 16 | to leave Mattel and work for competitors or for competitors' |
| 10:07 | 17 | employees to leave their competitive company and work for |
| 10:07 | 18 | Mattel, correct? |
| 10:07 | 19 | A.   That is correct. |
| 10:07 | 20 | Q.   In fact, you knew a number of people who went from |
| 10:07 | 21 | Mattel to MGA, right? |
| 10:07 | 22 | A.   That is correct. |
| 10:07 | 23 | Q.   Uh, one of 'em was Paula Garcia, for example. |
| 10:07 | 24 | A.   That is correct. |
| 10:07 | 25 | Q.   Uh -- and, uh, Mr. Brawer, for example? |

| | | |
|---|---|---|
| 10:07 | 1 | A.    That is correct. |
| 10:07 | 2 | Q.    Uh, do you know how many people?  Was it like a hundred |
| 10:07 | 3 | people who went from Mattel to MGA over a period of years? |
| 10:07 | 4 | A.    I have no idea on the exact number. |
| 10:07 | 5 | Q.    And I think you said that every year you would give |
| 10:07 | 6 | these -- these presentations about toy fairs, right? |
| 10:07 | 7 | A.    Correct. |
| 10:07 | 8 | Q.    You said you didn't -- you don't think you did it in |
| 10:07 | 9 | 2004? |
| 10:07 | 10 | A.    There were some years, right, where we didn't present |
| 10:07 | 11 | the findings.  But for the most part, we did present after |
| 10:07 | 12 | coming back from New York Toy Fair. |
| 10:07 | 13 | Q.    And you said a lot of people would come and look at |
| 10:07 | 14 | these presentations, correct? |
| 10:08 | 15 | A.    People would attend, correct. |
| 10:08 | 16 | Q.    And you tried to make it entertaining -- you know, we |
| 10:08 | 17 | saw one of those videos with *Entertainment Tonight*, right? |
| 10:08 | 18 | A.    That's correct. |
| 10:08 | 19 | Q.    In fact, it sounded kind of like an infomercial for |
| 10:08 | 20 | other companies' products.  Do you recall that? |
| 10:08 | 21 | A.    I do. |
| 10:08 | 22 | Q.    Okay.  And these reports you would do would say that |
| 10:08 | 23 | you were doing this based upon getting price lists and |
| 10:08 | 24 | catalogs from a variety of toy manufacturers, correct? |
| 10:08 | 25 | A.    Something like that, correct. |

| | | |
|---|---|---|
| 10:08 | 1 | Q.   And -- and there's been a suggestion that that would |
| 10:08 | 2 | tell people that you're doing something wrong; the only way |
| 10:08 | 3 | you could have gotten these was by using false |
| 10:08 | 4 | identifications.  That's not true, is it? |
| 10:08 | 5 | A.   I'm sorry.  You're gonna have to repeat that question, |
| 10:08 | 6 | please. |
| 10:08 | 7 | Q.   Sure. |
| 10:08 | 8 | A.   Or rephrase it. |
| 10:08 | 9 | Q.   It was muddled. |
| 10:08 | 10 | When you told these assembled groups of people -- |
| 10:08 | 11 | A.   I'm sorry.  Told who? |
| 10:08 | 12 | Q.   When you told these assembled groups of people that you |
| 10:09 | 13 | got the information -- |
| 10:09 | 14 | A.   Well -- |
| 10:09 | 15 | Q.   -- from price lists and catalogs -- okay? -- was it |
| 10:09 | 16 | your understanding you were telling them that you got this |
| 10:09 | 17 | through some unethical means such as using a false ID? |
| 10:09 | 18 | A.   Well, first of all, I never told them this at the |
| 10:09 | 19 | presentations.  That's not something you would discuss.  At |
| 10:09 | 20 | least I didn't mention that. |
| 10:09 | 21 | Q.   Well, it was -- it was, uh -- the presentations would |
| 10:09 | 22 | include photographs of product, correct? |
| 10:09 | 23 | A.   Correct. |
| 10:09 | 24 | Q.   It would say, "New York Toy Fair" or "report" or |
| 10:09 | 25 | something like that, correct? |

| | | |
|---|---|---|
| 10:09 | 1 | A.    Correct. |
| 10:09 | 2 | Q.    Uh, and in -- in the reports you do, it would say |
| 10:09 | 3 | things like 2000 -- you know, from competitors' catalogs? |
| 10:09 | 4 | A.    In the report? |
| 10:09 | 5 | Q.    Yes. |
| 10:09 | 6 | A.    It would say something like that, right. |
| 10:09 | 7 | Q.    And, uh, you went to toy fairs, right? |
| 10:09 | 8 | A.    I did. |
| 10:09 | 9 | Q.    You saw -- you saw catalogs, correct? |
| 10:09 | 10 | A.    Correct. |
| 10:09 | 11 | Q.    You saw people walking around with catalogs, right? |
| 10:09 | 12 | A.    Correct. |
| 10:10 | 13 | Q.    You would see people in private showrooms with |
| 10:10 | 14 | catalogs, right? |
| 10:10 | 15 | A.    Correct. |
| 10:10 | 16 | Q.    You would see people leaving private showrooms with |
| 10:10 | 17 | catalogs, correct? |
| 10:10 | 18 | A.    Correct. |
| 10:10 | 19 | Q.    Uh, you would see catalogs, uh, in public as well, |
| 10:10 | 20 | correct? |
| 10:10 | 21 | A.    What do you mean by "in public"? |
| 10:10 | 22 | Q.    Well, I mean there were manufacturers that didn't have |
| 10:10 | 23 | private showrooms that would have catalogs out there in |
| 10:10 | 24 | public? |
| 10:10 | 25 | A.    Correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 64 of 138   Page ID #:311658
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

64

| | | |
|---|---|---|
| 10:10 | 1 | Q.   And you're telling all these people, who at any moment |
| 10:10 | 2 | might go from Mattel to a competitor, that you have in your |
| 10:10 | 3 | possession price lists and catalogs from a variety of |
| 10:10 | 4 | manufacturers.  That's what you're saying here in -- in |
| 10:10 | 5 | 9510, correct? |
| 10:10 | 6 | A.   Correct. |
| 10:10 | 7 | Q.   And I guess my -- my question is, is that, you didn't |
| 10:10 | 8 | think this conveyed to them that you were doing anything |
| 10:10 | 9 | unethical or wrong, right? |
| 10:10 | 10 | A.   Correct. |
| 10:10 | 11 | Q.   I mean, because any of these folks, such as Mr. Brawer, |
| 10:10 | 12 | could at any day leave Mattel and join a competitor, right? |
| 10:11 | 13 | A.   Correct. |
| 10:11 | 14 | Q.   So where it says here that, "I have private lists and |
| 10:11 | 15 | catalogs," do you think that would lead someone like |
| 10:11 | 16 | Mr. Brawer or Ms. Garcia, if she had seen it, or anyone to |
| 10:11 | 17 | say, "Oh, this guy's going into showrooms and using fake |
| 10:11 | 18 | ID's"? |
| 10:11 | 19 | A.   No. |
| 10:11 | 20 | Q.   Can you deny that while Mr. Brawer was at Mattel that |
| 10:11 | 21 | you told him that you falsified your identity to visit toy |
| 10:11 | 22 | fairs?  Can you deny that? |
| 10:11 | 23 | MS. KELLER:  Objection.  Argumentative. |
| 10:11 | 24 | THE COURT:  Just a moment. |
| 10:11 | 25 | MS. KELLER:  And -- |

| | | |
|---|---|---|
| 10:11 | 1 | THE COURT:  In its present form.  It's a proper |
| 10:11 | 2 | area.  Just rephrase the question. |
| 10:11 | 3 | MR. PRICE:  Sure. |
| 12:59 | 4 | BY MR. PRICE: |
| 10:12 | 5 | Q.  Well -- |
| 10:12 | 6 | THE COURT:  It's a proper area.  It's just the |
| 10:12 | 7 | "can you deny." |
| 10:12 | 8 | BY MR. PRICE: |
| 10:12 | 9 | Q.  Do you believe that -- that Mr. Brawer, executive vice |
| 10:12 | 10 | president of sales at MGA, would be in at least as good a |
| 10:12 | 11 | position as you to recall whether or not you told him, while |
| 10:12 | 12 | you were at Mattel, that you were falsifying your identity |
| 10:12 | 13 | to visit toy fairs? |
| 10:12 | 14 | MS. KELLER:  Objection.  Speculation. |
| 10:12 | 15 | THE COURT:  Sustained.  You can certainly ask him |
| 10:12 | 16 | what he told Mr. Brawer. |
| 10:12 | 17 | BY MR. PRICE: |
| 10:12 | 18 | Q.  Well -- |
| 10:12 | 19 | THE COURT:  Conversations. |
| 10:12 | 20 | BY MR. PRICE: |
| 10:12 | 21 | Q.  My understanding is you don't recall -- you personally |
| 10:12 | 22 | don't recall telling Mr. Brawer, correct? |
| 10:12 | 23 | A.  That's correct. |
| 10:12 | 24 | Q.  Yeah.  Have you had any conversations with Mr. Brawer |
| 10:12 | 25 | since the time that you exchanged communications about |

| | | |
|---|---|---|
| 10:12 | 1 | getting a job at MGA? |
| 10:12 | 2 | A.   No, I have not. |
| 10:12 | 3 | Q.   Uh, have you read the deposition of Mr. Brawer in this |
| 10:13 | 4 | case where he testified under oath while being represented |
| 10:13 | 5 | by MGA? |
| 10:13 | 6 | A.   I have not. |
| 10:13 | 7 | Q.   So -- so sitting here today, you don't have any |
| 10:13 | 8 | information about Mr. Brawer's perspective as to whether or |
| 10:13 | 9 | not he learned, while at MGA, that -- I'm sorry -- while at |
| 10:13 | 10 | Mattel, that you were using, uh, uh, false identities to get |
| 10:13 | 11 | into toy fairs? |
| 10:13 | 12 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:13 | 13 | evidence.  Improper insinuation. |
| 10:13 | 14 | THE COURT:  Just a moment. |
| 10:13 | 15 | Well, the gist of the question is "have you got |
| 10:13 | 16 | any information about" -- I'm going to sustain the |
| 10:13 | 17 | objection, Counsel. |
| | 18 | BY MR. PRICE: |
| 10:13 | 19 | Q.   Well, let me ask it this way:  Uh, these conversations |
| 10:13 | 20 | took place years ago.  Is there a possibility that something |
| 10:13 | 21 | might refresh your recollection as to what you told |
| 10:13 | 22 | Mr. Brawer? |
| 10:13 | 23 | A.   Which conversations are you referring to? |
| 10:14 | 24 | Q.   I'm talking about a conversation where you told |
| 10:14 | 25 | Mr. Brawer that -- |

| | | |
|---|---|---|
| 10:14 | 1 | A.   I don't remember having -- I'm sorry for interrupting. |
| 10:14 | 2 | Q.   I understand you don't recall ever having it.  Could |
| 10:14 | 3 | that be because of the passage of time? |
| 10:14 | 4 | A.   It's a possibility, but again, I don't recall having |
| 10:14 | 5 | that conversation with him ever. |
| 10:14 | 6 | Q.   What you're saying, sitting here today, you don't have |
| 10:14 | 7 | a recollection of that, correct? |
| 10:14 | 8 | MS. KELLER:  Objection.  It's misstating the |
| 10:14 | 9 | testimony. |
| 10:14 | 10 | THE COURT:  Sustained. |
| 06:59 | 11 | BY MR. PRICE: |
| 10:14 | 12 | Q.   Well, do you believe your recollection might be |
| 10:14 | 13 | refreshed? |
| 10:14 | 14 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:14 | 15 | evidence that there was a recollection to be refreshed. |
| 10:14 | 16 | THE COURT:  Well, if we have something to refresh |
| 10:14 | 17 | his recollection between the two of you, let's just show it |
| 10:14 | 18 | to him. |
| 10:14 | 19 | MR. PRICE:  I'll see if this does.  I don't know |
| 10:14 | 20 | if it will.  I want to identify what it is. |
| 10:14 | 21 | THE COURT:  I would like a copy, also, so I know |
| 10:14 | 22 | what this is all about. |
| 10:14 | 23 | *(Document provided to the Court.)* |
| 10:15 | 24 | MS. KELLER:  Is there a question pending? |
| 10:15 | 25 | MR. PRICE:  I'm waiting. |

| | | |
|---|---|---|
| 10:15 | 1 | THE COURT:  Just a moment.  There's not. |
| 10:16 | 2 | You can refresh his recollection, Counsel. |
| 10:14 | 3 | *(Document provided to the witness.)* |
| | 4 | BY MR. PRICE: |
| 10:16 | 5 | Q.   So do you have that page in front of you? |
| 10:16 | 6 | A.   I do. |
| 10:16 | 7 | Q.   Okay.  Now, does that page which I've placed in front |
| 10:16 | 8 | of you, uh, refresh your recollection as to whether or not, |
| 10:16 | 9 | uh, you had a conversation with Mr. Brawer while he was at |
| 10:16 | 10 | Mattel where he was informed that you were using false |
| 10:16 | 11 | identifications to get into toy fair showrooms?  Does that |
| 10:16 | 12 | refresh your recollection? |
| 10:16 | 13 | A.   No, it does not. |
| 10:16 | 14 | Q.   Let me show you Exhibit 95 -- let's see.  It's 9511. |
| 10:16 | 15 | *(Document provided to the witness.)* |
| 10:17 | 16 | MR. PRICE:  And this is in evidence. |
| 10:17 | 17 | *(Document displayed.)* |
| 09:59 | 18 | BY MR. PRICE: |
| 10:17 | 19 | Q.   And if you would look at -- this is an e-mail chain, |
| 10:17 | 20 | again in January of 2003.  I want you to look at the |
| 10:17 | 21 | original message.  It starts at the very bottom of the first |
| 10:17 | 22 | page.  It says, "From Sal Villasenor," and it goes on to the |
| 10:17 | 23 | next page.  And, again, you have this list of folks that you |
| 10:17 | 24 | sent this to.  Do you see that? |
| 10:17 | 25 | A.   I see that. |

| 10:17 | 1 | Q.   And if you look two lines up from the bottom, I think, |
| 10:17 | 2 | of the CC's, you see there's Ron Brawer? |
| 10:17 | 3 | A.   I see his name. |
| 10:17 | 4 | Q.   And this was, again, part of your practice to send this |
| 10:17 | 5 | sort of marketing information kind of up the -- up the chain |
| 10:17 | 6 | of command? |
| 10:17 | 7 | A.   That's correct. |
| 10:17 | 8 | Q.   So when we have -- during the time frame that |
| 10:18 | 9 | Mr. Brawer is at Mattel in that chain of command -- uh, and |
| 10:18 | 10 | we've seen at least from 2001 to 2003 -- would he have been |
| 10:18 | 11 | on the, quote, "distribution list"?  You know, we have these |
| 10:18 | 12 | e-mails where you just say "To distribution"? |
| 10:18 | 13 | A.   Might have, might have not.  People would always ask to |
| 10:18 | 14 | be added or taken off distribution lists. |
| 10:18 | 15 | Q.   And this particular e-mail is about, uh, Hasbro's Fall |
| 10:18 | 16 | 2002 and Spring 2003.  Do you see that? |
| 10:18 | 17 | A.   I do. |
| 10:18 | 18 | Q.   And it talks about having, uh, price lists for boys, |
| 10:18 | 19 | Tiger, et cetera, correct? |
| 10:18 | 20 | A.   That's correct. |
| 10:18 | 21 | Q.   And then I'd like you to look, if you could, at |
| 10:18 | 22 | Exhibit 9293. |
| 10:18 | 23 | *(Document provided to the witness.)* |
| 10:18 | 24 | BY MR. PRICE: |
| 10:19 | 25 | Q.   And do you recognize this as an e-mail exchange between |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 70 of 138   Page ID #:311664
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

