1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                  - - - - - - -

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )    Day 38
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 2 of 3
                                      )
10            Defendants.             )
     _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                Santa Ana, California

18             Wednesday, March 23, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-23 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
              By:   JOHN B. QUINN
5                  MICHAEL T. ZELLER
                  WILLIAM PRICE
6              Attorneys at Law
              865 South Figueroa Street
7              10th Floor
              Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
              4 Park Plaza
13             Suite 1600
              Irvine, California 92614
14             (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                  Attorney at Law
              405 Howard Street
18             San Francisco, California 94105
              (415) 773-5700

19             – AND –

20             KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                  Attorney at Law
22             18500 Von Karman Avenue
              Suite 560
23             Irvine, California 92612
              (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
5                 Attorney at Law
             601 West Fifth Street
6            12th Floor
             Los Angeles, California 90071
7            (213) 613-4660

8            – AND –

9            LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO
             ROBERT ECKERT, Mattel CEO
16           LILY MARTINEZ, Mattel Employee
             KEN KOTARSKI, Mattel Technical Operator
17           MIKE STOVALL, MGA Technical Operator
             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
             WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19           MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
             FRANK RORIE, Orrick Herrington & Sutcliffe
20           DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
             DENISE MINGRONE, Orrick Herrington & Sutcliffe
21           EVAN JENNESS, Attorney for Sal Villasenor

22

23

24

25
```

```
 1                    I N D E X

 2

 3

 4                    EXAMINATION

 5

 6    Witness Name        Direct    Cross     Redirect     Recross

 7    VILLASENOR, SAL
        By Mr. Price                  5
 8      By Ms. Keller                           106

 9

10

11                    EXHIBITS

12

13    Exhibit                        Identification    Evidence

14    Plaintiffs' No. 9525                              36

15    Plaintiffs' No. 20587                             89

16    Plaintiffs' No. 20620                             88

17    Plaintiffs' No. 20621                             85

18    Plaintiffs' No. 20943                             58

19    Plaintiffs' No. 20944                             53

20    Plaintiffs' No. 21970                             55

21    Plaintiffs' No. 21970-0004                        52

22    Plaintiffs' No. 23903                             90

23    Plaintiffs' No. 24308                             64

24    Plaintiffs' No. 24309                             70

25    Plaintiffs' No. 24309-0004                        70
```

```
 1              SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 23, 2011

 2                       DAY 38, VOLUME 2 OF 3

 3                           (1:05 p.m.)

 4              (The following proceedings is taken in the

 5         presence of the jury.)

 6              THE COURT:  We're back on the record.

 7              All counsel are present.  The parties are present.

 8    The witness is present.

 9              Mr. Price, your continued cross-examination of

10    Mr. Villasenor, please.

11              MR. PRICE:  Thank you, your Honor.

12         SAL VILLASENOR, DEFENDANTS' WITNESS, RESUMED

13                 CROSS-EXAMINATION (Continued)

14    BY MR. PRICE:

15    Q    Mr. Villasenor, we were talking about Exhibit 9484 when

16    we broke, 9484R, and that's the December 22nd, 2005 e-mail

17    from your e-mail address to Mr. Normile and -- and others.

18         So we're talking about the sentence that says, "My

19    conscience doesn't allow me to continue in this role, and I

20    do not feel I can take the pressure to engage in

21    misrepresentations any longer."

22         Now, Mattel was a company of, what, 30,000 employees,

23    around the time?

24    A    I don't remember the exact amount.

25    Q    Yeah.  A lot of employees, right?
```

CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

6

1    A    Yes.

2              THE COURT:  Can you move a little closer to that

3    mike, or move that mike a little closer to you.

4              THE WITNESS:  Sure.

5              THE COURT:  Okay.  Thank you.

6    BY MR. PRICE:

7    Q    And there's a role for someone at -- someone at Mattel

8    to look at the public information, look at the press

9    releases, look at the news articles and have someone

10   responsible for collecting all that to get, and present to

11   others, a view of the trends and what the competitors were

12   doing, correct?

13   A    That's correct.

14   Q    And, in fact, what's what you were doing 90-plus

15   percent of the time at Mattel, and that is you were looking

16   at public information, you were looking at articles, news

17   letters, press releases and sending out things like that

18   DEFCON Alert 1, right?

19   A    I'm not sure it was 90 percent, but it was part of the

20   job, correct.

21   Q    And in you agree that -- in fact, your understanding is

22   that to this day, someone has that role at Mattel, which is

23   to collect all that information?

24   A    I don't know if that role still exists at Mattel today.

25   Q    Okay.  But you do recognize, though, that that's -- you

CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

7

```
 1    understood that that activity, which is collecting the
 2    competitive information from public sources like news
 3    releases and articles, paid subscription services, that
 4    that's something which is valuable in an organization like
 5    Mattel?
 6    A    You can say that.
 7    Q    And what you had been -- when you met with Mr. Louie,
 8    he said that you are to continue in your job, but you can't
 9    misrepresent yourself, correct?
10    A    He did say that, correct.
11    Q    And he didn't say -- well, let me back up.
12         Ms. Keller asked you some questions about this
13    litigation and whether that had anything to do with your
14    being told to stop by Mr. Louie in 2005; do you recall those
15    questions?
16    A    I do not.
17    Q    Okay.  Now, there's been a stipulation that MGA sued
18    Mattel in April of 2005, April 13th.  When did your -- when
19    did your deposition take place?
20    A    I had a deposition in July and September.
21    Q    Of 2010, right?
22    A    Yes.
23    Q    And --
24              THE COURT:  Just a moment, Counsel.
25              That wasn't the stipulation.
```

 1              MR. PRICE:  That was part of the stipulation, your

 2    Honor.

 3              THE COURT:  Well, the full stipulation was --

 4              MR. PRICE:  It was intervene and then --

 5              THE COURT:  Then state the full stipulation.

 6              MR. PRICE:  Pardon?

 7              THE COURT:  Then state the full stipulation.

 8              MR. PRICE:  I'll get a copy of it and come back to

 9    it.

10    BY MR. PRICE:

11    Q   Mr. Villasenor, do you have any idea whether or not any

12    lawsuit by MGA pending in 2005 had anything to do with

13    your --

14              THE COURT:  Hold on.  Just a moment.  Stop.  I

15    want to get that full stipulation so there is no

16    disagreement between the parties.

17              Ms. Keller, as you get up out of your seat, as you

18    approach Mr. Price, as you both stand at the lectern, and as

19    that full stipulation comes out, once again, so there is no

20    confusion.

21              MS. KELLER:  We'll have to pull the stipulation,

22    then, your Honor.

23              THE COURT:  We'll wait, then.  Time is running.

24              *(Attorney discussion held off the record.)*

25              MR. PRICE:  You'd want us to read it right into

1    the record.

2            THE COURT:  Read it right into the record, just as

3    it's stipulated to by the parties.

4            MR. PRICE:  "On April 27th, 2004, Mattel filed a

5    complaint against Carter Bryant in the Superior Court of

6    Los Angeles County, Case Number BC314398.

7            "After Bryant removed the action to the United

8    States District Court for the Central District of

9    California, Case Number 4-9059, Carter Bryant's deposition

10   was taken for the first time on November 4th, 2004.

11           "MGA Entertainment, Inc., intervened in the

12   Mattel v. Bryant action, Case Number 4-9059, on December

13   8th, 2004.

14           "On April 13th, 2005, MGA Entertainment, Inc.,

15   filed a complaint against Mattel, Inc., in the Central

16   District of California, Case Number 5-02727.

17           "On May 20th, 2005, the Court issued an order

18   staying the action pending an interlocutory appeal.

19           "On April 16th, 2006, the Court issued an order

20   vacating the stay.

21           "On November 20th, 2006, Mattel's first amended

22   complaint was lodged with the Court bringing claims against

23   MGA Entertainment, Inc., Isaac Larian, Carter Bryant, MGA

24   Entertainment, HK Limited, MGAE de Mexico, SLR de CV and

25   Gustavo Machado."

```
 1              THE COURT:  Excellent.  And that won't count
 2   against time.  I'll make sure that doesn't go against either
 3   party's time, so don't be concerned about that.
 4              That was entered into by counsel for both parties.
 5              All right.  Counsel?
 6   BY MR. PRICE:
 7   Q    So there's a stipulation that MGA sued Mattel on or
 8   about April 13, 2005, and your deposition took place in
 9   2010, correct?
10   A    Correct.
11   Q    And do you know one way or another whether that suit
12   that was pending in 2005 had anything to do with your toy
13   fair activities; do you know one way or the other?
14              MS. KELLER:  Objection.  Misstates the evidence.
15   It was pending since 2004.
16              THE COURT:  Just a moment.
17              Sustained, Counsel.
18   BY MR. PRICE:
19   Q    The lawsuit that was filed by MGA against Mattel --
20              THE COURT:  By MGA not against Carter Bryant.
21              MR. PRICE:  Yes.
22   BY MR. PRICE:
23   Q    A lawsuit that was filed by MGA against Mattel in 2005,
24   do you have any idea whether or not that lawsuit has
25   anything do with your toy fair activities?
```

1    A     I do not.

2    Q     And your deposition took place some five years after

3    that, more than five years after May -- April 13, 2005.

4    A     Something like that.

5    Q     Now, you were talking about Exhibit 9484, which is the

6    letter that your -- or e-mail that you and your attorney

7    worked on.  I asked you about taking a stress leave or

8    medical leave.  Around this timeframe of December 2005, were

9    you aware of whether an employer could get in trouble by

10   retaliating against someone; did you have any awareness of

11   that?

12            MS. KELLER:  Objection.  Insufficient facts --

13            THE COURT:  Overruled.

14            MS. KELLER:  -- and beyond this witness's

15   expertise.

16            THE COURT:  Overruled.

17            You can give us your state of mind if you knew

18   about this.

19            THE WITNESS:  Can you repeat the question, please.

20   BY MR. PRICE:

21   Q     Yeah.  Around the time you sent 9484 saying that your

22   conscience doesn't allow you to continue in the role, that

23   there is pressure to engage in misrepresentations, and where

24   you give your attorney's name, at that time did you have an

25   understanding that an employer like Mattel could be

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 12 of 109   Page ID #:311744
CV 04-9049-DOC – 03/23/2011 – Day 38, Vol. 2 of 3

12

```
 1    subjecting itself to liability if it was perceived to be

 2    retaliating against someone for giving it information?

 3    A    I don't think so, no.

 4    Q    Was it your understanding that this letter 9484 was

 5    kind of a setup letter for asking Mattel for monetary

 6    compensation?

 7    A    No.

 8    Q    Well, after the -- I'm sorry, I said "letter."  After

 9    the e-mail of December 2nd, 2005, after that, did you ever

10    work at Mattel?

11    A    After --

12    Q    After the time you sent this e-mail.

13    A    No, I never returned back to Mattel.

14    Q    So at the time you sent this e-mail, you quit going in

15    to work?

16    A    I quit going back to my office, correct.

17    Q    Okay.  And then in -- in January, you were copied on --

18    on letters between your attorney and Mattel, correct?

