1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
        vs.

                                    CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,   DAY 38
et al.,                             Volume 3 of 3
                    Defendants.

        --------------------------


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Wednesday, March 23, 2011


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870


SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
 1   APPEARANCES OF COUNSEL:

 2   For Plaintiff MATTEL, INC., ET AL.:

 3   JOHN B. QUINN
     MICHAEL T. ZELLER
 4   WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
 6   (213) 443-3000

 7   For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8   THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
 9   4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14
     KELLER RACKAUCKAS LLP
15   JENNIFER L. KELLER
     18500 Von Karman Avenue, Suite 560
16   Irvine, CA
     (949) 476-8700
17

18   FOR CARLOS GUSTAVO MACHADO GOMEZ:

19   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
20   Santa Monica, CA  90401
     (310) 459-2830
21

22   ALEXANDER COTE
     SCHEPER KIM AND HARRIS LLP
23   601 West Fifth Street, 12th Floor
     Los Angeles, CA  90071-2025
24   (213) 613-4655

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    ALSO PRESENT:

 2    MGA ENTERTAINMENT, INC.
      JEANINE PISONI
 3    16360 Roscoe Boulevard, Suite 105
      Van Nuys, CA  91406
 4

 5    ALSO PRESENT:

 6    ROBERT ECKERT, Mattel, CEO

 7    ISAAC LARIAN, MGA CEO

 8    KEN KOTARSKI, Mattel Technical Operator

 9    MIKE STOVALL, MGA Technical Operator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2                                    INDEX

3                                                              PAGE

4    PLAINTIFF'S
     WITNESSES:                  DIRECT      CROSS   REDIRECT   RECROSS
5

6     (None)

7    PLAINTIFF'S
     EXHIBITS:                            MARKED          RECEIVED
8
      (None)
9

10   DEFENSE
     WITNESSES:                  DIRECT   CROSS   REDIRECT   RECROSS
11
     SAL VILLASENOR
12      (Continued)                               5(K)      (31)

13   DEFENSE
     EXHIBITS:                            MARKED          RECEIVED
14

15    (None)

16

17

18

19

20

21

22

23

24

25

                 SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 23, 2011; 3:55 P.M.
 2              (Jury present.)
 3         SAL VILLASENOR, DEFENSE WITNESS, PREVIOUSLY SWORN
 4                  REDIRECT EXAMINATION (Continued)
 5    BY MS. KELLER:
 6    Q    And you had to get a badge that allowed you to get into
 7    the toy fair?
 8    A    That's correct.
 9    Q    In order to register and get that badge, you had to
10    show ID, and you had to show one of the very things that we
11    saw in Mattel's handout for employees on how to fake
12    identities?  You had to either show an invoice or some other
13    documentation that you really were who you said you were,
14    right?
15    A    From 2001 and forward, the State did require us to show
16    proof of identification.
17    Q    Once you had registered for the toy fair and once you
18    had given them all the fake credentials and gotten your
19    badge to begin with, it was a lot easier the next year and
20    the next year to get it?
21    A    You were in the system, correct.
22    Q    So when you walked up to a private showroom at the toy
23    fairs and you had your badge on and your business card, the
24    expectation of everybody was that you had already provided
25    all the proof of your identity to the toy fair itself, true?
```

1    A     You could say that.

2    Q     If we look at Exhibit 27464, this is your badge that

3    you got from the Nuremberg Toy Fair, right?  27464, page

4    four, that's the front?

5    Q     I will ask that you be shown 27464, page four and page

6    five.

7          You recognize those as your toy fair badges, right?

8    A     That is correct.

9              THE COURT:  Your Honor, I would move 27464, page

10   004 and 005, into evidence.

11             THE COURT:  Received.

12             (Exhibit 27464, page 4 and page 5, received.)

13             MS. KELLER:  Could you put them both up there side

14   by side?

15   BY MS. KELLER:

16   Q     You had to wear those in kind of a plastic holder

17   around your neck?

18   A     That's correct.

19   Q     If you didn't have the badge, you couldn't get into the

20   toy fair, right?

21   A     Correct.

22   Q     Now, you were asked some questions about the stress

23   that you were experiencing.

24         When you met with Mr. Louie in 2005, that was the first

25   time anybody at Mattel had told you to quit using phony

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    identities, right?

2    A    That's correct.

3    Q    In fact, you had the handout from Mattel telling

4    everybody exactly how to go about creating false identities

5    for a toy fair?

6    A    It was in one of my files, correct.

7    Q    And you saw it was also in Mattel's files produced in

8    this lawsuit?

9    A    Correct.

10   Q    When you talked to Mr. Louie, he said, okay, no more

11   using fake credentials, right?

12   A    Correct.

13   Q    But I still want you to get that confidential

14   information that the other toy companies only give out to

15   retailers, right?

16   A    That's correct.

17   Q    So did you tell him something to the effect of I can't

18   get it?

19   A    I did.

20   Q    And he said, well, get it anyway, right?

21   A    Something like that.

22   Q    And you said how am I supposed to do that, right?

23   A    That's correct.

24   Q    And his answer was basically I don't want to know, but

25   you can't misrepresent yourself, right?

```
 1              MR. PRICE:  Objection, argumentative.

 2              THE COURT:  In the present form, it is.

 3   BY MS. KELLER:

 4   Q    Was his answer essentially along the lines of I don't

 5   want to know how you do it, but you need to do it?

 6              MR. PRICE:  Same objection.

 7              THE COURT:  Overruled.  You can answer.

 8              THE WITNESS:  Correct, he gave me no direction on

 9   how to -- for me misrepresenting myself.

10   BY MS. KELLER:

11   Q    Mattel it was your understanding because of the lawsuit

12   pending with MGA did not want a paper trail of you doing

13   that officially?

14              MR. PRICE:  Objection.  Argumentative, lack of

15   foundation.

16              THE COURT:  If you had a specific conversation

17   about that, I'm going to let you state it.  Otherwise, I'm

18   going to sustain the objection.

19   BY MS. KELLER:

20   Q    Let me just ask your belief.  As a result of this

21   conversation, did you develop some stress as a result of a

22   belief that while officially you were being told you

23   couldn't do it unofficially you were still being expected to

24   do it?

25   A    Correct.
```

1  Q    It was your belief that they just didn't want any

2  documentation of it sitting around anymore?

3  A    That I am not sure of.

4  Q    But you knew that there was a lawsuit between Mattel

5  and MGA?

6  A    Correct.

7  Q    You knew you had been called into Michael Moore's

8  office, the attorney for Mattel, specifically about that

9  lawsuit, right?

10         MR. PRICE:  Objection.  Misstates his testimony.

11         THE COURT:  Overruled.

12         THE WITNESS:  Correct.

13  BY MS. KELLER:

14  Q    You knew that you had been asked to give lots of

15  documents and papers in your possession to those attorneys,

16  right?

17  A    That I don't recall.

18  Q    Well, you do recall your separation agreement, right?

19  A    I saw it today, correct.

20  Q    And you recall signing that in July of 2006, right?

21  A    If that's what is stated, correct.

22  Q    One of the things that you said in that document,

23  9266-5, Subdivision (h) -- you said that you would cooperate

24  with the company in taking all steps it deems to be legally

25  appropriate to comply, limit, or prevent disclosure of what

1    you had been doing, right?

2    A    Once again, I didn't really read this in its entirety.

3    I'm not really familiar with the separation agreement.

4    Q    You understood, though, whether you know it word for

5    word -- you knew as part of your deal with Mattel that you

6    were not supposed to tell anybody what you had been doing in

7    terms of faking the identities and getting into the private

8    showrooms, true?  It was written into the agreement, right?

9    A    Can you show me where in the agreement it says that?

10   Q    Yes.  Let's look at 9266, and let's look at page five,

11   Subdivision (h).  It says, "Except for my confidants, I

12   represent, understand, and agree that I will keep completely

13   confidential and not discuss or disclose to any person or

14   entity (a) the fact of this agreement; (b) any allegations

15   of alleged wrongful conduct by the company; and (c)

16   confidential and proprietary information that I had access

17   to as a former member of the company's Strategic Planning

18   Department, including market, competitive, and consumer

19   research, market and sales strategies, and other

20   confidential business information related to the released

21   parties that has not been made public."

22       When it talks about allegations of alleged wrongful

23   conduct, you knew what that was?

24   A    I had an idea.

25   Q    You knew that's what we had been talking about in this

1  courtroom, the faking of the IDs and getting into private

2  showrooms, true?

3  A    Correct.

4  Q    If you look down a couple more paragraphs, you say that

5  you agree to cooperate with the company in taking all steps

6  it deems to be legally appropriate to comply, limit, or

7  prevent the required disclosure.  That would be a disclosure

8  that you would have to make because you had been subpoenaed.

9  It says that in the sentence above that, correct?

10       "However, if I am subpoenaed or receive legal notice

11  where I may be asked to testify or provide any information

12  about the company or any confidential information, I will

13  notify the general counsel of Mattel as promptly as possible

14  by telephone and in writing, including by facsimile, and no

15  later than within five business days of receipt of such

16  subpoena or notice at the following address," and it gives

17  the general counsel's address?

18  A    It does.

19  Q    And then you say, "I agree to cooperate with the

20  company in taking all steps it deems to be legally

21  appropriate to comply, limit, or prevent the required

22  disclosure," right?

23  A    Correct.

24  Q    And you did fulfill that agreement?  We talked about

25  that earlier didn't we?  You abided by that agreement, true?

1   A    That is correct.

2   Q    In fact, you did not produce the documents in this

3   litigation from your files until July 7, 2010, right?

4           MR. PRICE:  Objection.  Irrelevant given the time.

5           THE COURT:  Overruled.

6           THE WITNESS:  Are you referring to the date of my

7   deposition?

8       (Defense counsel conferring.)

9   BY MS. KELLER:

10  Q    You produced the documents for your deposition, right?

11  A    That's correct.

12  Q    And the documents I am talking about included the

13  handout from Mattel on how to fake an identity, true, and

14  get into private showrooms?

15  A    No.

16          MR. PRICE:  It's vague.  Is this what he presented

17  at his deposition?

18          THE COURT:  She is asking about the time frame and

19  whether this was produced just shortly before or at the time

20  of your deposition.  Do you recall?

21          THE WITNESS:  It could have been before or after

22  my deposition.  I don't remember exactly when it was

23  produced.

24  BY MS. KELLER:

25  Q    Did you not produce these documents until September

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    2010?

2    A    I don't know exactly when I produced them.

3    Q    You know it was last year, right?

4    A    Right.

5    Q    Within the last six or seven months, right?

6    A    Correct.

7    Q    So from the time you signed your agreement in 2006,

8    until then, you complied with Mattel's request not to turn

9    them over?

10          MR. PRICE:  Objection.  That assumes there was

11   discovery before that on this topic.  It's improper.

12          THE COURT:  Overruled.

13          You can answer the question.

14          THE WITNESS:  Would you repeat the question?

15   BY MS. KELLER:

16   Q    Until September --

17          THE COURT:  I wouldn't say Mattel.  I'm going to

18   sustain the objection at least pursuant to this written

19   document.  You can refer to the exhibit number.

20   BY MS. KELLER:

21   Q    Pursuant to your separation agreement with Mattel,

22   Exhibit 9266, you cooperated with the company in trying to

23   limit or prevent the disclosure of those documents, right?

24          MR. PRICE:  Objection.  Argumentative.

25          THE COURT:  Overruled.