70

| | | |
|---|---|---|
| 10:19 | 1 | you and Mr. Machado of MGA? |
| 10:19 | 2 | A.   I do. |
| 10:19 | 3 | MR. PRICE:  Your Honor, move Exhibit 9293 into |
| 10:19 | 4 | evidence. |
| 10:19 | 5 | THE COURT:  Received. |
| 10:19 | 6 | *(Exhibit No. 9293 received in evidence.)* |
| 10:19 | 7 | *(Document displayed.)* |
| 10:19 | 8 | THE COURT:  Counsel, 9511 was not received. |
| 10:19 | 9 | MR. PRICE:  Your Honor, I'm sorry.  I move that in |
| 10:19 | 10 | evidence. |
| 10:19 | 11 | THE COURT:  I'll receive that also. |
| 10:19 | 12 | *(Exhibit No. 9511 received in evidence.)* |
| 10:19 | 13 | THE COURT:  And also 9510. |
| 10:19 | 14 | *(Exhibit No. 9510 received in evidence.)* |
| 10:19 | 15 | MR. PRICE:  Thank you. |
| 10:19 | 16 | BY MR. PRICE: |
| 10:19 | 17 | Q.   See at the bottom there, there appears to be an e-mail |
| 10:19 | 18 | from Mr. Machado to you, "Hello, Sal.  Remember me?  I used |
| 10:19 | 19 | to work at Mattel Mexico.  Now I work for Ron as VP |
| 10:20 | 20 | Marketing here in L.A." |
| 10:20 | 21 | Do you see that? |
| 10:20 | 22 | A.   I do. |
| 10:20 | 23 | Q.   Did you have an understanding who Mr. Machado was |
| 10:20 | 24 | referring to when you said he worked for Ron as vice |
| 10:20 | 25 | president of marketing in Los Angeles? |

Case 2:04-cv-09049-DOC-RNB  Document 10269  Filed 03/25/11  Page 71 of 138  Page ID #:311665
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

71

| | | |
|---|---|---|
| 10:20 | 1 | A.   I did. |
| 10:20 | 2 | Q.   And who did you understand he was referring to? |
| 10:20 | 3 | A.   Ron Brawer. |
| 10:20 | 4 | Q.   And it goes on, "He told me about you, and I am |
| 10:20 | 5 | interested in getting your curriculum and having an |
| 10:20 | 6 | interview with you." |
| 10:20 | 7 | Do you see that? |
| 10:20 | 8 | A.   I do. |
| 10:20 | 9 | Q.   And it says, "Please send your CV to this e-mail at |
| 10:20 | 10 | your earliest convenience.  I will coordinate with HR to |
| 10:20 | 11 | arrange an interview soon."  And then, the last page, it |
| 10:20 | 12 | says, "Thanks, Gustavo." |
| 10:20 | 13 | Do you see that? |
| 10:20 | 14 | A.   I do. |
| 10:20 | 15 | Q.   And if we look at your response, you say, "Hi, |
| 10:20 | 16 | Gustavo --" this was November 16, 2006? |
| 10:20 | 17 | A.   Correct. |
| 10:20 | 18 | Q.   It says, "Hi, Gustavo.  Of course I remember you.  How |
| 10:20 | 19 | could I forget the guy who's responsible for making Mattel's |
| 10:20 | 20 | international business so successful." |
| 10:21 | 21 | Do you see that? |
| 10:21 | 22 | A.   I do. |
| 10:21 | 23 | Q.   So Mr. Machado had previously worked, you understand, |
| 10:21 | 24 | for Mattel? |
| 10:21 | 25 | A.   Correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 72 of 138   Page ID #:311666
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

72

| | | |
|---|---|---|
| 10:21 | 1 | Q.   And did you actually, uh, have, uh, any communication |
| 10:21 | 2 | with him while he was at Mattel? |
| 10:21 | 3 | A.   I think he was on distribution for some of the reports, |
| 10:21 | 4 | but we wouldn't talk frequently or anything like that. |
| 10:21 | 5 | Q.   Okay.  So he would -- he would receive some of these |
| 10:21 | 6 | toy fair reports you would do, but you wouldn't have any |
| 10:21 | 7 | particular conversations with him? |
| 10:21 | 8 | A.   Correct. |
| 10:21 | 9 | Q.   And then it says, "I'm looking forward to meeting with |
| 10:21 | 10 | you and will get you a copy of my resumé in the next few |
| 10:21 | 11 | days.  If you wish to contact me before our interview, you |
| 10:21 | 12 | may reach me at --" and then there's a redacted number. |
| 10:21 | 13 | Do you see that? |
| 10:21 | 14 | A.   I do. |
| 10:21 | 15 | Q.   By the way, did you, in fact, meet with Mr. Machado? |
| 10:21 | 16 | A.   I did. |
| 10:21 | 17 | Q.   Did you also speak with Mr. Brawer? |
| 10:21 | 18 | A.   No, I don't think I met -- I saw Ron when I came to |
| 10:21 | 19 | MGA. |
| 10:21 | 20 | Q.   So your understanding was that Mr. Machado heard about |
| 10:22 | 21 | you from Ron Brawer, but you didn't meet with Mr. Brawer in |
| 10:22 | 22 | this process? |
| 10:22 | 23 | A.   Correct. |
| 10:22 | 24 | Q.   Now, this morning, you said something to, uh -- when |
| 10:22 | 25 | you first got on the stand, that you wanted to correct |

| 10:22 | 1 | something from yesterday, correct? |
| 10:22 | 2 | A.   Correct. |
| 10:22 | 3 | Q.   Uh, and I am kind of shooting in the dark here.  Uh, |
| 10:22 | 4 | what do you, uh -- what did you say yesterday you think was |
| 10:22 | 5 | incorrect? |
| 10:22 | 6 | A.   Well, both yesterday and today MGA's attorney had asked |
| 10:22 | 7 | some questions using the word "illegal" and "unlawful."  And |
| 10:22 | 8 | I just wanted to make it clear that I took that as |
| 10:22 | 9 | "unethical." |
| 10:22 | 10 | Q.   You're saying you didn't think you did anything |
| 10:22 | 11 | unlawful; is that what you're saying? |
| 10:23 | 12 | A.   Right.  I took it as being unethical. |
| 10:23 | 13 | Q.   Let's talk about what you did.  Uh, your first |
| 10:23 | 14 | supervisor you said was a Mr. Lange? |
| 10:23 | 15 | A.   Correct. |
| 10:23 | 16 | Q.   And he's the one who told you about getting into toy |
| 10:23 | 17 | fair showrooms using, uh, false identifications, correct? |
| 10:23 | 18 | A.   He's the person who did what, I'm sorry? |
| 10:23 | 19 | Q.   Who told you about getting into toy fair showrooms |
| 10:23 | 20 | using false identifications. |
| 10:23 | 21 | A.   That's correct. |
| 10:23 | 22 | Q.   Did anyone else tell you about that; that is, direct |
| 10:23 | 23 | you to get into toy fair showrooms with false |
| 10:23 | 24 | identifications, other than Mr. Lange? |
| 10:23 | 25 | A.   Depends on what time period you're talking. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

74

| | | |
|---|---|---|
| 10:23 | 1 | Q.   At any time.  I mean, you started out Mr. Lange telling |
| 10:23 | 2 | you that you were to do that.  Did anyone else tell you that |
| 10:23 | 3 | you were to do that, or did you just continue doing it? |
| 10:23 | 4 | A.   Jeff was the first person to mention it to me. |
| 10:23 | 5 | Q.   That is Mr. Lange? |
| 10:23 | 6 | A.   That is Mr. Lange, I'm sorry.  Mr. Lange. |
| 10:23 | 7 | Q.   So I'm just asking, did anyone else after that direct |
| 10:24 | 8 | you to do that, or did you just continue doing that? |
| 10:24 | 9 | A.   What do you mean exactly like directed? |
| 10:24 | 10 | Q.   I mean, like you get a new supervisor, and they say, |
| 10:24 | 11 | "Hey, wanna make sure you go into showrooms using false |
| 10:24 | 12 | identification"? |
| 10:24 | 13 | A.   There would be requests from certain supervisors for |
| 10:24 | 14 | information. |
| 10:24 | 15 | Q.   I'm not asking if there were requests for information. |
| 10:24 | 16 | I'm asking whether or not any supervisor said you are to get |
| 10:24 | 17 | information using false identifications after Mr. Lange told |
| 10:24 | 18 | you that? |
| 10:24 | 19 | A.   Yes, they had. |
| 10:24 | 20 | Q.   Who specifically said you were to get information using |
| 10:24 | 21 | false identification?  Who specifically directed you to do |
| 10:24 | 22 | that other than Mr. Lange? |
| 10:24 | 23 | A.   Well, during the meet-and-greets with my supervisors, |
| 10:24 | 24 | you know, again, I had numerous supervisors across the |
| 10:24 | 25 | years.  You know, that topic would come up, and it was part |

| | | |
|---|---|---|
| 10:24 | 1 | of the job and it was expected of me. |
| 10:24 | 2 | Q.   They would tell you that it was expected of you? |
| 10:24 | 3 | A.   Correct. |
| 10:24 | 4 | Q.   And we've seen some of your personnel file.  It -- in |
| 10:24 | 5 | your personnel file itself, it says that, uh, you are -- are |
| 10:25 | 6 | doing a good job getting, uh, competitive information and |
| 10:25 | 7 | getting catalogs and price lists, correct? |
| 10:25 | 8 | A.   Correct. |
| 10:25 | 9 | Q.   I mean, that's actually in writing in your personnel |
| 10:25 | 10 | file, correct? |
| 10:25 | 11 | A.   Correct. |
| 10:25 | 12 | Q.   And it's your understanding that -- that, uh, you're |
| 10:25 | 13 | supervisors thought you were doing something unethical and |
| 10:25 | 14 | illegal and are putting it in your personnel file in |
| 10:25 | 15 | writing? |
| 10:25 | 16 |         MS. KELLER:  Objection.  Assumes facts not in |
| 10:25 | 17 | evidence, that the illegal and unethical part was put in |
| 10:25 | 18 | writing. |
| 10:25 | 19 |         THE COURT:  Are you referring to the activities in |
| 10:25 | 20 | general?  Just rephrase it. |
| 10:25 | 21 | BY MR. PRICE: |
| 10:25 | 22 | Q.   Let me be clear. |
| 10:25 | 23 | A.   Okay. |
| 10:25 | 24 | Q.   Ms. Keller showed you a -- uh, I think some, uh, |
| 10:25 | 25 | reviews where it said that you were -- you were doing a good |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 76 of 138   Page ID #:311670
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

76

| | | |
|---|---|---|
| 10:25 | 1 | job getting competitive information and -- and catalogs and |
| 10:25 | 2 | price lists from toy fairs, right? |
| 10:25 | 3 | A.   If you're referring to my performance reviews, you're |
| 10:25 | 4 | correct. |
| 10:25 | 5 | Q.   Uh, and that itself doesn't indicate that you're doing |
| 10:25 | 6 | anything unethical or illegal, correct? |
| 10:25 | 7 | A.   Correct. |
| 10:26 | 8 | Q.   That is, someone could read that and think that you're |
| 10:26 | 9 | getting that information totally ethically and legally and |
| 10:26 | 10 | not having to misrepresent yourself, correct? |
| 10:26 | 11 | A.   Correct. |
| 10:26 | 12 | Q.   Now, let's -- let's talk about -- about what you did. |
| 10:26 | 13 | Uh, you would go to these things called "toy fairs," right? |
| 10:26 | 14 | A.   Correct. |
| 10:26 | 15 | Q.   How many people would be at these toy fairs? |
| 10:26 | 16 | A.   If you're talking about the major toy fairs, thousands |
| 10:26 | 17 | of people. |
| 10:26 | 18 | Q.   And, uh, there were some private showrooms, right? |
| 10:26 | 19 | A.   Correct. |
| 10:26 | 20 | Q.   And by the way, did you personally ever get into an MGA |
| 10:26 | 21 | private showroom? |
| 10:26 | 22 | A.   No. |
| 10:26 | 23 | Q.   Okay.  Did you, uh -- did you decide not to try or |
| 10:26 | 24 | what? |
| 10:26 | 25 | A.   I didn't bother trying, because, again, Paula Garcia, |

| | | |
|---|---|---|
| 10:26 | 1 | who used to work with me at Mattel, was now an MGA employee, |
| 10:26 | 2 | and she'd recognize me right away if I had tried to. |
| 10:27 | 3 | Q.   And there were other MGA employees who would also |
| 10:27 | 4 | recognize you? |
| 10:27 | 5 | A.   Yes. |
| 10:27 | 6 | Q.   Who were once at Mattel? |
| 10:27 | 7 | A.   That is correct. |
| 10:27 | 8 | Q.   But leaving that aside, whether you personally went in, |
| 10:27 | 9 | let me talk about your experience.  In these showrooms, |
| 10:27 | 10 | there would be retailers, correct? |
| 10:27 | 11 | A.   Correct. |
| 10:27 | 12 | Q.   There would be, uh, press, correct? |
| 10:27 | 13 | A.   Correct. |
| 10:27 | 14 | Q.   And as someone who worked for Mattel, uh, was it your |
| 10:27 | 15 | understanding that, uh, people who worked for the press are |
| 10:27 | 16 | kind of expected to write things in the press about what |
| 10:27 | 17 | they're seeing? |
| 10:27 | 18 | A.   Correct. |
| 10:27 | 19 | Q.   And when you went to these -- these toy fairs, while |
| 10:27 | 20 | you were at the toy fairs, uh, were there like toy fair |
| 10:27 | 21 | newspapers? |
| 10:27 | 22 | A.   Yes, there were. |
| 10:27 | 23 | Q.   Were there, uh, toy fair, uh, write-ups on the Internet |
| 10:27 | 24 | from the toy fair organization? |
| 10:27 | 25 | A.   Yes, there were. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 78 of 138   Page ID
#:311672
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:27 | 1 | Q.   Was there publicity? |
| 10:28 | 2 | A.   Correct. |
| 10:28 | 3 | Q.   During the toy fairs themselves, were there articles |
| 10:28 | 4 | that were -- you saw published concerning what was happening |
| 10:28 | 5 | at the toy fairs? |
| 10:28 | 6 | A.   Correct. |
| 10:28 | 7 | Q.   And in the time period right around the toy fairs, did |
| 10:28 | 8 | you see articles that were published concerning what had |
| 10:28 | 9 | happened at the toy fairs? |
| 10:28 | 10 | A.   Correct. |
| 10:28 | 11 | Q.   Was it your job -- one of your jobs to pay attention to |
| 10:28 | 12 | what was out there in terms of articles and press releases |
| 10:28 | 13 | and things of that nature? |
| 10:28 | 14 | A.   Absolutely, yes. |
| 10:28 | 15 | Q.   Well, let me ask you about press releases.  During the |
| 10:28 | 16 | toy fairs, were there press releases by the various |
| 10:28 | 17 | manufacturers? |
| 10:28 | 18 | A.   Yes, there were. |
| 10:28 | 19 | Q.   Did you see press releases by MGA? |
| 10:28 | 20 | A.   I don't recall if I did or didn't. |
| 10:28 | 21 | Q.   As part of your job, were you supposed to -- to -- to, |
| 10:28 | 22 | uh, review or collect press releases from manufacturers? |
| 10:29 | 23 | A.   As part of my job? |
| 10:29 | 24 | Q.   Uh-huh. |
| 10:29 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 10:29 | 1 | Q.   If MGA issued a press release, is that the kind of |
| 10:29 | 2 | thing that you believe that you would see as part of your |
| 10:29 | 3 | job? |
| 10:29 | 4 | A.   Press releases are part of the information we would go |
| 10:29 | 5 | after, correct. |
| 10:29 | 6 | Q.   And these -- these press releases and the articles |
| 10:29 | 7 | around the time of the toy fair, these would be about toys |
| 10:29 | 8 | that were going to be released in the future by these |
| 10:29 | 9 | manufacturers, correct? |
| 10:29 | 10 | A.   That is correct. |
| 10:29 | 11 | Q.   So let's talk about, then, your process of getting |
| 10:29 | 12 | into -- to this, uh, showroom where you would have retailers |
| 10:29 | 13 | and press and -- were licensees there also? |
| 10:29 | 14 | A.   Not sure.  I would assume so. |
| 10:29 | 15 | Q.   So to get into these -- these showrooms where there |
| 10:29 | 16 | were retailers and press, at least, you would hand them a |
| 10:29 | 17 | business card, right? |
| 10:29 | 18 | A.   Correct. |
| 10:29 | 19 | Q.   And if we can look at an example -- let's look at -- I |
| 10:30 | 20 | think Ms. Keller showed you 9480-5. |
| 10:30 | 21 |       MR. PRICE:  Well, just put that on -- Ken, if you |
| 10:30 | 22 | can. |
| 10:30 | 23 |       (Document provided to the witness.) |
| 10:30 | 24 |       (Document displayed.) |
| | 25 | |

| | | |
|---|---|---|
| 10:30 | 1 | BY MR. PRICE: |
| 10:30 | 2 | Q.   So you'd walk up to like a little table outside the |
| 10:30 | 3 | room? |
| 10:30 | 4 | A.   There was -- there were -- several bigger manufacturers |
| 10:30 | 5 | had like a reception area, a desk. |
| 10:30 | 6 | Q.   All right.  And you would go over and hand them a card |
| 10:30 | 7 | such as this, 9480-5, correct? |
| 10:30 | 8 | A.   That is correct. |
| 10:30 | 9 | Q.   In your experience, did you ever have to give them |
| 10:30 | 10 | anything else like a -- an invoice of some sort or even a |
| 10:30 | 11 | picture ID? |
| 10:31 | 12 | A.   I never had to. |
| 10:31 | 13 | Q.   Okay.  And let me ask you how you did this.  You've got |
| 10:31 | 14 | a company, The Toy Shop, right? |
| 10:31 | 15 | A.   That's what's written on there, correct. |
| 10:31 | 16 | Q.   Uh, why didn't you pick some company like, uh, Hasbro |
| 10:31 | 17 | or Jakks? |
| 10:31 | 18 | A.   At the time that's just a name that came to mind.  It's |
| 10:31 | 19 | just what I decided to go with at the time. |
| 10:31 | 20 | Q.   Well, this was a -- a totally fictitious shop, right? |
| 10:31 | 21 | It didn't exist, correct? |
| 10:31 | 22 | A.   Correct. |
| 10:31 | 23 | Q.   If you'd chosen Hasbro or Jakks, I mean, somebody there |
| 10:31 | 24 | might -- at the manufacturer might know people at Hasbro and |
| 10:31 | 25 | Jakks, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 81 of 138   Page ID #:311675
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