19    A    I don't remember if I was or wasn't.

20    Q    Okay.  Let's have you look at 9525.

21              MS. KELLER:  Your Honor, this previously has been

22    excluded by the Court on Mr. McConville's examination of

23    Ms. Leahy.

24              THE COURT:  Just a moment.  Just a moment.

25              Can one of you bring me 9525?
```

1          MR. PRICE:  Yes.

2          THE COURT:  It should be dated January 11th, 2006.

3          MR. PRICE:  Yes.

4          THE COURT:  Thank you.  I appreciate it.

5          All right.  Now, ladies and gentlemen, if you'd go

6    back to the jury room for just one moment.  This is one of

7    the few times I need to speak to counsel, with my apologies.

8          You are admonished not to discuss this matter

9    amongst yourselves, nor form or express any opinion

10   concerning this case.

11          *(The following proceedings is taken outside*

12      *the presence of the jury.)*

13          THE COURT:  Mr. Villasenor, I am going to ask you

14   to wait outside.  Pardon my discourtesy.  We'll be with you

15   in just a moment.

16          *(Mr. Villasenor exited the proceedings.)*

17          THE COURT:  All right.  Before the Court is

18   Exhibit 9525.  Ms. Leahy was not the appropriate vehicle.

19   Mr. Villasenor may be the appropriate vehicle.  Now --

20          MS. KELLER:  It was the same issue, your Honor.

21          THE COURT:  No, no, Counsel.  You're listening and

22   I'm speaking; did you notice that?

23          MS. KELLER:  I'm sorry.  I apologize.

24          THE COURT:  This letter is dated January 11th,

25   2006, and it's, "Dear Ms. Wagner," and it goes on,

1    basically, to discuss the severance proposal.  Apparently

2    it's part of the negotiations that went back and forth.

3           Now, I've anticipated that Mattel may try to get

4    into the demands made concerning settlement negotiations by

5    Mr. -- between Mr. Villasenor and Mattel.

6           MGA has previously represented, and I believe that

7    MGA is correct, that Mattel has refused discovery in the

8    negotiations with Mr. Villasenor and his attorney pursuant

9    to the mediation privilege.

10           The common law recognizes a privilege that, quote,

11   "shields mediation discussions from discovery by third

12   parties," and the Court cites Munoz v. JC Penny Corp., 2009,

13   Westlaw 975846.  It's the Central District of California

14   case, 2009.  My colleague Judge Otis Wright is writing for

15   the Court.

16           This mediation privilege is codified in California

17   Evidence Code Section 1119.  Of course, the Federal Rules of

18   Evidence contain no such provision regarding mediation

19   communications from disclosure.  In fact, Rule 408 clearly

20   implies that mediation and settlement communications may be

21   used as evidence.

22           So the question is on what ground, Mr. Price, was

23   Mattel invoking the mediation privilege?  Was it the

24   California Evidence Code section or was it common law?

25           MR. PRICE:  Your Honor, I'll have --

 1              THE COURT:  No.  You'll address the Court.

 2              MR. PRICE:  Oh, okay.

 3              THE COURT:  Only lead counsel will be involved in

 4    this.

 5              I want to cite to you Olam v. Congress Mortgage

 6    Company at 68 F.Supp 2d 1110, Northern District of

 7    California, 1999, and that contains a very thoughtful

 8    discussion about whether and to what extent the mediation

 9    privilege can be waived.  It clarifies that the mediation

10    privilege must be waived as to all parties to that

11    mediation, and heretofore, Mattel has not been willing to

12    waive that privilege.  Thus, the question really becomes

13    whether both Mr. Villasenor, and I will get his attorney

14    into court in just a moment, and Mattel are willing to waive

15    the mediation privilege.

16              So now, Ms. Keller?

17              MS. KELLER:  Well, your Honor, even if they were

18    willing to waive the privilege, the problem is that because

19    of the assertion of the privilege, we did not get discovery

20    into this area.

21              Mr. Moore said he didn't know the substance, and

22    that Ms. Thomas handled it, and we don't have a deposition

23    of her.  So we would be prejudiced in terms of doing any

24    kind of cross-examination.

25              THE COURT:  The difficulty is that while you might

1    be correct, Mattel has an equally difficult decision to

2    make, and that is this could potentially open up a series of

3    discussions that Mattel has wished to keep privileged thus

4    far under both the mediation privilege and the

5    attorney-client privilege.  That could extend as far as

6    Mr. Moore and, in fact, include Mr. Normile, and it could

7    include counsel Jill Hill, who's present in court who's

8    standing and is now about to be seated.

9           Counsel?

10          MS. KELLER:  Is that Ms. Thomas, your Honor?

11          THE COURT:  Ms. Thomas, my apologies.

12          MR. PRICE:  Your Honor, first, this letter has

13   nothing do with the mediation privilege.  This is way before

14   the mediation.

15          Second, I've been told, because you know I don't

16   have -- I wasn't on this case the entire time, but the Court

17   denied our motion in limine to keep out this settlement,

18   and -- and -- and, you know, we oppose that, MGA opposed

19   that, and the Court denied our motion in limine.

20          MGA also asked Mr. Villasenor about the

21   negotiations in his deposition, so this isn't a surprise.

22   And this -- this letter --

23          THE COURT:  What did he say in his deposition,

24   Mr. Price?  What did he say?

25          MR. PRICE:  Let me find out.

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 17 of 109   Page ID
#:311749
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

17

 1            *(Attorney discussion held off the record.)*

 2            THE COURT:  Would you invite counsel in for

 3    Mr. Villasenor?

 4            Counsel, thank you for being present.  Would you

 5    identify yourself for the record, please.

 6            MS. JENNESS:  Yes, your Honor.  Evan Jenness for

 7    Mr. Villasenor, who is outside of the courtroom.

 8            THE COURT:  Why don't you step forward and use the

 9    lectern.  I want to tell you where we're at.

10            We're about to attempt to get into any demands

11    made by Mr. Villasenor to Ms. Wagner through Counsel

12    Barrera.  The Court's anticipated that one or more parties

13    would get into that.  Initially, my research shows that MGA

14    had requested and Mattel had continually refused discovery

15    in the negotiations with Mr. Villasenor and his attorney,

16    who is Mr. Barrera, pursuant to the mediation privilege.

17            Common law recognizes a privilege that shields

18    mediation discussions from discovery by third parties, and

19    the Court's previously cited Munoz v. JC Penny Corp. at 2009

20    Westlaw 975846, and my colleague Otis Wright in Los Angeles

21    wrote that opinion.

22            This mediation privilege is codified in California

23    Evidence Code Section 1119, and, of course, the federal

24    rules don't speak to the mediation privilege.  It contains

25    no such provision guarding communications from disclosure.

Case 2:04-cv-09049-DOC-RNB  Document 10270  Filed 03/25/11  Page 18 of 109  Page ID #:311750
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

18

 1    In fact, Rule 408 of the Federal Rules of Evidence clearly

 2    imply that mediation and settlement communications may be

 3    used as evidence.

 4            So the question is initially to Mattel, and that

 5    is on what ground are they invoking the mediation privilege?

 6    Was that the California Evidence Code Section or common law?

 7    And I've cited to counsel outside of your presence, which is

 8    why I've asked you to come in, Olam v. Congress Mortgage

 9    Company, 68 F.Supp 2d 1110, Northern District of California,

10    1999.  So far that contains the most thoughtful discussion

11    about whether and to what extent the mediation privilege can

12    be waived.  It clarifies, I think, in my opinion, that the

13    mediation privilege must be waived as to all parties to the

14    mediation; thus, the question is whether both Mr. Villasenor

15    is waiving and whether Mattel is waiving that privilege

16    concerning mediation.

17            Now, Mattel was about to argue that the mediation

18    privilege doesn't apply, so I'd like you to be present

19    because you are going to be a part of this proceeding and

20    the decision the Court makes, and I don't want you to have

21    to come in at a later time, okay?  So if you'd listen to

22    Mattel's argument for a moment.

23            MS. JENNESS:  Should I be seated, your Honor?

24            THE COURT:  Oh, wherever you'd like to, a chair on

25    either side, it doesn't matter.

 1          MS. JENNESS:  It's a crowded courtroom, so I'll
 2   just move out of the way.
 3          THE COURT:  No.  I want you in the first row so
 4   you can participate.
 5          Mr. Price?
 6          MR. PRICE:  Your Honor, we are still trying to
 7   find the part in the transcript where Mr. Villasenor was
 8   asked about the settlement.  I would like to tell the --
 9          THE COURT:  Let me go down the line with this.
10   What happens with my attorney-client privilege?  For
11   instance, if Barrera is negotiating with Wagner, let's start
12   thinking this through.  What happens if Wagner is getting
13   directions from Moore or Normile, what does that do to the
14   attorney-client privilege?  In other words, do I need to go
15   back and start looking at other privileged documents up to
16   this point, because this can have huge ramifications for
17   Mattel, or none?  So I want to explore that with you before
18   we just walk into this and --
19          MR. PRICE:  Sure.  Well, I think it has no
20   implications because a demand obviously is not a privileged
21   act.  And this is what Exhibit 9525 is.  It is a -- it is a
22   demand couched in, you know, "We want somewhere between, you
23   know, 5.4 million and 40 million," and it goes on to say
24   that Mr. Villasenor is not making a demand for a specific
25   sum, but this is a -- a nonprivileged communication saying

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 20 of 109   Page ID #:311752
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

20

 1    "You should pay us some money."  And the next exhibit I was

 2    going to use, your Honor, is --

 3              THE COURT:  But it refers -- if I remember this

 4    document correctly, doesn't this document refer and infer

 5    that there was prior communication that we don't have a

 6    document for?  In other words, this is a reply back.

 7              MR. PRICE:  No, your Honor.  Actually, if you look

 8    at this document in the second paragraph, it says, "The

 9    purpose of this letter is to follow-up on Mr. Villasenor's

10    complaint and to communicate with Mattel through its legal

11    representative regarding a severance package," and that

12    complaint we've just been going through as Exhibit 9484,

13    which is the December 22nd, 2005 e-mail from Mr. Villasenor

14    to Bob Normile and others.

15              MS. KELLER:  Your Honor, if we may be heard.  I

16    have some cites for the Court from the depos where the

17    privilege was invoked by Mattel.

18              THE COURT:  Just a moment.  I'm going to have you

19    both read that deposition into the record, and I'm going to

20    hear if there was a prior implication or not, and I want to

21    see that deposition for a moment.  So here we sit until I

22    get it.

23              MS. KELLER:  Your Honor, it's page 693 --

24              THE COURT:  That's fine.  I can read.  Just give

25    me the deposition.

 1              MS. KELLER:  Your Honor, there are two places, one

 2    where the litigation privilege is asserted by Mr. -- that

 3    I've been able to find so far by the lawyer for

 4    Mr. Villasenor and one by Mattel, and Mattel's is --

 5              THE COURT:  Just a moment.  I want those pages,

 6    please.  I can read.

 7              MS. KELLER:  Page 693 to 694, for openers, is

 8    where Mattel invokes the privilege.

 9              THE COURT:  Just a minute.  Just a minute.

10              All right.  And where else?

11              MS. KELLER:  And Mr. Villasenor's attorney invokes

12    privilege on his behalf at pages 26 and -- well, 26 and 27,

13    and we're going to find the rest, your Honor, but Mattel

14    repeatedly invokes the settlement negotiation privilege 693

15    and 694.

16              THE COURT:  As to this document?

17              MS. KELLER:  Yes.

18              THE COURT:  Mr. Price?

19              MS. KELLER:  No, well --

20              THE COURT:  No.  Mr. Price?

21              MR. PRICE:  No, your Honor, that's not --

22              MS. KELLER:  I'm sorry, your Honor, I'm wrong

23    about that.  I've got the wrong page.  I'm finding it for

24    you.

25              The exhibit number that we're specifically looking

1   for is 9525.

2          THE COURT:  All right.  Who is waiting out in the

3   hallway as the next witness?

4          MS. HURST:  Mr. Vilppu, your Honor.

5          THE COURT:  Okay.

6          MS. HURST:  He may be across the street, but we

7   can get him --

8          THE COURT:  Call him.

9          MS. KELLER:  The pages that I gave you, your

10  Honor, went to 9484R, and Mattel was even claiming that that

11  was protected by the settlement negotiation privilege.  And

12  then --

13         THE COURT:  Well, as usual, you won't be able to

14  reach an agreement, and I'm not going to take this time

15  while the jury sits in the jury room.  So this gentleman is

16  going to be seated while you continue on with the rest of

17  are your examination, and we'll do this on nights and

18  weekends.

19         MR. PRICE:  I've got more to do in the

20  examination, obviously.

21         THE COURT:  Do you want to go forward with that,

22  or do you want him to step down?  In other words, what's

23  your advantage?

24         MR. PRICE:  No.  I'll go forward because I think

25  there are some other things to address.

```
 1              THE COURT:  But not in this area until I can make
 2     a ruling.
 3              MR. PRICE:  Correct.
 4              THE COURT:  I want to sort out what positions MGA
 5     took, what positions Mattel took, what positions counsel
 6     took in this, and I want to see the deposition and
 7     thoughtfully read it this evening.
 8              MR. PRICE:  Sure.  And I will represent, your
 9     Honor, there was no instruction not to answer.  There was a
10     statement objection, and he answered the questions with
11     respect to what he was asked.
12              THE COURT:  I just need time to look at it.
13              MR. PRICE:  Sure.
14              THE COURT:  I doubt that you're going to be
15     precluded from it, and I'm not going to make a ruling on a
16     wing and a prayer.  I want no surprises.
17              MR. PRICE:  Can I ask him --
18              THE COURT:  Nothing further in this area until I
19     sort this out.
20              MR. PRICE:  Not just orally, like, "Did you make a
21     demand" or -- see, she just asked him was the settlement
22     just for keeping quiet, that was the --
23              THE COURT:  You can certainly follow-up with that.
24              MR. PRICE:  Yeah.
25              THE COURT:  It's the demand and the amount, et
```

1    cetera.  And also, I'm concerned, and I don't know yet, I

2    don't think that I want Mattel's privilege opened up, and I

3    want to proceed cautiously.  I don't want this to be a

4    vehicle for MGA, quite frankly, and I'll put that on the

5    record, to get into attorney-client privileges between the

6    staff at --

7              MR. PRICE:  Yeah.

8              THE COURT:  -- Mattel.

9              MR. PRICE:  Yeah.

10              THE COURT:  And so I think we should be very

11    cautious in this area.  And if not, then MGA might have a

12    valid claim depending upon what's asked and what the

13    response is to privilege being waived, and far beyond the

14    mediation privilege.  That's one of my concerns, because

15    I've tried not to open that up, although I know Mattel has

16    objected on occasion to the Court's ruling concerning

17    privilege, and MGA's objected also, thinking that the Court

18    went too far on two occasions, one for each side, concerning

19    the privilege.  So I think this is a very touchy area.

20              MS. JENNESS:  Your Honor, may I be heard for a

21    moment?  It may have expedite things for today's purposes.

22              I don't believe my client knows many, if not any,

23    of the details of the settlement negotiations.  He was

24    letting his attorney negotiate that with --

25              THE COURT:  It's not going to be the problem.

 1    What's going to happen is even if he says "I don't know,"

 2    counsel is going to follow-up and put the document in front

 3    of him, and he's going to ask, "Were you informed of this

 4    request having been made by you through your counsel, or did

 5    your counsel inform you of this request having been made?"

 6    Obviously, there must have been some discussion at some

 7    point, you know, between counsel and the client before some

 8    dollar amount was made.

 9             Number two, it not only concerns your client, it

10    also has ramifications for Mattel and their attorney-client

11    privilege and their mediation privilege, and up until this

12    time, there's been opposition to disclosure.

13             MS. JENNESS:  Your Honor, I'm certainly going to

14    impose an attorney-client privilege objection to the extent

15    the questions inquire about Mr. Villasenor's confidential

16    communications with Mr. Barrera.

17             THE COURT:  Of course, and I think Mattel would

18    take the same position concerning any discussion between,

19    let's say, members of their legal staff and Ms. Wagner, for

20    instance, or Mr. Barrera.  And therefore, I don't want that

21    blurted out on the witness stand, and I'd like to proceed

22    cautiously, which may inconvenience everybody, but I think

23    I'd rather do that now.  I've given counsel an awful lot of

24    grace in terms of letting them put documents up on the ELMO.

25    This isn't going to be the time, though, and --

```
 1              MR. PRICE:  And I'll assure counsel, this letter
 2    was written and copied to Mr. Villasenor and sent to Mattel,
 3    so --
 4              Quick question, your Honor, can I go real quick
 5    for a two-minute break?
 6              THE COURT:  Oh, absolutely.  In fact, Counsel, if
 7    you need a five-minute recess, do it now, okay?
 8              (Mr. Price exited the proceedings.)
 9              MS. JENNESS:  Are we excused, your Honor?
10              THE COURT:  No.
11              MS. KELLER:  We did find the page, your Honor.
12    It's page 692 on this document where Mattel asserts the
13    privilege.  They consistently asserted the privilege --
14              THE COURT:  Just a moment.  Wait until Mr. Price
15    is back.
16              Anyway, I want Mr. Vilppu across the street.
17              MS. HURST:  He's coming over, your Honor.
18              THE COURT:  And I want him standing in the hallway
19    in case we can't proceed any further.  If Mr. Price chooses
20    to go forward, he may, but it's obvious that this gentleman
21    is coming back.
22              (Mr. Price re-entered the proceedings.)
23              THE COURT:  Mr. Price returned, and all counsel
24    are present.
25              Counsel, why does this appear to relate to
```

 1   Exhibit 9525?  It reads as follows:

 2           Mr. Molinski:  "Yeah, you guys produced it."

 3           Mr. Barrera:  "Yeah, let me just object, and I'm

 4   not going to instruct him not to answer and object under

 5   Evidence Code Sections 1119 and 1152 on the grounds that

 6   it's a confidential settlement communication."

 7           By Mr. Molinski, question:  "And you have, in

 8   fact, expressed concerns about continuing to follow Mattel's

 9   directives and instructions regarding market intelligence

10   concerning competition, correct, Mr. Villasenor?"

11           Mr. Searcy:  "Objection.  Lacks foundation.  Calls

12   for speculation.  It's also vague."

13           The Witness:  "That is correct."

14           By Mr. Molinski:  "And that was the concerns that

15   you had expressed in the December 22nd, 2005 e-mail,

16   correct?"

17           Well, Counsel, if that's the December 25th, 2000

18   e-mail, why do you believe we're referring to 9525 when

19   these objections are being made?

20           MS. KELLER:  Your Honor, we are looking at page

21   691.

22           THE COURT:  Well, you just referred me to 692 and

23   693 on the record.

24           MS. KELLER:  Well, 691 and 692.  It starts at line

25   14 on 691 and --

```
 1              THE COURT:  So the pages are moving around on me,

 2    here?