```
 1              THE WITNESS:  That's correct.
 2    BY MS. KELLER:
 3    Q    And it was only when you were forced to that you
 4    finally produced the documents, right?
 5    A    That's correct.
 6    Q    And that's because of your written agreement with
 7    Mattel, true -- it was because of your written agreement
 8    with Mattel that you withheld the documents until you were
 9    forced to turn them over?
10              MR. PRICE:  Objection.  Assumes facts not in
11    evidence.
12              THE COURT:  Forced to turn them over is sustained.
13    That's stricken.
14    BY MS. KELLER:
15    Q    In the letter that your attorney sent in December 2005,
16    the letter you and your attorney you said worked on
17    together -- this is Exhibit 9484-R.
18              MS. KELLER:  Can we display that?
19    BY MS. KELLER:
20    Q    Now, you didn't produce this letter until September of
21    2010, right?
22              MR. PRICE:  Objection.  Irrelevant.
23              THE COURT:  Overruled.
24              THE WITNESS:  I don't remember exactly when it was
25    produced.  I don't remember the exact date.
```

1    BY MS. KELLER:

2    Q     Within the last six months though, right?

3    A     Correct.

4    Q     In this letter, you are saying that you are worried

5    that your actions could expose you to person criminal

6    liability.  Did you believe that to be true?

7    A     I did.

8    Q     And you had had the opportunity before sending this

9    letter to consult with counsel, right?

10   A     Are you referring to my attorney?

11   Q     Your attorney, right?

12   A     Yes.

13   Q     And you had educated yourself about the potential

14   problems that you could face as a result of what you had

15   done, right?

16   A     We talked it over.

17   Q     And you were concerned, among other things, that you

18   could actually be charged with fraud, right?

19   A     I'm not sure about fraud.

20   Q     Theft of trade secrets?

21   A     I'm not sure about that either.

22   Q     In general, you thought that you might be charged with

23   felonies that could lead to a devastating impact on your

24   life, right?

25   A     I wasn't sure what I could be charged with.

1   Q     Something bad?

2   A     You could say that.

3   Q     Well, that's what I am asking you if that was in your

4   mind.  It was something criminal, something bad, right?

5   A     Correct.

6   Q     Something that could have a devastating impact on your

7   life, right?

8   A     Correct.

9   Q     And that was based on the investigation that you had

10  done and based on the fact that you had legal representation

11  to go over -- you could go over everything with your lawyer?

12  A     Correct.

13  Q     So when you said you were stressed, was that just to

14  try to shake down Mattel for money?

15  A     Not at all.

16  Q     You wanted out didn't you?

17          MR. PRICE:  Objection.  Argumentative.

18          THE COURT:  Sustained in the present form.

19  BY MS. KELLER:

20  Q     You wanted out of that situation where you were

21  expected to produce confidential information that you knew

22  you could only get through improper means?

23  A     That's correct.

24  Q     You didn't feel that -- as a result of Mr. Louie, you

25  didn't feel that you were being let out?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 1 | MR. PRICE:  Objection, vague. |
| 2 | THE COURT:  Overruled. |
| 3 | THE WITNESS:  I'm confused by that question. |
| 4 | Could you repeat it or rephrase it? |
| 5 | BY MS. KELLER: |
| 6 | Q    As a result of your conversation with Mr. Louie where |
| 7 | he was saying don't use a false ID anymore but we still want |
| 8 | the same information, you felt you were being left in the |
| 9 | same situation? |
| 10 | A    Correct. |
| 11 | Q    Having talked with Mr. Moore, Mattel's in-house |
| 12 | counsel, about the MGA litigation, you were very concerned |
| 13 | that all of this misconduct was going to come to light, |
| 14 | right? |
| 15 | A    Correct. |
| 16 | Q    And when your deposition was finally taken in 2010, you |
| 17 | were still so worried that you actually thought about |
| 18 | claiming the Fifth Amendment and saying I refuse to answer |
| 19 | on the grounds that my answers may tend to incriminate me? |
| 20 | A    That I don't recall. |
| 21 | Q    Do you remember being asked some questions about the |
| 22 | fact that Mattel said if you took the Fifth Amendment they |
| 23 | wouldn't pay your attorney's fees? |
| 24 | A    That I do remember. |
| 25 | Q    The reason that you were told that -- were you talking |

1    about taking the Fifth Amendment?

2    A    I don't recall that I was or wasn't.

3    Q    Do you know how that conversation came up?

4    A    I don't know.

5    Q    Do you recall hearing that if you took the Fifth

6    Amendment, because you were a former Mattel employee, that

7    that could have an adverse impact on Mattel's position in

8    this lawsuit because of the legal rules?

9    A    That I don't recall.

10              MR. PRICE:  Objection.

11              THE COURT:  Sustained.  Stricken, both the

12   question and the answer.

13   BY MS. KELLER:

14   Q    You do recall being asked by Mr. Molinski, who is

15   seated here in the front row, about the fact that if you

16   took the Fifth Amendment Mattel was no longer going to pay

17   your attorney's fees, right?

18   A    That's correct.

19   Q    So you felt you had to go ahead and testify?

20              MR. PRICE:  Objection, vague.

21              THE COURT:  Do you understand the question?

22              THE WITNESS:  No.  Can you rephrase it or --

23   BY MS. KELLER:

24   Q    You felt that you had to go ahead and testify, or you

25   were going to be on the hook yourself for all the legal fees

1     incurred?

2     A     That's correct.

3     Q     Were you told the legal reasoning behind that?

4     A     No, I was not.

5     Q     Were you told anything about why Mattel was saying

6     that?

7     A     I don't recall.

8     Q     You don't remember being told that there are some rules

9     that could come into affect if you took the Fifth

10    Amendment --

11              MR. PRICE:  Objection.

12              THE COURT:  The question is stricken.  Sustained.

13    Disregard the question, ladies and gentlemen.

14    BY MS. KELLER:

15    Q     Now, when your attorney -- you were asked about a

16    letter that your attorney wrote to Mattel asking for a

17    settlement for you, right?  I'm referring to Exhibit 9266

18    -- I'm sorry.  I'm referring to Exhibit 9525.  Is that a

19    letter that your lawyer wrote to Mattel trying to --

20              THE COURT:  Counsel, I don't think that's --

21              MS. KELLER:  I may be completely confused.

22              THE COURT:  It was referred to as 26979.

23              MS. KELLER:  I think that's a different document,

24    Your Honor.

25              MR. PRICE:  9525 I think it is.

| | |
|---|---|
| 1 | THE COURT:  I'm not certain what number it is. |
| 2 | Let me see that for just a minute. |
| 3 | MS. KELLER:  It's 9525, Your Honor, and it's in |
| 4 | evidence. |
| 5 | THE COURT:  My apologies. |
| 6 | BY MS. KELLER: |
| 7 | Q    Now, have you ever seen that letter before? |
| 8 | A    I don't remember it. |
| 9 | Q    Were you copied on it by your lawyer? |
| 10 | A    I might have. |
| 11 | Q    The stress that you were under that resulted in your |
| 12 | medical leave -- I know I have asked you this before, but |
| 13 | that was real? |
| 14 | A    Yes, it was real. |
| 15 | Q    Did it result in your having to obtain psychiatric or |
| 16 | psychological treatment? |
| 17 | A    Yes. |
| 18 | Q    How long did that go on for? |
| 19 | A    I don't remember exactly how long it went for. |
| 20 | Q    Were you depressed? |
| 21 | A    A little. |
| 22 | Q    Were you worried about being able to get another job? |
| 23 | A    That crossed my mind. |
| 24 | Q    In fact, does your job with Mattel remain as the only |
| 25 | job you have had in the toy industry? |

1   A     Correct.

2   Q     When your attorney said that that you had spent your

3   adult life working for Mattel in the toy industry, was that

4   true?

5   A     Most of my adult life, correct.

6   Q     When you said that your uncover work and covert

7   operations had benefited Mattel and its shareholders, was

8   that true?

9   A     That I'm not sure of.

10  Q     When you said that the fact that you were unable to

11  continue in that role meant that you had to start over in an

12  entirely new field or profession, was that true?

13  A     That's true.

14  Q     Were you independently wealthy?

15  A     No.

16  Q     Did you need the money that you were trying to get in a

17  severance package in order to live?

18  A     I needed income, absolutely.

19  Q     Now, if we could take a look at Exhibit 27464 -- and I

20  believe that's in evidence -- this is a copy of your

21  calendar from October 31, 2005, 27464-181?  Do you recognize

22  this as a copy of your calendar from --

23          MR. PRICE:  My understanding is we are doing this

24  large exhibit one page at a time for admission.

25          MS. KELLER:  I'm only referring to pages 181 and

```
 1    182, and it's already in evidence.