81

| 10:31 | 1 | A.   Probably.  It's a possibility. |
| 10:31 | 2 | Q.   Someone might say, "Hey, how's Joe Schmo doing at |
| 10:31 | 3 | Hasbro, and why isn't he here?" |
| 10:31 | 4 | A.   Again, that's a possibility.  I don't know. |
| 10:31 | 5 | Q.   You decided to choose a name that didn't exist and that |
| 10:32 | 6 | no one would have ever heard of, correct? |
| 10:32 | 7 | A.   That's correct. |
| 10:32 | 8 | Q.   And you chose the identity of a company that didn't |
| 10:32 | 9 | exist and no one had ever heard of in South El Monte |
| 10:32 | 10 | California, right? |
| 10:32 | 11 | A.   That's correct. |
| 10:32 | 12 | Q.   So in getting into those showrooms, you were a complete |
| 10:32 | 13 | stranger to the people you were handing this card to, right? |
| 10:32 | 14 | A.   Correct. |
| 10:32 | 15 | Q.   And you would give them the card of a toy shop that |
| 10:32 | 16 | they had never heard of, correct? |
| 10:32 | 17 | A.   Correct -- initially, correct. |
| 10:32 | 18 | Q.   I mean, if you went back the next year, they might have |
| 10:32 | 19 | remembered you from the year before, correct? |
| 10:32 | 20 | A.   Exactly. |
| 10:32 | 21 | Q.   Uh, uh, and then they would let you into these |
| 10:32 | 22 | showrooms where they were other retailers and the press, |
| 10:32 | 23 | correct? |
| 10:32 | 24 | A.   Correct. |
| 10:32 | 25 | Q.   And you'll agree that -- that once something is shown |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 82 of 138   Page ID #:311676
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:32 | 1 | to the press or to a complete stranger, it's no longer |
| 10:33 | 2 | confidential? |
| 10:33 | 3 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:33 | 4 | evidence.  Incomplete hypothetical. |
| 10:33 | 5 | THE COURT:  This is his opinion.  You'll decide |
| 10:33 | 6 | the issue concerning security and what is public information |
| 10:33 | 7 | and what's confidential information.  But I'll let him |
| 10:33 | 8 | express his own viewpoint about what his thoughts and |
| 10:33 | 9 | feelings are about that. |
| 10:33 | 10 | Overruled. |
| 10:33 | 11 | BY MR. PRICE: |
| 10:33 | 12 | Q.   Do you remember the question, sir? |
| 10:33 | 13 | A.   Repeat the question, please. |
| 10:33 | 14 | Q.   Yeah.  You would agree that once you show something to |
| 10:33 | 15 | the press, whose job is to publish it, or to a stranger, |
| 10:33 | 16 | that that information is no longer confidential? |
| 10:33 | 17 | MS. KELLER:  Objection.  Assumes "fact" not in |
| 10:33 | 18 | evidence. |
| 10:33 | 19 | THE COURT:  Overruled. |
| 10:33 | 20 | THE WITNESS:  I agree. |
| 10:33 | 21 | BY MR. PRICE: |
| 10:33 | 22 | Q.   And, in fact, on some occasions, you said you would use |
| 10:33 | 23 | a -- a card saying you were from the press? |
| 10:33 | 24 | A.   Correct. |
| 10:33 | 25 | Q.   In fact, if you'd look at Exhibit 36023. |

| | | |
|---|---|---|
| 10:33 | 1 | *(Document provided to the witness.)* |
| 11:59 | 2 | BY MR. PRICE: |
| 10:34 | 3 | Q.   Do you have that in front of you? |
| 10:34 | 4 | A.   I do. |
| 10:34 | 5 | Q.   And could you tell me what that is? |
| 10:34 | 6 | A.   It's the business card I used to get into the E3 |
| 10:34 | 7 | convention. |
| 10:34 | 8 | MR. PRICE:  Your Honor, if it's not in, |
| 10:34 | 9 | Your Honor, I move Exhibit 36023. |
| 10:34 | 10 | THE COURT:  Received. |
| 10:34 | 11 | *(Exhibit No. 36023 received in evidence.)* |
| 10:34 | 12 | *(Document displayed.)* |
| 10:34 | 13 | BY MR. PRICE: |
| 10:34 | 14 | Q.   And here it says, "The Daily 49er Newspaper."  And that |
| 10:34 | 15 | you're representing yourself as an editor of a newspaper, |
| 10:34 | 16 | California State University Long Beach, correct? |
| 10:34 | 17 | A.   That is correct. |
| 10:34 | 18 | Q.   And when you would get -- but you said this was at |
| 10:34 | 19 | what? |
| 10:34 | 20 | A.   I would use it.  I'm sorry? |
| 10:35 | 21 | Q.   What show -- I'm sorry.  What convention or toy fair? |
| 10:35 | 22 | A.   The Electronic Entertainment Expo. |
| 10:35 | 23 | Q.   And was that one of the expos where they had private |
| 10:35 | 24 | showrooms? |
| 10:35 | 25 | A.   Not -- they had huge galleries, open galleries, with, |

| | | |
|---|---|---|
| 10:35 | 1 | you know, reception areas that had, you know, press |
| 10:35 | 2 | releases. |
| 10:35 | 3 | Q.   And, uh, when you used this to get in, did you have to |
| 10:35 | 4 | sign some agreement that you wouldn't go back to, uh, your |
| 10:35 | 5 | office at California State University and write a long |
| 10:35 | 6 | article saying exactly what you saw? |
| 10:35 | 7 | A.   No. |
| 10:35 | 8 | Q.   At any time in getting in any of these showrooms, did |
| 10:35 | 9 | you have to sign anything saying, "I'm not gonna tell |
| 10:35 | 10 | anybody what I saw"? |
| 10:35 | 11 | A.   Are you referring to the E3 convention, or are you |
| 10:35 | 12 | referring to toy fair? |
| 10:35 | 13 | Q.   Let's go back to toy fair. |
| 10:35 | 14 | A.   Okay. |
| 10:35 | 15 | Q.   Were there instances at toy fair where you had to sign, |
| 10:35 | 16 | uh, an agreement that "I'm not gonna tell anybody anything"? |
| 10:36 | 17 | A.   Some manufacturers required for some retailers to sign |
| 10:36 | 18 | a nondisclosure agreement. |
| 10:36 | 19 | Q.   Do you know whether they required the press to sign |
| 10:36 | 20 | that? |
| 10:36 | 21 | A.   I'm not sure about that. |
| 10:36 | 22 | Q.   And there were a number of manufacturers who didn't |
| 10:36 | 23 | require you to sign anything, correct? |
| 10:36 | 24 | A.   That's correct. |
| 10:36 | 25 | Q.   And do you know whether or not MGA required retailers |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | and the press to sign anything that they would not reveal |
| 10:36 | 2 | what was in the showrooms? |
| 10:36 | 3 | A.   I do not know. |
| 10:36 | 4 | Q.   So, uh, you would go into these showrooms and -- and |
| 10:36 | 5 | the manufacturers would give out information to a fictitious |
| 10:36 | 6 | person who they'd never met before because you had a |
| 10:36 | 7 | business card, right? |
| 10:36 | 8 | A.   Correct. |
| 10:36 | 9 | Q.   And you'll agree that if they did that, they couldn't |
| 10:37 | 10 | have considered what they allowed you to see to be |
| 10:37 | 11 | confidential? |
| 10:37 | 12 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:37 | 13 | evidence and calls for speculation. |
| 10:37 | 14 | THE COURT:  Overruled. |
| 10:37 | 15 | MS. KELLER:  Incomplete hypothetical. |
| 10:37 | 16 | THE COURT:  Overruled. |
| 10:37 | 17 | I'll let him state his thought process about what |
| 10:37 | 18 | he believed, but eventually you'll decide what's |
| 10:37 | 19 | confidential information and what's not as a jury. |
| 10:37 | 20 | THE WITNESS:  Repeat the question, please. |
| 11:59 | 21 | BY MR. PRICE: |
| 10:37 | 22 | Q.   You'll agree that the manufacturers who would permit |
| 10:37 | 23 | you into their showrooms -- |
| 10:37 | 24 | THE COURT:  Not the manufacturers; his thought |
| 10:37 | 25 | process. |

DEBBIE GALE, U.S. COURT REPORTER

| 10:37 | 1 | BY MR. PRICE: |
| 10:37 | 2 | Q.   Okay.  Your thought process, your belief is if a |
| 10:37 | 3 | manufacturer let you into a showroom when you were a |
| 10:37 | 4 | complete stranger and you haven't signed a nondisclosure |
| 10:37 | 5 | agreement, uh, and all you have to do is show 'em a business |
| 10:37 | 6 | card, you would agree that in your opinion that information |
| 10:37 | 7 | is not considered confidential? |
| 10:37 | 8 | A.   That's correct. |
| 10:37 | 9 | Q.   And in your opinion, does it make sense to have the |
| 10:37 | 10 | press come in and look at information and sign a |
| 10:38 | 11 | nondisclosure agreement? |
| 10:38 | 12 | MS. KELLER:  Objection.  Argumentative. |
| 10:38 | 13 | THE COURT:  Sustained. |
| 10:38 | 14 | BY MR. PRICE: |
| 10:38 | 15 | Q.   Part of this process when you would go into showrooms |
| 10:38 | 16 | is that you would also be put on like a mailing list, right? |
| 10:38 | 17 | A.   By the manufacturer? |
| 10:38 | 18 | Q.   Yes. |
| 10:38 | 19 | A.   (No response.) |
| 10:38 | 20 | Q.   In other words, they would collect these cards and they |
| 10:38 | 21 | would send you catalogues? |
| 10:38 | 22 | A.   Correct.  If they didn't have a catalog or price list |
| 10:38 | 23 | available at the time, they would follow up by mailing one |
| 10:38 | 24 | to me. |
| 10:38 | 25 | Q.   And, uh, they would, uh -- did they just follow up with |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 87 of 138   Page ID #:311681
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

87

| | | |
|---|---|---|
| 10:38 | 1 | one catalog, or would you get stuff throughout the year, |
| 10:38 | 2 | kind of the promotional information? |
| 10:38 | 3 | A.   It varied by manufacturer. |
| 10:38 | 4 | Q.   Uh, so these -- these, uh, toy fairs with the |
| 10:38 | 5 | showrooms, uh, they didn't want competitors being in there, |
| 10:39 | 6 | right? |
| 10:39 | 7 | A.   Correct. |
| 10:39 | 8 | Q.   I mean, retailers were okay and the press is okay, but |
| 10:39 | 9 | they didn't want a competitor to be there at their little |
| 10:39 | 10 | private party, right? |
| 10:39 | 11 | A.   Correct. |
| 10:39 | 12 | MS. KELLER:  Objection.  Argumentative.  Motion to |
| 10:39 | 13 | strike as far as characterization as a private party. |
| 10:39 | 14 | THE COURT:  "Their little private party"? |
| 10:39 | 15 | MS. KELLER:  Yes. |
| 10:39 | 16 | THE COURT:  Everything else is fine, Counsel. |
| 10:39 | 17 | Take out "little private party," but the question remains. |
| 10:39 | 18 | MR. PRICE:  We'll forget the party. |
| 10:39 | 19 | BY MR. PRICE: |
| 10:39 | 20 | Q.   The manufacturers didn't -- I mean, they wanted |
| 10:39 | 21 | retailers there and they wanted the press there, but they |
| 10:39 | 22 | didn't want a competitor in this -- at this event, correct? |
| 10:39 | 23 | A.   I don't think so.  Correct. |
| 10:39 | 24 | Q.   And you knew that they wouldn't want a competitor at |
| 10:39 | 25 | the event, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 88 of 138   Page ID #:311682
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:39 | 1 | A.    At the event or in their showroom? |
| 10:39 | 2 | Q.    In their showroom. |
| 10:39 | 3 | A.    Correct. |
| 10:39 | 4 | Q.    And, uh, at –– when you got into any of these –– these |
| 10:39 | 5 | showrooms, did you, uh, try to sell Mattel products to the |
| 10:40 | 6 | retailers who were there for the other manufacturer?  I |
| 10:40 | 7 | mean, did you ever go in there and say, uh, you know, "I'm |
| 10:40 | 8 | from Mattel and I got something a lot better than this"? |
| 10:40 | 9 | A.    No. |
| 10:40 | 10 | Q.    Okay.  Did you ever, uh, go into the showrooms and in |
| 10:40 | 11 | any way, uh, you know, criticize that manufacturer's product |
| 10:40 | 12 | to the press who were there or to the, uh, buyers who were |
| 10:40 | 13 | there, the retailers? |
| 10:40 | 14 | A.    No. |
| 10:40 | 15 | Q.    Uh, did you ever do anything to try to prevent the |
| 10:40 | 16 | manufacturer from pricing and trying to sell their products |
| 10:40 | 17 | to the buyers and the press? |
| 10:40 | 18 | A.    No. |
| 10:41 | 19 | Q.    And certainly Mattel would not want competitors in its |
| 10:41 | 20 | showroom, you know, meeting with its retailers and trying |
| 10:41 | 21 | to –– and trying to lure those retailers from buying Mattel |
| 10:41 | 22 | products, correct? |
| 10:41 | 23 | A.    Correct. |
| 10:41 | 24 | Q.    Now, you were not part of the –– of the sales force at |
| 10:41 | 25 | Mattel, correct? |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

89

| 10:41 | 1 | A.   Correct. |
|-------|---|---------------|

10:41   2   Q.   You didn't go and -- and meet with these retailers of

10:41   3   Mattel on -- on a frequent basis, correct?

10:41   4   A.   Correct.

10:41   5   Q.   You were not the person that the retailers would

10:41   6   contact to say, "We want a better price" or "We want a

10:41   7   different product," correct?

10:41   8   A.   Correct.

10:41   9   Q.   And you were asked some questions about, uh, some price

10:41   10  information that were in your toy fair reports.  Do you

10:41   11  recall that?

10:41   12  A.   I do.

10:41   13  Q.   And, uh, is it your understanding that a retailer --

10:42   14  and to be clear, a retailer is someone who buys from Mattel

10:42   15  or MGA or from -- from Hasbro or Jakks, right?

10:42   16  A.   That's correct.

10:42   17  Q.   Or someone.

10:42   18       So is it your understanding that retailers don't try to

10:42   19  play off the -- their suppliers against each other, that

10:42   20  they don't come to the salespeople and say, "Hey, Jakks is

10:42   21  offering me this at this amount; you know, you have to do

10:42   22  something to beat that, or I'm not gonna buy from you"?