 3              MS. KELLER:  Your Honor, I'm sorry.  We are trying

 4    to find this on the fly, but this says "I'll show you what

 5    we'll mark as Exhibit 9525."

 6              By Mr. Molinski:  "Do you recognize this" --

 7              THE COURT:  Just a moment.  I can read.

 8              All right.  Reading from page 691, question, line

 9    14, "I'll show you what we'll mark as Exhibit 9525.

10    Deposition Exhibit 9525 was marked for identification."

11              By Mr. Molinski:  "Do you recognize this letter?"

12              Mr. Villasenor:  "I do."

13              Question:  "And did you receive this letter from

14    your attorney sometime around January 11th, 2006?"

15              Answer:  "Correct."

16              Question:  "Do you see the second page?"

17              About two sentences in, it says, "In addition, Sal

18    has expressed his concerns about continuing to follow

19    Mattel's directives and instructions regarding market

20    intelligence concerning competitors; do you see that?"

21              Answer:  "I do."

22              Mr. Searcy:  "Let me just object again.  That is,

23    this is a settlement communication protected under Rule 408

24    that was sent in another litigation, and I'll object to the

25    use of this document."
```

1           Mr. Molinski:  "Yeah, you guys produced it."

2           Mr. Barrera:  "Yeah.  Let me just object, and I'm

3     not going to instruct him not to answer and object under

4     Evidence Code Section 1119 and 1152."

5           Well, what is Mr. Barrera referring to?  On one

6     hand he objects and then he states "I'm not going to

7     instruct him not to answer."  What kind of objection is

8     that?

9           MS. KELLER:  Well, it goes on.  On the next page,

10    your Honor --

11          THE COURT:  No.  It goes on referring to an

12    entirely different document, and on the next page, if you

13    look at line 6, question, they are back on the December

14    22nd, 2005 e-mail.  They are not on 9525.

15          MS. KELLER:  No.  He's referred -- Mr. Molinski is

16    referring to the January 11th e-mail and saying, "And that

17    was the concerns you had expressed in the December 22nd,

18    2005 e-mail, correct?"  In other words, it's the same

19    concerns we've just been talking about.

20          The entire area, your Honor, of the mediation and

21    settlement was objected to, whether it's the December

22    document or the January document.  The whole area was being

23    objected to as settlement privileged.

24          MR. PRICE:  And he was allowed to testify about

25    it.  If you look at page 693 at line 22, Mr. Molinski goes

1    down this document, 9525, and says it's similar to the

2    December 22nd, 2005 e-mail.  He says -- the next sentence

3    says, quote, "Mr. Villasenor has specifically expressed his

4    concerns regarding Mattel's business" --

5              THE COURT:  Well, it's a relatively easy ruling,

6    in a sense, is Mattel waiving the privilege?

7              MR. PRICE:  To the extent there is one on this

8    document, yes, but there isn't one.

9              THE COURT:  I don't know the full ramifications of

10   that.  In other words, I am not sure where this leads us

11   eventually, and I'm not going to sort that out at the

12   present time.  It may be simply as to this document.  It may

13   have greater ramifications, so I want you to talk to

14   Mr. Quinn for a moment, and I want you to take a thoughtful

15   moment with Mr. Zeller.  I'm not representing to you that

16   it's limited to this document, and it may be, but I want you

17   to think that through very, very carefully.

18              (Attorney discussion held off the record.)

19              THE COURT:  Now, counsel on behalf of

20   Mr. Villasenor, are you waiving any mediation privilege

21   concerning this document?

22              MS. JENNESS:  Your Honor, I wasn't apprised of

23   this issue in advance, so I am not prepared to make a

24   judgment call.

25              THE COURT:  By the way, neither was I, so don't be

 1    concerned.  You've been doing a fine job, and I have nothing

 2    but compliments to you, and I want to apologize, once again.

 3    I really thought in good faith that we'd have your client on

 4    and off the stand, but it's not working that way.

 5            MS. JENNESS:  I understand.  Thank you, your

 6    Honor.

 7            THE COURT:  Now, it's certainly an appropriate

 8    area.

 9            MR. PRICE:  Your Honor, we will live with whatever

10    repercussions there are and --

11            THE COURT:  I didn't say there was going to be

12    any.  I just need to sort that out this evening, and I

13    haven't had time to sort those out.  I think it's going to

14    be limited, but I'm not going to be bound by that to the

15    demand letter.

16            MR. PRICE:  I -- I understand that, so as I said,

17    we will live with whatever the Court's --

18            THE COURT:  All right.

19            MR. PRICE:  We will live with whatever the

20    ramifications are.

21            THE COURT:  Well, it certainly makes sense if

22    there is a demand letter coming back, Mattel should be

23    entitled to show that exorbitant demands are being made upon

24    Mattel because it goes to the credibility of this witness,

25    and it goes to whether he's truly stressed or whether, in

1   fact, quite frankly, he's shaking Mattel down; simple as

2   that.

3            Now, let me hear from MGA, so you make your

4   record.

5            MS. KELLER:  Your Honor, if we can have Jill

6   Thomas' depo, who apparently was involved in this on behalf

7   of Mattel, then we can get the other side of the

8   transaction, and we can find out, because we haven't -- we

9   haven't been able to take her depo, so we ask to take her

10  deposition.

11           THE COURT:  I was pretty far down that line.  I'm

12  waiting for Mr. Moore because you said you called him, and

13  I've already expressed extreme dissatisfaction with the

14  testimony of Mr. Moore.  So Jill Thomas may, in fact, be

15  undergoing a depo.  I just want to be cautious and hear if

16  Mr. Moore had regained his memory.

17           MS. KELLER:  As to this, you Honor, he said he

18  wasn't responsible for this and Ms. Thomas was, and he

19  didn't know anything about it.

20           THE COURT:  Well, I hadn't gotten any part of that

21  depositional transcript in front of me from your 2:30

22  evening session, so that hasn't come over, and I've been

23  waiting to see that because it tells me, and I don't want

24  the whole Mattel staff brought in here, but I will get an

25  answer to certain questions I asked in camera.  It may take

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 33 of 109   Page ID #:311765
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

33

1    me a little while, but I've cautioned everybody on that.

2            All right.  You can inquire.

3            MR. PRICE:  Thank you.

4            THE COURT:  Let's bring in the jury, please.

5            *(Mr. Villasenor retook the stand.)*

6            THE COURT:  Thank you, sir.  If you'd retake the

7    stand.

8            Pardon me for my discourtesy and having a

9    conversation outside of your presence.

10           *(The following proceedings is taken in the*

11      *presence of the jury.)*

12           THE COURT:  The jury is present.

13           And counsel, if you'd have a seat, as well as the

14   alternates and the parties.

15           Ladies and gentlemen, let me apologize to you.  I

16   accept full responsibility for that needless recess you just

17   took.  That was my unpreparedness.  It doesn't reflect

18   poorly on counsel for MGA or Mattel.  I should have had this

19   sorted out beforehand, and I want you to know that that's my

20   responsibility.

21           Counsel, please proceed.

22           MR. PRICE:  Thank you, your Honor.

23   /

24   /

25   /

| 1 | **SAL VILLASENOR, DEFENDANTS' WITNESS, RESUMED** |
|---|---|
| 2 | **CROSS-EXAMINATION (Continued)** |

3  BY MR. PRICE:

4  Q   Mr. Villasenor, I think I asked to be placed before you

5  Exhibit 9525.  Do you have that?

6  A   I do.

7  Q   And do you see that's a letter from your attorney to an

8  attorney for -- outside attorney for Mattel concerning your

9  December 22nd, 2005 e-mail?

10  A   Correct.

11  Q   And you're copied on the second page, correct?  Do you

12  see where it says "cc"?

13  A   I do.

14        MR. PRICE:  I move Exhibit 9525 into evidence,

15  your Honor.

16        THE COURT:  It's received.

17        *(Plaintiffs' Exhibit No. 9525 is received in*

18      *evidence.)*

19  BY MR. PRICE:

20  Q   And you see this is addressed by Mr. Barrera to an Eve

21  Wagner.  Your understanding is that Ms. Wagner was

22  representing Mattel?

23  A   Correct.

24  Q   And if we can go to the second paragraph, you see

25  there's, "As you may know, Mr. Villasenor is currently under

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 35 of 109   Page ID #:311767
CV 04-9049-DOC – 03/23/2011 – Day 38, Vol. 2 of 3

35

1    the care of his provider and caused by the working

2    conditions he described in his recent complaint to human

3    resources."

4         And that's referring to Exhibit 9484, that December

5    22nd, 2005 e-mail that your attorney wrote the first draft

6    of, correct?

7    A    Correct.

8    Q    And you see it says, "The purpose is to follow up on

9    Mr. Villasenor's complaint"; do you see that?

10   A    I do.

11   Q    And then it says, "To communicate with Mattel through

12   its legal representative regarding a severance package with

13   Mr. Villasenor that would result in a termination of his

14   employment at Mattel, compensation during the severance

15   period, and allow him to continue his and receive out place

16   services for training in a new field or profession"; do you

17   see that?

18   A    Yes.

19   Q    And there is a section there, then, that talks about

20   factual overview; do you see that?

21   A    I do.

22   Q    And if we can go to the second page and the second

23   line, "Since the management shakeup at Mattel,

24   Mr. Villasenor has been reporting to John Louie and

25   ultimately to Robert Eckert"; do you see that?

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 36 of 109   Page ID #:311768
CV 04-9049-DOC – 03/23/2011 – Day 38, Vol. 2 of 3

36

1    A    I do.

2    Q    Did you ever consider yourself as reporting to

3    Mr. Eckert?

4    A    Not directly.

5    Q    I mean, every one of the 30,000 employees at Mattel

6    reports indirectly to Mr. Eckert, right?

7    A    Right, but Mr. Eckert is the boss.  He is the --

8    Q    Right, so every Mattel employee, the way the sentence

9    is used here, reports to Mr. Eckert?

10   A    You can say that.

11   Q    I mean, Mr. Louie didn't report directly to Mr. Eckert,

12   right?

13   A    I don't think so.

14   Q    Now, did you have input in this letter that you were

15   copied on?

16   A    No, I did not.

17   Q    And it says, "Mattel's new management team has placed

18   added pressures and unreasonable expectations on Sal.  In

19   addition, Sal has expressed his concerns about continuing to

20   follow Mattel's directives and instructions regarding

21   marketing intelligence concerning competitors"; do you see

22   that?

23   A    I do.

24   Q    And the directive that you were given by Mr. Louie was

25   to stop using fake -- to stop misrepresenting yourself,

1  correct?

2  A     You could say that, correct.

3  Q     And it goes on, "Mr. Villasenor has explicitly

4  expressed his concerns regarding Mattel's business practices

5  in connection with upcoming trade shows, and he is nervous

6  about issues raised in pending litigation against Mattel";

7  do you see that?

8  A     That's correct.

9  Q     And the concerns regarding business practices with

10  upcoming trade shows, you had been told that with trade

11  shows upcoming, you were not supposed to misrepresent

12  yourself, correct?

13  A     Well, I was told that I still needed to get the

14  information, the competitive information; however, doing it

15  without misrepresenting myself.

16  Q     And you spent 90 something -- well, a huge percentage

17  of your time at work getting useful competitive information

18  from newspaper articles, internet articles, news releases,

19  talking to people within the industry, right?

20         MS. KELLER:  Objection.  Misstates the evidence.

21  The phrasing is argumentative.

22         THE COURT:  Just a moment.

23         No, overruled.

24  BY MR. PRICE:

25  Q     Is that correct?

1    A     Repeat the question, please.

2    Q     Yeah.  You've been getting useful information that

3    you've been sending up the chain by looking at newspaper

4    articles, press releases, internet articles, talking to

5    people in the industry that you knew, correct?

6    A     Correct, including catalogs and prices, correct.

7    Q     Fine.  And so here where it says that you've expressed

8    your concerns about Mattel's business practices, your

9    concern was, can I do a good job since I've been told not to

10   misrepresent myself, right?

11   A     I'm sorry, I'm not understanding your question.  Can

12   you rephrase it or --

13   Q     Sure.  Where it says, "Mr. Villasenor has specifically

14   expressed his concerns regarding Mattel's business practices

15   in connection with upcoming trade shows"; do you see that?

16   A     Correct, I do.

17   Q     Okay.  It's correct that the business practice for

18   upcoming trade shows was not to use your fake business

19   cards, right?  That's what you were told?

20   A     I was told not to misrepresent myself.  However, I was

21   told also that I needed to continue to get the catalogs and

22   price list.

23   Q     And did you go to anyone at Mattel and say -- I mean,

24   you believed this sentence, fairly read, suggests that you

25   told Mattel, I don't want to misrepresent myself anymore;

1    isn't that how you'd read that sentence?

2    A    (No audible response.)

3    Q    "Mr. Villasenor has specifically expressed his concerns

4    regarding Mattel's business practices."

5    A    I'm not sure if that's exactly what -- what it means.

6    Q    Okay.  Well, certainly if that's what it suggests, that

7    would be wrong, that is, you didn't go and say in September

8    of 2005, I want to quit because I don't want to misrepresent

9    myself, right?  You never -- you didn't say that in December

10   of 2005?

11   A    Correct.

12   Q    And then it talks about nervous about issues raised in

13   pending litigation against Mattel.  You are aware as of this

14   time that there was a lawsuit between Mattel -- there were

15   lawsuits between Mattel and MGA, correct?

16   A    That's correct.

17   Q    Although you have no idea whether the April 13th, 2005,

18   suit by MGA had anything to do with your activities,

19   correct?

20   A    Correct.

21            MS. KELLER:  Objection.  Misstates the testimony,

22   at least as to disclosure.

23            THE COURT:  Just a moment.

24            Overruled.

25

1   BY MR. PRICE:

2   Q    And then, "Mr. Villasenor is unable to continue working

3   at Mattel in his current role because of the stress caused

4   by these activities"; do you see that?

5   A    I do.

6   Q    Okay.  And you are not referring to the stress of being

7   allowed to use -- or to misrepresent yourself, you are not

8   referring to that stress, right?

9   A    I don't -- I don't recall what stress I was referring

10  to.

11  Q    Okay.  So let me go down to the last full paragraph,

12  here, that begins with "Mr. Villasenor."  But did you

13  understand that your attorney was saying that you were due

14  some compensation because you had experienced stress as a

15  result of Mattel's business practices?

16  A    I don't recall him saying that.

17  Q    Okay.  Look at the -- that paragraph, it begins,

18  "Mr. Villasenor would like to negotiate a fair and

19  reasonable severance package that would include severance

20  pay, continued health and related insurance benefits and

21  outplacement services"; do you see that?

22  A    I do see that.

23  Q    "Mr. Villasenor is looking for a severance package

24  comparable to severance packages paid by Mattel to other

25  management level executives.  To this end, it was recently

1    reported that Mattel agreed to pay Mr. Bousquette about

2    5.4 million in cash and other benefits and perks as a

3    severance package.

4         "In addition, former CEO Jill Barad received over

5    $40 million in severance including 26.4 million in cash

6    despite the fact that Mattel lost 171 million in the quarter

7    in which her severance package was disclosed.

8         "Mr. Villasenor is not making a demand for a specific

9    sum; instead, he asks that Mattel acknowledge his

10   contributions, the risks he has taken, the value of his

11   services, and the toll it has taken on Sal's life and his

12   career in order to resolve this matter on fair terms."

13        Now, you reviewed this letter about the time

14   Mr. Barrera, your attorney, sent it out to Mattel, correct?

15   A    I never got involved with the negotiations.  I let my

16   attorney take care of all that.

17   Q    Well, I'm not suggesting you communicated with Mattel,

18   but you were kind of curious as to what was happening,

19   right?

20   A    Once again, he took care of everything.

21   Q    Okay.  So -- so you were told not to misrepresent

22   yourself at toy fairs, correct, in December of 2005, right?

23   A    I was told not to misrepresent myself.

24   Q    And then you went out on this medical leave because of

25   stress, correct?

1    A    Correct.

2    Q    And then your attorney sent a letter on January 11th

3    suggesting a fair severance package and noting the

4    $5.4 million to Mr. Bousquette and the 40 million to

5    Ms. Barad, correct?

6    A    Again, once again, I didn't get involved in this part

7    of the negotiations.

8    Q    Well, you were asked by Ms. Keller whether or not your

9    settlement agreement, whether or not that came to be, in

10   other words, that took place because you agreed to keep

11   matters confidential; do you remember that -- those

12   questions by Ms. Keller?

13   A    Not all the questions.

14   Q    Okay.  Your settlement with Mattel was in connection

15   with you making complaints that the stress caused you to go

16   out on a medical leave, and you could no longer function at

17   Mattel, that's the claim you were making, right?

18   A    That was part of the claim.

19   Q    And Mr. Barrera was acting on your behalf as your

20   representative and spokesperson, correct?

21   A    That is correct.

22   Q    And he copied you on -- on this letter which talked

23   about a -- it looks like a range between 5.4 million and

24   40 million; do you see that?

25   A    I do.

1   Q    Okay.  Now, if you could look at Exhibit 26979.

2             MS. KELLER:  Your Honor, we object to this as

3   hearsay, way beyond anything that the Court has permitted.

4             THE COURT:  That's an interesting objection.

5   Thank you.  That's overruled.

6             Now, let me see the document, though, just for a

7   moment.  There was one document I discussed with counsel

8   that didn't have his name on it.  I want to see if this is

9   the same one.

10            MR. PRICE:  This doesn't have his name on it.

11            THE COURT:  Then let's not go into it now, okay.

12   Let me see that.  Unless you want to take your time now.

13            MR. PRICE:  I'll wait until you've had a chance to

14   see it, your Honor.

15            THE COURT:  And why don't you move on?

16            MR. PRICE:  I will.

17   BY MR. PRICE:

18   Q    Let's look at Exhibit 9266.  It's the settlement

19   agreement that you were asked questions about.

20            And you see the first section says, "Consideration,"

21   and it says, "The company promises that in exchange for my

22   entering into this agreement and subject to the provisions

23   of Section 2A," and then it says what you are going to

24   receive as a result of settling your claim that you had been

25   injured because of stress that resulted when you were told

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 44 of 109   Page ID #:311776
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

44

1    not to misrepresent yourself anymore, right?

2    A    Something like that.

3    Q    And in Section 2, there's something called a release;

4    do you see that?

5    A    I do.

6    Q    And you had an understanding that you were basically

7    saying, I'm not going to pursue claims against you if we

8    enter into this settlement, that I'm not going to say you

9    caused me stress and that I've been injured by that, I mean,

10   that was going to go away, right, in return for you getting

11   a settlement amount?

12   A    Again, once again, I didn't pay a whole lot of

13   attention to this.  I let my attorney take care of

14   everything for me, so I'm not too familiar with the

15   document.

16   Q    Well, you understood that before this, your attorney

17   had communicated with Mattel and said that because you were

18   stressed and couldn't continue working at Mattel, that there

19   had to be some sort of -- or should be some sort of

20   arrangement where you would get somewhere, to be fair,

21   between 5,000,000 and 40,000,000, right?

22   A    I'm not sure.

23           MS. KELLER:  Objection.  That misstates the

24   letter.

25           THE COURT:  Overruled.

1    BY MR. PRICE:

2    Q    Well, in any event, you knew that as a result of

3    signing this --

4              THE COURT:  That was overruled.

5              You can answer the question.

6              MR. PRICE:  I think he actually answered that he

7    did recall that.

8              THE WITNESS:  You need to repeat the question.

9              THE COURT:  His answer was "I'm not sure."

10             MR. PRICE:  Okay.

11   BY MR. PRICE:

12   Q    Well, in any event, you knew that by signing this

13   agreement, you weren't going to be engaging in this dispute

14   with Mattel anymore?

15   A    That's correct.

16   Q    And that by signing this agreement, you were no longer

17   going to pursue any claims about stress or -- or -- or

18   stress being caused or not being able to work at Mattel,

19   correct?

20   A    I'm not sure if that was part of that.

21   Q    Okay.  Did you ever have -- did you have an

22   understanding after this agreement that you weren't going to

23   be able to sue Mattel?

24   A    I think so.

25   Q    And if we go to page 6 of the agreement, if you look at