 2    BY MS. KELLER:

 3    Q    Can you take a look at those two pages, sir?

 4    A    Yes.

 5    Q    Do you see a listing on October 31, 2005, for a meeting

 6    between you and Neil Friedman?

 7    A    I do.

 8    Q    And Neil Friedman was the president of Mattel?

 9    A    Correct.

10    Q    The new president who came after Matt Biskette?

11    A    That's correct.

12    Q    Do you remember having a meeting with Mr. Friedman just

13    one-on-one, the two of you sometime relatively soon after he

14    started?

15    A    I do.

16    Q    Do you remember about how long that meeting lasted?

17    A    Roughly half an hour.

18    Q    Where was the meeting held?

19    A    Up on the 15th floor.

20    Q    Now, you were asked a lot of questions by Mr. Price

21    about these various exhibits that showed public information

22    in the press or in press releases about some of the products

23    that you had also reported on in your toy fair reports.  Do

24    you remember that?

25    A    I do.
```

1  Q    But none of the press releases and none of the magazine

2  articles contained FOB prices, right?

3  A    That's correct.

4  Q    But your toy fair reports did, correct?

5  A    Some included FOB.  Some included the suggested retail

6  price.

7  Q    Well, I'm particularly talking about the MGA products.

8  If we could compare Exhibit 9504 and Exhibit 16786, if we

9  can put those up upside by side -- I'm trying to find the

10  page here.  It's 9504, page 40.  If we compare that to

11  Exhibit 16786, okay.  You were asked about that by

12  Mr. Price, some of the language about "Hello, Kitty," is

13  identical in each, right?

14  A    That's correct.

15  Q    In Exhibit 16786, the press release dated February 8,

16  2001, there is nothing about the FOB price in that, right?

17  A    That's correct.

18  Q    And no photos either, true?

19  A    That's correct.

20  Q    But if you look at Exhibit 9504-40, your toy fair

21  report, you have got the FOB price and some pictures?

22  A    Can I see a copy of that report?

23  Q    Let's first look at 9504, page 40.  Let's just look at

24  that alone.

25        That's the toy fair report that you did, April 2001,

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    right, and if you look at the screen, you will see that
2    there is an FOB price listed, right?
3    A    Just to clear something up, when you said I did, I
4    didn't work on this.
5    Q    Whoever on your team did, you see an FOB price there,
6    right?
7    A    For $13.99?
8    Q    9504-40, which is your toy fair report.
9    A    Correct.
10   Q    That has an FOB price?
11   A    It does.
12   Q    Then if you look at 16786, the press release with some
13   of the identical language from your toy fair report, no FOB
14   price?
15   A    That's correct.
16   Q    If we look at another pair that you were asked to
17   compare -- let's compare 9504-78 -- I'm sorry, 9504-76.  Do
18   you see that?
19   A    I do.
20   Q    Underneath the "Insecto" box, it says FOB price $14.99?
21   A    That's correct.
22   Q    That's the price that the retailer would pay MGA if the
23   retailer ordered it from MGA to be delivered to the
24   retailer, right?
25   A    That's correct.

1  Q    And if you look in the press release that Mr. Price
2  showed you, 16786, no FOB price, right?
3  A    That's correct.
4  Q    And you were asked along the way about the fact that
5  you could just go pick up some catalogs publicly at the toy
6  fair just lying out on tables, right?
7  A    What's your question?
8  Q    You were asked about the fact that some -- at the toy
9  fair you could get some catalogs from some manufacturers --
10 they were just lying out on the table for anybody to take,
11 right?
12 A    I don't think I was asked.  I think I mentioned that.
13 Q    MGA though had a private showroom, true?
14 A    It depends what toy fair you are referring to.
15 Q    Let's say the New York Toy Fair.  MGA had a private
16 showroom?
17 A    From what I remember, correct.
18 Q    Invitation only?
19 A    I'm not sure about the invitation.
20 Q    Let's look at a couple more comparisons here.  Let's
21 look at 21233-77.  That's this "Kid Screen Invasion of the
22 Robo Pets" article, right, and that has some suggested
23 retail prices in it, right?
24 A    The font is so small that I can't read it.
25 Q    Let's blow it up for you a little bit.  Do you see

1    those?

2    A    I see a $79.99 price, correct.

3    Q    Those are suggested retail prices, right?

4    A    That I'm not sure of.

5    Q    Well, no mass market publication ever listed MGA's FOB

6    prices, right?

7    A    That I don't know.

8    Q    Have you ever seen one in a magazine for general

9    circulation?

10   A    No, I have not.

11   Q    Let's look at Exhibit 9504-0076.  That's your toy fair

12   report.  That has the FOB price of $14.99, right?

13   A    Correct.

14   Q    But if we go back to the kid screen magazine, we see

15   that the price is going to be $19.99, and that's because

16   that's the retail price, suggested retail?

17   A    It looks to be that, correct.

18   Q    I don't want to go through every single one of these,

19   but time after time after time here today, over and over,

20   you have been shown public information from a press release

21   and asked about whether that was contained in your private

22   toy fair report, but what wasn't mentioned was that your

23   private toy fair report repeatedly also had the FOB prices

24   in it, right?

25            MR. PRICE:  Objection, argumentative.

1              THE COURT:  Sustained.

2     BY MS. KELLER:

3     Q    Did your comparisons that you talked about earlier

4     repeatedly contain FOB prices in your toy fair report but

5     did not appear in press releases or magazine articles?

6     A    That's correct.

7     Q    Knowing the other manufacturer's price is something

8     that allows you to undercut their price before the products

9     are released?

10             MR. PRICE:  Objection, lack of foundation with

11    this witness.

12             THE COURT:  Overruled.

13    BY MS. KELLER:

14    Q    Let's say you have Toy Company A planning an FOB price

15    of $14.99.  Toy Company B has a similar product.  They were

16    going to price theirs at $16.99.  Toy Company B now finds

17    out that Toy Company A is going to actually sell it at a

18    lower price.  Toy Company B can go ahead and undercut Toy

19    Company A by a dollar, and when the product hits the market,

20    all of a sudden the toy company that prices lower has a big

21    advantage, right?

22             MR. PRICE:  Objection, speculation.

23             THE COURT:  Sustained.

24    BY MS. KELLER:

25    Q    You know why confidential competitive price lists are

1    so valuable, right?

2                MR. PRICE:  Objection, lack of foundation.

3                THE COURT:  Overruled.

4                THE WITNESS:  Not really.

5    BY MS. KELLER:

6    Q    In all your years in the toy industry, you never

7    learned that the confidential price list of a competitor was

8    something of great value?

9    A    My job was just to get the information.

10   Q    So if we look, for example, at Exhibit 27464, your

11   November 12, 2004 e-mail -- that's 27464-158 -- this was the

12   response after you sent Mr. Turetzky the confidential TV

13   games price list that's listed in 27464-129, right?

14   A    That's correct.

15   Q    And that was -- getting that competitive price list was

16   important enough to Mr. Turetzky that in 27464-00158 he

17   says, "This is great.  You just saved Mattel close to

18   $1 million," right?

19   A    That's correct.

20   Q    And you knew why you saved Mattel close to $1 million,

21   right?

22   A    I wasn't sure exactly why.

23   Q    You knew generally didn't you?

24               MR. PRICE:  Objection, calls for speculation.

25               THE COURT:  Overruled.

1  BY MS. KELLER:

2  Q    You knew generally didn't you?

3  A    I did.

4  Q    In fact, you knew it was financially valuable

5  information because you wrote on top, "Hope this gets me a

6  good bonus this year.  See you on Monday," right?

7  A    I wrote that.

8  Q    But you knew that it was valuable financial

9  information, true?

10  A    I knew it was valuable information to Mr. Turetzky.

11  Q    Now, you also were asked about Exhibit 9525 in

12  conjunction -- I take that back.  You were also asked about

13  that same exhibit we just looked at, that same e-mail,

14  27464, and 27464-129 specifically.  Do you recall Mr. Price

15  pointing out to you that this was dated in November, right?

16  A    Correct.

17  Q    And the toy fair in New York doesn't occur until

18  January, right?

19  A    I think it's February.

20  Q    Or February even, right, but you know that October is

21  the month of something called a pre-toy fair, right?

22  A    There was a pre-toy fair.

23  Q    And the pre-toy fair is where the manufacturers have

24  private showrooms at their companies that they invite

25  selected retailers to, true?