10:42   23       MS. KELLER:  Objection.  Irrelevant.  No

10:42   24  foundation.  Irrelevant to this witness.

10:42   25       THE COURT:  I need more foundation, Counsel.

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

90

| 10:42 | 1 | BY MR. PRICE: |
|---|---|---|
| 10:42 | 2 | Q.   Do you have any information, given the position you |
| 10:42 | 3 | were in, as to whether or not retailers would contact |
| 10:42 | 4 | salespeople at Mattel and try to play off Mattel against one |
| 10:42 | 5 | of Mattel's competitors in trying to get a better price or a |
| 10:43 | 6 | better product? |
| 10:43 | 7 | A.   No, I have no information of that. |
| 10:43 | 8 | Q.   And that's because your job was simply to collect |
| 10:43 | 9 | information, correct? |
| 10:43 | 10 | A.   When visiting the toy fairs?  Is that what you're |
| 10:43 | 11 | referring to? |
| 10:43 | 12 | Q.   Yes. |
| 10:43 | 13 | A.   Correct. |
| 10:43 | 14 | Q.   And your job was also to kind of analyze information |
| 10:43 | 15 | that was out there, correct? |
| 10:43 | 16 | A.   Correct. |
| 10:43 | 17 | Q.   And in that job, you did not know how retailers |
| 10:43 | 18 | interacted with Mattel in connection with getting prices or |
| 10:43 | 19 | products from Mattel, correct? |
| 10:43 | 20 | A.   That's correct. |
| 10:43 | 21 | Q.   Now, you understand -- is it your understanding that in |
| 10:44 | 22 | this case that MGA is -- is contending that some of its |
| 10:44 | 23 | trade secrets were -- were revealed to you at these toy |
| 10:44 | 24 | fairs? |
| 10:44 | 25 | A.   That MGA trade secrets were revealed to me? |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

91

| | | |
|---|---|---|
| 10:44 | 1 | Q.   Yes.  Do you have any understanding that that's one of |
| 10:44 | 2 | the issues in this case? |
| 10:44 | 3 | A.   Correct. |
| 10:44 | 4 | Q.   So I want to take you through some of these -- these |
| 10:44 | 5 | reports that were done.  And in particular, language in the |
| 10:44 | 6 | reports.  Okay? |
| 10:44 | 7 | A.   Okay. |
| 10:44 | 8 | Q.   And if we could put in front of you -- let's see -- get |
| 10:44 | 9 | the right exhibit number here.  Let's start with |
| 10:44 | 10 | Exhibit 9502. |
| 10:44 | 11 | *(Document provided to the witness.)* |
| 10:44 | 12 | BY MR. PRICE: |
| 10:45 | 13 | Q.   And I believe you were asked about this yesterday. |
| 10:45 | 14 | Could you tell me what that is? |
| 10:45 | 15 | *(Document displayed.)* |
| 10:45 | 16 | BY MR. PRICE: |
| 10:45 | 17 | Q.   Actually, I think I've given you the wrong one.  I |
| 10:45 | 18 | meant it to be 9504, which is the actual report.  My |
| 10:45 | 19 | apologies. |
| 10:45 | 20 | *(Document provided to the witness.)* |
| 10:45 | 21 | *(Document displayed.)* |
| 10:45 | 22 | BY MR. PRICE: |
| 10:45 | 23 | Q.   And do you recall being shown 9504 yesterday, |
| 10:46 | 24 | April 2001, "Toy Fair 2001 Competitive Toy Review"? |
| 10:46 | 25 | Do you see that? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:46 | 1 | A.   I do. |
| 10:46 | 2 | Q.   And if you'd go in here and look at page 40, you see |
| 10:46 | 3 | there's an entry there under MGA, "Hello Kitty." |
| 10:46 | 4 | *(Document displayed.)* |
| 10:46 | 5 | BY MR. PRICE: |
| 10:46 | 6 | Q.   "Be Beautiful, Matchmaker Journal, and Virtual Crush." |
| 10:46 | 7 | Do you see that? |
| 10:46 | 8 | A.   Yes. |
| 10:46 | 9 | Q.   And it says, "Features:  Electronic Hello Kitty |
| 10:46 | 10 | products act as girl diary and address book, virtual |
| 10:46 | 11 | boyfriend or makeup adviser." |
| 10:46 | 12 | Do you see that? |
| 10:46 | 13 | A.   I do. |
| 10:46 | 14 | Q.   If you look at -- keep the report there handy. |
| 10:46 | 15 | If you would look at Exhibit 16786. |
| 10:47 | 16 | *(Document provided to the witness.)* |
| 10:47 | 17 | *(Document displayed.)* |
| 10:47 | 18 | BY MR. PRICE: |
| 10:47 | 19 | Q.   And do you recognize that as a press release dated |
| 10:47 | 20 | February 8, 2001, by MGA? |
| 10:47 | 21 | MS. KELLER:  Objection.  No foundation. |
| 10:47 | 22 | BY MR. PRICE: |
| 10:47 | 23 | Q.   Well, first let me ask you this.  It was your job to |
| 10:47 | 24 | keep track of the public information -- |
| 10:47 | 25 | THE COURT:  I'm going to sustain the objection as |

| | | |
|---|---|---|
| 10:47 | 1 | we discussed.  I want to know if he's seen this before. |
| 11:59 | 2 | BY MR. PRICE: |
| 10:47 | 3 | Q.   So let me ask you this:  Was it your job to review |
| 10:47 | 4 | public information, press releases, newspapers, articles |
| 10:47 | 5 | about competitive product? |
| 10:47 | 6 | A.   Yes, it was. |
| 10:47 | 7 | Q.   Have you seen Exhibit 16786 before? |
| 10:48 | 8 | A.   I don't recall seeing this. |
| 10:48 | 9 | Q.   Do you know one way or another whether or not around |
| 10:48 | 10 | the time of the toy fair MGA was, uh, publicly announcing, |
| 10:48 | 11 | uh, its Hello Kitty, Be Beautiful, and Matchmaker products? |
| 10:48 | 12 | MS. KELLER:  Objection.  Vague as to time.  No |
| 10:48 | 13 | foundation. |
| 10:48 | 14 | THE COURT:  Overruled. |
| 10:48 | 15 | You can answer that question. |
| 10:48 | 16 | THE WITNESS:  Repeat the question, please. |
| 10:48 | 17 | BY MR. PRICE: |
| 10:48 | 18 | Q.   Yeah.  Do you know whether or not MGA, around the time |
| 10:48 | 19 | of the New York Toy Fair in February 2001, uh, was publicly |
| 10:48 | 20 | announcing its Hello Kitty, Be Beautiful, and Matchmaker |
| 10:48 | 21 | products? |
| 10:48 | 22 | A.   I -- I don't remember whether they were or weren't. |
| 10:48 | 23 | Q.   Is that something that was your job to take -- to keep |
| 10:48 | 24 | track of? |
| 10:49 | 25 | MS. KELLER:  Objection.  Asked and answered. |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:49 | 1 | THE COURT:  Overruled. |
| 10:49 | 2 | Was your job to keep track?  That was the |
| 10:49 | 3 | question. |
| 10:49 | 4 | THE WITNESS:  At toy fair?  It was -- yes, it was |
| 10:49 | 5 | part of my job.  But keep in mind, it was a team effort, so |
| 10:49 | 6 | someone else within the team could have had this or have |
| 10:49 | 7 | gathered it or read it. |
| 10:49 | 8 | MR. PRICE:  Your Honor, I would offer |
| 10:49 | 9 | 16786 conditionally based upon a future witness, Mr. Larian. |
| 10:49 | 10 | MS. KELLER:  Objection. |
| 10:49 | 11 | THE COURT:  I'm going to allow it conditionally, |
| 10:49 | 12 | Counsel. |
| 10:49 | 13 | *(Exhibit No. 16786 received in evidence.)* |
| 10:49 | 14 | *(Document displayed.)* |
| 10:49 | 15 | BY MR. PRICE: |
| 10:49 | 16 | Q.   So if we could look at 16786, and you see here, under |
| 10:49 | 17 | where it says, "We've got a license to thrill" -- it's the |
| 10:50 | 18 | last paragraph. |
| 10:50 | 19 | And in the first paragraph, do you see here it talks |
| 10:50 | 20 | about Hello Kitty, Beautiful? |
| 10:50 | 21 | A.   I do. |
| 10:50 | 22 | Q.   Talks about "an electronic makeup compact that actually |
| 10:50 | 23 | tells 'em what makeup to wear and when to wear it," paren, |
| 10:50 | 24 | "Hello Kitty, Beautiful." |
| 10:50 | 25 | A.   I do. |

| | | |
|---|---|---|
| 10:50 | 1 | Q.   And it goes on to say, "as well as an organizer/journal |
| 10:50 | 2 | that analyze a current love interest and the user's |
| 10:50 | 3 | personality electronically," paren, "Hello Kitty Matchmaker |
| 10:50 | 4 | Journal." |
| 10:50 | 5 | Do you see that? |
| 10:50 | 6 | A.   I do. |
| 10:50 | 7 | Q.   And "Other products in the Hello Kitty line include a |
| 10:50 | 8 | standing pinball machine and junior scooter." |
| 10:50 | 9 | Do you see that? |
| 10:50 | 10 | A.   I do. |
| 10:50 | 11 | Q.   And based on this press release, 16786, that |
| 10:51 | 12 | information was made public by MGA at the time of the toy |
| 10:51 | 13 | fair, correct? |
| 10:51 | 14 | MS. KELLER:  Objection.  Vague as to "that |
| 10:51 | 15 | information." |
| 10:51 | 16 | MR. PRICE:  That I just read. |
| 10:51 | 17 | THE COURT:  Overruled. |
| 10:51 | 18 | THE WITNESS:  Correct. |
| 10:51 | 19 | BY MR. PRICE: |
| 10:51 | 20 | Q.   And if we look at -- go to Exhibit 9504, this is the |
| 10:51 | 21 | April 2001 Toy Fair Review.  Under MGA it says, "Hello Kitty |
| 10:51 | 22 | and Beautiful, Matchmaker Journal, and Virtual Crush." |
| 10:51 | 23 | Do you see that? |
| 10:51 | 24 | A.   I do. |
| 10:51 | 25 | Q.   Electronic Hello Kitty Products act as girls' diary and |

| | | |
|---|---|---|
| 10:51 | 1 | address book, virtual boyfriend, or makeup adviser." |
| 10:51 | 2 | Do you see that? |
| 10:51 | 3 | A.   I do. |
| 10:51 | 4 | Q.   If you'd look at page 41 of 9504, the next page. |
| 10:51 | 5 | *(Document displayed.)* |
| 10:51 | 6 | BY MR. PRICE: |
| 10:51 | 7 | Q.   Do you see it refers to, at the top, uh, a product with |
| 10:51 | 8 | the features "Matchmaker Journal acts as your personal |
| 10:52 | 9 | diary, analyzes your personality, and rates your |
| 10:52 | 10 | relationship." |
| 10:52 | 11 | Do you see that? |
| 10:52 | 12 | A.   I do. |
| 10:52 | 13 | Q.   If you'd look at your report, April 2001, page 71. |
| 10:52 | 14 | *(Document displayed.)* |
| 10:52 | 15 | *(Document provided to the witness.)* |
| 10:52 | 16 | BY MR. PRICE: |
| 10:52 | 17 | Q.   It should be the same -- I'm sorry.  It's the same |
| 10:52 | 18 | exhibit number.  I was trying to make sure we didn't use two |
| 10:52 | 19 | different numbers here.  And I actually told you the -- it's |
| 10:52 | 20 | the same April 2001 report. |
| 10:52 | 21 | If you'd look at page 71 in the same 2001 report.  And |
| 10:52 | 22 | do you see there's an MGA Hello Kitty scooter? |
| 10:52 | 23 | A.   I do. |
| 10:52 | 24 | Q.   Okay.  And if you'd look at 16786, the February 2001 |
| 10:53 | 25 | press release, you see it under the "License to Thrill"? |

| | | |
|---|---|---|
| 10:53 | 1 | (Document displayed.) |
| 01:59 | 2 | BY MR. PRICE: |
| 10:53 | 3 | Q.   Where we read that "other products in the Hello Kitty |
| 10:53 | 4 | line include a standing pinball machine and a junior |
| 10:53 | 5 | scooter." |
| 10:53 | 6 |      Do you see that? |
| 10:53 | 7 | A.   I do. |
| 10:53 | 8 | Q.   By the way, do you have -- you have no information, do |
| 10:53 | 9 | you, that anybody in Mattel's design product used any of the |
| 10:53 | 10 | information that you conveyed in your competition reports? |
| 10:53 | 11 |      MS. KELLER:  Objection.  No foundation.  No |
| 10:53 | 12 | foundation this witness knows anything about what the design |
| 10:53 | 13 | center used. |
| 10:53 | 14 |      THE COURT:  Well, let's find out if he does. |
| 10:53 | 15 |      Do you have any information about the design |
| 10:53 | 16 | center and what they used or didn't use? |
| 10:53 | 17 |      THE WITNESS:  I do not. |
| 10:53 | 18 |      MR. PRICE:  That was my question. |
| 10:53 | 19 | BY MR. PRICE: |
| 10:53 | 20 | Q.   So let's turn to, now, page 76 of your April 2001 |
| 10:54 | 21 | report.  And do you see there it talks about "MGA Insecto |
| 10:54 | 22 | Bots' features react and interact with each other.  Will |
| 10:54 | 23 | react to light, sound, and touch.  Contain two modes: |
| 10:54 | 24 | Interactive and lurk.  Totally wireless." |
| 10:54 | 25 |      Do you see that? |

| | | |
|---|---|---|
| 10:54 | 1 | A.   I do. |
| 10:54 | 2 | Q.   And if you look at MGA's press release, February 8th, |
| 10:54 | 3 | 2001, Exhibit 16786, and there's a paragraph that says, |
| 10:54 | 4 | "They're coming and nothing can stop them." |
| 10:54 | 5 |     Do you see that? |
| 10:54 | 6 | A.   I do. |
| 10:54 | 7 | Q.   "Having landed on earth today from a galaxy far, far |
| 10:54 | 8 | away, the Insecto Bots are sure to set a new precedent for |
| 10:54 | 9 | creepy, crawly robotic things and for life beyond our solar |
| 10:54 | 10 | system.  Equipped with different colored lights and sound, |
| 10:54 | 11 | the Insecto Bots are four different crawling robot insect |
| 10:55 | 12 | creatures with the ability to respond to environmental |
| 10:55 | 13 | changes in light, sound, touch, and infrared.  The Insecto |
| 10:55 | 14 | Bots even react to each other and come with three different |
| 10:55 | 15 | behavior modes including natural, lurk, and leader." |
| 10:55 | 16 |     Do you see that? |
| 10:55 | 17 | A.   I do. |
| 10:55 | 18 | Q.   So it's based upon the MGA press release.  Is it your |
| 10:55 | 19 | understanding that the information contained there about |
| 10:55 | 20 | Insecto Bots in the press release was public, uh, as of the |
| 10:55 | 21 | time of the toy fair? |
| 10:55 | 22 | A.   That is correct. |
| 10:55 | 23 | Q.   But the press release is February 8, 2001.  Do you |
| 10:55 | 24 | recall when the toy fair was in February, the New York Toy |
| 10:55 | 25 | Fair? |