```
 1    the little i where it says, "Other representations," it

 2    says, "In addition to any other representations in this

 3    release, I have made the following representations to the

 4    company on which I acknowledge it has relied in entering

 5    into this release with me.

 6         "I have not suffered any discrimination on account of

 7    my age, sex, race, national origin, marital status, sexual

 8    orientation or any other protected status, and none of these

 9    ever has been an adverse factor used against me by any

10    released party.  I have not suffered any job-related wrongs

11    or injuries for which I might still be entitled to

12    compensation or relief, such as an injury for which I might

13    receive a workers' compensation award in the future.

14         "I have sought and anticipate that I will require

15    ongoing psychological and/or psychiatric treatment for

16    nonwork-related medical/psychological injuries from which I

17    suffer."

18         Do you see that?

19    A    I do see that.

20    Q    Your understanding after this was that you weren't

21    going to be bringing any claims against Mattel whether for

22    stress or age discrimination or sex discrimination or

23    national origin or anything like that, right?

24    A    That's correct.

25    Q    And was it your understanding that it is practice,
```

1   standard practice, that settlement agreements are

2   confidential?

3   A    I'm not a hundred percent sure.  I am not sure if they

4   are all confidential or not.

5   Q    Was it your understanding that that was the standard

6   practice, that settlement agreements for employees and

7   employers are confidential?

8   A    Once again, I am not sure if they are or not.

9   Q    Now, you were asked, I think by Ms. Keller, whether or

10  not a court order was required to have you testify at your

11  deposition; do you recall that?

12  A    I do.

13  Q    Okay.  Do you know whether or not -- do you know

14  whether or not a subpoena is a court order?

15         MS. KELLER:  That misstates the questions in the

16  testimony, your Honor.  There were two subjects, production

17  of documents and testifying.

18         THE COURT:  No.  Overruled.  Overruled.

19  BY MR. PRICE:

20  Q    You were asked whether or not you testified because of

21  a court order.  Were you subpoenaed to testify?

22  A    I was.

23  Q    And did you appear to testify under that subpoena?

24  A    I did.

25  Q    And at your deposition, did you testify in response to

1    questions from MGA's counsel?

2    A    Correct.

3    Q    And at your deposition, did you have the understanding

4    that if you refused to testify under Fifth Amendment, Mattel

5    was not going to be paying your attorney's fees?

6    A    Correct.

7    Q    And when you were asked whether there was a court order

8    requiring you to testify, were you referring to that

9    subpoena?

10   A    I don't recall.

11   Q    Was that something that you again left up to your

12   attorneys?

13   A    Probably.  I'm not sure.

14   Q    Okay.  Let me -- I've gone through some of these toy

15   fair reports that you did up through, I think, 2002, and I

16   want to show you the ones, and I guess the last one would

17   have been 2005; is that right?

18   A    I'm not sure if that was the last one or not.

19   Q    Okay.  Well, you weren't involved in any -- any

20   competitive intelligence gathering after you left Mattel in

21   December of 2005, correct?

22   A    Correct.

23   Q    So you didn't attend the toy fairs in the January,

24   February of 2006, correct?

25   A    That's correct.

1    Q    So the last date that you would have gone to these toy

2    fairs would have been sometime in the year 2005, if you went

3    then?

4    A    That's correct.

5    Q    So I think we ended at 2002.  Let me show you

6    Exhibit 92 -- I'm not sure.  I don't want to duplicate the

7    exhibits in.  So let me see if I've got the same --

8         Yes, 9275.  And I believe this is in evidence.

9    Ms. Keller asked you questions about it.

10             MR. PRICE:  If we can just show the front page.

11   BY MR. PRICE:

12   Q    This is the April 22, 2003 toy fair report, correct?

13   A    That's correct.

14   Q    And if we look up there, it's from the, excuse me, WW

15   strategic planning and business development department; do

16   you see that?

17   A    Correct.

18   Q    Because that's what you were called then?

19   A    Probably at that time.

20   Q    And if we look at -- I want you to do side-by-side

21   things again.  If you could look at Exhibit 9275-020 -- I'm

22   sorry, Exhibit 20628.

23             MR. PRICE:  I'm sorry, Rachel, 26028.

24   BY MR. PRICE:

25   Q    And by the way, you see big black spaces because we

```
 1   redacted things that aren't related to the case in the
 2   article.
 3        And are you familiar with a publication, The Record?
 4   A    I don't recall The Record, no.
 5   Q    Okay.  In that case, let me ask you to look at 9275.
 6   That's 9275 -- no, I'm sorry.  I did it again.  I'm looking
 7   at the cross-reference.  21970.  I'll do better.  21970.
 8        And do you recall a publication "The Toy Book Serving
 9   the Global Marketplace"?
10   A    I'm sorry, the publication called "The Toy Book"?
11   Q    Yeah, "The Toy Book Serving the Global Marketplace."
12   A    I do recall a publication named "The Toy Book."
13   Q    And this is a publication, again, it would have been
14   one of your -- part of your duties to look at this sort of
15   publication, to read it -- it would be part of your duties
16   to look at this sort of publication and read it and see
17   what's out there?
18   A    That's correct.
19   Q    And this one's dated March 2003; do you see that on the
20   left side there?  I'm holding it up to --
21            MS. KELLER:  Excuse me, Counsel.  What page are we
22   on?
23            MR. PRICE:  It's 21970-0004, that might be the
24   holdup.
25
```

1    BY MR. PRICE:

2    Q    And see that's March of 2003?

3    A    That's correct.

4    Q    Now, if you would look at 9275, that's your 2003

5    report, the April 2003 report, and if you would look at

6    page 29.  And do you see there is a section there on Lil'

7    Bratz Slumber Party?

8    A    I do.

9    Q    And if you look at 21970-0004, in March 2003, do you

10   see it says in the second sentence, "Bratz slumber party

11   features mix and match fashions to create more than 25

12   fashion styles and lots of detailed accessories.  There are

13   five Bratz slumber party packs, Cloe, Yasmin, Jade, Meygan

14   and Sasha, and each comes with 15 unique party

15   responsibility accessories," and then it goes on to discuss

16   in detail the accessories; do you see that?

17   A    I do see that.

18   Q    Okay.  And so whatever was contained in The Toy Book in

19   March 2003 was obviously public information before

20   April 2003?

21        MS. KELLER:  Objection.  That is -- misstates the

22   evidence.  Incomplete.

23        THE COURT:  Overruled.

24        Ask the question.

25

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 52 of 109   Page ID #:311784
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

52

1   BY MR. PRICE:

2   Q    Whatever was stated in the March 2003 Toy Book magazine

3   obviously was public information before April 2003, whatever

4   is in there?

5   A    Correct.

6   Q    And if you look at Exhibit 9275 -- I'm sorry,

7   Exhibit 20944-0001.

8          MR. PRICE:  And your Honor, I move

9   Exhibit 21970-0004 into evidence.

10          THE COURT:  Received.

11          (Plaintiffs' Exhibit No. 21970-0004 is

12      received in evidence.)

13   BY MR. PRICE:

14   Q    And do you have 20944 in front of you?

15   A    I do.

16   Q    And do you see it seems to be "Raving Toy Maniac, the

17   magazine for your inner child"; do you see that?

18   A    I do.

19   Q    And this is the kind of thing that you would have

20   been -- part of your job would be to review this sort of

21   public information on this type of magazine?

22   A    Well, I'm not familiar with this Toy Maniac magazine.

23   Q    How about "RTM News, the latest news from the world of

24   toys," are you familiar with that?

25   A    No, it doesn't ring a bell.

```
 1   Q     How many magazines did you -- and kind of internet

 2   sources, you know, did you review over the time you were

 3   there?

 4   A     A whole lot.

 5   Q     Yeah, you probably can't remember them all?

 6   A     I cannot.

 7   Q     But it's the kind of thing -- looking at the internet,

 8   looking at magazines was the kind of thing you were trying

 9   to do the best job you could do while you were working at

10   Mattel to review and kind of figure out what's out there

11   publicly, right?

12   A     Correct.

13         MR. PRICE:  Then I'll move 20944 into evidence,

14   your Honor.

15         THE COURT:  Received.

16         MS. KELLER:  Objection.  Hearsay.

17         THE COURT:  Received.

18         (Plaintiffs' Exhibit No. 20944 is received in

19    evidence.)

20   BY MR. PRICE:

21   Q     And if you'd look at -- if you've got that in front of

22   you.  If you'd look at 92750011.  This is your April report.