```
 1   A     I never attended a pre-toy fair.

 2   Q     But you know about them?

 3   A     Not a whole lot.

 4   Q     You know that they exist, true?

 5   A     That's true.

 6   Q     You know at a pre-toy fair competitive price lists are

 7   also available to retailers?

 8              MR. PRICE:  Objection, lack of foundation.

 9              THE COURT:  Overruled.

10              THE WITNESS:  Again, I'm not sure because I have

11   never attended a pre-toy fair.

12   BY MS. KELLER:

13   Q     But you know that's where you got this price list,

14   right, from somebody who went to the pre-toy fair?

15   A     I got it from someone who e-mailed it to me.

16   Q     That someone could only have gotten it from the pre-toy

17   fair given the fact that this was still a confidential

18   competitive price list and the toy fair wasn't until

19   February, true?

20              MR. PRICE:  Objection, argumentative, assumes

21   facts.

22              THE COURT:  Overruled.

23              THE WITNESS:  I'm not sure where that person got

24   it from.

25   BY MS. KELLER:
```

```
 1    Q    You just knew it was worth a million dollars to Mattel?
 2              MR. PRICE:  Objection.
 3              THE COURT:  Sustained.
 4              MS. KELLER:  Nothing further.
 5              THE COURT:  Recross, Mr. Price.
 6                       RECROSS-EXAMINATION
 7    BY MR. PRICE:
 8    Q    Mr. Villasenor, you were asked a lot of questions about
 9    the FOB price and price lists.  Do you recall that?
10    A    Yes.
11    Q    Do you have any understanding one way or another as to
12    whether on not in this case MGA is claiming that FOB is a
13    trade secret?
14    A    I do not.
15    Q    In fact, do you recall that we went and compared the
16    description of the product in the public to the description
17    of the product that was not yet released that's in your toy
18    fair report?  We did that for a number of items?
19    A    That's correct.
20    Q    And do you know whether or not what MGA is claiming as
21    trade secret is the actual appearance and description of the
22    product and not the FOB price?  Do you know one way or the
23    other if that's the case?
24    A    I do not.
25    Q    With respect to these price lists, these price lists
```

```
 1  are given to retailers who go to these private showrooms?
 2  A    That's correct.
 3  Q    There is also press in these private showrooms,
 4  correct?
 5  A    For the press, it's a separate room.
 6  Q    Let me ask you about what is handed out for these price
 7  lists.  You were asked by Ms. Keller about your experience
 8  in the industry on price lists.  Retailers love competition
 9  amongst manufacturers don't they?
10  A    That I'm not sure of.
11  Q    Well, again, you have been in the industry for a number
12  of years.
13       Do you understand -- have a feeling that that customer,
14  that retailer, is trying to get the best price it can for
15  the toys that it hopes to buy, correct?
16  A    Correct.
17  Q    So you understand that retailers have an incentive when
18  they are talking to the sales people at Mattel and sales
19  people at MGA to tell them what their competitors' prices
20  are?
21  A    That I don't know.
22  Q    That's kind of the best way to help get your price down
23  to say, hey, they are charging me less?
24  A    Again, I don't know the answer to that question.
25  Q    You were asked questions about the settlement
```

1    agreement.

2         Did you understand that Ms. Keller was suggesting that

3    you performed your side of the settlement agreement by

4    withholding documents -- let me ask this.  Did you ever

5    withhold documents because of a settlement agreement?

6    A    Withhold them from who?

7    Q    From anyone who requested them.  Did you ever withhold

8    documents?

9    A    No one ever requested the documents.

10   Q    You were asked whether you had cooperated with Mattel

11   to comply, limit, or prevent -- do you recall those words,

12   "comply, limit, prevent"?

13   A    Correct.

14   Q    Did you ever cooperate with Mattel to limit documents

15   that were asked of you?

16   A    I'm sorry.  I'm a little mixed up with your question.

17   Can you rephrase it or repeat it?

18   Q    Did you ever cooperate with Mattel to limit documents

19   being produced by you to MGA?

20   A    Repeat the question.

21            THE COURT:  It's ambiguous.  The witness doesn't

22   understand the question.

23   BY MR. PRICE:

24   Q    Do you remember Ms. Keller showed you a provision in

25   the settlement agreement which said you would comply -- you

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    would assist Mattel in complying, limiting, or preventing

2    you from giving information?  Do you remember that?

3    A     Correct.

4    Q     Did you ever cooperate with Mattel to limit information

5    that was being asked of you -- to limit your communication

6    of information?

7    A     To limit my communication?

8    Q     Did someone ever ask you for information or documents,

9    and you worked with Mattel to limit what you were going to

10   handle?

11   A     No.

12   Q     Did you ever work with Mattel to limit what documents

13   you were going to produce?

14   A     No.

15   Q     Did you ever withhold any documents because of an

16   agreement that you had with Mattel?

17   A     Again, can you rephrase that?  I'm not clear on the

18   question.

19   Q     Did you ever refuse to hand over documents to someone

20   who asked for them because Mattel requested that you

21   withhold documents?

22   A     No.

23   Q     Did you ever cooperate with Mattel in withholding

24   documents from someone who asked about those documents?

25   A     No.

```
 1   Q    You weren't asked to provide documents until sometime
 2   in 2010, right?
 3   A    Correct.
 4   Q    And that was a request by MGA, correct?
 5             THE COURT:  If you understand.
 6             THE WITNESS:  Are you referring to the
 7   depositions?
 8             MR. PRICE:  Yes.
 9             THE WITNESS:  Correct.
10   BY MR. PRICE:
11   Q    At the deposition, you were shown documents, and you
12   were asked questions about them, right?
13   A    That's correct.
14   Q    Now, in connection with that agreement, you said
15   that -- when you were requested to produce documents and
16   then gave the testimony, you did so?
17   A    That's correct.
18   Q    To your knowledge did Mattel ever try to prevent you
19   from doing so?
20   A    No.
21   Q    In fact, when you got to that deposition and you were
22   about to testify, your understanding was that Mattel said if
23   you plead the Fifth, your attorney's fees aren't going to be
24   paid?
25   A    That's correct.
```

```
1    Q    You told Ms. Keller that you wanted out.  Do you recall

2    that?  She asked you when you sent your letter -- your

3    e-mail in December 2005 was it true that you wanted out?  Do

4    you recall that question?

5    A    I do not.

6    Q    Well, when you sent that e-mail and then there was a

7    subsequent communication from your counsel, you wanted to

8    get paid?

9              THE COURT:  Do you understand the question?

10             THE WITNESS:  Get paid?

11   BY MR. PRICE:

12   Q    You wanted money from Mattel?

13             THE COURT:  Do you understand the question?

14             THE WITNESS:  I'm confused with that question.

15   BY MR. PRICE:

16   Q    In December 2005 and then later in 2006 when you

17   stopped coming to work at Mattel, you were trying to get

18   paid money by Mattel, correct?

19   A    There were negotiations through my attorney, correct.

20   Q    I think you told Ms. Keller that you had living

21   expenses, correct?

22   A    I had expenses.

23   Q    So were your living expenses in the $5 million to

24   $40 million range?