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

99

| | | |
|---|---|---|
| 10:55 | 1 | A.   I do not. |
| 10:55 | 2 | Q.   When -- is there some time of year that that usually |
| 10:55 | 3 | takes place? |
| 10:55 | 4 | A.   In February. |
| 10:55 | 5 | Q.   And if we look at 9504, the first -- I'm sorry. |
| 10:56 | 6 | If we look at the April 2001 toy fair report, which is |
| 10:56 | 7 | 9504, on the first page. |
| 10:56 | 8 | *(Document provided to the witness.)* |
| 10:56 | 9 | *(Document displayed.)* |
| 10:56 | 10 | BY MR. PRICE: |
| 10:56 | 11 | Q.   Ms. Keller pointed out to you the language here: |
| 10:56 | 12 | "Although the VW Boys Marketing Research Department tries to |
| 10:56 | 13 | acquire as many competitive catalogues as possible, time |
| 10:56 | 14 | constraints and availability dictate catalog priorities." |
| 10:56 | 15 | Do you see that? |
| 10:56 | 16 | A.   I do. |
| 10:56 | 17 | Q.   By saying that you were attempting to acquire |
| 10:56 | 18 | competitive catalogues, was it your understanding that you |
| 10:56 | 19 | were indicating to everybody on this distribution list that |
| 10:56 | 20 | you were doing it by using false identifications? |
| 10:56 | 21 | A.   No. |
| 10:56 | 22 | Q.   And that's because you could acquire many competitive |
| 10:56 | 23 | catalogs without doing that, correct? |
| 10:56 | 24 | A.   Many? |
| 10:57 | 25 | Q.   Yeah. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:57 | 1 | A.   Correct. |
| 10:57 | 2 | Q.   And, in fact, you would see people, as I said, carrying |
| 10:57 | 3 | these catalogues with them, correct? |
| 10:57 | 4 | A.   Correct. |
| 10:57 | 5 | Q.   And one of the things you were told is you could trade |
| 10:57 | 6 | catalogues? |
| 10:57 | 7 | MS. KELLER:  Object.  No foundation as to what |
| 10:57 | 8 | companies we're talking about. |
| 10:57 | 9 | THE COURT:  Overruled. |
| 10:57 | 10 | THE WITNESS:  Correct.  We had trade catalogs in |
| 10:57 | 11 | the past. |
| 10:57 | 12 | BY MR. PRICE: |
| 10:57 | 13 | Q.   Would you go up to someone and say, "I'll give you a |
| 10:57 | 14 | Mattel catalog if you give me your catalog"? |
| 10:57 | 15 | A.   Well, we would do the trade -- at least I would do the |
| 10:57 | 16 | trading, not at toy fair, but back at the office. |
| 10:57 | 17 | Q.   Once you got back to the office, you contact someone -- |
| 10:57 | 18 | you would get catalogs by kind of like trading, uh, baseball |
| 10:57 | 19 | player cards?  You'd call and say, "Give me a Sandy Koufax |
| 10:57 | 20 | Mattel, and I'll give you a..." |
| 10:57 | 21 | A.   Something like that, correct. |
| 10:58 | 22 | Q.   Now, if you would look at Exhibit 2239. |
| 10:58 | 23 | THE WITNESS:  Before we move on, can I add |
| 10:58 | 24 | something as to the last question? |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:58 | 1 | BY MR. PRICE: |
| 10:58 | 2 | Q.   Go ahead.  Take up my time.  That's okay. |
| 10:58 | 3 | A.   I want to make it clear that, you know, catalogs were |
| 10:58 | 4 | not only available at private showrooms, they were available |
| 10:58 | 5 | at convention halls at toy fair, for example, at the Javits |
| 10:58 | 6 | Center in New York, and various manufacturers would have |
| 10:58 | 7 | tables with just the catalogs lying there for people to walk |
| 10:58 | 8 | through and pick 'em up themselves, without having to show a |
| 10:58 | 9 | business card. |
| 10:58 | 10 | Q.   Was it your understanding that the purpose of the |
| 10:58 | 11 | catalog was to help sell the product? |
| 10:59 | 12 | A.   Correct. |
| 10:59 | 13 | Q.   And was it your understanding that one of things |
| 10:59 | 14 | manufacturers tried to accomplish at the toy fairs was to -- |
| 10:59 | 15 | to publicize their upcoming products? |
| 10:59 | 16 | A.   Correct. |
| 10:59 | 17 |         MR. PRICE:  Your Honor, could we have a personal |
| 10:59 | 18 | break? |
| 10:59 | 19 |         THE COURT:  Certainly.  Why don't we come back and |
| 10:59 | 20 | get you in 15 minutes.  You're admonished not to discuss |
| 10:59 | 21 | this matter amongst yourselves, nor form or express any |
| 10:59 | 22 | opinion concerning the case.  We'll get you at 11:15.  Thank |
| 10:59 | 23 | you. |
| 10:59 | 24 |         *(Jury recesses at 10:59 a.m.)* |
| 10:59 | 25 |         THE COURT:  Sir, would you return at 11:15. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 102 of 138   Page ID #:311696
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

102

| | | |
|---|---|---|
| 10:59 | 1 | THE WITNESS:  Sure. |
| 10:59 | 2 | *(Witness steps down.)* |
| 10:59 | 3 | THE COURT:  Counsel, 11:15, please. |
| 10:59 | 4 | *(Recess held at 11:15 a.m.)* |
| 10:59 | 5 | *(Proceedings resumed at 11:16 a.m.)* |
| 11:07 | 6 | *(In the presence of the jury.)* |
| 11:16 | 7 | THE COURT:  All right.  We're back in session. |
| 11:16 | 8 | And the jury's present.  All counsel are present. |
| 11:16 | 9 | Mr. Villasenor is being cross-examined by |
| 11:16 | 10 | Mr. Price for Mattel. |
| 09:29 | 11 | BY MR. PRICE: |
| 11:16 | 12 | Q.  Mr. Villasenor, if you still have 9504 in front of you, |
| 11:16 | 13 | that April 2001 report? |
| 11:16 | 14 | A.  Yes, I do. |
| 11:16 | 15 | Q.  Okay.  I'd like you to look at Exhibit 21233-00077. |
| 11:16 | 16 | *(Document provided to the witness.)* |
| 11:16 | 17 | THE COURT:  And, Counsel, you asked me to |
| 11:16 | 18 | conditionally receive 16786.  I'm receiving that for all |
| 11:16 | 19 | purposes now. |
| 11:16 | 20 | MR. PRICE:  Thank you, Your Honor. |
| 11:16 | 21 | *(Exhibit No. 16786 received in evidence.)* |
| | 22 | BY MR. PRICE: |
| 11:17 | 23 | Q.  Mr. Villasenor, do you -- have you seen this before:  A |
| 11:17 | 24 | news article dated February 2001? |
| 11:17 | 25 | A.  I might have, but I don't recall it. |

| | | |
|---|---|---|
| 11:17 | 1 | Q.   Uh, have you heard of a publication called *Kidscreen*? |
| 11:17 | 2 | A.   Yes, I have. |
| 11:17 | 3 | Q.   What is *Kidscreen*? |
| 11:17 | 4 | A.   It's a kid-related magazine. |
| 11:17 | 5 | Q.   And would it have an issue around the time of the toy |
| 11:17 | 6 | fair, February 2001, et cetera? |
| 11:17 | 7 | A.   Correct. |
| 11:17 | 8 | Q.   And was part of your job to look at these sort of |
| 11:17 | 9 | articles about competitors? |
| 11:17 | 10 | A.   Correct. |
| 11:17 | 11 | Q.   So would it have been your practice to have seen this |
| 11:17 | 12 | article? |
| 11:17 | 13 | A.   Correct. |
| 11:17 | 14 |          MS. KELLER:  Object. |
| 11:17 | 15 |          MR. PRICE:  Pardon? |
| 11:17 | 16 |          MS. KELLER:  Well -- |
| 11:17 | 17 |          MR. PRICE:  I couldn't understand -- I didn't hear |
| 11:17 | 18 | the answer.  I'm sorry. |
| 11:17 | 19 |          THE WITNESS:  Correct. |
| 11:17 | 20 | BY MR. PRICE: |
| 11:17 | 21 | Q.   And you said you can't be sure.  Do you believe this |
| 11:18 | 22 | was an article you saw around February 2001? |
| 11:18 | 23 | A.   It's possible. |
| 11:18 | 24 |          MR. PRICE:  Your Honor, I'd move 21233 into |
| 11:18 | 25 | evidence. |

| | | |
|---|---|---|
| 11:18 | 1 | MS. KELLER:  No foundation. |
| 11:18 | 2 | MR. PRICE:  Dash 00077. |
| 11:18 | 3 | THE COURT:  Well, because of his position, in |
| 11:18 | 4 | terms of the breadth and extent of the alleged information |
| 11:18 | 5 | he's gathering, I'm going to allow this into evidence at |
| 11:18 | 6 | this time. |
| 11:18 | 7 | (Exhibit No. 21233-00077 received in |
| 11:18 | 8 | evidence.) |
| 11:18 | 9 | THE COURT:  Now, ladies and gentlemen, he may have |
| 11:18 | 10 | a difficult time recalling a specific article, but since he |
| 11:18 | 11 | was collecting numerous articles at this time, I'll allow |
| 11:18 | 12 | certain of these articles in. |
| 11:18 | 13 | I still need a foundation that he's seen most of |
| 11:18 | 14 | these; but if he states he hadn't, then another witness may |
| 11:18 | 15 | be testifying. |
| 11:18 | 16 | MR. PRICE:  It's 00077. |
| 11:18 | 17 | (Document displayed.) |
| 11:18 | 18 | BY MR. PRICE: |
| 11:18 | 19 | Q.   If we could blow up -- just use the *Kidscreen* |
| 11:18 | 20 | February 2001. |
| 11:18 | 21 | (Technician complies.) |
| 11:18 | 22 | BY MR. PRICE: |
| 11:18 | 23 | Q.   You recall earlier you were talking about those Insecto |
| 11:19 | 24 | Bots in your report.  Do you see this is -- |
| 11:19 | 25 | MR. PRICE:  Actually, if we can show the top half |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

105

| 11:19 | 1 | first. |
| 11:19 | 2 | (Technician complies.) |
| | 3 | BY MR. PRICE: |
| 11:19 | 4 | Q.   This is *Kidscreen*, February 2001; do you see that? |
| 11:19 | 5 | A.   I do. |
| 11:19 | 6 | Q.   And it says, "Toy Fair 2001.  Invasion of the robo |
| 11:19 | 7 | pets."  And then in the paragraph below: |
| 11:19 | 8 | "In July 2001, the cyber pet world will be challenged |
| 11:19 | 9 | by an interactive breed of bugs from MGA Entertainment," |
| 11:19 | 10 | paren, "U.S. 19.99 each," closed paren, "Insecto Bots geared |
| 11:19 | 11 | to kids ages six and up are a four-SKU line of wireless |
| 11:19 | 12 | insects that react to light, sound, and touch." |
| 11:19 | 13 | Do you see that? |
| 11:19 | 14 | A.   I do. |
| 11:19 | 15 | Q.   And it also talks about the Monkey See, Monkey Do |
| 11:19 | 16 | product, as well? |
| 11:19 | 17 | A.   Correct. |
| 11:19 | 18 | Q.   And so, in this article, they're talking about a |
| 11:19 | 19 | product that is going to come into the market some, uh, four |
| 11:20 | 20 | months after the magazine, right?  This is an article in the |
| 11:20 | 21 | future, correct? |
| 11:20 | 22 | A.   Correct. |
| 11:20 | 23 | Q.   An article that was reported on -- in, uh -- in your |
| 11:20 | 24 | April 2001 report, correct? |
| 11:20 | 25 | MS. KELLER:  Objection.  Assumes facts not in |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

106

| | | |
|---|---|---|
| 11:20 | 1 | evidence that this is what he reported. |
| 11:20 | 2 | THE COURT:  Well, just a moment. |
| 11:20 | 3 | Reported in the -- |
| 11:20 | 4 | MR. PRICE:  Well -- |
| 11:20 | 5 | THE COURT:  -- the 2001 report. |
| 11:20 | 6 | Could we see the 2001 report. |
| 11:20 | 7 | MR. PRICE:  90504-76 *(sic)*. |
| 11:20 | 8 | THE COURT:  Thank you. |
| | 9 | BY MR. PRICE: |
| 11:20 | 10 | Q.   We saw this earlier.  This is the Insecto Bots -- |
| 11:20 | 11 | THE COURT:  Overruled. |
| 11:20 | 12 | You may continue. |
| 11:20 | 13 | BY MR. PRICE: |
| 11:20 | 14 | Q.   -- is that right? |
| 11:20 | 15 | A.   That's right. |
| 11:21 | 16 | Q.   And actually, trade magazines like *Kidscreen* and |
| 11:21 | 17 | *Playthings* are usually available a month before the actual |
| 11:21 | 18 | date on the cover of the magazine; is that right? |
| 11:21 | 19 | A.   I don't remember exactly when they were available. |
| 11:21 | 20 | Q.   Let me ask you to look at 9507, "2002 Toy Fair Report." |
| 11:21 | 21 | *(Document provided to the witness.)* |
| 11:21 | 22 | BY MR. PRICE: |
| 11:21 | 23 | Q.   Do you have that in front of you? |
| 11:21 | 24 | A.   I do. |
| 11:21 | 25 | MR. PRICE:  I believe this is in evidence, |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

107

| | | |
|---|---|---|
| 11:21 | 1 | Your Honor. |
| 11:21 | 2 | *(Document displayed.)* |
| 11:21 | 3 | BY MR. PRICE: |
| 11:22 | 4 | Q.   Now, if you would look at Exhibit 2095.  Do you have |
| 11:22 | 5 | that in front of you? |
| 11:22 | 6 | THE WITNESS:  I do not. |
| 11:22 | 7 | BY MR. PRICE: |
| 11:22 | 8 | Q.   While Ms. Juarez is finding that, do you know of a |
| 11:22 | 9 | *License!* magazine? |
| 11:22 | 10 | A.   I think there was one called *The Licensing Report*. |
| 11:22 | 11 | Q.   Do you -- well, you said you do know the -- the |
| 11:22 | 12 | *Kidscreen* publication, correct? |
| 11:22 | 13 | A.   I think it was one of the subscriptions -- one of the |
| 11:22 | 14 | magazines we would subscribe to. |
| 11:23 | 15 | MR. PRICE:  I'm sorry.  20951.  I'm sorry. |
| 11:23 | 16 | *(Document provided to the witness.)* |
| 11:23 | 17 | BY MR. PRICE: |
| 11:23 | 18 | Q.   If you look at 20951, is this again the sort of |
| 11:23 | 19 | magazine that it would have been your job to look at to see |
| 11:23 | 20 | what public information there was out there about the |
| 11:23 | 21 | competitors? |
| 11:23 | 22 | A.   That's correct. |
| 11:23 | 23 | Q.   And that's *License!* magazine, February 2002? |
| 11:23 | 24 | A.   That's correct. |
| 11:23 | 25 | Q.   Do you specifically recall seeing this document? |

CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

108

| | | |
|---|---|---|
| 11:23 | 1 | A.    I do not. |
| 11:23 | 2 | Q.    Uh, as part of your job duties, would you have seen |
| 11:23 | 3 | this document at or around the time of February 2002? |
| 11:23 | 4 | A.    Can you repeat that, please? |
| 11:23 | 5 | Q.    Sure.  As part of your job duties in collecting |
| 11:23 | 6 | information in the public about competitors, would it -- is |
| 11:24 | 7 | this -- uh, a magazine you would have seen around February |
| 11:24 | 8 | of 2002? |
| 11:24 | 9 | MS. KELLER:  Objection, as to which magazine, your |
| 11:24 | 10 | Honor.  There are two on here. |
| 11:24 | 11 | MR. PRICE:  *License!* magazine, Exhibit 20951. |
| 11:24 | 12 | MS. KELLER:  There's a second magazine on here. |
| 11:24 | 13 | MR. PRICE:  No, there's not. |
| 11:24 | 14 | THE COURT:  You can answer the question as to one |
| 11:24 | 15 | or both magazines.  Okay? |
| 11:24 | 16 | THE WITNESS:  That's correct. |
| 11:24 | 17 | THE COURT:  Okay. |
| 11:24 | 18 | MR. PRICE:  Your Honor, move 20951 into evidence. |
| 11:24 | 19 | THE COURT:  I'm going to receive it. |
| 11:24 | 20 | *(Exhibit No. 20951 received in evidence.)* |
| 11:24 | 21 | *(Document displayed.)* |
| 11:24 | 22 | BY MR. PRICE: |
| 11:24 | 23 | Q.    If you look at Exhibit -- if you look at Exhibit 9507, |
| 11:24 | 24 | that's the marketing report, March 20, 2002.  And if you |
| 11:24 | 25 | could go to page 143. |

| | | |
|---|---|---|
| 11:25 | 1 | *(Document displayed.)* |
| 11:25 | 2 | BY MR. PRICE: |
| 11:25 | 3 | Q.   We have 143, do you see it says, in your report, "Bratz |
| 11:25 | 4 | Mobile."  It talks about the features:  Working FM radio, |
| 11:25 | 5 | opening trunk, glove compartment, and doors, wheels that |
| 11:25 | 6 | move and turn, and a moving stick shift and steering wheel. |
| 11:25 | 7 | Do you see that? |
| 11:25 | 8 | A.   I do. |
| 11:25 | 9 | Q.   Now, if you look at Exhibit 20951, at the bottom. |
| 11:25 | 10 | *(Document displayed.)* |
| 11:25 | 11 | BY MR. PRICE: |
| 11:26 | 12 | Q.   You see it says, "The Toy Book.  MGA Entertainment has |
| 11:26 | 13 | infused technology with its Bratz fashion dolls line with a |
| 11:26 | 14 | new Bratz Mobile convertible that doubles as an FM radio." |
| 11:26 | 15 | And then it goes on, "The Bratz Mobile from MGA is a super |
| 11:26 | 16 | stylish car that fits two Bratz dolls inside.  There's a |
| 11:26 | 17 | real working FM radio, a stick shift that moves, an opening |
| 11:26 | 18 | trunk, glove compartment and doors, wheels that move, and a |
| 11:26 | 19 | turning steering wheel." |
| 11:26 | 20 | Do you see that? |
| 11:26 | 21 | A.   Yes. |
| 11:26 | 22 | Q.   So, at least as of February 2002, a couple of months |
| 11:26 | 23 | before you did your -- or a month before you did your March |
| 11:26 | 24 | report, this information about the Bratz Mobile was public, |
| 11:26 | 25 | correct? |

| | | |
|---|---|---|
| 11:26 | 1 | MS. KELLER:  Objection.  As to which information, |
| 11:26 | 2 | Your Honor? |
| 11:26 | 3 | THE COURT:  Sustained. |
| 11:26 | 4 | BY MR. PRICE: |
| 11:26 | 5 | Q.   Information that I just read from Exhibit 20951 was |
| 11:27 | 6 | public, correct? |
| 11:27 | 7 | A.   That's correct. |
| 11:27 | 8 | Q.   And you see at the bottom, there's a Bates stamp.  It |
| 11:27 | 9 | says, "MGA." |
| 11:27 | 10 | Your understanding:  This was produced by MGA? |
| 11:27 | 11 | A.   I do. |
| 11:27 | 12 | Q.   And at the top -- actually, let me direct you to |
| 11:27 | 13 | 90507 (sic), page 142. |
| 11:27 | 14 | *(Document provided to the witness.)* |
| 11:27 | 15 | *(Document displayed.)* |
| 11:27 | 16 | BY MR. PRICE: |
| 11:27 | 17 | Q.   That talks about Bratz Boyz.  Do you see that -- |
| 11:27 | 18 | A.   I do. |
| 11:27 | 19 | Q.   -- in your report? |
| 11:27 | 20 | If you go to 20951, the top of 20951, which says, "MGA |
| 11:27 | 21 | Entertainment" with the address, "is building its Bratz doll |
| 11:27 | 22 | property with new products and new boyfriends, the Bratz |
| 11:27 | 23 | Boyz, aimed at Fall shipments." |
| 11:27 | 24 | Do you see that? |
| 11:27 | 25 | A.   I do. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:27 | 1 | Q.   By the way, Barbie had a, uh -- you've heard of Ken? |
| 11:28 | 2 | A.   Of course. |
| 11:28 | 3 | Q.   If you'd look at 9507, your March 20, 2002 report, at |
| 11:28 | 4 | page 113. |
| 11:28 | 5 | *(Document provided to the witness.)* |
| 11:28 | 6 | *(Document displayed.)* |
| 11:28 | 7 | BY MR. PRICE: |
| 11:28 | 8 | Q.   You see there's -- one of the things in your report is |
| 11:28 | 9 | the MGA Monster Surgery with the pictures, and talks about |
| 11:28 | 10 | "Gruesome game of operation.  Over 25 removable head parts, |
| 11:28 | 11 | and more than 25 interactive phrases." |
| 11:28 | 12 | Do you see that? |
| 11:28 | 13 | A.   I do. |
| 11:28 | 14 | Q.   "Three games in one."  Talks about "Emergency, Scary |
| 11:28 | 15 | Surgery, and Creepy Checkup"? |
| 11:28 | 16 | A.   I do. |
| 11:28 | 17 | Q.   And if you would look at Exhibit 21235. |
| 11:29 | 18 | *(Document provided to the witness.)* |
| 11:29 | 19 | BY MR. PRICE: |
| 11:29 | 20 | Q.   And do you see -- uh, is that another *Kidscreen* |
| 11:29 | 21 | magazine? |
| 11:29 | 22 | A.   That's correct. |
| 11:29 | 23 | Q.   From February 2002? |
| 11:29 | 24 | A.   That's correct. |
| 11:29 | 25 | Q.   And this is the kind of magazine you would have looked |

| | | |
|---|---|---|
| 11:29 | 1 | at, at the time? |
| 11:29 | 2 | A.    That's correct. |
| 11:29 | 3 | Q.    And it has an MGA Bates stamp at the bottom, 3770635. |
| 11:29 | 4 | MS. KELLER:  I'm sorry, Counsel.  Could you tell |
| 11:29 | 5 | us that document again? |
| 11:29 | 6 | MR. PRICE:  Yeah.  It's 21235. |
| 11:29 | 7 | MS. KELLER:  We don't have that one, I don't |
| 11:29 | 8 | think. |
| 11:29 | 9 | MR. PRICE:  It's in the binders, I believe.  Here |
| 11:29 | 10 | I'll show it to you. |
| 11:29 | 11 | Your Honor, move Exhibit 21235 into evidence. |
| 11:30 | 12 | MS. KELLER:  Well, Your Honor –– |
| 11:30 | 13 | THE COURT:  I'll look at it during the recess, if |
| 11:30 | 14 | there's a contention that somebody hasn't seen it before. |
| 11:30 | 15 | Okay? |
| 11:30 | 16 | BY MR. PRICE: |
| 11:30 | 17 | Q.   If you'd look at –– |
| 11:30 | 18 | MS. KELLER:  We do have it, Your Honor.  I'm |
| 11:30 | 19 | sorry. |
| 11:30 | 20 | THE COURT:  All right.  Then received. |
| 11:30 | 21 | *(Exhibit No. 21235 received in evidence.)* |
| 11:30 | 22 | *(Document displayed.)* |
| 11:30 | 23 | THE COURT:  Now, just a moment. |
| 11:30 | 24 | Ladies and gentlemen, there's gonna be a |
| 11:30 | 25 | contention between what's confidential and what's not. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 113 of 138   Page ID #:311707
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

113

| 11:30 | 1 | Put up the Monster Surgery again. |
| 11:30 | 2 | Take down Toy Biz Players for just a second. |
| 11:30 | 3 | *(Technician complies.)* |
| 11:30 | 4 | THE COURT:  One of the contentions you're going to |
| 11:30 | 5 | see is what's public and what's private.  Here, it's being |
| 11:30 | 6 | displayed.  You have an FOB Hong Kong price of 19.99.  So |
| 11:30 | 7 | that, obviously, will be in contention between the parties. |
| 11:30 | 8 | It will also be in contention concerning in the main body of |
| 11:31 | 9 | how the description's taking place. |
| 11:31 | 10 | So I'm not quite sure how these should be |
| 11:31 | 11 | displayed, Counsel.  You're referring to a portion. |
| 11:31 | 12 | MR. PRICE:  I'm referring to the -- to the |
| 11:31 | 13 | complete report. |
| 11:31 | 14 | THE COURT:  Including the FOB? |
| 11:31 | 15 | MR. PRICE:  Including FOB.  That's right there. |
| 11:31 | 16 | And I'm referring to what is public here of that part. |
| 11:31 | 17 | THE COURT:  Of that part. |
| 11:31 | 18 | Let's see the public part again. |
| 11:31 | 19 | *(Document displayed.)* |
| 11:31 | 20 | MR. PRICE:  And it is -- picture, and then a |
| 11:31 | 21 | description of the product, including the programmable |
| 11:31 | 22 | phrases, et cetera. |
| 11:31 | 23 | THE COURT:  All right.  Thank you. |
| 11:31 | 24 | Please continue. |
|  | 25 |  |

| | | |
|---|---|---|
| 11:31 | 1 | BY MR. PRICE: |
| 11:31 | 2 | Q.   So here we have the MGA Monster Surgery.  You see it |
| 11:31 | 3 | talks about -- here, "Monster Surgery is a talking monster |
| 11:31 | 4 | head programmed with more than 25 interactive phrases and |
| 11:31 | 5 | over 25 removable head parts." |
| 11:31 | 6 | Do you see that? |
| 11:31 | 7 | A.   I do. |
| 11:31 | 8 | Q.   It talks about it being three games in one: |
| 11:32 | 9 | "Grave Emergency," paren, "Kids have to find and remove |
| 11:32 | 10 | the diseased head part before it spreads. |
| 11:32 | 11 | "Scary Surgery," paren, "Remove all head parts without |
| 11:32 | 12 | upsetting the monster, paren. |
| 11:32 | 13 | And "Creepy Checkup," paren, "Remove and replace head |
| 11:32 | 14 | parts in the correct order." |
| 11:32 | 15 | Do you see that? |
| 11:32 | 16 | A.   I do. |
| 11:32 | 17 | Q.   And that's actually a more detailed description of the |
| 11:32 | 18 | product than you have in the -- your April 2002 -- I'm |
| 11:32 | 19 | sorry -- March 2002 report, correct? |
| 11:32 | 20 | A.   That is correct. |
| 11:32 | 21 | Q.   If you would look at Exhibit 23890. |
| 11:32 | 22 | *(Document provided to the witness.)* |
| | 23 | BY MR. PRICE: |
| 11:32 | 24 | Q.   Now, this appears to be an article, a *Reuters* article |
| 11:33 | 25 | by Jan Paschal.  And do you recall whether you saw this |

| | | |
|---|---|---|
| 11:33 | 1 | in -- around February of 2002? |
| 11:33 | 2 | A.   I do not. |
| 11:33 | 3 | Q.   Would you get *Reuters* reports -- wire reports about |
| 11:33 | 4 | what was happening with competitors? |
| 11:33 | 5 | A.   I don't think I did. |
| 11:33 | 6 | THE COURT:  Counsel, there's a similarity.  I |
| 11:33 | 7 | think I'm going to let you inquire regardless, because he |
| 11:33 | 8 | testified it was a team effort, and the competitive report |
| 11:33 | 9 | was put together. |
| 11:33 | 10 | And so I think you can inquire in this area. |
| 11:59 | 11 | BY MR. PRICE: |
| 11:33 | 12 | Q.   So if you'd look at the 23890-0003. |
| 11:33 | 13 | *(Document provided to the witness.)* |
| 11:33 | 14 | MS. KELLER:  Your Honor, could we just have a |
| 11:33 | 15 | continuing objection to hearsay and no foundation on all of |
| 11:34 | 16 | these documents? |
| 11:34 | 17 | THE COURT:  Certainly. |
| 11:34 | 18 | MS. KELLER:  Thank you. |
| 11:34 | 19 | THE COURT:  Overruled. |
| 11:34 | 20 | BY MR. PRICE: |
| 11:34 | 21 | Q.   And do you see that in this February 14 article |
| 11:34 | 22 | there's -- at the top, it says, "Toy Fair 2002." |
| 11:34 | 23 | Do you see that? |
| 11:34 | 24 | A.   I do. |
| 11:34 | 25 | Q.   Uh, and one of the things it talks about is a "Bratz |

| | | |
|---|---|---|
| 11:34 | 1 | Mobile, which looks like a squared-off blue 1957 Cadillac, |
| 11:34 | 2 | with a built-in FM radio, and a trunk that pops open," and |
| 11:34 | 3 | that being part of the year's extended toy line. |
| 11:34 | 4 | Do you see that? |
| 11:34 | 5 | A.   I do. |
| 11:34 | 6 | Q.   And you -- if you look at your report, 9507-143, which |
| 11:34 | 7 | we see -- that's the Bratz Mobile picture which is in your |
| 11:34 | 8 | report, correct? -- and the discussion.  It's 143. |
| 11:34 | 9 | *(Document displayed.)* |
| 11:35 | 10 | THE WITNESS:  That's correct. |
| 11:35 | 11 | MR. PRICE:  Your Honor, move Exhibit 23890 into |
| 11:35 | 12 | evidence. |
| 11:35 | 13 | THE COURT:  Received. |
| 11:35 | 14 | *(Exhibit No. 23890 received in evidence.)* |
| 11:35 | 15 | *(Document displayed.)* |
| | 16 | BY MR. PRICE: |
| 11:35 | 17 | Q.   Now, one of the things you wanted to do was to show |
| 11:35 | 18 | your supervisor that you were getting valuable information, |
| 11:35 | 19 | correct? |
| 11:35 | 20 | A.   It was part of my job. |
| 11:35 | 21 | Q.   I mean, one thing you wanted to convince your |
| 11:35 | 22 | supervisor of was that you were a valuable employee, |
| 11:35 | 23 | correct? |
| 11:35 | 24 | A.   I don't know about "convincing."  I don't know if |
| 11:35 | 25 | that's the right word. |

| | | |
|---|---|---|
| 11:35 | 1 | Q.   Well, you wanted 'em to think that the information you |
| 11:35 | 2 | got was, uh, unique, uh, useful and valuable, right? |
| 11:35 | 3 | A.   Again, it was part of my job to gather that |
| 11:36 | 4 | information. |
| 11:36 | 5 | Q.   Okay.  Let me show you Exhibit 9291. |
| 11:36 | 6 | *(Document provided to the witness.)* |
| 11:36 | 7 | MR. PRICE:  And this is in evidence, Your Honor. |
| 11:36 | 8 | *(Document displayed.)* |
| 11:36 | 9 | BY MR. PRICE: |
| 11:36 | 10 | Q.   You see this is an e-mail you wrote April 8, 2005, |
| 11:36 | 11 | correct? |
| 11:36 | 12 | A.   Correct. |
| 11:36 | 13 | Q.   And this is dated -- subject here is "DEFCON Alert: |
| 11:36 | 14 | MGA/Bratz 2005." |
| 11:36 | 15 | You see that? |
| 11:36 | 16 | A.   That's correct. |
| 11:36 | 17 | Q.   And then you have on the next line in all caps: |
| 11:36 | 18 | "DEFCON Alert!  DEFCON Alert!  DEFCON Alert!" exclamation |
| 11:37 | 19 | points after every one of those, right? |
| 11:37 | 20 | A.   That's correct. |
| 11:37 | 21 | Q.   And you see, "Below is a new issue of the," all caps, |
| 11:37 | 22 | "DEFCON Alert!" exclamation point.  "The purpose of this |
| 11:37 | 23 | alert is to notify you of an urgent matter that needs |
| 11:37 | 24 | immediate attention." |
| 11:37 | 25 | Do you see that? |

| 11:37 | 1 | A.   I do. |
| 11:37 | 2 | Q.   It says, "It consists of five stages as defined |
| 11:37 | 3 | below" -- "as follows" -- I'm sorry.  It says, "The |
| 11:37 | 4 | following information is currently categorized at DEFCON 1." |
| 11:37 | 5 |      Do you see that? |
| 11:37 | 6 | A.   Correct. |
| 11:37 | 7 | Q.   And "DEFCON 1" would be the highest, the most urgent |
| 11:37 | 8 | information, right? |
| 11:37 | 9 | A.   Correct. |
| 11:37 | 10 | Q.   And then it begins, "MGA Entertainment makes a variety |
| 11:37 | 11 | of toys." |
| 11:37 | 12 |      Do you see where it begins there -- |
| 11:37 | 13 | A.   I do. |
| 11:37 | 14 |           MR. PRICE:  And let's kind of get back -- Ken, |
| 11:37 | 15 | show the rest of the page. |
| 11:37 | 16 |           (Technician complies.) |
| 11:37 | 17 | BY MR. PRICE: |
| 11:38 | 18 | Q.   -- where it talks about Bratz themes, talks about |
| 11:38 | 19 | Midnight Dance series, holiday line, correct? |
| 11:38 | 20 | A.   Correct. |
| 11:38 | 21 | Q.   It's at least half a page here, single-spaced typing, |
| 11:38 | 22 | lots of information, correct? |
| 11:38 | 23 | A.   Correct. |
| 11:38 | 24 | Q.   And then if we go to the second page, this is a full |
| 11:38 | 25 | page, single-spaced type information about Bratz products, |

| 11:38 | 1 | right? |
| 11:38 | 2 | A.   That's correct. |
| 11:38 | 3 | Q.   Talks about the Wild Wild West line, the Bratz Rock |
| 11:38 | 4 | Angelz.  Do you see that? |
| 11:38 | 5 | A.   I do. |
| 11:38 | 6 | Q.   Talks about, "Also coming in Winter 2005 is the |
| 11:38 | 7 | Ooh-La-La line."  Do you see that? |
| 11:38 | 8 | A.   That's correct. |
| 11:38 | 9 | Q.   So you're talking about future product here, correct? |
| 11:38 | 10 | A.   Correct. |
| 11:39 | 11 | Q.   Talks about a spinoff of Ponyz further down there. |
| 11:39 | 12 | Correct?   *(Points laser pen.)* |
| 11:39 | 13 |         MR. PRICE:  Oops, got you, Rachel.  Sorry. |
| 11:39 | 14 |         THE WITNESS:  Correct. |
| 11:39 | 15 | BY MR. PRICE: |
| 11:39 | 16 | Q.   And then you look at the last page, this is about -- |
| 11:39 | 17 | what? -- a quarter of the page, single-spaced, typed, |
| 11:39 | 18 | talking about other Bratz products that's being released, |
| 11:39 | 19 | correct? |
| 11:39 | 20 | A.   Correct. |
| 11:39 | 21 | Q.   And then at the end, it says, "Brought to you by Sal |
| 11:39 | 22 | Villasenor and Stephanie Page, Market Intelligence |
| 11:39 | 23 | Department." |
| 11:39 | 24 |     You see that? |
| 11:39 | 25 | A.   That's correct. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 120 of 138   Page ID #:311714
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