23         I'm going to call your attention to, there's a -- it

24   says, "Licensees to watch," and under "Other licensees," do

25   you see it says, "MGA Entertainment which will make two-way
```

1    radios shaped like the Hulk, handheld games and tabletop

2    pinball"; do you see that?

3    A    I do.

4    Q    And if you would then look back to the raving toy

5    machine, do you see that has a date on it as -- this is

6    Exhibit 20944, it has a date of February 2003; do you see

7    that?

8    A    I do.

9    Q    And it has a picture there of the Hulk, right?

10   A    Correct.

11   Q    And it says, "MGA has announced a set of Hulk

12   walkie-talkies for 2003.  Each set includes Mean 'N Green

13   Hulk and Platinum Hulk," and then it talks about how tall

14   they are, that the arms on the walkie-talkies are

15   articulated and the right arm is also the antenna; do you

16   see that?

17   A    I do.

18   Q    Now, I'm going to show you 21970.

19        And do you see this is a January 2003 issue of the

20   magazine we talked about before, The Toy Book?

21   A    Correct.

22        MR. PRICE:  Your Honor, I move Exhibit 21970 into

23   evidence.

24        THE COURT:  In relation to what document, Counsel?

25        MR. PRICE:  This is in relationship to the

1    April 2003 toy fair report, and this is January.

2              THE COURT:  Which is 92 --

3              MR. PRICE:  Which is 9275.

4              THE COURT:  Received.

5              MR. PRICE:  Okay.

6              *(Plaintiffs' Exhibit No. 21970 is received in*

7        *evidence.)*

8    BY MR. PRICE:

9    Q    So if we look at 9275, and look at page 29.  And you

10   see on page 29, there is a picture there that says,

11   "Loungin' loft '03," it's the middle picture?

12   A    I see it.

13   Q    Okay.  If you look at Exhibit 21970-00011.

14             MR. PRICE:  Thank you.

15   BY MR. PRICE:

16   Q    Do you see there's a picture there that says, "Lil'

17   Bratz Loungin' Loft by MGA"; do you see that?

18   A    I do.

19   Q    So as of January 2003, that picture certainly wasn't

20   confidential, right?

21   A    Correct.

22   Q    Now, if you'll look at 9275, this is your April 2003

23   report, and page 183, 9275-183.

24             MS. KELLER:  I'm sorry, Counsel, I didn't catch

25   that?

```
 1              MR. PRICE:  9275-0183.
 2   BY MR. PRICE:
 3   Q    And you see there's a section there on My Beautiful
 4   Ballerina?
 5   A    I do.
 6   Q    "Following up on 2002's My Beautiful Mermaid, MGA has
 7   launched My Beautiful Ballerina, points her toes, spins her
 8   in circles, and touch her bar to produce ballet music"; do
 9   you see that?
10   A    I do.
11   Q    And if you look at -- back at 21970-00011, the
12   January 2003 Toy Book, on the bottom right, the last column
13   on the bottom right, the third line from the bottom -- well,
14   actually it says, "MGA also introduces My Beautiful
15   Ballerina's doll."
16        And then in the last sentence it says, "My Beautiful
17   Ballerina performs real spinning, pirouettes, printed with
18   ballet foot positions to teach, real ballet beam, plays
19   ballet music when pressed"; do you see that?
20   A    I do see that.
21   Q    So the information -- that information was public as of
22   2003 and not confidential, correct?
23   A    That's correct.
24   Q    So again, you're supplying useful and valuable
25   information in your reports, correct?
```

1    A    Correct.

2    Q    And maybe information that you initially received at

3    the toy fair, correct?

4    A    I'm sorry --

5    Q    What's in your report may be information that you

6    initially received at the toy fair in 2003, correct?

7    A    That was the intent, correct.

8    Q    And some of that information, as we're seeing, was not

9    confidential information because it was already public,

10   correct?

11   A    Are you referring to the magazines?

12   Q    Yes.

13   A    That's correct.

14   Q    If you'd look at 20943.  And do you recall a magazine

15   called "Fashion Doll Scene"?

16   A    I do not.

17   Q    Was Fashion Doll Scene the kind of publication that you

18   would be tracking as part of your job at Mattel?

19   A    I -- I don't know, considering that I'm not familiar

20   with it.

21   Q    I'm sorry?

22   A    I said I'm not sure because I'm not familiar with the

23   Fashion Doll Scene.

24   Q    I take it that if you had known about Fashion Doll

25   Scene at the time, you would have -- it would have been one

1    of the things you were tracking?

2              MS. KELLER:  Objection.  No foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  I'm not sure if I would or wouldn't.

5    BY MR. PRICE:

6    Q    Well, if it was giving you information about

7    competitive products and what was to come in the future, is

8    that the kind of thing you were looking for?

9              MS. KELLER:  Objection.  Calls for speculation.

10             THE COURT:  Overruled.

11             THE WITNESS:  That's correct.

12             MR. PRICE:  Your Honor, I'm going to move 20943

13   into evidence.

14             MS. KELLER:  Objection.  Hearsay.

15             THE COURT:  I'm going to receive it.  Overruled.

16             *(Plaintiffs' Exhibit No. 20943 is received in*

17        *evidence.)*

18   BY MR. PRICE:

19   Q    And if you look at -- remember earlier we were talking

20   about the Lil' Bratz that was in your April 2003 report?

21   A    Correct.

22   Q    And if you look at 20943-002, do you see there is a

23   section about, "Lil' Bratz are the same size as the mini

24   Bratz from last year, only these come in neat little

25   carrying cases and extra outfits," and it talks about the

1    Vespa style scooter and beach chair and lounge loft and

2    foldout doll house; do you see that?

3    A    I do.

4    Q    And there are also pictures of the Lil' Bratz in this

5    report; do you see that?

6    A    I do.

7    Q    Now, let's talk about the 2004 report, and on this, I'm

8    going to ask you to look at, I believe it's 31 -- oh, I'm

9    sorry, before we leave 2003, let me show you Exhibit 26546.

10   And I think it's 26546.

11        Now, is this a New York toy fair report that was done

12   by B'Box?

13            MR. PRICE:  Kind of confusing, Ken, if you can

14   take what's up there down, because it's going to confuse.

15            THE WITNESS:  Correct.

16   BY MR. PRICE:

17   Q    Is this something you saw when you were at Mattel?

18   A    Correct.

19   Q    And this was Ms. Rahimi's company?

20   A    That's correct.

21   Q    And your understanding is that she would go to toy

22   fairs and present herself as a journalist?

23   A    I'm not sure what she presented herself as.

24   Q    Okay.  And in this report, you recall also seeing

25   information about, for example, the Hulk license?

CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

60

```
 1    A     I would have to find it in here.

 2    Q     Okay.  If you look at 26546-0006.  Do you see where it

 3    says, "Licenses galore"?

 4    A     I do.

 5    Q     And one of those refers to the Hulk license?

 6    A     Correct.

 7    Q     And if you look at page 26546-44, it talks about the

 8    Bratz slumber party packs we talked about and the Bratz Boyz

 9    we talked about?

10    A     That's correct.

11    Q     So now getting to 2004, I hope, let's look at

12    Exhibit 27459.  27459.  And do you recognize 27459 as a 2004

13    report on trends, licenses and toys?

14    A     I don't recall the report.

15    Q     Okay.  So this is something that you didn't have

16    anything to do with, as far as you can recall?

17    A     I don't think I did.

18    Q     Okay.  If you'd look at Exhibit 31530.  It's 31530,

19    2004 New York toy fair.

20          MR. PRICE:  Just a second.  Let me see if there is

21    a duplicate exhibit number.

22          Ms. Juarez, could you tell me, is there a -- if

23    these are duplications, 9451 or 9603?

24          THE COURT:  I think if you are going to find it,

25    you are going to find it between 9516, someplace in that
```

1    area.  I may be wrong.

2            MR. PRICE:  Okay.  For right now, while the folks

3    are looking for that, we'll go on to the next year.

4    BY MR. PRICE:

5    Q    By the way, Mr. Villasenor, at some point, there was a

6    time when Mr. Turetzky became your supervisor, correct?

7    A    That's correct.

8    Q    When was that?  What year was Mr. Turetzky, did he

9    first become you supervisor?

10   A    I don't recall.

11   Q    Do you remember if it was 2004?

12   A    2003, 2004, somewhere around there.

13   Q    And your testimony is that Mr. Turetzky did not tell

14   you to stop using these IDs; is that right?

15   A    That is correct.

16   Q    But the reports, these toy fair reports, changed in

17   2004 and 2005, correct?

18   A    I'm not sure if they did or didn't.

19   Q    Well, for example, in the 2004, 2005 reports, do you

20   recall any information about FOB prices?

21   A    I would have to see the report.

22   Q    Okay.  And -- and to be clear, FOB prices, that's the

23   price that a customer of the manufacturer as opposed to, you

24   know, the person buying the doll, the consumer, that's the

25   price that -- that a retail store basically pays to a

1    manufacturer, correct?

2    A    That's correct.

3    Q    And it's your understanding that retail stores like

4    Walmart and Kmart and Toys R Us buy from more than one

5    manufacturer, that is they buy from an MGA, a Mattel, a

6    Hasbro and a Jack's, right?

7    A    That's correct.

8    Q    And certainly those stores know what they are paying

9    for their own product, right?

10            MS. KELLER:  Objection.  Argumentative, your

11   Honor.

12            THE COURT:  No, overruled.

13   BY MR. PRICE:

14   Q    And it's correct that you, given your position, did not

15   have contacts with those retailers, the Toys R Us, the

16   Walmarts, the Kmarts, in connection with Mattel negotiating

17   its prices with those retailers, correct?

18   A    That's correct.

19   Q    So let me see if we have in your binder, 27461.  And do

20   you recognize 27461?

21   A    I do not.

22   Q    Okay.  Let me ask you if you would look at 24308.

23        And do you see that appears to be an article dated

24   February 24, 2005 on CNNmoney.com, "Living a Bratzy

25   Lifestyle"?

1   A    I do.

2   Q    And were you familiar with CNN at the time?

3   A    I -- I don't remember visiting that website.

4   Q    Well, this research group would -- not just you but

5   others in the research group on the boys side, the girls

6   side would be looking at what's again out in the public, the

7   publications concerning competitors like MGA, right?

8   A    Right.

9   Q    And February 24, 2005, that's in the same month as the

10  New York toy fair would have been, correct?

11  A    Correct.

12          MR. PRICE:  Your Honor, I move Exhibit 24308 into

13  evidence.

14          THE COURT:  Received.

15          MS. KELLER:  Objection.  No foundation.

16          THE COURT:  Received.

17          (Plaintiffs' Exhibit No. 24308 is received in

18      evidence.)

19  BY MR. PRICE:

20  Q    And if you look at the first paragraph, it says, "Bratz

21  fans this year can look forward to everything from a

22  lipstick-shaped MP3 player to a Bratz-inspired video camera

23  and a TV with a built-in DVD player, all of which were

24  displayed at the American International Toy Fair this

25  weekend in New York."

1        And it says, "As part of its livin' Bratz home decor

2   collection are stylish pillows, a pink bed canopy, folding

3   chairs and funky desk clocks"; do you see that?

4   A    I do.

5   Q    And on the right-hand side, they have pictures of a TV,

6   DVD player, the Bratz bed canopy, and the lipstick-shaped

7   MP3 player; do you see that?

8   A    I do.

9   Q    And so as of February 2005, those products in this

10  article were not confidential, correct?

11  A    Correct.

12  Q    I want to ask you, by the way, it talks about a -- a --

13  talking about these pictures here, do you remember

14  Ms. Keller was asking you whether -- that you had purchased

15  a camera and expensed that to Mattel; do you recall those

16  questions?

17  A    I do.

18  Q    And we've looked through a number of these toy fair

19  reports.  Do any of those reports contain any pictures that

20  you took in a -- a private showroom?

21  A    In the private showroom?

22  Q    Yes.

23  A    I've never taken pictures in a private showroom.

24  Q    And I'm talking about showrooms where you would use

25  that business card saying you were from this El Monte store.

1  Going to those showrooms, did you ever use a camera to take

2  a picture?

3  A    I used a camera in the convention halls.  Whether or

4  not they were included in the reports, I don't recall.

5  Q    When you say you used them in convention halls, what

6  are you talking about?

7  A    The convention hall was where some of the smaller

8  manufacturers would exhibit their toys.  They weren't

9  private showrooms.  Instead, they were open to pictures

10  being taken of their products.

11  Q    And the showrooms you went into where you gave them the

12  card from The Toy Depot, they had catalogs with pictures

13  already in them, right?

14  A    That's correct.

15  Q    And so on your reports, you would use pictures that

16  were taken by somebody else, correct?

17  A    Mainly from the catalogs, correct.

18  Q    I mean, pictures that were in the catalog to sell the

19  product to retailers, correct?

20  A    Correct.

21  Q    And what do you think would have happened if you pulled

22  out a camera in a private showroom, did you have any

23  understanding as to what would happen?

24  A    I'm not sure.

25  Q    Pardon?

 1    A    I'm not sure what would happen.

 2    Q    Did you have an understanding as to whether or not that

 3    would be permitted?

 4    A    Probably wouldn't.

 5    Q    There are -- in your -- some of your e-mails, you talk

 6    about if anyone wants to see the video of the toy fair

 7    presentation, that you have a copy of that; do you recall

 8    those e-mails?

 9    A    I do.

10    Q    Are you talking there about a video of you at the toy

11    fair?

12    A    No.

13    Q    Okay.  What are you talking about?

14    A    I'm talking about the competitive toy review, the

15    presentation itself.

16    Q    Okay.  And so that's like the Entertainment Tonight

17    thing that we saw the beginning of, correct?

18    A    Exactly.

19    Q    If you'd look at 27460, and perhaps you can tell me

20    whether you recognize 27460?

21    A    I don't recall it.

22    Q    Do you recall a 2005 New York toy fair trend and

23    manufacturer overview?

24            THE COURT:  What's the specific date, Counsel?

25            MR. PRICE:  It says 2005 New York toy fair.

```
 1              MS. KELLER:  Your Honor, it doesn't even have a

 2    production stamp for who it's from.

 3              THE COURT:  Yeah.

 4              MR. PRICE:  This was produced without a production

 5    stamp by Ms. Rahimi, at her deposition.

 6              MS. KELLER:  Your Honor, there is no evidence of

 7    that right now.

 8              THE COURT:  Well, we can go back through the

 9    transcripts and just take a look at her deposition, can't

10    we?

11              MS. KELLER:  No evidence Mattel had it, your

12    Honor, and this witness is being asked about having had it.

13              MR. PRICE:  If he didn't see it, it's fine.

14              THE COURT:  Have you seen this document before?

15              THE WITNESS:  I don't recall if I did or didn't.

16              THE COURT:  All right.  Why don't we move on to

17    another area.