25             MS. KELLER:  Objection, argumentative.
```

| | |
|---|---|
| 1 | THE COURT:  Sustained. |
| 2 | BY MR. PRICE: |
| 3 | Q    Sir, is it correct that at some point in the |
| 4 | discussions with Mattel that your side demanded a payment |
| 5 | from Mattel of $3 million? |
| 6 | MS. KELLER:  Your Honor, it's vague as to your |
| 7 | side. |
| 8 | THE COURT:  You can ask him if he has knowledge of |
| 9 | any such request. |
| 10 | BY MR. PRICE: |
| 11 | Q    Do you have knowledge that you or someone acting on |
| 12 | your behalf demanded $3 million from Mattel? |
| 13 | A    I don't remember the exact amount, but my attorney had |
| 14 | said something. |
| 15 | Q    Is it your recollection that the range was about |
| 16 | $3 million? |
| 17 | A    I don't remember the exact amount. |
| 18 | Q    I'm not asking you about the exact amount.  I am asking |
| 19 | you about the range.  It was millions of dollars that were |
| 20 | for? |
| 21 | A    I don't recall. |
| 22 | Q    Is it possible that a document might refresh your |
| 23 | recollection? |
| 24 | A    Yes. |
| 25 | Q    If you would look at Exhibit 26979.  In particular, if |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

| 1 | you could look at the first part of that, the first |
|---|---|
| 2 | sentence.  I am asking if that refreshes your recollection |
| 3 | as to the range of the demand that was made by your counsel |
| 4 | to Mattel. |
| 5 | A    It does. |
| 6 | Q    Does that refresh your recollection? |
| 7 | A    It does. |
| 8 | Q    What amount did your counsel on your behalf demand from |
| 9 | Mattel? |
| 10 | A    It says $3 million. |
| 11 | Q    Without going into details, it's true, is it not, that |
| 12 | there were nonwork sources of stress in your life in this |
| 13 | time frame? |
| 14 | A    I'm sorry.  You need to repeat that. |
| 15 | Q    Is it true that without going into any detail that in |
| 16 | this time frame there were other nonwork sources of stress |
| 17 | in your life? |
| 18 | A    Not that I recall. |
| 19 | Q    Well, do you recall making that representation in your |
| 20 | settlement agreement? |
| 21 | A    I do not. |
| 22 | Q    You have testified in response to Ms. Keller's |
| 23 | questions that Mr. Louie -- when he told you that you should |
| 24 | not misrepresent yourself anymore that you said, well, how |
| 25 | am I supposed to get this information?  He said I don't |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  care.  I don't want to know.  Just continue getting the
2  information.  Do you recall that?
3  A    That is correct.
4  Q    In fact, what Mr. Louie said was fine.  If you don't
5  want to do it, you don't have to anymore?
6  A    I'm sorry?
7  Q    When he said don't continue misrepresenting yourself
8  and you said, well, what am I supposed to do, how am I
9  supposed to get the information, his response was that if
10 you don't feel like doing it you don't have to anymore?
11 A    I don't think he said that during that conversation.  I
12 think that was later in a different conversation.  We
13 actually met like three times to discuss that matter.
14 Q    In December '95 --
15 A    Sometime in --
16 Q    -- December 2005?
17 A    Sometime in December 2005.
18 Q    It was before you wrote your December -- it was before
19 your counsel drafted and you edited your December 22, 2005,
20 e-mail, Exhibit 9484, if you could put that up?  Before
21 sending this e-mail talking about your stress, Mr. Louie
22 said if you don't want to do this you don't have to do it,
23 right?
24         THE COURT:  Counsel, just we got a note from the
25 jury.  They say that they have to go, so if you have

1    additional questions, we will bring them back.

2              MR. PRICE:  Very few, but I understand.

3              THE COURT:  Do you have to go right now?

4              How long do you have, Counsel?

5              MR. PRICE:  Literally five minutes, maybe three.

6              THE COURT:  Three to five minutes.  Can you stay

7    with us?  Can you do it?  Okay.

8    BY MR. PRICE:

9    Q    You had a conversation with Mr. Louie where his

10   response to you when you said you had stress from this

11   pressure was  fine.  If you don't feel like doing it, you

12   don't have to do it anymore?

13   A    Right.  That was after I told him I no longer wanted to

14   continue to misrepresent myself.

15   Q    He said don't misrepresent yourself, correct?

16   A    After I had told him that.

17   Q    I thought you said he told you I talked to legal, and I

18   don't want you misrepresenting yourself.

19   A    That was a separate meeting.

20   Q    You told Mr. Louie that you were under stress because

21   he was putting you under pressure to take competitive

22   information even though you weren't able to misrepresent

23   yourself?

24   A    That I told Mr. Louie that?

25   Q    That you were under stress because he was saying don't

```
 1   misrepresent yourself but still get competitive information?
 2   You told us that?
 3   A    I was under stress because he was telling me not to
 4   misrepresent myself but yet continue to get the competitive
 5   information.  That led to stress.
 6   Q    In response to you saying that, he said he was shocked
 7   to hear that from you?
 8   A    I don't know if he was shocked or not shocked.
 9   Q    He said fine?  If you don't feel like doing it, you
10   don't have to do it anymore?
11   A    After I told him I no longer wanted to continue doing
12   that kind of activity.
13            MR. PRICE:  Your Honor, this might take more like
14   ten minutes, so --
15            THE COURT:  Okay.  You are admonished not to
16   discuss this matter amongst yourselves nor for form or
17   express any opinion concerning the case.  We will see you at
18   8:30 tomorrow morning.  Please drive safely.
19            (Jury not present.)
20            THE COURT:  The jury is no longer present.
21   Counsel is present.
22            Mr. Villasenor, I'm sorry we couldn't complete
23   you.  Be back tomorrow morning at 8:30.
24            Mr. Larian, and, Mr. Eckert, good evening.
25            Counsel have a seat.
```

1           What do we need to cover this evening?

2           MS. KELLER:  Your Honor, one housekeeping matter.

3    I know the Court has talked about having tangibles come over

4    to the Court at 7:30 Saturday.  Apparently that has already

5    been arranged with Kathy.  They are planning to bring over

6    shelves and then the tangibles.

7           The Court had also said that you wanted all the

8    exhibits brought over.  Apparently that also has been in the

9    works with Kathy where both parties have been going over

10   each exhibit and pulling out the relevant pages so that we

11   won't just have telephone book-sized exhibits.  Apparently

12   they have already been arranging that with her, and they

13   have made specific arrangements to get it over here.  Kathy

14   has it well under control.

15          THE COURT:  Let me make a record.  If Kathy has it

16   under control, the Court is going to get out of the way as

17   long as you are working well with Kathy and it's not at the

18   last moment that I have to take that last weekend away from

19   you.  That's what I am trying to avoid.

20          MS. KELLER:  She has it scheduled a certain way so

21   she wouldn't get overwhelmed.

22          THE COURT:  Let's leave it with Kathy.

23          MR. MCCONVILLE:  There is another housekeeping

24   issue.  Ms. Kuemmerle you recall was ordered back to come

25   tomorrow.  You said if the parties reached an agreement you

```
 1    would continue that date.  I spoke with Mr. Zeller, and we
 2    have agreed to continue that date to March 30.
 3              THE COURT:  Is that acceptable, Mr. Zeller?
 4              MR. ZELLER:  Yes, Your Honor, that is.
 5              THE COURT:  Now, how are you going to inform Ms.
 6    Kuemmerle so she is not inconvenienced?
 7              MR. MCCONVILLE:  We will take care of that.
 8              THE COURT:  All right.  Then I will order her back
 9    March 30 at 8:30.
10              What else?
11              MR. QUINN:  I have three issues of concern.
12              THE COURT:  Let me finish with MGA since we
13    started there.
14              MS. HURST:  On the investigation files that the
15    Court had ordered produced over the weekend, Your Honor,
16    they have been heavily redacted.  The problem is that in
17    some of them they have been redacted so much that we can't
18    even tell what they are about.  I have a couple of examples
19    here if the Court would like to see it.
20              THE COURT:  I didn't order any redaction of those
21    files.
22              MR. QUINN:  Your Honor, there are some
23    attorney/client privilege communications.
24              THE COURT:  I will go through those tonight.  They
25    better be attorney/client communications.
```

| | |
|---|---|
| 1 | MS. HURST:  Your Honor, we would ask that at least |
| 2 | in the meantime that all incident reports, that is, the form |
| 3 | that initiates the investigation, be turned over because |
| 4 | that's the thing that would give us the easiest way to see |
| 5 | what it is about. |
| 6 | THE COURT:  That's so ordered immediately.  I mean |
| 7 | now. |
| 8 | MR. QUINN:  They are in the -- |
| 9 | THE COURT:  I thought that they were in the log to |
| 10 | begin with. |
| 11 | MR. ZELLER:  They are, Your Honor. |
| 12 | THE COURT:  I am speaking to Mr. Quinn. |
| 13 | MR. QUINN:  We are a little surprised if they had |
| 14 | an issue with the production that they wouldn't raise it |
| 15 | first, that we hear about it first in this form.  The |
| 16 | incident reports I am informed are in the files that they |
| 17 | have. |
| 18 | THE COURT:  Let's find out.  Let's see if this is |
| 19 | just a complaint without substance. |
| 20 | MS. KELLER:  I am looking at one incident report |
| 21 | that is completely redacted.  There is nothing left on it. |
| 22 | THE COURT:  Show that to Mr. Quinn as you two get |
| 23 | up and move toward the lectern. |
| 24 | MS. KELLER:  The record should reflect I have |
| 25 | handed Mr. Quinn a largely blank page, and that would be -- |

1           THE COURT:  How many of those do we have?  In

2    other words, I don't know if it's a tempest in a teapot that

3    can be resolved easily or whether it's just heavily redacted

4    throughout.  I think we need a little bit of time.  What

5    time do you want to meet?

6           MS. KELLER:  Your Honor, I haven't been through

7    the documents.  I would have to ask Ms. Hurst.

8           THE COURT:  We are going to go through them.

9           MR. QUINN:  Anytime, Your Honor.

10          THE COURT:  Let's find out if this is a serious

11   problem or not.  I am hearing this for the first time, too.

12   I thought this was complied with.  I thought my order was

13   clear.  If you have got attorney/client privilege, of course

14   you can redact that.

15          MS. KELLER:  The problem is we have voluminous

16   files that are so heavily redacted that we can't tell as to

17   some of them what they are all about.  It's getting late in

18   the trial --

19          THE COURT:  I want the unredacted copies.  That's

20   all.  I have amazing resources.  Now, go get your sleeping

21   bags.

22          MR. QUINN:  We have them here.

23          THE COURT:  Okay.  They better be good for both

24   sides.  It better not just be a tempest in a teapot.  Let's

25   go get them.  I also need a special master, and I will get

```
 1    my law clerks, and I will give you an order.

 2              (Recess.)

 3              THE COURT:  All counsel are present.

 4              Counsel should know that the Court is calling in

 5    the special master who will be here within 45 minutes.  The

 6    Court has already gone through one volume and is working on

 7    the second volume, but I wanted to finish my discussion this

 8    evening with both counsel.  Hopefully, I get you on your way

 9    and get you a little rest tonight.

10              Let me start once again with MGA, and let me turn

11    to Mattel, then back to MGA, then back to Mattel, then back

12    to MGA, and then back to Mattel.  I am just kidding you.