120

| | | |
|---|---|---|
| 11:39 | 1 | Q.    This single-spaced detailed description of future MGA |
| 11:40 | 2 | Bratz products was taken word-from-word -- word-for-word |
| 11:40 | 3 | from a February 2005 public website, right? |
| 11:40 | 4 | A.    I don't recall where we got it from. |
| 11:40 | 5 | Q.    Okay.  Let me show you Exhibit 9350. |
| 11:40 | 6 | (Document provided to the witness.) |
| 11:40 | 7 | MR. PRICE:  Your Honor, this is in evidence. |
| 11:40 | 8 | (Document displayed.) |
| 11:40 | 9 | BY MR. PRICE: |
| 11:40 | 10 | Q.    Do you have that in front of you? |
| 11:40 | 11 | A.    I do. |
| 11:41 | 12 | Q.    At the top, it says, "Welcome to ASM's Toy Fair 2005 |
| 11:41 | 13 | Coverage," dated February 19, 2005. |
| 11:41 | 14 | A.    Correct. |
| 11:41 | 15 | Q.    And could you tell us what ASM is? |
| 11:41 | 16 | A.    I don't recall what "ASM" stands for. |
| 11:41 | 17 | Q.    Do you see it concerns a report as to what had happened |
| 11:41 | 18 | or was happening at the toy fair? |
| 11:41 | 19 | A.    I'm sorry.  Where is that at? |
| 11:41 | 20 | Q.    Well, it says, "Welcome to ASM's Toy Fair 2005 |
| 11:41 | 21 | Coverage."  Do you see that? |
| 11:41 | 22 | A.    I do see that. |
| 11:41 | 23 | Q.    And it's dated February 19, 2005, correct? |
| 11:41 | 24 | A.    Correct. |
| 11:41 | 25 | MS. KELLER:  Your Honor, can we have the same |

| | | |
|---|---|---|
| 11:41 | 1 | continuing objection? |
| 11:41 | 2 | THE COURT:  Overruled. |
| 11:59 | 3 | BY MR. PRICE: |
| 11:41 | 4 | Q.   And if you look at -- a little bit further down, where |
| 11:42 | 5 | it talks about -- starts talking about, "The trendy *(sic)* |
| 11:42 | 6 | basic price point for Bratz dolls." |
| 11:42 | 7 | You see that? |
| 11:42 | 8 | A.   *(No response.)* |
| 11:42 | 9 | Q.   Now, I want you to look from that line which says "the |
| 11:42 | 10 | traditional basic price point for Bratz dolls has been |
| 11:42 | 11 | 14.99." |
| 11:42 | 12 | Do you see that? |
| 11:42 | 13 | A.   I do. |
| 11:42 | 14 | Q.   Now, I want you to look at 9291, which is your |
| 11:42 | 15 | single-spaced, "DEFCON Alert!" urgent report in April of |
| 11:42 | 16 | 2005.  And you see there's a line that begins, "The |
| 11:42 | 17 | traditional basic price point for Bratz dolls has been |
| 11:42 | 18 | 14.99." |
| 11:42 | 19 | Do you see that? |
| 11:42 | 20 | A.   I do. |
| 11:42 | 21 | Q.   Now, if you would look -- just go side-by-side from |
| 11:42 | 22 | Exhibit 9350, the February 19, 2005 report, and |
| 11:42 | 23 | Exhibit 9291, the April 8, 2005 report.  This is just a |
| 11:43 | 24 | cut-and-paste job.  You've cut and pasted the ASM Toy Fair |
| 11:43 | 25 | 2005 Coverage, dated February 19, 2005? |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 122 of 138   Page ID #:311716
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:43 | 1 | A.   That's correct. |
| 11:43 | 2 | Q.   Uh, and, uh -- and that 9350, toy care -- uh, toy fair |
| 11:43 | 3 | coverage report of MGA goes on for three pages, |
| 11:43 | 4 | single-spaced type, although they have double spaces between |
| 11:43 | 5 | the paragraphs, right? |
| 11:43 | 6 | A.   Correct. |
| 11:43 | 7 | Q.   And, uh, this wasn't -- well, first of all, in your |
| 11:43 | 8 | DEFCON report -- and this is -- look at your distribution |
| 11:43 | 9 | list.  This is, again, the people who were like above the |
| 11:44 | 10 | chain, right? |
| 11:44 | 11 | A.   Some of 'em, correct. |
| 11:44 | 12 | Q.   And you've -- you've copied Mr. Bousquette on it and |
| 11:44 | 13 | Drew Vollero, correct? |
| 11:44 | 14 | A.   That's correct. |
| 11:44 | 15 | Q.   Uh, and Mr. Turetzky, you copied him?  He's your -- |
| 11:44 | 16 | your immediate boss at this time in 2005, correct? |
| 11:44 | 17 | A.   That's correct. |
| 11:44 | 18 | Q.   And is there anywhere on Exhibit 9291 where you explain |
| 11:44 | 19 | that this information is simply something you cut and pasted |
| 11:44 | 20 | from a, uh -- an article about the 2005 toy fair, which had |
| 11:44 | 21 | been published about two months earlier? |
| 11:45 | 22 | A.   No. |
| 11:45 | 23 | Q.   And this isn't the only time that you -- Exhibit 9291 |
| 11:45 | 24 | isn't the only time that you, uh, you know, cut and pasted |
| 11:45 | 25 | public information and presented it in an e-mail up the |

| | | |
|---|---|---|
| 11:45 | 1 | chain of command, saying this is what I've discovered, |
| 11:45 | 2 | right? |
| 11:45 | 3 | A.   That's correct. |
| 11:46 | 4 | Q.   You wanted to make your superiors -- let me rephrase |
| 11:46 | 5 | that. |
| 11:46 | 6 |      When you sent 9291 in April 2005, you wanted people up |
| 11:46 | 7 | the chain of command to think that you were doing valuable |
| 11:46 | 8 | work that had to be looked at as an urgent matter, DEFCON 1? |
| 11:46 | 9 | A.   I wanted to make them aware of the information that I |
| 11:46 | 10 | had came across regarding Bratz. |
| 11:46 | 11 | Q.   And you wanted to think that the information you came |
| 11:46 | 12 | across was something which was brand new and needed urgent |
| 11:47 | 13 | attention? |
| 11:47 | 14 | A.   Correct. |
| 11:47 | 15 | Q.   When, in fact, it was public information that was about |
| 11:47 | 16 | two months old? |
| 11:47 | 17 | A.   According to the date, correct. |
| 11:47 | 18 | Q.   And if you'd look at 9274. |
| 11:47 | 19 |           *(Document provided to the witness.)* |
| 11:47 | 20 | BY MR. PRICE: |
| 11:47 | 21 | Q.   Do you recognize that as an e-mail string with a |
| 11:47 | 22 | subject "MGA/Bratz Update." |
| 11:47 | 23 | A.   I do. |
| 11:47 | 24 |           MR. PRICE:  Move 9274 into evidence. |
| 11:48 | 25 |           THE COURT:  Received. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 124 of 138   Page ID #:311718
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:48 | 1 | *(Exhibit No. 9274 received in evidence.)* |
| 11:48 | 2 | *(Document displayed.)* |
| 11:48 | 3 | BY MR. PRICE: |
| 11:48 | 4 | Q.   And this starts with an e-mail from you to the Girls |
| 11:48 | 5 | Division, and you were copying Mr. Bousquette, Mr. Vollero, |
| 11:48 | 6 | Mr. Turetzky and Stephanie Page, where you have "MGA/Bratz |
| 11:48 | 7 | Update!" exclamation part -- exclamation point. |
| 11:48 | 8 | Do you see? |
| 11:48 | 9 | A.   I do. |
| 11:48 | 10 | Q.   And it says, "MGA is targeting tweens with their new |
| 11:48 | 11 | bedroom decor, including a dream pillow with a journal," |
| 11:48 | 12 | et cetera. |
| 11:48 | 13 | Do you see that? |
| 11:48 | 14 | A.   I do. |
| 11:48 | 15 | Q.   And this is in May of 2003, correct? |
| 11:48 | 16 | A.   Correct. |
| 11:48 | 17 | Q.   Is there a toy fair around this time? |
| 11:48 | 18 | A.   I don't think so.  I don't recall. |
| 11:48 | 19 | Q.   So this was something you got from public information |
| 11:48 | 20 | as part of your job of seeing what was out there, right? |
| 11:48 | 21 | A.   Most likely, correct. |
| 11:48 | 22 | MS. KELLER:  Objection.  Speculation.  Motion to |
| 11:48 | 23 | strike. |
| 11:48 | 24 | THE COURT:  Overruled. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 125 of 138   Page ID #:311719
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

125

| | | |
|---|---|---|
| 11:48 | 1 | BY MR. PRICE: |
| 11:48 | 2 | Q.   And that's -- that's pretty much what most of your |
| 11:49 | 3 | reports were, except for right around the toy fair, is -- |
| 11:49 | 4 | your job was to get information from public sources and |
| 11:49 | 5 | present them so that Mattel would have an idea of what the |
| 11:49 | 6 | competitive marketplace was like? |
| 11:49 | 7 | A.   That's correct. |
| 11:49 | 8 | Q.   Now, let me ask you, you -- Ms. Keller asked you about |
| 11:49 | 9 | prior to '95, whether you thought you would lose your job if |
| 11:49 | 10 | you didn't use these -- these fake business cards to get |
| 11:49 | 11 | into showrooms.  Do you recall those questions? |
| 11:49 | 12 | A.   Prior to '95? |
| 11:49 | 13 | Q.   Yeah.  Did you think, prior to '95 -- you're right. |
| 11:50 | 14 | Prior to 2005 - glad I've got people here -- prior to |
| 11:50 | 15 | 2005, you thought -- I think you said you thought that you |
| 11:50 | 16 | might lose your job if you didn't use these -- these |
| 11:50 | 17 | business cards to get into, uh, these toy fair showrooms? |
| 11:50 | 18 | A.   Right.  I felt like I could probably lose my job if I |
| 11:50 | 19 | didn't do my job, correct. |
| 11:50 | 20 | Q.   And, uh -- and I think you said to Ms. Keller that you |
| 11:50 | 21 | had found this stressful.  Uh, I think you said you began in |
| 11:50 | 22 | 1999 to go into toy fairs with using your -- your ID's? |
| 11:50 | 23 | A.   Correct. |
| 11:50 | 24 | Q.   And so, I think you told Ms.-- Ms. Keller that you |
| 11:50 | 25 | were -- this was stressful, something which -- which |

| | | |
|---|---|---|
| 11:50 | 1 | bothered you between 1999 and 2005. |
| 11:50 | 2 | A.   That's correct. |
| 11:50 | 3 | Q.   Uh, I think you also said that -- that you were good |
| 11:51 | 4 | friends of -- of Matt Bousquette? |
| 11:51 | 5 | A.   We were friends.  I don't know if we were good friends, |
| 11:51 | 6 | but we were friends.  We were friendly. |
| 11:51 | 7 | Q.   So, for example, if we look back at 16005, that's the |
| 11:51 | 8 | 2001 organizational chart. |
| 11:51 | 9 | *(Document provided to the witness.)* |
| 11:51 | 10 | MR. PRICE:  And it's in evidence, Your Honor. |
| 11:51 | 11 | If we could put up the second page. |
| 11:51 | 12 | *(Document displayed.)* |
| 11:00 | 13 | BY MR. PRICE: |
| 11:51 | 14 | Q.   You can see it on your monitor. |
| 11:51 | 15 | So Mr. Bousquette, at this time, was the head of the |
| 11:51 | 16 | Boys Division, correct? |
| 11:51 | 17 | A.   That's correct. |
| 11:51 | 18 | Q.   And Mr. Vollero reported to him, correct? |
| 11:51 | 19 | A.   That's correct. |
| 11:51 | 20 | Q.   And then if we go down to -- let's see, page 44 of |
| 11:51 | 21 | this. |
| 11:51 | 22 | *(Document displayed.)* |
| 11:52 | 23 | MS. KELLER:  Your Honor, I'm gonna object that |
| 11:52 | 24 | this misstates the evidence.  This says "November 2001." |
| 11:52 | 25 | MR. PRICE:  2001.  If I didn't say 2001, I |

| | | |
|---|---|---|
| 11:52 | 1 | apologize. |
| 11:52 | 2 | BY MR. PRICE: |
| 11:52 | 3 | Q.   We went through a number of years of these; do you |
| 11:52 | 4 | recall that? |
| 11:52 | 5 | A.   Correct. |
| 11:52 | 6 | Q.   And under Mr. Vollero, there's Mr. Wolk, correct? |
| 11:52 | 7 | A.   That's correct. |
| 11:52 | 8 | Q.   And then under Mr. Wolk, if we go to page 48 -- |
| 11:52 | 9 | (Document provided to the witness.) |
| 11:52 | 10 | (Document displayed.) |
| 11:52 | 11 | BY MR. PRICE: |
| 11:52 | 12 | Q.   Uh, there -- there you are, correct? |
| 11:52 | 13 | A.   That's correct. |
| 11:52 | 14 | Q.   So between 1999 and 2005, did you ever -- prior to your |
| 11:52 | 15 | December 2005 e-mail, did you ever put anything in writing |
| 11:52 | 16 | that you were, uh, stressed or -- or unhappy? |
| 11:53 | 17 | A.   Not -- not in writing.  But I remember having a |
| 11:53 | 18 | conversation with Bennett, and how stressful it was and how |
| 11:53 | 19 | much work it would be for just one person to attend toy |
| 11:53 | 20 | fairs.  And that's part of the reason why Kelly Osier came |
| 11:53 | 21 | onboard to help out with toy fairs. |
| 11:53 | 22 | Q.   So your complaint was it was just too much work and |
| 11:53 | 23 | wanted some help? |
| 11:53 | 24 | A.   Well, it was stressful.  It was also very stressful. |
| 11:53 | 25 | Q.   But you just said the reason you said it was stressful |

| 11:53 | 1 | was it was too much for one person to handle. |
| 11:53 | 2 | A.   That was just part of the reason. |
| 11:53 | 3 | Q.   Okay.  Well, we go up this chain, uh.  Did you ever go |
| 11:53 | 4 | to your friend, Mr. Bousquette, and say, "I -- I don't want |
| 11:53 | 5 | to do this.  It's too stressful"? |
| 11:53 | 6 | A.   No, not to Matt. |
| 11:53 | 7 | Q.   Did you ever tell anyone, "I don't want to do this. |
| 11:53 | 8 | It's too stressful," prior to your December 2005 e-mail, as |
| 11:53 | 9 | opposed to "I need more help"? |
| 11:53 | 10 | A.   I -- once again, I recall having conversations with |
| 11:53 | 11 | Bennett regarding how stressful it was. |
| 11:53 | 12 | Q.   And, therefore, you needed help? |
| 11:54 | 13 | A.   Needed -- correct. |
| 11:54 | 14 | Q.   Did you ever put anything in writing that it was too |
| 11:54 | 15 | stressful because you were -- you were misrepresenting |
| 11:54 | 16 | yourself? |
| 11:54 | 17 | A.   Not in writing. |
| 11:54 | 18 | Q.   And the first time you put something in writing was |
| 11:54 | 19 | when you were told you had to stop doing it or you'd lose |
| 11:54 | 20 | your job? |
| 11:54 | 21 | A.   Are you referring to 2005? |
| 11:54 | 22 | Q.   I'm gonna start with December 2005. |
| 11:54 | 23 | A.   The conversation with John Louie, is that what you're |
| 11:54 | 24 | referring to? |
| 11:54 | 25 | Q.   I'm saying that that time frame, December 2005, you |

| 11:54 | 1 | understood that you would lose your job unless you stopped |
| 11:54 | 2 | doing it, unless you stopped misrepresenting yourself, |
| 11:54 | 3 | correct? |
| 11:54 | 4 | A.   I don't recall if I was told that, but I felt that way. |
| 11:54 | 5 | Q.   Okay.  I mean, you felt that you would lose your job if |
| 11:54 | 6 | you didn't stop, uh, misrepresenting yourself, correct? |
| 11:55 | 7 | That's how you felt? |
| 11:55 | 8 | A.   Wait.  I'm sorry.  I'm confused.  Did you say if I |
| 11:55 | 9 | didn't stop? |
| 11:55 | 10 | Q.   Yeah.  It was a double negative. |
| 11:55 | 11 |      Your understanding was that you would lose your job |
| 11:55 | 12 | unless you stopped misrepresenting yourself, correct? |
| 11:55 | 13 | A.   That's the way I felt, correct. |
| 11:55 | 14 | Q.   Uh, and that's the first time that you put anything in |
| 11:55 | 15 | writing about stress:  When you were told not to |
| 11:55 | 16 | misrepresent yourself, correct? |
| 11:55 | 17 | A.   When they told me to stop misrepresenting myself. |
| 11:55 | 18 | Q.   That's the first time you put down anything in writing |
| 11:55 | 19 | that you were undergoing or had stress, correct? |
| 11:55 | 20 | A.   Right.  And part of the reason for that is because they |
| 11:55 | 21 | asked me to stop; however, they also asked me to continue to |
| 11:55 | 22 | get the information. |
| 11:55 | 23 | Q.   I mean, they wanted to continue to get valuable |
| 11:55 | 24 | information, correct? |
| 11:55 | 25 | A.   Competitive information. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 130 of 138   Page ID #:311724
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