18              MR. PRICE:  Okay.

19    BY MR. PRICE:

20    Q    If you would look at Exhibit 20740, and there's a lot

21    blacked out here.  If you look at the second page, 20740 --

22              THE COURT:  First, what's the date, Counsel?

23              MR. PRICE:  The date on this, your Honor, is -- I

24    saw it a second ago.  It's September 2004, prior to the 2005

25    toy fairs.
```

 1              THE COURT:  And the question?

 2              MR. PRICE:  Yeah.

 3    BY MR. PRICE:

 4    Q    Are you familiar with this publication, something

 5    called "Keeping Ken" as reported by Mike J. and some news

 6    supplied by Claudia from www.pinkponytail.com; are you

 7    familiar with that?

 8    A    No, I'm not.

 9    Q    If you'd look at Exhibit 26758.

10              THE COURT:  Date?

11              MR. PRICE:  This is Nuremberg toy fair February

12    2005.

13    BY MR. PRICE:

14    Q    Are you familiar with this document at all?

15    A    It looks like it's a report that Sharon Rahimi might

16    have created.

17    Q    Do you know if this is something that you recalled

18    seeing while you were at Mattel or you just don't recall one

19    way or the other?

20    A    I don't recall it.

21    Q    Look at Exhibit 26755, it's a report which says

22    "Fashion Dolls"?

23              THE COURT:  Date?

24              MR. PRICE:  Your Honor, there is no date on the

25    cover of the document, but the document refers to a 2005

1    product --

2              THE COURT:  Okay.

3              MR. PRICE:  -- as well as what happened in 2004.

4              MS. KELLER:  Counsel, I'm sorry, do we have that

5    document?

6              THE COURT:  It's 26755.

7              MS. KELLER:  I know.  I'm just wondering if it was

8    one given to us in our binders.

9              MR. PRICE:  I believe so.

10             THE COURT:  You may continue on, Counsel.

11   BY MR. PRICE:

12   Q    My first question may be a quick area of inquiry.  Is

13   this something you recall seeing while you were at Mattel?

14   A    I do not.

15   Q    Nothing that you were involved in?

16   A    I don't think so.

17   Q    If you'd look at Exhibit 24309.  And do you see this

18   appears to be a February 1, 2005 article in Global License

19   magazine?

20   A    Correct.

21   Q    And this is the kind of magazine that you'd be looking

22   at to see what's been -- what's out there in the public

23   concerning competitors' products?

24   A    Probably.

25             MR. PRICE:  Your Honor, I move Exhibit 24309 into

 1    evidence.

 2              THE COURT:  Received.

 3              (Plaintiffs' Exhibit No. 24309 is received in

 4         evidence.)

 5    BY MR. PRICE:

 6    Q    And if you'd look at 24309, page 4, do you see there's

 7    a section, "MGA Entertainment.  Bratz baby is the biggest

 8    brand extension for Bratz in 2005.  The doll's suggested

 9    retail 7.99 each, ship in spring as do a motor bike,

10    chill-out lounge and eight-ball blitz playsets for Bratz.

11    New lines for spring include Bratz Pretty 'N Punk, Bratz

12    Fabulous, Bratz Treasures and Bratz Sports."

13         Do you see that?

14    A    I do.

15              MS. KELLER:  Your Honor, we would object.  This

16    appears to be a printout March 7th, 2011.  We would object

17    that there is no foundation that this was what the website

18    looked like at the time.

19              THE COURT:  Thank you.

20              Received.

21              (Plaintiffs' Exhibit No. 24309-4 is received

22         in evidence.)

23    BY MR. PRICE:

24    Q    And on the front page, do you see where it says, "Tot

25    Spots by Don Molinski, February 1, 2005, despite uncertainty

1   as to the fate of the February American International Toy

2   Fair next year, exhibitors are set to showcase a range of

3   new products focused heavily on licensed characters and

4   technology"; do you see that?

5   A    I do.

6         MR. PRICE:  Your Honor, we now have copies of the

7   New York toy fair 2004, but copies are not in the binder, I

8   wonder if we can proceed with 2004.

9         THE COURT:  You may.  You may.

10        MS. KELLER:  Your Honor, this is the same -- I

11  think this is the same type of publication that the witness

12  has previously said he did not use at the time or didn't

13  remember.

14        THE COURT:  Well, we'll find out.

15        MR. PRICE:  Well, if that's what he says, that's

16  what he says.

17        THE COURT:  Ask him a question.

18  BY MR. PRICE:

19  Q    Mr. Villasenor, we have 31530 in front of you.  Is

20  this -- is this a report which you had any involvement in,

21  we'll start there?

22  A    I don't think so.

23  Q    Okay.  So is this a report you recall seeing

24  previously?

25  A    I don't recall the report.

1        (Attorney discussion held off the record.)

2    BY MR. PRICE:

3    Q    And in 2006, you had no involvement, correct?

4    A    Involvement in what?

5    Q    In connection with any toy fair shows or any toy fair

6    reports, correct?

7    A    Correct.

8    Q    Now, yesterday, you were talking about whether

9    management knew that you were using these fake business

10   cards to get into toy fairs; do you recall that?

11   A    Correct.

12   Q    And I believe yesterday -- if we can look at one of the

13   organizational charts so we can kind of orient ourselves.

14        MR. PRICE:  Let's go to, I think it's 9272, that's

15   the 2003 organizational chart, and go to the second page.

16   Now, we can go to the second page of that, Ken, where it has

17   the overall organizational chart.

18   BY MR. PRICE:

19   Q    And this is where Mr. Bousquette is at the top of the

20   chart; do you see that?

21   A    I do.

22   Q    We saw that earlier, Mr. Vollero is one of the many

23   people reporting to Mr. Bousquette, correct?

24   A    That's correct.

25   Q    And if we look at page 25, we see then underneath

CV 04-9049-DOC – 03/23/2011 – Day 38, Vol. 2 of 3

73

1    Mr. Vollero, there's -- I can't read that from here,

2    Mr. Frecht --

3    A    Frechtling.

4    Q    Thank you.

5         And at some point he was replaced by Mr. Turetzky,

6    correct?

7    A    That's correct.

8    Q    So if we had Mr. Turetzky in this -- in this chart, it

9    would be Turetzky up to Vollero; is that right?

10   A    Correct.

11   Q    And then you'd have Vollero, go back to page 2, up to

12   Bousquette along with these other folks, right?

13   A    Correct.

14   Q    And yesterday, you talked about having a friendship

15   with Mr. Bousquette; do you recall that?

16   A    Correct.

17   Q    And in defining friendship, did you see Mr. Bousquette

18   outside of work?

19   A    No.

20   Q    Okay.  Let's talk about, then, inside of work.  How

21   often during the period of 2003 to 2006 would you speak to

22   Mr. Bousquette?

23   A    Oh, I don't remember exactly how many times.

24   Q    Is it true that you didn't have one-on-one meetings,

25   scheduled meetings?

```
 1   A    That's correct.
 2   Q    And that you'd sometimes see him in the hallway once in
 3   a while?
 4   A    That's correct.
 5   Q    And that sometimes when you were on the 15th floor, you
 6   would poke your head in his office, correct?
 7   A    That's correct.
 8   Q    And that was the extent of the kind of contact you had
 9   with Mr. Bousquette at the office, correct?
10   A    Well, there were times where, you know, I'd get data
11   requests from him and I'd go up to the 15th floor to drop
12   off the information.
13   Q    So there's times that he would call you and say, hey, I
14   need this type of information, could you drop it off?
15   A    His assistants would call me.
16   Q    So there's that, no one-on-one meetings that were
17   scheduled, in the hallway once in a while, poke your head in
18   his office once in a while; is that right?
19   A    Yeah, the cafeteria, in the hallway, different places.
20   Q    Yeah, if you look at page 33 of your deposition
21   transcript, this is on July 12th, 2010, and specifically at
22   lines 3 through 10, do you see where you were asked, "How
23   often during the period of 2003 to 2006 would you speak with
24   Mr. Bousquette"; do you see that?
25   A    Yes, I see that.
```

1    Q    And you say there were no one-on-one meetings, but you

2    talked to him in the hallway once in a while and poke your

3    head in his office, things like that, correct?

4    A    That's correct.

5    Q    And that's the limit of what you testified at that time

6    as to your interactions with Mr. Bousquette, correct?

7    A    At that time, correct.

8    Q    And you also testified that you never had a

9    conversation -- and I'm going to refer you to page 68 of

10   your deposition.

11       During the time period of 1999 through 2006, you had no

12   conversations with Mr. Bousquette about your practice of

13   going into showrooms using false information, correct?

14   A    That's correct.

15   Q    And you don't recall having any conversations with

16   Mr. Bousquette, and I'm referring you to page 69, about you

17   having engaged in that practice, which is of using false

18   information to gain competitive information, correct?

19   A    Repeat the question, please.

20   Q    Sure.  I'm referring you to page 69, line 7.

21   A    Bear with me.

22   Q    You don't recall or expect that you would have had

23   conversations with Mr. Bousquette about your having engaged

24   in the practice of using false information, correct?

25   A    Correct, I don't recall.

```
 1    Q     Pardon?

 2    A     That's correct.

 3              MR. PRICE:  And now if we'd look at that -- at

 4    that organizational chart again, if we can, Ken.

 5    BY MR. PRICE:

 6    Q    So let's go down the organizational chart where you

 7    have Mr. Vollero, and do you recall that your initial

 8    testimony was that you did not believe you had conversations

 9    with Mattel while at Mattel with Mr. Vollero about your use

10    of false information to gain entry into showrooms?  That's

11    pages 71 to 72, 71, line 23, to 72, line 2.

12            Had you ever had conversations while at Mattel with

13    Mr. Vollero about your use of false information to gain

14    entry into competitive showrooms?

15    A    I stated I wasn't sure, but I do recall having a

16    conversation with him of that.

17    Q    So your initial testimony under oath on July 12th was

18    that you didn't think so, you don't remember, "I don't think

19    so, but I'm not 100 percent sure," correct?

20    A    At the time I did not remember, correct.

21    Q    And then later when you came back in September, you

22    said that you did have such conversations with Mr. Vollero,

23    correct?

24    A    Can I see that?

25    Q    Yeah, that's at September 13, line -- 486, line 5, to
```

1  487, line 24.

2      Actually it's 487, lines 10 through 24.

3          THE COURT:  Counsel, the jurors need a restroom

4  break.

5          MR. PRICE:  Certainly.

6          THE COURT:  While he's looking that up.

7      Ladies and gentlemen, you're admonished not

8  discuss to this matter amongst yourselves, nor form or

9  express any opinion concerning the case.

10         Go ahead and have a nice break.  We'll see you at

11  quarter after the hour, okay?

12             *(The following proceedings is taken outside*

13       *the presence of the jury.)*

14         THE COURT:  All right.  Thank you, sir.  If you'd

15  step down and we'll see you at quarter after the hour.

16         Now, Counsel, if you'd remain for just a moment.

17  The jury is no longer present.

18         Concerning 26979, this appears to be a letter from

19  Eve Wagner to Barrera responding apparently to the

20  following:  "Attached is a letter I've prepared prior to

21  listening to your voice mail message in which you demanded

22  that Mattel pay a so-called separation package of $3 million

23  to your client.

24         "While your message does not change anything

25  stated in the attached letter, I was, quite frankly, shocked

 1   and perplexed by your demand.  As you well know, no one at

 2   Mattel has asked your client to leave the company.  No

 3   adverse employment actions whatsoever have been taken

 4   against your client, and your client has no legal claim

 5   whatsoever against Mattel.

 6          "Rather, your client raised concerns about

 7   inappropriate conduct he and others were allegedly engaged

 8   in while working at Mattel, and Mattel has commenced an

 9   investigation to address the same.

10          "To put it mildly, your demand of $3 million for a

11   midlevel executive who earned approximately $90,000 a year

12   and who has had no adverse employment action whatsoever

13   taken against him raises serious doubts about the veracity

14   and motives of your client.

15          "Please give me a call so we can discuss the

16   above, as well as the attached letter.  Sincerely yours" --

17   strike that.  "Very truly yours, Eve Wagner."

18          Counsel, out of the presence of the jury, your

19   objection is?

20          MS. KELLER:  Well, we have several objections.

21   The first one, of course, is hearsay, that this is not an

22   agent of the witness.  That is an agent of Mattel, and so it

23   is --

24          THE COURT:  Just a moment.  The agent of Mattel is

25   Eve Wagner.

 1          MS. KELLER:  That's right.  And so it's hearsay.

 2   Secondly, it appears to be of an inflammatory and

 3   self-serving nature.

 4          Third, the witness has said he allowed his lawyer

 5   to handle everything for him, and he wasn't even seeing the

 6   correspondence that his own lawyer sent.

 7          THE COURT:  Let me ask this, counsel hasn't been

 8   allowed to inquire yet if Mr. Villasenor knew about this, in

 9   other words, the initial question would be, are you aware of

10   any demand made in the amount of $3 million regardless of

11   the -- of the letter.  The letter itself may be hearsay, but

12   why should Mattel be precluded from inquiring?

13          MS. KELLER:  Well, since the Court found that

14   there wasn't a mediation or settlement privilege attached,

15   there isn't any reason why Mattel shouldn't be allowed to

16   ask.

17          I mean, we still -- obviously we still maintain

18   that objection, but I'm talking about the letter itself.

19          THE COURT:  Well, I think what it's done is opened

20   up a complete new door.

21          I apparently misnamed Jill Thomas, Jill Hill, so

22   my apologies if she's here, and if not, she now has a new

23   a.k.a., Jill Hill.  I'm just kidding you, Counsel.

24          But I'm probably going to now cause the deposition

25   of Ms. Thomas in a little broader scope.  I want to see

1    Moore's deposition over from the other evening, though.  I

2    want to go through that.

3              MS. KELLER:  Well, your Honor, there is also --

4    there's just no independent corroborating information for

5    this $3 million demand.  There isn't even a demand from his

6    lawyer saying anything but the one we've already seen.

7              THE COURT:  Well, the problem is this, I've heard

8    from Eve Wagner, but I didn't inquire in camera concerning

9    this.  I've heard from every one of the attorneys, Wagner,

10   Barrera, outside of your presence, Normile, who I may want

11   to speak to again, Mr. Moore, who I certainly do.  Let's see

12   if I missed anyone?  No, I don't think so.

13             Bongiavanni.

14             MS. KELLER:  Well, no matter what Eve Wagner says,

15   though, it's hearsay as to MGA, and it's not -- it's not

16   anything that the witness has authorized because it's from

17   Mattel's lawyers, so it's --

18             THE COURT:  That goes to his credibility and bias

19   in this matter, frankly.  It goes to, quite frankly, the

20   allegation that he's, from Mattel's standpoint, shaking them

21   down for a large amount of money.  The severance package

22   eventually was about $160,000.

23             MS. KELLER:  Well, we don't have any independent

24   corroboration that, A, this was actually made.  This is from

25   Mattel's lawyer.  That, B, the witness knew about it.

 1          THE COURT:  I'm going to cure that very quickly,

 2   Eve Wagner.  Get down here in five minutes.

 3          MR. PRICE:  I just will ask him whether he's aware

 4   of it.  I won't publish the letter.

 5          THE COURT:  Okay.  The end result is this easily

 6   solvable.  Ms. Wagner is just down the highway.

 7          MS. KELLER:  It's Mr. Barrera who would have to be

 8   asked, not Ms. Wagner.

 9          THE COURT:  He's easily solvable also.

10          MS. KELLER:  It's supposed to be Mr. Barrera's

11   hearsay to Ms. Wagner that is being imputed to this witness.

12   This isn't even a letter from Barrera.

13          MR. PRICE:  You're right.  I'm just going to ask

14   him if he's aware of a demand and go on from there.

15          THE COURT:  It's up to you.  I'm going to let you

16   inquire about the demand.  You have the right to ask if he's

17   aware of a demand letter of 3 million.

18          Now, the question is whether this comes in.  If he

19   says "no," then you are going to have to call Barrera down

20   the highway.  If he says "yes," then you're going to be

21   allowed to inquire.

22          MS. KELLER:  But this isn't a demand letter for

23   3 million.  This refers to a voice mail message.  This is

24   Eve Wagner, Mattel's lawyer, referring to a voice mail

25   message from Mr. Barrera.  So it isn't even something that

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 82 of 109   Page ID #:311814
CV 04-9049-DOC – 03/23/2011 – Day 38, Vol. 2 of 3

82

 1    the witness would be copied on because it's not even a

 2    letter.

 3            MR. PRICE:  I probably wasn't clear.  I'm not

 4    going to move in the letter through him.  I'm going to

 5    ask him if he was aware of a $3 million demand.

 6            THE COURT:  It sounded like you were.

 7            MR. PRICE:  I know.  The last -- 30 seconds ago, I

 8    was saying I understand your concerns.  I'll ask him whether

 9    he's aware of it, and then we've got a solution.

10            THE COURT:  I'm not concerned at all.  I'm not

11    precluding you.  I can get Mr. Barrera down here pretty

12    quick.  And Ms. Wagner came down the highway lickety-split

13    the other evening.  I'm not concerned about it.  And I'm not

14    precluding you from it.

15            Now, I am precluding you from the letters, because

16    counsel is right, it's hearsay, but it's so easily solved,

17    it's ridiculous.  We're wasting a lot of time on it.

18            So I'm going to allow you to inquire if he knows a

19    $3 million demand was made through his counsel, and if he

20    says "no," then Barrera needs to come down the highway.  If

21    yes, then you can inquire further.

22            Now, meanwhile, I need to schedule Jill Thomas'

23    deposition, so I'm going to go back in the next couple

24    moments and talk to the special master.

25            And Ms. Hurst, you were up 'till 2:30 the other

 1    evening, so Mr. McConville will do this?

 2           *(No audible response.)*

 3           THE COURT:  I'm just kidding you.  Who's going to

 4    do it for each side?

 5           These are becoming important people, now.

 6           MR. PRICE:  We have to talk.  I mean, if you're

 7    going to order the deposition --

 8           THE COURT:  I am ordering the deposition.  Simply

 9    when.

10           MS. HURST:  I'll be doing it for us, your Honor.

11           THE COURT:  Well, you two talk about a convenient

12    time, but it's going to be the next 48 hours.

13           Thank you.

14           *(Recess.)*

15           *(The following proceedings is taken in the*

16       *presence of the jury.)*

17           THE COURT:  We are back in session.

18           Counsel are present, the parties are present, the

19    witness is present.

20           Mr. Price is continuing his cross-examination of

21    Mr. Villasenor.

22           MR. PRICE:  Thank you, your Honor.

23                   **CROSS-EXAMINATION (Continued)**

24    BY MR. PRICE:

25    Q    Mr. Villasenor, I'm going to take you to another one

```
 1    of those toy fair reports that we're talking about, and I
 2    just -- I apologize, I forgot whether I asked you about
 3    31530.  I know we talked about it, but I -- I -- we didn't
 4    have the document to begin with in your binder, and so I
 5    just want to get your testimony whether or not this is
 6    something you ever saw.  It says "2004 New York Toy Fair
 7    Trend and Manufacturer Overview"; did you ever see this?
 8            THE COURT:  And Counsel, I'm not requiring that he
 9    specifically saw them.  If it's a magazine that he's looked
10    at some time or that he regularly relied upon, that may be
11    good enough for the Court for this witness instead of
12    another witness.  In other words, I don't expect him to know
13    the exact magazine, but if he looks at the trend and
14    overview, you know, the normal course, and he's aware of it,
15    it's sufficient.
16            MS. KELLER:  Your Honor, this is one of the same
17    types of documents that he's previously said he hasn't seen.
18            THE COURT:  No.  I understand that.
19            You can ask again, though.
20    BY MR. PRICE:
21    Q    And again, if you don't recall this, we'll --
22    A    I don't recall it.
23    Q    Okay.  That would be for another day.
24            And if you can look at 20621.
25            And do you see this appears to be the business wire for
```

1   Dow Jones dated February 11, 2004 about MGA Entertainment

2   and the toy fair in New York City; do you see that?

3   A    I do.

4   Q    And this is the kind of thing, again, your group would

5   have looked at, these sort of news reports of what was

6   happening at the toy fair?

7   A    That's correct.

8         MR. PRICE:  Your Honor, I move Exhibit 20621 into

9   evidence.

10         THE COURT:  Received.

11         (Plaintiffs' Exhibit No. 20621 is received in

12         evidence.)

13   BY MR. PRICE:

14   Q    And if you look at the first page, it talks about

15   "Sun-Kissed Summer" at the bottom, "The summer's just

16   getting started, and it's already a scorcher.  Join the

17   Bratz as they kickoff the season with a super stylin' day at

18   the beach and by the pool.  Each girl comes with three

19   distinct beach looks and her own unique summer party

20   accessories, like a surfboard, beach towel and a tote."

21         And then it says, "The Splash 'n Dance Pool is a

22   five-in-one playset that features a real working pool, a

23   style and sundeck/dance floor, a smoothie bar, a fashion

24   runway and a chill-out balcony for catching a cool view, and

25   over 30 themed accessories, and you've got a party that's

1    bound to last all summer long.  And don't forget to join the

2    boys Sun-Kissed summer"; do you see that?

3    A    I do.

4    Q    And there is also a section in there on "girls night

5    out"?

6    A    That's correct.

7    Q    Second sentence talks about, "Each Bratz comes with

8    three nightlife looks that can be only be described as

9    funkalishis, over 30 accessories, the unique party night

10   accessories, real eyelashes and body glitter"; do you see

11   that?

12   A    I do.

13   Q    And there's also a section on Wild Life Safari

14   collection; do you see that?

15   A    I do.

16   Q    And that's with Nevra, Fianna, Meygan, Wild Life Safari

17   cruiser; do you see that?

18   A    I do.

19   Q    And if you look at the next page, 0003, do you see a

20   section there on alien racers?

21   A    Correct.

22   Q    And it says in the first sentence, "Alien racers is a

23   high-speed adventure with a strong story and amazing

24   characters set in the mythical universe, the struggle to win

25   the ultimate power source's key, speed is power"; do you see

1    that?

2    A    I do.

3    Q    This is for the initial release in early fall, correct?

4    A    That's correct.

5    Q    And this is a report in February of 2004, correct?

6    A    That's correct.

7    Q    And it talks about also having a CD-ROM; do you see

8    that?  The last sentence, "Also included is a CD-ROM to

9    further involve play."

10   A    That's correct.

11   Q    If you'd look at 20620, do you see this appears to be

12   an article dated February 1, 2004, regarding "Little dolls,

13   a big deal with girls on the toy fair 2004"; do you see that

14   of "Kids Screen"?

15   A    (No audible response.)

16   Q    It's 20620, right at the top?

17   A    I'm sorry, you said "Kids Screen."

18   Q    Yeah.  Do you see under the date, 1 February, 2004, it

19   says "Kids Screen"?

20   A    Okay.  I do.

21   Q    And that's one of the -- the magazines you were looking

22   at, correct?

23   A    That's correct.

24            MR. PRICE:  I move 20620 into evidence.

25            THE COURT:  Received.

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 88 of 109   Page ID #:311820
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

88

```
1              (Plaintiffs' Exhibit No. 20620 is received in

2        evidence.)

3  BY MR. PRICE:

4  Q    And if you look at the second page, do you see it says,

5  "MGA will also be bringing out Flower Fairies in March,

6  measuring a mere 5 inches, Flower Fairies (U.S. 12.99) are

7  each scented like a different blossom and come with a pet";

8  do you see that?

9  A    I do.

10  Q    And so that was public as of February 1, 2004, right?

11  A    That's correct.

12  Q    If you look at 20587 -- and if you look at 20587,

13  you'll see it's an Associated Press report dated

14  February 18, 2004, about "Hot toy trends for the

15  American-International toy fair"; do you see that?

16  A    I do.

17  Q    And AP wires would provide articles to various

18  newspapers across the country, correct?  That's what AP

19  does?

20  A    Correct.

21  Q    The kind of thing your group would be looking at if it

22  involved stories about competitors?

23  A    You could say that.

24              MR. PRICE:  I move 20587 into evidence.

25              THE COURT:  Received.
```

1          (Plaintiffs' Exhibit No. 20587 is received in

2     evidence.)

3  BY MR. PRICE:

4  Q    And in this article, there's a portion "Room decor, MGA

5  Entertainment, Inc., the maker of the highly popular Bratz

6  dolls is unveiling lamps and swinging chairs"; do you see

7  that?

8  A    I do.

9  Q    And do you remember seeing lamps and swinging chairs

10  when you were –– actually, let me step back.

11     In 2004 –– did you go to the toy fair in 2004?

12  A    Which toy fair are you referring to?

13  Q    The New York toy fair.

14  A    I don't recall if I did or didn't.

15  Q    If you look at Exhibit 23903, do you see that?  It

16  appears to be a January 2004 article in The Toy Book,

17  correct?

18  A    Correct.

19          MR. PRICE:  Your Honor, move 23903 into evidence.

20          THE COURT:  Is Toy Book one of the periodicals or

21  magazines you looked at in the trade, generally speaking?

22  Whether you recognize this specifically or not is not a

23  concern to me, but is this Toy Book familiar to you?

24          THE WITNESS:  I'm familiar with The Toy Book.

25          THE COURT:  What?

1    THE WITNESS:  Toy Book is -- correct.

2    THE COURT:  All right.

3    Received.

4    *(Plaintiffs' Exhibit No. 23903 is received in*

5    *evidence.)*

6  BY MR. PRICE:

7  Q    We look -- first, there is a section there on "Bratz

8  are hitting the beach," talking about the Sun-Kissed summer

9  line; do you see that?

10  A    I do.

11  Q    Okay.  And if you look at the bottom there, it says,

12  "MGA Entertainment, MGA's Bratz stylin' dance party is a

13  dance game that plugs into a television.  It includes a

14  built-in 10-song jukebox," et cetera; do you see that?

15  A    I do.

16  Q    And there is a picture of that to the right there,

17  correct?

18  A    Correct.

19  Q    So as of January 2004, that information was -- was

20  public, right?

21  A    That's correct.

22  Q    Mr. Villasenor, you were shown Exhibit 9273.  Let me

23  show that to you.

24      And do you recall being asked questions about this

25  document in connection with making a phone call to the

 1    public relations person at MGA?

 2            MR. PRICE:  Maybe you can blow it up a little bit

 3    so he can read it.

 4    BY MR. PRICE:

 5    Q    Below is a summary of a recent discussion with MGA's

 6    vice president of public relations; do you see that?

 7    A    Correct, I do.

 8    Q    And was your -- do you have an understanding of what

 9    directors of public relations do in companies?

10    A    They -- they talk to the public.

11    Q    Pardon?

12    A    They talk to the public.

13    Q    Is there any particular reason why you called the

14    director of public relations?

15    A    I don't remember exactly why he was -- I called him.

16    Q    But it's your understanding that a director of public

17    relations does PR for the company, correct?

18    A    That is correct.

19    Q    For the public, correct?

20    A    Correct.

21    Q    And I think you said in this call that you said that

22    you were a retailer; is that right?

23    A    I don't remember who I said I was.

24    Q    Pardon?

25    A    I don't recall who I said I was.

1   Q    Okay.  But certainly the MGA's vice president of public

2   relations did not know you, correct?

3   A    That's correct.

4   Q    I mean, you understood that as far as he was concerned

5   on this phone call, you were a total stranger, correct?

6   A    Correct.

7   Q    And it's your -- is it your experience that public

8   relations people give out confidential information over the

9   phone to strangers, people they've never met before?

10  A    That, I'm not aware of.

11  Q    And so if we look at this, the MGA's vice president of

12  public relations was giving information over the phone to

13  you, a stranger, that's not confidential information, is

14  it?

15  A    Correct.

16  Q    And if you look at the bottom -- look at the date of

17  this.  For example, this is May 13, 2003; do you see that?

18  A    I do.

19  Q    And look at the bottom bullet point on the e-mail where

20  it talks about "North American McDonald's promotion,

21  duration, May 2nd to May 29, 2003"; do you see that?

22  A    I do.

23  Q    So that promotion was already, you know, 11 days in the

24  making at the time that you had this conversation with the

25  vice president of public relations at MGA, correct?

1    A    That's correct.

2    Q    You were shown Exhibit 9502, and you'll see this refers

3    to the New York toy fair report in 2001; is that right?

4    A    That's correct.

5    Q    And if you'd look at page -- page 9502-00010, and

6    there, it talks about Bratz and Palm Puppies; do you see

7    that?

8    A    I do.

9    Q    And your report says, "Their biggest title this year is

10   Bratz.  The website of www.Bratzpack.com has been set up to

11   start to promote the girls"; do you see that?

12   A    I do.

13   Q    And then you said, "They are Diva Starz with a smarty

14   attitude," and it gives their names, correct?

15   A    That's correct.

16   Q    And it says FOB L.A. price?

17   A    That's correct.

18   Q    And you have no idea whether or not retailers share the

19   FOB price to the people at Mattel who were selling to the

20   retailers, correct?

21            MS. KELLER:  Objection.  Vague.  Whose FOB price?

22            MR. PRICE:  I'll rephrase, because I want this to

23   be specific.

24   BY MR. PRICE:

25   Q    You have no idea whether retailers share with Mattel

```
 1   the price they are charged by other competitors, the FOB
 2   price?
 3   A    That is correct.
 4   Q    And --
 5            MS. KELLER:  And that's vague as to time, your
 6   Honor.  Before the product is released or after?
 7            THE COURT:  Overruled -- well, before or after,
 8   Counsel?
 9            MR. PRICE:  At any time.
10   BY MR. PRICE:
11   Q    You don't know if they shared it before or after?
12   A    I do not.
13   Q    And in this report, you said there is actually a public
14   website one can go to, www.Bratzpack.com, to see information
15   and promotions about the Bratz, correct?
16   A    Where is that on the report?
17   Q    It's the first sentence, "Their biggest title this year
18   is Bratz, a website of www.Bratzpack.com has been set up";
19   do you see that?
20   A    I do see that.
21   Q    You spoke about attending a Pomona toy fair; do you
22   recall that?
23   A    I do.
24   Q    And at the Pomona toy fair, are there private
25   showrooms?
```

1    A      No.

2    Q      Okay.  Could you describe what the Pomona toy fair is

3    like.

4    A      It's a smaller-sized convention hall with a lot of

5    tables lined up in aisles with various manufacturers showing

6    their product.

7    Q      And is that toy fair opened to the press?

8    A      It's open to the trade.

9    Q      And -- and by "the trade," who do you mean?

10   A      People who work in the toy industry.

11   Q      Pardon?

12   A      People who work in the toy industry.

13   Q      Yesterday you were asked questions about providing

14   price information to Mr. Turetzky.  I think it was over a

15   weekend; do you recall that?  You were sending it from your

16   personal e-mail address?

17   A      (No audible response.)

18   Q      I may be wrong.  If you'd look at 27464-158.  You were

19   shown this yesterday.

20             THE COURT:  What was the number again?  I'm sorry,

21   Counsel.

22             MR. PRICE:  It's 27464-158.

23             THE COURT:  Thank you.

24   BY MR. PRICE:

25   Q      And if we can perhaps go down to the bottom e-mail,

```
 1   does this contain the entire e-mail string; do you recall?

 2   A    I do not recall.

 3   Q    Okay.  Look at page 129 in that, 27464-129.

 4   A    129.

 5   Q    We've blown it up here.

 6            MR. PRICE:  If we can go to the bottom of

 7   27464-129 in the first e-mail.

 8   BY MR. PRICE:

 9   Q    This is concerning a pricing information that

10   Mr. Turetzky asked you to provide?

11   A    That is correct.

12   Q    And the date of this is November of 2004, correct?

13   A    That's correct.

14   Q    Is this in connection with any toy fairs, November of

15   2004?

16   A    No.

17   Q    Okay.  And Mr. Turetzky contacted you and asked you if

18   you had any information about -- about a price list for a

19   Mattel competitor?

20   A    I'm sorry, can you repeat that or rephrase that,

21   please.

22   Q    Sure.  Let me just ask you, what did Mr. Turetzky ask

23   if you had?

24   A    He asked me to get this information for him.

25   Q    And that source has a TV games price list?
```

1    A    That's correct.

2    Q    And if you look at the date, it says Friday, and then

3    it looks likes it's 13:31.  Did Mattel close around 13:00 on

4    Fridays?

5    A    People would typically leave around 1:00, 1:30 on

6    Fridays.

7    Q    And you were able to obtain a price list, correct?

8    A    Was I able to -- I was able to obtain the price list,

9    correct.

10   Q    And this is a retail price list of some competitor of

11   Mattel's, correct?

12   A    That was a competitive price list, correct.

13   Q    And you obtained that by calling a -- a competitor of

14   Mattel?

15   A    That is correct.

16   Q    You said you were -- did you say you were press or Toy

17   Shop or something?

18   A    I don't recall who I said I was.

19   Q    All right.  And when you called, I take it you didn't

20   know the person you were calling personally, and they didn't

21   know you, correct?

22   A    That's correct.

23   Q    You asked for a retail price list, correct?

24   A    Something like that.

25   Q    And they -- they sent a retail price list to you?

1    A    They -- correct, they e-mailed me.

2         MR. PRICE:  Just one second, your Honor.

3         (Attorney discussion held off the record.)

4    BY MR. PRICE:

5    Q    Regarding Mr. Turetzky, and whether he told you you

6    shouldn't use -- shouldn't misrepresent yourself, do you

7    recall being asked at your deposition whether or not

8    Mr. Turetzky asked you to not misrepresent yourself?

9    A    I don't recall being asked that.

10   Q    Now, I take it that that's something that you either

11   would remember or not remember?  I mean, that would be

12   something that would stick with you?

13   A    Correct.

14   Q    And at your deposition, when you were asked whether

15   Mr. Turetzky ever told you to stop your practice of going to

16   competitors' showrooms using fake information, your answer

17   was "I don't remember."

18        MS. KELLER:  Objection.  Misstates the testimony.

19        MR. PRICE:  Look at page --

20        THE COURT:  Are you reading from something?  I

21   haven't seen that.

22        MR. PRICE:  Let's look at page 564 --

23        THE COURT:  I am going to strike the question and

24   the answer for the time being.

25        Ladies and gentlemen, you are to disregard it.

1          Now, let me look at the transcript.  564?

2          MR. PRICE:  564, December 13, 2010, lines 13

3    through 19.

4          THE COURT:  All right.  Counsel, you can ask the

5    question.

6    BY MR. PRICE:

7    Q    So when you were asked whether Mr. Turetzky reported to

8    you that based on the conversations he had had with counsel

9    at Mattel, your practice in going into competitive showrooms

10   using fake information had to stop, your answer was "I don't

11   remember," correct?

12   A    I don't remember him telling me to stop, correct.

13   Q    And we've gone through these toy fair reports.  Do you

14   even recall a 2004 toy fair report?

15   A    Off the top of my head, no, I do not.

16   Q    And I've shown you a number that you say you don't

17   recall seeing, correct?

18   A    Correct.

19   Q    How about a 2005 report; do you recall that report?

20   A    I would have to see it.

21   Q    Well, we've shown you 31530, which says, "2004 New York

22   Toy Fair Report," and you don't recall that, correct?

23   A    That's --

24          MS. KELLER:  Your Honor, I am going to object.

25   That document hasn't even been authenticated as to source.

```
 1              THE COURT:  In 2005?

 2              MR. PRICE:  This one is 2004, which he says he

 3   doesn't recall.

 4              THE COURT:  He doesn't recall it, Counsel.

 5              MR. PRICE:  Right.

 6              THE WITNESS:  Right.

 7   BY MR. PRICE:

 8   Q    And if you'd look at 95 --

 9              (Attorney discussion held off the record.)

10   BY MR. PRICE:

11   Q    Do you have 9593?

12              MS. KELLER:  Your Honor, I think this is in the

13   same category as the last one.  I think the witness has

14   already said he doesn't remember seeing it.

15              THE COURT:  Well, let's find out one more time.

16              Do you recognize this?

17              THE WITNESS:  I don't recall it.

18              THE COURT:  All right.

19   BY MR. PRICE:

20   Q    How about 27460?

21              MR. PRICE:  That's a duplicate, your Honor.  No

22   need to show it to him.

23   BY MR. PRICE:

24   Q    Mr. Villasenor, is it your testimony that you had no

25   understanding that your attorney was sending a communication
```

 1    to Mattel which suggested that you were stressed because you

 2    were told to continue misrepresenting yourself?

 3              MS. KELLER:  Objection.  Misstates the document.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  Can you repeat that?  I'm sorry.

 6    BY MR. PRICE:

 7    Q    Yeah, it was confusing.

 8         In the December 2005 and the early 2006 time frame, you

 9    did not intend to suggest by any of the communications

10    between you or your attorney and Mattel that you had been

11    told to continue misrepresenting yourself; you didn't mean

12    to suggest that, right?

13    A    I'm still a little confused.  I'm going to ask you to

14    repeat it one more time.

15    Q    Okay.  The time frame is December 2005 forward.

16    A    Correct.

17    Q    And you told us that Mr. Louie told you to stop

18    misrepresenting yourself; do you recall that?

19    A    That is correct.

20    Q    And I'm just asking you from that time forward, did you

21    ever mean to suggest or intend to suggest that Mattel had

22    done the opposite, that it had told you to continue

23    misrepresenting yourself?  Did you ever mean to suggest

24    that?

25              THE COURT:  Do you understand the question?

```
 1              THE WITNESS:  I'm a little confused with the
 2    question.
 3              THE COURT:  I'm going to sustain the objection,
 4    although there is not one.  It's not understandable.
 5              MR. PRICE:  Then it's obviously my fault.
 6              THE COURT:  That's okay.  I'm just kidding you a
 7    little bit, but --
 8    BY MR. PRICE:
 9    Q    You understood from 2005 -- from -- from sometime in
10    late 2005 forward that the direction to you was not to
11    misrepresent yourself, correct?
12    A    That is correct.
13    Q    And if anyone suggested that you were told to continue
14    misrepresenting yourself, that would be wrong, correct?
15              MS. KELLER:  Objection.  That calls for hearsay,
16    calls for commenting on another's testimony.
17              THE COURT:  Sustained.
18    BY MR. PRICE:
19    Q    Whatever was causing you stress in the 2005 time frame
20    going forward, whatever was causing it, it wasn't because
21    you were told to continue misrepresenting yourself, right?
22    A    What was causing stress to me was the fact that I was
23    told not to continue to misrepresent myself.  However, I was
24    also told at the same time that I needed to continue to get
25    that competitive information, being catalogs and price
```

Case 2:04-cv-09049-DOC-RNB   Document 10270   Filed 03/25/11   Page 103 of 109   Page ID #:311835
CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

103

1    lists, and that created the stress.

2    Q    And that kind of competitive information you've seen

3    in -- in -- in public document, after public document, after

4    public document, correct?

5    A    I'm referring to the catalogs and price lists.

6    Q    I'm talking about the catalogs, public document, after

7    public document, after public document contained the

8    information that was in those catalogs that you saw at the

9    toy fair, correct?

10          MS. KELLER:  Objection.  Vague as to time.

11   Released or unreleased?

12          THE COURT:  Sustained.

13   BY MR. PRICE:

14   Q    We went through a number of articles and compared them

15   to what was in your toy fair report, correct?

16   A    That's correct.

17   Q    And you understand that there's -- there are specific

18   allegations by MGA as to what specific items in your reports

19   were trade secrets; do you understand that?

20   A    I do.

21   Q    Okay.  And we've been going through specific items in

22   your reports and comparing those to what was in the public,

23   correct?

24   A    Correct.

25   Q    And you did a lot of reports using public information

1   and presented it as urgent, earth-shattering, DEFCON 1 news,

2   correct?

3           MS. KELLER:  Objection.  Misstates the testimony.

4           THE COURT:  Overruled.

5   BY MR. PRICE:

6   Q    Correct?

7   A    That's correct.

8   Q    And by the way, those articles we were looking at were

9   talking about unreleased products, correct?

10  A    Some of them, yes.

11  Q    Yeah, the ones from around the time of the toy fair all

12  were talking about unreleased products, right?

13  A    Press releases, correct.

14  Q    And you weren't being stressed in 2005 and 2006, you

15  weren't being stressed because you were told to continue

16  that practice, right?

17          MS. KELLER:  Objection.  Asked and answered.

18          THE COURT:  Counsel, I think he's asked and

19  answered that a number of times.

20          I'll let you ask it one more time, just to be

21  sure.

22  BY MR. PRICE:

23  Q    I'm talking about the stress that you talked about in

24  your December 2005 e-mail.

25  A    Correct.

1   Q    First time you ever put in writing you were stressed,

2   correct?

3   A    Correct.

4   Q    You never put in writing anytime before that you were

5   stressed because you were misrepresenting yourself, right?

6   A    That's correct.

7   Q    Only time you are saying you are stressed in writing is

8   December 2005, when you were told not to misrepresent

9   yourself, right?

10          MS. KELLER:  Objection.  Asked and answered.

11          THE COURT:  Overruled.

12          You can answer one more time.

13          THE WITNESS:  That's correct.

14          MR. PRICE:  Nothing further.

15          THE COURT:  Okay.  Redirect.

16          MS. KELLER:  I need to have a minute, your Honor,

17   while Mr. Price clears out.

18          Can we not have this deducted from our time?

19          THE COURT:  Huh?

20          MS. KELLER:  Can we not have the cleanup here

21   deducted?

22          THE COURT:  From either one of you; how's that?

23          MS. KELLER:  I'm not saying I'm tidy.

24          THE COURT:  We've been checking every night.  It's

25   been agreed to by both parties concerning the running time,

1    so --

2          All right.

3                    **REDIRECT EXAMINATION**

4    BY MS. KELLER:

5    Q    Mr. Villasenor, it looks like you went through an awful

6    lot of trouble to get these fake business cards and

7    everything when all of this information was public, right?

8    A    You can say that.

9    Q    Because it wasn't all public, was it?

10   A    That's correct.

11   Q    And, in fact, these price lists were some of the most

12   important confidential information that Mattel wanted you to

13   get, true?

14   A    (No audible response.)

15   Q    The price list pre-released so they can find out what

16   their competitors were going to be charging manufactures for

17   a product.  I mean, so they could -- so they could find out

18   what MGA was going to be charging retailers for a product;

19   they were very important, right?

20              MR. PRICE:  Objection.  Lack of foundation.

21              THE COURT:  Overruled.

22              THE WITNESS:  Can you -- can you rephrase that,

23   please.

24   BY MS. KELLER:

25   Q    Well, the price lists in particular, the competitors'

1    confidential price lists, especially if products hadn't been

2    released yet, those were really important to Mattel in

3    getting a competitive advantage, right?

4    A    Those -- those are part of the reason I would go to

5    New York.

6    Q    And those weren't public, right?

7    A    Correct.

8    Q    In fact, the manufacturers often asked at the toy fair,

9    for example, for people to sign a nondisclosure agreement

10   before they'd let them in the room, true?

11            MR. PRICE:  Object.  Irrelevant with respect to

12   MGA.

13            THE COURT:  Overruled.

14   BY MS. KELLER:

15   Q    True?

16   A    Not all of them require you to sign one.

17   Q    But some did, right?

18   A    Some did.

19   Q    And you were asked by Mr. Price some questions about

20   how, you know, you just had to show up with a business card

21   at the toy fair, and you'd be let into competitors'

22   showrooms without any other credentials, right; do you

23   remember that?

24   A    I do not, I'm sorry.

25   Q    Well, to get into the toy fairs to begin with, you had

1    to register with the TIA, the Toy Industry Association,

2    right?

3    A    That is correct.

4              *(Live reporter switch with Sharon Seffens.)*

5                           -oOo-

Case 2:04-cv-09049-DOC-RNB    Document 10270    Filed 03/25/11    Page 109 of 109    Page ID #:311841
CV 04-9049-DOC – 03/23/2011 – Day 38, Vol. 2 of 3

109

1                            -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 24, 2011

12

13

14                    _____

15                    JANE C.S. RULE, U.S. COURT REPORTER
                      CSR NO. 9316

16

17

18

19

20

21

22

23

24

25