13    Let me start with MGA.

14              MR. MCCONVILLE:  There was one other issue.  You

15    were discussing when to rule on the Rule 50 for Mr. Machado.

16    One of the things that I think the Court was considering was

17    whether there would be prejudice to Mattel for ruling in

18    advance.  I just wanted to point out to the Court that

19    whatever prejudice that would befall Mattel is because

20    Mattel failed to prove its claims.  So from our perspective,

21    consideration of prejudice to Mattel really should not be an

22    appropriate part of the analysis, and if the Court is

23    concerned about prejudice, it should be prejudice to MGA to

24    the ruling.

25              THE COURT:  As to No. 2, Kuemmerle, I think it's
```

```
 1    on the record that each of you stipulated Ms. Kuemmerle
 2    would be called back on March 30 at 8:30; is that correct?
 3              MR. MCCONVILLE:  Yes.
 4              MR. ZELLER:  Yes.
 5              THE COURT:  Who will notify Kuemmerle?
 6              MR. MCCONVILLE:  I will.
 7              THE COURT:  Okay, MGA will.
 8              The third issue for MGA.
 9              MS. KELLER:  I don't think we --
10              THE COURT:  The deposition of Ms. Thomas.  I would
11    suggest that that not take place and not set that yet until
12    I have gone through these files in the back.
13              MS. HURST:  Your Honor, whatever the contents of
14    those files are, we still need her on the Villasenor
15    mediation stuff.  We would really like to schedule it for
16    tomorrow night.
17              THE COURT:  I will tentatively set it for tomorrow
18    tonight, but let me talk to the special master when he comes
19    down here.  I think we are going to be up until midnight or
20    longer after you leave going through these files.  I may
21    simply refer them over to the special master.  I have
22    already gone through one volume.
23              What else on behalf of MGA?
24              MS. KELLER:  We're not planning to complain, Your
25    Honor.
```

1          THE COURT:  Mr. Quinn.

2          MR. QUINN:  I have four issues, Your Honor.  One,

3    during the questioning of Villasenor this afternoon, Ms.

4    Keller repeatedly made reference to outside counsel.  I

5    think the record will reflect that it was not necessary,

6    that she went out of here way to do it.  At one point, she

7    even said the words, "We won't say who they are."

8          This is a very experienced skilled trial lawyer.

9    She doesn't need to do that.  That's cheating.  The Court

10   has been clear that outside counsel are to be out of it.

11   For her to emphasize like that, "We won't say who they are"

12   and to refer to outside counsel was not necessary and wasn't

13   appropriate.

14         THE COURT:  I think there was also reference to

15   litigation counsel.  I'm going to go back and check the

16   record after you leave this eveing, and I will have a

17   transcript tomorrow.  I will look at that closely.  I

18   thought I heard litigation counsel.

19         MR. QUINN:  She said outside counsel in this case.

20   She might as well have said Quinn-Emanuel.

21         THE COURT:  Let me get the transcript from today,

22   and let me go back and look at that.  That's one issue.

23         MR. QUINN:  Yes.  The second issue is I was very

24   surprised about the extended examination of Mr. Villasenor

25   about whether he didn't produce documents, or produced

1  documents late, or didn't produce them until his deposition

2  because he was performing his contract with Mattel.  In

3  fact, you performed your contract by not producing these

4  documents, or producing them tardy, or not producing them

5  until the deposition.

6         Now, I understood, Your Honor, that discovery --

7  things that happened in discovery were not supposed to be in

8  this trial.  We can't possibly go -- the Court knows the

9  history about the Villasenor issue generally and the history

10  about when discovery was first sought, what responses were

11  made, when the discovery ultimately was provided, and why it

12  was provided when it was provided.  We can't possibly sort

13  all of that out before the jury and say, well, 34 document

14  requests were served this date.  Then there were these

15  objections.  It was thought to be irrelevant or overbroad

16  for this reason and then get into Villasenor's compliance or

17  noncompliance.

18         I don't think there was a good-faith basis for the

19  question.  I don't think there is a good-faith basis for the

20  suggestion that he was performing his agreement with Mattel

21  by not producing documents until his deposition or the eve

22  of his deposition.  I don't know how we undo that, Your

23  Honor.  That's completely irrelevant and entirely

24  prejudicial.

25         Again, this is a very skilled lawyer who knows how

1    to do things properly.  That wasn't proper.  It was contrary

2    to these Court's instructions that we are not going to get

3    into discovery.  That's the second issue.

4           THE COURT:  What is the exhibit number that was

5    referred to so I have a complete record concerning his let's

6    say severance document?  That's where the paragraph was

7    continually noted and where the testimony related back to

8    the alleged secret nature of this.

9           MR. QUINN:  It's Exhibit 9266.

10          THE COURT:  9266.  Thank you.

11          All right, third.

12          MR. QUINN:  Third, we heard through the questions

13   and I anticipate the improper argument -- we heard the false

14   suggestion in the questions that the Sal Villasenor toy fair

15   shenanigan allegations were part of the April 2005 MGA

16   Complaint.  The suggestion was clearly made to the jury that

17   they were pursuing those allegations at the time of these

18   events in conversations with Mr. Villasenor in 2005.

19          As the Court knows --

20          THE COURT:  Repeat that to me, Mr. Quinn.

21          MR. QUINN:  The suggestion was made and I am

22   anticipating the argument that at the time of these

23   conversations with Mr. Villasenor when he talks to Mr. Louie

24   and leading up to the conversations with Moore and leading

25   up then to his letter where he says he is going out, he is

| | |
|---|---|
| 1 | stressed out, that there was then pending an MGA Complaint, |
| 2 | which included the allegations regarding Mr. Villasenor's |
| 3 | conduct at toy fairs. |
| 4 | THE COURT:  As of April 2005 hadn't there only |
| 5 | been an intervention? |
| 6 | MR. QUINN:  No.  They intervened I think in |
| 7 | October -- December of 2004. |
| 8 | THE COURT:  That's correct. |
| 9 | MR. QUINN:  In April 2005, they filed a Complaint, |
| 10 | but it did not include anything relating to Mr. Villasenor's |
| 11 | allegations.  In fact, the Court will remember that MGA |
| 12 | denied last summer in discovery that its then pending -- |
| 13 | that is, pending in 2005 -- unfair competition claim |
| 14 | included anything relating to the conduct of Mattel's Market |
| 15 | Intelligence Group. |
| 16 | The Court will remember -- we have seen this |
| 17 | passage in the deposition several times when Mr. Molinski |
| 18 | said -- tells Mr. O'Brien, no, that's not part of it.  It's |
| 19 | in the context of a 30(b)(6) deposition concerning their |
| 20 | unfair competition claim that was then pending.  Mr. Zeller |
| 21 | tried to go into this, and Mr. Molinsky said, no, that |
| 22 | Complaint doesn't have anything to do with the activities of |
| 23 | the Market Intelligence Group. |
| 24 | The Court actually entered an order in the |
| 25 | in-limine motions.  It's a ruling on -- in the Court's |

1    ruling on Mattel's Motion In-Limine No. 20, the first line

2    of it says, "MGA's counsel previously represented that MGA's

3    unfair competition claim is not predicated on the conduct of

4    Mattel's Market Intelligence Group.  MGA's attempt to

5    reverse its prior position will cause undue prejudice to

6    Mattel."

7            The suggestion has been made in these questions

8    that you knew a case was pending to Mr. Villasenor.  You

9    know, you talked to Mr. Moore.  You knew there was a case

10   pending.  At the time Mr. Louie talked to you, you were

11   worried about that.  Clearly the suggestion has been made

12   and I anticipate in closing arguments that we are going to

13   hear that there was a case then pending that implicated the

14   activities of the Market Intelligence Group where they had

15   represented to this Court the exact opposite, and this Court

16   has so ordered.  That's the third.

17            THE COURT:  Okay.  Go ahead.

18            MR. QUINN:  The fourth is not so much a complaint,

19   but --

20            THE COURT:  Hong Kong?

21            MR. QUINN:  No.

22            THE COURT:  I'm just joking.

23            MR. QUINN:  I don't have much of a sense of humor.

24            THE COURT:  Mr. Quinn, you have a great sense of

25   humor.

1           What's you fourth complaint?

2           MR. QUINN:  It's not a complaint.  It's an

3    observation and a request for -- a plea for some help on

4    this.  Obviously the Court has referenced several times that

5    the deposition of Jill Thomas may be -- the Court ruled

6    today in the context of a discussion of the exchange of

7    letters concerning what Mr. Villasenor wanted out of his

8    claim against Mattel.  It was in that context that the Court

9    said Ms. Thomas's deposition would be taken.  I don't know

10   if that's what triggered -- put the Court over the edge on

11   that or not.  I don't know what the Court's thinking was.

12          I have said before and I hope the Court will

13   remember that Ms. Thomas has been -- she is a litigator.

14   She has been a part of our litigation team.  Although she is

15   in-house, she has been a part of our litigation team since

16   2005 on this case.  She has been intimately involved in all

17   aspects of the case.

18          The request that I would make is that there be

19   some parameters or scope limitations placed on her

20   deposition.  If it's going to be the issue about discussions

21   with Mr. Villasenor concerning what his demand is or what he

22   wanted as a result of his claim, that's one thing.  If the

23   Court has something else in mind, I would appreciate a

24   chance to engage in a discussion about that, so it isn't

25   just wide open.

1    I know the Court has a different view of the role

2  of in-house counsel.  I understand that, but still this is a

3  litigator who has been deeply involved in this, attended all

4  the depositions, preparation of witnesses, reviews the

5  pleadings, participates actively in strategic decisions.

6          THE COURT:  I'll be right back.

7          (Recess.)

8          THE COURT:  Let me turn to MGA.  You can respond.

9          MS. KELLER:  With respect to referring to outside

10  counsel, the Court has said that it didn't want the law firm

11  of Quinn-Emanuel mentioned, and I haven't mentioned them,

12  but repeatedly in this litigation, the role of outside

13  counsel is popping up.

14          When Mr. Villasenor was called in and questioned

15  by Mr. Moore in a rather critical stage, outside counsel was

16  there from Quinn-Emanuel.  It's been -- the law firm has

17  been redacted, but I don't think we should have to be so

18  delicate that we don't even mention that outside counsel was

19  there or all or litigation counsel because that's in fact

20  the point.

21          He is scared to death.  He is called up to Moore's

22  office, and the subject matter -- he said this in his

23  deposition and at least on direct he agreed -- I had to

24  refresh his memory with depo and read it -- that the subject

25  matter was the MGA litigation.  That was the subject matter

1    of his being called up to be grilled.  It really doesn't

2    matter whether it was the April 2005 Complaint or the

3    litigation itself that Mattel was bringing against MGA or

4    against Carter Bryant.  It was all of a piece.

5              What was going on here is that he was being called

6    up there obviously to find out what have you got?  What

7    documents have you got?  What were you doing?  Did you go

8    into MGA's showrooms?  Who else did?  Give us all the

9    documents that you have got.  To try to say that we

10   shouldn't be mentioning this litigation or mentioning that

11   it was outside counsel there -- it was Michael Moore

12   grilling him -- the whole point of cross-examination -- that

13   was why he was scared.  It had to do with MGA.

14             Now, as far as not producing the documents, that

15   was written into his contract by Mattel.  It was written

16   into his separation agreement.  I questioned him right out

17   of the separation agreement and asked him if he honored it.

18   If they didn't want it to be brought up, it shouldn't have

19   been written into the contract, but they specifically barred

20   him from disclosing to the litigant on the other side of the

21   litigation his wrongful conduct, and they specifically

22   required him to do everything possible to assist Mattel in

23   keeping it from us, in limiting it, keeping it from being

24   produced.

25             Now, why is that important?  Because that's

1    exactly what happened.  We didn't find out about it until
2    July 7, 2010, literally on the eve of his deposition.  This
3    is a perfectly legitimate area for inquiry.  What was
4    happening all those years that no one, neither Mattel -- he
5    wasn't producing it until he was subpoenaed.  Mattel wasn't
6    producing it to us at all.  I think that's just --
7    particularly when it's read in conjunction with his
8    separation agreement, that's a totally fair line of
9    questioning.  As I said, it's right out of the document
10   itself.

11           As far as we have agreed that discovery wouldn't
12   be an issue, well, it certainly has been an issue for
13   Mattel.  Mr. Larian was practically beaten over the head for
14   15 minutes with the suggestion that he had withheld the
15   O'Connor e-mail.  He was beaten over the head with the
16   suggestion that he abused the attorney/client privilege to
17   withhold discovery.  You know, his privilege was inquired
18   into and repeated by Mr. Price numerous times.  So it's not
19   the case that nobody has commented on withheld discovery,
20   but I only commented on what his contract itself provided
21   for that Mattel drafted for him along with such terms as his
22   having to agree that he hadn't incurred any damage from
23   anything he had done at work, which was certainly not what
24   he what he had contended and not what he has contended in
25   his deposition.

1          Those are our responses to Mr. Quinn's complaints.

2     Now, we have avoided having a list to complain about at the

3     end of every session.  We haven't done it, and we have

4     actually had a conscious agreement on MGA's side not to do

5     that because we think that for the most part unless there is

6     something just utterly beyond the pale that we don't to be

7     constantly complaining and as it were whining about what has

8     happened during the day, but it seems to have become a habit

9     of our counterparts.

10          One of the things we were alarmed by today was

11    that last night the Court had said that these articles

12    weren't coming in unless this witness either saw them at the

13    time or -- either used them, or saw them, or was aware of

14    them and tied them to a specific trade secret.  Then counsel

15    began inquiring today of the witness about documents he had

16    never seen that he couldn't remember, some that he

17    specifically said he didn't remember, and in they all came.

18    I wasn't planning to sit and start complaining about that

19    and talking about the bad faith and all that.  I mean, if we

20    are going to start coming up with a list every day, we could

21    have some pretty long lists ourselves.

22          At any rate, I don't think any of the current

23    complaint list from Mattel is justified.  I do appreciate

24    the compliment about my amazing skill, but I don't -- in

25    context, it's not quite as complimentary as one might hope.

1            I think Mr. McConville has something to add after

2    this on a different issue.

3            MR. MCCONVILLE:  Your Honor, just to follow up on

4    one thing on Tyler Schneider, she is a witness who is not

5    cumulative of any other witness who will provide context for

6    what she did while at Mattel as far as it relates to

7    sneaking into MGA showrooms.  You have made it abundantly

8    clear that whatever party is controlling that witness has

9    got to get them here.

10           THE COURT:  In terms of representation --

11           MR. MCCONVILLE:  I don't know if she has a

12   separation agreement.

13           THE COURT:  I would like to see the document that

14   governs her obligations because there was mention by one of

15   you in a sweeping question that weren't all four of you

16   represented by the same law firm?  It wasn't clear to me

17   whether Schneider fell under that umbrella.  I don't think

18   she does.

19           MR. MCCONVILLE:  I don't think so.

20           THE COURT:  I want to see what governs her

21   obligations, if any, to Mattel if Mattel is in fact paying

22   her legal fees?  I am having informal conversation about

23   that with counsel, but I don't think that that's a good

24   record for the Court, and I would like to see the document.

25           MR. MCCONVILLE:  Okay.  We'll get that.  My point

```
 1    was regardless of whatever the agreement was -- what we
 2    would hope is that in the event that we do not get her that
 3    we have some remedy that we can get that evidence in --
 4              THE COURT:  I am not going to make any
 5    representation until I see 100 percent effort on your part.
 6    That means if you need to go back out and serve her again or
 7    if you need to wait for Judge Hill's call back, which I
 8    think we are waiting for -- I'm not going to give you a
 9    commitment right now.
10              Now, I have offered and Mattel has agreed that the
11    best resolution is if we can simply get her on a video
12    conference, which I am willing to do.  So you have a
13    commitment on my part.  Until I see what the status is -- at
14    your request once again, I have took extraordinary effort to
15    place a call to Judge Hill for the second time.  His input
16    to me with you and Mr. Zeller present he was going to try to
17    call his client.  His client was upset about the way that
18    the service was served -- at least I was told that the first
19    time -- in the middle of the night with it hanging on the
20    door.
21              I don't know if that's simply an excuse not to
22    testify at all.  If it is, I can deal with that, but I want
23    to give Ms. Schneider every opportunity, and I want a full
24    and complete record.  Therefore, I am waiting for Judge Hill
25    to call the Court back and tell me if he has been able to
```

1   get ahold of his client because his representation this

2   morning was his client wasn't responding to his calls.

3            My suggestion is that you and Mr. Zeller meet me

4   again tomorrow at 7:30 or 8:00, and I will place another

5   call down to Judge Hill and see what efforts he went to

6   today and what the latest input is.  He said he would call

7   Nancy back as soon as he had an answer.  We haven't gotten

8   that call back, so let's call him tomorrow.  We will make

9   one more effort.  Hopefully we will get everybody here.

10            MR. MCCONVILLE:  Okay.

11            THE COURT:  What else?

12            MS. KELLER:  I think that's it for us, Your Honor.

13            THE COURT:  Okay, let me turn back to Mattel then.

14            MR. QUINN:  Your Honor, I don't think we have

15   gotten a good answer from Ms. Keller for these questions

16   this afternoon.  There was no need to say litigation counsel

17   was there.  We don't have to say their name.  That's just a

18   little too clever.  It's calculated.  That's not accidental.

19   A skilled trial lawyer says that.

20            Again, conduct in discovery, there is nothing in

21   the separation agreement that says he isn't to respond to a

22   subpoena.  To the contrary, it says, "Nor does this

23   subsection prohibit me from responding to a valid subpoena

24   or other legal notice."  It says if he receives a subpoena,

25   he will give a notice to Mattel and cooperate with the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   company in taking all steps it deems necessary or legally

2   appropriate to comply, limit, or prevent the required

3   disclosure.

4          It's a big jump from that to suggesting as she

5   clearly did that he didn't comply with the subpoena or was

6   tardy complying with the subpoena because of some type of

7   agreement with Mattel, that he was acting in conjunction

8   with Mattel.  One, he did comply with the subpoena.  Two,

9   there is no reason to think that Mattel had any input

10  whatsoever concerning his compliance or the timing of his

11  compliance.  He had his own lawyer.

12         I mean, this is the kind of thing you might argue,

13  but to ask these questions in that manner when there is no

14  basis to think that that is what happened, no basis to think

15  that he failed to respond to the subpoena, I think is

16  improper.

17         I didn't hear a response to the third issue, the

18  false suggestion that the then pending Complaint in 2005

19  included the activities of the Market Intelligence Group,

20  something that they have repeatedly -- this Court has

21  referenced it in its order and has said that MGA can't

22  reverse its position on that.  This was not at issue then.

23         Finally, Your Honor, I hope we can get some

24  direction, some limitation, on the scope of Ms. Thomas's

25  deposition.

```
 1              THE COURT:  Let me turn back to MGA for just a
 2    moment.
 3              MS. KELLER:  Your Honor, as far as the false
 4    suggestion that the allegations about the Market
 5    Intelligence Group were part of the April 2005 Complaint, I
 6    never asked him any question about that, so I don't even
 7    know where that is coming from.  What I asked his was, when
 8    Mr. Moore called you up there, it was to talk about this
 9    litigation?  He said in his deposition that was the subject
10    he was called up there on.  That's what he got scared to
11    death over.
12              As far as whether Mattel had any control over him
13    whatsoever, Mattel had a lot of control over him.  Not only
14    did Mattel pay his attorney's fees, but when apparently the
15    discussion came up at his deposition about taking the Fifth,
16    Mattel made it clear that he better go ahead and testify.
17    If he didn't testify, his attorney's fees were not going to
18    be paid, and who knows what that amount was by then?  I
19    don't know, and I have no way of finding out, but I think
20    it's fair to say to assume that it was substantial because
21    that was enough of a threat for him to go ahead and testify
22    when really he had no personal interest in doing so and
23    potential criminal liability for doing so.  I think that the
24    circumstances alone demonstrate that Mattel had a tremendous
25    amount of control over this guy.
```

1          They also had liquidated damages in their -- they

2     had liquidated damages in the separation agreement.  They

3     had clearly put the fear of God in the guy.  He had at least

4     according to Mr. Moore been called up to be interviewed by

5     Mr. Moore multiple times before this December 22, 2005

6     letter, not just once, not just twice, but many times.  What

7     was it about?  The MGA litigation.  That was a totally fair

8     question, and it was right out of the contract.

9          Your Honor, as to the Jill Thomas issue, would the

10    Court permit Ms. Hurst to address that?

11             THE COURT:  Certainly.

12             MS. HURST:  Your Honor, on the Jill Thomas

13    deposition, we don't have any answers on the Villasenor

14    thing.  We don't have good answers on a lot of these statute

15    of limitations issues from Mr. Moore.  It's really -- the

16    Court has reviewed the transcripts and can see that I have

17    labored mightily to ask proper questions that don't unduly

18    invade the privilege.

19          Advance limitation on the subject matter here

20    would not be appropriate.  In fact, we had Ms. Thomas on our

21    deposition list at an earlier time, and they had never moved

22    for a protective order.  We ultimately at that time did not

23    know of her involvement in those issues, so we passed.

24    There was no concern expressed then.

25             We still don't have answers on these talking

1    points documents even.  We still don't have answers.  Who

2    gave the information in the talking points document that

3    after Bryant left the Design Center people suspected he had

4    a conflict of interest at Mattel?  This is an amazing

5    admission in a document that was just produced of a Court

6    order a couple of weeks ago.

7            If the Court tries to limit the subject matter in

8    advance, it's going to unduly restrict a proper examination.

9    Of course Mr. O'Brien is going to be there.  He knows the

10   issues.  I have consistently submitted to his rulings.  In

11   fact, we haven't even appealed anything coming out of these

12   lawyer depositions.  There is no basis here to believe that

13   there would be any improper conduct.  We really do have

14   questions that need to be answered.

15           That investigation log and how that shows up in a

16   different file and everything else, we just don't have any

17   answers.

18           THE COURT:  Mr. Quinn.

19           MR. QUINN:  Your Honor, Mr. de Anda testified

20   about those investigation files, the history on those.  It's

21   not the case that they don't have any testimony.  They have

22   some answers.  They may not be completely satisfied with the

23   answers, but they do have answers.

24           Ms. Hurst says we don't have good answers from Mr.

25   Moore.  I understood the Court to say it was going to review

1     the transcript.  My understanding is that that deposition

2     that went to 2:30 or whatever it was the other night -- that

3     that was satisfactorily completed, and we haven't heard that

4     there were any issues about that.

5            What Ms. Hurst has now said -- let's be clear.

6     She wants to depose the in-house lawyer in charge of this

7     case on the waterfront.  She wants a free hand to ask any

8     questions relating to this case, not just Villasenor, not

9     just statute of limitations, but anything whatsoever.  I

10    don't know what the justification would be -- what we have

11    seen that would justify that type of sweeping deposition at

12    this point.

13           In response to Ms. Keller's comments about

14    Mattel's control over Mr. Villasenor, it's ironic that the

15    example of control she cites is Mattel insisting that

16    Mr. Villasenor disclose information, insisting that they

17    expected him to testify about these events.  They refer to

18    liquidated damages.  Yes, in the contract, there is a

19    liquidated damages provision.  It's for $2,000.  That's it.

20           We still have not heard that Mr. Villasenor did

21    not timely comply with that subpoena.  There is no claim

22    that he did not timely comply.  Yet the suggestion was made

23    in front of the jury that he did cooperate with Mattel by

24    not responding to the subpoena or at least not responding to

25    it in a timely fashion.  There is simply no evidence to

1    support that.

2            I still haven't heard why Ms. Keller thought it

3    was necessary to say outside litigation counsel was there.

4    We don't have to say their name.

5            I guess that's it, Your Honor.

6            THE COURT:  All right.

7            Ms. Keller.

8            MS. KELLER:  Mr. Villasenor produced many

9    documents long after his first deposition.  Whether those

10   documents are here now is irrelevant.  He withheld them.  He

11   did not produce them the first time around.  The first

12   deposition was in July.  Most of them weren't introduced

13   until the eve of his deposition in September.  I do think

14   there is evidence that he hung onto those.

15           When I asked him initially about whether he was

16   complying with his separation agreement, he said he was.  I

17   asked him if he had -- when I asked him if he had complied

18   with the agreement in trying to prevent those documents from

19   being produced, he said yes, and he was subject to

20   examination by Mr. Price.  Some of these topics were

21   actually introduced by Mr. Price.

22             This is probably going to sound disingenuous, but

23   when I was asking him about outside counsel, his eyes went

24   right over to that counsel table.  I don't know particularly

25   why because I don't think any of the lawyers -- at least I

1    don't think the lawyers at counsel table were present when

2    he was interviewed by Mr. Moore, but that's where his eyes

3    went.  I brought him right back and said let's not go into

4    who was there.  Now, I suppose that's subject to a sinister

5    interpretation.  Obviously it has been, but I was trying to

6    get him to move right on.  If the Court will remember, I

7    moved right on to another question.  Boom, got him right

8    away from it.

9              The Quinn-Emanuel firm is in this litigation

10   from beginning to end, from A to Z, before there even was

11   litigation.  They are all over the place.  It could be

12   argued that if they are that eager to be not only not

13   mentioned, but to put us in a position of having to

14   pretend that there wasn't even outside counsel at all

15   or there wasn't even litigation counsel at all involved

16   in these various stages -- it could be argued that the

17   proper remedy is recuse themselves and get somebody else

18   in.

19             Instead, we have tried to be respectful of not

20   mentioning their law firm, but at some point, it becomes

21   almost ridiculous.  Mr. Corey was there in the meetings --

22   that's my understanding -- with Michael Moore, and I don't

23   think Mr. Corey was sitting over at counsel table, so I

24   don't know why Mr. Villasenor when I asked him about outside

25   counsel looked right over there, but he did.  I don't know

1    if the Court was able to see that.  I don't remember if you

2    were looking at him, Your Honor, but that's what he did.  I

3    tried to get him back on track and move on, and I think I

4    did a good job of it.

5              THE COURT:  Thank you.

6              Mattel.

7              MR. QUINN:  I'm done, Your Honor.

8              THE COURT:  MGA.

9              MS. KELLER:  Submitted, Your Honor.

10             THE COURT:  All right.  Now, thank you.  Let me

11   think about it.  I have got a lot of work to do tonight.  I

12   have got a lot of files to go through, and I have got a

13   special master coming down here.  I don't know when the

14   appropriate time for Jill Thomas to be deposed is, but I

15   know I have one task tonight, and that's to get right back

16   to these files as quickly as possible.

17             So I am thinking this.  I really thinking that

18   there is absolutely no reason for you to be here while I do

19   that work.  I am going to send Sharon home, who is the court

20   reporter tonight and let her get some rest.  There is no

21   reason to bring her back at 11:00 or 12:00 midnight, and I

22   think all counsel could use some rest and be refreshed

23   tomorrow.

24             So unless you have anything else, I just invite

25   my morning coffee group, which is Mr. McConville and

1    Mr. Zeller, to join me at let's say 8:00 tomorrow, and

2    let's place that call back down to counsel, former Judge

3    Hill, and see what is occurring down there.  I know he said

4    he would get back to us, but let's impress him with how

5    important that is.  So let me bid you the best of all

6    evenings.

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                              CERTIFICATE

6

7            I hereby certify that pursuant to Section 753,

8   Title 28, United States Code, the foregoing is a true and

9   correct transcript of the stenographically reported

10  proceedings held in the above-entitled matter and that the

11  transcript page format is in conformance with the

12  regulations of the Judicial Conference of the United States.

13

14  Date:  March 24, 2011

15

16

                                Sharon A. Seffens 3/24/11
17                              _____
18                              SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25