130

| | | |
|---|---|---|
| 11:55 | 1 | Q.   And they wanted you to do that without misrepresenting |
| 11:55 | 2 | yourself, correct? |
| 11:55 | 3 | A.   That's what I was told. |
| 11:56 | 4 | Q.   And you have said that you did not agree with the |
| 11:56 | 5 | changes that new management wanted you to make, correct? |
| 11:56 | 6 | A.   I don't recall saying that. |
| 11:56 | 7 | Q.   If you'd look, uh, at your -- actually, that's how you |
| 11:56 | 8 | felt, though, whether you recall saying it or not, uh, uh, |
| 11:56 | 9 | that you felt that you didn't agree with some of the changes |
| 11:56 | 10 | that the new management in your department wanted to take |
| 11:56 | 11 | place -- that's -- that's how you felt? |
| 11:56 | 12 | A.   Once again, I don't remember feeling that way. |
| 11:56 | 13 | Q.   Well, you were shown Exhibit 9484-R.  We'll put that in |
| 11:57 | 14 | front of you. |
| 11:57 | 15 | (Document provided to the witness.) |
| 11:57 | 16 | (Document displayed.) |
| 11:57 | 17 | BY MR. PRICE: |
| 11:57 | 18 | Q.   And this is the e-mail that was sent in December of |
| 11:57 | 19 | '95 (sic); is that right? |
| 11:57 | 20 | A.   This is the e-mail that both my attorney and I worked |
| 11:57 | 21 | on together and was sent out, correct. |
| 11:57 | 22 | Q.   And that's what I wanted to -- to clarify.  At the top, |
| 11:57 | 23 | it says, "From:  Sal Villasenor," to Mr. Normile and Mark |
| 11:57 | 24 | Kimball.  And you're copying Mr. Michael Moore. |
| 11:57 | 25 | Do you see that? |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 131 of 138   Page ID #:311725
CV 04-9049 DOC – 3/23/2011 – Day 38, Volume 1 of 3

131

| | | |
|---|---|---|
| 11:57 | 1 | A.   I do. |
| 11:57 | 2 | Q.   So it's coming from -- from your e-mail address, |
| 11:57 | 3 | correct? |
| 11:57 | 4 | A.   That's correct. |
| 11:57 | 5 | Q.   Uh, but if we -- if we look at this in the text -- |
| 11:58 | 6 | let's say, for example, the -- the third paragraph that |
| 11:58 | 7 | believes -- that begins, "I believe that my work conditions |
| 11:58 | 8 | have become intolerable, and I'm writing to complain about |
| 11:58 | 9 | Mattel's directives and instructions." |
| 11:58 | 10 |      Do you see that? |
| 11:58 | 11 | A.   I do. |
| 11:58 | 12 | Q.   Now, do you know whether or not, quote, "intolerable |
| 11:58 | 13 | work conditions" is something that -- that has meaning under |
| 11:58 | 14 | employment law? |
| 11:58 | 15 | A.   I do not know that. |
| 11:58 | 16 | Q.   Are you the one who came up with the phrase, "I believe |
| 11:58 | 17 | that my work conditions have become intolerable." |
| 11:58 | 18 | A.   I don't -- I don't recall if that's something I added |
| 11:58 | 19 | or if my attorney added that.  I don't recall. |
| 11:58 | 20 | Q.   Well, let's go to the last paragraph here, where it |
| 11:58 | 21 | says, "I know that Mattel," et cetera.  It says, beginning |
| 11:59 | 22 | in the second sentence, "Because of my fears, I have |
| 11:59 | 23 | retained a legal representative, and I would ask that you |
| 11:59 | 24 | direct all future communications concerning this complaint |
| 11:59 | 25 | and my continued role with the company to my attorney Pat |

| | | |
|---|---|---|
| 11:59 | 1 | Barrera of Marcin Barrera LLP.  Mr. Barrera can be reached |
| 11:59 | 2 | at (310) 286-1050." |
| 11:59 | 3 | Do you see that? |
| 11:59 | 4 | A.   I do. |
| 11:59 | 5 | Q.   So it was Mr. Barrera who worked with you to send this |
| 11:59 | 6 | e-mail to Mattel, correct? |
| 11:59 | 7 | A.   That's correct. |
| 11:59 | 8 | Q.   And, by the way, no one at Mattel threatened you with |
| 11:59 | 9 | anything, correct? |
| 11:59 | 10 | A.   Regarding? |
| 11:59 | 11 | Q.   Well, it says here, "because of my fears."  I mean, in |
| 12:00 | 12 | this time frame, no one at Mattel was threatening you, |
| 12:00 | 13 | correct? |
| 12:00 | 14 | A.   I was not threatened. |
| 12:00 | 15 | Q.   And, uh, so, uh, was it Mr. Barrera who put that in |
| 12:00 | 16 | that "Because of my fears, I've retained legal |
| 12:00 | 17 | representative"? |
| 12:00 | 18 | A.   Once again, I don't recall who added that, if it was |
| 12:00 | 19 | him or I.  I -- I don't remember. |
| 12:00 | 20 | Q.   Well, what was the process?  Did you write something |
| 12:00 | 21 | out, and he edited it?  Or did he write it out, and you |
| 12:00 | 22 | edited it?  Do you recall? |
| 12:00 | 23 | A.   I think he wrote it, and then I edited it. |
| 12:00 | 24 | Q.   So -- so the first draft of this was written by your |
| 12:00 | 25 | attorney, not you, correct?  Your best recollection. |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 133 of 138   Page ID #:311727
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

133

| | | |
|---|---|---|
| 12:00 | 1 | A.   I think so. |
| 12:00 | 2 | Q.   And you were, obviously, uh -- you trusted your |
| 12:00 | 3 | attorney, correct? |
| 12:00 | 4 | A.   Of course. |
| 12:00 | 5 | Q.   You were going to take your attorney's advice, correct? |
| 12:00 | 6 | A.   Correct. |
| 12:00 | 7 | Q.   And, uh, you had an understanding, did you not, that if |
| 12:01 | 8 | you sent a letter saying that you were stressed -- and by |
| 12:01 | 9 | the way, let's step back. |
| 12:01 | 10 | Did you take a medical leave around this time? |
| 12:01 | 11 | A.   I took a medical leave in 2006. |
| 12:01 | 12 | Q.   And as a result of what was going on in this time |
| 12:01 | 13 | frame, uh, did you get an understanding that if you said to |
| 12:01 | 14 | your lawyer that you were stressed and that you were taking |
| 12:01 | 15 | a medical leave that it would be next to impossible for your |
| 12:01 | 16 | employer to fire you or reprimand you? |
| 12:01 | 17 | MS. KELLER:  Objection.  That calls for a legal |
| 12:01 | 18 | conclusion of the witness.  And there's no foundation for |
| 12:01 | 19 | this. |
| 12:01 | 20 | THE COURT:  Overruled.  He can tell you his state |
| 12:01 | 21 | of mind, if any, at that time. |
| 12:01 | 22 | You can answer that question. |
| 12:02 | 23 | THE WITNESS:  I need to hear the question again |
| 12:02 | 24 | now. |
| | 25 | |

| | | |
|---|---|---|
| 12:02 | 1 | BY MR. PRICE: |
| 12:02 | 2 | Q.   Around this time frame, did you have an understanding |
| 12:02 | 3 | that it would be extremely difficult for Mattel to fire you |
| 12:02 | 4 | or take any action against you if you said you were |
| 12:02 | 5 | experiencing stress and went on a medical leave? |
| 12:02 | 6 | A.   No.  I don't recall that.  I don't remember that. |
| 12:02 | 7 | Q.   Well, uh, in the letter, 9484, you do say that you are |
| 12:02 | 8 | stressed, correct?  And this is in the -- it's the paragraph |
| 12:02 | 9 | beginning with "I believe."  At the end you say, "I fear |
| 12:02 | 10 | that my actions may expose me to criminal -- personal |
| 12:02 | 11 | criminal liability, and I am stressed about the fallout |
| 12:02 | 12 | which may occur." |
| 12:02 | 13 |      Do you see that? |
| 12:02 | 14 | A.   I do. |
| 12:02 | 15 | Q.   "My conscience does not allow me to continue in this |
| 12:02 | 16 | role.  And I do not feel I can take the pressure to engage |
| 12:03 | 17 | in misrepresentations any longer." |
| 12:03 | 18 |      Do you see that? |
| 12:03 | 19 | A.   I do. |
| 12:03 | 20 | Q.   So the letter was intended to put in writing, uh, this |
| 12:03 | 21 | statement that you were being pressured to continue to |
| 12:03 | 22 | engage in misrepresentations, right? |
| 12:03 | 23 | A.   I was asked to continue to get competitive information, |
| 12:03 | 24 | if that's what you're referring to, correct. |
| 12:03 | 25 | Q.   That's not what I'm referring to. |

| | | |
|---|---|---|
| 12:03 | 1 | Uh, here, we have, "My conscience does not allow me to |
| 12:03 | 2 | continue in this role, and I do not feel I can take the |
| 12:03 | 3 | pressure to engage in misrepresentations any longer." |
| 12:03 | 4 | Do you see that? |
| 12:03 | 5 | A.   I do. |
| 12:03 | 6 | Q.   So what your attorney was putting down in writing and |
| 12:03 | 7 | sending to Mattel was a document which appeared to say that |
| 12:03 | 8 | Mattel was asking you to continue to engage in |
| 12:03 | 9 | misrepresentations, right?  That's what that says? |
| 12:04 | 10 | A.   I -- I don't see that on there. |
| 12:04 | 11 | Q.   Well, you don't see on there where it says, "I do not |
| 12:04 | 12 | feel I can take the pressure to engage in misrepresentations |
| 12:04 | 13 | any longer." |
| 12:04 | 14 | Do you see that? |
| 12:04 | 15 | A.   I do see that. |
| 12:04 | 16 | Q.   And, uh -- and Ms. Keller asked you in her examinations |
| 12:04 | 17 | whether you felt pressure and stress because you were |
| 12:04 | 18 | engaging in misrepresentations over the years, correct? |
| 12:04 | 19 | A.   Correct. |
| 12:04 | 20 | Q.   Okay.  And what this letter -- written, at least, in |
| 12:04 | 21 | part by your attorney -- said, was that you couldn't take |
| 12:04 | 22 | the pressure to engage in misrepresentations any longer. |
| 12:04 | 23 | "Any longer" meant going forward, correct? |
| 12:04 | 24 | A.   Correct. |
| 12:04 | 25 | Q.   Uh, but what you had been told was you weren't -- you |

Case 2:04-cv-09049-DOC-RNB   Document 10269   Filed 03/25/11   Page 136 of 138   Page ID #:311730
CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

136

| 12:04 | 1 | weren't supposed to engage in misrepresentations any longer, |
| 12:04 | 2 | correct? |
| 12:04 | 3 | A.   Correct. |
| 12:04 | 4 | Q.   So did you understand that -- that this letter was the |
| 12:05 | 5 | first volley -- like the first communication where you were |
| 12:05 | 6 | attempting to get a settlement from Mattel on the basis that |
| 12:05 | 7 | you had experienced stress because of, uh, having to engage |
| 12:05 | 8 | in misrepresentations and undercover assignments?  Did you |
| 12:05 | 9 | think this was the first volley for that? |
| 12:05 | 10 | A.   Not necessarily. |
| 12:05 | 11 | Q.   Well, did you -- did you continue to be involved in the |
| 12:05 | 12 | communications, then, between Mattel and your -- your |
| 12:05 | 13 | attorney concerning what you were demanding and -- and the |
| 12:05 | 14 | claims that you were going to make? |
| 12:05 | 15 | A.   That again -- once again, that was taken care of by my |
| 12:05 | 16 | attorney. |
| 12:05 | 17 | Q.   Okay.  And, uh, that's because you were kind of putting |
| 12:05 | 18 | your faith in your attorney to do the best thing they could |
| 12:05 | 19 | do for you? |
| 12:06 | 20 | A.   That's correct. |
| 12:06 | 21 |          MR. PRICE:  Your Honor, would this be a good time |
| 12:06 | 22 | for the lunch break? |
| 12:06 | 23 |          THE COURT:  This would be a good time, then. |
| 12:06 | 24 |          You're admonished not to discuss this matter |
| 12:06 | 25 | amongst yourselves, nor form or express any opinion |

| | | |
|---|---|---|
| 12:06 | 1 | concerning the case. |
| 12:06 | 2 | We'll see you at 1:00 o'clock.  Have a nice lunch. |
| 12:06 | 3 | Mr. Villasenor, if you would return at |
| 12:06 | 4 | 1:00 o'clock. |
| 12:06 | 5 | THE WITNESS:  Certainly. |
| 12:06 | 6 | THE COURT:  Thank you, sir. |
| 12:06 | 7 | All right.  Counsel, 1:00 o'clock.  Have a nice |
| 12:06 | 8 | lunch. |
| 12:06 | 9 | *(Lunch recess held at 12:06 p.m.)* |
| 12:06 | 10 | *(Further proceedings reported by Jane Sutton* |
| 12:06 | 11 | *Rule in Volume II.)* |
| 12:06 | 12 | –oOo– |
| 12:06 | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 12:06 | 1 | -oOo- |
| 12:06 | 2 | |
| 12:06 | 3 | CERTIFICATE |
| 12:06 | 4 | |
| 12:06 | 5 | I hereby certify that pursuant to Section 753, |
| 12:06 | 6 | Title 28, United States Code, the foregoing is a true and |
| 12:06 | 7 | correct transcript of the stenographically reported |
| 12:06 | 8 | proceedings held in the above-entitled matter and that the |
| 12:06 | 9 | transcript page format is in conformance with the |
| 12:06 | 10 | regulations of the Judicial Conference of the United States. |
| 12:06 | 11 | |
| 12:06 | 12 | Date:  March 23, 2011 |
| 12:06 | 13 | |
| 12:06 | 14 | |
| 12:06 | 15 | _____ |
| 12:06 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR |
| 12:06 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER